1                                              VOL 2

2                                              PAGES 196 – 416

3                    UNITED STATES DISTRICT COURT

4              FOR THE EASTERN DISTRICT OF CALIFORNIA

5             AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

6    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

7              TO SECTION 2284, TITLE 28 UNITED STATES CODE

8
     RALPH COLEMAN, ET AL.,              )
9                                        )
                  PLAINTIFFS,            )
10                                       )
       VS.                               ) NO. CIV S-90-0520 LKK JFM P
11                                       )
     ARNOLD SCHWARZENEGGER, ET AL.       )
12                                       ) THREE-JUDGE COURT
                  DEFENDANTS.            )
13                                       )
     _____ )
14
     MARCIANO PLATA, ET AL.,             )
15                                       )
                  PLAINTIFFS,            )
16                                       )
     VS.                                 ) NO. C 01-1351 TEH
17                                       )
     ARNOLD SCHWARZENEGGER, ET AL.       )
18                                       )
                  DEFENDANTS.            )
19   _____ )

20                    **TRANSCRIPT OF PROCEEDINGS**

21                    SAN FRANCISCO, CALIFORNIA
                      WEDNESDAY, NOVEMBER 19, 2008
22
     (APPEARANCES ON FOLLOWING PAGES)

23

24   ***REPORTED BY:***   JOAN MARIE COLUMBINI, CSR 5435, RPR
                      KATHERINE WYATT, CSR 9866, RMR
25                    OFFICIAL COURT REPORTER-S, U.S. DISTRICT COURT

1  **APPEARANCES:**

2  **FOR PLAINTIFFS:**          PRISON LAW OFFICE
                               1917 FIFTH STREET
3                              BERKELEY, CALIFORNIA  94710
                          BY:  **DONALD H. SPECTER, ESQUIRE**
4                              **ALISON HARDY, ESQUIRE**
                               **REBEKAH EVENSON, ESQUIRE**
5

6                              ROSEN, BIEN & GALVAN, LLP
                               315 MONTGOMERY STREET, TENTH FLOOR
7                              SAN FRANCISCO, CALIFORNIA 94104
                          BY:  **MICHAEL W. BIEN, ESQUIRE**
8                              **JANE KAHN, ESQUIRE**
                               **AMY WHELAN, ESQUIRE**
9                              **MARIA V. MORRIS, ESQUIRE**

10

    **FOR CCPOA**                 CARROLL, BURDICK & MCDONOUGH
11                             44 MONTGOMERY STREET, SUITE 400
                               SAN FRANCISCO, CALIFORNIA  94104
12                         BY:  **NATALIE LEONARD, ESQUIRE**

13

    **FOR DEFENDANTS**            STATE OF CALIFORNIA
14                             DEPARTMENT OF JUSTICE
                               OFFICE OF THE ATTORNEY GENERAL
15                             1300 I STREET, SUITE 125
                               P.O. BOX 944255
16                             SACRAMENTO, CALIFORNIA  94244
                          BY:  **LISA A. TILLMAN, ESQUIRE**
17

18                             STATE OF CALIFORNIA
                               DEPARTMENT OF JUSTICE
19                             OFFICE OF THE ATTORNEY GENERAL
                               455 GOLDEN GATE AVENUE, SUITE 11000
20                             SAN FRANCISCO, CALIFORNIA  94102
                          BY:  **KYLE A. LEWIS, ESQUIRE**
21

22  **FOR COLEMAN DEFENDANTS**  HANSON BRIDGETT
                               425 MARKET STREET, 26TH FLOOR
23                             SAN FRANCISCO, CALIFORNIA  94105
                          BY:  **PAUL B. MELLO, ESQUIRE**
24                             **S. ANNE JOHNSON, ESQUIRE**

25

1    **APPEARANCES (CONTINUED):**

2    **FOR DISTRICT ATTORNEY**      THE DISTRICT ATTORNEY'S OFFICE
     **INTERVENORS**               COUNTY OF RIVERSIDE
3                                  82-675 HIGHWAY 111, FOURTH FLOOR
                                   INDIO, CALIFORNIA  92201
4                     BY:   **WILLIAM E. MITCHELL, ESQUIRE**

5
     **FOR LEGISLATOR**            AKIN, GUM, STRAUSS, HAUER & FELD, LLP
6    **INTERVENORS**               580 CALIFORNIA STREET, 15TH FLOOR
                                   SAN FRANCISCO, CALIFORNIA  94104
7                     BY:   **STEVE SHEA KAUFHOLD, ESQUIRE**
                           **TERESA WANG, ESQUIRE**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            **PROCEEDINGS;  WEDNESDAY, NOVEMBER 19, 2008**

2

3            **THE CLERK:**  PLEASE STATE YOUR APPEARANCES, COUNSEL.

4            **MR. SPECTER:**  DONALD SPECTER, ALISON HARDY FOR THE

5    PLAINTIFFS.

6              **MR. BIEN:**  MICHAEL BIEN FOR THE COLEMAN PLAINTIFFS.

7            **JUDGE KARLTON:**  YOU DON'T NEED TO GO THROUGH ALL

8    THAT.  JUST PEOPLE ANNOUNCE WHEN THEY ARE SPEAKING.

9            **MS. LEONARD:**  NATALIE LEONARD, CARROLL, BURDICK &

10   MCDONOUGH.

11             **JUDGE HENDERSON:**  WE WILL ASSUME EVERYONE IS HERE.

12   WHY DON'T WE GET GOING?

13             **JUDGE REINHARDT:**  COULD WE DO YESTERDAY OVER TODAY?

14   NOW I CAN HEAR.

15             **JUDGE HENDERSON:**  YOU MAY CALL YOUR NEXT WITNESS,

16   COUNSEL.

17           **MR. SPECTER:**  THANK YOU, YOUR HONOR.  PLAINTIFFS CALL

18   DR. JEFFREY BEARD.

19             **JUDGE KARLTON:**  YOU VIOLATED THE FIRST RULE.  YOU

20   DIDN'T SAY WHO YOU WERE.

21           **MR. SPECTER:**  YOU ARE RIGHT.  I SINNED AGAIN.

22           DONALD SPECTER FOR THE PLAINTIFFS.

23                 **JEFFREY A. BEARD, PH.D.**

24   HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

25   DULY SWORN AND EXAMINED AS FOLLOWS:

1          **THE WITNESS:**  I DO.

2          **THE CLERK:**  SPELL AND STATE YOUR FULL NAME FOR THE

3    RECORD.

4          **THE WITNESS:**  JEFFREY A. BEARD.  J-E-F-F-R-E-Y,

5    MIDDLE INITIAL A., B-E-A-R-D.

6          **MR. SPECTER:**  THANK YOU.

7          YOUR HONORS, JUST A BRIEF NOTE OF INTRODUCTION,

8    DR. BEARD IS NOT A RETAINED WITNESS.  WE DID NOT FILE A REPORT

9    FOR HIM, THEREFORE, I'M GOING TO GO INTO SOME MORE DETAIL ABOUT

10   HIS BACKGROUND AND EXPERIENCE THAN WE HAVE BEEN WITH THE REST OF

11   THE WITNESSES.

12         **JUDGE HENDERSON:**  FINE.  OKAY.

13               <u>**DIRECT EXAMINATION BY MR. SPECTER**</u>

14   ***BY MR. SPECTER***

15   **Q**   DR. BEARD, WHERE ARE YOU CURRENTLY EMPLOYED?

16   **A**   I'M CURRENTLY SECRETARY OF THE PENNSYLVANIA DEPARTMENT OF

17   CORRECTIONS.

18   **Q**   WHY DO WE CALL YOU DOCTOR?

19   **A**   BECAUSE I HAVE A PH.D. FROM PENN STATE UNIVERSITY.

20   **Q**   IN WHAT DISCIPLINE?

21   **A**   COUNSELING.

22   **Q**   AND ARE YOU A LICENSED PSYCHOLOGIST?

23   **A**   I AM.

24   **Q**   HOW LONG HAVE YOU BEEN THE SECRETARY OF THE PENNSYLVANIA

25   DEPARTMENT OF CORRECTIONS?

1  A   I TOOK OVER AS SECRETARY IN -- I WAS CONFIRMED IN FEBRUARY

2  OF 2001.

3  Q   OKAY.  BEFORE THAT HOW LONG -- WELL, IN TOTAL HOW LONG HAVE

4  YOU WORKED FOR THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS?

5  A   I STARTED WORKING FOR THE PENNSYLVANIA DEPARTMENT OF

6  CORRECTIONS IN JUNE OF 1972, SO THAT'S JUST A LITTLE OVER 36

7  YEARS.

8  Q   OKAY.  AND IF YOU COULD COLLAPSE 36 YEARS INTO JUST A FEW --

9  BRIEF DESCRIPTION OF THE POSITIONS YOU'VE HELD IN THAT

10 DEPARTMENT?

11 A   WELL, I STARTED OFF AS A PSYCHOLOGIST IN THE SYSTEM; BECAME

12 A DEPUTY SUPERINTENDENT AT THE FIRST INSTITUTION THAT I WORKED

13 IN; WENT FROM THERE AND BECAME A SUPERINTENDENT FOR 3-1/2 YEARS

14 AND OPENED UP A NEW FACILITY.

15          THEN I WAS PROMOTED TO ANOTHER INSTITUTION AS

16 SUPERINTENDENT, IT WAS A LARGER INSTITUTION, AFTER THEY HAD TWO

17 DEVASTATING RIOTS.  I REMAINED THERE FOR ABOUT 3-1/2 YEARS.  I

18 WAS THEN PROMOTED INTO CENTRAL OFFICE, BECAME A REGIONAL DEPUTY,

19 SECRETARY, EXECUTIVE DEPUTY SECRETARY, AND THEN IN 2001 BECAME

20 THE SECRETARY.

21 Q   IN YOUR POSITIONS, IN THE POSITIONS AS DEPUTY SUPERINTENDENT

22 ON UP, HAVE YOU BEEN RESPONSIBLE FOR THE DELIVERY OF HEALTHCARE

23 SERVICES TO PRISONERS?

24 A   YES.

25 Q   TO MAKE SURE THAT OCCURS?

1  **A**   YES.  AS THE DEPUTY SUPERINTENDENT FOR TREATMENT AT THE

2  STATE CORRECTIONAL INSTITUTION AT ROCKVIEW, ONE OF MY

3  RESPONSIBILITIES WAS TO OVERSEE NOT ONLY THE HEALTHCARE

4  DEPARTMENT, BUT ALSO THE PSYCHOLOGY DEPARTMENT, MENTAL

5  HEALTHCARE, DENTAL CARE AND THINGS LIKE THAT.  THEN, OF COURSE,

6  AS WARDEN OF TWO INSTITUTIONS, I WAS ULTIMATELY RESPONSIBLE FOR

7  THE HEALTH AND MENTAL HEALTHCARE IN THOSE FACILITIES.  THEN AS A

8  DEPUTY SECRETARY AND NOW A SECRETARY, I'M ALSO ULTIMATELY

9  RESPONSIBLE AT DIFFERENT LEVELS FOR THOSE CARE -- FOR THOSE

10  TYPES OF CARE.

11  **Q**   IN YOUR CURRENT POSITION CAN YOU PLEASE DESCRIBE WHAT

12  ACTIVITIES YOU PURSUE IN TERMS OF HEALTHCARE?

13  **A**   IN MY CURRENT POSITION?

14  **Q**   YES.

15  **A**   WELL, WE CONTRACT FOR OUR MEDICAL CARE AND FOR OUR MENTAL

16  HEALTH CARE, SO I'M REGULARLY INVOLVED IN REVIEWING THE RFP'S

17  AND RESPONSES TO RFP'S THAT GO OUT TO ENSURE WE ARE PROVIDING

18  COMPREHENSIVE MENTAL HEALTH AND MEDICAL CARE TO THE INMATE

19  POPULATION.

20  **Q**   SO DO YOU PRACTICE AS A PSYCHOLOGIST?

21  **A**   I DON'T.  I HAVEN'T PRACTICED SINCE ABOUT 4-1/2 YEARS INTO

22  MY STAY WITH THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS, AND

23  I'VE ACTUALLY -- MY LICENSE IS IN AN INACTIVE STATUS RIGHT NOW

24  BECAUSE OF THAT.

25  **Q**   NEVERTHELESS, DO YOU CONSIDER YOURSELF AN EXPERT IN ANY

1   ASPECT OF THE DELIVERY OF HEALTHCARE TO PRISONERS?

2   **A**   WELL, I CERTAINLY CONSIDER MYSELF AN EXPERT IN THE VARIOUS

3   THINGS THAT ARE REQUIRED TO MAKE SURE THAT WE'RE DELIVERING

4   CONSTITUTIONALLY ADEQUATE HEALTHCARE TO THE INMATE POPULATION.

5   I'M NOT A PHYSICIAN, SO WHEN IT GETS TO INDIVIDUAL CLINICAL CARE

6   OF AN INDIVIDUAL, THAT'S NOT MY AREA OF EXPERTISE, CERTAINLY.

7   BUT I DO KNOW AND HAVE -- THROUGH MY LONG YEARS OF EXPERIENCE DO

8   KNOW THE VARIOUS ELEMENTS THAT ARE REQUIRED TO PROVIDE PROPER

9   HEALTHCARE AND PROPER MENTAL HEALTHCARE TO THE INMATE

10  POPULATION.

11  **Q**   AND COULD YOU BRIEFLY SUMMARIZE YOUR UNDERSTANDING OF THOSE

12  ELEMENTS, PLEASE?

13  **A**   WELL, WHEN YOU ARE TALKING ABOUT HEALTHCARE, FIRST OF ALL,

14  YOU HAVE PEOPLE COMING INTO YOUR SYSTEM.  YOU HAVE TO IDENTIFY

15  THE VARIOUS MEDICAL PROBLEMS AND MEDICAL NEEDS THAT THOSE

16  INDIVIDUALS HAVE.  YOU HAVE TO HAVE PRIMARY CARE PHYSICIANS

17  WORKING FOR YOU IN ADEQUATE NUMBERS SO THEY CAN REVIEW NOT ONLY

18  THE INCOMING PEOPLE, BUT ON AN ONGOING BASIS TAKE CARE OF SICK

19  CALL AND THINGS LIKE THAT.

20          YOU HAVE TO HAVE SPECIALISTS ON CONTRACT SO WHEN A

21  INDIVIDUAL HAS A DERMATOLOGICAL PROBLEM OR ORTHOPEDIC PROBLEM,

22  YOU CAN REFER THEM TO SOME SPECIALIST FOR CARE.  YOU HAVE TO

23  HAVE CONTRACTS WITH HOSPITALS SO THAT IF AN INDIVIDUAL NEEDS TO

24  GO OUT FOR SOME KIND OF OPERATION OR WHATEVER, THAT'S AVAILABLE.

25  YOU NEED TO HAVE TERTIARY CARE HOSPITALS FOR PEOPLE WHO NEED

1  HIGHER LEVELS OF CARE.  YOU HAVE TO HAVE A PROPER MEDICAL

2  RECORDS SYSTEM IN PLACE SO THAT YOU CAN FOLLOW THE INMATE, YOU

3  CAN PROVIDE CONTINUITY OF CARE, AND THAT IF THEY MOVE FROM ONE

4  INSTITUTION TO ANOTHER INSTITUTION, THE PEOPLE ARE AWARE OF WHAT

5  THEY NEED.  YOU HAVE TO HAVE A MEDICATION SYSTEM IN PLACE SO

6  THAT THOSE INDIVIDUALS WHO NEED MEDICATION RECEIVE MEDICATION

7  AND RECEIVE IT IN A TIMELY MANNER.  YOU HAVE TO HAVE POLICIES IN

8  PLACE THAT SEE THAT ALL OF THIS CARE IS PROVIDED IN AN

9  APPROPRIATE MANNER TO THE INMATE POPULATION.

10 **Q**   DO YOU HAVE TO HAVE ANY QUALITY ASSURANCE PROGRAMS?

11 **A**   CERTAINLY.  I DID MISS THAT.  IN OUR STATE WE DO HAVE A VERY

12 EXTENSIVE QUALITY ASSURANCE PROGRAM THERE.  THAT'S REALLY A

13 KEY -- IT'S A KEY NO MATTER WHAT YOU DO, WHETHER YOU'RE

14 PROVIDING MENTAL HEALTH CARE OR WHETHER YOU'RE PROVIDING MEDICAL

15 CARE OR PROVIDING PROGRAMS, BECAUSE IF YOU DON'T HAVE THAT IN

16 PLACE, YOU ARE NOT ABLE TO SEE WHERE YOU ARE DEVELOPING

17 PROBLEMS, MAYBE WHERE YOU ARE NOT DOING WHAT YOU SHOULD BE DOING

18 AND WHERE YOU NEED TO MAKE CHANGES.

19 **Q**   WHAT'S THE CURRENT POPULATION OF THE PENNSYLVANIA DEPARTMENT

20 OF CORRECTIONS?

21 **A**   WE CURRENTLY HAVE JUST A LITTLE OVER 48,000 INMATES.

22 **Q**   HOW MANY PRISONS ARE THOSE INMATES HOUSED IN?

23 **A**   THEY'RE HOUSED IN 26 PRISONS AND A BOOT CAMP.

24 **Q**   ARE YOU HOUSING PRISONERS OVER DESIGN CAPACITY IN

25 PENNSYLVANIA?

1  **A**   WE DON'T USE THE TERM "DESIGN CAPACITY."  WE USE "OPERABLE

2  CAPACITY."  WE LOOK AT EACH ONE OF OUR FACILITIES AND SEE WHAT

3  THOSE FACILITIES -- NOT ONLY SPACE-WISE BUT JOB-WISE,

4  PROGRAM-WISE, RECEIVER-WISE, WHAT THEY CAN HANDLE, AND WE

5  DETERMINE AN OPERABLE CAPACITY.  WE'RE CURRENTLY OPERATING ABOUT

6  5,000 INMATES OVER THAT OPERABLE CAPACITY IN OUR SYSTEM.

7  **Q**   AND DOES THAT CONCERN YOU IN ANY WAY IN TERMS OF THE

8  OPERATION OF YOUR SYSTEM?

9  **A**   IT CERTAINLY CONCERNS ME.  I THINK IT'S NOT HIGH ENOUGH YET

10  THAT WE CAN'T PROVIDE THE BASIC CARE THAT WE NEED TO PROVIDE TO

11  THE INMATES WITHIN THE INSTITUTION, AND WE MONITOR THAT VERY

12  CLOSELY.  BUT ANY TIME THAT YOU'RE RUNNING OVER CAPACITY, YOU

13  HAVE MORE INMATES WHO DON'T HAVE JOBS THAT ARE IDLE, YOU HAVE

14  MORE POSSIBILITIES OF HAVING PROBLEMS WITHIN AN INSTITUTION.  IT

15  INCREASES THE LEVEL OF RISK EVEN IF YOU ARE ONLY SOMEWHAT OVER

16  CAPACITY.

17          SO, YOU KNOW, MY HOPE AND ONE OF THE DIRECTIONS I'M

18  TAKING IN MY STATE IS TRY TO GET US DOWN TO A POINT WHERE WE GET

19  CLOSER TO THAT OPERABLE CAPACITY.

20  **Q**   SO WHAT HAVE YOU DONE TO GET CLOSER TO THE OPERABLE

21  CAPACITY?

22  **A**   WELL, ONE OF THE THINGS THAT WE DID IS WE RECENTLY PASSED

23  SOME LEGISLATION THAT HAS A -- REALLY WHAT IS TERMED AN EARNED

24  TIME PROVISION IN IT TO ALLOW CERTAIN NONVIOLENT OFFENDERS TO

25  GET OUT EARLIER, AND WE HAVE ANOTHER PIECE OF THAT, A STATE

 1  INTERMEDIATE PUNISHMENT.

 2         **MR. MELLO:**  YOUR HONORS, PAUL MELLO FOR DEFENDANTS.

 3  I'M GOING TO OBJECT.  I THINK IT'S A PHASE TWO ISSUE.  PAUL

 4  MELLO FOR PLATA DEFENDANTS.  I BELIEVE THIS IS A PHASE TWO

 5  SUBJECT MATTER, AND I OBJECT ON THE BASIS OF RELEVANCE.

 6         **JUDGE HENDERSON:**  OKAY.  I'M GOING TO OVERRULE IT.

 7  THE OBJECTION WILL BE PRESERVED.

 8  *BY MR. SPECTER*

 9  **Q**  MR. MELLO INTERRUPTED YOU IN THE MIDDLE -- PURSUANT TO THE

10  JUDGE'S REMARKS.  SO DO YOU REMEMBER WHERE YOU WERE IN THE

11  MIDDLE OF THAT?

12  **A**  YES.  WE HAVE THE EARNED TIME PROVISION THAT WILL HELP.  IT

13  WILL INCENTIVIZE INMATES.  IT'S IMPORTANT WITH WHAT WE KNOW

14  ABOUT THESE -- SOME OF THE LESS SERIOUS OFFENDERS IS THE

15  IMPORTANT THING ISN'T TO CONFINE THEM FOR LONG PERIODS OF TIME.

16  IN FACT, CONFINEMENT IS NOT SHOWN TO BE EFFECTIVE WITH THAT

17  GROUP OF PEOPLE.

18         THE IMPORTANT THING IS YOU ADDRESS THE CRIMINOGENIC

19  FACTORS THAT BROUGHT THEM TO PRISON IN THE FIRST PLACE.  MOST OF

20  THAT -- SUBSTANCE ABUSE ISSUES IS ONE OF THE BIG ONES.  THERE'S

21  CRIMINAL THINKING.  THERE'S VIOLENCE ISSUES, THINGS LIKE THAT

22  THAT YOU HAVE TO ADDRESS.  IF YOU ADDRESS THOSE ISSUES, THEY ARE

23  MORE LIKELY TO GO OUT AND SUCCEED AND NOT COME BACK TO PRISON.

24         SO WE DESIGNED A PACKAGE OF BILLS THAT HELPS

25  INCENTIVIZE THE INMATES TO GO THROUGH THEIR PROGRAMS, AND IF

1  THEY COMPLETE THEIR PROGRAMS, THEY CAN GET OUT A LITTLE BIT

2  EARLIER.

3         WE'VE ALSO DEVELOPED ANOTHER PROGRAM, A STATE

4  INTERMEDIATE PUNISHMENT PROGRAM, THAT WAS DESIGNED SPECIFICALLY

5  FOR SUBSTANCE ABUSE OFFENDERS.  THEY COME IN, GET A VERY HIGH

6  QUALITY TREATMENT PROGRAM, EXTENSIVE AFTERCARE.  IF THEY

7  COMPLETE THAT SUCCESSFULLY, THEY GET OUT EARLIER THAN THEY WOULD

8  HAVE HAD THEY GONE THROUGH A TRADITIONAL SENTENCE.

9  **Q**   YOU HAVE INPATIENT -- YOU HAVE VARIOUS LEVELS OF MENTAL

10 HEALTHCARE, FOR EXAMPLE, IN YOUR FACILITIES, DO YOU NOT?

11 **A**   YES, WE DO.

12 **Q**   AND ARE THOSE -- EVEN THOUGH YOU'RE ABOVE DESIGN CAPACITY,

13 ARE THOSE LEVELS OF CARE FULL?

14 **A**   NO, THEY'RE NOT.  IN FACT, THE VERY HIGHEST LEVELS OF CARE

15 WITHIN MY SYSTEM, WE'RE ONLY RUNNING ABOUT 80 PERCENT OF

16 CAPACITY.  WE HAVE LICENSED INPATIENT UNITS FOR THOSE PEOPLE

17 THAT ARE COMMITTED TO THOSE UNITS WITHIN OUR INSTITUTIONS, AND

18 WE ALSO RUN A FORENSIC HOSPITAL.  WE HAVE BEEN PRETTY

19 CONSISTENTLY RUNNING AT ABOUT 80 PERCENT.

20         PART OF THE REASON I ATTRIBUTE TO THAT, BECAUSE WE DO

21 HAVE ABOUT 19 PERCENT OF OUR OVERALL POPULATION THAT IS MENTALLY

22 ILL, IS BECAUSE WE RECOGNIZE THEM WHEN THEY FIRST COME INTO THE

23 SYSTEM, AND WE HAVE A SPECIAL UNIT TO TRY TO STABILIZE

24 INDIVIDUALS, RATHER THAN LETTING THEM GET WORSE.  AND THEN WE

25 HAVE SPECIAL NEEDS UNITS WITHIN ALL OF OUR INSTITUTIONS WHERE WE

1   PLACE THESE INDIVIDUALS SO THAT WE CAN SEE THAT THEY GET THE

2   PROPER CARE AND THEY DON'T DETERIORATE TO THE POINT WHERE THEY

3   HAVE TO GO TO THESE LICENSED UNITS IN OUR FORENSIC HOSPITAL.

4   **Q**   SO THE FACT THAT THESE UNITS HAVE SOME VACANCIES, DOES THAT

5   HELP YOU MANAGE YOUR SYSTEM IN AN APPROPRIATE WAY?

6   **A**   WELL, IT CERTAINLY DOES, BECAUSE, YOU KNOW, IF I HAVE AN

7   INDIVIDUAL THAT NEEDS SOME PARTICULAR LEVEL OF CARE, I'M ABLE TO

8   PROVIDE THAT CARE TO THEM.  IF THOSE UNITS WERE FULL, AND I HAD

9   SOMEBODY THAT NEEDED THE CARE, THEN I COULDN'T.  IT WOULD MAKE

10  IT MORE DIFFICULT FOR ME TO MANAGE MY SYSTEM.

11  **Q**   SO WOULD IT BE FAIR TO SAY, IN ORDER TO HAVE A PROPERLY

12  FUNCTIONING SYSTEM, YOU NEED A VACANCY RATE IN THOSE KIND OF

13  PROGRAMS?

14  **A**   YEAH, I THINK YOU NEED SOME -- I DON'T KNOW THAT WE NEED THE

15  80 PERCENT RATE THAT WE HAVE.  CERTAINLY YOU NEED SOME VACANCY

16  RATE BECAUSE IT IS A VARIATION.  YOU DO SEE OVER TIME SOMETIMES

17  YOU WILL SLIDE UP A LITTLE BIT, HAVE MORE PEOPLE IN THOSE UNITS,

18  AT OTHER TIMES A LITTLE BIT LESS.

19          YOU KNOW, IT SEEMS A LOT OF TIMES INMATES AROUND THE

20  HOLIDAYS, THEY GET A LOT MORE AGITATED, AND SOMETIMES WE SEE

21  MORE PEOPLE GOING IN AS THE HOLIDAY SEASONS ARE COMING.

22  **Q**   YOU HAVE HEARD THE TERM "HOT BUNKING"?

23  **A**   I HAVE.

24  **Q**   CAN YOU DESCRIBE TO THE JUDGES WHAT YOU UNDERSTAND IT MEANS?

25  **A**   WELL, WHERE I FIRST HEARD THE TERM "HOT BUNKING" WAS LIKE

1  WITH SUBMARINES BACK IN WORLD WAR II WHERE WE DIDN'T HAVE ENOUGH

2  BEDS FOR PEOPLE, SO TWO PEOPLE WOULD SHARE THE SAME BED.  THAT'S

3  NOT SOMETHING THAT WE DO OR HAVE EVER DONE IN PENNSYLVANIA,

4  DESPITE THE FACT THAT I READ IN ONE OF THE EXPERT'S REPORTS THAT

5  WE DID THAT.  I DON'T KNOW WHERE THAT INDIVIDUAL GOT THAT.

6  **Q**   NOW, YOU BECAME THE WARDEN OF AN INSTITUTION CALLED CAMP

7  HILL; IS THAT CORRECT?

8  **A**   YES.

9  **Q**   CAN YOU DESCRIBE THE CIRCUMSTANCES UNDER WHICH YOU BECAME

10  THE WARDEN OF THAT INSTITUTION?

11  **A**   WELL, THAT WAS BACK IN 1989 AT A TIME WHEN OUR SYSTEM WAS

12  QUITE OVERCROWDED.  WE WERE AT ABOUT 150 OR 160 PERCENT OF OUR

13  CAPACITY.  MOST OF OUR INSTITUTIONS WERE HAVING DIFFICULTIES

14  OPERATING.  CAMP HILL WAS PARTICULARLY OVERCROWDED, AND THEY HAD

15  TWO VERY SERIOUS RIOTS WITHIN THREE DAYS.  A LOT OF PEOPLE WERE

16  HURT.  A LOT OF PEOPLE WERE INJURED.  AND IT WAS SOME TEN DAYS

17  AFTER THAT RIOT THAT I WAS ASSIGNED TO TAKE OVER THAT FACILITY.

18  **Q**   AND DO YOU ATTRIBUTE THE RIOTS IN ANY WAY TO THE

19  OVERCROWDING?

20  **A**   ABSOLUTELY.  THERE WAS NO QUESTION THAT WE HAD RIOTS,

21  ACTUALLY, NOT ONLY AT CAMP HILL, BUT AT ROCKVIEW AND AT

22  HUNTINGTON, TWO OF OUR OTHER PRISONS, IN THE SAME TIME PERIOD.

23  AND THERE'S ABSOLUTELY NO QUESTION IN MY MIND THAT HAVING TOO

24  MANY INMATES IN THOSE FACILITIES, MAKING IT DIFFICULT TO MANAGE

25  THOSE FACILITIES SAFELY, LED TO THOSE RIOTS.

1  **Q**   OKAY.  AND DID THE LEVEL OF OVERCROWDING THAT YOU

2  EXPERIENCED IN PENNSYLVANIA DURING THAT TIME AFFECT THE

3  DEPARTMENT'S ABILITY TO PROVIDE ADEQUATE HEALTHCARE TO

4  PRISONERS?

5  **A**   YOU KNOW, WHEN I LOOK BACK, THE ANSWER IS YES.  YOU KNOW,

6  WHEN YOU'RE THERE AND YOU'RE DOING SOMETHING AT A PARTICULAR

7  TIME, YOU THINK YOU ARE DOING A GOOD JOB, BUT WE ACTUALLY HAD A

8  CLASS ACTION LAWSUIT PUT AGAINST US IN 1990, THE AUSTIN SUIT,

9  WHERE THE PLAINTIFFS WERE SAYING THAT WE REALLY WEREN'T

10 PROVIDING ADEQUATE MENTAL HEALTH AND MEDICAL CARE.

11          WHEN I LOOK BACK ON WHAT THEY WERE REQUESTING AND

12 WHAT WE FINALLY AGREED TO DO, BECAUSE WE SETTLED THAT SUIT,

13 THERE'S NO QUESTION THAT THE CARE WE PROVIDE TODAY IS FAR BETTER

14 THAN WHAT WE WERE PROVIDING BACK AT THAT TIME.

15 **Q**   DID THE STATE OF CALIFORNIA EVER ASK YOU TO HELP THEM IN

16 RELATION TO ITS PRISON SYSTEM?

17 **A**   I WAS ASKED TO BE A MEMBER OF THE EXPERT PANEL TO TAKE A

18 LOOK AT DESIGNING A ROAD MAP TO PROGRAMMING WITHIN THE STATE

19 BECAUSE I UNDERSTOOD THAT THEY WANTED TO GET MORE PROGRAMS IN

20 THEIR SYSTEM TO TRY TO REDUCE RECIDIVISM.  SO I WAS PART OF THAT

21 PANEL.

22 **Q**   WHEN WAS THAT?

23 **A**   IT WAS BACK A COUPLE OF YEARS AGO.

24 **Q**   2006, END OF 2006?

25 **A**   THAT WOULD BE ABOUT RIGHT.

1           **JUDGE HENDERSON:** EXCUSE ME.  LET ME GO BACK A

2    MINUTE.  I MAY HAVE MISSED IT, BUT WHAT WAS THE LEVEL OF

3    OVERCROWDING AT THE TIME OF THE RIOTS YOU JUST REFERRED TO; DO

4    YOU RECALL?

5           **THE WITNESS:** WE WERE AT 150 TO 160 PERCENT OF OUR

6    CAPACITY AT THAT TIME, YOUR HONOR.

7    *BY MR. SPECTER*

8    **Q**   DURING THE COURSE OF YOUR PARTICIPATION AS A MEMBER OF WHAT

9    HAS BEEN REFERRED TO AS THE EXPERT PANEL, DID YOU -- WERE YOU

10   PROVIDED WITH INFORMATION ABOUT THE CALIFORNIA PRISON SYSTEM?

11   **A**   YES.  WE WERE PROVIDED WITH PRETTY MUCH ANYTHING WE ASKED

12   FOR, DATA, INFORMATION, REPORTS.  WE ALSO HAD SOME PRESENTATIONS

13   BY MEMBERS OF THEIR STAFF, AND MEMBERS OF THEIR STAFF WERE PART

14   OF THE EXPERT PANEL.

15   **Q**   AND THE PRESENTATIONS INCLUDED FROM THE SECRETARY OF THE

16   DEPARTMENT?

17   **A**   THE SECRETARY -- SECRETARY TILTON DID ATTEND THE FIRST

18   MEETING THAT WE HAD AS AN EXPERT PANEL, YES.

19   **Q**   AND THEY PROVIDED YOU INFORMATION ON HOW OVERCROWDED THEY

20   WERE AND ANY INFORMATION THAT YOU NEEDED TO PERFORM YOUR TASK;

21   IS THAT RIGHT?

22   **A**   YES, THAT'S CORRECT.

23   **Q**   SO YOU UNDERSTAND THAT CALIFORNIA IS CLOSE TO 200 PERCENT OF

24   DESIGN CAPACITY; IS THAT RIGHT?

25   **A**   YES.  AT THE TIME THAT WE WERE DOING THAT BACK IN 2006, I

1   THINK THEY WERE OVER 200 PERCENT, AND I THINK NOW THEY'RE DOWN

2   AROUND 190-SOME PERCENT OF CAPACITY.

3          **JUDGE HENDERSON:**  LET ME INTERRUPT AGAIN.

4          **MR. SPECTER:**  SURE.

5          **JUDGE HENDERSON:**  YOU TALK IN PENNSYLVANIA IN TERMS

6   OF OPERABLE CAPACITY AND WE'RE NOW TALKING ABOUT DESIGN.  ARE

7   THOSE APPLES AND ORANGES, OR TELL US HOW WE CAN --

8          **THE WITNESS:**  WELL, I THINK, YOUR HONOR, PROBABLY

9   MORE COMPARABLE THAN THEY WOULD BE TODAY, BECAUSE BACK AT THAT

10  TIME WE WERE STILL LOOKING AT SINGLE CELLING ALL OF OUR INMATES,

11  AND WE WERE LOOKING AT DESIGN CAPACITY.  SINCE THEN WE HAVE

12  BUILT FACILITIES FOR DOUBLE CELLING, AND WE HAVE GONE MORE TO

13  DOUBLE CELLING, AND THAT'S WHY WE WENT TO THIS OPERABLE CAPACITY

14  THING.

15         WE ALSO SPENT MILLIONS OF DOLLARS UPGRADING THE

16  INFRASTRUCTURE AT OLDER INSTITUTIONS SO THAT WE WERE CAPABLE OF

17  PUTTING MORE INMATES THAN THAT INSTITUTION WAS ORIGINALLY

18  DESIGNED FOR.  SO THAT'S WHY IT'S NO LONGER APPROPRIATE FOR US

19  TO TALK ABOUT DESIGN CAPACITY.

20         BUT THE 150 OR 60 PERCENT I MENTIONED WAS BASED ON

21  DESIGN CAPACITY AT THAT TIME.

22         **JUDGE HENDERSON:**  OKAY.

23  **BY MR. SPECTER**

24  Q   HOW BIG ARE THE PRISONS IN PENNSYLVANIA IN TERMS OF THE

25  SIZE, OF THE NUMBER OF PRISONERS THAT ARE HOUSED THERE?

1  **A**  WE LIKE TO RUN OUR PRISONS AT ABOUT 2,000 INMATES.  WE HAVE

2  TWO LARGER PRISONS, THE ONE RUNS IN AROUND 3,200.  THE OTHER ONE

3  RUNS AROUND 3,300.  THOSE ARE OUR LARGEST TWO PRISONS.

4  EVERYTHING ELSE IS 2,000 OR LESS.  I SHOULD SAY 2,500 OR LESS.

5           WE FOUND THAT AS PRISONS GET MUCH HIGHER THAN 3,000,

6  3,500, THEY BECOME VERY, VERY DIFFICULT FOR ONE MANAGEMENT TEAM

7  TO OPERATE.

8           WE DID HAVE A PRISON, GRATERFORD, THAT WAS SEVERELY

9  OVERCROWDED BACK AT THE TIME I TALKED ABOUT IN THE LATE '80'S

10  AND EARLY '90'S.  THAT PRISON, WHICH WAS ORIGINALLY DESIGNED FOR

11  2,000 INMATES WAS RUNNING CLOSE TO 4,100 INMATES.  IT WAS

12  ACTUALLY OVER A HUNDRED -- TWO HUNDRED PERCENT OF CAPACITY.

13  THAT WAS OUR WORST PRISON, OUR MOST DIFFICULT PRISON.  HIGH

14  RATES OF ASSAULTS AND INCIDENTS IN THAT PRISON, VERY DIFFICULT

15  TO MANAGE.

16           WE'VE BROUGHT THAT DOWN TO ABOUT 3,200.  NOW WE ARE

17  ABLE TO MANAGE THAT PRISON.  BUT THAT'S SORT OF LIKE HITTING THE

18  UPPER LIMITS OF WHERE I WOULD WANT TO RUN A PRISON ABOUT, YOU

19  KNOW, 3,000 TO 3,500.  I WOULDN'T WANT TO GO OVER THAT.

20  **Q**  SO DURING THE COURSE OF YOUR PARTICIPATION IN THE EXPERT

21  PANEL, YOU BECAME AWARE OF THE SIZE OF THE CALIFORNIA PRISONS;

22  IS THAT CORRECT?

23  **A**  YES, I DID.

24  **Q**  AND WHAT'S YOUR UNDERSTANDING OF HOW LARGE THEY ARE?

25  **A**  WELL, MY UNDERSTANDING IS SOME OF THE PRISONS RUN UPWARDS OF

1  7,000 OR MORE INMATES.

2  **Q**   WHAT'S YOUR OPINION ABOUT AN ABILITY TO MANAGE AN

3  INSTITUTION WHICH IS THAT OVERCROWDED AND THAT LARGE?

4  **A**   MY OPINION IS IT IS IMPOSSIBLE TO REALLY DO A GOOD JOB WITH

5  PRISONS THAT LARGE.  AND THAT COMES FROM EXPERIENCE OF RUNNING A

6  PRISON, THE CAMP HILL PRISON.  BEFORE I LEFT THERE, GOT UP TO

7  BETWEEN -- I THINK WE GOT UP TO ABOUT 3,300 INMATES, AND THAT

8  WAS STARTING TO BECOME DIFFICULT AT THAT TIME TO MANAGE THAT

9  PRISON.  AND SO I WOULD SAY I WOULDN'T WANT TO HAVE TO RUN A

10 PRISON THAT WAS 7,000 INMATES.

11         **JUDGE KARLTON:**  YOU JUST SAID IT'S IMPOSSIBLE TO RUN

12 A PRISON AND DO A GOOD JOB.  I'M NOT SURE I KNOW WHAT A GOOD JOB

13 IS IN TERMS OF PRISON.  WOULD YOU GIVE ME AN IDEA, IF YOU CAN --

14         **THE WITNESS:**  SURE.

15         **JUDGE KARLTON:**  -- OF WHAT KINDS OF THINGS YOU CAN'T

16 DO?

17         **THE WITNESS:**  WELL, ONE OF THE BIG THINGS IS -- THE

18 KEY, IN MY OPINION, TO RUNNING PRISONS IS THE WARDEN AND HIS

19 TEAM WITHIN THE PRISON.  AND THE KEY TO THEM DOING A GOOD JOB IS

20 GOING OUT AND GETTING AROUND THE INSTITUTION, TALKING TO THE

21 INMATES, TALKING TO THE STAFF, TAKING CARE OF THE LITTLE

22 PROBLEMS THAT EXIST WITHIN PRISONS, SEEING THAT THOSE LITTLE

23 PROBLEMS DON'T BECOME BIG PROBLEMS.  AND THE BIGGER THE PRISON

24 GETS, THE MORE DIFFICULT IT IS FOR THAT MANAGEMENT TEAM TO

25 REALLY SUCCESSFULLY GO OUT THERE AND TAKE CARE OF THOSE SMALLER

1  PROBLEMS AND PREVENT THEM FROM GETTING BIGGER.

2          I'VE DONE A LOT OF WORK STUDYING PRISON DISTURBANCES

3  AND RIOTS AROUND THE COUNTRY, LOOKED AT SOME OF THE THINGS

4  WITHIN MY OWN STATE, AND WHAT YOU FIND IS WHEN YOU HAVE PROBLEMS

5  LIKE THAT, IT'S ONE OF TWO THINGS.  EITHER THE PRISONS ARE SO

6  LARGE THAT THE TEAM CAN'T HANDLE THAT PRISON, OR YOU HAVE A POOR

7  MANAGEMENT TEAM.

8          SO YOU CAN HAVE A SMALLER PRISON, 2,000 INMATES, AND

9  IF YOU HAVE A POOR WARDEN AND POOR DEPUTIES THAT NEVER GET OUT,

10 NEVER TALK TO ANYBODY, YOU CAN HAVE PROBLEMS WITHIN THAT PRISON.

11 SO, FROM MY EXPERIENCE, THAT'S THE BIGGEST THING OF HELPING YOU

12 MANAGE IT.

13         THERE'S A LOT OF OTHER THINGS ABOUT WHETHER YOU HAVE

14 THE CAPABILITY WITHIN THE PRISON.  YOU KNOW, IF YOU TAKE A

15 PRISON THAT'S BUILT FOR 4,000 INMATES AND YOU PUT 7,000 INMATES

16 IN THERE, THAT IS EVEN A COMPLICATING PROBLEM THEN.  NOT ONLY IS

17 IT SO HUGE THAT YOUR MANAGEMENT TEAM CAN'T DO A GOOD JOB, BUT

18 ALL YOUR SERVICES START SUFFERING WITHIN THAT PRISON.  YOU KNOW,

19 YOUR ABILITY TO PROVIDE, SAY, PROPER SANITATION, YOU KNOW,

20 BECAUSE YOUR SHOWERS, THEY'RE OVERUSED, EVERY DAY PEOPLE ARE

21 GOING IN THE SHOWERS AND OUT.  YOU DON'T HAVE TIME TO CLEAN THE

22 SHOWERS APPROPRIATELY BECAUSE THEY'RE IN USE ALL THE TIME.  OR

23 THE LAUNDRY SERVICES, YOU ARE NOT ABLE TO CLEAN THE CLOTHES AND

24 GET THE CLOTHES BACK TO THE INMATES.  YOU KNOW, ALL OF THESE

25 THINGS START SUFFERING WHEN YOU GET SO OVERCROWDED AND SO BIG

 1  AND THERE'S ALL THIS DAY-TO-DAY ACTIVITY THAT GOES ON WITHIN A

 2  PRISON.

 3          YOU KNOW, I THINK PEOPLE SOMETIMES DON'T UNDERSTAND

 4  THE COMPLEXITY OF RUNNING THESE PRISONS.  THIS IS LIKE RUNNING A

 5  CITY.  I MEAN, WE HAVE TO PROVIDE WATER.  WE HAVE TO PROVIDE

 6  SEWAGE.  WE HAVE TO PROVIDE JOBS TO PEOPLE.  WE HAVE TO PROVIDE,

 7  YOU KNOW, THE LAUNDRY SERVICES.  WE HAVE TO PROVIDE FOOD.

 8          WHEN YOU OVERCROWD PRISONS, THINGS GET USED MORE,

 9  THINGS BREAK DOWN A LOT MORE THAN THEY WOULD THAT YOU ARE

10  CONSTANTLY RUNNING OUT THERE FIXING THINGS.  YOUR INFRASTRUCTURE

11  SUFFERS.  ALL OF THESE THINGS OCCUR AS YOU PUT MORE AND MORE

12  INMATES IN A FACILITY THAT WAS DESIGNED FOR LESS INMATES.

13          **JUDGE KARLTON:**  PARTICULARLY IN TERMS OF WHAT THIS

14  LAWSUIT IS ABOUT, IS IT YOUR VIEW THAT IF THE INSTITUTION RUNS

15  MORE THAN 3,200 PEOPLE, PLUS OR MINUS, I UNDERSTAND, THERE IS

16  EFFECTS UPON THE PROVISION OF MEDICAL AND MENTAL HEALTH CARE,

17  AND, IF SO, HOW?

18          **THE WITNESS:**  I GUESS WHAT I WOULD SAY WITH THAT IS

19  IT IS POSSIBLE TO HAVE LARGER PRISONS AND TO PROVIDE PROPER

20  MEDICAL AND MENTAL HEALTH CARE IN THOSE PRISONS, BUT THAT'S

21  ASSUMING THAT THOSE PRISONS WERE DESIGNED FOR THE NUMBER OF

22  INMATES THAT YOU HAVE IN THERE.  THAT ASSUMES THAT YOU HAVE

23  ENOUGH SPACE IN THOSE PRISONS TO -- YOU KNOW, TO PROVIDE

24  WHATEVER THE CARE NEEDS TO BE DONE, TO INTERVIEW THE INMATES, TO

25  SEE THE INMATES.  THAT MAKES THOSE KINDS OF ASSUMPTIONS.

1          AND IT ALSO ASSUMES THAT THE LARGE SIZE OF THE PRISON

2   HAS NOT SERIOUSLY AFFECTED YOUR ABILITY TO RUN THAT PRISON

3   SAFELY, WHICH CAN HAPPEN.  AGAIN, AS THAT MANAGEMENT TEAM HAS

4   MORE DIFFICULTY MANAGING THESE LARGER NUMBERS OF PEOPLE, THEN

5   YOUR PRISON COULD BECOME MORE UNSAFE.  THERE'S MORE IDLENESS IN

6   THE PRISON AND THINGS -- YOU KNOW, IT COULD MAKE IT THEN

7   DIFFICULT -- FOR INSTANCE, IF YOU RELY A LOT ON LOCKDOWNS TO

8   CONTROL YOUR PRISON, HOW ARE PEOPLE GETTING TO THEIR MENTAL

9   HEALTHCARE?  HOW ARE THEY GETTING TO THEIR MEDICAL CARE?  HOW

10  ARE THEY GETTING THEIR MEDICATION APPROPRIATELY?  THOSE KINDS OF

11  THINGS DO GET IMPACTED.

12          SO I GUESS, TO ANSWER YOUR QUESTION, IT'S POSSIBLE TO

13  DO IT, BUT IT BECOMES THAT MUCH MORE DIFFICULT EVEN IF YOU HAVE

14  THE RESOURCES AND SPACE BECAUSE OF THE OTHER THINGS THAT START

15  OCCURRING THAT START INTERFERING WITH THE ABILITY TO PROVIDE

16  THIS KIND OF CARE.

17  **BY MR. SPECTER**

18  **Q**   TO ELABORATE ON THE JUDGE'S QUESTION FOR A BIT, YOU'RE AWARE

19  THAT CALIFORNIA'S PRISONS, LIKE YOU SAID, ARE CLOSE TO

20  200 PERCENT -- BETWEEN 190 TO 200 PERCENT OF CAPACITY, AND WITH

21  THAT LEVEL OF OVERCROWDING, IS IT POSSIBLE TO PROVIDE ADEQUATE

22  HEALTHCARE SERVICES TO PRISONERS?

23  **A**   WELL, FROM EVERYTHING THAT I HAVE SEEN, THE REPORTS THAT

24  I'VE LOOKED AT AND REVIEWED FROM THE VARIOUS EXPERTS AND OTHER

25  PEOPLE, I DON'T SEE HOW CALIFORNIA COULD, AS IT CURRENTLY SITS

Case 2:90-cv-00520-KJM-SCR    Document 3541-2    Filed 03/10/09    Page 23 of 222

1  WITH THE NUMBER OF INMATES THEY HAVE, DELIVER PROPER MENTAL

2  HEALTH OR MEDICAL CARE, BECAUSE THEIR PRISONS ARE UNSAFE.

3          AND WHEN I TALK ABOUT UNSAFE, YOU LOOK AT THE NUMBER

4  OF INCIDENTS THAT THEY HAVE.  YOU LOOK AT THEIR ASSAULT RATES

5  WITHIN THE PRISON.  THE ASSAULT RATES ARE GOING UP, AT LEAST UP

6  THROUGH 2006.  THAT'S THE ONLY REPORTS I WAS ABLE TO SEE OFF

7  THEIR WEBSITE.  THEIR INCIDENT RATES ARE GOING UP.

8          AND THEN I SORT OF COMPARED IT TO OUR ASSAULT RATES.

9  IT'S LIKE 2-1/2 TIMES, IF YOU BRING IT DOWN COMPARISON-WISE SIZE

10 OF THE INSTITUTION.  THEIR HOMICIDE RATE IS EXTREMELY HIGH.  YOU

11 LOOK BETWEEN 2000 AND 2006, AND THE AVERAGE IS 11.34 HOMICIDES

12 WITHIN THEIR SYSTEM.  IF YOU APPLIED THAT TO MY SYSTEM, WE WOULD

13 HAVE THREE A YEAR.  DURING THAT PERIOD OF TIME, WE'VE HAD THREE

14 OVER THAT PERIOD OF TIME, NOT THREE A YEAR.  SUICIDE RATES, FROM

15 WHAT I'VE READ AND FROM THE NUMBERS OF THAT I'VE SEEN, THEY'RE

16 JUST ABOUT TWICE WHAT THE NATIONAL AVERAGE IS.

17         ALL OF THOSE THINGS SHOW ME THAT YOU HAVE A SYSTEM

18 THAT ISN'T SAFE.  THEY RELY LARGELY ON LOCKDOWNS TO CONTROL

19 THEIR SYSTEM, AND THEY HAVE TO DO THAT.  I MEAN, YOU CAN'T HAVE

20 PEOPLE RUNNING AROUND HURTING PEOPLE.  BUT, YOU KNOW, I THINK IN

21 2006, THEY HAD 449 LOCKDOWNS, WHICH AVERAGED 12 DAYS A LOCKDOWN.

22 AND THEY HAD 20 OR SO OF THOSE LOCKDOWNS THAT WERE OVER 60 DAYS.

23 THOSE THINGS IMPACT UPON YOUR ABILITY TO PROPERLY DELIVER ANY

24 SERVICE WITHIN AN INSTITUTION, INCLUDING MENTAL HEALTH AND

25 MEDICAL SERVICES.

1  Q    AND YOU MENTIONED A LOT OF FACTORS THAT GO INTO THE DELIVERY

2  OF CARE AND THE OPERATION OF THE PRISONS.  IN TERMS OF THE MOST

3  IMPORTANT, WHICH ONE IS MOST IMPORTANT IN YOUR MIND?

4  A    MOST IMPORTANT?

5  Q    IN TERMS OF INHIBITING THE ABILITY OF --

6  A    I THINK FROM EVERYTHING THAT I'VE SEEN AND ALL OF THE

7  REPORTS AND INFORMATION THAT I'VE SEEN, I THINK THE BIGGEST

8  INHIBITING FACTOR RIGHT NOW IN CALIFORNIA BEING ABLE TO DELIVER

9  APPROPRIATE MENTAL HEALTH AND MEDICAL CARE IS THE SEVERE

10 OVERCROWDING OF THEIR SYSTEM.

11 Q    AND DO YOU BELIEVE THAT THEY ARE GOING TO BE ABLE -- BASED

12 ON YOUR EXPERIENCE IN PENNSYLVANIA AND THE INFORMATION YOU'VE

13 REVIEWED, DO YOU BELIEVE THEY'LL BE ABLE TO PROVIDE ADEQUATE

14 CARE WITHOUT REDUCING THE POPULATION TO A MANAGEABLE LEVEL?

15 A    THE ONLY WAY THAT I COULD SEE THAT THAT COULD OCCUR IS IF

16 WE'RE WILLING -- OR IF THEY'RE WILLING TO WAIT FOR MANY YEARS,

17 SPEND HUGE AMOUNTS OF MONEY.  AND I'M NOT EVEN SURE THAT THAT

18 WOULD GET THEM THERE, BECAUSE, YOU KNOW, OVER THE LAST 20 YEARS

19 THEY'VE SPENT BILLIONS OF DOLLARS ON CONSTRUCTION AND BUILDING,

20 AND THEY HAVEN'T REALLY BEEN ABLE TO DIG THEIR WAY OUT OF THE

21 HOLE.

22         SO I THINK IT WOULD BE VERY DIFFICULT TO JUST, YOU

23 KNOW, SAY, RELY ON CONSTRUCTION ALONE TO DEAL WITH THIS PROBLEM.

24 I THINK THEY HAVE TO FIND SOME WAY TO FAIRLY SUBSTANTIALLY

25 REDUCE THE INMATE POPULATION.

1    Q    AND IN TERMS OF YOUR EXPERIENCE OF TRYING TO BUILD YOUR WAY

2    OUT OF THE PROBLEM, CAN YOU EXPLAIN WHY YOU -- WHY YOU DON'T

3    THINK THAT IS A TIMELY RESPONSE TO THE ISSUES?

4    A    WELL, THE REASON I DON'T THINK IT'S A TIMELY RESPONSE IS

5    WHEN I LOOK AT WHAT'S HAPPENED IN MY STATE, AND EVEN SOME OTHER

6    STATES AROUND THE COUNTRY, PEOPLE AREN'T REALLY WILLING TO PUT

7    THE KINDS OF MONEY INTO THAT THAT NEEDS TO BE PUT IN.  SO WE'LL

8    HAVE APPROVED PROJECTS TO BUILD A NEW PRISON OR TO BUILD FIVE

9    NEW PRISONS, AND IT'S VERY SLOW COMING BECAUSE EVEN THOUGH THE

10   PROJECT IS APPROVED, SOMEBODY HAS TO RELEASE THE MONEY FOR

11   DESIGN AND SOMEBODY HAS TO RELEASE THE MONEY FOR CONSTRUCTION.

12           SO IN MY EXPERIENCE, YOU KNOW, STATES WANT TO SPEND

13   AS LITTLE AS THEY CAN ON THE PRISON SYSTEMS BECAUSE THERE'S SO

14   MANY OTHER COMPETING THINGS OUT THERE.  I MEAN, YOU KNOW, YOU

15   HAVE HEALTHCARE AND EDUCATION, THE ELDERLY AND ALL THESE OTHER

16   IMPORTANT THINGS TO SPEND MONEY ON.  SO THEY TEND TO ONLY SPEND

17   WHAT THEY ABSOLUTELY HAVE TO, AND THAT'S WHY I THINK THEY'RE

18   NEVER ABLE TO BUILD THEIR WAY OUT, BECAUSE THEY NEVER REALLY SIT

19   DOWN AND SAY, OKAY, WE GOT TO BUILD 20 NEW PRISONS, OR WHATEVER

20   IT IS.

21   Q    WHAT ABOUT ISSUES OF SITING IN THE COMMUNITY?

22   A    YOU KNOW, I MEAN, I DON'T KNOW IF BY THAT YOU MEAN THE

23   AB 900.

24   Q    NO.  I MEAN THE ABILITY OF COMMUNITIES TO ACCEPT PRISONS IN

25   THEIR NEIGHBORHOODS.

1  **A**   OKAY.  WELL, THERE'S NO QUESTION THAT THAT'S A PROBLEM.  WE

2  HAD THAT PROBLEM IN PENNSYLVANIA.  YOU HAVE THAT PROBLEM AROUND

3  THE COUNTRY.

4         I HAD -- EXCELLENT EXAMPLE.  WE HAD AN OLD PRISON,

5  OVER A HUNDRED YEARS OLD.  WE WANTED TO CLOSE IT.  WE WANTED TO

6  BUILD A NEW PRISON NEAR IT.  IT WAS IN THE PITTSBURGH AREA.  WE

7  COULDN'T FIND A SITE NEARBY.  WE KEPT GETTING RUN OUT OF TOWN;

8  THERE'S A SCHOOL TOO CLOSE, OR WHATEVER.  WE ENDED UP HAVING TO

9  BUILD THAT IN SOME MORE RURAL AREA, FAR REMOVED FROM WHERE WE

10  WANTED TO BUILD IT.

11         AND I THINK YOU ARE GOING TO FIND THE SAME THING

12  HERE, PARTICULARLY, YOU KNOW, IF YOU WANT TO BUILD A LOT OF

13  REENTRY FACILITIES.  YOU SHOULD BUILD THOSE REENTRY FACILITIES

14  NEAR YOUR MAJOR METROPOLITAN AREAS WHERE MOST OF YOUR INMATES

15  COME FROM.  I THINK IT'S GOING TO BE VERY, VERY DIFFICULT TO

16  SITE THOSE FACILITIES CLOSE TO THOSE AREAS.

17  **Q**   COULDN'T THE PROBLEM -- COULD THE PROBLEM OF THE LACK OF

18  HEALTHCARE BE CAUSED BY THE CULTURE OF THE PRISON SYSTEM IN

19  TERMS OF THE CUSTODIAL INTERFERENCE WITH THE DELIVERY OF CARE

20  RATHER THAN OVERCROWDING?

21  **A**   WELL, FROM WHAT I CAN SEE, YOU KNOW, THE CULTURE IS A

22  PROBLEM.  THERE IS NO QUESTION ABOUT THAT.  BUT YOU GOT TO LOOK

23  BACK WHERE DID THIS CULTURE COME FROM.  AND AT LEAST FROM WHAT

24  I'VE READ, CALIFORNIA BACK IN THE EARLY 1970'S WAS ONE OF THE

25  MOST PROGRESSIVE SYSTEMS IN THIS NATION, AND THEY WENT FROM

1  BEING ONE OF THE MOST PROGRESSIVE SYSTEMS TO BEING ONE OF THE

2  MOST OVERCROWDED SYSTEMS IN THIS NATION, AND THEY DID THAT

3  BECAUSE OF ALL THE LAWS, AND THE DRUG LAWS, AND ALL THE THINGS,

4  THE MANDATORIES, AND THE TWO STRIKES, AND THREE STRIKES, AND

5  EVERYTHING ELSE THAT DRIVES THAT POPULATION.

6          NOW, IF YOU FIX THE CROWDING PROBLEM, THAT DOESN'T

7  FIX ALL THE PROBLEM.  YOU DO HAVE TO DEAL WITH THE CULTURE, BUT

8  YOU HAVE TO REALIZE THAT THE CULTURE GREW OUT OF THE

9  OVERCROWDING.

10          IF I'M RUNNING AN INSTITUTION, IF I'M A WARDEN OF AN

11  INSTITUTION, MY FIRST JOB IS TO SEE THAT THAT INSTITUTION RUNS

12  SAFELY FOR MY STAFF AND FOR MY INMATES, AND IF IT'S NOT RUNNING

13  SAFELY, I'VE GOT TO TAKE THE STEPS THAT I'VE GOT TO TAKE.

14          AND FROM WHAT I CAN SEE, CALIFORNIA, THEY HAVE

15  INMATES COMING IN, SO THEY HAVE TO HAVE BED SPACE.  THEY HAVE TO

16  FIND A PLACE TO PUT PEOPLE.  THEY ARE HAVING A DIFFICULT TIME

17  CONTROLLING THEIR PRISONS, SO THEY HAVE TO TAKE A STRONG

18  CUSTODIAL APPROACH TO IT.  THEY HAVE TO RELY ON THE LOCKDOWNS.

19  THEY HAVE TO RELY ON GUNS, GAS, THOSE KINDS OF THINGS, TO

20  CONTROL THE PRISONS SO THEY'RE SAFE FOR THE STAFF AND FOR THEIR

21  INMATES.

22          IF YOU TRY TO CHANGE THAT CULTURE, YOU CAN'T.  YOU

23  CAN'T CHANGE THE CULTURE UNTIL YOU REDUCE THE POPULATION AND CAN

24  MAKE THE INSTITUTION SAFE.  BUT THEN YOU DO HAVE TO DEAL WITH

25  THE CULTURE AND TRY TO CHANGE THAT AS WELL.

1  **Q**   I UNDERSTAND.  OKAY.

2         YOU'VE COMPARED THE NUMBER OF ADMISSIONS IN

3  CALIFORNIA TO NUMBER OF PEOPLE COMING IN TO PENNSYLVANIA,

4  CORRECT?

5  **A**   YES.

6  **Q**   AND WHAT HAVE YOU LEARNED FROM THAT COMPARISON?

7  **A**   WELL, YOU KNOW, WHEN I TALK --

8         **MR. MELLO:**  OBJECTION.  PAUL MELLO AGAIN FOR PLATA

9  DEFENDANTS.  THIS IS ALL PHASE TWO.  DEFENDANTS OBJECT ON THE

10  BASIS OF RELEVANCE AND OBJECT TO ALL THIS PHASE TWO TESTIMONY

11  AND MOVE TO STRIKE IT.  THANK YOU.

12         **JUDGE HENDERSON:**  OVERRULED.  AND YOU WILL BE DEEMED

13  TO HAVE A CONTINUING OBJECTION IN THIS AREA, COUNSEL.

14         **THE WITNESS:**  WHEN I --

15         **JUDGE KARLTON:**  BEFORE YOU DO THAT, SIR, MR. MELLO,

16  WILL YOU HELP ME?  I DON'T KNOW WHY YOU WOULD EVEN THINK THAT.

17  THE JUDGE'S RULING, OF COURSE, WILL STAND, BUT I WANT TO

18  UNDERSTAND WHAT IT IS THAT YOU THINK THIS -- WHY THIS RELATES TO

19  THE SECOND PHASE RATHER THAN THE FIRST PHASE.

20         **MR. MELLO:**  WE'VE SPENT A GREAT DEAL OF TIME IN THIS

21  PARTICULAR WITNESS'S TESTIMONY DISCUSSING INTAKE, WHAT THEY'RE

22  DOING IN PENNSYLVANIA TO DEAL WITH POPULATION.  WE HAVE NOT

23  SPENT ALMOST ANY TIME DISCUSSING THE BARRIERS TO THE DELIVERY OF

24  CONSTITUTIONALLY ADEQUATE MEDICAL AND MENTAL HEALTH CARE.

25         **JUDGE KARLTON:**  I UNDERSTAND WHAT YOU THINK THE

1  TESTIMONY IS.  THANK YOU, SIR, FOR HELPING ME UNDERSTAND.

2          **MR. SPECTER:**  MAY I CONTINUE?

3          **JUDGE KARLTON:**  YES.  THE JUDGE'S RULING STANDS.  I

4  JUST WANTED TO UNDERSTAND WHY HE THOUGHT THIS WAS PHASE TWO.

5  YOU MAY PROCEED.

6          **MR. SPECTER:**  OKAY.  THANK YOU, YOUR HONOR.

7  *BY MR. SPECTER*

8  **Q**   YOU WERE TALKING ABOUT THE ADMISSIONS AND WHEN -- WELL, I'LL

9  ASK YOU A FOLLOW-UP QUESTION AFTER YOU DO THAT.

10 **A**   WELL, YOU KNOW, WHEN I LOOK AT THE CALIFORNIA SYSTEM, NOT

11 ONLY DO THEY HAVE A PROBLEM WITH THE SEVERE OVERCROWDING WITH

12 THE GROSS NUMBER OF INMATES, BUT THEY HAVE A SERIOUS PROBLEM

13 WITH THE THROUGHPUT INTO THE SYSTEM.

14          THEY HAVE A TREMENDOUS AMOUNT OF PEOPLE COMING IN TO

15 THEIR RECEPTION CENTERS.  I THINK SOME OF THOSE RECEPTION

16 CENTERS, THE LAST I LOOKED, ARE OVER 300 PERCENT OF CAPACITY?

17          AND WHEN YOU ASK ABOUT THE NUMBERS, THE COMPARISON,

18 THEY GET LIKE SOMEWHERE AROUND 140,000 ADMISSIONS A YEAR.  IN

19 PENNSYLVANIA WE'RE ABOUT 28 PERCENT OF THE SIZE OF THEIR SYSTEM.

20 WE ONLY GET 15,000.  SO WE ONLY GET LIKE ONE-NINTH THE AMOUNT.

21          NOW, ONE OF THE HUGE REASONS FOR THAT IS THE NUMBER

22 OF TECHNICAL VIOLATERS THEY HAVE COMING BACK IN.  BUT THAT

23 THROUGHPUT INTO THE SYSTEM AND THE FACT THOSE PEOPLE STAY FOR

24 SUCH A SHORT PERIOD OF TIME, THEY ALSO DIRECTLY INTERFERE WITH

25 THE ABILITY TO PROVIDE PROPER MENTAL HEALTH AND MEDICAL CARE TO

1  THE INMATE POPULATION.

2  **Q**    THAT WAS MY FOLLOW-UP QUESTION.  COULD YOU EXPLAIN WHY

3  THAT'S TRUE?

4  **A**    BECAUSE WHEN YOU HAVE SUCH HUGE NUMBERS COMING INTO THE

5  SYSTEM AND STAYING FOR, IN SOME CASES, RELATIVELY SHORT PERIODS

6  OF TIME, YOU DON'T HAVE THE CAPACITY TO IDENTIFY PEOPLE WHO HAVE

7  MENTAL HEALTH PROBLEMS AND THEN TO PROPERLY SLOT THOSE PEOPLE

8  WHERE THEY NEED TO GO.

9            AND YOU MAY MISS PEOPLE WHO HAVE MEDICAL PROBLEMS.

10  BECAUSE OF THIS HUGE THROUGHPUT THAT'S COMING IN, YOU MAY MISS

11  PEOPLE WHO HAVE CERTAIN NEEDS AND CERTAIN CARE NEEDS THAT AREN'T

12  BEING DEALT WITH.  SO, YOU KNOW, I THINK TO DEAL WITH THE

13  PROBLEM, YOU NOT ONLY HAVE TO REDUCE THE POPULATION BUT TRY TO

14  DO THINGS THAT ALSO DEAL WITH THAT HUGE AMOUNT OF RECEPTIONS

15  THAT THEY GET.

16  **Q**    AND YOU MENTION THE FACT YOU HAVE TO PLACE THEM IN OTHER --

17  YOU KNOW, ONCE THEY COME INTO RECEPTION, YOU HAVE TO PUT THEM IN

18  A PRISON IN WHICH THEY STAY FOR THE REST OF THEIR TERM.

19  PENNSYLVANIA USES A CLASSIFICATION SYSTEM; IS THAT CORRECT?

20  **A**    YES.

21  **Q**    HOW DOES OVER -- WELL, CAN YOU JUST EXPLAIN BRIEFLY -- A

22  WITNESS BEFORE YOU YESTERDAY EXPLAINED WHAT A CLASSIFICATION

23  SYSTEM IS.  IF YOU COULD SO THE JUDGES ARE FAMILIAR WITH THAT,

24  BUT IF YOU COULD EXPLAIN WHAT YOU DO IN PENNSYLVANIA?

25  **A**    WE CLASSIFY INDIVIDUALS ON SEVERAL GROUNDS.  NUMBER ONE, WE

Case 2:90-cv-00520-KJM-SCR    Document 3541-2    Filed 03/10/09    Page 31 of 222

 1  LOOK AT THEIR SECURITY LEVEL.  WE HAVE WHAT WE CALL A PACK

 2  SYSTEM THAT MAKES THEM MINIMUM, MEDIUM, CLOSED, OR MAXIMUM

 3  SECURITY.  THAT'S ONE OF THE THINGS, WE HAVE TO SLOT THEM TO AN

 4  INSTITUTION THAT'S CAPABLE OF DEALING WITH THE SECURITY LEVEL.

 5          BUT WE ALSO LOOK AT RISK LEVEL, RISK TO REOFFEND, AND

 6  WE LOOK AT THE NEEDS THAT THAT INDIVIDUAL HAS, THE PROGRAMS THAT

 7  THAT HAS.  WE DO THIS ASSESSMENT WITHIN OUR DIAGNOSTIC CENTER,

 8  BECAUSE WE'VE LEARNED THAT LOW RISK PEOPLE, YOU REALLY SHOULDN'T

 9  WASTE YOUR RESOURCES ON THEM.  THEY'RE GOING TO SUCCEED NO

10  MATTER WHAT YOU DO WITH THEM.

11          YOU'VE GOT TO TARGET MODERATE AND HIGH RISK

12  INDIVIDUALS, AND THEN YOU HAVE TO SEE WHAT OTHER PARTICULAR

13  NEEDS, WHETHER THOSE NEEDS ARE SUBSTANCE ABUSE NEEDS, OR

14  CRIMINAL THINKING NEEDS, OR VIOLENCE ISSUES, SEX OFFENDER

15  ISSUES.

16          AND SO WHEN WE'RE CLASSIFYING SOMEBODY, WE'RE LOOKING

17  TO PUT THEM NOT ONLY IN AN INSTITUTION THAT CAN MEET THEIR

18  SECURITY NEEDS, BUT ALSO AN INSTITUTION THAT CAN MEET THEIR

19  PROGRAM NEEDS.

20          AND THIS -- YOU KNOW, WE ALSO WOULD TAKE INTO ACCOUNT

21  MEDICAL NEEDS.  FOR INSTANCE, IF YOU HAD AN INDIVIDUAL WHO

22  REQUIRES NURSING HOME LEVEL OF CARE, THEY HAVE TO GO TO MY ONE

23  INSTITUTION THAT CAN PROVIDE THE NURSING HOME LEVEL OF CARE.  IF

24  THEY ARE A MENTAL HEALTH INMATE, THAT HAS TO BE TAKEN INTO

25  ACCOUNT IN CLASSIFYING THEM TO GET THEM TO A FACILITY THAT HAS

1   THE APPROPRIATE FACILITY TO DEAL WITH THAT.

2          SO WE CLASSIFY INDIVIDUALS ON A NUMBER OF GROUNDS

3   BEFORE WE SLOT THEM OUT THERE, WHICH IS ONE OF THE OTHER THINGS

4   THAT HUGE OVERCROWDING CREATES A PROBLEM, BECAUSE YOU HAVE AN

5   INDIVIDUAL WHO NEEDS TO GO TO INSTITUTION A, AND INSTITUTION A

6   IS FULL.  SO WHERE DO YOU PUT HIM.  YOU KNOW, YOU END UP HAVING

7   TO PUT THEM SOMEWHERE THAT MAYBE IS NOT THE MOST APPROPRIATE FOR

8   THAT INDIVIDUAL.

9   **Q**   AND BASED ON THE MATERIALS YOU'VE REVIEWED, HAVE YOU FOUND

10  THAT THAT'S A PROBLEM IN CALIFORNIA?

11  **A**   BASED ON THE MATERIALS THAT I'VE REVIEWED FROM THE EXPERTS,

12  OTHER EXPERTS THAT HAVE BEEN TESTIFYING, OR WILL TESTIFY IN THIS

13  CASE, REPORTS FROM THE MASTER AND THE RECEIVER, YES.

14  **Q**   YOU KNOW, DURING YOUR DEPOSITION MR. MELLO ASKED YOU ABOUT

15  MORTALITY RATES; DO YOU RECALL THAT DISCUSSION?

16  **A**   YES.

17  **Q**   AND THERE WAS A STUDY BY BUREAU -- DEPARTMENT OF JUSTICE

18  BUREAU OF JUSTICE STATISTICS WHICH RANKED CALIFORNIA 14TH LOWEST

19  OF ALL THE PRISON SYSTEMS IN THE COUNTRY IN TERMS OF THE

20  MORTALITY RATE.  HAVE YOU SEEN THAT STUDY?

21  **A**   I DIDN'T SEE THE SPECIFIC -- YES, I DID.  I'M SORRY.  I DID

22  LOOK AT THAT STUDY SUBSEQUENT TO THE DEPOSITION.

23  **Q**   AND WHAT SIGNIFICANCE WOULD YOU PLACE ON THE FACT THAT

24  CALIFORNIA IS THE 14TH LOWEST, IF ANY?

25  **A**   IN TERMS OF WHETHER THAT MEANS THEY'RE PROVIDING PROPER CARE

1  OR NOT?

2  **Q**    EXACTLY, YES.

3  **A**    THAT'S SIMPLY ONE FACTOR YOU WOULD LOOK AT AND WOULD NOT BE

4  A FACTOR THAT WOULD LEAD ME -- THAT ALONE WOULD NOT BE A FACTOR

5  THAT WOULD LEAD ME TO CONCLUDE THEY'RE PROVIDING

6  CONSTITUTIONALLY ADEQUATE CARE.

7  **Q**    COULD THE DEMOGRAPHICS OF THE DIFFERENT STATE PRISON

8  POPULATIONS HAVE AN EFFECT ON THE --

9  **A**    THERE'S A LOT OF THINGS THAT HAVE THE EFFECT ON THAT.

10 DEMOGRAPHICS CAN HAVE AN EFFECT OF IT.  THE AGE OF THE

11 POPULATION.

12        PROBABLY THE BIGGEST THING IS THE AGE DISTRIBUTION OF

13 THE POPULATION.  YOU KNOW, YOU COULD HAVE THE SAME AVERAGE AGE

14 POPULATION, BUT YOU MIGHT HAVE A BUNCH OF PEOPLE IN THAT OLDER

15 GROUP THAT COULD DRIVE UP YOUR STATISTICS, FOR INSTANCE.  SO YOU

16 HAVE TO REALLY LOOK AND ADJUST IT FOR AGE WHEN YOU'RE LOOKING AT

17 THOSE KIND OF STATISTICS.

18        **JUDGE KARLTON:**  SIR, BECAUSE OF THE LENGTHIER

19 SENTENCES THAT CALIFORNIA APPARENTLY IMPOSES, CONTRASTED WITH

20 OTHER PLACES IN THE COUNTRY, I AM TOLD THAT WE HAVE AN AGING

21 POPULATION.

22        **THE WITNESS:**  MM-HMM.

23        **JUDGE KARLTON:**  NOW, HAVING AN AGING POPULATION, BUT

24 STILL THE 14TH LOWEST, DOESN'T THAT SUGGEST SOMETHING ABOUT

25 MEDICAL CARE AND ITS ADEQUACY?  I'M ASKING YOU, NOT TELLING YOU.

1          **THE WITNESS:**  CERTAINLY IT'S A PIECE OF INFORMATION,

2    BUT IT'S ONLY ONE PIECE OF INFORMATION.  THERE MAY BE OTHER

3    THINGS, LIKE, FOR INSTANCE, IN PENNSYLVANIA OUR RATE IS HIGHER,

4    AND ONE OF THE REASONS OUR RATE IS HIGHER IS BECAUSE IN

5    PENNSYLVANIA LIFE IS LIFE, AND WE HAVE OVER 4,000 LIFERS THAT

6    WILL NEVER GO HOME.  YOU CAN'T BE CONSIDERED AFTER SO MANY YEARS

7    IF YOU HAVE A LIFE SENTENCE IN PENNSYLVANIA.

8          SO WHEN WE LOOK AT OUR AGE DISTRIBUTION, WE FIND A

9    HUGE NUMBER OF PEOPLE IN THAT OVER AGE 55 WHERE YOU TEND TO RUN

10   INTO THESE PROBLEMS.  WHEN WE THEN TAKE OUR AGE DISTRIBUTION AND

11   ADJUST IT FOR AGE, LOOKING AT THE AVERAGES AROUND THE COUNTRY,

12   OUR DEATH RATE FALLS EXACTLY WHERE IT SHOULD FALL BASED ON

13   ADJUSTING IT FOR AGE.

14         SO WITHOUT REALLY EXAMINING IT CLOSER, CERTAINLY IT'S

15   A FACTOR YOU CAN TAKE A LOOK AT, AND, CERTAINLY THE LOWER THAT

16   IS, THE BETTER, BUT I WOULD WANT TO UNDERSTAND IT BETTER, TOO.

17         THE OTHER THING WE RUN INTO SOME DIFFICULTIES WHEN WE

18   TRY TO MAKE COMPARISONS BETWEEN STATES, IS THE WAY THEY COUNT

19   THINGS.  COUNTING RULES CAN BE DIFFERENT.  LIKE, FOR INSTANCE, I

20   KNOW THAT WE INCLUDE DEATHS IN OUR COMMUNITY CORRECTION CENTERS

21   IN OUR TOTAL NUMBERS.  WE INCLUDE INMATE HOMICIDES, THE FEW THAT

22   WE HAVE WITHIN OUR NUMBERS.  OTHER STATES MAY NOT INCLUDE THOSE

23   TWO THINGS, SO THEIR COUNTING RULE MAY BE DIFFERENT THAN OURS.

24   SO ANY TIME YOU TRY TO DRAW COMPARISONS, YOU'VE GOT TO BE VERY,

25   VERY CAREFUL.

1  **BY MR. SPECTER**

2  Q   DR. BEARD, YOU HAVE BEEN A CORRECTIONS PROFESSIONAL FOR 36

3  YEARS.  HAVE YOU EVER TESTIFIED IN A CASE -- IN A PLAINTIFF'S

4  CASE?

5  A   ON WHAT?

6  Q   FOR THE PLAINTIFFS.

7  A   NO.

8  Q   AND YOU'RE HERE AS A NON-RETAINED EXPERT.  THAT MEANS YOU

9  ARE NOT BEING PAID FOR YOUR TESTIMONY, CORRECT?

10 A   THAT'S CORRECT.

11 Q   COULD YOU EXPLAIN TO THE COURT WHY YOU ARE -- YOU TOOK THE

12 TIME OUT FROM RUNNING YOUR SYSTEM TO COME TO CALIFORNIA TO

13 TESTIFY TODAY?

14 A   WELL, IT'S SORT OF -- I GUESS IT'S A COMPLEX ANSWER.  MAYBE

15 IT'S NOT A COMPLEX ANSWER.

16        I HAVE GIVEN 36 YEARS TO -- IN TRYING TO SEE THAT WE

17 RUN A SAFE SYSTEM IN PENNSYLVANIA, SAFE FOR INMATES, SAFE FOR

18 STAFF, AND THAT WE PROVIDE THE PROPER CARE, WHATEVER THAT CARE

19 MAY BE, WHETHER IT'S MEDICAL, MENTAL HEALTH, WHATEVER THE CARE

20 IS, TO THE INMATE POPULATION.

21        AND WHEN I CAME OUT HERE TO CALIFORNIA, I MET MANY

22 VERY GOOD PEOPLE THAT WORKED FOR THE CALIFORNIA DEPARTMENT OF

23 CORRECTIONS, PEOPLE WHO WANT TO DO THE RIGHT THING, PEOPLE WHO

24 WANT TO MOVE AHEAD.  AND I BEGAN LOOKING AT ALL THESE REPORTS

25 OVER THE LAST 20 YEARS, THE LITTLE HOOVER COMMISSION, THE

1  INDEPENDENT REVIEW PANEL REPORTS, AND I SEE THAT CALIFORNIA HAS

2  THIS PROBLEM THAT HAS JUST BEEN GOING ON AND ON AND ON FOR YEARS

3  AND YEARS AND YEARS, AND NOBODY SEEMS TO BE WILLING TO STEP UP

4  TO THE PLATE AND FIX THE PROBLEM.  AND AS A RESULT OF THAT, THEY

5  HAVE HUGELY OVERCROWDING PRISONS.  THEY HAVE -- THEY'RE UNABLE

6  TO PROVIDE PROPER CARE IN SOME CASES, MENTAL HEALTH CARE AND

7  MEDICAL CARE WITHIN THOSE PRISONS.

8          AND, MORE IMPORTANTLY, TO ME, AS A FORMER WARDEN IS

9  THE PRISONS AREN'T SAFE.  THEY AREN'T SAFE FOR THE STAFF AND THE

10  INMATES, AND THEY HAVE TO RELY ON ALL THESE DIFFERENT UNUSUAL

11  KIND OF THINGS TO CONTROL THOSE PRISONS.

12          I GUESS IF THERE'S ANYTHING THAT I CAN DO TO HELP SEE

13  THAT CALIFORNIA MOVES IN A DIRECTION THAT WILL ALLOW THE PEOPLE

14  THAT WORK WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS TO

15  START RUNNING A GOOD, SAFE SYSTEM AND PROVIDING THE PROPER CARE

16  THEY SHOULD BE PROVIDING TO THOSE PEOPLE THAT ARE PUT INTO OUR

17  CHARGE AND TO BE ENABLED TO DO THE PROGRAMS FOR THE INMATES SO

18  WHEN THOSE INMATES ARE RELEASED, THE PUBLIC SAFETY ISN'T

19  ADVERSELY AFFECTED.  I SUPPOSE IF I CAN DO ANYTHING TO HELP IN

20  THAT, THAT'S WHY I'M HERE TODAY.

21  Q    THANK YOU.  COUPLE MORE QUESTIONS.

22          YOU MENTIONED YOU'VE REVIEWED VARIOUS REPORTS FROM

23  DR. SHANSKY, THE SPECIAL MASTER, THE RECEIVER, MS. WOODFORD,

24  MR. SCOTT AND THE LIKE.  DID YOU -- ARE THOSE TYPE OF REPORTS

25  THAT YOU WOULD GENERALLY RECEIVE AS SECRETARY?

1  **A**   YES.  AS SECRETARY OF CORRECTIONS IN A RELATIVELY LARGE

2  STATE, YOU CAN'T BE EVERYWHERE ALL THE TIME, AND SO YOU HAVE TO

3  RELY ON DATA THAT YOU GET FROM THE INSTITUTIONS.  YOU HAVE TO

4  RELY ON REPORTS THAT YOU GET FROM YOUR SUPERINTENDENTS OR, IN MY

5  CASE, I ALSO HAVE MY REGIONAL DEPUTIES THAT GO OUT WITH TEAMS ON

6  A REGULAR BASIS TO REVIEW WHAT'S GOING ON, TO TELL ME WHAT'S

7  GOING ON IN MY PRISONS, AND I VISIT THEM MYSELF AS WELL, BUT I

8  CAN'T BE THERE ALL THE TIME.

9          SO I RELY LARGELY ON THOSE REPORTS, AND WHAT I READ

10 IN THESE EXPERT REPORTS THAT YOU MENTION, THAT'S THE KIND OF

11 INFORMATION THAT, IF I GOT THOSE KINDS OF THINGS, I WOULD BE

12 VERY, VERY CONCERNED ABOUT.

13         I KNOW WAYNE SCOTT.  I KNOW JEANNE WOODFORD.  THESE

14 PEOPLE ARE CONSUMMATE PROFESSIONALS.  THEY HAVE BEEN IN THE

15 BUSINESS FOR OVER 30 YEARS.  THE KINDS OF STUFF THEY WRITE IN

16 THEIR REPORTS ARE THE VERY KINDS OF THINGS I COULD SEE ME

17 WRITING IF I WAS WALKING THROUGH THE SAME INSTITUTIONS AND

18 SEEING THE SAME THINGS.

19 **Q**   IF THOSE REPORTS REFERRED -- INSTEAD OF REFERRING TO THE

20 DEPARTMENT OF CORRECTIONS IN CALIFORNIA, THEY REFERRED TO THE

21 PENNSYLVANIA DEPARTMENT OF CORRECTIONS, WHAT WOULD BE YOUR

22 REACTION?

23 **A**   MY REACTION WOULD BE THAT I WOULD NOT BE SITTING HERE TODAY;

24 I WOULD BE BACK IN PENNSYLVANIA FIXING WHATEVER PROBLEMS I

25 NEEDED TO FIX.

1      **MR. SPECTER:**  THANK YOU VERY MUCH FOR YOUR TESTIMONY.

2      **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

3      CROSS-EXAMINATION.

4      **JUDGE KARLTON:**  IS CCPOA GOING TO QUESTION?

5      **MS. LEONARD:**  NO FURTHER QUESTIONS, YOUR HONOR.

6  THANK YOU.

7                  **CROSS-EXAMINATION BY MR. MELLO**

8      **MR. MELLO:**  AGAIN, PAUL MELLO FOR DEFENDANTS.

9  *BY MR. MELLO*

10 **Q**   GOOD MORNING AGAIN, SECRETARY BEARD.

11 **A**   GOOD MORNING.

12 **Q**   YOU TESTIFIED THAT YOU HAVE A PH.D. IN COUNSELING.  YOU HAVE

13 NO MEDICAL DEGREES, CORRECT?

14 **A**   THAT'S CORRECT.

15 **Q**   WHEN WAS THE LAST TIME YOU PROVIDED MENTAL HEALTH TREATMENT

16 AS A CLINICIAN, WHAT YEAR?

17 **A**   PROBABLY 1974.

18 **Q**   WHEN I TOOK YOUR DEPOSITION BACK IN PENNSYLVANIA, SEEMS LIKE

19 YESTERDAY, BUT --

20 **A**   YES.

21 **Q**   EARLIER, AT THE TIME I TOOK YOUR DEPOSITION, YOU DID NOT

22 KNOW THE PHYSICIAN-TO-INMATE RATIO FOR THE PENNSYLVANIA PRISON

23 SYSTEM, CORRECT?

24 **A**   YES.

25 **Q**   THAT'S CORRECT, RIGHT?

1   A   I DIDN'T KNOW IT AT THAT TIME, NO.

2   Q   DO YOU KNOW IT NOW?

3   A   THE PHYSICIAN-TO-INMATE RATIO?

4   Q   YES.

5   A   OUR PRIMARY CARE PHYSICIANS AND PA'S IS ABOUT 3.14 PER

6   THOUSAND.

7   Q   DO YOU KNOW WHAT THE RATE IS FOR MENTAL HEALTH CLINICIANS?

8   A   FOR PSYCHIATRISTS, 1.45 PER THOUSAND.

9   Q   PSYCHIATRISTS?

10  A   PARDON?

11  Q   YOU SAID FOR PSYCHOLOGISTS?

12  A   PSYCHIATRISTS.

13  Q   I'M SORRY.

14  A   WE HAVE FAR MORE PSYCHOLOGISTS, AND I DON'T HAVE THE RATIO

15  OF THE PSYCHOLOGISTS, BUT MOST OF OUR INSTITUTIONS HAVE SIX,

16  SEVEN.  DEPENDS ON THE SIZE OR MORE PSYCHOLOGISTS.

17  PSYCHIATRISTS IS 1.45 PER THOUSAND.

18  Q   YOU'VE NEVER EVALUATED THE DELIVERY OF MEDICAL AND MENTAL

19  HEALTH CARE IN CALIFORNIA'S PRISONS, CORRECT?

20  A   I HAVE NOT PERSONALLY VISITED ANY OF THE PRISONS TO EVALUATE

21  THAT CARE.  I'VE ONLY REVIEWED THE REPORTS THAT WE MENTIONED

22  EARLIER.

23  Q   INCLUDING TRIAL AFFIDAVITS OF PLAINTIFF'S EXPERTS IN THIS

24  CASE, CORRECT?

25  A   PARDON?

1  Q    INCLUDING THE TRIAL AFFIDAVITS OF PLAINTIFFS' EXPERTS IN

2  THIS CASE, CORRECT?  WHEN YOU SAY "THE REPORTS OF THE EXPERTS,"

3  YOU ARE REFERRING TO PLAINTIFFS' EXPERTS, CORRECT?

4  A    YES.  I HAVE -- YOU MEAN I DIDN'T REVIEW THE DEFENDANTS'

5  EXPERTS?

6  Q    I'M JUST ASKING IF YOU REVIEWED PLAINTIFFS' EXPERT REPORTS,

7  CORRECT?

8  A    AND DEFENDANTS' EXPERTS REPORTS.

9  Q    AND DURING YOUR TESTIMONY, YOU INDICATED THOSE WERE THE

10  TYPES OF THINGS YOU WOULD REVIEW IF YOU WERE -- THOSE ARE THE

11  TYPES OF ITEMS THAT YOU REVIEW IN YOUR POSITION IN PENNSYLVANIA,

12  CORRECT?

13  A    THAT'S ONE OF THE KINDS OF THINGS THAT I WOULD BE REVIEWING.

14  INPUTS FROM MY DOCTOR, WE HAVE DOCTORS THAT WORK FOR ME THAT

15  OVERSEE THE HEALTHCARE.  I HAVE A PSYCHIATRIST THAT WORKS FOR

16  ME.  THEY PROVIDE ME REPORTS.  SO THEY MAY NOT BE EXACTLY LIKE

17  THESE REPORTS, BUT THEY'RE SIMILAR.  THEY WOULD PROVIDE ME A

18  REPORT IF WE HAVE A DEATH SOMEWHERE, WHETHER THAT DEATH WAS AN

19  APPROPRIATE DEATH OR NOT, THAT KIND OF THING.

20  Q    YOU REVIEW EXPERTS' REPORTS, CORRECT?

21  A    YES.

22  Q    DO YOU REGULARLY REVIEW LITIGATION REPORTS FROM EXPERTS IN A

23  CASE?

24  A    NO.

25  Q    AND IT'S TRUE THAT YOU'VE NEVER EVALUATED WHETHER

1  DEFICIENCIES EXIST IN THE MEDICAL AND MENTAL HEALTH CARE

2  DELIVERY SYSTEMS IN CALIFORNIA AS WELL, RIGHT?

3  **A**   YOU HAVE TO REPHRASE WHAT YOU'RE ASKING THERE.

4  **Q**   SURE.  YOU HAVE NEVER EVALUATED WHAT, IF ANY, DEFICIENCIES

5  EXIST IN THE MEDICAL AND MENTAL HEALTH CARE SYSTEMS IN

6  CALIFORNIA PRISONS --

7  **A**   NO, I HAVE NOT PERSONALLY GONE TO THE PRISONS AND DONE THAT.

8  I'VE ONLY REVIEWED THE REPORTS WE TALKED ABOUT.

9  **Q**   AND IN THE LAST TWO YEARS YOU'VE VISITED ONE PRISON,

10 CORRECT?

11 **A**   THAT'S CORRECT.

12 **Q**   WHICH PRISONS WAS THAT?

13 **A**   THAT WAS OLD FOLSOM.

14 **Q**   WHEN WAS THAT?

15 **A**   A LITTLE OVER A YEAR AGO.

16 **Q**   DURING YOUR TESTIMONY, YOUR DIRECT TESTIMONY WITH

17 MR. SPECTER, YOU MENTIONED THE PROBLEMS THAT COULD POSSIBLY

18 EXIST AT RECEPTION CENTERS; DO YOU REMEMBER THAT TESTIMONY?

19 **A**   YES.

20 **Q**   AND YOU DISCUSS THE FACT THAT IF RECEPTION CENTERS ARE

21 OVERCROWDED, THAT SCREENINGS MIGHT BE MISSED, CORRECT?

22 **A**   YES.

23 **Q**   ARE YOU AWARE OF ANY INMATE IN A CALIFORNIA PRISON WHO

24 SUFFERED AN ADVERSE MEDICAL OR MENTAL HEALTH CONSEQUENCE AS A

25 RESULT OF A MISSED SCREENING?

1  **A**   NO.

2  **Q**   WHEN YOU WERE DEPOSED BY ME IN THIS CASE, YOU COULD NOT

3  REMEMBER WHY YOU HAD TOURED FOLSOM PRISON, BUT IT WAS NOT IN

4  CONNECTION WITH EVALUATING THE STATUS OF THE DELIVERY OF MEDICAL

5  OR MENTAL HEALTH CARE, CORRECT?

6  **A**   I DID NOT TOUR THAT PRISON TO REVIEW THE MENTAL HEALTH OR

7  MEDICAL CARE.  THAT'S CORRECT.  IT WAS DONE, I BELIEVE, MORE FOR

8  THE EXPERT PANEL LOOKING AT PROGRAMS AND STUFF.

9  **Q**   AS A HIGH RANKING PRISON ADMINISTRATOR, YOU DO NOT SUPPORT

10  THE USE OF ANECDOTAL EVIDENCE TO EVALUATE A PRISON OR PRISON

11  SYSTEM, DO YOU?

12  **A**   I CERTAINLY DO NOT SUPPORT ANECDOTAL EVIDENCE, NO.

13  **Q**   YOU AGREE THAT A SINGLE EVENT AT AN INSTITUTION DOES NOT

14  NECESSARILY APPLY ACROSS THE ENTIRE SYSTEM, CORRECT?

15  **A**   I WOULD AGREE IF IT'S ONLY A SINGLE EVENT, THAT THAT SHOULD

16  NOT APPLY ACROSS THE SYSTEM.

17  **Q**   AND YOU TESTIFIED, I BELIEVE, THAT YOU SERVED ON THE EXPERT

18  PANEL, RIGHT?

19  **A**   YES.

20  **Q**   OKAY.  AND THAT EXPERT PANEL LOOKED AT THE EFFECTS OF

21  OVERCROWDING ON PROGRAMMING, NOT MEDICAL AND MENTAL HEALTH CARE,

22  CORRECT?

23  **A**   YES.

24  **Q**   YOU USE THE TERM "OPERABLE" --

25  **A**   EXCUSE ME.

1    Q    SURE.

2    A    I BELIEVE, AS I THINK BACK ON IT, WHEN WE WERE TALKING ABOUT

3    PROGRAMMING, WE DID GET INTO SOME OF THE MENTAL HEALTH CARE

4    ISSUES AND THE LACK OF BEDS AT CERTAIN ACUITY LEVELS FOR

5    MENTALLY ILL INMATES.  I BELIEVE THERE WAS SOME DISCUSSION OF

6    THAT DURING THE REPORT.

7    Q    CAN YOU RECALL ANY OF THOSE DISCUSSIONS AS YOU SIT HERE

8    TODAY?

9    A    PARDON?

10    Q    CAN YOU RECALL ANY OF THOSE DISCUSSIONS --

11    A    JUST THE FACT THAT THE ACU- -- THERE WERE INMATES WHO HAD

12    HIGHER ACUITY LEVELS OF MENTAL ILLNESS, AND THERE WASN'T

13    APPROPRIATE BEDS TO PROVIDE CARE FOR THOSE INMATES.

14    Q    RIGHT.  OKAY.  THANK YOU.

15           WE HEARD THE TERM "DESIGN BED CAPACITY" AND "OPERABLE

16    CAPACITY" DURING YOUR DIRECT TESTIMONY, CORRECT?

17    A    YES.

18    Q    AND YOU TOLD US THAT OPERABLE CAPACITY, YOU HAD A DEFINITION

19    FOR THAT, CORRECT?

20    A    YES.

21    Q    DO YOU KNOW THAT CALIFORNIA -- OR AT LEAST PLAINTIFFS'

22    COUNSEL USED THE WORD "DESIGN CAPACITY" WITH RESPECT TO

23    CALIFORNIA'S PRISONS; DO YOU KNOW WHAT HE MEANT?

24    A    TO THE BEST OF MY UNDERSTANDING, IT WAS WHAT THAT PRISON WAS

25    DESIGNED TO HOLD ORIGINALLY.

1    Q    AND ARE YOU AWARE THAT CALIFORNIA'S PRISONS' INFRASTRUCTURE

2    WERE DESIGNED TO ACCOMMODATE A POPULATION OF 190 PERCENT OR SO

3    OF DESIGN BED CAPACITY?

4    A    THAT'S NOT WHAT I'VE READ IN MANY OF THE EXPERT REPORTS THAT

5    I'VE READ.

6    Q    WHICH ONES?

7              **JUDGE KARLTON:**  ASSUMES SOMETHING NOT IN EVIDENCE,

8    COUNSEL.  I KNOW THE PLAINTIFFS WANTED TO MAKE THAT OBJECTION.

9              **MR. SPECTER:**  YES, THANK YOU, YOUR HONOR.  I'M HAVING

10   A LITTLE TROUBLE HEARING YOU, PAUL.  I DIDN'T KNOW THE NUMBER.

11             **MR. MELLO:**  IT'S INTENTIONAL.

12             I SAID 190.  AND IT'S CROSS-EXAMINATION.  I BELIEVE I

13   CAN ASK --

14             **JUDGE KARLTON:**  A QUESTION THAT HAS NO EVIDENTIARY

15   BASIS, AND TELL HIM THAT'S THE FACT?  AS GENEROUS AS I AM --

16             **MR. MELLO:**  OKAY.

17   *BY MR. MELLO*

18   Q    HAVE YOU EVER HEARD THAT INFORMATION?

19   A    PARDON?

20   Q    WITHOUT ANY REPRESENTATION OF WHETHER OR NOT IT'S TRUE, HAVE

21   YOU EVER HEARD THAT CALIFORNIA'S PRISONS' INFRASTRUCTURE WAS

22   DESIGNED TO ACCOMMODATE A POPULATION OF 190 DESIGN BED CAPACITY?

23   A    NO.  IN FACT, THAT'S NOT WHAT I READ IN A LOT OF THE EXPERT

24   REPORTS.

25   Q    AND YOU NEVER DETERMINED THAT THE OPERABLE CAPACITY OF

1  CALIFORNIA'S PRISON SYSTEM, HAVE YOU?

2  **A**   NO.  AS I TESTIFIED IN A DEPOSITION, IN ORDER TO DO THAT, I

3  WOULD HAVE TO GO OUT AND VISIT EVERY FACILITY.  CERTAINLY

4  SOMETHING I'M CAPABLE OF DOING, BUT I WOULD PROBABLY HAVE TO

5  RETIRE FROM MY CURRENT JOB TO HAVE THE TIME TO DO THAT.

6  **Q**   RIGHT.  SO YOU HAVE NO IDEA WHAT CALIFORNIA'S OPERABLE

7  CAPACITY IS?

8  **A**   I HAVE NO IDEA WHAT THE OPERABLE CAPACITY IS, BUT AS I SAID

9  IN THE DEPOSITION, I DID REVIEW THE INDEPENDENT REVIEW PANEL'S

10 REPORT OF 2004 WHERE A GROUP OF EXPERIENCED WARDENS SAID THAT

11 ABOUT 145 PERCENT WOULD BE THE MAXIMUM THAT THE SYSTEM SHOULD GO

12 FOR.  AND HAVING MET MANY OF THE STAFF OUT HERE I WOULD THINK

13 THAT A GROUP OF EXPERIENCED WARDENS IN CALIFORNIA WOULD HAVE A

14 PRETTY GOOD HANDLE ON WHAT THE SYSTEM COULD HANDLE.

15        I ALSO SAW THAT THE STRIKE TEAM HAD RECOMMENDED A

16 CAPACITY OF 130 PERCENT.  SO THAT WOULD LEAD ME TO CONCLUDE, IF

17 I WENT OUT AND WENT THROUGH ALL OF THE FACILITIES, I WOULD COME

18 OUT SOMEWHERE IN THAT 130 TO 145 PERCENT OF CAPACITY AS AN

19 OPERABLE CAPACITY FOR THE SYSTEM.

20 **Q**   BUT YOU HAVE NO IDEA UNLESS YOU ACTUALLY DID IT YOURSELF?

21 **A**   THAT'S CORRECT, UNLESS I DID IT MYSELF.

22        **JUDGE KARLTON:**  WELL, HE SAID YOU HAVE NO IDEA.

23        **THE WITNESS:**  THAT'S TRUE.  I'M SORRY, YOUR HONOR.  I

24 DO HAVE SOME IDEA BASED ON WHAT MY COMMENTS THAT I JUST MADE TO

25 YOU.

1  **BY MR. MELLO**

2  **Q**    YOU BELIEVE THAT CONSTITUTIONALLY ADEQUATE MEDICAL AND

3  MENTAL HEALTH CARE CAN BE PROVIDED IN OVERCROWDED CONDITIONS,

4  CORRECT?

5  **A**    I BELIEVE THAT IT CAN BE PROVIDED UP TO CERTAIN LIMITATIONS

6  OF OVERCROWDING, YES.

7  **Q**    AND YOU BELIEVE THAT INCREASED NUMBERS OF QUALIFIED AND

8  COMPETENT NURSES, PHYSICIAN'S ASSISTANTS, DOCTORS,

9  PSYCHOLOGISTS, PSYCHIATRISTS WOULD IMPROVE THE QUALITY OF

10  MEDICAL AND MENTAL HEALTH CARE IN CALIFORNIA'S PRISONS, CORRECT?

11  **A**    IT MAY.  IT DEPENDS WHETHER YOU HAVE ALL OF THE OTHER

12  INFRASTRUCTURE TO SUPPORT THE STAFF.

13  **Q**    AND THAT INFRASTRUCTURE WOULD INCLUDE CORRECTIONAL OFFICERS?

14  **A**    WELL, THE INFRASTRUCTURE WOULD INCLUDE CORRECTIONAL

15  OFFICERS, BUT IT WOULD ALSO INCLUDE SPACE TO DO EXAMS, PLACES

16  WHERE THERE'S PRIVACY SO IT CAN BE DONE PRIVATELY, YOU KNOW,

17  PLACES THAT ARE, YOU KNOW, SANITARY AND CLEAN.  AND ALSO THE

18  ABILITY TO PROVIDE THE PROPER LEVEL OF CARE ONCE YOU DETERMINE

19  WHAT THAT IS.

20          AND, AGAIN, THAT REQUIRES A SPACE.  THAT REQUIRES

21  SOMEPLACE TO PUT PEOPLE.  AND AT LEAST FROM WHAT I'VE SEEN IN

22  THE REPORTS, THAT SEEMS TO BE A HUGE PROBLEM OUT HERE.

23          AND THEN ALSO, AS I'VE MENTIONED, YOU CAN'T BE HAVING

24  ALL THESE LOCKDOWNS ALL THE TIME, BECAUSE THEN THAT IS GOING TO

25  INTERFERE WITH THE ABILITY TO PROVIDE THE CARE AS WELL, AND THAT

1  GETS BACK TO THE SAFETY OF THE SYSTEM.

2  **Q**   AND I BELIEVE --

3           **JUDGE HENDERSON:**  EXCUSE ME, MR. MELLO.  I FIND THE

4  QUESTION A BIT VAGUE.  INCREASED MEDICAL, NURSING, DOCTORS,

5  INCREASED FROM WHAT?  FROM WHEN THE SUIT WAS FILED?  FROM WHERE

6  WE ARE RIGHT NOW?  WHAT DO WE INCREASE ALL OF THAT FROM TO MAKE

7  IT BETTER?

8  *BY MR. MELLO*

9  **Q**   SECRETARY BEARD, DO YOU HAVE ANY UNDERSTANDING OF THE

10  INCREASED NUMBER OF CORRECTIONAL OFFICERS SINCE THE APPOINTMENT

11  OF A RECEIVER IN PLATA IN OCTOBER 2005 THROUGH THE END OF

12  AUGUST 2008; DO YOU KNOW WHAT THAT NUMBER IS?

13  **A**   I DON'T KNOW WHAT THE INCREASE IS, BUT I KNOW THAT THEY DO

14  HAVE MORE CORRECTIONS OFFICERS TODAY, AND SO THAT IS ONE PROBLEM

15  AREA THAT SHOULD BE OF SOMEWHAT LESS CONCERN.

16  **Q**   OKAY.  IF THE NUMBER INCREASED BY 2,200, DO YOU BELIEVE THAT

17  WOULD HELP IMPROVE ACCESS TO MEDICAL AND MENTAL HEALTH CARE?

18  **A**   WELL, AS YOU SAID, I HAVEN'T GONE OUT AND PERSONALLY LOOKED

19  AT IT, SO I WOULDN'T WANT TO MAKE THAT KIND OF -- I WOULDN'T

20  WANT TO ANSWER THAT QUESTION.

21  **Q**   UNDERSTOOD.

22           SO YOU COULDN'T, BASED UPON YOUR EXPERIENCE AND THE

23  REPORTS YOU'VE REVIEWED, EVALUATE WHETHER CARE WOULD IMPROVE IF

24  THE NUMBER OF CORRECTIONAL OFFICERS INCREASED BY 2,200

25  CORRECTIONAL OFFICERS SINCE OCTOBER OF 2005, CORRECT?

1  **A**  AS I SAID, THAT WAS ONLY ONE OF THE THINGS I READ ABOUT IN

2  THE REPORTS.

3          **JUDGE KARLTON:**  DR. BEARD, WHATEVER THE LEVEL OF

4  IMPROVEMENT, FROM YOUR OWN EXPERIENCE, PROVIDING GREATER NUMBERS

5  OF CORRECTIONAL OFFICERS, PARTICULARLY IF YOU HAVE BEEN SHORT

6  THEM, HAS GOT TO HAVE SOME IMPROVEMENT.  THE QUESTION IS WHETHER

7  IT MAKES ANY LONG TERM DIFFERENCE, WHICH IS A DIFFERENT QUESTION

8  MR. MELLO IS ASKING YOU ABOUT.  BUT EVEN ONE MORE IS SOME

9  INCREMENTAL BENEFIT, WOULD YOU NOT AGREE?

10         **THE WITNESS:**  I WOULD AGREE WITH THAT, YOUR HONOR.

11  **BY MR. MELLO**

12  **Q**  AND YOU WOULD AGREE THAT THE HIRING OF 1,400 PHYSICIANS AND

13  NURSES SINCE JULY OF 2007 WOULD HAVE SOME INCREMENTAL VALUE TO

14  THE DELIVERY OF MEDICAL AND MENTAL HEALTH CARE, CORRECT?

15  **A**  YES.

16  **Q**  AND YOU TESTIFIED THAT YOU BELIEVE PENNSYLVANIA IS CURRENTLY

17  PROVIDING CONSTITUTIONALLY ADEQUATE MEDICAL AND MENTAL HEALTH

18  CARE TO ITS INMATE PATIENTS, CORRECT?

19  **A**  YES.

20  **Q**  DO YOU KNOW THE AVERAGE AGE OF THE OFFENDERS IN

21  PENNSYLVANIA'S DEPARTMENT OF CORRECTIONS IS 37?

22  **A**  YES.

23  **Q**  MR. SPECTER ASKED YOU ABOUT IT.  IT SOUNDS TO ME LIKE MAYBE

24  SINCE YOUR DEPOSITION, YOU REVIEWED THE DEPARTMENT OF JUSTICE

25  REPORT?

1   **A**   YES.

2   **Q**   RELATING TO DEATHS?

3   **A**   I DID.  AND IF I MIGHT SAY, UPON DOING THAT, I HAD FORGOTTEN

4   THAT WE HAD ACTUALLY REVIEWED THAT REPORT AT THE TIME IT CAME

5   OUT, AND THERE HAD BEEN A REPORT BY MY DOCTOR ON IT.

6   **Q**   AND IT'S YOUR TESTIMONY THAT A PRISON SYSTEM'S DEATH RATE IS

7   A FACTOR THAT YOU WOULD LOOK TO SEE IF THERE MIGHT BE A PROBLEM

8   IN THE DELIVERY OF MEDICAL AND MENTAL HEALTH CARE, CORRECT?

9   **A**   CERTAINLY, YES.

10  **Q**   AND ARE YOU AWARE THAT THAT STUDY -- AND I BELIEVE IT'S

11  DEFENDANT'S EXHIBITS 1011 -- FROM THE PERIOD OF 2001 TO 2004

12  RANKED CALIFORNIA'S PRISONS AMONG THE TOP 15 -- I BELIEVE

13  MR. SPECTER SAID 14, SO I COUNTED WRONG -- IN TERMS OF DEATH

14  RATES; IS THAT CORRECT?

15  **A**   I BELIEVE SO, YES.

16  **Q**   AND ARE YOU AWARE, ACCORDING TO THE SAME REPORT, THAT

17  PENNSYLVANIA WAS IN THE BOTTOM FIVE?

18  **A**   YES.

19  **Q**   OKAY.  AND YOU WERE IN COMPANY WITH LOUISIANA, TENNESSEE,

20  WEST VIRGINIA, AND KENTUCKY?

21  **A**   YES.

22  **Q**   ARE YOU AWARE THAT, ACCORDING TO OFFICIAL PRISON CENSUS DATA

23  PUBLISHED BY CDCR, THAT THE AVERAGE AGE OF CALIFORNIA INMATES,

24  LIKE PENNSYLVANIA'S, IS 37 YEARS OLD?

25  **A**   I AM.  BUT, AS I SAID, YOU HAVE TO ADJUST IT FOR THE

1  DISTRIBUTION OF THE AGE WITHIN YOUR POPULATION.

2  **Q**   OKAY.  I BELIEVE THAT -- DOES PENNSYLVANIA PUBLISH SOMETHING

3  CALLED "POPULATION HIGHLIGHTS, THE ANNUAL STATISTICS REPORT,

4  2006, OF THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS"?

5  **A**   I BELIEVE WE DO.  WE HAVE A LOT OF STUFF UP ON OUR WEBSITE,

6  YES.

7  **Q**   OKAY.  I'M GOING TO PULL IT UP.

8                    (DOCUMENT DISPLAYED.)

9  *BY MR. MELLO*

10 **Q**   HAVE YOU SEEN THAT DOCUMENT?

11 **A**   YES.

12 **Q**   OKAY.  CAN WE GO TO THE NEXT PAGE?  THAT'S YOU.  AND YOU

13 SIGNED IT?

14 **A**   YES.

15 **Q**   OKAY.  LET'S GO TO THE NEXT PAGE THAT'S HIGHLIGHTED, AND

16 IT'S PAGE -- RIGHT THERE.

17          IT SAYS THE AVERAGE AGE OF DO -- OF A DOC OFFENDER IN

18 2006 WAS 37, AND APPROXIMATELY HALF OF THE OFFENDERS WERE WITHIN

19 THE AGES OF 25 TO 39 YEARS; DO YOU SEE THAT?

20 **A**   YES.

21 **Q**   IS THAT A TRUE STATEMENT, TO YOUR KNOWLEDGE?

22 **A**   I'M ASSUMING IT IS.  I DIDN'T CHECK THE STATISTICS.  I DON'T

23 PUT THIS DOCUMENT TOGETHER.

24 **Q**   THIS IS A PUBLIC DOCUMENT PUT FORTH IN THE REGULAR BUSINESS

25 PRACTICE OF YOUR DEPARTMENT, CORRECT?

1   A    YES.

2   Q    AND ACCORDING TO -- ITS MY UNDERSTANDING --

3        **JUDGE KARLTON:**  WE DON'T CARE WHAT YOUR UNDERSTANDING

4   IS, SIR.

5        **MR. MELLO:**  SURE, SURE.

6        CAN WE GO TO DEFENDANT'S EXHIBIT 1255, TABLE 6?  MAY

7   I HAVE A TWO-MINUTE BREAK TO TRY TO FIX THIS, PLEASE?

8        **JUDGE HENDERSON:**  YOU MAY.

9             (PAUSE IN PROCEEDINGS.)

10       **MR. MELLO:**  OKAY.  I'M SORRY.

11       **JUDGE HENDERSON:**  OKAY.  YOU MAY PROCEED.

12  *BY MR. MELLO*

13  Q    AGAIN, I BELIEVE YOU TESTIFIED THAT THE DOCUMENT PUT

14  TOGETHER BY YOUR DEPARTMENT INDICATES THAT APPROXIMATELY HALF OF

15  THE OFFENDERS IN YOUR DEPARTMENT ARE AGES 25 TO 39 AND THAT THE

16  AVERAGE AGE WAS 37 YEARS; DO YOU SEE THAT?  THAT'S CORRECT?

17  A    YES.

18  Q    ACCORDING TO THIS DOCUMENT IF YOU ADD UP THE NUMBERS I

19  BELIEVE IT INDICATES THAT -- AND THIS IS AN OFFICIAL CALIFORNIA

20  PUBLICATION PUT TOGETHER BY CDCR.  IT'S AN OFFICIAL BUSINESS

21  RECORD.

22       **JUDGE KARLTON:**  WAIT A MINUTE.  I'M LOST.  I THOUGHT

23  THIS WAS ABOUT PENNSYLVANIA.

24       **MR. MELLO:**  NO, THIS IS ABOUT CALIFORNIA NOW, TO MAKE

25  THE COMPARISON.

1          **MR. BIEN:**  WHAT EXHIBIT NUMBER IS THIS?

2          **JUDGE KARLTON:**  I WAS ABOUT TO ASK.

3          **MR. MELLO:**  1255.

4          **JUDGE HENDERSON:**  TABLE 6.

5          **MR. SPECTER:**  OBJECT ON RELEVANCE GROUNDS, BECAUSE

6   THE TITLE OF THE DOCUMENT IS -- RELATES TO PAROLEES.  SO I DON'T

7   KNOW WHAT THE RELEVANCE --

8          **MR. MELLO:**  THEY DIDN'T OBJECT, BUT I'LL WITHDRAW THE

9   QUESTION.

10          **JUDGE KARLTON:**  THEY'RE OBJECTING NOW THAT HE SAW IT.

11          **MR. MELLO:**  SORRY ABOUT THE DELAY FOR THAT BUILDUP TO

12   NOTHING.

13   ***BY MR. MELLO***

14   **Q**   JUST IN CLOSING, DR. BEARD, ARE YOU AWARE OF ANY INMATE IN A

15   CALIFORNIA PRISON IN THE LAST THREE YEARS WHO SUFFERED AN

16   ADVERSE MEDICAL OR MENTAL HEALTH CONSEQUENCE AS A RESULT OF THE

17   ALLEGED OVERCROWDING?

18   **A**   NO.

19          **MR. MELLO:**  THANK YOU.

20          **JUDGE HENDERSON:**  DEFENDER INTERVENOR.

21          **MR. MITCHELL:**  GOOD MORNING.  BILL MITCHELL FOR THE

22   DA INTERVENORS.  BRIEF CROSS-EXAMINATION.

23          **JUDGE HENDERSON:**  PROCEED.

24          <u>**CROSS-EXAMINATION BY MR. MITCHELL**</u>

25

1  **BY MR. MITCHELL**

2  **Q**   GOOD MORNING, DR. BEARD.

3  **A**   GOOD MORNING.

4  **Q**   GOOD MORNING, SIR.

5          SIR, YOU'VE INDICATED YOU REVIEWED A NUMBER OF

6  REPORTS, THOSE OF MR. SCOTT, THE WOODFORD REPORT, THE STEWART

7  REPORT, THE SHANSKY REPORT.  DID YOU REVIEW ANY OF THE

8  DEFENDANTS' EXPERTS' REPORTS?

9  **A**   YES.

10 **Q**   WAS THAT AFTER YOUR DEPOSITION THAT YOU REVIEWED THOSE?

11 **A**   YES.

12 **Q**   ARE YOU PRETTY COMFORTABLE THAT YOU'VE REVIEWED ALL THE

13 REPORTS THAT ARE FILED IN THIS CASE?

14 **A**   I DON'T KNOW THAT I REVIEWED EVERY REPORT.  I REVIEWED A

15 NUMBER OF REPORTS FROM THE RECEIVER, A NUMBER OF REPORTS FROM

16 THE MASTER, DR. SHANSKY'S, DR. STEWART'S, NOT ONLY THEIR

17 ORIGINAL, BUT THEIR FOLLOW-UP REPORTS.  JEANNE WOODFORD, HER

18 ORIGINAL AND FOLLOW UP.  WAYNE SCOTT, AND THEN DR. THOMAS, AND

19 DR. PACKER FROM THE DEFENDANTS.

20 **Q**   AND YOU'VE ALSO REVIEWED THE RECEIVER'S REPORTS?

21 **A**   I REVIEWED SOME.  I CAN'T SAY I READ EVERY SINGLE WORD, BUT

22 I REVIEWED SOME OF THE RECEIVER'S REPORTS.  I BELIEVE THE REPORT

23 ON OVERCROWDING, THEIR EIGHTH AND NINTH REPORT, AND THEIR

24 TURNAROUND PLAN.

25 **Q**   SINCE THE TIME OF THE DEPOSITION, YOU DID REVIEW THE NINTH

1  REPORT?

2  **A**   YES.

3  **Q**   YOU ALSO REVIEWED THE DEUKMEJIAN REPORT, THE LITTLE HOOVER

4  COMMISSION REPORT, THE GOVERNOR'S EMERGENCY PROCLAMATION?

5  **A**   I DID.

6  **Q**   YOU WERE PART OF THE EXPERT PANEL IN 2006?

7  **A**   I WAS.

8  **Q**   AND WHO CREATED THE EXPERT PANEL?

9  **A**   CALIFORNIA DEPARTMENT OF CORRECTIONS, AS FAR AS I

10 UNDERSTAND.

11 **Q**   AS I UNDERSTAND IT, YOU WORKED CLOSELY WITH A LOT OF MEMBERS

12 OF THAT CURRENT -- OR NOT THE CURRENT ONE, BUT THE CALIFORNIA

13 DEPARTMENT OF CORRECTIONS STAFF AT THAT TIME, CORRECT?

14 **A**   I DID.

15 **Q**   DO YOU STAY IN COMMUNICATION NOW WITH THE CALIFORNIA

16 DEPARTMENT OF CORRECTIONS STAFF?

17 **A**   I'VE TALKED TO THE CURRENT SECRETARY.

18 **Q**   FROM YOUR EXPERIENCE IN WORKING WITH THE INDIVIDUALS HERE IN

19 CALIFORNIA THAT ARE RESPONSIBLE FOR THE MANAGEMENT OF OUR

20 PRISONS AND THE DELIVERY OF THE HEALTHCARE IN THE PRISONS, I

21 THINK YOU TOLD US IN YOUR TESTIMONY EARLIER THAT GOOD PEOPLE

22 WANT TO MOVE AHEAD TRYING TO FIX THE PROBLEMS; IS THAT CORRECT?

23 **A**   THAT'S CORRECT.  THAT'S MY ASSESSMENT OF THE PEOPLE THAT I

24 TALKED TO, YES.

25 **Q**   THEY STUDY THE PROBLEM.  THEY'RE DOING WHAT THEY CAN TO FIX

1   THE PROBLEM.  AND YOU'VE ACTUALLY SEEN OVER THE -- AT LEAST THE

2   LAST 18 MONTHS TO TWO YEARS STEADY IMPROVEMENTS IN THE SYSTEM,

3   CORRECT?

4   **A**   FROM READING THE REPORTS, THERE DOES SEEM TO BE SOME

5   IMPROVEMENTS OVER THE LAST MONTHS, YES.

6   **Q**   IN PENNSYLVANIA THE DEPARTMENT OF CORRECTIONS IS RESPONSIBLE

7   NOT ONLY FOR THE CONDITIONS IN THE 27 PRISONS, BUT ALSO FOR THE

8   COUNTY JAIL SYSTEM, CORRECT?

9   **A**   NO, THAT'S NOT CORRECT.  WE -- IF YOU WOULD LIKE ME TO

10  EXPLAIN?  UNDER THE LAW THERE'S A THING CALLED TITLE 37, AND

11  THERE IS -- WE GO IN AND INSPECT THOSE PRISONS, BUT WE ARE NOT

12  RESPONSIBLE FOR THE OPERATION OF THE -- I MEAN, THE COUNTY

13  JAILS.  WE INSPECT THEM, BUT WE'RE NOT RESPONSIBLE FOR THEIR

14  OPERATION.

15  **Q**   BUT THE DEPARTMENT OF CORRECTIONS IS RESPONSIBLE TO ENSURE

16  THAT THE JAILS MEET MINIMUM STANDARDS, CORRECT?

17  **A**   WE DO DO REPORTS TO SEE THAT THEY MEET CERTAIN STANDARDS,

18  YES.

19  **Q**   AND YOU FOUND THAT IN MAINTAINING OR IN EVALUATING THE

20  CONDITIONS OF THE JAILS, THAT SOME DO A VERY GOOD JOB AND SOME

21  DO A VERY POOR JOB, CORRECT?

22  **A**   THAT'S CORRECT.

23  **Q**   OF THE INSTITUTIONS OR THE JAILS THAT YOU FOUND DID A POOR

24  JOB, YOU SAID THAT -- OR DO YOU RECALL SAYING THAT THE POOR JOB

25  OR THE BAD CONDITIONS USUALLY STEM FROM THINGS SUCH AS

1  OVERCROWDING, LACK OF MAINTENANCE, UNDERSTAFFING, THINGS OF THAT

2  SORT, LACK OF RESOURCES?

3  **A**    I'M NOT SURE WHAT DOCUMENT YOU ARE TALKING ABOUT THERE, BUT

4  FROM MY REVIEW OF THE VARIOUS REPORTS THAT ARE DONE BY MY STAFF,

5  OVERCROWDING IS A SIGNIFICANT ISSUE IN SOME OF THE COUNTY JAILS

6  THAT CREATE THE PROBLEM.  INFRASTRUCTURE PROBLEMS, SANITATION

7  PROBLEMS, THOSE THINGS ARE PROBLEMS THAT I DO SEE IN THE REPORTS

8  THAT I GET FROM THE COUNTY JAILS IN PENNSYLVANIA THAT ARE NOT

9  DOING WHAT THEY SHOULD BE DOING.

10  **Q**    AND IT IS GENERALLY FROM A LACK OF RESOURCES, CORRECT?

11  **A**    GENERALLY, IT IS A LACK OF RESOURCES, YES.

12  **Q**    AND, GENERALLY, IT'S NOT FOR WANT OF THE PEOPLE IN THE

13  POSITIONS TO WANT TO DO A GOOD JOB AND PROVIDE --

14  **A**    I WOULD SAY IN MOST CASES THAT'S CORRECT.  EVERY ONCE IN A

15  WHILE YOU RUN INTO SOMEBODY THAT REALLY DOESN'T KNOW WHAT

16  THEY'RE DOING OR ISN'T DOING THE PROPER THING, BUT, GENERALLY,

17  YES, I THINK GENERALLY PEOPLE WANT TO DO THE RIGHT THING, AND IF

18  THEY HAD THE RESOURCES, THEY WOULD.

19  **Q**    GENERALLY SPEAKING, THAT'S WHAT YOU'VE SEEN HERE IN

20  CALIFORNIA --

21  **A**    FROM THE PEOPLE THAT I'VE TALKED TO, YES.

22  **Q**    AND THE LEADERSHIP, CORRECT?

23  **A**    YES.

24  **Q**    NOW, THE PENNSYLVANIA CORRECTIONAL SYSTEM HAD AN OVERHAUL

25  THAT WAS INSTIGATED IN PART FROM RIOTS THAT TOOK PLACE AND FROM

1  A LAWSUIT THAT WAS FILED, *AUSTIN VERSUS DEPARTMENT OF*

2  *CORRECTIONS*?

3  **A**   YES, I MENTIONED THAT EARLIER.

4  **Q**   AND THAT LED TO A LOT OF REFORM MEASURES BEING PASSED,

5  CORRECT?

6  **A**   CERTAINLY DID.

7  **Q**   AND THAT LAWSUIT DEALT WITH OVERCROWDING AND THE LACK OF THE

8  PROVISION OF ADEQUATE MEDICAL AND MENTAL HEALTHCARE IN THE

9  PENNSYLVANIA PRISONS, CORRECT?

10 **A**   WHAT WAS THE FIRST PART OF YOUR THING?

11 **Q**   THAT LAWSUIT DEALT WITH THE LACK --

12 **A**   IT DEALT WITH NOT HAVING ENOUGH RESOURCES.  I WOULD HAVE TO

13 GO BACK AND READ EXACTLY WHAT THE LAWSUIT SAID.  THAT'S A LONG

14 TIME AGO.  SO, YOU KNOW, IF YOU ARE READING SOMETHING FROM THAT

15 DOCUMENT -- FROM THAT LAWSUIT, I WOULD ASSUME THAT'S ACCURATE,

16 BECAUSE WE WERE OVERCROWDED AT THE TIME, AND, YOU KNOW, WE

17 WEREN'T PROVIDING THE CARE THAT WE SHOULD HAVE BEEN PROVIDING.

18 **Q**   MEDICAL AND MENTAL HEALTH CARE?

19 **A**   YES.

20 **Q**   AND THAT CASE WAS ULTIMATELY SETTLED?

21 **A**   YES.

22 **Q**   AND IN THE SETTLEMENT, THE TERMS OF THE SETTLEMENT TO

23 RESOLVE THE ISSUES OF THE LACK OF ADEQUATE MENTAL AND MEDICAL

24 CARE IN PENNSYLVANIA, YOU ADDRESSED -- OR THE SETTLEMENT

25 ADDRESSED APPROXIMATELY FIVE DIFFERENT AREAS, WHICH I THINK YOU

1  ALLUDED TO EARLIER FROM THE MINIMUM NUMBER OF MEDICAL AND MENTAL

2  HEALTH, INCLUDING DENTISTS, TO POLICIES AND PROCEDURES,

3  SUFFICIENT EQUIPMENT AT FACILITIES, QUALITY ASSURANCE PROGRAMS

4  AND MONITORING, CORRECT?

5  **A**   YOU ARE READING FROM THAT REPORT.  I HAVEN'T READ THAT

6  AUSTIN SUIT FOR 20-SOME YEARS.  I WILL JUST HAVE TO SAY IF

7  THAT'S -- IF YOU ARE READING FROM THE REPORT, THEN MAYBE THAT'S

8  ACCURATE.  I CAN'T SAY THAT'S ACCURATE WITHOUT SEEING IT.

9  **Q**   IF THE SETTLEMENT COVERED PARTICULAR -- SPECIFIC FIVE AREAS

10 THAT REQUIRED IMPROVEMENTS IN THE PROVISION OF MEDICAL AND

11 MENTAL HEALTHCARE --

12 **A**   IT PROVIDED FOR VARIOUS IMPROVEMENTS IN MENTAL HEALTH AND

13 MEDICAL CARE.  HOW MANY EXACTLY IT WAS AND WHAT ALL THOSE THINGS

14 WERE, I CAN'T -- I CAN'T DIRECTLY RECOLLECT WITHOUT REVIEWING

15 THE DOCUMENT.

16 **Q**   IN ANY EVENT, IT LED TO PENNSYLVANIA, IN YOUR OPINION,

17 ACHIEVING CONSTITUTIONAL HEALTHCARE AND MENTAL HEALTH CARE --

18 **A**   IT HAD NEVER BEEN PROVEN THAT WE WERE UNCONSTITUTIONAL AT

19 THE TIME, BUT IT CERTAINLY IMPROVED BOTH THE MEDICAL AND MENTAL

20 HEALTHCARE IN PENNSYLVANIA.

21 **Q**   THAT WAS ALL DONE WITHOUT A PRISONER RELEASE ORDER, CORRECT?

22 **A**   PARDON?

23 **Q**   ALL DONE WITHOUT A PRISONER RELEASE ORDER?

24 **A**   THAT WAS DONE WITHOUT A PRISONER RELEASE ORDER, THAT'S

25 CORRECT.

1  Q    MR. MELLO TOUCHED ON THE DEATH RATES IN PENNSYLVANIA.

2           **JUDGE KARLTON:**  SIR, CAN I INTERRUPT FOR JUST A

3  MOMENT.  THAT'S NOT AN UNIMPORTANT POINT.

4           YOU INDICATED THAT -- I THINK YOU INDICATED -- IF I

5  AM MISSTATING, FEEL FREE TO SAY I GOT THAT WRONG -- THAT AT

6  LEAST PART OF THE PROBLEM THAT PENNSYLVANIA FACED WHEN THE SUIT

7  WAS FILED WAS OVERCROWDING; IS THAT RIGHT?

8           **THE WITNESS:**  THAT'S CORRECT.

9           **JUDGE KARLTON:**  BUT YOU ACHIEVED SOMEHOW OR OTHER A

10 SATISFACTORY MENTAL AND MEDICAL HEALTH WITHOUT A PRISONER

11 RELEASE ORDER.  DID YOU DO ANYTHING ABOUT REDUCING THE PRISON

12 POPULATION WITHOUT A PRISONER RELEASE ORDER?

13          **THE WITNESS:**  NO.  NO.  WE DIDN'T REDUCE THE PRISON

14 POPULATION AT THAT TIME.  IN ADDITION TO SOME OF THE CHANGES

15 THAT WE MADE IN THE MENTAL HEALTH AND MEDICAL CARE, WE ALSO WENT

16 ON AN AGGRESSIVE CONSTRUCTION PROGRAM AND ADDED A LOT OF CELLS

17 TO THE SYSTEM.

18          AND WE WEREN'T REALLY IN -- AS I RECOLLECT, IN THE

19 POSITION WHERE WE DIDN'T HAVE SPACE TO DO THINGS.  IT WAS MORE

20 THAT WE DIDN'T HAVE ENOUGH STAFF TO DO THINGS, THAT THE STAFFING

21 RATIOS WERE NOT SEEMED TO BE APPROPRIATE.  AND SO THE --

22 WHATEVER CHANGES WE HAD TO MAKE, EQUIPMENT, PERSONNEL, AND

23 STUFF, WE WERE ABLE TO MAKE IT WITHIN OUR EXISTING SYSTEM TO

24 MEET THE NEEDS OF THE SETTLEMENT.

25          **JUDGE KARLTON:**  ASSUMING THAT CALIFORNIA'S PRISON

1  SYSTEM IS NOT IN THAT DESIRABLE OF SHAPE, DO YOU BELIEVE THAT --

2  DO YOU BELIEVE THAT A CONSTITUTIONALLY SUFFICIENT MEDICAL AND

3  MENTAL HEALTH SYSTEM CAN BE ACHIEVED THROUGH ADDITIONAL

4  BUILDING, UNDERSTANDING THAT WOULD TAKE TIME?  BUT SETTING ASIDE

5  THE TIME QUESTION, WOULD YOU AGREE THAT THAT COULD OCCUR?

6          **THE WITNESS:**  THEORETICALLY, YES, SIR.  YES, YOUR

7  HONOR.

8          **JUDGE KARLTON:**  BUT YOU DON'T BELIEVE IT PRACTICALLY?

9  THEORETICALLY, YES; PRACTICALLY, NO.  WHY?

10          **THE WITNESS:**  WELL, I DON'T BELIEVE IT PRACTICALLY

11  BECAUSE OF THE TIME THAT IT TAKES AND THE COSTS THAT IT TAKES,

12  THE HUGE COSTS THAT IT TAKES TO DO THINGS LIKE THIS.  AND AT

13  LEAST FROM MY EXPERIENCE, STATES JUST HAVEN'T BEEN WILLING TO

14  MOVE AHEAD WITH THAT KIND OF THING AND TO DO THAT.  SO -- AND

15  CONSTRUCTION, IF YOU START BUILDING TODAY, AT LEAST IN MY STATE,

16  I PROBABLY CAN'T GET A PRISON IN THREE YEARS.  IT'S PROBABLY

17  GOING TO BE CLOSER TO FOUR YEARS TO GET A PRISON UP AND RUNNING.

18  AND THEN IF YOU NEED A WHOLE BUNCH OF PRISONS -- YOU KNOW, FOR

19  INSTANCE, ONE OF THE PROBLEMS OR CONCERNS I HAVE ABOUT AB 900 IS

20  THE IN-FILL BACKS, BECAUSE ALL YOU'RE DOING IS BUILDING ANOTHER

21  PLACE FOR THESE PEOPLE TO BE.  IT'S STILL AN OVERCROWDED PRISON.

22          SO, YOU KNOW, YOU'D HAVE TO GO OUT AND BUILD A WHOLE

23  BUNCH OF PRISONS TO REALLY DO THIS, AND THAT'S GOING TO TAKE YOU

24  YEARS, BECAUSE YOU ARE GOING TO BE THREE OR FOUR BEFORE YOU GET

25  THE FIRST PRISONS, AND YOU CAN'T BUILD, LIKE, YOU KNOW, 30

1  PRISONS ALL AT ONCE. SO YOU'D BE, LIKE, SEVEN, EIGHT YEARS OUT,

2  NINE YEARS OUT BEFORE YOU GET TO THE PLACE WHERE YOU HAVE THE

3  PROPER THING.

4          THAT'S WHY I THINK THE CONSTRUCTION, IN MY MIND,

5  WHILE CERTAINLY IT SHOULD BE A PART OF ANY PLAN AND SHOULD BE

6  PART OF A PLAN, IF YOU TRY TO RELY ON THAT ALONE, YOU ARE

7  PROBABLY NEVER GOING TO GET THERE, BECAUSE THEY HAVEN'T BEEN

8  ABLE TO GET THERE OVER THE LAST 20 YEARS.

9          **JUDGE KARLTON:**  SORRY TO HAVE INTERRUPTED, COUNSEL.

10         **MR. MITCHELL:**  THANK YOU.

11 **BY MR. MITCHELL**

12 **Q**   REGARDING THE DEATH RATES THAT YOU AND MR. MELLO SPOKE

13 ABOUT, WOULD YOU AGREE THAT THE MAJORITY OF DEATHS RESULT FROM

14 CONDITIONS PRESENT AT THE TIME OF INCARCERATION IN A PRISON

15 SYSTEM?

16 **A**   WOULD I AGREE THAT THE MAJORITY OF DEATHS RESULT FROM THE

17 CONDITIONS IN THE PRISON SYSTEM?

18 **Q**   NO.  CONDITIONS THAT ARE PRESENT IN THE INDIVIDUAL INMATE AT

19 THE TIME OF INCARCERATION.

20 **A**   WHERE ARE WE TALKING ABOUT?

21 **Q**   THEY COME INTO THE PRISON WITH THEIR DISEASES.

22 **A**   WELL, MANY INMATES DO COME IN -- INMATES ARE NOT AS A RULE A

23 HEALTHY PART OF OUR POPULATION.  THEY HAVE BAD LIFESTYLES.  THEY

24 GET INVOLVED IN A LOT OF THINGS THEY SHOULDN'T GET INVOLVED IN,

25 WHICH DOES DRIVE SOME OF THE HEALTHCARE ISSUES AND PROBLEMS THAT

1  WE SEE IN THE SYSTEM, CERTAINLY.

2  **Q**   MANY OF THE SERIOUS CONTAGIOUS DISEASES THAT ARE PRESENT IN

3  THE PRISONS WERE ACQUIRED BY THE INMATES DUE TO IV DRUG USE AND

4  UNSAFE SEX PRACTICES WHILE THEY WERE IN THE COMMUNITY, CORRECT?

5  **A**   A LOT OF THE PEOPLE WHO COME IN, THAT'S WHAT WE SEE.  WE SEE

6  A LOT OF IT BEING BROUGHT INTO THE SYSTEM FROM PEOPLE HAVING THE

7  UNSAFE SEX PRACTICES AND IV DRUG USE, THAT'S CORRECT.

8  **Q**   FOR A GOOD MAJORITY OF THE INMATES COMING INTO THE PRISON

9  SYSTEM, CALIFORNIA INCLUDED, THE FIRST INTENSIVE MEDICAL CARE

10 THEY ARE GETTING IS WHEN THEY COME INTO PRISON, CORRECT?

11 **A**   I CAN SPEAK FOR MY STATE, AND THAT'S TRUE FOR MANY OF THE

12 INMATES WHO COME IN.  THEY COME FROM A LOT OF OUR INNER CITIES

13 AND THEY HAVEN'T SEEN DOCTORS OR DENTISTS OR ANYTHING ELSE

14 BEFORE THEY'VE COME TO US, THAT'S CORRECT.

15 **Q**   DO YOU AGREE THAT PRISONS ARE NOT INCUBATORS FOR DISEASE?

16 **A**   I PERSONALLY DO NOT BELIEVE THAT PRISONS ARE INCUBATORS FOR

17 DISEASE.  THEY COULD BE IF YOUR POPULATION DENSITIES GET SO

18 INTENSE.  LIKE, FOR INSTANCE, IF YOU HAVE A GYMNASIUM THAT YOU

19 TRIPLE BUNK AND PUT HUNDREDS AND HUNDREDS OF PEOPLE IN A CLOSED,

20 DENSE AREA, THAT COULD CERTAINLY SERVE AS SOMEWHAT OF AN

21 INCUBATOR FOR IT, BUT, IN GENERAL, I DON'T BELIEVE THAT PRISONS

22 ARE AN INCUBATOR FOR DISEASE, NO.

23 **Q**   WOULD YOU AGREE THAT IF PRISONS INCUBATED AND SPREAD

24 DISEASE, THERE WOULD BE EVIDENCE OF TRANSMISSION TO STAFF AND

25 GENERAL INCREASES IN INFECTIONS AMONG INMATES NOT PREVIOUSLY

1  OBSERVED?

2  **A**   WHEN YOU SAY "TRANSMISSIONS TO STAFF," I THINK YOU HAVE TO

3  BE CAREFUL, BECAUSE YOU ARE TALKING ABOUT DISEASES THAT USUALLY

4  CAN ONLY BE TRANSMITTED, AT LEAST THE ONES YOU MENTIONED, BY IV

5  DRUG USE OR UNSAFE SEX PRACTICES.  SO IF YOU HAVE THOSE KINDS OF

6  DISEASES, IT'S UNLIKELY YOU ARE GOING TO PASS THAT ON TO THE

7  STAFF.

8  **Q**   IN FACT, YOU ARE NOT AWARE THAT THAT PHENOMENON HAS BEEN

9  OBSERVED IN ANY PRISONS, PENNSYLVANIA, CALIFORNIA, AND THERE

10 HAVEN'T BEEN ANY STUDIES --

11 **A**   ON WHAT?

12 **Q**   ON WHETHER OR NOT PRISONS CONTRIBUTE TO THE SPREAD OF THOSE

13 TYPES OF CONTAGIOUS DISEASES.

14 **A**   THE STUDIES THAT ARE OUT THERE DO NOT CONFIRM THAT'S THE

15 CASE, AND, IN FACT, THAT'S SOMETHING THAT -- WE WERE LOOKING AT

16 DOING SOME PRE, POST TESTING TO LOOK INTO THAT VERY MATTER IN

17 OUR STATE BECAUSE WE DON'T BELIEVE IT IS.

18 **Q**   JUST IN CLOSING, DO YOU KNOW HOW MUCH PENNSYLVANIA SPENDS

19 PER INMATE ON HEALTHCARE?

20 **A**   WE SPEND ABOUT $4,400 A YEAR.  THE LAST YEAR WE DID I THINK

21 WAS 44-SOMETHING, IN OUR LAST BUDGET REPORT FOR EACH INMATE.

22 **Q**   ARE YOU AWARE THAT CALIFORNIA IS CURRENTLY SPENDING OVER

23 13,000 PER INMATE?

24 **A**   I'M NOT AWARE OF PRECISELY WHAT CALIFORNIA SPENDS ON THEIR

25 INMATES.

 1          **MR. MITCHELL:**  THANK YOU, DR. BEARD.

 2          **JUDGE HENDERSON:**  COUNSEL, REDIRECT?

 3          <u>**REDIRECT EXAMINATION BY MR. SPECTER**</u>

 4  *BY MR. SPECTER*

 5  **Q**   MR. MITCHELL ASKED YOU QUESTIONS ABOUT THE -- ABOUT WHETHER

 6  THE STAFF IN CALIFORNIA WANT TO DO THE RIGHT THING AND PROVIDE

 7  THE CARE AND CUSTODY THAT THEIR PRISONERS ARE CONSTITUTIONALLY

 8  ENTITLED TO IN PRISONS; DO YOU RECALL THAT DISCUSSION?

 9  **A**   YES.

10  **Q**   DO YOU BELIEVE UNDER THE CURRENT OVERCROWDED CONDITIONS THEY

11  CAN DO THE RIGHT THING?

12  **A**   NO.

13          **MR. SPECTER:**  NO FURTHER QUESTIONS.

14          **JUDGE HENDERSON:**  OKAY.  THAT LOOKS LIKE --

15          **JUDGE KARLTON:**  LET'S EXCUSE THE WITNESS FIRST.

16          **JUDGE HENDERSON:**  THAT'S WHAT I WAS GOING TO SAY.  IT

17  LOOKS LIKE WE'RE FINISHED WITH THE TESTIMONY.  THANK YOU VERY

18  MUCH FOR APPEARING, MR. BEARD.  WE WILL NOW TAKE A 15-MINUTE

19  RECESS.

20          (RECESS TAKEN.)

21          **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

22  WITNESS WHEN YOU ARE READY, COUNSEL.

23          **MR. SPECTER:**  THANK YOU, YOUR HONOR.  PLAINTIFFS CALL

24  JOSEPH LEHMAN.

25          **JUDGE HENDERSON:**  STEP FORWARD AND BE SWORN IN, SIR.

1                    **JOSEPH D. LEHMAN,**

2    HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

3    DULY SWORN AND EXAMINED AS FOLLOWS:

4              **THE WITNESS:**  I DO.

5              **THE CLERK:**  SPELL AND STATE YOUR FULL NAME FOR THE

6    RECORD.

7              **THE WITNESS:**  JOSEPH D. LEHMAN, L-E-H-M-A-N.

8              **DIRECT EXAMINATION BY MR. SPECTER**

9    *BY MR. SPECTER*

10   **Q**    GOOD MORNING, MR. LEHMAN.

11   **A**    GOOD MORNING.

12   **Q**    MR. LEHMAN, WHAT'S YOUR CURRENT OCCUPATION?

13   **A**    I AM THE ADMINISTRATOR OF A PARISH, A CHURCH, IN LAKEWOOD,

14   WASHINGTON.

15   **Q**    ARE YOU IN ANY SORT OF TRAINING PROGRAM?

16   **A**    YES, I AM, IN THE DEACON FORMATION TRAINING PROGRAM, WHICH

17   IS AN ORDAINED MINISTER'S PROGRAM.

18   **Q**    BEFORE THAT, YOU WORKED IN CORRECTIONS, DID YOU NOT?

19   **A**    YES, I DID.

20   **Q**    AND FOR HOW MANY YEARS?

21   **A**    APPROXIMATELY 35 YEARS.

22   **Q**    AND DURING THAT TIME, WERE YOU IN CHARGE OF ANY STATES'

23   PRISONS SYSTEMS?

24   **A**    YES, I WAS.

25   **Q**    WHICH ONES?

1  **A**   PENNSYLVANIA, AND MAINE, AND THEN THE STATE OF WASHINGTON.

2  **Q**   AND WHICH STATE DID YOU SPEND THE MAJORITY OF YOUR TIME IN

3  CORRECTIONS?

4  **A**   IN THE STATE OF WASHINGTON.

5  **Q**   HOW MANY YEARS DID YOU WORK THERE?

6  **A**   ABOUT 29 YEARS.

7  **Q**   AND COULD YOU BRIEFLY DESCRIBE WHAT POSITIONS YOU HELD, JUST

8  BRIEFLY, PLEASE?

9  **A**   I WORKED IN ALL PARTS OF THE CORRECTIONS DEPARTMENT,

10  INCLUDING THE COMMUNITY SIDE, THE PRISON SIDE, WORK RELEASE, AND

11  IN MANAGEMENT OF THE SYSTEM.

12  **Q**   AND DURING YOUR TIME IN WASHINGTON, WERE YOU RESPONSIBLE FOR

13  THE OPERATION AND/OR MANAGEMENT OF ANY OF THE PRISONS?

14  **A**   YES, I WAS.

15  **Q**   HOW SO?

16  **A**   I WAS, IN FACT, WHAT WE REFER TO AS A COMMAND MANAGER OF A

17  COMPLEX OF THREE PRISONS IN MONROE, WASHINGTON, AND SUBSEQUENTLY

18  I WAS THE DIRECTOR OF DIVISION OF PRISONS.

19  **Q**   AND COULD YOU DESCRIBE THE CHRONOLOGY OF -- FIRST, YOU WERE

20  IN WASHINGTON, THEN WHAT STATE DID YOU GO TO IN WHAT CAPACITY?

21  **A**   OF COURSE, FIRST I WAS IN WASHINGTON UNTIL ABOUT 1990.  I

22  WENT TO PENNSYLVANIA TO HEAD UP THE PENNSYLVANIA DEPARTMENT OF

23  CORRECTIONS.  SUBSEQUENTLY, TO THE STATE OF MAINE TO HEAD UP

24  THEIR DEPARTMENT.  AND, ULTIMATELY, BACK TO WASHINGTON TO HEAD

25  UP THE DEPARTMENT OF CORRECTIONS IN WASHINGTON STATE.

1  Q    I SEE.  WHEN YOU BECAME THE SECRETARY OF CORRECTIONS IN

2  PENNSYLVANIA, DID YOU REORGANIZE THAT DEPARTMENT IN ANY WAY THAT

3  AFFECTS THE DELIVERY OF HEALTHCARE?

4  A    YES, I DID.  WHEN I CAME INTO THE DEPARTMENT OF CORRECTIONS,

5  THERE WAS NOT A CENTRALIZED AUTHORITY.  THERE WAS NOT A

6  CENTRALIZED AUTHORITY IN RELATION TO HEALTHCARE, SO I CREATED A

7  DIRECTOR OF HEALTHCARE SERVICES.

8  Q    AND DID YOU DO SOMETHING SIMILAR IN WASHINGTON STATE?

9  A    YES, I DID.  THE SAME SET OF CIRCUMSTANCES.  HEALTHCARE

10 EXISTED WITHIN THE PRISON SYSTEM, BUT THERE WAS NO COORDINATION

11 OF THAT HEALTHCARE, NO MEANS OF ENSURING CONTINUITY, SO I

12 CREATED A DIRECTOR OF HEALTHCARE SERVICES IN THE STATE OF

13 WASHINGTON.

14 Q    COULD YOU MAYBE -- I'M HAVING TROUBLE HEARING YOU, AND IT'S

15 NOT YOU; IT'S THE ACOUSTICS IN THE ROOM.  SO MAYBE YOU COULD

16 JUST STAY AWAY FROM THE MIC JUST A LITTLE BIT.

17          WHEN YOU CREATED THOSE DIVISIONS, DID YOU STILL

18 MAINTAIN ANY RESPONSIBILITY FOR HEALTHCARE?

19 A    I WAS CERTAINLY RESPONSIBLE FOR THE PROMULGATION OF THE

20 POLICIES AND PROCEDURES, ULTIMATELY FOR THE POLICIES AND

21 PROCEDURES OF THE HEALTHCARE PROGRAM, AS WELL AS FOR THE

22 OVERSIGHT OF THE DIRECTOR OF HEALTHCARE SERVICES.

23          **MS. JOHNSON:**  YOUR HONORS, EXCUSE ME.  I COULDN'T

24 UNDERSTAND ANY OF THAT ANSWER.

25          **JUDGE KARLTON:**  I DON'T KNOW WHAT WE CAN DO.  YOU

1  WILL SEE THE JUDGES ARE NOW WEARING WHATEVER THESE THINGS ARE.

2           **JUDGE HENDERSON:**  HEADPHONES.

3           **JUDGE KARLTON:**  I DON'T KNOW WHAT WE CAN DO ABOUT IT.

4       **MR. SPECTER:**  I JUST ASKED THE WITNESS IF YOU COULD

5  MOVE A LITTLE FARTHER BACK AND SPEAK A LITTLE LOUDER, AND MAYBE

6  THAT WILL WORK.

7           **JUDGE REINHARDT:**  ARE YOU HAVING TROUBLE GENERALLY

8  HEARING?

9        **MR. SPECTER:**  THE LAST WITNESS I HEARD FINE.  THIS

10  ONE IS A LITTLE BIT MORE DIFFICULT.  MAYBE I COULD BORROW YOUR

11  HEADPHONES.

12           **JUDGE REINHARDT:**  YOU OUGHT TO GET SOME.  THEY ARE

13  REALLY WONDERFUL.

14           **JUDGE KARLTON:**  THEY ARE WONDERFUL.  YESTERDAY I

15  COULDN'T HEAR ANYTHING.  I HOPE YOU DIDN'T HAVE ANYTHING

16  IMPORTANT --

17           **MS. JOHNSON:**  COULD WE ACTUALLY HAVE THAT ANSWER

18  BACK?  I LITERALLY COULD NOT HEAR IT.

19           **JUDGE KARLTON:**  "I WAS CERTAINLY RESPONSIBLE FOR THE

20  PROMULGATION OF THE POLICIES AND PROCEDURES, ULTIMATELY...OF THE

21  HEALTHCARE PROGRAM AS WELL AS OVERSIGHT OF THE DIRECTOR OF

22  HEALTH SERVICES."

23  ***BY MR. SPECTER***

24  Q   MR. LEHMAN, WHAT WERE THE CIRCUMSTANCES THAT LED TO YOUR

25  APPOINTMENT AS THE SECRETARY OF CORRECTIONS IN PENNSYLVANIA?

1  **A**    THERE WERE TWO -- WELL, THERE WERE APPROXIMATELY THREE

2  RIOTS.  A RIOT, A PARTICULARLY DEVASTATING RIOT, THAT OCCURRED

3  IN THE CAMP HILL FACILITY IN PENNSYLVANIA, WHICH WAS DESTROYED,

4  GOOD PARTS OF IT DESTROYED BY FIRE.  THERE WERE 50 HOSTAGES

5  TAKEN.  AND I REPLACED THE COMMISSIONER AT THAT TIME.

6  **Q**    I SEE.  AND THE PRISONS IN PENNSYLVANIA WERE OVERCROWDED AT

7  THE TIME, CORRECT?

8  **A**    THE PRISONS WERE OVERCROWDED, YES.

9  **Q**    A LAWSUIT WAS FILED IN PENNSYLVANIA, I BELIEVE IT IS THE

10  AUSTIN LAWSUIT, WHICH CONCERNED INADEQUATE HEALTHCARE AS WELL AS

11  OVERCROWDING; IS THAT RIGHT?

12  **A**    THAT IS CORRECT.  TWO WEEKS AFTER TAKING THE POSITION, I

13  RECEIVED A LETTER FROM AN ATTORNEY AT THE ACLU INDICATING THEIR

14  INTENTION TO SUE THE DEPARTMENT.

15  **Q**    AND DID YOU EVENTUALLY -- AND YOU WERE ONE OF THE NAMED

16  DEFENDANTS IN THAT LAWSUIT?

17  **A**    YES.

18  **Q**    AND DID YOU RESOLVE THAT LAWSUIT SHORT OF A TRIAL?

19  **A**    WE -- ACTUALLY, IT WAS RESOLVED DURING THE TRIAL.

20  **Q**    UH-HUH.

21  **A**    I -- INITIALLY, WHEN I HAD WORD OF THE DEFICIENCIES RELATIVE

22  TO THE HEALTHCARE, I HIRED TWO EXPERT WITNESSES WHO WERE EXPERTS

23  IN THE FIELD OF HEALTHCARE, INCLUDING MENTAL HEALTH; HAD THEM

24  COME TO THE DEPARTMENT OF CORRECTIONS AND DO ASSESSMENTS, AND

25  THEN MAKE SOME RECOMMENDATIONS ABOUT ACTIONS TO BE TAKEN, WHICH

1  WE DID.

2  **Q**   I SEE.  AND IN YOUR EXPERIENCE, DID YOU FIND THAT THE

3  OVERCROWDING IN PENNSYLVANIA WAS RELATED IN ANY WAY TO THE

4  INADEQUATE HEALTHCARE?

5  **A**   ABSOLUTELY.  IT WAS A SYSTEM WHERE THE –– THEY WERE

6  OVERWHELMING DEMAND WITH THE NEED TO PROVIDE SERVICES AND UNABLE

7  TO PROVIDE IT.

8  **Q**   COULD YOU MOVE BACK A LITTLE BIT AND TALK A LITTLE LOUDER?

9  I'M STILL HAVING A LITTLE TROUBLE ––

10 **A**   I'LL WORK AT IT.

11 **Q**   OKAY.  YOU WERE ABOUT 150 PERCENT OVERCROWDED AT THAT TIME

12 IN PENNSYLVANIA?

13 **A**   YES, OVER 150.

14 **Q**   THAT'S GREAT.

15         SO WHAT WAS THE FIRST ACTION THAT YOU TOOK TO ––

16 WELL, I SHOULD BACK UP.

17         GIVEN THAT OVERCROWDING WAS PRESENTING THESE

18 PROBLEMS, DID YOU TAKE ANY ACTIONS TO REDUCE THE NUMBER OF

19 PRISONERS IN YOUR DEPARTMENT?

20 **A**   THE FIRST THING I DID IS I GOT AHOLD OF THE FEDERAL BUREAU

21 OF PRISONS, ASKED FOR THEIR ASSISTANCE AND SHIPPED APPROXIMATELY

22 800 INMATES OUT, OUT OF THE SYSTEM, TO THE FEDERAL SYSTEM.

23 **Q**   AND DID YOU TRANSFER THOSE PRISONERS TO THE FEDERAL SYSTEM

24 BECAUSE ALL THE GYMS AND DAYROOMS AND OTHER PROGRAMS AND

25 NON–HOUSING SPACE WAS FULL?

1  **A**   NO, WE DID NOT, IN FACT, USE GYMS OR ACTIVITY SPACE FOR

2  HOUSING.

3  **Q**   OKAY.  LET ME ASK YOU ABOUT ANOTHER TECHNIQUE THAT I'VE

4  HEARD OF BUT NEVER -- WELL, LET ME ASK YOU ABOUT A PRACTICE

5  CALLED HOT BUNKING.  IN YOUR EXPERIENCE --

6           **JUDGE KARLTON:**  BEFORE YOU GO TO HOT BUNKING, ON WHAT

7  BASIS, IF YOU CAN TELL ME, WAS THE FEDERAL SYSTEM ABLE TO ACCEPT

8  800 STATE PRISONERS?

9           **THE WITNESS:**  THE FEDERAL SYSTEM, OF COURSE, HAS A

10  MUCH LARGER SYSTEM THAN PENNSYLVANIA, OR ANY OTHER STATE, AND

11  THEY WERE WILLING TO, IN FACT, DO THAT AND HAD THE ROOM TO DO

12  IT.

13           **JUDGE KARLTON:**  SO YOU CALLED THEM AND SAID, GEE,

14  GUYS, YOU GOT SPACE FOR 800 PEOPLE?  AND THEY SAY, SURE, JUST

15  SEND THEM ALONG?

16           **THE WITNESS:**  IN ACTUALITY, I CALLED THE DIRECTOR,

17  KATHY HAWK, AT THE TIME, ASKED FOR ASSISTANCE, INDICATED THE

18  DIFFICULTIES WE WERE HAVING IN PENNSYLVANIA, INCLUDING THE RIOTS

19  THAT HAD OCCURRED, AND SHE SAID THAT THEY COULD, AND THEY DID.

20           **JUDGE KARLTON:**  YOU PAID THEM FOR THAT?

21           **THE WITNESS:**  YES.

22           **JUDGE KARLTON:**  DO YOU KNOW WHETHER THE FEDERAL

23  SYSTEM PRESENTLY -- I MEAN, AS MANY PEOPLE AS I SEND TO PRISON

24  EVERY DAY, I THINK THE ANSWER IS NO, BUT DO YOU KNOW WHETHER THE

25  FEDERAL SYSTEM CAN ACCEPT PRISONERS TODAY?

1          **THE WITNESS:**  I DO NOT KNOW, YOUR HONOR.

2  *BY MR. SPECTER*

3  **Q**    IN YOUR OPINION, COULD YOU HAVE PROVIDED -- WELL, YOU

4  EVENTUALLY RESOLVED THE LAWSUIT AND WERE ABLE TO PROVIDE WHAT

5  YOU BELIEVE TO BE CONSTITUTIONALLY ADEQUATE HEALTHCARE; IS THAT

6  RIGHT?

7  **A**    THAT'S CORRECT.

8  **Q**    AND COULD YOU HAVE PROVIDED THAT ADEQUATE CARE WITHOUT

9  REDUCING THE PRISON POPULATION?

10 **A**    DID I PROVIDE THE CARE WITHOUT --

11 **Q**    COULD YOU HAVE DONE THAT WITHOUT --

12 **A**    NO.

13 **Q**    OKAY.  NOW, YOU'RE FAMILIAR WITH THE TERM "HOT BUNKING"?

14 **A**    YES, I AM.

15 **Q**    IT'S BEEN DESCRIBED BEFORE BY MR. -- DR. BEARD, SO I WON'T

16 BOTHER ASKING YOU WHAT IT MEANS AGAIN.  BUT HAVE YOU EVER HEARD

17 OF IT BEING DONE IN PRISONS?

18 **A**    NO, I HAVE NOT.

19 **Q**    AND IT WAS NEVER DONE IN ANY OF THE SYSTEMS, INCLUDING

20 PENNSYLVANIA?

21 **A**    IT HAS NEVER BEEN DONE IN ANY SYSTEM THAT I RAN OR AM

22 FAMILIAR WITH.

23 **Q**    OKAY.  THE STATE OF CALIFORNIA, DID THEY ASK YOU TO

24 PARTICIPATE IN WHAT IS COMMONLY REFERRED TO AS THE EXPERT PANEL?

25 **A**    YES, I WAS ASKED TO PARTICIPATE IN THAT ENDEAVOR.

1   Q    AND YOU WERE ASKED BY THE STATE OF CALIFORNIA, CORRECT?

2   A    THAT'S CORRECT.

3   Q    AND THAT PANEL WAS DESIGNED TO PROVIDE RECOMMENDATIONS TO

4   THE STATE FOR IMPROVING PROGRAMMING WITHIN THE DEPARTMENT OF

5   CORRECTIONS AND REHABILITATION; IS THAT CORRECT?

6   A    THAT'S SPECIFICALLY REHABILITATIVE PROGRAMMING.

7   Q    RIGHT.  WHEN WAS THAT?

8   A    IT WAS -- THE PANEL WAS PULLED TOGETHER IN DECEMBER OF 2006.

9   IT REALLY ACTUALLY OPERATED IN 2007.

10  Q    OKAY.  AFTER THAT PANEL COMPLETED ITS WORK, DID THE STATE

11  ASK YOU AGAIN TO PERFORM ANY OTHER SERVICE?

12  A    I WAS ASKED TO PARTICIPATE ALONG WITH A COUPLE OTHER

13  INDIVIDUALS, ON WHAT THEY REFERRED TO AS A STRIKE TEAM,

14  GOVERNOR'S STRIKE TEAM, TO ASSIST IN THE IMPLEMENTATION OF THE

15  RECOMMENDATIONS.

16  Q    DURING -- WHAT WAS THE FIRST RECOMMENDATION OF THE EXPERT

17  PANEL?

18  A    REDUCE OVERCROWDING.

19  Q    OKAY.  AND WAS THAT BECAUSE THE PANEL BELIEVED THAT WITHOUT

20  A REDUCTION IN OVERCROWDING, IT WOULD BE DIFFICULT, IF NOT

21  IMPOSSIBLE, TO PROVIDE THE PROGRAMMING THE PANEL ALSO

22  RECOMMENDED?

23  A    THAT WAS QUITE EVIDENT.  IT WAS A PREREQUISITE TO DOING

24  ANYTHING ELSE.

25  Q    AND THE SAME LOGIC APPLIES TO PROVIDING MANY HEALTHCARE

1  SERVICES, DOES IT NOT?

2  **A**   THAT IS CORRECT.

3  **Q**   AND IN THE COURSE OF THIS WORK ON REHABILITATIVE

4  PROGRAMMING, YOU BECAME AWARE OF THE OVERCROWDING IN

5  CALIFORNIA'S PRISONS; IS THAT RIGHT?

6  **A**   YES, I DID.

7  **Q**   OKAY.  AND YOU TOURED SOME OF THE PRISONS IN CONNECTION WITH

8  THAT WORK?

9  **A**   IN CONNECTION WITH THE EXPERT PANEL AND THE STRIKE TEAM,

10  YES.

11  **Q**   OKAY.  WHAT WAS YOUR IMPRESSION FROM THE TOURS AS IT RELATES

12  TO OVERCROWDING?

13  **A**   IT WAS IMMEDIATELY EVIDENT, GIVEN NOT ONLY THE TESTIMONY OF

14  THE STAFF THAT WERE PRESENT, BUT THE FACT THAT WE WERE OBSERVING

15  OTHERWISE PROGRAM SPACE, SUCH AS EDUCATION SPACE, FILLED WITH

16  INMATES IN TERMS OF DORMITORIES, AS WELL AS RECREATIONS, GYMS

17  FILLED WITH BEDS AND BUNK BEDS.

18  **Q**   AND DID YOU TALK TO ANY STAFF DURING YOUR TOURS?

19  **A**   YES, WE HAD CONVERSATIONS WITH THE STAFF, EXTERNAL CUSTODY

20  STAFF, WITHIN THE CELL BLOCKS.

21  **Q**   AND DID THEY TELL YOU ANYTHING THAT RELATES TO OVERCROWDING?

22  **A**   THEY INDICATED THAT IT WAS A VERY DIFFICULT SITUATION TO BE

23  IN.  THEY CERTAINLY RECOGNIZED, AS WE DID, THE OVERCROWDING AND

24  TRIPLE BUNKING AND INDICATED IT WAS A DIFFICULT -- IT WAS

25  DIFFICULT TO OPERATE IN THOSE CIRCUMSTANCES.

1  Q    OKAY.  AND IN YOUR EXPERIENCE -- YOU KNOW THAT CALIFORNIA'S

2  ABOUT 195, 196 PERCENT OF DESIGN CAPACITY, CORRECT?

3  A    YES, I DO.

4  Q    IN YOUR EXPERIENCE, HAVE YOU EVER KNOWN OF A CORRECTIONAL

5  SYSTEM THAT WAS THIS HIGH?

6  A    NEVER.

7  Q    OKAY.  IN YOUR EXPERIENCE, HOW DOES OVERCROWDING AFFECT THE

8  DELIVERY OF HEALTHCARE?

9  A    WELL, INITIALLY, OVERCROWDING IN AND OF ITSELF CONTRIBUTES

10  TO THE DIFFICULTIES OF HEALTHCARE DELIVERY BY VIRTUE OF THE FACT

11  THAT IT INCREASES THE INCIDENCE OF ILLNESSES, INFECTIOUS

12  DISEASE.  IT INCREASES THE AMOUNT OF TENSION, THE LEVEL OF

13  VIOLENCE, CERTAINLY REQUIRING RESPONSES, BOTH IN TERMS OF

14  CUSTODIAL AND MEDICAL.

15        IT IS A SITUATION WHERE THE DEMAND SIGNIFICANTLY

16  OUTSTRETCHES THE ABILITY TO RESPOND TO THE HEALTHCARE NEEDS,

17  BOTH IN TERMS OF TIMING AND ACTUAL SERVICE.

18  Q    AND YOU'RE AWARE THAT THE COURTS IN THE TWO CASES THAT WE'RE

19  PRESENT -- OF THIS PRESENT PROCEEDING HAVE EITHER DECLARED OR

20  THERE'S BEEN A STIPULATION TO THE FACT THAT THEY'RE

21  UNCONSTITUTIONAL; IS THAT CORRECT?

22  A    YES, I AM.

23  Q    THE DELIVERY OF CARE IS NOT ADEQUATE, CORRECT?

24  A    YES.

25  Q    BASED ON THE INFORMATION YOU RECEIVED ABOUT CALIFORNIA'S

Case 2:90-cv-00520-KJM-SCR   Document 3541-2   Filed 03/10/09   Page 76 of 222

1   PRISON SYSTEM, WHAT'S YOUR OPINION ABOUT WHETHER OVERCROWDING IS

2   THE PRIMARY CAUSE OF THE UNCONSTITUTIONAL HEALTHCARE?

3   **A**   I THINK THAT IS THE PRIMARY CAUSE OF THE INABILITY TO

4   PROVIDE THE SERVICES.  IT'S OVERWHELMING THE SYSTEM BOTH IN

5   TERMS OF SHEER NUMBERS, IN TERMS OF THE SPACE AVAILABLE, IN

6   TERMS OF PROVIDING HEALTHCARE.

7           MY UNDERSTANDING, FOR EXAMPLE, IS YOU COULD HAVE AN

8   INSTITUTION AT 200 PERCENT CAPACITY, BUT THE HEALTHCARE -- THE

9   PHYSICAL SPACE PROVIDED IS BASED ON THE HUNDRED PERCENT

10  POPULATION AS OPPOSED TO 200 PERCENT.  SO IT'S SIMPLY NOT ABLE

11  TO PROVIDE THE SERVICES THAT IS REQUIRED.

12  **Q**   OKAY.  YOU ARE AWARE THAT THE RECEIVER -- JUDGE HENDERSON

13  APPOINTED A RECEIVER TO IMPROVE THE MEDICAL CARE SYSTEM AND THEN

14  ACTUALLY TO RUN THE MEDICAL CARE SYSTEM IN CALIFORNIA?

15  **A**   YES, I AM.

16  **Q**   WHAT DO YOU SAY TO THE ARGUMENT THAT THE COURT SHOULD NOT

17  REDUCE THE POPULATION BECAUSE THERE'S THIS RECEIVER WHO'S GOT

18  AUTHORITY TO MAKE IMPROVEMENTS?

19  **A**   I THINK YOU HAVE TO ADDRESS THE OVERCROWDING.  IT IS SO

20  OVERWHELMING, IT'S OVERWHELMING IN THE SENSE OF NOT -- OF NOT

21  BEING ABLE TO MEET THE IMMEDIATE DEMANDS, BUT IT'S OVERWHELMING,

22  EXASPERATING THE PROBLEM IN THE FIRST PLACE.  YOU CANNOT

23  PROVIDE -- IN MY OPINION, YOU CANNOT PROVIDE ADEQUATE HEALTHCARE

24  AND MENTAL HEALTHCARE UNDER THE CURRENT SITUATION OF CROWDING

25  WITHIN THE STATE OF CALIFORNIA.

1  Q    IS THAT TRUE EVEN THOUGH THE RECEIVER HAS BEEN ABLE TO HIRE

2  ADDITIONAL BOTH CUSTODIAL AND CLINICAL STAFF?

3  A    I UNDERSTAND THAT, BUT THE PROBLEM STILL EXISTS BECAUSE

4  WHERE'S THIS SPACE THAT YOU ARE GOING TO PROVIDE THOSE SERVICES

5  IN?  I MEAN, WHERE ARE THE PROVIDERS GOING TO WORK AND HOW --

6  AND, BY THE WAY, THE ACTUAL REPORTS INDICATE THEY ARE NOT ABLE

7  TO PROVIDE THE SERVICES.

8  Q    SO WOULD THAT -- WOULD IT BE FAIR TO SAY THAT UNLESS YOU

9  HAVE WHAT WE'VE REFERRED TO AS THE INFRASTRUCTURE TO ALLOW THE

10  CARE TO BE PROVIDED, JUST HIRING STAFF ITSELF ISN'T GOING TO

11  WORK?

12  A    IT'S NOT GOING TO -- IT'S NOT GOING TO, GIVEN THE

13  OVERCROWDING.

14  Q    NOW, WHEN YOU WERE THE SECRETARY OF THE DEPARTMENT OF

15  CORRECTIONS IN PENNSYLVANIA, THE POPULATION IN THE PRISONS

16  WAS -- IT WAS OVERCROWDED, RIGHT?

17  A    ABSOLUTELY.

18  Q    DID YOU INFORM THE GOVERNOR OF YOUR STATE, OF THAT STATE, OF

19  THAT PROBLEM?

20  A    YES, I DID.

21  Q    AND WHAT WAS HIS RESPONSE?

22  A    HIS RESPONSE WAS, WELL, WE HAVE TO, IN FACT, ENGAGE IN

23  ACTIVITIES TO, IN FACT, REDUCE THAT POPULATION.

24  Q    NOW, IF YOU WERE THE SECRETARY OF CORRECTIONS FOR THE

25  DEPARTMENT OF CALIFORNIA, WHAT WOULD BE THE FIRST THING YOU'D

1  SAY TO THE GOVERNOR?

2  **A**  I'D SAY TO THE GOVERNOR, YOU ARE NOT GOING TO PROVIDE

3  ADEQUATE SERVICES TO THIS POPULATION WITHOUT REDUCING THE

4  POPULATION.

5  **Q**  OKAY.  NOW, TWO LAST QUESTIONS FOR YOU.

6          IN YOUR -- IS IT 35 YEARS OF EXPERIENCE?

7  **A**  YES.

8  **Q**  -- THIRTY-FIVE YEARS OF EXPERIENCE, HOW MANY TIMES HAVE YOU

9  TESTIFIED ON BEHALF OF PRISONERS?

10  **A**  THIS IS THE FIRST.

11  **Q**  AND WHY ARE YOU DOING THIS TODAY?

12  **A**  I THINK THE SITUATION IN CALIFORNIA IS SO EGREGIOUS -- I

13  MEAN, I'VE WORKED IN SYSTEMS WHERE THERE WAS OVERCROWDING, A

14  LEVEL OF OVERCROWDING.  WASHINGTON STATE SYSTEM WAS 150 PERCENT

15  WHEN I TOOK OVER AS SECRETARY.  IT WAS 107 WHEN I LEFT.  THE

16  PENNSYLVANIA SYSTEM WAS, IN FACT, OVER 150 PERCENT OVERCROWDED.

17  IT WAS DOWN TO OPERATING CAPACITY WHEN I LEFT.  YOU HAVE TO DEAL

18  WITH THE OVERCROWDING.

19  **Q**  IT'S AS SIMPLE AS THAT?

20  **A**  YES.

21          **MR. SPECTER:**  THANK YOU.  NO FURTHER QUESTIONS.

22          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

23          DOES CCPOA COUNSEL HAVE ANY QUESTIONS OF THIS

24  WITNESS?

25          **MS. LEONARD:**  NO FURTHER QUESTIONS, YOUR HONOR.

1          **JUDGE HENDERSON:**  OKAY.  CROSS-EXAMINATION.

2              **CROSS-EXAMINATION BY MS. JOHNSON**

3          **MS. JOHNSON:**  GOOD MORNING.  ANNE JOHNSON ON BEHALF

4    OF THE DEFENDANTS.

5    *BY MS. JOHNSON*

6    **Q**   GOOD MORNING, MR. LEHMAN.

7    **A**   GOOD MORNING.

8    **Q**   MR. LEHMAN, YOU DO NOT HAVE ANY ADVANCED DEGREES OTHER THAN

9    YOUR MASTER'S DEGREE, WITH AN EMPHASIS IN CRIMINAL JUSTICE, DO

10   YOU?

11   **A**   THAT'S CORRECT.

12   **Q**   YOU DO NOT HAVE ANY DEGREES OR TRAINING IN THE MEDICAL

13   FIELD, CORRECT?

14   **A**   NO, I DO NOT.

15   **Q**   AND YOU DON'T HAVE ANY DEGREES OR TRAINING IN THE MENTAL

16   HEALTH FIELD, CORRECT?

17   **A**   NO, I DO NOT.

18   **Q**   AND YOU HAVE NEVER BEEN A CLINICIAN WHO PROVIDED EITHER

19   MEDICAL OR MENTAL HEALTH CARE, HAVE YOU?

20   **A**   I HAVE NOT.

21   **Q**   YOU HAVE NEVER HELD A POSITION SUCH AS HEALTHCARE MANAGER AT

22   A PRISON, HAVE YOU?

23   **A**   I HAVE NOT.

24   **Q**   YOU HAVE NEVER HELD A POSITION SUCH AS HEAD OF THE HEALTH

25   DEPARTMENT OR A PRISON SYSTEM, HAVE YOU?

1   **A**   I HAVE NOT.

2   **Q**   WHEN YOU WERE COMMISSIONER OF THE MAINE DEPARTMENT OF

3   CORRECTIONS, THERE WAS A STAFF PERSON BELOW YOU WHO WAS IN

4   CHARGE OF WORKING TO CREATE HEALTHCARE POLICIES AND PROCEDURES,

5   CORRECT?

6   **A**   THAT'S CORRECT.

7   **Q**   WHEN YOU WERE SECRETARY OF THE PENNSYLVANIA DEPARTMENT OF

8   CORRECTIONS, YOU CREATED A HEALTH DEPARTMENT THAT WAS RUN BY A

9   FORMER HEALTHCARE MANAGER AT ONE OF THE PRISONS, CORRECT?

10  **A**   THAT'S CORRECT.

11  **Q**   AND WHEN YOU WERE SECRETARY FOR THE WASHINGTON STATE

12  DEPARTMENT OF CORRECTIONS, YOU DID NOT DIRECTLY MANAGE HEALTH

13  SERVICES YOURSELF, DID YOU?

14  **A**   NO, I DID NOT.

15  **Q**   IN FACT, WHEN YOU WERE SECRETARY FOR THE WASHINGTON STATE

16  DEPARTMENT OF CORRECTIONS, BOTH MEDICAL AND MENTAL HEALTH

17  SERVICES WERE RUN BY A MEDICAL DIRECTOR WHO WAS A PHYSICIAN,

18  CORRECT?

19  **A**   THAT'S CORRECT.  A POSITION I ESTABLISHED.

20  **Q**   THAT WAS MY NEXT QUESTION.

21          THE HEAD OF THE HEALTH DEPARTMENT FOR THE WASHINGTON

22  STATE DEPARTMENT OF CORRECTIONS WAS RESPONSIBLE FOR CREATING THE

23  POLICIES AND PROCEDURES DEALING WITH HEALTHCARE, CORRECT?

24  **A**   THAT'S CORRECT.

25  **Q**   THE HEAD OF THE HEALTH DEPARTMENT FOR THE WASHINGTON STATE

Case 2:90-cv-00520-KJM-SCR   Document 3541-2   Filed 03/10/09   Page 81 of 222

1  DEPARTMENT OF CORRECTIONS WAS RESPONSIBLE FOR SETTING UP A

2  SYSTEM TO MONITOR COMPLIANCE WITH THOSE POLICIES AND PROCEDURES,

3  CORRECT?

4  **A**   THAT'S CORRECT.

5  **Q**   AND THE HEAD OF THE HEALTH DEPARTMENT FOR THE WASHINGTON

6  STATE DEPARTMENT OF CORRECTIONS WHILE YOU WERE SECRETARY WAS

7  RESPONSIBLE FOR OVERSEEING AND PARTICIPATING IN THE HIRING OF

8  HEALTHCARE STAFF, CORRECT?

9  **A**   THAT'S CORRECT.

10  **Q**   YOU WERE NOT QUALIFIED TO SERVE AS HEAD OF THE HEALTH

11  DEPARTMENT OF THE WASHINGTON STATE DEPARTMENT OF CORRECTIONS

12  WHICH YOU HAD CREATED AS SECRETARY, WERE YOU?

13  **A**   CLARIFY THAT, PLEASE.

14  **Q**   WOULD YOU HAVE HIRED YOURSELF FOR THAT POSITION?

15  **A**   NO, I WOULD NOT.

16  **Q**   YOU DO NOT RECALL READING ANY STUDIES OR REPORTS OR BEST

17  PRACTICES MANUALS REGARDING PRISON MEDICAL CARE, DO YOU?

18  **A**   I CERTAINLY LOOKED AT LITERATURE IN TERMS OF THE AMERICAN

19  CORRECTIONAL ASSOCIATION AND HEALTHCARE ASSOCIATION.  I

20  CERTAINLY DID LOOK AT ARTICLES RELATIVE TO THE APPROPRIATE LEVEL

21  OF CARE FOR AN INMATE POPULATION.

22  **Q**   WHEN DID YOU LOOK AT THOSE?  WAS THAT AFTER YOUR DEPOSITION

23  IN THIS CASE?

24  **A**   NO.  I LOOKED AT IT WHILE I WAS HEAD OF THE DEPARTMENT OF

25  CORRECTIONS.

1  Q    OKAY.  WELL, IF I COULD REFRESH YOUR RECOLLECTION, WHEN I

2  ASKED YOU THE SAME QUESTION AT YOUR DEPOSITION YOU SAID YOU

3  DIDN'T RECALL HAVING READ THOSE TYPES OF ARTICLES.

4  A    WELL, THE ARTICLES I DID.  I'M SORRY.

5  Q    SO YOU SERVED ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS

6  AND REHABILITATION EXPERT PANEL ON ADULT OFFENDER AND RECIDIVISM

7  REDUCTION PROGRAM, CORRECT?

8  A    YES, I DID.

9  Q    AND THAT TITLE KIND OF SPEAKS FOR ITSELF, DOESN'T IT?

10 A    I THINK SO.

11 Q    SO THAT EXPERT PANEL DID NOT ADDRESS HEALTHCARE ISSUES IN

12 CALIFORNIA'S PRISONS, DID IT?

13 A    NO, IT DID NOT.

14 Q    IN YOUR REPORT --

15         **JUDGE KARLTON:**  DR. -- I'M SORRY.  MR. LEHMAN, DO YOU

16 HAVE TO BE A DOCTOR TO FIGURE OUT THAT YOU GOT TO HAVE THE SPACE

17 TO TREAT PEOPLE IN ORDER TO TREAT THEM EFFECTIVELY?

18         **THE WITNESS:**  NO, YOU DO NOT.  IN FACT, IT WOULD BE

19 THE SECRETARY'S RESPONSIBILITY TO ASSURE THERE WERE SUFFICIENT

20 SPACE AND ACCESS TO THOSE SERVICES.

21 *BY MS. JOHNSON*

22 Q    IN YOUR REPORT THAT YOU PREPARED FOR THIS CASE IN AUGUST OF

23 2008, YOU DID NOT REVIEW -- IN PREPARING THAT REPORT, YOU DID

24 NOT REVIEW ANY OF THE PLATA RECEIVER'S REPORTS, CORRECT?

25 A    NO, I DID NOT, AT THAT TIME.

1 Q    IN PREPARING YOUR REPORT, YOU DID NOT REVIEW ANY OF THE

2 COLEMAN SPECIAL MASTER'S REPORTS, CORRECT?

3 A    NO, I DID NOT.

4 Q    IN PREPARING YOUR REPORT, YOU DID NOT KNOW WHAT THE SPACE

5 NEEDS WERE FOR MEDICAL OR MENTAL HEALTHCARE IN CALIFORNIA'S

6 PRISONS, DID YOU?

7 A    SPECIFICALLY, NO.

8 Q    YOU DID NOT TOUR A SINGLE ONE OF CALIFORNIA'S 33 PRISONS FOR

9 THE PURPOSES OF PREPARING YOUR OPINION REGARDING THE IMPACT OF

10 OVERCROWDING ON MEDICAL OR MENTAL HEALTHCARE, DID YOU?

11 A    NOT FOR THOSE PURPOSES, NO.

12 Q    WHEN YOU PREPARED YOUR REPORT, YOU DID NOT HAVE KNOWLEDGE OF

13 THE STATUS OF MEDICAL CARE DELIVERY IN CALIFORNIA'S PRISONS AS

14 OF AUGUST 2008, DID YOU?

15 A    I'M SORRY.  REPEAT THE QUESTION.

16 Q    WHEN YOU PREPARED YOUR REPORT, YOU DID NOT HAVE KNOWLEDGE OF

17 THE STATUS OF MEDICAL CARE DELIVERY IN CALIFORNIA'S PRISONS AS

18 OF AUGUST 2008, DID YOU?

19          **MR. SPECTER:**  OBJECT AS VAGUE.

20          **JUDGE HENDERSON:**  VAGUE?  VAGUENESS?

21          **MR. SPECTER:**  VAGUE.

22          **JUDGE HENDERSON:**  LET ME ASK THE WITNESS.  DO YOU

23 UNDERSTAND THE QUESTION?

24          **THE WITNESS:**  REPEAT THE QUESTION.

25

1  **BY MS. JOHNSON**

2  **Q**   WHEN YOU PREPARED YOUR REPORT --

3  **A**   YES.

4  **Q**   -- YOU DID NOT HAVE KNOWLEDGE OF THE STATUS OF MEDICAL CARE

5  DELIVERY IN CALIFORNIA'S PRISONS AS OF AUGUST 2008, DID YOU?

6  **A**   NO, I DIDN'T.  ONLY ABOUT THE OVERCROWDING ITSELF.

7  **Q**   WHEN YOU PREPARED YOUR REPORT, YOU DID NOT HAVE KNOWLEDGE OF

8  THE STATUS OF MENTAL HEALTH DELIVERY IN CALIFORNIA'S PRISONS AS

9  OF AUGUST 2008, DID YOU?

10  **A**   NO.

11  **Q**   YOU DID NOT PREPARE THE FIRST DRAFT OF YOUR REPORT IN THIS

12  CASE, DID YOU?

13  **A**   I HAD CONVERSATIONS WITH MR. SPECTER.  WE DID TALK ABOUT THE

14  OVERCROWDING.  WE TALKED ABOUT THE IMPACT OF THE OVERCROWDING IN

15  THE SYSTEM, PARTICULARLY IN TERMS OF ITS CLASSIFICATION, THE

16  APPROPRIATE HOUSING OF INMATES.  ON THAT BASIS THE REPORT WAS

17  DRAFTED.

18  **Q**   DID YOU WRITE THE FIRST DRAFT OF YOUR REPORT, MR. LEHMAN?

19  **A**   NO.  I ASKED MR. SPECTER TO DO THAT BASED ON OUR

20  CONVERSATIONS.

21  **Q**   SO IT'S YOUR TESTIMONY THAT PLAINTIFF COUNSEL, MR. SPECTER,

22  WROTE THE FIRST DRAFT OF YOUR REPORT?

23  **A**   BASED -- ONCE AGAIN, BASED ON OUR CONVERSATION.

24  **Q**   ON PAGE 3 OF YOUR REPORT -- IF WE COULD HAVE THAT UP?

25              (DOCUMENT DISPLAYED.)

1  **BY MS. JOHNSON**

2  **Q**   PAGE 3, PARAGRAPH 8, THE REPORT STATES:

3            "PRISON OVERCROWDING IN MANY RESPECTS MAKES

4         THE PRISON CLASSIFICATION SYSTEM MEANINGLESS."

5  **A**   YES.

6  **Q**      "THE CLASSIFICATION OF INMATES BECOMES NO

7         MORE THAN A DRILL TO FIND AN EMPTY BED."

8         DO YOU SEE THAT?

9  **A**   YES, I DO.

10 **Q**   YOU DO NOT KNOW HOW MANY INMATES, IF ANY, HAVE BEEN

11 IMPROPERLY CLASSIFIED IN CALIFORNIA'S PRISONS DUE TO

12 OVERCROWDING, DO YOU?

13 **A**   HOW MANY INMATES?

14 **Q**   HOW MANY.

15 **A**   ARE -- NO, I DO KNOW FROM TALKING TO -- VISITING AT A

16 RECEPTION CENTER, VISITING THE STAFF OF THE RECEPTION CENTER,

17 VISITING WITH THE DEPARTMENT OF STAFF WHO WERE RESPONSIBLE FOR

18 ASSIGNMENT OF STAFF SUBSEQUENT TO RECEPTION, THAT THEIR ONLY

19 TASK AND PRIMARY TASK WAS TO FIND AN EMPTY BED.  I WAS TOLD

20 THAT.

21 **Q**   OKAY.  I'D LIKE TO READ FROM YOUR DEPOSITION TRANSCRIPT,

22 PAGE 73, LINES 10 THROUGH 21.

23            (DOCUMENT DISPLAYED.)

24 **BY MS. JOHNSON**

25 **Q**   THAT IS -- STARTING AT LINE 10:

1              "ON PAGE 3 OF YOUR REPORT, JUST AGAIN THE

2          NEXT SENTENCE DOWN, YOU WROTE 'PRISON

3          OVERCROWDING IN MANY RESPECTS MAKES THE PRISON

4          CLASSIFICATION SYSTEM MEANINGLESS.  THE

5          CLASSIFICATION OF INMATES BECOMES NO MORE THAN A

6          DRILL TO FIND AN EMPTY BED.'  DO YOU SEE THAT?"

7    **A**  YES, I DO.

8    **Q**  ANSWER -- I'M READING FOR RIGHT NOW.

9    **A**  I'M SORRY.

10   **Q**          "ANSWER:  YES.

11              "QUESTION:  TO YOUR KNOWLEDGE, HOW MANY

12          INMATES HAVE BEEN IMPROPERLY CLASSIFIED DUE TO

13          OVERCROWDING?

14              "ANSWER:  I CAN'T MAKE A QUANTITATIVE

15          JUDGMENT."

16          **MR. SPECTER:**  I WOULD LIKE THE NEXT SENTENCE READ, OR

17   THE NEXT TWO -- LINES 22 THROUGH PAGE 74, LINE 5.

18          **JUDGE HENDERSON:**  COULD YOU READ THOSE ALSO, COUNSEL?

19          **MS. JOHNSON:**  I'M SORRY.  I DIDN'T HEAR THOSE.

20          **JUDGE HENDERSON:**  REPEAT THE LINES YOU WANT ADDED,

21   MR. SPECTER.

22          **MR. SPECTER:**  PAGE 73, LINES 22 TO PAGE 74, LINE 5.

23          **JUDGE HENDERSON:**  READ THOSE INTO THE RECORD, IF YOU

24   WOULD.

25          **MS. JOHNSON:**  "QUESTION:  SO WHAT WAS THE BASIS

1        OF YOUR STATEMENT THAT THE CLASSIFICATION OF

2        INMATES BECOMES NO MORE THAN A DRILL TO FIND AN

3        EMPTY BED IF YOU DON'T EVEN KNOW HOW MANY INMATES

4        HAVE BEEN MISCLASSIFIED?

5            "ANSWER:  I OBSERVED THE PROCESS OF THE

6        CLASSIFICATION UNIT, OR RECEPTION CENTER UNIT,

7        RATHER.  I HAD CONVERSATION WITH THE PERSON WHO

8        HAD OVERALL RESPONSIBILITY WITHIN THE DEPARTMENT

9        RELATIVE TO CLASSIFICATION."

10        **MR. SPECTER:**  THANK YOU.

11   **BY MS. JOHNSON**

12   Q    ON PAGE 3 OF YOUR REPORT, AGAIN AT PARAGRAPH 8 YOU WROTE:

13            "THE CLASSIFICATION AS A DRILL TO FIND AN

14        EMPTY BED, 'RESULTS IN A GREATER RISK OF

15        VIOLENCE AND THE INAPPROPRIATE HOUSING OF

16        PRISONERS WHO NEED HEALTHCARE SERVICES'."

17        DO YOU SEE THAT?

18   A    YES.

19   Q    YOU DO NOT KNOW HOW MANY INMATES WHO NEED HEALTHCARE

20   SERVICES ARE CLASSIFIED INAPPROPRIATELY IN CALIFORNIA'S PRISONS,

21   DO YOU?

22   A    I CANNOT PUT A NUMBER TO IT, YES.

23   Q    YOU DO NOT KNOW HOW MANY INMATES WHO NEED HEALTHCARE

24   SERVICES WERE NOT IN APPROPRIATE HOUSING AS OF AUGUST 2008, DO

25   YOU?

1    **A**    NO, I DO NOT.

2    **Q**    ON PAGE 3 OF YOUR REPORT, PARAGRAPH 9, YOU WROTE:

3              "THE CONCLUSION THE EXPERT PANEL REACHED

4              WITH RESPECT TO REHABILITATION IS EQUALLY

5              APPLICABLE TO HEALTHCARE.  THE INCIDENCES OF

6              VIOLENCE AND OTHER NEGATIVE CONSEQUENCES OF

7              OVERCROWDING DEGRADE THE CDCR'S ABILITY TO

8              CONSISTENTLY OPERATE REHABILITATION PROGRAMS IN

9              THE PRISON ENVIRONMENT.

10             "WHILE LOCKDOWNS AND CONTROLLED MOVEMENTS

11             ALLOW THE CDCR TO INCREASE THE SAFETY OF ITS

12             CORRECTIONAL OFFICERS AND PRISONERS, WHEN

13             WARDENS ENACT THE SECURITY MEASURES, THEY CANCEL

14             ALL PROGRAMMING IN THE AFFECTED PRISON AREAS."

15             WHEN YOU PREPARED YOUR REPORT IN THIS CASE, YOU DO

16   NOT KNOW OF EVEN ONE SPECIFIC INSTANCE IN THE PRECEDING YEAR

17   WHERE A PRISONER WAS DENIED MEDICAL HEALTHCARE DUE TO A

18   LOCKDOWN, DID YOU?

19   **A**    NO, NOT A SPECIFIC.

20   **Q**    WHEN YOU PREPARED YOUR REPORT IN THIS CASE, YOU DID NOT KNOW

21   OF EVEN ONE SPECIFIC INSTANCE IN THE PRECEDING YEAR WHERE A

22   PRISONER WAS DENIED NEEDED MENTAL HEALTHCARE DUE TO A LOCKDOWN,

23   DID YOU?

24   **A**    I DID READ A CASE ABOUT A DEVELOPMENTALLY DISABLED INMATE

25   THAT WAS NOT PROVIDED SERVICES.  FROM MY EXPERIENCE, IN TERMS OF

1   THE OVERCROWDING, IN TERMS OF THE INCREASED LEVEL OF VIOLENCE

2   AND TENSION, IT WAS MY CONCLUSION THAT THERE WAS NOT SUFFICIENT

3   CAPACITY TO PROVIDE HEALTHCARE RESPONSE TO THAT POPULATION.

4   Q    OKAY.  I WOULD LIKE TO READ FROM YOUR DEPOSITION ON PAGE 81,

5   LINE 6 THROUGH 14, STARTING ON LINE 6.

6                   "OKAY.  TO YOUR KNOWLEDGE, IN THE LAST YEAR,

7               HOW MANY SPECIFIC INSTANCES HAVE OCCURRED WHERE

8               A PRISONER WAS DENIED NEEDED MEDICAL --"

9           **JUDGE KARLTON:**  WHAT BASIS IS THERE FOR YOU TO READ

10  IT?  IT'S NOT IMPEACHMENT.  HE AGREES WITH YOU THAT HE'S SIMPLY

11  EXPRESSING HIS OPINION BASED ON 35 YEARS OF EXPERIENCE, NOT

12  GOING OUT AND ASKING INDIVIDUALS WHETHER OR NOT THEY RECEIVED

13  ADEQUATE MEDICAL CARE.  WHY ARE YOU READING THIS?

14          **MS. JOHNSON:**  I WAS READING IT FOR IMPEACHMENT, YOUR

15  HONOR, BECAUSE HE DID NOT ANSWER A SIMPLE "NO" TO THE QUESTION,

16  WHICH IS WHAT HE DID -- HE DOES NOT HAVE INFORMATION ABOUT ANY

17  SPECIFIC INSTANCES WHERE A PRISONER WAS DENIED MENTAL

18  HEALTHCARE.

19          **JUDGE KARLTON:**  I BELIEVE YOU.  I ALSO BELIEVE HIM

20  WHEN HE SAID HE DIDN'T DO IT.

21  *BY MS. JOHNSON*

22  Q    ON PAGE 4 OF YOUR REPORT AT PARAGRAPH 10, YOU WROTE --

23          **JUDGE KARLTON:**  I'M SORRY.  I SPOKE FOR MYSELF

24  INSTEAD OF --

25          **JUDGE HENDERSON:**  THAT'S FINE.

1              **JUDGE KARLTON:**  I KEEP FORGETTING THOSE GUYS ARE

2 THERE.

3 *BY MS. JOHNSON*

4 **Q**             "SEVERE OVERCROWDING LIKE THAT

5             AFFECTING CALIFORNIA PRISONS RESULTS IN A LACK

6             OF TREATMENT AND OFFICE SPACE AND DECREASED

7             ACCESS TO HEALTHCARE SERVICES."

8             WHEN YOU PREPARED YOUR REPORT IN THIS CASE, YOU DID

9 NOT KNOW OF EVEN ONE SPECIFIC INSTANCE IN THE PRECEDING YEAR

10 WHERE A PRISONER WAS DENIED ACCESS TO HEALTHCARE SERVICES DUE TO

11 SEVERE OVERCROWDING, DID YOU?

12 **A**   I DID NOT KNOW OF A SPECIFIC CASE.

13 **Q**   ON PAGE 4 OF YOUR REPORT, AGAIN AT PARAGRAPH 10, YOU WROTE:

14             "OVERCROWDING REDUCES THE OPPORTUNITY FOR

15             PRISONERS TO PROGRAM WHICH CAUSES OBVIOUS

16             IDLENESS."

17             YOU ARE NOT AWARE OF ANY INSTANCES WHERE PRISONER

18 IDLENESS RESULTED IN THE DENIAL OF NEEDED MENTAL HEALTHCARE OR

19 MEDICAL HEALTHCARE, ARE YOU?

20 **A**   SPECIFIC CASES AGAIN, NO.

21 **Q**   AT TIMES WHEN YOU WERE SECRETARY OF THE WASHINGTON STATE

22 DEPARTMENT OF CORRECTIONS, THE PRISON POPULATION EXCEEDED THE

23 SYSTEM'S DESIGN CAPACITY, CORRECT?

24 **A**   THAT'S CORRECT.

25 **Q**   AT TIMES WHEN YOU WERE SECRETARY OF THE WASHINGTON STATE

1  DEPARTMENT OF CORRECTIONS, THE PRISON POPULATION EXCEEDED THE

2  PRISON SYSTEM'S OPERATIONAL CAPACITY, CORRECT?

3  **A**   THAT'S CORRECT.

4  **Q**   IT IS YOUR OPINION THAT THE WASHINGTON STATE DEPARTMENT OF

5  CORRECTIONS WAS STILL PROVIDING ADEQUATE MEDICAL AND MENTAL

6  HEALTHCARE AT THE TIMES THE PRISONS WERE ABOVE EVEN OPERATIONAL

7  CAPACITY WHEN YOU WERE SECRETARY, CORRECT?

8  **A**   THAT'S CORRECT.

9  **Q**   SO, IN YOUR EXPERIENCE, IT IS POSSIBLE FOR A PRISON SYSTEM

10 THAT IS ABOVE OPERATIONAL CAPACITY TO PROVIDE ADEQUATE MEDICAL

11 AND MENTAL HEALTHCARE, CORRECT?

12 **A**   DEPENDING ON THE LEVEL OF CROWDING, THERE IS A SIGNIFICANT

13 DIFFERENCE OF THE LEVEL OF CROWDING IN THE STATE OF CALIFORNIA

14 AND ANY OTHER JURISDICTION THAT I HAVE BEEN INVOLVED IN.

15         **JUDGE KARLTON:**  BUT THE QUESTION IS -- LET'S START

16 FROM THE BEGINNING.  IT IS POSSIBLE AT SOME LEVEL OF

17 OVERCROWDING TO NONETHELESS PROVIDE ADEQUATE CARE?

18         **THE WITNESS:**  AT SOME LEVEL, YES.

19         **JUDGE KARLTON:**  BUT YOUR OPINION IS THAT CALIFORNIA'S

20 OVERCROWDING, I TAKE IT THAT -- FEEL FREE TO TELL ME I GOT IT

21 WRONG.  I TAKE IT THAT YOUR OPINION IS THAT CALIFORNIA'S SYSTEM

22 IS SO OVERCROWDED THAT THAT IS NOT POSSIBLE?

23         **THE WITNESS:**  THAT IS MY OPINION.  IT IS -- I DON'T

24 KNOW OF ANOTHER STATE, YOUR HONOR, THAT HAS EXPERIENCED ANYTHING

25 CLOSE TO THIS LEVEL OF OVERCROWDING.  IT IS JUST -- IT JUST

1   DOESN'T EXIST.

2   **BY MS. JOHNSON**

3   Q    WHEN YOU WERE IN PENNSYLVANIA AND YOU HAD THAT LAWSUIT THAT

4   WAS BROUGHT AFTER THE RIOTS -- YOU AND MR. SPECTER SPOKE ABOUT

5   ON DIRECT, YOU RECALL THAT?

6   A    YES, I DO.

7   Q    ONE OF THE SOLUTIONS WAS SHIPPING 800 OF THE PRISONERS TO

8   FEDERAL BUREAU OF PRISONS?

9   A    THAT'S CORRECT.

10  Q    AND ANOTHER SOLUTION WAS BUILDING FIVE MORE PRISONS IN THREE

11  YEARS?

12  A    THERE WERE FIVE PRISONS BUILT IN FIVE YEARS, BUT THERE WAS

13  ADDITIONAL OTHER THINGS.  WE WENT TO THE LEGISLATURE.  WE

14  CREATED NEW SENTENCING LAWS.  IT WAS A STATE SIMILAR TO

15  CALIFORNIA.  THE SENTENCING GRID IN PENNSYLVANIA AT THE TIME,

16  YOUR HONOR, INITIALLY WAS -- ONLY ALLOWED FOR SENTENCE OF TOTAL

17  CONFINEMENT.  WE MODIFIED THE GRID AND ALLOWED MORE INTERMEDIATE

18  SANCTIONS AND NON-TOTAL CONFINEMENT CENTERS.

19  Q    ONE OF THE SOLUTIONS WAS TO BUILD MORE PRISONS, CORRECT?

20  A    THAT'S RIGHT.

21  Q    MR. LEHMAN, JUST TO CLARIFY, YOU WERE PAID BY PLAINTIFFS TO

22  TESTIFY IN THIS CASE, WERE YOU NOT?

23  A    YES.

24          **JUDGE HENDERSON:**  COUNSEL?

25  ///

1          **CROSS-EXAMINATION BY MR. KAUFHOLD**

2          **MR. KAUFHOLD:**  STEVE KAUFHOLD FOR THE LEGISLATIVE

3 INTERVENORS.

4 ***BY MR. KAUFHOLD***

5 **Q**   MR. LEHMAN, I WANT TO ASK JUST REAL QUICKLY ABOUT THE

6 RESOLUTION OF THE AUSTIN CASE THAT YOU TESTIFIED ABOUT EARLIER.

7 WERE YOU STILL THE SECRETARY WHEN THAT CASE WAS RESOLVED?

8 **A**   YES, I WAS.

9 **Q**   AND AS PART OF THE RESOLUTION OF THAT CASE, OR AT THE TIME

10 OF THE RESOLUTION, DID YOU BELIEVE THAT THE PENNSYLVANIA SYSTEM

11 WAS OVERCROWDED?

12 **A**   YES, I DID.

13 **Q**   AND WHEN YOU --

14 **A**   AT THE TIME OF THE RESOLUTION OR THE TIME OF THE -- IN

15 EITHER CASE, YES.

16 **Q**   AND WHEN THE CASE WAS RESOLVED, THE RESOLUTION DID NOT

17 INVOLVE A PRISONER RELEASE ORDER; IS THAT CORRECT?

18 **A**   THAT'S CORRECT.

19          **MR. KAUFHOLD:**  NO FURTHER QUESTIONS.

20          **JUDGE HENDERSON:**  REDIRECT?

21          **MR. SPECTER:**  I COULDN'T HEAR HIS LAST ANSWER.  COULD

22 YOU READ THAT TO ME, PLEASE?

23          **JUDGE KARLTON:**  THE LAST ANSWERS WAS "YES."

24          **MR. SPECTER:**  I'M SORRY.

25          **JUDGE KARLTON:**  "WHEN THE CASE WAS RESOLVED, THE

```
 1              RESOLUTION DID NOT INVOLVE A PRISONER RELEASE

 2              ORDER; IS THAT CORRECT?

 3              "ANSWER YES."

 4         MR. SPECTER:  THANK YOU.

 5         REDIRECT EXAMINATION BY MR. SPECTER

 6  BY MR. SPECTER

 7  Q    WAS THE PRISON POPULATION -- WAS THE CROWDING LOWER THAN IT

 8  WAS WHEN THE CASE WAS FILED?

 9  A    I'M SORRY, COUNSEL?

10  Q    I'LL START -- I'LL BACK UP A LITTLE BIT.

11              SPEAKING OF THE AUSTIN CASE?

12  A    OKAY.

13  Q    WHEN IT WAS FILED, YOU WERE AT ABOUT 150 PERCENT OF

14  OVERCROWDING, RIGHT?

15  A    THAT'S CORRECT.

16  Q    WHAT WAS THE PERCENT OF OVERCROWDING WHEN IT WAS RESOLVED?

17  WAS IT LOWER OR HIGHER OR WHAT?

18  A    ACTUALLY, IT WAS RESOLVED WITHIN SEVERAL MONTHS, AND IT WAS

19  RESOLVED ON SPECIFIC COMMITMENTS WE MADE IN TERMS OF BUILDING

20  AND REDUCING THE CROWDING.

21  Q    OKAY.  AND WHEN THE LEVEL OF MEDICAL CARE MET THE

22  REQUIREMENTS OF THE SETTLEMENT -- FIRST, YOU HAD A SETTLEMENT

23  WHICH REQUIRED YOU TO IMPROVE THE MEDICAL CARE SYSTEM; IS THAT

24  RIGHT?

25  A    THAT'S CORRECT.
```

1   Q    AND THAT TOOK SOME TIME TO EFFECTUATE; IS THAT RIGHT?

2   A    THAT'S CORRECT.

3   Q    AND DURING TIME WHEN YOU WERE EFFECTUATING THAT, THE

4   POPULATION OF THE PRISON SYSTEM WAS -- THE CROWDING AT LEAST WAS

5   BEING -- WAS REDUCED, RIGHT?

6   A    THE CROWDING WAS -- THERE WAS NOT A SPECIFIC TIMELINE

7   RELATIVE TO IT.  WE CREATED -- THE AGREEMENT WAS TO CREATE A

8   HEALTHCARE DEPARTMENT.

9   Q    RIGHT.

10  A    THE AGREEMENT WAS TO FOLLOW THE RECOMMENDATIONS OF THE

11  EXPERTS THAT WE BROUGHT IN AND TO ACQUIRE ADDITIONAL SPACE IN

12  RELATION TO HEALTHCARE THROUGH THE CONSTRUCTION PROGRAM.

13  Q    SO WHAT I'M SAYING IS THAT, ISN'T IT TRUE THAT THE

14  CROWDING -- THE LEVEL OF CROWDING WAS REDUCED FROM THE TIME WHEN

15  THE CASE WAS FIRST BROUGHT UNTIL THE TIME WHEN THE MEDICAL --

16  THE PROVISION OF MEDICAL CARE --

17  A    YES.

18  Q    -- BECAME ADEQUATE?

19  A    I'M SORRY.  YES.

20  Q    OKAY.  AND YOU MENTIONED INTERMEDIATE SANCTIONS OR -- IN

21  RESPONSE TO A QUESTIONS BY MS. JOHNSON.  DID THOSE INTERMEDIATE

22  SANCTIONS INVOLVE NOT COMING TO PRISON?

23  A    YES, IT DID.

24  Q    SO THEY WERE SENTENCED FOR THE SAME TYPE OF FELONIES, BUT

25  THE LEGISLATURE, WHOEVER THE AUTHORITY WAS, DECIDED TO SHIFT THE

1  SENTENCING STRUCTURE SO THAT FEWER PEOPLE -- FEWER PEOPLE FOR

2  THOSE CRIMES CAME TO PRISON?

3  **A**   THAT'S CORRECT, BECAUSE THE ORIGINAL GRID ONLY PROVIDED FOR

4  TOTAL CONFINEMENT.

5  **Q**   I SEE.  AND IN SUBSEQUENT DEPOSITION, YOU HAVE REVIEWED

6  REPORTS OF THE RECEIVER AND THE SPECIAL MASTER; IS THAT CORRECT?

7  **A**   THAT'S CORRECT.

8  **Q**   DO THOSE REPORTS CHANGE YOUR OPINION IN ANY WAY ABOUT THE

9  EFFECT OF OVERCROWDING ON THE DELIVERY OF HEALTHCARE SERVICES?

10  **A**   NO.  IN FACT, IT ONLY MADE MY OPINION STRONGER.  I MEAN,

11  BECAUSE READING THOSE REPORTS, YOU GET THE CLEAR PICTURE OF THE

12  INADEQUACY OF THE SPACE AVAILABLE RELATIVE TO HEALTHCARE.

13          **MR. SPECTER:**  THANK YOU, YOUR HONOR.

14          THANK, MR. LEHMAN.

15          **JUDGE HENDERSON:**  OKAY.  AND THANK YOU FOR

16  TESTIFYING, MR. LEHMAN.  YOU MAY STEP DOWN, AND YOU'RE EXCUSED.

17          WE WILL TAKE OUR LUNCH RECESS AT THIS TIME FOR ONE

18  HOUR.  AND LET ME REMIND THE PARTIES THAT WE NEED ENOUGH

19  WITNESSES TO GO THE REST OF THE DAY.  OKAY.  COURT IS ADJOURNED.

20              (LUNCHEON RECESS TAKEN FROM 11:55 A.M. UNTIL

21              1:05 P.M.)

22          **JUDGE HENDERSON:**  OKAY. COURT IS BACK IN SESSION.

23          YOU MAY PROCEED WHEN YOU'RE READY, COUNSEL.

24          **MS. KAHN:**  GOOD AFTERNOON, YOUR HONOR.  JANE KAHN ON

25  BEHALF OF PLAINTIFFS.  AND WE CALL OUR NEXT WITNESS, DR. CRAIG

 1  HANEY.

 2          **THE CLERK:**  PLEASE STEP UP, AND RAISE YOUR RIGHT

 3  HAND.

 4                  (THEREUPON, THE WITNESS WAS SWORN.)

 5          **THE WITNESS:**  YES, I DO.

 6          **THE CLERK:**  PLEASE HAVE A SEAT.  SPEAK INTO THE

 7  MICROPHONE.  MY NAME IS CRAIG WILLIAM HANEY, H-A-N-E-Y.

 8          **MS. KAHN:**  YOUR HONORS, DR. HANEY'S QUALIFICATIONS

 9  ARE SET FORTH IN PARAGRAPHS ONE THROUGH TEN OF THE AUGUST 15TH,

10  2008 REPORT.  AND HIS CV IS LOCATED IN APPENDIX A TO THE

11  AUGUST 15, 2008 EXPERT REPORT.

12          WE OFFER THIS REPORT NOW, WHICH IS LOCATED AT COLEMAN

13  DOCKET 3201 AS DR. HANEY'S DIRECT TESTIMONY.

14          DR. HANEY IS A PROFESSOR OF PSYCHOLOGY AT THE

15  UNIVERSITY OF CALIFORNIA AT SANTA CRUZ.

16          HE STUDIED THE PSYCHOLOGICAL EFFECTS OF LIVING AND

17  WORKING IN PRISONS FOR THE PAST 35 YEARS AND HAS ANALYZED PRISON

18  CONDITIONS IN AT LEAST 20 DIFFERENT STATE PRISON SYSTEMS AND IN

19  THE FEDERAL AND INTERNATIONAL PRISON SYSTEMS.

20          HE'S BEEN QUALIFIED AS AN EXPERT IN --

21          **MS. TILLMAN:**  OBJECTION TO COUNSEL TESTIFYING.

22          **JUDGE HENDERSON:**  PARDON?

23          **MS. TILLMAN:**  OBJECTION TO COUNSEL TESTIFYING.  I

24  APOLOGIZE.  THIS MICROPHONE IS NOT WORKING.

25          **JUDGE HENDERSON:**   SHE'S LAYING HIS QUALIFICATIONS.

1          **JUDGE KARLTON:**  IT'S ALL IN EVIDENCE, AND SHE'S JUST

2    REPEATING IT.  AND IT'S HER TIME, IF SHE THINKS THAT IS A USEFUL

3    THING TO DO, TO SPEND IT ON.

4          **MS. KAHN:**  SHORTENING THE TIME, YOUR HONORS.

5          HE'S BEEN QUALIFIED AS AN EXPERT IN NUMEROUS FEDERAL

6    CASES ON PRISON CONDITIONS, INCLUDING IN THE COLEMAN TRIAL.

7          WE NOW OFFER DR. HANEY AS AN EXPERT ON THE PSYCHOLOGY

8    OF IMPRISONMENT AND IMPACT OF PRISON CONDITIONS, INCLUDING

9    OVERCROWDING OF PRISONERS IN THE PRISON SYSTEMS.

10          **JUDGE HENDERSON:**  COURT WILL FIND HE IS SO QUALIFIED.

11          THEREUPON --

12                    **DR. CRAIG WILLIAM HANEY**

13    WAS CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFFS, AND AFTER

14    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15    FOLLOWS:

16                    **DIRECT EXAMINATION**

17    **BY MS. KAHN:**

18    **Q.**  DR. HANEY, I WOULD LIKE YOU TO BRIEFLY EXPLAIN WHAT IS

19    OVERCROWDING IN PRISONS AND IN WHAT WAYS DOES OVERCROWDING IN

20    PRISONS EFFECT THE FUNCTIONING OF A PRISON SYSTEM?

21    **A.**  OVERCROWDING IN A PRISON SYSTEM CAN BE DEFINED AS A PRISON

22    OR PRISON SYSTEM HOLDING MORE PEOPLE THAN IT HAS THE RESOURCES

23    TO HUMANLY AND SAFELY ACCOMMODATE.

24          SO IT MEANS WHAT IT MEANS IN MOST OTHER CONTEXTS:

25    HAVING TOO MANY PEOPLE IN A PARTICULAR ENVIRONMENT.  BUT IN A

1  PRISON SETTING, IT MEANS A COUPLE OF ADDITIONAL THINGS.

2          IN A PRISON ENVIRONMENT, BECAUSE PRISONS ARE TOTAL

3  INSTITUTIONS, THE ENVIRONMENT ITSELF HAS A RESPONSIBILITY FOR

4  PROVIDING FOR AND ADDRESSING THE NEEDS OF PRISONERS IN A MORE

5  COMPLETE OR FULL WAY THAN ALMOST ANY OTHER CONTEXT IN SOCIETY

6  THAN ANY ONE OF US FREE CITIZENS WOULD ENTER.

7          SO WHEN OVERCROWDING OCCURS IN A PRISON SETTING, IT

8  CAN REVERBERATE THROUGHOUT THE ENTIRE SYSTEM. THE SYSTEM HAS THE

9  RESPONSIBILITY OF, AS I SAID, ADDRESSING THE NEEDS OF THE

10 PRISONERS.

11         AND WHEN THOSE NEEDS BEGIN TO BE -- THE PRISON BEGINS

12 TO FAIL TO ADDRESS THOSE NEEDS, THEN THOSE PROBLEMS CAN AN

13 ACCUMULATE OR AGGREGATE IN THE PRISON SYSTEM BECAUSE PRISONERS

14 HAVE NO OTHER WAY, NO OTHER AVENUE, NO OTHER OUTLET TO GET THOSE

15 NEEDS AND THOSE PROBLEMS ADDRESSED.

16         IT'S PARTICULARLY POIGNANT ALSO IN A PRISON SYSTEM

17 BECAUSE PRISONERS WHO LEAVE A SYSTEM THAT IS OVERCROWDED, NOT

18 HAVING HAD THOSE PROBLEMS OR THOSE NEEDS ADDRESSED, ARE

19 OFTENTIMES AT GREATER RISK OF COMING BACK INTO THAT SYSTEM.

20         SO THAT OVER TIME AN OVERCROWDED SYSTEM TENDS TO

21 BECOME SELF-AGGRANDIZING OR SELF-EXACERBATING, IF YOU WILL.

22 THAT IS TO SAY PROBLEMS THAT DON'T GET ADDRESSED AT AN EARLIER

23 POINT IN TIME HAVE A WAY OF INCREASING OR INTENSIFYING OVER

24 TIME.

25         AND SO A SYSTEM THAT IS OVERCROWDED ALMOST BEGETS

1  ADDITIONAL OVERCROWDING, BECAUSE IT FAILS TO ADDRESS THE

2  PROBLEMS OF PEOPLE WHO WERE THERE, SOME PERCENTAGE OF WHOM WILL

3  COME BACK INTO THAT SYSTEM.

4  **Q.**  DOES THE DURATION THAT A SYSTEM HAS BEEN OVERCROWDED HAVE AN

5  IMPACT ON THE EFFECT OF OVERCROWDING IN A SYSTEM?

6  **A.**  YES, FOR PRECISELY --

7          **MS. TILLMAN:**  OBJECTION, VAGUE AND AMBIGUOUS.

8          **JUDGE KARLTON:**  I'M SORRY?

9          **MS. TILLMAN:**  VAGUE AND AMBIGUOUS.

10  **BY MS. KAHN:**

11  **Q.**  DOES THE DURATION OF TIME, THE NUMBER OF YEARS A SYSTEM HAS

12  BEEN OVERCROWDED, IMPACT ON THE EFFECT OF WHEN A SYSTEM IS

13  OVERCROWDED?

14  **A.**  YES, IT DOES. AND, AGAIN, FOR EXACTLY THAT REASON.

15  PRISONERS TEND TO STAY IN PRISON FOR A PERIOD OF TIME, AGAIN,

16  UNLIKE OTHER ENVIRONMENTS IN SOCIETY THAT MIGHT BE OVERCROWDED.

17          IF YOU THINK, FOR EXAMPLE, OF A DOCTOR'S OFFICE OR

18  SUBWAY STATION, YOU'RE THERE FOR A BRIEF PERIOD OF TIME, AND THE

19  OVERCROWDING IS SOMETHING THAT YOU CAN ESCAPE FROM OR CAN BE

20  ABATED OVER TIME.

21          IN A PRISON SYSTEM PRISONERS ARE THERE FOR A LONG

22  PERIOD OF TIME.  SO IF THEY ARE IN A OVERCROWDED ENVIRONMENT AND

23  NEEDS AND PROBLEMS THEY HAVE ARE NOT BEING SOLVED AND ADDRESSED,

24  THOSE PROBLEMS TEND TO EXACERBATE.

25          SO THERE WAS AN AGGREGATION OF PROBLEMS WITHIN A

1  SYSTEM AT THE TIME THE PRISONERS ARE THERE.  AND THEN, THERE'S

2  THIS OTHER DIMENSION THAT I ALLUDED TO A MOMENT AGO, WHICH IS

3  WHEN PRISONERS ARE RELEASED FROM PRISON, IF THEY ARE RELEASED

4  WITH UNMET NEEDS OR PROBLEMS THAT HAVE NOT BEEN RESOLVED OR

5  ISSUES THAT HAVE NOT BEEN ADDRESSED WHILE THEY ARE INCARCERATED,

6  THEY ARE AT RISK OF COMING BACK INTO THE SYSTEM OFTENTIMES WITH

7  THOSE PROBLEMS THE SAME OR HAVING EXACERBATED AFTER THEY ARE

8  RELEASED.

9           SO, AGAIN, THE PERIOD OF TIME THAT THE SYSTEM IS

10 OVERCROWDED MATTERS, BECAUSE THE LONGER THE OVERCROWDING OCCURS,

11 THE LONGER THE SYSTEM OPERATES, AND THE GREATER THE NUMBER OF

12 UNMET NEEDS THAT AGGREGATE OVER TIME, THE WORSE THE SITUATION

13 GETS.

14          AND AS I SAID, AS A RESULT OVERCROWDED, PARTICULARLY

15 SEVERELY OVERCROWDED SYSTEMS, TEND TO BEGAT EVEN MORE

16 OVERCROWDING, BECAUSE THEY ARE NOT SOLVING PROBLEMS THAT OVER

17 TIME EITHER HAVE TO BE SOLVED OR RESULT IN PEOPLE COMING BACK

18 INTO THE PRISON SYSTEM AT HIGHER RATES.

19 **Q.**  IN WHAT WAYS IS CALIFORNIA'S PRISON SYSTEM OVERCROWDED?

20 **A.**  IT'S OVERCROWDED IN VIRTUALLY EVERY CONCEIVABLE WAY ONE

21 WOULD MEASURE OVERCROWDING. IT'S OVERCROWDED IN THE SENSE OF

22 HAVING FAR TOO FEW SPACES FOR PEOPLE TO BE HOUSED.  AND IN A

23 CERTAIN SENSE, THAT'S THE MOST BASIC AND FOCUSED DEFINITION OF

24 OVERCROWDING.  SO AS I'M SURE THE COURT KNOWS, THIS SYSTEM HAS

25 BEEN OPERATING AT ROUGHLY 190 PERCENT OF CAPACITY.

1            190 PERCENT OF CAPACITY COMPARATIVELY SPEAKING IS

2    ALMOST AN UNHEARD OF NUMBER, AN UNHEARD OF AMOUNT OF

3    OVERCROWDING OPERATING AT A LEVEL BEYOND PHYSICAL OR DESIGN

4    CAPACITY OF THE SYSTEM.

5            THE PHYSICAL OR DESIGN CAPACITY TAKES INTO ACCOUNT

6    NOT ONLY THE NUMBER OF SPACES THAT ARE AVAILABLE FOR PEOPLE TO

7    LIVE IN, BUT DESIGN CAPACITY ALSO IS CALCULATED ON THE BASIS OF

8    PROGRAMMING IN OTHER NECESSARY SPACE WITHIN THE SYSTEM.

9            SO A SYSTEM THAT IS OPERATING AT 190 PERCENT OF

10   CAPACITY HAS NOT ONLY APPROXIMATELY HALF THE SPACES AVAILABLE

11   FOR PEOPLE TO BE HOUSED IN, BUT IT ALSO HAS APPROXIMATELY HALF

12   OF THE SPACES THAT ARE AVAILABLE TO PROVIDE PROGRAMMING AND

13   OTHER KINDS OF SUPPORT WITHIN THE SYSTEM.

14           CALIFORNIA IS -- SO THE DEPTH OF THE PROBLEM OR THE

15   MAGNITUDE OF THE OVERCROWDING IS ALMOST UNHEARD OF. AND I SAY

16   THAT, WHEN I SAY "ALMOST UNHEARD OF," I MEAN EVEN HISTORICALLY

17   ALMOST UNHEARD OF.

18           IN A PERIOD OF TIME IN THE LAST 30 YEARS WHEN LOTS OF

19   PRISON SYSTEMS HAVE BEEN VERY OVERCROWDED, A LEVEL OF

20   OVERCROWDING OF 190 PERCENT IS REMARKABLE. IT'S NOT

21   UNPRECEDENTED, BUT IT'S REMARKABLE.

22           CALIFORNIA'S OVERCROWDED IN ANOTHER SENSE.  AND THAT

23   IS IN THE SENSE THAT THE OVERCROWDING IS WIDESPREAD. IT IS NOT

24   RESTRICTED TO JUST A FEW INSTITUTIONS. IT'S OCCURRED THROUGHOUT

25   THE SYSTEM.

1          SO YOU'RE LOOKING AT INDIVIDUAL PRISONS THAT ARE

2   OPERATING AT 180, 190 OR EVEN OVER 200 PERCENT OF CAPACITY.  AND

3   THAT'S ESSENTIALLY ACROSS THE BOARD IN THE SYSTEM. IT'S

4   OVERCROWDED IN A COMPARATIVE SENSE.

5          I KNOW OF NO OTHER LARGE PRISON SYSTEM IN THE UNITED

6   STATES THAT IS AS REMOTELY OVERCROWDED AS CALIFORNIA IS.

7          AS BEST I'VE BEEN ABLE TO DETERMINE, THE ONLY STATE

8   THAT IS AS -- THAT IS EVEN CLOSE TO CALIFORNIA IN TERMS OF

9   EXTENT OF OVERCROWDING IS THE STATE OF ALABAMA, A VERY, VERY

10  SMALL SYSTEM COMPARED TO CALIFORNIA'S.

11         AND IT'S OVERCROWDED IN THE FINAL SENSE IN THAT IT

12  IS -- IT HAS BEEN OVERCROWDED FOR A LONG PERIOD OF TIME. IT

13  BEGAN TO BE OVERCROWDED 10 OR SO YEARS AGO. IT HAS CONTINUED TO

14  OPERATE.  IT BEGAN TO BE OVERCROWDED EVEN LONGER THAN THAT AGO,

15  BUT IT BEGAN TO BE SEVERELY OVERCROWDED 10 OR SO YEARS AGO AND

16  HAS CONTINUED TO OPERATE FOR THE LAST FIVE OR SIX YEARS AT A

17  LEVEL OF OVERCROWDING THAT, AS I SAID, IS ROUGHLY 190 PERCENT OF

18  CAPACITY.

19         AND ON ALL OF THOSE MEASURES THAT IS AN EXTRAORDINARY

20  LEVEL OF OVERCROWDING.

21  **Q.**  DR. HANEY, WHAT IS YOUR OPINION OF WHETHER OVERCROWDING IN

22  THE CALIFORNIA PRISONS IS THE PRIMARY CAUSE OF THE

23  CONSTITUTIONAL VIOLATIONS IN MEDICAL AND MENTAL HEALTHCARE?

24  **A.**  WELL, MY OPINION IS FOR ALL OF THE REASONS THAT I JUST

25  STATED THAT THE LEVEL OF OVERCROWDING IS UNPRECEDENTED IN THAT

1  THERE IS NO QUESTION THAT IT IS THE PRIMARY CAUSE OF THE

2  UNCONSTITUTIONAL PROVISION OF MENTAL HEALTHCARE IN THE SYSTEM.

3  **Q.**  IN FORMING YOUR OPINION, IS IT CORRECT THAT YOU RELIED ON

4  KEY DOCUMENTS IN THE CASE PRODUCED BY THE DEFENDANTS AND SPECIAL

5  MASTER AND RECEIVER, AND YOU TOURED EIGHT CALIFORNIA PRISONS?

6  **A.**  YES, THAT'S CORRECT.

7  **Q.**  DURING YOUR TOURS DID YOU SPEAK WITH PRISON STAFF AND

8  INTERVIEW PRISONERS DURING THE EIGHT PRISON SITE INSPECTIONS?

9  **A.**  YES.  EVERY ONE OF THE INSPECTIONS THERE WAS A BRIEFING, AND

10 THEN THERE WERE OFFICIALS FROM THE PRISON WHO ACCOMPANIED US

11 THROUGHOUT THE TOUR.

12 **Q.**  DO YOU RELY ON THESE TYPE OF INTERVIEWS WITH PRISON STAFF

13 AND PRISONERS IN THE COURSE OF YOUR WORK AS AN EXPERT?

14 **A.**  I DO ALL THE TIME.

15 **Q.**  DO OTHERS IN YOUR FIELD RELY ON THESE TYPE OF INTERVIEWS

16 WITH STAFF AND PRISONERS?

17 **A.**  YES, OF COURSE.

18 **Q.**  OKAY. DID YOU ALSO ON YOUR TOURS OF CDCR STAFF PERSONS ON

19 THE LAST FOUR PRISON SITE INSPECTIONS TAKE PHOTOS THAT YOU

20 DIRECTED TO HAVE TAKEN?

21 **A.**  YES, WE DIDN'T HAVE A CAMERA IN THE FIRST FOUR, BUT WE DID

22 ON THE SECOND FOUR.  AND WE HAD PHOTOGRAPHS THAT WERE TAKEN.

23 **Q.**  OKAY. I'D LIKE TO TURN TO THE PRISON SITE INSPECTIONS THAT

24 YOU UNDERTOOK IN THE CASE WHICH FORMED THE BASIS OF YOUR

25 OPINION, AND ASK YOU WHAT YOU SAW DURING THE SITE INSPECTIONS

1   THAT LED YOU TO INCLUDE THAT OVERCROWDING WAS THE PRIMARY CAUSE?

2   **A.**  I SAW A SYSTEM AS REFLECTED IN EACH ONE OF THESE INSPECTIONS

3   THAT WAS OVERWHELMED WITH THE SHEER NUMBER OF PEOPLE WHO WERE

4   CONFINED THERE. THESE WERE SYSTEMS THAT WERE CHOKED WITH TOO

5   MANY PRISONERS, NOT ENOUGH SPACE, INSUFFICIENT AMOUNT OF STAFF.

6           IN ALMOST EVERY DIRECTION THAT I TURNED I SAW

7   EVIDENCE AND EXAMPLES OF THIS, OF A SYSTEM OPERATING AT ROUGHLY

8   200 PERCENT OF ITS CAPACITY AND STRAINING UNDER THE WEIGHT OF

9   THAT CAPACITY.

10          UNABLE TO DELIVER SERVICES, UNABLE TO ADDRESS THE

11  NEEDS OF THE PEOPLE WHO WERE IN THE SYSTEM. I SAW AND HEARD FROM

12  INDIVIDUAL PRISONERS AND NUMEROUS STAFF MEMBERS ABOUT ALL OF THE

13  OVERCROWDING-RELATED PROBLEMS THAT THEY WERE CONFRONTING ON A

14  DAILY BASIS, WHETHER IT RANGED FROM THE KIND OF HOUSING THAT

15  PRISONERS WERE FORCED TO LIVE IN IN THE CALIFORNIA SYSTEM,

16  HOUSING IN SOME INSTANCES UNLIKE HOUSING I'VE SEEN ANYWHERE ELSE

17  IN ANY OTHER PRISON SYSTEM. AND I'VE BEEN LOOKING AT PRISONS FOR

18  A LONG TIME.

19          I SAW --

20  **Q.**  AND WHAT TYPE OF HOUSING WERE YOU TALKING ABOUT?

21  **A.**  I'M TALKING ABOUT PRISONERS LIVING IN CONVERTED OR MAKESHIFT

22  DORMITORIES.  PRISONERS STRETCHED OUT IN DOUBLE AND TRIPLE BUNKS

23  AS FAR AS THE EYE CAN SEE.  I'M TALKING ABOUT A VERY BIZARRE

24  HOUSING UNIT IN CALIFORNIA INSTITUTION FOR MEN IN THE COLUSA

25  UNIT WHERE THERE'S A DORMITORY HAS BEEN CREATED INSIDE THE

1  HOUSING UNIT IN THE DAYROOM OF THE HOUSING UNIT AND A CHAIN LINK

2  FENCE HAS BEEN PLACED AROUND THE DORMITORY INSIDE THAT HOUSING

3  UNIT.

4          THERE WERE DORMITORIES IN MANY OF THE REGULAR HOUSING

5  UNITS IN THE PRISONS THAT HAD BEEN CONVEYED FROM DAYROOM SPACES.

6  AS YOU PROBABLY KNOW, MOST PRISON HOUSING UNITS HAVE AREAS,

7  DAYROOM AREAS WHERE PRISONERS CAN CONGREGATE DURING THE DAY WHEN

8  THEY ARE NOT IN OTHER ACTIVITIES AND THEY ARE NOT IN THEIR

9  CELLS.

10          IN VIRTUALLY EVERY PRISON I TOURED AND INSPECTED MANY

11  OF THESE DAYROOMS HAD BEEN CONVERTED INTO DORMITORIES.  SO THERE

12  WERE DOUBLE AND TRIPLE BUNKS NOW PLACED 20 OR SO ON THE SIDE OF

13  EACH ONE OF THE --

14  Q.  WHAT OTHER AREAS, DR. HANEY -- EXCUSE ME -- DID YOU SEE

15  WHERE OVERCROWDING HAD IMPACTED THE DELIVERY OF CARE DURING YOUR

16  TOURS?

17  A.  WHAT OTHER KINDS OF AREAS?

18  Q.  BESIDES HOUSING?

19          MS. TILLMAN:  IF I MIGHT JUST ASK MS. KAHN TO GET A

20  LITTLE CLOSER TO THE MICROPHONE.  HER VOICE IS NOT CARRYING --

21          JUDGE HENDERSON:  DO THAT, PLEASE.

22          LET US KNOW IF IT WORKS.

23  BY MS. KAHN:

24  Q.  HOUSING WAS THE FIRST AREA?

25  A.  HOUSING WAS VERY MUCH CONNECTED TO PROGRAMMING.  SO IT'S NOT

1   JUST HOW PEOPLE WERE LIVING, WHAT THEY ARE DOING IN THEIR CELLS,

2   HOW THEY ARE BEING CONFINED IN THEIR CELLS AND WHAT KIND OF

3   CELLS OR DORMITORIES THEY ARE IN, BUT OVERCROWDING HAS A DIRECT

4   IMPACT ON PROGRAMMING.

5           THE LEVELS OF IDLENESS IN THE CALIFORNIA DEPARTMENT

6   OF CORRECTIONS ARE SEVERE AND WIDESPREAD. IT IS THE CASE THAT

7   ROUGHLY FIFTY PERCENT OF THE PRISONERS WHO EXIT THE CALIFORNIA

8   DEPARTMENT OF CORRECTIONS AT ANY GIVEN TIME HAVE NOT

9   PARTICIPATED IN A SINGLE PROGRAM, NOT AN EDUCATIONAL PROGRAM,

10  NOT A VOCATIONAL TRAINING PROGRAM, AND NOT A WORK PROGRAM.

11          SO THEY HAVE BEEN IDLE DURING THEIR ENTIRE PERIOD OF

12  TIME IN THE DEPARTMENT OF CORRECTIONS.  AND THAT WAS OBVIOUS IN

13  THE VARIOUS HOUSING UNITS THAT I'VE TOURED.

14          SO PROGRAMMING IS IMPACTED.

15          **JUDGE KARLTON:**  THIS IS NOT A CASE IN WHICH THE

16  PLAINTIFFS HAVE CHARGED THAT BY VIRTUE OF OVERCROWDING THERE IS

17  A GENERAL UNCONSTITUTIONAL CONDITION. IT SPECIFICALLY RELATES TO

18  WHETHER OVERCROWDING IS THE PRIMARY CAUSE OF THE FAILURE TO

19  DELIVER CONSTITUTIONALLY-ADEQUATE MENTAL AND PHYSICAL HEALTH.

20          I DON'T WANT TO CUT YOU OFF, BUT I DO WANT TO GET TO

21  WHAT THIS CASE IS ABOUT.

22          **MS. KAHN:**  EXACTLY.

23          **JUDGE KARLTON:**  WOULD YOU DISCUSS THAT WITH US, SIR?

24          **THE WITNESS:**  THOSE THINGS ARE RELATED. THE

25  ENVIRONMENT IN WHICH PEOPLE LIVE IS RELATED TO THEIR MENTAL

1  HEALTH. THE KINDS OF ADVERSE LIVING CONDITIONS THAT I SAW ARE

2  THE KINDS THAT HAVE BEEN ASSOCIATED WITH ADVERSE MENTAL HEALTH

3  CONSEQUENCES IN A NUMBER OF DIFFERENT SETTINGS.

4           IDLENESS IS ALSO SOMETHING WHICH ALSO UNDERMINES

5  PEOPLE'S MENTAL HEALTH.  SO WE'RE TALKING ABOUT A SYSTEM WHICH

6  IS CAPABLE OF EITHER GENERATING OR EXACERBATING ADVERSE MENTAL

7  HEALTH CONDITIONS AS A RESULT OF THE GENERAL CONDITIONS OF

8  CONFINEMENT.  BUT THERE WERE MANY OTHER MORE SPECIFIC ISSUES

9  THAT I CONFRONTED AND OBSERVED AS I WENT THROUGH THESE

10 INSTITUTIONS THAT SPEAK DIRECTLY TO YOUR HONOR'S POINT.

11          THE ACCESS TO APPROPRIATE LEVELS OF CARE WAS DIRECTLY

12 IMPACTED BY THE LEVEL OF OVERCROWDING.  AND THERE WERE EXAMPLES

13 OF THIS IN NUMEROUS DIFFERENT CONTEXTS.

14          THE ABILITY OF THE SYSTEM TO MOVE PEOPLE WHO WERE IN

15 CRISIS, SOMETIMES SUICIDAL OR DECOMPENSATING PRISONERS IN THE

16 MENTAL HEALTH CRISIS BEDS.  THESE ARE CRISIS BEDS COVERED BY

17 TITLE 22.

18          THERE'S A CERTAIN SPECIFIED KIND OF BED, KIND OF BED

19 A PERSON WHO IS IN NEED OF A MENTAL HEALTH CRISIS BED ARE TO BE

20 PLACED IN.

21          THERE ARE TIME LINES FOR PLACEMENT OF PEOPLE IN THESE

22 BEDS.  EVERYWHERE I WENT IN THE SYSTEM I SAW ALTERNATIVE HOUSING

23 OR WAITING AREAS WHERE PRISONERS WHO WERE WAITING TO GET INTO

24 THESE MENTAL HEALTH CRISIS BEDS WERE BEING HOUSED. NOT FOR

25 HOURS, BUT DAYS AT A TIME.

1          IN SOME INSTANCES IN TERMS OF THE MORE SHORT-TERM

2    CONFINEMENT, THEY WERE BEING HOUSED IN CAGES THAT EXIST IN THE

3    DIFFERENT PARTS OF THE PRISON.

4          SOMETIMES IN HALLWAYS, SOMETIMES ON THE DAYROOM FLOOR

5    OF A PARTICULAR UNIT, THEY WERE HOUSED IN WAITING ROOMS.  THEY

6    WERE HOUSED IN OUTPATIENT HOUSING UNIT, UNLICENSED FACILITIES OR

7    CLINICS WITHIN THE PRISON SYSTEM ITSELF, BACKED UP IN THE SYSTEM

8    AWAITING AN OPPORTUNITY TO GET INTO A MENTAL HEALTH CRISIS BED

9    OF THE SORT THAT THEY NEEDED.

10          **JUDGE KARLTON:**  LET ME INTERRUPT, AGAIN, SIR. IN YOUR

11   VIEW, IS THE DELAY WHICH YOU ARE DESCRIBING AND THE KIND OF

12   HOUSING UNITS THAT WERE BEING OCCUPIED BY PEOPLE WHO WERE BACKED

13   UP, IF YOU WILL, CONTRIBUTING TO THE MENTAL HEALTH PROBLEMS OF

14   THE POPULATION; OR THEY WERE JUST SICK BEFOREHAND, AND THEY

15   COULDN'T GET TREATMENT, OR BOTH?

16          **THE WITNESS:**  I WOULD SAY BOTH, YOUR HONOR. I BELIEVE

17   THAT THESE WERE PEOPLE WHO WERE, BY DEFINITION, SICK, BUT THEY

18   WERE GETTING SICKER AS A RESULT OF THEIR INABILITY TO GET THE

19   APPROPRIATE LEVEL OF CARE.

20          IN SOME INSTANCES THERE WERE EXAMPLES OF PEOPLE WHO

21   STARTED OUT RELATIVELY WELL WHO EITHER HAD NO MENTAL HEALTH

22   BACKGROUND OR WHO WERE AT A LOWER LEVEL OF MENTAL HEALTHCARE

23   NEED.  AND I INTERVIEWED AND SAW IN THEIR RECORDS EXAMPLES OF

24   THEM NOT GETTING THE APPROPRIATE LEVEL OF CARE, AND THEN WORKING

25   THEIR WAY TOWARDS MORE AND MORE EXTREME NEEDS, A HIGHER LEVEL OF

1  ACUITY, AND BEING PLACED IN MORE AND MORE DIRE CIRCUMSTANCES AS

2  A RESULT OF THE SYSTEM'S INABILITY TO RESPOND IN AN APPROPRIATE

3  AND TIMELY WAY TO THE NEEDS WHICH THEY HAD. MENTAL HEALTH CARE

4  MENTAL HEALTH CARE MENTAL HEALTH CARE.

5          **JUDGE KARLTON:** I WOULD ASSUME, BUT DON'T KNOW.

6  MAYBE I OUGHT TO ASK YOU THAT, FIRST OF ALL.

7          SIR, IS BEING CONFINED IN A PRISON A FACTOR

8  CONTRIBUTING TO MENTAL ILLNESS, MAYBE?

9          **THE WITNESS:**  I WOULD ANSWER YOUR HONOR BY SAYING

10 THAT IT DEPENDS ON THE KIND OF PRISONS.  I MEAN, I THINK THE

11 RESEARCH DONE OVER THE LAST 30 OR SO YEARS SUGGESTS THAT BEING

12 CONFINED IN A PRISON AND A WELL-RUN PRISON THAT IS NOT

13 SIGNIFICANTLY OVERCROWDED WHERE YOU'RE PROVIDED PROGRAMMING,

14 WHERE YOU HAVE AN OPPORTUNITY TO ENGAGE IN EDUCATIONAL OR

15 VOCATIONAL TRAINING, AND SO ON AND SO FORTH, THOSE --

16 CONFINEMENT UNDER THOSE KINDS OF CONDITIONS CERTAINLY DOES NOT

17 MAKE PEOPLE MENTALLY ILL OR EXACERBATE PREEXISTING MENTAL

18 ILLNESS.

19          BUT THE MORE SEVERE OR ADVERSE KINDS OF CONDITIONS OF

20 CONFINEMENT CAN, IN FACT, EXACERBATE EITHER PREEXISTING MENTAL

21 ILLNESS OR PREEXISTING PROBLEMS PEOPLE HAVE, WHICH GET WORSE

22 ONCE THEY ARE CONFRONTED WITH THESE KIND OF HARSH CONDITIONS OF

23 CONFINEMENT.

24          **JUDGE KARLTON:**  SO IT'S YOUR TESTIMONY -- I THINK I

25 UNDERSTAND YOU TO SAY YOUR TESTIMONY IS THAT PRESENT

1  OVERCROWDING IN CALIFORNIA IS SUCH THAT IT IS LEADING TO MORE

2  SIGNIFICANT ILLNESS THAN ONE WOULD FIND IN A PROPERLY RUN PRISON

3  WITH PROPER POPULATION.

4              **THE WITNESS:**  YES. AND ONE WITH AN ADEQUATELY

5  FUNCTIONING MENTAL HEALTHCARE DELIVERY SYSTEM.

6  **BY MS. KAHN:**

7  **Q.**  SO, DR. HANEY, SO FAR YOU HAVE TESTIFIED THAT YOU OBSERVED

8  DURING YOUR TOURS HOUSING CONDITIONS THAT WERE EITHER -- YOU

9  TESTIFIED ABOUT HOUSING CONDITIONS AND ACCESS TO MENTAL HEALTH

10 CARE. WERE THERE OTHER THINGS THAT YOU OBSERVED DURING YOUR

11 TOURS THAT YOU FELT WHERE OVERCROWDING IMPACTED ON THE DELIVERY

12 OF HEALTHCARE?

13 **A.**  YES, THERE WERE TWO OTHER MAJOR AREAS. ONE HAS TO DO WITH

14 TREATMENT SPACE. THE ABILITY OF CLINICIANS IN THE MENTAL

15 HEALTHCARE DELIVERY SYSTEM TO GARNER APPROPRIATE SPACE IN WHICH

16 TO DO TREATMENT.  AND I'M NOT TALKING ABOUT MOVING PEOPLE TO

17 APPROPRIATE LEVELS OF CARE WHICH, IN SOME SENSE, IS A

18 SPACE-RELATED ISSUE.  THERE AREN'T ENOUGH BEDS IN THE SYSTEM.

19              BUT I'M TALKING ALSO ABOUT THE ABILITY OF CLINICIANS

20 IN THE SYSTEM TO FIND APPROPRIATE SPACE IN WHICH TO ENGAGE IN

21 THERAPEUTIC ACTIVITY WITH PEOPLE WHO ARE ON THE MENTAL HEALTH

22 CASELOAD.

23              I SAW NUMEROUS EXAMPLES OF THE WAY IN WHICH

24 OVERCROWDING HAS UNDERMINED OR PRECLUDED THE ABILITY OF

25 CLINICIANS TO MAKE USE OF OPPORTUNITIES FOR THERAPY. WE'RE

1  TALKING ABOUT THE ABSENCE OF TREATMENT SPACE IN MANY UNITS,

2  PRISONERS HAVING TO BE TAKEN OUT OF UNITS, OFTENTIMES ESCORTED

3  LONG DISTANCES TO GET TO THE ONLY AVAILABLE TREATMENT SPACE IN

4  THE FACILITY.

5          CLINICIANS CONVERTING CHAPELS OR CLASSROOMS INTO

6  MAKESHIFT CLINICAL SPACES.  CONVERTING EVEN A CLOSET OR A

7  STOREROOM INTO AN AREA WHERE A CLINICAL TREATMENT ATTEMPTS TO BE

8  ACCOMPLISHED.

9          I'VE ALREADY ALLUDED TO THE USE OF CAGES. CAGES ARE

10 USED NOT ONLY AS HOLDING AREAS OR HOLDING FACILITIES IN THE

11 CALIFORNIA DEPARTMENT OF CORRECTIONS.  BUT FOR PRISONERS WHO

12 WERE IN ADMINISTRATIVE SEGREGATION, THEY ARE THE MOST COMMON

13 FORM OF THERAPEUTIC OR TREATMENT SPACE THAT IS PROVIDED.

14 OFTENTIMES THESE CAGES ARE ARRANGED --

15          **MS. TILLMAN:**  I'M GOING TO OBJECT TO THE EXTENT THAT

16 THE USE OF THE TERM "CAGES" IS MISCHARACTERIZING THE EVIDENCE.

17 I BELIEVE THEY ARE EITHER CALLED "HOLDING CELLS," IF THEY ARE

18 USED TO HOLD A PERSON PENDING TRANSFER FOR A SHORT PERIOD OF

19 TIME, OR IN A CASE OF A DIFFERENT TYPE OF SETTING THERE ARE WHAT

20 ARE CALLED "THERAPEUTIC MODULES."

21          I CAN'T TELL FROM HIS TESTIMONY WHAT HE MEANS BY

22 "CAGES."

23          **JUDGE KARLTON:**  WELL, YOU CAN FULLY EXAMINE THAT WHEN

24 YOU CROSS-EXAMINE HIM.

25          **THE WITNESS:**  THESE, THE CAGES THAT ARE USED FOR

1  THERAPY, IN MY EXPERIENCE ARE INDISTINGUISHABLE FROM THE ONES IN

2  TERMS OF THE PHYSICAL STRUCTURE USED AS HOLDING CAGES. BUT IT'S

3  NOT JUST THE USE OF CAGES FOR THESE THERAPEUTIC ACTIVITIES.

4          THE CAGES ARE OFTENTIMES LOCATED OUT ON THE DAYROOM

5  FLOOR OF AN ADMINISTRATIVE SEGREGATION FACILITY.  IN SOME

6  INSTANCES THE CAGES ARE ARRAYED IN ROWS OR SEMICIRCLES IN AREAS

7  THAT LOOK LIKE UTILITY ROOMS.

8          IN ONE OF THE FACILITIES, SALINAS VALLEY, FOR

9  EXAMPLE, THE CAGE -- THESE TREATMENT CAGES ARE IN AN AREA THAT

10 APPEARS TO BE A UTILITY ROOM WHERE THE NOISE THAT IS COMING FROM

11 THE MACHINERY IN THE IMMEDIATE AREA SO IS LOUD THAT IT'S

12 DIFFICULT EVEN TO CONVERSE IN THIS ENVIRONMENT.

13         THESE ARE OFTENTIMES DEGRADING PLACES FOR PRISONERS

14 TO BE PUT IN. THEY WILL TELL YOU THAT.

15         THEY DON'T PROVIDE CONFIDENTIALITY. THEY DON'T

16 PROVIDE THE KIND OF CONFIDENTIALITY THAT IS IMPORTANT IN A

17 CLINICAL OR THERAPEUTIC SETTING.

18         THEY ARE ALSO USED OFTENTIMES FOR SCREENING IN A

19 NUMBER OF THE RECEPTION CENTERS THAT I TOURED AND INSPECTED.

20 THE CAGES ARE USED FOR PSYCHOLOGICAL SCREENING.  SO PRISONERS

21 WHO ARE COMING INTO THE PRISON SYSTEM ARE PLACED IN ONE OF THESE

22 CAGES IN THE RECEPTION CENTER, AND THEN THERE'S AN ATTEMPT BY A

23 CLINICIAN TO DO A CLINICAL INTERVIEW.

24         AND, AGAIN, THEY PROVIDE VERY LITTLE IN THE WAY OF

25 PRIVACY, VERY LITTLE IN THE WAY OF DIGNITY, FRANKLY, FOR THE

 1  PRISONERS THAT ARE CONFINED THERE.

 2  **BY MS. KAHN:**

 3  **Q.**  THANK YOU, DR. HANEY.  AND WHAT WAS THE LAST AREA, GENERAL

 4  AREA WHERE YOU OBSERVED OVERCROWDING IMPACTING ON THE DELIVERY

 5  OF HEALTHCARE?

 6  **A.**  STAFFING. THIS IS A PROFOUND IMPACT BY THE LEVEL OF

 7  OVERCROWDING IN THE DEPARTMENT OF CORRECTIONS. I MENTIONED AT

 8  THE VERY OUTSET THAT OVERCROWDING CAN BE DEFINED AS HAVING TOO

 9  MANY PEOPLE FOR THE RESOURCES THAT ARE NEEDED TO ADDRESS THE

10  NEEDS AND THE PROBLEMS OF THE PEOPLE WHO ARE IN THAT

11  ENVIRONMENT.

12           OBVIOUSLY, STAFFING IS AN ISSUE THAT IS IMPLIED BY

13  THAT DEFINITION. SO YOU DON'T JUST NEED SPACE.  A LOT OF TIMES

14  YOU THINK OF OVERCROWDING AS JUST TOO MANY PEOPLE CONGESTED IN A

15  PARTICULAR ENVIRONMENT.  BUT PARTICULARLY WHEN YOU'RE TALKING

16  ABOUT PRISONERS AND PARTICULARLY WHEN YOU'RE TALKING ABOUT

17  PRISONERS WHO HAVE SIGNIFICANT MENTAL HEALTH NEEDS YOU HAVE TO

18  TAKE INTO ACCOUNT THE ADEQUACY OF THE STAFF WHO IS AVAILABLE TO

19  ADMINISTER TO THOSE NEEDS.

20           AND IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS THERE

21  ARE STAFFING SHORTAGES, STAFFING VACANCIES AT ALL CLINICAL

22  LEVELS.  IN ADDITION, THERE ARE SHORTAGES OF ASSOCIATED

23  PERSONNEL WHO ARE NEEDED TO ASSIST IN THE PROVISION OF SERVICES.

24  FOR EXAMPLE, ESCORTS WHO HAVE TO BE PROVIDED FOR PRISONERS BEING

25  TAKEN FROM ONE AREA TO ANOTHER IN ORDER TO RECEIVE TREATMENT OR

 1  THERAPY.

 2         I HEARD ACCOUNTS OF OVERCROWDING CAUSED STAFF

 3  SHORTAGES AND UNDERSTAFFING IN VIRTUALLY EVERY PRISON THAT I

 4  VISITED AND WITH WHOM I DISCUSSED THIS ISSUE WITH STAFF.

 5         IT'S A PROFOUND PROBLEM. IT COMPETES, REALLY, WITH

 6  THE SPACE SHORTAGE AS A CONSEQUENCE OF OVERCROWDING. IT IS

 7  WIDESPREAD NOT ONLY IN THE PRISONS THAT I LOOKED AT, BUT I

 8  VIEWED DEPARTMENT-WIDE DATA TO SUGGEST THAT IN SOME OF THE

 9  PRISONS THAT I DIDN'T VISIT THE PROBLEM IS EVEN GREATER THAN THE

10  ONES THAT I DID SEE.

11  **Q.**  THANK YOU.

12         **THE CLERK:**  YOU HAVE FIVE MINUTES.

13         **MS. KAHN:**  OKAY.

14         CAN WE PLEASE SEE -- I WOULD LIKE TO SHOW EXHIBIT --

15  DEFENDANTS' EXHIBIT 263.  I MEAN, PLAINTIFFS' EXHIBIT 263, WHICH

16  IS A CHART THAT WAS CREATED BY ROSEN BIEN AND GALVAN AT THE

17  DIRECTION OF DR. HANEY.  AND THIS IS TAB SIX IN YOUR BINDERS.

18         EXHIBIT 263.

19         **JUDGE KARLTON:**  WHILE YOU'RE DOING THAT, DOCTOR,

20  WILL YOU LOOK AT PLAINTIFFS' 237, AND TELL ME ARE THOSE TYPICAL

21  OF THE CAGES THAT YOU'VE BEEN DISCUSSING?

22         **THE WITNESS:**  YES, YOUR HONOR.  THOSE ARE TYPICAL. I

23  HAVE TO TELL YOU THAT I'VE SEEN A NUMBER OF THEM THAT ARE

24  ACTUALLY IN WORSE SHAPE THAN THESE, BUT THESE ARE CERTAINLY

25  TYPICAL.

1          **JUDGE KARLTON:**  THANK YOU, SIR.

2          **JUDGE HENDERSON:**  OKAY.

3          **MS. KAHN:**  YOUR HONORS, WE WOULD LOVE TO BE ABLE TO

4    GO THROUGH ALL THESE.  WE DON'T HAVE ENOUGH TIME.

5          **JUDGE HENDERSON:**  NO, BUT I JUST WANTED TO CLEAR --

6    RESPOND TO THE OBJECTION ABOUT TERMINOLOGY.

7          SO THE RECORD SHOULD REFLECT THAT PLAINTIFFS' 337 IS

8    A PICTURE ENTITLED:

9               "RECEPTION CENTER YARD THREE, CLINIC HOLDING

10          CELLS."

11         AND THOSE ARE THE CELLS THAT DR. HANEY IS REFERRING

12   TO, ALSO, AS HOLDING CAGES.

13         **MS. KAHN:**  THANK YOU.

14   **BY MS. KAHN:**

15   **Q.**  DR. HANEY, CAN YOU DESCRIBE THIS CHART, PLEASE?

16   **A.**  YES. THIS IS A CHART THAT I HAD PREPARED TO TRY TO DOCUMENT

17   AND ADDRESS THE ISSUE OF WHETHER THIS WAS A SYSTEM THAT IN

18   RECENT TIME WAS IMPROVING IN TERMS OF THE DELIVERY OF MENTAL

19   HEALTHCARE OR NOT.

20         AND THIS PARTICULAR PARAGRAPH SPEAKS TO THE ISSUE

21   THAT I WAS TALKING ABOUT EARLIER:  ACCESS TO APPROPRIATE LEVELS

22   OF CARE.

23         SO THAT YOU CAN SEE THAT WHAT WE'VE DONE IS TO GRAPH

24   OVER TIME, BEGINNING ABOUT A YEAR -- WELL, ACTUALLY, THIS BEGINS

25   ABOUT TWO YEARS AGO, IN NOVEMBER OF 2006.

1              THE BLUE LINE ON THE TOP SHOWS WHAT ARE CALLED

2    "MENTAL HEALTHCARE REFERRALS."

3              AS YOU MAY KNOW, THE DEPARTMENT MAINTAINS A

4    HEALTHCARE PLACEMENT OVERSIGHT PROGRAM.  AND WHAT THIS IS IS AN

5    OFFICE IN SACRAMENTO WHERE INDIVIDUAL PRISONS IN THE DEPARTMENT

6    OF CORRECTIONS THAT ARE IN NEED OF A MENTAL HEALTHCARE BED, A

7    MENTAL HEALTHCARE CRISIS BED CAN CONTACT THE OFFICE AND ASK THE

8    OFFICE TO LOCATE A BED SOMEWHERE IN THE SYSTEM WHERE THEY CAN

9    SEND A PRISONER WHO IS IN CRISIS WHO IS IN NEED OF SUCH A MENTAL

10   HEALTHCARE CRISIS BED, BUT WHERE ONE IS NOT AVAILABLE AT THE

11   PARTICULAR FACILITY THAT PRISONER IS IN.

12             AND THIS CAN BE A FACILITY THAT ACTUALLY HAS ITS OWN

13   MENTAL HEALTHCARE CRISIS BEDS OR WHICH ARE FULL, OR IT COULD BE

14   A FACILITY THAT DOESN'T HAVE MENTAL HEALTHCARE CRISIS BEDS.

15             YOU SEE BEGINNING TWO YEARS AGO, NOVEMBER, 2006,

16   THERE WERE 85 OF THESE.  AND THEN, YOU CAN SEE THAT OVER TIME

17   THE NUMBER OF SUCH REFERRALS, THE REQUEST FOR MENTAL HEALTH

18   CRISIS BEDS BY PRISONS THAT EITHER DIDN'T HAVE ANY OR DIDN'T

19   HAVE ANY AVAILABLE HAS INCREASED CONSISTENTLY, AND I WOULD SAY

20   FAIRLY DRAMATICALLY, OVER TIME, REACHING THE HIGH OF 388 IN

21   JUNE, AND DECREASING SOMEWHAT TO 322 IN JULY.

22             WHAT YOU CAN SEE GRAPHED WITH THE RED LINE AT THE

23   BOTTOM IS THE NUMBER OF PLACEMENTS THAT WERE MADE BY THIS

24   OFFICE. AND, AGAIN, THIS IS QUITE OBVIOUS, BUT A FAIRLY

25   CONSISTENT NUMBER OR FLATLINE NOT INCREASING TERRIBLY

1  DRAMATICALLY UNTIL JULY OF 2008.

2          I BELIEVE THE CLEAREST EXPLANATION OF THAT IS A

3  FIFTY-BED MENTAL HEALTH CRISIS BED UNIT AT THE CALIFORNIA

4  MEDICAL FACILITY WENT ONLINE IN JULY, AND SO THERE'S AN INCREASE

5  IN THE NUMBER OF SUCH BEDS THAT HAVE BEEN PROVIDED OR THE NUMBER

6  OF TRANSFERS THAT HAVE BEEN MADE.

7          THIS IS AN EXAMPLE OF THE KIND OF SYSTEM THAT I SAW,

8  A SYSTEM THAT IS IN CRISIS WHERE THE CRISIS IN MANY RESPECTS IS

9  GETTING WORSE, NOT BETTER.

10          AND THIS IS A MEASURE OF UNMET NEED IN THE SYSTEM OF

11  WHICH THERE ARE MANY OTHERS.

12          **MS. KAHN:**  YOUR HONORS, IN YOUR BINDER -- WE WON'T

13  HAVE TIME -- AT TABS SEVEN, EIGHT AND NINE ARE -- PLAINTIFFS'

14  TRIAL EXHIBITS SEVEN, EIGHT AND NINE ARE TRIAL EXHIBITS THAT

15  SHOW PLACEMENTS, PHOTOS TAKEN OF ALTERNATIVE PLACEMENTS THAT WE

16  SAW DURING SITE INSPECTIONS.

17          **JUDGE KARLTON:**  WHAT IS THE EXHIBIT NUMBER FOR THE --

18          **MS. KAHN:**  THE EXHIBIT NUMBER -- I'M SORRY.

19          **JUDGE KARLTON:**  NO.  NO.  NO. FOR THE --

20          **MS. KAHN:**  FOR THE PHOTOS?

21          **JUDGE KARLTON:**  -- FOR THE CHART?

22          **MS. KAHN:**  THE CHART IS EXHIBIT NUMBER 263.

23          **JUDGE KARLTON:**  THANK YOU, MA'AM.

24          **MS. KAHN:**  AND PHOTOS ARE TRIAL EXHIBIT 341, NUMBER

25  13; TRIAL EXHIBIT 341, NUMBER 17; TRIAL EXHIBIT 377, NUMBER 11;

1    AND TRIAL EXHIBITS 337, NUMBER 28.

2            AND THOSE ARE ALL PHOTOS THAT WERE TAKEN BOTH AT

3    WASCO AND CCI.

4            AND COULD WE PLEASE SEE QUICKLY TRIAL EXHIBIT P264?

5            THIS IS ANOTHER CHART THAT WAS CREATED BY ROSEN BIEN

6    AND GALVAN AT THE DIRECTION OF DR. HANEY.  ALSO USED THE CDCR

7    MONTHLY DATA PROVIDED TO THE SPECIAL MASTER AND TO PLAINTIFFS'

8    COUNSEL.

9            264.

10           **JUDGE KARLTON:**  I'M SORRY. THIS IS WHAT NUMBER?

11           **MR. BIEN:**  264.

12           **MS. KAHN:**  264. THIS IS TAB NINE. IT'S A CHART OF THE

13   EOP PROGRAM UNMET NEEDS.

14           YOUR HONORS, I'M NOT SURE WE CAN PROJECT THIS.

15   **BY MS. KAHN:**

16   **Q.**  DR. HANEY, DO YOU HAVE THIS CHART, THIS EXHIBIT IN FRONT OF

17   YOU, AS WELL?  CAN YOU DESCRIBE TO THE COURT WHAT THIS EXHIBIT

18   SHOWS?

19   **A.**  THIS PARTICULAR EXHIBIT, THE ONE THAT'S ON THE SCREEN?

20   **Q.**  NO, THE EOP UNMET NEED CHART.

21   **A.**  YES.

22           DOES THE COURT HAVE THAT AVAILABLE?

23           YES. AGAIN, I WAS INTERESTED IN TRYING TO DEVELOP

24   SOME ANALYSIS OR UNDERSTANDING OF THE MOVEMENT OF THE SYSTEM

25   OVER TIME.

1          I'M AWARE THAT THE COURT ASKED FOR AND RECEIVED

2    ANALYSES OF THE EFFECT OF OVERCROWDING ON THE SYSTEM, BOTH IN

3    TERMS OF THE MEDICAL AND MENTAL HEALTHCARE DELIVERY IN 2007, IN

4    MAY OF 2007.

5          I LOOKED AT THE SYSTEM AFTER THAT. SO I WANTED TO SEE

6    HOW WAS THE SYSTEM CHANGING OVER TIME; HOW IT HAD CHANGED SINCE

7    THOSE ANALYSES HAD BEEN DONE BY THE RECEIVER AND BY THE SPECIAL

8    MASTER.

9          AND SO THIS IS A GRAPH OF EN -- ON THE BLUE LINE AT

10   THE TOP, IT SHOWS THE ENHANCED OUTPATIENT PROGRAM POPULATION,

11   THE NUMBER OF PRISONER PATIENTS IN THE SYSTEM WHO HAVE BEEN

12   IDENTIFIED AS ENHANCED OUTPATIENT OR EOP PRISONERS.

13         AND YOU CAN SEE THAT FROM DECEMBER OF 2006 UNTIL

14   AUGUST OF 2008, THERE HAS BEEN A CONSISTENT, AND I THINK

15   SUBSTANTIAL, INCREASE, ABOUT 900 ADDITIONAL PRISONERS IDENTIFIED

16   AS PART OF THE EOP POPULATION IN THE SYSTEM, REFLECTING AN

17   INCREASING LEVEL OF ACUITY OR NUMBERS OF PEOPLE AT THAT HIGHER

18   LEVEL OF ACUITY IN THE SYSTEM.

19         AND WHAT YOU CAN ALSO SEE GRAPHED ON THE RED LINE ON

20   THE BOTTOM IS THE SYSTEM'S CAPACITY TO HANDLE OR DEAL WITH OR

21   ADDRESS THE NEEDS OF THOSE MENTALLY ILL PRISONERS HAS NOT

22   INCREASED IN ANY REMOTELY COMPARABLE WAY OVER TIME.

23         THE DISPARITY BETWEEN -- IF WE LOOK AT THE VERY END

24   OF THE GRAPHS, THE DISPARITY BETWEEN THE 4,051, WHO ARE IN THE

25   SYSTEM, THE SYSTEM'S CAPACITY TO ADDRESS THEIR NEED, AND THE

1   5,000 PEOPLE WHO NEED THE MENTAL HEALTHCARE PROVIDED IN THE EOP

2   PROGRAM IS A MEASURE OF INDEX OF UNMET NEED.

3            AND THAT GAP, THAT GAP WHICH I'VE DESCRIBED AS UNMET

4   NEED, HAS BEEN INCREASING OVER TIME, NOT DECREASING.  AND THAT,

5   TOO, SPEAKS TO THE ISSUE OF OVERCROWDING IN MY OPINION.

6   **Q.**  AND HOW DID OVERCROWDING IMPACT THOSE 4,000 THAT COULD BE

7   HOUSED IN EOP PROGRAMS?

8   **A.**  WELL, THE OVERCROWDING HAS IMPACTED THOSE PEOPLE, EVEN THE

9   PEOPLE WHO ARE FORTUNATE ENOUGH TO BE IN THE EOP PROGRAM, IN A

10  NUMBER OF DIFFERENT WAYS.

11           I TALKED EARLIER ABOUT TREATMENT SPACE. MANY OF THE

12  EOP PROGRAMS ARE SEVERELY COMPROMISED IN TERMS OF THE AMOUNT OF

13  AVAILABLE TREATMENT SPACE THAT THEY HAVE.  SO EVEN THOUGH THERE

14  ARE EOP PROGRAMS, THEY DON'T HAVE A SUFFICIENT AMOUNT OF SPACE

15  IN WHICH TO ENGAGE IN THERAPEUTIC OR TREATMENT ACTIVITIES.

16           THEY ARE IMPACTED BY STAFF SHORTAGES, AS WELL. STAFF

17  SHORTAGES THAT ARE REFLECTED NOT ONLY IN THE ACTUAL VACANCIES,

18  BUT ALSO ON THE BASIS OF THE SPECIAL MASTER'S WORKLOAD STUDY,

19  VACANCIES OR STAFF SHORTAGES WHICH ARE EVEN GREATER THAN THOSE

20  REFLECTED IN THE ACTUAL DEPARTMENT OF CORRECTIONS VACANCIES.

21           THEY'RE IMPACTED, IN ADDITION, BY ANOTHER

22  OVERCROWDING-RELATED ISSUE THAT PLAGUES THE CALIFORNIA SYSTEMS:

23  LOCKDOWNS.  LOCKDOWNS ARE USED IN THE CALIFORNIA DEPARTMENT OF

24  CORRECTIONS, I BELIEVE, IN LARGE PART BECAUSE OF THE PROFOUND

25  LEVEL OF OVERCROWDING AT A LEVEL THAT IS UNHEARD OF IN

1  CORRECTIONS DEPARTMENTS ACROSS THE UNITED STATES WITH WHICH I'M

2  FAMILIAR.

3          LOCKDOWNS MEAN THAT PRISONERS, INCLUDING EOP

4  PRISONERS, IF THEY ARE IN A UNIT THAT IS LOCKED DOWN, ARE

5  ESSENTIALLY WITHOUT PROGRAMS DURING THE PERIODS OF TIME THAT THE

6  LOCKDOWN IS IN PLACE.

7          THERE ARE HOUSING UNITS IN THE CALIFORNIA DEPARTMENT

8  OF CORRECTIONS THAT ARE LOCKED DOWN MORE OFTEN THAN THEY ARE

9  UNLOCKED.

10          THERE IS A NOTORIOUS FACILITY IN THE SALINAS VALLEY

11  STATE PRISON WHICH IS LOCKED DOWN ALMOST ALL THE TIME. AND WHERE

12  OBVIOUSLY PRISONERS, SOME OF WHOM ARE ON THE MENTAL HEALTH

13  CASELOAD, ARE NOT RECEIVING ANY TREATMENT, THERAPY OR OTHERWISE,

14  IN THE COURSE OF THE LOCKDOWN.

15  **Q.**  THANK YOU, DR. HANEY.

16          SO CAN YOU QUICKLY SUM UP WHY YOU CONCLUDED

17  OVERCROWDING IS THE PRIMARY CAUSE?

18  **A.**  I DON'T BELIEVE IN A SYSTEM THIS OVERCROWDED AT THIS

19  MAGNITUDE OF OVERCROWDING WITH OVERCROWDING AS WIDESPREAD AS IT

20  HAS BEEN IN CALIFORNIA FOR AS LONG A PERIOD THAT IT HAS BEEN

21  THAT THERE'S ANY OTHER PLAUSIBLE OR CREDIBLE EXPLANATION FOR THE

22  FAILURE OF THE SYSTEM TO PROVIDE CONSTITUTIONALLY-ADEQUATE

23  MENTAL HEALTHCARE.

24          THE COURT'S BEEN MONITORING THIS ISSUE FOR MANY, MANY

25  YEARS.  THERE HAVE BEEN MANY, MANY COURT ORDERS, AND THERE HAVE

1   BEEN MANY ACTIVITIES THAT HAVE BEEN ENGAGED IN IN TRYING TO

2   BRING THIS SYSTEM'S MENTAL HEALTHCARE DELIVERY INTO

3   CONSTITUTIONAL COMPLIANCE.

4            IN THE FACE OF ALL OF THOSE EFFORTS THERE HAS BEEN

5   THIS OVERWHELMING OVERCROWDING PROBLEM OF SUCH A DEGREE,

6   MAGNITUDE AND DURATION THAT IT HAS INCAPACITATED THE SYSTEM'S

7   ABILITY TO DELIVER CONSTITUTIONALLY-ADEQUATE CARE.  AND I SAW

8   NUMEROUS EXAMPLES OF IT WHEN I TOURED, AND NUMEROUS EXAMPLES OF

9   IT REFLECTED IN THE DOCUMENTS I REVIEWED.

10  **Q.**  THANK YOU.

11           **JUDGE HENDERSON:**  I HAVE A QUESTION THAT GOES BACK,

12  DR. HANEY.  IN THE SALINAS PRISON WHICH YOU DESCRIBED AS BEING

13  UNDER LOCKDOWN ALMOST ALL THE TIME, ARE YOU ABLE TO DETERMINE IS

14  THIS BECAUSE OF THE LEVEL OF OVERCROWDING THERE IS MORE SEVERE,

15  OR DO THEY HAVE A WARDEN WHO HOLDS THE LOCKDOWN TRIGGER FASTER,

16  OR DO YOU KNOW?

17           **THE WITNESS:**  AS BEST I CAN TELL YOUR HONOR IS THAT

18  PARTICULAR HOUSING, IT'S A LARGE HOUSING UNIT, ABOUT A THOUSAND

19  PRISONERS.  WE'RE NOT TALKING ABOUT A SMALL UNIT IN THIS PRISON.

20  IT'S A FACILITY THAT IS LOCKED DOWN, AND IT'S A FACILITY THAT IS

21  BESET WITH A LOT OF CONFLICTS.  AND OVERCROWDED SYSTEMS TEND TO

22  RESPOND TO CONFLICTS WITH LOCKDOWNS. AND THAT'S WHAT HAS BEEN

23  HAPPENING IN CALIFORNIA, AND THAT'S WHAT IS HAPPENING IN THAT

24  PARTICULAR PRISON.

25           AND WHAT IT RESULTS IN IS A LARGE NUMBER OF

1  PRISONERS, MANY OF WHOM HAVE MENTAL HEALTHCARE PROBLEMS, BEING

2  LOCKED IN THEIR CELLS AROUND THE CLOCK FOR WEEKS AND MONTHS ON

3  END.

4              **JUDGE HENDERSON:**  THANK YOU.

5              CCPOA COUNSEL HAVE ANY?

6          **MS. LEONARD:**  NO FURTHER QUESTIONS, YOUR HONOR.

7          **JUDGE HENDERSON:**  OKAY.

8              CROSS-EXAMINATION.

9                          **CROSS-EXAMINATION**

10 **BY MS. TILLMAN:**

11 **Q.**  GOOD AFTERNOON.  THIS IS LISA TILLMAN ON BEHALF OF THE

12 COLEMAN DEFENDANTS.

13              GOOD AFTERNOON, DR. HANEY.

14 **A.**  GOOD AFTERNOON.

15 **Q.**  DR. HANEY, I UNDERSTAND THAT YOU'VE TESTIFIED IN VARIOUS

16 COURTS, INCLUDING FEDERAL COURTS, A NUMBER OF TIMES IN A NUMBER

17 OF DIFFERENT CASES; IS THAT CORRECT?

18 **A.**  YES.

19 **Q.**  AND YOU'VE EVEN TESTIFIED AS AN EXPERT AT THE UNDERLYING

20 TRIAL OF THE COLEMAN CASE, CORRECT?

21 **A.**  YES, I DID.

22 **Q.**  YOU'VE TESTIFIED ON CORRECTIONAL ISSUES IN THE RUIZ CASE IN

23 TEXAS, A CLASS ACTION CASE IN TEXAS, CORRECT?

24 **A.**  YES.  YES.

25 **Q.**  IN THE GATES CASE INVOLVING THE CALIFORNIA MEDICAL FACILITY,

1  CORRECT?

2  **A.**  YES.

3  **Q.**  AND IN THE MADRID CASE INVOLVING SECURE HOUSING UNITS,

4  CORRECT?

5  **A.**  YES.

6  **Q.**  YOU'VE TESTIFIED IN THOSE CASES AND TODAY ON THE BASES OF

7  YOUR WORK AS A PROFESSOR OF PSYCHOLOGY, CORRECT?

8  **A.**  YES.

9  **Q.**  AND YOUR EXPERTISE IN PSYCHOLOGY IS WHAT IS CALLED, I

10  BELIEVE, THE SOCIAL COMPARISON THEORY WHERE YOU STUDY HOW PEOPLE

11  ARE INFLUENCED BY EVENTS IN THEIR ENVIRONMENT?

12  **A.**  I DO STUDY HOW PEOPLE ARE AFFECTED BY EVENTS IN THEIR

13  ENVIRONMENT.  THAT'S NOT TECHNICALLY SOCIAL COMPARISON THEORY,

14  WHICH IS ACTUALLY SOMETHING ELSE.

15  **Q.**  YOU'VE NEVER SERVED AS A CORRECTIONAL ADMINISTRATOR, HAVE

16  YOU?

17  **A.**  NO, I STUDY PRISON SYSTEMS.  I HAVEN'T WORKED IN THEM.

18  **Q.**  AND YOU'VE NOT WORKED IN A PRISON SYSTEM AS A PSYCHOLOGIST,

19  EITHER, HAVE YOU?

20  **A.**  NO, I HAVEN'T WORKED FOR A PRISON SYSTEM.

21  **Q.**  AND YOU ARE NOT A MEDICAL DOCTOR, CORRECT?

22  **A.**  CORRECT.

23  **Q.**   SO YOU'VE NOT WORKED IN A PRISON STEM PROVIDING MEDICAL

24  CARE.

25  **A.**  I HAVEN'T WORKED IN A PRISON SYSTEM AT ALL.

1  **Q.** AND WHILE YOU DO HAVE A PH.D, YOU ARE NOT -- A PH.D IN

2  PSYCHOLOGY, YOU'RE NOT A LICENSED CLINICAL PSYCHOLOGIST,

3  CORRECT?

4  **A.** NO, I DON'T PROVIDE TREATMENT OR DO DIAGNOSIS.

5  **Q.** LIKEWISE, WHILE YOU DO HAVE A JURIS DOCTORATE DEGREE, YOU

6  HAVE NOT TAKEN THE BAR EXAM AND HAVE NOT PRACTICED LAW?

7  **A.** NO, I STUDY LEGAL ISSUES.  I DON'T PRACTICE LAW OR PRACTICE

8  CLINICAL PSYCHOLOGY.

9  **Q.** AND WHEN YOU TESTIFIED IN THE UNDERLYING COLEMAN TRIAL IN

10 THE EARLY '90'S, THAT TESTIMONY IN THAT CASE AT THE TIME REALLY

11 FOCUSSED ON AN UNIDENTIFIED GROUP OF INMATES THAT NEEDED MENTAL

12 HEALTHCARE, CORRECT?

13 **A.** IT WAS AN UNDERIDENTIFIED GROUP.  I'M NOT SURE THEY WERE

14 UNIDENTIFIED.  THEY WERE UNDERIDENTIFIED.  THERE WERE CERTAINLY

15 MENTAL PATIENTS WERE IDENTIFIED IN THE DEPARTMENT OF

16 CORRECTIONS, BUT THE QUESTION WAS:  HOW MANY OF THEM WERE THERE?

17 **Q.** AND AT THE TIME OF YOUR TESTIMONY IN THE UNDERLYING TRIAL OF

18 COLEMAN, THERE WAS NO LEVEL OF CARE KNOWN AS THE CORRECTIONAL

19 CASE MANAGEMENT SYSTEM AT THE TIME, CORRECT?

20 **A.** YES, THAT'S CORRECT. ALL OF THAT IS POST COLEMAN, POST THAT

21 HEARING, POST MY TESTIMONY.

22 **Q.** AND WHEN YOU SAY "ALL OF THAT," THAT INCLUDES ENHANCED

23 OUTPATIENT PROGRAM LEVEL CARE DID NOT EXIST WHEN YOU TESTIFIED

24 IN THE COLEMAN TRIAL IN THE EARLY '90'S, CORRECT?

25 **A.** A WHOLE DIFFERENT DESIGNATION FOR MENTALLY ILL PRISONERS IN

1  THOSE DAYS.

2  **Q.**  THE REVISED PROGRAM GUIDE OF 2006 OBVIOUSLY DIDN'T EXIST AT

3  THE TIME OF THE TRIAL IN THE EARLY '90'S, CORRECT?

4  **A.**  WITHOUT A DOUBT.

5  **Q.**  AND, IN FACT, THE 1997 PROVISIONALLY-APPROVED PROGRAM GUIDE

6  DID NOT EXIST AT THAT TIME, CORRECT?

7  **A.**  I DON'T EVEN THINK IT WAS A GLIMMER IN ANYONE'S EYE AT THAT

8  TIME.

9  **Q.**  NOR WAS PROBABLY THE MENTAL HEALTH TRACKING SYSTEM THAT WE

10  NOW HAVE TODAY, CORRECT?

11  **A.**  CERTAINLY NOT THE ONE WE HAVE TODAY.

12  **Q.**  SO THERE HAVE BEEN SOME CHANGES TO THE CARE PROVIDED TO

13  MENTALLY ILL INMATES SINCE THE TIME OF YOUR TESTIMONY IN THE

14  UNDERLYING TRIAL OF THE COLEMAN CASE, CORRECT?

15  **A.**  YES, THE WHOLE COLEMAN-RELATED SYSTEM AND STRUCTURE AND

16  MONITORING PROCESS AND SO ON, ABSOLUTELY.

17  **Q.**  NOW, IN THE PLAINTIFFS' COUNSEL ASKED YOU TO FORM AN OPINION

18  REGARDING WHETHER OVERCROWDING WAS THE PRIMARY CAUSE OF ANY

19  DEFICIENCIES IN THE MENTAL HEALTHCARE SYSTEM.  WOULDN'T IT BE

20  CORRECT TO SAY THAT YOU UNDERTOOK THE TASK OF FIRST REVIEWING

21  AVAILABLE LITERATURE IN YOUR FIELD ON THE IMPACT OF

22  OVERCROWDING?

23  **A.**  YES, I DID. I MEAN, I WRITE ABOUT THESE ISSUES ALL THE TIME,

24  SO I CERTAINLY CONSULTED THE LITERATURE.  BUT IT WAS LITERATURE

25  WITH WHICH I WAS ALREADY FAMILIAR --

1   Q.   BECAUSE --

2   A.   -- THE FIRST TIME, YES.

3   Q.   -- BECAUSE OF YOUR SCHOLARLY WORK WITHIN THE UNIVERSITY OF

4   CALIFORNIA AT SANTA CRUZ, CORRECT?

5   A.   YES.

6   Q.   AND SOME OF THAT ACADEMIC LITERATURE, SOME OF THOSE

7   SCHOLARLY PUBLICATIONS THAT YOU REVIEWED AS PART OF YOUR WORK IN

8   THIS CASE CONCERNED OTHER CORRECTIONAL SYSTEMS IN OTHER STATES,

9   CORRECT?

10  A.   SOME OF IT DID, YES. THE RESEARCH HAS BEEN DONE AT DIFFERENT

11  CORRECTIONAL SYSTEMS ACROSS THE UNITED STATES.

12  Q.   AND YOU PROVIDED A DISCUSSION OF THOSE ACADEMIC PUBLICATIONS

13  IN YOUR OWN EXPERT REPORT THAT WAS PROVIDED TO THIS COURT, THE

14  EXPERT REPORT DATED AUGUST, 2008, CORRECT?

15  A.   YES.  AND A NUMBER OF THE GENERAL EFFECTS OF OVERCROWDING,

16  YES.

17  Q.   AND SO, SAY, FROM PAGE 27 OF YOUR EXPERT REPORT, WHERE IT

18  DISCUSSES THE PSYCHOLOGICAL EFFECTS OF OVERCROWDING, THROUGH

19  PAGE 34, IT'S ESSENTIALLY A DISCUSSION OF THE ACADEMIC

20  PUBLICATIONS CONCERNING OVERCROWDING, CORRECT?

21  A.   YES.

22  Q.   AND YOU ALSO PROVIDED A SCHOLARLY DISCUSSION OF THE

23  BEHAVIORAL EFFECTS OF OVERCROWDING ON PRISONERS IN PRISONS IN

24  OTHER AREAS OF YOUR REPORT, SAY, AT PAGES 34 THROUGH 74,

25  CORRECT?

1  **A.**  YES.  LET ME MAKE SURE THAT'S RIGHT. I REMEMBER HAVING DONE

2  THAT, BUT COULD YOU GIVE ME THE PARAGRAPHS AGAIN?

3  **Q.**  I BELIEVE IT WAS PARAGRAPHS 58 THROUGH 74.

4  **A.**  YES.

5  **Q.**  OTHER PARTS OF YOUR REPORT CONCERN DATA FROM YOUR TOURS OF

6  THE CALIFORNIA STATE PRISONS AND FROM YOUR REVIEW OF MONITORING

7  REPORTS OF THE CALIFORNIA STATE PRISONS, CORRECT?

8  **A.**  YES, AS WELL AS OTHER DOCUMENTS. DIFFERENT REPORTS THAT THE

9  DEPARTMENT OF CORRECTIONS HAS ISSUED, STATISTICAL COMPILATIONS

10  REPORTS, A LOT OF INFORMATION THAT I GOT ACTUALLY AT THE TIME OF

11  THE TOURS.  SO EACH TIME WE WENT ON A SITE INSPECTION WE WERE

12  OFTENTIMES GIVEN ADDITIONAL MATERIAL BY THE STAFF AT THE PRISON.

13  AND I RELIED ON THAT, WHEN APPROPRIATE.

14  **Q.**  YOUR REPORT IN SOME RESPECTS CAN BE EVENLY SPLIT -- I'M

15  SORRY -- CAN BE -- CAN BE SPLIT BETWEEN ONE PART OF THE REPORT

16  PROVIDES A SCHOLARLY DISCUSSION, OVERVIEW OF VARIOUS SCHOLARLY

17  ARTICLES AND PUBLICATIONS ON THE IMPACT OF OVERCROWDING AND THE

18  OTHER PORTION OF YOUR REPORT DISCUSSES YOUR ACTUALLY FINDINGS ON

19  TOUR AND LOOKING AT MONITORING REPORTS AND LOOKING AT THE

20  CALIFORNIA STATE PRISONS YOURSELF, CORRECT?

21  **A.**  I DON'T KNOW WHAT YOU MEAN BY "SPLIT."  I MEAN, THERE ARE

22  DIFFERENT SECTIONS OF THE REPORT.

23  **Q.**  DIFFERENT SECTIONS.

24  **A.**  YES.

25  **Q.**  NOW, IN ONE SECTION OF YOUR REPORT THERE IS A DISCUSSION OF

1  THE IMPACT OF OVERCROWDING AND THE USE OF SEGREGATION UNITS. DO

2  YOU RECALL THAT PART OF YOUR REPORT?

3  **A.**  YES.

4  **Q.**  AND IN THAT DISCUSSION, ISN'T IT CORRECT THAT YOU FOUND THAT

5  WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

6  REHABILITATION SUICIDES ARE ACTUALLY MUCH MORE LIKELY TO OCCUR

7  INSIDE SEGREGATED HOUSING UNITS?

8  **A.**  YES, I BELIEVE THE STATISTICS SHOW -- AND THIS IS NOT FROM

9  MY SCHOLARLY REVIEW OF THE LITERATURE.  THERE IS A -- DR.

10  PATTERSON DOES A YEARLY ANALYSIS OF THE COMPLETED SUICIDES IN

11  THE DEPARTMENT OF CORRECTIONS.  AND I READ THAT REPORT, AND I

12  INCORPORATED HIS FINDINGS, IDENTIFYING ISOLATED SINGLE-CELLED

13  PRISONERS AS BEING MORE LIKELY TO HAVE ENGAGED IN OR COMPLETED

14  SUICIDES.

15  **Q.**  AND SEGREGATED HOUSING UNITS ARE SINGLE CELL, CORRECT?

16  **A.**  MOSTLY, YES.

17  **Q.**  AND WHEN YOU TALK ABOUT DR. RAY PATTERSON, JUST FOR THE

18  BENEFIT OF THOSE WHO AREN'T FAMILIAR WITH SOME OF THE TEAM

19  MEMBERS ON THE COLEMAN SPECIAL MASTER'S TEAM, DR. RAY PATTERSON

20  IS A PSYCHIATRIST ON THE COLEMAN SPECIAL MASTER TEAM, A

21  COURT-APPOINTED EXPERT, CORRECT?

22  **A.**  YES.  I BELIEVE HE'S A PROFESSOR OF PSYCHIATRY AT

23  GEORGETOWN, BUT HE'S PART OF THE MONITORING TEAM IN THE COLEMAN

24  CASE.

25  **Q.**  AND YOU HAVE NO REASON TO IN ANY WAY QUESTION HIS FINDINGS

1  THAT SUICIDES ARE MUCH MORE LIKELY TO OCCUR IN THESE SEGREGATED

2  HOUSING UNITS WHERE THERE ARE SINGLE CELLS, CORRECT?

3  **A.**  NO, IT'S NOT A SHOCKING FINDING. I MEAN, IT'S COMMON SENSE.

4  BUT HE DOCUMENTS THE DEGREE TO WHICH IT'S TRUE, YES.

5          **MS. TILLMAN:**  IF I MIGHT HAVE A MOMENT.

6  **BY MS. TILLMAN:**

7  **Q.**  THERE IS NO DISCUSSION IN DR. PATTERSON'S REPORT UPON YOUR

8  REVIEW OF ANY CONCERNS --

9          **MS. TILLMAN:**  LET ME STRIKE THAT.

10 **BY MS. TILLMAN:**

11 **Q.**  WHEN DR. PATTERSON DISCUSSED THE LIKELIHOOD OF SUICIDE

12 WITHIN SEGREGATED HOUSING UNITS, HE FOUND THAT SUICIDE WAS MUCH

13 MORE LIKELY TO OCCUR IN THOSE SEGREGATED HOUSING UNITS THAN

14 OTHER PLACES, OTHER HOUSING UNITS WITHIN THE DEPARTMENT OF

15 CORRECTIONS, CORRECT?

16 **A.**  YES, I THINK I JUST ACKNOWLEDGED THAT.  THAT'S WHAT THE

17 STATISTICAL ANALYSIS SHOWS, THAT THAT'S A PLACE WHERE A

18 PREDOMINATE LARGE NUMBER OF THOSE EVENTS OCCURRED.  AND THAT

19 THAT'S NOT A -- THAT THAT COMPORTS WITH OTHER FINDINGS, AND

20 OTHER STUDIES OF SUICIDES IN CORRECTIONAL ENVIRONMENTS.

21 **Q.**   SO, IN ESSENCE, SUICIDE IS GOING TO OCCUR OR IS MORE

22 LIKELY IN THESE SEGREGATED HOUSING UNITS THAN THE TRIPLE-BUNK

23 AREAS, GYMS AND DORMS, CORRECT?

24 **A.**  STATISTICALLY SPEAKING, YES, THAT'S CORRECT. THERE'S A

25 REASON FOR THAT, OBVIOUS REASON FOR THAT, OF COURSE, RIGHT?

1          SUICIDE IS AN EVENT WHICH INQUIRIES AN OPPORTUNITY.

2   AND SO PEOPLE WHO ARE SINGLE-CELLED HAVE AN OPPORTUNITY TO,

3   SADLY, ATTEMPT TO TAKE THEIR LIFE IN A WAY WHERE PEOPLE WHO ARE

4   HOUSED WITH OTHER PEOPLE DON'T.

5          SO THAT'S WHAT I THINK MOST EXPERTS IN THIS AREA

6   WOULD ACKNOWLEDGE AS THE EXPLANATION FOR THAT.

7          NOW, THE EVENTS THAT LEAD UP TO SOMEBODY BEING

8   MENTALLY ILL ENOUGH TO WANT TO TAKE THEIR LIFE, HOWEVER, ARE

9   RELATED TO A NUMBER OF DIFFERENT THINGS, MANY OF WHICH I'VE BEEN

10  TALKING ABOUT AND WHICH DR. PATTERSON ACKNOWLEDGES IN HIS

11  ANALYSES OF COMPLETED SUICIDES.

12  **Q.**  NOW, WHEN YOU'VE LOOKED AT THE CALIFORNIA DEPARTMENT OF

13  CORRECTIONS AND REHABILITATIONS SUICIDE RATE IN EVALUATING THE

14  IMPACTS OF OVERCROWDING, WOULDN'T YOU AGREE THAT THE SUICIDE

15  RATE IS NOT INCREASED ON A ONE-TO-ONE, OR AS YOU PUT IN IT YOUR

16  DEPOSITION, A MONOTONIC BASIS AS THE CALIFORNIA DEPARTMENT OF

17  CORRECTIONS AND REHABILITATION POPULATION HAS INCREASED?

18  **A.**  NO, IT HASN'T.  YOU WOULDN'T NECESSARILY EXPECT IT TO, AND

19  IT HASN'T. IT'S VERY, VERY HIGH, AS YOU PROBABLY KNOW, COMPARED

20  TO VIRTUALLY ANY OTHER SYSTEM IN THE COUNTRY, WHICH I THINK

21  INDIRECTLY HAS TO DO WITH THE LEVEL OF OVERCROWDING IN THE

22  SYSTEM.  BUT THERE'S NOT A SIMPLE ONE-TO-ONE INCREASE,

23  POPULATION AND SUICIDE RATE AUTOMATICALLY GOES UP. THERE ARE A

24  COMPLICATED SET OF FACTORS INVOLVED.

25  **Q.**  AND WHEN YOU SAY THERE'S A COMPLICATED SET OF FACTORS

1  INVOLVED, YOU WOULD AGREE THAT DEMOGRAPHIC FACTORS SUCH AS AGE,

2  RACE CAN BE COSIDERED IN DETERMINING THE SUICIDE RATES AND THEIR

3  CAUSES, CORRECT?

4  **A.**  YES, AS WELL AS MANY OTHER THINGS.  FOR EXAMPLE, THE

5  ENVIRONMENTAL CONDITIONS UNDER WHICH PRISONERS LIVE.  YOU'RE

6  PROBABLY AWARE THAT THERE ARE STUDIES WHICH PROVIDED A DIRECT

7  CONNECTION BETWEEN LEVELS OF OVERCROWDING AND SUICIDE.

8            AND, IN FACT, IN ONE OF DR. PATTERSON'S OWN ARTICLES

9  HE TALKS ABOUT THE IMPORTANCE OF OVERCROWDING AS A POTENTIAL

10  CAUSAL FACTOR IN SUICIDE.

11            SO THAT, TOO, IS AN IMPORTANT CONSIDERATION.

12  **Q.**  HOWEVER, YOU WOULD AGREE THAT IT'S IN THE SINGLE CELLS WHERE

13  THE SUICIDE RATE IS THE HIGHEST, ISN'T IT?

14            **JUDGE HENDERSON:**  HASN'T THAT BEEN ASKED AND ANSWERED

15  SEVERAL TIMES?

16            **MS. TILLMAN:**  IT'S CROSS.

17            **JUDGE HENDERSON:**  I KNOW IT'S CROSS.  IT'S ALSO --

18            **JUDGE KARLTON:**  IT'S CUMULATIVE.

19            **JUDGE HENDERSON:**  WE MANAGE TRIALS ON TIME.

20            **MS. TILLMAN:**  YOU'VE HEARD IT?

21            **JUDGE HENDERSON:**  YES.

22            **JUDGE KARLTON:**  IN ANY EVENT, EVEN IF IT BE AN

23  APPROPRIATE OBJECTION OF CROSS, CUMULATIVE IS A PERFECTLY

24  APPROPRIATE OBJECTION.  AND IT IS CERTAINLY CUMULATIVE.

25            **MS. TILLMAN:**  THANK YOU.  I'LL RESPECT THAT.

1  **BY MS. TILLMAN:**

2  **Q.**  SUICIDES CAN AND HAVE OCCURRED WITHIN

3  CONSTITUTIONALLY-ADEQUATE SYSTEMS, CORRECT?

4  **A.**  YES, SADLY THAT'S A FACT OF LIFE IN PRISON ENVIRONMENTS AND

5  JAIL ENVIRONMENTS, AS WELL.

6  **Q.**  I'M SORRY.  CAN YOU JUST GET A TEENY BIT CLOSER TO THAT

7  MICROPHONE?  THANK YOU.

8  **A.**  YES.  SO I SAID:  YES, IT'S A FACT OF LIFE IN PRISON AND

9  JAIL ENVIRONMENTS, UNFORTUNATELY.

10  **Q.**  AND, IN FACT, SOME MENTALLY ILL INMATES MIGHT DECOMPENSATE

11  EVEN WHEN THEY ARE NOT IN AN OVERCROWDED SYSTEM, CORRECT?

12  **A.**  YES, THAT'S THE -- I'M NOT A CLINICIAN, BUT I KNOW ENOUGH

13  ABOUT MENTAL ILLNESS TO KNOW PEOPLE SOMETIMES DECOMPENSATE EVEN

14  UNDER THE BEST OF CIRCUMSTANCES.

15          BUT THEY ARE MORE LIKELY TO UNDER THE WORST OF

16  CIRCUMSTANCES.

17  **Q.**  YOU'VE MENTIONED THE FACT THAT YOU TOURED EIGHT FACILITIES,

18  CORRECT?

19  **A.**  YES.

20  **Q.**  AND IN TOURING THESE FACILITIES YOU MET WITH PATIENTS, YOU

21  MET WITH STAFF, YOU MET WITH CLINICIANS, CORRECTIONAL OFFICERS,

22  CORRECT?

23  **A.**  YES, SUPERVISORS, THE WARDENS WERE ALWAYS PRESENT, ASSOCIATE

24  WARDENS.

25  **Q.**  AND YOU FOUND THAT THE CALIFORNIA DEPARTMENT OF CORRECTIONS

1  AND REHABILITATION STAFF, THE CLINICIANS, THE CORRECTIONAL

2  OFFICERS TO BE FORTHCOMING WITH INFORMATION, DIDN'T YOU?

3  **A.**  THEY WERE EXTREMELY FORTHCOMING, YES, AND QUITE COOPERATIVE.

4  AND WE WERE APPRECIATIVE OF THAT.

5  **Q.**  AND IN TERMS OF THE PATIENTS THAT YOU MET WITH, SOME WERE

6  SELECTED BY THE PLAINTIFFS, CORRECT?

7  **A.**  YES.

8  **Q.**  SOME WERE SELECTED BY YOU AS YOU WERE TOURING, RIGHT?

9  **A.**  YES.

10 **Q.**  AND THE PERSONS OR PATIENTS THAT YOU MET WITH, WHETHER THEY

11 WERE ACTUALLY CASELOAD PATIENTS OR NOT, WERE PERSONS THAT, FOR

12 YOU, SEEMED TO BE EITHER DISTRESSED OR SOMEHOW REPRESENTATIVE OF

13 THE UNIT THAT THEY WERE HOUSED ON, CORRECT?

14 **A.**  YES, ALTHOUGH THERE WERE TWO EXCEPTIONS TO THAT.  IN ONE

15 INSTANCE, SOME OF THE PEOPLE THAT WERE INTERVIEWED WERE ACTUALLY

16 SELECTED BY DEFENDANT'S EXPERT, AND THOSE SELECTIONS WERE

17 RANDOM.  SO I HAD NOTHING TO DO WITH THE IDENTIFICATION OF THOSE

18 PEOPLE.

19          AND THEN, THERE WAS AN INSTANCE IN WHICH A GROUP OF

20 PEOPLE WAS BROUGHT TO US WHO THE PRISON SOMEHOW HAD, I THINK,

21 MISTAKENLY DECIDED OR CONCLUDED THAT WE WANTED TO INTERVIEW.

22 THEY WERE NOT ON OUR LIST, BUT THEY WERE PART OF THE COLEMAN

23 CASE, AND I INTERVIEWED THEM, ANYWAY.  AND THEY WERE PRODUCTIVE

24 INTERVIEWS.

25          SO WITH THOSE TWO EXCEPTIONS, IT WAS AS YOU DESCRIBE

1  IT.

2  Q.  YOUR JOB IN PERFORMING YOUR WORK FOR PLAINTIFFS' COUNSEL IN

3  EVALUATING THE ISSUE OF OVERCROWDING WAS NOT TO DIAGNOSE ANY OF

4  THE PATIENTS THAT YOU MET WITH, CORRECT?

5  A.  ABSOLUTELY CORRECT.

6  Q.  AND IT WASN'T TO TREAT ANY OF THESE PATIENTS, CORRECT?

7  A.  CORRECT.

8  Q.  YOU RELIED UPON WHAT THE PATIENTS TOLD YOU IN REGARDS TO

9  THEIR EXPERIENCE OF THEIR HOUSING UNIT AND THEIR CARE, CORRECT?

10 A.  I RELIED ON THAT, IN PART.  IT WASN'T ALL I RELIED ON, EVEN

11 WITH RESPECT TO THE PEOPLE I INTERVIEWED.  AS YOU KNOW, I HAD AN

12 OPPORTUNITY TO REVIEW RECORDS AT THE INSTITUTION.  I ALSO

13 REQUESTED RECORDS, WHICH I REVIEWED SUBSEQUENT TO THE

14 INTERVIEWS.  AND IN MOST INSTANCES WHEN APPROPRIATE I HAD AN

15 OPPORTUNITY TO TALK TO EITHER CORRECTIONAL OFFICERS OR CLINICAL

16 STAFF ABOUT A PARTICULAR PRISON PATIENT.

17 Q.  AND WHEN YOU TOURED THESE FACILITIES AND MET WITH THESE

18 PERSONS, THE INMATES, THE STAFF, YOU'RE VIEWING THESE

19 INSTITUTIONS AS ENVIRONMENTS, WHOLE ENVIRONMENTS TO CONSIDER IN

20 LOOKING AT THE IMPACT OF OVERCROWDING ON THE MENTAL HEALTHCARE

21 SYSTEM, CORRECT?

22 A.  I'M NOT SURE WHAT YOU MEAN BY "WHOLE ENVIRONMENTS."

23       I CERTAINLY WAS LOOKING AT THE ENVIRONMENT IN WHICH

24 THE PRISONER WAS HOUSED.  AND I WAS LOOKING AT -- PARTICULARLY

25 BECAUSE THESE WERE MEMBERS OF THE COLEMAN CLASS, I WAS LOOKING

1  AT THE MENTAL HEALTH DELIVERY SYSTEM TO WHICH THEY HAD ACCESS.

2          SO I MADE A POINT, FOR EXAMPLE, IF THERE WAS A

3  CORRECTIONAL TREATMENT CENTER, OF VIEWING THAT FACILITY.  OR IF

4  THERE WAS AN OUTPATIENT HOUSING UNIT I WENT THERE.

5          IN THE CASE OF SALINAS VALLEY I WENT TO THE

6  DEPARTMENT OF MENTAL HEALTH OPERATED FACILITY.  BUT I DIDN'T

7  PURPORT TO LOOK AT EVERY SINGLE ASPECT OF THE PRISON.  BUT

8  RATHER THE PARTS OF THE PRISON THAT WERE RELEVANT TO THE PEOPLE

9  THAT I WAS INTERVIEWING AND/OR THAT WERE RELEVANT TO THE MENTAL

10 HEALTHCARE DELIVERY SYSTEMS.

11 **Q.**  THOSE PARTS THAT ARE NECESSARY TO ACTUALLY CREATE AN

12 INTEGRATED AND APPROPRIATE MENTAL HEALTHCARE CARE SYSTEM?

13 **A.**  YES.  FOR THE MOST PART, YES.

14 **Q.**  NOW, ARE YOU AWARE OF THE TERM "RATED CAPACITY"?

15 **A.**  I'M AWARE OF THE TERM.  IT MEANS DIFFERENT THINGS IN

16 DIFFERENT CONTEXTS.

17 **Q.**  I THINK IN YOUR REPORT OF AUGUST, 2008, YOU MENTIONED -- THE

18 RATE OF CAPACITY, AT LEAST IN YOUR REPORT, WAS DEFINED AS:

19              "THE RATIO OF PRISONERS TO THE RATED CAPACITY OF

20          A PARTICULAR FACILITY."

21          DO YOU RECALL THAT?

22 **A.**  YES.  IT'S SOMETIMES CALLED "THE RATIO TO DESIGN CAPACITY,"

23 BUT, YES.

24 **Q.**  AND THE CONCEPT WOULD BE THAT THE RATE OF CAPACITY WOULD

25 INCREASE AS YOU HAVE A DECREASED NUMBER OF PRISONERS, CORRECT?

1  **A.**  THE DEGREE OF OVERCROWDING WOULD -- IF YOU'RE USING THAT

2  MEASURE, I MEAN, IF YOU'RE USING SIMPLY A MEASURE OF RATIO OF

3  THE NUMBER OF PEOPLE THERE TO DESIGN CAPACITY, THEN, YES.  AS

4  YOU DECREASE THE NUMBER OF PRISONERS YOU WOULD DECREASE THAT

5  RATIO, OR THE DEGREE OF OVERCROWDING.

6          THERE ARE OTHER WAYS TO THINK ABOUT IT AND TALK ABOUT

7  IT, BUT THAT'S ONE WAY TO DO IT, YES.

8  **Q.**  AND WOULD IT BE CORRECT TO SAY THAT WHEN YOU LOOK AT

9  OVERCROWDING YOU'RE NOT JUST LOOKING AT A FORMULAIC RATIO OF THE

10  NUMBER OF PRISONERS TO THE NUMBER OF CELLS?

11  **A.**  WELL, I'M LOOKING AT THAT, AND IN ADDITION LOOKING AT SOME

12  OTHER THINGS.  AND THAT'S WHAT I TRIED TO TALK ABOUT EVEN FROM

13  THE VERY OUTSET OF MY TESTIMONY WHEN I SAID IT'S NOT JUST A

14  MATTER OF HOW MANY CELLS ARE THERE AND HOW MANY PRISONERS ARE

15  THERE OR HOW MANY SPACES ARE THERE TO HOUSE PEOPLE AND HOW MANY

16  PRISONERS ARE THERE.

17          YOU HAVE TO LOOK AT ALSO OTHER KINDS OF RESOURCES.

18  IN THE CASE OF MENTAL HEALTHCARE DELIVERY YOU'RE TALKING ABOUT

19  SPACE, THINGS LIKE THINGS I TALKED ABOUT:  SPACES FOR TREATMENT,

20  ACCESS TO APPROPRIATE LEVELS OF CARE, STAFFING, AND SO ON.

21          ALL OF THAT HAS TO BE FACTORED INTO UNDERSTANDING THE

22  EXTENT TO WHICH A FACILITY IS OVERCROWDED.

23  **Q.**  I THINK YOU SAID IT VERY WELL IN YOUR REPORT AT PARAGRAPH

24  39, PAGE 23 -- I'M GOING TO HAVE IT PUT UP ON THE SCREEN --

25  WHERE IT STARTS:

1              "IT IS IMPORTANT TO NOTE THAT OVERCROWDING IS

2         MEASURED OR UNDERSTOOD AS A FUNCTION OF MORE THAN

3         JUST THE RATIO OF PRISONERS TO THE RATED CAPACITY OF

4         A PARTICULAR FACILITY."

5         AND THERE YOU INDICATE, ISN'T IT CORRECT, THAT:

6              "WHEN PRISON SYSTEMS INCREASE THEIR RATED

7         CAPACITY WITHOUT COMMENSURATE INCREASES IN

8         PROGRAMMING, MEDICAL AND MENTAL HEALTH RESOURCES THEY

9         ARE STILL OVERCROWDED, EVEN THOUGH TECHNICALLY THEY

10        DO NOT HOUSE A GREATER NUMBER OF PRISONERS THAN THEY

11        ARE DESIGNED TO HOLD."

12        IS THAT CORRECT.

13   **A.**   YES. YES.  A SYSTEM COULD BE OVERCROWDED IN THAT SENSE, YES.

14   INSUFFICIENT RESOURCES GIVEN THE NUMBER OF PEOPLE WHO HAVE TO

15   BE -- WHOSE PROBLEMS AND NEEDS NEED TO BE ADDRESSED.

16   **Q.**   SO, AGAIN, YOU'RE LOOKING AT THE WHOLE MENTAL HEALTHCARE

17   SYSTEM, NOT JUST THE NUMBER OF PEOPLE IN THAT SYSTEM?

18   **A.**   WELL, YES. THOSE FACTORS HAVE TO BE TAKEN INTO ACCOUNT. I

19   MEAN, IF YOU LOOK AT THE SENTENCE THAT YOU'VE -- THAT FOLLOWS

20   THE ONE THAT'S CUT OFF, I SAID HERE THAT:

21             "CALIFORNIA PRISONS ARE CHRONICALLY AND SEVERELY

22        OVERCROWDED, BOTH IN THE SENSE THAT THEY DO NOT --

23        THAT THEY HOUSE FAR MORE PEOPLE THAN THEY WERE

24        DESIGNED TO HOLD AND BECAUSE THEY DO NOT HAVE

25        REMOTELY ENOUGH PROGRAMMING, MEDICAL, MENTAL

1              HEALTHCARE RESOURCES, STAFF, SPACE, OTHER

2              INFRASTRUCTURE TO HOUSE THE UNPRECEDENTED NUMBERS OF

3              PRISONERS HOUSED IN THEM."

4         SO I CERTAINLY TOOK THOSE THINGS INTO ACCOUNT IN

5    EVALUATING THE SYSTEM IN THAT WAY.

6    **Q.**  YOU TOOK INTO ACCOUNT THE AVAILABILITY OF PROGRAMMING IN

7    THEORIES OF THERAPEUTIC PROGRAMMING AND SPACE TO PROVIDE THAT

8    THERAPY?

9    **A.**  THERAPEUTIC PROGRAMMING, PROGRAMMING BROADLY SPEAKING. I

10   MEAN, MENTAL HEALTH CRISIS PATIENTS, LIKE ALL PRISONERS, NEED

11   PROGRAMMING OF A VARIETY OF SORTS. AND PART OF THE PROBLEM WITH

12   OVERCROWDING IN THE CALIFORNIA SYSTEM IS NOT ONLY IS THERE NOT

13   THERAPEUTIC PROGRAMMING, THERE IS ALMOST NO OTHER KIND OF

14   PROGRAMMING, EITHER.

15        SO IN MOST SYSTEMS WHERE YOU'RE PROVIDING MENTAL

16   HEALTHCARE AND YOU'RE PROVIDING A PARTICULAR NUMBER OF HOURS OF

17   THERAPEUTIC PROGRAMMING THAT'S DONE IN THE CONTEXT WHERE YOU'RE

18   ALSO ASSUMING THAT THOSE PRISONERS, THOSE MENTALLY ILL PRISONERS

19   ARE GETTING OTHER KINDS OF PROGRAMMING.

20        IN THE CALIFORNIA SYSTEM THEY ARE OVERWHELMINGLY NOT.

21   SO THOSE THINGS HAVE TO BE TAKEN INTO ACCOUNT, AS WELL.

22        SO, TOO, DOES NOT ONLY THE STAFFING VACANCIES, BUT

23   THE CHRONIC UNDERSTAFFING THAT EXISTS THROUGHOUT THE MENTAL

24   HEALTHCARE DELIVERY SYSTEM IN CALIFORNIA.  AND I TOOK THAT INTO

25   ACCOUNT, AS WELL.

1  **Q.**  AND THAT'S WHY YOU WROTE IN YOUR REPORT --

2  **A.**  YES.

3  **Q.**  -- THAT YOU NEED TO HAVE A COMMENSURATE INCREASE IN

4  PROGRAMMING, MEDICAL AND MENTAL HEALTH RESOURCES, CORRECT?

5  **A.**  YES, GIVEN THE NUMBER OF PEOPLE WHO ARE IN THE PRISON, THOSE

6  ARE THE SHORTFALLS. SO IT'S NOT JUST THERE ARE TOO FEW CELLS OR

7  TOO FEW PLACES TO HOUSE PEOPLE.  IT'S THAT WE DON'T HAVE ENOUGH

8  OF ALL THOSE THINGS, AS WELL, GIVEN THE NUMBER OF PEOPLE WHO ARE

9  IN THE SYSTEM.

10  **Q.**  AND MOVING ON TO THE ISSUE OF HOUSING, FOR THE PURPOSE OF

11  PROVIDING CONSTITUTIONALLY-ADEQUATE MENTAL HEALTHCARE, YOU WOULD

12  AGREE THAT THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

13  REHABILITATION DOES NOT NEED TO PROVIDE EVERY INMATE WITH THEIR

14  OWN CELL, CORRECT?

15  **A.**  YES. I THINK THAT'S BEEN DECIDED A LONG TIME AGO, BOTH

16  CONSTITUTIONALLY AND BY CORRECTIONAL EXPERTS. THAT'S A MODEL

17  FROM A DIFFERENT TIME AND PLACE, AND IT'S A BYGONE ERA.

18  **Q.**  AND SO PUTTING TWO INMATES IN A CELL THAT MAY HAVE BEEN

19  DESIGNED FOR ONE IS, IN AND OF ITSELF, NOT ENOUGH TO ENDANGER A

20  PRISONER'S MENTAL HEALTH CONDITION, CORRECT?

21  **A.**  NOT NECESSARILY. FOR SOME PRISONERS, IT IS. I MEAN, AND

22  THAT'S -- IT'S -- YOU WANT TO GET CLOSE TO A LINE HERE.

23          I WOULDN'T SUGGEST TO YOU THAT IT'S CONSTITUTIONALLY

24  OR PSYCHOLOGICALLY IMPERMISSIBLE TO PUT TWO PRISONERS IN A CELL

25  DESIGNED FOR ONE.

1          HOWEVER –– AND THE "HOWEVER" IS IMPORTANT HERE ––

2    DEPENDS ON THE PRISONERS.  DEPENDS ON WHAT ELSE IS GOING ON AT

3    THE PRISON. IT DEPENDS ON THE CELLS.  IT DEPENDS ON THE ABILITY

4    OF THAT SYSTEM TO RESPOND TO MENTAL HEALTH PROBLEMS, IF THEY

5    ARISE AS A RESULT OF THAT KIND OF HOUSING OR FOR OTHER REASONS,

6    AND SO ON AND SO FORTH.

7          SO THE "IT DEPENDS" PART IS HUGE IN THAT FORMULATION.

8    Q.  WHAT YOU'RE REALLY SAYING IS IT'S NOT ABOUT PUTTING TWO

9    PEOPLE IN A CELL DESIGNED FOR ONE.  IT'S ABOUT STAFFING.  IT'S

10   ABOUT PROGRAMMING SPACE.  IT'S ABOUT THE ABILITY TO ACCESS

11   MENTAL HEALTHCARE.  IT'S ABOUT THE AVAILABILITY OF PATIENT CARE

12   INFORMATION.  IT'S ABOUT THE ABILITY OF THE MENTAL HEALTHCARE

13   SYSTEM TO SCREEN AND DETECT FOR MENTALLY ILL; ISN'T THAT  RIGHT?

14   A.  YES.  IT'S ABOUT ALL THOSE THINGS.  AND THAT'S WHY I

15   CONCLUDED THAT THE OVERCROWDING HAS IMPAIRED THE ABILITY OF THIS

16   SYSTEM TO PROVIDE ALL OF THOSE THINGS AT A

17   CONSTITUTIONALLY–REQUIRED LEVEL.

18   Q.  NOW, IN REGARDS TO THE NUMBER OF STAFF AVAILABLE TO PROVIDE

19   MENTAL HEALTHCARE, YOU WOULD DEFER TO A SPECIAL MASTER'S TEAM IN

20   THE COLEMAN CASE AND THEIR ONGOING MONITORING REPORTS REGARDING

21   WHETHER OR NOT PATIENTS ARE RECEIVING CONSTITUTIONALLY–ADEQUATE

22   MENTAL HEALTHCARE, WOULDN'T YOU?

23   A.  WELL, I WOULD DEFER TO THEM NOT ONLY ON THAT ISSUE, BUT I

24   WOULD DEFER TO THEM ALSO IN TERMS OF THE EVALUATION OF WHETHER

25   OR NOT THOSE STAFFING RATIOS WERE ACCURATELY AND VALIDLY

1  ESTABLISHED.

2          SO, AS I'M SURE YOU KNOW, THERE'S A WORKLOAD STUDY

3  WHICH HAS BEEN COMPLETED WHICH, IN FACT, INDICATES THAT THOSE

4  ORIGINAL STAFFING RATIOS, WHICH THE DEPARTMENT HAS NOT REMOTELY

5  BEGUN TO MEET IN MANY RESPECTS, GROSSLY UNDERSTATE THE STAFFING

6  NEEDS OF THE MENTAL HEALTH DELIVERY SYSTEM IN THE DEPARTMENT.

7          AND THEN, IN ADDITION, AS AGAIN I'M SURE YOU KNOW,

8  THE SPECIAL MASTER HIMSELF HAS PROVIDED A FAIRLY DETAILED

9  CRITIQUE OF EVEN THAT WORKLOAD STUDY SUGGESTING THAT THE

10 WORKLOAD STUDY ITSELF UNDERESTIMATES THE NUMBER OF STAFF MEMBERS

11 WHO ARE NEEDED TO ADEQUATELY PROVIDE CONSTITUTIONAL MENTAL

12 HEALTHCARE IN THE SYSTEM.

13         SO IT'S NOT JUST THE SPECIAL MASTER'S MONITORING

14 REPORTS, BUT IT'S ALL THE OTHER THINGS THE SPECIAL MASTER HAS

15 DONE WHICH UNDERSCORE MY CONCLUSION THAT THIS IS A GROSSLY

16 UNDERSTAFFED SYSTEM.

17 Q.  YOU HAVE NO REASON TO QUESTION THE SPECIAL MASTER'S FINDING

18 AND RECOMMENDATIONS CONCERNING THE NUMBER OF STAFF POSITIONS

19 NECESSARY TO FULLY IMPLEMENT THE REVISED PROGRAM GUIDE OF 2006,

20 DO YOU?

21         **MS. KAHN:**  OBJECTION.  IT'S A VAGUE QUESTION.  WHAT

22 RECOMMENDATION?

23         **JUDGE KARLTON:**  I'M SORRY, MA'AM?

24         **JUDGE HENDERSON:**  OBJECTION IS VAGUENESS.  WE HAVE NO

25 REASON TO QUESTION -- DO YOU HAVE ANY REASON TO QUESTION THAT?

1          **JUDGE KARLTON:**  ASSUMING THAT THERE WAS SUCH A THING.

2          **MS. TILLMAN:**  I BELIEVE THE SPECIAL MASTER FILED A

3  REPORT WITH THE COLEMAN COURT.

4          **JUDGE KARLTON:**  I'M SORRY.  LET ME PUT THIS PUT THIS

5  BACK ON.

6          GO AHEAD.

7          **MS. TILLMAN:**  I BELIEVE THE SPECIAL MASTER FILED A

8  REPORT WITH THE COLEMAN COURT SHORTLY BEFORE THE COLEMAN COURT

9  ORDERED SOME 500 ODD POSITIONS.

10          **JUDGE KARLTON:**  RIGHT.

11          **MS. TILLMAN:**  WE SOUGHT BY THE CALIFORNIA DEPARTMENT

12  OF CORRECTIONS TO FULLY IMPLEMENT THE PROGRAM GUIDE.  AND THAT'S

13  WHAT I AM REFERRING TO.

14          **JUDGE KARLTON:**  IT'S NOT CLEAR TO ME THAT IT WAS TO

15  FULLY IMPLEMENT THE PROGRAM GUIDE, BUT IT WAS CERTAINLY IN

16  SUPPORT OF THAT.

17          BUT IN ANY EVENT, WHAT'S YOUR QUESTION, AGAIN,

18  BECAUSE I GOT LOST?

19          **JUDGE HENDERSON:**  YES.

20          **MS. TILLMAN:**  SHALL I TRY AGAIN?

21          **JUDGE HENDERSON:**  THE QUESTION WAS:  DOES HE HAVE ANY

22  REASON TO QUESTION THE SPECIAL MASTER'S FINDING IN THAT REGARD.

23          **THE WITNESS:**  OKAY.

24  **BY MS. TILLMAN:**

25  **Q.**  YES.

1  **A.**  WELL, IT'S A STARTING POINT.  AND I THINK THE SPECIAL MASTER

2  HIMSELF ACKNOWLEDGES IT'S A STARTING POINT.  IN ADDITION TO THE

3  POSITIONS WHICH ARE NEEDED IN ORDER TO HELP IMPLEMENT THE

4  PROGRAMMING GUIDE, THERE IS, AS I MENTIONED A MOMENT AGO, A

5  WORKLOAD STUDY THAT SUGGESTS A SHORTFALL IN THE NEIGHBORHOOD OF

6  407 POSITIONS, ADDITIONAL POSITIONS NOT CONTEMPLATED IN EARLIER

7  ALLOCATIONS.

8          AND THEN, THERE IS THE SPECIAL MASTER'S ANALYSIS OF

9  THAT, ANALYSIS SUGGESTING THAT THAT'S AN UNDERSTATEMENT.

10         SO I HAVE NO -- I HAVE CERTAINLY NO REASON TO

11  QUESTION ALL OF THOSE INPUTS FROM THE SPECIAL MASTER WHO HAS

12  BEEN MONITORING THE DELIVERY OF THESE SERVICES FOR A LONG TIME

13  AND WHOSE ANALYSIS APPEARS TO BE SCRUPULOUSLY CAREFUL.

14  **Q.**  LIKEWISE, IN LOOKING AT THE NUMBER OF BEDS THAT ARE REQUIRED

15  BY THE DEFENDANTS TO ENABLE CONSTITUTIONALLY-ADEQUATE MENTAL

16  HEALTHCARE, YOU WOULD DEFER TO THE SPECIAL MASTER'S FINDINGS

17  CONCERNING THE AUGUST 2000 BED PLAN SUBMITTED BY THE DEFENDANTS,

18  WOULDN'T YOU.

19  **A.**  WELL, I'D HAVE TO LOOK AT THAT. I DON'T RECALL THAT,

20  OFFHAND. I MEAN, I'VE JUST IDENTIFIED EARLIER IN MY DIRECT

21  TESTIMONY A FAIRLY STAGGERING SHORTFALL OF AVAILABLE BEDS JUST

22  FOR PEOPLE IN THE ENHANCED OUTPATIENT PROGRAM.

23         I'M AWARE THAT THERE ARE BUDGET REQUESTS TO BUILD

24  ADDITIONAL PROGRAMMING SPACE IN THREE OR FOUR FACILITIES FOR THE

25  ENHANCED OUTPATIENT PROGRAMS THAT EXIST AT SALINAS, THE

1  CALIFORNIA STATE PRISON IN SACRAMENTO, MULE CREEK, AND I BELIEVE

2  CMF.

3            AND I'M AWARE THAT THERE ARE LOTS OF PLANS TO BEGIN

4  TO ADDRESS THE LIMITATIONS OF SPACE IN A WAY IN WHICH THE

5  OVERCROWDING IN THIS SYSTEM HAS MADE IT ALMOST IMPOSSIBLE TO

6  DELIVER CONSTITUTIONALLY-ADEQUATE MENTAL HEALTHCARE TO A

7  SIGNIFICANT POPULATION OF PEOPLE IN THE SYSTEM.

8            I'M NOT SURE WHETHER THE SPECIAL MASTER HAS APPROVED

9  THOSE THINGS OR WHAT HIS POSITION IS ON BUILDING PLANS.

10 **Q.** SO YOU'RE NOT -- I'M SORRY.  ARE YOU FINISHED?

11 **A.** YES.

12 **Q.** SO YOU'RE NOT AWARE THAT THE COLEMAN COURT ACTUALLY APPROVED

13 THE AUGUST 2000 BED PLAN SUBMITTED BY DEFENDANTS?

14 **A.** I BELIEVE --

15            **MS. KAHN:**  OBJECTION.

16            **THE WITNESS:**  I DON'T KNOW. YOU ASKED ME ABOUT THE

17 SPECIAL MASTER. I BELIEVE THAT I'VE SEEN THE BED PLAN, AND I

18 BELIEVE THAT IT'S BEEN APPROVED.  AND I HAVE NO REASON TO

19 DISPUTE THE DESIRABILITY THAT IS EXPRESSED FOR INCREASING THE

20 BEDS THAT ARE AVAILABLE IN THE MENTAL HEALTHCARE DELIVERY

21 SYSTEM.

22 **BY MS. TILLMAN:**

23 **Q.** AND YOU ACTUALLY DO NOT KNOW WHETHER THERE IS AN OBJECTIVE

24 STANDARD THAT MUST BE MET BY THE CALIFORNIA DEPARTMENT OF

25 CORRECTIONS AND REHABILITATION IN ORDER TO SHOW COMPLIANCE WITH

1  THIS CORE ELEMENT OF A CONSTITUTIONALLY-ADEQUATE MENTAL

2  HEALTHCARE SYSTEM, SUFFICIENT MENTAL HEALTHCARE BEDS FOR THE

3  MENTAL HEALTHCARE POPULATION?

4  **A.**  I'M WELL-AWARE THAT THERE ARE -- THAT THE AVAILABILITY OF

5  BEDS IS ONE COMPONENT IN THE DELIVERY OF A

6  CONSTITUTIONALLY-ADEQUATE MENTAL HEALTHCARE SYSTEM.

7          THE SPECIAL MASTER'S ANALYSIS OF OVERCROWDING TALKS

8  ABOUT THE PROVISION OF BEDS AS ONE COMPONENT OF THAT, AS WELL AS

9  STAFFING.  AND IT'S CERTAINLY A COMPONENT THAT I TOOK INTO

10 ACCOUNT AS I WENT THROUGH THESE FACILITIES AND REACHED THE

11 CONCLUSIONS I DID ABOUT A YEAR OR SO AFTER THE SPECIAL MASTER'S

12 ANALYSIS OF THESE ISSUES.

13 **Q.**  AND YOU RECALL AT PAGE 90 OF YOUR DEPOSITION, LINE 19, YOU

14 WERE ASKED:

15          "ARE YOU AWARE OF WHAT OBJECTIVE STANDARD MUST

16          BE MET BY THE CALIFORNIA DEPARTMENT OF CORRECTIONS

17          AND REHABILITATION IN ORDER TO SHOW COMPLIANCE WITH

18          THE ELEMENTS OF PROVIDING SUFFICIENT MENTAL HEALTH

19          BEDS FOR THE MENTAL HEALTHCARE POPULATION TO SHOW A

20          CONSTITUTIONAL COMPLIANCE?"

21 YOUR ANSWER AT LINE 24:

22          "NO, I'M NOT. I DON'T KNOW HOW TO CALCULATE

23          THAT."

24 YOU WERE THEN ASKED AT PAGE 91, LINE 12:

25          "AND YOU WOULD RELY UPON THOSE REPORTS IN

1           FINDING" -- I THINK YOU'RE REFERRING TO THE SPECIAL

2           MASTER'S REPORTS -- "IN FINDING CONSTITUTIONAL

3           VIOLATIONS WITHIN THE CALIFORNIA PRISON SYSTEM?"

4           AND YOUR ANSWER WAS:

5               "YES."

6  **A.**  YOU WANT ME --

7           **MS. KAHN:**  OBJECTION, YOUR HONOR.  CAN MS. TILLMAN

8  READ THE SENTENCE IN-BETWEEN THOSE TWO SENTENCES, THE QUESTIONS

9  AND ANSWERS?

10          **JUDGE HENDERSON:**  READ THAT, PLEASE.

11          **MS. TILLMAN:**  I'M SORRY.  THERE WAS ANOTHER QUESTION

12 AND ANSWER BETWEEN THOSE TWO.  WOULD YOU LIKE THAT READ?

13          **JUDGE HENDERSON:**  LET MS. KAHN TELL US.  SHE'S ASKED

14 FOR SOMETHING FURTHER TO BE READ.

15          WHAT LINE WOULD YOU LIKE?

16          **MS. KAHN:**  STARTING ON PAGE 91 AT THE TOP OF THE PAGE

17 THERE'S A QUESTION THAT SHE SKIPPED.

18          **MS. TILLMAN:**  THE PAGE 91, LINE ONE, THERE'S A

19 QUESTION:

20              "ARE YOU AWARE OF WHAT PARTICULAR OBJECTIVE

21          MEASURE MUST BE MET BY THE CALIFORNIA DEPARTMENT OF

22          CORRECTIONS AND REHABILITATION IN SHOWING COMPLIANCE

23          WITH THE CONSTITUTIONAL ELEMENT OF PROVIDING ADEQUATE

24          MEDICAL" -- AND THEN, I SAID -- "I'M SORRY.

25          MEDICATION MANAGEMENT OF THOSE MENTAL HEALTH PATIENTS

1           NEEDING MEDICATIONS FOR THEIR MENTAL ILLNESS?

2               "ANSWER:  I DON'T KNOW HOW THE SPECIAL MASTER

3           QUANTIFIES THAT.  AS I SAID, I REVIEWED THE SPECIAL

4           MASTER'S REPORTS AND THEIR SUMMARY TO THE EXTENT TO

5           WHICH THEY'RE IN COMPLIANCE," END OF SENTENCE.

6           **JUDGE HENDERSON:**  THANK YOU.

7  **BY MS. KAHN:**

8  **Q.**  NOW, ON THE ISSUE OF VIOLENCE, VIOLENCE ARISING FROM

9  INMATES, YOU AGAIN LOOK AT THE ENVIRONMENT IN WHICH THOSE

10 INMATES ARE HOUSED, CORRECT?

11 **A.**  I'M NOT SURE WHAT YOU MEAN. IN WHAT CONTEXT?

12 **Q.**  IF, FOR INSTANCE, THERE WAS A REDUCTION IN THE POPULATION,

13 WOULDN'T YOU AGREE THAT THAT REDUCTION MIGHT NOT ACTUALLY RESULT

14 IN ANY CHANGE IN THE RATE OF VIOLENCE AMONGST INMATES?

15 **A.**  IT WOULD DEPEND.  IT'S POSSIBLE.

16 **Q.**  AND IT WOULD DEPEND --

17 **A.**  IT'S POSSIBLE THAT IT WOULD, AND IT'S POSSIBLE THAT IT

18 WOULDN'T.

19 **Q.**  AND IT WOULDN'T, FOR EXAMPLE, IF NECESSARY STAFFING WASN'T

20 AVAILABLE TO ADDRESS THE NEEDS OF THE INMATES, CORRECT?

21 **A.**  THAT WOULD BE ONE COMPONENT OF THE ANALYSIS THAT YOU WOULD

22 DO TO UNDERSTAND THE VIOLENCE RATES IN A SYSTEM, YES.

23 **Q.**  OKAY.  YOU'VE HAD A CHANCE TO REVIEW THE 20TH ROUND

24 MONITORING REPORT, CORRECT?

25 **A.**  YES.

1  Q.  AND IN THAT MONITORING REPORT THERE ARE SITE-BY-SITE

2  EVALUATIONS OF COMPLIANCE WITH THE ELEMENTS OF A

3  CONSTITUTIONALLY-ADEQUATE MENTAL HEALTHCARE SYSTEM, CORRECT?

4  A.  YES.

5  Q.  AND ONE ELEMENT, OF COURSE, INVOLVES THE APPROPRIATE CARE OF

6  MENTALLY ILL INMATES, INCLUDING PROVIDING THEM WITH APPROPRIATE

7  MEDICATION IN A TIMELY WAY, CORRECT?

8  A.  YES.

9  Q.  AND DID YOU NOTICE IN THE SPECIAL MASTER'S 20TH ROUND REPORT

10 THAT WAS FILED WITH THIS COURT IN SEPTEMBER, 2008, AT PAGE 58

11 THERE IS A DESCRIPTION OF MULE CREEK STATE PRISON'S MEDICATION

12 MANAGEMENT PROGRAM?

13 A.  I DON'T RECALL IT SPECIFICALLY.  I WOULDN'T BE SURPRISED TO

14 FIND THERE WAS ONE THERE.

15 Q.   DO YOU RECALL THAT REPORT INDICATING, QUOTE:

16              "PHARMACY OPERATIONS WERE TRANSFORMED BY A 100

17          PERCENT INCREASE IN STAFFING AND INSTALLATION OF

18          MAXOR NATIONAL PHARMACY SERVICES CORPORATIONS PAREN

19          (MAXOR'S) END PAREN, NEW MANAGEMENT INFORMATION

20          SYSTEM"?

21 A.  YES.  NOW THAT YOU'VE REMINDED ME, I REMEMBER HAVING READ

22 THAT.

23 Q.  AND THAT'S A POSITIVE SIGN, ISN'T IT, TOWARDS THE

24 DEVELOPMENT AND ESTABLISHMENT OF A CONSTITUTIONALLY-ADEQUATE

25 MENTAL HEALTHCARE SYSTEM AT MULE CREEK?

1            **MS. KAHN:**  OBJECTION.

2            MS. TILLMAN, CAN YOU READ THE REST OF THIS QUOTE.

3            **MS. TILLMAN:**  THIS GOES ON FOR OVER A PARAGRAPH, YOUR

4   HONORS.  I'M HAPPY TO ALLOW MS. KAHN TO ENGAGE IN REDIRECT, IF

5   SHE NEEDS TO.

6            **JUDGE HENDERSON:**  LET'S DO IT THAT WAY. THAT'S FINE.

7   **BY MS. TILLMAN:**

8   **Q.**  ISN'T IT CORRECT THAT YOU'VE CONCLUDED THAT THE REDUCTION OF

9   THE OVERALL CALIFORNIA DEPARTMENT OF CORRECTIONS REHABILITATION

10  POPULATION IS ONLY THE FIRST STEP TOWARDS A

11  CONSTITUTIONALLY-COMPLIANT MENTAL HEALTHCARE SYSTEM?

12  **A.**  YES, IT'S A NECESSARY BUT NOT SUFFICIENT CONDITION. IF

13  THAT'S ALL YOU DID AND YOU STOPPED THERE, THEN THAN WOULDN'T DO

14  IT.  BUT I DON'T BELIEVE YOU CAN DO IT WITHOUT DOING THAT,

15  BECAUSE IT IS THE PRIMARY CAUSE OF THE PROBLEMS THAT I'VE BEEN

16  DESCRIBING.

17  **Q.**  AND I BELIEVE AT YOUR DEPOSITION AT PAGE 118, AT LINE EIGHT

18  THROUGH 20, YOU SAID IT VERY WELL.

19            LET'S SEE IF WE CAN GET A BETTER RESOLUTION ON THAT.

20            YOU SAID:

21              "IT'S ONE STEP, YES, ABSOLUTELY, AN EXTREMELY

22              IMPORTANT STEP IN MY OPINION.  I THINK A NECESSARY,

23              BUT NOT SUFFICIENT CONDITION."

24            YOU WERE ASKED:

25              "BUT EVEN AFTER IMPLEMENTING THAT CONDITION OTHER

1          STEPS MUST BE TAKEN BY DEFENDANTS TO REACH

2          CONSTITUTIONAL COMPLIANCE, RIGHT?

3             "ANSWER:  YES.  AND WE'VE BEEN TALKING ABOUT

4          STAFFING.  WE'VE BEEN TALKING ABOUT PROGRAMMING

5          SPACE.  WE'VE BEEN TALKING ABOUT ALL THESE OTHER

6          THINGS THAT ARE PART OF A CONSTITUTIONAL SYSTEM,"

7   CORRECT?

8   **A.**  IT'S WHAT I SAID IN THE DEPOSITION. IT'S WHAT I'VE SAID

9   HERE.

10          **MS. TILLMAN:**  THANK YOU. NOTHING FURTHER.

11          **JUDGE HENDERSON:**  OKAY, COUNSEL.

12          **MS. KAHN:**  OKAY.

13          **JUDGE HENDERSON:**  ANY INTERVENORS WISH TO

14   CROSS-EXAMINE THIS WITNESS?

15          **MS. JOHNSON:**  ANNE JOHNSON FOR THE PLATA DEFENDANTS.

16          SIMILAR TO THE MOTION TO STRIKE WE MADE YESTERDAY

17   WITH RESPECT TO DR. STEWART'S TESTIMONY, THE PLATA DEFENDANTS

18   MOVE TO STRIKE DR. HANEY'S BARE CONCLUSIONS REGARDING MEDICAL

19   CARE AND THE PRIMARY CAUSE OF THE ALLEGED CONSTITUTIONAL

20   VIOLATIONS IN THE PLATA CASE AS LACKING ANY FACTUAL BASIS OR

21   EXPLANATION.

22          WE WOULD NOTE THAT DR. HANEY IS NOT A PHYSICIAN. AND

23   ALL OF HIS TESTIMONY RELATES TO THE COLEMAN MEMBERS AND THE

24   MENTAL HEALTH ISSUES, NOT MEDICAL CARE.

25          **THE COURT:**  SIMILAR TO THE RULING YESTERDAY, MOTION'S

1   OVERRULED OR DENIED.

2           **MS. WANG:**  TERESA WANG FOR THE LEGISLATOR

3   INTERVENORS, YOUR HONORS.

4                   **CROSS-EXAMINATION**

5   **BY MS. WANG:**

6   **Q.**  I JUST HAVE A COUPLE OF QUESTIONS FOR YOU, DR. HANEY.

7           ISN'T IT TRUE THAT YOU DO NOT HAVE A DIRECT OPINION

8   ON HOW OVERCROWDING IS THE PRIMARY CAUSE OF ANY ALLEGED

9   DEFICIENCIES IN THE MEDICAL HEALTHCARE PROVISION?

10  **A.**  NO, ACTUALLY THAT'S NOT TRUE. I HAVE -- I'VE WRITTEN A

11  200-PAGE REPORT WHICH ADDRESSES ALMOST NOTHING ELSE.

12  **Q.**  I'M SORRY.  TO CLARIFY, THE MEDICAL HEALTHCARE PROVISION?

13  **A.**  I'M SORRY.  MEDICAL HEALTHCARE, NO.  I THINK I'VE TALKED IN

14  THE REPORT ABOUT THE WAY IN WHICH THE SYSTEM BREAKDOWN IN A

15  SYSTEM THAT IS AS OVERCROWDED AS CALIFORNIA'S SYSTEM EFFECTS THE

16  DELIVERY OF ALL OF THE SERVICES.  IT EFFECTS PROGRAMMING.  IT

17  EFFECTS PROVISION OF EDUCATIONAL PROGRAMMING.  IT EFFECTS

18  MEDICAL, AS WELL AS MENTAL HEALTHCARE.

19          MANY OF THE UNITS THAT I VISITED WHERE MENTAL

20  HEALTHCARE WAS TAKING PLACE ARE ALSO THE UNITS WHERE MEDICAL

21  CARE WAS TAKING PLACE.

22          THEY ARE SEVERELY CONGESTED AND CROWDED, AND

23  PRISONERS REPORTED DIFFICULTIES WITH MEDICAL CARE AS WELL AS

24  MENTAL HEALTHCARE.

25  **Q.**  IF I COULD JUST REFER YOU TO PAGE 84 OF YOUR DEPOSITION

1   TAKEN BY MS. TILLMAN EARLIER THIS YEAR.

2           ON PAGE 84, LINE ONE, MS. TILLMAN ASKED:

3               "COULD YOU LET ME KNOW HOW OVERCROWDING IS THE

4               PRIMARY CAUSE OF THE MEDICAL SYSTEM'S FAILURE TO

5               PROVIDE CONSTITUTIONAL LEVELS OF CARE?

6               "ANSWER:  WELL, I REALLY ADDRESSED THAT ONLY

7               INDIRECTLY AS PART -- AS OBVIOUSLY MY MAIN FOCUS WAS

8               ON THE PROVISION OF MENTAL HEALTHCARE."

9           AND YOU GO ON TO DISCUSS, DOCTOR, THE INTERSECTION OF

10  YOUR REPORT DISCUSSING THE INTERSECTION BETWEEN MEDICAL AND

11  MENTAL HEALTHCARE.

12          AS IT READS ON THE SCREEN:

13              "I DO DISCUSS IN THE REPORT BRIEFLY HOW THE TWO

14              ARE SOMEWHAT INTERCONNECTED IN THAT PRISONERS WHO ARE

15              RECEIVING INADEQUATE MENTAL HEALTHCARE MAY HAVE -- IT

16              MAY IMPACT THEIR ACCESSING OF THE MEDICAL SYSTEM, AS

17              WELL.  THAT PRISONERS WHO ARE BEING INADEQUATELY

18              TREATED MAY BE RELUCTANT TO USE THE MEDICAL SYSTEM,

19              MAY BEGIN TO EXPERIENCE MEDICAL PROBLEMS THAT THEY

20              ARE UNABLE TO RECEIVE ADEQUATE TREATMENT FOR, AND SO

21              ON. BUT IT'S REALLY ONLY THAT CROSSOVER AS A

22              CONNECTION BETWEEN THE TWO SYSTEMS. I DIDN'T LOOK IN

23              ANY PARTICULARLY SYSTEMIC WAY AT THE PROVISION OF

24              MEDICAL SERVICES.  I WAS FOCUSING ON MENTAL

25              HEALTHCARE."

1              DO YOU RECALL THAT BEING YOUR TESTIMONY, DOCTOR?

2    **A.**  YES.

3    **Q.**  AND SO THEN YOU DO AGREE THAT THAT WAS THE FOCUS        OF

4    -- THAT YOUR REPORT TOUCHED UPON MEDICAL CARE INSOFAR AS IT

5    INVOLVED INMATES SEEKING MENTAL HEALTHCARE SERVICES WHO MAY HAVE

6    BEEN DISSUADED FROM SEEKING MEDICAL SERVICES?

7    **A.**  WELL, THAT WAS PART OF IT, YES.  AND I JUST DESCRIBED AN

8    ADDITIONAL PART, WHICH IS THE WAY IN WHICH OVERCROWDED SYSTEMS

9    BEGIN TO FALTER AND FAIL IN THE PROVISION OF ALL SERVICES.

10             AND THEN, I ALSO ADDED A MOMENT AGO THAT IN THE

11   COURSE OF TOURING THESE FACILITIES IT WAS POSSIBLE TO VIEW AND

12   TO TALK TO CLINICAL STAFF ABOUT THE CONGESTED NATURE OF THE

13   MEDICAL TREATMENT AREAS, AS WELL AS THE MENTAL HEALTH AREAS.

14             ONE OF THE DISCUSSIONS THAT WE OFTENTIMES HAD WAS THE

15   WAY IN WHICH BECAUSE OF THE OVERCROWDING IN THE PRISONS THE

16   MENTAL HEALTHCARE SYSTEM WAS COMPETING WITH THE MEDICAL SYSTEM.

17             FOR EXAMPLE, THERE WERE WHAT WERE CALLED "FLEX BEDS"

18   WHICH COULD BE CONVERTED FROM A MEDICAL USE TO A MENTAL HEALTH

19   USE, AND BECAUSE OF THAT THESE KINDS OF BEDS WERE COMPETING WITH

20   ONE ANOTHER.

21             AND THE DIFFICULTY SOMETIMES IN CORRECTIONAL

22   TREATMENT FACILITIES THAT EVEN WHERE THEY HAD ENOUGH ROOMS,

23   ENOUGH AVAILABLE BEDS, BECAUSE ONE OR ANOTHER OF THE SYSTEM,

24   EITHER THE MEDICAL OR THE MENTAL HEALTH SYSTEM WAS OVERCROWDED

25   AT THE TIME, THE OTHER SYSTEM COULDN'T BE ACCOMMODATED AT THAT

 1  INSTITUTION.

 2          SO THOSE WERE THE OTHER WAYS IN WHICH THEY WERE

 3  INTERCONNECTED.  AND I DID SEE THEM DURING THE COURSE OF THE

 4  TOURS.

 5  Q.  THANK YOU.

 6          NO FURTHER QUESTIONS.

 7          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

 8          REDIRECT?

 9          **MS. KAHN:**  I JUST HAVE A COUPLE OF QUESTIONS HERE.

10          MAY I APPROACH THE WITNESS?

11          **JUDGE HENDERSON:**  YOU MAY.

12          THIS IS PLAINTIFFS' TRIAL EXHIBIT 477.

13          **MS. TILLMAN:**  WHAT IS IT?

14          **MS. KAHN:**  COLEMAN MENTAL HEALTH BED PLAN.

15                    **REDIRECT EXAMINATION**

16  **BY MS. KAHN:**

17  Q.  DR. HANEY, MS. TILLMAN A FEW MINUTES AGO WAS ASKING YOU

18  ABOUT THE AUGUST 17 BED PLAN WHICH WAS APPROVED BY THE COURT.

19  AND WHAT I'VE HANDED YOU HERE IS THE NEWEST VERSION OF THAT BED

20  PLAN, WHICH IS THE MENTAL HEALTH BED PLAN DATED JULY 16, 2008.

21  IT'S EXHIBITED 477.

22          HAVE YOU REVIEWED THIS?

23  A.  YES, I BELIEVE I HAVE.

24  Q.  OKAY.  I'D LIKE TO HAVE YOU TURN TO ATTACHMENT C, WHICH IS

25  AT THE BACK, THE SECOND TO LAST PAGE OF THE EXHIBIT.

1    **A.**  YES.

2    **Q.**  OKAY. CAN YOU DESCRIBE WHAT THIS CHART IS?

3    **A.**  YES.

4              **JUDGE REINHARDT:**  WHAT PAGE IS THAT ON?

5              **MS. KAHN:**  I'M SORRY, YOUR HONOR.  IT'S ATTACHMENT C,

6    WHICH IS THE SECOND TO LAST PAGE OF THIS BED PLAN.

7              **JUDGE REINHARDT:**  OKAY.

8              **JUDGE KARLTON:**  THE QUESTION WAS:

9              "CAN YOU TELL US WHAT THIS CHART IS?"

10   **BY MS. KAHN:**

11   **Q.**  CAN YOU TELL US WHAT THIS CHART IS, DR. HANEY?

12   **A.**  YES.  IT'S A VERY NEAT CHART DEPICTION OF THE STATUS OF

13   VARIOUS PROPOSED BUILDING PROGRAMS IN THE DEPARTMENT OF

14   CORRECTIONS WITH RESPECT TO THE PROVISION OF TREATMENT SPACE.

15           IT SHOWS THE DATE THAT THE COURT ORDERED IT. AND

16   THEN, AS YOU MOVE TOWARDS THE MIDDLE IT SHOWS THE STATUS.  AND

17   THEN, THE VERY FAR RIGHT COLUMN IT SHOWS THE -- THERE'S A

18   COMMENTARY ABOUT WHAT'S HAPPENED TO THE FATE OF THE PROGRAM.

19   **Q.**  AND IS IT YOUR UNDERSTANDING THAT THIS IS THE STATUS OF THE

20   AUGUST 17, 2007 BED PLAN?

21   **A.**  YES, EXACTLY.

22           MS. TILLMAN ASKED ME ABOUT THIS PLAN AND WHETHER IT

23   WAS APPROVED.  AND, OF COURSE, THE PLANS ARE APPROVED. BUT THE

24   GAP BETWEEN THE PLANS AND THE IMPLEMENTATION OF THE PLANS AND

25   CERTAINLY BETWEEN THE PLANS BEING APPROVED AND THE COMPLETION OF

1  THE PLANS IS WIDE AND WIDENING.

2  **Q.**  MS. TILLMAN ALSO WAS ASKING YOU QUESTIONS ABOUT ADSEG AND

3  SINGLE CELLING.  AND I'D LIKE YOU TO ADDRESS HOW OVERCROWDING

4  AFFECTS PRISONERS WHO ARE HOUSED IN ADSEG ON SINGLE CELL STATUS.

5  **A.**  WELL, OVERCROWDING AFFECTS THEM IN A NUMBER OF SIGNIFICANT

6  WAYS. IT OVER -- IT AFFECTS THEM, FIRST OF ALL, IN TERMS OF AN

7  ISSUE THAT I'VE BEEN TALKING ABOUT REPEATEDLY, WHICH IS ACCESS

8  TO TREATMENT SPACE.

9          WHETHER A PRISONER IS SINGLE OR DOUBLE-CELLED IN THE

10  ADMINISTRATIVE SEGREGATION, THEIR ACCESS TO TREATMENT SPACE IS

11  SEVERELY LIMITED BY THE OVERCROWDING THAT PLAGUES THE SYSTEM.

12          THE TREATMENT SPACES ARE AS I'VE DESCRIBED THEM.  THE

13  COURT HAS SEEN PICTURES OF THE CAGES WHICH ARE USED.  WHAT ARE

14  NOT DEPICTED IN THOSE PHOTOGRAPHS ARE THE LOCATION OF THOSE

15  CAGES IN SOME OF THE ADMINISTRATIVE SEGREGATION UNITS THAT I

16  TOURED.

17          MANY OF THEM OUT ON THE DAYROOM FLOOR OF THE

18  ADMINISTRATIVE SEGREGATION UNITS, SO THAT IF A PRISONER IS

19  ENGAGED IN ALLEGEDLY THERAPEUTIC ACTIVITY, THAT'S WITNESSED BY

20  ALL THE OTHER PRISONERS IN ADMINISTRATIVE SEGREGATION.

21          GROUP THERAPY SOMETIMES TAKES PLACE IN A TINY AREA

22  WHERE IT'S ALMOST IMPOSSIBLE FOR THE CAGES TO FIT IN THE AREA.

23          IN MANY INSTANCES, PRISONERS, EVEN SINGLE-CELLED

24  ADMINISTRATIVE SEGREGATION PRISONERS ARE AFFECTED BY

25  OVERCROWDING BECAUSE OF THE SHORTAGE OF CLINICAL STAFF TO

1  PROVIDE THEM WITH THE TREATMENT OPPORTUNITIES THAT THEY ARE

2  ENTITLED TO.

3         THEY ARE IMPACTED BY OVERCROWDING BECAUSE OF THE

4  SHORTAGE OF ESCORTS. AN ADMINISTRATIVE SEGREGATION PRISONER HAS

5  TO BE ESCORTED BY A CORRECTIONAL OFFICER WHENEVER THEY LEAVE THE

6  ADMINISTRATIVE SEGREGATION UNIT TO GET ACCESS TO THERAPY OR TO

7  GET ACCESS TO ANYTHING OUTSIDE OF THE ADMINISTRATIVE SEGREGATION

8  UNIT.

9         IN ADDITION, THEY ARE IMPACTED BY OVERCROWDING

10 BECAUSE OF THE DIFFICULTIES OF THE ADMINISTRATIVE SEGREGATION

11 UNITS IN PROVIDING THE CONSTITUTIONALLY-MANDATED ACCESS TO

12 EXERCISE.

13 **Q.**  HOW IS EXERCISE PROVIDED TO PRISONERS HOUSED IN ADSEG?

14 **A.**  WELL, THEY HAVE TO BE INDIVIDUALLY ESCORTED TO THE EXERCISE

15 AREA. MANY OF THEM, THEY TYPICALLY EXERCISE BY THEMSELVES. AND

16 THERE ARE INADEQUATE NUMBER OF THOSE EXERCISE FACILITIES

17 AVAILABLE.

18         AND THERE'S SOMETIMES CALLED "SMALL MANAGEMENT

19 YARDS."  THE COURT HAS ORDERED THOSE SMALL MANAGEMENT YARDS TO

20 BE CONSTRUCTED SO THAT PRISONERS WHO ARE IN ADMINISTRATIVE

21 SEGREGATION CAN GET THIS ACCESS.

22         IT'S NOT BEING PROVIDED NOW. AND, IN PART, IT'S NOT

23 BEING PROVIDED BECAUSE THERE'S A RESOURCE SHORTAGE, AN, I

24 BELIEVE, OVERCROWDING-RELATED RESOURCE SHORTAGE.

25         IN SOME INSTANCES ADMINISTRATIVE SEGREGATION UNITS

1  THEMSELVES, EVEN THOUGH THEY ARE ALREADY LOCKED DOWN UNITS ARE

2  LOCKED DOWN EVEN FURTHER.

3          I TOURED AN ADMINISTRATIVE SEGREGATION UNIT IN THE

4  CALIFORNIA CORRECTIONAL INSTITUTION IN TEHACHAPI WHERE THERE HAD

5  BEEN A VIOLENT INCIDENT THAT HAD OCCURRED IN THE BEGINNING OF

6  APRIL OF THIS PAST YEAR.

7          I TOURED THAT UNIT AT THE END OF JULY. THE PRISONERS

8  IN THAT UNIT HAD BEEN LOCKED DOWN AND HAD NOT GOTTEN OUTDOOR

9  EXERCISE BECAUSE THAT UNIT HAD BEEN LOCKED DOWN.  THAT

10 ADMINISTRATIVE SEGREGATION UNIT HAD BEEN LOCKED DOWN FROM THE

11 BEGINNING OF APRIL UNTIL THE END OF JULY.  SO NOT ONLY WERE THEY

12 NOT GETTING 10 HOURS A WEEK OF OUTDOOR EXERCISE, THEY WERE

13 GETTING NO HOURS A WEEK OF OUTSIDE EXERCISE.

14         LOCKDOWN IS A DIRECT RESULT OF A SYSTEM BEING

15 OVERCROWDED AND OVERWHELMED AND HAVING TOO MANY PEOPLE AND NOT

16 HAVING A WAY TO MANAGE CONFLICTS IN ANY OTHER WAY.  AND IT CAN

17 IMPACT EVEN ADMINISTRATIVE SEGREGATION UNITS.

18 Q.  THANK YOU.

19         NO MORE QUESTIONS.

20         **JUDGE HENDERSON:**  OKAY. THANK YOU, COUNSEL.

21         OKAY. WE'RE GOING TO TAKE A 15-MINUTE RECESS.

22         **MS. TILLMAN:**  YOUR HONOR, CAN I JUST ASK ONE OR TWO

23 MORE QUESTIONS?

24         **THE COURT:**  CERTAINLY. SORRY, MS. TILLMAN.

25         **MS. TILLMAN:**  I'LL TRY TO KEEP IT SHORT.

1          **JUDGE HENDERSON:**  IT'S YOUR CROSS-EXAMINATION.

2                      **RECROSS-EXAMINATION**

3  **BY MS. TILLMAN:**

4  **Q.**  DR. HANEY, YOU'VE MENTIONED CONCERN ABOUT THE USE OF

5  THERAPEUTIC MODULES FOR PROVIDING GROUP THERAPY FOR THE MOST

6  VIOLENT OF THE PATIENTS ON THE MENTAL HEALTH CASELOAD, HAVEN'T

7  YOU?

8  **A.**  PATIENTS WHO ARE IN ADMINISTRATIVE SEGREGATION TYPICALLY

9  RECEIVE THERAPEUTIC PROGRAMMING IN THE CAGES THAT WE'VE BEEN

10 TALKING ABOUT.

11 **Q.**  HAVE YOU EVER HAD A CONVERSATION WITH COURT-APPOINTED EXPERT

12 DR. METZNER ABOUT THOSE THERAPEUTIC MODULES AND THEIR DESIGN?

13 **A.**  I KNOW DR. METZNER.  I DON'T KNOW THAT WE'VE EVER TALKED

14 ABOUT THE PARTICULAR THERAPEUTIC MODULES THAT I'VE DESCRIBED IN

15 THE REPORT AND THAT THE COURT HAS PICTURES OF.

16 **Q.**  WERE YOU AWARE THAT DR. METZNER PROVIDED THE SPECIFICATIONS

17 FOR DESIGN OF THOSE THERAPEUTIC MODULES?

18 **A.**  MS. TILLMAN, I'M FAIRLY CERTAIN DR. METZNER DID NOT PROVIDE

19 THE SPECIFICATIONS FOR THE THERAPEUTIC MODULES THAT I SAW IN THE

20 ADMINISTRATIVE SEGREGATION UNITS THAT I TOURED, SOME OF WHICH

21 THE COURT DOES HAVE PHOTOGRAPHS OF.

22          WE'RE TALKING ABOUT OLD CAGES THAT HAVE NOT BEEN

23 RECENTLY CREATED THAT DR. METZNER CANNOT POSSIBLY HAVE HAD ANY

24 INPUT INTO BECAUSE THEY HAVE BEEN AROUND IN THIS SYSTEM FOR A

25 LONG TIME.

1   Q.   SO YOU WOULD APPROVE, THEN, THE USE OF THERAPEUTIC MODULES

2   THAT HAVE BEEN BUILT RECENTLY, SAY IN THE PAST YEAR, PURSUANT TO

3   THE SPECIFICATIONS PROVIDED BY DR. METZNER THEN, WOULDN'T YOU?

4   A.   NO, I DIDN'T SAY THAT. AND LET ME TRY TO ADDRESS THIS. I

5   THINK I UNDERSTAND THE CONTEXT OF THIS, AND IF I DON'T I HOPE

6   YOU'LL CORRECT ME.

7   Q.   I THINK YOU'VE ANSWERED THE QUESTION, ACTUALLY.

8            **MS. KAHN:**  OBJECTION?  CAN THE WITNESS ANSWER THE

9   QUESTION?

10           **THE WITNESS:**  I KNOW THAT DR. METZNER HAS HAD SOME

11  INPUT SOMETIME AGO IN THE CREATION OF THERAPEUTIC MODULES OR

12  CAGES THAT WERE ORIGINALLY INTENDED FOR USE IN A THERAPEUTIC

13  ENVIRONMENT, PSYCHIATRIC SERVICES AS A MATTER OF FACT.

14           WHEN THE ISSUE WAS HOW TO PROVIDE CARE IN A

15  THERAPEUTIC CONTEXT LIKE A PSU FOR PRISONERS WHO ALSO HAD

16  SERIOUS OR SIGNIFICANT SECURITY CONCERNS OR ISSUES. IT'S A HARD

17  PROBLEM. IT'S A DIFFICULT ISSUE TO ADDRESS.

18  Q.   YOU DON'T WANT YOUR STAFF TO GET ASSAULTED.  THAT'S REALLY

19  WHAT THE ISSUE IS.  YOU DON'T WANT THE INMATE PATIENT TO ASSAULT

20  ANOTHER INMATE IN THAT THERAPEUTIC GROUP?

21  A.   YES.  AND, YET, THERE'S A NEED FOR THE INMATE PATIENT TO

22  HAVE A THERAPEUTIC CONTACT IN AN ENVIRONMENT WHERE THERE ARE

23  OTHER PEOPLE PRESENT.

24           NOW, THIS IS AN ISSUE ABOUT WHICH REASONABLE PEOPLE

25  AND REASONABLE EXPERTS CAN DISAGREE WHETHER IT CAN OR SHOULD BE

1  DONE IN CAGES OR NOT.

2           DR. METZNER'S CONTRIBUTION WAS TO SAY IF IT'S GOING

3  TO BE DONE IN THESE CAGES, THE CAGES SHOULD BE IN A THERAPEUTIC

4  CONTEXT, SHOULD BE OF A PARTICULAR KIND.  THEY SHOULD HAVE A

5  PARTICULAR DESIGN.

6           IF THAT'S THE WAY THE DEPARTMENT HAS DECIDED TO

7  APPROACH THIS, THEN THIS IS WHAT THESE EXERCISE OR THESE THERAPY

8  CAGES OUGHT TO LOOK LIKE.

9           THOSE ARE NOT THE CAGES.  THOSE ARE NOT THE CAGES

10 THAT I SAW IN THE UNITS THAT WERE BEING USED IN ADMINISTRATIVE

11 SEGREGATION UNITS, IN ALL OF THE PRISONS THAT I LOOKED AT THAT

12 HAD ADSEG UNITS.  THOSE ARE NOT THE KINDS OF CAGES WE'RE TALKING

13 ABOUT.

14          AND I DOUBT VERY SERIOUSLY -- AND, OF COURSE, DR.

15 METZNER CAN SPEAK FOR HIMSELF -- THAT HE WOULD APPROVE OF THE

16 KINDS OF CAGES THAT I SAW IN THE ADMINISTRATIVE SEGREGATION

17 UNITS THAT I TOURED AND ABOUT WHICH I WROTE IN MY REPORT.

18 **Q.**  NOW, YOU WOULDN'T DISAGREE, WOULD YOU, THAT THE USE OF

19 THERAPEUTIC MODULES HAS BEEN ACCEPTED AS PART OF THE

20 COURT-APPROVED REVISED PROGRAM GUIDE OF 2006?

21 **A.**  I THINK IT'S -- I THINK IT'S CONTEMPLATED IN LIEU OF

22 ALTERNATIVE APPROACHES. BUT, AGAIN, WE'RE TALKING -- YOU'RE

23 TALKING ABOUT THIS AS AN ABSTRACTION.

24          I'M TALKING ABOUT THE REALITY OF WHAT THOSE CAGES

25 LOOK LIKE AND WHERE THEY ARE LOCATED, AND WHAT THEY ARE USED

1  FOR.

2        THOSE ARE THE ISSUES ABOUT WHICH I WAS CONCERNED AND

3  ABOUT WHICH I EXPRESSED MYSELF IN MY REPORT.

4  **Q.**  AND YOU DON'T DISPUTE THAT IN THE 20TH ROUND MONITORING

5  REPORT SPECIAL MASTER LOPES FOUND THAT SEVERAL CALIFORNIA

6  DEPARTMENT OF CORRECTION REHABILITATION INSTITUTIONS WERE

7  SUBSTANTIALLY COMPLIANT WITH THE REVISED PROGRAM GUIDE AND WITH

8  COURT-ORDERED STANDARDS.

9  **A.**  SPECIAL MASTER LOPES FOUND A NUMBER OF THINGS. IRONICALLY,

10 ONE OF THE THINGS THAT HE WAS MOST CONCERNED ABOUT AND, IN FACT,

11 ONE OF THE RECOMMENDATIONS HE MADE HAD TO DO WITH THE USE OF

12 THESE CAGES, HAD TO DO WITH THE USE OF THESE CAGES AS

13 ALTERNATIVE PLACEMENTS IN LIEU OF PUTTING PEOPLE IN MENTAL

14 HEALTH CRISIS BEDS.

15        IT'S THE THIRD RECOMMENDATION.  HE'S CONCERNED ENOUGH

16 ABOUT IT TO RECOMMEND THAT THE ACTUAL USE OF THESE THINGS BE

17 VERY CAREFULLY DOCUMENTED.

18 **Q.**  I'M JUST REFERENCING, ACTUALLY, PAGE SIX OF THE 20TH ROUND

19 MONITORING REPORT IN THE FIRST INTRODUCTORY STATEMENT WHERE IT

20 SAYS:

21        "OVERALL, THE MONITOR'S REVIEW FOUND THAT

22        SEVERAL CALIFORNIA DEPARTMENT OF CORRECTIONS AND

23        REHABILITATION INSTITUTIONS WERE SUBSTANTIALLY

24        COMPLIANT WITH PROGRAM GUIDE AND COURT-ORDERED

25        STANDARDS," CORRECT?

1  **A.** YES. I'M SURE SEVERAL WERE. THEY WERE NOT THE FACILITIES

2  THAT I SAW. BUT I DON'T DOUBT THAT THERE WERE SEVERAL THAT

3  WERE.

4  **Q.** THANK YOU.

5          NOTHING FURTHER.

6          **JUDGE HENDERSON:** BEFORE WE GET TO REREDIRECT --

7  OKAY.

8          REREDIRECT?

9          **MS. KAHN:** THANK YOU, YOUR HONOR.

10                **REREDIRECT EXAMINATION**

11 **BY MS. KAHN:**

12 **Q.** DR. HANEY, I JUST WANTED TO CLARIFY, MAKE SURE THIS IS THE

13 RECOMMENDATION THAT YOU'RE TALKING ABOUT. THAT THIS IS FROM THE

14 20TH REPORT, THAT SPECIAL MASTER LOPES' THIRD RECOMMENDATION IS

15 THAT:

16          "DEFENDANTS SHALL BE ORDERED TO IMPLEMENT AND

17          MAINTAIN INSTITUTIONAL ELECTRONIC AND MANUAL TRACKING

18          LOGS FOR INMATES WHO HAVE BEEN PLACED INTO

19          ALTERNATIVE HOUSING PENDING MHCB TRANSFERS, AND

20          THE DATES, TIMES AND PLACES OF RETURN TO REGULAR

21          HOUSING FOR INMATE-PATIENTS NOT TRANSFERRED TO AN

22          MHCB. THE TRACKING LOGS SHOULD ALSO INDICATE THE

23          SPECIFIC LEVELS OF CLINICAL MONITORING THAT WERE

24          REQUIRED (SUICIDE WATCH, SUICIDE PRECAUTION, OR

25          PSYCHIATRIC OBSERVATION), AND THE CLINICAL MONITORING

1          THAT OCCURRED.  WHEN AN INMATE IS REFERRED TO AN

2          MHCB FOR TREATMENT OF A SUICIDAL THREAT OR BEHAVIOR,

3          AND THE REFERRAL IS RESCINDED OR THE INMATE-PATIENT

4          IS NOT ADMITTED TO AN MHCB, THE INMATE SHALL RECEIVE

5          FOLLOW-UP TREATMENT INCLUDING DAILY CONTACT FOR FIVE

6          CONSECUTIVE DAYS FOLLOWING HIS OR HER RETURN TO

7          REGULAR HOUSING.  QUALITY MANAGEMENT FOR

8          IMPLEMENTATION OF DISCHARGE PLANNING, REQUIRED WHEN

9          AN INMATE IS DISCHARGED FROM AN MHCB, SHALL BE

10         IMPLEMENTED FOR THESE INMATES."

11          **MS. TILLMAN:**  OBJECTION.

12  **BY MS. KAHN:**

13  Q.  IS THAT THE RECOMMENDATION YOU WERE REFERRING TO, DR. HANEY?

14          **MS. TILLMAN:**  OBJECTION.  LEADING THE WITNESS.

15  MISCHARACTERIZES THE WITNESS.  IT ADDRESSES ALTERNATIVE HOUSING.

16  IT DOES NOT ADDRESS THERAPEUTIC MODULES.

17          **JUDGE HENDERSON:**  I THINK THE PORTION JUST READ, WAS

18  THAT THE PORTION THAT DR. HANEY --

19  **BY MS. KAHN:**

20  Q.  WAS THIS THE RECOMMENDATION THAT YOU --

21  A.  YES.

22          **MS. KAHN:**  OKAY.

23          THANK YOU.

24          **JUDGE HENDERSON:**  OKAY. COURT IS IN RECESS FOR 15

25  MINUTES.

1          **THE WITNESS:**  MAY I BE RELEASED?

2          **JUDGE HENDERSON:**  OH, I'M SORRY.  YES, YOU MAY BE

3  RELEASED.

4                    (THEREUPON, A RECESS WAS TAKEN.)

5          **THE CLERK:**  PLEASE BE SEATED.

6          **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

7  WITNESS, COUNSEL.

8          **MR. SPECTER:**  OKAY, YOUR HONORS.  PLAINTIFFS CALL

9  JEANNE WOODFORD.

10                    (THEREUPON, THE WITNESS WAS SWORN.)

11         **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

12 RECORD.

13         **THE WITNESS:**  MY NAME IS JEANNE WOODFORD, J-E-A-N-N-E

14 W-O-O-D-F-O-R-D.

15              THEREUPON --

16                       **JEANNE WOODFORD**

17 WAS CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFFS, AND AFTER

18 HAVING FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

19                     **DIRECT EXAMINATION**

20 BY MR. SPECTER:

21 Q.  MS. WOODFORD, YOU WERE -- YOU KNOW THESE CASES ARE BOTH THE

22 COLEMAN AND PLATA CASES, CORRECT?

23 A.  YES, I'M AWARE OF BOTH CASES.

24 Q.  PART OF THE REASON YOU'RE AWARE OF BOTH CASES IS THAT YOU

25 WERE A DEFENDANT AT ONE TIME; IS THAT TRUE?

1  **A.**  YES, I WAS A DEFENDANT IN BOTH CASES.

2  **Q.**  AND THAT'S BECAUSE YOU WORKED FOR THE CALIFORNIA DEPARTMENT

3  OF CORRECTIONS; IS THAT RIGHT?

4  **A.**  THAT IS CORRECT.

5  **Q.**  FOR HOW LONG DID YOU WORK FOR THEM?

6  **A.**  I WORKED FOR THE DEPARTMENT OF CORRECTIONS FOR A LITTLE OVER

7  27 YEARS.

8  **Q.**  AND IS IT TRUE THAT YOU HAVE -- YOU WORKED YOUR WAY UP FROM

9  A CORRECTIONAL COUNSELOR POSITION AT SAN QUENTIN TO THE ACTING

10 SECRETARY OF THE ENTIRE DEPARTMENT OF CORRECTIONS?

11 **A.**  I ACTUALLY WORKED MY WAY UP FROM A CORRECTIONAL OFFICER

12 POSITION AT SAN QUENTIN INTO BECOMING THE ACTING SECRETARY OF

13 THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION.

14 **Q.**  AND SO DURING -- COULD YOU GIVE US A LITTLE BRIEF SUMMARY OF

15 THAT JOURNEY IN TERMS OF THE POSITIONS YOU'VE HELD?

16 **A.**  I STARTED AT SAN QUENTIN IN JUNE OF 1978, TWO WEEKS AFTER

17 GRADUATING FROM SONOMA STATE UNIVERSITY WITH A DEGREE IN

18 CRIMINAL JUSTICE.

19           I WAS A CORRECTIONAL OFFICER FOR ABOUT FIVE YEARS.

20 THEN, I WAS A CORRECTIONAL COUNSELOR I, CORRECTIONAL COUNSELOR

21 II, A CORRECTIONAL COUNSELOR III, A PROGRAM ADMINISTRATOR, A

22 CORRECTIONAL CAPTAIN, AN ASSOCIATE WARDEN, AND THEN A CHIEF

23 DEPUTY WARDEN UNTIL BEING APPOINTED BY GOVERNOR DAVIS IN 1999 AS

24 A WARDEN AT SAN QUENTIN.

25           I WAS THE WARDEN AT SAN QUENTIN UNTIL 2004 WHEN

1   GOVERNOR SCHWARZENEGGER APPOINTED ME CHIEF DIRECTOR CALIFORNIA

2   DEPARTMENT OF CORRECTIONS.  AND THEN, ABOUT A YEAR-AND-A-HALF

3   LATER IN JULY OF 2006, I WAS APPOINTED AS THE UNDERSECRETARY OF

4   THE CALIFORNIA DEPARTMENT OF CORRECTIONS.

5            AND DURING MY TIME AS THE UNDERSECRETARY, THE

6   SECRETARY STEPPED DOWN, SO I WAS THE ACTING SECRETARY FOR A

7   SHORT TIME.

8   Q.  GREAT. AND YOU LEFT THE UNDERSECRETARY'S POSITION IN JULY OF

9   2007 OR SIX?  SEVEN?

10  A.  I THINK IT WAS 2007. I'D HAVE TO LOOK AT MY RESUME, BUT I

11  BELIEVE IT WAS JULY, 2007.

12  Q.  AND --

13  A.  ACTUALLY, IT WAS JULY, 2006.  I'M SORRY.

14  Q.  OKAY. SO YOU WERE WORKING AT SAN QUENTIN IN THE EARLY

15  1980'S, WERE NOW NOT?

16  A.  YES, I WAS.

17  Q.  AND AT THAT TIME YOU WERE NOT IN A MANAGEMENT POSITION.  YOU

18  WERE WORKING IN THE CELLBLOCKS; IS THAT RIGHT?

19  A.  THAT'S CORRECT.

20  Q.  AND YOU WERE FAMILIAR WITH A CASE CALLED TOUSSAINT?

21  A.  I WAS VERY FAMILIAR WITH A CASE CALLED TOUSSAINT.

22  Q.  AND THAT WAS A CASE THAT AROSE OUT OF A JUDGMENT OF THIS

23  COURT, THE DISTRICT COURT OF CALIFORNIA IN THE NORTHERN

24  DISTRICT?

25  A.  THAT'S CORRECT.

1  Q.  RIGHT. AND IN THAT CASE -- WELL, DURING THAT TIME PERIOD DID

2  YOU SEE THE POPULATION RISE DURING YOUR TIME AT SAN QUENTIN IN

3  THE EARLY '80'S?

4  A.  YES, I DID.  ACTUALLY, WHEN I STARTED AT SAN QUENTIN THERE

5  WERE CELLBLOCKS THAT WERE COMPLETELY CLOSED.  AND THEN, LATER WE

6  BEGAN TO EXPERIENCE LARGE NUMBER OF INMATES COMING INTO THE

7  SYSTEM AS A RESULT OF A CHANGE IN THE SENTENCING LAWS IN

8  CALIFORNIA.

9  Q.  I SEE. AND CAN YOU EXPLAIN TO THE COURT WHAT EFFECTS YOU SAW

10  FROM THAT INCREASE IN THE POPULATION AT SAN QUENTIN?

11  A.  WELL, WHEN I FIRST STARTED AT THE PRISON IT REALLY REMINDED

12  YOU OF A COLLEGE CAMPUS. YOU SAW INMATES TRAVELING TO SCHOOL AND

13  GOING TO THEIR WORK ASSIGNMENTS, CARRYING BOOKS.

14           THERE WERE VERY ACTIVE PROGRAMS GOING ON INVOLVING

15  INMATES.  MOST OF THE INMATES WERE SINGLE-CELLED.  THERE WAS NO

16  IDLENESS AT ALL.

17           WITHIN A VERY SHORT AMOUNT OF TIME, THE DETERMINATE

18  SENTENCING ACT BEGAN TO SEND PRISONERS WITHIN THE PRISON SYSTEM.

19

20           SO WITHIN A COUPLE OF YEARS OF ME STARTING THERE, WE

21  STARTED TO RECEIVE MORE AND MORE INMATES INTO THE SYSTEM.  AND

22  THESE WERE YOUNGER INMATES WHO WERE SERVING SENTENCES OF 25 TO

23  LIFE AS A RESULT OF THE CHANGE IN THE SENTENCING LAW.

24           SO WE WERE GETTING MORE AND MORE PEOPLE WHO WERE

25  SERVING LONGER AND LONGER SENTENCES. AND BECAUSE THE PURPOSE OF

1  SENTENCING NOW WAS PUNISHMENT, WE SAW MANY PROGRAMS GOING AWAY.

2          SO WE HAD THE IMPACT OF SEVERE OVERCROWDING ALONG

3  WITH VERY LITTLE FOR INMATES TO DO.

4          SO SAN QUENTIN AND FOLSOM WERE THE TWO PRISONS THAT

5  HOUSED INMATES IN SECURITY HOUSING UNITS.  AND SAN QUENTIN BEGAN

6  TO GET VERY OVERCROWDED AS WELL OVERGROWING INTO OTHER

7  BUILDINGS, BESIDES THE ORIGINAL ADJUSTMENT CENTER.  AND

8  OVERCROWDING CONTINUED IN THOSE UNITS.

9          AS A RESULT WE WERE SUED OVER CONDITIONS OF

10 CONFINEMENT TO INCLUDE OVERCROWDING IN THE CASE THAT YOU

11 REFERRED TO, TOUSSAINT.

12 Q.  AND YOU UNDERSTAND OR YOU'RE AWARE BECAUSE YOU HELPED COMPLY

13 WITH THE DECREE THAT THE COURT ENTERED A DECREE IN THAT CASE; IS

14 THAT RIGHT?

15 A.  I WAS INVOLVED INITIALLY IN INTERVIEWING INMATES TO

16 DETERMINE WHY THEY WERE IN LOCK-UP, BECAUSE OUR SYSTEM REALLY

17 DIDN'T KNOW, SOME OF THEM HAD BEEN IN LOCK-UP SO LONG.  AND

18 THEN, I BECAME PART OF THE COMPLIANCE EFFORT TO COME INTO

19 COMPLIANCE WITH ALL ASPECTS OF THE CONSENT DECREE.

20 Q.  WHAT EFFECT DID THE CROWDING THAT YOU JUST REFERRED TO HAVE

21 ON VIOLENCE IN THE INSTITUTION?

22 A.  THE PRISON BECOME VERY VIOLENT VERY QUICKLY.  WE ACTUALLY

23 ALMOST EVERY MORNING WOULD HEAR GUNSHOTS AS STAFF WERE USING

24 GUNS TO QUELL DISTURBANCES AMONG THE INMATE POPULATION.  MANY

25 INMATE DEATHS.  WE HAD AN INCREASE IN SUICIDES, ACTUALLY.

1          WE HAD DIFFICULTY KEEPING THE UNITS CLEAN.  THE NOISE

2     LEVEL OF THE UNITS WERE UNBEARABLE.  IT WAS JUST UNBELIEVABLE

3     CIRCUMSTANCES.

4     Q.  AND COULD YOU ALSO COMMENT ON HOW THE CROWDING AFFECTED THE

5     ABILITY TO DELIVER MEDICAL AND MENTAL HEALTHCARE?

6     A.  WELL, I WOULD -- IT BECAME VERY DIFFICULT TO KEEP UP WITH

7     MEDICAL CARE. WE PRETTY MUCH HAD THE SAME SYSTEM WE HAVE NOW.

8     INMATES WOULD PUT IN A SICK CALL SLIP, AND IT WOULD BE WEEKS

9     BEFORE THEY WOULD ACTUALLY BE SEEN BY A DOCTOR IN MANY CASES.

10          MENTAL HEALTHCARE WASN'T VERY CLEARLY DEFINED DURING

11    THAT TIME.  SO YOU HAD MANY INMATES IN OUR HOUSING UNITS WHO

12    WERE SO SEVERELY MENTALLY ILL AND VERY FEW OF THEM WERE

13    RECEIVING ANY KIND OF TREATMENT AT ALL.

14          NONE OF US, NONE OF THE STAFF WERE REALLY TRAINED ON

15    SIGNS AND SYMPTOMS OF MENTAL HEALTHCARE.  THERE WERE VERY FEW

16    DOCTORS THERE.

17          AS A RESULT, SOME INMATES WERE FORCED MEDICATED IN

18    VIOLATION OF THE LAW, AND THERE WAS ACTUALLY CASES FILED ON

19    THAT, SEPARATE AND APART FROM TOUSSAINT.

20          SO IT REALLY WAS UNBELIEVABLE CONDITIONS FOR BOTH

21    STAFF AND INMATES.

22    Q.  AND AT THAT TIME DO YOU RECALL WHAT THE LEVEL OF

23    OVERCROWDING WAS?

24    A.  THE LEVEL OF OVERCROWDING IN THE SHU UNITS AT SAN QUENTIN

25    WAS ABOUT AT 140 PERCENT.

1  Q. NOW, LATER ON AFTER THE COLEMAN AND PLATA CASES WERE FILED,

2  AND THEN JUDGMENTS WERE ENTERED, DID YOU BECOME FAMILIAR WITH

3  THOSE AS PART OF YOUR RESPONSIBILITIES AS WARDEN AT SAN QUENTIN?

4  A. YES, I BECAME FAMILIAR WITH BOTH PLATA AND COLEMAN AS THE

5  WARDEN AT SAN QUENTIN.

6  Q. AND CAN YOU EXPLAIN TO THE COURT WHAT DIFFICULTIES, IF  ANY,

7  THERE WERE YOU HAD AT SAN QUENTIN IN COMPLYING WITH THOSE

8  DECREES AND WHAT THE CAUSE OF THOSE DIFFICULTIES WERE?

9  A. WELL, IT WAS VIRTUALLY IMPOSSIBLE TO COMPLY WITH BOTH OF THE

10 DECREES, AND THE DIFFICULTY WAS PRIMARILY BECAUSE OF THE

11 OVERCROWDING AT SAN QUENTIN.

12       AND TO DESCRIBE IT, I THINK YOU HAVE TO UNDERSTAND

13 THE THREE MISSIONS THAT SAN QUENTIN HAS. ONE BEING THE

14 RECEPTION CENTER WHERE AT TIMES WE WERE RECEIVING ANYWHERE

15 BETWEEN 100 AND 200 INMATES A DAY.

16       SO WITH THAT KIND OF INTAKE INTO OUR -- INTO SAN

17 QUENTIN AND WITH THE KIND OF OVERCROWDING YOU SPENT YOUR DAY

18 MANAGING WHERE TO HOUSE PEOPLE.

19       MEDICAL STAFF DUE TO VACANCIES AND JUST THE SHEER

20 NUMBERS AND LACK OF SPACE WERE UNABLE TO KEEP UP WITH PHYSICALS

21 OR PROVIDING ANY KIND OF CHRONIC CARE FOLLOW-UP AT THE RECEPTION

22 CENTER POPULATION.

23       INMATES IN THE RECEPTION CENTER WHO WERE DIAGNOSED AS

24 MENTALLY ILL, EITHER AS EOP'S OR TRIPLE CMS WEREN'T RECEIVING

25 REALLY ANY TREATMENT BEYOND IDENTIFYING THAT THEY WERE TRIPLE

1  CMS OR EOP.

2          THERE CERTAINLY WASN'T ANYTHING IN THE RECEPTION

3  CENTER THAT WE WERE DOING TO PREVENT FURTHER DETERIORATION OF

4  PEOPLE'S MENTAL ILLNESS OR TO PREVENT MEDICAL PROBLEMS.

5          ALSO BECAUSE OF THE OVERCROWDING AROUND THE SYSTEM WE

6  WOULD END UP WITH INMATES BACKED UP IN THE RECEPTION CENTER WITH

7  NOWHERE TO SEND THEM, AND THE MORE SEVERELY MENTALLY ILL THE

8  HARDER IT WAS TO GET THEM OUT OF THE RECEPTION CENTER.  AND SO

9  WE WOULD HAVE INMATES IN THE RECEPTION CENTER THAT WERE THERE IN

10 EXCESS OF A YEAR, SOME AS LONG AS TWO YEARS.

11         EVEN MORE COMPLEX MEDICAL CASES IT WAS DIFFICULT TO

12 FIND PLACES TO SEND THEM THROUGHOUT THE SYSTEM. AND PARTICULARLY

13 THOSE INMATES WHO ARE DUAL DIAGNOSES AND WHO HAD LENGTHY PRISON

14 TERMS TO DO, SO THEY WERE THE HIGHER SECURITY INMATES, THEY

15 WOULD BACK UP IN THE RECEPTION CENTER.

16         SO YOU WOULD SPEND YOUR TIME AS THE WARDEN TRYING TO

17 FIGURE OUT HOW TO HOUSE PEOPLE APPROPRIATELY. AND YOU WOULD RUN

18 OUT OF SOLUTIONS OFTEN.

19         AND THEN, THE SECOND MISSION OF SAN QUENTIN, OF

20 COURSE, IS DEATH ROW.  AND THAT IS REALLY OVER 600 DEATH ROW

21 INMATES THAT ARE HOUSED IN A SECURITY HOUSING UNIT KIND OF

22 SETTING.

23         AT ONE POINT IN TIME, THERE WEREN'T ENOUGH STAFF TO

24 PROVIDE ANY MENTAL HEALTH TREATMENT FOR DEATH ROW INMATES AT

25 ALL. PROVIDING MEDICAL CARE FOR THE DEATH ROW INMATES WAS

1  INCREASINGLY MORE DIFFICULT BECAUSE WE DIDN'T HAVE ENOUGH STAFF

2  TO DO THE MEDICAL ESCORTS TO THE HOSPITAL.

3          AND IN SPITE OF OUR EFFORTS TO TRY TO JUSTIFY MORE

4  POSITIONS WE ACTUALLY WERE CUT POSITIONS FOR MEDICAL ESCORTS FOR

5  DEATH ROW INMATES.

6          THE THIRD MISSION IS THE GENERAL POPULATION, WHICH IS

7  A LARGE GENERAL POPULATION.  THE POPULATION AT SAN QUENTIN WOULD

8  GET AS HIGH AS 6200 DURING THE TIME I WAS WARDEN, WITH THE

9  GENERAL POPULATION OVER A COUPLE OF THOUSAND INMATES.

10         AGAIN, DIFFICULTY, EVEN THOUGH THEY COULD GO TO THE

11  INFIRMARY -- I WAS CALLED "INFIRMARY" AT THAT TIME -- LATER

12  BECAME A CTC -- THEMSELVES, BECAUSE OF THE NEED TO PROCESS

13  RECEPTION CENTER INMATES IN THAT SPACE, STAFF OFTEN -- MEDICAL

14  STAFF OFTEN WOULD NOT HAVE THE SPACE TO PROVIDE TREATMENT FOR

15  INMATES IN THE GENERAL POPULATION, EITHER FOR THEIR MEDICAL CARE

16  OR FOR THEIR ONGOING NEEDS IN THE MENTAL HEALTH PROGRAM.

17  Q.  NOW, MS. WOODFORD, YOU MENTIONED YOU WERE SPENDING A LOT OF

18  TIME TRYING TO PLACE INMATES.  DID THAT TAKE TIME?  OR HOW DID

19  THAT AFFECT YOUR ABILITY TO COMPLY WITH THE REQUIREMENTS OF THE

20  PLATA POLICIES AND PROCEDURES AND THE COLEMAN POLICIES AND

21  PROCEDURES?

22  A.  WELL, I THINK IT'S VERY DIFFICULT TO PLAN ANYTHING WHEN YOU

23  SPEND YOUR DAY FIREFIGHTING.  AND THAT'S REALLY WHAT YOU WOULD

24  DO WHEN I WAS THE WARDEN AT SAN QUENTIN.

25          AND I SHOULD MENTION THERE WERE TIMES AT SAN QUENTIN

1  WHEN WE WERE DOWN OVER 125 CORRECTIONAL OFFICERS, NOT TO MENTION

2  VACANCIES IN OUR SERGEANT AND LIEUTENANT CATEGORIES, AS WELL.

3           BUT YOU WOULD SPEND YOUR DAY TRYING TO FIGURE OUT HOW

4  TO HOUSE PEOPLE.  IT WAS A CRISIS. IT WOULD TAKE SOMETIMES UNTIL

5  MIDNIGHT OR AFTER TO HOUSE THE INTAKE THAT CAME IN THE RECEPTION

6  CENTER THAT DAY.

7           AND YOU WERE HAVING TO MAKE DECISIONS THAT WERE

8  CONTRARY TO GOOD CUSTODY PRACTICES.  SO HOUSING INMATES THAT YOU

9  KNEW HAD ENEMY ISSUES OR GANG ISSUES, YOU WOULD HAVE TO HOUSE

10 THEM IN AREAS THAT WEREN'T QUITE APPROPRIATE.

11          YOU WOULD SPEND YOUR TIME TRYING TO -- FOR A

12 SPECIALTY CASES THAT YOU COULDN'T GET TRANSFERRED ON THE PHONE,

13 TRYING TO CALL TO GET HEADQUARTERS TO HELP YOU MOVE PEOPLE TO

14 APPROPRIATE SPACES, TO HAVE THEM TELL YOU THAT THERE WAS NOWHERE

15 TO MOVE THEM.

16          AND I CAN TELL YOU THAT IT GOT TO THE POINT WHERE I

17 WOULD CALL HEADQUARTERS, AND THE ANSWER WOULD BE:

18             "OH, YOU'RE CALLING ABOUT YOUR OVERCROWDING,

19             AGAIN, HUH?"

20          NO ONE HAD ANSWERS FOR THIS OVERCROWDING PROBLEM THAT

21 WAS INTERFERING WITH OUR ABILITY TO COMPLY WITH EITHER COLEMAN

22 OR PLATA.

23 Q.  OKAY. DR. BEARD TESTIFIED THIS MORNING.  YOU WERE NOT HERE,

24 BUT HE TESTIFIED THAT IN PENNSYLVANIA THEY HAVE A CLASSIFICATION

25 SYSTEM WHICH LOOKS AT NOT ONLY THE PRISONERS' CUSTODY NEEDS, BUT

1    WHAT HE CALLED THE CRIMINOGENIC FACTORS AND THE PRISONERS'

2    MENTAL HEALTH AND MEDICAL NEEDS, AS A CLASSIFICATION SYSTEM.

3    AND THEN, THEY WOULD SEND PRISONERS TO THE APPROPRIATE

4    INSTITUTION BASED ON THOSE FACTORS.

5            WERE YOU ABLE TO CLASSIFY PRISONERS -- WELL, FIRST OF

6    ALL, DO YOU THINK THAT'S A GOOD CORRECTIONAL PRACTICE?  IS THAT

7    SOMETHING THAT WOULD KEEP PRISONERS SAFE?

8    **A.**  I THINK IT'S AN EXCELLENT CORRECTIONAL PRACTICE.

9    **Q.**  OKAY.

10   **A.**  AND IF I COULD COMMENT, IT ALSO MAKES BETTER USE OF YOUR

11   CORRECTIONAL SYSTEM. IF YOU ONLY TAKE INTO CONSIDERATION THE

12   SECURITY LEVEL, IT LIMITS YOUR ABILITY TO MOVE INMATES AROUND,

13   AS WELL.

14   **Q.**  SO WAS THAT THE CASE IN SAN QUENTIN THAT YOU WEREN'T ABLE

15   TO TAKE INTO ACCOUNT THEIR OTHER NEEDS, NOT TO MENTION WHAT THEY

16   CALL THE CRIMINOGENIC FACTORS?

17   **A.**  THAT IS CORRECT. SECURITY ISSUES WERE ALWAYS THE FIRST ISSUE

18   THAT HAD TO BE ADDRESSED.  THE LEVEL ONES WENT TO LEVEL ONES.

19   LEVEL TWOS TO LEVEL TWOS.  THREES AND FOURS, LEVEL THREES WENT

20   TO LEVEL THREES AND LEVEL FOURS WENT TO LEVEL FOURS.

21   **Q.**  YOU ALSO HAD RESPONSIBILITY WHILE YOU WERE AT

22   HEADQUARTERS -- AND BY THAT I MEAN THE TIME YOU SPENT AS THE

23   DIRECTOR OF THE DEPARTMENT OF CORRECTIONS, AND THEN THE

24   UNDERSECRETARY, AND THEN THE ACTING SECRETARY. YOU HAD

25   RESPONSIBILITIES AT THAT TIME FOR MANGAGING THE COMPLIANCE WITH

1  COLEMAN AND PLATA; IS THAT CORRECT?

2  **A.**  THAT IS CORRECT.

3  **Q.**  AND WERE YOU ABLE TO SPEND SUFFICIENT TIME ON THOSE AREAS TO

4  PROVIDE WHAT YOU THOUGHT WAS AN ADEQUATE RESPONSE TO THE COURT'S

5  ORDERS?

6  **A.**  I WOULD HAVE TO SAY THAT IN THOSE POSITIONS THAT YOU JUST

7  DIDN'T HAVE ENOUGH TIME AND ABSOLUTELY DID NOT HAVE SUFFICIENT

8  TIME TO ADDRESS THE ISSUES OF COLEMAN AND PLATA JUST BECAUSE

9  THERE WAS SO MANY ISSUES THAT YOU WERE TRYING TO ADDRESS IN

10 THOSE POSITIONS.

11 **Q.**  AND DID YOU BECOME FAMILIAR THROUGH YOUR RESPONSIBILITIES AT

12 HEADQUARTERS WITH THE REQUIREMENTS FROM A SYSTEM LEVEL OF

13 COLEMAN AND PLATA?

14 **A.**  THAT'S ABSOLUTELY TRUE.  BECAUSE OF OVERCROWDING, WHEN

15 YOU'RE OUT IN THE FIELD AS THE WARDEN, YOU KNOW THAT THE ANSWERS

16 HAVE TO COME FROM SACRAMENTO, BECAUSE OVERCROWDING NEEDED TO BE

17 ADDRESSED IN ORDER TO COME INTO COMPLIANCE WITH THE MANY ISSUES

18 OF COLEMAN AND PLATA.

19        SO AS THE DIRECTOR AND UNDERSECRETARY AND SECRETARY,

20 WE UNDERSTOOD IT WAS OUR RESPONSIBILITY TO TRY TO ADDRESS THOSE

21 ISSUES SO THAT THE PRISONS COULD RUN APPROPRIATELY AND PROVIDE

22 THE CARE AND TREATMENT THAT WAS REQUIRED BY BOTH CASES.

23 **Q.**  AND HOW, IF AT ALL, DID THE SYSTEM-WIDE OVERCROWDING AFFECT

24 YOUR ABILITY AT HEADQUARTERS TO MANAGE THE COLEMAN AND PLATA

25 CASES?

1  **A.**  IT WAS REALLY CLEAR THAT THERE WERE NO EASY ANSWERS FOR

2  OVERCROWDING. AND THAT IT WAS IMPOSSIBLE TO GET THE MONEY OR THE

3  RESOURCES THAT YOU NEEDED TO ADDRESS THAT ISSUE.

4          AND I WILL SAY, YOU KNOW, WHEN YOU'RE THE WARDEN

5  YOU'RE DEALING WITH IT EVERY DAY.  AND YOU SEE THE PEOPLE.  AND

6  IT'S ABOUT INDIVIDUALS.  AND YOU UNDERSTAND THE IMPACT OF

7  OVERCROWDING ON THE INMATES AND YOUR STAFF AND ON YOU.

8          AND AT HEADQUARTERS IT GETS TO BE A LITTLE MORE

9  ABSTRACT.  YOU'RE UP THERE TRYING TO SOLVE THE PROBLEMS. AND I

10 CLEARLY UNDERSTOOD AS BEING OUT THERE IN THE FIELD AS THE WARDEN

11 THINKING THAT HEADQUARTERS WASN'T TRYING TO DO ANYTHING TO HELP

12 YOU AND HOW FRUSTRATED I WAS AS A WARDEN UNDERSTANDING NOW AS

13 THE DIRECTOR HOW DIFFICULT IT WAS TO GET SOLUTIONS, AND THE

14 FIELD NOT THINKING THAT ANY ANSWERS WERE COMING THEIR WAY.

15         SO IT MADE IT HARDER FOR THE FIELD TO ATTRACT GOOD

16 STAFF AND KEEP GOOD STAFF, BECAUSE IT WAS A MORALE ISSUE.

17         SO I EVEN WAS MORE FRUSTRATED AS THE DIRECTOR AND

18 UNDERSECRETARY AND SECRETARY REMEMBERING MY EXPERIENCES AS

19 OPERATIONALLY AS A WARDEN.

20 **Q.**  OKAY.  AND I THINK YOU ALLUDED TO THIS A LITTLE BIT, BUT YOU

21 MENTIONED THE PROBLEM OF TRANSFERRING PRISONERS FROM ONE PRISON

22 TO ANOTHER IF YOU DON'T HAVE A PLACE FOR THEM.

23         WAS IT DIFFICULT TO TRANSFER PRISONERS TO OTHER

24 PRISONS BECAUSE OF THE OVERCROWDING SITUATION?

25 **A.**  IT'S NEARLY IMPOSSIBLE TO TRANSFER INMATES AROUND FOR THE

1  RIGHT REASONS. YOU WOULD HAVE TO TRANSFER INMATES AROUND BECAUSE

2  THERE WERE OPEN BEDS AND YOU NEEDED TO MOVE INMATES INTO THOSE

3  PARTICULAR BEDS.

4           BUT IN TERMS OF TRYING TO ADDRESS MANY OF THE MEDICAL

5  AND PARTICULARLY THE MENTAL HEALTH PROBLEMS, IT WAS IMPOSSIBLE

6  TO MOVE INMATES WHERE THEY NEEDED TO BE.

7  **Q.**  AND --

8           **JUDGE KARLTON:**  THAT'S BECAUSE THERE WASN'T ANY SPACE

9  BECAUSE OF OVERCROWDING?

10          **THE WITNESS:**  THERE WAS NO SPACE BECAUSE OF

11 OVERCROWDING, YES.

12 **BY MR. SPECTER:**

13 **Q.**  AND WHEN YOU MENTIONED THE TIMES YOU SPENT DEALING WITH

14 COLEMAN AND PLATA AT HEADQUARTERS, WERE YOU SPENDING JUST A

15 LITTLE BIT OF YOUR TIME ON THESE CASES?  WERE THEY AN

16 AFTERTHOUGHT OR SOMETHING DIFFERENT?

17 **A.**  THEY CERTAINLY WERE NOT AN AFTERTHOUGHT.  I SPEND A GREAT

18 DEAL OF TIME TRYING TO WORK WITH STAFF, DISCUSSING ISSUES WITH

19 DIFFERENT MEMBERS OF THE LEGISLATURE, TRYING TO FIND SOLUTIONS,

20 TALKING TO THE ADMINISTRATION ABOUT POTENTIAL SOLUTIONS, WORKING

21 WITH DEPARTMENT OF MENTAL HEALTH, BECAUSE THEY HAD GREAT

22 CONCERNS IN TERMS OF NOT HAVING ADEQUATE SPACE AND THE

23 APPROPRIATE NUMBER OF BEDS TO PROVIDE THE QUALITY MENTAL

24 HEALTHCARE THAT THEY WANTED TO PROVIDE.

25           I THINK THAT IT WAS A DAILY TOPIC OF DISCUSSION IN

1  MANY, MANY, MANY MEETINGS WITH THE VARIETY OF PEOPLE TRYING TO

2  BRING SOME SOLUTIONS TO THE DEPARTMENT OF CORRECTIONS.

3  **Q.**  AND SO, GIVEN ALL THAT EFFORT BOTH ON A INSTITUTION

4  MANAGEMENT INSTITUTION LEVEL AND ON THE HEADQUARTERS LEVEL AS A

5  HIGH LEVEL MANAGER, GIVEN ALL THAT EXPERIENCE AND YOUR

6  EXPERIENCE WITH THE DEPARTMENT OF CORRECTIONS, WHAT DO YOU THINK

7  WAS THE PRIMARY CAUSE OF THE INABILITY TO PROVIDE HEALTHCARE TO

8  PRISONERS?

9  **A.**  I ABSOLUTELY BELIEVE THE PRIMARY CAUSE IS OVERCROWDING,

10  BECAUSE WE WOULD COME UP WITH WONDERFUL IDEAS AND HAVE GREAT

11  PLANNING, BUT OVERCROWDING INTERFERED WITH OUR ABILITY TO

12  IMPLEMENT ANY OF THOSE IDEAS, TO BRING RESOLUTION TO ANY OF THE

13  PROBLEMS THAT WE'RE FACING IN BOTH OF THOSE LAWSUITS.

14          AND THE OVERCROWDING WAS EVERY DAY, MORE AND MORE

15  INMATES COMING INTO THE SYSTEM.

16  **Q.**  AND WHEN YOU'RE AT THE HEADQUARTERS DID YOU EXPRESS THAT

17  CONVICTION TO ANY OF YOUR SUPERIORS?

18  **A.**  YES.

19  **Q.**  AND WHO WOULD YOU TALK TO ABOUT THAT?

20  **A.**  WELL, I WOULD TALK TO -- WELL, AS THE DIRECTOR I WOULD TALK

21  TO THE UNDERSECRETARY AND SECRETARY ABOUT THAT. THEN, WHEN I WAS

22  THE UNDERSECRETARY AND ACTING SECRETARY I TALKED TO THE

23  GOVERNOR'S STAFF ABOUT THE OVERCROWDED CONDITIONS AND THAT WE

24  NEEDED TO ADDRESS OVERCROWDING IN ORDER FOR US TO BE SUCCESSFUL

25  AT ANY OF THE EFFORTS WE WERE TRYING TO DO, INCLUDING PROVIDING

1  MEDICAL CARE, MENTAL HEALTHCARE AND REHABILITATIVE SERVICES TO

2  INMATES.

3          **JUDGE HENDERSON:**  CAN I INTERRUPT YOU?

4          **MR. SPECTER:**  SURE.

5          **JUDGE HENDERSON:**  I WANT TO MAKE SURE I HAVE THIS

6  TIMELINE. YOU TALKED ALMOST LONGINGLY ABOUT THE GOOD OLD DAYS AT

7  SAN QUENTIN WHEN THERE WAS NOT OVERCROWDING. THAT'S MY

8  CHARACTERIZATION.

9          AND YOU NOW ARE TALKING ABOUT THE OVERCROWDING. WOULD

10 IT BE FAIR TO SAY THAT IN THOSE DAYS OF YOR, I DON'T KNOW IF

11 THERE WERE MEDICAL INADEQUACIES, BUT WOULD YOU, IF YOU WERE

12 ASKED THEN "ARE THEY SOLVABLE" BECAUSE THERE'S NOT OVERCROWDING,

13 WOULD IT HAVE BEEN YOUR VIEW LOOKING BACK THAT THEY ARE SOLVABLE

14 AND THAT BECAUSE OF THE OVERCROWDING THEY ARE NO LONGER

15 SOLVABLE?

16          IS THAT A FAIR SUMMATION?

17          **THE WITNESS:**  YES, YOUR HONOR.  THAT'S A VERY FAIR

18 SUMMATION.

19          **JUDGE REINHARDT:**  YOU GOT UP TO WHEN YOU WERE

20 UNDERSECRETARY.  WHEN YOU WERE ACTING SECRETARY TO WHOM DID YOU

21 TALK?  WHO WERE YOUR SUPERIORS THEN?

22          **THE WITNESS:**   WELL, I WORKED FOR THE GOVERNOR, BUT I

23 DID NOT GET TO HAVE A CONVERSATION WITH THE GOVERNOR UNTIL MY

24 LAST DAY WHEN I STEPPED DOWN AS SECRETARY.  SO I WAS TALKING TO

25 HIS CHIEF OF STAFF AND THE CABINET SECRETARY AND HIS LEGAL

1  PERSON, ANDREA HOAK, ABOUT THOSE ISSUES.

2        **JUDGE REINHARDT:**  AND THE CHIEF OF STAFF IS SUSAN

3  KENNEDY?

4        **THE WITNESS:**  YES, THAT'S CORRECT.

5  **BY MR. SPECTER:**

6  **Q.**  AND DID YOU NOT GET TO TALK TO THE GOVERNOR BECAUSE YOU

7  FAILED TO ASK FOR AN APPOINTMENT TO SEE HIM?

8        **MR. MELLO:**  PAUL MELLO.  CALLS FOR SPECULATION.

9        **JUDGE KARLTON:**  WHY DON'T YOU PUT IT THE OTHER WAY?

10       **MR. SPECTER:**  SURE.

11       **JUDGE KARLTON:**  DID YOU ASK TO SPEAK TO THE GOVERNOR?

12       **MR. MITCHELL:**  YES, I DID, ON MORE THAN ONE OCCASION.

13       **MR. SPECTER:**  THANK YOU, YOUR HONOR.

14 **BY MR. SPECTER:**

15 **Q.**  DID YOU ATTRIBUTE ANY OF THE PROBLEMS RECRUITING STAFF WITH

16 OVERCROWDING?

17 **A.**  I THINK OVERCROWDING WAS -- IS -- WAS AND IS A GREAT

18 HINDRANCE TO TRYING TO RECRUIT AND RETAIN STAFF.

19 **Q.**  YOU'RE AWARE THAT -- WELL, YOU MENTIONED THAT THERE WERE A

20 LOT OF VACANCIES WHEN YOU LEFT THE DEPARTMENT, CORRECTIONAL

21 OFFICER VACANCIES, CORRECT?

22 **A.**  YES, THAT'S CORRECT.

23 **Q.**  AND YOU'RE AWARE THAT THE CORRECTIONAL OFFICER VACANCIES

24 HAVE GONE DOWN, ARE YOU NOT?

25 **A.**  YES, I'VE BEEN TOLD THAT CORRECTIONAL OFFICER VACANCIES HAVE

1  GONE DOWN.

2  **Q.**  DOES THAT GIVE YOU CONFIDENCE THAT THOSE CORRECTIONAL

3  OFFICER VACANCIES WILL STAY THAT -- THAT VACANCY RATES WILL BE

4  STABLE OVER TIME?

5  **A.**  NO, IT DOES NOT. WHEN THE ECONOMY IS REALLY, REALLY GOOD,

6  IT'S INCREASINGLY MORE DIFFICULT TO RECRUIT AND RETAIN

7  CORRECTIONAL OFFICERS.  AND WHEN THE ECONOMY IS BAD, IT'S A

8  LITTLE EASIER.

9          AND THEN, I'M ALSO AWARE OF THE FACT THAT THERE'S

10 SOME CLOSURES GOING ON IN THE JUVENILE JUSTICE SIDE OF THE

11 HOUSE, WHICH HAS BROUGHT STAFF FROM JUVENILE JUSTICE INTO THE

12 PRISON SYSTEM, AS WELL.

13         SO I THINK BECAUSE I WAS THERE 27 YEARS I'VE SEEN US

14 FULLY STAFFED, AND THEN I'VE SEEN THOSE PERIODS WHERE WE'VE HAD

15 GREAT, GREAT DIFFICULTY BRINGING STAFF INTO THE SYSTEM.

16         **THE CLERK:**  YOU HAVE FIVE MINUTES, COUNSEL.

17         **MR. SPECTER:**  OKAY.

18 **BY MR. SPECTER:**

19 **Q.**  YOU TOOK SOME TOURS OF THE INSTITUTIONS, DID YOU NOT?

20 **A.**  YES, I DID.

21 **Q.**  AND THAT WAS IN THIS YEAR; IS THAT CORRECT?

22 **A.**  YES, IN JULY AND AUGUST, I BELIEVE.

23 **Q.**  RIGHT.  AND ONE OF THE PRISONS YOU TOOK WAS -- YOU TOURED

24 WAS LANCASTER; ISN'T THAT CORRECT?

25 **A.**  YES, THAT'S CORRECT.

1  **Q.**  AND I'M GOING TO REFER YOU TO THE PICTURE THAT'S ON SCREEN

2  THAT'S PLAINTIFF'S EXHIBIT 345. COULD YOU DESCRIBE WHAT YOU SEE

3  THERE, PLEASE?

4  **A.**  I SEE A PICTURE OF WHAT LOOKS LIKE A GYMNASIUM WITH  TRIPLE

5  BUNKS.  LOOKS LIKE IT'S SEVERELY OVERCROWDED.

6         LOOKS LIKE THERE'S BARELY ROOM BETWEEN THE BUNKS.

7  AND IT ALSO LOOKS LIKE IT'S CROWDED TO THE POINT INMATES ARE

8  EXPECTED TO BE ON THEIR BUNKS.

9  **Q.**  AND FROM A CORRECTIONS ADMINISTRATOR'S PERSPECTIVE DO YOU

10  SEE ANY PROBLEMS WITH THAT HOUSING ARRANGEMENT?

11  **A.**  I ABSOLUTELY SEE MANY PROBLEMS, AND I'VE SEEN SCENES LIKE

12  THIS ALL OVER THE DEPARTMENT AS THE DIRECTOR AND UNDERSECRETARY

13  OF THE DEPARTMENT OF CORRECTIONS, AND IN MY OWN EXPERIENCE AS

14  THE WARDEN AT SAN QUENTIN, OVERCROWDING INMATES INTO THE

15  GYMNASIUM THERE.

16         IT'S VERY DIFFICULT TO HAVE OF GOOD LINES OF SIGHT OF

17  THE INMATES. IT'S VERY DIFFICULT TO KNOW WHO THE INMATES ARE IN

18  THESE CROWDED SITUATIONS.

19         I THINK IT'S REALLY HARD ON THE INMATES WHEN THERE

20  ISN'T ROOM FOR THEM TO MOVE AROUND AT ALL, AND THEY SPEND THE

21  MAJORITY OF THEIR DAY ON OR NEAR THEIR BUNKS.  YOU END UP WITH

22  VIOLENCE BREAKING OUT IN THESE SITUATIONS.

23         I'VE PERSONALLY EXPERIENCED MORE THAN ONE RIOT AT SAN

24  QUENTIN, AND I KNOW THAT OCCURS AROUND THE DEPARTMENT OF

25  CORRECTIONS. AND, YOU KNOW, STAFF, MANY STAFF DON'T FEEL EVEN

1  COMFORTABLE WALKING AROUND UNITS LIKE THIS BECAUSE THEY ARE SO

2  OVERCROWDED, AND SO IT'S VERY HARD ON INMATES WHO ARE MORE

3  VULNERABLE.

4          AND IT'S REALLY DIFFICULT TO KNOW OFTEN IF THERE'S

5  MEDICAL ISSUES AND PARTICULARLY MENTAL HEALTH ISSUES WHEN YOU'RE

6  THIS CROWDED AND YOU'RE NOT HAVING THAT CONSTANT CONVERSATION

7  AND CONTACT WITH THE INMATES AS A STAFF PERSON.

8  **Q.**  AND WHEN YOU TOOK A TOUR IN AUGUST OF 2008, DID YOU SEE

9  UNITS WHERE OR HAD YOU HEARD ABOUT INCIDENTS WHERE THERE

10 WEREN'T ENOUGH STAFF ON THE UNIT?

11 **A.**  YES, I HEARD THAT WHEN I WAS AT LANCASTER.

12         BY THE WAY, WHEN WE WALKED IN THE -- WHEN I WALKED IN

13 THE GYM AT LANCASTER -- I DON'T KNOW IF IT WAS THIS GYM, BUT A

14 GYM LIKE THIS -- THERE WAS ONLY ONE OFFICER THERE.  AND SHE TOLD

15 ME THAT THERE WAS A SECOND OFFICER ASSIGNED THERE, BUT HE WAS

16 OUT ESCORTING INMATES.

17         SO THIS CLEARLY WAS A SITUATION WHERE THERE WASN'T

18 ENOUGH STAFF IN THE UNIT TO EVEN ATTEMPT TO WALK AROUND IN A

19 BUILDING THIS CROWDED.

20         BUT IN ANOTHER CASE, WE WERE IN AN EOP UNIT, AND I

21 BELIEVE IT WAS AN EOP UNIT AT LANCASTER.  AND THE STAFF TOLD US

22 THAT THE DAY BEFORE THEY WERE SO SHORT OF STAFF THAT THERE WAS

23 NO STAFF ON THE FLOOR.

24         AND THAT THE ONE STAFF MEMBER THAT WAS ASSIGNED TO

25 THE UNIT HAD TO GO UP TO THE CONTROL BOOTH AND MONITOR THE

 1  INMATES FROM THE CONTROL BOOTH.

 2              AND DURING THAT TIME, AN INMATE HAD A MEDICAL

 3  EMERGENCY, INJURED HIS FOOT IN HIS CELL.  AND THE INMATE HAD TO

 4  GET THE ATTENTION OF THE STAFF IN THE CONTROL BOOTH.  AND

 5  WITHOUT ANYONE TALKING TO HIM ON THE FLOOR, THEY OPENED THE

 6  DOOR. THE INMATE TOLD THE STAFF THAT HE'D INJURED HIMSELF, AND

 7  THE STAFF SAID:

 8                  "ARE YOU ABLE TO GET OVER TO THE CTC ON YOUR

 9              OWN?"

10          AND HE SAID:

11              "I THINK SO."

12          AND THEY LET HIM OUT OF THE UNIT WITHOUT ANYBODY

13  DOING A PHYSICAL CHECK OF THE INMATE.

14  **Q.**  AND WHILE YOU WERE IN THE DEPARTMENT, WAS THERE AN INCIDENT

15  AT THE CALIFORNIA REHABILITATION CENTER INVOLVING INMATE DEATH

16  IN A GYM THAT WAS NOTEWORTHY?

17  **A.**  YES.  WHILE I WAS -- I BELIEVE I WAS THE DIRECTOR.  I MAY

18  HAVE BEEN THE UNDERSECRETARY.  BUT I THINK I WAS THE DIRECTOR.

19  THERE WAS A DEATH IN A CROWDED GYM AT CRC THAT WENT ON.  IT WAS

20  A HOMICIDE OF AN INMATE, AND IT WENT UNNOTICED BY STAFF FOR

21  SEVERAL HOURS.

22              AN INVESTIGATION WAS ACTUALLY OPENED UP OF THAT CASE,

23  AND I'M SORRY I DON'T KNOW THE OUTCOME OF THE INVESTIGATION.

24  BUT CLEARLY IT'S VERY DIFFICULT TO OBSERVE INMATES APPROPRIATELY

25  IN OVERCROWDED SITUATIONS LIKE THIS.

1          AND YOU CAN HAVE MEDICAL EMERGENCIES THAT GO

2   UNNOTICED BY STAFF AND CAN END UP IN DEATH, AS THE CASE WAS AT

3   CRC.

4   **Q.**  SO DID THE TOURS -- WHAT EFFECT, IF ANY, DID THE TOURS HAVE

5   ON YOUR THOUGHTS ABOUT OVERCROWDING AFFECTING THE ABILITY OF THE

6   DEPARTMENT TO PROVIDE ADEQUATE HEALTHCARE?

7   **A.**  I'M STILL CONVINCED THAT OVERCROWDING IS A PRIMARY ISSUE

8   THAT INHIBITS THE DEPARTMENT FROM BEING SUCCESSFUL AT PROVIDING

9   BOTH HEALTHCARE OR MENTAL HEALTHCARE FOR INMATES THAT ARE IN THE

10  DEPARTMENT OF CORRECTIONS AND REHABILITATION.

11  **Q.**  IN HIS DEPOSITION, MATT CATE TESTIFIED THAT OVERCROWDING

12  MAKES ALL THE OPERATIONS OF A PRISON MORE DIFFICULT, HE SAID,

13  INCLUDING MEDICAL AND MENTAL HEALTHCARE.

14          DO YOU AGREE WITH THAT STATEMENT?

15  **A.**  I ABSOLUTELY AGREE WITH SECRETARY CATE. RUNNING A PRISON IS

16  A COORDINATED EFFORT. IN ADDITION TO PROVIDING MENTAL HEALTHCARE

17  AND MEDICAL CARE INMATES HAVE TO BE TAKEN TO THE DINING HALL TO

18  BE FED.  THEY NEED TO HAVE THE APPROPRIATE AMOUNT OF EXERCISE.

19          THEY NEED TO BE INVOLVED IN PROGRAMS.  AND ALL OF

20  THAT HAS TO BE DONE WITHIN A SHORT AMOUNT OF TIME BECAUSE MOST

21  PRISONS RUN THEIR OPERATIONS DURING DAYLIGHT HOURS, ESPECIALLY

22  THE HIGHER SECURITY ONES.

23          THE MORE OVERCROWDED YOU ARE, THE MORE DIFFICULT IT

24  IS TO MEET THE BASIC, BASIC NEEDS OF INMATES.

25          AND IT EVEN GETS TO BE IMPOSSIBLE TO GET TO THEM

1    THEIR MENTAL HEALTH TREATMENT AND HEALTHCARE EXAMS WHEN YOU'RE

2    TRYING TO DO JUST BASIC OPERATIONS IN AN OVERCROWDED SETTING.

3    **Q.**   IN TERMS OF INMATE WELL-BEING, PRISONER WELL-BEING AND THE

4    SAFETY OF PRISONERS, HOW SHOULD A PRISON SYSTEM REALLY BE

5    FUNCTIONING?

6    **A.**   WELL, I THINK IT'S THE RESPONSIBILITY OF PRISON

7    ADMINISTRATORS TO DESIGN A SYSTEM THAT ALLOWS INMATES TO HAVE AN

8    APPROPRIATE LIVING ENVIRONMENT, A SYSTEM THAT PROVIDES

9    PREVENTION OF MEDICAL PROBLEMS, AND THAT DOESN'T HAVE A

10   SITUATION WHERE INMATES DECOMPENSATE MENTALLY.

11             WE NEED TO TREAT PEOPLE HUMANELY.  YOU KNOW, I THINK

12   THE MOST GLARING EXAMPLE IS THE RECEPTION CENTERS WHERE SUCH A

13   LARGE PERCENT OF OUR POPULATION IS.  ABOUT 25 PERCENT OF THE

14   INMATE POPULATION IS IN RECEPTION CENTERS, AND IN THOSE

15   RECEPTION CENTERS WHEN YOU HAVE PEOPLE HOUSED IN BUNKS LIKE THIS

16   (INDICATING).

17             WE ARE PAROLING A LARGE NUMBER OF INMATES EVERY WEEK.

18   SAN QUENTIN OVER 200 A WEEK ARE PAROLED OUT OF A SITUATION LIKE

19   THIS (INDICATING).

20             I THINK JUST ANY CORRECTIONAL ADMINISTRATOR WOULD SAY

21   THAT THIS IS ABSOLUTELY INAPPROPRIATE TO HOUSE HUMAN BEINGS IN

22   THIS KIND OF SITUATION AND RETURN THEM BACK TO OUR SOCIETY WHERE

23   MENTALLY THEY ARE NO BETTER OFF, AND PROBABLY IN WORSE SHAPE AND

24   IN SITUATIONS LIKE THIS WHERE WE HAVE DONE NOTHING TO ASSIST

25   WITH THEIR MEDICAL TREATMENT IN A WAY THAT WOULD BE CONSIDERED

1   APPROPRIATE.

2   Q.  AND IS IT -- JUST TWO MORE QUESTIONS.

3         IS IT YOUR OPINION THAT WITHOUT A REDUCTION IN

4   OVERCROWDING THAT THE DEPARTMENT OF CORRECTIONS WILL BE UNABLE

5   TO PROVIDE ADEQUATE MEDICAL AND MENTAL HEALTHCARE?

6   A.  IT'S ABSOLUTELY MY OPINION.  AND WITHOUT ADDRESSING THE

7   ISSUE OF OVERCROWDING, THE DEPARTMENT OF CORRECTIONS WILL NEVER

8   BE ABLE TO PROVIDE APPROPRIATE MEDICAL OR MENTAL HEALTHCARE AND

9   SUSTAIN -- SUSTAIN ANY KIND OF QUALITY CONSTITUTIONALLY-ADEQUATE

10  MEDICAL OR MENTAL HEALTHCARE. MEDICAL OR MENTAL HEALTHCARE.

11  Q.  AND TWO MORE QUESTIONS, MS. WOODFORD.

12        FIRST, HOW MUCH ARE YOU GETTING PAID TO BE HERE

13  TODAY?

14  A.  I'M NOT BEING PAID TO BE HERE TODAY.

15  Q.  SO YOU DID ALL THESE TOURS AND REVIEW OF THE DOCUMENTS FOR

16  FREE, BASICALLY?  AND WHY DID YOU DO THAT?

17  A.  I DID IT FOR FREE BECAUSE I TRULY BELIEVE THAT WE CAN DO

18  BETTER THAN WE ARE IN CALIFORNIA. I THINK IT'S UNBELIEVABLE THAT

19  IN THIS STATE THAT WE HAVE THE KIND OF OVERCROWDED CONDITIONS

20  THAT WE HAVE; THAT WE DO LITTLE OR NOTHING TO PREPARE PEOPLE FOR

21  THE RETURN TO SOCIETY IN SPITE OF THE FACT THAT WE PAROLE 10,000

22  PEOPLE A MONTH FROM OUR PRISON SYSTEM.

23        AND I ABSOLUTELY BELIEVE THAT WE MAKE PEOPLE WORSE,

24  AND THAT WE ARE NOT MEETING PUBLIC SAFETY BY THE WAY WE TREAT

25  PEOPLE.

1          AND THAT I BELIEVE OVERCROWDING IS PROHIBITING US

2   FROM PROVIDING QUALITY MEDICAL CARE AND MENTAL HEALTHCARE TO

3   INMATES IN OUR SYSTEM.

4          AND FOR CALIFORNIA TO BE IN THE SHAPE THAT IT'S IN IS

5   JUST UNBELIEVABLE. I MEAN, WE JUST RECENTLY PASSED AN INITIATIVE

6   THAT GIVES CHICKENS APPROPRIATE LIVING SPACE, AND YET WE HAVE

7   PRISONS THAT LOOK LIKE THIS (INDICATING).

8          **MR. SPECTER:**  NO FURTHER QUESTIONS, YOUR HONOR.

9          **JUDGE HENDERSON:**  DOES CCPOA HAVE ANY QUESTIONS?

10          **MS. LEONARD:**  NO FURTHER QUESTIONS OF THIS WITNESS,

11   YOUR HONOR.

12          **THE COURT:**  ALL RIGHT.

13          CROSS-EXAMINATION?

14          **MR. MELLO:**  GOOD AFTERNOON.  PAUL MELLO FOR

15   DEFENDANTS.

16                  **CROSS-EXAMINATION**

17   **BY MR. MELLO:**

18   **Q.**  GOOD AFTERNOON, MS. WOODFORD.

19   **A.**  HI.

20   **Q.**  WHEN WAS THE LAST TIME YOU WORKED IN SAN QUENTIN PRISON?

21   **A.**  IT'S BEEN ABOUT THREE YEARS. WELL, I LEFT THERE IN FEBRUARY

22   OF 2004.

23   **Q.**  OKAY.

24   **A.**  SO IT'S BEEN FOUR YEARS.

25   **Q.**  FOUR YEARS. ALMOST FIVE?

1  **A.**  YES.

2  **Q.**  OKAY. AND YOU'VE NEVER BEEN A CLINICIAN WHO PROVIDED MEDICAL

3  OR MENTAL HEALTHCARE, CORRECT?

4  **A.**  THAT IS CORRECT.

5  **Q.**  AND WHEN YOU WERE THE WARDEN AT SAN QUENTIN THERE WAS A

6  CHIEF MEDICAL OFFICER WHO WAS CHARGED WITH RUNNING MEDICAL

7  SERVICES AT THE PRISON, CORRECT?

8  **A.**  YES, THAT IS CORRECT.

9  **Q.**  AND WHEN YOU WERE THE WARDEN AT SAN QUENTIN THERE WAS A

10 CHIEF PSYCHIATRIST WHO WAS CHARGED WITH RUNNING THE MENTAL

11 HEALTH SERVICES AT THE INSTITUTION, CORRECT?

12 **A.**  YES, THERE WERE. THERE WAS.

13 **Q.**  AND WHEN YOU WERE THE DIRECTOR OF THE DEPARTMENT OF

14 CORRECTIONS THERE WAS A STATEWIDE CHIEF MEDICAL OFFICER,

15 CORRECT?

16 **A.**  THAT IS CORRECT.

17 **Q.**  WHEN YOU WERE THE UNDERSECRETARY OF CDCR A PHYSICIAN WAS THE

18 HEAD OF THE MEDICAL AND MENTAL HEALTHCARE SERVICES OF THE PRISON

19 SYSTEM, CORRECT?

20 **A.**  YES, THERE WAS A PHYSICIAN THAT WAS RESPONSIBLE FOR MANAGING

21 THAT AREA, BUT IN ALL OF THE POSITIONS THAT YOU NAMED I STILL

22 HAD RESPONSIBILITY FOR ENSURING THAT PEOPLE RECEIVE MEDICAL AND

23 MENTAL HEALTH SERVICES.

24 **Q.**  UNDERSTOOD.

25         YOU TESTIFIED ON DIRECT ABOUT AN EVENT AT CRC, A

1  DEATH AT CRC. WHAT YEAR WAS THAT?

2  **A.**  IT WAS EITHER 2005 OR 2006. I'M NOT SURE ABOUT THE YEAR.

3  **Q.**  AND I WANT TO NOW ASK YOU QUESTIONS ABOUT YOUR NOVEMBER,

4  2007 REPORT.  NOW, I'M GOING TO ASK YOU TO GO TO PAGE TWO,

5  PARAGRAPH SIX OF THAT REPORT.

6            AND IN YOUR REPORT YOU OPINED THAT OVERCROWDING IS

7  THE PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS IN THE PLATA

8  AND COLEMAN CASES, CORRECT?

9            AND I BELIEVE I'VE ALSO GOT IT ON THE SCREEN TO YOUR

10 RIGHT.

11 **A.**  YES.

12 **Q.**  OKAY. IN FORMING THE OPINIONS EXPRESSED IN YOUR NOVEMBER,

13 2007 REPORT YOU DID NOT READ ANY OF THE PLATA RECEIVER'S REPORTS

14 OR PLAN OF ACTION, CORRECT?

15 **A.**  I'M SORRY. I DIDN'T HEAR THE FIRST PART OF YOUR QUESTION.

16 **Q.**  SURE. IN FORMING YOUR OPINIONS EXPRESSED IN YOUR NOVEMBER,

17 2007 REPORT, YOU DID NOT READ ANY OF THE RECEIVER'S REPORTS OR

18 HIS PLAN OF ACTION, RIGHT?

19 **A.**  THAT'S CORRECT.

20 **Q.**  OKAY. IN FORMING YOUR OPINIONS IN YOUR NOVEMBER, 2007

21 REPORT, YOU HAD NOT VISITED ANY CDCR PRISONS SINCE THE MIDDLE OF

22 2006, CORRECT?

23 **A.**  NO, BUT I DID READ THE SERVICE PLAN OF ACTION AND REPORTS

24 FOR MY SUPPLEMENTAL, AND I DID VISIT PRISONS FOR MY SUPPLEMENTAL

25 REPORT.

1  Q. AND I WAS ASKING YOU SPECIFICALLY ABOUT YOUR NOVEMBER, 2007

2  REPORT.

3          AND MY QUESTION IS:  AT THE TIME THAT YOU WERE

4  FORMING THE OPINIONS EXPRESSED IN YOUR NOVEMBER, 2007 REPORT YOU

5  HAD NOT VISITED A SINGLE CDCR INSTITUTION SINCE AT LEAST THE

6  MIDDLE OF 2006.  THAT'S TRUE, RIGHT?

7  A. THAT IS TRUE.

8  Q. IN FORMING THE OPINIONS EXPRESSED IN YOUR NUMBER OF 2007

9  REPORT, YOU DID NOT KNOW WHETHER THERE HAD BEEN ANY IMPROVEMENTS

10 IN THE DELIVERY OF MEDICAL CARE OR MENTAL HEALTHCARE SINCE YOU

11 LEFT CDCR, RIGHT?

12 A. THAT'S CORRECT.

13 Q. IN FORMING THE OPINIONS EXPRESSED IN YOUR NOVEMBER, 2007

14 REPORT, YOU DID NOT KNOW IF THERE WERE MORE OR FEWER

15 CORRECTIONAL OFFICERS SINCE YOU LEFT THE DEPARTMENT IN 2006,

16 CORRECT?

17 A. NO, I THINK I HAD -- AS I RECALL, I DID KNOW THAT THE

18 DEPARTMENT WAS STILL DOWN MANY CORRECTIONAL OFFICERS AT THAT

19 TIME.

20 Q. I'M SORRY?

21 A. I BELIEVE THAT I KNEW THE DEPARTMENT WAS STILL DOWN MANY

22 CORRECTIONAL OFFICERS AT THAT TIME.

23 Q. BUT DID YOU KNOW WHETHER OR NOT THERE WERE MORE OFFICERS OR

24 LESS OFFICERS THAN WHEN YOU LEFT THE DEPARTMENT?

25 A. NO, I DID NOT KNOW THAT.

1  Q.  AND IN FORMING THE OPINIONS EXPRESSED IN YOUR NOVEMBER, 2007

2  REPORT, YOU DID NOT KNOW WHETHER THERE WERE MORE CLINICIANS

3  PROVIDING MEDICAL OR MENTAL HEALTHCARE SINCE YOU LEFT THE

4  DEPARTMENT IN 2006, CORRECT?

5  A.  I BELIEVE THAT'S CORRECT.

6  Q.  BEFORE SIGNING YOUR NOVEMBER 7, 2000 -- 2000 --

7         MR. MELLO:  STRIKE THAT.

8  BY MR. MELLO:

9  Q.  BEFORE SIGNING YOUR NOVEMBER, 2007 REPORT, YOU DID NOT

10  REVIEW ANY DOCUMENTS THAT LISTED THE AMOUNT OF CLINICAL SPACE IN

11  CALIFORNIA'S PRISONS, DID YOU?

12  A.  NOT THAT I RECALL.

13  Q.  OKAY. IN FORMING THE OPINIONS EXPRESSED IN YOUR NOVEMBER,

14  2007 REPORT, YOU DID NOT KNOW THE STATUS OF THE DELIVERY OF

15  MEDICAL AND MENTAL HEALTHCARE AT EACH OF THE 33 PRISONS,

16  CORRECT?

17  A.  I DID NOT KNOW THE CURRENT STATUS AT THE TIME THAT I SIGNED

18  IT, BUT I WILL SAY THAT I HAD NOT BEEN GONE FROM THE DEPARTMENT

19  VERY LONG AT THAT POINT, EITHER.

20  Q.  RIGHT. I MEAN, THE EVIDENCE WILL SHOW THAT YOU WERE GONE

21  BETWEEN SOMETIME IN 2006 AND SOMETIME IN 2007. THAT'S

22  UNDISPUTED, RIGHT?

23  A.  YES, THAT'S CORRECT.

24  Q.  THE FIRST DRAFT OF YOUR NOVEMBER, 2007 REPORT WAS PREPARED

25  AND MADE AVAILABLE TO YOU ON AN INTERNET SITE BY PLAINTIFFS'

1  COUNSEL, CORRECT?

2  **A.**  THAT'S CORRECT.

3  **Q.**  YOU DID NOT HANDWRITE YOUR REPORT, CORRECT?

4  **A.**  NO, I ASSISTED IN PREPARING THE REPORT, BUT I DID NOT

5  HANDWRITE IT, THAT'S CORRECT.

6  **Q.**  THE FIRST TIME YOU SAW YOUR REPORT WAS WHEN YOU VIEWED IT ON

7  AN INTERNET SITE, CORRECT?

8  **A.**  THE FIRST TIME I SAW IT TYPED IS WHEN I REVIEWED IT ON THE

9  INTERNET SITE, THAT'S CORRECT.

10  **Q.**  DID YOU EVER SEE IT IN SOME OTHER FORM THAN TYPED PRIOR TO

11  LOOKING AT IT ON THE INTERNET SITE PROVIDED YOU TO BY

12  PLAINTIFFS' COUNSEL?

13  **A.**  NO, I DID NOT SEE IT IN WRITTEN FORM. I HAD DISCUSSIONS,

14  OBVIOUSLY, WITH THE PRISON LAW OFFICE IN PREPARING THE REPORT.

15  **Q.**  ON PAGE FOUR OF YOUR NOVEMBER, 2007 REPORT AT PARAGRAPH 11,

16  YOU WROTE THAT:

17         "CDCR LACKS A SUFFICIENT NUMBER OF PERSONNEL WHO

18         HAVE THE NECESSARY SKILL AND TRAINING TO MANAGE SUCH

19         A LARGE COMPLEX ORGANIZATION," END QUOTE.

20  **A.**  YES.

21  **Q.**  WHEN PREPARING YOUR REPORT, THE NOVEMBER, 2007 REPORT, YOU

22  DID NOT KNOW THE EXISTING PHYSICIAN-TO-INMATE RATIO AT CDCR, DID

23  YOU?

24  **A.**  DID YOU SAY "PHYSICIAN-TO-INMATE RATIO"?

25  **Q.**  YES, I DID.

1  **A.** NO, I DID NOT.

2  **Q.** DID YOU KNOW THE CLINICIAN-TO-INMATE RATIO WITH RESPECT TO

3  MENTAL HEALTHCARE AT THAT TIME?

4  **A.** NO, I DID NOT.

5  **Q.** WHEN PREPARING YOUR NOVEMBER, 2007 REPORT YOU DID NOT KNOW

6  THE EXISTING VACANCY RATE AT ANY OF THE INSTITUTIONS, ALL 33 OF

7  THEM, WITH RESPECT TO PHYSICIANS, NURSE PRACTITIONERS,

8  PHYSICIANS' ASSISTANTS, RN'S, LVN'S PSYCHIATRISTS OR

9  PSYCHOLOGISTS, DID YOU?

10  **A.** I DID NOT KNOW SPECIFIC NUMBERS, BUT I DID KNOW THAT THERE

11  WAS STILL A PROBLEM IN FILLING POSITIONS.

12  **Q.** DID YOU NOTE THAT PROBLEM, EVEN A RANGE, ANYWHERE IN YOUR

13  NOVEMBER, 2007 REPORT?

14  **A.** NOT THAT I RECALL.

15  **Q.** ON PAGE FIVE OF YOUR REPORT AT PARAGRAPH 13, YOU WROTE THAT:

16          "CROWDING CAUSES DELAYS IN MOVING RECEPTION

17          CENTER PRISONERS TO OTHER PRISONS FOR TREATMENT."

18          WHEN YOU PREPARED YOUR REPORT YOU DID NOT KNOW

19  WHETHER CROWDING HAD CAUSED DELAYS IN MOVING OF RECEPTION CENTER

20  PRISONERS TO OTHER PRISONS FOR TREATMENT SINCE YOU LEFT THE

21  DEPARTMENT, CORRECT?

22  **A.** I DID NOT KNOW SPECIFIC EXAMPLES, BUT I BELIEVE I KNEW THAT

23  IT WAS STILL A PROBLEM MOVING INMATES OUT OF RECEPTION CENTERS

24  JUST BECAUSE I KEEP IN CONTACT WITH PEOPLE WHO WORK IN THE

25  DEPARTMENT.

 1   Q.  BUT YOU CAN'T GIVE US --

 2        **JUDGE KARLTON:**  SIR, THERE'S NO QUESTION -- ARE YOU

 3   GOING TO PUT ON EVIDENCE THAT, IN FACT, WE'VE BEEN ABLE TO MOVE

 4   PEOPLE OUT OF THE RECEPTION CENTERS EFFICIENTLY?

 5        THE ANSWER'S "NO," CORRECT?

 6        **MR. MELLO:**  YOUR HONOR, I BELIEVE THAT PLAINTIFFS

 7   HAVE THE BURDEN IN THIS CASE.

 8        **JUDGE KARLTON:**  I UNDERSTAND.

 9        **MR. MELLO:**  AND THEY HAVE PROFFERED VARIOUS

10   EXPERTS --

11        **JUDGE HENDERSON:**  DON'T RAISE YOUR VOICE.

12        **MR. MELLO:**  I DIDN'T MEAN TO.

13        **JUDGE KARLTON:**  I'M GOING TO ASK YOU AGAIN:  IS THERE

14   GOING TO BE ANY EVIDENCE TENDERED BY THE DEFENDANTS THAT THE

15   BELIEFS OF THIS WITNESS, AND OTHERS LIKE HER, IS INACCURATE?

16        **MR. MELLO:**  WHETHER WE'RE GOING TO PUT ON EVIDENCE?

17        **JUDGE KARLTON:**  THAT THE BELIEFS OF THE WITNESS, AS

18   AN EXAMPLE, ABOUT THE MOVEMENT OF PEOPLE OUT OF THE RECEPTION

19   CENTERS IS INACCURATE?

20        **MR. MELLO:**  I DON'T KNOW, YOUR HONOR. I DON'T BELIEVE

21   THAT THAT'S MY BURDEN IN THIS CASE. I BELIEVE IT'S PLAINTIFFS'

22   BURDEN IN THIS CASE.

23        **JUDGE KARLTON:**  OKAY. ALL RIGHT. YOU'VE ANSWERED THE

24   QUESTION.

25        WE WILL CONTINUE TO SPEND TIME DOING THIS.

1   BY MR. MELLO:

2   Q.   ON PAGE SEVEN, PARAGRAPH 19 OF YOUR NOVEMBER, 2007 REPORT,

3   YOU WROTE THAT OFFICERS WHO ARE -- PARDON?

4            **JUDGE REINHARDT:**  MAY I ASK YOU ONE QUESTION?

5            **MR. MELLO:**  SURE.

6            **JUDGE REINHARDT:**  ABOUT THE PROBLEM WITH THE DATES,

7   YOU'RE NOT QUESTIONING THE ACCURACY OF THE WITNESS'S STATEMENTS

8   AS OF THE YEAR EARLIER. YOU'RE ASKING WHETHER SHE KNEW OF ANY

9   CHANGES BETWEEN THE TIME SHE LEFT WHEN SHE KNEW ALL THESE

10  THINGS, AND ONE YEAR LATER.

11           **MR. MELLO:**  WELL, I DON'T BELIEVE THAT PLAINTIFFS

12  HAVE ESTABLISHED THAT SHE KNEW ALL THOSE THINGS WITH ANY

13  SPECIFICITY IN 2006 WHEN SHE LEFT THE DEPARTMENT.

14           **JUDGE REINHARDT:**  WELL, YOUR ONLY QUESTION HERE ABOUT

15  WHETHER SHE KNEW ANYTHING A YEAR LATER --

16           **MR. MELLO:**  CORRECT.  I AM QUESTIONING WHEN SHE --

17           **JUDGE REINHARDT:**  CAN I ASK YOU A QUESTION?

18           **MR. MELLO:**  I'M SORRY.  YES.

19           **JUDGE REINHARDT:**  WHAT DATE DO YOU THINK IS RELEVANT

20  FOR OUR JOB IN PHASE I TO DETERMINE WHAT THE PRIMARY CAUSE OF

21  THE HEALTH AND MENTAL HEALTH VIOLATIONS WAS WHEN THE TWO

22  FINDINGS WERE MADE?

23           **MR. MELLO:**  I BELIEVE THIS COURT -- AND I HAVEN'T

24  SPOKEN WITH MY CO-COUNSEL.  BUT I BELIEVE THIS COURT ESTABLISHED

25  A CUTOFF THAT THE RELEVANT DATE WAS THE END OF AUGUST, 2008.

1          **JUDGE REINHARDT:**  NO.  NO, FOR EVIDENCE. BUT AS TO

2  THE PHASE I ISSUE, WHAT WAS THE PRIMARY CAUSE OR IS THE PRIMARY

3  CAUSE OF THE VIOLATIONS THAT WERE FOUND IN PLATA AND COLEMAN?

4          WHAT DO YOU THINK THE COURT NEEDS TO ESTABLISH WHAT

5  THE PRIMARY CAUSE IS AS OF 2008 AS OF DATE THE FINDINGS WERE

6  MADE?  WHAT IS YOUR POSITION WITH RESPECT --

7          **MR. MELLO:**  I BELIEVE THAT THE PLRA IS WRITTEN IN THE

8  PRESENT TENSE WITH RESPECT TO THIS ISSUE.  AND I BELIEVE THAT

9  CURRENT CONDITIONS ARE WHAT ARE RELEVANT.

10          I BELIEVE THIS COURT HAS TOLD US THAT WE CANNOT ARGUE

11  ABOUT WHETHER WE ARE CURRENTLY IN CONSTITUTIONAL COMPLIANCE. BUT

12  I BELIEVE THAT THE CURRENT CONDITIONS, THE STATUTE IS WRITTEN IN

13  THE PRESENT TENSE, I BELIEVE.  AND I BELIEVE THAT CURRENT

14  CONDITIONS ARE THOSE ITEMS THAT ARE RELEVANT TO THIS JUDGES'

15  DETERMINATION OF WHETHER OR NOT PLAINTIFFS CAN SHOW BY CLEAR AND

16  CONVINCING EVIDENCE THAT OVERCROWDING IS THE PRIMARY CAUSE OF

17  THE ALLEGED DEFICIENCIES RIGHT NOW IN CDCR'S MEDICAL AND MENTAL

18  HEALTHCARE SYSTEMS.

19          AND I BELIEVE THAT THE CURRENT STATUS IS PROBABLY THE

20  MOST IMPORTANT THING, AS OPPOSED TO SOMETHING THAT SHE RECALLS

21  WHEN SHE WAS A WARDEN BACK AT SAN QUENTIN YEARS AGO.

22          I BELIEVE THAT'S IMPORTANT. I BELIEVE THAT THE

23  EVIDENCE ALREADY TO DATE HAS SHOWN THAT THERE HAVE BEEN

24  INCREASES IN MANY, MANY THINGS, BOTH IN MENTAL HEALTH AND IN

25  MEDICAL CARE.

1          AND I BELIEVE THOSE GO TO THE FACT THAT WHILE WE

2   CAN'T PUT ON EVIDENCE THAT CURRENT CONSTITUTIONAL COMPLIANCE IS

3   MET, THAT THAT OVERCROWDING IS NOT THE PRIMARY BARRIER.

4          **JUDGE REINHARDT:**  WELL, SHE'S SAYING, I GATHER, THAT

5   THE CONSTITUTIONAL VIOLATION HAD TO EXIST FOR PHASE I PURPOSES;

6   THAT WHAT IS RELEVANT IS WHETHER THERE'S A CONSTITUTIONAL

7   VIOLATION TODAY, NOT WHETHER THERE WAS WHEN THE FINDINGS WERE

8   MADE BY THE COURT. THAT'S REALLY IRRELEVANT. IT'S ONLY WHETHER

9   THERE'S A CONSTITUTIONAL VIOLATION TODAY.

10         **MR. MELLO:**  I DON'T BELIEVE IT'S IRRELEVANT, BUT I DO

11  BELIEVE WHAT IS RELEVANT IS THE CURRENT CONDITIONS IN THE

12  SYSTEM.

13         AND I BELIEVE THE EVIDENCE HAS SHOWN AND WILL

14  CONTINUE TO SHOW THAT THAT CURRENT EVIDENCE DOESN'T SHOW THAT

15  OVERCROWDING IS THE PRIMARY BARRIER TO THE UNCONSTITUTIONAL

16  DELIVERY OF MEDICAL AND MENTAL HEALTHCARE.

17         **JUDGE REINHARDT:**  OKAY. THANK YOU.

18         **MR. MELLO:**  I'VE COMPLETELY FORGOTTEN WHERE I AM. I

19  USUALLY --

20         **JUDGE REINHARDT:**  YOU WERE IN ABOUT 2006 OR --

21         **MR. MELLO:**  I'M PRETTY SURE I WAS IN 2008.

22         **JUDGE REINHARDT:**  THAT'S THE SUPPLEMENTAL REPORT.

23         **MR. MELLO:**  OH, YOU ARE RIGHT. I WAS IN 2007. THANK

24  YOU, YOUR HONOR.

25

1  BY MR. MELLO:

2  Q.  THANKS FOR THE CUE.

3          ON PAGE SEVEN, PARAGRAPH 19 OF YOUR NOVEMBER, 2007

4  REPORT YOU WROTE THAT SOME STAFF WORKED BACK-TO-BACK DOUBLE

5  SHIFTS AND WOULD SLEEP IN THEIR CARS IN THE PRISON PARKING LOT

6  INSTEAD OF MAKING A LONG COMMUTE HOME.

7          DO YOU SEE THAT?

8  A.  YES.

9  Q.  AND MUCH TO -- I'LL JUST ASK THE QUESTION.

10          IN FORMING THE OPINIONS EXPRESSED IN YOUR NOVEMBER,

11  2007 REPORT, YOU DID NOT KNOW HOW MANY OCCASIONS CORRECTIONAL

12  OFFICERS, IF ANY, HAD ACTUALLY SLEPT IN THEIR CARS TO WORK

13  BACK-TO-BACK SHIFTS IN THE PRECEDING YEAR, DID YOU?

14  A.  NO, I DID NOT.

15  Q.  ON PAGE SEVEN, ALSO PARAGRAPH 19 OF YOUR REPORT, YOU WROTE

16  THAT OFFICERS WHO ARE TIRED AND SUFFER FROM LOW MORALE ARE LESS

17  THAN PRODUCTIVE AND DO NOT FULFILL ALL THEIR RESPONSIBILITIES TO

18  PROVIDE FOR THE BASIC NEEDS OF THEIR PRISONERS.

19          DO YOU SEE THAT?

20  A.  YES.

21  Q.  IN FORMING THOSE OPINIONS EXPRESSED IN YOUR NOVEMBER, 2007

22  REPORT YOU DID NOT KNOW WHETHER, SINCE YOU HAD LEFT CDCR, THERE

23  HAD BEEN ANY CORRECTIONAL OFFICERS WHO WERE SO TIRED OR WHO

24  SUFFERED SUCH LOW MORALE THAT THEY DID NOT FULFILL THEIR

25  RESPONSIBILITIES TO PROVIDE HEALTHCARE TO INMATES, CORRECT?

1   **A.** I HAD NO SPECIFIC KNOWLEDGE OF THAT AT THAT TIME, YES.

2   **Q.** IN FORMING YOUR OPINIONS EXPRESSED IN THE NOVEMBER, 2007

3   REPORT, YOU DID NOT KNOW WHETHER CORRECTIONAL OFFICERS BEING

4   TIRED AND SUFFERING LOW MORALE LED TO THE DEATHS OR ANY OTHER

5   ADVERSE MEDICAL OR MENTAL HEALTH CONSEQUENCES AS A RESULT OF

6   BEING TIRED, CORRECT?

7   **A.** CORRECT.

8   **Q.** IN FACT, YOU DO NOT KNOW WHETHER THOSE CIRCUMSTANCES THAT

9   YOU DESCRIBE IN YOUR REPORT LED TO THE UNCONSTITUTIONAL DELIVERY

10  OF MEDICAL CARE OR MENTAL HEALTHCARE IN 2006, 2007 OR 2008.

11  **A.** WELL, YOU KNOW, I DISAGREE WITH THAT STATEMENT. I THINK THE

12  GOVERNOR'S OVERCROWDING STATE OF EMERGENCY PROCLAMATION, WOULD

13  LET YOU KNOW THAT OVERCROWDING WAS STILL A SEVERE PROBLEM, AND

14  THAT IT WAS LEADING TO VIOLENCE IN MANY OF THE PRISONS IN THE

15  STATE OF CALIFORNIA.

16          AND SO I THINK I HAD GOOD REASON TO BELIEVE THAT

17  LITTLE HAD CHANGED WHEN I SUBMITTED MY REPORT IN 2007.  IT WAS

18  SUCH A SHORT AMOUNT OF TIME FROM THE TIME I LEFT THE PRISON

19  SYSTEM UNTIL THAT DATE. AND GOING THROUGH THE PRISON SYSTEM FOR

20  THE 27 YEARS I WAS THERE AND KNOWING HOW SLOWLY IT TAKES TO FIX

21  ANYTHING AND HOW YOU CAN TAKE ONE STEP FORWARD AND TWO STEPS

22  BACK JUST BECAUSE OF THE OVERCROWDING AND THE NUMBER OF INMATES

23  COMING INTO THE SYSTEM THAT I FELT VERY CONFIDENT THAT WHAT I

24  STATED IN THIS REPORT WAS ACCURATE.

25  **Q.** I'M GOING TO ASK YOU -- I'M GOING TO PULL UP A COUPLE OF

1   PORTIONS OF YOUR TRANSCRIPT.

2           I'D LIKE -- FROM YOUR DEPOSITION LAST DECEMBER, I

3   BELIEVE.  PAGE 79, 21 THROUGH 25.  21 THROUGH 25.

4           AND I ASKED YOU:

5               "DO YOU KNOW WHETHER -- WHETHER THAT

6           CIRCUMSTANCES" -- THAT'S A GREAT QUESTION -- "WHETHER

7           THAT CIRCUMSTANCES, OFFICERS BEING TIRED AND

8           SUFFERING FROM LOW MORALE AND BEING LESS PRODUCTIVE,

9           WHETHER THAT LED TO ANY DEATHS IN 2006?"

10          DO YOU SEE THAT?

11  **A.**  YES, I DO.

12  **Q.**  AND YOU SAID:

13              "I DO NOT KNOW," CORRECT?

14  **A.**  THAT IS CORRECT.

15  **Q.**  OKAY.  AND NOW ON THE NEXT PAGE, PAGE 80, LINES ONE THROUGH

16  FOUR, YOU TESTIFIED WHEN QUESTIONED BY ME THAT:

17              "YOU DO NOT KNOW WHETHER THESE CIRCUMSTANCES LED

18          TO THE UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE OR

19          MENTAL HEALTHCARE IN 2006, 2007."

20          AND YOU SAID:

21              "I DO NOT."

22  **A.**  YOU KNOW, I MAYBE MISINTERPRETED YOUR QUESTION. I THOUGHT

23  YOU WERE ASKING ME ABOUT SPECIFIC EVENTS.  I DID NOT HAVE ANY

24  DETAILS ABOUT ANY SPECIFIC CASE.

25  **Q.**  AND SO YOUR TESTIMONY IS DIFFERENT.  YOU BELIEVE THAT THOSE

1   CIRCUMSTANCES LED TO UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE

2   AND MENTAL HEALTHCARE IN 2006, 2007 DESPITE WHAT YOU SAID IN

3   YOUR DEPOSITION?

4   **A.**  I DON'T THINK IT'S DIFFERENT THAN WHAT I SAID IN MY

5   DEPOSITION. AGAIN, I THINK THAT IN MY DEPOSITION I THOUGHT YOU

6   WERE ASKING ME ABOUT SPECIFIC CASES. IN THE REPORT THAT I SIGNED

7   I WAS TALKING ABOUT OVERCROWDING AS FROM A MORE GLOBAL

8   PERSPECTIVE.

9   **Q.**  WHEN YOU SIGNED YOUR NOVEMBER, 2007 REPORT, YOU HADN'T SEEN

10  THE RECEIVER'S ANALYSIS OF 2006 DEATHS, WHICH IS DEFENDANTS'

11  EXHIBIT 1107, CORRECT?

12  **A.**  I DON'T BELIEVE I DID.

13  **Q.**  AND THAT'S JUST THE FRONT PAGE. DOES THAT REFRESH YOUR

14  RECOLLECTION?

15           **MR. SPECTER:**  OF SOMETHING SHE HASN'T SEEN?

16           **MR. MELLO:**  WELL --

17           **THE WITNESS:**  I HAVE SEEN THIS. I HAVE REVIEWED THIS,

18  BUT I DON'T KNOW THAT I HAD REVIEWED IT AT THE TIME OF THE

19  DEPOSITION.

20  **BY MR. MELLO:**

21  **Q.**  ON PAGE THREE, PARAGRAPH FOUR, OF YOUR AUGUST -- PARDON ME.

22           ON PAGES THREE AND FOUR, PARAGRAPH 8 OF YOUR

23  AUGUST 8, 2000 REPORT --

24           **JUDGE KARLTON:**  THERE WASN'T A 2000 REPORT.

25           **MR. MELLO:**  DID I MISSPEAK?

1              **JUDGE KARLTON:**  YES.

2              **MR. MELLO:**  I'M SORRY.  LET ME START OVER.

3         THANK YOU.

4    **BY MR. MELLO:**

5    **Q.**  ON PAGES THREE AND FOUR, PARAGRAPH 8 OF YOUR AUGUST, 2008

6    REPORT, IT READS:

7              "THIS ALLOWED PRISONERS WITH DIFFERENT POTENTIAL

8              FOR VIOLENCE TO BE MIXED IN HOUSING UNIT -- IN A

9              HOUSING UNIT WHERE THERE WAS SCANT ABILITY TO PROVIDE

10             SUPERVISION."

11        DO YOU SEE THAT?

12   **A.**  MY SCREEN JUST WENT BLANK.

13   **Q.**  SO THE ANSWER IS "NO"?

14   **A.**  OKAY. I'M SORRY.  WHICH LINE AGAIN?

15   **Q.**  YEAH. I BELIEVE WE'RE IN THE WRONG PLACE.

16        IT'S PARAGRAPH EIGHT.

17   **A.**  PARAGRAPH EIGHT?

18   **Q.**  YEAH.

19   **A.**  YES.

20   **Q.**  I'M TALKING ABOUT -- PARDON ME.  I'M TALKING ABOUT THE

21   AUGUST, 2008 REPORT. PAGE THREE AND FOUR, PARAGRAPH 8.

22        OKAY. IN THAT REPORT, IT READS THAT:

23             "THIS ALLOWED PRISONERS WITH DIFFERENT POTENTIAL

24             FOR VIOLENCE TO BE MIXED IN A HOUSING UNIT WHERE

25             THERE WAS SCANT ABILITY TO PROVIDE SUPERVISION."

1         DO YOU SEE THAT?

2  **A.**  YES.

3  **Q.**  WHEN THIS WAS WRITTEN, YOU WERE NOT AWARE OF EVEN A SINGLE

4  SPECIFIC EXAMPLE AT LANCASTER WHERE A CORRECTIONAL OFFICER HAD

5  FAILED TO PROVIDE ASSISTANCE TO A PRISONER WITH A HEALTH ISSUE

6  DUE TO THE MIXING OF POTENTIALLY VIOLENT PRISONERS, WERE YOU?

7  **A.**  NOT DUE TO THE MIXING OF POTENTIALLY VIOLENT PRISONERS, NO.

8  **Q.**  ON PAGE FOUR, PARAGRAPH NINE OF YOUR REPORT, YOUR AUGUST,

9  2008 REPORT, IT READS:

10             "ADDING TO THE RISK OF HARM IS THE FACT THAT

11             THESE UNITS ARE VERY HOT WITH THE OUTSIDE TEMPERATURE

12             BETWEEN 95 AND 102 DEGREES."

13         DO YOU SEE THAT?

14  **A.**  YES.

15  **Q.**  YOU WERE NOT AWARE OF ANY SPECIFIC EXAMPLES OF MEDICAL OR

16  MENTAL HEALTH ISSUES ARISING AT CTF CORCORAN OR LANCASTER DUE TO

17  THE INTERIOR TEMPERATURE OF THE HOUSING UNITS, ARE YOU?

18  **A.**  I'M NOT AWARE OF SPECIFIC CASES, NO.

19         I NEED TO SAY, THOUGH, THAT WE DID RECEIVE COMPLAINTS

20  FROM INMATES ABOUT HOW HOT IT WAS IN THEIR CELLS.

21         **JUDGE KARLTON:**  BUT THAT WAS IN 2006. THERE'S NO

22  REASON TO THINK THAT THAT WAS THE CONDITION IN --

23  **BY MR. MELLO:**

24  **Q.**  I'M SORRY.  WHEN WAS THAT THAT YOU RECEIVED THOSE COMPLAINTS

25  THAT YOU JUST TESTIFIED ABOUT?

1  A.  WHEN I TOURED LANCASTER AND CORCORAN.

2  Q.  IN 2008?

3  A.  IN 2008.

4  Q.  AND DESPITE THEM EXPLAINING TO YOU THAT IT WAS HOT AND THAT

5  THEY -- THAT IT WAS HOT, NONE OF THEM TOLD YOU AND YOU DID NOT

6  LEARN OF ANY OF THEM HAVING ADVERSE MEDICAL OR MENTAL HEALTH

7  CONSEQUENCES AS A RESULT OF THOSE TEMPERATURES, CORRECT?

8  A.  THEY COMPLAINED ABOUT THE DISCOMFORT, BUT I DIDN'T KNOW THE

9  SPECIFIC MEDICAL CASES, NO.

10  Q.  AND NONE OF THEM WROTE -- IDENTIFIED FOR YOU ANY SPECIFIC

11  MEDICAL CASES, CORRECT?

12  A.  I DON'T KNOW THAT THAT ACCURATELY DESCRIBES WHAT THEY TALKED

13  ABOUT. WHILE I CAN'T -- YOU KNOW, I CAN'T GIVE YOU SPECIFICS OF

14  A CONVERSATION, I DO THINK THAT THERE WERE COMPLAINTS ABOUT IT

15  AGGRAVATING THEIR MEDICAL CONDITIONS AND THINGS.

16          THERE WERE THOSE KINDS OF GENERAL COMPLAINTS.

17  Q.  GENERAL COMPLAINTS?

18  A.  UM-HUM.

19  Q.  THAT YOU CAN'T REMEMBER AS YOU SIT HERE TODAY, CORRECT?

20  A.  THAT'S CORRECT.

21  Q.  ON PAGE 11 OF YOUR AUGUST, 2008 REPORT AT PARAGRAPH 22, IT

22  READS:

23          "AT CTF THE NORTH FACILITY HAD BEEN ON LOCKDOWN

24          FOR ABOUT A MONTH PRIOR TO THE VISIT."

25          DO YOU SEE THAT?

1  **A.**  YES.

2  **Q.**  YOU'RE NOT AWARE OF ANY SPECIFIC INCIDENTS WHERE A PRISONER

3  BECAME SICK OR WAS DENIED NEEDED MEDICAL OR MENTAL HEALTHCARE

4  DUE TO THIS LOCKDOWN, ARE YOU?

5  **A.**  NO, I DON'T KNOW THE SPECIFIC INCIDENT.

6  **Q.**  ISN'T IT TRUE THAT INMATES CAN STILL BE ESCORTED TO MEDICAL

7  AND MENTAL HEALTH APPOINTMENTS DURING LOCKDOWNS?

8  **A.**  IT IS TRUE THAT THAT CAN HAPPEN, BUT THE STAFF THEMSELVES

9  TOLD US THAT THEY WERE HAVING DIFFICULTY MEETING ALL THE MEDICAL

10  AND MENTAL HEALTH NEEDS OF THE INMATE POPULATION AT SOLEDAD.

11  **Q.**  DESPITE BEING TOLD THAT, YOU WERE NOT TOLD OF ANY INMATE

12  SUFFERING ADVERSE MEDICAL OR MENTAL HEALTH CONSEQUENCE AS A

13  RESULT OF THOSE LOCKDOWNS, CORRECT?

14  **A.**  WE DID NOT HAVE A DISCUSSION ABOUT ANY PARTICULAR CASES AT

15  SOLEDAD, NO.

16  **Q.**  YOU AGREE THAT THE PROVISION OF HOUSING TO INMATES IS

17  DIFFERENT THAN THE PROVISION OF MEDICAL AND MENTAL HEALTHCARE,

18  CORRECT?

19  **A.**  I'M SORRY.  I DIDN'T HEAR THE FIRST PART OF THAT.

20  **Q.**  YOU AGREE THAT THE PROVISION OF HOUSING TO INMATES IS

21  DIFFERENT THAN FROM THE PROVISION OF MEDICAL AND MENTAL

22  HEALTHCARE TO INMATES, CORRECT?

23  **A.**  I'M NOT SURE THAT I UNDERSTAND THE QUESTION.

24  **Q.**  PULL UP PAGE 90, LINES 17 THROUGH 20 OF YOUR FIRST

25  DEPOSITION.

1  **A.** OKAY. I SEE THAT.

2  **Q.** OKAY. AND I ASKED YOU:

3           "WOULD YOU AGREE THAT THE PROVISION OF HOUSING

4        IS DIFFERENT FROM THE PROVISION OF MEDICAL AND MENTAL

5        HEALTHCARE?"

6  **A.** AGAIN, I WANT TO BE SURE THAT WE'RE TALKING ABOUT THE SAME

7  THING. SO COULD YOU EXPLAIN WHAT YOU MEAN BY THAT?

8           **JUDGE REINHARDT:** I DON'T UNDERSTAND THE QUESTION

9  MYSELF.

10          **MR. MELLO:** OKAY.

11          **JUDGE REINHARDT:** OBVIOUSLY, PROVIDING HOUSING IS

12 DIFFERENT FROM PROVIDING MEDICAL CARE.

13          **MR. MELLO:** OKAY.

14          **JUDGE REINHARDT:** BUT WHERE DOES THAT LEAD US?

15          **MR. MELLO:** UNDERSTOOD. AND I'LL WITHDRAW THE

16 QUESTION. HOW'S THAT?

17          **JUDGE REINHARDT:** OKAY.

18 **BY MR. MELLO:**

19 **Q.** IN YOUR OPINION, IF THE ADULT POPULATION IN CALIFORNIA'S

20 INSTITUTIONS WAS DECREASED BY 40,000 INMATES TOMORROW AND

21 NOTHING ELSE WAS DONE, THE CDCR WOULD NOT BE ABLE TO PROVIDE

22 CONSTITUTIONALLY-ADEQUATE MEDICAL OR MENTAL HEALTHCARE TO ITS

23 INMATES, WOULD IT?

24 **A.** IF THE POPULATION WERE REDUCED AND NOTHING ELSE WAS DONE,

25 MEANING THAT WE DIDN'T HIRE THE APPROPRIATE MEDICAL STAFF AND

1   PROVIDE APPROPRIATE MEDICAL FACILITIES AND ALL THAT, THEN I

2   WOULD AGREE YOU STILL WOULD NOT MEET A CONSTITUTIONAL LEVEL OF

3   CARE.

4   **Q.**   AND IN YOUR OPINION, EVEN IF CDCR RELEASED UP TO 40,000 OF

5   THE MOST PHYSICALLY SICK AND MOST ACUTELY MENTALLY ILL INMATES

6   OVER A PERIOD OF TIME AT THE END OF THAT PERIOD CDCR WOULD NOT

7   HAVE A CONSTITUTIONALLY-ADEQUATE MEDICAL AND MENTAL HEALTHCARE

8   SYSTEM UNLESS IT ALSO ADDRESSED OTHER PROBLEMS, SUCH AS ACCESS

9   TO CARE -- HEALTHCARE RECORDS, INFORMATION TECHNOLOGY,

10  CONTINUITY OF CARE, JUST TO NAME A FEW, CORRECT?

11  **A.**   MEDICATION MANAGEMENT AND MANY OTHER PROVISIONS OF

12  HEALTHCARE, YES.

13  **Q.**   CORRECT?

14  **A.**   CORRECT.

15          **MR. MELLO:**  NOTHING FURTHER.

16          THANK YOU.

17          **THE WITNESS:**  THANK YOU.

18          **JUDGE HENDERSON:**  ANY OTHER DEFENDANTS OR

19  INTERVENORS?

20          **MS. WANG:**  THE DEFENDANT INTERVENORS HAVE NO FURTHER

21  QUESTIONS, YOUR HONOR.

22          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

23          REDIRECT?

24                    **REDIRECT EXAMINATION**

25

1  **BY MR. SPECTER:**

2  **Q.**  MR. MELLO ASKED YOU WHETHER BEFORE YOU WROTE YOUR NOVEMBER,

3  2007 REPORT YOU REVIEWED VARIOUS DOCUMENTS FROM THE RECEIVER AND

4  SPECIAL MASTER. SUBSEQUENT TO THAT REPORT, HAVE YOU REVIEWED

5  SUCH DOCUMENTS?

6  **A.**  YES, I'VE REVIEWED MANY, MANY DOCUMENTS FROM A VARIETY OF

7  PEOPLE, INCLUDING THE RECEIVER'S STAFF, THE RECEIVER'S OFFICE,

8  AS WELL AS EXPERTS IN THIS CASE.

9  **Q.**  AND DO THEY CHANGE YOUR OPINION IN ANY WAY?

10  **A.**  NO, THEY DO NOT CHANGE MY OPINION IN ANY WAY.

11  **Q.**  THANK YOU, YOUR HONOR.  I MEAN, THANK YOU, MS. WOODFORDFORD.

12  **A.**  THANK YOU.

13          **MR. SPECTER:**  THANK YOU, YOUR HONORS.

14          **JUDGE KARLTON:**  MS. WOODFORD, YOU HAD 27 YEARS

15  EXPERIENCE.

16          I'M SORRY.  YOU HAD 27 YEARS, PLUS OR MINUS YEARS

17  EXPERIENCE WITH THE DEPARTMENT. GIVEN ALL OF THAT EXPERIENCE AND

18  ALL OF YOUR KNOWLEDGE, DO YOU HAVE ANY REASON TO BELIEVE THAT

19  THE DIFFERENCE BETWEEN YOUR UNDERSTANDING OF HOW THE SYSTEM

20  WORKED AND WHAT THE PROBLEMS WERE IN 2006 WAS SIGNIFICANTLY

21  DIFFERENT THAN WHAT HAPPENED -- THAN IN 2007?

22          **THE WITNESS:**  THEY WEREN'T SIGNIFICANTLY DIFFERENT AT

23  ALL, YOUR HONOR.

24          **JUDGE KARLTON:**  AND EVEN THOUGH YOU DIDN'T HAVE ANY

25  SPECIFIC INFORMATION ABOUT THAT, WHAT GIVES YOU CONFIDENCE THAT

1    THAT WAS TRUE?

2            **THE WITNESS:**  WELL, I WAS ABLE TO TOUR THREE

3    FACILITIES.

4            **JUDGE KARLTON:**  BEFORE YOU TOURED THE FACILITIES,

5    MR. MELLO WAS ASKING YOU --

6            **THE WITNESS:**   OH, OKAY.

7            **JUDGE KARLTON:**  -- QUESTIONS ABOUT YOUR REPORT.

8            **THE WITNESS:**  WELL, BECAUSE I FOLLOWED WHAT WAS GOING

9    ON IN THE NEWSPAPER AND READ WHAT THE RECEIVER HAD TO SAY ABOUT

10   THE HEALTHCARE IN THE STATE OF CALIFORNIA.

11           I ALSO FOLLOWED THE STATE'S DISCUSSION ABOUT BUILDING

12   MORE FACILITIES TO REDUCE OVERCROWDING SO THEY CAN MEET THE

13   NEEDS OF INMATES, NONE OF WHICH HAS HAPPENED, OF COURSE.

14           I KNOW THE GOVERNOR ISSUED AN EMERGENCY DECLARATION

15   BECAUSE OF THE OVERCROWDING.  AND I STAY IN TOUCH WITH LOTS OF

16   PEOPLE WHO STILL WORK IN THE DEPARTMENT OF CORRECTIONS.

17           **JUDGE KARLTON:**  AS A PRACTICAL MATTER, DO YOU BELIEVE

18   THAT THERE WOULD BE A RADICAL CHANGE IN THE CONDITIONS BETWEEN

19   2006 AND 2007 WITHOUT IT BEING BROUGHT TO YOUR ATTENTION JUST AS

20   SOMETHING RATHER REMARKABLE?

21           **THE WITNESS:**  IF I UNDERSTAND THE QUESTION, DO I

22   THINK THINGS COULD CHANGE THAT QUICKLY IN THE DEPARTMENT OF

23   CORRECTIONS?  BASED ON MY YEARS OF EXPERIENCE, ABSOLUTELY NOT.

24           IT TOOK -- FOR EXAMPLE, THE TOUSSAINT COURT CASE, I

25   THINK IT TOOK US OVER 20 YEARS TO COME INTO COMPLIANCE TO HAVE

1    THAT CASE END. NOTHING MOVES QUICKLY IN THE STATE OF CALIFORNIA.

2            **JUDGE HENDERSON:**  OKAY. THANK YOU FOR TESTIFYING, MS.

3    WOODFORD.

4            THANK YOU. YOU MAY STEP DOWN.

5            YOU'RE EXCUSED.  AND WE WILL ADJOURN FOR THE DAY.

6        **MR. MELLO:**  I BELIEVE MS. LEONARD --

7        **THE COURT:**  OH, EXCUSE ME.

8        **MR. MELLO:**  -- HAS SOME WITNESS ISSUES, I BELIEVE, WE

9    NEED TO DISCUSS.

10            **MS. LEONARD:**  YES, YOUR HONORS.  NATALIE LEONARD,

11   CALIFORNIA CORRECTIONAL PEACE OFFICERS.

12            THIS CASE IS GOING VERY QUICKLY.  MOST LIKELY DUE TO

13   EXCELLENT JUDICIAL MANAGEMENT.  AND WE HAVE BEEN WORKING

14   DILIGENTLY TO GET OUR WITNESSES HERE.  WE HAVE SIX WITNESSES IN

15   TOTAL. I CAN PRODUCE FOUR TOMORROW.

16            I AM NOT CERTAIN WHETHER THAT WILL FILL THE DAY. THE

17   REASONS FOR THE OTHER TWO, THE FIRST IS WORKING RIGHT NOW IN A

18   CORRECTIONAL FACILITY UNTIL 10:00 P.M. TONIGHT ON THE

19   CALIFORNIA-ARIZONA BORDER.  AND HE'S WILLING TO FLY OUT VERY

20   EARLY TOMORROW, BUT WOULD NOT GET HERE IN TIME WITH THE

21   CONNECTIONS.

22            THE SECOND HAS A SPECIAL NEEDS CHILD THAT REQUIRES

23   SPECIALIZED 24-HOUR CARE.  AND WE HAVE THE CARE PROVIDER SET UP

24   FOR FRIDAY MORNING.  SO WITH THE COURT'S PERMISSION AND

25   COMPASSION I WOULD LIKE TO BE ABLE TO PRODUCE THOSE TWO ON

1   FRIDAY.

2             **JUDGE HENDERSON:**  OKAY.

3             **JUDGE REINHARDT:**  ARE YOU THROUGH WITH ALL YOUR

4   WITNESSES?

5             **MR. SPECTER:**  WE HAVE ONE MORE WITNESS TOMORROW.

6             **JUDGE KARLTON:**  DR. SHANSKY?

7             **MR. SPECTER:**  YES.  HE'LL START TOMORROW.

8             **JUDGE REINHARDT:**  HOW LONG DO YOU EXPECT THAT HE WILL

9   TAKE?

10            **MR. SPECTER:**  PARDON ME?

11            **JUDGE REINHARDT:**  HOW LONG DO YOU EXPECT THAT HE WILL

12  TAKE?

13            **MR. SPECTER:**  WELL, ABOUT A HALF HOUR ON DIRECT, AND

14  THEN CROSS.

15            **JUDGE REINHARDT:**  BUT I MEAN, REALISTICALLY, WHAT DO

16  YOU BOTH THINK?

17            **MR. MELLO:**  I BELIEVE AN HOUR-AND-A-HALF TO TWO

18  HOURS. HE'S THEIR MEDICAL EXPERT IN PLATA, CROSS.

19            **MR. SPECTER:**  SO FROM A 9:15 TO 11:30, NOON.

20            **JUDGE REINHARDT:**  AND YOUR FOUR WITNESSES, HOW LONG

21  WILL THEY TAKE?

22            **MS. LEONARD:**  WE WILL TAKE THIRTY ON DIRECT AND 15

23  ON REDIRECT, ONLY IF NEEDED.

24            **JUDGE REINHARDT:**  SO YOU HAVE FOUR WITNESSES.  WON'T

25  THAT TAKE THE AFTERNOON?

 1          **MS. LEONARD:**  WE MAY.  BUT BECAUSE WE HAVE NOT BEEN

 2   CERTAIN BECAUSE THE TIMES HAVE NOT BEEN COMPLETELY TO THE

 3   PRETRIAL STATEMENT, WE WANTED TO ALERT THE COURT TO THE

 4   POSSIBILITY.  AND WE UNDERSTAND OUR RESPONSIBILITY TO THIS

 5   COURT.  ONE OF THE WITNESSES, FOR EXAMPLE, WILL DRIVE IN THE

 6   MIDDLE OF THE NIGHT AND PROVIDE CHILDCARE FOR HER FOUR CHILDREN

 7   AT HOME.

 8          **JUDGE REINHARDT:**  BUT YOU HAVE FOUR, AND THERE ARE

 9   ONLY TWO THAT MIGHT NOT BE HERE, RIGHT?

10          **JUDGE HENDERSON:**  FOUR WILL DEFINITELY BE HERE.

11          **JUDGE REINHARDT:**  SOUNDS LIKELY IT WILL TAKE THE

12   WHOLE DAY, BUT IF IT DOESN'T --

13          **MR. MELLO:**  AND THAT GETS TO OUR POINT.  WE'RE ALSO

14   SURPRISED BY THE SPEED AT WHICH THIS IS GOING, AND WE ONLY HAVE

15   TWO LIVE WITNESSES AVAILABLE ON FRIDAY.  IN THE WITNESS LIST WE

16   DID LIST THE FACT THAT WE HAVE THREE WITNESSES TESTIFYING BY WAY

17   OF DEPOSITION.

18          WE OBVIOUSLY WOULD PREFER THAT THAT DEPOSITION

19   TESTIMONY BE READ INTO THE RECORD, BUT WE VERY MUCH REALIZE THAT

20   PROBABLY WON'T HAPPEN FROM THIS COURT.  SO I JUST WANT TO POINT

21   OUT WE ONLY HAVE TWO LIVE WITNESSES, ALTHOUGH WE TRIED JUST

22   BECAUSE WE DIDN'T THINK WE WOULD GET THERE ON FRIDAY.

23          **JUDGE REINHARDT:**  AND IF YOUR TWO CAME ON FRIDAY THAT

24   WOULD SOLVE YOUR PROBLEM.

25          **JUDGE KARLTON:**  I MEAN, I'M VERY SURPRISED WE'RE

1  MOVING ALONG THIS QUICKLY, EITHER.  IT'S OBVIOUSLY JUDGE

2  HENDERSON'S --

3          **JUDGE HENDERSON:**  AW, SHUCKS, FELLOWS.

4          **JUDGE KARLTON:**  BUT WHAT I THINK I'M HEARING -- WELL,

5  LET ME ASK:  MS. TILLMAN, ARE YOU DOING ANYTHING ADDITIONAL TO

6  WHAT MR. MELLO IS DOING IN THE WAY OF PRESENTATION OF WITNESSES?

7          **MS. TILLMAN:**  I THINK MR. MELLO WAS SPEAKING,

8  ACTUALLY, IN REGARDS TO BOTH PLATA AND COLEMAN. WE HAD SET ASIDE

9  TWO WITNESSES FOR FRIDAY.

10         **JUDGE KARLTON:**  THAT'S FINE.

11         **JUDGE REINHARDT:**  WHAT ABOUT THE INTERVENORS?

12         **JUDGE KARLTON:**  INTERVENORS, ARE YOU PUTTING ON ANY

13 TESTIMONY AS TO THE FIRST PART -- WHAT AM I ASKING?

14         **JUDGE REINHARDT:**  FIRST PHASE.

15         **JUDGE KARLTON:**  THANK YOU.

16         **MS. WANG:**  WE -- ACTUALLY, YOUR HONOR, WE HAD

17 PREVIOUSLY LISTED SENATOR RUNNER AS A WITNESS, BUT IT'S VERY

18 LIKELY THAT IN VIEW OF THE COURT'S RULING ON THE FACT NO

19 EVIDENCE WILL BE PRESENTED ON CONSTITUTIONAL VIOLATIONS THAT ARE

20 CURRENT OR ONGOING THAT WE WILL WITHDRAW SENATOR RUNNER.

21         BUT WE ARE CONFIRMING TODAY, AND WE WILL GET BACK TO

22 THE COURT TOMORROW.

23         **JUDGE KARLTON:**  WHAT ABOUT INTERVENORS?

24         **MR. MITCHELL:**  INTERVENORS HAVE NOT NOTICED ANY

25 WITNESSES FOR THIS PHASE.

1              JUDGE KARLTON:  THANK YOU.

2              AND YOU'RE THE SAME.

3         **MS. WANG:**  THAT'S CORRECT.  NOR HAVE THE COUNTIES AND

4    LAW ENFORCEMENT INTERVENORS.

5              **JUDGE KARLTON:**  SO WE MAY BE DONE BY NEXT WEEK.

6              **JUDGE HENDERSON:**  WE'RE DARK.

7              **JUDGE KARLTON:**  IS THE ALL OF NEXT WEEK THAT WE'RE

8    DARK?

9              **JUDGE REINHARDT:**  YES.

10             **JUDGE KARLTON:**  OH, OKAY.

11             **MS. TILLMAN:**  YOUR HONOR, THIS IS LISA TILLMAN.

12             JUST IN REGARDS TO ADDITIONAL WITNESSES FOR PHASE I,

13   WE HAVE TODD JERUE, CINDY RADAVSKY, WHO ARE AVAILABLE THIS

14   FRIDAY, AND THEN ROBIN DEZEMBER, WHO ARE NOT AVAILABLE THIS

15   FRIDAY.

16             **JUDGE HENDERSON:**  OKAY.  BUT CAN WE HAVE THE NAMES OF

17   THE WITNESSES WE'RE NOW TALKING ABOUT?

18             WE WILL HAVE FOUR FROM CCPOA.  WHO ARE THEY?

19             **MS. LEONARD:**  YES, YOUR HONOR.  THEY ARE GARY

20   BENSON, KEVIN RAYMOND, ERIC ADELMAN, AND BRENDA GIBBONS (ALL

21   PHONETIC).

22             **JUDGE HENDERSON:**  OKAY?  PLUS DR. SHANSKY.

23             **MS. LEONARD:**  YES, YOUR HONOR.

24             **JUDGE HENDERSON:**  OKAY.  SO THAT WILL BE TOMORROW,

25   AND WE WILL GO HOWEVER LONG THAT TAKES US.  AND THEN, ON FRIDAY

```
 1  WE HAVE TWO ADDITIONAL CCPOA WITNESSES.

 2            AND WHO ARE THOSE, COUNSEL?

 3        MS. LEONARD:  THOSE ARE DEBORAH ROLET, AND RUBIN

 4  LAYHA (ALL PHONETIC).

 5        JUDGE HENDERSON:  OKAY.  AND THEN, WE HAVE TWO FROM

 6  DEFENDANTS. WHO ARE THOSE, COUNSEL?

 7        MS. TILLMAN:  THAT WOULD BE -- I'M SORRY.

 8        YOUR HONORS, WE HAVE MS. RADAVSKY AND MR. JERUE FOR

 9  THIS FRIDAY.  AND WE WILL SUBSEQUENTLY SCHEDULE FOR THE

10  FOLLOWING, I GUESS, TWO WEEKS AFTER THAT, MR. DEZEMBER AND

11  EXPERT DR. PACKER.

12        JUDGE HENDERSON:  OKAY.

13        JUDGE REINHARDT:  IS THAT IT?

14        MS. TILLMAN:  I'M SORRY.  I MISSED ONE.  FOR BOTH

15  PLATA AND COLEMAN, MR. KERNAN, PROBABLY THE FIRST WEEK OF

16  DECEMBER.

17        JUDGE HENDERSON:  DEZEMBER IN DECEMBER?

18        MS. TILLMAN:  IT CAN GET CONFUSING.

19        JUDGE REINHARDT:  WILL THOSE THREE BE -- ONLY TAKE

20  ONE DAY AMONG ALL OF THEM OR MORE THAN THAT?

21        MR. MELLO:  WE STILL HAVE THE ISSUE WITH RESPECT TO

22  THE EXPERTS, AND THEIR REBUTTAL EXPERT THAT HAVE AVAILABILITY

23  PROBLEMS FOR THAT WHOLE WEEK, I BELIEVE AND WE'RE TALKING ABOUT

24  VIDEO, BUT THAT'S STILL AN ISSUE.

25        JUDGE KARLTON:  I'M CONFUSED.  THE GUY WHO IS GOING
```

1  TO TESTIFY BY VIDEO MOST LIKELY, WHEN ARE WE SETTING HIM UP FOR?

2          **MR. SPECTER:**  WE DON'T KNOW YET.  WE'RE TRYING TO

3  FIND OUT HOW HIS SURGERY WENT, AND THEN WE WILL COME BACK TO YOU

4  AND YOU CAN BREAK TIES, IF YOU WANT TO.

5          **MR. MELLO:**  YOU GUYS WILL BREAK TIES.

6          **JUDGE HENDERSON:**  WILL WE KNOW THAT FRIDAY OR --

7          **MR. SPECTER:**  MS. JOHNSON SAYS SHE'S GOING TO CALL

8  HIS STAFF TOMORROW TO SEE HOW THE SURGERY WENT.  IF THERE

9  WEREN'T COMPLICATIONS, WE WILL HAVE A BETTER IDEA.  IF THERE

10  WERE COMPLICATIONS WE WILL KNOW THAT, TOO.  WE WILL BE ABLE TO

11  TELL YOU BY -- IT'S LIKELY, IN MY OPINION -- SORRY.  IT'S

12  LIKELY, IN MY OPINION, WE WILL FINISH VERY EARLY THE FIRST WEEK

13  OF DECEMBER.  AND THEN, WE WILL HAVE TO DO THOSE REMAINING

14  WITNESSES.

15          MY SUGGESTION IS WE PROBABLY COULD LET YOU GO, AND WE

16  PICK A DAY WHERE WE COME BACK FOR ONE OR TWO WITNESSES BY VIDEO

17  CONFERENCE OR SOMETHING LIKE THAT.  BUT WE WILL KNOW MORE LATER.

18          **JUDGE HENDERSON:**  OKAY. THANK YOU,  COUNSEL.

19          COURT'S ADJOURNED. WE WILL RESUME 9:15 TOMORROW

20  MORNING.

21                  (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL

22                  THURSDAY, NOVEMBER 20, 2008 AT 9:15 O'CLOCK

23                  A.M.)

24

25

1                          **I N D E X**

2

**PLAINTIFF'S WITNESSES**                    **PAGE**   **VOL.**

3
**JEFFREY A. BEARD, PH.D.**

4
DIRECT EXAMINATION BY MR. SPECTER            200      2
5    CROSS-EXAMINATION BY MR. MELLO              233      2
CROSS-EXAMINATION BY MR. MITCHELL            248      2
6    REDIRECT EXAMINATION BY MR. SPECTER         259      2

7

**JOSEPH D. LEHMAN**

8
DIRECT EXAMINATION BY MR. SPECTER            260      2
9    CROSS-EXAMINATION BY MS. JOHNSON            274      2
CROSS-EXAMINATION BY MR. KAUFHOLD            288      2
10   REDIRECT EXAMINATION BY MR. SPECTER         289      2

11

**DR. CRAIG WILLIAM HANEY**

12
DIRECT EXAMINATION BY MS. KAHN               293      2
13   CROSS-EXAMINATION BY MS. TILLMAN            319      2
CROSS-EXAMINATION BY MS. WANG                348      2
14   REDIRECT EXAMINATION BY MS. KAHN            351      2
RECROSS-EXAMINATION BY MS. TILLMAN           356      2
15   FURTHER REDIRECT EXAMINATION BY MS. KAHN    360      2

16

**JEANNE WOODFORD**

17
DIRECT EXAMINATION BY MR. SPECTER            362      2
18   CROSS-EXAMINATION BY MR. MELLO              386      2
REDIRECT EXAMINATION BY MR. SPECTER          407      2
19

20

21

22

23

24

25

1

2

3                   **CERTIFICATE OF REPORTER**

4

5        WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL

6   REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

7   CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

8   CIV S-90-0520 LKK JPM P, RALPH COLEMAN, ET AL V. ARNOLD

9   SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD

10  SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND

11  REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

12  INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

13  TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

14  FILING.

15        THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

16  TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

17  COURT FILE.

18

19                 /S/ JOAN MARIE COLUMBINI

20             JOAN MARIE COLUMBINI, CSR 5435, RPR

21

22               S/ KATHERINE WYATT

23             KATHERINE WYATT, CSR 9866, RMR

24             WEDNESDAY, NOVEMBER 19, 2008

25