VOL 3

PAGES 417 – 646

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

```
RALPH COLEMAN, ET AL.,            )
                                  )
            PLAINTIFFS,           )
                                  )
   VS.                            ) NO. CIV S-90-0520 LKK JFM P
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  ) THREE-JUDGE COURT
            DEFENDANTS.           )
                                  )
_____   )

MARCIANO PLATA, ET AL.,           )
                                  )
            PLAINTIFFS,           )
                                  )
VS.                               ) NO. C 01-1351 TEH
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  )
            DEFENDANTS.           )
_____   )
```

**TRANSCRIPT OF PROCEEDINGS**

SAN FRANCISCO, CALIFORNIA
THURSDAY, NOVEMBER 20, 2008

(APPEARANCES ON FOLLOWING PAGES)


*REPORTED BY:*   JOAN MARIE COLUMBINI, CSR 5435, RPR
                 KATHERINE WYATT, CSR 9866, RMR
                 OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

| | |
|---|---|
| **FOR PLAINTIFFS** | PRISON LAW OFFICE |
| | 1917 FIFTH STREET |
| | BERKELEY, CALIFORNIA  94710 |
| | **DONALD SPECTER, ESQUIRE** |
| | **ALISON HARDY, ESQUIRE** |
| | **REBEKAH EVENSON, ESQUIRE** |
| | |
| | ROSEN, BIEN & GALVAN, LLP |
| | 315 MONTGOMERY STREET, TENTH FLOOR |
| | SAN FRANCISCO, CALIFORNIA 94104 |
| BY: | **MICHAEL W. BIEN, ESQUIRE** |
| | |
| **FOR CCPOA** | CARROLL, BURDICK & MCDONOUGH |
| | 44 MONTGOMERY STREET, SUITE 400 |
| | SAN FRANCISCO, CALIFORNIA  94104 |
| BY: | **JAMES HENDERSON, ESQUIRE** |
| | **NATALIE LEONARD, ESQUIRE** |
| | |
| **FOR DEFENDANTS** | STATE OF CALIFORNIA |
| | DEPARTMENT OF JUSTICE |
| | OFFICE OF THE ATTORNEY GENERAL |
| | 1300 I STREET, SUITE 125 |
| | P.O. BOX 944255 |
| | SACRAMENTO, CALIFORNIA  94244 |
| BY: | **LISA A. TILLMAN, ESQUIRE** |
| | |
| | STATE OF CALIFORNIA |
| | DEPARTMENT OF JUSTICE |
| | OFFICE OF THE ATTORNEY GENERAL |
| | 455 GOLDEN GATE AVENUE, SUITE 11000 |
| | SAN FRANCISCO, CALIFORNIA  94102 |
| BY: | **KYLE A. LEWIS, ESQUIRE** |
| | |
| **FOR DEFENDANTS** | HANSON BRIDGETT |
| | 425 MARKET STREET, 26TH FLOOR |
| | SAN FRANCISCO, CALIFORNIA  94105 |
| BY: | **PAUL MELLO, ESQUIRE** |
| | **S. ANNE JOHNSON, ESQUIRE** |
| | |
| **FOR DISTRICT ATTORNEY INTERVENORS** | THE DISTRICT ATTORNEY'S OFFICE |
| | COUNTY OF RIVERSIDE |
| | 82-675 HIGHWAY 111, FOURTH FLOOR |
| | INDIO, CALIFORNIA  92201 |
| BY: | **WILLIAM E. MITCHELL, ESQUIRE** |

**FURTHER APPEARANCES:**


**FOR LEGISLATOR**   AKIN, GUM, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**    580 CALIFORNIA STREET, 15TH FLOOR
         SAN FRANCISCO, CALIFORNIA  94104
       BY: **STEVE SHEA KAUFHOLD, ESQUIRE**
          **TERESA WANG, ESQUIRE**

1                     **P R O C E E D I N G S**

2

3  **NOVEMBER 20, 2008**                      **9:15 O'CLOCK A.M.**

4            **THE CLERK:**  PLEASE BE SEATED.

5            **JUDGE HENDERSON:**  OKAY.  GOOD MORNING, COUNSEL.

6       YOU MAY CALL YOUR FIRST WITNESS WHEN YOU'RE READY.

7            **MS. HARDY:**  GOOD MORNING, YOUR HONORS.  ALISON HARDY

8  FOR THE PLAINTIFFS.  AND PLAINTIFFS CALL DR. RONALD M. SHANSKY.

9            **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

10                 (THEREUPON, THE WITNESS WAS SWORN.)

11            **THE CLERK:**  PLEASE STATE AND SPELL YOUR FULL NAME FOR

12  THE RECORD.

13            **THE WITNESS:**  MY NAME IS RONALD MARK SHANSKY,

14  S-H-A-N, AS IN NANCY, S-K-Y.

15            THEREUPON --

16                 **DR. RONALD MARK SHANSKY**

17  WAS CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFFS, AND AFTER

18  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

19  FOLLOWS:

20                      **DIRECT EXAMINATION**

21  **BY MS. HARDY:**

22  **Q.**  GOOD MORNING, DR. SHANSKY.

23  **A.**  GOOD MORNING.

24  **Q.**  YOU'RE A BOARD CERTIFIED PHYSICIAN IN INTERNAL MEDICINE AND

25  IN QUALITY ASSURANCE; ISN'T THAT RIGHT?

1  **A.**  THAT'S CORRECT.

2  **Q.**  AND YOU'VE BEEN A PHYSICIAN FOR OVER 30 YEARS?

3  **A.**  YES.

4  **Q.**  AND THE FOCUS OF YOUR PRACTICE OVER THE COURSE OF THREE

5  DECADES HAS BEEN ON CORRECTIONAL MEDICINE; ISN'T THAT RIGHT?

6  **A.**  THAT'S CORRECT.

7  **Q.**  AND YOU STARTED YOUR CAREER AS A PHYSICIAN RIGHT OUT OF

8  RESIDENCY AT THE FEDERAL JAIL IN CHICAGO?

9  **A.**  YES.  THAT WAS MY FIRST CORRECTIONAL HEALTHCARE WORK.

10  **Q.**  AND THEN -- AND HOW LONG DID YOU DO THAT JOB?

11  **A.**  SEVEN YEARS.

12  **Q.**  AND THEN, IN 1982, YOU BECAME THE MEDICAL DIRECTOR OF THE

13  ILLINOIS STATE PRISON SYSTEM; IS THAT RIGHT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  AND YOU DID THAT JOB FOR HOW LONG?

16  **A.**  FOR 11 YEARS.

17  **Q.**  AND THEN, SO YOU LEFT IN '93, BUT YOU RETURNED IN '98. WHY

18  WAS THAT?

19  **A.**  THERE WAS A NEW DIRECTOR OF CORRECTIONS, AND HE CALLED ME

20  AND ASKED ME IF I WOULD SERVE.  AND I SAID I WAS FINISHING OUT

21  MY RECEIVERSHIP, AND SO I COULD ONLY FILL THAT CAPACITY ON A

22  PART-TIME BASIS.  BUT HE SAID THAT WAS GOOD ENOUGH, AND SO I

23  CAME BACK FOR A YEAR ON A PART-TIME BASIS.

24  **Q.**  AND SINCE YOU LEFT THE DEPARTMENT OF CORRECTIONS IN ILLINOIS

25  YOU'VE BEEN A CORRECTIONAL HEALTHCARE CONSULTANT; IS THAT RIGHT?

1   **A.**  THAT'S CORRECT.

2   **Q.**  AND OVER THE COURSE OF YOUR ENTIRE CAREER, YOU'VE CONSULTED

3   WITH MORE THAN TWO DOZENS CORRECTIONAL AGENCIES ON HEALTHCARE

4   ISSUES; IS THAT RIGHT?

5   **A.**  MORE THAN HOW MANY?

6   **Q.**  TWO DOZEN?

7   **A.**  APPROXIMATELY.

8   **Q.**  OKAY. AND THAT'S BEEN BOTH DOMESTICALLY AND INTERNATIONALLY;

9   IS THAT RIGHT?

10  **A.**  A FEW INTERNATIONALLY.

11  **Q.**  AND IN THE COURSE OF YOUR CAREER YOU HAVE BEEN TO WELL OVER

12  A HUNDRED PRISONS TO SPECIFICALLY -- SPECIFICALLY FOR THE

13  PURPOSE OF REVIEWING HEALTHCARE IN THOSE FACILITIES; IS THAT

14  RIGHT?

15  **A.**  BOTH PRISONS AND JAILS.

16  **Q.**  ADDITIONALLY, COURTS HAVE APPOINTED YOU IN DIFFERENT CASES

17  IN VARIOUS CAPACITIES; IS THAT RIGHT?

18  **A.**  THAT'S CORRECT.

19  **Q.**  AND IN WHAT CAPACITIES HAVE YOU SERVED?

20  **A.**  WELL, I'VE BEEN APPOINTED AS A SPECIAL MASTER, AS A

21  COURT-APPOINTED EXPERT, AS A SPECIAL MONITOR, AS A RECEIVER IN

22  THE CASE OF THE D.C., WASHINGTON D.C JAIL.

23  **Q.**  AND YOU'VE ALSO EDITED A BOOK ON CORRECTIONAL MEDICINE; IS

24  THAT RIGHT?

25  **A.**  I WAS ONE OF THE ASSOCIATE EDITORS OF THE TWO EDITIONS OF

1  CLINICAL PRACTICE OF CORRECTIONAL MEDICINE.

2  **Q.**  AND YOU CONSIDER YOURSELF AN EXPERT ON CORRECTIONAL

3  HEALTHCARE, DON'T YOU?

4  **A.**  YES.

5  **Q.**  YOU'RE AWARE THAT THE PLATA COURT HAS FOUND THE MEDICAL CARE

6  IN THE CDR VIOLATES THE CONSTITUTION; IS THAT RIGHT?

7  **A.**  YES.

8  **Q.**  AND IN YOUR OPINION, WHAT IS THE CAUSE FOR THE

9  CONSTITUTIONALLY INADEQUATE MEDICAL CARE?

10  **A.**  FROM MY TOURS AND MY REVIEW OF THE DOCUMENTS, I WOULD SAY

11  OVERCROWDING IS THE PRIMARY CAUSE OF THE ONGOING INABILITY TO

12  MEET CONSTITUTIONAL LEVELS OF CARE.

13  **Q.**  DOCTOR, HOW CERTAIN ARE YOU OF THAT OPINION?

14  **A.**  I'M CONFIDENT IN IT.

15  **Q.**  OKAY.  YOU TOURED NINE PRISONS, CDCR PRISONS IN THE LAST 13

16  MONTHS; IS THAT RIGHT?

17  **A.**  THAT'S CORRECT.

18  **Q.**  AND DID YOUR OBSERVATIONS ON THESE TOURS PROVIDE A BASIS FOR

19  YOUR OPINION?

20  **A.**  YES.

21  **Q.**  AND WHAT DID YOU OBSERVE ON THESE TOURS?

22  **A.**  WELL, THERE WERE A VARIETY OF PROBLEMS RELATED TO INADEQUATE

23  PHYSICAL ENVIRONMENT, IMPACTING ON PROCESS OF CARE, BEGINNING

24  WITH THE RECEPTION PROCESS AND ABILITY TO PERFORM A

25  COMPREHENSIVE EXAM ON INTAKE.

1          THERE WERE PROBLEMS WITH ACCESS TO CARE IN TERMS OF

2    LACK OF OFFICERS, ESPECIALLY DURING LOCKDOWN PERIODS, AND

3    THEREFORE SCHEDULED VISITS DIDN'T OCCUR ANYWHERE NEAR THE RATE

4    THAT THEY DID USUALLY.

5          THERE WERE PROBLEMS WITH MEDICAL RECORDS, DOCUMENTS

6    NOT BEING FILED; DOCUMENTS BEING VERY DIFFICULT TO LOCATE; THE

7    MEDICAL RECORDS QUITE DISORGANIZED, WHICH INHIBITS DOCTORS TO

8    HAVE A SOUND FOUNDATION OF THE FACTS WITH A GIVEN PATIENT.

9          THERE WERE A VARIETY OF THOSE KINDS OF THINGS WE

10   IDENTIFIED.

11   Q.  AND WHEN YOU TOURED PRISONS, YOU REVIEWED HEALTHCARE -- OR,

12   SORRY, I MEAN HEALTH RECORDS SPECIFICALLY, A SAMPLE OF THEM,

13   DIDN'T YOU?

14   A.  YES.  WE REVIEWED RECORDS AT EACH OF THE FACILITIES.

15   Q.  AND WHAT DID YOU FIND IN THOSE RECORDS, SPECIFICALLY?

16   A.  WELL, I WAS LOOKING AT THE -- I WAS FOCUSING ON THESE

17   REVIEWS ON THE ABILITY OF THE PROGRAM TO PROVIDE NECESSARY

18   FOLLOW-UP AND CONTINUITY FOR INDIVIDUALS WHOSE PROBLEMS WERE

19   SERIOUS ENOUGH TO CAUSE THEM TO BE SENT OFFSITE, EITHER ON A

20   SCHEDULED BASIS FOR A CONSULTATION OR A CT EXAM OR AN MRI, OR ON

21   AN UNSCHEDULED BASIS, THAT IS, ON THE BASIS OF AN EMERGENCY

22   PROBLEM.

23          AND WHAT WE FOUND WAS IN A SIGNIFICANT PORTION OF THE

24   CASES WE REVIEWED, THERE WAS AN ABSENCE OF DOCUMENTS FROM THE

25   OFFSITE PROVIDER.  SO EVEN THOUGH THE PATIENT WENT OFFSITE, THE

1   CONSULTATION REPORT WASN'T THERE. THE CT REPORT WASN'T THERE.

2   THE MRI REPORT WASN'T THERE.

3          AND THERE WERE OTHER INSTANCES WHEN REPORTS HAD BEEN

4   FILED, BUT NO ONE HAD ACTUALLY SEEN THEM, INITIALED THEM AND

5   ACTED ON THEM.

6          THERE WERE ALSO INSTANCES IN WHICH WHEN THE REPORTS

7   WERE THERE, THERE WAS NO FOLLOW-UP WHEN THE PATIENT RETURNED

8   TO -- SORRY.

9          **JUDGE KARLTON:**  NOT YOUR FAULT.  NOBODY KNOWS WHY

10  THAT HAPPENS.

11         **THE WITNESS:**  OKAY.  THERE WERE MANY INSTANCES IN

12  WHICH THE FOLLOW-UP ASPECT OF CARE WAS NOT PROVIDED.  AND THAT

13  WAS IN A SIGNIFICANT PORTION OF THE RECORDS AT VIRTUALLY ALL THE

14  FACILITIES WE WENT TO.

15         IN FACT, THE POLICIES OF THE CDCR REQUIRE, ARE

16  DESIGNED TO FACILITATE CONTINUITY, AND YET THE PROGRAMS WERE NOT

17  YET ABLE TO NOT ONLY COMPLY WITH THE POLICIES, BUT ENSURE THE

18  CONTINUITY OF CARE THAT IS REQUIRED FOR ADEQUATE SERVICES.

19  **BY MS. HARDY:**

20  **Q.**  AND GIVEN THAT LACK OF CONTINUITY, IS THERE A RISK OF HARM

21  TO THE PATIENT?

22  **A.**  ABSOLUTELY. THERE'S UNQUESTIONABLY A RISK.

23  **Q.**  ON YOUR PRISON TOURS YOU SPOKE WITH PRISON CLINICIANS AND

24  WITH PRISON ADMINISTRATORS, CORRECT?

25  **A.**  YES.

1  Q.  AND DID THEY TELL YOU HOW OVERCROWDING WAS IMPACTING THEIR

2  OPERATIONS?

3  A.  YES, THEY DESCRIBED THEIR INABILITY TO ENSURE THAT PATIENTS

4  WERE SEEN TIMELY, BOTH FOR SERVICES PROVIDED ON-SITE AND FOR

5  SCHEDULING AND OBTAINING SERVICES OFFSITE.

6  Q.  AND DID THEY DESCRIBE HOW THE IMPACT OF THE AVAILABLE

7  CLINICAL SPACE AFFECTED THEIR ABILITY TO DELIVER CARE?

8  A.  YES, THERE WERE AT LEAST A FEW, IF NOT MORE, THAT INDICATED

9  THAT ONE OF THE MAJOR INHIBITING FACTORS AS THEY HAVE ADDED

10 ADDITIONAL STAFF WAS THEIR INABILITY TO MAXIMALLY UTILIZE THE

11 STAFF BECAUSE OF THE INADEQUATE SPACE ARRANGEMENTS.

12 Q.  WERE THE FINDINGS THAT YOU MADE ON THESE PRISON TOURS

13 CONSISTENT WITH OTHER DOCUMENTS YOU REVIEWED IN THIS CASE?

14 A.  YES, PARTICULARLY DOCUMENTS THAT WERE PRODUCED BY THE

15 RECEIVER'S OFFICE.  IT'S REALLY CONSISTENT WITH THE GOVERNOR'S

16 STATEMENT AND CONSISTENT WITH THE RECENT DEATH REVIEW DOCUMENT.

17 Q.  SO YOU REVIEWED THE RECEIVER'S 2007 PRISONER DEATH REPORT;

18 IS THAT RIGHT?

19 A.  YES.

20 Q.  AND IN THAT REPORT, THAT DEATH REVIEW COMMITTEE DIVIDES THE

21 DEATHS IN PREVENTABLE, POSSIBLY PREVENTABLE AND NONPREVENTABLE

22 DEATHS, CORRECT?

23 A.  CORRECT.

24 Q.  AND YOU'RE FAMILIAR WITH THOSE TERMS, RIGHT?

25 A.  YES.

1  Q.  IN YOUR EXPERIENCE AS A PHYSICIAN HAVE YOU DONE DEATH

2  REVIEWS?

3  A.  YES.

4  Q.  AND IS IT YOUR EXPERIENCE THAT PHYSICIANS ARE RELUCTANT OR

5  LIBERAL IN ATTRIBUTING PREVENTABILITY TO A PATIENT DEATH?

6  A.  IN MY EXPERIENCE -- AND I HAVE DONE DEATH REVIEWS.  NOT ONLY

7  DID I DO ALL OF THEM IN THE ILLINOIS SYSTEM FROM 1982 TO 1993,

8  BUT ALSO IN MY TRAVELS AROUND THE COUNTRY I HAVE PARTICIPATED IN

9  DEATH REVIEWS WITH COLLEAGUES FROM DIFFERENT SYSTEMS.

10          AND I DO THINK THE ATTRIBUTION OF "PREVENTABLE" IS

11  SOMETHING THAT DOCTORS ARE RELUCTANT TO DO FREQUENTLY, BECAUSE I

12  BELIEVE IT, IN THEIR MIND, MAY CONNOTE A CLINICIAN

13  RESPONSIBILITY FOR THE DEATH. AND SO THERE IS UNQUESTIONABLY A

14  RELUCTANCE TO DO THAT.

15          AND, THEREFORE, I THINK THAT'S WHAT MADE PEOPLE MORE

16  COMFORTABLE WITH THE CATEGORY OF "POSSIBLY PREVENTABLE."

17  Q.  DOES YOUR REVIEW OF THE REPORT AFFECT OR IMPACT YOUR OPINION

18  THAT CROWDING IS THE PRIMARY CAUSE OF THE CONSTITUTIONAL

19  VIOLATIONS IN THE CDCR?

20  A.  MY REVIEW OF THE REPORT BUTTRESSES MY VIEW OF THAT. IT IS

21  PARTICULARLY BUTTRESSED BY WHEN YOU LOOK AT THE TYPES OF LAPSES

22  IN CARE WHICH WERE EXTREME DEPARTURES FROM THE STANDARD OF CARE,

23  THERE ARE SEVERAL THAT CLEARLY ARE A CONSEQUENCE OF

24  OVERCROWDING.

25          THINGS LIKE DELAY IN ACCESS, FAILURE TO ADEQUATELY

1    PURSUE ABNORMAL TEST RESULTS, FAILURE OF PROVIDER-TO-PROVIDER

2    COMMUNICATION, MEDICATION DELIVERY PROBLEMS, MEDICATION

3    PRESCRIBING ERRORS.  THERE'S A SERIES OF ITEMS WHICH CLEARLY CAN

4    RESULT FROM OVERCROWDING.

5    **Q.**  FOR THE 395 CASES THAT ARE REVIEWED IN THAT DEATH REVIEW

6    REPORT, THERE WERE 292 EXTREME DEPARTURES FROM THE COMMUNITY

7    STANDARD OF CARE IDENTIFIED; IS THAT CORRECT?

8    **A.**  THAT'S CORRECT.

9    **Q.**  WERE YOU SURPRISED TO SEE THIS NUMBER OF LAPSES IN A SAMPLE

10   OF THIS SIZE?

11   **A.**  WELL, THE FACT THAT THE LAPSES OCCURRED IN ALMOST 60 PERCENT

12   OF THE CASES, YES, BECAUSE WHEN I REVIEWED -- AND MY POLICY THAT

13   I PROMULGATED I HAD TO REVIEW EVERY DEATH IN THE ILLINOIS

14   SYSTEM.  AND WHERE THERE WAS AN EXTREME LAPSE I WOULD MAKE IT

15   CLEAR TO THE DIRECTOR OF CORRECTIONS.

16          WE WOULD SEE FIVE, MAYBE TEN PERCENT OF THE DEATHS IN

17   WHICH THERE WAS AN EXTREME DEPARTURE FROM THE STANDARD OF CARE.

18          **JUDGE KARLTON:**  WHAT WAS THE PERCENTAGE FOR

19   CALIFORNIA THAT YOU WERE LOOKING AT?

20          **THE WITNESS:**  ABOUT A LITTLE LESS THAN 60 PERCENT OF

21   THE TOTAL CASES, INCLUDING PREVENTABLE AND NONPREVENTABLE.

22   **BY MS. HARDY:**

23   **Q.**   DID YOU LOOK AT THE RATE OF DEATHS THAT WERE PREVENTABLE

24   OR POSSIBLY PREVENTABLE FROM THE 110 DEATHS THAT WERE COSIDERED

25   NATURAL AND UNEXPECTED?

1  **A.**  YES.

2  **Q.**  AND WHAT DID YOU CONCLUDE FROM THAT?

3  **A.**  IF YOU DO THE MATH, OUT OF 110 THERE WERE 44 THAT WERE

4  POSSIBLY PREVENTABLE OR PREVENTABLE.  SO YOU'RE LOOKING AT A

5  40 PERCENT RATE OF THE NATURAL, UNEXPECTED DEATHS THAT WERE

6  EITHER POSSIBLY PREVENTABLE OR PREVENTABLE. AND THAT'S EXTREMELY

7  HIGH.

8              **JUDGE REINHARDT:**  OVER WHAT PERIOD OF TIME?

9              **THE WITNESS:**  THIS IS THE CALENDAR YEAR, I BELIEVE,

10  2007.

11  **BY MS. HARDY:**

12  **Q.**  AND THEN, YOU ALSO LOOKED AT THE DEATHS FOR THE 328 DEATHS

13  THAT OCCURRED BECAUSE OF ILLNESS, BOTH EXPECTED AND UNEXPECTED.

14  AND WHAT PROPORTION OF THOSE WERE COSIDERED PREVENTABLE OR

15  POSSIBLY PREVENTABLE?

16  **A.**  ABOUT 20 PERCENT, AS I RECALL.

17  **Q.**  AND COMPARED TO OTHER SETTINGS THAT YOU'VE WORKED IN, DO YOU

18  BELIEVE THAT THOSE RATES ARE HIGH?

19  **A.**  YES.

20  **Q.**  AND COMPARED BOTH TO THE ILLINOIS SETTING ARE THERE OTHER

21  SETTINGS THAT --

22  **A.**  WELL, STATES, FOR OBVIOUS REASONS, DON'T NECESSARILY PUBLISH

23  THIS TYPE OF DATA. BUT, IN MY EXPERIENCE OF REVIEWING RECORDS

24  WITH SYSTEMS OVER THE COURSE OF THE LAST FEW DECADES, THAT RATE

25  SEEMS TO BE QUITE HIGH.

1    **JUDGE KARLTON:** MAY I INQUIRE? YOU INDICATED THAT

2  STATES ORDINARILY DON'T PUBLISH THIS KIND OF DATA. IS THERE ANY

3  STATE AT ALL THAT YOU ARE AWARE OF THAT ATTEMPTS TO DISTINGUISH

4  BETWEEN PREVENTABLE AND UNPREVENTABLE.

5    **THE WITNESS:** I BELIEVE MANY SYSTEMS DO THAT, BUT

6  THEY DO NOT PUBLISH IT. CONCERNS ABOUT LITIGATION.

7    **JUDGE KARLTON:** I SEE.

8  **BY MS. HARDY:**

9  **Q.** BASED ON THE NUMBER OF LAPSES THAT YOU SAW IN THIS COHORT OF

10 395 DEATHS IN WHICH THERE WERE 292 EXTREME DEPARTURES FROM THE

11 COMMUNITY STANDARD OF CARE, DO YOU BELIEVE THAT THE EXTREME

12 DEPARTURES ARE LIMITED AND OCCURRING ONLY IN THE CASES OF

13 PATIENTS WHO DIE?

14 **A.** OH, NO, ABSOLUTELY NOT. WHEN YOU LOOK AT THESE -- AT THIS

15 REPORT YOU CAN SEE THAT EXTREME LAPSES CAN OCCUR EVEN IN A DEATH

16 CASE, BUT IT DOESN'T NECESSARILY CONTRIBUTE TO THE DEATH.

17    ON THE OTHER HAND, EXTREME LAPSES CAN CONTRIBUTE TO

18 DELAYS IN DIAGNOSIS AND TREATMENT, CAN CONTRIBUTE TO AVOIDABLE

19 EMERGENCY ROOM TRIPS, CAN CONTRIBUTE TO AVOIDABLE

20 HOSPITALIZATIONS.

21    SO, I DON'T THINK THERE'S ANY QUESTION FROM REVIEWING

22 THIS DATA YOU WOULD HAVE TO BELIEVE THAT THESE LAPSES ARE PRETTY

23 WIDESPREAD AT THIS POINT.

24 **Q.** AND YOU BELIEVE THAT THE LAPSES THAT WERE IDENTIFIED APPEAR

25 TO BE SYSTEMIC OR INDIVIDUAL CARE LAPSES?

1  **A.**  WELL, LAPSES CAN BE A MIXTURE OF BOTH. BUT CLEARLY SEVERAL

2  OF THESE POINT TO SYSTEMIC ISSUES RELATED TO CROWDING

3  UNQUESTIONABLY.

4  **Q.**  YOU'RE AWARE THAT THE RECEIVER HAS HIRED QUITE A FEW NURSES

5  AND ALSO HIRED PHYSICIANS; IS THAT RIGHT?

6  **A.**  YES.

7  **Q.**  DOES THIS CHANGE YOUR OPINION THAT CROWDING IS CAUSING THE

8  CONSTITUTIONAL MEDICAL PROBLEMS?

9  **A.**  NO.  AGAIN, IT BUTTRESSES IT. AT THE BEGINNING OF -- WELL,

10  SOMEWHERE IN THE MIDST OF THE PLATA CASE, I HAD A DISCUSSION

11  WITH JUDGE HENDERSON ABOUT HIS CONCERNS ABOUT THE QUALITY OF

12  PHYSICIANS AND HIS DESIRE AND INTENT TO DO SOMETHING ABOUT THAT

13  ISSUE SINCE THAT WAS AN ISSUE THAT ONE MIGHT CHARACTERIZE IN A

14  CERTAIN SENSE AS "LOW-HANGING FRUIT."

15          YOU COULD INTERVENE ON THAT WITH THE TOOLS OF THE

16  COURT.  AND AS A RESULT, IMPACT THINGS LIKE DEATH RATES AND

17  SEVERE NEGATIVE OUTCOMES.  ULTIMATELY, THEN, THINGS CHANGED.  IT

18  BECAME A FULL RECEIVERSHIP.

19          BUT THERE'S NO QUESTION THAT, A:  THE QUALITY OF

20  CLINICAL PROVIDERS WAS CLEARLY KNOWN TO JUDGE HENDERSON WHENEVER

21  THAT WAS, TWO OR THREE YEARS AGO, AND A MAJOR CONCERN.

22          AND IT'S CLEAR, AGAIN, FROM THE RECEIVER'S DOCUMENTS

23  THAT THEY BELIEVE THE MAJOR CONTRIBUTING FACTOR TO THE DECREASE

24  IN DEATH RATE IS RELATED TO THE INCREASE IN QUALITY AND QUANTITY

25  OF CLINICAL STAFF.

1  Q.  WHY NOT THEN LET THE RECEIVER JUST GO AHEAD AND FIX THE

2  PROBLEM?

3  A.  WELL, IN MY VIEW -- AND I DRAW -- I GUESS THERE'S NO WAY OF

4  AVOIDING IT -- FROM MY EXPERIENCE WHEN I WAS APPOINTED THE

5  RECEIVER AT THE D.C. JAIL.

6          I WAS THE FIRST RECEIVER OF A CORRECTIONAL HEALTHCARE

7  PROGRAM, AND I HAD OBVIOUSLY A STEEP LEARNING CURVE.

8          I DIDN'T APPRECIATE THAT AT THE D.C. JAIL AT THE TIME

9  I WAS APPOINTED RECEIVER THE JAIL WAS ALREADY UNDER A POPULATION

10  CAP, AND THE POPULATION HAD BEEN SUBSTANTIALLY REDUCED -- I

11  THINK IT WAS TWO OR THREE YEARS -- BEFORE MY APPOINTMENT.

12          AND WHEN I CAME ON AS THE RECEIVER, I, THEREFORE, HAD

13  THE ADVANTAGE OF BEING ABLE TO PUT TOGETHER A BRAND NEW SYSTEM,

14  IN A SENSE, INTO AN ENVIRONMENT THAT WAS NOT SUFFERING THE

15  STRESSES OF OVERCROWDING.

16          AND I DIDN'T APPRECIATE IT THEN BECAUSE THE ONLY

17  THING I KNEW WAS THAT SITUATION WHICH I HAD BEEN APPOINTED TO.

18          BUT IT'S CLEAR TO ME NOW THAT THAT GAVE ME A

19  TREMENDOUS ADVANTAGE OVER WHAT THE RECEIVER IS TRYING TO DO HERE

20  IN CALIFORNIA.

21  Q.  AND THAT ADVANTAGE WAS?

22  A.  WELL, THAT ADVANTAGE IS WHEN YOU'RE TRYING TO CREATE A NEW

23  SYSTEM IN THE MIDST OF OVERCROWDING, WHICH STRESSES EVERY

24  ASPECT, ENVIRONMENTAL RESOURCES, INFRASTRUCTURE SYSTEMS, MEDICAL

25  RECORDS, TRACKING, SCHEDULING, QUALITY AND QUANTITY OF STAFF,

1  THE ENVIRONMENT IN WHICH THOSE STAFF ARE GOING TO BE ATTEMPTED

2  TO BE RETAINED ONCE THEY ARE HIRED, THAT DRAMATICALLY REDUCES

3  YOUR ABILITY TO BRING A SYSTEM INTO COMPLIANCE.

4          AND WHAT IT DOES IS IT -- IF THE SYSTEM CAN BE

5  BROUGHT INTO COMPLIANCE UNDER THE CONDITIONS OF OVERCROWDING, AT

6  A MINIMUM THAT IS GOING TO DELAY THE TIME FRAME THAT THAT'S

7  ACHIEVABLE FOR A LENGTHY PERIOD OF TIME, WHICH JUST EXTENDS THE

8  PERIOD OF AVOIDABLE SUFFERING, HOSPITALIZATIONS AND DEATH.

9  **Q.**  THANK YOU, DR. SHANSKY.

10          **JUDGE HENDERSON:**  THANK YOU.

11          CCPOA WISH TO QUESTION THIS WITNESS?

12          **MR. LEONARD:**  NO FURTHER QUESTIONS.

13          **JUDGE HENDERSON:**  OKAY.

14          CROSS-EXAMINATION.

15                    **CROSS-EXAMINATION**

16  **BY MR. MELLO:**

17  **Q.**  GOOD MORNING, DR. SHANSKY.

18  **A.**  GOOD MORNING, MR. MELLO.

19  **Q.**  IN YOUR OPINION IS THE CALIFORNIA PRISON SYSTEM

20  OVERPOPULATED TODAY?

21  **A.**  YES.

22  **Q.**  AND POPULATION AND PERCENTAGE OF OVER DESIGN CAPACITY VARY

23  BETWEEN PRISONS IN THE SYSTEM, CORRECT?

24  **A.**  THAT'S CORRECT.

25  **Q.**  AND, IN FACT, SOME SEGMENTS OR UNITS IN PRISONS ARE LESS

1  OVERPOPULATED THAN OTHERS, CORRECT?

2  **A.**  CORRECT.

3  **Q.**  OKAY.  AND SOME PRISONS, LIKE CMF, AS I BELIEVE YOU

4  TESTIFIED, HAVE BEEN MORE PROTECTED THAN OTHERS FROM POPULATION

5  SURGES, CORRECT?

6  **A.**  THAT'S CORRECT.

7  **Q.**  DR. SHANSKY, HAVE YOU HEARD THE TERM "TO A DEGREE OF MEDICAL

8  CERTAINTY" BEFORE?

9  **A.**  YES.

10  **Q.**  AND IS IT SYNONOMOUS WITH THE TERM "TO A DEGREE OF MEDICAL

11  PROBABILITY," OR DO THEY MEAN SOMETHING DIFFERENT?

12  **A.**  WELL, I'M USED TO THE PHRASE "TO A DEGREE OF MEDICAL

13  CERTAINTY" WHEN IT'S USED IN RELATIONSHIP TO A DIAGNOSIS:  BASED

14  ON CLINICAL INFORMATION, TO WHAT DEGREE OF MEDICAL CERTAINTY DO

15  YOU HAVE THAT THIS IS A PARTICULAR DIAGNOSIS BASED ON THE DATA

16  AVAILABLE?

17  **Q.**  ARE YOU FAMILIAR WITH THE USE OF EITHER ONE OF THOSE TERMS

18  IN THE MALPRACTICE SETTING?

19  **A.**  I DON'T DO MALPRACTICE CASES, BUT COLLEAGUES HAVE MENTIONED

20  THAT.

21  **Q.**  OKAY.  AND IS IT YOUR UNDERSTANDING THAT FOR SOMETHING TO BE

22  TO A DEGREE OF MEDICAL PROBABILITY IN A MALPRACTICE --

23            **JUDGE KARLTON:**  YOU LOST --

24            **THE WITNESS:**  I CAN'T HEAR YOU.

25            **MR. MELLO:**  I'M SORRY.  LET ME TRY AGAIN.

1  **BY MR. MELLO:**

2  **Q.**  IS IT YOUR UNDERSTANDING BASED UPON YOUR EXPERIENCE IN YOUR

3  DISCUSSIONS WITH SEVERAL COLLEAGUES THAT "TO A MEDICAL

4  PROBABILITY" MEANS THAT AN ADVERSE MEDICAL CONSEQUENCE IS MORE

5  LIKELY TO HAVE HAPPENED OR NOT?  IS THAT YOUR UNDERSTANDING?

6  **A.**  I HAVEN'T USED -- I HAVEN'T HEARD OF THE TERM "TO A MEDICAL

7  PROBABILITY," SO I'M JUST NOT INFORMED.

8  **Q.**  HOW ABOUT "TO A MEDICAL CERTAINTY" IN THE MALPRACTICE

9  SETTING?  HAVE YOU HEARD THAT TERM USED THAT A DEATH IS MORE

10 LIKELY THAN NOT TO HAVE OCCURRED, AND, THEREFORE, IT COULD BE

11 SAID TO A MEDICAL CERTAINTY?

12              **JUDGE KARLTON:**  REASONABLE MEDICAL CERTAINTY.

13              **MR. MELLO:**  REASONABLE MEDICAL CERTAINTY.  I'M SORRY,

14 YOUR HONOR.

15              **THE WITNESS:**  AS I SAY, I HAVEN'T PARTICIPATED, BUT

16 MY COLLEAGUES HAVE MENTIONED THAT LANGUAGE TO ME.

17 **BY MR. MELLO:**

18 **Q.**  IT WAS YOUR UNDERSTANDING WHEN YOU WORKED FOR CDCR THAT

19 DEPARTMENT USED AN INMATE RATIO OF ONE PRIMARY CARE PHYSICIAN TO

20 EVERY 550 INMATES FOR GENERAL MEDIUM SECURITY PRISONS, CORRECT?

21 **A.**  THAT'S MY UNDERSTANDING.

22 **Q.**  AND IN 2005 YOU WHILE YOU WERE EMPLOYED BY THE CDCR AS AN

23 EXPERT IN PLATA AND TWO OF THE PLATA COURT'S EXPERTS, DOCTOR WE

24 SIS AND DOCTOR GOLDENSON APPLIED TO BE A TEMPORARY RECEIVER IN

25 THE PLATA CASE, CORRECT?

1  **A.**  CORRECT.

2  **Q.**  AND IN YOUR WRITTEN PROPOSAL TO BECOME THE TEMPORARY

3  RECEIVER YOURSELF, AND DRS. PUISIS AND GOLDENSON, YOU STATED

4  THAT THE CURRENT OVERALL PHYSICIAN-TO-INMATE RATIO IN

5  CALIFORNIA'S PRISONS WAS APPROXIMATELY ONE INMATE TO EVERY 478

6  INMATES, CORRECT?

7  **A.**  YES, I THINK THAT INCLUDED THE TOTAL IN ALL THE  FACILITIES.

8  RIGHT.

9  **Q.**  IN THE SAME PROPOSAL, YOU STATED THAT:

10              "IN A TYPICAL PRISON WITH A NONSPECIAL MISSION

11          A WELL-RUN HEALTHCARE PROGRAM CAN FUNCTION WITH A

12          PHYSICIAN-INMATE RATIO OF 1 TO 800," CORRECT?

13  **A.**  CORRECT.  THAT'S PRIMARY CARE HOURS.

14  **Q.**  RIGHT.

15          DR. SHANSKY, YOU WOULD AGREE THAT A KEY GOAL TO A

16  CONSTITUTIONALLY-ADEQUATE MEDICAL CARE PRISON DELIVERY SYSTEM IS

17  TO REDUCE UNNECESSARY MORBIDITY AND MORTALITY, CORRECT?

18  **A.**  CORRECT.

19  **Q.**  AND IN LAY TERMS THAT MEANS REDUCING UNNECESSARY ILLNESS AND

20  DEATH, CORRECT?

21  **A.**  YES.

22  **Q.**  IN YOUR OPINION, IS THE FACT THAT PRISONERS ARE HOUSED IN

23  NONTRADITIONAL HOUSING --

24          **MR. MELLO:**  STRIKE THAT.

25

1  **BY MR. MELLO:**

2  **Q.**  IN YOUR OPINION, THE FACT THAT PRISONERS ARE HOUSED IN

3  NONTRADITIONAL HOUSING DOES NOT NECESSARILY MEAN THAT THEY ARE

4  NOT -- THAT THEY ARE RECEIVING INADEQUATE MEDICAL CARE, CORRECT?

5  **A.**  CORRECT.

6  **Q.**  ISN'T IT TRUE THAT A PRISON CAN HOUSE PRISONERS IN

7  NONTRADITIONAL HOUSING AND STILL PROVIDE

8  CONSTITUTIONALLY-ADEQUATE MEDICAL CARE TO THOSE PRISONERS?

9  **A.**  IT'S CONCEIVABLE.

10  **Q.**  IT'S CONCEIVABLE?

11  **A.**  YES.

12  **Q.**  AND ISN'T IT ALSO TRUE THAT NOT EVERY LESS-THAN-IDEAL

13  CIRCUMSTANCE IN A PRISON CLINICAL SETTING RENDERS THE DELIVERY

14  OF MEDICAL CARE CONSTITUTIONALLY INADEQUATE?

15  **A.**  COULD YOU REPEAT THAT?

16  **Q.**  SURE.

17          NOT EVERY LESS-THAN-IDEAL CIRCUMSTANCE IN A PRISON

18  CLINICAL SETTING RENDERS THE DELIVERY OF MEDICAL CARE

19  UNCONSTITUTIONAL, DOES IT?

20  **A.**  NOT NECESSARILY.

21  **Q.**  I'M NOW GOING TO TAKE YOU TO -- WELL, I'M NOT.  I'LL JUST

22  REFERENCE IT.  AND IF YOU WANT TO SEE IT, I'LL BRING IT UP.

23          BUT ON PAGE SIX, PARAGRAPH 16 OF YOUR NOVEMBER, 2007

24  REPORT, YOU EXPRESSED CONCERNS ABOUT A SMALL EXAM ROOM OFF THE

25  GYMNASIUM AT VALLEY STATE PRISON FOR WOMEN THAT'S ONLY

1    ACCESSIBLE FROM THE PRISONERS' BATHROOM AND SHOWER AREA.

2              DO YOU REMEMBER?

3    **A.**   YES, IF I COULD HAVE A SECOND I'LL FIND MY --

4    **Q.**   SURE.

5              WE'VE PUT IT ON YOUR SCREEN FOR YOU TO YOUR RIGHT,

6    TOO, DOCTOR.  SO EITHER WAY.

7    **A.**   ALL RIGHT.  GIVE ME A SECOND HERE.

8              OKAY. NOW, WHAT PAGE?

9    **Q.**   PAGE SIX, PARAGRAPH 16.

10   **A.**   PAGE SIX.

11             AND PARAGRAPH 16, YOU SAID?

12   **Q.**   YES.

13   **A.**   OKAY.

14   **Q.**   AND YOU'RE TALKING ABOUT THAT EXAM ROOM.

15   **A.**   YES.

16   **Q.**   THAT IT WAS ONLY ACCESSIBLE FROM THE BATHROOM.  DO YOU

17   REMEMBER THAT?

18   **A.**   YES. YES.

19   **Q.**   IN AND OF ITSELF, THE LOCATION OF THAT EXAM ROOM WAS NOT THE

20   CAUSE OF CONSTITUTIONALLY-INADEQUATE HEALTHCARE IN YOUR OPINION,

21   WAS IT?

22   **A.**   YOU MEAN, THROUGHOUT THE SYSTEM?

23             YOU'RE TALKING ABOUT --

24   **Q.**   I'LL ASK IT AGAIN.  I'LL ASK THE QUESTION AGAIN.

25   **A.**   OKAY.

1  Q.  IN AND OF ITSELF, THE LOCATION OF THE EXAM ROOM WAS NOT A

2  CAUSE OF CONSTITUTIONALLY-ADEQUATE (SIC) MEDICAL CARE IN YOUR

3  OPINION AT THAT FACILITY?

4              **JUDGE KARLTON:**  THAT FACILITY.

5              **THE WITNESS:**  CONSTITUTIONALLY INADEQUATE, YOU'RE

6  SAYING.

7  **BY MR. MELLO:**

8  Q.  RIGHT.

9  A.  NO.  TAKEN IN ISOLATION, THAT, IN ITSELF, WOULDN'T

10  NECESSARILY ALWAYS CORRELATE WITH UNCONSTITUTIONAL CARE.

11  Q.  AND, IN FACT, IT'S YOUR OPINION THAT

12  CONSTITUTIONALLY-ADEQUATE MEDICAL CARE COULD BE PROVIDED IN THAT

13  UNUSUAL SETTING IF PLAINTIFFS WERE SEEN TIMELY AND WITH

14  APPROPRIATE ASSESSMENT AND FOLLOWTHROUGH, CORRECT?

15  A.  CORRECT.

16  Q.  AND IN YOUR OPINION IN EVEN VERY ODD SETTINGS

17  CONSTITUTIONALLY-ADEQUATE MEDICAL CARE CAN BE DELIVERED IF

18  PATIENTS ARE SEEN WITH TIMELY AND APPROPRIATE ASSESSMENT AND

19  FOLLOWTHROUGH, CORRECT?

20  A.  YES.

21  Q.  IT'S FAIR TO SAY BASED UPON YOUR TOURS AT THE VARIOUS

22  PRISONS THAT THE LEVEL OF MEDICAL CARE BEING PROVIDED IN CDCR'S

23  PRISONS VARIES FROM UNIT TO UNIT WITHIN DIFFERENT PRISONS IN

24  CALIFORNIA'S SYSTEM, CORRECT?

25  A.  YES.

1  Q.  IN PREPARING YOUR FIRST REPORT IN NOVEMBER, 2007 -- AND LET

2  ME JUST STOP.  ARE YOU HAVING A HARD TIME HEARING ME?

3  A.  SOMETIMES.  THE ACOUSTICS ARE NOT GREAT.

4          MR. SPECTER:  WE ARE HAVING A HARD TIME.

5          MR. MELLO:  I DON'T CARE ABOUT YOU GUYS.

6          THE WITNESS:  GO AHEAD.

7  BY MR. MELLO:

8  Q.  OKAY.  SORRY, DOCTOR.  IF I COULD JUST WALL OFF -- OKAY.

9          IN PREPARING YOUR NOVEMBER, 2007 REPORT, YOU REVIEWED

10 LETTERS PREPARED BY PLAINTIFFS' COUNSEL FOLLOWING TOURS THAT

11 THEY HAD DONE OF VARIOUS INSTITUTIONS, CORRECT?

12 A.  THAT'S CORRECT.

13 Q.  AND YOU ALSO REVIEWED THOSE POST-TOUR LETTERS IN PREPARING

14 YOUR SEPTEMBER, 2008 REPORT, CORRECT?

15 A.  YES.

16 Q.  IN YOUR -- ON PAGE 15 OF YOUR SEPTEMBER, 2008 REPORT, YOU

17 DISCUSS MULE CREEK STATE PRISON.

18 A.  YES.

19 Q.  OKAY. AND IN PREPARING THAT REPORT, YOU LOOKED AT CDCR'S

20 WEEKLY POPULATION REPORT FOR AUGUST 20, 2008, CORRECT?

21 A.  I HONESTLY DON'T REMEMBER. IT MAY HAVE BEEN.

22 Q.  I THINK IT MIGHT REFRESH YOUR RECOLLECTION IF YOU LOOK AT

23 THAT PAGE.

24          LET ME JUST BACK UP AND TRY TO SPEED IT UP HERE. DID

25 YOU UNDERSTAND THAT MULE CREEK STATE PRISON WAS OVER 215 PERCENT

1  OF DESIGN BED CAPACITY?

2  **A.**  YES.

3  **Q.**  OKAY. SO IN YOUR OPINION, MULE CREEK WAS SEVERELY

4  OVERCROWDED?

5  **A.**  YES.

6  **Q.**  ARE YOU AWARE THAT PLAINTIFFS' COUNSEL, MR. FAMA, PREPARED A

7  POST-TOUR REPORT FOLLOWING HIS TOUR OF MULE CREEK STATE PRISON

8  ON MARCH 4TH AND 5TH OF 2008?

9  **A.**  YES.

10  **Q.**  OKAY.  AND WE SPOKE ABOUT THAT AT YOUR DEPOSITION ON THAT

11  SATURDAY IN CHICAGO, RIGHT?

12  **A.**  YES. YES.

13  **Q.**  AND THAT'S DEFENDANTS' EXHIBIT 1084, PAGE TWO.  AND I'LL

14  PULL IT UP, AND IT WILL BE ON THE SCREEN THERE.

15  **A.**  DO YOU HAVE A --

16  **Q.**  IT WILL BE ON THE SCREEN, AND HE'LL BLOW IT UP FOR YOU.

17  OKAY?

18              AND IN THAT REPORT, IT READS THAT:

19                  "MULE CREEK STATE PRISON'S COMPLIANCE WITH KEY

20              ACCESS TO CARE TIME FRAME REQUIREMENTS, INCLUDING FOR

21              REGISTERED NURSE TRIAGE AND PCP APPOINTMENTS,

22              INCLUDING CHRONIC CARE AS WELL AS FOR SPECIALTY CARE

23              IS GENERALLY VERY GOOD AT PRESENT TIME."

24              DO YOU SEE THAT?

25  **A.**  YES.

1  Q.  AND IT GOES ON TO SAY:

2             "CERTAIN EXCEPTIONS ARE MENTIONED BELOW. THIS IS

3         DUE TO, AMONG OTHER THINGS, DILIGENT EFFORTS BY

4         STAFF, INCLUDING THE SCHEDULERS, A RELATIVELY LARGE

5         NUMBER OF PCP'S ALLOWING AT TIMES FOR THE SCHEDULING

6         OF DOUBLE PCP LINES IN CLINICS AND THE LOW VACANCY

7         RATE AMONG RN'S," CORRECT?

8  A.  YES.

9  Q.  IN YOUR OPINION FROM THIS SUMMARY IT APPEARS THAT ACCESS TO

10 NEEDED MEDICAL CARE CAN BE PROVIDED IN EVEN SEVERELY OVERCROWDED

11 CONDITIONS, CORRECT?

12 A.  ACCORDING TO THAT. WHEN I DO MY REVIEWS, I GENERALLY USE A

13 COMBINATION OF EXACTLY THAT TYPE OF SCHEDULING INFORMATION WITH

14 A SELECTED RECORD SAMPLE, WHICH IS THE VERIFICATION METHODOLOGY.

15 Q.  OKAY.

16 A.  AND I DON'T KNOW IF MR. FAMA USED THE RECORD METHODOLOGY.

17 Q.  OKAY. DO YOU HAVE ANY REASON TO BELIEVE HE DID OR DID NOT?

18 A.  I HAVE NO IDEA.

19 Q.  OKAY.

20            SINCE THE PLATA RECEIVER WAS APPOINTED IN APRIL,

21 2006, IN YOUR OPINION THERE HAVE BEEN NUMEROUS IMPROVEMENTS IN

22 THE DELIVERY OF MEDICAL CARE IN THE PRISONS, CORRECT?

23 A.  THAT'S MY UNDERSTANDING, YES.

24 Q.  AND THERE HAVE BEEN IMPROVEMENTS IN THE DELIVERY OF MEDICAL

25 CARE IN CALIFORNIA PRISONS AT THE TIME YOU SIGNED YOUR NOVEMBER,

1   2007 REPORT, CORRECT?

2   **A.**   YES.

3   **Q.**   THE POST-TOUR LETTERS PREPARED BY PLAINTIFFS' COUNSEL WHICH

4   YOU REVIEWED IN CONNECTION WITH PREPARING YOUR NOVEMBER, 2007

5   REPORT, DOCUMENTED SOME OF THOSE IMPROVEMENTS, CORRECT?

6   **A.**   YES.

7   **Q.**   AND IN THEIR POST-TOUR LETTERS PLAINTIFFS DOCUMENTED

8   RESPONSIVENESS TO APPEALS, TIMELINESS OF APPOINTMENTS?

9   **A.**   WHERE ARE YOU REFERRING TO NOW?

10  **Q.**   I CAN TAKE YOU TO YOUR DEPOSITION, IF YOU WANT.

11          LET ME ASK YOU A QUESTION.

12  **A.**   OKAY.  IT WOULD BE HELPFUL, BECAUSE I'M NOT SURE --

13  **Q.**   OKAY. LET ME ASK THE QUESTION, AND THEN YOU CAN TELL ME IF

14  YOU NEED YOUR RECOLLECTION REFRESHED.

15  **A.**   OKAY.

16  **Q.**   IN THEIR POST-TOUR LETTERS THAT YOU REVIEWED IN PREPARATION

17  OF YOUR REPORTS IN THIS CASE, PLAINTIFFS' COUNSEL DOCUMENTED

18  NUMEROUS IMPROVEMENTS IN RESPONSIVENESS AND APPEALS, TIMELINESS

19  OF APPOINTMENTS AND FILLING OF CLINICAL POSITIONS, CORRECT?

20          DO YOU REMEMBER TESTIFYING TO THAT?

21  **A.**   I MAY HAVE. I WOULD REALLY PREFER SEEING THE DEPOSITION.

22  **Q.**   OKAY. SURE.

23          **MR. MELLO:**  LET'S PULL UP DAY ONE OF HIS DEPOSITION.

24          **THE WITNESS:**  NOW, WHICH DEPOSITION WAS THIS?

25

1    BY MR. MELLO:

2    Q.    LAST DECEMBER.

3    A.    WELL, THE FIRST?

4    Q.    YES.

5    A.    THE FIRST DEPOSITION, OKAY.

6    Q.    PAGE 70, LINE 25 THROUGH 71, LINE NINE, PLEASE.

7              MS. HARDY:    WHICH DEPOSITION?

8              MR. MELLO:    DECEMBER.

9              THE WITNESS:    OKAY.  I SEE LINE NINE.

10    BY MR. MELLO:

11    Q.    OKAY. DO YOU WANT TO LOOK AT THOSE LINES THAT I JUST

12    MENTIONED TO SEE IF IT REFRESHES YOUR RECOLLECTION?

13    A.    LINES NINE THROUGH?

14    Q.    I'M SORRY.  I THINK I SAID LINES --

15              JUDGE REINHARDT:    THREE THROUGH NINE.

16    BY MR. MELLO:

17    Q.    PAGE 70.  70, LINE 25.

18    A.    25, OKAY.

19    Q.    THROUGH PAGE 71, LINE NINE.

20    A.    OKAY.

21              JUDGE KARLTON:    THAT'S NOT WHAT YOU'VE GOT UP.

22              MR. MELLO:    PARDON ME?

23              JUDGE KARLTON:    I SAY CURRENTLY THAT'S NOT WHAT

24    YOU'VE GOT UP.

25              OR IS IT?  MAYBE IT IS.

1            **THE WITNESS:**  25 BEGINS WITH:

2                 "DO YOU RECALL AS YOU SIT HERE TODAY ANY OF THE

3            IMPROVEMENTS THAT WERE IDENTIFIED IN ANY OF THOSE

4            POST-TOUR LETTERS?"

5            **JUDGE KARLTON:**  OH, I SEE.

6  BY MR. MELLO:

7  **Q.**  RIGHT. AND THEN, WHAT DID YOU ANSWER?

8  **A.**  YES, I -- WHAT I STATED WAS:

9                 "THERE WERE -- AND I CAN'T REMEMBER BY FACILITY

10            -- BUT THERE WERE IMPROVEMENTS WITH REGARD TO

11            RESPONSIVENESS IN APPEALS.  THERE WERE IMPROVEMENTS

12            WITH REGARD TO TIMELINESS OF APPOINTMENTS IN SOME

13            INSTANCES.  THERE WERE IMPROVEMENTS IN SOME INSTANCES

14            WITH REGARD TO STAFFING, YOU KNOW, FILLING POSITIONS,

15            THOSE KINDS OF THINGS."

16  **Q.**  AND YOU BELIEVE THAT TO BE ACCURATE?

17  **A.**  YES.

18  **Q.**  OKAY. AND TRUE, TO THE EXTENT THEY ARE DIFFERENT.

19            NOW, THAT' MY -- I'LL WITHDRAW THAT QUESTION.

20  **A.**  OKAY.

21  **Q.**  IN NOVEMBER, 2007 YOU SAID AT THE TIME YOU SIGNED THAT

22  REPORT YOU WERE AWARE THAT THE NUMBER OF BOARD-CERTIFIED,

23  BOARD-ELIGIBLE PHYSICIANS HAD INCREASED, CORRECT?

24  **A.**  YES.

25  **Q.**  IN YOUR OPINION, IMPROVED CREDENTIALS OF PHYSICIANS

1  GENERALLY MEANS IMPROVED COMPETENCE, CORRECT?

2  **A.**  CORRECT.

3  **Q.**  OTHER IMPROVEMENTS THAT YOU HAVE OBSERVED INCLUDE AN

4  IMPROVEMENT IN NURSE STAFFING FILLED POSITIONS, CORRECT?

5  **A.**  CORRECT.

6  **Q.**  YOU ARE AWARE -- BECAUSE YOU WERE ASKED ABOUT IT AT YOUR

7  DEPOSITION, I BELIEVE -- BUT YOU ARE AWARE THAT THE RECEIVER HAS

8  REPORTED THAT THE GOAL OF FILLING 90 PERCENT OF REGISTERED NURSE

9  POSITIONS HAS BEEN ACHIEVED AT 22 INSTITUTIONS, CORRECT?

10 **A.**  I KNOW THEY ARE VERY CLOSE. I FORGET WHAT THE TOTAL WAS, BUT

11 THAT SOUNDS ABOUT RIGHT.

12 **Q.**  AND DOES IT ALSO SOUND ABOUT RIGHT THAT SYSTEM-WIDE HE WAS

13 WITHIN 2 PERCENT OF HIS STATED GOAL OF FILLING 90 PERCENT OF

14 NURSING POSITIONS?

15 **A.**  EXCUSE ME. IS THAT IN ONE OF THE RECENT STAFFING REPORTS

16 THEY PRODUCED?

17 **Q.**  YES.

18        MY QUESTION IS:  DO YOU BELIEVE THAT TO BE TRUE OR

19 NOT?

20 **A.**  IF IT'S IN THE THEIR REPORT, I BELIEVE IT TO BE TRUE.

21        **JUDGE KARLTON:**  THE QUESTION IS WHETHER YOU YOURSELF

22 BELIEVE IT.  AND YOU DON'T KNOW; IS THAT RIGHT?

23        **THE WITNESS:**  CORRECT.

24 **BY MR. MELLO:**

25 **Q.**  RIGHT. YOU ARE AWARE THAT THE RECEIVER HAS --

1              **MR. MELLO:**  STRIKE THAT.

2    **BY MR. MELLO:**

3    **Q.**  THE RECEIVER, YOU BELIEVE, HAS AT LEAST CLOSELY REACHED

4    90 PERCENT FILLED REGISTERED NURSING RATES AT APPROXIMATELY 22

5    INSTITUTIONS, CORRECT?  SOMEWHERE IN THAT NEIGHBORHOOD?

6    **A.**  I'M NOT SURE, BUT IF IT'S IN THE REPORT I CERTAINLY BELIEVE

7    IT.

8    **Q.**  LET ME ASK IT THIS WAY:  ARE YOU AWARE THAT THE RECEIVER HAS

9    HIRED MORE THAN 1400 DOCTORS AND NURSES SINCE JULY, 2007?

10   **A.**  I BELIEVE I SAW THAT IN SOME DOCUMENT THAT THEY PRODUCED.

11   **Q.**  AND YOU AGREED THAT THAT WAS TRUE IN YOUR DEPOSITION IN

12   CHICAGO, CORRECT?

13   **A.**  YES.

14   **Q.**  AND THERE'S A NATIONWIDE SHORTAGE OF REGISTERED NURSES,

15   CORRECT?

16   **A.**  YES.

17   **Q.**  AND IT'S SEVERE, CORRECT?

18   **A.**  I'M SORRY?

19   **Q.**  IT'S A SEVERE SHORTAGE OF REGISTERED NURSES, CORRECT?

20   **A.**  YES.

21   **Q.**  THEREFORE, THE HIRING OF THAT MANY REGISTERED NURSES AND

22   DOCTORS SINCE JULY, 2007 IS QUITE IMPRESSIVE, ISN'T IT?

23   **A.**  YES, IT IS.

24   **Q.**  IN YOUR OPINION, THE HIRING OF MORE THAN 1400 DOCTORS AND

25   NURSES SINCE JULY, 2007 WILL IMPROVE THE DELIVERY OF MEDICAL

1  CARE TO CALIFORNIA'S INMATE PATIENTS, CORRECT?

2  **A.**  IT WILL, WITH THE CAVEAT THAT WAS INTRODUCED, I BELIEVE, IN

3  THE DEATH SUMMARY THAT THERE'S CONCERN ABOUT THE POTENTIAL FOR

4  PEOPLE NOT TO BE RETAINED IF THE ENVIRONMENT AND INFRASTRUCTURE

5  ARE NOT DEALT WITH EXPEDITIOUSLY.

6  **Q.**  AND YOU SPOKE ABOUT THAT VERY ISSUE IN ONE OR BOTH OF YOUR

7  REPORTS, CORRECT?

8  **A.**  THAT'S CORRECT.

9  **Q.**  AND WE WILL GET TO THAT PORTION OF YOUR REPORT LATER --

10  **A.**  OKAY.

11  **Q.**  -- IN CROSS, OKAY?

12  **A.**  OKAY.

13  **Q.**  I PROMISE.

14           YOU HAVE SPOKEN WITH THE CHIEF MEDICAL OFFICER,

15  DOCTOR -- AT FOLSOM PRISON -- DR. KAGAN AS RECENTLY AS AUGUST,

16  2008, CORRECT?

17  **A.**  I SAW HER IN OCTOBER AT THE NATIONAL COMMISSION CONFERENCE.

18  WE TALKED THEN.

19  **Q.**  AND YOU ALSO SPOKE TO HER IN AUGUST, CORRECT?

20  **A.**  I THINK SO.

21  **Q.**  OKAY. AND YOU, AS I, RESPECT HER AS A PHYSICIAN AND PERSON

22  RIGHT?

23  **A.**  YES.

24  **Q.**  YOU BELIEVE HER TO BE A COMPETENT, QUALIFIED PHYSICIAN,

25  CORRECT?

1  A.  YES.

2  Q.  AND AT THE TIME YOU SPOKE TO HER IN AUGUST OF 2008, DR.

3  KAGAN INDICATED THAT SHE HAD MADE IMPROVEMENTS AND CHANGES AT

4  FOLSOM, AND THEY WERE TRYING TO LEARN NEW WAYS TO IMPROVE AND

5  PROVIDE QUALITY CARE TO INMATES MORE EFFICIENTLY, CORRECT?

6  A.  CORRECT.

7  Q.  AND YOU UNDERSTOOD IN TALKING TO DR. KAGAN IN AUGUST OF

8  2008, THAT SHE FELT WITH HER TEAM THAT SHE HAD BEEN ABLE TO MAKE

9  SIGNIFICANT IMPROVEMENTS IN THE QUALITY OF CARE BEING RECEIVED

10 BY INMATE PATIENTS AT FOLSOM, CORRECT?

11 A.  YES.

12 Q.  IN AUGUST, 2008 YOU VISITED SOLANO PRISON, CORRECT?

13 A.  CORRECT.

14 Q.  THE MEDICAL STAFF AT SOLANO DESCRIBED IMPROVEMENTS IN THE

15 DELIVERY OF MEDICAL CARE SINCE THE APPOINTMENT OF THE RECEIVER

16 TO YOU, CORRECT?

17 A.  CORRECT.

18 Q.  AT SOLANO THE MEDICAL STAFF REPORTED IMPROVED PHYSICIAN

19 STAFFING; IMPROVED PHYSICIAN AND NURSE STAFFING, CORRECT?

20 A.  CORRECT.

21 Q.  AND IMPROVED COORDINATION WITH CUSTODY, CORRECT?

22 A.  CORRECT.

23 Q.  AND THE CREATION OF ALTERNATIVE SOMETIMES CREATIVE CLINICAL

24 SPACE, CORRECT?

25 A.  YES.

1  Q.  YOU'RE AWARE THAT THE RECEIVER -- AND I BELIEVE YOU

2  TESTIFIED TO IT ON DIRECT -- HAS IMPLEMENTED A FORMAL DEATH

3  REVIEW PROCESS.

4  A.  YES.

5  Q.  AND IN YOUR OPINION A LEGITIMATE DEATH REVIEW PROCESS WILL

6  IMPROVE THE QUALITY OF CARE THAT CDCR DELIVERS TO INMATE

7  PATIENTS, CORRECT?

8  A.  AS LONG AS IT'S USED IN THAT WAY.  AND IT APPEARS FROM THE

9  DEATH SUMMARY THAT THAT'S WHAT THEY INTEND TO DO.

10 Q.  AN EFFECTIVE AND UTILIZED DEATH REVIEW PROCESS IMPROVES

11 QUALITY OF CARE, CORRECT?

12 A.  YES, IT CAN.

13 Q.  AND IT'S YOUR TESTIMONY THAT YOU'VE REVIEWED THE RECEIVER'S

14 MOST RECENT ANALYSIS OF 2007 DEATHS, CORRECT?

15 A.  CORRECT.

16 Q.  AND YOU ALSO TESTIFIED EARLIER IN YOUR DEPOSITION THAT YOU

17 REVIEWED THE 2006 -- THE ANALYSIS OF 2006 DEATH REVIEWS,

18 CORRECT?

19 A.  YES.

20 Q.  AND IN THAT REPORT, THE 2006 REPORT, WHICH IS DEFENDANTS'

21 EXHIBIT 1107, THE RECEIVER REPORTED THAT THERE WERE SIX ASTHMA

22 DEATHS THAT ARE WERE PREVENTABLE IN 2006, CORRECT?

23 A.  CORRECT.

24 Q.  DO YOU UNDERSTAND IN REVIEWING THE 2007 DEATH REVIEW REPORT

25 THAT THERE WERE ZERO PREVENTABLE DEATHS DUE TO ASTHMA-RELATED

1    ISSUES IN 2007?

2    **A.**   CORRECT.

3    **Q.**   YOU'VE SPOKEN ABOUT "POSSIBLY PREVENTABLE" AND

4    "PREVENTABLE," AND THOSE ARE DEFINED IN THE 2007 DEATH REPORT,

5    CORRECT?

6    **A.**   CORRECT.

7    **Q.**   THE 2007 DEATH REPORT DEFINES "POSSIBLY PREVENTABLE" AS A

8    DEATH THAT IN THE JUDGMENT OF THE REVIEWER BETTER MEDICAL

9    MANAGEMENT OR A BETTER SYSTEM OF CARE MAY HAVE PREVENTED THE

10   PATIENT'S DEATH, CORRECT?

11   **A.**   RIGHT.

12   **Q.**   IT USES THE WORD "MAY HAVE." DOES THAT MEAN IT'S MORE OR

13   LESS LIKELY THAN NOT THAT BETTER CARE WOULD HAVE PREVENTED THE

14   DEATH, OR CAN YOU TELL?

15   **A.**   I HAVE NOT TALKED WITH ANY OF THE PEOPLE WHO PARTICIPATED IN

16   THE DEATH REVIEW PROCESS, SO I REALLY CAN'T ANSWER THAT.

17   **Q.**   IT USES THE TERM "PREVENTABLE," AND IT DEFINES "PREVENTABLE"

18   IN THAT REPORT, AS WELL.  IT DEFINES A PREVENTABLE DEATH OR THE

19   DEFINITION OF "PREVENTABLE" IS:

20              "IN THE JUDGMENT OF THE REVIEWER BETTER

21          MEDICAL MANAGEMENT OR A BETTER SYSTEM OF CARE WOULD

22          LIKELY HAVE PREVENTED THE PATIENT'S DEATH," CORRECT?

23   **A.**   YES, THAT'S CORRECT.

24   **Q.**   SO THAT MEANS IT'S MORE LIKELY THAN NOT THAT BETTER CARE

25   WOULD HAVE PREVENTED THE PATIENT'S DEATH, CORRECT?

1  **A.** CORRECT.

2  **Q.** AND THAT'S VERSUS MAY HAVE PREVENTED THE PATIENT'S DEATH,

3  WHICH IS DEFINED AS "POSSIBLY PREVENTABLE," CORRECT?

4  **A.** CORRECT.

5  **Q.** SO YOU DON'T KNOW WHETHER OR NOT OF THOSE POSSIBLY

6  PREVENTABLE DEATHS IDENTIFIED IN THE RECEIVER'S REPORT THAT ANY

7  OF THEM WOULD HAVE OCCURRED, CORRECT?  WOULD NOT HAVE OCCURRED

8  WITH BETTER CARE, CORRECT?

9  **A.** CAN YOU REDO THAT QUESTION?

10 **Q.** SURE. YOU BELIEVE THAT -- YOU UNDERSTAND THAT THE TERM

11 "PREVENTABLE" AND "POSSIBLY PREVENTABLE' ARE BEING USED

12 DIFFERENTLY IN THE REPORT, CORRECT?

13 **A.** YES.

14 **Q.** AND "PREVENTABLE" USES THE TERM "WOULD LIKELY," CORRECT?

15 **A.** YES.

16 **Q.** DOES THAT MEAN TO YOU OR DO YOU UNDERSTAND THAT TO MEAN THAT

17 THE DEATH WOULD HAVE MORE LIKELY THAN NOT OCCURRED WITH BETTER

18 CARE AND, THEREFORE, IT'S DEEMED PREVENTABLE?

19 **A.** THE DEATH MORE LIKELY WOULD NOT HAVE OCCURRED.

20 **Q.** WITH BETTER CARE.

21 **A.** CORRECT.

22 **Q.** AND THAT WOULD BE A PREVENTABLE DEATH?

23 **A.** CORRECT.

24 **Q.** CAN YOU SAY THE SAME THING WITH RESPECT TO THE DEFINITION OF

25 "POSSIBLY PREVENTABLE"?

1  **A.**  NO, I THINK THE CONCLUSION SUGGESTS LESS CLARITY WITH REGARD

2  TO THE PREDICTABILITY OF THE DEATH.

3  **Q.**  IN FACT, IT SUGGESTS THAT IT'S LESS LIKELY THAN NOT THAT THE

4  DEATH COULD HAVE BEEN PREVENTED, CORRECT?

5  **A.**  SO --

6            **MS. HARDY:**  OBJECTION, YOUR HONOR.

7            **THE WITNESS:**  -- I'M A LITTLE CONFUSED BY THE

8  QUESTION, AGAIN.

9            **MS. HARDY:**  OBJECTION, YOUR HONOR.  DR. SHANSKY HAS

10  STATED THAT HE HAS NOT SPOKEN TO THE PEOPLE WHO HAVE WRITTEN

11  THIS REPORT ABOUT THEIR CRITERIA, AND HE'S ANSWERED THAT

12  QUESTION.

13            **MR. MELLO:**  I HAVE TWO RESPONSES TO THAT, IF I MAY.

14            **JUDGE HENDERSON:**  WELL, LET ME JUST -- ANSWER THE

15  QUESTION AS IT'S POSED TO YOU.

16            **THE WITNESS:**  CAN YOU READ IT BACK TO ME?

17  **BY MR. MELLO:**

18  **Q.**  SURE.

19            THE "POSSIBLY PREVENTABLE" DEFINITION SAYS THAT

20  BETTER CARE MAY HAVE PREVENTED THE PATIENT'S DEATH, CORRECT?

21  **A.**  CORRECT.

22  **Q.**  AND "MAY HAVE" SUGGESTS THAT IT'S NOT MORE LIKELY THAN NOT

23  THAT BETTER CARE WOULD HAVE PREVENTED THE DEATH, BUT LESS LIKELY

24  THAN NOT THAT BETTER CARE WOULD HAVE PREVENTED THE DEATH,

25  CORRECT?

1           **JUDGE KARLTON:**  ARE YOU ASKING THIS AS A QUESTION OF

2  ENGLISH OR A QUESTION OF --

3           **MR. MELLO:**  I'M ASKING HIM HIS UNDERSTANDING BASED

4  UPON HIS EXPERIENCE WHOSE DONE -- AND HE'S GOT AN UNDERSTANDING

5  OF THE TERM "POSSIBLY PREVENTABLE."

6           **THE WITNESS:**  I DON'T THINK I WOULD SAY "LESS

7  LIKELY." I WOULD INTERPRET IT AS FIFTY-FIFTY.

8  **BY MR. MELLO:**

9  **Q.**  OKAY. BUT, AGAIN, YOU HAVEN'T HAD THE OPPORTUNITY TO SPEAK

10  TO THE RECEIVER?

11  **A.**  CORRECT.

12  **Q.**  OR DR. IMAI WHO AUTHORED THE REPORT, CORRECT?

13  **A.**  CORRECT.

14  **Q.**  AND HE WILL NOT BE TESTIFYING AT THIS TRIAL, CORRECT?

15  **A.**  I DON'T KNOW.

16  **Q.**  YOU ARE AWARE THAT IN THE RECEIVER'S NINTH QUARTERLY REPORT,

17  THE RECEIVER STATED THAT:

18           "PRISONER -- THE PRISONER DEATH RATE IN

19       CALIFORNIA'S PRISONS HAS TRENDED DOWNWARD IN THE LAST

20       10 QUARTERS STARTING IN JANUARY 1, 2006," CORRECT?

21  **A.**  THAT'S IN THE DEATH REVIEW SUMMARY, THE MORE RECENT DEATH

22  REVIEW SUMMARY.  IS THAT WHAT YOU'RE --

23  **Q.**  I BELIEVE IT'S IN THE NINTH QUARTERLY REPORT, AS WELL.

24  **A.**  OKAY.

25  **Q.**  DO YOU BELIEVE THAT TO BE TRUE?

1  **A.**  I'M SORRY?

2  **Q.**  DO YOU BELIEVE THAT THE DEATH RATE HAS TRENDED DOWN IN THE

3  LAST 10 QUARTERS STARTING IN JANUARY 1, 2006?

4  **A.**  YES.

5  **Q.**  OKAY. AND YOU AGREE WITH THE RECEIVER THAT THE DOWNWARD

6  TREND IN MORTALITY RATES IS RELATED, IN PART, TO AN INFLUX OF

7  NEW PHYSICIANS AND NURSES, CORRECT?

8  **A.**  CORRECT.

9  **Q.**  AND IN YOUR OPINION, THE DOWNWARD TREND IS VERY ENCOURAGING

10  WITH RESPECT TO WHETHER AND WHEN CONSTITUTIONALLY–ADEQUATE

11  MEDICAL CARE CAN BE PROVIDED SYSTEM–WIDE, CORRECT?

12  **A.**  CORRECT.

13  **Q.**  IN YOUR OPINION, WHILE NOT THE ONLY FACTOR, MORTALITY RATE

14  IS AN IMPORTANT FACTOR RELATED TO A CONSTITUTIONAL SYSTEM OF

15  PRISON MEDICAL CARE, CORRECT?

16  **A.**  IT'S A SIGNIFICANT FACTOR, YES.

17  **Q.**  AND ARE YOU AWARE THAT IN A REPORT DONE BY THE DEPARTMENT OF

18  JUSTICE THAT CALIFORNIA RANKED IN THE TOP 15 WITH RESPECT TO

19  DEATH RATES NATIONWIDE SYSTEM–WIDE?

20  **A.**  YES, I'VE HEARD THAT.

21  **Q.**  AND ARE YOU AWARE THAT PENNSYLVANIA RANKED IN THE BOTTOM

22  FIVE?

23  **A.**  I DON'T RECALL LOOKING AT PENNSYLVANIA, BUT I DID SEE THE

24  DOCUMENT. IT'S –– THE ONE I SAW WAS SEVERAL YEARS OLD.

25  **Q.**  IT WAS FROM ANALYSIS FROM EVEN BEFORE THE RECEIVER, CORRECT?

1   A.  CORRECT.

2   Q.  AND IT SHOWED THAT CALIFORNIA WAS WELL BELOW NATIONAL

3   AVERAGES, CORRECT?

4   A.  YES.

5   Q.  AND IT SHOWED THAT CALIFORNIA WAS WELL BELOW REGIONAL

6   AVERAGES, CORRECT?

7   A.  I BELIEVE SO, YES.

8   Q.  AND THAT WAS, AGAIN, PRIOR TO THE APPOINTMENT OF THE PLATA

9   RECEIVER?

10  A.  YES.

11  Q.  IN YOUR OPINION -- AND I BELIEVE YOU TESTIFIED TO THIS -- IT

12  IS POSSIBLE THAT SOME UNITS IN CALIFORNIA'S PRISONS ARE

13  CURRENTLY PROVIDING CONSTITUTIONAL LEVELS OF CARE TO INMATE

14  PATIENTS, CORRECT?

15  A.  THAT'S POSSIBLE.

16  Q.  IN YOUR NOVEMBER 7 -- NOVEMBER, 2007 REPORT, AT PAGES FOUR

17  AND FIVE, PARAGRAPH 12 -- AND I DON'T QUOTE IT, SO I SUMMARIZE

18  IT.  BUT WE WILL PULL IT UP FOR YOU.

19          YOU NOTE THAT THE RECEPTION CENTER SCREENING AT CIM

20  IS TOO SMALL, AND EACH ROOM IS SEPARATED ONLY BY A THIN WHITE

21  FABRIC FOLDING SCREEN.

22          DO YOU REMEMBER THAT?

23  A.  YES.

24  Q.  TAKE YOUR TIME GETTING THERE. DO YOU REMEMBER THAT?

25  A.  YES, I DO.

1   Q.  OKAY. IN YOUR OPINION, THAT PARTICULAR SPACE ISSUE COULD BE

2   ADDRESSED BY PROVIDING A MORE APPROPRIATELY-DESIGNED SCREENING

3   AREA, CORRECT?

4   A.  YES.

5   Q.  AND IT WOULDN'T NECESSARILY REQUIRE THE REDUCTION IN THE

6   PRISON POPULATION, CORRECT?

7   A.  WITH REGARD TO THE USE OF THAT SPACE AND HAVING TWO PEOPLE

8   SIMULTANEOUSLY?

9   Q.  YES.

10  A.  YES, YOU COULD ADDRESS THAT BY CHANGING THE SPATIAL

11  ARRANGEMENTS.

12  Q.  WITHOUT THE RELEASE OF PRISONERS, CORRECT?

13  A.  YES, THAT'S CORRECT.

14  Q.  ON PAGE FIVE OF YOUR REPORT IN NOVEMBER -- PARAGRAPH 13 --

15  IN NOVEMBER, 2007, YOU STATE THAT KERN VALLEY STATE PRISON IS

16  EMBLEMATIC OF INADEQUATE CLINICAL SPACE.

17          DO YOU REMEMBER SAYING THAT?

18  A.  WHAT PARAGRAPH?

19  Q.  PARAGRAPH 13.  I BELIEVE IT'S PAGE FIVE.

20          IT'S ALSO ON THE SCREEN, DOCTOR.

21  A.  YES, I SEE IT.

22  Q.  IN YOUR OPINION, NEW CONSTRUCTION OR MODULE SPACES COULD

23  ASSIST IN ALLEVIATING THAT PROBLEM, CORRECT?

24  A.  YES, THE SPACE ISSUE COULD BE ADDRESSED BY NEW SPATIAL

25  CONFIGURATIONS.

1  Q.  IN FACT, ALTERNATIVES FOR CREATING ADDITIONAL HEALTHCARE

2  SPACE COULD INCLUDE THE RENTAL OF TRAILERS, USE OF MODULARS, OR

3  PREFABRICATED BUILDINGS, OR SIMPLY FIXING CURRENT SPACE,

4  CORRECT?

5  A.  I DON'T KNOW ABOUT FIXING THE CURRENT SPACE, BUT THE OTHER

6  OPTIONS ARE CERTAINLY POSSIBILITIES.

7  Q.  OKAY.

8          IN YOUR OPINION, THE MANAGEMENT AND MAINTENANCE OF

9  MEDICAL RECORDS HAS BEEN A PROBLEM AT CDCR, CORRECT?

10  A.  YES.

11  Q.  AND IT'S YOUR UNDERSTANDING THAT MANY PRISONS' MEDICAL

12  DEPARTMENTS NOW OPERATE AT LEAST TWO SHIFTS, CORRECT?

13  A.  YES.

14  Q.  OKAY.  AND THAT'S A MAJOR IMPROVEMENT IN YOUR OPINION,

15  CORRECT?

16  A.  YES, THAT WOULD ALLOW THEM TO UTILIZE MORE STAFF IN ORDER TO

17  GET THE JOB DONE.

18  Q.  AND IN YOUR OPINION, MEDICAL RECORDS CAN BE IMPROVED WITH

19  MORE SHIFTS, CORRECT?

20  A.  YES.

21  Q.  AND IN YOUR OPINION MEDICAL RECORDS COULD BE IMPROVED WITH

22  MORE MEDICAL RECORD STAFF, CORRECT?

23  A.  CORRECT.

24  Q.  YOU VISITED PLEASANT VALLEY STATE PRISON IN AUGUST OF 2007,

25  CORRECT?

1              PARDON ME, 2008.

2   **A.**   2008, I BELIEVE, RIGHT.

3   **Q.**   TRIED TO TRICK YOU. NO, I'M SORRY.

4              SO YOU VISITED THAT PRISON IN AUGUST OF 2008, AND YOU

5   NOTED THAT SEVERAL INMATES FAILED TO RECEIVE FOLLOW-UP WITH A

6   PRIMARY CARE PHYSICIAN, CORRECT?

7   **A.**   THAT'S CORRECT.

8   **Q.**   IN YOUR OPINION, ONE POTENTIAL FIX FOR THAT PROBLEM WOULD BE

9   INCREASING STAFFING, CORRECT?

10  **A.**   WELL, STAFFING ALONE IS NOT GOING TO FIX THAT. YOU HAVE TO

11  PUT IN THE SYSTEMS TO ENSURE THAT THE SCHEDULING TAKES PLACE;

12  THAT THEIR DOCUMENTS FROM THE OFFSITE ENCOUNTERS ARE AVAILABLE

13  AND REVIEWED SO IT'S A MULTIFACTORIAL PROBLEM THAT HAS TO BE

14  ADDRESSED IN ORDER TO FIX IT.

15  **Q.**   BUT ONE COMPONENT OF THAT MULTIFACTORIAL PROBLEM IS

16  PHYSICIAN STAFFING, CORRECT?

17  **A.**   YES.

18  **Q.**   AND IN YOUR OPINION, THOSE OTHER FACTORS THAT YOU MENTION

19  WOULD CONTRIBUTE TO THE FIX OF THAT PARTICULAR PROBLEM, CORRECT?

20  **A.**   YES.

21  **Q.**   AS WOULD ADDITIONAL CLINICAL SPACE AT PLEASANT VALLEY STATE

22  PRISON?

23  **A.**   YES.

24  **Q.**   IN YOUR OPINION, YOU EXPECT THAT THE RECEIVER WILL USE

25  ADDITIONAL HIRINGS, TEMPORARY SPACE, PERMANENT SPACE, ELECTRONIC

1  MEDICAL RECORDS AND INCREASED STAFF TO DEAL WITH PAPER RECORDS

2  TO ADDRESS INCREASED POPULATION, CORRECT?

3  **A.**  YES, THE RECEIVER CAN USE ALL OF THOSE TOOLS.

4  **Q.**  IN YOUR OPINION, THE ADJUSTMENT OF THE MEDICAL

5  CLASSIFICATION SYSTEM IS ALSO A POSSIBLE SOLUTION TO THE

6  STAFFING ISSUES AT SOME OF THE REMOTE PRISONS, CORRECT?

7  **A.**  YES, IF YOU'RE TALKING ABOUT, IN ESSENCE, KIND OF TRIAGING

8  PATIENTS WITH MORE CLINICAL ISSUES TO FACILITIES THAT HAVE MORE

9  INTENSE MEDICAL RESOURCES.

10  **Q.**  AND ANOTHER POTENTIAL FIX OR PARTIAL FIX TO PROBLEMS AT

11  REMOTE PRISONS WOULD BE INCREASED USE OF TELEMEDICINE, CORRECT?

12  **A.**  YES.

13  **Q.**  YOU ARE AWARE THAT IN THE FINDINGS OF FACT AND CONCLUSIONS

14  OF LAW APPOINTING THE RECEIVER IN THIS CASE THE PLATA COURT

15  STATED THAT, QUOTE:

16           "THE PROVISION OF ADEQUATE MEDICAL CARE IN THIS

17       SITUATION PRESENTS A CLASSIC EXAMPLE OF A POLYCENTRIC

18       PROBLEM," END QUOTE.

19           YOU'RE AWARE OF THAT, RIGHT?

20  **A.**  I BELIEVE SO. THAT WAS AWHILE AGO.

21  **Q.**  AND DO YOU AGREE THAT IT'S A POLYCENTRIC PROBLEM?

22  **A.**  I THINK IT WAS AT THAT TIME, YES.

23  **Q.**  YOU BELIEVE IT IS TODAY?

24  **A.**  WELL, AT THIS POINT IN TIME, I THINK CONDITIONS HAVE

25  CHANGED. THEY HAVE CHANGED WITH THE ADVENT OF THE RECEIVER. AND

1  THE CHANGES -- AND, AGAIN, THIS COMES PARTLY FROM MY

2  EXPERIENCE -- THE RECEIVER -- THE RECEIVER HAS A SET OF TOOLS

3  TO, IN ESSENCE, CREATE A NEW SYSTEM.

4          THE RECEIVER DOES NOT HAVE A TOOL THAT DIRECTLY

5  ADDRESSES CROWDING. INSTEAD, WHAT THE RECEIVER IS LEFT TO DO IS

6  DO -- USE A BUNCH OF TOOLS IN A VARIETY OF WAYS BECAUSE OF THE

7  STRESSES PUT ON THE SYSTEM BY OVERCROWDING. AND AS A RESULT, THE

8  LONGEVITY OF THE RECEIEVERSHIP WILL UNQUESTIONABLY -- I CAN SAY

9  THIS WITH A HUNDRED PERCENT CERTAINTY -- THE LONGEVITY OF THE

10 RECEIEVERSHIP WILL BE EXTENDED IF CROWDING ISN'T ADDRESSED AND

11 ADDRESSED DIRECTLY AND SIGNIFICANTLY.

12         AND THE END RESULT IS THAT THE RECEIVER'S ABILITY TO

13 FIX THINGS WILL BE SUBSTANTIALLY DELAYED AND, THEREFORE, WHAT

14 WILL OCCUR AS A CONSEQUENCE IS UNNECESSARY, AVOIDABLE SUFFERING,

15 HOSPITALIZATIONS AND POTENTIALLY DEATHS. AND THAT'S THE IMPACT

16 OF CROWDING ON THE RECEIVER'S ABILITY TO SOLVE THINGS USING HIS

17 TOOLS.

18 Q.    SO, IN SUMMARY, IT WILL TAKE THE RECEIVER LONGER IF

19 CROWDING ISN'T ADDRESSED, IN YOUR OPINION?

20 A.    SUBSTANTIALLY LONGER.

21 Q.    IN FACT, I BELIEVE AT THE TIME OF YOUR DEPOSITION YOU

22 COULDN'T TELL US HOW MUCH SHORTER IT WOULD BE WITH POPULATION

23 REDUCTION MEASURES, CORRECT?

24 A.    IT DEPENDS ON THE DEGREE OF POPULATION REDUCTION. BUT I

25 COULD -- I WAS THINKING ABOUT THIS PRIOR TO MY TESTIMONY. AND

1  GIVEN THE RECEIVER'S ABILITIES TO USE THOSE TOOLS AS

2  DEMONSTRATED THUS FAR, IF THE POPULATION WERE REDUCED TO -- I

3  DON'T KNOW -- LET'S SAY A HUNDRED THOUSAND TOTAL -- AND I'VE

4  BEEN THINKING ABOUT THIS -- I BELIEVE THAT THE MAJORITY OF

5  PRISONS WOULD BE CONSTITUTIONAL WITHIN THREE YEARS.

6  Q.   SO EVEN WITH A REDUCTION IN POPULATION OF 56,000 INMATES

7  IT WOULD TAKE THREE YEARS, IN YOUR OPINION, TO HAVE 17 OF THE

8  INSTITUTIONS IN CONSTITUTIONAL COMPLIANCE?

9  A.   WELL, IT'S POSSIBLE THE RECEIVER COULD, IN SOME INSTANCES,

10 GO MORE RAPIDLY IN ACHIEVING THOSE GOALS.  BUT GIVEN MY

11 UNDERSTANDING OF THE PLANS WITH REGARDS TO I.T. AND SOME OF THE

12 OTHER ISSUES, I THINK THAT'S COMPLETELY REASONABLE.

13          AND MAYBE IT WOULD BE TWO-THIRDS OR THREE-QUARTERS

14 WOULD BE CONSTITUTIONAL WITHIN THREE YEARS.

15          THERE'S NO QUESTION THAT WITH REGARD TO HIRING, FOR

16 INSTANCE, THERE'S BEEN A SIGNIFICANT IMPROVEMENT.

17 Q.   AND THOSE ITEMS IN HIS TOOLBOX THAT ARE SEPARATE AND  APART

18 FROM OVERCROWDING, THOSE ARE SOME OF THE INTERRELATED COMPONENTS

19 TO THE DELIVERY OF A CONSTITUTIONAL -- THE DELIVERY OF

20 CONSTITUTIONALLY-ADEQUATE MEDICAL CARE?

21 A.   YES.

22 Q.   AND WAS THE SYSTEM OVERCROWDED IN 2005?

23 A.   WAS THE SYSTEM OVERCROWDED?  I DON'T HAVE THE NUMBERS.

24 Q.   DO YOU KNOW IF IT WAS OVERCROWDED WHEN YOUR DEPOSITION WAS

25 TAKEN IN DECEMBER OF 2007?

1   **A.**  YES.

2   **Q.**  WAS IT OVERCROWDED WHEN I TOOK YOUR DEPOSITION IN DECEMBER

3   OF 2007, AND YOU TOLD ME THAT THE DELIVERY OF MEDICAL CARE IN

4   CALIFORNIA'S PRISONS WAS A POLYCENTRIC PROBLEM?

5   **A.**  THAT'S IN WHICH DEPOSITION?

6   **Q.**  IN YOUR DECEMBER DEPOSITION.  DO YOU REMEMBER --

7   **A.**  DECEMBER '07?

8   **Q.**  CORRECT.

9   **A.**  OKAY. LET HELP JUST QUICKLY.

10  **Q.**  AND WHY DON'T WE JUST PULL IT UP?  PAGE 88, LINES 20 THROUGH

11  24.

12  **A.**  THIS WAS AT THE TIME OF THE -- THIS IS PRIOR TO THE

13  RECEIVER.

14  **Q.**  OKAY.

15  **A.**  YES.

16  **Q.**  SO YOU AGREE?

17  **A.**  YES.

18  **Q.**  OKAY.

19  **A.**  AT THAT TIME.

20          **JUDGE REINHARDT:**  CAN I ASK YOU A QUESTION ON THAT?

21          **THE WITNESS:**  YES.

22          **JUDGE REINHARDT:**  WHAT DOES THE TERM "POLYCENTRIC

23  PROBLEM" MEAN?

24          **THE WITNESS:**  WELL, FROM THE WAY I INTERPRET IT, IT

25  CONNOTES A PROBLEM THAT HAS MULTIPLE SOURCES THAT ARE

1  SIMULTANEOUSLY IMPACTING IT.

2            **JUDGE REINHARDT:**  IS IT POSSIBLE TO HAVE A

3  POLYCENTRIC PROBLEM WITH A PRIMARY CAUSE?

4            **THE WITNESS:**  I THINK SO. I THINK SO.

5  **BY MR. MELLO:**

6  **Q.**  JUST TO FOLLOW UP ON THAT POINT, THE DELIVERY OF MEDICAL

7  CARE IN CALIFORNIA'S PRISONS INVOLVES MULTIPLE INTERRELATED

8  COMPONENTS, CORRECT?

9  **A.**  CORRECT.

10  **Q.**  AND YOU'VE DISCUSSED SOME OF THOSE INTERRELATED COMPONENTS

11  ALREADY. YOU'VE DISCUSSED ADEQUATE NUMBER OF ADEQUATELY TRAINED

12  AND CREDENTIALED PHYSICIANS, CORRECT?

13  **A.**  CORRECT.

14  **Q.**  APPROPRIATE NUMBER OF ASSISTANTS AND STAFF AND NURSES AND

15  RECORDS FOLKS, CORRECT?

16  **A.**  CORRECT.

17  **Q.**  AN ADEQUATE ENVIRONMENT WITHIN WHICH TO WORK, CORRECT?

18  **A.**  CORRECT.

19  **Q.**  AND A SYSTEM FOR DOCUMENTING HEALTHCARE INTERACTIONS,

20  CORRECT?

21  **A.**  CORRECT.

22  **Q.**  JUST TO NAME A FEW?

23  **A.**  YES.

24  **Q.**  THESE COMPONENTS OF A CONSTITUTIONALLY-ADEQUATE MEDICAL CARE

25  SYSTEM ALSO INCLUDE AND MUST INCLUDE A SYSTEM TO TRACK AND

1  ENSURE CONTINUITY WITH REGARD TO ALL ELEMENTS OF

2  PROFESSIONALLY-CREATED PLANS, CORRECT?

3  **A.**  CORRECT.

4  **Q.**  A SYSTEM THAT ALLOWS FOR THE MOVEMENT OF PATIENTS TO

5  IMPROVE -- TO APPROPRIATE LEVELS OF CARE BASED UPON NEED AND

6  COMPLEXITY OF MEDICAL PROBLEMS, CORRECT?

7  **A.**  CORRECT.

8  **Q.**  THE ABILITY TO ENSURE TIMELY ACCESS TO SPECIALTY CARE?

9  **A.**  YES.

10 **Q.**  THE ABILITY TO ENSURE ACCESS TO MEDICAL CARE REGARDLESS OF

11 CUSTODY LEVEL?

12 **A.**  YES.

13 **Q.**  SUFFICIENT COMMUNITY RESOURCES TO PROVIDE OFFSITE SERVICES?

14 **A.**  YES.

15 **Q.**  AND IN YOUR OPINION IT'S DIFFICULT TO RANK THOSE

16 INTERRELATED COMPONENTS IN TERMS OF IMPORTANCE BECAUSE THEY ARE

17 INTERRELATED, CORRECT?

18 **A.**  CORRECT.

19 **Q.**  IN FACT, WITH RESPECT TO THOSE COMPONENTS, YOU ARE RELUCTANT

20 TO RANK ONE OF THEM FIRST, CORRECT?

21 **A.**  CORRECT.

22 **Q.**  IN YOUR OPINION, ONE OF THE MOST IMPORTANT THINGS IN TERMS

23 OF REMEDYING CDCR'S FAILED OR FORMERLY FAILED MEDICAL CARE

24 DELIVERY SYSTEM IS THE CULTURE, CORRECT?

25 **A.**  THE CULTURE IS IMPORTANT.

1  **Q.**  AND CULTURE HELPS ENSURE TIMELY AND APPROPRIATE ACCESS TO

2  MEDICAL CARE, CORRECT?

3  **A.**  CULTURE IS CRUCIAL, IN MY VIEW, BECAUSE APPROPRIATE CULTURE

4  CONNOTES A HEALTHCARE STAFF TEAM THAT IS INVESTED IN THEIR

5  PATIENT OUTCOMES.

6          THAT'S THE CRITICAL ASPECT OF CULTURE.

7  **Q.**  HOW MANY INSTITUTIONS HAVE YOU VISITED IN THE LAST

8  YEAR-AND-A-HALF?

9  **A.**  NINE.

10 **Q.**  NINE.

11          AND DID YOU SEE THAT CULTURE THAT YOU JUST DESCRIBED

12 WHEN YOU MET WITH MEDICAL AND CUSTODY STAFF AT THOSE

13 INSTITUTIONS?

14 **A.**  I WOULD -- IT WOULD BE PRESUMPTUOUS OF ME WITH MY QUICK ONE

15 DAY IN-AND-OUT DESCRIBE THE CULTURE. I WAS IMPRESSED AT A

16 VARIETY OF PLACES WITH THE INDIVIDUALS THAT I DID GET A CHANCE

17 TO SPEAK WITH, IN THAT THERE DID SEEM TO BE AN INCREASED LEVEL

18 OF CONCERN ABOUT PATIENT OUTCOMES.

19 **Q.**  AND DIDN'T MANY OF THOSE INDIVIDUALS REPORT YOU TO THAT THE

20 CULTURE THAT YOU DESCRIBED EARLIER HAD IMPROVED AT THEIR

21 INSTITUTIONS?

22 **A.**  WE DIDN'T REALLY DISCUSS THE CULTURE MUCH. FOR INSTANCE,

23 WHEN I WAS WORKING WITH -- WHEN I WAS REVIEWING MEDICAL RECORDS,

24 ONE OF THE THINGS I ALWAYS DO IS HAVE A STAFF CLINICIAN REVIEW

25 THE RECORDS WITH ME SO THAT I AM NOT CONCLUDING THAT SOMETHING

1  WASN'T THERE OR DIDN'T HAPPEN ON THE BASIS OF MY OWN

2  OBSERVATIONS, BUT RATHER IT'S A SHARED CONCLUSION, SHARED WHICH

3  A PERSON WHO WORKS IN THE INSTITUTION AND KNOWS WHERE TO LOOK IN

4  THE EXTRA PLACES, ET CETERA, ET CETERA.

5          WHEN WE WERE DOING THAT AND WE WOULD FIND THINGS THAT

6  SHOULD HAVE OCCURRED, BUT DIDN'T OCCUR, OR THINGS THAT DIDN'T

7  OCCUR TIMELY, MY SENSE WAS THAT THE INDIVIDUALS I TALKED TO

8  GENERALLY WERE EXTREMELY CONCERNED ABOUT IT AND EXTREMELY

9  BOTHERED BY THE FACT THAT THERE WAS THIS RISK TO THEIR PATIENTS.

10 Q.  SO THEY CARE ABOUT THEIR PATIENTS?

11 A.  YES.

12 Q.  AND THEY WANTED THE BEST FOR THEIR INMATE-PATIENTS?

13 A.  YES.

14 Q.  THERE'S A DIRECT CORRELATION BETWEEN THE QUALITY AND

15 STABILITY OF LEADERSHIP AND THE QUALITY OF CARE, ISN'T THERE?

16 A.  YES, THERE IS.

17 Q.  OKAY.

18          IN YOUR OPINION, A FACTOR THAT COULD RESULT IN THE

19 INSUFFICIENT DELIVERY OF SPECIALTY CARE TO CDCR INMATES IS

20 INADEQUATE CLINICAL PATIENT COMMUNICATION WITH REGARD TO CURRENT

21 AND FUTURE PLANS, CORRECT?

22 A.  YES.

23 Q.  IN YOUR OPINION, SIMPLY REDUCING THE NUMBER OF THE PRISON

24 POPULATION BY ITSELF WILL NOT CURE THE DEFICIENCIES WITH RESPECT

25 TO SPECIALTY MEDICAL CARE AT CDCR, WILL IT?

1    **A.**  WELL, IF -- LET ME RESPOND IN THE WAY I UNDERSTAND IT. IF

2    SOME OF THE ABSENCE OF FOLLOW-UP VISITS AND COMMUNICATION

3    BETWEEN PATIENT AND CLINICIAN AFTER AN OFFSITE SERVICE WAS

4    PROVIDED FOR A SERIOUS MEDICAL PROBLEM, IF THE REASONS FOR THE

5    VISITS NOT OCCURRING WERE BECAUSE OF A DEMAND TO RESOURCE

6    MISMATCH, THEN CROWDING AND REDUCING THE POPULATION WILL BRING

7    THE DEMAND-TO-RESOURCE RELATIONSHIP MORE INTO LINE AND THE

8    PROBABILITY OF THOSE VISITS AND THE COMMUNICATION OCCURRING WILL

9    BE GREATLY ENHANCED.

10   **Q.**  DO YOU KNOW SPECIFICALLY WHETHER ANY OF THOSE CIRCUMSTANCES

11   THAT YOU JUST DESCRIBED, OR POSSIBILITIES, WERE THE RESULT OF

12   OVERCROWDING?

13   **A.**  I KNOW THAT CLINICIANS TOLD ME THAT PATIENTS WERE NOT SEEN

14   AND FOLLOWED UP TIMELY BECAUSE OF LACK OF AVAILABLE SPACE, SLOTS

15   FOR PHYSICIANS TO SEE THEM TIMELY.  AND THAT WAS PARTLY RELATED

16   TO CUSTODY ISSUES, PARTLY RELATED TO THE PHYSICAL SPACE ISSUES,

17   ONLY ONE EXAM ROOM IN A CLINIC AREA.  BUT IT WAS THEIR

18   PERCEPTION THAT CROWDING WAS THE MAJOR FACTOR THAT IMPACTED IT.

19   **Q.**  AND, AGAIN, THOSE ISSUES COULD BE ADDRESSED BY INCREASING

20   SPACE AND INCREASING STAFFING, CORRECT?

21   **A.**  POTENTIALLY.

22   **Q.**  IN YOUR OPINION, AN EFFECTIVE COMPUTER NETWORK IS ESSENTIAL

23   TO PROVIDING MEDICAL CARE ACCESS TO CLINICAL INFORMATION,

24   CORRECT?

25   **A.**  YES, IN THIS DAY AND AGE IT REALLY IS CRITICAL.

1  Q.  AND IN YOUR OPINION, A REDUCTION IN THE PRISONER POPULATION

2  WILL NOT RESULT IN THE EFFECTIVE -- IN THE EFFECTIVE COMPUTER

3  NETWORK THAT IS ESSENTIAL TO A MEDICAL CARE DELIVERY SYSTEM,

4  WILL IT?

5  **A.**  JUST REDUCING THE POPULATION WILL NOT CREATE AN I.T.

6  STRUCTURE, THAT'S CORRECT.

7  Q.  IN YOUR NOVEMBER, 2007 REPORT YOU NOTE THAT:

8              "UNIT HEALTH RECORDS FOR RETURNING PRISONERS ARE

9          STORED AT A SOUTHERN REGIONAL FACILITY, WHICH IS A

10         PROBLEM, BECAUSE WHEN THE INFORMATION IS NOT

11         AVAILABLE -- WHICH IS A PROBLEM BECAUSE SOMETIMES

12         INFORMATION IS NOT AVAILABLE AT INTAKE," CORRECT?

13  **A.**  YES, THAT'S CORRECT.

14  Q.  IN YOUR OPINION, A REDUCTION IN THE PRISON POPULATION WOULD

15  NOT RESOLVE THE FACT THAT CDCR STORES THESE UNIT HEALTH RECORDS

16  AT A FACILITY IN SOUTHERN CALIFORNIA, WILL IT?

17  **A.**  I DON'T KNOW WHY THEY ARE STORED AT A FACILITY IN SOUTHERN

18  CALIFORNIA.  BUT IF THEY HAD SPACE LOCALLY, BASED ON THE FACT

19  THAT THE NUMBER OF RECORDS THAT NEEDED TO BE STORED WAS SMALLER,

20  THEN POSSIBLY THEY COULD MAKE MORE LOCAL ARRANGEMENTS THAT WOULD

21  BE MORE EFFECTIVE. I JUST DON'T KNOW.

22          **MR. MELLO:**  CAN WE PULL UP PAGE 135, LINES THREE

23  THROUGH EIGHT OF HIS FIRST DEPOSITION, PLEASE?

24          **THE WITNESS:**  I'M SORRY, FIRST?

25

1  **BY MR. MELLO:**

2  **Q.**  YOUR FIRST DEPOSITION.

3  **A.**  DEPOSITION.

4  **Q.**  PAGE 135, LINES THREE THROUGH EIGHT.

5  **A.**  WHAT PAGE WAS IT?

6  **Q.**  IT'S UP RIGHT IN FRONT OF YOU.

7        **MS. HARDY:**  OBJECTION.  THAT MISSTATES THE

8  STATEMENT --

9        **THE WITNESS:**  I'M SORRY.  WHAT PAGE?

10        **JUDGE HENDERSON:**  135, LINES THREE THROUGH EIGHT.

11        **THE WITNESS:**  OKAY.

12        **MR. MELLO:**  I'M SORRY.

13        **MS. JOHNSON:**  STARTING AT LINE 12, ON PAGE 135.

14  **BY MR. MELLO:**

15  **Q.**  STARTING AT LINE 12, ON PAGE 135.

16  **A.**  OKAY. I GOT IT.

17  **Q.**  I HAD IT WRONG.  SORRY.

18        IN FORMING THE OPINIONS EXPRESSED IN YOUR NOVEMBER,

19  2007 REPORTS, YOU REVIEWED DOCUMENTS IDENTIFIED BY PLAINTIFFS'

20  COUNSEL AND INSPECTED FACILITIES, BUT DID NOT DO ANY OF YOUR OWN

21  RESEARCH, CORRECT?

22  **A.**  MY OWN RESEARCH?  I'M NOT SURE WHAT YOU'RE REFERRING TO, BUT

23  I REVIEWED DOCUMENTS AND INSPECTED FACILITIES.

24  **Q.**  AND YOU REVIEWED DOCUMENTS THAT WERE IDENTIFIED BY

25  PLAINTIFFS' COUNSEL, CORRECT?

1    **A.**  YES.

2    **Q.**  YOU DIDN'T CONDUCT ANY OF YOUR OWN RESEARCH ON THE INTERNET

3    OR ANYTHING LIKE THAT WITH RESPECT TO THE ISSUES IN THIS CASE,

4    CORRECT?

5    **A.**  CORRECT.

6    **Q.**  AND YOU WENT TO PRISON FACILITIES, CORRECT?

7    **A.**  CORRECT.

8    **Q.**  AND YOU DIDN'T GO TO ANY LIBRARY OR DO ANY OTHER RESEARCH

9    WITH RESPECT TO THE ISSUES PRESENTED TO YOU IN THIS CASE,

10   CORRECT?

11   **A.**  CORRECT.

12   **Q.**  OKAY. AND YOU DID NOT PREPARE THE FIRST DRAFT OF YOUR

13   NOVEMBER, 2007 REPORT, CORRECT?

14   **A.**  WE JOINTLY PREPARED IT. I'M NOT SURE WHAT YOU MEAN.

15   **Q.**  YOU DID NOT TYPE IT, CORRECT?

16   **A.**  NO.

17   **Q.**  YOU DID NOT DICTATE IT, CORRECT?

18   **A.**  WELL, WE DISCUSSED WHAT -- THE WAY WE DID IT WAS WE SAT

19   DOWN, AND I WENT OVER ALL OF THE ISSUES THAT I FOUND, AND THE

20   CONCERNS I HAD WITH REGARD TO THOSE ISSUES.

21          AND THEN, ON THAT BASIS STEVE AND ALISON TYPED IT.

22   AND THEN, I WENT BACK OVER IT, AND WE DISCUSSED IT, AND I

23   REVISED IT.

24   **Q.**  AND YOU'RE TALKING ABOUT YOUR NOVEMBER, 2007 REPORT?

25   **A.**  YES.

1   Q.   OKAY. I'D LIKE TO PULL UP PAGE 51 OF YOUR FIRST DEPOSITION,

2   LINES NINE THROUGH 11.  AND HOPEFULLY GET THE RIGHT ONES THIS

3   TIME.

4          CAN YOU READ THAT, PLEASE?

5   A.   WHICH LINE?

6   Q.   NINE THROUGH 11.  IT'S UP THERE ON THE SCREEN, AS WELL.

7   A.   YES, I CLEARLY MISSPOKE.

8   Q.   YOU MISSPOKE DURING YOUR DEPOSITION?

9   A.   YES.

10          IF THE QUESTION WAS:

11              "DID YOU TYPE IT," THEN THE ANSWER IS:

12              "NO, I DID NOT."

13          I HATE TYPING.

14   Q.   NOR DID YOU DICTATE IT, NOR DID YOU WRITE IT OUT BY HAND,

15   CORRECT?

16   A.   IN THE SENSE THAT I TOLD THEM WHAT I WANTED IN THERE.  IF

17   YOU WANT TO CALL THAT "DICTATION," THEN CALL IT "DICTATION."

18   Q.   WAS EVERY ITEM THAT'S IN HERE ONE OF YOUR REPORTS ITEMS THAT

19   YOU ASKED TO BE PRESENT IN THOSE REPORTS?

20   A.   YES, THOSE WERE THE --

21   Q.   EVERY SINGLE QUOTE?

22   A.   I DON'T KNOW THAT EVERY SINGLE QUOTE I GAVE THEM. BUT I WENT

23   OVER IN A FAIR AMOUNT OF DETAIL.

24   Q.   YOU AGREED WITH IT.

25   A.   WHAT?

1  Q.  YOU AGREED WITH YOUR REPORT.

2  A.  WELL, I STARTED OUT INDICATING THE AREAS THAT I WANTED TO

3  ADDRESS AND WHAT MY CONCERNS WERE.

4  Q.  BUT YOU DID NOT SELECT EVERY ITEM OF TEXT IN THAT REPORT,

5  CORRECT?  PLAINTIFFS' COUNSEL SUGGESTED MUCH OF THE REPORT.

6  A.  THAT'S CORRECT.

7  Q.  THIS PREPARING YOUR SEPTEMBER 10TH, 2008 REPORT, YOU VISITED

8  NORTH KERN STATE PRISON, PLEASANT VALLEY STATE PRISON, SOLANO

9  AND HIGH DESERT STATE PRISON, CORRECT?

10  A.  NORTH CONCERN -- YOU'RE MISSING ONE.  AND SATF.

11  Q.  OH, AND SATF.

12        SO YOU WENT TO SIX PRISONS, THEN?

13  A.  NO, FIVE.  YOU ONLY GAVE ME FOUR.

14  Q.  I SAID:

15        "NORTH KERN, PLEASANT VALLEY, SOLANO AND HIGH

16        DESERT."

17  A.  THAT'S FOUR.

18  Q.  OKAY.  AND SATF.

19  A.  YOU TRIED TO TRICK ME AGAIN.

20  Q.  I'M SORRY.

21        YOU DO NOT KNOW WHETHER THOSE FIVE PRISONS ARE

22  REPRESENTATIVE OF THE CLINICAL SPACE AT ALL OTHER 28 PRISONS, DO

23  YOU?

24  A.  I CAN'T SAY "ALL OTHERS." I DO KNOW THAT THE DEPARTMENT TO

25  SOME EXTENT HAS USED TEMPLATES, AND BUILT SEVERAL PRISONS A

1  GIVEN MODEL.  AND I HAVE SEEN SEVERAL DIFFERENT MODELS.

2           I CAN'T TELL YOU WHAT PERCENTAGE OF THE TOTAL BEDS

3  THAT I'VE SEEN ARE REPRESENTATIVE OF THE ENTIRE SET OF BEDS IN

4  THE AGENCY. BUT I DO KNOW THAT THAT'S HOW THEY DESIGNED AND

5  BUILT.

6           SO IF YOU WENT TO A PARTICULAR MODEL, IT'S LIKELY

7  THAT THERE ARE TWO, THREE, FOUR, FIVE OTHER SIMILARLY-DESIGNED

8  PRISONS.

9  **Q.**  BUT YOU'RE NOT CERTAIN THAT THE FIVE PRISONS THAT YOU

10  VISITED IN AUGUST, 2008 ARE REPRESENTATIVE OF THE OTHER 28

11  PRISONS, CORRECT?

12  **A.**  CORRECT.

13  **Q.**  ON PAGES 35 AND 36, AT PARAGRAPH 118 OF YOUR SEPTEMBER 10,

14  2008 REPORT, WHY DON'T YOU GET THERE?  AND I'M GOING TO READ A

15  PORTION OF IT.

16  **A.**  WHAT WERE THE PAGES, AGAIN?

17  **Q.**  35 AND 36, PARAGRAPH 118.

18  **A.**  OKAY. YES.

19  **Q.**  YOU HAVE THAT IN FRONT OF YOU?

20  **A.**  YES.

21  **Q.**  LOOKS LIKE SOME OF THE TEXT IS CUT OFF ON THE SCREEN. I

22  BELIEVE IT READS THAT:

23           "THE CONDITIONS IN NONTRADITIONAL BEDS

24        INCLUDING THE CONVERTED GYMS, CREATE POTENTIAL

25        BREEDING GROUNDS FOR DISEASE."

1          DO YOU SEE THAT?

2   A.  YES.

3   Q.  WHEN YOU WROTE THAT, YOU WERE NOT AWARE OF ANY OUTBREAKS OF

4   DISEASE THAT WERE CAUSED IN THE PRECEDING YEARS BY THE USE OF

5   NONTRADITIONAL BEDS IN CDCR'S INSTITUTIONS, WERE YOU?

6   A.  THAT'S CORRECT.

7   Q.  ON PAGE SIX, PARAGRAPH 18 OF YOUR SEPTEMBER 10, 2008 REPORT,

8   YOU WROTE -- SO PAGE SIX, PARAGRAPH 18 OF THE SAME REPORT.

9   A.  OKAY.

10  Q.  "I BELIEVE THE LACK OF CLINICAL AND MEDICAL OFFICE SPACE

11          CREATES AN UNPROFESSIONAL WORKING ATMOSPHERE AND

12          LIKELY IMPEDES CDCR'S RECRUITMENT AND RETENTION

13          EFFORTS," END QUOTE.

14          DO YOU SEE THAT?

15  A.  YES.

16  Q.  WHEN YOU WROTE THAT YOU WERE NOT AWARE OF EVEN A SINGLE

17  INSTANCE WHERE A RECRUIT DECLINED A CLINICAL STAFF POSITION DUE

18  TO THE LACK OF CLINICAL AND MEDICAL OFFICE SPACE, WERE YOU?

19  A.  I DON'T KNOW NAMES, BUT SOME OF THE CMO'S I TALKED TO

20  INDICATED THAT THEY HAD PEOPLE COME IN, AND DO THEIR INTERVIEW

21  AND LOOK AROUND, AND THEN DECIDE IT WASN'T FOR THEM.

22  Q.  I'M GOING TO TAKE YOU TO PAGE 84 OF YOUR SECOND DEPOSITION

23  ONE MORNING IN CHICAGO, PAGE 84, LINES 13 THROUGH 17.

24  A.  PAGE 84?

25          OH, IT'S THE FOUR-THINGS-TO-PAGE.  WAIT A MINUTE.

1  **Q.**  IT'S ALSO PROBABLY ON THE SCREEN.

2  **A.**  YES, OKAY.  AND WHAT LINES?

3  **Q.**  LINES 13 THROUGH 17.

4  **A.**  YES.

5  **Q.**  OKAY.  AND IT SAYS:

6              "ARE YOU AWARE OF ANY SPECIFIC INSTANCE WHERE

7          A RECRUIT DECLINED A CLINICAL STAFF POSITION DUE TO A

8          LACK OF CLINICAL AND MEDICAL OFFICE SPACE," AND YOU

9  SAID:

10             "NO," CORRECT?

11  **A.**  CORRECT.  I THOUGHT YOU WERE REFERRING TO A SPECIFIC PERSON.

12  **Q.**  BUT YOU DIDN'T TELL HELP THAT AT YOUR DEPOSITION?

13  **A.**  CORRECT.

14  **Q.**  YOU WROTE THAT, OR YOUR SEPTEMBER, 2008 REPORT STATES AT

15  PAGE 36, PARAGRAPH 119 THAT:

16             "I STILL BELIEVE THAT SOME OF THE HIRING GAINS

17          FOR CLINICIANS WILL BE LOST IF THESE SYSTEMATIC

18          ISSUES ARE NOT ADDRESSED, BECAUSE MANY NEWLY-HIRED

19          CLINICIANS WILL BE UNWILLING TO RISK THEIR

20          PROFESSIONAL CREDENTIALS AND REPUTATIONS BY

21          PRACTICING IN AN ENVIRONMENT WHERE THEIR PATIENTS ARE

22          AT RISK OF HARM," END QUOTE.

23             DO YOU SEE THAT?

24  **A.**  YES.

25  **Q.**  WHEN YOU WROTE THAT YOU HAD NOT DONE ANY SURVEY OF THE

1  NEWLY-HIRED CLINICIANS AT CDCR, HAD YOU?

2  **A.**  NO, NOT AT THAT TIME.

3  **Q.**  AND WHEN YOU WROTE THAT YOU WERE NOT AWARE OF ANY SURVEYS

4  DONE BY CDCR OR THE RECEIVER REGARDING NEWLY-HIRED CLINICIANS,

5  WERE YOU?

6  **A.**  NOT AT THAT TIME.

7  **Q.**  AND THAT OPINION WAS NOT BASED -- PARDON ME.

8           AND THAT OPINION WAS NOT BASED OF ANY STUDIES OF

9  NEWLY-HIRED CLINICIANS IN ANY OTHER SYSTEMS, WAS IT?

10  **A.**  NO.

11  **Q.**  AND THAT OPINION WAS BASED SOLELY ON ANTIDOTAL INFORMATION

12  YOU RECEIVED FROM INDIVIDUAL PHYSICIANS IN OTHER STATES WHO QUIT

13  THEIR JOBS, CORRECT?

14  **A.**  WELL, BASED ON MY EXPERIENCE, NOT JUST ANTIDOTAL

15  INFORMATION.

16           I HAVE DEALT WITH THAT MYSELF IN HIRING PEOPLE.

17  **Q.**  BUT IT WAS NOT BASED UP ANY STUDIES OR SURVEYS OR REPORTS IN

18  CALIFORNIA, CORRECT?

19  **A.**  CORRECT.

20  **Q.**  DR. SHANSKY, YOU HAVE EXPERIENCE WORKING WITH OR EVALUATING

21  BADLY OVERCROWDED SYSTEMS, INCLUDING ILLINOIS IN THE '80'S,

22  CORRECT?

23  **A.**  CORRECT.

24  **Q.**  IN FACT, AS YOU TESTIFIED ON THE DIRECT, YOU WERE THE

25  MEDICAL DIRECTOR OF ILLINOIS SYSTEM FOR A PERIOD OF YEARS.

1  **A.**  YES.

2  **Q.**  AND ILLINOIS SYSTEM EVENTUALLY -- OR WAS IN CONSTITUTIONAL

3  COMPLIANCE, CORRECT?

4  **A.**  ILLINOIS SYSTEM WAS WHAT?

5  **Q.**  LET ME BACK UP.

6  **A.**  OKAY.

7  **Q.**  AT THE TIME IT WAS OVERCROWDED, WAS THE ILLINOIS SYSTEM IN

8  CONSTITUTIONAL COMPLIANCE?

9  **A.**  I WAS FORTUNATE.  AT THE TIME THAT I BECAME MEDICAL

10 DIRECTOR, THE SYSTEM WAS NOT BADLY OVERCROWDED. THERE WERE TWO

11 EXISTING LAWSUITS. ONE WAS LIGHTFOOT VERSUS WALKER, INVOLVING

12 MENARD, THE OTHER WAS COOK VERSUS ROE, INVOLVING STATEVILLE.

13        BUT THOSE CASES WERE NOT ABOUT CROWDING. IT WAS

14 ABOUT -- THEY WERE ABOUT AN INADEQUATE HEALTHCARE SYSTEM.  AND

15 THOSE WERE RESOLVED WITHIN A YEAR OR TWO, AFTER I CAME ONBOARD.

16 BUT WE DIDN'T HAVE A CROWDING CASE.

17 **Q.**  YOU DID NOT HAVE A CROWDING CASE, BUT I BELIEVE YOU

18 TESTIFIED THAT YOU HAD CROWDING?

19 **A.**  LATER ON IN MY TENURE, YES.

20 **Q.**  AND WERE YOU ABLE TO ADDRESS THE MEDICAL DEFICIENCIES IN

21 YOUR SYSTEMS WITHOUT A PRISONER RELEASE ORDER IN ILLINOIS?

22 **A.**  YES.

23        **JUDGE HENDERSON:**  CAN YOU CLARIFY WHETHER "CROWDING"

24 IS THE SAME AS "OVERCROWDING"?

25        **MR. MELLO:**  SURE.

1  **BY MR. MELLO:**

2  **Q.** YOU HAD OVERCROWDING IN ILLINOIS, CORRECT?

3  **A.** NOWHERE NEAR TO THE EXTENT THAT IT IS HERE.  I THINK SOME

4  PLACES MAY HAVE GOTTEN AS HIGH AS ABOUT 140 PERCENT OF

5  OCCUPANCY.

6  **Q.** AND WHEN YOU SAY "140 PERCENT OF OCCUPANCY," IS THAT

7  OPERABLE CAPACITY, DESIGN CAPACITY, SOME OTHER CAPACITY?

8  **A.** I THINK IT'S DESIGN CAPACITY.

9  **Q.** HAVE YOU HEARD THE TERM "OPERABLE CAPACITY"?

10 **A.** I'M NOT SURE WHAT THAT MEANS, THOUGH.

11 **Q.** AND BUT ILLINOIS WAS OVERCROWDED, CORRECT?

12 **A.** YES.

13 **Q.** AND IT SOLVED ITS MEDICAL CARE DEFICIENCIES WHILE

14 OVERCROWDED WITHOUT THE USE OF A PRISONER RELEASE ORDER,

15 CORRECT?

16 **A.** CORRECT.

17 **Q.** DR. SHANSKY, YOU WORKED AS A CONSULTANT FOR CDCR IN A SERIES

18 OF TWO-YEAR CONTRACTS THROUGH JUNE OF 2006, CORRECT?

19         LET ME JUST BACK IT UP, AND MAKE IT LESS COMPLICATED.

20         YOU WORKED AS A CONSULTANT TO THE CDCR FOR SOME

21 PERIOD OF TIME, CORRECT?

22 **A.** YES.

23 **Q.** AND YOU WORKED ON THIS VERY PLATA CASE FOR CDCR, CORRECT?

24 **A.** YES.

25 **Q.** AND YOU STOPPED WORKING FOR CDCR ON PLATA IN JUNE OF 2006,

1  CORRECT?

2  **A.**  YES.

3  **Q.**  DR. SHANSKY, YOU HAVE NEVER LEARNED OF AN INMATE-PATIENT

4  SUFFERING AN ADVERSE MEDICAL CONSEQUENCE AS A RESULT OF A

5  LOCKDOWN AT A CDCR INSTITUTION, HAVE YOU?

6              **MS. HARDY:**  EXCUSE ME.  I DIDN'T HEAR THE QUESTION.

7              **THE WITNESS:**  I DIDN'T HEAR YOU.

8              **MR. MELLO:**  SHE DIDN'T HEAR THE QUESTION.

9              CAN YOU READ IT BACK?

10             **THE COURT REPORTER:** SURE.

11                   (THE QUESTION WAS READ BACK BY THE REPORTER

12                   AS FOLLOWS:

13                 "**QUESTION:**DR. SHANSKY, YOU HAVE NEVER

14             LEARNED OF AN INMATE-PATIENT SUFFERING AN

15             ADVERSE MEDICAL CONSEQUENCE AS A RESULT OF A

16             LOCKDOWN AT A CDCR INSTITUTION, HAVE YOU?")

17             **THE WITNESS:**  I WOULDN'T NECESSARILY AGREE WITH THAT.

18  I CLEARLY WAS FAMILIAR WITH MANY INSTANCES OF ACCESS BEING

19  SUBSTANTIALLY DELAYED AND ADVERSE OUTCOMES OCCURRING.  WHETHER

20  SOME WERE THE RESULT OF LOCKDOWNS, SPECIFICALLY, I'M NOT

21  CERTAIN. BUT CLEARLY SUBSTANTIALLY-DELAYED ACCESS RESULTING IN

22  ADVERSE OUTCOMES I WAS AWARE OF.

23  **BY MR. MELLO:**

24  **Q.**  YOU WERE AWARE OF ADVERSE OUTCOMES?

25  **A.**  RELATED TO SUBSTANTIALLY-DELAYED ACCESS, ABSOLUTELY.

1  Q.  AND WAS THAT SUBSTANTIALLY-DELAYED ACCESS THE RESULT OF A

2  LOCKDOWN?

3  A.  I DON'T KNOW, SO I'M NOT CERTAIN ONE WAY OR THE OTHER.

4  Q.  OKAY. IN FACT, SUBSTANTIALLY-DELAYED ACCESS COULD BE THE

5  RESULT OF PATIENT REFUSALS, CORRECT?

6  A.  WELL, THAT WE WOULDN'T CONCERN -- PATIENT REFUSAL WOULDN'T

7  BE INCLUDED IN A DELAYED ACCESS CLASSIFICATION.

8  Q.  BUT YOU COULD IMPROVE ACCESS TO CARE WITH MORE MEDICAL

9  ESCORTS, CORRECT?

10  A.  I DIDN'T HEAR YOU.

11  Q.  YOU COULD IMPROVE ACCESS TO CARE WITH ADDITIONAL MEDICAL

12  ESCORTS, CORRECT?

13  A.  YES.

14  Q.  AND YOU'VE HEARD THAT THE RECEIVER HAS PILOTED MEDICAL CARE

15  ACCESS TEAMS THAT INCLUDE LARGE NUMBERS OF CORRECTIONAL

16  OFFICERS, CORRECT?

17  A.  CORRECT.

18  Q.  AND YOU BELIEVE THAT TO BE A GOOD THING, CORRECT?

19  A.  CORRECT.

20  Q.  AND YOU BELIEVE THAT WILL IMPROVE THE QUALITY AND IMPROVING

21  THE QUALITY OF CARE IN CDCR'S INSTITUTIONS, CORRECT?

22  A.  YES, IT SHOULD.

23  Q.  AS PART OF YOUR CONSULTATION WITH CDCR, YOU HAD A ROLE IN

24  DRAFTING THE PLATA POLICIES AND PROCEDURES THAT WERE ADPOTED BY

25  THE PARTIES IN THE PLATA CASE, CORRECT?

1    **A.**  THAT'S CORRECT.

2    **Q.**  AND WHILE YOU WERE A CONSULTANT TO CDCR, YOU MADE NUMEROUS

3    RECOMMENDATIONS AT IMPROVING CDCR'S MEDICAL CARE DELIVERY

4    SYSTEM, CORRECT?

5    **A.**  CORRECT.

6    **Q.**  AND WHEN YOU WERE A CONSULTANT TO CDCR, YOU NEVER SUGGESTED

7    TO CDCR THAT IT REDUCE ITS INMATE POPULATION TO 130 PERCENT OF

8    DESIGN BED CAPACITY, DID YOU?

9    **A.**  NO, I DIDN'T MAKE ANY RECOMMENDATIONS WITH REGARD TO

10   POPULATION.

11   **Q.**  PARDON?

12   **A.**  I MADE NO RECOMMENDATIONS WITH REGARD TO POPULATION.

13   **Q.**  AND WHEN YOU APPLIED TO BE THE TEMPORARY RECEIVER IN THE

14   PLATA CASE, YOU DID NOT MAKE ANY RECOMMENDATIONS WITH RESPECT TO

15   POPULATION, EITHER, DID YOU?

16   **A.**  NO, THAT WAS -- I MEAN, THE TEMPORARY RECEIVERSHIP WAS

17   FOCUSED ON PHYSICIAN QUALITY.  AND SO WE WERE -- BY PROPOSAL

18   DISCUSSED HOW WE WOULD ATTEMPT TO ACHIEVE IMPROVED PHYSICIAN

19   QUALITY.

20   **Q.**  BECAUSE YOU BELIEVE THAT TO BE -- AT THAT TIME YOU BELIEVED

21   THAT TO BE THE SINGLE MOST IMPORTANT ASPECT TO IMPROVING MEDICAL

22   CARE IN CALIFORNIA SYSTEMS?

23   **A.**  THAT WAS THE CONCERN OF JUDGE HENDERSON, AND IT'S CLEARLY

24   HIS DECISION AS TO WHAT PATH TO TAKE.

25          AND IN MY DISCUSSION WITH HIM, HE PERCEIVED THAT AS

1  SOMETHING THAT COULD BE ADDRESSED EFFECTIVELY RELATIVELY

2  QUICKLY.

3  **Q.**  AND I BELIEVE YOU'VE TESTIFIED GENERALLY ABOUT POPULATION

4  REDUCTION NUMBERS TO 100,000.  THAT'S A NUMBER YOU USED?

5  **A.**  I GAVE THAT AS A HYPOTHETICAL.

6  **Q.**  AS A HYPOTHETICAL EXAMPLE.

7        ISN'T IT TRUE, IN FACT, THAT YOU HESITATE TODAY TO

8  COME UP WITH A FIGURE TO WHICH THE PRISON POPULATION NEEDS TO BE

9  REDUCED TO ACHIEVE CONSTITUTIONAL LEVELS OF CARE, BECAUSE IN

10 YOUR OPINION THAT WOULD REQUIRE DOING A STUDY THAT REQUIRES DATA

11 FROM THE PLATA RECEIVER?

12 **A.**  YES, THAT'S CORRECT.

13 **Q.**  AND IN YOUR OPINION, IF THE ONLY IMPROVEMENT THAT WAS MADE

14 IN THE NEXT TWO YEARS IS THE DECREASE OF THE POPULATION IN

15 CALIFORNIA'S PRISONS BY 40,000 INMATES, AND EVERYTHING ELSE

16 REMAINED THE STATUS QUO, CDCR WOULD STILL NOT HAVE A SYSTEM-WIDE

17 CONSTITUTIONALLY-ADEQUATE MEDICAL CARE SYSTEM, CORRECT?

18 **A.**  YES, I BELIEVE THAT.

19 **Q.**  AND YOU, DR. SHANSKY, DO NOT HAVE AN OPINION AS TO WHETHER

20 OR NOT POPULATION IS THE PRIMARY CAUSE OF THE UNCONSTITUTIONAL

21 DELIVERY AT EACH OF THE INSTITUTIONS COVERED BY THE PLATA

22 STIPULATION, DO YOU?

23 **A.**  I HAVE.  MY OPINION IS THAT THE PRIMARY CAUSE OF THE

24 SYSTEM'S UNCONSTITUTIONALITY, ONGOING UNCONSTITUTIONALITY IS

25 OVERCROWDING.

1          **MR. MELLO:**  I THINK I ONLY HAVE ONE MORE QUESTION.

2          I'D LIKE TO PULL UP PAGE 151 OF HIS FIRST DEPOSITION,

3  LINES FIVE THROUGH 10.

4          **THE WITNESS:**  151?

5  BY MR. MELLO:

6  **Q.**  IT'S ALSO ON THE SCREEN, DR. SHANSKY.

7  **A.**  YES, I'M LOOKING AT IT IN THE DOCUMENT.

8  **Q.**  AND DR. SHANSKY, I'M JUST GOING TO READ THAT INTO THE

9  RECORD.

10          THE QUESTION WAS:

11              "DR. SHANSKY, DO YOU HAVE AN OPINION AS TO

12          WHETHER OR NOT POPULATION IS THE PRIMARY CAUSE OF THE

13          UNCONSTITUTIONAL DELIVERY OF HEALTHCARE IN EACH ONE

14          OF THE 32 INSTITUTIONS?

15              "ANSWER:  I DON'T HAVE AN OPINION ON THAT

16          BECAUSE I HAVE NO DATA."

17          DO YOU SEE THAT?

18  **A.**  YES.  THE CRITICAL PHRASE THERE IS:

19              "IN EACH ONE OF THE INSTITUTIONS."

20          I COULDN'T SPEAK TO EACH ONE OF THE INSTITUTIONS.

21  **Q.**  SO YOUR TESTIMONY IS THAT YOU CAN'T TELL THIS COURT WHETHER

22  OR NOT OVERCROWDING IS THE PRIMARY CAUSE OF THE UNCONSTITUTIONAL

23  DELIVERY OF HEALTHCARE AT THE 32 PRISONS THAT WERE STILL SUBJECT

24  TO THE PLATA STIPULATION IN DECEMBER, 2007?

25          **JUDGE KARLTON:**  THAT'S DIFFERENT QUESTION.  DIFFERENT

1  QUESTION.

2          THIS QUESTION SAYS:

3              "IN THE 32."

4          THE OTHER QUESTION SAYS:

5              "IN EACH OF THE 32."

6  **BY MR. MELLO:**

7  **Q.**  OKAY.  CAN YOU TELL ME WHETHER IT'S THE PRIMARY CAUSE AT

8  EACH INSTITUTION IN THE SYSTEM?

9          YOU SAID BEFORE YOU COULDN'T. CAN YOU TELL ME TODAY?

10 **A.**  AT EACH INDIVIDUAL PRISON, I CAN'T COMMENT ON EACH

11 INDIVIDUAL PRISON. I CAN TELL YOU FOR THE ENTIRE SYSTEM THERE'S

12 NO QUESTION IN MY MIND THAT IT'S THE PRIMARY CAUSE OF ONGOING

13 UNCONSTITUTIONALITY, AND IT'S OVERCROWDING.

14 **Q.**  DESPITE THE FACT THAT YOU CAN'T TELL ME WHETHER IT'S THE

15 PRIMARY CAUSE AT ANY OF THE PRISONS THAT YOU DIDN'T VISIT?

16         **MS. HARDY:**  OBJECTION, ARGUMENTATIVE.

17         OBJECTION, ARGUMENTATIVE.

18         **JUDGE HENDERSON:**  ANSWER IT, DR. SHANSKY.

19         **THE WITNESS:**  COULD YOU REPEAT THE QUESTION?

20         **JUDGE HENDERSON:**  IN SPITE OF THE FACT THAT YOU SAID

21 HERE THAT YOU DON'T HAVE AN OPINION ON WHETHER IT'S

22 UNCONSTITUTIONAL IN EACH ONE OF THE 32 INSTITUTIONS.

23 **BY MR. MELLO:**

24 **Q.**  SO THE QUESTION IS:  CAN YOU TELL ME -- IT'S A NEW QUESTION.

25         CAN YOU TELL ME WHICH ONE OF THE 33 CALIFORNIA

1  INSTITUTIONS AT WHICH OVERCROWDING IS THE PRIMARY CAUSE OF THE

2  UNCONSTITUTIONAL DELIVERY OF HEALTHCARE IN LIGHT OF YOUR

3  PREVIOUS TESTIMONY?

4  **A.**  AT WHICH OF THE 32 DO I BELIEVE BASED ON MY EXPERIENCES THAT

5  IT IS THE PRIMARY CAUSE. I CAN TELL YOU FROM, A: MY REVIEW OF

6  NINE FACILITIES, IT'S CLEARLY THE PRIMARY CAUSE AT THOSE NINE.

7            AND IN READING THE RECEIVER'S DOCUMENTS ABOUT THE

8  SYSTEM, IN GENERAL, INCLUDING THE DEATH REVIEW SUMMARY, THE

9  CONCLUSION IS, TO ME, NOT EVEN IN DOUBT THAT FOR THE ENTIRE

10  SYSTEM THIS IS THE PRIMARY CAUSE OF ONGOING UNCONSTITUTIONALITY.

11  AND THIS IS THE MAJOR REASON THAT THE RECEIVER WILL TAKE LONGER

12  TO FIX THE SYSTEM THAN WERE THE POPULATION REDUCED.

13  **Q.**  AND BACK TO THAT DEATH REVIEW, YOU'VE REVIEWED THE 2007

14  DEATH REVIEW, CORRECT?

15  **A.**  YES.

16  **Q.**  AND THAT DEATH REVIEW PROVIDES THERE WERE THREE PREVENTABLE

17  DEATHS IN 2007, CORRECT?

18  **A.**  YES.

19  **Q.**  THREE OUT OF 395 THAT WERE REVIEWED, CORRECT?

20  **A.**  YES.

21  **Q.**  THAT'S WELL BELOW 1 PERCENT, CORRECT?

22  **A.**  YES.

23  **Q.**  IS THAT NUMBER SURPRISING TO YOU?

24  **A.**  NO, THAT NUMBER IS NOT SURPRISING. BUT WHEN YOU ADD THE

25  PREVENTABLE WITH THE POSSIBLY ARE PREVENTABLE THAT NUMBER IS

1    SURPRISING.

2    **Q.**  AND IT'S YOUR TESTIMONY THAT "POSSIBLY PREVENTABLE" MEANS

3    IT'S FIFTY-FIFTY THAT BETTER CARE WOULD HAVE POSSIBLY PREVENTED

4    THE DEATH?

5    **A.**  MITIGATED THE OUTCOME, YES.

6    **Q.**  ONE SECOND.

7              **MR. MELLO:**  THAT'S IT. THANK YOU, DR. SHANSKY.

8              **THE WITNESS:**  THANK YOU.

9              **JUDGE HENDERSON:**  WE'RE GOING TO TAKE A 15-MINUTE

10   RECESS AT THIS POINT.

11             **THE CLERK:**  COURT'S ADJOURNED.

12                    (THEREUPON, A RECESS WAS TAKEN.)

13             **JUDGE HENDERSON:**  OKAY.  YOUR CROSS-EXAMINATION.

14             **CROSS-EXAMINATION BY MR. KAUFHOLD**

15             **MR. KAUFHOLD:**  THANK YOU, YOUR HONOR.  STEVE KAUFHOLD

16   FOR THE LEGISLATIVE INTERVENORS.

17   BY MR. KAUFHOLD

18   **Q**   GOOD MORNING, DR. SHANSKY.

19   **A**   GOOD MORNING.

20   **Q**   TURN TO THE FIRST PAGE OF YOUR SECOND EXPERT REPORT FROM

21   SEPTEMBER OF THIS YEAR.  ON THE FIRST PAGE, THERE'S A HEADING

22   THAT SETS FORTH THE BASIS FOR YOUR EXPERT OPINIONS.

23             IN PARAGRAPH FIVE THERE YOU WRITE:

24                "I HAVE BEEN ASKED TO RENDER MY OPINION WITH

25                RESPECT TO WHETHER OVERCROWDING IN THE

1          CALIFORNIA DEPARTMENT OF CORRECTIONS AND

2          REHABILITATION CDCR IS THE PRIMARY CAUSE OF THE

3          CURRENT UNCONSTITUTIONAL CONDITIONS EXPERIENCED

4          BY MEMBERS OF THE COLEMAN AND PLATA CLASSES."

5          DO YOU SEE WHERE I'M REFERRING TO?

6   **A**   YES.

7   **Q**   MY QUESTION IS THIS:  WHEN YOU REFER TO THE CURRENT

8   UNCONSTITUTIONAL CONDITIONS, WAS THAT SOMETHING THAT WAS PART OF

9   YOUR RESEARCH AND ANALYSIS AND OPINION, OR IS THAT A FACT THAT

10  YOU TOOK AS A GIVEN IN YOUR ANALYSIS?

11          **MS. HARDY:**  OBJECTION, YOUR HONOR.  RELEVANCE.

12          **JUDGE KARLTON:**  OVERRULED.  OH, EXCUSE ME.

13          **JUDGE HENDERSON:**  IT'S BEEN SAID BETTER THAN I COULD.

14          **THE WITNESS:**  I TOOK IT AS A GIVEN, BUT IT ALSO WAS

15  CONFIRMED BY MY REVIEWS OF THE PRISONS I WENT TO.

16  BY MR. KAUFHOLD

17  **Q**   SO IS IT YOUR TESTIMONY THAT YOU HAVE AN EXPERT OPINION ON

18  THE LEGAL ISSUE OF THE CURRENT CONSTITUTIONALITY OF THE

19  CALIFORNIA PRISONS?

20  **A**   ASK THE QUESTION AGAIN.

21  **Q**   SURE.  MY QUESTION IS:  IS IT YOUR TESTIMONY THAT YOU HAVE

22  FORMED AND HAVE TODAY AN EXPERT OPINION REGARDING THE CURRENT

23  CONSTITUTIONALITY OF THE CALIFORNIA PRISONS?

24  **A**   NO.  AS I SAID, THAT WAS A GIVEN, BUT MY REVIEWS WERE

25  CONSISTENT WITH THAT GIVEN.

1  Q   JUST TO MAKE COMPLETELY CLEAR.  SO THAT IS NOT PART OF THE

2  FORMAL OPINION THAT YOU ARE OFFERING TO THE COURT TODAY; IS THAT

3  CORRECT?

4  A   "THAT" BEING?

5  Q   "THAT" BEING THE ULTIMATE EXPERT OPINION THAT THERE IS

6  CURRENT UNCONSTITUTIONALITY IN THE CALIFORNIA PRISONS.  THAT IS

7  NOT PART OF YOUR EXPERT OPINION; IS THAT CORRECT?

8  A   THAT'S CORRECT.

9  Q   TURNING TO THE FINAL PAGE OF THE SAME REPORT, THAT'S PAGE 36

10 OF YOUR SEPTEMBER 9, SECOND SUPPLEMENTAL DECLARATION, OR EXPERT

11 REPORT, I'M SORRY.  YOU STATE:

12              "BASED ON ALL THAT I HAVE SET FORTH ABOVE IN

13          MY PREVIOUS REPORTS, I CONTINUE TO BELIEVE THAT

14          OVERCROWDING IS THE PRIMARY CAUSE OF THE CURRENT

15          STATE OF MEDICAL CRISIS IN THE CDCR."

16          DO YOU SEE WHERE I'M REFERRING TO?

17 A   YES.

18 Q   AND IN THE CONCLUSIONS PORTIONS OF YOUR OPINION, THERE'S NO

19 REFERENCE TO CURRENT UNCONSTITUTIONAL CONDITIONS; IS THAT

20 CORRECT?

21 A   IN THIS PARAGRAPH?

22 Q   CORRECT.

23 A   I DON'T REFER TO THAT, CORRECT.

24 Q   REFERRING TO YOUR EARLIER TESTIMONY WHEN YOU HAD YOUR

25 CONVERSATION WITH MR. MELLO, YOU DISCUSSED THE HYPOTHETICAL

1  FIGURE OF A HUNDRED THOUSAND INMATES IN THE SYSTEM; DO YOU

2  RECALL THAT?

3  **A**    YES.

4  **Q**    AND YOU HAVE NOT, HOWEVER, DONE ANY SYSTEMATIC ANALYSIS OF

5  WHAT AN APPROPRIATE NUMBER OF INMATES FOR THE CALIFORNIA CDCR

6  WOULD BE, HAVE YOU?

7  **A**    NO, BECAUSE I DIDN'T SAY THAT WAS THE APPROPRIATE NUMBER.

8  MY TESTIMONY WAS IF SUCH A NUMBER WERE REACHED, HYPOTHETICALLY,

9  THEN THE RECEIVER WOULD BE ABLE TO ACHIEVE A CONSTITUTIONAL

10  LEVEL OF CARE IN A MAJORITY OF THE PRISONS WITHIN THREE YEARS.

11  **Q**    RIGHT.  AND, IN FACT, IN YOUR SWORN TESTIMONY TO MR. MELLO,

12  YOU STATED YOU HAD, QUOTE, "NO CLUE," END QUOTE, WHAT AN

13  APPROPRIATE TARGET NUMBER IS; IS THAT CORRECT?

14  **A**    THAT'S CORRECT.

15  **Q**    NOW, ON SEPTEMBER 28TH OF THIS YEAR, 2008, YOU FILED A THIRD

16  SUPPLEMENTAL EXPERT REPORT; DO YOU REMEMBER THAT?

17  **A**    YES.

18  **Q**    WHOSE IDEA WAS IT THAT YOU FILE A THIRD SUPPLEMENTAL REPORT;

19  WAS THAT YOUR IDEA OR PLAINTIFFS' COUNSEL?

20  **A**    I DISCUSSED IT WITH PLAINTIFFS' COUNSEL.

21  **Q**    WHOSE IDEA -- WHO WAS IT THAT RAISED THAT POSSIBILITY; WAS

22  IT YOU OR PLAINTIFFS' COUNSEL?

23  **A**    PLAINTIFFS' COUNSEL.

24  **Q**    WHAT WAS THE PURPOSE FOR THAT?

25  **A**    I THINK IT WAS RESPONDING TO THE RECEIVER'S REPORT.

1  Q    TURNING TO THE SECOND PAGE OF THAT REPORT, OF YOUR SECOND

2  REPORT, WHICH WAS SUBMITTED TO THE COURT AND DATED

3  SEPTEMBER 28TH, 2008, YOU STATE:

4             "DISCUSSING THIS DEVELOPMENT THE RECEIVER

5             EMPHASIZES THAT, QUOTE, 'A CONSTITUTIONALLY

6             ADEQUATE AND SUSTAINABLE PRISON MEDICAL SYSTEM

7             WILL NOT BE ESTABLISHED UNTIL THE TURNAROUND

8             PLAN OF ACTION IS FULLY IMPLEMENTED,'" END

9             QUOTE.

10            AND THEN YOU WRITE:

11            "I AGREE.  AND THE INADEQUATE SYSTEM WILL

12            CONTINUE TO EXIST FOR LONGER THAN OTHERWISE --

13            LONGER THAN IT OTHERWISE WOULD UNLESS THERE'S A

14            SIGNIFICANT REDUCTION IN THE POPULATION."

15            DO YOU SEE WHERE I'M REFERRING TO?

16 A    YES.

17 Q    AND DO YOU AGREE WITH THAT STATEMENT TODAY?

18 A    YES, YES.

19 Q    DO YOU BELIEVE THE FULL IMPLEMENTATION OF THE TURNAROUND

20 PLAN WILL ENSURE A CONSTITUTIONAL LEVEL OF HEALTHCARE AND MENTAL

21 HEALTH CARE IN CALIFORNIA?

22 A    ALONG WITH THE OTHER ADDITIONAL CHANGES THEY'RE MAKING.

23 Q    SO YOU BELIEVE ADDITIONAL CHANGES ARE NEEDED BEYOND THOSE

24 SET FORTH IN THE TURNAROUND PLAN?

25 A    NO.  THE TURNAROUND PLAN LISTS A VARIETY OF THINGS, BOTH

1  ENVIRONMENTAL AND STAFFING AND I.T.  ALL OF THOSE THINGS

2  TOGETHER WILL EVENTUALLY BE ABLE TO ADDRESS MOST OF THE

3  PROBLEMS, UNLESS, OF COURSE, THE POPULATION WILDLY INCREASES

4  AGAIN.

5  **Q**   RIGHT.  AND IT IS NOT PART OF THE TURNAROUND PLAN -- THERE'S

6  NO REQUEST OR PLAN FOR A PRISONER RELEASE ORDER OF ANY SORT; IS

7  THERE?

8  **A**   NOT THAT I'M AWARE OF.

9           **JUDGE KARLTON:**  SIR, THE PLAN REQUIRES THE

10 LEGISLATURE TO PROVIDE LARGE SUMS OF MONEY THAT THEY HAVE NOT

11 YET DONE AND MAY NOT DO.  IS YOUR QUESTION -- IT APPEARS TO ME,

12 BUT I MAY BE WRONG -- THAT YOUR QUESTION IS TALKING ABOUT A

13 HYPOTHETICAL THAT AS OF NOW IS NOT LIKELY TO OCCUR.

14          **MR. KAUFHOLD:**  I CAN'T RESPOND TO THE LIKELIHOOD,

15 YOUR HONOR, BUT IT'S ABSOLUTELY A HYPOTHETICAL IN THE SENSE MY

16 QUESTION TO THE WITNESS WAS THAT, IF YOU ASSUME THAT EVERYTHING

17 IN THE TURNAROUND PLAN IS FULLY IMPLEMENTED, FULLY FUNDED, FULLY

18 IMPLEMENTED, THEN WOULD THAT BE THE RESULT.

19          **JUDGE KARLTON:**  OKAY.

20 BY MR. KAUFHOLD

21 **Q**   NOW, IN TERMS OF THE TIMEFRAME OF POSSIBLY ACHIEVING THAT,

22 DR. SHANSKY, I THINK YOU'VE TESTIFIED PREVIOUSLY THAT IT WASN'T

23 FORESEEABLE WHEN THAT COULD BE ACHIEVED ABSENT A PRISONER

24 RELEASE ORDER OR A POPULATION CAP OF SOME SORT; IS THAT CORRECT?

25 **A**   THAT'S CORRECT.

1  Q   BUT ISN'T IT -- ISN'T IT A FACT THAT IN THE TURNAROUND PLAN

2  ITSELF, THE RECEIVER SAYS IF THE TURNAROUND PLAN IS FULLY

3  IMPLEMENTED, WE CAN EXPECT TO SEE A CONSTITUTIONAL LEVEL OF

4  HEALTHCARE WITHIN THREE TO FIVE YEARS?

5  A   YES.

6          **MR. KAUFHOLD:**  I DON'T HAVE ANY FURTHER QUESTIONS.

7  THANK YOU, DR. SHANSKY.

8          **THE WITNESS:**  THANK YOU.

9          **JUDGE HENDERSON:**  ANY OTHER DEFENDANTS HAVE

10 CROSS-EXAMINATION OR INTERVENORS?

11         **MR. MITCHELL:**  WILLIAM MITCHELL FOR THE D.A.

12 INTERVENORS.  THERE'S ONLY ONE COUNSEL QUESTIONING --

13         **JUDGE HENDERSON:**  THANK YOU FOR REMINDING ME.

14         REDIRECT, COUNSEL.

15         **MS. HARDY:**  MAY I APPROACH THE WITNESS, YOUR HONOR?

16         **JUDGE HENDERSON:**  YOU MAY.

17              **REDIRECT EXAMINATION BY MS. HARDY**

18 BY MS. HARDY

19 Q   DR. SHANSKY, I HAVE HANDED YOU THE POST TOUR LETTER FROM

20 MULE CREEK STATE PRISON THAT IS DEFENDANT'S TRIAL EXHIBIT 1084

21 THAT THEY HANDED YOU EARLIER, THAT THEY DISCUSSED WITH YOU

22 EARLIER.

23         **MR. MELLO:**  OBJECTION.  PAUL MELLO FOR PLATA

24 DEFENDANTS.  OBJECTION, HEARSAY.

25         **JUDGE HENDERSON:**  THIS IS A DOCUMENT THAT MR. MELLO

1  USED?

2          **MS. HARDY:**  THIS IS THE DOCUMENT MR. MELLO USED

3  EARLIER.

4          **MR. MELLO:**  I USED A PORTION OF THE DOCUMENT WHICH I

5  GET TO SELECT AS A PARTY ADMISSION.  IT'S NOT A PARTY ADMISSION

6  FOR PLAINTIFFS.  IT'S HEARSAY.  IT CAN'T BE OFFERED FOR THE

7  TRUTH OF THE MATTER ASSERTED.  I UNDERSTAND THE COURT WILL

8  PROBABLY PRESERVE THE OBJECTION.

9          **JUDGE KARLTON:**  MORE IMPORTANTLY, IF THIS IS A

10 CONTRIBUTION TO HIS OPINION, IT COMES IN ON THAT BASIS.  I DON'T

11 KNOW WHETHER IT IS OR NOT.

12          DID YOU READ THIS BEFORE?

13          **THE WITNESS:**  A WHILE AGO.

14          **JUDGE KARLTON:**  AND DID YOU TAKE IT INTO

15 CONSIDERATION IN FORMING YOUR OPINIONS?

16          **THE WITNESS:**  YES, PARTICULARLY WITH REGARD TO THE

17 THESE DOCUMENTS AND THEIR CREDIBILITY.

18 BY MS. HARDY

19 **Q**   YOU TESTIFIED EARLIER ABOUT THIS PARTICULAR EXHIBIT THAT

20 MR. FAMA HAD WRITTEN THAT THERE APPEARED TO BE SOME LEVEL OF

21 COMPLIANCE WITH SOME OF ACCESS ISSUES AT MULE CREEK STATE

22 PRISON; IS THAT RIGHT?

23 **A**   THAT'S CORRECT.

24 **Q**   OKAY.  I WOULD LIKE YOU TO TURN TO PAGE 12 OF THAT DOCUMENT.

25          **JUDGE KARLTON:**  MA'AM, BEFORE HE DOES THAT, IS THE

1   DOCUMENT IN EVIDENCE?

2          **MS. HARDY:**  IT IS DEFENDANTS' DOCUMENT EXHIBIT NO.

3   1084.

4          **JUDGE KARLTON:**  YOU MAY PROCEED.

5          **MS. HARDY:**  THANK YOU.  I'LL START READING FROM THE

6   HEADING WHICH SAYS, "CTC AND OHU MEDICAL BEDS."

7          **MR. MELLO:**  YOUR HONORS, PAUL MELLO AGAIN.  I DON'T

8   BELIEVE ANY DOCUMENTS ARE ACTUALLY IN EVIDENCE YET.  THERE ARE

9   DOCUMENTS THAT HAVE BEEN OFFERED.  I DON'T BELIEVE THAT THE

10  COURT HAS ADMITTED ANY DOCUMENT INTO EVIDENCE, ANY EXHIBIT.  WE

11  HAVE NOT MOVED IT INTO EVIDENCE.  AND I BELIEVE THIS IS HEARSAY,

12  AND I DO NOT BELIEVE THAT THEY HAVE ESTABLISHED THAT HE USED

13  THIS DOCUMENT TO RELY ON IT IN FORMING HIS OPINIONS.

14          I BELIEVE THE RECORD WILL ACTUALLY DEMONSTRATE HE SAW

15  IT FOR THE FIRST TIME WHEN I TOOK HIS DEPOSITION.

16          **JUDGE HENDERSON:**  I WAS LISTENING.  I THINK JUDGE

17  KARLTON JUST ASKED HIM IF HE DID SO USE IT AND HE SAID HE DID.

18          **MR. MELLO:**  OKAY.  THEN I APOLOGIZE.

19  BY MS. HARDY

20  **Q**   DR. SHANSKY, IT STATES HERE:

21             "IT IS NO SECRET THAT STATEWIDE THE CDCR

22             LACKS ADEQUATE NUMBER OF BEDS AND/OR

23             APPROPRIATELY EQUIPPED AND STAFFED HOUSING UNITS

24             FOR PATIENTS WITH COMPLICATED MEDICAL NEEDS.

25             THE RECEIVER HAS IDENTIFIED THE NEED TO BUILD

```
 1                    LARGE NUMBERS OF SUCH BEDS AND/OR UNITS.  UNTIL

 2                    THEN, THE VERY SICK AND/OR ELDERLY WITH

 3                    COMPLICATED MEDICAL COMPLICATIONS UNFORTUNATELY

 4                    ARE LARGELY KEPT IN PRISON'S GENERAL POPULATIONS

 5                    OR CTC OR OHU BEDS AT VARIOUS STATE PRISONS.

 6                       "MCSP IS AN EXAMPLE OF THE CHALLENGES FACED

 7                    WHEN A PRISON MEDICAL DELIVERY SYSTEM GEARED

 8                    TOWARDS PROVIDING CARE TO A GENERAL INMATE

 9                    POPULATION ALSO MUST CARE FOR THE VERY SICK.

10                    MCSP'S CTC HAS ONLY TWO MEDICAL BEDS (THE OTHERS

11                    ARE USED FOR MENTAL HEALTH PLACEMENTS), AND ITS

12                    RELATIVELY SMALL OHU (SIX CELLS) IS USED

13                    ENTIRELY FOR MENTAL HEALTH PATIENTS, INCLUDING

14                    CRISIS BEDS PATIENTS FOR WHOM THERE IS NO ROOM

15                    AT THE CTC."

16          MR. MELLO:  SAME OBJECTION TO THE HEARSAY TO THE

17   EXTENT THAT IS COMING IN FOR THE TRUTH OF THE MATTERS ASSERTED.

18   PLAINTIFFS CANNOT USE THEIR OWN STATEMENTS AS A PARTY ADMISSION.

19   BY MS. HARDY

20   Q   DR. SHANSKY, ARE THOSE STATEMENTS --

21          JUDGE HENDERSON:  OBJECTION WILL BE PRESERVED.

22   BY MS. HARDY

23   Q   DR. SHANSKY, IS WHAT'S WRITTEN THERE CONSISTENT WITH THE

24   TYPES OF ISSUES THAT YOU VIEWED WHEN YOU WENT THROUGH THE PRISON

25   ON YOUR NINE PRISON TOURS?
```

1  **A**   YES, I DID SEE PATIENTS HOUSED IN THOSE ARRANGEMENTS WITH

2  COMPLEX MEDICAL PROBLEMS.

3          **JUDGE KARLTON:**  DID YOU ACTUALLY VISIT MULE STATE?

4          **THE WITNESS:**  NO, NOT ON THIS TOUR.

5  BY MS. HARDY

6  **Q**   DR. SHANSKY, MR. MELLO ASKED QUESTIONS ABOUT THE ITEMS THAT

7  YOU REFERRED TO AS ITEMS IN THE RECEIVER'S TOOLBOX THAT INCLUDE

8  STAFFING, THE PHARMACY SYSTEM.  WILL THOSE IMPROVEMENTS

9  ACCOMPLISH AND CREATE -- USE OF THOSE TOOLS CREATE A

10 CONSTITUTIONAL MEDICAL SYSTEM IF THE RECEIVER USES THEM?

11 **A**   YOU HAVE TO -- YOU ARE TALKING ABOUT AN ENTIRE SYSTEM OF THE

12 DEPARTMENT OF CORRECTIONS, AND YOU WOULD HAVE TO BE ABLE TO

13 INTEGRATE THE IMPLEMENTATION OF ALL THOSE CHANGES, AND CURRENTLY

14 YOU WOULD BE FORCED TO DO THAT IN THE FACE OF DRAMATIC

15 OVERCROWDING, WHICH COMPROMISES YOUR ABILITY TO SUCCESSFULLY

16 IMPLEMENT THEM.  WHEREAS, IN THE FACE OF A SYSTEM THAT IS NOT

17 HEAVILY OVERCROWDED, YOUR ABILITY TO USE THOSE TOOLS AND

18 SUCCESSFULLY CREATE AN ADEQUATE DELIVERY SYSTEM IS GREATLY

19 ENHANCED, AND THE TIMEFRAME TO DOING IT IS DRAMATICALLY

20 SHORTENED.

21 **Q**   MR. MELLO POINTED OUT THAT AT CERTAIN PRISONS, AND YOU

22 AGREE, THAT IF THEY RAISE THE STAFFING LEVELS, THEN THAT WOULD

23 IMPROVE CARE.  WOULD THAT RESOLVE THE CONSTITUTIONAL PROBLEMS,

24 BY RAISING STAFFING LEVELS?

25 **A**   NO.  YOU HAVE TO ADDRESS ALL OF THESE THINGS SYSTEMWIDE AND

1  WITHIN GIVEN FACILITIES IN ORDER TO ACHIEVE CONSTITUTIONAL

2  LEVELS.

3  Q    IN FACT, THE RECEIVER HAS SAID THAT THE SYSTEM HAS ONLY HALF

4  THE NECESSARY SPACE FOR THE NEEDED CLINICIANS FOR THE CURRENT

5  POPULATION; IS THAT RIGHT?

6  A    THAT'S CORRECT.

7  Q    MR. MELLO ASKED YOU WHETHER, IF PRISONERS ARE HOUSED IN

8  NON-TRADITIONAL BEDS, THEY NECESSARILY RECEIVE UNCONSTITUTIONAL

9  MEDICAL CARE.

10  A    YES, HE ASKED ME THAT.

11  Q    INCREASING STAFFING LEVELS AND CLINIC SPACE WILL NOT CURE

12  THE PROBLEM OF NON-TRADITIONAL BEDS IF THOSE NON-TRADITIONAL

13  BEDS ARE BREEDING GROUNDS FOR DISEASE; IS THAT RIGHT?

14          **MR. MELLO:**  OBJECTION, YOUR HONOR.  PAUL MELLO AGAIN.

15  THAT'S AN INCOMPLETE HYPOTHETICAL.

16          **JUDGE HENDERSON:**  REPHRASE IT, COUNSEL.

17  BY MS. HARDY

18  Q    YOU TESTIFIED THAT NON-TRADITIONAL BEDS IN AND OF THEMSELVES

19  DO NOT MEAN THAT PRISONERS ARE RECEIVING UNCONSTITUTIONAL

20  MEDICAL CARE, CORRECT?

21  A    CORRECT.

22  Q    HOWEVER, NON-TRADITIONAL BEDS DO POSE PROBLEMS FOR THE

23  MEDICAL CARE DELIVERY SYSTEM, DON'T THEY?

24  A    THERE'S AMPLE DATA THAT SHOWS THAT KIND OF CONGREGATED

25  HOUSING INCREASES PROBLEMS IN A VARIETY OF WAYS, INCLUDING THE

1    RISK OF COMMUNICABLE DISEASE, ESPECIALLY INFECTIONS, SKIN

2    INFECTIONS CERTAINLY, AS WELL AS INCREASES STRESS AMONG THE

3    POPULATION THAT CAN RESULT IN VARIOUS KINDS OF ACTING OUT,

4    VIOLENCE, ET CETERA.

5    Q    WHEN THERE IS ACTING OUT, HOW DOES THAT IMPACT THE DELIVERY

6    OF CARE?

7    A    THEN YOU GET INJURIES, AND IT JUST INCREASES THE DEMAND ON A

8    SYSTEM THAT IS ALREADY INADEQUATE TO MEET THE EXISTING DEMAND.

9    Q    YOU TESTIFIED THAT WHEN YOU DO FILE REVIEWS OF MEDICAL FILES

10   AT PRISONS, YOU SIT WITH THE -- WITH A PHYSICIAN FROM THAT

11   INSTITUTION AS YOU GO THROUGH THE FILES; IS THAT CORRECT?

12   A    THAT'S CORRECT.

13   Q    AND WHEN YOU DID THE LATEST ROUND OF FILE REVIEWS, I BELIEVE

14   IT WAS IN AUGUST, GENERALLY YOU HAD THE CHIEF PHYSICIAN WITH

15   YOU; ISN'T THAT RIGHT?

16   A    THAT'S CORRECT.

17   Q    AND YOU TESTIFIED THAT YOU FOUND WHEN YOU WENT THROUGH THESE

18   FILES, THAT THE PHYSICIANS YOU TALKED TO WERE CONCERNED ABOUT

19   THEIR PATIENT CARE AND THE APPARENT LAPSES; IS THAT CORRECT?

20   A    THAT'S CORRECT.

21   Q    WERE THE PHYSICIANS SURPRISED AT THE LAPSES?

22   A    NO.  THAT WAS, UNFORTUNATELY, THE PATTERN THROUGHOUT.  THEY

23   WERE AWARE THAT THE SYSTEM THAT THEY WERE RESPONSIBLE FOR WAS

24   STILL NOT ADEQUATELY RESPONDING TO THE CLINICAL NEEDS.

25   Q    DOCTOR, YOU HAVE BEEN TO A NUMBER OF -- MANY STATES, AND YOU

1  HAVE REVIEWED SCORES OF PRISONS, AND YOU HAVE BEEN THROUGH MANY

2  PRISON SYSTEMS.  IN ORDER TO DETERMINE WHETHER OR NOT

3  OVERCROWDING IS THE CAUSE OF UNCONSTITUTIONAL MEDICAL CARE IN A

4  SYSTEM, DO YOU HAVE TO GO TO EVERY PRISON FACILITY?

5  **A**   NO, GENERALLY NOT.  WE CAN GO TO A SUBSET, BUT IN THIS

6  PARTICULAR SITUATION, WE HAVE EVIDENCE BEYOND JUST THE PERSONAL

7  TOURS.  AND PARTICULARLY FROM THE RECEIVER'S OFFICE THERE ARE

8  REMARKABLY WELL-DOCUMENTED REPORTS THAT DESCRIBE THE ONGOING

9  DEFICIENCIES, AND THE RESOURCE-TO-DEMAND MISMATCH THAT IS

10 ENDEMIC THROUGHOUT THE SYSTEM.

11 **Q**   MR. MELLO ASKED YOU ABOUT FILLED CLINICAL POSITIONS, AND YOU

12 AGREED THAT THE RECEIVER HAS ACHIEVED 90 PERCENT OF --

13 90 PERCENT FILL RATE FOR CERTAIN CLINICAL POSITIONS, CORRECT?

14 **A**   YES.

15 **Q**   DO YOU KNOW WHETHER THOSE ARE ALL THE POSITIONS THAT THE

16 RECEIVER NEEDS IN THE SYSTEM?

17 **A**   I DO NOT KNOW.

18 **Q**   AND HAVE YOU SEEN A STAFFING STUDY OR WORKLOAD STUDY DONE BY

19 THE RECEIVER TO DETERMINE WHETHER OR NOT THOSE POSITIONS WILL BE

20 SUFFICIENT FOR THE SYSTEM?

21 **A**   I DON'T RECALL SEEING SUCH A STUDY.

22 **Q**   DO YOU RECALL TALKING TO PHYSICIANS ON YOUR TOURS WHO

23 INDICATED THAT THEY HAD OPINIONS ABOUT THE LEVEL OF STAFFING?

24 **A**   YES.  SOME OF THE CMO'S INDICATED THAT THEIR VIEW WAS THAT

25 EVEN IF ALL THE BUDGETED POSITIONS WERE FILLED, THEY WOULD STILL

1  NOT HAVE ADEQUATE CLINICAL RESOURCES TO MEET THE CLINICAL

2  DEMANDS.

3  Q   AND THEN THE OBVERSE WAS YOU SPOKE TO OTHER CLINICIANS WHO

4  TOLD YOU THAT, EVEN IF ALL THE POSITIONS WERE FILLED, WOULD THEY

5  HAVE HAD A PLACE TO PUT THEM?

6  A   I WAS ALSO TOLD BY SOME OF THE CMO'S THAT THEY WOULDN'T HAVE

7  SPACE IF ALL THE BUDGETED POSITIONS WERE FILLED.

8  Q   YOU LISTED A NUMBER OF INTERRELATED FACTORS THAT MAKE UP A

9  MEDICAL CARE SYSTEM, AND THAT INCLUDES MEDICAL STAFF,

10 MEDICATIONS DELIVERY SYSTEM, TRACKING, ACCESS TO SPECIALTY CARE,

11 OFFSITE CARE, AND YOU SAID THAT ALL OF THOSE ELEMENTS ARE

12 IMPORTANT; ISN'T THAT CORRECT?

13 A   YES.

14 Q   AND THERE ARE DEFICIENCIES IN THESE AREAS IN CDCR; IS THAT

15 CORRECT?

16 A   YES.

17 Q   AND WHAT IS THE RELATIONSHIP OF OVERCROWDING TO THOSE

18 DEFICIENCIES?

19 A   WELL, OVERCROWDING EXACERBATES DEMAND, AND WHEN A SYSTEM IS

20 NOT DESIGNED TO MEET BASIC NEEDS AND THEN YOU INCREASE THE

21 DEMAND ON IT, THE INADEQUACIES COME TO THE FORE MUCH MORE

22 FREQUENTLY.

23          **MS. HARDY:**  THANK YOU, DR. SHANSKY.

24          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

25          **MR. MELLO:**  I HAVE NOTHING FURTHER.

1          **JUDGE HENDERSON:**  THANK YOU.

2          **JUDGE KARLTON:**  NOTHING FURTHER.

3          **JUDGE HENDERSON:**  DO YOU HAVE ANYTHING FURTHER?

4          **MR. KAUFHOLD:**  NOTHING FURTHER, YOUR HONOR.

5          **JUDGE HENDERSON:**  THANK YOU VERY MUCH, DR. SHANSKY.

6  YOU'RE EXCUSED.

7          I BELIEVE OUR NEXT WITNESS IS GARY BENSON; IS THAT

8  CORRECT?

9          **MS. LEONARD:**  WE WILL BEGIN WITH ERIC ADELMAN, WITH

10 YOUR PERMISSION, YOUR HONOR.

11          **JUDGE HENDERSON:**  OKAY.  WILL YOU CALL MR. ADELMAN

12 IN?

13          **MS. LEONARD:**  YES, YOUR HONOR.

14          **JUDGE HENDERSON:**  REMAIN STANDING AND BE SWORN IN,

15 MR. ADELMAN.

16                          **ERIC ADELMAN**

17 HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

18 DULY SWORN AND EXAMINED AS FOLLOWS:

19          **THE WITNESS:**  YES.

20          **THE CLERK:**  STATE AND SPELL YOUR FOR THE RECORD.

21          **THE WITNESS:**  MY NAME IS ERIC ADELMAN, E-R-I-C.  LAST

22 NAME IS A-D-E-L-M-A-N.

23          **MR. HENDERSON:**  GOOD MORNING, YOUR HONORS.  MY NAME

24 IS JAMES HENDERSON.  I WILL BE EXAMINING MR. ADELMAN ON BEHALF

25 OF CALIFORNIA PEACE OFFICERS ASSOCIATION.

1          **DIRECT EXAMINATION BY MR. HENDERSON**

2   BY MR. HENDERSON

3   Q   MR. ADELMAN, ARE YOU EMPLOYED BY THE CALIFORNIA DEPARTMENT

4   OF CORRECTIONS AND REHABILITATION?

5   A   YES.

6   Q   WHAT IS YOUR POSITION?

7   A   I'M A CORRECTIONAL OFFICER AT THE CALIFORNIA MEDICAL

8   FACILITY IN VACAVILLE.

9   Q   HOW LONG HAVE YOU BEEN AT THAT FACILITY?

10  A   I HAVE BEEN AT VACAVILLE SINCE FEBRUARY 1994.

11          **MR. HENDERSON:**   YOUR HONORS, WE SUBMITTED A

12  DECLARATION OF DIRECT TESTIMONY; I'M SURE YOU ARE FAMILIAR WITH

13  IT.  THE FOUNDATION FOR MR. ADELMAN'S BACKGROUND AND EMPLOYMENT

14  WITH THE DEPARTMENT IS SET FORTH IN DETAIL THERE.  I WON'T GO

15  THROUGH THAT AT THIS POINT.

16  BY MR. HENDERSON

17  Q   WHAT IS YOUR PRESENT POSITION, SIR?

18  A   I'M ASSIGNED AS HEALTHCARE ACCESS OFFICER.

19  Q   OKAY.  AND CAN YOU TELL US WHAT YOUR DUTIES ARE IN THAT

20  CAPACITY?

21  A   GENERALLY SPEAKING, I ENSURE THAT INMATES GET TO THEIR

22  MEDICALLY -- OR THERE ARE DUCATED MEDICAL APPOINTMENTS.

23  Q   ANY OTHER DUTIES YOU HAVE IN CONNECTION WITH THAT?

24  A   PART OF OUR JOB, OR MY JOB IN PARTICULAR, AND OTHER OFFICERS

25  ASSIGNED IS WE DO AMBULANCE CODE RESPONSES.  IF AN AMBULANCE HAS

1  TO LEAVE THE INSTITUTION, WE ARE THE FIRST OFFICERS TO BE

2  DESIGNATED TO GO WITH THAT AMBULANCE.

3  Q    WHAT SHIFT DO YOU WORK, SIR?

4  A    WE CALL IT SECOND WATCH.  MY SHIFT IS 7:00 A.M. TO 3:00 P.M.

5  Q    HOW MANY OFFICERS ARE CURRENTLY ASSIGNED TO THE SECOND WATCH

6  AS HEALTHCARE ACCESS OFFICERS?

7  A    MONDAY THROUGH FRIDAY, THERE'S 12 HEALTHCARE ACCESS

8  OFFICERS, PLUS OFFICERS DESIGNATED TO COVER PARTICULAR CLINICS,

9  BUT THERE'S 12 OF US WHO DO ESCORTS.

10 Q    NOW, CAN YOU TELL US -- CAN YOU BRIEFLY SUMMARIZE YOUR

11 DUTIES WITH RESPECT TO MAKING SURE THAT INMATES ATTEND DUCATED

12 APPOINTMENTS WITHIN THE FACILITY ITSELF?

13 A    INMATES GET DUCATED THE PREVIOUS EVENING TO APPEAR AT A

14 DENTAL CLINIC OR EYE CLINIC, WHATEVER THE CLINIC MAY BE.  IF

15 THEY DON'T SHOW UP WITHIN A FEW MINUTES OF THAT DESIGNATED TIME,

16 THEN WE GO TO THEIR HOUSING UNIT TO FIND OUT WHERE THEY ARE, TO

17 REMIND THEM OR PHYSICALLY BRING THEM DOWN, IF THEY HAPPEN TO BE

18 FOR ANY NUMBER OF REASONS.

19 Q    OTHER THAN INMATES WHO FORGET WHERE THEY ARE SUPPOSED TO BE

20 GOING, ARE THERE ANY OTHER SITUATIONS YOU WILL BE INVOLVED IN

21 GETTING AN INMATE TO A MEDICAL APPOINTMENT?

22 A    IT COULD BE ANY NUMBER OF REASONS.  IT INCLUDES OF

23 INSTITUTIONAL-LOCKDOWNS-CAUSED DELAYS.  MAYBE THE INMATE'S AT

24 WORK AND CAN'T GET OUT OF WORK.  MAYBE HE JUST FORGOT OR DIDN'T

25 REALIZE HE HAD TO BE THERE.

1  Q    SO LOCKDOWNS WILL REQUIRE YOU TO ESCORT --

2  A    LOCKDOWNS REQUIRE ME TO ESCORT A LOT MORE INMATES, YES.

3  Q    WHAT ABOUT AD-SEG INMATES?

4  A    INMATES IN ADMINISTRATIVE SEGREGATION, BY THE NATURE OF

5  THEIR BEING LOCKED DOWN, CANNOT BRING THEMSELVES TO THEIR OWN

6  DUCATS, SO THEY HAVE TO BE ESCORTED DOWN.  WE HAVE TO GO TO

7  AD-SEG UNITS, PLACE WAIST RESTRAINTS ON INMATES, TAKE THEM OUT

8  OF THE CELL, BRING THEM TO THE CLINIC, WAIT FOR THE DOCTOR TO

9  SEE HIM, BECAUSE WE HAVE TO BE WITH HIM THE WHOLE TIME, AND TAKE

10 HIM BACK TO HIS HOUSING UNIT.

11 Q    AND WITH RESPECT TO THE OFFSITE AMBULANCE CODE RESPONSES,

12 WHAT IS THE PROCEDURE THERE FOR HEALTHCARE ACCESS TO OFFICERS?

13 A    WELL, WE HAVE TWO TYPES OF CODES, CODE THREE AND CODE TWO.

14 CODE THREES ARE IMMEDIATE ONES THAT REQUIRE THE OUTSIDE FIRE

15 AGENCY, IN OUR CASE VACAVILLE FIRE DEPARTMENT, TO REPORT WITH AN

16 AMBULANCE TO THE PRISON, AND THE INMATE IS TAKEN TO THE CLOSEST

17 HOSPITAL, WHICH IS VACA VALLEY HOSPITAL.  THAT KIND OF CODE

18 HAPPENS WITHIN MINUTES.

19         CODE TWO AMBULANCE WOULD BE SOMETHING MORE SCHEDULED.

20 THE INMATE MAY NEED A TEST OR ADMITTED TO A HOSPITAL.  SOMETIMES

21 THOSE ARE SCHEDULED ANYWHERE FROM 15 TO 20 MINUTES TO A COUPLE

22 OF HOURS LATER.

23         IF I AM A CODE RESPONDER FOR THE DAY AND WE HEAR A

24 CODE THREE BEING CALLED, I IMMEDIATELY LEAVE MY ASSIGNED WORK

25 AREA, TURN MY EQUIPMENT IN, PICK UP THE EQUIPMENT THAT WE USE TO

1  ESCORT THE INMATE.  THAT WOULD BE THE CHAINS AND OUR PEPPER

2  SPRAY AND OUR OTHER SECURITY EQUIPMENT.

3           MY PARTNER, THE OTHER OFFICER, WOULD, IN TURN, GO GET

4  A VEHICLE AND A WEAPON, AND HE WOULD ESCORT THE AMBULANCE

5  INSIDE.  THEN TOGETHER, I'D STAY WITH THE INMATE IN THE CLINIC,

6  INTO THE AMBULANCE, BACK OUTSIDE TO THE OUTSIDE HOSPITAL WHILE

7  MY PARTNER FOLLOWS ME IN A STATE VEHICLE.

8  Q   ARE THE TWO OFFICERS THAT RESPOND ON AN AMBULANCE RESPONSE

9  REQUIRED TO STAY WITH THE INMATE THE ENTIRE TIME THE INMATE IS

10 OUTSIDE OF THE FACILITY?

11 A   YES.

12 Q   SO EACH AMBULANCE RESPONSE REQUIRES TWO OF THE HEALTHCARE

13 ACCESS OFFICERS TO RESPOND?

14 A   YES.

15 Q   HAVE YOU HAD SITUATIONS WHERE THERE WERE MORE THAN ONE

16 AMBULANCE RESPONSE ON A GIVEN SHIFT?

17 A   YES.

18 Q   AS MANY AS HOW MANY?

19 A   I'VE SEEN TWO OR THREE WITHIN AN EIGHT-HOUR PERIOD,

20 SOMETIMES MORE.

21 Q   SO YOU COULD HAVE A SITUATION WHERE ACTUALLY HALF OF THE

22 HEALTHCARE ACCESS OFFICERS ARE OFFSITE?

23 A   THEY PROBABLY WOULDN'T TAKE THAT MANY.  THEY WOULD START

24 TAKING OFFICERS FROM OTHER UNITS, WHICH WOULD IMPACT THE OTHER

25 UNITS.

1  Q   NOW, WITH RESPECT TO THE CLINICS THEMSELVES AT THE FACILITY,

2  CAN YOU TELL US THE GENERAL NATURE OF WHEN THE INMATES ARE

3  BROUGHT THERE, ARE THEY IMMEDIATELY SEEN BY A DOCTOR?

4  A   NOT NECESSARILY, NO.

5  Q   WHAT IS PROCEDURE IF THEY ARE NOT IMMEDIATELY SEEN?

6  A   WELL, IF THE INMATE IS A GENERAL POPULATION INMATE, HE WOULD

7  SHOW UP AT 9:05 FOR A 9:00 O'CLOCK DUCAT, WHICH WOULD BE

8  REASONABLE.  HE WOULD WAIT UNTIL THE DOCTOR IS READY TO SEE HIM.

9  THE DOCTOR MAY HAVE TWO OR THREE INMATES AHEAD OF HIM.

10 DOCTORS -- THE INMATES ARE DUCATED SOMETIMES WITH A 15 OR

11 20-MINUTE WINDOW FOR EACH APPOINTMENT, HOWEVER, IT MAY TAKE

12 LONGER, THEREBY CAUSING A BACKUP.

13 Q   AND ARE THERE WAITING AREAS FOR THE VARIOUS MEDICAL CLINICS

14 AT CMF?

15 A   THERE ARE TWO CLINICS THAT HAVE WAITING AREAS, BUT WE HAVE

16 OTHER MEDICAL AREAS THAT DON'T HAVE WAITING AREAS, IF THAT MAKES

17 SENSE.

18 Q   THE TWO THAT DO, WHICH ONES ARE THOSE?

19 A   WOULD BE THE AMBULATORY CARE CLINIC.  THAT'S A BUILDING THAT

20 HAS 15 EXAMINATION ROOMS OR 14 EXAMINATION ROOMS.  THAT HAS A

21 SEATING WAITING OF MAYBE 24, TWO DOZEN INMATES.  WE HAVE AN AREA

22 CALLED SPECIALTIES CLINIC WHERE SIX OR SEVEN DOCTORS FROM

23 OUTSIDE COME IN FOR A SPECIALTY-TYPE VISIT, AND THAT SEATS MAYBE

24 A DOZEN.

25 Q   HAVE YOU SEEN SITUATIONS WHERE THOSE WAITING ROOM AREAS, TWO

1    WAITING ROOM AREAS, HAVE BEEN COMPLETELY FILLED WITH INMATES?

2    **A**   YES.

3    **Q**   HAVE THERE BEEN ADDITIONAL INMATES THAT WERE WAITING FOR

4    APPOINTMENTS?

5    **A**   I'M SORRY.

6    **Q**   HAVE THERE BEEN ADDITIONAL INMATES WAITING FOR APPOINTMENTS

7    AT THOSE CLINICS?

8    **A**   YES.

9    **Q**   WHERE DO THEY GO?

10   **A**   THEY STAND UP IN THAT SAME WAITING AREA OR THEY WAIT IN

11   HALLWAYS.

12   **Q**   OKAY.  WHAT ARE THE OTHER CLINICS THAT DON'T HAVE WAITING

13   AREAS?  CAN YOU BRIEFLY JUST DESCRIBE OR SUMMARIZE WHICH ONES

14   THOSE ARE?

15   **A**   THE OTHER CLINICS WOULD INCLUDE THE BREATHING TREATMENT

16   AREA; EARS, EYES, NOSE, THROAT; THE DENTAL AREA, OUR URGENT

17   CARE, AND PHYSICAL THERAPY, AND NONE OF THOSE HAVE WAITING

18   AREAS.

19   **Q**   WHERE DO THE INMATES WAIT FOR THOSE?

20   **A**   THE HALLWAY.

21   **Q**   THEY JUST STAND IN THE HALLWAYS?

22   **A**   STAND, SIT IN WHEELCHAIRS, SIT ON THE FLOOR, YES.

23   **Q**   ARE THERE ANY BENCHES OR ANYTHING OUT IN THE HALLWAYS?

24   **A**   THEY PUT LITTLE REGULAR CHAIRS OUT THERE, BUT THERE'S NEVER

25   ENOUGH.

1  Q    IN THE TIMES YOU'VE TAKEN INMATES TO THE CLINICS WHERE

2  YOU'VE HAD TO REMAIN WITH AN INMATE, AN AD-SEG INMATE, HOW LONG

3  HAVE YOU SEEN INMATES WAIT FOR APPOINTMENTS?

4  A    I WAITED WITH THEM FOR SOMETIMES UP TO TWO HOURS.

5  Q    WHAT EFFECT HAVE YOU OBSERVED THAT TO HAVE ON THE INMATES

6  THAT HAVE BEEN IN THAT SITUATION?

7  A    YOU'VE GOT VOLATILE INMATES WITH PHYSICAL OR MEDICAL NEEDS.

8  YOU COULD ALMOST EXPECT WHAT COULD HAPPEN.  IT COULD CREATE A

9  VOLATILE SITUATION AT TIMES, FRUSTRATION, IMPATIENCE.

10 Q    ARE THERE INMATES THAT HAVE INDICATED TO YOU THAT THEY

11 DIDN'T WANT TO WAIT ANY LONGER?

12 A    YES.  THE INMATES HAVE THE OPTION TO SIGN MEDICAL REFUSALS.

13 A NURSE OR MEDICAL PERSONNEL WOULD COME UP TO THEM AND THEY

14 WOULD WAIVE THEIR APPOINTMENT FOR THAT DAY.

15 Q    YOU HAVE -- SO INMATES ACTUALLY CANCEL THE APPOINTMENT AFTER

16 WAITING ONE TO TWO HOURS?

17 A    YES.

18 Q    WITH RESPECT TO THE CLINICS AND PROVISION OF MEDICAL CARE

19 THERE AT CMF, WHAT HAVE YOU OBSERVED IN MEETING THE NEEDS OF THE

20 INMATES?

21 A    I THINK BEING THAT WE ARE A MEDICAL FACILITY, THAT WE HAVE

22 SO MANY MEDICAL INMATES THAT NEED SO MUCH MEDICAL CARE AND

23 DIFFERENT VARIETIES OF MEDICAL CARE, THAT NEEDS AREN'T ALWAYS

24 MET.

25 Q    WHAT DO YOU ATTRIBUTE THAT TO?

1    A    IT WOULD BE THE LACK OF DOCTORS, THE LACK OF SPACE, THE

2    GEOGRAPHY OF THE BUILDING, AND THE GREAT NUMBER OF MEDICAL

3    INMATES THAT WE HAVE AT --

4    Q    SO TOO MANY INMATES FOR THE SERVICES AND THE SPACE THAT'S

5    PROVIDED FOR MEDICAL NEEDS?

6    A    THAT WOULD BE PART OF IT, YES.  YES, I THINK.

7    Q    OKAY.  DO YOU SEE ANY RISKS THAT RESULT FROM THE SITUATION

8    THAT YOU OBSERVED IN THE CLINICS?

9    A    WITHIN THE PRISON, THE GREATEST RISK WE ALWAYS ENCOUNTER

10   WOULD BE THE SAFETY AND SECURITY OF THE INSTITUTION.  WHEN YOU

11   HAVE INMATES IN A CROWDED AREA, BAD THINGS CAN HAPPEN.  WHEN YOU

12   HAVE INMATES THAT ARE IMPATIENT, BAD THINGS CAN HAPPEN.  IT'S

13   PRISON, AND BAD THINGS HAPPEN.

14        AND WHEN THEY ARE UPSET THAT THEY'RE LATE OR THEY'RE

15   NOT GETTING THE TREATMENT THEY THINK THEY NEED OR WANT, THAT CAN

16   KIND OF -- IT CAN CREATE PROBLEMS.

17        THEN THE HEALTH RISKS INVOLVED.  WHEN YOU HAVE TWO

18   DOZEN INMATES WAITING TO GO INTO CLINICS AND THEY HAVE ANY

19   VARIETY OF VIRUSES, AILMENTS, DISEASE -- THE EXCHANGE RATE OF

20   THE DISEASE IS HIGH.  WE AS OFFICERS ARE EXPOSED TO HIV,

21   HEPATITIS INSTANCES HAVE HAPPENED IN OUR PRISON, INFECTIONS.  SO

22   THE RISK IS JUST -- IT'S MULTI-FACETED.

23   Q    ARE YOU AWARE OF THE CURRENT INMATE POPULATION AT CMF?

24   A    APPROXIMATELY 3100.

25   Q    DO YOU KNOW IF THAT'S ABOVE OR BELOW DESIGN CAPACITY?

1   **A**   IT'S PROBABLY JUST A TAD BELOW.

2   **Q**   GIVEN THAT FACT, DO YOU STILL FEEL THAT OVERCROWDING IS AN

3   ISSUE AT CMF?

4   **A**   OVERCROWDING IN THE SENSE, YES, BECAUSE THERE IS TOO MANY

5   INMATES WITH MEDICAL NEEDS TO HAVE THEIR NEEDS MET PROPERLY AT

6   THE PRISON.

7   **Q**   NOW, THERE WAS A 50-BED MENTAL HEALTH UNIT RECENTLY OPENED

8   THERE?

9   **A**   MENTAL HEALTH CRISIS UNIT, YES.

10  **Q**   HOW LONG DID IT TAKE TO BUILD THAT UNIT?

11  **A**   APPROXIMATELY TWO YEARS.

12  **Q**   IS THERE -- YOU SAY THAT THE FACILITY IS SLIGHTLY UNDER

13  DESIGN CAPACITY.  DO YOU HAVE AN UNDERSTANDING -- DOES THAT MEAN

14  THERE'S EMPTY BEDS THERE AT CMF?

15  **A**   NO, THERE WOULD BE NOT, THAT I AM AWARE OF, THAT THERE'S

16  EMPTY BEDS, NO.  I'M NOT SURE OF YOUR QUESTION.

17  **Q**   I AM TRYING TO FIND OUT IF THAT MEANS THERE ARE VACANCIES

18  THERE AT CMF THAT ARE NOT BEING FILLED BY INMATES FROM OTHER

19  FACILITIES.

20         **MS. JOHNSON:**  ANNE JOHNSON FOR THE DEFENDANTS.  LACKS

21  FOUNDATION.

22         **JUDGE HENDERSON:**  LAY A FOUNDATION, COUNSEL.

23  BY MR. HENDERSON

24  **Q**   ARE YOU AWARE OF THE FUNCTION OF THE CMF FACILITY WITHIN THE

25  CORRECTIONAL SYSTEM?

1  **A**   IT'S A MEDICAL FACILITY.

2  **Q**   WHERE DOES IT DERIVE ITS INMATES FROM?

3  **A**   WE GET INMATES, OBVIOUSLY, FROM THE COURT SYSTEMS, BUT OTHER

4  INSTITUTIONS SEND THEM TO US TO MEET THEIR MEDICAL AND PSYCH

5  NEEDS.

6  **Q**   OKAY.  SO IS THAT GENERALLY WHERE THE INMATES, TO YOUR

7  KNOWLEDGE, COME FROM?

8  **A**   I COULDN'T TELL YOU STATISTICALLY IF THEY COME -- I JUST

9  KNOW FOR EVERY TIME AN INMATE LEAVES, THERE'S AT LEAST ONE OR

10 TWO WAITING TO REPLACE THEM.

11 **Q**   SO THERE ARE NO VACANT BEDS THERE FOR ANY LONG PERIOD OF

12 TIME?

13 **A**   I WOULDN'T THINK SO, NO.

14        **MR. HENDERSON:**  THANK YOU, SIR.  I THINK THAT'S ALL I

15 HAVE AT THIS POINT.

16        **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

17 CROSS-EXAMINATION.

18        **MR. MELLO:**  MR. MITCHELL IS GOING TO GO FIRST.  WE'RE

19 GOING TO RESERVE TIME, IF ANY, AFTER MR. MITCHELL.

20        **JUDGE HENDERSON:**  OKAY.  THANK YOU.

21              **CROSS-EXAMINATION BY MR. MITCHELL**

22 BY MR. MITCHELL

23 **Q**   GOOD MORNING.

24 **A**   HI.

25 **Q**   BILL MITCHELL FOR THE DA INTERVENORS.

1           MR. ADELMAN, YOU HAVE BEEN WITH THE DEPARTMENT OF

2   CORRECTIONS AS A CORRECTIONAL OFFICER SINCE 1991?

3   **A**   NO.  IN 1991 I STARTED AS A SUPERVISING COOK.  I WENT

4   THROUGH CORRECTIONAL ACADEMY IN JANUARY 1993.

5   **Q**   YOU HAVE BEEN AT CMF VACAVILLE SINCE 1994?

6   **A**   VACAVILLE SINCE 1994.

7   **Q**   DID I PRONOUNCE THAT WRONG?

8   **A**   YES.

9   **Q**   MUST BE MY CHICAGO ACCENT.

10          NOW, A GOOD PART OF THE TIME RECENTLY YOU HAVE SPENT

11  ON CONSTRUCTION PROJECTS; IS THAT CORRECT?

12  **A**   CORRECT.

13  **Q**   WHAT WAS THE LAST CONSTRUCTION PROJECT YOU WORKED ON?

14  **A**   I WAS ON THE GROUNDBREAKING OF THE MENTAL HEALTH CRISIS

15  BUILDING.

16  **Q**   WHEN DID YOU WORK ON THAT PROJECT?

17  **A**   GOT TO DO SOME MATH IN MY HEAD HERE.  I BELIEVE IT WAS IN

18  THE SPRING OF '06 THAT I STARTED OUT THERE, 2006.

19  **Q**   2006.  AND THAT WAS FROM THE GROUND UP THEY BUILT THAT

20  CONSTRUCTION, THAT BUILDING?

21  **A**   YES, SIR.

22  **Q**   THAT WAS A MENTAL HEALTH CRISIS BED BUILDING?

23  **A**   YES, SIR.

24  **Q**   HAS IT BEEN COMPLETED?

25  **A**   YES, SIR.

1  Q    AND IT'S OPEN AND FUNCTIONING?

2  A    YES.

3  Q    AND YOUR ROLE WAS TO ESCORT THE CONSTRUCTION CREW IN AND OUT

4  OF THE PRISON, CORRECT?

5  A    THAT, TO CONTROL INVENTORY.  LIKE YOU MENTIONED, THE

6  ESCORTS, IN AND OUT; GATE CLEARANCES FOR THE STAFF; GETTING THE

7  CONTRACTORS INTO THE BUILDING, INTO THE MAIN CMF BUILDING, IF

8  THEY NEEDED TO CONNECT THE PLUMBING OR ELECTRICAL, THINGS LIKE

9  THAT.

10 Q    THAT WAS 19 TO 20 MONTHS YOU SPENT ON THAT PROJECT?

11 A    I WAS PROBABLY THERE ABOUT 20 MONTHS, YES.

12 Q    ALMOST TWO YEARS?

13 A    CORRECT.  I LEFT BEFORE THE BUILDING WAS COMPLETED.

14 Q    AND PRIOR TO THAT, YOU WERE WORKING IN ANOTHER CONSTRUCTION

15 PROJECT?

16 A    THERE WAS A GAP.  IN BETWEEN THE TWO BUILDINGS I WORKED IN

17 THE ADMINISTRATIVE SEGREGATION AREA BETWEEN THE TWO BUILDINGS.

18 Q    THE GAP BETWEEN THE TWO BUILDING PROJECTS YOU WORKED ON WAS

19 FOR HOW MANY MONTHS?

20 A    PROBABLY LESS THAN A YEAR.

21 Q    LESS THAN A YEAR?

22 A    YEAH, I BELIEVE SO.

23 Q    AND THEN THE INITIAL CONSTRUCTION PROJECT THAT YOU WORKED

24 ON, WHAT WAS THAT FOR?

25 A    THAT WAS CALLED THE AMBULATORY CARE CLINIC.  WE CALL IT THE

1    ACC.

2    Q    WAS THAT FROM THE GROUND UP ALSO?

3    A    FROM THE GROUND UP.

4    Q    WHAT YEAR DID THAT START?

5    A    I'D HAVE TO DO THE NUMBERS IN MY HEAD.  THREE OR FOUR YEARS

6    AGO.  I DON'T -- WE JOB CHANGE SOMETIMES SO OFTEN, BUT IT WAS

7    PROBABLY ABOUT THREE YEARS AGO.

8    Q    2003?

9    A    MORE OR LESS, I'M GUESSING.

10   Q    DID YOU WORK ENTIRELY FROM GROUND UP TO COMPLETION OF THAT

11   PROJECT?

12   A    THAT BUILDING I COMPLETED, YES.

13   Q    SO YOU WERE ON THAT PROJECT FOR APPROXIMATELY THREE YEARS?

14   A    NO.  BUILDING WAS APPROXIMATELY 13 OR 14 MONTHS.  THAT'S WHY

15   I'M UNCLEAR.  I WOULD HAVE TO LITERALLY WRITE THE DATES OUT TO

16   FIGURE IT OUT.

17   Q    IN 13 MONTHS THEY COMPLETED THAT CONSTRUCTION PROJECT?

18   A    YES, SIR.

19   Q    AND WHILE YOU WERE WORKING ON THAT CONSTRUCTION PROJECT,

20   LIKE WHEN YOU WERE WORKING ON THE MENTAL HEALTH CRISIS BED

21   BUILDING, YOU DID NOT HAVE INMATE CONTACT?

22   A    NO.  THERE'S ALWAYS INMATE CONTACT BECAUSE I WAS ON GROUNDS.

23   HOWEVER, THE BULK OF MY JOB HAD TO DO WITH OUTSIDE CONTRACTORS.

24   INMATES ARE IN THE PRISONS, SO I ALWAYS HAVE INMATE CONTACT.

25   Q    BUT YOU WEREN'T INVOLVED IN THE DELIVERY OF MEDICAL CARE OR

1    ESCORTING INMATES TO RECEIVE MEDICAL CARE DURING THE TIME PERIOD

2    YOU WERE WORKING 13 MONTHS ON THE ONE PROJECT OR THE 20 MONTHS

3    ON THE SECOND PROJECT?

4    **A**    CORRECT.

5    **Q**    YOU INDICATED AT CERTAIN TIMES INMATES SOMETIMES HAVE TO

6    WAIT FOR MEDICAL CARE?

7    **A**    YES.

8    **Q**    AND THE WAITING ROOMS GET CROWDED?

9    **A**    YES.

10    **Q**    HAVE YOU EVER HAD TO WAIT FOR MEDICAL CARE?

11    **A**    YES.

12    **Q**    DO THE WAITING ROOMS GET CROWDED?

13    **A**    SOMETIMES, YES.

14    **Q**    DO YOU AND SOME OF THE OTHER PATIENTS WAITING FOR MEDICAL

15    CARE GET FRUSTRATED?

16    **A**    YES.

17    **Q**    WE PUT UP WITH THAT, DON'T WE?

18    **A**    SOMETIMES, YES.

19    **Q**    AND SOMETIMES WE GET FRUSTRATED AND WE LEAVE?

20    **A**    I DON'T.

21    **Q**    THE ROLE OF THE ESCORT OFFICER, YOU EVEN GO TO LENGTHS OF

22    TRACKING DOWN INMATES WHO DON'T SHOW UP FOR THEIR APPOINTMENTS;

23    YOU WILL GO GET THEM?

24    **A**    YES.

25    **Q**    AND MAKE SURE THEY GET THE MEDICAL CARE THAT THEY HAVE PUT

1  IN A DUCAT FOR AT ONE TIME?

2  **A**   I MAKE SURE THEY GET TO THEIR APPOINTMENT.

3  **Q**   AND THOSE WHO DON'T HAVE APPOINTMENTS CAN REQUEST MEDICAL

4  ATTENTION AT 9:00 A.M. AT SICK CALL AND THEN -- IS THAT CORRECT?

5  **A**   NO.

6  **Q**   DID YOU SAY THAT THE PROCEDURE FOR THE GENERAL POPULATION IS

7  THAT THEY -- WHEN THEY DON'T HAVE AN APPOINTMENT, AT 9:00 A.M.

8  THERE'S A PROCEDURE THEY CAN FILL OUT A REQUEST?

9  **A**   THAT'S MORE CORRECT.  THAT DOESN'T MEAN -- WE DON'T HAVE A

10  SICK CALL PER SE.  WE HAVE SCHEDULED APPOINTMENTS.  BUT WITHIN

11  THE HOUSING UNITS, THEY HAVE CLINICIANS WHO DO MEDICATION OR

12  NURSES THAT DO MEDICATION.  THE INMATES CAN TELL THEM THAT THEY

13  MAY HAVE A MEDICAL ISSUE.  THAT NURSE WILL CONTACT OUR URGENT

14  CARE CLINIC, WHO MAY OR MAY NOT CALL TO SEE THAT INMATE THAT

15  DAY.

16  **Q**   IS IT DEPENDENT UPON WHAT THEIR SYMPTOMS ARE OR THEIR

17  COMPLAINTS ARE WHETHER THEY GET SEEN THAT DAY OR NOT?

18  **A**   I DON'T KNOW WHAT THE STANDARD IS.  I JUST ESCORT INMATES.

19  **Q**   SO YOUR ROLE IS ONLY TO FACILITATE THE INMATE PUTTING IN HIS

20  REQUEST AND PERHAPS GETTING SEEN THAT DAY AND BEING ESCORTED?

21  **A**   NO, I DON'T HELP HIM FACILITATE PUTTING IN HIS REQUEST.  I

22  MAKE SURE HE GETS TO HIS APPOINTMENT.

23  **Q**   YOU'VE INDICATED THAT AT TIMES SOME INMATES DON'T GET TO BE

24  SEEN ON THE DAY THEY PUT IN THEIR REQUEST?

25  **A**   THAT'S NOT WHAT I SAID.  I SAID THEY DON'T GET TO BE SEEN

1    THE DAY THEY HAVE AN APPOINTMENT.

2    Q    THAT CAN BE FOR ANY NUMBER OF REASONS, CORRECT?

3    A    YES.

4    Q    NOT ALWAYS THE POPULATION OR THE CROWDED WAITING ROOM,

5    CORRECT?

6    A    I DIDN'T SAY THAT EITHER.  WHAT I SAID IS IT COULD BE THE

7    NUMBER OF INMATES THAT NEED TO BE SEEN FOR THE AMOUNT OF

8    CLINICIANS CAN CREATE MAJOR DELAYS.

9    Q    NOT ALWAYS HAVING TO DO WITH CROWDED CONDITIONS?

10   A    IF YOU HAVE A LOT OF INMATES THAT NEED TO SEE NOT ENOUGH

11   CLINICIANS, I WOULD THINK YOU COULD SAY THAT WOULD BE A

12   CROWDING -- YOU HAVE TOO MANY PEOPLE.

13   Q    YOU INDICATED THAT CMF IS UNDER DESIGN CAPACITY?

14   A    BY 50 OR 60 IS THE LAST NUMBER I THINK I SAW.  NOT VERY

15   MANY.

16   Q    TECHNICALLY, THAT WOULDN'T QUALIFY AS BEING OVERCROWDED,

17   ACCORDING TO DEFINITIONS THAT HAVE BEEN BANTERED ABOUT IN THE

18   COURTROOM?

19   A    I DON'T KNOW HOW THEY COME UP WITH THE DEFINITION OF WHAT IS

20   THE CAPACITY OR NOT, BUT THE QUESTION IS WHETHER THE INMATES GET

21   SEEN BASED ON THE NUMBER OF INMATES THAT NEED TO BE SEEN.  I

22   CAN'T SPEAK TO THE POPULATION AS WHY 3,100 IS A MAGIC NUMBER OR

23   SOMETHING LIKE THAT.

24           WHAT I DO SEE IS THAT WE HAVE TOO MANY INMATES AT

25   TIMES THAT NEED TO BE SEEN OR DOCTORS TOO FAR BEHIND SCHEDULE OR

1  NOT ENOUGH DOCTORS, THEREBY CREATING DELAYS.

2  **Q**   IF THEY INCREASE THE NUMBER OF STAFF TO ESCORT THE NUMBER OF

3  DOCTORS AND CLINICIANS TO SEE THESE INMATES, THAT COULD RESOLVE

4  SOME OF THE PROBLEMS OF MISSED --

5  **A**   I WOULD THINK IT'S NOT A SIMPLE QUESTION WITH A SIMPLE

6  ANSWER.  YOU CAN INCREASE THE NUMBER OF STAFF, MEDICAL STAFF,

7  ALL YOU WANT.  IF YOU DON'T HAVE THE SPACE, IT DOESN'T SOLVE THE

8  PROBLEM.  IF YOU STILL HAVE TOO MANY INMATES, IT DOESN'T SOLVE

9  THE PROBLEM.

10          SO, NO, I DON'T THINK YOU CAN BLANKET STATEMENT SAY,

11  INCREASING THE AMOUNT OF MEDICAL STAFF WOULD SOLVE THAT PROBLEM.

12  WE ARE STILL OVERCROWDED WITH LIMITED THE MEDICAL SPACE.

13  **Q**   IF YOU INCREASE THE MEDICAL SPACE, SUCH AS WITH ANOTHER

14  CONSTRUCTION PROJECT ON THE GROUNDS, AND ADDED MORE STAFF, THAT

15  WOULD RESOLVE THE PROBLEM?

16  **A**   THAT WOULD BE POSSIBLE.

17  **Q**   YOU'VE SEEN A LARGE INCREASE IN THE NUMBER OF CLINICIANS OR

18  MEDICAL STAFF WITH THE RECEIVER TAKING OVER MEDICAL CARE?

19  **A**   I HAVE.

20  **Q**   HAVE YOU SEEN IMPROVEMENTS IN THE DELIVERY OF HEALTHCARE

21  WITH THE RECEIVER'S EFFORTS?

22  **A**   THAT'S A BROAD QUESTION.  THAT WOULD BE A YES AND NO IS MY

23  ANSWER.  THE INCREASE OF THE STAFF HAS NOT --

24  **Q**   I THINK YOU ANSWERED IT.  THANK YOU.

25          WOULD YOU AGREE THAT THE STAFF THAT YOU WORK WITH IN

1  THE DELIVERY OF MEDICAL CARE IS EARNESTLY CONCERNED WITH

2  PROVIDING ADEQUATE SUFFICIENT CONSTITUTIONAL HEALTHCARE TO THE

3  INMATES?

4  **A**   I WOULDN'T COMMENT OR JUDGE ON THAT.

5  **Q**   PARDON?

6  **A**   I SAID I WOULD NOT COMMENT OR JUDGE WHAT THEIR QUALITY OF

7  CARE IS, IF THAT'S YOUR QUESTION.  DO I BELIEVE THEY ARE GIVING

8  CONSTITUTIONAL CARE, YOU WOULD HAVE TO ASK EACH INDIVIDUAL

9  DOCTOR.

10  **Q**   I DIDN'T ASK YOU THAT, AND I UNDERSTAND YOU DON'T WANT TO

11  ANSWER THAT QUESTION.

12          THE CARE THAT YOU PROVIDE, YOU DO YOUR BEST TO

13  GIVE -- YOUR BEST EFFORTS FOR FULFILLING YOUR FUNCTION AND YOUR

14  DUTIES AS A CORRECTIONAL OFFICER, RIGHT?

15  **A**   YES, SIR.

16  **Q**   IN YOUR DEPOSITION YOU HAVE A STATEMENT YOU MADE.  I WANT TO

17  MAKE SURE THAT YOU SAID THIS CORRECTLY.  DO YOU RECALL SAYING, I

18  BELIEVE IT'S AT PAGE 40, LINE 25, TO PAGE 41, LINE 6.

19              "IF YOU HAD LESS INMATES THAT NEEDED TO BE

20          SEEN, MORE WOULD BE SEEN."

21          DID YOU SAY THAT?

22  **A**   IF IT'S IN MY DEPOSITION, I'LL SAY, YES, I SAID IT.  I DON'T

23  RECALL SAYING IT, BUT THAT WOULD BE SOMETHING I WOULD HAVE SAID,

24  YES.

25  **Q**   WERE YOU PRESENT WHEN DR. THOMAS HAD HIS VISIT IN

1  DECEMBER 2007?

2  **A**  I BELIEVE THAT WAS THE DOCTOR I TOURED.

3  **Q**  YES.

4  **A**  YES.

5  **Q**  WERE YOU PART OF THE TOUR?

6  **A**  I WAS PROVIDING SECURITY.

7  **Q**  DR. THOMAS IN HIS VISIT INDICATED THERE WERE NO CLAIMS THAT

8  OVERCROWDING IMPACTED FUNCTIONS OR PUT -- STATED OVERCROWDING

9  WAS AN ISSUE REGARDING THE DELIVERY OF MEDICAL CARE.  DID YOU

10 HAVE CONVERSATIONS WITH DR. THOMAS?

11 **A**  NO.  ACTUALLY, I DIDN'T.

12 **Q**  WERE YOU PRESENT WHEN SOMEONE REMARKED, "I DON'T GET

13 HEALTHCARE AS GOOD AS THEY GET"?

14 **A**  I DON'T RECALL THAT STATEMENT BEING MADE.

15 **Q**  DO YOU HAVE ANY MEDICAL TRAINING?

16 **A**  CPR.

17 **Q**  THAT'S ALL?

18 **A**  THAT'S IT.

19 **Q**  SO YOU HAVE NO KNOWLEDGE REGARDING WHAT THE PROPER TREATMENT

20 IS FOR A PERSON WITH INFECTIOUS DISEASE, RIGHT?

21 **A**  NO MEDICAL KNOWLEDGE.

22 **Q**  MEDICAL TRAINING?

23 **A**  NO.

24 **Q**  I THINK YOU'VE ALREADY INDICATED YOU DON'T HAVE AN OPINION

25 WITH RESPECT TO THE QUALITY OR THE LEVEL OF MEDICAL CARE THAT

1   INMATES ARE RECEIVING, CORRECT?

2   **A**   NO.

3   **Q**   EXCUSE ME.  ONE MOMENT.

4                    (PAUSE IN PROCEEDINGS.)

5   BY MR. MITCHELL

6   **Q**   HAVE YOU ALSO WORKED AS MENTAL HEALTHCARE OFFICER?

7   **A**   WE DON'T HAVE THAT TITLE, SO I'M NOT SURE WHAT YOU MEAN.  I

8   WORKED IN THE DEPARTMENT OF MENTAL HEALTH, IF THAT'S WHAT YOU'RE

9   ASKING.

10  **Q**   WHEN WAS THAT?

11  **A**   JULY 2007 TO FEBRUARY 2008.

12  **Q**   WHAT WAS YOUR ROLE THERE?

13  **A**   I WAS A CORRECTIONAL OFFICER THAT COVERED TWO WINGS, Q1, Q2,

14  WITHIN THE DEPARTMENT OF MENTAL HEALTH.

15  **Q**   AND YOU ESCORTED THEM TO THEIR APPOINTMENTS, OR WERE MOST OF

16  THEIR SERVICES PERFORMED IN THE WING THERE?

17  **A**   FOR THE MAJORITY, THEY WERE PERFORMED WITHIN THE WING, THEIR

18  SERVICES.

19  **Q**   ALL THE CLINICIANS WOULD COME INTO THE WING AND PROVIDE THE

20  CARE TO THE INMATES AT THAT LOCATION?

21  **A**   YES.

22  **Q**   NOW, WERE YOU INVOLVED IN THE DELIVERY OF MEDICAL OR

23  MEDICINE OR PRESCRIPTION DRUGS TO THE INMATES?

24  **A**   WITH -- NO.  I'M NOT SURE I UNDERSTAND YOUR QUESTION.  IS

25  THAT PART OF MY FUNCTION AS A HEALTHCARE OFFICER?

1    Q    YES.

2    A    NO.  LET ME QUALIFY THAT PART OF OUR JOB IS WE DO COVER A

3    COUPLE OF HOUSING UNITS WHERE WE WATCH THE NURSE DISTRIBUTE

4    MEDICATION TO PROVIDE SECURITY, BUT I'M NOT SURE IF THAT'S WHAT

5    YOU'RE ASKING.

6              **MR. MITCHELL:**  THANK YOU.  I HAVE NOTHING FURTHER.

7              **MR. MELLO:**  NOTHING FURTHER.

8              **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

9              REDIRECT, MR. HENDERSON?

10             **MR. HENDERSON:**  SHORT REDIRECT, YOUR HONOR.

11                 **REDIRECT EXAMINATION BY MR. HENDERSON**

12   BY MR. HENDERSON

13   Q    MR. ADELMAN, YOU WERE ASKED ABOUT YOUR OWN EXPERIENCES WHEN

14   YOU GO TO APPOINTMENTS WITH HEALTHCARE PROVIDERS, IN THE

15   CROSS-EXAMINATION?

16   A    YES.

17   Q    AND YOU WERE ASKED IF YOU HAD TO WAIT SOMETIMES FOR MEDICAL

18   APPOINTMENTS?

19   A    YES.

20   Q    OKAY.  WHEN YOU -- WITH RESPECT TO THE INMATES THAT ARE IN

21   THE WAITING AREAS, IN THE HALLWAYS, IN CONNECTION WITH THE

22   CLINICS AT CMF, ARE THEY PROVIDED ANYTHING TO DO WHILE THEY'RE

23   WAITING THERE?

24   A    NO.

25   Q    THEY JUST STAND?

1    **A**    YES.

2    **Q**    OKAY.  WHEN YOU GO TO APPOINTMENTS, YOU CAN BRING MAGAZINES

3    AND BOOKS TO READ?

4    **A**    YES.

5    **Q**    OR YOU CAN READ THE OUTDATED ONES IN THE WAITING ROOMS?

6    **A**    CORRECT.

7    **Q**    AND IF YOU WANT TO GET UP AND GET SOMETHING TO EAT, YOU CAN

8    DO THAT, CORRECT?

9    **A**    CORRECT.

10   **Q**    ARE THE INMATES ALLOWED TO DO THAT?

11   **A**    NO.

12   **Q**    OKAY.  AND USUALLY WHEN YOU GO TO MEDICAL APPOINTMENTS, YOU

13   HAVE A PLACE TO SIT?

14   **A**    CORRECT.

15   **Q**    DO THE INMATES HAVE THAT?

16   **A**    NO.  FOR THE MOST PART, NO.

17   **Q**    ARE THERE ANY INMATES AT CMF THAT ARE DOUBLE CELLED?

18   **A**    YES.

19   **Q**    APPROXIMATELY WHAT FACILITY OR WHAT LOCATIONS ARE THEY IN?

20   **A**    THEY'RE THE GENERAL POPULATION INMATES.

21   **Q**    ARE THERE TIMES WHEN THERE ARE NOT SUFFICIENT HEALTHCARE

22   OFFICERS, ACCESS OFFICERS, TO GET INMATES TO SCHEDULED

23   APPOINTMENTS?

24   **A**    YES.

25   **Q**    OKAY.  WHAT HAPPENS WHEN THERE'S A LOCKDOWN AT THE FACILITY

1  IN TERMS OF GETTING PEOPLE TO APPOINTMENTS?

2  **A**   A LOCKDOWN ACTUALLY INCREASES THE AMOUNT OF INMATES I HAVE

3  TO GO GET, BECAUSE THE FACT THE INSTITUTION IS ON LOCKDOWN, THE

4  INMATES CAN'T JUST COME ON THEIR OWN.  SO EVEN A GENERAL

5  POPULATION OR MAINLINE INMATE MIGHT REQUIRE AN ESCORT.

6  **Q**   SO THERE'S AN -- EVEN DURING LOCKDOWN, THERE'S AN EVEN

7  GREATER LIKELIHOOD THAT AN INMATE MAY NOT MEET HIS APPOINTMENT

8  AS SCHEDULED?

9  **A**   THAT'S CORRECT.

10 **Q**   OKAY.  ARE THERE -- HOW OFTEN DO LOCKDOWNS OCCUR AT CMF?

11 **A**   LOCKDOWNS HAPPEN BECAUSE OF PRISON, SO THEY HAPPEN --

12          **MR. HENDERSON:**  OBJECT AS OUTSIDE THE SCOPE OF

13 CROSS-EXAMINATION.  OBJECTION.

14          **MR. MITCHELL:**  I ASKED ABOUT LOCKDOWNS IN DIRECT,

15 YOUR HONOR.

16          **JUDGE HENDERSON:**  HE'S TALKING ABOUT

17 CROSS-EXAMINATION.  YOU'RE REVISITING CROSS-EXAMINATION, SO I'LL

18 SUSTAIN THAT OBJECTION.

19 BY MR. HENDERSON

20 **Q**   ARE THE INMATES THAT ARE IN THE WAITING AREAS, ARE THEY IN

21 DIFFERENT SECURITY LEVELS?

22 **A**   YES.

23 **Q**   WHAT SECURITY LEVELS ARE PRESENT AT CMF?

24 **A**   LEVEL ONES THROUGH LEVEL FOURS.

25 **Q**   WHAT ARE LEVEL FOURS?

1   A    THE HIGHEST RATED SECURITY.  SOMETIMES THEY'RE AD-SEGS.

2   THEY HAVE A LOT OF POINTS, ANY NUMBER OF CRITERIA.  THE HIGHER

3   THE POINTS, THE HIGHER THE LEVEL.

4   Q    AND THERE'S NO SEGREGATION OF THE VARIOUS LEVELS WHEN THEY

5   ARE IN THE WAITING AREAS?

6   A    ONLY THE ADMINISTRATIVE SEGREGATED INMATES.  WE TRY TO

7   ESTABLISH SOME SPACE BETWEEN THEM AND THE GP, GENERAL POPULATION

8   INMATES.

9   Q    ARE THERE LEVEL FOUR INMATES IN THE GENERAL POPULATION?

10  A    I BELIEVE THERE STILL ARE AT CMF.

11  Q    SO THEY WOULD NOT BE SUBJECT TO AD-SEG?

12  A    NO, SIR.

13  Q    DO YOU LIKE WORKING AT CMF, SIR?

14  A    YES.

15  Q    WHY IS THAT?

16          **MR. MITCHELL:**  OBJECT ON RELEVANCE GROUNDS.

17          **JUDGE HENDERSON:**  I'M GOING TO ALLOW IT.

18          CMF, HAVE YOU WORKED ANYPLACE ELSE OTHER THAN CMF?

19          **THE WITNESS:**  YES, SIR.  I WORKED AT SAN QUENTIN WHEN

20  I WORKED AT -- WHEN I FIRST LEFT THE ACADEMY.

21          **JUDGE HENDERSON:**  WAS THE QUESTION CMF OR THE JOB?

22          **MR. HENDERSON:**  CMF.

23          **JUDGE HENDERSON:**  YOU MAY ANSWER.

24          **THE WITNESS:**  THE QUESTION AGAIN?

25

1  BY MR. HENDERSON

2  **Q**   WHY IS IT YOU LIKE WORKING AT CMF?

3  **A**   I'M FAMILIAR WITH IT.  I HAVE BEEN THERE A LONG TIME.  I

4  THINK WE'RE A GOOD PRISON.  WE DO GOOD THINGS.  WE HAVE A LOWER

5  RATE OF INCIDENTS COMPARED TO OTHER INSTITUTIONS.  I THINK A LOT

6  BECAUSE OF OUR MEDICAL INMATES, THAT WE DON'T HAVE THE HIGH

7  VIOLENCE RATE.  DOESN'T MEAN WE DON'T HAVE ANY VIOLENCE, JUST

8  NOT AS MUCH AS OTHER PLACES WHERE THERE'S HIGH GANG ACTIVITY.

9  THERE COULD BE ANY NUMBER OF REASONS.  I'M STILL NOT EXACTLY

10 SURE OF THE QUESTION.

11 **Q**   I THINK YOU ANSWERED IT FOR ME.

12 **A**   THANK YOU.

13         **MR. HENDERSON:**  THANK YOU, SIR.

14         **JUDGE HENDERSON:**  RECROSS?

15         **MR. MITCHELL:**  JUST BRIEFLY.

16              **RECROSS-EXAMINATION BY MR. MITCHELL**

17 BY MR. MITCHELL

18 **Q**   MR. ADELMAN, YOU INDICATED THAT, IN YOUR OPINION, YOUR

19 INSTITUTION IS OVERCROWDED.

20 **A**   NO, I DON'T THINK I SAID THAT.  I THINK IT'S OVERCROWDED FOR

21 ITS MEDICAL NEEDS BECAUSE WE HAVE SUCH A HIGH RATE OF MEDICAL

22 NEED INMATES.

23 **Q**   AND YOU THINK IT'S OPERATING FAIRLY WELL?

24 **A**   I DIDN'T SAY THAT EITHER.  I THINK THERE ARE TIMES WHEN ANY

25 NUMBER OF PROGRAMS DON'T OPERATE WELL BECAUSE, A, IT'S THE

1  STATE, THERE'S NOT ALWAYS A LOT OF MONEY, BUDGET CONSTRAINTS,

2  MEDICAL CONSTRAINTS.  SO, NO, I DON'T THINK I SAID THAT.

3  **Q**   BUT YOU ARE DOING A GOOD JOB?

4  **A**   PARDON ME?

5  **Q**   YOU JUST INDICATED PREVIOUSLY YOU ARE DOING A GOOD JOB.

6  **A**   I BELIEVE I'M DOING A GOOD JOB WITHIN THE CONFINES OF WHERE

7  I'M WORKING, YES.

8           **MR. MITCHELL:**  THANK YOU.

9           **JUDGE HENDERSON:**  OKAY.  LET'S TAKE A ONE-HOUR -- I

10  ASSUME YOU DON'T HAVE --

11          **MR. SPECTER:**  COULD I RAISE SOMETHING BEFORE WE BREAK

12  FOR LUNCH?

13          **JUDGE HENDERSON:**  OKAY.

14          **MR. SPECTER:**  DONALD SPECTER FOR THE PLAINTIFFS.

15          I WANTED TO -- AS YOU KNOW, THE PLAINTIFFS HAVE

16  FINISHED WITH OUR WITNESSES, AND THE STATE IS GOING TO START

17  PRESENTING ITS WITNESSES TOMORROW.  SO I WANTED TO RAISE KIND OF

18  A LEGAL ISSUE WITH YOU BEFORE THAT HAPPENS, SO IF IT NEEDS TO BE

19  RESOLVED, IT CAN BE RESOLVED.

20          AS YOU KNOW, WHEN YOU BIFURCATED THE PROCEEDINGS

21  HERE, YOU PUT PRIMARY CAUSE IN THIS PROCEEDING AND NO OTHER

22  RELIEF IN THE OTHER PART OF THE PROCEEDING, AND I UNDERSTAND

23  THAT.  BUT THE ISSUE COMES DOWN TO WHERE THE DIVIDING LINE

24  BETWEEN THE NO OTHER RELIEF IS AND THE PRIMARY CAUSE.

25          AS YOU HAVE HEARD THE TESTIMONY FROM OUR WITNESSES,

1  THEY'VE TESTIFIED BOTH THAT IT'S THE PRIMARY CAUSE AND THAT

2  NOTHING SHORT OF A POPULATION REDUCTION WILL ALLOW THE STATE OR

3  THE RECEIVER TO PROVIDE THE ADEQUATE MEDICAL AND MENTAL

4  HEALTHCARE THAT THE CONSTITUTION REQUIRES.  THAT SOMEWHAT SLIPS

5  IN, IN A WAY, TO THE ISSUE OF NO OTHER -- WHETHER THERE'S NO

6  OTHER RELIEF ISSUE.

7          I -- WE AS THE PLAINTIFFS ARE GOING TO REQUEST A

8  FINDING, FACTUAL FINDING, AT THE LEAST, THAT CROWDING IS THE

9  PRIMARY CAUSE AND THAT THE -- WITHOUT A POPULATION REDUCTION,

10 THE -- YOU KNOW, LEVEL OF CONSTITUTIONAL CARE WON'T BE PROVIDED

11 FOR MANY, MANY YEARS TO COME.

12         SO I DIDN'T WANT TO GO INTO THE NEXT PHASE OF THE

13 PROCEEDING WITHOUT IT BEING CLEAR WHICH WAY THAT STRIKES, AND I

14 DIDN'T WANT THE DEFENSE TO BE PUT ON WITHOUT IT BEING CLEAR THAT

15 THAT'S AT LEAST OUR POSITION, THAT THAT ISSUE NEEDS TO BE

16 ADDRESSED IN PHASE ONE OF THE PROCEEDINGS.

17         **JUDGE KARLTON:**  MR. SPECTER, CANDIDLY, I DON'T

18 UNDERSTAND WHAT YOU'RE SAYING.  ARE YOU SAYING YOU BELIEVE --

19 FIRST OF ALL, LET'S LET THIS GUY GO HOME.

20         **JUDGE HENDERSON:**  YES.  THANK YOU FOR TESTIFYING,

21 SIR.  YOU MAY STEP DOWN, AND YOU'RE EXCUSED.

22         **THE WITNESS:**  THANK YOU.

23         **JUDGE KARLTON:**  ARE YOU SAYING YOU DON'T INTEND TO

24 PUT ON ANY ADDITIONAL EVIDENCE CONCERNING ALTERNATIVE RELIEF

25 BECAUSE YOU THINK YOU'VE COVERED IT ALREADY?

 1              **MR. SPECTER:**  I'M SORRY.  I COULDN'T HEAR THE

 2    QUESTION, YOUR HONOR, BECAUSE OF THE ACOUSTICS.

 3              **JUDGE KARLTON:**  I'LL TRY ONCE MORE.

 4              **MR. SPECTER:**  OKAY.

 5              **JUDGE KARLTON:**  ARE YOU SAYING --

 6              **MR. SPECTER:**  YES.

 7              **JUDGE KARLTON:**  -- THAT YOU WILL NOT BE PUTTING ON

 8    ANY MORE EVIDENCE CONCERNING ALTERNATIVE ORDERS BECAUSE YOU

 9    BELIEVE YOU'VE CARRIED -- YOU'VE COVERED IT IN THE COURSE OF

10    PHASE ONE?

11              **MR. SPECTER:**  IN A WAY, I GUESS I AM SAYING THAT.

12              **JUDGE KARLTON:**  ALL RIGHT.

13              **MR. SPECTER:**  BECAUSE -- THAT'S WHY I THINK -- IT'S

14    THE FLIP SIDE OF THE PRIMARY CAUSE PRONG.  IF IT IS THE PRIMARY

15    CAUSE, THEN IT'S --

16              **JUDGE KARLTON:**  I'M REALLY NOT ASKING FOR AN

17    ARGUMENT.  I'M TRYING TO UNDERSTAND WHAT YOU ARE TALKING ABOUT.

18              **MR. SPECTER:**  I THINK THE ONLY OTHER EVIDENCE THAT WE

19    WOULD PUT ON IS MORE OR LESS REBUTTAL IF THE DEFENDANTS, YOU

20    KNOW --

21              **JUDGE REINHARDT:**  IT SEEMS TO ME YOU COULD, IF THE

22    TWO OF YOU AGREE THAT YOU HAVE COVERED WHAT WE HAVE SAID IS

23    GOING TO BE PART OF PHASE TWO --

24              **JUDGE KARLTON:**  THAT'S FINE.

25              **JUDGE REINHARDT:**  IF YOU BOTH AGREE THAT YOU FULLY

1   EXPLORED IN PHASE ONE THE QUESTION OF ALTERNATIVE CAUSES --

2   ALTERNATIVE RELIEF, THEN I SUPPOSE, CERTAINLY, WE WOULD BE

3   WILLING TO ACCEPT THAT IF YOU ALL AGREE, BUT IF THERE'S A

4   DISAGREEMENT ABOUT THAT, WE HAVE SAID THAT THAT'S GOING TO BE

5   CONSIDERED IN PHASE TWO.

6          **MR. SPECTER:**  WELL, I UNDERSTAND THAT YOU'VE SAID

7   THAT, BUT THE QUESTION --

8          **JUDGE REINHARDT:**  WE MEANT IT.

9          **MR. SPECTER:**  I'M NOT TRYING TO CHANGE THAT.  I'M

10  JUST TRYING TO FIGURE OUT WHERE THE DIVIDING LINE COMES BETWEEN

11  FACTUAL ISSUES AND RELIEF.

12         **JUDGE KARLTON:**  THAT'S NOT OUR PROBLEM.  I'M SORRY.

13  I DON'T WANT TO --

14         **MR. SPECTER:**  OKAY.  IT'S MY PROBLEM?

15         **JUDGE KARLTON:**  YES.

16         **MR. SPECTER:**  OKAY.  THEN THAT'S OUR POSITION.  I

17  JUST WANTED TO MAKE IT CLEAR.

18         **JUDGE REINHARDT:**  YOUR POSITION IS NO --

19         **MR. SPECTER:**  PARDON ME?

20         **JUDGE REINHARDT:**  YOUR POSITION IS NO MATTER WHAT

21  THEY DO IN PHASE TWO, YOU DON'T INTEND TO OFFER ANY ADDITIONAL

22  EVIDENCE?

23         **MR. SPECTER:**  NO, I DIDN'T SAY THAT.

24         **JUDGE KARLTON:**  NO, NO.  MR.  SPECTER --

25         **MR. SPECTER:**  I JUST WANTED TO RAISE IT SO IT'S CLEAR

1  AND EVERYBODY --

2         **JUDGE REINHARDT:**  NOTHING IS VERY CLEAR ABOUT

3  DIVIDING LINES IN THIS CASE.

4         **JUDGE KARLTON:**  LOOK, IT'S YOUR CASE.

5      **MR. SPECTER:**  YES.

6         **JUDGE KARLTON:**  OKAY?  IF YOU THINK YOU'VE COVERED IT

7  SUFFICIENTLY SO THAT YOU DON'T INTEND TO PUT ON ANY MORE OF YOUR

8  CASE IN CHIEF OR YOU'RE RESERVING THE RIGHT TO REBUT IT, THAT'S

9  FINE.  IT'S YOUR CASE.  WE ARE NOT GOING TO TELL YOU HOW TO RUN

10 YOUR CASE.

11     **MR. SPECTER:**  I UNDERSTAND.

12        **JUDGE REINHARDT:**  IF YOUR OPPONENTS ARE RESERVING THE

13 RIGHT TO PUT ON EVIDENCE ABOUT ALTERNATIVE REMEDIES IN PHASE

14 TWO, THAT WOULD BE CONSISTENT WITH OUR ORDER.

15     **MR. SPECTER:**  OKAY.

16        **JUDGE REINHARDT:**  ONE OTHER QUESTION I HAVE, WOULD IT

17 BE POSSIBLE FOR YOU ALL TO GIVE US AN ESTIMATE -- YOU GAVE US AN

18 ESTIMATE ABOUT HOW LONG PHASE ONE WOULD LAST, WHICH WAS NOT VERY

19 ACCURATE, BUT WE'RE DELIGHTED.  COULD YOU GET TOGETHER AND GIVE

20 US SOME KIND OF AN ESTIMATE ABOUT HOW MUCH TIME YOU WOULD NEED

21 FOR PHASE TWO?

22     **MR. SPECTER:**  YES, YOUR HONOR, WE WOULD BE HAPPY TO

23 DO THAT.

24        **JUDGE REINHARDT:**  AND IT WOULD HELP IF WE COULD DO

25 THAT EITHER BY THE END OF TODAY OR TOMORROW MORNING SO WE MIGHT

1  BE ABLE TO COME UP WITH SOME --

2          **MR. SPECTER:**  SURELY.  CERTAINLY, YOUR HONOR.  WE

3  WOULD BE HAPPY TO DISCUSS IT.

4          **JUDGE REINHARDT:**  IF YOU CAN.  I SEE SOME NEGATIVE

5  RESPONSES.

6          **MR. SPECTER:**  NOT EVERYBODY -- IN FAIRNESS, NOT

7  EVERYBODY OF THE INTERVENORS IS HERE, SO IT MIGHT TAKE US -- IT

8  WON'T TAKE US, BUT IT MIGHT TAKE THEM A LITTLE LONGER TO FIGURE

9  IT OUT.

10          **JUDGE REINHARDT:**  IF WE DON'T HAVE IT BY TOMORROW, WE

11  WON'T HAVE IT TOMORROW.  IT JUST MAY BE EASIER FOR EVERYBODY TO

12  START THINKING ABOUT WHEN WE ARE GOING TO DO THAT.

13          **MR. SPECTER:**  THAT -- ACTUALLY, THAT WAS PART OF WHY

14  I RAISED THIS ISSUE, BECAUSE WE WANT -- OBVIOUSLY, WE'LL WANT --

15  IF THE COURT AGREES WITH OUR POSITION ABOUT THE PRIMARY CAUSE

16  ISSUE, WE WOULD LIKE TO MOVE INTO THE SECOND PHASE OF THE

17  PROCEEDING AS SOON AS POSSIBLE.  I DON'T KNOW YOUR --

18          **JUDGE KARLTON:**  IT'S SOMETHING LIKE THAT TRIAL; IF

19  PIGS HAD WINGS, THEY'D ALL FLY.  LET'S JUST GO TO LUNCH.

20          **MR. MELLO:**  TWO QUICK POINTS.  I DON'T THINK THE

21  COURT HAS RULED IN FAVOR OF PLAINTIFFS IN PHASE ONE YET, SO WE

22  MIGHT BE GETTING AHEAD OF OURSELVES, NUMBER ONE.

23          NUMBER TWO, THE COURT'S POINT IS WELL TAKEN.  ONE OF

24  THE INTERVENORS WITH THE MOST WITNESSES IS NOT HERE.  WE'LL

25  ENDEAVOR TO DO THAT.  WE WILL SURE ENDEAVOR TO DO -- THE

1   POSSIBILITY OF PHASE ONE IS FOUND FOR PLAINTIFFS, WE CAN TRY TO

2   DO THAT.  I DON'T KNOW IF WE CAN DO IT BY THE END OF THE DAY OR

3   TOMORROW.

4           **JUDGE REINHARDT:**  I THINK WE CAN SET A TENTATIVE

5   SCHEDULE ON THE ASSUMPTION THERE'S A RULING OR THE POSSIBILITY

6   THERE'S A RULING ON PHASE ONE, AND IF THE RULING IS IN YOUR

7   FAVOR, THEN WE DON'T USE THOSE DAYS.

8           **MR. MELLO:**  GREAT.  RIGHT.  THANK YOU.

9           **JUDGE HENDERSON:**  OKAY.  COURT IS ADJOURNED FOR ONE

10  HOUR.

11              (LUNCHEON RECESS TAKEN AT 12:30 P.M.)

12          **THE CLERK:**  PLEASE BE SEATED.

13          **JUDGE HENDERSON:**  OKAY.  ARE YOU READY TO PROCEED,

14  COUNSEL?

15          **MR. HENDERSON:**  YES, YOUR HONORS.

16          **JUDGE HENDERSON:**  WHY DON'T YOU CALL YOUR NEXT

17  WITNESS?

18          **MR. HENDERSON:**  YES, WE WILL CALL MR. KEVIN RAYMOND.

19          **THE CLERK:**  PLEASE STEP UP, AND RAISE YOUR RIGHT

20  HAND.

21              (THEREUPON, THE WITNESS WAS SWORN.)

22          **THE WITNESS:**  I DO.

23          **THE CLERK:**  PLEASE HAVE A SEAT. STATE AND SPELL YOUR

24  FULL NAME FOR THE RECORD.

25          **THE WITNESS:**  KEVIN LEE RAYMOND.  K-E-V-I-N, L-E-E,

1    R-A-Y-M-O-N-D.

2            THEREUPON --

3                **KEVIN LEE RAYMOND**

4            CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING

5    BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

6                **DIRECT EXAMINATION**

7    **BY MR. HENDERSON:**

8    Q.  GOOD AFTERNOON, MR. RAYMOND.

9            **MR. HENDERSON:**  YOUR HONORS, I'LL AGAIN POINT YOU TO

10   THE FACT THAT WE SUBMITTED A DIRECT TESTIMONY DECLARATION, AND

11   THERE'S FOUNDATIONAL INFORMATION CONTAINED IN THERE, BUT I WILL

12   ASK SOME QUESTIONS OF THE WITNESS REGARDING HIS BACKGROUND.

13   **BY MR. HENDERSON:**

14   Q.  MR. RAYMOND, YOU'RE PRESENTLY EMPLOYED BY THE CALIFORNIA

15   DEPARTMENT OF CORRECTIONS AND REHABILITATION?

16   A.  YES.

17   Q.  OKAY.  AND HOW LONG HAVE YOU BEEN EMPLOYED BY THEM.

18   A.  18 YEARS, TWO MONTHS.

19   Q.  OKAY.  AND WHAT IS YOUR CURRENT POSITION?

20   A.  CORRECTIONAL OFFICER.

21   Q.  OKAY.  AND WHERE -- IN CONNECTION WITH YOUR DUTIES AS A

22   CORRECTIONAL OFFICER, WHERE ARE YOU CURRENTLY ASSIGNED?

23   A.  I'M ASSIGNED TO FOLSOM STATE PRISON, BUT I'M DETACHED DUTY

24   TO THE OFFICE OF FACILITIES MANAGEMENT.

25   Q.  I'M SORRY.  THE OFFICE OF FACILITIES MANAGEMENT?

1  **A.**  YES, SIR.

2  **Q.**  WHERE IS THAT LOCATED?

3  **A.**  OLD PLACERVILLE ROAD IN SACRAMENTO.

4  **Q.**  AND HOW LONG HAVE YOU BEEN ON DETACHED DUTY TO THE OFFICE OF

5  FACILITIES MANAGEMENT?

6  **A.**  SINCE OCTOBER OF 2006.

7  **Q.**  AND WHAT ARE YOUR DUTIES AT THE OFFICE OF FACILITIES

8  MANAGEMENT?

9  **A.**  I'M A LIAISON BETWEEN THE CALIFORNIA CORRECTIONAL PEACE

10  OFFICERS' ASSOCIATION AND THE DEPARTMENT WHEN IT COMES TO

11  MATTERS OF CONSTRUCTION.

12  **Q.**  OKAY. WHAT ARE THE TASKS THAT ARE ASSIGNED TO THE OFFICE OF

13  FACILITIES MANAGEMENT?

14  **A.**  DEVELOPING STAFFING PACKAGES FOR NEW CONSTRUCTION, REVIEWING

15  BLUEPRINTS FOR ANY NEW CONSTRUCTION THAT THE DEPARTMENT DOES.

16  **Q.**  AND WITHIN THAT -- THOSE CATEGORIES, WHAT, SPECIFICALLY, IS

17  YOUR INVOLVEMENT?

18  **A.**  I ASSIST THE CORRECTIONAL CAPTAINS THAT ARE ASSIGNED TO THE

19  DESIGN STANDARDS BRANCH IN DEVELOPING THE STAFFING PACKAGES AND

20  REVIEWING THE PLANS FOR SAFETY, SECURITY AND SO FORTH.

21  **Q.**  CAN YOU DESCRIBE FOR US WHAT YOU MEAN BY "STAFFING

22  PACKAGES"?

23  **A.**  WHEN A NEW CONSTRUCTION PROJECT IS DONE THEY DEVELOP A

24  STAFFING PACKAGE TO BASICALLY STAFF, WHETHER IT BE A NEW

25  BUILDING INSIDE AN EXISTING FACILITY, OR IN THE CASE OF WHAT

1  THEY ARE PLANNING NOW, NEW FACILITIES OUTSIDE OF THE EXISTING

2  FACILITIES IN ACCORDANCE WITH AB900 TO INFILL BEDS IN THE

3  REENTRY PROGRAM.

4  **Q.**  NOW, YOU MENTIONED "AB900."  CAN YOU TELL US WHAT YOU'RE

5  REFERRING TO BY "AB900"?

6  **A.**  ASSEMBLY BILL 900 THAT AUTHORIZED THE BUILDING OF INFILL

7  BEDS AND REENTRY BEDS, COUNTY JAIL BEDS, TO ALLEVIATE

8  OVERCROWDING.

9  **Q.**  OKAY.  AND THE -- WITHIN THE CONCEPT OF THE STAFFING

10  PACKAGE, WHAT STAFFING, SPECIFICALLY, ARE YOU REFERRING TO?

11  **A.**  WELL, STAFFING PACKAGE DEVELOPED FOR ALL STAFF:  CUSTODY,

12  MEDICAL, EDUCATION.

13  **Q.**  ADMINISTRATIVE?

14  **A.**  YES, ANYBODY THAT WORKS INSIDE OR OUTSIDE THE ADMINISTRATION

15  OF THE PRISON.

16  **Q.**  OKAY. AND WITH RESPECT TO THE STAFFING OF CUSTODIAL

17  OFFICERS, HOW IS THAT DETERMINED IN FORMULATING STAFFING

18  PACKAGES?

19  **A.**  HOW IS IT DETERMINED?

20  **Q.**  HOW --

21        **JUDGE KARLTON:**  WHAT ARE THE STANDARDS, I THINK IS

22  WHAT HE'S ASKING.

23        **MR. HENDERSON:**  I'M SORRY, YOUR HONOR?

24        **JUDGE KARLTON:**  WHAT ARE THE STANDARDS?

25

1  **BY MR. HENDERSON:**

2  **Q.**  WHAT IS UTILIZED TO DETERMINE HOW TO STAFF A NEW FACILITY

3  THAT IS BEING CONSTRUCTED FROM THE CUSTODIAL STANDPOINT?

4  **A.**  AS FAR AS CORRECTIONAL OFFICERS, BASICALLY THE DEPARTMENT

5  PRETTY MUCH GOES ON PAST PRACTICE, WHAT THEY HAVE ALREADY

6  ESTABLISHED AT EXISTING FACILITIES.

7  **Q.**  OKAY.  AND WITH RESPECT TO CUSTODIAL -- OR I'M SORRY --

8  CORRECTIONAL OFFICERS ASSIGNED TO HOUSING UNITS, IS THERE --

9  WHAT IS THE RATIO OF OFFICERS TO INMATES THAT IS UTILIZED?

10  **A.**  THERE IS A CONCEPT OF THE PRINCIPLES OF DIRECT SUPERVISION

11  WHICH SAYS THAT YOU SHOULD HAVE ONE OFFICER FOR EVERY 64

12  INMATES.

13          NATIONAL INSTITUTE OF CORRECTIONS DID A STUDY

14  SOMETIME IN THE PAST, AND CAME UP WITH THAT, THAT ANYTHING

15  BEYOND THAT YOU'RE REALLY IN DANGER OF WHAT THEY CALL "LOSING

16  THE COMMUNITY."

17          HOWEVER, THE DEPARTMENT OF CORRECTIONS RECOGNIZES

18  THAT, BUT THEY DON'T STAFF AT THAT LEVEL.

19          **JUDGE REINHARDT:**  CAN I ASK A DIFFERENT QUESTION?

20  YOU SAY YOUR JOB IS WITH RESPECT TO NEW FACILITIES BUILT UNDER

21  AB900?  OR ARE YOU TALKING ABOUT PAST, EXISTING FACILITIES?

22          **THE WITNESS:**  WELL, CURRENTLY THEY ARE BUILDING OTHER

23  BUILDINGS INSIDE OF FACILITIES, NEW CONSTRUCTION, MENTAL HEALTH

24  BEDS AND SO FORTH.  SO THAT DOES GO THROUGH THE OFFICE OF

25  FACILITIES MANAGEMENT, ALSO.  AND ALSO THE AB900 ASPECT OF

1    INFILL AND REENTRY.

2            BUT WHAT I WAS TRYING TO DO WAS COMPARE THE STAFFING

3    THAT'S ALREADY CURRENTLY IN PLACE TO THE STAFFING PACKAGES THAT

4    THE DEPARTMENT IS CURRENTLY DEVELOPING.

5            **JUDGE REINHARDT:**  OKAY. WELL --

6            **JUDGE KARLTON:**  GO AHEAD, COUNSEL.

7            **MR. HENDERSON:**  THANK YOU, YOUR HONOR.

8            **JUDGE REINHARDT:**  ARE THERE ANY FACILITIES THAT ARE

9    BEING BUILT PURSUANT TO AB900?

10           **THE WITNESS:**  THEY HAVE THE PLANS. THE MONEY ACTUALLY

11   HAS NOT BEEN ALLOCATED THROUGH AB900, SO THEY ARE PRETTY MUCH

12   STUCK RIGHT NOW WITH JUST PLANS.

13           **MR. HENDERSON:**  MAY I PROCEED?  THANK YOU.

14   **BY MR. HENDERSON:**

15   **Q.**  IN TERMS OF DETERMINING STAFFING, CORRECTIONAL OFFICER

16   STAFFING, WHAT GUIDELINES ARE USED BY THE OFFICE OF FACILITIES

17   MANAGEMENT IN DETERMINING THE TOTAL NUMBER OF INMATES AT A

18   FACILITY?

19   **A.**  COULD YOU REPHRASE THAT?  I'M NOT SURE I --

20   **Q.**  OKAY.  WHAT I'M TRYING TO FIND OUT IS:  HOW DO THEY

21   DETERMINE HOW MANY INMATES ARE GOING TO BE AT A FACILITY WHEN

22   IT'S BEING PLANNED?

23           **JUDGE KARLTON:**  WHEN IT'S BEING PLANNED?

24           **MR. HENDERSON:**  WHEN IT'S BEING PLANNED.

25           **JUDGE KARLTON:**  ALL RIGHT.

1          **MR. LEWIS:**  PARDON ME.  KYLE LEWIS ON BEHALF OF THE

2 STATE.

3          YOUR HONOR, I OBJECT TO THIS QUESTION.  THERE'S NO

4 FOUNDATION FOR THIS WITNESS TO SPEAK ABOUT INMATE POPULATION

5 DESIGN CAPACITY.

6          **JUDGE HENDERSON:**  WELL, THIS QUESTION IS HOW DO THEY

7 TAKE INTO ACCOUNT SIZE WHEN THEY ARE PLANNING.

8          BUT LAY A FOUNDATION, PLEASE.

9 **BY MR. HENDERSON:**

10 **Q.**  PART OF YOUR DUTIES AT THE OFFICE OF FACILITIES MANAGEMENT

11 INVOLVE DETERMINING THE NUMBER OF CUSTODIAL STAFF THAT WILL BE

12 NECESSARY FOR A NEW FACILITY TO BE CONSTRUCTED; IS THAT CORRECT?

13 **A.**  YES.

14 **Q.**  OKAY. AND IN DOING THAT, YOU UTILIZE CERTAIN PROCEDURES

15 WITHIN THE OFFICE OF FACILITIES MANAGEMENT TO DETERMINE HOW MANY

16 CUSTODIAL CORRECTIONAL STAFF WILL BE NECESSARY FOR A NEW

17 FACILITY; IS THAT CORRECT?

18 **A.**  YES.  YOU'RE TALKING DEVELOPING THE STAFFING PACKAGE.

19 **Q.**  RIGHT.  DEVELOPING THE STAFFING PACKAGE.

20          NOW, IN DEVELOPING THE STAFFING PACKAGE, WHAT INMATE

21 POPULATION -- HOW IS THE INMATE POPULATION DETERMINED FOR A NEW

22 FACILITY THAT IS CONTEMPLATED TO BE CONSTRUCTED?

23 **A.**  IT'S -- THE STAFFING PACKAGE GOES OFF THE PREMISE OF THE

24 DESIGN CAPACITY IS ONE INMATE PER CELL. SO THE INITIAL STAFFING

25 PACKAGE IS AT A HUNDRED PERCENT DESIGN BED CAPACITY.

1          THE SECOND PART OF THE STAFFING PACKAGE IS THE

2    OVERCROWDING PACKAGE, WHICH, DEPENDING ON THE LEVEL OF THE

3    FACILITY BEING BUILT, COULD BE 150 PERCENT, 175 PERCENT,

4    190 PERCENT OR 200 PERCENT.

5    Q.  AND IS THIS ACTUAL CAPACITY TAKEN INTO ACCOUNT AT THE TIME

6    OF THE PLANNING AND THE DEVELOPMENT OF THE STAFFING PACKAGE?

7    A.  THE STAFFING PACKAGE INCLUDES THE DESIGN BED CAPACITY AND

8    THE OVERCROWDING.

9    Q.  OKAY.  SO THE STAFFING PACKAGE -- WE HAVE TWO SEPARATE

10   PACKAGES, THEN, CORRECT?  WE HAVE THE STAFFING PACKAGE, AND WE

11   HAVE THE OVERCROWDING PACKAGE; IS THAT A FAIR SUMMARY?

12   A.  YES.

13   Q.  OKAY. NOW, THE STAFFING PACKAGE AS YOU'VE INDICATED IS BASED

14   ON A DESIGN BED CAPACITY OF ONE INMATE PER CELL?

15   A.  YES.

16   Q.  OKAY. NOW, ARE THE FACILITIES DESIGNED IN REALITY WITH THE

17   ASSUMPTION THAT THERE'S ONLY GOING TO BE ONE INMATE PER CELL?

18          MR. LEWIS:  OBJECTION, YOUR HONOR.  THIS CALLS FOR A

19   LACK -- OR THIS QUESTION CALLS FOR LACK OF FOUNDATION.  THIS

20   WITNESS IS SIMPLY NOT QUALIFIED TO ANSWER.

21          HE'S A LIAISON IN FACILITIES MANAGEMENT STAFFING, NOT

22   ABOUT DESIGN CAPACITY OR INMATES OR ANYTHING LIKE THAT.

23          JUDGE HENDERSON:  I'LL SUSTAIN THAT WITHOUT PREJUDICE

24   FOR LAYING A FOUNDATION, COUNSEL.

25

1    **BY MR. HENDERSON:**

2    **Q.**  MR. RAYMOND, YOU'VE SEEN THE PACKAGES THAT THE OFFICE OF

3    FACILITIES MANAGEMENT HAS PUT TOGETHER FOR NEW CONSTRUCTION; IS

4    THAT CORRECT?

5    **A.**  YES.

6    **Q.**  OKAY.  AND THESE PACKAGES CONTAIN A DESIGN BED STAFFING

7    PACKAGE, CORRECT?

8    **A.**  YES.

9    **Q.**  AND THAT IS BASED ON ONE INMATE PER CELL?

10   **A.**  YES, SIR.

11   **Q.**  AND HAVE YOU SEEN PLANS FOR THESE FACILITIES WHILE THEY ARE

12   STILL IN THE PLANNING STAGE WHERE, IN REALITY, THE PLANS SHOW

13   TWO BEDS PER CELL?

14   **A.**  YES, EVERYTHING --

15   **Q.**  I'M SORRY?

16   **A.**  EVERYTHING IS DESIGNED AT A HUNDRED PERCENT DESIGN BED

17   CAPACITY AS FAR AS EDUCATIONAL SPACES AND SO FORTH.

18   **Q.**  OKAY.

19   **A.**  THE ONLY DIFFERENCE HAS COME UP IN THE LAST YEAR, AND THAT'S

20   WITH THE FEDERAL RECEIVER HAVING THE MEDICAL SPACES INCREASED.

21   **Q.**  ARE THERE ASPECTS OF THE NEW CONSTRUCTION THAT ARE DESIGNED

22   TO REFLECT THE ACTUAL ANTICIPATED INMATE POPULATION?

23   **A.**  THE ONLY THING THAT'S TAKEN INTO CONSIDERATION AS FAR AS WHO

24   WILL ACTUALLY BE HOUSED THERE IS ANYTHING THAT THEY TERM TO BE

25   "STUFF."

1           IN OTHER WORDS, I CAN PUT TWO INMATES IN A CELL.  I

2   CAN ONLY HAVE A DESIGN BED CAPACITY A HUNDRED PERCENT SPACE FOR

3   EDUCATION. I CAN DOUBLE-SHIFT THAT, WHATEVER I HAVE TO DO TO

4   MAKE THAT WORK.

5           BUT WHEN IT COMES TO INMATE CONFIDENTIAL FILES AND SO

6   FORTH, THAT ACTUALLY TAKE UP PHYSICAL SPACE, I CAN'T PUT TWO

7   FILES IN A SPACE THAT I PROVIDED FOR ONE.

8           SO THE ONLY THING THAT THEY CONSIDER -- AND THEY DO

9   IT ON A CASE-BY-CASE BASIS.  ANYTHING THAT IS COSIDERED "STUFF,"

10  THEN THEY LOOK AT IT AND SAY:

11          "OKAY.  WE NEED TO INCREASE THE SPACE ALLOTTED

12          FOR THAT," BECAUSE YOU CAN'T DO AWAY WITH THAT BY

13  DOUBLE SHIFTING FILES.  IT DOESN'T WORK.

14  **Q.**  SO --

15          **MR. LEWIS:**  EXCUSE ME, YOUR HONOR.  I'M GOING TO

16  ASSERT ANOTHER OBJECTION.  THIS WITNESS IS JUST BASICALLY

17  TESTIFYING WITHOUT A LACK OF FOUNDATION.

18          NOW, THEY ARE TALKING ABOUT "STUFF" AND "FILES."

19          THIS WITNESS WAS PROFFERED FOR THE PURPOSE OF

20  STAFFING ASSESSMENT.  THIS IS FAR BEYOND THE SCOPE, AND THE

21  QUESTION IS NOT RESPONSIVE.

22          **JUDGE KARLTON:**  APPARENTLY, HE DOES.

23          APPARENTLY, THAT'S WHAT YOU DO FOR THE ORGANIZATION

24  YOU'RE ASSIGNED TO.

25          **THE WITNESS:**  YES, SIR. IF I MAY EXPAND?

1          **JUDGE KARLTON:**  SURE.

2          **THE WITNESS:**  I MEAN, MAYBE PEOPLE TOOK IT WRONG WHEN

3   I SAID "LIAISON BETWEEN CCPOA AND THE OFFICE OF FACILITIES

4   MANAGEMENT."

5          BUT PART OF THAT AGREEMENT WAS THAT I WOULD ACTUALLY

6   BE IN THE UNIT AND ACTUALLY WORK AND DO THE SAME JOB AS THE REST

7   OF THEM DO IN THE UNIT.

8          **MR. HENDERSON:**  ARE THE FOUNDATIONAL CONCERNS

9   RESOLVED, YOUR HONOR, AT LEAST FOR NOW?

10         **JUDGE HENDERSON:**  YES.

11         **MR. HENDERSON:**  THANK YOU.

12  **BY MR. HENDERSON:**

13  **Q.**   SO BASICALLY THE PLANS WILL TAKE INTO ACCOUNT THE NEED FOR

14  RECORDS FOR THE ACTUAL ANTICIPATED NUMBER OF INMATES THAT ARE

15  GOING TO BE HOUSED IN THAT FACILITY, BUT THE STAFFING PACKAGE

16  DOES NOT; IS THAT FAIR TO SAY?

17  **A.**  YOU MAY WANT TO REPHRASE THAT ONE.  I'M NOT SURE I GOT THAT.

18  **Q.**  OKAY. WE'VE GOT A STAFFING PACKAGE, AS I UNDERSTAND IT,

19  THAT IS BASED ON ONE -- THAT'S BASED ON A RATIO.  AND YOU SAID

20  IT'S SUBJECT TO SOME MODIFICATION OF ONE -- I'M SORRY.

21         YOU GOT A STAFFING PACKAGE THAT IS BASED ON A DESIGN

22  BED OF ONE INMATE PER CELL, CORRECT?

23  **A.**  RIGHT, ON THE BASE STAFFING.

24  **Q.**  AND YET AT THE TIME THESE PLANS ARE BEING TAKEN INTO ACCOUNT

25  THERE'S A HIGHER ACTUAL OCCUPANCY CAPACITY THAT'S CONTEMPLATED

1  AS BEING IN PLACE WHEN THIS FACILITY OPENS; IS THAT CORRECT?

2  **A.**  YES.

3             **JUDGE REINHARDT:**  APPARENTLY, HE SAID THERE WAS AN

4  ALTERNATIVE STAFFING PACKAGE FOR UP TO 200.

5             **THE WITNESS:**  THERE IS THE BASE STAFFING PACKAGE, AND

6  THEN THERE IS AN ADDITIONAL OVERCROWDING PACKAGE THAT'S ALSO

7  ATTACHED TO IT.

8             **JUDGE REINHARDT:**  YOU HAVE MORE THAN ONE STAFFING

9  PACKAGE.

10            **THE WITNESS:**  WELL, IT IS TECHNICALLY ONE STAFFING

11  PACKAGE, BUT IT HAS THE HUNDRED PERCENT DESIGN BED CAPACITY, AND

12  THEN IT SHOWS WHAT ADDITIONAL STAFF WILL COME ON WITH THE

13  OVERCROWDING.

14            **JUDGE REINHARDT:**  SO I'M NOT SURE I UNDERSTAND THE

15  POINT OF THIS.

16  **BY MR. HENDERSON:**

17  Q.  WELL, THE OVERCROWDING PACKAGE THAT WE'VE BEEN TALKING ABOUT

18  IS DESIGNED AS -- THAT'S A TEMPORARY -- IN THEORY, IT'S SUPPOSED

19  TO BE A TEMPORARY ASSIGNMENT OF STAFF; IS THAT CORRECT?

20            **MR. LEWIS:**  YOUR HONOR, I OBJECT TO THIS.  THE

21  ATTORNEY IS LEADING THE WITNESS, AND HAS BEEN DOING IT FOR LONG.

22            **JUDGE KARLTON:**  SIT DOWN, COUNSEL.  SIT DOWN.

23            I DON'T KNOW WHAT HE'S TALKING ABOUT. I DON'T KNOW

24  WHAT YOU'RE OBJECTING TO, BECAUSE I CAN'T UNDERSTAND. I MEAN,

25  YOU MAY BE RIGHT, BUT UNTIL WE CAN FIGURE OUT WHAT HE'S SAYING,

1  WE COULDN'T RULE, ANYHOW.

2          **MR. LEWIS:**  THANK YOU, YOUR HONOR.

3          **JUDGE KARLTON:**  HE DOESN'T KNOW WHAT THE QUESTION IS.

4  PUT THE QUESTION AGAIN.

5          **THE WITNESS:**  PLEASE.

6          **JUDGE KARLTON:**  LOOK, LET ME SEE WHETHER I'VE GOT

7  THIS MUCH RIGHT.

8          YOU'RE IN THE BUSINESS OF PROVIDING STAFFING SERVICES

9  TO THIS DEPARTMENT; IS THAT RIGHT?

10          **THE WITNESS:**  YES, PROPOSED STAFFING.

11          **JUDGE KARLTON:**  PROPOSED STAFFING.

12          AND IN CONNECTION WITH THAT, YOU GET TO REVIEW -- I

13  THINK THIS IS WHAT YOU'RE SAYING -- YOU GET REVIEW THE ENTIRE

14  DESIGN PACKAGE; IS THAT RIGHT?

15          **THE WITNESS:**  YES.

16          **JUDGE KARLTON:**  AND THE DESIGN PACKAGE CONTEMPLATES

17  ONE PERSON PER CELL, BUT THERE'S A RECOGNITION THAT IT COULD GO

18  UP TO TWO PEOPLE PER CELL; IS THAT RIGHT?

19          **THE WITNESS:**  YES.

20          **JUDGE KARLTON:**  WELL, I GOT THAT MUCH RIGHT.

21  **BY MR. HENDERSON:**

22  **Q.**  OKAY.  NOW, THE DESIGN BED STAFFING PACKAGE IS PREMISED ONLY

23  ON A ONE-INMATE-PER-CELL RATIO, CORRECT?

24  **A.**  YES.

25  **Q.**  OKAY.  AND ANY ADDITIONAL --

1        **JUDGE REINHARDT:** WAIT. WAIT. I DON'T UNDERSTAND.

2        I THOUGHT YOU SAID THAT THE PACKAGE NOT ONLY HAS ONE

3   PERSON PER CELL, BUT HAS ALTERNATIVES FOR 150 PERCENT, ONE

4   PERSON IN THE OTHER CELL, AND IT HAS UP TO 200 PERCENT. SO THAT

5   THE PACKAGE ALSO PROVIDES THE STAFFING FOR TWO PERSONS PER CELL.

6        **THE WITNESS:** YES, SIR. BUT WHAT HE ASKED ABOUT, IF

7   I'M NOT MISTAKEN, WAS THE DESIGN BED CAPACITY, WHICH IS

8   100 PERCENT, ONE PERSON PER CELL.

9        **JUDGE REINHARDT:** I THOUGHT YOU WERE TALKING ABOUT

10  STAFFING.

11  **BY MR. HENDERSON:**

12  **Q.** WELL, MAYBE YOU CAN EXPLAIN TO CLARIFY WHAT THE STAFFING

13  PACKAGE CONSISTS OF AND WHEN IT COMES INTO PLAY.

14  **A.** DEPENDING ON THE LEVEL OF THE INSTITUTION, WHETHER IT BE A

15  LEVEL TWO, LEVEL THREE, LEVEL FOUR, OR SECURITY HOUSING UNIT OR

16  ADMINISTRATIVE SEGREGATION, THEY ALL HAVE DIFFERENT PERCENTAGES,

17  IF YOU WILL, OF ACCEPTABLE OVERCROWDING.

18        LEVEL TWO BEING THE LEAST LEVEL. THEY GO UP TO 200

19  PERSON OF THE OVERCROWDING. SO IF YOU HAD CELLS YOU COULD PUT

20  TWO PEOPLE IN EVERY CELL IN THAT INSTITUTION.

21        THOSE NUMBERS DROP AS THE LEVELS GO UP BECAUSE THEY

22  REALIZE AS THE LEVELS GO UP THERE'S MORE PROPENSITY FOR

23  VIOLENCE.

24        SO WHEN THEY DO THE STAFFING PACKAGE, DEPENDING ON

25  WHAT LEVEL THEY ANTICIPATE TO PUT IN THAT FACILITY, THEY WILL DO

1  THE SECOND PART OF THE OVERCROWDING PACKAGE AND WILL COINCIDE

2  WITH THAT LEVEL AT 175, 190 PERCENT OR 200 PERCENT, DEPENDING ON

3  THE LEVEL.

4  **Q.**  BUT THE OVERCROWDING PACKAGE IS A SEPARATE AND DISTINCT

5  PACKAGE FROM THE STAFFING PACKAGE THAT IS PART OF THE DESIGN

6  BED?

7  **A.**  YES.  IT'S A STAFF ENHANCEMENT OF THE DESIGN BED PACKAGE,

8  BECAUSE YOU HAVE MORE INMATES THAN YOU DESIGN THE PLACE FOR.

9        THEORETICALLY -- AND IT DOES ACTUALLY HAPPEN -- WHEN

10  THEY DO GO AWAY, THAT STAFFING PACKAGE GOES AWAY. EVERYTHING

11  YOU'VE GOT WITH THAT STAFFING PACKAGE GOES AWAY.

12        IT'S NO LONGER FUNDED BY THE DEPARTMENT OF FINANCE

13  BECAUSE NOW YOU'RE BACK AT A HUNDRED PERCENT.

14        **JUDGE HENDERSON:**  CAN I ASK A QUESTION?  IN LEVEL

15  TWO, THE OVERCROWDING PACKAGE CAN GO UP TO 200 PERCENT. IS THERE

16  A COMPARABLE LEVEL FOR LEVEL THREE?  CAN IT GO UP TO WHAT?

17        **THE WITNESS:**  190 PERCENT.

18        **JUDGE HENDERSON:**  190.  AND WHAT ABOUT LEVEL FOUR?

19        **THE WITNESS:**  175.

20        **JUDGE HENDERSON:**  WHAT ABOUT SHU?

21        **THE WITNESS:**  SHU AND ADSEG IS 150.

22  **BY MR. HENDERSON:**

23  **Q.**  SO JUST SO WE CAN SUMMARIZE ON THESE DIFFERENT LEVELS OF

24  THE OVERCROWDING PACKAGES, LEVEL TWO WILL COME INTO EFFECT WHEN

25  YOU REACH 150 PERCENT OF DESIGN CAPACITY?

1          **JUDGE KARLTON:**  NO.

2          **MR. LEWIS:**  OBJECTION, YOUR HONOR.  THAT MISSTATES

3  THE TESTIMONY.

4          **JUDGE KARLTON:**  SUSTAIN THE OBJECTION.  I THINK WHAT

5  HE SAID IS IF IT'S DESIGNED FOR LEVEL TWO, IT CAN GO UP TO

6  150 PERCENT.

7          **THE WITNESS:**  UP TO 200.

8          **JUDGE KARLTON:**  I'M SORRY.  200 PERCENT.

9          **MR. HENDERSON:**  I'M SORRY.  I HAD MY --

10  **BY MR. HENDERSON:**

11  **Q.**  IS THERE --

12          **MR. HENDERSON:**  STRIKE THAT.

13  **BY MR. HENDERSON:**

14  **Q.**  THE OVERCROWDING PACKAGE THAT'S PUT TOGETHER, WHAT POSITIONS

15  DOES THIS SUPPLY?

16  **A.**  IT WILL BE MORE CUSTODY STAFF.  DEPENDING ON WHAT PROGRAMS

17  YOU'RE RUNNING, IT COULD BE MORE EDUCATIONAL STAFF, MORE MEDICAL

18  STAFF.

19  **Q.**  WHO DETERMINES THE ALLOCATIONS OF THIS STAFF FROM THE

20  OVERCROWDING PACKAGES FOR A NEW FACILITY?

21  **A.**  THAT ALL COMES THROUGH THE OFFICE OF FACILITIES MANAGEMENT.

22  **Q.**  OKAY. WILL THESE ALSO INCLUDE CORRECTIONAL OFFICERS THAT ARE

23  WORKING IN THE HOUSING UNITS?

24  **A.**  YES, SIR.

25  **Q.**  OKAY. ARE THERE ANY CURRENT NEW CONSTRUCTION IN THE PLANNING

1    STAGES?

2    **A.**   YES, THERE ARE A COUPLE PLANS FOR FACILITIES. THE TWO THAT

3    ARE ACTUALLY MOVING FORWARD ARE TWO REPURPOSING OF FACILITIES

4    THAT ARE ALREADY CONSTRUCTED. OBVIOUSLY, THEY ARE THE QUICKEST

5    ONES THAT YOU CAN PUT ONLINE.

6           SO THERE'S THE FORMER NORTHERN CALIFORNIA WOMEN'S

7    FACILITY, WHICH IS BEING LOOKED AT FOR A REENTRY FACILITY.  AND

8    THE FORMER YOUTH FACILITY AT PASA ROBLES THAT'S BEING LOOKED AT

9    FOR A LEVEL TWO MALE PRISON.

10   **Q.**   OKAY. AND DURING THE TIME THAT YOU'VE BEEN THERE, WHAT HAS

11   BEEN THE GENERAL PRACTICE WITH RESPECT TO ALLOCATIONS OF MEDICAL

12   STAFF TO CONSTRUCTION?

13          WHAT WAS THE PROCEDURE WHEN YOU FIRST GOT THERE?

14   **A.**   WHEN I FIRST GOT THERE AND WE WERE TRYING TO DO THE STAFFING

15   PACKAGES, WE TRIED TO GET RATIOS OF DOCTORS, NURSES, ET CETERA,

16   FROM THE RECEIVER SO THAT, YOU KNOW, WE TELL HIM, YOU KNOW:

17              "THIS IS GOING TO BE A THOUSAND BED FACILITY.

18          HOW MANY DOCTORS WILL YOU NEED?  HOW MANY NURSES?"

19          AND I DON'T THINK THEY HAD ANY RATIOS DEVELOPED AT

20   THAT TIME, BECAUSE WE WERE UNABLE TO GET THOSE.

21          SO IN THE INITIAL STAFFING PACKAGES THEY WERE JUST

22   KIND OF PLUGGING NUMBERS IN.

23          SUBSEQUENT TO THAT, THEY WENT TO JUST ZEROING OUT THE

24   MEDICAL PORTION OF IT, JUST PUTTING ZEROS IN THERE. BUT THE LAST

25   TWO FACILITIES THAT I MENTIONED, THE PASA ROBLES AND THE FORMER

1  NCWF, THEY ACTUALLY HAVE MEDICAL NUMBERS BACK IN THOSE PACKAGES.

2          AND I'M QUITE HONESTLY NOT SURE IF THEY DID THAT IN

3  CONJUNCTION WITH THE RECEIVER OR NOT.

4  **Q.**  HAS THE PROCEDURE IN DEALING WITH THE RECEIVER CHANGED

5  RECENTLY?

6  **A.**  THE PROCEDURE IN DEALING WITH THE RECEIVER?

7  **Q.**  BETWEEN THE OFFICE OF FACILITIES MANAGER AND THE RECEIVER

8  WITH RESPECT TO MEDICAL STAFF.

9          **MR. LEWIS:**  OBJECTION.  CALLS FOR SPECULATION ON THE

10  PART OF THIS WITNESS.

11          **JUDGE KARLTON:**  HE EITHER KNOWS OR HE DOESN'T KNOW.

12          DO YOU KNOW?

13          **THE WITNESS:**  I'M NOT SURE I UNDERSTAND THE QUESTION.

14  **BY MR. HENDERSON:**

15  **Q.**  OKAY.  I'M TRYING TO FIND OUT:  IS THE PROCEDURE YOU'VE JUST

16  DESCRIBED --

17          **JUDGE KARLTON:**  THERE WAS NO PROCEDURE.  WHAT THE

18  WITNESS SAID IS INITIALLY THEY WOULD ASK THE RECEIVER, AND THE

19  RECEIVER COULDN'T GIVE THEM AN ANSWER.

20          HAS ANYTHING CHANGED SINCE THAT TIME?

21          **THE WITNESS:**  NOTHING THAT I'M AWARE OF.

22  **BY MR. HENDERSON:**

23  **Q.**  WHAT IS THE PROCEDURE AFTER THE OFFICE OF FACILITIES

24  MANAGEMENT HAS PUT TOGETHER A BED PACKAGE?  WHERE DOES IT GO

25  FROM THERE?

1   **A.**  I THINK YOU MIGHT HAVE MISSPOKE.  DID YOU SAY A "BID

2   PACKAGE" OR A "BED PACKAGE"?

3   **Q.**  I'M SORRY?

4   **A.**  DID YOU SAY A "BID PACKAGE"?

5   **Q.**  DESIGN BED PACKAGE, WHERE DOES IT GO?

6   **A.**  IT GOES OVER TO 1515 S STREET, CDCR HEADQUARTERS.  THEY RUN

7   IT THROUGH THE PROGRAM SERVICES UNIT.  AND THEN, IT GOES TO

8   DEPARTMENT OF FINANCE TO BE COSTED OUT, AND THEN THEY DO THEIR

9   THING WITH IT.

10  **Q.**  NOW, THE OVERCROWDING PACKAGE THAT YOU REFERRED TO, THESE

11  ARE POSITIONS THAT YOU SAY ARE BASED ON NUMBERS THAT ARE IN

12  EXCESS OF THE DESIGN CAPACITY FOR THE FACILITY?

13  **A.**  RIGHT.

14  **Q.**  OKAY.  AND WHAT HAPPENS WHEN THOSE NUMBERS ARE LOWERED?

15  WHAT HAPPENS TO THE OVERCROWDING POSITIONS?

16  **A.**  THE OVERCROWDING PACKAGES DISAPPEAR WHEN THE INMATE

17  POPULATION DECREASES THAT CALLED FOR IT.

18  **Q.**  AND DOES THIS -- HAVE YOU SEEN SITUATIONS WHERE THIS CAN

19  CREATE PROBLEMS?

20         **JUDGE KARLTON:**  WHAT, LOWERING THE NUMBER?

21  **BY MR. HENDERSON:**

22  **Q.**  LOWERING THE NUMBER, IN TERMS OF THE OVERCROWDING PACKAGES.

23  **A.**  YES, THROUGH A LOT OF OUTSIDE INFLUENCES OVER THE YEARS THE

24  DEPARTMENT HAS LOST POSITIONS OUT OF THEIR BASE PACKAGES FOR

25  THEIR INSTITUTIONS.  DIFFERENT FINANCIAL CRISIS HAVE CAUSED

1  CUTS, THINGS OF THAT NATURE.  DEPARTMENT OF FINANCE HAS COME

2  BACK AND JUST TAKEN POSITIONS FROM THE DEPARTMENT.

3           SO WHAT HAPPENS IS YOU END UP LIVING ON THE

4  OVERCROWDING PACKAGE.  AND THEN, WHEN THE OVERCROWDING PACKAGE

5  DISAPPEARS, YOU DON'T HAVE ENOUGH LEFT IN WHAT WAS ORIGINALLY

6  YOUR BASE PACKAGE TO RUN THE INSTITUTION.

7           **JUDGE REINHARDT:**  WELL, WHY DON'T YOU HAVE ENOUGH IF

8  THE INSTITUTION'S RUNNING ON THE DESIGN CAPACITY, AND THAT'S ONE

9  PERSON PER CELL?  AND IF THAT'S WHAT'S HAPPENING, WHAT'S THE

10 PROBLEM?

11          **THE WITNESS:**  WELL, THE EXAMPLE THAT I'LL GIVE YOU --

12 AND I'LL TRY TO MAKE IT AS EASY AS POSSIBLE.  IF I HAVE AN

13 INSTITUTION THAT HOUSES A HUNDRED INMATES, THAT WOULD BE 100

14 INMATES AT DESIGN BED CAPACITY.

15          MY STAFF FOR THIS INSTITUTION IS 50 STAFF MEMBERS.

16          **JUDGE REINHARDT:**  YES.

17          **THE WITNESS:**  NOW, OVER THE NEXT 10 YEARS I HAVE

18 OVERCROWDING IN THIS FACILITY.  I GO UP TO 200 INMATES.  SO I

19 GET ADDITIONAL STAFF.  NOW, I HAVE 75 STAFF MEMBERS TO RUN THIS

20 INSTITUTION WITH 200 INMATES.

21          BUT OVER THE COURSE OF THAT 10 YEARS, THROUGH THE

22 DEPARTMENT OF FINANCE OR, YOU KNOW, THE GOVERNOR, WHOEVER, I CUT

23 POSITIONS IN THAT INSTITUTION. IF I TAKE THEM FROM MY ORIGINAL

24 FIFTY STAFFING PACKAGE, AND THEN I GO BACK TO A HUNDRED PERCENT.

25 SAY I TAKE 10 POSITIONS OUT OF MY ORIGINAL 50. I GO BACK TO A

1  HUNDRED PERCENT, OR A HUNDRED INMATES IN THIS CASE.  AND NOW I

2  HAVE 40 STAFF MEMBERS TO RUN THE PRISON.

3          **JUDGE KARLTON:**  WELL, WHY?  BECAUSE -- I'M SORRY,

4  SIR. I'M SURE IT'S ME AND NOT YOU.

5          **JUDGE REINHARDT:**  IT'S NOT YOU.

6          **JUDGE KARLTON:**  BUT YOU HAD 75 PEOPLE, BECAUSE YOU

7  WERE AT 200 PERCENT.

8          **THE WITNESS:**  YES, SIR.

9          **JUDGE KARLTON:**  THEN, THROUGH THE POLITICAL PROCESS

10 YOU WERE LOSING STAFF.  BUT YOU'D BEEN LOSING STAFF FROM 75, NOT

11 FROM 50.

12          **THE WITNESS:**  WELL, I'M LOSING MY 10 OUT OF MY

13 ORIGINAL FIFTY.

14          **JUDGE KARLTON:**  OH, I SEE.

15          **THE WITNESS:**  SEE?  AND THEN, WHEN THE OVERCROWDING

16 GOES AWAY, I LOSE THE ADDITIONAL 25 I GOT FOR THAT.

17          **JUDGE KARLTON:**  SO WHAT YOU'RE TELLING US IS THE WAY

18 THE SYSTEM WORKS IS THAT THEY DETERMINE HOW MANY PEOPLE THEY

19 GIVE YOU BASED UPON THE ORIGINAL DESIGN, NOT UPON WHAT'S REALLY

20 GOING ON IN THE INSTITUTION ITSELF.

21          IS THAT WHAT YOU'RE SAYING?

22          **THE WITNESS:**  YES.  OVER TIME IT BECOMES CONVOLUTED.

23          **JUDGE HENDERSON:**  OKAY.

24          **JUDGE KARLTON:**  TO SAY THE LEAST.

25

1  **BY MR. HENDERSON:**

2  **Q.** CURRENTLY, MR. RAYMOND, WHAT IS THE TIME ESTIMATE FOR THE

3  PROCESS FROM THE COMMENCEMENT OF THE PLANNING OF A NEW FACILITY

4  THROUGH THE OPENING OF THE FACILITY?

5  **A.** WITHOUT ANY MAJOR ROADBLOCKS YOU'RE LOOKING AT, FROM DESIGN

6  TO BUILD, APPROXIMATELY FIVE YEARS.

7           **JUDGE REINHARDT:** THAT'S ASSUMING YOU GET THE MONEY

8  IMMEDIATELY.

9           **THE WITNESS:** YES, SIR. WITH NO ROADBLOCKS.

10          **MR. HENDERSON:** THANK YOU, SIR.

11          NOTHING FURTHER.

12          **JUDGE KARLTON:** SIR, YOU'RE GOING TO BE

13 CROSS-EXAMINED IN A MINUTE, BUT I'M NOT SURE THAT WE EVEN --

14 SOME DEPARTMENT OF THE FEDERAL GOVERNMENT SAID ONE STAFF FOR

15 EVERY 64; IS THAT RIGHT?

16          **THE WITNESS:** NATIONAL INSTITUTE OF CORRECTIONS.

17          **JUDGE KARLTON:** ALL RIGHT. NATIONAL INSTITUTE SAID

18 ONE FOR 64. IS CALIFORNIA PLANNING ONE FOR 64?

19          **THE WITNESS:** NOT THAT I'M AWARE OF. IF I --

20          **JUDGE KARLTON:** GO AHEAD.

21          **THE WITNESS:** WHAT HAPPENS A LOT OF TIMES WE GET

22 STUCK IN PAST PRACTICE. SO IF YOU WERE TO SEND A STAFFING

23 PACKAGE TO THE DEPARTMENT OF FINANCE THAT WAS THAT RICH, THEY

24 WOULD KICK IT BACK AND SAY, YOU KNOW:

25               "FOR THE LAST 50 YEARS, YOU'VE BEEN LIVING AT A

1          HIGHER RATIO THAN THAT. WHY ALL OF A SUDDEN DO YOU

2          NEED THAT?"

3          **JUDGE KARLTON:**  CAN YOU TELL ME WHAT THE STAFF RATIO

4    THAT THE DEPARTMENT OF FINANCE APPROVES.

5          **THE WITNESS:**  I BELIEVE IT'S 5.62, SOMEWHERE IN THAT

6    AREA.

7          **JUDGE KARLTON:**  FOR --

8          **THE WITNESS:**  STAFF TO INMATE RATIO.

9          **JUDGE KARLTON:**  YOU HAVE FIVE -- I DON'T KNOW WHAT

10   THAT MEANS.

11         **THE WITNESS:**  5.62 INMATE TO EVERY STAFF MEMBER.

12         **JUDGE KARLTON:**  WELL, THAT'S CONSIDERABLY MORE THAN

13   ONE TO 64.

14         **MR. HENDERSON:**  YOUR HONOR, I CAN CLARIFY THAT.

15         **THE WITNESS:**  BUT THAT'S ALL STAFF.

16         **JUDGE KARLTON:**  OH, I AM TALKING CUSTODIAL STAFF.

17         **THE WITNESS:**  NO.

18         **JUDGE KARLTON:**  I ASKED THE WRONG QUESTION.

19         WHAT IS THE LEVEL THAT THE DEPARTMENT OF FINANCE HAS

20   APPROVED, GENERALLY SPEAKING, FOR CUSTODIAL STAFF VIS-A-VIS

21   PRISONERS?

22         **THE WITNESS:**  I DON'T KNOW THAT THERE IS AN ACTUAL

23   RATIO FOR INMATE TO JUST CUSTODY STAFF.

24         **JUDGE REINHARDT:**  THE NATIONAL INSTITUTE OF

25   CORRECTIONS, IS THAT A GOVERNMENT INSTITUTE OR A CORRECTIONS

1  OFFICERS INSTITUTE?

2          **THE WITNESS:**  IT WAS AN EXPERT PANEL THAT WAS PUT

3  TOGETHER -- I CAN'T REMEMBER EXACTLY WHEN -- OF SUPPOSED

4  CORRECTIONAL EXPERTS THAT LOOKED AT THOSE KIND OF THINGS, THE

5  STAFFING RATIOS AND SO FORTH.

6          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

7          **MR. LEWIS:**  GOOD AFTERNOON, YOUR HONORS.  IT'S KYLE

8  LEWIS ON BEHALF OF THE STATE DEFENDANTS.

9                          **CROSS—EXAMINATION**

10  **BY MR. LEWIS:**

11  **Q.**  GOOD AFTERNOON, MR. RAYMOND.

12  **A.**  HOW ARE YOU DOING?

13  **Q.**  ARE YOU AWARE THAT THE AMOUNT OF CORRECTIONAL OFFICER

14  POSITIONS IN CDCR HAS RISEN FROM 20,741 IN OCTOBER, 2005, TO

15  24,090 IN AUGUST, 2008?

16  **A.**  NO, SIR.

17          **MR. LEWIS:**  NO FURTHER QUESTIONS, YOUR HONOR.

18          **JUDGE HENDERSON:**  I ASSUME THERE'S NO DIRECT?

19          **MR. HENDERSON:**  NO, YOUR HONOR.

20          **JUDGE HENDERSON:**  OKAY. THANK YOU VERY MUCH FOR

21  TESTIFYING, MR. RAYMOND.

22          **THE WITNESS:**  THANK YOU, JUDGE.

23          **JUDGE HENDERSON:**  YOU'RE EXCUSED.

24          OKAY.  IF YOU WOULD STEP TO THE FRONT, MA'AM, AND BE

25  SWORN IN.

1          **MR. HENDERSON:**  RIGHT OVER HERE.

2                    (THEREUPON, THE WITNESS WAS SWORN.)

3          **THE WITNESS:**  I DO.

4          **THE CLERK:**  HAVE A SEAT. STATE AND SPELL YOUR FULL

5    NAME FOR THE RECORD.

6          **THE WITNESS:**  MY NAME IS BRENDA GIBBONS, B-R-E-N-D-A,

7    G-I-B-B-O-N-S.

8          **MR. HENDERSON:**  AND, YOUR HONOR, I'LL REFER TO THE

9    DECLARATION FOR THE FOUNDATIONAL BACKGROUND FOR THIS WITNESS, IN

10   GENERAL.  BUT WE WILL GO INTO SOME MORE SPECIFIC QUESTIONS WITH

11   HER.

12   THEREUPON --

13                    **BRENDA GIBBONS**

14          CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING

15   BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

16                    **DIRECT EXAMINATION**

17   **BY MR. HENDERSON:**

18   **Q.**  MS. GIBBONS, ARE YOU EMPLOYED BY THE CALIFORNIA DEPARTMENT

19   OF CORRECTIONS AND REHABILITATION?

20   **A.**  YES, I AM.

21   **Q.**  WHAT'S YOUR POSITION?

22   **A.**  CORRECTIONAL OFFICER.

23   **Q.**  AND WHERE DO YOU WORK?

24   **A.**  I WOULD AT SALINAS VALLEY STATE PRISON.

25   **Q.**  AND HOW LONG HAVE YOU WORKED THERE?

1  **A.** SINCE IT ACTIVATED IN '96.

2  **Q.** OKAY.  AND WHERE ARE YOU PRESENTLY ASSIGNED WITHIN THAT

3  FACILITY?

4  **A.** FACILITY D, BUILDING FOUR, FLOOR ONE.

5  **Q.** OKAY. NOW, FLOOR ONE REFERS TO YOUR POSITION, CORRECT?

6  **A.** CORRECT.

7  **Q.** IT'S ACTUALLY BUILDING D4, IS -- WHAT INMATES ARE HOUSED IN

8  D4?

9  **A.** IT'S AN EOP UNIT.

10  **Q.** OKAY.  AND CAN YOU TELL ME WHAT "EOP" REFERS TO?

11  **A.** IT IS "ENHANCED OUTPATIENT."

12  **Q.** OKAY.  AND WHAT DOES THAT REFER TO, SPECIFICALLY, WITH

13  RESPECT TO EOP INMATES?

14  **A.** IT'S A HOUSING UNIT FOR INMATES WHO HAVE PSYCHIATRIC ISSUES.

15  **Q.** OKAY.

16  **A.** THAT CAN'T PROGRAM ON A NORMAL YARD.

17  **Q.** THIS IS NOT A GENERAL POPULATION UNIT, THEN?

18  **A.** NO, IT IS NOT.

19  **Q.** OKAY. AND HOW LONG HAVE YOU BEEN FLOOR OFFICER ONE AT D4?

20  **A.** FEBRUARY OF THIS YEAR. BEFORE THAT I WORKED THE SAME UNIT,

21  BUT A DIFFERENT WATCH.

22  **Q.** OKAY. EXCUSE ME ONE MOMENT.

23          AND HOW LONG WERE YOU IN THE PRIOR UNIT?

24  **A.** I'M SORRY?

25  **Q.** HOW LONG WERE YOU IN THE PRIOR EOP UNIT?

1  **A.**  IT'S THE SAME UNIT.  IT WAS A DIFFERENT WATCH.  AND I'VE

2  BEEN THERE SINCE --

3  **Q.**  WHAT WATCH ARE YOU CURRENTLY ON?

4  **A.**  I'M ON SECOND WATCH, WHICH IS THE MORNING SHIFT, 06:00 TO

5  14:00 HOURS.

6  **Q.**  OKAY. AND WHAT WAS THE WATCH YOU WERE PREVIOUSLY ON ON THAT,

7  AT D4?

8  **A.**  SWING SHIFT, WHICH IS 14:00 HOURS TO 22:00 HOURS.

9  **Q.**  AND WHEN DID YOU FIRST START WORKING AT D4?

10  **A.**  PROBABLY SOMETIME --

11  **Q.**  BEST ESTIMATE?

12  **A.**  -- IN '98.

13  **Q.**  OKAY. AND WAS IT AN EOP UNIT AT THAT TIME?

14  **A.**  YES.

15  **Q.**  AND IT'S CONTINUED THAT WAY EVER SINCE?

16  **A.**  YES.

17  **Q.**  OKAY. NOW, HOW MANY INMATES ARE LOCATED IN D4, CURRENTLY?

18  **A.**  IT CHANGES EVERY DAY, BUT IT'S APPROXIMATELY A HUNDRED, 105.

19  **Q.**  AND WHAT IS YOUR UNDERSTANDING OF THE CURRENT CAPACITY THAT

20  HAS BEEN ASSIGNED BY THE DEPARTMENT TO THAT FACILITY?

21          IN OTHER WORDS, WHAT'S THE MAXIMUM NUMBER OF INMATES?

22  **A.**  IF EVERY BED WAS TAKEN IT WOULD BE 128.

23  **Q.**  OKAY.  HOW MANY CELLS ARE THERE IN THAT?

24          **MR. HENDERSON:**  STRIKE THAT.

25

1  BY MR. HENDERSON:

2  Q.   THERE ARE CELLS IN THAT FACILITY, CORRECT?

3  A.   YES.

4  Q.   AND HOW MANY CELLS ARE THERE IN THAT UNIT?

5  A.   64.

6  Q.   SO MOST OF THE CELLS ARE OCCUPIED BY TWO INMATES?

7  A.   YES.

8  Q.   NOW, DO YOU HAVE AN UNDERSTANDING OF WHAT THE DESIGN

9  CAPACITY IS?

10          MR. HENDERSON:  STRIKE THAT.

11  BY MR. HENDERSON:

12  Q.   DO YOU HAVE AN UNDERSTANDING OF THE TERM "DESIGN CAPACITY"?

13  A.   YES.

14  Q.   AND WHAT IS YOUR UNDERSTANDING OF THAT TERM?

15  A.   IT WOULD BE WHAT THE BUILDING WAS DESIGNED -- I GUESS YOU

16  MEAN DRAWN -- TO HOUSE.

17  Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHAT THE DESIGN CAPACITY

18  OF THAT BUILDING D4 WAS?

19  A.   I BELIEVE ON CONCEPTION THE 180 DESIGNED BUILDINGS WERE

20  MEANT TO HOUSE 64 INMATES.

21  Q.   AND IS THAT ON THE BASIS OF ONE INMATE PER CELL?

22  A.   CORRECT.

23  Q.   DO YOU REMEMBER IN YOUR DEPOSITION YOU INDICATED YOU THOUGHT

24  THE DESIGN CAPACITY WAS 128?

25  A.   IT'S POSSIBLE.

1   Q.  OKAY.  WHAT WERE YOU REFERRING TO AT THAT TIME?

2   A.  WHEN YOU LOOK IN A CELL AND YOU SAY "DESIGN CAPACITY," IF

3   YOU LOOK IN THE CELL AND YOU SEE TWO BUNKS, IT'S HARD TO TELL IF

4   THEY MEANT TO PUT TWO PEOPLE IN THERE OR NOT MEANT TO PUT TWO

5   PEOPLE.

6        WE LOOK AT MORE TRIGGER NUMBERS FOR STAFFING

7   PACKAGES.  BUT DESIGN CAPACITY, IF YOU PUT TWO BUNKS IN THERE,

8   IT DIDN'T MAKE SENSE THAT YOUR DESIGN CAPACITY WAS 64.

9   Q.  WHAT --

10       MR. LEWIS:  YOUR HONOR, PARDON ME.  I'M GOING TO

11  OBJECT TO THIS LINE OF QUESTIONING.  ALSO, THE WITNESS' LAST

12  ANSWER WAS PURELY SPECULATION.  ASK IT BE STRICKEN FROM THE

13  RECORD.

14       JUDGE HENDERSON:  OVERRULED.  SHE WAS EXPLAINING HER

15  ANSWER IN HER DEPOSITION, AS I UNDERSTAND IT.

16  BY MR. HENDERSON:

17  Q.  WHAT IS IT THAT LEADS YOU TO CONCLUDE THAT THE ORIGINAL

18  DESIGN CAPACITY IS 64 INMATES?

19  A.  THE STAFFING PACKAGE THAT WENT WITH THAT WAS FOR A HUNDRED

20  PERCENT.  THEN, AS WE GOT TO 150 PERCENT POPULATION, WE WOULD GET

21  MORE OFFICERS.  WHEN YOU GOT TO 200 PERCENT, YOU WOULD HAVE A

22  DIFFERENT STAFFING PACKAGE, WHICH WOULD BE MORE OFFICERS.

23  Q.  SO IS IT CORRECT, THEN, THAT AT SOME POINT ANOTHER OFFICER

24  WAS ADDED TO THAT FLOOR WHEN THE NUMBER OF INMATES REACHED 96?

25  A.  CORRECT.

1  Q.  NOW, WHAT HAVE YOUR OBSERVATIONS BEEN OF THE INMATES THAT

2  ARE HOUSED THERE IN TERMS OF THEIR DAY-TO-DAY FUNCTIONING?

3  A.  MY OBSERVATIONS?

4  Q.  YES.  HOW DO THEY DIFFER FROM THE GENERAL POPULATION?

5  A.  SOME OF THEM ARE SEVERELY MENTALLY ILL AND SOME JUST A

6  LITTLE MENTALLY ILL.

7  Q.  ARE THERE SOME OF THE INMATES THAT YOU UNDERSTAND HAVE BEEN

8  ASSIGNED TO BE TRANSFERRED TO DMH?

9  A.  WE HAVE INMATES IN OUR UNIT WHO ARE WAITING TO GO TO DMH,

10  AND WE HAVE SOME THAT HAVE COME OUT OF DMH.

11  Q.  OKAY.  AND THE ONES THAT HAVE BEEN WAITING FOR DMH, HAVE YOU

12  HAD INMATES THAT HAVE WAITED MORE THAN SIX MONTHS?

13  A.  YES.

14  Q.  HAVE YOU HAD INMATES THAT HAVE WAITED OVER A YEAR?

15  A.  YES.

16  Q.  WHAT -- IN TERMS OF THE INMATES' ABILITY TO DEAL WITH

17  DAY-TO-DAY ISSUES IN THE FACILITY, WHAT ARE YOUR OBSERVATIONS?

18  A.  THAT WOULD DEPEND ON THE INMATE.

19  Q.  OKAY.  ALL RIGHT.  THERE'S SOME THAT ARE ABLE TO FUNCTION

20  FAIRLY WELL?

21  A.  CORRECT.

22  Q.  AND SOME THAT ARE NOT?

23  A.  CORRECT.

24  Q.  OKAY.  HAVE YOU NOTICED PROBLEMS THAT HAVE ARISEN WITH THE

25  DOUBLE-CELLING, THAT IS TWO INMATES TO A CELL, IN D4?

1  **A.** YES.

2  **Q.** AND WHAT PROBLEMS HAVE YOU NOTICED?

3  **A.** A LOT OF TIMES WITH MENTALLY ILL INMATES YOU HAVE SOME THAT

4  HAVE BEHAVIOR DISORDERS THAT MAKE THEM SORT OF PREDATORIAL. AND

5  YOU HAVE OTHER GUYS WHO ARE REALLY LOW FUNCTIONING.

6            IF THEY CELL UP TOGETHER, IT'S PRETTY OBVIOUS THAT

7  THE LOWER FUNCTIONING GUY GETS VICTIMIZED EASILY BY THE HIGHER

8  FUNCTIONING INDIVIDUAL.

9  **Q.** AND BY "VICTIMIZED" WHAT DO YOU MEAN?

10 **A.** IN-CELL FIGHTS, GETTING MONEY, GETTING CANTEEN, GETTING

11 THINGS FROM THAT INMATE THAT AREN'T APPROPRIATE TO TAKE.

12 **Q.** ARE IN-CELL FIGHTS A FREQUENT OCCURRENCE AT D4 DURING YOUR

13 SHIFT?

14 **A.** IT'S NOT EVERY DAY, BUT, I MEAN, IT HAPPENS. WE HAD ONE LAST

15 WEEK.

16 **Q.** NOW, ARE THERE -- YOU ENCOUNTER ANY DIFFICULTIES IN DEALING

17 WITH THE INMATES IN TERMS OF THEIR EXPECTATIONS WITH RESPECT TO

18 THE DAY-TO-DAY ACTIVITIES THAT GO ON AT THE FACILITY?

19       **MR. LEWIS:** OBJECTION, YOUR HONOR.  VAGUE WITH

20 RESPECT TO THE TERM "EXPECTATIONS"?

21       **JUDGE HENDERSON:** CLARIFY THAT TERM, COUNSEL.

22       **MR. HENDERSON:** YES, YOUR HONOR.

23 **BY MR. HENDERSON:**

24 **Q.** DO EOP -- DO SOME OF THE EOP INMATES HAVE EXPECTATIONS THAT

25 WHEN THINGS OCCUR AT A CERTAIN TIME THAT THEY ARE GOING TO

1  CONTINUE AT THAT TIME IN THE FUTURE?

2  **A.**  EOP INMATES HAVE A DIFFICULT TIME WHEN YOU CHANGE THEIR

3  PROGRAM.

4  **Q.**  OKAY.

5  **A.**  PROBABLY MORE SO THAN THE GP UNIT.

6  **Q.**  NOW, BY "PROGRAM," WHAT ARE YOU REFERRING TO?

7  **A.**  ANYTHING THAT HAPPENS AT A CERTAIN TIME, PLACE, PRETTY MUCH

8  ANYTHING.

9  **Q.**  OKAY. WOULD THAT INCLUDE CANTEEN PRIVILEGES?

10  **A.**  CANTEEN, LAUNDRY, MEALS, GROUPS, YARD.  SOMETIMES IF YOU

11  HAVE A PROGRAM AT A CERTAIN TIME, IF YOU CHANGE THEIR PROGRAM IT

12  WILL REALLY -- IT WILL REALLY THROW THEM OFF.

13  **Q.**  NOW, HAVE THERE BEEN DISRUPTIONS IN, FOR EXAMPLE, CANTEEN

14  PRIVILEGES FOR THE INMATES AT D4?

15  **A.**  OF COURSE.

16  **Q.**  AND WHAT REACTIONS HAVE YOU OBSERVED FROM THAT?

17  **A.**  IT CAN RANGE. A LOT OF TIMES THEY ARE REALLY NEEDY. IT'S A

18  CONSTANT:

19                    "WHAT TIME IS CANTEEN?  ARE WE GETTING IT

20            TODAY, OR ARE WE GETTING IT TOMORROW?  ARE WE GETTING

21            IT LATER?"

22        AND THEY ARE EASILY AGITATED.

23  **Q.**  NOW, ARE THE -- AS EOP PATIENTS, THEY PARTAKE IN VARIOUS

24  THERAPEUTIC PROGRAMS; IS THAT CORRECT?

25  **A.**  CORRECT.

1  Q.  AND WHERE ARE THOSE PROGRAMS HELD?

2  A.  THERE'S A MENTAL HEALTH BUILDING ACROSS THE YARD. THEY GO

3  THERE FOR THEIR GROUP SESSIONS.  THEY HAVE SOME -- I WANT TO

4  SAY -- 20, 25-MAN ROOMS WHERE THEY WILL HAVE STRUCTURED GROUP,

5  LIKE ANGER MANAGEMENT AND THINGS OF THAT NATURE.

6           AND THEN, THEY HAVE YARD GROUPS THAT TAKE PLACE ON

7  THE -- YOU KNOW, IT'S A YARD, BUT THERE'S NO GRASS.  BUT RIGHT

8  THERE.

9  Q.  AND WHAT PERCENTAGE OF THE PROGRAMS INVOLVE BEING OUTSIDE IN

10  THE YARD FOR THE PROGRAM?

11           ESTIMATE.

12  A.  DEPENDING ON THE INMATE, I WOULD PROBABLY SAY 40,

13  50 PERCENT.

14  Q.  OKAY.  AND IF THE YARD IS UNAVAILABLE, DO THOSE PROGRAMS

15  THEN NOT TAKE PLACE?

16  A.  CORRECT.

17  Q.  AND WHAT SITUATIONS CAN CAUSE THE YARD TO BE UNAVAILABLE?

18  A.  WEATHER, HEAT.  WE LOCK UP IF THERE'S ANY TEMPERATURE OVER

19  95.

20           IF THERE'S AN INCIDENT ON ANOTHER YARD, IF THERE'S

21  NOT ENOUGH STAFF TO COVER THE YARD.

22  Q.  OKAY.

23  A.  THINGS LIKE THAT.

24  Q.  IS THE YARD SHARED WITH ANOTHER FACILITY OR UNIT?

25  A.  IT IS SHARED, BUT DIVIDED.  ON THE 180 YARDS THERE ARE FOUR

1 BUILDINGS ON ONE SIDE, FOUR BUILDINGS ON THE OTHER SIDE.  AND

2 THAT'S CALLED "A FACILITY."

3          SO THE INMATES CAN'T GET FROM ONE FACILITY TO THE

4 OTHER EASILY, OR JUST WALK THERE FREELY, I'D SAY.  BUT IT IS

5 STILL CONSIDERED THE SAME FACILITY.

6 Q.  ARE THERE ANY OTHER BUILDINGS THAT SHARE THE SAME SPECIFIC

7 YARD THAT D4 DOES?

8 A.  NO. DELTA THREE AND DELTA FOUR.

9 Q.  I'M SORRY?

10 A.  IT'S DELTA THREE AND DELTA FOUR.

11 Q.  OKAY.  SO IS DELTA THREE ALSO AN EOP?

12 A.  CORRECT.

13 Q.  AND DO YOU HAVE AN UNDERSTANDING WHY THE PROGRAMS TAKE PLACE

14 IN THE YARD THAT ARE CONDUCTED THERE?

15 A.  YES.

16 Q.  AND WHAT'S THAT?

17 A.  THEY HAVE A LOT OF PSYCH TECHS, AND THEY HAVE PSYCH

18 INTERACTION WITH THE INMATE POPULATION WHEN THEY ARE ON THE

19 YARD.  IT ENCOURAGES THEM TO GET OUT.  FOR THE GUYS WHO ARE LESS

20 FUNCTIONING THAT MIGHT BE THE BEST THEY GET. AND SOMETIMES IF

21 THEY GET OUT AND THEY GET WALKING, LIKE WALKING AROUND IS ONE OF

22 THE BEST ANTIDEPRESSANTS THERE IS.

23          SO THEY WILL GET OUT, AND THE PSYCH TECHS WILL GET

24 INVOLVED WITH THEM.  AND THEY ALSO HAVE TOURNAMENTS TO KIND OF

25 GET THE GUYS TO DO SOME GROUP ACTIVITIES TOGETHER WHERE THEY

1  HAVE TO INTERACT.

2  Q.  WELL, IS A LACK OF AVAILABLE SPACE FOR PROGRAMS ANOTHER

3  REASON THAT THEY USE THE YARD FACILITIES?

4  A.  WE DON'T USE -- THOSE KIND OF RECREATIONAL ACTIVITIES, YOU

5  COULD USE A GYM, BUT THEY DON'T USE THE GYM, SO I DON'T THINK

6  THERE'S A SPACE LARGE ENOUGH FOR THAT.

7  Q.  ARE YOU FAMILIAR WITH THE TERM "DECOMPOSITION" (SIC)?

8  A.  YES.

9  Q.  CAN YOU TELL ME WHAT YOUR UNDERSTANDING OF THAT TERM IS?

10 A.  THAT TERM IN MY WORK PLACE WOULD MEAN CERTAIN INMATES FOR

11 ONE REASON OR ANOTHER -- I DON'T REALLY KNOW WHY -- BUT THEY

12 WILL START TO DECOMPENSATE.

13         SOMETIMES IT MIGHT BE BAD NEWS.  IT MIGHT BE LACK OF

14 PROGRAMMING.  IT MIGHT BE CHANGE IN MEDICATION.  AND THEY WILL

15 START TO DETERIORATE.

16         THEY WILL HYGIENE.  THEY WILL HAVE HYGIENE ISSUES.

17 CLOTHING, THEY WILL LOOK DISHEVELED.

18 Q.  ALL RIGHT. I BELIEVE I MISSPOKE.  IT'S BEEN POINTED OUT TO

19 ME IT'S "DECOMPENSATION" AND NOT "DECOMPOSITION." I APOLOGIZE

20 FOR THAT.

21         BUT THAT'S WHAT YOU WERE REFERENCING, CORRECT?

22 A.  YES.

23 Q.  AND WHEN THAT OCCURS, IS THERE ANYTHING SPECIFIC THAT'S DONE

24 TO ASSIST THAT INMATE?

25 A.  IF I'M WORKING I'LL DO A PSYCH REFERRAL AND TRY TO GET HIS

1  DOCTOR TO COME SEE HIM, BECAUSE THEY MIGHT NOT.  THE INMATE

2  MIGHT NOT HAVE BEEN OUT.  THE DOCTOR MIGHT NOT EVEN KNOW.  SO

3  I'LL DO A PSYCH REFERRAL.

4  Q.  NOW, DO YOU FEEL THAT THERE IS ADEQUATE STAFF IN D4 FOR YOU

5  TO MONITOR THE INMATES PROPERLY?

6  A.  WE'RE DOING THE BEST WE CAN.

7  Q.  OKAY. NOW, WE REFERENCED --

8          **JUDGE KARLTON:**  THE QUESTION ISN'T WHETHER YOU'RE

9  DOING THE BEST YOU CAN. EVERYBODY WILL BELIEVE THAT. THE

10 QUESTION IS:  AS YOU VIEW THE TOTALITY OF THE CIRCUMSTANCES DO

11 YOU BELIEVE THAT MORE PERSONNEL ARE APPROPRIATE FOR THE JOB?

12         **THE WITNESS:**  MORE WOULD BE BETTER.

13 **BY MR. HENDERSON:**

14 Q.  WITH RESPECT TO THE HYGIENE WITHIN THE D4, HOW WOULD YOU

15 DESCRIBE THAT?

16 A.  HYGIENE OF THE UNIT OR THE INMATES?

17 Q.  YES, THE UNIT?

18 A.  THE UNIT CAN GET KIND OF DIRTY. WE DO OUR BEST. I HAVE A

19 CREW OF GUYS THAT WORK WITH ME TO HELP CLEAN THE UNIT. BUT SOME

20 OF IT -- THERE'S NOT A LOT OF CLEANING SUPPLIES.  YOU GET A

21 LIMITED AMOUNT PER MONTH.  SO WE DO THE BEST WE CAN.

22         **JUDGE HENDERSON:**  SO I DON'T HAVE A SENSE. IS HYGIENE

23 GOOD, OR IS IT BAD?  OR WHAT IS THE POINT OF HYGIENE HERE?

24         I DON'T KNOW ANYTHING ABOUT HYGIENE, OTHER THAN THEY

25 ARE TRYING TO KEEP IT CLEAN.

1  BY MR. HENDERSON:

2  Q.  ARE THERE INMATES THAT ARE CURRENTLY WASHING THEIR CLOTHES

3  IN THE TOILETS AT D4?

4          MR. LEWIS:  OBJECTION, YOUR HONOR, LEADING.

5          JUDGE HENDERSON:  I'M GOING TO ALLOW IT, COUNSEL.

6          THE WITNESS:  YES.

7  BY MR. HENDERSON:

8  Q.  OKAY. AND WHAT IS YOUR UNDERSTANDING OF THE REASON FOR THAT?

9  A.  IF INMATES SEND THEIR LAUNDRY OUT TO BE CLEANED, A LOT OF

10 TIMES IT WON'T COME BACK.  SOME OF IT WON'T COME BACK.  THE BAGS

11 ARE MISSING.  IT'S HARD FOR THEM TO GET REPLACEMENT CLOTHES FOR

12 THAT.

13          AND A LOT OF THE HIGHER FUNCTIONING INMATES BELIEVE

14 THAT IF THEY WASH THEIR OWN CLOTHES THAT THEY ARE LESS LIKELY TO

15 GET SOME OF THE DIFFERENT SKIN INFECTIONS AND THINGS THAT GO

16 AROUND THE UNIT.  SO THEY WILL WASH THEIR OWN CLOTHES IN THE

17 TOILET.

18 Q.  WHAT ABOUT HEALTH CONDITIONS THERE?  ARE THERE ANY PROBLEMS

19 WITH INFECTIOUS DISEASES?

20          MR. LEWIS:  OBJECTION, YOUR HONOR.  THIS WITNESS DOES

21 NOT HAVE THE FOUNDATION TO ANSWER THAT QUESTION.

22          JUDGE HENDERSON:  OVERRULED.

23          TELL US WHAT YOU SEE WITH RESPECT TO INFECTIOUS

24 DISEASES, IF ANYTHING.

25          THE WITNESS:  WE HAVE A LOT OF -- IT'S IN THE LAST

1  YEAR THERE'S BEEN MORE CASES OF STAPH INFECTIONS.

2  **BY MR. HENDERSON:**

3  **Q.**  BY "MORE CASES OF STAPH INFECTIONS," WHAT ARE YOU REFERRING

4  TO IN TERMS OF NUMBERS?

5  **A.**  CAN YOU REPEAT THE QUESTION?

6  **Q.**  I'M ASKING YOU WHAT'S YOUR ESTIMATE OF STAPH INFECTIONS THAT

7  YOU YOURSELF HAVE OBSERVED IN D4?

8  **A.**  WE HAVE -- IT'S ONGOING. IT SEEMS TO GET PASSED AROUND. SO,

9  I MEAN, IT'S KIND OF A ROLLING NUMBER.

10  **Q.**  IS THERE -- ARE CORRECTIONAL STAFF REQUIRED TO WORK

11  MANDATORY OVERTIME?

12  **A.**  YOU MEAN, LIKE RIGHT THIS SECOND?  TODAY?  I DON'T KNOW.

13  **Q.**  IN THE PAST SIX MONTHS?

14  **A.**  YEAH.

15  **Q.**  HAS THAT BEEN AN ONGOING SITUATION?

16  **A.**  CORRECT, IF SOMETHING HAPPENS.  WE DON'T HAVE THE ABILITY TO

17  JUST LEAVE OUR POST AT THE END OF EIGHT HOURS, AND IF THERE'S

18  NOT ENOUGH STAFF TO COMPLETE THE TASK AT HAND OR THE NEXT SHIFT,

19  THEN YOU'RE AUTOMATICALLY MANDATED OVERTIME.

20  **Q.**  AND DO YOU GET MEAL BREAKS --

21          **MR. HENDERSON:**  STRIKE THAT.

22  **BY MR. HENDERSON:**

23  **Q.**  SO YOU'RE WORKING 16 HOUR SHIFTS?

24  **A.**  CORRECT.

25  **Q.**  AND DO YOU GET MEAL BREAKS AS PART OF THAT?

1   **A.**  NO.

2   **Q.**  YOU ARE JUST THERE?

3   **A.**  CORRECT.

4   **Q.**  OKAY. IS THERE ANY ACCESS TO FOOD IN THE FACILITY IF YOU

5   HAVE TO WORK DOUBLE SHIFTS?

6   **A.**  YOU CAN'T LEAVE A HOUSING UNIT.  SO, I MEAN, A LOT OF TIMES

7   PEOPLE WILL GIVE FOOD TO YOU OR WATER BECAUSE THEY KNOW HOW IT

8   FEELS.

9   **Q.**  ARE THERE SITUATIONS WHERE YOU DON'T KNOW WHETHER YOU'RE

10  WORKING MANDATORY OVERTIME UNTIL YOU ARRIVE AT THE FACILITY FOR

11  YOUR SHIFT?

12  **A.**  RIGHT.

13          **MR. LEWIS:**  OBJECTION, YOUR HONOR.  I'M GOING TO

14  OBJECT TO THIS LINE OF QUESTIONING.  WE'RE GETTING INTO

15  INCREDIBLY IRRELEVANT TESTIMONY.

16          **JUDGE HENDERSON:**  OVERTIME IS RELEVANT, COUNSEL.

17          **MR. LEWIS:**  THANK YOU, YOUR HONOR.

18  **BY MR. HENDERSON:**

19  **Q.**  YOU HAVE MY QUESTION IN MIND?

20  **A.**  CAN YOU REPEAT THE QUESTION?

21  **Q.**  YES.

22          HAVE YOU HAD SITUATIONS WHERE YOU HAVE --

23          **MR. HENDERSON:**  OR STRIKE THAT.

24  **BY MR. HENDERSON:**

25  **Q.**  ARE THERE SITUATIONS WHERE CORRECTIONAL OFFICERS WILL NOT

1  LEARN THAT THEY HAVE MANDATORY OVERTIME UNTIL THEY ACTUALLY

2  ARRIVE AT THE FACILITY TO START THEIR REGULAR SHIFT?

3  **A.**  PRETTY MUCH ALWAYS.

4  **Q.**  THAT'S PRETTY MUCH HOW IT WORKS?

5  **A.**  RIGHT.

6  **Q.**  OKAY. I'D LIKE TO SHOW YOU SOME PICTURES, AND ASK YOU IF YOU

7  CAN IDENTIFY THOSE FOR ME.

8           CAN YOU TELL ME WHAT THIS PICTURE DEPICTS?

9  **A.**  THOSE ARE HOLDING CAGES THAT ARE IN A -- IT'S LIKE A CLOSET

10  OR USED TO BE A STORAGE AREA AT CTC AT SALINAS VALLEY.

11  **Q.**  I'M SORRY?

12           **MR. LEWIS:**  OBJECTION, YOUR HONOR.  THE WITNESS HAS

13  NOT ESTABLISHED THAT THESE PICTURES ARE OF HER HOUSING UNIT OR

14  WHERE THEY ARE.

15           WE WOULD ASK THAT THE ATTORNEY LAY THAT FOUNDATION.

16           **JUDGE HENDERSON:**  LAY A FOUNDATION FOR THESE

17  PICTURES.

18           **JUDGE KARLTON:**  HOW DO YOU KNOW WHAT THIS IS?

19           **MR. HENDERSON:**  THIS IS A PHOTOGRAPH OF PLAINTIFF'S

20  EXHIBIT 338, WHICH IS THE EXPERT REPORT.  IT'S AN ATTACHMENT TO

21  THE EXPERT REPORT. I BELIEVE IT SHOWS THE DATES.  THESE WERE

22  PREVIOUSLY SHOWN EARLIER IN THE TRIAL.

23           **JUDGE KARLTON:**  THE QUESTION IS HOW THE WITNESS KNOWS

24  WHAT THEY ARE.

25           **MR. HENDERSON:**  OKAY.

1  BY MR. HENDERSON:

2  Q.  HOW DO YOU KNOW THAT?

3          JUDGE KARLTON:  HOW DID YOU KNOW WHAT THOSE ARE?

4  HAVE YOU BEEN THERE BEFORE?

5          THE WITNESS:  YES, THEY ARE ON MY PRISON.

6  BY MR. HENDERSON:

7  Q.  HAVE YOU BEEN THERE WHEN THEY HAVE BEEN OCCUPIED BY INMATES?

8  A.  YES.

9  Q.  AND WHAT IS THE USE OF THOSE?

10          MR. LEWIS:  PARDON ME, YOUR HONOR.  I'M GOING TO

11  OBJECT. THE WITNESS SAYS THESE ARE AT HER PRISON.  BUT SHE'S NOT

12  IDENTIFIED WHERE.  SHE IDENTIFIED SHE WORKS IN D4, BUT THESE

13  PICTURES, WE DON'T KNOW WHERE THEY ARE.  SHE SAID SHE DON'T

14  KNOW -- SHE HAS NOT SAID WHERE EXACTLY THEY ARE.

15          JUDGE HENDERSON:  SHE'S SEEN THEM.  SHE'S A

16  PERCIPIENT WITNESS TO THOSE --

17          MR. LEWIS:  YOUR HONOR, WE DON'T KNOW IF SHE'S SEEN

18  THESE PARTICULAR CAGES.  WE DON'T KNOW WHERE THESE PARTICULAR

19  CAGES ARE.

20          MR. HENDERSON:  WELL, YOUR HONOR, I THINK SHE

21  IDENTIFIED WHERE SHE HAD SEEN THEM AT THE FACILITY BEFORE.

22  COUNSEL INTERRUPTED WITH HIS OBJECTION.

23          WE CAN HAVE HER STATE IT AGAIN.

24          JUDGE HENDERSON:  OBJECTION IS OVERRULED.

25          MR. LEWIS:  THANK YOU, YOUR HONOR.

1  **BY MR. HENDERSON:**

2  **Q.**  HAVE YOU SEEN THESE HOLDING CAGES IN USE?  IN OTHER WORDS,

3  WHERE THEY HAVE BEEN OCCUPIED BY INMATES?

4  **A.**  YES, THEY'RE IN A FORMER STORAGE AREA AT THE CTC.

5  **Q.**  OKAY. AND WHAT HAVE THESE CAGES BEEN USED FOR?

6  **A.**  THEY ARE HOLDING CAGES FOR INMATES WHO ARE WAITING FOR

7  APPOINTMENTS.  THEY ARE USED FOR INMATES WHO ARE WAITING FOR

8  SUICIDE BED OR MENTAL HEALTH CRISIS BED.  THEY ARE JUST LIKE A

9  WAITING ROOM, LIKE A LITTLE WAITING ROOM.

10  **Q.**  SO INMATES -- IS IT CORRECT THAT INMATES WHO ARE ON SUICIDE

11  WATCH HAVE BEEN HOUSED IN THESE CAGES?

12  **A.**  CORRECT.

13  **Q.**  AND HOW LONG HAVE THE INMATES -- WHAT IS THE DURATION THAT

14  THE INMATES WILL BE HOUSED IN THESE UNITS THAT YOU HAVE

15  OBSERVED?

16          **MR. LEWIS:**  OBJECTION.  CALLS FOR SPECULATION ON THE

17  PART OF THE WITNESS.

18          **MR. HENDERSON:**  I'VE ASKED HER WHAT SHE'S OBSERVED,

19  YOUR HONOR.

20          **JUDGE HENDERSON:**  TELL US WHAT YOU'VE OBSERVED.

21          **THE WITNESS:**  THEY WILL SOMETIMES -- THE POLICY

22  CHANGED. NOW THEY CAN ONLY STAY IN THERE FOR FOUR HOURS AT A

23  TIME.  YOU TAKE THEM OUT.  YOU MOVE THEM TO ANOTHER ROOM, AND DO

24  IT LIKE THAT. SO FOUR HOURS AT A TIME.

25

1  **BY MR. HENDERSON:**

2  **Q.**  AND WHEN DID THAT POLICY COME INTO EFFECT TO YOUR KNOWLEDGE?

3  **A.**  PROBABLY WITHIN THE LAST YEAR, TWO YEARS.

4  **Q.**  OKAY. AND HOW LONG WERE THEY HELD -- I'M SORRY.

5          HOW LONG WERE THEY KEPT IN THOSE CAGES PRIOR TO THAT

6  TO YOUR KNOWLEDGE?

7  **A.**  UNTIL THE NEXT DAY WHEN THERE WAS ROOM AT THE CTC FOR THEM

8  TO GET A NORMAL BED.

9  **Q.**  SO THEY WOULD BE KEPT THERE OVERNIGHT?

10  **A.**  CORRECT.

11  **Q.**  THESE WOULD BE SUICIDE WATCH INMATES?

12  **A.**  CORRECT.

13          **JUDGE KARLTON:**  DESPITE THE POLICY, HAVE INMATES BEEN

14  KEPT IN THESE CAGES FOR MORE -- I'M SORRY. I'M SORRY. SOMEBODY

15  WILL TELL ME THEY ARE NOT CAGES -- IN THESE ROOMS.

16          **JUDGE HENDERSON:**  HOLDING CELLS.

17          **JUDGE KARLTON:**  HOLDING CELLS. THANK YOU. FOR MORE

18  THAN FOUR HOURS?

19          **THE WITNESS:**  RIGHT.

20          **JUDGE KARLTON:**  HAS IT HAPPENED?

21          **THE WITNESS:**  YES.

22          **JUDGE KARLTON:**  AND WHEN YOU MOVE THEM, EVEN AT THE

23  END OF FOUR HOURS WHEN YOU MOVE THEM, WHERE DO YOU MOVE THEM TO?

24          **THE WITNESS:**  THEY WILL MOVE THEM TO A HOLDING --

25  THEY HAVE A WAITING ROOM NEARBY WHERE THESE CAGES ARE LOCATED.

1  SO THEY WILL CHANGE THE GUY IN THE CAGE TO THE WAITING ROOM, AND

2  THE GUY IN THE WAITING ROOM TO THE CAGE.

3           **JUDGE KARLTON:**  AND THEN THE NEXT FOUR HOURS, THEY

4  WILL SWITCH THEM BACK.

5           **THE WITNESS:**  CORRECT.

6  **BY MR. HENDERSON:**

7  **Q.**  NOW, YOU SAID EARLIER THAT MORE STAFF WOULD BE BETTER AT THE

8  D4 FACILITY?

9  **A.**  CORRECT.

10 **Q.**  WHY IS THAT?  WHAT WOULD BE BETTER WITH MORE STAFF?  WHAT

11 COULD YOU DO THAT YOU CAN'T DO NOW?

12 **A.**  IF THERE'S AN EMERGENCY -- WE HAVE THE STAFF NECESSARY TO

13 PERFORM THE NORMAL FUNCTIONS.  BUT IF THERE'S AN EMERGENCY AND

14 WE HAVE TO REMOVE STAFF FROM THE YARD, OR THERE'S A STAFFING

15 SHORTAGE AND WE DON'T HAVE ENOUGH STAFF ON THE YARD, THEN

16 EVENTUALLY WHAT HAPPENS IS YOU DON'T HAVE PROGRAM.

17           YOU HAVE TO CANCEL PROGRAM.  AND IF YOU HAD MORE TO

18 DRAW FROM, YOU'D PROBABLY BE ABLE TO MODIFY PROGRAM VERSUS

19 SUSPEND PROGRAM.

20 **Q.**  DO YOU TRY TO GET TO KNOW THE INMATES THAT ARE ON YOUR UNIT?

21 **A.**  YES.

22 **Q.**  AND DO YOU FIND THAT IT'S DIFFICULT TO DO WHEN YOU'RE

23 DEALING WITH 105 INMATES?

24 **A.**  I TRY REALLY HARD.

25 **Q.**  PARDON ME?

1  **A.**  I TRY REALLY HARD.

2  **Q.**  OKAY. WOULD IT BE EASIER FOR YOU TO GET TO KNOW THOSE

3  INMATES IF THERE WAS MORE STAFF AVAILABLE?

4           **MR. LEWIS:**  OBJECTION, YOUR HONOR.  CALLS FOR

5  SPECULATION.

6           **JUDGE HENDERSON:**  OVERRULED, COUNSEL.

7           **THE WITNESS:**  I WOULD OBVIOUSLY HAVE MORE TIME IN THE

8  HOUSING UNIT PODS OR ON THE TIERS.

9  **BY MR. HENDERSON:**

10  **Q.**  WOULD MORE STAFF BE BETTER FROM A SAFETY STANDPOINT WITHIN

11  THE UNIT?

12  **A.**  YES.

13  **Q.**  AND IN WHAT RESPECTS?

14  **A.**  YOU COULD HAVE -- IF YOU HAD EXTRA STAFF THAT COULD TAKE

15  OVER, SAY, THE GUN POSITION WITH THE DOORS, THE MANUAL DOORS,

16  YOU COULD HAVE MORE PEOPLE IN THE PODS WITH THE INMATES, MEANING

17  PSYCH STAFF, BECAUSE THERE WOULD BE GUN COVERAGE FOR THAT

18  PARTICULAR POD.

19  **Q.**  OKAY.

20           **MR. HENDERSON:**  I THINK I'M AT THE END OF MY TIME

21  HERE, SO I'LL REST AT THIS POINT.

22           **JUDGE HENDERSON:**  OKAY. THANK YOU, COUNSEL.

23           **JUDGE KARLTON:**  HOW MUCH STAFF DO YOU HAVE PER

24  EIGHT-HOUR SHIFT, PER SHIFT?

25           **THE WITNESS:**  IN THE HOUSING UNIT THERE'S TWO FLOOR

1  OFFICERS, A CONTROL BOOTH OFFICER. HE'S A GUNNER. AND THERE'S

2  TWO YARD OFFICERS.

3          **JUDGE KARLTON:** SO THERE ARE FIVE CUSTODIAL OFFICERS

4  FOR THE HUNDRED AND PLUS FOLKS; IS THAT RIGHT?

5          **THE WITNESS:** ACTUALLY, JUST THREE: THE TWO FLOOR

6  AND THE GUNNER.

7          **JUDGE HENDERSON:** OKAY. THANK YOU, COUNSEL.

8          CROSS-EXAMINATION.

9          **MR. LEWIS:** YES, YOUR HONOR.

10                          **CROSS-EXAMINATION**

11  **BY MR. LEWIS:**

12  **Q.** GOOD AFTERNOON, MS. GIBBONS.

13  **A.** HI.

14  **Q.** YOU CURRENTLY WORK AS A CORRECTIONAL OFFICER AT SALINAS

15  VALLEY STATE PRISON, CORRECT?

16  **A.** YES, SIR.

17  **Q.** AND YOU HAVE WORKED THERE SINCE APPROXIMATELY 1998, CORRECT?

18  **A.** NINETY-SIX.

19          **JUDGE KARLTON:** NINETY-SIX.

20          **MR. LEWIS:** THANK YOU.

21  **BY MR. LEWIS:**

22  **Q.** PRIOR TO WORKING AT SALINAS VALLEY, YOU WERE AT THE

23  CORRECTIONAL TRAINING FACILITY CENTER OR CORRECTIONAL TRAINING

24  FACILITY?

25  **A.** I WORKED AT CTF SOLEDAD FROM '94 TO '96.

1  Q.  SO YOU HAVE NOT WORKED AT ANY PRISONS OTHER THAN SALINAS

2  VALLEY OR SOLEDAD SINCE 1994?

3  A.  CORRECT.

4  Q.  SO YOU CANNOT TESTIFY REGARDING OBSERVATIONS RELATED TO

5  PRISON POPULATION OR ACTIONS AT ANY OTHER PRISONS SINCE 1994?

6  A.  NO, I THINK THAT'S WRONG. I WORK IN A PRISON RIGHT NOW.

7  Q.  YOU WORK AT SALINAS VALLEY, CORRECT, THOUGH?

8  A.  IT'S A PRISON.

9  Q.  AND YOU WORK AT CTF OR YOU WORKED AT CTF PREVIOUSLY?

10  A.  PREVIOUS.

11  Q.  OTHER THAN THOSE TWO FACILITIES -- AND THANK YOU FOR

12  CLARIFYING MY QUESTION -- YOU HAVE NOT OBSERVED ANY OTHER PRISON

13  OPERATIONS BESIDE THOSE TWO FACILITIES, CORRECT?

14  A.  NO, I HAVE NOT.

15  Q.  AND JUST FOR EASE OF REFERENCE, YOU CURRENTLY WORK AT

16  FACILITY D, BUILDING FOUR?

17  A.  CORRECT.

18  Q.  AND THAT'S OTHERWISE KNOWN AS "D4"?

19  A.  YES.

20  Q.  SINCE YOU MOVED TO SVSP, SALINAS VALLEY, IN 1996, D4 HAS

21  BEEN YOUR PRIMARY POST, CORRECT?

22  A.  IT HAS BEEN MY PRIMARY POST.

23  Q.  AND YOU HAVEN'T WORKED AT ANY OTHER FACILITY WITHIN SVSP AS

24  YOUR PRIMARY POST, HAVE YOU?

25  A.  NOT AS A PRIMARY POST.

1  Q.  DO YOU HAVE ANY MEDICAL OR MENTAL HEALTH FORMAL TRAINING OR

2  EDUCATION?

3  A.  NO.

4  Q.  YOU'RE NOT A MEDICAL DOCTOR OR AN INTERNIST --

5       **JUDGE KARLTON:**  SHE JUST FINISHED SAYING SHE DIDN'T

6  HAVE ANY TRAINING. WHY ARE YOU GOING TO ASK A SILLY QUESTION?

7       **MR. LEWIS:**  THANK YOU, YOUR HONOR.

8  **BY MR. LEWIS:**

9  Q.  DO YOU RECALL IN YOUR DEPOSITION FOR THIS CASE STATING THAT

10 PRIOR TO THE PLATA LAWSUIT IT WAS MORE DIFFICULT TO GET THINGS

11 DONE?

12 A.  YES.

13 Q.  AND THE PLATA LAWSUIT HAS BEEN AROUND FOR MANY YEARS,

14 CORRECT?

15       IS THAT A YES?

16 A.  I DON'T KNOW WHAT YEAR IT CAME OUT.

17 Q.  HAS THE PLATA LAWSUIT BEEN AROUND FOR MORE THAN TWO YEARS,

18 DO YOU KNOW?

19       **JUDGE HENDERSON:**  IT'S BEEN AROUND AS LONG AS IT'S

20 BEEN AROUND, AND WE WILL TAKE JUDICIAL NOTICE OF THAT.

21       **MR. LEWIS:**  THANK YOU, YOUR HONOR.

22 **BY MR. LEWIS:**

23 Q.  YOU ALSO STATED IT WAS MORE DIFFICULT BECAUSE THERE WAS A

24 DIFFERENT ATTITUDE TOWARDS MEDICAL DELIVERY, CORRECT?

25 A.  CORRECT.

1 **Q.** AND THEN, YOU WENT ON TO EXPLAIN THAT PRIOR TO THE PLATA

2 LAWSUIT IT WAS MORE DIFFICULT TO GET THINGS DONE?

3 **A.** IT WAS MORE DIFFICULT TO GET THINGS DONE.

4 **Q.** WHY WAS IT MORE DIFFICULT?

5 **A.** WITH THE PLATA -- AFTER PLATA, WE STARTED GETTING TRAINED IN

6 PLATA ISSUES. AND WE WERE TRAINED ABOUT THE DUCAT SYSTEM AND

7 WORKING THE DUCAT. WE GOT MORE DOCTORS.  WE GOT MORE NURSES.  WE

8 GOT MORE PSYCH TECHS AND LVN'S.

9 **Q.** WAS THERE ALSO A DIFFERENT ATTITUDE TOWARDS DELIVERY OF

10 MEDICAL CARE?

11 **A.** WELL, WHAT DO YOU MEAN?

12 **Q.** AMONG THE CORRECTIONAL STAFF?

13 **A.** WE WERE TAUGHT THAT THERE WAS SPECIFIC RULES THAT WE MUST

14 FOLLOW TO BE IN COMPLIANCE WITH PLATA.

15 **Q.** WOULD YOU SAY THAT THE ATTITUDE WAS TAKEN MORE SERIOUSLY

16 AMONG THE CORRECTIONAL STAFF REGARDING THE DELIVERY OF

17 HEALTHCARE?

18 **A.** CORRECT.

19           **MR. LEWIS:**  THANK YOU.

20           NO FURTHER QUESTIONS, YOUR HONOR.

21           **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

22           **MR. MITCHELL:**  GOOD AFTERNOON.  BILL MITCHELL FOR THE

23 INTERVENORS, DEFENDANT INTERVENORS.

24                    **CROSS-EXAMINATION**

25

1  BY MR. MITCHELL:

2  Q.  MS. GIBBONS, YOU MENTIONED BRIEFLY IN YOUR DIRECT TESTIMONY

3  THAT YOU HAD OBSERVED ON OCCASION SOME INMATES WOULD WASH THEIR

4  CLOTHES IN THE TOILETS?

5  A.  CORRECT.

6  Q.  ARE YOU AWARE -- DO YOU HAVE ANY EVIDENCE THAT THEIR WASHING

7  THEIR CLOTHES EVER CAUSED ANY ADVERSE MEDICAL CONDITIONS?

8  A.  I HAVE NO IDEA WHY THEY ARE WASHING THEIR CLOTHES IN THE

9  TOILET.

10  Q.  AND ARE YOU AWARE THAT WASHING THEIR CLOTHES IN THE TOILET

11  EVER CAUSED ANY OF THEM TO BECOME SICK?

12  A.  I DO NOT KNOW.

13  Q.  SO YOU HAVE NO EVIDENCE THAT WASHING THEIR CLOTHES IN THE

14  TOILET EVER CAUSED ANY TO BECOME SICK?

15  A.  I DO NOT KNOW.

16          JUDGE KARLTON:  YOU COULD ASK THE QUESTION A THIRD

17  TIME, IF YOU LIKE.

18          MR. MITCHELL:  I'M TRYING TO MAKE SURE SHE UNDERSTOOD

19  THE QUESTION, AND I UNDERSTOOD HER ANSWER.

20          JUDGE KARLTON:  YOU MAY PROCEED.

21          MR. MITCHELL:  THANK YOU, YOUR HONOR.

22  BY MR. MITCHELL:

23  Q.  ANY INDICATION OR ANY EVIDENCE THAT THE CONDITIONS ON THE

24  UNIT ARE CAUSING THE STAPH INFECTIONS THAT YOU'VE OBSERVED?

25  A.  COULD YOU REPEAT THAT?

1    Q.   DO YOU HAVE ANY EVIDENCE OF WHAT IS CAUSING THE STAPH

2    INFECTIONS THAT YOU'VE OBSERVED IN THE UNIT WHERE YOU WORK?

3    A.   I HAVE NO IDEA WHAT IS CAUSING THEM.

4    Q.   YOU JUST HAVE SEEN THEM?

5    A.   I HONESTLY DON'T KNOW THE CAUSE OF STAPH INFECTION OTHER

6    THAN WHAT THEY TELL US IS DIRT, HYGIENE.

7    Q.   NOTHING FURTHER.

8              **JUDGE HENDERSON:**  REDIRECT?

9                        **REDIRECT EXAMINATION**

10   **BY MR. HENDERSON:**

11   Q.   YOU SAID EARLIER THAT YOUR OBSERVATIONS WERE THAT STAPH

12   INFECTIONS GOT PASSED AROUND WITHIN THE UNIT.  WHAT DO YOU MEAN

13   BY THAT?

14   A.   THERE IS USUALLY SOMEBODY WITH IT, AND THEN AS SOON AS THEY

15   GET RID OF IT SOMEBODY ELSE WILL HAVE IT.

16   Q.   YOU SAID THAT IT WAS MORE DIFFICULT TO GET THINGS DONE

17   BEFORE THE LAWSUIT. YOU REMEMBER BEING ASKED ABOUT THAT?

18   A.   YES.

19   Q.   IS IT STILL DIFFICULT TO GET SOME THINGS DONE?

20   A.   OH, YES.

21   Q.   OKAY. AND SINCE YOU'VE BEEN -- YOU WERE ASKED ABOUT YOUR

22   PRIMARY WORKSTATION AT SVSP AS BEING D4.  HAVE YOU WORKED ON

23   OTHER UNITS ON OVERTIME SHIFTS?

24   A.   YES.

25   Q.   MOST OF THE UNITS WITHIN THE FACILITY?

1   **A.**  YES.

2   **Q.**  OKAY. THANK YOU.

3            **MR. HENDERSON:**  THAT'S ALL I HAVE.

4            **JUDGE HENDERSON:**  DO YOU HAVE SOMETHING IN RESPONSE

5   TO THAT?

6            **MR. LEWIS:**  NOTHING FURTHER, YOUR HONOR.

7            **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

8            OKAY.  THANK YOU, MS. GIBBONS.  YOU'RE EXCUSED.

9            **THE WITNESS:**  THANK YOU.

10           **JUDGE HENDERSON:**  YOU MAY CALL YOUR NEXT WITNESS.

11           **MR. HENDERSON:**  YOUR HONOR, IF I COULD ASK WHAT TIME

12   WE MIGHT BE TAKING THE AFTERNOON BREAK.

13           WOULD THIS BE APPROPRIATE TIME?

14           **JUDGE HENDERSON:**  WE CAN DO ONE NOW.  YOU'RE NOT

15   READY TO PROCEED?

16           **MR. HENDERSON:**  NO.  I'M READY TO PROCEED.  I WILL

17   PROBABLY HAVE ABOUT A HALF HOUR OR SO OF THIS WITNESS.

18           **JUDGE REINHARDT:**  AND THIS IS THE LAST WITNESS OF THE

19   DAY?

20           **MR. HENDERSON:**  YES, YOUR HONOR.

21           **JUDGE REINHARDT:**  WE MIGHT AS WELL GO AHEAD.

22           **JUDGE HENDERSON:**  YES, WHY DON'T WE?

23           **MR. HENDERSON:**  OKAY.

24                (THEREUPON, THE WITNESS WAS SWORN.)

25

1          **THE WITNESS:**  I DO.

2          **THE CLERK:**  PLEASE HAVE A SEAT, AND STATE AND SPELL

3    YOUR FULL NAME FOR THE RECORD.

4          **THE WITNESS:**  MY NAME IS GARY BENSON, G-A-R-Y,

5    B-E-N-S-O-N.

6          **MR. HENDERSON:**  AND, YOUR HONOR, I'LL REFER TO THE

7    DECLARATION FOR BACKGROUND AND FOUNDATION. AND I WILL ASK A FEW

8    QUESTIONS OF THIS WITNESS RELATING TO THAT.

9    THEREUPON --

10                         **GARY BENSON**

11          CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING

12   BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

13                     **DIRECT EXAMINATION**

14   **BY MR. HENDERSON:**

15   **Q.**  MR. BENSON, ARE YOU PRESENTLY EMPLOYED BY THE CALIFORNIA

16   DEPARTMENT OF CORRECTIONS AND REHABILITATION?

17   **A.**  YES.

18   **Q.**  AND WHAT IS YOUR PRESENT POSITION?

19   **A.**  I'M A CORRECTIONAL OFFICER.

20   **Q.**  OKAY. AND WHERE DO YOU WORK?

21   **A.**  I WORK IN THE TTA CLINIC.

22   **Q.**  AT WHAT FACILITY?

23   **A.**  AT OLD FOLSOM.

24          **JUDGE KARLTON:**  WHAT DOES "TTA" STAND FOR?

25          **THE WITNESS:**  TREATMENT TRIAGE AREA.  IT'S EMERGENCY

1  URGENT CARE FACILITY.

2  **BY MR. HENDERSON:**

3  Q.  WE WILL REFER TO IT AS "TTA" FROM THIS POINT FORWARD, JUST

4  FOR REFERENCE PURPOSES.

5            AND HOW LONG HAVE YOU BEEN ASSIGNED TO THE TTA

6  FACILITY?

7  A.  ABOUT TWO-AND-A-HALF TO THREE YEARS.

8  Q.  AND WHAT SHIFT ARE YOU CURRENTLY ASSIGNED TO?

9  A.  SECOND WATCH FROM 5:00 A.M. TILL 1:00 P.M.

10 Q.  AND THE TTA -- I BELIEVE YOU STATED THIS, BUT LET ME JUST

11 CLARIFY -- IS OPEN 24 HOURS A DAY?

12 A.  CORRECT.

13 Q.  SO THE INMATES HAVE ACCESS TO IT ALL THREE WATCHES THERE?

14 A.  YES.

15 Q.  HAS THAT ALWAYS BEEN YOUR SHIFT THAT YOU'VE WORKED AT AT THE

16 TTA?

17 A.  NO, SIR.

18 Q.  OKAY.  WHAT OTHER SHIFTS HAVE YOU WORKED?

19 A.  I WORKED THE THIRD SHIFT WATCH FROM ONE TO NINE.

20 Q.  AND WHEN DID YOU DO THAT?

21 A.  ABOUT A YEAR-AND-A-HALF AGO.

22 Q.  OKAY.  AND HAVE YOU BEEN WORKING THE SECOND WATCH

23 CONSISTENTLY SINCE THEN?

24 A.  YES.

25 Q.  OKAY.  HAVE YOU EVER WORKED THE FIRST WATCH ON AN OVERTIME

1   SHIFT?

2   **A.**   NOT THERE.

3   **Q.**   OKAY. NOW, THE TREATMENT, THE TTA, WHAT IS ITS FUNCTION,

4   SPECIFICALLY?

5   **A.**   IT'S TO CARE FOR THE INMATES THAT ARE IN URGENT OR EMERGENCY

6   CARE.  IF THERE'S A FIGHT OR A CHEST PAIN, SOMETHING URGENT OR

7   EMERGENCY.

8   **Q.**   AND WHAT IS THE -- WHAT PORTION OF THE INMATE POPULATION AT

9   FOLSOM DOES IT SERVE?

10  **A.**   ALL OF -- THE WHOLE FACILITY.

11  **Q.**   I SEE.  AND IS THIS THE ONLY CLINIC OF THIS TYPE AT FOLSOM?

12  **A.**   YES.

13  **Q.**   AND HOW MANY INMATES ARE PRESENTLY AT FOLSOM, APPROXIMATELY?

14  **A.**   APPROXIMATELY 4,000.

15  **Q.**   OKAY.  CAN YOU DESCRIBE FOR ME THE PHYSICAL LAYOUT OF THE

16  TTA FACILITY?

17           FIRST OF ALL, WHAT BUILDING IS IT IN?

18  **A.**   IT'S JUST OUTSIDE OF THE UNIT TWO. IT'S A MAIN CLINIC THAT

19  IS THE ENTIRE BUILDING, AND IT'S ATTACHED TO BUILDING TWO.

20  **Q.**   OKAY. NOW, YOU SAY IT'S THE MAIN CLINIC.  ARE THERE OTHER

21  MEDICAL FACILITIES WITHIN THE BUILDING THAT TTA IS LOCATED?

22  **A.**   THEY HAVE PUT THE NURSING STATIONS AND DOCTORS' OFFICES IN

23  EACH UNIT THROUGHOUT THE FACILITY.

24  **Q.**   OKAY. ARE THERE ANY MEDICAL CLINICS IN THE BUILDING THAT TTA

25  IS LOCATED, OTHER MEDICAL CLINICS?

1  **A.**  WHAT DO YOU MEAN BY THAT?

2  **Q.**  LIKE SAY DENTAL, PSYCHIATRIC?

3  **A.**  I UNDERSTAND. YES, THERE IS A DENTAL LAB.  THERE IS A BLOOD

4  LAB.  THERE IS WHERE THEY DO DENTAL WORK, DENTAL SURGERIES.

5  THERE'S A PSYCHIATRIC CARE UNIT THERE.

6          I THINK THAT'S ALL OF THEM.

7  **Q.**  OKAY. NOW, THE TTA FACILITY ITSELF, WHAT DOES IT CONSIST OF?

8  **A.**  AS FAR AS WHAT?

9  **Q.**  AS FAR AS ROOM LAYOUTS.

10  **A.**  THEY HAVE ONE ROOM THAT IS WHERE THE GURNEY COMES IN ON

11  EMERGENCY. THEY HAVE A ROOM THAT IS THE MAIN BODY OF THE TTA,

12  AND THEN THEY'RE A DOCTORS' LINE ROOM AND AN RN LINE ROOM.

13  **Q.**  OKAY.  NOW, THE DOCTORS' LINE ROOM AND THE RA -- OR RN LINE

14  ROOM, CAN YOU DESCRIBE FOR US WHAT THOSE ARE?

15  **A.**  YES, THE DOCTORS' LINE IS WHERE THERE'S THE SECOND ROOM

16  WHERE WE CAN PUT A GURNEY.  AND THE RN LINE ROOM IS WHERE THE RN

17  DOES BUILDING TWO'S DUCATED INMATES FOR ROUTINE DUCATS AND

18  EXAMINATIONS OF THEM.

19          THAT USED TO BE OUR SECURE ROOM WHERE ALL THE

20  NARCOTICS, SHARPS, THE TOOLS, ALL THE EMERGENCY BAGS, ALL THAT

21  THAT THE MEDICATIONS ALL THAT WAS KEPT IN THERE.

22  **Q.**  OKAY.  I WANT TO GO BACK TO THAT IN A MINUTE.

23          THE DOCTORS' LINE ROOM, IS THAT A PART OF THE TTA

24  CLINIC ITSELF?

25  **A.**  YES.

1  Q.  OKAY. THE NURSES' LINE ROOM, IS THAT A PART OF THE TTA

2  CLINIC?

3  A.  YES.

4  Q.  OKAY. PHYSICALLY A PART, BUT IS IT A PART IN TERMS OF THE

5  OPERATIONS?

6  A.  NO.

7  Q.  OKAY.  WHAT IS THE NURSES' LINE ROOM?  WHAT UNIT DOES THAT

8  SERVICE?

9  A.  UNIT TWO.

10  Q.  JUST UNIT TWO?

11  A.  YES.

12  Q.  AND WHAT ARE THOSE INMATES IN UNIT TWO?  WHAT DO THEY GO

13  THERE FOR?

14  A.  THEY GO IN FOR DUCATED CHRONIC CARE.  THEY REVIEW THEIR

15  MEDICAL FILES FOR ANY AILMENTS THAT THEY HAVE, ANYTIME THEY HAVE

16  GONE FOR PROCEDURES AND COME FOR FOLLOW-UPS AND JUST ROUTINE

17  DENTAL -- OR I MEAN ROUTINE DOCTOR APPOINTMENTS.

18  Q.  NOW, YOU SAID THAT THE NURSES' LINE ROOM USED TO BE THE

19  SECURE ROOM FOR THE TTA CLINIC ITSELF?

20  A.  YES.

21  Q.  OKAY.  AND WHAT WAS KEPT IN THERE?

22  A.  THE SHARPS CONTAINER OR THE SHARPS CONTAINING THE NEEDLES

23  AND ANY OF THE SHARPS.

24  Q.  WHAT ARE YOU REFERRING TO BY "SHARPS"?

25  A.  LIKE THE SCALPELS AND ANY OF THE ITEMS THAT COULD BE

1  DANGEROUS.

2  **Q.**  THAT INCLUDES SCISSORS?

3  **A.**  YES.

4  **Q.**  OKAY. AND WHEN THIS -- WHEN WAS THIS ROOM CONVERTED TO THE

5  NURSES' LINE ROOM?

6  **A.**  THEY TOOK -- ABOUT SIX MONTHS AGO, THEY TOOK THE NURSES'

7  ROOM AND THE SECURED ROOM, AND THEY TOOK IT AWAY FROM US FROM

8  THE MAIN TTA'S USE FOR URGENT AND EMERGENCY CARE AND GAVE IT TO

9  BUILDING TWO, AND BUILDING THE TWO NURSES AND DOCTORS' OFFICE.

10 **Q.**  NOW, THE DOCTORS' OFFICE IS FOR BUILDING THREE.

11 **A.**  THE DOCTORS' OFFICE IS FOR UNIT TWO AND THREE, AND THE

12 NURSES' LINE IS FOR THREE.

13 **Q.**  BUT THAT'S NO LONGER APART OF THE TTA CLINIC, THEN, ITSELF,

14 CORRECT?

15 **A.**  NO.

16 **Q.**  WHERE DID THEY MOVE THE NARCOTICS AND THE SHARP INSTRUMENTS

17 WHEN THEY CONVERTED THE ROOM?

18 **A.**  THEY BROUGHT ALL OF THOSE ITEMS OUT AND PUT THEM IN WOODEN

19 BOXES WITH PADLOCKS ON THEM, AND CRASH CART, AS WELL.

20 **Q.**  AND ARE THESE BOXES, ARE THEY ALL IN ONE BOX?

21 **A.**  NO.  THERE'S APPROXIMATELY SIX BOXES THAT ARE MOUNTED ON THE

22 WALLS AROUND DIFFERENT VARIOUS SITES IN THE TTA.

23 **Q.**  OKAY.  VARIOUS POINTS IN THE ROOM?

24 **A.**  YES.

25 **Q.**  AND WHERE -- WHAT HAPPENS WHEN THEY NEED ACCESS TO ITEMS IN

1  THOSE BOXES?

2  **A.**   THE DOCTORS OR THE NURSES TAKES THEIR MEDICAL KEYS AND THEY

3  UNLOCK THE PADLOCKS AND TAKE THE ITEMS OUT.

4  **Q.**   AND THEN, THEY ARE LEFT OPEN WHILE THE DOCTORS ARE WORKING

5  ON PATIENTS?

6  **A.**   YES.

7  **Q.**   OKAY. HOW BIG A ROOM IS THE TTA CLINIC CURRENTLY?  WHAT ARE

8  THE DIMENSIONS, APPROXIMATELY?

9  **A.**   IT'S ABOUT 35 FEET BY 20 FEET IS THE MAIN BODY.

10 **Q.**   OKAY.  AND WHAT ACTIVITIES ARE GOING ON IN THERE AT THAT

11 TIME DURING --

12              **MR. HENDERSON:**  STRIKE THAT.

13 **BY MR. HENDERSON:**

14 **Q.**   WHAT -- HOW MANY WORKSTATIONS ARE  THERE WITHIN THAT ROOM

15 CURRENTLY?

16 **A.**   THEY HAVE THE NURSES' LINE FOR BUILDING TWO.  THEY HAVE THE

17 --

18 **Q.**   I WANT TO EXCLUDE THE NURSES' LINE AND THE DOCTORS' LINE.  I

19 WANT TO JUST TALK ABOUT THE ROOM THAT IS ACTUALLY USED FOR THE

20 TTA ACTIVITIES.

21 **A.**   OH, I UNDERSTAND.

22              THE MAIN TTA IS SUPPOSED TO HAVE ONLY URGENT AND

23 EMERGENCY, SUCH AS CHEST PAINS, SEVERE CUTS, SHORTNESS OF

24 BREATH, LIFE THREATENING, FISTFIGHTS, ANY OF THE URGENT WHERE

25 THEY HAVE, SAY, A RIOT ON THE YARD OR A FIGHT ON THE YARD.

1              THE INMATES ARE BROUGHT DOWN TO US FOR

2    DECONTAMINATION.  THEY HAVE 7219'S DRAWN ON THEM AT THAT TIME.

3              AND THAT'S ANY OF THE WALK-IN PATIENTS THAT COME IN

4    FOR SEVERE COLDS, FLU, THAT TYPE OF THING.

5    **Q.**  HOW MANY INMATES CAN BE SEEN AT A TIME IN THE TTA CLINIC?

6    WHAT'S THE MOST YOU'VE SEEN TREATED IN THAT ROOM?

7              **JUDGE HENDERSON:**  IN A DAY?  IN AN HOUR?

8    **BY MR. HENDERSON:**

9    **Q.**  AT ANY ONE GIVEN TIME, TOTAL NUMBER.

10             **JUDGE KARLTON:**  YOU MEAN, TREATED OR WAITING FOR

11   TREATMENT?

12   **BY MR. HENDERSON:**

13   **Q.**  BEING TREATED AT ONE POINT IN TIME.

14   **A.**  INSIDE OF THE TTA THERE IS GENERALLY ABOUT FOUR TO SIX

15   INMATES AT A TIME IN THERE.

16   **Q.**  OKAY. AND ARE THERE OTHER INMATES THAT ARE IN THE ROOM AT

17   THAT TIME, AS WELL?

18   **A.**  I KEEP IT TO A MINIMUM. I TRY AND HAVE ONLY ONE COME IN AT A

19   TIME.

20             I'M AT THE DOOR, BUT I CAN'T HAVE COMPLETE CONTROL

21   OVER IT, BECAUSE THERE'S, YOU KNOW, INMATES COMING FROM TWO

22   DIFFERENT DOORS. THERE'S SO MANY PROGRAMS.  AND TO WHERE ONE

23   INMATE ISN'T DONE BEING TREATED BY A NURSE, AND A DOCTOR IS

24   BRINGING ANOTHER INMATE IN.

25             AND THEN, WE COULD HAVE LIKE A FISTFIGHT WHERE TWO

1  OFFICERS ARE BRINGING THESE INMATES IN AND THEY ARE, YOU KNOW,

2  CUT AND BLEEDING, NEEDING TREATMENT.  SO THERE ARE COULD BE

3  QUITE A FEW.

4  Q.  WHAT --

5          **JUDGE REINHARDT:**  I THOUGHT YOU SAID THERE WAS FOUR

6  TREATED AT A TIME.  AND NOW YOU SAID THERE'S ONE IN THE ROOM AT

7  A TIME?

8          **THE WITNESS:**  I'M SORRY?

9          **JUDGE REINHARDT:**  I THOUGHT A MINUTE AGO YOU SAID

10  THERE WAS USUALLY FOUR BEING TREATED IN THE ROOM AT THE SAME

11  TIME.  AND THEN, I UNDERSTOOD YOU TO SAY THAT YOU TRY TO KEEP IT

12  TO ONE IN A ROOM AT THE SAME TIME.  WHAT DO I MISUNDERSTAND?

13          **THE WITNESS:**  NO, I BRING THEM IN ONE AT A TIME. AND

14  I TRY AND KEEP IT TO A MINIMUM. BUT I SAID ON A GENERAL RULE

15  THERE'S GENERALLY BETWEEN FOUR AND SIX INMATES IN THE MAIN BODY

16  OF THE TTA.

17          **JUDGE KARLTON:**  THERE WILL BE SIX INSIDE, AND WHEN

18  ONE LEAVES HE LET'S ONE MORE IN?

19          **THE WITNESS:**  CORRECT.

20  **BY MR. HENDERSON:**

21  Q.  NOW, DOES THAT ALSO INCLUDE INMATES THAT ARE COMING IN TO

22  SEE EITHER A DOCTOR OR A NURSE IN CONNECTION WITH THE DOCTORS'

23  LINE ROOM OR THE NURSES' LINE ROOM?

24  A.  YES.

25  Q.  THEY WILL COME IN ALSO IN ADDITION TO THE ONES THAT ARE

1    BEING TREATED AT THE TTA?

2    **A.**    YES.

3    **Q.**    AND HOW MANY CAN THAT INVOLVE, ADDITIONALLY?

4    **A.**    TWO.

5    **Q.**    OKAY.  AND YOU SAY THERE ARE TWO DOORS INTO THE TTA

6    FACILITY?

7    **A.**    PARDON ME?

8    **Q.**    THERE ARE TWO DOORS INTO THE TTA FACILITY?

9    **A.**    CORRECT.

10    **Q.**    OKAY.  SO YOU HAVE -- YOU ARE THE CORRECTIONAL OFFICER THAT

11    IS ASSIGNED TO MAINTAIN SECURITY AT THE TTA CLINIC, CORRECT?

12    **A.**    CORRECT.

13    **Q.**    OKAY. SO YOUR DUTIES INVOLVE MONITORING THE INMATES THAT

14    COME IN AND WATCHING WHAT IS GOING ON WHILE THEY ARE IN THERE?

15    **A.**    CORRECT.

16    **Q.**    OKAY. AND THESE SECURITY BOXES FOR THE NARCOTICS AND THE

17    SHARP INSTRUMENTS ARE BASICALLY LOCATED AROUND THE WALLS IN THE

18    ROOM?

19    **A.**    YES.

20    **Q.**    OKAY.  SO YOU HAVE TO KEEP TRACK OF ALL OF THIS AT THE SAME

21    TIME?

22    **A.**    YES.

23    **Q.**    HOW DO YOU DEAL WITH THAT?

24    **A.**    IT'S VERY DIFFICULT, MULTITASKING.

25    **Q.**    IS THERE --

1              MR. HENDERSON:  STRIKE THAT.

2    BY MR. HENDERSON:

3    Q.  IF THE BOXES --

4              MR. HENDERSON:  STRIKE THAT.

5    BY MR. HENDERSON:

6    Q.  THE INMATES -- THERE ARE INMATES WAITING TO GET IN TO THE

7    TTA FACILITY, CORRECT?

8    A.  CORRECT.

9    Q.  WHERE ARE THEY LOCATED?

10   A.  THERE IS A HOLDING CAGED AREA. IT'S A CHAIN LINK FENCED AREA

11   THAT HAS A LOCK ON IT AND A RESTROOM.  AND THAT'S LOCATED

12   OUTSIDE THE HALLWAY OF THE HOSPITAL DOOR.

13   Q.  OKAY. AND WHAT -- THIS CAGE THAT YOU'RE TALKING ABOUT, WHAT

14   ARE THE DIMENSIONS OF IT?

15   A.  APPROXIMATELY 12 BY 20.

16   Q.  OKAY. AND WHAT IS INSIDE THAT LOCATION?

17   A.  THERE'S A TOILET AND A TV.

18   Q.  OKAY. AND IS THAT TV -- DOES THE TV RUN REGULAR CHANNELS OR

19   --

20   A.  NO.  IT JUST HAS A PRISON CHANNEL.

21   Q.  I'M SORRY?

22   A.  A PRISON CHANNEL.

23   Q.  A PRISON CHANNEL?  AND WHAT'S ON THE PRISON CHANNEL?

24             MR. MITCHELL:  OBJECT ON RELEVANCE GROUNDS.

25             MR. HENDERSON:  I'LL WITHDRAW IT.

1          **JUDGE KARLTON:**  I REALLY WANT TO KNOW.  I'M CURIOUS.

2          **JUDGE HENDERSON:**  WHAT IS THE PRISON CHANNEL?

3          IT'S IRRELEVANT, COUNSEL.

4          **MR. HENDERSON:**  OKAY.

5          **JUDGE HENDERSON:**  BUT, NO, WE WANT TO BE EDUCATED.

6          WHAT IS IT?

7          **THE WITNESS:**  THE PRISON CHANNEL, IT HAS MOVIES.  IT

8  HAS EDUCATIONAL PROGRAMS ON IT.  AND IT ALSO BROADCASTS PRISON

9  NEWS OF WHEN THEY GO TO GET THEIR CANTEEN AND, YOU KNOW, WHAT

10 THE PROGRAM IS FOR THE DAY.

11 **BY MR. HENDERSON:**

12 **Q.**  ARE THERE ANY MAGAZINES OR BOOKS IN THIS HOLDING AREA?

13 **A.**  NO.

14 **Q.**  THERE'S A BENCH THERE?

15 **A.**  IN THE HALLWAY OUTSIDE THE DOOR OF THE TTA THERE IS A BENCH.

16 **Q.**  IS THERE A BENCH IN THE CAGED AREA?

17 **A.**  YES.

18 **Q.**  AND HOW MANY PEOPLE CAN SIT ON THAT BENCH?

19 **A.**  PROBABLY ABOUT 20.

20 **Q.**  THAT'S IF THEY ARE ALL SCRUNCHED TOGETHER?

21 **A.**  YES.

22 **Q.**  OKAY. AND ABOUT HOW MANY PEOPLE --

23          **MR. HENDERSON:**  STRIKE THAT.

24 **BY MR. HENDERSON:**

25 **Q.**  WHAT'S THE MAXIMUM AMOUNT YOU'VE SEEN IN THAT 12 BY 20-FOOT

1  AREA?

2  **A.**  I'VE SEEN APPROXIMATELY 50 INMATES IN THERE AT A TIME.

3  **Q.**  FIFTY?

4  **A.**  YES.

5  **Q.**  OKAY. AND THE MAJORITY OF THEM -- WHEN YOU'VE OBSERVED THAT,

6  HAVE YOU OBSERVED THAT ON MORE THAN ONE OCCASION?

7  **A.**  PRETTY MUCH EVERY DAY.

8  **Q.**  OKAY. IS THAT 50 INMATES WAITING TO GET INTO THE TTA

9  FACILITY?

10  **A.**  NO, THEY HAVE DUCATS TO GO SEE THE PSYCH. THEY HAVE DUCATS

11  TO GO TO GET DENTAL WORK.  THE X-RAY LAB IS UP THERE TO GET

12  X-RAYS.  DOCTOR APPOINTMENTS, THE NURSING LINE.

13  **Q.**   SO ANY INMATE THAT'S COMING IN THE BUILDING TO GET MEDICAL

14  SERVICES, WHETHER IT'S TTA OR ONE OF THE CLINICS OR THE LINE

15  OFFICE WILL FIRST GO IN THIS HOLDING CAGE?

16  **A.**  YES.

17  **Q.**  OKAY. AND HOW LONG DO THE INMATES STAY IN THAT LOCATION?

18  **A.**  ON AN AVERAGE OR --

19  **Q.**  WELL, ON THE AVERAGE, YES.

20  **A.**  I WOULD SAY A MINIMUM OF TWO HOURS.

21  **Q.**  AND HAVE YOU SEEN THEM STAY LONGER THAN TWO HOURS?

22  **A.**  YES.

23  **Q.**  AND WHAT'S THE LONGEST YOU RECALL SEEING AN INMATE IN THAT

24  AREA?

25  **A.**  LIKE WHEN WE'VE HAD INCIDENTS ON THE YARD, AN ALARM, THEY

1   HAVE BEEN IN THERE UPWARDS OF FOUR TO FIVE HOURS.

2   Q.  OKAY. ARE THERE OTHER LOCATIONS FOR INMATES WAITING TO GET

3   INTO THE TTA FACILITY BESIDES THE CAGE?

4   A.  OUTSIDE OF PSYCH, THEY HAVE A WAITING AREA LIKE GENERALLY

5   LIKE A DOCTORS' WAITING AREA.

6   Q.  IS THAT ON THE SAME FLOOR AS THE TTA FACILITY?

7   A.  NO.  IT'S ON THE THIRD FLOOR.  OR, EXCUSE ME, SECOND FLOOR.

8   Q.  OKAY.  HAVE THERE BEEN TIMES WHEN THERE HAVE BEEN MORE THAN

9   40 OR 50 INMATES PRESENT IN THE -- WAITING TO GET IN FOR SOME

10  KIND OF MEDICAL TREATMENT?

11          **JUDGE HENDERSON:**  IN THE CAGE OR WAITING WHERE?

12  **BY MR. HENDERSON:**

13  Q.  JUST GENERALLY WAITING TO GET IN FOR TREATMENT, WHETHER IT'S

14  IN THE CAGE OR OUTSIDE.

15  A.  OH, ABSOLUTELY.

16  Q.  OKAY.  WHERE ARE THOSE INMATES PLACED?

17  A.  THERE IS AN OVERFLOW OF THE FIRST CAGED AREA OUTSIDE WHERE

18  THERE'S A CHAIN LINK.  THERE'S AN ADDITIONAL SPACE THAT IS NEXT

19  TO IT. AND THEY CAN OPEN UP THE GATE TO THAT, AND IT'S ABOUT

20  ANOTHER 12 TO 20 FEET.

21  Q.  HAVE YOU EVER SEEN THAT ONE FULL OF INMATES AS WELL AS THE

22  INMATES IN THE HOLDING?

23  A.  YES.

24  Q.  WHEN MOST RECENTLY DID YOU SEE THAT?

25  A.  DAY BEFORE YESTERDAY.

1   Q.  WHAT HAVE YOU OBSERVED IN TERMS OF THE INTERACTION OF THE

2   INMATES WHEN THEY ARE IN THIS HOLDING CAGE?

3   A.  IRRITATED, ANTSY.  AND THAT'S ONE OF THE REASONS THEY JUST

4   PUT THE TV IN THERE.

5   Q.  OKAY. DOES THAT SOLVE THE PROBLEM?

6   A.  NO.

7   Q.  ARE THERE INMATES THAT HAVE REQUESTED CANCELLATION OF THEIR

8   REQUESTED TREATMENT?

9   A.  YES.

10  Q.  WHILE THEY WERE IN THE CAGE?

11  A.  YES.

12  Q.  WHAT HAVE THEY INDICATED TO YOU IS THE REASON?

13  A.  THEY DIDN'T CARE TO WAIT.

14          MR. LEWIS:  OBJECTION, HEARSAY, YOUR HONOR.

15          MR. HENDERSON:  GOES TO STATE OF MIND.

16          JUDGE HENDERSON:  OVERRULED.

17          JUDGE KARLTON:  IT'S OVERRULED.

18          JUDGE HENDERSON:  YOU CAN ANSWER.

19          THE WITNESS:  WHAT?  DID YOU WANT ME TO ANSWER?

20  BY MR. HENDERSON:

21  Q.  YEAH.

22  A.  I SEE IT EVERY DAY.  AND THE REASON THEY TELL ME, THE

23  INMATES WILL ACTUALLY CALL ME OVER AND ASK ME TO GET THEM A

24  REFUSAL FOR MEDICAL TREATMENT SO THEY CAN SIGN BECAUSE THEY SAY

25  THAT THEY ARE NOT GOING TO WAIT.

1  Q.  BASED ON YOUR OBSERVATIONS IS THE TTA A FACILITY ADEQUATE

2  FOR DEALING WITH EMERGENCY AND URGENT CARE NEEDS OF THE INMATES

3  AT FOLSOM STATE PRISON AS IT'S PRESENTLY CONFIGURED?

4          **MR. LEWIS:**  OBJECT AS LACKING FOUNDATION.

5          **JUDGE HENDERSON:**  OVERRULED.

6          **THE WITNESS:**  NOT IN MY OPINION IT'S NOT.

7

8  **BY MR. HENDERSON:**

9  Q.  WHY IS THAT?

10 A.  THERE'S TOO MANY PROGRAMS, TOO MANY DOCTORS, TOO MANY NURSES

11 AND WAY TOO MANY INMATES IN THAT SMALL OF A SPACE TO DO THE JOB;

12 THAT IT'S NOT AN URGENT EMERGENCY AREA.  IT'S NOT BEING USED

13 THAT WAY.  THERE'S TOO MANY PROGRAMS TO BE SAFE.

14 Q.  NOW, HAVE YOU SEEN INMATES COME IN WITH STAPH INFECTIONS

15 FOR TREATMENT AT THE TTA?

16 A.  YES.

17 Q.  AND DID YOU -- WHAT HAVE YOU OBSERVED?  HAVE YOU OBSERVED

18 PHYSICALLY THE CONDITIONS THAT THEY HAVE?  THE STAPH INFECTIONS?

19 A.  YES.

20 Q.  OKAY.  AND WHAT HAVE YOU OBSERVED WHEN YOU'VE SEEN THOSE?

21 CAN YOU DESCRIBE FOR US WHAT YOU WERE REFERRING TO BY A "STAPH

22 INFECTION?

23 A.  BLEEDING, OOZING WITH PUS THAT IS SOAKING THROUGH THEIR

24 CLOTHES WHEN THEY COME IN TO GET THE WOUND COVERED AND TREATED.

25 Q.  OKAY. AND HAVE YOU WORKED OTHER LOCATIONS WITHIN THE FOLSOM

1  STATE PRISON ON OVERTIME SHIFTS?

2  **A.**  YES.

3  **Q.**  HAVE SOME OF THOSE POSITIONS THAT YOU'VE WORKED REQUIRED YOU

4  TO SUPERVISE INMATES THAT ARE TAKING SHOWERS?

5  **A.**  YES.

6  **Q.**  AND HAVE YOU SEEN INMATES WHEN THEY WERE SHOWERING WHERE YOU

7  OBSERVED STAPH INFECTIONS?

8  **A.**  YES.

9  **Q.**  AND WHERE WERE THOSE STAPH INFECTIONS LOCATED THAT YOU

10 OBSERVED?

11          **MR. MITCHELL:**  OBJECTION, LACK OF FOUNDATION AS TO

12 LOCATION AND/OR TIME.  IT'S VAGUE AS TO BOTH.

13          **JUDGE HENDERSON:**  HE'S ASKING HIM TO TELL US WHAT HE

14 SAW.

15          **MR. MITCHELL:**  BUT ABOUT THE LOCATION -- EXCUSE ME,

16 YOUR HONOR -- OF THE PRISON SHOWER, THE FACILITY WHERE HE'S

17 TALKING ABOUT, AND WHEN HE'S SPEAKING ABOUT IS VAGUE AS TO TIME

18 AS TO BOTH OF THOSE.

19          **MR. HENDERSON:**  I'LL BACK UP ON --

20          **JUDGE HENDERSON:**  DO THAT.

21          **MR. HENDERSON:**  I'LL BACK UP ON THAT, YOUR HONOR.

22 **BY MR. HENDERSON:**

23 **Q.**   DO YOU RECALL SPECIFIC LOCATIONS WITHIN THE PRISON

24 FACILITY WHERE YOU'VE BEEN ON DUTY WHERE YOU'VE OBSERVED INMATES

25 SHOWERING?

1  **A.**  I WORKED IN EVERY BUILDING.

2  **Q.**  OKAY. DID YOU OBSERVE INMATES SHOWERING WHEN YOU WERE

3  WORKING AT --

4          **MR. HENDERSON:**  STRIKE THAT.

5  **BY MR. HENDERSON:**

6  **Q.**  WHERE DID YOU WORK PRIOR TO THE TTA?

7  **A.**  WHERE WAS I ASSIGNED?

8  **Q.**  YEAH. YES.

9  **A.**  FTTF, THE DRUG REHAB PROGRAM.

10  **Q.**  IS THAT A SEPARATE BUILDING?

11  **A.**  YES.

12  **Q.**  HOW MANY INMATES ARE HOUSED IN THAT BUILDING?

13          **JUDGE KARLTON:**  LET'S NOT GO THROUGH THIS, PLEASE.

14          **JUDGE HENDERSON:**  YOU WERE ABOUT TO TELL US HE SAW

15  SOME PEOPLE SHOWERING WITH STAPH INFECTIONS.

16          **MR. HENDERSON:**  I WAS GOING TO --

17          **JUDGE HENDERSON:**  WHERE WAS THAT? TELL US WHERE THAT

18  WAS.

19          **MR. HENDERSON:**  IF I CAN SHORTCUT IT.

20          **JUDGE KARLTON:**  NO.

21          WHERE WAS IT?

22          **MR. HENDERSON:**  OKAY.

23          **THE WITNESS:**  I'VE SEEN INMATES SHOWERING IN BUILDING

24  ONE, BUILDING TWO, BUILDING THREE, BUILDING FIVE, AND FTTF.

25          **JUDGE KARLTON:**  HOW LONG AGO DO YOU SEE THESE FOLKS

1  SHOWERING WITH STAPH INFECTION?  IT'S VERY IMPORTANT FOR THE

2  COURT TO KNOW THAT.  THE CASE TURNS ON IT.

3       GO AHEAD.

4       **THE WITNESS:**  THE LATEST I'VE SEEN WAS DAY BEFORE

5  YESTERDAY WHEN I WAS AT WORK.

6  **BY MR. HENDERSON:**

7  **Q.**  OKAY.

8  **A.**  I WALKED THROUGH BUILDING FIVE.

9  **Q.**  OKAY. AND CAN YOU DESCRIBE FOR US THE SHOWER, THE

10  CONFIGURATIONS OF THE SHOWER WHERE YOU'VE OBSERVED THIS?

11  **A.**  THEY ARE MULTIPLE SHOWER HEADS THAT ARE STICKING OUT OF THE

12  WALLS.  AND IN BUILDING ONE THEY HAVE THE CHRISTMAS TREE TYPE

13  THAT SHOWERS COME UP ON A POLE, AND THEY SPRAY OUTWARDS, AND THE

14  INMATES STAND AROUND IT AND SHOWER.

15  **Q.**  ARE THERE BENCHES IN THESE AREAS WHERE THE INMATES SIT?

16  **A.**  JUST OUTSIDE THE SHOWER AREA.

17  **Q.**  WHERE THEY DRY OFF?

18  **A.**  YES, SIR.

19  **Q.**  OKAY.  HAVE YOU SEEN -- IN THOSE SITUATIONS, HAVE YOU SEEN

20  STAPH INFECTIONS ON THE BUTTOCKS OF THE INMATES?

21  **A.**  YES.

22  **Q.**  WHAT OTHER AREAS OF THE BODY?

23  **A.**  ON THE UNDERNEATH OF THEIR FOREARMS, ON THEIR STOMACHS, ON

24  THEIR THIGHS, ON THEIR CALFS, ON THEIR FACES AND NECKS A LOT.

25  **Q.**  OKAY.

1           SIR, ARE YOU FAMILIAR WITH -- I'M GOING TO READ THIS

2    SO I DON'T MISPRONOUNCE LIKE I DID THE LAST TIME.  I MAY STILL

3    MISPRONOUNCE IT, THOUGH -- METHICILLIN-RESISTANT STAPHYLOCOCCUS

4    AUREUS, OTHERWISE KNOWN AS MSRA?

5    **A.**  YES.

6    **Q.**  AND HOW ARE YOU FAMILIAR WITH THAT?  WHAT'S YOUR

7    UNDERSTANDING OF THAT CONDITION?

8    **A.**  IT'S A STAPH INFECTION THAT'S RESISTANT TO THE ANTIBIOTICS.

9    **Q.**  AND HOW ARE YOU FAMILIAR WITH THAT?

10   **A.**  I CONTRACTED IT AT WORK.

11   **Q.**  AND WHEN DID YOU CONTRACT IT?

12   **A.**  JULY OF '06.

13   **Q.**  AND WHERE WERE YOU WORKING AT THE TIME?

14   **A.**  FTTF.

15   **Q.**  OKAY. IS THERE -- ARE YOU AWARE OF INMATES THAT HAVE BEEN

16   DIAGNOSED WITH MSRA?

17   **A.**  YES.

18   **Q.**  OKAY.  ARE THERE ANY PROCEDURES FOR ISOLATING THOSE INMATES

19   FROM THE REST OF THE POPULATION?

20   **A.**  NO.

21   **Q.**  ARE THOSE INMATES RETURNED BACK TO THEIR LIVING

22   ARRANGEMENTS?

23   **A.**  YES.

24   **Q.**  AND ARE YOU -- HAVE YOU EVER BEEN NOTIFIED BY --

25           **MR. HENDERSON:**  OR STRIKE THAT.

1  **BY MR. HENDERSON:**

2  **Q.**  IS IT THE DEPARTMENT POLICY NOT TO NOTIFY CORRECTIONAL STAFF

3  OF WHICH INMATES HAVE MSRA?

4  **A.**  YES.

5  **Q.**  OKAY.

6        **MR. HENDERSON:**  I BELIEVE THAT'S ALL I HAVE AT THIS

7  TIME, YOUR HONOR.

8        **JUDGE HENDERSON:**  OKAY.  THANK YOU, COUNSEL.

9        CROSS.

10        **MR. MITCHELL:**  THANK YOU.  BILL MITCHELL FOR THE

11  DEFENDANT INTERVENORS.

12                    **CROSS-EXAMINATION**

13  **BY MR. MITCHELL:**

14  **Q.**  GOOD AFTERNOON, SIR.

15  **A.**  GOOD AFTERNOON.

16  **Q.**  IN WORKING IN THE TTA, THE TREATMENT TRIAGE CENTER, THE

17  SPACE WAS RECENTLY REDESIGNED AND CHANGES WERE MADE TO THE SPACE

18  ALLOCATION; IS THAT CORRECT?

19  **A.**  THEY RECENTLY REDESIGNED WHAT PROGRAMS THAT THEY WAS GOING

20  TO PUT IN THERE, AND THEY TOOK THE -- ALL THE EQUIPMENT, THE

21  SAFE BOXES.  THAT ONE ROOM, IT WAS THE NURSES' ROOM WAS ACTUALLY

22  CALLED "THE SECURE ROOM."

23        AND THAT'S WHERE ALL THE NARCOTICS, ALL THE

24  MEDICATIONS, ALL THE NEEDLES, THE INJECTABLES, ALL THE TOOLS,

25  THE SHARP -- ANYTHING THAT COULDN'T BE LEFT UNLOCKED WAS ALL PUT

1  IN THAT SAFETY ROOM.  AND THEY TOOK ALL THAT STUFF OUT, AND NOW

2  IT'S MOUNTED ON THE WALLS OF THE MAIN TTA TO PUT THE NURSES'

3  LINE IN THERE.

4  Q.  AND HOW LONG AGO WAS ALL OF THOSE CHANGES DONE?

5  A.  SIX MONTHS AGO.

6  Q.  ALL UNDER THE DIRECTION OF THE RECEIVER?

7  A.  I DON'T KNOW WHOSE DIRECTION.

8  Q.  HAS THE RECEIVER TAKEN OVER THAT YOU'VE OBSERVED, THE

9  CONTROL OF THE DELIVERY OF MEDICAL CARE AT YOUR PRISON?

10 A.  YES.

11 Q.  AND THOSE DIRECTIONS TOOK PLACE -- I MEAN, THE CHANGES TOOK

12 PLACE AFTER THE RECEIVER CAME IN AND TOOK CONTROL OF THE

13 DELIVERY OF MEDICAL CARE THERE?

14 A.  YES.

15 Q.  HAVE THERE BEEN INCIDENTS WHERE INMATES HAVE GOTTEN CONTROL,

16 TAKEN CONTROL OF SHARP INSTRUMENTS THAT WERE AVAILABLE IN THE

17 LOCKED BOXES THAT THE NURSES AND DOCTORS HAVE ACCESS TO?

18         **MR. HENDERSON:**  I'LL NOTE AN OBJECTION AS CALLING FOR

19 SPECULATION.  IF HE WANTS TO -- I'LL OBJECT AS CALLING FOR

20 SPECULATION.

21         **JUDGE HENDERSON:**  LET'S ASSUME HE MEANS:  ARE YOU

22 AWARE OF ANY SUCH INSTANCES?

23         **THE WITNESS:**  NO, I'M NOT.

24         **JUDGE HENDERSON:**  DID YOU OBSERVE ANY SUCH INSTANCES?

25         **THE WITNESS:**  I HAVE NOT OBSERVED AN INMATE TAKE ONE

1    YET.

2    **BY MR. MITCHELL:**

3    **Q.**   YOU HAVE OBSERVED THEM TAKE ONE?

4    **A.**   HAVE NOT.

5    **Q.**   HAVE NOT. THANK YOU.

6              SIR, COULD I ASK YOU TO PLEASE MOVE A LITTLE CLOSER

7    TO THE MICROPHONE?  I'M HAVING A VERY HARD TIME WITH HEARING

8    YOU.

9    **A.**   YES.

10   **Q.**   THANK YOU.

11             THE HOLDING CAGE THAT WAS REFERRED TO IN YOUR DIRECT

12   TESTIMONY, IS THAT THE TERM THAT YOU AS A CORRECTIONAL OFFICER

13   REFER TO THAT FACILITY BY?

14   **A.**   IT'S JUST A HOLDING AREA.  BUT I WAS TRYING TO DESCRIBE IT

15   TO YOU SO THAT YOU WOULD UNDERSTAND WHAT IT LOOKS LIKE. IT'S

16   JUST A HOLDING AREA THAT'S CHAIN LINK FENCED, WITH A GATE ON IT.

17   **Q.**   BUT IN THE PRISON AS A CORRECTIONAL OFFICER YOU REFER TO IT

18   AS A HOLDING CELL OR A HOLDING AREA?

19   **A.**   HOLDING AREA.

20   **Q.**   HOLDING AREA. THANK YOU.

21   **A.**   YES, SIR.

22   **Q.**   AND YOU'VE INDICATED SOMETIMES INMATES, AS MANY AS 40 TO 50,

23   CAN WAIT IN THERE AN AVERAGE OF TWO HOURS, SOMETIMES, BUT UP TO

24   FOUR TO FIVE HOURS?

25   **A.**   YES.

1   Q.  AND SOMETIMES INMATES MAY GET A LITTLE BIT IRRITATED AND

2   WANT TO FOREGO THEIR APPOINTMENT FOR BEING SEEN BY MEDICAL STAFF

3   AND GO SOMEPLACE ELSE?

4   A.  YES, SIR.

5   Q.  AND WHERE WOULD IT BE THAT THEY WOULD GO ONCE THEY LEAVE

6   THERE, RATHER THAN GO TO THEIR MEDICAL APPOINTMENT?

7   A.  USUALLY UP TO THE YARD.

8   Q.  AND IT'S A CHOICE THAT THEY CAN MAKE EITHER TO WAIT AND GET

9   SEEN BY A DOCTOR AND A NURSE, OR GO OUT TO YARD?

10  A.  YES.

11  Q.  AND THOSE THAT FOREGO THEIR APPOINTMENT ON THAT DAY, IS

12  THERE ANYTHING TO PREVENT FROM THEM COMING BACK THE NEXT DAY?

13  A.  THEY WOULD HAVE TO BE REDUCATED.

14  Q.  ANYTHING THAT CAN PREVENT THEM FROM BEING REDUCATED?

15  A.  THEY WOULD ACTUALLY HAVE TO FILL OUT PAPERWORK TO BE

16  REDUCATED.

17  Q.  ON THE -- WELL, LET ME ASK YOU THIS:  ARE YOU AWARE OF HOW

18  LONG AN INMATE HAS TO WAIT TO BE SEEN ONCE THEY FILL OUT THE

19  PAPERWORK, THE DUCATS, REQUESTING TO BE SEEN?

20  A.  I DON'T KNOW.

21  Q.  YOU INDICATED THAT SIX INMATES CAN BE TREATED AT ONE TIME IN

22  THIS TRIAGE AREA?

23  A.  COULD BE OR ARE?

24  Q.  ARE.

25  A.  GENERALLY, YES.

1  Q.  AND HAVE YOU SEEN THE STAFF, MEDICAL STAFF, THE NURSES AND

2  THE DOCTORS, THE NUMBER OF THEM, HAS THAT INCREASED WITHIN THE

3  LAST 12 TO 18 MONTHS?

4  A.  YES.  IN THE TTA, CORRECT.

5  Q.  YOU'VE INDICATED SOME CONCERN OVER THE SPACE THAT IS

6  AVAILABLE FOR THE TREATMENT OF THE INMATES IN THE TTA AREA,

7  CORRECT?

8  A.  YES.

9  Q.  IF YOU HAD ADDITIONAL SPACE, THAT WOULD ALLEVIATE SOME OF

10 YOUR CONCERN?

11 A.  IF THAT SPACE THAT WAS TAKEN AWAY, YOU MEAN?

12 Q.  IF YOU HAD ADDITIONAL SPACE AT THIS TIME, EITHER THE SPACE

13 THAT WAS TAKEN AWAY, OR IF ADDITIONAL SPACE WAS MADE AVAILABLE,

14 WOULD THAT ALLEVIATE SOME OF THE CONCERNS YOU HAVE REGARDING THE

15 DELIVERY OF MEDICAL CARE AND SAFETY CONCERNS?

16 A.  YES.

17 Q.  AND IF YOU HAD ADDITIONAL STAFF TO ASSIST YOU IN MAKING SURE

18 NONE OF THE INMATES GOT CONTROL OF ANY OF THE SHARP INSTRUMENTS

19 THAT ARE THERE, OR TO CONTROL THEM FOR DISTURBANCES, WOULD

20 ALLEVIATE SOME OF THE CONCERNS YOU'VE EXPRESSED?

21 A.  YES.

22 Q.  YOU INDICATED THAT YOU CONTRACTED -- AND I'LL REFER TO IT AS

23 "MRSA," BECAUSE I KNOW I CAN'T SAY IT.

24 A.  YES.

25 Q.  AND YOU BELIEVE YOU CONTRACTED IT AT WORK?

1  **A.**  THE DOCTORS, THE WORKERS' COMP DOCTORS, THEY CONCLUDED THAT

2  I DID, IN FACT.

3  **Q.**  WHAT PART OF YOUR BODY, SIR?

4  **A.**  MY TESTICLES, SCROTUM.

5  **Q.**  THE STAFF USE A STAPH RESTROOM, DO THEY NOT?

6  **A.**  PARDON ME?

7  **Q.**  TO THE STAFF, CORRECTIONAL OFFICERS, USE A RESTROOM THAT IS

8  SEPARATE AND APART FROM THAT USED BY THE INMATES?

9  **A.**  YES.

10  **Q.**  YOU DON'T SHOWER WITH THE INMATES, DO YOU?

11  **A.**  NO, SIR.

12  **Q.**  YOU DON'T SIT ON THE BENCHES THAT THEY SIT ON IN THE SHOWER,

13  DO YOU?

14  **A.**  NO.

15  **Q.**  ARE YOU AWARE THAT THE INCIDENCE OF MRSA HAS INCREASED IN

16  THE COMMUNITY?

17          **JUDGE HENDERSON:**  WHAT COMMUNITY?

18          **MR. HENDERSON:**  OBJECTION.

19          **MR. MITCHELL:**  SORRY, SIR?

20          **JUDGE HENDERSON:**  WHAT COMMUNITY?  THIS WORLD

21  COMMUNITY?

22  **BY MR. MITCHELL:**

23  **Q.**  ARE YOU AWARE OF THE INCIDENCE, THE NUMBER OF MRSA

24  INFECTIONS OCCURRING HAS ACTUALLY INCREASED IN THE FREE

25  COMMUNITY, IN SOCIETY, IN GENERAL?

1    **A.**  YES.

2    **Q.**  AND ARE YOU AWARE THAT IT EVEN OCCURS THIS HOSPITAL

3    SETTINGS?

4    **A.**  YES.

5    **Q.**  IT CAN OCCUR AT A HEALTH FACILITY?

6    **A.**  YES.

7    **Q.**  HEALTH CLUB.  ARE YOU A MEMBER OF THE HEALTH CLUB?

8    **A.**  I AM NOW.

9    **Q.**  PARDON?

10   **A.**  I AM NOW, YES.

11   **Q.**  WERE YOU THEN?

12   **A.**  NO.

13   **Q.**  IT CAN BE CONTRACTED IN SCHOOLS, CORRECT?

14   **A.**  YES.

15   **Q.**  ANY NUMBER OF PLACES.

16   **A.**  YES.

17   **Q.**  ARE YOU AWARE OF ANY EVIDENCE THAT INDICATES THAT THE NUMBER

18   OF --

19            **MR. MITCHELL:**  I KNOW THE ANSWER, BUT I'LL STRIKE

20   THAT.  NEVER MIND.

21   **BY MR. MITCHELL:**

22   **Q.**  THE POPULATION THAT YOU'RE DEALING WITH AT UNIT TWO, YOU

23   INDICATED A POPULATION OF ABOUT 4,000. ARE THOSE LIFERS?

24   **A.**  THE POPULATION OF THE ENTIRE INSTITUTION IS ABOUT 4,000.

25   **Q.**  IT'S ABOUT 4,000?

1  A.  CORRECT.

2  Q.  THE INDIVIDUALS THAT YOU OBSERVED THE STAPH INFECTIONS ON,

3  ARE THEY SHORT-TIMERS, OR ARE THEY NEWLY-RECEIVED, NEW

4  ADMITTEES, ARE THEY LIFERS?  HOW LONG HAVE THEY BEEN THERE?

5  A.  I WOULDN'T HAVE AN IDEA.

6  Q.  IS THIS A RECEPTION CENTER AREA?

7  A.  NO.

8  Q.  DO YOU SEE EVIDENCE THAT THE INMATES ENGAGE IN TATTOOING?

9  A.  I DON'T VIEW THEM TATTOOING.  I KNOW THAT IT GOES ON, BUT I

10  HAVE NOT SEEN AN INMATE TATTOOING ANOTHER INMATE.

11  Q.  AND INMATES WILL HAVE TATTOOS ON THEIR ARMS?

12  A.  YES.

13  Q.  THEIR FOREARMS?

14  A.  YES.

15  Q.  THEIR FACES?

16  A.  YES.

17  Q.  MANY OF THE AREAS IN WHICH YOU'VE SEEN STAPH INFECTIONS?

18  A.  YES.

19  Q.  THANK YOU.

20          MR. MITCHELL:  NO FURTHER QUESTIONS.

21          JUDGE HENDERSON:  THANK YOU, COUNSEL.

22          DEFENDANTS, DO YOU HAVE ANY?

23          MR. LEWIS:  NO QUESTIONS, YOUR HONOR.

24          MR. HENDERSON:  JUST A COUPLE ON REDIRECT, YOUR

25  HONOR.

1                    **JUDGE HENDERSON:**  REDIRECT.

2                          **REDIRECT EXAMINATION**

3    **BY MR. HENDERSON:**

4    **Q.**  MR. BENSON, YOU INDICATED THAT YOU HADN'T SEEN ANY INMATE

5    TAKE NARCOTICS OR SHARP INSTRUMENTS FROM ANY OF THE BOXES IN THE

6    TTA FACILITY; IS THAT CORRECT?

7    **A.**  CORRECT.

8    **Q.**  ISN'T IT TRUE THAT INMATES ARE PRETTY QUICK ABOUT GETTING

9    WHAT THEY WANT WHEN THEY NEED TO GET IT?

10   **A.**  YES.

11   **Q.**  OKAY. AND YOU HAVE A NUMBER OF ACTIVITIES, I THINK AS YOU'VE

12   DESCRIBED TO US, WHICH IS WATCHING ANYWHERE FROM FOUR TO SIX

13   INMATES THAT ARE IN THE FACILITY AT THE TIME, CHECKING INMATES

14   THAT ARE COMING IN THE DOOR, OBSERVING THE DOCTORS AND NURSES

15   ALL AT THE SAME TIME; IS THAT CORRECT?

16   **A.**  YES.

17   **Q.**  IS IT POSSIBLE FOR YOU TO WATCH EVERY ONE OF THE SECURITY

18   BOXES THAT HAVE EITHER NARCOTICS OR SHARP INSTRUMENTS AT THE

19   SAME TIME IF YOU'RE DOING YOUR JOB AND THE VARIOUS DUTIES THAT

20   YOU HAVE?

21   **A.**  NO.

22   **Q.**  YOU INDICATED THERE WAS AN INCREASE IN DOCTORS AND NURSES

23   SINCE THE RECEIVER BECAME INVOLVED FOR THE TTA FACILITY; AM I

24   CORRECT?

25   **A.**  THE INCREASE OF THE NURSES AND DOCTORS WERE THE ONES THAT

1   THEY PUT IN OUR NURSING LINE ROOM AND THE DOCTORS' LINE ROOM.

2   **Q.**  OKAY.  SO THOSE ARE THE ONES THAT WERE DEALING WITH INMATES

3   COMING IN WITH APPOINTMENTS FOR BUILDINGS TWO AND THREE, THEN,

4   CORRECT?

5   **A.**  CORRECT.

6   **Q.**  THERE WASN'T ANY INCREASE IN THE DOCTORS AND NURSES FOR THE

7   URGENT CARE FACILITY, WAS THERE?

8   **A.**  NOT ASSIGNED TO THE TTA, NO.

9   **Q.**  AND YOU WERE ALSO ASKED ABOUT ADDITIONAL SPACE BEING OF

10  ASSISTANCE TO YOU, OR YOU FELT ADDITIONAL SPACE WOULD BE HELPFUL

11  FOR WHAT HAS TO BE DONE AT THE TTA FACILITY, CORRECT?

12  **A.**  CORRECT.

13  **Q.**  DO YOU HAVE ANY IDEA WHERE THAT SPACE WOULD COME FROM?

14  **A.**  NO.

15  **Q.**  AND ISN'T IT TRUE THAT, IN FACT, THEY TOOK SPACE AWAY FROM

16  THE TTA FACILITY TO CREATE THE DOCTORS' AND THE NURSES' LINES

17  ROOMS?

18  **A.**  CORRECT.

19  **Q.**  NOW, WHEN YOU WERE --

20          **MR. HENDERSON:**  STRIKE THAT.

21          I THINK THAT'S ALL I HAVE, YOUR HONOR.

22          THANK YOU.

23          **MR. MITCHELL:**  BILL MITCHELL FOR DEFENDANT

24  INTERVENORS.

25                  **RECROSS-EXAMINATION**

1  **BY MR. MITCHELL:**

2  **Q.**  THE INSTRUMENTS, THE NEEDLES, THE THINGS THAT THE NURSES AND

3  THE DOCTORS USE, HAVE THEY REPORTED THAT INMATES HAVE TAKEN OR

4  THAT THEY ARE MISSING ANY OF THOSE ITEMS?

5  **A.**  ALL THE TIME.

6  **Q.**  THEY REPORT THEY ARE MISSING?

7  **A.**  ALL THE TIME.

8  **Q.**  NOTHING FURTHER.

9            **JUDGE HENDERSON:**  OKAY.

10           THANK YOU, MR. BENSON.  YOU'RE EXCUSED.

11           **THE WITNESS:**  THANK YOU.

12           **JUDGE KARLTON:**  MR. BIEN, YOU GOT UP TO DO SOMETHING,

13  I GATHER.

14           **MR. BIEN:**  YOUR HONOR, THERE ARE TWO MORE CCPOA

15  WITNESSES TOMORROW. PLAINTIFFS HAVE FINISHED OUR WITNESSES FOR

16  THIS PHASE.

17           WE WOULD LIKE TO SHOW THE COURT SOME OF THE PHOTOS

18  THAT WE HAVE OFFERED INTO EVIDENCE. WE BELIEVE THIS IS IMPORTANT

19  FOR THE COURT TO SEE, AS THEY SHOW CURRENT CONDITIONS.

20           AND WE'D ALSO LIKE TO SHOW SOME OF THE VIDEOS OF

21  GOVERNOR SCHWARZENEGGER AND OTHER DEFENDANTS INTERVENORS

22  SPEAKING ABOUT THE ISSUES GOING TO PHASE I.

23           IF THERE'S EXTRA TIME EITHER TODAY OR TOMORROW, WE

24  COULD DO THAT IN A PRETTY SHORT TIME. NO ARGUMENT.  JUST SHOW

25  WHAT IT IS, PLAY IT AND PROCEED LIKE THAT.

```
 1              IF WE HAD EXTRA TIME, I WAS JUST SUGGESTING TO THE

 2   COURT.

 3              JUDGE HENDERSON:  LET'S TALK ABOUT -- AND GET BACK TO

 4   THAT -- THE REST OF OUR SCHEDULE FOR PHASE I.

 5              WE HAVE TWO MORE CCPOA WITNESSES, AND I UNDERSTAND

 6   FROM YESTERDAY WE ANTICIPATE TWO DEFENSE WITNESSES TOMORROW.

 7              MR. MELLO:  CORRECT.

 8              JUDGE HENDERSON:  IS THAT CORRECT?

 9              MR. MELLO:  YES.

10              JUDGE HENDERSON:  OKAY.  AFTER THAT WHAT HAVE WE GOT

11   LEFT?

12              JUDGE REINHARDT:  HOW LONG IS YOUR SHOWING GOING TO

13   TAKE.

14              MR. BIEN:  I WOULD SAY 15 MINUTES.

15              JUDGE KARLTON:  1-5?

16              MR. BIEN:  1-5 MINUTES.

17              JUDGE HENDERSON:  OKAY.  WE CAN CERTAINLY DO THAT.

18              MR. MELLO:  JUST AS AN ASIDE, I DON'T BELIEVE THE

19   COURT HAS RULED UPON THE ADMISSIBILITY OF THOSE.  WE HAD

20   OBJECTIONS TO THOSE, NOT ONLY TO CUMULATIVE, BUT TO RELEVANCE.

21   AND I DON'T BELIEVE THE COURT HAS RULED ON THAT YET.

22              I UNDERSTAND YOU PRESERVED.

23              MR. BIEN:  WE UNDERSTAND, TOO.  AND I FORGOT ONE

24   OTHER THING.  THERE'S ALSO THREE CHARTS THAT WE HAD PREPARED

25   THAT DEFENDANTS HAVE RAISED VARIOUS OBJECTIONS TO, WHICH ARE
```

1  PRESERVED. ONE OF THEM IS AS TO HOW THEY WERE PREPARED AND THE

2  MANNER IN WHICH THEY ARE PREPARED.

3          AND, IF NECESSARY, WE'RE PREPARED TO BRING IN A

4  WITNESS FROM MY OFFICE WHO COULD TESTIFY AS TO WHICH DEFENDANT

5  DOCUMENTS THEY LOOKED AT AND PUT THEM ON THE CHART.

6          BUT WE WOULD LIKE TO SHOW THESE THREE CHARTS.  THE

7  COURT SAW THEM BRIEFLY DURING DR. HANEY'S TESTIMONY.  AND

8  THERE'S ONE OTHER ONE.  BUT THEN, IF THERE'S AN ISSUE WE CAN

9  BRING A WITNESS IN, IF IT'S -- IF THERE'S NOT AN ISSUE, MAYBE

10 WE'RE FINISHED.

11         **MR. MELLO:**  I JUST WANT TO THE ASK A POINT OF

12 CLARIFICATION.  THE COURT HAS NOT RULED ON --

13         **JUDGE KARLTON:**  PLEASE GO TO THE PODIUM.

14         **MR. MELLO:**  I'M SORRY. PAUL MELLO FOR DEFENDANTS.

15         THE COURT HAS NOT RULED ON ANY OF THESE ITEMS OR THE

16 ADMISSIBILITY OF THEM.  AND I JUST WANT TO ASK A QUESTION FOR

17 CLARIFICATION.

18         IS THIS THE WAY IT'S GOING TO WORK?  WE'RE GOING TO

19 ALL OF A SUDDEN DO PRESENTATIONS OF OUR EXHIBITS AT SOME POINT

20 DURING TRIAL?

21         IT SEEMS STRANGE, TO SAY THE LEAST. AND ESPECIALLY IN

22 LIGHT OF THE FACT THERE HAS BEEN NO RULING WITH RESPECT TO ANY

23 OF THOSE ISSUES. AND I BELIEVE THAT -- WELL, I'LL LEAVE IT AT

24 THAT, YOUR HONOR.

25         **JUDGE KARLTON:**  WELL, LET'S TAKE AN EXAMPLE. THE

1   CHARTS THAT THE PLAINTIFFS WANTED TO SHOW THE COURT THAT WERE

2   SHOWN APPARENTLY DURING DR. HANEY'S, YOU PERSIST IN FOUNDATIONAL

3   OBJECTIONS?

4           IT'S ALL RIGHT IF YOU DO.

5           **MR. MELLO:**  I HAVE TO ADMIT, I MEAN, THEY HAVE MANY,

6   MANY EXHIBITS, AND I DON'T KNOW WHAT OUR SPECIFIC OBJECTIONS

7   WERE TO THOSE EXHIBITS, I HAVE TO ADMIT.

8           **JUDGE KARLTON:**  WELL, THE POINT IS THAT IF IT IS A

9   PROBLEM THAT THEY HAVE GOT TO BRING WITNESSES IN TO ESTABLISH

10  THE FOUNDATION, THEN THEY HAVE GOT TO DO IT.

11          IF YOU ARE WAIVING THOSE BUT RESERVING THE OTHER

12  OBJECTIONS YOU HAVE, THAT'S ANOTHER STORY.

13          **MR. MELLO:**  CAN WE SPEAK ABOUT IT IN THE MORNING,

14  YOUR HONOR?

15          **JUDGE KARLTON:**  SURE.

16          **MR. MELLO:**  ABOUT THOSE THREE CHARTS AS TO WHETHER

17  THERE'S A FOUNDATIONAL DISPUTE OR NOT?

18          IT SEEMS TO ME THERE ARE THREE CHARTS AT ISSUE.  I

19  THINK THERE ARE MORE ISSUES.

20          AND I THINK, IN ADDITION, THEY SHOULD PROBABLY HAVE

21  TO IDENTIFY FOR US WHICH VIDEOS AND PICTURES THEY WOULD LIKE TO

22  SHOW, BECAUSE THE COURT HASN'T RULED ON THAT, AS WELL.

23          AND I DON'T MIND MEETING AND CONFERRING AND TRYING TO

24  BE SEMIREASONABLE ON THE ISSUES.

25          **JUDGE REINHARDT:**  HOW ABOUT BEING REALLY REASONABLE?

1          **MR. MELLO:**  I'M KIDDING.  I WAS TRYING TO BE -- IT'S

2  BEEN A LONG DAY.  SO I WILL TRY TO BE REASONABLE AND TAKE IT

3  INTO CONSIDERATION, BUT DO I BELIEVE THAT -- WELL, THANK YOU.

4          **JUDGE HENDERSON:**  OKAY. THE COURT --

5          **JUDGE REINHARDT:**  YOU'RE GOING TO MEET AND DISCUSS

6  ALL OF THOSE.

7          **JUDGE HENDERSON:**  YES.  BUT WE STILL WOULD LIKE AN

8  IDEA -- WE NEED TO SCHEDULE -- HOW MUCH -- HOW MANY MORE

9  WITNESSES WE'RE GOING TO HAVE FOR PHASE I.

10          WE HAVE TWO FROM CCPOA.  WE HAVE TWO FROM DEFENDANT

11  TOMORROW. AND I ASSUME WE WILL RECESS TOMORROW AFTER THAT.

12          WHAT HAVE WE GOT AFTER THAT?

13          **MR. MELLO:**  I BELIEVE THAT WE THEN HAVE TWO MORE

14  NONEXPERT WITNESSES, PERCIPIENT WITNESSES.  AND THEN, THE TWO

15  EXPERTS THAT WE STILL HAVEN'T FIGURED OUT HOW WE'RE GOING TO

16  DEAL WITH THEM, BY VIDEO OR COMING BACK ANOTHER DAY.

17          AND THEN, I BELIEVE PLAINTIFFS INDICATED THEY HAD A

18  REBUTTAL EXPERT THAT WAS ALSO A SCHEDULING ISSUE, DR. REINGOLD.

19  AND I DON'T KNOW IF ANY OF THE INTERVENORS -- I BELIEVE THAT

20  THERE WAS A POSSIBILITY THAT SENATOR RUNNER WAS TESTIFYING, BUT

21  I DON'T KNOW THE STATUS OF THAT.

22          AND YOU WANT TO KNOW THE TIME, RIGHT?

23          **JUDGE REINHARDT:**  FIRST, AFTER THE TWO TOMORROW, THEN

24  YOU HAVE TWO OTHER EXPERTS?

25          **MR. MELLO:**  NO.  SO THERE ARE TWO CCPOA WITNESSES

1  TOMORROW, AND TWO WITNESSES BY US.  AND THEN, I BELIEVE WE HAVE

2  TWO PERCIPIENT WITNESSES.  AND THEN, WE HAVE TWO EXPERT

3  WITNESSES.

4          HAVE I MISSED ANYONE?

5          **JUDGE HENDERSON:**  OKAY.  SO THAT'S FOUR PLUS.

6          **JUDGE REINHARDT:**  AND BOTH OF THOSE TWO EXPERTS MAY

7  APPEAR BY VIDEO OR ONLY ONE?

8          **MR. MELLO:**  BOTH.  MAYBE ALL THREE, I THINK,

9  INCLUDING THE REBUTTAL EXPERT.

10          **JUDGE REINHARDT:**  AND THAT YOU HAVEN'T WORKED IT OUT

11  YET?

12          **MR. MELLO:**  NO.

13          **MR. BIEN:**  YOUR HONOR, WE ARE WILLING TO FACILITATE

14  DEFENDANTS AND DO THEIR TWO EXPERTS BY VIDEO TESTIMONY, IF THEY

15  SET UP THE ELECTRONICS.  I DON'T KNOW HOW TO DO THAT.

16          BUT WE'D BE GLAD TO ACCOMMODATE THE COURT AND THEM BY

17  DOING IT.

18          **JUDGE REINHARDT:**  IS THAT TRUE OF YOUR EXPERT, TOO?

19          **MR. MELLO:**  NO, THIS IS OURS.

20          **JUDGE REINHARDT:**  NO, YOURS I UNDERSTAND.

21          **MR. SPECTER:**  OUR REBUTTAL EXPERT, I WAS -- HE

22  DOESN'T KNOW THIS YET, BUT I WAS GOING TO TALK TO HIM LATER AND

23  SUGGEST THAT OUR REBUTTAL EXPERT COME IN BY HIS REPORT AND THEIR

24  DEPO DESIGNATIONS.  THEY CROSSED HIM ON THE DEPOSITION.  I DON'T

25  KNOW WHETHER THAT'S ACCEPTABLE TO THEM OR NOT.

1          **MR. MELLO:**  I'D BE GLAD TO TALK TO HIM ABOUT THAT.  I

2    THINK IT MAY BE, BUT I WOULD BE GLAD TO TALK TO THEM.

3          ONE LAST POINT WE DID RAISE WAS WE DID HAVE THREE

4    WITNESSES THAT WE WERE PUTTING IN BY WAY OF DEPOSITION

5    TESTIMONY.  AND WE DID ASK THAT IT BE READ INTO THE RECORD.  I

6    ASSUME THE COURT IS GOING TO RULE THAT THAT'S NOT GOING TO

7    HAPPEN, BUT HAVE YOU DECIDED, YOUR HONORS?

8          **JUDGE HENDERSON:**  WE HAVE NOT.

9          **MR. MELLO:**  OKAY. THANK YOU.  BECAUSE THAT WOULD --

10   THOSE WOULD BE OUR FIRST THREE FOLKS AFTER CCPOA COMPLETES.

11         **MR. SPECTER:**  AND WE HAVE NO OBJECTION.  IN FACT, WE

12   WOULD RATHER THAT TIME BE SPENT NOT READING THE DEPO EXCERPTS

13   INTO THE RECORD AND JUST SUBMIT THEM.  THAT WOULD BE FINE WITH

14   US.

15         **JUDGE HENDERSON:**  OKAY. TRYING TO --

16         **JUDGE KARLTON:**  WAIT.  I WANT TO KNOW ABOUT -- NO,

17   NOT FROM YOU -- SENATOR RUNNER IS OR IS NOT GOING TO BE

18   TESTIFYING IN PHASE I?

19         **MR. KAUFHOLD:**  HE WILL NOT BE TESTIFYING IN PHASE I,

20   YOUR HONOR.

21         **JUDGE KARLTON:**  THANK YOU.

22         AND AS FAR AS YOU KNOW, GENTLEMEN, ARE ANY OF THE

23   INTERVENORS PROPOSING EVIDENCE AS TO PHASE I?

24         **MR. MITCHELL:**  NO, YOUR HONOR.

25         **JUDGE KARLTON:**  OKAY.

1          **JUDGE HENDERSON:**  OKAY. LOOKING AT THE -- BEYOND

2   TOMORROW, THE TWO PERCIPIENT WITNESSES, THE TWO EXPERTS,

3   PLAINTIFFS' REBUTTAL, IS THERE ANY REASON WE CAN'T DO THOSE --

4   WE'RE DARK NEXT WEEK, AS YOU KNOW, ON THE 25TH AND 26TH --

5   TUESDAY AND WEDNESDAY OF NOVEMBER?

6          **MR. SPECTER:**  YOU WANT TO DO INSTEAD OF DECEMBER --

7          **JUDGE KARLTON:**  RIGHT.  IS THERE ANY REASON?  WE

8   ASSUMED DECEMBER BECAUSE YOU GUYS SAID IT WAS GOING TO TAKE

9   TIME.  BUT IT APPEARS NOW THAT WE CAN GET TO THEM AT THE END OF

10  NOVEMBER.

11         **MR. SPECTER:**  YOU MEAN, NEXT WEEK?

12         **JUDGE REINHARDT:**  THE WEEK AFTER NEXT.

13         **JUDGE KARLTON:**  THE WEEK AFTER NEXT.

14         **JUDGE HENDERSON:**  WE'RE DARK NEXT WEEK.

15         **MR. SPECTER:**  THAT'S THE 25TH.

16         **MR. MELLO:**  WE'RE BACK TO THE 2ND.

17         **MR. BIEN:**  YOU MEAN, DECEMBER 2ND.

18         **MR. MELLO:**  YES, YOU MEAN THE 2ND AND 3RD?

19         **JUDGE HENDERSON:**  OH, I LOOKED -- I DIDN'T TURN

20  ENOUGH.  YES, I'M SORRY.

21         **MR. MELLO:**  SO ASSUMING AVAILABILITY OF WITNESSES, I

22  SEE NO REASON WHY WE CAN'T BE DONE BY THE 3RD.

23         **JUDGE HENDERSON:**  OKAY. AND I THINK -- WE CLEARLY

24  HAVEN'T RULED YET -- BUT IN TERMS OF SCHEDULING, WE SHOULD BE

25  READY AFTER THAT -- AND WE WILL TALK ABOUT IT FURTHER -- TO GO

1  INTO PHASE II.

2          **JUDGE KARLTON:**  BEFORE YOU DO THAT, I HAVE TO ASK

3  PLAINTIFFS AND CCPOA:  ARE YOU PUTTING ON ANY EVIDENCE AS TO

4  PHASE II, OR ARE YOU JUST WAITING TO REBUT WHATEVER THE

5  DEFENDANT INTERVENORS PUT ON AS TO PHASE II?

6          **MS. LEONARD:**  YOUR HONOR, CCOPA DOES NOT PLAN TO

7  INTRODUCE EVIDENCE.

8          SORRY.  CCOPA DOES NOT PLAN TO INTRODUCE EVIDENCE IN

9  PHASE II.

10          **JUDGE KARLTON:**  OKAY.

11          **MS. LEONARD:**  WE RESERVE OUR RIGHT TO CROSS.

12          **MR. BIEN:**  WE DO.  WE HAVE EVIDENCE IN PHASE II.

13          **JUDGE KARLTON:**  OKAY.

14          **MR. KAUFHOLD:**  AND, YOUR HONOR, LEGISLATIVE

15  INTERVENORS AND OTHER INTERVENORS, AS WELL, WILL BE PRESENTING

16  PHASE II.

17          **JUDGE KARLTON:**  OH, I KNOW THAT.  I UNDERSTAND THAT

18  ENTIRELY.  IT'S A QUESTION OF WHO GOES FIRST AND WHAT DO WE DO.

19          LOOK, LET ME TELL YOU WHAT WE'RE WORRYING ABOUT, WHAT

20  EVERYBODY OUGHT TO KNOW.  AND THIS ISN'T MAGIC.  WE HAVEN'T

21  RULED, BUT WE WANT TO KEEP GOING.

22          SO WHAT WE WANTED TO TELL THE PLAINTIFFS IS YOU'RE

23  PUTTING ON EVIDENCE AS TO PHASE II.  YOU GOT TO BE READY TO  PUT

24  ON THE EVIDENCE RIGHT AFTER EVERYBODY COMPLETES PHASE I. YOU GOT

25  TO BE READY.

```
 1            I'M NOT TELLING -- YOU KNOW, YOU MAY NOT GET THERE,

 2   BUT YOU GOT TO HAVE WITNESSES HERE, ALL RIGHT?

 3            MR. BIEN:  AT THE END OF THAT WEEK.

 4            JUDGE KARLTON:  WHENEVER IT IS.

 5            MR. SPECTER:  NO, THE 4TH.

 6            MR. BIEN:  RIGHT.

 7            JUDGE KARLTON:  WHENEVER IT IS.

 8            MR. MELLO:  DOES THE COURTS -- I BELIEVE JUDGE

 9   REINHARDT AND I HAD A DISCUSSION ON THIS -- DOES THE COURT

10   ENVISION CLOSING BRIEFS OR CLOSING ARGUMENTS ON PHASE I?

11            JUDGE KARLTON:  YOU KNOW, WE'VE TALKED ABOUT THAT A

12   LOT. WHAT WE THINK WE WANT TO DO -- BUT ACTUALLY, CAN WE TAKE 10

13   MINUTES TO TALK ABOUT THIS?  MIGHT BE SENSIBLE.

14            WE INFORMALLY -- INFORMALLY WE'RE TALKING ABOUT IT --

15   AND THOUGHT THAT THE BEST THING TO DO IF IT'S AT THE END OF

16   PHASE I, YES. BUT, OTHERWISE, KICK IT ALL TO THE END.  IF WE'RE

17   GOING TO HAVE PHASE II, WAIT UNTIL THE END TO HAVE FINDINGS,

18   PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW.

19            BRIEFING, WHAT DID WE WANT TO DO?

20            JUDGE REINHARDT:  CLOSING ARGUMENT.

21            JUDGE KARLTON:  YES.  WE WANTED CLOSING ARGUMENTS,

22   BUT BRIEFS WAITING UNTIL THE END.

23            MR. MELLO:  AND I UNDERSTAND THE COURT'S POSITION.

24   THE DEFENDANTS -- I DON'T KNOW IF I SPEAK FOR INTERVENORS --

25   WOULD LIKE TO HAVE BOTH ARGUMENT AND BRIEFING AT THE END OF
```

1  PHASE I.  THAT'S OUR PREFERENCE, BUT I UNDERSTAND YOU'RE THE

2  COURT.

3            **JUDGE KARLTON:**  WELL, YES.  BUT, YOU KNOW, THAT MAKES

4  A DIFFERENCE.

5            **MR. SPECTER:**  WE WOULD BE WILLING TO WAIVE THE

6  BRIEFING.  BUT IF YOU'RE GOING TO HAVE BRIEFING, WE WOULD

7  SUGGEST IT BE DONE CONCURRENT WITH THE CLOSE OF THE EVIDENCE.

8            **JUDGE KARLTON:**  WHAT WE WERE THINKING OF DOING -- I

9  MEAN, LET'S BE ALL CANDID ABOUT IT -- WAS RULING WITHOUT WRITING

10 AN OPINION SO THAT WE COULD GET ON TO PHASE II, IF THAT BECOMES

11 NECESSARY.  AND THEN, AWAITING THE COMPLETION OF THE TESTIMONY

12 TO GET BRIEFING AND ARGUMENT AS TO THE ENTIRETY OF THE CASE.

13           WELL, YOU KNOW, WE WILL DO PHASE I ORAL ARGUMENT, AND

14 THEN AFTER THE COMPLETION OF PHASE II, DO BRIEFING AND PROPOSED

15 FINDINGS OF FACT.

16           IS THAT NOT YOUR PREFERENCE, SIR?

17           **MR. MELLO:**  THAT IS DEFINITELY NOT OUR PREFERENCE.

18 WE WOULD LIKE A COMPLETED RECORD. WE WOULD LIKE A WRITTEN ORDER

19 AT THE END OF PHASE I.

20           **MR. MITCHELL:**  JUST FOR SCHEDULING PURPOSES, BILL

21 MITCHELL FOR THE DEFENDANT INTERVENORS.  PREVIOUSLY THE COURT

22 HAD ANNOUNCED WE WERE GOING TO BE DARK FOR THE DAYS OF THE 16TH

23 AND 17TH OF DECEMBER.

24           **JUDGE KARLTON:**  RIGHT.

25           **MR. MITCHELL:**  DOES THAT STILL HOLD TRUE?  SHOULD WE

1  HAVE WITNESSES AVAILABLE OR LINED UP FOR THE 18TH AND 19TH?

2            **JUDGE HENDERSON:**  YOU SHOULD.

3            **MR. MITCHELL:**  SHOULD. WHAT ABOUT THE FOLLOWING WEEK,

4  THE WEEK OF THE HOLIDAYS?

5            **JUDGE HENDERSON:**  WELL, WE'VE ONLY SCHEDULED UP TO

6  THE 19TH.

7            **MR. MITCHELL:**  UP TO THE 19TH, BUT WHAT ABOUT

8  THEREAFTER?

9            **JUDGE REINHARDT:**  LET'S HOPE WE'RE DONE.

10           **JUDGE HENDERSON:**  IF WE'RE NOT DONE, WE'LL HAVE TO

11 FIGURE IT OUT.  WE WILL KNOW AS WE APPROACH THAT.

12           **JUDGE KARLTON:**  MAY I INQUIRE OF MR. MELLO?  I WOULD

13 HAVE THOUGHT THAT YOU ALL WOULD HAVE PREFERRED TO DO WHAT WE

14 THOUGHT WAS THE SENSIBLE THING TO DO.

15           WHY DO YOU WANT A WRITTEN ORDER?  BECAUSE IT'S GOING

16 TO TAKE -- IT'S GOING TAKE A WEEK OR TWO OF HARD AND INTENSIVE

17 -- A WEEK OR TWO, GOD WILLING AND THE RIVER DON'T RISE -- TO

18 WRITE A FORMAL OPINION.

19           **MR. MELLO:**  I THINK FOR THE COMPLETENESS OF THE

20 RECORD -- THIS IS A VERY IMPORTANT CASE.  THE COURT BIFURCATED

21 THIS TRIAL INTO TWO PROCEEDINGS.  IT WAS GOING TO DECIDE IN

22 PHASE I WHAT THE PHASE I ISSUES ARE.  AND I THINK IN LIGHT OF

23 THE MAGNITUDE OF THE CASE, AND EVEN THOUGH WE'VE BEEN QUICK THE

24 MAGNITUDE OF THE EVIDENCE THAT THIS COURT HAS SEEN AND WILL SEE

25 ON PHASE I, THAT WE BELIEVE THAT IT'S APPROPRIATE TO ARGUE IT,

1  BRIEF IT AND RECEIVE A FORMAL ORDER BEFORE WE MOVE TO PHASE II.

2          THAT'S OUR POSITION, AND I UNDERSTAND --

3          **JUDGE HENDERSON:**  JUST FOR GUIDANCE OR FOR PHASE II

4  OR WHAT?

5          **MR. MELLO:**  FOR MANY REASONS, YOUR HONOR.  I MEAN, IF

6  WE'RE GOING TO BE FRANK, I MEAN WE NEED TO UNDERSTAND THE

7  POSITION OF THE CASE BEFORE WE MOVE INTO PHASE II.

8          **JUDGE REINHARDT:**  I DON'T SEE THAT THERE'S MUCH TO

9  UNDERSTAND --

10          **MR. MELLO:**  UNDERSTOOD.

11          **JUDGE REINHARDT:**  -- PHASE I.  EITHER THEY HAVE

12  ESTABLISHED WHAT THE PRIMARY CAUSE IS, OR THEY HAVEN'T.

13          **MR. MELLO:**  THAT'S FINE.  I'M JUST TRYING TO PRESERVE

14  MY RECORD.  I UNDERSTAND.

15          **JUDGE REINHARDT:**  NO.  NO.

16          **JUDGE KARLTON:**  BELIEVE IT OR NOT, MR. MELLO, THIS IS

17  NOT A RECORD QUESTION.  THIS IS REALLY TRYING TO UNDERSTAND WHAT

18  THE SENSIBLE THING TO DO IS.

19          I AGREE WITH YOU -- I'M SURE MY COLLEAGUES DO -- THIS

20  IS A VERY IMPORTANT CASE AND IT'S A DIFFICULT CASE.  AND IT'S A

21  VERY INVOLVED CASE.

22          AND THAT IS A MAJOR REASON THAT WE THOUGHT THAT WE

23  WANTED TO GIVE OUR -- THAT WE WANTED TO GIVE OURSELVES AN

24  OPPORTUNITY, APPROPRIATE OPPORTUNITY TO FULLY THINK OUR WAY

25  THROUGH ALL OF THE ISSUES. AND, YOU KNOW, IF WE WERE TO TAKE

```
 1    TIME OFF AFTER THE CLOSE OF PHASE I TO WRITE AN OPINION, IT'S

 2    GOOD FOR A MONTH -- GOD WILLING AND THE RIVER DON'T RISE -- IT'S

 3    GOOD FOR A MONTH.

 4              WELL, I THINK YOU UNDERSTAND MY CONCERN.

 5         MR. MELLO:  I TOTALLY UNDERSTAND WHAT THE COURT'S

 6    POSITION IS.  BUT IT'S OUR POSITION THAT THE MAGNITUDE OF THE

 7    CASE DESERVES BRIEFING AFTERWARDS AND AN ORAL ORDER.  AND THAT'S

 8    OUR POSITION, AND I UNDERSTAND YOU FOLKS MAY HAVE A DIFFERENT --

 9    YOUR HONOR'S MAY HAVE A DIFFERENT VIEW.

10              THANK YOU.

11         JUDGE KARLTON:  ALL RIGHT.

12         MR. BIEN:  I'LL JUST SAY THAT THE COURT IN ITS

13    DISCRETION ORDERED THE BIFURCATION IN RESPONSE TO THE PARTIES'

14    ESTIMATES.

15         JUDGE KARLTON:  SCARING THE HECK OUT OF US.

16         MR. BIEN:  YES.  ESTIMATES FOR TIME, WHICH TURNED

17    OUT TO BE INACCURATE.  AND YOU SET ASIDE YOUR VERY VALUABLE

18    TIME, AS DID WE AND OUR WITNESSES TO DO THIS TRIAL BEFORE

19    DECEMBER 19.  AND WE WOULD APPRECIATE THE OPPORTUNITY TO DO IT

20    RATHER THAN TRY TO RESCHEDULE IT.

21              AND PLUS, OF COURSE, THIS IS AN INJUNCTIVE RELIEF

22    MATTER.  AND WE, AS QUICKLY AS CAN BE DONE IN A FAIR AND

23    APPROPRIATE WAY, WOULD LIKE TO MOVE FORWARD.

24         JUDGE REINHARDT:  WE DID NOT ORIGINALLY CONTEMPLATE

25    THAT THERE WAS ANY NEED TO DECIDE PHASE I BEFORE PHASE II.  WE
```

1   HAD ORIGINALLY SCHEDULED THIS FOR JUST TO PROCEED STRAIGHT

2   THROUGH.  IT WAS ONLY THE NUMBER OF WITNESSES THAT CAUSED US TO

3   SEPARATE IT FOR CONVENIENCE.

4           YOU KNOW, I DON'T THINK IT'S EVEN REALLY NECESSARY TO

5   MAKE AN ORAL RULING ON PHASE I.  BUT I THINK FOR THE CONVENIENCE

6   OF THE COURT AND OUR OWN, IF WE'RE GOING TO CUT IT OFF AT PHASE

7   I, WE OUGHT TO DO IT, INSTEAD OF WASTING ANYBODY'S TIME ON PHASE

8   II.

9           ALTHOUGH, WE WOULD HAVE GONE STRAIGHT THROUGH HAD IT

10  NOT BEEN FOR THE NUMEROUS WITNESSES YOU ALL TOLD US WE HAD TO

11  HEAR.

12          BUT I THINK OUR PRESENT PLAN NOW IS THAT EVERYBODY'S

13  CONVENIENCE TO, WHEN IT'S OVER, HEAR ARGUMENTS.  AND IF YOU, YOU

14  KNOW, COULD GET A BRIEF IN AT THE SAME TIME, FINE.

15          **JUDGE KARLTON:**  DON'T EVEN --

16          **JUDGE REINHARDT:**  BUT FOR A TENTATIVE RULING AT LEAST

17  ORALLY AS TO WHAT WE THINK MAY NOT ULTIMATELY BE OUR RULING. BUT

18  IT'S JUST FOR CONVENIENCE TO TRY TO SAVE EVERYBODY'S TIME.

19          **JUDGE KARLTON:**  I MEAN, IT REALLY IS -- I MEAN, I

20  KNOW NOBODY OVER THERE BELIEVES IT -- WE'RE TALKING ABOUT A

21  TENTATIVE RULING SO PEOPLE GET THE FEEL FOR WHERE THE CASE

22  PROBABLY GOES.

23          BUT, ULTIMATELY, THE FINAL RULING WILL DEPEND UPON

24  THE BRIEFING OF THE PARTIES AND ARGUMENT AT THE END.  AND WHEN

25  WE SIT DOWN TO WRITE -- AND WHO KNOWS WHEN WE SIT DOWN TO WRITE

1  WE MAY FIND THAT THE TENTATIVE OPINION DOESN'T LAST.

2          **JUDGE REINHARDT:**  AND, ALSO, I'M NOT SURE YOU'VE

3  ASKED -- I'M NOT SURE IT BREAKS THAT EASILY IN THE PHASE I TO

4  PHASE II.

5          **JUDGE KARLTON:**  THAT'S TRUE, TOO.

6          **JUDGE REINHARDT:**  YOU'VE GOT THE MIDDLE PART OF

7  ALTERNATIVE REMEDIES, WHICH WOULD BE IN PHASE I, COULD BE IN

8  PHASE II.

9          I THINK WE ORIGINALLY HAD IT IN PHASE I.

10         **MR. MELLO:**  ORIGINALLY, YES.

11         **JUDGE REINHARDT:**  AND MOVED TO PHASE II.  SO IT'S NOT

12 SO CLEAR, BUT I THINK IT'S WORTHWHILE TRYING TO GIVE A TENTATIVE

13 RULING AFTER WE HEAR ALL THE THINGS WE'VE NOW --

14         **MR. MELLO:**  JUST ONE LAST POINT.  AND THAT IS I DO

15 KNOW THAT WE CALLED SOME OF OUR WITNESSES OFF.  AND I DON'T KNOW

16 WHAT HAPPENED WITH THEIR SCHEDULES IN LIGHT OF THAT FACT.

17         SO I JUST DON'T KNOW ABOUT SEVERAL OF MY EXPERTS.  I

18 DON'T KNOW ABOUT SEVERAL OF MY WITNESSES WHO WERE NOW -- WILL

19 COME IN IN PHASE II, IF THERE IS A PHASE II.

20         AND THAT'S JUST TO BE STRAIGHT WITH YOU, BECAUSE WE

21 DID CALL THEM OFF, AND WE HAVE SEVERAL FROM OTHER PLACES, ALL

22 HAVE BUSY SCHEDULES.

23         **JUDGE KARLTON:**  WE WILL HAVE TO LIVE OUR WAY THROUGH

24 THAT, AS WELL.

25         **JUDGE HENDERSON:**  NOT TO DO TIT FOR TAT FROM THE

1   COURT, BUT A VERY SIGNIFICANT PROBLEM -- THIS IS UNUSUAL.

2           **MR. MELLO:**  RIGHT.

3           **JUDGE HENDERSON:**  WE HAVE A BUSY NINTH CIRCUIT JUDGE

4   WHO HAS CARVED OUT TIME, AND HE'S GOT A SCHEDULE.

5           **MR. MELLO:**  UNDERSTOOD.

6           **JUDGE HENDERSON:**  HE'S GOT EXPECTATIONS TO GET BACK

7   TO PASADENA, AND THAT IS PART OF WHAT WE'RE WEIGHING.

8           **JUDGE REINHARDT:**  I CAN DO WITHOUT THAT.

9           **JUDGE HENDERSON:**  OKAY.

10          **JUDGE KARLTON:**  AND, YOU KNOW, I WANT TO REMIND YOU

11  PEOPLE THAT I CARRY THE HIGHEST LOAD OF DISTRICT JUDGES IN THE

12  UNITED STATES OF AMERICA.  EVERY DAY THAT I'M GONE, OTHER

13  PEOPLE'S RIGHTS ARE NOT BEING ADJUDICATED.  NOT TO SAY -- THIS

14  IS A TERRIFICALLY IMPORTANT CASE, AND IT DESERVES OUR FULL

15  ATTENTION.

16          BUT YOU HAVE TO UNDERSTAND IF YOU START PUTTING IT

17  ALL TOGETHER YOU SEE HOW DIFFICULT IT ALL IS FOR US.

18          ALL RIGHT. ENOUGH.

19          **JUDGE HENDERSON:**  OKAY.  WE WILL RESUME AT 9:15

20  TOMORROW MORNING.

21          **MR. MELLO:**  THANK YOU.

22          **MR. BIEN:**  YOUR HONOR, SHOULD WE LOOK AT THE PHOTOS

23  OR NOT, HAVE A BREAK?

24          **JUDGE HENDERSON:**  15 MINUTES.

25          **JUDGE REINHARDT:**  I THOUGHT YOU WERE GOING TO

```
 1   DISCUSS --

 2              MR. MELLO:  I THOUGHT WE WERE GOING TO TALK --

 3              MR. BIEN:  WELL --

 4              MR. MELLO:  I THOUGHT THEY WERE GOING TO SHOW US THE

 5   EXHIBITS AND WE WERE GOING TO TALK --

 6              MR. BIEN:  THE PHOTOS --

 7              JUDGE HENDERSON:  ARE THOSE AGREED?

 8              MR. MELLO:  NO.

 9              MR. SPECTER:  YOU HAVE TO LOOK AT THE EXHIBIT.  THEY

10   ARE VIDEOS.  YOU CAN LOOK AT THEM, AND THEN YOU'LL RULE ON THEIR

11   ADMISSIBILITY.  YOU WON'T BE ABLE TO RULE ON THEM BEFORE YOU SEE

12   THEM, ANYWAY.

13              MR. MELLO:  THE EXACT OPPOSITE WAS DISCUSSED

14   MOVEMENTS AGO.

15              JUDGE HENDERSON:  THAT'S WHAT I THOUGHT, YES.

16              JUDGE REINHARDT:  WELL, WE'D LIKE TO SEE THE

17   GOVERNOR. IT'S ALWAYS ENTERTAINING.

18              JUDGE KARLTON:  I'D LIKE YOU GUYS TO TRY TO WORK IT

19   OUT, MEANING --

20              MR. SPECTER:  THEY ARE NEVER GOING TO AGREE.

21              JUDGE KARLTON:  WHAT?

22              MR. SPECTER:  THEY ARE NEVER GOING TO AGREE TO IT.

23              MR. BIEN:  THEY'VE HAD IT FOR TWO WEEKS.

24              JUDGE HENDERSON:  IF YOU CAN DO IT.  WE DON'T WANT TO

25   SIT UP HERE UNTIL 4:15.  BUT IF YOU THINK YOU CAN GET IT
```

1  TOGETHER.

2         **JUDGE KARLTON:**  HE SAYS THAT THEY ARE NEVER GOING TO

3  AGREE.

4         **MR. MELLO:**  HE SAID WE'RE NEVER GOING TO AGREE.

5         **JUDGE KARLTON:**  I SAID:

6              "HE SAID YOU WOULD NEVER AGREE."

7         **MR. MELLO:**  AND MR. SPECTER HAS NOT IDENTIFIED THE

8  EXHIBITS FOR US.

9         **MR. SPECTER:**  I HAVE A SUGGESTION.  WE HAVE UNTIL

10  4:30.

11         **JUDGE REINHARDT:**  LET'S TAKE A BREAK.

12         **MR. SPECTER:**  YOU CAN COME BACK IN 15 MINUTES.  WE

13  WILL GIVE YOU OUR ANSWER THEN.

14         **JUDGE REINHARDT:**  WE WILL BE BACK AT 4:15.

15         **MR. SPECTER:**  OKAY.  THANK YOU.

16              (THEREUPON, A RECESS WAS TAKEN.)

17         **JUDGE HENDERSON:**  OKAY.  WE ARE BACK IN SESSION.

18         **MR. BIEN:**  YOUR HONOR, I THINK THE DEFENDANTS ARE

19  STILL DECIDING.  WE'RE ALMOST THERE.

20              (PAUSE IN PROCEEDINGS.)

21         **MR. BIEN:**  I THINK, YOUR HONOR, THE DEFENDANTS'

22  POSITION IS THAT THEY'RE NOT WAIVING ANY OF THEIR OBJECTIONS.

23  I'LL LET YOU SAY YOUR POSITION.

24         **MS. JOHNSON:**  YOUR HONORS, WE ARE NOT CONSENTING TO

25  THIS.  WE ARE GOING TO STAND ON OUR OBJECTIONS.  OBVIOUSLY, IT

1  WILL BE UP TO THE COURT TO DECIDE WHAT THE COURT WANTS TO DO.

2          **JUDGE HENDERSON:**  OKAY.  WE WILL LOOK AT IT ALL WHEN

3  WE GET A CHANCE TO THEN.  THAT'S THE WAY WE'LL DO IT.

4          **JUDGE KARLTON:**  GO AHEAD AND PLAY IT, AND WE'LL

5  DECIDE WHETHER WE ARE GOING TO PAY ANY ATTENTION TO IT WHEN WE

6  START RULING ON ALL THE OBJECTIONS.  YOU GUYS PUT A THOUSAND

7  OBJECTIONS, THOUSANDS OF OBJECTIONS.  SOMEBODY HAS TO SPEND TIME

8  TO GO THROUGH THEM.

9          **JUDGE HENDERSON:**  AND IN THAT VEIN, BEFORE WE START,

10 WE'RE MINDFUL OF MR. MELLO'S CONCERN ABOUT A LOT OF THE EXHIBITS

11 NOT BEING RULED UPON.  WE'LL START THIS PROCESS.  WE'RE GOING TO

12 CHANGE THE SCHEDULE FOR PRODUCING CD-ROMS SO THAT WE CAN BEGIN

13 THAT PROCESS.  YOU'RE TO BRING CD-ROMS FOR THE THREE MEMBERS OF

14 THE COURT TO TRIAL ON DECEMBER 2ND AND, AT THAT SAME TIME, YOU

15 ARE TO MAIL A COPY TO JUDGE KARLTON IN SACRAMENTO AND A COPY TO

16 JUDGE REINHARDT IN LOS ANGELES BY DECEMBER 2ND, ALSO.

17         **JUDGE KARLTON:**  YOU LEFT YOURSELF OUT.

18         **JUDGE HENDERSON:**  I'LL HAVE ONE HERE, BUT YOU GUYS

19 WILL BE AT BOTH PLACES.  YOU CAN WORK HERE AND BACK AT HOME.

20         **MS. LEONARD:**  YOUR HONOR, CCPOA DOES NOT HAVE FORMAL

21 EXHIBITS.  WE HAVE ONLY OUR TRIAL DECLARATIONS.  WOULD YOU LIKE

22 US TO PRESS CD COPIES OF THOSE TRIAL DECLARATIONS?

23         **JUDGE KARLTON:**  YES, IF THEY ARE BEING OBJECTED TO,

24 AND I GATHER THEY ARE.

25         **MS. LEONARD:**  YES, THEY ARE, AND WE SHALL.

1          **JUDGE KARLTON:**  GO AHEAD AND PLAY.

2          **MR. BIEN:**  YOUR HONOR, AS TO THE THREE CHARTS, WE ARE

3    GOING TO TRY TO WORK SOME MORE WITH THE DEFENDANTS.  WE ARE NOT

4    GOING TO SHOW YOU THOSE.  WE CAN RESOLVE THE CONFLICT ON THAT.

5          WE WOULD LIKE TO START WITH 336, PLEASE.

6              (PHOTOGRAPHS DISPLAYED.)

7          **MR. BIEN:**  EACH PICTURE STATES ON IT THE DATE AND

8    PLACE AND LOCATION.  THESE ARE -- ALL THE PICTURES WE ARE GOING

9    TO SHOW YOU TODAY WERE TAKEN ON THE PLAINTIFFS' EXPERT TOURS IN

10   JULY AND AUGUST OF 2008.

11         **MS. JOHNSON:**  COUNSEL, COULD YOU INDICATE WHERE THE

12   EXHIBIT NUMBER IS ON THIS?

13         **MR. BIEN:**  THE EXHIBIT NUMBER IS -- THIS IS 336,

14   WHICH IS A SERIES -- IT'S ON THE LEFT SIDE.  IT'S A SERIES OF

15   PHOTOS TAKEN AT SATF PRISON, A SUBSTANCE ABUSE TREATMENT

16   FACILITY, ON JULY 28TH, '08.

17         **JUDGE HENDERSON:**  AND THE OBJECTIONS TO THESE ARE AS

18   TO WHO TOOK IT AND WHAT DAY AND THAT KIND OF THING?

19         **MR. BIEN:**  THEY WERE TAKEN BY CDCR PHOTOGRAPHERS

20   ALONG ON THE TOUR.

21         **MS. JOHNSON:**  THE OBJECTIONS, I BELIEVE, FOR THE MOST

22   PART, WITHOUT LOOKING AT INDIVIDUAL OBJECTIONS, ARE GENERALLY TO

23   RELEVANCE AND CUMULATIVE NATURE.

24         **JUDGE HENDERSON:**  OKAY.

25         **JUDGE REINHARDT:**  WHETHER IT'S RELEVANT TO THE

1  QUESTION WHETHER THERE'S OVERCROWDING OR WHETHER --

2          **JUDGE KARLTON:**  AREN'T YOU EMBARRASSED TO SAY THAT?

3          **MR. MELLO:**  I'M SORRY?

4          **JUDGE KARLTON:**  NOTHING.  NOTHING.

5          **MS. JOHNSON:**  IF THE COURT WAS HONESTLY ASKING FOR AN

6  EXPLANATION OF OUR OBJECTION, I COULD OFFER IT.

7          **JUDGE REINHARDT:**  MAYBE AFTER WE SEE IT.

8                  (PHOTOGRAPHS DISPLAYED.)

9          **MR. BIEN:**  THIS IS THE FACILITY B YARD GYM.

10          THIS IS FACILITY E, BUILDING 4C.  THESE ARE BUNKS IN

11  THE DAYROOM OF THIS UNIT.

12          THIS IS FACILITY E, BUILDING 1, THE AD-SEG MENTAL

13  HEALTH CLINICIAN AREA.

14          THE NEXT GROUP OF PICTURES WAS TAKEN AT CCI, WHICH IS

15  KNOWN AS TEHACHAPI PRISON, ON JULY 29TH, 2008.  THE FIRST IS AT

16  THE RECEPTION CENTER YARD 3, CLINIC HOLDING CELLS.  THIS IS

17  FACILITY 4B GYM.  THIS IS AN INMATE IN AN OUTPATIENT HOUSING

18  UNIT CELL.

19          **JUDGE KARLTON:**  THERE'S NOBODY IN IT.

20          **MR. BIEN:**  THERE IS SOMEONE IN THERE ON THE MAT.

21          **JUDGE KARLTON:**  I CAN'T SEE IT.

22          **MR. BIEN:**  THIS IS A MENTAL HEALTH CLINICAL OFFICE

23  AND FACILITY FOR A-8.  THIS IS THE SAME OFFICE INTERIOR.  THIS

24  IS THE RECEPTION CENTER YARD 3, BUILDING 5.  THIS IS THE

25  RECEPTION CENTER HOLDING CELLS AND RECEPTION PROCESS.  THIS IS A

1    GYM IN THE RECEPTION CENTER YARD 3.  DR. HANEY ON THE LEFT SIDE

2    THERE.  THIS IS ANOTHER VIEW OF THE SAME RECEPTION CENTER, YARD

3    3 GYM.

4           WE'VE NOW MOVED TO SALINAS VALLEY STATE PRISON.  THIS

5    WAS A TOUR ALSO ON JULY 29TH, 2008.  THIS IS A HOLDING CELL IN

6    THE CTC.  THIS IS AGAIN, THIS IS OUTSIDE OF THE MHCB, ANOTHER

7    VIEW OF THE HOLDING CELL.  THESE ARE EXERCISE YARD CAGES OUTSIDE

8    THE ASU IN THE D YARD OF SALINAS VALLEY.

9           **JUDGE KARLTON:**  TELL ME WHAT AN ASU IS.

10          **MR. BIEN:**  I'M SORRY, YOUR HONORS.  IT'S

11   ADMINISTRATION SEGREGATION UNIT.  THESE ARE WALK ALONE

12   SEGREGATION YARDS.

13          THIS IS THE INTERIOR OF THE D YARD, BUILDING 5

14   TREATMENT SPACE.  THIS IS THE CONVERTED UNIT FOR DMH USE AT

15   SALINAS VALLEY.

16          THIS IS A PHOTO THAT I THINK DR. HANEY SHOWED DURING

17   MULE CREEK STATE PRISON.  THIS IS A CALLED A MHOHU CELL IN C-13

18   BUILDING.  "MHOHU" STANDS FOR MENTAL HEALTH OUTPATIENT HOUSING

19   UNIT.

20          **JUDGE HENDERSON:**  LET'S FOCUS ON THAT ONE.  WHY ISN'T

21   DEFENSE COUNSEL RIGHT?  IT IS CUMULATIVE.  WE'VE SEEN THIS.

22          **JUDGE KARLTON:**  IT'S THE SAME PHOTOGRAPH.

23          **MR. BIEN:**  YOU'RE RIGHT.

24          **JUDGE KARLTON:**  SO THE OBJECTION IS TO IT BEING

25   INTRODUCED, NOT THAT IT'S BEING SHOWN.  HOWEVER, COUNSEL, IF

1  WE'VE SEEN IT BEFORE, PLEASE DON'T SHOW IT AGAIN.

2            **MR. BIEN:**  WELL, OKAY.

3            SO FOR THE COURT'S REFERENCE, EXHIBITS 336 THROUGH

4  348 ARE ALL PHOTOS THAT ARE GATHERED -- AND THIS IS THE AREA OF

5  PLAINTIFF'S EXHIBIT, OR THEY ARE, WHERE YOU CAN REVIEW THEM.  WE

6  WILL REFER TO THEM IN OUR POST FINDINGS RATHER THAN DO THAT.

7            I GUESS WE WOULD NOW LIKE TO SHOW AP 357, PLEASE.

8            **JUDGE REINHARDT:**  BEFORE WE GET TO THAT, YOU ASKED

9  WHETHER -- YOU ASKED WHETHER WE WOULD LIKE TO HAVE AN

10 EXPLANATION OF YOUR OBJECTION.  IS IT ON RELEVANCE GROUNDS?  ARE

11 YOU OBJECTING, SAYING IT'S NOT RELEVANT TO THE QUESTION OF

12 OVERCROWDING OR WHETHER OVERCROWDING IS THE PRIMARY CAUSE?

13           **MS. JOHNSON:**  IT DEPENDS ON THE PHOTO, BUT IT COULD

14 BE ONE OR EITHER.  I DON'T THINK THAT -- I DON'T BELIEVE WE

15 THINK THAT SHOWING PHOTO AFTER PHOTO AFTER PHOTO OF TRIPLE BUNKS

16 ESTABLISHES ANYTHING.

17           **JUDGE REINHARDT:**  OVERCROWDING?

18           **MS. JOHNSON:**  WE ARE AWARE TRIPLE BUNKS EXIST.  I

19 DON'T THINK ANYONE IS NOT AWARE OF THAT.

20           **JUDGE REINHARDT:**  YOU ARE NOT STIPULATING TO

21 OVERCROWDING?

22           **MS. JOHNSON:**  ARE WE STIPULATING WE ARE OVERCROWDED?

23           **JUDGE REINHARDT:**  YES.

24           **MS. JOHNSON:**  I GUESS IT WOULD DEPEND ON THE

25 DEFINITION ONE WAS GOING TO USE FOR OVERCROWDED, BUT DO WE

1  ACKNOWLEDGE THAT TRIPLE BUNKS CAN EXIST?  YES.  SO THE PHOTOS --

2  I DON'T THINK IN THIS CASE THE PHOTO IS WORTH A THOUSAND WORDS.

3  IT'S A --

4         **JUDGE REINHARDT:**  IN A CRIMINAL CASE WHERE THERE'S NO

5  DISPUTE ABOUT THE FACTS THAT SOMEONE IS MURDERED, THE STATE IS

6  ALWAYS VERY ANXIOUS TO SHOW PICTURES OF THE BODY AND IN VARIOUS

7  POSITIONS, BLOODY PICTURES OF THE VICTIM.  NOBODY DISPUTES THERE

8  WAS A VICTIM.  SO I DON'T KNOW WHY HERE THE PICTURES OF THE

9  OVERCROWDING AREN'T RELEVANT TO THE QUESTION OF OVERCROWDING.

10        **MS. JOHNSON:**  I'M NOT SURE HOW TO ADDRESS WHAT

11  HAPPENS IN A CRIMINAL CASE.  THIS IS A CIVIL CASE.

12        **JUDGE REINHARDT:**  BUT INVOLVING PRISONERS, PEOPLE

13  THAT HAVE BEEN CONVICTED OF CRIMES.  IT'S ODD FOR ME TO HEAR THE

14  STATE SUDDENLY OBJECTING TO PICTURES THAT PROVE A POINT OR

15  DEMONSTRATE A POINT IN A CASE INVOLVING THE RIGHTS OF PRISONERS.

16        **MS. JOHNSON:**  I DON'T REALLY KNOW HOW -- THIS IS THIS

17  CASE.  IT'S NOT ANOTHER CASE.  THIS HAS TO DO WITH WHAT'S

18  RELEVANT IN THIS CASE AND WHAT'S CUMULATIVE IN THIS CASE, YOUR

19  HONOR, AND IT HAS NOTHING TO DO WITH CRIMINAL LAW.

20        **JUDGE KARLTON:**  JUST LET IT GO.

21        **MS. JOHNSON:**  THE POINT OF ALL THIS IS THAT THEY SHOW

22  TRIPLE BUNK SITUATION.  IT DOESN'T ESTABLISH ANYTHING ABOUT

23  WHETHER OVERCROWDING IS THE PRIMARY CAUSE OF THE ALLEGED

24  CONSTITUTIONAL VIOLATIONS OF MEDICAL OR MENTAL HEALTH CARE, AND

25  SHOWING PHOTO AFTER PHOTO AFTER PHOTO IS OBVIOUSLY CUMULATIVE.

1            **JUDGE REINHARDT:**  I DIDN'T ASK ABOUT CUMULATIVE.

2   THAT I UNDERSTAND.

3            **JUDGE KARLTON:**  OKAY.  THANK YOU.  GO AHEAD.

4            **MR. BIEN:**  THIS IS A SPEECH THAT YOU SAW JUST A SHORT

5   EXCERPT FROM.  WE ARE NOT DOING THE WHOLE SPEECH, BUT THIS IS

6   GOVERNOR SCHWARZENEGGER ON MARCH 6, 2007 AFTER HE TOURED A

7   FACILITY CALLED NORCO, WHICH IS A CCR FACILITY.

8                    (VIDEO PLAYED.)

9            **MR. BIEN:**  AGAIN, THIS IS NUMBER 373, PLEASE.  THIS

10  IS DOWNLOADED FROM THE CDCR WEBSITE.  IT'S A SPEECH AGAIN BY

11  GOVERNOR SCHWARZENEGGER GIVEN ON JUNE 6TH, '06.

12                    (VIDEO PLAYED.)

13           **MR. BIEN:**  THAT WAS MY FAULT AND NOT HIS.  WE SHOWED

14  YOU A SHORT EXCERPT FROM THIS IN THE OPENING.  THIS IS A LONGER

15  PIECE OF THIS FROM THE CDCR WEBSITE.  I APOLOGIZE.  THIS IS

16  PLAINTIFF'S 373.  GO AHEAD -- 363?  PLAINTIFFS' 363.

17           **MR. MELLO:**  OBJECTION.  HEARSAY TO ALL THAT, FOR THE

18  TRUTH OF THE MATTER ASSERTED.  I KNOW THE COURT PRESERVED THE

19  OBJECTION, BUT I FELT COMPELLED TO RAISE IT AGAIN.

20           **JUDGE HENDERSON:**  ACKNOWLEDGED.

21           **MR. BIEN:**  THE NEXT IS PLAINTIFF'S 373, GOVERNOR

22  SCHWARZENEGGER'S SPEECH OF JUNE 26, '06.

23                    (VIDEO PLAYED.)

24           **MR. BIEN:**  THE NEXT IS PLAINTIFFS' 383.  THIS IS A

25  SPEECH BY SENATOR GOGDILL, ALSO ON JUNE 26TH, '08.

1           **JUDGE REINHARDT:**  SENATOR WHO?

2           **MR. BIEN:**  HE IS AN INTERVENOR, ONE OF THE REPUBLICAN

3  INTERVENORS.

4           **JUDGE REINHARDT:**  SENATOR WHO?

5           **MR. BIEN:**  COGDILL, REPUBLICAN SENATOR.  HE'S ONE OF

6  THE --

7           **JUDGE REINHARDT:**  THAT'S FINE.

8                    (VIDEO PLAYED.)

9           **MR. BIEN:**  AND I MISSPOKE.  THAT WAS JUNE 26TH OF

10  2008.

11          MR. SPECTER HAS JUST EDITED DOWN THE PHOTOS TO JUST A

12  FEW MORE, AND THEN WE'D BE FINISHED.  IT'S WITHIN THE STUFF THAT

13  WE TOLD YOU.

14          THIS IS PART OF PLAINTIFFS' 339.  IT'S MULE CREEK

15  STATE PRISON AUGUST 1, 2008 TOUR, C YARD, BUILDING 12.  SHOWS AN

16  AD-SEG UNIT.  THESE ARE A GROUP OF TREATMENT MODULES FOR A GROUP

17  SESSION -- FOR GROUP THERAPY SESSION FOR MENTAL HEALTH.

18          THIS IS THE B YARD GYM DORM, MULE CREEK STATE PRISON.

19  THIS IS THE A YARD GYM DORM, ALSO MULE CREEK.

20          **JUDGE KARLTON:**  SIR, IF THE REST OF THESE PICTURES

21  ARE FURTHER DEMONSTRATIONS OF GYMNASIUMS BEING USED FOR SLEEPING

22  QUARTERS, ET CETERA, I THINK WE'VE GOT THE IDEA.  I CAN'T

23  IMAGINE WHY IT WOULD BE NECESSARY TO SEE --

24          **MR. SPECTER:**  TWO MORE THAT ARE NOT GYMNASIUMS.

25          **JUDGE KARLTON:**  ALL RIGHT.

```
1                    (PHOTOGRAPHS DISPLAYED.)

2         MR. BIEN:  THIS IS PLAINTIFFS' EXHIBIT 341.  THIS WAS

3   A TOUR OF WASCO STATE PRISON, AND THIS WAS A CELL WHERE SUICIDE

4   WATCH WAS PERFORMED IN FACILITY D, BUILDING 6A.  SO THERE'S BEEN

5   SOME CONVERSION IN THE CELL TO MAKE IT SAFER FOR SUICIDE SWATCH.

6         THIS IS A DIFFERENT KIND OF A DORM.  THERE ARE -- IF

7   YOU CAN SEE UP ON THE TWO TIERS AND UNDERNEATH THE TIER, THOSE

8   ARE DORM BEDS.  THIS IS FACILITY C 4A AT WASCO.  THAT'S AN

9   ENLARGEMENT.  JUST A DIFFERENT TYPE OF HOUSING.

10         THAT'S IT.  THANK YOU.

11         MR. MELLO:  CAN I JUST BRING UP ONE ITEM THAT

12   OCCURRED TO US DURING THE BREAK?

13         WITH RESPECT TO SCHEDULING PHASE TWO -- CAN YOU HEAR

14   ME?  WITH RESPECT TO SCHEDULING PHASE TWO, OBVIOUSLY, OUR CROSS

15   EXAMINATION OF THEIR PHASE ONE WITNESSES DID NOT GO INTO PHASE

16   TWO ISSUES.  SO I ASSUME PLAINTIFFS WILL HAVE TO BRING ALL OF

17   THOSE WITNESSES BACK THAT WE JUST HEARD FROM, CORRECT?  BECAUSE

18   WE CLEARLY DIDN'T GO INTO ALTERNATIVE RELIEF, ADVERSE IMPACT ON

19   PUBLIC SAFETY, AND ALL THOSE ISSUES.

20         JUDGE KARLTON:  THAT'S THEIR PROBLEM IF THE EVIDENCE

21   IS INSUFFICIENT.

22         MR. MELLO:  EXCEPT IT'S IN THEIR DECLARATIONS, THEIR

23   TRIAL AFFIDAVITS, AND I WASN'T ALLOWED TO CROSS-EXAMINE THEM ON

24   THOSE ISSUES OR -- AND DEFENDANT INTERVENORS WERE NOT.

25         MR. SPECTER:  WE UNDERSTAND MR. MELLO'S CONCERN, AND
```

1  THE LAST THING WE WANT TO DO IS DEPRIVE HIM OF HIS DUE PROCESS

2  IN THIS PROCEEDING.

3          **JUDGE KARLTON:**  MEANING WHAT?

4          **MR. SPECTER:**  MEANING THAT IF THEY ARE GOING TO

5  TESTIFY ABOUT PHASE TWO ISSUES, THEY WILL BE BACK HERE.

6          **JUDGE REINHARDT:**  HE SAID THE AFFIDAVITS WERE IN, HE

7  SAID --

8          **MR. SPECTER:**  PARDON ME?

9          **JUDGE REINHARDT:**  MR. MELLO SAYS THE AFFIDAVITS OF

10 THE EXPERTS THAT WE HAVE ADMITTED CONTAIN INFORMATION ABOUT

11 PHASE TWO ISSUES, OR THE DECLARATIONS, OR WHATEVER -- WAS IT

12 THEIR ACTUAL TESTIMONY?

13         **MR. MELLO:**  IT'S THEIR REPORTS.  I'M SORRY.  I

14 MISSPOKE.  THE EXPERT REPORTS CONTAIN PHASE TWO TESTIMONY.

15         **MR. SPECTER:**  THEY HAVE QUITE UNDERSTANDABLY OBJECTED

16 TO PARTS OF ALL OF OUR EXPERTS' REPORT THAT DISCUSS PHASE TWO,

17 AND THEY'VE LODGED THOSE OBJECTIONS.  AND IF WE MOVE ON IN THE

18 CASE, IF YOU FIND PRIMARY CAUSE, THEN WE WILL BE SEEKING TO HAVE

19 THE REST OF THE REPORTS SUBMITTED, AND THEY WILL BE ABLE TO

20 CROSS-EXAMINE THE EXPERTS ON THEM.

21         **MR. MELLO:**  SO THEY HAVE TO COME BACK IS THE POINT.

22         **MR. SPECTER:**  WE UNDERSTAND.  WE ARE GOING TO HAVE TO

23 HAVE SOME OF THEM BACK.  WE MAY EXPLORE VIDEO CONFERENCING FOR

24 SOME OF THE ONES THAT ARE FARTHEST AWAY.

25         **JUDGE REINHARDT:**  WHATEVER YOU EXPLORE AND AGREE ON

1    IS GOING TO BE FINE.

2              **JUDGE HENDERSON:**  OKAY.  COURT'S ADJOURNED.

3                   (PROCEEDINGS ADJOURNED AT 4:49 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

    **PLAINTIFF'S WITNESSES**                           **PAGE**    **VOL.**

3

4   **DR. RONALD SHANSKY**

5   DIRECT EXAMINATION BY MS. HARDY              420      3
    CROSS-EXAMINATION BY MR. MELLO               433      3
6   CROSS-EXAMINATION BY MR. KAUFHOLD            487      3
    REDIRECT EXAMINATION BY MS. HARDY            493      3

7

8   **ERIC ADELMAN**

9   DIRECT EXAMINATION BY MR. HENDERSON          503      3
    CROSS EXAMINATION BY MR. MITCHELL            512      3
10  REDIRECT EXAMINATION BY MR. HENDERSON        523      3
    RECROSS-EXAMINATION BY MR. MITCHELL          527      3

11

12  **KEVIN LEE RAYMOND**

13  DIRECT EXAMINATION BY MR. HENDERSON          525      3
    CROSS-EXAMINATION BY MR. LEWIS               557      3

14

15  **BRENDA GIBBONS**

16  DIRECT EXAMINATION BY MR. HENDERSON          558      3
    CROSS-EXAMINATION BY MR. LEWIS               579      3
17  CROSS-EXAMINATION BY MR. MITCHELL            583      3
    REDIRECT EXAMINATION BY MR. HENDERSON        584      3

18

19  **GARY BENSON**

20  DIRECT EXAMINATION BY MR. HENDERSON          586      3
    CROSS-EXAMINATION BY MR. MITCHELL            606      3
21  REDIRECT EXAMINATION BY MR. HENDERSON        614      3

22

23

24

25

1

2                          **CERTIFICATE OF REPORTER**

3

4          WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL

5    REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6    CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

7    CIV S-90-0520 LKK JPM P, RALPH COLEMAN, ET AL V. ARNOLD

8    SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD

9    SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND

10   REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

11   INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

12   TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

13   FILING.

14          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

15   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

16   COURT FILE.

17

18                    /S/ JOAN MARIE COLUMBINI

19               JOAN MARIE COLUMBINI, CSR 5435, RPR

20

21                    S/ KATHERINE WYATT

22               KATHERINE WYATT, CSR 9866, RMR

23               THURSDAY, NOVEMBER 20, 2008

24

25