1                                           VOL 4

2                                           PAGES 647 – 832

3                    UNITED STATES DISTRICT COURT

4               FOR THE EASTERN DISTRICT OF CALIFORNIA

5               AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

6       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

7               TO SECTION 2284, TITLE 28 UNITED STATES CODE

8

        RALPH COLEMAN, ET AL.,              )
9                                           )
                      PLAINTIFFS,           )
10                                          )
          VS.                               ) NO. CIV S-90-0520 LKK JFM P
11                                          )
        ARNOLD SCHWARZENEGGER, ET AL.       )
12                                          ) THREE-JUDGE COURT
                      DEFENDANTS.           )
13                                          )
        _____)
14
        MARCIANO PLATA, ET AL.,             )
15                                          )
                      PLAINTIFFS,           )
16                                          )
        VS.                                 ) NO. C 01-1351 TEH
17                                          )
        ARNOLD SCHWARZENEGGER, ET AL.       )
18                                          )
                      DEFENDANTS.           )
19      _____)

20                      **TRANSCRIPT OF PROCEEDINGS**

21                    SAN FRANCISCO, CALIFORNIA
                      FRIDAY, NOVEMBER 21, 2008
22
        (APPEARANCES ON FOLLOWING PAGES)
23

24      ***REPORTED BY:***   JOAN MARIE COLUMBINI, CSR 5435, RPR
                    OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT
25

1  **APPEARANCES:**

2  **FOR PLAINTIFFS:**          PRISON LAW OFFICE
                               1917 FIFTH STREET
3                              BERKELEY, CALIFORNIA  94710
                       BY:  **DONALD SPECTER, ESQUIRE**
4                            **STEVEN FAMA, ESQUIRE**
                             **REBEKAH EVENSON, ESQUIRE**

5

6                              ROSEN, BIEN & GALVAN, LLP
                               315 MONTGOMERY STREET, TENTH FLOOR
7                              SAN FRANCISCO, CALIFORNIA 94104
                       BY:  **MICHAEL W. BIEN, ESQUIRE**
8                            **ERNEST GALVAN, ESQUIRE**
                             **AMY WHELAN, ESQUIRE**
9                            **JANE KAHN, ESQUIRE**
                             **MARIA V. MORRIS, ESQUIRE**

10

11 **FOR CCPOA**                 CARROLL, BURDICK & MCDONOUGH
                               44 MONTGOMERY STREET, SUITE 400
12                             SAN FRANCISCO, CALIFORNIA  94104
                       BY:  **JAMES HENDERSON, ESQUIRE**
13                           **NATALIE LEONARD, ESQUIRE**
                             **GREGG MCLEAN ADAM, ESQUIRE**

14

15 **FOR DEFENDANTS**            STATE OF CALIFORNIA
                               DEPARTMENT OF JUSTICE
16                             OFFICE OF THE ATTORNEY GENERAL
                               1300 I STREET, SUITE 125
17                             P.O. BOX 944255
                               SACRAMENTO, CALIFORNIA  94244
18                     BY:  **LISA A. TILLMAN, ESQUIRE**

19

                               STATE OF CALIFORNIA
20                             DEPARTMENT OF JUSTICE
                               OFFICE OF THE ATTORNEY GENERAL
21                             455 GOLDEN GATE AVENUE, SUITE 11000
                               SAN FRANCISCO, CALIFORNIA  94102
22                     BY:  **KYLE A. LEWIS, ESQUIRE**

23

24

25

1  **APPEARANCES (CONTINUED):**

2

3  **FOR DEFENDANTS:**          HANSON BRIDGETT
                                425 MARKET STREET, 26TH FLOOR
4                               SAN FRANCISCO, CALIFORNIA  94105
                        BY:  **PAUL MELLO, ESQUIRE**
5                            **S. ANNE JOHNSON, ESQUIRE**

6

7  **FOR DISTRICT ATTORNEY**    THE DISTRICT ATTORNEY'S OFFICE
   **INTERVENORS**             COUNTY OF RIVERSIDE
8                               82-675 HIGHWAY 111, FOURTH FLOOR
                                INDIO, CALIFORNIA  92201
9                       BY:  **WILLIAM E. MITCHELL, ESQUIRE**

10

   **FOR LEGISLATOR**           AKIN, GUM, STRAUSS, HAUER & FELD, LLP
11 **INTERVENORS**             580 CALIFORNIA STREET, 15TH FLOOR
                                SAN FRANCISCO, CALIFORNIA  94104
12                      BY:  **TERESA WANG, ESQUIRE**

13

   **FOR COUNTY INTERVENORS**   OFFICE OF THE COUNTY COUNSEL
14                              COUNTY OF SANTA CLARA
                                70 WEST HEDDING STREET
15                              NINTH FLOOR, EAST WING
                                SAN JOSE, CALIFORNIA  95110
16                      BY:  **THERESA FUENTES, ESQUIRE'S**

17

18

19

20

21

22

23

24

25

1              **PROCEEDINGS; FRIDAY, NOVEMBER 21, 2008**

2

3              **JUDGE HENDERSON:**  OKAY.  GOOD MORNING, COUNSEL.

4              BEFORE WE BEGIN WITH OUR NEXT WITNESS, I HAVE

5    SOMETHING TO READ TO YOU.  THE COURT HAS REVIEWED THE PARTIES'

6    OBJECTIONS TO PREFERRED EXHIBITS AND NOW RULES AS FOLLOWS:

7              FIRST, AS TO OBJECTIONS BASED ON RELEVANCE AND

8    CUMULATIVENESS, THE COURT AGREES THAT SOME OF THE PREFERRED

9    EVIDENCE IS ARGUABLY IRRELEVANT, AND SOME OF IT, SUCH AS THE

10   PHOTOS WE SAW AT THE END OF THE DAY YESTERDAY, IS ARGUABLY

11   CUMULATIVE.  HOWEVER, THE COURT FINDS NO PREJUDICE TO ADMITTING

12   THE CONTESTED EXHIBITS IN THIS BENCH TRIAL.  IF THE EVIDENCE IS

13   NOT RELEVANT, WE WILL NOT RELY ON IT.  CUMULATIVE EVIDENCE

14   WILL, SIMILARLY, HAVE NO IMPACT ON THE COURT'S DECISION.

15             ACCORDINGLY, WHILE THE COURT WOULD HOPE THAT COUNSEL

16   WILL NOT HEREAFTER INTRODUCE EVIDENCE THAT IS ONLY TANGENTIALLY

17   RELEVANT AND/OR IS CUMULATIVE, ALL OBJECTIONS AS TO RELEVANCE

18   OR CUMULATIVENESS ARE OVERRULED.

19             SECOND, AS TO OBJECTIONS BASED ON HEARSAY, MOST OF

20   THE RESPONSES TO THE OBJECTIONS APPEAR TO SUPPORT APPLICATION

21   OF A HEARSAY EXCEPTION OR THE CONCLUSION THAT THE EXHIBIT IS

22   NOT BEING INTRODUCED FOR THE TRUTH OF THE MATTER ASSERTED.  THE

23   PARTIES HAVE CLEARLY OVERREACHED IN THEIR ATTEMPT -- ATTEMPTED

24   APPLICATION OF THE HEARSAY RULES, AND THE COURT FINDS IT

25   INEFFICIENT TO RULE ON THE OBJECTIONS AS PRESENTED.  INSTEAD

 1  THE COURT ORDERS THE PARTIES TO MEET AND CONFER IN GOOD FAITH

 2  TO ATTEMPT TO RESOLVE ALL OUTSTANDING HEARSAY DISPUTES.

 3          THIRD, AS TO --

 4          **JUDGE KARLTON:**  HEARSAY AND FOUNDATION.

 5          **JUDGE HENDERSON:**  HEARSAY AND FOUNDATION.  THANK

 6  YOU, JUDGE.

 7          THIRD, AS TO OBJECTIONS BASED ON FOUNDATION OR

 8  AUTHENTICITY, THE COURT UNDERSTANDS THAT THE PARTIES ARE

 9  ALREADY MEETING AND CONFERRING ON SOME OF THESE OBJECTIONS.

10  FOR EXAMPLE, THOSE CONCERNING THE CHARTS THAT PLAINTIFF SOUGHT

11  TO INTRODUCE INTO EVIDENCE YESTERDAY.

12          THE COURT NOW ORDERS THE PARTIES TO MEET AND CONFER

13  ON ALL SUCH OBJECTIONS.  DURING THEIR MEET AND CONFER THE

14  PARTIES SHALL CONSIDER WHETHER TO WITHDRAW ANY EXHIBITS WHOSE

15  FOUNDATION WAS TO BE LAID BY A WITNESS WHO IS NO LONGER

16  TESTIFYING.

17          BASED ON THE ABOVE, THE COURT DENIES ALL OF THE

18  OBJECTIONS TO THE PREFERRED EXHIBITS.  OBJECTIONS BASED ON

19  RELEVANCE, AS WELL AS THOSE BASED ON CUMULATIVENESS, ARE DENIED

20  WITH PREJUDICE.  ALL OTHER OBJECTIONS ARE DENIED WITHOUT

21  PREJUDICE, SUBJECT TO THE PARTIES AND INTERVENORS FURTHER

22  MEETING AND CONFERRING.  THE COURT FULLY EXPECTS EVERYONE TO

23  MEET AND CONFER REASONABLY AND IN GOOD FAITH IN ATTEMPTING TO

24  REACH INFORMAL RESOLUTION REGARDING WHICH EXHIBITS SHOULD BE

25  ADMITTED INTO EVIDENCE.  ASSUMING THE PARTIES AND INTERVENORS

1    ARE UNABLE TO RESOLVE ALL OF THEIR DISPUTES, THEY SHALL PRESENT

2    THEIR LIST OF OUTSTANDING OBJECTIONS, WHICH THE COURT EXPECTS

3    TO BE MUCH MORE NARROW THAN THE LIST FILED EARLIER THIS WEEK,

4    IN A JOINT FILING ON OR BEFORE MONDAY, DECEMBER 8TH.

5              IN THAT FILING, THE PARTIES AND INTERVENORS SHALL

6    IDENTIFY ALL EXHIBITS FOR WHICH ADMISSIBILITY REMAINS

7    CONTESTED, ALONG WITH THE SPECIFIC OBJECTION, RESPONSE AND

8    REPLY.  FOR EXAMPLE, FOR ALL EXHIBITS FOR WHICH A HEARSAY

9    OBJECTION IS CLAIMED BY THE OPPOSING PARTY, THE OFFERING PARTY

10   SHALL INCLUDE A REPLY EXPLAINING WHY IT CONTENDS THE EXCEPTION

11   DOES NOT APPLY.

12             TO BE CLEAR, THE ABOVE RULINGS DO NOT APPLY TO ANY

13   EXPERT REPORTS AND TRIAL DECLARATIONS IDENTIFIED AS EXHIBITS.

14   NOR DO THE RULINGS APPLY TO OBJECTIONS TO PREFERRED DEPOSITION

15   EXCERPTS.  THE COURT WILL RULE ON THOSE OBJECTIONS AT A LATER

16   TIME.

17             ADDITIONALLY, THE COURT -- ADDITIONALLY, THE COURT

18   HAS CONCLUDED THAT WITH RESPECT TO THE DEPOSITION TESTIMONY

19   OFFERED BY DEFENDANTS, YOU MAY READ IT INTO THE RECORD AT AN

20   APPROPRIATE TIME.

21             **JUDGE REINHARDT:**  BEFORE WE TAKE EVIDENCE,

22   MR. MELLO, IF YOU WOULD COME UP.  I'D LIKE TO JUST CONTINUE FOR

23   A MOMENT OUR DISCUSSIONS PREVIOUSLY.  I THINK THERE IS A

24   MISUNDERSTANDING OF SOME SORT ABOUT WHAT PHASE ONE IS.

25             THE PLAINTIFFS SUGGESTED WE COMBINE PHASE ONE WITH A

1   PART OF PHASE TWO.  PHASE TWO CONSISTS OF TWO PARTS; ONE, WHAT

2   ALTERNATIVES ARE POSSIBLE AND BEEN EXHAUSTED WITH RESPECT TO

3   RESOLVING THE CONSTITUTIONAL VIOLATIONS SHORT OF A PRISONER

4   RELEASE ORDER.  THE SECOND PART OF PHASE TWO IS SHOULD THERE BE

5   A PRISONER RELEASE ORDER IN THE EVENT THAT THE OTHER AVENUES

6   FAIL OR ARE NOT AVAILABLE; SHOULD THERE BE A PRISONER RELEASE

7   ORDER UNDER ALL OF THE CIRCUMSTANCES DESCRIBED IN THE STATUTE

8   AND IF SO, WHY?

9           THE FIRST PART OF PHASE TWO THAT THE PLAINTIFFS

10  SUGGESTED BE COMBINED WITH PHASE ONE WAS WHAT ARE THE OTHER

11  NON-PRISONER RELEASE ORDER REMEDIES, HAVE THEY BEEN TRIED, DO

12  THEY EXIST?  YOU OBJECTED TO THEIR SUGGESTION THAT THAT BE

13  MOVED INTO PHASE ONE, AND YOU PREVAILED ON THAT OBJECTION.

14  THEREFORE, PHASE ONE IS LIMITED SOLELY TO THE QUESTION OF WHAT

15  IS THE PROXIMATE CAUSE OR THE PRIMARY CAUSE OF THE

16  CONSTITUTIONAL VIOLATION, WHICH HAS ALREADY BEEN FOUND IN BOTH

17  OF THE CASES AND WAS ALSO REFOUND, IN EFFECT, IN THE COURT'S

18  ORDERS FOR THE THREE-JUDGE DISTRICT COURT.

19          SO FOR PHASE ONE THERE'S NO PARTICULAR REASON TO

20  HAVE ANY EVIDENCE ABOUT ANYTHING OTHER THAN WHAT IS THE PRIMARY

21  CAUSE OF THE VIOLATION.  EVIDENCE AS TO WHAT HAS BEEN TRIED

22  SINCE THEN, WHETHER IT'S BEEN SUCCESSFUL SINCE THEN, HOW MUCH

23  MONEY HAS BEEN SPENT, WHAT CHANGES HAVE BEEN MADE, TO ME -- AND

24  THIS IS NOT FOR THE COURT, BUT HAS BEEN MY DISCUSSION WITH

25  YOU -- EVIDENCE AS TO HOW MUCH MONEY HAS BEEN SPENT OR WHAT THE

1  STATE HAS TRIED TO DO SINCE THE VIOLATION DOES NOT SEEM TO ME

2  TO BE RELEVANT AT ALL TO THE QUESTION OF WHAT THE PRIMARY CAUSE

3  OF THE VIOLATION WAS.  THAT TYPE OF EVIDENCE WOULD SEEM TO ME

4  TO BE RELEVANT TO THE FIRST PART OF PHASE TWO.

5          **JUDGE KARLTON:**  I WANT TO SAY JUDGE REINHARDT WAS

6  SPEAKING FOR HIMSELF, BUT LAST NIGHT WHEN I READ THE STUFF YOU

7  PROPOSED TO PUT ON TODAY, I KEPT SAYING, MAYBE I'M

8  MISUNDERSTOOD.  I KEPT SAYING, THIS IS ALL PHASE TWO, WHY IS

9  THIS BEING OFFERED NOW?  SO I JOIN JUDGE REINHARDT'S

10 OBSERVATION.

11         **MR. MELLO:**  OBSERVATION AND QUESTION?

12         **JUDGE REINHARDT:**  WELL, YOU ARE FREE TO COMMENT,

13 YES.

14         **MR. MELLO:**  I BELIEVE THAT THE TESTIMONY THUS FAR

15 FROM PLAINTIFF'S EXPERTS HAS ALL IDENTIFIED MULTIPLE

16 INTERRELATED COMPONENTS THAT CONSTITUTE BARRIERS OR NOT

17 BARRIERS TO THE CONSTITUTIONAL DELIVERY OF MEDICAL CARE AND

18 MENTAL HEALTH CARE.  NOW, I BELIEVE THAT THE FACT THAT THERE

19 ARE MULTIPLE AND INTERRELATED COMPONENTS IS EVIDENCE THAT

20 OVERCROWDING IS NOT THE PRIMARY CAUSE AND, THEREFORE, THAT

21 EVIDENCE GOES TO THE FACT THAT IT'S NOT THE PRIMARY CAUSE.

22         I DO BELIEVE THAT -- OR I DO UNDERSTAND THE COURT'S

23 POSITION THAT IT ARGUABLY GOES TO THE SECOND HALF OF OLD PHASE

24 ONE BACK WHEN YOU DID THE FIRST ORDER BACK IN TIME.  I DON'T

25 DISAGREE WITH YOU THAT IT COULD CONCEIVABLY FALL INTO THAT, BUT

1    I BELIEVE IT ALSO GOES TO PRIMARY CAUSE BECAUSE PRIMARY CAUSE

2    MUST BE THE SINGLE MOST IMPORTANT CAUSE.  IF ALL THOSE OTHER

3    THINGS HAVE BEEN IDENTIFIED AS BARRIERS, THAT IS EVIDENCE THAT

4    OVERCROWDING IS NOT THE PRIMARY BARRIER IN DEFENDANT'S MIND,

5    BUT I UNDERSTAND THE COURT'S POSITION.

6         **JUDGE REINHARDT:**  WE HAVE BEEN VERY LIBERAL IN

7    ALLOWING THE PARTIES -- I'M SURE WE WILL CONTINUE TO BE --

8    ALLOWING THE PARTIES TO PUT ON ANY EVIDENCE THEY CONSIDER

9    RELEVANT.  AND AS JUDGE HENDERSON'S READING OF OUR RULINGS

10   DEMONSTRATES, I THINK, WE DON'T INTEND TO BE STRICT ABOUT -- WE

11   WANT YOU TO PUT ON WHATEVER IS RELEVANT.

12        IT DOES SEEM TO ME YOU OUGHT TO CONSIDER WHETHER

13   SOME OF YOUR EVIDENCE ISN'T REALLY MORE HELPFUL TO THE

14   PLAINTIFFS THAN TO YOU.  IF YOU ARE TRYING TO PROVE THAT YOU'VE

15   EXHAUSTED ALL THE OTHER POSSIBILITIES AND THAT THEY'RE NOT THE

16   CAUSE, BECAUSE YOU ARE SPENDING A LOT OF MONEY, THAT COULD WELL

17   BE ARGUED TO SHOW THAT THE CAUSE MUST BE THE OVERCROWDING.

18        **MR. MELLO:**  AND I HAVE DEFINITELY READ YOUR HONOR'S

19   MOTION -- DECISION ON OUR MOTION FOR SUMMARY JUDGMENT, AND THAT

20   THEME CAME THROUGH.  I UNDERSTAND.  I UNDERSTAND THE POSITION.

21        I THINK I'VE ARTICULATED OUR ALTERNATIVE POSITION.

22   AND IT ALSO GOES BACK TO THE QUESTION OR THE DISCUSSION WE HAD

23   A FEW DAYS AGO WITH RESPECT TO WHAT IS RELEVANT AND WHEN IS THE

24   EVIDENCE RELEVANT.  AND, AGAIN, I BELIEVE OUR POSITION THAT

25   WHAT'S CURRENTLY HAPPENING IS CLEARLY MORE RELEVANT THAN WHAT

1 HAPPENED IN THE PAST, BECAUSE IT'S -- IN OUR MINDS, YOUR HONOR.

2

3          **JUDGE REINHARDT:**  NO, NO, YOU ARE FREE TO DO

4 WHATEVER YOU WANT.  BUT IF YOU ARE TRYING TO PROVE YOU'VE TRIED

5 A LOT OF OTHER THINGS AND THEY DON'T WORK AND THAT DOESN'T

6 SOLVE THE PROBLEM, YOU MAY BE PROVING THAT OVERCROWDING IS THE

7 ONLY CAUSE BECAUSE THAT'S THE ONLY ONE THAT HADN'T BEEN TRIED.

8          **MR. MELLO:**  I UNDERSTAND THE COURTS' --

9          **JUDGE KARLTON:**  I WANT TO BACK UP BEFORE YOU

10 RESPOND.  JUDGE REINHARDT SAID YOU ARE FREE TO DO EVERYTHING

11 YOU WANT.  IF IT REALLY IS TRUE THAT IT'S PROPERLY, IN OUR

12 VIEW, PHASE TWO, I'M SORRY -- PROPERLY PHASE TWO MATTERS, WE

13 MAY JUST SAY ANY OBJECTION WILL BE SUSTAINED WITHOUT PREJUDICE

14 TO YOUR PUTTING IT ON IN THE APPROPRIATE PART OF THE CASE.  I

15 DIDN'T WANT TO JOIN JUDGE REINHARDT'S OPEN INVITATION FOR YOU

16 TO JUST PUT ANYTHING ON THAT YOU CHOOSE WHENEVER YOU CHOOSE TO.

17 ALL RIGHT.

18          **MR. MELLO:**  UNDERSTOOD.  AND I BELIEVE THERE ARE A

19 COUPLE MORE DEFENDANT -- PLAINTIFF INTERVENOR WITNESSES, AND WE

20 HEAR THE COURT, AND WE WILL TALK ABOUT IT.  OKAY.  THANK YOU.

21          **JUDGE REINHARDT:**  THANK YOU VERY MUCH.

22          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

23          OKAY.  YOU MAY PROCEED WITH YOUR NEXT WITNESS,

24 COUNSEL.

25          **MR. HENDERSON:**  THANK YOU, YOUR HONOR.  BEFORE WE

1  START, I WOULD JUST LIKE TO NOTIFY THE COURT THE NEXT WITNESS

2  HAS AN AUTISTIC SON AT HOME THAT HAS SPECIAL CARE.  SHE HAS A

3  CELL PHONE THAT'S STILL ON TO RING.  SHE DOESN'T HAVE IT ON

4  HER.  IT'S OVER AT THE TABLE.  BUT IF IT DOES RING, WE WANT TO

5  LET THE COURT KNOW THAT WILL BE THE EXPLANATION FOR IT.

6          **JUDGE HENDERSON:**  OKAY.

7          **MR. HENDERSON:**  THANK YOU.

8          **JUDGE HENDERSON:**  STEP FORWARD, MA'AM, AND BE SWORN

9  IN.

10                    **DEBBRA ROWLETT**

11  HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

12  DULY SWORN AND EXAMINED AS FOLLOWS:

13          **THE CLERK:**  PLEASE STATE AND SPELL YOUR FULL NAME

14  FOR THE RECORD.

15          **THE WITNESS:**  MY NAME IS DEBBRA ROWLETT, D-E-B-B-R-A

16  R-O-W-L-E-T-T.

17          <u>**DIRECT EXAMINATION BY MR. HENDERSON**</u>

18  **BY MR. HENDERSON**

19  **Q**  MS. ROWLETT, BY WHOM ARE YOU PRESENTLY EMPLOYED?

20  **A**  PARDON ME?

21  **Q**  BY WHOM ARE YOU PRESENTLY EMPLOYED?

22  **A**  CSP SOLANO DEPARTMENT OF CORRECTIONS AND REHABILITATION.

23  **Q**  HOW LONG YOU HAVE YOU BEEN EMPLOYED BY THE DEPARTMENT OF

24  CORRECTIONS AND REHABILITATION?

25  **A**  APPROXIMATELY 11 YEARS.

1    Q    OKAY.

2              I WILL REFER THE COURT AGAIN, AS WITH THE OTHER

3    WITNESSES, TO PARAGRAPHS TWO THROUGH TEN, I BELIEVE, OF OUR

4    DECLARATION REGARDING HER BACKGROUND, AND WE'LL MOVE ON FROM

5    THAT POINT.

6              ARE YOU CURRENTLY WORKING AT -- STRIKE THAT.

7              HOW LONG HAVE YOU BEEN ASSIGNED TO CSP SOLANO?

8    A    I STARTED AT CSP SOLANO IN APRIL OF 2000.

9    Q    OKAY.  AND ARE YOU CURRENTLY WORKING THERE AT THE PRESENT

10   TIME?

11   A    NO, I AM NOT.

12   Q    AND WHY IS THAT?

13   A    I FRACTURED MY ARM, AND I'M OUT ON DISABILITY AT THIS TIME.

14   Q    AND WHEN DID YOU GO OUT ON DISABILITY?

15   A    JULY 27TH.

16   Q    OF THIS YEAR?

17   A    YES.

18   Q    UP UNTIL THAT TIME YOU WORKED THERE, THOUGH, YOU WORKED

19   CONTINUOUSLY?

20   A    YES.

21   Q    NOW, WITH RESPECT TO YOUR -- WHAT IS YOUR CURRENT

22   POSITION -- WHAT WAS YOUR POSITION AT CSP SOLANO WHEN YOU WENT

23   OUT ON DISABILITY?

24   A    CORRECTIONAL OFFICER.

25   Q    WHERE WERE YOU ASSIGNED TO?

1    A    IN THE SPECIALTY CLINIC.

2    Q    WHAT WERE YOUR DUTIES THERE AS A CORRECTIONAL OFFICER AT

3    THE SPECIALTY CLINIC?

4    A    TO PROVIDE SAFETY AND SECURITY FOR THE CLINIC AREA.

5    Q    OKAY.  WHAT GOES ON IN THE CLINIC AREA?

6    A    THEY HAVE SEVERAL DIFFERENT DOCTORS THAT COME IN FROM

7    OUTSIDE, SPECIALISTS, X-RAY, PHYSICAL THERAPY,

8    GASTROENTEROLOGISTS, DIFFERENT TYPES OF DOCTORS.  THERE'S ALSO

9    A LAB IN THAT AREA AND A DENTAL AREA.

10   Q    OKAY.  AND DO YOU HAVE ANY OTHER DUTIES DURING YOUR

11   SHIFT -- STRIKE THAT.

12            WHAT SHIFT DO YOU WORK ON?

13   A    I WORK FROM 6:00 A.M. TO 2:00 P.M.

14   Q    DO YOU HAVE ANY DUTIES DURING YOUR SHIFT THAT TAKE PLACE

15   BEFORE THE SPECIALTY CLINIC OPENS UP?

16   A    YES.  AT 6:00 A.M. I GO TO THE PRIMARY CLINIC AND PROVIDE

17   SECURITY FOR THE MEDICATION ADMINISTRATION LINE.

18   Q    AND AS I UNDERSTAND IT, AND AS YOUR DECLARATION SETS FORTH,

19   PRIOR TO WORKING AS A -- STRIKE THAT.

20            WHEN DID YOU BECOME A CORRECTIONAL OFFICER?

21   A    WHEN?

22   Q    YES.

23   A    IN MAY OR JUNE OF 2007.

24   Q    AND BEFORE THAT, HOW WERE YOU EMPLOYED BY THE DEPARTMENT OF

25   CORRECTIONS AND REHABILITATION?

1  **A**   I WAS A MEDICAL TECHNICAL ASSISTANT, WHICH IS A NURSE AND A

2  CORRECTIONAL OFFICER FOR THE DEPARTMENT.

3  **Q**   OKAY.  AND ARE YOU A -- WERE YOU A LICENSED VOCATIONAL

4  NURSE WHEN YOU WERE PERFORMING THOSE DUTIES?

5  **A**   YES.

6  **Q**   OKAY.  AT THE TIME THAT YOU LEFT DUE TO YOUR DISABILITY,

7  WAS THERE OVERCROWDING OF INMATES AT CSP SOLANO?

8  **A**   I'M SORRY.

9  **Q**   AT THE TIME YOU WENT OUT ON YOUR DISABILITY, WAS THERE

10 OVERCROWDING OF INMATES AT CSP SOLANO?

11 **A**   YES.

12 **Q**   HOW LONG HAD THAT CONDITION BEEN THERE, TO YOUR

13 OBSERVATION?

14 **A**   WHEN I STARTED THERE IN 2000 THERE WAS OVERCROWDING.

15 **Q**   OKAY.  HAS THAT OVERCROWDING OF INMATES AT CSP SOLANO

16 IMPACTED THE DELIVERY OF MEDICAL CARE TO THOSE INMATES?

17 **A**   YES.

18 **Q**   HOW SO?

19 **A**   THERE'S AN IMPACT WITH THE AMOUNT OF CARE WE CAN GIVE TO

20 INMATES, STAFF VERSUS THE AMOUNT OF INMATES THAT NEED THE

21 MEDICAL CARE.

22 **Q**   OKAY.  LET'S TALK FIRST ABOUT THE THINGS THAT YOU WOULD

23 OBSERVE SPECIFICALLY IN CONNECTION WITH YOUR DUTIES, BOTH AS A

24 LICENSED VOCATIONAL NURSE AND AS A CORRECTIONAL OFFICER AT THE

25 SPECIALTY CLINIC.  ARE YOU INVOLVED IN THE DISTRIBUTION OF

1    INSULATION AT THE FACILITY?

2              **JUDGE KARLTON:**  INSULATION?

3              **MR. HENDERSON:**  I'M HAVING TROUBLE PRONOUNCING WORDS

4    HERE, YOUR HONOR.  I APOLOGIZE.

5    **BY MR. HENDERSON**

6    **Q**  INSULIN.

7    **A**  I DO NOT GIVE THE INSULIN, BUT I HAVE OBSERVED INSULIN

8    BEING GIVEN FROM THE TIME I WAS AN MTA THROUGH BEING A

9    CORRECTIONAL OFFICER.

10   **Q**  WHEN DOES THAT PROCESS OCCUR?

11   **A**  THAT PROCESS OCCURS IN THE PRIMARY CLINIC.

12             **JUDGE KARLTON:**  HE SAID WHEN.

13   **BY MR. HENDERSON**

14   **Q**  WHEN?

15   **A**  WHEN.

16   **Q**  IN THE MORNING AND --

17   **A**  IN THE MORNING AND IN THE EVENING BEFORE BREAKFAST AND

18   BEFORE DINNER.

19   **Q**  OKAY.  ARE THERE PROBLEMS WITH THE DISTRIBUTION OF INSULIN

20   DOSES TO INMATES DUE TO OVERCROWDING?

21   **A**  YES.

22   **Q**  WHAT ARE THOSE PROBLEMS THAT YOU'VE OBSERVED?

23   **A**  THERE ARE SUBSTANTIAL AMOUNT OF INMATES THAT NEED THE

24   INSULIN, AND WITH ONLY ONE NURSE BEING ABLE TO ADMINISTER THE

25   INSULIN, THERE'S NOT ANOTHER NURSE TO DO DOUBLE-CHECKING OF THE

1  RIGHT DOSE AND THE CORRECT INSULIN THAT'S BEING GIVEN.

2            THERE'S ALSO NOT ENOUGH NURSING STAFF FOR THE NURSE

3  THAT GIVES THE INSULIN TO ALSO BE THE NURSE THAT GETS A FINGER

4  STICK, WHICH IS THE NUMBER THAT WOULD DETERMINE HOW MUCH

5  INSULIN THEY WOULD GET DEPENDING ON THEIR BLOOD SUGAR LEVELS.

6  THEY HAVE ANOTHER PERSON DO IT, AND THEN GIVE THEM THE NUMBERS,

7  AND THEN THEY WOULD DISTRIBUTE THE MEDICATION DEPENDING ON WHAT

8  NUMBERS THEY WERE GIVEN.

9  **Q**   WHAT SITUATION HAPPENS AS A RESULT OF --

10           **JUDGE KARLTON:**   BEFORE YOU DO, MA'AM, IS THE

11  STANDARD OF CARE OUTSIDE OF THE PRISON SYSTEM THAT THERE ARE

12  TWO PERSONS INVOLVED IN THE ADMINISTRATION OF INSULIN, OR IS

13  THAT JUST PRACTICE IN THE PRISON SYSTEM, IF YOU KNOW?

14           **THE WITNESS:**   I WORKED AT A HOSPITAL, SUTTER

15  GENERAL, SUTTER MEMORIAL, SUTTER AUBURN FAITH HOSPITAL, AS A

16  FLOOR NURSE, AND THE GENERAL PRACTICE TO GIVE INSULIN WOULD BE

17  TWO NURSES THAT GIVE IT, BECAUSE THE SLIGHTEST AMOUNT OFF YOU

18  COULD REALLY HURT AN INMATE.

19  **BY MR. HENDERSON**

20  **Q**   HAVE YOU SEEN ANY PROBLEMS RESULT DURING THE DISTRIBUTION

21  OF INSULIN TO THE INMATES?

22  **A**   YES.

23  **Q**   WHAT PROBLEMS HAVE YOU SEEN?

24  **A**   THERE HAVE BEEN SEVERAL TIMES WHEN INMATES WERE GIVEN THE

25  WRONG TYPE OF INSULIN.

1  Q    HAVE THERE BEEN ANY PROBLEMS WHERE INMATES HAVE BEEN GIVEN

2  THE WRONG AMOUNT OF INSULIN?

3  A    YES.

4  Q    HOW IS THAT BROUGHT TO THE ATTENTION OF THE NURSE?

5  A    THE INMATE USUALLY TELLS THE NURSE IT'S THE WRONG AMOUNT OR

6  THE WRONG INSULIN THAT THEY'RE GIVING THEM.

7  Q    HOW OFTEN HAVE YOU SEEN THAT HAPPEN?

8  A    DAILY.

9  Q    OKAY.  ARE THERE OVERCROWDING PROBLEMS -- STRIKE THAT.

10        DOES OVERCROWDING HAVE ANY OTHER EFFECTS ON THE

11 DELIVERY OF MEDICAL CARE TO THE INMATES AT CSP SOLANO THAT YOU

12 OBSERVED?

13 A    YES.

14 Q    WHAT OTHER SITUATIONS DO WE HAVE?

15 A    THERE ARE SITUATIONS WHERE INMATES ARE SCHEDULED AN

16 APPOINTMENT IN THE MORNING, AND IT WILL BE TWO TO THREE HOURS

17 BEFORE THEY'RE SEEN BY A DOCTOR.  THERE ARE TIMES WHEN INMATES

18 FILL OUT SICK CALL SLIPS, AND BY THE TIME THEY COME INTO THE

19 CLINIC, THEY WILL TELL THE CORRECTIONAL OFFICERS THEY NO LONGER

20 NEED TO BE SEEN BECAUSE THEIR SYMPTOMS HAVE RESOLVED BY THE

21 TIME THEY'RE SCHEDULED IN.

22 Q    ARE THERE ANY PROBLEMS WITH THE CONFIDENTIALITY OF THE

23 INMATES AND THEIR CONDITIONS?

24 A    THE INMATES, BESIDES WHEN THEY'RE ACTUALLY IN SEEING THE

25 DOCTOR, THERE IS NO CONFIDENTIALITY.  WHEN THEY ARE BEING

1   TRIAGED BY THE NURSE AND THEY ASK THEM WHAT'S WRONG WITH THEM,

2   WHAT BROUGHT THEM TO THE CLINIC FOR THE DAY, THAT'S DONE IN THE

3   HALLWAY WHERE OTHER INMATES ARE SITTING WAITING FOR TREATMENTS,

4   GETTING BLOOD PRESSURES DONE, OTHER TREATMENTS AT THE SAME

5   TIME.

6   **Q**   OKAY.  IN YOUR DECLARATION, YOU REFERRED TO A SITUATION

7   WHERE A SECRETARY HAS TO WORK IN AN EXAMINATION ROOM AT THE

8   CLINIC?

9   **A**   YES.  IN THE SPECIALTY CLINIC, THE SCHEDULING SECRETARY

10  THAT DOES ALL THE SCHEDULING FOR THAT AREA HAS TO WORK THERE

11  SOMETIMES IN THE DARK IF THEY'RE DOING EYE EXAMINATIONS, AND

12  THEY DO OTHER EXAMINATIONS WHILE SHE'S IN THE ROOM, AND IT'S A

13  VERY SMALL ROOM.

14  **Q**   WHAT OTHER KIND OF EXAMINATIONS DO THEY DO?

15  **A**   THEY DO HEMORRHOID EXAMINATIONS.  THEY DO ANY TYPE OF BODY

16  EXAMINATION THAT YOU CAN THINK OF.

17  **Q**   OKAY.  HAVE THERE BEEN SITUATIONS INVOLVING THE COMPROMISE

18  OF CONFIDENTIALITY WITH RESPECT TO TB TESTING?

19  **A**   YES.

20  **Q**   CAN YOU TELL US WHAT THAT INVOLVES?

21  **A**   TUBERCULOSIS TESTING IS DONE IN A MASS MANNER INSIDE THE

22  HOUSING UNITS, AND THE INMATES FORM TWO LINES.  ONE LINE IS

23  WHERE THE INMATES WILL BE TESTED FOR TUBERCULOSIS.  THE OTHER

24  LINE IS FOR WHERE INMATES ALREADY HAVE TUBERCULOSIS OR HAVE HAD

25  A POST POSITIVE OF TUBERCULOSIS, AND THEY STAND IN A SECOND

1   LINE IN THE MIDDLE OF THE DAYROOM FLOOR.

2   Q   SO THEY ARE IN FULL VIEW OF ALL THE INMATES THEN?

3   A   EVERYONE.

4   Q   THE ONES THAT HAVE HAD PRIOR TUBERCULOSIS AND ARE STANDING

5   IN THAT LINE?

6   A   CORRECT.  AFTER THE MASS TESTING THEY DO, THEY READ THE

7   RESULTS, AND IF YOU'VE HAVE A POSITIVE RESULT, THEY HAVE YOU

8   STAND OFF TO THE SIDE, AND THEY ESCORT YOU OUT OF THE BUILDING

9   TO GET A CHEST X-RAY.  SO EVERYONE THAT'S IN THAT BUILDING

10  KNOWS AT THAT POINT THAT YOU HAVE NOW TESTED POSITIVE.

11  Q   OKAY.  ARE THERE PROBLEMS OR -- STRIKE THAT.

12          HAVE YOU OBSERVED ANY PROBLEMS RELATING TO

13  OVERCROWDING OF INMATES AT CSP SOLANO THAT RELATE TO MEDICATION

14  DISTRIBUTION?

15  A   YES.

16  Q   OKAY.  WHAT CAN YOU TELL US ABOUT THAT?

17  A   WHEN I FIRST STARTED AT CSP SOLANO, I HELPED WITH

18  MEDICATION ADMINISTRATION WHEN THERE WERE NARCOTICS TO BE

19  PASSED OUT, AND AT THE TIME WE APPROXIMATELY HAD 30 INMATES

20  THAT RECEIVED NARCOTICS.  AND TO THIS DAY THERE'S APPROXIMATELY

21  300 INMATES WHO RECEIVE NARCOTICS AND THE SAME AMOUNT OF STAFF

22  DOING THE JOB.

23          THEY CANNOT PROPERLY IDENTIFY THE MEDICATION, DO

24  THEIR PROPER NURSING CHECKS TO MAKE SURE IT'S THE RIGHT INMATE,

25  THE RIGHT AMOUNT OF MEDICATION AND THE RIGHT MEDICATION THAT

1  THEY'RE GETTING.  THEY CANNOT CRUSH THE MEDICATION, WHICH IS A

2  POLICY OF THE INSTITUTION TO PREVENT HOARDING AND CHEEKING OF

3  THE MEDICATION.

4  **Q**  BY "CHEEKING OF THE MEDICATIONS," WHAT ARE YOU REFERRING

5  TO?

6  **A**  I MEAN NOT SWALLOWING THE MEDICATION, PUTTING IT OFF TO THE

7  TOP OF THEIR MOUTH, TO THE TOP OF THE ROOF OF THEIR MOUTH SO

8  THEY COULD SPIT IT OUT LATER.

9  **Q**  TO YOUR EXPERIENCE, IS CHEEKING A FREQUENT OCCURRENCE WITH

10 INMATES IN TERMS OF MEDICATION DISTRIBUTION?

11 **A**  YES, IT'S A DAILY OCCURRENCE.

12 **Q**  I BELIEVE YOU INDICATED IN YOUR DECLARATION THAT YOU FOUND

13 NUMEROUS INSTANCES WHERE YOU FOUND PILLS OUT IN THE YARD WHERE

14 INMATES HAVE DISCHARGED THEM AFTER THEY RECEIVED THEM?

15 **A**  YES, YOU CAN.

16 **Q**  HOW OFTEN?

17 **A**  YOU CAN WALK THROUGH THE YARD DAILY AND SEE MEDICATION ON

18 THE CEMENT.

19 **Q**  WHAT ARE THE OTHER REASONS THAT YOU'RE AWARE OF THAT

20 INMATES WOULD CHEEK MEDICATIONS IN ADDITION TO JUST SPITTING

21 THEM OUT LATER?

22 **A**  REASONS WHY AN INMATE MAY CHEEK A MEDICATION WOULD BE

23 ADVERSE SIDE EFFECTS.  THEY DON'T LIKE THE SIDE EFFECTS THAT

24 THE MEDICATION GIVES THEM, SO THEY DON'T WANT TO TAKE THEM.

25 WITH NARCOTICS THEY MIGHT BE FORCED TO GIVE THEM TO ANOTHER

1  INMATE.  THEY MIGHT BE SELLING THE MEDICATION, OR THEY -- IN

2  ONE INSTANCE, AN INMATE WAS CHEEKING THE MEDICATION TO TRY TO

3  COMMIT SUICIDE.  HE OVERDOSED ON HIS NARCOTICS.

4  **Q**   NOW, IN THE DISTRIBUTION PROCESS, HOW DOES THAT WORK AT CSP

5  SOLANO WHERE YOU ARE LOCATED?

6  **A**   THERE'S A LINE OF INMATES.  ONE OF THEM WALKS UP TO THE

7  WINDOW.  THERE'S A SMALL HOLE LIKE A TELLER.  THE INMATE GIVES

8  THE NURSE HIS I.D.  THE NURSE GIVES HIM HIS MEDICATION.  HE

9  SWALLOWS IT, AND I STAND BY TO SEE IF THE INMATE IS CHEEKING

10 HIS MEDICATION.

11 **Q**   OKAY.  DO YOU HAVE ENOUGH TIME TO CONFIRM WHETHER OR NOT

12 THE INMATE IS CHEEKING HIS MEDICATIONS?

13 **A**   NO, THERE'S TOO MANY INMATES IN A SHORT WINDOW TO TRY TO

14 PROVIDE THE MEDICATION ADMINISTRATION TO DO IT.

15 **Q**   HOW MANY INMATES ARE -- YOU SAID 300 INMATES FOR THE

16 MEDICATION?

17 **A**   FOR THE NARCOTICS.

18 **Q**   THE NARCOTICS?

19 **A**   YES.

20 **Q**   AND OVER WHAT PERIOD OF TIME IS THAT ACCOMPLISHED?

21 **A**   YOU HAVE APPROXIMATELY ONE HOUR TO AN HOUR AND A HALF TO

22 GET THAT DONE.

23 **Q**   OKAY.  ARE THERE -- THERE'S SUPPOSED TO BE A PROCEDURE FOR

24 INQUIRING ABOUT SIDE EFFECTS THAT THE INMATES MAY BE

25 EXPERIENCING?

1   **A**   YES.  YOU SHOULD BE ABLE TO ASK INMATES IF THEY DON'T SHOW

2   UP FOR THEIR MEDICATION, IF THEY REFUSE THEIR MEDICATION, OR

3   JUST AN INMATE SHOULD BE ABLE TO COME UP TO A NURSE AT THE LINE

4   WHEN HE'S -- WHEN THE MEDICATION IS BEING ADMINISTERED TO HIM

5   TO TALK TO HIM ABOUT HIS MEDICATION, MAKE SURE THAT THE

6   MEDICATION IS WORKING OKAY FOR HIM.

7   **Q**   IS THERE SUFFICIENT TIME TO ACCOMPLISH THAT GIVEN THESE

8   LINES AND THE NUMBER OF INMATES?

9   **A**   NO.

10  **Q**   OKAY.  HAVE THERE BEEN SITUATIONS THAT YOU'VE OBSERVED

11  WHERE THE INMATES HAVE EITHER GOTTEN THE WRONG DOSE OR THE

12  WRONG TYPE OF MEDICATION IN THESE MEDICATION DISTRIBUTIONS?

13  **A**   YES.

14  **Q**   CAN YOU GIVE US ANY EXAMPLES OF THAT?

15  **A**   I WAS WORKING IN A MEDICATION ADMINISTRATION WINDOW, AND

16  INMATES GET SOMETHING CALLED BULK MEDS.  BULK MEDS IS

17  MEDICATION THEY CAN TAKE BACK TO THEIR HOUSING UNIT, WHICH IS

18  NOT A DIRECT OBSERVATION MEDICATION, AND I PULLED A BAG OF

19  MEDICATION OUT.  THE OUTSIDE OF THE MEDICATION PRESCRIPTION

20  SAID THAT IT WAS PENICILLIN, AND THE MEDICATION INSIDE THE BAG

21  WAS PREDNISONE.

22  **Q**   AND DO YOU KNOW WHAT THE DRUG PREDNISONE IS USED FOR?

23  **A**   PREDNISONE IS A STEROID.

24  **Q**   DO YOU KNOW OF ANY OTHER SITUATIONS WHERE INMATES HAVE

25  GOTTEN THE WRONG MEDICATION?

1    **A**   YES.  AN INMATE CAME UP TO ME AND GAVE ME A BAG OF

2    MEDICATION FULL OF PINK PILLS, WHICH I IDENTIFIED AS LITHIUM,

3    AND THE INMATE WAS NOT ON LITHIUM, AND HE DID NOT KNOW WHY HE

4    HAD THOSE PINK PILLS.

5    **Q**   OKAY.  IS THERE -- WITH RESPECT TO THE MEDICATION

6    DISTRIBUTION, IS THERE SUPPOSED TO BE DOUBLE-CHECKING UTILIZED

7    FOR THAT PROCESS AS WELL?

8    **A**   YES.

9    **Q**   IS IT USED THERE AT THE FACILITY?

10   **A**   NO.

11   **Q**   OKAY.  NOW, THERE'S ALSO -- WHAT OTHER MEDICATION YOU

12   SAID -- YOU HAVE TALKED ABOUT THE NARCOTIC MEDICATION AND THE

13   INSULIN DISTRIBUTION.  IS THERE ANY OTHER MEDICATION

14   DISTRIBUTION THAT GOES ON AT CSP SOLANO?

15   **A**   PSYCHOTROPIC MEDICATIONS.

16   **Q**   CAN YOU TELL US WHAT YOU MEAN BY PSYCHOTROPIC MEDICATIONS?

17   **A**   MEDICATION FOR THE USE OF MENTAL HEALTH INMATES.

18   **Q**   THAT'S A SEPARATE DISTRIBUTION?

19   **A**   YES.

20   **Q**   AND HOW MANY INMATES ARE INVOLVED IN THAT DISTRIBUTION

21   PROCESS?

22           **MR. MITCHELL:**  INTERPOSE OBJECTION.  BILL MITCHELL,

23   DEFENDANT INTERVENORS, LACK OF FOUNDATION REGARDING THE

24   DISTRIBUTION OF MENTAL HEALTH MEDICINES.

25           **MR. HENDERSON:**  I'LL --

1  BY MR. HENDERSON

2  Q   ARE YOU PRESENT AS A SECURITY OFFICER WHEN PROPHYLACTIC --

3  WHEN PSYCHOTROPIC MEDICATIONS ARE GIVEN TO INMATES?

4  A   YES, I HAVE BEEN AT THE LINE OBSERVING WHEN THE

5  PSYCHOTROPIC MEDICATIONS ARE ADMINISTERED.

6  Q   YOU'RE ALSO FAMILIAR WITH THE PROCESS WHEN YOU WERE A

7  LICENSED VOCATIONAL NURSE AT CSP SOLANO?

8  A   YES.

9  Q   OKAY.  HOW MANY INMATES ARE INVOLVED -- IN JULY OF 2008,

10  HOW MANY INMATES AT CSP SOLANO WERE INVOLVED IN RECEIVING

11  PSYCHOTROPIC MEDICATIONS?

12  A   AT EACH WINDOW, APPROXIMATELY 4- TO 600 INMATES.  IT WOULD

13  VARY DEPENDING OF THE POPULATION ON THAT YARD.

14          JUDGE KARLTON:  I'M SORRY.  I DON'T UNDERSTAND THE

15  ANSWER.  THERE ARE TWO LINES, TWO WINDOWS, CORRECT?  INCORRECT?

16          THE WITNESS:  INCORRECT.

17          JUDGE KARLTON:  THERE'S ONE WINDOW?

18          THE WITNESS:  THERE'S ONE WINDOW FOR EACH DIFFERENT

19  TYPE OF MEDICATION ADMINISTRATION.

20          JUDGE KARLTON:  IF YOU ARE TALKING ABOUT

21  PSYCHOTROPIC DRUGS, HOW MANY WINDOWS ARE THERE?

22          THE WITNESS:  THERE ARE FOUR WINDOWS, ONE ON EACH

23  YARD.  AT CSP SOLANO THERE ARE FOUR YARDS.

24          JUDGE KARLTON:  OKAY.  BUT IN THE YARD THAT YOU ARE

25  WORKING, THERE'S ONE WINDOW THEN?

1          **THE WITNESS:**  CORRECT.

2          **JUDGE KARLTON:**  AND HOW MANY PRISONERS ON -- ONE

3   WINDOW FOR PSYCHOTROPIC DRUGS?

4          **THE WITNESS:**  CORRECT.

5          **JUDGE KARLTON:**  HOW MANY INMATES ARE ON THAT LINE

6   EVERY DAY ROUGHLY?

7          **THE WITNESS:**  APPROXIMATELY 400.

8          **JUDGE KARLTON:**  SO THAT OVERALL THERE ARE ABOUT

9   1,200?

10          **THE WITNESS:**  CORRECT.

11          **JUDGE KARLTON:**  OKAY.

12  **BY MR. HENDERSON**

13  **Q**   IS THE DISTRIBUTION PROCESS SIMILAR TO THAT THAT YOU'VE

14  DESCRIBED FOR THE NARCOTIC MEDICATION DISTRIBUTION?

15  **A**   YES.

16  **Q**   ANY DIFFERENCES IN IT?

17  **A**   THERE ARE A NUMBER OF MEDICATIONS THAT ARE GIVEN, SO IT

18  COULD BE FOUR TO TWELVE MEDICATIONS THAT ARE GIVEN AT THE

19  PSYCHOTROPIC WINDOW VERSUS ONE TO TWO MEDICATIONS GIVEN AT THE

20  NARCOTIC WINDOW.

21  **Q**   ARE THERE -- IS THERE A DOUBLE-CHECKING PROCESS USED FOR

22  THE PSYCHOTROPIC MEDICATIONS?

23  **A**   THERE'S NOT ENOUGH TIME FOR THE NURSES TO DOUBLE-CHECK.

24  **Q**   SO THE ANSWER IS NO, THERE'S NOT?

25  **A**   NO, THERE IS NOT.

1  Q    OKAY.  AND HOW MUCH TIME IS THERE ALLOTTED FOR DISTRIBUTING

2  THE PSYCHOTROPIC MEDICATIONS TO 400 INMATES A DAY?

3  A    THE PSYCHOTROPIC MEDICATION IS DELIVERED IN THE MORNING

4  BEFORE BREAKFAST, AND THERE'S APPROXIMATELY ONE HOUR TO DELIVER

5  THAT MEDICATION.

6  Q    OKAY.  NOW, HAVE YOU SEEN IN THE PSYCHOTROPIC -- WITH THE

7  PSYCHOTROPIC MEDICATIONS SITUATIONS WHERE INMATES HAVE BEEN

8  PRESCRIBED WRONG MEDICATION OR AMOUNTS?

9            **JUDGE KARLTON:**  NOT PRESCRIBED, DELIVERED.

10           **MR. HENDERSON:**  I'M SORRY.  DELIVERED.

11           **THE WITNESS:**  YES.

12 BY MR. HENDERSON

13 Q    OKAY.  I THINK YOU MENTIONED ONE WAY TO AVOID THE CHEEKING

14 WOULD BE TO CRUSH UP THE MEDICATIONS, THE PILL MEDICATIONS,

15 INTO A POWDER FORM?

16 A    CORRECT.

17 Q    ARE YOU AWARE OF ANY OTHER PROCEDURES THAT MIGHT BE USED

18 THAT WOULD MINIMIZE THE POTENTIAL FOR CHEEKING?

19 A    YES, I HAVE SUGGESTED TO THE HEALTHCARE ADMINISTRATION THAT

20 THEY USE LIQUID NARCOTICS INSTEAD OF PILLS, AND THEY TOLD ME

21 THAT THAT WAS NOT FISCALLY POSSIBLE TO DO THAT.

22 Q    NOW, DURING LOCKDOWNS IS THERE ANY CHANGE IN THE PROCEDURES

23 FOR THE DELIVERY OF NARCOTIC OR PSYCHOTROPIC MEDICATIONS?

24 A    YES.  ALL OF THE MEDICATION DURING LOCKDOWN IS DELIVERED TO

25 THE BUILDINGS.

1  Q    OKAY.  AND THEN THEY ARE HANDED OUT AT THE BUILDINGS?

2  A    AT EACH CELLFRONT DOOR.

3  Q    SO THE INMATES AT THAT FACILITY ARE THEN MADE AWARE OF

4  WHICH INMATES ARE RECEIVING MEDICATIONS?

5  A    YES.

6  Q    OKAY.  AND HOW ARE THE MEDICATIONS GIVEN TO THE INMATES AT

7  THAT TIME?

8  A    THE NURSES COME IN, AND THEY PACK THE MEDICATION IN SMALL

9  COIN ENVELOPES, AND THEN THEY PASS THEM THROUGH THE CRACK IN

10 THE DOOR.

11 Q    OKAY.  DOES THAT PROCESS TAKE ADDITIONAL TIME OVER AND

12 ABOVE WHAT WOULD BE TAKEN IF THEY WERE BEING HANDED OUT AT THE

13 LINES AT THE SPECIALTY CLINIC?

14 A    THEY DON'T HAND OUT MEDICATION IN THE SPECIALTY CLINIC.

15 Q    I'M SORRY.  WHERE THE WINDOWS ARE WHERE THE MEDICATIONS ARE

16 HANDED OUT AT THE PRIMARY CLINIC.

17 A    YES, BECAUSE YOU HAVE TO TRANSFER INFORMATION FROM THE

18 MEDICATION ADMINISTRATION RECORD ONTO THE COIN ENVELOPE, AND

19 THEN PACK THE MEDICATION IN THE COIN ENVELOPE AND CARRY THE

20 MEDICATION OUT TO THE BUILDINGS.

21 Q    ARE THE NURSES THAT WORK AT CSP SOLANO REQUIRED TO WORK

22 MANDATORY DOUBLE SHIFTS?

23 A    YES, THEY ARE.

24 Q    HOW MUCH DOES THAT HAPPEN?

25 A    DAILY.

1  Q   OKAY.  WHAT EFFECT, IF ANY, HAVE YOU OBSERVED ON THE NURSES

2  AS THEY WORK A DOUBLE SHIFT?

3  A   THE NURSES ARE FATIGUED.  THEY ARE EMOTIONALLY UPSET.  THEY

4  ARE TIRED.

5  Q   BY "EMOTIONALLY UPSET," WHAT ARE YOU REFERRING TO?

6  A   THEY CRY.

7  Q   OKAY.  HAVE YOU OBSERVED A DIMINISHED PERFORMANCE OF THOSE

8  NURSES THAT ARE WORKING ON DOUBLE SHIFTS?

9          **MR. LEWIS:**  OBJECTION.  CALLS FOR LACK OF FOUNDATION

10  ON THIS WITNESS.  SHE HAS NOT TESTIFIED TO OBSERVATIONS OF ANY

11  OTHER NURSING ACTIVITIES.

12          **MR. HENDERSON:**  MAYBE I CAN BACK UP.

13  **BY MR. HENDERSON**

14  Q   WHEN YOU WERE A LICENSED VOCATIONAL NURSE, WERE YOU

15  REQUIRED TO WORK MANDATORY DOUBLE SHIFTS?

16  A   YES.

17  Q   DID YOU NOTICE A DIMINISHMENT IN YOUR PERFORMANCE TOWARDS

18  THE END OF YOUR SECOND SHIFT?

19  A   YES.

20  Q   DID YOU -- CAN YOU -- STRIKE THAT.

21          **JUDGE KARLTON:**  DID YOU OBSERVE OTHER NURSES IN A

22  SIMILAR SITUATION?

23          **THE WITNESS:**  YES, I HAVE.

24          **JUDGE KARLTON:**  AND WAS IT YOUR OBSERVATION THAT

25  THEIR PERFORMANCE WAS THE SAME OR DIMINISHED OR WHAT?

1      **THE WITNESS:**  DIMINISHED.

2  **BY MR. HENDERSON**

3  **Q**    OKAY.  IN THE COURSE OF YOUR EMPLOYMENT AS A CORRECTIONAL

4  OFFICER, IN ADDITION TO WORKING AT THE SPECIALTY CLINIC, HAVE

5  BEEN ASSIGNED TO ANY HOUSING FACILITIES?

6  **A**    YES, I HAVE.

7  **Q**    WHAT HOUSING FACILITIES HAVE YOU BEEN ASSIGNED TO?

8  **A**    PRETTY MUCH ALL THE HOUSING FACILITIES.  I WAS A SICK

9  RELIEF CORRECTIONAL OFFICER, SO WHEN ANYONE CALLED IN SICK, I

10 WOULD WORK IN THEIR POSITION.

11 **Q**    OKAY.  I'D LIKE TO PUT ON A PHOTOGRAPH WHICH I WILL

12 IDENTIFY FOR THE RECORD AS -- I BELIEVE IT'S FROM EXHIBIT P346.

13      **THE CLERK:**  YOU HAVE FIVE MINUTES.

14      **MR. HENDERSON:**  I'M SORRY?

15      **THE CLERK:**  FIVE MINUTES.

16      (PHOTOGRAPH DISPLAYED.)

17 **BY MR. HENDERSON**

18 **Q**    P346, PHOTOGRAPH ONE, DO YOU RECOGNIZE THIS PHOTOGRAPH?

19 **A**    YES, I DO.

20 **Q**    WHAT DOES IT DEPICT?

21 **A**    THIS IS THE H DORM.

22 **Q**    HAVE YOU WORKED IN THE H DORM?

23 **A**    YES, I HAVE.

24 **Q**    AND DOES THIS DEPICT THE CONDITION OF THE H DORM AT THE

25 TIME YOU WORKED IN IT?

1  **A**   YES.

2  **Q**   WHAT WE HAVE -- CAN YOU TELL US BEYOND THE BENCHES AND THE

3  TV, WHAT'S GOING ON IN THE BACK THERE?

4  **A**   THE INMATES ARE HANGING OUT.

5  **Q**   ARE THOSE BUNKS IN THOSE LOCATIONS?

6  **A**   WHERE THE LOCKERS ARE, THOSE ARE BUNKS.

7  **Q**   OKAY.  HOW MANY BUNKS ARE THERE IN A TIER?

8  **A**   THERE ARE THREE BUNKS.

9  **Q**   OKAY.  CAN WE GO TO 346-3?  THREE.  I'M SORRY.

10         DOES THIS PHOTOGRAPH DEPICT THE BUNK CONDITIONS THAT

11  YOU HAVE OBSERVED IN H DORM?

12  **A**   YES.

13  **Q**   OKAY.  ARE THOSE THE TYPES OF BUNKS THAT ARE INVOLVED?

14  **A**   YES.

15  **Q**   OKAY.  DO THOSE BUNKS HAVE ANY TYPE OF -- THE UPPER BUNKS

16  HAVE ANY TYPE OF RAILING?

17  **A**   NO, THEY DO NOT.

18  **Q**   OKAY.  ARE YOU AWARE OF ANY INCIDENTS THAT OCCURRED WHEN

19  YOU'VE WORKED IN ANY OF THE DORMS WHERE INMATES HAVE FALLEN OFF

20  OF THE THIRD BUNK AND INJURED THEMSELVES?

21  **A**   YES.

22  **Q**   WHAT HAVE YOU SEEN -- DID YOU ACTUALLY WITNESS THE INMATE

23  FALLING OFF?

24  **A**   NO, I HAVE NOT.

25  **Q**   OKAY.  WHAT HAVE YOU SEEN OR OBSERVED THAT LED YOU TO THE

1  CONCLUSION THAT SOMEBODY HAD FALLEN OFF A BUNK?

2  **A**    WHILE I WORKED IN THE PRIMARY CLINIC WHERE -- THAT'S THEIR

3  TRIAGE TREATMENT AREA, I'VE HAD INMATES COME IN WITH POSSIBLE

4  FRACTURES, HEAD INJURIES, BACK INJURIES FROM FALLING OFF OF THE

5  TOP BUNK.

6          **MR. MITCHELL:**  OBJECT AS CALLING FOR HEARSAY AND

7  SPECULATION AS TO THE CAUSE.

8          **JUDGE HENDERSON:**  OVERRULED.

9  **BY MR. HENDERSON**

10 **Q**    WHEN YOU WERE IN H DORM, DID YOU RESPOND TO ANY INCIDENTS

11 WHEN YOU FOUND AN INMATE ON THE FLOOR WHO APPARENTLY HAD FALLEN

12 FROM HIS BUNK?

13 **A**    YES.

14 **Q**    WHAT'S THE NOISE LEVEL -- WHAT WAS THE NOISE LEVEL LIKE IN

15 H BUILDING WHEN YOU WERE THERE?

16 **A**    IT VARIED DEPENDING ON THE TYPE OF PROGRAM THAT WAS RUNNING

17 DURING THE TIME, BUT DURING DAYROOM, IT WAS HARD TO EVEN HEAR

18 YOUR PARTNER TALKING TO YOU.

19 **Q**    OKAY.  WOULD YOU BE ABLE TO HEAR SOMEONE OR -- STRIKE THAT.

20         WHAT WAS CONTRIBUTING TO THE NOISE LEVEL THERE?

21 **A**    THE FANS IN THE BUILDINGS, RADIOS, TELEVISIONS, THE INMATES

22 TALKING OVER EACH OTHER, TELLING STORIES.

23 **Q**    OKAY.  WHEN YOU WERE IN H BUILDING, PART OF YOUR DUTIES

24 WERE TO MONITOR AND RESPOND TO MEDICAL CONDITIONS FOR THE

25 INMATES THAT WERE THERE?

1    **A**    YES.

2    **Q**    WERE YOU ABLE TO DO THAT JOB EFFICIENTLY IN H DORM WHEN YOU

3    WERE THERE?

4    **A**    IF THERE WAS A MEDICAL CONDITION, I WOULD RESPOND TO THE

5    MEDICAL CONDITION, YES.

6    **Q**    OKAY.  WHAT ABOUT BEING ABLE TO MONITOR MEDICAL CONDITIONS?

7    **A**    NO, I COULD NOT MONITOR THAT MANY INMATES TO TELL IF THEY

8    HAD A MEDICAL CONDITION.

9    **Q**    OKAY.  SO IT WOULD BE LIMITED TO WHAT YOU EITHER COULD

10   OBSERVE YOURSELF OR HAVE SOMEONE REPORT TO YOU?

11   **A**    CORRECT.

12   **Q**    AND YOUR ABILITIES TO BE INVOLVED IN OBSERVATION WERE

13   LIMITED BY THE NUMBER OF INMATES?

14   **A**    CORRECT.

15   **Q**    HOW MANY INMATES WERE IN H DORM AT THE TIME YOU WERE THERE?

16   **A**    APPROXIMATELY 250 TO 300 INMATES.

17   **Q**    WERE THE INMATES -- HOW MANY CORRECTIONAL OFFICERS ON YOUR

18   SHIFT IN THE DAY SHIFT?

19   **A**    THERE ARE TWO OFFICERS THAT WORK ON THE FLOOR IN THAT

20   BUILDING, AND THEN THERE'S A GUNNER AT THE TOP OF THE CEILING.

21   **Q**    SO YOURSELF AND ONE OTHER OFFICER WERE ON THE FLOOR?

22   **A**    YES.

23   **Q**    DID YOU HAVE AN INCIDENT WITH AN INMATE WHO HAD A SEIZURE

24   PROBLEM IN THE BUNKS?

25   **A**    YES.  THERE WAS AN INMATE THAT SLEPT ON A MIDDLE BUNK, AND

1   HE HAD SEIZURES DAILY AND FREQUENTLY DURING THE DAY ON A DAILY

2   BASIS.

3   Q   AND WHAT WOULD YOU DO -- DID YOU EVER OBSERVING HIM GO INTO

4   SEIZURE?

5   A   PARDON ME?

6   Q   DID YOU EVER OBSERVE THAT INMATE GO INTO SEIZURE?

7   A   YES, I DID.

8   Q   WHAT WOULD YOU DO IN RESPONSE TO THAT?

9   A   MYSELF AND THE OTHER OFFICER WORKING ON THE FLOOR IN THE

10  BUILDING WOULD GO STAND ON THE SIDE OF THE BUNKS SO HE WOULDN'T

11  FALL OUT.

12  Q   AND HOW OFTEN DID THAT OCCUR, DID YOU HAVE TO DO THAT?

13  A   ONE PARTICULAR DAY WHEN I WAS WORKING IN THERE THREE TIMES.

14  Q   OKAY.  THAT WOULD MEAN BOTH CORRECTIONAL OFFICERS ON THE

15  FLOOR WOULD BE AT THAT ONE BUNK, CORRECT?

16  A   YES.

17  Q   AND -- THANK YOU.

18          **THE CLERK:**  COUNSEL, TIME'S UP.

19          **MR. HENDERSON:**  OKAY.  THANK YOU.

20          **JUDGE KARLTON:**  BEFORE YOU DO THAT, DO PLAINTIFFS

21  HAVE ANYTHING THEY WANT TO ASK?

22          **MR. BIEN:**  I DO.  MICHAEL BIEN ON BEHALF OF THE

23  COLEMAN PLAINTIFFS.

24  ///

25  ///

1            **DIRECT EXAMINATION BY MR. BIEN**

2   **BY MR. BIEN**

3   **Q**    WHILE YOU WERE WORKING AT SOLANO IN THE LAST SIX MONTHS,

4   BEFORE YOU TOOK LEAVE, WERE THERE ANY LOCKDOWNS?

5   **A**    YES.

6   **Q**    OKAY.  DO YOU RECALL THE DURATION OF ANY LOCKDOWNS THAT

7   OCCURRED?

8   **A**    PARDON ME?

9   **Q**    HOW LONG WERE ANY OF THE LOCKDOWNS IN THE LAST SIX MONTHS

10  BEFORE YOU TOOK LEAVE?

11  **A**    I BELIEVE IT STARTED IN THE SUMMER, AND THEY WERE STILL ON

12  LOCKDOWN WHEN I LEFT AT THE END OF JULY.

13  **Q**    OKAY.  SO MORE THAN A MONTH?

14  **A**    YES.

15  **Q**    WHEN YOU DISTRIBUTED MEDICATION -- YOU SAID YOU WERE

16  INVOLVED IN DISTRIBUTION OF MEDICATION DURING LOCKDOWNS; IS

17  THAT CORRECT?

18  **A**    YES.

19  **Q**    AND WHEN YOU DISTRIBUTE MEDICATION THROUGH A LOCKDOWN, HOW

20  CAN YOU DESCRIBE THE PHYSICAL PROCESS OF DISTRIBUTING THE

21  MEDICATION?  HOW DO YOU GET IT TO INMATES?

22  **A**    FROM THE START TO THE END OR ONCE WE HAVE THE MEDICATION

23  PACKED?

24  **Q**    JUST FROM WHEN -- I UNDERSTAND YOU ACTUALLY TAKE IT TO

25  THEIR CELL; IS THAT CORRECT?

1  **A**   THAT'S CORRECT.

2  **Q**   SO WHAT HAPPENS NEXT?

3  **A**   YOU WALK UP TO A DOOR AND YOU ASK THEM IF THEY WANT THEIR

4  MEDICATION.

5  **Q**   OKAY.

6  **A**   AND THEY EITHER SAY YES OR THEY REFUSE THEIR MEDICATION.

7  IF THEY SAY THEY WANT THEIR MEDICATION, THEY BRING THEIR I.D.

8  TO THE WINDOW.  YOU PASS IT THROUGH A SMALL CRACK,

9  APPROXIMATELY ONE INCH WIDE.  THEY TAKE THE MEDICATION OUT OF

10 THE COIN ENVELOPE, DO WHATEVER THEY'RE DOING WITH IT, AND THEY

11 GIVE YOU THE COIN ENVELOPE BACK.

12         **JUDGE KARLTON:**  YOU CAN'T TELL WHETHER THEY ARE

13 CHEEKING IT IF IT'S BEING DELIVERED IN A CELL?

14         **THE WITNESS:**  NO, I COULD NOT.

15         **JUDGE HENDERSON:**  LET ME -- I'M CONFUSED.  IF YOU

16 ASK THEM WHETHER THEY WANT THEIR MEDICATION, I ASSUME IF THEY

17 SAY, NO, YOU DON'T GIVE IT TO THEM?

18         **THE WITNESS:**  CORRECT.

19         **JUDGE HENDERSON:**  WHY DO WE WORRY ABOUT CHEEKING?

20 WHY IS CHEEKING RELEVANT IF ALL THEY HAVE TO DO IS SAY, NO?  I

21 MEAN, EXCEPT FOR THOSE WHO ARE HOARDING AND MAY BE SELLING, BUT

22 THE ONES WHO SPIT IT OUT, I DON'T UNDERSTAND THAT.

23         **THE WITNESS:**  THERE ARE SEVERAL RELEVANCE TO

24 CHEEKING OF MEDICATION.  FOR PSYCHOTROPIC MEDICATIONS, NOT

25 EVERY INMATE IS GOING TO HAVE THE MENTAL CAPACITY TO BE ABLE TO

1   DETERMINE IF THEY'RE DECOMPENSATING.  IF WE THINK THEY'RE

2   ALWAYS TAKING THEIR MEDICATION AND THE PSYCHOLOGIST OR THE

3   PSYCHIATRIST LOOKS AT THEIR MEDICATION ADMINISTRATION RECORD,

4   AND IT SHOWS THEY ARE COMPLIANT WITH TAKING THEIR MEDICATION,

5   THEN THEY MIGHT NOT BE ADDRESSED IN THE SAME FASHION AS

6   SOMEBODY THAT'S NOT TAKING THEIR MEDICATION.

7   **BY MR. BIEN**

8   **Q**   HAVE YOU EVER DISTRIBUTED MEDICATION TO AN INMATE DURING A

9   LOCKDOWN WHEN THERE ARE TWO INMATES IN THE CELL?

10  **A**   YES.

11  **Q**   AND IS THERE ANY PRIVACY TO THE INMATE WHO YOU ARE

12  DISTRIBUTING THE MEDICATION TO IN THAT CIRCUMSTANCE?

13  **A**   NO.

14              **MR. BIEN:**  THANK YOU.

15              **JUDGE HENDERSON:**  CROSS.

16              **CROSS-EXAMINATION BY MR. MITCHELL**

17  **BY MR. MITCHELL**

18  **Q**   GOOD MORNING.  BILL MITCHELL FOR THE DEFENDANT INTERVENORS.

19              GOOD MORNING, OFFICER ROWLETT.

20  **A**   GOOD MORNING.

21  **Q**   OFFICER ROWLETT, YOU HAVE BEEN AT SOLANO SINCE 2000, YOU

22  TOLD US; IS THAT CORRECT?

23  **A**   YES.

24  **Q**   YOU FIRST STARTED THERE AS AN MTA?

25  **A**   YES.

1  Q    YOUR POSITION CHANGED IN FEBRUARY OF 2008?  OR WHEN WAS IT

2  YOUR POSITION CHANGED FROM MTA TO CORRECTIONAL OFFICER?

3  A    IN THE SUMMER OF 2007.

4  Q    WAS THAT A VOLUNTARY CHANGE IN GRADE FOR YOU OR DEMOTION?

5  WHAT WAS THAT?

6  A    IT WAS NOT A DEMOTION.  I MAKE THE SAME AMOUNT OF MONEY.

7  ACTUALLY, I MAKE A HUNDRED DOLLARS MORE A MONTH BECAUSE OF MY

8  EDUCATION.  IT WAS A TRANSFER OF NO LONGER DOING NURSING

9  SERVICES.

10 Q    DID THE RECEIVER DO AWAY WITH THE MTA POSITION?

11 A    NO, HE DID NOT.  THE MTA POSITION IS STILL UP AND RUNNING

12 AT DMH, AND IF I WISHED TO HAVE CONTINUED MY

13 NURSING/CORRECTIONAL OFFICER JOB AS AN MTA, I COULD HAVE

14 TRANSFERRED TO DMH, BUT I CHOSE TO STAY AT CSP SOLANO.

15 Q    THE OBSERVATIONS YOU RELATED TO US HERE TODAY OF THE

16 DIFFERENT DELIVERY OF MEDICATIONS TO INMATES, DID THAT TAKE

17 PLACE WHILE YOU WERE A CORRECTIONAL OFFICER OR DURING YOUR TIME

18 AS AN MTA?

19 A    COULD YOU REPEAT THE QUESTION, PLEASE?

20 Q    YOUR OBSERVATIONS THAT YOU'VE RELATED TO US TODAY ABOUT THE

21 DELIVERY OF MEDICATION FROM INSULIN TO EXAMINATIONS OF

22 INDIVIDUALS AND MED DISTRIBUTION, THOSE WERE OBSERVATIONS THAT

23 WERE MADE WHILE YOU WERE AN MTA OR A CORRECTIONAL OFFICER?

24           **JUDGE KARLTON:**  BOTH.

25           **THE WITNESS:**  BOTH.

1  BY MR. MITCHELL

2  Q    DO YOU RECALL WRITING IN YOUR TRIAL AFFIDAVIT THAT THERE

3  WERE MANY NUMEROUS CONDITIONS AT SOLANO CREATING PROBLEMS

4  REGARDING THE HEALTH OF INMATES?

5  A    I'M SORRY.  I'M HARD OF HEARING.  COULD YOU SPEAK A LITTLE

6  LOUDER?

7  Q    YES.  DO YOU RECALL WRITING IN YOUR TRIAL AFFIDAVIT THAT

8  THERE ARE NUMEROUS CONDITIONS AT SOLANO CREATING PROBLEMS

9  REGARDING THE HEALTH OF INMATES AND THE DELIVERY OF CARE AND

10 THAT THESE ARE DUE, AT LEAST IN PART, TO OVERCROWDING?

11 A    YES.

12 Q    YOU WOULD AGREE THAT THERE ARE REASONS OTHER THAN

13 OVERCROWDING CONTRIBUTING TO SOME OF THE PROBLEMS IN THE

14 DELIVERY OF MEDICAL CARE TO INMATES AT SOLANO, CORRECT?

15 A    YES.

16 Q    REGARDING THE DELIVERY OF PSYCHOTROPIC MEDICATIONS THAT YOU

17 TESTIFIED TO HERE TODAY, ARE YOU AWARE OF THE DIRECT

18 OBSERVATION THERAPY PROTOCOL THAT'S BEEN INSTITUTED AT SOLANO?

19 A    YES, I AM.

20 Q    DO YOU AGREE THAT THERE IS NOT A NUMBER ONE REASON FOR ALL

21 OF THE PROBLEMS REGARDING THE DELIVERY OF MEDICAL CARE AT

22 SOLANO?

23 A    YES.

24 Q    REGARDLESS OF THE PROBLEMS THAT YOU'VE DESCRIBED FOR US

25 HERE TODAY, WOULD YOU AGREE THAT THE INMATES, WHEN IT COMES TO

1    URGENT CARE, THEY GET THE CARE THAT THEY NEED?

2    **A**    NO.

3    **Q**    DO YOU RECALL TESTIFYING IN YOUR DEPOSITION THAT, AS FAR AS

4    URGENT CARE, YOU WOULD SAY THAT AT SOLANO THEY ARE UP TO SPEED

5    IF IT'S URGENT?

6    **A**    I DON'T THINK I SAID THEY WERE UP TO SPEED.

7              **MR. MITCHELL:**    COULD WE HAVE DEPOSITION AT PAGE 41?

8              (DOCUMENT DISPLAYED.)

9    **BY MR. MITCHELL**

10   **Q**    YOU RECALL BEING ASKED THE QUESTION:

11              "DO YOU KNOW SPECIFICALLY WHAT TYPES OF DELAYS

12           INMATES ARE EXPERIENCING IN RECEIVING SPECIALTY

13           CARE?"

14              AND ANSWERING:

15              "AS FAR AS URGENT, I WOULD SAY AT SOLANO THEY'RE

16           UP TO SPEED IF IT'S URGENT.  THEY'LL EITHER SEND THEM

17           OUT, OR IF THAT SPECIALIST IS THERE THAT DAY, THEY'LL

18           BE ABLE TO SEE THEM"?

19   **A**    THAT'S REFERRING TO SPECIALTY CARE, NOT URGENT CARE.

20   URGENT CARE TO ME WOULD BE SOMEONE THAT'S URGENTLY HURT OR VERY

21   SICK.  SPECIALTY CARE FOR URGENT REFERRALS WOULD BE AN INMATE

22   THAT'S SEEN IN ONE TO THREE DAYS.

23   **Q**    AS FAR AS SPECIALTY CARE WHEN THEY ARE HAVING URGENT

24   MATTERS, THEY'RE GETTING THE CARE THEY NEED?

25   **A**    WITHIN ONE TO THREE DAYS, YES.

1  Q   YOU WORKED IN THE COMMUNITY AS AN LVN, CORRECT?

2  A   YES.

3  Q   YOU WORKED IN AN EMERGENCY ROOM?

4  A   YES.

5  Q   WAS THAT A BUSY EMERGENCY ROOM?

6  A   YES.

7  Q   ARE THE PATIENTS THAT COME INTO THE EMERGENCY ROOMS WHEN

8  YOU WORKED IN THE COMMUNITY IN A GENERAL HOSPITAL, DO THEY

9  TRIAGE THE PATIENTS, AND THE ONES THAT NEED URGENT CARE GET

10 SEEN AHEAD OF THE ONES THAT AREN'T SO URGENT?

11 A   I WORKED AT SUTTER ROSEVILLE EMERGENCY ROOM.  IT'S A BIT

12 DIFFERENT THAN ANY OTHER TYPE OF EMERGENCY ROOM.  WE WERE A

13 TRAUMA FOUR WITH LIFE FLIGHT, SO I REALLY CAN'T COMPARE THE

14 TWO.

15 Q   YOU WOULD AGREE IN EMERGENCY ROOMS THAT THEY TRIAGE

16 PATIENTS ACCORDING TO THE SERIOUSNESS OF THEIR ILLNESS OR

17 INJURY, CORRECT?

18 A   YES.

19 Q   THE SAME TAKES PLACE IN THE PRISON SETTING, CORRECT?

20 A   TRIAGES TAKE PLACE.  THEY DO NOT TAKE PLACE IN THE SAME

21 TYPE OF MANNER.

22 Q   HAVE YOU SEEN AN INCREASE IN THE NUMBER OF NURSES OVER THE

23 LAST YEAR AT SOLANO?

24         **MR. HENDERSON:**  OBJECTION.  VAGUE.

25         **THE WITNESS:**  I HAVE SEEN MORE INMATES.

1          **MR. HENDERSON:**  OBJECTION.  VAGUE.

2          **JUDGE HENDERSON:**  HAVE YOU SEEN INCREASES IN NURSES

3   IN THE LAST YEAR?  WHAT'S VAGUE ABOUT THAT?

4          **MR. HENDERSON:**  IN WHAT LOCATION, YOUR HONOR?  JUST

5   NURSES GENERALLY?

6          **JUDGE KARLTON:**  THAT'S THE QUESTION.  YOU MAY

7   ANSWER.

8          **THE WITNESS:**  CAN YOU REPEAT THE QUESTION?

9   **BY MR. MITCHELL**

10  **Q**   YES.  HAVE YOU SEEN AN INCREASE IN THE NUMBER OF NURSES,

11  THE STAFF POSITIONS FOR NURSES, AT SOLANO WITHIN THE LAST YEAR?

12  **A**   YES.

13  **Q**   HAVE YOU SEEN A CHANGE IN PROCEDURES FOR THE DELIVERY OF

14  MEDICAL CARE AT SOLANO WITHIN THE LAST YEAR?

15         **MR. HENDERSON:**  I'LL OBJECT AS OVERBROAD, YOUR

16  HONOR.

17         **JUDGE HENDERSON:**  OVERRULED.

18         **THE WITNESS:**  THERE HAVE BEEN CHANGES IN POLICY, IS

19  THAT WHAT YOU MEAN, OR HOW THE NURSES ARE DOING THEIR JOB?

20  **BY MR. MITCHELL**

21  **Q**   POLICIES AND THE DELIVERY OF MEDICAL CARE TO INMATES, HAVE

22  THOSE CHANGED OVER THE LAST YEAR?

23  **A**   I DON'T KNOW.  I'M A CORRECTIONAL OFFICER NOW.

24         **MR. MITCHELL:**  NO FURTHER QUESTIONS.

25         **JUDGE HENDERSON:**  ANYTHING BY STATE DEFENDANTS?

1          **MR. MELLO:**  NO, YOUR HONOR.

2          **JUDGE HENDERSON:**  OKAY.  REDIRECT.

3          **MR. HENDERSON:**  JUST A FEW, YOUR HONOR.

4          **JUDGE HENDERSON:**  YES.

5          **MR. HENDERSON:**  COULD WE HAVE THE DEPOSITION PAGE

6  BROUGHT UP ON THE SCREEN, PAGE 41 THAT WAS PREVIOUSLY SHOWN TO

7  THE WITNESS?

8          **MR. MELLO:**  YOUR HONOR?

9          **JUDGE HENDERSON:**  EVERYONE IS POINTING AT EVERYONE.

10          **MR. MELLO:**  ARE WE SUPPOSED TO DO THAT WITH OUR

11  EQUIPMENT?

12          **JUDGE KARLTON:**  IF YOU'VE GOT IT.  IT IS A QUESTION

13  OF CONVENIENCE.

14          **MR. HENDERSON:**  I CAN READ IT, YOUR HONOR.

15          **JUDGE KARLTON:**  IF YOU'VE GOT IT, BRING IT UP.

16          **MR. HENDERSON:**  CAN WE TAKE THE HIGHLIGHTED PART

17  OUT, PLEASE?  WELL, THAT WAS A LITTLE MORE THAN I WANTED.

18          **JUDGE KARLTON:**  WHY DON'T YOU READ IT?

19          **THE WITNESS:**  THE ONLY THING I WOULD LIKE TO DO IS

20  JUST READ INTO THE RECORD THE ADDITIONAL PARAGRAPH TO THE

21  WITNESS'S ANSWER TO THE QUESTION SHE WAS POSED, AND I'LL --

22          **JUDGE HENDERSON:**  FOR FUTURE REFERENCE IT WORKS

23  BETTER IF YOU HAVE THEM DO IT AT THE TIME FOR THE COMPLETE

24  RECORD.

25          **JUDGE KARLTON:**  THAT'S ALL RIGHT.

1    **MR. HENDERSON:**  I'M SORRY.  I DIDN'T CATCH IT AT THE

2   TIME.

3         **JUDGE HENDERSON:**  OKAY.

4         **REDIRECT EXAMINATION BY MR. HENDERSON**

5   BY MR. HENDERSON

6   **Q**   SPECIFICALLY -- AND I'M READING STARTING ON LINE 20:

7         "FOLLOW-UP CARE, THE DOCTOR MAY WANT TO SEE A

8        FOLLOW-UP APPOINTMENT IN TWO WEEKS, BUT IT MIGHT BE

9        FOUR TO SIX TO EIGHT.  SOME OF THEM ARE THREE MONTHS,

10        SIX MONTHS BEHIND WITH FOLLOW-UPS BECAUSE THEY ARE SO

11        INUNDATED WITH NEW CONSULTS THAT COME IN."

12        WAS THAT YOUR TESTIMONY AT THE TIME?

13   **A**   YES.

14   **Q**   IS THAT STILL TRUE AND CORRECT TODAY?

15   **A**   I DON'T KNOW AS FAR AS TODAY.  AS FAR AS JULY WHEN I WAS

16   THERE LAST, YES, IT WAS STILL CORRECT.

17         **MR. HENDERSON:**  OKAY.  THANK YOU.  THAT'S ALL I

18   HAVE.

19         **JUDGE HENDERSON:**  ANYTHING BY INTERVENORS OR --

20         THANK YOU VERY MUCH, MS. ROWLETT.  YOU'RE EXCUSED.

21         **THE WITNESS:**  THANK YOU.

22         **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

23   WITNESS.

24         **MR. HENDERSON:**  DO YOU WANT TO PROCEED WITH A BREAK

25   OR DO YOU WANT ME TO BRING THE WITNESS IN?  IT WILL PROBABLY BE

1    ABOUT 30 MINUTES.

2              **JUDGE HENDERSON:** LET'S PROCEED.

3                          **RUBEN LEIJA**

4    HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

5    DULY SWORN AND EXAMINED AS FOLLOWS:

6              **THE CLERK:** STATE AND SPELL YOUR FULL NAME FOR THE

7    RECORD, PLEASE.

8              **THE WITNESS:** RUBEN LEIJA, JUNIOR. R-U-B-E-N

9    L-E-I-J-A.

10             **DIRECT EXAMINATION BY MR. HENDERSON**

11   **BY MR. HENDERSON**

12   **Q**   MR. LEIJA, ARE YOU PRESENTLY EMPLOYED?

13   **A**   YES.

14   **Q**   AND BY WHOM?

15   **A**   CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION.

16   **Q**   HOW LONG HAVE YOU BEEN EMPLOYED BY THEM?

17   **A**   FOR 12 YEARS NOW.

18   **Q**   WHAT IS YOUR CURRENT TITLE?

19   **A**   CORRECTIONAL OFFICER.

20   **Q**   AND HAS ALL OF YOUR EMPLOYMENT WITH CDCR BEEN AS A

21   CORRECTIONAL OFFICER?

22   **A**   YES.

23             **MR. HENDERSON:** I WILL AGAIN DRAW THE COURT'S

24   ATTENTION TO MR. LEIJA'S EXPERIENCE IN PARAGRAPHS ONE AND TWO

25   OF HIS DIRECT TESTIMONY DECLARATION.

1    BY MR. HENDERSON

2    Q    SIR, WHERE ARE YOU CURRENTLY ASSIGNED AS A CORRECTIONAL

3    OFFICER?  WHAT PRISON FACILITY?

4    A    CHUCKAWALLA VALLEY STATE PRISON.

5    Q    FOR THOSE OF US THAT HAVE NEVER BEEN WITHIN HAILING

6    DISTANCE OF CHUCKAWALLA PRISON FACILITY, CAN YOU TELL US WHERE

7    THAT IS?

8    A    IT'S LOCATED IN THE DESERT IN SOUTHERN CALIFORNIA,

9    TWENTY-TWO MILES WEST OF THE CITY OF BLYTHE.

10   Q    THAT'S IN RIVERSIDE COUNTY?

11   A    YES, IN RIVERSIDE COUNTY.

12   Q    WHAT IS YOUR CURRENT POST AT CHUCKAWALLA?

13   A    MY CURRENT POST IS D10 FLOOR HOUSING UNIT.

14   Q    OKAY.  AND BUILDING D10, WHAT IS THE COMPOSITION OF THE

15   INMATE POPULATION OF THAT UNIT?

16   A    THREE HUNDRED FORTY INMATES.

17   Q    WHAT TYPES OF INMATES ARE LODGED THERE?

18   A    LEVEL TWO INMATES.

19   Q    AND I THINK YOU INDICATED THERE'S PRESENTLY ABOUT 340

20   INMATES IN THAT UNIT?

21   A    YES.

22   Q    OKAY.  AND CAN YOU DESCRIBE THE UNIT FOR US IN TERMS OF ITS

23   PHYSICAL CONFIGURATION?

24   A    THERE'S TWO TIERS, A LOWER TIER AND AN UPPER TIER.  EACH

25   TIER HAS CUBICLES WITH BUNKS IN THERE, TRIPLE BUNKS AND DOUBLE

1   BUNKS.

2   **Q**   ARE THESE OPEN-ACCESS CUBICLES; IN OTHER WORDS, THERE'S NO

3   DOORS THAT HAVE TO BE UTILIZED?

4   **A**   YES.

5   **Q**   CAN YOU BRING YOUR MICROPHONE A LITTLE CLOSER TO YOU

6   BECAUSE YOU ARE HARD TO PICK UP?  THANK YOU.

7             IN THE CUBICLES, APPROXIMATELY HOW MANY INMATES ARE

8   HOUSED IN EACH OF THE CUBICLES?

9   **A**   THERE'S ANYWHERE BETWEEN 16 AND 20 INMATES IN A CUBICLE.

10  **Q**   HOW ARE THEY HOUSED WITHIN THE CUBICLE?  WHAT KIND OF

11  BEDDING DO THEY HAVE?

12  **A**   THEY HAVE DOUBLE AND TRIPLE BUNKS.  EACH BUNK SITS ON TOP

13  OF EACH OTHER.

14  **Q**   DO THE BUNKS HAVE RAILINGS ON THEM?

15  **A**   NO.

16  **Q**   OKAY.  HOW MANY OTHER -- WHAT SHIFT DO YOU WORK THERE?

17  **A**   THIRD WATCH, FROM 2:00 P.M. TO 10:00 P.M.

18  **Q**   AND HOW MANY OTHER CORRECTIONAL OFFICERS WORK THAT SHIFT AT

19  D10 DURING THE THIRD WATCH?

20  **A**   FOUR, TOTAL OF FOUR.

21  **Q**   COUNTING YOURSELF?

22  **A**   YES.

23  **Q**   SO THERE'S FOUR CORRECTIONAL OFFICERS FOR 340 INMATES?

24  **A**   YES.

25  **Q**   OKAY.  HOW MANY CORRECTIONAL OFFICERS WORK ON THE FIRST

1  SHIFT AT D10?

2  **A**   THERE'S THREE.

3  **Q**   AND HOW MANY WORK ON THE SECOND SHIFT?

4  **A**   THERE'S ALSO THREE.

5  **Q**   WHAT ARE YOUR JOB DUTIES AT D10?

6  **A**   MY MAIN DUTIES ARE OBSERVATION OF INMATES AND RUNNING THE

7  PROGRAM AS FAR AS DOOR LOCKS, UNLOCKS, SEEING THAT PEOPLE,

8  INMATES GET THE MEDICAL, AND OTHERS NUMEROUS OTHER DUTIES.

9  **Q**   OKAY.  DO THOSE DUTIES ALSO INCLUDE MONITORING FOR

10 POTENTIAL MEDICAL CONDITIONS OF INMATES?

11 **A**   YES.

12 **Q**   AND HOW IS THAT DONE?

13 **A**   MAINLY BY TOURS, WALKING AROUND, JUST TALKING WITH THE

14 INDIVIDUALS.

15 **Q**   DO YOU FEEL THAT YOU'RE ABLE TO EFFECTIVELY MONITOR FOR

16 MEDICAL CONDITIONS AS A CORRECTIONAL OFFICER?

17 **A**   NO.

18 **Q**   WHY IS THAT?

19 **A**   BECAUSE IT'S CROWDED IN THE BUILDINGS.  THE CUBICLES ARE

20 HARD TO LOOK INTO, ESPECIALLY WITH THE TRIPLE RACKS IN THERE

21 NOW.

22 **Q**   CAN YOU -- IS THERE A WORK STATION THAT YOU WORK AT WITHIN

23 THE BUILDING?

24 **A**   YES.

25 **Q**   WHERE IS THAT LOCATED?

1  **A**   IN THE CENTER OF THE BUILDING.

2  **Q**   OKAY.  DOES THAT GIVE YOU A FULL LINE OF SIGHT INTO ALL

3  AREAS OF BUILDING D10?

4  **A**   NO.

5  **Q**   WHAT AREAS DON'T YOU SEE?

6  **A**   THE -- BOTH CORNERS ON EACH SIDE OF THE BUILDING.

7  **Q**   OKAY.  ARE THERE -- HAVE YOU HAD SITUATIONS INVOLVING

8  INMATES WITH INFECTIOUS DISEASES?

9  **A**   YES.

10  **Q**   ARE THERE -- HAVE THESE BEEN SITUATIONS -- ARE THERE SOME

11  OF THESE SITUATIONS WHERE THE INMATES HAVE COME FORWARD TO TELL

12  YOU THEY HAVE AN INFECTIOUS DISEASE?

13  **A**   YES.

14  **Q**   ARE THERE OTHER SITUATIONS WHERE YOU FOUND OUT BY OTHER

15  MEANS?

16  **A**   YES.

17  **Q**   ARE THERE SITUATIONS WHERE YOU'VE OBSERVED THE INMATES TO

18  CONCEAL THEIR CONDITIONS?

19  **A**   YES.

20  **Q**   WHAT IS YOUR UNDERSTANDING OF THE REASONS FOR THE

21  CONCEALMENTS?

22  **A**   SOME OF THE REASONS ARE THEY DON'T WANT OTHER INMATES TO

23  FIND OUT IF THEY HAVE SOMETHING THAT'S ESPECIALLY CONTAGIOUS,

24  OR THEY JUST ARE EMBARRASSED JUST TO COME UP TO EVEN DESCRIBE

25  THAT THEY NEED WHATEVER THEY NEED, WHATEVER ISSUE THEY HAVE.

1  Q    WHAT KINDS OF SPECIALTY CONTAGIOUS CONDITIONS ARE WE

2  TALKING ABOUT?

3  A    STAPH INFECTIONS.

4  Q    AND YOU RELATED AN INCIDENT IN YOUR DEPOSITION THAT INVOLVE

5  AN INMATE THAT HAD A STAPH INFECTION THAT WAS TREATED BY ONE OF

6  HIS CUBICLE MATES?

7  A    YES.  THE INMATE THAT WAS HELPING HIS BUNKIE, THE PERSON

8  THAT HE WAS SLEEPING ABOVE, THEY BOTH APPROACHED ME.  HE TOLD

9  ME THAT HIS BUDDY NEEDED SOME HELP AND THAT HE HAD BEEN USING A

10 SPOON DIGGING OUT A STAPH INFECTION ON HIS BACK SHOULDER.

11 Q    DID HE TELL YOU WHY HE HAD COME FORWARD OR THEY HAD COME

12 FORWARD AT THAT POINT?

13 A    HE JUST SAID HE DIDN'T WANT ANYBODY TO KNOW.

14 Q    IS THERE MEDICATION DISTRIBUTIONS THAT GO ON IN THE -- IN

15 D10?

16 A    YES.

17 Q    WHEN DO THOSE OCCUR?

18 A    USUALLY THOSE OCCUR WHEN WE'RE LOCK DOWNED.

19 Q    AND HOW ARE THOSE HANDLED?

20 A    THEY WILL COME UP TO -- THE NURSES WILL COME UP TO THE

21 OFFICER STATION, AND THEY'LL USE THE PA, PUBLIC ANNOUNCEMENT

22 SYSTEM, AND THEY'LL CALL FOR CERTAIN INDIVIDUALS, OR THEY'LL

23 MAKE AN ANNOUNCEMENT THAT THEY ARE PASSING OUT CERTAIN MEDS,

24 MEDICATION.

25 Q    OKAY.  AND WHAT ANNOUNCEMENTS WILL THEY MAKE BY -- ARE

1   THERE SPECIFIC TYPES OF MEDICATIONS THEY WILL MAKE

2   ANNOUNCEMENTS FOR?

3   **A**   USUALLY THEY SAY "HOT MEDS, REPORT TO OFFICER STATION."

4   **Q**   WHAT IS YOUR UNDERSTANDING OF HOT MEDS?

5   **A**   THAT IT'S A PSYCHIATRIC MEDICATION.

6   **Q**   AND THEY WILL SAY "HOT MEDS," AND THEN THAT'S THE

7   INDICATION FOR THE INMATES THAT ARE TO BE RECEIVING HOT MEDS TO

8   COME DOWN AND GET THEM?

9   **A**   YES.

10  **Q**   OKAY.  AND THIS IS DONE RIGHT IN THE DAY ROOM THERE IN FULL

11  VIEW OF EVERYBODY?

12  **A**   YES.

13  **Q**   OKAY.  AND HOW MANY INMATES DO YOU CURRENTLY HAVE AT THE

14  FACILITY AT D10 THAT ARE RECEIVING HOT MEDS?

15  **A**   APPROXIMATELY TEN IN MY BUILDING RIGHT NOW.

16  **Q**   HAS THAT NUMBER FLUCTUATED?

17  **A**   YES.  THE MONTH BEFORE IT WAS 15.

18  **Q**   ARE YOU ADVISED BY MEDICAL STAFF WHEN AN INMATE HAS AN

19  INFECTIOUS DISEASE?

20  **A**   NO.

21  **Q**   BUT YOU ARE AWARE THAT THERE ARE INMATES THAT DO HAVE

22  INFECTIOUS DISEASES LIVING IN D10, CORRECT?

23  **A**   YES.

24  **Q**   HOW DOES THAT AFFECT THE WAY YOU DO YOUR WORK?

25  **A**   WE'RE MORE CAUTIOUS AS FAR AS SEARCHING, AND THEN THERE'S

1  NUMEROUS PAT DOWNS AS FAR AS GOING IN AND OFF THE FACILITY.  WE

2  HAVE TO TAKE EXTREME CAUTION, ESPECIALLY WITH, LIKE, RAZOR

3  BLADES AND SYRINGES.

4          **MR. BIEN:**  I CAN'T HEAR YOU.  CAN YOU SPEAK UP?

5          **JUDGE HENDERSON:**  THEY'RE HAVING TROUBLE HEARING

6  YOU.  SPEAK UP.

7  **BY MR. HENDERSON**

8  Q   ARE YOU FAMILIAR WITH THE TERM "UNIVERSAL PRECAUTIONS"?

9  A   YES.

10  Q   WHAT IS YOUR UNDERSTANDING OF THAT TERM?

11  A   THAT WE'RE SUPPLIED WITH GLOVES AND OTHER SUPPLIES TO KEEP

12  US FROM GETTING AN INFECTION.

13  Q   OKAY.

14  A   REDUCING --

15  Q   I'M SORRY.

16  A   AND REDUCING THE CHANCES OF GETTING -- CATCHING ANYTHING.

17  Q   AND UNDER UNIVERSAL PRECAUTIONS, ARE YOU TO CHANGE GLOVES

18  EACH TIME YOU ENCOUNTER SOME DIFFERENT SITUATION?

19  A   YES.

20  Q   DO YOU FOLLOW THE UNIVERSAL PRECAUTIONS?

21  A   YES.

22  Q   OKAY.  DO YOU GLOVE UP ALL THE TIME?

23  A   NOT WITH EVERY INTERACTION WITH THE INMATES.

24  Q   WHY IS THAT?

25  A   WELL, WHEN WE HELP THEM WITH PAPERWORK OR ANYTHING LIKE,

1   EXCHANGE PAPERWORK OR BOOKS, IT'S -- THE INMATE FEELS IT'S

2   DISRESPECTFUL IF WE TELL THEM, WAIT A MINUTE, PUT ON GLOVES AND

3   THEN DEAL WITH THEM, AND THEY JUST GET UPSET OVER THAT.  SO WE

4   CAN'T USE THEM EVERY SINGLE TIME WE'RE INTERACTING WITH THE

5   INMATES.

6   **Q**   NOW, THE FACILITY D10 HAS ITS OWN TOILETS, SINKS, AND

7   SHOWERS, CORRECT?

8   **A**   YES.

9   **Q**   AND I THINK WHEN YOUR DEPOSITION WAS TAKEN -- AND, AGAIN,

10  IN YOUR DECLARATION YOU GAVE AN ESTIMATE OF THE NUMBER OF

11  TOILETS AND SHOWERS AND SINKS THAT ARE LOCATED AT D10?

12  **A**   YES.

13  **Q**   OKAY.  AND I BELIEVE YOU INDICATED EIGHT TOILETS,

14  APPROXIMATELY EIGHT TOILETS, TWELVE SINKS -- TEN SINKS, AND

15  TWELVE SHOWERS?

16  **A**   YES.

17  **Q**   AND HAVE YOU GONE BACK AND ACTUALLY COUNTED THE NUMBER OF

18  TOILETS, SHOWERS, AND SINKS SINCE YOU GAVE YOUR DECLARATION?

19  **A**   YES.  THE TOTAL FOR THE ENTIRE BUILDING IS TWENTY-TWO

20  SINKS, FIFTEEN SHOWERS, TEN TOILETS, SIX URINALS.

21  **Q**   OKAY.  THAT'S FOR 340 INMATES?

22  **A**   YES.

23  **Q**   AND HAS THE -- SINCE YOU HAVE BEEN IN THAT -- OR STRIKE

24  THAT.

25          WAS THE -- WITHIN THE LAST TWO YEARS HAS THE SHOWER

1  NUMBER ALWAYS BEEN 15?

2  **A**   NO.  IT USED TO BE 20, BUT AFTER THEY DID MODIFICATIONS TO

3  THE ROOFS AND THE REPAIRS INSIDE THE BUILDING, THEY'VE TAKEN

4  AWAY FIVE SHOWERS OUT OF EACH BUILDING.

5  **Q**   OKAY.  NOW, ARE THERE -- OBVIOUSLY, PART OF YOUR DUTIES IS

6  TRYING TO ENSURE THAT THE DORM STAYS IN A CLEAN STATE?

7  **A**   YES.

8  **Q**   HOW IS THAT -- HOW DO YOU ATTEMPT TO ACCOMPLISH THAT?

9  **A**   THOSE ARE DONE BY -- THE CLEANING IS DONE BY PORTERS THAT

10  WE HAVE WORKING IN THE HOUSING UNIT.

11  **Q**   WITH RESPECT TO THE SHOWERS AND THE TOILETS, ARE YOU ABLE

12  TO KEEP THEM IN A CLEAN CONDITION?

13  **A**   NO, NOT FOR VERY LONG.

14  **Q**   WHAT'S THE PROBLEM THERE?  WHAT PREVENTS THAT FROM

15  HAPPENING?

16  **A**   AS SOON AS THE PORTER IS DONE CLEANING THE RESTROOM, IT

17  IMMEDIATELY GETS FULL RIGHT AFTERWARDS.  IT DOESN'T STAY CLEAN

18  FOR VERY LONG.

19  **Q**   WHAT -- IN THE SUMMER, WHAT IS THE OUTSIDE WEATHER LIKE AT

20  CHUCKAWALLA?

21  **A**   IT COULD GET INTO THE 120'S.

22  **Q**   HOW ABOUT -- HOW OFTEN ARE THE TEMPERATURES OVER A HUNDRED

23  DEGREES?

24  **A**   THEY CAN REMAIN UP TO THREE MONTHS DURING THE SUMMER.

25  **Q**   THREE MONTHS AT A TIME?

1  **A**   YEAH, THREE MONTHS AT A TIME.

2  **Q**   HAVE YOU SEEN MEDICAL REACTIONS FROM INMATES THAT ARE THERE

3  AT THE FACILITY DUE TO THE EFFECTS OF THE SUN?

4  **A**   YES.  HEAT STROKES GO UP, AND ALSO SEIZURES.

5  **Q**   WHAT KIND OF CIRCUMSTANCES, IF YOU KNOW, OCCUR?

6  **A**   IT'S USUALLY --

7  **Q**   WHAT DO YOU SEE WHEN IT MANIFESTS ITSELF?

8  **A**   THE INMATE USUALLY IS -- DROPS TO THE GROUND, JUST STARTS

9  SHAKING, CONVULSING.

10 **Q**   DO YOU KNOW IF THOSE SEIZURES HAD AFFECTED ANY OF THE

11 INMATES YOU KNEW TO BE TAKING HOT MEDS?

12 **A**   YES.

13          **JUDGE HENDERSON:**   COUNSEL, IT'S CLEAR TO ME THAT

14 THIS IS A HEAT PROBLEM.  IT'S LESS CLEAR THIS IS AN

15 OVERCROWDING PROBLEM.

16          **MR. HENDERSON:**   WELL, I THINK IT RELATES TO THE

17 FACT -- WELL, I DON'T KNOW IF YOU WANT ARGUMENT AT THIS POINT,

18 YOUR HONOR.  OKAY.  I'M MOVING ON FROM THAT TOPIC ANYWAY.

19 **BY MR. HENDERSON**

20 **Q**   IS THERE FORCED OVERTIME AT CHUCKAWALLA?

21 **A**   YES.

22 **Q**   AND DOES THIS CONSIST OF MANDATORY DOUBLE SHIFTS?

23 **A**   YES.

24 **Q**   AND, BASICALLY, HOW IS THE FORCED OVERTIME ASSIGNED?

25 **A**   IT'S ASSIGNED BY SENIORITY, OF COURSE.  LOWEST SENIORITY

1  NUMBER WILL GO FIRST, AND IT DEPENDS ON HOW MANY VACANT

2  POSITIONS THAT NEED TO BE FILLED.

3  **Q**   AND, TYPICALLY, WITH RESPECT TO FORCED OVERTIME, WHEN WILL

4  A CORRECTIONAL OFFICER BE NOTIFIED THAT HE'S GOING TO NEED TO

5  WORK A DOUBLE SHIFT?

6  **A**   TOWARDS THE END OF THE SHIFT, THEIR OWN SHIFT.

7  **Q**   OKAY.  NOW, YOU, YOURSELF, SIR, HOW FAR AWAY IN TIME DO YOU

8  LIVE FROM THE UNIT, CHUCKAWALLA?

9  **A**   CAN YOU CLARIFY?

10 **Q**   YES.  IN TERMS OF HOW LONG DOES IT TAKE YOU TO DRIVE TO

11 WORK EACH DAY?

12 **A**   HOUR AND TEN MINUTES.

13 **Q**   OKAY.  ARE YOU AWARE OF MANY CORRECTIONAL OFFICERS THAT

14 LIVE MORE THAN AN HOUR AWAY FROM THE FACILITY?

15 **A**   YES.

16 **Q**   OKAY.  WHAT'S -- YOU, YOURSELF, HAVE HAD TO WORK MANDATORY

17 DOUBLE SHIFTS, CORRECT?

18 **A**   YES.

19 **Q**   WHAT'S THE LONGEST YOU HAVE HAD TO WORK ON A CONTINUOUS

20 BASIS?

21 **A**   THE LONGEST SHIFT I EVER DID WAS 20 HOURS.

22 **Q**   AND WHAT DO YOU DO YOURSELF WHEN YOU DO HAVE TO -- STRIKE

23 THAT.

24        WHEN YOU WORK DOUBLE SHIFTS, IS THERE ANYTHING YOU

25 DO TO MAINTAIN YOUR ABILITY TO PERFORM YOUR DUTIES DURING THE

1    SECOND SHIFT?

2    **A**    DRINK LOTS OF COFFEE.

3    **Q**    AND OVER A TWO-SHIFT PERIOD, HOW MUCH ARE WE TALKING ABOUT?

4    **A**    OVER 12 CUPS, POT.  WHATEVER I THINK, 12 CUPS.

5    **Q**    IS THAT PER SHIFT OR IS THAT FOR BOTH SHIFTS?

6    **A**    IT'S USUALLY CLOSE TO PER SHIFT.

7    **Q**    OKAY.  YOU ARE DRINKING MORE IN THE FIRST SHIFT BECAUSE YOU

8    KNOW YOU ARE GOING TO BE WORKING THE SECOND SHIFT?

9    **A**    YES.

10   **Q**    WHAT PROBLEMS HAVE YOU PERCEIVED CAN RESULT FROM WORKING

11   DOUBLE SHIFTS?

12   **A**    I DO THE BEST I CAN AS FAR AS BEING ALERT.  IT'S TOUGH.

13   **Q**    OKAY.  WHAT -- WHEN -- I TAKE IT WITH A DOUBLE SHIFT YOU

14   ARE OFF EIGHT HOURS, AND YOU ARE SUPPOSED TO BE BACK AT WORK,

15   CORRECT?

16   **A**    YES.

17   **Q**    HOW DO --

18            **JUDGE REINHARDT:**  IS THIS ABOUT WHETHER THE GUARDS

19   GET TOO MUCH OVERTIME?

20            **MR. HENDERSON:**  I'M SORRY?

21            **JUDGE REINHARDT:**  IS THIS ABOUT WHETHER THE PRISON

22   GUARDS ARE GETTING TOO MUCH OVERTIME PAY?

23            **MR. HENDERSON:**  NO, NOT TOO MUCH OVERTIME PAY, JUST

24   THE EFFECTS OF THE OVERTIME ON THE GUARDS' ABILITIES TO HANDLE

25   SITUATIONS AT THE FACILITY.

1    **JUDGE KARLTON:**  I'M CONFUSED AS WELL.  OVERTIME --

2 HOW IS OVERTIME RELATED TO OVERCROWDING?  IT SEEMS TO ME THAT

3 IT'S A PROBLEM THAT THE SYSTEM HAS FAILED TO HIRE ENOUGH GUARDS

4 FOR A REMOTE PRISON SUCH AS THIS ONE.  I MEAN, IS IT AT ALL

5 CONNECTED TO PHASE ONE?

6    **MR. HENDERSON:**  WELL, I THINK IT IS, YOUR HONOR,

7 BECAUSE IT GOES TO THE QUESTION OF THE HEALTH PROBLEMS THAT ARE

8 CREATED BY OVERCROWDING ARE FURTHER AFFECTED BY THE ABILITY OF

9 THE GUARDS TO DO THEIR DUTIES.  IF THEY ARE ON A --

10    **JUDGE KARLTON:**  I SEE.  I UNDERSTAND.

11    **MR. HENDERSON:**  THANK YOU, YOUR HONOR.

12    **JUDGE KARLTON:**  BUT EVEN THAT -- I'M SORRY, I SAY I

13 SEE, BUT I DON'T SEE, NOW THAT I THINK ABOUT IT.

14    CONCEDING THAT, AGAIN THAT'S A PROBLEM, APPARENTLY,

15 OF THE INABILITY OR UNWILLINGNESS TO HIRE A SUFFICIENT NUMBER

16 OF GUARDS FOR A REMOTE PRISON SUCH AS THIS, AND WHILE IT HAS

17 OBVIOUSLY ADVERSE EFFECTS, THE QUESTION IS WHETHER THAT RELATED

18 TO CROWDING, OVERCROWDING.

19    **MR. HENDERSON:**  WELL, I THINK IT -- I GUESS THE

20 QUESTION THEN IS, YOUR HONOR, IF YOU HAD ENOUGH GUARDS, WOULD

21 YOU HAVE --

22    **JUDGE KARLTON:**  WILL YOU EXPLAIN TO US WHAT HE'S

23 DOING?

24    **MR. ADAM:**  GREGG ADAM, ALSO CARROLL, BURDICK &

25 MCDONOUGH, ALSO REPRESENTING CCPOA.  I REPRESENT CCPOA MORE

1   GENERALLY DOING LABOR CONDITIONS.

2         HERE'S THE CONNECTION, YOUR HONOR:  THE INCREASED

3   NEED FOR OVERTIME IS DIRECTLY DRIVEN BY THE OVERCROWDING.  THE

4   MORE INMATES YOU HAVE, THE MORE NEED FOR STAFF.  THAT'S WHAT

5   ONE OF OUR WITNESSES TESTIFIED TO YESTERDAY.  SO PART OF THE

6   PROBLEM IS, DUE TO THE INABILITY TO HIRE MORE STAFF, YOU HAVE

7   MORE AND MORE NEED FOR OVERTIME.  AND THE PROBLEMS WE ARE

8   IDENTIFYING IS THIS INCREASING NEED FOR OVERTIME HAS ALL KINDS

9   OF ADVERSE EFFECTS ON THE ABILITY OF CORRECTIONAL OFFICERS,

10  NURSES, WHATEVER STAFF, TO PROPERLY PERFORM THEIR DUTIES, AND

11  THAT HAS AN IMPACT ON INMATES.  IF A CORRECTIONAL OFFICER IS

12  HALF ASLEEP AT THE END OF A 16 OR 20-HOUR SHIFT, HE OR SHE IS

13  GOING TO BE MUCH LESS COMPETENT IN IDENTIFYING MEDICAL ISSUES

14  AMONG INMATES.

15         **JUDGE KARLTON:**  COUNSEL, THAT WOULD BE TRUE IF THERE

16  WERE HALF THE NUMBER OF INMATES.

17         **MR. ADAM:**  RIGHT.  BUT IF THERE WAS HALF THE NUMBER

18  OF INMATES, THERE WOULDN'T BE THE NEED FOR OVERTIME.  THERE

19  WOULD BE REDUCED NEED FOR STAFF.  AGAIN, THE OVERTIME, THE

20  NUMBER OF STAFF NECESSARY --

21         **JUDGE KARLTON:**  WE ARE SPENDING MORE TIME TRYING TO

22  FIGURE OUT IF IT'S RELEVANT.

23         **MR. ADAM:**  THE NUMBER OF STAFF NECESSARY IS DRIVEN

24  BY THE NUMBER OF INMATES.

25         **JUDGE KARLTON:**  THAT WAS AN INVITATION FOR YOU TO

1  STOP TALKING.

2            **MR. ADAM:**  I WILL.

3            **JUDGE REINHARDT:**  I THINK WE COULD SPEED UP THIS

4  SUBJECT -- I MEAN, WHETHER HE LIVES -- DRIVES AN HOUR TO WORK

5  OR NOT BECAUSE HE LIVES IN THE DESERT -- I HAVE TO DRIVE AN

6  HOUR TO WORK, AND I LIVE NEAR THE OCEAN.  I MEAN, PART OF THIS

7  MAY BE RELEVANT, BUT I THINK THE NUMBER OF THE QUESTIONS WOULD

8  BE ELIMINATED.

9            **MR. HENDERSON:**  THE POINT IS THIS --

10            **JUDGE REINHARDT:**  I ALSO SOMETIMES WORK 20 HOURS A

11  DAY.

12            **JUDGE KARLTON:**  THAT'S BECAUSE YOU ARE A GLUTTON.

13            **MR. HENDERSON:**  I UNDERSTAND.  THE POINT IS THIS,

14  YOUR HONOR, AND I WON'T BELABOR THIS.  THE POINT IS THEY DRIVE

15  AN HOUR EACH WAY.  THAT GIVES THEM SIX HOURS TO DO EVERYTHING

16  ELSE.

17            **JUDGE REINHARDT:**  HAVE THEM MOVE CLOSER THEN.  OKAY,

18  FINE.

19  **BY MR. HENDERSON**

20  **Q**    WHAT EFFECTS HAVE YOU SEEN AS A RESULT OF OVERCROWDING AT

21  CHUCKAWALLA?

22  **A**    THE LACK OF GETTING THEM TO MEDICAL, EITHER ON THE YARDS OR

23  CENTRAL INFIRMARY; CANNOT SEE IN THE CUBICLES AS FAR AS THE

24  INMATES, IF THERE'S ONE MISBEHAVING.  IT'S EXTREMELY CROWDED.

25  IT'S DANGEROUS WHEN WE HAVE TO WALK THE TIERS OR WALK THE

1    FLOOR.  AND, USUALLY, WE WALK IN TWOS BECAUSE IT'S JUST HARD TO

2    SEE.  THERE'S TOO MANY CORNERS.  THE BUNKS FILL THE CUBICLE

3    WHERE YOU CAN'T SEE INTO THEM AT ALL.

4    **Q**    DO YOU -- DOES OVERCROWDING LEAD TO A GREATER INCIDENCE OF

5    INMATE VIOLENCE?

6    **A**    YES.

7    **Q**    INMATE-TO-INMATE VIOLENCE?

8    **A**    YES.

9    **Q**    HOW ABOUT INMATE-TO-STAFF VIOLENCE?

10   **A**    WE'VE HAD A FEW INCIDENTS THIS YEAR.

11   **Q**    AND, IN YOUR OPINION, DO YOU CONSIDER OVERCROWDING TO BE

12   THE PRIMARY CAUSE FOR PROBLEMS WITH MENTAL HEALTHCARE DELIVERED

13   TO INMATES AT CS -- AT THE CHUCKAWALLA FACILITY?

14   **A**    YES.

15           **MR. MELLO:**  OBJECT.  PAUL MELLO FOR DEFENDANTS.

16   OBJECTION.  IT LACKS FOUNDATION.  IT'S AN IMPROPER EXPERT

17   OPINION.

18           **MR. HENDERSON:**  I THINK IT GOES TO WEIGHT, YOUR

19   HONOR, BUT I'LL --

20           **MR. MELLO:**  AND HE HASN'T BEEN QUALIFIED AS AN

21   EXPERT IN THE CASE.  THANK YOU.

22           **JUDGE HENDERSON:**  I'LL OVERRULE THE OBJECTION.  YOU

23   MAY ANSWER THAT.

24           **THE WITNESS:**  YES.

25

1  **BY MR. HENDERSON**

2  **Q**   IS THE OVERCROWDING -- DO YOU HAVE -- HOW ARE THE -- IN

3  TERMS OF THE CONDITIONS OF THE TOILETS AND THE SHOWERS, WHAT DO

4  YOU NOTE IN D10 ABOUT THE OPERATION OF THE SHOWERS AND THE

5  TOILETS, ARE THERE BREAKDOWNS?

6  **A**   YES.

7  **Q**   HOW FREQUENTLY DO THEY OCCUR?

8  **A**   QUITE FREQUENTLY.

9  **Q**   AND HOW ARE THEY DEALT WITH?  LET'S TALK FIRST ABOUT THE

10 TOILETS.

11 **A**   USUALLY, THE TOILETS, THEY'RE FIXED RIGHT AWAY.  BUT IF

12 IT'S A SHOWER HEAD OR A SINK, IT MAY TAKE A FEW DAYS, MAYBE UP

13 TO A WEEK.

14 **Q**   SO THE NUMBER OF -- STRIKE THAT.

15          **MR. HENDERSON:**  I THINK THAT'S ALL I HAVE.  THANK

16 YOU, YOUR HONOR.

17          **JUDGE HENDERSON:**  MR. BIEN?

18          **DIRECT EXAMINATION BY MR. BIEN**

19 **BY MR. BIEN**

20 **Q**   GOOD MORNING, SIR.  MY NAME IS MICHAEL BIEN.  I'M

21 REPRESENTATIVE OF PLAINTIFF COLEMAN CLASS.

22 **A**   GOOD MORNING.

23 **Q**   WERE YOU TRAINED AS A CORRECTIONAL OFFICER AT CHUCKAWALLA

24 STATE PRISON IN THE COLEMAN COURT ORDERS DEALING WITH HEAT

25 EMERGENCIES?

1  **A**    YES.

2  **Q**    AND CAN YOU EXPLAIN WHAT YOU WERE TRAINED TO DO IN

3  CONNECTION WITH A HEAT EMERGENCY?

4  **A**    IN A HEAT EMERGENCY CALL FOR A MEDICAL STAFF.

5  **Q**    AS PART OF THIS PROCEDURE, IS THERE TRACKING OF

6  TEMPERATURE, BOTH INSIDE AND OUTSIDE OF CHUCKAWALLA HOUSING

7  UNITS?

8  **A**    YES.

9  **Q**    HAVE YOU EVER PARTICIPATED IN THAT PROCESS?

10  **A**    YES, WHEN I WORKED OVERTIME.

11  **Q**    WHEN THE TEMPERATURE REACHES A CERTAIN LEVEL, ARE THERE

12  CERTAIN PROCEDURES THAT GO INTO EFFECT?

13  **A**    YES, AT 90 DEGREES.

14  **Q**    WHAT HAPPENS TO -- WHAT HAPPENS AT THAT POINT?  WHAT DO YOU

15  DO WHEN THE TEMPERATURE REACHES 90 DEGREES?

16  **A**    WE'LL MAKE AN ANNOUNCEMENT THAT THE TEMPERATURE HAS REACHED

17  90 DEGREES.  THAT LETS THE INMATES KNOW THEY'RE AT HEAT RISK,

18  COME INSIDE THE BUILDING, AND THEY HAVE ACCESS TO ICE.

19  **Q**    OKAY.  AND WHO DO YOU UNDERSTAND THESE INMATES WHO ARE AT

20  HEAT RISK ARE?

21  **A**    YES.

22  **Q**    WHO ARE THEY?  DO YOU KNOW WHO THEY ARE?

23  **A**    EXACTLY EACH INDIVIDUAL?

24          **JUDGE KARLTON:**  NO.  HE MEANS WHAT KIND.

25

1   **BY MR. BIEN**

2   **Q**   AS A GROUP.  AS A GROUP, DO YOU UNDERSTAND WHO THEY ARE?

3   **A**   AS A GROUP, HOT MEDS ARE AT HEAT RISK.

4   **Q**   YOU UNDERSTAND THESE ARE INMATES WHO HAVE BEEN PRESCRIBED

5   MEDICATIONS THAT MAKE THEM VULNERABLE TO HEAT?

6   **A**   YES.

7   **Q**   DO THEY GET SPECIFIC ID CARDS ISSUED TO THEM?

8   **A**   YES.

9   **Q**   AND WERE YOU TOLD IN YOUR TRAINING WHY IT IS THAT THESE

10  INMATES ARE SPECIALLY TRACKED TO CHUCKAWALLA?

11  **A**   JUST BECAUSE OF THE MEDICATION THAT THEY'RE TAKING.

12  **Q**   DO YOU UNDERSTAND THAT THEY'RE VULNERABLE TO SIDE EFFECTS

13  FROM THE COMBINATION OF THEIR MEDICATIONS AND EXTREME HEAT?

14         **MR. LEWIS:**  OBJECTION, YOUR HONOR.  LEADING.

15         **JUDGE HENDERSON:**  IT IS LEADING, COUNSEL.

16  **BY MR. BIEN**

17  **Q**   DID YOU RECEIVE TRAINING CONCERNING THAT, SIR?

18  **A**   YES.

19  **Q**   WHAT WERE YOU TOLD IN YOUR TRAINING?

20  **A**   THEY DESCRIBED THE DRUGS.  I CAN'T REMEMBER EXACTLY EACH

21  ONE, BUT THAT THEY DO HAVE AN EFFECT ON THE INMATE, ESPECIALLY

22  DURING THE SUMMER.

23  **Q**   OKAY.  AND HAVE YOU BEEN -- YOU HAVE BEEN AT CHUCKAWALLA

24  WHEN THERE HAVE BEEN HEAT EMERGENCIES?

25  **A**   YES.

1  Q   LET'S JUST LOOK AT THIS LAST SUMMER.  HAD THERE BEEN HEAT

2  EMERGENCIES DURING THIS LAST SUMMER?

3  A   YES.

4  Q   YOU MENTION THAT THERE ARE INMATES ON HEAT MEDS, HEAT --

5  INMATES IN THE UNIT THAT YOU WORK; IS THAT CORRECT?

6  A   YES.

7  Q   OKAY.  HAVE YOU WORKED IN YOUR UNIT AT A TIME WHEN THERE

8  WERE NOT INMATES ON HEAT RISK MEDICATIONS?

9  A   NO.

10  Q   OKAY.  THERE HAS ALWAYS BEEN SOMEONE THERE?

11  A   YES.

12  Q   WERE YOU TRAINED AT ANY TIME CONCERNING WHETHER OR NOT

13  CHUCKAWALLA STATE PRISON IS A PRISON THAT IS EXCLUDED FROM

14  HOUSING INMATES ON HEAT RISK?

15          **MS. TILLMAN:**  OBJECTION.

16          **THE WITNESS:**  CAN YOU CLARIFY?

17  **BY MR. BIEN**

18  Q   WERE YOU EVER TOLD THAT PEOPLE WHO ARE TAKING HOT MEDS

19  SHOULD NOT BE AT CHUCKAWALLA?

20  A   YES.

21  Q   CAN YOU EXPLAIN WHO TOLD YOU THAT?

22  A   MEDICAL HAVE SOMETIMES MENTIONED IT, AND MY SUPERVISORS.

23  Q   DO YOU HAVE ANY INSTRUCTIONS OF WHAT TO DO WHEN YOU FIND

24  THAT AN INMATE IS TAKING HOT MEDS?

25  A   NO.

1  Q   OKAY.  ARE YOU AWARE OF ANY PROCEDURE FOR REMOVING INMATES

2  ON HOT MEDS FROM CHUCKAWALLA STATE PRISON?

3  A   THE ONLY PROCEDURE I KNOW IS THAT THEY HAVE DESIGNATED

4  BUILDINGS, WHICH THERE ARE TWO ON EACH COMPLEX, AND THAT'S D11,

5  WHICH IS THE BUILDING NEXT TO MINE, AND THEN ON ANOTHER

6  FACILITY, WHICH IS A2, AND THE INMATES WILL MOVE FROM MY

7  BUILDING TO A DESIGNATED CUBICLE IN D11.

8  Q   SO THERE ARE OTHER UNITS AT CHUCKAWALLA STATE PRISON

9  WHERE -- IS THAT CORRECT?  THERE ARE OTHER UNITS WHERE INMATES

10  ON HOT MEDS ARE HOUSED REGULARLY?

11  A   YES.

12  Q   SO THERE WOULD BE MORE IN THOSE UNITS THAN IN YOUR UNIT?

13  A   YES.

14  Q   HAVE THERE EVER BEEN LOCKDOWNS AT CHUCKAWALLA STATE PRISON

15  WHILE YOU WERE WORKING THERE?

16  A   YES.

17  Q   HAVE ANY HAPPENED IN THE LAST SIX MONTHS?

18  A   YES.

19  Q   DURING A LOCKDOWN, HOW ARE MEDICATIONS DISTRIBUTED ON YOUR

20  UNIT?

21  A   THE NURSE WILL COME UP TO THE OFFICER STATION AND SHE'LL

22  MAKE AN ANNOUNCEMENT FOR HOT MEDS, OR SHE'LL CALL EACH PERSON

23  INDIVIDUALLY TO COME UP.  THEY STAND IN LINE, AND THEN SHE

24  GIVES THE MEDICATION ONE BY ONE.

25  Q   HOW IS THAT DIFFERENT WHEN THERE IS NOT A LOCKDOWN?

1   **A**   THEY WILL REPORT TO MEDICAL ON THE FACILITY AND PRETTY MUCH

2   THE SAME THING.

3   **Q**   ARE THERE ANY OTHER -- DURING A LOCKDOWN, DO INMATES GET

4   YARD?

5   **A**   NO.

6   **Q**   ARE THERE ANY OTHER RESTRICTIONS ON PROGRAMS DURING A

7   LOCKDOWN?

8   **A**   NO.

9   **Q**   HAVE YOU EVER HEARD THE TERM "EOP" OR "ENHANCED

10  OUTPATIENT"?

11  **A**   OUTPATIENT?

12  **Q**   HAVE YOU EVER HEARD OF THE TERM "ENHANCED OUTPATIENT" OR

13  "EOP"?

14  **A**   NO.

15  **Q**   OKAY.  ARE YOU AWARE OF ANY REQUIREMENTS TO TRANSFER

16  MENTALLY ILL PRISONERS WHO ARE IDENTIFIED AT CHUCKAWALLA AWAY

17  FROM CHUCKAWALLA?

18  **A**   I JUST KNOW THAT THEY SAY -- THEY TRANSFER THEM TO DONOVAN

19  STATE PRISON IN SAN DIEGO.

20  **Q**   HOW DO YOU KNOW THAT?

21  **A**   THE INMATES TELL ME, OR MEDICAL STAFF WILL SAY THAT.

22  **Q**   AND ARE YOU AWARE OF ANY -- HAVE YOU EVER BEEN INFORMED OF

23  ANY PROCEDURES FOR ACHIEVING THOSE TRANSFERS?

24  **A**   NO.

25  **Q**   HAS ANYONE EVER TOLD YOU THERE HAVE BEEN DELAYS IN SUCH

1   TRANSFERS?

2   **A**   YES.

3   **Q**   WHO TOLD YOU THAT?

4   **A**   MEDICAL STAFF AND THE INMATES THEMSELVES.

5   **Q**   WHAT DID THEY TELL YOU?

6   **A**   THAT I'M NOT SUPPOSED TO BE HERE BECAUSE OF MY MEDICATION,

7   IT'S HOT.  AND THEY COMPLAIN ABOUT THEIR TRANSFERS, OR THEY

8   FILE A 602 APPEAL TO MEDICAL, AND THERE'S DELAYS.

9   **Q**   HAVE YOU EVER BEEN INFORMED ABOUT THE LENGTH OF ANY OF

10  THESE DELAYS?

11  **A**   I AM AWARE OF THREE MONTHS ON A CERTAIN INDIVIDUAL.

12  **Q**   CAN YOU DESCRIBE THAT INDIVIDUAL?

13  **A**   HE HAD NUMEROUS SEIZURES, AND HE WAS ON MEDICATION.  HE WAS

14  HOUSED IN D11.  I HAD BEEN WORKING OVERTIME AND SHIFTS IN

15  THERE, AND HE WOULD ALWAYS COME UP AND COMPLAIN.

16  **Q**   OKAY.  DID YOU RECOMMEND TO HIM THAT HE FILE A 602?

17  **A**   YES, AND SENT HIM TO MEDICAL DEPARTMENT, TALK TO THEM.

18  **Q**   DID YOU HELP HIM DO THAT?

19  **A**   YES.

20  **Q**   OKAY.  AND WAS HE TRANSFERRED, TO YOUR KNOWLEDGE?

21  **A**   WHEN I TALKED TO HIM, IT WAS LIKE A MONTH LATER, SO HE HAD

22  BEEN IN THERE FOR LIKE THREE MONTHS.

23  **Q**   TO YOUR KNOWLEDGE, HAS HE BEEN TRANSFERRED?

24  **A**   YES, HE WAS TRANSFERRED.

25  **Q**   AND HOW LONG DID IT TAKE?

1   A   TOTAL OF THREE MONTHS, I GUESS.

2               **MR. BIEN:**  I HAVE NO FURTHER QUESTIONS.

3               **JUDGE HENDERSON:**  CROSS-EXAMINATION. GOOD MORNING.

4          **MR. LEWIS:**  YOUR HONORS, KYLE LEWIS FOR THE STATE

5   DEFENDANTS.

6               **CROSS-EXAMINATION BY MR. LEWIS**

7   BY MR. LEWIS

8   Q   GOOD MORNING, OFFICER LEIJA.

9   A   GOOD MORNING.

10  Q   YOU HAVE BEEN A CORRECTIONAL OFFICER FOR CDCR SINCE LATE

11  1996, CORRECT?

12  A   YES.

13  Q   AND DURING THAT TIME, THE ONLY PRISON YOU HAVE WORKED AT

14  HAS BEEN CHUCKAWALLA VALLEY STATE PRISON?

15  A   YES.

16  Q   HAVE YOU EVER RECEIVED ANY FORMAL EDUCATION IN THE MEDICAL

17  FIELD?

18  A   NO.

19  Q   HAVE YOU EVER RECEIVED ANY FORMAL EDUCATION IN THE MENTAL

20  HEALTH FIELD?

21  A   NO.

22  Q   AS A CORRECTIONAL OFFICER, YOU ARE RESPONSIBLE FOR

23  MAINTAINING SECURITY IN YOUR HOUSING UNIT, CORRECT?

24  A   YES.

25  Q   YOU HAVE TESTIFIED THAT YOU OBSERVED INMATES OR OBSERVED

1   INCIDENTS OF INMATES WITH GASTROINTESTINAL AILMENTS AND THE

2   FLU, CORRECT?

3   **A**   YES.

4   **Q**   YOU ALSO TESTIFIED REGARDING CONTAGIOUS STAPH INFECTIONS,

5   CORRECT?

6   **A**   YES.

7   **Q**   YOU HAVE TESTIFIED THAT THERE'S NO MEANS TO SPREAD -- OR

8   THERE'S NO MEANS TO PREVENT SPREAD OF GASTROINTESTINAL AILMENTS

9   AND FLU TO OTHERS IN YOUR HOUSING UNIT, CORRECT?

10  **A**   YES.

11  **Q**   AND WHEN YOU REPORT TO DUTY EACH DAY, YOU WORK IN THAT

12  HOUSING UNIT FOR MANY HOURS, CORRECT?

13  **A**   YES.

14  **Q**   YET, DESPITE ALL YOUR TIME IN THAT HOUSING UNIT, YOU HAVE

15  NEVER CONTRACTED A GASTROINTESTINAL DISEASE, HAVE YOU?

16  **A**   NO.

17  **Q**   ISN'T IT TRUE YOU DON'T KNOW THE CAUSE OF GASTROINTESTINAL

18  DISEASE?

19  **A**   CAN YOU CLARIFY?

20  **Q**   ISN'T IT TRUE THAT YOU DON'T KNOW WHAT CAUSES

21  GASTROINTESTINAL DISEASES?

22  **A**   NO.

23  **Q**   AND YOU CAN'T IDENTIFY ANY SPECIFIC -- ANY SPECIFIC

24  INCIDENTS WHERE AN INMATE WAS DENIED MEDICAL CARE DUE TO THE

25  SIZE OF THE PRISON POPULATION AT CHUCKAWALLA VALLEY STATE

1  PRISON, CAN YOU?

2  **A**   NO.

3  **Q**   YOU TESTIFIED THAT PROBLEMS EXIST REGARDING THE DELIVERY OF

4  MEDICAL SERVICES TO TREAT AILMENTS YOU OBSERVED, CORRECT?

5  **A**   YES.

6  **Q**   BUT YOU DON'T HAVE AN IDEA OR AN IN-DEPTH KNOWLEDGE OF THE

7  MEDICAL CARE SERVICES PROVIDED AT CHUCKAWALLA VALLEY STATE

8  PRISON, DO YOU?

9  **A**   NO.

10  **Q**   ISN'T IT TRUE THAT YOU CAN'T TELL THE DIFFERENCE BETWEEN

11  THE AILMENTS YOU DESCRIBED, FLU AND GASTROINTESTINAL AILMENTS

12  THAT YOU TESTIFIED ABOUT?

13  **A**   NO.

14           **JUDGE REINHARDT:**  NO, IT'S NOT TRUE, OR NO --

15           **THE WITNESS:**  NO, I CAN'T TELL THE DIFFERENCE.

16  **BY MR. LEWIS**

17  **Q**   IN FACT, YOU CAN'T IDENTIFY THESE AILMENTS BASED ON

18  PERSONAL OBSERVATION ALONE, CAN YOU?

19  **A**   NO.

20  **Q**   AND THAT'S BECAUSE YOU SAY THEY HAVE MANY OF THE SAME

21  SYMPTOMS, DON'T THEY?

22  **A**   YES.

23  **Q**   INDEED, YOUR UNDERSTANDING OF THESE AILMENTS IS BASED

24  PRIMARILY ON WHAT THE INMATES TELL YOU, CORRECT?

25  **A**   AND MEMOS THAT HAVE BEEN SUBMITTED BY SUPERVISORS.

1  Q   YOU'VE NEVER HAD A GASTROINTESTINAL DISEASE, CORRECT?

2  A   NO.

3  Q   AND YOU TESTIFIED THAT THERE WERE SITUATIONS WHERE INMATES

4  DID NOT RECEIVE MEDICAL CARE, CORRECT?

5  A   YES.

6  Q   AND THE BASIS FOR THIS IS WHAT THE INMATES HAVE TOLD YOU?

7  A   YES.

8  Q   AND, IN FACT, YOU HAVE NO SCIENTIFIC OR MEDICAL BACKGROUND

9  WHICH ENABLES YOU TO SAY THAT OVERCROWDING CAUSES INFECTIONS,

10 FLU OR GASTROINTESTINAL AILMENTS, DO YOU?

11 A   NO.

12 Q   I WANT TO ASK YOU SOME QUESTIONS ABOUT THE EOP PROGRAMS AND

13 SOME OF THOSE OTHER ISSUES YOU HEARD ABOUT IN REFERENCE TO

14 COLEMAN.

15        **JUDGE KARLTON:**  HE ALREADY SAID HE DOESN'T KNOW.

16        **JUDGE HENDERSON:**  HE DOESN'T KNOW EOP.

17 **BY MR. LEWIS**

18 Q   YOU TESTIFIED REGARDING YOUR KNOWLEDGE OF DELAYS IN

19 TRANSFERRING INMATES AWAY FROM CHUCKAWALLA VALLEY STATE PRISON,

20 CORRECT?

21 A   YES.

22 Q   ARE YOU AWARE THAT IT HAS BEEN DETERMINED THAT MANY INMATES

23 WITH THOSE KINDS OF NEEDS, WITH EOP-TYPE NEEDS, WERE

24 TRANSFERRED TO APPROPRIATE INSTITUTIONS WITHIN THE REQUIRED

25 TIMEFRAMES?

1          **JUDGE KARLTON:**  THAT ASSUMES SOMETHING NOT IN

2    EVIDENCE.  YOU CAN CERTAINLY ASK HIM WHETHER THAT'S TRUE.  HE

3    CAN'T SAY IT'S ESTABLISHED BECAUSE THERE'S NO EVIDENCE OF THAT

4    BEFORE THE COURT AT THE MOMENT.

5          **MR. LEWIS:**  THANK YOU, YOUR HONOR.  NO FURTHER

6    QUESTIONS, YOUR HONOR.

7          **JUDGE HENDERSON:**  I DIDN'T MEAN TO CUT YOU OFF, IF

8    THAT WAS THE LAST QUESTION.

9          **MR. LEWIS:**  THANK YOU VERY MUCH.

10         **JUDGE HENDERSON:**  LET'S SEE.  DEFENDANT INTERVENORS

11   HAVE ANY CROSS?

12         **MR. MITCHELL:**  NO FURTHER CROSS, YOUR HONOR.

13         **JUDGE HENDERSON:**  OKAY.  REDIRECT?

14         **MR. HENDERSON:**  JUST BRIEFLY, YOUR HONOR.

15         **REDIRECT EXAMINATION BY MR. HENDERSON**

16   **BY MR. HENDERSON**

17   **Q**   NOW, YOU WERE ASKED ABOUT DELAYS IN MEDICAL TREATMENT

18   DURING LOCKDOWNS?

19   **A**   YES.

20   **Q**   OKAY.  DURING A LOCKDOWN, IF AN INMATE HAS A -- WHEN THERE

21   ISN'T A LOCKDOWN AND AN INMATE SAYS THAT HE HAS A PROBLEM THAT

22   NEEDS MEDICAL ATTENTION, WHAT IS DONE FOR HIM?

23   **A**   I CALL MEDICAL, THE MEDICAL FACILITY ON THE YARD.  I LET

24   THEM KNOW HE'LL BE COMING OVER FOR WHATEVER ISSUE HE HAS AND

25   I'LL JUST SEND HIM.

1  **Q**   WHERE DO YOU SEND HIM TO?

2  **A**   I SEND HIM ACROSS THE YARD.  THERE'S A SMALL SATELLITE

3  MEDICAL FACILITY THERE ON THE YARD.

4  **Q**   OKAY.  AND IS THAT THE PROCEDURE YOU FOLLOW ON THE WEEKENDS

5  AS WELL?

6  **A**   NO.  ON THE WEEKENDS IT'S DIFFERENT.  THEY DON'T HAVE --

7  MEDICAL IS NOT OPEN ON THE YARDS SATURDAY AND SUNDAY AND

8  HOLIDAYS, SO WE HAVE TO CALL CENTRAL INFIRMARY AND ASK THEM

9  WHETHER IT'S APPROPRIATE FOR THEM TO COME UP AND BE TREATED.

10 **Q**   OKAY.  ARE THERE ANY SITUATIONS THAT CAN DELAY THE INMATE

11 GETTING TO THE CENTRAL CLINIC FOR TREATMENT?

12 **A**   THE MAIN DELAY IS THE SNY, SENSITIVE NEEDS YARDS, INMATES.

13 WHEN THEY'RE UP THERE, THEY CAN'T INTERACT WITH THE GENERAL

14 POPULATION INMATES.

15 **Q**   THE PATH THAT THE INMATES FROM YOUR UNIT HAVE TO TAKE TO

16 THE CLINIC, DOES THAT GO THROUGH THE SNY, THE SENSITIVE NEEDS,

17 YARD?

18 **A**   THEY ALL SHARE THE SAME WALKWAY, SO WE HAVE TO MAKE SURE

19 THE WALKWAY IS CLEAR AND NO SENSITIVE NEEDS INMATES ARE IN

20 CENTRAL INFIRMARY BEFORE A GENERAL POPULATION INMATE GOES FOR A

21 TREATMENT.

22 **Q**   AND THEN IN A LOCKDOWN WHAT GOES -- WHAT IS THE PROCEDURE?

23 **A**   IF SOMEBODY NEEDS MEDICAL TREATMENT, THEY'LL LET US KNOW,

24 AND WE'LL CALL UP THE CENTRAL INFIRMARY, AND THEY'LL EITHER

25 WALK DOWN TO THE YARD OR DEPENDING ON THE SEVERITY, THEY'LL

1 SEND A MEDICAL TRANSPORT.

2 Q   NOW, YOU WERE ASKED QUESTIONS ABOUT THE GASTROINTESTINAL

3 AND FLU ISSUES.  I AM GOING TO BE VERY BRIEF ON THAT, BUT I

4 WANTED TO ASK YOU, WHEN WAS THE MOST RECENT OUTBREAK OF EITHER

5 A GASTROINTESTINAL DISORDER OR A FLU ON A UNIT WHERE YOU WERE

6 LOCATED?

7 A   MARCH, MARCH OR FEBRUARY OF THIS YEAR.

8 Q   OKAY.  AND ON THAT OCCASION DID A NUMBER OF INMATES BECOME

9 SICK AT ONCE, OR WAS IT ONE OR TWO OR THREE AND THEN IT

10 INCREASED?  WHAT WAS THE SITUATION?

11 A   FROM MY HOUSING UNIT IT STARTED WITH TWO OR THREE.

12 Q   OKAY.  WHAT DID YOU DO WITH THOSE INMATES?

13 A   THEY WERE SENT IN CENTRAL INFIRMARY.  THEY WERE ISOLATED.

14 Q   HOW MANY BEDS ARE IN THE CENTRAL INFIRMARY?

15 A   AVAILABLE, I BELIEVE THERE'S EIGHT.

16 Q   OKAY.  AND DID OTHER INMATES BECOME SICK BEYOND THOSE FIRST

17 TWO OR THREE?

18 A   YES.

19 Q   DID YOU SEND THEM DOWN CENTRAL INFIRMARY?

20 A   NO.

21 Q   WERE THEY -- YOU DID NOT?

22 A   NO, I CALLED TO LET THEM KNOW I GOT A FEW MORE GETTING

23 SICK, AND THEY SAID, WE ARE GOING TO BE SENDING THE REST OF

24 THEM BACK TO THE YARD BECAUSE WE DON'T HAVE THE BEDS.

25 Q   SO THE SICK ONES THAT WERE ALREADY THERE WERE SENT BACK?

1   **A**   YES.

2   **Q**   AND THE SICK ONES YOU HAD REMAINED IN YOUR FACILITY?

3   **A**   YES.

4   **Q**   AND APPROXIMATELY WHAT WAS THE TOTAL NUMBER OF INMATES THAT

5   EITHER YOU OBSERVED TO BE SICK OR COMPLAINED TO YOU THAT THEY

6   WERE SICK WITH A GI OR THE FLU IN THIS SITUATION?  BEST

7   ESTIMATE.

8   **A**   I WOULD SAY MORE THAN HALF OF THE HOUSING UNIT.

9   **Q**   MORE THAN HALF OF THE 340?

10  **A**   YES.

11  **Q**   AND WHEN THE INMATES WERE SENT BACK, WHAT WAS DONE WITH THE

12  D10 FACILITY?

13  **A**   WE WERE GIVEN BLEACH TO WIPE DOWN STUFF.  THE INMATES HAD

14  ACCESS TO IT, TOO.

15  **Q**   WAS THE FACILITY PUT ON LOCKDOWN?

16  **A**   YES.

17  **Q**   HOW LONG DID THE LOCKDOWN LAST?

18  **A**   THE LOCKDOWN LASTED A WEEK, AND VISITING ON THE WEEKENDS

19  WAS CANCELED FOR ALMOST A MONTH.

20  **Q**   NOW, YOU WERE ASKED ABOUT YOUR OBSERVATIONS OR WHAT YOU

21  KNOW ABOUT THE MANIFESTATIONS OF GI, GASTROINTESTINAL,

22  DISORDERS OR THE FLU.  DID YOU SEE ANY PHYSICAL MANIFESTATION

23  OF SICKNESS AMONG THE INMATES?

24  **A**   THERE WAS A LOT OF INMATES VOMITING IN THE HOUSING UNIT.

25           **MR. HENDERSON:**   OKAY.  THANK YOU, SIR.  THAT'S ALL I

1    HAVE.

2              **JUDGE HENDERSON:**  OKAY.

3         **MR. LEWIS:**  NOTHING, YOUR HONOR.

4         **MR. SPECTER:**  ACTUALLY, I HAVE ONE QUESTION.  DON

5    SPECTER FOR PLAINTIFFS.

6              **DIRECT EXAMINATION BY MR. SPECTER**

7    **BY MR. SPECTER**

8    **Q**   DID YOU OBSERVE THAT OTHER PRISONERS IN OTHER HOUSING UNITS

9    WERE SICK, TOO, OR WAS THIS ONLY CONFINED TO YOUR HOUSING UNIT,

10   THIS GASTROINTESTINAL OUTBREAK?

11             **JUDGE REINHARDT:**  OR THE FLU OR WHATEVER IT WAS?

12        **MR. SPECTER:**  YES, THANK YOU.

13        **THE WITNESS:**  YES.

14   **BY MR. SPECTER**

15   **Q**   YES, WHAT?

16   **A**   I WITNESSED IT IN OTHER HOUSING UNITS.

17   **Q**   WAS IT INSTITUTION-WIDE?

18   **A**   YES.

19        **MR. SPECTER:**  NO FURTHER QUESTIONS.

20        **JUDGE HENDERSON:**  OKAY.  THANK YOU, MR. LEIJA, FOR

21   TESTIFYING.  YOU'RE EXCUSED.

22        **THE WITNESS:**  THANK YOU.

23        **MR. HENDERSON:**  AT THIS TIME, YOUR HONOR, THE

24   PLAINTIFF INTERVENORS WILL REST.

25        **JUDGE KARLTON:**  PHASE ONE.

 1              **JUDGE HENDERSON:**  PHASE ONE, RIGHT.  I ASSUME

 2    PLAINTIFFS HAVE RESTED?

 3              **MR. SPECTER:**  WELL, WE DON'T HAVE ANY MORE

 4    WITNESSES, BUT WE'D PREFER NOT TO REST UNTIL ALL THE EXHIBITS

 5    AND THE DEPOSITIONS --

 6              **JUDGE HENDERSON:**  SUBJECT TO THAT, YES.

 7              **MR. SPECTER:**  YES, WE HAVE -- YEAH, RIGHT.

 8              **MR. BIEN:**  THERE IS THIS MATTER LEFT OVER FROM

 9    YESTERDAY CONCERNING THE AUTHENTICITY OF SOME CHARTS, AND WE

10    ARE PREPARED TO PUT ON A WITNESS, IF NECESSARY.  HAS THAT BEEN

11    WORKED OUT?

12              **MR. MELLO:**  I BELIEVE THE COURT GAVE US AN ORDER

13    WITH RESPECT TO EXHIBITS AND THOSE THINGS.

14              **JUDGE KARLTON:**  THIS PARTICULAR EXHIBIT.

15              **JUDGE HENDERSON:**  THIS ONE WE HAD HANGING AT THE END

16    OF THE DAY LAST NIGHT.

17              **MR. BIEN:**  YES.  HAS THAT BEEN WORKED OUT?

18              **MR. MELLO:**  I GUESS WE'LL HAVE TO --

19              **MR. HENDERSON:**  IF I COULD JUMP IN WHILE THEY'RE

20    TALKING, YOUR HONOR?  WITH RESPECT TO THE PLAINTIFF

21    INTERVENORS, I BELIEVE THERE'S STILL SOME ISSUES ON THE

22    EVIDENTIARY CHALLENGES TO OUR DECLARATIONS.  SO I GUESS I WOULD

23    REST WITH THAT QUALIFICATION BECAUSE THAT'S STILL UNDER

24    SUBMISSION TO THE COURT.  THANK YOU.

25              **MR. BIEN:**  YOUR HONOR, AS TO THOSE CHARTS, THERE'S

1  STILL SOME CLARIFICATION WHICH MAY AVOID THE NEED FOR A

2  WITNESS.

3          **JUDGE KARLTON:**  WHY DON'T WE TAKE OUR BREAK?

4          **MR. BIEN:**  IF YOU COULD INDULGE US TO HAVE THAT

5  WITNESS LATER IN THE TRIAL IF WE CAN'T WORK IT OUT.

6          **JUDGE HENDERSON:**  OKAY.  THAT'S FINE.

7          **MR. BIEN:**  THANK YOU.

8          **JUDGE HENDERSON:**  THEN WE ARE GOING TO GET TO

9  DEFENDANTS' CASE, BUT LET'S TAKE A RECESS, 15 MINUTES FOR THAT

10 TRANSITION.

11         **JUDGE KARLTON:**  THERE WAS SOMETHING THE PLAINTIFFS

12 WANTED TO PUT ON.

13         **JUDGE HENDERSON:**  PLAINTIFFS HAVE RESTED, RIGHT?

14         **MR. BIEN:**  YOUR HONOR, I THINK AS LONG AS IF THERE'S

15 ANY PROBLEM ON THE FOUNDATION FOR THESE CHARTS, WE CAN DO IT

16 LATER IN THE TRIAL?

17         **JUDGE KARLTON:**  OKAY.

18         **JUDGE HENDERSON:**  OKAY.

19         OKAY.  LET'S PROCEED.  THE PRELIMINARY STATEMENT

20 THAT THE COURT REMAINS OF THE OPINION THAT THE WITNESSES LISTED

21 FOR TODAY ARE MORE PROPERLY PHASE TWO, BUT WE'RE NOT GOING TO

22 TELL YOU YOU CANNOT PUT THEM ON TODAY.

23         **MR. LEWIS:**  GOOD MORNING, YOUR HONORS.  KYLE LEWIS

24 FOR THE DEFENSE.  THE STATE DEFENDANTS NOW CALL TODD JERUE.

25                         **TODD JERUE**

1   HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANTS WAS FIRST

2   DULY SWORN AND EXAMINED AS FOLLOWS:

3              **THE WITNESS:**  YES.

4              **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

5   RECORD.

6              **THE WITNESS:**  MY NAME IS TODD JERUE.  SPELLING IS

7   T-O-D-D J-E-R-U-E.

8              **MR. LEWIS:**  YOUR HONORS, DEFENDANTS HAVE SUBMITTED A

9   TRIAL AFFIDAVIT FOR MR. JERUE.  SPECIFICALLY, IT'S IDENTIFIED

10  AS EXHIBIT 1008.  WE ASK THE COURT TO TAKE IT UNDER SUBMISSION

11  AT THIS TIME.

12             **JUDGE HENDERSON:**  WE WILL DO THAT.

13             **DIRECT EXAMINATION BY MR. LEWIS**

14  **BY MR. LEWIS**

15  **Q**   GOOD MORNING, MR. JERUE.

16  **A**   GOOD MORNING.

17  **Q**   WHAT IS YOUR CURRENT JOB TITLE?

18  **A**   PROGRAM BUDGET MANAGER FOR THE DEPARTMENT OF FINANCE FOR

19  THE STATE OF CALIFORNIA.

20  **Q**   HOW LONG HAVE YOU WORKED FOR THE STATE OF CALIFORNIA?

21  **A**   TWELVE YEARS IN FEBRUARY.

22  **Q**   COULD YOU PLEASE PROVIDE THE COURT WITH A BRIEF DESCRIPTION

23  OF YOUR EMPLOYMENT WITH CALIFORNIA?

24  **A**   SURE.  I BEGAN IN FEBRUARY OF 1997 AS AN ANALYST FOR THE

25  DEPARTMENT OF FINANCE.  I WORKED IN THAT CAPACITY FOR ABOUT

1   3-1/2 YEARS ON VARIOUS BUDGETING ASSIGNMENTS.  IN THE SUMMER OF

2   2000, I WAS PROMOTED TO SUPERVISOR, WHICH IS CALLED A PRINCIPAL

3   PROGRAM BUDGET ANALYST.  THAT WAS ON A GENERAL GOVERNMENT

4   ASSIGNMENT.

5              ABOUT EIGHT MONTHS LATER I ROTATED TO A NEW

6   ASSIGNMENT, WHICH WAS DEPARTMENT OF JUSTICE JUDICIARY

7   ASSIGNMENT.  IN 2002 I ROTATED TO THE DEPARTMENT OF CORRECTIONS

8   ASSIGNMENT.  IN OCTOBER OF 2004 I WAS PROMOTED TO ASSISTANT

9   PROGRAM BUDGET MANAGER OVER HALF OF OUR UNIT THAT HANDLES

10  PUBLIC SAFETY PROGRAMS, CORRECTIONS, JUDICIARY DEPARTMENT OF

11  JUSTICE.  IN JUNE OF 2006, PROMOTED TO MY CURRENT POSITION.

12  **Q**   AND AS PROGRAM BUDGET MANAGER FOR THE DEPARTMENT OF

13  FINANCE, WHAT ARE YOUR RESPONSIBILITIES?

14  **A**   I MANAGE A UNIT OF 22 PEOPLE.  OUR RESPONSIBILITY IS THAT

15  WE REVIEW AND OVERSEE THE SUPPORT AND OPERATING BUDGETS FOR

16  ABOUT 50 STATE DEPARTMENTS.

17  **Q**   AND WHEN YOU SAY THE PREPARATION AND SUBMISSION OF THE

18  SUPPORT BUDGETS, WHAT EXACTLY DOES THAT MEAN?

19  **A**   WELL, THE MAIN FUNCTION OF THAT IS STARTING WITH THE

20  CURRENT BUDGET ACT AS A STARTING POINT, THE MAIN ROLE WE DO IS

21  THAT WE REVIEW AND ANALYZE BUDGET CHANGE PROPOSALS SUBMITTED BY

22  THOSE DEPARTMENTS.

23  **Q**   AND YOU MENTION THAT YOU OVERSEE THE PREPARATION OF THOSE

24  BUDGETS FOR ABOUT 50 STATE AGENCIES AND DEPARTMENTS.  IS ONE OF

25  THEM THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

1   REHABILITATIONS?

2   **A**   YES, IT IS.

3        **JUDGE KARLTON:**  BEFORE YOU GO ON, I'M CONFUSED.  THE

4   BUDGET, DO YOU, FOR EXAMPLE, DO THE BUDGET, OR DO YOU REVIEW

5   THE BUDGET THAT COMES UP FROM THE AGENCY?

6        **THE WITNESS:**  WE REVIEW THE AGENCY'S PROPOSALS FOR

7   NEW SPENDING, AND THEN WE PHYSICALLY PUBLIC A BOOK -- OR NOW ON

8   THE INTERNET -- THAT ACTUALLY HAS ALL OF THOSE DEPARTMENTS IN

9   ONE PLACE.

10        **JUDGE KARLTON:**  I'M AFRAID I HAVEN'T ASKED THE

11   QUESTION APPROPRIATELY.

12        DO YOU PUT THE BUDGET TOGETHER FOR AN AGENCY, OR DO

13   THEY SEND YOU A PROPOSED BUDGET?

14        **THE WITNESS:**  THEY SEND US A PROPOSAL BUDGET.

15        **JUDGE KARLTON:**  OKAY.

16        **JUDGE REINHARDT:**  DO YOU THEN CHANGE IT?  YOU REVIEW

17   IT?  YOU CUT IT?  YOU GIVE THEM MORE MONEY THAN THEY ASK FOR?

18        **THE WITNESS:**  WE HAVE GIVEN THEM MORE THAN THEY'VE

19   ASKED FOR BEFORE, BUT, FOR THE MOST PART, WE BUDGET ON THE

20   MARGIN.  SO WE HAVE A BASE BUDGET.  MOST OF OUR CHANGES ARE

21   WHEN THEY REQUEST NEW MONEY, BUT IN ORDER TO BALANCE THE

22   BUDGET, THERE ARE TIMES WE HAVE TO MAKE BUDGET REDUCTIONS,

23   ALSO.

24        **JUDGE KARLTON:**  MY FAULT, NOT YOURS.  THE END OF THE

25   YEAR OR WHENEVER THE LEGISLATURE GETS AROUND TO IT, YOU GET,

1  "THIS IS HOW MUCH MONEY YOU GOT."  DOES THAT "THIS IS HOW MUCH

2  MONEY YOU GOT" INCLUDE SO MUCH FOR THIS DEPARTMENT, SO MUCH FOR

3  THAT DEPARTMENT AND SO FORTH?

4          **THE WITNESS:**  THAT'S CORRECT.  THE TOTAL STATE

5  BUDGET IS APPROXIMATELY $104 BILLION, AND WITHIN THAT

6  $104 BILLION, EVERY AGENCY HAS THEIR OWN APPROPRIATION.

7          **JUDGE KARLTON:**  OKAY.  AND THEN THE -- BUT THE

8  APPROPRIATION IS KNOCKED DOWN TO HOW MANY BUCKS YOU SPEND FOR

9  PENS OR WHAT HAVE YOU, THAT'S DONE BY THE AGENCY?

10          **THE WITNESS:**  THAT'S CORRECT.

11          **JUDGE KARLTON:**  OKAY.  NOW I'M WITH YOU.

12  **BY MR. LEWIS**

13  **Q**  WHAT PROGRAMS OR SERVICES ARE ENCOMPASSED WITHIN THE

14  OPERATION SUPPORT BUDGET THAT YOUR SECTION HANDLES FOR CDCR?

15  **A**  IT ENCOMPASSES THE ADULT INSTITUTIONS, WHICH INCLUDES THE

16  INMATE PROGRAMS AND HEALTHCARE SERVICES, ADULT PAROLE.  IT ALSO

17  INCLUDES THE DIVISION OF JUVENILE JUSTICE, THE BOARD OF PAROLE

18  HEARINGS, AND THE CORRECTION OF STANDARD AUTHORITIES.

19  **Q**  SO THEN THE DEPARTMENT COSTS FOR MEDICAL AND MENTAL HEALTH

20  PROGRAMS ARE INCLUDED WITHIN THE BUDGET THAT YOUR SECTION HELPS

21  PREPARE?

22  **A**  THAT'S CORRECT.

23          **JUDGE REINHARDT:**  YOU WERE TALKING TO JUDGE KARLTON

24  WHAT HAPPENS AFTER THE LEGISLATURE ACTS.  I ASSUME YOU FIRST

25  REVIEW THE AGENCY'S BUDGET AS THEY PREPARED IT AND DECIDE WHAT

1  THEY CAN SEND IN TO THE LEGISLATURE AS THE GOVERNOR'S BUDGET?

2       **THE WITNESS:**  THAT'S CORRECT.

3       **JUDGE KARLTON:**  SO THERE'S TWO STAGES.  FIRST, YOU

4  REVIEW AND APPROVE WHAT THEY ARE GOING TO SUGGEST TO THE

5  LEGISLATURE, AND THEN AFTER THE LEGISLATURE GIVES THEM THE

6  MONEY AND THEY PARCEL IT OUT TO WHATEVER THEY DO, THEN IT COMES

7  BACK TO YOU?

8       **THE WITNESS:**  YES.  IT'S AN ONGOING PROCESS.  ONE

9  YEAR WHERE YOU FINISH IS THE BEGINNING POINT FOR THE NEXT YEAR.

10      **JUDGE REINHARDT:**  THAT'S NOT QUITE THE QUESTION.

11  QUESTION IS, YOU ARE INVOLVED IN THE PREPARATION OF THE BUDGET

12  THAT'S SUBMITTED TO THE LEGISLATURE?

13      **THE WITNESS:**  THAT'S CORRECT.

14      **JUDGE REINHARDT:**  THEN AFTER IT COMES BACK, THE

15  LEGISLATURE GIVES YOU A BUDGET.  SO DO YOU THEN PARTICIPATE IN

16  ALLOCATING IT AMONG -- WHAT IT WILL BE USED FOR BY THE

17  DEPARTMENT -- VARIOUS DEPARTMENTS UNDER YOUR CONTROL?

18      **THE WITNESS:**  ACTUALLY, THAT DETERMINATION OF HOW IT

19  WILL BE ALLOCATED IS DONE THROUGH THE PROPOSAL PROCESS.  ONCE

20  THE LEGISLATURE APPROPRIATES, THAT HAS ALREADY BEEN DETERMINED.

21      **JUDGE KARLTON:**  NOT NECESSARILY.  THE LEGISLATURE

22  MIGHT GIVE YOU MORE OR LESS THAN WHAT YOU ASK FOR.

23      **THE WITNESS:**  THAT'S CORRECT.  AND SO THOSE CHANGES

24  ARE MADE THROUGHOUT THE PROCESS WHENEVER THE LEGISLATURE ACTS

25  ON THOSE CHANGES.

1          **JUDGE KARLTON:**  I BELIEVE YOU.  I'M TRYING TO FIND

2     OUT WHO DOES IT.

3          **JUDGE REINHARDT:**  IF THEY COME BACK WITH LESS MONEY

4     THAN YOU WANTED, THEY DON'T, OR DO THEY, TELL YOU WHAT WILL BE

5     DONE WITHIN THE DEPARTMENT WITH THAT MONEY?

6          **THE WITNESS:**  TYPICALLY, WHEN THE LEGISLATURE

7     REDUCES THE AMOUNT WE PROPOSE, THEY IDENTIFY EXACTLY WHERE

8     THEY'VE REDUCED IT.

9          **JUDGE REINHARDT:**  SO YOU DON'T HAVE ANYTHING TO DO

10    WITH THAT THEN?  YOUR FUNCTION IS BASICALLY IN THE PREPARATION

11    OF THE BUDGET?

12         **THE WITNESS:**  YEAH.  ONLY TO THE EXTENT THAT WE, ON

13    BEHALF OF THE GOVERNOR, ARE WORKING TO DEFEND HIS PROPOSALS.

14         **JUDGE REINHARDT:**  OKAY.  SO AFTER THE LEGISLATURE

15    REJECTS THEM, THEN YOU DON'T DO MUCH MORE?

16         **THE WITNESS:**  RIGHT.  AT THAT POINT IT'S THE

17    DEPARTMENTS RESPONSIBILITY TO SPEND WITHIN THAT BUDGET.

18         **JUDGE REINHARDT:**  OKAY.  NOW WE'VE LEARNED A LOT OF

19    ABOUT WHAT HE DOES, FOR WHATEVER THAT'S WORTH.

20         **MR. LEWIS:**  THANK YOU.  YOUR HONOR.

21         **JUDGE KARLTON:**  BUT IT WAS INTERESTING.

22         **MR. LEWIS:**  WE'RE ALL BETTER FOR IT.

23    **BY MR. LEWIS**

24    **Q**   DO YOU OR YOUR STAFF OVERSEE THE PREPARATION AND SUBMISSION

25    OF THE ANNUAL INFRASTRUCTURE OR FACILITIES CONSTRUCTION BUDGET

1  FOR CDCR?

2  **A**   NO, A DIFFERENT UNIT WITHIN THE DEPARTMENT OF FINANCE DOES

3  THAT.

4  **Q**   AND NOW I'D LIKE TO CALL YOUR ATTENTION TO CDCR OVERALL

5  MEDICAL AND MENTAL HEALTH SERVICES EXPENDITURES AND BUDGET.

6  DID YOU AND YOUR STAFF ANALYZE DATA OR STATISTICS REGARDING THE

7  AMOUNT OF EXPENDITURES DIRECTED TOWARD THE PROVISION OF CDCR

8  HEALTHCARE OVER A PERIOD OF YEARS?

9  **A**   YES, WE DID.

10 **Q**   IN PERFORMING THAT ANALYSIS, WHAT DID YOUR STAFF CONSIDER

11 IN TOTALING THAT AMOUNT OF MONEY DIRECTED TOWARD THE PROVISION

12 OF CDCR HEALTHCARE?

13 **A**   WHAT WE CONSIDERED IN THAT ANALYSIS, THAT'S IN THE

14 AFFIDAVIT, WAS THE DIRECT SERVICES FOR MENTAL HEALTH, SERVICES

15 FOR MEDICAL.  WE LOOKED AT -- WE KIND OF LOOKED AT ANCILLARY

16 COSTS, WHICH ARE RELATED COSTS LIKE PHARMACEUTICALS AND

17 EQUIPMENT THAT'S USED BY ALL DISCIPLINES BUT CURRENTLY ARE

18 BEING MANAGED BY THE RECEIVERSHIP.  WE ALSO LOOKED AT

19 HEALTHCARE ADMINISTRATION, AND WE LOOKED AT THE COST TO

20 TRANSPORT AND GUARD INMATES FOR PURPOSES OF RECEIVING

21 TREATMENT.

22 **Q**   ALL RIGHT.  DID YOUR ANALYSIS EXAMINE MONIES ACTUALLY

23 SPENT?

24 **A**   IT DID FOR ANY YEAR EXCEPT FOR THE '8/'9 FISCAL YEAR WHICH

25 WE'RE CURRENTLY IN.

1  Q   THEN IS THIS ANALYSIS OF THOSE EXPENDITURES CONTAINED IN

2  YOUR AFFIDAVIT?

3  A   IT IS.

4  Q   IT'S THE BASIS FOR THE NUMBERS IN YOUR AFFIDAVIT?

5  A   THAT'S CORRECT.

6  Q   ARE THE DATA THAT YOU AND YOUR STAFF STUDIED AND THE

7  INFORMATION THAT IS THE BASE OF THAT DATA, IS THAT MAINTAINED

8  BY THE DEPARTMENT AS PART OF ITS REGULARLY CONDUCTED BUSINESS?

9  A   THAT'S CORRECT.

10 Q   IS IT ROUTINE PRACTICE FOR THE DEPARTMENT OF FINANCE TO

11 ANALYZE BUDGET DATA?

12 A   THAT'S CORRECT.

13         MR. LEWIS:  MAY IT PLEASE THE COURT, I'M NOW GOING

14 TO SHOW WHAT HAS PREVIOUSLY BEEN IDENTIFIED AS EXHIBIT 1244.

15 IT'S A HEALTHCARE FUNDING CHART.  SPECIFICALLY, THERE ARE TWO

16 CHARTS WITHIN THIS, AND WITH THE COURT'S PERMISSIONS I WILL LAY

17 THE FOUNDATION FOR THESE CHARTS.

18         (DOCUMENT DISPLAYED.)

19 BY MR. LEWIS

20 Q   MR. JERUE, CAN YOU PLEASE DESCRIBE THIS FIRST CHART?

21 A   YES.  THIS FIRST CHART IS EXPENDITURE DATA FOR CORRECTIONS

22 HEALTHCARE FOR FIVE DIFFERENT POINTS IN TIME.

23 Q   AND ARE THOSE NUMBERS CONTAINED WITHIN YOUR DECLARATION?

24 A   YES, THEY ARE.

25 Q   SHOWING YOU THE SECOND CHART, COULD YOU PLEASE DESCRIBE THE

1   SECOND CHART UP THERE?

2   **A**   YES.  THE SECOND CHART, USING THE EXPENDITURE DATA FROM THE

3   FIRST CHART AND USING POPULATION FIGURES FOR ADULT

4   INSTITUTIONS, THE SECOND CHART IS THE PER-INMATE COST FOR

5   HEALTHCARE SERVICES FOR THE SAME FIVE YEARS.

6   **Q**   ARE THOSE NUMBERS ALSO CONTAINED WITHIN YOUR AFFIDAVIT?

7   **A**   YES, THEY ARE.

8   **Q**   AND WILL THESE CHARTS ASSIST YOU IN TESTIFYING HERE TODAY?

9   **A**   YES, THEY WILL.

10          **MR. LEWIS:**  YOUR HONORS, WE ASK THIS EXHIBIT BE

11   MOVED INTO EVIDENCE.

12          **MS. MORRIS:**  YOUR HONOR, WE OBJECT ON LACK OF

13   FOUNDATION, AND WE WOULD LIKE TO CROSS-EXAMINE THE WITNESS ON

14   IT BEFORE THIS IS ADMITTED INTO EVIDENCE.

15          **JUDGE HENDERSON:**  WE WILL TAKE THE OFFER PENDING

16   THAT.  WE'LL WAIT UNTIL CROSS-EXAMINATION.

17          **MR. LEWIS:**  IF YOUR HONORS COULD POSSIBLY DIRECT ME?

18   I THOUGHT I LAID THE FOUNDATION FOR THIS.

19          **JUDGE HENDERSON:**  I UNDERSTAND.

20          **MR. LEWIS:**  IN BRIEF, WHAT DID YOUR ANALYSIS

21   REGARDING THE AMOUNT OF BUDGET EXPENDITURES --

22          **JUDGE KARLTON:**  BEFORE YOU DO THAT, WHEN YOU SAY

23   "HEALTHCARE," THAT INCLUDES BOTH PHYSICAL AND MENTAL, THAT'S IN

24   THIS CHART?

25          **THE WITNESS:**  RIGHT.  THE NUMBERS USED WERE MEDICAL

1   AND MENTAL.  IT DID NOT INCLUDE DENTAL.

2           **JUDGE KARLTON:**  ALL RIGHT.

3   **BY MR. LEWIS**

4   Q    MR. JERUE, IN BRIEF, WHAT DID YOUR ANALYSIS SHOW REGARDING

5   THE AMOUNT OF BUDGET EXPENDITURES FOR CDCR HEALTHCARE SERVICES?

6   A    IN GENERAL OR FOR SPECIFIC YEARS?

7   Q    JUST IN TERMS OF RAW NUMBERS.

8   A    IN TERMS OF RAW NUMBERS?  CAN I REFER TO MY AFFIDAVIT?

9   Q    PLEASE.

10  A    IF YOU GO BACK TO THE OTHER CHART, I CAN SHOW YOU ON THE

11  FIRST CHART -- IT SHOWS IN '94/'95 FISCAL YEAR THE DEPARTMENT

12  SPENT $344 MILLION FOR THESE SERVICES.

13  Q    THEN MOVING FORWARD APPROXIMATELY TEN YEARS, CAN YOU TELL

14  WHAT THE NUMBER -- WHAT THE AMOUNT OF EXPENDITURES IN 2005/2006

15  WAS?

16  A    YES.  IT GREW TO 1.252 BILLION.

17  Q    WHAT WAS THE AMOUNT FOR 2006, 2007?

18  A    1.365 BILLION.

19  Q    WHAT WAS THE AMOUNT FOR 2007, 2008?

20  A    2.249 BILLION.

21  Q    SO, OVER A PERIOD OF YEARS, HOW MUCH HAS THE AMOUNT OF

22  FUNDING GROWN FOR CDCR'S HEALTHCARE SERVICES?

23  A    FROM WHERE WE STARTED '94/'95 THROUGH THE MOST RECENT

24  ACTUAL DATA FROM '7'/'8, IT GREW FROM 344 MILLION TO 2.249

25  BILLION, WHICH IS AN INCREASE OF 554 PERCENT.

1    Q    THANK YOU.

2              NOW, DID YOU AND YOUR STAFF ALSO ANALYZE THE TREND

3    OF THE CALIFORNIA STATE INMATE POPULATION AT THAT TIME BETWEEN

4    1995 AND 2006?

5    A    YES, WE DID.

6    Q    AND BASED ON YOUR ANALYSIS HOW MUCH DID THE CDCR POPULATION

7    GROW BETWEEN 1995 AND 1996 (SIC)?

8    A    THE POPULATION FOR THE YEARS '94/'95 THROUGH '7/'8 GREW

9    APPROXIMATELY 30 PERCENT.  I HAVE THE ACTUAL NUMBERS IF I CAN

10   REFER TO MY AFFIDAVIT.

11   Q    I THINK THE COURT HAS THAT.  IT'S ALL RIGHT.  THANK YOU,

12   THOUGH.

13             SO BETWEEN 1995 AND PRESENT, HOW MUCH DID THE CDCR

14   ANNUAL BUDGET EXPENDITURES FOR HEALTHCARE GROW?

15   A    FIVE HUNDRED FIFTY-FOUR PERCENT.

16   Q    DURING THAT SAME PERIOD, HOW MUCH DID THE POPULATION GROW?

17   A    APPROXIMATELY 30 PERCENT.

18   Q    DID YOU AND YOUR STAFF ALSO PERFORM AN ANALYSIS OF THE COST

19   PER INMATE EXPENDED BY CDCR ON ITS HEALTHCARE NEEDS FOR THE

20   POPULATION OVER THE COURSE OF YEARS?

21   A    YES, WE DID.

22             THE CLERK:  FIVE MINUTES, COUNSEL.

23             MR. LEWIS:  THANK YOU.

24   BY MR. LEWIS

25   Q    WHAT DID YOUR ANALYSIS SHOW?

1  **A**    OUR ANALYSIS SHOWED THAT IN '94/'95, THE PER-INMATE COST

2  WAS $2,714 GROWING TO $13,778 IN '07/'08, WHICH IS AN INCREASE

3  OF 408 PERCENT.

4  **Q**    AND SO LOOKING AT THE CHART FROM THE YEAR 2006 TO 2008,

5  WHAT WAS THE PERCENTAGE OF GROWTH IN JUST THOSE TWO YEARS?

6  **A**    THAT WAS APPROXIMATELY 80 PERCENT.

7  **Q**    AND LOOKING AHEAD, WHAT IS THE TOTAL ANTICIPATED

8  EXPENDITURE FOR CDCR HEALTHCARE SERVICES, TO INCLUDE MENTAL AND

9  MEDICAL HEALTH, FOR FISCAL YEAR 2008/2009?

10 **A**    CURRENTLY, 2.193 BILLION.

11 **Q**    I NOTICE THERE'S A SLIGHT DECREASE IN THE FY, FISCAL YEAR,

12 2008/'9 VERSUS THE PREVIOUS YEAR 2007/'8.  CAN YOU EXPLAIN

13 THAT?

14 **A**    YES, I CAN.  FOR THE PRIOR TWO FISCAL YEARS, THE BUDGET ACT

15 CONTAINED AN UNALLOCATED POT THAT WAS THEN USED FOR THE

16 RECEIVER WITHIN ANY GIVEN YEAR WITHIN THAT CURRENT YEAR FOR

17 REMEDIATION EFFORTS.  IN THE '7/'8 FISCAL YEAR, THAT WAS $125

18 MILLION.  THAT WAS NOT INCLUDED IN THE '8/'9 BUDGET ACT.

19 **Q**    BASED ON YOUR ANALYSIS OF THE FIGURES FOR BUDGET

20 EXPENDITURES, WHAT HAVE YOU LEARNED ABOUT THE AMOUNT OF FUNDING

21 APPROPRIATED TO CDCR BETWEEN 1994 AND 2008?

22 **A**    WHAT I HAVE LEARNED IS THAT THE EXPENDITURES HAVE GROWN

23 OVER 550 PERCENT WITH AN ACCOMPANYING INCREASE IN PER INMATE

24 SPENDING OF OVER 400 PERCENT, WHILE, AT THE SAME TIME, THE

25 POPULATION HAS ONLY GROWN APPROXIMATELY 30 PERCENT.

1          **MR. LEWIS:**  YOUR HONORS, DEFENDANTS REQUEST

2  MR. JERUE'S AFFIDAVIT BE MOVED INTO EVIDENCE AT THIS TIME.

3          **MS. WHELAN:**  YOUR HONOR, SAME OBJECTION.

4          **JUDGE REINHARDT:**  CAN YOU TELL ME, PERHAPS, WHAT

5  THIS TESTIMONY DOES TO HELP US DETERMINE WHAT THE PRIMARY CAUSE

6  OF THE CONSTITUTIONAL VIOLATION IS?

7          **MR. LEWIS:**  YES, YOUR HONOR.

8          THERE ARE MANY FACTORS THAT WE BELIEVE ARE

9  INDICATIVE OR ARE THE CAUSES OF THE ALLEGED UNCONSTITUTIONAL

10 VIOLATIONS.  WE BELIEVE THAT OVERCROWDING CANNOT BE OR IS NOT

11 THE PRIMARY CAUSE, AND THAT SOME OF THE OTHER FACTORS TO

12 INCLUDE FUNDING STAFFING, ET CETERA -- TO INCLUDE FUNDING

13 STAFF, ET CETERA --

14         **JUDGE REINHARDT:**  THE FUNDING IS THE PRIMARY CAUSE?

15         **MR. LEWIS:**  THAT THERE ARE POTENTIAL OTHER CAUSES

16 THAT INDICATE --

17         **JUDGE REINHARDT:**  WHAT DOES THIS SHOW?  THAT YOU'VE

18 INCREASED THE FUNDING AND IT HASN'T SOLVED THE CONSTITUTIONAL

19 VIOLATION?  HAVE YOU ELIMINATED FUNDING AS A POSSIBLE CAUSE?

20         **MR. LEWIS:**  YOUR HONOR, IT IS DEFENDANTS' CONTENTION

21 THAT THERE ARE MANY CAUSES, POTENTIAL CAUSES, AND THAT

22 OVERCROWDING IS NOT THE PRIMARY CAUSE.

23         **JUDGE REINHARDT:**  I UNDERSTAND THAT, BUT WHAT DOES

24 THIS EVIDENCE SHOW US AS TO WHAT IS THE PRIMARY CAUSE?  IS IT

25 SUPPOSED TO SHOW US IT'S NOT FUNDING BECAUSE YOU ARE SPENDING

1  SO MUCH MONEY NOW?

2           **MR. LEWIS:**  IT'S ONE OF THE CAUSES OUT THERE, BUT

3  THE FACT IS THAT --

4           **JUDGE REINHARDT:**  HOW DOES IT SHOW US THAT FUNDING

5  IS PERHAPS THE PRIMARY CAUSE?

6           **JUDGE KARLTON:**  THIS IS THE WHOLE PROBLEM ABOUT OUR

7  SAYING THIS IS PHASE TWO STUFF, NOT PHASE ONE.

8           **JUDGE REINHARDT:**  I'M JUST TRYING TO UNDERSTAND WHAT

9  THEY'RE ARGUING.  TO SHOW US YOU ARE SPENDING MORE AND MORE

10  MONEY, DOES THAT MEAN THAT FUNDING IS NOT ONE OF THE PRINCIPAL

11  CAUSES BECAUSE YOU ARE SPENDING SO MUCH NOW?

12           **MR. MELLO:**  IF I MAY, YOUR HONOR?  I BELIEVE THAT IT

13  DEMONSTRATES THE GOOD FAITH EFFORTS BY THE STATE, AND IT

14  ALSO --

15           **JUDGE REINHARDT:**  THE GOOD FAITH EFFORTS BY THE

16  STATE IS NOT PHASE ONE.

17           **MR. MELLO:**  I'M SORRY.  AND IT DEMONSTRATES THE

18  SPENDING THAT HAS CAUSED MANY OF THE OTHER IMPROVEMENTS WHICH

19  WERE BARRIERS, AND ARE BARRIERS, TO THE DELIVERY OF HEALTHCARE,

20  AND WHICH DEMONSTRATE THAT OVERCROWDING IS NOT THE PRIMARY

21  BARRIER.  IT GOES TO PROVING THAT -- I AGREE THAT THE PHASE ONE

22  ISSUE AND THE PHASE TWO ISSUE ARE CLOSELY RELATED.

23           **JUDGE KARLTON:**  THEY ARE NOT CLOSELY -- THE WAY YOU

24  PUT IT THEY ARE NOT CLOSELY RELATED AT ALL.  OKAY.  SO --

25           **MR. MELLO:**  I UNDERSTOOD.

1          **JUDGE KARLTON:**  -- IT'S HOPELESS.

2          **JUDGE REINHARDT:**  I JUST WONDERED WHY I WAS

3   LISTENING TO THIS TO PROVE THE STATE'S CASE OR THE DEFENSES' --

4   THE PLAINTIFFS' CASE.

5          **MR. MELLO:**  WE UNDERSTAND YOUR POSITION.

6          **JUDGE KARLTON:**  THAT'S WHY WE SAID WE'D LET IT IN,

7   BUT WE DON'T AGREE IT'S PROPERLY PHASE ONE.

8          **JUDGE REINHARDT:**  I MEAN, YOU WERE THE ONE WHO

9   OBJECTED TO COMBINING THIS PART OF THE PHASE ABOUT WHAT HAS

10  HAPPENED SINCE THE VIOLATION.  THE PLAINTIFFS WANTED TO COMBINE

11  THE QUESTION OF WHAT REMEDIES HAVE BEEN TRIED, AND YOU DID NOT

12  WANT TO DO THAT.  YOU SAID JUST KEEP IT TO THE PRIMARY CAUSE,

13  AND I'M JUST TRYING TO UNDERSTAND WHAT I'M SUPPOSED TO -- WHAT

14  SIGNIFICANCE I'M SUPPOSED TO GIVE TO THIS.

15          IT SEEMS TO ME IF IT HAS ANY SIGNIFICANCE IT SHOWS

16  THAT, EVEN THOUGH YOU SPENT TREMENDOUS AMOUNT OF MONEY, THE

17  VIOLATION HASN'T BEEN CURED; THEREFORE, IT MUST BE THE

18  OVERCROWDING.

19          **MR. MELLO:**  WELL, I THINK WE HAVE A DIFFERENT

20  POSITION AS TO WHETHER THE VIOLATION HAS BEEN CURED OR NOT.

21          **JUDGE REINHARDT:**  WELL, I KNOW WE ARE NOT DOING THAT

22  IN PHASE ONE.

23          **MR. MELLO:**  WE UNDERSTAND YOUR POSITION.  AND OUR

24  NEXT WITNESS, I DON'T THINK YOU WILL HAVE SIMILAR FEELINGS

25  ABOUT.

1          **JUDGE KARLTON:**  MR. MELLO, I'M GLAD THAT YOU

2    UNDERSTAND OUR POSITION.  I THINK WE SHARE IT.  BUT, HONEST TO

3    GOODNESS, I'M TRYING TO UNDERSTAND WHAT YOUR POSITION IS.

4    WELL, MAYBE IT'S JUST -- TAKE IT ONE MORE -- DO YOU MIND IF

5    I -- TAKE ONE MORE SHOT AT EXPLAINING TO ME HOW THIS HAS

6    ANYTHING TO DO WITH PHASE ONE.  I DON'T MEAN TO CUT YOU OUT,

7    BUT MR. MELLO HAS APPARENTLY TAKEN OVER THE ARGUMENT.

8          **MR. MELLO:**  NO.  I MEAN, PLAINTIFFS MUST SHOW THE

9    APPROPRIATE NEXUS BETWEEN OVERCROWDING AND THE ALLEGED

10   UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE AND MENTAL

11   HEALTHCARE, CORRECT?

12         **JUDGE KARLTON:**  I AGREE WITH THAT.

13         **MR. MELLO:**  AND THE EVIDENCE TO DATE HAS SHOWN, EVEN

14   THROUGH PLAINTIFFS' OWN EXPERTS, THAT MEDICAL CARE DELIVERY

15   AND --

16         **JUDGE KARLTON:**  OF --

17         **MR. MELLO:**  PLEASE.

18         -- AND MENTAL HEALTHCARE DELIVERY INVOLVES MANY

19   INTERRELATED COMPONENTS, CORRECT?

20         **JUDGE REINHARDT:**  AND WHAT DOES THIS SHOW, THAT NO

21   MATTER HOW MUCH MONEY YOU SPEND, IT'S NOT CURED?

22         **MR. MELLO:**  IN LIGHT OF THE COURT'S RULINGS, WE

23   CAN'T PROVE WHETHER IT'S BEEN CURED OR NOT CURED, I UNDERSTAND

24   THAT.  I DON'T THINK WE ARE ACCOMPLISHING ANYTHING.

25         **JUDGE REINHARDT:**  YOU ARE ALMOST DONE WITH THIS, I

1  HOPE.

2          **MR. MELLO:**  WE ARE DONE WITH THIS WITNESS.  I

3  BELIEVE YOU WERE DONE, CORRECT?

4          **JUDGE REINHARDT:**  I WAS JUST TRYING TO FIND OUT IF I

5  COULD TAKE ANYTHING FROM THE EVIDENCE THAT WOULD BE HELPFUL TO

6  YOUR CASE.

7          **MR. LEWIS:**  I HAVE NO FURTHER QUESTIONS.  THANK YOU,

8  MR. JERUE.

9          **JUDGE HENDERSON:**  LET ME -- BEFORE WE HAVE CROSS,

10 DOES THIS CHART SHOW US -- WE KNOW THERE'S BEEN A 554 PERCENT

11 INCREASE OVER THE YEARS OF THIS CHART WITH AN ATTENDANT

12 30 PERCENT POPULATION INCREASE.  DOES THIS SHOW US -- DOES IT

13 BREAK DOWN AS TO, WHEN WE REACH THE HIGH POINT, WHAT THIS MONEY

14 WAS USED FOR?

15          AND WHAT I HAVE IN MIND IS, AS RECENTLY AS THREE

16 YEARS AGO, PERHAPS, I TOOK A TOUR OF A PRISON IN WHICH THE

17 MEDICAL PEOPLE DIDN'T EVEN HAVE A WASH BOWL TO WASH THEIR

18 HANDS.  IS THIS -- WOULD IT BE FAIR TO CONCLUDE THAT SOME OF

19 THAT INCREASE WAS JUST TO GET THINGS THAT JUST HAD NOT BEEN

20 FURNISHED, OR DO YOU KNOW?

21          **THE WITNESS:**  THE DEPARTMENT WOULD HAVE THE EXACT

22 WAYS THAT THE MONEY WAS SPENT.  I WOULD HAVE GENERAL WAYS THAT

23 THE MONEY WAS SPENT, OR HAVE SOME KNOWLEDGE OF, FOR EXAMPLE,

24 WHAT THE RECEIVER HAS DONE SINCE HIS INCEPTION.

25          **JUDGE HENDERSON:**  BUT THERE ARE FIGURES SOMEPLACE TO

1  TELL YOU EXACTLY HOW THE TWO BILLION --

2         **THE WITNESS:**  THAT'S CORRECT, ESPECIALLY THE GROWTH

3  IN THE LAST COUPLE OF YEARS.  THERE WOULD BE SPECIFIC PROPOSALS

4  THAT THE ADMINISTRATION HAS PUT FORWARD, WHETHER IT BE FOR

5  MENTAL HEALTH CARE OR FROM THE RECEIVERSHIP, TO GROW THESE

6  BUDGETS.

7         **JUDGE KARLTON:**  I TAKE IT NO -- I DON'T KNOW WHETHER

8  I -- I TAKE IT THAT THERE'S NO CASE ON THESE CHARTS, OR EVEN IN

9  YOUR DOCUMENTS, WHETHER OR NOT THE INITIAL AMOUNT OF

10 $344 MILLION WAS AN APPROPRIATE SUM.  ALL THIS CHART MAY PROVE

11 IS THAT THERE WAS DESPERATE UNDERSPENDING UNTIL NOW; IS THAT

12 RIGHT OR WRONG?

13        **THE WITNESS:**  I DON'T THINK I COULD SPECULATE ON

14 EITHER SIDE, BUT I CAN'T SIT HERE AND TELL YOU I CAN SAY EITHER

15 WAY WHETHER $344 MILLION WAS THE CORRECT NUMBER IN '94/'95.

16        **MR. LEWIS:**  THANK YOU, YOUR HONOR.

17        THANK YOU, MR. JERUE.

18        **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

19        CROSS?

20        **MS. MORRIS:**  MARIA MORRIS ON BEHALF OF COLEMAN

21 PLAINTIFFS.

22            **CROSS-EXAMINATION BY MS. MORRIS**

23 **BY MS. MORRIS**

24 **Q**   MR. JERUE, I WOULD LIKE TO TAKE A MOMENT TO LOOK AT YOUR

25 TRIAL AFFIDAVIT, WHICH IS DOCUMENT 346.

 1          **JUDGE REINHARDT:**  I ASSUME -- MAYBE MY COLLEAGUES

 2   HAVE SOME COMMENT -- THAT WE ARE GOING TO ALLOW YOU TO GO INTO

 3   PHASE TWO IN YOUR CROSS-EXAMINATION OF THIS WITNESS.

 4          **JUDGE KARLTON:**  THE WAY IT IS, THAT'S THE WAY IT'S

 5   GOT TO BE.

 6          **JUDGE REINHARDT:**  SO WE DON'T HAVE TO GO THROUGH

 7   THIS AGAIN IN PHASE TWO ONCE HE'S HERE.

 8          **JUDGE KARLTON:**  YOU DON'T HAVE TO CALL HIM BACK,

 9   WHICH IS MAYBE WHAT WE SHOULD HAVE DONE.

10          **JUDGE REINHARDT:**  YOUR QUESTIONS, I ASSUME, RELATE

11   ONLY THE PHASE TWO.

12          **MR. LEWIS:**  YOUR HONOR, WE ARE HAPPY TO CALL THIS

13   WITNESS BACK AND PUT HIM IN THE APPROPRIATE ORDER FOR PHASE TWO

14   IF THE COURT SO WISHES, IF WE DETERMINE HE IS RELATIVE TO PHASE

15   TWO.

16          **JUDGE REINHARDT:**  I THOUGHT WE TOLD YOU BEFORE HE

17   WAS RELEVANT TO ONLY PHASE TWO.  I MEAN, I TRIED THREE TIMES TO

18   FIND OUT WHAT THE RELEVANCE WAS TO PHASE ONE AND I DON'T FIND

19   ANY.  SO I SUPPOSE -- I CAN'T IMAGINE THEY HAVE ANY QUESTIONS

20   WHAT HE TALKED ABOUT THAT WOULD BE RELEVANT TO PHASE ONE AND

21   NOT PHASE TWO.

22          **MS. MORRIS:**  WE HAVE QUESTIONS THAT ARE DEFINITELY

23   RELEVANT TO PHASE TWO.

24          **JUDGE REINHARDT:**  I ASSUME YOU DON'T HAVE ANY

25   RELEVANT TO PHASE ONE.

1        **MS. MORRIS:**  WE ALSO HAVE QUESTIONS THAT WE THINK

2   ARE RELEVANT TO THE VALIDITY OF HIS TRIAL AFFIDAVIT AND THE

3   CHART HE PUT IN AND THEY'RE PUTTING FORWARD IN PHASE ONE.

4        **JUDGE REINHARDT:**  I UNDERSTAND.  I THINK WE'VE TAKEN

5   TOO MUCH TIME WITH OUR PROBLEMS AND TOO LITTLE WITH YOURS.  SO

6   GO AHEAD.

7   **BY MS. MORRIS**

8   **Q**   MR. JERUE, IS THIS YOUR TRIAL AFFIDAVIT, THE EXHIBIT THAT'S

9   UP ON THE SCREEN RIGHT NOW?

10  **A**   YES, IT IS.

11  **Q**   AND IF YOU TURN TO THE FINAL PAGE OF IT, IS THAT YOUR

12  SIGNATURE?

13  **A**   THAT'S CORRECT.

14  **Q**   LOOKING AT PARAGRAPH THREE -- PARAGRAPH FOUR ON PAGE THREE?

15  AND IN YOUR TESTIMONY TODAY, YOU INDICATED THAT THERE HAS BEEN

16  GROWTH OF MORE THAN 550 PERCENT IN THE SPENDING ON HEALTHCARE

17  SINCE 1994/'95?

18  **A**   THAT'S CORRECT.

19  **Q**   GOING DOWN TO THE BOTTOM OF PAGE THREE, YOU INDICATE IN

20  PARAGRAPH SIX THAT, DUE TO CHANGES IN CATEGORIZATION OF BUDGET

21  EXPENDITURES, YOU ARE NOT ABLE TO DETERMINE IF THE TOTAL FROM

22  '95 -- '94/'95 INCLUDES EXPENDITURES FOR HEALTHCARE

23  ADMINISTRATION COSTS AND/OR CUSTODY-RELATED COSTS OR HOW MUCH

24  WAS SPENT ON THOSE ITEMS DURING THAT PERIOD; IS THAT CORRECT?

25  **A**   THAT IS CORRECT.

1  Q    OKAY.  SO WHEN YOU'RE COMPARING COSTS FROM 1994/1995 TO

2  2007/2008, YOU'RE NOT ACTUALLY COMPARING NECESSARILY THE SAME

3  SET OF COSTS; IS THAT CORRECT?

4  A    IT'S POSSIBLE.

5  Q    YOU JUST DON'T KNOW?

6  A    CORRECT.

7  Q    OKAY.  DO YOU KNOW HOW MUCH OF THE CURRENT COSTS OF MEDICAL

8  CARE IN 2007/2008, HOW MUCH OF THOSE WERE FOR ADMINISTRATION

9  COSTS?

10 A    IT WAS FACTORED INTO THE NUMBER.  I DON'T HAVE THAT WITH ME

11 TODAY.

12 Q    DO YOU KNOW HOW MUCH OF THOSE -- OF THE COSTS CURRENTLY ARE

13 CUSTODY-RELATED COSTS?

14 A    ONCE AGAIN I COULD GUESS AT A NUMBER.  I DON'T HAVE THE

15 EXACT NUMBER WITH ME TODAY.

16 Q    OKAY.  SO AGAIN, YOU DON'T KNOW -- THAT IS THE PORTION THAT

17 YOU DON'T KNOW ABOUT FOR 1994 AND '95, WHETHER THAT WAS

18 INCLUDED?

19 A    THAT'S CORRECT.

20         **JUDGE KARLTON:**  CAN YOU GIVE ME A ROUGH ESTIMATE AS

21 TO THOSE -- ROUGH, AS TO THOSE COMPONENTS?

22         **THE WITNESS:**  AS OF TODAY?

23         **JUDGE KARLTON:**  YES.

24         **THE WITNESS:**  I WOULD SAY ROUGHLY FOR BOTH

25 COMPONENTS IT WOULD BE APPROXIMATELY 250 TO 300 MILLION IN

1  TODAY'S DOLLARS.

2  **BY MS. MORRIS**

3  **Q**   SO ABOUT A FIFTH TO A SIXTH OF THE TOTAL COSTS?

4  **A**   THAT'S CORRECT.

5  **Q**   IN THIS CHART AS FAR AS -- RATHER, IN YOUR -- IN YOUR TRIAL

6  AFFIDAVIT, AS FAR AS I CAN TELL, YOU DID NOT FACTOR IN

7  INFLATION; IS THAT ACCURATE?

8  **A**   THAT'S CORRECT.

9  **Q**   AND YOU DIDN'T FACTOR IN MEDICAL CARE INFLATION

10  SPECIFICALLY EITHER, DID YOU?

11  **A**   NO.  WE JUST COMPARED THE ACTUAL COSTS OF THE DEPARTMENT.

12  **Q**   OKAY.  DO YOU KNOW HOW MUCH INFLATION THERE HAS BEEN IN

13  MEDICAL CARE SINCE 1994?

14  **A**   NO, I DON'T.

15  **Q**   HAVE YOU EVER USED THE CONSUMER PRICE INDEX?

16  **A**   FOR SOME APPLICATIONS, YES.

17  **Q**   SO YOU USE IT IN YOUR WORK?

18  **A**   RARELY.  RARELY IN WHAT WE DO IN BUDGETING, BUT EVERY NOW

19  AND THEN.

20  **Q**   I RAN SOME NUMBERS ON THE CONSUMER PRICE INDEX TO SEE HOW

21  MUCH GROWTH THERE HAS BEEN IN TODAY'S DOLLARS, AND I'D LIKE TO

22  JUST PUT UP FOR THE COURT THE CPI CALCULATOR.

23          **MR. LEWIS:**  OBJECTION, YOUR HONOR.  THIS LACKS

24  FOUNDATION, AND ALSO THE WITNESS OR THE -- I'M SORRY -- COUNSEL

25  IS TESTIFYING NOW, IT WOULD SEEM.

1          **JUDGE KARLTON:**  SHE'S ASKING US TO TAKE JUDICIAL

2   NOTICE OF THE U.S. BUREAU OF LABOR STATISTICS CPI INFLATION

3   CALCULATOR, WHICH I ASSUME COMES OFF OF A WEBSITE NOWADAYS.

4          **MS. MORRIS:**  THANK YOU.  IT COMES OFF OF THE BLS,

5   THE BUREAU OF LABOR STATISTICS WEBSITE.

6          **JUDGE KARLTON:**  WOULD YOU LIKE US TO TAKE JUDICIAL

7   NOTICE OF THAT?

8          **MS. MORRIS:**  I WOULD LIKE YOU TO TAKE JUDICIAL

9   NOTICE OF THAT.  THANK YOU.

10          **JUDGE KARLTON:**  PRESIDING JUDGE, WILL YOU TAKE --

11          **JUDGE HENDERSON:**  I WILL TAKE IT.

12  **BY MS. MORRIS**

13  **Q**   I RAN A CALCULATION.  IT DOESN'T DO MILLIONS.  I RAN IT FOR

14  344,000 IN 1995, CALCULATING IT TO TODAY, 344,000 WOULD HAVE

15  $488,852.44 WORTH OF BUYING POWER IN TODAY'S DOLLARS.  DO YOU

16  SEE THAT?

17  **A**   I DO.

18  **Q**   DOES THAT SEEM REASONABLE TO YOU?

19          **MR. LEWIS:**  OBJECTION, YOUR HONOR.  THIS ASSUMES

20  FACTS NOT WITHIN THE WITNESS'S KNOWLEDGE.  HE TESTIFIED HE

21  DOESN'T KNOW ABOUT THE CONSUMER PRICE INDEX.

22          **JUDGE KARLTON:**  HE SAYS HE OCCASIONALLY USES IT.

23          IF YOU CAN ANSWER IT, FINE.  IF YOU CAN'T, JUST TELL

24  US.

25          **THE WITNESS:**  WITHOUT SEEING THE ANNUAL RATE FOR

1  EACH OF THOSE YEARS, I DON'T KNOW.  IT DOESN'T SEEM

2  UNREASONABLE.

3  **BY MS. MORRIS**

4  Q    OKAY.  IF YOU HAD RUN YOUR PERCENTAGE INCREASE CALCULATION

5  BASED OFF TODAY'S DOLLARS, SO THE SPENDING IN 1994/1995

6  ADJUSTED FOR TODAY'S DOLLARS, COMPARED TO THE SPENDING TODAY,

7  THAT WOULD HAVE BEEN A SMALLER PERCENTAGE INCREASE, WOULDN'T

8  IT?

9  **A**    I'M SORRY.  I MISSED PART OF THE END THERE.

10 **Q**    IF YOU HAD RUN YOUR COMPARISON OF THE 1994/'95 SPENDING TO

11 THE 2007/2008 SPENDING USING ALL TODAY'S DOLLARS, THAT WOULD

12 HAVE RESULTED IN A DIFFERENT AMOUNT OF INCREASE, WOULDN'T IT?

13 **A**    IF I UNDERSTAND, IS -- I'M NOT SURE IF I UNDERSTAND YOUR

14 QUESTION STILL.  WHAT YOU ARE SHOWING ME HERE IS THE

15 EXPENDITURES WOULD HAVE BEEN $489 MILLION JUST THROUGH CPI.  IS

16 THAT WHAT YOU'RE ASKING?

17 **Q**    IN 1994, IF YOU ADJUSTED BACK FOR TODAY'S DOLLARS BACK TO

18 1994.  IF YOU CALCULATED THE INCREASE IN A CONSTANT DOLLAR,

19 RATHER THAN INCLUDING INFLATION, THAT WOULD BE A SMALLER

20 PERCENTAGE INCREASE IN SPENDING, WOULDN'T IT?

21 **A**    I'M STILL NOT SURE I UNDERSTAND YOUR QUESTION.

22 **Q**    OKAY.

23          **JUDGE KARLTON:**  THE FACT OF THE MATTER IS YOU DIDN'T

24 RUN THE INFLATION RATE IN WHEN YOU MADE THE CHART?

25          **THE WITNESS:**  THAT'S CORRECT.

1          **JUDGE KARLTON:**  AND, THEREFORE, IF YOU HAD RUN THE

2    INFLATION RATE IN, IT WOULD HAVE RESULTED IN A DIFFERENT

3    CALCULATION?

4          **THE WITNESS:**  RIGHT.  SO IF WE HAD CONVERTED 344

5    INTO THE 49, THEN THE PERCENT AVERAGE GROWTH WOULD HAVE BEEN

6    SOMEWHAT LESS.  THAT'S CORRECT.

7          **MS. MORRIS:**  THANK YOU.

8    **BY MS. MORRIS**

9    **Q**   I ALSO -- I ALSO USED THE BUREAU OF LABOR STATISTICS TO RUN

10   MEDICAL CARE INFLATION AND SEE WHAT THE CHANGE IN COST OF

11   MEDICAL CARE IS SINCE 1995.

12          AND COULD WE PUT THAT UP?

13          (DOCUMENT DISPLAYED.)

14          **JUDGE KARLTON:**  WOULD YOU LIKE US TO TAKE JUDICIAL

15   NOTICE OF THAT?

16          **MS. MORRIS:**  AND I WOULD LIKE YOU TO TAKE JUDICIAL

17   NOTICE OF THIS AS WELL.

18          **JUDGE HENDERSON:**  TAKEN.

19   **BY MS. MORRIS**

20   **Q**   SO LOOKING AT THE PERIOD -- LOOKING AT 1995, HALF ONE, SO

21   THE TOP COLUMN, THE SECOND TO LAST ENTRY, DO YOU SEE THAT, 218?

22   **A**   I DO.

23   **Q**   AND THEN COMPARING THAT TO 2008, WHICH IS THE BOTTOM ROW,

24   SECOND TO LAST COLUMN, LAST COLUMN THAT'S FILLED IN, SO THAT'S

25   COMPARED FOR WESTERN URBAN AREAS FROM 19 -- FROM JANUARY --

1  FROM JUNE 30TH, 1995 THROUGH JUNE 30TH, 2008, THAT'S COMPARING

2  HEALTHCARE COSTS; IS THAT HOW YOU UNDERSTAND THIS AS WELL?

3  **A**  I NEVER LOOKED AT THE CHART.

4  **Q**  YOU'VE NEVER LOOKED AT THE MEDICAL CARE INFLATER CHART?

5  **A**  NO.

6  **Q**  OKAY.  SO YOU HAVE NO KNOWLEDGE, WHEN YOU TALK ABOUT HOW

7  MUCH THE COST HAS INCREASED, WHAT PERCENTAGE OF THAT IS DUE TO

8  INFLATION?

9  **A**  NO, BECAUSE WE DIDN'T DO OUR ANALYSIS BASED ON THAT.

10         **THE CLERK:**  FIVE MINUTES, COUNSEL.

11         **MS. MORRIS:**  OKAY.

12         **JUDGE HENDERSON:**  COUNSEL YOU SAID WESTERN URBAN.

13  THIS SAYS ALL URBAN.

14         **MS. MORRIS:**  LET'S SEE -- CAN YOU BLOW UP THE PLACE

15  IN THE TOP RIGHT ABOVE THE CHART WHERE IT SAYS -- DOWN LOWER,

16  THE -- INSIDE THE CHART, THAT PORTION.

17         **JUDGE HENDERSON:**  THERE'S SOME BLURRED READING.  I

18  CAN'T SEE.

19         **MS. MORRIS:**  I DO HAVE A COPY OF IT I CAN PROVIDE

20  FOR THE COURT -- AND I CAN PROVIDE --

21         **JUDGE HENDERSON:**  JUST GIVE IT TO THE DEPUTY.  OKAY.

22         **JUDGE REINHARDT:**  WE SEE IT.  WE SEE IT.

23         **JUDGE HENDERSON:**  IT'S JUST NOT CLEAR ON THAT CHART.

24  **BY MS. MORRIS**

25  **Q**  ALSO, YOU DON'T GIVE ANY INFORMATION IN YOUR AFFIDAVIT

1  REGARDING THE COST OR THE SPENDING ON HEALTHCARE BETWEEN

2  1994/'95 AND 2005/2006, CORRECT?

3  **A**   THAT'S CORRECT.

4  **Q**   DID YOU DO THOSE CALCULATIONS?

5  **A**   NO, WE DID NOT.

6  **Q**   SO YOU DON'T ACTUALLY HAVE ANY KNOWLEDGE ABOUT THE LEVEL OF

7  SPENDING DURING THE TEN -- DURING THAT TEN-YEAR PERIOD,

8  CORRECT?

9  **A**   THAT'S CORRECT.

10 **Q**   DO YOU KNOW WHAT THE IMPACT OF OVERCROWDING IS ON

11 HEALTHCARE SPENDING FOR CDCR?

12 **A**   NO, I'VE NEVER TAKEN A LOOK AT THAT.

13 **Q**   DO YOU KNOW HOW MUCH OF THE GROWTH AND EXPENDITURES

14 ACTUALLY REPRESENTS GROWTH IN THE AMOUNT OF HEALTHCARE

15 PROVIDED?

16          **MR. LEWIS:**  OBJECTION, YOUR HONOR.  THAT'S A VAGUE

17 QUESTION.

18          **JUDGE HENDERSON:**  OVERRULED.

19          **THE WITNESS:**  NO, THE DEPARTMENT WOULD KNOW THAT.  I

20 WOULDN'T KNOW THAT.

21 **BY MS. MORRIS**

22 **Q**   DO YOU KNOW HOW MUCH OF THE ADDITIONAL SPENDING IS USED

23 EFFICIENTLY?

24 **A**   NO.

25 **Q**   DO YOU KNOW HOW MUCH OF THE INCREASED SPENDING IS GOING FOR

1  INCREASING THE QUALITY OF HEALTHCARE?

2          **MR. LEWIS:**  OBJECTION, YOUR HONOR.  VAGUE, AND THIS

3  WITNESS IS NOT BEING PROFFERED FOR ANY OF THIS EVIDENCE.

4          **JUDGE HENDERSON:**  I THINK IT'S A FAIR

5  CROSS-EXAMINATION QUESTION, AND I'LL ALLOW IT.

6          **THE WITNESS:**  NO, I WOULDN'T HAVE THE EXPERTISE TO

7  KNOW HOW IT'S AFFECTING THE QUALITY OF THE CARE.

8  **BY MS. MORRIS**

9  **Q**   SO YOU DID NOT CONSIDER INFLATION, YOU DID NOT CONSIDER

10 QUALITY OF HEALTHCARE, QUANTITY OF HEALTHCARE, FOR ANY OF THE

11 YEARS BETWEEN 1994 AND 2005, AND YOU DON'T ACTUALLY KNOW WHAT

12 THE STARTING POINT INCLUDED IN YOUR CATEGORIES OF HEALTHCARE

13 SPENDING, CORRECT?

14 **A**   THAT'S CORRECT.

15         **MS. MORRIS:**  YOUR HONORS, WE WOULD MOVE TO STRIKE

16 THE TESTIMONY OF THIS WITNESS AS LACKING FOUNDATION, AND AS

17 BEING IRRELEVANT AND NOT PROBATIVE TO ANY MATTER IN THIS CASE,

18 AND WE WOULD LIKE ALSO TO STRIKE THE CHART WHICH IS BASED

19 ENTIRELY ON HIS TESTIMONY.

20         **MR. LEWIS:**  YOUR HONOR, IF I MAY ADDRESS THAT VIA

21 REDIRECT?

22         **JUDGE HENDERSON:**  YOU MAY.  WE'LL TAKE IT UNDER --

23              **REDIRECT EXAMINATION BY MR. LEWIS**

24 **BY MR. LEWIS**

25 **Q**   MR. JERUE, WHEN THE CHART COMES UP, I WOULD LIKE YOU TO

1  LOOK AT TWO SPECIFIC NUMBERS, 2006 TO 2008.  BASED ON YOUR

2  KNOWLEDGE OF INFLATION MATTERS, JUST IN THE VERY BASIC SENSE,

3  HAS INFLATION GONE UP DRAMATICALLY SINCE 2006 TO 2008?

4  **A**  NO, IT HAS NOT.

5  **Q**  SO THEN IS IT SAFE TO SAY THAT BETWEEN 2006 AND 2008, THERE

6  HASN'T BEEN MUCH OF A CHANGE IN INFLATIONARY RATES IN TERMS OF

7  ACTUAL DOLLAR VALUE?

8         **JUDGE KARLTON:**  THAT'S A DIFFERENT QUESTION.  HAS

9  THERE BEEN A CHANGE?

10         **THE WITNESS:**  HAS THERE BEEN ANY CHANGE IN

11  INFLATION?  I WOULD ASSUME THERE'S BEEN SOME.

12         **JUDGE KARLTON:**  DO YOU KNOW HOW MUCH?

13         **THE WITNESS:**  I KNOW IT RUNS TYPICALLY IN THE RANGE

14  OF TWO TO THREE PERCENT A YEAR.

15  **BY MR. LEWIS**

16  **Q**  BETWEEN 2006 AND 2008, A TWO-YEAR PERIOD, WHAT WAS THE

17  PERCENTAGE INCREASE IN HEALTHCARE SPENDING AT CDCR FOR MEDICAL

18  AND MENTAL HEALTH CARE SERVICES THAT ALSO INCLUDES CUSTODY AND

19  TRANSPORTATION AND THE ADMINISTRATIVE COST YOU REFERRED TO?

20  **A**  OVER THE TWO-YEAR PERIOD, IT WAS APPROXIMATELY 80 PERCENT

21  INCREASE.

22  **Q**  AND THAT'S WITHIN A SHORT TWO-YEAR PERIOD?

23  **A**  THAT'S CORRECT.

24  **Q**  AND IN THE ACCOUNTING FOR THE NEXT YEAR, FISCAL YEAR

25  2008/2009, THAT'S A ONE-YEAR CHANGE AS WELL, RIGHT?

1  **A**   THAT'S CORRECT.

2  **Q**   FOR A SHORT DURATION OF THAT, FOR A THREE OR TWO-YEAR

3  PERIOD, WOULD YOU EXPECT THAT THE INFLATION WOULD CHANGE AS

4  MUCH AS, SAY, THE 344 MILLION FIGURE CHANGED AS MUCH AS WHEN

5  YOU SAW THAT VALUE RATIO THING?

6  **A**   I'M SORRY.  ONE MORE TIME.

7  **Q**   IN A THREE-YEAR PERIOD OF TIME, WOULD THE INFLATION RATE --

8  AND THANK YOU.  PARDON MY QUESTION.

9        IN A THREE-YEAR PERIOD OF TIME, WOULD THAT FIGURE BE

10  AFFECTED MUCH IN TERMS OF BETWEEN 2006 AND 2009 BY AN INFLATION

11  RATE OF TWO OR THREE PERCENT?

12        **JUDGE KARLTON:**  AFFECTED BY A RATE OF TWO OR

13  THREE PERCENT.

14        **MR. LEWIS:**  YES.

15        **THE WITNESS:**  RIGHT.  IT WOULD BE MUCH SMALLER

16  GROWTH IF IT WAS CONSISTENT WITH INFLATION.

17  **BY MR. LEWIS**

18  **Q**   YET, STILL IT'S IN THE RANGE OF 80 PERCENT?

19  **A**   THAT'S CORRECT.

20        **MR. LEWIS:**  NO FURTHER QUESTIONS, YOUR HONOR.  THANK

21  YOU.

22        **JUDGE HENDERSON:**  REDIRECT?

23        **MS. MORRIS:**  NO FURTHER QUESTIONS.

24        **JUDGE KARLTON:**  THERE MAY BE OTHER DEFENDANTS.

25        **MR. LEWIS:**  IF YOUR HONOR WOULD HAVE ANY QUESTIONS

1   REGARDING FOUNDATION OR ANYTHING LIKE THAT, I COULD ADDRESS

2   THAT.  I TRIED TO ESTABLISH THESE ARE RECORDS AND THEY ARE

3   BASED ON NUMBERS HIS UNIT IS RESPONSIBLE FOR KEEPING.

4          **JUDGE HENDERSON:**  NO FURTHER QUESTIONS FOR ANYONE?

5   I'M GOING TO DENY THE MOTION AND RULE IT GOES THE WEIGHT OF

6   THIS TESTIMONY AND NOT ITS ADMISSIBILITY, COUNSEL.

7          THANK YOU, MR. JERUE.

8          YOU MAY CALL YOUR NEXT WITNESS.

9          **MS. TILLMAN:**  THE WITNESS IS RIGHT IN THE HALLWAY,

10  YOUR HONOR.

11         **JUDGE HENDERSON:**  STEP FORWARD, MA'AM, AND BE SWORN

12  IN.

13         **MS. TILLMAN:**  YOUR HONOR, THIS IS MS. CYNTHIA

14  RADAVSKY FROM THE DEPARTMENT OF MEDICAL HEALTH.  MY NAME IS

15  LISA TILLMAN ON BEHALF OF THE COLEMAN DEFENDANTS.

16                  **CYNTHIA ANNE RADAVSKY**

17  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANTS WAS FIRST

18  DULY SWORN AND EXAMINED AS FOLLOWS:

19         **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

20  RECORD.

21         **THE WITNESS:**  MY NAME IS CYNTHIA ANNE RADAVSKY,

22  R-A-D-A-V, AS IN VICTOR, -S-K-Y.

23         **MS. TILLMAN:**  GOOD MORNING, YOUR HONOR.  LISA

24  TILLMAN ON BEHALF OF THE DEFENDANTS.  WE'VE PRESENTED THE COURT

25  WITH A TRIAL AFFIDAVIT OF CYNTHIA RADAVSKY.  I THINK IT WAS

1   TAGGED AS EXHIBIT NO. 1106.  WE RESPECTFULLY REQUEST THIS COURT

2   ADMIT THAT TRIAL AFFIDAVIT INTO EVIDENCE TODAY.

3              **JUDGE HENDERSON:**  1106?

4          **MS. TILLMAN:**  I BELIEVE IT IS 1106.

5              **JUDGE HENDERSON:**  IT SAYS 1006.

6          **MS. TILLMAN:**  I'M SORRY.  IS IT 1006?  MY TYPO.

7   THANK YOU.

8              **JUDGE HENDERSON:**  IT WILL BE ADMITTED.

9          (DEFENDANTS' EXHIBIT 1006 RECEIVED IN EVIDENCE.)

10             **DIRECT EXAMINATION BY MS. TILLMAN**

11  **BY MS. TILLMAN**

12  **Q**   MS. RADAVSKY, WHO ARE YOU EMPLOYED BY?

13  **A**   THE STATE DEPARTMENT OF MENTAL HEALTH.

14  **Q**   AND CAN YOU INFORM THE COURT, PLEASE, OF THE NATURE OF YOUR

15  POSITION WITH THE DEPARTMENT OF MENTAL HEALTH BY JOB TITLE AND

16  YOUR RESPONSIBILITIES?

17  **A**   I'M THE DEPUTY DIRECTOR OF LONG-TERM CARE SERVICES, WHICH

18  IS RESPONSIBLE FOR THE OVERSIGHT AND MANAGEMENT OF THE FIVE

19  STATE MENTAL HOSPITALS, TWO PSYCHIATRIC PROGRAMS.  I'M

20  RESPONSIBLE FOR THE CONDITIONAL RELEASE, AND MENTALLY

21  DISORDERED OFFENDER PROGRAM, AND THE SEXUALLY VIOLENT PREDATOR

22  PROGRAM.

23  **Q**   MS. RADAVSKY, WHEN DID YOU FIRST BEGIN WORKING WITH THE

24  FEDERAL COURT IN THE COLEMAN CASE ON COMPLIANCE ISSUES?

25  **A**   IN 1998 WHEN I BECAME THE ASSISTANT DEPUTY DIRECTOR, ONE OF

1  MY FIRST RESPONSIBILITIES WAS ATTENDING AND PARTICIPATING AS

2  GATES WAS BEING MERGED INTO COLEMAN.

3  **Q**   AND GATES, GATES WAS A CLASS ACTION SUIT, OF COURSE,

4  INVOLVING JUST THE CALIFORNIA MEDICAL FACILITY, FOR THE RECORD.

5        AT THE TIME DID THE DEPARTMENT OF MENTAL HEALTH

6  PROVIDE INPATIENT SERVICES TO THE CALIFORNIA DEPARTMENT OF

7  CORRECTIONS AND REHABILITATION INMATES?

8  **A**   YES, THEY DID.

9  **Q**   AND SINCE THAT TIME OF 1998 THROUGH TODAY, HAS DMH PROVIDED

10 INPATIENT MENTAL HEALTHCARE SERVICES TO DEPARTMENT OF

11 CORRECTION INMATES?

12 **A**   YES, THEY DO.

13 **Q**   TO YOUR KNOWLEDGE, DOES ANY OTHER ENTITY PROVIDE INPATIENT

14 MENTAL HEALTHCARE SERVICES TO THESE CDCR INMATES?

15 **A**   NO, THEY DON'T.

16 **Q**   SO DMH IS THE SOLE PROVIDER OF MENTAL HEALTHCARE SERVICES

17 REQUIRED BY CDCR INMATES WHO NEED INPATIENT CARE?

18 **A**   THAT'S CORRECT.

19 **Q**   DOES THE DEPARTMENT OF MENTAL HEALTH RECEIVE PATIENTS FROM

20 ANY OTHER AGENCIES OTHER THAN THE DEPARTMENT OF CORRECTIONS AND

21 REHABILITATION?

22 **A**   YES, WE DO.  THE MISSION OF THE DEPARTMENT OF MENTAL HEALTH

23 IS OUTLINED IN THE STATE CONSTITUTION, AND WE'RE REQUIRED TO

24 PROVIDE SERVICES FOR MENTALLY ILL THAT COME IN THROUGH EITHER A

25 VOLUNTARY OR INVOLUNTARY SHORT COMMITMENT.  WE'RE RESPONSIBLE

1   UNDER PENAL CODE 1370, INCOMPETENT TO STAND TRIAL; PENAL CODE

2   26, NOT GUILTY BY REASON OF IN SANITY; WELFARE AND INSTITUTIONS

3   CODE 6600, SEXUALLY VIOLENT PREDATORS; AND VARIOUS PENAL CODES,

4   2962, 2972, AND 2974, MENTALLY DISORDERED OFFENDERS.

5            SO WE RECEIVE MULTIPLICITY OF PATIENTS FROM THE

6   VARIOUS SUPERIOR COURTS WITHIN THE COUNTIES OF CALIFORNIA, THE

7   BOARD OF PRISON HEARINGS.  I SERVICE THE POPULATION FROM THE

8   DEPARTMENT OF JUVENILE JUSTICE WITHIN THE CALIFORNIA DEPARTMENT

9   OF CORRECTIONS AND REHABILITATION, AS WELL AS PROVIDING

10  SERVICES TO THE COUNTIES.

11            (DOCUMENT DISPLAYED.)

12  **BY MS. TILLMAN**

13  **Q**   WOULD YOU LOOK AT EXHIBIT 1243, PLEASE, THAT WE PUT UP ON

14  THE SCREEN?  WAS YOUR STAFF RESPONSIBLE FOR CREATING THIS

15  EXHIBIT?

16  **A**   YES, THEY WERE.

17  **Q**   AND, TO YOUR KNOWLEDGE, WHEN WAS IT PREPARED BY YOUR STAFF?

18  **A**   WITHIN THE LAST 30 TO 60 DAYS.

19  **Q**   WHAT DOES THIS EXHIBIT SHOW?

20  **A**   THIS EXHIBIT SHOWS THE LOCATIONS THROUGHOUT THE STATE OF

21  CALIFORNIA OF OUR FIVE STATE MENTAL HOSPITALS AND THE TWO

22  PSYCHIATRIC PROGRAMS.

23  **Q**   DOES IT ALSO SHOW THE NUMBER OF INPATIENT MENTAL HEALTHCARE

24  BEDS PROVIDED BY THE DEPARTMENT OF MENTAL HEALTH TO CDCR IN

25  STATES?

1  **A**   YES, IT NOT ONLY SHOWS THE NUMBER, BUT IT SHOWS THE

2  BREAKDOWN BETWEEN GENDER AND BETWEEN ACUTE LEVEL OF CARE, WHICH

3  IS ESSENTIALLY FOR THOSE PATIENTS THAT REQUIRE IMMEDIATE

4  TREATMENT TO STABILIZE A PSYCHOTIC CRISIS OR THOSE, FOR

5  EXAMPLE, IN INTERMEDIATE CARE, WHICH IS FOR LONGER TERM AND

6  CHRONIC MENTAL ILLNESS.

7  **Q**   WILL THIS MAP ASSIST IN YOUR TESTIMONY TODAY?

8  **A**   YES.

9  **Q**   LOOKING AT THE MAP, WOULD YOU DESCRIBE TO THE COURT WHERE

10  THE DEPARTMENT OF MENTAL HEALTH PROVIDES INPATIENT MENTAL

11  HEALTHCARE TO CDCR INMATES WITHIN CDCR PREMISES?

12  **A**   OKAY.  LET'S START WITH THE STATE HOSPITALS.  AT THE TOP OF

13  THE BOX ON THE SIDE WHERE IT SAYS "ATASCADERO," ATASCADERO HAS

14  25 BEDS SET ASIDE FOR THE DEPARTMENT OF CORRECTIONS AND

15  REHABILITATION INMATES.  SO WE HAVE 25 ACUTE CARE BEDS AND 231

16  INTERMEDIATE CARE BEDS, WHICH ARE BEDS FOR INMATES THAT HAVE A

17  LOWER RISK OF VIOLENCE OR SECURITY.  THAT HOSPITAL IS WITHIN

18  THE CITY OF ATASCADERO, CLOSE TO SUN LUIS OBISPO.

19         COALINGA STATE HOSPITAL IS IN COALINGA.  IT HAS A

20  50-BED INTERMEDIATE CARE FOR THE CDCR INMATES.  PATTON STATE

21  HOSPITAL IS IN SAN BERNADINO, AND WE HAVE 30 FEMALE

22  INTERMEDIATE CARE BEDS.

23         THEN THE TWO PSYCHIATRIC PROGRAMS ARE WITHIN TWO

24  PRISONS.  SO THE VACAVILLE PSYCHIATRIC PROGRAM IS WITHIN THE

25  CALIFORNIA MEDICAL FACILITY, THERE'S 150 ACUTE BEDS, WHICH

1  RIGHT NOW HAS 20 BEDS DEDICATED FOR MENTAL HEALTH CRISIS BEDS,

2  AND 150 INTERMEDIATE CARE BEDS.  THAT 150 INCLUDES A 44-BED DAY

3  TREATMENT PROGRAM.  THEN THE SALINAS VALLEY PSYCHIATRIC PROGRAM

4  IS WITHIN SALINAS VALLEY STATE PRISON, AND CURRENTLY WE HAVE

5  176 MALE INTERMEDIATE CARE BEDS.

6  **Q**  NOW, IN REGARDS TO THE PROGRAMS AT VACAVILLE PSYCHIATRIC

7  AND SALINAS VALLEY PSYCHIATRIC PROGRAM, ARE THOSE PARTICULAR

8  INPATIENT PROGRAMS WITHIN -- LET ME STRIKE THAT.

9         DO THOSE PARTICULAR PSYCHIATRIC PROGRAMS AT SALINAS

10 VALLEY AND VACAVILLE PSYCHIATRIC PROGRAM PROVIDE THEIR OWN

11 DINING FACILITIES FOR YOUR PATIENTS?

12 **A**  YES, BECAUSE IT'S LICENSED CARE, THEY MUST HAVE SERVICES

13 PROVIDED THROUGH A LICENSED DINING AND THERAPEUTIC KITCHEN, SO

14 THEY ARE NOT ALLOWED TO COMMINGLE IN THE OTHER DINING ROOMS OR

15 HAVE FOOD SERVED TO THEM BY OTHER INMATES.

16        **JUDGE KARLTON:**  MS. TILLMAN, MAY I INTERRUPT?  I

17 HAVE THE SAME PROBLEM WITH THIS WITNESS AS I HAVE WITH THE

18 FIRST, ALTHOUGH IT'S NOT AS DRAMATIC.  HOW DOES THIS BEAR UPON

19 THE QUESTION OF WHETHER OR NOT OVERCROWDING IS THE PRIMARY

20 CAUSE?  WHERE ARE WE GOING?

21        **MS. TILLMAN:**  I'M TRYING TO LAY A NECESSARY

22 FOUNDATION, YOUR HONOR, FOR THIS WITNESS TO TESTIFY THAT,

23 INDEED, THE MENTAL HEALTHCARE PATIENTS THAT ARE PROVIDED

24 INPATIENT SERVICES BY THE DEPARTMENT OF MENTAL HEALTH ARE NOT

25 IN OVERCROWDED CONDITIONS.

1              **JUDGE KARLTON:**  I SEE.  ALL RIGHT.  NOW I UNDERSTAND

2    WHERE YOU ARE GOING.

3    **BY MS. TILLMAN**

4    Q    MS. RADAVSKY, WHEN YOU MENTION THERE IS NO COMMINGLING IN

5    THE DINING FACILITIES, ARE YOU ALSO INDICATING THAT THERE'S NO

6    COMMINGLING IN TERMS OF THE HOUSING OF INMATES RECEIVING

7    INPATIENT MENTAL HEALTHCARE SERVICES BY THE DEPARTMENT OF

8    MENTAL HEALTH AT CDCR SITES WITH GENERAL POPULATION INMATES AT

9    CDCR SITES?

10   A    THAT'S CORRECT.  OUR PATIENTS, WHEN THEY ARE WITH US, NOT

11   ONLY DINE SEPARATELY THERE, THEY ARE IN SEPARATE THERAPEUTIC

12   ENVIRONMENTS, SEPARATE INDIVIDUAL AND THERAPEUTIC GROUPS, AND

13   THEY'RE NOT ALLOWED TO BE OUT FOR RECREATION OR YARD TIME AT

14   THE SAME TIME.

15   Q    IS ANY OF YOUR PATIENTS -- ARE ANY OF YOUR PATIENTS TRIPLE

16   BUNKED AT ANY OF YOUR SITES WITHIN STATE HOSPITALS OR WITHIN

17   PREMISES --

18   A    NO, THEY ARE NOT.

19   Q    UNDER APPLICABLE STATE LICENSURE REQUIREMENTS OF TITLE 22,

20   ARE YOUR PATIENTS PERMITTED TO BE TRIPLE BUNK?

21              **MR. GALVAN:**  OBJECTION.  LEADING.

22              **JUDGE HENDERSON:**  I WILL ALLOW IT.

23   **BY MS. TILLMAN**

24   Q    ARE YOUR STATE HOSPITALS SUBJECT TO JOINT COMMISSION

25   ACCREDITATION OF HOSPITAL ORGANIZATION ACCREDITATION STANDARDS?

1          **MR. GALVAN:** OBJECTION. LEADING.

2          **JUDGE HENDERSON:** OVERRULED.

3          **THE WITNESS:** FOUR OF MY HOSPITALS ARE JOINT

4 COMMISSION ACCREDITED: ATASCADERO, PATTON, NAPA, AND

5 METROPOLITAN. AND WE DO HAVE STANDARDS FOR CARE IN THE LIVING

6 ENVIRONMENT.

7 **BY MS. TILLMAN**

8 **Q** IN THE COURSE OF WORKING WITH THE ACCREDITATION STANDARDS

9 OF THE JOINT COMMISSION, ARE YOU AWARE OF WHETHER OR NOT ANY OF

10 THOSE STANDARDS PERMIT TRIPLE BUNKING OF YOUR PATIENTS?

11 **A** NO, THEY DO NOT.

12 **Q** ARE YOU FAMILIAR WITH THE COURT ORDERS FROM THE COLEMAN

13 COURT CONCERNING CARE PROVIDED TO CALIFORNIA DEPARTMENT OF

14 CORRECTION PATIENTS BY THE DEPARTMENT OF MENTAL HEALTH?

15 **A** YES, I AM.

16 **Q** HAVE ANY OF THOSE COURT ORDERS ADDRESSED THE ADEQUACY OF

17 THE CARE RENDERED BY THE DEPARTMENT OF MENTAL HEALTH TO THESE

18 PARTICULAR PATIENTS?

19 **A** NO, THEY HAVE NOT.

20 **Q** WHAT HAVE THE ORDERS ADDRESSED?

21 **A** THE ORDERS HAVE PRIMARILY REQUESTED ADDITIONAL BEDS FROM

22 THE DEPARTMENT OF MENTAL HEALTH.

23 **Q** WHEN YOU MENTION THAT THE COURT HAS REQUESTED ADDITIONAL

24 BEDS BE PROVIDED BY THE DEPARTMENT OF MENTAL HEALTH FOR THE

25 CARE OF COLEMAN PATIENTS, ARE YOU FAMILIAR WITH THE COURT ORDER

1  OF MARCH 3, 2006, WHICH WE'VE LABELED AS EXHIBIT 1043?  AND

2  LOOKING AT PAGE FOUR OF THAT COURT ORDER, ARE YOU FAMILIAR WITH

3  THE PARAGRAPH FOUR THAT REQUIRES DEFENDANTS TO BUILD 64 SINGLE

4  CELLS IN THE PRESENTLY PLANNED EXPANSION OF SALINAS VALLEY

5  PSYCHIATRIC PROGRAM OPERATED BY THE DEPARTMENT OF MENTAL HEALTH

6  FOR LEVEL FOUR VIOLENT INMATES AT SALINAS VALLEY STATE PRISON?

7  **A**  YES, I AM.  AND THAT PROGRAM, THE ADMINISTRATION BUILDING

8  HAS BEEN TURNED OVER TO ME, AND WE'RE ANTICIPATING THE HOUSING

9  PORTION TO BE COMPLETED AND TURNED OVER BY THE END OF DECEMBER,

10 EARLY JANUARY '09 SO THAT WE CAN START OCCUPANCY EITHER THE END

11 OF JANUARY '09 OR FEBRUARY '09.

12 **Q**  AND ARE YOU ALSO FAMILIAR WITH A COURT ORDER OF MAY 2,

13 2006, DEFENDANT'S EXHIBIT 1296?

14           **THE CLERK:**  YOU HAVE FIVE MINUTES, COUNSEL.

15 **BY MS. TILLMAN**

16 **Q**  AGAIN, THAT COURT ORDER INDICATES NOT ONLY, IN PARAGRAPH

17 SEVEN, THE ADDITION OF 36 BEDS FOR INMATES AT SALINAS VALLEY

18 STATE PRISON, BUT ALSO THE ADDITION OF, IN PARAGRAPH TEN, 25

19 ADDITIONAL INPATIENT BEDS FOR INMATES AT COALINGA STATE

20 HOSPITAL, CORRECT?

21 **A**  THAT'S CORRECT.

22 **Q**  AND WERE THOSE BEDS MADE AVAILABLE AT COALINGA STATE

23 HOSPITAL?

24 **A**  YES, THEY WERE.

25 **Q**  LOOKING AT PARAGRAPH 11 OF THAT EXHIBIT, THAT PARAGRAPH

1    ALSO ADDRESSES THE NEED TO PROVIDE ADDITIONAL BEDS TO THOSE

2    INMATES OF THE DEPARTMENT OF CORRECTIONS WHO NOT ONLY NEED

3    INPATIENT SERVICES BUT HAVE LEVEL FOUR HIGH CUSTODY

4    CLASSIFICATION, CORRECT?

5    **A**   THAT'S CORRECT.

6    **Q**   IN THE COURSE OF YOUR WORK WITH THE DEPARTMENT OF MENTAL

7    HEALTH, HAVE YOU FOUND THAT THERE IS A WAIT LIST FOR BEDS

8    PROVIDED BY THE DEPARTMENT OF MENTAL HEALTH TO THESE CDCR

9    INMATES IN NEED OF INPATIENT SERVICES?

10   **A**   THE WAIT LIST IS FOR THE HIGH SECURITY INMATES THAT HAVE A

11   RISK OF VIOLENCE.

12   **Q**   WHERE DOES THAT WAIT LIST USUALLY OCCUR?  IS IT AT YOUR

13   STATE HOSPITALS OR AT THE PSYCHIATRIC PROGRAMS WITHIN CDCR?

14   **A**   THE WAIT LIST IS PREDOMINANTLY FOR SALINAS VALLEY

15   PSYCHIATRIC PROGRAM AND THE HIGH SECURITY UNITS THAT WE OPERATE

16   WITHIN THE VACAVILLE PSYCHIATRIC PROGRAM, P2 AND P3, WHICH WERE

17   OPENED WITHIN THE LAST THREE TO FOUR YEARS, SPECIFICALLY TO

18   ADDRESS THE WAIT LIST FOR THESE HIGH SECURITY INMATES.

19   **Q**   WHY IS THERE NO WAIT LIST FOR THE BEDS, THE INPATIENT BEDS

20   PROVIDED BY THE DEPARTMENT OF MENTAL HEALTH AT PLACES WITHIN

21   THE STATE HOSPITALS LIKE ATASCADERO STATE HOSPITAL?

22           **MR. GALVAN:**  OBJECTION.  ASSUMES FACTS NOT IN

23   EVIDENCE.

24           **JUDGE HENDERSON:**  WHY DON'T YOU REPHRASE, COUNSEL?

25           **MS. TILLMAN:**  THANK YOU.

1    **BY MS. TILLMAN**

2    **Q**    IN REGARDS TO THE INPATIENT BEDS AVAILABLE AT ATASCADERO

3    STATE HOSPITAL, IS THERE USUALLY A WAIT LIST FOR THOSE BEDS?

4    **A**    NO, THERE IS NOT.

5    **Q**    DO YOU HAVE AN UNDERSTANDING OR HAVE YOU FORMED AN OPINION

6    AS TO WHY THERE IS NO WAIT LIST FOR THE BEDS PROVIDED AT

7    ATASCADERO STATE HOSPITAL FOR THE CARE OF CDCR INMATES?

8    **A**    WE HAVE NOT RECEIVED SUFFICIENT REFERRALS TO FILL THOSE

9    BEDS.  I HAVE OPENINGS IN THE LOW SECURITY BEDS AT VACAVILLE,

10   ATASCADERO, AND EVEN FOR THE WOMEN AT PATTON.  SO IT'S -- YOU

11   KNOW, THE LOWER SECURITY FOLKS ARE BEING TREATED OR NOT

12   REFERRED TO US.

13             IF WE GET A REFERRAL AND WE REJECT IT, THE

14   CLINICAL -- THE COORDINATED CLINICAL ASSESSMENT TEAM REVIEWS

15   THE REJECTION.  IF THERE'S SUFFICIENT EVIDENCE AFTER A JOINT

16   DISCUSSION BY CDCR CLINICIANS AND DEPARTMENT OF MENTAL HEALTH

17   CLINICIANS, WE WILL ACCEPT THAT AND MAKE -- THE FINAL APPEAL

18   DECISION RESIDES WITH MYSELF AND MY COUNTERPART OVER AT

19   CORRECTIONS.  IF THE REJECTION STANDS IN THE MONTHLY REPORT

20   THAT I SUBMIT TO THE SPECIAL MASTER IN THE COURT FOR BED

21   UTILIZATION, THAT REJECTION IS ATTACHED.

22   **Q**    SO AT THE END OF THE DAY, ALL THE REJECTIONS THAT STAND ARE

23   ESSENTIALLY SUBMITTED TO THE SPECIAL MASTER'S TEAM FOR REVIEW;

24   IS THAT CORRECT?

25   **A**    THAT IS CORRECT.

1  Q    DO YOU FIND THAT MENTALLY ILL PATIENTS WITHIN THE COLEMAN

2  CASELOAD ARE SUBJECT TO PERIODIC EPISODES OF DECOMPENSATION?

3           **MR. BIEN:**  OBJECTION.  LEADING.

4           **JUDGE HENDERSON:**  I'M GOING TO ALLOW IT.  IT'S NOT

5  PREJUDICIAL IN ANY WAY.  YOU MAY ANSWER THAT.

6           **THE WITNESS:**  MENTAL ILLNESS BEING A METABOLIC AND A

7  BIOLOGICAL DISEASE HAS ITS EBBS AND FLOWS.  IT'S NOT BLACK AND

8  WHITE.  THERE ARE GRAY AREAS.  AND IT'S BASED ON THE

9  STABILIZATION OF PATIENTS.  SOMETIMES THERE ARE TRIGGERS THAT

10  ADD TO THE DECOMPENSATION, AND THAT'S WHY YOU HAVE VARYING

11  LEVELS OF CARE TO MEET THE INDIVIDUAL NEEDS OF PATIENTS AS THEY

12  STABILIZE OR THEY DECOMPENSATE TO HELP GET THEM BACK ON TRACK.

13  **BY MS. TILLMAN**

14  Q    HOW WOULD YOU TERM THE MODEL OF CARE PROVIDED BY THE

15  DEPARTMENT OF MENTAL HEALTH?

16  **A**    THE PHILOSOPHY OF THE DEPARTMENT OF MENTAL HEALTH IS TO USE

17  WHAT IS CALLED A RECOVERY MODEL.  IT'S AN INCLUSION OF

18  BIOPSYCHOSOCIAL REHABILITATION AND RELAPSE PREVENTION.  IT'S

19  VERY PERSON CENTERED.  IT TREATS THE WHOLE PERSON, NOT JUST THE

20  SYMPTOMS THAT BRING THEM TO US FOR ADMISSION.  SO IT TAKES US

21  APPROXIMATELY 60 DAYS TO DO A FULL ADMISSION SET OF EVALUATIONS

22  FROM AN ENTIRE INTERDISCIPLINARY TEAM.

23           **THE CLERK:**  TIME'S UP, COUNSEL.

24           **JUDGE HENDERSON:**  LET ME ASK, IS THE RECOVERY MODEL

25  THAT YOU JUST -- IS THAT A PRISON MODEL, OR IS THAT IN THE

1  BROADER WORLD OUTSIDE THE PRISON WORLD?  IS THAT SOMETHING

2  YOU'VE DEVISED WITHIN THE PRISON SYSTEM?  JUST FOR MY

3  INFORMATION.

4          **THE WITNESS:**  THAT'S A GOOD QUESTION.  IT STARTED AS

5  A COMMUNITY BASIS OF SERVICES AND A MODEL WHERE TRADITIONALLY

6  MENTAL HEALTH WAS A -- WHAT WAS CALLED A MEDICAL MODEL.  THE

7  DOCTOR TOLD THE TEAM HOW TO TREAT THE PATIENT.  THIS MODEL WAS

8  STARTED BY THE CONSUMERS IN THE COMMUNITY AND HAS GROWN THROUGH

9  THE STATE MENTAL HEALTH HOSPITALS ACROSS THE COUNTRY, BECAUSE

10 IT'S BASED ON THE WANTS, THE NEEDS, AND THE DESIRES OF THE

11 PATIENT WITH THE FULL TEAM IN COLLABORATION BRINGING EVERY

12 CLINICIAN TO BEAR.  YOU HAVE PSYCHOLOGISTS, REHABILITATION

13 THERAPISTS, SOCIAL WORKERS, PSYCHIATRISTS, CLINICAL DIETICIANS,

14 BECAUSE THEY ALL PLAY A ROLE.

15          **JUDGE HENDERSON:**  THANK YOU.

16          **MS. TILLMAN:**  MAY I HAVE JUST ONE LAST QUESTION?

17 THANK YOU.

18 **BY MS. TILLMAN**

19 **Q**   WHAT WOULD ENABLE THE DEPARTMENT OF MENTAL HEALTH TO BETTER

20 SERVE THE MENTAL HEALTHCARE NEEDS OF THE DEPARTMENT OF

21 CORRECTION INMATES?

22 **A**   ADDITIONAL HIGH SECURITY BEDS.

23          **MS. TILLMAN:**  THANK YOU.  NOTHING FURTHER.

24          **JUDGE HENDERSON:**  ANY INTERVENORS HAVE ANY

25 QUESTIONS?

1        **MS. WANG:**  NO, YOUR HONOR.

2        **MR. MITCHELL:**  NO, YOUR HONOR.

3        **JUDGE HENDERSON:**  CROSS-EXAMINATION.

4        **MR. GALVAN:**  YES, YOUR HONOR.  ERNEST GALVAN FOR THE

5  PLAINTIFF CLASS.

6                  **CROSS-EXAMINATION BY MR. GALVAN**

7  BY MR. GALVAN

8  Q    GOOD MORNING, MS. RADAVSKY.

9  A    GOOD MORNING.

10 Q    IT'S YOUR TESTIMONY THAT THE DMH PATIENTS, INMATE PATIENTS,

11 ARE NOT IMPACTED BY OVERCROWDING AT CDCR; IS THAT CORRECT?

12 A    THAT'S CORRECT.

13 Q    AND COULD WE LOOK AT 1243, D1243, PLEASE?  OR D1295, THIS

14 IS THE MAP THAT YOU TESTIFIED ABOUT EARLIER.

15        **JUDGE HENDERSON:**  EXCUSE ME, COUNSEL.  HOW LONG DO

16 YOU THINK YOUR CROSS IS GOING TO TAKE?  JUST GIVE US YOUR BEST

17 ESTIMATE.

18        **MR. GALVAN:**  I'VE PLANNED FOR 75 MINUTES, ONE HOUR

19 15 MINUTES, YOUR HONOR.

20        **JUDGE HENDERSON:**  OKAY.  LET'S BREAK FOR LUNCH.

21        **MR. GALVAN:**  THANK YOU.

22        (LUNCHEON RECESS TAKEN.)

23        **JUDGE HENDERSON:**  OKAY.  YOU MAY PROCEED WITH YOUR

24 CROSS WHEN YOU'RE READY, COUNSEL.

25        **MR. GALVAN:**  THANK YOU, YOUR HONOR.

1              (DOCUMENT DISPLAYED.)

2  **BY MR. GALVAN**

3  **Q**   GOOD AFTERNOON, MS. RADAVSKY.  ERNEST GALVAN FOR THE

4  PLAINTIFFS.

5              THIS IS DEFENDANT'S 1243, YOUR MAP.  I BELIEVE YOU

6  TESTIFIED YOU PREPARED THIS FOR THE TRIAL.  IF WE COULD ZOOM IN

7  TO JUST THE TABLE OF THE BEDS FOR A MOMENT?  THE LARGEST SET OF

8  BEDS ARE THE VACAVILLE PSYCHIATRIC PROGRAM; IS THAT RIGHT?  THE

9  BEDS AT CMF CALIFORNIA MEDICAL FACILITY VACAVILLE.

10 **A**   AT THIS TIME, CORRECT.

11 **Q**   AND THOSE ARE THE BEDS THAT WERE AT ISSUE IN *GATES*, THOSE

12 BEDS WERE THERE DURING THE PERIOD OF THE *GATES* LITIGATION; IS

13 THAT RIGHT?

14             **MS. TILLMAN:**  OBJECTION AS TO RELEVANCE.

15             **JUDGE HENDERSON:**  OVERRULED.

16             WAS THERE AN ANSWER?

17             **THE WITNESS:**  NOT ALL OF THEM WERE.

18 **BY MR. GALVAN**

19 **Q**   THOSE BEDS INCLUDE A UNIT KNOWN AS THE Q UNIT; IS THAT

20 CORRECT?  Q1, 2 AND 3?

21 **A**   YES.

22 **Q**   AND AT THE BEGINNING OF 2007, YOU HAD TWO SUICIDES THERE

23 TOWARD THE END OF JANUARY AMONG COLEMAN CLASS MEMBERS IN THE Q

24 UNITS; IS THAT CORRECT?

25 **A**   YES.

1  Q    OKAY.  IF WE COULD PUT UP, PLEASE, THE APRIL 16TH, 2007,

2  MEMO?

3             (DOCUMENT DISPLAYED.)

4             **MR. GALVAN:**  THANK YOU.

5             **JUDGE KARLTON:**  WHAT EXHIBIT IS THIS, COUNSEL?

6             **MR. GALVAN:**  THIS IS NOT AN EXHIBIT YET.  WE ARE

7  GOING TO OFFER THIS AS A REBUTTAL IMPEACHMENT EXHIBIT.  IT WILL

8  BE NUMBER P588.  I HAVE COPIES FOR COUNSEL.  MAY I PRESENT ONE

9  TO THE WITNESS?

10            **JUDGE HENDERSON:**  YOU MAY.

11 **BY MR. GALVAN**

12 Q    MS. RADAVSKY, ARE YOU FAMILIAR WITH THAT REPORT?

13 A    YES, I AM.

14 Q    THE DOCUMENT P588, DID YOU RECEIVE A COPY OF THAT REPORT

15 WHEN IT WAS ISSUED?

16 A    I DIDN'T HEAR THE END OF YOUR QUESTION.

17 Q    DID YOU RECEIVE A COPY OF THAT REPORT?

18            **JUDGE HENDERSON:**  WHEN IT WAS ISSUED.

19            **THE WITNESS:**  YES, I DID.

20 **BY MR. GALVAN**

21 Q    FOR THE RECORD, THIS IS -- THE REPORT DESCRIBES ON THE

22 TITLE "THE SUICIDE REPORT OF INMATE," AND I'VE REDACTED THE

23 NAME.  I'LL JUST REFER TO HIM AS D.M.  THIS IS ONE OF MY

24 CLIENTS WHO DIED IN THE Q UNIT AT VACAVILLE, ACCORDING TO THIS

25 REPORT, JANUARY 27TH, 2007.  I WOULD ASK YOU TO PLEASE TURN TO

1    PAGE -- THE PAGE AFTER THE CC IF YOU WOULD, PAGE THREE, THE ONE

2    THAT STARTS:  "MEMORANDUM TO SUSAN HUBBARD" AT THE TOP.  IT'S

3    PAGE ONE OF THE ACTUAL MEMORANDUM, ONE PAGE IN FROM HERE.

4             AND THE BODY OF TEXT THERE IN THE MEMORANDUM

5    DESCRIBES THE CIRCUMSTANCE UNDER WHICH D.M. DIED, YOU'LL SEE

6    THERE, THE FIRST SENTENCE:

7            "AN ORDER FOR ONE-TO-ONE DIRECT VISUAL

8         OBSERVATION FOR THE PURPOSES OF SUICIDE WATCH WAS IN

9         EFFECT."

10            AND IT SAYS THERE.

11           "HE HAS SMEARED FECES ON THE WINDOW, AND THEN

12        WHEN THEY CHECKED ON HIM -- "

13             DOWN AT THE BOTTOM, IF I CAN READ, IT SAYS:

14           "M WAS KNEELING IN FRONT OF HIS DESK WITH A NOOSE

15        AROUND HIS NECK,"

16             AND DESCRIBES THE LIFESAVING MEASURES.

17             IF YOU COULD TURN NOW TO THE RECOMMENDATIONS PAGE,

18    WHICH IS PAGE FOUR OF THIS SAME MEMO.  AND THE -- ONE PAGE

19    BACK, PLEASE.

20            (DOCUMENT DISPLAYED.)

21    **BY MR. GALVAN**

22    **Q**   IF I COULD ASK YOU, MS. RADAVSKY, TO LOOK AT THE VERY FIRST

23    CELL IN THE TABLE WHICH HAS SOME TEXT?  IT'S A LITTLE BIT

24    OBSCURED BY THE WATERMARK.  I WILL READ IT FOR THE RECORD.

25            "THE DEPARTMENT OF MENTAL HEALTH ADMINISTRATION

1        REQUESTED TO HAVE 124 CELLS RETROFITTED TO REMOVE THE

2        DESKS AND STOOLS, REPLACE THE BEDS, DOORS AND VENT

3        AND WINDOW SCREENS."

4               ARE YOU FAMILIAR WITH THAT RECOMMENDATION?

5  **A**   YES, I AM.

6  **Q**   AND, TO YOUR KNOWLEDGE, HAS THAT CELL BEEN RETROFITTED AS

7  DESCRIBED THERE?

8  **A**   THERE'S A PLAN DEVELOPED TO COMPLETE ALL OF THE

9  RETROFITTING.  SOME OF THE PIECES HAVE BEEN REMOVED, BUT NOT

10 ALL OF IT BECAUSE WE HAVE TO REMOVE INMATES FROM THE CELLS IN

11 ORDER TO DO THIS, AND WE'VE SUBMITTED A PLAN FOR THE RETROFIT,

12 BUT THAT HAS NOT BEEN APPROVED YET AT THIS TIME BECAUSE I WAS

13 ASKED FOR FURTHER CLARIFICATION ON IT.

14 **Q**   AND IS IT CORRECT THAT YOU CAN'T REMOVE THE INMATES FROM

15 THOSE CELLS BECAUSE, IF YOU DO, YOU'LL PUT YOUR DEPARTMENT AND

16 THE CDCR TO THE HOBSON'S CHOICE OF DEPRIVING INMATES WHO ARE

17 WAITING FOR THOSE CELLS OF THE LEVEL OF CARE THEY NEED?

18           **MS. TILLMAN:**  OBJECTION.  ARGUMENTATIVE.  MISSTATES

19 EVIDENCE.

20           **JUDGE HENDERSON:**  I WILL ALLOW IT.

21           **THE WITNESS:**  FROM MY POINT OF VIEW, I CAN'T REMOVE

22 THEM BECAUSE THE COURT HAS NOT ALLOWED ME, AND I HAVE BEEN

23 DIRECTED BY THE COURT THAT ALL PLANS AND CHANGES IN THE

24 VACAVILLE SITE PROGRAM MUST OCCUR UPON APPROVAL OF THE COURT.

25

1  BY MR. GALVAN

2  Q    DIDN'T THE COURT MAKE THAT ORDER IN ORDER TO AVOID THE

3  DEPRIVATION OF LIFESAVING CARE TO PEOPLE WAITING FOR THOSE

4  BEDS?

5              MS. TILLMAN:  OBJECTION.  CALLS FOR SPECULATION.

6              JUDGE HENDERSON:  SUSTAINED, UNLESS YOU CAN LAY A

7  FOUNDATION.

8              JUDGE KARLTON:  I DON'T KNOW WHAT I SAID AT THE TIME

9  I DID IT SO --

10             MR. GALVAN:  THANK YOU, YOUR HONOR.  I'D LIKE AT

11 THIS TIME TO SWITCH THE DOCUMENT TO THE APRIL 20TH MEMO, THE

12 ONE THAT WAS UP BEFORE, THE REPORT OF R.M.  THIS IS ALSO AN

13 IMPEACHMENT REBUTTAL EXHIBIT THAT WILL BE NUMBERED FOR THE

14 RECORD P589.

15             MAY I PRESENT THIS TO THE WITNESS?

16             FOR THE RECORD, WHAT I PRESENTED TO WITNESS WILL BE

17 NUMBERED P589, AND IT'S TITLED "SUICIDE REPORT OF INMATE," AND

18 AGAIN IT'S BEEN REDACTED TO PROTECT THE PRIVACY OF R.M. AND

19 SURVIVING FAMILY IN ACCORDANCE WITH THE PROTECTIVE ORDERS IN

20 THIS CASE.

21             R.M. WAS ANOTHER CLIENT OF MINE.  IT SAYS HERE HE

22 COMMITTED SUICIDE IN THE DEPARTMENT OF MENTAL HEALTH IN

23 VACAVILLE JANUARY 28TH, 2007.

24             JUDGE KARLTON:  JANUARY 29TH.

25             MR. GALVAN:  I'M SORRY, YOUR HONOR.  JANUARY 29TH,

1    2007.

2              **JUDGE HENDERSON:**  THIS IS TWO DAYS OF AFTER THE

3    OTHER ONE; IS THAT CORRECT?

4              **MR. GALVAN:**  YES, YOUR HONOR.  THE REPORT INDICATES

5    IT IS TWO DAYS AFTER D.M. COMMITTED SUICIDE IN THE SAME UNIT.

6    I WOULD LIKE TO ASK THE WITNESS TO TURN TO PAGE NINE OF THE

7    REPORT.

8    **BY MR. GALVAN**

9    **Q**   MS. RADAVSKY, DID YOU RECEIVE THIS REPORT AS WELL?

10   **A**   YES, I DID.

11   **Q**   WHEN IT WAS ISSUED?

12   **A**   YES, I DID.

13   **Q**   AND IF YOU COULD MOVE FORWARD TWO PAGES, PLEASE, IN THE

14   REPORT TO THE PAGE NUMBERED NINE THERE?  IF I COULD DRAW YOUR

15   ATTENTION TO THE TABLE, THE SECOND ROW, FIRST COLUMN NUMBERED

16   ITEM TEN.  AGAIN IT'S SOMEWHAT OBSCURED BY THE WATERMARK, SO I

17   WILL READ IT.

18        "TEN, THE DEPARTMENT OF MENTAL HEALTH HAS BEEN

19        ATTEMPTING TO HAVE THE VENTS RETROFITTED IN PATIENT

20        ROOMS SINCE THE LAST HANGING IN DECEMBER 2005.  THE

21        CALIFORNIA DEPARTMENT OF CORRECTIONS AND

22        REHABILITATION MUST FACILITATE THE PHYSICAL PLANT

23        MODIFICATIONS REQUESTED."

24          MS. RADAVSKY, YOU'VE TESTIFIED YOU ARE THE PERSON

25   RESPONSIBLE FOR THESE PROGRAMS; IS THAT RIGHT?

1  **A**   I'M RESPONSIBLE FOR THE OPERATIONS AND THE TREATMENT

2  PROVIDED IN THESE PROGRAMS, YES.

3  **Q**   YOU ARE NOT ABLE TO, JUST AFTER YOU LEAVE THE COURTROOM

4  TODAY, CALL A CONTRACTOR AND HAVE THOSE VENTS REDONE, ARE YOU?

5  **A**   NO, I AM NOT.

6  **Q**   YOU ARE NOT ABLE TO DO THAT BECAUSE THESE SO-CALLED

7  SEPARATE AND APART DMH FACILITIES ACTUALLY ARE CONTROLLED BY

8  THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,

9  AREN'T THEY?

10           **MS. TILLMAN:**  OBJECTION.  CALLS FOR A LEGAL

11  CONCLUSION BEYOND THE EXPERTISE OF THIS WITNESS.

12           **JUDGE HENDERSON:**  SUSTAINED.

13           **JUDGE KARLTON:**  WELL, SETTING ASIDE THE LEGAL

14  QUESTION, AS A PRACTICAL MATTER, IS THAT TRUE?

15           **THE WITNESS:**  THE DEPARTMENT OF CORRECTIONS AND

16  REHABILITATION IS RESPONSIBLE FOR THE PHYSICAL PLANT

17  MODIFICATIONS.

18  **BY MR. GALVAN**

19  **Q**   AND THE BEDS THAT WE ARE DISCUSSING HERE, THE BEDS IN THE Q

20  UNIT, THESE ARE PART OF WHAT'S KNOWN AS THE ACUTE PSYCHIATRIC

21  PROGRAM; IS THAT RIGHT?

22  **A**   THAT'S CORRECT.

23  **Q**   THEY USE THE ACRONYM APP?

24  **A**   THAT'S CORRECT.

25  **Q**   IS IT FAIR TO SAY THESE ARE THE HIGHEST LEVELS OF CARE IN

1   THE SYSTEM -- IN YOUR SYSTEM OF CARE FOR CDCR INMATE PATIENTS?

2   **A**   IN MY SYSTEM OF CARE, THAT IS CORRECT.

3   **Q**   AND AS THE HIGHEST LEVEL OF CARE, IS IT FAIR TO SAY THESE

4   ARE THE SCARCEST AND MOST AVAILABLE BEDS -- I'M SORRY -- BEDS

5   MOST IN DEMAND?

6           **MS. TILLMAN:**  OBJECT.  VAGUE AND AMBIGUOUS.

7           **JUDGE HENDERSON:**  OVERRULED.  ARE THESE THE BEDS

8   MOST IN DEMAND?

9           **THE WITNESS:**  NOT ACCORDING TO MY WAITING LIST.

10  **BY MR. GALVAN**

11  **Q**   ACCORDING TO YOUR WAITING LIST, WHAT ARE THE BEDS MOST IN

12  DEMAND?

13  **A**   THE HIGH SECURITY BEDS AT SALINAS VALLEY PSYCHIATRIC

14  PROGRAM.

15  **Q**   WOULD IT BE FAIR TO SAY THAT THESE APP BEDS ARE IN SUCH

16  HIGH DEMAND THAT YOU'RE FORCED TO OPERATE THEM IN THIS STATE

17  OF -- IN THE STATE THAT THEY ARE IN NOW, NOT RETROFITTED?

18          **MS. TILLMAN:**  OBJECTION.  MISSTATES EVIDENCE ALREADY

19  PROVIDED BY THIS WITNESS.

20          **JUDGE HENDERSON:**  I WILL ALLOW IT AS A QUESTION --

21  AS AN APPROPRIATE CROSS-EXAMINATION.  YOU MAY ANSWER THAT.

22          **THE WITNESS:**  WELL, AS I STATED EARLIER, WE

23  SUBMITTED A PLAN TO THE COURT, AND I HAVE BEEN ASKED TO ADD

24  SOME CLARIFICATION, WHICH HAS SINCE BEEN ADDED TO THE PLAN.  SO

25  I'M PENDING A RESPONSE.

1  BY MR. GALVAN

2  Q   I'M SORRY.  YOU ARE PENDING A RESPONSE FROM WHOM?

3  A   I SUBMITTED A RETROFIT PLAN IN ORDER TO START THE

4  RETROFITTING OF THESE CELLS, WITH SO MANY CELLS AT A TIME

5  COMING OFF LINE, AND SPECIAL MASTER LOPES ASKED ME TO ADD SOME

6  CLARIFICATION AND ANSWER SOME QUESTIONS FOR HIM, WHICH HAS

7  RECENTLY BEEN PROVIDED.

8  Q   DID YOU AT ANY TIME CALL SPECIAL MASTER LOPES AND ASK FOR

9  PERMISSION TO ACCELERATE THE RETROFITTING?

10 A   IT WAS INCLUDED -- NOT ACCELERATING, BUT IN THE ORIGINAL

11 REQUEST.  THAT'S WHY WE SUBMITTED THE PLAN.

12        JUDGE HENDERSON:  A REQUEST FOR ACCELERATION WAS IN

13 THE ORIGINAL SUBMISSION?

14        THE WITNESS:  NO, SIR.  A REQUEST TO TAKE

15 APPROXIMATELY FOUR CELLS OFF LINE AT A TIME IN ORDER TO HAVE

16 FOUR CELLS RETROFITTED AT A TIME SO THERE WOULD BE FOUR LESS

17 BEDS AVAILABLE FOR AN ACUTE PSYCHE PATIENT.

18 BY MR. GALVAN

19 Q   DO YOU KNOW WHAT THE CURRENT SIZE OF THE WAITING LIST IS

20 FOR THOSE BEDS?

21 A   FOR THE ACUTE PSYCH PROGRAM?

22 Q   YES, MA'AM.

23 A   AS OF YESTERDAY, IT WAS THREE.

24 Q   AT THIS POINT, I WOULD LIKE TO TURN TO DEFENDANT'S EXHIBIT

25 1175, WHICH IS THE -- TITLED, "JULY 16TH, 2008, MENTAL HEALTH

1    BED PLAN," AND IT HAS AN ATTACHMENT C AT PAGE 29 .

2           MS. RADAVSKY, ARE YOU FAMILIAR WITH THIS CHART, THIS

3    TABLE?

4    **A**   I'M SORRY, COUNSEL.  COULD YOU REPEAT THIS QUESTION?

5    **Q**   MS. RADAVSKY, ARE YOU FAMILIAR WITH THIS CHART OR TABLE?

6    **A**   I'M TRYING TO SEE THE BOTTOM TO SEE WHAT DOCUMENT THIS WAS

7    IN.

8           **MR. GALVAN:**  MAY I PRESENT THIS TO THE WITNESS?

9           **JUDGE HENDERSON:**  YOU MAY.

10          **THE WITNESS:**  YES, I HAVE.

11   **BY MR. GALVAN**

12   **Q**   IF I MAY DIRECT YOUR ATTENTION ON THIS CHART TO THE SECOND

13   ROW FROM THE TOP, WHICH I PRESUME WILL BE MUCH EASIER TO SEE, I

14   THINK --

15          **MR. GALVAN:**  I APOLOGIZE, YOUR HONOR.  THIS CHART IS

16   BURIED WITHIN THAT EXHIBIT.  IT'S APPROXIMATELY -- IT'S ABOUT

17   29 PAGES IN, YOUR HONOR, AFTER THE TEXT, THE BODY OF THE TEXT.

18   **BY MR. GALVAN**

19   **Q**   DOES THE SECOND ROW THERE, MS. RADAVSKY, REFER TO THIS

20   PROJECT OF THE Q1 THROUGH 3 AND S2 RENOVATIONS WE HAVE BEEN

21   DISCUSSING?

22   **A**   YES, IT DOES.

23   **Q**   AND UNDER "STATUS" DO YOU KNOW THE SIGNIFICANCE OF, "APRIL

24   '8 TO AUGUST 2009," DOES THAT MEAN THAT'S THE PERIOD DURING

25   WHICH THE PROJECT WILL BE BUILT?

1  **A**    THAT'S MY UNDERSTANDING OF THE STATUS CHART, BECAUSE IT WAS

2  SUPPOSED TO BE COORDINATED AS THE ADDITIONAL CRISIS BEDS CAME

3  ON LINE AT CMF.

4  **Q**    AND THE COMMENT THAT READS, "PROJECT PENDING FULL

5  ACTIVATION OF THE MHCB," MENTAL HEALTH CRISIS BED, "PER REQUEST

6  OF THE COLEMAN SPECIAL MASTER," DOES THAT REFLECT THE STATUS OF

7  THE PROJECT AT THE TIME THAT YOU PREPARED THIS BED PLAN REPORT?

8  **A**    THAT WAS THE STATUS AT THE TIME.

9  **Q**    AND ISN'T IT TRUE THAT THE PROJECT WAS PENDING ACTIVATION

10  OF THE MHCB BECAUSE THOSE BEDS, THE BEDS YOU WOULD HAVE TO TAKE

11  OFF IN ORDER TO RETROFIT THEM, WERE NEEDED FOR MENTAL HEALTH

12  CRISIS BED ACUTE PATIENTS?

13  **A**    THAT'S CORRECT.

14  **Q**    IF WE COULD GO BACK TO 1243, THE MAP, PLEASE -- I'M SORRY.

15  ACTUALLY, ONE -- IF WE COULD GO TO P159, EXHIBIT P159?  P159,

16  PLEASE.  THANK YOU.

17          (DOCUMENT DISPLAYED.)

18          **MR. GALVAN:**  THIS IS, FOR THE RECORD, PLAINTIFF'S

19  EXHIBIT P159.  IT HAS A BATES NUMBER E-PRIV 183396.  AND IF WE

20  COULD GO BACK TO THE FULL DOCUMENT?

21  **BY MR. GALVAN**

22  **Q**    MS. RADAVSKY, THIS IS A MEMO ON YOUR LETTERHEAD; IS THAT

23  CORRECT?  I REALIZE THIS IS ANOTHER ONE THAT'S HARD TO READ.

24  **A**    THAT'S CORRECT.

25  **Q**    AND IT'S ADDRESSED TO J. MICHAEL KEATING, THE SPECIAL

1    MASTER IN THIS CASE?

2              **JUDGE KARLTON:**  COLEMAN SPECIAL MASTER.

3              **MR. GALVAN:**  COLEMAN SPECIAL MASTER.

4              IF WE COULD GO TO THE SECOND PAGE, PLEASE, OF P159?

5    IT'S ACTUALLY THE LAST PAGE, PAGE FOUR, THAT I WOULD LIKE TO

6    LOOK AT, OF P159.  IF WE CAN GO TO THE LAST PAGE?  IF WE COULD

7    MAKE THE TEXT BIG ENOUGH TO READ?  MAY I PRESENT THE WITNESS A

8    PAPER COPY?

9              (DOCUMENT DISPLAYED.)

10             **JUDGE HENDERSON:**  YOU MAY.

11   **BY MR. GALVAN**

12   **Q**   IS IT CORRECT, MS. RADAVSKY, THAT -- WELL, FIRST, I WANT TO

13   ASK YOU, WHO IS VICTOR BREWER, THE PERSON WHO SIGNED THIS?

14   **A**   VICTOR BREWER IS THE EXECUTIVE DIRECTOR OF BOTH THE

15   VACAVILLE PSYCHIATRIC PROGRAM AND THE SALINAS VALLEY

16   PSYCHIATRIC PROGRAM.

17   **Q**   AND HE WORKS FOR YOU; IS THAT RIGHT?

18   **A**   HE WORKS FOR ME.

19   **Q**   TO SEND A MEMO LIKE THIS TO THE SPECIAL MASTER IN THE

20   COLEMAN CASE, HE WOULD NEED YOUR PERMISSION; IS THAT RIGHT?

21   **A**   THAT IS CORRECT.

22   **Q**   ISN'T IT TRUE THE PURPOSE OF THIS -- OF SENDING THIS MEMO

23   WAS TO SEEK ASSISTANCE FROM THE SPECIAL MASTER OVER A CONFLICT

24   IN THE USE OF THE BEDS IN THE S1 UNIT, A CONFLICT BETWEEN TWO

25   DEFINITIONS THAT THOSE BEDS COULD SERVE?

1  **A**    THE PURPOSE OF SENDING THE MEMO WAS TO REQUEST SOME

2  GUIDANCE ABOUT -- YOU'RE CORRECT -- CONFLICT OVER THE VARIOUS

3  MISSION OF A MENTAL HEALTH CRISIS BED VERSUS THE MISSION OF AN

4  ACUTE PSYCH BED BECAUSE A MENTAL HEALTH CRISIS BED IS TEN DAYS

5  OR LESS.

6  **Q**    AND TO BE CLEAR, WHEN WE TALK ABOUT THE S1 UNIT, THE BEDS

7  THAT ARE THE SUBJECT OF THIS LETTER, WE ARE TALKING ABOUT YOUR

8  BEDS, NOT THE CDCR'S BEDS?   THE DMH BEDS?

9          **MS. TILLMAN:**  OBJECTION.  IT'S VAGUE AND AMBIGUOUS,

10  ARGUMENTATIVE, MISSTATES EVIDENCE.

11          **JUDGE HENDERSON:**  OVERRULED.

12          **THE WITNESS:**  THOSE ARE THE BEDS OPERATED BY THE

13  DEPARTMENT OF MENTAL HEALTH.

14  **BY MR. GALVAN**

15  **Q**    AND I BELIEVE THE LETTER -- THE LETTER WILL HELP US EXPLAIN

16  TO THE COURT WHAT THE CONFLICT IS.  IF WE COULD ZOOM INTO ABOUT

17  THE SIXTH LINE DOWN THAT HAS THE WORD "HOWEVER" TOWARD THE

18  MIDDLE.  MR. BREWER WROTE:

19          "HOWEVER, IF IT IS DETERMINED THAT THE

20          APPROPRIATE LOC," LEVEL OF CARE, "IS TO TRANSFER THE

21          PATIENT FROM MENTAL HEALTH CRISIS BED TO AN APP BED,

22          THE QUESTION ARISES, IS MHCB PATIENT TO TAKE PRIORITY

23          OVER THE CURRENT PATIENTS ON THE APP WAIT LIST.  IF

24          THIS IS THE DIRECTION OF THE SPECIAL MASTER, IF THIS

25          IS THE DIRECTION THE SPECIAL MASTER ELECTS TO TAKE,

1    THEN THE NEGATIVE ASPECT IS THAT ANY PATIENT IN THE

2    MHCB WITHIN VPP," VACAVILLE PSYCHIATRIC PROGRAM,

3    "WILL TAKE PRIORITY OVER THE CURRENT WAIT LIST WHICH

4    WILL RESULT IN ADDITIONAL DAYS BEFORE THE

5    NON-VACAVILLE PSYCHIATRIC PATIENT MENTAL HEALTH IS

6    MANY CRISIS BED PATIENTS WILL BE ADMITTED TO THE

7    ACUTE PSYCHIATRIC PROGRAM."

8         NOW, THE CONFLICT THAT MR. BREWER IS TALKING ABOUT

9    THERE IS THAT YOU'VE GOT MORE THAN ONE PERSON CALLING ON ONE

10   BED; ISN'T THAT RIGHT?

11   **A**   YES, WITH THE MISSION THAT WE WERE ASKED TO TAKE BY SETTING

12   ASIDE 20 OF THE APP BEDS FOR THE MENTAL HEALTH CRISIS BEDS, I

13   THINK PART OF THE QUESTION ALSO CALLED TO PROTOCOL BECAUSE,

14   BEING THE ACUTE BEDS THAT ARE THE PATIENTS WITH THE MOST SEVERE

15   MENTAL ILLNESS, THEY'RE THE FOLKS WE WANT TO EXPEDITE IN THE

16   QUICKEST.

17        THE QUESTION THAT WE WERE ASKING WAS, DID AN MHCB

18   PATIENT, IF YOU HAD A PATIENT GOING INTO ANOTHER BED, BUMP THE

19   ACUITY OF THE ACUTE PATIENT?

20        **JUDGE KARLTON:**   THE POINT IS, YOU WOULDN'T HAVE ANY

21   BUMPING PROBLEM IF YOU HAD ENOUGH BEDS, RIGHT?

22        **THE WITNESS:**   CORRECT.

23   **BY MR. GALVAN**

24   **Q**   IF WE COULD JUST LOOK AT THE SECOND PARAGRAPH, WHAT

25   MR. BREWER WROTE, HIS FINAL SENTENCE:

1        "THE SIMPLE FACT IS THE BED SHORTAGE PLACES BOTH

2     CDCR," CALIFORNIA DEPARTMENT OF CORRECTIONS AND

3     REHABILITATION, "AND VPP," VACAVILLE PSYCHIATRIC

4     PROGRAM, "IN THE CURRENT OPERATIONAL DILEMMA."

5          I WOULD LIKE NOW TO SKIP BACK TO 12 -- SWITCH BACK

6  TO 1244 WHICH IS THE MAP 1243, I'M SORRY 1243, THE MAP IN

7  COLOR.  D-1243.  THANK YOU.

8          MS. RADAVSKY, WE'VE DISCUSSED VACAVILLE, AND JUST

9  NOW, JUST TALKING NOW ABOUT THE FACILITIES OPERATED, OR AS YOU

10 SAY IN THE CHART, CO-LOCATED IN THE CDCR FACILITIES, I WOULD

11 LIKE TO SWITCH NOW TO SALINAS VALLEY PSYCHIATRIC PROGRAM, THE

12 LAST CATEGORY.  AND IS IT CORRECT TO SAY THAT THERE ARE 176

13 MALE INTERMEDIATE CARE FACILITY BEDS IN THAT PROGRAM?

14 **A**   YES, THERE ARE.

15 **Q**   AND IS IT YOUR TESTIMONY THAT EVERY SINGLE ONE OF THOSE

16 BEDS PROVIDES CARE THAT IS NOT IMPACTED BY OVERCROWDING IN

17 THIS -- ALLEGED OVERCROWDING IN THE CDCR?

18 **A**   THEY'RE NOT IMPACTED BECAUSE THEY'RE SEPARATE FROM THE

19 GENERAL POPULATION, AND I PROVIDE LICENSED CARE IN THERE, SO I

20 CANNOT DOUBLE OR TRIPLE BUNK THOSE PATIENTS.

21 **Q**   SO IT'S YOUR TESTIMONY THAT YOU OPERATE EVERY SINGLE ONE OF

22 THOSE 176 BEDS INDEPENDENTLY FROM THE CDCR?

23          **MS. TILLMAN:**  OBJECTION.  ARGUMENTATIVE, VAGUE.

24          **JUDGE HENDERSON:**  IS THAT YOUR TESTIMONY, OR IS IT

25 NOT YOUR TESTIMONY?

1        **THE WITNESS:**  WHEN YOU SAY "INDEPENDENT," IT'S

2   INDEPENDENT IN THE POLICIES.  IT'S INDEPENDENT IN THE

3   TREATMENT, IN THE THERAPEUTIC MILIEU.  IT'S INDEPENDENT IN THE

4   STAFFING THAT WE HIRE AND THAT WE'RE REQUIRED TO HIRE UNDER

5   LICENSURE.  HOWEVER, WE ARE A CONSULTANT INSIDE THE PRISON.  IT

6   IS THEIR PHYSICAL PLANT, AND WE ARE ON THEIR LICENSE.

7   **BY MR. GALVAN**

8   **Q**   I'M SORRY.  ON WHOSE LICENSE?

9   **A**   CDCR'S LICENSE.

10  **Q**   CDCR HAS A LICENSE TO OPERATE A MENTAL HEALTH FACILITY?

11  **A**   CDCR HOLDS THE LICENSE FOR SALINAS VALLEY PSYCHIATRIC

12  PROGRAM.  THAT'S THEIR CTC LICENSE, AND WE ARE A PART OF THAT

13  LICENSE.

14  **Q**   THE 176 BEDS, THEY'RE NOT ALL IN ONE PLACE, RIGHT?

15  **A**   THAT'S CORRECT.

16  **Q**   IN FACT, 64 OF THEM ARE IN A STAND-ALONE UNIT OPERATED BY

17  THE DMH; IS THAT RIGHT?

18  **A**   THAT'S CORRECT.

19  **Q**   AND THAT LEAVES 112 THAT ARE INSIDE SALINAS VALLEY STATE

20  PRISON; IS THAT RIGHT?

21  **A**   YES, WE ARE IN D5 AND D6.

22  **Q**   D5 AND D6.  AND IT'S YOUR TESTIMONY THAT THOSE MEN IN D5

23  AND D6, 112 OF THEM, ARE ALSO RECEIVING THE BENEFIT OF DMH

24  INPATIENT CARE INDEPENDENT OF THE CDCR?

25  **A**   UNDER THE DEFINITION OF "INDEPENDENT" THAT I JUST STATED,

1    YES.

2    **Q**   AND IT'S YOUR TESTIMONY THAT THOSE 112 MEN ENJOY CARE,

3    INPATIENT CARE FROM THE DMH, THAT IS NOT IMPACTED BY ALLEGED

4    OVERCROWDING IN THE CDCR?

5    **A**   YES.

6    **Q**   I'D LIKE TO SWITCH TO ANOTHER -- SHOW YOU ANOTHER DOCUMENT

7    P427, P427, WHICH, WHEN IT COMES UP, WILL BE THE APRIL 12, 2007

8    REPORT OF SPECIAL MASTER KEATING.

9            (DOCUMENT DISPLAYED.)

10   **BY MR. GALVAN**

11   **Q**   IF WE COULD TURN -- I WILL GET HARD COPIES OF THOSE, BUT

12   WHILE WE HAVE THEM ON THE MONITOR IF WE COULD LOOK AT PAGE FOUR

13   OF THE REPORT?  THIS IS AN EXCERPT OF THE REPORT.  IT IS NOT

14   THE FULL REPORT.  THE FULL REPORT IS IN OUR EXHIBITS AS P427.

15           IF I COULD DRAW YOUR ATTENTION TO THE TOP OF PAGE

16   FOUR?

17           **JUDGE KARLTON:**  MR. GALVAN, THIS IS SPECIAL MASTER

18   LOPES' REPORT, NOT SPECIAL MASTER KEATING, WHO RETIRED.

19           **MR. GALVAN:**  THANK YOU, YOUR HONOR.  THIS IS THE

20   REPORT OF SPECIAL MASTER LOPES IN THE UNDERLYING COLEMAN CASE.

21   **BY MR. GALVAN**

22   **Q**   IF WE COULD TURN TO THE TOP OF PAGE FOUR AND LOOK AT WHAT

23   YOU WROTE THERE AT THE TOP?  YOU WROTE:

24           "THESE UNITS, AS INDICATED ALREADY, ARE NOT

25       INTENDED TO FORM A PERMANENT PART OF THE DMH

1      INTERMEDIATE INPATIENT PROGRAM AT SALINAS VALLEY

2      STATE PRISON.  RATHER, THEY ARE TEMPORARY EXPEDIENTS,

3      COBBLED TOGETHER TO PROVIDE SOME INTERIM HOUSING TO

4      BRIDGE THE GAP BETWEEN CURRENTLY INADEQUATE RESOURCES

5      FOR HIGH SECURITY INMATES IN NEED OF INTERMEDIATE

6      INPATIENT TREATMENT AND THE ANTICIPATED FUTURE

7      DELIVERY OF PERMANENT BEDS CREATED SPECIFICALLY FOR

8      THE PROVISION OF INPATIENT MENTAL HEALTH TREATMENTS.

9      UNITS D5 AND D6 ARE BASICALLY HIGH SECURITY GENERAL

10     POPULATION EOP," ENHANCED OUTPATIENT PROGRAM, "UNITS,

11     WITH SOME PHYSICAL MODIFICATIONS AND ENHANCEMENTS

12     DESIGNED TO PROVIDE LIMITED ADDITIONAL PROGRAMMING

13     SPACE."

14           DO YOU AGREE WITH THAT STATEMENT BY THE SPECIAL

15 MASTER IN THE COLEMAN CASE?

16           **MS. TILLMAN:**  COUNSEL, JUST FOR THE RECORD, I

17 BELIEVE THE PAPER COPY YOU PROVIDED WAS FROM THE 20TH ROUND

18 MONITORING REPORT.

19           **JUDGE KARLTON:**  IT'S THE WRONG DOCUMENT.

20           **MR. GALVAN:**  I'M READING FROM THE WRONG DOCUMENT.

21 I'M SORRY.

22           **JUDGE HENDERSON:**  YOU READ FROM UP THERE, BUT YOU

23 GAVE US SOMETHING THAT DOESN'T MATCH.

24           **JUDGE KARLTON:**  WE CAN READ IT.  IT'S OKAY.

25           **MR. GALVAN:**  I'M SORRY.

1  **BY MR. GALVAN**

2  **Q**   I BELIEVE THE QUESTION WAS, DO YOU AGREE WITH THAT

3  STATEMENT BY SPECIAL MASTER KEATING?

4  **A**   I WOULD HAVE ISSUE WITH THE STATEMENT WHERE IT'S BASICALLY

5  A HIGH SECURITY GENERAL POPULATION EOP, BECAUSE SINCE I'M

6  OPERATING ICF WITHIN D5 AND D6, AND IN ORDER TO MEET THE

7  LICENSING STANDARDS, I'M PROVIDING THE SAME HOURS OF

8  THERAPEUTIC TREATMENT THAT I AM PROVIDING IN THE STAND-ALONE 64

9  HOUR (SIC) BUILDING WITHIN SALINAS VALLEY, AS WELL AS THE OTHER

10  ICF'S THAT I OPERATE.

11  **Q**   SO IT'S YOUR TESTIMONY THAT YOU'RE OPERATING THE D5 AND D6

12  UNITS TO THE SAME STANDARDS THAT YOU OPERATE YOUR STATE

13  HOSPITALS?

14  **A**   THERAPEUTIC ENVIRONMENT AND TREATMENT, ABSOLUTELY.

15  **Q**   AND IS IT YOUR TESTIMONY THAT YOU ARE PROVIDING THE

16  RECOVERY MODEL OF CARE IN THOSE UNITS?

17  **A**   WE ARE PROVIDING AS MUCH TREATMENT, TREATMENT HOURS,

18  TREATMENT SERVICES, BEHAVIOR MANAGEMENT, MEDICATION MANAGEMENT.

19  IT'S NOT THE FULL ARRAY.  WE HAVE NOT ROLLED OUT THE ENTIRE

20  ARRAY THAT WE'VE ROLLED OUT IN THE STATE HOSPITALS, BUT THE

21  BASIC FUNDAMENTALS, WE'VE ROLLED THEM INTO THE NEW TREATMENT

22  PLAN.  SO, YES, WE'VE STARTED.

23  **Q**   IF WE COULD MOVE ONE PAGE FORWARD, PLEASE, IN SPECIAL

24  MASTER LOPES' REPORT?  I'D LIKE TO DRAW YOUR ATTENTION TO THE

25  FIRST FULL PARAGRAPH, THE FIRST SENTENCE.

1          "THE D5 AND D6 UNITS MUST FUNCTION IN A DIFFERENT

2      WORLD, SITUATED AS THEY ARE WITHIN A LARGER GENERAL

3      POPULATION YARD, UNATTUNED TO THE SPECIAL NEEDS OF

4      DELIVERING INTERMEDIATE IN PATIENT CARE."

5          IS IT YOUR TESTIMONY THAT THE INPATIENT -- THE CDCR

6  PATIENTS IN THAT UNIT ARE NOT COMMINGLED WITH THE GENERAL

7  POPULATION IN ANY WAY?

8  **A**   THAT'S CORRECT.

9  **Q**   NOW, AT THIS POINT, I WOULD LIKE TO LOOK AT THE 20TH ROUND

10 REPORT PART A, WHICH IS P57, PLAINTIFF'S EXHIBIT 57, WHICH THE

11 COURT ALREADY HAS PAPER COPIES OF.  IF WE COULD TURN TO PAGE

12 189?  MOVE FORWARD TO 189.

13         (DOCUMENT DISPLAYED.)

14 **BY MR. GALVAN**

15 **Q**   I'D LIKE TO DRAW YOUR ATTENTION TO THE MIDDLE PARAGRAPH

16 THAT STARTS WITH, "INMATES HOUSED IN UNITS D5, D6," SPECIAL

17 MASTER WRITES, SPECIAL MASTER LOPES IN THIS CASE WRITES, THE

18 LAST SENTENCE:

19         "TAKING TOGETHER THESE CUSTODY AND SECURITY

20      RELATED POLICIES AND PRACTICES, RESTRICTED ACCESS TO

21      PATIENTS AND COMPROMISED THE PROGRAM'S THERAPEUTIC

22      MILIEU AND MENTAL HEALTH MISSION."

23         DO YOU AGREE WITH WHAT SPECIAL MASTER LOPES OBSERVED

24 THERE?

25 **A**   I AGREED WITH IT AT THE TIME IT WAS WRITTEN, AND SINCE THEN

1  I'VE TAKEN SEVERAL TRIPS DOWN THERE WITH THE DEPUTY OF THE

2  INSTITUTION'S DIVISION.  WE'VE MET WITH THE WARDEN AND THE

3  CUSTODY STAFF AT SALINAS VALLEY, AND WE'VE ADDED ADDITIONAL

4  TIME OUT IN THE YARD FOR THE PATIENTS WE SERVE.

5  **Q**   I'D LIKE TO MOVE TO DEFENDANT'S EXHIBIT 1019, PLEASE, THE

6  REPORT OF DR. IRA PACKER, D1019.  AND IF WE COULD LOOK AT PAGE

7  10 OF DR. PACKER'S REPORT.

8          YOU ARE AWARE THAT DR. PACKER, DR. IRA PACKER,

9  TOURED YOUR FACILITIES TOWARD THE END OF LAST YEAR; IS THAT

10  CORRECT?

11  **A**   THAT'S CORRECT.

12          **MS. TILLMAN:**  MISSTATES THE EVIDENCE.  I DON'T THINK

13  HE TOURED ALL THE DMH FACILITIES.

14  **BY MR. GALVAN**

15  **Q**   ARE YOU AWARE THAT HE, DR. PACKER, TOURED SOME OF YOUR

16  FACILITIES TOWARDS THE END OF LAST YEAR?

17  **A**   YES.  IT'S CORRECT.  I KNOW HE WENT TO SALINAS VALLEY.

18  **Q**   AND YOU ACCOMPANIED HIM ON THE TOURS, DIDN'T YOU?

19  **A**   NO, I DID NOT.

20  **Q**   I SEE.  ARE YOU AWARE THAT HE WENT TO D5 AND D6?

21  **A**   I WOULD ASSUME HE DID.

22  **Q**   OKAY.  AND HAVE YOU BEEN PROVIDED BEFORE WITH A COPY OF HIS

23  REPORT ABOUT CONDITIONS THERE?

24  **A**   NO, I HAVE NOT.

25  **Q**   OKAY.  PERHAPS YOU WOULD LIKE TO READ IT.  LET'S LOOK UP AT

1    THE TOP OF IT, AND IF WE CAN BLOW IT UP LARGE ENOUGH?

2            "IN THE INTERIM, ONE OF THE STRATEGIES MAY BE TO

3        CONVERT EXISTING SPACE FOR USE WITH THESE POPULATION

4        RETROFITTING.  HOWEVER, THE EFFECTIVENESS OF THIS

5        STRATEGY IS LIMITED BY THE FACT THAT EXISTING SPACE

6        WAS NOT DESIGNED TO SERVE THE FUNCTIONS REQUIRED FOR

7        THESE UNITS.  A GOOD EXAMPLE OF THIS PROBLEM WAS

8        NOTED AT SALINAS VALLEY, SVSP, WHERE THERE IS BOTH A

9        FREESTANDING DMH BUILDING, AS WELL AS AN INTERMEDIATE

10       CARE DMH UNIT IN THE D BUILDING OF THE PRISONS.  THE

11       DIFFERENCES IN THE UNITS IS QUITE STRIKING AS THE

12       FREESTANDING BUILDING HAS A THERAPEUTIC FEEL TO IT,

13       APPEARS DESIGNED TO PROVIDE THERAPEUTIC SERVICES AND

14       HAS REASONABLY ADEQUATE SPACE TO PROVIDE THOSE

15       SERVICES.  BY CONTRAST, THE UNIT IN THE D BUILDING,

16       WHICH HAS BEEN DESIGNATED AS TEMPORARY SPACE IS

17       STANDARD PRISON UNIT, WITHOUT ADEQUATE SPACE FOR

18       TREATMENT AND DIFFICULTIES IN PROVIDING CONFIDENTIAL

19       ONE-TO-ONE TREATMENT ENVIRONMENTS.  THE PROBLEM IS

20       NOT WITH THE CENSUS IN THE UNIT, BUT, RATHER, THAT

21       THE SPACE IS NOT APPROPRIATE FOR THE PURPOSES OF

22       PROVIDING INTERMEDIATE CARE TREATMENT TO MENTALLY ILL

23       INMATES."

24           DO YOU AGREE WITH THAT STATEMENT BY DR. PACKER?

25   A   I WOULD SAY DR. PACKER RAISED THE SAME ISSUES THAT I RAISED

1   WHEN I WAS ASKED TO OPEN THAT SPACE.

2   **Q**   AND SINCE YOU AGREE WITH DR. PACKER, I PRESUME YOU HAVE

3   PLANS TO IMMEDIATELY TAKE THOSE UNITS DOWN, TO MOVE THOSE 112

4   MEN; IS THAT CORRECT?

5   **A**   I HAVE NOT SUBMITTED A REQUEST TO THE COURT TO TAKE THOSE

6   UNITS DOWN.

7   **Q**   YOU ARE SATISFIED THOSE 112 MEN ARE WELL CARED FOR IN THOSE

8   UNITS AS THEY ARE NOW?

9   **A**   I'M SORRY.  I DIDN'T HEAR YOUR QUESTION.

10  **Q**   I'LL WITHDRAW IT.

11          ISN'T IT TRUE THAT YOU, THE OFFICIALS AT THE

12  DEPARTMENT OF MENTAL HEALTH, HAVE BEEN ORDERED TO REMEDIATE

13  LACK OF TREATMENT SPACE IN THE D5 AND D6 UNITS?

14  **A**   THERE IS AN ORDER TO REMEDIATE THE LACK OF TREATMENT SPACE,

15  AND WE'VE BEEN WORKING DILIGENTLY WITH OUR PARTNERS ON THAT.

16  **Q**   I'D LIKE TO LOOK AT THE PROGRESS REPORT ON THAT THAT'S

17  CONTAINED IN THE LATEST, ONLY, AS FAR AS I KNOW, PENDING MENTAL

18  HEALTH BED PLAN, D1175, EXHIBIT D1175 IN THIS CASE, AND, AGAIN,

19  THE CHART, APPENDIX C AT PAGE 29.  WE'VE LOOKED AT THIS BEFORE.

20  IN FACT, I TOOK IT AWAY FROM THE WITNESS.  I WOULD LIKE TO GIVE

21  IT BACK.

22          ONCE AGAIN, WE ARE LOOKING AT THE ATTACHMENT, THE

23  CHART TO THE BED PLAN, D1175, APPENDIX C, COLEMAN CONSTRUCTION

24  ORDERS.  IF I READ THIS CORRECTLY, ONE, TWO, THREE, FOUR, FIVE

25  ROWS DOWN IS CONSTRUCTION FOR D5 AND D6?

1   **A**   THAT'S CORRECT.

2   **Q**   IT SAYS –– THE FIRST COLUMN, THE SIGNIFICANCE OF DAY COURT

3   ORDERED –– I THINK THAT'S AN ODDLY FORMATTED DATE –– BUT I READ

4   IT TO BE OCTOBER 18TH, 2007; IS THAT RIGHT?

5   **A**   YES.

6   **Q**   AND STATUS, FISCAL YEAR 2010/11, DOES THAT MEAN THAT YOU

7   WILL HAVE THE TREATMENT SPACE SOMETIME IN FISCAL 2010/11?

8   **A**   THAT WAS THE PLAN AT THE TIME.

9   **Q**   THAT WAS THE PLAN AT THE TIME?

10          AND THIS COMMENT:

11          "FUNDING FOR PRELIMINARY PLANS AND WORKING

12           DRAWINGS ARE INCLUDED IN THE 2008/2009 GOVERNOR'S

13           BUDGET."

14          OF COURSE, AT THE TIME THIS WAS WRITTEN IN JULY,

15   THERE WAS NO BUDGET YET, AND I PRESUME IT'S YOUR TESTIMONY

16   TODAY THAT THE FUNDING FOR THOSE PLANS AND DRAWINGS WERE

17   APPROVED IN THE BUDGET?

18          **MS. TILLMAN:**   OBJECTION.  COUNSEL IS TESTIFYING.  IS

19   THAT A QUESTION?

20          **JUDGE KARLTON:**   YES, IT IS.  I'M SORRY.  EXCUSE ME.

21          IS THAT RIGHT, MA'AM?

22          **THE WITNESS:**   I'M NOT SURE IF IT'S STILL IN THE

23   GOVERNOR'S BUDGET OR NOT.  I KNOW WE HAVE BEEN LOOKING AT

24   OPTIONS, AND THERE IS SOME FUNDING, AND WE MET THE OTHER DAY TO

25   TALK ABOUT HOW TO BEST PROCEED.

1  **BY MR. GALVAN**

2  **Q**   THE GOVERNOR'S BUDGET WAS SIGNED SEPTEMBER 23RD, 2008;

3  ISN'T THAT RIGHT?

4  **A**   I BELIEVE SO.

5  **Q**   THAT'S ABOUT –– COMING ON TWO MONTHS AGO.

6          **JUDGE KARLTON:**  WHAT'S YOUR QUESTION, SIR?  AND SHE

7  DOESN'T KNOW.  AND YOU STILL DON'T KNOW WHETHER IT'S IN THE

8  BUDGET OR NOT; IS THAT RIGHT, MA'AM?

9          **THE WITNESS:**  THAT'S CORRECT.

10         **JUDGE KARLTON:**  THAT WAS THE QUESTION YOU WANTED TO

11  ASK, WASN'T IT, MR. GALVAN?

12         **MR. GALVAN:**  THANK YOU, YOUR HONOR.

13  **BY MR. GALVAN**

14  **Q**   AND IT'S TRUE THAT IF YOU DO, IN FACT, GET THAT FUNDING,

15  WHAT YOU'LL HAVE AS A RESULT OF THAT FUNDING ARE PLANS AND

16  DRAWINGS; IS THAT RIGHT?

17  **A**   IF THAT'S THE WAY WE PROCEED, YES.

18  **Q**   YOU WON'T HAVE ANY TREATMENT SPACE?  AFTER YOU SPEND THE

19  LAST DIME OF THAT FUNDING, YOU'LL HAVE PLANS AND DRAWINGS; IS

20  THAT RIGHT?

21  **A**   IF THAT'S THE WAY WE PROCEED, YES.

22  **Q**   YOU ALSO HAVE PLANS FOR A NEW STAND-ALONE –– ANOTHER 64 BED

23  STAND-ALONE AT SALINAS VALLEY PSYCHIATRIC PROGRAM; ISN'T THAT

24  TRUE?

25  **A**   THAT'S CORRECT.

1    **Q**    OKAY.  I BELIEVE THE CURRENT STATUS OF THAT PLAN WOULD ALSO

2    BE CONTAINED IN THIS CHART DOWN AT THE THIRD ROW FROM THE

3    BOTTOM.  I BELIEVE YOU TESTIFIED THIS MORNING ACTUALLY THAT

4    YOU -- THE ADMINISTRATIVE SPACE HAS BEEN TURNED OVER TO YOU?

5    **A**    THAT'S CORRECT.

6    **Q**    AND THAT THERE'S OCCUPANCY.  THAT WOULD BE OCCUPANCY BY

7    PATIENTS; IS THAT RIGHT?

8    **A**    THAT'S -- THE ADMINISTRATION THAT'S BEEN TURNED OVER TO US

9    IS OCCUPIED BY STAFF.

10    **Q**    BY STAFF.  OKAY.  AND THE CLINICAL STAFFING, IS THAT

11    COMPLETE?

12    **A**    I MISSED THE END.  I'M SORRY.

13    **Q**    I'LL JUST CUT TO THE CHASE.

14            WHEN WILL THAT FACILITY RECEIVE ITS FIRST PATIENTS?

15    **A**    FEBRUARY OF '09.

16    **Q**    AND HOW MANY -- ABOUT HOW MANY PATIENT BEDS WILL BE

17    ACTIVATED THEN?

18    **A**    WE HAVE A PLAN TO GEAR UP AND BE AT FULL OCCUPANCY, SHOULD

19    ALL GO WELL, BY THE END OF MARCH.

20            **JUDGE KARLTON:**  THE QUESTION IS HOW MANY BEDS.

21            **THE WITNESS:**  SIXTY-FOUR BEDS.

22    **BY MR. GALVAN**

23    **Q**    THE CURRENT WAITING LIST FOR THE SVPP PROGRAM, IS IT 176

24    NOW?

25    **A**    I KNOW IT'S OVER A HUNDRED, AND IT VARIES.

1  Q   HAS IT EVER BEEN UNDER A HUNDRED, TO YOUR KNOWLEDGE?

2  A   IN THE VERY EARLY DAYS OF ACTIVATION.

3  Q   ISN'T IT TRUE THAT SOME MEN STAY ON THAT LIST ALL THE WAY

4  TO THEIR PAROLE DATE AND PAROLE TO THE STATE WITHOUT EVER

5  GETTING INTO INPATIENT CARE?

6  A   I DON'T KNOW ABOUT PAROLE DATES.

7  Q   IT WOULDN'T BE A MATTER OF CONCERN FOR YOU IF PEOPLE STAY

8  ON THAT LIST THE ENTIRE TIME OF THEIR SENTENCE AND THEN ARE

9  RELEASED WHILE THEY'RE STILL WAITING TO GET INTO YOUR HOSPITAL?

10         MS. TILLMAN:  OBJECTION.  RELEVANCE.  WE ARE GETTING

11  INTO ANOTHER CASE ENTIRELY CALLED *VALDIVIA*, I BELIEVE.

12         JUDGE HENDERSON:  THE QUESTION IS, IS THAT A MATTER

13  OF CONCERN?  I'M GOING TO SUSTAIN THE OBJECTION.

14  BY MR. GALVAN

15  Q   DO YOU HAVE ANY KNOWLEDGE ABOUT WHAT KIND OF CARE THOSE MEN

16  RECEIVED WHILE THEY ARE ON THE WAITING LIST?

17         MS. TILLMAN:  OBJECTION AS TO RELEVANCE.  THIS IS

18  PHASE ONE, NOT PHASE TWO.

19         JUDGE KARLTON:  THAT'S THE WHOLE POINT, ACTUALLY.

20  IT IS PHASE ONE.  YOU MAY ANSWER.  DO YOU KNOW WHAT KIND OF

21  CARE?

22         THE WITNESS:  I HAVE PERIPHERY KNOWLEDGE HAVING

23  WALKED THROUGH AND TOURED VARIOUS EOPS.

24         MS. TILLMAN:  I'M SORRY.  I MISHEARD PLAINTIFF'S

25  QUESTION, SO I WITHDRAW THAT OBJECTION, THANK YOU.

1          **JUDGE HENDERSON:**  IT WAS RULED ON ANYWAY.  DON'T

2  WORRY ABOUT IT.

3  **BY MR. GALVAN**

4  **Q**   YOU ARE NOT RESPONSIBLE FOR THE ADMINISTRATION OF THE CARE

5  THEY RECEIVE WHILE THEY ARE ON THE WAITING LIST, ARE YOU?

6  **A**   NO, SIR, I'M NOT.

7  **Q**   HAS ANYONE EVER SHOWN YOU THE LISTS THAT SOME OF THE

8  INSTITUTIONS KEEP OF THE STATUS OF THOSE MEN ON THE WAITING

9  LISTS?

10  **A**   I'VE REVIEWED THEM, AND MY STAFF REVIEW THEM WEEKLY –– WITH

11  MY STAFF AT SALINAS VALLEY.  MY HEADQUARTERS STAFF REVIEW THEM

12  WITH MY STAFF AT THE PRISON, AND THEY MAKE CALLS ON THOSE

13  GENTLEMAN THAT ARE THERE.

14          **MR. GALVAN:**  P583, PLEASE.

15          (DOCUMENT DISPLAYED.)

16  **BY MR. GALVAN**

17  **Q**   GOING TO LOOK AT AN EXHIBIT THAT WE HAVE OFFERED AS P583.

18  THIS IS A REDACTED LIST.  OKAY.

19          LET ME TURN BACK TO ASH, ATASCADERO STATE HOSPITAL,

20  THAT IS, I THINK YOU'VE TESTIFIED, A TRULY STAND-ALONE STATE

21  HOSPITAL, NEAR BUT NOT ON THE GROUNDS OF A PRISON?

22  **A**   THAT'S CORRECT.

23  **Q**   ISN'T IT TRUE THAT THE DEPARTMENT OF JUSTICE MONITORS FOUND

24  IN 2006 THAT YOU ENGAGE IN A PRACTICE CALLED OVERBEDDING AT

25  ATASCADERO?

1        **MS. TILLMAN:**  I'M GOING TO OBJECT.  IT'S VAGUE AND

2   AMBIGUOUS AS TO DEPARTMENT OF JUSTICE MONITORS.  IF YOU COULD

3   IDENTIFY WHICH AGENCY?  I BELIEVE IT'S DEPARTMENT -- UNITED

4   STATES DEPARTMENT OF JUSTICE.

5        **MR. GALVAN:**  I'M SORRY.  I MEANT TO SAY UNITED

6   STATES.  I'M SORRY.

7        **JUDGE KARLTON:**  IS THAT TRUE, MA'AM?

8        **THE WITNESS:**  THEY ESSENTIALLY HAVE INDICATED THAT

9   THERE WAS SOME OVERBEDDING IN THE STATE HOSPITALS.

10  **BY MR. GALVAN**

11  **Q**   ISN'T OVERBEDDING THE PRACTICE OF ATTEMPTING TO CARE FOR

12  MORE PATIENTS THAN YOU HAVE STAFF FOR?

13  **A**   IT'S NOT CARE FOR MORE PATIENTS THAN YOU HAVE STAFF FOR.

14  IT'S PUTTING, YOU KNOW, MORE PEOPLE IN THAN LICENSED CAPACITY.

15  **Q**   ISN'T IT TRUE IN JANUARY 2007, YOU SENT A LETTER TO THEN

16  SPECIAL MASTER KEATING SAYING YOU HAD TO RESTRICT ADMISSIONS TO

17  ASH, TO ATASCADERO STATE HOSPITAL?

18  **A**   THAT IS CORRECT.

19  **Q**   AND ISN'T IT TRUE IN THE LETTER YOU REPORTED TO SPECIAL

20  MASTER KEATING THAT, AS A RESULT OF THE RESTRICTION OF

21  ADMISSIONS, THERE WERE THREE MEN WHO HAD BEEN CLEARED FOR CARE,

22  IN TRANSIT, ALREADY ON THE WAY THERE, AND HAD TO BE TURNED

23  BACK?

24  **A**   I DON'T HAVE THE LETTER IN FRONT OF ME, AND THAT'S

25  POSSIBLE.

 1            **MR. GALVAN:**  IF WE COULD LOOK AT P257, PLEASE?

 2            (DOCUMENT DISPLAYED.)

 3            **MR. GALVAN:**  MIGHT I PRESENT THE WITNESS WITH THIS?

 4   P257.

 5            **THE WITNESS:**  THANK YOU.

 6   **BY MR. GALVAN**

 7   **Q**   P257, IS IT CORRECT, IS YOUR DECLARATION OF CYNTHIA A.

 8   RADAVSKY IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFF'S

 9   MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF

10   ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH STATE HOSPITALS?

11   **A**   THAT'S CORRECT.

12   **Q**   IF YOU TURN TO -- IT ONLY HAS ONE EXHIBIT, EXHIBIT A.  THIS

13   IS A COPY OF YOUR LETTER TO J. MICHAEL KEATING; ISN'T THAT

14   RIGHT?

15   **A**   THAT IS CORRECT.

16   **Q**   YOU WROTE HERE:

17            "THIS LETTER IS TO OFFICIALLY NOTIFY YOU THAT THE

18            DEPARTMENT OF MENTAL HEALTH LONG-TERM CARE SERVICES

19            HAS RECEIVED INFORMATION FROM ATASCADERO STATE

20            HOSPITAL THAT NECESSITATES IMMEDIATE RESTRICTION OF

21            ADMISSIONS DUE TO STAFFING LIMITATIONS."

22   **A**   THAT IS CORRECT.

23   **Q**   IF WE SKIP DOWN TO THE SECOND PARAGRAPH, ABOUT ONE, TWO,

24   THREE, FOUR, FIVE, SIX, SEVEN, EIGHT, NINE LINES, NINE LINES

25   FROM THE BOTTOM:  "AN EXAMPLE OF THIS OCCURRED JANUARY 18TH,

1  2007," ABOUT FIVE DAYS BEFORE YOU WROTE THE LETTER, "WHEN THREE

2  INMATES WERE DENIED ADMISSION TO ASH," ATASCADERO STATE

3  HOSPITAL, "ALTHOUGH THE SENDING INSTITUTION WAS INFORMED OF THE

4  ADMISSION RESTRICTION EARLY IN THE A.M., THESE INMATES WERE

5  ALREADY IN TRANSIT, RECOGNIZABLY AN UNFORTUNATE SITUATION FOR

6  ALL PARTIES."  IS THAT CORRECT?

7  **A**   THAT'S CORRECT.

8  **Q**   IF WE COULD GO BACK TO THE MAP, WHICH IS DEFENDANT'S D1243?

9  THIS IS THE COLOR MAP, STATE OF CALIFORNIA.  SO ATASCADERO

10 STATE HOSPITAL, YOU WENT THROUGH THE NUMBERS IN YOUR DIRECT

11 TESTIMONY, MALE ACUTE BEDS, 25; MAIL ICF BEDS, 231; TOTAL OF

12 256.  IS IT YOUR TESTIMONY THAT YOU ARE CARING FOR 256 CDCR

13 INMATE PATIENTS THERE?

14 **A**   NO.  THOSE ARE THE BEDS THAT ARE DEDICATED.  IF WE RECEIVE

15 THE REFERRALS, THOSE ARE THE BEDS THAT I HAVE COMMITTED WE

16 WOULD PROVIDE SERVICES FOR.

17 **Q**   IF I REPRESENTED THAT THE LAST MONTHLY REPORT I SAW HAD 147

18 MEN IN THOSE BEDS, WOULD THAT SEEM RIGHT?

19 **A**   THAT WOULD PROBABLY BE ACCURATE.

20 **Q**   OKAY.  AND SO THE BALANCE, MORE THAN A HUNDRED BEDS, 109

21 BEDS, THOSE ARE EMPTY, JUST WAITING FOR PATIENTS?

22 **A**   NO, THEY ARE NOT.

23 **Q**   I'M SORRY.  THOSE BEDS ARE NOT AVAILABLE FOR THE COLEMAN

24 CLASS MEMBERS?

25 **A**   THOSE ARE VERY VALUABLE RESOURCES WITHIN THE STATE OF

1  CALIFORNIA, AND IF I DON'T HAVE AN APPROPRIATE REFERRAL FROM

2  CDCR AND A PATIENT WAITING TO GET INTO THOSE BEDS, I WILL PUT

3  1370, INCOMPETENT TO STAND TRIAL, AND NOT GUILTY BY REASON OF

4  INSANITY, WITH A MENTALLY DISORDERED OFFENDER COMMITTED TO ME

5  FROM ANOTHER COURT INTO ONE OF THOSE BEDS.  I CAN'T JUST LEAVE

6  THEM SITTING EMPTY WHEN I HAVE WAIT LISTS FOR OTHER PATIENTS TO

7  COME IN IF I DON'T HAVE REFERRALS FROM CDCR.

8  **Q**   YOU TESTIFIED THIS MORNING THAT THERE'S NO WAIT LIST TODAY

9  FOR THOSE BEDS?

10  **A**   THAT'S CORRECT.

11  **Q**   NO WAIT LIST FOR CDCR INMATE PATIENTS?

12  **A**   NO.

13  **Q**   DO YOU REMEMBER WHEN YOU WERE AT MY OFFICE AND YOU SAT FOR

14  YOUR DEPOSITION WITH MS. WHELAN IN AUGUST 2008?

15  **A**   YES, I DO.

16  **Q**   THAT DAY, ON THE DAY YOU TESTIFIED, THERE WAS A WAITING

17  LIST OF 15 INMATE PATIENTS FOR ATASCADERO; ISN'T THAT RIGHT?

18  **A**   I DON'T REMEMBER THE EXACT NUMBER, BUT THERE WAS A

19  QUESTION, YES.

20  **Q**   IF WE CAN GO BACK TO THE BED PLAN CHART, WHICH IS D1157,

21  AND IT'S PAGE -- THE 29TH PAGE IN, AND I BELIEVE I'VE LEFT A

22  COPY ON THE WITNESS STAND, D1175, 29TH PAGE, THE JULY 2008

23  MENTAL HEALTH BED PLAN.  THIS MORNING IN YOUR DIRECT TESTIMONY,

24  MS. TILLMAN TOOK YOU THROUGH SEVERAL COURT ORDERS, ORDERS TO

25  PROVIDE BEDS, BUILD BEDS, ADD BED SPACE, AND I BELIEVE THOSE

1  ORDERS HAVE LEFT THEIR TRACE IN THIS CHART AS WELL, AND I

2  WANTED TO ASK YOU ABOUT THAT.

3          IF WE LOOK AT THE -- RIGHT AROUND THE MIDDLE THERE

4  IS A -- ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN ROWS DOWN,

5  THERE IS A CATEGORY OF BEDS THERE CALLED CIW, CALIFORNIA

6  INSTITUTION FOR WOMEN, 45-BED ACUTE CARE INTERMEDIATE CARE

7  FACILITY.  IS THAT ONE OF YOUR PROJECTS?

8  **A**   NO, IT IS NOT.

9  **Q**   I SEE.  THAT WOULD BE CDCR WOULD HAVE THAT PROJECT?

10 **A**   THAT WOULD BE MY SUPPOSITION.

11 **Q**   SO THE DEPARTMENT OF MENTAL HEALTH WILL NOT BE PROVIDING

12 ANY CARE IN THOSE FACILITIES?

13 **A**   NO.

14 **Q**   OKAY.  AND THE ONE BELOW IT, CMF, CALIFORNIA MEDICAL

15 FACILITY, 64 BED ICF, NEW STAND-ALONE, WILL THE DEPARTMENT OF

16 MENTAL HEALTH BE PROVIDING ANY CARE IN THAT FACILITY?

17 **A**   THAT'S ONE I BELIEVE WE'RE WORKING ON WORKING DRAWINGS FOR

18 RIGHT NOW.

19 **Q**   I'M SORRY, MA'AM.  I COULDN'T UNDERSTAND YOU.

20 **A**   WE'RE WORKING ON WORKING DRAWINGS FOR THOSE ADDITIONAL

21 BEDS.

22 **Q**   SO IT IS YOUR TESTIMONY THOSE ARE YOUR BEDS, THOSE 64 BEDS?

23 **A**   AT CMF, YES.

24 **Q**   OKAY.  AND CAN YOU TELL ME WHAT THE SIGNIFICANCE OF THE

25 YELLOW SHADING -- I DIDN'T PUT THAT THERE.  THAT'S PART OF THE

1   EXHIBIT.  WHAT'S THE SIGNIFICANCE OF YELLOW SHADING ON THAT

2   PART?

3              **MS. TILLMAN:**  LACK OF FOUNDATION.

4   **BY MR. GALVAN**

5   **Q**   DO YOU KNOW WHAT THE SIGNIFICANCE IS OF THE YELLOW SHADING

6   ON THE CHART?

7   **A**   NO, I DO NOT.

8   **Q**   IF WE LOOK AT THOSE TOGETHER, IT SEEMS EVERY ONE OF THOSE

9   HAVE THE SAME ENTRY IN COMMON.  "THIS BED NEED IS PROPOSED TO

10  BE INCORPORATED INTO THE CDCR/RECEIVER CHCF," WHICH I WILL

11  REPRESENT IS COMPREHENSIVE HEALTHCARE FACILITY, "PROJECT."

12             SO IS IT YOUR TESTIMONY TODAY THAT AS TO THE 64 BED

13  INTERMEDIATE CARE FACILITY AT CMF ORDERED BY THE COURT,

14  ACCORDING TO THIS CHART, OCTOBER 18TH, 2007, YOUR PLAN UNDER

15  THE CURRENT BED PLAN, THE ONLY PLAN PENDING, IS THAT THOSE WILL

16  BE PROVIDED AS PART OF THE RECEIVER'S PROJECT?

17             **MS. TILLMAN:**  OBJECT.  VAGUE AND AMBIGUOUS, ALSO I

18  THINK IT'S CONSOLIDATED HEALTHCARE FACILITIES.

19             **MR. GALVAN:**  I STAND CORRECTED.  CONSOLIDATED

20  HEALTHCARE FACILITIES.

21  **BY MR. GALVAN**

22  **Q**   IS IT YOUR TESTIMONY YOU'LL MEET THAT BED NEED USING THE

23  CONSOLIDATED HEALTHCARE FACILITIES?

24  **A**   WHEN THE BED PLAN WAS AMENDED AND WE WERE ADVISED THAT

25  MENTAL HEALTH WOULD BE PART OF THE RECEIVER'S CONSTRUCTION,

1  PART OF THE AMENDMENT OF THE BED PLAN WAS TO ROLL THOSE NEW

2  BEDS INTO THE RECEIVER'S PLAN.

3  **Q**  ISN'T IT TRUE WHEN YOU MADE YOUR SWORN AFFIDAVIT,

4  OCTOBER 30TH, 2008, WHERE YOU CITED THIS BED PLAN AS -- IN YOUR

5  AFFIDAVIT AS EVIDENCE OF YOUR EFFORTS TO FULFILL THE COURT'S

6  ORDERS, THAT YOU KNEW ON OCTOBER 30TH, 2008, WHEN YOU SWORE

7  THAT AFFIDAVIT, THAT THE STATE OF CALIFORNIA HAD CHANGED ITS

8  MIND AND WAS DENYING FUNDING TO THE RECEIVER TO TAKE EVEN THE

9  INITIAL STEPS FOR THE CHCF HEALTHCARE FACILITY?

10         **MS. TILLMAN:**  OBJECTION.  CALLS FOR SPECULATION.

11         **JUDGE KARLTON:**  OVERRULED.  BEFORE YOU SAY

12  ANYTHING --

13         **JUDGE HENDERSON:**  IS THAT TRUE YOU KNEW THAT?

14         **JUDGE KARLTON:**  LET'S START, IS IT TRUE THAT YOU ARE

15  AWARE THAT THE STATE OF CALIFORNIA HAS DENIED ANY FUNDING FOR

16  THE RECEIVER'S PLAN; ARE YOU AWARE OF THAT?

17         **MS. TILLMAN:**  YOUR HONOR, WITH ALL DUE RESPECT, I

18  MAY NEED TO INTERJECT OBJECTIONS TO SOME OF THE QUESTIONS IN

19  THIS VEIN OF QUESTIONING, IF I MAY DO SO.  I WANT TO SHOW

20  RESPECT FOR THE COURT.

21         **JUDGE KARLTON:**  THAT'S FINE.  YOU GO AHEAD AND

22  OBJECT.

23         MA'AM, DO YOU KNOW THAT?

24         **MS. TILLMAN:**  AGAIN, I'LL OBJECT AS TO RELEVANCE.

25         **JUDGE KARLTON:**  TERRIFIC.

1          MA'AM, YOU SHALL ANSWER THE QUESTION.

2          **THE WITNESS:**  OKAY.  THE DIRECTION I HAVE BEEN GIVEN

3     IS TO CONTINUE ON WITH PLANNING.  I'M NOT SURE OF ALL OF THE

4     DECISIONS MADE TO FUNDING BECAUSE THOSE ARE NOT ALWAYS IN MY

5     PURVIEW.

6          **JUDGE HENDERSON:**  WELL, ON THIS ONE, DID YOU KNOW

7     THAT THE RECEIVER HAD BEEN DENIED FUNDING ON THE DATE THAT YOU

8     WROTE THIS AFFIDAVIT, OCTOBER 30TH, 2008?

9          **MS. TILLMAN:**  AGAIN, WITH ALL DUE RESPECT, I BELIEVE

10    I NEED TO INTERJECT THE RELEVANCE OBJECTION, YOUR HONOR.

11         **JUDGE HENDERSON:**  WE'LL CONSIDER THAT A CONTINUING

12    OBJECTION, COUNSEL.

13         **MS. TILLMAN:**  THANK YOU.

14         **JUDGE HENDERSON:**  WHAT'S YOUR ANSWER?  YOU READ THE

15    NEWSPAPERS?

16         **THE WITNESS:**  RIGHT.  I READ THE PAPER, AND I READ

17    IT IN THE PAPER, BUT I DON'T HAVE THE EXACT, FROM THE

18    GOVERNOR'S OFFICE OR FROM SOMEONE ELSE, THAT THAT FUNDING IS

19    DENIED.

20    **BY MR. GALVAN**

21    **Q**   YOU'RE THE DEPUTY DIRECTOR OF LONG-TERM CARE SERVICES FOR

22    THE CALIFORNIA DEPARTMENT OF MENTAL HEALTH; IS THAT RIGHT?

23    **A**   CORRECT.

24    **Q**   WHO'S HIGHER YOU THAN YOU IN THE DEPARTMENT OF MENTAL

25    HEALTH?

1  **A**  CHIEF DEPUTY DIRECTOR, THE DIRECTOR.

2  **Q**  DO YOU MEET WITH THEM EVER?

3  **A**  YES, I DO.

4  **Q**  DO THEY MEET WITH THE GOVERNOR?

5  **A**  THEY MEET WITH THE AGENCY SECRETARY.

6          **JUDGE KARLTON:**  LET'S BE CLEAR.  WHEN YOU RECEIVED

7  AN OFFICIAL –– WELL, REPORT THAT THE MONEY HAD NOT BEEN

8  ALLOCATED, YOU KNEW FROM READING THE NEWSPAPERS THAT THE MONEY

9  HAD NOT BEEN ALLOCATED, RIGHT?

10          **THE WITNESS:**  CORRECT.

11          **JUDGE KARLTON:**  DID YOU GO TALK TO YOUR BOSSES AND

12  SAY, WHAT DO WE DO NOW?

13          **THE WITNESS:**  THE DIRECTION WAS TO CONTINUE WORKING

14  TOWARDS THE PLAN.

15          **JUDGE KARLTON:**  HOW COULD YOU WORK THROUGH A PLAN

16  WHERE THEY'VE –– THE STATE HAS SAID, WE ARE NOT GOING TO GIVE

17  YOU THE MONEY?  I MEAN, JUST COMMON SENSE.  WHAT'S THE ANSWER

18  TO THAT?

19          **THE WITNESS:**  WELL, WE WERE CONTINUING TO WORK ON

20  THE 64 BEDS, BECAUSE ORIGINALLY IT WAS IN THE CONSOLIDATED

21  CENTERS AND THEN POTENTIALLY ROLLED INTO THE RECEIVER'S.

22  **BY MR. GALVAN**

23  **Q**  NOW THAT YOU KNOW THAT, THE STATUS OF THE RECEIVER'S

24  PROJECT, WILL THERE BE ANOTHER BED PLAN?

25          **JUDGE REINHARDT:**  ANOTHER WHAT?

1        **MR. GALVAN:**  ANOTHER COLEMAN BED PLAN.

2        **THE WITNESS:**  I DON'T KNOW AT THIS POINT.

3        **MR. GALVAN:**  NO FURTHER QUESTIONS.

4            **CROSS-EXAMINATION BY MR. HENDERSON**

5  **BY MR. HENDERSON**

6  **Q**   MS. RADAVSKY, MY NAME IS JIM HENDERSON.  I'M FOR THE

7  PLAINTIFF INTERVENORS.  I'M PRETTY SURE I ONLY HAVE TWO

8  QUESTIONS FOR YOU.

9        IN DIRECT TESTIMONY THIS MORNING YOU INDICATED YOU

10 HAD A COUNTERPART AT THE CDCR.

11 **A**   YES, SIR.

12 **Q**   OKAY.  WHOM DO YOU CONSIDER TO BE YOUR COUNTERPART AT THE

13 CDCR?

14 **A**   MENTAL HEALTHCARE, ROBIN DEZEMBER.

15 **Q**   I'M SORRY.  DID YOU GIVE HER TITLE?

16       **JUDGE KARLTON:**  HIS.

17       **MR. HENDERSON:**  HIS.  I'M SORRY.

18       **THE WITNESS:**  I'M NOT SURE WHAT HIS TITLE IS.  HE'S

19 DEPUTY OVER CORRECTIONAL HEALTHCARE SERVICES.

20       **MR. HENDERSON:**  THANK YOU VERY MUCH.

21       **THE WITNESS:**  OKAY.

22       **JUDGE HENDERSON:**  REDIRECT.

23          **REDIRECT EXAMINATION BY MS. TILLMAN**

24 **BY MS. TILLMAN**

25 **Q**   MS. RADAVSKY, YOU'VE MENTIONED EARLIER THAT YOU HAVE

1  ESSENTIALLY A RELATIONSHIP WITH THE DEPARTMENT OF CORRECTIONS

2  AND REHABILITATION IN REGARDS TO THE REFERRAL OF DEPARTMENT OF

3  CORRECTION INMATE PATIENTS TO THE DEPARTMENT OF MENTAL HEALTH

4  FOR INPATIENT PSYCHIATRIC SERVICES, CORRECT?

5  **A**   THAT'S CORRECT.

6  **Q**   AND THAT WORKING RELATIONSHIP HAS BEEN AN ONGOING

7  RELATIONSHIP FOR HOW MANY YEARS?

8          **MR. GALVAN:**  OBJECTION.  LEADING.

9          **JUDGE HENDERSON:**  OVERRULED.

10         **THE WITNESS:**  IT'S BEEN A WORK IN PROGRESS FOR OVER

11 TEN YEARS.

12 **BY MS. TILLMAN**

13 **Q**   AND AS MUCH AS IT IS A RELATIONSHIP, HOW WOULD YOU DESCRIBE

14 WHAT HAS OCCURRED IN TERMS OF YOUR RELATIONSHIP WITH THE

15 DEPARTMENT OF CORRECTIONS STAFF AT THE SALINAS VALLEY STATE

16 PRISON AS DISCUSSED IN THE SPECIAL MASTERS 20TH ROUND REPORT?

17 **A**   I THINK WE'VE MADE SOME PROGRESS.  THE DEPUTY FROM

18 INSTITUTIONS, AS I MENTIONED, WENT DOWN WITH ME EARLIER THIS

19 YEAR.  WE SAT DOWN.  WE SPENT ABOUT FOUR HOURS IDENTIFYING

20 ISSUES ON THE DEPARTMENT OF MENTAL HEALTH SIDE ISSUES, ON THE

21 DEPARTMENT OF CORRECTIONS SIDE, AND CAME UP WITH A PLAN OF

22 ACTION, WHICH ACTUALLY ON MONDAY WE SAT DOWN TO REVIEW THE

23 STATUS AND THE PROGRESS, AND OUR PLAN IS TO GO BACK DOWN IN

24 FEBRUARY TO MAKE SURE THINGS ARE STILL MOVING ALONG.

25 **Q**   WAS IT SCOTT KERNAN OF THE DEPARTMENT OF CORRECTIONS YOU

1  MET WITH ON THESE ISSUES?

2  **A**   YES, IT WAS.

3  **Q**   WERE YOU SATISFIED WITH THE OUTCOME OF THOSE DISCUSSIONS?

4  **A**   VERY.

5  **Q**   THERE'S ALSO BEEN MENTION MADE OF SOME OF THE WAIT LISTS.

6  HAS THE DEPARTMENT OF MENTAL HEALTH ENGAGED IN ANY ACTIVITY

7  WITH OR EVEN WITHOUT THE DEPARTMENT OF CORRECTIONS STAFF TO

8  ADDRESS THE WAIT LIST ISSUE?

9  **A**   WE'VE MADE NUMEROUS ATTEMPTS AT ENSURING THE FORMS ARE

10  STREAMLINED, THAT CLINICIANS HAVE BEEN TRAINED ON BOTH SIDES OF

11  THE HOUSE, THAT WE'VE MADE JOINT VISITS SO THAT THE MENTAL

12  HEALTH CLINICIANS COULD SEE THE ENVIRONMENT THAT THE PATIENTS

13  WERE COMING FROM, AND THAT THE CORRECTIONS CLINICIANS COULD SEE

14  THE ENVIRONMENT AND THE MILIEU THAT THE PATIENTS ARE IN WHEN

15  THEY'RE WITH US SO WE COULD SHARE TREATMENT MODALITIES AND TRY

16  TO MAINTAIN STABILIZATION ONCE PATIENTS ARE MOVED BACK TO

17  DEPARTMENT OF CORRECTIONS.

18  **Q**   WOULD IT BE CORRECT TO SAY THAT -- LET ME STRIKE THAT.

19        DO YOU ALSO HAVE A WORKING RELATIONSHIP WITH THE

20  COLEMAN SPECIAL MASTER?

21  **A**   YES, I DO.

22  **Q**   AND HOW WOULD YOU DESCRIBE HOW THAT WORKING RELATIONSHIP IS

23  CONDUCTED?

24  **A**   WELL, I THINK THE COLEMAN SPECIAL MASTER AND HIS EXPERTS

25  RAISE ISSUES TO US THAT WE TAKE VERY SERIOUSLY.  WE DO

1  POPULATION MANAGEMENT FOR THE STATE HOSPITALS, AND IN A RECENT

2  DISCUSSION HE MENTIONED TO US THAT WE MIGHT WANT TO SEPARATE

3  AND DO POPULATION MANAGEMENT FOR THE DEPARTMENT OF CORRECTIONS

4  INMATES, WHICH WE STARTED.

5           WE MET WITH HIM AND THEN ON TUESDAY AFTERNOON

6  IDENTIFIED THE GROUP OF FORENSIC LIAISONS THAT DEAL WITH THE

7  POPULATION AND STARTED THEM WITH WEEKLY MEETINGS SO WE COULD

8  TRACK THE WAITING LISTS WHEN THERE ARE WAITING LISTS AND MAKE

9  SURE REFERRALS ARE MOVING TO THE APPROPRIATE PLACE.

10 **Q**   IN ADDITION TO THAT OUTREACH, IN REGARDS TO THE WAIT LIST,

11 THE DEPARTMENT OF CORRECTIONS AND REHABILITATIONS, HAVE YOU

12 ALSO WORKED WITH THE COLEMAN SPECIAL MASTER IN REGARDS TO THE

13 ACTIVATION OF APPROPRIATE MENTAL HEALTHCARE BEDS FOR THE

14 CALIFORNIA DEPARTMENT OF CORRECTIONS INMATES?

15 **A**   YES, I THINK WHEN THE INITIAL ACTIVATION OF THE 64

16 STAND-ALONE AT SALINAS VALLEY, THE ACTIVATION OF P2, THE

17 ACTIVATION OF P3.

18 **Q**   AND WHERE ARE P2 AND P3?

19 **A**   I'M SORRY.  P2 AND P3 ARE AT THE VACAVILLE PSYCHIATRIC

20 UNIT, AND THOSE WERE IDENTIFIED AND OPENED FOR HIGH RISK

21 INMATES THAT WERE ON THE WAITING LIST.  IT WAS A WAY TO HELP

22 WHITTLE DOWN THE WAITING LIST FOR SALINAS VALLEY.

23 **Q**   HAVE YOU EXAMINED THE FEASIBILITY OF CONVERTING SPACE AT

24 EXISTING STATE HOSPITALS FOR USE BY COLEMAN INMATES?

25 **A**   WE DID TWO STUDIES REGARDING COALINGA STATE HOSPITAL.

1  Q   I BELIEVE THIS IS IN EXHIBIT 1158, CORRECT?  WE CAN PUT

2  THAT UP HERE IF YOU LIKE.

3          **MR. GALVAN:**  OBJECTION TO THIS AREA.  I DON'T SEE

4  HOW IT'S WITHIN THE SCOPE OF CROSS.

5          **MS. TILLMAN:**  I BELIEVE THERE WAS A LENGTHY

6  DISCUSSION ON CROSS ABOUT THE AVAILABILITY OF BEDS.

7          **JUDGE HENDERSON:**  PROCEED.

8  **BY MS. TILLMAN**

9  Q   IS THAT THE COALINGA FEASIBILITY STUDY YOU WERE REFERRING

10 TO, MS. RADAVSKY, IN EXHIBIT 1158?

11 A   YES, IT IS.

12 Q   AND YOU HAVE PLACED COLEMAN CASELOAD PATIENTS INTO BEDS AT

13 COALINGA STATE HOSPITAL; IS THAT CORRECT?

14 A   LOWER CUSTODY INMATES, YES.

15 Q   IN TERMS OF THE BED PLANS THAT HAVE BEEN PREPARED IN

16 RESPONSE TO THE NEEDS OF THE MENTALLY ILL INMATES OF THE

17 DEPARTMENT OF CORRECTIONS, WERE THOSE BED PLANS SUBMITTED FOR

18 APPROVAL BY THE SPECIAL MASTER IN THE COLEMAN CASE?

19 A   YES, THEY WERE.

20 Q   ON CROSS-EXAMINATION PLAINTIFFS' COUNSEL ASKED YOU

21 QUESTIONS ABOUT THE CLOSURE OF THE ATASCADERO STATE HOSPITAL

22 FACILITY IN JANUARY 2007; DO YOU RECALL THAT?

23 A   IT WAS NOT CLOSURE.  IT WAS A REDUCTION OF ADMISSIONS.

24 YES, I DO.

25 Q   AND WHEN YOU SAY "REDUCTION OF ADMISSIONS," WHAT DOES THAT

1   MEAN?

2   **A**   IT MEANS I HAD TO LIMIT ADMISSIONS DUE TO HEALTH AND SAFETY

3   CONCERNS, AND IN ORDER TO MAINTAIN THE LICENSURE OF THE

4   HOSPITAL UNTIL I COULD STAFF UP THROUGH EMERGENCY CONTRACTS

5   ADEQUATE STAFF TO START ADMISSIONS AGAIN.

6   **Q**   AND DID ATASCADERO STATE HOSPITAL -- LET ME STRIKE THAT.

7            IS THAT REDUCTION IN ADMISSIONS POLICY STILL IN

8   EFFECT AT ATASCADERO STATE HOSPITAL?

9   **A**   NO, IT IS NOT.

10  **Q**   DO YOU RECALL APPROXIMATELY WHEN THAT REDUCTION IN

11  ADMISSIONS POLICY WAS ELIMINATED?

12  **A**   THE MEMO WENT IN JANUARY, AND I BELIEVE MARCH OR APRIL OF

13  THAT SAME YEAR, '07, WE WERE ABLE TO START ADMISHING (SIC) AT

14  OUR REGULAR RATE.

15  **Q**   HAVE YOU UNDERTAKEN ANY EFFORTS TO ENSURE THAT THE

16  DEPARTMENT OF MENTAL HEALTH HAS ADEQUATE STAFFING TO OPERATE

17  ITS INSTITUTIONS WITHOUT HAVING TO DO A REDUCED ADMISSIONS

18  POLICY?

19  **A**   YES.  THE INITIAL REASON FOR THE REDUCTION IN ADMISSIONS

20  WAS A PAY INCREASE UNDER A COLEMAN COURT ORDER FOR THE

21  DEPARTMENT OF CORRECTIONS AND REHABILITATION.

22  **Q**   WAS THAT -- I'M SORRY.  GO AHEAD.

23  **A**   I'M SORRY.  WE PURSUED PAY PARITY WHICH HELPS DRAW OUR

24  CLINICIANS BACK AND KEEP US VIABLE.

25  **Q**   WAS THAT UNDER YOUR MAY 2007 PAY PARITY PLAN?  I THINK IT

1  WAS ADMITTED AS DEFENDANT'S EXHIBIT 1040.  WE CAN BRING THAT UP

2  ON THE SCREEN IF YOU LIKE.  JUST PAGING DOWN THERE -- YOU HAVE

3  IT?

4  **A**   YES, IT IS.

5  **Q**   AND IS IT CORRECT THAT THE PAY PARITY PLAN WAS SUBMITTED TO

6  THE COLEMAN SPECIAL MASTER AND THE COLEMAN COURT FOR APPROVAL

7  IN MAY 2007?

8  **A**   THAT'S CORRECT.

9  **Q**   AND WAS THAT APPROVED BY THE COLEMAN COURT?

10  **A**   YES, IT WAS.

11  **Q**   HAVE YOU FOUND THAT THE INCREASE IN PAY SCALES FOR THE

12  DEPARTMENT OF MENTAL HEALTH, MENTAL HEALTH CLINICIANS, HAS

13  ENABLED ANY REDUCTION IN STAFF VACANCIES?

14  **A**   YES, IT HELPED.  ALTHOUGH WE STILL HAVE SOME CONTRACTS IN

15  PLACE, IT HAS HELPED US WITH RECRUITMENT OF CLINICIANS.

16  **Q**   HAS THE DEPARTMENT OF MENTAL HEALTH ENGAGED IN ANY OTHER

17  EFFORTS BESIDES OBTAINING PAY PARITY WITH DEPARTMENT OF MENTAL

18  HEALTH CLINICIANS TO ENSURE ADEQUATE STAFFING FOR ITS

19  FACILITIES?

20  **A**   YES, WE CONTINUE TO REACH OUTSIDE OF THE STATE OF

21  CALIFORNIA, BECAUSE IT'S VERY COMPETITIVE WITHIN THE STATE.

22  THERE'S A NATIONAL SHORTAGE ON CLINICIANS, SO WE MAKE SURE WE

23  HAVE LICENSED INTERNSHIPS FOR ALL OF OUR CLINICAL CLASSES, AS

24  WELL AS FELLOWSHIPS FOR OUR PSYCHIATRISTS.  THAT'S A VERY

25  STRONG RECRUITING BASE FROM US ACROSS THE COUNTRY, AND WE DON'T

1    WANT TO KEEP COMPETING AS MUCH WITHIN THE STATE, WE WANT TO

2    DRAW FROM OUTSIDE OF THE STATE AND FROM FOREIGN NATIONALS AS

3    POSSIBLE.

4    **Q**    DID THE DEPARTMENT OF MENTAL HEALTH PROVIDE THE SPECIAL

5    MASTER IN THE COLEMAN CASE WITH A RECRUITMENT PLAN?

6    **A**    YES, WE DID.

7    **Q**    AND I BELIEVE THAT'S EXHIBIT 1145-2.  WE CAN PAGE DOWN,

8    AND -- THERE IS THE RECRUITMENT PLAN.

9            (DOCUMENT DISPLAYED.)

10   **BY MS. TILLMAN**

11   **Q**    IS THAT THE PLAN YOU DRAFTED AND SUBMITTED TO THE COLEMAN

12   SPECIAL MASTER AND THE COLEMAN COURT?

13   **A**    YES, IT IS.

14   **Q**    THANK YOU.  SINCE THE INCREASE IN PAY FOR THE DEPARTMENT OF

15   MENTAL HEALTH CLINICIANS AND WITH THE IMPLEMENTATION OF THESE

16   RECRUITMENT STRATEGIES, HAS ATASCADERO STATE HOSPITAL -- HAS

17   ATASCADERO STATE HOSPITAL IMPLEMENTED ANY REDUCTION IN ITS

18   ADMISSIONS?

19   **A**    NO, IT HAS NOT.

20   **Q**    HAS COALINGA STATE HOSPITAL IMPLEMENTED ANY REDUCTION IN

21   ITS ADMISSIONS?

22   **A**    NO, IT HAS NOT.

23   **Q**    DO YOU REPORT TO THE COLEMAN SPECIAL MASTER IN REGARDS TO

24   THE STATUS OF YOUR RECRUITMENT STRATEGIES AND THE SUCCESS OF

25   THOSE STRATEGIES ON ANY PERIODIC BASIS?

1  **A**   I'M REQUIRED TO PROVIDE A VACANCY REPORT MONTHLY, AND IT

2  INCLUDES CIVIL SERVICE CLASS CLINICIANS, AS WELL AS ANY

3  CONTRACTORS.

4  **Q**   WE'VE HEARD ABOUT NATIONAL SHORTAGE OF PSYCHIATRISTS.  DO

5  YOU BELIEVE THAT TO BE TRUE, THAT THERE'S A NATIONAL SHORTAGE

6  OF PSYCHIATRISTS?

7  **A**   I BELIEVE SO.

8  **Q**   HAVE YOU BEEN ABLE TO OBTAIN SUFFICIENT PSYCHIATRISTS TO

9  OPERATE YOUR FACILITIES WITHIN THE DEPARTMENT OF MENTAL HEALTH?

10 **A**   YES.

11 **Q**   IN TERMS OF YOUR WORKING RELATIONSHIP WITH THE COLEMAN

12 SPECIAL MASTER, DO YOU MAKE CONTACT WITH THE COLEMAN SPECIAL

13 MASTER REGARDING THE ACTIVATION OR THE DEACTIVATION OF MENTAL

14 HEALTHCARE BEDS FOR COLEMAN CASELOAD PATIENTS?

15 **A**   YES, I DO NOT MAKE MOVES WITHOUT REQUESTING AND THEN MAKING

16 FORMAL REQUESTS TO THE COURT, WHETHER IT'S CLOSURE, A REQUEST

17 TO SWAP, OR IDEAS THAT WE HAVE.

18 **Q**   AND SO IF THE SPECIAL MASTER IN THE COLEMAN CASE IS

19 REVIEWING A REQUEST TO, SAY, DEACTIVATE BEDS TO RETROFIT CELLS

20 SUCH AS THOSE AT THE SALINAS VALLEY -- I'M SORRY -- CALIFORNIA

21 MEDICAL FACILITY IN S1, S2, DO YOU WAIT FOR HIS APPROVAL BEFORE

22 MOVING FORWARD ON THAT PLAN?

23 **A**   YES, I DO.

24 **Q**   HAVE YOU DONE SO IN THAT REGARD IN TERMS OF RETROFITTING

25 THE S1, S2 UNITS AT CALIFORNIA MEDICAL FACILITY?

1   A   WE ARE WAITING FOR APPROVAL.

2          **MS. TILLMAN:**  THANK YOU.  NOTHING FURTHER.

3          **JUDGE HENDERSON:**  ANYTHING FROM INTERVENORS?

4          **MR. MITCHELL:**  NO QUESTIONS FROM THE INTERVENORS.

5          **JUDGE HENDERSON:**  OKAY.  RECROSS?

6          **RECROSS-EXAMINATION BY MR. GALVAN**

7          **MR. GALVAN:**  ERNEST GALVAN FOR THE PLAINTIFFS.

8   **BY MR. GALVAN**

9   Q   YOU TESTIFIED YOU HAVE A GOOD WORKING RELATIONSHIP WITH THE

10  COLEMAN SPECIAL MASTER; IS THAT RIGHT?

11  A   YES.

12  Q   SO IF YOU HAD A NEED TO CHANGE THE MISSION OF SOME BEDS,

13  YOU COULD JUST PICK UP THE PHONE AND CALL HIM; IS THAT RIGHT?

14  A   NO.  I GO THROUGH MY ATTORNEY.

15  Q   OKAY.  YOUR ATTORNEY SITTING WITH YOU COULD PICK UP THE

16  PHONE AND CALL HIM; IS THAT RIGHT?

17         **MS. TILLMAN:**  OBJECTION.  CALLS FOR SPECULATION.

18  **BY MR. GALVAN**

19  Q   ON REDIRECT YOU DISCUSSED THE COALINGA STATE HOSPITAL STATE

20  FEASIBILITY STUDY AND COALINGA IN GENERAL.  I BELIEVE WE SAW ON

21  THE MAP YOU HAD 50 BEDS THERE, AND THE CAPACITY OF COALINGA IS

22  ABOUT 1,500; IS THAT RIGHT?

23  A   THE CAPACITY OF COALINGA IS 1,500.

24  Q   ONE THOUSAND FIVE HUNDRED.  AND THE CENSUS IS ABOUT?

25  A   IT'S CLOSE TO 800 RIGHT NOW.

1   Q   CLOSE TO 800.  SO ABOUT 700 EMPTY BEDS THERE?

2   A   THAT IS CORRECT.

3   Q   AND THEY'RE EMPTY BECAUSE YOU CAN'T STAFF THE FACILITY; IS

4   THAT RIGHT?

5   A   THEY ARE EMPTY BECAUSE WE ARE STAFFING UP AND BECAUSE I

6   ADMIT SEXUALLY VIOLENT PREDATORS INTO THAT FACILITY.

7   Q   DO YOU REMEMBER AROUND DECEMBER 2006 GETTING AN E-MAIL FROM

8   THE PAROLE DEPARTMENT ASKING YOU ABOUT COALINGA?

9   A   NOT OFF THE TOP OF MY HEAD.

10          **MR. GALVAN:**  COULD WE LOOK AT E-PRIV 85851?  THIS IS

11  A DOCUMENT RECEIVED IN DISCOVERY FROM THE DEFENDANTS.  IT'S NOT

12  BEEN MADE AN EXHIBIT YET.

13          **JUDGE KARLTON:**  WELL, DO YOU PROPOSE TO MAKE IT AN

14  EXHIBIT AND MOVE IT INTO EVIDENCE?

15          **MR. GALVAN:**  I'M NOT CERTAIN, YOUR HONOR.

16          **JUDGE KARLTON:**  YOU CAN'T SHOW IT IF IT'S NOT IN

17  EVIDENCE.

18          **MR. GALVAN:**  IN THAT CASE, YOUR HONOR, I PROPOSE TO

19  MAKE IT AN EXHIBIT AND MOVE IT INTO EVIDENCE, AND IT WILL BE

20  DESIGNATED AS P590.

21          **JUDGE HENDERSON:**  AND SEEING AT THIS POINT THERE'S A

22  TIMELINESS ISSUE, WHY SHOULD WE ADMIT THIS?

23          **MR. GALVAN:**  YOUR HONOR, I WILL APPEAL TO THE

24  NORTHERN DISTRICT LOCAL RULE 1610.

25          **JUDGE HENDERSON:**  WHICH IS THE THREE-JUDGE COURT --

1          **MR. GALVAN:**  I WILL APPEAL TO THE GENERAL PRINCIPAL

2   THAT IMPEACHMENT AND REBUTTAL EVIDENCE DOES NOT HAVE TO BE

3   EXCHANGED --

4          **JUDGE HENDERSON:**  I WAS ASKING YOU, IS THIS

5   IMPEACHMENT OR REBUTTAL?

6          **MR. GALVAN:**  I'M SORRY, YOUR HONOR.  IT IS

7   IMPEACHMENT OR REBUTTAL.

8          IF WE COULD ZOOM IN ON THE PART THAT STARTED WITH

9   STORMS ROBERT AND SAYS "CINDY" AT THE BOTTOM -- ACTUALLY THE

10  PART -- NO, THAT WAS TOO MUCH.  RIGHT THERE.  PERFECT.  AND

11  MAKE THAT BIGGER?

12         DO YOU KNOW WHO ROBERT STORMS IS?

13  **A**   YES, I DO.

14  **Q**   DO YOU REMEMBER GETTING AN E-MAIL WHERE HE WROTE:

15         "CINDY:  CDCR IS CURRENTLY PLANNING TO END THE

16          PSYCH RETURN PROCESS EFFECTIVE 1/8/07.  WE WILL NO

17          LONGER RETURN PAROLEES TO PRISON SOLELY FOR

18          PSYCHIATRIC SERVICES.  CAN YOU FREE UP MORE BEDS FOR

19          MORE MONEY FOR CONSERVED PAROLEES?  THANKS."

20         DO YOU REMEMBER GETTING THAT E-MAIL?

21  **A**   I DO NOW THAT I SEE IT.

22  **Q**   OKAY.  IF WE CAN GO UP AND SEE THE RESPONSE?  THERE'S A

23  RESPONSE THERE.  AND IT SAYS AS A HEADER, IT SAYS, DECEMBER 11,

24  2006 FROM CINDY RADAVSKY.

25         "DMH DOES NOT HAVE BED SPACE FOR THESE PAROLEES

1        AND, IN FACT, HAS ASKED CDCR TO DO BED PLANNING TO

2        REMOVE ALL OF THEIR INMATES FROM THE STATE HOSPITALS

3        DUE TO OUR POPULATION ISSUES AND THE NEW PRESSURES

4        UNDER JESSICA'S LAW."

5             DO YOU REMEMBER WRITING THAT BACK TO ROBERT STORMS?

6  **A**  I REMEMBER NOW THAT I SEE IT.

7  **Q**  DO YOU REMEMBER THERE WAS SOME DISCUSSION WITH THE PAROLE

8  DEPARTMENT ABOUT THE EMPTY BEDS AT COALINGA AND COULD THEY USE

9  THOSE FOR PSYCH --

10             **MS. TILLMAN:**  COULD I HAVE THAT BACK AGAIN?

11             **MR. GALVAN:**  I CAN ASK IT AGAIN.

12  **BY MR. GALVAN**

13  **Q**  DO YOU REMEMBER THAT THERE WAS DISCUSSION WITH THE PAROLE

14  DEPARTMENT IN DMH AT THAT TIME ABOUT USING THE EMPTY BEDS IN

15  COALINGA FOR THE PSYCH RETURN POPULATION?

16             **MS. TILLMAN:**  OBJECTION.  RELEVANCE THIS IS A

17  *VALDIVIA* MATTER.

18             **JUDGE HENDERSON:**  I AM GOING TO ALLOW IT.

19             **THE WITNESS:**  I DON'T REMEMBER THE CONVERSATION

20  BEING SPECIFIC TO COALINGA.  THE REQUEST WAS FOR STATE HOSPITAL

21  BEDS.

22  **BY MR. GALVAN**

23  **Q**  AND YOUR RESPONSE WAS TO DENY THE REQUEST; IS THAT RIGHT?

24  **A**  MY RESPONSE WAS THAT I HAD POPULATION PRESSURES RELATED TO

25  THE DEPARTMENT OF MENTAL HEALTH AND SPECIFICALLY NOT KNOWING,

1  SINCE JESSICA'S LAW HAD RECENTLY PASSED IN NOVEMBER OF '06 AS A

2  NEW INITIATIVE WHAT THAT POPULATION INCREASE WAS OR POTENTIALLY

3  COULD LOOK LIKE.

4  **Q**    YOU TESTIFIED YOU HAD POPULATION PRESSURES ON THE STATE

5  HOSPITALS?

6  **A**    YES.

7  **Q**    YOU ALSO TESTIFIED ON REDIRECT ABOUT PAY PARITY.  YOU

8  SUBMITTED A PLAN TO ACHIEVE PAY PARITY WITH THE CDCR

9  CLINICIANS; IS THAT RIGHT?

10 **A**    CORRECT.

11 **Q**    YOU SUBMITTED THAT PLAN VOLUNTARILY; IS THAT RIGHT?

12 **A**    CORRECT.

13 **Q**    YOU WEREN'T ORDERED BY THE COURT TO SUBMIT A PLAN ON PAY

14 PARITY?

15 **A**    WE HAD PAPER FROM THE COURT, YES.

16 **Q**    I'M SORRY.  YOU HAD A PAPER FROM THE COURT?

17 **A**    I DON'T HAVE THE ORDER IN FRONT OF ME TO DETERMINE WAS IT

18 AN ORDER.

19         **JUDGE KARLTON:**  YOU MISUNDERSTOOD THE QUESTION.  YOU

20 ULTIMATELY GOT AN ORDER FROM THE COURT PERMITTING YOU -- THE

21 QUESTION WAS, DID THE COURT ORDER YOU TO SUBMIT A PAY PARITY

22 PLAN?

23         **MS. TILLMAN:**  I'LL OBJECT.  CALLS FOR A LEGAL

24 CONCLUSION.  I THINK THE COURT DOCKET SPEAKS FOR ITSELF.  THAT

25 COURT ORDER IS IN THE DOCKET.

1          **JUDGE KARLTON:**  YOU ARE SAYING I ORDERED HER TO

2    SUBMIT A PAY PLAN?

3          **MS. TILLMAN:**  I BELIEVE THERE WAS A COURT ORDER.

4    THERE WAS CERTAINLY A SPECIAL MASTER'S PLAN ABOUT THAT.

5          **JUDGE KARLTON:**  A DIFFERENT QUESTION.

6          MA'AM, AS FAR AS YOU CAN RECALL, DID THE PROPOSAL TO

7    INCREASE -- TO REACH PAY PARITY ORIGINATE WITH THE DEPARTMENT

8    OF MENTAL HEALTH, THE SPECIAL MASTER OR ANYBODY ELSE?

9          **THE WITNESS:**  OFF THE TOP OF MY HEAD, I DON'T RECALL

10   WHERE IT WAS STARTED.

11   **BY MR. GALVAN**

12   **Q**   DO YOU RECALL AFTER THE COLEMAN COURT ISSUED ITS PAY ORDERS

13   REGARDING THE CDCR CLINICIANS A MEETING WITH PLAINTIFFS'

14   COUNSEL AT WHICH MR. BIEN ASKED YOU, "AND YOU'RE ALSO GOING TO

15   INCREASE THE PAY FOR THE DEPARTMENT OF MENTAL HEALTH

16   CLINICIANS, AREN'T YOU?"

17   **A**   YES, I RECALL THE MEETING.

18   **Q**   DO YOU RECALL THE ANSWER MR. BIEN RECEIVED?

19   **A**   NO, I DON'T.

20   **Q**   IF I SAID IT WAS "NO," WOULD THAT SEEM FAR OFF?

21   **A**   AT THAT POINT IN TIME, PROBABLY NOT.

22          **MR. GALVAN:**  THANK YOU.  NO FURTHER QUESTIONS.

23          **JUDGE HENDERSON:**  OKAY.  590 WILL BE ADMITTED AT

24   THIS TIME.

25          (PLAINTIFFS' EXHIBIT 590 RECEIVED IN EVIDENCE.)

1          **JUDGE KARLTON:**  MAY I ASK A QUESTION, WHICH I'M

2    SORRY TO SAY, MAY INVITE MORE TO DO?

3          HAVE YOU HEARD -- I'M NOT SAYING IT'S TRUE, BUT HAVE

4    YOU HEARD THAT THERE ARE CLINICIANS IN THE DEPARTMENT OF

5    CORRECTIONS AND REHABILITATION WHO HAVE CEASED REFERRING TO THE

6    DEPARTMENT OF MENTAL HEALTH BECAUSE THEY BELIEVE THAT THE

7    STANDARDS ARE SUCH THAT THEIR PATIENTS WILL NOT BE ADMITTED?

8    HAVE YOU HEARD THAT?

9          **THE WITNESS:**  I HAVE HEARD THAT AT VARIOUS ALL PARTY

10   MEETINGS, YES, SIR.

11         **JUDGE KARLTON:**  AND IS THERE ANY TRUTH TO THAT?

12   OBVIOUSLY, TRUTH ISN'T THE POINT.  ALL RIGHT.  THANK YOU.

13         DOES THAT INVITE ANOTHER LONG CONVERSATION FROM

14   COUNSEL?  IT'S YOUR CLIENT.

15         **MS. TILLMAN:**  I DON'T HAVE ANY RESPONSE TO THE

16   COURT'S INQUIRY.  I HAVE ONE OR TWO QUESTIONS TO CLARIFY THE

17   RECORD ABOUT THE COURT ORDERS.

18         **MR. GALVAN:**  I DO HAVE QUESTIONS.  ARE YOU INVITING

19   FURTHER QUESTIONS?

20         **JUDGE KARLTON:**  I'M NOT INVITING.  I'M TERRIFIED

21   I'VE DONE IT.

22         **JUDGE HENDERSON:**  IN FACT, WE WILL OVERRULE HIM IF

23   HE INVITES IT.

24         **MR. GALVAN:**  NO FURTHER QUESTIONS, YOUR HONOR.

25         **JUDGE HENDERSON:**  IS THAT IT?

1            **MS. TILLMAN:**  IF I MIGHT, YOUR HONOR?

2            **JUDGE HENDERSON:**  YES, PLEASE.

3            **FURTHER REDIRECT BY MS. TILLMAN**

4  **BY MS. TILLMAN**

5  Q    MS. RADAVSKY, THE COURT ASKED IN REGARDS TO THE PAY PARITY

6  PLAN OF DMH WHETHER OR NOT IT WAS ORDERED.  LET ME PUT UP ON

7  THE SCREEN WHAT APPEARS TO BE EXHIBIT 1305.  I BELIEVE IT'S A

8  SPECIAL MASTER'S REPORT OF JANUARY 2007.

9            AND IF YOU COULD PAGE DOWN TO THE LAST PAGE WHERE

10 THE SIGNATURE APPEARS FROM THE SPECIAL MASTER?  THERE IT IS.

11            (DOCUMENT DISPLAYED.)

12 **BY MS. TILLMAN**

13 Q    AND THIS -- I BELIEVE THIS STATES AT THE FIRST PARAGRAPH:

14            "THE DEFENDANT SHOULD BE DIRECTED TO SUBMIT TO

15       THE COURT THE PRODUCT OF SUCH AN ASSESSMENT AND

16       CORRESPONDING PLAN WITHIN 60 DAYS OF THE ADOPTION OF

17       THE RECOMMENDED ORDER."

18            IF WE COULD JUST GO UP ONE PAGE TO THE BOTTOM

19 PARAGRAPH OF THE PRECEDING PAGE?

20            AND HERE IT SAYS:

21       "ALL OF THIS SUGGESTS THAT THAT PORTION OF

22       PLAINTIFFS' REQUEST SEEKING AN ORDER THAT DEFENDANTS

23       ASSESS AND DEVELOP A PLAN TO MEET THE ISSUES CREATED

24       BY THE DISPARITY IN PAY FOR DMH CLINICIANS PROVIDING

25       MENTAL HEALTH SERVICES TO CDCR INMATES IN CDCR

1          INSTITUTIONS AND THOSE PROVIDING SERVICES TO CDCR

2          INMATES IN ALL OTHER DMH INSTITUTIONS HAS MERITS."

3               AND I WOULD ASK THE WITNESS IF SHE RECALLS REVIEWING

4     THAT REPORT FROM THE SPECIAL MASTER?

5     **A**    YES, I DO.

6     **Q**    AND DID YOU ENGAGE YOUR OFFICE TO CREATE SUCH A PLAN?

7     **A**    YES, I DID.

8     **Q**    AND DID YOU RECEIVE -- LET ME STRIKE THAT.

9          **MS. TILLMAN:**  I WOULD ASK THE COURT TO TAKE JUDICIAL

10    NOTICE OF THE COLEMAN COURT ORDER, I BELIEVE DATED FEBRUARY 7,

11    2007.

12         **JUDGE KARLTON:**  THERE'S NO QUESTION THAT THE COURT

13    ISSUED AN ORDER.  THE QUESTION IS WHAT THE SOURCE OF THE

14    APPLICATION WAS.  ALL RIGHT.

15         **MS. TILLMAN:**  THANK YOU, NOTHING FURTHER.

16         **JUDGE HENDERSON:**  ANYTHING FURTHER, MR. GALVAN?

17         **MR. GALVAN:**  NOTHING FURTHER FROM PLAINTIFFS.

18         **JUDGE HENDERSON:**  THANK YOU FOR TESTIFYING,

19    MS. RADAVSKY.  YOU MAY STEP DOWN.  YOU'RE EXCUSED.

20         **THE WITNESS:**  THANK YOU.

21         **JUDGE HENDERSON:**  AND THAT ENDS OUR SESSION FOR

22    TODAY.  WE WILL CONTINUE ON TUESDAY, DECEMBER 2ND, AND, AS I

23    UNDERSTAND IT, WE WILL GO DECEMBER 2ND AND DECEMBER 3RD.

24         I WILL REPEAT THE ORDER THAT DEFENDANTS SHOULD BE

25    READY TO GO INTO PHASE ONE-PLUS, WHETHER WE'RE INTO NOW

 1  ONE-PLUS, OR SOMETHING, ON DECEMBER 4TH, AND BE REMINDED ALSO,

 2  THAT ON DECEMBER 5TH, WHICH IS A FRIDAY, THAT WE'RE SCHEDULED

 3  TO END AT 1:30 ON THAT DAY.

 4          **MR. MELLO:**  YOUR HONOR, JUST FOR CLARIFICATION, YOU

 5  SAID -- I BELIEVE YOU SAID DEFENDANTS SHOULD BE PREPARED TO GO

 6  ON TO PHASE ONE-A OR PHASE TWO.  DID YOU MEAN PLAINTIFFS?  YOU

 7  MEANT PLAINTIFFS?

 8          **JUDGE HENDERSON:**  I MEANT PLAINTIFFS.  EXCUSE ME.

 9          **MR. MELLO:**  THANK YOU, YOUR HONOR.

10          **MR. BIEN:**  YOUR HONOR, JUST FOR CLARIFICATION, THERE

11  ARE A FEW THINGS WE THINK, BASED ON OUR INFORMAL DISCUSSION

12  YESTERDAY AFTERNOON, SHOULD BE CLARIFIED.

13          FIRST, WE WANT TO MAKE SURE ON THE RECORD THAT ALL

14  PARTIES, INCLUDING THE INTERVENORS, HAVE NOTICE OF WHAT THE

15  COURT STATED ON THE RECORD AND THE FACT THAT THERE'S BEEN SOME

16  CHANGE IN TERMS OF THE TRIAL, YOU KNOW, THERE HAS BEEN AN

17  ENDING OF THE PHASE ONE TRIAL AND A GAP.  I THINK IT'S

18  IMPORTANT THAT ALL PARTIES BE FORMALLY NOTICED OF THAT, AND

19  MAYBE -- I DON'T KNOW WHETHER THE INTERVENORS ARE HERE TODAY,

20  BUT HAVE ALL INTERVENORS RECEIVED THAT NOTICE?

21          **JUDGE KARLTON:**  INTERVENORS ARE PRESENT, OF COURSE,

22  OR AT LEAST SOME OF THE INTERVENORS ARE PRESENT, AND LET --

23  THOSE WHO HAVE NOT ARE ON THEIR OWN RISK.

24          **MR. BIEN:**  AND, AGAIN, IN TERMS OF EFFICIENCY AND

25  PRACTICALITY, WE WOULD REQUEST THAT ANY WITNESS THAT TESTIFIES

1    FROM HERE FORWARD TESTIFY TO ANYTHING THEY'RE GOING TO TESTIFY

2    ABOUT ON ALL SUBJECTS.  WE, OF COURSE, WILL BRING BACK ANY

3    WITNESSES THAT NEED TO BE BROUGHT BACK.  BUT IF THE DEFENDANTS

4    ARE GOING TO PUT A WITNESS ON AND WE CAN -- IN A COUPLE OF

5    DAYS, THEY SHOULD PUT THAT WITNESS ON FOR ALL PURPOSES.

6          **JUDGE REINHARDT:**  THERE'S NO OTHER ALTERNATIVE.  WE

7    ARE GOING TO THE REST OF THE TRIAL WHEN WE START AGAIN ON THAT

8    THURSDAY, WHATEVER IT IS THE 4TH OR --

9          **MR. BIEN:**  TUESDAY.

10         **JUDGE REINHARDT:**  NO, NO.  WE'RE GOING TO CLOSE

11   PHASE ONE AFTER TWO MORE WITNESSES, RIGHT?  YOU ARE SUGGESTING

12   THOSE TWO WITNESSES SHOULD TALK ABOUT EVERYTHING?

13         **MR. BIEN:**  WELL, I GUESS THE QUESTION IS, WHEN THE

14   WITNESSES PREPARED THEIR WITNESS STATEMENTS, IT WAS BEFORE

15   BIFURCATION.  SO THE WITNESS STATEMENTS DEALT WITH BOTH PHASE

16   ONE AND PHASE TWO ISSUES.  WE ARE PREPARED TO CROSS-EXAMINE

17   THEM ON ALL ISSUES.  THEY HAVE SUBMITTED THEIR WITNESS

18   STATEMENT ON ALL ISSUES.

19         **JUDGE REINHARDT:**  ARE YOU TALKING ABOUT THE NEXT TWO

20   WITNESSES?

21         **MR. BIEN:**  YES.  AND THERE'S ONLY -- THERE'S ONLY --

22   AND THERE'S TWO PERCIPIENT WITNESSES FROM DEFENDANTS.  THEN,

23   THERE ARE TWO EXPERT WITNESSES.  FOR EXAMPLE, THE EXPERT

24   PSYCHIATRIC WITNESS HAS SEVERAL REPORTS THAT ARE, QUOTE, PHASE

25   ONE, THEN HE'S, QUOTE, ONE REPORT THAT'S PHASE TWO.  WHY WOULD

1  HE GO TWICE?  WHY DON'T WE JUST DO IT IN ONE SESSION?

2              **JUDGE HENDERSON:**  I DON'T HAVE ANY PROBLEM WITH

3  THAT.  I THINK IT'S --

4              **JUDGE REINHARDT:**  YOU'RE TALKING -- DOES THE DEFENSE

5  HAVE ANY PROBLEM WITH THAT?

6              **MR. MELLO:**  I DON'T BELIEVE SO.  BUT I BELIEVE IT

7  DOES OPEN MANY QUESTIONS WITH RESPECT TO -- I'M SORRY.  PAUL

8  MELLO FOR DEFENDANTS.  FIRST OF ALL, TAKING YOUR HONORS'

9  STATEMENTS EARLIER ABOUT PHASE ONE, PHASE TWO, PHASE ONE-A, I

10 DON'T BELIEVE WE WERE GOING TO HAVE MR. KERNAN TESTIFY IN PHASE

11 ONE, OR MAYBE IT'S NOW OLD PHASE ONE.  AND COUNSEL, MR. FAMA,

12 AND I SPOKE ABOUT THAT.  SO THAT'S ONE ISSUE.  SO WE WOULD

13 ACTUALLY HAVE LESS WITNESSES IF WE WERE STILL IN A PHASE ONE

14 TRIAL, WHICH I'M NOT SURE IF WE ARE OR ARE NOT.

15              SECONDLY, I THINK IT OPENS UP ISSUES WITH RESPECT TO

16 DEPOSITION EXCERPTS AND COUNTERDESIGNATIONS AND OBJECTIONS,

17 BECAUSE I BELIEVE OBJECTIONS WERE TONED THE DOWN IN LIGHT OF

18 THE BIFURCATED TRIAL.  IT ALSO RAISES ISSUES WITH RESPECT TO

19 OBJECTIONS WITH RESPECT TO TRIAL AFFIDAVITS AND EXPERTS'

20 REPORTS, BECAUSE I BELIEVE THOSE WERE DONE WITH PHASE ONE

21 ISSUES.  I DON'T MEAN TO MAKE IT DIFFICULT.

22              **JUDGE KARLTON:**  WE HAVE GREAT CONFIDENCE IN COUNSEL.

23 YOU HAVE BEEN DIRECTED TO MEET WITH PLAINTIFFS TO STOP ALL

24 THIS -- I WAS ABOUT TO USE A VERY BAD WORD, WHICH I DON'T MEAN.

25 BUT TO, IN A SPIRIT OF COOPERATION AND EFFORT TO GET THIS TRIAL

1  DONE WITHIN ALL OF OUR LIFETIMES, THAT YOU ARE GOING TO MEET

2  WITH COUNSEL AND DEAL WITH WHETHER OR NOT YOU REALLY MEAN THOSE

3  OBJECTIONS, AND IF YOU DON'T, GIVE US A NEW DESIGNATION OF

4  OBJECTIONS WHICH HAVE MERIT.

5          **MR. MELLO:**  UNDERSTOOD.  AND I BELIEVE THAT WAS WITH

6  RESPECT TO EXHIBITS.  I DON'T BELIEVE IT ADDRESSED TRIAL

7  AFFIDAVITS AND EXPERTS' REPORTS.

8          **JUDGE KARLTON:**  YOU ARE RIGHT.  THAT WAS RESERVED

9  OUT.

10          **MR. MELLO:**  AND I BELIEVE OBJECTIONS WERE DONE WITH

11  AN EYE ON A BIFURCATED PROCEEDING.

12          **JUDGE KARLTON:**  HANG ON.

13          (PAUSE IN PROCEEDINGS.)

14          **JUDGE HENDERSON:**  OKAY.  WITH RESPECT TO THE POINT

15  MR. BIEN RAISED, THE COURT HAS DECIDED THAT THE WITNESSES WHO

16  WILL TESTIFY NEXT TUESDAY, AND PERHAPS WEDNESDAY, QUESTION THEM

17  FOR ALL PURPOSES, FOR ALL -- MAKE UP A PHASE FIVE, AND GET IT

18  ALL OUT OF THE WAY AT THAT ONE TIME.  AS TO THE OBJECTIONS, WE

19  WILL TAKE WHAT YOU GIVE US.  WE HOPE YOU'LL OPERATE IN GOOD

20  FAITH AFTER YOU MEET AND CONFER, AND WE'LL TAKE IT UNDER

21  ADVISEMENT AND ACT APPROPRIATELY.

22          **JUDGE KARLTON:**  I SUPPOSE TO THE EXTENT THAT YOU DID

23  NOT FILE OBJECTIONS TO EXCERPTS OF DEPOSITIONS AND

24  DECLARATIONS, YOU KNOW, BE PREPARED TO DO THAT NEXT TIME WE

25  MEET BUT, FOR EXAMPLE, WE EXPECT YOU TO BE SERIOUS.  I WILL

1    TELL YOU THAT AT LEAST SOME OF THE OBJECTIONS BY BOTH SIDES

2    AMAZED ME.  SERIOUS LAWYERS SHOULDN'T BE DOING THINGS LIKE

3    THAT.  IT JUST WASTES EVERYBODY'S TIME, BUT IF YOU FEEL

4    COMPELLED TO DO IT, WE'LL DO THE BEST WE CAN.

5            **JUDGE HENDERSON:**  OKAY.  COURT IS ADJOURNED.

6            **MR. HENDERSON:**  EXCUSE ME, YOUR HONOR.  JIM

7    HENDERSON FOR PLAINTIFF INTERVENORS.  ONE OTHER HOUSEKEEPING

8    ITEM.

9            THIS MORNING THE DEFENSE ATTORNEY MOVED INTO

10   EVIDENCE DIRECT TESTIMONY AFFIDAVITS OF THEIR WITNESSES.  I

11   WANTED TO GET A CLARIFICATION ON THAT.

12           **JUDGE KARLTON:**  ALL THE THINGS THAT HAVE BEEN FILED

13   AS DIRECT TESTIMONY ARE IN, SUBJECT TO THE OBJECTIONS THAT THE

14   PARTIES HAVE LODGED.

15           **MR. HENDERSON:**  THANK YOU, YOUR HONOR.

16           **JUDGE KARLTON:**  THEY WERE JUST BEING SUPER CAUTIOUS.

17           **MR. HENDERSON:**  I WAS BEING THAT, TOO, ALSO, YOUR

18   HONOR.

19           **JUDGE KARLTON:**  I UNDERSTAND.

20           **MR. MELLO:**  THE LAST ISSUE WAS WE'RE SUPPOSED TO GO

21   ON THE 2ND AND THE 3RD, AND OUR WITNESS ORDER IS CHANGING A

22   LITTLE BIT.  WE STILL HAVE THE TWO EXPERTS BY VIDEO.

23           **JUDGE KARLTON:**  OKAY.

24           **MR. MELLO:**  I'M BEING HONEST WITH YOU.  I'M NOT SURE

25   WE'LL USE A FULL DAY THE 2ND AND THE 3RD BECAUSE OF THE CHANGED

1   CIRCUMSTANCES.  I DON'T WANT TO SURPRISE YOU FOLKS ON THE 2ND

2   OR 3RD.

3              **JUDGE KARLTON:**  IF YOUR PEOPLE ARE SICK AND YOU

4   CAN'T MEET, WE'LL DO WHATEVER YOU THINK IS APPROPRIATE TO DO.

5              **MR. SPECTER:**  IF THEY CAN'T -- DONALD SPECTER.  IF

6   THEY CAN'T USE ALL OF THE 2ND OR 3RD, WE'LL SEE IF SOME OF OUR

7   WITNESSES ARE AVAILABLE AT THAT TIME.  IF YOU WOULDN'T MIND,

8   WE'LL JUST START PHASE TWO EARLIER.

9              **JUDGE HENDERSON:**  THAT'S FINE.

10             **JUDGE KARLTON:**  GOOD.

11             **MR. HENDERSON:**  ONE LAST POINT, YOUR HONOR.  JIM

12  HENDERSON.  WE SUBMITTED SIX DECLARATIONS OF IMMINENTLY

13  REASONABLE LENGTH.  WE SUBMITTED THEM IN HARD COPY.  THERE WERE

14  NO EXHIBITS.  I WOULD LIKE TO FIND OUT WOULD THE COURT

15  APPRECIATE -- WE DID NOT SUBMIT THEM ON CD'S.  DO YOU WANT US

16  TO SUBMIT THEM ON CD'S?

17             **JUDGE KARLTON:**  I THINK.  SO WE ARE GOING TO HAVE

18  TO, I'M SORRY TO SAY, IT WILL BE REALLY CONVENIENT FOR ALL OF

19  US.

20             **MR. HENDERSON:**  NOT A PROBLEM.  WE WILL DO THAT.

21             **JUDGE HENDERSON:**  PLEASE DO.  THANK YOU.

22             COUNSEL, ONE FURTHER HOUSEKEEPING MATTER, TO REMIND

23  YOU THAT WE'LL BE WANTING ARGUMENT AFTER PHASE ONE, AFTER THE

24  DEFENSE PUTS ON THE REST OF ITS WITNESSES.

25             **JUDGE REINHARDT:**  BEFORE YOU START YOUR SECOND PART

 1  OF THE CASE.

 2          **MR. SPECTER:**  WELL, ACTUALLY, THAT WAS WHAT I JUST

 3  WAS TRYING -- TO SUGGEST THE COURT, AND YOU SEEMED HAPPY WITH

 4  IT, WAS THAT IF THEY DON'T USE THE REST OF THEIR TIME ON PHASE

 5  ONE, LIKE ON TUESDAY AFTERNOON, AND WE CAN FIT A WITNESS IN ON

 6  PHASE TWO, IS THAT STILL OKAY?

 7          **JUDGE KARLTON:**  YES.  OF COURSE, IT'S A QUESTION OF

 8  WHEN WE FINALLY FINISH, GOD KNOWS WHEN, PHASE ONE, WE WANT TO

 9  HEAR FROM -- I THINK WE STILL DO, DON'T WE?

10          **JUDGE REINHARDT:**  YES.  FROM BOTH SIDES.

11          **JUDGE KARLTON:**  WE'D LIKE TO HEAR FROM, I GUESS IT'S

12  ALL SIDES, AT LEAST, YOU KNOW, SOME ARGUMENT ABOUT WHERE WE ARE

13  AS TO PHASE ONE.

14          **MR. SPECTER:**  AND WE LOOK FORWARD TO THAT.

15          **JUDGE REINHARDT:**  IF WE DECIDE THAT YOU HAVEN'T

16  ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE WHAT THE PRIMARY

17  CAUSE OF THE CONSTITUTIONAL VIOLATION IS, THEN YOU WON'T HAVE

18  TO WORRY ABOUT THE WITNESSES FOR PHASE TWO.

19          **MR. SPECTER:**  YES, YOUR HONOR.

20          **JUDGE KARLTON:**  EVEN THOUGH YOU PUT A COUPLE IN

21  ALREADY, IT'S ALL RIGHT.

22          **MR. SPECTER:**  YOU JUST SHOULD KNOW THE END OF PHASE

23  ONE MAY STRETCH A LITTLE BIT BECAUSE THE VIDEOTAPE OF SOME OF

24  THE DOCTORS.  YOU KNOW, HE'S SICK, IT MIGHT NOT GO UNTIL AFTER

25  THE --

1            **JUDGE HENDERSON:** YES.

2            **JUDGE KARLTON:** I WOULD LIKE SAY, I WOULD LIKE TO BE

3    ON THE SUPREME COURT AND LOOK AT THIS RECORD AND WONDER, WHAT

4    IS THE MATTER WITH THOSE JUDGES AND THOSE LAWYERS THAT THEY ARE

5    SPENDING ALL THIS TIME ON HOW TO TAKE THE NEXT STEP?

6            **JUDGE REINHARDT:** I'D LIKE TO SEE YOU ON THE SUPREME

7    COURT, ALSO.

8            **MR. SPECTER:** ME, TOO.

9            **JUDGE HENDERSON:** OKAY.  OKAY.  COURT IS ADJOURNED.

10   HAVE A NICE THANKSGIVING.

11            (PROCEEDINGS ADJOURNED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**PLAINTIFF'S WITNESSES**                                    **PAGE**   **VOL.**


**DEBBRA ROWLETT**

DIRECT EXAMINATION BY MR. HENDERSON                          657     4
DIRECT EXAMINATION BY MR. BIEN                               680     4
CROSS-EXAMINATION BY MR. MITCHELL                            682     4
REDIRECT EXAMINATION BY MR. HENDERSON                        689     4


**RUBEN LEIJA**

DIRECT EXAMINATION BY MR. HENDERSON                          690     4
DIRECT EXAMINATION BY MR. BIEN                               707     4
CROSS-EXAMINATION BY MR. LEWIS                               714     4
REDIRECT EXAMINATION BY MR. HENDERSON                        718     4
DIRECT EXAMINATION BY MR. SPECTER                            722     4


**TODD JERUE**

DIRECT EXAMINATION BY MR. LEWIS                              725     4
CROSS-EXAMINATION BY MS. MORRIS                              742     4
REDIRECT EXAMINATION BY MR. LEWIS                            752     4


**CYNTHIA RADAVSKY**

DIRECT EXAMINATION BY MS. TILLMAN                            756     4
CROSS-EXAMINATION BY MR. GALVAN                              768     4
CROSS-EXAMINATION BY MR. HENDERSON                           806     4
REDIRECT EXAMINATION BY MS. TILLMAN                          806     4
RECROSS-EXAMINATION BY MR. GALVAN                            815     4
FURTHER REDIRECT EXAMINATION BY MS. TILLMAN                  822     4


**PLAINTIFFS' EXHIBITS**              **IDEN**   **VOL.**   **EVID**   **VOL.**

590                                                          820     4

**DEFENDANTS' EXHIBITS**              **IDEN**   **VOL.**   **EVID**   **VOL.**

1006                                                        756     4

## CERTIFICATE OF REPORTER

I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK JPM P, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY ME, CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR

FRIDAY, NOVEMBER 21, 2008