VOL 5

PAGES 833 – 1067

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, ET AL.,          )
                                )
          PLAINTIFFS,           )
                                )
  VS.                           ) NO. CIV S-90-0520 LKK JFM P
                                )
ARNOLD SCHWARZENEGGER, ET AL.   )
                                ) THREE-JUDGE COURT
          DEFENDANTS.           )
                                )
_____

MARCIANO PLATA, ET AL.,         )
                                )
          PLAINTIFFS,           )
                                )
VS.                             ) NO. C 01-1351 TEH
                                )
ARNOLD SCHWARZENEGGER, ET AL.   )
                                )
          DEFENDANTS.           )
_____)

## **TRANSCRIPT OF PROCEEDINGS**

SAN FRANCISCO, CALIFORNIA
TUESDAY, DECEMBER 2, 2008

(APPEARANCES ON FOLLOWING PAGES)


***REPORTED BY:***   JOAN MARIE COLUMBINI, CSR 5435, RPR
              KATHERINE WYATT, CSR 9866, RMR
              OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                           1917 FIFTH STREET
                           BERKELEY, CALIFORNIA  94710
                           **SARA NORMAN, ESQUIRE**
                           **ALISON HARDY, ESQUIRE**
                           **DONALD SPECTER, ESQUIRE**


                           ROSEN, BIEN & GALVAN, LLP
                           315 MONTGOMERY STREET, TENTH FLOOR
                           SAN FRANCISCO, CALIFORNIA 94104
                       BY: **MICHAEL W. BIEN, ESQUIRE**
                           **JANE KAHN, ESQUIRE**

                           K&L GATES
                           FOUR EMBARCADERO CENTER
                           SUITE 1200
                           SAN FRANCISCO, CALIFORNIA 94111
                       BY: **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**               CARROLL, BURDICK & MCDONOUGH
                           44 MONTGOMERY STREET, SUITE 400
                           SAN FRANCISCO, CALIFORNIA  94104
                       BY: **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**          STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           1300 I STREET, SUITE 125
                           P.O. BOX 944255
                           SACRAMENTO, CALIFORNIA  94244
                       BY: **LISA A. TILLMAN, ESQUIRE**

                           STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           455 GOLDEN GATE AVENUE, SUITE 11000
                           SAN FRANCISCO, CALIFORNIA  94102
                       BY: **KYLE A. LEWIS, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **FOR DEFENDANTS** | HANSON BRIDGETT<br>425 MARKET STREET, 26TH FLOOR<br>SAN FRANCISCO, CALIFORNIA  94105 |
| BY: | **PAUL MELLO, ESQUIRE** |

| | |
|---|---|
| **FOR DISTRICT ATTORNEY**<br>**INTERVENORS** | THE DISTRICT ATTORNEY'S OFFICE<br>COUNTY OF RIVERSIDE<br>82-675 HIGHWAY 111, FOURTH FLOOR<br>INDIO, CALIFORNIA  92201 |
| BY: | **WILLIAM E. MITCHELL, ESQUIRE** |

| | |
|---|---|
| **FOR LEGISLATOR**<br>**INTERVENORS** | AKIN, GUMP, STRAUSS, HAUER & FELD, LLP<br>580 CALIFORNIA STREET, 15TH FLOOR<br>SAN FRANCISCO, CALIFORNIA  94104 |
| BY: | **TERESA WANG, ESQUIRE** |

| | |
|---|---|
| **FOR LAW ENFORCEMENT**<br>**INTERVENORS** | JONES & MAYER<br>3777 NORTH HARBOR BOULEVARD<br>FULLERTON, CALIFORNIA  92835 |
| BY: | **KIMBERLY HALL BARLOW, ESQUIRE** |

| | |
|---|---|
| **FOR COUNTY INTERVENORS** | OFFICE OF THE COUNTY COUNSEL<br>COUNTY OF SANTA CLARA<br>70 WEST HEDDING STREET<br>NINTH FLOOR, EAST WING<br>SAN JOSE, CALIFORNIA  95110 |
| BY: | **THERESA FUENTES, ESQUIRE** |

| | |
|---|---|
| **FOR SONOMA COUNTY**<br>**INTERVENORS** | COUNTY OF SONOMA<br>575 ADMINISTRATION DRIVE, ROOM 105A<br>SANTA ROSA, CALIFORNIA  95403 |
| BY: | **CAROL LYNNE WOODWARD, ESQUIRE** |

```
 1   DECEMBER 2, 2008                          9:15 O'CLOCK A.M.

 2

 3                    P R O C E E D I N G S

 4           JUDGE HENDERSON:  OKAY. GOOD MORNING.  ARE WE READY

 5   TO PROCEED?

 6           MR. BIEN:  YES, YOUR HONOR.

 7           MS. TILLMAN:  YES, YOUR HONOR.

 8           JUDGE HENDERSON:  YOU MAY PROCEED.

 9           MS. TILLMAN:  GOOD MORNING, YOUR HONORS.  WE CALL

10   ROBIN DEZEMBER.

11           (THEREUPON, THE WITNESS WAS SWORN.)

12           THE WITNESS:  YES.

13           THE CLERK:  PLEASE HAVE A SEAT.

14           STATE YOUR FULL NAME FOR THE RECORD.

15           JUDGE HENDERSON:  OKAY. BEFORE WE BEGIN, I WANT TO

16   MAKE SOMETHING CLEAR ON THE RECORD -- AND PROCEED AS YOU

17   PLANNED, COUNSEL -- BUT I'VE READ MR. DEZEMBER'S DECLARATION,

18   AND IT WILL NOT BE RECEIVED TO THE EXTENT THAT IT SEEMED TO SAY

19   THAT THE STATE IS IN COMPLIANCE. WE'VE RULED ON THAT, AND IT

20   WILL NOT BE RECEIVED FOR THAT PURPOSE.

21           MS. TILLMAN:  THANK YOU FOR INFORMING ME OF THAT,

22   YOUR HONORS.  I APOLOGIZE TO THE COURT.  I MUST HAVE LEFT MY

23   CELL PHONE ON.

24           MAY I JUST STEP AWAY AND TURN THAT THING OFF?

25           JUDGE HENDERSON:  CERTAINLY.
```

1          **MS. TILLMAN:**  THANK YOU.

2          IN REGARDS TO MR. DEZEMBER'S AFFIDAVIT, MAY I SPEAK

3    VERY QUICKLY TO THE COURT'S COMMENTS?

4          **JUDGE HENDERSON:**  YES.

5          **MS. TILLMAN:**  THAT DECLARATION WAS SUBMITTED TO

6    INFORM THE COURT OF EXACTLY THE IMPACT OF OVERCROWDING ON THE

7    MENTAL HEALTH SERVICES DELIVERY SYSTEM AND WHETHER OR NOT THE

8    PRIMARY CAUSE OF ANY DEFICIENCIES WAS, INDEED, OVERCROWDING.

9          AND SO WE WANTED TO ILLUMINATE FOR THE COURT WHERE

10   WE WERE IN THE PAST AS THE POPULATION EXISTED THEN AND WHERE WE

11   ARE TODAY AS THE POPULATION EXISTS TODAY.  SO IT'S PROFFERED

12   WITH THAT CONCEPT IN MIND.

13         **JUDGE KARLTON:**  MS. TILLMAN, WE'VE SAID -- AND

14   EVERYBODY KNOWS IT, I HOPE -- THAT ALL OF THE OBJECTIONS WILL

15   BE RESERVED TO THE END.  AND WE'RE RECEIVING EVERYTHING PENDING

16   THOSE DECISIONS.  BUT IT IS IMPORTANT BECAUSE CERTAINLY I READ,

17   AND PERHAPS UNFAIRLY, THE DEZEMBER DIRECT TESTIMONY -- AND

18   CERTAINLY THE PLAINTIFFS READ IT THAT WAY, AS WELL -- AS GOING

19   TO THE QUESTION OF WHETHER OR NOT THERE'S A CONTINUING

20   CONSTITUTIONAL VIOLATION.

21         AND IT IS ONLY IN THAT CONTEXT THAT WE HAVE

22   INDICATED THAT THE DIRECT TESTIMONY WILL NOT BE RECEIVED FOR

23   THAT PURPOSE. TO THE EXTENT THAT IT ILLUMINATES QUESTIONS THAT

24   ARE PROPERLY BEFORE THE COURT, OF COURSE IT WILL BE.

25         **MS. TILLMAN:**  THANK YOU, YOUR HONOR.

1          IF THERE'S NOTHING FURTHER, MAY I PROCEED WITH THE

2   EXAMINATION?

3          **JUDGE HENDERSON:**  YOU MAY.

4          **MS. TILLMAN:**  THANK YOU.

5          I'D LIKE TO APPROACH THE WITNESS AND PROVIDE HIM

6   WITH A COPY OF THAT TRIAL AFFIDAVIT.  WE'VE MARKED IT AS TRIAL

7   EXHIBIT 1007.

8          **JUDGE HENDERSON:**  YOU MAY DO SO.

9          **THEREUPON --**

10                    **ROBIN DEZEMBER**

11  WAS CALLED AS A WITNESS ON BEHALF OF THE DEFENDANTS, AND AFTER

12  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

13  FOLLOWS:

14                    **DIRECT EXAMINATION**

15  **BY MS. TILLMAN:**

16  **Q.**  GOOD MORNING, MR. DEZEMBER.

17  **A.**  GOOD MORNING.

18  **Q.**  WOULD YOU PLEASE INFORM THE COURT OF YOUR PRESENT

19  EMPLOYMENT IN TERMS OF ITS JOB TITLE AND JOB RESPONSIBILITIES?

20  **A.**  YES.  AND MY NAME IS ROBIN DEZEMBER, R-O-B-I-N,

21  D-E-Z-E-M-B-E-R.

22          MY PRESENT TITLE IS CHIEF DEPUTY SECRETARY

23  CORRECTIONAL HEALTHCARE SERVICES DIVISION OF THE DEPARTMENT OF

24  CORRECTIONS AND REHABILITATION.

25  **Q.**  IS IT CORRECT THAT YOU SERVED PREVIOUSLY AS AN

1  UNDERSECRETARY OF THE YOUTH AND ADULT CORRECTIONAL AGENCY FROM

2  1982 TO 1986?

3  **A.**  YES, THAT'S CORRECT.

4  **Q.**  AND DURING THAT TIME HOW MANY PRISONS WERE BUILT?

5  **A.**  YES, SOME WERE BUILT.  WE BEGAN A PROGRAM THAT BUILT A LOT

6  OF PRISONS EVEN THEREAFTER.

7  **Q.**  AND TO THE EXTENT THAT PRISONS WERE BUILT DURING YOUR

8  TENURE AS UNDERSECRETARY OF THE YOUTH AND ADULT CORRECTIONAL

9  AGENCY, DID STAFF PAY ATTENTION TO CREATING SPACES TO HOUSE

10 SEPARATELY, TO SEPARATE HOUSE AND TREAT THE MENTALLY ILL

11 INMATES?

12 **A.**  AT THAT TIME, NO.

13 **Q.**  AS WE SIT HERE TODAY HAVE THERE BEEN CHANGES IN HOW THE

14 MENTALLY ILL INMATES ARE HOUSED AND TREATED?

15 **A.**  WELL, OVER THE YEARS SINCE THIS CASE BEGAN, WHICH I THINK

16 WAS 1995 WHEN THE ORDER CAME OUT, THERE HAVE BEEN A LOT OF

17 CHANGES NOT ONLY IN PROCESS AND PROCEDURES, BUT IN RETROFITTING

18 THE INTERIOR SPACES OF THE PRISONS TO ACCOMMODATE THE NECESSARY

19 ELEMENTS OF MENTAL HEALTH TREATMENT FOR THE POPULATION.  THAT

20 HAS GONE ON FOR YEARS AS THE POPULATION GREW.

21 **Q.**  AND HAS THE COLEMAN SPECIAL MASTER HAD A ROLE IN THOSE

22 CHANGES TO THE PRISONS TO ENABLE SPACE TO BE PROVIDED TO THE

23 MENTALLY ILL INMATES FOR TREATMENT AND HOUSING PURPOSES?

24 **A.**  YES, HE'S ALWAYS HAD A ROLE.

25 **Q.**  AND HOW WOULD YOU DESCRIBE THAT ROLE?

1  **A.**  WELL, IN THE BEGINNING IT WAS MORE OF A MONITORING ROLE.

2  IT BECAME MUCH MORE OF A COLLABORATION THEREAFTER. FOR MOST OF

3  THE PERIOD OF THE SPECIAL MASTERSHIP TODAY IT'S BEEN A

4  COLLABORATIVE PROCESS.

5  **Q.**  AND WHEN YOU TALK ABOUT COLLABORATION, WHAT EXACTLY DOES

6  THAT MEAN?

7  **A.**  WELL, WE PROPOSE PLANS, THE SPECIAL MASTER REVIEWS THEM.

8  HIS MONITORS REVIEW THE OPERATION OF THE MENTAL HEALTH PROGRAM

9  IN THE PRISONS THEMSELVES. THEY PROVIDE US WITH INFORMATION.

10  THEY PROVIDE REPORTS TO THE COURT, WHICH WE TAKE VERY

11  SERIOUSLY.

12         AND TO THAT DEGREE I BELIEVE WE'VE HAD WHAT YOU

13  MIGHT CALL AN EFFECTIVE PARTNERSHIP UNDER DIFFICULT CONDITIONS.

14  **Q.**  LOOKING AT EXHIBIT 1247, WHICH WE WILL PUT ON THE SCREEN

15  FOR YOU, AND YOU CAN SEE IT ON YOUR MONITOR, AS WELL, IS THAT

16  AN EXHIBIT THAT YOU'RE FAMILIAR WITH?

17  **A.**  YES.

18  **Q.**  AND HOW WOULD YOU DESCRIBE THAT EXHIBIT?

19  **A.**  IT'S A MAP OF CALIFORNIA INDICATING WHERE THE STATE PRISONS

20  ARE LOCATED, AND IN THOSE PRISONS WHICH MENTAL HEALTH PROGRAMS

21  THEY HAVE.

22  **Q.**  DO EACH OF THE PRISONS STATEWIDE HAVE A MENTAL HEALTH

23  PROGRAM?

24  **A.**  THEY DO TO VARYING DEGREES.

25  **Q.**  SOME MIGHT OFFER A FULL RANGE OF MENTAL HEALTH SERVICES,

1  OTHERS MAY NOT?

2  **A.**  YES.  THE DESERT PRISONS THEY ARE THERE TO IDENTIFY NEED,

3  TREAT FOR SHORT-TERM, IF NECESSARY, BUT TRANSFER AN INMATE TO A

4  PLACE WHERE THEY CAN GET THE SERVICES THEY REQUIRE.  AND THEN,

5  SOME OF THE PRISONS HAVE A FAIRLY EXTENSIVE MENTAL HEALTH

6  PROGRAM.

7  **Q.**  WHERE THE MAP INDICATES INPATIENT BEDS, LIKE INTERMEDIATE

8  CARE AND ACUTE CARE ENHANCED OUTPATIENT PROGRAM BEDS, ARE THOSE

9  MENTAL HEALTHCARE BEDS IN HOUSING UNITS SEPARATE AND APART FROM

10  GENERAL POPULATION BEDS, HOUSING GENERAL POPULATION UNITS?

11  **A.**  YES.  THE HIGHER LEVELS OF CARE ARE ANYTHING WE WOULD CALL

12  ENHANCED OUTPATIENT AND ABOVE.

13  **Q.**  NOW, WHEN YOU MENTIONED THAT MANY OF THE PRESENT HOUSING

14  SPACES AND CLINICAL TREATMENT AREAS PROVIDED FOR THE TREATMENT

15  OF MENTALLY ILL INMATES WERE FROM RETROFITTED INTERIOR SPACES,

16  DOES THAT MEAN THAT CELLS THAT MIGHT HAVE BEEN USED PREVIOUSLY

17  BY THE GENERAL POPULATION MAY HAVE BEEN SOMEHOW RETROFITTED?

18  **A.**  YES.

19  **Q.**  ARE CLINICIANS' OFFICES SOMETIMES PLACED INSIDE RETROFITTED

20  CELLS?

21          **MR. BIEN:**  OBJECTION, LEADING.

22          **MS. TILLMAN:**  PARDON ME?

23          **JUDGE HENDERSON:**  OVERRULED.

24          **THE WITNESS:**  TREATMENT SPACES AND CLINICAL OFFICE

25  SPACES, AS WE LUMP TOGETHER TREATMENT AND OFFICE SPACE, THOSE

1   ARE ALWAYS PROVIDED IN -- SUBJECT TO THE CONDITIONS AVAILABLE.

2            WE HAVE IN SOME CASES CONSTRUCTED NEW FACILITIES. IN

3   MANY OF THE RETROFITTED FACILITIES, THE CLINICAL SPACES ARE

4   ACQUIRED WHERE THEY CAN BE ACQUIRED, AND PEOPLE OPERATE OUT OF

5   THOSE.

6   **BY MS. TILLMAN:**

7   **Q.**  IS IT YOUR UNDERSTANDING THAT ADEQUATE CARE CAN BE RENDERED

8   IN THESE KIND OF MAKE-DO ARRANGEMENTS?

9   **A.**  IN MY OPINION, YES.

10           **JUDGE KARLTON:**  THE OBJECTION THAT IT'S BEYOND THE

11  SCOPE OF HIS EXPERTISE IS WELL-TAKEN.  I KNOW THAT'S JUST WHAT

12  YOU WERE GOING TO SAY, MR. BIEN.

13  **BY MS. TILLMAN:**

14  **Q.**  HAVE YOU EVER RECEIVED ANY REPORT FROM THE SPECIAL MASTER

15  IN THE COLEMAN CASE INDICATING THAT THIS RETROFITTED SPACE FOR

16  EITHER OFFICES FOR THE CLINICIANS OR FOR HOUSING THE MENTALLY

17  ILL INMATES WAS SOMEHOW NOT APPROPRIATE FOR THE PURPOSES?

18  **A.**  YES.

19  **Q.**  AND IN TERMS OF THE COLEMAN SPECIAL MASTER, HAS THE COLEMAN

20  SPECIAL MASTER EVER INDICATED THAT ANY LICENSURE STANDARDS

21  WOULD BE WAIVED SO THAT CLINICAL SPACE AND HOUSING SPACE COULD

22  BE PROVIDED TO THE MENTALLY ILL?

23  **A.**  THAT HAS OCCURRED IN ONE INSTANCE THAT I'M AWARE OF.

24  **Q.**  AND WHERE WAS THAT?

25  **A.**  THAT WAS AT CALIFORNIA MEN'S COLONY IN WHAT IS CALLED THE

1  LOCKED OBSERVATION UNIT.  IT'S ALMOST A EUPHEMISM.  IT'S A

2  HOUSING UNIT FOR TREATING MENTALLY ILL PATIENTS.

3  **Q.**  AND HAS THE COLEMAN SPECIAL MASTER ALLOWED CARE TO PROCEED

4  IN THAT FACILITY NOTWITHSTANDING THE LICENSURE ISSUES?

5  **A.**  YES.

6  **Q.**  HAS THE COLEMAN COURT ORDERED THE DEFENDANTS TO CREATE MORE

7  MENTAL HEALTH BEDS?

8  **A.**  YES.

9  **Q.**  AND LOOKING AT EXHIBIT 1044, ARE YOU FAMILIAR WITH THAT

10 MAY, 2006 ORDER TO CREATE ADDITIONAL BEDS?

11 **A.**  YES, I AM.

12 **Q.**  AND HAVE THE DEFENDANTS RESPONDED WITH A PLAN TO CREATE

13 ADDITIONAL BEDS?

14 **A.**  YES, WE HAVE. WE SUBMITTED MORE THAN ONE PLAN.

15 **Q.**  AND IN TERMS OF THE PLANS THAT HAVE BEEN SUBMITTED, CAN YOU

16 INFORM THE COURT OF ESSENTIALLY THE PRESENT PLAN TO CREATE MORE

17 BEDS FOR THE MENTALLY ILL?

18 **A.**  THE PRESENT CONTROLLING PLAN WAS REALLY BASED ON A

19 DECEMBER, 2006 -- WHAT WE CALL THE DECEMBER, 2006 PLAN,

20 ALTHOUGH IT WAS UPDATED IN APRIL, I THINK, OF 2007.  AND WHAT

21 IT IS IS AN EFFORT BY THE DEPARTMENT TO CONSOLIDATE HIGHER

22 LEVELS OF CARE FOR MENTAL HEALTH AND TO BUILD SPACES THAT WERE

23 APPROPRIATE FOR THE TREATMENT FOR THE INMATES THAT ARE GOING TO

24 BE TREATED.

25         THAT IS -- IT'S AN EXTENSIVE REVISION OF THE WAY

1   MENTAL HEALTH TREATMENT CAN BE PROVIDED NOW BECAUSE OF THE

2   SPACE IMPROVEMENTS THAT IT CONTAINS. THAT PLAN HAS BEEN

3   APPROVED BY THE COURT.

4   Q.  AND THAT IS THE AUGUST, 2007 PLAN, CORRECT?

5   A.  IT'S AUGUST, 2007.  YES.  I'M SORRY.  I FORGOT THAT MONTH.

6   Q.  AND WAS THERE ALSO A PLAN SUBMITTED IN JULY, 2008 TO CREATE

7   MORE BEDS?

8   A.  WE CREATED A PLAN IN CONJUNCTION WITH THE PLATA

9   RECEIVERSHIP IN RESPONSE TO ONE OF THE COORDINATED COURT ORDERS

10  WHICH GAVE THE RECEIVER LEAD RESPONSE -- PROJECT RESPONSIBILITY

11  ON CONSTRUCTING HEALTHCARE FACILITIES, INCLUDING MEDICAL AND

12  MENTAL HEALTH.

13          SO WE JOINED IN THAT EFFORT AND HAVE BEEN WORKING

14  FOR PROBABLY THE LAST 16 TO 18 MONTHS ON THAT WITH THE RECEIVER

15  SO THAT IT TRANSFORMS THE AUGUST, 2007 BED PLAN INTO ONE THAT

16  WOULD BE CONSISTENT WITH THE FACILITIES THAT THE RECEIVER HAD

17  PLANNED TO BUILD.  AND THAT'S -- I CONSIDER THAT A VERY

18  EFFECTIVE, COOPERATIVE PLANNING EFFORT THAT THE RECEIVER'S

19  STAFF AND MY STAFF HAVE ENGAGED IN TO PRODUCE THAT.

20          THAT HAS NOT TO MY KNOWLEDGE BEEN SUBMITTED TO THE

21  COURT, ALTHOUGH IT HAS BEEN SUBMITTED TO THE SPECIAL MASTER.

22  Q.  WITH THESE BED PLANS IS THE AIM TO PROVIDE CARE TO THE

23  MENTALLY ILL INMATES AT SEPARATE CONSOLIDATED CENTERS WHERE

24  THEY NEED INPATIENT CARE?

25  A.  IN THE FIRST PLAN THAT IS THE CONCEPT TO THE DEGREE

1  FEASIBLE.  AND IT DOES RECOMMEND CLOSING DOWN SOME OF OUR

2  EXISTING FACILITIES.

3            IN THE PLAN WITH THE RECEIVER, IT TAKES ANOTHER STEP

4  IN THAT DIRECTION AND PRETTY MUCH CONSOLIDATES MOST OF THE

5  HIGHER LEVEL OF CARE -- I DON'T KNOW THE EXACT NUMBERS -- BUT

6  MOST OF THE HIGHER LEVELS OF CARE IN THOSE NEW FACILITIES THAT

7  WERE CONCEIVED BY THE PLATA RECEIVERSHIP.

8  Q.  WOULD THERE BE ALSO BEDS FOR THE -- NOT ONLY THE PATIENTS

9  WHO NEED HOSPITAL SETTING CARE, LIKE ACUTE INPATIENT OR

10 INTERMEDIATE INPATIENT, BUT WOULD THERE ALSO BE NEW BEDS

11 CREATED FOR THE PATIENTS IN THE ENHANCED OUTPATIENT PROGRAM?

12 A.  YES.

13 Q.  AND WOULD THAT PROVIDE ANY RELIEF FOR THE PRESENT NUMBER OF

14 PATIENTS RECEIVING ENHANCED OUTPATIENT CARE AT THE RECEPTION

15 CENTERS?

16 A.  YES, IT WOULD.

17 Q.  WOULD IT BE CORRECT TO SAY THAT THE DEPARTMENT OF

18 CORRECTIONS HAS ESSENTIALLY MADE DUE WITH THE SPACE AVAILABLE

19 IN THE PRESENT PRISON SETTINGS TO PROVIDE MENTAL HEALTHCARE TO

20 THE MENTAL HEALTH POPULATION?

21 A.  TO THE LARGEST DEGREE, THAT'S CORRECT.  IN MORE RECENT

22 TIMES THERE HAS BEEN NEW CONSTRUCTION.

23 Q.  AND EVEN WITH THAT SPACE AND WITH THE PRESENT POPULATION OF

24 CDCR, HAS CDCR BEEN ABLE TO IMPLEMENT THE REVISED PROGRAM GUIDE

25 STANDARDS SYSTEM-WIDE?

1  **A.**  I'M SORRY.  I DIDN'T CATCH THAT ENTIRELY.

2  **Q.**  EVEN WITH THE PRESENT SPACE ISSUES CONFRONTING THE

3  DEPARTMENT OF CORRECTIONS AND THE PRESENT POPULATION OF THE

4  DEPARTMENT OF CORRECTIONS, HAS THE DEPARTMENT OF CORRECTIONS

5  AND REHABILITATION BEEN ABLE TO IMPLEMENT THE REVISED PROGRAM

6  GUIDE STANDARDS FOR MENTAL HEALTHCARE?

7  **A.**  YES, WE HAVE IMPLEMENTED THEM STATEWIDE.

8  **Q.**  HAVE YOU BEEN ABLE TO INCREASE MENTAL HEALTH CLINICAL

9  STAFFING SYSTEM-WIDE?

10 **A.**  YES.

11 **Q.**  AND LOOKING AT EXHIBIT 1235, HAVE YOU SEEN THAT EXHIBIT

12 BEFORE?

13 **A.**  YES, I HAVE.

14 **Q.**  AND WHAT DOES THAT SHOW?

15 **A.**  THAT'S A BAR GRAPH DEPICTION OF MENTAL HEALTH PROGRAM

16 POSITIONS, THE CLINICAL POSITIONS THAT WE UTILIZE IN THE PRISON

17 SYSTEM.

18 **Q.**  AND COMPARED TO 1994, HOW ARE -- HOW IS STAFFING OF THE

19 PSYCHOLOGISTS TODAY?

20 **A.**  WELL, STAFFING IS VERY MUCH HIGHER TODAY THAN IT WAS IN

21 1994, AS DEMONSTRATED IN THIS CHART.

22 **Q.**  AND LOOKING AT EXHIBIT 1246 --

23         **MR. BIEN:**  YOUR HONOR, WE HAVE A RELEVANCE OBJECTION

24 TO THIS CHART.

25         **JUDGE HENDERSON:**  I'M GOING TO OVERRULE IT, AND LET

1    HIM PROCEED.

2    **BY MS. TILLMAN:**

3    Q.   DOES 1246 ALSO SHOW THE PRESENT STATUS OF THE MENTAL HEALTH

4    PROGRAM'S ABILITY TO PROVIDE STAFFING IN TERMS OF

5    PSYCHIATRISTS?

6    **A.**   YES, THIS IS A CHART OF PSYCHIATRIST POSITIONS IN THE

7    DEPARTMENT.

8    **Q.**   AND CAN YOU INFORM THE COURT OF WHETHER OR NOT THE

9    DEPARTMENT OF CORRECTIONS HAS BEEN SUCCESSFUL IN RECRUITING

10   PSYCHIATRISTS OVER THE PAST FEW MONTHS?

11   **A.**   WE HAVE BEEN INCREASINGLY SUCCESSFUL IN THE LAST EIGHT OR

12   NINE MONTHS.

13   **Q.**   AND LOOKING AT THE NEXT PAGE OF 1246 --

14             **JUDGE KARLTON:**   BEFORE YOU GO ON, I JUST WANT TO BE

15   SURE I UNDERSTAND WHAT I'M LOOKING AT.

16             CAN WE GO BACK?

17             YES, I'M SORRY.

18             THE RED LINES INDICATE WHAT IS NEEDED AND THE BLUE

19   LINES INDICATE THE NUMBERS FILLED; IS THAT RIGHT OR WRONG,

20   MR. DEZEMBER?

21             **THE WITNESS:**   THAT'S CORRECT.

22             **JUDGE KARLTON:**   ALL RIGHT.

23             **THE WITNESS:**   THE PURPLE IS WHAT IS ESTABLISHED.

24   THAT'S WHAT WE HAVE.  THE BLUE SHOWS THOSE POSITIONS.  AS WE

25   HIRE PEOPLE, THEY FILL THOSE.

1          **JUDGE KARLTON:**  OKAY.

2   **BY MS. TILLMAN:**

3   **Q.**  AND MOVING TO THE NEXT PAGE OF 1246, WE HAVE A BAR GRAPH

4   SHOWING THE STATUS OF FILLED AND AVAILABLE POSITIONS FOR

5   PSYCHOLOGISTS.  HAVE THERE ALSO BEEN INCREASED, NOT ONLY

6   AVAILABLE POSITIONS, BUT FILLED POSITIONS FOR PSYCHOLOGISTS

7   WITHIN CDCR?

8   **A.**  YES, BOTH HAVE BEEN INCREASED.

9   **Q.**  YOU MENTIONED EARLIER THAT THERE HAVE BEEN SOME ADDITIONAL

10  TREATMENT SPACES CREATED WITH THE HELP OF FACILITIES MANAGEMENT

11  OF THE DEPARTMENT OF CORRECTIONS.  DOES THAT INCLUDE THE 50-BED

12  MENTAL HEALTH CRISIS BED UNITS AT CALIFORNIA MEDICAL FACILITY

13  AT VACAVILLE?

14  **A.**  YES, IT DOES.

15  **Q.**  CAN YOU RECALL ANY OTHER NEW ACTIVATIONS OF MENTAL HEALTH

16  TREATMENT FOR OFFICE SPACE OR HOUSING SPACE?

17  **A.**  WELL, SOME YEARS AGO WE OPENED 64-BED INTERMEDIATE CARE

18  FACILITY AT SALINAS VALLEY STATE PRISON.  AND SOMETIME THIS

19  MONTH WE'RE EXPECTING TO OPEN ANOTHER 64-BED INTERMEDIATE CARE

20  FACILITY AT SALINAS VALLEY.

21          WE HAVE PLANS UNDERWAY THROUGH THE STATE'S CAPITAL

22  OUTLAY PROCESS TO BUILD 64 INTERMEDIATE CARE FACILITY BEDS AT

23  THE CALIFORNIA MEDICAL FACILITY, AND ALSO A 50-BED MENTAL

24  HEALTH CRISIS FACILITY AT THE CALIFORNIA MEN'S COLONY.

25  **Q.**  HAVE YOU ANY OPINION ON WHETHER OR NOT THE PRIMARY CAUSE OF

1  THE CONSTITUTIONAL DEFICIENCIES IN THE MENTAL HEALTHCARE SYSTEM

2  OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION IS

3  OVERCROWDING?

4  **A.**  I DO HAVE AN OPINION ON THAT.

5  **Q.**  AND WHAT IS YOUR OPINION?

6  **A.**  WELL, I DON'T THINK IT'S OVERCROWDING AS A PRIMARY CAUSE.

7  **Q.**  HAVE YOU --

8  **A.**  WOULD YOU LIKE ME TO EXPLAIN?

9  **Q.**  YES, PLEASE.

10 **A.**  OKAY. IT'S CONNECTED TO POTENTIAL RESOLUTION OF THE ISSUE,

11 BECAUSE I AM OF THE BELIEF THAT THE FACILITIES WE'RE TRYING TO

12 CREATE IN THE NEW PLAN ARE GOING TO BE ADDRESSING THOSE HIGHER

13 LEVELS OF CARE IN THE MENTAL HEALTH POPULATION.  AND ALTHOUGH I

14 HAVE NOT DONE SPECIFIC RESEARCH ON THIS, MY SENSE OF THE

15 DEMOGRAPHICS OF THE MENTAL HEALTH POPULATION AT LARGE IS THAT A

16 RELEASE ORDER OR A CAPPING OF THE POPULATION WOULD HAVE LITTLE

17 EFFECT ON THOSE HIGHER LEVELS OF CARE.

18         AND SO WE WOULD STILL NEED TO HAVE THOSE FACILITIES

19 CONSTRUCTED. AND IF THOSE FACILITIES ARE CONSTRUCTED, WE

20 BELIEVE WE CAN PROVIDE THE CARE IN THOSE FACILITIES THAT IS

21 REQUIRED.

22         SO A REDUCTION OF POPULATION WILL IMPACT OUR GENERAL

23 POPULATION MENTAL HEALTH POPULATION, WHAT'S CALLED THE CLINICAL

24 CASE MANAGEMENT POPULATION, TO A MUCH LARGER DEGREE THAN ANY OF

25 THE OTHER SEGMENTS.

1          AS I SAID, I DON'T HAVE A BREAKDOWN OF ALL THAT

2    DATA, BUT THESE ARE CONVERSATIONS THAT I'VE HAD IN THE PAST

3    WITH FORMER SPECIAL MASTER MICHAEL KEATING, WHO CONCURRED IN

4    THAT ASSESSMENT.

5          **MR. BIEN:**  OBJECTION, HEARSAY.

6          **JUDGE HENDERSON:**  SUSTAINED.

7    **BY MS. TILLMAN:**

8    **Q.**  IN REGARDS TO --

9          **JUDGE KARLTON:**  UNLESS IT WAS PUT INTO A REPORT. I

10   KNOW OF NO REPORT FROM SPECIAL MASTER KEATING THAT DEALT WITH

11   OVERCROWDING.  I MAY BE WRONG.

12          DO YOU THINK THERE IS SUCH A REPORT THAT I CAN TAKE

13   JUDICIAL NOTICE OF?

14          **MS. TILLMAN:**  I BELIEVE YOU CAN TAKE JUDICIAL NOTICE

15   OF THE SPECIAL MASTER'S REPORT OF MAY 31, 2007, YOUR HONOR, IN

16   WHICH THERE WAS AN DISCUSSION --

17          **JUDGE KARLTON:**  THAT ONE I READ, AND I DON'T

18   AGREE -- WELL, IT SAYS WHAT IT SAYS.

19   **BY MS. TILLMAN:**

20   **Q.**  HAS THE COLEMAN COURT EVER DIRECTED THE DEPARTMENT OF

21   CORRECTIONS AND REHABILITATION TO REDUCE ANY PORTION OF ITS

22   MENTAL HEALTH POPULATION?

23   **A.**  OF THE MENTAL HEALTH POPULATION?  NO.  NO, OUR ROLE IS NOT

24   TO CURTAIL THE POPULATION THAT WE'RE REQUIRED TO TREAT. I MEAN,

25   THOSE OF YOU WHO HAVE BEEN HERE A LONG TIME WILL RECALL THAT

1  WHEN THIS PROGRAM BEGAN WE HAD AN ESTIMATE OF ROUGHLY 7 PERCENT

2  OF THE PRISONER POPULATION WOULD BE CATEGORIZED REQUIRING

3  TREATMENT FOR SEVERE MENTAL ILLNESS.  AND TODAY IT IS AT

4  20 PERCENT.

5        THE PROGRAM IS INTENTIONALLY DESIGNED AS AN

6  INCLUSIVE PROGRAM.  IT IS NOT AN EXCLUSIVE PROGRAM.  THERE ARE

7  MECHANISMS TO ALLOW TREATMENT WHEN IT IS DETERMINED BY A

8  CLINICIAN TO BE REQUIRED. AND THERE CAN BE REFERRALS FROM ANY

9  OF THE STAFF IN ANY INSTITUTION.

10 Q.  WOULD IT BE CORRECT TO SAY TO APPROPRIATELY -- YOUR PLAN IS

11 TO CREATE MORE BEDS AND ENABLE MORE STAFFING?

12 A.  WELL, I THINK OVER THE YEARS WE HAVE ADDRESSED AND ARE

13 CONTINUING TO ADDRESS THE STAFFING ISSUE, WHICH IS HUGE. WE

14 HAVE POLICIES AND PROCEDURES IN PLACE NOW THAT ARE, I BELIEVE,

15 EFFECTIVE AND COMPREHENSIVE, AND THEY HAVE THE CONCURRENCE OF

16 THE COURT.

17        WE HAVE NOW A CENTRAL OFFICE ORGANIZATION THAT IS

18 EVOLVING THAT, ONCE AGAIN -- FOR THE SECOND TIME, I SHOULD

19 SAY -- IT'S EVOLVING A MONITORING FUNCTION OF ITS OWN SO THAT

20 WE CAN BEGIN TO INFORM OURSELVES OF THE CONDITIONS OF THE

21 DELIVERY OF HEALTHCARE IN THE FIELD.

22        AND UTILIZATION, WE HAVE AN UTILIZATION MANAGEMENT

23 FUNCTION THAT IS BEGINNING TO EVOLVE, AS WELL.  SO ONCE WE GET

24 THOSE IN PLACE WE'RE GOING TO HAVE A PRETTY GOOD SYSTEM.  BUT

25 WE DON'T HAVE THE FACILITIES WE REQUIRE. SO I THINK THAT'S THE

```
 1  LAST BIG PIECE.

 2          AND IF WE COULD CONTINUE THE MOMENTUM THAT WE HAVE

 3  NOW AND HAVE THE FACILITIES TO OPERATE IN, THEN I THINK WE

 4  WOULD HAVE A SOUND SYSTEM.

 5  Q.  THANK YOU.

 6          MS. TILLMAN:  NOTHING FURTHER.

 7          JUDGE KARLTON:  IS THERE ANYBODY ELSE?

 8          MS. WANG:  NO FURTHER QUESTIONS, YOUR HONOR.

 9                      CROSS-EXAMINATION

10  BY MR. BIEN:

11  Q.  GOOD MORNING, MR. DEZEMBER.

12  A.  GOOD MORNING.

13  Q.  YOU JUST EXPLAINED TO THE COURT WHAT YOU EXPLAINED TO MY

14  ASSOCIATE IN YOUR DEPOSITION, THAT YOU DON'T BELIEVE THAT

15  OVERCROWDING IS THE PRIMARY CAUSE OF THE ONGOING CONSTITUTIONAL

16  VIOLATIONS IN MEDICAL AND MENTAL HEALTHCARE; IS THAT CORRECT?

17  A.  IN MENTAL HEALTHCARE.

18  Q.  YOU'RE NOT EXPRESSING ANY OPINION ABOUT MEDICAL CARE?

19  A.  I'M NOT.

20  Q.  IN YOUR WITNESS STATEMENT IN PARAGRAPH ONE, YOU REFERRED TO

21  THE ALLEGED OVERCROWDING OF THE CDCR POPULATION.  DO YOU AGREE

22  WITH THE GOVERNOR, WHO HAS DECLARED A STATE OF EMERGENCY BASED

23  ON OVERCROWDING, THAT THE CDCR PRISONS AS THEY CURRENTLY EXIST

24  ARE EXTREMELY OVERCROWDED?

25  A.  YES.  I DON'T KNOW ABOUT THE ALLEGED, IF IT'S THERE, I'M
```

1  NOT SURE. BUT I DON'T KNOW ANYONE WHO DENIES THAT OUR PRISONS

2  ARE OVERCROWDED, AND CERTAINLY NOT ME.

3  **Q.**    SO IF YOU PUT THAT IN A STATEMENT IT SHOULD BE REMOVED,

4  PARAGRAPH ONE?  YOU AGREE IT'S OVERCROWDED, RIGHT?

5  **A.**  I WOULD HAVE TO LOOK AT PARAGRAPH ONE.  IS IT IN HERE?

6  **Q.**  IT IS.

7  **A.**  WOULD YOU LIKE ME TO GO THERE?  ALL I'M SAYING IS MY

8  TESTIMONY IS THAT I CONCUR THAT THE PRISON SYSTEM IS

9  OVERCROWDED.

10  **Q.**  AND YOU AGREE WITH THE GOVERNOR'S PROCLAMATION THAT

11  THERE'S AN EXTREME LEVEL OF OVERCROWDING THAT JUSTIFIES A

12  DECLARATION OF A STATE OF EMERGENCY DUE TO OVERCROWDING.

13  **A.**  WELL, I DON'T ASSESS STATES OF EMERGENCY. BUT I CAN'T STATE

14  MORE CLEARLY MY BELIEF THAT WE ARE TERRIBLY OVERCROWDED IN OUR

15  PRISON SYSTEM.

16  **Q.**  IN PARAGRAPH 7 OF YOUR DECLARATION OF YOUR WITNESS

17  STATEMENT, YOU SAY THAT YOU UNDERSTAND THAT THIS THREE-JUDGE

18  COURT IS CONVENED TO ADDRESS THE ISSUE OF CDCR'S OVERCROWDING

19  AND ITS IMPACT, IF ANY, ON THE DELIVERY OF MENTAL HEALTH

20  SERVICES TO CDCR INMATES.

21          DO YOU AGREE, MR. DEZEMBER, THAT OVERCROWDING IS

22  HAVING AN IMPACT ON THE DELIVERY OF MENTAL HEALTH SERVICES TO

23  CDCR'S MENTALLY ILL POPULATION TODAY?

24  **A.**  IT HAS TO HAVE AN IMPACT.  WHAT I'M SAYING IS I DON'T THINK

25  IT'S A PRIMARY CAUSE OF THE DIFFICULTY IN DELIVERING SERVICE.

1  Q.  SO YOU AGREE THAT OVERCROWDING DOES IMPACT THE DELIVERY OF

2  MENTAL HEALTH SERVICES ON CDCR'S INMATES POPULATION TODAY?

3  A.  IN SOME CASES, YES.

4  Q.  IN WHAT CASES?

5  A.  WELL, IN AN OVERCROWDED SYSTEM YOU MAY HAVE MORE DIFFICULTY

6  WITH TRANSPORTATION FROM ONE LOCATION TO ANOTHER. WE DON'T HAVE

7  A -- YOU KNOW, I CAN'T THINK OF VERY MANY OTHERS. BUT I WOULD

8  SIMPLY SAY AS A REASONABLE HUMAN BEING IF YOU FILLED THIS

9  COURTROOM WITH 500 PEOPLE, WE WOULD ALL BE A LOT MORE

10 UNCOMFORTABLE.  AND IT MAY BE EVEN WORSE THAN THAT.

11            SO I'M NOT OFFERING AN EXPERT VIEW HERE.  I'M

12 OFFERING MY VIEW AS A GOVERNMENT OFFICIAL FOR ALL THESE YEARS.

13 Q.  AND IS IT YOUR VIEW -- I JUST WANT TO MAKE IT CLEAR WHAT

14 YOUR VIEW IS.

15            IS IT YOUR VIEW AS A GOVERNMENT OFFICIAL THAT

16 OVERCROWDING DOES NOT HAVE AN IMPACT TODAY ON THE MENTALLY ILL?

17            **MS. TILLMAN:**  OBJECTION, ASKED AND ANSWERED.

18            **THE WITNESS:**  I'M NOT SAYING --

19            **JUDGE HENDERSON:**  I'LL ALLOW IT.

20            PROCEED.

21            **JUDGE KARLTON:**  YOU MAY ANSWER, SIR.

22            **THE WITNESS:**  I'M NOT SAYING IT DOESN'T HAVE AN

23 IMPACT.  I'M SAYING IT'S NOT THE PRIMARY CAUSE OF THE PROBLEMS.

24 AND I ALSO CONNECT THAT TO THE LOGIC OF A POTENTIAL SOLUTION,

25 BECAUSE IN MY VIEW IF YOU LOOK AT OVERCROWDING AND YOU SAY:

1              "WELL, HOW DO WE SOLVE OVERCROWDING?"

2          WELL, ONE WAY IS TO CUT THE AMOUNT OF PEOPLE IN THE

3          PRISON SYSTEM.  AND IF YOU DO THAT, IS THAT GOING TO

4          HAVE AN AMELIORATIVE EFFECT ON OUR ABILITY TO

5  DELIVER

6          HEALTHCARE, MENTAL HEALTHCARE TO THE INMATE

7          POPULATION?"

8          AND TO THE DEGREE WE LOOK AT THE HIGHER LEVELS OF

9  CARE WHERE WE HAVE FOCUSSED MOST OF THE ATTENTION OF THIS CASE

10 OVER THE YEARS, I DON'T THINK IT HAS AN APPRECIABLE EFFECT ON

11 THAT.

12         WE'RE STILL GOING TO NEED TO PROVIDE CARE TO A LARGE

13 NUMBER OF THOSE IN THE CASELOAD POPULATION OF EOP ENHANCED

14 OUTPATIENT CARE AND ABOVE.

15         IF AN ORDER OF THIS COURT, FOR EXAMPLE, WERE CRAFTED

16 TO SAY THOSE PEOPLE ARE RELEASED, WELL, THEN, OBVIOUSLY IT

17 WOULD HAVE A SIGNIFICANT IMPACT ON OUR DEMAND FOR SERVICES.

18         BUT I DON'T THINK THAT'S THE KIND OF ORDER THAT IS

19 RESPONSIBLE IN A SITUATION LIKE THIS.

20 **BY MR. BIEN:**

21 **Q.**  CAN YOU SEPARATE -- ARE YOU UNABLE TO SEPARATE WHETHER OR

22 NOT OVERCROWDING IS THE PRIMARILY CAUSE FROM YOUR CONCERN ABOUT

23 THE TYPE OF ORDER THE COURT SHOULD ISSUE?

24         IN OTHER WORDS, FOCUSING SIMPLY ON THE QUESTION:  IS

25 OVERCROWDING HARMING MENTALLY ILL PRISONERS OF ALL TYPES IN

1   TODAYS PRISON SYSTEM, YOU AGREE THAT THAT'S THE CASE?

2   **A.**  OVERCROWDING HAS NEGATIVE EFFECTS ON EVERYBODY IN THE

3   PRISON SYSTEM:  INMATES AND STAFF, MENTALLY ILL NOT MENTALLY

4   ILL, MEDICAL, ALL OF THEM.  THOSE I COULD CERTAINLY SAY YES,

5   THAT'S CORRECT. THAT HAS A NEGATIVE IMPACT.

6            I THINK THERE'S A GREAT DISTINCTION BETWEEN WHETHER

7   IT HAS A NEGATIVE IMPACT AND WHETHER IT IS THE PRIMARY ELEMENT

8   OF THE PROBLEM.

9   **Q.**  YOU'VE TESTIFIED THAT OVERCROWDING IS NOT THE PRIMARY

10  CAUSE, AND IT'S YOUR CONTENTION, ISN'T IT, THAT THE CAUSE IS

11  POOR PLANNING AND FORECASTING BY THE STATE OF CALIFORNIA FOR

12  THE NEEDS OF THE MENTALLY ILL POPULATION; IS THAT CORRECT?

13  THAT'S ONE OF THE CAUSES THAT YOU BELIEVE?

14  **A.**  I CAN ELUCIDATE THOSE, IF YOU LIKE. I HAVE INDICATED BEFORE

15  THAT I THINK THERE HAS BEEN A PERIOD OF TIME WHEN THERE HAS

16  BEEN POOR MANAGEMENT OF THE MENTAL HEALTH SYSTEM IN CALIFORNIA

17  PRISONS, AND THAT THAT HAS LED TO A SITUATION THAT WE'RE FACED

18  WITH TODAY.

19  **Q.**  SO, IN OTHER WORDS, CALIFORNIA AUTHORITIES, WHOEVER THEY

20  MAY BE, DID NOT DO A GOOD JOB OF PLANNING SUFFICIENT RESOURCES

21  TO ADDRESS THE CURRENT NEEDS FOR MENTAL HEALTHCARE AND

22  TREATMENT SPACE FOR THE CURRENT POPULATION.

23  **A.**  GOOD PLANNING -- GOOD MANAGEMENT WOULD HAVE INVOLVED GOOD

24  PLANNING, WHICH WOULD HAVE PRODUCED ON A MORE GRADUAL BASIS THE

25  BED PLANS THAT WE HAVE TODAY. AS THE DEMAND WAS RECOGNIZED AS

1  OVER A, WHAT, RESPONSIBLE FIVE-YEAR PLANNING PERIOD. AS FAR AS

2  I CAN TELL IN RECENT TIMES THAT WAS ONLY INITIATED IN ABOUT

3  2006.

4          SO FOR SOME PERIOD OF TIME THERE WAS A LACK OF

5  ATTENTION TO SOLVING THE PROBLEM OF TREATING THE HIGHER LEVELS

6  OF MENTALLY ILL.

7  **Q.**  WELL, WHEN THE PRISONS WERE BUILT -- AND YOU PERSONALLY

8  WERE INVOLVED IN THE EFFORT OF THIS MASSIVE PRISON CONSTRUCTION

9  IN CALIFORNIA IN THE '80'S; ISN'T THAT CORRECT?

10  **A.**  THAT'S CORRECT.

11  **Q.**  YOU WERE FIRST PART OF THE ADMINISTRATION THAT AUTHORIZED

12  THE BUILDING, RIGHT?

13  **A.**  YES.

14  **Q.**  OKAY.  AND THEN, YOU MOVED OVER TO KITCHELL, THE COMPANY

15  FOR SEVEN YEARS THAT WAS IN CHARGE, WAS THE GENERAL CONTRACTOR

16  THAT ACTUALLY BUILT THOSE PRISONS.

17  **A.**  WELL, KITCHELL WASN'T A GENERAL CONTRACTOR.  IT WAS A

18  MANAGEMENT -- CAPITAL EXPENDITURE MANAGEMENT COMPANY THAT I WAS

19  ASSOCIATED WITH FOR SEVEN YEARS.

20  **Q.**  AND DURING THAT TIME ISN'T THAT WHAT THEY WERE -- ONE OF

21  THE THINGS YOU DID WITH KITCHELL WAS TO HELP THEM WORK ON THE

22  PROJECT OF BUILDING THIS MASSIVE CALIFORNIA PRISON

23  CONSTRUCTION.

24  **A.**  BY THE TIME I WAS THERE, THE PRISON CONSTRUCTION PROGRAM

25  WAS PRETTY WELL UNDERWAY.  AND KITCHELL DOES A LOT OF DIFFERENT

1  KINDS OF WORK. SO, I WAS IN CHARGE OF THE OFFICE, AND WE WERE

2  RESPONSIBLE FOR SCHOOL CONSTRUCTION, OTHER PUBLIC BUILDING

3  CONSTRUCTION.  AND CERTAINLY KITCHELL WAS A PROGRAM MANAGER OF

4  THE DEPARTMENT OF CORRECTIONS IN THE PRISON BUSINESS.

5  **Q.**  AND YOU HAD SOME RESPONSIBILITY FOR THAT, TOO?

6  **A.**  YES, OF COURSE.

7  **Q.**  AND THOSE ARE THE PRISONS THAT WERE BUILT WITHOUT ADEQUATE

8  MEDICAL TREATMENT SPACE AND MENTAL HEALTH TREATMENT SPACE; IS

9  THAT CORRECT?

10  **A.**  WE HAD -- THEY HAD TREATMENT SPACE.  THEY HAD ADEQUATE

11  TREATMENT SPACE.  THERE WAS NO FORECAST AT THAT TIME OF THIS

12  DEMAND WE'RE DEALING WITH TODAY.

13  **Q.**   SO IT'S CORRECT THAT THEY WERE BUILT FOR TREATMENT SPACE

14  FOR MEDICAL CARE BASED ON DESIGN CAPACITY OF A HUNDRED PERCENT

15  AND NOT BASED ON THE CURRENT USE OF THOSE PRISONS AT CLOSE TO

16  200 PERCENT?

17  **A.**  WELL, THEY WERE DESIGNED -- LET ME PUT IT THIS WAY:  THEY

18  WERE DESIGNED SPECIFICALLY FOR PRISON POPULATION.  IT WAS A

19  LEGISLATIVE DECLARATION THAT REQUIRED THEM TO BE OVERCROWDED

20  INDIVIDUALLY, AS INDIVIDUAL PRISONS WERE AUTHORIZED BY THE

21  LEGISLATURE.

22        WHAT WE ATTEMPTED WAS TO DESIGN PRISONS WITH A

23  DESIGN CAPACITY. WE HAD NOT STARTED OUT SAYING:

24             "WE WANT TO PUT 200 PERCENT POPULATION IN

25  HERE."

 1          THAT EVOLVED OVER TIME AND LARGELY CAME OUT OF

 2   LEGISLATIVE ENACTMENTS.

 3   Q.  BE THAT AS IT MAY, TODAY WE HAVE CLOSE TO 200 PERCENT

 4   CAPACITY IN PRISONS THAT WERE DESIGNED FOR A POPULATION OF A

 5   HUNDRED PERCENT.

 6   A.  THAT'S CORRECT.

 7   Q.  AND AS A RESULT, YOU AGREE THAT THERE IS A SHORTAGE OF

 8   TREATMENT AND OFFICE SPACE FOR MEDICAL AND MENTAL HEALTH

 9   CLINICIANS WHO NEED TO DO THEIR WORK TO PROVIDE CARE TO THE

10   PRISONERS IN THE PRISON TODAY?

11   A.  WELL, THERE IS A SHORTAGE OF WHAT YOU MIGHT CALL

12   "APPROPRIATE SPACE" FOR THEM. WE CERTAINLY HAVE THEM. WE

13   HAVE -- IT HAS NOT PREVENTED US FROM INCREASING THE RANKS OF

14   OUR TREATING CLINICIANS.  THEY ARE OPERATING IN CONDITIONS THAT

15   I WOULD PREFER BE IMPROVED.  AND DEFINITELY WE WOULD PLAN TO DO

16   THAT AS PART OF THIS BUILDING PROGRAM THAT WE HAVE.

17   Q.  AS OF TODAY, MR. DEZEMBER, YOU AGREE THAT IT'S

18   INAPPROPRIATE TO PLACE CLINICIANS IN CONVERTED TOILETS AS THEIR

19   OFFICES.

20   A.  I'VE AGREED TO THAT ALREADY IN MY DEPOSITION --

21   Q.  OKAY.

22   A.  -- MORE THAN ONCE.

23   Q.  OKAY.  WE SHOWED YOU PICTURES, AND THE COURT HAS SEEN THESE

24   PICTURES.

25          YOU AGREE THAT IS INAPPROPRIATE OFFICE SPACE.

1   **A.**  YES.

2   **Q.**  AND YOU AGREE IT'S ALSO INAPPROPRIATE TO BE PROVIDING

3   MENTAL HEALTHCARE TO PRISONERS IN NONCONFIDENTIAL SPACES.

4   **A.**  YES.

5   **Q.**  YET THAT IS WHAT IS GOING ON TODAY IN MANY OF YOUR PRISONS;

6   IS THAT CORRECT?

7   **A.**  THAT'S EXACTLY RIGHT. IT'S PART AND PARCEL OF DELIVERING A

8   MAJOR MENTAL HEALTH PROGRAM, PROBABLY THE LARGEST MENTAL HEALTH

9   PROGRAM IN A SINGLE LOCATION IN THE WORLD, AND DELIVERING THAT

10  INSIDE A PRISON SYSTEM.

11  **Q.**  AND YOU HAVE SAID THAT ONE REASON -- OVERCROWDING IS NOT

12  THE CAUSE.  THE OTHER CAUSE IS THAT THERE'S BEEN INSUFFICIENT

13  MANAGEMENT RECOGNITION OF THE GROWING PROBLEM, THE INCREASING

14  PREVALENCE RATE OF MENTALLY ILL.

15          IS THAT ONE OF YOUR ALTERNATIVE EXPLANATIONS FOR THE

16  PROBLEMS WE HAVE TODAY?

17  **A.**  WELL, IT'S CERTAINLY -- IN THIS SITUATION THERE ARE

18  CUMULATIVE CAUSES, AND THAT'S ONE OF THEM.

19          AND WHEN I TALK ABOUT MANAGEMENT, NOW, I DON'T TALK

20  ABOUT LOCAL MANAGEMENT.  YOU HAVE TO HAVE THAT.  YOU HAVE TO

21  HAVE LOCAL MANAGEMENT IN THE PRISONS.  YOU HAVE TO HAVE A

22  CENTRAL OFFICE HEADQUARTERS MANAGEMENT STRUCTURE.  THERE WERE

23  DEFICIENCIES THERE.

24          BUT WE ALSO -- THE RESOURCES NEED TO COME FROM WHERE

25  THE RESOURCES ARE GENERATED, AND THAT'S THE LEGISLATURE. SO

1   THAT ALL HAS TO BE IN A CONCERTED EFFORT TO PRODUCE THE FINAL

2   RESULT.  AND I HAVE SAID THAT FOR SOME PERIOD OF TIME I DIDN'T

3   SEE THAT HAPPENING.

4   **Q.**  OKAY. SO FOR A PERIOD OF TIME THE PEOPLE IN CHARGE OF THE

5   PRISON SYSTEM IN YOUR ROLE -- YOU WERE THERE FOR AWHILE, AND

6   OTHER PEOPLE DIDN'T CORRECTLY FORECAST THE MENTAL HEALTH

7   POPULATION -- THE PREVALENCE OF MENTAL ILLNESS --

8   **A.**  WELL --

9   **Q.**  -- ACUTELY; IS THAT CORRECT?

10  **A.**  OVER WHAT PERIOD OF TIME?  I MEAN --

11  **Q.**  THERE ARE TIMES --

12  **A.**  -- YOU'VE GIVEN ME MY ANSWER, AND ASKING ME IF IT'S "YES."

13  SO IF YOU WANT ME TO ANSWER, I'LL BE HAPPY TO DO THAT.

14  **Q.**  WELL, AT THE BEGINNING -- AT THE BEGINNING WHEN YOU WENT TO

15  TRIAL -- AND I WAS THERE -- YOU GUYS HAD CONSULTANTS THAT WERE

16  TELLING YOU WHAT YOU NEEDED TO DO.  AND THE COURT FOUND THAT

17  YOU HAD IGNORED THOSE CONSULTANTS, AND YOU WERE DELIBERATELY

18  INDIFFERENT.

19          SO AT THAT POINT THE CONSULTANTS DIDN'T HAVE A LOT

20  OF IMPACT; ISN'T THAT CORRECT?

21  **A.**  WELL, I WASN'T THERE AT THE BEGINNING.

22  **Q.**  SO YOU DON'T KNOW?

23          **MS. TILLMAN:**  OBJECTION, LACK OF FOUNDATION.

24          **THE WITNESS:**   IN ABOUT 1993 WE BEGAN TO CREATE THE

25  MENTAL HEALTH SYSTEM THAT WE HAVE NOW FROM PRETTY MUCH NOTHING.

1   WE HAD MENTAL HEALTH FOCUSSED IN THREE INSTITUTIONS ONLY. AND

2   WE DID FOLLOW CONSULTANT ADVICE IN SETTING UP THE DISBURSED

3   MENTAL HEALTH SYSTEM THAT WAS THE RESULT OF OUR -- WHAT WE

4   CALLED OUR MENTAL HEALTH SERVICE DELIVERY SYSTEM --

5   **BY MR. BIEN:**

6   **Q.**  BUT DESPITE --

7   **A.**  -- PUT IN IT EVERY PRISON.

8   **Q.**  DESPITE LISTENING TO THOSE CONSULTANTS THEN, SOMETHING

9   HAPPENED BETWEEN, RIGHT?  BETWEEN 1995 AND TODAY, YOU LOST

10  TRACK OF FORECASTING FOR THE GROWING POPULATION; IS THAT

11  CORRECT?

12  **A.**  I'M LOOKING AT A PERIOD OF TIME MAYBE FOR EIGHT OR NINE

13  YEARS PRIOR TO 2006, MAYBE SEVEN OR EIGHT YEARS WHERE THERE

14  SEEMED TO BE A LACK OF CONTINUOUS ATTENTION TO THIS PROGRAM.

15  **Q.**  AND THAT WAS THE TIME WHEN YOU WERE NOT THERE.

16  **A.**  AND I WAS NOT THERE AS A RESPONSIBLE OFFICIAL, BUT I WAS

17  CALLED BACK FROM TIME TO TIME AS A CONSULTANT MYSELF.

18  **Q.**  WHATEVER -- MY POINT IS, YOU KNOW, SOMETHING HAPPENED IN

19  THE PAST THAT'S RESULTED IN TODAY'S PROBLEMS, RIGHT?  RIGHT NOW

20  YOU AGREE THAT WE NEED A MASSIVE CONSTRUCTION PROGRAM OF NEW

21  HIGH-LEVEL INTENSE BEDS TO MEET THE NEEDS OF THE POPULATION; IS

22  THAT CORRECT?

23  **A.**  YES.

24  **Q.**  AND YOU AGREE WE NEED A PROGRAM TO GO PRISON BY PRISON AND

25  BUILD ADEQUATE TREATMENT AND OFFICE SPACE TO PROVIDE CARE FOR

1  THE PRISONERS WHO ARE STILL IN THE PRISONS?

2  **A.**  YES, FOR THOSE PRISONERS WHO ARE STILL THERE WHO ARE

3  MENTALLY ILL PATIENTS.

4  **Q.**  AND THE REASON IS THAT RIGHT NOW TODAY THE DEPARTMENT HAS

5  INSUFFICIENT TREATMENT AND OFFICE SPACE TO PROVIDE FOR THE

6  NEEDS OF THE CURRENT MENTALLY ILL POPULATION?

7  **A.**  I'M NOT SAYING THAT. I'M SAYING THAT --

8          **JUDGE KARLTON:**  LET ME JUST DROP THE WORD

9  "APPROPRIATE" IN THERE, AND I THINK IT ENDS THIS DEBATE.

10         THE DEPARTMENT PRESENTLY DOESN'T HAVE SUFFICIENT

11  APPROPRIATE OFFICE AND TREATMENT SPACE.

12         **THE WITNESS:**  THAT I COULD SAY IS CORRECT.

13  **BY MR. BIEN:**

14  **Q.**  ISN'T IT CORRECT, MR. DEZEMBER, THAT HISTORICAL PERSPECTIVE

15  THAT YOU HAVE GIVEN YOUR TESTIMONY HERE, SOMEONE WHO WAS THERE

16  FOR A LONG TIME, YOU'VE GONE IN AND OUT OF GOVERNMENT, IS

17  REALLY AN EXPLANATION FOR WHY WE'RE IN THE CURRENT STATE OF

18  AFFAIRS WE'RE IN TODAY, BUT NOT AN ALTERNATIVE CAUSE OF THE

19  PROBLEMS?

20         **MS. TILLMAN:**  I'LL OBJECT. VAGUE AND AMBIGUOUS.

21         **JUDGE KARLTON:**  I DIDN'T UNDERSTAND THE QUESTION,

22  EITHER. I AGREE WITH MS. TILLMAN.  I DON'T KNOW WHETHER YOU

23  GUYS DID.

24         **JUDGE HENDERSON:**  I AGREE WITH YOU.

25         **MR. BIEN:**  I'LL TAKE YOUR GUIDANCE AND TRY AGAIN,

 1  YOUR HONOR.

 2  **BY MR. BIEN:**

 3  Q.   MR. DEZEMBER, YOUR EXPLANATION FOR OUR CURRENT SITUATION IS

 4  NOT INCONSISTENT WITH THE FACT THAT TODAY OVERCROWDING IS A

 5  PRIMARY CAUSE OF THE ONGOING CONSTITUTIONAL VIOLATIONS.  IN

 6  OTHER WORDS, AREN'T YOU JUST EXPLAINING HOW WE GOT TO THE MESS

 7  WE'RE IN TODAY, RATHER THAN AN ALTERNATIVE CAUSE OF THE

 8  PROBLEMS?

 9         **MS. TILLMAN:**  SAME OBJECTION.

10         **JUDGE REINHARDT:**  WELL, LET ME ASK A QUESTION. AS I

11  UNDERSTAND YOUR TESTIMONY, THERE AREN'T ADEQUATE FACILITIES FOR

12  THE NUMBER OF PEOPLE WHO ARE THERE; IS THAT RIGHT?

13         **THE WITNESS:**  THERE ARE NOT ADEQUATE FACILITIES FOR

14  THE -- MY TESTIMONY IS THERE ARE NOT ADEQUATE FACILITIES FOR

15  THE HIGHER LEVELS OF CARE, THE ENHANCED OUTPATIENT CARE AND

16  ABOVE, WHICH IS WHAT WE HAVE PROPOSED TO BUILD, THAT'S CORRECT.

17         BUT YOU CAN'T JUST LEAVE IT AT THAT. WHAT I CONCLUDE

18  IS THAT IF THE POPULATION WERE REDUCED WE WOULD STILL HAVE THAT

19  NEED.

20         **JUDGE KARLTON:**  WELL, LET'S DO IT ONE AT A TIME.

21         **THE WITNESS:**  I'M SORRY TO CONNECT IT THAT WAY, BUT

22  THAT'S THE WAY I THINK.

23         **JUDGE REINHARDT:**  WELL, IF THERE WERE -- IF THE

24  POPULATION WERE REDUCED, WOULD THERE NOT BE ADEQUATE FACILITIES

25  FOR THE REDUCED POPULATION?

1      **THE WITNESS:** THERE WOULD NOT.

2      **JUDGE REINHARDT:** WHY IS THAT?

3      **THE WITNESS:** BECAUSE WHAT WE REQUIRE FOR THE HIGHER

4  LEVEL OF CARE IS SPACE THAT IS DESIGNED FOR THE TREATMENT OF

5  MENTAL ILLNESS AMONG PRISONERS. AND WHAT WE'VE BEEN DOING ALL

6  OF THESE YEARS IS RETROFITTING PRISON ENVIRONMENTS FOR THESE

7  PRISONERS.

8      **JUDGE KARLTON:** USING ONE EXAMPLE -- I MEAN, IT IS

9  EXTREME, BUT STILL, YOU GOT ENOUGH FOLKS OUT OF THAT PARTICULAR

10 PRISON. YOU COULD TAKE THE OFFICE SPACE OUT OF THE TOILET AND

11 PUT IT IN MORE -- I'M ASKING, NOT TELLING. I RECOGNIZE I WAS

12 TELLING YOU, AND I DIDN'T MEAN TO.

13      IS IT NOT TRUE THAT YOU COULD MOVE THE OFFICE SPACE

14 OUT OF THE TOILET -- I MEAN, THIS IS SO SERIOUS. NOTHING FUNNY

15 ABOUT IT, BUT IT'S JUST BIZARRE -- AND PROVIDE MORE ADEQUATE,

16 MORE APPROPRIATE TREATMENT SPACE AND OFFICE SPACE. JUST --

17      **THE WITNESS:** THERE ARE CERTAINLY OTHER PLANS THAT

18 WE COULD UNDERTAKE IF -- YOU KNOW, IF WE WANTED TO STILL

19 CONVERT PRISONS INTO MENTAL HEALTH TREATMENT PLACES, WE COULD

20 STILL DO THAT.

21      I DON'T THINK THAT'S THE BEST THING TO DO, BUT I

22 THINK WE COULD STILL DO IT. WE WOULD PROVIDE BETTER OFFICES.

23 WE WOULD STILL BE OPERATING WITHIN A PRISON. THE INMATES WOULD

24 STILL BE IN LOCATIONS THAT WERE DESIGNED TO HOUSE NONMENTALLY

25 ILL PRISONERS.

1         SO IF YOU LOOK AT IT THAT WAY AND SAY:

2           "WELL, WE CAN STOP THE PROJECTION THAT WE'VE

3           BEEN ON FOR THE LAST TWO YEARS WITH THE BED PLAN AND

4           RECONFIGURE OUR PRISON SYSTEM," THAT'S SOMETHING TO

5  BE CONSIDERED, CERTAINLY.

6       **JUDGE KARLTON:**  LET ME ASK YOU ABOUT ALL OF THAT. I

7  DON'T WANT TO INTERFERE WITH MR. BIEN'S EXAMINATION, BUT THE

8  POINT THAT JUDGE REINHARDT WAS MAKING SEEMS TO ME IS OF GREAT

9  SIGNIFICANCE.

10       THE PRESENT GOD-WILLING-AND-THE-RIVER-DON'T-RISE BED

11  PLAN REQUIRES LEGISLATIVE APPROPRIATION. YOU ARE AWARE, OF

12  COURSE, THAT RIGHT NOW THE RECEIVER IS NOT GETTING THE MONEY

13  THAT HE NEEDS TO KEEP GOING.

14       THERE'S NO PRESENT INDICATION -- IS IT NOT CORRECT

15  THAT THERE'S NO PRESENT INDICATION THAT THE LEGISLATURE IS

16  GOING TO PROVIDE THE FUNDS FOR THE 10,000 BEDS, WHICH IS WHAT

17  ULTIMATELY YOU'RE TALKING ABOUT; IS THAT NOT RIGHT?

18       **MS. TILLMAN:**  YOUR HONOR, IF I MIGHT VERY

19  RESPECTFULLY INTERPOSE AN OBJECTION, AS I HAVE IN THE PAST, TO

20  THIS LINE OF QUESTIONING.  I THINK IT CALLS FOR A LEGAL

21  CONCLUSION ON THE PART OF THIS WITNESS AND LACKS RELEVANCE.

22       **JUDGE KARLTON:**  OKAY.  EXCUSE ME.  I'M JUST GOING TO

23  OVERRULE IT.

24       THAT'S TRUE, ISN'T IT, SIR, AS WE SIT HERE TODAY?

25       **THE WITNESS:**  WELL, FROM MY OBSERVATION POINT, NOT

1    BEING AN PART OF THE BIG FIVE CONVERSATIONS OR THE LEGISLATIVE

2    ACTIVITY --

3              **JUDGE KARLTON:**  NOR ARE WE.

4              **THE WITNESS:**  YES.  I DON'T SEE A PRESENT VEHICLE

5    FOR THAT.

6              **JUDGE KARLTON:**  OKAY. ASSUMING THAT THAT MEANS THAT

7    IT IS DIFFICULT TO BELIEVE -- NO, I DON'T MEAN THAT.

8              THAT THERE'S AN ENORMOUS UNCERTAINTY AS TO WHETHER

9    OR NOT THAT WILL BE ACCOMPLISHED EVER.  IF THIS COURT IS

10   CONVINCED THAT SOMETHING HAS TO BE DONE FORTHWITH, PARTICULARLY

11   FORTHWITH, IS THE ALTERNATIVE -- IS THE ONLY ALTERNATIVE

12   PRESENTLY AVAILABLE TO THE COURT -- I'M ASKING YOU BECAUSE

13   YOU'RE AN EXPERT. YOU KNOW THE ANSWERS -- IS THAT THAT WE GOT

14   TO CLEAR PEOPLE OUT SO WE CAN PROVIDE AT LEAST ADEQUATE SPACE?

15             YOU SEE WHAT I'M ASKING YOU?

16             **THE WITNESS:**  I THINK I FOLLOW YOUR REASONING. THE

17   FLY IN THE OINTMENT IS LEGISLATIVE APPROPRIATION FOR THAT,

18   BECAUSE YOU CAN'T SIMPLY SAY:

19                  "WELL, WE'VE EMPTIED OUT THIS SPACE, SO YOU

20   GUYS

21             CAN HAVE THAT."

22             IT'S REALLY A RETROFITTING THERE.

23             **JUDGE KARLTON:**  I UNDERSTAND THAT.  BUT AT LEAST WE

24   COULD STOP -- I'M SOUNDING LIKE I'M TELLING YOU, AND I DON'T

25   MEAN TO BE.

1          **THE WITNESS:**  I UNDERSTAND.

2          **JUDGE KARLTON:**  IT WOULD PROVIDE US WITH AT LEAST

3   SPACE THAT WAS MORE APPROPRIATE, EVEN IF NOT FULLY APPROPRIATE,

4   RIGHT OR WRONG?

5          **THE WITNESS:**  I'M SORRY. I HAVE TO HEDGE MY BET A

6   LITTLE BIT AND SAY THAT THAT IS POSSIBLE.  BUT AS I SAID, IT

7   WOULD REQUIRE -- AND I SAY THIS A LOT IN MY PRESENT WORK

8   ENVIRONMENT -- THIS REQUIRES ADDITIONAL PLANNING.

9          I'VE BEEN ASKED THAT QUESTION INSIDE THE

10  ORGANIZATION:

11               "WHAT ARE THE ALTERNATIVES TO WHAT WE'RE FACED

12          WITH HERE?"

13          WELL, THE ALTERNATIVES CAN BE DEVELOPED, BUT YOU

14  HAVE TO BRING THE RIGHT PEOPLE IN THE ROOM, AND IT'S A VERY

15  CONCENTRATED EFFORT.  I PARTICIPATED IN PART OF THE 2006 BED

16  PLAN EFFORT.  AND THAT TOOK MONTHS. I LEFT MY CONSULTANCY IN

17  JUNE OF '06.  THE PLAN DIDN'T REALLY COME TOGETHER UNTIL

18  DECEMBER, AND WE STARTED IT IN APRIL.

19          SO WHEN YOU'RE GOING TO UNDERTAKE SOMETHING LIKE

20  THAT, THERE IS AN POSSIBILITY, BUT CERTAINLY NO ONE CAN DECLARE

21  THAT YES, THAT WILL FIX IT.

22          THAT'S ALL I CAN SAY.

23          **JUDGE KARLTON:**  BUT YOU SEE IT'S SOMETHING LIKE --

24  WHATEVER IT IS -- 64 BEDS THAT I ORDERED.  I'M THE COLEMAN

25  JUDGE.

1        **THE WITNESS:** YES.

2        **JUDGE KARLTON:** THAT I ORDERED TO BE OPEN, REOPENED

3   DESPITE ITS ABSENCE OF LICENSING. SOMETHING IS BETTER THAN

4   NOTHING, IF YOU'RE DESPERATE. DO YOU SEE WHAT I MEAN?

5        **THE WITNESS:** I UNDERSTAND. I ALSO UNDERSTOOD THAT

6   ORDER WAS BASED ON ASSESSMENT OF THE SPECIAL MASTER THAT THE

7   CARE WAS BEING ACTUALLY PROVIDED.

8        **JUDGE KARLTON:** YES.

9        **THE WITNESS:** NOTWITHSTANDING THE FACILITY COULDN'T

10  BE LICENSED.

11       **JUDGE KARLTON:** RIGHT.

12       **THE WITNESS:** AND, YES, THAT IS AN EXAMPLE.

13       **JUDGE KARLTON:** I'M SORRY. I DIDN'T MEAN TO

14  INTERRUPT, MR. BIEN, BUT MR. DEZEMBER'S OPINIONS ARE IMPORTANT,

15  AT LEAST TO THIS JUDGE. I'M NOT QUITE SURE I UNDERSTAND.

16       YOU TALK ABOUT ALTERNATIVES, AND I THINK THE

17  APPROPRIATE QUESTION IS: IS THERE ANY ALTERNATIVE?

18       GO AHEAD.

19  **BY MR. BIEN:**

20  **Q.** I'M GOING TO JUMP RIGHT THERE, ROBIN -- EXCUSE ME -- MR.

21  DEZEMBER.

22  **A.** YES.

23  **Q.** WE'VE BEEN WORKING TOGETHER FOR MORE THAN 20 YEARS. I

24  APOLOGIZE.

25  **A.** A LONG TIME.

1  Q.  LET'S ASSUME THAT THE POPULATION WAS REDUCED BY 40,000.

2  OKAY?  FOR EXAMPLE, THE GOVERNOR PROPOSED IN HIS BUDGET IN

3  JANUARY OF 2008 REDUCING THE POPULATION BY 22,000. DO YOU

4  RECALL THAT?

5  A.  I DO.

6  Q.  OKAY.  AND THAT WAS A GENERAL REDUCTION THROUGH ADJUSTMENTS

7  AND VARIOUS CREDITS AND SENTENCING AND PAROLE IDEAS, RIGHT?

8  A.  YES.

9  Q.  OKAY. AND IF THE POPULATION WAS GENERALLY REDUCED BY

10  40,000, WITHOUT ANY DISCRIMINATION AGAINST THE MENTALLY ILL, DO

11  YOU AGREE THAT APPROXIMATELY 20 PERCENT OF THAT 40,000 WOULD BE

12  COLEMAN CLASS MEMBERS?

13          MS. TILLMAN:  OBJECTION, INCOMPLETE HYPOTHETICAL.  I

14  THINK ALSO IT'S COUNSEL'S DUTY TO FRAME THE HYPOTHETICAL, NOT

15  THE WITNESS'S.  HE'S ASKING THE WITNESS TO INSERT AN ELEMENT OF

16  THE HYPOTHETICAL.

17          JUDGE KARLTON:  NO.

18  BY MR. BIEN:

19  Q.  YOU'VE RUN THESE NUMBERS, BECAUSE THEY WERE PRESENTED,

20  ROBIN --  EXCUSE ME, AGAIN I APOLOGIZE.

21          MR. DEZEMBER, THEY WERE PRESENTED TO THE LEGISLATURE

22  HOW MANY EOP'S WOULD BE RELEASED, HOW MANY TRIPLE C'S WOULD BE

23  RELEASED.  THAT WAS PRESENTED TO THE LEGISLATURE IN THE SPRING,

24  RIGHT?

25  A.  IT WOULD HAVE A LARGE IMPACT ON THE TRIPLE CMS POPULATION,

1  WHICH I'VE ALREADY STATED.  IT WOULD HAVE LESS IMPACT ON THE

2  EOP, AND VERY LITTLE IMPACT ON ACUTE AND INTERMEDIATE CARE AND

3  THE HIGH CUSTODY CASES INVOLVING THE PSYCHIATRIC SERVICES UNIT,

4  THE ADMINISTRATION SEGREGATION, THE EOP'S AND THE LIKE.

5  **Q.**  LET ME GO BACK.  SO IF YOU RELEASED -- IF 40,000 PEOPLE

6  WERE REDUCED OVER TIME THROUGH JUST ADJUSTMENTS TO VARIOUS

7  CREDITS, OR PAROLE POLICIES, APPROXIMATELY 20 PERCENT OF THAT

8  WOULD BE COLEMAN CLASS MEMBERS.  THAT WOULD BE 8,000 COLEMAN

9  CLASS MEMBERS.

10  **A.**  I'M NOT SURE OF THAT PERCENTAGE OR THE NUMBER. I DO KNOW

11  THAT WHEN YOU LOOK AT OUR -- WHEN YOU LOOK AT THE -- SAY YOU

12  LOOK AT CUSTODY LEVELS, WHICH IS ABOUT -- IT'S KIND OF A GROSS

13  NUMBER, BUT IT'S ABOUT THE ONLY THING WE HAVE READILY AVAILABLE

14  WITHOUT DOING A RESEARCH PROJECT.  YOUR LEVEL ONE AND TWO

15  POPULATIONS ARE LARGELY FOCUSSED IN THE TRIPLE CMS POPULATION,

16  WHICH IS THE GENERAL POPULATION OF THE MENTAL HEALTH CASELOAD.

17  AND BY "LARGELY," I MEAN A GREAT PERCENTAGE.  THERE'S A SMALLER

18  PERCENTAGE IN EOP, AND AS YOU GO UP, STILL SMALLER.

19          OUR CONCERN IN TERMS OF THE STATEMENT I'M MAKING

20  ABOUT REQUIRING SPACE IS NOT WITH REGARD TO TRIPLE CMS, NOT TO

21  DOWNGRADE THEIR IMPORTANCE.  BUT THEY ARE GENERAL POPULATION

22  INMATES, AND WE ARE HERE FOCUSING ON THE CREATION OF FACILITIES

23  IS WITH THAT HIGHER LEVEL.

24          SO I DON'T KNOW HOW AN ORDER WOULD BE -- IF THAT'S

25  ALL THAT WAS GOING TO HAPPEN IS AN ORDER TO RELEASE, I DON'T

1  SEE HOW AN ORDER COULD BE CRAFTED TO EFFECT THESE HIGHER LEVEL

2  CASES IN A RESPONSIBLE WAY.

3  **Q.**  LET ME HELP YOU OUT.

4  **A.**  OKAY.

5  **Q.**  I'M GOING TO ASK YOU A SERIES OF QUESTIONS.  YOU GOT THE

6  40,000.  20 PERCENT OF THEM ARE GOING TO BE COLEMAN CLASS

7  MEMBERS.  OF THE COLEMAN CLASS APPROXIMATELY 13 PERCENT, 10 TO

8  13 PERCENT ARE EOP; IS THAT CORRECT?

9  **A.**  I DON'T KNOW WHERE YOU'RE GETTING YOUR NUMBERS.

10  **Q.**  I CAN SHOW YOU YOUR OWN -- I'LL SHOW YOU LOTS OF THINGS.

11  WHAT DO YOU THINK THAT -- YOU DON'T KNOW?  YOU'RE IN CHARGE OF

12  THIS PROGRAM.  YOU DON'T KNOW WHAT PERCENTAGE OF THE MENTALLY

13  ILL ARE EOP?

14  **A.**  NO, I DON'T HAVE THAT OFF THE TOP OF MY HEAD.

15  **Q.**  YOU DON'T THINK TEN PERCENT?

16  **A.**  I DON'T EVEN KNOW WHAT 40,000 YOU'RE TALKING ABOUT IN THE

17  INMATE POPULATION.

18  **Q.**  ANY 40,000. IN OTHER WORDS, LET'S SAY THE RELEASE -- LET'S

19  SAY THE PLAN WAS TO DIVERT SHORT-TERM PAROLE VIOLATORS GOING TO

20  PRISON, OKAY?  PEOPLE WHO HAVE THREE MONTHS OR LESS WON'T GO TO

21  PRISON.  YOU'VE SEEN THOSE PLANS, MR. DEZEMBER?  THOSE ARE

22  PLANS THAT THE ADMINISTRATION ITSELF HAS STUDIED; ISN'T THAT

23  CORRECT?

24  **A.**  AND HOW DO YOU KNOW I'VE SEEN THEM?

25  **Q.**  HOW DO I KNOW YOU'VE SEEN THEM?  BECAUSE I LOOKED THROUGH

1  YOUR E-MAIL.

2          **MS. TILLMAN:**  OBJECTION. COUNSEL'S TESTIFYING.

3          **JUDGE KARLTON:**  WELL, HE'S RESPONDING TO THE

4  WITNESS, WHICH HE SHOULDN'T HAVE DONE.  BUT THE WITNESS

5  SHOULDN'T HAVE ASKED, EITHER.

6          **THE WITNESS:**  I'M SORRY.

7  **BY MR. BIEN:**

8  **Q.**  OKAY.  I ASSUME, MR. DEZEMBER, THAT YOU AGREE THAT PAROLE

9  VIOLATORS INCLUDE PEOPLE WHO ARE BOTH -- AS THEY COME BACK TO

10 PRISON, INCLUDE PEOPLE THAT ARE BOTH EOP'S AND TRIPLE C'S IN

11 THE MENTAL HEALTH POPULATION?

12 **A.**  YES.

13 **Q.**  OKAY. THERE IS NO POLICY THAT EXCLUDES SOMEONE WHO IS EOP

14 FROM BEING VIOLATED ON PAROLE.

15 **A.**  YES, THAT'S CORRECT.

16 **Q.**  OKAY.  SO LET'S SAY IF THERE'S A PLAN TO STOP SHORT-TERM

17 PAROLE VIOLATORS FROM BEING SENT BACK TO PRISON, THAT WOULD

18 INCLUDE EOP'S AND TRIPLE C'S, ALONG WITH EVERYTHING ELSE,

19 RIGHT?

20 **A.**  IT COULD, YES.

21 **Q.**  AND DR. PACKER -- DO YOU KNOW WHO DR. PACKER IS?

22 **A.**  I'VE HEARD OF HIM. I HAVEN'T MET HIM.

23 **Q.**  HAVE YOU READ HIS REPORTS?

24 **A.**  NO, I HAVEN'T.

25 **Q.**  HE'S THE EXPERT THE STATE HAS HIRED TO REPRESENT THEM IN

1  THIS CASE. HE'S THE MENTAL HEALTH EXPERT.

2          HE'S RECOMMENDED THAT THE STATE DO THAT, THAT THEY

3  DIVERT MENTALLY ILL PAROLE VIOLATORS FROM GOING BACK TO PRISON

4  AS A WAY OF SOLVING SOME OF THE OVERCROWDING PROBLEMS IN THE

5  RECEPTION CENTERS.  HAVE YOU CONSIDERED THAT RECOMMENDATION?

6  **A.**  I HAVE NOT.

7  **Q.**  ALL RIGHT.  HAVE YOU STUDIED THE WAIT LISTS OF PEOPLE FOR

8  HIGHER LEVELS OF CARE TO DETERMINE HOW MANY OF THEM ARE LEVEL

9  ONES OR LEVEL TWOS OR LEVEL THREES OR LEVEL FOURS?

10  **A.**  NO.

11  **Q.**  HAVE YOU STUDIED THOSE WAIT LISTS TO SEE HOW MANY PEOPLE

12  PAROLE DIRECTLY FROM THOSE WAIT LISTS TO THE COMMUNITY?

13  **A.**  I KNOW THAT THAT HAPPENS, BUT I DON'T KNOW THE NUMBERS OR

14  PERCENTAGE.

15  **Q.**  SO IF SOMEONE IS SERVING A TERM IN PRISON AND THEY HAPPEN

16  TO BE ON A WAIT LIST, THEY STILL GET OUT ON THEIR DAY THAT THEY

17  ARE READY TO BE RELEASED, RIGHT?

18          **JUDGE KARLTON:**  NOT THAT THEY ARE READY TO BE

19  RELEASED; THAT THE STATE IS GOING TO RELEASE THEM.

20          **THE WITNESS:**  THAT THEY ARE REQUIRED TO BE RELEASED,

21  YES.

22  **BY MR. BIEN:**

23  **Q.**  YES. YOU DO HAVE THIS MENTALLY DISORDERED OFFENDER PROCESS,

24  SO IF SOMEONE IS READY FOR PAROLE, BUT THERE'S A REASON THAT

25  THEY QUALIFY UNDER THE MENTALLY DISORDERED OFFENDER STATUTE

1   THEY WILL BE EVALUATED FOR THAT; IS THAT CORRECT?

2   **A.**   YES.

3   **Q.**   AND IF THEY QUALIFY THEY THEN ARE COMMITTED TO A STATE

4   MENTAL HOSPITAL; IS THAT CORRECT?

5   **A.**   THEY CAN BE, YES.

6   **Q.**   SO IF A PROGRAM DEVELOPED THROUGH A PRISONER RELEASE

7   REDUCTION POPULATION REDUCTION PLAN THAT THIS COURT ORDERED TO

8   REMEDY THE CONSTITUTIONAL VIOLATIONS IN THE PRISONS TODAY SAID

9   THAT PEOPLE WERE GOING TO EARN MORE CREDITS THAN THEY CURRENTLY

10  DO, SO EVERYONE IS GOING TO GET OUT A WEEK EARLIER, SOME OF

11  THOSE PEOPLE WHO GET OUT WOULD BE PEOPLE ON THOSE WAIT LISTS;

12  ISN'T THAT CORRECT?

13  **A.**   IT COULD BE.

14  **Q.**   WELL, IF THEY WERE ELIGIBLE, THEY WOULD BE JUST LIKE

15  EVERYONE ELSE?

16          **MS. TILLMAN:**   OBJECTION.

17          **THE WITNESS:**   THAT'S RIGHT.

18          **MS. TILLMAN:**   INCOMPLETE HYPOTHETICAL.

19          **JUDGE HENDERSON:**   OVERRULED.

20  **BY MR. BIEN:**

21  **Q.**   SO YOU REALLY HAVE NO BASIS -- YOU HAVEN'T STUDIED THE

22  ISSUE ABOUT WHETHER GENERAL POPULATION REDUCTION WOULD BENEFIT

23  THE COLEMAN CLASS ONE WAY OR THE OTHER, HAVE YOU?  HAVE YOU

24  DONE ANY STUDY TO SEE HOW MANY PEOPLE WOULD COME OFF THE

25  WAITING LISTS FOR EOP, FOR EXAMPLE?

1    **A.**   TO THE DEGREE THAT WE HAVE INFORMATION AVAILABLE ON THOSE

2    QUESTIONS, I HAVE ASKED AND I HAVE LOOKED AT IT. IT'S VERY

3    GENERAL. I HAVE TO SAY THE DEPARTMENT HAS -- DOES NOT HAVE A

4    SOPHISTICATED INFORMATION SYSTEM.

5             THAT'S WHY I MENTIONED EARLIER IN MY TESTIMONY THAT

6    IT WOULD REQUIRE A RESEARCH PROJECT TO GENERATE THAT

7    INFORMATION.

8    **Q.**   OKAY.  AND YOU HAVE HAD A NOTICE OF THIS PROCESS, OF THIS

9    CASE SINCE NOVEMBER OF 2006 WHEN PLAINTIFFS FILED THEIR MOTION

10   TO ESTABLISH A POPULATION REDUCTION IN THE PRISON SYSTEM,

11   RIGHT?

12   **A.**   I KNEW ABOUT THAT, YES.

13   **Q.**   AND BETWEEN DECEMBER OF 2006 AND TODAY, YOU HAVEN'T

14   UNDERTAKEN ANY STUDY TO BACK UP THIS THEORY THAT SOMEHOW A

15   GENERAL POPULATION REDUCTION WILL NOT ASSIST THE COLEMAN CLASS?

16   **A.**   WOULD YOU ASK A QUESTION, THEN, BECAUSE I JUST HEARD YOU

17   MAKING A BUNCH OF STATEMENTS, AND I DON'T KNOW WHAT I WOULD BE

18   SAYING "YES" OR "NO" TO.

19   **Q.**   HAVE YOU UNDERTAKEN A STUDY, OR DIRECTED ANYONE TO

20   UNDERTAKE A STUDY, TO DETERMINE WHETHER OR NOT A GENERAL

21   POPULATION REDUCTION OF THE CALIFORNIA PRISON POPULATION WOULD

22   BENEFIT OR NOT BENEFIT THE COLEMAN CLASS?

23            **MS. TILLMAN:**  OBJECTION, VAGUE AND AMBIGUOUS AS TO

24   "BENEFIT."

25            **JUDGE HENDERSON:**  I'M GOING TO ALLOW IT.

1              DO YOU UNDERSTAND THE QUESTION?

2              **THE WITNESS:**  YES, I UNDERSTAND THAT QUESTION.

3              NOW --

4    **BY MR. BIEN:**

5    **Q.**  CAN YOU JUST ANSWER IT "YES" OR "NO"?

6    **A.**  NO, I'M NOT GOING TO ANSWER IT "YES" OR "NO." THIS IS A

7    QUALIFYING ANSWER.

8    **Q.**  WELL, CAN YOU ANSWER "YES" OR "NO":  HAVE YOU UNDERTAKEN A

9    STUDY?

10   **A.**  YES.

11   **Q.**  OKAY.  AND WHAT STUDY DID YOU UNDERTAKE?

12   **A.**  AS I INDICATED ALREADY, I HAVE LOOKED AT THE DEMOGRAPHIC

13   DATA THAT WAS AVAILABLE WITH RESPECT TO THE COLEMAN CLASS AND

14   THEIR LEVELS OF CUSTODY THAT ARE APPLIED TO THEM TO GET

15   UNDERNEATH THAT.  AGAIN, I SAID IT REQUIRES A RESEARCH PROJECT

16   WHICH I HAVE NOT UNDERTAKEN.

17   **Q.**  WHAT DID YOU FIND OUT IN THIS STUDY?  WHEN DID YOU DO THIS

18   STUDY, MR. DEZEMBER?

19   **A.**  I'VE LOOKED AT IT SEVERAL TIMES OVER THE LAST FEW MONTHS.

20   **Q.**  CAN YOU POINT TO A PIECE OF PAPER THAT SHOWS THAT?

21   **A.**  A PIECE OF PAPER?

22   **Q.**  YOU KNOW, YOU HAVE SOMETHING YOU WANT TO SUBMIT TO THE

23   COURT AS SUPPORT OF THIS STUDY?

24   **A.**  OF MY STUDY?

25   **Q.**  YES.

 1  **A.**  NO, I READ MANAGEMENT REPORTS TO THE DEGREE WE HAVE THEM

 2  ALL THE TIME.

 3  **Q.**  SO YOU HAVE NOTHING TO SUBMIT TO THE COURT ABOUT THIS

 4  STUDY?

 5  **A.**  NO.

 6  **Q.**  OKAY.  AND WHO DID YOU WORK WITH TO DO THE STUDY?

 7  **A.**  I DO THEM MYSELF. I READ THE INFORMATION MYSELF.  THAT'S

 8  WHAT A MANAGER DOES, MR. BIEN.

 9  **Q.**  OKAY.  AND HOW MANY EOP'S WOULD BE RELEASED IN THE

10  POPULATION REDUCTION THAT YOU STUDIED?

11  **A.**  DEPENDS ON HOW THE POPULATION REDUCTION IS CRAFTED.

12  **Q.**  SO WHICH ONE DID YOU STUDY?

13  **A.**  WHAT I DETERMINED WAS THAT LOWER CUSTODY INMATES WOULD BE

14  RELEASED, WHICH IS CONSISTENT WITH WHAT THE GOVERNOR HAD

15  PROPOSED WHEN HE PUT THAT FORTH LAST YEAR.

16          AND WHEN YOU LOOK AT IT THAT WAY, YOU HAVE A MORE

17  SUBSTANTIAL RELEASE. I DON'T KNOW THE EXACT NUMBERS OFFHAND

18  FROM THE C3MS (SIC) POPULATION THAN YOU DO.  ANYTHING ABOVE

19  THAT.

20  **Q.**  AND WHAT'S YOUR BASIS FOR STATING THAT THE TRIPLE CMS --

21  THE LOWER CUSTODY LEVEL ONES AND TWOS ARE NOT ON THOSE WAITING

22  LISTS FOR MHCB BEDS, FOR EOP BEDS, FOR ACUTE CARE BEDS?

23  **A.**  WELL, THEY CERTAINLY AREN'T GOING TO MAKE UP A MAJORITY OF

24  THEM OR THEY WOULDN'T BE IN 3CMS, BECAUSE THOSE WAITING LISTS

25  ARE FOR HIGHER LEVELS OF CARE.  AND OFTEN SOME OF THEM ARE FOR

1  CRISIS CARE.

2          SO, YOU KNOW, I DON'T INTEND TO BE ARGUMENTATIVE

3  HERE. I ONLY INTEND HERE TO DESCRIBE THE CIRCUMSTANCES WHEREIN

4  TO THE BEST OF MY ABILITY AND TO DESCRIBE MY VIEW POINT ABOUT

5  IT. THAT'S REALLY THE EXTENT OF IT.

6  **Q.**  SO YOU THINK THAT PRISONER REDUCTION PERHAPS TO 30 OR

7  40,000 FROM THE CURRENT POPULATION WOULD NOT PROVIDE THE MEANS

8  FOR THIS DEPARTMENT TO IMPROVE ON THE DELIVERY OF MENTAL

9  HEALTHCARE IN THE PRISONS?

10 **A.**  I DIDN'T SAY THAT. I'M TALKING ABOUT PRIMARY CAUSATION AND

11 IMPACT. AND I'VE ALREADY SAID THE IMPACT OF CROWDING A PLACE IS

12 SOMEWHAT -- CAN BE SOMEWHAT NEGATIVE.  AND, CERTAINLY, IF YOU

13 CRAFTED AN ORDER THAT SAID:

14              "THIS MUCH OF WHATEVER THE PERCENTAGE IS OF THE

15              CASELOAD INMATES WOULD BE RELEASED EARLY," IT WOULD

16 HAVE A POSITIVE IMPACT.

17         A GENERAL ORDER THAT THE DEPARTMENT WOULD CARRY OUT

18 WOULD BE MORE CONSISTENT WITH WHAT THE GOVERNOR HAD PROPOSED IN

19 TERMS OF DIFINING WHO IS RELEASED.  AND THAT'S GOING TO BE

20 LOWER LEVEL POPULATION.  AND SO FAR THAT'S ALL I KNOW ABOUT IT.

21         I'VE NOT UNDERTAKEN A RESEARCH PROJECT SPECIFICALLY

22 ON AN ALTERNATE SET OF POTENTIAL ORDERS THAT MIGHT COME FROM

23 THIS COURT. I HAVEN'T DONE THAT.

24 **Q.**  SO YOU DON'T KNOW THE WHOLE RANGE OF POSSIBLE SOLUTIONS TO

25 THE POPULATION PROBLEM THAT MAY EMERGE FROM AN ORDER TO REDUCE

1  THE POPULATION, DO YOU?

2  **A.**  NO, I DON'T.

3  **Q.**  OKAY.  AND SO YOU DON'T KNOW WHETHER OR NOT THOSE ORDERS

4  MAY INCLUDE MECHANISMS THAT WOULD BENEFIT ALL PARTS OF THE

5  COLEMAN CLASS?

6  **A.**  WELL, DEPENDS ON WHAT YOU MEAN BY "BENEFIT" AT THAT POINT.

7  **Q.**  WELL, YOU AGREE THAT OVERCROWDING IS IMPACTING THE PRISON

8  SYSTEM, RIGHT?

9  **A.**  I DO.

10  **Q.**  OKAY.  AND ONE WAY OVERCROWDING IMPACTS THE PRISON SYSTEM

11  IS THROUGH INCREASED STRESS, VIOLENCE, WHICH RESULTS IN

12  LOCKDOWNS IN THE PRISON SYSTEM; ISN'T THAT CORRECT?

13  **A.**  IT CAN, YES.

14  **Q.**  AND THOSE LOCKDOWNS AND STRESS IMPACT ALL PRISONERS IN THE

15  SYSTEM.

16        **MS. TILLMAN:**  OBJECTION, VAGUE AND AMBIGUOUS AS TO

17  "STRESS"; CALLS FOR A POSSIBLE CLINICAL CONCLUSION ON PEOPLE'S

18  CARE AND CONDITION?

19        **JUDGE HENDERSON:**  CLARIFY WHAT YOU MEAN BY "STRESS."

20  **BY MR. BIEN:**

21  **Q.**  YOU AGREE THAT THE --

22        **MR. BIEN:**  I'LL REPHRASE, YOUR HONOR.

23  **BY MR. BIEN:**

24  **Q.**  YOU AGREE THAT THE IMPACT OF OVERCROWDING AFFECTS PRISONERS

25  THROUGHOUT THE PRISON SYSTEM?

1    **A.**   UM-HUM.

2    **Q.**   IS THAT RIGHT?

3    **A.**   YES.

4    **Q.**   OKAY. SO, FOR EXAMPLE, IF YOU'RE A TRIPLE C IN A PROGRAM

5    AND THE PROGRAM IS LOCKED DOWN, THAT'S GOING TO AFFECT YOUR

6    LIFE. YOU MAY NOT BE ABLE TO GO TO PROGRAM.

7    **A.**   YES, IF THERE'S A LOCKDOWN, THAT'S CORRECT.

8    **Q.**   AND YOU MAY NOT BE ABLE TO GET ACCESS TO A GROUP, A MENTAL

9    HEALTH GROUP THAT YOU MIGHT HAVE BEEN IN?

10   **A.**   YES.

11   **Q.**   SO TRIPLE C'S ARE ALSO AFFECTED BY OVERCROWDING.

12   **A.**   YES, THEY ARE.

13   **Q.**   AND IF THERE'S A REDUCTION IN OVERCROWDING TRIPLE C'S WOULD

14   BENEFIT, JUST LIKE EVERYONE ELSE.

15          **MS. TILLMAN:**   OBJECTION, CALLS FOR SPECULATION AS TO

16   WHAT REDUCTION.

17          **JUDGE HENDERSON:**   I'M GOING TO ALLOW IT.

18          YOU MAY ANSWER THAT.

19          **THE WITNESS:**   WELL, TO THE DEGREE THAT RELEASING

20   FROM PRISON IS A BENEFIT -- AND I WOULD ASSUME IN MOST CASES IT

21     IS -- THEN, YES, THEY WOULD.

22          **JUDGE KARLTON:**   NOT JUST THAT. THE PROBLEM IS -- THE

23   QUESTION IS:  EVEN AS TO THOSE WHO REMAIN IN PRISON, IF YOU

24   REDUCED THE LEVEL OF STRESS -- AND I KNOW MS. TILLMAN WILL

25   OBJECT, BUT I'M GOING DO USE IT ANYHOW -- BY VIRTUE OF

1    REDUCING THE OVERCROWDING, THAT WILL HAVE A BENEFICIAL EFFECT

2    UPON ALL PRISONERS, INCLUDING THOSE SUFFERING FROM MENTAL

3    ILLNESS. YES? NO? MAYBE?

4         **THE WITNESS:** YES. NOW, I THINK IT WOULD. THERE IS

5    A CAVEAT, BECAUSE THE HIGHER LEVELS OF CARE THAT WE HAVE NOW,

6    EVEN UNDER THE CONDITIONS THAT WE'VE HAD OVER -- SINCE WE BEGAN

7    THIS PROGRAM, THEY ARE SEGREGATED INTO HOUSING UNITS THERE.

8         IT'S A RESIDENTIAL CARE PROGRAM FOR MENTALLY ILL.

9    AND THEY ARE NOT MIXING WITH THE GENERAL POPULATION TO A LARGE

10   DEGREE.

11        C3MS IS. THEY ARE GENERAL POPULATION. SO I HAD

12   FOCUSSED MOST OF MY ATTENTION ON A RELEASE ORDER OF THE TYPE

13   THAT'S BEING DESCRIBED HERE WOULD STILL LEAVE THE REQUIREMENT

14   THAT WE ESTABLISH THE MEANS FOR HOUSING AND TREATING THE HIGHER

15   LEVEL OF CARE INMATES. AND SO, THEREFORE, OVERPOPULATION HAS

16   AN IMPACT. AND I DON'T THINK IT'S THE PRIMARY CAUSE OF OUR

17   DIFFICULTY TO DELIVERING MENTAL HEALTHCARE.

18        **JUDGE KARLTON:** BUT EVEN AS TO THOSE PEOPLE IF

19   THERE'S A LOCKDOWN, THEY'RE NOT GOING TO BE RECEIVING THE KIND

20   OF TREATMENT AND PROGRAMMING THAT THEY ARE SUPPOSED TO. I'M

21   ASKING YOU, NOT TELLING YOU; ISN'T THAT RIGHT?

22        **THE WITNESS:** OF THE C3MS INMATES, YES.

23        **JUDGE KARLTON:** NO, I'M TALKING EVEN OF THE HIGHER

24   LEVEL.

25        **THE WITNESS:** IF THEY'RE IN A INTERMEDIATE CARE

1  PROGRAM, ACUTE CARE PROGRAM OR A MENTAL HEALTH CRISIS BED

2  PROGRAM, YOU'RE STILL RECEIVING THE CARE YOU MAY REQUIRE.  EOP

3  MAY BE STILL IN A LOCKDOWN, BUT THEY'RE STILL IN A SEGREGATED

4  HOUSING AREA WHERE THE CLINICIANS HAVE ACCESS TO THEM.

5          **JUDGE KARLTON:**  SO IT'S YOUR -- AS I UNDERSTAND YOUR

6  TESTIMONY -- ASKING NOT TELLING YOU -- YOUR VIEW IS EVEN A

7  SIGNIFICANT RELEASE ORDER WOULD HAVE NO EFFECT UPON HIGHER

8  LEVELS OF CARE REQUIRED OF EOP AND ABOVE.

9          **THE WITNESS:**  IT WOULD HAVE MUCH LESS EFFECT, YES.

10  IT WOULD HAVE A SMALL EFFECT.

11          **JUDGE KARLTON:**  I'M GOING TO ASK A QUESTION, AND THE

12  ANSWER IS:  WHO KNOWS?

13          TELL ME WHAT YOU MEAN BY "A SMALL EFFECT."

14          **THE WITNESS:**  WELL, A RELEASE ORDER -- A GENERAL

15  RELEASE ORDER WILL IMPACT SOME SMALL PART OF THAT POPULATION IN

16  TERMS OF THEIR BEING RELEASED. WHERE WE HAVE --

17          **JUDGE KARLTON:**  THAT WOULD BE INDEPENDENT OF WHAT

18  TREATMENT PROGRAMS AND TREATMENTS THAT THEY WOULD BE RECEIVING

19  IF THEY WEREN'T RELEASED.

20          **THE WITNESS:**  YES.  IF YOU RELEASED LEVEL ONES AND

21  LEVELS TWO --

22          **JUDGE KARLTON:**  OKAY.

23          **THE WITNESS:**  -- AND YOU DIDN'T EXCLUDE FROM RELEASE

24  A SEVERELY MENTALLY ILL INMATE WHO WAS IN THAT INTERMEDIATE

25  CARE FACILITY OR AN ACUTE FACILITY, THEN THAT PERSON WOULD BE

1  RELEASED, AS WELL. IT WOULD BE A SMALL PERCENTAGE OF THAT

2  POPULATION.

3         **JUDGE KARLTON:** LET ME ASK A QUESTION. I THINK I

4  KNOW THE ANSWER, BUT MAYBE I DON'T. YOU'VE GOT A SEVERELY ILL

5  PRISONER WHO IS -- WHO REACHES ELIGIBILITY FOR PAROLE. IS HE

6  GOING TO BE PAROLED DESPITE HIS MENTAL ILLNESS?

7         **THE WITNESS:** YES.

8         **JUDGE KARLTON:** I DIDN'T MEAN TO INTERRUPT.

9         GO AHEAD.

10 **BY MR. BIEN:**

11 **Q.** MR. DEZEMBER, YOU HAVE TOLD THE COURT ABOUT A SERIES OF

12 PLANS THAT THE DEPARTMENT NOW HAS IN PLACE THAT YOU BELIEVE ARE

13 MORE APPROPRIATE, BETTER THAN PRIOR PLANS; IS THAT CORRECT?

14 **A.** WELL, THE PLAN WE HAVE NOW THAT I'VE BEEN REFERRING TO IS

15 ONE THAT THE ADMINISTRATION -- MY DEPARTMENT, THE

16 ADMINISTRATION APPROVED AND THE COURT APPROVED, THE COLEMAN

17 COURT APPROVED IT.

18 **Q.** THE COLEMAN COURT HAS APPROVED LOTS OF PLANS BEFORE THIS

19 ONE, MR. DEZEMBER; ISN'T THAT CORRECT?

20 **A.** ON A MUCH SMALLER SCALE, YES.

21 **Q.** BUT YOU BELIEVE THAT THE COURT CAN RELY ON CURRENT PLANS

22 THAT YOU TALKED ABOUT IN YOUR WITNESS STATEMENT AND YOUR

23 TESTIMONY TODAY?

24 **A.** RELY ON IN WHAT WAY?

25         **JUDGE KARLTON:** THAT'S GOING TO HAPPEN.

1  **BY MR. BIEN:**

2  **Q.**  THEY ARE GOING TO HAPPEN. THEY ARE GOING TO COME TO

3  FRUITION.

4  **A.**  WELL, YOU KNOW, WE'VE ALREADY TALKED ABOUT THE RECEIVER'S

5  DIFFICULTY GETTING FUNDING. THIS IS AN APPROVED PLAN AND IT IS

6  PROGRESSING IN STEPS AND STAGES.  AND MY ASSUMPTION IS THAT IT

7  WILL CONTINUE THAT WAY.

8              I CAN'T GUARANTEE WHAT IS GOING TO BE FUNDED OR WHAT

9  ISN'T GOING TO BE FUNDED.

10 **Q.**  YOU CLAIM THAT YOU NOW HAVE A GOOD SYSTEM OF PROJECTING

11 FUTURE NEEDS FOR MENTAL HEALTHCARE.  YOU HAVE VALIDATED -- YOU

12 CALLED IT A VALIDATED SYSTEM NOW; IS THAT CORRECT?

13 **A.**  YES.

14 **Q.**  AND THAT'S THE NAVIGANT CONSULTANT?

15 **A.**  RIGHT.

16 **Q.**  THAT'S JOHN RIZNER?

17 **A.**  THAT IS CORRECT, YES.

18 **Q.**  JOHN RIZNER IS THE INDIVIDUAL THAT DOES THE WORK FOR THE

19 STATE?

20 **A.**  HE DOES WHAT?

21 **Q.**  HE'S THE INDIVIDUAL THAT YOU RELY ON WHO IS EMPLOYED AS A

22 CONSULTANT?

23 **A.**  HE'S EMPLOYED BY NAVIGANT UNDER THEIR CONTRACT WITH THE

24 STATE, AND HE PROVIDES THIS FUNCTION OF FORECASTING POPULATION

25 AND BED DEMAND.

1  Q.  AND BASED ON HIS -- ON THESE FORECASTS YOU HAVE DEVELOPED

2  THESE BED PLANS WHICH SHOW CURRENT NEED AND FUTURE NEED?

3  A.  YES.

4  Q.  OKAY. AND YOU RELY ON THOSE IN YOUR WORK AND YOU'VE GONE TO

5  THE GOVERNOR AND TO THIS COURT AND SAID:

6            "THIS IS WHAT WE NEED"; IS THAT CORRECT?

7  A.  YES.

8  Q.  AND ISN'T IT CORRECT THAT THE MOST OPTIMISTIC PROJECTIONS

9  OF WHEN THE DEPARTMENT WILL HAVE CONSTRUCTED SUFFICIENT BEDS TO

10  MEET THE NEEDS OF THE MENTAL HEALTH POPULATION BASED ON THESE

11  PROJECTIONS IS 2014.

12  A.  I THINK IN THE BED PLAN THAT WE'RE REFERRING TO IT WAS

13  2013, BUT IT ALSO IS ADDRESSING THE POPULATION DEMAND OF THAT

14  TIME. SO THIS IS A FIVE-YEAR FORECAST AND A FIVE-YEAR PLAN

15  THAT'S UPDATED ANNUALLY SO THAT YOU WOULD STILL -- YOU WOULD

16  ALWAYS HAVE A FIVE-YEAR LOOK.

17            IF YOU CUT IT OFF AT THE CURRENT BED PLAN, IT'S OUT

18  AT YEAR 2013.  CONSTRUCTION PROCESSES ORDINARILY SOMEWHERE IN

19  THE THREE TO FIVE YEAR RANGE.  BUT THE FOCAL POINT IS TO HAVE

20  BEDS AT 2013 THAT MEET THE POPULATION EXPECTED FOR 2013.  AND

21  ALL THAT IS CHANGEABLE ON AN ANNUAL BASIS.

22  Q.  WHEN YOU DID THAT PLAN, THE 2007 PLAN THAT YOU SAY WAS

23  APPROVED BY THIS COURT, THINGS HAVE GOTTEN DELAYED SINCE THEN;

24  ISN'T THAT CORRECT?

25  A.  DELAYED?

 1  Q.  IN OTHER WORDS, SINCE THAT PLAN WAS APPROVED BY THE COURT,

 2  DEPARTMENT MADE A DECISION TO JOIN IN WITH THE RECEIVER IN THE

 3  10,000 BED PLAN; IS THAT CORRECT?

 4  A.  WELL, THAT'S PARTIALLY CORRECT. THERE IS AN ORDER OF FOUR

 5  JUDGES IN A COORDINATED ORDER THAT INDICATED THAT THE RECEIVER

 6  HAS THE LEAD RESPONSIBILITY FOR BUILDING THE 10,000 BEDS, WHICH

 7  IS MEDICAL AND MENTAL HEALTH.

 8          SO WHILE WE DECIDED TO DO THAT, BECAUSE IT'S A GOOD

 9  THING TO DO, AND IT WILL FULFILL THE BED PLAN, THERE WAS ALSO

10  AN ORDER THAT SAID:

11          "THIS IS HOW YOU SHOULD DO IT."

12          AND SO WE FOLLOWED THAT.

13  Q.  I WON'T GO OVER WHAT THE ORDER SAYS, BUT I UNDERSTOOD THE

14  ORDER TO ASK THE DEPARTMENT TO COOPERATE AND WORK WITH THE

15  RECEIVER; ISN'T THAT CORRECT?

16  A.  WELL, THERE ARE THOSE ORDERS, AS WELL.

17  Q.  RIGHT.

18  A.  BUT THIS ONE IS SPECIFIC IN GIVING THE RECEIVER THE

19  LEAD -- I DON'T REMEMBER THE EXACT -- LEAD PROJECT AUTHORITY

20  FOR THE 10,000 BEDS.

21  Q.  RIGHT. AND YOU WERE THE REPRESENTATIVE OF THE STATE OF

22  CALIFORNIA IN MANY MEETINGS WHERE THE DECISION ABOUT WHETHER TO

23  THROW THE MENTAL HEALTH BEDS INTO THE RECEIVER'S PROJECTS WERE

24  DISCUSSED.

25  A.  I HAVE BEEN, YES. I'VE BEEN IN MEETINGS LIKE THAT.

1   Q.   OKAY. AND YOU'VE DISCUSSED THESE ISSUES WITH

2   REPRESENTATIVES OF THE GOVERNOR'S OFFICE, HAVEN'T YOU?

3   A.   YES.

4   Q.   AND ARE YOU AWARE OF ANY -- PRIOR TO JUNE OF 2008, ARE YOU

5   AWARE OF ANY OBJECTION THE STATE OF CALIFORNIA HAS RAISED TO

6   ANY COURT ORDER DEALING WITH MENTAL HEALTH PROJECTS, JOINING

7   INTO THE RECEIVER'S 10,000 BED PROJECT?

8   A.   NO, I'M NOT.

9   Q.   AND, IN FACT, YOU WERE -- YOU PERSONALLY TESTIFIED IN

10  DEPOSITION, MR. DEZEMBER, THAT YOU THOUGHT THAT WAS A GOOD

11  THING TO DO TO MERGE THESE PROJECTS AND LET THE RECEIVER TAKE

12  THE LEAD.

13  A.   YES.

14  Q.   AND YOU SAID THAT WAS A GOOD THING TO DO BECAUSE BY

15  COOPERATING YOU COULD USE THE SPACE MORE EFFECTIVELY.  THAT WAS

16  ONE OF THE REASONS; ISN'T THAT CORRECT?

17  A.   THAT'S ONE OF THE REASONS.

18  Q.   THERE'S ONLY A CERTAIN AMOUNT OF SPACE AVAILABLE AT THESE

19  SITES TO BUILD.  AND IT'S BETTER TO BUILD IN AN UNIFIED

20  STRUCTURE THAN IN TWO SEPARATE PROJECTS.

21  A.   YES.

22  Q.   OKAY.  AND YOU ALSO SUPPORTED THE PROJECT BECAUSE YOU FELT

23  THE RECEIVER MIGHT HAVE THE ABILITY TO CUT THROUGH SOME OF THE

24  GOVERNMENTAL RED TAPE AND GET THESE THINGS BUILT MORE RAPIDLY.

25  A.   IT APPEARED THAT WAY, YES.

1  Q.  AND IN YOUR DEPOSITION IN DECEMBER OF 2007, YOU UNDERSTOOD

2  THAT THE RECEIVER WAS GOING TO BREAK GROUND FOR ITS FIRST

3  PROJECT BY JUNE OF 2008; ISN'T THAT CORRECT?

4          **JUDGE KARLTON:**  ORIGINALLY IT WAS FEBRUARY.

5          **THE WITNESS:**  YES, I WAS GOING TO SAY I THINK IT WAS

6  EARLIER THAN THAT.

7          **JUDGE KARLTON:**  IT GOT DELAYED.

8          **THE WITNESS:**  YES. BUT I DID -- I WAS RELYING ON THE

9  SCHEDULES THAT I HAD SEEN, YES.

10 **BY MR. BIEN:**

11 Q.  AND IT'S CORRECT THAT AS OF NOW THE STATE OF CALIFORNIA HAS

12 MADE A DECISION NOT TO SUPPORT THE RECEIVER'S TEN THOUSAND BED

13 PROJECT?

14 A.  WELL, I DON'T KNOW THAT THAT'S TRUE, BECAUSE I DON'T KNOW

15 THAT. I HAVE NOT BEEN GIVEN THAT INSTRUCTION FROM THE -- FROM

16 PEOPLE WHO ARE MY SUPERIORS IN GOVERNMENT.

17 Q.  YOU'VE HAD MEMBERS OF YOUR STAFF WHO HAVE BEEN ASSIGNED TO

18 WHAT'S CALLED "THE CORE TEAM" OF THE RECEIVER'S PLANNING AND

19 ARCHITECTURE AND OTHER PROFESSIONALS WHO ARE DESIGNING THESE

20 HEALTHCARE FACILITIES.

21          AND WHAT ARE THEY CALLED NOW?  I FORGOT THE CURRENT

22 TERMINOLOGY.  CONSOLIDATED -- NO.  WHAT'S THE NAME OF THE

23 RECEIVER'S 10,000 BED --

24 A.  OH, CALIFORNIA HEALTHCARE FACILITIES.

25 Q.  CALIFORNIA HEALTHCARE FACILITIES.

1  **A.**  CHCF.

2  **Q.**  RIGHT.  AND ISN'T IT CORRECT THAT YOUR STAFF HAS BEEN ON

3  THE CORE PLANNING TEAM FOR THOSE PROJECTS?

4  **A.**  YES.

5  **Q.**  AND THAT THEY REPORT TO YOU CONCERNING WHAT IS GOING ON IN

6  THE DEVELOPMENT OF THESE PROJECTS?

7  **A.**  YES.

8  **Q.**  AND THEY, IN FACT, HAVE JOINED THE RECEIVER AND HIS STAFF

9  AT TRAVELING AROUND THE COUNTRY AND VISITING MODEL HEALTHCARE

10  FACILITIES AT OTHER PRISONS AND SYSTEMS AROUND THE COUNTRY?

11  **A.**  YES.

12  **Q.**  AND THEY CAME BACK AND WORKED WITH THE CORE TEAM.  AND THIS

13  CORE TEAM WORKED ON DEVELOPING WHAT THE MODEL FOR THESE

14  FACILITIES WOULD BE THAT WOULD BE MOST APPROPRIATE TO DELIVER

15  THE HEALTHCARE AND MENTAL HEALTH NEEDS OF THE CALIFORNIA PRISON

16  SYSTEM GIVEN THE SAFETY AND SECURITY REQUIREMENTS?

17  **A.**  YES.

18  **Q.**  IS YOUR STAFF TODAY STILL WORKING ON THESE PROJECTS,

19  MR. DEZEMBER?

20  **A.**  YES.

21  **Q.**  AND THERE ARE ALSO REPRESENTATIVES OF THE DEPARTMENT OF

22  MENTAL HEALTH THAT ARE WORKING ON THESE PROJECTS; ISN'T THAT

23  CORRECT?

24  **A.**  YES.

25  **Q.**  MR. BREWER HAS BEEN ASSIGNED TO THE RECEIVER FOR THIS

1  PURPOSE?

2  **A.**  YES.  FROM THE DEPARTMENT OF MENTAL HEALTH, YES.

3  **Q.**  RIGHT. AND HE IS A SENIOR OFFICIAL AT DEPARTMENT OF MENTAL

4  HEALTH THAT REPORTS TO MS. TOBASKY (PHONETIC)?

5  **A.**  IN THIS CAPACITY I DON'T KNOW WHETHER HE REPORTS TO HER OR

6  NOT.

7  **Q.**  HE'S THE PERSON WHO IS THE DIRECTOR OF THE DEPARTMENT OF

8  MENTAL HEALTH PROGRAMS AT THE CALIFORNIA MEDICAL FACILITY AND

9  THE SALINAS VALLEY PRISON.

10  **A.**  YES.

11  **Q.**  SO HE UNDERSTANDS A LOT ABOUT WHAT HAS BEEN GOING ON IN

12  THESE MENTAL HEALTH FACILITIES THAT ARE OPERATING INSIDE OF

13  PRISONS.

14          **MS. TILLMAN:**  OBJECTION, VAGUE, CALLS FOR

15  SPECULATION.

16          **JUDGE HENDERSON:**  OVERRULED.

17          **THE WITNESS:**  I CAN ASSUME HE DOES, YES.

18  **BY MR. BIEN:**

19  **Q.**  OKAY. HAVE YOU REPORTED TO THE GOVERNOR AT ANY TIME THAT

20  YOU THINK THESE FACILITIES THAT ARE BEING DESIGNED ARE

21  INAPPROPRIATE OR WASTEFUL?

22  **A.**  I HAVE NOT.

23  **Q.**  YOU DO REGULARLY REPORT TO REPRESENTATIVES OF THE

24  GOVERNOR'S OFFICE ABOUT MENTAL HEALTH AND MEDICAL ISSUES, DON'T

25  YOU?

1  **A.**  I DON'T REGULARLY, NO.

2  **Q.**  HOW OFTEN?

3  **A.**  WHEN I'M ASKED. I DO TAKE THIS UP INSIDE THE DEPARTMENT OF

4  CORRECTIONS AND REHABILITATION WITH THE SECRETARY, ET CETERA,

5  BUT NOT DIRECTLY WITH THE GOVERNOR'S OFFICE.

6  **Q.**  WOULD YOU LIKE ME TO SHOW YOU E-MAILS WHERE YOU'RE

7  COMMUNICATING WITH MR. GORE OF THE GOVERNOR'S OFFICE OR MR. --

8  **A.**  WELL --

9  **Q.**  -- BRYCE (PHONETIC) OF THE GOVERNOR'S OFFICE?

10 **A.**  -- YOUR QUESTION WAS "REGULARLY REPORT."  I DO COMMUNICATE

11 WITH THEM, CERTAINLY.

12 **Q.**  AND ONE OF THE TOPICS YOU COMMUNICATE WITH THEM ABOUT IS

13 HOW THIS CONSTRUCTION PROGRAM, WHICH IS A MAJOR FINANCIAL ISSUE

14 FOR THE STATE, ISN'T IT?

15 **A.**  YES.

16 **Q.**  AND IT'S ALSO A MAJOR ISSUE IN TERMS OF RESOLVING THE

17 COLEMAN AND PLATA CASES ALSO.

18 **A.**  I BELIEVE SO.

19 **Q.**  AND AS PART OF YOUR RESPONSIBILITIES YOU REPORT TO BOTH THE

20 SECRETARY OF THE DEPARTMENT AND ALSO REPRESENTATIVES OF THE

21 GOVERNOR'S OFFICE ABOUT THESE PROJECTS.

22 **A.**  IT DEPENDS ON HOW YOU'RE ASKING THE QUESTION. I REPORT MUCH

23 MORE REGULARLY TO THE SECRETARY THAN I DO THE GOVERNOR, BUT I

24 MEAN THERE IS A COMMUNICATION LINK BACK AND FORTH. I'M NOT

25 SAYING THERE ISN'T.

1  Q.  AND YOU'VE NEVER REPORTED TO ANYONE THAT YOU BELIEVE THAT

2  THESE PROJECTS WERE WASTEFUL OR INAPPROPRIATE AS HEALTHCARE

3  FACILITIES TO TAKE CARE OF PRISONERS IN CALIFORNIA.

4          **MS. TILLMAN:**  I'LL OBJECT ON RELEVANCE GROUNDS TO

5  THE EXTENT WE'RE GETTING INTO ANOTHER PROCEEDING.

6          **JUDGE HENDERSON:**  OVERRULED.

7          **THE WITNESS:**  I HAVE NOT REPORTED THAT, NO.

8          **JUDGE KARLTON:**  AND YOU DON'T BELIEVE THAT.

9          **THE WITNESS:**  WELL, I DON'T BELIEVE THAT BECAUSE OF

10  THE IMPACT OF MY OWN PRESENCE THROUGH MY STAFF HAS ON THE

11  PROGRAM. AND --

12          **JUDGE KARLTON:**  BUT YOU ARE AWARE, AS AN EXAMPLE,

13  THAT THERE'S CONCERN THAT THE PROGRAM IS NOT BEING FUNDED

14  PRESENTLY BY THE STATE OF CALIFORNIA.  ARE YOU AWARE OF THAT,

15  SIR?

16          **THE WITNESS:**  YES.

17          **MS. TILLMAN:**  I'LL OBJECT, YOUR HONOR, TO THE EXTENT

18  THAT IT ASSUMES FACTS NOT IN EVIDENCE AS TO WHO IS SUPPOSED TO

19  FUND THOSE PROGRAMS, WHETHER IT'S THE STATE OR THE LEGISLATURE.

20          **JUDGE KARLTON:**  STATE AND THE LEGISLATURE ARE THE

21  SAME FOLKS. YOU KNOW, THERE'S ONLY ONE STATE.  IT'S GOT THREE

22  BRANCHES OF GOVERNMENT.

23          THE ANSWER IS:  YES?

24          **THE WITNESS:**  YES.

25          **JUDGE KARLTON:**  OKAY.

1          THERE'S SOME CONCERN THAT THE PROGRAM MAY FOLD JUST

2   BECAUSE AT SOME POINT PEOPLE ARE NOT GOING TO WORK FOR FREE.

3          **THE WITNESS:**  I UNDERSTAND THAT.

4   **BY MR. BIEN:**

5   **Q.**  LET'S GO OVER WHAT JUDGE KARLTON JUST BROUGHT TO YOU,

6   MR. DEZEMBER. LET'S ASSUME THAT A DECISION IS MADE NOT TO

7   PROCEED WITH THE RECEIVER'S CONSTRUCTION PROGRAM. WE ASKED YOU

8   THAT QUESTION IN YOUR DEPOSITION.

9          AND YOU SAID -- WHAT WOULD YOU DO IF THE RECEIVER'S

10  10,000 BED PROGRAM IS TAKEN OFF THE TABLE TO COMPLY WITH THIS,

11  THIS COURT, JUDGE KARLTON'S ORDERS TO BUILD MENTAL HEALTH BEDS?

12  **A.**  WELL, THE ORDER WE STILL HAVE, NOTWITHSTANDING THE

13  RECEIVER'S EFFORTS, IS TO BUILD THE AUGUST, 2007 BED PLAN.

14  THAT'S WHERE WE WOULD BE.

15  **Q.**  AND HOW MANY OF YOUR STAFF ARE WORKING ON DEVELOPING THE

16  AUGUST, 2007 PROJECTS?

17  **A.**  WELL, THEY ARE NOT AT THIS POINT, EXCEPT ON INDIVIDUAL

18  PROJECTS, SUCH AS THE PRELIMINARY PLANNING FOR THE 64-BED AT

19  CMF AND THE PRELIMINARY PLANNING FOR THE 50-BED AT CMC AND

20  OTHER VARIOUS SMALL PROJECTS.

21          WHAT WOULD REQUIRE -- WHAT THAT WOULD REQUIRE IF

22  THIS IS THE RESULT THAT THE RECEIVER IS NOT GOING TO BUILD HIS

23  FACILITIES, THE CHCF, IS A SHIFT TO THE AUGUST, '07 BED PLAN.

24  AND THE PROJECTS WOULD THEN HAVE TO PROCEED THROUGH THE CAPITAL

25  OUTLAY PROCESS OF THE STATE.

1  Q.  OKAY. AND THAT PROCESS -- WE'RE TALKING ABOUT THESE

2  CONSOLIDATED CARE CENTERS.  I THINK THAT'S WHAT THEY ARE

3  CALLED, RIGHT, AT THAT POINT?

4  A.  YES.  YES.

5  Q.  AND THESE WERE SIMILAR TO THE RECEIVER PROJECTS IN THAT

6  THEY WERE EFFORTS TO CONCENTRATE IN CERTAIN LOCATIONS A LARGE

7  NUMBER OF THE HIGH-LEVEL MENTAL HEALTH BEDS?

8  A.  YES.

9  Q.  OKAY. AND ONE OF THE REASONS YOU WANTED TO DO THAT WAS TO

10 IMPROVE YOUR ABILITY TO RECRUIT AND RETAIN CLINICIANS BY

11 CONCENTRATING THEM IN PLACES WHERE YOU MIGHT HAVE A BETTER

12 CHANCE OF HIRING THEM?

13 A.  YES.

14 Q.  IS IT CORRECT THAT THOSE PROJECTS, IF WE HAVE TO GO BACK

15 THERE, WE'VE LOST AT LEAST A YEAR ON THOSE PROJECTS?

16 A.  PERHAPS MORE.

17 Q.  WHEN ARE YOU GOING TO DECIDE WHICH PROJECT YOU'RE DOING,

18 MR. DEZEMBER?  YOU HAVE A COURT ORDER TO BUILD THESE MENTAL

19 HEALTH BEDS.  WHEN ARE YOU GOING TO DECIDE WHETHER YOU'RE GOING

20 TO BUILD THE AUGUST, 2007 PLAN OR GO ALONG WITH THE RECEIVER'S

21 BEDS?

22 A.  WELL, ON A GRADUAL BASIS WE HAVE BEEN ON BOTH TRACKS.  AND

23 BELIEVE ME, IN GOVERNMENT THAT'S A DIFFICULT THING TO SUSTAIN,

24 BECAUSE THE ATTENTION OVER THE PAST, SAY, 15 MONTHS HAS BEEN ON

25 THE RECEIVER'S BUILDING PROGRAM.

1    I DON'T KNOW ANYONE WHO DIDN'T THINK THAT WAS GOING

2  TO MATERIALIZE.

3    SO THE PROJECTS THAT I'VE MENTIONED ARE PART -- PART

4  OF THE AUGUST, 2007 PLAN.  AND THEY ARE PROCEEDING. THEY ARE

5  NOT NUMEROUS PROJECTS FROM THAT PLAN THAT HAVE BEEN PROCEEDING.

6  AND IF THAT WAS THE ONLY THING LEFT, THEN WE WOULD HAVE TO

7  PROCEED WITH THAT.

8  Q.  HAVE YOU DISCUSSED WITH THE GOVERNOR'S OFFICE WHEN THE

9  DECISION IS GOING TO BE MADE ABOUT GOING BACK TO THE AUGUST

10 PLAN OR PROCEEDING WITH THE 10,000 BED PLAN?

11 A.  I HAVE NOT TALKED DIRECTLY WITH THE GOVERNOR'S OFFICE ON

12 THAT. I HAVE TALKED WITH THE NEW SECRETARY OF OUR DEPARTMENT ON

13 A NUMBER OF THOSE ISSUES.

14 Q.  AND WHAT'S THE SCHEDULE FOR MAKING THAT DECISION, MR.

15 DEZEMBER?

16 A.  I DON'T KNOW.

17 Q.  SO AS YOU SIT HERE TODAY, YOU CAN'T REPRESENT A DATE

18 CERTAIN IN THE FUTURE WHEN THESE MENTAL HEALTH BEDS THAT YOU

19 AGREE ARE NECESSARY TO PROVIDE TREATMENT WILL BE AVAILABLE?

20 A.  THAT'S CORRECT.

21 Q.  NOW, YOU'VE TESTIFIED THAT AN APPROPRIATE VACANCY RATE FOR

22 CLINICIANS IN YOUR AREA, THE MENTAL HEALTHCARE, IS EIGHT TO TEN

23 PERCENT; IS THAT CORRECT?

24 A.  YES.

25 Q.  AND TODAY THE VACANCY RATE IS CLOSER TO 20 PERCENT; ISN'T

1   THAT CORRECT?

2   **A.**   WELL, IT'S TODAY BETWEEN 17 AND 19 PERCENT.

3   **Q.**   AND FOR PSYCHIATRISTS IT'S FAR WORSE; ISN'T THAT CORRECT?

4   **A.**   IT'S HIGHER, YES.

5   **Q.**   FORTY, 50 PERCENT?

6   **A.**   NO, IT'S ROUGHLY 30 PERCENT, 32 PERCENT.

7   **Q.**   IS THAT AFTER YOU COUNT YOUR USE OF REGISTRY OR BEFORE?

8   **A.**   BEFORE.  WHEN WE COUNT USE OF REGISTRY OUR VACANCY IS ABOUT

9   11 PERCENT.

10  **Q.**   NOW, WHEN YOU'RE TALKING ABOUT YOUR VACANCIES -- AND YOU

11  SHOWED A CHART EARLIER TO THE COURT -- YOU'RE TALKING ABOUT

12  POSITIONS THAT HAVE BEEN ALLOCATED TO THE DEPARTMENT AS OF THE

13  DATE THAT YOU PROJECTED THAT INFORMATION; IS THAT CORRECT?

14  **A.**   YES.

15  **Q.**   OKAY.  AND ISN'T IT CORRECT THAT THE DEPARTMENT HAS

16  UNDERTAKEN, AS A DIRECTION OF LEGISLATURE AND OF THIS COURT, A

17  WORKLOAD STUDY TO EVALUATE THE APPROPRIATENESS OF THE POSITIONS

18  IT HAS ALLOCATED FOR MENTAL HEALTHCARE?

19  **A.**   WELL, THE WORKLOAD STUDY ASSESSES THE WORK REQUIRED AND

20  DETERMINES THE NUMBER AND TYPE OF STAFF REQUIRED TO PERFORM IT.

21  IT'S A TRUE WORKLOAD STUDY.

22  **Q.**   AND YOU PERFORMED THAT WORKLOAD STUDY.  THE DEPARTMENT

23  PERFORMED THAT STUDY?

24  **A.**   IT DID, YES.

25  **Q.**   AND THAT WAS SOMETHING THAT IS PART OF CALIFORNIA

1  LEGISLATION, WASN'T IT?

2  **A.**  IT WAS APPROVED, AND THEY PASSED THE BUDGET ACT.

3  **Q.**  AND IT WAS ALSO SOMETHING THIS COURT ORDERED THE DEPARTMENT

4  TO DO.

5  **A.**  YES, CORRECT.

6  **Q.**  AND THAT STUDY WAS FINISHED IN THE SUMMER OF 2007; IS THAT

7  CORRECT?

8  **A.**  YES, AS I RECALL. I ONLY REJOINED THE DEPARTMENT IN THE

9  SUMMER OF 2007.  AND I THINK IT WAS BEING COMPLETED AT THAT

10  TIME.

11  **Q.**  OKAY. YET THE DEPARTMENT COULDN'T FIND SUFFICIENT RESOURCES

12  TO EVALUATE THE STUDY UNTIL DECEMBER OF 2007.

13  **A.**  NO, I THINK THE EVALUATION WAS DONE BY MORE THAN THE

14  DEPARTMENT.  IT WAS DONE ALSO BY DEPARTMENT OF FINANCE AND THE

15  LEGISLATIVE STAFF THAT ARE ASSIGNED TO THESE BUDGET MATTERS.

16  AND IT WAS ALSO EVALUATED BY THE COLEMAN SPECIAL MASTER AND HIS

17  STAFF.

18  **Q.**  BUT FOR SIX MONTHS THE DEPARTMENT SAT ON THE STUDY.

19  **A.**  WELL, IT DIDN'T SIT ON IT. THIS IS THE NORMAL BUDGET

20  PROCESS.

21  **Q.**  WELL, IT WASN'T --

22  **A.**  BUDGET PROCESSES ARE LENGTHY.

23  **Q.**  IT WASN'T PROVIDED TO THE COLEMAN SPECIAL MASTER UNTIL

24  FEBRUARY OF 2008; IS THAT CORRECT?

25  **A.**  I DON'T KNOW THE DATES. I DON'T KNOW THOSE EXACTLY.

1  Q.  OKAY.  IT WASN'T PROVIDED TO THE LEGISLATURE UNTIL ALSO

2  EARLY IN 2008; ISN'T THAT CORRECT?

3  A.  DEPENDS ON WHAT DATE -- WHAT YOU'RE DETERMINING IS THE

4  PROVISION DATE.  THERE WERE LOTS OF BRIEFINGS OF THIS DOCUMENT

5  GOING ON.  IT'S A COMPLICATED DOCUMENT, AND IT TOOK A LOT OF

6  PEOPLE'S ATTENTION TO UNDERSTAND IT.

7  Q.  THE WORKLOAD STUDY INDICATED 0WHEN YOU FINALLY DID PROVIDE

8  IT TO THE LEGISLATURE AND TO THE SPECIAL MASTER, THE WORKLOAD

9  STUDY INDICATED THAT THE DEPARTMENT NEEDED 400 ADDITIONAL

10 POSITIONS; ISN'T THAT CORRECT?

11 A.  YES, I THINK IT WAS 407.

12 Q.  OKAY.  AND THE SPECIAL MASTER EVALUATED THE WORKLOAD STUDY

13 SUBSEQUENT TO YOU SUBMITTING IT TO THE LEGISLATURE; ISN'T THAT

14 CORRECT?

15 A.  WELL, I THINK IT WAS DURING AND SUBSEQUENT.

16 Q.  DURING THE SUMMER OF 2008 WHILE THE BUDGET WAS NOT BEING

17 PASSED, THE SPECIAL MASTER WROTE A REPORT TO YOU AND TO THE

18 PLAINTIFFS' COUNSEL ABOUT THE WORKLOAD STUDY; ISN'T THAT

19 CORRECT?

20 A.  YES.

21 Q.  AND THE SPECIAL MASTER ENDORSED THE PROCESS OF THE WORKLOAD

22 STUDY.  THAT'S CORRECT, ISN'T IT?

23 A.  YES.

24 Q.  THOUGHT IT WAS IMPORTANT THAT YOU STUDY THE ACTUAL

25 WORKLOADS TO DETERMINE HOW MANY CLINICIANS, OF WHICH TYPE THE

1  DEPARTMENT WILL NEED TO IMPLEMENT THE PROGRAM GUIDE STANDARDS;

2  ISN'T THAT CORRECT?

3  **A.**  I'M NOT SURE I UNDERSTAND THE QUESTION THERE.

4  **Q.**  OKAY.  HE ENDORSED THE PROCESS OF STUDYING WORKLOAD, AND HE

5  THOUGHT THAT THE CONSULTANTS YOU HAD ENGAGED HAD DONE A GOOD

6  JOB; ISN'T THAT CORRECT?

7  **A.**  YES.

8  **Q.**  BUT HE ALSO FOUND THAT THE -- THERE WAS SOME PROBLEMS WITH

9  THE ASSUMPTIONS THAT THEY HAD USED IN THEIR WORKLOAD STUDY.

10  **A.**  THERE WERE SOME PROBLEMS WITH SOME OF THE ASSUMPTIONS, YES.

11  **Q.**  FOR EXAMPLE, THEY WERE TOLD BY THE DEPARTMENT OF

12  CORRECTIONS STAFF TO ASSUME THAT 30 PERCENT OF THE TRIPLE CMS

13  POPULATION WAS ON PSYCHOTROPIC MEDICATIONS; ISN'T THAT CORRECT?

14  **A.**  THAT I DON'T KNOW.  I KNOW THAT WAS THEIR ASSUMPTION, BUT I

15  DON'T KNOW HOW THEY ARRIVED AT IT.

16  **Q.**  THAT'S THE ASSUMPTION THAT THEY ENDED UP USING.

17  **A.**  YES.

18  **Q.**  AND THEY USED THAT ASSUMPTION TO ESTIMATE HOW MANY PEOPLE

19  WOULD BE NEEDED TO DISTRIBUTE MEDICATION AND HOW MANY

20  PSYCHIATRISTS WOULD BE NEEDED TO EVALUATE; ISN'T THAT CORRECT?

21  **A.**  YES.

22  **Q.**  AND THE TRIPLE CMS POPULATION IS WHAT, APPROXIMATELY 28,000

23  RIGHT NOW?  29,000?

24  **A.**  CLOSE, 26,000 TRIPLE CMS, PROBABLY.

25  **Q.**  AND THE COLEMAN SPECIAL MASTER POINTED OUT THAT THE

INFORMATION THAT THEY HAD FROM MONITORING THE PRISONS AND LOOKING AT YOUR OWN DATA WAS THAT THE APPROPRIATE PERCENTAGE WAS CLOSER TO 80 PERCENT, NOT 30 PERCENT; ISN'T THAT CORRECT?

**A.** THAT WAS THEIR OPINION, YES.

**Q.** OKAY. AND THAT WHEN THEY APPLIED THE DIFFERENCE BETWEEN 30 PERCENT AND 80 PERCENT TO A SINGLE INSTITUTION THEY FOUND -- AND THEY USED THE WORKLOAD AS CALCULATIONS -- THEY FOUND THAT 11 MORE CLINICIANS WERE REQUIRED FOR THAT SINGLE INSTITUTION; ISN'T THAT CORRECT?

**A.** I DON'T KNOW THAT.

**Q.** AND THEY ALSO FOUND THAT THE WORKLOAD STUDY HAD OTHER PROBLEMS IN ITS ASSUMPTIONS. FOR EXAMPLE, IT LEFT OUT MANY NEW REQUIREMENTS THAT THE DEPARTMENT HAD AGREED NEEDED TO BE DONE IN THE MENTAL HEALTH DELIVERY SYSTEM; ISN'T THAT CORRECT?

**A.** I'M NOT ABLE TO TESTIFY TO THE CONTENT OF THE REPORT. I CAN ONLY TESTIFY TO THE RESPONSE TO THE REPORT.

**Q.** DO YOU RECALL THAT THE WORKLOAD STUDY DID NOT INCLUDE, FOR EXAMPLE, THE RECEPTION CENTER EOP PROGRAM?

**A.** AS I SAID, I DON'T HAVE -- I DON'T HAVE THOSE DETAILS. I'M NOT --

**Q.** WE WILL GET IT OUT FOR YOU.

THE OTHER THING THAT YOU AGREED TO DO, THE DEPARTMENT AGREED TO DO IN THE WORKLOAD STUDY WAS TO USE IT TWICE A YEAR TO RERUN THE WORKLOAD STUDY TO IMPROVE THE ASSUMPTIONS, TO MAKE IT MORE ACCURATE OVER TIME AS A TOOL FOR

1  THE DEPARTMENT TO MAKE SURE IT HAD THE RIGHT STAFF IN PLACE; IS

2  THAT CORRECT?

3  **A.**  YES.

4  **Q.**  AND THE SPECIAL MASTER AND HIS TEAM HAVE WORKED WITH THE

5  DEPARTMENT IN THE LAST FEW MONTHS TO FIX THOSE INCORRECT

6  ASSUMPTIONS AND TO RERUN THE WORKLOAD STUDY; ISN'T THAT

7  CORRECT?

8  **A.**  YES, WE HAD A SPECIAL PROJECT TO ADDRESS THE PROBLEMS WITH

9  THE ASSUMPTION THAT BEGAN SHORTLY AFTER THE BUDGET HEARINGS, I

10  THINK IN THE SPRING OF THIS YEAR.

11  **Q.**  WERE THE 400 POSITIONS THAT THE WORKLOAD STUDY ORIGINALLY,

12  YOU REQUESTED, BASED ON THE WORKLOAD STUDY, WERE THOSE INCLUDED

13  IN THIS BUDGET THAT WAS JUST PASSED IN SEPTEMBER?

14  **A.**  THE 400?  YES.

15  **Q.**  AND ARE THOSE POSITIONS REFLECTED ON THE CHARTS THAT YOU

16  JUST SHOWED THE COURT?

17  **A.**  YOU KNOW, I DON'T KNOW IF THEY ARE OR NOT. I'D HAVE TO LOOK

18  AT THE CHARTS IN MORE DETAIL. I CAN'T TELL.

19          THE INTENT OF THE CHART IS NOT NECESSARILY TO SAY

20  THE EXTENT OF THE STAFF THAT WE REQUIRE. THE CHARTS WERE

21  INTENDED TO DEMONSTRATE PROGRESS IN ACQUIRING CLINICIANS, WHICH

22  HAS BEEN A MAJOR PROBLEM IN THIS PROGRAM.

23          AND AS WE ADD MORE VACANT POSITIONS, OF COURSE WE

24  KEEP SETTING THE GOALPOSTS OUT, AND WE STILL HAVE TO RECRUIT

25  MORE.  AND SO THAT'S WHY WE HAVE A FOCUSED RECRUITING AND

1  HIRING EFFORT.

2           SO I DON'T THINK THE CHARTS -- I DON'T KNOW THAT

3  THEY INCLUDED THOSE POSITIONS OR NOT.

4  **Q.**  YOUR CHARTS INCLUDED -- SHOWED POSITIONS THAT THE -- THEY

5  SHOW ACTUAL STAFF THAT WERE IN THE FIELD, OR ARE THEY DESIGNED

6  TO SHOW POSITIONS THAT WERE -- LET ME START THAT AGAIN.

7           WHO PREPARED THE CHARTS, MR. DEZEMBER?

8  **A.**  WELL, THE CHARTS ARE PREPARED BY OUR MENTAL HEALTH

9  HEADQUARTERS STAFF BASED UPON DATA THAT THEY RECEIVE FROM THE

10 STATE CONTROLLER'S OFFICE AND FROM THE INSTITUTIONS IN THE

11 FIELD.

12 **Q.**  BASED ON YOUR MEETINGS WITH THE SPECIAL MASTER AND HIS

13 EXPERTS THAT HE ASSIGNED TO WORK WITH THE DEPARTMENT TO APPLY

14 THE WORKLOAD STUDY IN THE FALL, THERE'S BEEN A DETERMINATION

15 THAT YOU NEED ADDITIONAL POSITIONS BEYOND THE 400; ISN'T THAT

16 CORRECT?

17 **A.**  YES.

18 **Q.**  OKAY. AND HAVE THOSE ADDITIONAL POSITIONS BEEN APPROVED BY

19 LEGISLATURE?

20 **A.**  NO, NOT YET.

21 **Q.**  SO WHATEVER INFORMATION YOU'RE SHOWING TO THE COURT IS

22 NOT -- DOESN'T SHOW THE POSITIONS THAT YOU CURRENTLY BELIEVE

23 ARE NECESSARY TO DELIVER MENTAL HEALTHCARE TO THIS POPULATION.

24 **A.**  WE HADN'T INCORPORATED THEM BECAUSE WHAT WE'RE SHOWING IN

25 THE CHART ARE ESTABLISHED POSITIONS, NOT WHAT WE'RE PROJECTING.

1  WE CAN ONLY SHOW ESTABLISHED POSITIONS THAT THE LEGISLATURE HAS

2  APPROVED.

3  **Q.**  LET ME SHOW YOU --

4          **MR. BIEN:**  CAN YOU PUT UP, MR. JONES, CHART --

5  PLAINTIFFS' 245?  DO YOU HAVE THAT?

6          LET ME -- MAY I APPROACH THE WITNESS AND GIVE HIM

7  THAT?

8          **JUDGE HENDERSON:**  YOU MAY.

9  **BY MR. BIEN:**

10 **Q.**  IT'S A LITTLE HARD TO READ, AND I APOLOGIZE FOR THAT,

11 MR. DEZEMBER.  THIS INFORMATION IS A LITTLE DIFFERENT FROM THE

12 INFORMATION THAT YOU SHOWED THE COURT EARLIER, BECAUSE IT'S

13 BASED ON THE INFORMATION THAT THE DEPARTMENT REGULARLY PROVIDES

14 THE SPECIAL MASTER AND PLAINTIFFS' COUNSEL IN THIS CASE ABOUT

15 YOUR HIRING AND VACANCIES.

16         SO THIS IS THE ONLY INFORMATION THAT WE HAVE ACCESS

17 TO, AND THE SPECIAL MASTER.

18         YOU'LL SEE THAT THIS IS TAKEN FROM THE MONTHLY

19 INFORMATION THAT YOU PROVIDE, THE DEPARTMENT OF CORRECTIONS

20 PROVIDES.

21         ISN'T IT CORRECT THAT AS OF AUGUST OF 2008 THERE'S A

22 40 PERCENT VACANCY FOR PSYCHIATRISTS?

23 **A.**  ACCORDING TO THIS REPORT, YES.

24 **Q.**  AND YOU HAD 955 VACANT POSITIONS IN AUGUST OF 2008?

25 **A.**  155 WHAT?

1  **Q.**  955 TOTAL POSITIONS?

2  **A.**  OH, TOTAL. TOTAL, YES.

3  **Q.**  YES.

4  **A.**  VACANT.

5  **Q.**  AND SO IF YOU ADD IN THE ADDITIONAL POSITIONS THAT YOU'VE

6  BEEN AUTHORIZED --

7        **JUDGE KARLTON:**  NOT POSITIONS; PROPOSED.

8  **BY MR. BIEN:**

9  **Q.**  PROPOSED POSITIONS -- EXCUSE ME -- YOUR VACANCY RATE WOULD

10  CURRENTLY BE HIGHER.  IN OTHER WORDS, YOU'VE ADDED 400 MORE

11  POSITIONS THAN WHAT IS SHOWN HERE?

12  **A.**  I BELIEVE IT WOULD BE THAT MUCH HIGHER. I'M TRYING TO THINK

13  OF WHEN THE BUDGET WAS APPROVED.

14  **Q.**  LATE SEPTEMBER.

15  **A.**  SEPTEMBER.

16  **Q.**  RIGHT.

17  **A.**  SO IT WOULD JACK THIS NUMBER UP, YES.

18  **Q.**  OKAY. AND IN ADDITION TO THE 400 POSITIONS, WE ALSO HAVE

19  THESE ADDITIONAL POSITIONS THAT YOU AND THE SPECIAL MASTER HAVE

20  DECIDED ARE NECESSARY UNDER THE WORKLOAD STUDY BASED ON THE

21  CHANGED ASSUMPTIONS WE HAVE DISCUSSED.  AND YOU HAVEN'T EVEN

22  ASKED THE LEGISLATURE FOR THOSE POSITIONS YET, HAVE YOU?

23  **A.**  THAT'S CORRECT.  THEY ARE NOT YET ESTABLISHED.

24  **Q.**  AND BEFORE YOU CAN START ACTUALLY HIRING FOR A POSITION,

25  YOU HAVE TO GO TO THE LEGISLATURE AND GET THEM ESTABLISHED; IS

1  THAT CORRECT?

2  **A.**  WELL, WE GET THEM APPROVED IN THE BUDGET, THEN WE ESTABLISH

3  THEM, WHICH IS A PAPERWORK PROCESS.

4  **Q.**  AND THEN, AFTER THAT HAPPENS, YOU HAVE TO GO TO A DIFFERENT

5  AGENCY, DEPARTMENT OF PERSONNEL ADMINISTRATION, TO GET THEM

6  APPROVED?

7  **A.**  NO.

8  **Q.**  DOESN'T IT TAKE A CERTAIN AMOUNT OF MONTHS FROM THE TIME

9  THE LEGISLATURE --

10        **JUDGE KARLTON:**  WHY DON'T YOU DESCRIBE THE PROCESS

11  INSTEAD OF THIS BEING QUESTION AND ANSWER?  TELL US WHAT IT

12  MEANS.

13        **THE WITNESS:**  OKAY.

14        **JUDGE KARLTON:**  YOU'VE BEEN TOLD BY THE SPECIAL

15  MASTER THAT YOU NEED SOME ADDITIONAL FOLKS.  WHAT DO YOU DO?

16        **THE WITNESS:**  WE WOULD SUBMIT THAT REQUEST INTO THE

17  BUDGET PROCESS WHICH RUNS THROUGH THE DEPARTMENT OF FINANCE,

18  THROUGH THE SENATE AND ASSEMBLY FINANCE STAFF TO THE BUDGET

19  COMMITTEES.

20        THEY REVIEW THEM, ARGUE ABOUT THEM.  IF EVERYTHING

21  WORKS WELL, THEY APPROVE THEM. THEY ORDINARILY THEN, AS WE HAVE

22  IN CALIFORNIA, THEY GO TO A CONFERENCE COMMITTEE BECAUSE WE

23  DON'T HAVE A SOLUTION TO THE BUDGET.

24        BUT ULTIMATELY THE LEGISLATURE HAS TO SAY "YES" OR

25  WE DON'T HAVE THE POSITIONS. WHEN WE HAVE THE POSITIONS IT

1  WOULD PROBABLY TAKE US A MONTH OR MAYBE SIX TO EIGHT WEEKS TO

2  ESTABLISH THOSE POSITIONS.

3           WE WOULD -- OUR RECRUITMENT AND HIRING PROGRAM IS

4  ONGOING, SO WE WOULD CONTINUE THE RECRUITMENT PROCESS WHILE

5  WE'RE DOING THAT.

6           THEN, THERE'S SOME DELAY IN WHEN THEY SHOW UP IN THE

7  STATE CONTROLLER'S OFFICE INFORMATION.  BUT WE DO KNOW WHAT WE

8  HAVE AT THAT POINT, AND WE CAN BEGIN TO TRACK IT. BUT WE USE

9  THE STATE CONTROLLER'S OFFICE INFORMATION CONVENIENTLY WHEN

10 IT'S AVAILABLE, BECAUSE IT'S SOMETHING EVERYBODY CAN HAVE

11 ACCESS TO.  AND IT IS THE OFFICIAL INFORMATION FOR THE STATE ON

12 WHAT STATE EMPLOYEES EXIST.

13           **JUDGE KARLTON:**  IS IT CORRECT, THEN, THAT IF THE

14 LEGISLATURE ESTABLISHES IT THAT'S THE END?  YOU DON'T HAVE TO

15 GO THROUGH ANY OTHER BUREAUCRACY TO DO ANYTHING?

16           **THE WITNESS:**  NO, WE DON'T.

17           **JUDGE KARLTON:**  ALL RIGHT.

18 **BY MR. BIEN:**

19 **Q.**  IS THE PROCESS ONCE THE LEGISLATURE ESTABLISHES THE

20 POSITION -- AS I UNDERSTAND, BECAUSE DEFENDANTS HAVE EXPLAINED

21 THAT TO US IN NUMEROUS MEETINGS, YOU GET NEW POSITIONS, AND YET

22 A CMO AT A PRISON ISN'T ALLOWED TO HIRE FOR THEM YET.  ISN'T

23 THERE A PROCESS OF ALLOCATING THE POSITIONS TO EACH PRISON?

24 **A.**  SURE.  BUT THAT'S WHAT WE DO.

25 **Q.**  THAT TAKES SOME TIME?

1  **A.**  IT TAKES A LITTLE BIT OF TIME, BUT NOT A WHOLE LOT,

2  PARTICULARLY WHEN NOW YOU HAVE THE WORKLOAD STUDY BECAUSE YOU

3  CAN DETERMINE FAIRLY WELL WHAT THE INSTITUTIONS REQUIRE.

4  **Q.**  AND YOU'VE CONTINUED TO HAVE -- ONCE YOU GET THESE

5  POSITIONS, YOU'VE CONTINUED TO HAVE DIFFICULTIES IN RECRUITING

6  AND RETAINING CLINICIANS; ISN'T THAT CORRECT?

7  **A.**  WELL, IT --

8  **Q.**  IS THAT TOO BROAD?  LET ME --

9  **A.**  IT MAY BE TOO BROAD. I DON'T KNOW THAT WE HAVE DIFFICULTY

10  IN DOING THAT. WE HAVE NOT HAD A HUNDRED PERCENT SUCCESS IN

11  FILLING ALL OF OUR POSITIONS. THERE ARE LOTS OF REASONS FOR

12  THAT.

13         BUT WE DO HAVE AN ACTIVE RECRUITMENT AND HIRING

14  PROGRAM THAT IS MAKING HEADWAY. THERE ARE MORE RECENT REPORTS

15  THAN THE ONE YOU'VE GIVEN ME HERE.

16  **Q.**  THERE ARE CERTAIN PARTS OF THE STATE THAT ARE PARTICULAR

17  CHALLENGES FOR THE DEPARTMENT TO HIRE CLINICIANS; ISN'T THAT

18  CORRECT?

19  **A.**  YES.

20  **Q.**  AND THERE ARE CERTAIN CATEGORIES OF CLINICIANS, SUCH AS

21  PSYCHIATRISTS, THAT ARE PARTICULARLY DIFFICULT FOR THE

22  DEPARTMENT TO RETAIN AND HIRE.

23  **A.**  YES, THAT'S TRUE.

24  **Q.**  YOU TESTIFIED THAT COLEMAN CLASS MEMBERS ARE NOT IMPACTED

25  BY OVERCROWDING AS MUCH AS OTHER PRISONERS; IS THAT CORRECT?

1            **JUDGE KARLTON:**  ACTUALLY, HE'S TALKING ABOUT HIGHER

2   LEVELS OF CARE.

3            **THE WITNESS:**  ONLY THOSE IN THE -- WHAT I WOULD CALL

4   THE RESIDENTIAL TREATMENT PROGRAMS WHERE THEY ARE SEGREGATED

5   FROM GENERAL POPULATION.

6   **BY MR. BIEN:**

7   **Q.**  SO YOU AGREE THAT THE VAST MAJORITY OF THE COLEMAN CLASS,

8   85 PERCENT THE TRIPLE CMS PRISONERS ARE IMPACTED BY THE

9   OVERCROWDING TO THE SAME EXTENT AS EVERYONE ELSE?

10  **A.**  TO SOMEWHAT LESSER DEGREE, BECAUSE WE DON'T -- YOU KNOW, IN

11  THIS SITUATION OF OVERCROWDING IT'S HARD TO CONTROL ENTIRELY.

12  BUT WE DON'T WANT OUR TRIPLE CMS POPULATION TO GO INTO A TRIPLE

13  BUNKED GYM, FOR EXAMPLE.

14            SO WE ATTEMPT TO CONTROL THAT. SO A SMALLER

15  PERCENTAGE OF OUR TRIPLE CMS WOULD BE IN THAT KIND OF HOUSING

16  AS OPPOSED TO SOMEONE WHO IS NOT PART OF THE CASELOAD. BUT

17  THERE ARE TRIPLE CMS HOUSED, NEVERTHELESS, IN WHAT YOU CALL

18  "ALTERNATIVE HOUSING SPACES" THAT ARE RETROFITTED FOR HOUSING

19  THAT WERE NOT DESIGNED FOR IT.

20  **Q.**  IN PARAGRAPH 78 OF YOUR WITNESS STATEMENT YOU STATE THAT

21  SOME 80 -- SOME 20 -- YOU SAY 80 PERCENT OF THE TRIPLE CMS

22  CLASS ARE NOT IN THESE NONTRADITIONAL BEDS; IS THAT CORRECT?

23  **A.**  ROUGHLY.  WE THINK ABOUT 20 PERCENT ARE AT ANY GIVEN TIME.

24  **Q.**  SO 20 PERCENT ARE?

25  **A.**  RIGHT.

1  Q.  AND WOULD YOU AGREE THAT 20 PERCENT OF THE TRIPLE CMS CLASS

2  TODAY IS MORE THAN 5,000 PRISONERS?

3  A.  YES.

4  Q.  SO YOU AGREE THAT AS OF TODAY, AS YOU SIT HERE TODAY,

5  NOVEMBER OF 2008, 5,000 --

6           **JUDGE KARLTON:**  DECEMBER, BUT WHO'S COUNTING?

7           **MR. BIEN:**  IT'S DECEMBER NOW.  EXCUSE ME.

8  **BY MR. BIEN:**

9  Q.  IN DECEMBER OF 2008, 5,000 COLEMAN CLASS MEMBERS ARE HOUSED

10 IN WHAT YOU WOULD CALL "BAD BEDS" OR "NONTRADITIONAL BEDS."

11 A.  YES.

12 Q.  YOU'VE, IN FACT, CALLED THEM "UGLY BEDS" IN A REPORT THAT

13 YOU WROTE -- HELPED WRITE TO GOVERNOR SCHWARZENEGGER; ISN'T

14 THAT CORRECT?

15 A.  WHICH REPORT?

16 Q.  THE DEUKMEJIAN REPORT?

17 A.  OH, THE INDEPENDENT REVIEW PANEL.

18 Q.  INDEPENDENT REVIEW PANEL.

19 A.  YES, THERE ARE EUPHEMISTIC TERMS FOR THEM.  THEY ARE BAD

20 BEDS.  THEY ARE UGLY BEDS.  THEY ARE ALTERNATIVE BEDS.  THEY

21 ARE PLACES WHERE HOUSING AN INMATE WAS NOT DESIGNED OR INTENDED

22 WHEN THE PLACE WAS BUILT. AND SO THEY ARE GYMNASIUMS.  THEY ARE

23 DAYROOMS, THINGS LIKE THAT.

24 Q.  ARE YOU AWARE OF ANY PROGRAM POLICY WRITTEN STATEMENT THAT

25 EXCLUDES TRIPLE CMS INMATES FROM THESE BAD BEDS?

1  **A.**  I DON'T THINK WE HAVE A WRITTEN POLICY ON THAT. IT'S A

2  MATTER OF COOPERATION BETWEEN OUR MENTAL HEALTH FOLKS AND THE

3  CLASSIFICATION AND HOUSING PEOPLE IN THE DIVISION OF ADULT

4  INSTITUTIONS.

5  **Q.**  NOW, I'M TALKING ABOUT THE TRIPLE C RIGHT NOW. YOU SAY

6  THERE'S SOME POLICY?

7  **A.**  NO, I SAID I DON'T THINK THERE'S A WRITTEN POLICY DIRECTIVE

8  ON THAT, AS FAR AS I KNOW. I COULD BE WRONG, BUT I DO KNOW AS A

9  MATTER OF COOPERATIVE RELATIONSHIP, IF YOU WILL, BETWEEN THE

10  MENTAL HEALTH ORGANIZATION AND THE DIVISION OF ADULT

11  INSTITUTIONS THAT IF -- THAT A CASELOAD INMATE IS NOT

12  NECESSARILY TREATED BY A NONCASELOAD INMATE IN THIS REGARD.

13  **Q.**  BUT 5,000 OF THEM ARE THERE RIGHT NOW.

14  **A.**  WELL, YEAH. WE'RE 200 PERCENT OVERCROWDED.

15  **Q.**  AND I'LL REPRESENT TO YOU, AND YOU CAN LOOK AT THE -- HAVE

16  YOU LOOKED AT THE DECLARATIONS OF DR. HANEY OR DR. STEWART?

17  **A.**  NO.

18  **Q.**  YOU UNDERSTAND THAT THOSE ARE EXPERTS WORKING FOR THE

19  PLAINTIFFS IN THIS CASE?

20  **A.**  I UNDERSTAND THAT, YES.

21  **Q.**  AND THEY TOURED THE PRISONS AND STUDIED THE PRISONS AND

22  EXAMINED MEDICAL RECORDS AND LOOKED AT THESE ISSUES, AND THEY

23  FIRST ISSUED THEIR REPORTS IN NOVEMBER OF 2007?

24          DO YOU KNOW THAT?

25  **A.**  I DON DON'T KNOW THAT, NO.

1   Q.  YOU STILL HAVEN'T READ THEM?

2   A.  I DON'T KNOW HOW THEY QUALIFY AS CONSULTANTS, AND I HAVEN'T

3   READ THEIR REPORTS.

4   Q.  AND YOU HAVEN'T READ DR. PACKER'S REPORTS, EITHER?

5   A.  NO.

6   Q.  AND HE WORKS FOR YOU?

7   A.  HE WORKS FOR THE DEPARTMENT.

8   Q.  IN YOUR DEPOSITION THAT WAS TAKEN IN AUGUST, YOU STATED

9   YOU'D BE SURPRISED IF OVER 2000 COLEMAN CLASS MEMBERS WERE IN

10  BAD BEDS.

11  A.  UM-HUM.

12          MS. TILLMAN:  OBJECTION, MISSTATES THE TESTIMONY.

13          JUDGE HENDERSON:  HE JUST AGREED WITH YOU.

14          JUDGE KARLTON:  I DON'T THINK YOU HAVE TO GO ANY

15  FURTHER.  THE WITNESS HAS AGREED THAT'S WHAT HE SAID.

16          MR. BIEN:  OKAY.

17          JUDGE KARLTON:  I'M SORRY.

18          IS THAT WHAT YOU SAID, SIR?

19          THE WITNESS:   YES. YES.

20  BY MR. BIEN:

21  Q.  YOU ALSO SAID IF IT WAS MORE THAN THAT YOU'D INVESTIGATE

22  THE ISSUE, HAVE YOUR STAFF INVESTIGATE THE ISSUE.

23  A.  WELL, WE HAVE ADDRESSED THE ISSUE IN THE DIALOGUE THAT I

24  HAVE MENTIONED.  AND WITH THAT PARTICULAR GROUP OF CASELOAD

25  INMATES C3MS, THERE ARE VERY FEW OPTIONS, IF ANY.

1    Q.   WE'RE HOPING THE COURT WILL COME UP WITH AN OPTION.

2           YOU'RE AWARE, MR. DEZEMBER, THAT NOT ONLY ARE THERE

3    TRIPLE CMS INMATES HOUSED IN THOSE BAD BEDS, BUT THERE ARE ALSO

4    EOP INMATES HOUSED IN THOSE BAD BEDS.

5    A.   I'M NOT AWARE OF THAT.

6    Q.   IF YOU'D READ THE EXPERT REPORTS YOU'D SEE TESTIMONY ABOUT

7    THOSE SUBJECTS.

8           I'M GOING TO READ TO YOU FROM DR. HANEY'S REPORT,

9    PARAGRAPH 110, ABOUT CIM. YOU'VE BEEN TO THE CIM PRISON IN THE

10   LAST YEAR?

11   A.   NO, I HAVE NOT.

12   Q.   THIS IS PARAGRAPH 110:

13              "MANY OF THE HOUSING UNITS THAT HAVE BEEN

14              DEVISED AT CIM TO ACCOMMODATE SEVERE OVERCROWDING

15              THAT PLAGUES THE FACILITY ARE SHOCKING TO SEE.  FOR

16              EXAMPLE, THE UNITS I SAW AT CIM WERE BUNKS THAT HAVE

17              BEEN INSTALLED IN THE DAYROOMS ARE VERY TROUBLING IN

18              TERMS OF THE INADEQUATE SPACE AFFORDED THE

19   PRISONERS,

20              THE DEGRADING AND DEGRADED NATURE OF A NUMBER OF THE

21              HOUSING UNITS THEMSELVES AND THE WAY THE PRISONERS

22              ARE ENCLOSED INSIDE THE DAYROOMS OF SOME OF THEM. IN

23              FACT, THE DAYROOM DORMITORIES IN THE CALOOSA UNIT

24   ARE

25              UNLIKE ANYTHING I'VE SEEN IN ANY OTHER PRISON SYSTEM

```
 1              I HAVE VISITED.  THE MAKESHIFT DAYROOM DORMITORY

 2              HOLDS SOME 38 BEDS AND HOUSES TRIPLE CMS AND EOP

 3              PRISONERS TOGETHER.  HOWEVER, THE DAYROOM ITSELF IS

 4              ACTUALLY FENCED IN GIVING THE VERY DISTINCT

 5              IMPRESSION THAT THE ENTIRE DORMITORY IS A LARGE

 6 CAGE,

 7              A CAGED IN DORMITORY WITHIN A PRISON HOUSING UNIT.

 8              DURING THE TOUR WE WERE TOLD THAT THE UNIT WAS CAGED

 9              BECAUSE OF A RIOT THAT OCCURRED SEVERAL YEARS AGO AT

10              CIM THAT RESULTED IN INJURIES TO THE STAFF AND

11              PRISONERS.  THE UNIT, WHICH IS A GENERAL POPULATION

12              UNIT WITHIN THE RECEPTION CENTER FELT VERY MUCH LIKE

13              AN ADMINISTRATIVE SEGREGATION UNIT."

14              MS. TILLMAN:  OBJECTION, NO PENDING QUESTION.

15              JUDGE KARLTON:  I DON'T KNOW WHAT THAT WAS.

16              NOW THAT YOU'VE READ SOMETHING THAT WE'VE ALL READ,

17 WHAT IS IT THAT YOU WANT TO ASK HIM?

18 BY MR. BIEN:

19 Q.  THE QUESTION IS:  HAVE YOU BEEN INFORMED BY ANYONE THAT EOP

20 PRISONERS ARE CURRENTLY BEING HOUSED IN WHAT YOU CALL "BAD" OR

21 "NONTRADITIONAL BEDS"?

22 A.  NO.

23 Q.  ARE YOU AWARE OF ANY POLICY --

24              JUDGE HENDERSON:  HOW MUCH LONGER ARE YOU GOING WITH

25 YOUR -- JUST GIVE ME AN ESTIMATE. WE'RE THINKING OF TAKING A
```

1   BREAK.

2           **MR. BIEN:**  I CAN PROBABLY DO ANOTHER HALF HOUR IF

3   THE COURT WOULD PERMIT.

4           **JUDGE HENDERSON:**  WELL, YOUR OWN ESTIMATE WAS AN

5   HOUR AND 20 MINUTES.

6           **MR. BIEN:**  AM I OVER?

7           **JUDGE HENDERSON:**  WE'RE BEYOND THAT NOW. BUT LET'S

8   TAKE A 15-MINUTE RECESS.

9           **MR. BIEN:**  OKAY.

10          (THEREUPON, A RECESS WAS TAKEN.)

11          **JUDGE HENDERSON:**  I CONFUSED 120 MINUTES WITH AN

12  HOUR AND 20 MINUTES, MR. BIEN, SO YOUR ESTIMATE OF ANOTHER 30

13  MINUTES OR SO IS CORRECT.  I APOLOGIZE.

14          **JUDGE REINHARDT:**  THAT DOESN'T MEAN YOU HAVE TO TAKE

15  IT.

16          **JUDGE HENDERSON:**  RIGHT.  YOU ARE NOT OBLIGED TO

17  TAKE IT.

18  **BY MR. BIEN**

19  **Q**   MR. DEZEMBER, YOU TALKED ABOUT COLEMAN CLASS MEMBERS WHO

20  ACTUALLY ACCESS HIGHER LEVELS OF CARE, LIKE EOP PROGRAMS OR DMH

21  PROGRAMS, NOT BEING IMPACTED BY OVERCROWDING; IS THAT CORRECT?

22  **A**   I DIDN'T SAY THEY WEREN'T IMPACTED.  I SAID THEY WERE

23  IMPACTED LESS THAN PEOPLE LIVING IN GENERAL POPULATION.

24  **Q**   YOU'D AGREE THEY'RE IMPACTED TO THE EXTENT THERE'S A

25  SHORTAGE OF THOSE BEDS AND THEY HAVE TO WAIT LONGER THAN

1  PROGRAM GUIDE STANDARDS TO ACCESS THOSE BEDS?

2  **A**   YES.

3  **Q**   AND YOU AGREE THAT WHEN PRISONERS TODAY IN OUR SYSTEM ARE

4  WAITING FOR THESE HIGHER LEVELS OF CARE, SOME OF THEM ARE

5  HOUSED IN WHAT'S CALLED ALTERNATIVE SETTINGS, SETTINGS THAT ARE

6  NOT APPROVED BY THE PROGRAM GUIDE?

7  **A**   YES.

8  **Q**   MR. DEZEMBER, HAVE YOU EVER WORKED IN A PRISON?

9  **A**   DO YOU MEAN AS A CORRECTIONAL OFFICER OR --

10  **Q**   YES.

11  **A**   NOT AS A CORRECTIONAL OFFICER, NO.

12  **Q**   HAVE YOU EVER WORKED AS A WARDEN?

13  **A**   NOT AS A WARDEN.

14          **JUDGE REINHARDT:**   WHAT HAVE YOU WORKED AS IN THE

15  PRISONS?

16          **THE WITNESS:**   IN THE PRISONS I HAVE SPENT, I THINK,

17  IF I RECALL CORRECTLY, SIX YEARS AS THE CHIEF HEARING OFFICER,

18  AND ALSO THE EXECUTIVE OFFICER OF THE STATE PAROLE BOARD, AND I

19  WAS IN THE PRISONS ALMOST ALL THE TIME.

20  **BY MR. BIEN**

21  **Q**   AND WHEN WAS THAT?

22  **A**   THAT WAS 1977 OR 1976 TO 1982.

23  **Q**   SINCE THEN HAVE YOU HAD WORK EXPERIENCE WHERE YOUR WORK

24  RESPONSIBILITY WAS PRIMARILY INSIDE OF PRISONS?

25  **A**   NO, NOT PRIMARILY.

1  Q    OKAY.  IN THE LAST YEAR, HOW MANY PRISONS HAVE YOU

2  PERSONALLY VISITED?

3  A    THREE.

4  Q    WHICH ONES?

5  A    CSP SACRAMENTO, CALIFORNIA MEDICAL FACILITY, AND THE CSP

6  LANCASTER IN SOUTHERN CALIFORNIA.

7  Q    SO YOU HAVEN'T SEEN CURRENT CONDITIONS AT THE OTHER 30?

8  A    THAT'S CORRECT.

9  Q    WHEN YOU TOURED THE PRISONS, YOU TOURED, YOU WENT THERE FOR

10  MEETINGS.  WERE YOU DOING AN INSPECTION OF THE PRISONS?

11  A    I WAS DOING A NUMBER OF THINGS WHEN I WENT TO THE PRISONS.

12  MEETING WITH STAFF, MEETING WITH THE MANAGEMENT, LOOKING AT THE

13  SPACE WITHIN WHICH THEY CONDUCT THE PROGRAMS.

14  Q    AND EACH ONE OF THOSE -- CMF, FOR EXAMPLE, HAS A REQUEST

15  FOR TREMENDOUS INCREASE IN ITS TREATMENT SPACE THAT IS NOW

16  PENDING; IS THAT CORRECT?

17  A    WHAT SPACE?

18  Q    ISN'T THERE A PROJECT THAT YOU HAVE --

19  A    OH, FOR TREATMENT SPACE?  YES, THERE IS A PROJECT FOR

20  PROVIDING OFFICE AND TREATMENT SPACE.

21  Q    AND YOU AGREE THAT PROJECT IS A GOOD PROJECT?

22  A    YES.

23  Q    IT'S NECESSARY IN ORDER TO DELIVER THE CARE AT THAT

24  INSTITUTION THAT THE PROGRAM GUIDE REQUIRES?

25  A    WELL, I THINK IT'S NECESSARY TO DELIVER A SOUND MENTAL

1  HEALTH PROGRAM CONSISTENT WITH OUR PROGRAM GUIDE.  I DON'T

2  FAULT THE STAFF THERE AT ALL.  I BELIEVE THEY ARE WORKING

3  DILIGENTLY TO PROVIDE CARE TO THESE INMATES AND CONSISTENT WITH

4  THE REQUIREMENTS THAT WE'VE SET FORTH.

5  **Q**   WHEN YOU SAID IN YOUR TESTIMONY THAT YOU HAVE IMPLEMENTED

6  THE PROGRAM GUIDES, IS IT YOUR -- IS IT YOUR TESTIMONY THAT THE

7  PRISON SYSTEM AS IT'S CURRENTLY OPERATING IS OPERATING IN

8  COMPLIANCE WITH EACH AND EVERY ONE OF THE PROGRAM GUIDE

9  STANDARDS?

10 **A**   I DON'T -- I DON'T THINK SO, CERTAINLY NOT IN ALL THE

11 PRISONS, BUT TO A CERTAIN DEGREE THEY ARE, AND MORE SO IN SOME

12 PRISONS THAN OTHERS.  THERE ARE SOME BETTER OPERATING PRISONS

13 WITHIN THE SYSTEM.

14 **Q**   YOU GET -- DO YOU RELY ON THE SPECIAL MASTER'S REPORTS AS

15 ONE OF YOUR MAJOR SOURCES OF INFORMATION CONCERNING COMPLIANCE

16 WITH PROGRAM GUIDE STANDARDS?

17 **A**   THAT, AND THE EXIT CONFERENCES THAT HIS MONITORS CONDUCT

18 AFTER THEY VISITED A PRISON.  THEY ARE THE MOST CONSISTENT

19 MONITORING THAT'S HAPPENING NOW IN OUR PRISON SYSTEM FOR MENTAL

20 HEALTH.

21 **Q**   WOULD YOU AGREE THAT INFORMATION IS BETTER FOR YOU TO RELY

22 ON THAN THE INFORMATION YOU'RE GETTING FROM YOUR NORMAL

23 REPORTING AS A PRISON HEALTHCARE ADMINISTRATOR?

24 **A**   IT DEPENDS ON WHAT THE INFORMATION IS.  USUALLY THE EXIT

25 CONFERENCES ARE FOCUSED ON PARTICULAR ELEMENTS THAT WERE

1  EVALUATED OR REVIEWED OR DISCOVERED AT THAT -- FROM THAT SITE.

2  THE REPORTS OF THE SPECIAL MASTER ARE OFTEN -- THEY TAKE PLACE

3  MONTHS, SOMETIMES A YEAR LATER THAN THE ACTUAL VISITS.  SO --

4  BUT SUFFICE TO SAY I RELY ON THEM A LOT.

5  Q    YOU ARE AWARE THE SPECIAL MASTER IN HIS MOST RECENT REPORT,

6  THE 20A REPORT -- HAVE YOU READ THAT REPORT?

7  A    THE 20TH REPORT?  I HAVE READ IT, YES.

8  Q    AND YOU ARE AWARE THAT THE SPECIAL MASTER HAS FOUND

9  SIGNIFICANT DEFICIENCIES IN THE DEPARTMENT'S ABILITY TO ACCESS

10 HIGHER LEVELS OF CARE FOR PRISONERS WHO NEED THAT?

11 A    YES, THAT'S IN THE REPORT THAT THAT'S A CONTINUING ISSUE.

12 Q    AND HAS DOCUMENTED THE INADEQUACIES OF OFFICE AND TREATMENT

13 SPACE THAT YOU HAVE TALKED ABOUT HERE TODAY?

14 A    YES.

15 Q    AND YOU ALSO FOUND THAT THE DEPARTMENT CONTINUES TO USE

16 THESE ALTERNATIVE SITES IN PRISONS, HOLDING CELLS, OHU, OTHER

17 SITES THAT ARE NOT APPROVED FOR THE PURPOSE THE DEPARTMENT IS

18 USING THEM, AND THAT USE IS CONTINUING?

19 A    YES, THAT IS THE CASE.

20 Q    OKAY.  OKAY.  AND HE FOUND THAT, FOR EXAMPLE, SUICIDE WATCH

21 IS TAKING PLACE IN SOME PRISONS IN HOLDING CELLS, RATHER THAN

22 IN MENTAL HEALTH CRISIS BEDS?

23 A    YOU KNOW, I'D HAVE TO KNOW WHAT THE HOLDING CELL IS, AND

24 I'M NOT SURE WHAT THAT IS, BUT IT CAN OCCUR WHERE IT NEEDS TO

25 OCCUR.  I DON'T THINK I'VE TESTIFIED THAT OUR SPACE IS ADEQUATE

1  FOR THESE HIGHER LEVELS OF CARE.  I'VE TESTIFIED TO THE

2  CONTRARY.  YET THE DEMAND FOR SERVICE IS STILL THERE, AND

3  THAT'S WHY I COMMEND THE STAFF THAT WE HAVE FOR THEIR ABILITY

4  TO PROVIDE THAT UNDER THOSE CONDITIONS.

5  **Q**   THE SPECIAL MASTER ALSO FOUND THAT THE STAFF, IN ATTEMPTING

6  TO DO THEIR JOB, HAS BEEN FORCED TO HAVE NUMEROUS MENTAL HEALTH

7  CONTACTS WITH PATIENTS IN NON-CONFIDENTIAL SETTINGS; ARE YOU

8  AWARE OF THAT?

9  **A**   THAT'S ALSO A PROBLEM, YES.

10 **Q**   OKAY.  AND THE SPECIAL MASTER'S MADE A RECOMMENDATION TO

11 THE DEPARTMENT AS PART OF THE 20A REPORT TO -- FOR THE

12 DEPARTMENT TO TRACK USE OF THESE ALTERNATIVE SITES TO MAKE SURE

13 THE DEPARTMENT KNOWS HOW MANY PRISONERS ARE FORCED TO BE HELD

14 IN HOLDING CELLS AND FOR HOW LONG.  ARE YOU AWARE OF THAT

15 RECOMMENDATION?

16 **A**   YES.

17 **Q**   ISN'T IT CORRECT THAT THE SPECIAL MASTER IN THE PAST, THE

18 PRIOR SPECIAL MASTER, MR. KEATING, HAS MADE SIMILAR

19 RECOMMENDATIONS TO THE DEPARTMENT THAT HAVE NOT BEEN FOLLOWED?

20 **A**   THAT I'M NOT SURE OF.

21      **MR. BIEN:**  I HAVE NO FURTHER QUESTIONS.

22      **JUDGE HENDERSON:**  DOES CCPOA HAVE ANY QUESTIONING OF

23 THIS WITNESS?

24      **MS. LEONARD:**  NO FURTHER QUESTIONS, YOUR HONOR.

25      **JUDGE HENDERSON:**  REDIRECT?

1          **MS. TILLMAN:**  THANK YOU, YOUR HONOR.

2          **REDIRECT EXAMINATION BY MS. TILLMAN**

3    **BY MS. TILLMAN**

4    **Q**   MR. DEZEMBER, IN THE COURSE OF PROVIDING HOUSING FOR THE

5    MENTALLY ILL WITHIN THE DEPARTMENT OF CORRECTIONS AND

6    REHABILITATION, ARE THESE MENTALLY ILL PATIENTS ALSO PROVIDED

7    WITH FOOD?

8    **A**   YES.

9    **Q**   AND THEY ARE PROVIDED WITH MENTAL HEALTHCARE?

10   **A**   YES.

11   **Q**   AND IN THE COURSE OF PROVIDING FOOD AND SHELTER AND CARE TO

12   THE MENTALLY ILL, ARE YOU AWARE THAT SOMETIMES THE LOWEST LEVEL

13   OF THE MENTALLY ILL, THE 3CMS, OR THOSE PATIENTS WHO NEED THE

14   LEAST AMOUNT OF CARE ARE HOUSED IN TRIPLE BUNK AREAS?

15   **A**   I KNOW THAT, YES, SOME OF THEM ARE.

16   **Q**   HAVE YOU EVER RECEIVED ANY REPORT FROM THE COLEMAN SPECIAL

17   MASTER CRITICIZING THE PLACEMENT OF THESE PATIENTS, THESE

18   PATIENTS AT THE LOWEST LEVEL OF MENTAL HEALTHCARE, INTO TRIPLE

19   BUNK AREAS?

20   **A**   NOT -- I'M NOT AWARE OF ANY SPECIFICALLY, NO.

21   **Q**   HAVE YOU EVER RECEIVED ANY ORDER FROM THE COLEMAN COURT

22   DIRECTING THE DEPARTMENT OF CORRECTIONS AND REHABILITATION TO

23   REMOVE THESE PATIENTS OF THE MENTAL HEALTHCARE SYSTEM, THE 3CMS

24   OR ESSENTIALLY SPECIFIC CARE TO REMOVE THEM FROM THE TRIPLE

25   BUNK AREAS?

1  **A**   NO.

2  **Q**   DO YOU --

3         **JUDGE KARLTON:**  YOU REALIZE TECHNICALLY THERE ISN'T

4  ANY WAY YOU COULD COMPLY WITH SUCH AN ORDER IN ANY EVENT; ISN'T

5  THAT TRUE, MR. DEZEMBER?

6         **THE WITNESS:**  WELL, YOU KNOW, YOUR HONOR, I HAVEN'T

7  REALLY THOUGHT ABOUT IT, BUT I'D HAVE TO SAY THAT WAS VERY

8  LOGICALLY TRUE.

9  **BY MS. TILLMAN**

10 **Q**   IN YOUR OPINION, HAS THE DEPARTMENT OF CORRECTIONS AND

11 REHABILITATION BEEN ABLE TO DELIVER ADEQUATE CARE TO THESE

12 INMATES AT THE 3CMS LEVEL WHO ARE HOUSED IN THE TRIPLE BUNK

13 AREAS?

14         **MR. BIEN:**  OBJECTION.  BEYOND HIS EXPERTISE.

15         **JUDGE HENDERSON:**  I WILL ALLOW IT, COUNSEL.

16         **THE WITNESS:**  WOULD YOU ASK IT AGAIN, PLEASE.

17 **BY MS. TILLMAN**

18 **Q**   IN YOUR OPINION, AS THE ADMINISTRATOR OF THE HEALTHCARE

19 PROGRAM FOR THE DEPARTMENT OF CORRECTIONS AND REHABILITATION,

20 HAVE YOU BEEN ABLE TO DELIVER ADEQUATE MENTAL HEALTHCARE TO

21 THOSE 3CMS INMATES IN TRIPLE BUNK AREAS?

22 **A**   ARE THEY ABLE TO, IS THAT WHAT YOU SAID?

23 **Q**   YES.

24 **A**   YES.

25 **Q**   WE'VE ALSO HEARD ABOUT WAIT LISTS FOR MENTAL HEALTH CRISIS

1   BEDS.  CAN YOU TAKE A LOOK AT EXHIBIT 1164-2?  WE'LL PUT IT ON

2   THE SCREEN FOR YOU.

3            **MS. TILLMAN:**  I'M SORRY.  IF I COULD HAVE A MOMENT,

4   YOUR HONOR, WITH THE CHART?  LET ME CORRECT MYSELF. THAT'S

5   EXHIBIT 1290.  IF WE COULD HAVE 1290 PUT UP ON THE SCREEN?

6            (DOCUMENT DISPLAYED.)

7   **BY MS. TILLMAN**

8   **Q**   LOOKING AT EXHIBIT 1290, WE CAN SEE THE WAIT LISTS FOR

9   MENTAL HEALTH CRISIS BEDS, CORRECT?

10            **MR. BIEN:**  YOUR HONOR, THAT'S NOT WHAT THIS EXHIBIT

11  IS.

12            **THE WITNESS:**  THIS LOOKS LIKE EOP PSU CRISIS BED.

13  IT LOOKS LIKE ALL OF THE --

14  **BY MS. TILLMAN**

15  **Q**   MOVING TO PAGE 4 OF THAT EXHIBIT, WE SEE THE MENTAL HEALTH

16  CRISIS BED WAIT LIST?

17  **A**   THIS IS THE MENTAL HEALTH CRISIS BED WAIT LIST, YES.

18  **Q**   LOOKING AT THAT CHART, DO YOU HAVE ANY OPINION AS TO

19  WHETHER OR NOT THE MENTAL HEALTH CRISIS BED WAIT LIST HAS

20  IMPROVED?

21            **JUDGE KARLTON:**  IS THAT ACCURATE?

22            **THE WITNESS:**  THIS?

23            **JUDGE KARLTON:**  YES.

24            **THE WITNESS:**  YES, SIR.

25            **JUDGE KARLTON:**  IF WE GO BACK TO THE WAIT LIST

1  REPORT -- WELL, GO AHEAD. I DON'T WANT TO -- GO AHEAD,

2  MS. TILLMAN.

3          **THE WITNESS:** THIS IS -- THIS CHART DEMONSTRATES

4  IMPROVEMENT COINCIDING, I THINK, WITH THE OPENING OF OUR

5  CALIFORNIA MEDICAL FACILITY MENTAL HEALTH CRISIS BED.

6  **BY MS. TILLMAN**

7  **Q**  AND THAT OPENED IN JUNE 2008; IS THAT CORRECT?

8  **A**  EXCUSE ME?

9  **Q**  DID THAT OPEN IN JUNE 2008?

10 **A**  YES.

11 **Q**  EVEN WITH THE OPENING OF THE MENTAL HEALTH CRISIS BED UNIT

12 AT CALIFORNIA MEDICAL FACILITY, THERE APPEARS TO STILL BE A

13 WAIT LIST FOR MENTAL HEALTH CRISIS BEDS, CORRECT?

14 **A**  YES.

15 **Q**  AND ARE THERE REASONS THAT THERE STILL REMAIN A WAIT LIST

16 FOR MENTAL HEALTH CRISIS BEDS?

17 **A**  WELL, THE DEMAND -- ALL I CAN SAY IS DEMAND EXCEEDS THE

18 SUPPLY OF THOSE BEDS.

19 **Q**  AND WE MOVE TO PAGE 5 OF EXHIBIT 1290. WE SEE THE ASH WAIT

20 LIST, CORRECT?

21 **A**  YES.

22 **Q**  AND ASH PROVIDES INTERMEDIATE CARE BEDS?

23 **A**  EXCUSE ME?

24 **Q**  DOES ASH PROVIDE INTERMEDIATE CARE BEDS?

25 **A**  YES.

1  **Q**   AND, AGAIN, WE SEE A MARKED DECREASE IN THAT WAIT LIST,

2  CORRECT?

3  **A**   YES, CORRECT.

4  **Q**   MOVING TO PAGE 7, THE SALINAS VALLEY PSYCHIATRIC PROGRAM

5  WAIT LIST, DO WE SEE ANY CHANGE IN THE WAIT LIST FOR THE

6  INPATIENT BEDS PROVIDED BY SALINAS VALLEY PSYCHIATRIC PROGRAM

7  OVER THE PAST FOUR MONTHS?

8  **A**   VERY LITTLE.

9  **Q**   WHY IS THAT?

10  **A**   AGAIN, THERE'S A LARGE DEMAND THERE THAT EXCEEDS THE

11  AVAILABLE BEDS.

12  **Q**   WHAT IS THE DEMAND FOR, EXACTLY?

13  **A**   IT'S FOR HIGH CUSTODY INTERMEDIATE CARE FOR SEVERELY

14  MENTALLY ILL INMATES.

15  **Q**   AND THOSE INMATES ARE AMENABLE TO PLACEMENT ONLY AT SALINAS

16  VALLEY PSYCHIATRIC PROGRAM BECAUSE OF THEIR HIGH CUSTODY

17  STATUS?

18  **A**   FOR THE MOST PART.

19  **Q**   IN TERMS OF THE TREATMENT AND CARE OF HIGH CUSTODY INMATES

20  WITH MENTAL ILLNESS ISSUES, ARE YOU FAMILIAR WITH THE USE OF

21  THERAPEUTIC MODULES?

22  **A**   YES.

23          **MR. BIEN:**  BEYOND THE SCOPE OF THE DIRECT -- CROSS.

24  EXCUSE ME.

25          **MS. TILLMAN:**  YOUR HONOR, I WANTED TO GET INTO THE

1    CONTRAST BETWEEN HOLDING CELLS AND THERAPEUTIC MODULES, IF I

2    MIGHT PROCEED ON THAT BASIS?  HOLDING CELLS WERE DISCUSSED ON

3    CROSS-EXAM.

4         **JUDGE HENDERSON:**  DISCUSSING AND OPENING -- GO ON.

5    GO ON.

6    **BY MS. TILLMAN**

7    **Q**   MR. DEZEMBER, ARE YOU FAMILIAR WITH ANY DIFFERENCES OR

8    SIMILARITIES -- LET ME STRIKE THAT.

9         MR. DEZEMBER, CAN YOU EXPLAIN TO THE COURT WHAT A

10   HOLDING CELL IS VERSUS WHAT A THERAPEUTIC MODULE IS?

11   **A**   WELL, HOLDING CELLS MAY VARY FROM PRISON TO PRISON.  IT'S A

12   PLACE WHERE THEY'RE KEEPING AN INMATE WHILE MOVING FROM ONE

13   LOCATION TO ANOTHER, AND IT'S A TEMPORARY LOCATION.

14        A THERAPEUTIC TREATMENT MODULE IS A DESIGNED -- I

15   DON'T KNOW -- PHONE BOOTH SORT OF THING WITH A MESH -- WIRE

16   MESH AROUND IT.  IT'S FOR THE PURPOSE OF PERMITTING ONE-ON-ONE

17   OR GROUP THERAPY WITH A CLINICAL PSYCHOLOGIST OR SOCIAL WORKER

18   IN A SETTING IN WHICH THEY WOULD BE AT RISK OTHERWISE IF THE

19   INMATES WERE NOT SO CONTAINED.

20   **Q**   WHEN YOU SAY "AT RISK," AT RISK FOR WHAT?

21   **A**   ATTACK.  WE DO HAVE STAFF THAT ARE ATTACKED FROM TIME TO

22   TIME.

23   **Q**   AND WHEN YOU PREVIOUSLY TESTIFIED THAT YOU RELY UPON THE

24   MONITORING TOURS OF THE SPECIAL MASTER'S TEAM OF EXPERTS TO

25   OBTAIN INFORMATION ABOUT THE OPERATIONS OF THE WHOLE RANGE OF

1  CDCR INSTITUTIONS PROVIDING MENTAL HEALTHCARE, HAVE YOU

2  RECEIVED ANY INFORMATION CRITICAL OF THE USE OF HOLDING CELLS

3  FROM THE SPECIAL MASTER'S TEAM?

4  **A**   HOLDING CELLS?

5  **Q**   CORRECT.

6  **A**   I THINK -- YOU KNOW, I CAN'T REMEMBER SPECIFIC, BUT MY

7  GENERAL SENSE IS IF THEY'RE USED FOR ANYTHING MORE THAN A VERY

8  SHORT STAY, THEY'RE INAPPROPRIATE.

9           **JUDGE KARLTON:**  AND YOU HAVE BEEN TOLD THAT BY THE

10  SPECIAL MASTER THAT'S GOING ON?

11           **THE WITNESS:**  YES.

12  **BY MS. TILLMAN**

13  **Q**   AND HAVE YOU RECEIVED ANY REPORTS FROM THE SPECIAL MASTER'S

14  TEAM CRITICAL OF THE USE OF THERAPEUTIC MODULES?

15  **A**   INITIALLY, YES.  ALTHOUGH, THERE'S BEEN -- THERE WAS A

16  RECOGNITION THAT AT LEAST UNDER THE CONDITIONS WE'RE USING THEM

17  THEY WERE NECESSARY, AND SO THE SPECIAL MASTER ALLOWED HIS

18  MONITORING STAFF TO ASSIST US WITH PUTTING TOGETHER AN

19  APPROPRIATE DESIGN THAT WOULD SUIT BOTH THE PURPOSES OF THE

20  COMMUNICATION WITH THE INMATE THAT'S NECESSARY FOR THE THERAPY

21  AND ALSO THE SAFETY OF THE CLINICIAN.

22  **Q**   WHEN YOU SAY "AN APPROPRIATE DESIGN," WHAT ARE YOU

23  REFERRING TO?

24  **A**   WELL, WE NOW HAVE A STANDARD DESIGN THAT WE HAVE GIVEN THE

25  PRISON INDUSTRY AUTHORITY WHEN THEY BUILD THESE.  THAT IS A

 1   DESIGN THAT WAS CONCURRED IN BY AT LEAST ONE OR MORE OF THE

 2   SPECIAL MASTER'S MONITORS.

 3              **JUDGE KARLTON:**  DR. METZNER APPROVED THE PRESENT

 4   DESIGN?

 5              **THE WITNESS:**  YES, DR. METZNER WAS INVOLVED IN THAT.

 6   **BY MS. TILLMAN**

 7   **Q**   IS THE PRESENT DESIGN ALL THAT DIFFERENT FROM THE PREVIOUS

 8   DESIGN?

 9   **A**   IT'S SOMEWHAT DIFFERENT.  I DON'T KNOW.  I CAN'T TELL YOU

10   EXACTLY WHAT THE DIFFERENCES ARE.  I THINK IT'S A LITTLE

11   ROOMIER, MORE SPACE IN IT.

12   **Q**   TO THE EXTENT THAT YOU REVIEW THE SPECIAL MASTER'S

13   MONITORING REPORTS THAT ARE FILED WITH THE COLEMAN COURT, ARE

14   YOU AWARE OF THE SPECIAL MASTER'S LATEST 20TH ROUND REPORT'S

15   FINDINGS AS TO THE DECREASED VACANCIES AT CERTAIN INSTITUTIONS?

16   **A**   WELL, I THINK AS -- YES, IN THAT REPORT, HE SUMMARIZES

17   EVERY INSTITUTION, AND SOME DISCUSSIONS ARE FARING QUITE WELL

18   IN ALL OF THE CATEGORIES WE'RE CONCERNED ABOUT, AND SOME

19   INSTITUTIONS ARE NOT, AND THAT INCLUDES THE VACANCY RATES AT

20   THE INDIVIDUAL FACILITY.

21   **Q**   SO, FOR INSTANCE, THE CALIFORNIA INSTITUTE FOR WOMEN, THE

22   REPORT INDICATED, QUOTE, "ACHIEVED NEARLY FULL STAFFING WITH A

23   VACANCY RATE OF .018."  THAT'S AT PAGE 306 OF THE REPORT.  WAS

24   THAT A FINDING THAT YOU AGREED WITH?

25   **A**   I ACCEPT IT.  I DID NOT GO AND MAKE MY OWN SURVEY.  I WAS

1  VERY HAPPY TO SEE THAT RESULT.

2  **Q**   AND, LIKEWISE, THE REPORT INDICATED THAT AT FOLSOM STATE

3  PRISON THEY WERE ABLE TO ACHIEVE FULL MENTAL HEALTH CLINICAL

4  STAFFING WITH THE EXCEPTION OF .75 RECREATIONAL THERAPIST.

5  AND, AGAIN THAT WAS SOMETHING YOU WERE HAPPY TO SEE?

6  **A**   YES, YES, OF COURSE.

7  **Q**   LIKEWISE, HIGH DESERT STATE PRISON WAS FOUND TO HAVE

8  CONSISTENT COMPLIANCE WITH QUARTERLY CASE MANAGER CONTACTS AND

9  ANNUAL INTERDISCIPLINARY TREATMENT TEAM REVIEW OF THE CLIENTS,

10  PATIENTS, WITH RECEPTION SERVICES APPEARING TO BE SUBSTANTIALLY

11  IN COMPLIANCE WITH PROGRAM GUIDE REQUIREMENTS.  WAS THAT A

12  FINDING THAT YOU ALSO ACCEPTED?

13  **A**   YES.

14  **Q**   AND THE CALIFORNIA INSTITUTE FOR MEN, THE REPORT INDICATED

15  THAT ALL SUPERVISING CLINICAL POSITIONS WERE FILLED.  AGAIN A

16  FINDING THAT YOU ACCEPTED?

17  **A**   YES.

18  **Q**   SIERRA CONSERVATION CENTER WAS REPORTED HAD NO MENTAL

19  HEALTH VACANCIES AND REMAINED RICHLY STAFFED AS TO

20  INMATE/CLINICIAN RATIOS.  WAS THAT A REPORT FINDING THAT YOU

21  ACCEPTED?

22  **A**   YES.

23  **Q**   IN DISCUSSING THE POTENTIAL IMPACT OF A PRISONER RELEASE

24  ORDER, YOU WERE POSED VARIOUS HYPOTHETICALS BY PLAINTIFF

25  COUNSEL.  IT WAS INDICATED IN PLAINTIFF COUNSEL'S HYPOTHETICALS

1  THAT THERE MIGHT BE A PRISONER RELEASE ORDER, SAY, OF A

2  MAGNITUDE REQUIRING THE REDUCTION OF THE 3CMS POPULATION.

3  PUTTING IT IN THE FRAMEWORK THAT WAS DISCUSSED IN THE SPECIAL

4  MASTER'S MAY 31, 2000 REPORT, AND THAT'S EXHIBIT 1292, WOULD

5  YOU AGREE THAT EVEN THE RELEASE OF A HUNDRED THOUSAND INMATES

6  WOULD LIKELY LEAVE THE DEFENDANTS WITH A LARGELY UNMITIGATED

7  NEED TO PROVIDE INTENSIVE MENTAL HEALTH SERVICES TO PROGRAM

8  POPULATIONS THAT WOULD REMAIN UNDIMINISHED BY A REDUCTION OF

9  SOME 19,000 3CMS INMATES?

10          **JUDGE KARLTON:**  WERE YOU FAMILIAR WITH THESE

11 FIGURES?  WAS THIS SOMETHING NEW TO YOU, TOO?

12          **THE WITNESS:**  THIS WAS NOT NEW.  I SAW THIS REPORT

13 AT THE TIME.  IN MY EARLIER TESTIMONY HERE I REFERENCED

14 CONVERSATIONS WITH SPECIAL MASTER KEATING ON THIS POINT.

15 **BY MS. TILLMAN**

16 **Q**   IS IT A STATEMENT THAT YOU AGREE WITH?

17 **A**   WELL, LET ME SAY I AGREE WITH IT, AND IT INFLUENCES THAT I

18 AGREE WITH IT, BECAUSE I BELIEVE HE IS VERY THOROUGHLY FAMILIAR

19 WITH OUR PRISON SYSTEM AND OUR MENTAL HEALTH PROGRAM.  AND I

20 THINK AT THAT TIME THAT THIS REPORT CAME OUT, I WAS NOT

21 EMPLOYED BY THE DEPARTMENT OF CORRECTIONS AND REHABILITATION.

22 NEVERTHELESS, I, OVER THE YEARS, HAVE MAINTAINED CONTACT WITH

23 MR. KEATING, AS WELL AS WITH MR. LOPES, AND ON A COUPLE OF

24 OCCASIONS I WAS HIRED BY THE DEPARTMENT AS A CONSULTANT.

25 **Q**   AND WOULD YOU AGREE WITH THE OTHER HYPOTHETICAL POSED IN

1  THE SPECIAL MASTER'S MAY 31, 2007 REPORT, THAT EVEN A PRISONER

2  RELEASE ORDER ASKING FOR HALF THAT AMOUNT, SAY A POPULATION

3  DECREASE OF 50,000 INMATES, WITH A REDUCTION OF THE CASELOAD BY

4  9,500 PATIENTS, WOULD STILL NOT RAISE STAFFING RESOURCES INTO

5  EQUILIBRIUM WITH THE MENTAL HEALTH CASELOAD?

6  **A**   WELL, I AM AWARE OF THAT, AND I CERTAINLY THINK AT THE TIME

7  IT WAS SPOKEN IT WAS TRUE.  IT PROBABLY IS NOW AS WELL SINCE

8  THE STAFFING REQUIREMENTS ARE INCREASING AND WE'RE STILL

9  RECRUITING WITHIN A RELATIVELY FIXED POOL OF AVAILABLE

10 CLINICIANS.

11 **Q**   AND ALSO BECAUSE CLINICIANS CAN'T BE MOVED AROUND OR SPREAD

12 OUT LIKE BUTTER, AS MR. KEATING SAID?

13 **A**   THAT'S CORRECT.  AND THERE WAS SOME PLACES IN THE STATE

14 WHERE WE HAVE MUCH MORE DIFFICULTY FINDING THEM.

15 **Q**   EVEN IF YOU WERE DIRECTED TO ENGAGE IN A RETROFIT OF

16 EXISTING CALIFORNIA DEPARTMENT OF CORRECTIONS AND

17 REHABILITATION SPACE TO ENABLE ADDITIONAL TREATMENT SPACE AND

18 OFFICE SPACE, PERHAPS LEFT VACANT BY A PRISONER RELEASE ORDER,

19 WOULDN'T THAT TAKE SOME AMOUNT OF TIME TO DO, TO ACCOMPLISH?

20 **A**   IT SHOULD BE CLEAR TO EVEN THOSE WHO'VE BEEN INVOLVED HERE

21 THAT THE STATE'S CAPITAL OUTLAY PROCESS IS SLOW.  IT HAS

22 MULTIPLE STEPS, AND I WOULD -- YOU KNOW, IF I EXPECT A BUILDING

23 TO BE DONE THREE YEARS AFTER IT'S AUTHORIZED BY THE

24 LEGISLATURE, THAT WOULD BE FAIRLY REASONABLE EXPECTATION.  A

25 SHORTER TIME PERIOD WOULD NOT.

1  Q   AND SO WHEN YOU TALK ABOUT THE CAPITAL OUTLAY PROCESS,

2  THERE FIRST MUST BE AUTHORIZATION TO ENGAGE IN THE EFFORT TO

3  RETROFIT A BUILDING?

4  A   THERE'S AUTHORIZATION TO BEGIN THE PROCESS.  THERE'S

5  AUTHORIZATION AT THE END OF EACH STEP AND THE BEGINNING OF THE

6  NEXT.

7  Q   WHAT ARE THOSE STEPS?

8  A   WELL, THERE'S A DESIGN, AND THIS -- ALL OF THESE

9  APPROVAL -- AUTHORIZATIONS REQUIRE FUNDING.  SO THERE'S A

10 DESIGN THAT'S FUNDED WHICH PRODUCES A PRELIMINARY PLAN.  IT

11 GOES THROUGH A PROCESS OF BEING APPROVED FOR THE WORKING

12 DRAWINGS.  THEN IT GOES INTO BID PACKAGES.  THEN IT GOES OUT ON

13 THE STREET, AND BIDS ARE ACCEPTED, AND THEN CONSTRUCTION

14 BEGINS.  YOU CAN HAVE A COUPLE OF YEARS PASS DURING THAT

15 PROCESS THE WAY THAT SYSTEM IS STRUCTURED NOW.

16 Q   AND SO AT EVERY STEP OF THE WAY, FROM THE DESIGN STEP, TO

17 THE PRELIMINARY DRAWING STEP, TO THE WORKING DRAWING STEP, MUST

18 THE DEPARTMENT RETURN TO THE LEGISLATURE FOR FUNDING UNDER A

19 CAPITAL OUTLAY BUDGET CHANGE PROPOSAL?

20 A   ORDINARILY.  IF THE LEGISLATURE AUTHORIZES A LEASE REVENUE

21 BOND FINANCING FOR THAT, THEN IT'S GOING TO BE CONTROLLED

22 THROUGH THE PUBLIC WORKS BOARD WITH ONLY REPORTS TO THE

23 LEGISLATURE, BUT IT STILL HAS THAT SAME STEP-BY-STEP PROCESS.

24 Q   AND SO THE OUTCOME IS IT CAN TAKE A MINIMUM OF WHAT LENGTH

25 OF TIME TO ENGAGE IN THIS PROCESS OF GOING FROM THE DESIGN TO

1  THE ACTUAL CONSTRUCTION STAGE?

2  **A**  IT'S GOING TO BE SEVERAL YEARS.

3  **Q**  AND DURING THAT TIME YOU'LL MAKE DO WITH WHAT YOU HAVE?

4  **A**  I CAN'T HEAR.

5  **Q**  DURING THAT TIME YOU'LL MAKE DO WITH WHAT YOU HAVE?

6  **A**  THAT'S ALL THAT IS AVAILABLE.

7          **MS. TILLMAN:**  THANK YOU.  NOTHING FURTHER.

8          **MR. BIEN:**  CAN YOU SHOW PLAINTIFF EXHIBIT 585,

9  PLEASE?  FIRST PAGE?

10         MAY I APPROACH THE WITNESS?

11         **JUDGE HENDERSON:**  YOU MAY.

12              <u>**RECROSS EXAMINATION BY MR. BIEN**</u>

13 **BY MR. BIEN**

14 **Q**  IS PLAINTIFF'S EXHIBIT 585 A DOCUMENT THAT YOU RECEIVE IN

15 THE COURSE OF YOUR WORK AS CHIEF DEPUTY SECRETARY?

16 **A**  YES.

17 **Q**  OKAY.  AND THIS IS A REPORT PREPARED BY THE HEALTHCARE

18 PLACEMENT OVERSIGHT PROGRAM RUN BY MR. RICK JOHNSON?

19 **A**  YES.

20 **Q**  AND YOU'VE TESTIFIED THIS IS SOME OF THE MOST ACCURATE

21 INFORMATION YOU RECEIVE?

22         **MS. TILLMAN:**  I OBJECT TO THE EXTENT THIS PARTICULAR

23 EXHIBIT IS AFTER THE AUGUST 30, 2008 DEADLINE.  IT REFERS TO

24 INFORMATION GATHERED IN SEPTEMBER 2008, I BELIEVE.

25         **MR. BIEN:**  THE CHART THEY PUT UP COVERED SEPTEMBER A

1  MINUTE AGO.

2          **JUDGE HENDERSON:**  PROCEED.

3          **THE WITNESS:**  WHAT WAS THE QUESTION AGAIN?

4  **BY MR. BIEN**

5  **Q**   YOU'VE TESTIFIED THAT MR. JOHNSON'S DEPARTMENT PROVIDES

6  GOOD, ACCURATE INFORMATION THAT YOU RELY ON; ISN'T THAT

7  CORRECT?

8  **A**   YES.

9  **Q**   OKAY.  AND THIS IS A REPORT ON PRISONERS WHO ARE REFERRED

10 FOR MENTAL HEALTH CRISIS BEDS AND NEED ASSISTANCE IN GETTING

11 THERE BY THE -- BY HEADQUARTERS BECAUSE THEY CAN'T GET TO THEM

12 IN THEIR OWN PRISON; IS THAT CORRECT?

13 **A**   WELL, THIS REPORT DOES THAT, AND OTHER THINGS.

14 **Q**   OKAY.  SO IS IT CORRECT THAT IN THE MONTH OF SEPTEMBER --

15 I'M LOOKING AT THE FIRST PARAGRAPH -- MR. JOHNSON REPORTS TO

16 YOU THERE WERE 359 REFERRALS FOR MENTAL HEALTH CRISIS BEDS,

17 RIGHT?

18 **A**   YES.

19 **Q**   AND OF THE 359, 100 GOT TO A MENTAL HEALTH CRISIS BED; IS

20 THAT RIGHT?

21 **A**   IT SAYS A HUNDRED WERE PLACED.

22          **JUDGE KARLTON:**  THAT MEANS THEY GOT TO A MENTAL

23 HEALTH CRISIS BED, RIGHT?

24          **THE WITNESS:**  WELL, I CERTAINLY ASSUME SO.  IT

25 DOESN'T SAY THAT.  I'M JUST TRYING TO BE ACCURATE.

1  **BY MR. BIEN**

2  **Q**   OKAY.  THEN IF YOU GO DOWN TWO PARAGRAPHS BELOW, IT SAYS OF

3  THE HUNDRED TRANSFERRED, 27 CASES WERE TRANSFERRED WITHIN THE

4  REQUIRED 24 HOURS?

5  **A**   YES.

6  **Q**   OKAY.  SO OF THE 359 REFERRALS IN SEPTEMBER 2008, 27 OF THE

7  PATIENTS WERE PLACED IN A MENTAL HEALTH CRISIS BED WITHIN THE

8  REQUIRED 24 HOURS, RIGHT?

9  **A**   YES.

10  **Q**   FOR THE HUNDRED RIGHT BEFORE THAT, FOR THE HUNDRED THAT DID

11  GET TO MENTAL HEALTH CRISIS BEDS, THE AVERAGE NUMBER OF DAYS

12  WAITING WAS 2.45, RIGHT?

13  **A**   YES.

14  **Q**   AND THE PROGRAM GUIDE STANDARD IS 24 HOURS OR LESS, RIGHT?

15  **A**   YES.

16  **Q**   OKAY.

17        **MR. BIEN:**  CAN YOU SHOW 263, PLEASE?  I THINK I'M

18  GOING TO GIVE YOU A COPY, ALSO.

19        **JUDGE KARLTON:**  I THINK WE'VE GOT A COPY.  MAYBE WE

20  DON'T.

21        (DOCUMENT DISPLAYED.)

22  **BY MR. BIEN**

23  **Q**   MR. DEZEMBER, THIS IS PLAINTIFF'S EXHIBIT 263 THAT WAS

24  CREATED BASED ON DATA THAT WE RECEIVE AND THE SPECIAL MASTER

25  RECEIVES FROM YOU.  THIS VERY CHART -- THIS VERY DOCUMENT WE

1  GET FROM MR. JOHNSON.  IT'S ALSO PROVIDED TO US, AS YOU KNOW.

2  AND ON THE TOP LINE YOU'LL SEE ARE THE -- IS THE REFERRAL

3  NUMBER, THE SAME NUMBER I SHOWED YOU HERE, THE 359.  AND THE

4  BOTTOM LINE IS THE -- AND THE BOTTOM LINE IS THE TRANSFER

5  NUMBER, THE SAME NUMBER WE JUST DISCUSSED, THE HUNDRED

6  TRANSFERRED.

7           YOU'LL NOTE THAT BETWEEN JUNE AND JULY AND AUGUST

8  THERE WAS SOME IMPROVEMENT, WASN'T THERE, IN TERMS OF THE

9  NUMBER OF PRISONERS THAT ACTUALLY WERE ABLE TO BE TRANSFER TO A

10 MENTAL HEALTH CRISIS BED?

11 **A**   YES.

12 **Q**   OKAY.  AND DO YOU ATTRIBUTE THAT TO THE OPENING OF A 50-BED

13 MENTAL HEALTH CRISIS BED FACILITY AT CMF?

14 **A**   IT AT LEAST HAD A POSITIVE IMPACT ON THAT.

15 **Q**   AND YOU HAVE BEEN SUBJECT TO A COURT ORDER TO BUILD AN

16 ADDITIONAL 50-BED MENTAL HEALTH CRISIS BED UNIT AT CMC PRISON;

17 ISN'T THAT CORRECT?

18 **A**   THAT'S CORRECT.

19 **Q**   AND AS OF TODAY, IS THAT PROGRAM UNDER CONSTRUCTION?  IS

20 THERE ANY --

21 **A**   NOT UNDER CONSTRUCTION.  IT IS IN THAT CAPITAL OUTLAY

22 PROCESS I DESCRIBED A FEW MINUTES AGO.

23 **Q**   SEVERAL YEARS AWAY STILL?

24 **A**   PROBABLY.

25 **Q**   ARE THERE ANY OTHER CRISIS BED CONSTRUCTION PROJECTS THAT

1  YOU CAN TELL THE COURT ABOUT THAT ARE --

2  **A**   NOT INDIVIDUAL.  THEY ARE ALL PART OF THE PLAN, EITHER IN

3  THE AUGUST '08 PLAN OR THE PLAN PENDING WITH THE RECEIVER.

4  **Q**   YOU TESTIFIED THAT THE SPECIAL MASTER HASN'T CRITICIZED THE

5  DEPARTMENT'S USE OF THERAPEUTIC MODULES AND HOLDING CELLS.

6  ISN'T IT CORRECT THAT THE SPECIAL MASTER IN HIS 20A REPORT

7  REPEATEDLY CRITICIZED THE DEPARTMENT'S USE OF THERAPEUTIC

8  MODULES AND HOLDING CELLS?

9  **A**   I DON'T THINK THAT'S TRUE.  MAYBE THE HOLDING CELLS, BUT I

10  DON'T THINK THE THERAPEUTIC MODULES.

11  **Q**   READING FROM PAGE 105 OF THE SPECIAL MASTER'S 20A REPORT

12  ABOUT SAN QUENTIN:

13

14          "AVAILABLE GROUP ROOMS CONTAINED THERAPEUTIC

15       MODULES; HOWEVER, STAFF ACKNOWLEDGED THAT THESE

16       THERAPEUTIC MODULES DID NOT MEET THE COLEMAN

17       STANDARD.  STAFF ALSO REPORTED ENVIRONMENTAL ISSUES

18       OF VENTILATION NOISE FROM COOLING FANS IMPACTED ON

19       THE ACOUSTICAL QUALITY OF THE SESSIONS AND WAS

20       DISTRACTING TO THE PARTICIPANTS."

21          YOU ARE AWARE THAT SPECIAL MASTER HAS CRITICIZED THE

22  DEPARTMENT FOR -- WHEN IT USED THERAPEUTIC MODULES, SETTING

23  THEM UP IN LOCATIONS THAT WERE NOT APPROPRIATE; IS THAT

24  CORRECT?

25  **A**   THAT'S CORRECT.

1  Q    SUCH AS LAUNDRY ROOMS THAT WERE NOISY OR OTHER PLACES?

2  A    YES.

3  Q    IS THAT CORRECT?

4  A    YES.

5  Q    HE'S ALSO CRITICIZED THE DEPARTMENT FOR USING THE

6  THERAPEUTIC MODULES FOR GROUP THERAPY WHEN THEY ARE SET UP IN A

7  STRAIGHT LINE SO THE PRISONERS CAN'T SEE EACH OTHER; ISN'T THAT

8  CORRECT?

9  A    THAT'S CORRECT.

10  Q    AND HE'S ALSO CRITICIZED THE DEPARTMENT FOR SETTING UP

11  THERAPEUTIC MODULES FOR USE IN GROUP THERAPY IN

12  NON-CONFIDENTIAL SETTINGS WHERE EVERYONE COULD BE OBSERVING THE

13  GROUP THERAPY OR HEARING OR SEEING IT?

14  A    I'M NOT SURE WHAT YOU'RE REFERRING TO.  I WOULD THINK THAT

15  WOULD BE AN APPROPRIATE CRITICISM.

16  Q    YOU ARE AWARE THE THERAPEUTIC MODULES HAVE BEEN SET UP BY

17  THE DEPARTMENT IN NON-CONFIDENTIAL SETTINGS?

18  A    YES, I AM.

19  Q    YOU ALSO TESTIFIED ABOUT THE WAITING LIST FOR DMH CARE AND

20  HOW THOSE -- SOME OF THEM HAVE IMPROVED AND SOME OF THEM ARE

21  PERSISTENT.  ISN'T IT CORRECT THAT THE SPECIAL HAS FOUND THAT

22  CLINICIANS HAVE -- IN MANY PLACES HAVE STOPPED REFERRING

23  PATIENTS FOR DMH CARE BECAUSE IT'S SO DIFFICULT FOR THEM TO

24  ACCESS DMH CARE?

25  A    WELL, IN FACT, WE HAVE -- WE'RE RESPONDING TO AN ORDER OF

1  THE COURT TO DEVELOP A PLAN FOR DEALING WITH ATASCADERO STATE

2  HOSPITAL WHICH HAS BEDS AVAILABLE THAT ARE NOT BEING USED, AND

3  WE HAVE A MAJOR PROJECT UNDERWAY FOR THAT THAT HAS IMPLICATIONS

4  FOR SALINAS VALLEY'S INTERMEDIATE CARE FACILITY AS WELL.

5          SO WE ARE APPROACHING THAT IN A VERY VIGOROUS AND

6  INTENSE MANNER, AND IT'S -- IT'S -- IT'S A COMPLICATED

7  SITUATION, BUT I BELIEVE WE'RE ON THE TRACK TO WORKING THAT

8  OUT.

9  **Q**   YOU AGREE, THOUGH, THAT THE -- RIGHT NOW THE WAITING LISTS

10 ARE NOT AN ACCURATE INDICATOR OF THE NEED FOR THE LEVEL OF CARE

11 BECAUSE CLINICIANS ARE NOT NECESSARILY REFERRING EVERYONE WHO

12 SHOULD BE REFERRED --

13 **A**   WELL, I DON'T NECESSARILY AGREE THAT CLINICIANS ARE NOT

14 REFERRING.  THAT IS SUGGESTED AS A POSSIBLE CAUSE, BUT I

15 HAVEN'T ESTABLISHED THAT.

16          I THINK THE WAITING LISTS ARE A GOOD INDICATION.

17 WHEN YOU SEE A LONG WAITING LIST AT SALINAS VALLEY, FOR

18 EXAMPLE, FOR INTERMEDIATE CARE AND A SPACE AVAILABLE AT

19 CALIFORNIA MEDICAL FACILITY OR ATASCADERO STATE HOSPITAL, THAT

20 RAISES TO ME THE ISSUE OF WHETHER OR NOT THOSE INMATES WAITING

21 FOR SALINAS VALLEY SHOULD MORE APPROPRIATELY BE SENT TO THOSE

22 OTHER LOCATIONS BUT -- FOR THEIR CUSTODY DETERMINATION.  AND SO

23 WE ARE FOCUSING ON THE REVIEW OF CUSTODY DETERMINATIONS TO SEE

24 IF, IN FACT, THESE ARE HIGH CUSTODY INMATES OR REQUIRE HIGH

25 CUSTODY TREATMENT AND, SO, THEREFORE, HAVE TO STAY AT SALINAS

1  VALLEY OR OTHERWISE COULD THEY BE REFERRED TO INTERMEDIATE CARE

2  AT OTHER LOCATIONS.

3        THAT'S A PROBLEMATIC SITUATION CAUSED BY, AS I

4  INDICATED BEFORE, OPERATING A MENTAL HEALTH PROGRAM IN A HIGHLY

5  SECURE PRISON ENVIRONMENT.

6        **JUDGE KARLTON:**  YOU'RE SAYING THAT YOU ARE UNAWARE

7  THAT THERE IS, IN FACT, A PROBLEM WITH CLINICIANS FINALLY

8  GIVING UP AND NOT REFERRING PEOPLE FOR MENTAL HEALTH CRISIS

9  BEDS BECAUSE OF THE DIFFICULTY IN GETTING THEM PLACED?

10       **THE WITNESS:**  I KNOW THAT WE HAD THAT PROBLEM IN

11  MORE CASES THAN WE SHOULD.  I AM NOT AWARE THAT THAT'S A

12  CURRENT CAUSE OF THIS.

13  **BY MR. BIEN**

14  **Q**   LET ME REFER YOU TO 20A AGAIN, PLEASANT VALLEY STATE

15  PRISON, PAGE 162 REFERS TO:

16        "DMH ACUTE AND INTERMEDIATE LEVELS OF CARE

17        DECREASED DURING THE MONITORING PERIOD, INDICATING

18        UNDERUTILIZATION OF THE PROCESS.  MENTAL HEALTH

19        CRISIS BED STAFF APPEAR TO FOCUS ON ONLY REFERRING TO

20        THE DMH ACUTE PSYCHIATRIC PROGRAM AND MADE ONLY TWO

21        REFERRALS THERE, ONE OF WHICH WAS RESCINDED WHEN THE

22        INMATE IMPROVED.  IT TOOK ALMOST THREE MONTHS FOR THE

23        SECOND INMATE TO RECEIVE A BED ASSIGNMENT.  HE WAS

24        TRANSFERRED TWO DAYS AFTER THE BED WAS ASSIGNED."

25        AVENAL PRISON, PAGE 174:

1        "AS REPORTED IN PREVIOUS MONITORING REPORTS

2    AVENAL DID NOT APPEAR TO CONSISTENTLY CONSIDER

3    REFERRALS TO ACUTE OR INTERMEDIATE DMH ADMISSION

4    PROGRAMS AS TREATMENT OPTIONS, NOTWITHSTANDING THAT

5    HALF OF ALL INMATES PLACED IN THE OHU REMAINED FOR

6    LONGER PERIODS THAN 72 HOURS OR HAD SIGNIFICANT

7    MULTIPLE ADMISSIONS."

8        SALINAS VALLEY STATE PRISON, PAGE 182:

9        "SALINAS VALLEY STATE PRISON DID NOT MOVE INMATES

10   WHEN TRANSFERS WERE WARRANTED.  HIGHER LEVELS OF CARE

11   WERE RARELY USED.  DESPITE HAVING A BUSY MHCB AND

12   MAKING REGULAR USE OF HOLDING CELLS, SALINAS VALLEY

13   STATE PRISON MADE ONLY ONE REFERRAL TO ACUTE CARE IN

14   SIX MONTHS.  FIVE INMATES WERE REFERRED TO

15   INTERMEDIATE CARE, STAFF TOOK TOO LONG TO COMPLETE

16   NECESSARY PAPERWORK.  WAITING TIMES FOR INTERMEDIATE

17   CARE BEDS RANGE FROM A FEW DAYS TO OVER FOUR MONTHS.

18   SALINAS VALLEY STATE PRISON EXPLAINED THAT NO

19   REFERRALS TO ASH WERE MADE BECAUSE LEVEL 4 INMATES

20   WERE INELIGIBLE FOR ADMISSION DUE TO THEIR SECURITY

21   LEVEL."

22        **MS. TILLMAN:**  OBJECTION.  NO PENDING QUESTION, AND

23   THIS IS 2007 DATA, SO NOT RELEVANT.

24        **MR. BIEN:**  THIS IS THE 20A REPORT THAT WAS ISSUED

25   SEPTEMBER 2008, THE MOST RECENT REPORT OF THE SPECIAL MASTER.

1          **JUDGE HENDERSON:**  I WILL ADDRESS THE OBJECTION.

2    IT'S NOT CLEAR TO ME WHETHER YOU ARE IMPEACHING HIM, YOU'RE

3    REFRESHING HIS RECOLLECTION, YOU'RE POSING A QUESTION OR JUST

4    PUTTING SOMETHING IN THE RECORD.

5    **BY MR. BIEN**

6    **Q**   THE QUESTION, MR. DEZEMBER, IS, IT IS CORRECT THAT YOU HAVE

7    BEEN INFORMED BY THE SPECIAL MASTER ON MORE THAN ONE OCCASION

8    THAT CLINICIANS FOR GOOD REASON HAVE STOPPED MAKING REFERRALS

9    TO ATASCADERO AND OTHER PRISONS BECAUSE THERE HASN'T BEEN AN

10   AVAILABLE RESOURCE FOR THEM?

11          **JUDGE KARLTON:**  OTHER HOSPITALS -- GO AHEAD.

12          **THE WITNESS:**  YOU KNOW, EVERY TIME THERE'S A

13   NEGATIVE FACTOR IN THE SPECIAL MASTER'S REPORT IT TRIGGERS OUR

14   INQUIRY INTO THOSE SITUATIONS.  IT DOESN'T ALWAYS RISE TO THE

15   OCCASION OF A -- OF AN ESTABLISHED ADMONITION.  SOMETIMES IT'S

16   AN OBSERVATION OF WHAT THE POTENTIAL CAUSES COULD BE.  THOSE

17   ARE THE CONVERSATIONS I HAVE BEEN REFERRING TO.

18          I HAVEN'T SAID THAT I HAVE IDENTIFIED, OR ANYBODY

19   HAS IDENTIFIED AS A MATTER OF FACT, THE CLINICIANS ARE NOT

20   REFERRING AS A PROBLEM THAT CAUSES OUR WAIT LIST PROBLEMS.  IT

21   CAN BE THAT AN OCCASIONAL CLINICIAN WILL NOT MAKE THAT

22   REFERRAL, AND THAT'S ONE REASON I HAVE ESTABLISHED AND

23   ORGANIZED AND BEGINNING UTILIZATION MANAGEMENT PROGRAM FOR THAT

24   VERY PURPOSE.  BUT I STILL AM NOT CONVINCED THAT THE REFERRAL

25   BY CLINICIANS IS THE SOLUTION TO THIS PROBLEM.

1              I STILL BELIEVE THE SOLUTION TO THE PROBLEM IS

2   UTILIZING AVAILABLE BEDS THAT WE HAVE AT ATASCADERO AND

3   CALIFORNIA MEDICAL FACILITY FOR INTERMEDIATE CARE,

4   NOTWITHSTANDING CUSTODY DETERMINATIONS, WHICH ARE NOW BEING

5   REVIEWED VERY CAREFULLY BY THE DIVISION OF ADULT INSTITUTIONS

6   WHO MAKE THOSE DETERMINATIONS.

7   **BY MR. BIEN**

8   **Q**   DO YOU KNOW THAT DR. PACKER LOOKED AT THE ISSUE OF

9   UTILIZATION MANAGEMENT FOR THESE HIGHER LEVEL OF CARE BEDS?

10              **MS. TILLMAN:**  LACK OF FOUNDATION.  I THINK HE

11  TESTIFIED PREVIOUSLY HE HASN'T READ MR. PACKER'S REPORT.

12              **JUDGE HENDERSON:**  HE HAS NOT READ DR. PACKER'S

13  REPORT.

14              **THE WITNESS:**  I HAVE NOT, AND I HAVEN'T MET HIM

15  EITHER.

16  **BY MR. BIEN**

17  **Q**   OKAY.  YOU AGREE WITH THE NAVIGANT STUDY THAT SHOWS THAT

18  THERE IS A CURRENT DEFICIT IN INPATIENT CARE BEDS THE

19  DEPARTMENT NEEDS?  IN OTHER WORDS, YOU AGREE THAT THERE IS A

20  NEED TO BUILD MORE BEDS?

21  **A**   LET ME JUST SAY THIS:  I AGREE -- I UNDERSTAND AND AGREE

22  WITH THE NAVIGANT INFORMATION, THE STUDY, THE REPORT.  I'D HAVE

23  TO LOOK AT IT TO IDENTIFY ANY DETAILS IN IT.  BUT I CONCUR IN

24  THAT REPORT.  IT'S WHY WE HIRE THEM.

25  **Q**   AND YOU AGREE THAT THE BEDS THAT YOU HAVE RECOMMENDED TO

1  THIS COURT AND THE GOVERNOR THAT NEED TO BE BUILT SHOULD BE

2  BUILT?

3  **A**  YES, I DO.

4         **MR. BIEN:**  THANKS.

5         **JUDGE HENDERSON:**  DO YOU HAVE SOMETHING FURTHER,

6  COUNSEL?

7         **MS. TILLMAN:**  ONE QUESTION.

8         **JUDGE HENDERSON:**  DO YOU HAVE SOMETHING?

9         **JUDGE KARLTON:**  NO, I DIDN'T KNOW WHAT WAS GOING ON.

10             **FURTHER REDIRECT EXAMINATION BY MS. TILLMAN**

11  **BY MS. TILLMAN**

12  **Q**  WOULD IT BE CORRECT TO SAY, MR. DEZEMBER, THAT EVEN IF

13  THERE IS A POPULATION REDUCTION, YOU'LL STILL HAVE TO CREATE

14  BEDS, WHETHER OUT OF EXISTING SPACE OR HOPEFULLY OUT OF NEW

15  SPACE?

16  **A**  THAT'S MY CONVICTION, YES, THAT WE WILL STILL NEED TO BUILD

17  MOST, IF NOT ALL, OF THE BEDS WE'RE PLANNING IN THE PLAN NOW.

18         **MS. TILLMAN:**  THANK YOU, NOTHING FURTHER.

19         **JUDGE HENDERSON:**  OKAY.  ANY OTHER DEFENDANTS OR

20  INTERVENORS?  CCPOA?

21         **MS. LEONARD:**  NO FURTHER QUESTIONS.

22         **JUDGE HENDERSON:**  OKAY.  THANK YOU FOR TESTIFYING,

23  MR. DEZEMBER.  YOU MAY STEP DOWN.  YOU'RE EXCUSED.

24         LET'S TAKE OUR LUNCH RECESS FOR AN HOUR.  COURT'S

25  ADJOURNED.

1          (LUNCHEON RECESS TAKEN.)

2          **JUDGE HENDERSON:** OKAY. LET'S GET GOING. YOU MAY

3 CALL YOUR NEXT WITNESS.

4          **MS. KAHN:** GOOD AFTERNOON. JANE KAHN FOR

5 PLAINTIFFS, AND WE WOULD LIKE TO CALL BACK DR. HANEY.

6          **JUDGE HENDERSON:** WELCOME BACK, DR. HANEY. YOU ARE

7 STILL UNDER OATH FROM YOUR PREVIOUS SWEARING IN.

8          **JUDGE KARLTON:** YOU'RE STILL UNDER OATH.

9                   **CRAIG WILLIAM HANEY,**

10 HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS

11 PREVIOUSLY DULY SWORN AND EXAMINED AS FOLLOWS:

12              **DIRECT EXAMINATION BY MS. KAHN**

13 **BY MS. KAHN**

14 **Q**   DR. HANEY, IN YOUR AUGUST 2008 REPORT, YOU EXPRESSED THE

15 OPINION THAT NO RELIEF OTHER THAN A POPULATION REDUCTION ORDER

16 WILL REMEDY THE CONSTITUTIONAL VIOLATIONS IN MENTAL HEALTH AND

17 MEDICAL CARE. CAN YOU BRIEFLY EXPLAIN THE BASIS OF YOUR

18 OPINION?

19 **A**   YES, I CAN. THERE ARE REALLY THREE OR FOUR REASONS WHY I

20 REACHED THAT CONCLUSION. THE FIRST ONE IS THAT THE ALTERNATIVE

21 APPROACHES TO ADDRESSING THE PROBLEMS ARE ONES THAT ARE VERY

22 TIME CONSUMING IN NATURE. THE KINDS OF PROBLEMS THAT I

23 IDENTIFIED IN MY REPORT, THE THINGS THAT I SAW WHEN I TOURED

24 THE PRISONS, THE THINGS THAT ARE REFLECTED IN THE DOCUMENTS

25 THAT I REVIEWED SPEAK TO REALLY EMERGENCY-LIKE CONDITIONS.

HANEY - DIRECT / KAHN                    946

```
 1            THERE ARE PEOPLE, PRISONERS, SUFFERING THROUGHOUT
 2   THE ENTIRE PRISON SYSTEM, MENTALLY ILL AND MEDICALLY ILL
 3   PRISONERS WHO ARE NOT ABLE TO GET THE LEVEL OF CARE THEY NEED.
 4   THEY ARE NOT ABLE TO PARTICIPATE IN PROGRAMS BECAUSE OF
 5   SHORTAGES OF STAFF AND SPACE AND SO ON AND SO FORTH.  THOSE
 6   THINGS ARE URGENT PROBLEMS, AND ONLY A SOLUTION WHICH CAN BE
 7   BROUGHT TO FRUITION QUICKLY CAN ADDRESS THE KIND OF IMMEDIATE
 8   SUFFERING WHICH IS TAKING PLACE THROUGHOUT THE SYSTEM WHICH I
 9   SAW AND OTHER EXPERTS SAW AS WELL.
10            THE PROPOSAL -- THE PROPOSALS THAT I'VE LOOKED AT
11   THAT IDENTIFY POTENTIAL SOLUTIONS TO THIS PROBLEM WHICH INVOLVE
12   CONSTRUCTION OF ADDITIONAL MENTAL HEALTH FACILITIES AND
13   HEALTHCARE FACILITIES AND SO ON, AS WELL AS CONSTRUCTION AT THE
14   PRESENT SITES OF THE PRISON PROJECT TIMETABLES OUT TO 2013,
15   2014, BEFORE THESE PLANS ARE FINALIZED.  THE PRISONERS WHO WERE
16   IN THE SITUATIONS THAT I SAW CAN'T WAIT THAT LONG.
17            IN ADDITION, HOWEVER, UNFORTUNATELY, IT APPEARS TO
18   ME, AGAIN BASED ON EVERYTHING THAT I'VE READ IN THIS CASE, THAT
19   EVEN THOSE PROJECTIONS ARE UNREALISTIC.  SO 2013 AND 2014 IS
20   NOT ONLY A BEST CASE SCENARIO.  IT APPEARS TO BE AN IMPOSSIBLE
21   SCENARIO FOR THE STATE TO BE ABLE TO MEET.
22            THERE HAVE ALREADY BEEN A SERIES OF DELAYS IN THE
23   CASE, NOT CONTEMPLATED IN THE PLANS THAT I REVIEWED THAT
24   PROJECT TO 2014 OR SO, DELAYS WHICH INVOLVE EXPENDITURE OF
25   FUNDS IN THE EARLY STAGES OF PLANNING SO THAT THINGS HAVE BEEN
```

1  PLACED ON HOLD.  THE RECEIVER'S BEDS, FOR EXAMPLE, WHICH ARE

2  SUCH AN INTEGRAL PART OF THE STATE'S PROPOSED SOLUTION TO THESE

3  PROBLEMS.  THAT PLAN IS AT ABOUT STEP TWO OR THREE OR FOUR IN

4  WHAT MAY END UP BEING A HUNDRED-STEP PROCESS AND IT'S ON HOLD.

5          I'VE LOOKED AT OTHER DOCUMENTS WHICH SPEAK TO

6  RELATIVELY, ONE WOULD THINK, SEEMINGLY STRAIGHTFORWARD KINDS OF

7  SMALL-SCALE REMEDIES TO IMMEDIATE PROBLEMS, THINGS LIKE

8  CREATING SMALL MANAGEMENT YARDS THAT PRISONERS IN THE

9  ADMINISTRATIVE SEGREGATION UNITS NEED BECAUSE THEY ARE NOT

10 GETTING ADEQUATE ACCESS TO EXERCISE.  AND EVEN SOMETHING LIKE

11 THAT HAS TAKEN A LONG PERIOD OF TIME TO BE COMPLETED.

12         SO A SEVERAL-YEAR PROCESS, REQUEST FOR THE COURT TO

13 STAY OR EXTEND THE DEADLINE IN ORDER TO FINISH A PROJECT PALES

14 IN COMPARISON TO THE LARGE-SCALE ISSUES AND PROBLEMS THAT HAVE

15 BEEN IDENTIFIED BY MYSELF AND OTHER EXPERTS.

16         THE OTHER REASON REALLY HAS TO DO WITH A FRANK

17 RECOGNITION ON MY PART THAT EVEN IF THESE PLANS DID COME TO

18 FRUITION AND EVEN IF THEY WERE SOMEHOW MIRACULOUSLY DONE ON

19 TIME, OR EVEN AHEAD OF TIME, THEY WOULD NOT ADEQUATELY ADDRESS

20 ALL OF THE OVERCROWDING RELATED CONSTITUTIONAL PROBLEMS THAT I

21 SAW IN THE SYSTEM.  THERE ARE PLANS FOR INCREASING SPACE FOR

22 ONLY A SMALL PERCENTAGE OF THE COLEMAN CLASS MEMBERS.  THEY

23 DON'T ADDRESS THE WAY IN WHICH OVERCROWDING IS AFFECTING 29-,

24 OR, WHAT MAY BE BY 2013 OR '14, 30,000 3C CLASS MEMBERS.

25         IN FACT, THE PLANS THAT I'VE SEEN, THE RECEIVER'S

HANEY - DIRECT / KAHN                    948

1   BEDS CONTEMPLATE ONLY THE CREATION OF ADEQUATE SPACE FOR ABOUT

2   5,300 EOP PRISONERS, 2,000 OF WHOM WILL BE LEFT IN THE PRISON

3   SYSTEM UNLESS STEPS ARE TAKEN TO ADDRESS THE OVERCROWDING WHICH

4   PLAGUES THAT SYSTEM AND ALL ASPECTS OF THAT SYSTEM.

5            THOSE 3C PRISONERS, ALL OF WHOM WILL REMAIN IN THOSE

6   FACILITIES, AND THE 2,000 REMAINING EOP PRISONERS WILL STILL BE

7   SUBJECTED TO MANY OF THE KINDS OF CONDITIONS THAT I HAVE BEEN

8   DESCRIBING AND OTHER EXPERTS HAVE TALKED ABOUT AS WELL.

9            THOSE PLANS ALSO, IN MY OPINION, DON'T REALISTICALLY

10  ADDRESS THE KINDS OF MASSIVE INCREASES IN STAFFING THAT WOULD

11  NEED TO BE INTRODUCED INTO THE SYSTEM IN ORDER TO RESPOND TO

12  THE KIND OF OVERCROWDING-RELATED CONSTITUTIONAL VIOLATIONS THAT

13  I ADDRESSED IN MY REPORT AND THAT I TESTIFIED ABOUT A FEW WEEKS

14  AGO.

15           I GUESS THE FINAL ISSUE IS THAT I -- THIS IS A

16  PROBLEM THAT I HAVE BEEN LOOKING AT FOR A LONG TIME IN THE

17  STATE OF CALIFORNIA, SOMEBODY WHO STUDIES OVERCROWDING AND HOW

18  PRISON SYSTEMS OPERATE AND FUNCTION, THE DEPARTMENT OF

19  CORRECTIONS HAS BEEN TALKING ABOUT ADDRESSING THE ISSUE OF

20  OVERCROWDING AND THE WAY IN WHICH OVERCROWDING IMPACTS MENTAL

21  HEALTH AND MEDICAL CARE AND OTHER ASPECTS OF THE CONDITIONS

22  THAT PRISONERS IN THE SYSTEM CONFRONT IN PRETTY MUCH THE SAME

23  WAY FOR ALMOST 28 YEARS.

24           THE VERY FIRST OVERCROWDING CASE I PARTICIPATED IN

25  WAS IN 1980 AND THERE, AND IN EACH SUBSEQUENT CASE, INCLUDING A

1   CASE THAT INVOLVES A FAIR NUMBER OF MENTALLY ILL PRISONERS IN

2   THE CALIFORNIA MEN'S COLONY IN SAN LUIS OBISPO, A CASE CALLED

3   *DONNER VERSUS MCCARTHY*.  EACH TIME THE PROPOSED SOLUTION IS TO

4   ADDRESS AN UNEXPECTED INFLUX OF PRISONERS WHOSE PRESENCE IN THE

5   SYSTEM HAS CREATED OVERCROWDING WHICH IS UNDERMINING THE

6   DELIVERY OF SERVICES AND CARE THROUGH A LITTLE BIT BETTER

7   PLANNING AND MORE CONSTRUCTION, AND OVER THAT 28-YEAR PERIOD OF

8   TIME, THE SYSTEM HAS GOTTEN WORSE NOT BETTER.  IT HAS GOTTEN

9   MORE AND MORE OVERCROWDED.

10          THE DELIVERY OF SERVICES, WITH SOME PEAKS AS A

11  RESULT OF THE INTERVENTION OF THE COURT AND SOME INJECTION OF

12  ENERGY AND RESOURCES, THINGS HAVE IMPROVED FROM TIME TO TIME,

13  BUT THE OVERWHELMING PRESS OF THE NUMBERS IN THE SYSTEM IS NOW

14  WEIGHTING IT DOWN IN SUCH A WAY THAT THIS PROPOSED SOLUTION, I

15  THINK, HAS FINALLY RUN ITS COURSE, AND IT IS TIME, IN MY

16  OPINION, TO ADDRESS THE ISSUE AT ITS CAUSE, AND THE CAUSE OF IT

17  IS OVERCROWDING.  AND UNTIL AND UNLESS OVERCROWDING IS DEALT

18  WITH IN A DIRECT AND SIGNIFICANT WAY, ALL OF THESE OTHER

19  APPROACHES TO THE DELIVERY OF SERVICES IN A CONSTITUTIONAL

20  MANNER, FRANKLY, MISS POINT.

21  **Q**   IN YOUR REPORT, WHEN YOU WERE DISCUSSING A POPULATION

22  REDUCTION ORDER, YOUR OPINION WAS THE CDCR POPULATION SHOULD BE

23  REDUCED TO A LEVEL OF CAPACITY 145 PERCENT OR LOWER?

24  **A**   YES.

25  **Q**   CAN YOU EXPLAIN HOW YOU CAME TO THAT NUMBER?

1    **A**   YES.  WELL, I WOULD BE MISLEADING THE COURT IF I SUGGESTED

2    THIS WAS AN EXACT SCIENCE.  SO THIS WAS AN APPROXIMATION ON MY

3    PART, AND I SPECIFIED A RANGE WITHIN WHICH I THOUGHT A TARGET

4    RANGE, WITHIN WHICH I THOUGHT THE POPULATION -- OR TO WHICH I

5    THOUGHT THE POPULATION SHOULD BE REDUCED, AND I BEGAN THAT

6    RANGE WITH A HUNDRED PERCENT OF THE POPULATION, A HUNDRED

7    PERCENT OF THE RATED CAPACITY OF THE SYSTEM.

8            **JUDGE KARLTON:**  LET ME INTERRUPT YOU BEFORE YOU GO

9    ON.  I THINK I READ IN YOUR DIRECT TESTIMONY THAT MOST EXPERTS

10   THOUGHT THAT 93 TO 95 PERCENT OF CAPACITY WAS APPROACHING

11   OVERCROWDING.

12           **THE WITNESS:**  YES, YOUR HONOR.

13           **JUDGE KARLTON:**  HOW DO YOU GET TO 145?

14           **THE WITNESS:**  YOU GET TO 145, FRANKLY, BY MAKING A

15   CONCESSION TO WHAT'S PRACTICAL IN THE IMMEDIATE CIRCUMSTANCE,

16   AND THAT'S WHY I DID NOT WANT TO TAKE A HUNDRED PERCENT OF

17   CAPACITY OFF THE TABLE.  THERE WAS A TIME IN CORRECTIONS WHEN

18   95 PERCENT WAS REGARDED AS A SYSTEM THAT WAS BEGINNING TO GET

19   DANGEROUSLY OVERCROWDED.  DESIGN CAPACITIES ARE ESTABLISHED FOR

20   A REASON.  THEY'RE ESTABLISHED NOT ONLY BASED ON THE NUMBER OF

21   CELLS, BUT ALSO BASED ON THE AMOUNT OF RESOURCES, THE

22   PROGRAMMING SPACE AND SO ON THAT A FACILITY HAS.  SO THESE ARE

23   MEANINGFUL LIMITS.

24           WE HAVE BEEN OPERATING ROUGHLY FOR TEN OR SO YEARS

25   IN THIS SYSTEM AT ALMOST TWICE WHAT THOSE RATED CAPACITIES ARE

 1   AT.  SO I CERTAINLY DID NOT WANT TO EXCLUDE THE POSSIBILITY

 2   THAT WE WOULD MOVE BACK TO A POINT IN TIME AT SOME POINT IN THE

 3   FUTURE WHERE A HUNDRED PERCENT OF CAPACITY OR EVEN LESS,

 4   ASSUMING THE SYSTEM BEGINS TO FUNCTION AS IT SHOULD, COULD BE

 5   ATTAINED.

 6            NOW, THE 145, I SAID, IS THE OUTSIDE LIMIT, THE

 7   OUTSIDE LIMIT OF A TARGET, AND THAT WAS BASED ON AN ANALYSIS

 8   THAT WAS DONE ACTUALLY BY ANOTHER GROUP OF EXPERTS WHO RELIED

 9   ON THE INPUT OF A GROUP OF EXPERIENCED CALIFORNIA WARDENS.  THE

10   COURT MAY BE AWARE THAT IN 2004 A GROUP CALLED THE CORRECTIONS

11   INDEPENDENT REVIEW BOARD MET.  IT WAS HEADED BY FORMER GOVERNOR

12   GEORGE DEUKMEJIAN.  THERE WERE A GROUP OF EXPERTS, MANY OF WHOM

13   EMPLOYEES OF THE DEPARTMENTS OF CORRECTIONS AND OTHER EXPERTS.

14   MR. DEZEMBER, WHO I UNDERSTAND WAS HERE THIS MORNING, WAS THE

15   CHIEF CONSULTANT TO THAT GROUP.

16            THEY FASHIONED AN ESTIMATE OF WHAT THEY BELIEVED TO

17   BE, BASED ON THEIR KNOWLEDGE OF THE CALIFORNIA PRISON SYSTEM,

18   WHAT THEY CALLED A MAXIMUM OPERABLE CAPACITY.  THIS WAS THE

19   CAPACITY THAT, IN THEIR OPINION, THE PRISONS COULD OPERATE AT

20   SAFELY BUT ALSO COULD DELIVER PROGRAMMING SERVICES IN AN

21   EFFECTIVE WAY.

22            I HASTEN TO ADD THEY WERE EXPLICIT IN THAT

23   CALCULATION, AND MR. DEZEMBER HAS ACKNOWLEDGED THEY WERE

24   EXPLICIT IN THAT CALCULATION, AS EXCLUDING FROM THAT NUMBER THE

25   KIND OF TREATMENT SPACE THAT WOULD BE REQUIRED TO DELIVER

1   CONSTITUTIONALLY ADEQUATE HEALTH AND MENTAL HEALTHCARE.

2              SO WHEN THEY TALKED ABOUT MAXIMUM OPERABLE CAPACITY,

3   THEY WERE TALKING ABOUT ROUTINE PROGRAMMING ACTIVITIES,

4   VOCATIONAL TRAINING, EDUCATIONAL TRAINING AND SO ON.  THEY DID

5   NOT TAKE INTO ACCOUNT THE ADDITIONAL SPACE THAT WOULD BE

6   REQUIRED, AND, THEREFORE, VERY LIKELY, A REDUCTION IN THAT

7   NUMBER OF MAXIMAL OPERABLE CAPACITY, IF YOU TOOK INTO ACCOUNT

8   THE KINDS OF SPACE THAT WOULD BE NEEDED IN ORDER TO DELIVER

9   CONSTITUTIONALLY ADEQUATE MENTAL HEALTH AND MEDICAL CARE.

10             SO THAT SEEMED TO ME TO BE THE MOST GENEROUS

11  POSSIBLE UPPER LIMIT TO A REDUCTION IN THE SIZE OF THE PRISON

12  POPULATION.  CERTAINLY CLOSER TO A HUNDRED PERCENT WOULD BE

13  MUCH MORE DESIRABLE.  ONE HUNDRED FORTY-FIVE PERCENT SEEMED TO

14  ME TO BE THE ABSOLUTE MOST GENEROUS ESTIMATE OF HOW THIS SYSTEM

15  COULD BEGIN TO OPERATE AND DELIVER SERVICES, OPERATE SAFELY,

16  AND ALSO ADDRESS THE CONSTITUTIONAL INADEQUACIES THE COURT IS

17  CONCERNED WITH.

18  **BY MS. KAHN**

19  **Q**   DR. HANEY, IN YOUR OPINION, WHY WILL REDUCING THE

20  CALIFORNIA PRISON POPULATION TO THAT PERCENTAGE OF DESIGN -- OF

21  CAPACITY ALLOW THE DEPARTMENT TO PROVIDE CONSTITUTIONALLY

22  ADEQUATE CARE TO THE COLEMAN CLASS, EVEN THE HIGHER LEVELS OF

23  CARE?

24  **A**   IT IS MY OPINION THAT UNLESS AND UNTIL OVERCROWDING IN THE

25  SYSTEM, WHICH IS CONGESTING AND CHOKING THE SYSTEM IN THE

1   DELIVERY OF ALL OF THE SERVICES, WITHIN THE SYSTEM IS ADDRESSED

2   IN A DIRECT AND SYSTEMATIC WAY AND IN A SUBSTANTIAL WAY, THEN

3   THE DELIVERY OF MENTAL HEALTH SERVICES SIMPLY CANNOT PROGRESS

4   TO A CONSTITUTIONALLY ADEQUATE LEVEL OR PLATEAU.

5           THE REDUCTION OF POPULATION, EVEN AN

6   ACROSS-THE-BOARD REDUCTION OF POPULATION, ONE THAT COULD BE

7   DONE IN A VARIETY OF WAYS THAT I KNOW OTHER PEOPLE ARE GOING TO

8   TESTIFY SPECIFICALLY ABOUT, WOULD REDUCE THE CONGESTION IN THE

9   SYSTEM, AND IT WOULD ADDRESS MANY OF THE WAYS IN WHICH THE

10  COLEMAN CLASS MEMBERS ARE BEING ADVERSELY AFFECTED BY THE

11  CONDITIONS OF CONFINEMENT THAT EXIST IN THE PRISON.

12          WE'RE TALKING ABOUT CLASS MEMBERS WHO ARE ENTERING

13  THE SYSTEM IN RECEPTION CENTERS AND BEING HOUSED UNDER TOXIC,

14  NOXIOUS, PSYCHOLOGICALLY AND MEDICALLY UNHEALTHY CONDITIONS,

15  AND THEY ARE CLASS MEMBERS.  BOTH PLATA AND COLEMAN CLASS

16  MEMBERS ARE IN THOSE RECEPTION CENTERS.  THEY ALL COME INTO THE

17  SAME PLACES.

18          AS YOU KNOW, I TESTIFIED TWO WEEKS AGO ABOUT THE

19  FACT THAT THEY'RE BACKED UP IN THESE ENVIRONMENTS.  THEY DON'T

20  COME THROUGH AND ARE NOT EXPEDITIOUSLY PROCESSED THROUGH THE

21  SYSTEMS, BUT, RATHER, BECAUSE OF THE OVERCROWDING IN THE SYSTEM

22  COLEMAN CLASS MEMBERS, EVEN AT THE HIGHER LEVELS OF ACUITY, SIT

23  IN THESE ENVIRONMENTS WAITING FOR AN EOP BED SOMEWHERE ELSE IN

24  THE SYSTEM WHICH THEY CAN'T GET TO BECAUSE THERE AREN'T ANY

25  AVAILABLE.

1  **Q**   IS IT ALSO YOUR TESTIMONY AND OPINION THAT REMAINING IN THE

2  RECEPTION CENTERS FOR LONG PERIODS OF TIME CAN ACTUALLY CAUSE

3  DECOMPENSATION AND CAUSE PATIENTS TO MOVE TO HIGHER LEVELS OF

4  CARE?

5  **A**   YES.

6          **MS. TILLMAN:**  OBJECTION TO RELEVANCE.  WE ALREADY

7  DISCUSSED IT.  IT'S BEEN ASKED AND ANSWERED IN THE COURSE OF

8  PHASE ONE TESTIMONY.

9          **JUDGE HENDERSON:**  OVERRULED.

10         **THE WITNESS:**  IT IS ABSOLUTELY MY TESTIMONY -- IN

11 PHASE ONE TESTIMONY, JUDGE KARLTON ASKED ME WHETHER BEING IN

12 PRISON IN AND OF ITSELF ADVERSELY AFFECTED PEOPLE'S MENTAL

13 HEALTH.  I ANSWERED UNDER IDEAL CONDITIONS, OF COURSE IT

14 DIDN'T.  WE ARE TALKING ABOUT IN THIS SYSTEM, FAR FROM IDEAL

15 PRISON CONDITIONS.  WE ARE TALKING ABOUT PRISONERS, MANY OF

16 WHOM ARE MENTALLY ILL, WHO COME INTO THIS SYSTEM AND WHO SIT IN

17 SOME OF THE WORST CONDITIONS OF CONFINEMENT THAT I HAVE SEEN

18 ANYWHERE IN THE UNITED STATES, AND THEY SIT THERE NOT FOR SHORT

19 PERIODS OF TIME, BUT MORE FOR MONTHS ON END, WAITING FOR

20 TRANSFER TO APPROPRIATE BEDS ELSEWHERE IN THE SYSTEM.

21         MANY OF THEM ARE TRANSFERRED OUT OF THESE HOUSING

22 UNITS INTO ENVIRONMENTS WHERE -- THE 3C'S CAN GO ANYWHERE IN

23 THE SYSTEM, INCLUDING BEING HOUSED IN WHAT, AGAIN, ARE BAD

24 BEDS, PSYCHOLOGICALLY AND MEDICALLY UNHEALTHY ENVIRONMENTS FOR

25 THEM TO LIVE IN.

1              REDUCING THE OVERCROWDING IN THE SYSTEM BY REDUCING,

2     AMONG OTHER THINGS, THE EXISTENCE OF THESE BAD BEDS TAKES CLASS

3     MEMBERS OUT OF THESE ENVIRONMENTS AND PREVENTS THEIR EXPOSURE

4     TO THOSE ENVIRONMENTS FROM ADVERSELY AFFECTING THEIR MENTAL

5     HEALTH AND FROM LEADING SOME OF THEM, SOME PERCENTAGE OF THEM,

6     TO DECOMPENSATE OR DETERIORATE IN THE FACE OF THESE CONDITIONS.

7              REDUCING THE OVERCROWDING DOES MANY OTHER THINGS AS

8     WELL.  MANY OF THE PROBLEMS THAT AFFECT THE COLEMAN CLASS

9     MEMBERS ARE PROBLEMS THAT HAVE TO DO WITH SPACE AND ACCESS TO

10    TREATMENT.  THAT INVOLVES SPACE FOR TREATMENT, SPACE WHICH IS

11    INADEQUATE IN PART BECAUSE IT'S BEING USED FOR OTHER THINGS, IN

12    PART BECAUSE IT IS NOT ENOUGH SPACE TO ACCOMMODATE THE NUMBERS

13    OF PEOPLE WHO NEED TO USE IT.  A REDUCTION IN OVERCROWDING WILL

14    DIRECTLY -- WILL DIRECTLY BEGIN TO RESOLVE THAT PROBLEM.

15             MANY OF THE ACCESS TO TREATMENT AND ACCESS TO

16    APPROPRIATE LEVEL OF CARE ISSUES HAVE TO DO WITH THE

17    UNDERSTAFFING THAT PLAGUES THE SYSTEM.  MUCH OF THIS

18    UNDERSTAFFING CAN ONLY BE UNDERSTOOD IN TERMS OF OVERCROWDING.

19    UNDERSTAFFING IS ALSO IN RELATIONSHIP TO THE NUMBER OF PEOPLE

20    THAT THE STAFF NEEDS ARE INTENDED TO ADDRESS.

21             SO, OBVIOUSLY, IF YOU REDUCE THE AMOUNT OF

22    OVERCROWDING IN THE SYSTEM, YOU REDUCE THE LEVEL OR PERCENTAGES

23    OF UNDERSTAFFING THAT CURRENTLY PLAGUES THE SYSTEM, AND THAT

24    DIRECTLY AFFECTS COLEMAN CLASS MEMBERS.

25             IT ALLOWS THEM TO GET ACCESS TO BETTER CARE.  IT

1  ALLOWS THEM TO MOVE THROUGH THE SYSTEM MORE QUICKLY BECAUSE

2  THEY HAVE BETTER AND MORE CLINICAL CONTACT.  IT GIVES

3  CLINICIANS OPPORTUNITIES TO MAKE RECOMMENDATIONS ABOUT HOUSING

4  THAT ARE CLINICALLY MANDATED, THE KINDS OF RECOMMENDATIONS THAT

5  THEY'RE NOT IN A POSITION TO MAKE NOW, SIMPLY BECAUSE THERE ARE

6  NO BEDS AVAILABLE.

7          THE FEWER PEOPLE THERE ARE IN THE SYSTEM, THE FEWER

8  PEOPLE THERE WILL BE ON THE WAITING LISTS IN THE SYSTEM.  ONCE

9  THE SYSTEM BEGINS TO OPERATE AND FUNCTIONS MORE EFFECTIVE AS A

10 MENTAL HEALTHCARE DELIVERY SYSTEM, THEN THE LEVEL OF ACUITY YOU

11 WOULD EXPECT TO GO DOWN, RATHER THAN GOING UP WE'RE LOOKING AT.

12         AND I SHOWED CHARTS IN MY TESTIMONY IN THE FIRST

13 PHASE OF THE TRIAL ABOUT THE INCREASE IN, NOT ONLY THE SIZE OF

14 THE COLEMAN CLASS POPULATION IN GENERAL, BUT ALSO WHAT APPEARS

15 TO BE AN INCREASING LEVEL OF ACUITY, A LARGER NUMBER OF

16 MENTALLY ILL PRISONERS IN THE SYSTEM AND A LARGER NUMBER OF

17 MORE SERIOUSLY MENTALLY ILL PRISONERS.  I BELIEVE THAT IS, IN

18 PART, THE RESULT OF THE OVERCROWDING WHICH PLAGUES THE ENTIRE

19 SYSTEM.

20 **BY MS. KAHN**

21 **Q**   THANK YOU.  ONE LAST QUESTION.

22         ARE YOU AWARE OF ANY OTHER PRISON SYSTEMS THAT WERE

23 ABLE TO COME INTO CONSTITUTIONAL COMPLIANCE AFTER THEY REDUCED

24 THE LEVEL OF OVERCROWDING IN THEIR SYSTEM?

25 **A**   YES.  THERE ARE A NUMBER OF INSTANCES OF THIS.  I KNOW THE

1    NATIONAL COUNCIL ON CRIME AND DELINQUENCY HAS DONE A VERY

2    EFFECTIVE PAPER ON PRISONER RELEASE ORDERS AND CATEGORYING

3    PRISONER RELEASE ORDERS DONE AROUND THE UNITED STATES.  AND I

4    BELIEVE BARRY KRISBERG IS GOING TO TESTIFY DIRECTLY ABOUT THAT

5    ISSUE.  BUT I HAVE BEEN INVOLVED IN THREE SUCH CASES DIRECTLY

6    INVOLVED, FIRST OF ALL, AS AN EXPERT WHO ANALYZED THE NATURE OF

7    THE CONSTITUTIONAL VIOLATIONS, PARTICIPATED IN TRIALS IN WHICH,

8    AT LEAST IN TWO OF THOSE THREE CASES, CONSTITUTIONAL VIOLATIONS

9    WERE FOUND BY A COURT, AND THEN IN ALL THREE INSTANCES WHERE

10   THE REDUCTION IN THE POPULATION IN THE PRISON SYSTEM WAS

11   INSTRUMENTAL TO THAT -- THOSE SYSTEMS COMING INTO

12   CONSTITUTIONAL COMPLIANCE.

13            THE FIRST ONE WAS IN WASHINGTON STATE WAY BACK IN

14   1980 IN A CASE CALLED *HOPTOWIT VERSUS RAY*.  IT INVOLVED A

15   SINGLE PRISON IN WASHINGTON STATE, BUT OVERCROWDING WAS AN

16   IMPORTANT ISSUE IN THE CASE.  AND THE WASHINGTON STATE SYSTEM,

17   AFTER THAT CASE, DEALT WITH OVERCROWDING-RELATED PROBLEMS FOR A

18   PERIOD OF A DECADE OR MORE, AND THEY IMPLEMENTED A NUMBER OF

19   EMERGENCY ORDERS.  THEY SET UP A SENTENCING COMMISSION, THEY

20   DID PRISONER RELEASES FROM THE SYSTEM IN ORDER TO MANAGE THE

21   SIZE OF THE POPULATION AND BRING THAT PARTICULAR PRISON AND THE

22   LARGER SYSTEM INTO CONSTITUTIONAL COMPLIANCE.

23            THE SECOND CASE WAS IN NEW MEXICO, AND THE NEW

24   MEXICO CASE DID NOT ACTUALLY GO TO TRIAL, BUT THERE WAS A

25   CONSENT DECREE ENTERED INTO BY THE PARTIES TO AVOID A TRIAL.

1   AND THIS LITIGATION WAS BROUGHT ABOUT AFTER THE 1980 NEW MEXICO

2   PRISON RIOT.  I WAS ASKED TO DO AN INDEPENDENT EVALUATION OF

3   THE CAUSES OF THAT RIOT, AND ONE OF THE MAJOR CAUSES OF THAT

4   RIOT WAS THE OVERCROWDING THAT PLAGUED THE SYSTEM IN NEW

5   MEXICO.

6           AND SO WHEN THE CONSENT DECREE WAS ENTERED INTO IN

7   NEW MEXICO, ONE OF THE FIRST THINGS THEY DID WAS TO ENTER A

8   POPULATION CONTROL ORDER WHICH PROHIBITED DOUBLE CELLING IN ANY

9   OF THE OLDER INSTITUTIONS AND PERMITTED DOUBLE CELLING ONLY IN

10  CELLS THAT HAD BEEN SPECIFICALLY DESIGNED TO HOLD TWO

11  PRISONERS.  AND THERE WERE A NUMBER OF OTHER POPULATION CAPS

12  THAT WERE ALSO BUILT INTO THAT CONSENT DECREE.

13          WHEN THE COURT FINALLY RELINQUISHED JURISDICTION IN

14  THE CASE IN 1999, THEY DID SO ONLY ON THE PRECONDITION THAT THE

15  STATE PASS A LAW WHICH ESSENTIALLY CAPPED THE POPULATION IN --

16  OF THE PRISONER POPULATION IN NEW MEXICO, AND AT THAT POINT THE

17  COURT RELINQUISHED JURISDICTION, THE LEGISLATURE PASSED THE

18  LAW.  NEW MEXICO WAS ABLE TO DELIVER CONSTITUTIONALLY ADEQUATE

19  MENTAL HEALTH AND MEDICAL CARE THROUGHOUT ITS ENTIRE SYSTEM.

20  IT'S OPERATING AT UNDER A HUNDRED PERCENT OF CAPACITY, AND IT

21  IS -- I THINK MOST EXPERTS AGREE THAT IT IS PROVIDING SOME OF

22  THE MOST EFFECTIVE MENTAL HEALTHCARE IN THE UNITED STATES.

23          THE THIRD EXAMPLE IS IN MANY WAYS THE MOST DRAMATIC.

24  IT'S THE STATE OF TEXAS.  I WAS INVOLVED IN THE *RUIZ VERSUS*

25  *ESTELLE* LITIGATION STARTING IN THE EARLY 1980'S.  IT WOULD BE

1  HARD FOR ME TO DESCRIBE TO YOU WHAT EXACTLY THE TEXAS SYSTEM

2  LOOKED LIKE IN THE EARLY 1980'S AFTER IT HAD ALREADY BEEN

3  DECLARED UNCONSTITUTIONAL BY JUDGE JUSTICE IN THE *RUIZ* CASE.

4          BUT MY FOCUS -- MY ROLE IN THAT CASE WAS TO ANALYZE

5  OVERCROWDING AND THE EFFECTS OF OVERCROWDING AND THE DELIVERY

6  OF ALL KINDS OF SERVICES IN THE SYSTEM.

7          AND JUDGE JUSTICE HAD ORDERED A POPULATION CAP, BUT

8  THE STATE WAS HAVING A DIFFICULT TIME COMING INTO COMPLIANCE,

9  AND SO WE WERE ABLE TO -- I WAS ABLE TO SEE FIRSTHAND THE

10 EFFECTS OF OVERCROWDING IN THAT SYSTEM, WHAT IT LOOKED LIKE,

11 HOW DIFFICULT IT WAS FOR ANY OF THE OTHER PARTS OF THAT SYSTEM

12 TO BE FIXED UNLESS AND UNTIL THE OVERCROWDING THAT PLAGUED THE

13 SYSTEM WAS BROUGHT UNDER CONTROL.

14         JUDGE JUSTICE, AS I SAID, CAPPED POPULATION AT 95

15 PERCENT OF CAPACITY, AND EVENTUALLY THE SYSTEM CAME INTO

16 COMPLIANCE, AND THEY WERE ABLE TO BRING THE MENTAL HEALTHCARE

17 DELIVERY SYSTEM, THE MEDICAL CARE DELIVERY SYSTEM INTO

18 COMPLIANCE.

19         THE COURT RELINQUISHED JURISDICTION IN THE CASE

20 IN -- I BELIEVE IT WAS THE YEAR 2000.  THERE WERE A FEW

21 REMAINING ISSUES WHICH -- WHICH I ALSO IDENTIFIED.  I HAD AN

22 OPPORTUNITY TO COME BACK AND LOOK AT THE SYSTEM, INSPECT SOME

23 OF THE SAME PLACES AT THE END OF 1999.  IT WAS AN ENTIRELY

24 DIFFERENT PRISON SYSTEM.

25         I DON'T THINK ANYBODY INVOLVED WITH THAT CASE

1  BELIEVES THEY COULD HAVE DONE WHAT THEY DID IN TEXAS IN THE

2  ABSENCE OF A CAP ON THE POPULATION SO THAT THE SYSTEM WAS ABLE

3  TO HANDLE THE POPULATION, HOLD THE POPULATION AT A MANAGEABLE

4  LEVEL AT THE SAME TIME THAT THEY WERE TRYING TO INTRODUCE

5  CONSTITUTIONALLY ADEQUATE MENTAL HEALTH AND MEDICAL CARE AS

6  WELL AS MANY OTHER THINGS THEY WERE DOING IN TEXAS.

7            **MS. KAHN:**  THANK YOU.  THANK YOU VERY MUCH.

8            **JUDGE HENDERSON:**  DOES CCPOA HAVE ANYTHING?

9            **MS. LEONARD:**  NO FURTHER QUESTIONS.

10           **JUDGE HENDERSON:**  OKAY.  DEFENDANTS?

11                **CROSS-EXAMINATION BY MS. TILLMAN**

12 **BY MS. TILLMAN**

13 **Q**   GOOD AFTERNOON, DR. HANEY.

14 **A**   GOOD AFTERNOON.

15 **Q**   I UNDERSTAND YOU HAVE TESTIFIED AS AN EXPERT WITNESS IN A

16 VARIETY OF MATTERS INVOLVING PRISON SYSTEMS, CORRECT?

17 **A**   I HAVE, YES.

18 **Q**   MANY OF THOSE CASES HAVE INVOLVED INDIVIDUAL INMATES?

19 **A**   SOME HAVE, YES.

20 **Q**   AND MANY OF THE CASES HAVE ALSO INVOLVED THE EFFECTS OF THE

21 CORRECTIONAL ENVIRONMENT UPON THE PSYCHOLOGICAL CONDITION OF

22 INMATES?

23 **A**   SOMETIMES, YES.

24 **Q**   FOR INSTANCE, IN THE LOWER COURT MATTER OF COLEMAN, YOU

25 TESTIFIED ABOUT THE PSYCHOLOGICAL EFFECTS OF THE PRISON

1   ENVIRONMENT OF THE SECURED HOUSING UNIT, CORRECT?

2   **A**   YES.

3   **Q**   NOW, YOU'VE WRITTEN A LOT OF ARTICLES ABOUT THE PRISON

4   ENVIRONMENT, CORRECT?

5   **A**   I HAVE.

6   **Q**   AND YOU'VE TESTIFIED IN COURTS ABOUT THE PRISON

7   ENVIRONMENT, CORRECT?

8   **A**   YES.

9   **Q**   BUT YOU'VE NEVER ACTUALLY BEEN RESPONSIBLE AS AN

10  ADMINISTRATOR FOR AN --

11          **MS. KAHN:**   OBJECTION, YOUR HONOR.   THIS WAS COVERED

12  IN THE FIRST TESTIMONY.   IT'S BEYOND THE SCOPE OF HIS TESTIMONY

13  NOW.

14          **JUDGE HENDERSON:**   I AM GOING TO ALLOW IT.

15          **THE WITNESS:**   NO, I'VE NEVER WORKED IN A PRISON

16  SYSTEM.   I STUDY PRISON SYSTEMS AND WRITE ABOUT THEM, BUT I

17  HAVE NEVER WORKED IN ONE.

18  **BY MS. TILLMAN**

19  **Q**   NOW, WHEN YOU TESTIFIED AT THE TRIAL OF THE COLEMAN CASE IN

20  1994, YOU INDICATED AT THAT TIME, DIDN'T YOU, THAT THE

21  DEPARTMENT OF CORRECTIONS WAS OVER THE 100 PERCENT CAPACITY

22  MARK?

23  **A**   I DON'T REMEMBER MY TESTIMONY SPECIFICALLY.   IT'S BEEN 15

24  OR SO YEARS, BUT I WOULDN'T BE SURPRISED TO FIND THAT WAS THE

25  CASE.   BY 1993, THE DEPARTMENT OF CORRECTIONS WAS GETTING

1  OVERCROWDED.  YES, IT HAD BEEN FOR A BIT OF TIME.  NOWHERE NEAR

2  AS OVERCROWDED AS IT IS NOW.

3  **Q**   LOOKING AT YOUR DEPOSITION, I THINK AT PAGE 36, IF WE CAN

4  GET THIS UP ON THE SCREEN --

5           (DOCUMENT DISPLAYED.)

6  **BY MS. TILLMAN**

7  **Q**   YOU WERE ASKED IN YOUR DEPOSITION IN SEPTEMBER 2008:

8           "QUESTION:  AT THE TIME OF YOUR TESTIMONY IN THE

9        COLEMAN TRIAL, HAD YOU FORMED ANY OPINION AS TO

10       WHETHER OR NOT THE CDCR POPULATION EXCEEDED THE

11       DESIGN CAPACITY OF THE FACILITIES?

12          "ANSWER:  YES, I BELIEVE I DID.

13          "QUESTION:  BY HOW MUCH?

14          "I DON'T RECALL.

15          "QUESTION:  WAS IT OVER THE ONE HUNDRED PERCENT

16       CAPACITY MARK?

17          "ANSWER:  YES, IT WAS.  I THINK IT VARIED BY

18       FACILITY.  I THINK -- MY RECOLLECTION IS IT VARIED

19        WIDELY BY FACILITY, BUT I THINK IN GENERAL IT WAS

20        OVER THE ONE HUNDRED CAPACITY MARK."

21           DOES THAT REFRESH YOUR RECOLLECTION?

22  **A**   YES, THAT'S HOW I RECALL IT.  I THINK THAT'S WHAT I SAID.

23  **Q**   SO YOUR TESTIMONY IS, IN ESSENCE, THAT OVERCROWDING THAT

24  YOU TALKED ABOUT AT THE TIME OF THE COLEMAN TRIAL IN 1993, 1994

25  HAS CONTINUED TO THIS DAY?

1    **A**    IT HAS CONTINUED TO THIS DAY, YES, IT HAS.

2    **Q**    AND NOW IT'S YOUR TESTIMONY -- IS IT NOT CORRECT THAT YOUR

3    TESTIMONY IS THAT CDCR IS AT 190 PERCENT CAPACITY, CORRECT?

4    **A**    YES.

5    **Q**    YES.

6    **A**    GIVE OR TAKE A FEW PERCENTAGE POINTS.  IT CHANGES.  THAT'S

7    ROUGHLY WHAT IT'S AT AND ROUGHLY WHAT IT'S BEEN AT FOR A WHILE.

8    **Q**    I'M SORRY.  I DIDN'T QUITE HEAR THAT.

9    **A**    I SAID, YES, IT CHANGES A FEW PERCENTAGE POINTS FROM TIME

10   TO TIME.  THAT IS THE LEVEL IT'S AT, AND THAT'S THE LEVEL IT'S

11   BEEN AT FOR SOME TIME.

12   **Q**    AND THAT CAPACITY LEVEL HAS -- LET ME STRIKE THAT.

13           AND THE OVERCROWDING THAT YOU'VE SEEN WITHIN THE

14   DEPARTMENT OF CORRECTIONS SYSTEM HAS OCCURRED EVEN AS NEW

15   PRISONS HAVE BEEN ACTIVATED, CORRECT?

16   **A**    YES, THAT'S RIGHT.  THAT'S REALLY WHAT LEADS TO THE

17   PROPOSITION THAT IT IS ALMOST IMPOSSIBLE TO BUILD YOUR WAY OUT

18   OF A PROBLEM THAT HAS GOTTEN THIS LARGE AND IS THIS ENDEMIC.

19   **Q**    AND YET YOUR OPINION ALSO THEN IS THAT THE PRIMARY CAUSE OF

20   ANY DEFICIENCIES IN THE MENTAL HEALTHCARE SERVICES DELIVERY

21   SYSTEM IS OVERCROWDING?

22   **A**    YES, THAT WAS THE OPINION I EXPRESSED TWO WEEKS AGO.  IT'S

23   STILL MY OPINION.

24   **Q**    AND THE ONLY WAY, IN YOUR OPINION, TO ADDRESS THESE

25   DEFICIENCIES IN THE MENTAL HEALTH SERVICES DELIVERY SYSTEM THEN

1  IS TO ENGAGE IN, AT LEAST AS A FIRST STEP, A PRISONER RELEASE

2  ORDER, CORRECT?

3  **A**   YES.  AS A FIRST STEP.  I'VE NEVER SUGGESTED THAT WAS THE

4  ONLY THING THAT NEEDED TO BE DONE OR THAT A CONSTITUTIONALLY

5  ADEQUATE SYSTEM WOULD MAGICALLY APPEAR ONCE THE POPULATION WAS

6  REDUCED.  THERE ARE MANY OTHER THINGS THAT NEED TO CONTINUE TO

7  BE DONE, BUT THAT IS A NECESSARY BUT NOT SUFFICIENT CONDITION.

8  **Q**   AND THE REMAINING TASKS THAT WOULD HAVE TO BE DONE BY THE

9  DEPARTMENT OF CORRECTIONS AND REHABILITATION WOULD BE TO BUILD

10 MORE MENTAL HEALTH TREATMENT AND PROGRAMMING AND HOUSING SPACE,

11 CORRECT?

12 **A**   THAT WOULD BE ONLY ONE COMPONENT OF IT.  ONLY ONE PART OF

13 THE CONSTITUTIONAL VIOLATION INVOLVES THE INADEQUACY OF

14 TREATMENT SPACE, BUT THAT WOULD CERTAINLY BE PART OF IT, YES.

15 **Q**   OBVIOUSLY, THE NEXT PART WOULD BE ADD CLINICIANS TO STAFF

16 THAT SPACE ONCE IT'S BUILT, CORRECT?

17 **A**   YES, THERE ARE GROSS UNDERSTAFFING PROBLEMS THAT PLAGUE THE

18 ENTIRE SYSTEM.  IN SOME -- IN SOME OF THE FACILITIES THAT I

19 LOOKED AT AS MANY AS 50 OR 60 PERCENT OF THE CLINICAL STAFF

20 POSITIONS ARE UNFILLED.

21 **Q**   SO EVEN IN THE STATES WHERE YOU'VE SEEN VARIOUS PRISONER

22 RELEASE ORDERS IN THE FORM OF CAPS, THE CORRECTIONAL SYSTEM

23 STILL HAD TO DO WORK TO INCREASE THEIR BEDS, INCREASE THEIR

24 STAFF, TO OBTAIN CONSTITUTIONAL COMPLIANCE, CORRECT?

25 **A**   YES, YOU COULD HAVE A SYSTEM THAT WAS OPERATING AT LESS

1  THAN ITS RATED CAPACITY, BUT IF IT DIDN'T HAVE ADEQUATE MENTAL

2  HEALTH RESOURCES, ALL THE THINGS WE ARE TALKING ABOUT, THEN IT

3  COULD WELL NOT BE DELIVERING, AND I WOULD EXPECT IT NOT TO BE

4  DELIVERING CONSTITUTIONALLY ADEQUATE CARE.

5  Q   NOW, YOU ARE FAMILIAR WITH THE INDEPENDENT REVIEW PANEL'S

6  REPORT OF 2004, CORRECT?

7  A   YES.

8  Q   IT'S BEEN A FEW YEARS SINCE IT CAME OUT.  AND YOU RELIED

9  UPON THAT REPORT IN FORMING YOUR OPINION THAT THE DEPARTMENT OF

10  CORRECTIONS SHOULD REACH 145 PERCENT CAPACITY, CORRECT?

11  A   YES.  I USED THE NUMBER THAT WAS CALCULATED BY THE WARDENS

12  IN CHAPTER SIX IN THE REPORT, AND IT PROVIDES A CALCULATION OF

13  WHAT THEY CALL MAXIMUM OPERABLE CAPACITY, THE CAPACITY AT WHICH

14  THE SYSTEM CANNOT ONLY BE SAFELY RUN, BUT CAN BE RUN IN SUCH A

15  WAY IT DELIVERS PROGRAMMING SERVICES, NOT INCLUDING THE MEDICAL

16  AND MENTAL HEALTH SERVICES, AT A CONSTITUTIONALLY ADEQUATE

17  LEVEL.

18  Q   IN FACT, THE RECOMMENDATION OF THE INDEPENDENT REVIEW PANEL

19  WAS FOR THE DEPARTMENT OF CORRECTIONS AND REHABILITATION TO

20  LITERALLY DEFINE WHAT IS THE OPERABLE CAPACITY FOR THEIR

21  INSTITUTIONS, CORRECT?

22  A   WELL, FOR INDIVIDUAL INSTITUTIONS, YES, CORRECT, FOR THE

23  SYSTEM.  THAT DEFINITION IS CONTAINED IN THE REPORT.  I MEAN,

24  THAT 145 PERCENT FIGURE IS THEIR FIGURE, AND THAT IS THEIR

25  CALCULATION.

1   Q   AND I THINK WHAT YOU'RE REALLY SAYING, ISN'T IT, AS THE

2   REPORT STATED, QUOTE:

3          "A GROUP OF EXPERIENCED CALIFORNIA PRISON WARDENS

4        TOLD THE PANEL AT A RECENT FORUM THAT THE OPERABLE

5        CAPACITY OF THE STATE'S PRISONS TO SUPPORT FULL

6        INMATE PROGRAMMING IN A SAFE AND SECURE ENVIRONMENT

7        IS 111,309 INMATES, OR 145 PERCENT OF DESIGN

8        CAPACITY."

9          CORRECT?

10  A   YES.  ONE HUNDRED FORTY-FIVE PERCENT OF CAPACITY IS HOW

11  THEY DEFINED MAXIMAL OPERABLE CAPACITY.

12  Q   AT LEAST HOW THAT SET OF WARDENS DEFINED IT, CORRECT?

13  A   HOW THAT SET OF WARDENS DEFINED IT AND THAT FIGURE BEING

14  ENDORSED BY THE CORRECTIONS INDEPENDENT REVIEW PANEL.

15  Q   IN YOUR MIND, RIGHT?

16          AND SO WOULDN'T YOU SAY THAT THE 145 PERCENT NUMBER

17  IS AT BEST A RANGE OF APPROPRIATE CAPACITY?

18  A   WELL, I'M NOT SURE IT'S A RANGE.  IT'S A NUMBER.  IT'S NOT

19  A RANGE, SO I DIDN'T SEE ANYTHING IN THE -- IN THAT REPORT OR

20  IN THE LOGIC BY WHICH THAT NUMBER WAS ARRIVED AT THAT SUGGESTED

21  IT WAS A -- IT WAS A RANGE OF NUMBERS AROUND WHICH IT MIGHT BE

22  POSSIBLE TO OPERATE AT MAXIMAL OPERABLE CAPACITY.  I SUGGESTED

23  IT TO YOU AS A RANGE.  I ARTICULATED A RANGE FROM 100 TO

24  145 PERCENT, AND ALSO ARTICULATED WHY I THOUGHT 145 PERCENT WAS

25  THE MOST GENEROUS POSSIBLE ESTIMATE THAT WAS DEFENSIBLE, GIVEN

1  THE FACT THAT THOSE WARDENS AND THE CORRECTIONS INDEPENDENT

2  REVIEW BOARD DID NOT TAKE INTO ACCOUNT MANY OF THE ISSUES THAT

3  WE'RE GRAPPLING WITH HERE, WHICH IS WHAT KIND OF SPACE IS

4  NEEDED FOR A CONSTITUTIONALLY ADEQUATE MENTAL AND MEDICAL

5  HEALTHCARE DELIVERY SYSTEM.

6         **JUDGE KARLTON:**  HANG ON A SECOND, DR. HANEY.  NOW

7  I'M EVEN MORE CONFUSED THAN I WAS WHEN I CAME IN, WHICH IS VERY

8  CONFUSED.

9         IF 145 PERCENT IS INADEQUATE BECAUSE IT DOESN'T

10 REPRESENT THE OPERABLE LEVEL INCLUDING MENTAL HEALTH AND

11 PHYSICAL HEALTH PROVISION, HOW CAN WE –– HOW COULD ANYBODY FIND

12 145 PERCENT ADEQUATE, APPROPRIATE?

13        **THE WITNESS:**  WELL, THAT'S A VERY GOOD QUESTION.

14 WHAT I'M ASSUMING IS WE WOULD BE DOING OTHER THINGS AS WELL, SO

15 IN ADDITION TO THAT, ARRIVING AT THAT PERCENT OF THE

16 POPULATION, THAT THERE WOULD BE OTHER THINGS THAT WOULD BE

17 BEING DONE AS WELL SO THAT WE WOULD BEGIN TO APPROXIMATE A MUCH

18 MORE VIABLE OVERALL SYSTEM OF MEDICAL AND MENTAL HEALTHCARE

19 DELIVERY.

20        ADMITTEDLY, A BETTER NUMBER WOULD BE A HUNDRED

21 PERCENT, BUT GIVEN THE FACT THIS IS A SYSTEM THAT'S OPERATED AT

22 190 PERCENT FOR A DECADE OR SO, IT SEEMED TO ME IT WAS

23 APPROPRIATE TO ARTICULATE A RANGE THAT WAS REACHABLE, A RANGE

24 AT WHICH WE COULD BEGIN TO –– WE COULD BEGIN TO PERCEIVE THE

25 BENEFITS OF SOME OF THE MODIFICATIONS THAT HAD BEEN MADE IN THE

1  MEDICAL AND MENTAL HEALTHCARE DELIVERY SYSTEM.

2           IT'S CONCEIVABLE THAT A SYSTEM OPERATING AT

3  145 PERCENT OF CAPACITY IN CALIFORNIA, GIVEN THE SIZE OF THE

4  POPULATION AND SO ON, WOULD, IN FACT, HAVE TO BE FURTHER

5  REDUCED, BUT IT SEEMED TO ME IT WAS A GOOD PLACE TO BEGIN.

6  **BY MS. TILLMAN**

7  **Q**   YOU DIDN'T PARTICIPATE IN THE DISCUSSIONS WITH THE WARDENS

8  THAT WERE A PART OF THIS INDEPENDENT REVIEW PANEL REPORT, DID

9  YOU?

10  **A**   NO, I SIMPLY READ THE CHAPTER THAT WAS DEVOTED TO IT.  I

11  READ MR. DEZEMBER'S DEPOSITION TESTIMONY IN WHICH HE DISCUSSED

12  THAT MEETING.

13  **Q**   AND YOU DON'T KNOW WHAT METHODOLOGY OR FORMULA THE WARDENS

14  MAY OR MAY NOT HAVE USED IN COMING TO THIS 145 PERCENT FIGURE,

15  DO YOU?

16  **A**   AS IT'S REFLECTED IN THE CHAPTER IN THE DISCUSSION OF HOW

17  THEY CAME TO THAT CONCLUSION.

18  **Q**   IT SIMPLY SAYS, "A GROUP OF EXPERIENCED WARDENS TOLD THE

19  INDEPENDENT REVIEW PANEL."  THERE'S NO DISCUSSION OF FORMULA,

20  IS THERE?

21  **A**   I THINK THERE'S MORE DISCUSSION ABOUT WHAT WAS DISCUSSED,

22  WHERE IT WAS DISCUSSED, HOW IT WAS DISCUSSED.  AND I THINK MR.

23  DEZEMBER DISCUSSED THESE IN HIS DEPOSITION TESTIMONY AS WELL.

24  **Q**   YOU DON'T KNOW WHAT THAT FORMULA WAS, DO YOU?

25  **A**   I DON'T KNOW THE SPECIFIC FORMULA, NO.

1  Q    IN YOUR REVIEW OF THE INDEPENDENT REVIEW PANEL'S -- I'M

2  SORRY.

3         IN YOUR READING OF THIS INDEPENDENT REVIEW PANEL'S

4  REPORT, YOU NOTICED, DIDN'T YOU, THAT THE PANEL RECOMMENDED

5  THAT THE DEPARTMENT OF CORRECTIONS AND REHABILITATION ENGAGE IN

6  CERTAIN POPULATION REDUCTION MEASURES?

7  A    YES.  THERE WERE A WHOLE SERIES OF THOSE RECOMMENDATIONS,

8  YES.

9  Q    AND ONE POPULATION REDUCTION MEASURE WAS TO INCREASE

10 PROGRAM SPACE AND TO INCREASE STAFFING FOR EFFECTIVE

11 PROGRAMMING OF PRISONERS, WASN'T IT?

12 A    YES.

13 Q    NOW, YOU'VE TESTIFIED THAT THE MENTALLY ILL ARE MORE

14 SUSCEPTIBLE TO MENTAL HEALTH CONDITIONS IN OVERCROWDED

15 CIRCUMSTANCES, CORRECT?

16 A    YES.  I DON'T THINK THERE'S ANY QUESTION ABOUT THAT.

17 Q    AND YOU'VE ALSO TESTIFIED THAT MENTALLY ILL INMATES, EVEN

18 THOSE AT THE HIGHEST LEVELS OF CARE LIKE INPATIENT MENTAL

19 HEALTHCARE, SHOULD BE SUBJECT TO A RELEASE ORDER, CORRECT?

20 A    YES.  AS THEY CURRENTLY ARE RELEASED IN PROPORTION TO THEIR

21 NUMBERS IN THE POPULATION OF THE PRISON SYSTEM.  THEY ARE

22 CURRENTLY RELEASED WHEN THEIR SENTENCES ARE UP IRRESPECTIVE OF

23 THEIR MENTAL HEALTH STATUS OR LEVEL OF ACUITY OF MENTAL

24 ILLNESS.

25 Q    YOU WOULD DEFER TO SPECIAL MASTER KEATING'S FINDINGS IN HIS

1  MAY 31, 2000 REPORT, REPORT ON POPULATION THAT AT LEAST SOME 60

2  TO -- 60 PERCENT OF THE MENTALLY ILL INMATES WITHIN THE

3  DEPARTMENT OF CORRECTIONS AND REHABILITATION ARE HAVING THEIR

4  MENTAL HEALTH NEEDS MET BY THE PRESENT STAFF OF THE DEPARTMENT

5  OF CORRECTIONS AND REHABILITATION?

6  **A**  I BELIEVE THE REPORT SAYS THAT CONSTITUTIONALLY ADEQUATE

7  MENTAL HEALTHCARE IS BEING PROVIDED.  THAT'S SLIGHTLY DIFFERENT

8  FROM WHETHER ALL THEIR MENTAL HEALTH NEEDS ARE BEING MET.

9  THEY'RE RELATED, BUT THEY'RE NOT EXACTLY THE SAME THING.

10 **Q**  YOU WOULD AGREE THAT AT LEAST SOME PORTION OF THE MENTAL

11 HEALTH CASELOAD WITHIN THE DEPARTMENT OF CORRECTIONS AND

12 REHABILITATION IS RECEIVING SOME FORM OF MENTAL HEALTHCARE?

13 **A**  YES, OF COURSE.

14 **Q**  AND YOU WOULD AGREE THAT THOSE WITHIN THE COLEMAN MENTAL

15 HEALTH CASELOAD, PARTICULARLY THE ONES WITHIN THE ENHANCED

16 OUTPATIENT PROGRAM, THE ONES WHO REQUIRE INTERMEDIATE AND ACUTE

17 INPATIENT HOSPITAL CARE, NEED ONGOING MENTAL HEALTH MEDICATION,

18 MENTAL HEALTH CLINICAL SUPPORT?

19 **A**  YES, MANY OF THEM DO, AND, UNFORTUNATELY, MANY OF THEM ARE

20 NOT GETTING IT IN THE SYSTEM AS IT'S PRESENTLY CONSTITUTED FOR,

21 IN MY OPINION, OVERCROWDING-RELATED REASONS.

22 **Q**  AND, IN FACT, EVEN THOSE MENTALLY ILL INMATES AT THE LOWEST

23 LEVEL OF CARE, THOSE AT THE 3CMS OUTPATIENT LEVEL OF CARE, ALSO

24 NEED APPROPRIATE MENTAL HEALTHCARE AND APPROPRIATE MENTAL

25 HEALTHCARE FROM CLINICIANS, CORRECT?

1  **A**   YES, THEY DO, IN MANY RESPECTS.  THIS IS NOT ONLY THE

2  LARGEST GROUP IN THE SYSTEM, BUT IT'S ALSO THE LEAST WELL

3  SERVED.  THEY ARE THE MOST IMPACTED IN MANY WAYS BY THE

4  OVERCROWDING THAT'S PLAGUED THE SYSTEM.

5  **Q**   YOU HAVE NO OPINION, DO YOU, AS TO WHETHER OR NOT THE

6  EXISTING PAROLE OUTPATIENT CLINICS FOR THE MENTALLY ILL THAT

7  ARE RELEASED ARE SUFFICIENT TO SERVE THE MENTAL HEALTH NEEDS OF

8  THE RELEASED MENTALLY ILL INMATES, DO YOU?

9  **A**   I DON'T HAVE ANY REASON TO BELIEVE THEY ARE NOT.  I AM WELL

10  AWARE THERE ARE TRANSITIONAL BRIDGE PROGRAMS, AND THERE ARE

11  PAROLE OUTPATIENT CLINICS THAT ARE SET UP TO SERVE THE NEEDS OF

12  ALL OF THE MENTAL HEALTH PATIENTS WHO COME OUT OF THE SYSTEM,

13  MANY OF THEM WHO COME OUT IN ALL LEVELS OF ACUITY.

14  **Q**   AND LOOKING BACK AT YOUR DEPOSITION, I BELIEVE YOU

15  TESTIFIED OTHERWISE AT PAGE 56.  YOU WERE ASKED AT LINE 19:

16      "ARE YOU AWARE WHETHER OR NOT THE PRESENT SYSTEM

17     OF PAROLE OUTPATIENT CLINICS IS ADEQUATE TO SUPPORT

18     THE MENTAL HEALTH NEEDS OF THOSE PAROLEES WITH MENTAL

19     HEALTHCARE ISSUES?"

20      THERE WAS AN OBJECTION, BEYOND THE SCOPE OF HIS

21  EXPERT REPORT.  A RESPONSE ALONG THE LINES OF THERE'S ALSO BEEN

22  A DISCUSSION BY THIS WITNESS OF PRE-PAROLE PLANNING AND AGAIN

23  ANOTHER OBJECTION.  THE QUESTION AT LINE 8, PAGE 66 WAS:

24      "DO YOU HAVE ANY OPINION ON THAT?

25      "ANSWER: I DON'T.  I WASN'T ASKED TO LOOK INTO

1    IT, AND I HAVEN'T LOOKED AT IT."

2         ON THAT BASIS WE ASK HIS LAST RESPONSE BE STRUCK,

3  YOUR HONOR.

4         **JUDGE KARLTON:**  THAT'S NOT WHAT HAPPENS.  THE RECORD

5  IS WHAT THE RECORD IS.

6  **BY MS. TILLMAN**

7  **Q**   DO YOU HAVE ANY OPINION AS TO WHETHER OR NOT ANY OF THE

8  RELEASED INMATES, PARTICULARLY RELEASE INVOLVING SOME 40,000

9  INMATES, WOULD ACTUALLY RECEIVE CONSTITUTIONALLY ADEQUATE CARE

10 IN THE COMMUNITIES THEY'RE RELEASED TO?

11 **A**   WELL, YES, I DO.  I THINK IT WOULD DEPEND ENTIRELY ON HOW

12 THEY WERE RELEASED, THE TIME PERIOD OVER WHICH THEY WERE

13 RELEASED, WHAT KINDS OF CHANGES WERE DETERMINED TO BE

14 NECESSARY, IF ANY, IN THE RESOURCES THAT WERE AVAILABLE TO

15 COMMUNITIES WHERE THE PRISONERS WERE BEING RELEASED TO, WHETHER

16 THERE NEEDED TO BE ENHANCEMENT, IF ANY, TO THE PAROLE

17 OUTPATIENT CLINICS.  I THINK ALL OF THOSE THINGS WOULD NEED TO

18 BE DETERMINED.

19         **JUDGE KARLTON:**  HANG ON A SECOND, MS. TILLMAN.

20         WE HAVE AN OBLIGATION, IN THE EVENT WE REACH THE

21 POINT WHERE WE THINK -- THE POINT THAT SOMETHING HAS TO BE DONE

22 IN CONSIDERING WHAT HAS TO BE DONE TO CONSIDER PUBLIC SAFETY.

23 UNLIKE YOU, I'M NOT AN EXPERT, BUT IT SEEMS TO ME THAT IT AT

24 LEAST RAISES A SERIOUS QUESTION IF YOU WERE TO TAKE 40,000, FOR

25 EXAMPLE, SOME 20 PERCENT OF WHICH WERE SERIOUSLY ILL, AND MOVE

1   THEM INTO THE COMMUNITY -- LET ME ASK INSTEAD OF TELLING YOU.

2   DOES THAT REPRESENT A THREAT TO PUBLIC SAFETY?

3           **THE WITNESS:**  IF IT WAS DONE THOUGHTLESSLY WITHOUT

4   PLANNING, WITHOUT A PROCESS, THEN IT MIGHT, NOT ONLY BECAUSE

5   SOME PERCENTAGE OF THEM WERE MENTALLY ILL, BUT BECAUSE THAT

6   KIND OF OUTPOURING INTO COMMUNITIES THAT WEREN'T PREPARED TO

7   RECEIVE A VERY LARGE INFLUX OF PRISONERS MIGHT BE PROBLEMATIC

8   IN A VARIETY OF DIFFERENT WAYS.  SO I DID NOT IN MY REPORT, AND

9   I DON'T KNOW ANYBODY TO BE SUGGESTING, THAT AN IMMEDIATE

10  RELEASE OF 40,000 PRISONERS IS WHAT IS CALLED FOR.

11          WHAT I RECOMMENDED HERE, AND MS. TILLMAN AND I

12  DISCUSSED THIS IN MY DEPOSITION, IS A PROCESS BY WHICH

13  PRISONERS WERE RELEASED -- A PROCESS BY WHICH AT THE VERY LEAST

14  PRISONERS WHO ARE ALREADY SCHEDULED TO BE RELEASED SIMPLY BE

15  RELEASED AT AN ACCELERATED PACE, AN ACCELERATED PACE CONSISTENT

16  WITH THE RESOURCES AVAILABLE IN THE COMMUNITY, INCLUDING

17  RESOURCES FOR THE MENTALLY ILL, AND THAT, IN ADDITION, OTHER

18  KINDS OF POPULATION CONTROL MECHANISMS BE ADDRESSED.

19          FOR EXAMPLE, THE ISSUE OF WHETHER OR NOT TECHNICAL

20  PAROLE VIOLATERS NEEDED TO BE RETURNED TO PRISON OR COULD BE

21  HANDLED IN SOME OTHER WAY THROUGH SOME OTHER SET OF SANCTIONS;

22  WHETHER OR NOT IN A LONGER-TERM, SOME KIND OF SENTENCING

23  RESTRUCTURING NEEDED TO BE REDONE SO THE POPULATION OF

24  PRISONERS BEGAN TO BE REDUCED OVER TIME IN A WAY THAT COULD BE

25  STABILIZED RATHER THAN A ONE TIME ONLY RELEASE OF PRISONERS.

 1          SO I THINK THERE ARE A VARIETY OF WAYS THIS COULD BE

 2   DONE.  PUBLIC SAFETY WOULD BE ONE CONSIDERATION.  BUT I WOULD

 3   CONTINUE TO UNDERSCORE FOR THE COURT WE ARE TALKING ABOUT

 4   PRISONERS WHO COME OUT OF THIS SYSTEM ANYWAY.  SOME 130,000 OR

 5   10 -- PLUS OR MINUS 10,000 EACH YEAR COME OUT OF THE SYSTEM.

 6   IF THE DEPARTMENT OF CORRECTIONS HAD STARTED A YEAR AGO SIMPLY

 7   ACCELERATING THE RELEASES BY TEN PERCENT, THAT WOULD MEAN IN AN

 8   AVERAGE YEAR INSTEAD OF 130,000 COMING OUT, 143,000 CAME OUT.

 9   THAT SINGLE STEP WOULD HAVE IN A YEAR ELIMINATED MOST, IF NOT

10   ALL, THE BAD BEDS IN THE SYSTEM, WHICH ARE ABOUT 13,000 WORTH.

11          SO THERE ARE -- THERE ARE SMALL BUT DIRECTED STEPS

12   THAT CAN BE TAKEN THAT MINIMIZE OR ELIMINATE ANY PUBLIC SAFETY

13   CONCERN BUT WHICH HAVE SIGNIFICANT IMPACT ON A SERIOUSLY

14   OVERCROWDED SYSTEM.  NOT TAKING ANY OF THEM, IT SEEMS TO ME, IS

15   ALSO A PUBLIC SAFETY-RELATED ISSUE, BECAUSE THE PRISONERS WHO

16   WE'RE TALKING ABOUT COMING OUT, 130,000 OF THEM EVERY YEAR,

17   BEING SUBJECTED TO EXACTLY THE KIND OF NOXIOUS AND UNHEALTHY

18   CONDITIONS THAT WE HAVE BEEN TALKING ABOUT.  I DON'T THINK -- I

19   DON'T THINK THAT BENEFITS PUBLIC SAFETY EITHER.  NOT TO BE ABLE

20   TO ADDRESS THE MENTAL HEALTH NEEDS AND ISSUES OF A SIGNIFICANT

21   PERCENTAGE OF PEOPLE WHO ARE GOING TO BE RELEASED IN THE LONG

22   RUN IT SEEMS TO ME PLACES PUBLIC SAFETY AT RISK NOT AT BENEFIT.

23          **MS. TILLMAN:**  JUST FOR THE RECORD, YOUR HONOR, THIS

24   EXPERT WAS NOT DESIGNATED ON THE PUBLIC SAFETY IMPLICATIONS OF

25   THE RELEASE.

1          **JUDGE KARLTON:**  I UNDERSTAND.

2          **MS. TILLMAN:**  THAT WAS NOT BROUGHT UP IN HIS

3   DEPOSITION, AND HE WAS NOT PERMITTED TO TESTIFY ABOUT IT.

4          **JUDGE KARLTON:**  THANK YOU, MA'AM.  YOU MAY PROCEED.

5   **BY MS. TILLMAN**

6   **Q**   YOU WOULD AGREE THAT MENTALLY ILL INMATES WHO ARE RELEASED,

7   WHETHER ON PAROLE OR OTHERWISE, CAN DECOMPENSATE WHEN THEY ARE

8   NOT GIVEN SUFFICIENT MEDICATION MANAGEMENT AND PSYCHIATRIC

9   SUPPORT?

10  **A**   PERSONS WHO ARE MENTALLY ILL DO SOMETIMES DECOMPENSATE FOR

11  A VARIETY REASONS.

12  **Q**   UNDER THE BEST OF CIRCUMSTANCES AND UNDER THE WORST OF

13  CIRCUMSTANCES, CORRECT?

14  **A**   YES.  AND AS I THINK I SAID THE LAST TIME, I TESTIFIED MUCH

15  MORE OFTEN UNDER THE WORST OF CIRCUMSTANCES, WHICH IS WHY THE

16  CIRCUMSTANCES UNDER WHICH THEY'RE LIVING IN THE PRISON IS OF

17  SUCH CONCERN.

18  **Q**   WOULDN'T THE WORST CIRCUMSTANCE BE AN INMATE WHO NEEDS

19  MENTAL HEALTH ASSISTANCE WHO'S NOT ABLE TO GET IT WHILE ON THE

20  STREETS?

21  **A**   NO.  NO, NOT NECESSARILY.  FIRST OF ALL, YOU ARE ASSUMING

22  THAT THEY'RE GETTING MENTAL HEALTH ASSISTANCE IN THE SYSTEM,

23  AND FOR A VERY, VERY LARGE NUMBER OF THEM THEY ARE NOT.

24  **Q**   CAN YOU STATE TO ANY DEGREE OF CERTAINTY THAT, WITH

25  140 PERCENT CAPACITY OR 145 PERCENT CAPACITY, THE DEPARTMENT OF

1  CORRECTIONS WILL BE ABLE TO OPERATE A CONSTITUTIONALLY ADEQUATE

2  MENTAL HEALTHCARE SYSTEM?

3  **A**   NO.  I SAID AT THE OUTSET OF THAT ESTIMATE, THAT IT WAS NOT

4  AN EXACT SCIENCE.  THAT'S WHY I PROVIDED A RANGE.  I TRIED TO

5  DEFEND BOTH THE BOTTOM AND UPPER LIMIT TO THE RANGE.

6        I ALSO SAID REPEATEDLY THAT OTHER THINGS NEED TO BE

7  DONE, THAT THIS IS -- THERE'S NOTHING MAGICAL ABOUT 145 PERCENT

8  OR EVEN A HUNDRED PERCENT, BUT THAT AT 190 PERCENT, IN MY

9  OPINION, IT DOESN'T MATTER WHAT YOU DO, YOU CANNOT ACHIEVE A

10  CONSTITUTIONALLY ADEQUATE SYSTEM.

11        AND THE CLOSER TO A HUNDRED PERCENT WE GET, THE

12  BETTER WE WILL BE, AND THE GREATER THE LIKELIHOOD THAT THE

13  OTHER THINGS THE COURTS HAVE BEEN ORDERING IN THESE TWO CASES

14  WILL, IN FACT, SIGNIFICANTLY AFFECT THE DELIVERY OF THE SYSTEM

15  AND BRING IT INTO CONSTITUTIONAL COMPLIANCE.

16  **Q**   ISN'T IT TRUE YOU SAID IN DEPOSITION THAT, QUOTE:

17        "I AM NOT JUDGE OF WHETHER OR NOT A SYSTEM AT THE

18        TIME WE ARRIVE AT THAT POINT OF 145 PERCENT CAPACITY

19        (145 PERCENT CAPACITY) IS OPERATING AT A

20        CONSTITUTIONALLY ADEQUATE LEVEL"?

21  **A**   OF COURSE, IT GOES WITHOUT SAYING I WOULDN'T BE THE JUDGE

22  OF WHETHER OR NOT A SYSTEM IS CONSTITUTIONALLY ADEQUATE.

23        **MS. TILLMAN:**  THANK YOU.  NOTHING FURTHER.

24        **MS. KAHN:**  NOTHING FURTHER.

25        **JUDGE HENDERSON:**  NOTHING FURTHER?  THANK YOU FOR

1    COMING, DR. HANEY.  YOU'RE EXCUSED AGAIN.

2              YOU MAY CALL YOUR NEXT WITNESS.

3          **MR. BIEN:**  YOUR HONOR, PLAINTIFFS DO NOT HAVE

4    ADDITIONAL WITNESSES TODAY.  WE WILL HAVE PHASE TWO WITNESSES

5    LATER IN THE WEEK, BUT THE INTERVENORS WERE KIND ENOUGH TO GET

6    SOME WITNESSES FOR THIS AFTERNOON.

7          **JUDGE HENDERSON:**  BEFORE WE DO THAT, I LOOKED AT

8    VARIOUS PIECES OF PAPER THAT PEOPLE ARE FILING.  I CAN'T FIGURE

9    OUT WHAT'S GOING ON.  I KNOW JUDGE REINHARDT RAISES THE SAME

10   QUESTION.  ARE WE STILL IN PHASE ONE?

11         **MR. BIEN:**  WE ARE -- WE HAVE BEEN --

12         **JUDGE HENDERSON:**  THAT WAS PHASE TWO, I UNDERSTAND.

13         **MR. BIEN:**  YES, THAT WAS PHASE TWO.  WE HAVE

14   TOMORROW TWO DEFENSE EXPERTS ON PHASE ONE, DR. PACKER AND

15   DR. THOMAS.

16         **JUDGE KARLTON:**  OKAY.

17         **MR. BIEN:**  AND THAT WILL BE -- FROM NOW IT'S GOING

18   TO BE PHASE TWO TODAY.

19         **MR. MELLO:**  PAUL MELLO FOR DEFENDANTS.

20              IN ADDITION TO THE TWO PHASE ONE MEDICAL AND MENTAL

21   HEALTHCARE EXPERTS, THERE'S ALSO THE READING INTO THE

22   TRANSCRIPT OF DEPOSITIONS FROM MR. MUMOLA, WHICH I BELIEVE IS

23   PHASE ONE, AS WELL AS TWO CLASS REPS, ONE FROM COLEMAN AND ONE

24   FROM PLATA, WHICH I BELIEVE ARE LARGELY PHASE ONE ISSUES AS

25   WELL, BUT I THINK THE REST IS DEFINITELY PHASE TWO.

1              **JUDGE REINHARDT:**  AND YOU HAVE -- THE REST OF TODAY

2    YOU HAVE PHASE TWO OR PHASE ONE?

3              **JUDGE KARLTON:**  THEY'RE FINISHED FOR TODAY, THESE

4    FOLKS.

5              **JUDGE REINHARDT:**  SO YOU'RE GOING TO CONTINUE WITH

6    PHASE ONE?

7              **MR. MELLO:**  I BELIEVE THE PARTIES TALKED ABOUT WHAT

8    WAS NEXT GOING TO HAPPEN WAS WE WERE GOING TO READ INTO THE

9    RECORD DEPOSITION TESTIMONY; HOWEVER, BECAUSE THE INTERVENORS

10   BROUGHT WITNESSES, AND THEY'RE HERE, RATHER THAN INCONVENIENCE

11   THEM, WE WOULD PUT -- THOSE LIVE WITNESSES WERE GOING TO GO ON,

12   CORRECT?

13             **JUDGE REINHARDT:**  OKAY.  THEY ARE GOING TO BE PHASE

14   TWO?

15             **MR. MELLO:**  YES.  THANK YOU.

16             **JUDGE HENDERSON:**  YOU MAY CALL YOUR WITNESS,

17   COUNSEL.

18             **MR. MITCHELL:**  BILL MITCHELL FOR THE DA INTERVENORS.

19   WE'RE CALLING LISA RODRIGUEZ.  I BELIEVE SHE'S OUT IN THE

20   HALLWAY.

21             **JUDGE HENDERSON:**  STEP TO THE FRONT AND BE SWORN IN,

22   MA'AM.

23                        **LISA RODRIGUEZ,**

24   HAVING BEEN CALLED AS A WITNESS BY THE INTERVENORS WAS FIRST

25   DULY SWORN AND EXAMINED AS FOLLOWS:

1          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

2   RECORD.

3          **THE WITNESS:**  LISA RODRIGUEZ, R-O-D-R-I-G-U-E-Z.

4          **MR. MITCHELL:**  LET ME -- THE DA INTERVENORS HAVE

5   FILED A DECLARATION IN LIEU OF DIRECT TESTIMONY WITH THE COURT.

6   I HAVE EXTRA COPIES FOR THE COURT AT THIS TIME.

7          **JUDGE HENDERSON:**  HAND IT UP.

8          **MR. SANGSTER:**  YOUR HONOR, ED SANGSTER FOR THE

9   PLAINTIFFS.  THAT DOES NOT APPEAR TO BE THE DECLARATION.  THE

10  DECLARATION I SAW HAD EXHIBITS.

11         **MR. MITCHELL:**  THE EXHIBITS ARE FORTHCOMING.

12         **MR. SANGSTER:**  I DON'T WANT TO SLOW US DOWN ON

13  ADMINISTRATIVE --

14         **JUDGE KARLTON:**  COUNSEL, I DON'T EVEN KNOW WHO YOU

15  ARE.

16         **MR. SANGSTER:**  I'M SORRY, YOUR HONOR.  I'M ED

17  SANGSTER.  I REPRESENT PLAINTIFFS.

18         **JUDGE KARLTON:**  ALL RIGHT.  AND WHAT'S THE PROBLEM

19  NOW?

20         **JUDGE HENDERSON:**  THE DECLARATION HE SAW HAD

21  EXHIBITS ON IT, AND THIS ONE DOESN'T.  IS THAT THE CONCERN?

22         **MR. SANGSTER:**  YES, YOUR HONOR.

23         **MR. MITCHELL:**  THEY'RE HERE AND THEY'RE COMING.

24         **JUDGE KARLTON:**  GOOD.

25  ///

1      **DIRECT EXAMINATION BY MR. MITCHELL**

2   **BY MR. MITCHELL**

3   **Q**   CAN YOU TELL US YOUR OCCUPATION, PLEASE?

4   **A**   I'M A DEPUTY DISTRICT ATTORNEY IN SAN DIEGO COUNTY.

5   **Q**   HOW LONG HAVE YOU BEEN WORKING THERE AS A DEPUTY DISTRICT

6   ATTORNEY?

7   **A**   I HAVE BEEN WITH THE DA'S OFFICE A LITTLE OVER TEN YEARS.

8   **Q**   ARE YOU FAMILIAR WITH THE PROGRAM CALLED THE SB 618,

9   COMMUNITY RE-ENTRY PROGRAM?

10  **A**   I AM.

11  **Q**   HOW ARE YOU FAMILIAR WITH THAT?

12  **A**   I HAVE BEEN ASSIGNED TO WORK ON THAT PROGRAM SINCE ABOUT

13  MAY OF 2006.

14  **Q**   IN YOUR DECLARATION YOU DESCRIBE THAT PROGRAM AS A EXAMPLE

15  OR -- EXCUSE ME -- AS A COMPREHENSIVE MULTI-AGENCY PROGRAM

16  DESIGNED TO TRANSITION NONVIOLENT OFFENDERS BACK INTO THEIR

17  COMMUNITIES; IS THAT CORRECT?

18  **A**   THAT'S CORRECT.

19  **Q**   AND IS THIS PROGRAM INTENDED TO REDUCE HIGH RECIDIVISM

20  RATES AMONG THAT TARGET POPULATION OF NONVIOLENT OFFENDERS?

21  **A**   THAT'S EXACTLY WHAT IT'S TARGETED TO DO.

22  **Q**   COULD YOU BRIEFLY DESCRIBE FOR US HOW THE PROGRAM WAS

23  DESIGNED TO WORK AND HOW IT DOES WORK?

24  **A**   IT WAS WRITTEN -- ACTUALLY THE LEGISLATION, WHICH IS NOW

25  PENAL CODE SECTION 1203.8, WAS WRITTEN BY MY BOSS, BONNIE

1  DUMANIS AND VAUGHN JEFFREY.  IT WAS SPONSORED, THE LEGISLATION,

2  BY JACKIE SPEIER AND PASSED INTO LAW BY GOVERNOR SCHWARZENEGGER

3  IN 2005.

4         THE INTENT OF THE PROGRAM WAS TO STOP THE SILO

5  EFFECT OF PEOPLE GOING THROUGH THE PRISON SYSTEM AND PROVIDE A

6  COMPREHENSIVE PROGRAM THAT STARTS AT THE TIME OF THE CHANGE OF

7  PLEA, GOES ALL THE WAY WHILE SOMEBODY IS IN PRISON AND 18

8  MONTHS AFTER RELEASE.  IT INVOLVES EVERYTHING FROM TESTING, TO

9  PUTTING TOGETHER A LIFE PLAN, PROGRAMMING, PROGRAMMING WHILE

10 THEY'RE IN PRISON, AND THEN RESOURCES WHILE THEY ARE OUT ON

11 PAROLE.

12 **Q**   ATTACHED TO YOUR DECLARATION WAS EXHIBIT A, WHICH IS NOW

13 MARKED AS DEFENDANT INTERVENOR EXHIBIT 507, SYMPOSIUM SB 618

14 COMMUNITY REENTRY PROGRAM.  DO YOU HAVE A COPY OF THIS?

15 **A**   I DO.

16 **Q**   CAN YOU EXPLAIN WHAT THIS IS, PLEASE?

17 **A**   THAT WAS A HANDOUT THAT I ACTUALLY PUT TOGETHER WHEN I DID

18 AN EDUCATIONAL SEMINAR FOR THE SUPERIOR COURT BENCH IN SAN

19 DIEGO.  IT INCLUDES AN OVERVIEW OF THE PROGRAM, A POWERPOINT

20 PRESENTATION THAT I PUT TOGETHER AND SOME OF THE DIFFERENT

21 ELEMENTS OF THE PROGRAM.

22 **Q**   DOES IT OUTLINE HOW THE PROGRAM IS DESIGNED, HOW IT WORKS,

23 AND ALL THE DIFFERENT STEPS FROM THE TIME OF THE ENTRY OF THE

24 PLEA TO PERSON GETTING OUT OF PRISON AND --

25 **A**   IT DOES GENERALLY.

1  Q   COULD YOU EXPLAIN FOR US, PLEASE, THE TARGET POPULATION WHO

2  THIS PROGRAM APPLIES TO?

3  A   ABSOLUTELY.

4  Q   AND THE CLASS OF OFFENDERS THAT IT APPLIES TO?

5  A   IT APPLIES TO NONVIOLENT OFFENDERS WHO ARE GOING TO BE

6  SERVING A SENTENCE OF BETWEEN EIGHT YEARS -- EXCUSE ME -- EIGHT

7  MONTHS AND SIX YEARS, WITH NO LESS THAN FOUR MONTHS TO SERVE

8  AND NO MORE THAN THIRTY-SIX MONTHS TO SERVE.

9        MOST OF THE PEOPLE THAT ARE IN OUR PROGRAM ARE GOING

10  TO PRISON BECAUSE OF AUTO THEFT, DRUG OFFENSES, LOW LEVEL

11  OFFENSES.  THEY CAN HAVE CERTAIN PRIOR FELONIES OR EVEN SERIOUS

12  FELONIES, BUT NO VIOLENT FELONIES WITHIN THE LAST FIVE YEARS.

13  THE CURRENT OFFENSE CANNOT BE A VIOLENT FELONY.  OTHER

14  EXCLUSIONARY FACTORS WOULD BE AN ARSON REGISTRANT, A 290

15  REGISTRANT, HAVING INFLICTED GREAT BODILY INJURY OR DEATH UPON

16  ANOTHER PERSON AT ANY TIME, IN THEIR CRIMINAL HISTORY.  SO IT'S

17  GENERALLY GEARED TOWARDS PEOPLE WHO ARE KIND OF ON THAT

18  REVOLVING DOOR OF THE PRISON SYSTEM; THEY GO IN, COME OUT, THEY

19  REOFFEND, THEY GO BACK AGAIN.

20  Q   THE TARGET POPULATION FOR THIS PROGRAM IN SAN DIEGO COUNTY,

21  THE INDIVIDUALS THAT GET ENROLLED IN THIS PROGRAM, ARE THEY

22  GOING TO PRISON ANYWAY DESPITE THE FACT THIS PROGRAM EXISTS?

23  A   ABSOLUTELY.  IT'S ONLY OFFERED TO PEOPLE WHO ARE GOING TO

24  PRISON.  WE DON'T OFFER IT TO ANYBODY WHO MIGHT BE ON THE CUSP

25  BETWEEN PROBATION AND PRISON.  THAT WAS VERY IMPORTANT WHEN WE

1  WERE PUTTING THE PROGRAM TOGETHER.  WE DISCUSSED THAT WITH THE

2  PUBLIC DEFENDER REPRESENTATIVES AND THE DEFENSE BAR

3  REPRESENTATIVES ON OUR OPERATIONS COMMITTEE.

4           WE DID THAT BECAUSE WE DIDN'T WANT ANYBODY TO CHOOSE

5  TO GO INTO THIS PROGRAM THAT WASN'T GOING TO PRISON ANYWAY.  WE

6  DON'T WANT PEOPLE GOING TO PRISON THAT DON'T NEED TO BE THERE,

7  SO WE HAVE VERY FEW FIRST TIMERS, AND WE DON'T MAKE IT PART OF

8  OUR NEGOTIATION PROCESS.  IT'S ONLY OFFERED TO THE POTENTIAL

9  CANDIDATES AFTER THEY HAVE AGREED TO A STIPULATED PRISON TERM.

10 Q   SO YOU HAVE REPEAT OFFENDERS, PAROLEES WHO ARE ACTUALLY IN

11 THE PROGRAM?

12 A   YES, THEY HAVE TO BE GETTING A NEW PRISON TERM FOR A NEW

13 OFFENSE, BUT IT IS ALMOST ENTIRELY, WITH VERY FEW EXCEPTIONS,

14 PEOPLE WHO HAVE BEEN TO PRISON BEFORE.

15 Q   PARAGRAPH 11 OF YOUR DECLARATION, YOU LIST OUT THE NUMBER

16 OF OFFENSES AND THE NUMBER OF INDIVIDUALS FOR A CERTAIN NUMBER

17 OF THOSE OFFENSES.  IS THAT ACCURATE THAT THERE ARE

18 APPROXIMATELY 204 THAT HAVE BEEN CONVICTED OF VEHICLE CODE

19 SECTION 10A 51, OR AUTO THEFT, AND ANOTHER, EXCUSE ME, 121 --

20 EXCUSE ME -- 204 FOR VEHICLE THEFT, BURGLARY, POSSESSION OF

21 STOLEN PROPERTY, GRAND THEFT, IDENTITY THEFT, AND FORGERY?

22 A   I WOULD SAY THOSE NUMBERS ARE PROBABLY STILL

23 PERCENTAGE-WISE ABOUT RIGHT.  WE HAVE MORE PEOPLE ENROLLED,

24 BECAUSE WE ENROLL SIX PEOPLE EVERY WEEK, BUT IT SHOULD BREAK

25 DOWN PRETTY CONSISTENTLY ALONG THOSE LINES.

1  Q   THEN ANOTHER 121 FOR DRUG OFFENSES?

2  A   YES.  MOST OF OUR PEOPLE WHO GO IN THE PROGRAM, EVEN IF

3  THEY'RE NOT GOING IN FOR A DRUG OFFENSE, USUALLY HAVE SOME DRUG

4  CONNECTION.

5  Q   SO THE GREAT MAJORITY OF THE INDIVIDUALS IN THE PROGRAM ARE

6  PROPERTY CRIME OFFENDERS AND DRUG OFFENDERS?

7  A   ABSOLUTELY.

8  Q   AND THEY'RE REPEAT OFFENDERS.  APPROXIMATELY HOW MANY PRIOR

9  CONVICTIONS DO EACH OF THESE INDIVIDUALS HAVE?

10 A   I WOULD BE WAGERING A GUESS, BUT I WOULD SAY A MINIMUM OF

11 THREE OR FOUR TIMES THEY HAVE BEEN TO PRISON BEFORE.  WE HAVE,

12 LIKE I SAID, VERY FEW PEOPLE WHO ARE GOING ON THEIR FIRST TIME

13 TO PRISON.

14         IN FACT, YOU KNOW, A LOT OF OUR GUYS WHO GO THE

15 FIRST TIME TO PRISON TURN DOWN SB 618.  THEY'RE YOUNG.  THEY

16 THINK, I CAN DO IT; I'LL DO MY PRISON SENTENCE.

17         IT'S PEOPLE WHO HAVE BEEN TIME AND TIME AGAIN WHO

18 WANT TO TAKE ADVANTAGE OF THIS.  THEY DON'T WANT TO GO BACK TO

19 PRISON.  THEY WANT TO DO SOMETHING DIFFERENT, SO THEY DON'T GET

20 BACK AGAIN.  VERY OFTEN IT'S OUR MIDDLE-AGE GUYS WHO HAVE BEEN

21 A NUMBER OF TIMES TO PRISON WHO DECIDE TO PARTICIPATE.  THIS IS

22 AN ENTIRELY VOLUNTARILY PROGRAM.

23 Q   VOLUNTARY ON THE OFFENDER'S PART?

24 A   ABSOLUTELY.

25 Q   HOW DID THIS PROGRAM COME TO BE IMPLEMENTED IN SAN DIEGO

1  COUNTY?

2  **A**  WELL, AS I SAID, BONNIE DUMANIS WROTE THE LEGISLATION.  WE

3  HAD A COMMUNITY ROUNDTABLE THAT STARTED GETTING TOGETHER BEFORE

4  THE LEGISLATION WAS EVEN ENACTED, TRYING TO FIGURE OUT WHO CAN

5  BE INVOLVED IN THIS, WHAT DO THEY NEED.  THEY START DOING

6  RESEARCH AND LOOKING AT THE PRACTICES THAT WERE WORKING ACROSS

7  THE NATION, AND THEY PUT TOGETHER THIS MODEL.

8           IT'S REALLY THE FIRST OF ITS KIND THAT STARTS AT THE

9  VERY BEGINNING OF THE PROCESS AND GOES FOR 18 MONTHS AFTER.  IT

10 THEN INVOLVED FOR THE OPERATIONS COMMITTEE GETTING PROBATION

11 TOGETHER, THE DEPARTMENT OF CORRECTIONS, PAROLE, THE SHERIFF'S

12 DEPARTMENT, MY OFFICE, THE DEFENSE BAR AND THE BENCH, AND

13 EVERYBODY IS INVOLVED AND MEETS WEEKLY STILL KEEPING THIS

14 PROGRAM GOING, CHANGING THINGS, ADDRESSING PROBLEMS AS THEY

15 ARISE.  IT'S LIKE A WORK IN PROGRESS.  WE'RE CONSTANTLY TRYING

16 TO IMPROVE IT.

17 **Q**  THE GOAL OF THE PROGRAM IS TO REDUCE RECIDIVISM; IS THAT

18 CORRECT?

19 **A**  THAT'S CORRECT.  WHEN WE HAVE 70 PERCENT OF THE PEOPLE THAT

20 COME OUT OF PRISON GOING BACK TO PRISON, THERE'S A PROBLEM.  WE

21 HAVE TO DO SOMETHING BETTER, AND THAT'S WHAT THIS PROGRAM WAS

22 DESIGNED TO DO.

23          WE KNOW THAT PEOPLE ARE GOING TO COME BACK TO SAN

24 DIEGO COUNTY, AND IF THEY ARE COMING BACK TO SAN DIEGO COUNTY,

25 WE WANT TO MAKE SO IT WE ARE PROTECTING THE COMMUNITY ON THE

1  BACK END.  WE DON'T WANT THEM COMING BACK TO OUR OFFICE AND

2  COMING BACK TO COURT AND COMMITTING NEW OFFENSES.  THE PROGRAM

3  IS DESIGNED TO GIVE THEM TOOLS IN ORDER TO KEEP THEM FROM

4  COMMITTING CRIMES IN THE FUTURE.

5           I WAS TALKING TO ONE OF OUR PAROLEES, A LADY WHO HAD

6  BEEN IN PRISON A NUMBER OF TIMES, AND SHE SAID SB 618 DOESN'T

7  DO ANYTHING FOR YOU BUT OPEN THE DOORS THAT YOU NEED TO GO

8  THROUGH, AND THAT WAS A PERFECT WAY OF PUTTING IT.  WE ARE

9  GIVING PEOPLE TOOLS SO THEY CAN CHOOSE TO MAKE BETTER

10 DECISIONS.

11          **JUDGE REINHARDT:**  THESE FIGURES YOU GAVE US IN

12 PARAGRAPH 11, ARE THEY THE TOTAL NUMBER OF PARTICIPANTS IN THIS

13 PROGRAM, ABOUT 330 OR SO?

14          **THE WITNESS:**  THEY WERE AS OF THE TIME THIS WAS

15 WRITTEN.  AS I SAID, WE ADD SIX EVERY WEEK, SO WE ARE ACTUALLY

16 UP TO 389 PARTICIPANTS AT THIS TIME WITH 107 THAT HAVE BEEN

17 RELEASED ON PAROLE.

18 **BY MR. MITCHELL**

19 **Q**   LET'S TALK ABOUT THOSE NUMBERS FOR A MOMENT.  THE PROGRAM

20 HAS BEEN UP AND RUNNING FOR HOW LONG?

21 **A**   WE PUT OUR FIRST PARTICIPANTS IN IN FEBRUARY OF 2007.

22 **Q**   YOU HAVE HOW MANY IN THE PROGRAM RIGHT NOW?

23 **A**   THREE HUNDRED EIGHTY-NINE AT VARIOUS STAGES OF THE PROGRAM.

24 **Q**   NOW, THE TERMS OF IMPRISONMENT ARE FROM EIGHT MONTHS TO SIX

25 YEARS, CORRECT?

1  **A**   YES.

2  **Q**   HOW MANY PEOPLE HAVE GOTTEN OUT OF PRISON AND INTO THE

3  SB 618 PROGRAM OUT OF PRISON?

4  **A**   THAT ARE ACTUALLY ON PAROLE NOW?  WE HAVE 107 ACTIVE SB 618

5  PARTICIPANTS ON PAROLE.

6  **Q**   WHEN DID THE FIRST PARTICIPANTS COME OUT ON PAROLE, HOW

7  LONG AGO?

8           **JUDGE KARLTON:**  NOW I'M UTTERLY CONFUSED, PLEASE

9  FORGIVE ME.  YOU HAVE 380 ROUGHLY PEOPLE IN THE PROGRAM?

10           **THE WITNESS:**  YES.

11           **JUDGE KARLTON:**  ONLY 160 OF THEM ARE ON PAROLE?

12           **THE WITNESS:**  I'M SORRY.  WE HAVE 389 AS OF

13  YESTERDAY, BECAUSE WE KEEP ADDING NEW PEOPLE EVERY DAY.  SO 389

14  PEOPLE THAT ARE IN VARIOUS STAGES OF THE PROGRAM.  THEY MAY BE

15  PRESENTENCING.  THEY MAY BE ON THEIR WAY TO PRISON.  THEY MAY

16  BE IN PRISON.

17           **JUDGE KARLTON:**  I UNDERSTAND NOW.

18           **THE WITNESS:**  THEN WE HAVE 107 THAT HAVE BEEN

19  RELEASED OUT INTO THE COMMUNITY.

20  **BY MR. MITCHELL**

21  **Q**   WHAT HAPPENS WHEN SOMEBODY WHO IS IN THE SB 618 PROGRAM

22  LEAVES COUNTY JAIL AND GOES TO PRISON?

23  **A**   WELL, IF I COULD TAKE A STEP BACK?  BEFORE THEY GO TO

24  PRISON, WE HAVE THE 20 COURT DAYS WHERE THEY ARE BEING ASSESSED

25  TO MAKE SURE THEY ARE ELIGIBLE FOR THE PROGRAM.  THEY ARE

1   GETTING TESTING DONE, LITERACY, VOCATIONAL.  A PLAN IS BEING

2   PUT TOGETHER FOR THEM; WHAT DO WE NEED TO DO TO HELP YOU BE

3   SUCCESSFUL.

4          THEY GET SENTENCED.  AT SENTENCING THEY SIGN A

5   CONTRACT SAYING THEY WOULD LIKE TO PARTICIPATE IN THE PROGRAM.

6   WITHIN 48 HOURS, BECAUSE THEY'RE IN THE SB 618 PROGRAM, THE

7   MINUTE ORDERS, ABSTRACT OF JUDGMENT, AND PRISON PACK IS PUT

8   TOGETHER, SO WE CAN GET THEM TO PRISON AS QUICKLY AS POSSIBLE.

9          FOR OUR MEN THEY GO TO R.J.D., RICHARD J. DONOVAN,

10  FACILITY, WHICH IS ACTUALLY DOWN THE STREET FROM THE JAIL.  THE

11  WOMEN GO TO THE CALIFORNIA INSTITUTE FOR WOMEN.  WHEN THEY GET

12  TO PRISON, THEY HAVE A SHORTER TIME IN RECEPTION THAN OTHER

13  INMATES BECAUSE MOST OF THEIR ASSESSMENTS HAVE BEEN DONE ON THE

14  LOCAL LEVEL.  THEY'RE PAID FOR BY THE PRISON.

15         WE INTEND TO HAVE ALL OF THEIR ASSESSMENTS DONE,

16  INCLUDING MEDICAL, SO THAT THEY COULD SPEND AS MINIMAL OF TIME

17  IN RECEPTION AS POSSIBLE, BECAUSE THAT'S WHERE A LOT OF THE

18  PROBLEMS OCCUR, BUT BECAUSE OF THE RECEIVER, WE HAVE NOT BEEN

19  ABLE TO WORK THAT OUT.  THEY STILL NEED TO GET THEIR MEDICAL

20  CHRONOS AND THINGS DONE WHEN THEY GET TO PRISON.

21         ONCE THEY GET TO DONOVAN OR CIW, THEY ACTUALLY MEET

22  THEIR PRISON CASE MANAGER WHO STARTS WORKING WITH THEM AND

23  TELLING THEM WHAT THEY CAN EXPECT WHILE THEY'RE IN PRISON.

24  THEN THEY'RE PUT INTO GENERAL POPULATION.  THEY'RE ESSENTIALLY

25  PRECLASSIFIED BEFORE THEY GET TO PRISON.  THEY ARE GIVEN THEIR

1    PRISON NUMBER AT THE LOCAL LEVEL, WHICH IS UNHEARD OF.  THAT

2    DOESN'T HAPPEN USUALLY.  THEY ALREADY HAVE A PRISON NUMBER,

3    THEY'RE IDENTIFIED, AND THEY CAN GET INTO THE PROGRAMMING AND

4    GENERAL POPULATION IN A SHORTER TIME THAN ANYONE ELSE CAN.

5    **Q**   ARE THEY ACTUALLY DOING PROGRAMMING WHILE IN PRISON?

6    **A**   YES.  AS A DIRECT RESULT OF 618, THERE'S ENHANCED

7    PROGRAMMING, VOCATION PROGRAMMING, PARTICULARLY AT DONOVAN AND

8    CIW.  AT DONOVAN WE NOW HAVE C-TECH, WHICH IS CABLE TECHNOLOGY,

9    WELDING.  MILL AND CABINETRY SHOULD BE UP WITHIN DAYS.  AND I'M

10   FORGETTING ONE.  THERE'S A FOURTH PROGRAM.

11           THEY ARE ALL UP AND RUNNING SPECIFICALLY AS A RESULT

12   OF SB 618.  MOST OF THOSE PROGRAMS ARE ON OUR LEVEL ONE

13   FACILITY WHICH HAS NEVER HAD VOCATIONAL PROGRAMMING BEFORE AND

14   SOME ARE ON OUR LEVEL THREE FACILITIES.

15   **Q**   ONCE A PARTICIPANT COMPLETES THEIR TIME IN PRISON, WHAT

16   HAPPENS DIFFERENT WITH AN SB 618 PARTICIPANT THAN THE REGULAR

17   PAROLEE LEAVING PRISON?

18   **A**   ACTUALLY, SIX MONTHS BEFORE THEIR RELEASE DATE, THE

19   COMMUNITY CASE MANAGER STARTS MEETING WITH THEM.  AND THEY HAVE

20   ONE COMMUNITY CASE MANAGER, SO THEY DEVELOP A RELATIONSHIP WITH

21   THEM, MUCH LIKE WITH THE PRISON CASE MANAGER.

22           OUR COMMUNITY CASE MANAGERS ACTUALLY GO TO THE MDT

23   AT THE BEGINNING OF THE PROCESS, SO THEY GET TO KNOW THEM FROM

24   THE GET-GO.  THEY CAN SEE THERE'S GOING TO BE SOME CONSISTENCY.

25   SO THE COMMUNITY CASE MANAGER STARTS MEETING WITH THEM,

1   PLANNING WHERE WILL YOU GO, WHERE ARE YOU GOING TO LIVE, DO YOU

2   NEED IDENTIFICATION, BECAUSE MOST PEOPLE DON'T HAVE ID'S OR

3   DRIVER'S LICENSES; ARE THERE GOING TO BE ISSUES WITH YOUR

4   FAMILY COURT?  DO YOU NEED A JOB?  ARE YOU GOING TO NEED REHAB?

5          THEY PLAN FOR WHERE THEY'RE GOING TO GO AND WHAT

6   THEY'RE GOING TO DO, SO WHEN THEY GET RELEASED, THEY'RE MET AT

7   THE DOOR BY THEIR COMMUNITY CASE MANAGER, INSTEAD OF BEING

8   GIVEN $200 AND SAYING CHECK IN WITH YOUR PAROLE AGENT WITHIN 48

9   HOURS.  THEY HAVE AN EXACT PLAN OF WHERE THEY'RE GOING AND WHAT

10  THEY'RE GOING TO DO.  THE COMMUNITY CASE MANAGER THEN WORKS

11  WITH THEM UPON RELEASE FROM PRISON AS WELL, MEETING WITH THEM,

12  WORKING AS AN ADVOCATE PAROLE AGENT.  THEY ALL WORK TOGETHER

13  LIKE COMMUNITY PEOPLE TO BE INVOLVED IN THEIR PROCESS AND THEY

14  FOLLOW THEM EVEN AFTER THEY GET OFF PAROLE.

15  Q   WHO PAYS FOR THE COMMUNITY CASE MANAGERS?

16  A   IT'S OUT OF THE CDCR BUDGET.

17  Q   THE NUMBER THAT YOU HAVE THAT HAVE BEEN RELEASED FROM

18  PRISON ON THE SB 618 PROGRAM, 107 YOU SAID?

19  A   AS OF FRIDAY.

20  Q   WHAT'S GOING ON WITH THEM?  HOW MANY OF THEM HAVE GONE BACK

21  TO PRISON?  HOW MANY HAVE RECIDIVATED?

22  A   WE HAVE FOUR PEOPLE THAT HAVE COMMITTED OFFENSES THAT HAVE

23  GOTTEN NEW PRISON TERMS, WHICH IS NOT BAD, OUT OF 107.  WE ALL

24  KNOW THERE'S GOING TO BE RECIDIVISM NO MATTER WHAT WE DO.  SO

25  FAR ONLY FOUR HAVE NEW OFFENSES THAT HAVE RESULTED IN NEW

1  PRISON TERMS.  WE HAVE ONE PERSON THAT GOT PROP 36'D, SO THEY

2  ARE ON PROBATION LOCALLY BUT RETAINED IN THE PROGRAM, DID NOT

3  GO BACK TO PRISON.  ONE PERSON GOT ANOTHER PROBATIONARY GRANT,

4  DID NOT GO BACK TO PRISON.  AND WE HAVE FOUR OTHERS THAT ARE

5  PENDING CASES.

6  **Q**   DO YOU MEET AND DISCUSS THE SB 618 PROGRAM WITH THESE

7  OFFENDERS THEMSELVES?

8  **A**   I DO, YES.  JUST LAST WEEK -- THE WEEK BEFORE, ACTUALLY.

9  THE WEEK BEFORE THANKSGIVING I SPENT THE DAY AT DONOVAN STATE

10 PRISON MEETING WITH THE INMATES THERE BECAUSE WE LIKE, ONE, TO

11 LET THEM KNOW THE DA IS STILL INTERESTED IN THEM AND THAT WE'RE

12 FOLLOWING ALONG TO SEE WHAT'S GOING ON.  WE ALSO LIKE TO GET

13 THEIR INPUT, WHAT COULD WE DO BETTER, WHAT ARE SOME OF THE

14 PROBLEMS WITH THE PROGRAM, WHAT'S GOING ON WITH THEM?

15         I ALSO WENT TO CIW THE WEEK BEFORE THANKSGIVING AND

16 MET WITH THE LADIES, AND THE WOMEN ARE DOING PHENOMENALLY.  WE

17 HAVE NOT HAD ONE SINGLE WOMAN THAT HAS BEEN RELEASED ON PAROLE

18 RECIDIVATE.

19 **Q**   EXHIBIT B IN YOUR DECLARATION, WHICH IS NOW MARKED AS

20 DI 508, DETAILS TWO SUCCESS STORIES.  DO YOU RECALL -- DO YOU

21 HAVE A COPY OF THAT?

22 **A**   YES.

23 **Q**   AND IS IT -- DOES IT REFLECT THE OVERALL SUCCESS OF THE

24 SB 618 PROGRAM, IN YOUR OPINION, AS IT APPLIES GENERALLY TO THE

25 OVERALL NUMBER OF PARTICIPANTS?

1  **A**    I THINK IT REFLECTS -- ONE OF THE THINGS ABOUT SB 618 IS IT

2  IS TAILORED TO EACH INDIVIDUAL.  INSTEAD OF A

3  ONE-SIZE-FITS-ALL, WE TRY TO FIT THE INDIVIDUAL'S NEEDS.  SO

4  SOME OF THE PEOPLE THAT ARE REFERRED TO IN THERE HAVE HAD

5  DIFFERENT NEEDS THAN OTHERS.  BUT ON THE WHOLE, I THINK IT

6  REFLECTS THE IDEA THAT PEOPLE ARE TAKING RESPONSIBILITY FOR

7  THEMSELVES, GETTING JOBS, STAYING IN REHAB.

8          ONE OF THE THINGS THAT'S REALLY INTERESTING IS WE'VE

9  HAD A NUMBER OF OUR PEOPLE SUCCESSFULLY COMPLETE REHAB UPON

10 RELEASE, AND WE HAVE PEOPLE THAT ARE ACTUALLY OFF PAROLE NOW,

11 AND I BELIEVE TWO OF THE INDIVIDUALS THAT WE PUT IN THAT LIST

12 HAVE ALREADY BEEN RELEASED FROM PAROLE THROUGH 1453.  SO WE ARE

13 WORKING IN CONJUNCTION WITH DRUG TREATMENT AS WELL, 1453.  THAT

14 WAY, EVEN AFTER PEOPLE ARE OFF PAROLE, THEY ARE STILL GETTING

15 THE SB 618 SERVICES.

16 **Q**    EVEN THOUGH THEY ARE NOT REQUIRED AS A CONDITION OF PAROLE

17 TO PARTICIPATE IN SB 618 PROGRAMMING, THEY ARE STILL

18 PROGRAMMING?

19 **A**    YES.

20 **Q**    DO YOU FIND THE PARTICIPANTS IN SB 618, THE CRIMINAL

21 OFFENDERS ARE ACTUALLY EAGER TO PARTICIPATE IN THIS TYPE OF A

22 PROGRAM?

23 **A**    THEY ARE MORE THAN EAGER TO PARTICIPATE, THE ONES WHO

24 VOLUNTEER FOR THIS PROGRAM, THE VAST MAJORITY.  AND THERE'S A

25 FEW THAT THINK THEY ARE GOING TO GET A BETTER DEAL ALONG THE

1  WAY, BUT THE VAST MAJORITY ARE DOING IT BECAUSE THEY ARE SICK

2  OF GOING BACK TO PRISON.  THEY DON'T WANT TO LIVE THAT WAY.

3  THEY JUST DON'T KNOW HOW TO DO IT BETTER.

4          SO WHEN I TALK TO THEM, THEY ARE VERY EAGER TO

5  PARTICIPATE.  I GET CALLS EVERY SINGLE DAY FROM THE OUTLYING

6  AREAS BECAUSE WE OFFER THIS IN TWO OF THE BRANCHES FOR SAN

7  DIEGO.  WE HAVE NORTH COUNTY AND SOUTH BAY THAT DON'T HAVE

8  SB 618 YET.  DEFENSE ATTORNEYS CALL ME.  I HAVE DEFENDANTS CALL

9  ME FROM JAIL.  I THINK MY PHONE NUMBER MUST BE UP AT GEORGE

10 BAILEY.  I GET COLLECT CALLS FROM DEFENDANTS ASKING IF THEY CAN

11 GET INTO SB 618.  IT IS VERY MUCH WANTED, AND IT'S VERY

12 FRUSTRATING, IF ANYTHING, THAT WE DON'T HAVE MORE SPACES

13 AVAILABLE BECAUSE WE HAVE MORE PEOPLE THAT WOULD LIKE TO TAKE

14 ADVANTAGE OF IT.

15 Q   YOU PREVIOUSLY MENTIONED A 70 PERCENT ESTIMATE OF A

16 RECIDIVISM RATE FOR THIS CLASS OF OFFENDER.  HOW DO YOUR

17 NUMBERS --

18          **JUDGE HENDERSON:**  IS THIS FOR THIS CLASS OF

19 OFFENDER?

20          **MR. MITCHELL:**  NON-VIOLENT OFFENDERS.

21          **JUDGE KARLTON:**  HE DOESN'T MEAN PEOPLE IN THE

22 PROGRAM; HE MEANS OVERALL.

23 **BY MR. MITCHELL**

24 Q   HOW DO YOUR RESULTS WITH THE SB 618 PROGRAM COMPARE WITH

25 CDCR STATISTICS FOR RETURNS TO PRISON IN A 30 TO 90-DAY PERIOD?

1  A  WE ARE JUST STARTING TO GET OUR NUMBERS BECAUSE WE HAVE A

2  SMALLER NUMBER OUT, AND WE WILL GET BETTER STATISTICS AS WE GO

3  ON, BUT I WENT THROUGH AND I LOOKED AT, OUT OF OUR FIRST SIX

4  MONTHS THAT WE HAD PEOPLE OUT, SO PEOPLE THAT HAVE BEEN OUT SIX

5  MONTHS OR LONGER, SINCE THEN, NOT OUT SOMETIME BETWEEN NOVEMBER

6  AND MAY.

7          OUT OF ALL THOSE PEOPLE, THERE WERE 38 THAT WERE

8  RELEASED ON PAROLE.  ONLY ONE HAD GONE BACK WITH A NEW PRISON

9  TERM.  WE HAVE HAD A COUPLE OTHERS SINCE THEN, BUT FOR THAT

10 FIRST SIX MONTHS, COMPARED TO CDCR, I LOOKED AT THEIR NUMBERS,

11 AND -- THEY ACTUALLY GAVE US NUMBERS FOR 2007, AND IN THE FIRST

12 90 DAYS THAT THEY HAD NONVIOLENT OFFENDERS OUT IN SAN DIEGO,

13 THERE WERE 95 PEOPLE THAT HAD GONE BACK TO PRISON WITH A NEW

14 PRISON TERM.

15 Q  OUT OF HOW MANY?

16 A  WELL, I KNOW THERE WERE 4,000 TOTAL RELEASED IN 2007 BACK

17 TO SAN DIEGO.  SO THAT'S JUST THE FIRST 90.  I KNOW THERE WERE

18 771 OUT OF THAT 4,000 THAT WERE ACTUALLY UNDER REVIEW.  SO THEY

19 MAY END UP GOING BACK FOR A VIOLATION OR FOR A NEW PRISON TERM.

20 Q  IN YOUR OPINION, WILL THE PARTICIPANTS IN THE SB 618

21 PROGRAM REALIZE LOWER RECIDIVISM RATES BECAUSE OF SB 618?

22 A  WE CERTAINLY HOPE SO.  I MEAN, WE'RE DOING EVERYTHING WE

23 CAN.  THE EDUCATION THAT THEY'RE GETTING, THE SUBSTANCE ABUSE

24 PROGRAMMING, THE VOCATIONAL TRAINING AND HELPING THEM GET JOBS.

25 THEY HAVE MORE EYES WATCHING THEM, SO THEY ACTUALLY STAND A

1  BETTER CHANCE OF RECIDIVATING BECAUSE SOMEONE IS ALWAYS KEEPING

2  AN EYE ON THEM.  BUT SO FAR OUR NUMBERS ARE BEARING OUT TO BE

3  CONSIDERABLY BETTER THAN CDCR'S.

4  **Q**   YOU INDICATED THAT ONLY SIX PER WEEK ARE ALLOWED INTO THIS

5  PROGRAM.  WHY IS THAT?

6  **A**   THAT WAS ALL THE FUNDING THAT WE WERE PROVIDED.  WE WANTED

7  TO KEEP IT SMALL INITIALLY JUST TO MAKE SURE WE WERE DOING

8  EVERYTHING RIGHT.  IT'S A MORE MANAGEABLE GROUP.  IT'S MORE

9  MANAGEABLE FOR US TO PROCESS.  IT'S MORE MANAGEABLE FOR SANDAG

10 TO OVERSEE.

11          IT'S ALSO A MATTER OF FUNDING.  WE HAD FUNDING TO

12 HIRE PROBATION OFFICERS, CASE MANAGER, COMMUNITY CASE MANAGER.

13 CERTAIN NUMBER OF PAROLE AGENTS HAVE TO BE ASSIGNED TO THIS.

14 IT'S TWO-FOLD; ONE, ECONOMICS, AND, TWO, MANAGEABILITY.  BUT

15 OUR HOPE IS WE WILL BE ABLE TO OFFER IT TO EVERYBODY.  AND WE

16 HAVE ACTUALLY PUT IN FOR AN INCREASE IN BUDGET SO WE CAN START

17 RAMPING IT UP AND MAKE IT THE -- IT AVAILABLE TO MORE PEOPLE IN

18 SAN DIEGO.

19 **Q**   HOW LONG DID IT TAKE THE PROGRAM TO BE IMPLEMENTED IN SAN

20 DIEGO FROM THE GROUND UP?

21 **A**   THEY STARTED BEFORE THE LAW PASSED, STARTED PUTTING THINGS

22 TOGETHER.  ONCE THE LAW PASSED IN OCTOBER OF 2005, IT WAS JUST

23 ABOUT 16, 17 MONTHS BEFORE OUR FIRST PEOPLE WENT INTO THE

24 PROGRAM.  BUT WE WERE THE FIRST OF OUR KIND.  IT TOOK A LONG

25 TIME TO GET ALL THOSE DIFFERENT AGENCIES TOGETHER.

1    JUST GETTING US TO TALK ABOUT THE INDIVIDUAL IN THE

2 SAME TERMS WAS A BIG DEAL.  WE TALK ABOUT THEM -- AT THE DA'S

3 OFFICE, THEY'RE DEFENDANTS.  TO THE SHERIFF, THEY'RE INMATES.

4 TO CDCR THEY'RE INMATES OR PAROLEES.  SO WE ALL HAD TO COME UP

5 WITH A COMMON TERM JUST TO DISCUSS THEM, BUT WE PUT TOGETHER A

6 PROGRAM THAT SEES THROUGH, IT'S TRANSPARENT.

7    WE'VE DOCUMENTED EVERYTHING WE'VE DONE RIGHT DOWN TO

8 HOW WE PUT TOGETHER A COMPUTER PROGRAM FOR TRACKING THEM SO

9 THAT IT CAN BE TAKEN AND COPIED, HOPEFULLY, IN A MUCH QUICKER

10 WAY IN OTHER COUNTIES.

11 **Q**   IS THE SB 618 PROGRAM BEING INDEPENDENTLY EVALUATED?

12 **A**   IT IS -- THE SAN DIEGO ASSOCIATION OF GOVERNMENTS HAS THE

13 CONTRACT TO INDEPENDENTLY EVALUATE IT.  THEY HAVE BEEN INVOLVED

14 SINCE THE BEGINNING.  THEY COME TO OUR OPERATIONS MEETINGS.

15 THEY MEET WITH OUR STAFF.  THEY MEET WITH THE INMATES

16 THEMSELVES.  THEY ACTUALLY DO EVALUATIONS WITH THEM.  THEY ARE

17 FOLLOWING EVERY STEP OF THE PROCESS TO DETERMINE WHAT WORKS,

18 WHAT DOESN'T WORK, HOW COST EFFECTIVE IS IT.

19    AND THEY ALSO ARE FOLLOWING A CONTROL GROUP PEOPLE

20 THAT ARE SIMILARLY SITUATED WHO, FOR WHATEVER REASON, WEREN'T

21 OFFERED THE OPPORTUNITY TO PARTICIPATE IN SB 618 SO THEY CAN

22 SEE HOW WELL THEY DO WITH THE PROGRAMMING COMPARED TO HOW WELL

23 OUR PARTICIPANTS DID.

24 **Q**   YOU REFERENCED THE FIRST ANNUAL EVALUATION PART IN YOUR

25 DECLARATION AS EXHIBIT C THAT'S NOW MARKED AS DI 509.  DO YOU

1    RECOGNIZE THAT?

2    **A**    I DO.

3    **Q**    CAN YOU TELL US WHAT THAT EVALUATION REPORT CONSISTS OF?

4    **A**    THAT IS SANDAG'S INDEPENDENT EVALUATION, NOT ONLY OF THE

5    PROGRAM, BUT THE NEED FOR THE PROGRAM, WHY THEY BELIEVE THERE

6    IS SO MUCH RECIDIVISM, AND THEN THEIR ANALYSIS OF HOW THE

7    PROGRAM IS WORKING SO FAR.  THEY DIDN'T HAVE MUCH STATISTICAL

8    DATA YET BECAUSE OUR PROGRAM WAS SO NEW.  THEY WILL BE PUTTING

9    OUT A NEW REPORT IN MARCH OF THIS YEAR, AND ANOTHER ONE THE

10   NEXT YEAR, AND THAT SHOULD HAVE MORE STATISTICAL INFORMATION IN

11   IT.

12          **JUDGE KARLTON:**  WHEN YOU SAY "MARCH OF THIS YEAR,"

13   YOU MEAN '09?

14          **THE WITNESS:**  YES, THANK YOU.

15   **BY MR. MITCHELL**

16   **Q**    YOU ARE AWARE THESE PROCEEDINGS ARE TO DETERMINE WHETHER OR

17   NOT A PRISONER RELEASE ORDER SHOULD ISSUE, CORRECT?

18   **A**    YES.

19   **Q**    IN YOUR OPINION, FROM WORKING WITH THE SB 618 PROGRAM, HOW

20   WOULD THAT IMPACT THE SB 618 PROGRAM?  WOULD IT BE ADVERSE OR

21   POSITIVE IMPACT?

22   **A**    IT WOULD BE AN ADVERSE IMPACT TO OUR PARTICIPANTS,

23   PARTICULARLY BECAUSE WE DON'T HAVE ANYTHING SET IN PLAN FOR

24   THEM.  ONE, THEY WOULDN'T BE GETTING THE PROGRAMMING THAT

25   THEY'RE SUPPOSED TO BE GETTING IN PRISON, WHICH IS A BIG PART

1   OF SHORTENING THAT TIME IN RECEPTION.  WE WANT TO GET THEM IN,

2   GET THEM PROGRAMMING, GET THEM TO START THINKING ABOUT HOW TO

3   TRANSITION BETTER IN THE COMMUNITY; TWO, THEY WOULDN'T HAVE

4   TIME FOR THEIR COMMUNITY CASE MANAGER TO START BUILDING THAT

5   RELATIONSHIP WITH THEM.  IF THEY ARE RELEASED WHOLESALE, THEY

6   DON'T HAVE ANYTHING SET UP WITH THE COMMUNITY CASE MANAGER;

7   THREE, WE ALREADY KNOW OUR COMMUNITY RESOURCES ARE TAXED.

8           OUR PAROLE AGENTS DON'T HAVE ENOUGH TIME TO TAKE

9   CARE OF THESE PEOPLE, WHICH IS A HUGE PART OF WHY THERE'S SO

10  MUCH RECIDIVISM.

11          THERE'S A VERY SMALL AMOUNT OF REHABS OUT THERE,

12  HOUSING OUT THERE, SOBER LIVING FACILITIES, EMPLOYMENT

13  POSSIBILITIES.  SO THIS SMALL POOL OF RESOURCES THAT WE WOULD

14  TRY TO GET OUR SB 618 PARTICIPANTS WOULD BE WAY OVERTAXED, AND

15  THEY WOULD NOT GET THE SERVICES WE HAVE PROMISED TO PROVIDE

16  THEM.

17          ADDITIONALLY, THEY WOULD NOT BE PREPARED FOR THE

18  COMMUNITY IN THE WAY THAT WE INTENDED TO HAVE THEM PREPARED,

19  NOR WOULD THE COMMUNITY BE READY FOR THEM.  SO IT WOULD

20  DEFINITELY HAVE AN ADVERSE IMPACT ON OUR POPULATION

21  SPECIFICALLY.

22  Q   WORKING WITH THE PROGRAM AS LONG AS YOU HAVE, IS THERE IN

23  ANY REASON IN YOUR MIND THAT THIS PROGRAM COULDN'T BE

24  IMPLEMENTED IN OTHER COUNTIES IN CALIFORNIA?

25  A   IT'S JUST A MATTER OF THE WILL, GETTING EVERYBODY SITTING

1   DOWN TOGETHER, WORKING TOGETHER.  I KNOW CDCR IS WATCHING US

2   VERY CAREFULLY BECAUSE THEY KNOW WE ARE KIND OF THE WAVE OF THE

3   FUTURE.  THIS IS THE BEST THING THEY'VE GOT GOING RIGHT NOW.

4   SO I THINK IT CAN EASILY BE COPIED AND TAKEN TO OTHER

5   COMMUNITIES.

6   **Q**   AND CDCR IS FUNDING THIS PROGRAM, CORRECT?

7   **A**   YES.  SOME OF IT IS IN KIND.  LIKE MY SERVICES, THERE'S NOT

8   A GRANT FOR ME TO BE SPENDING THE TIME AND ENERGY I DO WORKING

9   ON THIS PROGRAM.  MY OFFICE JUST OFFERS ME UP TO ASSIST WITH

10  THE PROGRAM.

11          BUT PROBATION HAS EXTRA PROBATION OFFICERS THAT WERE

12  HIRED THAT ARE PAID FOR BY CDCR.  OUR PRISON CASE MANAGERS ARE

13  PAID FOR BY CDCR.  THE COMMUNITY CASE MANAGERS, THE PAROLE

14  AGENTS ARE TAKEN OUT OF A GENERAL ASSIGNMENT, AND THEY WORK

15  SPECIFICALLY WITH A SMALLER GROUP, SO THEY HAVE FIFTY TO ONE,

16  INSTEAD OF NINETY TO ONE.  ALL OF THAT IS PAID FOR BY CDCR, AS

17  WELL AS OUR CONTRACTS WITH THE COMMUNITY FOR THE TESTING FOR

18  THE VOCATIONAL SERVICES FOR THE HOUSING MANAGER.  THAT IS ALL

19  COVERED BY CDCR.

20          **MR. MITCHELL:**  I SUBMIT HER SIGNED DECLARATION INTO

21  EVIDENCE AT THIS TIME, AS WELL AS THE THREE EXHIBITS, AND I

22  HAVE NO FURTHER QUESTIONS.

23          **JUDGE HENDERSON:**  THEY WILL BE ADMITTED AT THIS

24  TIME.

25          (EXHIBITS DI 507-509 RECEIVED IN EVIDENCE.)

1       **JUDGE HENDERSON:**  OTHER DEFENDANTS HAVE ANY

2   QUESTIONS?  OKAY.

3              **CROSS-EXAMINATION BY MR. SANGSTER**

4   **BY MR. SANGSTER**

5   **Q**   GOOD AFTERNOON, MS. RODRIGUEZ.  MY NAME IS ED SANGSTER.

6              YOU BELIEVE THAT THE PROGRAMS THAT YOU HAVE BEEN

7   DESCRIBING WILL REDUCE RECIDIVISM; IS THAT CORRECT?

8   **A**   YES.

9   **Q**   AND BY REDUCING RECIDIVISM, THEY WILL IMPROVE PUBLIC

10  SAFETY; IS THAT CORRECT?

11  **A**   ABSOLUTELY.

12  **Q**   AND, IN ADDITION TO REDUCING RECIDIVISM WILL IMPACT -- LET

13  ME REPHRASE IT.

14             REDUCING RECIDIVISM WILL REDUCE THE STATE PRISON

15  POPULATION, CORRECT?

16  **A**   ULTIMATELY, YES.

17  **Q**   IF THE -- YOU BELIEVE THAT IF THE PROGRAM AS ADOPTED BY SAN

18  DIEGO WERE ADOPTED THROUGHOUT THE STATE, THE STATE PRISON

19  POPULATION AS A WHOLE WOULD DECREASE, CORRECT?

20  **A**   ULTIMATELY, YES.

21  **Q**   NOW, WAS SOME LEGISLATION REQUIRED BEFORE SAN DIEGO COUNTY

22  COULD START IMPLEMENTING THESE PROGRAMS?

23  **A**   PENAL CODE SECTION 1203.8 WAS IMPLEMENTED AND ACTUALLY

24  PROVIDED FOR FUNDING FOR THREE COUNTIES OFF THE BAT TO START UP

25  THE PROGRAM.  WE ARE JUST FIRST TO GET IT GOING.

1  Q   WOULD OTHER LEGISLATION BE REQUIRED IN ORDER FOR THIS

2  PROGRAM TO BE APPLIED STATEWIDE?

3  A   I DON'T THINK OTHER LEGISLATION.  YOU WOULD JUST NEED TO

4  EXPAND THE FUNDING FOR IT.

5  Q   SO THE --

6          JUDGE KARLTON:  NOW I'M CONFUSED.  THE INITIAL

7  LEGISLATION AUTHORIZED THREE COUNTIES.  YOU WOULD HAVE TO HAVE

8  NEW LEGISLATION TO EXPAND THAT; IS THAT RIGHT?

9          THE WITNESS:  YES.  I'M SORRY.  I KIND OF

10 MISUNDERSTOOD THE QUESTION.  YOU WOULD NEED TO AMEND THAT TO

11 INCLUDE ALL OF THE COUNTIES OF SAN DIEGO -- OR OF CALIFORNIA.

12 BY MR. SANGSTER

13 Q   SO THIS COURT WOULD NEED TO DEPEND ON ACTION BY THE

14 CALIFORNIA LEGISLATURE IN ORDER TO EXPAND THIS PROGRAM,

15 CORRECT?

16 A   PAST THE THREE COUNTIES, ALTHOUGH I'M SURE THERE'S

17 SOMETHING THAT COULD BE EMERGENCY, YOU KNOW, LEGISLATION

18 ENACTED, YES.

19          JUDGE HENDERSON:  ARE THE OTHER TWO COUNTIES

20 UNDERWAY?  DO YOU KNOW WHERE THEY ARE IN THIS PROCESS?

21          THE WITNESS:  I KNOW THERE'S ONE COUNTY THAT'S BEEN

22 COMING DOWN TO SEE US.  I WANT TO SAY IT'S SAN BERNADINO, AND

23 OTHER COUNTIES HAVE EXPRESSED INTEREST IN IT.

24          JUDGE KARLTON:  NOTHING IS ACTUALLY GOING OUT?

25          THE WITNESS:  NOT THAT I AM AWARE OF ANYTHING IN

1   SPECIFIC.

2   **BY MR. SANGSTER**

3   Q    SO AS OF TODAY, SAN DIEGO COUNTY IS THE ONLY COUNTY THAT IS

4   FOLLOWING THIS PROGRAM EVEN THOUGH THE LEGISLATION AUTHORIZES

5   THREE; IS THAT CORRECT?

6   **A**    THAT'S CORRECT.

7   **Q**    NOW, THE DESIGN OF THE PROGRAM REQUIRED COLLABORATION

8   BETWEEN VARIOUS AGENTS WITHIN SAN DIEGO COUNTY AND THE

9   CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,

10  CORRECT?

11  **A**    CORRECT.

12  **Q**    YOUR EXHIBIT C TO YOUR DECLARATION DESCRIBES THAT AMOUNT OF

13  COLLABORATION OF BEING UNPRECEDENTED.  WOULD YOU AGREE WITH

14  THAT?

15  **A**    YES, I WOULD.

16  **Q**    SO YOU WOULD AGREE THAT UNPRECEDENTED COLLABORATION WAS

17  REQUIRED IN ORDER TO GET THIS PROGRAM OFF THE GROUND?

18  **A**    I WOULD AGREE THAT IT DID TAKE MANY DIFFERENT AGENCIES

19  GETTING TOGETHER, BUT IT'S NOT SOMETHING THAT CAN'T BE DONE,

20  SINCE WE WERE ABLE TO ACCOMPLISH IT.

21  **Q**    YOU'VE ACCOMPLISHED IT FOR 389 INMATES?

22  **A**    SO FAR, YES.

23  **Q**    SO THE FIRST PARTICIPANT WAS ENROLLED IN FEBRUARY OF '97,

24  BUT, ACTUALLY, THOSE WERE JUST TWO PEOPLE, RIGHT?

25  **A**    THOSE WERE LIKE OUR TEST RUN TO KIND OF GET THE KINKS OUT,

1   SO, YES, THE FIRST TWO -- I WANT TO SAY IT WAS FEBRUARY 17TH.

2   Q   AND THE PROGRAM DIDN'T GET UP AND RUNNING UNTIL NOVEMBER OF

3   '97 -- EXCUSE ME -- NOVEMBER OF 2007?

4   A   NO, NO.  MARCH WAS WHEN WE STARTED ENROLLING PARTICIPANTS

5   ON A REGULAR BASIS OF 2007.

6   Q   SO YOU HAVE ABOUT 18 MONTHS OF EXPERIENCE WITH THIS

7   PROGRAM?

8   A   OF IT UP AND RUNNING, YES.

9   Q   AND WE'RE UP TO HOW MANY PEOPLE NOW THAT HAVE BEEN RELEASED

10  UNDER THIS PROGRAM?

11  A   ONE HUNDRED SEVEN.

12  Q   I COULDN'T HEAR YOU.  I'M SORRY.

13  A   ONE HUNDRED SEVEN.

14  Q   ONE HUNDRED SEVEN.  AND OF THE 107 RELEASED FROM PRISON,

15  HOW MANY HAVE SO FAR BEEN RELEASED FROM PAROLE?

16  A   TEN.

17  Q   NOW, YOU TESTIFIED ON DIRECT THAT YOU FEEL THE PROGRAM WILL

18  BE ADVERSELY AFFECTED IF THERE'S A PRISONER RELEASE ORDER.  SO

19  I WANT TO EXPLORE THAT FOR A LITTLE BIT.  WE ARE TALKING ABOUT

20  ADVERSELY AFFECTING THE PROGRAM.  WE ARE TALKING ABOUT

21  ADVERSELY AFFECTING THE 389 PEOPLE IN THE PROGRAM, CORRECT?

22  A   YES.

23  Q   SO AS AGAINST THE PRISON POPULATION OF 190-SOME-THOUSAND,

24  WE ARE TALKING ABOUT THE ADVERSE IMPACT TO 389 PEOPLE?

25  A   WELL, FOR THIS PARTICULAR SB 618 POPULATION, YES, ALTHOUGH

1   I THINK THERE'S ADVERSE IMPACTS GENERALLY TO RELEASE.

2   Q   YOU ARE JUST TALKING ABOUT THE 389 PEOPLE?

3   A   YES.

4   Q   SO OF THE 389 PEOPLE IN THE PROGRAM, HOW MANY OF THOSE

5   WOULD BE RELEASED EARLY IF THERE WERE A PRISONER RELEASE ORDER?

6   A   WELL, THEY'RE ALL NONVIOLENT OFFENDERS, SO IT WOULD DEPEND

7   UPON HOW THAT WAS STRUCTURED, BUT IT COULD BE -- YOU KNOW, ALL

8   OF THEM, THEY'RE ALL LOW LEVEL, LOW PRISON SENTENCE OFFENDERS.

9   YOU KNOW, YOU SAY 389, BUT WE HAVE SIX NEW GOING IN EVERY

10  SINGLE WEEK.

11  Q   MY QUESTION IS HOW MANY?  IS YOUR ANSWER "I DON'T KNOW"?

12  A   I DON'T HAVE AN EXACT NUMBER.  NO, I DON'T KNOW HOW IT WILL

13  BE STRUCTURED FOR THE RELEASE.

14  Q   SO ARE YOU ABLE TO APPROXIMATE HOW MANY PEOPLE WOULD BE

15  ADVERSELY IMPACTED WITHOUT KNOWING WHAT THE PARAMETERS ARE OF A

16  PRISONER RELEASE ORDER?

17  A   NO, I DON'T.

18  Q   NOW, YOU TALKED ABOUT PEOPLE BEING RELEASED.  HOW MUCH OR

19  HOW EARLY WOULD PEOPLE BE RELEASED FROM PRISON?  A MONTH EARLY,

20  FIFTEEN DAYS EARLY, TWO MONTHS EARLY?

21  A   AGAIN, EACH PERSON HAS A DIFFERENT SENTENCE, SO I CAN'T

22  TELL YOU EXACTLY HOW MANY ARE AT WHICH POINT.  SOME PEOPLE HAVE

23  ONE MONTH LEFT TO SERVE.  NORMALLY -- SOME PEOPLE HAVE 2-1/2

24  YEARS TO SERVE.  ANYWAY, IT VARIES.  THEY'RE ALL AT DIFFERENT

25  STAGES OF THE PROCESS.

1  Q   WHAT I WAS TALKING ABOUT IS THE PRISONER RELEASE ORDER.

2  YOU SAID THERE WOULD BE AN ADVERSE IMPACT BECAUSE PEOPLE IN

3  THIS PROGRAM WOULD BE RELEASED.  IS IT CORRECT YOU DON'T KNOW

4  HOW MUCH EARLIER THEY WOULD BE RELEASED?

5  A   NO, BECAUSE, AGAIN, I DON'T KNOW HOW THE COURT WOULD

6  STRUCTURE IT ULTIMATELY.

7  Q   IS IT CORRECT THE FUNDING FOR THIS PROGRAM COMES FROM THE

8  STATE?

9  A   THE MAJORITY OF IT, YES.

10  Q   HOW MUCH MONEY DO YOU GET FROM THE STATE FOR THIS PROGRAM

11  FOR THE 389 PEOPLE?

12  A   WELL, THE DA'S OFFICE DOESN'T GET MONEY FOR IT.  IT GOES TO

13  A PUBLIC ENTITY AGREEMENT, AND THE INITIAL CONTRACT WAS FOR

14  $4 MILLION.  IT'S AN ECONOMIES OF SCALE KIND OF THING.  YOU

15  SPEND THE MONEY UP FRONT SO YOU ARE NOT SPENDING $35,000 PER

16  PERSON ON THE BACK END WHEN THEY GO BACK TO PRISON.

17  Q   HOW MUCH OF THE $4 MILLION HAS BEEN SPENT ON THE 39

18  INDIVIDUALS?

19  A   I'M NOT SURE I UNDERSTAND THE QUESTION.

20  Q   I'M JUST TRYING TO GET A SENSE OF HOW MUCH THIS PROGRAM IS

21  COSTING.  IN OTHER WORDS, YOU ARE TALKING ABOUT A PROGRAM YOU

22  BELIEVE IS VERY SUCCESSFUL IN REDUCING RECIDIVISM, RIGHT?

23  A   YES.

24  Q   SO WHAT I'M TRYING TO GET A SENSE OF IS HOW MUCH MONEY IS

25  BEING SPENT BY THE STATE TO ACHIEVE THAT RESULT?

1   **A**   AND THE INITIAL CONTRACT, AS I SAID, WAS ABOUT $4 MILLION.

2   WE BUDGETED FOR $4 MILLION THIS YEAR.  EVERY YEAR WE WILL

3   BUDGET FOR THE AMOUNT WE NEED.

4   **Q**   SO IS IT $4 MILLION PER YEAR?

5           **JUDGE KARLTON:**  HAVE YOU DEEMED A SET OF CRITERIA

6   WHICH TELLS YOU AT LEAST APPROXIMATELY HOW MUCH PER MEMBER OF

7   THE PROGRAM IS COSTING?

8           **THE WITNESS:**  WE ARE WAITING FOR THE SANDAG.  IN

9   THEIR NEXT ANALYSIS, THEY SHOULD BE ABLE TO HAVE A BREAKDOWN

10  BETTER FOR US.  WE JUST DON'T HAVE THAT NUMBER.

11  **BY MR. SANGSTER**

12  **Q**   SANDAG IS SAN DIEGO ASSOCIATION OF COUNTY GOVERNMENT'S OR

13  SOMETHING LIKE THAT?

14  **A**   YES.

15  **Q**   AND THEY ARE DOING A STUDY OF THIS PROGRAM TO DETERMINE

16  WHETHER IT'S COST EFFECTIVE; IS THAT CORRECT?

17  **A**   EXACTLY.

18  **Q**   AS OF TODAY, HAS THERE BEEN A DECISION WHETHER THIS PROGRAM

19  IS COST EFFECTIVE?

20  **A**   WELL, WE DON'T HAVE ANY KIND OF RESULTS, STATISTICAL

21  RESULTS, YET BECAUSE IT IS STILL SO NEW.  BUT IF WE HAVE 107

22  PEOPLE OUT ON PAROLE THAT WE ARE NOT SPENDING $35,000 A YEAR

23  FOR, SO FAR IT'S DOING PRETTY WELL.  THE EXPECTATION IS THE

24  ECONOMIES OF SCALE, AS YOU SAVE THAT MONEY ON THE BACK END,

25  THEN YOU ARE NOT SPENDING IT.  DO YOU SEE WHAT I'M KIND OF

1    SAYING?  YOU START OFF -- YOU GOT TO PUT MONEY INTO IT IN ORDER

2    TO SAVE MONEY LATER.

3    **Q**    I SEE EXACTLY WHAT YOU'RE SAYING, I THINK.  YOU'RE SAYING

4    THIS IS A TOOL BY WHICH THE STATE PRISON POPULATION COULD BE

5    EFFECTIVELY REDUCED WITHOUT JEOPARDIZING PUBLIC SAFETY; IS THAT

6    CORRECT?

7    **A**    YES.

8    **Q**    SO IF THIS COURT IMPOSES AN ORDER THAT LIMITS CALIFORNIA

9    STATE PRISON POPULATION, YOU BELIEVE THE MEANS EXIST TODAY TO

10   REDUCE THE PRISON POPULATION WITHOUT ADVERSELY IMPACTING PUBLIC

11   SAFETY; IS THAT TRUE?

12   **A**    I'M NOT SURE I UNDERSTAND YOUR QUESTION.  IT GOT A LITTLE

13   LOST.

14   **Q**    DO YOU THINK THE MEANS EXIST TODAY TO APPLY THIS PROGRAM

15   STATEWIDE?

16   **A**    I THINK IT WOULD TAKE SOME TIME.  IT COULDN'T BE DONE

17   TOMORROW, BUT IT'S CERTAINLY SOMETHING THAT CAN BE IMPLEMENTED.

18   THIS WAS NOT SOMETHING THAT HAPPENED OVERNIGHT.  YOU HAVE TO

19   GET THE PRISONS INVOLVED.  YOU HAVE TO GET THE PROGRAMMING, AND

20   SOME OF THAT BUDGET GOES TOWARDS THE PROGRAMMING.

21   **Q**    ONCE ALL THAT HAPPENS, THIS IS A TOOL BY WHICH THE PRISON

22   POPULATION CAN BE CONTROLLED WITHOUT ADVERSELY IMPACTING PUBLIC

23   SAFETY, TRUE OR CORRECT -- TRUE OR FALSE?  I LIKE MY FIRST

24   QUESTION BETTER.

25   **A**    I WOULD SAY AND TRUE AND CORRECT.  IF WE CAN BENEFIT THE

1  COMMUNITY BY HAVING LESS RECIDIVISM, THEN WE ARE PROTECTING

2  COMMUNITY SAFETY.

3  **Q**   SO THIS IS A MODEL FOR REDUCING THE PRISON POPULATION?

4  **A**   I BELIEVE IT WILL BE.

5          **MR. SANGSTER:**  NO FURTHER QUESTIONS, YOUR HONOR.

6          **JUDGE HENDERSON:**  LET ME ASK YOU, MS. RODRIGUEZ, YOU

7  SAID AT SOME POINT A WHILE BACK, AS A MATTER OF WILL, COUNTY

8  WILL.  IS THAT WHY SAN DIEGO IS HERE AND THE OTHER TWO

9  AUTHORIZED COUNTIES ARE NOT?  IS IT WILL AND --

10         **THE WITNESS:**  I THINK SO.  IT'S A CULTURE CHANGE.

11 YOU KNOW, IN THE PAST -- AND I CAN SAY AS A DEPUTY DA, I

12 THOUGHT MY JOB ENDED WHEN I PUT SOMEBODY IN PRISON, I'M DONE,

13 I'VE CLEARED UP THE PROBLEM.  AND WE, AS A COMMUNITY, WE AS A

14 DA'S OFFICE, CDCR, THE SHERIFF DEPARTMENT, WE ALL LOOKED AT

15 EACH OF OUR INDIVIDUAL JOBS AND DIDN'T THINK ABOUT WHAT HAPPENS

16 WHEN THEY GET OUT BECAUSE EVERYBODY IS GOING TO GET OUT AT SOME

17 POINT.

18         **JUDGE KARLTON:**  THAT TURNS OUT NOT TO BE TRUE.

19         **THE WITNESS:**  THE 90 PERCENT OF THE PEOPLE WHO GO TO

20 PRISON ARE GOING TO GET OUT AT SOME POINT.  IT TOOK MY BOSS

21 SAYING, HEY, WAIT A MINUTE, YOU KNOW, AS THE DA, I CAN BETTER

22 PROTECT MY COMMUNITY BY PREVENTING CRIME, NOT JUST REACTING TO

23 CRIME, BUT PREVENTING IT, BY GIVING PEOPLE TOOLS TO DO

24 SOMETHING OTHER THAN COMMIT CRIME.  SO IT IS A MATTER OF WILL.

25 IT'S A MATTER OF CHANGING PERCEPTION AND CHANGING THE CULTURE

 1  OF CDCR, THE PAROLE DEPARTMENT, THE DA'S OFFICE.  EVEN THE

 2  PUBLIC DEFENDERS, YOU HAVE TO CHANGE THEIR THINKING, TOO,

 3  BECAUSE THEY LOOKED AT MY OFFICE AS, WELL, WHAT DO YOU GET OUT

 4  OF IT, HOW ARE YOU GOING TO TRICK THESE GUYS INTO GIVING UP

 5  MORE OF THEIR TIME?  I THINKS IT IS A MATTER OF WILL, BUT IT IS

 6  SOMETHING -- IT REALLY IS THE WAY OF THE FUTURE.

 7          YOU ARE SEEING THIS HAPPEN ACROSS THE UNITED STATES,

 8  THAT WE ARE RECOGNIZING THAT WE, AS A COMMUNITY, HAVE TO DO

 9  SOMETHING BETTER TO PROTECT OUR COMMUNITIES AND NOT JUST

10  RELEASING PEOPLE, BUT RELEASING THEM WITH TOOLS SO THEY DON'T

11  COME BACK AGAIN.

12          **JUDGE REINHARDT:**  I THINK IT'S A WONDERFUL THOUGHT

13  THAT YOU DON'T SEND PEOPLE TO PRISON AND KEEP THEM THERE,

14  WAREHOUSE THEM FOREVER, BUT, INSTEAD, YOU HAVE PROGRAMS IN THE

15  LOCAL COMMUNITIES, AND YOU CAN SEND THEM HOME, AND THEY CAN BE

16  TRAINED SO THAT THEY WON'T GO BACK TO PRISON.  BUT THAT'S A

17  WONDERFUL CONCEPT, MUCH BETTER THAN KEEPING PEOPLE IN PRISON

18  TOO LONG.

19          THE QUESTION I HAVE, THOUGH, IS YOU DON'T REALLY

20  HAVE ANY IDEA HOW MUCH SHORTER THE TERM WOULD BE BEFORE PEOPLE

21  WERE LET OUT IF YOU REDUCE THE PRISON POPULATION.  ONE OF THE

22  WITNESSES SAID SOMETHING ABOUT YOU REDUCE IT BY A VERY SMALL

23  AMOUNT, YOU LET THEM OUT A LITTLE BIT EARLIER.  WHY DO YOU

24  THINK THAT IT WOULD HURT YOUR PROGRAM IF PEOPLE WHO WERE IN

25  PRISON FOR, SAY, FIVE YEARS WERE LET OUT AFTER FOUR YEARS AND

 1  NINE MONTHS?  HOW WOULD THAT HURT YOUR PROGRAM?

 2          **THE WITNESS:**  WELL, THE MAJORITY OF OUR PEOPLE IN

 3  THE PROGRAM HAVE A SENTENCE BETWEEN SIXTEEN MONTHS AND FOUR

 4  YEARS, SO THE MAXIMUM THEY'RE ACTUALLY GOING TO SERVE FOR MOST

 5  OF THEM IS TWO YEARS, AND A LOT OF THEM, THEY'RE ONLY SERVING

 6  EIGHT MONTHS.  SO IF YOU LET SOMEBODY OUT --

 7          **JUDGE REINHARDT:**  SIX MONTHS.

 8          **THE WITNESS:**  WE JUST DON'T HAVE THINGS IN PLACE FOR

 9  THEM.  THE COMMUNITY IS NOT PREPARED FOR THEM.  OUR PROGRAM

10  ISN'T PREPARED FOR THEM.  WE HAVE ONE PAROLE AGENT FOR 50

11  PEOPLE.  WE HAVE COMMUNITY CASE MANAGERS THAT WON'T HAVE HAD

12  TIME TO DEVELOP THE PLAN FOR THEM, THE PROCESS FOR THEM, THE

13  RESOURCES ON THE OUTSIDE, AND WE WON'T HAVE HIRED ENOUGH PEOPLE

14  TO TAKE CARE OF THEM.

15          **JUDGE KARLTON:**  LET'S ASSUME ALL OF THAT; YOU

16  CONTINUE WITH YOUR PROGRAM AS IT IS DOING THE BEST YOU CAN, AND

17  ALL THESE PEOPLE ARE BEING LET OUT, NOT ALL OF THEM ARE BEING

18  LET OUT A MONTH EARLY, A MONTH AND A HALF, TWO MONTHS, WHATEVER

19  IT IS.  THAT'S GOING TO BE A BURDEN ON EVERYBODY ELSE, BUT IT'S

20  NOT GOING TO AFFECT YOUR PROGRAM AT ALL, RIGHT?

21          **THE WITNESS:**  IT DOES AFFECT THE RESOURCES THAT ARE

22  AVAILABLE TO THEM.

23          **JUDGE KARLTON:**  THAT'S A QUESTION OF COST BENEFIT.

24  AGAIN, CDCR IS LETTING OUT PEOPLE AND NOT SPENDING THE MONEY

25  KEEPING THEM IN PRISON; THEY'RE SAVING THIS MONEY AND THEY CAN

1    USE THAT MONEY.

2              **JUDGE REINHARDT:**  THEY CAN GIVE IT TO YOU.

3              **JUDGE KARLTON:**  THEY CAN GIVE IT TO YOU OR OTHERS'

4    COMMUNITY PROGRAMS.  IT SEEMS TO ME, MAYBE I'M MISSING THE

5    POINT, PLEASE DON'T FEEL SHY, IT SEEMS TO ME THE SUCCESS OR

6    FAILURE OF YOUR PARTICULAR PROGRAM IS NOT AFFECTED BY WHETHER

7    OR NOT THIS COURT ISSUES A PRISON -- I'M NOT SUGGESTING WE ARE

8    GOING TO.  I'M JUST SAYING HE'S NOT AFFECTED BY OUR ISSUING A

9    PRISON RELEASE ORDER IF THAT BECOMES NECESSARY.

10             **THE WITNESS:**  WELL, AGAIN, I THINK IT DOES, IN THE

11   SENSE THAT RESOURCES ARE ALREADY TAXED IN THE COMMUNITY.  WE

12   HAVE VERY FEW RESOURCES FOR ALL THE PEOPLE, LET ALONE OUR

13   SB 618.  THAT'S NOT INCLUDING ALL THE PEOPLE THAT HAVE TO BE

14   INVOLVED AND PAID FOR BY THE PROGRAM --

15             **JUDGE KARLTON:**  THERE'S NOTHING INHERENT IN A PRISON

16   RELEASE ORDER THAT WOULD REDUCE ANY AMOUNT THAT THE CDCR IS

17   FUNDING THROUGH YOUR PROGRAM; THAT'S A JUDGMENT THEY HAVE TO

18   MAKE ON ANOTHER BASIS.  BUT, YOU KNOW, THEY START ASKING

19   THEMSELVES HOW MUCH THEY'RE SAVING BY RELEASING PEOPLE, NO

20   DISRESPECT, BUT YOUR $4 MILLION ISN'T A REALLY SIGNIFICANT

21   NUMBER.  WELL, OKAY.  I UNDERSTAND WHAT I'M SAYING.  I THINK I

22   UNDERSTAND WHAT YOU'RE SAYING.

23             **THE WITNESS:**  I THINK JUST IN GENERAL, YOU KNOW, THE

24   IDEA OF RECIDIVISM IS INCREASED, AND FOR OUR PEOPLE WHO WE HAVE

25   PROMISED SO MUCH TO, IF WE DON'T SUPPLY TO THEM WHAT WE HAVE

1  PROMISED, IT CAUSES A LACK OF TRUST, AND IT CAUSES, YOU KNOW, A

2  GREATER CHANCE -- AND WE ARE TALKING ABOUT A POPULATION THAT

3  WALKS A PRETTY THIN LINE AS IT IS.

4        THESE ARE PEOPLE THAT HAVE TROUBLE FOLLOWING RULES.

5  THESE ARE PEOPLE THAT CAN, YOU KNOW, REOFFEND VERY EASILY

6  BECAUSE IT'S JUST WHAT THEY DO.  THAT'S THE LIFE THEY KNOW, AND

7  IF YOU DON'T FOLLOW THROUGH ON WHAT YOU'VE PROMISED THEM,

8  THAT'S JUST AN EXCUSE FOR THEM TO RECIDIVATE.  I THINK, IN

9  GENERAL, IF WE HAVE 70 PERCENT OF THE PEOPLE ARE RECIDIVATING

10  AND WE LET OUT A LARGE PROPORTION OF THEM OUT, A GREAT NUMBER

11  OF THAT IS GOING TO COME RIGHT BACK.

12        **JUDGE KARLTON:**  THAT ALSO DEPENDS ON WHAT THE PRISON

13  RELEASE ORDER SAYS.  IF IT SAYS THAT YOU'RE NOT GOING TO SEND

14  TECHNICAL VIOLATERS BACK THE WAY WE DO, THAT PROBLEM DOESN'T

15  EXIST, BUT I UNDERSTAND WHAT YOU'RE SAYING.

16        **MR. SANGSTER:**  YOUR HONOR, I REALIZE I SAID I WAS

17  COMPLETED, BUT MAY I HAVE ONE OR TWO FOLLOWS UPS TO CLEAR UP

18  SOMETHING THAT CAME UP.

19        **JUDGE HENDERSON:**  YOU MAY.

20        **CROSS-EXAMINATION BY MR. SANGSTER (RESUMED)**

21  BY MR. SANGSTER

22  **Q**   I WANT TO CLEAR UP AN ANSWER YOU GAVE TO BOTH JUDGE

23  HENDERSON AND JUDGE KARLTON.  IT HAS TO DO WITH COUNTIES

24  PARTICIPATING IN THE PROGRAM.  AS FAR AS YOU KNOW, THERE'S ONLY

25  ONE COUNTY PARTICIPATING IN THIS PROGRAM, AND THAT'S SAN DIEGO;

1   IS THAT CORRECT?

2   **A**   ONE THAT IS UP AND GOING, YES.  I DO KNOW THAT ANOTHER

3   COUNTY HAS BEEN VISITING US VERY REGULARLY AND IS PUTTING

4   TOGETHER A PROGRAM.  I DON'T KNOW WHEN THEY WILL HAVE IT UP AND

5   RUNNING.  I KNOW OTHER COUNTIES CONTACT OUR OFFICE AND HAVE

6   EXPRESSED INTEREST IN TRYING TO PUT SOMETHING TOGETHER AS WELL.

7   I'M SURE YOU ALL KNOW THAT BONNIE DUMANIS IS THE PRESIDENT OF

8   THE CALIFORNIA DISTRICT ATTORNEY'S ASSOCIATION.  SHE HAS MADE

9   IT ONE OF HER GOALS TO GET THIS MOVING ALONG THROUGH THE STATE.

10  THEY'D LIKE TO HAVE OTHER COUNTIES GET IT UP AND RUNNING.

11  **Q**   I'M TRYING NAIL DOWN PROGRESS.  SHE'S MAKING THE PROGRESS

12  SHE'S MADE IN TWO YEARS IN HER OWN COUNTY, AND ONE OTHER COUNTY

13  THAT'S TALKED TO YOU A NUMBER OF TIMES, IS THAT WHAT YOU KNOW?

14  **A**   TO THE BEST OF MY KNOWLEDGE, BUT I WILL SAY THERE IS A

15  PROGRAM MANAGER WHO IS OUR PUBLIC SPOKESPERSON WHO DOES A LOT

16  OF TALKING TO OTHER COUNTIES.  YOU WOULD HAVE TO ASK HIM THAT.

17  **Q**   MS. DUMANIS MAY KNOW?

18  **A**   YES.

19           **JUDGE REINHARDT:**  LET ME SEE IF I UNDERSTAND YOUR

20  FIGURES.  YOU PUT APPROXIMATELY SIX PEOPLE PER WEEK INTO THIS

21  PROGRAM, AND ABOUT 85 PER WEEK COME BACK TO SAN DIEGO?

22           **THE WITNESS:**  I'M NOT SURE --

23           **JUDGE KARLTON:**  HOW MANY COME BACK PER WEEK?

24           **THE WITNESS:**  I KNOW LAST YEAR --

25           **JUDGE REINHARDT:**  THIS BREAKS DOWN TO APPROXIMATELY

 1  SEVENTY-FIVE MEN AND TEN WOMEN EACH WEEK THAT YOU SEND TO STATE

 2  PRISON?

 3          **THE WITNESS:**  THAT WE SEND TO STATE PRISON THROUGH

 4  THE ENTIRE COUNTY OF SAN DIEGO, YES.  AND BASED ON OUR NUMBERS,

 5  OUR KIND OF CRUNCHING WHAT WE HAVE AND KNOWING OR POPULATION,

 6  WE THINK THAT ABOUT 20 PEOPLE WOULD BE ELIGIBLE FOR THE

 7  PROGRAM.  OF THOSE 80 PEOPLE THAT GO EVERY WEEK TO PRISON, WE

 8  THINK WE'VE GOT ABOUT 25 PERCENT THAT ARE ELIGIBLE, BUT WE JUST

 9  CAN'T OFFER IT TO THEM.  WE DON'T HAVE THE FINANCES FOR IT.

10          **JUDGE HENDERSON:**  LOOKING DOWN THE ROAD, DID YOU

11  HAVE ANY SENSE -- YOU'RE ADMITTING SIX A WEEK NOW, AND I THINK

12  THAT'S WHILE YOU SEE WHAT YOU CAN DO AND DELIVER.  DO YOU HAVE

13  ANY SENSE IN AN IDEAL WORLD FOR YOU OR, YOU KNOW, WHAT YOU

14  WOULD LIKE TO SEE HAPPEN FOR THIS PROGRAM TO HOW MANY YOU COULD

15  ADMIT ONCE YOU GET GOING AND THERE'S MONEY AND ALL THESE THINGS

16  ONE WOULD HOPE FOR?

17          **THE WITNESS:**  WELL, JUST ON OUR POPULATION ON THE

18  NONVIOLENT OFFENDERS THAT WE'RE LOOKING AT RIGHT NOW, WE WOULD

19  LIKE TO BE PUTTING IN 20 PEOPLE.  WE TRIED TO GET THE BUDGET

20  INCREASE, BUT, AS YOU KNOW, THERE WAS A BUDGET CRISIS THIS

21  YEAR, AND SO WE HAD FULLY ANTICIPATED RAMPING UP, STARTING

22  OCTOBER OF THIS YEAR, BUT THEN BECAUSE OF THE BUDGET PROBLEMS,

23  WE WEREN'T GIVEN THAT OPPORTUNITY.  WE ARE HOPEFUL IN JULY

24  THERE WILL BE A NEW BUDGET SIGNED AND WE CAN START RAMPING UP

25  AND ADDING MORE PEOPLE TO THE PROGRAM.

 1          WHEN I HAVE SPOKEN WITH OUR DA, HER HOPE IS THAT NOT

 2    ONLY WILL WE BE ABLE TO OFFER IT TO ALL THESE NONVIOLENT

 3    OFFENDERS THAT FIT WITHIN THE PARAMETERS WE HAVE CURRENTLY, BUT

 4    WE WOULD BE ABLE TO IS EXPAND IT TO INCLUDE MORE PEOPLE AS TIME

 5    PROGRESSES.

 6          I KNOW THE DEFENSE BAR IS EAGER TO HAVE US GETTING

 7    PEOPLE WHO ARE PROBATION VIOLATERS THAT ARE GOING TO GO TO

 8    PRISON TO BE A PART OF THIS PROGRAM, AS WELL THOSE ARE PEOPLE

 9    WHO ARE GOING TO HAVE A SHORT TIME BUT THEY NEED SERVICES.  WE

10    HAVE GRAND PLANS, ALL FINANCIAL.

11          **JUDGE REINHARDT:**  DO YOU THINK IF THE PEOPLE THAT

12    WERE BEING SENT TO PRISON NOW WERE GIVEN SENTENCES TWO MONTHS

13    SHORTER, THAT THAT WOULD HAVE AN ADVERSE EFFECT ON YOUR

14    PROGRAM?

15          **THE WITNESS:**  I PERSONALLY BELIEVE IT WOULD,

16    BECAUSE --

17          **JUDGE REINHARDT:**  WOULD SENDING THEM TO PRISON FOR

18    EXACTLY THE RIGHT TIME NOW, NOT TOO LONG, NOT TOO SHORT, TWO

19    MONTHS LESS ON THEIR SENTENCE WOULD HAVE AN ADVERSE EFFECT ON

20    YOUR PROGRAM?

21          **THE WITNESS:**  NO.  ONE OF THE QUESTIONS THAT HAD

22    BEEN ASKED OF ME AT THE DEPOSITION WAS ABOUT RELEASING PEOPLE

23    EARLY.  THAT USED TO BE THE WAY WE DID IT.  WE DIDN'T HAVE

24    DETERMINATE SENTENCES, AND PEOPLE COULD ACTUALLY EARN TIME OFF

25    THEIR CREDITS.  I THINK THAT'S A BETTER WAY OF DOING IT, WHERE

1   YOU EARN IT, AS OPPOSED TO YOU GOT A BONUS, YOU GET TO GET OUT

2   TWO MONTHS EARLY.

3           I THINK IT HAS CERTAINLY AN EFFECT ON OUR COMMUNITY.

4   IT HAS A RECIDIVISM EFFECT ON OUR COMMUNITY, MORE PEOPLE GOING

5   BACK TO THE COMMUNITY, FOR OUR COMMUNITY MORE PEOPLE

6   REOFFENDING.  I THINK IT HAS EFFECTS ON OUR PEOPLE WHO WE ARE

7   PARTICULARLY TRYING TO TEACH TO TAKE RESPONSIBILITY.  SO

8   LETTING THEM OUT EARLY DOES SEND A NEGATIVE MESSAGE.

9           **JUDGE KARLTON:**  I WANT TO TELL YOU I AM OLD ENOUGH,

10  THERE IS NOBODY ELSE IN THIS COURTROOM OLDER.

11          **JUDGE REINHARDT:**  I DON'T KNOW ABOUT THAT.

12          **JUDGE KARLTON:**  TAKE IT BACK.  SOMEBODY ELSE IS

13  OLDER.  DETERMINATE SENTENCING CAME IN, AND EVERYBODY WAS

14  CONVINCED THAT WAS GOING TO SAVE THE WORLD, AND I COULDN'T GET

15  ANYBODY TO SAY WITH ME, LOOK, EARN YOUR WAY OUT IS THE BEST WAY

16  OF ENSURING THAT THERE'S SOME DEVELOPING SENSE OF

17  RESPONSIBILITY.  WE'RE WELL PAST GETTING PEOPLE TO ASK

18  QUESTIONS ABOUT PRISON THAT ARE RATIONALE.  THAT HAS NOTHING TO

19  DO WITH YOUR TESTIMONY.  I'M JUST MUMBLING.  I'M SORRY.

20          **JUDGE HENDERSON:**  REDIRECT?

21          **MR. MITCHELL:**  NO REDIRECT.

22          **JUDGE HENDERSON:**  OKAY.  THANK YOU, MS. RODRIGUEZ.

23          COURT REPORTER NEEDS A BREAK.  LET'S TAKE A

24  15-MINUTE RECESS.

25          (RECESS TAKEN.)

1          **THE CLERK:**  PLEASE BE SEATED.

2          **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

3   WITNESS WHEN YOU'RE READY, COUNSEL.

4          **MS. BARLOW:**  GOOD AFTERNOON, YOUR HONORS. KIMBERLY

5   HILL BARLOW JONES & MAYER ON BEHALF OF THE LAW ENFORCEMENT

6   INTERVENORS, CALLING JERRY POWERS, CHIEF PROBATION OFFICER

7   STANISLAUS COUNTY.

8          **THE CLERK:**  PLEASE STEP UP, AND RAISE YOUR RIGHT

9   HAND.

10          (THEREUPON, THE WITNESS WAS SWORN.)

11          **MS. BARLOW:**  IF IT PLEASE THE COURT, I HAVE COPIES

12   OF MR. POWERS' EXPERT REPORT FOR THE COURT.

13          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME.

14          **THE WITNESS:**  JERRY POWERS, J-E-R-R-Y P-O-W-E-R-S.

15          **MS. BARLOW:**  THANK YOU, MR. POWERS.

16          THEREUPON --

17                          **JERRY POWERS**

18   WAS CALLED ON BEHALF OF THE DEFENDANT LAW ENFORCEMENT

19   INTERVENORS, AND AFTER HAVING BEEN FIRST DULY SWORN WAS

20   EXAMINED AND TESTIFIED AS FOLLOWS:

21                      **DIRECT EXAMINATION**

22   BY MS. BARLOW:

23   Q.  COULD YOU STATE YOUR POSITION, PLEASE?

24   A.  I'M THE CHIEF PROBATION OFFICER FOR STANISLAUS COUNTY.

25   Q.  AND IN YOUR CAPACITY AS CHIEF PROBATION OFFICER, WHAT ARE

 1   YOUR DUTIES?

 2   **A.**   ESSENTIALLY OVERSIGHT OF THE ENTIRE DEPARTMENT, POLICY

 3   SETTING, BUDGET CONTROL, BUDGET SETTING, PERSONNEL DECISIONS,

 4   THE ENTIRE FUNCTIONING OF THE PROBATION DEPARTMENT IN THE

 5   COUNTY.

 6   **Q.**   AND HOW MANY PROBATIONERS ARE YOU RESPONSIBLE FOR

 7   ULTIMATELY SUPERVISING?

 8   **A.**   RIGHT IN THE NEIGHBORHOOD OF ABOUT 8,000 BETWEEN JUVENILES

 9   AND ADULTS.

10   **Q.**   AND ABOUT HOW MANY OF THOSE ARE ADULTS?

11   **A.**   LITTLE OVER 7,000.

12           **JUDGE REINHARDT:**   EXCUSE ME. YOUR DECLARATION SAYS

13   YOU'RE RESPONSIBLE FOR OVERSEEING APPROXIMATELY 8,000, BOTH

14   STANISLAUS COUNTY AND OTHER COUNTIES WITHIN THE STATE OF

15   CALIFORNIA.

16           WHAT DOES THAT MEAN?

17           **THE WITNESS:**   WELL, SOME OF THE PROBATIONERS FROM

18   STANISLAUS COUNTY ARE ACTUALLY RESIDING IN OTHER COUNTIES STILL

19   UNDER THE JURISDICTION OF OUR COUNTY.

20           **JUDGE REINHARDT:**   THANK YOU.

21           **THE WITNESS:**   OKAY.

22   **BY MS. BARLOW:**

23   **Q.**   IN ADDITION, ARE YOU RESPONSIBLE FOR OPERATING ANY

24   DETENTION FACILITIES?

25   **A.**   YES, I AM.

1  Q.   WHAT ARE THOSE?

2  A.   WE HAVE 158 BED JUVENILE HALL.

3  Q.   PRIOR TO YOUR EMPLOYMENT WITH THE STANISLAUS -- COUNTY OF

4  STANISLAUS, HAVE YOU SERVED AS PROBATION CHIEF OR PROBATION

5  OFFICER ANYWHERE ELSE?

6  A.   YES, I SPENT A LITTLE OVER FIVE YEARS IN SAN DIEGO COUNTY.

7  NOT AS CHIEF, BUT AS A PROBATION OFFICER.

8  Q.   HOW LONG HAVE YOU BEEN WITH STANISLAUS COUNTY?

9  A.   A LITTLE OVER EIGHT YEARS.

10 Q.   AND WHAT ROLES HAVE YOU PLAYED FOR STANISLAUS COUNTY

11 BESIDES CHIEF, IF ANY?

12 A.   WHEN I FIRST CAME TO THE COUNTY I WAS THE SUPERINTENDENT OF

13 THE JUVENILE DETENTION FACILITY. THEN, I WAS PROMOTED TO CHIEF

14 DEPUTY OVER FIELD SERVICES.  AND THEN, I WAS PROMOTED TO CHIEF

15 A LITTLE OVER SIX YEARS AGO.

16 Q.   NOW, COULD YOU JUST DESCRIBE BRIEFLY YOUR EDUCATIONAL

17 BACKGROUND FOR THE COURT?

18 A.   SURE. I HAVE A B.A. IN PSYCHOLOGY FROM THE UNIVERSITY OF

19 CALIFORNIA AT SAN DIEGO.

20 Q.   DO YOU HAVE ANY SPECIAL CERTIFICATIONS THAT YOU NEED TO

21 PERFORM THE SERVICES THAT YOU DO?

22 A.   YES, I HAVE CERTIFICATIONS IN -- AS A CORRECTIONS OFFICER,

23 AS A DEPUTY PROBATION OFFICER.  THOSE WERE TO FULFILL MY DUTIES

24 AS LINE STAFF.

25          I HAVE A CERTIFICATION AS A SUPERVISING PROBATION

 1  OFFICER AND ALSO A MANAGEMENT CERTIFICATION FOR MANAGEMENT

 2  LEVEL POSITIONS IN PROBATION.

 3  **Q.**  OKAY.  SO IF I'M DOING MY MATH CORRECTLY THAT'S 24 YEARS OF

 4  PROBATION EXPERIENCE?

 5  **A.**  CORRECT. ACTUALLY BE 24 YEARS ON SUNDAY.

 6  **Q.**  CONGRATULATIONS.

 7  **A.**  THANK YOU.

 8  **Q.**  NOW, IN ADDITION TO YOUR JOB RESPONSIBILITIES, ARE YOU

 9  AFFILIATED WITH ANY PROFESSIONAL ORGANIZATIONS IN YOUR CAPACITY

10  AS PROBATION CHIEF?

11  **A.**  YES.  I'M A MEMBER OF THE CHIEF PROBATION OFFICERS OF

12  CALIFORNIA.  ACTUALLY, I'M THE CURRENT PRESIDENT OF CHIEF

13  PROBATION OFFICERS OF CALIFORNIA.

14  **Q.**  WHAT DO THE CHIEF PROBATION OFFICERS OF CALIFORNIA DO?

15  **A.**  IT'S A PROFESSIONAL ASSOCIATION THAT CONSISTS OF THE 59

16  CHIEF PROBATION OFFICERS IN THE STATE OF CALIFORNIA.  WE CALL

17  IT CPOC.  IT'S THE ACRONYM FOR IT.  IT IS ESSENTIALLY AN

18  ORGANIZATION THAT PROVIDES A VENUE FOR THE VOICE OF PROBATION

19  IN THE STATE OF CALIFORNIA.

20         THEY WORK LEGISLATIVELY ON PROBATION ISSUES AT THE

21  STATE LEVEL, AS WELL AS SOMETIMES AT LOCAL LEVELS AND

22  SOMETIMES, AS YOU SEE, AT THE FEDERAL LEVEL, AS WELL.

23  **Q.**  NOW, DOES CPOC UNDERTAKE TO GATHER -- COLLECT DATA ON

24  BEHALF OF THE CHIEF PROBATION OFFICERS?

25  **A.**  YES.  CPOC TENDS TO BE THE CENTRAL REPOSITORY FOR COUNTY

 1  LEVEL STATISTICS. THEY THEN AGGREGATE THE STATISTICS TO COME UP

 2  WITH A STATEWIDE PICTURE OF POPULATION NUMBERS, TYPES OF

 3  OFFENDERS, THOSE TYPES OF THINGS.

 4  **Q.**    SO IN COLLECTING THAT DATA, WHAT ARE THEY LOOKING FOR?

 5  ARE THEY LOOKING FOR THE NUMBER OF PROBATION OFFICERS, THE

 6  NUMBER OF OFFENDERS, BREAKDOWN OF CRIMES, ET CETERA?

 7  **A.**   YES.   WHAT WE WILL DO, TYPICALLY -- AND THEN, THIS IS QUITE

 8  FRANKLY IN RESPONSE TO QUESTIONS OVER THE YEARS -- WE WILL HAVE

 9  STATISTICS RELATED TO THE TYPES OF CASELOADS THAT PROBATION

10  OFFICERS CARRY; THE OVERALL NUMBERS OF OFFENDERS UNDER

11  SUPERVISION; ANY SPECIALIZED CASELOAD, SUCH AS DOMESTIC

12  VIOLENCE CASELOADS, SEX OFFENDER CASELOADS, THE NUMBERS ON

13  THOSE CASELOADS AND THINGS RELATED TO THE ACTUAL MONITORING OF

14  OFFENDERS IN THE STATE.

15  **Q.**  AND IN ADDITION TO YOUR AFFILIATION WITH CPOC, ARE YOU ALSO

16  ASSOCIATED WITH ANY OTHER ORGANIZATIONS?

17  **A.**   I AM.   I'VE BEEN APPOINTED BY THE GOVERNOR TO TWO STATE

18  LEVEL BOARDS:   THE CALIFORNIA COUNCIL ON CRIMINAL JUSTICE.

19  I'VE BEEN A MEMBER THERE FOR ABOUT TWO-AND-A-HALF YEARS. AND

20  I'M ALSO A GOVERNOR APPOINTEE TO THE SEX OFFENDER MANAGEMENT

21  BOARD FOR THE STATE.   AND THAT'S BEEN A LITTLE BIT OVER A YEAR,

22  YEAR AND A HALF.

23  **Q.**  AND WHAT IS CALIFORNIA COUNCIL ON CRIMINAL JUSTICE?

24  **A.**   IT'S A -- IT'S AN ADVISORY BODY THAT IS DESIGNED TO ADVISE

25  THE LEGISLATURE AND THE ADMINISTRATION WITH RESPECT TO OVERALL

1   STATE POLICIES WHEN IT COMES TO DEALING WITH CRIMINAL JUSTICE

2   ISSUES. IT'S CONSISTING OF SOMEWHERE IN THE NEIGHBORHOOD OF

3   ABOUT 15 PRACTITIONERS AND PEOPLE INVOLVED IN THE CRIMINAL

4   JUSTICE SYSTEM.

5   **Q.**   OKAY. NOW, YOU TALKED ABOUT THE CHIEF PROBATION OFFICERS

6   AND THE REPORTS THAT THEY PREPARE. YOU HAVE THE SET OF EXHIBITS

7   IN FRONT OF YOU?

8   **A.**   YES.

9   **Q.**   OKAY. IF YOU WOULD PLEASE REFER TO EXHIBIT 604 THROUGH 607,

10  AND TELL ME IF YOU RECOGNIZE THOSE DOCUMENTS?

11  **A.**   THEY APPEAR TO BE OUR ANNUAL SURVEY DATA ON ESSENTIALLY

12  NUMBERS THAT I PREVIOUSLY DISCUSSED:  THE TYPES OF OFFENDERS,

13  ADULTS, MISDEMEANOR FELON, NUMBERS FOR INDIVIDUAL COUNTIES

14  ACROSS THE STATE.

15  **Q.**   AND FOR WHAT PERIOD OF TIME WOULD THE EXHIBIT 604 THROUGH

16  607 COVER?

17  **A.**   IT LOOKS LIKE 2006, 2007.

18  **Q.**   NOW, THIS ISN'T ALL THE DATA THAT IS COMPILED BY CPOC,

19  CORRECT?

20  **A.**   ACTUALLY, THERE'S 2007, 2008 ALSO AS PART OF THE EXHIBITS

21  WHEN YOU GO FARTHER IN.

22          NO.  CPOC ACTUALLY COLLECTS QUITE A BIT OF DATA --

23  **Q.**   OKAY.

24  **A.**   -- ON JUVENILES AND ADULTS. THIS WOULD BE PART OF IT, YES.

25  **Q.**   SO THIS IS KIND OF A SUMMARY --

 1  **A.**  YES.

 2  **Q.**  -- BY COUNTY?

 3          IF YOU WOULD TAKE A LOOK AT 608 THROUGH 611, I

 4  BELIEVE THOSE WERE THE 2007, 2008 YOU WERE --

 5          **JUDGE KARLTON:**  I THINK THERE'S CONFUSION.  I HAVE

 6  JUST 2008.  DOWN AT THE BOTTOM HERE, THAT'S WHAT IT SAYS.

 7          **JUDGE HENDERSON:**  YES, THAT'S WHAT I HAVE.

 8          **THE WITNESS:**  IF YOU LOOK AT THE TOP --

 9          **JUDGE KARLTON:**  OH, I SEE.

10          **THE WITNESS:**  -- IT SAYS:

11              "CPOC ANNUAL SURVEY 2006, 2007 DATA."

12          **JUDGE KARLTON:**  GOT IT.

13          **THE WITNESS:**  YES.  2007 AND 2008 IS IN THE BACK.

14  **BY MS. BARLOW:**

15  **Q.**  SO TO THE BEST OF YOUR KNOWLEDGE THOSE ARE THE TRUE AND

16  CORRECT COPIES OF THE CPOC COMPILED STATISTICS FOR THOSE TWO

17  CALENDAR OR FISCAL YEARS, RATHER?

18  **A.**  YES.

19  **Q.**  OKAY. THANK YOU.

20          COULD YOU DESCRIBE FOR US HOW THE PROBATION

21  DEPARTMENT WORKS WITH OTHER DEPARTMENTS IN THE COMMUNITY TO

22  SERVE OFFENDERS?

23  **A.**  WELL, PROBATION ACTS AS -- WE REFER TO IT AS "A BROKER FOR

24  SERVICES."

25          PROBATION ACTUALLY SHORT OF THE SUPERVISION OF

1  OFFENDERS DOES NOT REALLY PROVIDE DIRECT SERVICES, TREATMENT

2  SERVICES TO OFFENDERS.  QUITE FRANKLY, WE DON'T HAVE THE

3  RESOURCES OR THE EXPERTISE TO DO THAT.

4          WE DO PROVIDE, AS I SAID, ON A BROKER-TYPE MODEL

5  REFERRALS TO OFFENDERS FOR WHETHER IT BE DRUG TREATMENT OR

6  DOMESTIC VIOLENCE CLASSES OR THINGS LIKE THAT.  WE REFER THEM

7  TO THE LOCAL AGENCIES THAT CAN PROVIDE THEM THE SERVICES.

8  Q.  SO YOU WORK WITH THE COMMUNITY AGENCIES AND OTHER AGENCIES

9  IN THE COUNTY THAT PROVIDE WHAT KIND OF SERVICES?

10 A.  WELL, WE WORK WITH PUBLIC AND PRIVATE.  MENTAL HEALTH IS A

11 GOOD EXAMPLE OF PUBLIC AND PRIVATE.  WE WILL USE OUR COUNTY

12 MENTAL HEALTH SERVICES FOR SOME SERVICES FOR PROBATIONERS.

13         IN SOME INSTANCES, WE WILL USE PRIVATE PROVIDERS FOR

14 MENTAL HEALTH SERVICES, AS WELL.  SUBSTANCE ABUSE COUNSELLING

15 IS THE SAME SORT OF THING. WE HAVE COUNTY ALCOHOL AND DRUG

16 PROGRAMS THAT PROVIDE SOME SERVICES.  BUT THERE ARE ALSO AA AND

17 NA PROGRAMS AND OTHER PROGRAMS THAT ARE PROVIDED AT THE

18 COMMUNITY LEVEL THAT WE WILL ALSO USE.

19         DOMESTIC VIOLENCE PROGRAMS ARE THE SAME SORT OF

20 THING.  SEX OFFENDER PROGRAMS ARE TYPICALLY PROVIDED BY PRIVATE

21 PROVIDERS BECAUSE OF THE SPECIALIZED NATURE OF THAT TYPE OF

22 SERVICE.

23 Q.  SO IS IT FAIR TO SAY THAT IN SUPERVISING YOUR 8,000

24 PROBATIONERS YOU WORK CLOSELY WITH BOTH PRIVATE AND PUBLIC

25 COMMUNITY RESOURCES TO PROVIDE THOSE SERVICES TO THEM?

1  **A.**  ABSOLUTELY, YES.

2  **Q.**  NOW, DO YOU -- ARE YOU ALSO FAMILIAR WITH THE JAIL AND HOW

3  THE JAIL PROCESSES YOUR PROBATIONERS, HOW YOU WORK WITH THE

4  SHERIFF'S OFFICE?

5  **A.**  YES.

6  **Q.**  WHAT DO YOU DO, EXACTLY?

7  **A.**  WHAT DO WE DO WITH THE JAIL?

8  **Q.**  HOW DO YOU WORK WITH THE SHERIFF'S OFFICE IN TERMS OF YOUR

9  PROBATIONERS?

10  **A.**  WELL, OUR PROBATIONERS MANY TIMES TYPICALLY SERVE A

11  CUSTODIAL SENTENCE BEFORE THEY COME INTO THE COMMUNITY AND

12  BEGIN SUPERVISION ON OUR PART. WE WILL MANY TIMES START TO

13  PROVIDE SERVICES, OR AT LEAST MAKE CONTACT WITH THE OFFENDER

14  BEFORE THEY ARE RELEASED SO WE CAN MAKE THAT CONNECTION SO WHEN

15  THEY GO OUT INTO THE COMMUNITY THEY WILL UNDERSTAND WHAT THEIR

16  CONDITIONS OF PROBATION ARE AND THINGS LIKE THAT?

17          OUR SHERIFF'S DEPARTMENT ALSO PROVIDES SOME IN

18  CUSTODY SUBSTANCE ABUSE TREATMENT PROGRAMS AND THINGS LIKE

19  THAT, SO SOME OFFENDERS WILL ACTUALLY HAVE THE ABILITY TO START

20  THEIR TREATMENT WHILE THEY ARE IN CUSTODY AND TRANSITION OUT

21  INTO THE COMMUNITY.

22  **Q.**  SO IN ADDITION TO YOUR FAMILIARITY WITH THE COMMUNITY

23  PROGRAMS AND SHERIFF'S DEPARTMENT PROGRAMS, ARE THERE OTHER

24  THINGS THAT YOU HAVE DONE TO PREPARE FOR YOUR TESTIMONY IN THIS

25  CASE?

1  **A.** WELL, I'VE REVIEWED SOME OF THE DOCUMENTS THAT HAVE -- WERE

2  PROVIDED:  MR. AUSTIN'S REPORT, CDCR RECIDIVISM REPORTS, THINGS

3  LIKE THAT, YES.

4  **Q.** AND HAVE YOU AS A RESULT OF THOSE REVIEWS AND YOUR WORK

5  FORMED ANY OPINIONS IN THIS MATTER?

6  **A.** YES.

7  **Q.** OKAY. AND ARE THOSE OPINIONS BASED UPON JUST THOSE

8  DOCUMENTS, OR WHAT ARE THEY BASED ON?

9  **A.** WELL, THEY ARE BASED ON THE DOCUMENTS AS WELL AS MY 24

10 YEARS WORKING IN THE CRIMINAL JUSTICE SYSTEM AND THE KNOWLEDGE

11 THAT I'VE GARNERED THROUGH THAT, AS WELL AS MY TIME IN CPOC.

12 AND AT THE STATE LEVEL MY OPPORTUNITIES TO DEAL WITH THESE

13 ISSUES AT THE STATE LEVEL.

14 **Q.** SO AS PRESIDENT OF CPOC YOU WOULD HAVE FAMILIARITY WITH

15 SIMILAR ISSUES, NOT JUST IN STANISLAUS COUNTY, BUT IN OTHER

16 COUNTIES, AS WELL?

17 **A.** CORRECT, YES.

18 **Q.** NOW, DO YOU HAVE AN OPINION ABOUT WHETHER A PRISONER

19 RELEASE ORDER WOULD ENDANGER PUBLIC SAFETY IN THIS CASE?

20 **A.** YES.

21 **Q.** WHAT PLAINTIFFS HAVE PROPOSED IN THEIR TRIAL BRIEF IS THAT

22 THERE BE A RELEASE OVER A PERIOD OF TWO YEARS OF APPROXIMATELY

23 52,000 TO GET TO 130 PERCENT OF THE CAPACITY.

24          **MS. NORMAN:** OBJECTION.  I BELIEVE THAT MISSTATES

25 OUR MOTION.

1           **MS. BARLOW:**  TRIAL BRIEF SAYS 130 PERCENT, I

2    BELIEVE.

3           **MR. SPECTER:**  REDUCTION OF POPULATION.

4           **MS. NORMAN:**  WE HAVEN'T SUGGESTED THAT FIFTY SOME

5    THOUSAND PRISONERS BE RELEASED, BUT POPULATION BE REDUCED BY A

6    SIMILAR NUMBER.

7           **MS. BARLOW:**  WITH RESPECT, YOUR HONOR, I'M NOT SURE

8    HOW THEY ARE GOING TO GET THERE IF THEY DON'T LET ANYBODY GO.

9           **JUDGE KARLTON:**  WELL, IT'S OBVIOUS.  THE PROBATION

10   OFFICER WILL NOT SEND PEOPLE TO ANY PRISON FOR THREE MONTHS AS

11   AN EXAMPLE.  JUST AS ONE EXAMPLE.

12          **MS. BARLOW:**  WELL, OKAY.

13          **JUDGE KARLTON:**  I'M SORRY THAT YOU DON'T UNDERSTAND

14   THAT, BUT IT'S FAIRLY STRAIGHTFORWARD.

15          **MS. BARLOW:**  WELL, A REDUCTION OF 52,000.  IF I'M

16   MAY, I'M TRYING TO ESTABLISH THE FOUNDATION FOR HIS OPINION.

17          **JUDGE HENDERSON:**  PROCEED.

18   **BY MS. BARLOW:**

19   Q.  IF THERE'S A REDUCTION IN THE PRISON POPULATION FROM ITS

20   CURRENT LEVELS BY 52,000 PRISONERS, HOWEVER IT OCCURS, MR.

21   AUSTIN HAS OPINED THAT IT SHOULD OCCUR SIMPLY BY RELEASING

22   PEOPLE A FEW MONTHS EARLY.

23          **MS. NORMAN:**  OBJECTION.  I BELIEVE THAT MISSTATES

24   MR. AUSTIN'S REPORT, WHICH SPEAKS FOR ITSELF.

25          **JUDGE HENDERSON:**  THE REPORT SPEAKS FOR ITSELF.

1          PROCEED.

2          **MS. BARLOW:**  YES.

3  **BY JUDGE REINHARDT:**

4  **Q.**  IF THAT WERE TO HAPPEN, MR. POWERS, DO YOU HAVE AN OPINION

5  ABOUT HOW THAT WOULD IMPACT PUBLIC SAFETY IN THE STATE OF

6  CALIFORNIA?

7  **A.**  WELL, I BELIEVE IT WOULD HAVE A DETRIMENTAL IMPACT FROM

8  MULTIPLE PERSPECTIVES:  OPERATIONALLY, CERTAINLY WITH RESPECT

9  TO CRIME IN THE COMMUNITY; INCREASED WORKLOAD; INCREASED

10 RESOURCES TO DEAL WITH THE ADDITIONAL OFFENDERS.

11 **Q.**  NOW, LET'S JUST TALK A LITTLE BIT ABOUT HOW PEOPLE GET TO

12 THE CDCR, AND THEY COME THROUGH PROBATION. IS IT TYPICAL FOR

13 SOMEONE TO SERVE A PROBATIONARY SENTENCE BEFORE THEY EVER GET

14 SENT TO PRISON?

15 **A.**  I'M NOT SURE THAT I WOULD SAY "TYPICAL."  MANY OR MOST

16 OFFENDERS WHO END UP GOING TO PRISON HAVE SERVED SOME SORT OF A

17 LOCAL PROBATION TERM AND MANY TIMES A CUSTODIAL TERM IN LOCAL

18 CUSTODY, YES.

19 **Q.**  OKAY.  NOW, YOU DON'T SEND PEOPLE TO PRISON, RIGHT?  COURTS

20 DO THAT.

21 **A.**  COURTS COMMIT TO PRISON, CORRECT.

22 **Q.**  OKAY.  SO WHEN YOU GET SOMEBODY ON PROBATION, WHAT ARE

23 THE -- YOU TALKED A LITTLE BIT ABOUT THE SERVICES YOU PROVIDED

24 TO THEM.  BUT WHAT'S YOUR GOAL IN PROVIDING THOSE SERVICES TO

25 THEM?

1  **A.**  WELL, OUR PRIMARY GOAL IS PUBLIC SAFETY TO ENSURE THAT THE

2  COMMUNITY IS KEPT SAFE. THERE'S MULTIPLE WAYS TO DO THAT.

3            PROBATION'S PHILOSOPHY IS THAT IF WE CAN PROVIDE

4  SERVICES TO THE OFFENDER THAT REHABILITATES THEM PUBLIC SAFETY

5  IS SERVED BEST.

6            IF OFFENDERS ARE NOT ABLE TO BE REHABILITATED THEN

7  CERTAINLY PUBLIC SAFETY CAN BE SERVED BY INCAPACITATING THE

8  OFFENDER BY PLACING THEM IN CUSTODY.

9            SO HAVING IN MIND THAT THE CENTER PHILOSOPHY IS

10 PUBLIC SAFETY, YOU HAVE TO LOOK AT THE INDIVIDUAL OFFENDER OR

11 LOOK AT YOUR SYSTEM AND SAY:

12               "HOW IS IT THAT YOU MOST EFFECTIVELY AND

13               APPROPRIATELY ENSURE THAT THE COMMUNITY IS KEPT SAFE

14               FROM THE OFFENDERS FROM REOFFENDING OR FROM FURTHER

15               OFFENDING?"

16 **Q.**  SO INCAPACITATION MIGHT BE ONE WAY TO DO THAT?

17 **A.**  YOU CERTAINLY COULD ARGUE THAT LOCKING SOMEONE AWAY,

18 ALTHOUGH THERE ARE CRIMES COMMITTED INSIDE FACILITIES, SO --

19 **Q.**  WITH YOUR PROBATION -- ADULT PROBATIONERS THAT HAVE NEVER

20 BEEN TO PRISON, YOU TRY TO HELP THEM OBTAIN PROGRAMS IN ORDER

21 TO KEEP THEM GOING, CORRECT?

22 **A.**  TO THE EXTENT THAT WE CAN. WE'RE NOT A COUNTY THAT HAS A

23 TREMENDOUS AMOUNT OF LOCAL RESOURCES, OR QUITE FRANKLY, MONEY

24 TO PROVIDE THOSE RESOURCES FOR OFFENDERS.  SO WE DO THE BEST WE

25 CAN. WE TRY AND FIND PROGRAMS THAT ARE LOW COST OR HAVE SLIDING

1  SCALE FEES.  BUT IT'S NOT ALWAYS POSSIBLE TO GET A PROGRAM FOR

2  EVERY OFFENDER.

3  **Q.**  ARE YOU SATISFIED AT THE LEVEL OF SERVICES THAT YOU'RE ABLE

4  TO PROVIDE TO YOUR CURRENT PROBATIONERS?

5  **A.**  ABSOLUTELY NOT.

6  **Q.**  AND WHY IS THAT?

7  **A.**  IT'S WOEFULLY INADEQUATE. TAKING MY DEPARTMENT AS AN

8  EXAMPLE, WE'VE GOT SOMEWHERE IN THE NEIGHBORHOOD OF 7,000 ADULT

9  OFFENDERS THAT ARE RESPONSIBLE TO MY DEPARTMENT FOR THEIR

10 PROBATION TERMS.

11         I HAVE SOMEWHERE IN THE NEIGHBORHOOD OF ABOUT 40

12 OFFICERS TO SUPERVISE THEM. AND THAT INCLUDES PROVIDING COURT

13 SERVICES ON TOP OF THE SUPERVISION. IT'S RIDICULOUS TO THINK

14 THAT A PROBATION OFFICER CAN PROVIDE ANY MEANINGFUL SUPERVISION

15 OR SERVICE TO A POPULATION WITH THAT KIND OF RATIO OUT THERE.

16         SO WE DO THE BEST WE CAN. WE TRIAGE.  WE TRY AND

17 FIND THOSE THAT EITHER ARE AT THE HIGHEST RISK TO THE COMMUNITY

18 FROM A PUBLIC SAFETY PERSPECTIVE OR HAVE THE HIGHEST NEED, OR

19 BOTH, FOR TREATMENT SERVICES.  AND WE SORT OF -- BY TRIAGE WE

20 FOCUS ON THOSE, AND WE IGNORE THE REST UNTIL THEY GET

21 REARRESTED OR IF THEY GET REARRESTED.

22 **Q.**  WHEN YOU SAY "IGNORE THE REST," ARE YOU TALKING ABOUT THE

23 BANKED CASES?

24 **A.**  WELL, THERE'S A -- YES, PARTIALLY.  BUT THERE WILL BE SOME

25 WHERE WE WILL SUPERVISE AT A RATIO OF, SAY, FIFTY OFFENDERS TO

1  ONE OFFICER.  THAT WE CONSIDER THAT INTENSIVE CASELOAD.  THEY

2  WILL GET THE MAJORITY OF THE SERVICES.

3          WE WILL HAVE SOME THAT WE WILL SUPERVISE AT

4  APPROXIMATELY 150 OR 200 OFFENDERS TO ONE OFFICER. AND THAT IS

5  KIND OF JUST A CURSORY MONITORING.  AND THEN, WE HAVE OTHERS

6  THAT FRANKLY SIT IN A FILE CABINET AND WILL NOT SEE A PROBATION

7  OFFICER UNLESS THEY REOFFEND.  SO --

8          **JUDGE KARLTON:**  WHAT'S A BENT -- A BENT CASE?

9          **THE WITNESS:**  BANKED, B-A-N-K-E-D.

10         **JUDGE KARLTON:**  I'M SORRY.

11         **THE WITNESS:**  IT'S A COLLOQUIAL TERM THAT'S USED UP

12 AND DOWN THE STATE.  IT JUST MEANS "FILE CABINET."  THEY ARE

13 NEGLECTED.

14 **BY MS. BARLOW:**

15 **Q.**  IF YOU HAD THE RESOURCES WOULD YOU BE SUPERVISING ALL THOSE

16 BANKED CASES?

17 **A.**  WITH THE INFORMATION THAT WE HAVE NOW AND THE SCIENCE

18 THAT'S AVAILABLE NOW WITH RESPECT TO BEING ABLE TO DO RISK

19 ASSESSMENT, VALIDATED RISK ASSESSMENT, RESEARCH TELLS US

20 THERE'S SOME PEOPLE THAT YOU DON'T NEED TO WASTE RESOURCES ON.

21         THEY ARE NOT GOING TO PRESENT A SIGNIFICANT THREAT

22 TO THE COMMUNITY.  SO I CAN'T TELL YOU THAT WE WOULD SUPERVISE

23 EVERY ONE OF THOSE, BUT THERE ARE SOME IN THERE THAT, YES, WE

24 WOULD SUPERVISE IF WE HAD THE RESOURCES.

25 **Q.**  AND DO YOU FEEL IF YOU WERE ABLE TO SUPERVISE MORE OF THE

1  PROBATIONERS THAT YOU DO HAVE THAT YOU BELIEVE NEED IT, THAT

2  YOU WOULD BE ABLE TO KEEP MORE OF THEM OUT OF PRISON?

3  **A.**  ABSOLUTELY.

4  **Q.**  YOU TALK IN YOUR REPORT ABOUT SOME PRISONERS WHO GO TO CDCR

5  ON PROBATION VIOLATIONS. AND I THINK YOU MENTIONED THAT THERE

6  WERE ABOUT 14,000 A YEAR; IS THAT CORRECT?

7  **A.**  THAT WAS AN ESTIMATE, YES.

8  **Q.**  ABOUT TEN PERCENT ARE FROM TECHNICAL PROBATION VIOLATIONS?

9  **A.**  YES.

10 **Q.**  WHAT DO YOU MEAN BY "TECHNICAL PROBATION VIOLATIONS"?

11 **A.**  A TECHNICAL VIOLATION WOULD BE WHAT'S NOT TERMED A NEW LAW

12 VIOLATION.  IN OTHER WORDS, THEY WOULD HAVE A DIRTY DRUG TEST.

13 THEY TEST POSITIVE FOR DRUGS. THEY WOULD FAIL TO REPORT TO

14 THEIR PROBATION OFFICER WHEN DIRECTED.  THEY REFUSE TO ENROLL

15 IN OR COMPLETE A COUNSELING PROGRAM, SUCH AS LIKE A DV PROGRAM.

16 SOMETHING THAT IN AND OF ITSELF WOULD NOT BE COSIDERED A NEW

17 LAW VIOLATION, BUT IS A VIOLATION OF A PROBATION CONDITION.

18 **Q.**  IS THERE A REASON THAT THOSE PEOPLE GO TO CDCR, IN YOUR

19 OPINION?

20 **A.**  IS THERE A REASON?

21 **Q.**  WHAT'S THE ALTERNATIVE?

22 **A.**  THE ALTERNATIVE IS WE PROVIDE THEM SOME SERVICES, AND WE

23 DON'T LET THEM GET THERE.

24           I'VE STATED PREVIOUSLY THAT IN MY OPINION THAT'S

25 LOW-HANGING FRUIT OUT THERE; THAT WITH A MINIMAL AMOUNT OF

1  ADDITIONAL RESOURCES YOU CAN DIVERT FROM RECEIVING PRISON

2  SENTENCES.

3          **JUDGE REINHARDT:**  COULD I -- ARE YOU SAYING THAT AS

4  TO THOSE 14,000 PEOPLE THAT THEY SHOULD NOT BE SENT TO PRISON?

5          **THE WITNESS:**  I -- I'M SORRY.

6          **JUDGE REINHARDT:**  OR THAT YOU SHOULD BE GIVEN MORE

7  MONEY TO MAKE SURE THAT THEY DON'T COMMIT TECHNICAL VIOLATIONS.

8          **THE WITNESS:**  THAT'S WHAT I'M SAYING IS THAT BECAUSE

9  OF THE MODEL THAT WE HAVE MANY OF THOSE INDIVIDUALS ARE NOT

10 BEING SUPERVISED OR PROVIDED SERVICES AT THE LOCAL LEVEL. AND

11 BECAUSE OF THE BENIGN NEGLECT THEY ARE ALLOWED TO COMMIT THESE

12 TECHNICAL VIOLATIONS THAT IF WE WERE PROVIDING SERVICES AND

13 SUPERVISING THEM THEY WOULD NEVER COMMIT.

14         **JUDGE REINHARDT:**  BUT IF YOU DON'T PROVIDE THOSE

15 SERVICES, THEN YOU WOULD SEND THEM TO PRISON FOR TECHNICAL

16 VIOLATIONS.

17         **THE WITNESS:**  WHAT HAPPENS IS THEY AMASS MULTIPLE

18 VIOLATIONS AND ESSENTIALLY EXHAUST THEIR LOCAL CUSTODIAL TIME.

19         WE HAVE A LIMIT OF 365 DAYS IN LOCAL CUSTODY THAT

20 THEY CAN GET.  SO AS THEY ACCRUE THESE TECHNICAL VIOLATIONS AND

21 ADDITIONAL CUSTODIAL TIME RELATED TO IT, AT SOME POINT THEY RUN

22 OUT OF LOCAL JURISDICTION.  AND BECAUSE OF THE NATURE OF THEIR

23 SENTENCE, THEY ARE COMMITTED TO THE STATE PRISON SYSTEM.

24         **JUDGE KARLTON:**  WHY IS IT THAT YOU'RE LIMITED TO 365

25 DAYS LOCAL?  IS IT A STATUTE?

1          **THE WITNESS:**  THAT'S STATUTORY.

2 **BY MS. BARLOW:**

3 **Q.**  NOW, WE'VE HAD A LOT OF CONVERSATIONS THROUGHOUT THIS CASE

4 ABOUT TECHNICAL -- PAROLE VIOLATIONS AND TECHNICAL PROBATION

5 VIOLATIONS.  AND THERE HAVE BEEN SOME OPINIONS EXPRESSED THAT

6 THEY ARE NOT IMPORTANT.

7          DO YOU AGREE WITH THAT OPINION?

8 **A.**  WELL, I GUESS IT DEPENDS ON THE NATURE OF THE TECHNICAL

9 VIOLATION. I THINK THAT SOMEBODY WHO IS TESTING POSITIVE FOR

10 DRUGS IN THEIR SYSTEM IS TELLING YOU THAT THEY ARE DOING

11 SOMETHING ILLEGAL.

12          THEY ARE TAKING DRUGS.  IT DOESN'T GET IN THERE

13 WITHOUT INGESTING AN ILLEGAL SUBSTANCE. SO AT SOME POINT THAT

14 MEANS THEY COULD HAVE BEEN ARRESTED AT SOME POINT IN TIME FOR

15 POSSESSING THOSE ILLEGAL SUBSTANCES.  THE FACT THAT WE GOT A

16 DIRTY DRUG TEST IS INDICATIVE OF THAT.

17          DOES THAT MEAN THAT THEY SHOULD GO TO PRISON?  YOU

18 KNOW, THAT'S -- I GUESS THAT'S A DEBATE THAT WE COULD HAVE AND

19 WE HAVE HAD AT THE BALLOT BOXES AS WELL AS OTHER PLACES.

20          SO I GUESS I WOULDN'T NECESSARILY AGREE THAT A

21 TECHNICAL VIOLATION IS NOT A BIG DEAL.  SOMEBODY WHO IS ORDERED

22 TO ATTEND A DOMESTIC VIOLENCE CLASS, FOR INSTANCE, AND WHO IS

23 ORDERED TO ATTEND A DOMESTIC VIOLENCE CLASS AND REFUSES TO DO

24 THAT, I THINK THAT THE VICTIM WOULD TELL YOU THAT THEY DON'T

25 SEE THAT AS A TECHNICAL VIOLATION; THAT THAT MAKES THEM FEEL

1  LIKE THEY ARE AT SIGNIFICANT RISK FOR FUTURE REOFFENDING SO --

2  Q.  IN YOUR VIEW, DO PROBATIONERS WHO FAIL TO COMPLY WITH THE

3  TERMS OF THEIR PROBATION BY FAILING TO ATTEND A REQUIRED CLASS

4  OR FAILING TO MEET WITH A PROBATION OFFICER OR GETTING DIRTY

5  DRUG TESTS, ARE THEY AT HIGHER RISK TO REOFFEND?

6  A.  WELL, I THINK THEY HAVE ALREADY IN SOME INSTANCES

7  REOFFENDED.  THEY JUST HAVEN'T BEEN ARRESTED.  SUCH AS THE

8  DIRTY DRUG TEST, THAT INDIVIDUAL POSSESSED DRUGS, WHICH IS

9  TECHNICALLY A NEW OFFENSE.  THEY JUST WEREN'T CAUGHT.  SO I

10 GUESS I WOULD HAVE TO SAY, YES, IN SOME INSTANCES.

11 Q.  NOW, IN YOUR REPORT YOU INDICATE THAT YOU BELIEVE THAT

12 THERE WOULD BE MORE CRIME AS A RESULT OF A RELEASE ORDER WHERE

13 PEOPLE ARE LET OUT EARLY FROM THEIR SENTENCES, WHICH HAS BEEN

14 PROPOSED AT LEAST AS ONE ALTERNATIVE.

15         DO YOU BELIEVE -- CAN YOU EXPLAIN WHY YOU BELIEVE

16 THAT THAT WOULD RESULT IN MORE CRIME?

17 A.  I THINK IN JUST LOOKING AT THE MECHANISM FOR REDUCING

18 POPULATION, IF IT IS, IN FACT, AN EARLY RELEASE, IT GOES BACK

19 TO WHAT I TALKED ABOUT EARLIER, WHICH IS INCAPACITATION.

20 SOMEBODY WHO IS INCAPACITATED IS MUCH LESS LIKELY TO CREATE OR

21 TO COMMIT AN OFFENSE IN THE COMMUNITY THAN SOMEONE WHO IS NOT.

22         SO IF WE ALLOW THEM TO COME OUT TWO MONTHS EARLIER,

23 THEY HAVE 60 DAYS OF ADDITIONAL OPPORTUNITY TO REOFFEND.

24         WE HAVE STATISTICS OR DEPARTMENT OF CORRECTIONS HAS

25 STATISTICS THAT SHOWS THAT MANY OF THESE PEOPLE HAVE RECIDIVISM

1   RATES 60 PERCENT OR GREATER.  SO IF YOU ALLOW THEM MORE

2   OPPORTUNITY OR A GREATER WINDOW OF OPPORTUNITY BY BEING OUT OF

3   CUSTODY, YOU'VE ESSENTIALLY EXPOSED THE COMMUNITY TO A 60

4   ADDITIONAL DAYS OF REOFFENDING, ESPECIALLY GIVEN THE FACT THAT

5   IT'S ACKNOWLEDGED THAT THERE'S VERY LITTLE REHABILITATIVE

6   TREATMENT GOING ON WITHIN CDCR.  SO THEY ARE COMING OUT WITHOUT

7   ANY TREATMENT OR VIRTUALLY NO TREATMENT.

8           AND TO THINK THAT RELEASING THEM 60 DAYS EARLY OR 90

9   DAYS EARLY IS NOT GOING TO CREATE CRIME, ANY ADDITIONAL CRIME,

10  I GUESS ASSUMING THAT WE CATCH THEM THE FIRST TIME THEY COMMIT

11  THE OFFENSE, YOU COULD PROBABLY ARGUE THAT. BUT WE DON'T DO

12  THAT.

13  **Q.**  WHAT DO YOU MEAN?

14  **A.**  WELL, IF THE FIRST TIME -- JUST DOING THE SCENARIO, IF THE

15  FIRST TIME YOU COMMIT AN OFFENSE YOU'RE ARRESTED FOR IT, THEN

16  YOU COULD -- YOU COULD SAY THAT:

17              "WELL, THEN, IT DOESN'T MATTER IF THEY ARE OUT

18  60

19              DAYS EARLY, BECAUSE IF THEY COMMIT THE OFFENSE THREE

20              DAYS AFTER THEY ARE OUT, WHETHER IT'S 60 DAYS FROM

21              NOW OR NOW, AND THEY ARE ARRESTED FOR IT, THEN, YES,

22              THERE'S NO ADDITIONAL CRIME."

23          BUT IF THEY ARE NOT ARRESTED FOR THE OFFENSE WHICH

24  MANY, MANY OFFENSES RESULT IN NO ARREST, YOU'VE GIVEN THEM 60

25  ADDITIONAL DAYS OR OPPORTUNITY OF 60 ADDITIONAL DAYS TO COMMIT

POWERS - DIRECT / BARLOW          1037

 1  ADDITIONAL CRIMES.

 2          SO, YOU KNOW --

 3  Q.  I JUST WANT TO ASK YOU ABOUT AN OPINION THAT DR. AUSTIN

 4  EXPRESSED IN HIS LAST SUPPLEMENTAL REPORT AND IN HIS

 5  DEPOSITION. HE INDICATED THAT HE BELIEVED THAT THERE MIGHT BE A

 6  VERY SMALL -- "INSIGNIFICANT" I THINK WAS HOW HE TERMED IT --

 7  BUMP IN CRIME AS A RESULT OF THE EARLY RELEASE OF PRISONERS,

 8  SAY THREE TO FOUR MONTHS PRIOR TO THE END OF THEIR TERM OVER

 9  SOME PERIOD OF TIME.  BUT THAT THAT WOULD LEVEL OUT BY THE

10  SECOND OR THIRD YEAR.

11          DO YOU AGREE WITH THAT?

12  A.  NO.  AND I HEARD MR. AUSTIN'S PRESENTATION.  AND I GUESS

13  THE BEST WAY I COULD PUT IT IS IF WE HAVE A BATHTUB, AND THE

14  SPIGOT IS ON AND ALL OF A SUDDEN WE SAY:

15              "YOU CAN ONLY FILL THAT BATHTUB UP TWO-THIRDS

16          FULL.  YOU HAVE TO TAKE A THIRD OF THE WATER OUT,"

17  BUT YOU DO NOTHING TO THE SPIGOT, TWO YEARS FROM NOW YOU'VE

18  STILL GOT TO DO SOMETHING WITH ALL THAT WATER THAT IS FLOWING

19  IN.

20          WHAT DO YOU DO?  IN OTHER WORDS, IF WE'RE STILL

21  GOING TO HAVE 140,000 PEOPLE COMING INTO THE STATE PRISON

22  SYSTEM, IF THERE'S A CAP OF AN 110,000 AND WE'RE AT 160 NOW,

23  WHERE DO WE PUT THOSE 140,000 PEOPLE THAT ARE COMING INTO THE

24  STATE PRISON SYSTEM IN YEAR TWO, IN YEAR THREE, IN YEAR FOUR?

25          I CAN'T -- THE CONCEPT OF A ONE-YEAR BLIP DOESN'T

1   MAKE -- IT DOESN'T -- IT DOESN'T MAKE SENSE TO ME HOW WE'VE GOT

2   TO FIND A PLACE TO PUT THOSE OTHER PEOPLE.

3        DO WE PUT THEM BACK IN LOCAL CUSTODY?  DO WE HOLD

4   THEM?  I THINK ONE OF THE JUSTICES SAID THAT, YOU KNOW, DO WE

5   KEEP THEM LOCALLY?

6        WE HOLD THEM TWO MONTHS LONGER IN LOCAL CUSTODY, AND

7   WE JUST LET THEM OUT LOCALLY.  WELL, THERE'S AN IMPACT THERE.

8        DO WE NOT SENTENCE THEM TO PRISON?  THERE'S AN

9   IMPACT TO PROBATION THERE SO --

10  **Q.**  COULD YOU DESCRIBE A LITTLE BIT MORE ABOUT WHAT THAT IMPACT

11  IS, IN YOUR VIEW?

12  **A.**  WELL, OUR CONCERN IS THAT WHEN WE LOOK AT -- SO FAR IT

13  APPEARS THAT WE'VE JUST LOOKED AT THE STATE END OF THE SYSTEM.

14  WE HAVEN'T LOOKED AT THE IMPACTS BECAUSE IT IS A SYSTEM FROM

15  DAY ONE ALL THE WAY THROUGH THE END OF THEIR PAROLE PERIOD.

16  IT'S NOT JUST A STATE SYSTEM.  IT'S AN ENTIRE SYSTEM.

17        AND SO IF WE'RE REQUIRED TO KEEP MORE PEOPLE

18  LOCALLY, WHICH TO MAINTAIN 110,000 IF YOU DON'T MAKE SOME

19  DRASTIC SENTENCE STRUCTURE CHANGES, WHICH IN THIS STATE THERE

20  HAS BEEN NO WILL TO THIS POINT TO DO, YOU'RE GOING TO HAVE

21  140,000 PEOPLE BEING COMMITTED. WE'RE GOING TO HAVE TO KEEP

22  SOME OF THOSE.

23        DO WE KEEP THEM?  DO WE CHANGE THE STATUTORY

24  REQUIREMENT THAT WE CAN ONLY HOLD THEM FOR 365 DAYS TO MAKE IT,

25  YOU KNOW, 365 PLUS AN ADDITIONAL SIX MONTHS?

1          WE DON'T HAVE THE CAPACITY LOCALLY TO DO THAT.

2          DO WE PUT MORE INDIVIDUALS, BACK THEM OUT OF THE

3   SYSTEM AND PUT THEM ON PROBATION INSTEAD OF REFERRING?  ON THE

4   NATURAL, WILL COURTS NOT SEND PEOPLE TO PRISON?  WILL THEY NOT

5   MAKE THE COMMITMENT TO THE STATE PRISON SYSTEM, IF IT MEANS

6   THEY ARE GOING TO BE PUT ON PROBATION?

7          IT MEANS THAT THE PROSECUTION IS GOING TO HAVE TO

8   HAVE MORE ATTORNEYS TO DEAL WITH IT.  IT MEANS THE PUBLIC

9   DEFENDER IS GOING TO HAVE TO HAVE MORE RESOURCES.  MEANS

10  PROBATION, MEANS MENTAL HEALTH.  MEANS PUBLIC HEALTH AS WE KEEP

11  THESE PEOPLE LOCAL.  IT REALLY TURNS INTO A SHIFT FROM USING

12  STATE RESOURCES.  AND IF THERE IS NO SHIFT OF THE STATE

13  RESOURCES TO THE LOCALS, WE END UP WITH WHAT WE CALL "AN

14  UNFUNDED MANDATE," WHICH IS WE HAVE TO DEAL WITH THESE PEOPLE.

15  WE DON'T HAVE THE RESOURCES TO DEAL WITH WHAT WE HAVE RIGHT

16  NOW.

17         HOW ARE WE GOING TO DEAL WITH THIS ADDITIONAL

18  POPULATION THAT EITHER BACKS OUT OF THE SYSTEM OR COMES OUT THE

19  BACK DOOR AND GETS DUMPED INTO THE LOCAL SYSTEM WITH NO

20  REHABILITATION?

21  **Q.**  SO, IS IT -- IS IT YOUR TESTIMONY THAT YOU DON'T HAVE

22  ENOUGH RESOURCES IN STANISLAUS COUNTY NOW TO DEAL WITH THE

23  PEOPLE YOU ALREADY HAVE ON PROBATION?  SO IF YOU RETAINED MORE

24  PEOPLE ON PROBATION, WHERE WOULD THEY GO?

25  **A.**  GOOD QUESTION. THEY WOULD GO -- PROBABLY WHAT WOULD HAPPEN

1  IN OUR SYSTEM THE INDIVIDUALS WHO GO TO STATE PRISON ARE THE

2  HIGHER ENDS OF THE SYSTEM.

3             SO WE WOULD KEEP THOSE INDIVIDUALS, MONITOR THEM.

4  BUT WE WOULD HAVE TO CARVE OUT SOME ON THE LOWER ENDS OF OUR

5  SUPERVISION AND BANK MORE CASES, PUT MORE CASES INTO THE FILE

6  CABINET.

7  **Q.**  NOW, IN TERMS OF LOCAL CUSTODIAL OPPORTUNITIES, LET'S SAY

8  THE COUNTY JAIL, STANISLAUS COUNTY JAIL IS OPERATING UNDER A

9  CAP, CORRECT?

10  **A.**  YES, THEY HAVE A CONSENT DECREE.

11  **Q.**  NOW, ARE YOU FAMILIAR WITH THE FACT THAT THEY ARE ALREADY

12  RELEASING PEOPLE BOTH PRESENTENCE AND POSTSENTENCE EARLY FROM

13  THE COUNTY JAIL?

14  **A.**  THAT'S MY UNDERSTANDING, YES.

15  **Q.**  SO HOW WOULD IT AFFECT YOUR ABILITY TO KEEP SOMEBODY IN A

16  CUSTODIAL SETTING IF WE HAVE A CAP AT THE STATE LEVEL AND A CAP

17  AT THE COUNTY LEVEL?

18  **A.**  AND I CAN GIVE YOU A PRACTICAL EXAMPLE FROM OUR

19  PERSPECTIVE. WE HAVE INDIVIDUALS NOW WHO ARE BOOKED BY MY

20  DEPARTMENT FOR VIOLATIONS OF PROBATION FOR SOME OF THOSE

21  TECHNICAL VIOLATIONS THAT WE TALKED ABOUT, SUCH AS A DIRTY DRUG

22  TEST.  WE BOOK THEM INTO OUR COUNTY JAIL.  NOW, THEY ARE

23  RELEASED. SO WE DON'T HAVE THE ABILITIES -- WHEN WE BOOKED THEM

24  IN PART OF THE REASONING BEHIND BOOKING THEM IN IS TO DRY THEM

25  OUT, CLEAN THEM UP SO THAT WE CAN GET THEM BACK INTO A PROGRAM.

1    BUT IF THEY ARE RELEASED BECAUSE OF A POPULATION CAP

2 THEY GO RIGHT BACK ONTO THE STREET.  AND BELIEVE ME, THEIR NEXT

3 DRUG TEST WILL BE DIRTY, AS WELL.  SO THEN WE START GETTING

4 MULTIPLE VIOLATIONS OF PROBATION.

5    AND THAT'S WHERE I SAID I BELIEVE IN MY REPORT THAT

6 THEY GET INTO THIS STREAM, THE WATERFALL, THE PRISON SYSTEM

7 RIGHT THERE, AND THEY ARE JUST SWEPT RIGHT INTO IT.

8 **Q.**  AND YOU BELIEVE THAT WITH APPROPRIATE LEVEL OF FUNDING OF

9 PROBATION SERVICES THAT YOU COULD STOP THAT STREAM?

10 **A.**  WELL --

11 **Q.**  AT LEAST TRICKLE IT DOWN?

12 **A.**  ALL RIGHT.  I DON'T KNOW ABOUT STOP.  I THINK WE COULD

13 DIVERT SOME PEOPLE INTO SOME EDDIES IN THAT STREAM, TO USE THAT

14 ANALOGY, AND HOLD THEM LOCALLY.

15    AND I'M NOT SO NAIVE TO THINK THAT IT CAN BE DONE ON

16 EVERY PERSON OUT THERE.  BUT IF YOU LOOK AT THE AMOUNT OF MONEY

17 THAT IS SPENT, WHICH I THINK THE ARGUMENT IS IT'S NOT ENOUGH,

18 ON A STATE PRISONER -- I'VE HEARD ESTIMATES OF $40,000 -- YOU

19 DIVERT THIS PERSON, DON'T LET THEM EVER GET TO THE FRONT DOOR.

20 YOU TAKE SOME OF THAT MONEY AND PUT IT INTO A MODEL WHERE YOU

21 FRONT LOAD THE SYSTEM, YOU SAVE MONEY.  THE STATE SAVES MONEY,

22 QUITE FRANKLY.

23    GIVE COUNTY SOME OF THE MONEY.  THE STATE SAVES THE

24 MONEY BECAUSE THEY DON'T HAVE TO PAY $40,000 TO LOCK THEM UP.

25 THEY DON'T HAVE TO BUILD AS MANY FACILITIES.

1          WE HAD AN MODEL IN CALIFORNIA THAT DID EXACTLY THAT.

2   IT WAS THE SUBSIDY MODEL STARTED IN 1963. I WAS THREE, SO I

3   DON'T REMEMBER.  BUT IT WAS EXACTLY THAT MODEL.

4          AND IT WAS A LITTLE OVER A DECADE LONG. AND

5   INFORMATION THAT I HAVE IS THAT DURING THE COURSE OF THAT

6   MODEL -- AND BASICALLY WHAT IT WAS WAS THE STATE INCENTIVIZED

7   COUNTIES FOR NOT SENDING OFFENDERS TO STATE PRISON.  YOU GOT

8   MONEY IF YOU WERE ABLE TO REDUCE YOUR PRISON COMMITMENT RATE.

9          COUNTIES TOOK THAT MONEY AND SPENT IT ON PROBATION,

10  ON COUNSELLING PROGRAMS, PREVENTION PROGRAMS.  THAT WAS BACK

11  BEFORE WE KNEW WHAT ACTUALLY WORKED.

12         AND YOU SAW A 30 PERCENT REDUCTION IN THE STATE

13  PRISON POPULATION.  THE STATE ACTUALLY CLOSED, THEY SHUTTERED

14  EIGHT PRISONS USING THAT MODEL.

15         AND THAT, LIKE I SAID, WAS BEFORE WE EVEN KNEW WHAT

16  EVIDENCE-BASED PROGRAMS WERE AND WHAT REALLY WORKED.

17  **Q.**  COULD YOU DESCRIBE FOR THE COURT WHAT "EVIDENCE-BASED

18  PROGRAMMING" IS?

19  **A.**  WELL, THERE'S A LOT OF RESEARCH OUT THERE REGARDING THE

20  TYPES OF PROGRAMS THAT WORK WITH OFFENDERS. THERE'S A LOT OF

21  RESEARCH THAT TALKS ABOUT THE TYPES OF PROGRAMS THAT DON'T WORK

22  WITH OFFENDERS.  WE KNOW MUCH MORE TODAY ABOUT WHAT DOESN'T

23  WORK WITH OFFENDERS. BOOT CAMPS, FOR INSTANCE, ARE NOT

24  EFFECTIVE WITH OFFENDERS AS FAR AS REHABILITATING THEM.

25         WE KNOW THAT PROGRAMS LIKE FUNCTIONAL FAMILY

1  THERAPY, WE KNOW THAT COGNITIVE BEHAVIORAL-BASED PROGRAMS ARE

2  VERY EFFECTIVE AT REDUCING RECIDIVISM.

3           THERE'S RESEARCH OUT THERE THAT SHOWS SOME PROGRAMS

4  ARE EFFECTIVE TO OVER 30 PERCENT REDUCTIONS IN RECIDIVISM. AND

5  YOU CAN DO IT FOR PENNIES ON THE DOLLAR COMPARED TO WHAT IT

6  COSTS US TO LOCK ONE OF THESE GUYS IN THE STATE FACILITY.

7           YOU PROVIDE THEM MENTAL HEALTH PROGRAMMING.  IT'S

8  MUCH CHEAPER TO PROVIDE THEM MENTAL HEALTH PROGRAMMING LOCALLY

9  THAN IT IS TO GO BUILD, AS THE RECEIVER HAS TALKED ABOUT, $8

10 BILLION WORTH OF NEW FACILITIES.

11          DO IT EARLIER.  IT'S LIKE A VACCINE.  YOU GIVE THEM

12 THE VACCINE, OR YOU WAIT UNTIL THEY GET THE FULL-BLOWN DISEASE.

13 WE CAN COME UP WITH SIGNIFICANT POPULATION REDUCTION BY FRONT

14 LOADING THE SYSTEM, NOT --

15          **JUDGE KARLTON:**  NOBODY'S EVER GOING PAY FOR IT.

16          **THE WITNESS:**  THAT IS THE BILLION-DOLLAR QUESTION.

17          **JUDGE KARLTON:**  SO THE REALITY IS WE CAN ALL DO

18 THESE THINGS IF SOMEBODY WOULD JUST GIVE YOU THE MONEY, AND

19 NOBODY IS GOING TO GIVE YOU THE MONEY.  AND THEN, THE QUESTION

20 IS:  WHAT DO WE DO NEXT?

21          **THE WITNESS:**  WELL, WE WILL BE BACK HERE, YOUR

22 HONOR, WOULD BE MY GUESS.

23          **JUDGE REINHARDT:**  IF THERE WERE A POPULATION CAP ON

24 PRISONS, WOULDN'T IT BE TO THE STATE'S ADVANTAGE TO GIVE YOU

25 THAT MONEY?

1      **THE WITNESS:**  WELL, WITH AN $11 BILLION DEFICIT I

2   DON'T SEE THE STATE THROWING A LOT OF MONEY TOWARDS COUNTIES,

3   EVEN IF THEY SAFE MONEY ON A POPULATION CAP.

4      **JUDGE REINHARDT:**  THEN THEY ARE NOT GOING TO BUILD

5   PRISONS, EITHER.

6      **THE WITNESS:**  THAT WOULD BE WHAT IT SEEMS TO BE.

7      **JUDGE REINHARDT:**  SO WE SHOULD START FROM THE

8   PREMISE THAT THERE'S NOT GOING TO BE ANYMORE MONEY SPENT ON

9   THIS PROBLEM. AND THEN, WHAT DO YOU DO IF THERE ARE

10  UNCONSTITUTIONAL CONDITIONS IN THE PRISON BECAUSE OF

11  OVERCROWDING?  IF THAT WERE THE CASE, AND THERE'S NOT GOING TO

12  BE ANYMORE MONEY SPENT TO SOLVE THE PROBLEM, IF YOU WERE A

13  JUDGE, WHAT WOULD YOU DO?

14     **THE WITNESS:**  I'D LOVE TO BE A JUDGE, BUT --

15     **JUDGE REINHARDT:**  WELL, MAYBE DEPENDING ON YOUR

16  ANSWER WE CAN --

17     **THE WITNESS:**  YOU KNOW, QUITE FRANKLY, I THINK YOUR

18  THREE-COURT PANEL HAS A TREMENDOUS AMOUNT OF INFLUENCE ON

19  POLICYMAKERS AND ON INDIVIDUALS IN POINTS OF POWER WHO CAN MAKE

20  DECISIONS TO DIVERT MONEY.

21     **JUDGE REINHARDT:**  WELL, THESE TWO GENTLEMEN HERE

22  HAVE FOR YEARS NOW TOLD THEM THAT THE CONDITIONS ARE

23  UNCONSTITUTIONAL. AND YOU'VE SAID, I THINK QUITE ACCURATELY, IT

24  DOESN'T LOOK LIKE ANYBODY'S GOING TO SPEND ANY MONEY TO CORRECT

25  THOSE CONDITIONS.

1           SO ASSUMING THAT NOBODY IS GOING TO SPEND ANY MONEY,

2    BECAUSE WE DON'T HAVE AS MUCH INFLUENCE AS YOU THINK, WHAT'S

3    THE NEXT STEP?

4           **THE WITNESS:** WELL, QUITE FRANKLY -- MAYBE I'M JUST

5    A FOOLISH OPTIMIST -- I THINK THAT REASONED MINDS CAN COME TO A

6    POINT WHERE THEY FINALLY REALIZE THAT, YOU KNOW, WE CAN PUT

7    MONEY IN THE FRONT END AND RESOLVE THIS THING MOVING FORWARD IN

8    A RESPONSIBLE WAY THAT DOES NOT NEGATIVELY IMPACT PUBLIC

9    SAFETY, OR WE CAN CONTINUE THROWING MONEY DOWN A HOLE AND BE

10   BACK HERE LITIGATING, RELITIGATING THIS THING PROBABLY AFTER

11   THE THREE OF YOU ARE RETIRED AND IN ANOTHER THREE JUDGE PANEL.

12          **JUDGE REINHARDT:** YOU MIGHT GET A BETTER ONE NEXT

13   TIME.

14          **JUDGE KARLTON:** THE QUESTION -- AT LEAST SMARTER.

15   THE QUESTION THAT IS BEING ASKED IS TERRIFICALLY SERIOUS.

16          **THE WITNESS:** YES.

17          **JUDGE KARLTON:** WE HAVE AN OBLIGATION UNDER THE

18   CONSTITUTION TO ENSURE CONSTITUTIONALLY ADEQUATE MEDICAL AND

19   MENTAL HEALTHCARE.  JUDGE HENDERSON AND I HAVE BOTH DECIDED IN

20   OUR INDIVIDUAL CASES THAT IS NOT THE CASE.

21          YOU'RE TELLING US THAT -- AND I THINK QUITE

22   ACCURATELY -- THAT IT IS VERY UNLIKELY THAT ANYBODY IS GOING TO

23   FIND ANYMORE MONEY EITHER TO BUILD MORE PRISONS OR TO PROVIDE

24   FRONT LOADING MONEY.

25          IF THE STATE WANTS TO PROTECT ITS CITIZENS, WHICH IS

1   ITS FUNDAMENTAL OBLIGATION, AND IS UNWILLING TO PAY FOR IT,

2   WHAT DO WE DO?

3           **THE WITNESS:**  AND I THINK YOU GUYS ARE WADING

4   THROUGH THAT AS WE SPEAK, AND IN SOME OF YOUR HEARINGS. AND I

5   DON'T MEAN TO BE FLIPPANT.  AND I DID NOT MEAN TO MINIMIZE.

6   AND I HAVE TO GIVE CREDIT. WE HAVE BEEN SUCCESSFUL ON THE

7   JUVENILE SIDE OF CONVINCING THE POLICYMAKERS AT THE STATE TO DO

8   EXACTLY THIS SYSTEM.

9           12, 15 YEARS AGO THE ADULT OR THE JUVENILE STATE

10  SYSTEM HAD 10,000 KIDS IN IT. AND IT WAS BUSTING AT THE SEAMS.

11  THE EXACT SAME SCENARIO THAT WE HAVE HERE IN THE ADULT SYSTEM.

12          THE STATE GAVE US MONEY AT THE FRONT END. TODAY

13  THERE'S ABOUT 20, 21, 2200 KIDS -- LOWER THAN THAT -- FEWER

14  THAN 2000 KIDS IN THE STATE SYSTEM, BECAUSE WE WERE ABLE TO GO

15  AND DO EFFECTIVE PROGRAMS WITH JUVENILES.

16          IT'S THE SAME MODEL YOU JUST TRANSITION IT TO. NOW,

17  TO GIVE CREDIT, WE WERE ABLE TO GET A HUNDRED MILLION DOLLARS

18  PUT INTO THE GOVERNOR'S BUDGET PROPOSAL TWO YEARS AGO FOR

19  EXACTLY THIS KIND OF PROPOSAL, THIS MODEL THAT I JUST PORTRAYED

20  TO YOU. IT DIDN'T MAKE IT THROUGH THE BUDGET PROCESS. SO WE'VE

21  GOT SOME INDIVIDUALS LISTENING.

22          WE JUST CAN'T PUSH IT UP THE FINAL PART OF THE HILL.

23  AND, FRANKLY, I THINK IF IT COMES DOWN TO YOU CAN SPEND

24  8 BILLION AND GET FURTHER LITIGATION, OR YOU CAN SPEND WHATEVER

25  AND REALLY SOLVE THIS PROBLEM AND MOVE FORWARD.  I HAVE TO --

1  AND MAYBE LIKE I SAID I'M BEING A -- I HAVE TO BELIEVE THAT

2  REASONED MINDS WILL SAY:

3              "WELL, THIS IS THE WAY WE NEED TO GO."

4          WHEN BACKED INTO A CORNER, LET'S LOOK AT WHAT IT

5  REALLY TAKES TO RESOLVE THIS.  ARE WE IN THE CORNER YET?  I'VE

6  TOLD THE LEGISLATURE ON MULTIPLE OCCASIONS THE DAY OF RECKONING

7  IS HERE.  I TOLD THEM THAT TWO YEARS AGO WHEN WE WERE TALKING

8  ABOUT EXACTLY THIS MODEL:

9              "THE DAY OF RECKONING IS HERE.  YOU HAVE

10 FEDERAL

11             JUDGES WHO ARE GOING TO DO THINGS TO YOU YOU'RE NOT

12             GOING TO LIKE."

13     **JUDGE REINHARDT:**  WELL, IT SEEMS NOT TO HAVE

14 FRIGHTENED THEM.

15     **THE WITNESS:**  THEY DON'T LISTEN TO ME.  MAYBE THEY

16 WILL LISTEN TO YOU.

17     **JUDGE KARLTON:**  THE ARGUMENT IS THEY DON'T LISTEN TO

18 ANYBODY. THEIR REPRESENTATIVE IS GOING TO EXPLAIN TO ME THAT'S

19 NOT TRUE.

20     **THE WITNESS:**  AND I DON'T MEAN TO BASH THE PROCESS.

21 IT'S PART OF THE PROCESS IN SACRAMENTO, AND I'M FAMILIAR WITH

22 IT. BUT, YOU KNOW --

23     **JUDGE KARLTON:**  HE'S NOT EVEN HERE.

24     **MS. WANG:**  WE'RE HERE.

25     **JUDGE KARLTON:**  OH, THAT'S WHO YOU ARE. OKAY.

 1          **MR. MITCHELL:**  THERE'S HOPE. I DON'T MEAN TO BE

 2   GLOOM AND DOOM. I THINK THERE IS A WAY TO GET IT DONE.

 3          **JUDGE KARLTON:**  I THINK YOU HAVE -- MORE POWER TO

 4   YOU -- YOUR HOPE.  BUT WE ARE FACED WITH A MOTION SOME PEOPLE

 5   MIGHT THINK WAS -- NEVER MIND THAT.  I'M ABOUT TO -- ANYWAY,

 6   THE QUESTION IS TODAY, NOT NEXT YEAR, NOT THE YEAR AFTER.

 7          WE HAVE A MOTION TODAY TO EXERCISE A VERY PROFOUND

 8   AND SERIOUS ORDER WHICH INTERFERES IN A PROFOUND WAY WITH THE

 9   STATE'S RIGHT TO RUN ITS OWN AFFAIRS.

10          AND ON THE OTHER HAND, WE HAVE A SERIOUS FAILURE OF

11   THE STATE TO PROVIDE ADEQUATE CARE.  TODAY, WITHOUT THE PROGRAM

12   BEING ACCEPTED, WHAT DO WE DO?

13          **THE WITNESS:**  YOUR HONOR, IF I COULD RESPOND.

14          **JUDGE KARLTON:**  PLEASE.

15          **THE WITNESS:**  WHAT I WOULD SAY, MY FEAR IS -- AND MY

16   ORGANIZATION, MY 59 CHIEFS UP AND DOWN THE STATE, AS WELL AS I

17   THINK THE REST OF LAW ENFORCEMENT -- OUR FEAR IS THAT IF

18   THERE'S A CAP PUT ON AND THE STATE IS LEFT OR THE SYSTEM IS

19   LEFT TO ITS OWN DEVICES TO GET TO IT. AND GIVEN OUR EXPERIENCE

20   THOSE DEVICES TEND TO BE SHOVED DOWN OUR THROATS LOCALLY --

21          **JUDGE KARLTON:**  LET ME ASK IT:  WE HAD TESTIMONY

22   EARLIER TODAY, I THINK -- YOU KNOW, SOME OF IT BLENDS INTO

23   ITSELF.  IT'S IMPOSSIBLE -- THAT NEW MEXICO, I THINK, THE

24   FEDERAL COURT SURRENDERED JURISDICTION UPON A PASSAGE OF A

25   STATUTE BY THE STATE LEGISLATURE OF SOME KIND.  IT WASN'T

1   EXPLAINED PRECISELY WHAT.

2             IN LIGHT OF WHAT YOU'RE SAYING, DO YOU THINK, IF YOU

3   HAVE AN OPINION -- AND IF YOU DON'T, THAT'S OKAY, TOO -- DO YOU

4   THINK THAT THIS COURT COULD ISSUE A CONDITIONAL ORDER SAYING:

5                  "VERY BAD THINGS ARE GOING TO HAPPEN. WE'RE

6             GOING TO DUMP GOD KNOWS HOW MANY PEOPLE OUT ON THE

7             STREET UNLESS YOU GIVE COUNTIES ENOUGH MONEY TO

8             SUPERVISE THEM IN AN APPROPRIATE WAY," TO WHICH THEY

9   SAY:

10                 "DUMP THEM OUT ON THE STREET."

11            NO, I DON'T KNOW. MAYBE THEY DO. IS THAT, IN YOUR

12  VIEW, A POSSIBILITY AS TO SOLVE WHAT APPEARS TO THIS JUDGE TO

13  BE CLOSE TO AN INSOLVABLE PROBLEM?

14            **THE WITNESS:**  WELL, YOUR HONOR, QUITE FRANKLY, WE

15  HAVE THE STATUTE ON THE BOOKS THAT THOSE OTHER STATES ARE

16  USING. WE WERE ACTUALLY ONE OF THE FIRST STATES TO PUT THE

17  STATUTE ON THE BOOKS.  IT'S JUST NEVER BEEN FUNDED.

18            **JUDGE KARLTON:**  DO YOU KNOW WHAT THAT STATUTE IS?

19            **THE WITNESS:**  NO, BUT I CAN GET IT TO YOU.  IT WAS

20  ACTUALLY SPONSORED THROUGH MY ASSOCIATION.

21            **JUDGE KARLTON:**  WOULD YOU GIVE IT TO YOUR LAWYER?

22            **THE WITNESS:**  YES.  IT NEVER GOT THE FUNDING.  IF

23  YOU READ IT -- AND MAYBE MR. SPECTER KNOWS THE NUMBER. IF YOU

24  READ IT, IT'S A VERY COMPREHENSIVE -- AND TALKS MUCH ABOUT WHAT

25  WE'RE TALKING ABOUT HERE TODAY.

1    AS TO WHAT THE STATE WOULD DO IF YOU MADE THAT

2 OFFER, YOU KNOW -- AND I WOULD SAY IT'S NOT JUST ABOUT FUNDING

3 FOR PROBATION. I MEAN, AS MUCH AS I WOULD LOVE TO SEE

4 ADDITIONAL FUNDING, IT'S ALSO FUNDING FOR MENTAL HEALTH

5 PROGRAMS AND THE KINDS OF THERAPEUTIC AND REHABILITATIVE

6 PROGRAMS THAT THEY NEED THAT THEY ARE NOT CURRENTLY GETTING

7 NOW.

8    **JUDGE REINHARDT:**  WELL, YOUR DECLARATION OR

9 AFFIDAVIT STATES AS AN ALTERNATIVE TO RELEASING PRISONERS THAT

10 THAT COULD BE ACCOMPLISHED. THE PROGRAM WOULD RESULT IN A

11 DESIRED POPULATION REDUCTION, AND THAT YOU COULD EXPECT 20 TO

12 25,000 -- REDUCTION OF 20 TO 25,000 PER YEAR IF THE PROGRAM

13 THAT YOU DESCRIBE WERE PUT INTO EFFECT.

14    DO YOU KNOW WHAT THE COST OF THAT PROGRAM WOULD BE?

15    **THE WITNESS:**  WE SPENT A LOT OF TIME WORKING ON THAT

16 PREVIOUSLY. I CAN TELL YOU THAT IT WOULD BE MUCH LESS THAN IF

17 WE SPENT THE $40,000 PER OFFENDER THAT THOSE 20 TO 25,000 WOULD

18 COST AT THE STATE LEVEL. THAT WOULD BE -- I CAN'T DO THE MATH

19 RIGHT NOW.

20    **JUDGE REINHARDT:**  WELL, IF WE WERE TO AGREE WITH

21 WHAT YOU DESCRIBE IN YOUR AFFIDAVIT, THEN JUDGE KARLTON'S

22 QUESTION, IF THE STATE WERE TOLD YOU HAVE A CHOICE BETWEEN

23 FUNDING THIS PROGRAM, WHICH WILL, IN EFFECT, CONSTITUTE A CAP,

24 BECAUSE YOUR PROGRAM WOULD SERVE TO REDUCE IT, YOU COULD OR --

25    **JUDGE KARLTON:**  JUST GOING TO LET THEM OUT.

1    **JUDGE REINHARDT:**  OR LET THEM OUT, WE DON'T KNOW

2   WHAT THE LEGISLATURE WOULD SAY.

3    **THE WITNESS:**  AND I THINK THAT GOES BACK TO MY

4   STATEMENT ABOUT YOU GOT TO -- WHEN THEY GET BACKED INTO A

5   CORNER, I THINK AT SOME POINT, YOU KNOW -- ARE THEY THERE YET.

6   I CAN'T TELL YOU THAT.

7    **JUDGE REINHARDT:**  BUT THAT WOULD ALSO REQUIRE

8   ACCEPTING YOUR THEORY THAT IF THAT PROGRAM WERE FUNDED IT WOULD

9   ACHIEVE THE POPULATION CAP.

10    **THE WITNESS:**  WELL, AND I THINK -- AND I REFERRED IN

11   SOME OF MY DEPOSITION TESTIMONY -- IT REALLY COMES DOWN TO

12   DOING THE MATH. IF THERE ARE 140,000 ADMISSIONS, WHICH THE

13   NUMBER 141,000, WHICH IS THE NUMBER I'VE HEARD, 50,000 ARE NEW

14   COMMITMENTS OUT OF THE COURT; 90,000 ARE THE CHURNERS, THE

15   PAROLE VIOLATOR CHURNERS.

16    IF YOU TAKE IN YOUR ONE -- LET'S SAY WE ARE ABLE TO

17   TAKE 10,000 OUT OF THAT SYSTEM, 10 OF THE 50,000, YOU REDUCE

18   THAT NUMBER.  BUT THEY ALSO DON'T GET A CHANCE TO BECOME THAT

19   90,000 IN YEAR TWO THAT ARE CHURNERS THAT CLOG THE SYSTEM, YOU

20   KNOW, TO THE POINT OF OVERLOAD.

21    AND IF YOU ARE ABLE TO DO THAT FOR TWO YEARS OR

22   THREE YEARS, PRETTY SOON -- BECAUSE IT MAGNIFIES OR MULTIPLIES

23   -- YOU'RE DOING EXACTLY WHAT HAPPENED FROM 1965 TO 1978 OR

24   1979.

25    YOU HAVE A DRAMATIC REDUCTION IN YOUR POPULATION.

1   THE EXACT SAME THING IS WHAT HAPPENED ON THE JUVENILE SIDE WITH

2   RESPECT TO THE STATE JUVENILE INMATE POPULATION. YOU ARE

3   20 PERCENT OF WHAT IT WAS A DECADE AGO.

4           **JUDGE REINHARDT:**  SO YOU COULD ORDER A CAP, THEN,

5   AND SAY THE WAY TO MEET THIS CAP, HERE'S ONE ALTERNATIVE THAT

6   YOU MIGHT TRY TO IMPLEMENT.  BUT IT WOULDN'T DO ANY HARM TO

7   HAVE A CAP IF IT COULD FORCE YOUR PROGRAM.

8           **THE WITNESS:**  IF THE RESOURCES ARE APPROPRIATELY PUT

9   IN, AND YOU'RE GIVEN THE TIME TO GET VERSUS -- I THINK THAT

10  ALTERNATIVE VERSUS "LET'S THROW THE DOOR OPEN, AND IN SIX

11  MONTHS FROM NOW WE WILL BE THERE," YOU KNOW, WE CAN -- YEAH.

12  I'D PREFER THAT ALTERNATIVE TO "LET'S JUST GET THERE TOMORROW."

13          NOT THAT IT'S MY CHOICE, QUITE FRANKLY, BUT --

14          **MS. BARLOW:**  MAY I RESUME?  THANK YOU, YOUR HONORS.

15  **BY MS. BARLOW:**

16  **Q.**  COULD YOU JUST EXPLAIN WHY YOU THINK IT WOULD BE MORE

17  EFFECTIVE AT THE FRONT END THAN THE BACKEND IN TERMS OF PUBLIC

18  SAFETY?

19  **A.**  WELL, ONE OF OUR CONCERNS OR ONE OF THE CONCERNS THAT I

20  HAVE IS THAT WHEN YOU PUT SOMEONE INTO THE STATE PRISON SYSTEM,

21  THEY DON'T GET BETTER. AND IN MANY INSTANCES THEY GET WORSE. SO

22  WHEN THEY COME OUT -- SO YOU PUT SOMEONE WHO IS A LOW RISK, LOW

23  LEVEL PERSON INTO AN ENVIRONMENTS WITH HIGH RISK INDIVIDUALS,

24  THEY DON'T NATURALLY GET BETTER. THEY GRAVITATE UP.  SO WHEN

25  THEY COME OUT, THEY ARE WORSE OFF.

1        SO FROM OUR PERSPECTIVE WE'D MUCH RATHER KEEP THE

2   DEVIL WE KNOW, WORK WITH THEM.  WE KNOW THEM.  WE HAVEN'T LOST

3   TRACK.  AND "THE DEVIL" IS PROBABLY NOT THE BEST WORD.  BUT

4   KEEP THE INDIVIDUAL WE KNOW. WE'VE ALREADY STARTED WORKING WITH

5   THEM, AS OPPOSED TO 18 MONTHS DOWN THE LINE WHEN THEY HAVE BEEN

6   PUT INTO A SYSTEM THAT MAKES THEM WORSE, GETTING THEM BACK AND

7   TRYING TO MAKE SOMETHING BETTER.  IT GOES BACK TO MY COMMENT

8   ABOUT LET'S VACCINATE THEM HERE AND NOT LET THEM GET THE

9   DISEASE THERE.

10       WE CAN DO IT MUCH CHEAPER.

11       **JUDGE REINHARDT:**  CAN I JUST PUT MY QUESTION YOU TO

12   SOMEWHAT DIFFERENTLY?  I DON'T THINK IT WAS REALLY PUT

13   ADEQUATELY.

14       IF WE TAKE YOUR AFFIDAVIT SERIOUSLY, WHICH IS IF YOU

15   CAN MEET A CAP WITH YOUR ASSISTANCE, THEN THERE REALLY SHOULD

16   BE NO OBJECTION TO A CAP, BECAUSE YOU BELIEVE THAT THE STATE

17   CAN MEET THE CAP IF IT ACTS PROPERLY. IT DOESN'T HAVE TO

18   RELEASE ANYBODY TO MEET THE CAP. ALL IT HAS TO DO IS HELP THE

19   COUNTIES PROPERLY.

20       **THE WITNESS:**  LET'S NOT GET THEM --

21       **JUDGE REINHARDT:**  SO IF THE COURT JUST SIMPLY

22   ORDERED A CAP, IT'S UP TO THE STATE TO DECIDE WHETHER TO OPEN

23   THE DOORS OR WHETHER TO FUND YOUR SYSTEM.

24       **THE WITNESS:**  WELL --

25       **JUDGE KARLTON:**  I'M NOT PREPARED TO SAY THAT YET.

1          **JUDGE REINHARDT:**  NO.  NO. THAT'S A QUESTION.

2          **JUDGE KARLTON:**  YES.

3          **THE WITNESS:**  BUT I GUESS WHAT I WOULD SAY IS IF WE

4    DID THIS --

5          **JUDGE REINHARDT:**  YES.

6          **THE WITNESS:**  MY PROFESSIONAL JUDGMENT WOULD BE YOU

7    WOULDN'T NEED A CAP.  IT WOULD ON THE NATURAL REDUCE

8    SIGNIFICANTLY.

9          **JUDGE REINHARDT:**  WELL, IT WOULD --

10         **THE WITNESS:**  NOT THAT YOU WOULDN'T WANT TO IMPOSE

11   ONE JUST TO MAKE SURE AND KEEP US ON TRACK.

12         **JUDGE REINHARDT:**  WELL, THE PURPOSE OF THE CAP WOULD

13   BE TO GIVE THE STATE A CHOICE OF HOW TO GET THERE.  WITHOUT THE

14   CAP, AS YOU SAY, THE STATE'S NOT GOING TO FUND YOU.

15         **THE WITNESS:**  AND I GUESS OUR FEAR IS IF YOU GIVE

16   THE STATE A CHOICE --

17         **JUDGE KARLTON:**  THEY ARE GOING TO DO WHAT THEY HAVE

18   ALWAYS DONE, BECAUSE THAT'S WHAT THEY KNOW HOW TO DO.

19         **THE WITNESS:**  YOU COULD ARGUE THAT.

20         **JUDGE KARLTON:**  YES.

21         **MS. BARLOW:**  THANK YOU, YOUR HONORS.

22   **BY MS. BARLOW:**

23   Q.  MR. POWERS, IF WE HAVE FOLKS -- WE HAVE A CHOICE BETWEEN

24   SAYING FOLKS THAT ARE IN PRISON ALREADY, YOU'VE INDICATED THEY

25   GET WORSE, NOT BETTER.  WE'RE GOING TO LET THEM OUT EARLY.

1  THREE, FOUR MONTHS EARLY, LET'S SAY, AS DR. AUSTIN PROPOSES, OR

2  WE'RE GOING TO DO SOMETHING DIFFERENT AT THE FRONT END.  WE'RE

3  GOING TO TRY TO KEEP THEM FROM GETTING THERE.  AND WE CAN DO

4  THAT BETTER AND CHEAPER. YOU WOULD PREFER THE FORMER.  OR THE

5  LATTER, RATHER.

6  **A.**  THE LATTER.

7  **Q.**  THE KEEPING THEM OUT, THE FRONT END, RIGHT?

8  **A.**  THE FRONT END, YES, MA'AM.

9  **Q.**  AND YOU'VE INDICATED IN RESPONSE TO ONE OF THE JUDGES'

10  QUESTIONS EARLIER THAT THAT HAS SORT OF A DOUBLE BONUS EFFECT.

11  NOT ONLY DO YOU KEEP THEM OUT IN THE FIRST PLACE, BUT YOU KEEP

12  THEM OUT OF THAT POOL OF CHURNERS, RIGHT?

13  **A.**  CORRECT.

14  **Q.**  DOES DR. AUSTIN'S PROPOSAL DO THAT, IF YOU JUST LET PEOPLE

15  OUT THREE MONTHS EARLY WITH NO PROGRAM AND NO RISK ASSESSMENT?

16          **MS. NORMAN:**  OBJECTION.  I BELIEVE THAT IS

17  MISCHARACTERIZING DR. AUSTIN'S TESTIMONY.

18          **MS. BARLOW:**  THAT'S EXACTLY WHAT HE TESTIFIED.

19          **JUDGE KARLTON:**  JUST TAKE OUT DR. AUSTIN.  WE WILL

20  ARGUE ABOUT THAT IF WE EVER GET THIS CASE OVER WITH, WHICH I

21  DOUBT. THE QUESTION IS --

22          **THE WITNESS:**  NO, THEY STILL BECOME CHURNERS.

23          **JUDGE KARLTON:**  THERE YOU GO.

24          **THE WITNESS:**  THEY WILL STILL BE CHURNERS.  THEY

25  WILL STILL BE PART OF THAT 90,000.  THEY JUST GOT RELEASED TWO

1   MONTHS EARLY.  NOW, IF YOU THROW IN EARLY DISCHARGE FROM

2   PAROLE, THEN THEY ARE NOT CHURNERS.  THEY ARE BACK IN MY COUNTY

3   WITH THE 60 PLUS PERCENT RECIDIVISM RATE COMING BACK THROUGH

4   OUR COURT SYSTEM, BACK THROUGH THE JAIL SYSTEM, AND BACK

5   THROUGH PROBATION.  AND WE DO THIS ALL OVER AGAIN.

6           SO YOU HAVE NOT ACCOMPLISHED ANYTHING THERE EXCEPT

7   TO GET THEM BACK ON THE STREETS 60 DAYS EARLY.

8   **BY MS. BARLOW:**

9   **Q.**  AND IN YOUR VIEW THAT WOULD HAVE A NEGATIVE IMPACT ON

10  PUBLIC SAFETY?

11  **A.**  THAT'S MY OPINION, YES.

12  **Q.**  JUST A COUPLE OF QUICK FOLLOW-UP QUESTIONS.  IN TERMS OF

13  THE PROBATIONERS THAT YOU HAVE OR THE PAROLEES COMING OUT OR

14  ANYBODY THAT MIGHT BE GETTING RELEASED, IN YOUR VIEW ARE THERE

15  ADEQUATE MENTAL HEALTH AND MEDICAL RESOURCES TO SERVICE THOSE

16  FOLKS?

17  **A.**  NO, NOT EVEN CLOSE.

18  **Q.**  SO IF -- AND WE'RE TALKING ABOUT THE PEOPLE THAT ARE

19  ALREADY --

20  **A.**  CORRECT.

21  **Q.**  -- THERE. SO IF MORE PEOPLE COME INTO THE COMMUNITY WITH

22  MEDICAL AND MENTAL HEALTHCARE NEEDS, THAT PROBLEM IS ONLY GOING

23  TO GET WORSE?

24  **A.**  CORRECT.

25  **Q.**  AND YOU'VE INDICATED, TOO, THAT YOU HAVE A CONCERN ABOUT

1    INTRODUCING ADDITIONAL PAROLEES INTO THIS COMMUNITY BECAUSE OF

2    FAMILY RELATIONSHIPS?  CAN YOU EXPLAIN THAT?

3    **A.**  WELL, MANY TIMES VICTIMS OF CRIME ARE FAMILY MEMBERS. SO

4    YOU HAVE ADDITIONAL VICTIMS WITHIN THE FAMILY.  IT FRAGMENTS

5    THE FAMILY.  THEY END UP NEEDING TO REQUIRE ADDITIONAL SOCIAL

6    SERVICE INTERVENTION AND THINGS LIKE THAT.

7            ADDITIONALLY, RESEARCH SHOWS IN A JUVENILE

8    PERSPECTIVE -- AND WE ARE RESPONSIBLE FOR ALL JUVENILES ON

9    PROBATION IN OUR COUNTY -- THAT A RISK FACTOR FOR DELINQUENCY

10   IS HAVING A FAMILY MEMBER ON PROBATION OR PAROLE IN THE FAMILY,

11   IN THE HOUSEHOLD.

12           SO IF YOU BRING SOMEBODY BACK ON PROBATION OR

13   PAROLE, DOESN'T MATTER IF YOU PUT THEM IN THE HOUSEHOLD, AND

14   THEY HAVEN'T BEEN OFFERED TREATMENT OR REHABILITATION, AND THEY

15   ARE STILL CONTINUING TO DO THE THINGS THAT GOT THEM IN THERE IN

16   THE FIRST PLACE, YOU'RE EXPOSING THE CHILDREN OF THAT FAMILY TO

17   ADDITIONAL RISK FACTORS, WHICH JUST PERPETUATES THE CYCLE.

18           THEN THEY COME INTO MY SYSTEM AS JUVENILES.  THEY

19   GRADUATE INTO IT AS AN ADULT, AND THEN WE DO THIS ALL OVER

20   AGAIN.

21   **Q.**  ALL RIGHT.  NOW, WAS THE STATUTE YOU'RE REFERRING TO

22   EARLIER THE COMMUNITY CORRECTIONS ACT?

23   **A.**  YES.

24   **Q.**  OKAY.

25           **MS. BARLOW:**  DOES THAT HELP THE COURT, THE COMMUNITY

1  CORRECTIONS ACT?

2          **JUDGE KARLTON:**  NO, I NEED THE CITATION.

3          **MS. BARLOW:**  WE WILL GET IT FOR YOUR HONOR.

4          **JUDGE KARLTON:**  ALL RIGHT.

5          **MS. BARLOW:**  JUST WANTED TO MAKE SURE.

6  **BY MS. BARLOW:**

7  **Q.**  JUST A COUPLE OF QUESTIONS.  YOU TALKED ABOUT 18 TO 25 YEAR

8  OLDS --

9          **JUDGE KARLTON:**  LET ME INTERRUPT FOR A MOMENT. WE

10 HAD "A COUPLE OF QUESTIONS" JUST A SHORT WHILE AGO.  IT'S AFTER

11 OUR ORDINARY TIME. ARE YOU SERIOUS ABOUT A COUPLE OF QUESTIONS?

12         **MS. BARLOW:**  YES, YOUR HONOR.

13 **BY MS. BARLOW:**

14 **Q.**  THE 18 TO 25 YEAR OLD GROUP, WHY IS THAT GROUP OF

15 PARTICULAR IMPORTANCE TO YOU?

16 **A.**  WELL, WHAT RESEARCH SHOWS US IS THE 18 TO 25 YEAR OLD GROUP

17 IS A SIGNIFICANT PORTION OF THE AT RISK POPULATION. THEY STILL

18 FUNCTION IN MANY WAYS AS JUVENILES.

19         IF YOU'VE GOT KIDS WHO ARE 18 TO 25 YOU KNOW THAT.

20 THEY ARE ALSO IN MANY WAYS THE MOST AMENABLE TO REHABILITATION

21 AND TO PROGRAMMING AND CAN BE DIVERTED BEFORE THEY BECOME THAT

22 CAREER CRIMINAL THAT WE ALL HAVE IN OUR MIND.

23         SO THAT'S THE POPULATION, QUITE FRANKLY, THAT WE CAN

24 GET THE BIGGEST IMPACT IN.  AND YOU SAVE MONEY FOR THE

25 LONG-TERM IF YOU'RE ABLE TO DIVERT THEM OUT OF THE SYSTEM.

1    Q.  IS THAT ALSO THE GROUP THAT'S CURRENTLY THE HIGHEST -- HAS

2    THE HIGHEST RATE OF INCARCERATION?

3    A.  YES.

4    Q.  DO YOU THINK THE JUVENILE MODEL THAT YOU DESCRIBED EARLIER

5    TO THE COURT WOULD WORK EFFECTIVELY WITH THE 18 TO 25 YEAR OLD

6    GROUP?

7    A.  I THINK IT CAN BE VERY EFFECTIVE WITH THEM, YES.

8    Q.  GREAT.  THANK YOU.

9              **MS. BARLOW:**  I HAVE NOTHING FURTHER.

10             **JUDGE HENDERSON:**  BECAUSE OF THE TIME, WE'RE GOING

11   TO HAVE TO ASK YOU TO RETURN TOMORROW MORNING, MR. POWERS.

12             **THE WITNESS:**  OKAY.

13             **JUDGE HENDERSON:**  I'M VERY SORRY.

14             **THE WITNESS:**  THAT'S OKAY.

15             **JUDGE HENDERSON:**  WE WILL BEGIN AT 9:15 TOMORROW.

16             NOW, LET'S -- BEFORE WE RECESS FOR THE EVENING, AT

17   LEAST THE THREE OF US UP HERE ARE CONFUSED ABOUT OUR REMAINING

18   SCHEDULE. WE WENT INTO A BIT ABOUT PHASE I, PHASE II, PHASE

19   III, BUT --

20             **MS. BARLOW:**  I COULD PROBABLY HELP CLARIFY THAT FOR

21   THE COURT.

22             **JUDGE HENDERSON:**  OKAY.

23             **MS. BARLOW:**  WE WERE NOT INTENDING TO BEGIN THE CASE

24   ON BEHALF OF THE DEFENDANT INTERVENORS UNTIL AT LEAST THE 10TH

25   AND PROBABLY THE 11TH, BUT ESSENTIALLY PLAINTIFFS INDICATED

1   THEY HAD NO WITNESSES AVAILABLE TODAY FOR THE AFTERNOON AND

2   THAT IF WE DIDN'T BRING WITNESSES IN THEY WOULD OBJECT TO US

3   PRESENTING THEM LATER.

4           SO WE WERE TRYING TO ACCOMMODATE THE COURT.

5           **JUDGE HENDERSON:**  WE APPRECIATE THAT.

6           **JUDGE KARLTON:**  THAT'S OKAY.  WE'RE JUST TRYING TO

7   FIGURE OUT WHAT WE'RE DOING.  WE DON'T WANT TO POINT FINGERS AT

8   ANYBODY.

9           **JUDGE HENDERSON:**  WE'RE NOT COMPLAINING.

10          **JUDGE KARLTON:**  VERY PLEASED THAT YOU DID.

11          **JUDGE HENDERSON:**  OUT OF ORDER IS OKAY.  AND ONCE WE

12  START ON THE 10TH OR THE 11TH OR THEREABOUTS AND CHRISTMAS SORT

13  OF DOWN THE ROAD, WHEN DO YOU THINK WE WOULD END?  JUST YOUR

14  BEST ESTIMATE.

15          **MS. BARLOW:**  WELL, YOUR HONOR, WE DO HAVE A NUMBER

16  OF WITNESSES ON THESE PHASE II ISSUES. AT THIS POINT BECAUSE OF

17  THE BIFURCATION ORDER, AND THEN THE CHANGES IN THAT, IF YOU

18  WILL, I DON'T THINK -- WE HAVEN'T EXCHANGED OR RECEIVED FROM

19  PLAINTIFFS ESTIMATES ON CROSS. I'VE ASKED PLAINTIFFS TO ADVISE

20  ME WHO THEY NEED TO HAVE HERE LIVE TO CROSS-EXAMINE. I HAVEN'T

21  RECEIVED A RESPONSE TO THAT.

22          WE'D CERTAINLY LIKE TO TRY AND LIMIT THE TIME, BUT I

23  HAVE TO SAY WE --

24          **JUDGE KARLTON:**  LET'S STOP. WHAT DO YOU HAVE?  HOW

25  MANY WITNESSES DO YOU HAVE ON PHASE I?

1        **MS. BARLOW:**  ME?

2        **JUDGE KARLTON:**  NO.

3        **MR. SPECTER:**  ARE YOU LOOKING AT ME?

4        **JUDGE KARLTON:**  YES.

5        HE CAN GO HOME, CAN'T HE?

6        **JUDGE HENDERSON:**  YES.

7        **MR. MELLO:**  ONE POINT BEFORE HE LEAVES, YOUR HONOR.

8   PAUL MELLO, AGAIN, FOR DEFENDANTS.  WE'RE CALLING HIM BACK BUT

9   WE HAVE TWO WITNESSES WHO ARE SET FOR TOMORROW MORNING BY VIDEO

10  CONFERENCING, WHICH CREATES A PROBLEM FOR MR. POWERS COMING IN

11  RIGHT AT 9:15, BECAUSE I DON'T THINK WE CAN HOLD UP THE VIDEO

12  PEOPLE.

13       **JUDGE KARLTON:**  VIDEO PEOPLE ARE GOING TO TAKE HOW

14  LONG?  ROUGH.

15       **MR. MELLO:**  I THINK MORNING.

16       **JUDGE KARLTON:**  THE WHOLE MORNING.

17       CAN YOU BE HERE TOMORROW AFTERNOON?

18       **JUDGE HENDERSON:**  9:15.

19       **JUDGE REINHARDT:**  HE SAID "YES" HE CAN BE HERE IN

20  THE AFTERNOON.

21       **JUDGE HENDERSON:**  OKAY.  GOOD.

22       **THE WITNESS:**  1:30?

23       **MR. SPECTER:**  I'M SORRY. COULD WE MEET AND CONFER

24  ABOUT THAT, AND THEN LET MR. POWERS KNOW?

25       **JUDGE KARLTON:**  NO.

1        **MR. SPECTER:**   OKAY.

2        **JUDGE KARLTON:**   IF HE'S GOT TWO PEOPLE BY VIDEO --

3        **MR. SPECTER:**   I WOULDN'T INCONVENIENCE HIM BY THAT.

4 I JUST WANTED TO CONFER WITH HIM.   THAT'S ALL.

5        **MR. MELLO:**   WITH ME?

6        **MR. SPECTER:**   YES.   WE WILL WORK IT OUT.

7        **JUDGE REINHARDT:**   WHAT ABOUT WORKING OUT THE REST OF

8 THE SCHEDULE SO THAT WE CAN HAVE AN IDEA WHAT'S GOING TO HAPPEN

9 THE REST OF THIS WEEK, AND THEN WHAT'S GOING TO HAPPEN BETWEEN

10 NOW AND THE END OF THE TRIAL?

11        CAN YOU ALL GET TOGETHER AND DO WHAT YOU DID WITH

12 PHASE I?

13        **JUDGE KARLTON:**   NO, DO BETTER THAN PHASE I.

14        **MR. SPECTER:**   YOU SHOULD BE -- WE DID PHASE I FAST

15 SO --

16        **MR. MELLO:**   AND WE DID FILE OUR WITNESS LIST TODAY.

17        **JUDGE REINHARDT:**   BUT THE WITNESS LIST --

18        **MR. MELLO:**   WE WITHDREW A COUPLE OF WITNESSES, WHICH

19 I THINK MAKES IT FASTER.

20        **JUDGE REINHARDT:**   I KNOW.   BUT THE WITNESS LIST

21 DOESN'T REALLY TELL US WHAT YOU'RE GOING TO DO WITH THE REST OF

22 THE TRIAL:   HOW LONG EACH WITNESS IS GOING TO TAKE, HOW MANY

23 WITNESSES THERE ARE REALLY GOING TO BE.

24        **MR. SPECTER:**   WELL, I THINK I CAN GIVE YOU A GENERAL

25 SKETCH.   DO YOU WANT THAT, OR WOULD YOU LIKE US TO COME BACK

1  WITH DETAILS?

2          **JUDGE REINHARDT:** WE WOULD LIKE YOU TO AGREE TO --

3          **MR. SPECTER:** NO. WE'VE AGREED BASICALLY FOR THIS

4  COMING WEEK WE KNOW.

5          **JUDGE REINHARDT:** NOW THEN, FOR THE REST OF THE

6  TRIAL.

7          **MR. SPECTER:** THE REST OF THE TRIAL ON THE 9TH AND

8  THE 10TH, MR. MELLO IS GOING TO BE PRESENTING THE STATE'S

9  WITNESSES. WE'RE GOING TO HAVE ONE OF OUR WITNESSES COME OUT

10 OF ORDER, MR. LEHMAN, ON THE 11TH AND THE 12TH.

11         THEN, THE INTERVENORS -- 10TH, 11TH AND 12TH.

12         THE INTERVENORS ARE GOING TO START PRESENTING THEIR

13 WITNESSES. NOW, MS. BARLOW IS CORRECT. WE HAVEN'T REACHED ANY

14 AGREEMENTS ABOUT HOW LONG THOSE ARE GOING TO TAKE, AND WE DON'T

15 KNOW HOW MANY THEY ARE GOING TO CALL. AND WE'RE ALSO TRYING TO

16 NEGOTIATE WITH THE COUNTY WITNESSES TO SEE IF THEIR TESTIMONY

17 CAN COME IN IN A WRITTEN FORM BY STIPULATION.

18         WE HAVEN'T QUITE GOTTEN THERE YET, BUT WE'RE WORKING

19 ON IT.

20         WE'RE ALSO GOING TO APPROACH MS. BARLOW TO SEE IF WE

21 CAN CUT DOWN ON THAT PURSUANT TO SOME AGREEMENT. SO THE REASON

22 WE CAN'T TELL YOU TODAY EXACTLY WHAT IS GOING TO HAPPEN IS WE

23 HAVEN'T FINISHED THE NEGOTIATIONS, WHICH WE ARE TRYING TO

24 SHORTEN IT AS MUCH AS POSSIBLE.

25         **JUDGE REINHARDT:** I DIDN'T SUGGEST YOU SHOULD TELL

1  US TODAY. I SAID CAN YOU GET TOGETHER AND EVEN TELL US TOMORROW

2  MORNING WHEN YOU ARE GOING TO REACH AN AGREEMENT AS TO WHAT IS

3  LEFT OF THE TRIAL?

4          **MR. SPECTER:**  I CAN'T PROMISE THAT.

5          **JUDGE REINHARDT:**  YOU CAN'T TELL US WHEN YOU WILL

6  AGREE?

7          **MR. SPECTER:**  THE REASON WHY IS BECAUSE WE'RE TRYING

8  TO REACH FACTUAL STIPULATIONS ON WITNESSES.  AND UNTIL WE

9  EXCHANGE THEM AND SEE WHETHER WE HAVE AGREEMENTS ON THEM, WE

10 CAN'T SAY WHETHER THE WITNESS IS GOING TO BE CALLED OR NOT.  SO

11 I CAN'T TELL YOU TOMORROW WHETHER WE'RE GOING TO HAVE AN

12 AGREEMENT OR EXACTLY WHEN. WE'RE WORKING OUR HARDEST.

13         **JUDGE KARLTON:**  IS IT CORRECT THAT THE LEGISLATORS

14 ARE NOT TENDERING ANY EVIDENCE AT ALL?

15         **MS. WANG:**  NO, YOUR HONOR.  THE LEGISLATORS WILL BE

16 PRESENTING TWO WITNESSES FOR PHASE II.

17         **JUDGE KARLTON:**  OKAY.

18         **JUDGE HENDERSON:**  AND LET'S ME ASK MS. BARLOW:  DID

19 THE TWO WITNESSES YOU PRESENTED TODAY --

20         **MS. BARLOW:**  ACTUALLY, ONE OF THEM WAS MINE, YOUR

21 HONOR.  THE OTHER WAS THE DISTRICT ATTORNEY'S WITNESS.

22         **JUDGE HENDERSON:**  THAT'S CORRECT.  LET ME ADD THE

23 DISTRICT ATTORNEY.  ARE THOSE FAIRLY TYPICAL OF WHAT WE WILL BE

24 GETTING IN TERMS OF THE LENGTH, OR WILL THERE BE A COUPLE OF

25 SUPER WITNESSES WHO WILL TAKE ALL DAY OR --

1        **MS. BARLOW:**  MR. POWERS WAS ONE OF THE ONLY TWO

2   WITNESSES OF MINE WHO ACTUALLY PREPARED AN EXPERT REPORT AS

3   OPPOSED TO A DECLARATION.  AND IT WAS ONE OF THE LONGER

4   CROSS-EXAM ESTIMATES THAT I HAVE RECEIVED THUS FAR.  HOWEVER, I

5   DO HAVE CONCERN ABOUT THE AMOUNT OF TIME THAT MIGHT BE

6   CONSUMED, BECAUSE, FOR EXAMPLE, I'VE PROPOSED I THINK FIFTY

7   STIPULATED FACTS THAT DEAL WITH JAIL CAPS AND THE NUMBER OF

8   PEOPLE RELEASED AT THE COUNTY LEVEL OVER THE LAST YEAR.  AND

9   PLAINTIFFS HAVEN'T STIPULATED TO ANY OF THOSE FACTS.  SO I MAY

10  BE COMPELLED TO BRING IN WITNESSES, OR AT LEAST SUBMIT

11  DECLARATIONS TO ESTABLISH THOSE FACTS IF I CAN'T GET IT DONE BY

12  STIPULATION.

13        SO WE ARE WORKING ON IT. BUT I THINK MR. POWERS

14  PERHAPS WAS A LITTLE LONGER THAN MOST OF MY WITNESSES, IN PART

15  BECAUSE OF HIS STATEWIDE BREADTH OF EXPERIENCE.

16        **JUDGE KARLTON:**  WHAT ABOUT THE D.A.'S?  HOW MANY

17  MORE WITNESSES ARE YOU GOING TO BE?

18        **MR. MITCHELL:**  I HAVE TWO ADDITIONAL WITNESSES:  THE

19  D.A. FROM RIVERSIDE AND THE D.A. FROM SAN DIEGO.  I ESTIMATE

20  THEY TAKE ABOUT 45 MINUTES TO AN HOUR EACH.

21        **MR. SPECTER:**  EXCUSE ME. OH, YOU MEAN WITH CROSS?

22  YES, OKAY.

23        **JUDGE KARLTON:**  ALL RIGHT.

24        **JUDGE HENDERSON:**  OKAY. COURT'S ADJOURNED UNTIL 9:15

25  TOMORROW.

1          **MR. SPECTER:**  OH, DID YOU -- MR. MELLO REMINDED ME,

2   DID YOU ALSO CONTINUE TO WANT US TO DO CLOSING ARGUMENTS

3   TOMORROW ON PHASE I?

4          **JUDGE KARLTON:**  YOU KNOW WHAT?  IF WE CAN GET

5   TESTIMONY, I'D RATHER JUST WAIT UNTIL THE END. NO?

6          **MR. SPECTER:**  I'M NOT DYING TO DO IT BUT --

7          **MR. MELLO:**  IF YOU'RE WILLING TO RULE FOR US NOW ON

8   PHASE I, THAT WOULD MAKE ME MOST HAPPY.  BUT IF YOUR DESIRE IS

9   TO HAVE ONE CLOSING AT THE END, I WOULD THINK DEFENDANTS ARE --

10         **MR. SPECTER:**  NEITHER ARE WE.

11         **MR. MELLO:**  I MEAN --

12         **JUDGE KARLTON:**  I THINK WE'RE AT A PLACE NOW, THAT'S

13  WHERE WE ARE GOING TO DO. WE ARE HALFWAY --

14         **MR. MELLO:**  SO THERE WILL BE NO PHASE I CLOSING

15  TOMORROW.

16         **JUDGE HENDERSON:**  YES.

17         **MR. MELLO:**  OKAY.

18         **JUDGE KARLTON:**  THANK YOU VERY MUCH.

19         **MR. SPECTER:**  WE APPRECIATE THAT.

20         (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL WEDNESDAY,

21          DECEMBER 3, 2008, AT 9:15 O'CLOCK A.M.)

22

23

24

25

1                            **I N D E X**

2

**DEFENSE WITNESSES**                              **PAGE**   **VOL.**

3

**ROBIN DEZEMBER**

4

DIRECT EXAMINATION BY MS. TILLMAN                  838      5
5  CROSS-EXAMINATION BY MR. BIEN                     852      5
   REDIRECT EXAMINATION BY MS. TILLMAN              921      5
6  RECROSS-EXAMINATION BY MR. BIEN                  933      5
   FURTHER REDIRECT EXAMINATION BY MS. TILLMAN      944      5

7

8  **CRAIG WILLIAM HANEY**

9  DIRECT EXAMINATION BY MS. KAHN                    945      5
   CROSS-EXAMINATION BY MS. TILLMAN                 960      5

10

11  **LISA RODRIGUEZ**

12  DIRECT EXAMINATION BY MR. MITCHELL                980      5
    CROSS-EXAMINATION BY MR. SANGSTER               1000     5

13

14  **JERRY POWERS**

15  DIRECT EXAMINATION BY MS. BARLOW                  1017     5

16                          –   –   –   –

17  **DEFENDANT INTERVENOR EXHIBITS**       **IDEN**   **VOL.**   **EVID**   **VOL.**

18  507-509                                                  999      5

19

20

21

22

23

24

25

*JOAN MARIE COLUMBINI, CSR, RPR*
*KATHERINE WYATT, CSR, RMR*
*OFFICIAL COURT REPORTERS, USDC, 415-255-6842*

**<u>CERTIFICATE OF REPORTER</u>**


WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER, AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.


/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR


S/ KATHERINE WYATT

KATHERINE WYATT, CSR 9866, RMR

TUESDAY, DECEMBER 2, 2008