VOL 6

PAGES 1068 - 1309

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

```
RALPH COLEMAN, ET AL.,            )
                                  )
            PLAINTIFFS,           )
                                  )
  VS.                             ) NO. CIV S-90-0520 LKK JFM
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  ) THREE-JUDGE COURT
            DEFENDANTS.           )
                                  )
_____
```

```
MARCIANO PLATA, ET AL.,           )
                                  )
            PLAINTIFFS,           )
                                  )
VS.                               ) NO. C 01-1351 TEH
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  )
            DEFENDANTS.           )
_____)
```

**TRANSCRIPT OF PROCEEDINGS**

SAN FRANCISCO, CALIFORNIA
WEDNESDAY, DECEMBER 3, 2008

(APPEARANCES ON FOLLOWING PAGES)


***REPORTED BY:***   JOAN MARIE COLUMBINI, CSR 5435, RPR
             KATHERINE WYATT, CSR 9866, RMR
             OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                           1917 FIFTH STREET
                           BERKELEY, CALIFORNIA  94710
                           **SARA NORMAN, ESQUIRE**
                           **ALISON HARDY, ESQUIRE**
                           **DONALD SPECTER, ESQUIRE**


                           ROSEN, BIEN & GALVAN, LLP
                           315 MONTGOMERY STREET, TENTH FLOOR
                           SAN FRANCISCO, CALIFORNIA 94104
                       BY: **MICHAEL W. BIEN, ESQUIRE**
                           **JANE KAHN, ESQUIRE**

                           K&L GATES
                           FOUR EMBARCADERO CENTER
                           SUITE 1200
                           SAN FRANCISCO, CALIFORNIA 94111
                       BY: **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**              CARROLL, BURDICK & MCDONOUGH
                           44 MONTGOMERY STREET, SUITE 400
                           SAN FRANCISCO, CALIFORNIA  94104
                       BY: **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**         STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           1300 I STREET, SUITE 125
                           P.O. BOX 944255
                           SACRAMENTO, CALIFORNIA  94244
                       BY: **LISA A. TILLMAN, ESQUIRE**

                           STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           455 GOLDEN GATE AVENUE, SUITE 11000
                           SAN FRANCISCO, CALIFORNIA  94102
                       BY: **KYLE A. LEWIS, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**        HANSON BRIDGETT
                         425 MARKET STREET, 26TH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94105
              BY:  **PAUL MELLO, ESQUIRE**

**FOR DISTRICT ATTORNEY**    THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**              COUNTY OF RIVERSIDE
                         82-675 HIGHWAY 111, FOURTH FLOOR
                         INDIO, CALIFORNIA  92201
              BY:  **WILLIAM E. MITCHELL, ESQUIRE**

**FOR LEGISLATOR**           AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**              580 CALIFORNIA STREET, 15TH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94104
              BY:  **TERESA WANG, ESQUIRE**

**FOR LAW ENFORCEMENT**      JONES & MAYER
**INTERVENORS**              3777 NORTH HARBOR BOULEVARD
                         FULLERTON, CALIFORNIA  92835
              BY:  **KIMBERLY HALL BARLOW, ESQUIRE**

**FOR COUNTY INTERVENORS**   OFFICE OF THE COUNTY COUNSEL
                         COUNTY OF SANTA CLARA
                         70 WEST HEDDING STREET
                         NINTH FLOOR, EAST WING
                         SAN JOSE, CALIFORNIA  95110
              BY:  **THERESA FUENTES, ESQUIRE**

**FOR SONOMA COUNTY**        COUNTY OF SONOMA
**INTERVENORS**              575 ADMINISTRATION DRIVE, ROOM 105A
                         SANTA ROSA, CALIFORNIA  95403
              BY: **CAROL LYNNE WOODWARD, ESQUIRE**

1  DECEMBER 3, 2008                      9:15 O'CLOCK A.M.

2

3                   P R O C E E D I N G S

4          **JUDGE HENDERSON:**  OKAY. LET'S GET GOING. I

5  UNDERSTAND THAT WITH THIS SETUP THE JUDICIAL HEADPHONES CAN'T

6  BE USED.  SO I'M GOING TO ASK EVERYONE TO SPEAK IN A LOUD AND

7  CLEAR VOICE AND INTO THE MICROPHONES SO WE CAN HEAR.

8          YOU MAY PROCEED WHEN YOU'RE READY.

9          **MS. TILLMAN:**  GOOD MORNING.  CAN EVERYONE HEAR ME?

10         **JUDGE HENDERSON:**  YES.

11         **THE WITNESS:**  YES.

12         **MS. TILLMAN:**  GOOD MORNING, DR. PACKER. HOW ARE YOU

13 THIS MORNING?

14         **THE WITNESS:**  FINE.

15         **MS. TILLMAN:**  JUST WANT TO MAKE SURE EVERYONE CAN

16 HEAR EACH OTHER.  WE'RE GOING TO SWEAR YOU IN.

17         **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

18         (THEREUPON, THE WITNESS WAS SWORN.)

19         **THE WITNESS:**  I DO.

20         **THE CLERK:**  PLEASE HAVE A SEAT.

21         **THE WITNESS:**  I DO.

22         **THE CLERK:**  PLEASE HAVE A SEAT.

23         PLEASE HAVE A SEAT.

24         PLEASE STATE AND SPELL YOUR FULL NAME FOR THE

25 RECORD.

1          **THE WITNESS:**  IRA K. PACKER, P-A-C-K-E-R.

2          **MS. TILLMAN:**  GOOD MORNING, YOUR HONORS.  WE ARE

3  CALLING DR. PACKER THIS MORNING, WHO OBVIOUSLY IS TESTIFYING

4  FROM BOSTON, MASSACHUSETTS, VIA VARIOUS VIDEO TELECONFERENCING

5  TECHNOLOGY.

6          DR. PACKER'S EXPERTS REPORTS IN THIS CASE ARE MARKED

7  AS DEFENDANTS' TRIAL EXHIBITS NUMBER 1018, 1019, 1020 AND 1021,

8  AND THEY ARE HEREBY OFFERED INTO EVIDENCE.

9          DR. PACKER'S QUALIFICATIONS TODAY ARE SET FORTH ON

10 HIS CURRICULUM VITAE, AND THAT IS ATTACHED TO HIS REPORT OF

11 NOVEMBER, 2008, WHICH IS MARKED AS EXHIBIT 1018.  THERE'S ALSO

12 A SUMMATION OF HIS QUALIFICATIONS ON PAGES TWO AND THREE OF

13 THAT REPORT.

14          THEREUPON --

15              **DR. IRA K. PACKER**

16 WAS CALLED ON BEHALF OF THE DEFENDANTS, AND AFTER HAVING BEEN

17 FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

18              **DIRECT EXAMINATION**

19 **BY MS. TILLMAN:**

20 **Q.**  GOOD MORNING, DR. PACKER.

21 **A.**  GOOD MORNING.

22 **Q.**  SINCE YOU ARE TESTIFYING REMOTELY, PLEASE LET US KNOW IF AT

23 ANY TIME YOU ARE HAVING DIFFICULTY HEARING US OR SEEING ANY

24 DOCUMENT THAT IS BEING PRESENTED.

25 **A.**  OKAY.

1  Q.  DR. PACKER, I UNDERSTAND THAT YOU HAVE RECEIVED A COPY OF

2  YOUR REPORTS FROM THE COURT REPORTER.  AND WITH THE COURT'S

3  PERMISSION --

4  A.  NOT QUITE YET.  NOT QUITE YET. COULD YOU GIVE US THE

5  EXHIBIT NUMBER SO SHE CAN HAND TO IT ME?

6  Q.  YES.  THAT WOULD BE TRIAL EXHIBIT NUMBERS 1018, 1019, 1020

7  AND 1021.

8  A.  YES, I HAVE THEM ALL.

9           MR. BIEN:  YOUR HONORS, WE HAVE AN OBJECTION AS TO

10  1018, WHICH IS THE FIRST DR. PACKER REPORT. THE EXHIBIT THAT'S

11  MARKED AS 1018 IS NOT SIGNED, AND IT IS DIFFERENT FROM THE

12  EXHIBIT THAT WAS PROVIDED TO THE COURT AND TO PLAINTIFFS'

13  COUNSEL.

14           I MIGHT BE ABLE TO, IN OUR SET OF EXHIBITS, GIVE HIM

15  THE ACTUAL SIGNED ONE, LISA.

16           JUDGE HENDERSON:  CAN YOU RECONCILE THAT, MS.

17  TILLMAN?

18           MS. TILLMAN:  YES.

19           OKAY. MAY WE PROCEED?

20           JUDGE HENDERSON:  PROCEED.

21           MS. TILLMAN:  THANK YOU.

22  BY MS. TILLMAN:

23  Q.  DR. PACKER, I'M GOING TO START FIRST, OF COURSE, WITH YOUR

24  QUALIFICATIONS.

25  A.  EXCUSE ME.  I COULD NOT HEAR YOU WHEN YOU'RE AWAY FROM THE

1    MICROPHONE.

2    **Q.**  DR. PACKER, I'LL RAISE MY VOICE, AND IF YOU COULD JUST

3    LOWER YOUR VOICE ENOUGH, I THINK THAT WOULD HELP.

4    **A.**  OKAY.

5    **Q.**  THANK YOU.

6              DR. PACKER, ARE YOU A PRACTICING PSYCHOLOGIST?

7    **A.**  YES, I AM.

8    **Q.**  AND HOW MANY YEARS HAVE YOU BEEN A PSYCHOLOGIST?

9    **A.**  I'VE BEEN PRACTICING FOR 29 YEARS.

10   **Q.**  ARE YOU A LICENSED PSYCHOLOGIST BY THE COMMONWEALTH OF

11   MASSACHUSETTS?

12   **A.**  YES, I AM.

13   **Q.**  AND PLEASE INFORM THE COURT OF YOUR EDUCATIONAL BACKGROUND.

14   **A.**  I RECEIVED MY B.A. IN PSYCHOLOGY FROM COLUMBIA UNIVERSITY

15   IN 1974.

16              I RECEIVED MY M.A. IN PSYCHOLOGY FROM UNIVERSITY OF

17   PENNSYLVANIA IN 1976.

18              AND I RECEIVED MY PH.D. IN PSYCHOLOGY FROM THE

19   UNIVERSITY OF PENNSYLVANIA IN 1979.

20              IN 1987, I BECAME A DIPLOMATE, WHICH MEANS BOARD

21   CERTIFIED, IN FORENSIC PSYCHOLOGY BY THE AMERICAN BOARD OF

22   PROFESSIONAL PSYCHOLOGY.

23   **Q.**  ARE YOU CURRENTLY EMPLOYED?

24   **A.**  YES, I AM.

25   **Q.**  AND WHAT IS YOUR CURRENT POSITION?

1  **A.**  MY FULL-TIME POSITION IS AS CLINICAL PROFESSOR OF

2  PSYCHIATRY AT THE UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL.

3  **Q.**  AND ARE YOU PRESENTLY ON ANY PARTICULAR PROFESSIONAL BOARDS

4  OR --

5  **A.**  YES, I AM.

6  **Q.**  AND WHAT ARE THEY?

7  **A.**  I AM CURRENTLY THE CHAIR OF THE FORENSIC SPECIALTY COUNCIL,

8  WHICH IS BASICALLY THE GROUP THAT REPRESENTS FORENSIC

9  PSYCHOLOGY TO THE BROAD GROUP OF PSYCHOLOGY ORGANIZATIONS.

10         AND I'M ALSO THE CURRENT PRESIDENT OF THE COUNCIL OF

11  SPECIALTY IN PROFESSIONAL PSYCHOLOGY.

12  **Q.**  HAVE YOU HELD ANY EMPLOYMENT POSITION WITHIN ANY

13  CORRECTIONAL SETTINGS?

14  **A.**  I LOST THE WORD. HAVE I HELD ANY?

15  **Q.**  EMPLOYMENT POSITIONS WITHIN ANY CORRECTIONAL SETTINGS?

16  **A.**  OH, EMPLOYMENT. YES, I HAVE.

17  **Q.**  AND CAN YOU PROVIDE INFORMATION TO THE COURT ON THAT, ON

18  THOSE EMPLOYMENT POSITIONS?

19  **A.**  YES.

20         **JUDGE KARLTON:**  MS. TILLMAN, I DON'T WANT TO

21  DISCOURAGE YOU, BUT THAT'S ALL IN HIS REPORTS, WHICH TOTALLY WE

22  HAVE READ.  IF YOU WANT TO WASTE -- I DON'T MEAN "WASTE TIME,"

23  BUT IT SEEMS UNNECESSARY.  IT'S YOUR TIME.  IT'S YOUR RIGHT TO

24  USE.

25         **MS. TILLMAN:**  THANK YOU, YOUR HONOR.

1  **BY MS. TILLMAN:**

2  **Q.**  IF YOU COULD JUST ANSWER THAT LAST QUESTION, I'LL MOVE ON.

3  **A.**  YES.  THE EMPLOYMENT POSITIONS, YES. I WAS IN CHARGE OF

4  BOTH PROVIDING CLINICAL SERVICES AND BEING THE DIRECTOR OF A

5  PROGRAM THAT PROVIDED MENTAL HEALTH SERVICES TO THREE

6  CORRECTIONAL FACILITIES OF WESTERN MASSACHUSETTS.

7       I WAS ALSO THE DIRECTOR OF THE MENTAL HEALTH PROGRAM

8  FOR ALL THE PRISONS IN MASSACHUSETTS. AND I ALSO WORKED

9  DIRECTLY IN PRISON PSYCHIATRIC HOSPITALS IN BRIDGEWATER STATE

10 HOSPITAL.

11 **Q.**  HAVE YOU WORKED IN ANY SETTINGS WHERE OVERCROWDING WAS AN

12 ISSUE?

13 **A.**  YES, I DID.

14 **Q.**  AND WHEN WAS THAT?

15 **A.**  THAT WAS FROM THE LATE EIGHTIES, EARLY NINETIES, WHEN I WAS

16 RUNNING THE MENTAL HEALTH PROGRAM IN HAMPDEN COUNTY, WHICH IS

17 IN WESTERN MASSACHUSETTS.

18 **Q.**  AND DID YOU HAVE ANY --

19       **MS. TILLMAN:**  LET ME STRIKE THAT.

20 **BY MS. TILLMAN:**

21 **Q.**  WAS THERE ANY REMEDY PROVIDED TO ADDRESS THE OVERCROWDING

22 ISSUES AT THAT PARTICULAR CORRECTIONAL FACILITY?

23 **A.**  YES.

24 **Q.**  AND WHAT WAS THAT?

25 **A.**  THE REMEDY AT THAT POINT WAS THAT THERE WAS A CAP PLACED ON

1  THE NUMBER OF INMATES.  AND SO EACH DAY THAT THE COURT WANTED

2  TO SEND SOMEBODY IN, THEY WOULD HAVE A SPECIAL PROCESS BY WHICH

3  THEY WOULD HAVE A DOUBLE REVIEW OF THE BAIL STATUS, AND IN THAT

4  WAY LIMIT IT TO WHO COULD GO INTO THE JAIL.  IF THEY DECIDED

5  THEY WERE GOING TO SEND THAT INMATE IN, SOMEBODY ELSE HAD TO BE

6  RELEASED ON THE OTHER END.

7  **Q.**  DR. PACKER, IS IT CORRECT THAT YOUR REPORTS INDICATE THAT

8  YOU TOURED PRISON FACILITIES WITHIN THE STATE OF CALIFORNIA IN

9  PREPARING YOUR OPINION IN THIS CASE?

10 **A.**  I'M SORRY. I COULD NOT HEAR THE LAST PART OF YOUR SENTENCE.

11 **Q.**  DID YOU TOUR SOME 11 PRISONS WITHIN THE STATE OF CALIFORNIA

12 IN PREPARING YOUR OPINION IN THIS CASE?

13 **A.**  YES, I DID.

14 **Q.**  AND THOSE TOURS OCCURRED IN NOVEMBER '07 AND AUGUST '08,

15 CORRECT?

16 **A.**  JULY, THE END OF JULY, 2008, AND NOVEMBER, 2007.

17 **Q.**  AND, IN GENERAL, WHAT DID YOU DO DURING THESE TOURS?

18 **A.**  DURING THESE TOURS I MET WITH THE LEADERSHIP OF EACH

19 PRISON, INCLUDING THE CORRECTIONAL, AS WELL AS THE HEALTH AND

20 MENTAL HEALTH ADMINISTRATORS.  I TOURED THE VARIOUS SETTINGS

21 WHERE INMATES WERE BEING HOUSED, PARTICULARLY FOCUSING ON THOSE

22 IN THE COLEMAN CLASS.

23          I LOOKED AT ADSEG UNITS, EOP UNITS WHEN THEY WERE

24 AVAILABLE, MENTAL HEALTH CRISIS BEDS.  I ALSO SPECIFICALLY

25 LOOKED AT GYM HOUSING, GYMS THAT HAD BEEN CONVERTED TO

1  HOUSING.

2            I INTERVIEWED CORRECTIONAL OFFICERS, MENTAL HEALTH

3  PROFESSIONALS, AS WELL AS INMATES.

4  **Q.**  DID PLAINTIFFS' COUNSEL ATTEND ANY OF THESE TOURS?

5  **A.**  ON EVERY SINGLE TOUR THERE WAS AT LEAST ONE PLAINTIFFS'

6  COUNSEL PRESENT DURING THE ENTIRE TOUR.

7  **Q.**  WERE YOU ASKED IN THIS CASE TO FORM AN OPINION ON WHETHER

8  OVERCROWDING WAS THE PRIMARY CAUSE OF THE ALLEGED DEFICIENCIES

9  IN THE MENTAL HEALTHCARE SYSTEM?

10  **A.**  YES, I WAS.

11  **Q.**  AND WHEN YOU FORMED YOUR OPINION IN THIS CASE ON THAT

12  ISSUE, WHAT FACTORS DID YOU CONSIDER?

13  **A.**  WHAT FACTORS DID I CONSIDER?

14  **Q.**  YES.

15  **A.**  I CONSIDERED ALL THE INFORMATION THAT I OBTAINED FROM MY

16  TOURS, AS WELL AS VOLUMINOUS DOCUMENTS AND RECORDS THAT I

17  REVIEWED, INCLUDING AFFIDAVITS, SPECIAL MASTER'S REPORTS, OTHER

18  EXPERT REPORTS, REPORTS FROM PAROLE, ET CETERA.  AND LOOKING AT

19  ALL OF THOSE MATERIALS I ARRIVED AT CONCLUSIONS ABOUT WHAT

20  FACTORS WITHIN THE CURRENT SYSTEM WERE CONTRIBUTING MOST

21  HEAVILY TOWARDS DEFICIENCIES IN DELIVERY OF MENTAL HEALTH

22  SERVICES.

23  **Q.**  AND WHAT WERE THOSE FACTORS?

24  **A.**  OBVIOUSLY, ONE THING I WAS LOOKING AT WAS THE IMPACT OF

25  OVERCROWDING OR TOO MANY INDIVIDUALS IN THE SYSTEM.  BUT THERE

1  WERE MANY OTHER FACTORS, AS WELL, INCLUDING ISSUES SUCH AS LACK

2  OF ELECTRONIC MEDICAL RECORDS, LACK OF APPROPRIATE TYPE OF

3  PLACEMENTS, BOTH CONCERNED WITH PHYSICAL ENVIRONMENTS AS WELL

4  AS PROGRAMMATIC ELEMENTS FOR THE MOST SEVERELY MENTALLY ILL

5  PEOPLE WHO ARE IN THE SYSTEM.

6         I ALSO TOOK INTO ACCOUNT THE FACTORS SUCH AS ABILITY

7  TO ATTRACT AND RETAIN APPROPRIATELY TRAINED MENTAL HEALTH

8  STAFF, AND, AGAIN, THE PHYSICAL CONDITIONS IN TERMS OF SPACE

9  AVAILABLE BOTH FOR HOUSING, TREATMENT AND ALSO SPACE FOR THE

10 CLINICIANS.

11 **Q.**  BASED ON YOUR REVIEW OF THE DOCUMENTS AND YOUR TOURS OF THE

12 PRISON AND YOU'RE INTERVIEWS WITH VARIOUS PERSONNEL WITHIN THE

13 PRISONS, WHAT OPINION DID YOU FORM TO AS TO WHETHER

14 OVERCROWDING WAS THE PRIMARY CAUSE?

15 **A.**  AS I INDICATED IN MY REPORT, ALTHOUGH I -- EXCUSE ME --

16 ALTHOUGH I CONCLUDED THAT OVERCROWDING WAS CONTRIBUTING AND

17 EXACERBATING MANY OF THE OTHER PROBLEMS, IN MY OPINION THE

18 MOST -- THE PRIMARY CAUSE IS THAT THE PRISON SYSTEM IN

19 CALIFORNIA AND MANY OTHER STATES, NOW HAS MANY MORE ACUTELY

20 MENTALLY ILL INDIVIDUALS AND AT A LEVEL OF MORE SEVERITY THAN

21 HAD BEEN ANTICIPATED WHEN THE PRISONS WERE BUILT.

22         AND AS A RESULT, THE EXISTING SPACE AND EXISTING

23 PROGRAMS REALLY WERE NOT DESIGNED TO MEET THE NEEDS OF THIS

24 TYPE OF POPULATION.  AND THIS HAS RESULTED IN A MISMATCH IN

25 THAT INDIVIDUALS WHO ARE MUCH MORE MENTALLY ILL ARE NOW PLACED

1    IN PRISONS THAT WERE NOT DESIGNED FOR THAT PURPOSE.  AND AS A

2    RESULT, IT'S DIFFICULT IN THAT ENVIRONMENT TO PROVIDE ADEQUATE

3    SERVICES ABSENT DEVELOPMENT OF NEW FACILITIES, AS WELL AS NEW

4    PROGRAMS WITHIN THE NEW FACILITIES.

5    **Q.**  BASED -- I'M SORRY.  GO AHEAD.

6    **A.**  YES, THAT WAS THE MAIN FACTORS. THERE WERE OTHER FACTORS,

7    AS WELL.  AS I INDICATED IN MY REPORT, THE MEDICAL RECORD

8    SYSTEM IS A PAPER SYSTEM, AND THE PRISON IS SIMPLY NOT ABLE TO

9    KEEP UP WITH THE AMOUNT OF WORK AND VOLUME THAT'S REQUIRED IN

10   ORDER TO MAINTAIN AN APPROPRIATE MEDICAL RECORD SYSTEM WITHOUT

11   GOING TO AN ELECTRONIC PROCESS, WHICH IS NOT YET IN PLACE.

12   **Q.**  BASED UPON YOUR EXPERIENCE AND EDUCATIONAL BACKGROUND AND

13   EMPLOYMENT BACKGROUND, DO YOU HAVE AN OPINION REGARDING WHETHER

14   CONSTITUTIONAL LEVEL OF CARE CAN BE ACHIEVED IN OVERCROWDING

15   CONDITIONS WITHIN A CORRECTIONAL SETTING?

16   **A.**  YES, I DO.

17   **Q.**  AND WHAT IS THAT OPINION?

18   **A.**  MY OPINION IS THAT ALTHOUGH OVERCROWDING EXACERBATES THE

19   PROBLEMS IN PROVIDING SUCH APPROPRIATE CARE, IF OTHER CHANGES

20   ARE MADE IN THE SYSTEM PARTICULARLY BASED ON MY EXPERIENCE,

21   VERY PARTICULARLY IN HAMPDEN, BUT OTHER POSITIONS, AS WELL,

22   THAT IF APPROPRIATE FACILITIES AND PROGRAMS ARE DEVELOPED THAT

23   THE NEEDS OF THE MOST SEVERELY MENTALLY ILL PEOPLE CAN MANAGE

24   WITHIN A CORRECTIONAL FACILITY.

25              **JUDGE HENDERSON:**  CAN YOU GIVE US SOME EXAMPLES OF

1  THE KINDS OF PROGRAMS THAT WOULD BE DEVELOPED TO MEET THESE

2  NEEDS?  WHAT DO YOU HAVE IN MIND?

3          **THE WITNESS:**  YES. WELL, FOR EXAMPLE, IF SOME OF THE

4  MANY PROGRAMS THAT MAY BE THERE NOW, BUT JUST DON'T HAVE ENOUGH

5  OF THEM. TO ME, THE MOST BLATANT EXAMPLES THAT I CAME ACROSS IN

6  ALL OF MY TOURS AND READING ALL OF THE MATERIALS WERE THE

7  INTERMEDIATE CARE FACILITIES.

8          THESE ARE FACILITIES THAT ARE DESIGNED TO PROVIDE

9  MENTAL HEALTH SERVICE TO PROBABLY THE MOST SEVERELY IMPAIRED

10  INDIVIDUALS IN THE PRISON SYSTEM. AND AT SALINAS VALLEY, FOR

11  EXAMPLE, THERE ARE TWO SUCH UNITS.

12  **BY MS. TILLMAN:**

13  **Q.**  DR. PACKER, COULD YOU JUST MOVE BACK A LITTLE BIT FROM THE

14  MICROPHONE?

15  **A.**  EXCUSE ME?

16  **Q.**  JUST MOVE BACK A LITTLE BIT FROM THE MICROPHONE.

17          THANK YOU.

18  **A.**  OKAY. ALL RIGHT. I THINK I WAS SAYING THE MOST BLATANT

19  EXAMPLE I SAW WAS AT SALINAS VALLEY WHERE -- IS THAT STILL TOO

20  LOUD?

21  **Q.**  WE WILL MAKE SOME ADJUSTMENTS OVER HERE, AS WELL.

22  **A.**  SORRY.  THE MOST BLATANT EXAMPLE I CAME ACROSS WAS AT

23  SALINAS VALLEY. SALINAS VALLEY HAS TWO INTERMEDIATE CARE

24  FACILITIES UNITS, ICF UNITS.  ONE OF THEM IS A FREESTANDING

25  UNIT THAT WAS BUILT SPECIFICALLY FOR THE PURPOSE OF PROVIDING

1  SERVICES TO INMATES IN THE FACILITY.  AND THAT SEEMS TO BE WELL

2  DESIGNED AND PLENTY OF SPACE FOR TREATMENT, HAD A THERAPEUTIC

3  FEEL TO IT AND SEEMED TO BE A VERY APPROPRIATE WAY OF DEALING

4  WITH SEVERELY MENTALLY ILL INDIVIDUALS.

5           ON THE OTHER HAND, ANOTHER STANDARD TREATMENT UNIT

6  HAD BEEN RETROFITTED.  AND THAT WAS ALSO CALLED AN ICF.  THAT

7  WAS WITHIN THE WALLS OF THE PRISON. AND THAT FACILITY WAS

8  CLEARLY NOT. WASN'T ENOUGH ROOM, WASN'T AN APPROPRIATE MILIEU

9  THAT WAS REALLY THERAPEUTIC.  AND I BELIEVE IT DEMONSTRATES

10 WHAT HAPPENS WHEN YOU JUST TRY TO TAKE EXISTING PRISON SPACES

11 AND RETROFIT THEM AND CLAIM YOU HAVE A PROGRAM VERSUS

12 DEVELOPING A PROGRAM THAT IS SUFFICIENT.

13           ANOTHER VERY SPECIFIC EXAMPLE --

14           **JUDGE HENDERSON:**  WAIT.

15           **JUDGE KARLTON:**  WAIT.  YOU TURNED IT DOWN TOO LOW

16 NOW.

17           **THE WITNESS:**  HOW ABOUT NOW?

18           **JUDGE KARLTON:**  GOOD.

19 **BY MS. TILLMAN:**

20 **Q.**  THAT'S JUST RIGHT.  THANK YOU SO MUCH.

21           COULD YOU JUST RESTATE YOUR LAST SENTENCE, PLEASE?

22 **A.**  I BELIEVE I WAS SAYING THAT AN ADDITIONAL EXAMPLE WAS I

23 WENT TO VACAVILLE.  I WAS THERE TWICE. THE SECOND TIME -- THE

24 REASON I RETURNED WAS BECAUSE IN THE INTERIM THEY HAD BUILT A

25 SPECIAL 50 BED MENTAL HEALTH CRISIS CENTER, AND THAT ALSO

1  SEEMED TO HAVE ADEQUATE SPACE.

2  **Q.**  DID YOU SAY A 50-BED MENTAL HEALTH CRISIS BED?

3  **A.**  FIVE-OH.  FIVE-OH, 50 BED MENTAL HEALTH CRISIS BED UNIT AT

4  VACAVILLE. AND THAT UNIT WAS SPECIFICALLY DESIGNED WITH THE

5  INTENTION OF SERVING AS A FACILITY THAT PROVIDES THESE KINDS OF

6  SERVICES.

7          AND I BELIEVE THAT THAT IS -- AGAIN, IN MY OPINION

8  ONE OF THE BIGGEST DIFFICULTIES IS THAT THESE PRISONS WERE NOT

9  DESIGNED FOR THIS POPULATION.  THAT ALL THESE OTHER MEASURES

10 THAT ARE BEING DONE ARE INADEQUATE.

11          THAT'S EXACTLY WHAT HAPPENED WHEN I WAS IN HAMPDEN

12 COUNTY. THEY DID BUILD A NEW FACILITY, AND THEY BUILT A SPECIAL

13 UNIT FOR THE INMATES WHO WERE MOST IN NEED. THEY WERE SEPARATED

14 OUT.

15          THERE WAS PLENTY OF ROOM. THERE WERE TREATMENT ROOMS

16 AVAILABLE, OFFICE SPACE FOR THE STAFF.

17 **Q.**  AND SO TO ADDRESS PROVIDING CONSTITUTIONAL LEVEL OF

18 HEALTHCARE WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

19 REHABILITATION FACILITIES, YOU WOULD RECOMMEND THE CONSTRUCTION

20 OF BUILDINGS DESIGNED FOR THE MENTALLY ILL?

21 **A.**  YES.  I MEAN, THERE'S SOME OF THAT GOING ON.  AND OBVIOUSLY

22 THERE'S ANOTHER BUILDING I SAW AT SALINAS VALLEY, WHICH IS

23 BEING BUILT.  AND I SAW PLANS FOR ADDITIONAL FACILITIES, BOTH

24 IN SUPPLEMENTAL BED PLANS AS WELL AS CONSOLIDATED CARE CENTERS.

25 AND I BELIEVE UNTIL YOU BUILD AND  STAFF AND DEVELOP

1   PROGRAMMING THAT'S DESIGNED PARTICULARLY TO PROVIDE MENTAL

2   HEALTH SERVICES, PROVIDING THEM IN THE EXISTING ENVIRONMENT IS

3   ALWAYS GOING TO BE INADEQUATE.

4          **JUDGE KARLTON:**  SO THAT IS IT YOUR OPINION, DOCTOR,

5   THAT UNTIL WE GET ADEQUATE SPACE WE'VE GOT TO LET PEOPLE OUT

6   BECAUSE WE CAN'T TREAT THEM PROPERLY?

7          **THE WITNESS:**  ALL I'M SAYING IS UNTIL THESE SPACES

8   IMPROVE, I THINK YOU'RE GOING TO CONTINUE TO HAVE PROBLEMS.

9   IT'S A CONTINUUM, NOT A CATEGORICAL "YES" OR "NO."

10          IN OTHER WORDS, THERE'S THINGS THAT YOU CAN DO THAT

11  MAKE IT A LITTLE BIT BETTER. I SAW EXAMPLES OF THAT WHEN I WENT

12  TO THE RECEPTION CENTER, AND THEY DEVELOPED A NEW RECEPTION

13  CENTER EOP.  THAT WAS A BIG IMPROVEMENT OVER WHAT WAS THERE

14  EARLIER.  I THINK IT'S JUST SORT OF MOVING YOU IN THE RIGHT

15  DIRECTION.

16          SO THERE ARE THINGS THAT CAN BE DONE INCREMENTALLY.

17  BUT I THINK TO GET TO THE LEVEL THAT REALLY NEEDS TO BE DONE

18  NEEDS TO HAVE NEW CONSTRUCTION.  AND AT WHICH POINT IT BECOMES

19  CONSTITUTIONALLY INADEQUATE VERSUS JUST, YOU KNOW, STILL

20  PROBLEMATIC IS SOMETHING THAT A PSYCHOLOGIST CAN'T REALLY --

21          **JUDGE KARLTON:**  RIGHT.

22          **THE WITNESS:**  -- DECIDE.

23          **JUDGE KARLTON:**  WE WILL TAKE CARE OF THAT.  I'M

24  GOING TO ASK YOU AGAIN, SIR. WHAT I HEAR YOU SAY IS THAT WE'VE

25  GOT TO BUILD ALL THESE NEW FACILITIES.

1      I ASSUME YOU ARE AWARE THAT, FOR INSTANCE, THE

2  CONSOLIDATED CARE CENTERS, THE STATE HAS DECLINED TO FUND.  SO

3  THAT'S AT THE MOMENT AT LEAST OFF THE TABLE. DO YOU UNDERSTAND

4  THAT?

5          **THE WITNESS:**  I WAS NOT AWARE OF THAT UNTIL THIS

6  MOMENT, YOUR HONOR.

7          **JUDGE KARLTON:**  ALL RIGHT.  IN ADDITION TO WHICH WE

8  WERE TOLD YESTERDAY THAT IT'S ABOUT A THREE-YEAR -- TAKES ABOUT

9  THREE YEARS TO GET ANYTHING BUILT IN THE STATE OF CALIFORNIA

10 PRISON SYSTEM, THAT IS GOD WILLING AND THE RIVER DON'T RISE.

11     THE QUESTION IS:  IN LIGHT OF THE LACK OF FUNDING

12 FOR THE CONSOLIDATED CONSTRUCTION PROGRAM, THE LENGTH OF TIME

13 FOR GETTING ANYTHING BUILT AND THE FACT THAT RETROFITTING WILL

14 TAKE ABOUT -- WHICH I DON'T UNDERSTAND, BUT THAT WAS THE

15 TESTIMONY -- WILL TAKE ABOUT AS MUCH TIME AS BUILDING NEW

16 FACILITIES, IS THERE ANY SOLUTION TO THE ABSENCE OF ADEQUATE

17 CARE OTHER THAN A CAP?

18         **THE WITNESS:**  AGAIN, IN THE INFORMATION I WAS

19 PROVIDED THERE WAS SOME INTERIM SOLUTIONS BEING SUGGESTED, SUCH

20 AS BUILDING SOME TRAILERS OR BRINGING IN TRAILERS. I AM NOT

21 UP-TO-DATE ON THE SPECIFICS.  APPARENTLY, SOME NEW INFORMATION

22 HAS BEEN PROVIDED SINCE I WAS INVOLVED. BUT SOME OF THOSE

23 INTERIM MEASURES WILL MAKE THINGS BETTER.

24     I THINK THEY WON'T GET TO THE POINT WHERE I THINK

25 THEY NEED TO BE UNTIL THESE OTHER FACILITIES ARE BUILT.  BUT

1  THEY CAN BECOME INCREMENTALLY BETTER.  AND I GUESS I HAVEN'T

2  GOTTEN THAT FAR IN THE TESTIMONY, BUT I'M NOT ALSO NECESSARILY

3  SAYING THAT JUST RELEASING PRISONERS WOULD IMPROVE THE

4  SITUATION, ANYWAY.

5  **BY MS. TILLMAN:**

6  **Q.**  DR. PACKER, IS IT YOUR TESTIMONY THAT HAMPDEN COUNTY JAIL

7  AND THE OVERCROWDING CONDITIONS THERE YOU WERE ABLE TO DELIVER

8  CONSTITUTIONALLY-ADEQUATE MENTAL HEALTHCARE?

9  **A.**  AGAIN, I CAN'T SPEAK TO THE WORD

10  "CONSTITUTIONALLY-ADEQUATE," BUT I WILL SAY THAT WE WERE ABLE

11  TO PROVIDE WHAT I CONSIDERED AND WHAT OTHERS CONSIDERED AN

12  APPROPRIATE LEVEL OF MENTAL HEALTHCARE.

13  **Q.**  AND WERE YOU ABLE TO DO THAT WITH THE USE OF CERTAIN

14  STAFFING RESOURCES, PROGRAMMING RESOURCES?

15  **A.**  YES, BUT PART OF IT WAS OUR PROCESS OF HOW WE EMPLOY OUR

16  STAFF AND PROGRAMS WE HAD.  THE OTHER PART I BELIEVE I ALREADY

17  TESTIFIED TO IS THAT THERE WAS SOME EFFORT ON THE PART OF THE

18  COURTS TO NOT SEND IN SOME OF THE MENTALLY ILL INMATES INTO THE

19  SYSTEM.

20          AND, FRANKLY, IN MY OPINION THE MOST EFFECTIVE

21  PROCEDURE WE HAD WAS THAT WE PROVIDED MENTAL HEALTH SERVICES AT

22  THE COURTS, AND WE DIVERTED MENTALLY ILL PEOPLE AWAY FROM THE

23  JAIL.  SO THAT THAT HAD A VERY GOOD IMPACT ON OUR ABILITY TO

24  PROVIDE THE SERVICES, EVEN THOUGH THE JAIL WAS OVERCROWDED.

25          **JUDGE KARLTON:**  SIR, THAT WOULD BE UNDER THE VERY

1  BROAD DEFINITION OF A PRISON RELEASE PROGRAM, A PRISON RELEASE

2  ORDER. WHAT I'M ASKING YOU -- I THINK I WHAT I HEARD YOU SAY --

3  AND IT'S VERY -- YOU KNOW, THIS IS NOT THE BEST WAY TO HAVE A

4  CONVERSATION.  BUT WHAT I THINK I HEARD YOU SAY WAS THAT

5  PERHAPS THE MOST EFFECTIVE THING TO DO IN THE INTERIM IS TO IN

6  SOME WAY DIVERT MENTALLY ILL PRISONERS AWAY FROM THE PRISON.

7          IS THAT CORRECT?

8          **THE WITNESS:**  THAT IS WHAT I'M SAYING NOW, AND I

9  ALSO INCLUDED IN MY REPORTS.

10          **JUDGE KARLTON:**  OKAY.  SO THAT TO THE EXTENT THAT

11  THAT WOULD BE UNDER THE LAW A PRISON RELEASE ORDER, YOU WOULD

12  THINK NONETHELESS THAT WOULD BE THE APPROPRIATE THING TO DO?

13  AM I UNDERSTANDING WHAT YOU'RE SAYING?

14          **THE WITNESS:**  YES.  YES.

15          **JUDGE KARLTON:**  OKAY.

16          **THE WITNESS:**  I APOLOGIZE.  WHEN THEY SAID "PRISON

17  RELEASE," I THOUGHT THEY WERE LITERALLY RELEASING PEOPLE FROM

18  THE PRISON.

19          I DID RECOMMEND IN MY REPORT, AND I'M SAYING THAT

20  NOW, THAT EFFORTS TO DIVERT MENTALLY ILL PEOPLE FROM THE PRISON

21  IN THE FIRST PLACE I DO THINK WOULD BE A VERY REASONABLE

22  STRATEGY.

23          **JUDGE KARLTON:**  THANK YOU, SIR.

24  **BY MS. TILLMAN:**

25  **Q.**  DR. PACKER, TAKING A NARROWER DEFINITION OF A PRISON

1  RELEASE ORDER TO SIMPLY ADDRESS THE RELEASE OF PRISONERS, HAVE

2  YOU FORMED ANY OPINION ON THE IMPACT OF RELEASE OF PRISONERS ON

3  THE HEALTH AND SAFETY OF THE GENERAL PUBLIC, AS WELL AS ON

4  THOSE PRISONERS WHO ARE MENTALLY ILL?

5  **A.**  YES, I HAVE.

6  **Q.**  AND WHAT IS THAT OPINION?

7  **A.**  IT'S MY OPINION THAT SIMPLY RELEASING PRISONERS FROM THE

8  SYSTEM IS UNLIKELY TO ADD A SIGNIFICANT ENOUGH IMPACT ON THE

9  MOST SEVERELY MENTALLY ILL PEOPLE IN THE SYSTEM FOR A COUPLE OF

10 REASONS.

11         NUMBER ONE, JUST LOOKING AT THE DATA THAT I WAS

12 GIVEN, FOR EXAMPLE, BY NAVIGANT, IF YOU LOOK AT THE MOST

13 SEVERELY MENTALLY ILL PEOPLE IN THE SYSTEM, THE EOP'S AND THOSE

14 NEEDING HIGHER LEVEL OF SERVICES, THEY REPRESENT MAYBE

15 3 PERCENT OF THE POPULATION.  SO YOU NEED AT LEAST 33 INMATES

16 JUST TO GET REDUCTION IN ONE PERSON NEEDING THAT HIGHER LEVEL

17 OF CARE.  THAT'S ONE ISSUE.

18         THE SECOND ISSUE IS THE EXTREMELY HIGH RATE OF

19 RECIDIVISM THAT WAS SHOWN TO ME IN THE DOCUMENTS.  AND MOST

20 CONCERNING WAS THE HIGH RATE OF RECIDIVISM FOR MENTALLY ILL

21 INDIVIDUALS, WHICH WAS SOMEWHERE BETWEEN 75 AND 77 PERCENT,

22 WHICH MEANS YOU RELEASE THEM OUT OF ONE DOOR AND THEY ARE

23 COMING RIGHT BACK IN THE OTHER DOOR.

24         AND MY CONCERN THERE IS THAT THEY ARE BEING RELEASED

25 FROM ALL OF THE DIFFERENT FACILITIES, BUT THEY ARE COMING BACK

1  IN ONLY TO THE RECEPTION CENTERS, WHICH ARE THE PLACE LEAST

2  EQUIPPED TO DEAL WITH THE INFLUX OF MORE INMATES, PARTICULARLY

3  MENTALLY ILL INMATES.

4          SO THAT'S ONE ASPECT OF THE ANSWER.

5  **Q.** AND IN TERMS OF THE MENTAL HEALTH CONDITIONS OF THESE

6  MENTALLY ILL INMATES WHO WOULD BE RELEASED, HAVE YOU FORMED ANY

7  OPINIONS AS TO WHAT WOULD HAPPEN IF THEY ARE RELEASED WITHOUT

8  ADEQUATE MENTAL HEALTH SUPPORT IN THE COMMUNITY?

9  **A.** YES, I HAVE.

10 **Q.** AND WHAT IS THAT OPINION?

11 **A.** MY OPINION IS SIMPLY RELEASING MENTALLY ILL INMATES INTO

12 THE COMMUNITY, WHICH IS NOT EQUIPPED TO PROVIDE THE APPROPRIATE

13 SERVICES TO THEM, IS UNLIKELY TO BE PRODUCTIVE. THESE PEOPLE

14 WILL VERY QUICKLY DECOMPENSATE, WHICH IS HAPPENING JUST TO BE

15 CLEAR RIGHT NOW, WITH A CURRENT NUMBER OF INDIVIDUALS BEING

16 RELEASED.

17          YOU EXPECT THIS PATTERN TO ACCELERATE, PARTICULARLY

18 IF THERE'S NOT ENOUGH TIME TO PROVIDE ADEQUATE PLANNING AND NO

19 ADDITIONAL RESOURCES ARE PLACED INTO THE COMMUNITY. WHAT

20 HAPPENS AT THAT POINT IN TIME IS THEY DECOMPENSATE.

21          IF EVERYONE IS LUCKY, THEY GET BACK IN ON A

22 RELATIVELY MINOR SITUATION. BUT, OTHERWISE, UNFORTUNATELY

23 SOMETHING -- THEY MAY GET BACK IN BY DOING A MORE SERIOUS ACT.

24          SO IF THEY ARE RELEASED IN THEIR COMMUNITY WITHOUT

25 ADEQUATE DISCHARGE PLANNING AHEAD OF TIME AND WITHOUT SOME

1   INFUSION OF RESOURCES INTO THE COMMUNITY TO PROVIDE THEM WITH

2   THE SERVICES THEY NEED THERE, THAT MAY BE DOABLE.  BUT SHORT OF

3   THAT I THINK THEY ARE JUST GOING TO COME RIGHT BACK IN ANOTHER

4   DOOR AND CREATE, FRANKLY, EVEN MORE PROBLEMS FOR THE RECEPTION

5   CENTERS.

6           **JUDGE REINHARDT:**  DR. PACKER, IS THERE ANY REAL

7   DIFFERENCE BETWEEN WHAT YOU SUGGESTED WITH RESPECT TO -- CAN

8   YOU HEAR ME?

9           **THE WITNESS:**  I'M SORRY.  I CANNOT HEAR YOU AT ALL.

10          **JUDGE REINHARDT:**  LET ME TRY AGAIN.  HOW'S THAT?

11          **THE WITNESS:**  THAT'S BETTER.

12          **JUDGE REINHARDT:**  HOW ABOUT THIS?

13          **THE WITNESS:**  ONE MORE TIME?

14          **JUDGE REINHARDT:**  HOW ABOUT THIS?

15          **THE WITNESS:**  YES, THAT'S BETTER.

16          **JUDGE REINHARDT:**  OKAY.  IS THERE ANY REAL

17  DIFFERENCE BETWEEN WHAT YOU SUGGESTED WITH RESPECT TO DIVERTING

18  THE MENTALLY ILL AND GIVING THEM PROPER TREATMENT AND RELEASING

19  THE MENTALLY ILL AND GIVING THEM PROPER TREATMENT?

20          **THE WITNESS:**  YOU ARE ASKING IF THERE'S A DIFFERENCE

21   BETWEEN DIVERTING THE MENTALLY ILL AND RELEASING THEM AND

22  PROVIDING THEM WITH ADEQUATE TREATMENT?

23          OKAY. BUT THE COMMUNITY -- THE COMMONALITY WITH BOTH

24  OF THOSE IS THERE NEEDS TO BE AN INFUSION OF RESOURCES INTO THE

25  COMMUNITY TO PROVIDE COMMUNITY RESOURCES.

1          SO IN THAT PART, I THINK THEY ARE BOTH THE SAME. THE

2    ONLY OTHER ISSUE IS THAT IF CURRENTLY MENTALLY ILL INDIVIDUALS

3    ARE RELEASED, THERE NEEDS TO BE AN ADEQUATE TIME FROM THE TIME

4    THE DECISION IS MADE TO RELEASE THEM TO DEVELOP A PLAN FOR

5    THEM.

6          THEY CAN'T JUST SIMPLY BE RELEASED AND ASSUME THAT

7    SOMEBODY WILL PICK THEM UP IN THE COMMUNITY.  EVEN IF THERE ARE

8    SOME IMPROVED SERVICES, IF I REMEMBER CORRECTLY THE CPMP OR

9    CMTP, THE TRANSITIONAL PROGRAM, I BELIEVE IN YOUR STATE IT WAS

10   90 DAYS PRIOR TO DISCHARGE.

11          ON THE DISCHARGE PLAN IN MASSACHUSETTS --

12          **JUDGE KARLTON:**  FOR SOME REASON YOU ARE FADING.

13   **BY MS. TILLMAN:**

14   **Q.**  I THINK YOUR MICROPHONE GOT PUSHED.

15   **A.**  HOW'S THAT NOW?

16          **JUDGE HENDERSON:**  BETTER.

17          **JUDGE KARLTON:**  OKAY.

18          **THE WITNESS:**  SORRY.  WHEN I WAS THE ASSISTANT

19   COMMISSIONER IN MASSACHUSETTS, WE DEVELOPED SOMETHING CALLED "A

20   TRANSITION TEAM."

21          AND BASICALLY WHAT THAT MEANT WAS THAT INMATES

22   WITHIN SIX MONTHS, SOMETIMES OF A YEAR OF DISCHARGE OF PRISON

23   BEGAN A DISCHARGE PLANNING PROCESS SO THAT BY THE TIME THEY

24   LEFT THE SERVICES WERE IN PLACE.  AND SO LONG AS THAT --

25   THERE'S ENOUGH TIME TO DEVELOP A PLAN, AND WHEN THEY GET OUT

1   SOMEBODY ACTUALLY IS PROVIDING THE SERVICES, I THINK THAT'S

2   DOABLE.

3            BUT IN THE ABSENCE OF THOSE TWO ELEMENTS, RELEASING

4   THEM WITHOUT ADEQUATE TIME TO PLAN AND WITHOUT APPROPRIATE

5   RESOURCES IN THE COMMUNITY, IT'S NOT LIKELY TO BE VERY

6   EFFECTIVE.  I THINK THEY WILL DECOMPENSATE AND GO RIGHT BACK IN

7   AGAIN, AND THEN VERY LITTLE HAS BEEN ACCOMPLISHED.

8            **JUDGE HENDERSON:**  THANK YOU.

9            **MS. TILLMAN:**  THANK YOU.  NOTHING FURTHER.

10           **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

11           ANY OTHERS FROM DEFENSE TABLE HAVE ANYTHING OF THIS

12  WITNESS?

13           **MS. WANG:**  NOTHING FURTHER, YOUR HONOR.

14           **MR. MITCHELL:**  NO QUESTIONS.

15           **JUDGE HENDERSON:**  OKAY. CROSS-EXAMINATION.

16                    **CROSS-EXAMINATION**

17  **BY MR. BIEN:**

18  **Q.**  GOOD MORNING, DR. PACKER.

19  **A.**  GOOD MORNING.

20  **Q.**  DR. PACKER, IF YOU ASSUME THAT CROWDING MEANS THAT THE

21  SUPPLY FOR MENTAL HEALTH SERVICES AND SPACE EXCEEDS

22  THE EXISTING -- I'M SORRY.  I'M GOING TO START THAT AGAIN.

23           IF YOU ASSUME THAT OVERCROWDING MEANS THAT THE

24  DEMAND FOR MENTAL HEALTH SPACE AND SERVICES EXCEEDS THE

25  EXISTING SUPPLY FOR MENTAL HEALTH SPACE AND SERVICES, WOULD YOU

1  AGREE THAT CROWDING IS THE PRIMARY CAUSE OF THE ONGOING

2  PROBLEMS IN CALIFORNIA?

3          **MS. TILLMAN:**  OBJECTION, MISSTATES THE LAW.

4  MISSTATES THE PLRA.  I THINK THAT'S A LEGAL DEFINITION USED IN

5  THIS PROCEEDING.

6          **JUDGE HENDERSON:**  I'M GOING TO ALLOW THAT.

7          YOU MAY ANSWER THAT, DOCTOR.  DID YOU HEAR THE

8  QUESTION?

9          **THE WITNESS:**  YES, I DID. LET ME MAKE SURE I

10  UNDERSTOOD THE QUESTION.

11          YOU'RE ASKING ME TO REDEFINE "CROWDING" TO SAY --

12  AND SAY THE EXISTING RESOURCES, MEANING THE NUMBER OF ICF'S AND

13  CRISIS BEDS AND ET CETERA IS NOT ENOUGH RELATIVE TO THE NUMBER

14  OF INMATES WHO NEED THOSE SERVICES.  THAT IF I CALL THAT

15  "CROWDING," WOULD I SAY THAT'S THE MAIN CAUSE?

16          **JUDGE KARLTON:**  OVERCROWDING.

17          **JUDGE HENDERSON:**  WOULD YOU CALL THAT

18  "OVERCROWDING"?

19  **BY MR. BIEN:**

20  **Q.**  IF YOU CALLED THAT "OVERCROWDING" WOULD YOU AGREE THAT

21  THAT'S THE PRIMARY CAUSE OF THE PROBLEMS YOU OBSERVED RIGHT

22  NOW?

23          **MS. TILLMAN:**  SAME OBJECTIONS.

24          **JUDGE HENDERSON:**  SAME RULING.

25          **THE WITNESS:**   YES.  BUT LET ME JUST BE CLEAR.  I

1    WANT TO MAKE SURE I'M SAYING THIS RIGHT.  I BELIEVE YOU ARE

2    REDEFINING IT AS BEING THAT THE FACT THAT THERE AREN'T ENOUGH

3    ICF BEDS, CRISIS BEDS, ACUTE CARE BEDS, EOP BEDS, GIVEN THE

4    CURRENT POPULATION, THAT IS IF THAT IS EQUAL TO OVERCROWDING,

5    YES.  THEN, I WOULD SAY THAT IS WHAT CAUSES IT, THE PRIMARY

6    CAUSE.

7    **BY MR. BIEN:**

8    **Q.**  THERE ALSO AREN'T ENOUGH TREATMENT SPACES IN PRISONS.

9    THERE AREN'T ENOUGH CONFIDENTIAL SPACES IN THE PRISONS YOU SAW

10   ALSO, CORRECT?

11   **A.**  THAT'S CORRECT.

12          **JUDGE KARLTON:**  AND THERE WASN'T ENOUGH STAFF; IS

13   THAT CORRECT?

14          **THE WITNESS:**  YES, THE STAFFING THING WAS MUCH MORE

15   VARIABLE. I HAVE TO BE FRANK.  AT SOME PLACES THE STAFFING WAS

16   BETTER THAN OTHERS.  AND CERTAINLY THERE HAD BEEN SOME

17   IMPROVEMENT IN THE STAFFING OVER AT LEAST THE TIME PERIOD THAT

18   I SAW THE DOCUMENTATION, AND EVEN FROM ONE PLACE TO ANOTHER.

19          SO THAT WAS A CONTRIBUTORY FACTOR.

20   **BY MR. BIEN:**

21   **Q.**  DR. PACKER, JUST TO BE CLEAR, IN THE ONE SYSTEM THAT YOU

22   PERSONALLY WORKED IN THAT EXPERIENCED OVERCROWDING, THE HAMPDEN

23   COUNTY, MASSACHUSETTS -- IT'S CALLED THE HOUSE OF CORRECTIONS.

24   IT'S TYPICALLY WHAT WE CALL A JAIL; IS THAT RIGHT?

25   **A.**  IT ACTUALLY WAS BOTH CALLED A JAIL AND A COUNTY

1  CORRECTIONAL FACILITY.  IT'S BOTH INDIVIDUALS WHO ARE -- HALF

2  THE PEOPLE ARE AWAITING TRIAL AND HALF HAVE BEEN SENTENCED TO

3  TWO-AND-A-HALF YEARS OR LESS.

4          SO IT'S SOME OF THE SAME PEOPLE YOU HAVE IN YOUR

5  PRISON, BUT THEY ARE JUST HOUSED IN MASSACHUSETTS, IN THE

6  COUNTY.

7  **Q.**  AND THAT WAS FOUND BY A COURT TO BE OVERCROWDING?

8  **A.**  YES.  WELL, NOTHING TO DO WITH HEALTH AND MENTAL HEALTH.

9  IT WAS JUST THAT THERE WERE -- I DON'T REMEMBER THE NUMBER, BUT

10 THEY WERE HOUSING, LET'S SAY, 800 MEN IN A FACILITY THAT THEY

11 ONLY HAD SPACE FOR, YOU KNOW, MUCH LESS THAN THAT.

12 **Q.**  AND YOU FELT THEY WERE ABLE TO DELIVER APPROPRIATE

13 HEALTHCARE IN THAT FACILITY?

14 **A.**  LET ME BE CLEAR.  I ONLY PROVIDED MENTAL HEALTHCARE, HAD

15 NOTHING TO DO WITH THE HEALTHCARE IN THAT FACILITY.  BUT WE

16 WERE ABLE TO PROVIDE ADEQUATE MENTAL HEALTHCARE.  AND THAT WAS

17 NEVER A FOCUS OF ANY OF THE LEGAL ACTION OR ANY OF THE

18 COMPLAINTS ABOUT WHAT WAS HAPPENING AT THAT FACILITY.

19 **Q.**  AND THERE WAS A CAP. THE COURT HAD IMPOSED A POPULATION CAP

20 ON THAT FACILITY WHILE YOU WERE WORKING THERE.

21 **A.**  THAT'S CORRECT.

22 **Q.**  SO EACH TIME AN INMATE CAME IN YOU HAD TO DISCHARGE AN

23 INMATE OUT THE BACK DOOR, RIGHT?

24 **A.**  I DIDN'T.  THE COUNTY FACILITY DID, YES. BUT THEY HAD

25 SOMETHING -- I DON'T KNOW THE MECHANISM FOR HOW THEY DID THAT,

1  BUT THAT IS WHAT THEY DID.

2  **Q.**  AND PART OF THE SERVICES THAT YOU PROVIDED TO THAT COUNTY

3  ASSISTED THE PROCESS OF REDUCING THE POPULATION IN THAT COUNTY;

4  IS THAT CORRECT?

5  **A.**  I'M NOT QUITE SURE.  ARE YOU TALKING ABOUT THE SERVICES WE

6  PROVIDED AT THE COURTHOUSE?

7  **Q.**  YES. YOU PROVIDED -- LET ME REPHRASE THE QUESTION, DR.

8  PACKER.

9           ISN'T IT CORRECT THAT THE MENTAL HEALTH SERVICES YOU

10 PROVIDED AT HAMPDEN COUNTY INCLUDED SERVICES NOT ONLY IN THE

11 CORRECTIONAL FACILITY, BUT IN THE COMMUNITY AND IN THE

12 COURTHOUSE?

13 **A.**  YES, THAT'S EXACTLY RIGHT.

14 **Q.**  AND YOU PROVIDED THOSE SERVICES TO PROVIDE APPROPRIATE

15 CONTINUITY OF CARE FOR PATIENTS AS A ACCESS TO CRIMINAL JUSTICE

16 SYSTEM.  AND YOU HELPED THE COURT DIVERT PARTICULAR PATIENTS

17 WHO REQUIRED, FOR EXAMPLE, PSYCHIATRIC HOSPITALIZATION FROM THE

18 HOUSE OF CORRECTIONS TO AN APPROPRIATE MENTAL HEALTH FACILITY?

19 **A.**  YES.  JUST TO BE CLEAR, WE DID BOTH. HELP THEM TO DIVERT TO

20 A PSYCHIATRIC HOSPITAL, BUT WE ALSO HELPED DIVERT THEM TO

21 EXISTING COMMUNITY RESOURCES.  AND THAT WAS ACCOMPLISHED ONLY

22 BY A VERY SIGNIFICANT INFLUX OF RESOURCES INTO THE COMMUNITY.

23           WE HAD AN EXTREMELY WELL-DEVELOPED COMMUNITY MENTAL

24 HEALTH SYSTEM THAT WAS ABLE TO HANDLE MANY OF THESE INDIVIDUALS

25 IN THE COMMUNITY SO THEY DID NOT HAVE TO BE HOSPITALIZED OR IN

 1  THE JAIL.

 2  **Q.** AND THAT HELPED REDUCE THE NUMBER OF MENTALLY ILL WHO WERE

 3  COMING INTO THE HOUSE OF CORRECTIONS; IS THAT CORRECT?

 4  **A.** YES, IT DID.

 5  **Q.** AND YOU ALSO HELPED PEOPLE ON THE WAY OUT. IN OTHER WORDS,

 6  PEOPLE BEING DISCHARGED FROM THE HOUSE OF CORRECTIONS, YOUR

 7  PROGRAM HELPED PROVIDE THEM WITH DISCHARGE PLANNING, CONTINUITY

 8  OF CARE AS THEY WERE DISCHARGED BACK TO THE COMMUNITY?

 9  **A.** YES. I NEED TO QUALIFY THAT, BECAUSE OBVIOUSLY THE PLACE

10  WE HAD THE TROUBLE IS SOMEBODY WAS BEING DISCHARGED

11  PRECIPITOUSLY DUE TO THIS ONE-IN-ONE-OUT, THEN YOU ARE STRUCK

12  BECAUSE YOU WOULDN'T HAVE ENOUGH TIME TO DEAL WITH THE

13  DISCHARGE THING.

14  **Q.** BUT YOUR PROGRAM IS DESIGNED TO IMPROVE CONTINUITY OF CARE

15  FOR PEOPLE COMING OUT OF PRISON GOING TO THE COMMUNITY WITH

16  MENTAL ILLNESS.

17  **A.** NO, JUST TO BE CLEAR, OUR PROGRAM WAS DEVELOPED BEFORE THE

18  CAP CAME IN PLACE. OUR PROGRAM HAD BEEN THERE FOR SEVERAL

19  YEARS, AND THEN, THE CAP CAME IN PLACE. OUR PROGRAM DEVELOPED.

20      ONE DIFFICULTY WE HAD, OF COURSE, IS WHEN SOMEBODY

21  GOT PRECIPITOUSLY DISCHARGED, WE WEREN'T ABLE TO, WHEN WE GOT A

22  CALL -- JUST TO BE CLEAR -- AT 2:00 O'CLOCK IN THE AFTERNOON

23  SAYING SOMEBODY IS GOING TO BE RELEASED BY THE END OF THE DAY

24  AT FIVE.

25      SO IN THOSE CASES THERE WAS NOTHING WE COULD REALLY

1  DO IN THOSE CASES TO PROVIDE CONTINUITY OF CARE.

2  **Q.**  YOU COULD CALL UP YOUR COHORTS IN THE COMMUNITY AND SEE IF

3  THEY KNEW THIS GUY, RIGHT?

4  **A.**  I GUESS THAT WAS POSSIBLE.  I'M JUST TELLING YOU THAT WAS

5  THE ONE AREA WE FELT WE WERE VERY CONCERNED ABOUT HOW THE CAP

6  PROCESS WAS REALLY IMPACTED.  AND THAT WAS ONE AREA THAT

7  CREATED DIFFICULTY FOR US.

8  **Q.**  YOU'VE OFFERED THE OPINION THAT SUICIDES IN THE CALIFORNIA

9  PRISON SYSTEM ARE NOT AFFECTED BY OVERCROWDING; IS THAT

10  CORRECT?

11  **A.**  NO, THAT'S NOT CORRECT.

12  **Q.**  I'M LOOKING AT YOUR DECEMBER 10TH, '07 REPORT, PAGE 22.

13  **A.**  I'M LOOKING AT THAT, TOO. WHICH SENTENCE ARE YOU REFERRING

14  TO?

15  **Q.**  THE FIRST SENTENCE:

16           "IT'S MY PROFESSIONAL OPINION THAT THE

17  INCREASE

18           IN SUICIDES IN THE CALIFORNIA PRISON SYSTEM IS NOT

19           PRIMARILY A FUNCTION OF CENSUS AND OVERCROWDING."

20  **A.**  THAT'S WHAT I SAID.  YOUR QUESTION SAID IT DIDN'T AFFECT

21  IT.  I DIDN'T SAY THAT. I SAID IT'S NOT PRIMARILY A FUNCTION OF

22  THAT.  I DIDN'T SAY THERE'S NO IMPACT THAT ONE CAN IMAGINE OR

23  ONE COULD ARGUE IT HAD. I'M SAYING IT'S NOT -- IT  WASN'T THE

24  PRIMARY ONE.  AND I DON'T PERSONALLY SAY IT WOULD BE ONE OF THE

25  MOST SIGNIFICANT FACTORS.

1  Q.  YOU AGREE THAT THE RATE OF SUICIDE IN CALIFORNIA PRISONS IS

2  ABOVE THE NATIONAL AVERAGE?

3  A.  YES, I AM AWARE OF THE DATA THAT WAS PROVIDED COMPARING THE

4  RATE TO WHAT'S AVAILABLE IN NATIONAL DATA.

5  Q.  OKAY. AND IT'S SIGNIFICANTLY ABOVE THE NATIONAL AVERAGE.

6  IT'S ABOVE 20 PER 100,000, WHILE THE NATIONAL AVERAGE IN

7  PRISONS IS 14; ISN'T THAT CORRECT?

8  A.  AGAIN, I DON'T KNOW EXACT NUMBERS.  I JUST WANT TO BE CLEAR

9  THAT I BELIEVE SOME OF THOSE NUMBERS WERE BASED ON SEVERAL

10 YEARS AGO.  SO I DON'T KNOW.  I HAVEN'T SEEN ANYTHING FOR 2007,

11 2008.  BUT I WOULD CERTAINLY AGREE IT'S ABOVE.  IN ALL THE DATA

12 I HAD SEEN, IT WAS ABOVE THE NATIONAL AVERAGE.

13 Q.  DO YOU HAVE ANY INFORMATION THAT WOULD LEAD YOU TO BELIEVE

14 THAT THE SUICIDE RATE IN 2007 HAS DECLINED IN ANY WAY?

15 A.  IN CALIFORNIA OR ACROSS THE COUNTRY?

16 Q.  IN CALIFORNIA.

17 A.  NO, I THINK WHAT I WAS SAYING IS THAT THE DATA THAT I'D

18 SEEN COMPARING CALIFORNIA TO THE NATIONAL NUMBER 14, AT LEAST

19 THE NUMBER I'VE SEEN IS NOT THE YEAR 2007.  THE YEAR 14 I JUST

20 DON'T REMEMBER THAT FROM THE DOCUMENTS.  I THOUGHT IT WAS A

21 COUPLE YEARS OLD.

22         I SIMPLY DON'T KNOW IF 14 IS STILL THE NUMBER FOR

23 THE NATIONAL AVERAGE.

24         **JUDGE KARLTON:**  THE QUESTION WAS, DOCTOR, DIFFERENT.

25 HE SAYS:  DO YOU HAVE ANY REASON TO BELIEVE THAT THE RATIO WAS

1  LOWERED IN 2007.

2            **THE WITNESS:**  NO.  I'M SORRY.  I DIDN'T HEAR THAT,

3  YOUR HONOR.

4            **JUDGE KARLTON:**  THIS IS VERY DIFFICULT.

5            DO YOU HAVE ANY REASON TO BELIEVE THAT THERE WAS ANY

6  SIGNIFICANT CHANGE IN THE RATIO OF CALIFORNIA TO THE REST OF

7  THE PRISON POPULATION IN 2007?

8            **THE WITNESS:**  NO, I DO NOT.

9            **JUDGE KARLTON:**  ALL RIGHT.

10 **BY MR. BIEN:**

11 **Q.**  YOU ENDORSE THE VARIOUS ORDERS OF THE COURT THAT REQUIRE

12 THE CALIFORNIA PRISON SYSTEM TO ADDRESS THE PARTICULAR RISK OF

13 SUICIDE IN ADMINISTRATION SEGREGATION UNITS; ISN'T THAT

14 CORRECT?

15 **A.**  I'M NOT SURE WHAT YOU MEAN WHEN YOU SAY I "ENDORSE."

16 **Q.**  WELL, YOU REFER TO THE VARIOUS PLANS THAT THE STATE IS

17 IMPLEMENTING IN AN ATTEMPT TO REDUCE THE HIGH RATE OF SUICIDE

18 IN THE ADSEG UNITS.

19            YOU'RE AWARE OF THOSE PLANS, AREN'T YOU?

20 **A.**  OFF THE TOP OF MY HEAD, I'M NOT PARTICULARLY FINDING WHAT

21 YOU'RE SAYING. I DON'T KNOW WHAT PAGE YOU'RE REFERRING TO IN MY

22 REPORT TO KNOW SPECIFICALLY WHAT YOU'RE TALKING ABOUT.

23 **Q.**  ARE YOU AWARE OF ANY PLANS BY THE STATE OF CALIFORNIA TO

24 ADDRESS THE HIGH RATE OF SUICIDE IN ADSEG UNITS?

25 **A.**  I DID REVIEW BOTH THE REPORTS BY DR. PATTERSON AND THE

1  RESPONSE FROM THE STATE THAT INCLUDED THOSE PLANS, BUT OFF THE

2  TOP OF MY HEAD I COULDN'T AGREE TO THEM AT THIS POINT.

3  **Q.**  OKAY.  YOU AGREE THAT OVERCROWDING CAN CONTRIBUTE TO RISKS

4  THAT MIGHT LEAD TO SUICIDE.

5  **A.**  IN AND OF ITSELF, THAT COULD BE ONE OF THE FACTORS THAT

6  COULD CONTRIBUTE.

7  **Q.**  SO, FOR EXAMPLE, IF SOMEONE WAS IN -- A MENTALLY ILL PERSON

8  WAS HOUSED IN AN ADSEG UNIT THAT WAS IMPACTED BY OVERCROWDING,

9  THAT MIGHT INCREASE THE RISK OF SUICIDE FOR THAT INDIVIDUAL.

10          **MS. TILLMAN:**  OBJECTION, VAGUE AND AMBIGUOUS.

11          **THE WITNESS:**  I'M NOT SURE WHAT YOU MEAN WHEN YOU'RE

12  SAYING "ADSEG UNITS IMPACTED BY OVERCROWDING."

13  **BY MR. BIEN:**

14  **Q.**  WELL, FOR EXAMPLE, AN ADSEG UNIT LIKE THE ONES WE VISITED

15  WHERE THEY WERE UNABLE TO PROVIDE OUTDOOR EXERCISE TO THE

16  MENTALLY ILL INMATES THAT WERE HOUSE IN THAT UNIT.

17          DO YOU AGREE THAT IF THEY COULDN'T PROVIDE OUTDOOR

18  EXERCISE AS A RESULT OF OVERCROWDING, THAT THAT MENTALLY ILL

19  INMATE IN THAT UNIT WAS AT RISK AS A RESULT OF OVERCROWDING?

20          **MS. TILLMAN:**  SAME OBJECTIONS.

21          **JUDGE HENDERSON:**  OVERRULED.

22          YOU MAY ANSWER THAT.

23          **THE WITNESS:**  YES. IF YOU'RE ASKING ME IF, INDEED,

24  SOMEONE IS IN AN ADSEG UNIT, AND AS A RESULT OF OVERCROWDING

25  THEIR ABILITY TO GET OUT OF THAT CELL AND HAVE OTHER TYPES OF

1  INTERACTION IS LIMITED, COULD THAT INCREASE THAT PERSON'S RISK

2  OF SUICIDE?  MY ANSWER IS:  YES.

3  **BY MR. BIEN:**

4  Q.  AND IF THEY ARE IN AN ADSEG UNIT THAT AS A RESULT OF

5  OVERCROWDING THERE'S LIMITED ACCESS TO MENTAL HEALTHCARE, THE

6  CLINICIANS CAN'T SEE THE PATIENTS IN A CONFIDENTIAL SETTING,

7  WOULD YOU AGREE THAT ALSO MIGHT INCREASE THE RISK OF SUICIDE?

8  A.  YES, IN THAT HYPOTHETICAL, AGAIN, THAT COULD LEAD TO AN

9  INCREASED RISK OF SUICIDE.

10 Q.  AND YOU'RE AWARE, THEN, THAT AS PART OF THE PROGRAM GUIDE,

11 THE MENTAL HEALTH DELIVERY SYSTEM, PRISONERS AT THE ENHANCED

12 OUTPATIENT LEVEL OF MENTAL HEALTHCARE, PEOPLE WHO ARE AT THE

13 HIGHER LEVEL OF CARE ARE SUPPOSED TO BE REMOVED FROM REGULAR

14 ADSEG UNITS TO SPECIALIZED ADSEG UNITS WHERE THEY CAN RECEIVE

15 10 HOURS A WEEK OF EOP CARE.

16         YOU'RE AWARE OF THAT REQUIREMENT?

17 A.  YES, I AM AWARE OF THAT.

18 Q.  AND IN THE COURSE OF YOUR TOURS, DID YOU LEARN THAT THE

19 SYSTEM AS IT CURRENTLY EXISTS IS UNABLE TO MEET THAT TRANSFER

20 REQUIREMENT, AND SO YOU FOUND MANY EOP'S HOUSED IN NORMAL ADSEG

21 UNITS THAT HAD NOT BEEN ABLE TO BE TRANSFERRED TO THESE

22 SPECIALIZED UNITS?

23 A.  OVER THE COURSE OF MY TOURS, I DID COME ACROSS SOME EOP

24 INMATES WHO WERE AWAITING TRANSFER TO AN EOP ADSEG AND WERE AT

25 THIS TIME BEING HOUSED IN REGULAR ADSEG AWAITING A BED SPACE,

1    YES.

2    Q.  AND ISN'T IT CORRECT THAT WE FOUND -- I'M SAYING "WE"

3    BECAUSE YOU AND I WERE TOGETHER ON SEVERAL OF THESE TOURS -- WE

4    FOUND SOME OF THESE EOP PRISONERS WHO HAD BEEN REFERRED FOR

5    TRANSFER AND HAD BEEN WAITING FOR MONTHS AND MONTHS AND MONTHS.

6            MS. TILLMAN:  OBJECTION.

7            THE WITNESS:  I DEFINITELY REMEMBER COMING ACROSS A

8    NUMBER OF INMATES WHO HAD BEEN WAITING FOR A LONG PERIOD OF

9    TIME.

10   BY MR. BIEN:

11   Q.  AND, IN FACT, WASN'T IT CORRECT THAT, FOR EXAMPLE, AT

12   TEHACHAPI PRISON YOU DISCOVERED SEVERAL INMATES WHO HAD BEEN

13   WAITING FOR TRANSFER NOT ONLY TO AN EOP PROGRAM, BUT TO AN ICF

14   OR APP PROGRAM, THE HIGHEST LEVEL OF CARE, THE ACUTE

15   PSYCHIATRIC PROGRAM, HAD BEEN WAITING FOR MONTHS AND MONTHS AND

16   MONTHS FOR THAT TRANSFER?

17           MS. TILLMAN:  OBJECTION, VAGUE AND AMBIGUOUS,

18   ARGUMENTATIVE.

19           JUDGE HENDERSON:  OVERRULED.

20           YOU MAY ANSWER THAT, DR. PACKER.

21           THE WITNESS:  YES, ALTHOUGH LET ME PUT A QUALIFIER.

22   I BELIEVE YOU SAID THE WORD "ACUTE."  THE ICF WAS INTERMEDIATE

23   CARE.  AND THAT WAS MUCH MORE PROBLEMATIC THAN THE ACUTE.

24   THERE WERE INDIVIDUALS WAITING TO GET INTO ACUTE.  MUCH MORE

25   SIGNIFICANT WAS THE WAITING FOR THE PEOPLE WAITING TO GET INTO

1   THIS INTERMEDIATE CARE FACILITY.

2           AND AS I INDICATED IN MY REPORT, THE NUMBER THAT

3   THEY GAVE ME WHEN I WAS LAST THERE WAS 160 SOMETHING PEOPLE ON

4   THE WAITING LIST TO GET INTO THE INTERMEDIATE CARE.  AND THAT'S

5   WHAT I SAW WAS THE BIGGEST PROBLEM THAT THEY JUST WEREN'T --

6   DIDN'T HAVE ENOUGH INTERMEDIATE CARE BEDS TO BE ABLE TO

7   ACCOMMODATE THE INDIVIDUALS THAT NEEDED TO BE TRANSFERRED

8   THERE.

9   **BY MR. BIEN:**

10  **Q.**   DO YOU RECALL YOUR TOUR OF TEHACHAPI PRISON WHICH

11  OCCURRED -- I THINK IT WAS ON JULY 31ST OR AUGUST 1ST, 2008?

12  **A.**   I WOULD LIKE TO LOOK AT MY REPORT IN FRONT OF ME.  I'D BE

13  ABLE TO TELL YOU WHAT DATE THAT WAS.

14          TEHACHAPI, JULY 29TH, 2008.

15  **Q.**   AND ISN'T IT CORRECT THAT ON THAT TOUR YOU WERE ACCOMPANIED

16  BY DR. CRAIG HANEY, PLAINTIFFS' EXPERT, ALONG WITH OTHER

17  PEOPLE, INCLUDING ME?

18  **A.**   THAT'S CORRECT.

19  **Q.**   AND ISN'T IT CORRECT THAT DURING THE COURSE OF THAT TOUR

20  WE -- AT THE END OF THE DAY, WE VISITED A UNIT CALLED "4A." DO

21  YOU RECALL THAT?  AND WE VISITED SEVERAL MEN WHO WERE ON THE

22  WAITING LIST FOR TRANSFER FOR DMH CARE?

23  **A.**   TO BE FRANK, I DON'T REMEMBER SPECIFICALLY THE UNIT.  I

24  CERTAINLY DO REMEMBER COMING ACROSS SOME MEN WHO WERE WAITING

25  TO GET IN --

1          **MR. BIEN:**  IF THE COURT REPORTER COULD PROVIDE DR.

2   PACKER WITH EXHIBITS WE PREMARKED AS P800.  THESE ARE DR.

3   PACKER'S HANDWRITTEN NOTES OF HIS TOURS.

4   **BY MR. BIEN:**

5   **Q.**  MAYBE THAT WILL HELP REFRESH YOUR RECOLLECTION.

6          AND, DR. PACKER, IF YOU COULD TURN TO PAGE -- YOU

7   SEE THE PAGE NUMBERS ON THE BOTTOM RIGHT?  THEY ARE PRODUCTION

8   NUMBERS, START WITH "PAC"?

9   **A.**  YES.

10  **Q.**  IF YOU TURN TO PAGE -- TAKE A LOOK AT 2274 AND 2275,

11  PLEASE.

12  **A.**  EXCUSE ME.  2274?

13  **Q.**  AND 2275.  AND I WOULD LIKE YOU TO FIRST CONFIRM THAT THOSE

14  ARE YOUR NOTES FOR THIS TOUR.

15  **A.**  YES, THEY ARE.

16  **Q.**  OKAY. AND ON 2275, DO YOU RECALL THAT WE VISITED UNIT 4A

17  TOWARDS THE END OF THE DAY?

18  **A.**  YES, I DO. I'M LOOKING AT THAT RIGHT NOW.

19  **Q.**  AND IF I COULD JUST -- IF I COULD INDULGE THE COURT AND DR.

20  PACKER -- ON YOUR NOTES THERE ARE SOME NAMES OF PARTICULAR

21  PRISONERS THAT WE INTERVIEWED THAT WERE IN THE MENTAL HEALTH

22  CASELOAD.

23          **MR. BIEN:**  AND IF IT IS OKAY WITH THE COURT, WE

24  WOULD PREFER NOT TO REFER TO THEM BY NAME.

25          **JUDGE HENDERSON:**  THAT'S FINE.

1  **BY MR. BIEN:**

2  **Q.**  SO IF WE CAN REFER TO THE FIRST INMATE AS INMATE M, DR.

3  PACKER.

4  **A.**  YES, I UNDERSTAND.

5  **Q.**  AND THE SECOND ONE IS INMATE L; IS THAT OKAY?

6  **A.**  YES. YES.

7  **Q.**  OKAY. SO IS IT CORRECT THAT -- IF YOU REMEMBER -- THAT,

8  FIRST OF ALL, THAT UNIT 4A WAS LOCKED DOWN WHEN WE VISITED IT;

9  IS THAT CORRECT?

10 **A.**  I HAVE TO SAY I DON'T RECALL EXACTLY WHICH UNIT WAS LOCKED

11 DOWN, BUT I CERTAINLY VISITED SOME UNITS THAT WERE LOCKED DOWN.

12 I DON'T RECALL THIS PARTICULAR ONE.

13 **Q.**  WELL, TURN ONE PAGE BEFORE TO 2274. DID YOU RECALL THAT WE

14 WERE INFORMED THAT THAT UNIT HAD NOT BEEN GIVEN ANY YARD SINCE

15 APRIL OF 2008?

16 **A.**  YES, I'M LOOKING AT THAT NOW, AND IT DOES REFRESH MY

17 MEMORY.  THAT UNIT HAD BEEN LOCKED DOWN FOR QUITE A LONG TIME.

18 **Q.**  AND DO YOU RECALL WHAT WE WERE TOLD BY THE CUSTODIAL

19 OFFICER AS TO WHY THE UNIT WAS LOCKED DOWN?

20 **A.**  YES.  THERE HAD BEEN A SERIOUS ASSAULT ON A COUPLE OF

21 OFFICERS, AND THAT UNIT HAD BEEN LOCKED DOWN.

22 **Q.**  AND WE WERE ALSO INFORMED THAT -- ISN'T IT CORRECT THAT YOU

23 WERE INFORMED BY THE OFFICERS THAT NO YARD WHATSOEVER WAS BEING

24 PROVIDED TO THE INMATES ON THAT UNIT SINCE APRIL OF '08?

25 **A.**  THAT'S CORRECT.

1  Q.    SO THEY HAD NOT BEEN ALLOWED OUTDOORS FOR MONTHS.

2              **JUDGE HENDERSON:**  THAT'S WHAT "NO YARD" MEANS.

3              **THE WITNESS:**  THEY HAD NOT BEEN ALLOWED INTO THE

4  YARD, IT SAYS, SINCE APRIL.  AND IT WAS IN JULY.

5  **BY MR. BIEN:**

6  Q.  NOW, DO YOU RECALL THAT INMATE M HAD BEEN REFERRED FOR

7  INPATIENT PSYCHIATRIC CARE AND HAD BEEN ACCEPTED BY THE APP

8  UNIT IN FEBRUARY OF '08?

9  A.  YES, THAT'S CORRECT.

10  Q.  SO HE'D BEEN ACCEPTED IN FEBRUARY OF '08, BUT IN LATE JULY

11  HE WAS STILL HERE IN TEHACHAPI?

12  A.  YES.  THE ONLY THING MY NOTES DON'T SAY IS IT WAS ACUTE

13  UNIT.  SAYS HE WAS REFERRED TO DMH, AND THEN SAYS HE WAS ON THE

14  WAITING LIST FOR ICF, WHICH IS INTERMEDIATE CARE UNITS.  BUT HE

15  WAS SO FAR DOWN ON THE WAIT LIST THAT HE WASN'T GOING TO GET

16  IN, AND SO THEY DROPPED HIM FROM THE LIST.

17  Q.  OKAY. AND IS IT CORRECT THAT THE ADSEG UNIT AT 4A WAS NOT

18  AN EOP ADSEG UNIT.  IN OTHER WORDS, DIDN'T PROVIDE 10 HOURS A

19  WEEK OF SERVICES?

20  A.  THAT'S CORRECT.

21  Q.  AND I THINK YOUR NOTE, IF YOU LOOK DOWN A LITTLE BIT, ABOUT

22  A QUARTER OF THE WAY DOWN THE PAGE, WERE YOU TOLD BY THE

23  CLINICIANS THAT IT WAS EVEN -- IT TOOK EVEN LONGER TO TRANSFER

24  A PRISONER TO AN EOP ADSEG UNIT THAN IT DID TO GET THEM TO A

25  DMHICF UNIT?

1   **A.** I THOUGHT THEY WERE TALKING ABOUT THIS PARTICULAR

2   INDIVIDUAL. BUT, YES, I THINK WHAT THEY TOLD ME, BASED ON MY

3   NOTES, IS THAT THERE WAS A LONG WAITING LIST TO GET INTO THE

4   ICF, BUT MIGHT BE LONGER TO GET THEM INTO THE EOP ADSEG.

5   **Q.** AND ONE OF THE TWO MEN THAT YOU AND DR. HANEY INTERVIEWED

6   WHOSE FIRST NAME BEGINS WITH M REFUSED TO COME OUT OF HIS CELL;

7   ISN'T THAT CORRECT?

8   **A.** THAT'S CORRECT.

9   **Q.** AND YOU ATTEMPTED TO INTERVIEW HIM THROUGH THE CELL DOOR.

10  WHAT WAS THAT LIKE, DR. PACKER?

11  **A.** TO BE HONEST, I CANNOT OFF THE TOP OF MY HEAD RECALL

12  WHETHER IT WAS THIS PARTICULAR INTERVIEW OR NOT. BUT I DID

13  SEVERAL INTERVIEWS OVER THE COURSE OF MY VISIT, SO I TRIED TO

14  INTERVIEW PEOPLE THROUGH THE CELL DOORS. I CAN'T REMEMBER

15  SPECIFICALLY THIS CASE.

16  **Q.** WHAT WAS YOUR EXPERIENCE IN GENERAL IN TERMS OF YOUR

17  SUCCESS AS A CLINICIAN IN OBTAINING INFORMATION FROM AN INMATE

18  TALKING THROUGH A CELL DOOR?

19  **A.** I CAN TELL YOU BOTH BASED ON THESE TOURS AND HAVING BEEN IN

20  OTHER SYSTEMS THAT IT IS SIMPLY NOT THE WAY TO CONDUCT A

21  CLINICAL INTERVIEW. ONE CANNOT ASK AS MUCH DETAILED

22  INFORMATION, CANNOT INTERACT AS LONG. AND THE ENVIRONMENT

23  DOESN'T LEND ITSELF TO ANYTHING OTHER THAN A BRIEF MENTAL

24  STATUS ASSESSMENT TO GIVE A SENSE OF WHETHER THE PERSON IS IN

25  ACUTE CRISIS OR HAS SOME IMMEDIATE NEEDS.

1  Q.  THE OTHER INMATE THAT YOU INTERVIEWED AGREED TO COME OUT.

2  AND WHERE DID YOU INTERVIEW HIM?

3  A.  I DON'T RECALL.

4  Q.  IF YOU GO A LITTLE FURTHER DOWN, DO YOU RECALL THAT THERE

5  WERE SOME -- I'LL USE THE EUPHEMISM -- "HOLDING MODULES" SET UP

6  IN AN AREA SO YOU COULD INTERVIEW PEOPLE?

7  A.  AGAIN, I CERTAINLY REMEMBER THAT. I DON'T REMEMBER THIS

8  PARTICULAR INDIVIDUAL.  OVER THE COURSE OF MY VISITS ON A

9  NUMBER OF OCCASIONS THEY BROUGHT SOMEBODY OUT, PUT HIM IN ONE

10  OF THESE HOLDING CELLS OR MODULES, AND I WOULD SIT RIGHT NEXT

11  TO THEM AND INTERVIEW THEM.

12  Q.  HAVE YOU MADE A RECOMMENDATION -- LOOKING BACK ON YOUR

13  REPORT ABOUT -- YOUR DECEMBER REPORT ABOUT SUICIDE, YOU MADE A

14  RECOMMENDATION TO THE DEPARTMENT OF CORRECTIONS THAT THEY

15  SHOULD REEXAMINE THEIR POLICY OF HOUSING IN THE SAME ADSEG UNIT

16  PEOPLE WHO ARE THERE FOR NONDISCIPLINARY REASONS AND

17  DISCIPLINARY REASONS; IS THAT CORRECT?

18          THAT'S ON PAGE --

19  A.  TO BE MORE PRECISE -- YES, I KNOW.  BUT TO BE MORE PRECISE

20  I RECOMMENDED REEXAMINING THE POLICY OF PLACING SOMEBODY IN

21  ADSEG SIMPLY BECAUSE THEY HAD BEEN THE VICTIM, RATHER THAN THE

22  PERPETRATOR.

23  Q.  IT'S YOUR UNDERSTANDING THAT THAT IS THE POLICY IN

24  CALIFORNIA RIGHT NOW, ISN'T IT?

25  A.  I ACTUALLY USED THE WORD "POLICY." I DON'T KNOW IF IT'S A

1  POLICY OR A PROCEDURE, BUT THEY WERE DOING IT. I FOUND INMATES

2  LIKE THIS ONE WHO HAD BEEN INVOLVED IN A FIGHT, AND HAD BEEN

3  NOT THE INSTIGATOR, BUT THE VICTIM, AND FOR THEIR OWN SAFETY

4  HAD BEEN PLACED IN AN ADSEG UNIT.

5          AND JUST TO BE CLEAR, MY RECOMMENDATION WAS --

6  READING THIS REPORT, WAS EITHER NOT TO PUT THEM IN SUCH A UNIT,

7  OR AT LEAST SINCE THEY WERE -- THEY NEEDED TO FOR SAFETY

8  REASONS, FOR ENHANCED SERVICES PROVIDED FOR THOSE INDIVIDUALS

9  AS OPPOSED TO THE INSTIGATOR, THE ONE WHO STARTED THE FIGHT.

10 Q.  ARE YOU AWARE THAT IN RESPONSE TO AN ORDER OF JUDGE

11 KARLTON, THAT THE STATE BROUGHT TOGETHER EXPERTS FROM ALL OVER

12 THE COUNTRY ABOUT SUICIDE PREVENTION, AND THESE EXPERTS MADE A

13 SERIES OF RECOMMENDATIONS TO CALIFORNIA AS TO WHAT IT CAN DO TO

14 ADDRESS THE PROBLEM OF SUICIDE IN ADSEG UNITS?

15 A.  YES, I CAME ACROSS THAT IN THE COURSE OF MY WORK ON THIS

16 CASE.

17 Q.  AND ARE YOU AWARE THAT ONE OF THE RECOMMENDATIONS THAT

18 THOSE EXPERTS MADE TO CALIFORNIA IN 2006 WAS THE SAME

19 RECOMMENDATION THAT YOU JUST MADE TO CALIFORNIA IN DECEMBER OF

20 2007?

21 A.  I DON'T HAVE AN INDEPENDENT RECALL OF THAT, BUT THAT

22 DOESN'T SURPRISE ME.

23 Q.  AND YOU ALSO ARE AWARE THAT IN RESPONSE TO THAT

24 RECOMMENDATION THE STATE SAID THAT DUE TO OVERCROWDING IT WAS

25 UNABLE TO IMPLEMENT THIS IDEA OF SEPARATING PEOPLE IN ADSEG WHO

1  ARE THERE FOR THEIR OWN SAFETY FROM PEOPLE WHO ARE THERE FOR

2  RULES VIOLATIONS?

3           **MS. TILLMAN:**  OBJECTION, ASSUMES FACTS NOT IN

4  EVIDENCE.

5           **JUDGE HENDERSON:**  OVERRULED.

6           **THE WITNESS:**  I DON'T RECALL THAT PARTICULAR

7  DOCUMENT THAT MAKES THAT STATEMENT.

8  **BY MR. BIEN:**

9  **Q.**  WE WILL COME BACK TO THAT, DOCTOR. THANK YOU.

10          I'LL REPRESENT TO YOU THAT THAT IS WHAT HAPPENED,

11  AND WE WILL BE ABLE TO SHOW THAT TO YOU IN A MINUTE.

12          DO YOU RECALL TOURING THE CALIFORNIA INSTITUTE FOR

13  MEN?

14  **A.**  YES, I DO.

15  **Q.**  AND DO YOU RECALL MEETING DR. JORDAN WHO TOOK US ON A TOUR

16  OF THE ADSEG UNITS AT CALIFORNIA INSTITUTE FOR MEN?

17  **A.**  I DO RECALL THE NAME, BUT I CAN'T QUITE VERIFY THAT THAT

18  WAS THE DOCTOR WHO GAVE US THAT PARTICULAR TOUR.  BUT I DID GET

19  A TOUR OF THAT FACILITY, YES. AND I DID COME ACROSS A DR.

20  JORDAN.

21  **Q.**  ARE YOU AWARE THAT DR. JORDAN WAS VERY CONCERNED ABOUT THE

22  RISK OF SUICIDE IN THE CIM AND ADSEG UNITS?

23          **MS. TILLMAN:**  CALLS FOR SPECULATION ON THE PART OF

24  THE WITNESS.

25          **JUDGE KARLTON:**  HE'S JUST ASKING HIM IF HE'S AWARE

1  OF IT. EITHER HE'S AWARE OF IT OR NOT.

2          **JUDGE HENDERSON:**  YOU MAY ANSWER THAT QUESTION, DR.

3  PACKER.

4          **THE WITNESS:**  I DON'T HAVE AN INDEPENDENT RECALL AT

5  THIS POINT, NO.

6  **BY MR. BIEN:**

7  **Q.**  DO YOU RECALL THAT THERE HAD BEEN SEVERAL SUICIDES IN THE

8  ADSEG UNITS AT CIM IN THE RECENT YEARS PRIOR TO YOUR TOUR?

9  **A.**  IN THE YEARS PRIOR TO, YES.  I DO RECALL THAT.

10  **Q.**  AND ARE YOU AWARE THAT VARIOUS RECOMMENDATIONS WERE MADE TO

11  CIM AS TO WHAT MEASURES IT COULD TAKE TO LESSEN THE RISK OF

12  SUICIDES IN ITS ADSEG UNITS?

13          **JUDGE KARLTON:**  RECOMMENDATIONS BY WHOM?

14          **MR. BIEN:**  BY THE SPECIAL MASTER AND HIS TEAM.

15          **JUDGE KARLTON:**  ALL RIGHT.

16          **THE WITNESS:**  AGAIN, I THINK I HAVE AN INDEPENDENT

17  RECALL OF THAT SPECIFICALLY WITHOUT BEING REFERRED TO A

18  DOCUMENT.

19  **BY MR. BIEN:**

20  **Q.**  DO YOU RECALL THAT AS PART OF THE ADSEG SUICIDE PLAN, ONE

21  OF THE RECOMMENDATIONS THAT THE STATE SAID THEY WOULD ATTEMPT

22  TO ADDRESS WAS THE LACK OF OUTDOOR EXERCISE?

23  **A.**  AGAIN, I DON'T RECALL SPECIFICALLY AT CIM.  I DO RECALL

24  OVER THE COURSE OF MY READING MATERIALS THAT THAT WAS ONE OF

25  THE ISSUES THAT HAD BEEN DISCUSSED ABOUT ADSEG UNITS.  I DON'T

1  RECALL IF IT WAS SPECIFIC TO CIM OR PARTICULAR TO THIS

2  SITUATION.

3  **Q.**  YOU KNOW THAT THE COURT HAS ORDERED THE STATE TO INCREASE

4  THE NUMBER OF SMALL MANAGEMENT YARDS.  YOU'RE AWARE OF THAT

5  ORDER?

6  **A.**  YES, I AM.

7  **Q.**  AND WHAT IS A SMALL MANAGEMENT YARD, DR. JORDAN?  I'M

8  SORRY, DR. PACKER. WHAT IS A SMALL MANAGEMENT YARD?

9  **A.**  THESE ARE BASICALLY YARDS WHERE INMATES IN HIGH SECURITY

10  SITUATIONS HAVE ROOM TO GO OUTSIDE, BUT EACH ONE OF THEM IS

11  KIND OF IN A CAGED AREA SO THAT THEY ARE NOT IN WITH A LOT OF

12  OTHER INMATES.

13  **Q.**  AND YOU SAW SOME OF THESE SMALL MANAGEMENT YARDS ON YOUR

14  TOURS?

15  **A.**  YES, I DID.

16  **Q.**  AND DO YOU UNDERSTAND THAT THERE ARE INSUFFICIENT SMALL

17  MANAGEMENT YARDS TODAY FOR CALIFORNIA TO BE ABLE TO PROVIDE 10

18  HOURS A WEEK OF OUTDOOR EXERCISE FOR THE INMATES IN ADSEG?

19  **A.**  I'M NOT PARTICULARLY FAMILIAR EXACTLY WHAT THE SITUATION IS

20  TODAY. ALL I CAN SAY IS OVER THE COURSE OF MY TOURS THERE WAS

21  VARIABILITY.  SOME SITES WERE BETTER EQUIPPED THAN OTHERS.

22  **Q.**  AND YOU ARE AWARE THAT MANY OF THE ADSEG UNITS WERE UNABLE

23  TO PROVIDE THIS 10 HOURS A WEEK UNLESS AND UNTIL ADDITIONAL

24  SMALL MANAGEMENT YARDS WERE CONSTRUCTED?

25  **A.**  I'M AWARE THAT AT LEAST SOME FACILITIES HAD THAT PROBLEM. I

1  DON'T HAVE A QUANTIFIED NUMBER ON THAT. BUT I KNOW THAT THAT

2  WAS STILL AN ONGOING ISSUE, THAT MORE YARDS NEEDED TO BE

3  CONSTRUCTED.

4  **Q.**  DID YOU REVIEW TO EXPERT REPORT OF DR. CRAIG HANEY?

5  **A.**  THERE WERE TWO REPORTS THAT I BELIEVE I REVIEWED BOTH OF

6  THEM.

7  **Q.**  AT PARAGRAPH 123 OF DR. HANEY'S FINAL REPORT HE TALKS ABOUT

8  THE TOUR OF CIM THAT YOU AND HE TOOK.  AND HE TALKS ABOUT DR.

9  JORDAN STATING HIS CONCERNS ABOUT THE RISK OF SUICIDE IN THE

10 ADSEG UNITS AT CIM.

11 **A.**  WELL, FIRST OF ALL, I NEED TO CORRECT YOU ON SOMETHING. I

12 NEVER TOURED CIM WITH DR. HANEY.  AND, SECONDLY, I DON'T HAVE

13 THAT DOCUMENT IN FRONT OF ME.  BUT I CAN ASSURE YOU WE DIDN'T

14 TOUR CIM TOGETHER.

15 **Q.**  YOU ARE CORRECT, AND I APOLOGIZE. YOU TOURED A COUPLE OF

16 WEEKS AFTER DR. HANEY AT CIM; IS THAT CORRECT?

17 **A.**  WELL, I DON'T KNOW WHEN DR. HANEY TOURED, BUT I TOURED CIM

18 IN NOVEMBER OF 2007.

19 **Q.**  DR. PACKER, WHEN YOU WORKED AT THE MASSACHUSETTS PRISON

20 SYSTEM IT WAS NOT OVERCROWDED; IS THAT CORRECT?

21 **A.**  THAT'S CORRECT.

22 **Q.**  IN FACT --

23 **A.**  NO, I NEED TO CORRECT MYSELF ON THAT. I BELIEVE AT THE VERY

24 BEGINNING OF OUR WORK IN THE MASSACHUSETTS SYSTEM THERE STILL

25 WAS AN ISSUE OF OVERCROWDING, AND SOME INMATES HAD BEEN SENT

1  OUT TO TEXAS TO RELIEVE THAT PROBLEM. THAT WAS JUST FOR A SMALL

2  PART OF THE TIME I WORKED THERE.

3           SHORTLY AFTER THAT, WITHIN A COUPLE OF YEARS AT

4  MOST, THE SYSTEM WAS NO LONGER CONSIDERED OVERCROWDED, AND THE

5  INMATES IN TEXAS WERE RETURNED.

6           THE COURT REPORTER:  CAN HE REPEAT THE LAST

7  SENTENCE?

8  **BY MR. BIEN:**

9  **Q.**  CAN YOU REPEAT THE LAST SENTENCE?

10          **JUDGE KARLTON:**  THE INMATES FROM TEXAS WERE

11 RETURNED.

12          **THE WITNESS:**  WHAT I'M SAYING IS WHEN I FIRST

13 STARTED WORKING IN THAT SYSTEM IN MASSACHUSETTS IN '98, THE

14 SYSTEM WAS CONSIDERED OVERCROWDED, AND SEVERAL HUNDRED INMATES

15 HAD BEEN SENT OUT OF STATE, I BELIEVE TO TEXAS.  I DON'T

16 REMEMBER EXACTLY AT WHAT POINT, BUT CERTAINLY WITHIN TWO TO

17 THREE YEARS THE POPULATION IN THE PRISON SYSTEM IN

18 MASSACHUSETTS DECLINED.  THE INDIVIDUALS WERE BROUGHT BACK, AND

19 THE SYSTEM WAS NO LONGER CONSIDERED OVERCROWDED BY THE

20 DEPARTMENT OF CORRECTIONS.

21 **BY MR. BIEN:**

22 **Q.**  OKAY. AND, IN FACT, WHILE YOU WERE WORKING IN MASSACHUSETTS

23 THEY WERE CONSIDERING CLOSING DOWN SOME OF THE PRISONS; IS THAT

24 CORRECT?

25 **A.**  WELL, THEY HAD TO CLOSE ONE DOWN, YES. THEY ALSO BUILT A

1  NEW ONE, BUT THEY CLOSED ONE DOWN.

2  **Q.**  AND YOU HAVE NEVER PUBLISHED ANY ARTICLES CONCERNING PRISON

3  OR JAIL OVERCROWDING; IS THAT CORRECT?

4  **A.**  THAT'S CORRECT.

5  **Q.**  AND YOU'VE NEVER DONE ANY SCIENTIFIC STUDIES ABOUT THE

6  EFFECTS OF OVERCROWDING ON A CORRECTIONAL SYSTEM?

7  **A.**  NO, I HAVE NOT.

8  **Q.**  AND YOU MENTIONED OVERCROWDING IN ONE ARTICLE YOU PUBLISHED

9  IN 2001, AND THAT'S PLAINTIFFS' 806. COULD I --

10  **A.**  YES, I HAVE THAT IN FRONT OF ME.

11  **Q.**  AND IN THAT ARTICLE, I'M LOOKING AT THE BOTTOM OF THE FIRST

12  PAGE, BOTTOM OF PAGE 1343.  THIS WAS PUBLISHED IN 2001; IS THAT

13  CORRECT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  AND I'M READING FROM THE BOTTOM OF THE ARTICLE.  IT SAYS:

16              "REGARDLESS OF THE CRITERIA USED TO DEFINE A

17          MENTAL DISORDER, PRISONS IN THE UNITED STATES FACE

18          SERIOUS PROBLEMS IN DEALING WITH INMATES WHO HAVE

19          MENTAL DISORDERS.  SYMPTOMATIC INMATES CAN IMPAIR

20  THE

21          SAFE AND EFFICIENT OPERATION OF A CORRECTIONAL

22          FACILITY, AND THE CORRECTIONAL ENVIRONMENT CAN

23          EXACERBATE SYMPTOMS OF MENTAL ILLNESS.  INCARCERATED

24          PERSONS, EVEN THOSE WHO DO NOT HAVE A MENTAL

25          DISORDER, EXPERIENCE SIGNIFICANT STRESS, SEPARATION

1           FROM FAMILY AND SOCIAL SUPPORTS, SIGNIFICANT

2           LIMITATIONS ON PRIVACY.  FEAR OF ASSAULT AND BOREDOM

3           ARE SOME OF THE COMMON STRESSORS IN PRISON.

4           OVERCROWDING, WHICH OCCURS COMMONLY IN STATE AND

5           FEDERAL PRISONS, CAN EXACERBATE THESE PROBLEMS.

6   THESE

7           CHALLENGES OFTEN OVERWHELM THE LIMITED COPING SKILLS

8           OF INMATES WHO HAVE MENTAL DISORDERS RESULTING IN

9           FUNCTIONAL DETERIORATION."

10          YOU STILL AGREE WITH THAT STATEMENT THAT YOU WROTE

11  IN THIS ARTICLE, DR. PACKER?

12  **A.**  THAT WHOLE PARAGRAPH YOU READ?  THE WHOLE PARAGRAPH.

13  **Q.**  DR. PACKER, YOU HAVE NEVER WORKED AS A SPECIAL MASTER OR

14  MONITOR AS PART OF A REMEDIAL PROCESS IN A PRISON OR JAIL CASE,

15  HAVE YOU?

16  **A.**  NO, I HAVE NOT.

17  **Q.**  AND YOU'VE NEVER BEEN RETAINED BY A SPECIAL MASTER OR

18  MONITOR TO WORK IN A PRISON OR JAIL TO HELP WITH THE REMEDIAL

19  PROCESS?

20  **A.**  THAT'S CORRECT.

21  **Q.**  AND YOU'VE NEVER BEEN RETAINED BY THE U.S. DEPARTMENT OF

22  JUSTICE TO ASSIST AS AN EXPERT IN A PRISON OR JAIL CASE, HAVE

23  YOU?

24  **A.**  I BELIEVE I HAD ONE SMALL OPPORTUNITY TO WORK IN A JUVENILE

25  SYSTEM FOR A VERY CIRCUMSCRIBED ISSUE, BUT NOT THE ISSUE WE'RE

1  TALKING ABOUT TODAY.

2  Q.  AND YOU'VE NEVER TESTIFIED AS AN EXPERT WITNESS IN A CLASS

3  ACTION, HAVE YOU?

4            **JUDGE KARLTON:**  WELL, HE IS NOW.

5  **BY MR. BIEN:**

6  Q.  PRIOR TO TODAY. EXCUSE ME.

7  A.  NO, I DON'T BELIEVE I HAVE.

8  Q.  YOU'VE TESTIFIED IN SEVERAL CASES AS AN EXPERT WITNESS,

9  THAT'S CORRECT.  YOU'VE TESTIFIED --

10 A.  I'VE WHAT?

11 Q.  YOU'VE TESTIFIED AS AN EXPERT WITNESS BEFORE, RIGHT?

12 A.  YES, HUNDREDS OF TIMES.

13 Q.  OKAY. AND THOSE CASES HAVE INVOLVED ISSUES SUCH AS

14 COMPETENCY TO STAND TRIAL; IS THAT RIGHT?

15 A.  SOME OF THE CASES, YES.

16 Q.  MEDICAL MALPRACTICE?

17 A.  YES.

18 Q.  INSANITY DEFENSE?

19 A.  YES.  THOSE ARE NOT ALL OF THEM, THOUGH.

20 Q.  DR. PACKER, HAVE YOU FOUND SIGNIFICANT PROBLEMS WITH

21 MEDICAL RECORDS THAT YOU SAW IN THE CALIFORNIA PRISON SYSTEM,

22 DIDN'T YOU?

23 A.  YES, BOTH IN SOME OF THE SITES THAT I VISITED, AND AS WELL

24 AS IN THE DOCUMENTATION I WAS GIVEN.

25 Q.  AND IT'S YOUR OPINION THAT OVERCROWDING IS THE PRIMARY

1  CAUSE OF THE PROBLEMS WITH MEDICAL RECORDS?

2  **A.**  AGAIN, JUST TO BE CLEAR ABOUT THE TERMINOLOGY, IT WAS MY

3  OPINION THAT THE SHEER NUMBER OF INMATES IN THE SYSTEM IS THE

4  MOST DIRECT CAUSE RESULTING IN THE DIFFICULTY OF CDCR TO MANAGE

5  THEIR MEDICAL RECORDS APPROPRIATELY.

6  **Q.**  AND YOU FOUND THAT MEDICAL RECORDS WERE NOT ALWAYS

7  AVAILABLE TO CLINICIANS WHO NEEDED THEM WHEN THEY WERE SEEING

8  PATIENTS?

9  **A.**  RIGHT.  IN SOME INSTITUTIONS THE PROBLEM WAS THAT FOR

10  CERTAIN PERIODS OF TIME AND IN CERTAIN SETTINGS THE CLINICIANS

11  COULD NOT ACCESS THE RECORDS AT THE TIME THEY WERE EVALUATING

12  OR TREATING AN INDIVIDUAL.

13  **Q.**  AND YOU ALSO SAW THAT THERE WERE DELAYS IN UPDATING CHARTS

14  IN MEDICAL RECORDS AS A RESULT OF THESE PROBLEMS.

15  **A.**  THERE WERE, YES.

16  **Q.**  AND THERE WERE DELAYS IN FILING THE RECORDS. YOU HEARD

17  ABOUT STACKS OF UNFILED RECORDS AT VARIOUS PRISONS YOU VISITED,

18  RIGHT?

19  **A.**  AGAIN, THERE WERE VARIABLES. SOME PRISONS PEOPLE WERE DOING

20  A VERY GOOD JOB, UP-TO-DATE.  OTHERS WERE DOING A MUCH POORER

21  JOB.  AND ALL PRISONS IN THE DOCUMENTATION I REVIEWED, THERE

22  WERE ALSO INSTANCES IN THE SPECIAL MASTER'S REPORT, OTHER

23  INSTITUTIONS HAVING SIGNIFICANT DIFFICULTY KEEPING UP WITH

24  THEIR FILING.

25  **Q.**  AND DO YOU RECALL THAT THERE WAS A MEDICAL RECORD THAT YOU

1  AND DR. HANEY HAD REVIEWED DURING YOUR TOUR OF SATIF, THE

2  SUBSTANCE ABUSE TREATMENT FACILITY.  THERE WAS AN INMATE THAT

3  YOU BOTH INTERVIEWED, AND THEN YOU WENT AND REVIEWED HIS

4  MEDICAL RECORD, AND INSIDE THE MEDICAL RECORD WERE MANY PAGES

5  FROM OTHER INMATES THAT WERE JUST SORT OF STUCK INTO HIS

6  MEDICAL RECORD.

7  **A.**  I DO RECALL THAT.

8  **Q.**  AND IT'S ALSO YOUR OPINION, DR. PACKER, THAT CROWDING IS

9  THE PRIMARY CAUSE OF THE PARTICULAR DIFFICULTIES IN PROVIDING

10  SERVICES TO THE COLEMAN CLASS IN RECEPTION CENTERS?

11  **A.**  THAT IS RIGHT. THAT IS MY OPINION, ALTHOUGH I THINK LIKE

12  THE DEFINITION OF CROWDING, OVERCROWDING IS A LITTLE AMORPHOUS.

13  BUT I DO HAVE AN OPINION THAT THE NUMBER OF MENTALLY ILL

14  INMATES WITH ACUTE DISORDERS WHO ARE AT THE RECEPTION CENTERS

15  CREATING THE MOST SIGNIFICANT DIFFICULTY PROVIDING THE PROPER

16  LEVEL OF SERVICE.

17       **JUDGE KARLTON:**  DOCTOR, JUST SO WE CAN BE CLEAR,

18  YOU'RE DEFINING "OVERCROWDING" IN TERMS OF THE DESIGN CAPACITY

19  OF AN INDIVIDUAL PRISON; IS THAT CORRECT?

20       **THE WITNESS:**  YES. WELL, MAYBE I CAN BE A LITTLE

21  MORE CLEAR. IF THERE WERE TOO MANY INMATES IN THE PRISON

22  RELATIVE TO THE CAPACITY OF THE PRISON, SO YOU HAVE TO DEFINE

23  "DESIGN CAPACITY."

24       **JUDGE KARLTON:**  THAT THEN BECOMES MORE AMORPHOUS,

25  BECAUSE WE HAVE HEARD AS A DEFINITION OF "OVERCROWDING" THAT IT

1  NOT ONLY RELATES TO THE -- I'M SORRY.  YOU'RE NOT HEARING ME --

2  THAT IT RELATES NOT ONLY TO THE DESIGN CAPACITY OF THE PRISON,

3  BUT INCLUDES THE CAPACITY OF THE PRISON TO PROVIDE APPROPRIATE

4  REHABILITATIVE SERVICES, ET CETERA, PROGRAMS.

5          IN YOUR DEFINITION THAT IS NOT A RELEVANT FACTOR; IS

6  THAT CORRECT OR IS THAT WRONG?

7          **THE WITNESS:**  I NEED TO GIVE A LITTLE MORE NUANCE TO

8  THAT.  I THINK I'LL DEFINE IT IF THAT'S THE DEFINITION YOU'RE

9  ASKING FOR ANY INDIVIDUAL PRISON.  I THINK THAT I WOULD -- I

10 THINK THAT IS CONSISTENT WITH WHAT I'M SAYING.

11          I THINK THE REASON IT MAY HAVE GOTTEN A LITTLE MORE

12 COMPLICATED IS SOME OF THESE ISSUES HAVE LESS TO DO WITH ANY

13 PARTICULAR PRISON THAN THE OVERALL LACK OF, FOR EXAMPLE,

14 ADEQUATE NUMBER OF ICF BEDS IN THE SYSTEM, PER SE, NOT JUST IN

15 THAT ONE FACILITY.

16          THAT'S WHAT I WAS REFERRING TO. IN TERMS OF THE

17 RECEPTION CENTERS, I BELIEVE THE DEFINITION IS THE SAME, IS

18 THAT THE NUMBER AND TYPE OF INMATES IN THAT FACILITY OVERWHELMS

19 THAT FACILITY'S CAPACITY TO PROVIDE ADEQUATE SERVICES.

20          SO I THINK FOR THE RECEPTION CENTERS WE MAY BE USING

21 THE VERY SAME DEFINITION.

22          **JUDGE KARLTON:**  WELL, THE PROBLEM IS THAT I'M NOT AT

23 ALL CLEAR THAT MR. BIEN AND YOU ARE USING THE SAME DEFINITION.

24 YOU'RE USING THE WORD "OVERCROWDING," AND IT IS NOT CLEAR TO ME

25 WHAT IT IS YOU MEAN WHEN YOU SAY THERE'S OVERCROWDING.

1          YOU INDICATED THAT THE RECEPTION CENTERS ARE

2    OVERCROWDED FOR TWO REASONS. ONE:  THE NUMBER OF PRISONERS

3    RELATIVE TO DESIGN CAPACITY IS OVERWHELMED; AND, TWO:  BY

4    VIRTUE THEREOF, THEY ARE UNABLE TO PROVIDE SERVICES THAT ARE

5    REQUIRED.

6          IS THAT CORRECT AS FAR AS THE RECEPTION CENTERS ARE

7    CONCERNED?

8          **THE WITNESS:**  NO, I'M SAYING IT'S MORE THE SECOND

9    PART, BECAUSE THE RECEPTION FACILITIES AREN'T NECESSARILY MORE

10   OVERCROWDED RELATIVE TO CAPACITY THAN SOME OF THE OTHER PRISONS

11   I SAW.

12         THE ISSUE THAT I HAVE WITH THE RECEPTION CENTERS AND

13   WHY I THOUGHT THEY WERE MORE PROBLEMATIC IN TERMS OF USING THE

14   TERM "OVERCROWDING" IS THE NATURE OF THE POPULATION THAT THEY

15   HAVE OVERWHELMS THEIR ABILITY TO PROVIDE ADEQUATE SERVICES.

16   AND BECAUSE THE INDIVIDUALS WHO COME IN, THERE'S SO MANY OF

17   THEM WITH ACUTE MENTAL HEALTH NEEDS THAT IN THOSE FACILITIES

18   THE ABILITIES OF THE FACILITY TO PROVIDE ADEQUATE SERVICES IS

19   OVERWHELMED, EVEN THOUGH THE OTHER FACILITIES THAT I SAW THEY

20   MAY HAVE THE SAME NUMBER OF PERCENTAGE, WHOLE PERCENTAGE, AND

21   YET THEY CAN MANAGE IT BETTER.

22         BUT THE RECEPTION CENTER, IT'S NOT JUST THE NUMBERS

23   BUT THE COMMUNITY AND THE TYPE OF POPULATION THAT IS MAKING

24   THEM SO INCAPABLE OF PROVIDING AN ADEQUATE LEVEL OF SERVICE.

25         **JUDGE KARLTON:**  USING TEHACHAPI AS AN EXAMPLE, I'M

1  JUST TRYING TO UNDERSTAND WHAT YOU'RE SAYING. WHEN YOU SAY

2  OVERCROWDING IN TEHACHAPI, ARE YOU REFERRING TO SIMPLY THE

3  NUMBER OF PRISONERS VERSUS ITS DESIGN CAPACITY?  OR ARE YOU

4  INCLUDING WITHIN THAT DEFINITION WHETHER OR NOT IT CAN PROVIDE

5  APPROPRIATE SERVICES?

6          **THE WITNESS:**  I AM INCLUDING WHETHER IT CAN PROVIDE

7  APPROPRIATE SERVICES.  AND IF THIS ANSWERS YOUR QUESTION, YOUR

8  HONOR, WHAT I WOULD SAY IS THAT IF THEY HAVE THE SAME NUMBER OF

9  INMATES THERE, BUT THE PARTICULAR INMATES WERE NOT AS ACUTELY

10 MENTALLY ILL, THEN I BELIEVE IT WOULD BE A DIFFERENT SITUATION.

11          I THINK THEY WOULD ARE WOULD BE MUCH MORE CAPABLE OF

12 PROVIDING SERVICES BECAUSE THESE INDIVIDUALS ARE SO MENTALLY

13 ILL THAT THEY CANNOT PROVIDE THE LEVEL OF SERVICE THEY NEED IN

14 THE CONTEXT OF BOTH THE PRISONERS' NEEDS AND THE NUMBER OF

15 INMATES IN THE FACILITY.

16          **JUDGE KARLTON:**  ALL RIGHT.  YOU MAY PROCEED. I'M

17 SORRY TO INTERRUPT.

18 **BY MR. BIEN:**

19 **Q.**  DR. PACKER, PERHAPS TO HELP THE COURT OUT IN UNDERSTANDING

20 WHERE YOU COME FROM ABOUT OVERCROWDING, YOU WERE TOLD FOR

21 PURPOSES OF YOUR WORK ON THIS CASE TO ASSUME THAT THE

22 CALIFORNIA PRISON SYSTEM IS OVERCROWDED; IS THAT CORRECT?

23 **A.**  THAT'S CORRECT.

24 **Q.**  YOU MADE NO INDEPENDENT DETERMINATION OF WHETHER OR NOT THE

25 CALIFORNIA PRISON SYSTEM WAS OVERCROWDED YOURSELF?

1          **JUDGE KARLTON:**  THAT QUESTION MEANS THE SYSTEM AS A

2  WHOLE. YOU OBVIOUSLY HAVE MADE A DETERMINATION THAT THE

3  PARTICULAR PRISONS WERE OVERCROWDED BY WHATEVER DEFINITION YOU

4  WERE USING, CORRECT, SIR?

5          **THE WITNESS:**  YES. IN INDIVIDUAL PRISONS I WAS USING

6  THE CONCEPT THAT YOUR HONOR MENTIONED, THAT I WAS LOOKING AT

7  THE CAPACITY TO DEAL WITH THE INDIVIDUALS WITHIN THAT PRISON.

8  BUT WHAT I WAS ASKING, GENERALLY, BECAUSE THE ISSUE WAS:  IS

9  THE OVERCROWDING CAUSING THE DEFICIENCIES IN THE SYSTEM ITSELF?

10 190 PERCENT, OR WHATEVER THE NUMBER I WAS GIVEN ABOVE DESIGN

11 CAPACITY, EVERYBODY LOOKED AT THE SYSTEM AND AGREED IT WAS

12 OVERCROWDED.  THE GOVERNOR ACKNOWLEDGES IT'S OVERCROWDED.

13          SO, YES, THE SYSTEM AS A WHOLE IS OVERCROWDED.  I

14 DID LOOK AT INDIVIDUAL INSTITUTIONS IN TERMS OF USING THOSE

15 OTHER CONTEXTS OF GIVING PARTICULAR INDIVIDUALS IN THAT

16 INSTITUTION THE ABILITY TO MEET THE NEEDS IN THAT INSTITUTION

17 THAT I WAS ASSESSING.

18 **BY MR. BIEN:**

19 **Q.**  YOU DID NOT USE ANY PARTICULAR MEASURE OR LEVEL OF STANDARD

20 OF OVERCROWDING IN DEVELOPING YOUR OPINION IN THIS CASE.

21 **A.**  NO, I DID NOT.

22 **Q.**  AND YOU AGREE THAT THE CALIFORNIA SYSTEM WAS -- I QUOTE YOU

23 -- "VERY OVERCROWDED"; IS THAT RIGHT?

24 **A.**  YES. YES.

25 **Q.**  YOU DIDN'T COMPARE THE LEVEL OF OVERCROWDING IN CALIFORNIA

1  WITH ANY LEVEL OF OVERCROWDING IN OTHER SYSTEMS IN DEVELOPING

2  YOUR OPINION; IS THAT CORRECT?

3  **A.**  THAT'S CORRECT.

4  **Q.**  AND YOU'RE ALSO NOT EXPRESSING ANY OPINION TO THIS COURT AS

5  TO WHAT THE TARGET LEVEL OF OVERCROWDING FOR THE CALIFORNIA

6  PRISON SYSTEM SHOULD BE?

7  **A.**  I AM NOT.

8  **Q.**  IT'S YOUR OPINION THAT THE DEFICIENCIES IN MENTAL

9  HEALTHCARE THAT YOU OBSERVED IN YOUR TOURS OF CALIFORNIA

10  PRISONS AND IN READING SPECIAL MASTER REPORT AND THE OTHER

11  DOCUMENTS CAN BE REMEDIED WITHOUT REGARD TO ANY POPULATION

12  REDUCTION PLAN OR ORDERS.

13  **A.**  WITHIN THE CONTEXT OF SOME OF THE PLANS THAT WERE OFFERED,

14  YES.

15  **Q.**  IT COULD HAPPEN WITHOUT ANY CONTROL OF THE POPULATION IS

16  YOUR OPINION.

17  **A.**  NO, I ACTUALLY DIDN'T SAY THAT, BECAUSE IF YOU READ MY

18  REPORT AGAIN, THE ONE EXCEPTION I MADE OVER THERE WAS THAT

19  RECEPTION CENTERS WHERE I WANT TO SAY THERE NEEDED TO BE SOME

20  REDUCTION IN THE NUMBER OF MENTALLY ILL PEOPLE COMING INTO THE

21  RECEPTION CENTERS.

22          BUT WITH THAT CAVEAT, THAT'S WHAT I WAS SAYING.

23  THAT'S WHAT I AM SAYING.

24  **Q.**  SO YOU AGREE THAT IN ORDER TO REMEDY THE

25  OVERCROWDING-RELATED PROBLEMS THAT YOU OBSERVED IN THE

1  CALIFORNIA RECEPTION CENTERS YOU VISITED, THERE NEEDS TO BE

2  SOME MEASURE OF CONTROL ON THOSE PRISONERS COMING INTO THOSE

3  RECEPTION CENTERS.

4  **A.**  ON THE MENTALLY ILL PRISONERS COMING INTO THE RECEPTION

5  CENTERS.

6  **Q.**  NOW, YOU'RE NOT EXPRESSING ANY OPINION IN THIS CASE

7  CONCERNING MEDICAL CARE IN THE CALIFORNIA PRISON SYSTEM; IS

8  THAT CORRECT?

9  **A.**  THAT'S CORRECT.

10  **Q.**  NOW, YOU'VE TALKED ABOUT THESE OTHER PLANS AND PROGRAMS

11  THAT CALIFORNIA SHOWED YOU THAT ARE THE ALTERNATIVES TO FIXING

12  THE PROBLEMS WITHOUT CONTROLLING POPULATION; IS THAT CORRECT?

13          I MEAN, YOU SAW, FOR EXAMPLE, THE RECEIVER'S PLANS

14  TO CONSTRUCT THESE 1500 BED HEALTHCARE FACILITIES DEDICATED TO

15  MEDICAL AND MENTAL HEALTH.  YOU REVIEWED THOSE.

16  **A.**  I DON'T KNOW ABOUT 1500.  YES, I DID SEE THOSE PLANS.

17  **Q.**  AND IN YOUR REPORT THAT YOU FILED IN AUGUST, AUGUST 15TH,

18  ON THE LAST PAGE, PAGE NINE, YOU QUOTED FROM ONE OF THE

19  RECEIVER'S CONSULTANTS ABOUT THOSE HEALTHCARE FACILITIES THAT

20  THEY WERE BUILDING, RIGHT?

21  **A.**  THAT'S CORRECT.

22          **JUDGE KARLTON:**  THEY AREN'T BUILDING THEM.  THEY

23  HOPE TO BUILD THEM, AND THEY ARE NOT PRESENTLY FINANCED.

24  **BY MR. BIEN:**

25  **Q.**  IN YOUR OPINION, DR. PACKER, YOU THOUGHT THAT THE BUILDING

1  OF THOSE FACILITIES, THE PLANS FOR WHICH YOU REVIEWED IN

2  CONNECTION WITH YOUR OPINION, WAS A NECESSARY PART OF THE

3  REMEDY FOR THE DEFICIENCIES IN MENTAL HEALTHCARE THAT YOU

4  OBSERVED.

5  **A.**  WELL, THAT'S NOT EXACTLY PRECISE. SOME ADDITIONAL

6  FACILITIES WAS NECESSARY. THIS SEEMS TO BE THE GOLD STANDARD

7  PLAN, WHICH WOULD BE THE IDEAL ONE.

8          BEFORE I'D SEEN THIS, AS YOU RECALL IN THE PREVIOUS

9  REPORT, THEY HAD A MORE -- A DIFFERENT SUPPLEMENTAL BED PLAN

10 THAT WASN'T QUITE AS ELABORATE.  SO MY OPINION WAS THAT SOME

11 ADDITIONAL SPECIALIZED PROGRAM FACILITY NEEDS TO BE IN PLACE TO

12 ACCOMMODATE THIS POPULATION.  IDEALLY IT WILL BE THESE

13 CONSOLIDATED CARE CENTERS.  BUT IF THAT'S NOT IN PLACE, SOME

14 OTHER MECHANISM, SUCH AS THE ICF AND THE CRISIS THAT I

15 OBSERVED, SOMETHING ALONG THOSE LINES NEEDS TO BE IN PLACE.

16 **Q.**  AND YOU THINK THAT'S -- ONE WAY OR THE OTHER ONE OF THOSE

17 BED PLANS, EITHER THE 2007 BED PLAN THAT DIDN'T INVOLVE THE

18 RECEIVER, OR THE 2008 BED PLAN THAT DID INVOLVE THE RECEIVER,

19 THEY BOTH INCLUDED PLANS TO CONSTRUCT MORE EOP BEDS, MORE,

20 MENTAL HEALTH CRISIS BEDS AND MORE DMH BEDS; IS THAT CORRECT?

21 **A.**  THAT'S CORRECT.

22 **Q.**  AND YOU THINK THAT'S A NECESSARY ELEMENT TO DELIVER

23 APPROPRIATE MENTAL HEALTHCARE TO THE POPULATION THAT YOU

24 OBSERVED.

25 **A.**  YES, WHETHER OR NOT THOSE SPECIFIC PLANS, BUT CONSTRUCTION

1  OF THOSE KINDS OF PROGRAMS, FACILITIES IN MY OPINION ARE

2  NECESSARY IN ORDER TO ALLOW THE MENTAL HEALTH SERVICE DELIVERY

3  TO BE MORE ADEQUATE.

4  **Q.**  AN AS YOU SIT HERE TODAY, CAN YOU TELL THIS COURT WHEN IN

5  YOUR OPINION THESE FACILITIES, EITHER ONE OF THEM WILL BE

6  BUILT?  HOW MANY YEARS FROM NOW?

7             HOW MANY YEARS FROM NOW?

8  **A.**  I HAVE NO IDEA.

9  **Q.**  YOU HAVE NO IDEA?

10 **A.**  I HAVE NO IDEA.

11 **Q.**  YOU UNDERSTAND THAT BOTH PLANS HAVE BEEN SEVERELY DELAYED?

12 **A.**  I LEARNED THAT SINCE I STARTED TESTIFYING.

13 **Q.**  THE ATTORNEY GENERAL'S OFFICE WHEN YOU CAME TO YOUR

14 DEPOSITION, HADN'T TOLD YOU THAT THE RECEIVER'S PLANS WERE

15 DELAYED. I HAD TO TELL YOU THAT; ISN'T THAT CORRECT?

16            **MS. TILLMAN:**  OBJECTION, RELEVANCE, ARGUMENTATIVE.

17            **JUDGE HENDERSON:**  OVERRULED.

18            IS THAT CORRECT?

19            **THE WITNESS:**  I DON'T BELIEVE THEY HAD. MY

20 RECOLLECTION IS THE FIRST I HEARD ABOUT IT WAS SOME QUESTIONING

21 FROM MR. BIEN AT THE DEPOSITION.

22 **BY MR. BIEN:**

23 **Q.**  AND, DR. PACKER, IN YOUR REPORTS YOU FOUND THAT THE

24 PREVALENCE OF MENTAL ILLNESS IN THE CALIFORNIA PRISON SYSTEM TO

25 BE A SIGNIFICANT FACTOR; ISN'T THAT CORRECT?

1   **A.**  I DON'T UNDERSTAND THAT QUESTION.

2           **JUDGE KARLTON:**  THAT MAKES TWO OF US, DOCTOR.

3   **BY MR. BIEN:**

4   **Q.**  OKAY.  DO YOU UNDERSTAND WHAT THE WORD "PREVALENCE" MEANS

5   IN RELATIONSHIP TO A MENTAL HEALTH POPULATION?  I MEAN, IN

6   OTHER WORDS, THE NUMBER OF MENTALLY ILL AS A PROPORTION OF THE

7   TOTAL POPULATION, YOU FOUND THAT TO BE SIGNIFICANT.

8   **A.**  NO, I UNDERSTAND THE WORD "PREVALENCE."

9   **Q.**  OH.

10  **A.**  I DON'T UNDERSTAND WHAT YOU'RE ASKING ME, WHETHER IT'S

11  RELEVANT.  I'M NOT SURE WHAT YOU WANT ME TO REFER TO IT AS.

12  **Q.**  WELL, DIDN'T YOU TESTIFY THAT YOU FOUND THAT THE FACT THAT

13  THE PREVALENCE OF MENTAL ILLNESS IN THE CALIFORNIA PRISON

14  SYSTEM OF 20 PERCENT WAS BOTH SIGNIFICANT AND STRIKING?

15  **A.**  IF YOU CAN REFER ME TO A PAGE.

16          **JUDGE KARLTON:**  WELL, FORGET THAT.  DO YOU FIND IT

17  PRESENTLY SIGNIFICANT AND STRIKING?

18          **THE WITNESS:**  NO, THAT'S FRANKLY ABOUT AVERAGE FOR A

19  PRISON SYSTEM.  SO IT'S NOT CALIFORNIA 20 PERCENT.  IN

20  MASSACHUSETTS THAT'S ABOUT THE FIGURE WE HAVE. THE NATIONAL

21  REPORTS OF DATA FROM DIFFERENT STATES AND FEDERAL SYSTEMS

22  USUALLY GIVE AN AVERAGE OF SOMEWHERE IN THAT RANGE.

23  **BY MR. BIEN:**

24  **Q.**  AND I THOUGHT YOU TESTIFIED THAT THE AVERAGE WAS BETWEEN 15

25  AND 20 PERCENT.

1  **A.**  I'M NOT SURE IF I TESTIFIED TO THAT; IN THAT BALLPARK.

2  **Q.**  ISN'T IT CORRECT THAT CALIFORNIA IS AT THE HIGH END OF

3  PREVALENCE OF MENTAL ILLNESS IN YOUR OPINION IN CALIFORNIA IN

4  THE PRISON SYSTEMS THAT YOU'VE STUDIED OR READ ABOUT?

5  **A.**  AGAIN, THE LITERATURE IS SOMEWHERE IN THAT 15.  I DON'T

6  KNOW IF I SAID 20 -- SOME PLACES HAD A LITTLE HIGHER -- IN THE

7  BALLPARK OF WHAT THE PREVALENCE RATE IS.

8          I DON'T KNOW IF I SAID ANYTHING ABOUT "STRIKING,"

9  BUT FOR ONE THING THAT'S DIFFERENT THAT I TESTIFIED TO IS THE

10 ACUITY LEVEL OF THE PEOPLE COMING INTO YOUR RECEPTION CENTERS,

11 WHICH IS MUCH HIGHER THAN OTHER -- AT LEAST THAT I'VE BEEN

12 INVOLVED.

13          **MR. BIEN:**  I'M GOING TO REFER TO DR. PACKER'S

14 DEPOSITION TAKEN ON OCTOBER 3, 2008 AT PAGE 79.

15          **THE WITNESS:**  IS THERE AN EXHIBIT NUMBER FOR THAT?

16 **BY MR. BIEN:**

17 **Q.**  NO. I ASSUME YOUR COUNSEL PROVIDED YOU WITH YOUR

18 DEPOSITION. YOU DON'T HAVE IT THERE?

19 **A.**  I DIDN'T BRING IT.

20          **JUDGE KARLTON:**  JUST READ IT.  LET'S GET ON WITH IT.

21 **BY MR. BIEN:**

22 **Q.**  DOESN'T MATTER.  LET ME START READING AT PAGE 78, LINE 16.

23              "HOW DID YOU USE THE DATA CONCERNING THE

24          PERCENTAGE OF COLEMAN CLASS MEMBERS IN THE TOTAL

25          PERCENTAGE OF THE PRISON POPULATION?  HOW THAT IS

1           RELEVANT TO YOUR ANALYSIS?"

2           THERE WAS AN OBJECTION.

3               "I'M SORRY.  I DIDN'T QUITE HEAR ALL THAT.  CAN

4           I HAVE IT READ BACK?

5               "SURE."

6           REPORTS READS IT AGAIN.

7               "THE WITNESS:  ONE OF THE THINGS THAT SORT OF

8   IS

9           VERY STRIKING IS THE PERCENTAGE IS, I BELIEVE,

10  AROUND

11          20 PERCENT OR SO, OR MAYBE EVEN A LITTLE MORE.  SO

12          THE FIRST THING I THOUGHT IT WAS A FAIRLY

13  SIGNIFICANT

14          PERCENTAGE. SECONDLY, I WAS VERY STRUCK BY GOING TO

15          RECEPTION CENTERS WHERE IT BECAME QUITE CLEAR THAT

16          THE PERCENTAGES WERE EVEN HIGHER.

17              "QUESTION:  WHEN YOU SAY 'A SIGNIFICANT

18          PERCENTAGE' IN THE COLEMAN -- THE PERCENTAGE OF THE

19          POPULATION THAT WAS IN THE MENTAL HEALTH COLEMAN

20          CLASS WAS SIGNIFICANT, MAYBE OVER 20 PERCENT, DID

21  YOU

22          FIND THAT HIGH IN YOUR EXPERIENCE?"

23          THERE'S AN OBJECTION:

24              "VAGUE AND AMBIGUOUS, INCOMPLETE HYPOTHETICAL.

25              "QUESTION:  WHY DID YOU THINK THAT WAS

1          SIGNIFICANT?

2               "ANSWER:  WELL, FIRST OF ALL, THAT NUMBER IS

3  NOT

4          THAT OUT OF KEEPING WITH SOME OF THE LITERATURE

5  ABOUT

6          THE NUMBERS OF PERCENTAGE OF MENTALLY ILL WITHIN

7          THE PRISON SYSTEMS.  THEY TEND TO BE IN THE 10 TO

8          20 PERCENT RANGE.  THIS WAS ON THE HIGH END.  SO

9  THAT

10         WAS THE FIRST ISSUE IS THAT THERE SEEMED TO BE QUITE

11         A LOT OF MENTALLY ILL PEOPLE IN THE SYSTEM."

12         **JUDGE KARLTON:**  MR. BIEN, DO YOU THINK YOU'RE

13 IMPEACHING?

14         **MR. BIEN:**  I THOUGHT SO, BUT --

15         **JUDGE KARLTON:**  ALL RIGHT.

16 **BY MR. BIEN:**

17 **Q.**  DR. PACKER, ONE OF YOUR ASSUMPTIONS IN YOUR STUDY WAS THAT

18 YOU FOUND THAT THE PREVALENCE OF SERIOUS MENTAL ILLNESS IN THE

19 RECEPTION CENTERS WAS HIGHER THAN THE PREVALENCE RATE IN THE

20 REST OF THE PRISON SYSTEM; ISN'T THAT CORRECT?

21 **A.**  YES.  I'M NOT SAYING IT FOUND IT.  THAT WAS SOME OF THE DATA

22 THAT I WAS PROVIDED.

23 **Q.**  YOU DIDN'T MAKE ANY EMPIRICAL STUDY TO SEE WHETHER OR NOT

24 THAT WAS CORRECT, DID YOU?

25 **A.**  NO.  AGAIN, THAT WAS BASED REVIEWING THE DOCUMENTS AND

1  TALKING TO THE CLINICAL STAFF AT THE RECEPTION FACILITY.

2  **Q.**  AND ONE OF THE THINGS YOU RELIED ON TO DETERMINE THAT

3  INFORMATION WAS THE DECLARATION OF DR. MCALOON, WHO IS A

4  PSYCHOLOGIST WITH THE CDCR; IS THAT CORRECT?

5  **A.**  THAT'S ONE OF THE ELEMENTS, YES.

6  **Q.**  AND THAT IS P8O7, IF THE COURT REPORTER CAN PROVIDE IT TO

7  YOU.

8  **A.**  I HAVE IT. THANK YOU.

9  **Q.**  AND AT PARAGRAPH SEVEN OF HER DECLARATION, MS. MCALOON

10  SAYS THAT:

11             "IN THE OVERALL INMATE POPULATION,

12  APPROXIMATELY

13             18 PERCENT OF INMATES ARE IN THE MENTAL HEALTH

14             CASELOAD.  IN THE RECEPTION CENTER POPULATION, AN

15             EVEN HIGHER PERCENTAGE OF INMATES ARE IN NEED OF

16             IMMEDIATE MENTAL HEALTH SERVICES AT THE TIME OF

17             ARRIVAL."

18             IS THAT CORRECT?

19             IS THAT CORRECT?

20  **A.**  YES, BUT SHE GOES ON TO MAKE AN EVEN MORE SIGNIFICANT POINT

21  IN THE NEXT SENTENCE.

22  **Q.**  AND WHAT IS THAT?

23  **A.**  THE NEXT SENTENCE -- CAN I READ FROM THIS DOCUMENT?

24  **Q.**  PLEASE.

25  **A.**  IT SAYS:

```
 1                "UPON ENTRY, INMATES WITH MENTAL HEALTH NEEDS

 2           ARE OFTEN SEVERELY DECOMPENSATED BECAUSE THEY HAVE

 3           NOT HAD ACCESS TO MENTAL HEALTHCARE RESOURCES,

 4           PARTICULARLY MEDICATION MANAGEMENT, IN THE

 5           COMMUNITY."

 6   Q.  AND DO YOU CONSIDER THIS TO BE AN EMPIRICAL STUDY?

 7   A.  NO.

 8   Q.  AND DID YOU EVER SPEAK TO DR. MCALOON ABOUT WHERE SHE

 9   OBTAINED THIS INFORMATION?

10   A.  NO, I DID NOT.

11   Q.  HAVE YOU EVER SPOKEN TO HER AT ALL?

12   A.  NO.

13   Q.  AND YOU YOURSELF DIDN'T DO ANY STUDY BEYOND INTERVIEWING

14   CLINICIANS AT VARIOUS RECEPTION CENTERS TO DETERMINE WHETHER OR

15   NOT IT WAS, IN FACT, TRUE THAT INMATES IN RECEPTION CENTERS

16   HAVE A HIGHER PREVALENCE OF MENTAL ILLNESS THAN INMATES OTHER

17   PLACES IN THE SYSTEM.

18   A.  AGAIN, IN EACH FACILITY I WENT TO THAT WAS A RECEPTION

19   CENTER, I SPECIFICALLY ASKED THEM NOT SO MUCH HOW IT COMPARES

20   TO THE GENERAL POPULATION. I DON'T HAVE ANY REASON TO THINK

21   THEY WOULD KNOW THAT.  I ASKED THEM ABOUT THE POPULATION COMING

22   INTO THEIR FACILITY.  AND UNIFORMLY THEY CONFIRMED -- NOT SO

23   MUCH EVEN THE NUMBER, BUT THE ACUITY LEVEL -- THAT PEOPLE WERE

24   COMING IN VERY MENTALLY ILL, VERY SEVERELY DECOMPENSATED.

25                AND THAT'S WHAT WE CALL "ACUITY" OR "ACUTENESS."
```

1          AND THAT IS EVEN MORE ESSENTIAL TO UNDERSTANDING THE

2   POLICY IN THE RECEPTION CENTERS THAN SIMPLY THE NUMBER OF

3   INDIVIDUALS THERE.

4   **Q.**  BUT YOU DIDN'T DO ANY STUDY OR ASK CDCR TO DO ANY STUDY TO

5   DETERMINE WHETHER OR NOT THERE'S BEEN ANY CHANGE IN THE ACUITY

6   OF MENTALLY ILL PRISONERS ARRIVING IN THE RECEPTION CENTERS.

7   **A.**  ANY CHANGE?  OVER WHAT PERIOD ARE YOU REFERRING TO?

8   **Q.**  ANY PERIOD OF TIME. HAVE YOU SEEN ANY STUDY THAT SAYS THAT

9   IN THE LAST FIVE YEARS PRISONERS OR PAROLEES COMING INTO THE

10  PRISON SYSTEM ARE NOW MORE MENTALLY ILL THAN THEY WERE FIVE

11  YEARS AGO?

12  **A.**  I HAVE SEEN NO STUDIES TO THAT EFFECT.

13  **Q.**  ARE YOU AWARE OF ANY INFORMATION THAT MENTAL HEALTHCARE

14  PROVIDED IN THE COMMUNITIES IN CALIFORNIA HAS CHANGED IN THE

15  LAST THREE YEARS?

16  **A.**  I HAVE NO DATA ON THAT.

17  **Q.**  YOU DID NO STUDY OF CALIFORNIA'S COMMUNITY MENTAL HEALTH

18  SYSTEM ON YOUR OWN, DID YOU, DR. PACKER?

19          **JUDGE KARLTON:**  YOU'VE ASKED THAT QUESTION SEVERAL

20  TIMES, MR. BIEN.

21          I'M SORRY.  I DIDN'T MEAN TO RAISE MY VOICE. EXCUSE

22  ME.

23  **BY MR. BIEN:**

24  **Q.**  ARE YOU AWARE OF ANY CHANGES IN CALIFORNIA CRIMINAL LAW

25  THAT WOULD RESULT IN AN INCREASE IN THE NUMBER OF MENTALLY ILL

1 PRISONERS OR PAROLEES BEING —— ARRIVING IN RECEPTION CENTERS IN

2 CALIFORNIA?

3 **A.** I DON'T KNOW SPECIFICALLY ABOUT THE LEVEL. I SUPPOSE THE

4 REPORT FROM MARCH, 2008 FROM THE PAROLE DEPARTMENT INDICATING

5 PAROLEES RETURNING AT A RATE OF ABOUT 75 PERCENT.

6 **Q.** WE CUT OFF THE LAST PART OF YOUR ANSWER. IF YOU COULD TRY

7 THAT AGAIN.

8 **A.** I SAY THE ONLY EMPIRICAL DATA I HAVE RELATIVE TO THIS ISSUE

9 IS THE REPORT FROM THE PAROLE DEPARTMENT MARCH, 2008 INDICATING

10 THAT APPROXIMATELY 75 TO 77 PERCENT OF THE MENTALLY ILL INMATES

11 WHO WERE PAROLED ARE RECIDIVATING WITHIN ONE YEAR.

12 **Q.** AND YOU DON'T KNOW IF THAT WAS THE SAME OR DIFFERENT THAN

13 THE RATES FOUR YEARS AGO, DO YOU?

14 **A.** I DO NOT.

15 **Q.** NOW, IN YOUR DECEMBER REPORT, DR. PACKER, YOU SAID

16 OVERCROWDING SIGNIFICANTLY CONTRIBUTES TO THE DIFFICULTIES IN

17 PROVIDING ADEQUATE MENTAL HEALTH SERVICES, BUT IS NOT THE

18 PRIMARY CAUSE OF THE PROBLEMS. THAT'S AT PAGE EIGHT.

19 **JUDGE HENDERSON:** AND THAT'S WHAT HE SAID, ACCORDING

20 TO MY NOTES. WHAT ARE WE ADDING HERE?

21 **MR. BIEN:** I'M JUST ORIENTING HIM. I APOLOGIZE,

22 YOUR HONOR.

23 **JUDGE HENDERSON:** LET ME —— WE'RE SUFFERING UP HERE.

24 IN JUDGES' SCHOOL I REMEMBER A WISE OLD JUDGE TOLD MY CLIENTS:

25 "YOU KNOW, THERE WILL BE TIMES YOU FEEL LIKE

1          YOU'RE BEING PUNISHED FOR LISTENING CAREFULLY."

2          AND WE'VE BEEN LISTENING CAREFULLY AND --

3          **JUDGE KARLTON:**  I CAN'T IMAGINE WHAT YOU'RE DOING.

4          **JUDGE HENDERSON:**  -- MY DEPUTY HAS JUST GIVEN ME A

5  NOTE THAT YOU HAVE ABOUT AN HOUR LEFT.

6          **JUDGE KARLTON:**  OH, MY GOODNESS.

7          **JUDGE HENDERSON:**  AND I HONESTLY CAN'T UNDERSTAND

8  WHAT YOU'RE GOING TO GIVE US. BUT YOU SHOULD KNOW THAT. YOU PUT

9  ON YOUR OWN CASE, BUT YOU SHOULD KNOW.

10         **MR. BIEN:**  I WILL WRAP UP.

11         **JUDGE HENDERSON:**  WELL, WHY DON'T WE TAKE A RECESS

12  NOW?

13         **JUDGE KARLTON:**  GOOD IDEA.

14         **JUDGE HENDERSON:**  ACTUALLY, I THINK ALL THREE OF US

15  NEED A RECESS, WHETHER YOU DO OR NOT.

16         (RECESS WAS TAKEN.)

17         **JUDGE HENDERSON:**  WELCOME BACK.  YOU MAY PROCEED

18  WHEN YOU'RE READY, COUNSEL.

19         **MR. BIEN:**  YOUR HONOR, I DIDN'T GO TO JUDGE'S

20  SCHOOL, BUT I'M GOING TO SIT DOWN NOW.

21         **JUDGE HENDERSON:**  OKAY.  THANK YOU, COUNSEL.

22  REDIRECT?  DOES CCPOA HAVE ANY QUESTIONS OF THIS WITNESS?

23         **MS. LEONARD:**  NO FURTHER QUESTIONS, YOUR HONOR.

24         **JUDGE HENDERSON:**  THANK YOU.  REDIRECT?  LET'S -- WE

25  HAVE A WITNESS SCHEDULED FOR 12:00, AND I'M NOT QUITE SURE WHAT

1   THAT DOES TO LUNCH.  IT'S 11:30 NOW.  HOW LONG WILL THE NEXT

2   WITNESS TAKE, YOUR BEST ESTIMATE?

3           **MS. TILLMAN:**  DR. THOMAS?  IF YOU'RE TALKING ABOUT

4   MR. POWERS, THE CROSS-EXAMINATION, ABOUT 15 MINUTES.

5           **JUDGE HENDERSON:**  OKAY.  OKAY.  PROCEED.

6           **REDIRECT EXAMINATION BY MS. TILLMAN**

7   **BY MS. TILLMAN**

8   **Q**   DR. PACKER, YOU'VE SPOKEN A BIT ABOUT THE FACT THAT THE

9   DEPARTMENT OF CORRECTIONS AND REHABILITATION RELIES UPON PAPER

10  RECORDS ON PATIENT CARE; IS THAT CORRECT?

11  **A**   YES, THAT'S CORRECT.

12  **Q**   HAVE YOU FORMED ANY OPINION AS TO WHETHER A TRANSITION AWAY

13  FROM PAPER RECORDS AND UP TO TOWARDS COMPUTER-ASSISTED

14  TECHNOLOGY FOR RECORDKEEPING WOULD ASSIST IN MAINTAINING THE

15  PATIENT RECORDS IN A TIMELY FASHION?

16  **A**   YES, I HAVE.

17  **Q**   AND WHAT IS THAT OPINION?

18  **A**   A MOVING TO AN ELECTRONIC MEDICAL RECORD SYSTEM WOULD

19  GREATLY ENHANCE THE ABILITY TO HAVE THOSE RECORDS AVAILABLE TO

20  CLINICIANS IN A TIMELY MANNER AND TO ALLOW THOSE RECORDS TO BE

21  USED IN CONTINUITY OF CARE.

22  **Q**   DOCTOR, AT PAGE 22 OF YOUR DECEMBER 2007 REPORT?

23  **A**   YES.

24  **Q**   LOOKING AT PARAGRAPH 6, YOU MENTION THAT DATA WAS REVIEWED,

25  INCLUDING SUICIDE REPORTS FROM 2005 AND 2006.  CAN YOU INFORM

1  THE COURT WHAT SUICIDE REPORTS YOU REVIEWED IN PREPARING YOUR

2  OPINION IN THAT PORTION OF YOUR REPORT?

3  A    YES.  IN EACH YEAR A VERY THOROUGH REPORT WAS COMPLETED BY

4  DR. RAYMOND PATTERSON, AND THIS INCLUDED A SPECIFIC DISCUSSION

5  OF EACH AND EVERY SUICIDE IN THE SYSTEM, WHETHER IT WAS

6  PREVENTABLE, WHAT FACTORS WERE THAT SEEMED TO BE IMPACTING ON

7  EACH OF THOSE SUICIDES.

8  Q    ARE YOU AWARE THAT DR. PATTERSON IS A COURT-APPOINTED

9  MONITOR IN THE COLEMAN CASE?

10 A    YES, I AM.

11 Q    AND SO AT THAT PART OF YOUR REPORT WHERE YOU MENTION THAT

12 THE DATA DOES NOT SUGGEST THAT A HIGHER STAFF-INMATE RATIO

13 WOULD SIGNIFICANTLY IMPACT ON THE NUMBER OF SUICIDES, ARE YOU

14 REFERRING AGAIN TO THE DATA IN DR. PATTERSON'S ANNUAL SUICIDE

15 REPORTS?

16 A    YES.

17 Q    AND WHEN YOU MENTION IN THE NEXT LINE THAT DEFICIENCIES

18 WERE NOTED IN ROOM DESIGN, THAT IS FAILURE TO MAKE THE ROOMS

19 MORE SUICIDE RESISTANT BY REMOVING GRATES, FOR EXAMPLE, FAILURE

20 TO FOLLOW POLICY AND LACK OF FOLLOW THROUGH ON THE

21 INSTITUTIONAL LEVEL TO PREVIOUS RECOMMENDATIONS, AGAIN, ARE YOU

22 CITING TO AND RELYING UPON DR. PATTERSON'S FINDINGS AT THAT

23 PORTION OF YOUR REPORT?

24 A    YES, I AM.

25 Q    AND SO YOUR STATEMENT IN YOUR REPORT, QUOTE:

1          "THESE ARE ISSUES THAT NEED TO BE ADDRESSED TO

2     REDUCE SUCCESSFUL SUICIDES IN THE PRISON AND ARE

3     INDEPENDENT OF THE SIZE OF THE PRISON AND COLEMAN

4     CLASS POPULATION."

5          END QUOTE.

6          IS THAT STATEMENT BASED UPON THE FINDINGS MADE BY

7  DR. PATTERSON IN HIS ANNUAL SUICIDE REPORT?

8  **A**   YES.  MY STATEMENT NOW --

9          **JUDGE KARLTON:**  THANK YOU.  I WAS ABOUT TO SAY THAT.

10 THIS IS YOUR CONCLUSION BASED UPON YOUR REVIEW OF ALL THE

11 RECORDS, CORRECT, SIR?

12         **THE WITNESS:**  THAT'S CORRECT.  THE PREVIOUS SENTENCE

13 I THINK THAT QUOTED -- WAS DR. PATTERSON'S QUOTE.  THIS

14 SENTENCE IS MY QUOTE THAT I ARRIVED AT BASED ON THE DATA.

15         **MS. TILLMAN:**  THANK YOU.  WE ARE GETTING A BIT OF

16 FEEDBACK.  IS IT SOMETHING --

17         **THE CLERK:**  DOES ANYONE HAVE PDA'S WITH YOU?  CELL

18 PHONES WILL TRIGGER THAT.  NOTHING?

19 **BY MS. TILLMAN**

20 **Q**   DOCTOR, LOOKING AT YOUR AUGUST 2008 REPORT AT PAGE 3?

21 **A**   YES.

22 **Q**   THERE IS AN ANALYSIS OF THE RECEPTION CENTER ENHANCED

23 OUTPATIENT PROGRAMS AT TWO OF THE FACILITIES THAT YOU VISITED,

24 I BELIEVE IT WAS NORTH KERN STATE PRISON AND WASCO STATE

25 PRISON, CORRECT?

1  **A**  YOU ARE TALKING ABOUT THE PARAGRAPH THAT IS HEADLINED

2  "DISCHARGE PLANNING"?

3  **Q**  I'M LOOKING AT YOUR AUGUST 15TH, 2008 REPORT.

4  **A**  PAGE 8, DISCHARGE PLANNING?

5  **Q**  PAGE 3.

6  **A**  OKAY.  SORRY.  YES, I HAVE PAGE 3.

7  **Q**  IN REGARDS TO THE CARE FOR THE ENHANCED OUTPATIENT PROGRAM

8  INMATES AT THOSE RECEPTION CENTERS, WHAT WERE YOUR FINDINGS?

9  **A**  IN AUGUST OF 2008 I LOOKED -- I VISITED THESE FUNCTIONING

10  RC EOP PROGRAMS, AND I COMMENTED THOUGH I HAD SEEN THEM IN A

11  DIFFERENT FACILITY IN MY FIRST TOUR, THEY HAD BEEN BETTER

12  DEVELOPED BY THE TIME I GOT TO THESE FACILITIES, AND THEY

13  SEEMED TO BE FUNCTIONING WELL, AT LEAST AS DESIGNED.  THE

14  OFFICERS WERE AVAILABLE TO ESCORT SERVICES.  THE INMATES WERE

15  GETTING THE LEVEL OF SERVICE THEY WERE SUPPOSED TO BE GETTING

16  IN THE EOP PROGRAMS.

17  **Q**  WERE YOU AWARE THAT AT THE TIME OF THE WRITING OF YOUR

18  REPORT, THAT THE DEFENDANT CALIFORNIA DEPARTMENT OF CORRECTIONS

19  REHABILITATION HAD LAUNCHED A STRATEGY TO ENHANCE AND IMPROVE

20  THE QUALITY OF --

21          **JUDGE KARLTON:**  MS. TILLMAN, EVEN I THINK THAT'S

22  LEADING.

23          **MS. TILLMAN:**  THANK YOU, YOUR HONOR.

24  **BY MS. TILLMAN**

25  **Q**  DID YOU REVIEW ANY PLANS TO IMPROVE THE CARE AT RECEPTION

1  CENTERS?

2  **A**   I'M SORRY.  I LOST THAT SENTENCE.

3  **Q**   DID YOU REVIEW ANY PLANS TO IMPROVE THE CARE AT RECEPTION

4  CENTERS?

5  **A**   I'M NOT SPECIFICALLY CLEAR.  THERE WAS EARLY ON SOME

6  DOCUMENTATION ABOUT THE DEVELOPMENT OF THE RC EOP IN RESPONSE

7  TO EARLIER PROBLEMS, AND I BELIEVE THAT WAS BEFORE MY FIRST

8  VISIT.  SO MY FIRST VISIT I'D ALREADY SEEN AT LEAST ONE EXAMPLE

9  OF THAT, AND BY THE TIME I CAME BACK THERE, I'D SEEN THESE

10 EXAMPLES.

11 **Q**   GOING AGAIN TO YOUR DECEMBER 2007 REPORT AT PAGE 23?

12 **A**   YES.

13 **Q**   IN THE SUMMARY AND CONCLUSION PORTION OF THAT REPORT YOU

14 INDICATE THAT THE PRIMARY ISSUE IMPACTING SERVICE DELIVERY TO

15 THE COLEMAN CLASS IS A LACK OF SUFFICIENT RESOURCES AT THE

16 HIGHER INTENSITY LEVELS.  WHAT DO YOU MEAN BY "THE HIGHER

17 INTENSITY LEVELS"?

18 **A**   I WAS REFERRING SPECIFICALLY TO HIGH INTENSITY, MEANING THE

19 MOST SEVERELY DISTURBED INMATES AND THE SERVICES THAT NEEDED TO

20 BE PROVIDED TO THEM.  THOSE INCLUDE THINGS SUCH AS THE

21 INTERMEDIATE CARE FACILITY, ICF, THE ACUTE TREATMENT PROGRAM,

22 INCLUDING DMH PROGRAMS.  THE MENTAL HEALTH CRISIS BEDS AND THE

23 EOP -- SPECIAL EOP PROGRAMMING.

24 **Q**   THOSE INDIVIDUALS ARE -- LET ME STRIKE THAT.

25         IS IT YOUR OPINION THAT THOSE INDIVIDUALS WHO NEED

1    THAT TYPE OF WHAT YOU CALL HIGHER INTENSITY CARE WITHIN A

2    CORRECTIONAL SETTING WOULD ALSO NEED THAT HIGHER INTENSITY

3    LEVEL OF CARE IN A COMMUNITY SETTING IF RELEASED?

4    **A**    YES.

5             **MS. TILLMAN:**  THANK YOU.  NOTHING FURTHER.

6             **JUDGE HENDERSON:**  ANYTHING ELSE FROM DEFENDANTS?

7    MR. BIEN?

8             **MR. BIEN:**  NO REDIRECT, YOUR HONOR.

9             **JUDGE HENDERSON:**  OKAY.  THANK YOU VERY MUCH FOR

10   BEING WITH US TODAY, DR. PACKER.  YOU'RE EXCUSED AT THIS POINT,

11   AND WE'LL DISASSEMBLE THE EQUIPMENT THAT BROUGHT YOU TO US

12   HERE.

13            **THE WITNESS:**  THANK YOU VERY MUCH.

14            **MS. NORMAN:**  PLAINTIFFS CALL MR. POWERS FOR

15   CROSS-EXAMINATION.

16            **MS. JOHNSON:**  YOUR HONORS, BRIEFLY, TO CLARIFY I

17   THINK A QUESTION YOU HAD EARLIER, MR. POWERS IS BEING BROUGHT

18   BACK TODAY FOR, I THINK, A BRIEF CROSS-EXAMINATION.  WE DID

19   HAVE SCHEDULED DR. THOMAS AT NOON.

20            **JUDGE HENDERSON:**  WE UNDERSTAND.

21            **JUDGE KARLTON:**  WE UNDERSTAND.  HOW LONG DO YOU

22   THINK YOUR CROSS-EXAMINATION IS GOING TO TAKE?

23            **MS. NORMAN:**  ABOUT 15 MINUTES.

24            **JUDGE KARLTON:**  WE ARE NOT TRYING TO CUT YOU OFF.

25   WE ARE TRYING TO UNDERSTAND.

1          **MS. NORMAN:** ABOUT 15 MINUTES.

2          **JUDGE KARLTON:** I HAVE ABOUT FIVE MINUTES.

3          **JUDGE REINHARDT:** AFTER THAT, IS THAT WHEN WE HAVE

4 THE WITNESS AT 12:00?

5          **JUDGE HENDERSON:** HOW LONG WILL THAT TAKE?

6          **JUDGE REINHARDT:** HOW LONG ABOUT WILL THAT WITNESS

7 TAKE?

8          **MS. JOHNSON:** HE'S GOING TO TAKE APPROXIMATELY 20,

9 30 MINUTES ON DIRECT. I'M NOT SURE, I THINK THE PLAINTIFFS

10 HAVE ABOUT AN HOUR AND A HALF FOR CROSS.

11          **MS. HARDY:** I BELIEVE, ACTUALLY, YOUR HONOR, IT WILL

12 BE 45 MINUTES TO AN HOUR.

13          **JUDGE REINHARDT:** WHAT DO WE DO ABOUT LUNCH?

14          **JUDGE HENDERSON:** LET'S START THINKING ABOUT IT

15 AFTER DIRECT. WE MAY TAKE A BREAK AFTER DIRECT.

16          **JUDGE KARLTON:** SIR, YESTERDAY I THINK I WAS SO

17 ENTHUSIASTIC ABOUT THE POSSIBILITY THAT THERE MIGHT BE SOME

18 SOLUTION TO WHAT APPEARS TO BE AN INSOLUBLE PROBLEM THAT I

19 STOPPED THINKING. AND WHEN I WENT BACK TO MY ROOM YESTERDAY A

20 COUPLE OF QUESTIONS --

21          **JUDGE REINHARDT:** CAN YOU SPEAK UP?

22          **JUDGE KARLTON:** I'M SORRY. A COUPLE OF QUESTIONS

23 OCCURRED TO ME.

24          ESTABLISHING FUNDING FOR A PROGRAM THAT WOULD

25 PREVENT PEOPLE FROM GETTING INTO PRISONS, FROM YOUR POINT OF

1  VIEW, APPEARS TO BE DIRECTED TO THE PROBATION DEPARTMENTS OF

2  THE VARIOUS COUNTIES; IS THAT CORRECT?

3          **THE WITNESS:**  NOT JUST PROBATION DEPARTMENTS BUT TO

4  COUNTIES IN GENERAL FOR PROBATION SUPERVISION, TREATMENT

5  PROGRAMS, THINGS LIKE THAT, YES, SIR.

6          **JUDGE KARLTON:**  BUT PROBATION DEPARTMENTS INITIALLY

7  DON'T DECIDE WHETHER OR NOT PEOPLE GO TO PRISON.  JUDGES DO.

8          **THE WITNESS:**  CORRECT, SIR.

9          **JUDGE KARLTON:**  AND YOU CAN RECOMMEND AND SAY, WE'VE

10 GOT ALL THESE OTHER PROGRAMS, BUT THE JUDGES WILL ULTIMATELY

11 DECIDE WHETHER OR NOT THEY'RE SENDING PEOPLE TO PRISON OR NOT,

12 AND THAT'S INDEPENDENT OF ANYTHING THAT THE PROBATION

13 DEPARTMENTS HAVE?

14         **THE WITNESS:**  I THINK THAT'S ACCURATE UNTIL THEY'RE

15 PLACED ON PROBATION.

16         **JUDGE KARLTON:**  I UNDERSTAND, BUT WHETHER THEY GET

17 PLACED ON PROBATION IS OUT OF YOUR HANDS?

18         **THE WITNESS:**  ABSOLUTELY, YES.

19         **JUDGE KARLTON:**  SO YOUR PROGRAM PRESUPPOSES A LEVEL

20 OF COOPERATION WITH A STRATA OF INDEPENDENT JUDICIAL OFFICERS

21 WHICH WE COULDN'T POSSIBLY CONTROL?

22         **THE WITNESS:**  WELL, I WOULDN'T SAY IT PRESUPPOSES.

23 I THINK WHAT WE'RE DISCUSSING, OR THE MODEL THAT HAS BEEN USED

24 PREVIOUSLY AND WE BELIEVE COULD BE USED IN THE FUTURE,

25 PRESUPPOSES THE EXISTING STRUCTURE THAT WE HAVE NOW, THE

1  EXISTING PROBATIONERS THAT WE HAVE NOW.  OBVIOUSLY, IF COURTS

2  REFUSE TO PUT ANYONE ON PROBATION, WE COULDN'T HAVE ANY

3  CLIENTS.

4          **JUDGE KARLTON:**  WE ARE NOT TALKING ABOUT ANY.  WE

5  ARE TALKING ABOUT VERY SUBSTANTIAL NUMBERS OF PEOPLE.

6          **THE WITNESS:**  WE HAVE 300,000 PEOPLE ON PROBATION

7  RIGHT NOW, YOUR HONOR, IN THE STATE.  SO THERE IS A SIGNIFICANT

8  POPULATION CURRENTLY EXISTING.

9          **JUDGE KARLTON:**  THE QUESTION FROM OUR POINT OF VIEW

10 IS DEVELOPING AN EFFECTIVE SET OF ORDERS THAT WILL, ON THE ONE

11 HAND, PROTECT SOCIETY AND, ON THE OTHER, ENSURE THAT THERE'S

12 CONSTITUTIONALLY SUFFICIENT PROVISION OF CARE.  AGAIN, I'M -- I

13 JUST WANT TO BE CLEAR.  JUDGES SENTENCE, PROBATION OFFICERS

14 ONLY RECOMMEND.

15          **THE WITNESS:**  CORRECT.

16          **JUDGE KARLTON:**  AND WE WOULDN'T HAVE ANY POWER OVER

17 WHAT THE JUDGES DO.

18          **THE WITNESS:**  ABSOLUTELY.

19          **JUDGE KARLTON:**  AND LET ME ASK, I DON'T KNOW ABOUT

20 THE STATE SYSTEM.  I HAVEN'T BEEN A STATE JUDGE FOR OVER 30

21 YEARS.  BUT AT LEAST IN THE FEDERAL SYSTEM THERE ARE MANDATORY

22 SENTENCES.  DOES THE STATE HAVE A SIMILAR SET OF --

23          **THE WITNESS:**  YES AND NO.  MOST SENTENCES HAVE --

24 VIRTUALLY ANY PENAL CODE VIOLATION WITH THE EXCEPTION OF A FEW,

25 THERE IS AN ELIGIBILITY PROVISION FOR PROBATION.  SOME YOU ARE

1   PRESUMPTIVELY ELIGIBLE.  SOME YOU ARE PRESUMPTIVELY INELIGIBLE

2   WITHOUT A FINDING OF THE JUDGE THAT THERE'S SOME SPECIAL

3   CIRCUMSTANCES.  THERE ARE SOME YOU ARE NOT ELIGIBLE FOR

4   PROBATION ON -- IT'S, DEPENDING ON THE CIRCUMSTANCES, FIRST

5   OFFENSE, SECOND OFFENSE, THINGS LIKE THAT.

6           SO MANY CASES, YES, THERE IS ELIGIBILITY FOR

7   PROBATION.

8           **JUDGE KARLTON:**  AND IN ADDITION TO THAT PROBLEM, IS

9   THERE, AS THERE IS IN THE FEDERAL SYSTEM, CERTAIN CRIMES WHICH

10  THERE ARE MANDATORY MINIMUM SENTENCES WHICH MUST BE SERVED?

11          **THE WITNESS:**  YES.

12          **JUDGE KARLTON:**  OKAY.  ALL OF THAT WOULD SEEM TO

13  ME -- AS ENTHUSIASTIC AS I WAS YESTERDAY WHEN I WALKED AWAY --

14  TO CREATE A SIGNIFICANT PROBLEM IN IMPLEMENTING AN ORDER THAT

15  WOULD EFFICIENTLY MEET OUR ENDS.

16          **THE WITNESS:**  I GUESS IF YOU WERE TO LOOK AT YOUR

17  CURRENT STATE PRISON POPULATION, YOUR HONOR, AND PARCEL THEM

18  OUT AS TO THOSE WHO HAVE BEEN ON PROBATION VERSUS THOSE WHO ARE

19  OR WERE INELIGIBLE FOR PROBATION, THE NUMBERS THAT ARE

20  INELIGIBLE OR WHO WERE NEVER TOUCHED BY PROBATION ARE VERY,

21  VERY SMALL IN THE STATE POPULATION OF PRISONERS.

22          AND I GUESS WHAT I WAS TRYING TO PORTRAY YESTERDAY

23  IS THAT WE TOUCH VIRTUALLY ALL OF THOSE PRISONERS WHO THE STATE

24  CURRENTLY HAVE AT ONE TIME OR ANOTHER WERE TOUCHED BY

25  PROBATION, BY PROBATION SYSTEM, BY THE LOCAL CRIMINAL JUSTICE

 1  SYSTEM.

 2          WE HAVE OFFENDERS WHO -- I'LL GIVE YOU AN EXAMPLE.

 3  OUR PROPOSITION 36 PROGRAM WHICH IS A SUBSTANCE ABUSE PROGRAM,

 4  A DIVERSION PROGRAM FROM CUSTODY, THE AVERAGE OFFENDER IN MY

 5  COUNTY HAS BEEN ARRESTED IN THAT, PRIOR TO ENTERING THE PROGRAM

 6  13 TIMES, HAS MULTIPLE GRANTS OF PROBATION WHEN THEY COME

 7  THROUGH OUR PROGRAM.  SO THIS IS NOT A FIRST TIME TOUCHING OF

 8  THE PERSON.  MANY INDIVIDUALS WHO END UP IN THE STATE PRISON

 9  SYSTEM HAVE MULTIPLE GRANTS OF PROBATION WHEN THEY'RE FINALLY

10  SENTENCED AND ACTUALLY DO GO TO STATE PRISON.

11          **JUDGE KARLTON:**  THE NEXT PROBLEM THAT OCCURRED TO ME

12  IS THE QUESTION OF COST.  OBVIOUSLY, THIS PROGRAM WILL BE

13  EXPENSIVE AND, AT THE SAME TIME, BECAUSE UNDER THE PROPOSAL WE

14  WOULDN'T BE RELEASING ANYBODY, THE STATE STILL HAS THE

15  MANDATORY DUTY OF PROVIDING SUPPORT FOR THE PRISONERS THAT ARE

16  THERE AT 40,000 BUCKS A CLIP.  REALISTICALLY, THEN A STATE IS

17  GOING TO HAVE TO SAY, WE'RE GOING TO CONTINUE TO FUND THE

18  PRISONS, AT LEAST FOR THE FIRST COUPLE OF YEARS, AT A LEVEL

19  THAT MANY PEOPLE FIND DIFFICULT TO JUSTIFY NOW, AND, AT THE

20  SAME TIME, CREATE A PROGRAM WHICH HOPEFULLY SOMEDAY, GOD

21  WILLING AND THE RIVER DON'T RISE, IS GOING TO REDUCE THAT

22  POPULATION.  IS THAT A FAIR ASSESSMENT?

23          **THE WITNESS:**  I WOULDN'T DISAGREE WITH THE COMMENTS

24  GENERALLY IN THAT YOU PROBABLY ARE GOING TO HAVE TO FRONTLOAD

25  FOR A YEAR BEFORE YOU SEE REDUCTIONS.  BUT MANY OF THE PROGRAMS

1  CAN BE BROUGHT IN FAIRLY QUICKLY LOCALLY AND IMPLEMENTED FAIRLY

2  QUICKLY, SO I THINK YOU'LL START TO SEE REDUCTIONS AFTER YEAR

3  ONE.

4          NOW, YOU WON'T GET COMPLETE, BUT YOU WILL START TO

5  SEE A REDUCTION IN COST SAVINGS AFTER 12 MONTHS.  AT 18 MONTHS

6  IT WILL PROBABLY START TO GET CLOSE TO BREAKING EVEN.  I'D SAY

7  TWO YEARS OUT YOU ARE -- I WOULD BE PRETTY CONFIDENT IN SAYING

8  THE STATE WILL BEGIN TO SEE SOME COST SAVINGS THERE.

9          **JUDGE KARLTON:**  AND, AT THE SAME TIME, THE PEOPLE

10 WHO ARE STILL IN PRISON ARE SUFFERING AN UNCONSTITUTIONAL

11 STANDARD OF CARE.  THAT'S PART OF THE PROBLEM.

12         **THE WITNESS:**  THAT'S NOT MY -- THAT IS NOT MY CALL.

13         **JUDGE KARLTON:**  BUT THAT'S OUR PROBLEM.

14         **THE WITNESS:**  RIGHT, RIGHT.  I UNDERSTAND THAT.

15              **CROSS-EXAMINATION BY MS. NORMAN**

16 **BY MS. NORMAN**

17 **Q**  GOOD MORNING, MR. POWERS.

18 **A**  GOOD MORNING.

19 **Q**  AS YOU KNOW, I'M SARA NORMAN FROM THE PRISON LAW OFFICE.

20 **A**  YES, MA'AM.

21 **Q**  JUST TO FOLLOW UP WITH A FEW QUESTIONS TO FOLLOW UP WHAT

22 JUDGE KARLTON WAS ASKING ABOUT, YOU SAID YOU ALREADY HAVE ABOUT

23 300,000 PEOPLE UNDER YOUR JURISDICTION IN THE PROBATION

24 DEPARTMENT IN STANISLAUS -- STATEWIDE.  I'M SORRY.

25 **A**  IN THE STATE.

1  Q    THREE HUNDRED THOUSAND PEOPLE STATEWIDE, AND A LOT OF THOSE

2  PEOPLE, MANY, MANY, MANY THOUSANDS OF THOSE PEOPLE, WILL GO

3  BACK TO STATE PRISON; IS THAT RIGHT?

4  A    I DON'T KNOW ABOUT GO BACK.  MANY OF THEM HAVEN'T GONE YET.

5  Q    MANY OF THEM WILL END UP IN STATE PRISON?

6  A    MANY OF THEM AT SOME POINT WILL END UP IN THE STATE PRISON

7  SYSTEM, YES.

8  Q    THAT'S -- THAT'S OFTEN REFERRED TO AS GRADUATING UP, ISN'T

9  IT?

10 A    THAT'S WHAT I REFER TO IT AS, YES.

11 Q    AND IF YOU HAD MORE RESOURCES TO FUND PROGRAMS AT THE

12 COUNTY LEVEL, FEWER OF THOSE PRISONERS -- I'M SORRY -- FEWER OF

13 THOSE PROBATIONERS WOULD GRADUATE UP TO THE STATE PRISON

14 SYSTEM; ISN'T THAT RIGHT?

15 A    CORRECT.

16 Q    YOUR ESTIMATE IS THAT ACROSS THE STATE, IF YOU HAD MORE

17 PROGRAMS, YOU'D HAVE 20- TO 25,000 FEWER PRISON COMMITMENTS A

18 YEAR; IS THAT RIGHT?

19 A    YES.  I GUESS I WOULD QUALIFY THAT BY SAYING ONCE YOU GET

20 EVERYTHING IN PLACE -- KIND OF MY CONVERSATION WITH THE JUDGE

21 HERE.  ON DAY ONE, NO.  BUT WHEN WE GET UP TO DOING THIS THE

22 WAY WE BELIEVE IT CAN BE DONE, YES, THAT WOULD BE MY

23 PROFESSIONAL ESTIMATE.

24 Q    OKAY.  SHIFTING GEARS, AB 900, THE STATE'S PRISON BUILDING

25 BILL?

1  **A**   YES, MA'AM.

2  **Q**   IT'S NOT PROVING TO BE A GOOD SOLUTION TO THE OVERCROWDING

3  CRISIS, IS IT?

4  **A**   I CAN'T ANSWER IT.  I MEAN, IT HASN'T DONE ANYTHING YET, SO

5  I CAN'T TELL YOU WHETHER IT'S A GOOD SOLUTION AT THIS POINT OR

6  NOT BECAUSE WE DON'T HAVE ANYTHING BUILT.

7  **Q**   SO THERE'S NOTHING BUILT, THERE'S BROWN -- GROUND HAS NOT

8  BEEN BROKEN ON A SINGLE PRISON BED, HAS IT?

9  **A**   NOT TO MY KNOWLEDGE, NO.

10      **JUDGE KARLTON:**  NOR, AS FAR AS YOU KNOW, HAS ANY

11  PLANNING BEEN DONE?

12      **THE WITNESS:**  I HAVEN'T BEEN INTIMATELY INVOLVED IN

13  AB 900.  TO MY KNOWLEDGE, I'M NOT AWARE OF ANY NEW BEDS BEING

14  BROUGHT ON LINE.

15  **BY MS. NORMAN**

16  **Q**   AND THE STATE DOESN'T EVEN HAVE ANY MONEY TO START

17  BUILDING, DO THEY?

18  **A**   AGAIN, THE FUNDING MECHANISM, YOU WOULD HAVE TO WORK THAT

19  OUT WITH THE STATE.  THEY HAVE SOME MECHANISM FOR IT, AND I

20  DON'T KNOW WHERE THAT MONEY IS IN THE PROCESS.  I KNOW THERE'S

21  BEEN DISCUSSION ABOUT LEGISLATIVE AUTHORITY AND THINGS LIKE

22  THAT, AND THERE'S SOME ISSUES AROUND THAT.

23  **Q**   BUT, FROM YOUR PERSPECTIVE, IN LOOKING AT THE PRISON

24  OVERCROWDING AND THE SITUATION IN THE COUNTIES, YOU DON'T HOLD

25  OUT MUCH HOPE THAT THE STATE CAN BUILD ITS WAY OUT OF THE

1  OVERCROWDING CRISIS, DO YOU?

2  **A**   I DON'T SEE BUILDING AS A TOTAL SOLUTION TO THIS ISSUE, NO.

3  **Q**   ARE YOU FAMILIAR WITH THE BRIDGING PROGRAM IN CDCR?

4  **A**   I'VE HEARD OF IT, BUT JUST -- HAVE TO REFRESH MY MEMORY.

5  **Q**   SO IT'S A PROGRAM THAT SPEEDS UP CREDIT EARNING FOR

6  PRISONERS IN RECEPTION CENTERS; DOES THAT SOUND FAMILIAR?

7  **A**   I'VE HEARD SOME DISCUSSIONS OF IT IN SOME MEETINGS.  I'M

8  NOT INTIMATELY FAMILIAR WITH IT, THOUGH.

9          **MS. BARLOW:**  THIS IS BEYOND THE SCOPE OF DIRECT

10 TESTIMONY.

11         **MS. NORMAN:**  THIS IS ABOUT EARLY RELEASE AND CREDIT

12 EARNING POTENTIAL WITHIN THE DEPARTMENT OF CORRECTIONS, AND

13 MR. POWERS TALKED ABOUT DR. AUSTIN'S PROPOSALS TO HAVE CREDIT

14 REFORM IN THE PRISON SYSTEM WHICH WOULD DECREASE LENGTH OF

15 STAY.

16         **JUDGE HENDERSON:**  PROCEED.

17 **BY MS. NORMAN**

18 **Q**   SO ARE YOU AWARE -- YOU SAID YOU ARE SOMEWHAT FAMILIAR WITH

19 THE BRIDGING PROGRAM.  ARE YOU AWARE IT IS CURRENTLY IN

20 EXISTENCE?

21 **A**   I'VE HEARD IT IS IN EXISTENCE, YES.

22 **Q**   AND YOU'VE HEARD IT ALLOWS PRISONERS IN RECEPTION CENTERS

23 TO EARN INCREASED TIME CREDITS AGAINST THEIR RELEASE?

24 **A**   FRANKLY, I WAS NOT -- I WAS NOT -- I'M NOT AWARE OF THE

25 MECHANISM THAT THEY USE TO AWARD THE CREDITS OR HOW THEY'RE

1  COMPUTED OR ANYTHING LIKE THAT.  I JUST KNOW GENERALLY IT'S A

2  CREDIT-BASED PROGRAM.

3  Q    ARE YOU AWARE THAT IT INVOLVES INCREASED CREDIT EARNING AT

4  THE RECEPTION CENTER STAGE?

5  A    I GUESS, YEAH, THAT WOULD BE A FAIR STATEMENT.

6  Q    OKAY.  DO YOU KNOW HOW LONG THE BRIDGING PROGRAM HAS BEEN

7  IN EXISTENCE?

8  A    NOT A CLUE, MA'AM.

9  Q    OKAY.  DO YOU KNOW WHAT IMPACT THE BRIDGING PROGRAM

10 ENHANCED CREDIT EARNING ABILITY FOR SOME PRISONERS -- DO YOU

11 KNOW WHAT IMPACT THAT HAS HAD ON PUBLIC SAFETY?

12 A    NO, I DO NOT, MA'AM.

13 Q    OR ON THE ADMINISTRATION OF LOCAL CRIMINAL JUSTICE SYSTEMS?

14 A    NO, I DO NOT.

15 Q    AND HAVE YOU -- I THINK I KNOW THE ANSWER TO THIS.  HAVE

16 YOU REQUESTED ANY ADDITIONAL RESOURCES TO DEAL WITH THE EFFECTS

17 OF THE BRIDGING PROGRAM ON YOUR COUNTY?

18 A    BECAUSE OF THE BRIDGING PROGRAM.  NO.

19 Q    OKAY.  AND CPOC, THAT'S THE STATEWIDE CHIEF PROBATION

20 OFFICERS ASSOCIATION, OF WHICH YOU ARE THE PRESIDENT, RIGHT?

21 A    YES, MA'AM.

22 Q    HAS CPOC TAKEN ANY STEPS TO STUDY THE EFFECTS OF THE

23 BRIDGING PROGRAM?

24 A    NO, MA'AM.

25 Q    OR ADVOCATE ANY CHANGES IN THE PROGRAM?

1   **A**   NO, NOT TO MY KNOWLEDGE.

2   **Q**   YOU'VE READ DR. AUSTIN'S REPORTS, RIGHT?

3   **A**   YES, I HAVE.

4   **Q**   AND DR. AUSTIN CONCLUDES THAT LENGTH OF STAY IN PRISON DOES

5   NOT AFFECT RECIDIVISM RATES, DOESN'T HE?

6   **A**   THAT'S ONE OF HIS STATEMENTS, YES.

7   **Q**   DO YOU HAVE ANY BASIS TO DISAGREE WITH THAT CONCLUSION?

8   **A**   NO.  NOT STRICTLY THAT STATEMENT, NO.

9   **Q**   OKAY.  SO THEN IF LENGTH OF STAY IN PRISON DOES NOT AFFECT

10  RECIDIVISM RATES, THEN RELEASING PRISONERS A FEW MONTHS EARLY

11  WOULDN'T HAVE ANY EFFECT ON THEIR RATE OF REARREST OR

12  REOFFENSE, WOULDN'T IT?

13  **A**   REPEAT THAT.

14          **JUDGE HENDERSON:**  BEYOND HIS TESTIMONY THAT IT GIVES

15  HIM 60 MORE DAYS TO DO SOMETHING THAT THEY MIGHT BE INCLINED TO

16  DO.  YOU MEAN BEYOND THAT?

17  **BY MS. NORMAN**

18  **Q**   WHAT I'M TRYING TO GET AT IS IF THE RECIDIVISM RATE REMAINS

19  THE SAME, THEN THE RATE OF REOFFENSE REMAINS THE SAME.  SO

20  PEOPLE ARE AS LIKELY TO REOFFEND IF THEY'RE RELEASED A FEW

21  MONTHS EARLIER THAN IF THEY ARE RELEASED A FEW MONTHS LATER?

22  **A**   ASSUMING ALL THINGS BEING EQUAL WITH RESPECT TO LACK OF

23  PROGRAMMING AND STUFF LIKE THAT, IF WE'RE JUST TALKING ABOUT

24  LENGTH OF STAY, YEAH, YOU COULD MAKE THAT ASSUMPTION.

25  **Q**   OKAY.  SO WE'RE TALKING ABOUT THE SAME POPULATION OF

1  PEOPLE, RIGHT, JUST A QUESTION OF WHETHER THEY GET OUT IN

2  JANUARY OR IN MARCH, RIGHT?

3  **A**   YES, MA'AM.

4  **Q**   SO RELEASING THEM EARLY MIGHT CHANGE THE TIME AND THE

5  CIRCUMSTANCE OF ANY REOFFENSES, BUT IT WOULDN'T CHANGE THE

6  LIKELIHOOD THAT THEY ARE GOING TO REOFFEND, WOULD IT?

7  **A**   STATISTICALLY SPEAKING, PROBABLY NOT.

8  **Q**   YOU'RE AWARE THAT CDCR HAS BEEN WORKING TO REFORM THE

9  PAROLE VIOLATION PROCESS, RIGHT?

10  **A**   YES.

11  **Q**   AND THAT INCLUDES PROVIDING A RISK ASSESSMENT TO DETERMINE

12  A PAROLEE'S RISK FOR REOFFENDING TO THEN DETERMINE HOW TO

13  PROPERLY DIRECT PAROLE RESOURCES, RIGHT?

14  **A**   CORRECT.

15  **Q**   AND THAT WOULD ALLOW CDCR TO DIRECT ENHANCED PAROLE

16  RESOURCES TOWARDS THE PEOPLE WHO NEED IT MOST, RIGHT?

17  **A**   THAT'S THE CONCEPT, YES.

18          **JUDGE KARLTON:**  BUT THERE HAVE GOT TO BE ENHANCED

19  RESOURCES, RIGHT?

20          **THE WITNESS:**  THE RESOURCES HAVE TO BE APPLIED IF

21  YOU HAVE THEM.

22  **BY MS. NORMAN**

23  **Q**   THAT'S THE GENERAL IDEA?

24  **A**   THAT'S THE CONCEPT.

25          **JUDGE KARLTON:**  THAT'S LIKE THEY'RE PLANNING BEDS.

1  YOU KNOW, GOD WILLING AND THE RIVER DON'T RISE.

2  **BY MS. NORMAN**

3  **Q**   WE'LL TALK THEORETICALLY HERE.  CDCR'S PAROLE VIOLATION

4  REFORM PLANS INCLUDE A PAROLE VIOLATION MATRIX TO PROVIDE THE

5  APPROPRIATE CONSEQUENCE FOR PAROLE VIOLATERS, RIGHT?

6  **A**   TO PROVIDE A CONSEQUENCE, YEAH.  I THINK SOME WOULD DISPUTE

7  WHETHER IT IS AN APPROPRIATE CONSEQUENCE OR NOT.

8  **Q**   SO THE MATRIX LOOKS AT A DIFFERENT RANGE OF BEHAVIORS, A

9  RANGE OF CONSEQUENCES, AND TRIES TO MATCH UP THE RIGHT --

10  **A**   A DECISION MAKING TOOL, YES.

11  **Q**   YOU SUPPORT REFORMS LIKE THIS, DON'T YOU?

12  **A**   I SUPPORT EVIDENCE-BASED PRACTICES, YES.

13  **Q**   AND SO IF THESE REFORMS ARE DONE CONSISTENT WITH

14  EVIDENCE-BASED PRACTICES, THEN YOU WOULD THINK THAT THEY SHOULD

15  BE EFFECTIVE, RIGHT?

16  **A**   AS LONG AS THEY'RE BASED ON GOOD RESEARCH, YES.

17  **Q**   OKAY.  AND IF SUCH PAROLE VIOLATION REFORMS ARE DONE

18  CONSISTENT WITH THE RESEARCH, IF THEY ARE DONE RIGHT, THEY KEEP

19  PEOPLE OUT OF PRISON WHO DON'T NEED TO BE THERE, DON'T THEY?

20  **A**   I THINK THE QUESTION -- AND YOU'RE PROBABLY GOING TO TELL

21  ME I'M NOT BEING RESPONSIVE, THE QUESTION IS DOES IT HAVE A

22  NEGATIVE OR POSITIVE IMPACT ON PUBLIC SAFETY.  THAT'S REALLY

23  WHAT YOU NEED TO USE TO GUIDE YOUR DECISION MAKING.  IF IT ALSO

24  HAS A BENEFICIAL IMPACT ON PAROLE REVOCATIONS, THE NUMBER, THE

25  SEVERITY, HOW MANY END UP GOING BACK INTO CUSTODY, THEN THAT'S

1  WONDERFUL, TOO.  I GUESS THAT WOULD BE MY RESPONSE TO THE

2  QUESTION.

3  **Q**   SO, IN YOUR OPINION, IF THESE REFORMS ARE DONE RIGHT,

4  CONSISTENT WITH EVIDENCE-BASED PRACTICES, SHOULD THEY HAVE BOTH

5  EFFECTS, IMPROVED PUBLIC SAFETY AND REDUCE THE PRISON

6  POPULATION?

7  **A**   NOT NECESSARILY.  SOMETIMES IMPROVING PUBLIC SAFETY MEANS

8  INCAPACITATION.  THEY CAN BE MUTUALLY EXCLUSIVE, BUT THEY CAN

9  ALSO RESULT IN REDUCTIONS AS WELL.  SO YOU CAN HAVE ONE WITHOUT

10 THE OTHER.  YOU DON'T HAVE TO HAVE BOTH.  BUT YOU CAN CERTAINLY

11 IMPROVE PUBLIC SAFETY BY LOCKING SOMEBODY UP SOMETIMES.  THAT'S

12 AN APPROPRIATE RESPONSE FROM A PUBLIC SAFETY PERSPECTIVE.

13 **Q**   LET'S TAKE THIS A LITTLE OUT OF THE REALM OF THEORY AND

14 INTO THE CURRENT SITUATION.  CURRENTLY CDCR LOCKS UP A LOT OF

15 TECHNICAL PAROLE VIOLATERS; ISN'T THAT RIGHT?

16 **A**   THAT'S THE STATISTICS I'VE SEEN, YES.

17 **Q**   THEY LOCK UP PAROLE VIOLATERS, TECHNICAL PAROLE VIOLATERS

18 AT A TREMENDOUS RATE, DON'T THEY?

19 **A**   WELL, THE STATISTICS SAY YES, THERE ARE A LOT.  NINETY

20 THOUSAND A YEAR, I BELIEVE, PAROLE VIOLATERS ARE ADMITTED BACK

21 INTO THE FACILITY, OUT OF THE 140,000D ADMISSION.  SO, OFF THE

22 TOP OF MY HEAD, I CAN'T RECALL HOW MANY OF THEM ARE FOR -- I

23 GUESS THEY ARE ALL TECHNICAL VIOLATERS, BUT MANY -- YOU CAN

24 ARGUE WHETHER THEY COMMITTED NEW CRIMES AND THEY ARE BEING

25 RECOMMITTED ON VIOLATIONS FOR EXPEDIENCE AND OTHER ISSUES

1    REASONS.

2              **JUDGE HENDERSON:**  I'M SORRY.  DID YOU SAY OF 140,000

3    ADMITTED EACH YEAR, 90,000 OR SO ARE TECHNICAL, WHATEVER THAT

4    MEANS?

5              **THE WITNESS:**  WELL, THEY'RE PAROLE.  THEY'RE IN

6    FOR -- THEY GET PLACED BACK IN FOR PAROLE VIOLATIONS.

7              **JUDGE HENDERSON:**  PAROLE VIOLATIONS?

8    **BY MS. NORMAN**

9    **Q**   YOU DON'T THINK THAT ALL TECHNICAL PAROLE VIOLATIONS SHOULD

10   BE -- ALL TECHNICAL PAROLE VIOLATERS SHOULD AUTOMATICALLY BE

11   PUT IN PRISON, DO YOU?

12   **A**   WELL, NO.  NO, I WOULDN'T SAY THAT'S THE CASE.

13   **Q**   SO, IN FACT, PUTTING SOME -- FOR SOME TECHNICAL PAROLE

14   VIOLATERS, PUTTING THEM BACK IN PRISON CAN ACTUALLY BE VERY

15   DISRUPTIVE TO THEIR LIVES AND THE COMMUNITIES IN WHICH THEY'RE

16   LIVING; ISN'T THAT RIGHT?

17   **A**   CORRECT.  IF I STATED -- I DIDN'T MEAN TO MISSTATE THAT

18   EVERYBODY WHO IS A TECHNICAL PAROLE VIOLATER GOES TO PRISON,

19   BECAUSE THAT'S CERTAINLY NOT THE CASE.  THERE ARE 90,000 WHO

20   DO, BUT THERE ARE CERTAINLY MANY MORE TECHNICAL PAROLE

21   VIOLATIONS WHO DON'T GO TO PRISON.

22   **Q**   SO PAROLE VIOLATION REFORM THAT WOULD HAVE THE EFFECT OF

23   REDUCING THE NUMBER OF TECHNICAL PAROLE VIOLATERS WHO RETURN TO

24   PRISON WHO WOULD NOT BE BENEFITED BY A RETURN TO PRISON, IF

25   THOSE NUMBERS ARE REDUCED, WOULD THAT BE -- WOULD YOU SUPPORT

1  THAT KIND OF REFORM?

2  **A**   I APOLOGIZE.  YOU ARE GOING TO HAVE TO REPEAT THAT

3  QUESTION.

4  **Q**   YOU KNOW, I THINK I'M NOT.

5  **A**   I LOST TRACK.

6  **Q**   I LOST IT, TOO.

7  **A**   OKAY.

8  **Q**   YOU SPOKE YESTERDAY ABOUT PROVIDING SERVICES AT THE FRONT

9  END TO KEEP PEOPLE OUT OF PRISON, RIGHT?

10  **A**   YES.

11  **Q**   WE TALKED A LITTLE BIT ABOUT THAT WITH JUDGE KARLTON AT THE

12  BEGINNING OF THIS SESSION?

13  **A**   YES.

14  **Q**   SO, IN YOUR OPINION, PROVIDING EVIDENCE-BASED PROGRAMS IN

15  THE COMMUNITY CAN BOTH REDUCE THE PRISON POPULATION AND

16  INCREASE PUBLIC SAFETY, RIGHT?

17  **A**   WELL, IT WON'T -- IN SOME INSTANCES, PUBLIC SAFETY IS

18  IMPROVED, BUT I GUESS WORST CASE, IT WOULDN'T MAKE IT ANY

19  WORSE.

20  **Q**   OKAY.

21  **A**   SO THAT WOULD BE THE FLOOR THAT I WOULD PUT THERE.  I

22  WOULD -- I WOULD BE COMFORTABLE TO SAY WE WOULD NOT WANT TO

23  MAKE PUBLIC SAFETY WORSE, AND I WOULD BE COMFORTABLE WITH THAT

24  STATEMENT.

25  **Q**   SO WOULDN'T YOU AGREE THAT PROVIDING SERVICES -- SO THAT'S

1  AT THE FRONT END?

2  **A**   YES.

3  **Q**   WOULDN'T YOU AGREE THAT PROVIDING SERVICES AT THE BACK END

4  AFTER SOMEONE HAS BEEN SENTENCED TO PRISON, PROVIDING THEM

5  SERVICES WHILE THEY'RE IN PRISON OR ON THEIR RELEASE FROM

6  PRISON, THAT CAN ALSO BE EFFECTIVE AT REDUCING RECIDIVISM?

7  **A**   I'VE NEVER, NEVER ARGUED AGAINST THAT, MA'AM.

8  **Q**   OKAY.  SO THAT MEANS THAT SUCH MEASURES, LIKE PROVIDING

9  PROGRAMS AT THE FRONT END, PROVIDING PROGRAMS AT THE BACK END

10  WOULD ALSO SERVE TO REDUCE THE PRISON POPULATION AND IMPROVE

11  PUBLIC SAFETY?

12  **A**   WELL, YEAH.  I THINK IT'S INEFFICIENT USE OF RESOURCES TO

13  WAIT UNTIL THEY GET THROUGH THE SYSTEM AS OPPOSED TO PUTTING

14  THEM BEFORE THEY GET INTO THE SYSTEM.  PHILOSOPHICALLY, WHAT

15  YOU'RE SAYING, OR TECHNICALLY WHAT YOU'RE SAYING, YES, I WOULD

16  HAVE TO AGREE WITH, BUT I THINK IT'S A HORRIBLE AND INEFFICIENT

17  WAY TO USE THE TAXPAYER MONEY.

18          **JUDGE KARLTON:**  BUT WE HAVE A WHOLE BUNCH OF PEOPLE

19  IN WHICH AT LEAST THIS MOTION SUGGESTS HAVE TO BE LEFT OUT --

20  LET OUT ONE WAY OR ANOTHER IN ORDER TO COMPLY WITH THE

21  CONSTITUTION.  GIVEN THAT FACT, YOUR JUDGMENT IS THAT OVER THE

22  LONG RUN, WE WOULD BE WAY BETTER OFF PUTTING IT ON THE FRONT

23  END, BUT, REALISTICALLY, THE IMPLICATION IS IF WE FIND THAT

24  IT'S THE PRIMARY CAUSE, WE ARE GOING TO HAVE TO LET PEOPLE OUT,

25  WE OUGHT TO BE MAKING SURE THAT THERE'S ENOUGH RESOURCES TO

1  PROVIDE THEM WITH A KIND OF PROGRAMS THAT YOU THINK ARE

2  APPROPRIATE FOR THE FRONT END?

3          **THE WITNESS:**  WELL, I GUESS, YOUR HONOR, I HAVEN'T

4  CONCEDED YET, AND I'M NOT WILLING TO CONCEDE AT THIS POINT,

5  THAT WE HAVE TO LET PEOPLE OUT.

6          **JUDGE KARLTON:**  I UNDERSTAND.

7          **THE WITNESS:**  I THINK WE CAN DO IT BY INTAKE.

8          **JUDGE KARLTON:**  ASSUMING THAT WE WERE TO FIND THAT

9  THAT WAS NECESSARY -- I'M NOT SAYING WE WILL -- I'M SAYING

10 ASSUMING THAT, YOU WOULD SAY THAT WOULD NOT BE APPROPRIATE

11 WITHOUT SIGNIFICANT INCREASE IN RESOURCES TO PROGRAM THOSE

12 PEOPLE?

13         **THE WITNESS:**  I WOULD SAY THAT LACKING THAT, YOU

14 HAVE A SIGNIFICANT PUBLIC SAFETY PROBLEM.

15         **JUDGE KARLTON:**  FAIR ENOUGH.

16 **BY MS. NORMAN**

17 **Q**   AND JUST ONE FOLLOW-UP TO THAT.  FOR THE PEOPLE WHO ARE

18 ALREADY OUT OF PRISON BUT STILL UNDER THE JURISDICTION OF

19 PROBATION, PROVIDING PROGRAMS -- IT WOULD HAVE BEEN PREFERABLE

20 IF THEY HAD MORE PROGRAMS EARLIER, BUT PROVIDING THEM PROGRAMS

21 AT THIS POINT IS SOMETHING THAT COULD BE BENEFICIAL; IS THAT

22 RIGHT?

23         **MS. BARLOW:**  OBJECTION, YOUR HONOR.  THE PEOPLE

24 COMING OUT OF PRISON AREN'T UNDER THE JURISDICTION OF

25 PROBATION.  THEY ARE UNDER THE JURISDICTION OF PAROLE.

1      **JUDGE KARLTON:**  I WAS ABOUT TO SAY THIS IS SOMEWHAT

2  DIFFERENT.  IS IT CORRECT THAT PAROLE IS SEPARATE FROM THE

3  PROBATION DEPARTMENT?

4      **THE WITNESS:**  YES.  YOU CAN BE ON PAROLE AND

5  PROBATION AT THE SAME TIME, BUT YOU WOULD BE SERVED BY

6  ESSENTIALLY TWO SEPARATE DEPARTMENTS AND AGENTS.

7      **JUDGE KARLTON:**  UNLIKE THE FEDERAL SYSTEM, THERE'S A

8  PAROLE SYSTEM WITH PAROLE OFFICERS AND A WHOLE SYSTEM SET UP

9  OVER THERE?

10      **THE WITNESS:**  RIGHT.  CORRECT, YOUR HONOR.

11      **MS. NORMAN:**  NO FURTHER QUESTIONS.

12      **THE WITNESS:**  OKAY.

13      **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

14      **MS. LEONARD:**  NO, YOUR HONOR.

15      **JUDGE HENDERSON:**  OKAY.  REDIRECT?

16      **JUDGE REINHARDT:**  WHILE WE ARE WAITING, I HAVE ONE.

17      **THE WITNESS:**  SURE.

18      **JUDGE REINHARDT:**  YOU ARE NOT SUGGESTING, ARE YOU,

19  THE PEOPLE WHO -- FORGET RELEASING THEM NOW.  PEOPLE COME OUT

20  ALL THE TIME FROM PRISON.  YOU ARE NOT SUGGESTING THAT THE KIND

21  OF PROGRAMS YOU'RE TALKING ABOUT WOULDN'T HELP REDUCE CRIME AND

22  INCREASE THE WELFARE OF THE COMMUNITY IF THEY WERE INSTITUTED

23  FOR ALL THOSE PEOPLE WHO JUST COME OUT ORDINARILY?

24      **THE WITNESS:**  I CERTAINLY ADVOCATE YOU HAVE TO

25  PROVIDE PROGRAMS TO THOSE INDIVIDUALS AS WELL; OTHERWISE, IT IS

1  THE REVOLING DOOR THAT WE HAVE RIGHT NOW.  WHAT I WOULD SAY,

2  RESEARCH TELLS US, YOU WANT TO HAVE SEPARATE PROGRAMS FOR THEM,

3  SEPARATE AND APART FROM THE FRONT END, BECAUSE WHAT I TALKED

4  ABOUT YESTERDAY, ABOUT INTERMINGLING LOWER RISK WITH HIGHER

5  RISK.  SO WHEN WE HAVE PAROLEE PROGRAMS, THOSE NEED TO BE

6  STAND-ALONE PROGRAMS FROM COUNTY LEVEL PROGRAMS.

7            **JUDGE REINHARDT:**  WHETHER THEY CAME OUT PURSUANT TO

8  A RELEASE ORDER OR THEY --

9            **JUDGE KARLTON:**  USE THE MICROPHONE.

10           **JUDGE REINHARDT:**  I WOULD IF I COULD FIGURE IT OUT.

11           WHETHER THEY COME OUT PURSUANT TO A PRISON RELEASE

12 ORDER OR WHETHER THEY JUST COME OUT ORDINARILY AS THEY DO EVERY

13 YEAR, IT WOULD BE BENEFICIAL TO HAVE THESE PROGRAMS, AND THEY

14 WOULD REDUCE RECIDIVISM?

15           **THE WITNESS:**  CERTAINLY, THEY'RE COMING OUT ONE WAY

16 OR ANOTHER.  THE VAST MAJORITY ARE COMING OUT.  WE KNOW THAT.

17 AND THE QUESTION IS HOW DO THEY COME OUT?  DO THEY COME OUT

18 WORSE?  DO THEY COME OUT THE SAME?  IDEALLY, THEY COME OUT

19 BETTER.

20           **JUDGE KARLTON:**  NOBODY THINKS THAT'S GOING ON.

21           **THE WITNESS:**  NOT CURRENTLY, YOUR HONOR, I WOULD

22 AGREE.

23           **MS. BARLOW:**  THANK YOU VERY MUCH, YOUR HONORS.

24           FIRST, I WANTED TO ADVISE THE COURT, AT ITS REQUEST,

25 WE'VE GOT COPIES OF THE PENAL CODE SECTION THAT SET FORTH THE

1  COMMUNITY CORRECTIONS ACT PROVISIONS.

2          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

3          **MS. BARLOW:**  JUST A HOUSEKEEPING MATTER SO THE COURT

4  HAS THOSE PROVISIONS.

5                  **REDIRECT EXAMINATION BY MS. BARLOW**

6  **BY MS. BARLOW**

7  **Q**   MR. POWERS, JUDGE KARLTON WAS ASKING YOU AT THE BEGINNING

8  OF OUR SESSION TODAY ABOUT THE FACT THAT IT'S JUDGES WHO ARE

9  SENDING PEOPLE TO PRISON, AS OPPOSED TO SENTENCING THEM TO

10  PROBATIONARY PERIODS WHEN THAT CHOICE IS MADE, AND YOU

11  INDICATED THAT THERE'S SORT OF AN OVERWHELMING SENSE THAT MOST

12  OF THOSE CASES REALLY START OUT AS PROBATIONERS; IS THAT

13  CORRECT?

14  **A**   YES, MA'AM.

15  **Q**   IF THE COURTS, AT LEAST IN YOUR COMMUNITY, BASED UPON

16  RECOMMENDATIONS OF PROBATION OFFICERS AND AVAILABILITY OF

17  RESOURCES, WERE AWARE THAT THERE WERE, IN FACT, BETTER

18  RESOURCES AVAILABLE TO PROBATION AND WE WERE HAVING SUCCESS AT

19  KEEPING THOSE PROBATIONERS FROM GRADUATING UP, WOULD THAT

20  AFFECT THEIR SENTENCING DECISIONS, IN YOUR VIEW?

21  **A**   WELL, I CAN TELL YOU IT WOULD BE A TWO-PRONG ANSWER TO THE

22  QUESTION.

23          NUMBER ONE IS IF WE WERE AWARE, "WE" BEING THE

24  PROBATION OFFICER WERE AWARE THAT THERE WERE SUFFICIENT

25  RESOURCES, OUR RECOMMENDATIONS MANY TIMES WOULD BE FOR

1  PROBATION VERSUS SENDING THEM TO PRISON, AND I WILL SAY THAT

2  CERTAINLY A RECOMMENDATION FROM A PROBATION OFFICER -- FROM THE

3  PROBATION OFFICER CARRIES SIGNIFICANT WEIGHT, TYPICALLY, IN THE

4  SENTENCING DECISIONS THAT ARE MADE BY COURTS.

5          SO IF YOU END UP HAVING MORE RECOMMENDATIONS FOR

6  PROBATION BECAUSE YOU HAVE RESOURCES THAT ALLOW YOU TO WORK

7  WITH OFFENDERS MAYBE MORE INTENSELY AND FOR A LONGER PERIOD

8  THAN WHAT WE CURRENTLY HAVE, MY EXPERIENCE TELLS ME THAT YOU

9  WOULD SEE MORE PEOPLE, MORE INDIVIDUALS BEING PLACED ON

10 PROBATION IF YOU WERE BEING SENT TO PRISON.

11 Q   BUT IF A PRISON RELEASE ORDER THAT WAS ENTERED THAT IMPOSED

12 A CAP ON THE PRISON POPULATION, YOU TESTIFIED PREVIOUSLY THAT

13 WOULD SORT OF PUSH DOWN AND HAVE THE EFFECT OF HAVING MORE

14 PROBATIONERS, CORRECT?

15         **JUDGE KARLTON:**  NOT MORE PROBATIONERS, BUT MORE

16 PEOPLE THAT YOU'RE SERVING BECAUSE THEY CAN'T GET INTO PRISON.

17         **THE WITNESS:**  YEAH.  AND IT COULD BE EITHER/OR

18 PRACTICALLY SPEAKING.  THE COURTS COULD MODIFY THEIR

19 RECOMMENDATIONS BECAUSE THEY KNOW THAT INDIVIDUALS ARE NOT

20 GOING TO GO TO PRISON -- IF THEY GIVE THEM, SAY, A 16-MONTH

21 PRISON ORDER, THEY ARE NOT GOING TO GO TO PRISON, THEY ARE NOT

22 GOING TO BE PLACED ON PAROLE.  THEY MAY ON THE NATURAL BE MORE

23 INCLINED TO PLACE THEM UNDER PROBATION SUPERVISION BECAUSE AT

24 LEAST THEY WILL GET SOME SUPERVISION.

25         YOU ALSO MIGHT SEE INSTANCES WHERE THEY ARE GOING TO

1   GO AHEAD AND MAKE THE RECOMMENDATIONS, BUT THAT INDIVIDUAL,

2   BECAUSE OF THE POPULATION CAP, WILL NEVER GO TO PRISON.

3   THEY'LL SPEND THEIR TIME IN LOCAL CUSTODY AND, ESSENTIALLY, GET

4   THEIR CUSTODY CREDITS AND BE RETURNED TO COMMUNITY.

5           I'VE RUN SCENARIOS WHERE YOU COULD CONCEIVABLY HAVE

6   A SITUATION WHERE SOMEBODY GETS A LOWER TERM PRISON SENTENCE, A

7   16-MONTH PRISON SENTENCE WHO ENDS UP CONCEIVABLY DOING LESS

8   TIME THAN SOMEBODY WHO GETS A LOCAL JAIL SENTENCE.  IF SOMEBODY

9   GETS A 365-DAY JAIL SENTENCE, THEY MAY ACTUALLY END UP DOING

10  MORE TIME IN CUSTODY THAN SOMEBODY WHO GETS COMMITTED TO THE

11  STATE PRISON WHEN YOU FACTOR IN THE THINGS THAT HAVE BEEN

12  PROPOSED, SUCH AS ADDITIONAL GOOD TIME CREDITS AND STUFF LIKE

13  THAT.

14          SO, IN THAT INSTANCE, YOU ACTUALLY MAY HAVE

15  INDIVIDUALS WHO WOULD BE MORE LIKELY TO PLEAD TO A PRISON

16  SENTENCE SO THEY CAN GET OUT OF CUSTODY, WHICH IN SOME WAYS

17  TURNS INTO A DOWNWARD CYCLE BECAUSE IT MAY BE A STRIKE, AND

18  THEN THE NEXT TIME THEY COME IN, YOU HAVE A CIRCUMSTANCE WHERE

19  THEY'VE ALREADY GOT A PRIOR PRISON WHICH ADDS AN ENHANCEMENT OR

20  A STRIKE.  SO IN SOME WAYS IT MIGHT BE DETRIMENTAL, THE

21  ADDITIONS OF CREDITS, BECAUSE COUNTIES DON'T COMPUTE CREDITS AT

22  THE LOCAL LEVEL IN THE SAME WAY.

23          **JUDGE KARLTON:**  BUT, OF COURSE, THE JUDGE, I

24  GATHER -- AND I MAY BE SPEAKING OUT OF PURE IGNORANCE -- PART

25  OF THE PLEA PROCESS IN THE STATE COURTS, AS I UNDERSTAND IT,

1   INCLUDES THE PROCESS OF STRIKING STRIKES BECAUSE A STRIKE MAY

2   COMPEL PEOPLE TO GO TO PRISON; IS THAT RIGHT?

3           **THE WITNESS:**  IT MAY.  AND, QUITE FRANKLY, THE

4   DISTRICT ATTORNEYS WOULD GIVE YOU MUCH BETTER INFORMATION ON

5   THAT THAN MYSELF.

6   **BY MS. BARLOW**

7   **Q**   IN YOUR EXPERIENCE, IS SENDING SOMEONE TO PRISON REALLY A

8   LAST RESORT FOR MOST JUDGES FOR MOST DEFENDANTS?

9   **A**   IN MY EXPERIENCE IN PROBATION, I CAN TELL YOU FROM A

10  PROBATION PERSPECTIVE IT'S THE LAST THING WE WANT TO DO, QUITE

11  FRANKLY, BECAUSE WE KNOW WHAT'S GOING TO HAPPEN WHEN THEY GO.

12  SO IT'S NOT SOMETHING THAT WE TAKE LIGHTLY, BUT WE DO IT.  WE

13  HAVE NO RESOURCES FOR THE INDIVIDUAL.  THEY'RE A PUBLIC SAFETY

14  THREAT.  THEY'VE EXHAUSTED THEIR TIME WITH US LOCALLY.  THE

15  ALTERNATIVE, THE ONLY ALTERNATIVE, QUITE FRANKLY, IS TO SEND

16  THEM TO STATE PRISON.

17          **JUDGE REINHARDT:**  I WAS CURIOUS.  YOU SAY, WE KNOW

18  WHAT'S GOING TO HAPPEN WHEN THEY GO.  WHAT IS THAT?

19          **THE WITNESS:**  THEY'RE GOING TO GET WORSE.  AND I

20  PROBABLY SHOULD SAY MANY OF THEM ARE GOING TO GET WORSE, NOT

21  ALL.  THAT'S NOT A FAIR STATEMENT TO MAKE, BUT MANY ARE GOING

22  TO GET WORSE.

23          **JUDGE KARLTON:**  PRISONS ARE VIOLENT PLACES WHERE

24  THEY'RE ASSOCIATING WITH PEOPLE WITH MUCH HIGHER DEGREES OF

25  CRIMINALITY?

1          **THE WITNESS:**  CORRECT.

2   **BY MS. BARLOW**

3   **Q**   IF YOU HAVE A SITUATION WHERE YOU HAVE, AS YOU DO IN

4   STANISLAUS COUNTY, A JAIL POPULATION CAP AND THERE IS A PRISON

5   CAP, IF YOU ASSUME THAT BOTH THE CAP AT THE PRISON LEVEL IS

6   FULL AND NOBODY CAN GO THERE AND THAT THE JAIL CAP IS ALSO

7   FULL, WHAT -- DOES THAT IMPACT YOUR ABILITY TO USE LOCAL

8   CUSTODY TIME AS AN INCENTIVE TO HELP KEEP YOUR PROBATIONERS IN

9   LINE?

10  **A**   WELL, CERTAINLY IF YOU DON'T HAVE THE ABILITY TO -- OR IF

11  THE COURT DOESN'T HAVE THE ABILITY TO IMPOSE SANCTIONS FOR

12  NONCOMPLIANCE, I BELIEVE THAT HAS AN IMPACT IN THE ABILITY TO

13  COMPEL PEOPLE TO ENGAGE IN TREATMENT, AND I THINK WE SEE A

14  NEGATIVE IMPACT WITH THAT, GENERALLY SPEAKING.

15  **Q**   WELL, LET ME ASK IT TO YOU IN KIND OF A DIFFERENT WAY, NOT

16  THAT YOU DIDN'T ANSWER MY QUESTION, BUT AS A WAY OF GIVING A

17  SPECIFIC EXAMPLE.  YOU TALKED ON CROSS ABOUT PROPOSITION 36.

18  NOW, THERE'S AN ALTERNATIVE CALLED DRUG COURT TO PROP 36,

19  RIGHT?

20  **A**   YES.

21  **Q**   AND, IN YOUR VIEW, YOU TESTIFIED IN YOUR DEPOSITION THAT

22  PROPOSITION 36 HAS A MUCH LOWER SUCCESS RATE THAN THE DRUG

23  COURT DOES.  WHY IS THAT?

24  **A**   BECAUSE THERE ARE NO SANCTIONS AVAILABLE FOR NONCOMPLIANCE

25  IN PROP 36, WHEREAS DRUG COURT HAS SANCTIONS AVAILABLE TO THE

1   COURT TO, AS I SAID, TO COMPEL COMPLIANCE AND COMPEL PEOPLE TO

2   ENGAGE IN TREATMENT.

3   **Q**   AND I THINK YOU TESTIFIED IT'S ABOUT TEN TIMES MORE

4   SUCCESSFUL THAN PROP 36 IS?

5   **A**   YEAH.  WE HAVE ABOUT A THREE PERCENT POSITIVE DRUG TEST

6   RATE IN DRUG COURT AND ABOUT A 20 TO 25 PERCENT POSITIVE DRUG

7   TEST RATE IN PROP 36, AND IF YOU LOOK AT THE NUMBERS WHO

8   COMPLETE SUCCESSFULLY, IT'S DRAMATICALLY DIFFERENT.

9   **Q**   SO WITH A CAP AT BOTH THE STATE AND THE COUNTY, DO YOU

10  THINK YOU WOULD SEE A COMPARABLE IMPACT TO THE OTHER KINDS OF

11  TREATMENT PROGRAMS YOU WANT YOUR PROBATIONERS TO DO TO BECOME

12  SUCCESSFUL, DOMESTIC VIOLENCE, ANGER MANAGEMENT AND SO ON;

13  WOULD YOU EXPECT A NEGATIVE IMPACT TO THOSE KINDS OF OUTCOMES?

14  **A**   WELL, IF THERE'S MORE BODIES THAN THERE ARE TREATMENT

15  SLOTS, THEN CERTAINLY, WHICH IS WHAT WE HAVE NOW.  IF THERE'S A

16  LOT MORE BODIES BECAUSE OF A BACKUP FROM THE SYSTEM, THEN

17  THERE'S MORE PEOPLE WHO AREN'T GOING TO GET TREATMENT.

18          **JUDGE REINHARDT:**  ISN'T IT TRUE, ALSO, IN LIGHT OF

19  YOUR EARLIER ANSWER, IF YOU SEND THEM TO PRISON AND THEY'RE

20  GOING TO COME OUT WORSE, DOESN'T THAT ALSO INCREASE THE DANGER

21  AND THE CRIME IN THE LOCAL COMMUNITIES?

22          **THE WITNESS:**  YES, IT DOES, YOUR HONOR.

23          **JUDGE KARLTON:**  BACK TO BEING INSOLUBLE.  GO AHEAD.

24  **BY MS. BARLOW**

25  **Q**   AND MS. NORMAN ASKED YOU A QUESTION ABOUT THE REDUCTION YOU

1  THOUGHT COULD OCCUR THROUGH THE FRONT LOADING SYSTEM, AND THAT

2  WAS 20 TO 25 FEWER PRISONERS?

3          **JUDGE KARLTON:**  TWENTY-FIVE PERCENT.

4          **THE WITNESS:**  THOUSAND.

5          **MS. BARLOW:**  HE ACTUALLY SAID 20,000 TO 25,000 FEWER

6  COMMITMENTS PER YEAR.

7  **BY MS. BARLOW**

8  Q   THAT'S NEW COMMITMENTS, CORRECT, ULTIMATELY?

9  A   IT'S -- ULTIMATELY, WHAT IT COMES DOWN TO, A COMMITMENT IS

10 A COMMITMENT IS A COMMITMENT.  IT WOULD BE A COMBINATION OF NEW

11 COMMITMENTS, AND BECAUSE YOU'VE REDUCED NEW COMMITMENTS -- I

12 THINK I DESCRIBED IT YESTERDAY.  BECAUSE YOU REDUCED NEW

13 COMMITMENTS, THEY DON'T GET A CHANCE TO BECOME THOSE PAROLE

14 VIOLATERS WHO ARE THE CHURNERS, THOSE OTHER 90,000.  SO SOME

15 WILL BE NEW COMMITMENTS, AND SOME WILL BE A REDUCTION IN PAROLE

16 VIOLATIONS BECAUSE YOU ARE GOING TO HAVE FEWER PEOPLE ON

17 PAROLE, QUITE FRANKLY.

18 Q   WITH RESPECT TO AB 900, OBVIOUSLY, THAT HASN'T BEEN FUNDED

19 YET, BUT THE CONCEPT OF THE COMMUNITY REENTRY FACILITY, DO YOU

20 THINK THAT COULD PROVIDE BENEFITS TO PUBLIC SAFETY?

21 A   IT MAKES SENSE, YES, ANY TYPE OF AFTERCARE OR TRANSITION

22 FROM CUSTODY BACK INTO THE COMMUNITY IS GOING TO HELP FROM A

23 PUBLIC SAFETY STANDPOINT.  IT'S JUST A FUNCTION OF GETTING

24 THEM.

25 Q   SO THERE WAS A DISCUSSION ABOUT THE DIFFERENCE BETWEEN THE

1  RATES OF RECIDIVISM AND THE EARLY RELEASE AND WHAT IMPACTS THAT

2  HAS.  I WANT TO ASK YOU A QUESTION ABOUT THE RATES OF

3  RECIDIVISM AND HOW THEY DIFFER BETWEEN HIGH LEVEL AND LOW LEVEL

4  OFFENDERS.  WE KEEP HEARING ABOUT LOW RISK OFFENDERS, AND IF WE

5  LET LOW RISK OFFENDERS OUT, WHAT DOES LOW RISK VERSUS LOW LEVEL

6  OFFENDERS MEAN TO YOU?

7  **A**   WELL, IT'S DIFFICULT TO EXPLAIN HOW AN OFFENDER WHO COMES

8  OUT OF OUR STATE PRISON SYSTEM OR OFFENDERS IN THE POPULATION

9  WITH 60 PLUS RECIDIVISM RATES WOULD BE LABELED LOW RISK.  THAT

10 DOESN'T MAKE SENSE.  IT DOESN'T LOGICALLY MAKE SENSE, HOW YOU

11 CAN CALL SOMEBODY A LOW RISK TYPE WHO HAS A 60 PERCENT

12 POTENTIAL TO REOFFEND WITHIN THREE YEARS.

13         NOW, LOW LEVEL, THAT SORT OF MAKES SENSE TO ME, IN

14 THAT IF YOU TAKE THE MOST SERIOUS CRIMES TO THE LESS SERIOUS

15 CRIMES, YOU CAN TALK LOW LEVEL AND TALK ABOUT PROPERTY CRIMES

16 AND THINGS LIKE THAT.  I UNDERSTAND THAT.  BUT IF YOU LOOK AT

17 THE RECIDIVISM RATES THAT CDCR REPORTS, THE HIGHEST RECIDIVISM

18 RATES TEND TO BE IN THOSE LOWER LEVEL OFFENDERS.  SO YOU'VE GOT

19 ESSENTIALLY HIGH RISK FOR REOFFENDING IN THE LOWER LEVEL

20 POPULATION, WHICH WOULD -- WE WOULD THINK WOULD BE THE

21 POPULATION YOU WOULD LOOK AT IF YOU HAD TO RELEASE, TO

22 RELEASE --

23         **JUDGE KARLTON:**  WHAT THAT SAYS IS THAT SENDING

24 PEOPLE TO PRISON IS NOT AFFECTING ANY SIGNIFICANT SAFETY

25 PROVISION FOR THE PUBLIC?

 1          **THE WITNESS:**  NO, NO.  YES, I WOULD AGREE WITH THAT.

 2          **JUDGE KARLTON:**  HERE WE ARE.

 3          **THE WITNESS:**  WE CAN'T -- WE HAVE TO BE CAREFUL WHEN

 4  WE TALK ABOUT WHO WOULD BE ELIGIBLE FOR RELEASE BECAUSE REALLY

 5  IN --

 6          **JUDGE KARLTON:**  WHAT WE OUGHT TO BE DOING IS

 7  RELEASING ALL THE SECOND DEGREE MURDERERS.

 8          **THE WITNESS:**  IF YOU LOOK AT RECIDIVISM RATES,

 9  MANSLAUGHTER, THINGS LIKE THAT, ARE LESS THAN AUTO THEFT.

10          TO BE FAIR, YOU HAVE TO ASK WHAT THEY DO TO

11  RECIDIVATE.  DOES THE AUTO THIEF GO OUT AND RECIDIVATE BY

12  STEALING CANDY BARS?  DOES THE MANSLAUGHTER PERSON GO OUT AND

13  RECIDIVATE BY STEALING CANDY BARS OR COMMITTING NEW

14  MANSLAUGHTER?  I DON'T WANT PEOPLE TO THINK MANSLAUGHTER

15  RECIDIVATES BY DOING ANOTHER MANSLAUGHTER.  THAT'S NOT WHAT

16  WE'RE TALKING ABOUT.  SOME OF THEM ARE JUST PAROLE VIOLATIONS,

17  IF YOU LOOK AT CDCR STATISTICS.

18          SO WE HAVE TO -- THIS CONCEPT OF LOW RISK IS NOT

19  REALLY AN ACCURATE DESCRIPTION OF THE CDCR POPULATION.

20  **BY MS. BARLOW**

21  **Q**    SO LET'S TALK ABOUT THEM IN TERMS OF BEING LOW OFFENSE --

22  **A**    LOW LEVEL.

23  **Q**    LOW LEVEL OFFENDERS.

24  **A**    YES.

25  **Q**    OKAY.  SO THEY'RE DOING PROPERTY CRIMES, FOR EXAMPLE.

1  THOSE ARE THE ONES YOU SAID THAT HAVE THE HIGHEST RECIDIVISM

2  RISK?

3  **A**    TEND TO, YES.

4  **Q**    DO THEY ALSO TEND TO COMMIT CRIMES AT A HIGHER RATE THAN,

5  SAY, THE SECOND DEGREE MURDERERS?

6  **A**    THERE'S RESEARCH OUT THERE, AND I CAN'T GIVE IT TO YOU, BUT

7  THERE'S RESEARCH THAT HAVE LOOKED AT THE NUMBER OF OFFENSES

8  COMMITTED PRIOR TO FINALLY BEING CAUGHT AND THINGS LIKE THAT.

9  I'M NOT COMFORTABLE QUOTING ANY OF THOSE NUMBERS.  IT JUST IT'S

10 HARD TO PROVE SOMETHING THAT YOU WERE NEVER CAUGHT DOING.  SO

11 I'LL LEAVE THAT TO OTHER EXPERTS.

12 **Q**    WELL, DR. AUSTIN HAS OPINED THAT YOU HAVE ABOUT A TEN

13 PERCENT CHANCE OF GETTING ARRESTED FOR EACH CRIME YOU COMMIT,

14 SO IF ASSUMING THAT'S TRUE AND HE ACKNOWLEDGES 13,000 CRIMES

15 FROM A RELEASE ORDER OR ARREST, RATHER, WHAT DOES THAT

16 TRANSLATE INTO IN TERMS OF THE NUMBERS OF CRIMES --

17          **MS. NORMAN:**  OBJECTION.  MISCHARACTERIZES THE

18 EVIDENCE.

19          **JUDGE KARLTON:**  JUST ASSUME THAT WHETHER DR. AUSTIN

20 SAID THAT OR NOT.

21          **THE WITNESS:**  WELL, TEN PERCENT WOULD MEAN THEY ARE

22 GOING TO COMMIT TEN CRIMES BEFORE THEY GET CAUGHT, BUT, REALLY,

23 WHAT IT MEANS IS SOME WILL COMMIT 20 CRIMES AND SOME MIGHT ONLY

24 COMMIT ONE BEFORE THEY GET CAUGHT.  IT'S AN AVERAGE.  SO, YOU

25 KNOW, WE KNOW THAT WE DON'T CATCH EVERYBODY WHO COMMITS A

1  CRIME.  THERE ARE MANY UNSOLVED CRIMES.

2          ANECDOTALLY, IF YOU TALK TO OFFENDERS, THEY WILL

3  TELL YOU I STOLE SIX CARS BEFORE YOU CAUGHT ME, OR I HAVE BEEN

4  STEALING EIGHT CARS.

5          MY COUNTY, UNFORTUNATELY, IS THE AUTO THEFT CAPITAL

6  OF THE COUNTRY, SO AUTO THEFT IS A NEAR AND DEAR ISSUE FOR US.

7  WHEN WE TALK TO OFFENDERS ABOUT WHY THEY'RE STEALING, HOW

8  THEY'RE STEALING, HOW MANY THEY'RE STEALING, THEY TALK ABOUT

9  THINGS LIKE THAT, SO WE KNOW WE ARE NOT CATCHING EVERYBODY.  WE

10 KNOW MANY ARE COMMITTING MULTIPLE, MULTIPLE CRIMES BEFORE

11 THEY'RE ARRESTED.

12         **JUDGE HENDERSON:**  EXCUSE ME, COUNSEL.  WE ARE

13 WORRIED ABOUT SCHEDULING AT THIS POINT.  WHAT'S HAPPENING WITH

14 OUR 12:00 O'CLOCK WITNESS?

15         **MS. BARLOW:**  I JUST HAVE A COUPLE MORE, YOUR HONOR.

16         **JUDGE HENDERSON:**  DO YOU HAVE FURTHER RECROSS?

17         **MS. NORMAN:**  JUST A FEW QUESTIONS.

18         **JUDGE HENDERSON:**  THEN WHAT HAPPENS?

19         **MR. MELLO:**  WE ARE OUT ON THE PHONE WITH THAT

20 WITNESS RIGHT NOW.

21         **JUDGE HENDERSON:**  HE'S ON STANDBY?

22         **MR. MELLO:**  YES.

23         **JUDGE REINHARDT:**  I GATHER IT WOULD NOT BE A TRAGEDY

24 IF WE HAD LUNCH BEFORE WE GOT TO HIM?

25         **MR. MELLO:**  I DON'T KNOW.  I CAN WALK OUT AND SEE IF

1    IT'S A TRAGEDY TO DR. THOMAS OR NOT.

2            **JUDGE HENDERSON:**  WOULD YOU DO THAT?

3            PROCEED.

4            **MS. BARLOW:**  SO -- THANK YOU, YOUR HONOR.

5    **BY MS. BARLOW**

6    **Q**   SO, IN YOUR DIRECT TESTIMONY, YOU INDICATED THAT WE WOULD

7    HAVE A GREATER WINDOW OF OPPORTUNITY FOR PEOPLE TO COMMIT THESE

8    CRIMES, MANY OF WHICH GO UNSOLVED, AND SO INSTEAD OF -- IF

9    THEY'RE OUT IN JANUARY INSTEAD OF MARCH, THERE MIGHT BE 60

10   ADDITIONAL DAYS WHERE THEY COULD BE COMMITTING HOWEVER MANY

11   AUTO THEFTS THEY MIGHT COMMIT, RIGHT?

12           **JUDGE REINHARDT:**  I DON'T UNDERSTAND WHY IT'S 60

13   ADDITIONAL DAYS.  MAYBE YOU CAN EXPLAIN IT TO ME.  IF IT TAKES

14   THEM THREE MONTHS TO GET CAUGHT OR SIX MONTHS TO GET CAUGHT,

15   THEY'RE GOING TO GET CAUGHT 60 DAYS EARLIER, AS WELL AS START

16   60 DAYS EARLIER.  SO WHAT'S THE DIFFERENCE?

17           **MS. BARLOW:**  IT'S NECESSARILY TRUE, YOUR HONOR, I

18   THINK.  I ONLY USE 60 DAYS BECAUSE THAT WAS THE EXAMPLE

19   MS. NORMAN GAVE.

20           **JUDGE REINHARDT:**  I'M TAKING YOUR EXAMPLE.  IF THESE

21   PEOPLE ARE GOING TO KEEP COMMITTING CRIMES AND THEY ARE GOING

22   TO GET CAUGHT, ONE OF OUT OF SIX TIMES -- SAY THEY START

23   COMMITTING THEM SIX MONTHS EARLIER --

24           **JUDGE KARLTON:**  SIXTY DAYS, TWO MONTHS EARLIER,

25   THEY'LL GET CAUGHT TWO MONTHS EARLIER.  IT'S NOT GOING TO

1   CHANGE ANYTHING.  IT'S GOING TO MOVE THE CRIMES UP BY TWO

2   MONTHS.

3          **MS. BARLOW:**  THAT'S NOT NECESSARILY TRUE, YOUR

4   HONOR.

5          **JUDGE REINHARDT:**  I JUST SAID THAT BECAUSE I WOULD

6   LIKE SOMEBODY TO EXPLAIN WHY THAT'S NOT TRUE.

7          **THE WITNESS:**  BECAUSE NOT EVERYBODY GETS CAUGHT.

8   SOME YOU WERE RIGHT, WILL GET CAUGHT 60 DAYS SOONER.  SOME

9   WON'T GET CAUGHT 60 DAYS SOONER.  THEY MIGHT BE BETTER THAN

10  OTHERS.

11         **JUDGE KARLTON:**  BUT THAT'S TRUE WITH WHAT WE'RE

12  DOING TODAY.

13         **THE WITNESS:**  I UNDERSTAND.

14         **JUDGE KARLTON:**  JUDGE REINHARDT'S QUESTION IS REALLY

15  CRITICAL TO WHAT WE'RE TRYING TO UNDERSTAND.  WE CAN DEAL WITH

16  AVERAGES BECAUSE THAT'S ALL WE CAN DEAL WITH.  IS THERE ANY

17  SIGNIFICANCE THAT YOU CAN SEE BY VIRTUE OF AN EARLY RELEASE,

18  THEY GET CAUGHT OR THEY DON'T GET CAUGHT, JUST THE WAY THEY GET

19  CAUGHT OR DON'T GET CAUGHT, IF WE RELEASE THEM 60 DAYS LATER?

20         **THE WITNESS:**  WHEN YOU SAY "ANY SIGNIFICANCE," I'M

21  NOT SURE I UNDERSTAND THE QUESTION, YOUR HONOR.

22         **JUDGE KARLTON:**  I DON'T KNOW HOW ELSE TO PUT IT.  IN

23  THE LONG RUN, DOES IT MAKE ANY DIFFERENCE TO PUBLIC SAFETY IF

24  WE RELEASE THEM 60 DAYS EARLIER BECAUSE EITHER THEY'LL GET

25  CAUGHT OR THEY WON'T GET CAUGHT JUST AS IF THEY WERE RELEASED

1  WHEN THEY WERE DUE?  IS THAT WRONG OR IS THAT RIGHT?

2          **THE WITNESS:**  THERE IS -- I GUESS THERE'S TWO PARTS

3  HERE.  NUMBER ONE IS YOU'VE ALLOWED THEM TO COMMIT A CRIME 60

4  DAYS EARLIER, ON AVERAGE 60 DAYS EARLIER THAN THEY WOULD HAVE.

5  THAT GOES BACK TO THE INCAPACITATION PART OF THIS.  THE LONGER

6  YOU INCAPACITATE, THE LONGER THEY DON'T COMMIT A CRIME.  THE

7  SECOND PART OF IT IS, IF WE HAVE A CAP AND THE WAY WE GET TO

8  THE CAP IS THROUGH A RELEASE, YOU ARE GOING TO HAVE MORE

9  INDIVIDUALS OUT IN THE COMMUNITY 60 DAYS EARLIER.

10          IN ORDER TO GET TO THE CAP AND TO MAINTAIN THE CAP,

11  IT'S WHAT I TALKED YESTERDAY.  IF THE WATERSPOUT ISN'T TURNED

12  OFF, THE SAME NUMBER OF PEOPLE ARE HEADING INTO THAT SYSTEM,

13  AND THEY'RE GETTING OUT, THEY'RE GETTING OUT FASTER, AND

14  THERE'S MORE OF THEM COMING OUT THAT ARE NEVER ENTERING THROUGH

15  THAT SYSTEM THE WAY THEY DO NOW.  SO IF WE HAVE 140,000 PEOPLE

16  CONTINUE TO BE COMMITTED INTO THAT SYSTEM, AND OUR POPULATION

17  CAP IS LOWERED FROM -- OR THE CAP IS PLACED AT 110,000, FOR

18  INSTANCE, YOU'VE STILL GOT THIS FLOOD OF PEOPLE COMING IN,

19  THEY'RE GOING TO GO RIGHT BACK OUT.  SO THERE IS NO

20  INCAPACITATION COMPONENT.  AND FROM A PUBLIC SAFETY PERSPECTIVE

21  YOU LOSE THAT TIME THEY WOULD HAVE BEEN INCAPACITATED SO THEY

22  ARE BACK IN THE COMMUNITY.

23          **JUDGE KARLTON:**  I UNDERSTAND WHAT YOU'RE SAYING.

24          **JUDGE HENDERSON:**  IT SEEMS TO ME -- AND I'M PROBABLY

25  NOT ASKING YOU A QUESTION AS MUCH AS THINKING ALOUD.  I BELIEVE

1  IT WAS YOU YESTERDAY WHO TESTIFIED ABOUT A GOLDEN PERIOD OF

2  1965?

3         **THE WITNESS:** YES, SIR.

4         **JUDGE HENDERSON:** AND UP UNTIL THE LATE '70'S, I

5  BELIEVE YOU SAID. I'M ALL TOO AWARE OF A STATISTIC THAT I'VE

6  USED THAT IN 1980 THE PRISON POPULATION WAS 30,000 --

7         **THE WITNESS:** YES.

8         **JUDGE HENDERSON:** -- IN CALIFORNIA. IT WAS ABOUT

9  THAT TIME THAT, IT SEEMS TO ME, FLIPPING YOUR ARGUMENT OVER,

10 THAT THE LONGER WE KEEP THEM IN, THE SAFER THE STREETS ARE.

11 AND SO HERE WE ARE IN THIS MASSIVE ALMOST -- HOW DO YOU GET OUT

12 OF THAT? IT SEEMS THAT'S THE --

13        **JUDGE KARLTON:** HE HAS A PROPOSAL TO GET OUT OF IT.

14 THAT I WAS VERY ENTHUSIASTIC ABOUT YESTERDAY.

15        **THE WITNESS:** STAY ENTHUSIASTIC.

16        **JUDGE KARLTON:** IT TURNS OUT IT'S MUCH MORE COMPLEX.

17        **THE WITNESS:** I GUESS I WOULD GIVE YOU AN EXAMPLE.

18 IN CALIFORNIA, THE JUVENILE SYSTEM IS AN ABSOLUTE MODEL FOR

19 WHAT WE'RE TALKING ABOUT. THE JUVENILE POPULATION IS THE

20 LARGEST IT'S EVER BEEN IN THE STATE OF CALIFORNIA. WE HAVE

21 FEWER -- WE HAVE FEWER JUVENILES IN CUSTODY. FORGET ABOUT JUST

22 THE STATE PERIOD -- STATE OR LOCAL -- THAN WE'VE EVER HAD IN

23 THE LAST 15 PLUS YEARS. THERE ARE FEWER JUVENILE IN CUSTODY,

24 BUT THERE ARE MORE JUVENILES OUT THERE. JUVENILE CRIME IS DOWN

25 DESPITE WHAT YOU MIGHT READ IN NEWSPAPERS. JUVENILE CRIME IS

1  DOWN.  I GUESS THAT'S MORE OF THE SAME THAT I HAVE BEEN TALKING

2  FOR THE LAST TWO DAYS THAT YOU ARE SO ENTHUSIASTIC ABOUT.

3            **MS. BARLOW:**  THANK YOU, YOUR HONOR.

4  **BY MS. BARLOW**

5  **Q**   I JUST WANT TO FOLLOW UP TO JUDGE KARLTON'S QUESTION.  THAT

6  IS, IF YOU ADD THESE FOLKS TO THE ALREADY EXISTING PEOPLE BEING

7  RELEASED, THAT IS BECAUSE THEY'RE COMING OUT EARLIER, DOES THAT

8  REDUCE THE LIKELIHOOD THAT THEY'RE ACTUALLY GOING TO GET CAUGHT

9  FOR THOSE CRIMES BECAUSE WE ONLY HAVE LIMITED POLICE RESOURCES?

10 **A**   THAT'S A GOOD QUESTION.  GIVEN BUDGETS NOW, PROBABLY, YEAH,

11 BECAUSE WE'RE -- WE'VE GOT -- WE'RE GOING TO HAVE AND WE HAVE

12 FEWER ENFORCEMENT OFFICERS OUT THERE, SO THERE ARE GOING TO BE

13 MORE UNSOLVED CRIMES.  THAT WOULD BE MY BEST GUESS ON THAT,

14 YES.

15 **Q**   AND IS IT FAIR TO SAY THAT ALSO WE ARE GOING TO HAVE

16 VICTIMS THAT WOULDN'T HAVE BEEN VICTIMS BUT FOR THAT RELEASE?

17 **A**   I THINK THAT'S A FAIR STATEMENT, YES.

18 **Q**   OKAY.  NOW, IF THERE'S A CAP AND WE HAVE NO INCREASE IN THE

19 AMOUNT OF POLICE SERVICES AVAILABLE OR PROGRAMMING AVAILABLE

20 AND THE FOLKS THAT DO GET CAUGHT FOR THESE CRIMES AND WOULD

21 OTHERWISE GO TO PRISON CAN'T GO, THAT ALSO ELIMINATES THE

22 INCAPACITATION EFFECT YOU WERE TALKING ABOUT, RIGHT?

23 **A**   YES.  AND WE SEE THAT LOCALLY ALREADY.  WE ARE ALREADY

24 FUNCTIONING UNDER A POPULATION CAP LOCALLY IN OUR JAILS.  WE

25 DISCUSSED IT EARLIER.  WE HAVE INDIVIDUALS WHO, WHILE THEY'RE

1  ON ELECTRONIC MONITORING PROGRAMS OR ALTERNATIVE PROGRAMS,

2  COMMIT CRIMES THAT, HAD THERE BEEN INCAPACITY, THEY WOULD NOT

3  HAVE BEEN AVAILABLE TO COMMIT THAT CRIME.

4           **JUDGE REINHARDT:**  IN YOUR VIEW, THE ONLY REASON THAT

5  WE'RE NOT REDUCING CRIME, WHICH YOUR PROGRAM WOULD DO

6  SUBSTANTIALLY, BECAUSE WE WOULD SEND FAR FEWER PRISONERS TO

7  PRISON, THE ONLY REASON WE ARE NOT REDUCING CRIME IN THIS STATE

8  IS THAT THE STATE IS NOT WILLING TO SPEND THE MONEY TO FUND

9  YOUR PROGRAM?

10          **THE WITNESS:**  WELL, IT'S NOT JUST MY PROGRAM.

11          **JUDGE REINHARDT:**  I KNOW.

12          **THE WITNESS:**  LOCAL PROGRAMS.

13          **JUDGE REINHARDT:**  THE PROGRAM YOU DESCRIBED.

14          **THE WITNESS:**  YES.

15          **JUDGE REINHARDT:**  SO THE ONLY REASON WE HAVE THIS

16 HIGH CRIME RATE IS BECAUSE THE STATE ISN'T SPENDING THE

17 NECESSARY MONEY TO REDUCE CRIME?

18          **THE WITNESS:**  I WOULDN'T SAY THE ONLY REASON, BUT A

19 SIGNIFICANT REASON, YES.

20          **JUDGE REINHARDT:**  IF WE REDUCED JUVENILE CRIME AS

21 YOU DESCRIBED, WE COULD REDUCE ADULT CRIME THE SAME WAY IF THE

22 STATE WERE WILLING TO SPEND THE MONEY TO FUND YOUR PROGRAM?

23          **THE WITNESS:**  THAT'S OUR POSITION, YES, SIR.

24          **JUDGE REINHARDT:**  WHO DO WE BLAME FOR THAT?

25          **JUDGE KARLTON:**  BLAME IS NOT THE POINT.  HOW DO WE

1  SOLVE THE PROBLEM?  AND THE ANSWER IS I DON'T KNOW.

2          **MS. BARLOW:**  I JUST HAVE ONE MORE QUESTION FOR THE

3  WITNESS.

4  **BY MS. BARLOW**

5  **Q**   IF WE HAVE A CAP AND WE ARE STILL ABLE FOR SOME REASON TO

6  SEND SOME OF THESE OFFENDERS TO PRISON, BUT THEY ARE

7  CONTINUALLY LET OUT 60 TO 120 DAYS EARLIER THAN THEY OTHERWISE

8  WOULD HAVE BEEN THE RESULT, DOES THAT HAVE A LONG-TERM

9  CUMULATIVE NEGATIVE IMPACT ON PUBLIC SAFETY?

10 **A**   I BELIEVE SO, YES.

11 **Q**   AND THAT'S JUST BECAUSE YOU'VE GOT THIS PERSON

12 INCAPACITATED FOR A MUCH SHORTER TOTAL PERIOD OF TIME, CORRECT?

13 **A**   YES.

14          **MS. BARLOW:**  I HAVE NOTHING FURTHER.

15          **JUDGE HENDERSON:**  I'M NOT SURE WHAT YOU MEANT IN

16 THAT QUESTION BY CUMULATIVE.

17          **MS. BARLOW:**  WE KNOW THEY ARE GOING TO REOFFEND,

18 CORRECT, MR. POWERS?  WE KNOW THEY ARE GOING TO REOFFEND AT A

19 RATE OF SOMEWHERE BETWEEN 60 AND 70 PERCENT DEPENDING ON THE

20 CRIME?

21          **JUDGE KARLTON:**  WE KNOW THAT NOW.

22          **MS. BARLOW:**  YES.

23          **JUDGE HENDERSON:**  BECAUSE WE DON'T HAVE ANY

24 PROGRAMS.  ONE OF THE MAIN REASONS THEY'RE REOFFENDING IS

25 BECAUSE WE'RE DOING SOMETHING PROFOUNDLY STUPID.  IT ISN'T

1 NECESSARILY TRUE THAT EVERY OFFENDER WOULD REOFFEND AT A RATE

2 OF 60 PERCENT IF WE WERE DOING THINGS SMARTER.

3          **THE WITNESS:**  CORRECT.

4          **MS. BARLOW:**  I DON'T DISPUTE THAT AT ALL, YOUR

5 HONOR, BUT WE'RE TALKING ABOUT --

6          **JUDGE KARLTON:**  SO THE POINT IS, THE QUESTION

7 PRESUMES THAT WE'LL CONTINUE TO BE AS STUPID AS WE HAVE BEEN.

8 THAT MAY BE THE CASE.

9          **MS. BARLOW:**  I WISH I COULD NOT PRESUME THAT, YOUR

10 HONOR, BUT AT THIS POINT, ASSUMING THAT WHAT WE HAVE IS A CAP

11 AND NOTHING MORE, THAT'S REALLY WHAT I'M ASKING THE WITNESS.

12 **Q**   IF WE HAVE A CAP AND NOTHING MORE, WILL AN OFFENDER WHO IS

13 ALLOWED TO BE RELEASED EARLY OVER AND OVER AGAIN BECAUSE THEY

14 HAVE RELATIVELY SHORT SENTENCES, RIGHT?  TWENTY-FOUR MONTHS,

15 FOUR YEARS, TWO YEARS, FOR THESE CRIMES?  EACH TIME THEY ARE

16 GOING TO GET OUT EARLIER, CORRECT?

17 **A**   WELL, THE AVERAGE LENGTH OF STAY IN THE DEPARTMENT OF

18 CORRECTIONS IS 11.34 MONTHS, I BELIEVE IS THE STATISTIC THAT'S

19 BEEN CITED.  SO THEY'RE SPENDING ON AVERAGE LESS THAN A YEAR IN

20 CUSTODY.

21 **Q**   SO IF THEY REOFFEND AND GO BACK AND WE HAVE TO RELEASE THEM

22 EARLY AGAIN IN ORDER TO MAINTAIN THAT CAP, WE'RE GOING TO JUST

23 KEEP CHURNING THEM?

24 **A**   AT THAT POINT, WE ESSENTIALLY HAVE THE COUNTY MODEL, WHICH

25 IS WHAT MANY COUNTIES DO.  IF YOU'RE BOOKED ON A MISDEMEANOR,

1   IN MANY COUNTIES YOU NEVER SEE THE INSIDE OF A JAIL.  YOU ARE

2   BACK ON THE STREET BEFORE THE OFFICER HAS AN OPPORTUNITY TO

3   FINISH HIS REPORT.  AND WE SEE THESE PERPETUAL MULTIPLE ARRESTS

4   OVER AND OVER AND OVER, AND THAT'S THAT STREAM TOWARDS THE

5   WATERFALL THAT I WAS TALKING ABOUT.

6           UNLESS WE BREAK THE CYCLE, THOSE MISDEMEANORS WILL

7   TURN TO FELONIES AND FROM PROBATION GRANTS TO PRISON GRANTS TO

8   PAROLE VIOLATIONS.  IT'S JUST THE CYCLE THAT CALIFORNIA HAS AT

9   THIS POINT.

10          **MS. BARLOW:**  ALL RIGHT.  THANK YOU.  I HAVE NOTHING

11  FURTHER.

12          **JUDGE REINHARDT:**  IS IT YOUR SUGGESTION WE MAKE YOUR

13  ASSUMPTION WHEN WE DETERMINE THIS CASE THAT THERE WILL NOT BE

14  ANY MORE MONEY SPENT ON TRYING TO REDUCE CRIME, BUILD PRISONS;

15  WE SHOULD JUST ASSUME WE WILL BE SPENDING THE SAME AMOUNT OF

16  MONEY AS WE NOW ARE?  IS THAT THE WAY THE ASSUMPTION --

17  BECAUSE, OTHERWISE, WE COULD ASSUME THE MONEY WOULD BE SPENT ON

18  HIS PROGRAM, BUT IF YOU PRESUME THERE'S NO MORE MONEY TO BE

19  SPENT --

20          **MS. BARLOW:**  WELL, WITH THE $11 BILLION DEFICIT,

21  YOUR HONOR, THAT'S THE PRESUMPTION I AM ASKING THE WITNESS TO

22  MAKE AT THIS POINT.

23          **JUDGE REINHARDT:**  SO WE SHOULD PRESUME THEY WOULD

24  NOT IMPROVE HEALTHCARE IN THE PRISON?

25          **MS. BARLOW:**  I AM NOT PRESUMING THAT AT ALL.

1          **JUDGE REINHARDT:**  YOU ARE PRESUMING THEY ARE WILLING

2    TO SPEND MONEY ON THAT --

3          **MS. BARLOW:**  THE PIE IS ONLY SO BIG, YOUR HONOR,

4    THAT'S ALL.

5          **JUDGE REINHARDT:**  I'M NOT DISAGREEING WITH YOU.  I'M

6    SAYING YOUR SUGGESTION IS, AS WE LOOK AT THIS CASE, WE PRESUME

7    THAT MONEY WILL NOT BE SPENT TO RESOLVE THIS PROBLEM, AND,

8    THEREFORE, WHAT WE SHOULD DO IS ALLOW THE UNCONSTITUTIONAL

9    CONDITIONS TO INCREASE AND HAVE MORE AND MORE INADEQUATE

10   HEALTHCARE AS MORE AND MORE PEOPLE ARE SENT TO PRISON?

11         **MS. BARLOW:**  WELL, I'M CERTAINLY NOT SUGGESTING

12   THAT, YOUR HONOR.  MY CONCERN IS THAT, TO THE EXTENT THAT WHAT

13   IS BEING REQUESTED IS A CAP AND NOT WHAT IS BEING REQUESTED IS

14   PROVIDE FUNDING AND PROVIDE PROGRAMMING AND DO ALL THESE OTHER

15   THINGS, TO THE EXTENT THEY'RE REQUESTING A CAP --

16         **JUDGE REINHARDT:**  I THOUGHT YOU JUST SAID WE SHOULD

17   ASSUME THERE WASN'T GOING TO BE ANY MORE MONEY AVAILABLE.

18         **JUDGE KARLTON:**  AND THERE'S A QUESTION ABOUT WHAT WE

19   CAN PROPERLY ORDER.

20         **MS. BARLOW:**  WELL, THAT'S --

21         **JUDGE KARLTON:**  YOU KNOW, IF THE STATE WERE TO WAKE

22   UP AND START BEHAVING IN A RATIONAL WAY, WE ALL WOULDN'T BE

23   HERE.  WE'RE HERE BECAUSE WE ALL AGREE THAT WHAT'S GOING ON NOW

24   IS COUNTERPRODUCTIVE, AND THE QUESTION THEN BECOMES WHAT CAN

25   THE FEDERAL COURTS DO CONSISTENT WITH OUR FEDERAL SYSTEM THAT

1  WILL HAVE ANY EFFECT UPON ANYTHING, AND IF WE CAN'T AFFECT --

2  IF WE CAN'T AFFECT PUBLIC SAFETY AND WE MUST ADDRESS THE

3  QUESTION OF UNCONSTITUTIONAL CONDITIONS, WHAT HAPPENS NEXT?

4  BUT --

5        **MS. BARLOW:**  THE SHIFTING OF MONEY IS UP TO THE

6  COURT TO DETERMINE WHETHER IT CAN DO THAT.  BUT I'M SIMPLY

7  TRYING TO --

8        **JUDGE KARLTON:**  THANK YOU, MA'AM.

9        **JUDGE REINHARDT:**  WE CAN LEAVE THIS QUESTION FOR

10  BRIEFING AT THE END OF THE PROGRAM.

11        **JUDGE KARLTON:**  INDEED.

12        **JUDGE REINHARDT:**  SOMEBODY SHOULD SUGGEST TO US HOW

13  UNCONSTITUTIONAL CONDITIONS CAN BE CURED, IF IT'S THROUGH THE

14  EXPENDITURE OF SUMS.  I ASSUME THE STATE WILL ADVISE US OF HOW

15  THAT MONEY WILL BE OBTAINED AND WHAT GUARANTEES THERE ARE.  I

16  GUESS THAT'S NOT --

17        **JUDGE KARLTON:**  RIGHT NOW WHAT WE KNOW IS THEY'RE

18  NOT FUNDING PROGRAMS THAT HAVE ALREADY BEEN -- GO AHEAD.

19        **MR. MELLO:**  CAN I BE HEARD FOR ONE MOMENT?  I

20  BELIEVE THE EVIDENCE IN THE CASE SO FAR IS THAT THE STATE IN

21  THE LAST TWO YEARS WENT FROM SPENDING 1.2 BILLION DOLLARS ON

22  MEDICAL CARE TO 2.193, OR ABOUT THAT; I DON'T RECALL EXACTLY.

23  SO I THINK IT'S A MISCHARACTERIZATION OF THE EVIDENCE TO SAY

24  THAT SIGNIFICANT SUMS OF MONEY AREN'T BEING SPENT ON MEDICAL

25  AND MENTAL HEALTHCARE.

1    **JUDGE KARLTON:** THEY ARE ABSOLUTELY INADEQUATE TO

2    MEET THE PROBLEM. THAT'S THE FACT. NEVER MIND, MR. MELLO.

3    **JUDGE REINHARDT:** AS I SAID, WE CAN HAVE IT BRIEFED

4    IN BRIEFING. HOW ABOUT THE QUESTION OF THE NEXT WITNESS WHICH

5    IS MORE IMMEDIATE?

6    **MS. JOHNSON:** I HAVE INFORMED DR. THOMAS IN FORT

7    LAUDERDALE THAT HE SHOULD EXPECT TO START TESTIFYING AROUND

8    1:30. IT SEEMS MS. NORMAN MAY HAVE SOME ADDITIONAL QUESTIONS.

9    **JUDGE HENDERSON:** LET'S FINISH WITH MS. NORMAN, AND

10   WE'LL TAKE A LUNCH BREAK.

11   <u>**RECROSS-EXAMINATION BY MS. NORMAN**</u>

12   **BY MS. NORMAN**

13   **Q** MR. POWERS, I WANTED TO TALK ABOUT THIS QUESTION OF THE

14   LONG-TERM EFFECTS OF A POPULATION CAP. MS. BARLOW ASKED YOU

15   SOME QUESTIONS ABOUT THAT. SO TODAY THERE'S SOMETHING LIKE 160

16   TO 170,000 PEOPLE IN STATE PRISON AND SOMETHING LIKE 140,000 GO

17   IN, AND ABOUT 140,000 COME OUT, RIGHT? SO THERE ARE SOME

18   ADJUSTMENTS IN THE PRISON POPULATION. BUT AS LONG AS THE SAME

19   NUMBER GOES IN, THE SAME NUMBER COMES OUT, YOU KEEP THE SAME

20   LEVEL; IS THAT RIGHT?

21   **A** ASSUMING LENGTH OF STAY IS FOR -- YEAH, YEAH.

22   **Q** THOSE NUMBERS ARE ABOUT RIGHT?

23   **A** IT APPEARS THAT OVER THE PAST 12 MONTHS OR SO THAT THE

24   POPULATION HAS KIND OF PLATEAUED.

25   **Q** IT'S KIND OF PLATEAUED, AND THEY ESTIMATE IT IS GOING TO

1  START GOING UP AGAIN?

2  **A**   I HAVEN'T SEEN THAT ESTIMATION.

3  **Q**   BUT, IN GENERAL, THOSE NUMBERS ARE WHAT YOU KNOW; ISN'T

4  THAT RIGHT?

5  **A**   THE POPULATION NUMBERS YOU QUOTED?

6  **Q**   RIGHT.

7  **A**   YES, 155, 160, SOMEWHERE IN THAT NEIGHBORHOOD, YES.

8  **Q**   SO IMAGINE A SYSTEM WHERE THE POPULATION HAS BEEN

9  REDUCED -- AND WE'RE GOING TO GET INTO HOW RIGHT NOW.  SO THE

10  POPULATION IS BETWEEN 110, 120,000.  THAT'S THE PRISON

11  POPULATION, OKAY?  IMAGINE YOU STILL HAVE 140,000 GOING IN,

12  140,000 PEOPLE A YEAR COMING OUT, YOU REACHED EQUILLIBRUM ON

13  THAT POPULATION CAP.  SAME NUMBER GO IN, SAME NUMBER COME OUT,

14  RIGHT?

15  **A**   WELL, IN ORDER TO DO THAT, YOU ARE GOING TO HAVE TO HAVE

16  SHORTER LENGTH OF STAY.  IS THAT THE ASSUMPTION THAT YOU'RE

17  MAKING?

18  **Q**   ACTUALLY, MR. POWERS, I'M NOT TALKING ABOUT WHAT IT TAKES

19  TO GET TO A LOWER POPULATION.  I'M TALKING ABOUT IMAGINE WE ARE

20  AT A REDUCED POPULATION RIGHT NOW.

21  **A**   OKAY.

22          **JUDGE REINHARDT:**  HOW COULD 140 COME OUT IF YOU'VE

23  ONLY GOT 110 IN?

24          **MS. NORMAN:**  I'M SORRY IF I MISSPOKE.  I APOLOGIZE.

25  YOU HAVE 110 TO 120,000 CURRENTLY EXISTING IN THE -- THAT'S

1  YOUR POPULATION.

2          **JUDGE KARLTON:**  YOU HAVE 140?

3          **MS. NORMAN:**  ONE FORTY COME IN EVERY YEAR.  ONE

4  FORTY GO OUT EVERY YEAR.

5  **BY MS. NORMAN**

6  **Q**   THAT'S WHERE WE WERE NOW, RIGHT, MR. POWERS?

7          **JUDGE KARLTON:**  AND THERE'S 120,000 LEFT YOU'RE

8  SAYING?

9          **MS. NORMAN:**  RIGHT.

10  **BY MS. NORMAN**

11  **Q**   LET'S IMAGINE 200,000 CAME IN EVERY YEAR AND 200,000 CAME

12  OUT EVERY YEAR, TO MAKE THE NUMBER A LITTLE DIFFERENT.  AS LONG

13  AS THE SAME NUMBER COME IN AND THE SAME NUMBER COME OUT, YOU

14  ARE MAINTAINING THE SAME POPULATION LEVEL; ISN'T THAT RIGHT?

15  **A**   YES.

16  **Q**   SO IF YOU HAD A PRISON POPULATION OF 110,000 IN THE STATE

17  OF CALIFORNIA, SIGNIFICANTLY REDUCED POPULATION, YOU AND THE

18  COUNTIES STILL COULD BE SENDING THE SAME LEVEL PEOPLE INTO

19  PRISON EVERY YEAR AS LONG AS THE SAME NUMBER OF PEOPLE WERE

20  COMING OUT AND THIS POPULATION WOULD BE MAINTAINED; ISN'T THAT

21  RIGHT?

22  **A**   YEAH, I GUESS THE KEY WOULD BE HOW ARE YOU GETTING THAT

23  SAME NUMBER OUT.

24  **Q**   OKAY.  SLIGHTLY DIFFERENT TOPIC.  MS. BARLOW ASKED YOU

25  ABOUT LOW RISK/HIGH RISK OFFENDERS?

1    **A**    YES.

2    **Q**    PRISON PLACEMENTS ARE A SCARCE RESOURCE IN OUR SOCIETY,

3    RIGHT?  WE AS A SOCIETY DECIDE WHO SHOULD BE SENT TO PRISON?

4    **A**    WELL, JUDGES DECIDE THAT.

5    **Q**    RIGHT.  WE'VE SET UP CRIMINAL JUSTICE SYSTEMS --

6    **A**    YES.

7    **Q**    -- TO DETERMINE WHICH OFFENDERS SHOULD BE INCAPACITATED,

8    RIGHT?

9    **A**    YES.

10   **Q**    AND WHICH ARE THE HIGHEST RISK OF REOFFENDING, RIGHT?

11   **A**    NOT NECESSARILY.  I MEAN, THERE IS A PUNITIVE ASPECT TO

12   PLACEMENT IN CUSTODY.  THE SYSTEM TAKES THAT INTO ACCOUNT AS

13   WELL, BECAUSE, QUITE FRANKLY, IF YOU LOOK, SOME OF YOUR HIGH

14   END CRIMES HAVE THE LOWEST RECIDIVISM RATES.

15   **Q**    RIGHT.

16   **A**    AS FAR AS A THREAT TO SAFETY --

17   **Q**    BUT PART OF THE DECISION MAKING IN THE CRIMINAL JUSTICE

18   SYSTEM IS FIGURING OUT WHICH PEOPLE BEST FIT THIS SCARCE

19   RESOURCE OF PRISON BEDS, RIGHT?

20   **A**    YES.

21   **Q**    AND WE HAVE THINGS LIKE VALID RISK NEEDS ASSESSMENT TOOLS

22   TO HELP MAKE THOSE DETERMINATIONS, DON'T WE?

23   **A**    SOME DO, YEAH.

24   **Q**    OKAY.  SO IF WE MAKE THOSE DETERMINATIONS AND THOSE TOOLS

25   EXIST TO DECIDE WHO SHOULD GO INTO PRISON IN THE FIRST PLACE,

1 WOULDN'T IT BE APPROPRIATE TO APPLY SIMILAR TOOLS TO MAKE A

2 DETERMINATION AS TO WHOSE LENGTH OF STAY COULD BE REDUCED WITH

3 THE MOST SAFETY FOR THE PUBLIC?

4 **A**   NOW YOU'RE TALKING ABOUT SENTENCING.  I DON'T KNOW THAT YOU

5 CAN USE A RISK ASSESSMENT TOOL TO DETERMINE LENGTH OF SENTENCE.

6 I HAVEN'T SEEN THAT SCIENCE YET.

7 **Q**   I'M ACTUALLY NOT TALKING ABOUT SENTENCE.  I AM TALKING

8 ABOUT THINGS LIKE CREDIT REFORM ONCE YOU'RE IN AN INSTITUTION.

9 WE TALKED ABOUT THE BRIDGING PROGRAM, OTHER PROGRAMS THAT WOULD

10 APPLY ENHANCED CREDITS OR REDUCE THE LENGTH OF STAY ONCE A

11 PERSON HAS BEEN SENTENCED TO PRISON.

12        **MS. BARLOW:**  AGAIN, YOUR HONORS, THIS IS BEYOND THE

13 SCOPE OF THE REDIRECT.  WE DIDN'T TALK ABOUT PRISON PROGRAMS AT

14 ALL.

15        **JUDGE HENDERSON:**  I'M GOING TO SUSTAIN THAT, I

16 THINK, UNLESS YOU CAN TELL ME HOW THIS CONNECTS TO THE

17 REDIRECT.

18        **MS. NORMAN:**  WHAT I WANT TO TALK ABOUT IS THE

19 ABILITY TO MAKE ASSESSMENTS AS TO WHAT PRISONERS MR. POWERS

20 TALKED ABOUT, RELEASING LOW LEVEL OFFENDERS EARLY FROM PRISON,

21 AND HE TALKED ABOUT THE DANGERS OF THAT BECAUSE THEY MIGHT BE

22 HIGH RISK.  WHAT I WANT TO GET AT IS WHETHER IT'S NOT POSSIBLE

23 TO FIGURE OUT WHO'S HIGH RISK AND MAKE DETERMINATIONS ABOUT

24 EARLY RELEASE, AS YOU WERE PUTTING IT, BASED ON SCIENTIFIC

25 METHODS.

1  **Q**  IS THAT POSSIBLE?

2  **A**  IT'S CERTAINLY POSSIBLE.  I BELIEVE IT WOULD BE POSSIBLE TO

3  DO THE ASSESSMENTS ON THE INDIVIDUALS IN PRISON WHETHER -- I'M

4  NOT SURE I WOULD BE COMFORTABLE AS A PRACTITIONER MAKING

5  REDUCTIONS IN SENTENCES BASED ON EVEN A VALIDATED RISK

6  ASSESSMENT TOOL.

7  **Q**  BUT THINGS LIKE CREDIT EARNING POTENTIAL AND REDUCING

8  LENGTH OF STAY BASED ON IN-PRISON BEHAVIOR, THAT HAPPENS EVERY

9  DAY IN THE PRISON ENVIRONMENT?

10 **A**  YES, IT DOES.

11          **MS. NORMAN:**  OKAY.  NO FURTHER QUESTIONS.

12          **MS. BARLOW:**  I HAVE NOTHING FURTHER, YOUR HONOR.

13          **JUDGE HENDERSON:**  OKAY.  OKAY.  COURT IS IN RECESS.

14 WE'LL COME BACK AT 1:45 AND BEGIN WITH MR. THOMAS.

15                  (LUNCHEON RECESS.)

16          **JUDGE HENDERSON:**  OKAY.  YOU MAY PROCEED WHEN YOU'RE

17 READY, COUNSEL.

18          **MS. JOHNSON:**  GOOD AFTERNOON, YOUR HONOR.  ANNE

19 JOHNSON FOR THE DEFENDANTS.  WE ARE CALLING DR. DAVID THOMAS.

20 I HAVE BEEN ASKED TO SPEAK A LITTLE LOUDER.  SORRY ABOUT THAT.

21 THAT'S A RARE, RARE REQUEST.

22          **JUDGE KARLTON:**  DR. THOMAS, CAN YOU HEAR US NOW?

23          **THE WITNESS:**  YES, SIR, I CAN.

24          **JUDGE HENDERSON:**  YOU ARE GOING TO BE SWORN IN,

25 DR. THOMAS.

1                    **DAVID L. THOMAS,**

2    HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

3    DULY SWORN AND EXAMINED AS FOLLOWS:

4              **THE CLERK:**  PLEASE STATE AND SPELL YOUR FULL NAME

5    FOR THE RECORD.

6              **THE WITNESS:**  DAVID L. THOMAS, D-A-V-I-D L.

7    T-H-O-M-A-S.

8                        (DR. THOMAS APPEARED REMOTELY THROUGH VIDEO

9                        CONFERENCING.)

10            **MS. JOHNSON:**  DR. THOMAS'S EXPERT REPORTS IN THIS

11   CASE ARE MARKED AS DEFENDANT'S TRIAL EXHIBITS NUMBERS 1015,

12   1016, AND 1017, AND ARE HEREBY OFFERED INTO EVIDENCE.

13            ALSO, TO THE COURT REPORTER IN FLORIDA, WE DID MAIL

14   COPIES OF DR. THOMAS'S EXPERT REPORTS TO YOU, AS WELL AS A COPY

15   OF HIS DEPOSITION TRANSCRIPT.  IF YOU COULD MAKE THOSE

16   AVAILABLE TO HIM AT THIS TIME?

17            DR. THOMAS'S QUALIFICATIONS ARE SET FORTH ON PAGES 1

18   THROUGH 3 OF HIS FIRST REPORT, DEFENDANT'S EXHIBIT 1015, AND

19   HIS CURRICULUM VITAE, WHICH IS ATTACHED AS EXHIBIT A TO THAT

20   REPORT.  WE'RE GOING TO SUMMARIZE, HIGHLIGHT SOME OF HIS

21   SALIENT QUALIFICATIONS.

22            **JUDGE HENDERSON:**  OKAY.

23                **DIRECT EXAMINATION BY MS. JOHNSON**

24   BY MS. JOHNSON

25   **Q**   GOOD AFTERNOON, DR. THOMAS.

1  **A**   GOOD AFTERNOON.

2  **Q**   SINCE YOU'RE TESTIFYING REMOTELY, PLEASE LET ME KNOW IF AT

3  ANY TIME YOU HAVE DIFFICULTY HEARING ME OR SEEING A DOCUMENT

4  THAT'S BEING PRESENTED.  OKAY?

5  **A**   OKAY.  YES.

6  **Q**   DR. THOMAS ARE YOU A PRACTICING PHYSICIAN?

7  **A**   YES, MA'AM, I AM.

8  **Q**   FOR HOW MANY YEARS TOTAL HAVE YOU PRACTICED MEDICINE?

9  **A**   JUST UNDER 40.

10 **Q**   ARE YOU BOARD CERTIFIED IN ANY SPECIALTY?

11 **A**   YES, MA'AM.  I AM BOARD CERTIFIED BY THE AMERICAN BOARD OF

12 OPHTHALMOLOGY.

13 **Q**   DO YOU HAVE ANY FORMAL TRAINING OR EXPERIENCE IN ANY OTHER

14 MEDICAL SPECIALTIES?

15 **A**   YES, MA'AM.  I WAS PARTIALLY TRAINED IN GENERAL AND CHEST

16 SURGERY AND SERVED AS A GENERAL AND CHEST SURGEON IN VIETNAM.

17 AND I ALSO AT ONE TIME WAS CERTIFIED BY THE AMERICAN BOARD OF

18 AMERICAN FORENSIC EXAMINERS AS A DIPLOMATE IN FORENSIC

19 MEDICINE.

20 **Q**   WHEN DID YOU RECEIVE YOUR MEDICAL DEGREE AND FROM WHERE?

21 **A**   FROM UNIVERSITY OF MIAMI IN 1970.

22 **Q**   DO YOU HAVE ANY OTHER ADVANCED DEGREES?

23 **A**   YES, MA'AM.  I HAVE A J.D. FROM STETSON UNIVERSITY LAW

24 SCHOOL, AND I AM CURRENTLY WORKING ON A DOCTORATE IN HEALTH

25 EDUCATION.

1  Q    ARE YOU CURRENTLY EMPLOYED?

2  A    YES, MA'AM, I AM.

3  Q    WHAT ARE YOUR CURRENT POSITIONS?

4  A    I AM PROFESSOR AND CHAIRMAN OF THE DEPARTMENT OF SURGERY,

5  PROFESSOR AND CHAIRMAN OF THE DIVISION OF CORRECTIONAL MEDICINE

6  AND PROFESSOR OF PUBLIC HEALTH, ALL AT NOVA SOUTHEASTERN

7  UNIVERSITY.

8  Q    YOU MENTIONED YOU SERVED AS A PHYSICIAN IN THE MILITARY?

9  A    YES, MA'AM.

10 Q    AND WHAT POSITIONS DO YOU HAVE -- OR WHAT WERE YOUR

11 RESPONSIBILITIES AT THAT TIME?

12 A    I WAS DRAFTED AND WENT TO VIETNAM, AND IN VIETNAM I SERVED

13 AS COMMANDING OFFICER OF A 30-BED HOSPITAL WITH THREE OR FOUR,

14 DEPENDING ON THE TIME, OTHER PHYSICIANS WORKING FOR ME.  IT WAS

15 A GENERAL MEDICAL AND SURGICAL HOSPITAL.

16 Q    DID YOU ALSO SERVE IN THE FLORIDA HOUSE OF REPRESENTATIVES?

17 A    YES, MA'AM, FROM 1984 TO 1994.

18 Q    WHAT COMMITTEES DID YOU SERVE ON WHILE YOU WERE A

19 REPRESENTATIVE IN FLORIDA?

20 A    COULD YOU RESTATE THAT QUESTION, PLEASE?

21 Q    WHAT WERE THE COMMITTEES THAT YOU SERVED ON WHEN YOU WERE A

22 REPRESENTATIVE IN FLORIDA?

23 A    OKAY.  I SERVED ON A VARIETY OF COMMITTEES, PROBABLY TOO

24 MANY TO REMEMBER ACCURATELY AS WE SIT HERE.  BUT I SERVED ON

25 APPROPRIATION.  I ALWAYS SERVED ON HEALTHCARE.  I SERVED ON

1  CORRECTIONS.  I SERVED ON REAPPORTIONMENT AND A VARIETY OF

2  OTHER COMMIT -- NATURAL RESOURCES.  THOSE WERE ONES THAT COME

3  TO -- JUDICIARY.  THOSE WERE THE ONES THAT COME TO THE TOP OF

4  MY HEAD AS WE SPEAK.

5  **Q**   AFTER SERVING IN THE FLORIDA HOUSE OF REPRESENTATIVES, DID

6  YOU WORK AS A CORRECTIONAL HEALTHCARE ADMINISTRATOR FOR THE

7  FLORIDA DEPARTMENT OF CORRECTIONS?

8  **A**   YES, MA'AM.  IN 1994 I WORKED AS THE EXECUTIVE DIRECTOR

9  OF -- THE EXECUTIVE MEDICAL DIRECTOR OF ZEPHER HILLS

10 CORRECTIONAL INSTITUTION.  IN THAT CAPACITY, I SERVED AS A

11 PHYSICIAN AND AN ADMINISTRATOR, AND I HAD ABOUT NINE DOCTORS

12 WORKING FOR ME.

13 **Q**   FOR HOW MANY YEARS TOTAL DID YOU WORK FOR THE FLORIDA

14 DEPARTMENT OF CORRECTIONS?

15 **A**   NINE YEARS TOTAL.

16 **Q**   AND YOU SAID THE FIRST POSITION WAS AS EXECUTIVE DIRECTOR

17 OF THE ZEPHER HILLS FACILITY?

18 **A**   YES, MA'AM.

19 **Q**   CAN YOU JUST SUMMARIZE BRIEFLY FROM THAT POSITION UNTIL

20 YOUR LAST POSITION WHAT POSITIONS YOU HELD IN THE FLORIDA

21 DEPARTMENT OF CORRECTIONS?

22 **A**   YES, MA'AM.  AFTER BEING AT ZEPHER HILLS FOR A LITTLE LESS

23 THAN A YEAR, I BECAME THE REGIONAL MEDICAL DIRECTOR FOR REGION

24 FIVE AND HAD ABOUT 12 OR SO INSTITUTIONS THAT I WAS RESPONSIBLE

25 FOR THE MEDICAL CARE.

1    AFTER DOING THAT FOR ABOUT A YEAR, I BECAME THE

2   CHIEF OF CLINICAL SERVICES, WHICH WAS LATER RENAMED DEPUTY

3   ASSISTANT SECRETARY FOR CLINICAL SERVICES, AND I WAS

4   RESPONSIBLE FOR THE CLINICAL CARE TO THE ENTIRE POPULATION.

5    AFTER THAT I BECAME ASSISTANT SECRETARY FOR HEALTH

6   SERVICES, WHICH WAS ALSO CALLED DIRECTOR OF HEALTH SERVICES,

7   AND AT THAT TIME I HAD THE RESPONSIBILITY FOR THE CLINICAL AND

8   ADMINISTRATIVE CARE OF THE ENTIRE 75,000 INMATES IN THE FLORIDA

9   DEPARTMENT OF CORRECTIONS.

10  **Q**   WHEN YOU WERE THE ASSISTANT SECRETARY DIRECTOR FOR HEALTH

11  SERVICES FOR THE FLORIDA DEPARTMENT OF CORRECTIONS, DID YOU

12  REORGANIZE THERE THE PRISONS WITH RESPECT TO MEDICAL CARE?

13  **A**   YES, MA'AM, I DID.

14  **Q**   COULD YOU EXPLAIN BRIEFLY WHAT YOU DID?

15  **A**   I'LL TRY TO BE BRIEF.  TYPICAL PRISON SYSTEM HAS A

16  PHYSICIAN AND INMATE SIDE OF THAT PRISON, AND THAT PHYSICIAN IS

17  EXPECTED TO HANDLE ANY PROBLEM THAT COMES UP, ANY MEDICAL

18  PROBLEM THAT COMES UP WITH THAT PATIENT.  I FELT THAT WAS AN

19  INEFFICIENT AND INAPPROPRIATE WAY TO USE RESOURCES, SO WE

20  CREATED A LEVEL SYSTEM, AND THAT IS RELATIVELY HEALTHY INMATES

21  WERE ASSIGNED TO SPECIAL, TO CERTAIN INSTITUTIONS.  PATIENTS

22  WHO HAD CHRONIC ILLNESSES BUT THEY WERE STABLE WERE ASSIGNED TO

23  OTHER INSTITUTIONS.  HEALTHY PATIENTS WERE ASSIGNED TO LEVEL

24  ONE.  CHRONIC ILLNESS, MANY PATIENTS THAT WERE STABLE WERE

25  ASSIGNED TO LEVEL TWO INSTITUTIONS.

1           LEVEL THREE INSTITUTIONS WERE PATIENTS WITH CHRONIC

2    ILLNESSES BUT WERE NOT STABLE, AND LEVEL FOUR INSTITUTIONS WERE

3    CENTERS OF EXCELLENCE, WHICH INCLUDED A HOSPITAL AND A 152-BED

4    LICENSED HOSPITAL AND AN HIV CARE FACILITY.

5    **Q**   WAS THERE ANY PARTICULAR ADVANTAGE THAT YOU BELIEVE WAS

6    GAINED BY USING THE LEVEL SYSTEM YOU JUST DESCRIBED?

7    **A**   SURE.  ONE, ECONOMIES OF SCALE, ECONOMIES OF PURCHASING,

8    BETTER USE OF EMPLOYEES, FAR LESS OUTSIDE SPECIALTY

9    CONSULTATIONS, BECAUSE AT THE LEVEL 3 AND LEVEL 4 INSTITUTIONS

10   YOU WOULD HAVE A VARIETY OF PHYSICIANS WITH VARYING SKILLS, AND

11   THEY COULD HANDLE THE PROBLEMS OF THE PATIENTS RATHER THAN

12   SENDING THEM OUT.  FEWER HOSPITALIZATIONS, BETTER PRIMARY CARE

13   AND BETTER SECONDARY CARE.

14   **Q**   DID YOU HAVE SPECIFIC STAFFING RATIOS FOR THE NUMBER OF

15   PHYSICIANS AND NUMBER OF PRISONERS AT THE INSTITUTIONS IN

16   FLORIDA?

17   **A**   NO, MA'AM.

18   **Q**   WHY DID FLORIDA NOT USE STAFFING RATIOS, PHYSICIAN/INMATE

19   STAFFING RATIOS?

20   **A**   IT WAS MY STRONG FEELING THAT ARBITRARY STAFFING NUMBERS DO

21   NOT ACTUALLY ACCOUNT FOR THE PROBLEMS OF THE PATIENTS AND THE

22   DISTRIBUTION OF PERSONNEL.  I FELT THAT -- I FELT AND STILL

23   FEEL THERE ARE BETTER WAYS TO DO THAT.

24           FOR INSTANCE, LADIES, IT'S WELL RECORDED IN THE

25   LITERATURE THAT LADY PATIENTS REQUIRE THREE TO FOUR TIMES THE

1  AMOUNT OF TIME WITH A PHYSICIAN THAN GENTLEMEN PATIENTS DO.  SO

2  TO USE AN ARBITRARY STAFFING IN THAT SITUATION WOULD UNDERATE

3  THE NUMBER OF PHYSICIANS NEEDED COMPLETELY.

4          PATIENTS REQUIRE MORE TIME GENERALLY THAN SIMPLE

5  PATIENTS.  SO, IN MY MIND, A MUCH BETTER WAY TO DO IT WAS WITH

6  OUTCOME MEASUREMENTS OF WORK STUDY PROGRAMS.

7  **Q**   WHY DID -- WHY DID YOU LEAVE YOUR POSITION AS ASSISTANT

8  SECRETARY DIRECTOR FOR HEALTH SERVICES FOR THE FLORIDA

9  DEPARTMENT OF CORRECTIONS?

10 **A**   YOU'RE GOING TO HAVE TO REPEAT THAT QUESTION AGAIN,

11 MS. JOHNSON, INTO THE OTHER MICROPHONE.

12 **Q**   WHY DID YOU LEAVE YOUR POSITION AS ASSISTANT SECRETARY

13 DIRECTOR FOR HEALTH SERVICES FOR THE FLORIDA DEPARTMENT OF

14 CORRECTIONS?

15 **A**   I WAS CALLED TO SECRETARY CROSBY'S OFFICE, WHO WAS MY

16 IMMEDIATE SUPERIOR, AND HE WANTED ME TO PRIVATIZE THE SYSTEM

17 WITHIN A TWO-MONTH PERIOD OF TIME.  THAT WAS A DIRECT DIRECTIVE

18 FROM SECRETARY CROSBY.  THAT'S IN VIOLATION OF STATE LAW, AND

19 THE ONLY WAY YOU COULD DO THAT WOULD BE TO DECLARE AN EMERGENCY

20 SITUATION.  HE ASKED ME TO DECLARE AN EMERGENCY SITUATION.  IT

21 WAS MY STRONG FEELING THAT THERE WAS NO EMERGENCY IN THE

22 HEALTHCARE, AND SO WE HAD NO MEETING OF THE MINDS.  I OFFERED

23 TO RESIGN.  HE REFUSED TO ACCEPT MY RESIGNATION AND TERMINATED

24 ME.

25 **Q**   DO YOU CURRENTLY HAVE ANY ROLE IN THE PROVISION OF

1  HEALTHCARE FOR THE FLORIDA DEPARTMENT OF CORRECTIONS PRISONERS?

2  A    THE UNIVERSITY THAT I WORK WITH, NOVA SOUTHEASTERN

3  UNIVERSITY AND COLLEGE OF MEDICINE, HAS A VARIETY OF PROGRAMS

4  IN THE FLORIDA DEPARTMENT OF CORRECTIONS.  WE HAVE MEDICAL

5  STUDENTS THAT ROTATE THROUGH THE HOSPITAL AND OTHER SITES.  WE

6  HAVE A CORRECTIONAL FELLOWSHIP THAT IS INTIMATELY RELATED TO

7  THE FLORIDA DEPARTMENT OF CORRECTIONS, AND WE ARE DEVELOPING A

8  CORRECTIONALLY-BASED PSYCHIATRY RESIDENCY.  I AM RESPONSIBLE

9  FOR THOSE PROGRAMS, THE SUPERVISION OF BOTH OUR FACULTY AND THE

10 VOLUNTARY FACULTY FROM THE DEPARTMENT OF CORRECTIONS.

11 Q    HAVE YOU PARTICIPATED IN ANY CORRECTIONAL HEALTHCARE

12 ORGANIZATIONS?

13 A    YES, MA'AM.  I HAVE BEEN A SURVEYOR FOR THE NATIONAL

14 COMMISSION OF CORRECTIONAL HEALTHCARE, AND I HAVE, ON MULTIPLE

15 OCCASIONS, PRESENTED TO THAT ORGANIZATION.  I HAVE ALSO BEEN A

16 THE CHAIRMAN AND A MEMBER OF THE COMMISSION ON ACCREDITATION IN

17 CORRECTIONS, WHICH IS AN ACCREDITING BODY FOR PRISONS AND

18 JAILS.  I HAVE BEEN WITH THAT GROUP FOR EIGHT YEARS AND WAS

19 CHAIRMAN FOR TWO.  AND I'M CURRENTLY ON THE BOARD OF GOVERNORS

20 OF THE AMERICAN CORRECTIONAL ASSOCIATION, THE LARGEST

21 CORRECTION -- LARGEST AND OLDEST CORRECTIONAL ASSOCIATION IN

22 THE COUNTRY.

23 Q    DID YOU --

24 A    ACTUALLY, IN THE WORLD.

25 Q    DID YOU TOUR PRISONS UNDER THE AUSPICES THE AMERICAN

1    CORRECTIONAL ASSOCIATION AND THE NATIONAL COMMISSION OF

2    CORRECTIONAL HEALTHCARE IN THE UNITED STATES?

3    **A**    YES, MA'AM, I DID.

4    **Q**    YOU TOURED PRISONS IN APPROXIMATELY HOW MANY STATES?

5    **A**    I WOULD ESTIMATE BETWEEN 20 AND 30.  NOT AS MANY AS 30, BUT

6    PROBABLY MORE THAN 20.

7    **Q**    HAVE YOU EVER TESTIFIED AS AN EXPERT IN ANY OTHER CASES

8    REGARDING PRISON CONDITIONS?

9    **A**    YES, MA'AM.

10   **Q**    DID YOU ACT AS A CONSULTANT IN THE *RUIZ VERSUS ESTELLE*

11   CASE?

12   **A**    YES, MA'AM, I DID.

13   **Q**    WHAT WAS THE *RUIZ VERSUS ESTELLE* CASE ABOUT?

14   **A**    IT WAS SPECIFICALLY ABOUT A LACK OF CARE TO THE IN -- LACK

15   OF MEDICAL CARE TO THE INMATES IN THE TEXAS DEPARTMENT OF

16   CRIMINAL JUSTICE.

17   **Q**    AND YOU WERE A CONSULTANT FOR WHICH SIDE IN THAT CASE,

18   DR. THOMAS?

19   **A**    PLEASE REPEAT THAT AGAIN, MS. JOHNSON.

20   **Q**    THIS MIC IS CUTTING OUT.

21          YOU WERE A CONSULTANT FOR WHICH SIDE IN THE *RUIZ*

22   *VERSUS ESTELLE* CASE?

23   **A**    I WAS A PLAINTIFFS' CONSULTANT IN THAT CASE.

24   **Q**    HAVE YOU EVER BEEN ASKED BY THE MEDICAL DIRECTOR OF A STATE

25   DEPARTMENT OF CORRECTIONS TO EVALUATE THEIR SYSTEM OUTSIDE THE

1  CONTEXT OF LITIGATION?

2  **A**   YES, MA'AM.

3  **Q**   WHO ASKED YOU TO DO THAT?

4  **A**   DR. FRED MAUE, M-A-U-E, WHO WAS MEDICAL DIRECTOR OF

5  PENNSYLVANIA AT THAT TIME.  THAT WAS ABOUT '98 OR '99, MAYBE AS

6  EARLY AS '97.

7  **Q**   WHAT DID YOU DO TO EVALUATE THE PENNSYLVANIA DEPARTMENT OF

8  CORRECTIONS HEALTHCARE SYSTEM AT DR. MAUE'S REQUEST?

9  **A**   SOMEBODY COUGHED AND TOOK AWAY TWO OF YOUR WORDS.  COULD

10 YOU PLEASE REPEAT THAT AGAIN?

11 **Q**   WHAT DID YOU DO TO EVALUATE THE PENNSYLVANIA DEPARTMENT OF

12 CORRECTION'S HEALTHCARE SYSTEM AT DR. MAUE'S REQUEST?

13 **A**   THE SAME THING YOU DO ON ANY EVALUATION.  YOU TAKE A LOOK

14 AT THE FACILITIES, THEIR FUNCTIONING.  YOU TALK TO THE STAFF.

15 YOU INSPECT MEDICAL RECORDS.  YOU INTERACT WITH PHYSICIANS AND

16 NURSING PROVIDERS, CORRECTIONAL OFFICERS.  YOU WITNESS THE

17 PHARMACEUTICAL FUNCTIONING.  YOU WATCH DIRECT CARE, INCLUDING

18 TRIAGE.  YOU LOOK AT THE CHRONIC ILLNESS CLINICS.  YOU LOOK AT

19 ACUTE CARE RESPONSES.  YOU LOOK AT INDIVIDUAL PROVIDER

20 INTERACTIONS AND SYSTEM FUNCTIONING, AND I DID ALL OF THAT.

21 **Q**   AT THE TIME THAT YOU EVALUATED THE PENNSYLVANIA DEPARTMENT

22 OF CORRECTIONS HEALTHCARE SYSTEM, DID YOU OBSERVE THAT THE

23 SYSTEM WAS SEVERELY OVERCROWDED?

24 **A**   YES, MA'AM.  IT WAS MY IMPRESSION IT WAS SIGNIFICANTLY

25 OVERCROWDED.

1  Q   WHAT DID YOU SPECIFICALLY OBSERVE THAT LED YOU TO THAT

2  CONCLUSION?

3  A   THAT MANY CELLS WERE DESIGNED FOR SINGLE CELL -- SINGLE

4  INMATE USE BUT HAD BUNK BEDS, AND MANY OF THEM HAD WHAT ARE

5  KNOWN AS A TERM OF ART CALLED A BOAT.  A BOAT IS A FIBERGLASS

6  BED, FOR WANT OF A BETTER TERM, THAT RESEMBLES A LARGE CANOE

7  THAT'S PLACED ON THE FLOOR, AND AN INMATE SLEEPS IN THAT BOAT.

8  Q   SO DID THE USE OF BOATS AND THOSE BEDS PROVIDE FOR THREE

9  INMATES IN A CELL THAT HAD BEEN DESIGNED FOR ONE?

10 A   THAT'S CORRECT.

11         AND THEN THERE WAS ANOTHER ISSUE IN SEVERAL OF THE

12 PRISONS, WHICH WAS HOT BUNKING.  THAT'S A SITUATION WHERE A

13 PERSON GETS TO USE A BUNK ONLY FOR A CERTAIN PERIOD OF TIME AND

14 THEN HAS TO RELINQUISH THAT TO ANOTHER PERSON.

15 Q   DID YOU PERSONALLY OBSERVE THE PRACTICES OF HOT BUNKING AND

16 BOATS IN THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS?

17 A   I DID NOT WITNESS ANY INMATE BEING RELIEVED OF THE BUNK BY

18 ANOTHER INMATE, BUT I WAS TOLD BY A CORRECTIONAL OFFICER THAT

19 WAS ACCOMPANYING ME AND -- ME AND DR. MAUE THAT ONE INMATE

20 WOULD HAVE TO LEAVE AT, LIKE, 3:00 O'CLOCK BECAUSE THAT WAS

21 THEN ASSIGNED TO ANOTHER INMATE.

22 Q   DID YOU PERSONALLY SEE THE BOATS?

23 A   DID I PERSONALLY WHAT?

24 Q   SEE THE BOATS?

25 A   YES, I PERSONALLY WITNESSED THE BOATS, YES, MA'AM.

1  Q   BASED ON YOUR REVIEW OF PENNSYLVANIA'S HEALTHCARE SYSTEM

2  WITH DR. MAUE, DID YOU REACH ANY CONCLUSIONS REGARDING THE

3  ADEQUACY OF THAT HEALTHCARE SYSTEM?

4  A   YES, MA'AM.  I WAS RELATIVELY -- I WAS CONVINCED THEY WERE

5  PROVIDING ADEQUATE CARE, THAT IS THE INMATES HAD ACCESS TO CARE

6  WITHOUT REAL BARRIERS.  THEY HAD ACCESS TO A PROFESSIONAL

7  MEDICAL OPINION.  THAT OPINION SEEMED TO BE CARRIED OUT.  THERE

8  DIDN'T SEEM TO BE ANY BARRIERS TO THAT, AND THERE SEEMED TO BE

9  REASONABLE DOCUMENTATION THAT THIS OCCURRED.

10  Q   IN BRIEF, WHAT DOCUMENTS DID YOU REVIEW IN PREPARING FOR

11  YOUR OPINIONS IN THIS CASE REGARDING CALIFORNIA'S CORRECTIONAL

12  MEDICAL CARE SYSTEM?

13  A   WELL, IN BRIEF IS DIFFICULT.  I CERTAINLY HAD A COMPLETE

14  SET OF THE PLATA POLICIES AND PROCEDURES, THE REPORTS OF THE

15  RECEIVER, ALL THE REPORTS OF THE RECEIVER, THE PLAINTIFF

16  COUNSEL'S LETTERS OF SITE VISIT REPORTS, COURT ORDERS, AND A

17  VARIETY OF OTHER THINGS.

18  Q   DR. THOMAS, IN PREPARING YOUR OPINIONS FOR THIS CASE, DID

19  YOU TOUR ANY PRISONS IN CALIFORNIA?

20  A   YES, MA'AM, I DID.

21  Q   HOW MANY?

22  A   A TOTAL OF EIGHT.

23  Q   WHICH PRISONS DID YOU TOUR IN PREPARING YOUR OPINIONS FOR

24  THIS CASE AND WHEN?

25  A   IN DECEMBER OF 2007 I TOURED SAN QUENTIN, THE CALIFORNIA

1    MEDICAL FACILITY, AND THE CALIFORNIA INSTITUTE FOR MEN.  IN

2    SEPTEMBER OF '08, I TOURED NORTH KERN, THE SUBSTANCE ABUSE

3    TREATMENT FACILITY, PLEASANT VALLEY, SALINA (SIC) AND HIGH

4    DESERT.

5    Q    WHEN YOU "SALINA" DID YOU MEAN SOLANO?

6    A    YES, MA'AM.  SOLANO.  I'M SORRY.

7    Q    IN GENERAL WHAT DID YOU DO DURING YOUR TOURS OF THESE EIGHT

8    PRISONS IN CALIFORNIA?

9    A    IN GENERAL?  THAT'S ALL I GOT, IN GENERAL.

10   Q    WHAT DID YOU DO DURING YOUR TOURS OF THESE EIGHT PRISONS IN

11   CALIFORNIA?

12   A    THE SAME THINGS THAT I DID WHENEVER I WAS ASKED TO EVALUATE

13   A PRISON SYSTEM.  I TOOK A LOOK AT DAILY, AND IN SOME CASES

14   WEEKEND, FUNCTIONING OF THE PRISON, THE MEDICAL FACILITIES AND

15   THEIR FUNCTIONING.  I TALKED TO STAFF.  I INSPECTED MEDICAL

16   RECORDS.  I INTERACTED WITH PHYSICIANS, PHYSICIAN PROVIDERS,

17   NURSING STAFF, CORRECTIONAL OFFICERS, INMATES; WITNESSED

18   PHARMACEUTICAL FUNCTIONING; LOOKED AT THE CHRONIC ILLNESS

19   CLINICS; LOOKED AT ACUTE CARE RESPONSES; LOOKED AT INDIVIDUAL

20   PROVIDER INTERACTIONS AND SYSTEM FUNCTIONING.

21   Q    DOES PLAINTIFFS' COUNSEL ATTEND THESE TOURS WITH YOU?

22   A    YES, MA'AM.

23   Q    ARE YOU FAMILIAR WITH THE CONCEPT OF PREVENTABLE DEATH IN

24   THE CONCEPT OF MEDICAL CARE?

25   A    YES, MA'AM.

1  Q   WHAT IS YOUR UNDERSTANDING OF THE MEANING OF PREVENTABLE

2  DEATH IN THE CONTEXT OF MEDICAL CARE?

3  A   THAT'S ANY DEATH THAT OCCURRED -- THAT OCCURRED BECAUSE OF

4  A FAILURE OF THE MEDICAL SYSTEM OR AN INDIVIDUAL PROVIDER.

5  IT'S A DEATH THAT SHOULD NOT HAVE HAPPENED.

6  Q   DR. THOMAS, BASED ON YOUR EXPERIENCE AS A PRACTITIONER IN

7  THE COMMUNITY AND CHAIR OF THE DEPARTMENT OF SURGERY FOR SCHOOL

8  OF MEDICAL AND A PROFESSOR OF PUBLIC HEALTH, IS IT YOUR

9  UNDERSTANDING THAT PREVENTIBLE DEATHS HAPPEN IN THE COMMUNITY

10 AT LARGE?

11 A   YES, MA'AM.

12 Q   ARE YOU FAMILIAR WITH ANY STUDIES ESTIMATING THE NUMBER OF

13 PREVENTIBLE DEATHS THAT OCCUR ANNUALLY IN U.S. HOSPITALS DUE TO

14 MEDICAL ERROR?

15 A   YES, MA'AM.  THERE ARE A WHOLE VARIETY OF STUDIES.  THE ONE

16 THAT'S QUOTED MOST WAS -- THE DATA WAS GATHERED 1999, IT WAS

17 RELEASED IN 2000, BY THE INSTITUTE OF MEDICINE.  IT'S CALLED,

18 "TO ERR IS HUMAN," BUT THERE HAVE BEEN A VARIETY OF OTHER

19 STUDIES INDICATING THAT PEOPLE DIE UNNECESSARILY IN THE

20 AMERICAN HEALTHCARE SYSTEM.

21 Q   CAN YOU TELL ME WHAT RATE -- OR INCIDENCE, ACTUALLY, IS THE

22 PROPER TERM -- INCIDENCE OF PREVENTIBLE DEATH IN U.S. HOSPITALS

23 THAT "TO ERR IS HUMAN" REFERRED TO?

24 A   YES, MA'AM.  IT WAS SOMETHING BETWEEN 44,000 AND 98,000

25 DEATHS ANNUALLY THAT THE INSTITUTE OF MEDICINE FELT WERE

1  PREVENTIBLE.

2  **Q**   IS IT ACCURATE TO SAY "TO ERR IS HUMAN" EXPRESSED THAT

3  PREVENTIBLE DEATHS IN U.S. HOSPITALS WERE A SIGNIFICANT PROBLEM

4  THAT NEEDED TO BE ADDRESSED BY THE MEDICAL COMMUNITY?

5  **A**   YES, MA'AM.

6  **Q**   BASED ON YOUR EXPERIENCE, ARE INFECTIOUS DISEASES A PROBLEM

7  AT U.S. HOSPITALS?

8  **A**   BASED ON MY EXPERIENCE -- AND THEN YOU DROPPED YOUR VOICE.

9  BASED ON MY EXPERIENCE?

10  **Q**   ARE INFECTIOUS DISEASES A PROBLEM AT U.S. HOSPITALS?

11  **A**   YES, MA'AM, THEY CERTAINLY ARE.

12  **Q**   SPECIFICALLY, DO YOU KNOW WHETHER U.S. HOSPITALS HAVE BEEN

13  EXPERIENCING OUTBREAKS OF METHICILLIN-RESISTANT STAPHYLOCOCCUS

14  AUERUS?

15  **A**   YES, MA'AM.  THAT'S CALLED MRSA, AND THAT'S A SIGNIFICANT

16  PROBLEM.

17  **Q**   ARE THERE ANY PARTICULAR CONCERNS REGARDING THE MRSA

18  OUTBREAKS AT U.S. HOSPITALS AT THIS TIME?

19  **A**   YES, MA'AM.  OUR ONE DRUG AVAILABLE FOR THE TREATMENT OF

20  MRSA IS CALLED VANCOMYCIN, AND VANCOMYCIN IS -- MRSA IS SHOWING

21  SOME RESISTANCE TO VANCOMYCIN, AND THAT'S A MAJOR CONCERN OF

22  THE MEDICAL COMMUNITY.

23  **Q**   DR. THOMAS, BASED ON YOUR EXPERIENCE, IS THE TRANSPORT OF

24  INMATES BETWEEN FACILITIES A REALITY OF PRISONS THAT IMPACTS

25  CORRECTIONAL HEALTHCARE?

1  **A**   YES, MA'AM.

2  **Q**   IN YOUR EXPERIENCE, WHAT ARE SOME OF THE REASONS THAT

3  INMATES ARE MOVED BETWEEN FACILITIES?

4  **A**   THERE ARE A WHOLE VARIETY OF REASONS.  MOST COMMONLY CITED

5  ONE IS FOR AN OUTSIDE COURT APPOINTMENT, THAT IS, THE COURT

6  DEMANDS AN INMATE BE TRANSPORTED TO A LOCAL JAIL FOR AN

7  APPEARANCE, BUT THERE ARE HUNDREDS OF OTHERS.

8            ONES THAT COME TO THE TOP OF MY MIND ARE TO PROTECT

9  THE INMATE BECAUSE THE INMATE'S CUSTODY HAS CHANGED, BECAUSE

10  THE MISSION OF THE INSTITUTION HAS CHANGED, BECAUSE THERE WAS A

11  FIGHT AND THEY HAVE TO GET SOME OF THE INMATES OUT OF THE AREA,

12  BECAUSE OF A SECURED THREAT GROUP OR A GANG, FOR PROTECTIVE

13  CUSTODY.  THERE ARE A WHOLE VARIETY OF REASONS THAT INMATES ARE

14  MOVED AND MOVED CONSTANTLY.

15  **Q**   IN YOUR EXPERIENCE, DOES THE DAILY NEED TO TRANSFER INMATES

16  IN A CORRECTIONAL SETTING IMPACT CONTINUITY OF CARE WITH THE

17  SAME MEDICAL CARE PROVIDER OR TEAM OF PROVIDERS EVEN IN PRISONS

18  OR SYSTEMS THAT ARE NOT OVERCROWDED?

19  **A**   OH, YES, MA'AM.

20  **Q**   IN YOUR EXPERIENCE, HOW DO CORRECTIONAL SYSTEMS ADDRESS THE

21  STRAIN OF ONGOING INMATE MOVEMENT BETWEEN FACILITIES?

22  **A**   WELL, THE RECEIVER HAS ALREADY ADDRESSED SOME OF THE

23  ISSUES.  IT IS UNREALISTIC IN A CORRECTIONAL SYSTEM TO EXPECT

24  TREMENDOUS CONTINUITY OF CARE WITH AN INDIVIDUAL PROVIDER, SO

25  YOU ESTABLISH CHRONIC ILLNESS CLINICS WITH DEFINED INTERVALS

1   AND TIMES FOR REGULAR APPOINTMENTS.  YOU ASSIGN APPROPRIATE

2   INMATES TO APPROPRIATE CHRONIC ILLNESS CLINICS.

3          YOU ASSURE THAT HEALTHCARE IS A HIGH PRIORITY ISSUE

4   AND CONSCIOUSNESS OF ALL SECURITY PERSONNEL.  YOU HAVE AN

5   INTEGRATED PHARMACY SYSTEM.  YOU CREATE A SYSTEM OF LOGS TO

6   ENSURE FOLLOW UP.  YOU HAVE A VARIETY OF OTHER PRACTICES TO

7   ENSURE THE DELIVERY OF CONSTITUTIONAL HEALTHCARE IN THE

8   REALITIES OF PRISON LIFE.

9   Q   IN YOUR EXPERIENCE, ARE THERE FACTORS OTHER THAN

10  OVERCROWDING THAT IMPACT WHETHER HEALTHCARE IS BEING ADEQUATELY

11  DELIVERED IN A CORRECTIONAL SETTING?

12  A   COULD YOU REPEAT THAT, MS. JOHNSON?

13  Q   IN YOUR EXPERIENCE, ARE THERE OTHER FACTORS BESIDES

14  OVERCROWDING THAT IMPACT WHETHER HEALTHCARE IS BEING ADEQUATELY

15  DELIVERED IN CORRECTION SETTINGS?

16  A   OH, SURE.  THERE'S A TREMENDOUS NUMBER OF OTHER ISSUES.

17  WHILE OVERCROWDING MAY MAKE AN IMPACT, LACK OF RESOURCES, LACK

18  OF QUALITY STAFF, DISORGANIZED PHARMACEUTICAL DISTRIBUTION

19  SYSTEM, A NONFUNCTIONING SUPPLY SYSTEM, A LABORATORY REPORT

20  SYSTEM THAT'S FRAUGHT WITH DELAY, A WHOLE HOST OF OTHER THINGS.

21  Q   BASED ON YOUR REVIEW OF DOCUMENTS AND TOURS OF PRISONS IN

22  CALIFORNIA, HAVE THESE FACTORS BEEN PRESENT IN THE MEDICAL

23  DELIVERY SYSTEM IN CALIFORNIA'S PRISONS?

24  A   ALL OF THEM HAVE BEEN PRESENT, AND THE RECEIVER IS

25  ADDRESSING ALL OF THEM.

1  Q    ARE THESE FACTORS UNIQUE TO CALIFORNIA?

2  A    ARE THESE FACTORS WHAT?

3  Q    UNIQUE TO CALIFORNIA.

4          **JUDGE HENDERSON:**  UNIQUE TO CALIFORNIA.

5          **THE WITNESS:**  I'M SORRY.  THANK YOU, YOUR HONOR.

6          NO, THEY'RE CERTAINLY NOT UNIQUE TO CALIFORNIA.

7  **BY MS. JOHNSON**

8  Q    BASED ON YOUR REVIEW OF DOCUMENTS AND TOURS OF PRISONS IN

9  CALIFORNIA, ARE THERE FACTORS IMPACTING THE DELIVERY OF

10 HEALTHCARE THAT ARE UNRELATED TO THE SIZE OF THE PATIENT

11 POPULATION?

12 A    YES, MA'AM.

13 Q    WHAT ARE THOSE FACTORS?

14 A    WELL, WE JUST ENUMERATED MANY OF THEM.  I CAN DO IT AGAIN

15 IF YOU'D LIKE, IF I CAN RECALL.

16         **JUDGE KARLTON:**  PLEASE DON'T.

17         **JUDGE HENDERSON:**  THAT'S OKAY.

18         **THE WITNESS:**  THANK YOU, YOUR HONOR.

19 **BY MS. JOHNSON**

20 Q    TO YOUR KNOWLEDGE —— AND I THINK YOU PERHAPS ALREADY

21 ANSWERED THIS —— IS THE RECEIVER BEGINNING TO ADDRESS THOSE

22 FACTORS?

23 A    YES, MA'AM.

24 Q    BASED ON YOUR REVIEW OF DOCUMENTS AND TOURS OF PRISONS,

25 HAVE THOSE FACTORS IMPROVED EVEN IN LIGHT OF THE SIZE OF

1  CALIFORNIA'S PRISON POPULATION?

2  **A**   YES, MA'AM.  IN FACT, THE COUNSEL SITE VISIT REPORTS

3  INDICATE THEY ARE IMPROVING.

4  **Q**   IN YOUR OPINION, IS THERE A SINGLE MOST IMPORTANT FACTOR IN

5  THE DELIVERY OF ADEQUATE HEALTHCARE IN A CORRECTIONAL

6  ENVIRONMENT?

7  **A**   YES, MA'AM.

8  **Q**   AND WHAT IS THAT FACTOR?

9  **A**   THE CULTURE OF THE SYSTEM.  THE CULTURE MUST FOSTER

10  PROVIDING CARE AT A CONSTITUTIONAL LEVEL.  IN THIS CASE THE

11  COURT RECOGNIZED OVER AND OVER AGAIN THAT THE MEDICAL CARE

12  STAFF HAD LEARNED A -- WHAT THE COURT CALLED A TRAINED

13  INCAPACITATION.  THE RECEIVER HAS ALSO RECOGNIZED THIS.

14  **Q**   DID YOU REVIEW --

15        **JUDGE REINHARDT:**  CAN YOU TELL ME WHAT TRAINED

16  INCAPACITATION IS?

17        **JUDGE KARLTON:**  YOU MIGHT ASK JUDGE HENDERSON.  IT'S

18  HIS PHRASE.

19        **JUDGE REINHARDT:**  I HAVEN'T HAD THE OPPORTUNITY TO

20  READ ALL HIS DECISIONS.

21        **JUDGE HENDERSON:**  I CAN TELL YOU.  I WAS HAVING

22  DINNER WITH TWO FRIENDS WHO ARE DISTINGUISHED SOCIOLOGISTS, AND

23  I WAS DESCRIBING THE CASE.  AND THEY SAID, OH, THAT'S TRAINED

24  INCAPACITY, WHICH IS CAPACITY OF AN INSTITUTION TO TRAIN ITSELF

25  OVER A PERIOD OF TIME TO SAY, OH, WE CAN'T DO THAT, EVEN THOUGH

1  IT IS DOABLE.

2          THAT'S THE WAY I HAVE BEEN USING THE TERM, AND THAT

3  CAME AS A RESULT OF MEETINGS BEFORE I APPOINTED A RECEIVER,

4  SAYING, WELL, WHY DON'T WE DO THIS AS A SOLUTION, AND WE'D GO

5  AWAY FOR 45 DAYS, AND THEY'D COME BACK AND SAY, WE COULDN'T DO

6  IT.  IT WAS CLEARLY, IN MY VIEW, DOABLE.

7          **JUDGE REINHARDT:**  IS THAT LIKE POLY -- WHAT WAS IT?

8          **JUDGE HENDERSON:**  POLYCENTRIC.  I'LL NEVER WRITE

9  ANYTHING AGAIN.  NO, THOSE ARE DIFFERENT.

10  **BY MS. JOHNSON**

11  **Q**   DR. THOMAS, DID YOU REVIEW PLAINTIFFS' COUNSEL'S POST-TOUR

12  LETTER REGARDING A SITE VISIT ON JULY 17TH -- REGARDING A SITE

13  VISIT ON JULY 17 AND 18, 2007, TO KERN VALLEY STATE PRISON,

14  WHICH IS MARKED AS DEFENDANT'S TRIAL EXHIBIT 1081?

15  **A**   YES, I DID.

16  **Q**   THAT'S SUPPOSED TO APPEAR ON THE SCREEN IN A MOMENT.

17          **JUDGE HENDERSON:**  WHILE WE ARE DOING THAT, I SHOULD

18  MENTION, JUDGE REINHARDT, THAT TERM WAS COINED BY THORSTEIN

19  VEBLEN, NOT MY FRIENDS, A WELL-KNOWN TERM IN SOCIOLOGY.

20  **BY MS. JOHNSON**

21  **Q**   I'M GOING TO START READING.  WE'LL TRY TO FIGURE OUT WHERE

22  IT IS IN THE LETTER HERE.  THE LETTER NOTES -- AND I'M TRYING

23  TO SEE WHERE IT IS.  "I WAS IMPRESSED -- " HERE WE GO.  IN THE

24  FIRST PARAGRAPH:

25          "I WAS IMPRESSED BY MANAGEMENT STAFF'S KNOWLEDGE

1        OF AND COMPETENCE IN THE PLATA POLICIES AND

2        PROCEDURES.  THIS LETTER ..." ET CETERA.

3              IF YOU GO TO THE NEXT PARAGRAPH?

4        "WHILE THERE WERE -- " OKAY.

5        "WHILE THERE WERE A NUMBER OF REQUIREMENTS OF THE

6        POLICIES AND PROCEDURES THAT HAD NOT YET BEEN PUT

7        INTO PLACE ON THIS TOUR, I AM OPTIMISTIC THAT KVSP

8        WILL CONTINUE TO SPEEDILY IMPROVE ITS PLATA

9        COMPLIANCE."

10            **JUDGE KARLTON:**  MS. JOHNSON, I'M SORRY.  WHO WROTE

11   THIS LETTER?

12            **MS. JOHNSON:**  PLAINTIFFS' COUNSEL.  I'M NOT SURE

13   WHICH ONE, YOUR HONOR.

14            **JUDGE KARLTON:**  OKAY.  ALL RIGHT.

15            **MS. JOHNSON:**  OKAY.  THE NEXT -- OKAY.

16            **JUDGE REINHARDT:**  HE DIDN'T FIND TRAINED

17   INCAPACITATION?

18            **MS. JOHNSON:**  NO.

19            **JUDGE REINHARDT:**  HE FOUND THEY WERE QUITE WILLING

20   TO IMPROVE.

21            **MS. JOHNSON:**  WE'RE GOING TO GET THERE.

22        "WHILE THERE WERE A NUMBER OF REQUIREMENTS OF THE

23        POLICIES AND PROCEDURES THAT HAD NOT YET BEEN PUT

24        INTO PLACE ON THIS TOUR, I AM OPTIMISTIC THAT KVSP

25        WILL CONTINUE TO SPEEDILY IMPROVE ITS PLATA

1    COMPLIANCE.  THE DEDICATION AND COMPETENCE OF STAFF

2    AT KVSP WAS VISIBLE IN THE FOLLOWING AREAS:

3        "UTILIZATION MANAGEMENT, WHERE THERE WAS NO

4    BACKLOG, AND A NURSE WHO WAS VERY KNOWLEDGEABLE ABOUT

5    THE INDIVIDUAL PATIENTS WHOSE MEDICAL ISSUES I

6    RAISED.  PHARMACY, WHICH WAS CLEARLY RUNNING VERY

7    SMOOTHLY UNDER THE SUPERVISION OF TWO SKILLED PHARMS

8    ONES.  APPEALS, WHICH HAVE MADE SIGNIFICANT

9    IMPROVEMENTS AND HAD BEEN MUCH HELPED BY FREQUENT

10    VISITS BY HCSD.  MEDICAL RECORDS, WHERE THE LOOSE

11    FILINGS AND OLSEN REQUESTS WERE CAREFULLY MONITORED

12    AND CONTROLLED.  AND SPECIALTY, WHICH IS TRACKING THE

13    RELATIVELY SMALL NUMBER OF PENDING APPOINTMENTS

14    PROPERLY DESPITE LACKING THE SPECIALTY ACKNOWLEDGING

15    REPORT SYSTEM USED IN OTHER INSTITUTIONS."

16  **BY MS. JOHNSON**

17  **Q**   ARE THE COMMENTS IN THIS POST-TOUR LETTER BY PLAINTIFFS'

18  COUNSEL THE TYPE OF COMMENTS YOU RELIED ON TO DRAW YOUR

19  CONCLUSION THAT THE CULTURE OF THE CALIFORNIA DEPARTMENT OF

20  CORRECTIONS AND REHABILITATION WITH RESPECT TO HEALTHCARE IS

21  CHANGING?

22  **A**   YES, MA'AM.

23  **Q**   IN YOUR OPINION, IS A SEPARATION BETWEEN THE SECURITY AND

24  HEALTHCARE MISSIONS IMPORTANT IN A CORRECTIONAL MEDICAL CARE

25  SYSTEM?

1    **A**    YES, MA'AM.

2    **Q**    LOOKING AGAIN AT DEFENDANT'S EXHIBIT 1081, IF YOU GO TO THE

3    NEXT PAGE, AT THE SECOND -- THE SECOND FULL PARAGRAPH, THE

4    SECOND FULL PARAGRAPH?  THE SECOND FULL PARAGRAPH.

5              **JUDGE KARLTON:**  THAT IS THE SECOND FULL PARAGRAPH.

6              **MS. JOHNSON:**  THAT'S NOT A FULL PARAGRAPH.  THE

7    THIRD PARAGRAPH DOWN.  OKAY.

8    **BY MS. JOHNSON**

9    **Q**    CONTINUING, PLAINTIFFS' COUNSEL ALSO NOTED:

10              "ALSO, IN THE ASU2 CLINIC, WE NOTED A SIGNIFICANT

11          PROBLEM WITH CUSTODY MAKING DECISIONS AFFECTING

12          ACCESS TO MEDICAL CARE.  IN THIS ASU, PATIENTS WERE

13          NOT BEING SEEN IN FTF TRIAGE WITHIN THE TIMEFRAMES

14          REQUIRED BY THE POLICIES AND PROCEDURES BECAUSE

15          CUSTODY WAS DICTATING WHAT DAYS PATIENTS CAN COME TO

16          THE CLINIC.  CUSTODY WAS ALSO INAPPROPRIATELY MAKING

17          DETERMINATIONS ABOUT WHEN PATIENTS CAN BE SEEN IN A

18          AND B CLINICS.  THERE PRISONERS WITH EITHER LOWER

19          CUSTODY DESIGNATIONS OR GANG AFFILIATIONS ARE

20          ASSIGNED LIMITED CLINIC DAYS BY CUSTODY.  AS A

21          RESULT, MANY PATIENTS WERE NOT BEING SEEN FOR FTF

22          NURSING TRIAGE WITHIN THE TIMEFRAMES REQUIRED BY

23          PLATA AND WERE BEING DENIED TIMELY ACCESS TO NEEDED

24          MEDICAL CARE.  THIS ISSUE WAS RAISED DURING THE TOUR

25          AND WAS ACKNOWLEDGED AS PROBLEMATIC BY THE AW OF

1          HEALTHCARE AND BY THE SERGEANT WHO ACCOMPANIED US."

2               IS THAT THE TYPE OF ISSUE YOU ARE REFERRING TO WHEN

3     YOU STATE THAT A SEPARATION BETWEEN THE CUSTODY AND HEALTHCARE

4     MISSION IS IMPORTANT?

5     **A**   YES, MA'AM.

6               **JUDGE KARLTON:**  SIR, WHAT IS THE AW?

7               **THE WITNESS:**  ASSOCIATE WARDEN OR ASSISTANT WARDEN.

8               **JUDGE KARLTON:**  THANK YOU, SIR.

9               **THE WITNESS:**  YES, SIR.

10    **BY MS. JOHNSON**

11    **Q**   IN YOUR OPINION, HAS THE CALIFORNIA PRISON SYSTEM OVERALL

12    SHOWN A SHIFT IN THE RELATIONSHIP BETWEEN THE SECURITY AND THE

13    HEALTHCARE FUNCTIONS?

14    **A**   AGAIN, IN MY OPINION, HAS THE CALIFORNIA DEPARTMENT OF

15    CORRECTIONS?

16    **Q**   OVERALL SHOWN A SHIFT IN THE RELATIONSHIP BETWEEN THE

17    SECURITY AND THE HEALTHCARE FUNCTIONS?

18    **A**   YES, MA'AM, SINCE THE RECEIVER WAS APPOINTED, THERE

19    CERTAINLY HAS BEEN.

20    **Q**   CAN YOU DESCRIBE THAT SHIFT AS YOU UNDERSTAND IT?

21    **A**   YES, MA'AM.  THE CULTURE WAS SUCH PRIOR TO APPOINTING OF

22    THE RECEIVER THAT THIS WAS A SECURITY-DRIVEN SYSTEM WITHOUT

23    REGARD FOR ANY OTHER PROGRAMS OR ANY OTHER CONSTITUTIONAL

24    REQUIREMENTS.  SINCE THE RECEIVER HAS BEEN APPOINTED, POSSIBLY

25    BECAUSE OF THE MANAGEMENT STYLE OF THE FIRST RECEIVER, BUT

1  THERE IS CLEAR INDICATION THAT THE CULTURE IS SHIFTING IN THE

2  DEPARTMENT TO UNDERSTAND THE NEED FOR A CORRECTIONAL HEALTHCARE

3  SYSTEM THAT WORKS ON A CONSTITUTIONAL LEVEL OF HEALTHCARE.

4  **Q**   IN YOUR OPINION, HAS THE ATTITUDE OF THE ACTUAL MEDICAL

5  STAFF -- MEDICAL CARE STAFF IN CALIFORNIA'S PRISONS CHANGED

6  SINCE THE RECEIVER WAS APPOINTED?

7  **A**   ABSOLUTELY.  FROM MY COMMUNICATION WITH OTHER CORRECTIONAL

8  SYSTEMS, PEOPLE ARE VERY ENVIOUS OF THE STAFF PATTERN AND THE

9  SALARY STRUCTURE AND THINGS LIKE THAT IN THE CALIFORNIA SYSTEM.

10 **Q**   BUT WITH RESPECT TO ATTITUDE OF MEDICAL CARE STAFF, DID YOU

11 HAVE AN OPINION REGARDING WHETHER THE ATTITUDE OF THE MEDICAL

12 CARE STAFF IN CALIFORNIA'S PRISONS HAS CHANGED SINCE THE

13 RECEIVER WAS APPOINTED?

14 **A**   YES, MA'AM.  I'M SORRY.  I INTERPRETED YOUR WORD "ATTITUDE"

15 TO BE "ADEQUATE."  I'M SORRY.

16          IN TERMS OF ATTITUDE, THERE CLEARLY HAS BEEN A

17 SHIFT.  AT ALMOST EVERY INSTITUTION I VISITED, PEOPLE IN THE

18 MEDICAL CARE SERVICE AREA FELT EMPOWERED TO DO THEIR JOB FOR

19 THE FIRST TIME, AND SOME OF THESE WERE LONG-TERM EMPLOYEES WHO

20 HAD NEVER FELT EMPOWERED.

21 **Q**   BASED ON YOUR EXPERIENCE, DO YOU HAVE AN OPINION REGARDING

22 WHETHER A CONSTITUTIONAL LEVEL OF HEALTHCARE CAN BE ACHIEVED IN

23 SEVERELY OVERCROWDED CONDITIONS?

24 **A**   SURE.  I'VE SEEN -- PERSONALLY WITNESSED HEALTHCARE

25 SERVICES DELIVERED IN EXTREMELY OVERCROWDED CONDITIONS AND THE

1  HEALTHCARE COMPORTS TO ALL STANDARD CONSTITUTIONAL CARE IN

2  SPITE OF OVERCROWDING.  TIMELY QUALITY APPROPRIATE SERVICES

3  WERE PROVIDED.

4  **Q**  BASED ON YOUR EXPERIENCE, YOUR REVIEW OF DOCUMENTS AND YOUR

5  TOURS OF PRISONS IN CALIFORNIA, DO YOU HAVE AN OPINION

6  REGARDING WHETHER OVERCROWDING IS THE PRIMARY CAUSE OF THE

7  ALLEGED DEFICIENCIES IN THE DELIVERY OF MEDICAL CARE IN

8  CALIFORNIA'S PRISONS?

9  **A**  YES, MA'AM.

10 **Q**  WHAT IS YOUR OPINION?

11 **A**  OVERCROWDING -- IN MY OPINION, OVERCROWDING IS NOT THE

12 PRIMARY CAUSE OF THE ALLEGED PROBLEMS IN THE DEPARTMENT OF

13 CORRECTIONS.

14 **Q**  BASED ON YOUR EXPERIENCE, YOUR REVIEW OF DOCUMENTS, AND

15 YOUR TOURS OF PRISONS IN CALIFORNIA, DO YOU HAVE AN OPINION

16 REGARDING WHETHER REMOVING OVERCROWDING WILL EFFECTUATE A

17 CONSTITUTIONAL LEVEL OF MEDICAL CARE DELIVERY IN CALIFORNIA'S

18 PRISONS?

19 **A**  YES, MA'AM, I DO.

20 **Q**  WHAT IS THAT -- WHAT IS THAT OPINION?

21 **A**  THAT THERE'S NO REAL NEXUS BETWEEN OVERCROWDING AND A

22 CONSTITUTIONAL DELIVERY OF HEALTHCARE.  IF YOU OBLIGED PEOPLE

23 TO LEAVE, THERE MAY NOT BE A NEXUS IN THEIR MEDICAL CARE NEEDS

24 TO RELIEVING THE ISSUES OF OVERCROWDING, PLUS YOU HAVE ALL OF

25 THE OTHER ISSUES THAT WE'VE TALKED ABOUT THAT THE RECEIVER IS

1   ADDRESSING.

2          **JUDGE KARLTON:**  MS. JOHNSON, CAN YOU --

3          I'M SORRY, DR. THOMAS.  I DON'T UNDERSTAND YOUR

4   ANSWER.  WOULD YOU ELABORATE AS TO WHAT IT IS YOU'RE SAYING?

5          **THE WITNESS:**  YES, YOUR HONOR.  IT IS MY STRONG

6   FEELING THAT OVERCROWDING IS NOT THE PRIMARY CAUSE OF THE

7   ALLEGED PROBLEMS OF THE DEPARTMENT OF CORRECTIONS.  THIS IS A

8   MULTIFACETED PROBLEM, AND SIMPLY REMOVING ONE ISSUE, WHILE IT

9   MAY OR MAY NOT MAKE THE RECEIVER'S JOB EASIER, WON'T GET RID OF

10  THE PROBLEM.  THE RECEIVER HAS DONE A WONDERFUL JOB IN MANY,

11  MANY AREAS.  IT IS MY STRONG FEELING, AND I'VE OPINED, THAT IF

12  THE CULTURE HAD NOT CHANGED, YOU CAN HAVE A SITUATION OF ONE

13  INMATE IN A PRISON AND THAT INMATE MAY NOT GET A CONSTITUTIONAL

14  LEVEL OF CARE BECAUSE OF A SECURITY-DRIVEN SYSTEM.  THAT IS

15  CLEARLY CHANGING, AND THAT CHANGE IN CULTURE IS THE FUNDAMENTAL

16  REASON THAT THE RECEIVERSHIP IS GOING TO SUCCEED.

17          **MS. JOHNSON:**  NO FURTHER QUESTIONS.

18          **JUDGE HENDERSON:**  DO INTERVENORS HAVE ANY QUESTIONS

19  OF THIS WITNESS?

20          **MR. MITCHELL:**  I HAVE NO QUESTIONS, YOUR HONOR.

21          **JUDGE HENDERSON:**  CROSS-EXAMINATION.

22              **CROSS-EXAMINATION BY MS. HARDY**

23  **BY MS. HARDY**

24  **Q**   GOOD AFTERNOON, DR. THOMAS.  THIS IS ALISON HARDY FOR THE

25  PLAINTIFFS.

---

*JOAN MARIE COLUMBINI, CSR, RPR*
*KATHERINE WYATT, CSR, RMR*
*OFFICIAL COURT REPORTERS, USDC, 415-255-6842*

1    **A**    HI, MS. HARDY.

2    **Q**    HELLO.

3            YOU TESTIFIED THAT YOU HAD REVIEWED THIS REPORT FROM

4    KVSP, AND THIS REPORT FROM KVSP DRAFTED BY PLAINTIFFS' COUNSEL

5    REFLECTED THERE WAS A CHANGE IN THE CUSTODY VERSE CULTURE,

6    CORRECT?

7    **A**    YES, MA'AM.

8    **Q**    EXCUSE ME.  I'M SORRY.  I MISSPOKE.  WHAT IT SAID WAS THAT

9    THE -- THERE WERE CUSTODY-MAKING DECISIONS THAT THEY SHOULD NOT

10   BE MAKING, CORRECT?

11   **A**    THAT'S CORRECT.

12   **Q**    YOU'VE ALSO TESTIFIED THAT THE RECEIVER HAS -- HAD CHANGED

13   THAT, THAT PROBLEM, HAD ADDRESSED THAT PROBLEM SO THAT THAT IS

14   NO LONGER THE CASE THAT CUSTODY IS MAKING MEDICAL DECISIONS; IS

15   THAT RIGHT?

16            **JUDGE KARLTON:**  AT THAT PRISON.

17            **THE WITNESS:**  NO, MA'AM.  THAT -- EXCUSE ME.  NO

18   MA'AM.  THAT MISCHARACTERIZES WHAT I SAID.  THE RECEIVER IS

19   ADDRESSING THE CULTURE.  THAT'S GOING TO BE AN ONGOING ISSUE.

20   I WAS SHOCKED AT THE SHORT LENGTH OF TIME THE RECEIVER HAS BEEN

21   IN PLACE COMPARED TO THE AMOUNT OF CHANGE THAT I HAVE SEEN

22   BETWEEN '07 AND '08.

23   **BY MS. HARDY**

24   **Q**    WHEN WAS THE RECEIVER APPOINTED?

25   **A**    I DON'T REMEMBER OFF THE TOP OF MY HEAD, BUT I'M CERTAIN

1    THAT DATA IS READILY AVAILABLE.

2  **Q**    THANK YOU.

3            DOCTOR, YOU DRAFTED THREE REPORTS IN THIS CASE,

4    CORRECT?

5  **A**    YES, MA'AM.

6  **Q**    FOR CONVENIENCE I'M GOING TO REFER TO THOSE AS YOUR FIRST,

7    SECOND, AND THIRD REPORTS, OKAY?

8  **A**    YES, MA'AM.

9  **Q**    YOUR FIRST REPORT IS DATED NOVEMBER 2007, CORRECT?

10  **A**    I BELIEVE I HAVE IT IN FRONT OF ME, AND I'M NOT ENTIRELY

11    CERTAIN I SEE THE DATE.  LET ME JUST LOOK.  YES.  THE NINTH DAY

12    OF NOVEMBER 2007.

13  **Q**    YOU DON'T RECALL WHETHER YOU VISITED ANY CALIFORNIA PRISONS

14    BEFORE DRAFTING THAT FIRST REPORT, DO YOU?

15  **A**    I DO NOT.  I MAY HAVE VISITED CALIFORNIA PRISONS PREVIOUSLY

16    WHEN THE ACA, THE CORRECTIONAL ASSOCIATION, HAD MEETINGS OUT

17    THERE, AND ALWAYS THERE ARE TOURS OF PRISONS, BUT I DON'T

18    RECALL WHETHER I VISITED ANY PRISONS DURING ANY OF THOSE

19    MEETINGS.

20  **Q**    SO FOR THE PURPOSES OF DRAFTING YOUR FIRST REPORT, YOU DID

21    NOT TOUR ANY CALIFORNIA PRISONS, CORRECT?

22  **A**    THAT'S ESSENTIALLY CORRECT, YES.

23  **Q**    AND FOR THE SECOND REPORT YOU VISITED THREE PRISONS,

24    CORRECT?

25  **A**    THAT'S CORRECT.

1  Q    AND THE THIRD YOU VISITED FIVE PRISONS, CORRECT?

2  A    THAT'S CORRECT.

3  Q    AND THE OPINIONS THAT YOU DEVELOPED IN THIS CASE ARE

4  RELATED SOLELY TO THE IMPACT OF OVERCROWDING ON MEDICAL CARE,

5  NOT ON MENTAL HEALTHCARE; IS THAT CORRECT?

6  A    I WAS NOT ASKED TO LOOK AT MENTAL HEALTHCARE.

7  Q    AND DO YOU CONSIDER YOURSELF AN EXPERT IN MENTAL

8  HEALTHCARE?

9  A    NO, MA'AM, I DO NOT.

10 Q    YOU TESTIFIED THAT WHEN YOU VISITED THE PRISONS IN

11 PENNSYLVANIA, THAT A CUSTODY OFFICER TOLD YOU THAT THEY HOT

12 BUNK BEDS IN THE PENNSYLVANIA PRISON SYSTEM; IS THAT CORRECT?

13 A    YES, MA'AM.

14 Q    DID YOU ASK ANYONE BESIDES THAT CUSTODY OFFICER WHETHER

15 THAT WAS, IN FACT, TRUE?

16 A    NO, MA'AM, I DIDN'T THINK TO.  HE TOLD ME THAT THAT INMATE

17 HAD TO GET OUT OF THE BUNK WITHIN SEVERAL HOURS SO ANOTHER

18 INMATE COULD GET IN, AND THAT WAS MY CONCEPT AND HIS CONCEPT OF

19 HOT BUNKING.  I DID NOT ASK HIS SUPERVISOR OR ANYBODY ELSE.  HE

20 WAS THE PERSON RESPONSIBLE FOR THE INMATES.

21 Q    ARE YOU AWARE THAT THE FORMER AND THE CURRENT DIRECTORS OF

22 THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS HAVE BOTH TESTIFIED

23 IN THIS PROCEEDING ALREADY?

24 A    I HAVE NO KNOWLEDGE OF THAT.

25 Q    WOULD IT CHANGE YOUR TESTIMONY ABOUT WHETHER YOU SHOULD

1  HAVE VERIFIED THAT INFORMATION IF YOU KNEW THAT BOTH OF THE

2  FORMER AND THE CURRENT DIRECTORS OF THE PENNSYLVANIA DEPARTMENT

3  OF CORRECTIONS HAVE BOTH TESTIFIED THAT PENNSYLVANIA DOES NOT

4  NOW AND NEVER HAS HOT BUNKED?

5          **MS. JOHNSON:**  YOUR HONORS, I WANT TO POINT OUT THAT

6  PLAINTIFFS' COUNSEL HAS NOT ESTABLISHED THAT EITHER OF THOSE

7  WITNESSES WAS THE DIRECTOR IN CHARGE AT THE TIME THAT

8  DR. THOMAS REVIEWED THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS

9  HEALTHCARE SYSTEM.

10         **JUDGE KARLTON:**  YOU CAN MAKE THAT ARGUMENT WHEN WE

11  GET TO THE APPROPRIATE PLACE.  I'M SORRY.

12         **JUDGE HENDERSON:**  GO ON.  YOU CAN EXPLORE THAT ON

13  REDIRECT.

14         GO ON, MS. HARDY.

15         **THE WITNESS:**  TO ANSWER YOUR QUESTION THEN, IT WOULD

16  NOT ALTER WHAT I WITNESSED, IT WOULD NOT ALTER WHAT I HEARD,

17  AND IT WOULD NOT ALTER WHAT I BELIEVE.

18  **BY MS. HARDY**

19  **Q**  DOCTOR, YOU BELIEVE THAT SOME PATIENT ENCOUNTERS WITH A

20  PHYSICIAN SHOULD TAKE PLACE IN A CONFIDENTIAL SETTING, CORRECT?

21  **A**  YES, I BELIEVE THERE ARE SOME PATIENT CARE INTERACTIONS

22  THAT SHOULD BE CONFIDENTIAL.

23  **Q**  AND IF A SETTING IS NOT CONFIDENTIAL, SOME PATIENTS MAY BE

24  UNWILLING TO DIVULGE INTIMATE PERSONAL INFORMATION TO THEIR

25  PROVIDER, CORRECT?

1  **A**   YES, THAT VARIES, BUT THERE ARE MANY PATIENTS WHO HAVE

2  LITTLE CONCERN ABOUT CONFIDENTIALITY, BUT SOME WHO DO, MAY HAVE

3  CONCERNS, AND I HAVE TAKEN IN -- WHEN I WAS AT JACKSON MEMORIAL

4  HOSPITAL BOTH AS A RESIDENT AND AS FACULTY MEMBER TAKEN

5  PATIENTS THAT WERE UNFORTUNATELY HOUSED IN THE HALL INTO THE

6  BATHROOMS TO ACHIEVE CONFIDENTIAL LEVEL, YES.

7  **Q**   AND SO IT'S YOUR TESTIMONY THAT IT'S AN APPROPRIATE

8  ACCOMMODATION TO SPACE SHORTAGES TO PROVIDE TREATMENT TO

9  PATIENTS IN THE MEN'S ROOM?

10  **A**   IT'S -- IT'S NOT NECESSARILY THE BEST WAY TO DO THINGS, BUT

11  CERTAINLY ONE HAS TO BE CREATIVE IN ACADEMIC MEDICAL CENTERS

12  AND IN TRAINING PROGRAMS AND IN CORRECTIONS.

13  **Q**   DOCTOR, DURING YOUR CALIFORNIA PRISON TOURS, YOU OBSERVED

14  HEALTHCARE BEING DELIVERED IN AN ENVIRONMENT THAT WAS NOT

15  CONDUCIVE TO CONFIDENTIALITY AT SOME PRISONS, CORRECT?

16  **A**   YES.

17  **Q**   AND YOU AGREE THAT EVEN THE NEWEST OF CALIFORNIA'S PRISONS

18  HAVE INADEQUATE SPACE FOR PATIENT CARE, CORRECT?

19  **A**   I'M NOT ENTIRELY CERTAIN I HAVE SEEN OR WITNESSED THE

20  NEWEST.  YOU WOULD HAVE TO GIVE ME THE DATES OF THE NEWEST

21  ONES.  I DID SEE FACILITIES THAT WERE NOT PURPOSE FILLED FOR

22  MEDICAL CARE BEING USED.

23  **Q**   DOCTOR, I WOULD DIRECT YOU TO PAGE 17 OF YOUR THIRD REPORT

24  AT PARAGRAPH 33.

25  **A**   YES.

1  Q   THE SECOND SENTENCE -- ACTUALLY, STARTING AT THE BEGINNING:

2          "NOTE MUST BE MADE OF THE SPACE FOR MEDICAL

3       FACILITIES IN THE CALIFORNIA DEPARTMENT OF

4       CORRECTIONS AND REHABILITATION.  BECAUSE OF THE

5       AFOREMENTIONED CULTURE OF CUSTODY DOMINANCE, EVEN THE

6       NEWEST OF CALIFORNIA PRISONS HAVE INADEQUATE SPACE

7       FOR CARE."

8  A   YES, MA'AM.

9  Q   THAT WAS YOUR TESTIMONY?

10 A   YES, MA'AM.  THAT'S NOT A TERM OF ART.  THAT'S A TERM OF

11 COMMON LANGUAGE.  THAT IMPLIES THAT THE NEWEST ONES I HAVE

12 SEEN.  I AM NOT CERTAIN IF THERE ARE OTHER FACILITIES THAT I

13 HAVE NOT SEEN THAT ARE NEWER.  BUT, CLEARLY, YOU KNOW, FROM

14 YEARS OF HAVING CUSTODY DOMINANCE, THE FACILITIES THAT I HAVE

15 SEEN DID NOT HAVE ADEQUATE SPACE FOR PATIENT CARE.

16 Q   YOU AGREE THE LACK OF ADEQUATE SPACE REFLECTS A MINDSET

17 WHERE THERE'S SIMPLY NOT MUCH THOUGHT GIVEN THE NEEDS OF

18 MEDICAL CARE FOR INMATES WHEN THESE SPACES WERE CONSTRUCTED,

19 CORRECT?

20 A   THAT'S CORRECT.

21 Q   YOU ARE AWARE THAT THE RECEIVER HAS WRITTEN THAT THE

22 FACILITIES AVAILABLE FOR PROVIDING HEALTHCARE WITHIN THE CDCR

23 ARE WOEFULLY INADEQUATE, CORRECT?

24 A   YES, MA'AM.

25 Q   AND YOU ARE AWARE THAT THE RECEIVER'S TURNAROUND PLAN OF

1  ACTION INCLUDES A BUILDING PLAN TO ADD MEDICAL BEDS TO THE

2  SYSTEM, CORRECT?

3  **A**   YES, MA'AM.

4  **Q**   AND THAT BUILDING PLAN ALSO INCLUDES UPGRADES TO EXISTING

5  MEDICAL CLINICS, CORRECT?

6  **A**   YES, MA'AM.

7  **Q**   AND YOU BELIEVE THE RECEIVER'S BUILDING PLAN IS NOT

8  NECESSARY TO ACHIEVE CONSTITUTIONAL LEVEL OF HEALTHCARE IN

9  CALIFORNIA, CORRECT?

10  **A**   THAT'S CORRECT.

11  **Q**   AND YOU DISAGREE WITH THE RECEIVER'S POSITIONS THAT

12  HEALTHCARE WILL DETERIORATE UNLESS MONEY IS ALLOCATED TO FUND A

13  BUILDING PROJECT, CORRECT?

14  **A**   THAT'S CORRECT.

15  **Q**   AND, IN FACT, YOU'VE DESCRIBED THE RECEIVER'S POSITION THAT

16  HEALTHCARE WILL DETERIORATE UNLESS MONEY IS ALLOCATED TO THE

17  BUILDING PROJECT AS LUDICROUS, CORRECT?

18  **A**   THE EIGHT BILLION DOLLARS, MA'AM.

19  **Q**   AND YOU BELIEVE THAT THE SHORTAGE OF CLINICAL SPACE IN

20  CALIFORNIA PRISONS DOES NOT CREATE A BARRIER TO THE DELIVERY OF

21  UNCONSTITUTIONAL MEDICAL CARE, CORRECT?

22          **JUDGE KARLTON:**  NO.  THE DELIVERY OF CONSTITUTIONAL.

23          **MS. HARDY:**  I'M SORRY.  THANK YOU.  I'LL SAY IT FOR

24  A CLEAR RECORD.

25

 1  **BY MS. HARDY**

 2  **Q**   YOU BELIEVE THE SHORTAGE OF CLINICAL SPACE IN CALIFORNIA

 3  PRISONS DOES NOT NECESSARILY CREATE A BARRIER TO THE DELIVERY

 4  OF CONSTITUTIONAL MEDICAL CARE, CORRECT?

 5  **A**   THAT'S CORRECT, NOT NECESSARILY.  THERE ARE A VARIETY OF

 6  THINGS THAT COULD BE DONE TO USE THE EXISTING SPACE MUCH

 7  BETTER.

 8  **Q**   AND THAT WOULD INCLUDE PROVIDING TREATMENT IN CLOSETS,

 9  CORRECT?

10  **A**   NO, YOU WOULDN'T NECESSARILY PROVIDE IT IN A CLOSET,

11  ALTHOUGH YOU COULD DO THAT, BUT YOU COULD USE IT DURING -- MORE

12  FREQUENTLY THAN THE AVERAGE SHIFTS THAT ARE BEING USED.  YOU

13  COULD USE IT ON THE WEEKENDS WHEN IT'S NOT AS DEMANDED.  THERE

14  ARE A VARIETY OF ALTERNATIVES THAT COULD BE DONE, INCLUDING

15  MODULAR BUILDINGS AND THINGS LIKE THAT.

16  **Q**   THIS WOULD ALSO INCLUDE TREATING PEOPLE IN THE MEN'S ROOM

17  AS YOU ALREADY TESTIFIED?

18  **A**   THAT WOULD NOT NECESSARILY DO THAT, BUT I USE THAT AS AN

19  EXAMPLE FOR THE COURT, BECAUSE IN MY RESIDENCY AT JACKSON

20  MEMORIAL HOSPITAL, THE UNIVERSITY OF MIAMI, I HAVE HAD TO DO

21  THAT, AND, UNFORTUNATELY, EVEN IN THIS MODERN DAY WE HAVE

22  PATIENTS IN HALLS AND THINGS LIKE THAT THAT YOU HAVE TO ACHIEVE

23  CONFIDENTIALITY BY REMOVING THEM FROM THEIR LOCATION.

24  **Q**   DOCTOR, MEDICAL RECORDS PLAY AN IMPORTANT PART IN THE

25  PROVISION OF HEALTHCARE, CORRECT?

1   **A**   YES, MA'AM.

2   **Q**   AND ONE REASON THEY ARE IMPORTANT IS THEY MAY CONTAIN

3   INFORMATION THAT IMPACTS THE CLINICIAN'S TREATMENT DECISIONS,

4   CORRECT?

5   **A**   YES, MA'AM.

6   **Q**   AND THAT INFORMATION MIGHT INCLUDE DRUG ALLERGIES, CORRECT?

7   **A**   YES, MA'AM.

8   **Q**   CURRENT MEDICATION REGIMES?

9   **A**   YES, MA'AM.

10  **Q**   AND REPORTS FROM SPECIALTY PROVIDERS?

11  **A**   YES, MA'AM.

12  **Q**   YOU HAVE SEEN PRISON MEDICAL SYSTEMS THAT YOU BELIEVE

13  PRACTICE CONSTITUTIONAL LEVELS OF CARE WHERE MEDICAL RECORDS

14  ARE NOT TIMELY MAINTAINED, CORRECT?

15  **A**   THAT'S CORRECT.

16  **Q**   AND YOU HAVE SEEN PRISON MEDICAL SYSTEMS THAT YOU BELIEVE

17  PRACTICE CONSTITUTIONAL LEVELS OF CARE WHERE MEDICAL RECORDS

18  ARE NOT COMPLETE, CORRECT?

19  **A**   THAT'S CORRECT.

20  **Q**   AND YOU HAVE SEEN MEDICAL -- PRISON MEDICAL SYSTEMS THAT

21  YOU BELIEVE PRACTICE CONSTITUTIONAL LEVELS OF CARE WHERE

22  MEDICAL RECORDS ARE NOT AVAILABLE TO THE CLINICIAN AT THE TIME

23  OF SERVICE TO THE PATIENT, CORRECT?

24  **A**   CORRECT.

25  **Q**   SO, IN YOUR OPINION, MEDICAL RECORDS ARE NOT AN ESSENTIAL

1    ELEMENT OF A CONSTITUTIONAL PRISON MEDICAL CARE SYSTEM,

2    CORRECT?

3    **A**    THAT DOES NOT FOLLOW, MS. HARDY.  THAT OVERSTATES WHAT I'M

4    SAYING.  ALL PROVIDERS, WHETHER THEY'RE IN A CORRECTIONAL

5    SYSTEM OR A FREE SYSTEM, OCCASIONALLY SOMETIMES, UNFORTUNATELY,

6    REGULARLY HAVE TO SEE PATIENTS WITHOUT A MEDICAL RECORD, OR THE

7    MEDICAL RECORD IS INCOMPLETE BECAUSE OF LAB RESULTS OR OTHER

8    THINGS.  THAT DOESN'T MEAN THE CARE PROVIDED IS POOR.  IT DOES

9    MEAN THAT THERE ARE SOME DIFFICULTIES IN EVALUATING THE

10   PATIENT.  THE PATIENT HAS TO BE MORE COGNIZANT OF THEIR

11   HISTORY.  IT TAKES LONGER FOR THE DOCTOR TO ANALYZE THE PATIENT

12   AND MAKE A DIFFERENTIAL DIAGNOSIS.

13   **Q**    YOUR SECOND AND THIRD REPORTS ARE BASED IN PART OF YOUR

14   TOURS OF CALIFORNIA STATE PRISON IN DECEMBER 2007 AND

15   SEPTEMBER 2008, CORRECT?

16   **A**    YES, MA'AM.

17   **Q**    YOU TOOK NO NOTES AT ANY OF THE EIGHT PRISONS YOU TOURED,

18   CORRECT?

19   **A**    PLEASE SAY THAT AGAIN.

20   **Q**    YOU TOOK NO NOTES AT ANY OF 28 PRISONS YOU TOURED, CORRECT?

21   **A**    THAT'S CORRECT.  I MADE ONE PIECE OF NOTE AT ONE OF THE

22   PRISONS AND THEN THREW IT AWAY.

23   **Q**    AND YOU PREPARED NO NOTES FOR YOUR OWN USE AFTER DOING ANY

24   OF THE TOURS, CORRECT?

25   **A**    THAT'S CORRECT.

1  Q    AND YOU DID NOT MAKE ANY AUDIO OR VIDEO RECORDINGS DURING

2  THE TOURS, CORRECT?

3  A    THAT'S CORRECT.

4  Q    THE THREE PRISONS THAT YOU VISITED IN DECEMBER 2007, YOU'VE

5  ALREADY TESTIFIED WERE SAN QUENTIN, CALIFORNIA MEDICAL

6  FACILITY, AND CALIFORNIA INSTITUTION FOR MEN, RIGHT?

7  A    YES, MA'AM.

8  Q    HOW SOON AFTER THE TOURS DID YOU DRAFT YOUR REPORT?

9  A    AS WE SIT HERE, I DON'T REMEMBER.  I MEAN, I HAD MY

10 COMPUTER WITH ME AND PROBABLY STARTED THAT NIGHT, BUT I

11 HONESTLY DON'T RECALL.

12 Q    REGARDING YOUR FIRST ROUND OF TOURS, YOU SPENT ABOUT FOUR

13 HOURS AT SAN QUENTIN, CORRECT?

14 A    HAVE NO RECOLLECTION OR KNOWLEDGE, BUT THAT SOUNDS ABOUT

15 RIGHT.

16 Q    AND ABOUT THREE HOURS AT CMF?

17 A    I WOULD -- YOUR RECORDS ARE -- I'M CERTAIN THERE ARE LOGS

18 THAT CAN DOCUMENT THAT.  THAT SOUNDS ROUGHLY CORRECT.

19 Q    AND YOU VISITED CIM ON A SATURDAY FOR A FEW HOURS, CORRECT?

20 A    THAT'S CORRECT.

21 Q    FOR EACH PRISON YOU DON'T RECALL WHO YOU SPOKE TO, CORRECT?

22 A    FOR EACH PRISON I DON'T RECALL WHAT?

23 Q    WHO YOU SPOKE TO.

24 A    THAT'S CORRECT.

25 Q    AND YOU REVIEWED UNIT HEALTH RECORDS FOR PRISONERS AT EACH

1  OF THE PRISONS, CORRECT?

2  **A**   THAT'S CORRECT.

3  **Q**   AND YOU DON'T RECALL HOW MANY YOU REVIEWED, CORRECT?

4  **A**   THAT'S CORRECT.

5  **Q**   BUT IT WAS FEWER THAN TEN AT EACH OF THE PRISONS, CORRECT?

6  **A**   THAT'S ABOUT RIGHT.

7  **Q**   AND YOU DON'T RECALL HOW LONG YOU SPENT WITH EACH OF THE

8  RECORDS, CORRECT?

9  **A**   THAT'S CORRECT.

10 **Q**   BASED ON YOUR FIRST THREE TOURS, YOU WROTE THAT ONE HUNDRED

11 PERCENT OF THE PEOPLE YOU ELICITED COMMENTS FROM FELT POSITIVE

12 AND EMPOWERED TO DO THEIR JOBS, CORRECT?

13 **A**   THAT'S CORRECT.

14 **Q**   YOU DON'T KNOW WHAT PROPORTION OF THE PEOPLE YOU SPOKE TO

15 WERE MEDICAL STAFF, CORRECT?

16 **A**   THAT'S NOT CORRECT.  WHEN I SAID THAT, YOU'D HAVE TO POINT

17 TO MY REPORT EXACTLY, BUT FOR THE FIRST TOUR, I AM COMMENTING

18 BASICALLY ON THE MEDICAL STAFF.

19 **Q**   FOR EACH OF THE THREE PRISONS YOU VISITED, YOU DON'T RECALL

20 HOW MANY PHYSICIANS, NURSES OR CUSTODY OFFICERS YOU SPOKE TO,

21 CORRECT?

22 **A**   YOU WOULD HAVE TO REPEAT THAT, MS. HARDY.  YOUR VOICE

23 DROPPED.  FOR EACH OF THE THREE PRISONS?

24 **Q**   YOU DO NOT RECALL HOW MANY PHYSICIANS, NURSES OR CUSTODY

25 OFFICERS YOU SPOKE TO, CORRECT?

1   **A**   THAT'S CORRECT.

2   **Q**   OTHER THAN ONE PSYCHIATRIST AT THE CALIFORNIA INSTITUTION

3   FOR MEN, YOU SPOKE TO NO PHYSICIANS AT THAT PRISON, CORRECT?

4   **A**   THAT'S CORRECT.  THAT WAS A SATURDAY.  THE PSYCHIATRIST WAS

5   THE ONLY PHYSICIAN THERE.

6   **Q**   YOU DO NOT RECALL WHAT QUESTIONS YOU ASKED THE STAFF AT

7   THESE PRISONS, CORRECT?

8   **A**   I DON'T RECALL A SPECIFIC INDIVIDUAL QUESTION; THAT'S

9   CORRECT.

10  **Q**   YOU DO RECALL SPEAKING, HOWEVER, TO A YOUNG FEMALE

11  DOCTOR IN THE SAN QUENTIN GYMNASIUM CLINIC, CORRECT?

12  **A**   THAT IS CORRECT.

13  **Q**   AND SHE TOLD YOU SHE WAS OFTEN UNABLE TO SEE ALL THE

14  PATIENTS THAT HAD APPOINTMENTS WITH HER ON A GIVEN DAY,

15  CORRECT?

16  **A**   I DON'T REMEMBER SPECIFICALLY HER WORDS.  SHE WAS CONCERNED

17  ABOUT VOLUME OF PATIENTS, YES.

18  **Q**   DOCTOR, I'LL DIRECT YOU TO YOUR DEPOSITION TESTIMONY,

19  PAGE 84, STARTING ON LINE 6.

20  **A**   WHAT PAGE ARE YOU ON, MS. HARDY?

21  **Q**   PAGE 84.

22  **A**   PAGE 84.  GIVE ME JUST A SECOND, PLEASE.  PAGE 84, LINE 6.

23  **Q**   PAGE 84, LINE 6.

24          "QUESTION:  AND SHE SAID SHE WAS OFTEN UNABLE TO

25     SEE ALL OF THE PATIENTS THAT HAD APPOINTMENTS WITH

1       HER ON A GIVEN DAY AT THE SAME TIME, CORRECT?

2           "ANSWER: SHE DID SAY THAT."

3   **A**   THANK YOU FOR REFRESHING MY MEMORY ON THAT.

4   **Q**   YOU RECALL MEETING THE CHIEF MEDICAL DOCTOR AT SAN QUENTIN,

5   CORRECT?

6   **A**   YES.

7   **Q**   YOU DON'T RECALL HOW LONG THAT MEETING LASTED, CORRECT?

8   **A**   THAT'S CORRECT.

9   **Q**   AND YOU DO NOT RECALL ASKING HER ANY QUESTIONS, CORRECT?

10  **A**   I DON'T RECALL A SPECIFIC QUESTION.  I DO RECALL THAT SHE

11  HAD SOME FUNCTION THAT SHE HAD TO BE TO.

12  **Q**   DOCTOR, YOUR THIRD REPORT IS BASED ON TOURS OF NORTH KERN

13  STATE PRISON, SUBSTANCE ABUSE TREATMENT FACILITY, PLEASANT

14  VALLEY STATE PRISON, SOLANO, AND HIGH DESERT, CORRECT?

15  **A**   THAT'S CORRECT.

16  **Q**   AND EACH OF THOSE TOURS TOOK LESS THAN FIVE HOURS, CORRECT?

17  **A**   THAT'S PROBABLY CORRECT.

18  **Q**   AND ON THIS ROUND OF TOURS, ALMOST ALL PERSONNEL UNIFORMLY

19  CITED THE NEED FOR MORE SPACE AND MORE STAFF, CORRECT?

20  **A**   THAT'S CORRECT.

21  **Q**   AND THE PLEASANT VALLEY STATE PRISON HEALTHCARE MANAGER

22  TOLD YOU THE PRISON WAS VERY HARD TO STAFF, CORRECT?

23  **A**   THE PLEASANT VALLEY HEALTHCARE ADMINISTRATOR SAID WHAT,

24  PLEASE?

25  **Q**   THAT THE PRISON WAS VERY HARD TO STAFF.

1   **A**   YES, IT WAS VERY HARD TO STAFF, YES.

2   **Q**   AND THE PLEASANT VALLEY WARDEN TOLD YOU THAT POPULATION

3   REDUCTION WOULD ENHANCE THEIR ABILITY TO DELIVER HEALTHCARE,

4   CORRECT?

5   **A**   CERTAINLY MANY OF THE EMPLOYEES FELT THAT REDUCING THEIR

6   WORKLOAD WOULD MAKE IT EASIER, YES.

7   **Q**   AND AT HIGH DESERT, THE CHIEF MEDICAL OFFICER TOLD YOU SHE

8   HAD NO DOUBT THAT OVERCROWDING AFFECTED HER ABILITY TO PROVIDE

9   SERVICES IN A TIMELY FASHION, CORRECT?

10  **A**   NOT ENTIRELY.  SHE INITIALLY SAID THAT.  THEN WE DISCUSSED

11  THAT A LITTLE FURTHER, WHEN I ASKED HER ROUGHLY HOW MANY

12  PATIENTS DID SHE SAY WHEN SHE WAS PRACTICING IN -- HOW MANY

13  PATIENTS DID SHE SEE WHEN SHE WAS PRACTICING IN THE ADJACENT

14  COMMUNITY, SHE DID INDICATE THAT PRODUCTIVITY NEEDED TO BE

15  IMPROVED AT HER INSTITUTION.

16  **Q**   SHE TOLD YOU THAT THE RESOURCES SHE HAD WERE SUFFICIENT FOR

17  A POPULATION OF ABOUT HALF THE NUMBER THEY WERE TREATING,

18  CORRECT?

19  **A**   THAT WAS HER FEELING INITIALLY AT THE TIME.  THEN WE HAD

20  SEVERAL DISCUSSIONS.

21  **Q**   SHE TOLD YOU THAT THE PRESCRIPTIONS WERE OFTEN DELIVERED

22  LATE TO PRISONERS, CORRECT?

23  **A**   YES.  THERE WAS MEDICATION DELIVERY ISSUES, YES.

24  **Q**   AND SHE TOLD YOU --

25  **A**   I DON'T REMEMBER ANY MENTION OF PRESCRIPTIONS, PER SE, BUT,

1  CLEARLY, THERE WERE MEDICATION DELIVERY ISSUES.

2  **Q**   SHE TOLD YOU THAT SEVERAL OF THE PHYSICIANS ON STAFF AT

3  HIGH DESERT STATE PRISON WERE NOT PROVIDING MEDICAL CARE,

4  CORRECT?

5  **A**   NO, SHE TOLD ME THAT ONE WAS FORBIDDEN TO SEE PATIENTS

6  BECAUSE OF HER FEARS AND SOME ADMINISTRATION, ADMINISTRATIVE

7  ISSUES.  THAT'S NOT TERRIBLY UNCOMMON IN A CORRECTIONAL SYSTEM.

8  **Q**   DOCTOR, I'LL REMIND YOU, PAGE 182 OF YOUR DEPOSITION,

9  PLEASE.

10  **A**   OKAY.  GIVE ME A SECOND, PLEASE.  WHAT LINE ARE WE AT,

11  MS. HARDY?

12  **Q**   LINE 9.

13  **A**   LINE 9.

14  **Q**           "QUESTION:  DO YOU RECALL BEING TOLD THAT

15              THREE OF THE PHYSICIANS WHO WERE ON STAFF AT

16              THE PRISON EITHER WERE ON LEAVE OR HAD THEIR

17              CLINICAL PRIVILEGES TAKEN AWAY?

18          "ANSWER:  AS I MENTIONED, SHE SAID THAT ONE HAD

19           HIS CLINICAL PRIVILEGES TAKEN AWAY, AND THAT WAS

20           UNDER REVIEW.  ONE OR TWO OTHERS WERE AWAY FOR ONE

21           REASON OR ANOTHER, AND I DON'T REMEMBER."

22  **A**   YES, MA'AM, AND THAT'S CONSISTENT WITH WHAT I JUST SAID.

23  **Q**   YOU SAID THAT ONE PERSON WAS NOT PROVIDING CLINICAL CARE.

24  IT WAS MORE THAN ONE PERSON, CORRECT?

25          **JUDGE KARLTON:**   NEITHER YOU NOR THE WITNESS OUGHT TO

1   BE ARGUING.

2              **THE WITNESS:**  I'M SORRY.  YOUR HONOR.

3   **BY MS. HARDY**

4   **Q**   AT EACH OF THE FIVE PRISONS YOU REVIEWED MEDICAL FILES,

5   CORRECT?

6   **A**   YES, MA'AM.

7   **Q**   AND AT SATF, DURING THE FILE REVIEWS YOU DON'T RECALL HOW

8   MANY OF THE FILES REFLECTED THAT PRISONERS HAD REQUESTED A

9   MEDICAL CARE APPOINTMENT, CORRECT?

10  **A**   AT SATF?  AND THEN YOU HAVE TO REPEAT THAT, PLEASE.

11  **Q**   I'LL GO FOR ALL OF THEM.

12             AT ANY OF THE PRISONS DO YOU RECALL WHETHER THE

13  PRISONER'S FILES REFLECTED THAT THE PRISONERS HAD REQUESTED A

14  MEDICAL APPOINTMENT IN THE LAST TWO MONTHS?

15  **A**   AT ANY OF THE PRISONS DID I NOTE WHETHER PATIENTS HAD

16  REQUESTED MEDICAL APPOINTMENTS IN THE LAST FEW MONTHS; IS THAT

17  WHAT YOU'RE ASKING?

18  **Q**   YES.

19  **A**   YES.

20  **Q**   AND DO YOU RECALL WHAT THEY ASKED FOR -- ASKED FOR CARE

21  FOR?

22  **A**   I REMEMBER TALKING TO ONE INMATE WHO WAS BITTERLY

23  COMPLAINING ABOUT THE WAIT AND HAD WAITED FOR TWO HOURS.

24  **Q**   DOCTOR, I'M ASKING ABOUT YOUR REVIEW.

25  **A**   THAT'S THE ONLY THING THAT JUMPS INTO MY MIND RIGHT NOW.

1  Q    IN YOUR REVIEW OF MEDICAL FILES, DOCTOR, DO YOU RECALL ANY

2  SPECIFIC DETAILS ABOUT ANY OF THE MEDICAL FILES YOU REVIEWED ON

3  THE FIVE PRISON TOURS YOU DID?

4  A    NOT AS WE SIT HERE RIGHT NOW, NO.

5  Q    YOU DO NOT RECALL HOW LONG IT TOOK FOR PATIENTS TO SEE A

6  PRIMARY CARE PROVIDER FOR ROUTINE CARE AT ANY OF THE PRISONS

7  YOU VISITED, DO YOU?

8  A    AS WE SIT HERE RIGHT NOW, IT VARIES.  IT VARIED BETWEEN

9  FOUR WEEKS AT ONE INSTITUTION AND ABOUT EIGHT AT THE OTHERS,

10  AND THE ONES THAT WERE OUTSIDE OF GENERAL PARAMETERS, I WAS

11  IMPRESSED THAT EACH OF THOSE INSTITUTIONS HAD SOME KIND OF A

12  MECHANISM TO BRING IT UP TO DATE.

13          ONE OF THE DOCTORS WAS GOING TO HAVE HIS PEOPLE WORK

14  WEEKENDS.  ANOTHER WAS GOING TO HAVE THEM DO STAGGERED SHIFTS

15  AND THINGS LIKE THAT.  BUT EACH OF THEM HAD ADDRESSED A

16  MECHANISM TO BRING THE REQUESTS INTO A TIMELY FASHION.

17          **JUDGE KARLTON:**  MOVE TO STRIKE AS NON-RESPONSIVE.

18          **MS. HARDY:**  MOVE TO STRIKE AS NON-RESPONSIVE.

19          **JUDGE KARLTON:**  WHAT'S YOUR QUESTION AGAIN, MA'AM?

20  DOCTOR, LISTEN TO THE QUESTION AND ANSWER THE QUESTION, IF YOU

21  WILL.

22          **MS. HARDY:**  I'M SORRY, COULD YOU READ BACK THE

23  QUESTION?

24          **JUDGE KARLTON:**  I'M SORRY.

25          **MS. HARDY:**  I'M ASKING THE REPORTER TO READ BACK THE

1   QUESTION.

2           **JUDGE KARLTON:**  THE QUESTION IS, ON YOUR REVIEW OF

3   MEDICAL FILES, DOCTOR, DO YOU RECALL ANY SPECIFIC DETAILS ABOUT

4   ANY OF THE MEDICAL FILES YOU REVIEWED OF THE FIVE PRISON TOURS

5   YOU DID.

6           **THE WITNESS:**  AS WE SIT HERE RIGHT NOW, I DON'T

7   RECALL SPECIFIC DETAILS, THAT'S CORRECT, YOUR HONOR.

8           **JUDGE KARLTON:**  AND THE NEXT QUESTION WAS, DO YOU

9   RECALL HOW LONG IT TOOK FOR PATIENTS TO SEE A PRIMARY CARE

10  PROVIDER FOR ROUTINE CARE AT ANY OF THE PRISONS YOU VISITED?

11          **THE WITNESS:**  YES, SIR.

12          **MS. HARDY:**  HE DID ANSWER THAT QUESTION, ACTUALLY.

13          **JUDGE KARLTON:**  I'M SORRY?

14          **MS. HARDY:**  I BELIEVE HE DID ANSWER THAT QUESTION.

15          **JUDGE KARLTON:**  I'M SORRY.

16          **MS. HARDY:**  I THINK THERE'S ANOTHER QUESTION THAT

17  MIGHT HAVE HAPPENED AFTER THAT.  PERHAPS NOT.  OKAY.

18  **BY MS. HARDY**

19  **Q**   YOU DO NOT RECALL WHETHER YOU ASKED SCHEDULERS AT THE FIVE

20  PRISONS HOW LONG IT TOOK FOR THEM TO SCHEDULE A ROUTINE PRIMARY

21  CARE APPOINTMENT, DO YOU?

22  **A**   I SPOKE TO SOME SCHEDULERS.  MOST OF THEM WERE CONCERNED

23  WITH OUTSIDE APPOINTMENTS RATHER THAN INTERNAL PRIMARY CARE

24  PROVIDERS.  BUT AS WE SIT HERE NOW, I DON'T RECALL WHICH WAS

25  WHICH.

1  Q   YOU TESTIFIED THAT YOU WERE IMPRESSED THAT AT EACH OF THE

2  PRISONS THAT YOU VISITED THE STAFF HAD PLANS FOR ADDRESSING

3  BACKLOGS OF APPOINTMENTS, CORRECT?

4  A   THAT'S CORRECT, YES, MA'AM.

5  Q   WHICH PRISONS -- AT WHICH PRISONS WERE YOU TOLD THAT THEY

6  HAD A PLAN TO ADDRESS THE BACKLOG FOR OLD APPOINTMENTS?

7  A   AS WE SIT HERE RIGHT NOW, I DON'T RECALL.  BUT, AS I

8  MENTIONED TO YOU, IN SPEAKING TO THE CHIEF HEALTH OFFICERS AND

9  OTHER PEOPLE, EACH OF THEM SEEMED TO HAVE CONCERNS AND PLANS TO

10 ADDRESS BACKLOGS IF THEY HAD BACKLOGS.

11 Q   AND DID YOU ASK THEM HOW LONG THEIR BACKLOGS HAD EXISTED?

12 A   SOME IN SOME PLACES I DID, YES.

13 Q   AND WHAT DID THEY TELL YOU?

14 A   THE LONGEST ONE -- WELL, ONE OF THE SHORTEST ONES WAS FOUR

15 WEEKS.  THE LONGEST ONE WAS 16 WEEKS.

16 Q   DOCTOR, I DON'T THINK YOU UNDERSTOOD MY QUESTION.  THEY HAD

17 HAD A BACKLOG FOR ONLY FOUR WEEKS, BEFORE THAT THEY HAD BEEN

18 CAUGHT UP; IS THAT YOUR TESTIMONY?

19 A   NO.  THE BACKLOG WAS FOUR WEEKS.

20 Q   SO THE BACKLOGS EXTENDED FROM FOUR WEEKS TO SIXTEEN WEEKS,

21 BUT YOU DON'T KNOW HOW LONG THEY HAD BEEN IN THAT SITUATION,

22 CORRECT?

23 A   AS WE SIT HERE NOW, I DON'T RECALL.

24 Q   AND DO YOU RECALL WHAT THE DETAILS WERE OF THEIR PLANS TO

25 ADDRESS THE BACKLOG?

1    **A**    AS I MENTIONED PREVIOUSLY, SEVERAL OF THE INSTITUTIONS WERE

2    GOING TO DO NON-TRADITIONAL HOURS.  ONE OF THEM WAS GOING TO DO

3    WEEKENDS.  THERE WERE OTHER MECHANISMS, BUT I DON'T RECALL WHAT

4    THEY ARE NOW, BUT YES, EACH OF THE PEOPLE THAT I SPOKE TO FELT

5    EMPOWERED TO BRING ABOUT CORRECTION IN THE BACKLOG.

6    **Q**    AND DID YOU ASK THEM WHETHER THEY HAD THE CUSTODY COVERAGE

7    TO PERMIT THEM TO RUN THE NON-TRADITIONAL LINES?

8    **A**    I DID NOT.

9    **Q**    FOLLOWING YOUR TOUR OF THE FIVE PRISONS, YOU WROTE:

10        "ONE HUNDRED PERCENT OF ALL PERSONNEL FELT THERE

11         WAS ADEQUATE COMMITMENT, ADEQUATE RESOURCES, AND

12         ADEQUATE ABILITY TO PROVIDE A CONSTITUTIONAL LEVEL OF

13         CARE," CORRECT?

14   **A**    COULD YOU INDICATE WHERE THAT IS?

15   **Q**    THAT'S IN YOUR THIRD REPORT, PAGE 3, PARAGRAPH 5, JUST

16   BELOW HALFWAY DOWN.  THAT IS:

17        "ONE HUNDRED PERCENT OF ALL PERSONNEL FELT THERE

18         WAS ADEQUATE COMMITMENT, ADEQUATE RESOURCES, AND

19         ADEQUATE ABILITY TO PROVIDE A CONSTITUTIONAL LEVEL OF

20         HEALTHCARE."

21   **A**    YES, MA'AM.  THAT'S EXACTLY WHAT IT SAYS.

22   **Q**    YOU DID NOT SPEAK TO A HUNDRED PERCENT OF THE STAFF AT EACH

23   OF THE PRISONS YOU VISITED, DID YOU?

24   **A**    NO, MA'AM.  THAT STATEMENT IS NOT A TERM OF ART; IT'S A

25   TERM OF COMMON USE.  A HUNDRED PERCENT OF THE PEOPLE I TALKED

1    TO INDICATED THAT.

2    Q    AND YOU DON'T RECALL HOW MANY PEOPLE YOU SPOKE TO AT EACH

3    OF THE FIVE PRISONS, CORRECT?

4    A    AS WE SIT HERE NOW, I HAVE NO RECOLLECTION HOW MANY.

5    Q    AND YOU DO NOT RECALL WHAT SPECIFIC QUESTIONS YOU ASKED

6    THEM, CORRECT?

7    A    PLEASE, CAN I HAVE THAT QUESTION AGAIN, MS. HARDY?

8    Q    YOU DON'T RECALL WHAT SPECIFIC QUESTIONS YOU ASKED THEM,

9    CORRECT?

10   A    THAT'S CORRECT.  THAT WAS -- THAT WOULD BE PART OF A

11   DIALOGUE, YES, MA'AM.

12   Q    YOU DON'T RECALL WHETHER YOU ASKED THE SAME QUESTION OF

13   EACH PERSON, CORRECT?

14   A    THAT'S CORRECT.

15   Q    YOU WROTE THAT:

16        "WHEN PHYSICIAN'S POSITIONS WERE FILLED WITH

17        REGISTRY PROVIDERS, THOSE PROVIDERS GENERALLY HAD A

18        LONG-TERM COMMITMENT TO THE INSTITUTION."

19        THAT'S ON PAGE 2 OF YOUR THIRD REPORT, CORRECT?

20   A    YES, MA'AM.

21   Q    AND YOU TESTIFIED THAT AT EACH OF THE FIVE PRISONS VISITED,

22   YOU THOUGHT MOST OF THE PHYSICIANS WERE CONTRACT PROVIDERS

23   RATHER THAN STATE EMPLOYEES, CORRECT?

24   A    YES, MA'AM.

25   Q    AND YOU BELIEVE THAT THIS IS BECAUSE OF THE RICHNESS OF THE

1    REGISTRY CONTRACT COMPARED TO THE STATE CONTRACT?

2    **A**    SEVERAL PHYSICIANS EXPLAINED THAT TO ME, YES, MA'AM.

3    **Q**    BUT YOU DID NOT REVIEW THE REGISTRY CONTRACTS, CORRECT?

4    **A**    YES, MA'AM, THAT'S CORRECT.

5    **Q**    AND YOU DO NOT KNOW HOW MANY OF THE REGISTRY PHYSICIANS AT

6    EACH OF THE PRISONS YOU WENT TO HAD BEEN THERE FOR MORE THAN 12

7    MONTHS, CORRECT?

8    **A**    AS WE SIT HERE NOW, I DON'T KNOW THAT, BUT CLEARLY AT EACH

9    OF THE INSTITUTIONS WE WENT TO, THAT WAS SOMETHING THAT WAS

10   GENERALLY DELVED INTO, AND I REMEMBER MANY OF THEM HAD BEEN

11   THERE FOR A YEAR OR MORE.

12   **Q**    YOU WROTE ON PAGE --

13   **A**    IN FACT -- EXCUSE ME.  IN FACT, THE CHIEF HEALTH OFFICER AT

14   ONE HAD BEEN A REGISTRY PHYSICIAN FOR MANY YEARS AND WAS

15   UNCOMFORTABLE GIVING IT UP TO BECOME A STATE PHYSICIAN BECAUSE

16   HIS EXPENSES WOULDN'T BE REIMBURSED, BUT HE DID IT.

17   **Q**    ON PAGE 4 OF YOUR THIRD REPORT YOU WROTE:

18        "EACH AND EVERY OFFICER IN ALL HOUSING UNITS OF

19         EVERY INSTITUTION VISITED KNEW IMMEDIATELY WHERE THE

20         REQUESTS WERE, HOW INMATES ACCESSED THEM, AND WHERE

21         THEY WERE DISTRIBUTED," CORRECT?

22   **A**    I DON'T SEE THAT, BUT THAT CHARACTERIZES CORRECTLY WHAT I

23   SAID, YES.

24   **Q**    AND YOU DID NOT SPEAK TO EVERY CUSTODY OFFICER AT ALL FIVE

25   PRISONS YOU VISITED, DID YOU?

1  **A**   NO, MA'AM.  ONCE AGAIN, THIS IS A TERM OF COMMON USAGE.

2  EVERY OFFICER I TALKED TO.  IT WOULD BE IMPOSSIBLE TO TALK TO

3  EVERY OFFICER.

4  **Q**   BUT YOU DID NOT ASK EVERY CUSTODY OFFICER YOU ENCOUNTERED

5  IN THE PRISONS ABOUT THEIR KNOWLEDGE OF HEALTHCARE REQUESTS,

6  DID YOU?

7  **A**   NO, MA'AM, JUST THE ONES THAT WERE INSIDE OF FACILITIES.

8  **Q**   AND YOU DON'T KNOW HOW MANY CO'S, CUSTODY OFFICERS, YOU

9  SPOKE TO AT EACH PRISON ABOUT HEALTHCARE REQUESTS, CORRECT?

10 **A**   I DON'T KNOW WHAT, MS. HARDY?

11 **Q**   YOU DO NOT KNOW HOW MANY CUSTODY OFFICERS YOU SPOKE TO AT

12 EACH PRISON ABOUT HEALTHCARE REQUESTS, CORRECT?

13 **A**   THAT'S CORRECT.

14 **Q**   AND YOU DO NOT RECALL WHETHER YOU ASKED EACH OF THEM THE

15 SAME QUESTION ABOUT HEALTHCARE REQUESTS, CORRECT?

16 **A**   THAT'S CORRECT.  CORRECT.

17 **Q**   AGAIN, YOU WROTE ON PAGE 20 OF YOUR THIRD REPORT:

18        "ALL PROVIDERS FELT THEIR INTERACTIONS WITH

19         INMATES WERE AS GOOD OR BETTER THAN IN THE

20         COMMUNITY."

21            THAT'S ON PAGE 20 OF YOUR THIRD REPORT, AND, AGAIN,

22 YOU WERE USING THAT AS A TERM OF ART; YOU DID NOT TALK TO EVERY

23 PROVIDER AT ANY OF THE PRISONS YOU VISITED, CORRECT?

24 **A**   THAT'S CORRECT.

25 **Q**   ON PAGE 6 OF YOUR REPORT YOU WROTE:

1          "ON THIS VISIT MOST ALL PHYSICIANS I SPOKE TO

2      INDICATED THEY WOULD LIKE TO SPEND ABOUT AN HOUR WITH

3      EACH INMATE AT EACH VISIT BECAUSE OF THE COMPLEXITY

4      OF MEDICAL CONDITIONS."

5   A   THAT'S CORRECT.

6   Q   AND YOU DO NOT REMEMBER WHICH PHYSICIANS TOLD YOU, AT ANY

7   OF THE PRISONS THAT YOU WENT TO TOLD YOU THIS, CORRECT?

8   A   AS WE SIT HERE NOW, I DON'T RECALL ANY SPECIFIC INDIVIDUAL

9   SAYING THAT.

10  Q   OKAY.

11  A   BUT MOST INDICATED THAT, YES.

12  Q   YOU WROTE IN YOUR REPORT THAT A STAFFING RATIO FOR PRIMARY

13  CARE PROVIDER TO PRISONER OF ONE TO 500 EXCEEDS TYPICAL

14  STAFFING PATTERNS THROUGHOUT THE COUNTRY, CORRECT?

15  A   THAT'S CORRECT.

16  Q   AND YOU COMPARED CALIFORNIA TO FLORIDA PRISONS WHERE YOU

17  SAID, QUOTE:

18          "ONE PHYSICIAN LEVEL PROVIDER WAS GENERALLY

19      AVAILABLE FOR EVERY 12 TO 1500 PRISONERS, EXCEPT IN

20      SPECIALIZED FACILITIES," CORRECT?

21  A   YES, MA'AM.

22  Q   AND YOU BELIEVE THAT THAT LEVEL OF STAFFING IS SUFFICIENT

23  TO PROVIDE AN ADEQUATE LEVEL OF MEDICAL CARE IN FLORIDA,

24  CORRECT?

25  A   I THINK THAT MISCHARACTERIZES WHAT I SAID.  AS I MENTIONED

1  EARLIER, A STAFFING PATTERN IS BEST WORKED OUT WITH WORK STUDY

2  AND OUTCOMES RATHER THAN ARBITRARY NUMBERS.

3          IF YOU TAKE THE TOTAL NUMBER OF INMATES AND DIVIDE

4  IT BY THE TOTAL NUMBER OF PROVIDERS, THAT MAY WORK OUT TO THAT

5  NUMBER.  HOWEVER, THERE ARE CERTAINLY INMATES AT INSTITUTIONS

6  THAT REQUIRE FAR MORE THAN ONE PROVIDER FOR 1,250, AND THERE

7  ARE OTHER INSTITUTIONS THAT REQUIRE LESS THAN THAT.

8  **Q**   AND, DOCTOR, HOW WOULD YOU DO ONE OF THOSE WORK STUDY AND

9  OUTCOME TESTS THAT YOU JUST DESCRIBED?

10 **A**   IN THE FLORIDA DEPARTMENT OF CORRECTIONS EVERY TIME YOU SEE

11 AN INMATE, A PROVIDER SEES AN INMATE, YOU NOTE THE TIME THAT

12 YOU STARTED SEEING THEM AND THE TIME YOU STOPPED SEEING THEM.

13 THAT GIVES YOU SOME INDICATION OF THE DURATION OF EACH

14 ENCOUNTER.  THEN YOU CAN ADD TO THAT THE OUTCOME.  FOR

15 INSTANCE, IF YOU HAVE A HYPERTENSIVE PATIENT, YOU KNOW WHAT

16 PERCENTAGE HAVE CONTROLLED HYPERTENSION, AND SO YOU KNOW HOW

17 EFFECTIVE OR INEFFECTIVE YOUR STAFF RESOURCES ARE, AND YOU CAN

18 MODULATE THE STAFF RESOURCES PREDICATED ON THAT.

19 **Q**   DOCTOR, YOU ARE FAMILIAR WITH THE CORRECTIONAL MEDICAL

20 AUTHORITY IN FLORIDA, CORRECT?

21 **A**   YES, MA'AM.

22 **Q**   AND THE CORRECTIONAL MEDICAL AUTHORITY WAS CREATED IN THE

23 MID 1980'S TO GIVE INDEPENDENT ADVICE TO THE GOVERNOR, THE

24 LEGISLATURE, AND THE DEPARTMENT OF CORRECTIONS ON THE CONDUCT

25 OF HEALTHCARE AND MANAGEMENT OF COSTS CONSISTENT WITH QUALITY

1  CARE, CORRECT?

2  **A**   THAT'S CORRECT.

3  **Q**   AND BY STATUTE THE CORRECTIONAL MEDICAL AUTHORITY IS

4  REQUIRED TO REPORT AT LEAST ANNUALLY TO THE GOVERNOR AND THE

5  LEGISLATURE ON THE STATUS OF THE FLORIDA DEPARTMENT OF

6  CORRECTIONS HEALTHCARE DELIVERY SYSTEM, CORRECT?

7  **A**   THAT'S CORRECT.

8  **Q**   AND THOSE REPORTS WERE REQUIRED TO INCLUDE RECOMMENDATIONS

9  REGARDING PERFORMANCE AND FINANCIAL AUDITS OF THE DEPARTMENT OF

10  CORRECTIONS OFFICE OF HEALTHCARE SERVICES, RIGHT?

11  **A**   YES.

12  **Q**   AND YOU WERE THE ASSISTANT SECRETARY FOR HEALTH SERVICES

13  AND DIRECTOR OF HEALTH SERVICES FOR THE DEPARTMENT OF

14  CORRECTIONS FROM 1998 TO 2003, CORRECT?

15  **A**   THAT'S CORRECT.

16  **Q**   AND DID YOU REVIEW THE CORRECTIONAL MEDICAL AUTHORITY

17  ANNUAL REPORTS WHEN YOU WERE THE DIRECTOR OF HEALTH SERVICES?

18  **A**   SAY THAT AGAIN, MS. HARDY.

19  **Q**   DID YOU REVIEW THE CORRECTIONAL MEDICAL AUTHORITY ANNUAL

20  REPORTS WHEN YOU WERE THE DIRECTOR OF HEALTH SERVICES?

21  **A**   FREQUENTLY I DID.

22  **Q**   WERE YOU AWARE THAT THE CORRECTIONAL MEDICAL AUTHORITY'S

23  REPORT ON HEALTHCARE DELIVERY OF THE FLORIDA DEPARTMENT OF

24  CORRECTIONS FOR FISCAL YEAR 2002/2003 FOUND THAT THE OFFICE OF

25  HEALTH SERVICES HAD NOT PUBLISHED STAFFING STANDARDS SINCE

1 │ 1992?

2 │         **MS. JOHNSON:**  THAT ASSUMES FACTS THAT AREN'T IN

3 │ EVIDENCE, YOUR HONOR.

4 │         **MS. HARDY:**  IF I COULD ASK THE COURT REPORTER TO

5 │ HAND DR. THOMAS A COPY OF "INSIDE COVER," WHICH WILL BE THE

6 │ REPORT, THE NEXT IN ORDER EXHIBIT.

7 │         **JUDGE KARLTON:**  DO YOU WANT THEM MARKED?  ARE THEY

8 │ PRESENTLY MARKED AS EXHIBITS?

9 │         **MS. HARDY:**  THEY ARE NOT, YOUR HONOR.

10 │        **JUDGE KARLTON:**  DO YOU INTEND TO --

11 │        **MS. HARDY:**  I WOULD LIKE TO MAKE THEM PLAINTIFFS'

12 │ NEXT IN ORDER, AND I HAVE A COPY FOR THE BENCH.

13 │        **JUDGE HENDERSON:**  WHAT WOULD THAT NUMBER BE?

14 │        **JUDGE KARLTON:**  DO WE KNOW WHAT NUMBER THAT WILL BE?

15 │        **JUDGE HENDERSON:**  ROWENA, ARE YOU KEEP THE NUMBERS?

16 │        **THE CLERK:**  WE DON'T HAVE THE LIST, NO.

17 │        **MS. HARDY:**  THIS IS PLAINTIFFS' 825.

18 │        **JUDGE HENDERSON:**  EIGHT TWENTY-FIVE.  OKAY.  THIS

19 │ WILL BE MARKED AS PLAINTIFFS' NUMBER 825 FOR IDENTIFICATION.

20 │                    (PLAINTIFFS' EXHIBIT 825 MARKED FOR

21 │                    IDENTIFICATION.)

22 │ **BY MS. HARDY**

23 │ **Q**   DR. THOMAS, DO YOU RECOGNIZE THIS AS A CORRECTIONAL MEDICAL

24 │ AUTHORITY REPORT?

25 │ **A**   I DON'T RECALL AS WE SIT HERE, NO, MA'AM.

1  Q   IS IT A CORRECTIONAL MEDICAL AUTHORITY REPORT, DR. THOMAS?

2  A   I DON'T REMEMBER SEEING ONE THAT SAID "INSIDE COVER" ON THE

3  NEXT PAGE.  IT DOES TALK ABOUT THE CORRECTIONAL MEDICAL

4  AUTHORITY, BUT I JUST DON'T RECALL THIS ONE AT ALL, AND IT

5  COULD BE BECAUSE IT TALKS ABOUT 2002, 2003.  SO IT PROBABLY

6  WOULDN'T BE PREPARED UNTIL AFTER I LEFT THE DEPARTMENT.

7  Q   BUT IT WOULD HAVE COVERED THE TIME DURING WHICH YOU WERE AT

8  THE DEPARTMENT, CORRECT, BECAUSE YOU WERE THERE IN 2003,

9  CORRECT?

10  A   POSSIBLY, YES.

11  Q   OKAY.  AND I DIRECT YOUR ATTENTION TO PAGE 5.

12          MIDWAY DOWN THE PAGE IT SAYS:

13          "AUTHORITY SURVEYORS OVER THE PAST TWO FISCAL

14       YEARS MORE FREQUENTLY IDENTIFIED AREAS WHERE

15       INSUFFICIENT STAFFING APPEARED TO AFFECT THE

16       PROVISION OF ADEQUATE CARE AND/OR THE DOCUMENTATION

17       OF THAT CARE IN SUFFICIENT DETAIL."

18          DOCTOR, IS THIS -- DO YOU RECALL RECEIVING SURVEYS

19  THAT TOLD YOU THAT THERE WERE FREQUENTLY IDENTIFIED AREAS WHERE

20  INSUFFICIENT STAFFING APPEARED TO AFFECT THE PROVISION OF

21  ADEQUATE CARE?

22  A   I DON'T SEE WHERE YOU'RE READING, BUT I DO RECALL RECEIVING

23  COMMENTS, DOCUMENTS FROM THE CORRECTIONAL MEDICAL AUTHORITY

24  SAYING WE WERE UNDERSTAFFED.

25  Q   OKAY.  DOCTOR, YOU ARE AWARE THAT THE FLORIDA'S DEPARTMENT

1  OF CORRECTIONS PRISON POPULATION IS STATUTORILY CAPPED,

2  CORRECT?

3  **A**   THAT'S CORRECT.

4  **Q**   AND THAT POPULATION CAP WAS THE PRODUCT OF A NEGOTIATED

5  SETTLEMENT IN THE SUIT *COSTELLO VERSUS WAINWRIGHT*, CORRECT?

6  **A**   THAT'S CORRECT.

7  **Q**   AND BECAUSE OF *COSTELLO*, THE FLORIDA STATE PRISON

8  POPULATION WAS REDUCED IN ORDER TO RECEIVE A CONSTITUTIONAL

9  LEVEL OF MEDICAL CARE, CORRECT?

10  **A**   THAT'S CORRECT.

11  **Q**   AND PURSUANT TO STATUTE, FLORIDA HAS A CONTROL RELEASE

12  AUTHORITY, CORRECT?

13  **A**   THAT'S CORRECT.

14  **Q**   AND THE AUTHORITY IS CHARGED WITH IMPLEMENTING A SYSTEM FOR

15  DETERMINING THE NUMBER AND TYPE OF INMATES WHO MUST BE RELEASED

16  INTO THE COMMUNITY UNDER CONTROL RELEASE TO MAINTAIN THE PRISON

17  SYSTEM BETWEEN 99 PERCENT AND A HUNDRED PERCENT OF TOTAL

18  CAPACITY, CORRECT?

19  **A**   MY RECOLLECTION IS DIFFERENT THAN THAT, MS. HARDY.  THAT

20  SUIT WAS THREE SEPARATE SUITS, AND ONE WAS MEDICAL CARE.  THE

21  OTHER WAS OVERCROWDING IN GENERAL.  I FORGET THE THIRD.  I

22  THINK IT WAS FOOD.

23          MY RECOLLECTION IS THAT IT'S 150 PERCENT OF DESIGN

24  CAPACITY.  IF YOU HAVE INFORMATION DIFFERENT THAN THAT, THAT'S

25  MORE CURRENT, I MIGHT CERTAINLY BE WILLING TO YIELD TO THAT.

1  BUT MY RECOLLECTION IS IT'S 150 PERCENT OF DESIGN CAPACITY.

2  Q   I BELIEVE THAT TOTAL CAPACITY IS DEFINED AT 150 PERCENT OF

3  DESIGN CAPACITY, EXCEPT THAT CERTAIN BEDS, INCLUDING MEDICAL

4  AND MENTAL HEALTH BEDS, MUST REMAIN AT DESIGN CAPACITY.  IS

5  THAT YOUR UNDERSTANDING?

6  A   I DON'T RECALL NOW AS WE SIT HERE.

7  Q   OKAY.  I'D ASK THAT THE COURT REPORTER HAND TO YOU FLORIDA

8  STATUTE 944.023.

9  A   WE'RE HAVING A LITTLE DIFFICULTY.  IF IT'S ACCEPTABLE TO

10 YOUR HONOR, IF YOU COULD READ THAT TO ME, IT MAY REFRESH MY

11 RECOLLECTION.

12 Q   I'M SORRY.  I WOULD LIKE TO MAKE THAT EXHIBIT NO. 826,

13 PLAINTIFFS' 826.

14         **JUDGE HENDERSON:**  HE ASKED IF YOU COULD READ THAT TO

15 HIM.

16         **THE WITNESS:**  WE DON'T SEEM TO HAVE THAT, MS. HARDY.

17 **BY MS. HARDY**

18 Q   YOU DO NOT HAVE 944.023?

19 A   NO, MA'AM.  THAT'S CORRECT.   MICHELLE IS INDICATING WE

20 ONLY HAVE 945 STATUTES AND 1947.

21 Q   I APOLOGIZE.

22         YOU ARE AN ATTORNEY, CORRECT, DOCTOR?

23 A   YES, MA'AM.

24 Q   AND YOU ARE FAMILIAR WITH THE FLORIDA STATUTES, CORRECT?

25 A   SAY AGAIN, PLEASE.

1   Q    SO YOU DO HAVE SOME FAMILIARITY WITH FLORIDA STATUTES,

2   CORRECT?

3   A    YES, MA'AM.  I HELPED CREATE MANY OF THEM.

4   Q    THE STATUTE NUMBER 944.023, COMPREHENSIVE CORRECTIONAL

5   MASTER PLAN, SUB-ONE:

6            "AS USED IN THIS SECTION, THE TERM,"

7             AND THEN JUMPING DOWN TO SUB-B.

8            "TOTAL CAPACITY OF THE STATE CORRECTIONAL SYSTEM

9         MEANS THE TOTAL DESIGN CAPACITY OF ALL INSTITUTIONS

10        AND FACILITIES IN THE STATE CORRECTIONAL SYSTEM,

11        WHICH MAY INCLUDE THOSE FACILITIES AUTHORIZED AND

12        FUNDED UNDER CHAPTER 957, INCREASED BY ONE-HALF WITH

13        THE FOLLOWING EXCEPTIONS,"

14            AND INCLUDED AMONG THOSE EXCEPTIONS ARE MEDICAL AND

15   MENTAL HEALTH BEDS WHICH MUST REMAIN AT DESIGN CAPACITY.

16            SO THAT'S WHAT THE STATUTE SAYS.  THAT IS THE

17   STATUTE UNDER WHICH YOU OPERATED.

18   A    THANK YOU FOR REFRESHING MY MEMORY.  AND THE WAY THAT WAS

19   INTERPRETED, OF COURSE, WAS THE HOSPITAL AND THE INFIRMARIES

20   CAN'T EXCEED DESIGN CAPACITY, BUT THE FACILITIES THAT THEY'RE

21   ASSOCIATED WITH CAN EXCEED DESIGN CAPACITIES BY 50 PERCENT.

22   Q    CORRECT.  SO DURING YOUR TENURE AS A PHYSICIAN WITH THE

23   FLORIDA DEPARTMENT OF CORRECTIONS, THE SYSTEMS POPULATION WAS

24   NOT PERMITTED TO EXCEED 150 PERCENT OF DESIGN CAPACITY,

25   CORRECT?

1  **A**   THAT'S CORRECT.

2  **Q**   YOU TESTIFIED THAT A WORK STUDY AND OUTCOMES STUDY WOULD

3  NOTE THE TIME AT EACH ENCOUNTER, THE TIME OF EACH ENCOUNTER

4  WITH A PHYSICIAN, AND ANALYZE THE OUTCOME.  DID YOU DO SUCH A

5  STUDY WHEN YOU TOURED THE CALIFORNIA STATE PRISON SYSTEM?

6  **A**   NO, MA'AM.  I SAW NO SUCH DOCUMENTATION.  WERE I TO BE

7  CONSULTED BY THE SYSTEM, I FEEL THERE COULD BE SEVERAL

8  IMPROVEMENTS ADMINISTRATIVELY, YES, MA'AM.

9  **Q**   YOU TESTIFIED THAT YOU EVALUATED THE ADEQUACY OF THE

10 WORKLOADS OF THE HEALTHCARE STAFF, INCLUDING THE PHYSICIANS AND

11 NURSES AT ALL EIGHT OF THE PRISONS YOU VISITED, CORRECT?

12 **A**   THAT'S -- YES, MA'AM.

13 **Q**   AND YOU DETERMINED THAT AT EACH PRISON, AND PARTICULARLY

14 THE LAST FIVE YOU TOURED, SEEMED TO HAVE AN ADEQUATE NUMBER OF

15 STAFF TO PERFORM THE FUNCTIONS REQUIRED OF THEM, CORRECT?

16 **A**   YES, MA'AM, COMPARED TO OTHER CORRECTIONAL INSTITUTIONS, MY

17 FEELING WAS THEY WERE RICHLY STAFFED, YES.

18 **Q**   BUT YOU HAVE NO WRITTEN DATA FROM THESE TOURS, CORRECT?

19 **A**   BUT I HAVE NO WHAT DATA?

20 **Q**   WRITTEN DATA THAT YOU PERSONALLY COMPILED FROM THESE TOURS,

21 CORRECT?

22 **A**   NO WRITTEN DATA, THAT IS CORRECT.

23 **Q**   AND YOU HAVE NO STATISTICS FROM ANY OF THE PRISONS THAT YOU

24 VISITED SHOWING HOW MUCH TIME EACH OF THE REQUIRED MEDICAL

25 FUNCTIONS TAKE, CORRECT?

 1   **A**   THAT'S CORRECT.

 2   **Q**   AND YOU HAVE NO STATISTICS FROM ANY OF THE PRISONS SHOWING

 3   HOW MANY STAFF ARE ALLOCATED TO EACH OF THESE FUNCTIONS,

 4   CORRECT?

 5   **A**   THAT'S NOT NECESSARILY CORRECT.  AT EACH INSTITUTION WE HAD

 6   SOME INDICATION OF THE NUMBER OF INMATES AND THE NUMBER OF

 7   PROVIDERS AND THE NUMBER OF HEALTHCARE STAFF.

 8   **Q**   DO YOU RECALL HOW MANY PROVIDERS THERE WERE FOR THE NUMBER

 9   OF PRISONS AT PLEASANT VALLEY STATE PRISON?

10   **A**   NOT OFF THE TOP OF MY HEAD, I DON'T.

11   **Q**   DO YOU RECALL THE RATIO FOR ANY OF THE PRISONS YOU VISITED?

12   **A**   I DO RECALL AT ONE I WAS VERY IMPRESSED WITH THE FACT THAT

13   THERE WERE NO NURSING VACANCIES, AND THE NURSE -- THE CHIEF

14   NURSE HAD BEEN CREATIVE ENOUGH TO NOT ONLY HAVE 40 OF HER

15   ALLOCATED NURSES, BUT TO HAVE 41 NURSES BECAUSE SHE SWUNG, WITH

16   THE WARDEN'S PERMISSION, ANOTHER POSITION.

17   **Q**   WHAT PRISON WAS THAT?

18   **A**   I DON'T RECALL.

19          **MS. HARDY:**  I HAVE NOTHING FURTHER.

20          **JUDGE HENDERSON:**  OKAY.  DOES CCPOA HAVE ANY

21   QUESTIONS FOR THIS WITNESS?

22          **MR. HENDERSON:**  NOT AT THIS TIME, YOUR HONOR.

23          **JUDGE HENDERSON:**  OKAY, COUNSEL.

24          **MS. JOHNSON:**  WE HAVE NO FURTHER QUESTIONS, YOUR

25   HONOR.

1          **JUDGE HENDERSON:**  OKAY.  THANK YOU VERY MUCH FOR

2    TESTIFYING, DOCTOR.  YOU'RE EXCUSED AT THIS TIME.

3          **THE WITNESS:**  THANK YOU, YOUR HONOR.  I WANT TO

4    INDICATE THAT I APPRECIATE THE COURT PERMITTING ME TO DO THIS

5    BECAUSE OF PERSONAL REASONS.

6          **JUDGE HENDERSON:**  ALWAYS WILLING TO ACCOMMODATE.  I

7    HOPE IT WORKED OUT FOR YOU.  THANK YOU, SIR.  I DON'T KNOW HOW

8    TO TURN YOU OFF.  THERE WE GO.

9          **THE WITNESS:**  MY WIFE DOES THAT ALL THE TIME, YOUR

10   HONOR.

11         **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

12   WITNESS, COUNSEL.  OKAY.  WE ARE GOING TO TAKE A BREAK, A COURT

13   REPORTER BREAK.  FIFTEEN MINUTES.

14         LET'S TALK BEFORE WE DO.  WHAT'S THE REST OF THE

15   DAY?  WHAT DO WE HAVE AT THIS POINT?

16         **MS. JOHNSON:**  THE DEPOSITIONS WE WERE GOING TO READ

17   INTO THE --

18         **JUDGE HENDERSON:**  OKAY.

19         **MS. JOHNSON:**  WE HAVE THE DEPOSITIONS WE ARE GOING

20   TO READ INTO THE TRANSCRIPT.

21         **JUDGE KARLTON:**  ASSUMING THAT HAPPENS, WHAT HAPPENS

22   AFTER THAT?  THAT'S IT FOR THE DAY?

23         **MS. JOHNSON:**  THAT'S IT FOR THE DAY.

24         **JUDGE HENDERSON:**  TO GIVE YOU A LITTLE WARNING, WE

25   ARE GOING TO ASK YOU TO MAKE AN OFFER OF PROOF.  IT'S NOT CLEAR

1    TO US THE RELEVANCE OF THE TWO NAMED PLAINTIFFS.

2              **MR. MELLO:**  OKAY.  YOU ARE NOT DISCUSSING

3    MR. MUMOLA'S TESTIMONY; YOU ARE DISCUSSING THE NAMED

4    PLAINTIFFS' TESTIMONY?  OKAY.

5              **JUDGE REINHARDT:**  HOW LONG WILL IT TAKE TO READ THE

6    DEPOSITIONS?

7              **JUDGE HENDERSON:**  THEY'RE ESTIMATING 15 MINUTES.

8              **MS. JOHNSON:**  ACTUALLY, MUMOLA'S TESTIMONY WE ARE

9    ESTIMATING MIGHT TAKE 45, YOUR HONOR.

10                   (RECESS TAKEN.)

11             **MS. JOHNSON:**  YOUR HONORS, YOU ASKED US TO ADDRESS

12   AN OFFER OF PROOF WITH RESPECT TO --

13             **JUDGE HENDERSON:**  ALL RIGHT. WITH RESPECT TO THE

14   READING OF DEPOSITIONS OF THE TWO -- MR. COLEMAN AND MUMOLA.

15             **MS. JOHNSON:**  MR. STODDARD, I BELIEVE.  MUMOLA IS --

16             **JUDGE HENDERSON:**  OH, MR. STODDARD, YES.

17             **MS. JOHNSON:**  DO YOU NEED ME TO STATE MY NAME?

18             ANNE JOHNSON FOR THE RECORD.

19             SO WE'VE OFFERED PORTIONS OF THE DEPOSITION

20   TRANSCRIPTS OF TWO -- WELL, A NAMED PLAINTIFF IN EACH OF THE

21   CASES HERE. WE BELIEVE THOSE -- THEIR TESTIMONY IS RELEVANT AND

22   CERTAINLY IS AS RELEVANT AS THE TESTIMONY OF AN INDIVIDUAL

23   CCPOA OFFICER IN ORDER TO DESCRIBE THEIR INDIVIDUAL PERSONALLY

24   OBSERVED EXPERIENCE WITH RESPECT TO THE DELIVERY OF MEDICAL

25   CARE IN THE CASE OF MR. STODDARD, AND MENTAL HEALTHCARE IN THE

1  CASE OF MR. COLEMAN.

2          **JUDGE KARLTON:**  YOU'RE SUGGESTING THAT IF YOU WERE

3  TO SELECT THE PEOPLE WHO WERE NAMED AS PLAINTIFFS AND PROVIDE

4  THEM WITH A SPECIALLY ADEQUATE CARE THAT WOULD SOMEHOW OR

5  ANOTHER BEAR UPON THE TOTALITY OF THE CIRCUMSTANCES AS WE'VE

6  JUST BEEN LISTENING FOR THE LAST COUPLE OF WEEKS.  IS THAT WHAT

7  YOU'RE SAYING?

8          **MS. JOHNSON:**  NOT AT ALL, YOUR HONOR.  I DON'T THINK

9  WE'VE IN ANY WAY SUGGESTED THAT WE SELECT --

10         **JUDGE KARLTON:**  OH, I KNOW YOU HAVEN'T SUGGESTED

11 THAT.

12         **MS. JOHNSON:**  -- SPECIALIZED CARE.  WE'RE SUGGESTING

13 THAT THE INDIVIDUALIZED EXPERIENCES OF MR. COLEMAN AND

14 MR. STODDARD, WHO ARE THE NAMED PLAINTIFFS AND ARE PRESUMABLY

15 REPRESENTATIVE OF THE NAMED PLAINTIFFS IN THIS CASE --

16         **JUDGE KARLTON:**  WERE AT THE TIME.  WERE AT THE TIME

17 THE JUDGMENT WAS ENTERED.

18         **MS. JOHNSON:**  -- ARE CERTAINLY, BY THE BROAD

19 STANDARD OF RELEVANCE, RELEVANT TO THIS PROCEEDING.

20         **JUDGE KARLTON:**  I'M SATISFIED WITH THE ANSWERS. YOU

21 GUYS DO WHAT YOU WANT.

22         **JUDGE REINHARDT:**  IS THE PURPOSE TO TESTIFY TO THEIR

23 OWN EXPERIENCE?  WHAT I THOUGHT YOU WERE SAYING IS WHAT HE

24 OBSERVED WITH RESPECT TO OTHERS OR WITH RESPECT TO HIMSELF.

25         **MS. JOHNSON:**  NO, I BELIEVE IT'S THEIR PERSONAL

1   OBSERVATIONS, MOST CERTAINLY WITH MOST DIRECTLY WITH

2   THEMSELVES.

3             I HAVEN'T -- YES, IT'S ABOUT THEIR OWN PERSONAL

4   OBSERVATIONS ABOUT THE STATUS OF MEDICAL CARE AND MENTAL

5   HEALTHCARE THEY ARE RECEIVING.

6             **MR. SPECTER:**  MAY I BE HEARD ON THIS, YOUR HONOR?

7   THIS IS DONALD SPECTER.  I WOULD SUGGEST A COMPROMISE. WE DON'T

8   REALLY MIND. WE DON'T THINK IF THEY ARE RELEVANT, THEY ARE

9   MARGINALLY RELEVANT.  AND IF THEY ARE RELEVANT, THE WEIGHT THAT

10  YOU SHOULD GIVE IT IS VERY LITTLE BECAUSE OF THE -- I THINK

11  WHAT'S IMPLIED IN YOUR REMARKS JUST NOW.

12            SO MY SUGGESTION IS THAT WE ALLOW THE STATE TO PUT

13  THEM INTO THE RECORD. I DON'T NECESSARILY THINK WE NEED TO

14  SPEND THE COURT'S TIME HAVING IT READ OUT LOUD, BUT WE DON'T --

15            **JUDGE KARLTON:**  WELL, IF YOU DON'T CARE, I MEAN --

16            **MR. SPECTER:**  I'D RATHER HAVE THAT THAN HAVE A LEGAL

17  ISSUE HANGING OVER --

18            **MS. JOHNSON:**  WE WILL ACCEPT THAT COMPROMISE, YOUR

19  HONOR.

20            **JUDGE HENDERSON:**  FINE BY ME. THAT'S AT LEAST TWO TO

21  ONE, SO WHATEVER YOU DO.

22            **JUDGE KARLTON:**  THAT'S FINE, TWO TO ONE.

23            **MS. JOHNSON:**  WE WILL NOW PROCEED WITH THE READING

24  OF THE DEPOSITION TESTIMONY OF CHRISTOPHER MUMOLA INTO THE

25  RECORD.

1          **MR. SPECTER:** BEFORE WE GET TO THAT, COULD WE

2  ADDRESS A COUPLE OF HOUSEKEEPING ISSUES? OR DO YOU WANT TO

3  WAIT? IT'S UP TO YOU.

4          THIS IS FINE. THE FIRST, WE'RE TRYING TO SCHEDULE

5  THE REST OF THE TRIAL. AND ONE OF THE QUESTIONS I HAD WAS

6  TALKING ABOUT RELEVANCE OF WITNESS TESTIMONY. COULD WE ADDRESS

7  THE RELEVANCE OF THE LEGISTATOR INTERVENOR WITNESSES? I

8  THOUGHT ABOUT THIS, AND I'VE TRIED TO FIGURE OUT HOW THEIR

9  TESTIMONY COULD BE RELEVANT.

10          AND I CAN'T REALLY -- I CAN'T REALLY SEE IT. AND ONE

11  OF THE PEOPLE, MR. SPITZER, WHO APPEARED HERE IN ONE OF THE

12  PROCEEDINGS, IS NO LONGER A LEGISTATOR. HE WAS TERMED OUT. SO

13  AS OF MONDAY HE'S NOT A LEGISTATOR. HE STILL COULD BE A

14  WITNESS, OF COURSE, BUT HE'S NOT A PROPER PARTY.

15          BUT EVEN IF HE WAS A WITNESS I DON'T KNOW WHAT

16  EITHER OF THEM COULD SAY WHICH COULD BEAR ON THE MATTERS THAT

17  ARE UNDER CONSIDERATION FROM YOUR COURT.

18          SO A RULING ON THAT WOULD HELP US FIGURE IT OUT.

19          **JUDGE REINHARDT:** ARE THE LEGISLATOR'S LAWYERS HERE

20  TODAY?

21          **MR. SPECTER:** PARDON ME?

22          **JUDGE REINHARDT:** ARE THE LEGISLATOR'S LAWYERS HERE

23  TODAY?

24          **MS. WANG:** YES.

25          **JUDGE REINHARDT:** YES.

1        **MS. WANG:**  YOUR HONOR, IT'S TRUE THAT ASSEMBLYMAN

2   SPITZER --

3        **JUDGE KARLTON:**  NAME, FIRST.

4        **MS. WANG:**  TERESA WANG, ATTORNEY FOR THE LEGISTATOR

5   INTERVENORS.

6        ASSEMBLYMAN SPITZER WAS TERMED OUT THIS PAST

7   SESSION, BUT BECAUSE OF HIS ACTIVITY AS -- SORRY -- HEAD OF THE

8   SELECT COMMITTEE ON PRISON CONSTRUCTION AND OPERATIONS AND

9   VARIOUS ACTIVITIES DURING HIS TIME AS LEGISTATOR, WE BELIEVE

10  THAT HIS EXPERIENCE DURING THE, I BELIEVE, SIX YEARS AS HE WAS

11  SERVING AS ASSEMBLY MEMBER ARE PERTINENT TO SOME OF THE

12  ALTERNATIVES THAT HAVE BEEN RAISED IN THIS CASE.  AND THE SAME

13  GOES FOR SENATOR RUNNER.

14       **JUDGE REINHARDT:**  THEY ARE GOING TO TESTIFY THAT

15  THERE ARE ALTERNATIVES?

16       **MS. WANG:**  RIGHT. THEY ARE BOTH TESTIFYING AS TO THE

17  EXISTENCE OF LESSER ALTERNATIVES.  THEY ARE ALSO TESTIFYING AS

18  TO THE PERTINENCE OF AB900, OUT-OF-STATE TRANSFERS, AND OTHER

19  POTENTIAL ALTERNATIVES TO PRISONER RELEASE ORDER.

20       **JUDGE HENDERSON:**  OKAY.

21       **MR. SPECTER:**  OKAY. SO IS THAT OKAY?  AND YOU'RE

22  GOING TO LISTEN TO THE TESTIMONY?

23       **JUDGE HENDERSON:**  THAT MEANS WE'VE HEARD, BUT YOU

24  KNOW, ONE OF THE PROBLEMS I'M HAVING -- I DON'T KNOW ABOUT

25  JUDGE KARLTON -- IS THAT IF THIS WERE A TRIAL IN MY COURT WE

1  WOULD HAVE DECIDED THIS UNDER MOTIONS IN LIMINE.  AND WE'RE

2  SORT OF STAGGERING THROUGH THIS CASE.

3          THIS IS JUST A VERY IMPORTANT EXAMPLE OF IT.

4          **JUDGE KARLTON:**  YES.

5      **MR. SPECTER:**  YES, YOUR HONOR.

6          **JUDGE KARLTON:**  I MEAN, I AGREE WITH YOU THAT -- I

7  MEAN, IN MY COURT, OF COURSE -- THOSE OF YOU WHO HAVE BEEN

8  THERE -- WE WOULD HAVE HAD PRETRIAL THREE MONTHS BEFORE TRIAL.

9  AND WE WOULD HAVE ORDERED ALL OF THESE THINGS TO BE RESOLVED

10 BEFORE WE EVER GOT THERE.  AND THE TRIAL WOULD BE ABOUT HALF OF

11 WHAT WE'VE SEEN SO FAR.

12         BUT THAT DIDN'T HAPPEN, AND HERE WE ARE. SO --

13     **MR. SPECTER:**  OKAY.

14     **JUDGE REINHARDT:**  SO WHY IS IT NOT RELEVANT?  WE DO

15 HAVE TO EXPLORE ALTERNATIVES.

16     **MR. SPECTER:**  YEAH, RIGHT. I THINK THAT'S VERY TRUE.

17 I DON'T KNOW. THEY ARE NOT EXPERTS. THEY ARE POLICYMAKERS.

18     **JUDGE KARLTON:**  NO, BUT THEY MAY BE EXPERTS ON WHAT

19 CAN BE DONE.

20     **MR. SPECTER:**  OR WHAT THEY HAVEN'T DONE, MAYBE.

21     **JUDGE KARLTON:**  MAYBE.

22     **JUDGE REINHARDT:**  OR EVEN MORE IMPORTANT THAN WHAT

23 THE EXPERTS SAY. THIS MAY REALLY TELL US WHAT THERE IS TO BE

24 DONE. MAYBE THEY CAN TELL US THEY ARE GOING TO GIVE $9 BILLION,

25 $20 BILLION TO SOLVE THIS PROBLEM.

1          **MR. SPECTER:**  WELL, ONE LEGISLATOR CAN'T DO THAT.

2     THAT'S WHY EVEN IF THEY SAID THEY WANTED TO, IT WOULDN'T MATTER

3     BECAUSE THEY HAVE A LOT OF OTHER PEOPLE WHO HAVE TO VOTE.

4          **JUDGE KARLTON:**  WELL, I AGREE WITH THAT.  BUT THEY

5     COULD CONCEIVABLY GIVE US TESTIMONY AS TO WHAT THEY THINK THE

6     LIKELIHOOD OF ANY OF THESE THINGS HAPPENING. I AGREE WITH YOU

7     THAT ONE GUY SAYING:

8               "YEAH.  OH, YEAH, WE WILL JUST WRITE A CHECK."

9          OF COURSE, NOBODY IS GOING TO SAY THAT BECAUSE WE'RE

10    11 -- RIGHT NOW 11 BILLION OR 11 MILLION, WHATEVER THE NUMBERS.

11         **JUDGE HENDERSON:**  BILLION.

12         **JUDGE KARLTON:**  IT'S TOO MUCH FOR ME TO PUT --

13         **JUDGE REINHARDT:**  SENATOR RUNNER CAN PUT A MEASURE

14    ON THE BALLOT, AND THAT CAN SOLVE EVERYTHING.

15         **MR. SPECTER:**  OKAY. SINCE THAT'S CLEAR, I HAVE ONE

16    OTHER ISSUE THAT I THOUGHT I WOULD RAISE BEFORE WE START

17    TOMORROW.  AND THAT IS TO SORT OF CLEAR UP WHAT -- USUALLY, I'M

18    HERE TELLING WHAT YOU WE WANT. AND I WANTED TO TELL YOU WHAT

19    WE'RE NOT SEEKING IN THIS PROCEEDING, BECAUSE A LOT OF THE

20    QUESTIONS YOU'VE BEEN ASKING ARE RELEVANT TO THAT ISSUE.

21         AND SO I WANTED TO MAKE IT A LITTLE CLEARER ABOUT

22    WHAT WE WANT YOU TO DO, IF YOU FIND THE LEGAL REQUIREMENTS HAVE

23    BEEN MET.

24         AND WHAT WE'RE NOT ASKING YOU TO DO IS CRAFT A PLAN

25    FOR -- AND ORDER THE STATE TO DEVELOP -- TO FIGURE OUT WHICH OF

1   THE VARIOUS PRISON REDUCTION MEASURES SHOULD BE ISSUED AND

2   APPLIED TO WHICH TYPE OR SPECIFIC PRISONERS.

3           ALL WE ARE ASKING FOR IS FOR YOU TO ORDER THE STATE

4   TO COME UP WITH A PLAN TO REDUCE THE POPULATION TO A CERTAIN

5   LEVEL.

6           NOW, THAT MUCH IS CERTAIN. THE NEXT QUESTION WHICH

7   YOU'VE BEEN DEALING WITH A LOT, WHICH RELATES TO THE

8   $11 BILLION ISSUE, IS WHETHER YOU HAVE THE AUTHORITY TO ORDER

9   THE STATE TO FUND SUCH A PLAN.

10          I'M NOT SURE THAT YOU HAVE TO EVEN CONSIDER THAT,

11  BECAUSE I THINK IF YOU LOOK AT THE PLRA'S SECTIONS, WHAT THE --

12  THE TWO RELEVANT SECTIONS ARE BROKEN DOWN INTO TWO SUBPARTS.

13          THE FIRST SUBPART DEALS WITH PRIMARY THE COST.

14      **JUDGE KARLTON:**  NO.  I'M SORRY.  I'M GOING TO

15  INTERRUPT.  IT APPEARS TO ME THIS IS FINAL ARGUMENT.

16      **MR. SPECTER:**  IT'S MORE OF A KIND OF AN ANALYSIS OF

17  THE EVIDENCE WE'RE GOING TO SHOW THAN WE'RE GOING TO HAVE --

18      **JUDGE KARLTON:**  THAT'S WHAT OPENING STATEMENTS WERE

19  ABOUT.

20      **MR. SPECTER:**  WELL --

21      **JUDGE KARLTON:**  WHICH WE DIDN'T -- NEVER MIND.

22      **JUDGE HENDERSON:**  IS THERE A SUGGESTION WE'RE

23  SPENDING TIME ASKING THINGS THAT YOU'RE NOT INTERESTED IN?

24      **MR. SPECTER:**  WELL, I AM INTERESTED IN EVERYTHING

25  YOU ASK, OF COURSE.

1      **JUDGE HENDERSON:**  NO, YOU DON'T HAVE TO BE.

2      **MR. SPECTER:**  BUT I GUESS WHAT I'M SAYING IS I GUESS

3  I WANT TO MAKE CLEAR THAT YOU DON'T HAVE TO ISSUE -- YOU DON'T

4  HAVE TO FIGURE OUT WHICH OF THESE ALTERNATIVES SHOULD BE DONE

5  IF YOU ORDER A POPULATION CAP. THAT WOULD BE SOMETHING WE WOULD

6  ASK YOU TO ASK THE STATE TO FIGURE OUT.

7      AND THEY'RE POLICY CHOICES THAT THE STATE HAS TO

8  MAKE, LIKE MR. DYER WAS TALKING ABOUT.  AND THE SAME THING

9  WITH THE MONEY. WHETHER YOU ORDER THEM OR NOT TO MAKE IT DONE

10 SO THAT IT'S SAFE, YOU DON'T HAVE TO GO ANYWHERE NEAR THE

11 MONEY.

12     **JUDGE HENDERSON:**  JUST A MINUTE, THOUGH. BUT IT

13 SEEMS TO ME I THINK OUR THINKING IS GOING WAY BEYOND THAT.

14     AS AN EXAMPLE, WE WERE INTRIGGERED WITH MR. POWERS'

15 TESTIMONY AND THINKING:

16     "BOY, THAT'S INTERESTING.  WHAT MIGHT WE DO?"

17     **MR. SPECTER:**  RIGHT.

18     **JUDGE HENDERSON:**  SO THAT'S WHY WE'RE PARTICIPATING.

19     **MR. SPECTER:**  WE WANT YOU -- WE WILL BE ASKING YOU

20 WHEN WE GET TO THE --

21     **JUDGE KARLTON:**  WE'RE NEVER GOING TO GET THERE, MR.

22 SPECTER.

23     **MR. SPECTER:**  I'M SOMEWHAT OF AN OPTIMIST.

24     **JUDGE REINHARDT:**  YOU'RE NOT ASKING US TO DEVELOP A

25 PLAN.  YOU'RE ASKING US TO ASK THE STATE TO --

1        **MR. SPECTER:**  BUT WE ARE ASKING YOU TO MAKE FINDINGS

2  THAT THERE ARE SAFE METHODS BY WHICH A PLAN COULD BE DEVELOPED

3  AND ORDER THE STATE TO DEVELOP A PLAN THAT IS SAFE. THAT'S ALL.

4        **JUDGE HENDERSON:**  OKAY.

5        **JUDGE REINHARDT:**  I THINK SOMEONE IS SHAKING HIS

6  HEAD.

7        **MR. MELLO:**  NO, I THINK THIS IS CLOSING ARGUMENTS. I

8  BELIEVE THESE ARE ALL ISSUES FOR BRIEFING.  I BELIEVE THAT THE

9  PLRA SAID THAT WE HAVE TO ADDRESS PRIMARY CAUSE, OTHER REMEDIES

10 AND WHETHER THERE'S AN ADVERSE IMPACT ON PUBLIC SAFETY.

11       **JUDGE KARLTON:**  WE WILL HEAR THAT FINAL ARGUMENT.

12       **MR. MELLO:**  AND WE WOULD LIKE TO CALL MR. MUMOLA TO

13 THE STAND BY WAY OF SOMEBODY ELSE.

14       **JUDGE KARLTON:**  TERRIFIC. PLEASE DO.

15       **JUDGE HENDERSON:**  LET'S MOVE THERE RIGHT NOW.

16       **MS. JOHNSON:**  THANK YOU, YOUR HONORS. SAMATHA TAMA

17 WITH DEFENSE COUNSEL IS GOING TO PLAY THE ROLE OF MR. MUMOLA.

18       WE'RE GOING TO BE READING FROM THE DEPOSITION

19 TRANSCRIPT OF CHRISTOPHER MUMOLA, WHICH WAS TAKEN ON -- I MAY

20 NOT HAVE THE DATE HERE -- AUGUST 25, 2008 IN THIS CASE.

21       AS AN EXPLANATORY NOTE, THE REFERENCES TO THE

22 DEPOSITION EXHIBITS USE DIFFERENT IDENTIFIERS THAN THE TRIAL

23 EXHIBITS.

24       SO, FOR EXAMPLE, THE DEPOSITION EXHIBITS ARE

25 NUMBERED EXHIBIT A, B AND C. WE HAVE AGREED WITH PLAINTIFFS'

1   COUNSEL THAT WE'RE GOING TO SUBSTITUTE THE TRIAL EXHIBIT NUMBER

2   WHEN READING THE DEPOSITION TO MAKE IT MUCH MORE

3   COMPREHENSIBLE.

4           **JUDGE KARLTON:**  GOOD.

5           **JUDGE HENDERSON:**  FINE.

6                   (THEREUPON, THE DEPOSITION OF **CHRISTOPHER**

7                   **MUMOLA** WAS READ AS FOLLOWS, WITH MS.

8                   JOHNSON READING THE QUESTIONS AND MS. TAMA

9                   READING THE ANSWERS:)

10  **Q.**  PLEASE STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

11  **A.**  CHRISTOPHER JOHN MUMOLA, C-H-R-I-S-T-O-P-H-E-R, J-O-H-N,

12  M-U-N-O-L-A.

13  **Q.**  DO YOU UNDERSTAND THAT YOU HAVE AN OBLIGATION TO TESTIFY

14  TRUTHFULLY UNDER PENALTY OF PERJURY?

15  **A.**  YES.

16  **Q.**  WHERE DO YOU CURRENTLY WORK?

17  **A.**  I CURRENTLY WORK FOR THE U.S. DEPARTMENT OF JUSTICE'S

18  BUREAU OF JUSTICE STATISTICS OR BJS.

19  **Q.**  WHAT IS THE PARTICULAR DIVISION THAT YOU WORK FOR FOR YOUR

20  EMPLOYER?

21  **A.**  I WORK IN THE CORRECTIONS STATISTICS UNIT OF BJS.

22  **Q.**  DESCRIBE WHAT YOUR UNIT IS RESPONSIBLE FOR.

23  **A.**  THE CORRECTIONS STATISTICS UNITS IS RESPONSIBLE FOR

24  COLLECTING DATA ON THE NATION'S CORRECTIONAL POPULATIONS

25  RANGING FROM INSTITUTIONAL POPULATIONS, SUCH AS STATE AND

1  FEDERAL PRISONERS AND LOCAL JAIL INMATES, TO COMMUNITY

2  SUPERVISION POPULATIONS LIKE PROBATION AND PAROLE OFFENDERS.

3  **Q.** WHAT IS YOUR JOB TITLE?

4  **A.** I AM A POLICY ANALYST AND PROGRAM MANAGER FOR THE BUREAU'S

5  DEATH IN CUSTODY REPORTING PROGRAM.

6  **Q.** DESCRIBE YOUR JOB DUTIES AND RESPONSIBILITIES.

7  **A.** AS MANAGER OF THE DEATHS IN CUSTODY REPORTING PROGRAM, I AM

8  RESPONSIBLE FOR THE BUREAU'S DATA COLLECTIONS PERTAINING TO

9  MORTALITY IN THE CRIMINAL JUSTICE SYSTEM. THIS PROGRAM INVOLVES

10  COLLECTING INDIVIDUAL REPORTS OF ALL DEATHS THAT TAKE PLACE IN

11  ANY OF THE 1,300 PLUS STATE PRISONS AND 3,000 PLUS LOCAL JAILS

12  NATIONWIDE, AS WELL AS COLLECTING SIMILAR REPORTS OF ALL DEATHS

13  THAT OCCUR IN THE PROCESS OF ARRESTS BY THE NEARLY 17,000 STATE

14  AND LOCAL LAW ENFORCEMENT AGENCIES IN THE UNITED STATES.  MY

15  DUTIES INCLUDE DAY-TO-DAY SUPERVISION OF THE WORK OF ONE BJS

16  STAFFER, AS WELL AS SEVERAL U.S. CENSUS BUREAU STAFF WORKING ON

17  THE PROGRAM UNDER AN INTERAGENCY AGREEMENT.

18  **Q.** WHAT ARE YOUR QUALIFICATIONS TO PERFORM YOUR CURRENT

19  DUTIES?

20  **A.** I HAVE OVER A DECADE OF EXPERIENCE WORKING WITH AND

21  MANAGING NATIONAL CRIMINAL JUSTICE DATA COLLECTIONS FOR BJS. I

22  HAVE WORKED ON A WIDE VARIETY OF PROGRAMS FOR THE CORRECTIONS

23  UNITS OVER THE YEARS. I HELPED TO ESTABLISH OUR DATA

24  COLLECTIONS MEASURING INCARCERATED POPULATIONS HELD BY U.S.

25  TERRITORIES, THE U.S. DEPARTMENT OF DEFENSE MILITARY JUSTICE

1  SYSTEM AS WELL AS PERSONS HELD UNDER THE AUTHORITY OF U.S.

2  IMMIGRATION AND CUSTOMS ENFORCEMENT I HAVE ALSO DONE EXTENSIVE

3  ANALYSIS ON NATIONAL PRISONER SURVEY DATABASES, AS WELL AS

4  TAKING A ROLE IN DESIGNING OUR SURVEY QUESTIONNAIRES ON TOPICS

5  RANGING FROM SUBSTANCE ABUSE TO PRISON SEXUAL VICTIMIZATION.

6  **Q.**  WHAT IS THE BUREAU OF JUSTICE STATISTICS?

7  **A.**  BJS IS THE STATISTICAL ARM OF THE U.S. DEPARTMENT OF

8  JUSTICE.

9  **Q.**  HOW MANY PUBLISHED REPORTS HAVE YOU AUTHORED WHILE WORKING

10 FOR THE BUREAU OF JUSTICE STATISTICS?

11 **A.**  11.

12 **Q.**  WHAT ARE THEIR TITLES?

13 **A.**  ARREST-RELATED DEATHS IN THE UNITED STATES, 2003 TO 2005,

14 PUBLISHED IN OCTOBER OF 2007.  VETERANS IN STATE AND FEDERAL

15 PRISONS, 2004, WITH MARGARET NOONAN, PUBLISHED MAY 2007.

16 MEDICAL CAUSES OF DEATH IN STATE PRISONS, 2001 TO 2004,

17 PUBLISHED JANUARY OF 2007. DRUG USE AND DEPENDENCE, STATE AND

18 FEDERAL PRISONERS, 2004, WITH JENNIFER KARBERG, PUBLISHED

19 OCTOBER 2006. SUICIDE AND HOMICIDE IN STATE PRISONS AND LOCAL

20 JAILS, PUBLISHED AUGUST 2005.  INCARCERATED PARENTS AND THEIR

21 CHILDREN, PUBLISHED AUGUST 2000. VETERANS IN PRISON OR JAIL,

22 PUBLISHED JANUARY OF 2000.  PRISONERS IN 1998, PUBLISHED AUGUST

23 1999. SUBSTANCE ABUSE AND TREATMENT, STATE AND FEDERAL

24 PRISONERS, 1997, PUBLISHED JANUARY 1999. SUBSTANCE ABUSE AND

25 TREATMENT OF ADULTS ON PROBATION, 1995, WITH THOMAS BONCZAR,

1  PUBLISHED MARCH 1998. PRISONERS IN 1996, WITH ALLEN BECK,

2  PH.D., PUBLISHED JUNE 1997.

3  **Q.**  I'M HANDING YOU WHAT HAS BEEN MARKED AS DEFENDANTS' TRIAL

4  EXHIBIT 1011, A DOCUMENT ENTITLED "MEDICAL CAUSES OF DEATH IN

5  STATE PRISONS, 2001 TO 2004."

6          PLEASE REVIEW EXHIBIT 1011 AND LET ME KNOW WHEN YOU

7  ARE DONE.

8          ARE YOU FAMILIAR WITH EXHIBIT 1011?

9  **A.**  YES.

10  **Q.**  WERE YOU THE AUTHOR OF EXHIBIT 1011?

11  **A.**  YES.

12  **Q.**  IS EXHIBIT 1011 A TRUE AND ACCURATE COPY OF THE ORIGINAL?

13  **A.**  YES.

14  **Q.**  WHAT IS DEATHS IN CUSTODY REPORTING ACT OF 2000?

15  **A.**  THIS FEDERAL LEGISLATION, PUBLIC LAW 106-297, REQUIRED

16  STATES TO REPORT ON A QUARTERLY BASIS ALL DEATHS IN STATE

17  PRISONS, LOCAL JAILS, JUVENILE FACILITIES AND PERSONS IN THE

18  PROCESS OF ARREST TO THE U.S. ATTORNEY GENERAL IN ORDER TO

19  QUALIFY FOR A SERIES OF FEDERAL CORRECTIONAL GRANTS.

20  **Q.**  WHAT IS THE DEATHS IN CUSTODY REPORTING PROGRAM?

21  **A.**  BJS ESTABLISHED THE DEATHS IN CUSTODY REPORTING PROGRAM TO

22  COLLECT THE CUSTODIAL DEATH REPORTS REQUIRED BY THE DEATH IN

23  CUSTODY REPORTING ACT OF 2000. UNDER THE NEW PROGRAM BJS PHASED

24  IN A SERIES OF NEW QUARTERLY DATA COLLECTIONS TO IMPLEMENT THE

25  ACT.

1              IN 2000, COLLECTION OF LOCAL JAIL DEATH RECORDS

2 BEGAN, STATE PRISON SYSTEMS WERE ADDED TO THE PROGRAM IN 2001,

3 STATE JUVENILE CORRECTIONAL AGENCIES WERE ADDED IN 2002, AND

4 STATES BEGAN REPORTING ARREST RELATED DEATHS IN 2003.

5 **Q.**  WHAT IS YOUR CONNECTION TO THE DEATHS IN CUSTODY REPORTING

6 PROGRAM, IF ANY?

7              **JUDGE HENDERSON:**  LET'S REMEMBER TO TALK A LITTLE

8 SLOWER.

9 **A.**  I HAVE MANAGED THE PROGRAM SINCE ITS INCEPTION IN 2000.

10 **Q.**  FROM WHERE DID THE BUREAU OF JUSTICE STATISTICS OBTAIN THE

11 DATA THAT IS ANALYZED IN EXHIBIT 1011?

12 **A.**  THE DATA ANALYZED AND PRESENTED IN DEFENDANTS' TRIAL

13 EXHIBIT 1011 WAS ALL SUBMITTED TO BJS BY STATE DEPARTMENTS OF

14 CORRECTIONS.  FOR THE PERIOD COVERED BY THE REPORT, 2001 TO

15 2004, ALL 50 STATE DEPARTMENTS OF CORRECTION PARTICIPATED IN

16 THE PROGRAM.

17 **Q.**  AS THE AUTHOR OF EXHIBIT 1011, WHAT ROLE DID YOU PLAY IN

18 ITS PREPARATION?

19 **A.**  I WAS INVOLVED IN ALL ASPECTS OF THE REPORT'S PREPARATION.

20 I DIRECTLY OVERSAW THE WORK OF COLLECTING THE DATA AND THE WORK

21 OF A CLINICAL DATA SPECIALIST IN APPLYING CLINICAL CODES TO

22 EACH CAUSE OF DEATH. I PERFORMED ALL OF THE DATA ANALYSIS

23 PRESENTED IN THE REPORT AND WROTE THE TEXT.

24 **Q.**  IN GENERAL, WHAT WAS THE METHODOLOGY --

25              **JUDGE KARLTON:**  HOLD ON A SECONDS.

1        I'M NOT SURE I KNOW WHAT IT MEANS, BUT THAT'S OKAY.

2   GO AHEAD.

3   **Q.**  IN GENERAL, WHAT WAS THE METHODOLOGY USED TO PREPARE

4   EXHIBIT 1011?

5   **A.**  THE METHODOLOGY IS EXPLAINED IN THE REPORT.  THE DATA

6   COLLECTED FROM STATE DEPARTMENTS OF CORRECTIONS WAS ANALYZED

7   USING SPSS SOFTWARE, AND TEXT AND TABLES WERE DEVELOPED IN

8   CONSULTATION WITH THE CHIEF OF CORRECTIONS STATISTICS AND THE

9   CHIEF EDITOR.

10  **Q.**  IS THE STATEMENT OF THE METHODOLOGY ON PAGE FOUR OF EXHIBIT

11  1011 ACCURATE?

12  **A.**  YES.

13  **Q.**  PAGE FOUR OF EXHIBIT 1011 STATES THAT MARGARET E. NOONAN

14  VERIFIED THE REPORT.  ARE YOU FAMILIAR WITH WHAT MS. NOONAN DID

15  TO VERIFY THE REPORT?

16  **A.**  YES.

17  **Q.**  PLEASE DESCRIBE HOW THE REPORT WAS VERIFIED.

18  **A.**  MS. NOONAN IS A BJS STATISTICIAN WHO WORKS ON THE DEATHS IN

19  CUSTODY REPORTING PROGRAM, SO SHE IS VERY FAMILIAR WITH ALL OF

20  THE DATA INVOLVED IN THIS REPORT. SHE REVIEWED ALL SPSS

21  ANALYSIS CODING TO DETECT ERRORS, AND REVIEWED ALL DATA OUTPUT

22  TO ENSURE THAT IT WAS ACCURATELY REFLECTED IN THE REPORT'S DATA

23  TABLES AND TEXT.

24        MS. NOONAN ALSO REVIEWED ALL SPREADSHEETS INVOLVED

25  IN GENERATING THE DATA PRESENTED IN THE REPORT TO ENSURE THAT

1  ALL FORMULAS WERE ACCURATE AND CONSISTENT. CONSISTENT WITH BJS

2  VERIFICATION PRACTICES, MS. NOONAN RED DOTTED ALL DATA CITED IN

3  THE REPORT BY MATCHING IT UP WITH DATA OUTPUT IN SPSS AND OTHER

4  TOOS SUCH AS MICROSOFT EXCEL.

5  **Q.**  IS EXHIBIT 1011 AN OFFICIAL PUBLICATION OF THE BUREAU OF

6  JUSTICE STATISTICS?

7  **A.**  YES.

8  **Q.**  PLEASE TURN TO APPENDIX TABLE NINE OF EXHIBIT 1011.

9          **MS. JOHNSON:**  IS THERE ANY WAY TO GET THAT A LITTLE

10  BIT LARGER?

11  **Q.**  WHAT DOES THIS TABLE REPRESENT?

12  **A.**  THIS TABLE PRESENTS THE AVERAGE ANNUAL MORTALITY RATE OF

13  STATE PRISON INMATES PER 100,000 INMATES FROM LEADING CAUSES OF

14  ILLNESS DEATHS FOR THE PERIOD 2001 TO 2004.  THESE FINDINGS ARE

15  PRESENTED FOR EACH STATE AND BROKEN DOWN SPECIFICALLY FOR THE

16  FIVE LEADING CAUSES OF ILLNESS DEATHS, AS WELL AS FOR ILLNESS

17  DEATHS OVERALL.

18  **Q.**  WHAT WAS THE PARTICULAR METHODOLOGY USED TO CREATE APPENDIX

19  TABLE NINE?

20  **A.**  FOR EACH YEAR THE NUMBER OF INMATE ILLNESS DEATHS IN EACH

21  STATE WAS DIVIDED BY THE CUSTODY POPULATION OF THAT STATE'S

22  PRISON SYSTEM ON JUNE 30TH.  THEN MULTIPLIED BY 100,000 TO

23  OBTAIN A STATE-SPECIFIC RATE OF ILLNESS DEATH IN EACH STATE'S

24  PRISON POPULATION.

25          THE RESULTING ILLNESS MORTALITY RATES FOR EACH YEAR

1  WERE THEN SUMMED UP FOR EACH STATE AND DIVIDED BY FOUR TO

2  OBTAIN AN AVERAGE ANNUAL RATE OF ILLNESS DEATH IN EACH STATE'S

3  PRISON SYSTEM FOR THE ENTIRE FOUR-YEAR PERIOD.

4          THE SAME PROCEDURES WERE REPEATED FOR EACH OF THE

5  FIVE LEADING CAUSES OF ILLNESS DEATHS. THESE FIVE LEADING

6  CAUSES OF ILLNESS DEATHS WERE DETERMINED BY NATIONAL TOTALS OF

7  ILLNESS DEATH OVER THE FOUR YEARS AND ARE NOT NECESSARILY THE

8  FIVE LEADING CAUSES OF ILLNESS DEATHS IN EACH STATE.

9  **Q.** WHAT WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL

10  ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO 2004

11  FOR THE ENTIRE UNITED STATES?

12  **A.** THE RATE WAS 223 ILLNESS DEATHS PER 100,000 STATE PRISONERS

13  NATIONWIDE.

14  **Q.** WHAT WAS THE AVERAGE ANNUAL MORTALITY FOR ALL ILLNESSES PER

15  100,000 STATE PRISON INMATES FROM 2001 TO 2004 FOR THE  WEST

16  REGION.

17  **A.** FOR THE 13 STATES INCLUDED IN THE WEST REGION, THE AVERAGE

18  ANNUAL MORTALITY RATE FROM ALL ILLNESSES WAS 181 DEATHS PER

19  100,000 STATE PRISONERS.

20  **Q.** WHAT WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL

21  ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO 2004

22  FOR INMATES FOR CALIFORNIA?

23  **A.** THE RATE WAS 170 ILLNESS DEATHS PER 100,000 PRISONERS HELD

24  IN CALIFORNIA STATE PRISONS.

25  **Q.** WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL ILLNESSES PER

1  100,000 STATE PRISON INMATES FROM 2001 TO 2004 IN CALIFORNIA

2  LOWER THAN THE SAME RATE FOR THE ENTIRE UNITED STATES?

3  **A.** YES.

4  **Q.** WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL ILLNESSES PER

5  100,000 STATE PRISON INMATES FROM 2001 TO 2004 IN CALIFORNIA

6  LOWER THAN THE SAME RATE FOR THE WEST REGION?

7  **A.** YES.

8  **Q.** PAGE THREE OF THE BODY OF EXHIBIT 1011 IDENTIFIES THE

9  STATES WITH THE FIVE HIGHEST MORTALITY RATES PER 100,000 STATE

10  INMATES FROM 2001 TO 2004. IS CALIFORNIA AMONG THEM?

11  **A.** NO.

12  **Q.** HOW MANY STATES HAD A HIGHER AVERAGE ANNUAL MORTALITY RATE

13  FOR ALL ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO

14  2004 THAN CALIFORNIA?

15  **A.** 36.

16  **Q.** IS CALIFORNIA AMONG THE 15 STATES WITH THE LOWEST AVERAGE

17  ANNUAL MORTALITY RATE PER 100,000 STATE INMATES FROM 2001 TO

18  2004?

19  **A.** YES.  CALIFORNIA RANKED 14TH LOWEST AMONG ALL STATES IN

20  TERMS OF AVERAGE ANNUAL ILLNESS MORTALITY PER 100,000 STATE

21  PRISONERS FROM 2001 TO 2004.

22  **Q.** PAGE THREE OF THE BODY OF EXHIBIT 1011 IDENTIFIES

23  CALIFORNIA AS AMONG THE FIVE STATES WITH THE HIGHEST NUMBER OF

24  PRISON DEATHS. PLEASE EXPLAIN THE DIFFERENCE BETWEEN THE NUMBER

25  OF DEATHS AND THE MORTALITY RATE FROM ILLNESS.

1   **A.**  PRESENTING THE DATA IN TERMS OF A STANDARD RATE OF DEATH

2   PER 100,000 INMATES IN A TABLE LIKE THIS FACILITATES

3   COMPARISONS ACROSS STATE SYSTEMS.  GIVEN THE HUGE DISPARITY IN

4   THE SIZES OF DIFFERENT STATES' PRISON POPULATIONS.  SOME STATES

5   HAD PRISON POPULATIONS AS SMALL AS 1,200 PERSONS DURING THIS

6   PERIOD, WHILE OTHERS HELD OVER 160,000 PRISONERS.

7          GIVEN SUCH WIDE VARIATION IN THE SIZES OF THE

8   POPULATIONS INVOLVED, LARGE STATE PRISON SYSTEMS CAN HAVE BELOW

9   AVERAGE MORTALITY RATES YET STILL HAVE A GREATER NUMBER OF

10  DEATHS THAN MANY SMALLER STATES.  RATES ALLOW FOR THE

11  COMPARISON OF THE PREVALENCE OF SUCH DEATHS ACROSS STATES AS

12  OPPOSED TO MEASURING THEIR INCIDENCE OR SIMPLE FREQUENCY.

13         FOR EXAMPLE, CALIFORNIA, TEXAS, NEW YORK AND FLORIDA

14  ROUTINELY HAVE THE FOUR BIGGEST STATE PRISONER POPULATIONS IN

15  THE NATION, AND THESE SAME FOUR STATES HAD THE FOUR HIGHEST

16  COUNTS OF PRISONER DEATHS DURING THIS PERIOD.

17         LIKEWISE, THE OTHER STATE LISTED ON PAGE THREE AMONG

18  THE FIVE STATES WITH THE HIGHEST NUMBER OF DEATHS,

19  PENNSYLVANIA, ROUTINELY HAS ONE OF THE NATION'S 10 LARGEST

20  PRISON POPULATIONS. LARGER POPULATIONS INCREASE THE POOL OF

21  PRISONERS WHO COULD POTENTIALLY DIE IN CUSTODY DURING THE YEAR,

22  BUT ONLY ONE OF THESE FIVE STATES, PENNSYLVANIA, APPEARS AMONG

23  THE FIVE STATES WITH THE HIGHEST RATE OF ILLNESS DEATHS.

24         CONVERSELY, A SMALL STATE LIKE WEST VIRGINIA, WITH A

25  PRISON POPULATION OF LESS THAN 5,000 INMATES DURING THIS

1  PERIOD, MAY HAVE A SMALL NUMBER OF DEATHS, ONLY 53 OVER THESE

2  FOUR YEARS, BUT THEIR RATE OF ILLNESS DEATH IN WEST VIRGINIA

3  WAS NEARLY DOUBLE THAT OF CALIFORNIA, WHICH HAD OVER 1300 TOTAL

4  DEATHS OVER THE SAME TIME PERIOD.

5  **Q.**  HAVE YOU MADE THE DETERMINATION OF WHETHER CALIFORNIA'S

6  AVERAGE ANNUAL MORTALITY RATE FOR STATE PRISONERS FROM 2001 TO

7  2004 WAS LOWER THAN THE SAME RATE FOR U.S. RESIDENTS AGES 15 TO

8  64 FROM 2001 TO 2003?

9  **A.**  YES.

10  **Q.**  HOW DID YOU MAKE THAT DETERMINATION?

11  **A.**  LOOKING AT THE DATA PRESENTED IN STATE PRISON TABLE EIGHT

12  OF DEFENDANTS' TRIAL EXHIBIT 1013, "DEATHS IN CUSTODY

13  STATISTICAL TABLES," YOU CAN FIND THE MORTALITY RATE FROM ALL

14  CAUSES FOR CALIFORNIA STATE PRISONERS FOR EACH YEAR, 2001 TO

15  2004. THE TABLE ALSO INCLUDES DATA, BUT THAT DATA IS OUTSIDE

16  THE SCOPE OF THE QUESTION POSED HERE. ADDING TOGETHER THESE

17  FOUR CALIFORNIA PRISONER MORTALITY RATES FOR THE FOUR YEARS,

18  AND DIVIDING THE SUM BY FOUR, YIELDS AN AVERAGE ANNUAL RATE OF

19  MORTALITY FROM ALL CAUSES FOR CALIFORNIA PRISONERS DURING 2001

20  TO 2003 OF 203 PER 100,000 INMATES.

21  **Q.**  WHAT WAS YOUR CONCLUSION?

22          **JUDGE KARLTON:**  CAN YOU HELP ME?  WHAT IT POINTS OUT

23  WAS 207, AND THE WITNESS READ 203?

24          IS THAT JUST A MISREADING?

25          **MS. JOHNSON:**  YOUR HONORS, THIS TABLE ACTUALLY

1  COVERS MORE DATA.  THIS HAS 2005 IN AVERAGE.  THOSE INCLUDE

2  THAT 2005 DATA.

3  **Q.**  WHAT WAS YOUR CONCLUSION?

4  **A.**  MY CONCLUSION IS THAT THE AVERAGE ANNUAL RATE OF MORTALITY

5  FROM ALL CAUSES FOR CALIFORNIA PRISONERS, DURING 2001 TO 2004,

6  WAS 34 PERCENT LOWER THAN THE AVERAGE ANNUAL RATE OF DEATH FROM

7  ALL CAUSES FOR U.S. RESIDENTS AGE 15 TO 64, DURING 2001 TO

8  2003.

9           WHEN DEATHS FROM TRANSPORTATION ACCIDENTS ARE

10  EXCLUDED, THE DIFFERENCE BETWEEN THE TWO RATES IS REDUCED, WITH

11  THE CALIFORNIA PRISONER RATE 30 PERCENT LOWER THAN THE U.S.

12  RESIDENT RATE.

13           EXCLUDING TRANSPORTATION ACCIDENT DEATHS FROM THE

14  RESIDENT POPULATION DATA OFFERS A MORE REALISTIC COMPARISON,

15  BECAUSE STATE PRISONERS ARE NOT ALLOWED TO DRIVE AND ONLY

16  RARELY TRAVEL BY VEHICLE.  COMPARED TO MOST U.S. ADULT

17  RESIDENTS THEY EXPERIENCE FAR LOWER EXPOSURE TO ANY RISK OF

18  FATAL TRANSPORTATION ACCIDENTS.

19  **Q.**  IS THERE ANY DOCUMENT EVIDENCING THIS CONCLUSION?

20  **A.**  THE CALCULATIONS WERE NOT EXPLICITLY DOCUMENTED IN THE

21  PUBLISHED DOCUMENTS, BUT THE DATA NECESSARY TO MAKE THE

22  CALCULATIONS ARE AVAILABLE IN APPENDIX TABLE 11 OF DEFENDANTS'

23  TRIAL EXHIBIT 1011 AND STATE PRISON TABLE EIGHT OF DEFENDANTS'

24  TRIAL EXHIBIT 1013, AS NOTED EARLIER.

25  **Q.**  I'M HANDING YOU WHAT HAS BEEN MARKED AS DEFENDANTS' TRIAL

1  EXHIBITS 1012, WHICH IS A LETTER DATED DECEMBER 18, 2007, FROM

2  JEFFREY L. SEDGWICK, DIRECTOR OF THE OFFICE OF JUSTICE PROGRAMS

3  BUREAU OF JUSTICE STATISTICS TO S. ANNE JOHNSON, COUNSEL FOR

4  DEFENDANTS IN THE MATTER, WHICH CONTAINS TWO ATTACHMENTS.

5          ARE YOU FAMILIAR WITH EXHIBIT 1013, INCLUDING THE

6  ATTACHMENTS?

7  **A.**  YES.

8  **Q.**  IS EXHIBIT 1013 A TRUE AND ACCURATE COPY OF THE ORIGINAL?

9  **A.**  YES.

10 **Q.**  DO YOU HAVE ANY -- DID YOU HAVE ANY ROLE IN CREATING

11 EXHIBIT 1013, INCLUDING THE ATTACHMENTS?

12 **A.**  YES, I PERFORMED THE DATA ANALYSIS, PREPARED THE DATA

13 TABLES AND HIGHLIGHTS, AS WELL AS DRAFTED THE LETTER FOR DR.

14 SEDGWICK'S SIGNATURE.

15 **Q.**  WHAT DOES ATTACHMENT ONE REPRESENT?

16 **A.**  THIS TABLE PRESENTS THE ILLNESS MORTALITY RATE PER 100,000

17 STATE PRISONERS FOR EACH STATE'S PRISON SYSTEM WITH GROUPINGS

18 OF ALL STATES, EXCLUDING CALIFORNIA, AND ALL WESTERN STATES,

19 EXCLUDING CALIFORNIA, FOR THE YEARS 2001 TO 2005.

20 **Q.**  DOES ATTACHMENT ONE TO EXHIBIT 1012 PRESENT SIMILAR

21 INFORMATION TO APPENDIX TABLE NINE OF EXHIBIT 1011 EXCEPT THAT

22 IT ALSO INCLUDES THE YEAR 2005?

23 **A.**  YES, THE DATA FOR 2005 WERE NOT AVAILABLE AT THE TIME

24 DEFENDANTS' TRIAL EXHIBIT 1011 WAS BEING PREPARED FOR

25 PUBLICATION.

1  Q.  WHAT WAS THE SOURCE OF THE DATA FOR THE YEAR 2005?

2  A.  THE SOURCE OF THE DATA FOR 2005 IS THE SAME AS THAT USED

3  FOR 2001 TO 2004 IN BOTH DEFENDANTS' TRIAL EXHIBIT 1011 AND

4  EXHIBIT 1013. ALL DATA ARE FROM THE BJS DEATH IN CUSTODY

5  REPORTING PROGRAM.

6  Q.  WHAT WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL

7  ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO 2005

8  FOR THE ENTIRE UNITED STATES?

9  A.  THE AVERAGE ANNUAL MORTALITY RATE FOR ALL ILLNESSES WAS 224

10  DEATHS PER 100,000 STATE PRISON INMATES NATIONWIDE DURING 2001

11  TO 2005.

12  Q.  WHAT WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL

13  ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO 2005

14  FOR THE WEST REGION?

15  A.  THE AVERAGE ANNUAL MORTALITY RATE FOR ALL ILLNESSES FOR

16  STATE PRISONERS IN THE WEST REGION WAS 184 DEATHS PER 100,000

17  STATE PRISONERS HELD BY THESE 13 STATES.

18  Q.  WHAT WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL

19  ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO 2005

20  FOR INMATES FOR CALIFORNIA?

21  A.  THE AVERAGE ANNUAL MORTALITY RATE FOR ALL ILLNESSES FOR

22  CALIFORNIA STATE PRISONERS IS 172 DEATHS PER 100,000 PRISONERS

23  DURING THE PERIOD 2001 TO 2005.

24  Q.  WHAT WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL

25  ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO 2005 IN

1  CALIFORNIA LOWER THAN THE SAME RATE FOR THE ENTIRE UNITED

2  STATES?

3  **A.**  YES.

4  **Q.**  WAS THE AVERAGE ANNUAL MORTALITY RATE FOR ALL ILLNESSES PER

5  100,000 STATE PRISON INMATES FROM 2001 TO 2005 IN CALIFORNIA

6  LOWER THAN THE SAME RATE FOR THE WEST REGION?

7  **A.**  YES.

8  **Q.**  HOW MANY STATES HAD A HIGHER AVERAGE ANNUAL MORTALITY RATE

9  FOR ALL ILLNESSES PER 100,000 STATE PRISON INMATES FROM 2001 TO

10  2005 IN CALIFORNIA?

11  **A.**  36.

12  **Q.**  IS CALIFORNIA AMONG THE 15 STATES WITH THE LOWEST AVERAGE

13  ANNUAL MORTALITY RATES PER 100,000 STATE INMATES FROM 2001 TO

14  2005?

15  **A.**  YES.  CALIFORNIA PRISONERS HAD THE 14TH LOWEST AVERAGE

16  ANNUAL MORTALITY RATE FROM ALL ILLNESSES. IN TERMS OF DEATHS

17  FROM ALL CAUSES, I WOULD REFER YOU TO STATE PRISON TABLE EIGHT

18  OF DEFENDANTS' TRIAL EXHIBIT 1013, WHICH SHOWS THAT CALIFORNIA

19  PRISONERS HAD THE 12TH LOWEST MORTALITY RATE.

20  **Q.**  ATTACHMENT ONE ALSO CONTAINS HIGHLIGHTS AT THE BOTTOM.

21  NUMBER ONE SAYS, "FOR EACH YEAR IN THE PERIOD 2001 TO 2005,

22  CALIFORNIA PRISONERS HAD A LOWER RATE OF ILLNESS DEATHS THAN

23  THE TOTAL OF ALL OTHER WESTERN STATES RANGING FROM THE

24  5 PERCENT LOWER IN 2004, 182 ILLNESS DEATHS PER 100,000

25  INMATES, VERSUS 191 PER 100,000 FOR ALL OTHER WESTERN STATES,

1  TO 27 PERCENT LOWER IN 2001."

2           IS THIS CONCLUSION ACCURATE?

3  **A.**  YES.

4  **Q.**  TO YOUR KNOWLEDGE, HOW WAS THE CONCLUSION REACHED?

5  **A.**  THE CONCLUSION WAS REACHED BY COMPARING THE ILLNESS

6  MORTALITY RATES SHOWN FOR CALIFORNIA FOR EACH YEAR WITH THE

7  RATES PRESENTED FOR THE WESTERN STATES, EXCLUDING CALIFORNIA IN

8  THE SAME TABLE. EACH YEAR THE CALIFORNIA RATE WAS LOWER. THE

9  PERCENTAGE DIFFERENCE WAS CALCULATED BY DIVIDING THE DIFFERENCE

10  BETWEEN THE TWO RATES BY THE HIGHER RATE.

11           FOR INSTANCE, THE 5 PERCENT LOWER IN 2004 FINDING

12  WAS CALCULATED BY DIVIDING THE DIFFERENCE IN THE TWO RATES, 191

13  MINUS 182 EQUALS NINE BY THE HIGHER RATE, 191. NINE DIVIDED BY

14  191 EQUALS .047, OR A DIFFERENCE OF 5 PERCENT.

15           CALCULATION OF THESE RATES FOR ALL WESTERN STATES,

16  EXCLUDING CALIFORNIA, INVOLVES SUMMING ALL OF THE ILLNESS

17  DEATHS IN THE REMAINING 12 WESTERN STATES, AND DIVIDING THE SUM

18  OF ILLNESS DEATHS BY THE SUM OF JUNE 30TH CUSTODY POPULATIONS

19  IN EACH OF THESE 12 STATES' PRISON SYSTEMS FOR EACH YEAR. THE

20  RESULTS WERE MULTIPLIED BY 100,000 TO CALCULATE AN ILLNESS

21  MORTALITY RATE FOR THESE 12 WESTERN STATES FOR EACH YEAR.

22  **Q.**  ATTACHMENT ONE, HIGHLIGHT NUMBER ONE ALSO SAYS OVER THE

23  ENTIRE FIVE-YEAR PERIOD, CALIFORNIA'S AVERAGE ANNUAL DEATH RATE

24  FROM ILLNESS, 172 PER 100,000, WAS 14 PERCENT LOWER THAN THAT

25  OF ALL OTHER WESTERN STATES, 201 PER 100,000.

1        IS THIS CONCLUSION ACCURATE?

2  **A.** YES.

3  **Q.** ATTACHMENT ONE, HIGHLIGHT NUMBER TWO SAYS, "FOR EACH YEAR

4  IN THIS PERIOD THE CALIFORNIA PRISONER DEATH RATE FROM ILLNESS

5  WAS LOWER THAN THE TOTAL FOR ALL OTHER STATES NATIONWIDE

6  RANGING FROM 16 PERCENT LOWER IN 2002, 187 PER 100,000,

7  COMPARED TO 223 PER 100,000, TO 38 PERCENT LOWER IN 2001, 141

8  PER 100,000 COMPARED TO 229 PER 100,000.

9        IS THIS CONCLUSION ACCURATE?

10  **A.** YES.

11  **Q.** ATTACHMENT ONE, HIGHLIGHT NUMBER ONE -- I'M SORRY.

12  ATTACHMENT ONE, HIGHLIGHT NUMBER TWO ALSO SAYS, "OVER THE

13  ENTIRE FIVE-YEAR PERIOD, CALIFORNIA'S AVERAGE ANNUAL ILLNESS

14  MORTALITY RATE, 172 PER 100,000, WAS 26 PERCENT LOWER THAN THAT

15  OF ALL OTHER STATES, 232 PER 100,000."

16        IS THIS CONCLUSION ACCURATE?

17  **A.** YES.

18  **Q.** ATTACHMENT ONE, HIGHLIGHT NUMBER THREE, STATES,

19  "CALIFORNIA'S PRISONER DEATH RATE FROM ILLNESS WAS LOWEST IN

20  2001, 141 PER 100,000, THEN PEAKED THE FOLLOWING YEAR IN 2002,

21  187 PER 100,000."

22        IS THIS CONCLUSION ACCURATE?

23  **A.** YES.

24  **Q.** TO YOUR CONCLUSION, HOW THIS -- TO YOUR KNOWLEDGE, HOW IS

25  THIS CONCLUSION REACHED?

1  A.   IN COMPARING THE CALIFORNIA ILLNESS MORTALITY RATES FOR

2  EACH OF THE FIVE YEARS COVERED BY THESE DATA, THE RATE FOR 2001

3  WAS FOUND TO BE THE LOWEST, AND THE RATE FOR 2002 WAS FOUND TO

4  BE THE HIGHEST.

5  Q.   ATTACHMENT ONE, HIGHLIGHT NUMBER THREE ALSO STATES, "IN THE

6  MOST RECENT YEARS FOR WHICH DATA WERE AVAILABLE THE ILLNESS

7  DEATH RATE IN CALIFORNIA PRISONS WAS VIRTUALLY UNCHANGED, 182

8  PER 100,000 IN 2004, 181 PER 100,000 IN 2005?

9          IS THIS CONCLUSION ACCURATE?

10  A.   YES.

11  Q.   TO YOUR KNOWLEDGE, HOW WAS THIS CONCLUSION REACHED?

12  A.   THE DIFFERENCE BETWEEN THESE ILLNESS DEATH RATES IN

13  CALIFORNIA PRISONS OVER THESE TWO YEARS WAS ONE DEATH PER

14  100,000, OR A DECLINE OF ONE HALF OF 1 PERCENT.  GIVEN THIS

15  VERY SMALL PERCENTAGE CHANGE, I CHARACTERIZED THE RATE AS

16  VIRTUALLY UNCHANGED.

17  Q.   WHAT DOES ATTACHMENT TWO TO EXHIBIT 1012 REPRESENT?

18  A.   ATTACHMENT TWO PRESENTS COMPARATIVE COUNTS AND RATES OF

19  STATE PRISONER DEATHS FOR CALIFORNIA AND ALL OTHER 49 STATES

20  COMBINED BY CAUSE OF DEATH FOR THE PERIOD 2001 TO 2005.

21  Q.   TO YOUR KNOWLEDGE, WHO PREPARED ATTACHMENT TWO?

22  A.   I PREPARED BOTH ATTACHMENTS TO DEFENDANTS' TRIAL EXHIBIT

23  1012.

24  Q.   TO YOUR KNOWLEDGE, WHAT METHODOLOGY WAS USED TO PREPARE

25  ATTACHMENT TWO?

1  A.   THE METHODOLOGY BEHIND THESE TABLES IS QUITE SIMPLE. FOR

2  THE TOP TWO TABLES PRESENTING COUNTS OF DEATH BY CAUSE I SUMMED

3  UP THE COUNTS OF DEATH IN CALIFORNIA, AND IN THE REMAINING 49

4  STATES, RESPECTIVELY.  FOR THE LOWER TWO TABLES PRESENTING

5  RATES OF DEATH BY CAUSE, I FOLLOWED THE METHODOLOGY DESCRIBED

6  EARLIER, DIVIDING THE COUNT OF DEATHS FOR A GIVEN YEAR BY THE

7  JUNE 30TH CUSTODY POPULATIONS FOR THAT YEAR, AND MULTIPLYING

8  THE RESULT BY 100,000 TO OBTAIN A RATE OF DEATH PER 100,000

9  INMATES.

10  Q.   ATTACHMENT TWO ALSO CONTAINS HIGHLIGHTS. NUMBER ONE STATES,

11  "THE TABLES ABOVE PROVIDES A COMPARISON OF CALIFORNIA AND ALL

12  OTHER STATES FOR THE DATA PRESENTED IN TABLES ONE AND THREE OF

13  OUR ONLINE TABLES OF STATE MORTALITY DATA."

14       WHAT IS THE STATEMENT REFERRING TO?

15  A.   THE ONLINE TABLES OF STATE PRISONER MORTALITY DATA ARE

16  PRESENTED IN DEFENDANTS' TRIAL EXHIBIT 1013.  THESE TABLES ARE

17  UPDATED EACH YEAR WITH THE LATEST FINALIZED DATA FROM THE DEATH

18  IN CUSTODY REPORTING PROGRAM WHICH IS THE SAME DATA SERIES USED

19  TO PRODUCE OUR PUBLISHED REPORTS.

20       THE ONLINE TABLES ALLOW US TO UPDATE A NUMBER OF OUR

21  BASIC FINDINGS ON STATE PRISONER MORTALITY WITHOUT HAVING TO

22  PRODUCE AN IN-DEPTH REPORT EACH AND EVERY YEAR. FOR THE PURPOSE

23  OF COMPARING CALIFORNIA TO THE REST OF THE COUNTRY, I TOOK THE

24  PUBLISHED ONLINE TABLES ONE AND THREE AND ADAPTED THEM TO

25  REMOVE CALIFORNIA FROM THE CALCULATIONS OF NATIONAL STATE

1   PRISONER FINDINGS.  BY DOING SO, CALIFORNIA COULD BE PROPERLY

2   COMPARED TO A GROUPING OF ALL OTHER STATES.

3   **Q.**  I'M HANDING YOU A DOCUMENT MARKED AS EXHIBIT -- MARKED AS

4   DEFENDANTS' TRIAL EXHIBIT 1013, WHICH IS ENTITLED "DEATHS IN

5   CUSTODY STATISTICAL TABLES."

6            ARE YOU FAMILIAR WITH EXHIBIT 1013?

7   **A.**  YES.

8   **Q.**  IS EXHIBIT 1013 A TRUE AND ACCURATE COPY OF THE INFORMATION

9   AVAILABLE ON THE WEBSITE?

10  **A.**  YES.

11  **Q.**  THE FIRST PAGE, WHICH I THINK IS ACTUALLY THE NEXT PAGE, OF

12  EXHIBIT 1013 REFERENCES DATA TABLES FOR STATE PRISONS, STATE

13  PRISON DEATHS FROM 2001 TO 2005. ARE THESE THE TABLES YOU

14  REFERRED TO IN HIGHLIGHT NUMBER ONE OF ATTACHMENT TWO TO

15  EXHIBIT 1012?

16  **A.**  YES.

17  **Q.**  EXHIBIT 1012, ATTACHMENT TWO, HIGHLIGHT NUMBER TWO, SAYS,

18  "AS THESE DATA SHOW, THE ILLNESS DEATH RATE IN CALIFORNIA

19  PRISONS WAS BELOW THAT OF THE RATE FOR ALL OTHER STATES IN EACH

20  YEAR AVERAGING 23 PERCENT LOWER FOR THE ENTIRE FIVE-YEAR

21  PERIOD, 161 ILLNESS DEATHS PER 100,000 INMATES VERSUS 208

22  ILLNESS DEATHS PER 100,000 INMATES."

23            IS THIS CONCLUSION ACCURATE?

24  **A.**  YES.

25  **Q.**  EXHIBIT 1012, ATTACHMENT TWO, HIGHLIGHT NUMBER THREE,

1  STATES, "THE RATE OF DEATH FROM AIDS IN CALIFORNIA PRISONS WAS

2  LOWER THAN THAT OF ALL OTHER STATES COMBINED EACH YEAR, AS

3  WELL, AVERAGING ABOUT ONE-THIRD LOWER OVER THE ENTIRE PERIOD,

4  11 AIDS DEATHS PER 100,000 INMATES VERSUS 10 (SIC) AIDS DEATHS

5  PER 100,000 INMATES."

6          IS THIS CONCLUSION ACCURATE?

7  **A.**  YES.

8  **Q.**  IN THE LETTER WHICH IS THE FIRST PAGE OF EXHIBIT 1012,

9  MR. SEDGWICK WRITES, "IN NOVEMBER YOU REQUESTED THAT BUREAU OF

10 JUSTICE STATISTICS BJS STAFF PRODUCE STATISTICAL TABLES OF

11 STATE PRISONER DEATH RECORDS THAT WOULD ALLOW FOR COMPARISONS

12 BETWEEN CALIFORNIA AND OTHER STATES.  ATTACHED YOU WILL FIND

13 THE DATA REQUESTED.  THESE DATA ARE UNPUBLISHED BUT HAVE BEEN

14 VERIFIED BY BJS STAFF AS ACCURATE."

15          DO YOU KNOW WHAT WAS DONE TO VERIFY THE DATA ON

16 ATTACHMENTS ONE AND TWO TO EXHIBIT 1012 AS ACCURATE?

17 **A.**  YES.

18 **Q.**  PLEASE EXPLAIN WHAT WAS DONE TO VERIFY THE DATA ON

19 ATTACHMENTS ONE AND TWO TO EXHIBIT 1012 AS ACCURATE.

20 **A.**  MUCH OF THE DATA PRESENTED HERE IN THIS ATTACHMENT WAS

21 ALREADY PUBLISHED IN OUR ONLINE DATA TABLES, ALL OF WHICH WAS

22 VERIFIED FOLLOWING BJS PUBLICATION STANDARDS.  ANY NEW FINDINGS

23 WHICH WERE NOT ALREADY PRESENTED IN THE BJS ONLINE TABLES WERE

24 PUT THROUGH THE SAME PROCEDURES, WITH SPSS DATA OUTPUT AND

25 EXCEL SPREADSHEET FORMULAS CHECKED BY MS. NOONAN FOR ACCURACY.

1  Q.  ALTHOUGH IT IS NOT PUBLISHED, DOES EXHIBIT 1012 REFLECT THE

2  OFFICIAL ANALYSIS OF THE BUREAU OF JUSTICE STATISTICS PERFORMED

3  IN THE COURSE OF ITS DUTIES?

4  A.  YES.  AS NOTED IN THE PREVIOUS RESPONSE, THE DATA WERE

5  VERIFIED IN THE SAME MANNER AS FORMALLY PUBLISHED FINDINGS.

6  FULFILLING DATA REQUESTS SUCH AS THESE IS PART OF ROUTINE BJS

7  ACTIVITIES, AND ALL WORK PERFORMED BY MYSELF IN PREPARING THESE

8  DATA WAS DONE AS PART OF MY NORMAL WORK DUTIES.

9  Q.  I'M HANDING YOU WHAT HAS BEEN MARKED AS DEFENDANTS' TRIAL

10  EXHIBIT 1014, TITLED "SUICIDE AND HOMICIDE IN STATE PRISONS AND

11  LOCAL JAILS."

12          ARE YOU FAMILIAR WITH EXHIBIT 1014?

13  A.  YES.

14  Q.  WERE YOU THE AUTHOR OF EXHIBIT 1014?

15  A.  YES.

16  Q.  IS EXHIBIT 1014 A TRUE AND ACCURATE COPY OF THE ORIGINAL?

17  A.  YES.

18  Q.  IS IT CORRECT THAT EXHIBIT 1014 WAS PUBLISHED IN AUGUST OF

19  2005 IN THE BUREAU OF JUSTICE STATISTICS SPECIAL REPORT?

20  A.  YES.

21  Q.  IS IT CORRECT THAT EXHIBIT 1014 ANALYZES THE SUICIDE AND

22  HOMICIDE RATES OF COUNTY JAILS AND STATE PRISONS FROM 2000 TO

23  2002 FROM DATA SUBMITTED BY THOSE ENTITIES?

24  A.  YES.  HOWEVER, I SHOULD NOTE THAT THE STATE PRISON DATA

25  ONLY COVERED 2001 AND 2002 BECAUSE THAT DATA COLLECTION BEGAN A

1  YEAR LATER THAN THE LOCAL JAIL COLLECTION.

2  Q.  SINCE THE PREPARATION OF EXHIBIT 1014, HAVE YOU PREPARED

3  ANY ARTICLE ANALYZING THE SUICIDE AND HOMICIDE RATES OF STATE

4  PRISONS FROM 2003 TO PRESENT?

5  A.  NO.  I HAVE PREPARED DATA TABLES FOR THE BJS WEBSITE THAT

6  HAVE INCLUDED STATE PRISON SUICIDE RATES FROM 2003 THROUGH

7  2006, BUT NONE OF THESE ONLINE PRODUCTS HAS INCLUDED ANY TEXT

8  OR COMMENTARY.  I HAVE NOT PREPARED ANY ARTICLES OR OTHER

9  PUBLICATIONS ANALYZING SUICIDE RATES SINCE THE PUBLICATION OF

10  THE REPORT INCLUDED AS DEFENDANTS' TRIAL EXHIBIT 1014.

11  Q.  ON PAGE THREE OF EXHIBIT 1014, YOU REPORT THAT FOR THE TIME

12  PERIOD OF 2000 TO 2002, 42 PERCENT OF ALL SUICIDES TOOK PLACE

13  IN FOUR STATES:  CALIFORNIA, 52; TEXAS, 49; NEW YORK, 21; AND

14  ILLINOIS 20.

15          IS THAT CORRECT?

16  A.  YES.

17  Q.  SINCE YOUR ARTICLE, EXHIBIT 1014, STATES AT PAGE 11 THAT

18  "THE DEMOGRAPHIC COMPOSITIONS OF THE INMATE POPULATIONS DO NOT

19  REFLECT THOSE OF THE U.S. RESIDENT POPULATION," WOULD YOU AGREE

20  THAT THE DEMOGRAPHIC COMPOSITION OF THE CALIFORNIA INMATE

21  POPULATION DOES NOT REFLECT THOSE OF THE U.S. RESIDENT

22  POPULATION?

23  A.  YES.

24  Q.  IS IT CORRECT THAT YOUR ARTICLE, EXHIBIT 1014, ALSO STATES

25  AT PAGE 11 THAT "STATE PRISONERS HAD A HIGHER RATE OF SUICIDE,

1  14 PER 100,000, THAN THE OVERALL RESIDENT POPULATION, 11, AND

2  THAT ONCE STANDARDIZED BY AGE, RACE AND GENDER TO MATCH THE

3  STATE PRISONER POPULATION, THE U.S. RESIDENT RATE OF SUICIDE,

4  18, EXCEEDED THAT OF STATE PRISONERS IN 2002"?

5  **A.**  YES.

6  **Q.**  WOULD YOU AGREE THAT ONCE STANDARDIZED BY AGE, RACE AND

7  GENDER TO MATCH THE CALIFORNIA STATE PRISON POPULATION, THE

8  U.S. RATE OF SUICIDE WOULD EXCEED THAT OF CALIFORNIA PRISONERS

9  IN 2002?

10  **A.**  WITHOUT KNOWING THE EXACT AGE, RACE AND GENDER

11  DISTRIBUTIONS OF THE CALIFORNIA STATE PRISONER POPULATION, IT

12  IS NOT POSSIBLE FOR ME TO AGREE WITH CERTAINTY. IF I HAD TO

13  OFFER MY BEST GUESS, I WOULD SAY THAT I AM LIKELY TO AGREE,

14  GIVEN THE FACT THAT STANDARDIZED U.S. POPULATION RATE OF

15  SUICIDE IS 55 PERCENT HIGHER THAN THE NATIONWIDE STATE PRISONER

16  RATE.

17  **Q.**  HAVE YOU DISCUSSED THE CALIFORNIA PRISON POPULATION SUICIDE

18  RATES WITH DR. RAY PATTERSON?

19  **A.**  NO.

20  **Q.**  HAVE YOU REVIEWED AN ARTICLE PUBLISHED IN PSYCHIATRIC

21  SERVICES, JUNE 2008 EDITION, AUTHORED BY RAYMOND PATTERSON,

22  M.D. AND DR. KERRY HUGHES, M.D. ENTITLED, "REVIEW OF COMPLETED

23  SUICIDES IN CALIFORNIA DEPARTMENT OF CORRECTIONS AND

24  REHABILITATION 1999 TO 2004"?

25  **A.**  NO.

1   **Q.**  DID YOU PROVIDE ANY DATA TO DR. PATTERSON AND DR. HUGHES

2   REGARDING SUICIDE RATES WITH THE CALIFORNIA DEPARTMENT OF

3   CORRECTIONS AND REHABILITATION AT ANY TIME?

4   **A.**  NO.

5   **Q.**  HAS ANYONE AT ANY TIME INFORMED YOU OF ANY ERRORS IN THE

6   DATA FINDINGS AND CONCLUSIONS YOU REPORTED IN EXHIBIT 1014?

7   **A.**  NO.

8   **Q.**  IS IT TRUE THAT EXHIBIT 1014 REFLECTS THE OFFICIAL ANALYSIS

9   OF THE BUREAU OF JUSTICE STATISTICS PERFORMED IN THE COURSE OF

10  ITS DUTIES?

11  **A.**  YES.

12          **MS. JOHNSON:**  YOUR HONORS, WE'RE GOING TO DO A

13  SERIES OF QUESTIONS TO WHICH DEFENDANTS HAD SOME OBJECTIONS

14  THAT WERE RAISED IN THE TRANSCRIPT.

15          WE HAVE NOTED THOSE OBJECTIONS. WE HAVE NOTED THOSE,

16  AND PERHAPS OTHERS.  WE HAVE NOTED OBJECTIONS TO PORTIONS OF

17  THIS TRANSCRIPT IN A DOCUMENT THAT WE FILED ON NOVEMBER 16 WITH

18  THE COURT.

19          WE'RE GOING TO READ -- I UNDERSTAND THE COURT IS

20  KIND OF LEAVING A STANDARD OBJECTION WITHOUT WAIVING THEM.  SO

21  WE'RE GOING TO READ THEM WITHOUT THE OBJECTIONS, BUT WITH THE

22  NOTATION WE'RE NOT WAIVING ANY OBJECTIONS.

23          **JUDGE HENDERSON:**  FINE.

24  **Q.**  A STATE PRISON SYSTEM'S MORTALITY RATE WILL BE HIGHLY

25  DEPENDENT ON THE COMPOSITION OF THE PRISON POPULATION,

1  INCLUDING THE AGE, GENDER, RACE AND LENGTH OF TIME SERVED OF

2  THE STATE PRISONERS IN A GIVEN STATE'S PRISON SYSTEM, CORRECT?

3  **A.**  A STATE PRISON SYSTEM'S MORTALITY RATE WILL CERTAINLY BE

4  IMPACTED BY THESE FACTORS AS WELL AS OTHERS.  FOR EXAMPLE,

5  QUALITY OF MEDICAL CARE, USE OF COMPASSIONATE RELEASE POLICIES.

6  HOWEVER, IT IS VERY DIFFICULT TO DISCERN THE LEVEL OF IMPACT

7  EACH OF THESE FACTORS MAY HAVE SIMPLY BECAUSE MANY OF THEM ARE

8  INTERTWINED.

9        FOR EXAMPLE, AGE AND LENGTH OF TIME SERVED ARE

10  CLOSELY LINKED BECAUSE INMATES AGE AS THEY SERVE TIME. CAREFUL

11  ANALYSIS WOULD BE REQUIRED TO DETERMINE JUST HOW MUCH THE

12  LENGTH OF TIME SERVED IN PRISON IMPACTS MORTALITY RATES, APART

13  FROM THE AGING OF THE INMATES INVOLVED.

14        LIKEWISE, VARIATIONS IN THE GENDER MAKEUP OF A STATE

15  PRISON SYSTEM'S POPULATION LIKELY WILL BRING WITH IT VARIATIONS

16  IN THE CRIMINAL OFFENDERS HOUSED.

17        AS WE SAW IN DEFENDANTS' TRIAL EXHIBITS 1014,

18  VIOLENT OFFENDERS IN STATE PRISON WERE THREE TIMES MORE LIKELY

19  THAN DRUG OFFENDERS TO COMMIT SUICIDE AND TWICE AS LIKELY TO BE

20  KILLED IN HOMICIDE. OFFENSE DISTRIBUTIONS OF MALE AND FEMALE

21  PRISONERS VARY DRAMATICALLY, WHICH MAKES IT DIFFICULT TO

22  ISOLATE IMPACT OF EACH FACTOR, GENDER AND CRIMINAL OFFENSE ON

23  OVERALL MORTALITY RATES.

24        TWO STATES WITH LARGE DIFFERENCES IN THESE

25  POPULATION CHARACTERISTICS COULD HAVE VERY SIMILAR RATES OF

1   MORTALITY IN THEIR SYSTEMS BECAUSE SOME OF THESE DIFFERENCES

2   CANCEL EACH OTHER OUT.  OTHER FACTORS SUCH AS THE QUALITY OF

3   MEDICAL CARE AND THE USE OF COMPASSIONATE RELEASE POLICIES FOR

4   TERMINALLY ILL PRISONERS COULD ALSO HAVE IMPACT ON MORTALITY

5   RATES.

6            BASICALLY, THE OVERALL MORTALITY RATE FOR ANY STATE

7   PRISON SYSTEM IS THE RESULT OF MANY FACTORS INTERACTING

8   TOGETHER. IT IS NOT SIMPLY A DIRECT RESULT OF A FEW DEMOGRAPHIC

9   FACTORS.

10  Q.  PLEASE REVIEW EXHIBIT 1012, DEFENDANTS' TRIAL EXHIBIT 1012.

11           THE SECOND PAGE OF EXHIBIT 1012 IS A CHART ENTITLED

12  "ATTACHMENT ONE:  ILLNESS MORTALITY RATE PER 100,000 STATE

13  PRISONERS BY STATE, 2001 TO 2005," CORRECT?

14  A.  YES.

15  Q.  THE YEARLY AND FIVE-YEAR MORTALITY RATES ON THIS CHART DO

16  NOT TAKE INTO ACCOUNT THE PROPORTION OF STATE PRISONERS IN

17  DIFFERENT AGE COHORTS IN THE DIFFERENT STATE PRISONS, CORRECT?

18  A.  CORRECT.  THESE ILLNESS MORTALITY RATES ARE NOT ADJUSTED TO

19  ACCOUNT FOR VARIATIONS IN PRISONER AGE ACROSS STATE SYSTEMS.

20  Q.  THE YEARLY AND FIVE-YEAR MORTALITY RATES ON THIS CHART DO

21  NOT TAKE INTO ACCOUNT THE PROPORTION OF MALE AND FEMALE

22  PRISONERS IN THE DIFFERENT STATE PRISONS, CORRECT?

23  A.  CORRECT.  THESE ILLNESS MORTALITY RATES ARE NOT ADJUSTED TO

24  ACCOUNT FOR VARIATIONS IN PRISONER GENDER ACROSS STATE SYSTEMS.

25  Q.  THE YEARLY AND FIVE-YEAR MORTALITY RATES ON THIS CHART DO

1  NOT TAKE INTO ACCOUNT THE RACIAL MAKEUP OF THE DIFFERENT STATE

2  PRISONS, CORRECT?

3  **A.**  CORRECT.  THESE ILLNESS MORTALITY RATES ARE NOT ADJUSTED TO

4  ACCOUNT FOR VARIATIONS IN PRISONER RACE OR HISPANIC ORIGIN

5  ACROSS STATE SYSTEMS.

6  **Q.**  THE YEARLY AND FIVE-YEAR MORTALITY RATES ON THIS CHART DO

7  NOT TAKE INTO ACCOUNT THE PROPORTION OF PRISONERS SERVING

8  DIFFERENT LENGTHS OF TIME IN THE DIFFERENT STATE PRISONS,

9  CORRECT?

10  **A.**  CORRECT.  THESE ILLNESS MORTALITY RATES ARE NOT ADJUSTED TO

11  ACCOUNT FOR VARIATIONS IN TIME SERVED ACROSS STATE SYSTEMS.

12  **Q.**   SO FOR PEOPLE IN THE U.S. AGED 15 TO 64 UNINTENTIONAL

13  INJURY IS A VERY SIGNIFICANT CONTRIBUTING FACTOR TO THE OVERALL

14  MORTALITY RATE, CORRECT?

15  **A.**  FROM THE DATA PRESENTED IN THIS CHART, IT APPEARS THAT THE

16  CONTRIBUTION OF UNINTENTIONAL INJURY TO THE OVERALL MORALITY

17  RATE OF U.S. RESIDENTS DROPS SUBSTANTIALLY AS AGE INCREASES.

18  FOR EXAMPLE, UNINTENTIONAL INJURY ACCOUNTED FOR 46 PERCENT OF

19  THE OVERALL MORTALITY RATE OF PERSONS AGE 15 TO 24, BUT THIS

20  PERCENTAGE DROPPED TO 20 PERCENT OF THE OVERALL MORTALITY AMONG

21  PERSONS 35 TO 44, TEN PERCENT OF PERSONS 45 TO 54, AND FINALLY

22  DOWN TO ONLY 4 PERCENT OF MORTALITY AMONG PERSONS 55 TO 64

23  YEARS OLD.

24          ACCORDING TO THIS CHART, AMONG PERSONS AGE 55 TO 64,

25  THE COMBINED RATE OF MORTALITY FROM JUST TWO MEDICAL

1  CONDITIONS, HEART DISEASE AND CANCER, 541.7 PER 100,000 IS 15

2  TIMES GREATER THAN THE RATE OF DEATH FROM UNINTENTIONAL INJURY

3  35.8 PER 100,000.

4           SO I WOULD SAY THAT UNINTENTIONAL INJURY IS A VERY

5  SIGNIFICANT FACTOR IN THE OVERALL MORTALITY RATE OF THOSE

6  PERSONS AGE 15 TO 34, BUT A MUCH SMALLER CONTRIBUTOR TOWARDS

7  THE OVERALL MORTALITY OF ADULTS OVER THE AGE OF 35.

8  **Q.**  THE FACT THAT THE MORTALITY RATE FOR 2001 TO 2004 IS LOWER

9  IN STATE PRISONS THAN IN THE U.S. RESIDENT POPULATION IS LIKELY

10 RELATED TO THE VERY LOW RATE OF DEATH FROM UNINTENTIONAL INJURY

11 FOR STATE PRISONERS AGED 15 TO 64 YEARS OLD, CORRECT?

12 **A.**  WHILE I AGREE THAT THE LOWER RATE OF UNINTENTIONAL INJURY

13 DEATHS IN STATE PRISON WAS A FACTOR IN THE LOWER OVERALL

14 MORTALITY RATES OF STATE PRISONERS 15 TO 64, I WOULD DISAGREE

15 THAT IT WAS THE PRIMARY FACTOR IN THE OVERALL DIFFERENCE.

16 **Q.**  PLEASE EXPLAIN WHY.

17 **A.**  IF YOU LOOK AT APPENDIX TABLE 11 OF THE DATA BRIEF, WHICH

18 IS DEFENDANTS' TRIAL EXHIBIT 1011, YOU CAN SEE THAT WE

19 PRESENTED TWO AVERAGE ANNUAL MORTALITY RATES FOR THE U.S.

20 RESIDENT POPULATION AGE 15 TO 64 FOR THE YEARS 2001 THROUGH

21 2003. ONE RATE INCLUDED ALL CAUSES OF DEATH, AND THE OTHER RATE

22 EXCLUDED ALL TRANSPORTATION DEATHS.

23           TRANSPORTATION DEATHS TYPICALLY ACCOUNT FOR CLOSE TO

24 HALF OF ALL ACCIDENTAL DEATHS IN THE U.S. POPULATION. HOWEVER,

25 STATE PRISONERS ARE EXPOSED TO DRASTICALLY LOWER RATES OF

1  TRANSPORTATION DEATHS THAN OTHER U.S. RESIDENTS BECAUSE THEY

2  ARE NOT ALLOWED TO DRIVE AND ONLY RARELY TRANSPORTED BY

3  VEHICLES DRIVEN BY OTHERS FOR PURPOSES SUCH AS COURT

4  APPEARANCES, TRANSFERS OR WORK DETAILS.

5          FOR THE MOST PART, STATE PRISONERS SPEND MOST OF

6  THEIR DAYS IN CONFINEMENT AND ARE REMOVED FROM ANY RISK OF

7  DYING IN MOTOR VEHICLE ACCIDENTS. AS A RESULT, I FELT IT WOULD

8  BE APPROPRIATE TO REFLECT THIS DIFFERING EXPOSURE TO RISK IN

9  THE DATA BRIEF'S COMPARISON OF STATE PRISON AND U.S. RESIDENT

10  MORTALITY RATES, BUT THE REMOVAL OF ALL TRANSPORT DEATHS FROM

11  THE CALCULATION OF U.S. RESIDENT MORTALITY RATES DID NOT CHANGE

12  THE FACT THAT STATE PRISONER MORTALITY RATES WERE STILL LOWER

13  FOR PERSONS AGE 15 TO 64.

14          WITH TRANSPORTATION DEATHS INCLUDED, THE U.S.

15  RESIDENT MORTALITY RATE AMONG PERSONS AGE 15 TO 64 WAS 58

16  DEATHS HIGHER PER 100,000 PEOPLE, 308 COMPARED TO 250.

17          WITH TRANSPORT DEATHS EXCLUDED, THE U.S. RESIDENT

18  MORTALITY RATE REMAINED 39 DEATHS HIGHER PER 100,000 PEOPLE,

19  289 COMPARED TO 250.

20          EXPRESSED ANOTHER WAY, THE HIGHER PREVALENCE OF

21  TRANSPORT DEATHS IN THE U.S. POPULATION ONLY ACCOUNTED FOR

22  ONE-THIRD OF THE DIFFERENCE IN THESE OVERALL MORTALITY RATES.

23  THE REMAINING TWO-THIRDS OF THE DIFFERENCE IN THESE MORTALITY

24  RATES MUST BE EXPLAINED BY OTHER FACTORS.

25          MY FURTHER RESEARCH ON THIS SUBJECT HAS LED ME TO

1  BELIEVE THAT THE CONSISTENTLY LOWER MORTALITY RATES OF BLACK

2  MALES IN STATE PRISON IS A MAJOR FACTOR IN THE DIFFERENCE IN

3  THESE OVERALL MORTALITY RATES. FOLLOWING THE RELEASE OF THE

4  DATA BRIEF, I HAD A NUMBER OF REQUESTS FROM EPIDEMIOLOGISTS TO

5  TAKE A CLOSER LOOK AT THESE DIFFERING MORTALITY RATES WITHIN

6  RACE AND GENDER GROUPS.  SPECIFICALLY, THESE RESEARCHERS WERE

7  INTRIGUED BY THE FACT THAT WHITE AND HISPANIC PRISONERS BOTH

8  HAD HIGHER MORTALITY RATES IN PRISON, BUT THE MORTALITY RATE OF

9  BLACK PRISONERS WAS LESS THAN HALF THAT OF OTHER BLACK U.S.

10  RESIDENTS.

11          ORIGINALLY, OUR DISCUSSIONS FOCUSSED ON HOMICIDE

12  DEATHS AMONG YOUNG BLACK MALES AS THE REASON FOR THIS

13  DISPARITY.

14          AS YOU CAN SEE IN DEFENDANTS' TRIAL EXHIBIT 1014,

15  PAGE 11, BJS DATA FROM THE DEATHS IN CUSTODY REPORTING PROGRAM

16  INDICATE THAT U.S. RESIDENTS ARE NINE TIMES MORE LIKELY TO DIE

17  FROM HOMICIDE THAN STATE PRISONERS ONCE RATES ARE STANDARDIZED

18  TO MATCH THE AGE, RATE AND GENDER COMBINATIONS OF STATE

19  PRISONS.

20          ON PAGE FIVE OF THAT SAME REPORT, YOU CAN SEE THAT

21  BLACK STATE PRISONERS HAD THE LOWEST HOMICIDE RATE, TWO

22  HOMICIDES PER 100,000 INMATES, MAKING THEM THE LEAST LIKELY

23  RACIAL GROUP TO EXPERIENCE A HOMICIDE WITHIN A LARGER

24  POPULATION THAT WAS ALREADY FAR LESS LIKELY TO BE KILLED IN A

25  HOMICIDE THAN OTHER U.S. RESIDENTS.

1          THIS DIFFERENCE WAS EVEN MORE NOTABLE BECAUSE YOUNG

2    BLACK MALES TYPICALLY HAVE THE HIGHEST HOMICIDE MORTALITY RATES

3    IN THE U.S. RESIDENT POPULATION, AND YOUNG BLACK MALES

4    ROUTINELY HAVE THE HIGHEST PRISON INCARCERATION RATES OF ANY

5    GROUP IN THE U.S. RESIDENT POPULATION. BUT WHEN I PERFORMED A

6    CLOSER ANALYSIS OF THE DATA PRESENTED IN THE DATA BRIEF WITH

7    MORE SPECIFIC BREAKDOWNS BY GENDER, RACE AND AGE, I FOUND THAT

8    THE LOWER PRISON MORTALITY RATES FOR BLACK MALES WERE NOT

9    CONFINED TO YOUNG ADULTS WITH MUCH HIGHER RATES OF HOMICIDE

10   DEATH OUTSIDE OF PRISON.

11          IN FACT, THE PRISON MORTALITY RATES OF BLACK MALES

12   WERE LOWER FOR ALL AGE GROUPS BETWEEN 15 AND 64, AS OPPOSED TO

13   WHITES AND HISPANICS WHO HAD LOWER MORTALITY RATES IN PRISON

14   FOR YOUNG ADULTS, BUT MUCH HIGHER RATES OF DEATHS FOR PRISONERS

15   AMONG MALES AGE 45 TO 64.

16          THIS FINDING SEEMS TO INDICATE THAT LOWER MORTALITY

17   RATES FOR BLACK STATE PRISONERS ARE THE RESULT OF BOTH LOWER

18   RISK OF HOMICIDE FOR YOUNG MALES, AS WELL AS LOWER RISK OF

19   FATAL ILLNESS AMONG OLDER MALES.

20          GIVEN THAT BLACK MALES ROUTINELY MAKE UP 40 PERCENT

21   OR MORE OF THE STATE PRISON POPULATION, THESE LOWER DEATH RATES

22   FOR BLACK MALES IN PRISON ARE LIKELY A MAJOR CONTRIBUTING

23   FACTOR IN THE OVERALL LOWER DEATH RATE FOR STATE PRISONERS AGE

24   15 TO 64.

25   Q.  DIRECTING YOUR ATTENTION BACK TO DEFENDANTS' EXHIBIT 1012,

1  ON THE FOURTH PAGE, THE BUREAU OF JUSTICE STATISTICS REPORTED

2  THAT THE MORTALITY RATE FOR CALIFORNIA STATE PRISONERS FROM

3  AIDS FOR 2005 WAS NINE PER 100,000, CORRECT?

4  **A.**  YES.  HOWEVER, IT SHOULD BE NOTED THAT THIS QUESTION

5  IMMEDIATELY FOLLOWING THE PREVIOUS ITEM IMPLIES AN

6  INAPPROPRIATE COMPARISON BETWEEN THE AIDS MORTALITY RATE IN

7  CALIFORNIA PRISONS, NINE PER 100,000 INMATES, AND THE AIDS

8  MORTALITY RATE IN THE RESIDENT POPULATIONS OF THE INDIVIDUAL

9  STATES AND THE DISTRICT OF COLUMBIA, I.E. THE STATEMENT THAT

10  JUST TWO STATES IN THE DISTRICT OF COLUMBIA HAD A MORTALITY

11  RATE FROM HIV GREATER THAN NINE PER 100,000.

12        AS HAS BEEN NOTED AT LENGTH EARLIER IN THIS

13  DEPOSITION, STATE PRISON POPULATIONS DIFFER QUITE SHARPLY FROM

14  RESIDENT POPULATIONS BY AGE, RACE AND GENDER, AMONG SEVERAL

15  OTHER MEASURES.

16        WHILE CALIFORNIA STATE PRISONER RATE OF HIV DEATHS

17  WAS HIGHER THAN THAT FOR 48 STATES' RESIDENT POPULATIONS, A

18  MORE APPROPRIATE BASIS OF COMPARISON WOULD BE THE STATE PRISON

19  POPULATIONS OF THESE OTHER STATES.

20        ACCORDING TO APPENDIX TABLE NINE OF DEFENDANTS'

21  TRIAL EXHIBIT 1011, YOU CAN SEE THAT THE PRISON POPULATIONS OF

22  21 STATES HAD HIGHER RATES OF AIDS DEATHS THAN THE CALIFORNIA

23  PRISON POPULATION.

24  **Q.**  HAVE YOU PERFORMED ANY STUDIES TO DETERMINE ON A

25  STATE-BY-STATE BASIS THE RELATIONSHIP BETWEEN EACH STATE'S

1  OVERALL MORTALITY RATE AND THE MORTALITY RATE FOR THE STATE'S

2  PRISONER POPULATION?

3  **A.**  NO.  ALL OF THE STATE-SPECIFIC DATA I HAVE ANALYZED HAVE

4  REFERRED TO THE COMPARISONS OF STATE PRISONER DEATH RATES

5  ACROSS STATES.  I HAVE NOT FOCUSED RELATING STATE-SPECIFIC

6  RESIDENT POPULATION MORTALITY RATES TO PRISON DEATH RATES IN

7  THOSE SAME STATES.

8  **Q.**  ARE YOU FAMILIAR WITH ANY STUDIES PERFORMED TO DETERMINE A

9  STATE-BY-STATE BASIS THE RELATIONSHIP BETWEEN EACH STATE'S

10  OVERALL MORTALITY RATE AND THE MORTALITY RATE FOR THAT STATE'S

11  PRISONER POPULATION?

12  **A.**  NO.

13  **Q.**  WHO MADE THE DECISION AS TO WHAT INFORMATION TO HIGHLIGHT

14  IN THE NOTES TO THE STATISTICAL CHARTS TO DEFENDANTS' EXHIBIT

15  1012?

16  **A.**  AS STATED PREVIOUSLY, I WROTE THE HIGHLIGHTS INCLUDED WITH

17  THESE DATA ATTACHMENTS. MY DECISIONS WERE GUIDED BY THE

18  RESEARCH INTERESTS OF THE DATA REQUESTER, NAMELY THEIR INTEREST

19  IN COMPARING CALIFORNIA'S PRISON MORTALITY RATES WITH THOSE OF

20  OTHER STATES WITH PARTICULAR EMPHASIS ON DEATHS ARISING FROM

21  MEDICAL PROBLEMS.

22  **Q.**  WHO DECIDED THAT THE HIGHLIGHTS IN DEFENDANTS' TRIAL

23  EXHIBIT 1012 WOULD TEND TO INCLUDE COMPARISONS THAT PORTRAYED

24  CALIFORNIA'S RATES AS LOWER THAN THE RATES OF OTHER GROUPS OF

25  STATES?

1  **A.** NO SUCH DECISION WAS MADE BY ANYONE. AS STATED IN MY

2  RESPONSE TO THE PREVIOUS QUESTION, THE COMPARISONS CHOSEN FOR

3  THE HIGHLIGHTS WERE GUIDED BY THE TOPICAL INTERESTS OF THE

4  PARTY REQUESTING THE DATA.

5           THE COMPARISONS THEY WERE INTERESTED IN FOCUSED ON

6  COMPARING MORTALITY RATES, PARTICULARLY ILLNESS AND AIDS DEATH

7  RATES IN CALIFORNIA WITH OTHER STATE PRISON SYSTEMS.  WHEN

8  THOSE COMPARISONS WERE MADE, CALIFORNIA'S RATES WERE

9  CONSISTENTLY LOWER.  AND THAT WAS WHAT WAS REPORTED IN THE

10 HIGHLIGHTS.

11          IF CALIFORNIA'S RATES ON SUCH DEATHS WERE FOUND TO

12 BE HIGHER THAN OTHER STATES ON ALL OF THE SAME MEASURES, THE

13 SAME COMPARISONS WOULD HAVE BEEN SELECTED FOR HIGHLIGHTS.

14          SIMPLY PUT, THE COMPARISONS IN THE HIGHLIGHTS WERE

15 CHOSEN BASED ON QUESTIONS POSED AND NOT ON THE ANSWERS THAT I

16 FOUND WHEN ANALYZING THE DATA.

17 **Q.** IS IT CORRECT THAT ATTACHMENT TWO TO DEFENDANTS' TRIAL

18 EXHIBIT 1012 SHOWS THAT THE SUICIDE DEATH RATE FOR CALIFORNIA

19 PRISONS WAS EQUAL TO OR ABOVE THE AVERAGE RATE FOR ALL OTHER

20 STATES IN EACH YEAR AVERAGING 17 PERCENT HIGHER FOR THE ENTIRE

21 FIVE-YEAR PERIOD, 18 SUICIDE DEATHS PER 100,000 INMATES VERSUS

22 15 SUICIDE DEATHS PER 100,000 INMATES?

23 **A.** THE SUICIDE MORTALITY RATE FOR THE CALIFORNIA PRISONS WAS

24 EQUAL TO OR ABOVE THE RATE OF SUICIDE DEATHS IN ALL OTHER

25 STATES COMBINED IN EACH YEAR FROM 2001 TO 2005. THE AVERAGE

1   ANNUAL SUICIDE RATES REFERENCED IN THIS QUESTION WERE ACCURATE

2   FOR TWO GROUPS, BUT THE CALIFORNIA SUICIDE RATE WAS ACTUALLY

3   20 PERCENT HIGHER FOR THIS PERIOD, A DIFFERENCE OF THREE

4   DIVIDED BY A BASE OF 15 COMES TO A DIFFERENCE OF .2 OR

5   20 PERCENT.

6   **Q.**  IS IT CORRECT ATTACHMENT TWO TO DEFENDANTS' TRIAL EXHIBIT

7   1012 SHOWS THAT HOMICIDE DEATH RATES FOR CALIFORNIA PRISONS --

8   SORRY -- THAT THE HOMICIDE DEATH RATE FOR CALIFORNIA'S PRISONS

9   WAS ABOVE THE AVERAGE RATE FOR ALL OTHER STATES IN EACH YEAR

10  AVERAGING MORE THAN DOUBLE THE AVERAGE RATE FOR THE OTHER

11  STATES FOR THE ENTIRE FIVE-YEAR PERIOD, EIGHT HOMICIDE DEATHS

12  PER 100,000 INMATES VERSUS THREE HOMICIDE DEATHS PER 100,000?

13  **A.**  YES, THAT IS CORRECT.

14  **Q.**  WHO DECIDED NOT TO INCLUDE THIS INFORMATION AS A HIGHLIGHT?

15  **A.**  MY ROLE IN WRITING ALL OF THE HIGHLIGHTS HAS ALREADY BEEN

16  DESCRIBED IN RESPONSES TO EARLIER QUESTIONS. THE DEFENDANTS DID

17  NOT REQUEST ANY COMPARISONS ON MORTALITY ISSUES BEYOND ILLNESS

18  AND AIDS. IN MY CONVERSATIONS WITH THEM, THEY ONLY MENTIONED

19  THEY WERE DEALING WITH ALLEGATIONS REGARDING THE QUALITY OF

20  MEDICAL CARE PROVIDED IN THEIR PRISONS.  THEY MADE NO MENTION

21  OF SECURITY CONCERNS BEING PART OF THE COMPLAINTS.

22          HAD THEY COMMUNICATED ANY INDICATION THAT MORTALITY

23  RELATED TO SECURITY WAS A TOPIC OF CONCERN, I WOULD HAVE

24  CERTAINLY INCLUDED THESE RATES IN THE HIGHLIGHTS.  BUT AS I

25  UNDERSTOOD THEIR QUESTIONS, SUCH COMPARISONS WERE OUTSIDE THE

1  SCOPE OF THEIR REQUEST.

2          FURTHERMORE, THE SCALE OF THE DIFFERENCE BETWEEN

3  CALIFORNIA AND ALL OTHER STATES COMBINED WAS QUITE SMALL

4  COMPARED TO THE DIFFERENCE IN ILLNESS AND AIDS MORTALITY RATES.

5  THE DIFFERENCE IN HOMICIDE RATES AMOUNTED TO FIVE HOMICIDES PER

6  100,000 INMATES EACH YEAR COMPARED TO A DIFFERENCE OF 53

7  ILLNESS OR AIDS DEATHS PER 100,000 INMATES EACH YEAR.

8  **Q.**  IS IT CORRECT THAT ATTACHMENT TWO TO DEFENDANTS' TRIAL

9  EXHIBIT 1012 SHOWS THAT THE DRUG ALCOHOL INTOXICATION DEATH

10 RATE FOR CALIFORNIA PRISONS WAS ABOVE THE RATE FOR ALL OTHER

11 STATES IN EACH YEAR AVERAGING TRIPLE THE AVERAGE RATES FOR ALL

12 OTHER STATES FOR THE ENTIRE FIVE-YEAR PERIOD, SIX DRUG ALCOHOL

13 INTOXICATION DEATHS PER 100,000 INMATES VERSUS TWO DRUG ALCOHOL

14 INTOXICATION DEATHS PER 100,000 INMATES?

15 **A.**  YES, THAT'S CORRECT.

16 **Q.**  WHO DECIDED NOT TO INCLUDE THIS INFORMATION AS A HIGHLIGHT?

17 **A.**  I MADE THIS DECISION CONSISTENT WITH THE REASONS ALREADY

18 STATED SEVERAL TIMES FOR HOW I SELECTED FINDINGS FOR THESE

19 HIGHLIGHTS. DRUG AND ALCOHOL INTOXICATION DEATHS WERE NOT A

20 TOPIC OF INTEREST FOR THE DATA REQUESTER, AND THE SCALE OF

21 DIFFERENCE BETWEEN THE RATES WAS QUITE SMALL, FOUR DEATHS PER

22 100,000 INMATES PER YEAR COMPARED TO THE DIFFERENCE IN ILLNESS,

23 AIDS MORTALITY RATES, 53 ILLNESS OR AIDS DEATHS PER 100,000

24 INMATES EACH YEAR.

25 **Q.**  IS IT CORRECT THAT ATTACHMENT TWO TO DEFENDANTS' EXHIBIT

1  EXHIBIT 1012 SHOWS THAT CALIFORNIA PRISONS MORTALITY RATE FROM

2  ALL CAUSES HAS INCREASED FROM 2001, 178 PER 100,000 INMATES, TO

3  2005, 223 PER 100,000 INMATES, AN INCREASE OF ABOUT 25 PERCENT?

4  **A.**  YES, THAT IS CORRECT.

5  **Q.**  WHO DECIDED NOT TO INCLUDE THIS INFORMATION AS A HIGHLIGHT?

6  **A.**  IN AN INDIRECT WAY THIS TREND WAS ALREADY DISCUSSED IN

7  ATTACHMENT ONE, HIGHLIGHT NUMBER THREE. I NOTED THAT

8  CALIFORNIA'S ILLNESS MORTALITY RATE SPIKED FROM A LOW OF 141

9  PER 100,000 IN 2001 TO A HIGH OF 187 IN 2002. I ALSO OBSERVED

10 THAT THE RATE REMAINED STABLE IN THE YEARS SINCE.

11          GIVEN THAT ILLNESS DEATHS ACCOUNTED FOR OVER 1,300

12 OF THE 1,672 CALIFORNIA PRISON DEATHS DURING THIS PERIOD, IT IS

13 NOT SURPRISING THAT THE OVERALL DEATH RATE FOR THE STATE

14 FOLLOWED THE SAME TREND AS THE ILLNESS DEATH RATE.

15          THE OVERALL CALIFORNIA PRISON MORTALITY RATE SPIKED

16 FROM A LOW OF 178 PER 100,000 IN 2001, TO 213 PER 100,000 IN

17 2002.

18          OVER THE ENSUING THREE YEARS, 2003 TO 2005, THE

19 TOTAL MORTALITY RATE REMAINED VERY STABLE, INCREASING BY 10

20 DEATHS PER 100,000 INMATES, AN INCREASE OF 5 PERCENT OVER THREE

21 YEARS?

22          IN MY VIEW, IT WAS THE STABILITY OF THE RATES OVER

23 FOUR CONSECUTIVE YEARS OF THE FIVE-YEAR PERIOD THAT

24 CHARACTERIZED THE PERIOD.  BECAUSE THE TREND IN OVERALL

25 MORTALITY RATES SIMPLY REFLECTED WHAT I HAD ALREADY DISCUSSED

1  IN ATTACHMENT ONE, HIGHLIGHT NUMBER THREE, I DIDN'T THINK IT

2  WAS IMPORTANT TO REPEAT THE POINT WHEN COMPOSING HIGHLIGHTS FOR

3  ATTACHMENT TWO.

4  **Q.**  IS IT CORRECT THAT ATTACHMENT TWO TO DEFENDANTS' EXHIBIT

5  1012 ALSO SHOWS THAT THE MORTALITY RATE FOR ALL OTHER STATES

6  FOR ALL CAUSES HAS DECLINED FROM 2001, 252 PER 100,000 INMATES,

7  TO 2005, 225 PER 100,000 INMATES, A DECLINE OF ABOUT

8  11 PERCENT?

9  **A.**  YES, THAT'S CORRECT.

10 **Q.**  WHO DECIDED NOT TO INCLUDE THIS INFORMATION AS A HIGHLIGHT?

11 **A.**  MY PROCESS FOR SELECTING AND WRITING THESE HIGHLIGHTS HAS

12 ALREADY BEEN DISCUSSED IN MY RESPONSE TO NUMEROUS ITEMS. IN

13 TERMS OF THIS PARTICULAR QUESTION, I WOULD POINT OUT THAT THE

14 11 PERCENT DECLINE OVER THIS FIVE-YEAR PERIOD WAS NEITHER A

15 VERY DRAMATIC TREND NOR A STABLE ONE.

16          THE 2005 OVERALL MORTALITY RATE FOR ALL OTHER STATES

17 COMBINED WAS THE LOWEST OF THE FIVE-YEAR PERIOD, 225 DEATHS PER

18 100,000 INMATES.  BUT IT WAS PRECEDED BY THE TWO HIGHEST RATES

19 OF THE PERIOD, AS WELL.

20          IN 2003 AND 2004, THE OVERALL MORTALITY RATE WAS 266

21 AND 259 DEATHS, RESPECTIVELY PER 100,000 INMATES. COMPARING

22 2001 TO EITHER OF THESE YEARS WOULD HAVE INDICATED THE OPPOSITE

23 TREND IN THE PRISON MORTALITY OF OTHER STATES.

24          IT WAS IMPOSSIBLE TO JUDGE WHETHER THE 2005 DECLINE

25 IN OTHER STATES' PRISON MORTALITY RATE WAS A ONE-YEAR EXCEPTION

1   TO THIS EARLIER INCREASE OR THE BEGINNING OF A SUSTAINED

2   DOWNWARD TREND.

3            IN CONTRAST, THE TREND THAT I DID HIGHLIGHT, THAT OF

4   CALIFORNIA'S STABLE RATE OF ILLNESS DEATHS FOLLOWING THE 2002

5   INCREASE, WAS A MORE ESTABLISHED PATTERN OVER FOUR YEARS.

6   **Q.**  PLEASE TURN YOUR ATTENTION TO DEFENDANTS' TRIAL EXHIBIT

7   1014, ENTITLED "SUICIDE AND HOMICIDE IN STATE PRISONS AND LOCAL

8   JAILS."

9            YOU WERE THE AUTHOR OF THIS REPORT, CORRECT?

10  **A.**  YES, THAT'S CORRECT.

11  **Q.**  ON PAGE THREE OF THAT REPORT YOU REPORTED THAT DURING 2001,

12  31 STATES REPORTED NO PRISON HOMICIDES, CORRECT?

13  **A.**  YES, THAT'S CORRECT.

14  **Q.**  AND IN 2002, 29 STATES REPORTED NO PRISON HOMICIDES,

15  CORRECT?

16  **A.**  YES, THAT'S CORRECT.

17  **Q.**  ON THAT SAME PAGE YOU WROTE THAT JUST THREE STATES REPORTED

18  MORE THAN FIVE HOMICIDES IN 2001 TO 2002, CORRECT?

19  **A.**  YES.  BUT GIVEN THE WIDE RANGE OF PRISON POPULATIONS ACROSS

20  THE FIFTY STATES IT'S REALLY NOT ADVISABLE TO COMPARE

21  INDIVIDUAL STATES, PARTICULARLY FOR SUCH A RARE PHENOMENON AS

22  PRISON HOMICIDE ON PURELY NUMERICAL GROUNDS.  COMPARING RATES

23  OF HOMICIDE ACROSS STATES WOULD BE MORE APPROPRIATE.

24  **Q.**  ON THE SAME PAGE YOU STATED THAT THERE WERE 87 PRISON

25  HOMICIDES DURING 2001 TO 2002, CORRECT?

1  A.  YES, THAT'S CORRECT.

2  Q.  AND THAT 21 OF THOSE HOMICIDES OCCURRED IN CALIFORNIA,

3  CORRECT?

4  A.  YES.  BUT, AGAIN, COMPARISONS OF RATES RATHER THAN COUNTS

5  OF HOMICIDES WOULD BE MORE APPROPRIATE GIVEN HOW MUCH LARGER

6  CALIFORNIA'S PRISON POPULATION IS THAN MOST STATES.  BASED ON

7  HOMICIDES PER 100,000 INMATES, CALIFORNIA TIED FOR TEN HIGHEST

8  WITH SOUTH CAROLINA.

9          THE STATES THAT HAD THE FOUR HIGHEST RATES OF

10  HOMICIDE, SOUTH DAKOTA, NEW MEXICO, MARYLAND AND UTAH HAD

11  DECEPTIVELY LOW NUMBERS OF HOMICIDES.  ONLY 11 COMBINED

12  COMPARED TO 21 IN CALIFORNIA ALONE.

13          HOWEVER, THE COMBINED PRISON POPULATION OF THESE

14  FOUR STATES IS ONLY ROUGHLY A QUARTER OF CALIFORNIA'S PRISON

15  POPULATION. THEREFORE, A MUCH SMALLER NUMBER OF HOMICIDES IN

16  THESE MUCH SMALLER PRISON SYSTEMS RESULTED IN HIGHER RATES OF

17  HOMICIDE.

18  Q.  TURNING TO PAGE 11 OF THE SAME REPORT, THE REPORT STATES

19  THAT THE RATE OF SUICIDES FOR STATE PRISONERS IS 14 PER 100,000

20  AND FOR THE OVERALL POPULATION IS 11 PER 100,000, CORRECT?

21  A.  TO BE CLEAR, THE REPORT INCLUDED THESE RESPECTIVE RATES FOR

22  A SINGLE YEAR, 2002.

23  Q.  WHEN THE BUREAU OF JUSTICE STATISTICS STANDARDIZED THE U.S.

24  RESIDENT POPULATION TO REFLECT THE AGE, RACE AND GENDER OF THE

25  STATE PRISONER POPULATION, WHICH STATE PRISON SYSTEM'S

1  DEMOGRAPHIC DATA DID YOU USE?

2  **A.**  IT AGE, RACE AND GENDER CHARACTERISTICS OF THE TOTAL

3  POPULATION OF ALL STATE PRISON SYSTEMS WAS USED TO STANDARDIZE

4  THE U.S. RESIDENT POPULATION RATES.  IN BJS PUBLICATIONS, ALL

5  REFERENCES TO THE STATE PRISONER POPULATION ARE USED

6  COLLECTIVELY IN THIS FASHION, AND THEY DO NOT REFER TO A SINGLE

7  STATE'S PRISON POPULATION.

8  **Q.**  ARE THE DEMOGRAPHICS OF THE CALIFORNIA PRISON POPULATION

9  THE SAME AS THE DEMOGRAPHIC DATA YOU USED TO STANDARDIZE THE

10  U.S. RESIDENT POPULATION WHEN YOU MADE THESE CALCULATIONS?

11  **A.**  NO, THE DATA REFLECTS THE DEMOGRAPHIC COMPOSITION OF THE

12  OVERALL STATE PRISONER POPULATION ACROSS ALL FIFTY STATES.  IT

13  IS LIKELY THAT THE DEMOGRAPHIC COMPOSITION OF ANY SINGLE

14  STATE'S PRISON SYSTEM DURING 2002 DIFFERED IN SOME FASHION FROM

15  THESE ACCUMULATED NATIONWIDE CHARACTERISTICS.

16  **Q.**  PLEASE EXPLAIN HOW THE DEMOGRAPHICS OF THE CALIFORNIA

17  PRISON POPULATION DIFFER FROM THE DEMOGRAPHIC DATA YOU USED TO

18  STANDARDIZE THE U.S. RESIDENT POPULATION WHEN YOU MADE THESE

19  CALCULATIONS.

20  **A.**  I DO NOT HAVE A DEMOGRAPHIC BREAKDOWN OF THE CALIFORNIA

21  PRISONER POPULATION FOR 2002 TO WHICH I CAN REFER.  AS FAR AS I

22  KNOW FROM WORKING WITH OTHER CORRECTIONAL POPULATION DATA

23  SERIES, THE PERCENTAGE OF HISPANIC PRISONERS IN THE CALIFORNIA

24  SYSTEM IS HIGHER THAN THE NATIONAL STATE PRISON POPULATION

25  AVERAGE.  AND WOMEN MAKE UP A SLIGHTLY LOWER PERCENT OF THE

1  CALIFORNIA PRISONERS THAN THE NATIONAL AVERAGE AMONG STATE

2  PRISON SYSTEM.

3         I DON'T KNOW HOW THE AGE DISTRIBUTION OF CALIFORNIA

4  PRISONERS COMPARES TO THE NATIONAL AVERAGE FOR STATE PRISONERS.

5  **Q.**  CALIFORNIA REPORTED MORE SUICIDES THAN ANY OTHER STATE,

6  CORRECT?

7  **A.**  NUMERICALLY, YES. BUT PLEASE BEAR IN MIND THE POINTS I MADE

8  EARLIER ABOUT COMPARING HOMICIDES ACROSS STATE SYSTEMS ON A

9  PURELY NUMERICAL BASIS.  GIVEN THE VAST DIFFERENCES IN PRISON

10  POPULATION SIZE ACROSS STATES, YOU CAN SEE STATES WITH

11  RELATIVELY SMALL NUMBERS OF SUCH DEATHS HAVE THE HIGH RATES OF

12  HOMICIDE. THE POINT IS THE SAME WHEN DISCUSSING PRISON SUICIDE

13  COMPARISONS.

14         WHILE CALIFORNIA AND TEXAS EACH HAD FAR MORE

15  SUICIDES THAN ANY OTHER STATE DURING THIS PERIOD, THEY HAD 52

16  AND 49, RESPECTIVELY, WHILE NO OTHER STATE HAD MORE THAN 21,

17  NEITHER STATE WAS AMONG THE TOP 20 HIGHEST SUICIDE RATES PER

18  100,000 INMATES.

19         THIS IS BECAUSE THESE TWO STATES ALSO HAVE BY FAR

20  THE LARGEST PRISON POPULATIONS IN THE NATION.

21         AS WITH HOMICIDES, MOST OF THE STATES WITH THE

22  HIGHEST SUICIDE RATES HAD RELATIVELY SMALL PRISON POPULATIONS

23  AND RELATIVELY SMALL NUMBERS OF SUICIDES.

24  **Q.**  NOTHING FURTHER.

25         **JUDGE HENDERSON:**  OKAY. THANK YOU, COUNSEL. WE WILL

1  RECESS FOR THE DAY, AND I ASSUME READ THE OTHER TWO DEPOSITIONS

2  BEGINNING TOMORROW.

3           **JUDGE KARLTON:**  NO.  THEY ARE JUST SUBMITTING THEM

4  FOR US TO READ, IN OUR COPIOUS FREE TIME.

5           **MS. HARDY:**  MY NAME IS ALISON HARDY FOR THE

6  PLAINTIFFS. I ALSO HAVE ONE THING.

7           THE PARTIES HAVE BOTH STIPULATED THAT PLAINTIFFS'

8  REBUTTAL WITNESS TO MR. MUMOLA, DR. REINGOLD, WILL NOT BE

9  TESTIFYING.  INSTEAD, HIS REPORT WILL COME IN, AS WILL HIS

10 DEPOSITION DESIGNATIONS, WHICH ARE MUCH, MUCH SHORTER THAN

11 MR. MUMOLA'S. IT'S ABOUT 10 PAGES AS OPPOSED TO ABOUT -- I

12 THINK THAT WAS ABOUT 60 OR 70.

13          AT SOME POINT DURING THE NEXT TWO WEEKS WHEN THERE'S

14 A SPARE MOMENT WE WOULD LIKE TO BE ABLE TO ALSO READ IN DR.

15 REINGOLD'S DEPOSITION.

16          **JUDGE HENDERSON:**  OKAY.

17          **MS. HARDY:**  THANK YOU.

18          **JUDGE KARLTON:**  SO WE HAVE THE SAME TIME, RIGHT?

19          **MR. BIEN:**  YOUR HONOR, I UNDERSTAND THAT YESTERDAY

20 AT THE CLOSE OF THE SESSION THE COURT EXPRESSED AN INTEREST IN

21 THE NEW MEXICO STATUTE DR. HANEY REFERRED TO. WE HAVE A COPY OF

22 IT FOR THE COURT.  AND HERE'S -- WE MARKED IT JUST FOR THE

23 RECORD AS PLAINTIFFS' EXHIBIT 827.

24          **JUDGE KARLTON:**  MR. BIEN, JUST TO REMIND YOU BECAUSE

25 WE'RE GETTING TOO MUCH INFORMATION TOO QUICKLY, THIS IS THE

1  NEGOTIATED STATUTE WHICH GAVE RISE AT THE END OF ITS PASSAGE TO

2  THE COURT RELINQUISHING JURISDICTION.

3          **MR. BIEN:**  YES.  WE SPENT SOME TIME ONLINE AND

4  LOOKING. WE DID SEE THAT THERE IS A STIPULATED INJUNCTION AND

5  CONSENT DECREE THAT DOES REFER TO A STATUTE. THIS IS THE MOST

6  CURRENT VERSION OF THE STATUTE THAT IS IN EXISTENCE, AND WE CAN

7  GIVE YOU MORE INFORMATION, IF YOU WISH.

8          **JUDGE HENDERSON:**  OKAY. WE WILL ADJOURN.

9          I CERTAINLY DON'T SPEAK FOR MY COLLEAGUES.  OF

10 MR. MUMOLA'S TESTIMONY I WAS MOST INTERESTED IN THAT THAT

11 INDICATES THAT UNINTENTIONAL INJURY RATES GO DOWN TO 4 PERCENT

12 FOR THOSE OVER 65.

13          COURT'S ADJOURNED UNTIL 9:15.

14                  (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL

15                  THURSDAY, DECEMBER 4, 2008 AT 9:15 O'CLOCK

16                  A.M.)

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

**DEFENSE WITNESSES**                              **PAGE**    **VOL.**

3    **IRA PACKER**

4    DIRECT EXAMINATION BY MS. TILLMAN            1072      6
5    CROSS-EXAMINATION BY MR. BIEN               1092      6
     REDIRECT EXAMINATION BY MS. TILLMAN         1138      6
6

7    **JERRY POWERS  (RESUMED)**

8    CROSS-EXAMINATION BY MS. NORMAN             1149      6
     REDIRECT EXAMINATION BY MS. BARLOW          1164      6
9    RECROSS-EXAMINATION BY MS. NORMAN           1186      6

10

     **DR. DAVID L. THOMAS**
11
     DIRECT EXAMINATION BY MS. JOHNSON           1192      6
12   CROSS-EXAMINATION BY MS. HARDY              1218      6

13

     **DEPOSITION OF CHRISTOPHER J. MUMOLA**          1264      6
14

15                          –   –   –   –

16   **DEFENSE EXHIBITS**              **IDEN**    **VOL.**    **EVID**    **VOL.**

17   825                           1246      6

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK JPM, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.


/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR


S/ KATHERINE WYATT

KATHERINE WYATT, CSR 9866, RMR

WEDNESDAY, DECEMBER 2, 2008