VOL 7

PAGES 1310 - 1541

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, ET AL.,           )
                                 )
            PLAINTIFFS,          )
                                 )
  VS.                            ) NO. CIV S-90-0520 LKK JFM
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 ) THREE-JUDGE COURT
            DEFENDANTS.          )
                                 )
_____

MARCIANO PLATA, ET AL.,          )
                                 )
            PLAINTIFFS,          )
                                 )
VS.                              ) NO. C 01-1351 TEH
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 )
            DEFENDANTS.          )
_____)

### TRANSCRIPT OF PROCEEDINGS

SAN FRANCISCO, CALIFORNIA
THURSDAY, DECEMBER 4, 2008

(APPEARANCES ON FOLLOWING PAGES)

*REPORTED BY:*   JOAN MARIE COLUMBINI, CSR 5435, RPR
                 KATHERINE WYATT, CSR 9866, RMR
                 OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

FOR PLAINTIFFS                PRISON LAW OFFICE
                              1917 FIFTH STREET
                              BERKELEY, CALIFORNIA  94710
                              **SARA NORMAN, ESQUIRE**
                              **ALISON HARDY, ESQUIRE**
                              DONALD SPECTER, ESQUIRE
                              REBEKAH EVENSON, ESQUIRE

                              ROSEN, BIEN & GALVAN, LLP
                              315 MONTGOMERY STREET, TENTH FLOOR
                              SAN FRANCISCO, CALIFORNIA 94104
                          BY: **MICHAEL W. BIEN, ESQUIRE**
                              **JANE KAHN, ESQUIRE**

                              K&L GATES
                              FOUR EMBARCADERO CENTER
                              SUITE 1200
                              SAN FRANCISCO, CALIFORNIA 94111
                          BY: **EDWARD P. SANGSTER, ESQUIRE**


FOR CCPOA                     CARROLL, BURDICK & MCDONOUGH
                              44 MONTGOMERY STREET, SUITE 400
                              SAN FRANCISCO, CALIFORNIA  94104
                          BY: **NATALIE LEONARD, ESQUIRE**


FOR DEFENDANTS                STATE OF CALIFORNIA
                              DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
                              1300 I STREET, SUITE 125
                              P.O. BOX 944255
                              SACRAMENTO, CALIFORNIA  94244
                          BY: **LISA A. TILLMAN, ESQUIRE**

                              STATE OF CALIFORNIA
                              DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
                              455 GOLDEN GATE AVENUE, SUITE 11000
                              SAN FRANCISCO, CALIFORNIA  94102
                          BY: **KYLE A. LEWIS, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**           HANSON BRIDGETT
                             425 MARKET STREET, 26TH FLOOR
                             SAN FRANCISCO, CALIFORNIA  94105
                    **BY:  PAUL MELLO, ESQUIRE**
                             S. ANNE JOHNSON, ESQUIRE


**FOR DISTRICT ATTORNEY**    THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**              COUNTY OF RIVERSIDE
                             82-675 HIGHWAY 111, FOURTH FLOOR
                             INDIO, CALIFORNIA  92201
                    **BY:  WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**           AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**              580 CALIFORNIA STREET, 15TH FLOOR
                             SAN FRANCISCO, CALIFORNIA  94104
                    **BY:  TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT**      JONES & MAYER
**INTERVENORS**              3777 NORTH HARBOR BOULEVARD
                             FULLERTON, CALIFORNIA  92835
                    **BY:  KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS**   OFFICE OF THE COUNTY COUNSEL
                             COUNTY OF SANTA CLARA
                             70 WEST HEDDING STREET
                             NINTH FLOOR, EAST WING
                             SAN JOSE, CALIFORNIA  95110
                    **BY:  THERESA FUENTES, ESQUIRE**


**FOR SONOMA COUNTY**        COUNTY OF SONOMA
**INTERVENORS**              575 ADMINISTRATION DRIVE, ROOM 105A
                             SANTA ROSA, CALIFORNIA  95403
                    **BY: ANNE L. KECK, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE.)

APPEARANCES (CONTINUED):

**FOR DEFENDANTS**

```
FOR THE COUNTY OF       OFFICE OF MICHAEL P. MURPHY
SAN MATEO               COUNTY COUNSEL, SAN MATEO COUNTY
INTERVENORS:            HALL OF JUSTICE AND RECORDS
                        400 COUNTY CENTER, 6TH FLOOR
                        REDWOOD CITY, CALIFORNIA 94063-1662
```

1    DECEMBER 4, 2008                          9:15 O'CLOCK A.M.

2

3                        P R O C E E D I N G S

4            THE CLERK:  PLEASE BE SEATED.

5            JUDGE HENDERSON:  OKAY. YOU MAY PROCEED WHEN YOU'RE

6    READY, COUNSEL.

7            MR. SPECTER:  GOOD MORNING. PLAINTIFFS CALL JEANNE

8    WOODFORD BACK TO THE STAND TO TESTIFY, YOUR HONOR.

9            JUDGE HENDERSON:  GOOD MORNING, MS. WOODFORD.  YOU'RE

10   STILL UNDER OATH FROM YOUR PREVIOUS SWEARING IN.

11           THE WITNESS:  THANK YOU. GOOD MORNING.

12           THEREUPON --

13                          JEANNE WOODFORD

14   RESUMED THE STAND AND HAVING BEEN PREVIOUSLY DULY SWORN,

15   TESTIFIED FURTHER FOR PLAINTIFFS AS FOLLOWS:

16                        DIRECT EXAMINATION

17   BY MR. SPECTER:

18   Q.  GOOD MORNING MS. WOODFORD.

19   A.  GOOD MORNING.

20   Q.  LAST TIME YOU TESTIFIED HERE YOU EXPLAINED THAT YOU HELD

21   VARIOUS POSITIONS WITHIN THE DEPARTMENT OF CORRECTIONS,

22   INCLUDING WARDEN AT SAN QUENTIN AND THE ACTING SECRETARY OF THE

23   AGENCY; IS THAT CORRECT?

24   A.  THAT IS CORRECT.

25   Q.  AND WHILE YOU WERE THE WARDEN AT SAN QUENTIN, DIDN'T SAN

1 QUENTIN HAVE A RECEPTION CENTER?

2 **A.** YES, IT HAD A VERY LARGE RECEPTION CENTER, ACTUALLY.

3 **Q.** AND MANY OF THE OFFENDERS WHO OCCUPIED THAT RECEPTION CENTER

4 WERE PAROLE VIOLATORS, WERE THEY NOT?

5 **A.** THAT'S CORRECT.

6 **Q.** AND APPROXIMATELY HOW MANY PRISONERS DID YOU PAROLE A WEEK

7 AT THE RECEPTION CENTER?

8 **A.** FROM JUST THE RECEPTION CENTER WE WERE PAROLING ABOUT 200 A

9 WEEK.

10 **Q.** AND HOW MANY PEOPLE DID YOU HAVE COMING IN; DO YOU REMEMBER

11 THAT?

12 **A.** WELL, IT VARIED. WHEN I FIRST BECAME WARDEN OUR INTAKE COULD

13 BE AS HIGH AS ABOUT 200 A DAY. BUT THEY DIVERTED SOME OF THE

14 RECEPTION CENTER OVER TO DVI, SO OUR INTAKE COULD AVERAGE ABOUT

15 A HUNDRED A DAY.

16 **Q.** OKAY. AND YOU ARE AWARE OF THE AVERAGE LENGTH OF STAY OF

17 PAROLE VIOLATORS IN THE DEPARTMENT OF CORRECTIONS?

18        **JUDGE KARLTON:** NOW OR THEN?

19        **MR. SPECTER:** THEN, YOUR HONOR.

20        **THE WITNESS:** YES, THE AVERAGE LENGTH OF STAY WAS A

21 LITTLE OVER FOUR MONTHS.

22 **BY MR. SPECTER:**

23 **Q.** ALL RIGHT. AND THAT WAS CONSISTENT WITH YOUR EXPERIENCE AT

24 SAN QUENTIN?

25 **A.** YES, IT WAS.

1  Q.  OKAY. DURING THOSE FOUR MONTHS WERE YOU ABLE TO PROVIDE

2  THOSE PAROLE VIOLATORS WITH ANY MEANINGFUL REHABILITATIVE

3  SERVICES THAT WOULD AFFECT PUBLIC SAFETY?

4  A.  NO, NOT IN THE RECEPTION CENTER. THERE JUST WASN'T THE

5  SPACE, AND THAT REALLY ISN'T THE MISSION OF THE RECEPTION

6  CENTER.

7  Q.  AND SO WHAT EFFECT, IF ANY, DID YOU THINK -- WHAT EFFECT, IF

8  ANY, ON PUBLIC SAFETY DO YOU THINK RETURNING PAROLE VIOLATORS TO

9  PRISON FOR FOUR-AND-A-HALF --

10        **JUDGE KARLTON:**  THAT ASSUMES SOMETHING THAT YOU

11  HAVEN'T ESTABLISHED.

12        AS BEST YOU KNOW, THAT AVERAGE LENGTH OF FOUR MONTHS

13  CONTINUES TO BE WHAT WE DO WITH -- NOT "WE" -- WHAT YOU DO WITH

14  PAROLE VIOLATORS TODAY.

15        **THE WITNESS:**  ACTUALLY, I RECENTLY LISTENED TO A TALK

16  GIVEN BY JOAN PETERSILIA.  AND THE AVERAGE LENGTH OF STAY

17  CURRENTLY, ACCORDING TO HER TALK, WAS 4.2 MONTHS.

18        **JUDGE KARLTON:**  OKAY.  NOW, YOU CAN ASK HER.

19        **MR. SPECTER:**  THANK YOU VERY MUCH.

20  BY MR. SPECTER:

21  Q.  SO WHAT EFFECT, IF ANY, DO YOU THINK THE POLICY OF RETURNING

22  PRISONERS TO PRISON FOR 4.2 TO 4.5 MONTHS HAS ON PUBLIC SAFETY?

23  A.  I ACTUALLY THINK THAT IT HURTS PUBLIC SAFETY.

24  Q.  EXPLAIN THAT, PLEASE.

25  A.  YOU KNOW, I BASE THAT ON MY OWN OBSERVATIONS.  AND I ALSO

1   BASE IT ON READING MANY OF THE REPORTS THAT HAVE BEEN WRITTEN BY

2   JOAN PETERSILIA.  SHE REFERS TO THIS CATCH AND RELEASE PROGRAM.

3   THAT REALLY IS WHAT IT IS.  WE CATCH PEOPLE AND WE RELEASE THEM.

4   WE DON'T DO ANYTHING FOR THEM WHILE THEY ARE INCARCERATED.  AND

5   WE'RE JUST REALLY DISRUPTING THEIR LIVES OVER AND OVER AGAIN.

6   AND IT REALLY DOESN'T ADD TO PUBLIC SAFETY.

7           IT ACTUALLY CAN ADD TO GANG ACTIVITY, ACCORDING TO

8   JOAN PETERSILIA, BECAUSE INDIVIDUALS ARE COMING INTO THE PRISON

9   SYSTEM, RETURNING TO THE STREETS, AND IT IS CAUSING GANG

10  ACTIVITY BOTH INSIDE THE PRISON AND OUTSIDE ON THE STREETS TO

11  GROW AND BECOME A GREATER PROBLEM.

12          **JUDGE REINHARDT:**  YOU WANT TO TELL US WHO JOAN

13  PETERSILIA IS?

14          **MR. SPECTER:**  YES. SHE'S AN ACADEMIC. SHE'S A

15  PROFESSOR OF CRIMINOLOGY OR SOCIOLOGY OR SOMETHING LIKE THAT AT

16  THE UNIVERSITY OF CALIFORNIA AT IRVINE. AND SHE HAS WRITTEN

17  PAPERS ON PAROLE.

18          **JUDGE KARLTON:**  SHE'S BEEN HIRED BY THE STATE

19  PARTICULARLY TO STUDY VARIOUS ASPECTS OF THE PROBLEM FOR THE

20  STATE.

21          **MR. SPECTER:**  THAT'S CORRECT.

22  **BY MR. SPECTER:**

23  **Q.**  AND MS. PETERSILIA WAS ON A RADIO SHOW, YOU SAID?

24  **A.**  I'M SORRY.  I COULDN'T HEAR YOU.

25  **Q.**  WHERE DID YOU HEAR MS. PETERSILIA?

1          **JUDGE KARLTON:**  SHE WAS READING PAPERS WRITTEN BY

2   MS. PETERSILIA.

3          **MR. SPECTER:**  OKAY.  FINE.  THANK YOU.

4   **BY MR. SPECTER:**

5   **Q.**  YOU MENTIONED THAT THERE WAS A DISRUPTION IN THE -- OF THE

6   PAROLE VIOLATORS' LIVES IN THE COMMUNITY. CAN YOU EXPLAIN THAT A

7   LITTLE MORE, PLEASE?

8   **A.**  WELL, IT BECAME IMPOSSIBLE FOR THEM TO FIND PERMANENT

9   HOUSING AND EMPLOYMENT AND TO GET SITUATED BACK IN THEIR

10  COMMUNITIES, BECAUSE THEY WOULD BE RETURNED TO PRISON FOR

11  TECHNICAL VIOLATIONS.  AND THEN, THERE IS VERY LITTLE

12  ASSISTANCE, IF ANY, INSIDE THE PRISON SYSTEM, PARTICULARLY FOR

13  THOSE WHO ARE PAROLED RIGHT OUT OF THE RECEPTION CENTER.

14          SO THEY ARE JUST RETURNING BACK TO THE SAME PROBLEMS.

15  AND SO IT'S VERY DISRUPTIVE TO THEIR LIVES.  IT DOESN'T ENHANCE

16  PUBLIC SAFETY AND, IN FACT, MAY ACTUALLY BE ADDING TO SOME OF

17  OUR CRIME PROBLEMS AND GANG PROBLEMS OUT IN OUR SOCIETY.

18  **Q.**  AND DO YOU MEAN TO SUGGEST BY THAT ANSWER THAT YOU DON'T

19  THINK THAT PAROLE VIOLATORS SHOULD BE SANCTIONED FOR VIOLATING

20  PAROLE?

21  **A.**  OH, NO.  I THINK THERE'S MANY SANCTIONS THAT COULD BE PUT IN

22  PLACE THAT COULD OCCUR OUT WHILE THEY ARE OUT IN THEIR

23  COMMUNITIES. THEY COULD BE PLACED IN DRUG TREATMENT PROGRAMS.

24  THEY COULD BE HOUSED IN THE COUNTY JAIL.

25          THERE'S A VARIETY OF OTHER OPTIONS THAT COULD BE PUT

1   IN PLACE:  GPS MONITORING.  THERE'S MANY OTHER ALTERNATIVES TO

2   RETURNING PEOPLE TO PRISON.

3   Q.  AND IN YOUR EXPERIENCE DO YOU BELIEVE THAT WOULD BE MORE OR

4   LESS EXPENSIVE THAN SENDING THEM BACK TO PRISON?

5   A.  I THINK IT WOULD BE MUCH LESS EXPENSIVE THAN SENDING THEM

6   BACK TO PRISON. IT'S QUITE EXPENSIVE TO HAVE THE PAROLE

7   VIOLATORS SENT TO THE COUNTY JAIL WHERE THEY UNDERGO ALL KINDS

8   OF MEDICAL EVALUATIONS, THEN SENT TO THE STATE PRISON.

9           YOU HAVE BUS TRANSPORTATION AT STATE PRISON.  MANY OF

10  THOSE MEDICAL PROCEDURES AND THINGS ARE REPEATED. IT'S VERY

11  COSTLY.

12          IF WE KEPT PEOPLE IN THEIR COMMUNITY, IT WOULD BE A

13  GREATER USE OF OUR TAX DOLLARS.

14  Q.  NOW, AFTER YOU LEFT THE CDC, WHERE DID YOU WORK?

15  A.  I WORKED FOR ADULT PROBATION HERE IN SAN FRANCISCO.

16  Q.  AND WHAT WAS YOUR POSITION AT ADULT PROBATION?

17  A.  I WAS THE CHIEF OF ADULT PROBATION IN SAN FRANCISCO.

18  Q.  AND HOW LONG DID YOU WORK THERE?

19  A.  ABOUT A YEAR-AND-A-HALF.

20  Q.  OKAY.  AND WHAT WAS YOUR GOAL AS CHIEF PROBATION OFFICER?

21  A.  MY GOAL AS CHIEF PROBATION OFFICER WAS TO HELP INDIVIDUALS

22  BE SUCCESSFUL ON PROBATION, AND TO BRING THE SCIENCE OF

23  COMMUNITY CORRECTIONS TO THE ADULT PROBATION DEPARTMENT HERE IN

24  SAN FRANCISCO.

25          AND SO WE DID THAT BY BRINGING IN A RISK AND NEEDS

1  ASSESSMENT TOOL SO THAT WE WERE ASSESSING PEOPLE ON PROBATION TO

2  IDENTIFY THEIR RISK FOR REOFFENDING, IDENTIFYING THEIR NEEDS,

3  AND THEN MATCHING THEM UP TO THE RIGHT KINDS OF PROGRAMS TO

4  ADDRESS THOSE NEEDS.

5          IT WAS ALSO MY GOAL TO REDUCE THE CASELOAD OF PEOPLE,

6  OF OUR PROBATION OFFICERS BECAUSE UNFORTUNATELY THE CASELOADS

7  ARE INCREDIBLY HIGH WITH CASELOADS LIKE 400 TO 1 FOR SOME VERY

8  HIGH RISK OFFENDERS.  SO MY GOAL WAS TO BRING DOWN THE CASELOADS

9  SO WE COULD BE MUCH MORE SUCCESSFUL IN CASE MANAGEMENT, SO THAT

10 WE WEREN'T SENDING PEOPLE TO STATE PRISON.

11 **Q.**  AND DO YOU BELIEVE THAT PROVIDING FOR THE NEEDS OF THE

12 PROBATIONERS WOULD HAVE ANY EFFECT ON REDUCING CRIME?

13 **A.**  OH, I THINK IT ABSOLUTELY WOULD HAVE AN EFFECT ON REDUCING

14 CRIME AND IN REDUCING THE NUMBER OF PEOPLE THAT END UP IN STATE

15 PRISON. IT'S JUST AN INCREDIBLE OPPORTUNITY TO HELP PEOPLE

16 CHANGE THEIR LIVES AND MEET THEIR NEEDS.

17          AND MANY OF THE PEOPLE THAT ARE ON PROBATION ARE VERY

18 YOUNG PEOPLE, AND IT REALLY IS AN OPPORTUNITY TO CHANGE THEIR

19 LIVES AT THAT POINT.

20 **Q.**  TURNING TO THE PRISON POPULATION FOR A MINUTE OR FOR AWHILE,

21 DO YOU BELIEVE THAT THE CALIFORNIA PRISON POPULATION CAN BE

22 REDUCED WITHOUT ADVERSELY AFFECTING PUBLIC SAFETY?

23 **A.**  ABSOLUTELY.

24 **Q.**  AND CAN YOU EXPLAIN WHY YOU BELIEVE THAT TO BE TRUE?

25 **A.**  WELL, BECAUSE I UNDERSTAND THE PRISON POPULATION AND WHO IS

1  COMING INTO THE SYSTEM. 30 PERCENT OF THE INDIVIDUALS IN THE

2  PRISON POPULATION ARE IN FOR NONSERIOUS, NONVIOLENT OFFENSES.

3          WE ALSO HAVE A LARGE NUMBER, ABOUT 70,000 REVOCATIONS

4  A YEAR, PAROLE VIOLATORS THAT MANY OF THEM COMING IN FOR

5  TECHNICAL VIOLATIONS THAT COULD BE MANAGED OUT IN THE COMMUNITY.

6          AND WHEN YOU UNDERSTAND THE PRISON POPULATION YOU

7  KNOW THAT THERE ARE NOW BETTER METHODS FOR HANDLING THOSE KIND

8  OF ISSUES.  LOW END OFFENDERS NEED TO BE KEEP IN THEIR

9  COMMUNITIES.  SENDING SHORT SENTENCES TO STATE PRISON JUST

10 REALLY ISN'T THE DETERRENT THAT PEOPLE THINK THAT IT IS.

11         KEEPING PEOPLE LOCALLY AND PROVIDING SERVICES, USING

12 RISK AND NEEDS ASSESSMENT TOOLS, MEETING THEIR NEEDS CAN REDUCE

13 THE PRISON POPULATION, REDUCE CRIME AND JUST BRING ABOUT BETTER

14 OUTCOMES, AND WE CAN DO IT MORE EFFECTIVELY AND MORE

15 EFFICIENTLY.

16 **Q.**  AND BY "EFFICIENTLY" DO YOU MEAN LESS COSTLY?

17 **A.**  LESS COSTLY. IT'S ALWAYS CHEAPER TO DO COMMUNITY CORRECTIONS

18 AS OPPOSED TO INCARCERATION.

19 **Q.**  NOW, THE RELIEF THAT THE PLAINTIFFS ARE SEEKING IN THIS CASE

20 IS TO REDUCE THE PRISON POPULATION TO 130 PERCENT OF DESIGN

21 CAPACITY OVER TWO YEARS.  YOU UNDERSTAND THAT, CORRECT?

22 **A.**  YES.

23 **Q.**  AND THAT WOULD MEAN A REDUCTION OF ABOUT 50,000 PRISONERS

24 WITHIN THOSE TWO-YEAR PERIODS.  YOU UNDERSTAND THAT, TOO?

25 **A.**  YES, I DO.

1  Q.  AND DO YOU BELIEVE THAT CAN BE ACCOMPLISHED WITHOUT AN

2  ADVERSE IMPACT ON PUBLIC SAFETY?

3  A.  YES, I ABSOLUTELY DO THINK IT CAN BE ACCOMPLISHED WITHOUT

4  ADVERSELY IMPACTING PUBLIC SAFETY.  I BELIEVE THAT WE ACTUALLY

5  CAN IMPROVE PUBLIC SAFETY IF WE DO IT CORRECTLY.

6          **MS. KECK:**  MR. SPECTER, I'M HAVING DIFFICULTY HEARING

7  YOU.  CAN YOU SPEAK UP?

8          **MR. SPECTER:**  SURE.  SURE.

9  **BY MR. SPECTER:**

10  Q.  AND WOULD THAT BE FOR THE SAME REASONS THAT YOU DISCUSSED

11  JUST A MINUTE AGO?

12  A.  YES.

13  Q.  OKAY. WOULD THE FACT THAT -- YOU ARE AWARE THAT CALIFORNIA

14  HAS BETWEEN A 60 AND 70 PERCENT RECIDIVISM OVER THREE YEARS,

15  RIGHT?

16  A.  THAT'S CORRECT.

17  Q.  WOULD THE FACT THAT CALIFORNIA HAS THAT HIGH OF A PAROLE

18  FAILURE RATE AFFECT YOUR OPINION ABOUT REDUCING THE PRISON

19  POPULATION WITHOUT ADVERSELY AFFECTING PUBLIC SAFETY?

20  A.  COULD YOU REPEAT THAT?

21  Q.  YES.

22          WOULD THE FACT THAT CALIFORNIA HAS SUCH A HIGH --

23          **JUDGE KARLTON:**  RECIDIVISM.

24  **BY MR. SPECTER:**

25  Q.  -- RECIDIVISM RATE AFFECT YOUR OPINION THAT THE POPULATION

1  COULD BE REDUCED WITHOUT ADVERSELY AFFECTING PUBLIC SAFETY?

2  **A.**  WELL, BECAUSE WE HAVE SUCH A HIGH RECIDIVISM RATE IT REALLY

3  IS TIME TO DO SOMETHING DIFFERENT.  I THINK WE COULD LOWER THE

4  RECIDIVISM RATE AND IMPROVE PUBLIC SAFETY BY REDUCING THE PRISON

5  POPULATION AND DOING VERY EFFECTIVE PROGRAMS IN THE COMMUNITY.

6  **Q.**  AND WOULD ONE OF THE WAYS WE CAN DO THAT INVOLVE THE

7  DECISION OR THE DECISION TO DETERMINE WHO TO PUT ON PAROLE

8  INSTEAD OF DETERMINING TO PUT EVERYBODY ON PAROLE?

9  **A.**  ABSOLUTELY. WE ARE JUST ONE OF TWO STATES THAT PUTS EVERYONE

10  ON PAROLE LEAVING THE PRISON SYSTEM, AND WE COULD MAKE MUCH

11  BETTER DECISIONS ABOUT THAT. LOW RISK, NONSERIOUS, NONVIOLENT

12  OFFENDERS CERTAINLY COULD LEAVE THE PRISON SYSTEM WITHOUT BEING

13  ON PAROLE.

14         THERE ARE ACTUALLY STUDIES THAT SHOW THAT THERE'S

15  WORSE OUTCOMES WHEN YOU PUT THOSE KINDS OF INDIVIDUALS UNDER

16  SUPERVISION. THE MODEL ACROSS THE UNITED STATES IS TO IDENTIFY

17  YOUR HIGH RISK OFFENDERS AND PUT YOU'RE RESOURCES TOWARDS THOSE

18  OFFENDERS.  AND BY DOING THAT YOU ACTUALLY CAN REDUCE RECIDIVISM

19  AND CRIME AND VICTIMIZATION IN OUR COMMUNITIES.

20         AND I BELIEVE VERY STRONGLY THAT THAT'S TRUE. I

21  THINK, YOU KNOW, THERE'S MODELS OUT ALREADY.  NEW YORK, FOR

22  EXAMPLE, HAS REDUCED THEIR CRIME RATE AND THEIR PRISON

23  POPULATION ALL AT THE SAME TIME. SO THERE CERTAINLY ARE SUCCESS

24  STORIES THAT CALIFORNIA CAN FOLLOW.

25  **Q.**  YOU ARE AWARE THAT MANY OF THE COUNTY JAILS ARE -- HAVE

1  COURT-ORDERED OR SOMEWHAT VOLUNTARY CAPS?  IN OTHER WORDS, ARE

2  FULL, ARE YOU NOT?

3  **A.**  YES, I AM.

4  **Q.**  WHAT, IF ANY, EFFECT DOES THAT HAVE ON YOUR OPINION ABOUT

5  REDUCING THE PRISON POPULATION?

6  **A.**  I STILL BELIEVE THAT WE NEED TO REDUCE THE PRISON

7  POPULATION.

8  **Q.**  AND CAN THAT BE DONE EVEN THOUGH THE COUNTY JAILS ARE AT OR

9  NEAR -- OR SOME OF THE COUNTY JAILS ARE AT OR NEAR THEIR

10 CAPACITY?

11 **A.**  I THINK I ABSOLUTELY BELIEVE THAT IT CAN BE DONE. AGAIN, IT

12 REQUIRES USING THE SCIENCE OF CORRECTIONS.  AND MANY OF THE

13 COUNTY JAILS OR PROBATION DEPARTMENTS ARE JUST BEGINNING TO USE

14 RISK AND NEEDS ASSESSMENT TOOLS.  SO THERE'S MANY TOOLS OUT

15 THERE THAT COULD ASSIST COUNTY JAILS IN DECIDING WHO SHOULD

16 REMAIN IN THEIR COUNTY JAIL AND WHO COULD BE RELEASED SAFELY

17 INTO THE COMMUNITY.

18          SO, YES, I THINK IN A VERY INTEGRATED SYSTEM WHERE

19 WE'RE WORKING TOGETHER TO SOLVE THIS PROBLEM THAT IT COULD BE

20 DONE.

21 **Q.**  GREAT.

22          MANY LAW ENFORCEMENT OFFICIALS, INCLUDING SOME OF

23 YOUR COLLEAGUE CHIEF PROBATION OFFICERS HAVE INTERVENED IN THIS

24 CASE TO OPPOSE A CAP ON THE PRISON POPULATION. THEY ARGUE THAT A

25 REDUCTION IN THE PRISON POPULATION WOULD PRODUCE MORE CRIME.

1          WHAT DO YOU SAY TO THAT POINT?

2  **A.**  I DON'T THINK THAT IT WILL PRODUCE MORE CRIME. THE REDUCTION

3  IN THE PRISON POPULATION, THESE ARE INDIVIDUALS THAT ARE COMING

4  HOME, ANYWAY.  AND SO HOW WE APPROACH IT, ACTUALLY, COULD REDUCE

5  CRIME.  I JUST DON'T THINK IT WILL INCREASE CRIME, AND I DON'T

6  THINK THAT'S THE EXPERIENCE OF OTHER STATES WHO HAVE HAD SIMILAR

7  REDUCTIONS IN PRISON POPULATIONS.

8  **Q.**  AND WHAT DO YOU SAY TO THE ARGUMENT THAT RELEASING PRISONERS

9  EARLY OR A FEW MONTHS EARLY WOULD RESULT IN MORE CRIME BECAUSE

10 THEY ARE OUT 60 DAYS BEFORE THEY WERE SUPPOSED TO GET OUT?

11 **A.**  THERE JUST ISN'T A CORRELATION BETWEEN THE LENGTH OF TIME

12 SOMEONE IS INCARCERATED AND CRIME. THESE ARE INDIVIDUALS THAT

13 ARE COMING HOME ANYWAY. AND SO IT WILL NOT INCREASE CRIME.

14          AND, AGAIN, DEPENDING ON WHAT MODEL WE PUT IN PLACE,

15 WE ACTUALLY COULD LEAD TO A REDUCTION IN CRIME AND A REDUCTION

16 IN GANG AND OTHER KINDS OF VIOLENCE IN OUR COMMUNITIES.

17          **JUDGE KARLTON:**  MS. WOODFORD, YOU KNOW, YOU ARE

18 OBVIOUSLY AN EXPERT, AND THE COURT VALUES YOUR OPINIONS.  BUT

19 THE SUGGESTION HAS BEEN MADE BY ONE OF YOUR COLLEAGUES,

20 PARTICULARLY, THAT SO-CALLED LOW RISK CRIMES ARE SIMPLY WHAT

21 PEOPLE ARE CAUGHT FOR.  AND IN ANY EVENT, THOSE ARE THE PEOPLE

22 WHO ARE MOST LIKELY TO REOFFEND, THAT IS PROPERTY CRIMES, AND I

23 GATHER DRUGS MAY BE THE SAME.

24          AND THAT IN REALITY, THE PEOPLE LESS LIKELY ARE

25 SECOND DEGREE MURDERERS AND SO FORTH THAT NOBODY IS GOING TO LET

1    OUT BECAUSE IT'S POLITICALLY IMPOSSIBLE.

2              WHAT DO YOU SAY TO THE IDEA THAT YOU LET PEOPLE OUT

3    60 DAYS EARLIER AND ALL THEY ARE GOING TO DO IS COMMITTING MORE

4    CRIMES THAT THEY ARE NOT CAUGHT FOR UNTIL THEY ARE ACTUALLY

5    CAUGHT?

6              THAT'S THE ARGUMENT THAT'S BEEN MADE TO US.

7         **THE WITNESS:**  I'M JUST HAVING TROUBLE UNDERSTANDING

8    THAT ARGUMENT, BECAUSE THEY WERE GOING TO COME HOME ANYWAY.  AND

9    IF THEY WERE GOING TO INVOLVE THEMSELF IN CRIME AGAIN --

10        **JUDGE KARLTON:**  YES, BUT THE ARGUMENT WAS IT GIVES

11   THEM 60 MORE DAYS OF COMMITTING CRIMES -- YES.  THEY WILL BE

12   CAUGHT EVENTUALLY, BUT THERE'S THAT MUCH MORE OPPORTUNITY.

13        **JUDGE HENDERSON:**  IT DOESN'T INCREASE CRIME, BUT IT

14   ACCELERATES CRIME.  WE GET OUR BURGLARIES 60 DAYS BEFORE WE

15   WOULD OTHERWISE, IS WHAT I UNDERSTAND.

16        **THE WITNESS:**  I'M JUST -- I GUESS I'M STILL HAVING

17   DIFFICULTY UNDERSTANDING THAT, BECAUSE THEY WERE GOING TO GET

18   OUT.  AND IT WAS GOING TO TAKE THE SAME AMOUNT OF TIME TO CATCH

19   THEM WHETHER THEY GET OUT TODAY OR TWO WEEKS AGO. IT JUST

20   DOESN'T MAKE SENSE TO ME.

21              AND, IN FACT, THERE ARE STUDIES THAT SHOW THAT THAT

22   ISN'T THE CASE WHEN THEY HAVE HAD RELEASED INMATES EARLY.  AND

23   YOU CERTAINLY CAN HAVE MODELS WHERE YOU'RE BUILDING INCENTIVES

24   INTO THE SYSTEM, BOTH INSIDE THE PRISON FOR INDIVIDUALS TO GO

25   HOME EARLY, AND OUTSIDE, SUCH AS EARNED DISCHARGE WHILE THEY ARE

1  ON PAROLE, SO THAT THERE ARE INCENTIVES TO FOLLOW THE DIRECTIONS

2  AND RULES THAT THEY ARE SUPPOSED TO FOLLOW.

3          SO IT REALLY DEPENDS ON THE MODEL. YOU REALLY CAN

4  REDUCE YOUR PRISON POPULATION, AS NEW YORK HAS DONE, AND REDUCE

5  CRIME AT THE SAME TIME IF YOU'RE BUILDING THE RIGHT MODEL AND

6  HAVE THE ATTITUDE THAT YOU CAN BE SUCCESSFUL.

7          **JUDGE KARLTON:**  I'M SORRY, MR. SPECTER, BUT --

8          **MR. SPECTER:**  GO AHEAD.

9          **JUDGE KARLTON:**  I THINK AT LEAST PART OF WHAT YOU'RE

10  SAYING SUGGESTS THAT AN EXPENDITURE OF SIGNIFICANT FUNDS, BOTH

11  IN PRISON AND OUTSIDE, AS A WAY OF DIRECTING PEOPLE AWAY FROM

12  THEIR CRIMINAL BEHAVIOR TOWARDS A MORE LAW-ABIDING BEHAVIOR,

13  THAT TAKES APPARENTLY A LOT OF MONEY.

14          AND IS THERE ANY -- IN YOUR VIEW, ANY REASON TO THINK

15  THAT WE'RE GOING TO SEE THAT KIND OF MONEY?

16          **THE WITNESS:**  WELL, I GUESS I WOULD ANSWER IT THIS

17  WAY:  IT COSTS ALMOST  $46,000 PER YEAR PER INMATE NOW.  AND

18  BUILDING INCENTIVES SUCH AS WORK TIME CREDITS OR MORE

19  PARTICIPATION CREDITS DOESN'T HAVE TO COST MORE MONEY.  I MEAN,

20  THERE ARE CERTAINLY PROGRAMS AVAILABLE TO INMATES INSIDE THE

21  PRISON SYSTEM.

22          AND IF YOU'RE SENDING THEM OUT AND KEEPING THEM IN

23  THE COMMUNITIES, THAT'S MUCH CHEAPER. I BELIEVE THAT THE CHIEF

24  PROBATION OFFICERS' ASSOCIATION OF CALIFORNIA HAS SAID THAT IT

25  WOULD COST ABOUT $10,000 PER YEAR PER INDIVIDUAL TO PROVIDE

1  APPROPRIATE CASE MANAGEMENT.  THAT'S FAR CHEAPER THAN WHAT WE'RE

2  DOING NOW.

3          I ALSO THINK THAT IT'S IMPORTANT TO NOTE THAT

4  CALIFORNIA HAS THE HIGHEST RECIDIVISM RATE IN THE NATION, AND

5  WE'RE ONE OF -- WE'RE ONLY ONE OF TWO STATES THAT PUTS EVERYBODY

6  ON PAROLE AND SENDS ALL THEIR VIOLATIONS BACK TO STATE PRISON.

7  SO IT ISN'T WORKING. AND TO CONTINUE DOWN THE SAME ROAD IS JUST

8  GOING TO INCREASE THE NUMBER OF PEOPLE WHO ARE INCARCERATED.

9          WE'RE GOING TO HAVE TO BUILD MORE PRISONS THAT WE

10 CAN'T AFFORD AND STAFF THOSE PRISONS WE CAN'T AFFORD THAT. THE

11 CHEAPER OPTION IS TO INVEST OUR RESOURCES IN OUR COMMUNITIES FOR

12 COMMUNITY CORRECTIONS.

13         IT'S WORKING ELSEWHERE, AND IT CAN WORK IN

14 CALIFORNIA.

15         **JUDGE HENDERSON:**  IS THE MATH THAT -- COMING FROM

16 WHAT YOU JUST SAID IS OBVIOUS AS IT SEEMS?  THAT 40,000 OR MORE

17 INSIDE, 10,000 TO DO IT THE WAY YOU'RE SUGGESTING; 30,000 PROFIT

18 OR CLEARANCE PER PRISONER?  IS IT AS OBVIOUS AS THAT?

19         **THE WITNESS:**  I THINK THE MATH IS THAT SIMPLE. I

20 MEAN, IF YOU GO TO WASHINGTON STATE INSTITUTE OF PUBLIC  POLICY

21 -- AND ONE OF THE THINGS THAT I NOTED RECENTLY IN  LOOKING AT

22 SOME OF THEIR JUVENILE STATS, JUST FOR EXAMPLE, IS EVER DOLLAR

23 SPENT ON FUNCTIONAL FAMILY THERAPY SAVES THAT STATE $32,000 IN

24 INCARCERATION AND OTHER COSTS.

25         SO THERE'S LOTS OF EVIDENCE OUT THERE THAT WE CAN

1  LOOK AT THAT SAYS THAT MONEY THAT IS SPENT ON TREATMENT REDUCES

2  INCARCERATION.

3           EVEN KAISER SAYS EVERY DOLLAR SPENT ON DRUG TREATMENT

4  THEY SEE A RETURN FOR THAT KIND OF MONEY. SO THERE'S SO MANY

5  STUDIES THAT SAY THE MORE WE PROVIDE TREATMENT FOR PEOPLE, THE

6  LOWER OUR INCARCERATION RATE IS. AND THAT'S CHEAPER.

7  **BY MR. SPECTER:**

8  **Q.**  SO YOU'RE REFERRING TO THE NUMBER OF CRIMES THAT PEOPLE

9  WOULD COMMIT IF THEY WERE RELEASED EARLY.  YOU'RE AWARE OF

10 STUDIES THAT SUGGEST THAT THE RECIDIVISM RATE OR THE LENGTH OF

11 STAY HAS AN EFFECT --

12          **JUDGE KARLTON:**  HAS NO EFFECT.

13 **BY MR. SPECTER:**

14 **Q.**  -- HAS NO EFFECT ON THE RECIDIVISM RATE, ARE YOU NOT?

15 **A.**  YES, I'M AWARE OF STUDIES THAT SAY THAT.

16 **Q.**  SO WOULD IT BE FAIR TO SAY THAT WITH THAT FACT IN MIND, THE

17 NUMBER OF CRIMES WOULDN'T BE INCREASED.  IT WOULD JUST BE THE

18 TIME AND CIRCUMSTANCES OF THE CRIME; IS THAT CORRECT?

19 **A.**  YES, THAT'S CORRECT.

20 **Q.**  OKAY. WOULD IT BE FAIR TO SAY THAT DURING MOST OF YOUR

21 CAREER IN THE DEPARTMENT OF CORRECTIONS YOU WERE RESPONSIBLE IN

22 ONE WAY OR ANOTHER FOR COMPLYING WITH COURT ORDERS?

23 **A.**  I THINK THAT'S VERY FAIR TO SAY.

24 **Q.**  AND, IN FACT, FOR VIRTUALLY ALL OF YOUR CAREER YOU WERE

25 DOING THAT IN ONE WAY OR ANOTHER; ISN'T THAT RIGHT?

1  **A.**  YES, THAT'S CORRECT.

2  **Q.**  CAN YOU THINK OF ANY TYPE OF COURT ORDER OTHER THAN A

3  REDUCTION IN THE PRISON POPULATION THAT WOULD ENABLE THE STATE

4  TO PROVIDE ADEQUATE HEALTHCARE TO PRISONERS?

5  **A.**  NO, I CANNOT.

6  **Q.**  OKAY. AND COULD THE STATE, IF ORDERED TO DO SO BY THE COURT,

7  COME UP WITH A PLAN TO REDUCE THE PRISON POPULATION WITHOUT AN

8  ADVERSE AFFECT ON PUBLIC SAFETY?

9  **A.**  YES, I ABSOLUTELY BELIEVE THE STATE CAN DO THAT.

10  **Q.**  AND HOW WOULD YOU ENVISION THAT HAPPENING IF IT WAS -- WERE

11  ORDERED TO DO SO?

12  **A.**  WELL, I THINK THE WAY THAT THAT SHOULD HAPPEN IS THAT A TEAM

13  OF EXPERTS, BOTH AT THE COUNT AND STATE LEVEL, SHOULD BE PUT

14  TOGETHER, AND THAT SHOULD BE THEIR SOLE RESPONSIBILITY TO COME

15  UP WITH A PLAN.

16          AND I THINK IT'S IMPORTANT TO KEEP IN MIND THAT THIS

17  ISSUE HAS BEEN STUDIED BY MANY, MANY PEOPLE.  LITTLE HOOVER HAS

18  PUT OUT SEVERAL REPORTS.  THE DEUKMEJIAN COMMISSION, THE

19  GOVERNOR'S OWN PANEL OF EXPERTS.   MANY OF THE REMEDIES HAVE

20  ALREADY BEEN LOOKED AT AND BEEN OUTLINED.  AND IT'S REALLY A

21  MATTER OF MAKING DECISIONS ABOUT WHAT THE STATE WANTS TO DO TO

22  ADDRESS THIS ISSUE.

23          SO PUTTING TOGETHER A TEAM OF PEOPLE WITH THE SOLE

24  RESPONSIBILITY OF DESIGNING THE FINAL PLAN AND HAVING

25  DECISION-MAKERS AVAILABLE TO THEM TO AGREE TO THE PLAN, IT

1  SHOULD BE DONE VERY QUICKLY.

2          **JUDGE KARLTON:**  WHAT DOES "VERY QUICKLY" MEAN?

3          **THE WITNESS:**  I PERSONALLY BELIEVE IT COULD BE DONE

4  IN 60 DAYS.

5          **JUDGE HENDERSON:**  AND WHEN YOU SAY "THE

6  DECISION-MAKERS," IS THAT ANYTHING OTHER THAN THE LEGISLATURE,

7  OR WHO ARE THE DECISION-MAKERS?

8          **THE WITNESS:**  THE ADMINISTRATION AND THE LEGISLATURE.

9          **JUDGE KARLTON:**  YOU GET A PLAN -- I WANT TO

10 UNDERSTAND WHAT YOU'RE SAYING.  IF THIS COURT WERE TO DO

11 SOMETHING AS RADICAL AS ORDERING THE STATE TO COME UP WITH A

12 PLAN TO REDUCE POPULATIONS BY THE FIGURES THAT HAVE BEEN

13 SUGGESTED, YOU THINK IT WOULD TAKE 60 DAYS FOR THE PLANNERS TO

14 GET THE PLAN TO THE GOVERNOR AND THE LEGISLATURE.

15          HOW LONG AFTER THAT, IF YOU HAVE ANY IDEA -- AND IF

16 YOU DON'T, YOU DON'T. I UNDERSTAND.

17          **THE WITNESS:**  YES. I REALLY DON'T KNOW HOW LONG IT

18 WOULD TAKE THEM TO LOOK AT IT. I THINK THAT HAVING A TIME FRAME

19 THAT THEY MUST MAKE SOME DECISION ABOUT IT WOULD BE HELPFUL TO

20 MAKE THAT HAPPEN.

21          **JUDGE KARLTON:**  SIX MONTHS?  SIX MONTHS?  A YEAR?

22 WHAT DOES THAT MEAN?

23          **THE WITNESS:**  WELL --

24          **JUDGE KARLTON:**  I DON'T KNOW.  I'M ASKING.

25          **THE WITNESS:**  YES.  I CERTAINLY THINK IT'S REASONABLE

1  THAT DESIGNING THE PLAN AND HAVING THE LEGISLATURE AND THE

2  ADMINISTRATION WEIGH IN ON IT WITHIN SIX MONTHS IS A REASONABLE

3  TIME FRAME.

4  **BY MR. SPECTER:**

5  **Q.**  AND --

6          **MR. SPECTER:**  I'M SORRY.

7          **JUDGE KARLTON:**  THAT'S ALL RIGHT.

8          **MR. SPECTER:**  OKAY.

9  **BY MR. SPECTER:**

10 **Q.**  AS SOMEONE WHO IS INTERACTING WITH THE ADMINISTRATION, DID

11 YOU SEE THOSE DECISIONS MADE QUICKLY WHEN DEADLINES WERE -- WHEN

12 THERE WERE DEADLINES?

13 **A.**  I THINK YOU ABSOLUTELY HAVE TO HAVE DEADLINES.  AND THEY ARE

14 MADE MORE QUICKLY WITH DEADLINES, YES.

15 **Q.**  OKAY.

16          **MR. SPECTER:**  NO FURTHER QUESTIONS.

17          THANK YOU.

18          **JUDGE HENDERSON:**  OKAY. AM I THINKING SIMPLISTICALLY,

19 IF WE WERE TO DO WHAT JUDGE KARLTON SUGGESTED?  IT SEEMS TO ME

20 WE'VE GOT A GOOD START WITH THE DEUKMEJIAN REPORT, AND I GUESS

21 THE GOVERNOR'S COMMITTEE, WOULD YOU SAY, AND LITTLE HOOVER?

22 WOULD YOU START THERE, OR WOULD YOU END THERE?  WOULD IT BE

23 SOMETHING BEYOND LOOKING AT THAT, OR DO YOU KNOW?

24          DO YOU HAVE ANY IDEA?

25          **THE WITNESS:**  I THINK IT REALLY -- THE MANY

1 INITIATIVES THAT COULD BE PUT IN PLACE HAVE BEEN DISCUSSED BY

2 ALL OF THOSE PANELS.  SO IT'S REALLY A MATTER OF DECIDING:  ARE

3 WE GOING TO DO ALL OF THEM?  ARE WE GOING TO DO THREE OF THEM?

4 MAKING DECISIONS ABOUT WHICH OF THOSE PLANS TO FOLLOW. AND THEN,

5 YOU KNOW, FOLLOWING UP WITH THE DOLLARS AND ANY LEGISLATION THAT

6 WOULD BE NECESSARY TO PUT THEM IN PLACE.

7            **JUDGE HENDERSON:**  THANK YOU.

8 **BY MR. SPECTER:**

9 **Q.**  I JUST HAVE A COUPLE OF FOLLOW-UP QUESTIONS TO JUDGE

10 HENDERSON'S QUESTIONS.

11            YOU'RE FAMILIAR WITH THE EXPERT PANEL REPORT WHICH

12 CAME OUT ABOUT A YEAR-AND-A-HALF AGO; IS THAT RIGHT?

13 **A.**  YES, I AM.

14 **Q.**  AND THAT WAS THE LATEST OF THESE GROUPS TO STUDY THE

15 CALIFORNIA PRISON SYSTEM; IS THAT CORRECT?

16 **A.**  AS FAR AS I KNOW, YES.

17 **Q.**  AND YOU RECALL THAT THAT PANEL MADE ITS FIRST RECOMMENDATION

18 WHICH WAS TO REDUCE OVERCROWDING, CORRECT?

19 **A.**  YES.  THAT'S CORRECT.

20 **Q.**  AND YOU ALSO RECALL THAT WHAT THAT PANEL SAID WAS THAT THAT

21 PANEL HAD GONE THROUGH ALL THE PREVIOUS STUDIES AND LISTED ABOUT

22 10 FACTORS THAT ALL THE PREVIOUS STUDIES HAD RECOMMENDED,

23 CORRECT?

24 **A.**  YES, IT HAD REVIEWED ALL THE PREVIOUS STUDIES.

25 **Q.**  AND THAT PANEL'S CONCLUSION WAS THERE'S NO NEED TO STUDY THE

1  PROBLEM FURTHER. THAT PANEL CONCLUDED THAT THERE'S JUST THE TIME

2  TO PICK THE RECOMMENDED SOLUTIONS AND IMPLEMENT THEM; IS THAT

3  RIGHT?

4  **A.**  THAT IS CORRECT. IT'S TIME TO MAKE DECISIONS.

5        **MR. SPECTER:**  THANK YOU, YOUR HONOR.

6        **JUDGE HENDERSON:**  THANK YOU.

7        **MR. SPECTER:**  THAT'S WHAT IS IN WHAT IS CALLED THE

8  EXPERT PANEL THAT VARIOUS WITNESSES HAVE BEEN MEMBERS.

9        THANK YOU.

10       **JUDGE HENDERSON:**  THANK YOU.

11       CCPOA HAVE ANY QUESTIONS OF THIS WITNESS?

12       **MS. LEONARD:**  NO QUESTIONS, YOUR HONOR.

13       **JUDGE HENDERSON:**  OKAY.  MR. MELLO?

14       **MR. MELLO:**  GOOD MORNING, YOUR HONORS.

15                    **CROSS—EXAMINATION**

16  **BY MR. MELLO:**

17  **Q.**  GOOD MORNING, AGAIN, MS. WOODFORD.

18  **A.**  GOOD MORNING.

19  **Q.**  WHEN WERE YOU THE WARDEN AT SAN QUENTIN PRISON?

20  **A.**  I WAS THE WARDEN FROM 1999 UNTIL 2004.

21  **Q.**  AND DO YOU KNOW HOW MANY COUNTIES IN CALIFORNIA CURRENTLY

22  OPERATE UNDER SOME FORM OF A POPULATION CAP?

23  **A.**  I DID KNOW THAT NUMBER. I THINK IT'S AROUND 26.

24  **Q.**  COULD IT BE POSSIBLY OVER 30?

25  **A.**  IT COULD BE. BUT I'M REMEMBERING 26 FOR SOME REASON.

1  **Q.**  DO YOU KNOW WHETHER CALIFORNIA IS CURRENTLY PILOTING AND

2  USING A RISK ASSESSMENT TOOL IN THE CDCR SYSTEM?

3  **A.**  I KNOW THAT THEY ARE ATTEMPTING TO USE A COUPLE OF RISK AND

4  NEEDS ASSESSMENT TOOLS.

5  **Q.**  AND MR. SPECTER WAS ASKING YOU ABOUT THE EXPERT PANEL

6  REPORT, CORRECT?

7  **A.**  YES.

8  **Q.**  AND THAT REPORT WAS RELATING TO REHABILITATIVE PROGRAMMING,

9  CORRECT?

10  **A.**  I THINK IT WAS BEYOND THAT. IT WAS REALLY LOOKING AT HOW TO

11  REDUCE RECIDIVISM, WHICH REALLY GOES INTO ALL AREAS OF PUBLIC

12  SAFETY, QUITE FRANKLY.

13  **Q.**  THAT REPORT DID NOT ANALYZE MEDICAL OR MENTAL HEALTHCARE

14  PROGRAMMING IN CDCR INSTITUTIONS, DID IT?

15  **A.**  NOT THAT I RECALL.

16  **Q.**  AND THAT PROGRAM DID NOT PROVIDE A POPULATION NUMBER THAT

17  WAS NECESSARY TO PROVIDE CONSTITUTIONALLY-ADEQUATE MEDICAL AND

18  MENTAL HEALTHCARE, DID IT?

19  **A.**  I DON'T THINK IT USED THAT LANGUAGE, NO. IT DID RECOMMEND

20  REDUCING THE PRISON POPULATION TO MAKE IT OPERATIONAL.

21  **Q.**  OKAY. ARE YOU AWARE OF ANY STUDY THAT SETS FORTH THE

22  APPROPRIATE POPULATION OR NECESSARY POPULATION TO PROVIDE

23  CONSTITUTIONALLY-ADEQUATE MEDICAL AND MENTAL HEALTHCARE IN

24  CALIFORNIA'S PRISONS?

25  **A.**  I DON'T KNOW THAT THOSE WORDS WERE USED. I KNOW THAT THE

1  STATE ITSELF HAS LOOKED AT WHAT IT CONSIDERS TO BE APPROPRIATE

2  LEVEL OF POPULATION TO BE OPERATIONAL.

3  **Q.**  OKAY. BUT ARE YOU AWARE OF ANY STUDY THAT SPECIFICALLY

4  ANALYZED THE POPULATION LEVEL NECESSARY IN ORDER TO OBTAIN

5  APPROPRIATE MEDICAL AND MENTAL HEALTHCARE?

6  **A.**  WELL, I'M NOT AWARE OF A STUDY THAT JUST DEALT WITH THAT.

7  BUT IF YOU'RE USING THE TERM "OPERATIONAL," IT INCLUDES

8  PROVIDING THE SERVICES TO INMATES THAT INCLUDE MEDICAL AND

9  MENTAL HEALTHCARE.

10 **Q.**  I TOOK YOUR DEPOSITION TWICE IN THIS CASE, CORRECT?

11 **A.**  YES, THAT'S CORRECT.

12 **Q.**  MS. WOODFORD, YOU DO NOT BELIEVE THAT THE ONLY WAY TO

13 PROVIDE CONSTITUTIONALLY-ADEQUATE MEDICAL AND MENTAL HEALTHCARE

14 IN CDCR PRISONS IS TO RELEASE PRISONERS, DO YOU?

15 **A.**  COULD YOU REPEAT THAT ONE MORE TIME?

16 **Q.**  SURE.

17          **MR. SPECTER:**  PAUL, CAN YOU SPEAK A LITTLE LOUDER?

18          **MR. MELLO:**  OKAY.

19 **BY MR. MELLO:**

20 **Q.**  MS. WOODFORD, YOU DO NOT BELIEVE THAT THE ONLY WAY TO

21 PROVIDE CONSTITUTIONALLY-ADEQUATE MEDICAL AND MENTAL HEALTHCARE

22 IN CDCR PRISONS IS TO RELEASE PRISONERS, DO YOU?

23 **A.**  I BELIEVE THAT WE CAN ONLY DO THAT BY REDUCING OVERCROWDING.

24 **Q.**  OKAY.  BUT YOU DO NOT ADVOCATE THE IMMEDIATE RELEASE OF

25 PRISONERS, CORRECT?

1    **A.**  I DON'T KNOW THAT THAT'S A FAIR STATEMENT. I THINK THAT

2    THERE'S OTHER WAYS TO REDUCE OVERCROWDING OTHER THAN RELEASING

3    INMATES. BUT YOU ABSOLUTELY HAVE TO REDUCE OVERCROWDING.

4    **Q.**  DO YOU KNOW WHAT THE "RATE OF INCARCERATION PER CONVICTION"

5    MEANS?

6    **A.**  COULD YOU REPEAT THAT ONE MORE TIME?

7    **Q.**  YES.  DO YOU KNOW WHAT THE "RATE OF INCARCERATION PER

8    CONVICTION" MEANS?

9    **A.**  PERHAPS YOU SHOULD GIVE ME YOUR DEFINITION OF THAT.

10   **Q.**  OKAY. I ASKED YOU AT YOUR DEPOSITION IN SEPTEMBER OF 2008:

11                   "WHAT IS CALIFORNIA'S RATE OF INCARCERATION PER

12           CONVICTION?"

13           I ASKED YOU:

14                   "DO YOU KNOW?"

15           AND YOU SAID AT -- I'M SORRY -- PAGE 110, LINES 20

16   THROUGH 21 -- JUST PULL IT UP.

17           YOU SAID:

18                   "I DON'T KNOW."

19           DO YOU KNOW WHAT I MEANT BY "RATE OF INCARCERATION

20   PER CONVICTION" WHEN YOU ANSWERED THAT QUESTION?

21   **A.**  I MIGHT KNOW, BUT IF YOU WOULD EXPLAIN WHAT YOU MEAN, THEN I

22   WOULD HAVE A BETTER UNDERSTANDING IF I KNOW OR NOT.

23   **Q.**  OKAY.  LET'S GO TO THE NEXT QUESTION. MAYBE THAT WILL ANSWER

24   THE QUESTION.

25           LINES 23 TO 25, I SAY:

1                "DO YOU KNOW OUR RATE OF INCARCERATION PER --

2           HOW OUR RATE OF INCARCERATION PER CONVICTION COMPARES

3           TO OTHER STATES?"

4           AND YOU SAID:

5                "WE'RE SOMEWHERE IN THE MID-RANGE."

6  **A.**  OKAY.  SO IF YOU'RE SPEAKING OF PRISON INCARCERATION AS

7  OPPOSED TO JAIL --

8  **Q.**  CORRECT.

9  **A.**  -- WE ARE SOMEWHERE IN THE MID-RANGE, ACCORDING TO REPORTS

10 BY JOAN PETERSILIA.

11 **Q.**  AND WHAT DOES THAT MEAN?

12 **A.**  IT MEANS THE RATE OF FELONY CONVICTIONS THAT ENDS UP IN

13 STATE PRISON.

14 **Q.**  OKAY. AND MUCH --

15 **A.**  BUT THAT DOESN'T INTO ACCOUNT -- I MEAN, CALIFORNIA IS

16 UNIQUE IN THAT WE SEND PAROLE VIOLATORS BACK TO STATE PRISON.

17 **Q.**  OKAY. IT DOESN'T ACCOUNT FOR THAT?

18 **A.**  NO, NOT MY UNDERSTANDING OF THE RATE OF INCARCERATION.

19 **Q.**  IS CALIFORNIA INCARCERATING PEOPLE AT A MUCH HIGHER RATE

20 THAN OTHER JURISDICTIONS AROUND THE COUNTRY?

21 **A.**  FOR NEW ADMISSIONS WE'RE IN THE MID-RANGE. I THINK WE ARE

22 INCARCERATING PAROLE VIOLATORS AT A MUCH HIGHER RATE BECAUSE WE

23 SEND EVERYBODY OUT ON PAROLE, AND OUR TECHNICAL VIOLATIONS COME

24 BACK TO STATE PRISON.

25           OTHER STATES' TECHNICAL VIOLATIONS -- SOME STATES NO

1  TECHNICAL VIOLATIONS COME BACK TO STATE PRISON. AND OTHER

2  STATES, TECHNICAL VIOLATIONS ARE HANDLED WITH OTHER KINDS OF

3  SANCTIONS BEFORE STATE PRISON IS IMPOSED.

4            SO I THINK OUR RATE IS MUCH HIGHER WHEN IT COMES TO

5  PAROLE VIOLATORS.

6  **Q.**  DO YOU -- MS. WOODFORD, YOU BELIEVE THAT APPROPRIATE CASE

7  MANAGEMENT OF PROBATIONERS AND PAROLEES BY PROBATION AND PAROLE

8  OFFICERS CAN REDUCE RECIDIVISM, CORRECT?

9  **A.**  YES, I DO BELIEVE THAT.

10 **Q.**  AND YOU BELIEVE THAT THERE IS A LACK OF APPROPRIATE CASE

11 MANAGEMENT OF PROBATION OR RESOURCES FOR APPROPRIATE CASE

12 MANAGEMENT OF PROBATIONERS AND PAROLEES CURRENTLY IN CALIFORNIA,

13 CORRECT?

14 **A.**  WELL, I CERTAINLY AGREE WITH THAT STATEMENT AS IT PERTAINS

15 TO PROBATIONERS. ON THE PAROLE SIDE, I DON'T KNOW THAT IT'S

16 REALLY A LACK OF PAROLE AGENTS. IT'S REALLY THE FACT THAT WE'RE

17 PUTTING EVERYBODY ON PAROLE WHEN THAT ISN'T NECESSARY. SO THE

18 RESOURCES COULD BE ALIGNED UP WITH APPROPRIATE POLICY.

19 **Q.**  AND YOU BELIEVE THAT THERE AREN'T -- WELL, LET ME ASK IT

20 THIS WAY.  YOU TALKED ABOUT DIVERSIONARY PROGRAMS DURING YOUR

21 DIRECT TESTIMONY WITH MR. SPECTER, CORRECT?

22 **A.**  YES.

23 **Q.**  AND THOSE INCLUDE DRUG PROGRAMS?

24 **A.**  DRUG PROGRAMS, YES.

25 **Q.**  CAN YOU TELL ME SOME OF THE OTHER PROGRAMS?

1  **A.**  THAT YOU COULD HAVE IN THE COMMUNITY?

2  **Q.**  CORRECT.

3  **A.**  WELL, SOME OF THEM ARE THE KINDS OF PROGRAMS THAT ARE RUN

4  HERE IN SAN FRANCISCO, SUCH AS THE CHARTER HIGH SCHOOL THAT

5  CONTINUES OUTSIDE IN THE COMMUNITY.

6          YOU COULD HAVE DAY REPORTING CENTERS WHERE

7  PROBATIONERS AND PAROLEES REPORT ON A DAILY BASIS TO RECEIVE

8  SERVICES.

9          THE GENDER-RESPONSIVE PROGRAM, SUCH AS THE WOMEN'S

10  PROGRAM HERE IN SAN FRANCISCO WHERE FEMALE OFFENDERS COULD BE

11  SENT TO TO RECEIVE SERVICES FOR THEMSELVES AND THEIR CHILDREN.

12          YOU COULD HAVE FAMILY SERVICES THAT DIRECT RESOURCES

13  TO THE ENTIRE FAMILY, BECAUSE IT REALLY IS A FAMILY ISSUE.

14          PROVIDING HEALTHCARE IS ANOTHER SERVICE. MENTAL

15  HEALTHCARE IN THE COMMUNITY FOR INDIVIDUALS WHO ARE IN NEED OF

16  THAT.

17          IT'S REALLY PROVIDING HOUSING, APPROPRIATE HOUSING

18  FOR INDIVIDUALS.

19          IT'S -- IT REALLY SHOULD BE BASED ON USING GOOD RISK

20  AND NEEDS ASSESSMENT TOOLS, AND THEN PROVIDING THE PROGRAMS THAT

21  ARE IDENTIFIED BY THE NEEDS OF THE INDIVIDUAL.

22          **JUDGE KARLTON:**  AND YOU THINK THAT WE CAN DO ALL THAT

23  FOR $10,000 A PAROLEE INSTEAD OF 40 OR 45,000?  I DON'T MEAN

24  "PAROLEE."  I MEAN "OFFENDER."

25          **THE WITNESS:**  I BELIEVE THAT IS THE NUMBER FROM THE

1  CHIEF PROBATION OFFICERS OF CALIFORNIA. AND I PERSONALLY DO

2  BELIEVE THAT'S TRUE. YOU CAN DO THAT MUCH CHEAPER IN THE

3  COMMUNITY.

4          **JUDGE REINHARDT:**  ARE YOU TALKING, THEN, JUST

5  PROBATION IS IN NEED OF THAT FIGURE OR PROBATION AND PAROLEES?

6          **THE WITNESS:**  I'M NOT SURE WHAT THE COST IS PER

7  PERSON FOR PAROLE, BUT IT WOULD REFER TO BOTH, BECAUSE ONE OF

8  THE THINGS THAT I DID FIND OUT AS THE CHIEF PROBATION OFFICER IS

9  MANY, MANY PEOPLE ARE ON PROBATION AND PAROLE AT THE SAME TIME.

10  SO THE COST OF PROVIDING THAT KIND OF COMMUNITY CORRECTION

11  SHOULD BE THE SAME FOR BOTH INDIVIDUALS.

12  **BY MR. MELLO:**

13  **Q.**  OKAY.  DO YOU BELIEVE THE LACK OF APPROPRIATE CASE

14  MANAGEMENT OF PROBATIONERS AND PAROLEES CAN INCREASE RECIDIVISM?

15  **A.**  THAT THE LACK OF CASE MANAGEMENT CAN INCREASE RECIDIVISM?

16  WELL, IT IS THE FEEDER TO THE STATE PRISON SYSTEM.  SO IF YOU

17  DON'T -- IF YOU'RE NOT PROVIDING APPROPRIATE CASE MANAGEMENT ON

18  PROBATION, YOU HAVE LESS PEOPLE BEING SUCCESSFUL ON PROBATION.

19  **Q.**  SO THE ANSWER IS:  YES?

20  **A.**  I THINK FOR PEOPLE ON PROBATION THE ANSWER IS YES, THEY CAN

21  END UP IN STATE PRISON IF THEY ARE NOT SUCCESSFUL ON PROBATION.

22  **Q.**  AND MANY OF THOSE -- I CALL THEM "DIVERSIONARY PROGRAMS"

23  THAT YOU'VE TESTIFIED ABOUT A FEW MOMENTS AGO. DO YOU UNDERSTAND

24  WHAT I MEAN?

25  **A.**  YES.

1  Q.  OKAY. MANY OF THOSE DIVERSIONARY PROGRAMS, DO YOU KNOW IF

2  THE STATE -- IF THERE ARE SUFFICIENT NUMBERS OF THOSE

3  DIVERSIONARY PROGRAMS IN THE LOCAL COMMUNITIES FOR THE CURRENT

4  POPULATION OF PROBATIONERS AND PAROLEES?

5  A.  I KNOW THAT THERE IS NOT SUFFICIENT NUMBERS OF THOSE

6  PROGRAMS.

7  Q.  AND WOULD IT ALSO BE TRUE THAT IF THE 52,000 ADDITIONAL

8  PAROLEES WERE ADDED TO THE SYSTEM OVER A TWO-YEAR PERIOD THAT

9  THERE ARE WOULD STILL NOT BE ENOUGH OF THOSE RESOURCES

10 AVAILABLE?

11 A.  YOU'RE TALKING ABOUT TWO DIFFERENT SYSTEMS. SO IT'S THE SAME

12 RESOURCES THAT ARE THERE FOR PAROLE.  THESE ARE THE SAME PEOPLE

13 COMING OUT. SO, AGAIN, IT'S TWO SYSTEMS. PROBATION CAN BE A

14 PREVENTION FOR PEOPLE EVER GETTING INTO THE STATE PRISON SYSTEM.

15 Q.  RIGHT.

16 A.  PEOPLE ON PAROLE ARE ALREADY ON PAROLE.

17 Q.  RIGHT.  AND THERE ARE --

18         JUDGE KARLTON:  BUT YOU'RE ADVOCATING, AMONG OTHER

19 THINGS, REDUCING THE NUMBER OF PAROLEES THAT WE -- I KEEP SAYING

20 "WE" -- THAT THE STATE SENDS BACK TO PRISON WHILE THEY ARE ON

21 PAROLE FOR WHAT IS DESCRIBED AS "TECHNICAL PAROLE VIOLATIONS."

22         THE WITNESS:  RIGHT.

23         JUDGE KARLTON:  AND MR. MELLO'S QUESTION IS:  ARE

24 THERE SUFFICIENT RESOURCES PRESENTLY, MUCH LESS IF WE RELEASED

25 20 -- 52,000, TO PROPERLY PROGRAM THE PAROLEES NOW, MUCH LESS

1    LATER?

2              **THE WITNESS:**  UM-HUM.

3              **JUDGE KARLTON:**   THAT'S HIS QUESTION.

4              **THE WITNESS:**  WELL, IF YOU'RE KEEPING PEOPLE ON -- IF

5    YOU'RE SENDING PAROLEES, KEEPING THEM FROM COMING BACK TO STATE

6    PRISON FOR TECHNICAL VIOLATIONS, THE PAROLE OFFICERS HAVE SET

7    CASELOAD STANDARDS, SO THERE WOULD BE ADDITIONAL PAROLE OFFICERS

8    ADDED TO HANDLE THE CASELOAD. SO THERE WOULD BE GREATER

9    SUPERVISION OF THOSE INDIVIDUALS.

10             **JUDGE KARLTON:**  BUT THE QUESTION THAT MR. MELLO IS

11   TRYING TO EXPLORE WITH YOU IS, AS YOU VIEW -- IF YOU ARE ABLE TO

12   ANSWER.

13             **THE WITNESS:**  RIGHT.

14             **JUDGE KARLTON:**  AS YOU VIEW THE PAROLE SYSTEM TODAY,

15   IS IT -- DOES IT HAVE ADEQUATE PROGRAMMING FOR THE PEOPLE BEING

16   RELEASED TODAY?

17             **THE WITNESS:**  NO, IT DOES NOT HAVE ADEQUATE

18   PROGRAMMING.

19             **JUDGE KARLTON:**  AND IF WE INCREASE THAT NUMBER BY

20   52,000, EVEN IF WE WERE ADDING PAROLE OFFICERS, WE STILL

21   WOULDN'T HAVE ENOUGH PROGRAMS TO PROGRAM THOSE -- I'M NOT

22   SPEAKING ENGLISH -- TO ACHIEVE APPROPRIATE PROGRAMMING FOR THE

23   PAROLEES.

24             **THE WITNESS:**  WELL, MY ANSWER TO THAT WOULD BE THIS:

25   THE GOAL OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

1  REHABILITATION IS REHABILITATION.  SO YOU HAVE TO SPEND THE

2  DOLLARS TO REHABILITATE PEOPLE, WHETHER THEY ARE IN PRISON OR

3  OUTSIDE OF PRISON.  IT'S MUCH MORE EXPENSIVE IN PRISON.

4          SO THOSE DOLLARS CAN BE SENT TO THE COMMUNITY TO

5  PROVIDE THE KINDS OF PROGRAMS THAT PAROLE IS WORKING ON NOW. AND

6  THAT'S WHERE THE MONEY SHOULD BE SPENT.

7          I THINK IT'S ALSO IMPORTANT TO REMEMBER THAT THE

8  STATE OF CALIFORNIA'S CURRENTLY PAROLING 10,000 PEOPLE A MONTH.

9  AND SO WHEN YOU TALK ABOUT 50,000 PEOPLE OVER TWO YEARS, THE

10 INCREASE ISN'T AS DRAMATIC AS SAYING "50,000 PEOPLE."

11          IT'S ADDING A COUPLE OF THOUSAND MORE PER MONTH AND

12 BRINGING UP THE RESOURCES TO ADDRESS THEIR NEEDS, WHICH IS WHAT

13 PAROLE IS SUPPOSED TO DO. THAT'S THE MISSION OF PAROLE.

14 **BY MR. MELLO:**

15 **Q.**    SO THE STATE WOULD GO FROM PAROLING 10 TO 12,000

16 INDIVIDUALS PER MONTH, CORRECT?  THAT'S WHAT YOU JUST TESTIFIED

17 TO?

18 **A.**  WELL, IF YOU'RE REDUCING -- DEPENDING ON THE MODEL. I MEAN,

19 YOU KNOW, IF YOU'RE REDUCING THE POPULATION BY 50,000, YOU HAVE

20 TWO YEARS TO DO IT, IT DEPENDS ON WHAT MODEL YOU USE.  I WOULD

21 HOPE THAT SOME OF THE MODEL IS PREVENTION DOLLARS SO THAT THEY

22 ARE NOT COMING IN THE FRONT DOOR, WHICH MEANS THAT YOU'RE NOT

23 REALLY REDUCING THAT MANY MORE.  YOU'RE STOPPING THE INFLOW.

24          AND THEN, SOME OF THE MODEL IS PUTTING IN INCENTIVES

25 INSIDE THE PRISON SYSTEM SO PEOPLE ARE LEAVING PRISON EARLIER

1  BECAUSE THEY ARE PARTICIPATING IN THE KINDS OF PROGRAMS THAT

2  THEY NEED TO PARTICIPATE IN.

3           SO, AGAIN, IT'S REALLY HARD TO ANSWER YOUR QUESTION

4  WITHOUT KNOWING WHAT DECISIONS ARE GOING TO BE MADE ABOUT HOW TO

5  DO THIS. IT CERTAINLY CAN BE DONE SAFELY WITHOUT IMPACTING

6  PUBLIC SAFETY AND PROBABLY IMPROVING PUBLIC SAFETY IF IT'S DONE

7  CORRECTLY AND AS HAS BEEN RECOMMENDED BY THE MANY EXPERTS WHO

8  HAVE REVIEWED THIS ISSUE.

9  **Q.**  UNDERSTOOD.

10          YOUR TESTIMONY EARLIER WAS THAT CALIFORNIA'S

11 RECIDIVISM RATE WAS IN THE 60 TO 70 PERCENT RANGE, CORRECT?

12 **A.**  YES.

13 **Q.**  SO DOES THAT MEANING THAT 60 TO 70 PERCENT OF THOSE 52,000

14 INDIVIDUALS THAT PLAINTIFFS ARE ASKING THE COURT TO REDUCE THE

15 PRISON POPULATION BY WILL RECIDIVATE?

16 **A.**  THAT'S A RECIDIVISM RATE OVER THREE YEARS, AND THAT

17 CERTAINLY IS POSSIBLE IF WE DON'T PUT THE INVESTMENT INTO THE

18 KINDS OF PROGRAMS THAT KEEP PEOPLE FROM RECIDIVATING.

19          **MR. MELLO:**  NOTHING FURTHER.

20          **JUDGE REINHARDT:**  IS THERE ANY WAY TO ESTIMATE HOW

21 MUCH OF THE REDUCTION OF THE PRISON POPULATION WOULD BE

22 ACCOMPLISHED IF YOUR PROGRAMS WERE INSTITUTED AND FEWER PEOPLE

23 WERE THEN SENT TO PRISON?  HOW MUCH OF THE REDUCTION WOULD BE

24 ACCOMPLISHED?

25          **JUDGE KARLTON:**  DO YOU KNOW THE ANSWER TO THAT

1   QUESTION?

2          **THE WITNESS:**  I PERSONALLY DO NOT HAVE THE ANSWER TO

3   THAT QUESTION. I UNDERSTAND THAT OTHER PEOPLE HAVE ESTIMATED

4   THAT IF YOU PUT MORE MONEY IN THE PROBATION THAT YOU WOULD HAVE

5   A GREATER SUCCESS RATE AND ACTUALLY REDUCE THE NUMBER OF PEOPLE

6   WHO COME INTO THE PRISON SYSTEM BY ABOUT 20,000.

7          **JUDGE REINHARDT:**  WOULD IT ALSO REDUCE IT BY THE

8   NUMBER OF PAROLEES WHO DO NOT RETURN TO PRISON?

9          **THE WITNESS:**  YES, THAT'S CORRECT.

10          **JUDGE REINHARDT:**  AND IS THERE ANY ESTIMATE FOR THAT

11   NUMBER?

12          **THE WITNESS:**  NOT THAT I CAN RECALL OFF THE TOP OF MY

13   HEAD.  I'M SURE THAT PEOPLE HAVE DONE THAT STUDY BECAUSE THEY

14   HAVE LOOKED AT EVERY ASPECT OF THIS, BUT I'M NOT RECALLING THAT

15   NUMBER.

16          **JUDGE REINHARDT:**  WELL, MY QUESTION REALLY IS WE'RE

17   NOT TALKING, THEN, ABOUT RELEASING 52,000. WE'RE TALKING ABOUT

18   REDUCING THE NUMBER THAT WILL BE GOING IN, AND WE DON'T KNOW

19   QUITE -- WHERE DO WE GET AN ESTIMATE OF THAT NUMBER?

20          **THE WITNESS:**  I'M SURE SOME OF THE EXPERTS WHO ARE

21   GOING TO TESTIFY CAN ANSWER THAT. BUT REALLY IT IS THE BEST PLAN

22   IS TO LOOK AT REDUCING THE NUMBER OF PEOPLE COMING IN IN THE

23   FIRST PLACE, AND ASSISTING THOSE THAT ARE EXITING THE PRISON

24   SYSTEM SO YOU CAN HAVE AN IMPACT ON BOTH ENDS.

25          **JUDGE REINHARDT:**  OKAY.

1          **MR. MITCHELL:**  GOOD MORNING.

2          **JUDGE HENDERSON:**  YOU MAY PROCEED, COUNSEL.

3          **MR. MITCHELL:**  BILL MITCHELL FOR THE DEFENDANT

4   INTERVENORS.

5                           **CROSS-EXAMINATION**

6   BY MR. MITCHELL:

7   **Q.**  GOOD MORNING, MS. WOODFORD.

8   **A.**  GOOD MORNING.

9   **Q.**  I JUST HAVE A FEW QUESTIONS FOR YOU.

10          I BELIEVE YOU INDICATED IN YOUR PREVIOUS TESTIMONY

11  THAT YOU STARTED YOUR CAREER AS A CORRECTIONAL OFFICER AT SAN

12  QUENTIN IN EITHER THE LATE '70'S OR EARLY '80'S; IS THAT

13  CORRECT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  WHEN WAS IT THAT YOU BEGAN?

16  **A.**  1978.

17  **Q.**  AS A CORRECTIONAL OFFICER; IS THAT CORRECT?

18  **A.**  AS A CORRECTIONAL OFFICER.

19  **Q.**  AND YOU REMAINED AT SAN QUENTIN MOVING UP THROUGH THE RANKS

20  ALL THE WAY TO WARDEN THROUGH THE '90'S, CORRECT?

21  **A.**  UNTIL 2004, UM-HUM.

22  **Q.**  I BELIEVE THAT AT ONE POINT IN YOUR TESTIMONY YOU LIKENED

23  THE YARD AT SAN QUENTIN TO ALMOST LIKE A COLLEGE CAMPUS IN THE

24  EARLY YEARS WHILE YOU WERE THERE AS A CORRECTIONAL OFFICER WITH

25  PEOPLE GOING TO -- INMATES GOING TO PROGRAMMING, CLASSES, THINGS

1  OF THAT SORT?

2  **A.**  I TALKED ABOUT INMATES. I DON'T KNOW THAT I USED THE WORD

3  "YARD," BUT THE ATMOSPHERE BEING LIKE A COLLEGE CAMPUS.

4  **Q.**  AND DURING THE COURSE OF YOUR CAREER THERE YOU SAW IT CHANGE

5  DRAMATICALLY, DIDN'T YOU?

6  **A.**  THAT IS CORRECT.

7  **Q.**  INCARCERATION RATES TRIPLED, IF NOT QUADRUPLED, AT SAN

8  QUENTIN DURING THAT TIME PERIOD.

9  **A.**  I'M NOT SURE WHAT THE ACTUAL RATES WERE, BUT, YES, WE BEGAN

10 RECEIVING LARGE NUMBER OF INMATES FOR LONGER PERIODS OF TIME.

11 **Q.**  AND THAT WAS DURING THE TIME IN CALIFORNIA WHEN THE STATE

12 LEGISLATURE WAS INCREASING PENALTIES FOR SERIOUS VIOLENT

13 OFFENDERS, CORRECT?

14 **A.**  NOT JUST FOR SERIOUS VIOLENT OFFENDERS, BUT INCREASING

15 PENALTIES OVERALL, INCLUDING DRUG OFFENSES AND OTHER KINDS OF

16 CRIMES, YES.

17 **Q.**  INCARCERATION RATES WERE INCREASING, THEREFORE THE

18 POPULATION IN THE PRISON AT SAN QUENTIN WAS INCREASING, AND YOU

19 WITNESSED THAT, CORRECT?

20 **A.**  YES, THAT'S TRUE.

21 **Q.**  YOU'RE AWARE BACK IN 1982 THAT THE BUREAU OF JUSTICE

22 STATISTICS INDICATED THAT THE CALIFORNIA NUMBER OF VICTIMS OF

23 SERIOUS CRIMES WERE APPROXIMATELY 4,771 PER 100,000 OF

24 POPULATION, CORRECT?

25 **A.**  NO, I'M NOT AWARE OF THAT.

1  **Q.**  ARE YOU AWARE THAT DURING THAT TIME PERIOD WHILE YOU WERE AT

2  SAN QUENTIN WHILE INCARCERATION RATES WERE TRIPLING, IF NOT

3  QUADRUPLING, THAT THE NUMBER OF CALIFORNIA VICTIMS OF SERIOUS

4  CRIMES DROPPED FROM 4,777 PER 100,000 DOWN TO 2381 PER 100,000?

5  **A.**  WHAT I AM AWARE OF IS THAT VIOLENT CRIME WENT DOWN AROUND

6  THE NATION, AND INCLUDING STATES WHERE INCARCERATION RATES DID

7  NOT INCREASE, IN FACT DECREASED.  SO I'M QUITE AWARE OF THAT

8  STATISTIC.

9        AND EXPERTS SAY THAT REDUCTIONS IN CRIME RATES HAVE

10  VERY LITTLE TO DO WITH INCARCERATION.

11  **Q.**  IS IT YOUR OPINION THAT THE LENGTH OF TERMS OR THE LENGTH OF

12  STAY IN PRISON DOES NOT DETER CRIME?

13  **A.**  I THINK THAT IT IS ONE ASPECT OF DETERRING CRIME. IT CAN BE.

14  **Q.**  WHAT STATES AND WHAT STUDIES ARE YOU REFERRING TO WHEN YOU

15  INDICATE THAT THE INCARCERATION RATES DO NOT LEAD TO A REDUCTION

16  IN CRIME RATES?

17  **A.**  I'VE READ SO MANY STUDIES. BUT I WOULD REFER YOU TO JOAN

18  PETERSILIA, MUCH OF HER WORK.  SOME OF THE WORK OF JIM AUSTIN,

19  BARRY KRISBERG, NATIONAL COUNCIL ON CRIME AND DELINQUENCY,

20  STUDIES OUT OF JOHN JAY COLLEGE.

21        THERE IS SO MUCH WORK IN THIS AREA THAT TALKS ABOUT

22  THE FACT THAT INCARCERATION RATES REALLY HAVE NOT BEEN

23  PROVIDED -- BEEN THE REASON FOR THE REDUCTION IN CRIME RATES.

24  IT'S BEEN LOTS OF OTHER STRATEGIES.

25  **Q.**  HAVE YOU REVIEWED -- ARE YOU AWARE OF THE STUDY DONE BY THE

1  STANFORD UNIVERSITY BOARD OF TRUSTEES, THE SOCIAL BENEFITS OF

2  CONFINING HABITUAL CRIMINALS?

3  **A.**  NO, I'M NOT AWARE OF THAT STUDY.

4  **Q.**  WOULD YOU AGREE WITH THE PROPOSITION THAT A LAW HAS NO

5  PENALTY, IT HAS NO DETERRENT EFFECT?

6  **A.**  COULD YOU REPEAT THE STATEMENT AGAIN?

7  **Q.**  IF A LAW HAS NO PENALTY, IT HAS NO DETERRENT EFFECT.

8         **JUDGE KARLTON:**  YOU OUGHT TO BE CAREFUL ABOUT WHAT

9  YOU'RE SAYING. WE HAVE A LOT OF FEDERAL LAWS THAT ARE PREDATORY

10 IN NATURE.

11        **MR. MITCHELL:**  I'M SORRY.  I COULDN'T HEAR YOU, YOUR

12 HONOR.

13        **JUDGE KARLTON:**  NEVER MIND.  GO AHEAD.

14        YOUR ASSUMPTION THAT THAT IS NOT THE CONDITION OF THE

15 LAW IS CERTAINLY NOT TRUE OF FEDERAL LAW, BUT GO RIGHT AHEAD.

16 **BY MR. MITCHELL:**

17 **Q.**  LET ME REPEAT IT.

18 **A.**  THANK YOU.

19 **Q.**  IF A LAW HAS NO PENALTY, THERE IS NO DETERRENT EFFECT TO ITS

20 VIOLATION.

21        WOULD YOU AGREE WITH THAT STATEMENT?

22 **A.**  YES, I THINK THAT'S TRUE.

23        **JUDGE KARLTON:**  TELL THAT TO THE UNITED STATES

24 CONGRESS.

25        GO AHEAD.

1    **THE WITNESS:** BUT THAT ALSO DOESN'T SAY THAT THE

2   PENALTY HAS TO BE INCARCERATION, EITHER. THERE'S OBVIOUSLY A

3   NEED FOR PRISONS, AND OBVIOUSLY THEY PROVIDE SOME DETERRENCE.

4    BUT IN AND OF ITSELF, IT DOES NOT REDUCE CRIME RATES

5   AND DOES NOT MAKE OUR SOCIETY SAFER. THERE'S LOTS OF OTHER

6   ELEMENTS OF THIS VERY COMPLICATED ISSUE. CRIME IS A VERY

7   COMPLICATED ISSUE, AND THERE'S LOTS OF OTHER ELEMENTS THAT NEED

8   TO COME INTO PLAY.

9   **BY MR. MITCHELL:**

10  **Q.** YOU WOULD AGREE THAT AN HABITUAL CRIMINAL WHO IS IN PRISON

11  IS GOING TO BE DETERRED AND PREVENTED FROM COMMITTING ADDITIONAL

12  CRIMES, CORRECT?

13    **MR. SPECTER:** OBJECTION.

14    **THE WITNESS:** I'M NOT SURE I UNDERSTAND THE QUESTION.

15    **JUDGE KARLTON:** A GUY WHO IS IN PRISON CAN'T COMMIT

16  CRIMES TO SOCIETY, AT LARGE. HE MAY COMMIT CRIMES RELATIVE TO

17  OTHER PRISONERS, BUT AT LEAST HE ISN'T DOING HARM TO SOCIETY, AT

18  LARGE.

19    **THE WITNESS:** AT LEAST WHILE HE'S INCARCERATED. BUT

20  EVERYBODY COMES HOME, AND SO -- OR MOST INDIVIDUALS COME HOME.

21  AND SO IT'S REALLY HAVING APPROPRIATE STRATEGIES TO MAKE A

22  SOCIETY SAFER ARE MUCH MORE COMPLICATED THAN JUST SAYING

23  INCARCERATION.

24  **BY MR. MITCHELL:**

25  **Q.** DURING THE 1990'S AND THE THREE STRIKES LEGISLATION AND

1  OTHER CRIME LEGISLATION THAT INCREASED PENALTIES, THE NUMBER OF

2  SERIOUS CRIMES IN CALIFORNIA HAS DECREASED, HAS IT NOT?

3  **A.**  VIOLENT CRIME ACROSS THE NATION HAS DECREASED.  THAT'S TRUE.

4  **Q.**  ARE YOU AWARE THAT IN 1993 THERE WERE 126,000 ROBBERIES IN

5  THE STATE OF CALIFORNIA?

6  **A.**  NO, I WAS NOT AWARE OF THAT.

7  **Q.**  ARE YOU AWARE THAT IN 1999 IT WAS DOWN TO 60,000 ROBBERIES?

8  **A.**  NO, I WAS NOT AWARE OF THAT.

9  **Q.**  ARE YOU AWARE THAT IN 1993 CALIFORNIA HAD THE FOURTH WORST

10 CRIME INDEX IN THE COUNTRY AT 6,456 PER 100,000 OF POPULATION?

11 **A.**  NO, I'M NOT AWARE OF THAT.  BUT I AM AWARE THAT NEW YORK IS

12 CONSIDERED THE SAFEST CITY IN AMERICA, AND THEY ARE LOCKING UP

13 FEWER AND FEWER PEOPLE IN NEW YORK.

14         SO INCARCERATION IS NOT THE ONLY STRATEGY THAT CAN BE

15 UTILIZED TO REDUCE A CRIME RATE.  CRIME RATES ARE GOING DOWN

16 ACROSS THE UNITED STATES, VIOLENT CRIME, EVEN IN AREAS WHERE

17 THEY ARE KEEPING MORE PEOPLE OUT OF PRISON.

18 **Q.**  ARE YOU AWARE OF THE FACT THAT IN 1999, CALIFORNIA HAD

19 IMPROVED TO NOW BEING THE 29TH WORSE CRIME INDEX STATE AT 3,804

20 PER 100,000 OF POPULATION?

21 **A.**  NO, I'M NOT AWARE OF THOSE STATISTICS.

22 **Q.**  ARE YOU AWARE THAT DURING THAT TIME PERIOD THE NUMBER OF

23 MURDERS DROPPED 54 PERCENT IN CALIFORNIA, WHILE INCARCERATION

24 RATES WERE INCREASING?

25 **A.**  AGAIN, I'M AWARE THAT VIOLENT CRIME ACROSS THE NATION HAS

1  GONE DOWN, INCLUDING STATES WHERE INCARCERATION HAS BEEN

2  DECREASED.

3  **Q.**  NOW, YOU'VE INDICATED THAT THE WAY IN WHICH CALIFORNIA

4  TREATS TECHNICAL PAROLE VIOLATORS IS DIFFERENT FROM HOW OTHER

5  STATES TREAT PAROLE VIOLATORS, CORRECT?

6  **A.**  WE'RE ONE OF TWO STATES WHERE EVERYBODY LEAVES ON PAROLE,

7  YES.

8  **Q.**  YOU WOULD AGREE THAT CERTAIN TECHNICAL PAROLE VIOLATORS

9  SHOULD BE SENT BACK TO PRISON.  NOT ALL OF THEM SHOULD BE

10  TREATED IN THE COMMUNITY, CORRECT?

11  **A.**  YES, I THINK THAT CERTAIN TECHNICAL VIOLATIONS WOULD NEED TO

12  BE SENT BACK TO PRISON.

13  **Q.**  I THINK, AS I UNDERSTOOD FROM YOUR TESTIMONY, YOU WOULD

14  INDICATE OR YOU WOULD RECOMMEND OR SUPPORT THE IDEA OF USING

15  SOME TYPE OF A RISK ASSESSMENT TOOL TO DETERMINE WHICH TECHNICAL

16  PAROLE VIOLATORS ARE ACTUALLY RETURNED TO CUSTODY?

17  **A.**  THE USE OF A RISK AND NEEDS ASSESSMENT TOOL IS REALLY A TOOL

18  TO BE UTILIZED TO KNOW HOW TO CASE MANAGE A CASE.

19          SO IT'S ONE ELEMENT OF MAKING A DECISION ABOUT HOW

20  PEOPLE SHOULD BE MANAGED, YES, THAT'S TRUE. I AGREE WITH THAT

21  STATEMENT.

22          **JUDGE KARLTON:**  NO, BUT THE QUESTION WAS SOMEWHAT

23  DIFFERENT. THE QUESTION RAISED WAS WHETHER A RISK AND NEED

24  ASSESSMENT TOOL WOULD, AMONG OTHER THINGS, IDENTIFY PEOPLE WHO

25  OUGHT TO BE RETURNED TO PRISON DESPITE THE FACT THAT THERE'S A

1    TECHNICAL VIOLATION.

2              **THE WITNESS:**  NO, I DON'T AGREE WITH THAT STATEMENT.

3              THANK YOU. I MISUNDERSTOOD THE QUESTION.

4              THE RISK AND NEEDS ASSESSMENT TOOL IS BETTER UTILIZED

5    TO DECIDE WHAT INDIVIDUALS NEED TO BE ON PAROLE AT ALL, AND THEN

6    WHAT KIND OF SUPERVISION SHOULD BE UTILIZED FOR THE REMAINING

7    PEOPLE WHO ARE ON PAROLE.

8              THE BEHAVIOR OF THE INDIVIDUAL WILL DETERMINE WHETHER

9    THEY SHOULD BE SENT BACK TO PRISON. AFTER USING INTERMEDIATE

10   SANCTIONS IN THE COMMUNITY, IF THOSE FAIL THEN YOU HAVE THE

11   OPTION OF SENDING PEOPLE EITHER BACK TO JAIL OR PRISON.

12             I THINK THE BETTER OPTION, QUITE FRANKLY, IS JAIL,

13   BECAUSE THE LONGEST AMOUNT OF TIME YOU CAN SEND A PAROLE

14   VIOLATOR BACK TO PRISON IS 12 MONTHS.  AND IT'S MUCH BETTER TO

15   KEEP THAT INDIVIDUAL IN THE COMMUNITY WHERE THEY ARE GOING TO BE

16   PAROLED INTO, ANYWAY.

17             SO IN MY MIND I NEED TO CORRECT MY EARLIER STATEMENT.

18   YOU NEED TO HAVE JAIL OR PRISON SANCTIONS.  THE BETTER

19   ALTERNATIVE IS JAIL SANCTIONS.

20   **BY MR. MITCHELL:**

21   **Q.**  AND WOULD THAT APPLY TO EVEN YOUR SERIOUS VIOLENT AND SEX

22   OFFENDERS WHO ARE ON PAROLE, OR ARE YOU QUALIFYING IT TO

23   NONVIOLENT PAROLE VIOLATORS?

24   **A.**  YOU'RE ASKING MY PERSONAL OPINION. AND, AGAIN, SENDING

25   SOMEBODY BACK TO STATE PRISON FOR AN AVERAGE OF 4.2 MONTHS ISN'T

1  HELPING.

2           KEEPING THE INDIVIDUAL IN THE LOCAL COMMUNITY, EVEN

3  IF THAT'S COUNTY -- IN THE LOCAL JAIL WHERE YOU CAN BEGIN TO

4  DESIGN HOW YOU'RE GOING TO MANAGE THAT PERSON OUT IN THAT

5  COMMUNITY IS A BETTER OPTION.

6  **Q.** YOU'RE AWARE THAT CALIFORNIA PRISONS HOUSE APPROXIMATELY

7  30,000 OR MORE ILLEGAL ALIENS IN CUSTODY, CORRECT?

8  **A.** I THINK THAT NUMBER IS A LITTLE HIGH FROM MY -- MY

9  INFORMATION ABOUT THAT PARTICULAR TOPIC IS ABOUT TWO YEARS OLD.

10 IT SEEMS A LITTLE HIGH TO ME.

11 **Q.** ARE YOU AWARE THAT CALIFORNIA HAS MORE THAN DOUBLED THE NEXT

12 FOUR STATES -- LET ME REPHRASE THAT.

13          ARE YOU AWARE THAT CALIFORNIA HAS MORE ILLEGAL ALIENS

14 IN CUSTODY MORE THAN TWICE AS MANY AS THE NEXT FOUR STATES

15 COMBINED?

16 **A.** NO, I'M NOT AWARE OF THAT.

17 **Q.** WOULD YOU AGREE WITH THE PROPOSITION THAT FEDERAL -- THAT

18 THE ILLEGAL ALIENS SHOULD BE PLACED IN FEDERAL CUSTODY TO

19 RELIEVE OVERCROWDING IN CALIFORNIA PRISONS?

20 **A.** YOU KNOW, I HONESTLY DON'T HAVE ENOUGH INFORMATION TO ANSWER

21 THAT QUESTION. IT REALLY DEPENDS ON HOW MANY PEOPLE WOULD END UP

22 BEING DEPORTED.  NOT EVERYONE ENDS UP BEING DEPORTED.

23          THERE'S JUST A LOT OF VARIABLES I WOULD HAVE TO

24 UNDERSTAND BEFORE I COULD EVEN GIVE AN INTELLIGENT ANSWER TO

25 THAT QUESTION.

1  Q.  IF THE FEDERAL PRISON SYSTEM WAS ABLE AND WILLING TO TAKE

2  THE ILLEGAL ALIENS OUT OF THE CALIFORNIA SYSTEM AND HOUSE THEM

3  FOR THEIR TERMS WHILE THEY WERE -- BEFORE THEY WERE DEPORTED,

4  WOULD YOU AGREE WITH THAT PROPOSITION?

5  A.  AGAIN, I REALLY DON'T HAVE ENOUGH INFORMATION TO ANSWER THAT

6  QUESTION. THERE'S A LOT OF QUESTIONS THAT HAVE TO BE ANSWERED TO

7  SAY THEY ARE BETTER SENT TO THE FEDERAL SYSTEM OR BEING KEPT

8  LOCALLY.

9          **JUDGE HENDERSON:**  DO YOU KNOW, MR. MITCHELL, IF WE

10 GOT TO THAT POINT WHETHER THE THREE OF US COULD ORDER THAT?

11         **MR. MITCHELL:**  I DON'T.  BUT BEING FEDERAL JUDGES, I

12 WOULD THINK THAT THERE MIGHT BE SOME AUTHORITY THERE.

13         **JUDGE KARLTON:**  THAT'S A TERRIBLY EXAGGERATED VIEW OF

14 WHAT WE -- THAT'S PART OF THE PROBLEM IN THE INSTANT CASE.

15         GO AHEAD.

16         **MR. MITCHELL:**  THANK YOU.

17 **BY MR. MITCHELL:**

18 Q.  THERE ARE A NUMBER OF DIFFERENT WAYS AND MEANS BY WHICH THE

19 PRISON POPULATION CAN BE REDUCED.  WE'VE TALKED ABOUT TECHNICAL

20 PAROLE VIOLATORS. ARE YOU AWARE OF TO WHAT EXTENT OR WHAT NUMBER

21 OF BEDS COULD BE SAVED IN OUR STATE PRISON SYSTEM PER YEAR BY

22 DIVERTING TECHNICAL PAROLE VIOLATORS OUT OF THE SYSTEM?

23 A.  IT'S INCLUDED IN SOME OF THE REPORTS THAT HAVE BEEN DONE,

24 AND I BELIEVE IT WAS AROUND 20,000 A YEAR.

25 Q.  20,000 PER YEAR?

1   **A.**  YES. YES, I BELIEVE THAT WAS THE NUMBER.

2           IT MAY HAVE BEEN HIGHER THAN THAT, BUT THAT'S WHAT

3   I'M RECALLING.

4   **Q.**  AND IF THEIR AVERAGE LENGTHS OF STAY IS FOUR MONTHS, IF THAT

5   WAS IMPLEMENTED IN COMMUNITIES OR IN THE LOCAL JURISDICTIONS,

6   YOU WOULDN'T ACTUALLY HAVE TO RELEASE ANYONE FROM PRISON TO SAVE

7   20,000 BEDS PER YEAR, BECAUSE THEY ARE GOING TO BE GETTING OUT

8   IN FOUR MONTHS, ANYWAY, RIGHT?

9   **A.**  SOMEHOW I GOT LOST IN THAT QUESTION.  IF YOU COULD REPEAT IT

10  AGAIN?

11  **Q.**  I'LL REPHRASE IT.  IN FACT, I'LL GO ON TO SOMETHING

12  DIFFERENT.

13          LET ME ASK YOU THIS:  YOU INDICATED THAT NONVIOLENT

14  OFFENDERS ARE THE POPULATION THAT WE SHOULD BE LOOKING AT FOR

15  EARLY RELEASE; IS THAT CORRECT?

16  **A.**  YES, THAT'S CORRECT.

17  **Q.**  YOU'RE AWARE OF THE FACT THAT THE GREAT MAJORITY OF THE

18  NONVIOLENT OFFENDERS, THE PROPERTY AND DRUG OFFENDERS THAT ARE

19  IN PRISON ARE HABITUAL PROPERTY AND DRUG OFFENDERS, CORRECT?

20          **JUDGE KARLTON:**  THAT ASSUMES SOMETHING -- WELL, I

21  DON'T KNOW. THAT MAY BE MR. STORY'S (SIC) TESTIMONY.

22          YOU MAY ANSWER THAT QUESTION.

23          **THE WITNESS:**  YES. I'M NOT SURE THAT I AGREE TOTALLY.

24  I DON'T THINK I AGREE WITH THAT STATEMENT.

25

1  **BY MR. MITCHELL:**

2  **Q.**  MOST OF THE PEOPLE THAT GO TO PRISON FOR PROPERTY AND DRUG

3  CRIMES, IT'S NOT THEIR FIRST OFFENSE, CORRECT?

4  **A.**  GENERALLY, THAT'S TRUE, YES.

5  **Q.**  IN FACT, ARE YOU AWARE THAT -- EXCUSE ME ONE MOMENT.

6  **A.**  YOU KNOW, BACK TO YOUR LAST STATEMENT, I'M NOT SURE. IT

7  USUALLY ISN'T THEIR FIRST OFFENSE WHEN THEY END UP WITH THEIR

8  FIRST CONVICTION TO STATE PRISON.  BUT I DON'T KNOW THAT THAT

9  TRANSLATES THAT WHEN THEY ARE OUT ON PAROLE THAT THEY ARE THE

10  PRIMARY CAUSE OF PROPERTY AND DRUG CRIMES.

11         AND I THINK THE STATISTICS ACTUALLY DON'T BEAR THAT

12  OUT.

13  **Q.**  MAYBE WE'RE TALKING ABOUT DIFFERENT THINGS HERE.

14         INDIVIDUALS WHO GET SENTENCED TO PRISON FOR A

15  NONVIOLENT PROPERTY OR DRUG OFFENSE, ARE YOU AWARE OF THE NUMBER

16  OF PRIOR FELONY CONVICTIONS, ON AVERAGE, THAT THOSE INDIVIDUALS

17  HAVE?

18  **A.**  NO, I'M NOT.

19  **Q.**  WOULD IT SURPRISE YOU TO LEARN THAT THE MAJORITY OF THOSE IN

20  PRISON HAVE, ON AVERAGE, THREE OR MORE PRIOR FELONY CONVICTIONS

21  BEFORE THEY WENT TO PRISON FOR THEIR FIRST TIME,  SECOND TIME OR

22  THIRD TIME?

23  **A.**  NO, IT WOULD NOT SURPRISE ME. IT'S REALLY A FAILURE OF OUR

24  PROBATION SYSTEM IN CALIFORNIA. WE'VE NOT FUNDED IT

25  APPROPRIATELY TO ASSIST -- TO REDUCE THE NUMBER OF PEOPLE WHO

1    END UP IN STATE PRISON FOR THOSE LOW END OFFENSES.  AND IT

2    CERTAINLY IS AN AREA THAT WE CAN IMPROVE UPON TO REDUCE THE

3    PRISON POPULATION.

4             I WOULD AGREE WITH THAT.

5    **Q.**  AND THE HIGH RECIDIVISM RATES INDICATE, I THINK YOU

6    INDICATED 70 PERCENT, WHEN THESE NONVIOLENT, HABITUAL PROPERTY

7    AND DRUG OFFENDERS GET OUT OF PRISON, EVEN THOUGH PRISON

8    CONDITIONS ARE AS TERRIBLE AS WE ALL KNOW THEY ARE, THEY END UP

9    GOING BACK AT A RATE OF 70 PERCENT, DON'T THEY?

10             **JUDGE HENDERSON:**  LOW END?  YOU'RE TREATING THE

11   RECIDIVISM RATE AS ALL, CONSISTING ONLY OF THESE LOW END

12   OFFENDERS?  THAT SEEMS TO BE --

13             **MR. MITCHELL:**  CORRECT, YOUR HONOR.  I BELIEVE THAT'S

14   BEEN SOME OF THE TESTIMONY HERE.  AND SOME OF THE STATISTICS WE

15   HAVE IS THAT THE NONVIOLENT OFFENDERS HAVE A RECIDIVISM RATE

16   APPROACHING 70 PERCENT.

17             **JUDGE KARLTON:**  BUT I DON'T THINK THAT'S WHAT THE

18   TESTIMONY IS. THE AVERAGE IS, OF ALL OFFENDERS WHO ARE RELEASED

19   ON PROBATION, THE RECIDIVISM RATE IS 70 PERCENT.  I THINK THAT'S

20   WHAT THE EVIDENCE IS.

21             DO YOU KNOW, MA'AM?

22             **THE WITNESS:**  YES.  IT'S THE OVERALL RATE OF WHETHER

23   THEY ARE SERIOUS OR NONSERIOUS OFFENDERS.  IT'S ALL INCLUDED

24   INTO ONE RATE.

25

1   **BY MR. MITCHELL:**

2   **Q.**  YOU'VE BEEN FAMILIAR WITH -- I'M SURE YOU'VE REVIEWED BEFORE

3   THE CDCR TABLES ON RECIDIVISM RATES WITH ONE AND TWO YEAR

4   FOLLOW-UP PERIODS?

5   **A.**  I HAVE SEEN THEM IN THE PAST, YES.

6   **Q.**  TABLES THAT LIST OUT THE VARIOUS TYPES OF CRIMES FROM

7   BURGLARY TO PETTY THEFT OR PRIOR VEHICLE THEFT, AND THEN HAVE

8   RECIDIVISM RATES FOR ONE AND TWO-YEAR PERIODS?

9   **A.**  I HAVE SEEN THOSE IN THE PAST, YES.

10  **Q.**  AND JUST, FOR EXAMPLE, FOR A BURGLARY SECOND DEGREE, A

11  TWO-YEAR RECIDIVISM RATE OF 60.49 PERCENT FOR VEHICLE THEFT, A

12  RECIDIVISM RATE OF 69.08 PERCENT.  YOU'RE AWARE OF THOSE HIGH

13  RECIDIVISM RATES FOR PEOPLE CONVICTED, RELEASED, AND THEN SENT

14  BACK TO PRISON WITH NEW TERMS, CORRECT?

15  **A.**  BECAUSE YOU'VE JUST TOLD ME.  I'VE NOT REVIEWED THOSE FOR A

16  VERY LONG TIME, RIGHT.

17  **Q.**  NOW, THESE OFFENDERS ARE ALREADY ONLY SERVING HALF OF THEIR

18  TERMS, CORRECT?

19  **A.**  SOME ARE SERVING HALF OF THEIR TERMS. SOME HAVE DIFFERENT

20  CREDIT EARNING STATUSES, YES.

21          **JUDGE KARLTON:**  IF YOU'RE ON ONE STRIKES AND TWO

22  STRIKES, YOU'RE REDUCING IT FURTHER, BECAUSE -- I DON'T REMEMBER

23  THE NUMBERS, BUT 80 PERCENT.

24          **THE WITNESS:**  80 PERCENT, RIGHT.

25

1  **BY MR. MITCHELL:**

2  **Q.**  BUT FOR THOSE WHO DON'T HAVE VIOLENT OR STRIKE PRIORS THAT

3  ARE SERVING TERMS OF 16 MONTHS TO THREE YEARS TO FOUR-YEAR

4  TERMS, THEY ARE GETTING CREDITS NOW FOR HALF OF THEIR TOTAL

5  TERM, CORRECT?

6  **A.**  THAT'S CORRECT.

7  **Q.**  AND YOU'VE INDICATED IN ADVOCATING FOR EARLY RELEASE THAT

8  THOSE TERMS SHOULD BE FURTHER REDUCED TO ALLOW FOR POPULATION

9  REDUCTION IN THE PRISON, CORRECT?

10  **A.**  WITH INCENTIVES, YES.

11  **Q.**  NOW, YOU'VE INDICATED IN YOUR OPINION EARLY RELEASE CAN BE

12  IMPLEMENTED WITHOUT ADVERSE EFFECTS ON PUBLIC SAFETY.

13  **A.**  YES.

14  **Q.**  ARE YOU AWARE OF STUDIES THAT HAVE INDICATED THAT EARLY

15  RELEASE INCREASED THE AMOUNTS OF CRIMES SUFFERED BY THE PUBLIC

16  AND FURTHER DISCREDITS AN ALREADY TROUBLED CRIMINAL JUSTICE

17  SYSTEM?

18  **A.**  NO, I'M NOT AWARE. YOU ARE OBVIOUSLY REFERRING TO A SPECIFIC

19  STUDY I'M NOT AWARE OF.

20  **Q.**  A STUDY WRITTEN BY A MAN NAMED JAMES AUSTIN.  ARE YOU AWARE

21  OF THAT?

22  **A.**  I'VE READ SOME OF JIM AUSTIN'S WORK, BUT I DON'T RECALL

23  READING THAT.

24  **Q.**  ARE YOU AWARE OF A STUDY WRITTEN BY A STEVEN LEVITT OF THE

25  UNIVERSITY OF CHICAGO ENTITLED: "THE EFFECT OF PRISON

1  POPULATION SIZE ON CRIME RATES:  EVIDENCE FROM PRISON

2  OVERCROWDING LITIGATION," PUBLISHED IN 1996?

3  **A.**  I RECALL READING THAT A LONG TIME AGO, YES.

4  **Q.**  SO YOU'RE AWARE, THEN, THAT THAT STUDY COMPARED STATES WITH

5  PRISON POPULATION CAPS TO STATES WITHOUT PRISON POPULATION CAPS

6  AND SHOWED THAT THERE WAS AN INCREASE IN VIOLENT CRIME OF

7  7.9-8.3 PERCENT.

8  **A.**  IT'S BEEN SO LONG AGO THAT I READ THAT THAT I'M NOT -- I

9  DON'T RECALL READING THAT. I DO KNOW THAT MANY PEOPLE DISAGREED

10  WITH THAT STUDY.

11  **Q.**  AND THAT STUDY ALSO INDICATED THERE WAS AN INCREASE IN

12  PROPERTY CRIME OF 5.7 TO 6.2 PERCENT IN STATES WITH POPULATION

13  CAPS, CORRECT?

14  **A.**  I DON'T KNOW.

15  **Q.**  ARE YOU AWARE OF THE EARLY RELEASE PROGRAM THAT TOOK PLACE

16  IN ILLINOIS?

17  **A.**  NO, I DON'T HAVE SPECIFIC INFORMATION ABOUT ILLINOIS.

18  **Q.**  HAVE YOU STUDIED OR LOOKED AT ANY OF THE OTHER STATES THAT

19  HAVE ACTUALLY EMPLOYED EARLY RELEASE PROGRAMS AND EXAMINED WHAT

20  THE EFFECTS OF THE EARLY RELEASE WAS IN THOSE STATES?

21  **A.**  I'VE NOT LOOKED AT SPECIFIC STATES. I'VE READ STUDIES THAT

22  HAVE BEEN DONE ABOUT EARLY RELEASE PROGRAMS, YES.

23  **Q.**  WHAT ABOUT THE RELEASE OF PRISONERS EARLY IN PHILADELPHIA IN

24  THE STATE OF PENNSYLVANIA?  WERE YOU AWARE OF WHAT THE IMPACTS

25  ON THE PUBLIC SAFETY WERE THERE?

1  **A.**  WHEN DID THAT OCCUR?

2  **Q.**  PARDON?

3  **A.**  WHEN DID THAT OCCUR?

4  **Q.**  1986.

5  **A.**  NO, I'M NOT AWARE OF THAT.

6  **Q.**  WOULD IT SURPRISE YOU TO LEARN THAT OUT OF 9,000 --

7            **JUDGE KARLTON:**  THAT'S GOING TO ASSUME FACTS NOT IN

8  EVIDENCE UNLESS YOU'VE GOT SOMEBODY WHO IS GOING -- IF YOU TELL

9  ME THAT YOU'LL HAVE SOMEBODY COMING IN TO VERIFY THESE STUDIES,

10  THEN -- I'M SORRY. I DIDN'T MEAN TO INTERRUPT -- THEN, OF

11  COURSE, YOU CAN PROCEED. BUT OTHERWISE, IT'S NOT IN EVIDENCE.

12            **THE WITNESS:**  AND IF I CAN SAY --

13            **MR. MITCHELL:**  I CAN BRING IT UP AT A LATER TIME.

14            **THE WITNESS:**  OKAY.

15  **BY MR. MITCHELL:**

16  **Q.**  ARE YOU AWARE OF THE EARLY RELEASE PROGRAM THAT TOOK PLACE

17  IN ILLINOIS BETWEEN 1980 AND 1983?

18  **A.**  NO, I'M NOT.

19            BUT I REALLY WOULD LIKE TO SAY THAT WE HAVE LEARNED A

20  LOT ABOUT THE SCIENCE OF CORRECTIONS AND COMMUNITY CORRECTIONS

21  SINCE THE '80'S.  AND SO I'M NOT SURE THAT ANYTHING THAT

22  OCCURRED IN THE '80'S IS REALLY RELEVANT TO THE DISCUSSION OF

23  CORRECTIONS TODAY, BECAUSE SINCE THAT TIME MANY STATES ARE USING

24  RISK AND NEEDS ASSESSMENT TOOLS AND USING EVIDENCE-BASED

25  PROGRAMS THAT HAVE PROVEN TO BE SUCCESSFUL TO REDUCE THEIR

1    RECIDIVISM RATES.

2    Q.   ARE YOU AWARE OF THE INCREASE IN CRIME THAT TOOK PLACE WITH

3    THE INDIVIDUALS WHO WERE RELEASED EARLY IN THE ILLINOIS SYSTEM?

4              **JUDGE KARLTON:**  SAME OBJECTION.  SAME RULING.

5              SIR, TELL ME, ARE YOU GOING TO HAVE SOMEBODY COMING

6    IN TO VERIFY THAT -- THESE QUESTIONS?  IF YOU ARE, YOU MAY

7    PROCEED. OTHERWISE, IT'S JUST -- I MEAN, I WILL ACCEPT YOUR

8    REPRESENTATION THAT SOMEBODY IS COMING IN. BUT OUTSIDE OF THAT,

9    YOU'RE NOT PERMITTED TO DO WHAT YOU'RE DOING.

10             **MR. MITCHELL:**  I BELIEVE THAT THE NEXT WITNESS CALLED

11   BY THE PLAINTIFFS, ACTUALLY, CONDUCTED STUDIES, MR. AUSTIN AND

12   MR. KRISBERG.

13             **JUDGE KARLTON:**  OKAY.  DO YOU KNOW WHETHER THEY DID

14   OR NOT?  YOU MAY PROCEED ON THAT BASIS.

15             IT IS REPRESENTED THAT SOMETIME THERE WAS A STUDY

16   WHICH DEALT WITH RECIDIVISM RATE OF EARLY RELEASEES IN ILLINOIS?

17             **MR. MITCHELL:**  CORRECT.

18             **JUDGE KARLTON:**  ARE YOU AWARE OF THAT STUDY?

19             **THE WITNESS:**  NO, I'M NOT.

20             **MR. MITCHELL:**  EXCUSE ME ONE MOMENT.

21             ON SECOND THOUGHT, YOUR HONOR, I'M NOT GOING TO GO

22   INTO THAT AT THIS TIME WITH THIS WITNESS.

23             I HAVE NO FURTHER QUESTIONS.

24             **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

25             REDIRECT, MR. SPECTER?

1        **MR. SPECTER:**  YES, YOUR HONOR.

2                    **REDIRECT EXAMINATION**

3    **BY MR. SPECTER:**

4    **Q.**  WHILE YOU WERE WORKING FOR THE DEPARTMENT OF CORRECTIONS WAS

5    THE BRIDGING PROGRAM, WHAT'S CALLED "THE BRIDGING PROGRAM"

6    OPERATING?

7    **A.**  YES.

8            **MR. MELLO:**  OBJECTION, OUTSIDE THE SCOPE OF CROSS.

9            **JUDGE KARLTON:**  IT IS.

10           **MR. SPECTER:**  OH, WELL, MR. MITCHELL JUST SPENT A LOT

11   OF TIME TALKING TO MS. WOODFORD ABOUT CREDITS. THIS IS A

12   CREDIT-EARNING PROGRAM.

13           **JUDGE HENDERSON:**  PROCEED.

14   **BY MR. SPECTER:**

15   **Q.**  SO THE BRIDGING PROGRAM ALLOWS PRISONERS WHO ARE IN THE

16   RECEPTION CENTER TO EARN CREDITS, CORRECT?  HALFTIME CREDITS;

17   IS THAT CORRECT?

18   **A.**  THE BRIDGING PROGRAM ALLOWED INMATES TO BEGIN EARNING

19   HALFTIME CREDITS WHILE THEY WERE IN THE RECEPTION CENTER

20   PROCESSING, YES.

21   **Q.**  AND THAT BRIDGING PROGRAM WAS ENACTED SO THAT WHEN PRISONERS

22   ENGAGED IN CERTAIN ACTIVITIES THEY WOULD BE GIVEN THOSE CREDITS;

23   IS THAT RIGHT?

24   **A.**  THAT IS CORRECT.

25   **Q.**  THOSE WEREN'T EVIDENCE-BASED ACTIVITIES, WERE THEY?

1   **A.**  NO, THEY WERE NOT.

2   **Q.**  AND THE EFFECT OF THE BRIDGING PROGRAM WAS THAT SINCE THEY

3   EARN THE CREDITS DURING RECEPTION CENTER, WHEN THEY WENT TO

4   THE -- THEIR NEXT INSTITUTION, THEY WOULD CONTINUE TO EARN

5   CREDITS EVEN THOUGH THEY DIDN'T HAVE A JOB; IS THAT CORRECT?

6   **A.**  THAT IS CORRECT.

7   **Q.**  AND PRIOR TO THE BRIDGING PROGRAM, PRISONERS WOULDN'T START

8   EARNING HALFTIME CREDITS UNTIL THEY WERE IN AND

9   CREDIT-QUALIFYING PROGRAM, CORRECT?

10  **A.**  THAT IS CORRECT.

11  **Q.**  SO THE NET EFFECT OF THE BRIDGING PROGRAM WAS TO ALLOW

12  PRISONERS TO EARN CREDITS AGAINST THEIR SENTENCE WITHOUT

13  ENGAGING IN A CREDIT-QUALIFYING PROGRAM; IS THAT RIGHT?

14  **A.**  THAT IS CORRECT.

15  **Q.**  AND THAT RESULT -- AND WHEN YOU EARN CREDITS YOU GET OUT OF

16  PRISON SOONER; IS THAT CORRECT?

17  **A.**  YOU GET OUT OF PRISON SOONER, THAT IS CORRECT.

18  **Q.**  SO IT WOULD BE ESSENTIALLY AN EARLY RELEASE PROGRAM; ISN'T

19  THAT RIGHT?

20  **A.**  THAT IS CORRECT.

21          **MS. JOHNSON:**  A LEADING LINE OF QUESTIONING, YOUR

22  HONORS.

23          **JUDGE KARLTON:**  ONE LAWYER. MR. MELLO IS THE PERSON.

24          **MR. MELLO:**  OBJECTION, LEADING.

25          **MR. SPECTER:**  I THOUGHT YOU WERE ALLOWED TO LEAD

1  EXPERTS, BUT I CAN DO IT THE OTHER WAY IF YOU WANT TO GO SLOWER.

2            **JUDGE HENDERSON:**  YOU ARE RIGHT. PROCEED.

3  **BY MR. SPECTER:**

4  **Q.**  OKAY.  DURING THE TIME WHEN THE BRIDGING PROGRAM WAS

5  IMPLEMENTED, DID YOU -- YOU WERE STILL WORKING IN THE DEPARTMENT

6  OF CORRECTIONS, CORRECT?

7  **A.**  YES, I WAS.

8  **Q.**  AND THAT RESULTED IN MORE PRISONERS GETTING RELEASED A DATE

9  EARLIER THAN THEY WOULD HAVE OTHERWISE, CORRECT?

10 **A.**  THAT'S CORRECT.  IT ACTUALLY INCREASED THE NUMBER OF

11 INDIVIDUALS PAROLING OUT OF RECEPTION CENTERS.

12 **Q.**  WERE AWARE OF ANY PUBLIC OUTCRY ABOUT THIS PROGRAM?

13           **JUDGE KARLTON:**  LET'S START BY SAYING:  WERE YOU

14 AWARE OF ANY PUBLIC KNOWLEDGE OF THE PROGRAM?

15 **BY MR. SPECTER:**

16 **Q.**  YES.

17 **A.**  I THINK IT REALLY STAYED UNDER THE RADAR.  I DIDN'T HEAR

18 MUCH ABOUT IT IN THE PUBLIC, IN THE NEWS OR ANYTHING, REALLY.

19 **Q.**  SO LAW ENFORCEMENT OFFICIALS WEREN'T CONTACTING YOU

20 COMPLAINING ABOUT THIS PROGRAM?

21 **A.**  I DON'T RECALL EVER RECEIVING ONE CONTACT.

22 **Q.**  AND YOU'RE AWARE OF THE FACT THAT THERE WAS -- YOU'RE AWARE

23 OF THE FACT THAT THERE ARE CONSERVATION CAMPS IN THE DEPARTMENT

24 OF CORRECTIONS, CORRECT?

25 **A.**  IT IS A WONDERFUL PROGRAM, YES.  I'M QUITE AWARE OF THAT.

1  Q.  AND THEY FIGHT FOREST FIRES ESSENTIALLY, RIGHT?

2  A.  THEY ARE OUT THERE FIGHTING FIRES ALL THE TIME SAVING THE

3  TAXPAYERS LOTS OF MONEY, YES.

4  Q.  AND AT A CERTAIN POINT WHILE YOU WERE IN THE DEPARTMENT OR A

5  CERTAIN POINT THESE PRISONERS' CREDIT-EARNING STATUS INCREASED.

6  THEY WENT FROM A DAY-FOR-DAY CREDIT TO TWO DAYS FOR ONE DAY

7  CREDIT; IS THAT RIGHT?

8  A.  THAT IS CORRECT.

9          MR. MELLO:  OBJECTION, LEADING TO THE WHOLE LINE OF

10  QUESTIONS.

11          JUDGE HENDERSON:  OVERRULED.

12  BY MR. SPECTER:

13  Q.  AND WERE YOU AWARE OF ANY PUBLIC OUTCRY ABOUT THE FACT THAT

14  THOSE PRISONERS WERE GETTING OUT OF PRISON EARLY?

15  A.  I DIDN'T HEAR ANYTHING, ANY PUBLIC OUTCRY ABOUT THAT. THE

16  PUBLIC IS GENERALLY VERY HAPPY WITH THE FIREFIGHTERS.

17  Q.  OKAY. NOW, MR. MELLO ASKED YOU -- MR. MELLO ASKED YOU ABOUT

18  A QUESTION ABOUT THE FACT THAT THERE AREN'T ENOUGH SERVICES TO

19  BE PROVIDED -- THE KIND OF SERVICES THAT YOU WOULD LIKE TO BE --

20  SEE PROVIDED IN THE COMMUNITY, BOTH FOR PROBATION AND CERTAINLY

21  PROBATION AND POSSIBLY PAROLE, DEPENDING ON HOW THEY ALLOCATE

22  THEIR RESOURCES.

23          REMEMBER THAT LINE OF QUESTIONING?

24  A.  YES, I DO.

25  Q.  KNOWING THAT, IS IT STILL YOUR OPINION THAT IF

1  PRISONERS -- IF THE POPULATION WAS REDUCED, THAT THE PUBLIC

2  SAFETY WOULDN'T BE ADVERSELY EFFECTED?

3  **A.**  IT IS STILL MY OPINION.

4  **Q.**  THANK YOU.

5          **JUDGE KARLTON:**  WAIT.  WAIT.  WAIT.  THIS IS NOT AN

6  UNIMPORTANT POINT, NOT THAT I'M SUGGESTING EVERYTHING ELSE YOU

7  SAID WAS.

8          DO I UNDERSTAND YOU TO BE SAYING -- I MISUNDERSTOOD.

9  IT IS NOT YOUR -- I DON'T KNOW HOW TO FORMULATE THIS. IS IT YOUR

10 VIEW THAT EVEN GIVEN THE LACK OF PROGRAM -- RESOURCES FOR

11 ADEQUATE PROGRAMMING TODAY, A RELEASE OF PRISONERS WITH THE

12 PRESENT SYSTEM WOULD NOT INCREASE PUBLIC DANGER?

13         MIGHT NOT BE A GOOD QUESTION.

14         **THE WITNESS:**  IT IS MY OPINION THAT IT WOULD NOT

15 INCREASE PUBLIC DANGER FOR SOME OF THE REASONS THAT WE JUST

16 DISCUSSED.

17         WE'VE BEEN GIVING CREDITS TO PEOPLE IN THE RECEPTION

18 CENTER, RELEASING THEM EARLIER, AND WE HAVEN'T SEEN A RISE IN

19 CRIME AS A RESULT OF THAT.

20         WE'RE GIVING -- LETTING OUT OUR FIREFIGHTERS EARLIER,

21 AND WE HAVEN'T SEEN A RISE IN CRIME AS A RESULT OF THAT.  SO

22 BASED ON MY EXPERIENCE I DON'T THINK THAT IT WOULD INCREASE

23 CRIME.

24         I THINK IT GIVES US AN OPPORTUNITY TO ACTUALLY REDUCE

25 CRIME IF WE TAKE THE RESOURCES THAT WE'RE USING TO INCARCERATE

1    PEOPLE AND PUT IT IN THE COMMUNITY.

2              EXCUSE ME.

3          **JUDGE KARLTON:**  BUT YOUR VIEW IS THAT'S NOT A

4    NECESSARY PREREQUISITE TO RELEASING PEOPLE TODAY.

5          **THE WITNESS:**  THAT IS MY VIEW.

6          **JUDGE KARLTON:**  ALL RIGHT.  I'M SORRY.  IT TURNED OUT

7    THOSE QUESTIONS DID HAVE MEANING.  I JUST DIDN'T UNDERSTAND

8    THEM.

9          **MR. SPECTER:**  OKAY.  WELL, I ACCEPT YOUR APOLOGY.

10   THANK YOU.

11         **JUDGE HENDERSON:**  MR. MELLO WOULD BE FIRST.

12         **MR. MELLO:**  I HAVE NOTHING FURTHER.

13         **JUDGE HENDERSON:**  OKAY.  MR. MITCHELL, BEFORE YOU

14   BEGIN, YOU ASKED MS. WOODFORD SOME QUESTIONS ABOUT THE CRIME

15   LEVEL IN 1996, AND THEN IT WENT DOWN IN 1999. AND YOU SEEM TO

16   STOP THERE. THAT WAS 10 YEARS AGO.

17             ARE THERE ANY MORE CURRENT?  DID IT KEEP GOING DOWN,

18   AND IS IT DOWN NOW?  OR DID IT -- WHAT HAPPENED AFTER 19 -- I

19   DON'T HAVE A SENSE.

20         **MR. MITCHELL:**  I BELIEVE CRIME RATES HAVE CONTINUED

21   TO GO DOWN.

22         **JUDGE HENDERSON:**  FROM 1999.

23         **MR. MITCHELL:**  I BELIEVE THAT'S CORRECT.

24         **JUDGE HENDERSON:**  OKAY.

25         **JUDGE KARLTON:**  THAT'S TRUE NATIONWIDE.

1          **THE WITNESS:** IT'S TRUE ACROSS THE NATION, YES.

2                    **RECROSS-EXAMINATION**

3    **BY MR. MITCHELL:**

4    **Q.** I JUST WANTED TO FOLLOW-UP A LITTLE BIT ON WHAT JUSTICE

5    CARLTON JUST ASKED YOU ABOUT.

6          **JUDGE KARLTON:** JUDGE.

7          **MR. MITCHELL:** JUDGE, EXCUSE ME.

8          **JUDGE KARLTON:** MUCH MORE MODEST IN THE FEDERAL

9    SYSTEM.

10         **JUDGE HENDERSON:** HE'S A JUSTICE.

11         **JUDGE REINHARDT:** NO, NO.

12         **JUDGE HENDERSON:** NO JUSTICES UP HERE.

13         **JUDGE REINHARDT:** NO JUSTICES.

14   **BY MR. MITCHELL:**

15   **Q.** IF I UNDERSTOOD THE QUESTION, COMMUNITY RESOURCES ARE WHAT

16   THEY ARE NOW. YOU'VE INDICATED THAT EARLY RELEASE OR A PRISONER

17   RELEASE ORDER WILL NOT ADVERSE LY IMPACT PUBLIC SAFETY SO -- IS

18   THAT YOUR OPINION?

19   **A.** THAT IS MY OPINION, YES.

20   **Q.** IF WE ARE TO RELEASE EARLY SOME OF THE NONVIOLENT PROPERTY

21   AND DRUG OFFENDERS THAT HAVE THAT 60 TO 70 PERCENT RECIDIVISM

22   RATE, THAT THEY HAVE SHOWN US IN THE PAST THAT THEY ARE GOING TO

23   CONTINUE TO COMMIT CRIMES WHEN THEY GET OUT, WHAT'S GOING TO

24   STOP THEM?

25   **A.** THESE ARE INDIVIDUALS THAT ARE GOING HOME, ANYWAY. SO

1 HAVING THEM GO HOME 30, 60, 90 DAYS EARLIER, WE HAVE SEEN WITH

2 THE BRIDGING PROGRAM IN THE RECEPTION CENTER AND THE CAMPS

3 CREDIT PROGRAM AND WITH THE OTHER -- THE DRUG PROGRAM THAT --

4 THE JACKIE SPEAR BILL HASN'T IMPACTED THE CRIME RATE.  IN FACT,

5 YOU'VE SAID IT CONTINUES TO GO DOWN.

6 Q.  BUT THE NUMBER OF CRIMES THAT THEY COMMIT CONTINUE TO TAKE

7 PLACE WHILE THEY ARE IN THE COMMUNITY.

8          JUDGE HENDERSON:  AREN'T YOU JUST ARGUING?

9          MR. MITCHELL:  NO, I'M ASKING.

10 BY MR. MITCHELL:

11 Q.  CORRECT?

12 A.  I'M NOT SURE THAT -- COULD YOU REPEAT IT AGAIN, THE

13 QUESTION?

14 Q.  IF THEY ARE NOT IN PRISON -- REGARDLESS OF WHEN THEY ARE

15 GETTING OUT, IF THEY ARE NOT IN PRISON THEY ARE IN THE

16 COMMUNITY, AND THEY ARE COMMITTING CRIMES AT A RATE OF 60 TO

17 70 PERCENT?

18          JUDGE KARLTON:  OVER 30 --

19          MR. SPECTER:  THAT MISSTATES THE EVIDENCE, PAROLE

20 VIOLATION, NOT COMMITTING CRIME.

21          MR. MITCHELL:  THANK YOU.

22          JUDGE HENDERSON:  ANYTHING FURTHER?

23          MR. SPECTER:  NOTHING FURTHER.

24          JUDGE HENDERSON:  THANK YOU FOR RETURNING, MS.

25 WOODFORD. YOU'RE EXCUSED.

1          LET'S TAKE A 15 MINUTE RECESS.

2          (THEREUPON RECESS WAS TAKEN.)

3          **JUDGE KARLTON:**  BEFORE WE BEGIN, SOMETHING THAT

4   HAPPENED LAST SESSION HAS NOW CAUSED SOME CONFUSION AMONG THE

5   JUDGES.  WE'RE NOT SURE WHETHER THE WORD "RECIDIVISM" HAS THE

6   SAME MEANING TO BOTH SIDES OF THE TWO TABLES.  WHAT DO THE

7   PLAINTIFFS UNDERSTAND THE WORD "RECIDIVISM" IN THE --

8          **MS. EVENSON:**  YOUR HONOR, REBEKAH EVENSON FOR

9   PLAINTIFFS.

10         **JUDGE KARLTON:**  THANK YOU.

11         **MS. EVENSON:**  OUR UNDERSTANDING OF THE RECIDIVISM

12  STATISTICS THAT EXIST FOR CDCR IS THAT THEY SHOW RETURN TO

13  PRISON RATES WITHIN THREE YEARS.

14         **JUDGE KARLTON:**  IN OTHER WORDS, THAT INCLUDES

15  TECHNICAL VIOLATIONS?

16         **MS. EVENSON:**  YES, YOUR HONOR.

17         **JUDGE HENDERSON:**  DO THE DEFENDANTS AGREE WITH THAT

18  DEFINITION?

19         **MS. JOHNSON:**  WE AGREE THAT'S HOW THE STATISTICS ARE

20  CALCULATED BY THE CDCR.

21         **JUDGE KARLTON:**  THANK YOU VERY MUCH.  THAT MAKES A

22  BIG DIFFERENCE.

23         **MR. SPECTER:**  BEFORE WE CALL DR. AUSTIN, THERE'S AN

24  EVIDENTIARY POINT THAT IT WOULD BE NICE TO CLEAR UP.  THE

25  DEFENDANTS HAVE MADE A MOTION TO STRIKE CERTAIN -- DR. AUSTIN

1    WROTE HOW MANY REPORTS?

2              **MS. EVENSON:**  FOUR.

3              **MR. SPECTER:**  FOUR REPORTS.  THEY'VE MADE A MOTION TO

4    STRIKE PORTIONS OF THAT REPORT BECAUSE THIS IS NOW CALLED SORT

5    OF PHASE TWO AND WE'RE DONE WITH PHASE ONE.  WE HAVE NOT

6    OBJECTED TO THAT MOTION BECAUSE WE DIDN'T CALL MR. -- OR

7    DR. AUSTIN IN PHASE ONE.  I JUST WANT TO MAKE -- IF THE COURT

8    ACCEPTS THAT RULING, I JUST WANT TO MAKE IT CLEAR THAT THAT GOES

9    FOR OTHER WITNESSES AS WELL.

10             THERE ARE WITNESSES THAT ORIGINALLY TESTIFIED OR

11   SUBMITTED DECLARATIONS WHICH HAVE PHASE ONE EVIDENCE IN THEM,

12   AND THEY WEREN'T CALLED AS PHASE ONE.  SO IF YOUR COURT IS GOING

13   TO GRANT THAT MOTION, THEN I JUST WANT TO KNOW ABOUT IT BEFORE

14   WE GO FORWARD SO WE CAN FIGURE OUT OUR CROSS FOR THE REST OF THE

15   TRIAL.  DOES THAT MAKE SENSE?

16             **JUDGE KARLTON:**  I UNDERSTAND WHAT YOU'RE SAYING.  YOU

17   KNOW, I HAVE NOT LOOKED AT THE MOTIONS TO STRIKE BECAUSE MY VIEW

18   WAS THAT WE WOULD WORRY ABOUT THAT AT THE END OF THE TRIAL.  NOW

19   YOU'RE SAYING IT MAKES A DIFFERENCE AS TO HOW YOU CROSS-EXAMINE,

20   WHICH MAKES SENSE.  I HADN'T THOUGHT OF THAT.  I DON'T KNOW WHAT

21   THE HECK TO DO, TO TELL YOU THE TRUTH.

22             **JUDGE REINHARDT:**  I DON'T UNDERSTAND THE MOTION.

23   WHAT IS THE MOTION --

24             **MS. JOHNSON:**  THE MOTION IS VERY SIMPLE, YOUR HONORS.

25   IT WAS WITH RESPECT TO DR. AUSTIN'S FIRST EXPERT REPORT WHERE HE

1   DREW CONCLUSIONS REGARDING WHETHER OVERCROWDING WAS THE PRIMARY

2   CAUSE.  HE WAS NOT CALLED TO TESTIFY AND SO WE'D MOVE TO STRIKE

3   THOSE PORTIONS THAT RELATED TO THE PRIMARY CAUSE QUESTION.  WE

4   ARE NOT AWARE OF ANY SIMILAR MOTIONS HAVING BEEN MADE BY

5   PLAINTIFFS, AND I DON'T THINK IT'S POSSIBLE TO ADDRESS ANY

6   ISSUES THEY HAVE EXCEPT ON A CASE-BY-CASE BASIS.

7           **JUDGE HENDERSON:**  THAT'S MY POINT.  I ASSUME AT THIS

8   POINT THAT'S AN UNOPPOSED MOTION.

9           **JUDGE KARLTON:**  ARE YOU SAYING -- I'M ASKING YOU, NOT

10  TELLING YOU, MR. SPECTER.  ARE YOU SAYING THAT THERE WILL BE

11  WITNESSES FOR THE DEFENSE WHICH HAVE FILED AFFIDAVITS OR DIRECT

12  TESTIMONY WHICH REALLY GOES TO PART ONE AND THEN THEY WERE NOT

13  CALLED IN PART ONE?

14          **MR. SPECTER:**  YES, YOUR HONOR, I'M SAYING THAT, AND

15  IT WILL MAKE A DIFFERENCE WHEN THEY PUT ON THEIR CASE.

16          **JUDGE KARLTON:**  I SUPPOSE WE ARE JUST GOING TO HAVE

17  TO WAIT UNTIL WE GET TO THOSE PEOPLE AND YOU TELL US WHAT YOU

18  THINK OUGHT TO BE STRICKEN.  I DON'T KNOW WHAT WE COULD DO

19  OTHERWISE TODAY.

20          **JUDGE REINHARDT:**  THE QUESTION IS, ARE WE GOING TO

21  EXCLUDE THE PART OF DR. AUSTIN'S THAT RELATES TO PHASE ONE?

22          **JUDGE KARLTON:**  THEY'VE STIPULATED TO THAT.

23          **MR. SPECTER:**  WELL, THEY'VE MADE THE MOTION.  IF YOU

24  GRANT THEIR MOTION --

25          **JUDGE REINHARDT:**  IT'S AN UNOPPOSED MOTION?

1          **MR. SPECTER:** RIGHT.

2          **JUDGE HENDERSON:** LET'S SEE IF WE HAVE --

3          **JUDGE REINHARDT:** WHY IS THAT A PART OF --

4          **MR. SPECTER:** BECAUSE THE REASON IS WE'VE MADE

5    OBJECTIONS TO SOME OF THEIR PHASE TWO WITNESSES, AND THE

6    RESPONSE HAS COME BACK FROM THE STATE THAT IT'S A PHASE -- IT IS

7    RELEVANT BECAUSE IT'S PHASE ONE TESTIMONY. AND SO NOW I'M

8    CONFUSED BECAUSE THE DEFENDANTS' POSITIONS SEEMS INCONSISTENT,

9    AND I WOULD -- EXCUSE ME -- AND I WOULD LIKE A RULING BEFORE WE

10   GET TO THEIR WITNESSES SO WE KNOW WHAT THE SCHEDULE IS GOING TO

11   BE AND HOW MUCH CROSS THEY SHOULD --

12         **MS. JOHNSON:** YOUR HONORS, WE HAVE BROUGHT A SPECIFIC

13   MOTION TO STRIKE TWO SPECIFICS PORTIONS.

14         **JUDGE KARLTON:** NO, NO.

15         **MS. JOHNSON:** WE CANNOT ADDRESS -- WE DON'T EVEN KNOW

16   WHAT HE'S REFERRING TO IN TERMS OF WHAT PORTIONS OF WHOSE

17   DECLARATIONS OR EXPERT REPORTS HE BELIEVES ARE ONLY ADDRESSED TO

18   PHASE ONE AND SHOULD NOT BE OFFERED INTO EVIDENCE BECAUSE THAT

19   WITNESS WASN'T OFFERED IN PHASE ONE. IF PLAINTIFFS HAVE AN

20   ISSUE, I RECOMMEND THEY TELL US EXPLICITLY WHAT IT IS OR MAKE A

21   MOTION TO THE COURT. WE DON'T KNOW WHAT THEY ARE TALKING ABOUT.

22         **JUDGE KARLTON:** JUST A MINUTE.

23         MR. SPECTER, HAVE YOU MADE FORMAL MOTIONS BEFORE THE

24   COURT, WHICH I'M NOT AWARE OF, CONCERNING DEFENDANTS' WITNESSES

25   THAT YOU PERCEIVE ARE TESTIFYING AS TO PHASE ONE MATERIAL?

1          **MR. SPECTER:**  WELL, WE ARE GOING TO FILE OUR

2  FORMAL --

3          **JUDGE KARLTON:**  PLEASE ANSWER ME.  HAVE YOU DONE SO

4  SO FAR?

5          **MR. SPECTER:**  NO.

6          **JUDGE KARLTON:**  THANK YOU.  WHEN WOULD YOU LIKE TO DO

7  THAT?

8          **MR. SPECTER:**  I COULD DO IT TOMORROW.

9          **JUDGE KARLTON:**  ALL RIGHT.  WE'LL WORRY ABOUT IT

10 THEN.

11         **MR. SPECTER:**  THANK YOU.

12         **JUDGE KARLTON:**  LET THE DEFENDANTS LOOK AT --

13         **MR. SPECTER:**  I ALREADY SPOKE TO MR. MELLO ABOUT THIS

14 PROBLEM.  HE'S NOT HERE RIGHT NOW, SO I DON'T WANT HIM TO TAKE

15 ADVANTAGE OF THAT.

16         **JUDGE KARLTON:**  HERE HE IS.  HE'S ABOUT TO POP UP.

17 WE DON'T NEED A SPEECH --

18         **MR. MELLO:**  THEY CAN FILE A MOTION AND WE'LL OPPOSE

19 THE MOTION OR NOT OPPOSE THE MOTION, LIKE THEY CHOSE NOT TO DO.

20         **JUDGE KARLTON:**  FINE.

21         **JUDGE HENDERSON:**  AND WE'LL DO OUR BEST TO BE

22 CONSISTENT IF WE RULE ON THE PRESENT MOTION.

23         **JUDGE KARLTON:**  THE PRESENT MOTION IS UNOPPOSED.

24         **JUDGE HENDERSON:**  THAT'S TRUE.  OKAY.

25         **MR. SPECTER:**  THANK YOU.

 1              **JUDGE HENDERSON:**  YOU MAY CALL YOUR NEXT WITNESS.

 2              **MS. EVENSON:**  THANK YOU, YOUR HONOR.  REBEKAH EVENSON

 3    FOR PLAINTIFFS.

 4              PLAINTIFFS CALL DR. JAMES AUSTIN --

 5                    **JAMES AUSTIN, PH.D.**

 6    HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS FIRST

 7    DULY SWORN AND EXAMINED AS FOLLOWS:

 8              **THE CLERK:**  STATE AND SPELL YOUR FULL NAME.

 9              **THE WITNESS:**  MY NAME IS JAMES AUSTIN.  LAST NAME IS

10    SPELLED A-U-S-T-I-N.

11              **MS. EVENSON:**  DR. AUSTIN, AS WE JUST INDICATED, FILED

12    FOUR SEPARATE EXPERT REPORTS, AND WE PROVIDED COURTESY COPIES OF

13    THOSE REPORTS TO THE COURT.  I WON'T PROVIDE ANOTHER SET OF

14    COPIES NOW, BUT FOR THE COURT'S CONVENIENCE I HAVE REPRODUCED

15    COPIES OF KEY GRAPHS THAT APPEAR IN HIS REPORTS.

16              I ALSO HAVE A CORRECTION TO ONE REPORT.  TABLE 8 IN

17    THE AUGUST 15, 2008 REPORT HAD AN ARITHMETICAL ERROR WHICH WE

18    HAVE CORRECTED.  I HAVE REVISED VERSIONS OF TABLE 8, WHICH WE

19    MARKED AS PLAINTIFF'S EXHIBIT NUMBER 829.

20              DR. AUSTIN'S QUALIFICATIONS ARE SET FORTH IN

21    PARAGRAPHS ONE THROUGH TWELVE OF HIS FIRST REPORT WHICH WAS

22    SUBMITTED IN NOVEMBER OF 2007.  SO I'M NOT GOING TO SPEND TOO

23    MUCH TIME ON THAT HERE.

24              I'D LIKE TO TURN NOW TO DR. AUSTIN.

25    ///

1                   **DIRECT EXAMINATION BY MS. EVENSON**

2   BY MS. EVENSON

3   **Q**    GOOD MORNING.

4   **A**    GOOD MORNING.

5   **Q**    CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL AND EMPLOYMENT

6   HISTORY?

7   **A**    BRIEFLY, I HAVE A BACHELOR'S, MASTER'S DEGREE AND PH.D. IN

8   SOCIOLOGY.  GOT MY PH.D. FROM THE UNIVERSITY OF CALIFORNIA AT

9   DAVIS.

10              I FIRST STARTED WORKING IN CORRECTIONS IN 1970 WHERE

11  I TOOK A JOB WORKING FOR THE ILLINOIS DEPARTMENT OF CORRECTIONS

12  AND THEN MOVED TO CALIFORNIA AND TOOK A JOB WITH THE NATIONAL

13  COUNCIL ON CRIME AND DELINQUENCY.  I WORKED THERE FOR

14  APPROXIMATELY 20 YEARS AND THEN ASSUMED THE POSITION AT GEORGE

15  WASHINGTON UNIVERSITY FOR APPROXIMATELY THREE OR FOUR YEARS, AND

16  THEN STARTED MY OWN NOT FOR PROFIT INSTITUTE WHICH IS CALLED THE

17  JFA INSTITUTE, WHICH I PRESENTLY AM THE PRESIDENT OF.

18  **Q**    NOW, IN THE COURSE OF YOUR WORK WITH THE JFA INSTITUTE, HAVE

19  YOU HAD THE OPPORTUNITY TO WORK WITH STATE AND LOCAL GOVERNMENTS

20  SEEKING TO REDUCE THEIR PRISON OR JAIL POPULATIONS?

21  **A**    YES, I HAVE.

22  **Q**    CAN YOU DESCRIBE THAT WORK?

23  **A**    BRIEFLY, I'M PRESENTLY WORKING IN APPROXIMATELY TEN STATES.

24  THAT WOULD INCLUDE, VERY BRIEFLY, MICHIGAN, OHIO, MARYLAND,

25  LOUISIANA, MISSISSIPPI, KENTUCKY, SOME MORE I CAN NAME.

1  BASICALLY, I'M WORKING WITH THOSE STATES' STATE LEGISLATORS TO

2  CRAFT POLICIES THAT THEY CAN DEVELOP AND IMPLEMENT TO EITHER

3  REDUCE THEIR PRISON POPULATION OR STOP IT FROM GROWING.  A LOT

4  OF THAT WORK IS DONE THROUGH THE COUNCIL STATE GOVERNMENTS,

5  WHICH GETS FINANCIAL GRANTS.  THEN THEY SUBCONTRACT WITH ME TO

6  COME IN AND DO THE ANALYSIS FOR THE STATES.

7  **Q**    WHO ARE YOU WORKING WITH IN THOSE VARIOUS STATES, WHAT

8  ACTORS?

9  **A**    THE PRINCIPAL PEOPLE I INTERACT WITH WOULD BE GOVERNORS,

10 STAFF, LEGISLATORS, AND DEPARTMENT OF CORRECTIONS OFFICIALS.

11 **Q**    AND IN ADDITION TO THE TEN STATES YOU JUST NAMED, OR

12 REFERENCED, HAVE YOU WORKED WITH OTHER STATES IN THE PAST TO DO

13 THE SAME TYPE OF WORK?

14 **A**    YES.  IN MY CAREER I'VE PROBABLY WORKED WITH PROBABLY 30

15 SOME STATES IN THIS AREA.

16 **Q**    IN THE AREA OF POP -- OF ADDRESSING POPULATION?

17 **A**    IT'S POPULATION REDUCTION, AND IT IS ALSO JUST ANALYZING THE

18 PRISON POPULATION.  A LOT OF OUR WORK IS DOING POPULATION

19 PROJECTIONS, WE DO THAT FOR 20 STATES NOW, WHERE WE FORECAST FOR

20 THEM WHERE THEIR PRISON POPULATION IS GOING SO THEY CAN BUDGET

21 APPROPRIATELY.  THAT ALSO TELLS THEM WHICH OPTIONS THEY HAVE

22 WHICH CAN CHANGE THAT POPULATION TREND.

23 **Q**    NOW, HAS THE U.S. DEPARTMENT OF JUSTICE RECENTLY ASKED YOU

24 TO CONDUCT A SIMILAR ANALYSIS?

25 **A**    RECENTLY, YES, THE U.S. DEPARTMENT OF JUSTICE THROUGH ITS

1   NATIONAL INSTITUTE OF CORRECTIONS HAS ASKED ME TO DRAFT A WHITE

2   PAPER FOR THEM ON HOW THE NATION AND STATES COULD REDUCE ITS

3   PRISON POPULATION BY AS MUCH AS 50 PERCENT OVER THE NEXT EIGHT

4   YEARS.

5   **Q**   IN ADDITION TO THE WORK YOU JUST DESCRIBED, CALIFORNIA CHOSE

6   YOU TO BE A MEMBER OF ITS EXPERT PANEL, ALONG WITH OTHER EXPERTS

7   AND HEADS OF OTHER CORRECTIONAL INSTITUTIONS; IS THAT RIGHT?

8   **A**   THAT'S CORRECT.

9   **Q**   AND THE NUMBER ONE RECOMMENDATION THAT CAME OUT OF THIS

10  EXPERT PANEL WAS TO REDUCE OVERCROWDING.  DO YOU AGREE WITH THAT

11  RECOMMENDATION?

12  **A**   I DO AGREE WITH THAT RECOMMENDATION.

13  **Q**   I WANT TO TURN YOUR ATTENTION TO WHAT'S BEEN MARKED AS

14  EXHIBIT 830, WHICH IS ON THE EASEL HERE.  I HAVE ADDITIONAL

15  COURTESY COPIES.

16          CAN YOU BRIEFLY EXPLAIN WHAT THIS CHART SHOWS?

17  **A**   YES.  I'M GOING TO STEP OVER TO IT AND KIND OF POINT TO SOME

18  THINGS.

19          **JUDGE KARLTON:**  YOU ARE GOING TO NEED A MICROPHONE.

20  DO WE HAVE A -- ROWENA?

21          **MS. EVENSON:**  CAN WE MOVE THIS AND SEE IF THIS WORKS?

22          **THE WITNESS:**  CAN YOU HEAR ME?

23          **JUDGE HENDERSON:**  YES.

24          **THE WITNESS:**  THIS IS AN IMPORTANT CHART BECAUSE WHEN

25  I'M ASKED TO COME INTO A STATE AND LOOK AT THEIR PRISON

1  POPULATION, YOU HAVE TO START UNDERSTANDING WHAT'S PRODUCING

2  THAT POPULATION.  SO THIS IS CALIFORNIA.  I'M GOING TO POINT OUT

3  THE BASIC KEY FACTORS AND THEN ALSO GIVE SOME INDICATION OF HOW

4  CALIFORNIA IS DIFFERENT THAN OTHER STATES.  THIS INFORMATION IS

5  COMING FROM THEIR MOST RECENT POPULATION FORECAST WHICH JUST WAS

6  RELEASED.

7        THE TWO BIG POPULATIONS ARE THE PRISON POPULATION,

8  WHICH, IN THE REPORT, IT INDICATED APPROXIMATELY 170-, 171,000.

9  THAT'S NOT THE INSTITUTIONAL, THAT'S THE ENTIRE JURISDICTIONAL

10  POPULATION.  THEN YOU HAVE A PAROLE POPULATION OF ABOUT 125,000.

11  THIS POPULATION HERE IS PRODUCED BY THREE FLOWS OF PEOPLE COMING

12  IN AT A RATHER LARGE RATE.

13        THE BIGGEST GROUP THAT'S COMING IN ARE THE TECHNICAL

14  PAROLE VIOLATERS, WHICH IS 66,000 COMING IN.  THOSE 66,000 ARE

15  ACTUALLY COMING OFF OF THE PAROLE POPULATION.  SO THEY ARE BEING

16  RECYCLED IN THROUGH THE SYSTEM.  THEY WILL SPEND APPROXIMATELY

17  30 DAYS IN THE COUNTY JAIL AS PART OF THEIR REVOCATION, AND THEN

18  WHEN THEY COME BACK INTO THE PRISON SYSTEM, THEY'LL SPEND ABOUT

19  FOUR MONTHS BEFORE THEY'RE KICKED BACK OUT.

20        THIS IS VERY UNUSUAL.  YOU DON'T SEE THIS IN ANY

21  OTHER STATES, THE VOLUME OF THESE PEOPLE THAT ARE BEING

22  RECYCLED, NOR THAT RELATIVELY SHORT LENGTH OF STAY.  IT'S

23  IMPORTANT, THOUGH, BECAUSE OF WHERE THESE PEOPLE GO.  THEY SIT

24  PRIMARILY IN THE RECEPTION CENTERS AND CLOG THOSE RECEPTION

25  CENTERS AND PRETTY MUCH ARE IDLE.

1          THESE TWO STREAMS ARE MORE TYPICAL WHAT YOU'LL SEE IN

2    A STATE.  THE FIRST MIDDLE GROUP IS PEOPLE THAT COME FROM THE

3    COURT.  THEY HAVE BEEN ARRESTED, SENTENCED.  THEY ARE NOT ON

4    PAROLE.  THEY MAY HAVE BEEN ON PROBATION, BUT THEY HAVE NOW BEEN

5    SENTENCED TO THE DEPARTMENT OF CORRECTIONS.  THEIR AVERAGE

6    SENTENCE IS ABOUT 49, MONTHS AND THEY'LL DO ANYWHERE FROM 50 TO

7    80, 85 PERCENT OF THAT SENTENCE.  IT'S ALSO IMPORTANT TO NOTE

8    THAT THEY WILL SPEND ABOUT SEVEN MONTHS IN THE COUNTY JAILS

9    BEFORE THEY COME.

10          IN THE LAST GROUP THERE'S ANOTHER RECYCLING GROUP.

11   THEY'RE COMING OFF THE PAROLE POPULATION, ABOUT 19,000, ABOUT

12   THE SAME SENTENCES.  THEY ALSO SPEND ABOUT SEVEN MONTHS BEFORE

13   THEY COME BACK IN.

14          NOW, WHAT IS IMPORTANT FROM MY PERSPECTIVE IS THAT

15   THIS IS THE CURRENT FLOW.  SO WE ARE BRINGING IN ABOUT 135-,

16   140,000 PEOPLE A YEAR, AND WE ARE RELEASING ABOUT THE SAME

17   NUMBER OUT TO THE COUNTIES EACH YEAR.  SO THAT'S THE OVERALL

18   FLOW, AND THEN THIS PROPORTION IS PRETTY NORMAL.  THIS

19   PROPORTION IS VERY ABNORMAL COMPARED TO OTHER STATES.

20   (INDICATING.)

21          **JUDGE KARLTON:**  FOR THE RECORD, DR. AUSTIN WAS

22   POINTING TO NEW COURT COMMITMENT AND NEW COURT PAROLE VIOLATERS

23   AS BEING RELATIVELY NORMAL AND THE TECHNICAL PAROLE VIOLATERS

24   BEING VERY UNUSUAL; IS THAT CORRECT, DOCTOR?

25          **THE WITNESS:**  THAT'S CORRECT.

1          **MS. EVENSON:**  THANK YOU, YOUR HONOR.

2   BY MS. EVENSON

3   **Q**   DR. AUSTIN, YOU UNDERSTAND THAT THE PLAINTIFFS IN THIS CASE

4   ARE SEEKING AN ORDER THAT WOULD REQUIRE THE STATE TO REDUCE ITS

5   PRISON POPULATION TO 130 PERCENT OF DESIGN CAPACITY OVER TWO

6   YEARS, WHICH AMOUNTS TO APPROXIMATELY 50,000 INDIVIDUALS, AND

7   THAT WE'LL BE ASKING THE COURT TO ORDER DEFENDANTS TO COME UP

8   WITH A PLAN TO ACCOMPLISH THAT POPULATION REDUCTION SAFETY.  IN

9   YOUR OPINION, IS IT POSSIBLE TO PUT TOGETHER A PLAN TO REDUCE

10  CALIFORNIA'S PRISON POPULATION BY THAT MAGNITUDE IN THAT

11  TIMEFRAME WITHOUT ADVERSELY IMPACTING PUBLIC SAFETY?

12  **A**   YES, IN MY OPINION, THE STATE COULD DO THAT.

13  **Q**   DR. AUSTIN, I NOW WANT TO TURN YOUR ATTENTION TO WHAT'S BEEN

14  MARKED AS EXHIBIT 828, AND IT'S ANOTHER CHART WHICH I'LL JUST

15  SHOW YOU NOW.  EXHIBIT 828 LISTS FOUR POPULATION REDUCTION

16  METHODS WHICH ARE OUTLINED IN YOUR REPORT.  CAN YOU PLEASE

17  EXPLAIN EACH OF THOSE METHODS?

18  **A**   YES, BEFORE I DO THAT, THOUGH, I JUST AGAIN WANT TO

19  EMPHASIZE SOMETHING.  A PRISON POPULATION OR PAROLE POPULATION

20  IS THE FUNCTION OF TWO VARIABLES, HOW MANY PEOPLE COME IN AND

21  HOW LONG DO THEY STAY.  SO TO LOWER A PRISON POPULATION, YOU

22  HAVE TO ATTACK THOSE TWO CHARACTERISTICS, THE NUMBER COMING IN

23  AND HOW LONG THEY ARE STAYING.  SO THESE FOUR RECOMMENDATIONS

24  ARE VERY COMMON RECOMMENDATIONS THAT WE APPLY TO OTHER STATES,

25  AND THESE ARE BEING ADOPTED THROUGHOUT THE COUNTRY.

1          THE FIRST ONE WOULD BE TO REDUCE THE NUMBER OF

2    TECHNICAL PAROLE VIOLATERS.  THERE ARE -- AND WHAT WE'RE TRYING

3    TO DO HERE IS TWO THINGS.  ONE IS WE ARE GOING TO LOWER THE

4    POPULATION, AND THEY DON'T OCCUPY A HUGE NUMBER OF BEDS BECAUSE

5    THEIR LENGTH OF STAY IS NOT THAT LARGE, BUT IT'S A CONSIDERABLE

6    NUMBER.  BUT, MORE IMPORTANT, THEY'RE CLOGGING THOSE RECEPTION

7    CENTERS, WHICH, FROM A CORRECTIONS' POINT OF VIEW, IS THE BRAIN

8    OF YOUR SYSTEM.  IF YOU HAVE PROBLEMS IN YOUR RECEPTION CENTERS,

9    YOU CANNOT PROPERLY DIAGNOSE AND REVIEW PEOPLE FOR PROGRAMS AND

10   RISK ASSESSMENT, THOSE KINDS OF THINGS.

11         THE DEPARTMENT IS ALREADY DOING THAT.  THAT'S IN

12   PROGRESS.  THEY HAVE ADOPTED A VIOLATION MATRIX WHICH BASICALLY

13   IS LOOKING AT THE NATURE OF THAT VIOLATION AND MAKING A

14   DETERMINATION, DOES IT WARRANT A RETURN TO THE PRISON SYSTEM OR

15   CAN WE HANDLE THIS PERSON IN THE COMMUNITY WITH INTERMEDIATE

16   SANCTIONS OR ALTERNATIVE PROGRAMS?

17         THE EXPERT PANEL, WHICH I WAS A MEMBER OF, ALSO MADE

18   THE SAME RECOMMENDATION.  THIS IS A VERY COMMON REFORM.  IT'S

19   BEING USED IN MANY STATES.  THE PRINCIPAL QUESTION IS, WHAT TYPE

20   OF BEHAVIOR IS GOING TO WARRANT SOME COMING BACK TO THE PRISON

21   SYSTEM FOR A TECHNICAL VIOLATION?

22         THE SECOND MAJOR RECOMMENDATION IS THAT WE WOULD

23   DIVERT LOW RISK PRISONERS WITH SHORT SENTENCES.  THERE'S AN

24   EXHIBIT -- I DON'T KNOW IF YOU WANT -- IF I COULD SHOW IT, WHICH

25   SHOWS -- TABLE FIVE, I DON'T KNOW IF YOU HAVE TABLE FIVE IN YOUR

1   HANDOUT.

2          MOST PEOPLE DON'T REALIZE, BUT THERE IS A VERY LARGE

3   NUMBER OF PEOPLE COMING INTO THE CALIFORNIA PRISON WITH

4   RELATIVELY SHORT SENTENCES, BY THAT, UNDER 24 MONTHS.  THE

5   BIGGEST GROUP IS THIS GROUP COMING IN WITH A 16-MONTH SENTENCE.

6          NOW, YOU HAVE TO UNDERSTAND WHAT 16 MONTHS MEANS.

7   THEY WILL HAVE SPENT, LIKE I SAID, SEVEN MONTHS IN THE COUNTY

8   JAIL ALREADY BEFORE THEY COME TO THE DEPARTMENT OF CORRECTIONS.

9   SO YOU SUBTRACT THAT SEVEN MONTHS, AND YOU'VE GOT NINE MONTHS

10  LEFT IF THEY GET THE WORK INCENTIVE CREDITS, THAT'S GOING TO GET

11  SLASHED IN HALF.  SO THEY'RE COMING IN AND OUT OF THE SYSTEM

12  VERY QUICKLY, ALMOST LIKE TECHNICAL PAROLE VIOLATERS.

13         SO THE RECOMMENDATION HERE IS TO IDENTIFY THOSE

14  PRISONERS WHO ARE COMING IN FOR THOSE SHORT SENTENCES WHO ARE

15  NOT HIGH RISK, USING RISK ASSESSMENT, AND RETURN THEM TO THE

16  COMMUNITY IMMEDIATELY, AND THERE'S DIFFERENT WAYS YOU CAN DO

17  THAT.  SOME CALIFORNIA COUNTIES ARE ALREADY DOING THAT.  I THINK

18  SAN DIEGO IS ALREADY DOING THAT.  AND THE GOVERNOR'S SPECIAL

19  SESSION BUDGET PROPOSAL TALKED ABOUT NOT ALLOWING PEOPLE TO COME

20  INTO THE PRISON SYSTEM WITH SENTENCE LENGTHS OF 24 MONTHS OR

21  LESS.

22         SO THAT WOULD BE THE SECOND MAJOR THING.

23         THE THIRD RECOMMENDATION IS VERY CRITICAL TO THE

24  CALIFORNIA SITUATION, AND I JUST WANT TO SHOW A COUPLE OTHER

25  THINGS IN MY EXHIBITS.  FIGURE 2 AND TABLES 6 AND 7.

1          COLLECTIVELY, WHAT THESE FIGURES ARE SHOWING -- AND

2    THIS HAS BEEN KNOWN BY CRIMINOLOGISTS FOR MANY, MANY, MANY

3    YEARS -- THERE IS NO DIFFERENCE IN RECIDIVISM RATES BY LENGTH OF

4    STAY.  SO IT DOESN'T MATTER IF SOMEONE COMES OUT IN SIX MONTHS,

5    TWELVE MONTHS, TWENTY-FOUR MONTHS, YOU ARE GOING TO GET THE SAME

6    RECIDIVISM RATE.

7          IF YOU START CHANGING THE LENGTH OF STAY BY A VERY

8    MODERATE PERIOD OF TIME -- AND BY "MODERATE" IN THE NEIGHBORHOOD

9    OF FOUR, FIVE OR SIX MONTHS, YOU CAN DO THAT WITHOUT CHANGING

10   THE RISK TO PUBLIC SAFETY, BECAUSE THAT RECIDIVISM RATE IS NOT

11   MOVING ON YOU.

12          NOW, THE EXPERT PANEL NOTED THAT ONE OF THE PROBLEMS

13   WITH THE CALIFORNIA SYSTEM, IT DOES NOT HAVE GOOD TIME CREDITS

14   THAT CAN SERVE AS AN INCENTIVE FOR PRISONERS TO PARTICIPATE IN

15   WHAT WE CALL RISK REDUCTION PROGRAMS.  SO WHAT WE'RE

16   RECOMMENDING HERE IS THAT THE DEPARTMENT AND THE STATE INCREASE

17   THE NUMBER OF CREDITS THAT PRISONERS CAN EARN FOR PARTICIPATION

18   IN PROGRAMS, OR BEING IN COMPLIANCE WITH A CASE MANAGEMENT PLAN,

19   OR WHAT'S REQUIRED OF THEM, AND REWARD THEM FOR THAT BY ALLOWING

20   THEM TO BE RELEASED SOONER THAN THEY WOULD IF THEY HAD NOT

21   PARTICIPATED.  AGAIN, THERE'S EXISTING PENAL CODE THAT ALLOWS

22   FOR THAT TO HAPPEN.

23          THE GOVERNOR'S JANUARY 2008 BUDGET PROPOSAL HAS NOW

24   SAID THEY ARE GOING TO RECOMMEND THAT AS PART OF THEIR BUDGET,

25   GIVING INMATES UP TO FOUR MONTHS FOR COMPLETION OF THE PROGRAM.

1  SPECIAL SESSION BUDGET PROPOSAL TALKED ABOUT IT, AND, OF COURSE,

2  THE EXPERT PANEL ALSO RECOMMENDED THIS.  IT WAS PROBABLY THE

3  NUMBER ONE RECOMMENDATION, IN ADDITION TO REDUCING THE CROWDING,

4  WAS TO GET GOOD TIME CREDITS INTO THIS SYSTEM WHICH WOULD ALLOW

5  PRISONERS WHO ARE SO MOTIVATED TO PARTICIPATE AND, THUS, REDUCE

6  THEIR RISK WHEN THEY GET OUT.

7          THE LAST RECOMMENDATION IS CRITICAL BECAUSE IF YOU

8  START DIVERTING THESE PEOPLE IN PARTICULAR, YOU START CHANGING

9  THE LENGTH OF STAY AS I'VE SUGGESTED, THAT MEANS YOU ARE GOING

10  TO GET MORE PEOPLE COMING OUT ONTO THE PAROLE SYSTEM.  SO TO

11  ADJUST FOR THAT, WE WOULD DO THE SAME THING THAT OTHER STATES

12  ARE DOING, WHICH IS CHANGING THE LENGTH OF TIME SPENT ON PAROLE,

13  BECAUSE THE SAME THING IS KNOWN WITH PAROLE, IT DOES NOT MATTER

14  HOW LONG SOMEONE SPENDS ON PAROLE SUPERVISION.

15          TYPICALLY, MOST OF THE PAROLEES ENCOUNTER PROBLEMS IN

16  THE FIRST 12 MONTHS.  AFTER THAT IT DOESN'T MAKE MUCH DIFFERENCE

17  IF THEY ARE STAYING ON FOR 24 OR 36 MONTHS.  SO THE SUGGESTION

18  HERE IS WE WOULD PUT IN PLACE MECHANISMS BY WHICH PEOPLE WOULD

19  BE PLACED ON PAROLE SUPERVISION FOR A LIMITED PERIOD OF TIME.

20  THAT WOULD REDUCE THE PAROLE POPULATION.  AND WE'VE ALSO FOUND

21  IN A COUPLE OF STATES ALREADY WHEN WE DO THAT, WE GET A LOWER

22  REVOCATION RATE BECAUSE WE'VE CREATED AN INCENTIVE FOR THE

23  PAROLEE TO CONFORM AND BEHAVE.  IN OTHER WORDS, THEY CAN SEE, IF

24  I BEHAVE, I'LL GET OFF THIS SUPERVISION FASTER THAN IF I DIDN'T

25  BEHAVE.

1      THOSE ARE THE FOUR MAJOR RECOMMENDATIONS THAT WOULD

2  DO TWO THINGS.  IT WOULD SLOW THE ADMISSIONS, IT WOULD ALTER THE

3  LENGTH OF STAY MODESTLY, AND -- FOR SELECTED PRISONERS, AND THAT

4  WOULD DROP THE POPULATION DOWN OVER A REASONABLE PERIOD OF TIME.

5  **Q**   TO BE CLEAR, DR. AUSTIN, NONE OF THESE FOUR PROPOSALS

6  CONTEMPLATE EITHER REDUCING THE SENTENCE OR DIVERTING

7  INDIVIDUALS WHO WOULDN'T ALREADY BE GETTING OUT IN A COUPLE

8  SHORT MONTHS ANYWAY; IS THAT RIGHT?

9  **A**   RIGHT.  IF YOU GO BACK TO THE ORIGINAL FLOW CHART, I AM NOT

10 CHANGING ANYTHING ABOUT THE FLOW OF PEOPLE NUMERICALLY.  IT'S

11 THE SAME NUMBER ARE COMING IN AND SAME NUMBERS ARE COMING OUT,

12 EXCEPT FOR THE TECHNICAL.  WE ARE GOING TO BE DIVERTING THEM OUT

13 OF THE PRISON SYSTEM.

14      BUT THE PEOPLE COMING IN FOR THE NEW COURT

15 COMMITMENTS, THEY CONTINUE TO COME IN, AND THEY CONTINUE TO BE

16 RELEASED IN EXACTLY THE SAME NUMBERS.  SO THERE'S NO FLOODING OF

17 ANY COUNTIES OR ANYTHING LIKE THAT.  WHAT WE'RE CHANGING IS

18 THEIR PERIOD OF THE EXPERIENCE IN THE PRISON SYSTEM.  THAT'S ALL

19 WE'RE DOING.

20 **Q**   AND THE CHANGE YOU ARE CONTEMPLATING IN THE LENGTH OF STAY

21 HAS NO IMPACT ON RECIDIVISM, RIGHT?

22 **A**   HAS NO IMPACT ON RECIDIVISM WHATSOEVER.

23 **Q**   DR. AUSTIN, I'D LIKE TO SHOW YOU WHAT'S BEEN MARKED AS

24 EXHIBIT 328.

25      MAY I APPROACH?

1          EXHIBIT 328 IS THE GOVERNOR'S JANUARY 2008 BUDGET

2    PROPOSAL.  I'D LIKE TO TURN YOUR ATTENTION TO PAGE 178 OF THAT

3    PROPOSAL.

4    **A**   OKAY, I HAVE IT.

5    **Q**   AT THE BOTTOM OF THE -- THE FINAL TWO BULLET POINTS ON THAT

6    PAGE DESCRIBES PRISON POPULATION REDUCTION MEASURES PROPOSED BY

7    THE GOVERNOR.  CAN YOU BRIEFLY DESCRIBE THOSE MEASURES?

8    **A**   THE FIRST ONE, IT APPEARS THAT THEY ARE RECOMMENDING THAT

9    NONVIOLENT, NON-SERIOUS, NON-SEX OFFENDERS WITHOUT PRIOR SERIOUS

10   OR VIOLENT OFFENSES WOULD BE RELEASED 20 MONTHS EARLIER THAN

11   THEIR ORIGINAL RELEASE DATE.

12          THEN THE SECOND RECOMMENDATION WOULD BE SUMMARY

13   PAROLE, WHICH WOULD BE REDUCING THE NUMBER OF PEOPLE WHO ARE

14   SUBJECT TO PAROLE SUPERVISION.

15   **Q**   I'D NOW LIKE TO SHOW YOU WHAT'S BEEN MARKED AS --

16   **A**   COULD I COMMENT ON ONE OF THOSE?

17   **Q**   CERTAINLY.

18   **A**   IF YOU DON'T MIND?

19          THE FIRST ONE IS I WOULD CONSIDER TO BE VERY

20   IRRESPONSIBLE BECAUSE THE REDUCTION IN THE LENGTH OF STAY IS

21   HUGE.  I'M NOT PROPOSING THAT AT ALL.  WE'RE TALKING ABOUT A

22   MUCH MORE MODEST REDUCTION IN LENGTH OF STAY.  SO I WAS KIND OF

23   PUZZLED WHEN I SAW THE 20 MONTHS.  THAT WOULD BE -- WELL, PUT

24   FRANKLY, THE AVERAGE LENGTH OF STAY FOR PEOPLE COMING IN FOR NEW

25   COURT SENTENCE IS ABOUT THAT.  SO THERE WOULD BE ALMOST NO ONE

1  IN PRISON IF YOU HAD A 20-MONTH EARLY RELEASE PROGRAM LIKE THAT.

2  SO THAT'S THE ONLY COMMENT I MAKE ON THAT.

3  Q    DR. AUSTIN, I WANT TO NOW SHOW YOU WHAT'S BEEN MARKED AS

4  EXHIBIT P780, WHICH IS THE GOVERNOR'S MOST RECENT BUDGET

5  PROPOSAL FOR THE SPECIAL SESSION FOR 2008/2009.  I'D LIKE TO

6  TURN YOUR ATTENTION TO PAGE 18 OF THAT DOCUMENT.

7              **MS. JOHNSON:**  WHAT PAGE?

8              **MS. EVENSON:**  EIGHTEEN.

9              **THE WITNESS:**  OKAY.  I HAVE IT.

10 BY MS. EVENSON

11 Q    AGAIN, THE BOTTOM THREE BULLET POINTS HERE REPRESENT THE

12 GOVERNOR'S PROPOSALS FOR REDUCING THE PRISON POPULATION AND THE

13 BUDGET OF THE DEPARTMENT OF CORRECTIONS.

14            CAN YOU BRIEFLY DESCRIBE THOSE THREE PROPOSALS?

15 A    YES.  THE THREE PROPOSALS WOULD BE TO, AGAIN, LIMIT PAROLE

16 SUPERVISION TO A SELECT GROUP OF PEOPLE BEING RELEASED FROM

17 PRISON, SO AN UNKNOWN, BUT SOME SUBSTANTIAL NUMBER OF PEOPLE

18 RELEASED FROM PRISON WOULD NOT HAVE ANY PAROLE SUPERVISION.

19            THE SECOND ONE WOULD ENACT STATUTORY CHANGE WHICH

20 WOULD ALLOW THEM TO PROVIDE PROGRAM CREDITS UP TO FOUR MONTHS

21 FOR EACH PROGRAM THAT THEY'VE COMPLETED.

22            THE LAST RECOMMENDATION WOULD CHANGE THE THRESHOLD

23 FOR DETERMINING WHETHER A PROPERTY CRIME IS PROSECUTED AS A

24 FELONY AS OPPOSED TO A MISDEMEANOR.

25 Q    IN OTHER WORDS, THE GOVERNOR'S SPECIAL BUDGET PROPOSAL

1   INCLUDES PROPOSALS THAT WOULD DIVERT CERTAIN PRISONERS FROM

2   PRISON, CORRECT?

3   **A**   RIGHT.

4   **Q**   WOULD REDUCE THE LENGTH OF STAY FOR CERTAIN PRISONERS?

5   **A**   CORRECT.

6   **Q**   AND WOULD DO AN EARLY DISCHARGE FROM PAROLE?

7   **A**   RIGHT.  I SHOULD ALSO ADD THE DEPARTMENT ALREADY IS CHANGING

8   THE LENGTH OF STAY.  IT'S ALREADY RELEASING PEOPLE SOONER

9   BECAUSE OF THE PARTICIPATION IN THE BRIDGE PROGRAM, THE WORK

10  INCENTIVE PROGRAM, EDUCATION CREDITS.  THERE'S WAYS --

11  CONSERVATION CAMP.  THEY ARE ENGAGED IN THOSE KIND OF CREDIT

12  SYSTEMS.  WHAT THIS WOULD DO WOULD EXPAND THE CREDIT ARSENAL SO

13  WE COULD GET MORE BANG OUT OF THE BUCK OF THE PROGRAM CREDITS.

14  **Q**   RETURNING BACK TO THE FOUR POPULATION REDUCTION METHODS THAT

15  YOU'VE LAID OUT, HAVE ANY OTHER JURISDICTIONS OTHER THAN

16  CALIFORNIA TRIED REDUCING PRISON POPULATIONS USING THOSE METHODS

17  THAT YOU'VE LAID OUT?

18  **A**   YES, THEY HAVE.

19  **Q**   AND CAN YOU DESCRIBE WHAT THOSE JURISDICTIONS ARE AND WHAT

20  THEY FOUND?

21  **A**   WELL, I'LL JUST NAME A FEW, BUT ON THE TECHNICAL PAROLE

22  VIOLATER, KANSAS IS PROBABLY THE MOST FAMOUS.  THEY HAVE PUT --

23  IN THE LAST COUPLE OF YEARS THEY'VE PUT IN A MATRIX WHICH HAS

24  DIVERTED A VAST MAJORITY OF THEIR TECHNICAL PAROLE VIOLATERS

25  INTO THE COMMUNITY.

1          WASHINGTON STATE BACK IN 19 -- I BELIEVE IT'S ABOUT

2   1982 OR 1993 (SIC) BY STATUTE FORBIDS PAROLE VIOLATERS WHO ARE

3   TECHNICAL VIOLATERS TO BE SENT TO PRISON, BECAUSE THEY FELT THAT

4   PRISONS WERE FOR PEOPLE THAT COMMIT FELONY CRIMES, NOT PEOPLE

5   THAT VIOLATE THE TERMS OF PAROLE.

6          THOSE ARE TWO RECENT STATES -- NOT RECENT, BUT TWO

7   STATES THAT COME TO MIND.  THERE'S QUITE A FEW MORE OUT THERE

8   THAT ARE DOING THAT.

9   **Q**   DR. AUSTIN, DID EITHER OF THOSE STATES EXPERIENCE AN

10  INCREASE IN CRIME AFTER IMPLEMENTING THAT PROGRAM?

11  **A**   NO.  THERE'S ANOTHER CHART I HAVE HERE, WHICH IS LOOKING AT

12  CALIFORNIA, MICHIGAN AND NEW YORK, JUST AS EXAMPLES ON THEIR

13  REPORTED CRIME RATES.

14         THE THING ABOUT CRIME RATES IS THAT CRIME RATES HAVE

15  DROPPED DRAMATICALLY IN THE COUNTRY.  EVERY STATE HAS DROPPED

16  DRAMATICALLY IN THE COUNTRY REGARDLESS OF WHAT THEY'VE DONE WITH

17  THEIR PRISON SYSTEM.  SO THIS CRIME RATE DROP HAS BEEN

18  OCCURRING.

19         SO THE STATES THAT I MENTION, YES, THEIR CRIME RATES

20  HAVE DROPPED.  STATES THAT HAVE INCREASED THEIR PRISON

21  POPULATIONS, THEIR CRIME RATES HAVE DROPPED.  NEW YORK, WHICH IS

22  PROBABLY THE GOLD STANDARD OUT THERE NOW, HAS DROPPED ITS PRISON

23  POPULATION BY ABOUT 15 TO 20 PERCENT AND HAS THE BIGGEST DROP IN

24  CRIME THAT THE COUNTRY HAS SEEN.

25         TO GO BACK TO CALIFORNIA, CALIFORNIA TODAY HAS THE

1   LOWEST CRIME RATE IT'S HAD SINCE 1962, 1963.  CALIFORNIA IS MUCH

2   SAFER TODAY THAN IT'S EVER BEEN.  BACK IN 1962, '63 WE HAD ABOUT

3   22,000 PEOPLE IN OUR PRISON SYSTEM.  INCARCERATION RATE WAS

4   ABOUT ONE-FOURTH WHAT IT IS TODAY.  SO KIND OF LIKE THE BIG

5   PICTURE.  CRIME RATES KIND OF MOVE AT THEIR OWN SPEED, YOU KNOW.

6   WHAT PRODUCES CRIME IS MUCH MORE COMPLEX, MUCH MORE DEFINITIVE

7   THAN HOW MANY PEOPLE YOU INCARCERATE.

8        SO, YES, THESE STATES THAT HAVE DIVERTED TECHNICAL

9   VIOLATERS, STATES THAT HAVE REDUCED THE LENGTH OF STAY, LIKE NEW

10  YORK HAS REDUCED ITS LENGTH OF STAY BY PROGRAM CREDITS AND

11  DIVERSION, THEY HAVE SEEN LARGE DROPS IN THEIR CRIME RATES.

12      **JUDGE KARLTON:**  EXCUSE ME, SIR.  CALIFORNIA HAS HAD A

13  SIGNIFICANT DROP IN THE CRIME RATE, YOU SAY, YET WE HAVE THIS

14  OVERCROWDING WHICH APPARENTLY IS EQUALLY UNPRECEDENTED.  HOW DO

15  YOU ACCOUNT FOR THE FACT THAT THERE ARE FEWER CRIMES BEING

16  COMMITTED, AT LEAST THAT WE CAN RECORD, AND THE FACT THAT WE'VE

17  GOT SO MANY MORE PEOPLE IN PRISON?

18      **THE WITNESS:**  WELL, THE FACT THAT YOU HAVE SO MANY

19  PEOPLE IN PRISON IS AN ARTIFACT OF THE POLICY DECISIONS MADE BY

20  THE STATE LEGISLATURE ON PASSING VARIOUS BILLS.

21      FOR EXAMPLE, IN YOUR STATE, AGAIN GOING BACK TO THE

22  PAROLE VIOLATION, THAT'S PURPOSEFUL POLICY DECISION MAKING.  THE

23  OTHER PART IS LAWS THAT HAVE BEEN PASSED.  IN PARTICULAR, IN

24  YOUR STATE, IT WOULD BE THE SECOND STRIKE LAW.  THAT'S A BIG

25  POPULATION THAT'S STACKING UP.  AND ALSO YOUR LIFER POPULATION

1    WHICH IS STACKING UP.

2           YOU DON'T SEE THOSE KINDS OF POPULATIONS IN OTHER

3    STATES.  THAT'S STRICTLY, IN MY OPINION, AN ARTIFACT OF

4    LEGISLATIVE ACTION DESIGNED TO PUT CERTAIN PEOPLE IN PRISON FOR

5    A VERY LONG PERIOD OF TIME.

6           **JUDGE KARLTON:**  I'M SORRY.  LET ME UNDERSTAND.  I

7    THINK I UNDERSTAND WHAT YOU'RE SAYING, BUT I'VE GOT TO PUT IT IN

8    MY OWN -- YOU'RE SAYING THAT DESPITE THE REDUCTION IN THE NUMBER

9    OF CRIMES BEING RECORDED IN CALIFORNIA, THE PRISON POPULATION IS

10   INCREASING, NOT ONLY BECAUSE OF THE PAROLE VIOLATERS GOING BACK,

11   BUT ALSO BECAUSE OF THE INCREASE IN THE LENGTH OF INTERNMENT?

12          **THE WITNESS:**  YES, SIR.

13          **JUDGE KARLTON:**  ALL RIGHT.

14   BY MS. EVENSON

15   **Q**   YOU DESCRIBED A COUPLE OF --

16   **A**   LET ME JUST ADD, EMPHASIZE, AGAIN, THIS IS WHY YOU LOOK AT

17   STATES, WHICH I HAVE HAD THE BENEFIT, I WORK WITH A LOT OF

18   STATES.  YOUR LENGTH OF STAY IS, YOU KNOW, FOR THOSE THAT COME

19   IN FOR THE REGULAR SENTENCES -- I'LL EXCLUDE THE LIFERS -- IS IN

20   THE NEIGHBORHOOD OF TWO YEARS, SOMETHING LIKE THAT.  YOU GO TO A

21   STATE LIKE ILLINOIS, THEIR LENGTH OF STAY IS 14 MONTHS.

22   ILLINOIS HAS A MUCH LOWER INCARCERATION RATE THAN CALIFORNIA.

23   BOTH STATES HAVE EXACTLY THE SAME CRIME RATE.  BOTH STATES HAVE

24   DROPPED DRAMATICALLY IN THEIR CRIME RATES.  PRISON POPULATIONS

25   GO ON THEIR OWN KIND OF SEPARATE TRACK INDEPENDENT OF THE CRIME

1  RATES.  THERE'S VERY LITTLE RELATIONSHIP THERE.

2         **JUDGE HENDERSON:**  EXCUSE ME.  ARE YOU ABLE TO ACCOUNT

3  FOR THIS DROP IN THE CRIME RATE YOU JUST DESCRIBED?  I BELIEVE

4  IT WOULD BE ACCURATE TO SAY THERE'S BEEN PREVIOUS TESTIMONY THAT

5  SUGGESTS IT'S BECAUSE MORE PEOPLE ARE IN JAIL SO THEY CAN'T

6  CREATE CRIMES.

7         **THE WITNESS:**  THIS OBVIOUSLY IS A VERY INTERESTING

8  TOPIC.  RECENTLY A BOOK WAS ISSUED BY, I GUESS, PROBABLY THE

9  BEST CRIMINOLOGIST WE HAVE.  IT'S A BOOK DEDICATED TO WHY CRIME

10 DROPPED IN THE UNITED STATES.

11        THE CONSENSUS OF THOSE PEOPLE, THE VAST MAJORITY OF

12 REASONS THE CRIME DROPPED IN THE UNITED STATES WERE DEMOGRAPHIC

13 FACTORS, CHANGES IN THE DRUG TRADE AND SOCIOECONOMIC CONDITIONS.

14 THEY DO ASCRIBE SOME EFFECT TO INCREASED NUMBER OF

15 INCARCERATION, BUT THAT'S NOT THE MAJORITY.  THAT'S NOT THE

16 MAJOR REASON WHY CRIME HAS DROPPED.

17        THEY HAVE TO SAY THAT BECAUSE THEY SEE STATES THAT

18 HAVE DROPPED THEIR PRISON POPULATIONS AND THE CRIME RATE IS

19 DROPPING EVEN FASTER IN THOSE STATES.  YOU HAVE COUNTIES IN

20 CALIFORNIA THAT HAVE LOWERED THEIR PRISON ADMISSIONS TO CDCR AND

21 HAVE EXPERIENCED THE SAME OR GREATER DROPS IN CRIME RATE THAN

22 COUNTIES THAT HAVE INCREASED THEIR NUMBERS.

23        SO THIS IS THE -- THE THING I TRY TO COMMUNICATE, YOU

24 KNOW, THE CRIME RATE -- CRIME IS A MUCH MORE IMPORTANT THING.

25 IT'S A FUNCTION OF, IN MY OPINION, HOW WE RAISE, IN PARTICULAR,

1   YOUNG MEN IN OUR SOCIETY.  WHEN WE DO A FORECAST OF A PRISON

2   POPULATION FOR TEN YEARS OUT, I'M BASICALLY FORECASTING HOW MANY

3   TEENAGE BOYS ARE GOING TO GO INTO YOUR PRISON SYSTEM.

4           SO IF YOU WANT TO ADDRESS THE CRIME PROBLEM, START

5   DEALING WITH THOSE FOLKS AT AN EARLY AGE.  ONCE THEY HAVE --

6   THEY GET TO A CERTAIN AGE, YOU'VE LOST YOUR ABILITY TO DO MUCH.

7           BUT THE GENERAL CONSENSUS OF ALL CRIMINOLOGISTS IS IF

8   YOU WANT TO REDUCE CRIME, DON'T INCREASE YOUR INCARCERATION

9   RATE.

10          I LIVE IN WASHINGTON, D.C. HALF THE TIME.  WE HAVE

11  ONE OF THE HIGHEST INCARCERATION RATES.  WE ALSO HAVE ONE OF THE

12  HIGHEST CRIME RATES.  WE SHOULD BE AS SAFE AS CAN BE.  WE'RE

13  NOT.

14          **JUDGE KARLTON:**  YOU INDICATED THIS GROUP OF

15  CRIMINOLOGISTS ATTRIBUTED AT LEAST SOME SIGNIFICANT PERCENTAGE

16  OF CRIME RATE REDUCTION TO SOCIOECONOMIC FACTORS.  DOES THAT

17  SUGGEST IF THE PRESENT ECONOMIC CRISIS DEEPENS AND BECOMES

18  GREATER, WE ARE GOING TO FACE YET MORE PEOPLE FACING PRISON?

19          **THE WITNESS:**  IT WOULD DEPEND ON THE LENGTH OF THE

20  RECESSION AND/OR DEPRESSION IF WE GO INTO THAT.  YOU KNOW,

21  PEOPLE THAT HAVE BEEN RAISED, EDUCATED, HAD JOBS, IF THEY LOSE

22  THEIR JOB, THEY DON'T ALL OF A SUDDEN START BECOMING CRIMINALS.

23  IT WOULD TAKE SOME TIME FOR AN ECONOMIC DOWNTURN TO HAVE AN

24  ECONOMIC EFFECT.

25          THERE ARE STUDIES SHOWING A RELATIONSHIP BETWEEN

1  POVERTY AND THINGS LIKE THAT AND CRIME RATES, BUT THAT -- IT

2  TAKES ALMOST LIKE A GENERATION OF SOMEONE EXPERIENCING THAT.

3  SO, HOPEFULLY, IF THE ECONOMIC THING TURNS AROUND, WE SHOULDN'T

4  SEE A SIDE EFFECT OF THAT.

5  BY MS. EVENSON

6  **Q**   YOU DESCRIBED A COUPLE OF JURISDICTIONS THAT IMPLEMENTED A

7  REDUCTION IN THE NUMBER OF TECHNICAL PAROLE VIOLATERS, AND YOU

8  ALLUDED TO OTHER STATES THAT HAVE SHORTENED THE LENGTH OF STAY

9  THROUGH GOOD TIME CREDIT PROGRAMS.  CAN YOU ELABORATE ON THAT

10 EXAMPLE IN OTHER STATES?

11 **A**   JUST ABOUT ALL THE STATES HAVE THIS, BUT SOME RECENT

12 EXAMPLES WOULD -- WELL, LIKE THE FEDERAL GOVERNMENT, FOR

13 EXAMPLE, IF YOU GET SENTENCED TO THE BUREAU OF PRISONS, YOU GET

14 A 12-MONTH REDUCTION IF YOU PARTICIPATE AND COMPLETE A DRUG

15 PROGRAM.

16       IN NEVADA WHERE I'M WORKING CURRENTLY, WE INCREASED

17 THE NUMBER OF PROGRAM CREDITS THAT PRISONERS COULD GET, DOUBLING

18 THAT AMOUNT.  IN MARYLAND WE'RE INCREASING THE PROGRAM CREDITS.

19 I CAN GO ON AND ON.  THERE'S A NUMBER OF STATES THAT ARE

20 CHANGING THE PROGRAM CREDITS SCHEDULE.

21       IN INDIANA, AN INTERESTING STATE, IF YOU GET YOUR

22 HIGH SCHOOL DEGREE, YOU GET 12 MONTHS OFF.  YOU GET A COLLEGE

23 DEGREE, YOU GET TWO YEARS OFF.  THE WHOLE ARGUMENT HERE IS TO

24 PROVIDE THAT CARROT FOR PRISONERS TO PARTICIPATE IN PROGRAMS

25 THAT LOWER THEIR RISK.  SO IT'S A WIN-WIN.  YOU LOWER THE RISK,

 1  YOU LOWER THE LENGTH OF STAY, YOU LOWER THE COST OF THAT SYSTEM.

 2  Q    NOW, YOU MENTION THAT SOME COUNTIES IN CALIFORNIA ALREADY

 3  IMPLEMENT DIVERSION PROGRAMS.  ARE YOU AWARE OF OTHER STATES

 4  THAT HAVE IMPLEMENTED DIVERSION PROGRAMS?

 5  A    OHIO HAS A VERY LARGE COMMUNITY CORRECTIONS PROGRAM.

 6  MICHIGAN HAS A VERY LARGE COMMUNITY CORRECTIONS PROGRAM, WHERE

 7  THE STATE BASICALLY IS PAYING THE COUNTIES TO HOLD PEOPLE AT THE

 8  COUNTY LEVEL WHO OTHERWISE WOULD GO TO PRISON.  SO THOSE ARE TWO

 9  STATES THAT COME TO MIND THAT HAVE VERY LARGE COMMUNITY

10  CORRECTIONS PROGRAMS.

11  Q    NOW, IN THE STATES THAT YOU'VE DESCRIBED THAT HAVE

12  IMPLEMENTED GOOD TIME CREDITS, SHORTENED LENGTH OF STAY, OR

13  DIVERSION PROGRAMS, HAVE THOSE PROGRAMS AGAIN BEEN ATTRIBUTED TO

14  ANY INCREASE IN CRIME?

15  A    NO, NO.

16  Q    DR. AUSTIN, YOU'VE SEEN SOME OF THE REPORTS FROM DEFENSE

17  EXPERTS AND INTERVENOR EXPERTS, MANY OF WHOM ARE EXPERIENCED LAW

18  ENFORCEMENT OFFICIALS, HAVE YOU NOT?

19  A    YES, I HAVE.

20  Q    AND SOME OF THOSE REPORTS SAY THAT REDUCING THE PRISON

21  POPULATION WILL SEND MORE OFFENDERS BACK INTO THE COMMUNITY

22  WHICH WILL NECESSARILY INCREASE CRIME.  WHY AREN'T THEY RIGHT?

23  A    WELL, AGAIN, YOU HAVE TO LOOK AT THE BIG PICTURE.  IN

24  CALIFORNIA -- LET'S TAKE CALIFORNIA.  CALIFORNIA HAS

25  APPROXIMATELY 1.5, 1.6 ARRESTS A YEAR.  THAT'S HOW MANY PEOPLE

1    ARE ARRESTED IN THE STATE OF CALIFORNIA.

2    **Q**    EXCUSE ME, DR. AUSTIN.  DO YOU MEAN 1.5 MILLION?

3    **A**    1.6, I SAID 1.6 MILLION ARRESTS.

4            **JUDGE KARLTON:**  YOU SAID 1.6 ARRESTS.

5            **THE WITNESS:**  I'M SORRY.  1.6 MILLION ARRESTS A YEAR.

6            THIS IS SOMETHING THAT PEOPLE DON'T QUITE COMPREHEND,

7    BUT A VERY SMALL PERCENT OF THOSE ARRESTS ARE PEOPLE RELEASED

8    FROM PRISON.  THE FEDERAL GOVERNMENT HAS DONE TWO STUDIES ON

9    THIS.  CALIFORNIA IS ONE OF THE STATES IN THESE TWO STUDIES, AND

10   THEY LOOKED AT PEOPLE COMING OUT OF THE PRISON SYSTEMS

11   NATIONALLY, INCLUDING CALIFORNIA, AND THEY TRIED TO FIGURE OUT

12   WHAT PERCENT OF ALL THE ARRESTS THAT OCCURRED IN THOSE STATES

13   AND NATIONALLY WERE ARRESTS OF PEOPLE RELEASED FROM PRISON.

14   THEIR ESTIMATES ARE ALWAYS IN THE THREE TO FIVE PERCENT RANGE,

15   MEANING THAT THE OVERWHELMING NUMBER OF ARRESTS THAT OCCUR IN A

16   STATE ARE NOT PEOPLE COMING OUT OF THE PRISON SYSTEM.  THAT'S

17   NOT TO SAY PEOPLE WHO DON'T COME OUT OF THE PRISON SYSTEM DON'T

18   HAVE HIGH ARREST RATES, THEY DO, BUT THEY ARE NOT THE ONES THAT

19   CONTRIBUTE TO THE ARREST POOL IN A STATE.

20           SO GOING BACK TO CALIFORNIA, WE HAVE 1.6 MILLION

21   ARRESTS.  THAT'S JUVENILE AND ADULT, FELONY AND MISDEMEANORS.

22   IF YOU LOOK AT HOW MANY PRISONERS ARE RELEASED FROM THAT OTHER

23   CHART, WHICH IS ABOUT 125,000 -- I'M SORRY -- ABOUT --

24           **JUDGE KARLTON:**  145,000.

25           **THE WITNESS:**  139,000 PEOPLE.  JUST BACK OF THE

1  ENVELOPE, WE KNOW FROM THE RECIDIVISM DATA THEY'VE GIVEN ME,

2  ABOUT 50 PERCENT OF THOSE PEOPLE GET ARRESTED AGAIN IN 12

3  MONTHS.  SO 50 PERCENT OF 130-, 140,000 IS GOING TO BE 60-,

4  65,000.  THE VAST MAJORITY OF THOSE ARRESTS ARE MISDEMEANOR

5  LEVEL ARREST.  THE NUMBER ONE IS OBSTRUCTING JUSTICE, RESISTING

6  ARREST, POSSESSION OF DRUGS.  ONLY FIVE PERCENT WE FOUND TO BE

7  VIOLENT ARRESTS.

8          SO, ANYWAY, TAKE THAT 60,000 OR SO AS OPPOSED TO

9  1.6 MILLION, YOU CAN SEE IN THE LAKE OF ARRESTS, PEOPLE COMING

10 OUT OF THE PRISON SYSTEM IS NOT THE BIG GROUP THAT WE SHOULD BE

11 WORRIED ABOUT.  THEY ARE NOT THE ONES CONTRIBUTING, THEY ARE NOT

12 THE ONES TAXING THE COUNTIES.  IT IS OTHER PEOPLE WHO ARE BEING

13 ARRESTED THAT IS CAUSING THAT KIND OF PHENOMENON.

14 **Q**  BUT, DR. AUSTIN, IF WE KNOW THERE IS A REARREST RATE OF SAY

15 50 PERCENT WITHIN THE FIRST YEAR, WHY WON'T IT INCREASE CRIME TO

16 SHIFT THE DATE OF RELEASE BACK A COUPLE OF MONTHS?

17 **A**  WELL, AGAIN, YOU HAVE TO KIND OF LOOK AT THESE CASES --

18         **MS. BARLOW:**  YOUR HONORS, I JUST WANT TO OBJECT THAT

19 THE PROPOSAL WAS FOUR MONTHS, NOT A COUPLE OF MONTHS.  SO I

20 THINK IT'S MISSTATING THE REPORT.

21         **MS. EVENSON:**  WE CAN USE THAT EXAMPLE, TOO.  ANY

22 EXAMPLE WORKS.

23         **THE WITNESS:**  YEAH, ANY MONTH WOULD BE FINE.  SO

24 LET'S TAKE FOUR MONTHS.

25         UNDER CURRENT PRACTICES, JOHN DOE GETS OUT IN APRIL.

1   IF YOU HAD A FOUR-MONTH PROGRAM CREDIT HE GOT, HE GOT OUT IN

2   JANUARY.  YOU HAVE NOT CHANGED JOHN DOE'S PROBABILITY OF BEING

3   INVOLVED IN A CRIME.  YOU'VE SIMPLY CHANGED THE DATE AND

4   LOCATION.

5          ONE COULD ACTUALLY ARGUE THAT BY CHANGING

6   CIRCUMSTANCES, YOU MAY HAVE PREVENTED HIM -- BY COMING OUT

7   SOONER HE ENGAGED IN CERTAIN INTERACTIONS THAT DID NOT ALLOW HIM

8   TO PARTICIPATE IN A CRIME.  KEEPING HIM IN LONGER COULD HAVE

9   GONE THE OTHER WAY.

10          BUT, BASICALLY, IT'S NOT CHANGING THE RATE OF

11   RECIDIVISM.  THE NUMBERS ARE SO SMALL THEY'RE INSIGNIFICANT, AND

12   SO IT DOESN'T HAVE ANY IMPACT ON THE OVERALL CRIME PICTURE IN A

13   STATE.

14          **JUDGE KARLTON:**  BUT IT DOES HAVE AN IMPACT.  THE

15   PERSON WHO IS THE VICTIM OF THE CRIME DOESN'T THINK IT'S

16   INSIGNIFICANT AS FAR AS HE OR SHE IS CONCERNED.

17          **THE WITNESS:**  RIGHT.  BUT --

18          **JUDGE KARLTON:**  AND AS TO THAT PERSON -- I MEAN, IT

19   FOLLOWS TO THAT PERSON THAT'S A VERY SERIOUS EVENT WHICH IS

20   CAUSED BY THE EARLY RELEASE.

21          **THE WITNESS:**  CORRECT, BUT THE WAY YOU ALSO HAVE TO

22   LOOK AT THAT, YOUR HONOR, IS THAT -- LET'S SAY IT WAS YOU.

23          **JUDGE KARLTON:**  YOU BET.  I'VE LIVED IN FOUR HOUSES

24   AND HAD FOUR BURGLARIES.

25          **THE WITNESS:**  I'VE HAD FOUR MYSELF AND TWO AGGRAVATED

1  ASSAULTS MYSELF.  I'M WITH YOU.  IT'S NEVER BEEN A PAROLEE, I

2  CAN TELL YOU THAT.  ON EARLY RELEASE YOU GET VICTIMIZED, I

3  DON'T.  IF WE DON'T EARLY RELEASE, YOU DON'T, I DO GET

4  VICTIMIZED.  SO WE CAN HAVE KIND OF A MEETING HERE AND SEE WHO'S

5  MORE VICTIMIZED.  BUT THAT'S THE WAY IT IS.

6          IT'S KIND OF LIKE A RANDOM PROCESS GOING ON.  IF YOU

7  KEPT PEOPLE IN FOR YEARS, THEN YOU GET SOME INCAPACITATION

8  EFFECT, BUT BY MOVING THIS LENGTH OF STAY AROUND, YOU KNOW, IN

9  THESE VERY MODEST LEVELS -- AND, AGAIN, THERE'S A NUMBER OF

10 STUDIES SHOWING THIS -- BY CHANGING THE LENGTH OF STAY, YOU

11 DON'T CHANGE THE RECIDIVISM RATES, YOU DON'T CHANGE THE OVERALL

12 CRIME RATE IN A STATE.  THAT'S GOING TO BE FAIRLY CONSTANT.

13 BY MS. EVENSON

14 Q   WHEN YOU SAY IT DOESN'T CHANGE THE OVERALL CRIME RATE, DOES

15 IT HAVE ANY IMPACT ON THE LIKELIHOOD THAT ANY OF US IN

16 CALIFORNIA WILL BE A VICTIM OF CRIME?

17 A   YOUR LIKELIHOOD IS EXACTLY THE SAME.  YOU HAVE THE SAME

18 PROBABILITY OF BEING VICTIMIZED BY JOHN DOE.  IT'S JUST WHEN HE

19 GETS OUT OR DOESN'T GET OUT.

20          THE OTHER THING PEOPLE NEED TO REMEMBER, A LARGE

21 NUMBER, A LARGE PERCENTAGE OF THESE PEOPLE ARE NOT GETTING

22 ARRESTED.  CRIMINAL CAREERS BEGIN AND THEY END.

23          AND THE RESEARCH DONE IN CALIFORNIA BY THE RAND

24 CORPORATION AND OTHER PEOPLE ON CAREER CRIMINALS FOUND THAT THE

25 VAST MAJORITY OF PRISONERS COMING IN AND COMING OUT ARE INVOLVED

1  IN RELATIVELY LOW EPISODIC CRIMINAL ACTIVITY.  THERE'S A SMALL

2  GROUP, THEY THINK, THAT'S VERY ACTIVE IN THEIR CRIMINAL

3  ACTIVITY.  THAT'S THE GROUP YOU WANT TO INCAPACITATE AS LONG AS

4  YOU CAN.  IF YOU CAN IDENTIFY THEM AND KEEP THEM LOCKED UP, YES,

5  YOU HAVE A POSITIVE IMPACT.

6          BUT THE OTHER GROUP, WHICH IS THE MAJORITY, ARE JUST

7  KIND OF RANDOMLY INVOLVED IN THESE LOW LEVEL KINDS OF

8  ACTIVITIES, THEY ARE NOT BEING AFFECTED -- THEY ARE NOT

9  AFFECTING US IN TERMS OF PROBABILITIES OF COMMITTING CRIMES

10 AGAINST US.  THEY HAVE THE SAME PROBABILITIES WHETHER YOU KEEP

11 THEM IN SIX MONTHS, TWELVE MONTHS, EIGHTEEN MONTHS, BUT YOU HAVE

12 A HUGE IMPACT ON THE PRISON POPULATION AND THE COST OF THAT

13 PRISON SYSTEM.  YOU MOVE THAT PRISON POPULATION DOWN 30 DAYS ANY

14 DIRECTION, YOU ARE TALKING TENS OF MILLIONS OF DOLLARS.  THAT'S

15 WHAT YOU ARE TALKING ABOUT.

16 Q   NOW, DR. AUSTIN, YOUR MODELS IN YOUR REPORT LOOK AT ARREST

17 RATES, BUT CHIEF DYER, WHO SUBMITTED A REPORT FOR THE

18 INTERVENORS IN THIS CASE, ASSUMES THAT FOR EVERY ARREST, A

19 PAROLEE WOULD HAVE ALREADY COMMITTED 12 CRIMES FOR WHICH THEY

20 ARE NOT ARRESTED.  YOU JUST ALLUDED TO THE PORTION OF POPULATION

21 THAT'S A CAREER CRIMINAL.  CAN YOU EXPLAIN WHETHER YOU AGREE

22 WITH DR. DYER'S CONCLUSIONS?

23          **JUDGE KARLTON:**  CHIEF DYER.

24          **MS. EVENSON:**  CHIEF DYER, THANK YOU.

25          **THE WITNESS:**  I READ CHIEF DYER'S -- I HAVE TO

1    CONGRATULATE CHIEF BECAUSE HIS CITY AND COUNTY HAS ONE OF THE

2    LARGEST DROPS IN CRIME RATES IN CALIFORNIA, JUST AN EXTREMELY

3    LARGE DROP IN CRIME.  EVEN THOUGH THEY ARE GETTING MORE PAROLEES

4    EACH YEAR, HE HAS BEEN ABLE TO DO THAT.  SO I CONGRATULATE HIM

5    ON THAT.

6           BUT, BASICALLY, WHAT'S GOING ON THERE IS -- LET ME

7    PUT IT THIS WAY:  HE MENTIONS THE 12 CRIMES FOR EVERY ARREST.

8    NOW, HE DOESN'T CITE ANY STUDIES, SO I HAVE TO SPECULATE WHAT

9    STUDY HE'S TALKING ABOUT, BUT I THINK HE'S TALKING ABOUT A STUDY

10   DONE BY AL BLOOMSTEIN IN THE DISTRICT OF COLUMBIA 30 YEARS AGO,

11   WHERE MR. BLOOMSTEIN IDENTIFIED PEOPLE THAT HE CALLS PERSISTERS.

12   THESE ARE PEOPLE THAT ARE CAREER CRIMINALS.  HE FOUND OF THE

13   PEOPLE BEING ARRESTED, THIS IS A VERY, VERY SMALL PERCENT OF THE

14   POPULATION THAT'S BEING ARRESTED.

15          SO MY NUMBER ONE RESPONSE TO CHIEF DYER IS THAT YOU

16   CANNOT APPLY THE 12-TO-1 TO EVERY PERSON COMING OUT.  THAT WOULD

17   ONLY PERTAIN TO THESE CAREER CRIMINALS WHO ARE VERY ACTIVE AND

18   REPRESENT A VERY SMALL PORTION OF THE POPULATION AS BEING

19   RELEASED FROM PRISON TO HIS COUNTY.  SO THAT PRODUCES A

20   STATISTIC THAT JUST EXAGGERATES THE POTENTIAL DANGER.

21   BY MS. EVENSON

22   Q   NOW, YOU MENTION THAT APPROXIMATELY TEN PERCENT -- OR I

23   DON'T KNOW IF YOU PUT A PERCENT TO IT, BUT A SMALL PERCENTAGE OF

24   THEM ARE ACTUALLY -- OF THE ARRESTS ARE ACTUALLY CAREER

25   CRIMINALS?

1  **A**   THAT'S CORRECT, A SMALL PERCENTAGE.

2  **Q**   AND IN CONJUNCTION WITH THE DIVERSION PROGRAMS OR REDUCTION

3  IN LENGTH OF STAY THAT YOU HAVE SET FORTH, IS IT POSSIBLE TO USE

4  A RISK ASSESSMENT INSTRUMENT THAT WOULD IDENTIFY THOSE

5  INDIVIDUALS AND CULL THEM OUT?

6  **A**   YES, AND THEY SHOULD BE -- THEY SHOULD BE USING RISK

7  ASSESSMENT INSTRUMENTS.  CALIFORNIA IS A LITTLE BIT HAMSTRUNG

8  BECAUSE IT HAS DETERMINATE SENTENCING, AND THAT REDUCES YOUR

9  ABILITY TO DISCRETIONARILY RELEASE PEOPLE.

10          BUT EVEN IF YOU HAVE TO RELEASE PEOPLE, YOU CAN APPLY

11  A RISK ASSESSMENT THAT WOULD THEN TELL THE POLICE OFFICIALS, WE

12  ARE RELEASING JOHN DOE, AND HE IS A HIGH RISK PERSON, WE NEED TO

13  WATCH HIM.

14          I'LL GIVE YOU AN EXAMPLE OF A STATE THAT'S DOING THAT

15  VERY SUCCESSFULLY THAT I'M WORKING WITH, WHICH IS MARYLAND.

16  MARYLAND DOES THAT RISK ASSESSMENT, BECAUSE WE DISCOVERED IN

17  BALTIMORE CITY A LARGE PROPORTION OF THE HOMICIDES AND ATTEMPTED

18  HOMICIDES, EITHER AS A VICTIM OR PERPETRATOR, WERE PEOPLE ON

19  PROBATION, NOT PAROLEES, BUT PROBATIONERS.

20          SO WE EQUIPPED THE PROBATION DEPARTMENT WITH A RISK

21  ASSESSMENT TOOL, AND THEY ARE AGGRESSIVELY SUPERVISING THOSE

22  PEOPLE.  AGGRESSIVE MEANS FIVE CONTACTS A WEEK AND ZERO

23  TOLERANCE.  SO IF THEY GET OFF -- ANY KIND OF INDICATION THEY

24  ARE NOT IN COMPLIANCE, THEY ARE BROUGHT BACK INTO CUSTODY.

25  SINCE WE HAVE BEEN DOING THAT, THE HOMICIDE RATE HAS DROPPED

1    ABOUT 30 PERCENT IN BALTIMORE CITY.

2              SO THIS IS AN EXAMPLE OF NOT RESTRICTING RELEASES TO

3    EVERYONE, BECAUSE ALSO THE PAROLE BOARD IS PAROLING MORE PEOPLE

4    IN MARYLAND, BECAUSE THEY HAVE TO REDUCE THEIR PRISON

5    POPULATION.  SO THEY ARE RELEASING MORE PEOPLE, BUT THOSE

6    THEY'RE RELEASING OR SUPERVISING, THEY'RE TARGETING THEM USING

7    RISK ASSESSMENT.

8              SO IF YOU DO THIS PROPERLY, YOU CAN ACCOMPLISH ALL

9    OUR OBJECTIVES WHICH IS LOWER YOUR COST, LOWER THE POPULATION,

10   MAKE IT A SAFER PLACE FOR PEOPLE TO LIVE.

11   Q    DR. AUSTIN, SOME OF THE PARTIES IN THIS LITIGATION HAVE

12   GIVEN THE OPINION THAT LOCAL RESOURCES FOR PROVIDING

13   REHABILITATIVE PROGRAMS, LIKE DRUG TREATMENT OR MENTAL HEALTH

14   TREATMENT, ARE OVERTAXED.  DON'T THOSE PROGRAMS NEED TO BE IN

15   PLACE BEFORE YOU CAN IMPLEMENT ANY OF THESE POPULATION REDUCING

16   METHODS?

17   A    NO, THEY DON'T.  WHAT THIS WILL DO, THIS WOULD, BASICALLY --

18   AGAIN, GOING BACK TO THE ORIGINAL FLOW DIAGRAM, WHICH IS

19   PRODUCING -- THIS IS WHAT WE'RE DOING NOW IN CALIFORNIA, WHICH

20   HAS THIS HIGH RECIDIVISM RATE, WE CAN TALK ABOUT THAT IF YOU

21   WANT -- THIS WILL LOWER THE PRISON POPULATION AT A LEVEL THAT IT

22   WILL GENERATE, THE EXPERT PANEL ESTIMATED AND I'M ESTIMATING,

23   APPROXIMATELY A BILLION DOLLARS IN SAVINGS A YEAR.

24              MY PROPOSAL WOULD BE TO TAKE A CHUNK OF THAT MONEY

25   AND GIVE THAT TO THE COUNTIES SO THAT THEY CAN MAKE THIS RELEASE

1  PROCESS EVEN SAFER.  IT'S NOT GOING TO JEOPARDIZE PUBLIC SAFETY

2  IF YOU DO IT WITHOUT THE PROGRAMS.  THERE ARE SOME PROGRAMS OUT

3  THERE, AND THEY ARE BEING UTILIZED.  BUT YOU DON'T HAVE TO WAIT

4  FOR THE PROGRAMS TO BE IN PLACE.

5          YOU CAN START THIS PROCESS.  THAT GENERATES --

6  BECAUSE OVER TIME -- THIS IS GOING TO TAKE SOME TIME TO GENERATE

7  THIS REDUCTION.  MONEY WILL START BEING GENERATED.  YOU START

8  FEEDING THAT MONEY TO THE COUNTIES TO PROVIDE SERVICES OR TO

9  INCREASE LAW ENFORCEMENT, WHATEVER IT IS.

10          I'M SURE THE COUNTIES WOULD LIKE TO GET $500 MILLION

11  A YEAR TO DO WHAT THEY WANT WITH THE KINDS OF PEOPLE THAT ARE

12  COMING TO THEIR COMMUNITIES.

13          REMEMBER, ALSO, I'M NOT CHANGING THE NUMBER OF PEOPLE

14  COMING TO THE COUNTIES.  WHEN YOU DO THIS CHANGE IN THE LENGTH

15  OF STAY, THERE IS A PERIOD OF TIME, SHORT PERIOD OF TIME, WHERE

16  YOU HAVE DOUBLE RELEASES, BECAUSE YOU HAVE A GROUP -- GROUP

17  COMING OUT OF THE OLD SYSTEM, THEN A GROUP COMING OUT UNDER THE

18  NEW SYSTEM.  THEY COME OUT SIMULTANEOUSLY.  THAT IS DONE

19  RELATIVELY QUICKLY, THEN THE SYSTEM GOES BACK INTO EQUILLIBRUM.

20  THEN THERE IS NO CHANGE FROM THE FLOW OF PEOPLE FROM WHAT IT IS

21  TODAY COMING INTO THE PRISON.

22          IN FACT, IF WE DIVERT THOSE PAROLE VIOLATERS, THERE

23  WILL BE FEWER COMING OUT OF PRISON BACK TO THE COUNTIES.  THEY

24  WON'T BE GOING THROUGH THAT LOOP-DE-LOOP THING.

25  Q   SO IN YOUR OPINION, THESE PROGRAMS CAN ALL BE IMPLEMENTED

1   EVEN BEFORE THE -- STRIKE THAT.

2            IN YOUR OPINION, THE REDUCTION IN THE LENGTH OF STAY

3   OR THE DIVERSION OF INDIVIDUALS WHO MIGHT OTHERWISE SPEND TIME

4   IN PRISON WOULDN'T CHANGE THE STATUS QUO IN TERMS OF CRIME --

5   LIKELIHOOD OF VICTIMIZATION --

6   **A**   IT'S --

7   **Q**   -- REGARDLESS OF -- I'M SORRY.

8            -- REGARDLESS OF WHETHER THE PROGRAMS, MORE PROGRAMS

9   ARE DEVELOPED AT THE OUTSET?

10  **A**   RIGHT.  WELL, I DID SOME MODELS, AND THE MODELS THAT I WAS

11  USING SHOWED THAT -- I WAS LOOKING AT THE EXTENT TO WHICH THESE

12  PEOPLE GET ARRESTED.  THEY WOULD OTHERWISE HAVE BEEN IN PRISON,

13  NOW THEY'RE OUT, SO YOU CAN CALCULATE AN ARREST RATE THERE, LIKE

14  IN THE FIRST FOUR MONTHS, IF THEY DID FOUR MONTHS SOONER, ET

15  CETERA.  IT'S AN INSIGNIFICANT CHANGE IN THE NUMBER OF PEOPLE

16  BEING ARRESTED IN THOSE COUNTIES.  IT'S AN INSIGNIFICANT CHANGE

17  IN PEOPLE BEING BOOKED INTO THE COUNTY JAILS.

18            IT'S NOT GOING TO HAVE ANY IMPACT AT ALL ON THOSE

19  COUNTIES.  IN FACT, YOU MIGHT SEE -- AND THIS HAS HAPPENED IN

20  EARLY RELEASE STUDIES IN OTHER JURISDICTIONS I'VE DONE, AND

21  OTHER PEOPLE HAVE DONE, CRIME RATES GO DOWN AND ARREST RATES

22  GOING DOWN EVEN AS YOU ARE LOWERING THAT POPULATION, LIKE NEW

23  YORK.

24            SO, YES, THERE WOULD BE NO CHANGE.  YOU DON'T NEED

25  THE PROGRAMS.  BUT MY POSITION WOULD BE TAKE THAT MONEY THAT

1   YOU'RE SAVING AND REINVEST IT IN THE COUNTIES, BECAUSE THAT'S

2   WHERE YOU COULD MAKE IT EVEN A SAFER SITUATION.

3           I MEAN, I UNDERSTAND CHIEF DYER'S STATEMENTS, WHICH

4   ARE WELL NOTED, THAT HE NEEDS SUBSTANCE ABUSE.  HE'S GOT A METH

5   PROGRAM GOING ON.  HE'S NOT GOING TO GET THAT MONEY UNDER THE

6   CURRENT SITUATION.  IT'S ALL GOING TO STATE.  SO UNDER THIS

7   PLAN, WE REINVEST THAT MONEY INTO THE COUNTIES AND ACTUALLY

8   START DEALING WITH THE CRIME PROBLEM IN A MUCH MORE CONSTRUCTIVE

9   MANNER.

10          **MS. EVENSON:**  THANK YOU, DR. AUSTIN.

11          **JUDGE HENDERSON:**  DOES CCPOA HAVE ANY QUESTIONS OF

12  THIS WITNESS?

13          **MS. LEONARD:**  NO, YOUR HONOR.

14          **JUDGE HENDERSON:**  OKAY.  CROSS-EXAMINATION.

15          **MS. JOHNSON:**  DID YOU WANT TO START THAT NOW OR TAKE

16  OUR LUNCH BREAK, YOUR HONORS?

17          **JUDGE HENDERSON:**  OKAY.  LET'S TAKE A LUNCH BREAK.

18  THIS IS A GOOD TIME.  COURT IS IN RECESS FOR AN HOUR.

19               (LUNCHEON RECESS TAKEN.)

20          **THE CLERK:**  PLEASE BE SEATED.

21          **JUDGE HENDERSON:**  OKAY. YOU MAY BEGIN YOUR

22  CROSS-EXAMINATION WHEN YOU'RE READY, COUNSEL.

23          **MS. JOHNSON:**  GOOD AFTERNOON, YOUR HONORS.

24  ///

25  ///

1                       CROSS-EXAMINATION

2   BY MS. JOHNSON:

3   Q.  GOOD AFTERNOON, DR. AUSTIN.

4         IN YOUR DIRECT TESTIMONY, THE TOPIC YOU DISCUSSED WERE

5   POPULATION REDUCTION METHODS THAT COULD BE IMPLEMENTED IN YOUR

6   OPINION WITHOUT AN ADVERSE IMPACT ON PUBLIC SAFETY, CORRECT?

7   A.  YES.

8   Q.  IN YOUR EXPERT REPORTS, YOUR FIRST EXPERT REPORT IN

9   PARTICULAR, YOU DIDN'T DISCUSS THAT.  YOU DISCUSSED ANOTHER

10  TOPIC, IF YOU RECALL?

11  A.  YES.

12  Q.  OKAY.  WE'RE GOING TO START WITH THAT TOPIC.

13            MS. JOHNSON:  I JUST WANTED TO INFORM EVERYBODY OF

14  KIND OF TOPIC SHIFT?

15            JUDGE REINHARDT:  THIS ISN'T PHASE I, IS IT?

16            MS. JOHNSON:  I DON'T BELIEVE IT IS PHASE I.

17            JUDGE REINHARDT:  I HAVE NO IDEA WHAT THE TOPIC IS,

18  SO --

19            MS. JOHNSON:  I JUST WANTED TO INFORM YOU --

20            JUDGE REINHARDT:  THAT'S FINE.

21            MS. JOHNSON:  I'M WANTED TO INFORM YOU.  I JUST

22  WANTED TO LET EVERYONE KNOW IF I START ASKING QUESTIONS ON A

23  DIFFERENT SUBJECT, THAT'S WHY I'M DOING THAT.

24            JUDGE KARLTON:  IT'S NOT CLEAR TO ME THAT'S PROPER

25  CROSS-EXAMINATION.  IF YOU ARE SHIFTING TO A TOPIC THAT HE

1  HASN'T TESTIFIED TO, HE BECOMES YOUR WITNESS.

2           **MS. JOHNSON:**  HIS AFFIDAVIT, HIS EXPERT REPORTS ARE

3  IN EVIDENCE.

4           **JUDGE KARLTON:**  I SEE.

5           **MS. JOHNSON:**  HE SIMPLY DIDN'T ADDRESS IT ON DIRECT

6  EXAMINATION IN THIS COURTROOM.

7           **JUDGE KARLTON:**  I GOT YOU.  I UNDERSTAND NOW.

8           GO AHEAD.

9  **BY MS. JOHNSON:**

10 **Q.**  DR. AUSTIN, YOU OPINED IN YOUR NOVEMBER, 2007 REPORT THAT

11 THE ONLY REMEDY THAT WILL FULFILL THE REQUIREMENTS SET FORTH BY

12 THE COLEMAN AND PLATA COURTS IS A PROMPT REDUCTION OF THE

13 CALIFORNIA PRISON POPULATION, CORRECT?

14 **A.**  WHAT PAGE ARE YOU --

15 **Q.**  PAGE 21, PARAGRAPH 54.

16 **A.**  YES.

17 **Q.**  AS APPENDIX B TO YOUR NOVEMBER, 2007 REPORT YOU ATTACHED A

18 TWO-AND-A-HALF PAGE LIST OF DOCUMENTS, QUOTE:

19           "PROVIDED TO YOU BY PLAINTIFFS' COUNSEL."

20           CORRECT?

21 **A.**  YES.

22 **Q.**  APPENDIX B IS A LIST OF DOCUMENTS PROVIDED YOU TO AS

23 DISTINCT FROM A LIST OF DOCUMENTS THAT YOU KNOW THAT YOU READ,

24 CORRECT?

25 **A.**  YES.

1  Q.  I'M SORRY.  I COULDN'T HEAR YOU.

2  A.  YES.

3  Q.  WITHOUT LOOKING AT EACH OF THE DOCUMENTS ON THE

4  TWO-AND-A-HALF PAGE LIST, YOU CANNOT TELL ME WHICH OF THE

5  DOCUMENTS YOU ACTUALLY REVIEWED IN FORMING YOUR OPINION, CAN

6  YOU?

7  A.  CAN I TELL YOU WHICH DOCUMENTS I REVIEWED?

8  Q.  YOU REVIEWED ON THAT LIST, THAT APPENDIX B.

9  A.  I'D HAVE TO STUDY THEM, SO I DON'T KNOW.

10  Q.  YOU HAVE A PH.D. IN SOCIOLOGY, CORRECT?

11  A.  YES, I DO.

12  Q.  YOU DO NOT HAVE ANY MEDICAL TRAINING, EDUCATION OR

13  EXPERIENCE, DO YOU?

14  A.  NO, I HAVE NO MEDICAL DEGREE.

15  Q.  YOU DO NOT HAVE ANY MENTAL HEALTHCARE TRAINING, EDUCATION OR

16  EXPERIENCE DO YOU?

17  A.  NO, I DO NOT.

18  Q.  I'M SORRY.  I'M HAVING A HARD TIME HEARING.  COULD YOU SPEAK

19  --

20  A.  NO, I DO NOT.  SORRY.

21  Q.  YOU SERVED AS A SPECIAL MONITOR IN TWO JUVENILE CORRECTIONAL

22  SYSTEMS WHICH WERE SUBJECT TO AGREEMENTS WITH THE U.S.

23  DEPARTMENT OF JUSTICE REGARDING MEDICAL AND MENTAL HEALTHCARE,

24  CORRECT?

25  A.  THAT WAS PART OF THE AGREEMENT.  THE AGREEMENTS WERE BROADER

1  THAN THAT, BUT MEDICAL AND MENTAL HEALTH AREAS WERE PART OF THE

2  AGREEMENT.

3  **Q.**  THOSE SYSTEMS WERE IN GEORGIA AND LOUISIANA, CORRECT?

4  **A.**  THAT'S CORRECT.

5  **Q.**  WHEN YOU WORKED AS A SPECIAL MONITOR FOR GEORGIA AND

6  LOUISIANA, YOU HIRED MEDICAL AND MENTAL HEALTH EXPERTS IN BOTH

7  STATES TO DO THEIR OWN ASSESSMENTS OF WHETHER THE STATES WERE IN

8  COMPLIANCE WITH THE AGREED-TO MEDICAL AND MENTAL HEALTHCARE

9  STANDARDS, CORRECT?

10 **A.**  WELL, THEY WERE -- THE WAY IT WORKED IN BOTH THE STATES --

11 LET ME GO BACK.

12              IN GEORGIA, I SUBMITTED NAMES OF PEOPLE TO BE MEDICAL

13 EXPERTS.  AND THEY HAD TO BE AGREED TO BY BOTH PARTIES. AND

14 THEIR JOB WAS TO DO ANALYSIS FOR ME. AND THEN, THEY WOULD REPORT

15 THEIR FINDINGS TO ME.  AND THEN, I WOULD -- I WAS ULTIMATELY

16 RESPONSIBLE FOR THE PRODUCTION OF THE FINAL DETERMINATION OF

17 WHETHER OR NOT, YOU KNOW, THE STATE WAS IN COMPLIANCE WITH THE

18 MOA AGREEMENTS.

19 **Q.**  THEY DID THEIR OWN INDEPENDENT ASSESSMENT OF WHETHER OR NOT

20 THE STATES WERE IN COMPLIANCE, CORRECT?

21 **A.**  THEY DID THEIR OWN INDEPENDENT ASSESSMENTS, BUT I WAS

22 INVOLVED IN THOSE ASSESSMENTS.

23 **Q.**  YOU WERE INVOLVED IN OVERSEEING, OVERVIEWING THE WORK THEY

24 DID AS MENTAL AND MEDICAL HEALTH EXPERTS.

25 **A.**  NO, I WOULD -- OKAY. GEORGIA, FOR EXAMPLE, WAS DR. PABLO

1  STEWART.  AND DR. STEWART AND I WOULD JOINTLY VISIT FACILITIES

2  AND JOINTLY LOOK AT RECORDS, JOINTLY DO INTERVIEWS.

3          I WOULD DEPEND UPON HIS OPINION AS TO WHAT HE WAS

4  SEEING AS TO WHETHER OR NOT THEY WERE IN COMPLIANCE.  BUT IT

5  WASN'T LIKE THEY WERE COMPLETELY ISOLATED FROM ME.  I WAS

6  USUALLY WITH HIM, IN PARTICULAR, ON THE MEDICAL AND MENTAL

7  HEALTH AREAS.

8  Q.  YOU HIRED MEDICAL AND MENTAL HEALTH EXPERTS TO WORK UNDER

9  YOU, RATHER THAN JUST DOING THE ASSESSMENTS DIRECTLY YOURSELF

10 BECAUSE YOU'RE NOT A DOCTOR OR PSYCHIATRIST.  SO YOU FELT YOU

11 NEEDED TO GET PEOPLE WITH EXPERTISE IN THOSE AREAS, DIDN'T YOU?

12 A.  IN PART, YES. IT WAS ALSO A REQUIREMENT OF THE MOA.

13 Q.  PRIOR TO THIS CASE, OTHER THAN MEDICAL AND MENTAL HEALTH

14 SCREENING AS A COMPONENT OF INMATE CLASSIFICATION AND YOUR WORK

15 AS A SPECIAL MONITOR IN GEORGIA AND LOUISIANA, YOU HAVE NOT DONE

16 ANY WORK THAT RELATES TO MEDICAL AND MENTAL HEALTHCARE IN

17 PRISONS, HAVE YOU?

18 A.  WELL, I WOULDN'T SAY THAT. I MEAN, FOR EXAMPLE, I'M ALSO

19 CALLED UPON TO PUT IN PLACE WHAT THEY CALL "A CLASSIFICATION

20 SYSTEM."  AND THOSE CLASSIFICATION SYSTEMS HAVE SCREENING

21 COMPONENTS IN THEM THAT ARE DESIGNED TO LOOK AT MEDICAL MENTAL

22 HEALTH INDICATORS.  AND I DO DESIGN THOSE, BUT I DO THAT IN

23 CONSULTATION WITH PROFESSIONALS LIKE YOU'RE SUGGESTING I RELY

24 UPON, HELPFUL TO TELL ME WHAT'S THE PROPER QUESTIONS TO ASK.

25 Q.  OKAY.  SO LET ME REPEAT MY QUESTION BECAUSE I THINK YOU

1  MISSED IT.

2          OTHER THAN THIS CASE AND OTHER THAN MEDICAL AND

3  MENTAL HEALTH SCREENING AS A COMPONENT OF INMATE CLASSIFICATION,

4  AND YOUR WORK AS SPECIAL MONITOR IN GEORGIA AND LOUISIANA, YOU

5  HAVE NOT DONE ANY WORK THAT RELATES TO MEDICAL OR MENTAL

6  HEALTHCARE IN PRISONS, HAVE YOU?

7  **A.**  THAT'S CORRECT, YES.

8  **Q.**  YOU SERVED ON CDCR'S EXPERT PANEL ON ADULT OFFENDER REENTRY

9  AND RECIDIVISM REDUCTION PROGRAMMING, CORRECT?

10  **A.**  CORRECT.

11  **Q.**  YOU WERE A MEMBER OF THE MODEL PROGRAM SUBCOMMITTEE OF THE

12  EXPERT PANEL, CORRECT?

13  **A.**  YES.  I WAS IN THAT PARTICULAR COMMITTEE, YES.

14  **Q.**  I'M SORRY?

15  **A.**  I WAS PART OF THAT COMMITTEE.  BUT LET ME ALSO ADD THAT MR.

16  JACOBSEN, DR. JACOBSEN AND I WERE DESIGNATED TO AUTHOR THE

17  SECTION -- I THINK IT'S CALLED "APPENDIX E," WHICH IS DEVELOPING

18  THE COST ESTIMATES AND THE POPULATION REDUCTION ESTIMATES.  I

19  BELIEVE IT'S APPENDIX E TO THE EXPERT PANEL REPORT.

20          THERE WAS A SEPARATE GROUP.  WE HAD ANOTHER TASK WE

21  WERE ASKED TO DO.  AND I WAS ALSO ASKED TO AUTHOR THE

22  RECOMMENDED 24-MONTH IMPLEMENTATION PLAN THAT WOULD REDUCE THE

23  POPULATION AND ALSO PROVIDE THE PROGRAMS.

24          SO I ALSO DID THAT, AS WELL.

25  **Q.**  AS A MEMBER OF THE EXPERT PANEL, YOU DID NOT STUDY THE

1  MEDICAL OR MENTAL HEALTHCARE DELIVERY SYSTEMS IN CALIFORNIA'S

2  PRISONS, DID YOU?

3  **A.**  NO, WE DID NOT.

4  **Q.**  YOU TOURED CALIFORNIA MEN'S COLONY IN APRIL, 2007 IN YOUR

5  CAPACITY AS A MEMBER OF THE EXPERT PANEL, CORRECT?

6  **A.**  I DID.

7  **Q.**  AS A MEMBER OF THE EXPERT PANEL, YOU ALSO TOURED LANCASTER

8  PRISON IN LOS ANGELES IN 2005, CORRECT?

9  **A.**  I DON'T BELIEVE I TOURED -- NO, I DID NOT TOUR -- I DID TOUR

10  LANCASTER, BUT NOT -- I DON'T BELIEVE I DID THAT AS PART OF THE

11  EXPERT PANEL GROUP. I THINK THAT WAS PART OF A -- IF IT WAS

12  2005, MY RECOLLECTION THAT WAS PART OF AN EFFORT THAT THE CDCR

13  WANTED ME TO LOOK AT FUNDING FROM THE OPEN SOCIETY INSTITUTE TO

14  LOOK AT A MODEL REENTRY PROGRAM AT LANCASTER.

15          I BELIEVE THAT WAS THE REASON FOR IT IN 2005.

16  **Q.**  THE PURPOSE OF YOUR TOURS OF CALIFORNIA MEN'S COLONY AND

17  LANCASTER WAS TO -- WAS NOT TO EVALUATE MEDICAL OR MENTAL

18  HEALTHCARE, CORRECT?

19  **A.**  THAT'S CORRECT.

20  **Q.**  WHEN YOU WROTE YOUR NOVEMBER, 2007 REPORT IN WHICH YOU

21  OPINED THAT THERE'S -- THE ONLY REMEDY THAT WILL FULFILL THE

22  REQUIREMENTS SET FORTH BY THE COLEMAN AND PLATA COURTS IS A

23  PROMPT REDUCTION OF THE CALIFORNIA PRISON POPULATION, YOU WERE

24  NOT AWARE OF THE STATUS OF MEDICAL OR MENTAL HEALTHCARE DELIVERY

25  AT CALIFORNIA MEN'S COLONY, WERE YOU?

1  **A.**  NO, I DID NOT STUDY THE CMC MEDICAL SYSTEM.

2  **Q.**  APPENDIX B OF YOUR NOVEMBER, 2007 REPORT INDICATES THAT

3  PLAINTIFFS' COUNSEL PROVIDED YOU WITH A SELECTION OF DOCUMENTS

4  FROM THE CSP LANCASTER COLEMAN TOUR BINDER, MAY 15TH THROUGH

5  18TH, 2007 MONITORING TOUR.

6         APPENDIX B DOES NOT INDICATE THAT PLAINTIFFS' COUNSEL

7  PROVIDED YOU WITH ANY OF THEIR OTHER MONITORING TOUR DOCUMENTS,

8  DOES IT?

9  **A.**  I'M SORRY.  WHAT'S YOUR QUESTION, AGAIN?

10 **Q.**  APPENDIX B --

11 **A.**  GO BACK TO THE FIRST QUESTION.

12 **Q.**  OKAY. SOMEWHERE IN THAT APPENDIX --

13 **A.**  OKAY.

14 **Q.**  -- INDICATES THAT PLAINTIFFS' COUNSEL PROVIDED YOU WITH A

15 SELECTION OF DOCUMENTS FROM THE CSP LANCASTER COLEMAN TOUR

16 BINDER.

17 **A.**  ON THE TOUR THAT I TOOK AT LANCASTER?

18 **Q.**  NO.  THIS IS THEIR OWN TOUR. I DON'T ACTUALLY KNOW.

19 **A.**  BECAUSE I --

20 **Q.**  DID YOU TOUR LANCASTER?

21 **A.**  YES, I TOURED IT.  I TOURED IT IN THE COMPANY OF MICHAEL

22 BIEN AND HIS COUNSEL.

23 **Q.**  DO YOU RECALL WHEN YOU TOURED IT?

24 **A.**  NOT OFF THE TOP OF MY HEAD, BUT IT WAS --

25 **Q.**  I THINK YOU TOURED THAT IN NOVEMBER OF 2007.

1           THAT'S WHAT IT SAYS IN YOUR EXPERT REPORT.

2   **A.**  YES, IF THAT'S THE CASE.

3   **Q.**  THIS IS FROM MAY OF 2007, SO I BELIEVE THIS IS ACTUALLY ONE

4   OF THEIR OWN TOURS THAT THE PLAINTIFFS DID.

5   **A.**  OKAY.  I'LL TAKE YOU AT YOUR WORD.

6   **Q.**  OTHER THAN THAT TOUR, YOU WEREN'T PROVIDED WITH ANY OF

7   PLAINTIFFS' COUNSEL'S OTHER MONITORING TOUR OF DOCUMENTS, WERE

8   YOU?

9   **A.**  CAN YOU REPEAT THAT, AGAIN?  I WAS NOT PROVIDED WITH WHAT?

10  **Q.**  OTHER THAN THAT TOUR -- THOSE TOUR DOCUMENTS --

11  **A.**  YES.

12  **Q.**  -- PLAINTIFFS' COUNSEL DID NOT PROVIDE YOU WITH ANY OF THEIR

13  OTHER MONITORING TOUR DOCUMENTS, DID THEY?

14  **A.**  ON LANCASTER?

15  **Q.**  NO, OF ANY OF THEIR OTHER PRISON TOURS.

16  **A.**  I DON'T KNOW. I'D HAVE TO -- I'M NOT PREPARED TO SAY "YES"

17  OR "NO" TO THAT. YOU MAY BE CORRECT.  I'M NOT SURE.

18  **Q.**  OKAY. SO YOU'RE NOT SURE WHAT DOCUMENTS YOU REVIEWED IN

19  PREPARING YOUR NOVEMBER, 2007 REPORT?

20  **A.**  WELL, QUITE FRANKLY, I WASN'T PREPARED TO GO OVER THIS

21  TESTIMONY, SO -- I WAS PREPARED TO TALK ABOUT THE ISSUES THAT I

22  WAS ASKED TO APPEAR TODAY.  SO I HAVEN'T STUDIED THIS IN ABOUT A

23  YEAR, YEAR-AND-A-HALF.  SO FOR ME TO SAY "YES" OR "NO" -- AND

24  I'D LIKE TO RESPOND, BUT I WOULD LIKE TO HAVE SOME TIME TO STUDY

25  IT, BUT I DON'T THINK THE COURT WANTS TO SEE THAT TIME.

1  Q.    SO PLAINTIFF'S COUNSEL PREPARED A MONITORING TOUR REPORT

2  OF THEIR VISIT.

3          **JUDGE KARLTON:**  MA'AM, I WANT TO TELL YOU IT'S THE

4  JUDGMENT -- I KNOW OF ALL THREE JUDGES -- THAT CROSS-EXAMINATION

5  OF THIS WITNESS IS TERRIFICALLY IMPORTANT FOR YOUR CASE.

6          WHAT YOU ARE DOING NOW AS BEST I CAN TELL IS NOT

7  HELPFUL. NOW, YOU CAN CONTINUE, IF YOU WANT TO.  BUT IF YOU CAN

8  GET TO MATERIAL THAT HE TESTIFIED ABOUT, THAT WOULD BE VERY

9  HELPFUL.

10          **MS. JOHNSON:**  WE'RE GOING TO GET THERE, YOUR HONOR.

11          **JUDGE KARLTON:**  I KNOW?  AND SOMEDAY I'LL HAVE

12  GRANDCHILDREN.

13          GO AHEAD. GO AHEAD.

14          I'VE TOLD YOU SOMETHING THAT I WOULD HAVE HOPED WOULD

15  BE HELPFUL TO YOU, BUT IF YOU DON'T THINK SO, PROCEED AS YOU

16  CHOOSE.

17  **BY MS. JOHNSON:**

18  Q.  PLAINTIFFS' COUNSEL PREPARED A MONITORING TOUR REPORT OF

19  THEIR VISIT TO CALIFORNIA'S MEN'S COLONY ON JULY 10TH AND 11TH,

20  2007, WHICH WAS JUST A FEW MONTHS AFTER YOUR OWN VISIT FOR THE

21  EXPERT PANEL, WHICH IS MARKED AS DEFENDANTS' TRIAL EXHIBIT 1080.

22          THE MONITORING LETTER STATES:

23              "DURING THE YEAR SINCE MY JULY, 2006 VISIT, CMC

24          MADE CONSIDERABLE STRIDES TOWARD IMPLEMENTING THE

25          INMATE MEDICAL SERVICES PROGRAM POLICIES AND

1    PROCEDURES, AND THE RESULTS ARE IMPRESSIVE. THE

2    PRISON HAS MADE THE TRANSITION FROM A PCP-FOCUSSED

3    SICK CALL SYSTEM INITIATED BY PATIENT SIGNUPS TO ONE

4    THAT INCORPORATES THE RN FACE-TO-FACE TRIAGE PROCESS

5    WITH PATIENTS SUBMITTING SICK CALL SLIPS. PROPERLY

6    EQUIPPED, CLEAN AND PRIVATE EXAM ROOMS HAVE BEEN

7    CREATED ON EACH OF THE YARDS ON BOTH EAST AND WEST.

8    AS DETAILED BELOW, BASED UPON REVIEW OF THE

9    SCHEDULING DATA AND RECENTLY SUBMITTED SICK CALL

10   SLIPS, IT APPEARS THAT THE PATIENTS ARE USUALLY SEEN

11   BY AN RN CERTIFIED IN PROTOCOLS WITHIN ONE BUSINESS

12   DAY OF RECEIPT OF THE SICK CALL SLIPS.  AND THAT THE

13   PATIENTS REQUIRING FOLLOW-UP WITH A PCP ON A ROUTINE

14   BASIS ARE SEEN WITHIN 14 DAYS."

15   THE LETTER CONTINUES:

16        "THERE ARE SIGNIFICANT AREAS OF IMPROVEMENT, AS

17   WELL -- OTHER SIGNIFICANT AREAS OF IMPROVEMENT, AS

18   WELL.  THE PRISON HAS ACQUIRED ADDITIONAL

19   TRANSPORTATION VEHICLES TO FACILITATE OFFSITE MEDICAL

20   ENCOUNTERS AND FOR TRANSFERS BETWEEN EAST AND WEST

21   FACILITIES. MEDICAL STAFF HAVE IDENTIFIED ADDITIONAL

22   ORTHOPEDIC PROVIDERS, AND THE BACKLOG COMPRISING

23   HUNDREDS OF PRISONERS THAT EXISTED DURING MY LAST

24   VISIT HAS BEEN ELIMINATED. INDEED, WITH THE NOTABLE

25   EXCEPTION OF PHYSICAL THERAPY, ROUTINE ON-SITE AND

1              OFFSITE SPECIALTY APPOINTMENTS ARE GENERALLY

2              SCHEDULED TO OCCUR WELL WITHIN THE 90-DAY TIME LINE.

3              WITH ITS LOW MEDICAL STAFFING VACANCIES, CMC APPEARS

4              TO BE DOING A GOOD JOB ENSURING THAT PATIENTS RECEIVE

5              TIMELY, PRIMARY AND TERTIARY CARE IN MOST AREAS.

6              CONCERNS RAISED DURING MY LAST VISIT REGARDING THE

7              TRANSFER OF 200 TRIPLE CMS PATIENTS TO WEST WERE

8              ALLAYED AS THE TRANSFER DID NOT MATERIALIZE."

9              WHEN YOU CONCLUDED IN YOUR NOVEMBER, 2007 REPORT THAT

10   THE ONLY REMEDY WHICH WILL FULL-TIME THE REQUIREMENTS SET FORTH

11   BY THE COLEMAN AND PLATA COURTS IS A PROMPT REDUCTION OF THE

12   CALIFORNIA PRISON POPULATION, YOU WERE NOT AWARE OF THIS

13   ASSESSMENT BY PLAINTIFFS' COUNSELS OF IMPROVEMENTS IN MEDICAL

14   CARE DELIVERY AT CALIFORNIA MEN'S COLONY, WERE YOU?

15   **A.**  NO, BUT LET ME ADD SOMETHING. THE REASON THAT I WENT TO CMC

16   ALONG WITH JOAN PETERSILIA AS ART OF THE EXPERT PANEL GROUP WAS

17   BECAUSE CMC HAS ALWAYS BEEN VIEWED IN THE DEPARTMENT AS ONE OF

18   THEIR BEST FACILITIES.  IT IS A FACILITY THAT IS RICH WITH

19   PROGRAMS.  IT'S NOT CROWDED.  IT'S NOT CROWDED BECAUSE OF THE

20   LIMIT ON ITS POPULATION BECAUSE OF ITS INFRASTRUCTURE.

21              SO WE WANTED TO GO TO CMC TO SEE WHAT WOULD BE

22   POSSIBLE WITHIN THE DEPARTMENT OF CORRECTIONS.  AND WE KNEW THAT

23   -- EVERYONE SHOULD KNOW THAT CMC IS PROBABLY ONE OF THE BETTER

24   RUN FACILITIES.

25              SO I TAKE IT THIS IS AN ACCURATE DESCRIPTION, BUT IT

1  WOULD NOT AFFECT MY OPINION ABOUT THE CDCR SYSTEM AS A WHOLE,

2  BECAUSE OBVIOUSLY AS EVERYONE KNOWS WHEN YOU DO MONITORING WORK

3  YOU CAN HAVE FACILITIES THAT ARE IN COMPLIANCE, BUT IF A

4  MAJORITY OF THE FACILITIES ARE NOT IN COMPLIANCE, THEN YOU STILL

5  HAVE ISSUES.

6         SO THAT'S THE ONLY COMMENT THERE. I DON'T WANT TO

7  ARGUE WITH YOU THAT THEY WERE MAKING GREAT IMPROVEMENTS.  BUT I

8  DO THINK IT IS IMPORTANT TO NOTE THAT CMC HAS ALWAYS BEEN VIEWED

9  AS ONE OF THE BEST RUN FACILITIES IN THE SYSTEM.

10 **Q.**  YOU WERE NOT AWARE OF ANY STUDIES THAT TIE THE PERCENTAGE

11 OVER DESIGN CAPACITY TO THE INABILITY TO MEET THE BASIC MEDICAL

12 NEEDS OF PRISONERS, ARE YOU?

13 **A.**  WELL, YEAH. WHEN YOU -- WHEN YOU -- LET ME PUT IT THIS WAY.

14 WHEN YOU TRY TO FIGURE OUT IS A FACILITY OR SYSTEM CAPABLE OF

15 MANAGING ITS PRISON POPULATION PROPERLY, LIKE AS A MONITOR I

16 WOULD SET PERCENTAGES, BUT I WOULD SET THOSE PERCENTAGES BASED

17 ON WHAT I WAS SEEING THE CIRCUMSTANCES TO BE.

18         SO, YES, PERCENTAGES ARE SET WHEN YOU TRY TO

19 EVALUATE -- YOU NEED TO GIVE A MARK TO THE DEPARTMENT WHAT THEY

20 NEED TO ACHIEVE. SO I WOULD SAY YES, PERCENTAGES ARE BEING USED.

21         ARE THERE STUDIES THAT SAY WHEN YOU HIT A CERTAIN

22 PERCENTAGE OR TIPPING POINT IT FALLS INTO DISARRAY?  I'M NOT

23 AWARE OF ANY STUDIES THAT SAID THIS IS THE DEFINITIVE PERCENTAGE

24 YOU HAVE TO HIT.

25         LET ME JUST ADD REAL QUICKLY THAT'S BECAUSE PEOPLE

1  START TALKING ABOUT CAPACITY IN ALL SORTS OF WAYS.  THERE'S

2  DESIGN CAPACITY.  THERE'S OPERATING CAPACITY.  IT REALLY GETS

3  DOWN TO THE FUNCTIONALITY OF THAT PRISON AND THAT PRISON SYSTEM:

4  IS IT ABLE TO PROVIDE THE BASIC CARE IT NEEDS TO, REGARDLESS OF

5  THE LEVEL OF CROWDING THAT MAY BE GOING ON?

6        YOU COULD HAVE A PRISON SYSTEM THAT IS UNDERCROWDED

7  AND STILL NOT BE MEETING MEDICAL MENTAL HEALTHCARE.

8  **Q.**  AND YOU CAN HAVE A SYSTEM THAT WAS OVERCROWDED AND STILL

9  COULD BE MEETING MEDICAL AND MENTAL HEALTHCARE, CORRECT?

10  **A.**  ABSOLUTELY. ABSOLUTELY.

11  **Q.**  YOU TOURED LANCASTER, AGAIN, IN NOVEMBER, 2007 IN YOUR

12  CAPACITY AS AN EXPERT IN THIS CASE; IS THAT CORRECT?

13  **A.**  THAT'S CORRECT.

14  **Q.**  OTHER THAN THAT ONE TOUR OF LANCASTER IN NOVEMBER, 2007 YOU

15  HAVE NOT TOURED ANY OTHER OF CALIFORNIA'S 33 PRISONS IN YOUR

16  CAPACITY AS AN EXPERT IN THIS CASE, HAVE YOU?

17  **A.**  THAT'S CORRECT.

18  **Q.**  ON PAGE FIVE, PARAGRAPH 39 OF YOUR NOVEMBER 2007 REPORT, YOU

19  NOTE THAT:

20        "CALIFORNIA PRISONS HAVE AN ASSAULT RATE OF

21        APPROXIMATELY 5.6 PER 100, OR 5600 PER 100,000 INMATE

22        POPULATION," WHICH YOU STATE IS 20 TIMES THE

23  AGGRAVATED ASSAULT RATE REPORTED BY THE FBI FOR THE NATION,

24  WHICH IS 288 PER 100,000 POPULATION.

25        YOU GO ON TO NOTE THAT:

1                    "THE CDCR POPULATION IS NOT COMPARABLE TO THE

2              U.S. RESIDENT POPULATION."

3              YOU DO NOT KNOW HOW THE RATE OF ASSAULTS IN

4    CALIFORNIA'S PRISONS COMPARES TO THAT OF OTHER STATES' PRISONS,

5    DO YOU?

6    **A.**  NO, THE REASON BEING IS THAT THEY ALL REPORT THEM IN

7    DIFFERENT STANDARDS. THERE IS NO SOURCE YOU CAN GO TO THAT SHOWS

8    THE RATES BY EVERY STATE IN THE COUNTRY.

9    **Q.**  SO YOU DO NOT KNOW WHETHER CALIFORNIA PRISONS HAVE AN

10   EXTREMELY HIGH RATE OF ASSAULTS AS COMPARED TO OTHER STATE

11   PRISONS, DO YOU?

12   **A.**  THAT'S CORRECT. I CAN MAKE COMPARISONS, BUT IT'S HARD TO

13   SAY, YOU KNOW, THE EXTENT TO WHICH -- HOW COMPARABLE THOSE RATES

14   ARE TO OTHER PRISON SYSTEMS.

15   **Q.**  WHEN YOU INCLUDED IN YOUR NOVEMBER, 2007 REPORT THAT:

16                    "THE ONLY REMEDY WHICH WILL FULFILL THE

17              REQUIREMENTS SET FORTH BY THE COLEMAN AND PLATA

18              COURTS IS A PROMPT REDUCTION OF THE CALIFORNIA PRISON

19              POPULATION," WERE YOU AWARE THAT IN HIS MAY 31ST,

20   2007 REPORT, WHICH IS DEFENDANTS' TRIAL EXHIBIT 1292, ON PAGE

21   15, BEFORE THE SPECIAL MASTER IN THE COLEMAN CASE HAD STATED

22   THAT:

23                    "REDUCTION OF THE CASELOAD BY 9500

24              INMATE-PATIENTS WOULD REQUIRE AN OVERALL POPULATION

25              DROP OF 50,000 INMATES.  BUT EVEN SUCH A DECLINE IN

1              THE OVERALL POPULATION WOULD PROBABLY NOT RAISE

2         STAFFING RESOURCES INTO EQUILLIBRIUM WITH THE MENTAL

3         HEALTHCARE CASELOAD.  CLINICIANS CANNOT BE SPREAD OUT

4         EVENLY LIKE BUTTER OVER THE MDHS CASELOAD."

5         GOING DOWN, HE SAYS:

6              "THE IMPACT OF A POPULATION CUT ON MENTAL HEALTH

7         STAFFING DEPENDS MORE ON THE NATURE OF THE PROGRAM

8         CUT THAN THE OVERALL NUMBERS OF INMATES DIVERTED.

9         EVEN THE RELEASE OF 100,000 INMATES WOULD LIKELY

10        LEAVE THE DEFENDANTS WITH A LARGELY UNMITIGATED NEED

11        TO PROVIDE INTENSE MENTAL HEALTH SERVICES TO PROGRAM

12        POPULATIONS THAT WOULD REMAIN UNDIMINISHED BY A

13        REDUCTION I OF SOME 19,000 3CMS INMATES.

14             "THIS WOULD SUFFICE TO COVER JUST THE FUNCTIONAL

15        VACANCY RATE AMONG CASE MANAGERS.  ONLY A TARGETED

16        RELEASE OF SERIOUSLY MENTAL ILL INMATES WILL SERVE

17        QUICKLY TO REVERSE CURRENT DEFICIENCIES, ESPECIALLY

18        BED AND SPACE PROGRAM SPACE."

19        WERE YOU AWARE OF THAT?

20   A.  I BELIEVE I READ THAT, YES.

21   Q.  THAT DIDN'T IMPACT YOUR CONCLUSION IN ANY WAY?

22   A.  NO, BECAUSE HE'S NOT PROPERLY MODELING THIS ISSUE. WHEN HE

23   USES THE PHRASE:

24             "EVEN THE RELEASE OF 100,000 INMATES," AND

25   THIS IS -- YOU SEE THIS KIND OF -- THEY CALL IT KIND OF "SLOPPY

1  LANGUAGE."

2            AS I ALREADY POINTED OUT, WE RELEASE OVER 140,000

3  EVERY YEAR, SO I THINK HE MAY BE TALKING ABOUT A REDUCTION IN

4  THE AVERAGE DAILY POPULATION. BUT I DON'T THINK I NECESSARILY

5  AGREE WITH HIS CONCLUSIONS THERE.

6            YOU'D HAVE TO MODEL THE REDUCTION, WHO IS BEING

7  TARGETED, AND THEN SEE WHAT THE RESIDUAL POPULATION IS.

8            I DID FEEL PRETTY STRONGLY THAT ONE OF THE -- YOU

9  KNOW, BECAUSE ORIGINALLY I WENT TO LANCASTER BECAUSE IT'S A

10  RECEPTION CENTER.  AND ONE OF THE MAJOR ISSUES THAT I SAW THERE

11  WAS BECAUSE OF THE CLOGGING OF INMATES THERE IT WAS VERY

12  DIFFICULT TO DO A PROPER ASSESSMENT AND SERVICE DELIVERY WITH

13  THE CROWDING FACTOR.

14            AND SO IN MY OPINION THE DIVERSION OF THE TECHNICAL

15  VIOLATORS AND THE DIVERSION OF THE SHORT-TERMERS BASICALLY WILL

16  CLEAN UP THIS PROBLEM IN THE RECEPTION CENTERS BY THEMSELVES.

17            AND THEN, WE'D HAVE TO SEE WHAT'S LEFT IN THE

18  RESIDUAL POPULATION; IS THERE ENOUGH SERVICES THERE.

19            SO I RECALL READING THIS, BUT I DON'T BELIEVE I

20  NECESSARILY AGREE WITH HIS CONCLUSIONS.

21  Q.  SITTING HERE TODAY DO YOU KNOW WHAT PERCENTAGE OF THE CDCR

22  PRISON POPULATION HAS MENTAL ILLNESS?

23  A.  WELL, THERE'S TWO TYPES.  AND I CAN'T OFF THE TOP OF MY

24  HEAD -- THERE'S A RELATIVELY SMALL GROUP THAT HAS THE INTENSIVE

25  MENTAL HEALTH NEEDS.  AND THEN, THERE'S A LARGER GROUP THAT HAS

1  MENTAL HEALTH ISSUES, BUT THEY ARE ON MEDICATION GETTING

2  TREATMENT.

3         AS YOU LOWER THAT POPULATION, UNLESS THEY ARE NOT

4  BEING TARGETED PROPERLY, THEY WILL BE DROPPING, ALSO. THAT'S WHY

5  I THINK IT'S IMPORTANT YOU'D HAVE TO MODEL THE WHOLE SYSTEM TO

6  SEE WHAT'S LEFT IN TERMS OF MEDICAL AND MENTAL HEALTH INMATES,

7  AND THEN SEE WHERE THEY ARE HOUSED AND SEE WHAT THE SERVICES

8  ARE.

9         BUT, AGAIN, I THINK THIS IS KIND OF SPECULATIVE. I

10  DON'T NECESSARILY AGREE WITH IT.

11  **Q.**  YOU DISAGREE WITH THE COLEMAN SPECIAL MASTER.

12  **A.**  ON THIS MATTER.

13  **Q.**  YOU FEEL THAT YOU'RE MORE QUALIFIED THAN THE COLEMAN SPECIAL

14  MASTER TO OPINE ON THIS TOPIC?

15  **A.**  ON THIS THIS TOPIC, YEAH.

16  **Q.**  IN YOUR AUGUST 15, 2008 REPORT, YOU RENDERED AN OPINION ON

17  WHETHER A PRISONER RELEASE ORDER WOULD HAVE AN ADVERSE IMPACT ON

18  PUBLIC SAFETY OR THE OPERATION OF A LOCAL CRIMINAL JUSTICE

19  SYSTEM, CORRECT?

20         YOUR AUGUST --

21  **A.**  YES.

22  **Q.**  -- 15, 2008 REPORT.

23  **A.**  YES, I SEE IT.

24  **Q.**  YOU DID NOT OFFER AN OPINION ON WHETHER A REDUCTION OF THE

25  PRISON POPULATION IS THE ONLY REMEDY THAT WILL FULFILL THE PLATA

1  AND COLEMAN REQUIREMENTS IN THAT REPORT, DID YOU?

2  **A.**  I'M SORRY.  CAN YOU REPEAT THAT?  I APOLOGIZE.

3  **Q.**  IN YOUR AUGUST 15, 2008 REPORT, AND YOUR TWO LATER  REPORTS

4  --

5  **A.**  OH, 2008.

6  **Q.**  -- IN 2008, YOU DID NOT OFFER AN OPINION ON WHETHER A

7  REDUCTION OF THE PRISON POPULATION IS THE ONLY REMEDY THAT WILL

8  FULFILL THE PLATA AND COLEMAN REQUIREMENTS, DID YOU?

9  **A.**  THAT'S CORRECT.

10  **Q.**  YOU DO NOT KNOW THE STATUS OF MEDICAL OR MENTAL HEALTHCARE

11  DELIVERY IN CALIFORNIA'S PRISONS ANY TIME IN 2008, DO YOU?

12  **A.**  I BELIEVE THAT'S CORRECT, YES.

13  **Q.**  IT'S NOT YOUR OPINION THAT NO MATTER WHAT RESOURCES HE HAS

14  OR WHAT ACTIONS HE TAKES THE RECEIVER CANNOT PROVIDE

15  CONSTITUTIONAL LEVELS OF MEDICAL CARE AT CURRENT POPULATION

16  LEVELS, IS IT?

17  **A.**  WELL, MY OPINION IN READING THE VARIOUS REPORTS IS THAT THEY

18  ARE TRYING VERY HARD, AND THEY ARE BEING UNABLE TO REACH THOSE

19  LEVELS OF CARE, SIMPLY BY THROWING AS MUCH STAFF AND RESOURCES

20  THEY CAN INTO THE EXISTING SYSTEM.

21          IT IS MY OPINION THAT THE ONLY WAY TO REALLY SOLVE

22  THE PROBLEM IS TO REDUCE THAT POPULATION AT SOME LEVEL.  IT HAS

23  TO BE REDUCED FOR THE REASONS I'VE STATED ALREADY.

24  **Q.**  OKAY.  I'M GOING TO LOOK AT YOUR FIRST DEPOSITION OF

25  SEPTEMBER 19, 2008, PAGE 26, LINE 22 -- PAGE 126.

```
 1              READING:
 2                  "IS IT YOUR OPINION THAT NO MATTER WHAT
 3              RESOURCES HE HAS OR WHAT ACTIONS HE TAKES, THE
 4              RECEIVER CANNOT PROVIDE FOR CONSTITUTIONAL LEVELS OF
 5              MEDICAL CARE AT CURRENT POPULATION LEVELS?
 6                  "ANSWER:  NO."
 7  A.  RIGHT.
 8  Q.  YOU WROTE IN YOUR AUGUST 15, 2008 REPORT ON PAGE EIGHT,
 9  PARAGRAPH 19 --
10              MS. JOHNSON:  AUGUST 15, 2008.
11              THIS IS NOT THE RIGHT PAGE. PAGE EIGHT, PARAGRAPH 19.
12              UP.
13              THAT'S THE WRONG ONE.
14              HOLD ON A SECOND. WAS THAT IT?
15              OH, YES.  THERE WE GO.  THE LAST SENTENCE IN THE
16  FIRST -- TAKE THE LAST SENTENCE OF THE PARAGRAPH, ACTUALLY.
17                  "AND AS WILL BE SHOWN BELOW, COMMA, MODERATELY
18              LOWERING THE PRISON POPULATION AND INCARCERATION RATE
19              WHILE USING EVIDENCE-BASED MODELS FOR REHABILITATION
20              DOES NOT RESULT IN HIGHER CRIME."
21  BY MS. JOHNSON:
22  Q.  DO YOU SEE THAT?
23  A.  YES.
24  Q.  ONE OF THE STATES THAT YOU USE AS AN EXAMPLE OF THE IMPACT
25  OF A REDUCTION IN THE PRISON POPULATION ON THE CRIME RATE IS NEW
```

1   YORK, CORRECT?

2   **A.**   CORRECT.

3   **Q.**   THE PRISON POPULATION REDUCTION IN NEW YORK INVOLVED THE

4   RELEASE OF 24,000 PRISONERS FROM 1997 THROUGH 2006, A NINE-YEAR

5   PERIOD, CORRECT?

6   **A.**   ARE YOU REFERRING TO A REPORT?

7   **Q.**   YOU DON'T RECALL?

8   **A.**   I'M ASKING YOU. ARE YOU REFERRING TO -- WHEN YOU SAY THOSE

9   STATISTICS --

10  **Q.**   I'M ASKING YOU IF YOU RECALL SITTING HERE TODAY WHAT THE

11  PRISON POPULATION REDUCTION IN NEW YORK INVOLVED --

12  **A.**   WELL --

13  **Q.**   -- IN TERMS OF THE NUMBER OF PRISONERS OVER THE NUMBER OF

14  YEARS.

15  **A.**   THEY HAVE A REPORT OUT ABOUT THEIR EFFORTS TO DO THAT. I

16  THINK IT'S REFERENCED IN MY REPORT.

17  **Q.**   IS WHAT I SAID INCORRECT?

18  **A.**   WELL, I NEED TO KNOW THE REPORT THAT YOU'RE REFERRING TO,

19  BECAUSE NEW YORK PUTS OUT A LOT OF REPORTS.

20  **Q.**   I'M REFERRING TO YOUR REPORT, SIR.

21  **A.**   AND THE ONE THAT I CITED IN THE NEW YORK REPORT.

22  **Q.**   I'VE REFERRED TO YOUR SECOND REPORT ON PAGE 11, PARAGRAPH

23  28. I'M SORRY. PAGE -- YES, THAT IS -- YES, PAGE 11, PARAGRAPH

24  28.

25  **A.**   PAGE 11?  OKAY. JUST A SECOND.

1  Q.  A REPORT RELEASED BY THE NEW YORK STATE DEPARTMENT OF

2  CORRECTIONS ESTIMATES THAT OVER 24,000 PRISONERS WERE RELEASED

3  AN ESTIMATED SIX MONTHS EARLIER FROM 1997 THROUGH 2006.

4  A.  CORRECT.

5  Q.  SO THAT'S 24,000 PRISONERS OVER A NINE-YEAR PERIOD.

6  A.  CORRECT.  OVER A LONG PERIOD OF TIME, YES.

7  Q.  SO THE PRISON POPULATION REDUCTION IN NEW YORK AVERAGED

8  ABOUT 2600 PRISONERS PER YEAR, CORRECT?

9  A.  NO. I DON'T THINK THAT'S --

10  Q.  24,000 DIVIDED BY NINE IS NOT 2600?

11  A.  RIGHT. AGAIN, THE PROBLEM HERE IS THAT NEW YORK'S PRISON

12  POPULATION DROPPED FOR A NUMBER OF REASONS. THIS IS PART OF IT.

13          BUT THE OTHER PART IS THE CRIME RATE WAS GOING DOWN.

14  I DON'T WANT TO GO INTO TOO MUCH DETAIL. THERE'S A REPORT

15  WRITTEN ABOUT THIS.

16          AND IT WAS BECAUSE OF ACTIONS BEING TAKEN LARGELY IN

17  NEW YORK CITY WHERE THEY CHANGED ARREST POLICIES.  THEY STARTED

18  ARRESTING MORE PEOPLE FOR MISDEMEANORS AS OPPOSED TO FELONIES.

19  AND, THEREFORE, THE PRISON ADMISSION INTAKE STARTED TO GO DOWN.

20  THAT WAS ONE PART.

21          THE OTHER PART IS THIS PROGRAM WHERE THEY WERE

22  RELEASING THEM EARLY THROUGH A CREDIT REDUCTION PROGRAM. BUT YOU

23  CAN'T JUST TAKE THE SEVEN YEARS AND DIVIDE IT, YOU KNOW, BY THAT

24  NUMBER AND SAY THAT'S WHAT IS CAUSING -- IT WENT DOWN BY THAT

25  AMOUNT.  IF YOU ACTUALLY LOOKED AT NEW YORK, IT'S NOT GOING TO

1  BE AT THAT LEVEL SO --

2  **Q.**  DO YOU CONSIDER A REDUCTION IN CALIFORNIA'S PRISON

3  POPULATION OF APPROXIMATELY 52,000 OVER A TWO-YEAR PERIOD A

4  MODERATE REDUCTION IN THE PRISON POPULATION?

5  **A.**  WELL, THE WAY I LOOK AT IT IS YOU HAVE TO LOOK AT WHERE

6  CALIFORNIA IS COMPARED TO THE REST OF THE STATES. THAT WOULD BE

7  A SIGNIFICANT -- NO QUESTION ABOUT IT.  THAT'S A VERY

8  SIGNIFICANT DROP.

9          AND IT MAY SOUND VERY AMBITIOUS TO A LOT OF FOLKS.

10 BUT CALIFORNIA'S INCARCERATION RATE NOW IS APPROXIMATELY -- IT'S

11 ABOVE THE NATIONAL AVERAGE.

12         WHEN I SAY "RATE" THAT'S THE RATE PER CAPITA.  IT'S

13 ABOUT 470, 480 PER 100,000 POPULATION.

14         AND IF YOU DROPPED IT TO THE 50,000 BY 50,000

15 PRISONERS OVER SOME PERIOD OF TIME -- THAT WOULD DEPEND ON HOW

16 YOU DO THAT AND THE STRATEGY FOR DOING IT -- ITS INCARCERATION

17 RATE WOULD THEN DROP TO APPROXIMATELY 350 PER 100,000.

18         NOW THAT'S -- THERE'S 25 STATES IN THE COUNTRY THAT

19 HAVE RATES AT THAT LEVEL OR LOWER, INCLUDING NEW YORK.

20         SO MY -- I GUESS I WOULD SAY TO YOUR QUESTION:  YES,

21 THAT'S A LARGE DROP.  NO QUESTION ABOUT IT.

22         IS IT DOABLE?  ABSOLUTELY YES.

23         IS IT TYPICAL OF OTHER STATES?  YES, AT LEAST HALF OF

24 THE STATES HAVE INCARCERATION RATES AT THAT LEVEL.

25         SO I DON'T SEE IT AS SOMETHING THAT'S NOT DOABLE,

1  UNREASONABLE, BECAUSE HALF THE COUNTRY IS ABLE TO DO IT.

2  **Q.**  OKAY.  SO LET ME -- LET'S TRY THIS AGAIN.

3         ON PAGE EIGHT, JPARAGRAPH 19 OF YOUR REPORT, YOU

4  WROTE:

5             "MODERATELY LOWERING THE PRISON POPULATION AND

6             INCARCERATION RATE WHILE USING EVIDENCED-BASED MODELS

7             FOR REHABILITATION DOES NOT RESULT IN HIGHER CRIME."

8  **A.**  CORRECT.

9  **Q.**  SO MY QUESTION TO YOU IS:  DO YOU CONSIDER A REDUCTION IN

10 CALIFORNIA'S PRISON POPULATION OF APPROXIMATELY 52,000 OVER A

11 TWO-YEAR PERIOD A MODERATE REDUCTION IN THE PRISON POPULATION?

12 **A.**  ABSOLUTELY.  BECAUSE, AGAIN, GOING BACK TO MY CHART, YOU

13 HAVE THIS VERY ABNORMAL PRACTICE GOING ON IN THE STATE OF

14 CALIFORNIA OF THE TECHNICAL PAROLE VIOLATORS.

15         AND THAT PUTS CALIFORNIA IN KIND OF AN ABNORMAL

16 SITUATION.  IT'S LIKE SAYING TO SOMEONE WHO IS REALLY

17 OVERWEIGHT, YOU KNOW:

18             "LISTEN, CAN I GET YOU TO LOSE FIFTY POUNDS," AS

19 OPPOSED TO SOMEONE WHO WEIGHS 200 POUNDS:

20             "CAN YOU LOSE FIFTY POUNDS," AS OPPOSED TO

21 SOMEONE WHO WEIGHS 125 POUNDS:

22             "CAN YOU LOSE FIFTY POUNDS?"

23         SO A STATE THAT HAS GOT THIS BIG BULGE IN IT, IT'S AN

24 EASIER TARGET. IT'S MUCH MORE REASONABLE TO GET THEM TO A LOWER

25 LEVEL.

1          SO I CALL IT "MODERATE" BECAUSE WHAT I'M PROPOSING IS

2    REALLY WHAT WE'VE DONE IN OTHER STATES.  AND IT WILL PRODUCE A

3    LARGE DECLINE, BUT IT'S NOT ANYTHING THAT'S -- THAT A DOCTOR

4    WOULDN'T PRESCRIBE TO A PATIENT IN THAT SITUATION.

5          **JUDGE KARLTON:**  EXCUSE ME, DOCTOR. WHATEVER THE

6    REASON, THERE IS THIS VERY LARGE NUMBER OF PEOPLE IN THE

7    CALIFORNIA SYSTEM. AND THE QUESTION IS WHETHER A REDUCTION OF

8    SOME 52,000 OVER A COUPLE OF YEARS, OR WHATEVER, IS -- I'M

9    SORRY.  I'VE LOST THE -- A MODERATE -- A MODERATE LOWERING OF

10   THE PRISON POPULATION.

11         **THE WITNESS:**  WELL, STATISTICALLY IT'S ABOUT A

12   30 PERCENT OR SO DECLINE.  SO THAT'S SUBSTANTIAL. THAT'S LARGE.

13         FOR EXAMPLE, I'M WORKING IN THE STATE OF LOUISIANA

14   WHICH HAS THE HIGHEST INCARCERATION RATE IN THE WORLD.

15         **JUDGE HENDERSON:**  I THOUGHT D.C. DID, BUT THAT'S ALL

16   RIGHT.

17         **THE WITNESS:**  WELL, FOR CITIES.  IT'S A LOT EASIER TO

18   REDUCE THAT POPULATION THAN IF I GO TO RHODE ISLAND, WHICH HAS

19   AN INCARCERATION RATE OF 185 PER 100,000.

20         SO THAT'S MY POINT, I GUESS.  YES, IT'S SIGNIFICANT.

21   IT'S LARGE.

22         IF YOU'RE ASKING -- AND WHEN I SAY "MODERATE," THE

23   NUMBER ONE THING THAT WILL WORK HERE -- I MEAN, THE TECHNICAL

24   VIOLATION THING TO ME IS -- THAT BUYS YOU, DEPENDING ON HOW YOU

25   DO IT, 10 TO 15,000 INMATES RIGHT THERE.

1      AND THOSE ARE PEOPLE THAT ARE INVOLVED IN ACTIVITIES

2  THAT IN MOST STATES CAN'T GO TO PRISON FOR.  BUT IN CALIFORNIA

3  YOU BRING THEM TO THE PRISON SYSTEM.

4      THAT'S AN EASY ONE TO DO.  AND WE CAN DROP IT PRETTY

5  QUICKLY IF WE DO SOME THINGS THAT OTHER STATES HAVE DONE.

6      THE REAL TOUGH ONE IS GOING TO BE THE LENGTH OF STAY

7  ISSUE. YOU HAVE TO GO AFTER THE LENGTH OF STAY ISSUE.

8      AND BY "MODERATE" THAT'S WHAT I'M TALKING ABOUT.  IN

9  MY REPORT I TALK ABOUT FOUR MONTHS.  YOU COULD MAKE IT FIVE

10  MONTHS, WHATEVER YOU WANT TO USE SO WE CAN GET TO THAT NUMBER.

11      THE EXPERT PANEL ALSO ESTIMATED IN OUR APPENDIX --

12  AND I'LL SAY THIS BECAUSE THIS IS SOMETHING THE STATE WOULD HAVE

13  TO DEAL WITH -- YOU WOULD HAVE TO GO AFTER A CERTAIN GROUP THAT

14  THUS FAR PEOPLE DON'T WANT TO GO AFTER, BUT THEY ARE VERY

15  SUITABLE CANDIDATES.  IN PARTICULAR, THE TWO STRIKERS.  YOU

16  WOULD HAVE TO GO AFTER THE TWO STRIKERS AND GET THEIR SENTENCE

17  TIMES SERVED DOWN MODERATELY.

18      IF YOU DON'T GO AFTER THE TWO STRIKERS, YOU CANNOT

19  HIT THE 50,000 MARK. IF THEY ARE OFF THE TABLE, THEN YOU CAN'T

20  DO IT. IF THEY ARE ON THE TABLE, THEN YOU CAN DO IT.

21      SO IT ALL DEPENDS WHAT THE STATE SAYS IS ON THE

22  TABLE, IS OFF THE TABLE, YOU KNOW.

23      **JUDGE KARLTON:**  WE WOULD NOT HAVE THE POWER -- AT

24  LEAST I DON'T THINK WE WOULD.  I SUPPOSE WE WILL FIND OUT WHEN

25  WE GET BRIEFING FROM PEOPLE.  BUT IT DOES NOT APPEAR TO ME THAT

1  WE WOULD HAVE THE POWER TO ALTER THE SENTENCING DECISIONS MADE

2  BY THE CALIFORNIA LEGISLATURE.

3          THUS, PEOPLE WOULD BE LET OUT -- IF WE ORDERED A CAP,

4  WOULD BE LET OUT WHO WERE UNDER THE PRESENT LAW CAPABLE OF BEING

5  LET OUT.

6          **THE WITNESS:**  RIGHT.

7          **JUDGE KARLTON:**  SO THESE TWO STRIKERS, IF THEY AREN'T

8  CAPABLE OF BEING LET OUT, WOULDN'T BE LET OUT?

9          **THE WITNESS:**  AND I WOULD SAY THERE'S NO STATE THAT

10  I'VE WORKED WITH WHERE YOU'RE TALKING ABOUT THIS KIND OF A

11  DECLINE THAT YOU ARE NOT GOING TO HAVE TO GO AFTER LEGISLATION.

12          THAT'S WHY I THINK IN THE GOVERNOR'S NEW BUDGET, WHEN

13  HE TALKS ABOUT FOUR MONTHS, HE'S TALKING ABOUT GIVING INMATES

14  NOW FOUR MONTHS OFF FOR EACH PROGRAM THEY COMPLETE.

15          HE WAS SILENT ON:  DOES THAT INCLUDE TWO STRIKERS OR

16  NOT?  YOU KNOW, HE DOESN'T TALK ABOUT THE CATEGORY.  HE'S JUST

17  KIND OF PUTTING THAT OUT THERE.

18          BUT YOU WOULD HAVE TO.  YOU WOULD HAVE TO GET

19  LEGISLATIVE REFORM, BECAUSE LEGISLATIVE REFORM GOT YOU INTO THIS

20  SITUATION.  IT'S THE ONLY WAY IT'S GOING TO GET YOU OUT OF THIS

21  SITUATION.

22          **JUDGE KARLTON:**  ARE YOU SAYING -- I'M SORRY, MS.

23  JOHNSON.

24          ARE YOU SAYING THAT GIVEN WHAT I BELIEVE TO BE THE

25  LIMITATIONS ON OUR POWER, A CAP WHICH DOESN'T REACH PEOPLE THAT

1   WE CAN'T REACH BECAUSE OF LEGISLATION WOULD NOT -- WOULD NOT

2   RESULT IN THE LOWERING OF THE POPULATION THAT DID NOT ENDANGER

3   THE PUBLIC?

4           **THE WITNESS:**  REPEAT -- I'M SORRY.

5           **JUDGE KARLTON:**  IT'S VERY COMPLICATED.

6           **THE WITNESS:**  NO, I WANT TO BE CLEAR BEFORE I ANSWER.

7           **JUDGE KARLTON:**  ALL RIGHT.  LET'S START ALL OVER

8   AGAIN.

9           I UNDERSTAND YOU NOW TO BE SAYING THAT IN ORDER FOR

10  THERE TO BE AN EFFECTIVE PRISON LIMITATION ORDER, IT WOULD HAVE

11  TO REACH PEOPLE WHO ARE NOW LEGISLATIVELY BARRED FROM BEING

12  RELEASED.

13          **THE WITNESS:**  WELL, THEY ARE NOT BARRED FROM BEING

14  RELEASED. THEY ARE BEING RELEASED. THE QUESTION IS --

15          **JUDGE KARLTON:**  I MEAN --

16          **THE WITNESS:**  -- HOW LONG?  HOW LONG ARE THEY

17  STAYING?

18          **JUDGE KARLTON:**  RIGHT.

19          **THE WITNESS:**  AND THE ISSUES THAT THE STATE WOULD

20  HAVE TO ADDRESS ARE WHAT THEY CALL THEIR GOOD TIME CREDIT

21  EARNING CLASSES, WHICH ARE 50 PERCENT, 80 PERCENT, 85 PERCENT

22  CLASSES.

23          **JUDGE KARLTON:**  WHATEVER GOOD TIME CLASSES THAT THERE

24  ARE, PERSONS WHO ARE SUBJECT TO TWO STRIKES INCARCERATION ARE

25  NOT ELIGIBLE TO BE RELEASED BEFORE THEIR TERM IS ACTIVELY --

1  ACTUALLY EXPERIENCED, RIGHT?

2          **THE WITNESS:**  THEY HAVE TO SERVE 80 PERCENT.

3          **JUDGE KARLTON:**  OKAY. SO, I THINK WHAT YOU SAID A FEW

4  MOMENTS AGO WAS FOR THERE TO BE AN EFFECTIVE PROGRAM WHICH

5  MODERATELY LOWERS THE PRISON POPULATION, DOES NOT RESULT IN

6  HIGHER CRIME RATE, CRIMES.

7          **THE WITNESS:**  RIGHT.

8          **JUDGE KARLTON:**  BUT IF YOU CANNOT REACH THE TWO

9  STRIKERS, THE QUESTION IS:  CAN YOU HAVE A MODERATE REDUCTION IN

10  THE PRISON POPULATION WHICH DOES NOT --

11          **THE WITNESS:**  YES.  WELL, YOU CAN. I THINK MY

12  ESTIMATE AND THE ESTIMATE BY THE EXPERT PANEL IS IF YOU EXCLUDE

13  THE TWO STRIKERS -- AND LET ME JUST THROW THIS ON THE TABLE,

14  BECAUSE PEOPLE NEED TO HEAR THIS -- LIFERS.  LIFERS ARE ELIGIBLE

15  TO BE RELEASED NOW.  THERE'S A LARGE NUMBER OF LIFERS ELIGIBLE

16  TO BE RELEASED RIGHT NOW UNDER CURRENT LAW.

17          BUT EXCLUDING THAT GROUP AND OTHER

18  POLITICALLY-SENSITIVE GROUPS, YOU CAN STILL ACHIEVE A 30, 35,000

19  POPULATION REDUCTION.  THAT'S ACHIEVABLE NOW.

20          BUT TO GO FURTHER, UP TO 50,000 OR SO, YOU WOULD HAVE

21  TO GET SOME LEGISLATIVE REFORM.

22          I'M NOT AN EXPERT IN THE STATUTES, AND A LOT OF

23  STATES HAVE THESE.  I BELIEVE THERE IS A CLAUSE.  I MAY BE

24  WRONG, BUT MAYBE COUNSEL CAN CORRECT ME ON THIS.

25          BUT THE DEPARTMENT OF CORRECTIONS HAS THE POWER TO

1  RELEASE PEOPLE UNDER CERTAIN SITUATIONS, AND IT'S PRETTY BROAD.

2  AND A LOT OF STATES HAVE USED THAT IN THE PAST, BUT I'M NOT

3  RECOMMENDING YOU DO THAT.  I WOULD RECOMMEND THE LEGISLATURE

4  DEAL WITH THIS AND MAKE THE CORRECTIONS THEY NEED TO MAKE.

5              BUT TO ANSWER YOUR QUESTION I WANT TO BE CLEAR.  YOU

6  CAN MAKE STILL A SUBSTANTIAL REDUCTION IF YOU GO UP TO THE

7  50,000.  IN MY OPINION, YOU'RE GOING TO HAVE TO CHANGE THE

8  LENGTH OF STAYS ON THE TWO STRIKERS, AND TO GO BEYOND THAT YOU

9  WOULD HAVE TO START ALLOWING PEOPLE WITH LIFE SENTENCES WHO ARE

10  PAST THEIR PAROLE ELIGIBILITY DATES AND HAVE BEEN SCREENED AND

11  ARE SUITABLE FOR RELEASE TO BE RELEASED.

12  **BY MS. JOHNSON:**

13  **Q.**  ANOTHER STATE YOU USE AS AN EXAMPLE IN YOUR AUGUST 15, 2008

14  REPORT IS NEVADA, CORRECT?

15  **A.**  YES, MA'AM.

16  **Q.**  NEVADA JUST INSTITUTED PRISON POPULATION REDUCTION MEASURES

17  IN 2007, CORRECT?

18  **A.**  YES, THEY DID.

19  **Q.**  AND ACCORDING TO YOUR REPORT ON PAGE 16, PARAGRAPH 36, IF

20  YOU WANT TO -- WE'RE STILL IN THE SECOND REPORT.

21              THE LAST SENTENCE THERE:

22              "TO DATE, THERE HAS BEEN NO INCREASES IN CRIME,

23              ARRESTS OR EVEN COURT FILINGS," CORRECT?

24  **A.**  THAT'S CORRECT.

25  **Q.**  IF WE LOOK AT THE GRAPH ON PAGE 17 OF YOUR REPORT, YOU'VE

1  REPRESENTED ON THAT GRAPH, I BELIEVE, THE ACTUAL PRISON

2  POPULATION OF NEVADA BETWEEN JULY, 2007 AND JULY, 2008.

3  **A.**  CORRECT.

4  **Q.**  DO YOU SEE THAT?

5  **A.**  YES.

6  **Q.**  CAN YOU TELL ME WHAT THE ACTUAL NUMERIC DIFFERENCE, IF ANY,

7  IN THE NEVADA POPULATION BETWEEN JULY, 2007 AND JULY, 2008 IS?

8  **A.**  WELL, THE IMPORTANT LINE, WHICH I'M AFRAID YOU CAN'T SEE,

9  THE TOP LINE.  THE TOP LINE --

10  **Q.**  YES, BUT JUST -- I'M SORRY TO INTERRUPT.  BUT WHAT I'M

11  ASKING ABOUT IS THE MIDDLE LINE.  SO WE CAN TALK ABOUT THE TOP

12  LINE LATER.  BUT RIGHT NOW I'M ASKING ABOUT THE MIDDLE LINE,

13  WHICH IS THE ACTUAL PRISON POPULATION.

14  **A.**  RIGHT.

15  **Q.**  DO YOU SEE THAT?

16  **A.**  YES.

17  **Q.**  AND YOU'RE SAYING THERE HAVE BEEN PRISON POPULATION MEASURES

18  INTRODUCED IN JULY 'O7 -- I'M SORRY -- PRISON POPULATION

19  REDUCTION MEASURES IN JULY 'O7.

20  **A.**  CORRECT.

21  **Q.**  AND WE'RE LOOKING A YEAR LATER IN JULY, 2008.  AND YOU SAY:

22          "TO DATE, THERE HAVE BEEN NO NEW CRIMES OR

23          ARRESTS REPORTED."

24  **A.**  NO, I'M SAYING --

25  **Q.**  THERE'S BEEN NO -- I'M SORRY -- INCREASE IN CRIME, ARRESTS

1  OR COURT FILINGS, RIGHT, IN THAT ONE YEAR THAT'S REPRESENTED

2  THERE?

3  **A.**  NO, WE'VE BEEN -- YEAH.  FROM JULY TO -- YEAH.

4  **Q.**  OKAY. SO CAN YOU TELL ME LOOKING AT THAT MIDDLE LINE, WHICH

5  IS THE ACTUAL PRISON POPULATION IN NEVADA OVER THAT ONE YEAR,

6  WHAT IS THE NUMERIC DIFFERENCE IN THE PRISON POPULATION?

7  **A.**  IT'S FLAT; HASN'T CHANGED.

8  **Q.**  DOES THAT MEAN THERE'S NO DIFFERENCE?

9  **A.**  NO.

10 **Q.**  YOU SAID "IT'S FLAT."

11 **A.**  LET ME ANSWER.  THE REASON THEY INSTITUTE THESE POLICIES,

12 WHICH THE TOP LINE YOU'RE NOT SHOWING FOR SOME REASON OR YOU

13 CAN'T SEE IT, BUT THAT IS THE LINE THAT THEY WERE HEADED ON.

14          AND THEY WENT INTO SPECIAL SESSION.  NEVADA HAS HAD

15 ONE OF THE FASTEST GOING PRISON POPULATIONS THERE IS.  SO THEY

16 HIRED ME TO COME IN AND SAY:

17              "WE HAVE TO STOP THIS GROWTH FROM HAPPENING."

18          SO THEY ASKED ME TO LOOK -- THAT'S WHAT THEY ASKED.

19 THEY SAID:

20              "STOP THE GROWTH."

21          THEY DIDN'T SAY TO BRING IT DOWN.  THEY SAID:

22              "STOP IT."

23          SO I SAID:

24              "OKAY.  HERE'S HOW YOU'RE GOING TO STOP IT."

25          AND SO THEY HAVE STOPPED IT.  AND, IN FACT, YOU DON'T

1  HAVE IT.  IT'S IN MY REPORT.  IF YOU GO TO NOVEMBER NOW, IT'S

2  DROPPED BELOW THE BUDGET LINE.

3  Q.  OKAY.

4  A.  SO IT'S WORKING EXACTLY AS WE INTENDED.  I DID EXACTLY WHAT

5  THE STATE WANTED. THAT'S WHAT I DO.

6          YOU KNOW, I COME TO A STATE AND THEY TELL ME:

7              "HERE'S WHAT WE WANT TO PAY FOR PRISONS.  HERE'S

8          OUR POPULATION."

9          AND I SET MY METHODOLOGY TO THAT MARK.

10 Q.  RIGHT.  BUT WHAT I'M ASKING YOU, LOOKING AT YOUR GRAPH AND

11 BECAUSE THERE IS NOT A NUMBER REPRESENTED IN YOUR REPORT, I'M

12 ASKING YOU DO YOU KNOW THE NUMERIC DIFFERENCE IN THE ACTUAL

13 PRISON POPULATION IN THAT ONE YEAR?

14 A.  NO, IT'S RELATIVELY FLAT.

15 Q.  OKAY.

16 A.  BUT I WILL ALSO SAY IF YOU HAD NOVEMBER, WHICH YOU DON'T,

17 IT'S BELOW THAT NOW.

18 Q.  ANOTHER STATE YOU USE AS AN EXAMPLE IN YOUR AUGUST 15, 2008

19 REPORT IS MISSISSIPPI, CORRECT?

20 A.  CORRECT.

21 Q.  ACCORDING TO YOUR REPORT, MISSISSIPPI ENACTED PRISON

22 POPULATION REDUCTION MEASURES JUST THIS YEAR, 2008, CORRECT?

23 A.  CORRECT.

24 Q.  WHEN YOU WROTE YOUR AUGUST 15, 2008 REPORT, MISSISSIPPI HAD

25 NOT YET RELEASED A SINGLE PRISONER UNDER THE MEASURES ENACTED

1  EARLIER THIS YEAR, HAD IT?

2  **A.**  I DON'T BELIEVE THEY HAD.

3  **Q.**  SO WHEN YOU WROTE YOUR AUGUST 15, 2008 REPORT IN WHICH YOU

4  USED MISSISSIPPI AS AN EXAMPLE, YOU DID NOT HAVE ANY DATA

5  REGARDING THE IMPACT OF THE PRISON POPULATION REDUCTION MEASURES

6  ON THE INCIDENCE OF CRIME IN MISSISSIPPI, DID YOU?

7  **A.**  I DON'T KNOW WHERE I SAID IN THE PARAGRAPH YOU'RE REFERRING

8  TO -- THAT I THINK I STAND BY WHAT I SAY THERE,   BUT --

9  **Q.**  WELL, WE CAN LOOK AT PAGE 18, PARAGRAPH 38.

10  **A.**  OKAY. I'M LOOKING AT IT.

11  **Q.**  YOU CAN EVEN PUT THE WHOLE PAGE UP THERE.

12        WHAT I'M SAYING TO YOU IS THAT MISSISSIPPI HADN'T

13  RELEASED A PRISONER WHEN YOU WROTE YOUR AUGUST 15, 2008 REPORT,

14  SO YOU HAD NO DATA TO EVALUATE THE IMPACT ON THE INCIDENCE OF

15  CRIME BASED ON THE POPULATION REDUCTION MEASURES ESTABLISHED IN

16  MISSISSIPPI JUST THIS YEAR, DID YOU?

17  **A.**  WELL, THAT'S CORRECT.

18        BUT MY INTENTION OF PUTTING THAT IN THE REPORT WAS

19  JUST AN EXAMPLE OF A STATE, FAIRLY CONSERVATIVE STATE, THAT HAD

20  REACHED A LEVEL SIMILAR TO NEVADA THAT THEY FELT THAT THEY COULD

21  NO LONGER AFFORD THE PRISON POPULATION THAT THEY HAD.

22        SO, LIKE NEVADA, THEY -- WHAT THEY DID, THEY MADE A

23  LARGE NUMBER OF PRISONERS ELIGIBLE FOR PAROLE WHO PREVIOUSLY

24  WERE NOT ELIGIBLE FOR PAROLE.  IT'S A LEGISLATIVE ACTION.

25        GOVERNOR BARBOUR ENDORSED IT.  AND SO IT'S NOW

1   STARTING TO UNFOLD.

2            AND I GUESS MY POINT HERE IS THAT I'M WORKING WITH

3   THE STATE NOW, BECAUSE WE NOW HAVE ABOUT 3,000 PRISONERS THAT

4   ARE ELIGIBLE FOR PAROLE.  WE'RE PROCESSING THEM FOR THE PAROLE

5   BOARD.

6            WE HAVE RISK ASSESSMENT THAT WE NOW ARE USING TO

7   SCREEN THE PEOPLE TO MAKE SURE WE'RE NOT RELEASING A HIGH RISK

8   PERSON.

9            SO, YES, WE DON'T HAVE ANY RESULTS.  BUT THIS IS

10  SIMPLY AN EXAMPLE OF A STATE THAT HAS TAKEN LEGISLATIVE ACTION

11  TO ALLOW PRISONERS WHO PREVIOUSLY COULD NOT BE PAROLED TO BE

12  CONSIDERED BY THE PAROLE BOARD.  AND SOME PORTION OF THEM CAN BE

13  PAROLED.  BUT WE DO NOT KNOW THE RESULTS OF THAT AS YET.

14  **Q.**  YOU DON'T KNOW THE RESULTS ON THE INCIDENCE OF CRIME IN

15  MISSISSIPPI, CORRECT?

16  **A.**  OBVIOUSLY NOT.

17  **Q.**  IN YOUR AUGUST 15, 2008 REPORT ON PAGE 20, YOU HAVE A TABLE

18  SHOWING THE CRIME RATE AND PRISON DISPOSITION RATES FOR 13 OF

19  CALIFORNIA'S 58 COUNTIES.

20  **A.**  THAT'S CORRECT.

21  **Q.**  BASED ON 2005 DATA.

22  **A.**  THAT'S CORRECT.

23  **Q.**  IN PARAGRAPH 42 ON THAT SAME PAGE, YOU WRITE:

24            "MANY COUNTIES ARE MAINTAINING LOW PRISON

25            COMMITMENT RATES, MEANING THAT THEY ARE KEEPING

1              OFFENDERS IN THE COMMUNITY WITHOUT JEOPARDIZING

2              PUBLIC SAFETY."

3              SEE THAT?

4  A.  YES.

5  Q.  SO LET'S LOOK AT THE TABLE.  AND LET'S LOOK AT ALAMEDA

6  COUNTY, THE COUNTY CLOSE TO MY OWN HEART.

7              OF THE 13 COUNTIES FOR WHICH YOU PRESENTED

8  INFORMATION, IT HAS THE LOWEST PRISON DISPOSITION RATE,

9  9 PERCENT, CORRECT?

10  A.  CORRECT.

11  Q.  THAT MEANS ALAMEDA COUNTY SENDS A LOWER PERCENTAGE OF THE

12  PEOPLE IT CONVICTS OF FELONIES TO PRISON THAN ANY OTHER OF THE

13  12 COUNTIES ON THIS TABLE TWO THAT YOU CREATED, CORRECT?

14  A.  YES.  THEY HAVE THE LOWEST DISPOSITION RATE, CORRECT.

15  Q.  ACCORDING TO TABLE TWO --

16          **JUDGE KARLTON:**  THE LOWEST PRISON DISPOSITION.

17          **THE WITNESS:**  YES, PRISON DISPOSITION RATE.

18  BY MS. JOHNSON:

19  Q.  WHICH I WAS TRYING EXPLAIN TO THE COURT MEANS -- WHAT THAT

20  MEANS -- "PRISON DISPOSITION" MEANS THAT THE NUMBER OF PEOPLE

21  BEING CONVICTED OF FELONIES WHO ACTUALLY GO TO PRISON, RATHER

22  THAN ON PROBATION OR SOME OTHER SENTENCE, CORRECT?  THAT'S WHAT

23  YOU MEAN?

24  A.  YEAH, THAT'S THE --

25

1  Q.  NUMBER OF PEOPLE SENT TO PRISON FROM THAT COUNTY?

2  A.  FOR PEOPLE THAT ARE CONVICTED OF A FELONY, THIS IS THE

3  PERCENT OF THOSE THAT WE SEE THE PRISON DISPOSITION.

4  Q.  ACCORDING TO TABLE TWO, AT THE SAME TIME THAT ALAMEDA COUNTY

5  HAS THE LOWEST PRISON DISPOSITION RATE, IT ALSO HAS THE SECOND

6  HIGHEST CRIME RATE OF THESE 13 COUNTIES, CORRECT?

7  A.  RIGHT.  SACRAMENTO HAS THE HIGHEST.

8          JUDGE HENDERSON:  12 COUNTIES IN THE STATEWIDE THERE,

9  COUNSEL.

10          MS. JOHNSON:  DID I MISCOUNT?

11          THE WITNESS:  12 IN THE "STATEWIDE" COLUMN.

12          MS. JOHNSON:  OH, I'M SORRY.  I APOLOGIZE.  I

13  MISUNDERSTOOD THAT BOTTOM LINE.  SO THIS IS ONE OF THE 12

14  COUNTIES, AND THEN A STATEWIDE FIGURE.

15          OKAY. THANK YOU FOR CATCHING THAT, YOUR HONOR.  I

16  COUNTED THE LAST BAR AS A STATE -- I MEAN, AS A COUNTY.

17  BY MS. JOHNSON:

18  Q.  YOU WROTE ON PAGE NINE, PARAGRAPH 20 OF YOUR AUGUST 15, 2008

19  REPORT -- PARAGRAPH 20, LAST SENTENCE THERE:

20              "RESEARCH ON CRIME AND INCARCERATION DOES NOT

21              CONSISTENTLY INDICATE THAT THE MASSIVE USE OF

22              INCARCERATION HAS REDUCED CRIME RATES."

23          AND I THINK AS YOU INDICATED IN YOUR DIRECT TESTIMONY

24  SOME RESEARCH HAS INDICATED THAT MASSIVE INCARCERATION RATE HAS

25  REDUCED OR AT LEAST CONTRIBUTED TO THE REDUCTION OF CRIME RATES,

1  HASN'T IT?

2  **A.**  SOME RESEARCH HAS INDICATED THAT.

3  **Q.**  "AUTHORS OF RESEARCH INDICATING THAT MASSIVE INCARCERATION

4        HAS REDUCED CRIME RATES INCLUDE JAMES Q. WILSON AND

5        WILLIAM SPELLMAN," CORRECT?

6  **A.**  YES, THOSE ARE TWO AUTHORS THAT HAVE INDICATED THAT.

7  **Q.**  IN FACT, MR. SPELLMAN CLAIMS THAT 25 PERCENT OF THE

8  REDUCTION IN CRIME THAT'S OCCURRED IN THE LAST 20 YEARS IS THE

9  RESULT OF INCREASED INCARCERATION, CORRECT?

10 **A.**  NO, NOT PARTICULARLY.  WHAT HE FOUND WAS THAT -- TECHNICALLY

11 WHAT HE FOUND WAS -- I BELIEVE IT WAS BETWEEN 1972 AND 1999, OR

12 THE YEAR 2000 -- THAT'S THE PERIOD HE LOOKED AT -- HE LOOKED AT

13 ALL THE STATES, AND HE CONCLUDED THAT 25 PERCENT IN THE

14 REDUCTION IN VIOLENT CRIME -- NOT ALL CRIME, BUT VIOLENT

15 CRIME -- COULD BE ATTRIBUTED TO THE INCREASE IN THE PRISON

16 POPULATION.

17 **Q.**  THE ANALYSIS REGARDING THE -- WELL, LET ME STEP BACK.

18       YOU'VE PUBLISHED PEER REVIEW ARTICLES BEFORE, HAVEN'T

19 YOU, DR. AUSTIN?

20 **A.**  A FEW OF THEM, YES, I HAVE.

21 **Q.**  YOU DO NOT CONSIDER THE ANALYSIS THAT YOU HAVE DONE

22 REGARDING THE RELATIONSHIP BETWEEN CRIME RATES AND IMPRISONMENT

23 RATES IN YOUR EXPERT REPORTS APPROPRIATE FOR PUBLICATION IN A

24 PEER REVIEW JOURNAL IN YOUR FIELD, DO YOU?

25 **A.**  WELL, IT'S NOT APPROPRIATE BECAUSE THE STYLE OF WRITING.  I

1   WOULD WRITE A VERY DIFFERENT KIND OF REPORT. I WOULD USE THE

2   SAME ANALYSIS, BUT IT WOULD BE A DIFFERENT STYLE OF WRITING AND

3   DIFFERENT FORMATTING, THINGS LIKE THAT.

4           CAN I ADD SOMETHING ELSE, SINCE YOU HAVE GOT THAT UP?

5   I GUESS THE ANSWER WOULD BE IT DOES NOT CONSISTENTLY INDICATE.

6   I THINK THERE ARE A COUPLE OF OTHER THINGS THAT ARE INSTRUCTIVE.

7           ONE OF THE ISSUES IN THE FIELD NOW IS:

8               "OKAY.  WE'VE RAMPED UP OUR INCARCERATION RATE.

9           AND NOW THE QUESTION IS:  AND WE'VE RAMPED IT UP

10          PRETTY GOOD."

11          THIS IS WHAT JAMES Q. WILSON SAYS, SINCE YOU QUOTED

12  HIM.  HE RAISES THIS ISSUE OF DIMINISHING RETURNS.

13          YOU REACH A SATURATION POINT WHERE WHATEVER CRIME

14  EFFECT YOU WANT TO CITE, YOU LOSE THAT EFFECT AT SOME POINT,

15  BECAUSE YOU'RE NOW GOING FOR PEOPLE THAT DON'T HAVE MUCH TO DO

16  WITH THE CRIME RATE OR YOUR INCARCERATION EFFECTS ARE BEING

17  DIMINISHED, LIKE YOU'VE OVERSATURATED THE SITUATION.

18          THAT'S WHAT JAMES Q. WILSON SAID.  HE SAID WE HAVE

19  REACHED A PERIOD OF DIMINISHING RETURNS BECAUSE WE'VE GONE TOO

20  DEEP INTO THE INCARCERATION BIN.

21          AND THERE'S A COUPLE OF STUDIES THAT HAVE COME OUT

22  REAL POST-SPELLMAN WHICH LOOK AT A VARIATION, LIKE WITHIN STATES

23  BY COUNTY.  AND WHEN YOU GET DOWN TO THE COUNTY -- AND THIS WAS

24  IN FLORIDA -- THEY FOUND NO CRIME REDUCTION EFFECTS IN THE

25  LAST -- THIS WOULD BE IN THE LAST 15 YEARS OR SO IN FLORIDA,

1  WHICH IS A HIGH INCARCERATION RATE STATE.

2          SO, IN MY OPINION, YES. AND OBVIOUSLY, IF WE --

3  OBVIOUSLY, WHAT WE DID WHEN I FIRST STARTED WE WERE AT 190,000

4  PEOPLE IN PRISON IN 1970.  NOW WE HAVE 1.7 MILLION.

5          THAT'S GOING TO HAVE SOME EFFECT. BUT AT SOME POINT

6  IT'S A DIMINISHING RETURN.  AND THAT IS WHAT WILSON HAS CITED.

7          SPELLMAN IN HIS ARTICLE RAISES THE SAME THING.  YOU

8  KNOW, AT WHAT EXPENSE ARE WE DOING THIS REDUCTION?

9          AND HE'S THE ONE THAT SAID 75 PERCENT OF THE

10 REDUCTION IN VIOLENT CRIME IS BEING CAUSED BY THESE OTHER

11 FACTORS, WHICH IS THE DEMOGRAPHIC, SOCIOECONOMIC FACTORS THAT HE

12 FOUND IN THE STATE.

13         SO I JUST WANTED TO CLARIFY THAT.

14 **Q.**  I'M SORRY.  YOU SAID 75 PERCENT OF VIOLENT CRIME?

15 **A.**  YES, IS EXPLAINED NOT BY INCARCERATION INCREASES, BUT BY

16 DEMOGRAPHICS SOCIOECONOMIC CHANGES IN OUR SOCIETY.

17 **Q.**  SO THE REMAINING PERCENTAGE, THAT OTHER 25 PERCENT OF

18 VIOLENT CRIME HAD BEEN DECREASED BECAUSE OF INCREASE IN

19 INCARCERATION RATES.

20 **A.**  THAT'S HIS ESTIMATE.  AND, REMEMBER, THESE ARE FAIRLY

21 COMPLICATED STATISTICAL MODELS.  AND THEY HAVE A LOT OF

22 ASSUMPTIONS.  AND THERE ARE PEOPLE THAT DISAGREE WITH HIM, SO

23 THAT'S NOT THE FINAL WORD ON THIS ISSUE.

24 **Q.**  ON PAGE 20, AT PARAGRAPH 43 OF YOUR AUGUST 15, 2008 REPORT

25 YOU WROTE:

1              "CALIFORNIA CAN REDUCE PRISON ADMISSIONS AND

2         REDUCE LENGTH OF STAY IN A SAFE AND PRACTICAL MANNER

3         IN FOUR WAYS.  ONE:  PROVIDE EVIDENCE-BASED

4         PROGRAMMING AND SUPERVISION TO TECHNICAL PAROLE

5         VIOLATORS INSTEAD OF RETURNING THEM TO PRISON. TWO:

6         DIVERT LOW LEVEL OFFENDERS TO PROBATION AND PAROLE

7         INSTEAD OF PRISON.  THREE: PROVIDE MORE AVENUES FOR

8         PRISONERS TO EARN GOOD TIME CREDITS TOWARD RELEASE

9         FOR GOOD BEHAVIOR.  AND FOUR:  PROVIDE MORE AVENUES

10        FOR EARLY DISCHARGE FROM PAROLE."

11   **A.**   CORRECT.

12   **Q.**   WE'RE GOING TO TAKE A LOOK AT THESE ONE AT A TIME, NOT

13   NECESSARILY IN THE ORDER YOU HAVE ENUMERATED THEM.

14          SO LET'S LOOK AT THE FIRST -- WELL, THE FIRST ONE

15   WE'RE GOING TO LOOK AT FIRST:

16            "PROVIDE EVIDENCE-BASED PROGRAMMING TO TECHNICAL

17        PAROLE VIOLATORS INSTEAD OF RETURNING THEM TO

18        PRISON."

19          TECHNICAL PAROLE VIOLATORS INCLUDE PAROLEES WHO HAVE

20   BEEN REARRESTED FOR THE ALLEGED COMMISSION OF A NEW CRIME,

21   CORRECT?

22   **A.**   CORRECT.

23   **Q.**   IN FACT, A SUBSTANTIAL PORTION OF TECHNICAL PAROLE VIOLATORS

24   WHO ARE RETURNED TO PRISON ARE RETURNED FOR ALLEGED COMMISSION

25   OF A NEW CRIME, CORRECT?

1  **A.**  THEY HAVE BEEN ARRESTED.  THAT'S THE WAY I WOULD PHRASE IT.

2         AS EVERYONE KNOWS, THERE ARE PEOPLE THAT ARE ARRESTED

3  WHO HAVE NOT COMMITTED ANY CRIME.  SO JUST TO BE TECHNICALLY

4  CORRECT, THESE ARE PEOPLE WHO HAVE BEEN REARRESTED, HAVE NOT

5  BEEN CONVICTED OF A NEW FELONY.

6  **Q.**  SO THEY ARE BEING RETURNED --

7  **A.**  SOME PORTION OF THE TECHNICAL --

8         **JUDGE KARLTON:**  EVERYBODY STOP FOR A MINUTE.

9         OKAY.  GO AHEAD.

10 **BY MS. JOHNSON:**

11 **Q.**  SO MY QUESTION WAS THAT A SUBSTANTIAL PORTION OF TECHNICAL

12 PAROLE VIOLATORS ARE RETURNED TO PRISON FOR ALLEGED COMMISSION

13 OF A NEW CRIME, CORRECT?

14 **A.**  WELL, I JUST DON'T LIKE THAT WORD "ALLEGED COMMISSION."

15        I GUESS, WHAT DO YOU MEAN BY "ALLEGED"?  ALL I CAN

16 TELL YOU IS THEY HAVE BEEN ARRESTED. AND THEY HAVE BEEN ARRESTED

17 FOR A VARIETY OF THINGS. SOME PORTION OF THOSE PEOPLE DO HAVE AN

18 ARREST FOR A CRIMINAL CONDUCT.

19        YES. THAT'S THE WAY I PREFER TO SAY IT.

20 **Q.**  LOOKING AT YOUR CHART -- AND I THINK THE FIGURES YOU USE IN

21 YOUR REPORT MIGHT BE A LITTLE DIFFERENT BY ABOUT 3,000, BUT I

22 THINK IN YOUR REPORT WE WERE LOOKING AT A FIGURE OF 69,000

23 REVOCATIONS FOR TECHNICAL PAROLE VIOLATORS.  AND HERE ON YOUR

24 CHART, WHICH I DON'T REMEMBER -- LET ME SEE IF I CAN FIND THE

25 NUMBER.

1 **A.** THE CHART IS LOWER BECAUSE IT'S MORE CURRENT, AND IT'S

2 REPRESENTING SOME OF THE REFORMS THAT THE DEPARTMENT IS

3 UNDERTAKING NOW.

4 **Q.** THAT'S PLAINTIFFS' EXHIBIT 830, WHICH IS STILL DISPLAYED.

5 IT'S NOT ON THE EASEL, BUT IT'S THE BOTTOM.

6        **MS. JOHNSON:** CAN YOUR HONORS SEE THAT?

7        **JUDGE KARLTON:** I'M SURPRISED YOU CARE ABOUT WHETHER

8 OR NOT WE'RE PAYING ANY ATTENTION, GIVEN YOUR RESPONSE TO MY

9 PREVIOUS COMMENT. BUT, YES, WE CAN SEE IT.

10 **BY MS. JOHNSON:**

11 **Q.** YOUR CHART SAYS "66,000 TECHNICAL PAROLE VIOLATORS." AND

12 THAT'S AN ANNUAL FIGURE?

13 **A.** THAT'S CORRECT.

14 **Q.** IN YOUR REPORT THE FIGURE MIGHT HAVE BEEN 69. AND I'M NOT

15 SUGGESTING THAT THAT WAS A DIFFERENCE IN YOUR NUMBERS. I'M JUST

16 SAYING THAT WE'RE DEALING WITH SLIGHTLY DIFFERENT NUMBERS.

17 **A.** OKAY.

18 **Q.** SO ACCORDING TO YOUR FIGURES, ABOUT 66 TO 69,000 REVOCATIONS

19 FOR TECHNICAL PAROLE VIOLATIONS OCCUR WITHIN A YEAR IN

20 CALIFORNIA, CORRECT?

21 **A.** YES.

22 **Q.** ACCORDING TO YOUR FIGURES OF THESE APPROXIMATELY 69,000

23 REVOCATIONS FOR TECHNICAL PAROLE VIOLATIONS, ONLY APPROXIMATELY

24 14,500 ARE RETURNED FOR PURELY TECHNICAL VIOLATIONS.

25 **A.** I BELIEVE THAT'S CORRECT.

1  Q.  AND THE PURELY TECHNICAL VIOLATION COULD INCLUDE SOMETHING

2  LIKE A FAILED DRUG TEST, RIGHT?

3  **A.**  IT COULD INCLUDE THAT.

4  Q.  YOU STATE ON PAGE 22, AT PARAGRAPH 49 OF YOUR AUGUST 15,

5  2008 REPORT --

6          **JUDGE KARLTON:**  MAY I INTERRUPT FOR A MOMENT, BECAUSE

7  I WANTED TO GO BACK TO WHAT YOU JUST SAID.

8          SIR, IT IS MY IMPRESSION -- AND MAYBE YOU KNOW --

9  THAT WHAT HAPPENS IS PEOPLE GET ARRESTED WHO ARE ON PAROLE AND

10 GET ARRESTED FOR SOME NEW CRIME.  AND THE DISTRICT ATTORNEY AND

11 THE DEFENSE COUNSEL, PUBLIC DEFENDER, USUALLY, IN THESE KINDS OF

12 CASES -- SAY:

13          "LOOK.  IT ISN'T WORTH GOING THROUGH THE WHOLE

14          PROCESS OF TRIAL AND CONVICTION.  WE WILL JUST

15          STIPULATE TO A PAROLE VIOLATION."

16      DO YOU KNOW WHETHER THAT'S A COMMON OCCURRENCE IN

17 CALIFORNIA COURTS?

18          **THE WITNESS:**  I WOULD SAY IT'S COMMON.  I MEAN, LET

19 ME GIVE YOU AN EXAMPLE, THOUGH. WHEN WE LOOKED AT DATA THAT CDCR

20 GAVE ME TO LOOK AT, THE NUMBER ONE CRIME THAT THEY ARE BEING

21 ARRESTED FOR IS OBSTRUCTION OF JUSTICE. AND WHAT IS ENTAILED IN

22 THAT I DON'T KNOW, BUT YOU CAN'T EVEN FIND IT ON THE ATTORNEY

23 GENERAL'S ARREST CHARTS AS A CATEGORY IN TERMS OF THE GENERAL

24 POPULATION.

25          BUT THIS IS, YOU KNOW -- AND I THINK A GOOD ANALYSIS

1   NEEDS TO BE DONE OF WHAT IS REALLY GOING ON HERE WITH THESE

2   PAROLEES.

3            THE BIG CATEGORIES ARE ABSCONDING FROM SUPERVISION,

4   ASSOCIATING WITH PEOPLE THAT ARE PROHIBITED, OBSTRUCTION OF

5   JUSTICE, THE DRUG TESTING, AND ON AND ON.

6            AND THERE'S A WHOLE ENUMERATION OF THESE INCIDENTS.

7   AND I GUESS MY POINT -- I'M NOT TRYING TO ROMANCE THIS

8   SITUATION. AND SHE'S RIGHT, YOU KNOW, IN THAT THERE IS IN MANY

9   CASES CRIMINAL CONDUCT THAT THE DISTRICT ATTORNEY IS SAYING:

10            "IT'S NOT WORTH MY EFFORTS TO PROSECUTE THIS

11            PERSON."

12           SO WHAT THEY DO, THEY HAVE BEEN ARRESTED.  THEY ARE

13   IN THE JAIL.  THEY GO THROUGH THEIR HEARING. THEY GET REVOKED.

14   GO TO THE CDCR RECEPTION CENTER AND COME RIGHT BACK OUT. AND --

15           **JUDGE KARLTON:**  WE UNDERSTAND ALL ABOUT THAT.

16           I'M TRYING TO UNDERSTAND WHETHER IT IS SAFE FOR THIS

17   COURT TO ASSUME THAT THE TECHNICAL VIOLATORS ARE NOT REALLY

18   COMMITTING CRIMES THAT IN A MORE -- IN A SYSTEM THAT WOULD

19   PERMIT PEOPLE TO DO SO WOULDN'T RESULT IN NEW CONVICTIONS RATHER

20   THAN PAROLE VIOLATIONS.

21           YOU SEE WHAT I'M ASKING?

22           **THE WITNESS:**  YEAH, I UNDERSTAND. SOME ARE AND SOME

23   ARE NOT. BUT LET ME GIVE YOU SOME EXAMPLE HERE TO KIND OF RAISE

24   QUESTIONS ABOUT WHAT THESE ARRESTS REPRESENT.

25           IN 2007, THEY HAD 138 PEOPLE ARRESTED FOR RAPE THAT

1  THEY CHARGED -- THEY PROCESS AS A TECHNICAL PAROLE VIOLATOR.

2  OVER A HUNDRED PEOPLE ARRESTED FOR A HOMICIDE THAT THEY PROCESS

3  AS A TECHNICAL PAROLE VIOLATOR.

4          NOW, YOU CAN'T TELL ME THAT IF YOU HAVE BEEN ARRESTED

5  FOR RAPE OR HOMICIDE, THAT'S NOT WORTHY -- I HOPE THAT'S WORTHY

6  OF PROSECUTION BY THE DISTRICT ATTORNEY.

7          SO THERE'S SOME NOISE IN THIS DATA.  SO I'M CONCEDING

8  YOUR POINT, BUT NOT A HUNDRED PERCENT THE POINT.  THERE'S SOME

9  STUFF GOING ON HERE, TOO, THAT IS NOT SERIOUS THAT CAN BE

10 HANDLED IN A DIFFERENT MANNER.

11         **JUDGE KARLTON:**  YOU DON'T HAVE TO CONCEDE MY POINT

12 BECAUSE I DON'T KNOW THAT I HAVE A POINT. I'M TRYING TO

13 UNDERSTAND.

14         TO SAY THAT "THERE'S NOISE IN THE SYSTEM" DOESN'T

15 EVEN BEGIN TO -- DOESN'T EVEN BEGIN TO ADDRESS QUESTIONS LIKE A

16 HUNDRED PEOPLE CONVICTED -- I MEAN, NOT CONVICTED -- ARRESTED

17 FOR HOMICIDE WHO WERE THEN PROCESSED AS PAROLE VIOLATORS GO TO

18 PRISON.

19         **THE WITNESS:**  AS A TECHNICAL, TECHNICAL PAROLE

20 VIOLATOR.

21         **JUDGE HENDERSON:**  RIGHT.

22         **THE WITNESS:**  THERE'S 282 PEOPLE WHO WERE ARRESTED

23 FOR HOMICIDE WHO WERE PROCESSED AS A TECHNICAL PAROLE VIOLATOR.

24 THAT'S THE CDCR DATA.

25         **JUDGE KARLTON:**  AND THOSE PEOPLE GO FOR AN AVERAGE OF

1   FOUR MONTHS?

2            **THE WITNESS:**  FOUR MONTHS AND THEY ARE BACK ON THE

3   STREET.  SO THERE'S A LOT OF NOISE IN THIS DATA. AND I WOULD SAY

4   FROM WHAT I'VE SEEN MOST OF THIS STUFF IS MISDEMEANOR LEVEL

5   STUFF FOR WHICH YOU CAN'T GO TO PRISON FOR.

6            BUT YOU CAN GO TO PRISON IF YOU'RE A PAROLEE. AND

7   THAT -- I DID A STUDY -- IT'S REFERENCED IN MY REPORT -- BACK IN

8   1982. THIS WAS DONE PURPOSELY. CALIFORNIA USED TO HAVE A VERY

9   LOW RECIDIVISM RATE.  AND WHAT RAISED IT WAY UP HERE WAS THIS

10  TECHNICAL VIOLATION.  IN PART IT WAS DONE TO, AS I UNDERSTAND

11  IT -- IT WAS TOLD TO ME -- SALVAGE SOME OF THE JAIL ISSUES, YOU

12  KNOW, PEOPLE STAYING IN THE JAIL THAT THEY WOULD CLUTTER UP, AND

13  THEN THEY WOULD PROCESS THE CASE AND KICK THEM BACK OUT ON THE

14  STREET.

15           NOW THEY GO TO CDCR 90 DAYS, AND THEN THEY ARE KICKED

16  BACK ON THE STREET.  AND A LOT OF THESE PEOPLE ARE BEING

17  ARRESTED FOR SERIOUS CRIMES.  OTHERS FOR VERY SERIOUS OR NOT

18  EVEN A CRIME.

19           SO IT'S ALL OVER THE MAP.  AND I'M NOT SAYING ALL

20  THESE PEOPLE GET DIVERTED.  IN MY RECOMMENDATION SOME PORTION OF

21  THEM GET DIVERTED BASED ON RISK ASSESSMENT.  AND THIS IS NOT

22  JUST MY IDEA.  THIS IS THE EXPERT PANEL.

23           YOU KNOW, THIS IS LIKE 15 PEOPLE AROUND THE COUNTRY

24  WHO LOOKED AT THIS ISSUE AND SAID:

25                "YOU ARE BRINGING IN WAY TOO MANY PEOPLE FOR

1              RELATIVELY MINOR STUFF AND HANDLING THEM IN A VERY

2              EXPENSIVE WAY THAT IS CAUSING YOUR PRISON SYSTEM IN

3              PARTICULAR RECEPTION CENTERS TO BE CROWDED. AND

4              THERE'S OTHER WAYS YOU CAN DO THIS, WHICH OTHER

5              STATES HAVE DONE."

6         **JUDGE REINHARDT:** WHEN YOU --

7         **JUDGE KARLTON:** GIVEN --

8         **JUDGE REINHARDT:** GO AHEAD.

9         **JUDGE KARLTON:** GIVEN THE AMOUNT OF NOISE THAT YOU

10   HAVE JUST BEEN POINTING TO, CAN WE SAFELY RELY ON ANY OF THE

11   STATISTICAL EVIDENCE THAT UNDERLIE A LOT OF YOUR CONTENTIONS

12   ABOUT WHAT CAN BE DONE AND CAN'T BE DONE?

13              I AM NOW CONCERNED WITH THE GREATEST OF RESPECT, SIR,

14   THAT THE DATA THAT YOU'RE OPERATING WITH DOESN'T FAIRLY REFLECT

15   WHAT IS GOING ON. I DON'T KNOW. I'M ASKING.

16         **THE WITNESS:** WELL, ALL I CAN DO IS RELY ON THE DATA

17   THAT IS GIVEN TO US. AND I THINK THE PROPER WAY TO LOOK AT THIS

18   WOULD HAVE BEEN -- YOU KNOW, I DON'T HAVE ALL THE TIME IN THE

19   WORLD.  BUT WHAT YOU DO, YOU GO IN AND YOU LOOK AT WHAT IS GOING

20   ON HERE IN TERMS OF THE SO-CALLED CONDUCT OF THE PAROLEE.

21              BUT I DIDN'T LOOK AT THAT.  BUT PEOPLE ON THE EXPERT

22   PANEL DID.  AND THEY WERE CONVINCED THAT WHAT THEY SAW WAS -- I

23   THINK THEY ESTIMATED ABOUT HALF OF THE PEOPLE DIDN'T NEED TO GO

24   BACK.

25              SHE MENTIONED THE TECHNICALS, WHICH IS -- WHAT DID WE

1  SAY THAT NUMBER WAS -- 15,000 OR SOMETHING.  THEY ARE PURE

2  TECHNICAL VIOLATORS.

3       AND THEN, THERE'S OTHER KINDS OF PEOPLE BEING

4  ARRESTED FOR BEHAVIOR. IT'S A MISDEMEANOR CHARGE.  NO ONE WOULD

5  BE HANDLING THIS CASE BECAUSE IT IS SUCH A LOW LEVEL MISDEMEANOR

6  CHARGE.  AND THEN, YOU ALSO LOOK AT THE RISK LEVEL OF THE PERSON

7  THAT IS BEING CHARGED.

8       AND YOU MAKE DECISIONS BASED ON THAT INFORMATION:

9  NATURE OF THE CRIME, THE RISK LEVEL OF THAT PERSON.  AND THEN

10 YOU DECIDE:  DO THEY NEED TO GO BACK INTO THE PRISON SYSTEM?  OR

11 CAN WE HANDLE THEM IN A DIFFERENT MANNER THAN THE WAY WE ARE

12 DOING NOW?

13       AGAIN, I WOULD HAVE TO SAY THIS IS SUCH AN ABNORMAL

14 PROCESS YOU HAVE.  IT IS COMPLETELY DIFFERENT THAN ANY OTHER

15 STATE; THAT YOU BRING IN SUCH A LARGE NUMBER OF PEOPLE FOR SUCH

16 A SHORT PERIOD OF TIME FOR ALL THIS -- I WOULD CALL IT

17 "TECHNICAL MISDEMEANOR ARREST ACTIVITY."

18 **JUDGE REINHARDT:**  WHEN YOU TALK ABOUT THE AVERAGE

19 INCARCERATION FOR THE TECHNICAL VIOLATOR BEING FOUR MONTHS, WHAT

20 IS THE MAXIMUM THAT A TECHNICAL VIOLATOR MAY BE HELD FOR?

21 **THE WITNESS:**  WELL, THE BOARD OF -- IS IT THE BOARD

22 OF PRISON TERMS?  BOARD OF PRISON TERMS.  I'M NOT SURE WHAT

23 THEIR LIMIT IS. IT MAY BE 12 MONTHS.

24 **JUDGE KARLTON:**  I THOUGHT WE WERE TOLD 365 DAYS.

25 **THE WITNESS:**  RIGHT.  I THINK IT'S THAT.

1          BEAR IN MIND THE AVERAGE IS SKEWED, SO IT'S REALLY

2    MOST PEOPLE DO LESS THAN FOUR MONTHS. THE TYPICAL PAROLE

3    VIOLATOR WILL HAVE -- HE'LL BE ARRESTED, SHE'LL BE ARRESTED.

4    THEY WILL GO TO THE COUNTY JAIL.  TAKES ABOUT 30 DAYS TO GO

5    THROUGH THEIR HEARING PROCESS.

6          THEY WILL GO BACK TO CDCR.  AND THEY WILL BE

7    RERELEASED IN TWO TO THREE MONTHS -- THAT'S THE TYPICAL

8    PROCESS -- BACK TO THE STREETS, BACK TO THE SAME PAROLE

9    SUPERVISION.

10         AND IT'S ALSO TRUE THAT THEY LOSE THAT TIME, THE TIME

11   THAT THE BOARD TAKES.  SO THEIR TIME IS BEING ADDED NOW TO --

12   YOU KNOW, IN CALIFORNIA YOU DO YOUR SENTENCE, AND THEN BOARD

13   GIVES YOU -- APPARENTLY NOW IT'S THREE YEARS OF PAROLE

14   SUPERVISION.  THAT'S LIKE ANOTHER SENTENCE YOU HAVE TO DO. AND

15   YOU DO NOT GET CREDIT FOR THAT TIME THAT YOU'RE IN CUSTODY.

16         SO SOME PEOPLE ARE SPENDING MANY, MANY YEARS ON

17   PAROLE SUPERVISION.  THEY ARE CHURNING BACK AND FORTH.  THEY

18   CALL THEM "CHURNERS."

19         THERE'S A STUDY DONE BY THE DEPARTMENT OF JUSTICE

20   CALLED "THE CALIFORNIA CHURNERS."  AND THAT'S WHAT YOU'VE GOT,

21   AND IT'S UNIQUE.

22         I THINK, YOU KNOW, WITH PROPER PROGRAMS -- THAT'S WHY

23   I SAID THE EVIDENCE-BASED PROGRAMS -- YOU KNOW, WE CAN DO A LOT

24   BETTER.  THERE'S A BETTER WAY TO HANDLE THESE KINDS OF PEOPLE,

25   THESE KINDS OF INCIDENTS. THAT'S MY OPINION.

1  **BY MS. JOHNSON:**

2  **Q.**  YOU STATE ON PAGE 22, AT PARAGRAPH 49 OF YOUR AUGUST 15TH,

3  2008 REPORT, THAT ONE OF THE FACTORS THAT INCREASE THE NUMBER OF

4  TECHNICAL PAROLE VIOLATORS BEING ADMITTED TO PRISON WAS, QUOTE:

5              "THE DECISION BY THE BUREAU OF PRISON TERMS TO

6              ACCOMMODATE LOCAL COUNTY OFFICIALS BY ADMITTING

7              PAROLE VIOLATORS WHO OTHERWISE WOULD HAVE REMAINED IN

8              THE LOCAL JAIL PENDING THEIR REVOCATION HEARING. THIS

9              WAS DONE TO HELP REDUCE THE JAIL POPULATION AND JAIL

10             CROWDING."

11  **A.**  CORRECT.

12  **Q.**  ARE YOU AWARE OF HOW MANY COUNTIES IN CALIFORNIA TODAY HAVE

13  COURT ORDERED JAIL POPULATION CAPS IN PLACE OR HAVE ADOPTED JAIL

14  POPULATION CONTROL MEASURES?

15  **A.**  I ASSUME QUITE A NUMBER HAVE. LET ME ADD THAT THERE'S MANY

16  JAILS WITH SURPLUS CAPACITY NOW IN CALIFORNIA.  AND MY REFERENCE

17  HERE IS TO THE STUDY THAT I DID, WHICH IS REFERENCED THERE. YES.

18             AND WHERE IS THE RECIDIVISM CHART?  CAN WE PUT THAT

19  UP, MY RECIDIVISM CHART OF CALIFORNIA?

20  **Q.**  I DON'T KNOW WHAT THAT IS, SIR.  I DON'T THINK WE HAVE THAT

21  IN OUR -- I DON'T KNOW WHAT IT IS.

22  **A.**  IT'S IN MY REPORT.

23  **Q.**  IF YOU CAN TELL ME WHICH PAGE, I CAN TRY TO ASSIST THAT.

24  BUT I DON'T KNOW WHICH ONE YOU'RE TALKING ABOUT OFF THE TOP OF

25  MY HEAD.

1   **A.**   IT'S FIGURE 1.

2   **Q.**   I'M SORRY?

3   **A.**   FIGURE 1.

4   **Q.**   FIGURE 1?

5   **A.**   IN MY REPORT.

6   **Q.**   THAT'S IN YOUR AUGUST 15 REPORT?

7   **A.**   AUGUST, AUGUST 2008.

8   **Q.**   AUGUST 27?  I THINK IT'S AUGUST --

9   **A.**   NO.  IT'S LABELED "AUGUST, 2008."

10  **Q.**   BUT YOU REDID FIGURE 1 AT SOME POINT.  DID YOU WANT TO LOOK

11  AT THE --

12  **A.**   NOT THAT FIGURE 1.

13  **Q.**   NOT THAT FIGURE 1?  OKAY.

14  **A.**   YOU'RE IN THE SUPPLEMENTAL.

15  **Q.**   DO YOU KNOW WHAT --

16  **A.**   MY POINT IS THAT THE RECIDIVISM RATE, WHICH IS THE RETURN TO

17  PRISON RATES IN CALIFORNIA WERE EXTREMELY LOW PRIOR TO 1975,

18  '76. THEN, IT STARTED TO GO UP.

19          AND SO I WAS COMMISSIONED BY THE BOARD OF PRISON

20  TERMS TO DO A STUDY OF WHAT WAS GOING ON. AND THE OFFICIALS TOLD

21  ME THAT WHAT THEY WERE DOING WAS PURPOSEFUL.  THEY WERE TAKING

22  PEOPLE THAT WERE BEING -- PAROLEES THAT WERE BEING VIOLATED, AND

23  RATHER THAN STAYING IN THE COUNTY JAILS FOR MORE THAN 30 DAYS OR

24  SO, THEY AGREED TO PROCESS THEM QUICKLY AND BRING THEM TO THE

25  PRISON SYSTEM BECAUSE THEY WOULD RELIEVE THE PROSECUTORS OF

1  HAVING TO DEAL WITH THEM, AND IT WOULD REDUCE THE JAIL

2  POPULATION.

3          NOW, THAT WAS BACK IN THE MID-1970'S, EARLY 1980'S.

4  SO THAT'S WHAT THIS IS REFERRING TO, THAT STATEMENT.

5          BUT I CAN COUNT IN LOS ANGELES, LOS ANGELES COUNTY

6  JAIL NOW HAS ABOUT 2500 OF EMPTY JAIL BEDS.

7          **JUDGE REINHARDT:**  WHAT?

8          **THE WITNESS:**  2500 EMPTY JAIL BEDS.

9          **JUDGE REINHARDT:**  THAT'S HARD TO BELIEVE, BECAUSE THE

10 SHERIFF'S BEEN RELEASING PEOPLE IN LOS ANGELES COUNTY BECAUSE HE

11 DOESN'T HAVE ENOUGH JAIL CELLS TO --

12         **THE WITNESS:**  NO, HE CAN'T STAFF THEM.  HE'S GOT THE

13 BEDS.

14         **JUDGE REINHARDT:**  WELL, HE ALWAYS SAYS THE

15 EXPLANATION IS THE COURT ORDER.

16         **THE WITNESS:**  I'LL BE GLAD TO SHOW YOU.  I GET THEIR

17 WEEKLY POPULATION COUNT.  THEY HAVE ABOUT 2100 BEDS.  THEY HAVE

18 ABOUT 18,000 INMATES.

19         THE OTHER THING THAT IS GOING ON BECAUSE OF THE

20 POLICE PRACTICES WITH CHIEF BRATTON DOWN THERE, CRIME IS GOING

21 DOWN DRAMATICALLY.  ARRESTS, THEREFORE, ARE GOING DOWN.  SO THEY

22 ARE EASING THAT WHOLE JAIL POPULATION.

23         FRESNO HAS A SURPLUS.  THERE'S PLENTY OF JAILS THAT

24 HAVE SURPLUSES NOW.  WHAT THEY ARE REALLY TALKING ABOUT PROBABLY

25 IS THAT THEY DON'T HAVE THE BUDGET TO OPEN THOSE JAIL BEDS AND

1  STAFF THEM.

2          LET ME SAY SOMETHING ELSE.  THE JAILS MAKE MONEY ON

3  THIS.

4          **JUDGE KARLTON:**  WELL, I WAS ABOUT TO SAY IN

5  SACRAMENTO COUNTY WE ARE BEING ASKED -- "WE", THE FEDERAL

6  COURTS -- WE SEND A LOT OF PEOPLE TO PRISON, TOO -- ARE BEING

7  ASKED TO GET OUR PRISONERS OUT OF THE JAILS BECAUSE EVEN THOUGH

8  THEY MAKE A PROFIT, THEY NEED THE BEDS. AND WE'RE NOW TRYING TO

9  FIND PLACES TO PUT PRISONERS THAT ARE OURS AWAY FROM THE COURT.

10          SO, I MEAN, I DON'T KNOW ABOUT LOS ANGELES COUNTY,

11  BUT IT'S CERTAINLY NOT TRUE IN OTHER PLACES.

12          **THE WITNESS:**  WELL, IT VARIES FROM COUNTY TO COUNTY,

13  YES.

14  **BY MS. JOHNSON:**

15  **Q.**  ON THE TOP OF PAGE 23, YOU ALSO NOTE THAT PAROLE REVOCATIONS

16  INCREASED BECAUSE OF THE WILLINGNESS OF PROSECUTORS TO ACCEPT A

17  PAROLE REVOCATION IN LIEU OF FURTHER PROSECUTION.

18  **A.**  CORRECT.

19  **Q.**  ARE YOU AWARE OF WHETHER THE COUNTIES ACROSS THE STATE HAVE

20  THE RESOURCES TODAY TO HANDLE MORE PROSECUTIONS IN LIEU OF

21  PAROLE REVOCATION?

22  **A.**  I CAN'T ANSWER THAT QUESTION.

23  **Q.**  ON PAGE 25, AT PARAGRAPH 57, YOU WRITE:

24          "IF EFFECTIVE EVIDENCE-BASED PROGRAMMING WERE

25          PROVIDED TO THE TECHNICAL PAROLE VIOLATORS, THE

1          DIVERSION PROGRAM WOULD LIKELY HAVE NO IMPACT ON

2          CRIME RATES."

3          DO YOU KNOW WHETHER TODAY THERE ARE SUFFICIENT PAROLE

4    AGENTS AND EVIDENCE-BASED PROGRAMMING IN PLACE TO HANDLE THE

5    DIVERSION OF TECHNICAL PAROLE VIOLATORS YOU PROPOSE?

6    **A.**  YES, I DO. I THINK THERE ARE, BECAUSE WHAT "EVIDENCE-BASED

7    PROGRAMMING" MEANS IS KIND OF A FADISH KIND OF TERM NOW.  BUT

8    ONE OF THE FADISH IS THAT NEXT SENTENCE:

9              "THERE IS A SIGNIFICANT NUMBER OF PEOPLE BEING

10             RELEASED FROM PRISON WHO ARE LOW RISK AND THEIR

11             CRIMINAL CAREERS ARE DONE, AND YOU DON'T NEED TO

12             SUPERVISE THEM."

13         THIS IS WHY THE GOVERNOR, I THINK, HAS RECOMMENDED

14   THAT CERTAIN PEOPLE NOT RECEIVE ANY PAROLE SUPERVISION.

15         EVIDENCE-BASED PROGRAMMING MEANS THAT LOW RISK PEOPLE

16   GET NO SUPERVISION. YOU LEAVE THEM ALONE.  BECAUSE THERE'S A LOT

17   OF EVIDENCE THAT PAROLE SUPERVISION IS CRIMINOGENIC TO CERTAIN

18   PEOPLE.  IT GETS IN THEIR WAY OF GETTING REUNITED AND GETTING

19   REASSIMILATED INTO SOCIETY.

20         SO WHAT DOESN'T HAPPEN IN CALIFORNIA IS THAT. THEY

21   GIVE IT TO EVERYONE REGARDLESS OF THEIR RISK. PART OF THE

22   REASON:  THEY DON'T HAVE A GOOD RISK INSTRUMENT, ALTHOUGH THEY

23   ARE WORKING ON THAT NOW, WHICH IS, AGAIN, UNIQUE.

24         SO WHAT SHOULD BE GOING ON IS AN ASSESSMENT OF

25   EVERYONE GOING OUT ON PAROLE.  IF YOU'RE LOW RISK, WHICH MOST

1   PLACES WE WILL FIND THAT'S IN THE NEIGHBORHOOD OF 15 TO 30

2   PERCENT OF THE RELEASES ARE ASSESSED LOW RISK, DON'T NEED ANY

3   SUPERVISION.

4             THEN, YOU TAKE THOSE ADDITIONAL RESOURCES OR THE

5   RESOURCES YOU HAVE AND FOCUS THEM ON THE HIGH RISK PEOPLE. THAT

6   IS WHERE YOU GET REDUCTIONS. AND I THINK YOU HAVE ENOUGH

7   PROGRAMMING AND SUPERVISION TO HANDLE THE HIGH RISK PEOPLE.

8             I ALSO AGREE, THOUGH, THAT MORE COULD BE DONE IN THIS

9   AREA, BUT YOU DON'T NEED TO HAVE PROGRAMS TO LAUNCH THIS

10  RECOMMENDATION. WHAT YOU NEED TO DO IS REALIGN THE RESOURCES YOU

11  HAVE NOW AND DO BETTER SELECTION, BETTER SORTING, AND YOU'LL BE

12  ABLE TO LOWER THE POPULATION WITHOUT HAVING AN ADVERSE AFFECT ON

13  PUBLIC SAFETY.

14  Q.  DO YOU HAVE ANY NUMBERS YOU COULD TELL US TO SUPPORT THAT?

15  A.  WHICH?  ON THE --

16  Q.  THE NUMBERS OF SLOTS AVAILABLE IN EVIDENCE-BASED PROGRAMMING

17  VERSUS THE NUMBER OF HIGH RISK TECHNICAL PAROLE VIOLATORS THAT

18  WOULD NEED IT UNDER YOUR PROPOSAL AS THEY ARE NOT BEING -- SINCE

19  THEY ARE BEING DIVERTED?  DO YOU HAVE ANY NUMBERS TO SUPPORT

20  THAT THAT YOU CAN TELL ME?

21  A.  THERE ARE SOME NUMBERS THAT ARE COMING OUT, BUT THEY ARE ALL

22  IN DRAFT FORM.  AND, AGAIN, WHEN WE'RE AS PART OF THE EXPERT

23  PANEL ALL I MEANT WAS THERE WAS NO RISK ASSESSMENT BEING DONE OF

24  PEOPLE COMING OUT ON PAROLE SUPERVISION.

25            WE WERE TRYING TO FIGURE OUT WHAT IS THE NUMBER OF

1    LOW RISK PEOPLE. NOW, WE DO KNOW STATISTICALLY THAT OF THE

2    PEOPLE RELEASED FROM PRISON, ABOUT 30 PERCENT, MAYBE 34 PERCENT,

3    DO NOT GET ARRESTED AGAIN.

4              SO THAT'S YOUR LOW RISK GROUP.  SO THEY ARE NOT

5    GETTING ARRESTED AGAIN.

6              THERE'S ANOTHER GROUP THAT GETS ARRESTED OR VIOLATED

7    EITHER FOR PURE TECHNICALS OR FOR MINOR MISDEMEANOR LEVEL

8    CRIMES.  THAT'S GOING TO BE YOUR MODERATE RISK GROUP.

9              AND THEN, YOU HAVE A SMALL GROUP GETTING INVOLVED IN

10   VERY SERIOUS CRIMES.  GENERALLY, THAT'S GOING TO BE MOST STATES

11   IN THE 10 TO 15 PERCENT RANGE.

12             SO I THINK -- PERSONALLY, I THINK CDCR HAS ENOUGH

13   RESOURCES TO, IF THEY REALIGNED THEIR PAROLE SUPERVISION

14   SERVICES PROPERLY -- AND ALSO BEAR IN MIND THAT IF YOU START

15   DOING THIS DEPOPULATION, MONEY STARTS APPEARING IMMEDIATELY.

16             CDCR HAS AN ESTIMATE OF WHAT THEY CALL THEIR

17   "CROWDING COSTS."  I THINK IT'S IN THE 21, 22,000 PER INMATE

18   REDUCTION.  THAT'S HOW MUCH MONEY THEY ACTUALLY SAVE IN THEIR

19   BUDGETS IF YOU START THIS PROCESS.

20             MONEY SHOULD BECOME AVAILABLE QUICKLY, WHICH COULD

21   THEN BE DIVERTED TO KEY COUNTIES OR LOCATIONS FOR SERVICES THAT

22   DO NEED TO BE DONE.

23             YOU KNOW, I THINK IT'S TRUE.  NOT ENOUGH ASSESSMENT

24   HAS BEEN DONE ON WHAT IS NEEDED.  BUT I WOULD NOT AGREE THAT YOU

25   NEED TO WAIT FOR THE PROGRAMS TO GET PUT IN PLACE.  THERE'S

1  PLENTY OF PROGRAMS.  THERE'S PLENTY OF PAROLE OFFICERS.  THEY

2  JUST NEED TO BE REALIGNED MORE APPROPRIATELY.

3  Q.  ON PAGE FIVE AT FOOTNOTE SIX OF YOUR AUGUST 15, 2008 REPORT,

4  YOU CITE AN ARTICLE BY RYAN FISHER, ENTITLED:  "ARE CALIFORNIA'S

5  RECIDIVISM RATES REALLY THE HIGHEST IN THE NATION?"

6          IT COMMENTS ON WHAT MEASURE OF RECIDIVISM YOU USE.

7  A.  CORRECT.

8  Q.  ACCORDING TO THE ARTICLE BY MR. FISHER, WHICH YOU CITED:

9          "A HIGHER PERCENTAGE OF INMATES IN CALIFORNIA

10         AND FLORIDA HAD 10 OR MORE PRIOR ARRESTS. CALIFORNIA

11         MAY BE DEALING WITH MORE HARDENED OFFENDERS WHO ARE

12         MORE SUSCEPTIBLE TO PAROLE FAILURE, IN GENERAL.

13         SINCE ALL OF THESE INMATES GO TO PAROLE SUPERVISION

14         IN CALIFORNIA, WHEREAS IN FLORIDA LESS THAN

15         40 PERCENT DO, CALIFORNIA PAROLEES ARE MORE LIKELY TO

16         HAVE THEIR MINOR AND MAJOR CRIMINAL MISDEEDS

17         DETECTED."

18  A.  RIGHT.

19  Q.  YOU HAVE NO REASON TO DISAGREE WITH MR. FISHER'S STATEMENTS

20  THAT A HIGHER PERCENTAGE OF INMATES IN CALIFORNIA AND FLORIDA

21  HAD 10 OR MORE PRIOR ARRESTS, DO YOU?

22  A.  WHAT MR. FISHER -- MR. FISHER SAID SOME THINGS THERE THAT

23  YOU DIDN'T CITE.  ONE IS THAT HE LOOKED AT THE REARREST RATES.

24  AND THAT'S WHERE HE FOUND THE REARREST RATE WAS SIMILAR IN

25  CALIFORNIA AS IT IS TO OTHER STATES. WHEN YOU OPENED YOUR

1   SESSION I HEARD YOU TALK ABOUT THE RECIDIVISM DEFINITION.

2           AND ONE IS RETURN TO PRISON, WHICH INCLUDES THE

3   PAROLE VIOLATORS.  IF YOU LOOK AT REARREST RATES, IT'S A

4   DIFFERENT MEASURE.  CALIFORNIA WHICH IS -- THEY ARE IN THAT 65,

5   I THINK, 69 PERCENT RANGE, WHICH MOST STATES ARE IN THAT RANGE.

6           WHAT HE'S SAYING, ALSO, THOUGH, IS THAT IF EVERYONE

7   GOES ON PAROLE SUPERVISION IN CALIFORNIA, WHICH IS NOT LIKE

8   OTHER STATES, OTHER STATES YOU DON'T HAVE THAT KIND OF --

9   EVERYONE HAS TO GO FOR THIS PERIOD OF THREE YEARS.

10          AND IF YOU'RE ON PAROLE SUPERVISION YOU CAN BE

11  DETECTED AND BROUGHT IN FOR MISDEEDS, AS SHE SAID, AND MINOR

12  KINDS OF CRIMES.

13          EVERYONE KNOWS THAT THE BEST WAY TO STAY OUT OF

14  PRISON IS NOT TO GO ON PAROLE SUPERVISION. PEOPLE THAT DISCHARGE

15  HAVE THE LOWEST RECIDIVISM RATES BECAUSE THEY CAN'T BE BROUGHT

16  IN FOR THESE TECHNICAL VIOLATIONS.

17          SO I DON'T DISAGREE WITH WHAT MR. FISHER IS SAYING AT

18  ALL. I THINK HE'S SAID A LOT OF THINGS THAT WERE VERY USEFUL.

19  Q.  I JUST WANTED TO CLARIFY, BECAUSE I HEARD YOU REFER TO MINOR

20  MISDEEDS, JUST IN CASE I MISSPOKE, THAT MR. FISHER SAID:

21              "CALIFORNIA PAROLEES ARE MORE LIKELY TO HAVE

22              THEIR MINOR AND MAJOR CRIMINAL MISDEEDS DETECTED."

23          SO I JUST WANTED TO MAKE SURE THAT WAS CLEAR.

24  A.  THAT WOULD BE FAIR.

25  Q.  THE NEXT RECOMMENDATION THAT I WANTED TO TALK TO YOU ABOUT

1  IS PROVIDING MORE AVENUES -- IF WE GO BACK TO -- YES, PAGE 20,

2  AT PARAGRAPH 43, THE NUMBER THREE.

3           YOU ARE RIGHT. I WAS WRONG.

4           THE NUMBER FOUR.  AND I'VE GROUPED IN THIS WAY

5  BECAUSE WE'RE STILL TALKING ABOUT PAROLE. PROVIDING MORE AVENUES

6  FOR EARLY DISCHARGE FROM PAROLE.

7  **A.**  OKAY. YES.

8  **Q.**  ON PAGE FOUR AT PARAGRAPH 12 OF YOUR AUGUST 27TH, 2008

9  REPORT, YOU RECOMMEND DISCHARGING PAROLEES WHO REMAIN ARREST

10 FREE FOR 12 MONTHS FROM PAROLE -- I'M SORRY. LET ME RESTATE

11 THAT.

12          YOU RECOMMEND DISCHARGING FROM PAROLE SUPERVISION

13 PAROLEES WHO REMAIN ARREST FREE FOR 12 MONTHS, CORRECT?

14 **A.**  YES, BUT JUST TO CLARIFY THIS WAS THE ORIGINAL INTENTION OF

15 THE DETERMINATE SENTENCING WHEN IT WAS PASSED IN 1977, THE

16 ORIGINAL LAW.  THAT WAS THE IDEA THAT IF YOU WERE ARREST FREE

17 YOU WOULD BE DISCHARGE FROM PAROLE.

18 **Q.**  OKAY.  AND THAT'S A RECOMMENDATION IN YOUR REPORT?

19 **A.**  IT'S A FURTHER RECOMMENDATION IN MY REPORT.

20 **Q.**  PAROLEES WHO HAVE BEEN ARREST FREE FOR 12 MONTHS STILL HAVE

21 A RISK OF COMMITTING CRIMES IN THE FUTURE, CORRECT?

22 **A.**  YES, THEY DO.

23 **Q.**  THE PURPOSE OF RELEASING THE PAROLEES IS SO THEY CANNOT BE

24 SENT BACK TO PRISON ON A TECHNICAL PAROLE VIOLATION LATER DURING

25 THE PAROLE PERIOD THAT THEY WOULD OTHERWISE HAVE SERVED,

1   CORRECT?

2   **A.**   IS THE FIFTY PERCENT THE DISCHARGE AT 12 MONTHS, ARE YOU

3   SAYING?

4   **Q.**   YES.

5   **A.**   THAT WOULD BE ONE.  BUT THE OTHER PART IS TO PROVIDE AN

6   INCENTIVE FOR THE PAROLEE TO CONFORM WITH THE CONDITIONS OF

7   PAROLE. KIND OF GIVES THEM A CARROT, LIKE YOU GET ADMITTED TO

8   COLLEGE.

9              "HOW DO I GET OUT OF COLLEGE?

10              "WELL, YOU HAVE TO GO TO CLASS.  AND IF YOU DO

11        THIS, YOU'RE DONE IN FOUR YEARS."

12        SO THAT'S THE OTHER PART OF IT IS TO PRODUCE AN

13   INCENTIVE.  AND I NEED TO KEEP SAYING THIS. IN THE EXPERT PANEL

14   REPORT WE KEPT ON NOTING THAT THERE ARE NO INCENTIVES HERE FOR

15   PEOPLE TO DO THINGS THAT WOULD BE MORE CONFORMING.

16        BUT, YES, WHAT THAT DOES IS -- AND THIS IS WHAT

17   HAPPENED IN NEVADA.  THE REVOCATION RATE HAS DROPPED IN NEVADA.

18        IN NEVADA NOW APPROXIMATELY 15 PERCENT OF PAROLEES

19   ARE REVOKED. 15 PERCENT. IT USED TO BE 50 PERCENT.  AND WHAT WE

20   DID, WE PUT IN -- THEY PASSED A LAW THAT ALLOWS PRISONERS TO GET

21   OFF PAROLE SUPERVISION THROUGH GOOD CONDUCT.  THE PAROLE

22   POPULATION DID NOT GROW, AND THE NUMBER OF TECHNICAL PAROLE

23   VIOLATORS COMING INTO THE SYSTEM HAS DROPPED.

24        SO IT'S BEEN AS FAR AS THE STATE OF NEVADA IS

25   CONCERNED A GOOD EXPERIMENT. BUT THAT'S WHAT THIS WOULD DO, THE

1    SAME THING HERE.

2    **Q.**   FOLLOWING EARLY DISCHARGE FROM PAROLE, AS YOU PROPOSE, A

3    FORMER PAROLEE WHO WAS INVOLVED IN ILLEGAL DRUG USE WILL NOT

4    COME TO THE ATTENTION OF THE AUTHORITIES UNTIL REARRESTED,

5    CORRECT?

6    **A.**   THAT'S CORRECT.

7              **JUDGE REINHARDT:**   YOU'RE SAYING THAT IF YOU REDUCE

8    THE PERIOD OF PAROLE FROM THREE TO ONE YEARS THAT YOU WILL HAVE

9    LESS REVOCATION, FEWER REVOCATIONS?

10             **THE WITNESS:**   ABSOLUTELY.

11             **JUDGE REINHARDT:**   WELL, ISN'T THAT NATURAL IN EVERY

12   CASE, IF THE ONLY TIME DURING WHICH YOU CAN REVOKE IT IS ONE

13   YEAR INSTEAD OF THREE?  AND YOU ELIMINATE ALL THE ACTS IN THE

14   SECOND AND THIRD YEARS?  OF COURSE YOU'LL HAVE FEWER.

15             **THE WITNESS:**   ABSOLUTELY. OF COURSE YOU WILL.

16             **JUDGE REINHARDT:**   WELL, IF YOU ELIMINATED PAROLE

17   ENTIRELY YOU WOULD HAVE NO PAROLE REVOCATIONS.

18             **THE WITNESS:**   ABSOLUTELY.  AND THERE ARE STATES THAT

19   HAVE DONE THAT.

20             **JUDGE REINHARDT:**   OKAY.

21             **THE WITNESS:**   I MEAN, I MENTIONED WASHINGTON STATE.

22   WASHINGTON STATE YOU CANNOT FIND A PAROLE VIOLATOR IN THEIR

23   PRISON SYSTEM, BECAUSE THEY BANNED PAROLE VIOLATORS FROM COMING

24   TO PRISON LEGISLATIVELY. THEY HAVE A CRIME RATE AND

25   INCARCERATION RATE WELL BELOW CALIFORNIA.

1          MY POINT, JUDGE, IS WHAT ARE YOUR PRISONS FOR?  I

2   MEAN, THE QUESTION -- I DON'T HAVE THE ANSWER -- BUT STATES HAVE

3   TO ASK THIS QUESTION AND ANSWER IT.

4          WHO IS GOING TO GO TO YOUR PRISON?  WHO IS GOING TO

5   GO TO YOUR JAILS?  WHO IS GOING TO GO TO PROBATION?  WHAT DO YOU

6   RESERVE THOSE BED SPACE -- AND DO YOU HAVE ENOUGH MONEY TO PAY

7   FOR YOUR POLICY?  IT'S KIND OF A PRETTY BASIC -- TO ME, IT'S A

8   PRETTY BASIC KIND OF A SERIES OF QUESTIONS.

9          **JUDGE REINHARDT:**  THEN WHY ARE YOU ONLY RECOMMENDING

10  CUTTING IT TO ONE YEAR?  WHY DON'T YOU RECOMMEND THE ELIMINATION

11  OF PAROLE?

12         **THE WITNESS:**  WELL, PERSONALLY IN THE ARTICLES I'VE

13  WRITTEN WHAT I HAVE RECOMMENDED THAT IF YOU'RE LOW RISK YOU

14  DON'T HAVE ANY SUPERVISION.  SO I WOULD AGREE WITH THE GOVERNOR.

15  IF YOU'RE LOW RISK, THERE'S NO PAROLE.

16         I DO THINK --

17         **JUDGE REINHARDT:**  BUT IF YOU'RE HIGH RISK YOU CUT

18  FROM IT THREE TO ONE.

19         **THE WITNESS:**  NOW, WITH THE HIGH RISK CANDIDATE --

20  AGAIN, IF THEY ARE HIGH RISK, THEY ARE GOING TO -- IF THEY ARE

21  REALLY HIGH RISK THEY ARE GOING TO DO SOMETHING IN THAT FIRST 12

22  MONTHS.

23         THERE'S ANOTHER THING ABOUT RISK, OKAY?  THERE ARE

24  PEOPLE THAT WE THINK ARE HIGH RISK, BUT THEY ARE NOT. FALSE

25  POSITIVES. WE DO A LOT OF THE FALSE POSITIVES.

1        EVERYONE NEEDS TO UNDERSTAND THAT CRIMINALS COMING

2   OUT OF THE PRISON SYSTEM ARE NOT GETTING WORSE IN TERMS OF THEIR

3   CRIMINAL CONDUCT. THEY ARE SLOWING DOWN.

4        ONE OF THE BIG PROJECTORS OF THESE RISK INSTRUMENTS

5   IS AGE. AND PRISONERS AS A CLASS OF PEOPLE ARE HEADED TOWARD

6   THEIR GOLDEN PONDS.  THEY ARE LIKE THE ROGER CLEMENS OF

7   BASEBALL.  THEY THREW A GOOD BASEBALL, GOOD FASTBALL IN THEIR

8   YOUTH, BUT THEY CAN'T THROW IT NOW.

9        AND TO WASTE -- AND THIS IS WHY THE LENGTH OF STAY

10  THING SHOWS UP THE WAY IT DOES.  AND THIS IS WHY PRISONERS

11  AREN'T THE BIGGEST SOURCE OF YOUR CRIME PROBLEM.  IT'S THE NEXT

12  GENERATION OF YOUNG FOLKS COMING UP.

13       SO THE WAY I LOOK AT IT IS RISK.  YOU KNOW, WHAT'S

14  THE RISK?  WHAT'S YOUR INVESTMENT STRATEGY?

15       AND, YES, YOU COULD GET RID OF PAROLE SUPERVISION

16  COMPLETELY.  BUT I DO KNOW THERE ARE PEOPLE COMING OUT OF THE

17  PRISON SYSTEM THAT ARE PRETTY DANGEROUS AND NEED TO BE WATCHED.

18       YOU COULD DO THAT THROUGH SOME OTHER MEANS.  BUT MOST

19  PEOPLE WOULD SAY WE NEED TO WATCH SOME OF THESE PEOPLE FOR SOME

20  PERIOD OF TIME.  IF THEY DO FINE, THEN THEY WOULD COME OFF.

21       BUT IN MY WORLD, YES, NO ONE WOULD DO MORE THAN 12

22  MONTHS OF PAROLE SUPERVISION.  LOW RISK PEOPLE WOULD BE NO

23  PAROLE SUPERVISION. THEY HAVE DONE THEIR PRISON TERM.  THEY PAID

24  THEIR DEBT TO SOCIETY.  LET THEM GET BACK ON WITH THEIR LIVES.

25       IF THEY GET BACK IN TROUBLE AGAIN AND ARRESTED FOR A

1   NEW FELONY, YOU'RE COMING BACK TO PRISON.

2           THAT'S RELATIVELY RARE.  MOST PEOPLE THAT GO TO

3   PRISON DON'T COME BACK TO PRISON AGAIN, UNLESS THEY ARE THESE

4   VIOLATORS.  BUT IN ANY STATE YOU'LL SEE THAT.  ONE SHOT IS ALL

5   THEY NEED.  THEY ARE DONE.  THANK YOU VERY MUCH.

6           THERE'S A FEW THAT KEEP COMING BACK FOR A VARIETY OF

7   REASONS.

8           **JUDGE REINHARDT:**  HOW DO YOU HAVE SUCH A HIGH

9   RECIDIVISM RATE?

10          **JUDGE KARLTON:**  BECAUSE IT'S THE PAROLE VIOLATORS.

11          **THE WITNESS:**  THE PAROLE VIOLATORS.

12          **JUDGE REINHARDT:**  IF YOU ELIMINATED PAROLE VIOLATIONS

13  YOU WOULD HAVE A VERY LOW RECIDIVISM RATE.

14          **THE WITNESS:**  YOU'D HAVE A NORMAL RECIDIVISM RATE.

15          **JUDGE REINHARDT:**  WHICH WOULD BE WHAT?

16          **THE WITNESS:**  ABOUT 40 PERCENT COMING BACK TO PRISON.

17          **JUDGE KARLTON:**  FOUR-OH?

18          **THE WITNESS:**  FOUR-OH. IT'S INTERESTING.  IF YOU LOOK

19  AT THE BUREAU OF JUSTICE STATISTICS, THEY PUBLISH THIS.  AND

20  THEY HAVE A FOOTNOTE IN IT.  THEY HAVE TWO FIGURES, 40 PERCENT

21  AND 52. 52 IS WHEN THEY PUT CALIFORNIA IN THE MIX.

22          40 IS THE NATIONAL AVERAGE.  AND THERE'S PROBABLY 15,

23  20 STATES WITH RECIDIVISM RATES BELOW 30 PERCENT.

24          SO -- AND CALIFORNIA WAS THERE. CALIFORNIA HAD ONE OF

25  THE LOWEST RECIDIVISM RATES IN THE '60'S AND '70'S. SO A LOT OF

1    THIS IS MANUFACTURED AND CAN BE BROUGHT UNDER CONTROL, I

2    BELIEVE, WITH PROPER PROGRAMMING, PROPER STRATEGY, PROPER

3    THINKING ABOUT HOW TO MANAGE THE RESOURCES, BECAUSE I DON'T JUST

4    THINK IT.  I'VE SEEN IT. I'VE SEEN IT DONE IN TEXAS.

5            TEXAS HAS REDUCED ITS PRISON RATES SUBSTANTIALLY.

6    HOW?  BY BASICALLY NOT ALLOWING TECHNICAL VIOLATORS TO COME IN

7    BACK TO THE INSTITUTION PRISON DIVISION.  THEY DON'T ALLOW IT TO

8    HAPPEN.  THEY GO THROUGH A REVIEW PROCESS.  THEY PUT THEM BACK

9    ON THE STREET.  THEY WORK WITH THEM.  HANDLE THEM.  MANAGE THEM.

10           WHY?  BECAUSE IT'S CHEAPER?  CALIFORNIA IN 1994 THEY

11   HAD AN EXPERIMENT WHICH WAS VERY SUCCESSFUL.  THEY LOWERED THEIR

12   REVOCATION RATE BY ABOUT 25 PERCENT BY GIVING THE PAROLE REGIONS

13   MONEY.  THEY GAVE THEM -- BASICALLY SAID:

14               "YOU CAN OCCUPY SO MANY BED CELLS IN CALIFORNIA

15               FOR TECHNICALS.  IF YOU GO OVER THAT, WE'RE GOING TO

16               FINE YOU.  WE'RE GOING TO TAKE MONEY AWAY FROM YOU.

17               IF YOU BEAT THAT, WE'RE GOING TO GIVE THE PAROLE

18               DIVISION MORE MONEY AND RESOURCES."

19           WHEN THEY DID IT, THE REVOCATION RATE WENT DOWN.

20   WENT DOWN.

21           AND SO CALIFORNIA HAS DONE THIS BEFORE. IT COULD

22   OBVIOUSLY DO IT AGAIN. OTHER STATES ARE DOING THIS.  SOME

23   STATES FORBID PAROLE VIOLATORS COMING IN THEIR SYSTEM.  AND

24   THEIR CRIME RATE IS LOWER THAN YOUR CRIME RATE.  THEIR

25   INCARCERATION RATE IS LOWER THAN YOUR RATE.

1          SO JUST LOOKING AT DIFFERENT CULTURES OR COUNTRIES OR

2    STATES YOU CAN SEE THERE ARE WAYS TO DO THIS AND ARE BEING DONE.

3

4    **BY MS. JOHNSON:**

5    **Q.**  LET'S GO BLACK TO THE FOUR RECOMMENDATIONS. PAGE -- THERE WE

6    GO.  PARAGRAPH 43. WE'RE GOING TO TALK ABOUT NUMBER THREE.

7          HE KNOWS WHAT I'M GOING TO TALK ABOUT BEFORE I DO.

8              "PROVIDE MORE AVENUES FOR PRISONERS TO EARN GOOD

9          TIME CREDITS TOWARD RELEASE FOR GOOD BEHAVIOR."

10   **A.**  RIGHT.

11   **Q.**  ON PAGE 41, AT PARAGRAPH 94 OF YOUR AUGUST 15, 2008 REPORT

12   YOU INDICATED THAT YOUR PROPOSAL OF ADDITIONAL OPPORTUNITIES FOR

13   GOOD TIME CREDITS WOULD CREATE A FOUR-MONTH SURGE OF EXTRA

14   INMATES BEING RELEASED IN ADDITION TO THOSE ORDINARILY BEING

15   RELEASED, CORRECT?

16   **A.**  CORRECT.

17   **Q.**  ON PAGE 45, AT PARAGRAPH 95, YOU WROTE:

18              "DURING THIS FOUR-MONTH WINDOW (A TIME DURING

19          WHICH THE INMATE WOULD HAVE BEEN INCARCERATED

20          ABSENT THE GOOD TIME RELEASE PROGRAM) APPROXIMATELY

21          5 PERCENT OF THE RELEASED PRISONERS WILL BE

22          REARRESTED WILL RETURN TO PRISON FOR TECHNICAL

23          VIOLATION.  THE GOOD TIME CREDIT RELEASES WOULD

24          ACCOUNT FOR A TEMPORARY INCREASE IN ARRESTS OF LESS

25          THAN 1 PERCENT OF ALL ARRESTS OCCURRING IN THE

1          COUNTIES."

2          YOU REPRESENTED THIS ESTIMATED IMPACT IN TABLE 11 ON

3    THAT SAME PAGE, CORRECT?

4    A.  YES.

5    Q.  YOU REVISED TABLE 11 BECAUSE YOUR ESTIMATE THAT 5 PERCENT OF

6    THE RELEASED PRISONERS WOULD BE REARRESTED OR RETURNED TO PRISON

7    FOR A TECHNICAL VIOLATION WAS TOO LOW, CORRECT?

8    A.  I CALCULATED THAT MYSELF, YES.  FOUND THAT OUT, YES.

9    Q.  LOOKING AT THE REVISED TABLE 11, WHICH IS ON PAGE 10 OF YOUR

10   AUGUST 27, 2008 REPORT --

11   A.  YES.

12   Q.  -- YOU USED AN ESTIMATE OF ADDITIONAL ARRESTS AT A

13   26 PERCENT RATE, CORRECT?

14   A.  TABLE?

15   Q.  TABLE 11.

16   A.  11, NOT 10.  YES.

17   Q.  YOU DID NOT PROVIDE AN ESTIMATE OF THE POSSIBLE STATEWIDE

18   IMPACT OF THOSE REARRESTS, DID YOU?

19   A.  NO, BUT THAT COULD BE DONE.

20   Q.  YOU ONLY PROVIDED AN ESTIMATE OF THE POSSIBLE IMPACT ON

21   THREE COUNTIES, INCLUDING LOS ANGELES COUNTY, CORRECT?

22   A.  CORRECT.

23   Q.  YOU INDICATED IN TABLE 11 THAT A FOUR-MONTH SHORTENED LENGTH

24   OF SENTENCE FOR ELIGIBLE OFFENDERS MAY CORRELATE WITH 1,398

25   ADDITIONAL ARRESTS IN LOS ANGELES COUNTY ALONE IN THAT

1    FOUR-MONTH SURGE PERIOD, CORRECT?

2    **A.**   WELL, THE WAY YOU SHOULD INTERPRET THIS, IF YOU LOOK AT THE

3    TOP LINE YOU'LL SEE THE TOTAL ARRESTS IN THOSE COUNTIES. AMADOR,

4    FRESNO AND LOS ANGELES.  AND THEN, I'M BASICALLY WORKING MY WAY

5    DOWN BY LOOKING AT HOW MANY PEOPLE WOULD BE RELEASED EARLIER IN

6    THOSE COUNTIES.

7            SO, FOR EXAMPLE, RIGHT NOW WE'RE RELEASING ABOUT 22

8    TO 24,000 INMATES INTO L.A. COUNTY.  AND IF WE TARGETED THE

9    GROUP I TARGETED, WHICH IS THESE NONCONTROVERSIAL FIFTY PERCENT

10   EARNING CLASS PEOPLE, THAT WOULD BE 5,375 ADDITIONAL   RELEASES

11   -- AND I'LL GET TO A COUPLE OF POINTS ABOUT THAT -- WHICH IS

12   24 PERCENT.

13           IF THEY GET ARRESTED AT THAT RATE DURING THAT

14   FOUR-MONTH WINDOW IT PRODUCES ABOUT 1400 ARRESTS.  THAT

15   TECHNICALLY WHAT THAT IS IN THAT FOUR-MONTH WINDOW HOW MANY OF

16   THOSE FOLKS GOT ARRESTED IN THAT FOUR-MONTH WINDOW, WHICH IS THE

17   LESS THAN 1 PERCENT FIGURE.

18           NOW, THE WAY YOU SHOULD INTERPRET THIS IS THAT DOES

19   THAT MEAN THAT ARRESTS IN LOS ANGELES COUNTY ARE GOING TO GO UP

20   OR DOWN?

21           NO, IT DOESN'T MEAN THAT.  IT MEANS THAT THAT POOL,

22   WHATEVER THAT POOL OF ARRESTS ARE, THE POOL IS GOING TO BE

23   INCREASED IN TERMS OF -- THE POOL THAT IS BEING CONTRIBUTED BY

24   THE PEOPLE GETTING THESE CREDITS IS INCREASING BY LESS THAN

25   1 PERCENT.

1       SO THAT'S TECHNICALLY WHAT THAT IS DOING IS LOOKING

2  AT THAT. NOW, I THINK YOU ALSO MENTIONED ABOUT THE TEMPORARY.

3  AND IF YOU CAN LOOK AT MY -- IF YOU CAN REFER TO MY CHART AGAIN,

4  I HAVE A CHART IN THERE NO ONE CAN UNDERSTAND, SO I'LL JUST TRY

5  AND EXPLAIN IT TO YOU.

6       BUT WHEN YOU START TO EARLY RELEASE -- I DON'T WANT

7  TO USE THAT WORD.  WHEN YOU START THE DIFFERENT RELEASES, LET'S

8  SAY PEOPLE GETTING OUT AT 24 MONTHS, THERE'S A GROUP THAT'S

9  GOING TO FOLLOW THEM, A COHORT IN THE MONTH THAT FOLLOWS THAT

10 GETS TO 20 MONTHS.

11      THAT'S WHERE YOU HAVE THIS DOUBLE.  AND YOU HAVE THAT

12 FOR FOUR MONTHS.

13      ONCE THAT IS OVER, THE NUMBER OF PEOPLE GOING INTO

14 THESE COUNTIES IS EXACTLY THE SAME. IT'S NOT CHANGING. SO WE

15 HAVE THIS -- AS I KEEP MENTIONS, FOLKS -- IT'S A TEMPORARY SURGE

16 THAT LASTS JUST FOR THE PERIOD OF THE IMPLEMENTATION.  AND THEN,

17 THE STREAM RETURNS ITSELF TO ITS NORMAL PATH.

18      IT'S KIND OF LIKE YOU HAVE A STREAM.  YOU HAVE A DAM.

19 YOUR DAM IS YOUR LENGTH OF STAY. YOU'RE GOING TO LOWER THAT DAM

20 FOR A PERIOD OF TIME.  AT A POINT IN TIME YOU'RE GOING TO LOWER

21 THAT DAM, WHICH MEANS MORE WATER IS GOING TO COME OUT.

22      IT COMES OUT, BUT THEN THAT WATER COMING IN IS THE

23 SAME.  THE WATER GOING DOWN RETURNS AT THE SAME RATE.  SO THERE

24 IS ULTIMATELY NO CHANGE IN THE NUMBER OF PEOPLE GOING OUT OF THE

25 PRISON SYSTEMS INTO THESE COUNTIES.  BUT THERE IS A TEMPORARY

1   SURGE THAT DOES OCCUR.  AND THAT'S THE ISSUE THAT EVERYONE NEEDS

2   TO BE AWARE OF.

3          BUT I'VE SEEN COMMENTS SAYING:

4              "WE'RE GOING TO RELEASE 40,000 PEOPLE" ALL OF A

5   SUDDEN. THAT DOESN'T HAPPEN THAT WAY AT ALL. IT'S A VERY

6   GRADUAL, VERY MINOR INCREASE IN THE RIVER, AND THEN IT DROPS

7   BACK DOWN.

8   **Q.**  THAT TEMPORARY SURGE MAY ALSO RESULT IN A TEMPORARY INCREASE

9   IN THE NUMBER OF ARRESTS ACROSS THE STATE, CORRECT?

10  **A.**  IT MAY OR IT MAY NOT. THERE HAVE BEEN STUDIES OF STATES THAT

11  DO THIS WHERE THE NUMBER OF ARRESTS HAVE GONE DOWN AND CRIME HAS

12  GONE DOWN. SO THEY KIND OF GO ALSO ON -- AGAIN, GOING BACK TO --

13  YOU HAVE TO UNDERSTAND THAT THE TOTAL ARREST POOL IS NOT BEING

14  DRIVEN BY PRISONERS COMING OUT OF THE PRISON SYSTEM. THAT'S NOT

15  WHERE THE ACTION IS.

16          **JUDGE REINHARDT:**  I DON'T QUITE UNDERSTAND WHAT

17  YOU'RE SAYING. THERE AREN'T GOING TO BE ROUGHLY IN LOS ANGELES

18  AN ADDITIONAL 1400 ARRESTS DURING THAT FOUR-MONTH PERIOD.

19          **THE WITNESS:**  NO.

20          **JUDGE REINHARDT:**  WELL --

21          **THE WITNESS:**  WELL --

22          **JUDGE REINHARDT:**  ISN'T --

23          **THE WITNESS:**  BECAUSE YOU COULD HAVE OTHER THINGS.

24  LIKE WHAT IS GOING ON NOW IN LOS ANGELES, ARRESTS ARE GOING

25  DOWN. AND THIS IS AT A TIME, YOUR HONOR, AT A TIME WHEN CDCR IS

1   EARLY RELEASING PEOPLE.  THEY ARE EARLY RELEASING PEOPLE NOW

2   BECAUSE THEY ARE GIVING OUT MORE CREDITS.  THEY ARE EARLY

3   RELEASING PEOPLE IN LOS ANGELES.

4           THEY ARE ALSO RESTRICTING PAROLE VIOLATORS.  THEY GOT

5   A MAJOR -- THAT'S WHY THE DIFFERENCE IN OUR NUMBER. AND CRIME

6   AND ARRESTS ARE GOING DOWN.

7           JAIL POPULATION HAS GONE DOWN. SO THIS IS HOW THIS

8   CAN HAPPEN.

9           **JUDGE REINHARDT:**  CRIME MAY GO DOWN, BUT THERE WILL

10  BE A CERTAIN AMOUNT OF CRIME MORE THAN THERE WOULD OTHERWISE BE

11  DURING THAT BRIEF SURGE.

12          **THE WITNESS:**  NOT NECESSARILY.

13          LET ME TRY TO EXPLAIN IT THIS WAY. OF YOUR POOL OF

14  CRIME, WHATEVER THAT POOL OF CRIME IS, THAT POOL WILL HAVE A

15  SLIGHT GREATER REPRESENTATION OF CRIME THAT'S BEING CAUSED BY

16  THE RELEASED PRISONERS WOULD OTHERWISE WOULD HAVE BEEN

17  INCARCERATED.  BUT THAT POOL OF CRIME COULD HAVE ALSO SHRUNK.

18          **JUDGE REINHARDT:**  WELL, I THINK THAT'S WHAT I SAID,

19  ALSO.  BUT I THINK I UNDERSTAND THAT CRIME ITSELF MAY GO DOWN,

20  BUT THERE WILL BE SLIGHTLY MORE CRIME.  DEPENDS ON WHAT YOU

21  CONSIDER "SLIGHTLY."

22          **THE WITNESS:**  THERE COULD BE, BECAUSE LET ME GIVE YOU

23  ANOTHER EXAMPLE OF AN ESTIMATE BY DR. JOAN PETERSILIA.

24          **JUDGE REINHARDT:**  SLIGHTLY MORE THAN THERE WOULD

25  OTHERWISE BE IF THERE WASN'T THIS SURGE OF RELEASES.

1          **THE WITNESS:** PERHAPS. WE DON'T KNOW THIS.  AND LET

2    ME AGAIN GIVE YOU --

3          **JUDGE REINHARDT:** WE REALLY DON'T KNOW ANYTHING.

4          **THE WITNESS:** WELL, I GUESS I LOOK AT THE RISK LEVEL.

5    AND ME, AS A CITIZEN OF LOS ANGELES COUNTY, I DON'T FEEL

6    THREATENED AT ALL, IF YOU ADOPTED MY RECOMMENDATIONS. I KNOW I

7    HAVE THE SAME PROBABILITY OF BEING VICTIMIZED IN LOS ANGELES

8    COUNTY WHETHER YOU FOLKS DO NOTHING OR WHETHER YOU LOWER THE

9    PRISON POPULATION OR YOU JACK IT UP.

10          IT'S NOT GOING TO CHANGE SIGNIFICANTLY MY

11   PROBABILITIES OF BEING MURDERED, ASSAULTED, WHATEVER. YOU KNOW

12   THAT'S NOT CHANGING.  IT HASN'T CHANGED IN, QUITE FRANKLY, THE

13   30 YEARS THAT I'VE LIVED, IN MY PROBABILITY OF WHO I AM AND MY

14   SOCIAL STANDING AND STUFF LIKE THAT.

15          WE IN THIS ROOM ARE NOT THAT AT RISK TO THIS KIND OF

16   STUFF. THERE'S CERTAIN SEGMENTS, CERTAIN LOCATIONS IN OUR

17   SOCIETY THAT HAVE A MUCH HIGHER RISK OF BEING VICTIMIZED.  WE'RE

18   PRETTY FORTUNATE.

19          **JUDGE REINHARDT:** WELL, THAT'S REALLY, UNFORTUNATELY,

20   NOT THE ISSUE. THE ISSUE IS WHETHER CRIME, IN GENERAL, WILL GO

21   UP AND WHETHER THE COMMUNITY AS A WHOLE, WHETHER THERE WILL BE A

22   LAW ENFORCEMENT DANGER.

23          **THE WITNESS:** I THINK YOU WOULD HAVE A BETTER CHANCE

24   OF REDUCING CRIME IF YOU, IN MY OPINION, LOWER THE PRISON

25   POPULATION, TAKE THAT BILLION DOLLARS A YEAR AND INVEST IT IN

 1   THE COMMUNITIES.

 2           THAT'S WHERE I'D RATHER WE PUT OUR MONEY.

 3       **JUDGE KARLTON:**  SIR, I WANT TO FOLLOW-UP ON WHAT

 4   JUDGE REINHARDT JUST SAID. I AM CONCERNED. OBVIOUSLY, THESE

 5   FIGURES ARE THE BEST FIGURES THAT YOU CAN COME UP WITH.

 6           BUT WHAT HAS HAPPENED -- AND MAYBE I'M

 7   MISUNDERSTANDING -- IS THAT THERE'S A REASON TO DOUBT THE

 8   RELIABILITY OF THESE FIGURES BECAUSE WE REALLY CAN'T UNDERSTAND

 9   WHAT'S REALLY HAPPENING.

10           THE FIGURES DON'T NECESSARILY TELL US WHO'S WHO AND

11   WHAT'S WHAT. I MEAN, I'M GOING BACK TO THE 400 HOMICIDES WHO

12   WERE SENTENCED FOR FOUR MONTHS.

13           HOW CONFIDENT -- THAT MAY BE THE WRONG WORD.  BUT HOW

14   CONFIDENT CAN WE, AS JUDGES, BE THAT THE FIGURE THAT YOU'RE

15   GIVING US, WHILE CONTAINING NOISE, BASICALLY REFLECT THE

16   REALITIES OUT THERE IN THE WORLD?

17       **THE WITNESS:**  I THINK YOU SHOULD BE CONFIDENT. I

18   THOUGHT YOU WERE GOING SOME OTHER DIRECTION. I'M EXTREMELY

19   CONFIDENT THAT IF YOU DID THE RECOMMENDATIONS -- OKAY.

20       **JUDGE KARLTON:**  THE RECOMMENDATIONS DEPEND UPON THE

21   ANALYSIS. AND THE QUESTION IS:  CAN WE BE CONFIDENT IN THE

22   ANALYSIS GIVEN THE AMOUNT OF NOISE THAT IS PROBABLY IN THE

23   FIGURE, IN THE UNDERLYING DATA?

24       **THE WITNESS:**  I GUESS I WOULD ASK YOU, JUDGE, WHAT

25   LEVEL -- I GUESS, THE DATA YOU'RE CONCERNED ABOUT, WHAT DATA ARE

1   YOU CONCERNED ABOUT?

2            **JUDGE KARLTON:**  IT'S NOT CLEAR TO ME THAT ANY OF IT

3   IS RELIABLE. IT'S NOT CLEAR TO ME HOW MUCH OF IT HAS WHAT YOU

4   CALL "NOISE" AND HOW MUCH OF IT IS HARD FIGURES.

5            **THE WITNESS:**  WITHIN THE REVOCATIONS, YOU MEAN?

6            **JUDGE KARLTON:**  YES.

7            **THE WITNESS:**  WELL, THE REVOCATIONS, I'M PRETTY

8   CONFIDENT. I WOULD HOPE WE HAVE CONFIDENCE THAT PROSECUTORS ARE

9   GOING AFTER PEOPLE WHO HAVE BEEN RELEASED FROM THE PRISON AND

10  THERE'S A FAIR SENSE THAT THEY HAVE COMMITTED A CRIME ARE GOING

11  TO PROSECUTE THOSE PEOPLE.

12           I CAN'T SPEAK FOR THE PROSECUTORS, BUT I WOULD FEEL

13  PRETTY CONFIDENT THAT THEY WOULD GO AFTER SOMEONE IF THEY FELT

14  THEY HAVE A GOOD CASE.

15           **JUDGE KARLTON:**  WHEN WE TALK ABOUT THE FACT THAT

16  CRIMES -- THAT THE NUMBER OF CRIMES BEING COMMITTED BY PAROLEES

17  IS A RELATIVELY SMALL PORTION OF THE NUMBER OF CRIMES -- THAT

18  THAT'S NOT WHERE THE ACTION IS, I THINK YOU SAID -- HOW

19  CONFIDENT CAN WE BE THAT THOSE FIGURES ARE NOT CONTAINED WITH SO

20  MUCH NOISE AS TO BE UNRELIABLE?

21           **THE WITNESS:**  I DON'T WORRY ABOUT THOSE AT ALL.

22  THOSE ARE VERY CONFIDENT.  THAT'S A CONSTANT FINDING IN STATE

23  AFTER STATE, AND IN YOUR STATE. THERE'S NO QUESTION ABOUT THAT.

24  I DON'T THINK ANYONE WOULD --

25

1  **BY MS. JOHNSON:**

2  **Q.**  IF WE CAN LOOK BACK AT TABLE 11, AGAIN. YOU ESTIMATED THAT

3  THOSE 1398 ADDITIONAL ARRESTS THAT MIGHT OCCUR IN LOS ANGELES

4  COUNTY ARE LESS THAN 1 PERCENT OF THE TOTAL ARRESTS ONE WOULD

5  EXPECT DURING THE SAME TIME PERIOD.

6          IS THAT THE SAME TIME PERIOD THAT FOUR MONTHS, OR IS

7  THAT THE WHOLE YEAR NUMBER OF ARRESTS IN LOS ANGELES COUNTY?

8  **A.**  THAT WOULD BE, YOU KNOW, DURING THE TIME THAT YOU IMPLEMENT

9  THE REFORM, SO AS THESE PEOPLE COME OUT WITH A DIFFERENT LENGTH

10 OF STAY.  AND, AGAIN, TECHNICALLY -- TECHNICALLY WHAT I DID, I

11 LOOKED AT ALL THE PEOPLE THAT WOULD BE AFFECTED.  AND I ASKED:

12              "DID YOU GET ARRESTED DURING THAT FOUR-MONTH

13          WINDOW?"

14          THAT'S TECHNICALLY WHAT I'M DOING THERE.

15 **Q.**  SORRY TO INTERRUPT.

16 **A.**  ALL RIGHT.

17 **Q.**  IF YOU LOOK AT THE TOP NUMBER, YOU'RE DOING THAT AS A

18 PERCENTAGE OF 720,959, CORRECT?

19 **A.**  RIGHT.

20 **Q.**  AND IS THAT 720,959 A FOUR-MONTH FIGURE OR AN ANNUAL FIGURE?

21 **A.**  ANNUAL.

22 **Q.**  SO YOU'RE COMPARING A FOUR-MONTH PERIOD TO AN ANNUAL FIGURE?

23 **A.**  WELL, THAT'S -- THE FOUR-MONTH IS -- THE 720 REPRESENTS

24 CURRENT POLICY IN THE STATE.  SO THE ONLY THING YOU'RE DOING IS

25 GETTING SOME PEOPLE OUT, LIKE I SAID, SOONER THAN THEY WOULD

1  OTHERWISE.

2          I'M LOOKING AT THAT WINDOW.  AND THAT'S THE RELATIVE

3  CONTRIBUTION TO THE 720,959.

4          **JUDGE KARLTON:**  THE FACT OF THE MATTER IS THAT PEOPLE

5  WERE LET OUT AND COMMITTING CRIMES GO INTO THE 720,000 FIGURE.

6          **THE WITNESS:**  RIGHT.  THEY ARE ALREADY DOING THAT.

7          **JUDGE KARLTON:**  RIGHT.

8          **THE WITNESS:**  THAT 720 IS BEING PRODUCED BY YOUR

9  CURRENT POLICY.

10         **JUDGE KARLTON:**  RIGHT.

11 **BY MS. JOHNSON:**

12 **Q.**  BUT YOU'RE SHOWING THAT SURGE NOT COMPARED TO THE FOUR-MONTH

13 PERIOD.  YOU'RE SHOWING THAT SURGE COMPARED TO THE ANNUAL

14 PERIOD.

15 **A.**  I AM.

16 **Q.**  OKAY. YOU PRESENTED A REVISED TABLE EIGHT.

17 **A.**  RIGHT.

18 **Q.**  I THINK IT'S PLAINTIFFS' 829.  I CANNOT PUT THAT UP ON THE

19 SCREEN, BECAUSE WE JUST RECEIVED THAT.

20         **MS. JOHNSON:**  YOUR HONORS, I THINK, RECEIVED COURTESY

21 COPIES OF THEM THIS MORNING.

22         OH, I CAN PUT IT UP ON THE SCREEN.

23 **BY MS. JOHNSON:**

24 **Q.**  ONE OF THE NUMBERS YOU REVISED WAS THE NUMBER OF GRAND TOTAL

25 ARRESTS FOR A YEAR IN LOS ANGELES COUNTY.  AND YOU  REVISED THAT

1  DOWN BY ABOUT ONE HALF?

2  **A.**  THAT'S RIGHT.

3  **Q.**  YES.  SO NOW INSTEAD OF -- WHAT WAS IT?  LET ME LOOK AT

4  THAT -- TABLE 11, INSTEAD OF 720,959 BEING THE TOTAL NUMBER OF

5  ARRESTS, YOU'VE DETERMINED THAT THIS NUMBER WAS TWICE AS LARGE

6  AS IT SHOULD HAVE BEEN, AND THAT NUMBER SHOULD HAVE BEEN

7  390,829, CORRECT?

8  **A.**  THE TOTAL, YES.

9  **Q.**  OKAY. BUT YOU DIDN'T REVISE TABLES 10 AND 11, DID YOU?

10  **A.**  NO, I DIDN'T HAVE TIME TO DO THAT.

11  **Q.**  DID YOU RECALCULATE WHAT PERCENTAGE THOSE 1398 ARRESTS ARE

12  OF YOUR NEW TOTAL ARREST NUMBER?

13  **A.**  I THINK I DID. I DON'T HAVE THEM WITH ME, THOUGH.

14  **Q.**  YOU CAN'T TELL ME?

15  **A.**  I CAN. DO YOU HAVE A PEN?

16          THANKS.

17          THAT COMES TO 3 PERCENT.

18  **Q.**  NO LONGER LESS THAN 1 PERCENT?

19  **A.**  THAT'S CORRECT.

20          **JUDGE KARLTON:**  MAY I HAVE MY PEN BACK?

21          **THE WITNESS:**  OH.

22  **BY MS. JOHNSON:**

23  **Q.**  DOES THAT CHANGE YOUR OPINION WHETHER THOSE 1398 ADDITIONAL

24  ARRESTS ARE MORE SIGNIFICANT?

25  **A.**  WHAT I'M TRYING -- THEY FALL WITHIN THE BASIC -- NO, MY

1   CONCLUSION THAT THEY DO NOT HAVE A SIGNIFICANT IMPACT, NO, ON

2   THE CRIME RATE OR THE ARREST RATE IN LOS ANGELES COUNTY OR THE

3   OTHER COUNTIES.

4   Q.  BUT THEY ARE NOT LESS THAN 1 PERCENT?

5   A.  I'LL DOUBLE-CHECK MY MATH.

6   Q.  ARE YOU SAYING --

7   A.  BUT IT'S EITHER THREE OR THREE-TENTS OF 1 PERCENT.

8   Q.  PARDON ME?  THREE AND THREE-TENTHS PERCENT?

9   A.  IT'S EITHER THREE OR THREE-TENTHS OF ONE PERCENT.

10  Q.  THREE OR THREE --

11  A.  THREE OR THREE-TENTHS OF 1 PERCENT, EITHER ONE. I HAVE TO

12  DOUBLE-CHECK THE MATH.

13          **JUDGE KARLTON:**  I'M SORRY?

14  **BY MS. JOHNSON:**

15  Q.  THREE OR THREE AND THREE-TENTHS?

16  A.  NO.  EITHER THREE OR THREE-TENTHS, THREE-TENTHS OF

17  1 PERCENT.  .3

18          **JUDGE REINHARDT:**  IT'S EITHER 3 PERCENT OR

19  THREE-TENTHS OF 1 PERCENT?

20          **THE WITNESS:**  YES, I NEED A CALCULATOR.

21          **JUDGE REINHARDT:**  I'M NOW --

22          **JUDGE KARLTON:**  WE KNEW BEFORE THAT IT WAS ABOUT

23  1 PERCENT, IF YOU DROP A HALF IT'S NOT GOING TO BE LESS THAN

24  1 PERCENT.

25          **THE WITNESS:**  IT DEPENDS WHAT THAT "LESS THAN

1 1 PERCENT" WAS SO --

2          **JUDGE REINHARDT:** I SEE. SO WHEN YOU HAD LESS THAN

3 1 PERCENT, THAT COULD HAVE BEEN ONE-TENTH OF 1 PERCENT.

4          **JUDGE HENDERSON:** THERE'S A CALCULATOR.

5          **THE WITNESS:** FINE. THANK YOU.

6          **JUDGE REINHARDT:** WHILE WE'RE WAITING, JUDGE KARLTON

7 FOR A DIFFERENT REASON, I THINK -- I DON'T THINK ANYONE KNOWS

8 WHAT CAUSES CRIME, WHAT CAUSES OUR ECONOMIC CRISIS TODAY. AND

9 ALL THESE FIGURES ARE REALLY NICE TO PLAY WITH, BUT WHAT WILL

10 CAUSE CRIME TO GO UP OR DOWN IS SOMETHING NOBODY HAS EVER BEEN

11 ABLE TO FIGURE OUT.

12          AND HOW MUCH IT REALLY RISES OR FALLS, OR WHETHER YOU

13 PUT PEOPLE IN JAIL OR LET THEM OUT OF JAIL IS -- IT'S WONDERFUL

14 FOR EVERYONE TO HAVE FIGURES FOR IT, BUT I DON'T KNOW HOW MUCH

15 THAT HAS TO DO WITH THE REALITY OF WHAT WE'RE REALLY -- WHAT IS

16 REALLY OCCURRING.

17          **THE WITNESS:** WELL, THESE -- THESE ARE, AGAIN,

18 ESTIMATES. I'LL GIVE YOU AN ANSWER NOW.

19          THESE ARE WAYS THAT I'M TRYING TO SHOW THE MAGNITUDE

20 OF THE CHANGE. IT'S THREE-TENTHS OF 1 PERCENT, SO IT'S STILL

21 LESS THAN 1 PERCENT, BECAUSE IF YOU TOOK THE 39,000, TEN PERCENT

22 IS 39,000, 1 PERCENT IS 3,900. SO I'M AT 1398. SO IT'S LESS

23 THAN 1 PERCENT. SO --

24          **JUDGE REINHARDT:** SO IT WAS REALLY ONE-TENTH OF

25 1 PERCENT.

1          **THE WITNESS:** IT WAS VERY LOW, YEAH. BUT WHAT SHE'S

2   POINTING TO, WE HAD A SPREADSHEET THING.  IT WAS DOUBLE-COUNTING

3   SOMETHING SO --

4          **JUDGE REINHARDT:** WELL, NOW --

5          **THE WITNESS:** BUT 39,000.  TEN PERCENT IS 39,000. ONE

6   PERCENT IS 3,900.  SO IF THE NUMBER IS 139, IT'S ABOUT

7   THREE-TENTHS OF ONE PERCENT.  IT'S STILL WELL BELOW THE

8   1 PERCENT THRESHOLD.

9          I THOUGHT I HAD CALCULATED THAT RIGHT.

10         BUT I THINK YOUR POINT -- I MEAN, SOMETIMES PEOPLE --

11  WHAT I'M TRYING TO DO IS ILLUSTRATE THE MAGNITUDE OF THE EFFECTS

12  ON SOCIETY, PUBLIC SAFETY.  AND THIS IS THE ONLY WAY I KNOW TO

13  DO IT.

14         THERE'S SO MANY COMPLEX THINGS.  I GIVE THIS EXAMPLE

15  OF, AND THIS IS TRUE. YOU KNOW, IF I GOT OUT EARLY I MAY HAVE

16  MET SOMEONE WHO LURES ME INTO A CRIMINAL CONDUCT, OR MAY NOT

17  HAVE LURED ME INTO A CRIMINAL CONDUCT.  I MET SOMEONE WHO WAS A

18  POSITIVE THING IN MY LIFE.  I WOULDN'T HAVE MET THAT PERSON IF I

19  DIDN'T COME OUT THREE MONTHS EARLY.

20         IF I STAYED IN LATER, I RUN INTO A BAD INFLUENCE.

21  YOU'VE ALL SEEN THOSE FILMS WHERE YOU JUST CHANGE THE SCENARIO

22  AND YOU HAVE A VERY DIFFERENT OUTCOME.

23         SO THAT'S WHY THIS STUFF IS VERY TENUOUS IN TERMS OF

24  SAYING IT'S GOING TO INCREASE IT OR DECREASE IT.  BUT I DO THINK

25  THE MAGNITUDE OF THE RISK IS VERY, VERY LOW.

1          I WOULD BE RECOMMENDING -- I WOULD NEVER RECOMMEND

2   ANYTHING THAT I THOUGHT PERSONALLY WOULD JEOPARDIZE THE PUBLIC

3   SAFETY OF PEOPLE IN THE STATE OF CALIFORNIA. SO --

4   **BY MS. JOHNSON:**

5   **Q.**  YOUR LAST RECOMMENDATION, IF WE GO BACK TO PARAGRAPH 43 --

6   NO, I'M SORRY. WELL, THE LAST ONE WE'RE GOING TO DO, IT'S

7   ACTUALLY NUMBER SEVEN, WHICH IS THE LAST ONE WE'RE GOING TO

8   DISCUSS.

9          THIS WILL BE THE FOURTH ONE, SO WE WILL HAVE COVERED

10  THEM ALL. IS DIVERT LOW LEVEL OFFENDERS TO PROBATION AND PAROLE

11  INSTEAD OF PRISON.

12  **A.**  CORRECT.

13  **Q.**  ACCORDING TO TABLE FIVE --

14  **A.**  RIGHT.

15  **Q.**  -- ON PAGE 27 OF YOUR AUGUST -- I'M SORRY -- AUGUST 15, 2008

16  REPORT, THERE ARE APPROXIMATELY 16,300 PERSONS SENTENCED TO CDCR

17  WHO WERE SENTENCED FOR A NONVIOLENT OFFENSE, DO NOT HAVE A

18  SECOND OR THIRD STRIKE AGAINST THEM, AND HAVE RECEIVED A

19  SENTENCE FOR 16 MONTHS OR LESS.

20  **A.**  CORRECT.

21  **Q.**  YOUR PREFERENCE IS TO DIVERT THESE OFFENDERS TO PROBATION OR

22  PAROLE SO THAT THEY NEVER SERVE ANY TIME IN PRISON, CORRECT?

23  **A.**  NO. WHAT THEY WOULD DO -- AND, AGAIN, A COUPLE OF

24  CLARIFICATIONS.  ONLY -- I KNOCKED OUT ABOUT A QUARTER OF THESE

25  PEOPLE, ASSUMING THEY ARE HIGH RISK.  SO I WANT THEM TO COME IN

1   AND DO TIME.

2          SO THAT THE GROUP THAT'S LEFT, THEIR DEAL -- I MEAN,

3   YOU HAVE TO WORK THROUGH THE TECHNIQUES HERE.  BUT THEY HAVE

4   SPENT SEVEN MONTHS IN THE JAIL.  AND NOW THEY ARE COMING INTO

5   THE PRISON SYSTEM.

6          AND IF YOU LOOK AT THEIR -- THE 16 MONTH GROUP, IT'S

7   KIND OF AN INTERESTING GROUP.  I DON'T KNOW WHY THE COURTS GIVE

8   16-MONTH SENTENCES AS OPPOSED TO 12, BUT THEY DO.

9          AND IF THEY DO SEVEN MONTHS IN THE JAIL, THEY HAVE

10  NINE MONTHS LEFT. THEY ARE ELIGIBLE FOR THE FIFTY PERCENT

11  DAY-FOR-DAY, AND THEY ARE GETTING THAT BECAUSE OF THE BRIDGE

12  PROGRAM.

13         SO YOU TAKE THAT NINE AND DIVIDE THAT BY HALF

14  ROUGHLY.  AND IN SOME JAILS THEY GIVE THEM DAY-FOR-DAY WHILE

15  THEY ARE IN THE JAIL.  SO THEY ARE GOING TO DO ABOUT THREE OR

16  FOUR MONTHS.

17         AND THEY ARE GOING TO COME IN.  THEY ARE GOING TO SIT

18  IN THE RECEPTION CENTERS, DO NOTHING, AND COME OUT.

19         SO MY SUGGESTION AND MY COLLEAGUES AT THE EXPERT

20  PANEL WERE TO TAKE THESE PEOPLE, KEEP SOME PORTION OF THEM IN

21  THE COMMUNITY, PAY THE COUNTY TO KEEP THEM IN THE COMMUNITY.

22  OFFER MONEY TO THE COUNTIES TO KEEP THEM THERE THROUGH THE

23  SAVINGS THAT WOULD BE GENERATED BY THE POPULATION REDUCTION.

24         SO THAT'S WHAT THIS IS DOING. THE OTHER BIG GROUP ARE

25  THE 24-MONTH GROUPS.  AND IT'S ALSO INTERESTING THAT YOU SHOULD

1  BE AWARE OF, THE 27,765, THAT RELATES BACK TO THE 65,000 NEW

2  COURT COMMISSIONS.  YOU CAN SEE THAT A BIG CHUNK OF THESE PEOPLE

3  COMING INTO THE CALIFORNIA PRISON SYSTEM HAVE VERY SHORT PERIODS

4  OF LENGTH OF STAY NOW.

5        THEY HAVE THESE RELATIVELY SHORT SENTENCES FOR THESE

6  CRIMES.

7  **Q.**  ON PAGE 26 AT PARAGRAPH 61, YOU STATE --

8        **JUDGE KARLTON:**  MAY I INTERRUPT FOR A MOMENT?

9  SOMETIMES IT'S HARD TO FORGET WHY WE'RE HERE. BUT THE QUESTION

10 ULTIMATELY WILL BE WHETHER OR NOT -- AND I KNOW THIS IS NOT THE

11 SUBJECT OF YOUR TESTIMONY.  BUT WHAT YOU'VE JUST SAID RAISES IT.

12 THE QUESTION IS WHETHER OR NOT THIS WILL EFFECTIVELY PERMIT THE

13 CDCR TO PROVIDE ADEQUATE MEDICAL AND MENTAL HEALTHCARE.

14        NOW, WHAT YOU'RE TELLING ME IS THAT A HUGE NUMBER OF

15 THESE PEOPLE ARE STUCK IN RECEPTION CENTERS AND NEVER GO

16 ANYWHERE.

17        **THE WITNESS:**  CORRECT.

18        **JUDGE KARLTON:**  SO THE HUGE IMPACT THAT WE HAVE IN

19 THE PRISON SYSTEM OUTSIDE OF THE RECEPTION CENTERS WON'T BE

20 AFFECTED BY LETTING THESE PEOPLE OUT AT ALL; IS THAT RIGHT?  YOU

21 SEE WHAT I'M ASKING HERE?

22        **THE WITNESS:**  I THINK I DO. CAN YOU RESTATE IT TO

23 MAKE SURE I GOT IT RIGHT?

24        **JUDGE KARLTON:**  LET ME START ALL OVER AGAIN.

25        OUR CONCERN IS WITH PEOPLE WHO ARE NOT GETTING

1  ADEQUATE MEDICAL AND MENTAL HEALTH SERVICES.

2           **THE WITNESS:**  CORRECT.

3           **JUDGE KARLTON:**  THOSE ARE -- AND RIGHT NOW AT LEAST

4  FOR COLEMAN PRISONERS, AND I ASSUME FOR PLATA, AS WELL, THOSE

5  ARE THE PEOPLE WHO ARE ALREADY IN PRISON AND ARE NOT RECEIVING

6  ADEQUATE CARE, MUCH LESS THOSE -- BECAUSE IT'S ALL SCREWED UP --

7  CAN'T BE DETERMINED TO REQUIRE IT.  BUT THOSE ARE THE PEOPLE IN

8  PRISON.

9           NOW, IF WE LET OUT ALL OF THESE PEOPLE THAT YOU'RE

10 TALKING ABOUT, THAT RELIEVES THE BURDEN IN THE RECEPTION CENTER.

11 IT DOESN'T DO ANYTHING FOR THE PEOPLE WHO ARE ALREADY IN PRISON

12 INSTITUTIONS.

13          **THE WITNESS:**  YEAH, THIS ONE PARTICULARLY IS GOING TO

14 GO AFTER THE RECEPTION CENTER PROBLEM, AS WELL AS THE TECHNICAL

15 PAROLE VIOLATOR.  THAT KIND OF SOLVES YOUR RECEPTION CENTER

16 PROBLEM.

17          THE FOUR MONTHS IN CREDIT TIME, THAT GOES AFTER WHAT

18 I WOULD CALL "THE GENERAL POPULATION."  IT'S GONE THROUGH THE

19 RECEPTION PROCESS, AND THAT SHOULD LOWER THAT GROUP.

20          **JUDGE KARLTON:**  CAN YOU DEFERENTIATE BETWEEN OR TELL

21 ME HOW MANY PRISONERS WILL BE RELEASED FROM GENERAL POPULATION

22 AS CONTRASTED FROM -- AS CONTRASTED WITH THE RECEPTION CENTER?

23          **THE WITNESS:**  I COULD DO THAT, YES.

24          **JUDGE KARLTON:**  CAN YOU DO IT NOW?

25          **THE WITNESS:**  NO.

1          **JUDGE KARLTON:**  ALL RIGHT.

2          **THE WITNESS:**  IF YOU PAID ME, I WOULD.

3          **JUDGE KARLTON:**  WHAT?

4          **THE WITNESS:**  IF YOU PAID ME I WOULD. I CAME HERE --

5          **JUDGE KARLTON:**  WELL, YOU ARE PAID.

6          **THE WITNESS:**  YOU HAVE TO KIND OF DO IT CAREFULLY.

7    BUT IT CAN BE DONE.  AND IF YOU WANTED ME TO GET BACK TO YOU IN

8    A DAY OR TWO, I COULD GIVE YOU AN ESTIMATE, IF YOU'RE

9    INTERESTED.

10   **BY MS. JOHNSON:**

11   **Q.**  ON PAGE 26, AT PARAGRAPH 61 OF YOUR AUGUST 15, 2008 REPORT

12   YOU STATE:

13               "MOREOVER, IF THE STATE PROVIDED APPROPRIATE

14          COMMUNITY-BASED TREATMENT FOR INDIVIDUALS DIVERTED

15          FROM PRISON, THE DIVERSION PROGRAM WOULD LIKELY HAVE

16          A NEUTRAL OR POSITIVE IMPACT ON PUBLIC SAFETY."

17   **A.**  RIGHT.

18   **Q.**  DO YOU KNOW WHETHER TODAY SUFFICIENT RESOURCES EXIST IN THE

19   COMMUNITY TO PROVIDE APPROPRIATE COMMUNITY-BASED TREATMENT FOR

20   THESE INDIVIDUALS YOU PROPOSE TO DIVERT?

21   **A.**  I DON'T PERSONALLY, NO.  I HAVEN'T DONE AN ANALYSIS OF THAT.

22          **JUDGE KARLTON:**  ARE YOU AWARE OF ANY STUDIES THAT

23   WOULD HELP US ANSWER THAT QUESTION?

24          **THE WITNESS:**  THE ONLY STUDY -- I DID DO A STUDY AT

25   LANCASTER AS PART OF THE DEVELOPMENT OF THE REENTRY PROGRAM.  WE

1  LOOKED AT SERVICES THAT WERE AVAILABLE IN LOS ANGELES COUNTY.

2  AND I WAS IMPRESSED BY THE LARGE NUMBER OF SERVICES THAT ARE

3  THERE.

4           BUT I HAVE TO TELL YOU I CAN'T TELL YOU WITH A REAL

5  RIGOROUS SCIENTIFIC STUDY.  MY SENSE, YOUR HONOR, IS THERE'S

6  MORE OUT THERE THAN PEOPLE THINK.  I THINK YOU CAN RAMP UP

7  SERVICES PRETTY QUICKLY TO NONPROFITS DUE TO THE CONTRACTUAL

8  PROCESS, ESPECIALLY IN THESE ECONOMIC TIMES.

9           SO IF THEY ARE NOT THERE, I THINK SERVICES CAN BE

10 RAMPED UP PRETTY QUICKLY.

11          **JUDGE KARLTON:**  WE HAD TESTIMONY FROM THE CHIEF

12 PROBATION OFFICER OF STANISLAUS COUNTY WHO TOLD US THAT A VERY

13 SIGNIFICANT NUMBER -- AND I'M SORRY.  I'VE FORGOTTEN WHAT IT IS

14 NOW -- OF PEOPLE WERE BEING BANKED, I THINK WAS THE TERM.

15          **THE WITNESS:**  ON PROBATION SUPERVISION?

16          **JUDGE KARLTON:**  YES, THEY WERE JUST SIMPLY STUCK IN A

17 BOX, AND NOBODY PAID ANY ATTENTION UNTIL THEY COMMITTED ANOTHER

18 CRIME OR DID SOMETHING THAT CALLED THEIR ATTENTION.

19          DO WE HAVE A SIMILAR SITUATION -- DO YOU KNOW IF WE

20 HAVE A SIMILAR SITUATION IN THE PAROLE PROCESS TODAY?

21          **THE WITNESS:**  YES, I THINK THEY HAVE A PORTION OF

22 THEIR POPULATION THAT IS NOT BEING AGGRESSIVELY SUPERVISER.

23          BY THE WAY, THAT'S THE GROUP I GET RID OF.

24          **JUDGE KARLTON:**  I UNDERSTAND.

25          ALL RIGHT.  GO AHEAD.

1    BY MS. JOHNSON:

2    Q.  I WOULD LIKE TO LOOK AGAIN AT PLAINTIFFS' 830, WHICH I HAVE

3    JUST MOVED UP FOR YOUR HONORS TO BE ABLE TO SEE.

4            THE BIG MIDDLE BAR THERE SAYS:

5                "PRISON POPULATION:  171,000."

6            DO YOU SEE THAT?

7    A.  YES.

8    Q.  THAT'S NOT ACTUALLY THE PRISON POPULATION IN THE STATE OF

9    CALIFORNIA, IS IT?

10   A.  IT'S NOT THE INSTITUTIONAL POPULATION. IT'S -- IT IS THE

11   POPULATION THAT'S PUBLISHED IN THE CDCR POPULATION FORECAST,

12   WHICH I UNDERSTAND INCLUDES THE OUT-OF-STATE PRISONERS, THE

13   CONSERVATION CAMPS, I THINK.

14   Q.  THERE ARE NOT 171,000 PEOPLE TODAY IN CALIFORNIA'S PRISONS,

15   ARE THERE?

16   A.  WELL --

17            JUDGE REINHARDT:  I DON'T THINK THAT'S --

18            MS. JOHNSON:  YOUR HONORS, IT'S OVER HERE ON THE

19   EASEL.

20            JUDGE REINHARDT:  OH.

21            MS. JOHNSON:  IT'S THE CHART THEY USED THIS MORNING.

22            JUDGE REINHARDT:  THANK YOU.

23            THE WITNESS:  THE DEPARTMENT PUBLISHED --

24   BY MS. JOHNSON:

25   Q.  YES, I HAVE THE STATISTICS.

1  **A.**  I'M JUST TELLING YOU WHERE IT CAME FROM. IT'S IN THE REPORT.

2  2000 -- AS OF JUNE 30, 2008, ACTUAL INSTITUTIONAL  POPULATION AS

3  OF JUNE, 2008, 171,000 INMATES.

4  **Q.**  OKAY. BUT THAT FIGURE IS THE TOTAL INSTITUTIONAL POPULATION,

5  INCLUDING CAMPS, COMMUNITY CORRECTIONAL CENTERS, AND INCLUDING

6  THE 8,000 HOWEVER MANY OUT-OF-STATE TRANSFERS, CORRECT?

7  **A.**  I BELIEVE SO, YES.

8  **Q.**  IF YOU PULL UP DEFENDANTS' 1203, WHICH IS THE WEEKLY

9  POPULATION REPORT FOR AUGUST 27, 2008 --

10          **JUDGE HENDERSON:**  AFTER YOU FINISH THIS PORTION,

11  COUNSEL, WE'RE GOING TO TAKE A BREAK.  MY REPORTER NEEDS ONE.

12          **MS. JOHNSON:**  YOUR HONOR, THIS PORTION PROBABLY HAS

13  10 MORE QUESTIONS, BUT I'M PERFECTLY WILLING -- I DON'T HAVE

14  ANYTHING AFTER THE NEXT 10 QUESTIONS.  THERE'S NO OTHER PORTION.

15          **JUDGE HENDERSON:**  LET'S ASK THE REPORTER, THEN.  CAN

16  YOU HOLD OUT FOR TEN?

17          THE COURT REPORTER:  SURE.

18  **BY MS. JOHNSON:**

19  **Q.**  IF YOU LOOK AT SUB (1) (A) (1 (1), INSTITUTIONS, CAMPS,

20  NUMBER OF INSTITUTIONS, WHICH ON THIS DOCUMENT IS THE PRISONS.

21          **MS. JOHNSON:**  AND THIS NUMBER HAS ACTUALLY BEEN

22  STIPULATED TO BY THE PARTIES, YOUR HONOR.

23  **BY MS. JOHNSON:**

24  **Q.**  THIS 156,352, THERE ARE 400 AND -- 4,386 IN CAMPS.  AND

25  THERE ARE ANOTHER 6,312 IN COMMUNITY CORRECTIONAL FACILITIES.

1          **MS. EVENSON:**  COUNSEL, FOR PURPOSES OF COMPLETENESS,

2   COULD YOU ALSO READ THE TOP LINE ON THIS DOCUMENT?  YOU

3   SKIPPED -- THIS IS THE SECTION ON DOWN.  COULD YOU JUST READ THE

4   TOP?

5          **MS. JOHNSON:**  YES, THE TOP LINE IS --

6          **MS. EVENSON:**  NO.  NO.  THAT'S NOT THE TOP LINE.

7   THAT'S WHAT YOU PULLED OUT.

8   **BY MS. JOHNSON:**

9   **Q.**  THE TOP LINE IS ABOUT 171,000.  BUT WHAT I'M TRYING TO POINT

10  OUT IS THAT'S NOT THE PRISON POPULATION.  THE PRISON POPULATION

11  IS 156,352.

12          CALIFORNIA -- AND YOU'RE AWARE, ARE YOU NOT, DR.

13  AUSTIN, CALIFORNIA HAS A VARIETY OF DIFFERENT INSTITUTIONS TO

14  WHICH THEY SEND PEOPLE WHO ARE INCARCERATED?

15  **A.**  I AM AWARE OF THAT, YES.

16  **Q.**  OKAY.

17  **A.**  BUT LET ME --

18  **Q.**  PLEASE LET ME FINISH.

19  **A.**  OKAY.

20  **Q.**  OKAY.  THOSE INCLUDE PRISONS, CORRECT?

21  **A.**  PRISONS, YES.

22  **Q.**  THOSE INCLUDE CAMPS?

23  **A.**  YES.

24  **Q.**  THOSE INCLUDE COMMUNITY CORRECTIONAL FACILITIES?

25  **A.**  YES.

1  **Q.** AND THERE'S I THINK SOME DMH FACILITIES WE SEND PRISONERS

2  TO, AS WELL.

3  **A.** YES.

4  **Q.** THERE'S ALSO, AS YOU POINTED OUT, A CERTAIN NUMBER OF

5  INMATES WE HAVE TRANSFERRED TO OUT-OF-STATE FACILITIES, CORRECT?

6  **A.** YES.

7  **Q.** SO YOU ARE AWARE THE 171,000 NUMBER IS THE TOTAL POPULATION

8  AMONG ALL THOSE FACILITIES, NOT THE 33 PRISONS, CORRECT?

9  **A.** RIGHT.

10  **Q.** OKAY.

11  **A.** CAN I SAY SOMETHING?

12  **Q.** SURE.

13  **A.** SO BUT, AGAIN, THESE FLOW NUMBERS ARE PRODUCING THAT 171.

14  AND I KNOW YOU'RE TALKING ABOUT REDUCING THE INSTITUTION

15  POPULATION FOR PURPOSES OF THIS LITIGATION.

16  **Q.** BY "INSTITUTION" YOU MEAN PRISON?

17  **A.** YEAH. YEAH. PRISON. BUT YOU WOULD HAVE THESE CHANGES IN

18  PAROLE VIOLATIONS AND LENGTH OF STAY, ALL WORK TOGETHER, IF YOU

19  GET WHAT I'M SAYING. EVEN THOUGH THEY ARE HOUSED IN DIFFERENT

20  LOCATIONS, YOU'RE AFFECTING THESE PEOPLE. THEY ARE UNDER THE

21  JURISDICTION. SO WHATEVER THE REDUCTIONS ARE, IT'S THE

22  REDUCTION IN THE 171,000 POPULATION.

23          THE DEPARTMENT COULD CHOOSE WHERE IT ACTUALLY HOUSES

24  THESE PEOPLE, BUT IT'S THE REDUCTION IN THAT POPULATION,

25  171,000.

1        **JUDGE KARLTON:**  WHAT YOU'RE SAYING IS THERE WOULD

2    STILL BE THE CAMPS.

3        **THE WITNESS:**  THAT'S RIGHT.

4        **JUDGE KARLTON:**  THERE WOULD STILL BE THE COMMUNITY?

5        **THE WITNESS:**  STILL BE ALABAMA.

6        **JUDGE KARLTON:**  RIGHT.

7    **BY MS. JOHNSON:**

8    **Q.**  NOW, YOU'RE RECOMMENDING DIVERTING LOW LEVEL OFFENDERS,

9    CORRECT?

10   **A.**  YES.

11   **Q.**  AREN'T MANY LOW LEVEL OFFENDERS ACTUALLY HOUSED AT THE CAMPS

12   IN THE COMMUNITY CORRECTIONAL FACILITIES?

13   **A.**  ABSOLUTELY THERE ARE. THERE'S ALSO, THOUGH -- ONE OF THE

14   CAMPS IS NEAR MY HOUSE IN LOS ANGELES -- FEMALE INMATES.  AND IT

15   HAS A LARGE NUMBER OF SERIOUS VIOLENT FEMALE OFFENDERS IN IT.

16        KIND OF INTERESTING.  THEY DON'T LOOK THAT VIOLENT,

17   THOUGH, TO ME.

18   **Q.**  I'M SORRY. ARE YOU STATING TO ME THAT THE REQUIREMENTS FOR A

19   COMMUNITY CORRECTIONAL FACILITY INCLUDE HIGH LEVEL OFFENDERS?

20        **JUDGE KARLTON:**  HE SAID "CAMPS."

21        **THE WITNESS:**  CAMPS.

22   **BY MS. JOHNSON:**

23   **Q.**  CAMPS.

24   **A.**  CONSERVATION CAMPS.  YES.  THEY HAVE SO-CALLED DANGEROUS

25   PEOPLE IN THE CAMPS.

1            THE CAMPS ARE BASICALLY OPERATED ON A CLASSIFICATION

2   SYSTEM.  RISK ASSESSMENT IS RISK TO RECIDIVATE, COMMIT A CRIME.

3   CLASSIFICATION IS:  CAN WE MANAGE THEM IN A CAMP?

4            BUT THERE'S A LARGE NUMBER OF -- THERE'S TWO

5   STRIKERS.  THERE'S SERIOUS VIOLENT OFFENDERS IN THE CONSERVATION

6   CAMPS.  THEY ALL GO OUT AND FIGHT FIRES FOR US.

7   Q.  ARE YOU AWARE THAT THE INMATES IN THE COMMUNITY CORRECTIONAL

8   FACILITIES ARE SERVING 18 TO 24 MONTHS OR LESS, AND THEY TO MEET

9   ELIGIBILITY CRITERIA FOR MINIMUM TO MEDIUM SECURITY HOUSING?

10  AND THAT'S THE COMMUNITY CORRECTIONAL FACILITY.

11  A.  YES, YOU'RE RIGHT.

12  Q.  AND ARE YOU AWARE THAT THERE ARE APPROXIMATELY 6,312 OF

13  THOSE 18 TO 24 MONTH OR LESS MINIMUM TO MEDIUM SECURITY

14  OFFENDERS PER WEEK IN COMMUNITY CORRECTIONAL FACILITIES?

15  A.  YES.

16  Q.  ARE YOU AWARE WHETHER OR NOT THE COMMUNITY CORRECTIONAL

17  FACILITIES ARE OVERCROWDED?

18  A.  I'M NOT AWARE OF THAT.

19  Q.  THEY ARE NOT OVERCROWDED, ARE THEY?

20  A.  WELL, THEY ARE AT THEIR CAPACITY, I BELIEVE. THEY ARE RIGHT

21  AT THEIR CAPACITY.

22  Q.  THEY ARE AT THEIR DESIGN CAPACITY?

23  A.  RIGHT.

24  Q.  AND THAT'S TRUE FOR THE CAMPS, AS WELL.  THE CAMPS ARE AT

25  THEIR DESIGN CAPACITY, CORRECT?

1  **A.**  THAT'S CORRECT.

2  **Q.**  DR. AUSTIN, THOSE ADDITIONAL OFFENDERS YOU PROPOSE TO DIVERT

3  FROM PRISON TO PROBATION OR PAROLE WHO WOULD OTHERWISE BE

4  SENTENCED TO 24 MONTHS OR LESS IN PRISON WILL NOT EXPERIENCE THE

5  INCAPACITATION EFFECT OF SERVING A PRISON SENTENCE WHICH THEY

6  WOULD HAVE OTHERWISE EXPERIENCED, CORRECT?

7  **A.**  THEY WILL HAVE EXPERIENCED THE SEVEN MONTHS IN THE COUNTY

8  JAIL, BUT NOT THE ADDITIONAL FOUR MONTHS.

9  **Q.**  YOU'RE SAYING --

10  **A.**  I'M SORRY.  IT WOULD BE FOUR TO SEVEN MONTHS, NOT JUST FOUR

11  MONTHS.  IT WOULD BE MORE THAN THAT.

12  **Q.**  ON TABLE 10 OR IN TABLE 10 ON PAGE 40 OF YOUR AUGUST 15,

13  2008 REPORT --

14  **A.**  OKAY.

15  **Q.**  -- YOU ESTIMATED THE IMPACT ON ARRESTS OF THE DIVERSION OF

16  ADDITIONAL OFFENDERS FROM PRISON TO PROBATION OR PAROLE,

17  CORRECT?

18  **A.**  CORRECT.

19  **Q.**  YOU INITIALLY ESTIMATED THAT OF THOSE ADDITIONAL OFFENDERS

20  DIVERTED FROM PRISON TO PROBATION OR PAROLE 35 PERCENT WOULD BE

21  REARRESTED WITHIN 12 MONTHS, CORRECT?

22  **A.**  CORRECT.  CORRECT.

23  **Q.**  BUT THAT ESTIMATE WAS TOO LOW?

24  **A.**  CORRECT.

25  **Q.**  IN YOUR AUGUST 27, 2008 REPORT, YOU REVISED THAT ESTIMATE

1  UPWARD TO FIFTY PERCENT --

2  **A.** CORRECT.

3  **Q.** -- OF THOSE ADDITIONAL OFFENDERS DIVERTED FROM PRISON TO

4  PROBATION OR PAROLE WOULD BE REARRESTED WITHIN 12 MONTHS,

5  CORRECT?

6  **A.** CORRECT.

7  **Q.** SO CAN WE GET THE REVISED TABLE, PLEASE?  REVISED TABLE 10.

8         OKAY. ACCORDING TO TABLE 10, YOU ESTIMATE THAT

9  DIVERSION OF THESE ADDITIONAL OFFENDERS FROM PRISON TO PROBATION

10 OR PAROLE WOULD RESULT IN A REDUCTION OF THE CDCR INSTITUTIONAL

11 POPULATION OF 12,147, CORRECT?

12 **A.** CORRECT.

13 **Q.** THAT SAME TABLE 10 INDICATES THAT THE DIVERSION OF THOSE

14 ADDITIONAL OFFENDERS FROM PRISON TO PROBATION OR PAROLE MAY

15 CORRELATE WITH 10,412 ARRESTS, REARRESTS STATEWIDE WITHIN ONE

16 YEAR, CORRECT?

17 **A.** KIND OF.  BUT I'LL LET YOU GET TO YOUR NEXT QUESTION AND

18 I'LL CLARIFY IT.  SO I'LL SAY TENTATIVELY "YES."

19 **Q.** AND YOU INDICATED THAT WAS LESS THAN 1 PERCENT OF TOTAL

20 ARRESTS.  BUT JUST AS WITH TABLE 11, YOU'VE REVISED --

21 **A.** RIGHT.

22 **Q.** -- THE NUMBER.

23 **A.** RIGHT.

24 **Q.** SO THAT PERCENTAGE HAS ACTUALLY GONE UP?

25 **A.** TO THE NAKED EYE IT APPEARS, BUT WHAT HAPPENED IS THAT THE

1  12 -- 24 -- I'M SORRY.  THE 12 MONTHS SHOULD HAVE BEEN RATCHETED

2  DOWN TO SEVEN MONTH REARREST RATE.  SO I FACTORED IN THERE --

3  **Q.**  NO, I THINK WE'RE TALKING APPLES AND ORANGES.

4  **A.**  NO.  NO.  I'M BEING VERY -- SEE, THERE'S FIFTY PERCENT, 12

5  MONTHS, OKAY?  THAT SHOULD HAVE BEEN SET TO SEVEN MONTHS BECAUSE

6  THAT'S HOW MUCH TIME THEY ARE NOT SPENDING IN PRISON, NOT 12

7  MONTHS.

8            SO IT'S NOT FIFTY PERCENT.  IT'S MORE LIKE THE 30

9  SOME PERCENT RATE, NOT 30.  SOMEWHERE ABOUT 35 --

10 **Q.**  NO --

11 **A.**  IT STAYS BELOW 1 PERCENT.  LET ME PUT IT THAT WAY.  IT STAYS

12 BELOW 1 PERCENT.

13 **Q.**  WITH THE NEW PERCENTAGE OF TOTAL ARRESTS IN THE BINDER TABLE

14 --

15 **A.**  STAYS BELOW 1 PERCENT.

16 **Q.**  NOT "NEW PERCENTAGE."  THE NEW NUMBER OF TOTAL ARRESTS

17 INDICATED ON YOUR TABLE EIGHT.

18 **A.**  STAYS BELOW 1 PERCENT.

19 **Q.**  OKAY.  BUT IT'S HIGHER.

20 **A.**  IT'S HIGHER, BUT IT'S STILL BELOW 1 PERCENT.

21 **Q.**  OKAY. IT IS TRUE, ISN'T IT, THAT ACCORDING TO THE

22 VICTIMIZATION STUDIES, THE NUMBER OF CRIMES COMMITTED EXCEEDS

23 THE NUMBER OF CRIMES REPORTED TO THE AUTHORITIES, CORRECT?

24 **A.**  YES.

25 **Q.**  IT'S ALSO TRUE, ISN'T IT, THAT THE NUMBER OF CRIMES REPORTED

1   IN THE COMMUNITY EXCEEDS THE NUMBER OF ARRESTS MADE.

2           **JUDGE KARLTON:**  THAT'S THE SAME QUESTION.

3   **BY MS. JOHNSON:**

4   Q.  NO.  ONE IS THE CRIMES THAT PEOPLE SUFFER VERSUS THE CRIMES

5   THEY REPORT.  AND THE OTHER IS THE CRIMES THAT THEY REPORT

6   VERSUS THE NUMBER OF ARRESTS THAT ARE MADE.

7   A.  YES.  THERE'S TWO MEASURES OF CRIME.  THE VICTIMIZATION

8   SURVEY, WHICH IS CENSUS GOES OUT AND INTERVIEWS HOUSEHOLDS AND

9   ASKS THEM:

10              "HAVE YOU BEEN VICTIMIZED?"

11              SO YOU WOULD BE ANSWERING "YES" IN THE SURVEY.  AND

12  IF YOU DIDN'T REPORT THAT TO THE POLICE, IT WOULD BE PICKED UP

13  BY THE POLICE, WHICH IS THE UCR.  AND WHAT SHE'S REFERRING TO IS

14  THE VICTIMIZATION REPORTS ARE HIGHER THAN THE REPORTS TO THE

15  POLICE, BECAUSE NOT EVERYONE REPORTS A CRIME TO THE POLICE.

16  Q.  AND NOT FOR EVERY CRIME THAT IS REPORTED IS AN ARREST MADE,

17  CORRECT?

18  A.  OH, ABSOLUTELY.

19  Q.  SO THERE ARE MORE CRIMES THAT OCCUR THAN THERE ARE ARRESTS?

20  A.  YES.

21          **MS. JOHNSON:**  NO FURTHER QUESTIONS, YOUR HONOR.

22          **JUDGE HENDERSON:**  OKAY.  WE WILL TAKE A 15-MINUTE

23  RECESS.

24              (THEREUPON, A RECESS WAS TAKEN.)

25          **JUDGE HENDERSON:**  OKAY.  YOU MAY BEGIN YOUR CROSS

 1  WHEN YOU'RE READY, COUNSEL.

 2              **MS. BARLOW:**  THANK YOU, VERY MUCH, YOUR HONOR.

 3  KIMBERLY HALL BARLOW, JONES & MAYER ON BEHALF OF DEFENDANT

 4  INTERVENORS.

 5              <u>**CROSS-EXAMINATION BY MS. BARLOW**</u>

 6  BY MS. BARLOW

 7  **Q**   DOCTOR, I WOULD LIKE TO START WITH WHERE WE LEFT OFF IN THE

 8  PRIOR SESSION, THAT IS THE FACT THAT THE AMOUNT OF CRIME EXCEEDS

 9  THE NUMBER OF ARRESTS.  CAN WE AGREE ON THAT?

10  **A**   IN THE AGGREGATE, YES.

11  **Q**   IN FACT, SOME STUDIES HAVE INDICATED THAT SOME CRIMES OCCUR

12  20 TIMES MORE OFTEN THAN THEY ARE ACTUALLY REPORTED TO POLICE;

13  IS THAT CORRECT?

14  **A**   THAT MAY WELL BE THE CASE.  I HAVE TO LOOK AT THE STUDY YOU

15  ARE TALKING ABOUT.

16  **Q**   IT'S IN YOUR OWN REPORT FROM, "CRIME AND DELINQUENCY USING

17  EARLY RELEASE TO RELIEVE PRISON CROWDING AND DILEMMA IN PUBLIC

18  POLICY" FROM 1986?

19  **A**   YES.

20  **Q**   NOW, WHEN WE WERE TALKING ABOUT THE TABLES THAT YOU PREPARED

21  AND YOUR TESTIMONY THAT THE AMOUNT OF CRIME THAT WOULD BE CAUSED

22  BY EARLY RELEASE WOULD BE MINIMAL AND, ALSO, THE AMOUNT OF

23  ADDITIONAL ARRESTS FOR CRIME THAT MIGHT BE GENERATED AS A RESULT

24  OF THE DIVERSION THAT YOU TALK ABOUT WOULD BE LESS THAN ONE

25  PERCENT?

1   **A**   I JUST WANT TO SAY I DON'T USE THAT WORD "EARLY RELEASE."   I

2   THINK IT IS IMPORTANT IN THE DISCUSSION THAT WE NOT USE THAT

3   WORD "EARLY RELEASE," BECAUSE EARLY RELEASE SUGGESTS THERE'S

4   SOME KIND OF NATIONAL STANDARD OUT THERE THAT SAYS THIS IS THE

5   PROPER TIME TO RELEASE SOMEONE.   I DON'T WANT TO CHARACTERIZE IN

6   ANY WAY, SHAPE OR FORM MY RECOMMENDATIONS AS EARLY RELEASE.

7   THEY HAVE NOTHING TO DO WITH EARLY RELEASE.

8   **Q**   WITH RESPECT, SIR, YOU USED THE PHRASE "EARLY RELEASE" IN

9   YOUR 1986 STUDY OF ILLINOIS PRISONS, AND WHAT THAT WAS WAS A

10  REDUCTION IN THE LENGTH OF SENTENCE TIME SERVED, CORRECT?

11  **A**   I WAS EVALUATING A PROGRAM THAT WAS CALLED AN EARLY RELEASE

12  PROGRAM.

13          **JUDGE KARLTON:**   HE'S LEARNED SOMETHING IN 20 YEARS.

14  HE NO LONGER USES THE SAME TERM.

15          **MS. BARLOW:**   I'M TRYING TO USE THE SAME TERM, BECAUSE

16  HE USES IT REPEATEDLY IN A STUDY I WILL BE ASKING HIM ABOUT.

17  BY MS. BARLOW

18  **Q**   LET'S TALK ABOUT TABLES 10 AND TABLE 11.   IN TABLE 10,

19  YOU'RE ESTIMATING EFFECTS OF DIVERSION, CORRECT?   AND YOU JUST

20  TESTIFIED A MOMENT AGO THAT YOU SHOULD HAVE USED A SEVEN-MONTH

21  REARREST RATE AT 50 PERCENT RATHER THAN A 50 PERCENT REARREST

22  RATE AT 12 MONTHS, CORRECT?

23  **A**   CORRECT.

24  **Q**   SHOULD YOU ALSO NOT HAVE USED THE FOUR MONTHS THEN FOR THE

25  GOOD TIME FOR SELECTED PRISONERS?   REDUCTION IN LEVEL OF TIME

1   SERVED?

2   **A**   NO.   WHY WOULD I NOT USE THE FOUR MONTHS?

3   **Q**   WELL, IF YOU SHOULD HAVE USED THE ACTUAL ARREST RATE OVER

4   THE PERIOD OF EARLY RELEASE IN ONE --

5   **A**   THE 12 -- WHAT I'M SAYING IN THE OTHER -- THE 12 MONTH IS

6   NOT THE PERIOD OF TIME THAT THEY OTHERWISE WOULD HAVE BEEN

7   INCARCERATED.   IT'S SEVEN MONTHS FOR THE REASON WHY I WENT

8   THROUGH THAT 16-MONTH SENTENCE.

9   **Q**   RIGHT.   AND, LIKEWISE, TABLE 11 TALKS ABOUT ADDITIONAL

10  ARRESTS AT THE 26 PERCENT RATE OF THOSE RELEASED 120 DAYS EARLY

11  FROM THEIR SENTENCES, CORRECT?

12  **A**   THAT'S CORRECT.

13  **Q**   SO SHOULDN'T THAT ALSO BE A RATE FOR THE FOUR MONTHS, NOT

14  TWELVE MONTHS?

15  **A**   THE TWENTY-SIX PERCENT IS AT THE FOUR-MONTH LEVEL.

16  **Q**   BUT YOU ARE COMPARING THAT TO 12-MONTH ARREST RATE?

17  **A**   NO.

18  **Q**   WHAT WOULD HAPPEN, SIR, IF YOU COMPARED THE 26 PERCENT

19  ADDITIONAL ARRESTS DURING THAT 120-DAY EARLY RELEASE OR

20  REDUCTION IN SENTENCE TIME PERIOD TO THE SAME -- THE ARREST RATE

21  DURING THAT SAME FOUR MONTHS?   IT WOULD CHANGE, WOULD IT NOT?

22  **A**   YOU MEAN THE TOTAL ARRESTS --

23  **Q**   THE TOTAL ARRESTS --

24  **A**   -- FOR AMADOR, FRESNO, LOS ANGELES?

25  **Q**   YES.

1  **A**   WELL, YEAH, YOU'D HAVE TO -- IT WOULD LOWER THOSE NUMBERS.

2  BUT THE POINT IS, IS THAT IN THIS TIME OF IMPLEMENTATION, YOU

3  ARE GOING TO HAVE -- THAT'S BASICALLY YOUR HISTORICAL NUMBER OF

4  ARREST THAT ARE OCCURRING NOW.  WHAT I'M TRYING TO DEMONSTRATE,

5  IF YOU DO A FOUR-MONTH CHANGE IN LENGTH OF STAY, THIS IS THE

6  MAGNITUDE OF CHANGE IN THAT TOTAL ARREST PICTURE, AND THAT'S --

7  I THINK THAT'S A FAIR WAY TO DO IT.

8  **Q**   WELL, SIR, IF WE WERE MEASURING THE IMPACT OF THE ADDITIONAL

9  ARRESTS DURING THAT SHORTENED LENGTH OF STAY AND COMPARING IT TO

10 THE ARRESTS THE TOTAL NUMBER OF ARRESTS FOR THAT SAME PERIOD OF

11 TIME, IN FACT, IT WOULD BE MUCH GREATER THAN 3/10 OF ONE

12 PERCENT, CORRECT?

13 **A**   YES, BUT THAT'S NOT THE APPROPRIATE WAY TO DO IT.

14 **Q**   IN ADDITION TO THAT, IS IT FAIR TO SAY THAT WHEN YOU

15 MEASURED TOTAL ARRESTS AND COMPARED THE NUMBER OF NEW ARRESTS

16 FOR BOTH THE DIVERSION AND THE LENGTH OF SENTENCE SHORTENING,

17 THAT YOU INCLUDED JUVENILE ARRESTS IN THOSE TOTAL NUMBERS?

18 **A**   NO.  I THINK IT'S APPROPRIATE.  WHAT I'M TRYING TO SHOW --

19         **JUDGE KARLTON:**  SHE JUST ASKED WERE YOU INCLUDING.

20         **THE WITNESS:**  I'M SORRY.  YES.

21 BY MS. BARLOW

22 **Q**   YOU WERE, IN FACT, INCLUDING JUVENILE ARRESTS?

23 **A**   YES.

24 **Q**   BUT, IN FACT, NONE OF THE PEOPLE THAT WOULD BE DIVERTED

25 UNDER YOUR DIVERSION PROGRAM THAT YOU -- IS REFLECTED IN

1  TABLE 10 WOULD BE JUVENILES, CORRECT?

2  **A**   THAT'S CORRECT.

3  **Q**   AND NONE OF THE PEOPLE THAT WOULD BE RELEASED FROM STATE

4  PRISON HAVE THEIR TERMS ON AVERAGE SHORTENED BY FOUR MONTHS

5  WOULD BE JUVENILES, CORRECT?

6  **A**   THAT'S CORRECT.

7  **Q**   SO IF YOU TOOK THE JUVENILE ARRESTS OUT, IN FACT, THE

8  PERCENTAGE OF ADULT ARRESTS IN BOTH OF THOSE CATEGORIES WOULD BE

9  SUBSTANTIALLY HIGHER, WOULD THEY NOT?

10 **A**   THEY WOULD BE HIGHER, BUT IT IS INAPPROPRIATE TO DO IT THAT

11 WAY.

12            **JUDGE KARLTON:**  WHY IS IT INAPPROPRIATE?

13            **THE WITNESS:**  BECAUSE I'M TRYING TO EXAMINE THE

14 OVERALL EFFECT ON PUBLIC SAFETY IN THE STATE.  SO IF I'M IN LOS

15 ANGELES COUNTY, THERE ARE CRIMES BEING COMMITTED BY JUVENILES

16 AND ADULTS.  AND IN ALL THESE SYSTEMS, THINGS ARE BEING DONE

17 THAT AFFECT, YOU KNOW, THAT LEVEL OF CRIME THAT GOES ON IN THOSE

18 PLACES.  SO I'M TRYING TO ISOLATE THE EFFECT IF YOU CHANGE THIS

19 LENGTH OF STAY, WHAT'S THE MAGNITUDE OF CHANGE --

20            **JUDGE KARLTON:**  OF TOTAL CRIMES?

21            **THE WITNESS:**  -- OF TOTAL CRIMES FOR THAT GIVEN TIME

22 PERIOD.

23            **JUDGE KARLTON:**  I SEE.

24 BY MS. BARLOW

25 **Q**   NOW, YOU DO SHOW THE NUMBER OF JUVENILE ARRESTS IN ONE OF

1  YOUR TABLES, CORRECT?

2  **A**   YES.

3  **Q**   SO IF WE DID THAT MATH, WE WOULD COME UP WITH A MUCH HIGHER

4  PERCENTAGE OF PERSONS RELEASED ON A SHORTENED SENTENCE FROM

5  PRISON COMPARED TO THE TOTAL NUMBER OF ARRESTS, CORRECT?

6  **A**   THAT WOULD HAPPEN MATHEMATICALLY, YES.

7  **Q**   IS IT ALSO FAIR TO SAY IF WE DID A STATEWIDE NUMBER --

8  BECAUSE YOU DIDN'T DO THAT FOR THIS ONE?

9  **A**   CORRECT.

10 **Q**   IF WE DID A STATEWIDE NUMBER, THAT WOULD REPRESENT AN

11 ABSOLUTE NUMBER OF ADDITIONAL ARRESTS WHICH WOULD BE FAIRLY

12 SUBSTANTIAL IN SIZE, CORRECT?

13 **A**   WELL, IT WOULD BE WHAT IT IS.  AGAIN, IT'S NOT APPROPRIATE

14 TO DO THAT.

15 **Q**   IT'S NOT APPROPRIATE TO MEASURE HOW MANY ADDITIONAL ARRESTS

16 THERE MIGHT BE ON A STATEWIDE BASE?

17 **A**   I DIDN'T SAY THAT.  YOU WERE TALKING ABOUT TAKING JUVENILE

18 ARRESTS?

19 **Q**   NO, SIR.  WHAT I'M ASKING YOU IS, YOU CALCULATED THE

20 DIVERSION FOR AMADOR, FRESNO, LOS ANGELES AND STATEWIDE, THE

21 ADDITIONAL ARRESTS.

22 **A**   OH, OKAY.

23 **Q**   BUT YOU DIDN'T DO THAT FOR THE GOOD TIME CREDIT PROGRAM THAT

24 YOU'RE RECOMMENDING ON A STATEWIDE BASIS?

25 **A**   OKAY.

1  **Q**   CORRECT?

2  **A**   THAT'S CORRECT.

3  **Q**   IS THERE A REASON YOU DIDN'T INCLUDE THE STATEWIDE NUMBERS?

4  IT'S A PRETTY HIGH NUMBER, ISN'T IT?

5  **A**   NO, THERE IS NO PARTICULAR REASON WHY I DIDN'T INCLUDE THEM.

6  IT WOULD BE THE SAME LESS THAN ONE PERCENT CALCULATION.

7  **Q**   WELL, HOW MANY TOTAL ARRESTS ARE THERE OF ADULTS IN THE

8  STATE?

9  **A**   ABOUT 1.6 MILLION.

10  **Q**   SO ONE PERCENT OF THAT WOULD BE 160,000 ADDITIONAL ARRESTS?

11  **A**   NO, IT WOULD BE OF THE PEOPLE ARRESTED -- AGAIN, I HAVE TO

12  TAKE -- EVERYONE IS TRYING TO -- YOU ARE MISUNDERSTANDING WHAT

13  I'M SAYING HERE, BECAUSE EVERYONE KEEPS ON SAYING IF YOU DO

14  THIS, ARRESTS ARE GOING TO GO UP, AND CRIME IS GOING TO GO UP.

15  AND THAT'S JUST FACTUALLY, YOU KNOW, NOT THE CASE.

16         SO I HOPE THAT'S GETTING CLEAR TO FOLKS THAT THIS --

17  YOU KNOW, MY OPINION, WILL HAVE NO IMPACT ON THE CHANCES OF

18  BEING VICTIMIZED BY A CRIME IN THE STATE OF CALIFORNIA.

19         **JUDGE REINHARDT:**  IT IS GOING UP SLIGHTLY.  IT'S LESS

20  THAN ONE PERCENT, RIGHT?

21         **THE WITNESS:**  WELL, JUDGE, LET'S GO BACK TO WHAT

22  PRODUCES -- I'M TRYING NOT TO CONFUSE PEOPLE HERE.  AND THIS IS

23  BECAUSE OF WHAT WE SEE STATE AFTER STATE AFTER STATE.  THERE ARE

24  STATES THAT ARE DOING THESE THINGS NOW, AND THEIR CRIME RATES

25  ARE DROPPING DRAMATICALLY.  SO YOU CAN CHANGE THE SIZE OF YOUR

1   PRISON POPULATION.

2           **JUDGE REINHARDT:**  YOU SAY THE CRIME RATES ARE

3   DROPPING EVERYWHERE NO MATTER WHAT YOU DO.

4           **THE WITNESS:**  YES.

5           **JUDGE REINHARDT:**  PUT PEOPLE IN JAIL, PUT PEOPLE NOT

6   IN JAIL, MORE POLICE ON THE STREET, LESS POLICE ON THE STREET.

7   WHATEVER YOU DO, FOR WHATEVER REASONS NOBODY KNOWS, CRIME RATES

8   ARE GOING DOWN, AND SOME OTHER TIME THEY WILL GO UP.  I DON'T

9   THINK ANYONE KNOWS THE REASON.

10          **THE WITNESS:**  THERE ARE SOME REASONS WE KNOW.

11          **JUDGE REINHARDT:**  SOME POLICE CHIEFS I HAVE HAD HEARD

12  ACROSS THE COUNTRY ALL SAY IT'S BECAUSE THEY ARE GOOD POLICE

13  CHIEFS, THEY HAVE GOOD POLICIES.  YOU CAN GET ANY EXPLANATION

14  YOU WANT.

15          **JUDGE KARLTON:**  IF IT GOES UP, IT'S NOT BECAUSE THEY

16  ARE --

17          **JUDGE REINHARDT:**  IT'S NOT THEIR FAULT.

18          **JUDGE KARLTON:**  RIGHT.

19          **JUDGE REINHARDT:**  BUT WHAT YOU -- EVEN UNDER YOUR

20  THEORY, THE CRIME DROPS, IT'S STILL ONCE YOU HAVE A CERTAIN

21  NUMBER OF ADDITIONAL ARRESTS, THERE MUST BE A CERTAIN NUMBER OF

22  ADDITIONAL CRIMES.  AND AS I UNDERSTOOD YOUR TESTIMONY, YOU ARE

23  SAYING THERE IS SOME INCREASE IN ARRESTS OVER WHAT THEY WOULD

24  OTHERWISE BE, BUT IT'S LESS THAN ONE PERCENT.  AM I

25  MISUNDERSTANDING YOUR TESTIMONY?

1             **THE WITNESS:**  TECHNICALLY, ALL I'M SAYING IS THAT

2    WHATEVER THAT ARREST POOL IS GOING TO BE, IF IT IS HIGHER OR

3    LOWER, THE PERCENT OF THAT THAT CAN BE ATTRIBUTED TO RELEASED

4    PRISONERS IS GOING TO BE AT NO MORE THAN LESS THAN ONE PERCENT

5    HIGHER.

6             **JUDGE REINHARDT:**  THAT'S WHAT I SAID.

7             **THE WITNESS:**  RIGHT.

8             **JUDGE REINHARDT:**  WHATEVER THE CRIME WOULD OTHERWISE

9    BE --

10            **THE WITNESS:**  RIGHT.

11            **JUDGE REINHARDT:**  AND THAT MAY BE LOWER THAN IT IS

12   TODAY --

13            **THE WITNESS:**  RIGHT.

14            **JUDGE REINHARDT:**  -- WHATEVER IT WOULD OTHERWISE BE.

15   IT'S GOING TO BE SLIGHTLY HIGHER BY LESS THAN ONE PERCENT.

16            **THE WITNESS:**  I'LL GO ALONG WITH THAT.

17            **JUDGE REINHARDT:**  OKAY.

18   BY MS. BARLOW

19   **Q**   CAN WE AGREE, DR. AUSTIN, THAT 1.6 MILLION ARRESTS IN THE

20   STATE OF CALIFORNIA TRANSLATES INTO SUBSTANTIALLY MORE CRIMES

21   THAN THAT?

22   **A**   WELL, IT'S INTERESTING.  THE ACTUAL NUMBER OF REPORTED

23   SERIOUS CRIMES IN CALIFORNIA IS WELL BELOW THAT NUMBER.  IT'S

24   ABOUT -- I THINK THE 2007 DATA SHOW ABOUT 7- TO 800,000 SERIOUS

25   CRIMES.  SO THAT WOULD BE CRIMES OF VIOLENCE, THEFT, PROPERTY,

1    MOTOR VEHICLE THEFT, ARSON, 800,000.  AND THAT'S WELL BELOW WHAT

2    IT WAS 15, 20 YEARS AGO.

3              A NUMBER OF ARRESTS IS 1.5 MILLION.  SO WE ARREST A

4    LOT OF PEOPLE FOR STUFF THAT IS NOT BEING REPORTED TO POLICE; IN

5    PARTICULAR, THE DRUG USE AND TRAFFIC VIOLATIONS, DWI, THINGS

6    LIKE THAT, VICTIMLESS CRIMES, PROSTITUTION.  MOST OF THESE

7    ARRESTS IN THE STATE OF CALIFORNIA ARE MISDEMEANOR CRIMES FOR

8    WHICH YOU CAN'T GO TO PRISON.

9              **JUDGE REINHARDT:**  SO YOU ARE SAYING THERE ARE REALLY

10   MORE ARRESTS THAN THERE ARE CRIMES?

11             **THE WITNESS:**  ABOUT REPORTED SERIOUS CRIMES, YES.

12   THAT'S CALLED SERIOUS CRIMES.  CRIMES-TO-POLICE THE NUMBER OF

13   ARRESTS IS TWO-TO-ONE.

14             **JUDGE REINHARDT:**  AND THEN SOME CRIMES HAVE MORE THAN

15   ONE PERSON WHO COMMITTED THEM, THEY MAY ARREST A NUMBER OF

16   PEOPLE FOR ONE CRIME?

17             **THE WITNESS:**  TRUE.  ONE INCIDENT, YES.

18             **JUDGE REINHARDT:**  OKAY.

19             **THE WITNESS:**  I'M NOT TRYING TO CONFUSE YOU AT ALL,

20   BUT ON THE REPORTED CRIMES, IT LIMITS IT TO CRIMES REPORTED TO

21   POLICE.  SO IF SOMEONE USES DRUGS, THAT PERSON DOESN'T REPORT

22   HIMSELF TO THE POLICE, I JUST SAW SOMEONE USING DRUGS.  YOU HAVE

23   TO BE ARRESTED FOR THAT.  YOU HAVE TO BE ARRESTED FOR A DWI.

24   THE PEOPLE DON'T TURN THEMSELVES IN FOR DWI'S.

25             SO THERE'S A BUNCH OF BEHAVIORS THAT PEOPLE GET

1    ARRESTED FOR THAT WILL NOT FALL INTO THIS CATEGORY OF CRIMES

2    BEING REPORTED TO POLICE.

3    BY MS. BARLOW

4    **Q**    BUT, AGAIN, YOU TESTIFIED A FEW MOMENTS AGO THAT THE AMOUNT

5    OF CRIME EXCEEDS THE AMOUNT OF REPORTED CRIME, AND THE AMOUNT OF

6    REPORTED CRIME EXCEEDS THE AMOUNT OF ARRESTS FOR CRIME?

7    **A**    RIGHT.

8    **Q**    THAT'S WHAT YOU TESTIFIED TO?

9    **A**    IF YOU CONTROL FOR THE CRIMES THAT UCR CAPTURES, AND --

10   WELL, I'M JUST TRYING TO BE FACTUAL HERE.  IF YOU LOOK AT JUST

11   THOSE CRIMES, THERE IS FEWER ARRESTS THAN REPORTED TO THE

12   POLICE.

13   **Q**    WHICH WAS THE POINT, I THINK.  THANK YOU.

14   **A**    YES, BUT IT'S ALSO USEFUL TO POINT OUT THAT TOTAL NUMBER

15   OF REPORTED CRIMES IS MUCH LESS THAN THE TOTAL NUMBER OF PEOPLE

16   BEING ARRESTED.  I'M USING ARRESTS.  WHEN YOU START USING

17   ARRESTS, YOU BRING IN A LOT OF LOW LEVEL, MISDEMEANOR KINDS OF

18   ACTIVITIES THAT ARE NEVER REPORTED TO THE POLICE AND WILL NEVER

19   BE REPORTED TO THE POLICE BECAUSE THEY ARE VICTIMLESS CRIMES, OR

20   THEY ARE CRIMES OF SUCH LOW STATURE THE UCR DOESN'T CAPTURE

21   THEM.

22            **JUDGE KARLTON:**  WHAT IS UCR, SIR?

23            **THE WITNESS:**  UNIFORM CRIME REPORTS.

24   BY MS. BARLOW

25   **Q**    YOU INCLUDE IN THAT, FOR INSTANCE, DRIVING UNDER THE

1  INFLUENCE, A VICTIMLESS CRIME, THAT'S NOT INCLUDED IN THE

2  INDEXED CRIMES, CORRECT?

3  **A**    IT'S NOT IN THE INDEXED CRIMES.

4  **Q**    LET'S TALK FOR A MOMENT ABOUT YOUR TESTIMONY CONCERNING THE

5  FACT THAT, I THINK IN RESPONSE TO THE COURT'S QUESTION, WHETHER

6  IT WAS SAFE FOR THE COURT TO ASSUME THAT THE TECHNICAL PAROLE

7  VIOLATERS WERE NOT COMMITTING CRIMES.

8        YOU ACKNOWLEDGED PREVIOUSLY THAT THERE WAS SOME

9  INDICATION THAT DISTRICT ATTORNEYS WERE, QUOTE, "CHOOSING TO USE

10 PAROLE REVOCATION INSTEAD OF PROSECUTION FOR A NEW CRIME," AND

11 YOU TOOK THAT TO MEAN THAT THE NEW CRIME WASN'T SERIOUS.  YOU

12 GAVE AN EXAMPLE, I THINK, OF RAPE AND MURDER, AND INDICATED THAT

13 YOU WERE SURPRISED THAT THE DISTRICT ATTORNEY WOULD USE A PAROLE

14 REVOCATION INSTEAD OF REPROSECUTION OR PROSECUTION FOR THOSE

15 CRIMES.

16       WHAT EVIDENCE DO YOU HAVE, SIR, THAT THOSE CRIMES

17 AREN'T BEING PROSECUTED AFTER THE PAROLE REVOCATION PROCESS HAS

18 OCCURRED?

19 **A**    THE CDCR DATA.

20 **Q**    AND WHERE DOES THE CDCR DATA TELL YOU THAT –– LET'S SAY AN

21 ARREST FOR RAPE THAT ENDED UP IN A TECHNICAL PAROLE VIOLATION,

22 AS YOU PHRASE IT, DIDN'T ULTIMATELY GET PROSECUTED AS A RAPE?

23 **A**    SOME MAY HAVE, BUT IF YOU LOOK AT THE RELEASES OF TECHNICAL

24 VIOLATERS, YOU SEE THE SAME NUMBERS.  PEOPLE WHO WERE BROUGHT IN

25 FOR A HOMICIDE WERE RELEASED TWO MONTHS LATER.

1  Q    FROM PRISON.  MIGHT THEY HAVE BEEN RETURNED TO LOCAL CUSTODY

2  TO BE TRIED FOR THOSE VERY CRIMES THEY WERE ARRESTED FOR?

3  A    MY RECOLLECTION, THEY WERE BEING RETURNED TO SUPERVISION.

4  Q    THAT SHOWS IN THE DATA THAT YOU HAVE?  WHERE IS THAT, SIR?

5  A    ON DATA TAPES.

6  Q    IS IT POSSIBLE, SIR --

7          **JUDGE KARLTON:**  ANYTHING IS POSSIBLE.  ANYTHING IS

8  POSSIBLE.

9          **MS. BARLOW:**  I UNDERSTAND THAT, YOUR HONOR, BUT HE'S

10 ATTRIBUTING --

11         **JUDGE HENDERSON:**  IT GOES TO MEANINGFUL QUESTIONS.

12         **MS. BARLOW:**  I'M TRYING TO --

13         **JUDGE HENDERSON:**  MA'AM, YOU'RE NOT LISTENING.

14         YOU JUST SAY IS IT POSSIBLE.

15         **JUDGE KARLTON:**  I'M SORRY.  I DIDN'T MEAN TO SAY

16 THAT.

17 BY MS. BARLOW

18 Q    WITH RESPECT TO THE ONE HUNDRED SOME MURDERS YOU CITED?

19 A    TWO HUNDRED -- IT'S ACTUALLY --

20         **JUDGE KARLTON:**  I THOUGHT IT WAS 400.

21         **THE WITNESS:**  ONE HUNDRED FORTY-SIX MURDERS, EIGHT

22 VOLUNTARY MANSLAUGHTERS, 282 ATTEMPTED MURDERS, EIGHT CONSPIRACY

23 TO COMMIT MURDER, EIGHT ACCESSORIES TO MURDERS.  IT GETS ABOUT

24 OVER 400.

25

1  BY MS. BARLOW

2  **Q**   LET'S JUST TALK ABOUT THE 146 MURDERS.  DO YOU HAVE DATA,

3  SIR, THAT TELLS YOU THAT NONE OF THOSE MURDERS WAS ULTIMATELY

4  PROSECUTED AFTER THE PAROLE REVOCATION PROCESS?

5  **A**   I HAVE DATA.  I HAVE NOT ANALYZED THAT.  I HAVE DATA THAT

6  COULD DETERMINE THAT.

7  **Q**   ARE YOU AWARE THAT SOMETIMES PEOPLE ARE ARRESTED FOR CRIMES

8  THAT THEY MAY HAVE ACTUALLY COMMITTED BUT THERE IS INADEQUATE

9  EVIDENCE TO PROSECUTE THEM FOR THOSE CRIMES?

10  **A**   I DON'T HAVE A PARTICULAR CASE IN FRONT OF ME.

11  **Q**   ARE YOU AWARE THAT HAPPENS SOMETIMES, DR. AUSTIN?

12  **A**   I DON'T HAVE ANY PARTICULAR CASES IN FRONT OF ME.

13  **Q**   ARE YOU SAYING IT DOESN'T HAPPEN?

14  **A**   I JUST TOLD YOU WHAT I TOLD YOU.

15  **Q**   LET'S TALK A MINUTE ABOUT THE PROGRAMMING THAT YOU HAVE

16  INDICATED IN YOUR REPORTS AT LEAST IS ESSENTIAL TO HAVE THESE

17  POPULATION REDUCTION MEASURES SUCCEED.

18         **JUDGE KARLTON:**  THAT IS SOMETHING THAT WE TALKED

19  ABOUT, THE ASSUMPTION IS, AND I'M NOT SURE THAT THAT'S WHAT YOU

20  SAID.

21         **THE WITNESS:**  I DIDN'T SAY THAT.

22         **JUDGE KARLTON:**  I DIDN'T THINK YOU DID.

23         IS IT YOUR POSITION THAT THIS RELEASE AND THE

24  BENEFITS OF IT CAN BE ACHIEVED WITHOUT ENDANGERING THE PUBLIC

25  WITHOUT THE PROGRAMS THAT YOU THINK WOULD ENHANCE THEM?

1          **THE WITNESS:**  ABSOLUTELY.

2          **JUDGE KARLTON:**  ALL RIGHT.

3    BY MS. BARLOW

4    **Q**    WELL, IF I MAY REFER YOU TO YOUR AUGUST 15TH REPORT, PAGES 8

5    AND 9?  STARTING AT THE LAST SENTENCE OF -- ON PAGE 8, IN

6    PARAGRAPH 19:

7               "AS WILL BE SHOWN BELOW, MODERATELY

8               LOWERING THE PRISON POPULATION AND INCARCERATION

9               RATE WHILE USING EVIDENCE BASED MODELS FOR

10              REHABILITATION DOES NOT RESULT IN HIGHER CRIME."

11   **A**    RIGHT.  AND, AGAIN, AS I TESTIFIED, EVIDENCE-BASED MODELS --

12   THE PRINCIPLE OF EVIDENCE-BASED MODELS, WHICH I THINK I

13   TESTIFIED BEFORE, IS THAT REQUIRES -- THAT WOULD REQUIRE THE

14   STATE OF CALIFORNIA TO STOP SUPERVISING LOW RISK PEOPLE AND TO

15   REALLOCATE THEIR RESOURCES TO THE HIGH RISK PEOPLE ONLY.  THAT'S

16   WHAT EVIDENCE-BASED PROGRAMS DO.  SO THAT'S WHAT I MEAN BY

17   EVIDENCE-BASED SCIENCE.  THAT'S HOW YOU DO IT?

18              THE RESEARCH IS CLEAR THAT WHEN YOU GIVE A LOT OF

19   SUPERVISION OR SERVICES TO PEOPLE THAT ARE LOW RISK, YOU

20   INCREASE THEIR RECIDIVISM RATE.  YOU MAKE THEM WORSE.  THAT'S

21   BEEN PUBLISHED OVER AND OVER AGAIN.  THAT'S PART OF THE PROBLEM

22   WITH THE HIGH RECIDIVISM RATE.  THEY'RE SUPERVISING TOO CLOSELY

23   LOW RISK PEOPLE WHICH CAUSES A NEGATIVE REACTION.

24              **JUDGE KARLTON:**  THAT IS NOT, IN YOUR VIEW, THE KIND

25   OF PROGRAMMING YOU WOULD LIKE TO SEE WHICH WOULD ENHANCE PUBLIC

 1  SAFETY?

 2              **THE WITNESS:**  RIGHT.

 3              **JUDGE KARLTON:**  THAT'S A SEPARATE ISSUE?

 4              **THE WITNESS:**  THAT'S CORRECT.

 5  BY MS. BARLOW

 6  **Q**   AGAIN, LET ME REFER YOU TO PAGE 20 OF YOUR AUGUST 15TH

 7  REPORT.  WHEN YOU -- SO WHEN YOU SAID IN PAGE -- IN PARAGRAPH

 8  43, "PROVIDE EVIDENCED-BASED PROGRAMMING AND SUPERVISION TO

 9  TECHNICAL PAROLE VIOLATERS INSTEAD OF RETURNING THEM TO PRISON,"

10  YOU REALLY MEANT NO PROGRAM AND NO SUPERVISION?

11  **A**   NO.  YOU TARGET THE PROGRAMMING AND SUPERVISION THAT YOU

12  HAVE BASED ON RISK.  THAT'S WHAT I'M SAYING.

13  **Q**   BUT THAT REQUIRES PROGRAMMING, DOES IT NOT, SIR?

14  **A**   YOU HAVE PAROLE AGENTS.  YOU HAVE PROGRAMS NOW.  YOU TARGET

15  THEM THE WAY THEY'RE SUPPOSED TO BE TARGETED.  THEY ARE NOT

16  TARGETED PROPERLY NOW.

17  **Q**   OKAY.  BUT YOU DIDN'T ASSESS THE AVAILABILITY OF COUNTY

18  MENTAL HEALTH PROGRAMS, FOR EXAMPLE, TO DETERMINE WHETHER THEY

19  WOULD BE IMPACTED BY THE NEW ARRESTS YOU TALKED ABOUT?

20  **A**   I'M NOT SURE I UNDERSTAND YOUR QUESTION, BUT I DID NOT

21  ASSESS THE MENTAL HEALTH PROGRAMS IN THE COUNTIES.

22  **Q**   DID YOU ASSESS THE COSTS OF PROCESSING THE ADDITIONAL

23  ARRESTEES THROUGH THE CRIMINAL JUSTICE SYSTEM?

24              **JUDGE KARLTON:**  WHAT ADDITIONAL ARRESTEES?

25              **MS. BARLOW:**  THE ADDITIONAL ARRESTEES FROM THE TWO

1    PROGRAMS HE ACKNOWLEDGED WOULD OCCUR.

2           **JUDGE KARLTON:**  AGAIN, IF YOU LOOK BACK AT THAT

3    TABLE.

4           **THE WITNESS:**  LET'S GO TO THE LESS THAN ONE PERCENT.

5    LESS THAN ONE PERCENT MEANS, IN MY MIND MEANS NO IMPACT ON

6    OPERATING COSTS.  ANYONE KNOWS ANYTHING ABOUT A JAIL AND THE

7    BOOKINGS KNOWS THOSE BOOKINGS FLUCTUATE.  IF THEY MOVE LESS THAN

8    ONE PERCENT, THERE'S NO ADDITIONAL COST TO THAT JAIL SYSTEM.

9    YOU NEED TO GET BIG CHANGES TO AFFECT THE COST OF A JAIL SYSTEM.

10   YOU NEED TO GET BIG CHANGES TO AFFECT THE COST OF POLICE

11   DEPARTMENTS.

12          SO MOVING -- IF I SAID THE ARRESTS -- THE BOOKINGS

13   INCREASED BY 3/10 OF ONE PERCENT, THAT DOES NOT TRANSLATE INTO

14   COST AT ALL.  THERE ARE NO COSTS THERE.

15   BY MS. BARLOW

16   Q   DR. AUSTIN, WHEN YOU WERE DETERMINING THAT YOU DIDN'T NEED

17   TO HAVE ANY PROGRAMMING AVAILABLE FOR THESE NEW PAROLEES THAT

18   WOULD BE COMING OUT EARLIER --

19   A   THESE ARE NOT NEW PAROLEES.  THEY ARE THE SAME PEOPLE THAT

20   ARE COMING OUT NOW.

21   Q   FOR THE PAROLEES THAT WOULD BE COMING OUT EARLIER AND FOR

22   THE DIVERTED PEOPLE, RIGHT?  THOSE ARE NEW PAROLEES, ARE THEY

23   NOT?

24   A   NO.  THEY WENT TO PRISON.  THEY DID THEIR TIME.  THAT'S THE

25   LOOP.  SO THEY DID TWO OR THREE YEARS.  THEY CAME OUT ON PAROLE.

1  SO THEY GOT TO THE COUNTY ON PAROLE SUPERVISION.  THEN THEY

2  VIOLATED.  THEY SAT IN THE JAIL FOR 30 DAYS, THEY WENT TO CDCR

3  RECEPTION CENTER FOR TWO MONTHS, AND THEY GOT KICKED BACK THE

4  COUNTY.  THAT'S THE LOOP.

5  Q   SIR, I'M NOT ASKING YOU ABOUT THE TECHNICAL PAROLE VIOLATERS

6  RIGHT NOW.  I'M ASKING YOU ABOUT THE DIVERSION PROGRAM.  THOSE

7  ARE NEW PAROLEES, ARE THEY NOT?

8           **JUDGE KARLTON:**  THEY AREN'T PAROLEES AT ALL.  THEY

9  ARE NEW PROBATIONERS.

10 BY MS. BARLOW

11 **Q**   THEY ARE PEOPLE STAYING IN THE COUNTIES THAT WOULDN'T

12 OTHERWISE BE THERE, CORRECT?

13 **A**   YOU COULD EITHER PUT THEM ON PROBATION OR PUT THEM ON

14 PAROLE.  YOU COULD DO WHAT YOU WANT.

15 **Q**   THEY WOULD BE NEW PAROLES IF YOU PUT THEM ON PAROLE OR THEY

16 WOULD BE ADDITIONAL PROBATIONERS IF YOU PUT THEM ON PROBATION,

17 CORRECT?

18 **A**   THEY --

19                (INTERRUPTION BY THE COURT REPORTER)

20 BY MS. BARLOW

21 **Q**   WITH RESPECT TO THE DIVERTED POPULATION THAT YOU HAVE BEEN

22 TALKING ABOUT --

23 **A**   SHORT SENTENCES.

24 **Q**   IT WOULD HELP THE REPORTER IF YOU WOULD WAIT UNTIL I'M

25 FINISHED.  SHE'S HAVING TROUBLE GETTING US BOTH AT THE SAME

 1  TIME.

 2          WITH RESPECT TO THE DIVERTED POPULATION, YOU JUST

 3  SAID A MINUTE AGO YOU COULD EITHER PLACE THEM ON PAROLE OR YOU

 4  COULD PLACE THEM ON PROBATION, CORRECT?

 5  **A**  CORRECT.

 6  **Q**  BUT EITHER WAY THEY WOULD BE IN ADDITION TO THE EXISTING

 7  PAROLE LOAD AND THE EXISTING PROBATION LOAD, CORRECT?

 8  **A**  LET ME CORRECT YOU.  IF PUT THEM ON PAROLE, THEY ARE NOT NEW

 9  PAROLEES.  THEY WERE GOING TO GO TO PAROLE ANYWAY.  THEY WERE

10  GOING TO GET THERE IN ABOUT FOUR, FIVE, SIX MONTHS.  THEY ARE

11  NOT NEW PAROLEES.  IT'S THE SAME STREAM OF PEOPLE BEING RELEASED

12  FROM PRISON?

13          IF THEY DECIDE -- AND IT DEPENDS WHAT THE PLAN IS --

14  TO PUT THEM ON PROBATION, NOW YOU HAVE A NEW PROBATIONER.  BUT

15  YOU HAVE -- YOU'VE STOPPED THEM FROM GOING ONTO PAROLE.  SO

16  THERE'S A SAVINGS.  IN OTHER WORDS, THERE'S NOT AS MANY PEOPLE

17  ON PAROLE AS THERE WOULD HAVE BEEN.  THERE'S MORE PEOPLE ON

18  PROBATION.  AND YOU'VE SAVED QUITE A BIT OF MONEY IN DOING THAT.

19          DO YOU UNDERSTAND, I DON'T WANT TO BE --

20  **Q**  I DO UNDERSTAND, SIR.

21  **A**  OKAY.

22  **Q**  WHAT I'M TRYING TO GET AT IS THAT IN YOUR ANALYSIS, IN

23  SAYING THERE WOULD BE NO IMPACT, YOU DIDN'T DO ANY ASSESSMENT OF

24  WHAT RESOURCES WERE AVAILABLE TO PAROLE OFFICERS IN THE COUNTIES

25  THAT YOU MEASURED, CORRECT?

1  **A**  WELL, I DID.  THAT'S WHY ON RECOMMENDATION 4, IF WE PUT THEM

2  ON PAROLE THEN AND THEY'RE GETTING THERE SOONER, THEN WE HAVE TO

3  TO DO SOMETHING WITH THE LENGTH OF TIME ON PAROLE SUPERVISION.

4  THAT'S WHY I HAD EARLY DISCHARGE WHICH REDUCES THAT.

5      IF YOU DECIDE TO SHIP THEM TO PROBATION, YOU KNOW, MY

6  RECOMMENDATION IS TO TAKE -- NOW IT'S NO LONGER A COST TO THE

7  STATE PAROLE SYSTEM OR STATE DEPARTMENT OF CORRECTIONS.  SO

8  THERE ARE SAVINGS THERE.  THOSE SAVINGS WOULD GET TRANSFERRED

9  OVER TO THE COUNTY, SO THEY WOULD HAVE THE MONEY TO SUPERVISE

10 THEM AT THE COUNTY.  WE ARE NOT REALLY ADDING COSTS HERE.  WE

11 ARE MOVING THE MONEY AROUND, MOVING THE BODIES AROUND INTO A

12 MORE EFFECTIVE SYSTEM OF SUPERVISION AND CONTROL WITH GREATER

13 PUBLIC SAFETY.

14      I WANT TO BE CLEAR ON THAT.  IT'S NOT AN INCREASE IN

15 ANYTHING.  IT'S MOVING THE BODIES INTO DIFFERENT DIRECTIONS THAT

16 ARE MORE EFFECTIVELY REPRESENTING WHAT WE NEED TO DO.

17 **Q**  I WOULD LIKE TO READ FROM THE DEPOSITION, IF I MAY.  THIS IS

18 FROM THE SECOND DEPOSITION, VOLUME TWO, PAGE 450 -- I'M SORRY,

19 451, LINES 10 THROUGH 452, LINE 6.

20      "QUESTION:  DID YOU DO ANY ASSESSMENT OF

21      AVAILABLE PROGRAMS FOR PAROLEES IN FRESNO

22      COUNTY?

23      "NO.

24      "QUESTION:  DID YOU DO ANY ASSESSMENT OR

25      STUDY OF THE RATIO OF PAROLEES TO PAROLE AGENTS

```
1              IN FRESNO COUNTY?

2                   "NO.

3                   "QUESTION:  HOW ABOUT LOS ANGELES COUNTY?

4                   "NO.

5                   "QUESTION:  AMADOR COUNTY?

6                   "NO.

7                   "QUESTION:  DID YOU MAKE ANY ASSESSMENT OR

8              DETERMINATION OF HOW THAT ADDITIONAL WAVE, IF

9              YOU WANT TO CALL IT, OF PAROLEES WHO ACCEPT DRUG

10             TREATMENT PROGRAMS IN THE COUNTY?

11                  "ANSWER:  NO.

12                  "QUESTION:  DOMESTIC VIOLENCE TREATMENT

13             PROGRAMS?

14                  "ANSWER:  NO.

15                  "QUESTION:  ANGER MANAGEMENT TREATMENT

16             PROGRAMS?

17                  "ANSWER:  NO.

18                  "QUESTION:  DID YOU DO ANY KIND OF

19             ASSESSMENT ABOUT THE AVAILABILITY OF HOUSING FOR

20             THOSE ADDITIONAL RELEASEES OR THOSE EARLY

21             RELEASEES?

22                  "ANSWER:  NO."

23   A   DO YOU WANT ME TO RESPOND TO THAT?

24             JUDGE KARLTON:  NO.  SHE THINKS SHE'S IMPEACHED YOU.

25
```

 1  BY MS. BARLOW

 2  **Q**   NOW, SIR, WHEN YOU WERE DETERMINING THAT WE COULD DIVERT

 3  SOME OF THESE FOLKS TO THE LOCAL SYSTEM, DID YOU CONSIDER THE

 4  NUMBER OF PEOPLE THAT ARE ALREADY BEING RELEASED EARLY FROM THE

 5  LOCAL COUNTY JAILS DUE TO OVERCROWDING?

 6  **A**   YES.

 7  **Q**   YOU DID?

 8  **A**   YES.

 9  **Q**   DO YOU KNOW HOW MANY THAT IS?

10  **A**   YEAH, THERE'S A REPORT THAT THE STATE PUTS OUT OF PEOPLE

11  THAT ARE SERVING LESS THAN THEIR FULL TERMS.

12  **Q**   AT THE COUNTY LEVEL?

13  **A**   AT THE COUNTY LEVEL.

14  **Q**   AND THEY'RE SERVING LESS THAN THEIR FULL TERMS BECAUSE

15  THERE'S NO SPACE FOR THEM, CORRECT?

16  **A**   THEY LACK SPACE OR A COURT ORDER.  THEY CAN'T BUDGET THE

17  BEDS THEY HAVE.

18  **Q**   SO YOUR RECOMMENDATION ISN'T THAT WE DIVERT THESE

19  DIVERSIONARY PEOPLE TO COUNTY CUSTODY, BUT THAT WE DIVERT THEM

20  TO COMMUNITIES, CORRECT, TO LIVE IN THE COMMUNITIES?

21  **A**   YES, LIKE -- YES.  THAT THEY WOULD LIVE IN THE COMMUNITIES?

22  **Q**   YES.

23  **A**   YES.

24  **Q**   AND YOU ARE AWARE THAT THERE WERE ALMOST 200,000 PEOPLE

25  RELEASED EARLY FROM COUNTY FACILITIES IN 2007?

1   **A**   I LOOKED AT THAT.

2   **Q**   FOR LACK OF CAPACITY?

3   **A**   I LOOKED AT THAT, AND THE CRIME RATES WERE GOING DOWN.  I

4   WANT YOU TO KNOW I DID LOOK AT THAT, BECAUSE THE REPORT CAME OUT

5   AND --

6   **Q**   YOU ATTRIBUTE THAT TO RELEASING INMATES FROM COUNTY CUSTODY?

7   **A**   PARDON?

8   **Q**   DO YOU ATTRIBUTE THAT PRIMARY --

9                    (INTERRUPTION BY THE COURT REPORTER.)

10            **JUDGE HENDERSON:**  PLEASE STOP INTERRUPTING HER,

11   DOCTOR.

12            **THE WITNESS:**  SORRY.

13   BY MS. BARLOW

14   **Q**   YOU ATTRIBUTE THAT CRIME REDUCTION IN COUNTIES TO THE EARLY

15   RELEASE OF PEOPLE FROM COUNTY FACILITIES?

16   **A**   I DON'T ATTRIBUTE THAT.

17   **Q**   OKAY.  THANK YOU.

18            NOW, YOU TESTIFIED THAT YOUR PROPOSAL TO DIVERT IS

19   FOR LOW RISK INMATES, CORRECT?

20   **A**   YES.

21   **Q**   OR LOW RISK OFFENDERS, SHALL WE SAY?

22   **A**   YES.

23   **Q**   BUT YOU ALSO SAID WE DON'T KNOW WHO THE LOW RISK PEOPLE ARE,

24   WE DON'T HAVE AN EFFECTIVE WAY OF ASSESSING WHO THEY ARE,

25   CORRECT?

1    **A**   WELL, I MAY HAVE SAID THAT AT THE TIME THAT I WAS DOING MY

2    ANALYSIS.  I GOT, YOU KNOW, DATA TAPES FROM THE DEPARTMENT OF

3    CORRECTIONS.  THEY DID NOT HAVE IN PLACE A RISK ASSESSMENT TOOL,

4    ALTHOUGH I HAVE ONE, AND I DEVELOPED ONE FOR THEM, SO IT EXISTS.

5    **Q**   SO WOULD YOU AGREE, SIR, THAT YOU'D HAVE TO HAVE IN PLACE A

6    VALID RISK ASSESSMENT TOOL IN ORDER TO DETERMINE WHO THE LOW

7    RISK PEOPLE ARE THAT WOULD BE DIVERTED?

8    **A**   I DO, AND THEY HAVE ONE.

9    **Q**   THEY HAVE ONE?

10   **A**   YEAH.

11   **Q**   NOW, DOES YOUR OPINION CHANGE ABOUT THE IMPACT TO PUBLIC

12   SAFETY, IN OTHER WORDS, THAT THERE ISN'T ONE, EVEN THOUGH WE

13   KNOW THAT 70 PERCENT OF THOSE COMING OUT OF PRISON HAVE

14   SUBSTANCE ABUSE PROBLEMS OF SOME KIND?

15   **A**   YES.

16   **Q**   THAT CHANGES YOUR OPINION?

17   **A**   NO, IT DOESN'T CHANGE MY OPINION.  I KNOW THEY HAVE -- I

18   KNOW 70 PERCENT OF SUBSTANCE ABUSE PROBLEMS COMING OUT, YES, I

19   KNOW THAT PART.

20   **Q**   AND DOES YOUR OPINION CHANGE IF I TELL YOU THAT THE

21   TESTIMONY HAS BEEN THAT THERE ARE NOT ENOUGH SUBSTANCE ABUSE

22   PROGRAMS AVAILABLE IN ANY COUNTY IN THIS STATE?

23   **A**   DOES NOT CHANGE MY OPINION.

24   **Q**   DOES YOUR OPINION CHANGE AT ALL IF YOU TAKE INTO ACCOUNT

25   THAT 20 PERCENT OF THOSE RELEASED FROM PRISON HAVE MENTAL HEALTH

1  NEEDS?

2  **A**   NO.

3  **Q**   DOES YOUR OPINION CHANGE IF YOU ARE AWARE THAT THE TESTIMONY

4  IS OR WILL BE THAT THERE ARE INADEQUATE MENTAL HEALTHCARE

5  TREATMENT FACILITIES IN ALL OF THE COUNTIES?

6  **A**   NO.

7  **Q**   I WANT TO TALK FOR JUST A MOMENT ABOUT YOUR TESTIMONY

8  CONCERNING THE OPINIONS OF CHIEF JERRY DYER FROM FRESNO.  I

9  BELIEVE I HEARD YOU SAY YOU DIDN'T KNOW WHAT STUDY OR DATA

10 MR. DYER WAS USING WITH RESPECT TO THE NUMBER OF CRIMES THAT

11 WERE BEING COMMITTED BY THOSE ARRESTED, BUT YOU WERE SPECULATING

12 ABOUT THE STUDIES THAT HE WAS USING?

13 **A**   HE DIDN'T CITE A STUDY.

14 **Q**   YOU WEREN'T PROVIDED WITH THE STUDY OR THE DATA THAT WAS

15 PROVIDED TO PLAINTIFFS' COUNSEL, CORRECT, SO YOU DON'T KNOW WHAT

16 STUDY OR DATA HE USED?

17         **JUDGE KARLTON:**  HE DOESN'T KNOW WHETHER YOU PROVIDED

18 SOMETHING TO THE PLAINTIFFS' COUNSEL THEY DIDN'T PROVIDE HIM.

19         **MS. BARLOW:**  ACTUALLY, YOUR HONOR, HE TESTIFIED HE

20 DIDN'T RECEIVE DOCUMENTS THAT WERE PRODUCED, AND THAT WAS THE

21 SUBJECT OF A MOTION IN LIMINE TO PRECLUDE HIM FROM TESTIFYING ON

22 THAT ISSUE.  FOR THAT REASON --

23         **JUDGE KARLTON:**  MA'AM, HE DOESN'T KNOW WHAT HE DIDN'T

24 GET.  EVERYBODY AGREES TO THAT.

25         WOULD YOU AGREE TO THAT?

 1              **THE WITNESS:**  I WOULD AGREE TO THAT, YOUR HONOR.

 2    BY MS. BARLOW

 3    **Q**   IS IT FAIR TO SAY, DR. AUSTIN, YOU WERE SPECULATING ABOUT

 4    WHAT DATA MR. DYER RELIED ON?

 5    **A**   ALL I AM OBSERVING IN A REPORT WHEN I WROTE MY REPORTS, I

 6    CITED THE STUDY.  SO WHEN HE GIVES STATISTICS, THERE'S NO

 7    FOOTNOTE SAYING THIS IS WHAT THIS IS BASED UPON.  THAT'S ALL I'M

 8    SAYING.

 9    **Q**   SO YOU DON'T HAVE ANY IDEA, DO YOU, ABOUT IF THE STUDY YOU

10    THINK HE MIGHT HAVE REFERRED TO IS, IN FACT, THE STUDY?

11    **A**   I DON'T KNOW WHAT IT IS.

12              **MS. BARLOW:**  SO FOR THAT REASON I WOULD MOVE THE

13    TESTIMONY HE GAVE EARLIER ABOUT MR. DYER'S OPINIONS BE STRICKEN.

14              **JUDGE HENDERSON:**  GOES TO THE WEIGHT.

15              **JUDGE KARLTON:**  DENIED.  AND LET'S MOVE ON.

16              **MS. BARLOW:**  THANK YOU, YOUR HONOR.

17    BY MS. BARLOW

18    **Q**   ONE OF THE STUDIES YOU TALKED ABOUT HAVING DEALT WITH EARLY

19    RELEASE IS FROM ILLINOIS, CORRECT?

20    **A**   YES.

21    **Q**   AND YOU CONDUCTED A STUDY THERE IN 1986?

22    **A**   I THINK IT WAS PUBLISHED -- WAS IT PUBLISHED IN 1986?

23    **Q**   IT WAS PUBLISHED IN 1986, YOU ARE CORRECT.

24              DO YOU KNOW WHAT PERIOD OF TIME WAS COVERED BY THAT

25    STUDY?

1  **A**   I CAN'T -- I THINK IT'S, OFF THE TOP OF MY HEAD,

2  1980-SOMETHING TO 1984.  I'D HAVE TO LOOK AT THE STUDY AND SEE

3  THE TIME.  IT'S ABOUT 20 SOME YEARS AGO.

4  **Q**   JUST 1984?

5           **JUDGE KARLTON:**  HE SAID 1980-SOMETHING.

6           **THE WITNESS:**  1980 TO 1984, SOMETHING LIKE THAT.  I

7  REALLY DON'T KNOW WITHOUT LOOKING AT THE REPORT.  IT'S BEEN 20

8  SOME YEARS SINCE I HAVE SEEN IT.

9  BY MS. BARLOW

10 **Q**   I UNDERSTAND THAT.  IT'S THE SECOND DOCUMENT CITED IN YOUR

11 CURRICULUM VITAE AS A PUBLICATION BY YOU.

12 **A**   I KNOW I WROTE IT.  I'M SAYING I HAVEN'T LOOKED AT IT FOR

13 ABOUT 20 YEARS.

14 **Q**   OKAY.  WOULD YOU AGREE, DR. AUSTIN, THAT -- I'M SORRY.  I

15 CANNOT GET USED TO THESE GLASSES -- EARLY RELEASE SUBSTANTIALLY

16 ACCELERATED THE AMOUNT OF CRIME SUFFERED BY THE PUBLIC?

17 **A**   I HAVE TO SEE THE PAGE YOU ARE QUOTING FROM.

18 **Q**   IT'S ACTUALLY FROM THE SUMMARY ON PAGE 1.

19 **A**   CAN YOU SHOW IT TO ME?

20 **Q**   I ONLY HAVE ONE COPY OF YOUR STUDY.

21 **A**   WELL, AS SOON AS YOU SHOW IT TO ME, I'LL COMMENT ON IT.

22           **MS. BARLOW:**  MAY I APPROACH, YOUR HONOR?

23           **JUDGE HENDERSON:**  YOU MAY.

24           **THE WITNESS:**  WHAT SECTION ARE YOU -- EARLY RELEASE

25 DID NOT INCREASE THE PROBABILITY OF AN INMATE WOULD COMMIT

1  ADDITIONAL CRIMES ONCE RELEASED.

2           **MS. BARLOW:**  THAT'S NOT THE PARAGRAPH --

3           **THE WITNESS:**  "ALSO EARLY RELEASE SUBSTANTIALLY

4  ACCELERATED THE AMOUNT OF CRIME SUFFERED BY THE PUBLIC BUT

5  CONTRIBUTED TO LESS THAN ONE PERCENT OF ALL CRIMES REPORTED -- "

6           **MS. JOHNSON:**  I DON'T THINK ANYONE HEARD WHAT HE

7  SAID, YOUR HONOR.

8           **JUDGE REINHARDT:**  NOTHING'S CHANGED.  LESS THAN ONE

9  PERCENT HE SAID.

10           **JUDGE KARLTON:**  AFTER 20 YEARS NOTHING'S CHANGED.

11  BY MS. BARLOW

12  **Q**   LET'S TALK ABOUT WHAT THAT MEANS, SIR.  ISN'T IT TRUE IN

13  THAT STUDY, YOU CONCLUDED THAT OUT OF THE 21,000 PEOPLE THAT

14  WERE ARRESTED EARLY, THERE WERE APPROXIMATELY 4,500 ARRESTS

15  DURING THE EARLY RELEASE PERIOD?

16  **A**   USING THE SAME TABLES YOU'VE ALL SEEN HERE, I WAS DOING THE

17  SAME THING.

18           I WANT TO ADD, BY THE WAY, THAT WHAT YOU READ IS THE

19  ABSTRACT WRITTEN BY THE PUBLISHER.

20  **Q**   WELL, I'LL BE HAPPY TO GET INTO THE TEXT WRITTEN BY YOU.

21  **A**   THAT'S FINE.

22  **Q**   OKAY.  I'M JUST STARTING.

23           **JUDGE REINHARDT:**  OH, NO, DON'T SAY THAT.

24           **MS. BARLOW:**  ACTUALLY, IF HE REMEMBERS THE STUDY AT

25  ALL, YOUR HONOR, IT SHOULDN'T TAKE VERY LONG.

1  BY MS. BARLOW

2  Q    FORTY-FIVE HUNDRED ARRESTS OUT OF THE 21,000 EARLY RELEASE,

3  CORRECT?

4  A    RIGHT.

5  Q    AND THAT REFLECTED 14,396 REPORTED CRIMES, CORRECT?

6  A    WELL, THAT WAS BASED ON THE CALCULATION THERE OF ARRESTS TO

7  REPORTED CRIMES USING THE AL BLOOMSTEIN METHOD, RIGHT.  THERE

8  SHOULD BE A TABLE IN THERE.

9  Q    THAT WAS YOUR CONCLUSION, WAS IT NOT, THAT THOSE 4,500

10  ARRESTS EQUAL 14,396 REPORTED CRIMES?

11  A    RIGHT.

12  Q    AND THAT, IN FACT, THERE WERE ACTUALLY 30,610 CRIMES

13  COMMITTED BY THAT EARLY RELEASE GROUP OF 4,500?

14  A    IF THAT'S WHAT YOU ARE READING, IF IT'S ACCURATE, I'LL TAKE

15  YOU AT YOUR POINT.

16  Q    LET'S TALK A MOMENT ABOUT WHAT HIGH RISK OFFENDERS -- YOU

17  SAID ONLY TEN PERCENT OF OFFENDERS ARE HIGH RISK; DO YOU

18  REMEMBER THAT?

19  A    IN THAT NEIGHBORHOOD, 10, 10, 15.  IT DEPENDS ON THE STATE.

20  TEN, MAYBE AS MANY AS TWENTY.

21  Q    OKAY.  IN THIS STUDY AT LEAST, YOU INDICATE THAT FOR HIGH

22  RISK OFFENDERS, THAT COULD EQUATE TO 250 CRIMES PER YEAR?

23  A    I'D HAVE TO SEE THAT, WHERE YOU'RE READING FROM AGAIN.

24            MS. BARLOW:  MAY I APPROACH, YOUR HONOR?

25            JUDGE HENDERSON:  YOU MAY.

1          CAN YOU GIVE US SOME IDEA OF HOW MUCH MORE YOU HAVE

2    WITH THAT REPORT THAT HE HASN'T SEEN?

3          **MS. BARLOW:**  IT SUBSTANTIALLY UNDERMINES HIS

4    TESTIMONY.

5          **JUDGE HENDERSON:**  I WANT AN ESTIMATE.  GIVE ME YOUR

6    BEST ESTIMATE.

7          **MS. BARLOW:**  I'M GOING TO SAY ABOUT A HALF AN HOUR,

8    YOUR HONOR.

9          **JUDGE HENDERSON:**  I'M GOING TO SUGGEST TO MY

10   COLLEAGUES THAT WE RECESS AND YOU MAKE THIS AVAILABLE TO HIM SO

11   HE WILL BE READY TO ANSWER TOMORROW WITHOUT HAVING TO DO THIS.

12         **MS. BARLOW:**  I'D BE HAPPY TO DO THAT, YOUR HONOR.  I

13   THOUGHT SINCE HE WROTE IT HE MIGHT REMEMBER IT.  I'D BE HAPPY TO

14   DO THAT.

15         **JUDGE REINHARDT:**  THAT'S FINE.  WHEN WE GO OVER THESE

16   FIGURES, YOU'RE NOT DIFFERENTIATING BETWEEN THE NUMBER THEY

17   WOULD HAVE COMMITTED HAD THEY BEEN RELEASED A FEW MONTHS LATER

18   AND THE NUMBER THEY COMMITTED AS A RESULT OF BEING RELEASED?

19         **MS. BARLOW:**  ACTUALLY, YOU'LL SEE, YOUR HONOR, THAT

20   THE CONCLUSIONS ARE THAT THEY'RE ADDITIONAL CRIMES, NOT JUST

21   EARLIER.

22         **JUDGE REINHARDT:**  OKAY.  THANK YOU.

23         **MS. BARLOW:**  THANK YOU.

24         **JUDGE HENDERSON:**  MR. SPECTER.

25         **MR. SPECTER:**  YES, YOUR HONOR.  I DON'T THINK --

1  MR. AUSTIN IS FLYING OUT TO SOMEWHERE ELSE TOMORROW.

2          **JUDGE HENDERSON:**  WELL, I'M NOT -- I'LL TELL YOU, I'M

3  A TEAM PLAYER, BUT I'M NOT GOING TO SIT UP HERE WITH YOU GUYS

4  FOR HALF AN HOUR FOR THIS AND THEN DIRECT --

5          **MR. SPECTER:**  I HAVE A SUGGESTION FOR THAT, YOUR

6  HONOR, BECAUSE IT SEEMS TO ME THE REPORT SPEAKS FOR ITSELF, THAT

7  IF SHE WANTS TO MAKE IT AN EXHIBIT, SHE CAN MAKE IT AN EXHIBIT

8  AND ARGUE FROM IT.

9          **JUDGE KARLTON:**  THAT'S NOT EFFECTIVE.

10          SIR, YOU'RE FLYING OUT TOMORROW?

11          **THE WITNESS:**  TOMORROW MORNING.

12          **JUDGE KARLTON:**  WHEN DO YOU COME BACK?

13          **THE WITNESS:**  I COULD BE BACK THE WEEK OF

14  DECEMBER 15TH.

15          **MS. BARLOW:**  I COULD CERTAINLY FINISH IT THEN, YOUR

16  HONOR.

17          **JUDGE HENDERSON:**  LET'S GO INTO ONE OF THE QUESTIONS.

18  WHAT IS OUR REMAINING SCHEDULE?  CAN YOU TELL US WHAT THAT IS AT

19  THIS POINT?

20          **JUDGE KARLTON:**  NOBODY EVER EXPECTED THIS, DID YOU?

21          **MR. SPECTER:**  NO.  WE HAVE TO -- WE JUST HAD TWO

22  WITNESSES -- WE JUST HAD TWO WITNESSES WHO LEFT WHO HAD BEEN

23  HERE ALL DAY.

24          **JUDGE KARLTON:**  I TELL YOU THE OTHER THING YOU ARE

25  GOING TO DO TONIGHT.  I WANT TO KNOW THE NAMES OF THE WITNESSES,

1    AND I WANT A SCHEDULE, BECAUSE, OTHERWISE, WE WILL IMPOSE TIME

2    LIMITS THAT NOBODY CAN LIVE WITH.  THIS IS INAPPROPRIATE.

3            **MR. SPECTER:**  YES, YOUR HONOR.

4            **JUDGE REINHARDT:**  I THINK WE'D LIKE TO KNOW WHAT THEY

5    CAN AGREE ON BY TOMORROW, BUT THEN I THINK WE WANT FINAL

6    SCHEDULE FOR WITNESSES, HOURS, TIMES FROM NOW UNTIL THE END OF

7    THIS PROCEEDING.

8            **MR. SPECTER:**  YES, YOUR HONOR.

9            **JUDGE REINHARDT:**  IF YOU CAN DO IT BY TOMORROW

10   MORNING, THAT WOULD BE FINE, BUT CERTAINLY BY MONDAY.

11           **THE WITNESS:**  COULD I --

12           **JUDGE REINHARDT:**  I THINK WE NEED A FINAL SCHEDULE OF

13   WHO THE WITNESSES WILL BE, HOW MUCH TIME EACH WILL TAKE, HOW YOU

14   ARE GOING TO DIVIDE THAT TIME, AND THEN WE CAN WORK FROM THAT

15   AND CUT IT TO A REASONABLE SCHEDULE.  SO WE DO NOT HAVE TO HAVE

16   WITNESSES WHO DUPLICATE THE TESTIMONY OF OTHERS, SO WE DON'T

17   HAVE TO HAVE WITNESSES WHOSE TESTIMONY WILL RUN FOR A FULL DAY,

18   UNLESS THEY'RE CRITICAL.  I THINK WE CAN DO THAT IF YOU WILL

19   GIVE US YOUR FINAL SCHEDULE THAT YOU CAN AGREE ON, OR IF YOU

20   DON'T AGREE ON IT ENTIRELY, JUST TELL US WHAT YOU DISPUTE, AND

21   WE CAN RESOLVE THE DISPUTE.

22           **MR. SPECTER:**  I THINK WE CAN DO THAT BY MONDAY, YOUR

23   HONOR.

24           **JUDGE REINHARDT:**  OKAY.

25           **JUDGE HENDERSON:**  SO WE'RE AGREED THAT THIS WITNESS

1  WILL COME BACK AROUND THE 15TH, IS THAT --

2          **MS. BARLOW:**  IF IT WOULD PLEASE THE COURT, I COULD DO

3  SOME QUESTIONS ON ANOTHER TOPIC THAT SHOULDN'T TAKE VERY LONG,

4  IF YOU WOULD LIKE TO USE SOME OF THE TIME AVAILABLE TODAY.

5          **JUDGE HENDERSON:**  WE'VE BEEN ENDING AT 4:15.

6          **MS. BARLOW:**  OH, OKAY.  WELL, IT IS 4:15.  I

7  APOLOGIZE, YOUR HONOR.

8          **JUDGE HENDERSON:**  OKAY.  COURT IS ADJOURNED UNTIL --

9  AND REMEMBER THAT WE'RE ENDING AT 1:30 TOMORROW.

10          **MR. SPECTER:**  WILL WE BE GOING THROUGH UNTIL --

11          **JUDGE HENDERSON:**  PROBABLY WITH A COUPLE OF 15-MINUTE

12  BREAKS, YES.  NO LUNCH BREAK.

13                  (PROCEEDINGS ADJOURNED.)

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>**I N D E X**</u>

2

<u>**PLAINTIFF'S WITNESSES**</u>                          <u>**PAGE**</u>    <u>**VOL.**</u>

3

<u>**JEANNE WOODFORD**</u>

4

DIRECT EXAMINATION BY MR. SPECTER            1314     7
5  CROSS-EXAMINATION BY MR. MELLO               1334     7
   CROSS-EXAMINATION BY MR. MITCHELL            1347     7
6  REDIRECT EXAMINATION BY MR. SPECTER          1365     7
   RECROSS-EXAMINATION BY MR. MITCHELL          1371     7

7

8  <u>**JAMES AUSTIN, PH.D.**</u>

9  DIRECT EXAMINATION BY MS. EVENSON            1379     7
   CROSS-EXAMINATION BY MS. JOHNSON             1411     7
10 CROSS-EXAMINATION BY MS. BARLOW              1508     7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2 **<u>CERTIFICATE OF REPORTER</u>**

3

4        WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL

5 REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6 CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

7 CIV S-90-0520 LKK JPM P, RALPH COLEMAN, ET AL V. ARNOLD

8 SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD

9 SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND

10 REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

11 INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

12 TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

13 FILING.

14        THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

15 TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

16 COURT FILE.

17

18            /S/ JOAN MARIE COLUMBINI

19        JOAN MARIE COLUMBINI, CSR 5435, RPR

20

21            S/ KATHERINE WYATT

22        KATHERINE WYATT, CSR 9866, RMR

23        THURSDAY, DECEMBER 4, 2008

24

25