VOL 8

PAGES 1542 – 1664

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

```
RALPH COLEMAN, ET AL.,            )
                                  )
            PLAINTIFFS,           )
                                  )
  VS.                             ) NO. CIV S-90-0520 LKK JFM
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  ) THREE-JUDGE COURT
            DEFENDANTS.           )
                                  )
_____
                                  )
MARCIANO PLATA, ET AL.,           )
                                  )
            PLAINTIFFS,           )
                                  )
VS.                               ) NO. C 01-1351 TEH
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  )
            DEFENDANTS.           )
_____)
```

### *TRANSCRIPT OF PROCEEDINGS*

SAN FRANCISCO, CALIFORNIA
FRIDAY, DECEMBER 5, 2008

(APPEARANCES ON FOLLOWING PAGES)


*REPORTED BY:*   JOAN MARIE COLUMBINI, CSR 5435, RPR
OFFICIAL COURT REPORTER, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                            1917 FIFTH STREET
                            BERKELEY, CALIFORNIA  94710
                            **DONALD SPECTER, ESQUIRE**
                            **REBEKAH EVENSON, ESQUIRE**


                            ROSEN, BIEN & GALVAN, LLP
                            315 MONTGOMERY STREET, TENTH FLOOR
                            SAN FRANCISCO, CALIFORNIA 94104
                     BY:    **MICHAEL W. BIEN, ESQUIRE**
                            **ERNEST GALVAN, ESQUIRE**
                            **JANE KAHN, ESQUIRE**


**FOR CCPOA**               CARROLL, BURDICK & MCDONOUGH
                            44 MONTGOMERY STREET, SUITE 400
                            SAN FRANCISCO, CALIFORNIA  94104
                       BY:  **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**          STATE OF CALIFORNIA
                            DEPARTMENT OF JUSTICE
                            OFFICE OF THE ATTORNEY GENERAL
                            1300 I STREET, SUITE 125
                            P.O. BOX 944255
                            SACRAMENTO, CALIFORNIA  94244
                     BY:    **LISA A. TILLMAN, ESQUIRE**


                            STATE OF CALIFORNIA
                            DEPARTMENT OF JUSTICE
                            OFFICE OF THE ATTORNEY GENERAL
                            455 GOLDEN GATE AVENUE, SUITE 11000
                            SAN FRANCISCO, CALIFORNIA  94102
                      BY:   **KYLE A. LEWIS, ESQUIRE**


**FOR DEFENDANTS**          HANSON BRIDGETT
                            425 MARKET STREET, 26TH FLOOR
                            SAN FRANCISCO, CALIFORNIA  94105
                     BY:    **PAUL MELLO, ESQUIRE**
                            **S. ANNE JOHNSON, ESQUIRE**


(FURTHER APPEARANCES ON FOLLOWING PAGE)

**APPEARANCES (CONTINUED):**


**FOR DISTRICT ATTORNEY**    THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**              COUNTY OF RIVERSIDE
                             82-675 HIGHWAY 111, FOURTH FLOOR
                             INDIO, CALIFORNIA  92201
                        BY:  **WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**           AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**              580 CALIFORNIA STREET, 15TH FLOOR
                             SAN FRANCISCO, CALIFORNIA  94104
                        BY:  **TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT**      JONES & MAYER
**INTERVENORS**              3777 NORTH HARBOR BOULEVARD
                             FULLERTON, CALIFORNIA  92835
                        BY:  **KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS**   OFFICE OF THE COUNTY COUNSEL
                             COUNTY OF SANTA CLARA
                             70 WEST HEDDING STREET
                             NINTH FLOOR, EAST WING
                             SAN JOSE, CALIFORNIA  95110
                        BY:  **THERESA FUENTES, ESQUIRE**


**FOR SONOMA COUNTY**        COUNTY OF SONOMA
**INTERVENORS**              575 ADMINISTRATION DRIVE, ROOM 105A
                             SANTA ROSA, CALIFORNIA  95403
                       BY: **ANNE L. KECK, ESQUIRE**

1  **FRIDAY, DECEMBER 5, 2008**                    9:15 O'CLOCK A.M.

2

3                    **P R O C E E D I N G S**

4

5        **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR FIRST

6  WITNESS WHEN YOU'RE READY, COUNSEL.

7        **MR. SPECTER:**  PLAINTIFFS CALL JEFFREY BEARD BACK TO

8  TESTIFY.

9        **JUDGE REINHARDT:**  WHILE WE'RE WAITING, I NOTE THAT

10  THERE'S NO TIME ALLOTMENT FOR THE WITNESSES HERE, WHICH MAY NOT

11  BE VERY HELPFUL TODAY, ALTHOUGH IT WILL NOT AFFECT THE AMOUNT OF

12  TIME ALLOCATED TO THEM BY THE COURT, BUT THAT WILL NOT COMPLY

13  WITH WHAT WE REQUESTED FOR MONDAY WHEN WE ASKED FOR THE LIST.

14        **JUDGE KARLTON:**  TUESDAY.  WE ARE NOT HERE MONDAY.

15        **JUDGE REINHARDT:**  WE ASKED FOR MONDAY AFTERNOON IT BE

16  SUBMITTED, WE BE SUPPLIED WITH YOUR LIST OF, WE HOPE, AGREED

17  WITNESSES AND TIMES FOR THE REST OF THE TRIAL.  THAT MEANS NOT

18  BLANK MINUTES.  IT MEANS ACTUAL TIMES ON THE LIST WE EXPECT FROM

19  TWO OF YOU JOINTLY, OR IF THERE ARE BLANKS, AS I SAID WE'LL FILL

20  THEM IN FOR YOU BY TUESDAY OR WEDNESDAY.

21        **JUDGE KARLTON:**  THAT'S --

22        **MR. SPECTER:**  WE UNDERSTAND, YOUR HONOR, AND WHEN WE

23  SUBMIT OUR TRIAL SCHEDULE ON MONDAY, WE WON'T HAVE THAT SAME

24  OMISSION.  TODAY SHOULDN'T BE A PROBLEM.  THERE ARE ONLY TWO

25  WITNESSES, RIGHT?  ONLY TWO WITNESSES.  WE MIGHT EVEN GET DONE

1   EARLY, I HOPE.

2           **JUDGE REINHARDT:** OKAY. THANK YOU.

3           **JUDGE HENDERSON:** YOU MAY PROCEED.

4           **JUDGE KARLTON:** YOU ARE STILL UNDER OATH.

5           **THE WITNESS:** YES.

6                           **JEFFREY BEARD**

7   HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS

8   PREVIOUSLY DULY SWORN AND EXAMINED AS FOLLOWS:

9               **DIRECT EXAMINATION BY MR. SPECTER**

10  **BY MR. SPECTER**

11  **Q**   DR. BEARD, YOU'RE STILL THE SECRETARY OF THE PENNSYLVANIA

12  DEPARTMENT OF CORRECTIONS?

13  **A**   YES, I AM.

14  **Q**   AND I THINK YOU ALLUDED LAST TIME YOU WERE HERE BRIEFLY TO

15  THE FACT THAT THE PENNSYLVANIA PRISON SYSTEM WAS SOMEWHAT

16  OVERCROWDED; IS THAT RIGHT?

17  **A**   YES, WE ARE CURRENTLY SOMEWHAT OVERCROWDED.

18  **Q**   AT WHAT PERCENTAGE OF OPERABLE CAPACITY ARE YOU?

19  **A**   WE ARE AT 113 OR -14 PERCENT OF OPERABLE CAPACITY, MAYBE

20  115 PERCENT RIGHT NOW, WHICH IS ABOUT 6,500 INMATES MORE THAN WE

21  WOULD LIKE TO HAVE IN OUR SYSTEM.

22  **Q**   AND --

23          **JUDGE REINHARDT:** WHAT DOES THAT TRANSLATE INTO IN

24  DESIGN CAPACITY?

25          **THE WITNESS:** THAT'S VERY DIFFICULT TO DO, YOUR

1  HONOR, BECAUSE WE REALLY -- THEY'RE APPLES AND ORANGES.  IT HAS

2  TO DO WITH HOW MANY INMATES WE FEEL WE CAN HOLD AND TAKE CARE OF

3  IN A PARTICULAR INSTITUTION, TAKE CARE OF THEIR MEDICAL MENTAL

4  HEALTH, FOOD SERVICES, ALL THE VARIOUS NEEDS WE HAVE TO.  AND IT

5  REALLY DOESN'T RELATE THEN TO THE DESIGN CAPACITY, BECAUSE MANY

6  OF OUR OLDER FACILITIES WE PUT MILLIONS AND MILLIONS OF DOLLARS

7  IN UPGRADING THE INFRASTRUCTURE, YOU KNOW, ADDING BIGGER

8  KITCHENS AND BIGGER DINING ROOMS AND BIGGER LAUNDRIES AND

9  TREATMENT SERVICE BUILDINGS, AND THINGS LIKE THAT, BIGGER

10 INFIRMARIES SO THAT WE COULD HANDLE THE LARGER POPULATION THERE.

11         **JUDGE KARLTON:**  AND YOU'RE TELLING US YOU HAVEN'T

12 ACTUALLY SAT DOWN AND CALCULATED WHAT THE DESIGN CAPACITY,

13 INCLUDING THE UPGRADES ARE; IS THAT WHAT YOU'RE SAYING, YOU JUST

14 HAVEN'T DONE THAT?

15         **THE WITNESS:**  NO, BECAUSE WE DON'T LOOK AT THAT

16 ANYMORE.  WE LOOK AT -- BECAUSE, YOU KNOW, I HAVE A FACILITY I

17 USED TO WORK IN, I STARTED IN FCI ROCKVIEW BACK MANY YEARS AGO

18 BACK IN 1972, AND THAT FACILITY WAS BUILT TO HOUSE A THOUSAND

19 INMATES.  TODAY WE HAVE 2,000 INMATES THERE.  BUT WE'VE EXPANDED

20 THE KITCHEN.  WE HAVE EXPANDED THE DINING ROOMS IN THAT

21 INSTITUTION.  WE BUILT A LARGE THREE-STORY TREATMENT BUILDING,

22 LARGE INFIRMARY, EXPANDED DENTAL CARE, MENTAL HEALTH UNIT.  WE

23 BUILT A BRAND NEW RESTRICTED HOUSING UNIT.  WE PUT OTHER HOUSING

24 UNITS, WHAT THEY CALL IN-FILL BEDS IN THERE.

25         TODAY THAT FACILITY HAS ABOUT IS 2,100 INMATES IT,

1    AND WE SAY THE OPERABLE CAPACITY OF THAT FACILITY IS ABOUT 1,700

2    INMATES.  SO WE ARE ABOUT 400 OVER THE OPERABLE CAPACITY.

3    THAT'S WHY IT'S DIFFICULT TO TRANSLATE, BECAUSE THAT WAS A

4    FACILITY WE BUILT FOR A THOUSAND, BUT WE UPGRADED IT, SO WE NOW

5    CAN HANDLE 1,700, AND WE HAVE 2,100 AND WE'RE OKAY.  WE'D LIKE

6    JUST TO HAVE LESS.  WE COULD DO A BETTER JOB IF WE HAD A FEW

7    LESS HUNDRED INMATES THERE.

8              DOES THAT HELP EXPLAIN AT ALL, YOUR HONOR?

9              **JUDGE REINHARDT:**  YES, THANK YOU.

10   **BY MR. SPECTER**

11   **Q**    PENNSYLVANIA RECENTLY ENACTED LEGISLATION AIMED AT

12   CONTROLLING THE PRISON POPULATION; IS THAT RIGHT?

13   **A**    YES.

14   **Q**    AND YOU WERE INSTRUMENTAL IN GETTING THAT LEGISLATION

15   PASSED; IS THAT RIGHT?

16   **A**    THAT'S CORRECT.

17   **Q**    CAN YOU EXPLAIN WHAT THAT LEGISLATION IS, PLEASE?

18   **A**    WELL, THE LEGISLATION INCLUDES A COUPLE COMPONENTS.

19              FIRST OF ALL, A NUMBER OF YEARS AGO, ABOUT THREE OR

20   FOUR YEARS AGO, I WORKED ON LEGISLATION ON A PROGRAM CALLED

21   STATE INTERMEDIATE PUNISHMENT, AND THAT WAS A PROGRAM THAT WOULD

22   ALLOW JUDGES, WITH THE DA'S AUTHORIZATION, TO SENTENCE PEOPLE TO

23   A FLAT TWO YEARS TO MY DEPARTMENT, INSTEAD OF GETTING, MAYBE A

24   TWO TO FOUR OR A THREE TO SIX-YEAR SENTENCE.

25              THEY WOULD THEN COME TO MY FACILITY.  I WOULD GIVE

1    THEM A HIGH QUALITY THERAPEUTIC COMMUNITY FOR ABOUT THE FIRST

2    NINE OR TEN MONTHS.  THEY WOULD THEN GO OUT INTO THE COMMUNITY,

3    GET SOME ADDITIONAL DRUG AND ALCOHOL TREATMENT, TRANSITIONAL

4    SERVICES.  AND, EVENTUALLY, IF THEY WERE SUCCESSFUL, AT THE END

5    OF THAT TWO YEARS THEY WERE DONE.  THERE WAS NO PAROLE OR

6    ANYTHING ELSE.  THEY COMPLETED THE PROGRAM.  AND THE INCENTIVE

7    FOR THEM WAS INSTEAD OF SERVING TWO YEARS IN JAIL AND THEN TWO

8    YEARS ON PAROLE, THEY ONLY HAD A TWO YEARS, HALF OF WHICH WAS IN

9    JAIL.

10           SO WHAT WE TRIED TO DO -- ONE OF THE THINGS WE TRIED

11   TO DO WAS BUILD ON THAT PROGRAM.  ONE OF THE THINGS WE FOUND IS

12   A LOT OF INMATES THAT ARE COMING TO US SHOULD BE ELIGIBLE FOR

13   THAT STATE INTERMEDIATE PUNISHMENT, BUT THEY'RE NOT GETTING IT.

14           ONE OF THE THINGS THE NEW LEGISLATION ALLOWS US TO DO

15   WHEN WE SEE SOMEONE COME IN WHO SHOULD GET STATE INTERMEDIATE

16   PUNISHMENT, WE COULD GO BACK TO THE JUDGE AND DA, GET THEIR

17   AUTHORIZATIONS, AND CONVERT THAT TO THE STATE INTERMEDIATE

18   PUNISHMENT CASE.

19           THAT'S ONE OF THE THINGS WE ARE DOING.  SO, YOU KNOW,

20   IT'S BUILDING ON A PREVIOUS POPULATION MANAGEMENT PROGRAM WHICH

21   ALSO GREATLY ENHANCES THE PUBLIC SAFETY BECAUSE IT GIVES THESE

22   PEOPLE WHAT THEY NEED TO KEEP THEM OUT OF PRISON IN THE FUTURE.

23           THE OTHER PART OF THE LEGISLATION WAS A RISK

24   REDUCTION INITIATIVE, AND, BASICALLY, WHAT WE'RE DOING IS

25   INMATES IN CERTAIN NONVIOLENT OR LESS SERIOUS CLASSIFICATIONS,

1  AND THIS IS FOR NONVIOLENT OFFENDERS, ESSENTIALLY, PRIMARILY

2  YOUR PROPERTY AND DRUG OFFENDERS, INSTEAD OF GETTING A TWO TO

3  FOUR-YEAR SENTENCE, THEY WOULD GET TWO MINIMUM SENTENCES.  THEY

4  WOULD GET AN 18 MONTHS -- IF IT WAS TWO TO FOUR, THEY WOULD GET

5  AN 18-MONTH RISK REDUCTION SENTENCE AND A TWO-YEAR MINIMUM.

6         THEY WOULD THEN COME TO US, IF THEY GET INVOLVED IN

7  THE PROGRAMS THAT WE SAY THAT THEY SHOULD -- NEED TO BE INVOLVED

8  IN TO MAKE IT LESS LIKELY THAT THEY COME BACK TO PRISON, THEN

9  THEY'RE ELIGIBLE FOR THEIR RELEASE, IF THEY COMPLETE THEIR

10 PROGRAMS AT 18 MONTHS INSTEAD OF 24 MONTHS.  SO THE INCENTIVE

11 FOR THE INMATE, YOU ARE TRYING TO GIVE THEM AN INCENTIVE -- THE

12 KEY IS TO INCENTIVIZE PEOPLE TO GET IN PROGRAMS AND COMPLETE

13 PROGRAMS, BECAUSE YOU GET THE BIGGEST BANG FOR THE BUCK WHEN

14 PEOPLE COMPLETE THE PROGRAMS.

15         AND SO THAT'S WHAT THAT PROGRAM IS TRYING TO DO, GET

16 THEM THERE, GET THEM IN THE PROGRAM.  AND I THINK PEOPLE

17 UNDERSTAND THAT IT'S NOT HOW LONG SOMEBODY SERVES TIME IN PRISON

18 THAT'S IMPORTANT; WHAT'S IMPORTANT IS THAT YOU ADDRESS THE

19 CRIMINOGENIC FACTORS, AT LEAST WHEN YOU ARE DEALING WITH THESE

20 PROPERTY AND DRUG OFFENDERS.

21 Q   WHEN YOU SAID IT'S IMPORTANT, DO YOU MEAN IMPORTANT FOR WHAT

22 PURPOSE?

23 A   IT'S IMPORTANT TO LOWER THEIR RECIDIVISM.  IF WE WANT TO

24 IMPROVE PUBLIC SAFETY AND HAVE PEOPLE LESS LIKELY TO COME BACK

25 TO PRISON, THEN WE HAVE TO ADDRESS WHAT WE CALL THE CRIMINOGENIC

1   FACTORS THAT BRING THEM TO PRISON.  THOSE FACTORS ARE THINGS

2   LIKE SUBSTANCE ABUSE PROBLEMS, EDUCATION DEFICITS, LACK OF

3   VOCATIONAL SKILLS, CRIMINAL THINKING ISSUES, IMPULSIVITY AND

4   AGGRESSION-TYPE ISSUES.  THOSE ARE WHAT WE CALL CRIMINOGENIC

5   FACTORS.

6           SO THE KEY TO THIS WHOLE THING IS WHAT WE CALL

7   EVIDENCE-BASED PROGRAMMING, AND THE BASIS OF EVIDENCE-BASED

8   PROGRAMMING IS WHEN SOMEBODY COMES INTO YOUR SYSTEM, YOU GIVE

9   THEM AN ASSESSMENT, YOU DECIDE WHAT THEIR DEFICITS ARE, YOU

10  KNOW, WHAT'S THEIR EDUCATIONAL, VOCATIONAL LEVELS, WHAT'S THEIR

11  DRUG AND ALCOHOL PROBLEM?  DO THEY HAVE A PROBLEM WITH CRIMINAL

12  THINKING?  DO THEY HAVE A PROBLEM WITH VIOLENCE?  AND THOSE

13  KINDS OF THINGS.

14          THEN YOU DEVELOP A PROGRAM FOR THAT INDIVIDUAL.  YOU

15  PUT THE PERSON THROUGH THAT PROGRAM, AND IF THEY SUCCESSFULLY

16  COMPLETE THE PROGRAM, THEN THEY'RE ELIGIBLE TO GET THIS CREDIT

17  WE ARE TALKING ABOUT, AND THEY'RE ALSO MORE LIKELY TO NOT COME

18  BACK TO PRISON IN THE FUTURE BECAUSE YOU'VE ADDRESSED THE

19  REASONS THAT BROUGHT THEM THERE.

20  **Q**   SO, ESSENTIALLY, YOU'RE CUTTING THEIR PRISON -- THEIR PRISON

21  SENTENCE.  IN SOME SENSE YOU'RE RELEASING THEM EARLY, BUT YOU

22  ARE MORE CONFIDENT THEY WOULD BE LESS LIKELY TO COMMIT NEW

23  CRIMES; IS THAT CORRECT?

24  **A**   THAT'S CORRECT.

25  **Q**   WERE THERE ANY OTHER COMPONENTS OF THE LEGISLATION --

1    **A**   YEAH, THERE WERE TWO OTHER COMPONENTS.  THE ONE COMPONENT

2    WAS FOR THIS SAME GROUP OF LESS SERIOUS OFFENDERS WHO WERE

3    ELIGIBLE FOR THE RISK REDUCTION INITIATIVE.  THEY ALSO WOULD GET

4    WHAT MIGHT BE TERMED A PRESUMPTIVE PAROLE.  IN OTHER WORDS,

5    WHILE PAROLE WAS STILL -- LOOK AT THE CASE.  THEY'RE PRETTY WELL

6    PRESUMED TO BE GONE.  UNLESS THERE'S SOMETHING VERY ODD ABOUT A

7    PARTICULAR CASE, THEY'RE ALMOST AUTOMATICALLY GOING TO BE

8    PAROLED.  SO THAT'S ANOTHER THING.  IT'S A LESS OF A THRESHOLD

9    THERE TO GET OUT ON PAROLE.

10          IN THE THIRD COMPONENT OF THIS WAS THAT IF THEY DO

11   WELL WHILE THEY'RE ON PAROLE, THESE LESS SERIOUS OFFENDERS,

12   AGAIN, THEY CAN GET OFF PAROLE AND BE PUT ON WHAT WE CALL

13   ADMINISTRATIVE PAROLE, SO THEY ARE NOT SUPERVISED ANYMORE ON A

14   REGULAR BASIS.  IT'S SET AFTER ONE YEAR.  IF THEY BEHAVED

15   THEMSELVES, FOLLOWED WHAT THEY'RE SUPPOSED TO DO ON PAROLE.

16   AND, AGAIN, THE INCENTIVE IS FOR THEM TO DO THAT, YOU ARE TRYING

17   TO INCENTIVIZE THE INDIVIDUAL, BECAUSE IF THEY COMPLETE THE

18   PROGRAM, THEY GET OFF OF PAROLE AFTER -- AFTER ONE YEAR.

19          LET ME ADD THAT WE DIDN'T JUST GO PULL THIS OUT OF

20   THE AIR.  I'VE SPENT A LOT OF TIME IN THE LAST SEVEN YEARS

21   STUDYING WHAT OTHER STATES HAVE DONE AND LOOKING FOR WAYS THAT

22   WE CAN BETTER MANAGE OUR POPULATION FROM A PUBLIC SAFETY

23   PERSPECTIVE, FROM A POPULATION CONTROL PERSPECTIVE, AND FROM A

24   COST PERSPECTIVE, AND THE KIND OF THINGS THAT WE'RE DOING

25   ACTUALLY IMPROVE ON PUBLIC SAFETY BECAUSE THEY ADDRESS THE

1  PROBLEMS THAT BROUGHT PEOPLE TO JAIL.  THEY HELP LOWER YOUR

2  POPULATION, AND THEY SAVE YOU MONEY.  THOSE ARE LIKE THE SIDE

3  BENEFITS OF DEALING APPROPRIATELY WITH THESE PEOPLE.

4          SO WHEN WE WERE OUT THERE LOOKING AROUND, ONE OF THE

5  STATES THAT WE SAW WAS NEW YORK, AND NEW YORK HAD DONE A VERY

6  SIMILAR THING BACK ABOUT 11 YEARS AGO IN 1997.  THEY CAME OUT

7  WITH A PROGRAM CALLED MERIT TIME, WHERE, ESSENTIALLY, THEY GAVE

8  CREDIT OFF THE SENTENCE FOR INMATES WHO COMPLETED PROGRAMS, AND

9  THEY HAD A PRESUMPTIVE RELEASE FOR THOSE INMATES, AND THEY LET

10 THOSE PEOPLE OFF OF PAROLE AFTER ONE YEAR IF THEY DID WELL.

11 THEY HAVE BEEN DOING THIS, LIKE I SAID, FOR 11 YEARS.

12         THEY DID A STUDY IN 2004, AND WHAT THEY FOUND WAS

13 THAT THE INMATES WHO WENT THROUGH THE MERIT TIME PROGRAM WHO GOT

14 OUT OF JAIL EARLIER BUT WHO COMPLETED THEIR PROGRAMS HAD LOWER

15 RECIDIVISM RATES THAN THE PEOPLE WHO SERVED THEIR WHOLE

16 SENTENCE, THEY ACTUALLY DID BETTER, AND THEY ALSO FOUND THAT

17 THEY SAVED MILLIONS OF DOLLARS, SOMETHING LIKE A QUARTER OF A

18 BILLION DOLLARS DURING THAT TIME PERIOD WITH THAT PROGRAM.

19         ALL DURING THAT TIME PERIOD THE CRIME RATE IN NEW

20 YORK WAS GOING DOWN, AND IT CONTINUED TO GO DOWN.  IT WAS NOT AT

21 ALL ADVERSELY AFFECTED.  SO I HAD A PROGRAM THAT DIDN'T

22 ADVERSELY AFFECT CRIME RATE, INCENTIVIZED THE INMATES TO

23 COMPLETE PROGRAMS, AND THOSE INMATES WHO DID THAT WENT OUT AND

24 DID BETTER AND WERE LESS LIKELY TO GO BACK TO PRISON.  THAT'S

25 HOW WE SORT OF DESIGNED OUR PROGRAM, AND WE TOOK SOME DIFFERENT

1  SLANTS TO IT LIKE ACTUALLY DOING IT AT SENTENCING SO THE

2  VICTIMS -- IT'S TRANSPARENT AT SENTENCING, EVERYBODY KNOWS WHAT

3  THE MINIMUM DATE IS AND SOME OF THOSE THINGS.

4          SOME OF THOSE WERE BUILT INTO IT BECAUSE WHEN WE

5  BUILT OUR -- WENT TO DO THIS LEGISLATION, WE JUST DIDN'T GO OUT

6  AND DO IT ON OUR OWN.  WE WENT OUT AND ENGAGED THE VARIOUS

7  INTEREST GROUPS.  WE ENGAGED THE DA ASSOCIATION AND VICTIMS, AND

8  PEOPLE LIKE THIS, AND SAID, WOULD YOU WORK WITH US ON THIS, AND

9  BASICALLY GOT AGREEMENT FROM THOSE ORGANIZATIONS, AND THAT'S HOW

10 WE WERE ABLE TO GET IT THROUGH THE LEGISLATION, BECAUSE THERE

11 WASN'T ANYBODY OUT THERE GOING TO THE LEGISLATURE SAYING, WE

12 DON'T WANT YOU TO DO THIS.

13         THAT'S ANOTHER IMPORTANT THING.  YOU DO HAVE TO WORK

14 WITH THE VARIOUS COMMUNITY GROUPS OUT THERE, THE STAKEHOLDERS,

15 WHEN YOU ARE TRYING TO DO THESE KIND OF THINGS, WHEN YOU ARE

16 TRYING TO BUILD THESE KIND OF PROGRAMS.

17 Q   DOES PENNSYLVANIA USE DIVERSION IN ANY WAY?

18 A   PARDON?  DIVERSION?

19 Q   YES.

20 A   YES, WE DO.  IT'S ONE OF THE POPULATION MANAGEMENT THINGS

21 THAT WE STARTED BACK IN 1997.  WE HAVE A PROGRAM THAT'S CALLED

22 RESTRICTIVE INTERMEDIATE PUNISHMENT, AND WHAT THIS PROGRAM

23 ALLOWS IS IT ALLOWS FOR COUNTIES TO GET GRANTS TO DIVERT INMATES

24 FROM BOTH COUNTY JAILS AND FROM STATE PRISONS AND PUT THOSE

25 INMATES -- INSTEAD OF SEND THEM TO THE COUNTY JAILS OR STATE

1   PRISONS, TO PUT THEM IN SUBSTANCE ABUSE TREATMENT PROGRAMS.  AND

2   THERE WAS A STUDY DONE ON THAT PROGRAM, WHICH BASICALLY FOUND

3   THAT INMATES WHO WENT THROUGH THE RESTRICTIVE INTERMEDIATE

4   PUNISHMENT PROGRAM HAD LOWER RECIDIVISM RATES THAN PEOPLE WHO

5   WERE SENT TO COUNTY JAILS OR STATE PRISONS.

6          THE OTHER THING THAT WE FOUND WITH THAT PROGRAM IS, I

7   THINK WHEN THEY STARTED, THEY WERE FUNDING AT ABOUT $15 MILLION

8   A YEAR.  I THINK NOW IT'S UP, THOUGH, 18- OR 19 MILLION.  I KEEP

9   TRYING TO PUSH IT UP EVEN MORE.

10          WHEN THEY STARTED IT, THAT $15 MILLION, BECAUSE THEY

11   ONLY SPEND ABOUT $10,000 A YEAR ON EACH INMATE, WHICH IS FAR

12   CHEAPER THAN PUTTING THEM IN JAIL OR PRISON, THAT 15 MILLION WAS

13   A COST AVOIDANCE OF 30 MILLION IF YOU HAD PUT THEM IN JAIL, AND

14   IT WOULD HAVE BEEN A COST AVOIDANCE OF 45 MILLION IF ALL OF THE

15   PEOPLE HAD GONE TO PRISON.  SO THERE WAS SIGNIFICANT COST

16   AVOIDANCE IN THE PROGRAM, AS WELL AS THE FACT THAT THE PEOPLE

17   DID BETTER AND DIDN'T COME BACK.

18          AND, YOU KNOW, I SHOULD SAY THAT PART OF THE REASON

19   THAT DIVERTING PEOPLE IN THE FRONT END, IF THEY ARE LESS SERIOUS

20   OFFENDERS, AND GETTING THEM INTO PROGRAMMING MAKES A WHOLE BUNCH

21   OF SENSE IS THE RESEARCH IS REALLY CLEAR OUT THERE THAT

22   COMMUNITY-BASED PROGRAMMING IS ACTUALLY MORE EFFECTIVE THAN

23   PRISON-BASED PROGRAMMING.  YOU CAN STILL -- PRISON-BASED

24   PROGRAMMING CAN BE EFFECTIVE, BUT IT'S MORE EFFECTIVE IF YOU DO

25   IT IN A COMMUNITY.

1          THE OTHER THING THAT YOU ACHIEVE BY DIVERTING THE

2    PERSON ON THE FRONT END IS YOU DON'T TAKE THEM AWAY FROM THEIR

3    COMMUNITY AND THEN CREATE THIS WHOLE PROBLEM THAT WE TALK ABOUT,

4    REENTRY, AND THAT'S THE BIG THING EVERYBODY'S TALKING ABOUT AND

5    HAS BEEN FOR THE PAST FEW YEARS.  THESE MILLIONS AND MILLIONS OF

6    PEOPLE THAT ARE GOING BACK, REENTERING INTO THE COMMUNITIES, AND

7    IT'S A VERY DIFFICULT PROCESS, BECAUSE IF THEY HAD A JOB, YOU'VE

8    TAKEN THEM AWAY FROM THEIR JOB.  IF THEY HAVE A FAMILY, YOU'VE

9    TAKEN THEM AWAY FROM THEIR FAMILY.  YOU'VE TAKEN THEM AWAY FROM

10   THEIR HOUSING.  YOU'VE GOT TO NOW NOT ONLY GET THEM BACK OUT,

11   YOU HAVE GOT TO GET THEM A PLACE TO LIVE, GET THEM A JOB, SEE

12   THEY GET THEIR AFTERCARE.  WHEREAS, IF YOU COULD HAVE DIVERTED

13   THEM IN THE FIRST PLACE, YOU COULD HAVE AVOIDED ALL THOSE

14   PROBLEMS YOU CREATE.

15          I MIGHT ADD THAT I'M HOPING THIS YEAR TO DO A

16   FORMULA-BASED DIVERSION.  IN OTHER WORDS, WHERE WE WILL TELL

17   COUNTIES, IF YOU DIVERT PEOPLE, WE'LL COME UP WITH A NUMBER; IF

18   YOU DIVERT PEOPLE BELOW THIS NUMBER BELOW THE STATE PRISON

19   SYSTEM, I'LL PAY THEM OUT OF MY BUDGET, BECAUSE IT WILL BE

20   CHEAPER FOR ME TO DO IT THAN TO SEND THEM TO ME.

21          **JUDGE KARLTON:**  EXCUSE ME, SIR.  ONE CONSEQUENCE OF

22   THESE PROGRAMS -- I'M NOT SURE IT MATTERS FOR WHAT WE DO FOR A

23   LIVING, BUT I'M JUST CURIOUS.  ONE CONSEQUENCE OF THIS PROGRAM

24   IS THAT YOU WIND UP IN THE PRISONS WITH MANY MORE DANGEROUS

25   PEOPLE, VIOLENT AND SO FORTH.  HAS YOUR -- HAS THE COST OF

1  IMPRISONMENT, BECAUSE OF THE NEED TO REGULATE THOSE PEOPLE, GONE

2  UP, OR IS IT ESSENTIALLY THE SAME PER PERSON?  DO YOU UNDERSTAND

3  WHAT I'M ASKING?

4          **THE WITNESS:**  IT IS MORE COSTLY TO HOUSE THE MORE

5  DANGEROUS -- MORE DANGEROUS PEOPLE, NOT NECESSARILY PEOPLE WHO

6  COMMIT VIOLENT CRIMES, BECAUSE, YOU KNOW, FOR INSTANCE, IN

7  PENNSYLVANIA LIFE IS LIFE, AND WE HAVE 4,000 LIFERS IN OUR

8  STATE.  THEY ARE SOME OF OUR BETTER INMATES BECAUSE THEY KNOW

9  THAT'S THEIR HOME.  SO JUST BECAUSE THEY'VE COMMITTED A VIOLENT

10 OFFENSE DOESN'T NECESSARILY MAKE THEM MORE DIFFICULT TO MANAGE.

11          BUT THERE ARE CERTAIN VIOLENT OFFENDERS WHO NOT ONLY

12 ARE VIOLENT IN THE COMMUNITY, BUT ARE VIOLENT WITHIN THE PRISON

13 SYSTEM.  THOSE PEOPLE ARE MOST COSTLY.  THEY ARE MORE DIFFICULT.

14 BUT AS A WHOLE CLASS THERE'S A LOT OF VIOLENT OFFENDERS WHO ARE

15 NOT NECESSARILY MORE COSTLY WHILE IN PRISON.  IT'S WHILE THEY

16 ARE IN THE COMMUNITY THAT WE HAVE TO BE CONCERNED ABOUT THEM.

17 **BY MR. SPECTER**

18 **Q**   ISN'T IT TRUE THAT WHETHER OR NOT YOU DIVERT THE LOW RISK

19 OFFENDERS, YOU STILL HAVE TO CARE FOR THE -- CARE AND

20 INCARCERATE --

21 **A**   ABSOLUTELY.  YOU KNOW, I THINK EVERYTHING THAT I'VE EVER

22 TRIED TO DO IN MY STATE, I KNOW THAT WORKING WITH THE EXPERT

23 PANEL, THE STUFF THAT WE DID, THE FOCUS WAS ALWAYS ON THESE LESS

24 SERIOUS OFFENDERS, NOT ON VIOLENT OFFENDERS.  THAT IS WHAT I

25 THINK OUR PRISONS ARE FOR.  OUR PRISONS ARE TO HOLD AND MANAGE

1  THOSE VIOLENT OFFENDERS TO PROTECT OUR COMMUNITIES.

2  Q    AND IN ADDITION TO THE SAVING ON THE OPERATING COSTS, WERE

3  YOU ABLE TO SAVE ON CAPITAL CONSTRUCTION COSTS?

4  A    WELL, CERTAINLY.  CERTAINLY, IF YOU CAN EFFECTIVELY CONTROL

5  YOUR POPULATION, YOU NOT ONLY SAVE MONEY BY HAVING A LOWER

6  POPULATION, BUT YOU HAVE THE COST AVOIDANCE OF NOT HAVING TO

7  CONSTRUCT.

8           NEW YORK, FOR EXAMPLE, DID THIS PROGRAM, YOU KNOW, AS

9  I SAID, FOR ABOUT 11 YEARS.  THEIR POPULATION IS GOING DOWN AND

10 THEY'RE ACTUALLY TALKING ABOUT CLOSING PRISONS, WHILE MANY OTHER

11 STATES ARE TALKING ABOUT BUILDING PRISONS.

12 Q    WHAT'S THE PAROLE VIOLATION RATE IN PENNSYLVANIA?

13 A    THE PAROLE VIOLATION RATE?

14 Q    THE RATE AT WHICH PAROLE VIOLATERS COME BACK TO PRISON.  IN

15 CALIFORNIA YOU'VE HEARD THE FIGURES THAT IT'S BETWEEN 60 AND

16 70 PERCENT OVER THREE YEARS?

17 A    OUR RECIDIVISM RATE, THE WAY WE MEASURE IT, IS AT ABOUT

18 47 PERCENT.  BUT IF WE MEASURED IT MORE THE WAY I THINK

19 CALIFORNIA DOES -- AND THIS IS -- IT'S VERY DIFFICULT TO COMPARE

20 RECIDIVISM RATES BECAUSE EVERYBODY MEASURES IT DIFFERENTLY.  I'M

21 VERY FAMILIAR WITH THIS BECAUSE I'M A MEMBER OF THE ASSOCIATION

22 OF STATE CORRECTIONAL ADMINISTRATORS, AND WE HAVE A

23 PERFORMANCE-BASED MEASURES PROJECT WHERE WE'RE TRYING TO GET ALL

24 OF THE STATES TO MEASURE EVERYTHING THE SAME WAY, BECAUSE

25 USUALLY IT'S APPLES AND ORANGES.

1          FOR INSTANCE, WHEN I SAY 47 PERCENT, WE INCLUDE

2     EVERYBODY THAT WALKS THROUGH OUR FRONT DOOR, EVEN PEOPLE WHO

3     AREN'T EVENTUALLY RECOMMITTED BY THE PAROLE BOARD AND EVEN

4     PEOPLE WHO MAY COME BACK TWICE IN ONE YEAR.  WHEREAS, SOME

5     STATES WILL ONLY -- IF YOU FAIL, YOU CAN ONLY FAIL ONCE OUT OF

6     THAT COHORT, AND THEY DON'T COUNT PEOPLE UNTIL THEY'RE ACTUALLY

7     ADJUDICATED AS BEING RETURNED.  THEY'RE GOING TO SHOW A LOWER

8     RATE BECAUSE OF THAT.

9          WHEN WE APPLY OUR INFORMATION TO THE NATIONAL MODEL,

10    WHICH AS ALASKA HAS, OUR RATE IS 31 PERCENT.  I CAN'T TELL YOU

11    WHAT CALIFORNIA'S WOULD BE BECAUSE I WOULD HAVE TO WORK WITH

12    THEIR STATISTICAL PEOPLE TO FIGURE OUT AND GET THEM TO

13    BASICALLY, OKAY, DO IT ACCORDING TO THE NATIONAL RATE AND THEN

14    WHAT WOULD THEY COME OUT TO BE.

15    **Q**    I SEE.

16    **A**    I DON'T KNOW WHAT IT WOULD BE.

17    **Q**    OKAY.  HAVE YOU TAKEN EFFORTS TO BRING THAT RATE TO WHERE IT

18    IS NOW; IN OTHER WORDS, TO MAKE IT AS LOW AS POSSIBLE?

19    **A**    YES, I HAVE.  I MEAN, ONE OF THE THINGS THAT I WAS VERY

20    FORTUNATE TO TAKE OVER THE DEPARTMENT AFTER WE HAD TWO

21    COMMISSIONERS, ONE WHO CAME IN AND DEALT WITH THE SEVERE

22    OVERCROWDING THAT WE HAD, ANOTHER WHO CAME IN AND DEALT WITH

23    SOME OF THE PROBLEMS WE HAD WITH DRUGS AND SAFETY IN OUR

24    PRISONS.  SO I HAD ESSENTIALLY IN 2001 WHEN I TOOK OVER A SAFE

25    PRISON SYSTEM TO OPERATE WITH, AND OVER THE LAST SEVEN YEARS I

1    WORKED VERY HARD TO IMPLEMENT EVIDENCE-BASED PROGRAMS TO GET THE

2    PROPER ASSESSMENT INSTRUMENTS IN PLACE SO WE CAN PROPERLY

3    IDENTIFY WHAT INMATES SHOULD GET WHAT TREATMENT, WHAT INMATES

4    DON'T NEED ANY TREATMENT.

5            BEFORE THIS, THE WAY WE USED TO GET PEOPLE IN

6    TREATMENT IS, YOU KNOW, SOMEBODY SAYS, OKAY, I THINK THIS

7    PROGRAM IS GOOD, OR THAT PROGRAM IS GOOD.  AND WHEN YOU PUT LOW

8    RISK PEOPLE, FOR INSTANCE, IN TREATMENT, YOU'RE WASTING YOUR

9    MONEY, BECAUSE THEY'RE PROBABLY GOING TO SUCCEED NO MATTER WHAT

10   YOU DO.  AND, IN FACT, IF YOU MIX THEM IN WITH HIGHER RISK

11   PEOPLE, YOU CAN ACTUALLY MAKE LOWER RISK PEOPLE WORSE.  SO IT'S

12   HUGELY IMPORTANT THAT YOU DO PROPER ASSESSMENTS UP FRONT SO YOU

13   NOT ONLY GET THE RIGHT PEOPLE IN PROGRAMS BUT THE RIGHT PEOPLE

14   IN THE RIGHT PROGRAMS.  THAT'S WHAT I HAVE BEEN WORKING ON.

15           IT'S A HARD PROCESS, BECAUSE YOU NOT ONLY HAVE TO GET

16   THE ASSESSMENT PEOPLE PART IN PLACE AND THE PROGRAM PIECE IN

17   PLACE, BUT THEN YOU HAVE TO HAVE A QUALITY CONTROL PIECE BECAUSE

18   THINGS DON'T STAY STAGNANT.  WHAT LOOKS GOOD TODAY MAY NOT LOOK

19   GOOD TOMORROW.  THERE'S A LOT INVOLVED IN IT.  WE HAVE BEEN

20   WORKING VERY HARD OVER THE LAST SIX OR SEVEN YEARS TO GET THAT

21   IN PLACE, AND WE STILL -- WE'RE STILL DEVELOPING AND WORKING ON

22   IT.

23   Q    YOU PROVIDE -- INSTEAD OF SENDING PAROLE VIOLATERS BACK TO

24   PRISON, DO YOU PUT THEM IN SUBSTANCE ABUSE TREATMENT IF THAT'S

25   CALLED FOR?

1   **A**   YES, WE -- ONE OF THE THINGS THAT -- OUR PAROLE BOARD ABOUT

2   TWO OR THREE YEARS AGO ADOPTED A MATRIX BASICALLY, A RISK-BASED

3   MATRIX THAT THEY WOULD LOOK AT THE RISK OF THE INDIVIDUAL, AND

4   THEY WOULD LOOK AT THE OFFENSE THAT THE INDIVIDUAL COMMITTED,

5   THE TECHNICAL OFFENSE THAT THEY COMMITTED THEN LOOK AT THEIR

6   CRIME, AND MAKE A DECISION WHAT TO DO WITH THAT INDIVIDUAL.

7   RATHER THAN JUST SENDING THEM BACK TO JAIL, THEY TRIED TO DIVERT

8   MORE OF THESE TECHNICAL PAROLE VIOLATERS.

9           IN A TWO-YEAR PERIOD FROM 2005 TO 2007, THEY REDUCED

10  OUR TECHNICAL PAROLE VIOLATER RATE, WHICH IS FAR LOWER THAN

11  CALIFORNIA'S TO START WITH.  WE ONLY HAD 3,800 TWO YEARS PRIOR,

12  DOWN TO 2,800.  SO WE REDUCED ABOUT A THOUSAND TECHNICAL PAROLE

13  VIOLATERS.  IT WAS AROUND 900 AND SOME ACTUALLY, OVER THAT

14  TWO-YEAR PERIOD AND DIVERTED THEM INTO PROGRAMS THAT WE

15  OPERATED.  IN OTHER WORDS, PAROLE IN PENNSYLVANIA IS SEPARATE

16  FROM CORRECTIONS.

17          SO WE DIVERTED THEM INTO PROGRAMS THAT WE OPERATED,

18  THINGS THAT WE CALL LIKE "HALFWAY BACK" WHERE THEY WOULD GET

19  INTO SUBSTANCE ABUSE, BECAUSE MANY OF THESE PEOPLE WERE

20  VIOLATING -- THEY WERE COMING UP WITH HOT URINES AND THINGS LIKE

21  THAT.  THEY WERE HAVING SUBSTANCE ABUSE RELAPSE ISSUES.  SO WE

22  WERE GETTING THEM INTO SUBSTANCE ABUSE TREATMENT PROGRAMS RATHER

23  THAN SENDING THEM BACK TO PRISON.

24          WE DEVELOPED A SERIES OF PROGRAMS IN CONJUNCTION WITH

25  PAROLE AND FIND THAT'S BEEN VERY SUCCESSFUL IN REDUCING THE

1  TECHNICAL PAROLE VIOLATER RATE AND FIND A GOOD PERCENTAGE OF

2  THOSE PEOPLE WHO COMPLETE THOSE PROGRAMS STAY OUT.  SO, YOU

3  KNOW, WE'RE PLEASED WITH THE DIRECTION THAT WE'VE TAKEN THERE.

4  **Q**   NOW, WE'VE JUST DISCUSSED THE FACT THAT THE CALIFORNIA

5  PAROLE VIOLATION RATE IS MUCH HIGHER THAN THE NATIONAL AVERAGE

6  AND IN YOUR STATE, DO YOU BELIEVE IT'S NECESSARY TO REVOKE THAT

7  MANY PAROLEES FOR PUBLIC SAFETY?

8  **A**   NO.  AND, IN FACT, I THINK THERE'S A POSSIBILITY THAT YOU

9  COULD ADVERSELY AFFECT PUBLIC SAFETY BY REVOKING SO MANY PEOPLE.

10 SOME OF THE RESEARCH I'VE SEEN, SOME OF WHAT WE'VE DONE IN OUR

11 STATE, SHOWS WHEN YOU REVOKE AN INDIVIDUAL THE FIRST TIME,

12 THEY'RE MORE LIKELY TO FAIL THE SECOND TIME; THEN THEY'RE EVEN

13 MORE LIKELY TO FAIL THE THIRD TIME.  AND IF YOU ARE REVOKING

14 PEOPLE AND SENDING THEM BACK TO PRISON FOR AN AVERAGE OF FOUR

15 MONTHS AND THEY'RE NOT REALLY ABLE TO GET ANY PROGRAMMING TO

16 ADDRESS WHATEVER THE PROBLEM WAS THAT CAUSED THE REVOCATION,

17 THEN THEY'RE UNLIKELY TO SUCCEED WHEN THEY GO BACK OUT.  THE

18 IMPORTANT THING IS YOU FIGURE OUT WHAT THE PROBLEM IS AND

19 INTERVENE WITH THE PROBLEM.

20         NOW, SOME OF THOSE TECHNICAL VIOLATERS SHOULD COME

21 BACK TO PRISON.  THEY MAY BE HIGH RISK INDIVIDUALS.  THEY MAY

22 HAVE COMMITTED SERIOUS-TYPE OFFENSES, OR THEY MAY BE VIOLENT

23 OFFENDERS THAT YOU ARE VERY CONCERNED ABOUT, AND THEY SHOULD GO

24 BACK TO PRISON.

25         BUT IT DOESN'T SEEM TO ME, LOOKING AROUND THE

1  COUNTRY, LOOKING AT OTHER PEOPLE'S VIOLATION RATE AND SEEING HOW

2  FAR ABOVE THE NATIONAL AVERAGE THAT CALIFORNIA IS, IT WOULD TELL

3  ME THAT THAT MIGHT ACTUALLY BE HINDERING PUBLIC SAFETY BECAUSE

4  YOU ARE GOING TO GET SOME OF THESE INDIVIDUALS THAT ARE JUST

5  GOING TO CHURN THROUGH THE SYSTEM, AND THEY'RE NEVER GOING TO

6  GET BETTER, AND THEY'RE JUST GOING TO KEEP GOING THROUGH AND

7  GOING THROUGH.  SO I THINK THE BETTER WAY IS TRY TO FIND SOME

8  WAY TO INTERVENE WITH AT LEAST SOME OF THOSE PEOPLE AND PREVENT

9  THEM FROM GOING BACK IN THE FIRST PLACE.

10 **Q**   FROM YOUR RESEARCH DID YOU DISCOVER A METHOD THAT CALIFORNIA

11 WAS USING EARLIER IN THE LAST DECADE ABOUT HOW -- THAT HAD THE

12 EFFECT OF --

13 **A**   YEAH, I HAPPENED TO NOTICE, IN LOOKING AT THEIR WEBSITE,

14 THAT IN 1993 THEIR VIOLATION RATE -- THEY WERE VIOLATING, I

15 THINK, 40 PERCENT OF THE AT-RISK POPULATION.  I THINK TODAY THEY

16 ARE DOING 50 PERCENT OF THE AT-RISK POPULATION.  IF THEY WERE

17 VIOLATING IT TODAY AT THE SAME RATE THEY WERE VIOLATING IN 1993,

18 THEY WOULD HAVE 17,000 LESS VIOLATERS.

19         WHAT THEY APPARENTLY WERE DOING BACK THEN, AND I

20 DON'T KNOW EVERYTHING ABOUT IT, BUT THEY SET TARGETS FOR THE

21 VARIOUS DISTRICTS ON VIOLATIONS, AND AS THE DISTRICTS REDUCED

22 THE NUMBER OF PEOPLE THAT THEY SENT BACK, THEY PROVIDED MORE

23 RESOURCES TO THOSE DISTRICTS SO THEY COULD PROVIDE THE

24 PROGRAMMING AND THE RESOURCES THAT THOSE PEOPLE NEEDED.  SO EVEN

25 IF THEY WOULD GO BACK AND DOING WHAT THEY WERE DOING HERE IN

1  1993, PROVIDE THOSE RESOURCES TO INTERDICT, WHICH IS ESSENTIALLY

2  WHAT I SAY WE'RE DOING IN OUR STATE, RIGHT THERE THEY COULD

3  ALMOST DROP 17,000 VIOLATERS JUST WITH THAT ALONE.

4  **Q**   NOW, YOU HAVE REVIEWED DOCUMENTS ABOUT THE CDCR'S PLAN TO

5  REFORM PAROLE, CORRECT?

6  **A**   YES.

7  **Q**   AND THAT INVOLVED THE PILOT PROJECT, CORRECT?

8  **A**   I THINK THEY HAVE A PAROLE VIOLATER'S DECISION-MAKING

9  INSTRUMENT THAT THEY'RE LOOKING TO PUT IN PLACE, SOMETHING

10 SIMILAR TO THE INSTRUMENT WE PUT IN PLACE IN PENNSYLVANIA A FEW

11 YEARS AGO.

12 **Q**   RIGHT.  AND YOU ARE FAMILIAR WITH THE LENGTH OF TIME THEY

13 WANT TO STUDY OR THE LENGTH OF TIME THAT THEY WANT THE PILOT

14 PROJECT TO RUN?

15 **A**   FROM WHAT I SAW, DOCUMENTS THAT I SAW, INDICATED THAT THE

16 PILOT PROGRAM WAS TO RUN FOR TWO YEARS.

17 **Q**   WHAT DO YOU THINK ABOUT THAT LENGTH OF TIME?

18 **A**   I THINK THAT THAT IS PROBABLY LONGER THAN IS NEEDED.  WE

19 DIDN'T DO THAT IN PENNSYLVANIA.  WE CAME UP WITH A MATRIX AND

20 PILOTED IT OVER -- THE PAROLE DID, PAROLE IS A SEPARATE

21 AGENCY -- OVER A FEW MONTHS, MADE SOME ADJUSTMENTS, AND THEN GOT

22 IT OUT THERE AND GOT IT RUNNING.

23         THIS ISN'T SOMETHING NEW OR DIFFERENT.  MANY, MANY

24 STATES HAVE DONE THIS.  AS LONG AS CALIFORNIA HAS DEVELOPED

25 THEIR INSTRUMENT ALONG THE LINES OF WHAT OTHER STATES HAVE DONE,

1  I DOUBT A TWO-YEAR STUDY IS GOING TO TEACH THEM A WHOLE BUNCH.

2  IF THEY WANT TO DO ANY KIND OF A THING, WHAT I WOULD SUGGEST

3  THEY DO IS DO A PILOT OVER THREE TO SIX MONTHS, AND WHILE

4  THEY'RE DOING THAT, TRAIN THE OTHER STAFF SO THAT AT THE END OF

5  SIX MONTHS, LET'S SAY, THEY COULD MAKE ANY ADJUSTMENTS THEY

6  WANTED AS A RESULT OF THE PILOT AND THEN BEGIN ROLLING IT OUT ON

7  A MORE STATEWIDE BASIS.  I CAN'T IMAGINE WHY THEY WOULD NEED TWO

8  YEARS TO STANDARDIZE IT.

9  **Q**   THE EXPERT PANEL ESSENTIALLY MADE THIS RECOMMENDATION FOR

10  THE PAROLE VIOLATION MATRIX, RIGHT?

11  **A**   YES.

12  **Q**   AND THE EXPERT PANEL MADE THAT RECOMMENDATION ABOUT A YEAR

13  AND A HALF AGO NOW, RIGHT?

14  **A**   I THINK IT'S SOMETIME, YEAH, ABOUT A YEAR AND A HALF AGO,

15  BACK EARLY 2007, I THINK.

16  **Q**   JUNE OF 2007?

17  **A**   JUNE OF 2007.

18  **Q**   RIGHT.

19        SO, ESSENTIALLY, IN YOUR OPINION, IT SHOULD HAVE BEEN

20  UP AND RUNNING BY NOW; IS THAT RIGHT?

21  **A**   WELL, IF THAT'S WHAT THEY -- YOU KNOW, IF CALIFORNIA HAD

22  CHOSE TO FOLLOW THROUGH WITH THAT RECOMMENDATION, CERTAINLY THEY

23  COULD HAVE DEVELOPED IT, THEY COULD HAVE PILOTED IT, AND THEY

24  COULD BE A YEAR INTO IT BY NOW.

25  **Q**   NOW?

1  **A**   OR ALMOST A YEAR INTO IT BY NOW.

2  **Q**   RIGHT.  YOU UNDERSTAND THAT IF YOU REDUCE THE NUMBER OF

3  PAROLE VIOLATERS WHO ARE SENT BACK TO PRISON, THAT WOULD REDUCE

4  THE IMPACT OF CROWDING ON THE RECEPTION CENTERS, CORRECT?

5  **A**   YES.

6  **Q**   YESTERDAY JUDGE KARLTON ASKED THE WITNESS BEFORE YOU,

7  DR. AUSTIN, WHETHER THAT WOULD HAVE ANY IMPACT ON THE DELIVERY

8  OF HEALTHCARE SERVICES TO PRISONERS IN THE GENERAL POPULATION,

9  AND AS A CORRECTIONAL PRACTITIONER WHO RUNS A LARGE SYSTEM, I

10 WOULD LIKE YOU TO ALSO ANSWER THAT QUESTION.

11 **A**   WELL, I THINK THE ANSWER IS THAT ABSOLUTELY WOULD HAVE A

12 HUGE IMPACT.  WHEN I LOOK AT THE CROWDING PROBLEM IN CALIFORNIA,

13 I SEE, REALLY, TWO CROWDING PROBLEMS THAT ARE IMPACTING ON THE

14 MENTAL HEALTHCARE, THE MEDICAL CARE AND EVERYTHING, THE ONE

15 BEING THE GROSS POPULATION, THE OTHER BEING THE HUGE AMOUNT OF

16 PEOPLE COMING INTO THE SYSTEM EVERY YEAR.

17         IF YOU HAVE 140,000 PEOPLE COMING THROUGH -- AND WE

18 ONLY IN OUR STATE HAVE 15,000, ABOUT 15, 16,000 -- YOU HAVE

19 140,000 COMING IN, IT TAKES A HUGE AMOUNT OF RESOURCES, AND FROM

20 EVERYTHING THAT I'VE SEEN WITH THE TRIPLE BUNKING AND THE WELL

21 OVER 200 PERCENT OF CAPACITY OF THEIR RECEPTION CENTERS AND

22 EVERYTHING ELSE, THE IMPACT IS THAT YOU'RE WASTING A HUGE AMOUNT

23 OF RESOURCES ON ALL THESE PEOPLE.  IF YOU REDUCE IT, SAY, BY

24 40,000 TO 100,000, YOU NOW, FIRST OF ALL, CAN REDISTRIBUTE SOME

25 OF THOSE RESOURCES TO YOUR POPULATION INSTITUTIONS.  AND,

1   SECONDLY, YOU CAN DO A BETTER JOB AT IDENTIFYING THE PEOPLE WITH

2   THE MENTAL HEALTH AND MEDICAL PROBLEMS THAT ARE COMING IN IN THE

3   FIRST PLACE.  THERE'S A MUCH GREATER CHANCE YOU ARE GOING TO

4   MISS PEOPLE WHEN YOU HAVE SO MANY PEOPLE COMING IN.  SO I THINK

5   FROM THOSE TWO PERSPECTIVES, YOU CAN DO THAT.

6          THEN IF THE RECEPTION NUMBERS ARE COMING DOWN, THE

7   OTHER THING THAT HAPPENS IS YOUR POPULATION SHOULD BE COMING

8   DOWN, TOO, AND AS THAT COMES DOWN, THEN YOU ARE BETTER ABLE TO

9   MOVE PEOPLE TO THE PROPER FACILITIES, WHICH IS A HUGE PROBLEM

10  RIGHT NOW BECAUSE EVERYTHING IS SO CROWDED.

11         SO IT ALL WORKS TOGETHER, AND THAT'S WHY, YOU KNOW,

12  IF I WERE DOING SOMETHING, I WOULD FOCUS ON THE FRONT END AND

13  THE BACK END DIVERSION ALMOST FIRST BECAUSE THEY NOT ONLY IMPACT

14  ON YOUR POPULATION, BUT THEY IMPACT ON THE RECEPTION NUMBERS,

15  AND YOU CAN JUST START GETTING HUGE BENEFITS OPERATIONAL BY

16  REDUCING THOSE NUMBERS.

17  **Q**   AND THAT WOULD MEAN THAT PRISONERS WHO NEEDED CLINICAL

18  SERVICES AT PARTICULAR INSTITUTIONS WOULD HAVE A GREATER CHANCE

19  OF GETTING TO THOSE SERVICES IN A TIMELY MANNER; IS THAT RIGHT?

20  **A**   CERTAINLY, IF THERE'S LESS POPULATION THERE AND MORE

21  RESOURCES, BECAUSE YOU ARE SAVING YOUR RESOURCES, YES, IT WOULD

22  MEAN THOSE PEOPLE WOULD MORE LIKELY GET THE SERVICES THEY SHOULD

23  GET.

24  **Q**   OKAY.  NOW, YOU'VE READ DR. AUSTIN'S AUGUST 15TH, 2008

25  REPORT; IS THAT RIGHT?

1   **A**   YES.

2   **Q**   AND DO YOU THINK THAT THE RECOMMENDATIONS CONTAINED IN THAT

3   REPORT ARE AS AGGRESSIVE AS THE ONES THAT THE EXPERT PANEL MADE?

4   **A**   NO.  I THINK DR. AUSTIN WAS –– TOOK A MORE CONSERVATIVE

5   APPROACH, WHICH I DON'T DISAGREE WITH, BECAUSE IN THE EXPERT

6   PANEL I BELIEVE IN AT LEAST ONE OF THE RECOMMENDATIONS IT WAS

7   DEALING WITH SOME SECOND STRIKERS WOULD HAVE BEEN DEALT WITH,

8   AND I THINK IN WHAT DR. AUSTIN DID IN HIS IS HE PRETTY MUCH

9   LIMITED ALL HIS NUMBERS TO THE 50 PERCENT CLASS, WHICH IS THIS

10  LESS SERIOUS GROUP, AND IT'S A GROUP I THINK SHOULD BE FOCUSED

11  ON.

12  **Q**   AND, IN GENERAL, DO YOU AGREE WITH HIS RECOMMENDATIONS?

13  **A**   YES.

14  **Q**   OKAY.  NOW, THERE'S BEEN A LOT OF DISCUSSION IN THE TRIAL ––

15  IN THIS TRIAL ABOUT RELEASING PRISONERS BEFORE THEIR SENTENCES

16  ARE OVER WHEN YOU FIGURE IN THE CREDITS THAT THEY WOULD HAVE HAD

17  BEFOREHAND.  WHAT'S YOUR OPINION ABOUT WHAT'S BEEN CALLED

18  ACCELERATED RELEASE OF PRISONERS BEFORE THEIR SENTENCE IS OVER?

19  DO YOU THINK THAT WOULD HAVE AN ADVERSE IMPACT ON PUBLIC SAFETY?

20  **A**   WELL, FIRST OF ALL, WHAT KIND OF AN ACCELERATED RELEASE ARE

21  WE TALKING ABOUT?  ARE WE TALKING ABOUT AN ACCELERATED RELEASE

22  WHERE PEOPLE GET CREDITS FOR COMPLETING PROGRAMS OR ARE WE

23  TALKING ABOUT A FLAT OUT ACCELERATED RELEASE?

24  **Q**   LET'S TALK ABOUT THEM EACH IN TURN.

25  **A**   OKAY.  LET'S FOCUS ON THE ONE WHERE YOU JUST COME UP AND SAY

1  WE ARE GOING TO CUT FOUR MONTHS OFF THE SENTENCE, AND YOU ARE

2  GOING TO GO HOME FOUR MONTHS EARLY.

3  **Q**    RIGHT.

4  **A**    THOSE PEOPLE HAVEN'T DONE ANYTHING TO GET THAT.  THEY

5  HAVEN'T GOT ANY SPECIAL PROGRAMMING OR ANYTHING ELSE, THEY ARE

6  GOING TO GO HOME FOUR MONTHS EARLY.  ESSENTIALLY, THEY ARE GOING

7  TO GET A BUS TICKET AND THE TWO HUNDRED DOLLARS, OR WHATEVER

8  THEY GIVE THEM, AND THEY ARE GOING TO SEND THEM HOME THE SAME AS

9  THEY DO BUT FOUR MONTHS EARLIER.

10 **Q**    RIGHT.

11 **A**    FROM ALL OF THE RESEARCH THAT I HAVE SEEN OUT THERE, OTHER

12 STATES, AND THERE'S BEEN MANY OTHER STATES THAT HAVE DONE THIS

13 KIND OF THING, CALIFORNIA DID IT, I THINK, THEMSELVES BACK 20

14 SOME YEARS OR SO AGO.  SOME BIG CITIES HAVE DONE THESE KINDS OF

15 THINGS.  IT DOES NOT HAVE AN ADVERSE EFFECT ON RECIDIVISM, AND

16 IT DOES NOT HAVE AN ADVERSE EFFECT ON THE CRIME RATE.  THAT'S

17 WHAT THOSE STUDIES SHOW YOU.  YOU RELEASE THESE PEOPLE -- THE

18 BASIC REASON IS, IS BECAUSE ALL YOU ARE DOING IS LETTING

19 SOMEBODY GET OUT OF JAIL FOUR MONTHS EARLIER.  THAT'S ALL YOU

20 ARE DOING, SO IT DOESN'T HAVE AN ADVERSE EFFECT.

21      NOW, THAT BEING SAID, IT ALSO DOESN'T FIX YOUR

22 OVERALL STRUCTURAL PROBLEM BECAUSE YOU HAVE TO CONSTANTLY BE

23 LEAVING PEOPLE OUT EARLY, AND IF YOU DO NOTHING ELSE, IT ALSO

24 PROBABLY DOESN'T ENHANCE PUBLIC SAFETY.  SO WHAT I WOULD PREFER

25 TO SEE, IF YOU WERE GOING TO GO AND SAY WE ARE GOING TO TAKE

1  FOUR MONTHS OFF OF SOMEBODY'S SENTENCE AND LET THEM OUT, I WOULD

2  PREFER TO SEE THAT THERE BE FUNDING PROVIDED TO THE COUNTIES OR

3  TO STATE PAROLE TO PROVIDE RESOURCES SO THAT THE PERSON ISN'T

4  JUST COMING BACK WITH THE $200, BUT SO YOU CAN FOCUS ON GETTING

5  THEM A PLACE TO LIVE, GETTING A JOB, GETTING INTO ANY AFTERCARE

6  LIKE SUBSTANCE ABUSE PROGRAMMING THEY NEED TO GET INTO.  IF YOU

7  DO THAT KIND OF THING, COUPLED WITH LEAVING THEM OUT FOUR MONTHS

8  EARLY, THE RESEARCH WOULD SAY THAT YOU ARE GOING TO GET BETTER

9  RECIDIVISM RATES.  YOU ARE GOING TO HAVE LESS CRIME AND LESS

10 VICTIMIZATION.  SO THAT'S IF YOU DO THAT.

11 **Q**  RIGHT.

12 **A**  AND, LIKE I SAID, IF YOU DON'T GIVE THE SERVICES, IT

13 PROBABLY ISN'T GOING TO HURT ANYTHING, BUT IT ISN'T GOING TO

14 HELP ANYTHING OR FIX THE LONG TERM PROBLEM.

15       NOW, LEAVING SOMEBODY OUT EARLY THAT YOU'RE GIVING

16 CREDIT TO BECAUSE THEY'VE DONE SOMETHING THAT I THINK WOULD HELP

17 THE PUBLIC SAFETY, AND THAT WOULD HELP THE PUBLIC SAFETY

18 BECAUSE, NUMBER ONE, YOU ARE GETTING THEM INTO THE PROGRAMS THEY

19 NEED TO GET INTO TO MAKE IT LESS LIKELY THEY ARE GOING TO COME

20 BACK TO PRISON, SO YOU ARE GOING TO LOWER RECIDIVISM RATES.

21       SO, BY JUST GIVING SOMEBODY A CREDIT -- I THINK IN

22 THE ONE BUDGET DOCUMENT I SAW THERE'S A PROPOSAL TO GIVE CREDIT

23 FOR FOUR MONTHS FOR EVERY PROGRAM A PERSON COMPLETES, BUT IT HAS

24 TO BE A SUBSTANTIAL EVIDENCE-BASED PROGRAM, RIGHT.  IT CAN'T

25 JUST BE ANY PROGRAM.

1    YOU PUT THEM IN A SUBSTANTIAL PROGRAM, GIVE THEM THAT

2    FOUR MONTHS, THEN LET THEM OUT FOUR MONTHS EARLY FOR DOING THAT,

3    THAT PERSON IS GOING TO HAVE A LOWER RECIDIVISM RATE BASED ON

4    WHAT WE'VE SEEN, LIKE WITH THE MERIT TIME PROGRAM I TALKED ABOUT

5    IN OTHER STUDIES AROUND THE COUNTRY.

6    **Q**   NOW, AS YOU KNOW, WITH CALIFORNIA'S OVERCROWDING, THE

7    GOVERNOR, THE SECRETARY AND MANY PEOPLE HAVE MENTIONED THAT WITH

8    THIS KIND OF OVERCROWDING, IT'S DIFFICULT TO DEVELOP PROGRAMS

9    THAT ARE NECESSARY BECAUSE THERE'S NO SPACE AND ALL THE OTHER

10   PROBLEMS ASSOCIATED WITH OVERCROWDING.  IT'S BEEN DESCRIBED AS A

11   CATCH-22 SITUATION.  WHAT'S YOUR REACTION TO THAT?

12   **A**   WELL, MY REACTION IS, YOU KNOW, YOU'RE RIGHT THAT YOU CAN'T

13   START OFF AND DO MEANINGFUL PROGRAMMING TODAY.  IT'S GOING TO BE

14   VERY DIFFICULT TO DO IN ANY LARGE AMOUNT OF WAYS BECAUSE OF THE

15   LOCKDOWNS, BECAUSE OF THE LACK OF SPACE, AND THE SEVERE

16   OVERCROWDING AND EVERYTHING LIKE THAT.

17        SO IT'S GOING TO BE DIFFICULT TO GET THAT UP AND

18   RUNNING, BUT THERE'S OTHER THINGS YOU CAN DO.  I MEAN, YOU CAN

19   CERTAINLY GET THAT PAROLE VIOLATION INSTRUMENT IN PLACE AND TRY

20   TO REDUCE ON THE BACK END THE PAROLE VIOLATERS THAT ARE COMING

21   BACK INTO THE SYSTEM.  YOU CERTAINLY CAN LIMIT PAROLE

22   SUPERVISION FOR LESS SERIOUS OFFENDERS.  YOU CERTAINLY CAN COME

23   UP WITH SOME KIND OF A PROGRAM TO FUND COUNTIES ON A FORMULA

24   BASIS TO DIVERT PEOPLE ON THE FRONT END, AND JUST DOING THOSE

25   TWO THINGS ALONE WILL HAVE A HUGE REDUCTION IN THE RECEPTION

1   CENTERS AND WILL BEGIN BRINGING THE POPULATION DOWN.

2          AND THE OTHER THING IS -- AND I SAW THIS IN ANOTHER

3   BUDGET DOCUMENT THAT I THINK THAT WE'RE PROPOSING, AND IT'S

4   SOMETHING THE EXPERT PANEL HAD RECOMMENDED.  YOU CAN ALSO MAKE

5   SOME CHANGES IN HOW THEY AWARD THAT RIP CREDIT THEY HAVE RIGHT

6   NOW SO IT'S AWARDED MORE DIRECTLY ACROSS THE BOARD, THAT SORT OF

7   GOOD TIME CREDIT THAT YOU CAN DO WITHOUT HAVING THE PROGRAMS.

8          SO THOSE PIECES CAN ALL BE DONE RIGHT NOW AND THEN

9   CAN BEGIN GENERATING SPACE WITHIN THE SYSTEM SO YOU CAN GET THE

10  PROGRAMS UP AND RUNNING, AND THEN YOU CAN GIVE THE CREDITS FOR

11  THE PEOPLE THAT COMPLETE THE PROGRAMS.  SO THAT'S HOW YOU WOULD

12  BUILD ON THAT.  IT WOULD BE VERY DIFFICULT TO, OBVIOUSLY, GIVE A

13  WHOLE BUNCH OF CREDITS FOR PROGRAMS RIGHT NOW WHEN YOU REALLY

14  CAN'T DO MEANINGFUL PROGRAMS RIGHT NOW, OR AT LEAST A LOT OF

15  THEM.

16  **Q**   RIGHT.

17         NOW, DR. AUSTIN HAD TESTIFIED THAT A MODEST

18  ACCELERATION -- ACCELERATED RELEASE OF PRISONERS COULD CAUSE A

19  .3 PERCENT INCREASE IN ARRESTS.  YOU ARE FAMILIAR WITH THAT?

20  **A**   YES.

21  **Q**   ASSUMING FOR THE MOMENT THAT SUCH A RELEASE WOULD CAUSE SUCH

22  AN INCREASE IN ARRESTS, IS THERE A WAY THE STATE COULD ELIMINATE

23  EVEN THAT SMALL INCREASE?

24  **A**   YES.

25  **Q**   HOW?

1  **A**   BY PROVIDING SERVICES TO THOSE PEOPLE WHO ARE COMING OUT IN

2  THE FORM OF EDUCATION, VOCATIONAL TRAINING, JOB, HOUSING,

3  SUBSTANCE ABUSE, THOSE THINGS I SAID.

4        THE WAY YOU WOULD ADDRESS THAT, YOU KNOW, ASSUMING

5  THERE WOULD BE AN ADVERSE IMPACT AND THAT IMPACT ONLY OCCURS IF

6  IT DOES BECAUSE THE AT-RISK GROUP IS BIGGER, YOU KNOW, YOU'VE

7  JUST SHIFTED IT.  IT REALLY ISN'T MORE CRIME, IT'S JUST MORE

8  CRIME HAPPENING HERE INSTEAD OF HAPPENING DOWN THE ROAD WHEN THE

9  PERSON WOULD HAVE GOT OUT ANYWAY.  BUT YOU COULD ELIMINATE THE

10 POTENTIAL FOR THAT BY SEEING THAT PROPER SERVICES ARE PROVIDED

11 TO PEOPLE.  ALL THE RESEARCH WOULD SAY IF YOU DO THAT, THOSE

12 PEOPLE ARE GOING TO BE LESS LIKELY TO FAIL IF YOU PROVIDE THOSE

13 SERVICES.

14 **Q**   AND IF YOU PROVIDED THE SERVICES, IN YOUR OPINION, WOULD

15 THAT DO MORE THAN COMPENSATE FOR THE .3 PERCENT INCREASE?

16 **A**   I THINK IT WOULD.  I HAVE NO DOUBT THAT THE INCREASE IS

17 REALLY GOING TO BE QUITE SMALL WHEN YOU LOOK AT THE TOTAL AMOUNT

18 OF ARRESTS THAT YOU ARE DEALING WITH IF YOU ONLY HAVE A .3.  THE

19 EXAMPLE WOULD BE EVEN IF YOU HAD A .5, A HALF A PERCENT, IF A

20 PARTICULAR JURISDICTION HAD 200 ARRESTS IN A MONTH AND IT'S A

21 HALF A PERCENT MORE, WHICH IS A LITTLE MORE THAN WHAT AUSTIN

22 SAID IN HIS THING, NOW YOU HAVE 201 ARRESTS.  SO THE NUMBER IS

23 RELATIVELY SMALL, BUT IF YOU PROVIDE THE SERVICES, IF THAT EVEN

24 OCCURS, BUT THE NUMBERS -- IF YOU PROVIDE THE SERVICES, THEN

25 THAT -- YOU WOULD TAKE IT, AND YOU WOULD HAVE LESS THAN THE 200

1  THAT YOU WERE HAVING IN THE FIRST PLACE, BECAUSE YOU ARE

2  PROVIDING SERVICES TO THE PEOPLE THAT ARE COMING OUT WHICH YOU

3  AREN'T PROVIDING NOW.

4  **Q**   SO IF THIS COURT WERE TO ORDER THE STATE TO REDUCE ITS

5  PRISON POPULATION AND THEY CHOSE A METHOD SUCH AS RELEASING

6  PRISONERS BEFORE THEIR SENTENCES WERE OVER, THEY WOULD -- THE

7  STATE WOULD HAVE THE CHOICE ABOUT WHETHER TO FUND THE SERVICES

8  THAT YOU ARE TALKING ABOUT OR NOT.  IT'S ESSENTIALLY A POLITICAL

9  DECISION, WOULD YOU AGREE?

10  **A**   I GUESS THAT'S CORRECT, THEY WOULD, YES.

11  **Q**   OKAY.  YOU SAW THE GOVERNOR'S NOVEMBER SPECIAL SESSION

12  BUDGET PROPOSAL?

13  **A**   YES.

14  **Q**   AND DO YOU AGREE THAT THE POPULATION-REDUCING MEASURES IN

15  THAT BUDGET PROPOSAL ARE SOMETHING THAT'S APPROPRIATE FOR THE

16  STATE TO DO?

17  **A**   ABSOLUTELY.  THEY ARE THINGS THAT WE HAVE BEEN TALKING ABOUT

18  IN -- AT LEAST THREE OF THE PROPOSALS THERE COME RIGHT DIRECTLY

19  PRETTY MUCH FROM THE EXPERT PANEL, THE ONE BEING TO LIMIT THE

20  SUPERVISION, PAROLE SUPERVISION OF THE LESS SERIOUS OFFENDERS,

21  THE OTHER BEING TO PROVIDE THE FOUR MONTHS CREDIT FOR PEOPLE WHO

22  COMPLETE EVIDENCED-BASED PROGRAMS, THE OTHER BEING TO MAKE SOME

23  ADJUSTMENTS TO THE -- THAT GOOD TIME CREDIT THAT'S BEING AWARDED

24  NOW SO YOU CAN PROVIDE THE FULL CREDIT TO PEOPLE IN JAILS AND

25  THINGS LIKE THAT.  THOSE ARE THREE OF THE THINGS MENTIONED IN

1  THERE.  THEY'RE RIGHT FROM THE EXPERT PANEL.

2          THE FOURTH THING WAS TO REDEFINE IN PROPERTY CRIMES

3  THE AMOUNT.  APPARENTLY, THE AMOUNT TO BECOME A FELONY FOR A

4  PROPERTY CRIME HASN'T BEEN ADJUSTED SINCE 1982, AND, OBVIOUSLY,

5  YOU KNOW, THERE'S BEEN HUGE INFLATION SINCE 1982, SO YOU ARE

6  PROBABLY GETTING A WHOLE BUNCH MORE PEOPLE TODAY THAT ARE BEING

7  CALLED FELONY OFFENDERS SIMPLY BECAUSE THAT HASN'T BEEN

8  ADJUSTED.  I THINK THAT MAKES A LOT OF SENSE.

9          THAT GETS TO LOOKING AT THE WHOLE SENTENCING ISSUE,

10  WHICH IS ANOTHER THING WE HAVEN'T REALLY TOUCHED ON.  THAT'S

11  ANOTHER AREA THAT COULD BE LOOKED AT, AND THOSE KINDS OF

12  THOUGHTFUL THINGS COULD BE DONE AND PROBABLY MAKE SOME

13  ADDITIONAL THINGS.

14          SO I THINK ALL OF THOSE RECOMMENDATIONS SEEM LIKE

15  REALLY, REALLY GOOD, FINE RECOMMENDATIONS THAT THEY HAVE THERE.

16  HOPEFULLY, THAT WILL GET DONE.

17  Q   WELL, THE SPECIAL SESSION ENDED -- NEVER MIND.  I DON'T WANT

18  TO TESTIFY HERE.

19          YOU KNOW ABOUT AB 900, CORRECT?

20  A   YES.

21  Q   THAT'S A PRISON CONSTRUCTION AUTHORIZATION BILL?

22  A   YES, I THINK IT CALLS FOR 8,000 IN-FILL BEDS AND 8,000

23  REENTRY BEDS ESSENTIALLY.

24  Q   RIGHT.  DO YOU THINK THAT EVEN IF THE LEGISLATURE DECIDED TO

25  FUND IT, WHICH IT HASN'T SO FAR, DO YOU THINK THAT WOULD SOLVE

1  CALIFORNIA'S OVERCROWDING CRISIS?

2  **A**   I DON'T THINK SO, NO.   I DON'T THINK IT WOULD FOR A NUMBER

3  OF REASONS.

4           FIRST OF ALL, CALIFORNIA, OVER THE PAST TEN YEARS OR

5  MORE, 20 YEARS, HAS BEEN SPENDING BILLIONS OF DOLLARS ON

6  CONSTRUCTION AND NEVER HAVE GOTTEN THERE.   THEY'RE IN WORSE

7  SHAPE TODAY THAN WHEN THEY STARTED DOING THAT.   YOU KNOW, IT

8  TAKES SO LONG TO BUILD IN THE FIRST PLACE, YOU KNOW, YOU ARE NOT

9  GOING TO SEE ANY IMPACT FOR THREE OR FOUR YEARS AND GOSH KNOWS

10  HOW LONG IT'S GOING TO TAKE TO GET ALL 16,000 OF THOSE BEDS IF

11  YOU DID IT.   IT'S GOING TO BE HUGELY COSTLY TO THE SYSTEM IF YOU

12  DO THAT.   SO THE TIME YOU HAVE IS ALSO A PROBLEM.

13           THE OTHER PROBLEM I HAVE WITH AB 900 IS WITH THE

14  IN-FILL BEDS, AS I'VE THINK TESTIFIED LAST TIME.   I THINK THESE

15  BIG MEGA INSTITUTIONS ARE VERY DIFFICULT TO MANAGE.   I REALIZE

16  THEY HAVE THEM, AND THEY ARE GOING TO HAVE TO OPERATE WITH THEM,

17  HOPEFULLY WITH LOWER POPULATIONS, BUT THE IN-FILL BEDS, ALL

18  YOU'RE DOING IS YOU'RE PUTTING A NEW HOUSING UNIT IN THIS

19  MASSIVELY OVERCROWDED INSTITUTION, AND MOVING INMATES FROM UGLY

20  BEDS TO NOW A NICER BED, BUT YOU HAVEN'T DONE ANYTHING WITH THE

21  INFRASTRUCTURE'S ABILITY TO HANDLE THOSE EXTRA INMATES.

22           I THINK PERSONALLY THAT CALIFORNIA SHOULD BE LOOKING

23  AT BUILDING NEW INSTITUTIONS IN THE 2- TO 3,000 MAN RANGE.

24  THAT'S WHERE THE MONEY SHOULD BE SPENT RATHER THAN ON IN-FILL

25  BEDS.

1          THEN IF THEY GET CONTROL OF THEIR POPULATION DOWN THE

2    ROAD AND THEY BUILD SOME OF THESE NEWER INSTITUTIONS, WHICH ARE

3    GOING TO BE MORE COST EFFECTIVE TO RUN, THEN MAYBE THEY COULD

4    LOOK AT CLOSING SOME OF THE OLDER FACILITIES.  THEY HAVE SOME

5    SIGNIFICANT PROBLEMS, TOO.

6          THE OTHER PROBLEM WITH AB 900 WITH THE REENTRY BEDS,

7    THEY'RE TALKING ABOUT 8,000 REENTRY BEDS.  I THINK THE CONCEPT

8    IS A GREAT CONCEPT TO HAVE THESE REENTRY FACILITIES IN THE

9    COUNTIES FOR THESE PEOPLE TO GO BACK TO.  I THINK IT'S A GREAT

10   CONCEPT.

11         BUT THEY'RE GOING TO HAVE A HECK OF A HARD TIME

12   SITING THESE PLACES.  I'M GOING TO BE VERY SURPRISED IF THEY ARE

13   ABLE TO SITE ALL 8,000 BEDS AND APPROPRIATELY SITE THEM.  FOR

14   INSTANCE, MANY OF THEM ARE GOING TO NEED TO BE CITED TO THE LOS

15   ANGELES AREA BECAUSE THAT'S WHERE MOST OF THE INMATES ARE GOING

16   BACK TO.  I THINK THAT'S A HUGE PROBLEM FINDING SITING.  I KNOW

17   WE HAVE THOSE PROBLEMS IN PENNSYLVANIA.

18         THOSE ARE SOME OF THE PROBLEMS I SEE WITH AB 900 THE

19   WAY IT'S CURRENTLY CONSTRUCTED.

20   **Q**   SO YOU'VE TESTIFIED ABOUT A LOT OF DIFFERENT THINGS THAT

21   YOUR STATE IS DOING AND THAT OTHER STATES HAVE DONE TO CONTROL

22   OR REDUCE THEIR POPULATION.  IS THE PROBLEM FIGURING OUT -- IS

23   THE PROBLEM WITH CALIFORNIA'S OVERCROWDING CRISIS THE FACT THAT

24   THERE AREN'T SAFE WAYS TO REDUCE THE POPULATION?

25   **A**   NO.  IN MY OPINION, IT IS NOT -- YOU KNOW, THAT'S NOT THE

1  PROBLEM OUT HERE IN CALIFORNIA.  THERE ARE MANY SAFE WAYS TO DO

2  IT, MANY WAYS THAT OTHER PEOPLE HAVE BEEN DOING IT.

3          YOU KNOW, THERE'S A LOT OF RESEARCH OUT THERE.  THE

4  CALIFORNIA DEPARTMENT OF CORRECTIONS HAS THEMSELVES TRIED TO DO

5  IT.  I KNOW SOME OF THEIR PRIOR SECRETARIES WERE TRYING TO PUT

6  INTO PLACE CERTAIN PROGRAMS TO REDUCE THEIR POPULATIONS.  I

7  THINK THEY TRIED TO PUT A PAROLE VIOLATION MATRIX IN PLACE WHEN

8  SECRETARY HICKMAN WAS HERE AT ONE TIME.

9          TO ME IT SEEMS THAT THIS IS ALL ABOUT THE POLITICAL

10 WILL, THAT WHEN IT COMES UP TO GETTING IT DONE, GETTING THE

11 LEGISLATURE TO PASS THIS, THAT'S WHERE IT STOPS, AND THAT'S

12 WHERE IT DOESN'T HAPPEN.  AND THAT'S REALLY UNFORTUNATE BECAUSE

13 NOT ONLY ARE THEY CAUSING HUGE PROBLEMS WITHIN THEIR

14 INSTITUTIONS, BUT THEY'RE COSTING THE TAXPAYERS, AND THEY'RE

15 GOING TO COST THE TAXPAYERS MUCH, MUCH MORE MONEY THAN THEY HAVE

16 TO, AND THIS IS AT A TIME WHEN NONE OF US CAN REALLY AFFORD

17 THESE ADDITIONAL COSTS ANYWHERE IN THE COUNTRY.

18 **Q**  AND BY "COSTS," DO YOU INCLUDE THE FACT THAT IT COULD BE

19 SAFER THAN IT IS NOW?

20 **A**  ABSOLUTELY.  I REALLY BELIEVE IF THEY WOULD ADOPT SOME OF

21 THESE THINGS, THEY WOULD NOT ONLY REDUCE THEIR POPULATION, BUT

22 THEY WOULD SEE THEIR RECIDIVISM RATES COMING DOWN, PARTICULARLY

23 AS THEY GOT THEIR PROGRAMS GOING, PARTICULARLY AS THEY GOT MORE

24 RESOURCES OUT THERE IN THE COMMUNITY AND IN THE LONG RUN.  THE

25 STATE WOULD BECOME SAFER FOR THE PUBLIC, AND THE CONSEQUENCE IS

1  YOU WOULD ALSO SAVE MONEY, AND, YOU KNOW, THAT'S A WIN-WIN

2  SITUATION AS FAR AS I'M CONCERNED FOR EVERYBODY.

3  **Q**    AND PRISONERS WOULD RECEIVE ADEQUATE HEALTHCARE?

4  **A**    IF YOU GET THE POPULATION DOWN TO THE POINTS IN THESE

5  FACILITIES WHERE THEY CAN MANAGE THAT, YES, THEY SHOULD GET

6  ADEQUATE HEALTHCARE, MENTAL HEALTHCARE, WHATEVER CARE, PROPER

7  PROGRAMMING, EVERYTHING SHOULD BE ABLE TO BE HANDLED AND YOU CAN

8  GET THE POPULATION DOWN TO A MANAGEABLE LEVEL.

9              **MR. SPECTER:**  THANK YOU.  NO FURTHER QUESTIONS.

10              **JUDGE REINHARDT:**  DR. BEARD, I ASK YOU A MORE

11  SPECIFIC QUESTION.  THE POLITICAL WILL IS SOMEWHAT OUT OF OUR

12  FIELD, BUT WE'VE HAD TESTIMONY IN PHASE ONE THAT OVERCROWDING IS

13  THE CAUSE OF INADEQUATE, UNCONSTITUTIONAL HEALTHCARE AND MEDICAL

14  CARE.  I'M NOT SUGGESTING EVERYBODY AGREES ON THAT, BUT WE'VE

15  HAD SOME TESTIMONY TO THAT EFFECT.

16              I LISTENED TO YOUR TESTIMONY ABOUT THE FACT THAT WE

17  COULD IMPROVE SAFETY WITH THESE REFORMS.  MY QUESTION IS:  IS

18  WHAT YOU WERE SAYING -- AND I WASN'T CLEAR ON THIS -- THAT IF WE

19  JUST LEFT THE CONDITIONS AS THEY ARE, THAT THE OVERCROWDING

20  ITSELF WOULD MAKE SOCIETY LESS SAFE BECAUSE THE PEOPLE WHO COME

21  OUT OF THE PRISONS ULTIMATELY, HAVING BEEN SUBJECTED TO

22  OVERCROWDING, THAT THEY ARE MORE LIKELY TO COMMIT CRIMES AS A

23  RESULT OF THE CONDITIONS THEY EXPERIENCE IN PRISON?  IS THAT IN

24  ITSELF A CAUSE OF MORE CRIME WHEN THEY COME OUT?  AND IF THEY

25  HAD THEIR PRISON EXPERIENCE IN A MORE CONSTRUCTIVE ENVIRONMENT,

1 THEY WOULD BE LESS LIKELY TO COMMIT CRIMES WHEN THEY COME OUT?

2 IS THAT A PART OF WHAT YOU'RE SAYING OR NOT?

3          **THE WITNESS:** I THINK HOW I WOULD ANSWER THAT, YOUR

4 HONOR, IS THAT, FIRST OF ALL, WITH THE LOWER RISK INMATES THAT

5 ARE IN PRISON, THEY ARE PROBABLY BEING HARMED. THEY ARE

6 PROBABLY GETTING WORSE WITH THE ENVIRONMENT THAT THEY'RE IN,

7 ASSOCIATING WITH THE HIGHER RISK PEOPLE AND WITH THE

8 OVERCROWDING, WITH THE VIOLENCE, THOSE LOWER RISK PEOPLE ARE

9 PROBABLY GOING TO BE MORE LIKELY TO REOFFEND.

10          THERE'S A LOT OF RESEARCH WHICH SHOWS IF YOU MIX

11 LOWER RISK PEOPLE WITH HIGHER RISK PEOPLE, THEY GET WORSE. THE

12 OTHER THING THE RESEARCH SHOWS IS THAT WHILE THE HIGHER RISK

13 PEOPLE MAY NOT GET WORSE, THEY DON'T GET BETTER, AND SO BY NOT

14 PROVIDING THE APPROPRIATE PROGRAMMING TO INDIVIDUALS WHILE

15 THEY'RE IN PRISON, YOU DO NOT REDUCE THEIR LIKELIHOOD OF

16 COMMITTING OFFENSES. SO I GUESS THAT'S WHAT I'M SAYING. I

17 MEAN, YES, I'M SAYING THE PUBLIC IS ADVERSELY AFFECTED BECAUSE

18 SOME PEOPLE ARE GETTING WORSE AND THEN ANOTHER GROUP OF PEOPLE

19 AREN'T GETTING ANY BETTER.

20          **JUDGE REINHARDT:** THANK YOU.

21          **JUDGE HENDERSON:** DOES CCPOA COUNSEL HAVE ANY

22 QUESTIONS?

23          **MS. LEONARD:** NO, YOUR HONOR.

24          **CROSS-EXAMINATION BY MR. MELLO**

25          **MR. MELLO:** GOOD MORNING, YOUR HONORS.

1  **BY MR. MELLO**

2  **Q**   GOOD MORNING, SECRETARY BEARD.

3  **A**   GOOD MORNING.

4  **Q**   HAS THERE BEEN A SPIKE IN THE PENNSYLVANIA POPULATION SINCE

5  I TOOK YOUR DEPOSITION IN SEPTEMBER OF 2008?

6  **A**   HAS THERE BEEN A SPIKE?

7  **Q**   UH-HUH.

8  **A**   YES.

9  **Q**   DO YOU KNOW THE REASONS FOR THAT SPIKE?

10 **A**   WELL, FIRST OF ALL, OUR POPULATION HAS BEEN GROWING, LIKE

11 EVERYBODY'S POPULATION, FOR -- SINCE, YOU KNOW, THE LATE 1970'S,

12 THE EARLY 1980'S, AND WHAT WE HAVE BEEN DOING IS WORKING ON THE

13 THINGS THAT WE CAN CONTROL THAT GROWTH, AND WE HAVE BEEN

14 BRINGING DOWN THE RATE OF GROWTH BY SOME OF THE THINGS THAT

15 WE'VE TALKED ABOUT; WORKING WITH PAROLE TO REDUCE PAROLE

16 VIOLATERS, THE RESTRICTIVE INTERMEDIATE PUNISHMENT PROGRAMS THAT

17 DIVERT PEOPLE.  WE HAVE BEEN BRINGING DOWN THE RATE OF GROWTH.

18 WE STILL HAVEN'T GOT IT WHERE IT IS FLAT OR GOING DOWN, BUT

19 WE'VE GOT THE RATE OF GROWTH DOWN.

20 **Q**   AND, SECRETARY BEARD, IS INCAPACITATION ONE OF THE THINGS

21 ACCOMPLISHED -- I MEAN, IT'S ONE OF THE MEANS THAT AFFECTS CRIME

22 RATES, CORRECT?

23 **A**   INCAPACITATION?

24 **Q**   YES.

25 **A**   WELL, A CERTAIN AMOUNT OF INCAPACITATION CAN AFFECT CRIME

1  RATES, YES.  THERE'S BEEN SOME STUDIES OUT THERE THAT INDICATE

2  FOR EVERY TEN PERCENT INCREASE IN INCARCERATION RATE, YOU CAN

3  GET A TWO TO FOUR PERCENT DECREASE IN CRIME RATE, BUT THAT SAME

4  RESEARCH SAYS THAT ONCE YOU REACH A CERTAIN POINT OF INCAR --

5  YOUR INCARCERATION RATE GETS TO A CERTAIN POINT, AND THAT POINT

6  IS BETWEEN LIKE ABOUT 360 AND 470 PER HUNDRED THOUSAND, IT'S

7  WHAT THEY CALL AN INFLEXION POINT, THAT ACTUALLY INCARCERATING

8  MORE PEOPLE CAN BE COUNTERPRODUCTIVE.

9            AND, OF COURSE, CALIFORNIA SITS AT THE HIGH END OF

10  THAT INFLEXION RATE.  I THINK THEIR LATEST NUMBERS I SAW ON

11  THEM, THEY'RE LIKE 473 OR 475 PER HUNDRED THOUSAND, SOMETHING IN

12  THAT RANGE.  SO THEY ARE RIGHT AT THE VERY TOP OF THE INFLECTION

13  POINT.

14            SO IF YOU MEAN CAN CALIFORNIA LOCK UP MORE PEOPLE AND

15  MAKE IT SAFER?  IT DOESN'T APPEAR THEY CAN, BASED ON OTHER

16  STUDIES THAT HAVE BEEN DONE OUT THERE.  IT APPEARS THERE'S OTHER

17  THINGS THEY COULD DO THAT WOULD HAVE MUCH MORE IMPACT FOR THE

18  SAME COSTS, AND JUST LOCKING UP MORE PEOPLE PROBABLY ISN'T GOING

19  TO HAVE MORE IMPACT.  IN FACT, IT MAY BE HURTING THE CRIME RATE

20  BECAUSE OF THOSE PEOPLE THAT YOU HAVE CHURNING THAT I TALKED

21  ABOUT ON THE BACK END, THAT MAY ACTUALLY BE MAKING THE CRIME

22  RATE WORSE.

23  **Q**  SO AS I UNDERSTAND IT, THE TOP OF THAT INFLEXION RATE OR

24  POINT IS ABOUT 470 --

25  **A**  SOMEWHERE IN THAT RATE.

1  **Q**   AND CALIFORNIA --

2  **A**   RIGHT ABOUT AT THE TOP OF THAT RATE.

3  **Q**   SECRETARY BEARD, YOU NEVER EVALUATED WHETHER CALIFORNIA CAN

4  PROVIDE ADEQUATE MEDICAL AND MENTAL HEALTH CARE WITHOUT A

5  REDUCTION IN THE PRISON POPULATION, DID YOU?

6  **A**   NO, I NEVER WENT AND VISITED ALL -- I ONLY VISITED ONE

7  INSTITUTION AS I TESTIFIED TO.

8  **Q**   YOU NEVER EVALUATED WHETHER CALIFORNIA CAN PROVIDE ADEQUATE

9  MEDICAL AND MENTAL HEALTHCARE ABSENT A REDUCTION IN ITS

10  POPULATION, CORRECT?

11         **JUDGE KARLTON:**  THAT'S WHAT YOU JUST ASKED.

12         **MR. MELLO:**  OH, REALLY?  IT'S BEEN A LONG WEEK.  I

13  APOLOGIZE.

14         **JUDGE REINHARDT:**  I'M NOT SURE HE ANSWERED.

15         **THE WITNESS:**  MY ANSWER WOULD BE I HAVEN'T PERSONALLY

16  EVALUATED IT, BUT I REVIEWED A LOT OF INFORMATION, AND I THINK

17  WE TALKED ABOUT THIS IN MY TESTIMONY BEFORE THE LAST TIME, THAT

18  I REVIEWED A LOT OF REPORTS BY A LOT OF EXPERTS, AND THAT'S WHAT

19  I DO IN MY JOB NOW TO RUN MY SYSTEM.  SO FROM REVIEWING THOSE

20  REPORTS, I WOULD CONCLUDE THAT OVERCROWDING IS THE PRIME CAUSE

21  FOR THE MENTAL HEALTH AND MEDICAL PROBLEMS, AND THE ONLY WAY TO

22  REALLY ADDRESS THAT IS TO LOWER THE POPULATION.

23         **MR. MELLO:**  I DIDN'T MEAN TO GO BACK TO PHASE ONE, SO

24  I APOLOGIZE.

25         **JUDGE REINHARDT:**  IT'S NOT PHASE ONE.  PHASE TWO IS

1  ARE THERE ALTERNATIVE METHODS OF SOLVING THE PROBLEM.

2          **MR. MELLO:**  CORRECT.  THAT'S MY NEXT QUESTION.

3  **BY MR. MELLO**

4  **Q**   MY NEXT QUESTION IS:  HAVE YOU -- YOU'VE NEVER EVALUATED

5  WHETHER CALIFORNIA CAN FIX THE DELIVERY OF MEDICAL AND MENTAL

6  HEALTHCARE BY MEANS OTHER THAN REDUCING THE POPULATION, CORRECT?

7  **A**   FROM WHAT I KNOW ABOUT THE WAYS THAT YOU CAN ADDRESS THIS

8  PROBLEM, AND, LIKE I SAID, OVER THE LAST SEVEN YEARS I HAVE BEEN

9  INTIMATELY LOOKING AT ALL OF THIS, BECAUSE I HAVE BEEN TRYING TO

10 GET A HANDLE AND CONTROL OUR OWN POPULATION, THERE IS ONLY A FEW

11 THINGS THAT YOU CAN DO TO GET THE POPULATION DOWN.  ONE IS YOU

12 BUILD MORE FACILITIES, AND WE'VE TALKED ABOUT THE PROBLEMS

13 INVOLVED WITH THAT.  AND THE OTHER THING IS TO DO SOMETHING TO

14 LOWER THE ACTUAL POPULATION ITSELF, EITHER DIVERT OR REDUCE

15 LENGTH OF STAY.

16 **Q**   DURING YOUR DEPOSITION ON SEPTEMBER 26TH AT PAGE 166, LINES

17 14 THROUGH 20, I ASKED YOU, SECRETARY BEARD -- PARDON ME.  I

18 ASKED YOU:

19              "HAVE YOU EVER EVALUATED WHETHER CALIFORNIA

20         MUST TAKE STEPS TO FIX THE DELIVERY OF MEDICAL

21         CARE AND MENTAL HEALTHCARE IN ITS PRISONS BY

22         MEANS OTHER THAN REDUCING POPULATION?

23              "ANSWER: I HAVEN'T PERSONALLY EVALUATED

24         THAT, NO."

25         SECRETARY BEARD, DO YOU RECALL THE CALIFORNIA'S

1  THREE-YEAR RECIDIVISM RATE FOR ALL FELONS RELEASED TO PAROLE?

2  **A**   NOT EXACTLY, NO.  I LOOKED AT THAT SOME TIME AGO, AND I

3  DON'T RECOLLECT WHAT IT IS.

4  **Q**   I BELIEVE MR. SPECTER DISCUSSED THE THREE-YEAR RECIDIVISM

5  RATES FOR PAROLE VIOLATERS BEING IN THE 60 TO 70 PERCENT RANGE.

6  DO YOU BELIEVE THAT TO BE TRUE?

7  **A**   FROM WHAT I'VE HEARD, IT SOUNDS LIKE THAT'S FAIRLY ACCURATE.

8  **Q**   AND SECRETARY BEARD, DO YOU BELIEVE THAT THE APPROPRIATE

9  SUPERVISION OF PAROLEES BY PAROLE OFFICERS CAN REDUCE RECIDIVISM

10  RATES?

11  **A**   WHEN YOU SAY "APPROPRIATE," IT DEPENDS HOW YOU DEFINE

12  "APPROPRIATE" BECAUSE SUPERVISION ALONE DOES NOT NECESSARILY

13  HELP REDUCE THE LIKELIHOOD OF PAROLE VIOLATIONS.  YOU REALLY

14  NEED TO HAVE SUPERVISION WITH PROGRAMMING, WITH EVIDENCE-BASED

15  PROGRAMMING, TO DO IT.  SO WHEN YOU SAY -- IF YOU MEAN, YOU

16  KNOW, BY GETTING PEOPLE THE PROPER PROGRAMS AND STUFF, THE

17  ANSWER IS YES.

18  **Q**   SO, SECRETARY BEARD, YOU DO BELIEVE THAT APPROPRIATE

19  SUPERVISION AND PROGRAMMING OF PAROLEES CAN REDUCE RECIDIVISM,

20  CORRECT?

21  **A**   IF IT'S DONE APPROPRIATELY, YES.

22  **Q**   AND YOU BELIEVE THAT PROGRAMS THAT DIVERT OFFENDERS FROM

23  PRISON, LIKE DRUG TREATMENT PROGRAMS, CAN REDUCE RECIDIVISM,

24  CORRECT?

25  **A**   YES.

1   Q    AND, SECRETARY BEARD, DO YOU KNOW WHETHER THERE ARE ENOUGH

2   PAROLE OFFICERS IN CALIFORNIA TO SUPERVISE CURRENT LEVELS OF

3   PAROLEES IN CALIFORNIA?

4   A    I DID NOT LOOK AT WHAT THE ACTUAL PERCENTAGE AND CASELOADS

5   ARE OF PAROLE OFFICERS, NO.

6   Q    SECRETARY BEARD, YOU TESTIFIED THAT PENNSYLVANIA INCREASED

7   THE CAPACITY, THE OPERABLE CAPACITY, OF ITS PRISONS BY

8   INCREASING INFRASTRUCTURE, SPACE GENERALLY, TREATMENT SPACE, AND

9   THE LIKE, CORRECT?

10  A    YES.

11  Q    DO YOU KNOW WHETHER OTHER STATES HAVE INCREASED CAPACITY IN

12  A SIMILAR MANNER?

13  A    NOT SPECIFICALLY, NO.  I HAVEN'T REALLY LOOKED AT WHAT OTHER

14  STATES HAVE DONE DIRECTLY IN THAT, THE WHOLE INFRASTRUCTURE

15  THING.  I WOULD ASSUME MANY STATES HAVE DONE THAT, BUT I DON'T

16  KNOW.

17  Q    DO YOU BELIEVE THAT CALIFORNIA COULD INCREASE ITS OPERABLE

18  CAPACITY IN A SIMILAR MANNER AS PENNSYLVANIA DID?

19  A    I THINK THE PROBLEM THAT I -- OR THE CONCERN I WOULD HAVE IS

20  THE FACT THAT YOU ARE DEALING WITH THESE MEGA PRISONS.  IN THE

21  FIRST PLACE, THE PRISONS ARE SO LARGE THAT, YOU KNOW, EVEN IF

22  YOU WERE TO PUT IN THE INFRASTRUCTURE AND EVERYTHING SO YOU CAN

23  HANDLE THINGS, IT'S STILL VERY, VERY DIFFICULT TO MANAGE, AND

24  THAT IN AND OF ITSELF CAN BE A PROBLEM.

25            **JUDGE KARLTON:**  IN THAT REGARD, WHEN YOU INCREASE

1   CAPACITY, SPACE, THAT IS HAVE BETTER BEDS, YOU'VE GOT TO HAVE --

2   I WAS ABOUT TO TELL YOU INSTEAD OF ASK YOU.  DO YOU ALSO TO HAVE

3   TO HAVE AN INCREASE IN ALL OF THE SUPPORT FACILITIES, MEDICAL,

4   MENTAL, GUARDS FIRST OF ALL AND AS YOU SAY FOOD SERVICES,

5   LAUNDRY, ET CETERA?

6           **THE WITNESS:**  YES, ABSOLUTELY, YOUR HONOR.  I MEAN,

7   YOU KNOW, WHILE WE HAVE PUT IN-FILL BEDS IN SOME OF OUR OLDER

8   INSTITUTIONS, AS I TESTIFIED TO, WE ALSO BUILT OTHER FACILITIES

9   TO TAKE CARE OF THESE OTHER -- THESE OTHER THINGS SO WE COULD

10  PROPERLY DEAL WITH THE INMATES AND SO CALIFORNIA COULD DO THAT,

11  THEY COULD BUILD IN-FILL BEDS.  THEY COULD ALSO BUILD LARGE

12  TREATMENT BUILDINGS AND BIGGER KITCHENS AND BIGGER DINING ROOMS.

13          THAT'S NOT THE WAY I WOULD GO ABOUT IT, SIMPLY

14  BECAUSE THEY'RE SO LARGE THAT IT'S VERY DIFFICULT TO MANAGE A

15  FACILITY OF THAT SIZE, AND THAT IN AND OF ITSELF COULD CAUSE

16  PROBLEMS, BUT BEING THAT THEY HAVE THOSE LARGE FACILITIES,

17  CERTAINLY THEY COULD DO THAT.  CERTAINLY, IF THEY WANT TO SPEND

18  MILLIONS OF DOLLARS TO UPGRADE THESE OLDER FACILITIES, THEY

19  COULD DO THAT.

20          **JUDGE KARLTON:**  SIR, THE --

21          **JUDGE REINHARDT:**  I'M SORRY.  GO AHEAD.

22          **JUDGE KARLTON:**  WE'VE HAD TESTIMONY ABOUT SHORTFALL

23  IN PRISON GUARDS PRESENTLY.  I'VE NOT UNDERSTOOD WHY THAT IS SO,

24  BUT I WANT YOU TO ASSUME FOR A MOMENT THAT THAT IS THE CASE.

25  HOW DOES THAT RELATE TO THE NEEDS IF YOU IN-FILL?  VERY BAD

1  QUESTION.  DO YOU UNDERSTAND WHAT I'M ASKING YOU?

2            **MR. MELLO:**  YOUR HONOR, MAY I, JUST FOR THE RECORD

3  AND RESPECTFULLY, INTERPOSE AN OBJECTION THAT I BELIEVE THAT MAY

4  MISSTATE THE RECORD IN THE CASE.

5            **JUDGE KARLTON:**  OKAY.  THAT'S NOTED.

6            ASSUME THAT FOR A MOMENT, SIR.

7            **THE WITNESS:**  WELL, IF YOU PUT A NEW HOUSING UNIT IN,

8  IT DEPENDS HOW YOU'RE SUPERVISING THOSE OTHER INMATES, YOU MAY

9  BE ABLE TO MOVE THE STAFF JUST OVER TO THAT OTHER PLACE BECAUSE

10 NOW THIS IS GOING TO BE PROGRAM SPACE.  SO IT DOESN'T

11 NECESSARILY INCREASE YOUR STAFFING NEEDS.  YOU'D HAVE TO TAKE A

12 LOOK AT THE FACILITY.

13           WHAT I WOULD SAY IS GENERALLY, THOUGH, ONE OF THE

14 REASONS WHY I LIKE THE IDEA OF BUILDING NEWER INSTITUTIONS AND

15 SEPARATE ONES IS BECAUSE YOU CAN BUILD THEM MUCH CHEAPER.  THEY

16 CAN BE MUCH MORE COST EFFICIENT.  THE OLDER FACILITIES REQUIRE

17 MORE STAFF TO OPERATE THEM.

18           **JUDGE KARLTON:**  AT LEAST SOME OF THE TESTIMONY THAT

19 WE'VE HEARD, DESPITE MR. MELLO'S OBJECTIONS, TALKS ABOUT TWO

20 GUARDS IN HUGE GYMNASIUMS WITH THREE-LEVEL BUNKS AND SO FORTH.

21 YOU COULDN'T JUST MOVE THAT BECAUSE IT'S INADEQUATE, NOW YOU'D

22 STILL HAVE TO STAFF UP EVEN IF YOU BUILT THESE NEW FACILITIES?

23           **THE WITNESS:**  YES, IF YOU BUILT NEW HOUSING UNITS,

24 YOU WOULD PROBABLY NEED MORE THAN TWO OFFICERS TO REPLACE, TO DO

25 THE SUPERVISION OF WHAT'S BEING DONE IN THOSE LARGE -- LARGE

1 GYMS. I'VE READ SOME OF THAT, TOO. I'VE ALSO HEARD THEY HAVE

2 DONE A BETTER JOB AT FILLING SOME OF THEIR CORRECTION OFFICER

3 POSITIONS MORE RECENTLY.

4          **JUDGE KARLTON:** IS THERE -- I JUST REALIZED I DON'T

5 THINK ANYBODY HAS EVER TOLD US: IS THERE A FORMULA FOR HOW MANY

6 GUARDS YOU NEED PER PRISONER, OR IS THAT SORT OF AS BEST YOU CAN

7 DO OR WHAT --

8          **THE WITNESS:** NO, THERE'S NOT A SPECIFIC FORMULA.

9 THERE'S A NUMBER OF THINGS THAT YOU HAVE TO TAKE INTO ACCOUNT.

10 NUMBER ONE, WHAT'S THE SECURITY LEVEL OF THE INSTITUTION? THE

11 HIGHER THE SECURITY LEVEL, THE MORE STAFF YOU NEED; THE LOWER

12 THE SECURITY LEVEL, THE LESS STAFF YOU NEED.

13          THE OTHER THING IS WHAT IS THE DESIGN, HOW IS THE

14 FACILITY DESIGNED? WHAT IS THE LAYOUT OF THE FACILITY? SOME

15 FACILITIES, PARTICULARLY OLDER FACILITIES, ARE SO CHOPPED UP, OR

16 THEY HAVE MULTIPLE TIERS, THESE HIGH FOUR, FIVE-TIER HIGH CELL

17 BLOCKS, THEY REQUIRE A LOT MORE STAFF THAN THE NEWER HOUSING

18 UNITS THAT ARE MORE A BUTTERFLY-SHAPED UNIT WHERE AN OFFICER CAN

19 STAND IN THE MIDDLE AND BASICALLY SEE EVERYTHING, WHERE YOU

20 CAN'T IN THESE OLDER HOUSING UNITS.

21          WHAT YOU HAVE TO DO IS DECIDE WHAT A PARTICULAR

22 FACILITY NEEDS. YOU HAVE TO GO INTO THAT FACILITY AND EVALUATE

23 EACH LOCATION IN THAT FACILITY BASED ON THE CONSTRUCTION OF THE

24 FACILITY AND BASED ON THE SECURITY LEVEL OF THAT FACILITY, AND

25 THEN YOU DECIDE WHAT THE MANPOWER -- WE DO THAT IN OUR

1    INSTITUTIONS, AND EVERY THREE YEARS GO BACK AND REEVALUATE THAT

2    AND COME UP WITH A MANPOWER FOR THAT FACILITY BASED ON JUST WHAT

3    I SAID, BY LOOKING AT THOSE THINGS.

4           AND IF PROGRAMS -- YOU KNOW, PROGRAMS THEY COULD

5    DRIVE IT AS WELL.  YOU KNOW, YOU HAVE MORE PROGRAMS, YOU MAY

6    NEED MORE STAFF TO SUPERVISE SOME OF THE PROGRAMS.  SO ALL OF

7    THAT HAS TO BE TAKEN INTO ACCOUNT TO DECIDE WHAT THE STAFFING OF

8    A GIVEN FACILITY IS.

9    **BY MR. MELLO**

10   **Q**    SECRETARY BEARD, ARE YOU AWARE OF CALIFORNIA'S PROGRAMS --

11   PROGRAM TO TRANSFER INMATES OUT OF STATE TO REDUCE SOME OF THOSE

12   NON-TRADITIONAL BEDS?

13   **A**    I AM, YES.

14   **Q**    AND ARE YOU AWARE THAT THEY'RE ON TRACK TO TRANSFER

15   APPROXIMATELY 8,000 INMATES OUT OF STATE?

16   **A**    EIGHT THOUSAND, YES.  I THINK THEY'RE UP TO 6,000 OR SO THE

17   LAST I LOOKED.

18   **Q**    OKAY.  SECRETARY BEARD, I BELIEVE YOU TESTIFIED THAT

19   PENNSYLVANIA SYSTEM IS OPERATING AT 114 TO 115 OF OPERABLE --

20   PERCENT OF OPERABLE CAPACITY, CORRECT?

21   **A**    YES, YES.

22   **Q**    SECRETARY BEARD, DO YOU KNOW WHAT PERCENTAGE OVER OPERABLE

23   CAPACITY CALIFORNIA PRISONS ARE OPERATING AT?

24   **A**    I DON'T BECAUSE I'VE NEVER GONE OUT AND EVALUATED WHAT THEIR

25   OPERABLE CAPACITY IS, AND I AM NOT AWARE THAT I'VE READ ANYTHING

1   THAT ANYBODY HAS EVER DONE THAT.

2              **MR. MELLO:**  THANK YOU.  NOTHING FURTHER.

3              **JUDGE HENDERSON:**  INTERVENORS?

4              **MR. MITCHELL:**  YES, THANK YOU.

5              **CROSS-EXAMINATION BY MR. MITCHELL**

6   **BY MR. MITCHELL**

7   **Q**   GOOD MORNING.

8   **A**   GOOD MORNING.

9   **Q**   BILL MITCHELL FOR THE DEFENDANT INTERVENORS, SECRETARY.

10  **A**   HI.

11  **Q**   THE LEGISLATION YOU SPOKE ABOUT ON DIRECT EXAMINATION WITH

12  MR. SPECTER, HAS THAT ALREADY PASSED, OR IS THAT PENDING?

13  **A**   IT HAS PASSED.

14  **Q**   DO YOU HAVE OTHER LEGISLATION THAT'S ALSO PENDING IN THE

15  STATE OF PENNSYLVANIA?

16  **A**   NOT RIGHT NOW, NOT POPULATION REDUCTION KIND OF LEGISLATION,

17  NO.  WE JUST PASSED -- THE PACKAGE JUST WAS SIGNED INTO LAW,

18  AND, ACTUALLY, SOME OF IT STARTED TO TAKE EFFECT.  IT WAS ABOUT

19  60 -- A LITTLE OVER 60 DAYS AGO.

20  **Q**   DO YOU HAVE ANY PENDING LEGISLATION THAT HOUSE SPEAKER

21  O'BRIEN IS PREPARING THAT WOULD CONTAIN ANY EARLY RELEASE

22  PROVISIONS?

23  **A**   ANY WHAT?

24  **Q**   EARLY RELEASE PROVISIONS.

25  **A**   WELL, WHAT YOU'RE TALKING ABOUT, SPEAKER O'BRIEN, IS HOUSE

1  BILL 4, WHICH I WORKED WITH HIM ON THAT.  THAT'S PART OF THE

2  PACKAGE OF BILLS THAT HAS PASSED AND BEEN SIGNED INTO LAW.

3  **Q**   YOUR PRISON POPULATION IS GOING IN PENNSYLVANIA RIGHT NOW,

4  CORRECT?

5  **A**   YES.

6  **Q**   MR. MELLO ASKED YOU A QUESTION ABOUT A SPIKE IN THE PRISON

7  POPULATION.  IN FACT, IN OCTOBER, IS IT TRUE THAT THERE WAS AN

8  INCREASE IN THE PRISON POPULATION IN PENNSYLVANIA OF OVER A

9  THOUSAND INMATES?

10 **A**   YES.

11 **Q**   MR. MELLO ASKED YOU WHAT THE CAUSE OR THE REASON FOR THE

12 SPIKE WAS, IN YOUR OPINION.  DO YOU HAVE AN EXPLANATION AS TO

13 WHY YOU'RE SEEING A SPIKE?

14 **A**   WELL, THE SPIKE THAT OCCURRED OCCURRED BEFORE THE GOVERNOR

15 PUT A PAROLE MORATORIUM ON FOR TWO MONTHS.  IT'S BEEN TAKEN OFF

16 AT THAT PARTICULAR POINT, AND HE DID THAT BECAUSE TWO PAROLEES

17 IN A TWO-MONTH PERIOD OF TIME -- AND THESE WERE VIOLENT

18 OFFENDERS, NOW; THEY HAD BEEN IN PRISON FOR VIOLENT OFFENSES AND

19 HAD BEEN RELEASED ON PAROLE -- SHOT TWO PHILADELPHIA POLICE

20 OFFICERS IN A TWO-MONTH PERIOD OF TIME, AND THE PEOPLE IN

21 PHILADELPHIA FROM WHERE THE GOVERNOR CAME FROM WERE CONCERNED,

22 AND HE'S RESPONSIBLE FOR PUBLIC SAFETY.  I THINK HE FELT HE

23 NEEDED TO PUT A MORATORIUM ON UNTIL HE COULD HAVE AN EXPERT,

24 DR. GOLDCAMP FROM TEMPLE UNIVERSITY, TAKE A LOOK AT THE PAROLE

25 SYSTEM AND THE CORRECTION SYSTEM AND SEE IF WE WERE DOING WHAT

1  WE SHOULD BE DOING.  AND DR. GOLDCAMP HAS RELEASED HIS SECOND

2  REPORT AND BASICALLY FOUND BOTH THE CORRECTIONS AND PAROLE

3  SYSTEM ARE FOLLOWING BEST PRACTICES AND STATE OF THE ART IN

4  DEALING WITH PAROLEES, AND HE RECOMMENDED THE RESTORATION OF

5  PAROLE IN PENNSYLVANIA.  HE MADE SOME OTHER RECOMMENDATIONS THAT

6  COULD MAYBE HELP IMPROVE THINGS.

7          YOU KNOW THAT'S SOMETHING WE ARE ALWAYS TRYING TO DO.

8  AS I SAID ON THE DIRECT EXAMINATION, WE'RE NOT THERE AND WE'RE

9  NEVER GOING TO BE THERE PERFECTLY.  THIS IS A MOVING THING.  YOU

10 GOT TO CONSTANTLY KEEP WORKING TO GET BETTER, AND WE DO THAT.

11 WE'RE OUT THERE LOOKING AT THE RESEARCH, SEEING WHAT OTHER

12 PEOPLE ARE DOING.  WE'RE RESEARCHING OUR OWN STUFF VERY CLOSELY

13 TO MAKE SURE WE HAVE THE IMPACTS WE WANT TO HAVE.  I THINK

14 DR. GOLDCAMP SAW THAT, AND THAT'S WHY HE WAS NOT CONCERNED WITH

15 THE SYSTEM THAT WE HAVE IN PLACE.

16          I'M HOPING OVER THE NEXT TWO OR THREE MONTHS THAT THE

17 SPIKE THAT WE HAD, THAT LITTLE BUBBLE OF EXTRA INMATES, WILL

18 COME BACK DOWN, AND, YOU KNOW, WE'LL STILL KEEP GROWING BECAUSE

19 WE WERE GROWING, BUT, HOPEFULLY, NOW THIS NEW LEGISLATION THAT

20 WE HAVE WILL HELP MODERATE THAT SOME AS WELL AS THAT STARTS

21 TAKING EFFECT.

22 **Q**  ASIDE FROM THE SPIKE DUE TO THE MORATORIUM, PRISON

23 POPULATION HAS BEEN GROWING BY ABOUT 200 INMATES PER MONTH?

24 **A**  NO, IT -- THAT'S NOT TRUE.  IT DEPENDS WHAT PERIOD OF TIME

25 YOU LOOK AT.  THESE THINGS VARY.  OUR LATEST LOOK, IF YOU LOOK

1  OVER THE LAST YEAR OR SO, HAS BEEN ABOUT 150 A MONTH, IF YOU

2  DON'T TAKE THAT SPIKE INTO ACCOUNT.

3          THE GROWTH RATE WAS ABOUT 150 A MONTH, AND PART OF

4  THAT -- LET ME SAY PRIOR TO THAT IT WAS 120 A MONTH.  THE YEAR

5  PRIOR TO THAT IT WENT TO ABOUT 150 A MONTH AFTER THE SHOOTING OF

6  THE FIRST POLICE OFFICER, BECAUSE PAROLE, WHICH IS A SEPARATE

7  AGENCY, SLIGHTLY CHANGED THEIR PRACTICES AS A RESULT OF THE

8  FIRST SHOOTING, AND WERE RELEASING LESS PEOPLE.

9          BUT, AGAIN, THE PEOPLE THAT WE'RE TALKING ABOUT HERE

10  ARE VIOLENT OFFENDERS AND NOT THE PEOPLE THAT WE'RE TALKING

11  ABOUT DIVERTING, NOT THESE LESS SERIOUS PROPERTY AND DRUG

12  OFFENDERS.

13  **Q**   YOU HAVE RECENTLY ASKED FOR MONEY FROM THE LEGISLATURE TO

14  BUILD THREE NEW PRISONS, CORRECT?

15  **A**   YES.

16  **Q**   AND EXPAND OTHERS?

17  **A**   YES.  THAT'S PART OF OUR WHOLE STRATEGY TO DEAL WITH THE

18  CONTINUING GROWTH IN THE POPULATION.  BUT, ACTUALLY, I'M

19  HOPEFUL, AND I'VE TOLD THE LEGISLATURE IF THEY PASS THAT

20  LEGISLATION -- WHAT I TOLD THE LEGISLATURE, IF THEY DIDN'T PASS

21  THE LEGISLATION, I NEEDED THREE NEW PRISONS, AND THEN IN 2012 I

22  NEEDED ONE NEW PRISON A YEAR EACH YEAR THEREON; AND IF THEY DID

23  PASS THE LEGISLATION, I COULD PROBABLY GET AWAY WITH ONE OR TWO

24  NEW PRISONS AND PUT OFF THE OUT YEAR CONSTRUCTION OF PRISONS.

25          THAT'S WHAT I TOLD THEM.  IT WAS PART OF WHAT I USED

1    TO HELP GET THE LEGISLATION THROUGH, THAT THEY COULD HELP

2    MODERATE GROWTH ENOUGH, AND PERHAPS EVEN FLATTEN THE GROWTH OUT,

3    BY PASSING THAT LEGISLATION, AND WE'RE STILL ON TRACK TO DO

4    THIS.  THIS PAROLE MORATORIUM PUT A LITTLE BUBBLE THERE AS SOON

5    AS WE GET THAT OUT.  WE'RE STILL ON TRACK TO, HOPEFULLY, NOT

6    HAVE TO BUILD MORE THAN TWO NEW PRISONS.

7    **Q**    BUT WITH THE OPENING OF SCI PITTSBURGH IN 2005, YOU HAVE A

8    TOTAL OF 27 PRISONS RIGHT NOW IN PENNSYLVANIA, CORRECT?

9    **A**    YES.

10   **Q**    NOW, YOU'VE EMBARKED ON PLANS AND HAVE NEW LEGISLATION

11   LOOKING FOR ALTERNATIVE PUNISHMENT FOR LOW-LEVEL NONVIOLENT

12   OFFENDERS, CORRECT?

13   **A**    ARE YOU TALKING ABOUT THE LEGISLATION?

14   **Q**    YES.

15   **A**    THE RISK REDUCTION INITIATIVE AND STUFF?

16   **Q**    THAT'S HOW YOU ARE SEEKING TO CONTROL YOUR PRISON

17   POPULATION, IS TO COME UP WITH INTERMEDIATE SANCTIONS, LESSER --

18   **A**    YES.

19   **Q**    -- ALTERNATIVES TO PRISON FOR YOUR LOW-LEVEL VIOLATERS,

20   CORRECT?

21   **A**    RIGHT.  WE ARE LOOKING AT A NUMBER OF THINGS.  INCREASING

22   FRONT END DIVERSION, WHICH I TALKED ABOUT, TRYING TO DO SOME

23   FORMULA-BASED THINGS.

24          WE ARE LOOKING AT LEGISLATION, LOOKING AT THE STOCK

25   POPULATION, REDUCING LENGTH OF STAY WITHIN THE SYSTEM, AT THE

1  BACK END.  WE'RE WORKING WITH THE PAROLE BOARD ON THE TECHNICAL

2  PAROLE VIOLATERS.  IT WAS A MULTI-FACETED THING WE WERE LOOKING

3  AT.

4  **Q**   WHAT PERCENTAGE OF YOUR PRISON POPULATION IN PENNSYLVANIA IS

5  VIOLENT OFFENDERS?

6  **A**   PROBABLY -- PROBABLY ABOUT 60 PERCENT, I THINK.

7          **JUDGE KARLTON:**  MAY I INTERRUPT FOR JUST A MOMENT?

8  I'M REALLY PUZZLED.  EXPERTS KEEP COMING IN AND TELLING US THAT

9  THE CRIME RATE IS REDUCING ALL OVER THE COUNTRY, GOING DOWN

10 EVERYWHERE, YET, AT THE SAME TIME, THE PRISON POPULATIONS ARE

11 INCREASING.  I MEAN, I GATHER IT'S MOSTLY JUDGES' FAULT, BUT I

12 DON'T KNOW.  HOW IS THAT POSSIBLE?

13          **THE WITNESS:**  WELL, THE REASON THAT THE PRISON

14 POPULATIONS ARE GOING UP IS BECAUSE OF THE LAWS THAT WE'VE

15 PASSED OVER THE YEARS.  WE DID IT IN PENNSYLVANIA.  WE HAVE

16 MANDATORY SENTENCES.  SO FOR CERTAIN CRIMES, YOU HAVE THESE

17 MANDATORY SENTENCES.

18          WE JUST PASSED A LAW THAT IF YOU POINT -- IF YOU

19 SHOOT A GUN AT A POLICE OFFICER, IT'S A MANDATORY TEN YEARS,

20 JUST THAT ALONE.  AND BEFORE IT WAS A MANDATORY FIVE YEARS.  SO

21 THAT'S NOT GOING TO AFFECT OUR POPULATION FOR THE FIRST FIVE

22 YEARS, BECAUSE THAT ALREADY EXISTED, BUT AS WE GET IN THE OUT

23 YEARS, WE ARE GOING TO SEE MORE OF A PROBLEM.  SO IT'S THESE

24 SENTENCES THAT ARE PUTTING PEOPLE IN JAIL FOR LONGER AND LONGER

25 PERIODS OF TIME, YOUR HONOR.

1          **JUDGE KARLTON:**  I'M HAPPY TO SAY IT'S NOT THE JUDGES;

2   IT'S THE LEGISLATORS.

3   **BY MR. MITCHELL**

4   **Q**   YOU ARE FAMILIAR WITH SOME OF THE STUDIES THAT JOHN

5   PETERSILIA HAS PRODUCED, CORRECT?

6   **A**   I'VE READ SOME OF DR. PETERSILIA'S STUDIES, YES.

7   **Q**   ONE OF THOSE WAS, I BELIEVE, "UNDERSTANDING CALIFORNIA

8   CORRECTIONS"?

9   **A**   I DON'T KNOW IF I READ THAT SPECIFIC ONE.  IF I DID, IT WAS

10  SOME TIME AGO.

11  **Q**   GENERALLY SPEAKING, PRISON POPULATION INCREASES ARE

12  ATTRIBUTABLE TO INCREASES IN THE POPULATION OF THE COMMUNITIES

13  THAT HAVE THE PRISONS, CORRECT?  AS POPULATION GOES UP,

14  CRIMINALS -- THE NUMBER OF CRIMINALS GO UP, AND PRISON

15  POPULATION GOES UP, CORRECT?

16  **A**   AS YOU EXPAND THE AT-RISK POPULATION, YOU KNOW, YES, YOU

17  WOULD GET MORE PEOPLE THAT WOULD GO TO JAIL.

18  **Q**   NOW, YOU INDICATED THAT YOU'RE TRYING TO MODEL SOME OF YOUR

19  PROGRAMS AFTER WHAT WAS DONE IN NEW YORK?

20  **A**   YES.

21  **Q**   TO LOWER THEIR PRISON POPULATION?

22  **A**   YES.

23  **Q**   PRIOR TO NEW YORK LOWERING THEIR PRISON POPULATION, THEY HAD

24  THE STRICTEST, OR PERHAPS ONE OF THE STRICTEST, LAWS OR SERIES

25  OF LAWS DEALING WITH DRUG OFFENDERS, CORRECT?

1  **A**   THE ROCKEFELLER LAWS.

2  **Q**   SO THEY HAD A HUGE PRISON POPULATION OF DRUG OFFENDERS?

3  **A**   YES.

4  **Q**   THAT THEY COULD INSTITUTE NEW POLICIES AND PROCEDURES AND

5  PROGRAMS FOR AND REDUCE THAT POPULATION, BOTH FROM THE PRISON

6  AND AT THE FRONT END DIVERTING THEM?

7  **A**   THAT'S CORRECT.

8  **Q**   DOES PENNSYLVANIA HAVE A SIMILAR POPULATION THAT IT CAN WORK

9  WITH THAT ARE DRUG OFFENDERS?

10 **A**   ABOUT 33 PERCENT OF THE PEOPLE THAT WE RECEIVE IN OUR SYSTEM

11 EVERY YEAR COMES IN WITH 12 MONTHS OR LESS TO SERVE, AND THE

12 VAST MAJORITY OF THOSE PEOPLE WOULD BE LESS SERIOUS OFFENDERS.

13 SO WHILE THE STOCK POPULATION HAS MORE VIOLENT OFFENDERS BECAUSE

14 THEY STAY FOR LONGER PERIODS OF TIME, WE HAVE A HUGE AMOUNT OF

15 THESE SHORTER SENTENCED PEOPLE, THESE PROPERTY AND DRUG

16 OFFENDERS, THAT ARE CHURNING THROUGH OUR SYSTEM, WHICH IS WHY

17 WE'RE FOCUSING ON TRYING TO DEAL WITH THOSE PEOPLE AND TRYING TO

18 REDUCE THE RECIDIVISM RATES AMONG THOSE PEOPLE.

19 **Q**   DID PENNSYLVANIA HAVE SIMILAR STRICT DRUG LAWS?

20 **A**   NOT AS STRICT AS WHAT NEW YORK HAD, NO, NOTHING NEAR WHAT

21 THE ROCKEFELLER LAWS DID.  I CAN'T SIT AND TELL YOU A

22 COMPARISON.  I JUST KNOW WE DO HAVE MANDATORY SENTENCES, AND

23 THEY HAVE BEEN APPLIED TO SOME DRUG OFFENSES, AND THAT DOES

24 DRIVE SOME OF THE POPULATION, BUT NOT AS SERIOUS AS WHAT NEW

25 YORK'S WAS.

1  Q    NOW, IN PENNSYLVANIA YOU HAVE A SEPARATE BOARD OF PROBATION

2  AND PAROLE SEPARATE FROM THE DEPARTMENT OF CORRECTIONS?

3  A    YES.

4  Q    AND INMATES MUST SEEK PAROLE; THEY DON'T HAVE AUTOMATIC

5  PAROLE LIKE WE HAVE IN CALIFORNIA, CORRECT?

6  A    THAT'S CORRECT.  IT'S A DISCRETIONARY RELEASE.

7  Q    INMATES HAVE TO APPLY FOR PAROLE AND COME UP WITH AN

8  EMPLOYMENT AND HOUSING PLAN TO GET PERMISSION TO BE RELEASED

9  FROM PRISON, CORRECT?

10 A    THEY'RE SUPPOSED TO HAVE A HOME PLAN.  MANY OF THEM GET

11 RELEASED, AND THEY DON'T HAVE JOBS, BUT YES.

12 Q    YOU'RE SEEKING TO CHANGE THAT TO SOME DEGREE WITH SOME OF

13 YOUR NEW PROPOSALS TO GIVE PAROLEES A MORE DEFINITE LESSER TERM,

14 KNOWING THAT THEY WILL GET OUT AT A CERTAIN POINT IN THE EVENT

15 THAT THEY --

16 A    THOSE PEOPLE DEFINED IN THAT LESS SERIOUS GROUP, YES.

17 Q    SO YOU ARE SEEKING TO BECOME MORE OF A DETERMINATE

18 SENTENCING TYPE OF PROGRAMMING RATHER THAN THE INDETERMINATE

19 THAT YOU HAVE NOW?

20 A    IT STILL ISN'T GOING LIKE YOUR DETERMINATE.  THEY'RE STILL

21 GOING TO HAVE A MINIMUM AND A MAXIMUM SENTENCE, WITH THE

22 EXCEPTION OF THAT STATE INTERMEDIATE PUNISHMENT PROGRAM THAT I

23 TOLD YOU ABOUT, WHICH IS A FLAT TWO YEARS.

24 Q    GOING BACK TO THE PRISON POPULATION IN PENNSYLVANIA, I SAW

25 ONE STATISTIC THAT SAID YOU WERE THE THIRD FASTEST PRISON

1  POPULATION RISING STATE BEHIND FLORIDA AND NORTH CAROLINA AMONG

2  THE TEN LARGEST POPULATION STATES.  DO YOU REMEMBER SEEING A

3  STATISTICAL LIKE THAT?

4  **A**   NO, NO.  I KNOW AT ONE TIME WE DID HAVE SOME FAIRLY DRAMATIC

5  GROWTH AT SOME PERIODS ALONG THE WAY.  YOU KNOW, THESE GROWTH

6  PATTERNS DO SEEM TO FLUCTUATE.  SOMETIMES IT LOOKS LIKE YOU ARE

7  GOING TO FLATTEN OUT, AND ALL OF A SUDDEN IT TAKES OFF AGAIN.

8  IT REALLY DEPENDS WHAT TIME PERIOD YOU ARE TALKING ABOUT.  THAT

9  MAY HAVE BEEN ACCURATE DURING THAT PARTICULAR TIME PERIOD.

10  PROBABLY WOULDN'T BE ACCURATE TODAY.  BUT IT WAS PROBABLY

11  ACCURATE AT WHATEVER TIME PERIOD THAT WAS.

12  **Q**   STATISTICS SHOW FROM THE DEPARTMENT OF CORRECTIONS THAT OF

13  5,434 PAROLEES THAT WERE RECOMMITTED IN 2006, 70 PERCENT OF

14  THOSE WERE SENT BACK TO TECHNICAL PAROLE VIOLATIONS.

15  **A**   THAT'S --

16  **Q**   IS THAT ABOUT CORRECT?

17  **A**   BACK BEFORE THEY GOT THE MATRIX RUNNING AND EVERYTHING, YES,

18  THEY WERE, PROBABLY AROUND 70 PERCENT WERE TECHNICAL VIOLATERS.

19  ABOUT 3,800 OR SO OF THOSE PEOPLE IT SEEMS TO ME WERE PROBABLY

20  TECHNICAL VIOLATERS.

21  **Q**   SO YOUR PAROLE MATRIX HAS BEEN IMPLEMENTED FOR ABOUT TWO

22  YEARS?

23  **A**   PAROLE'S PAROLE MATRIX HAS BEEN IN PLACE FOR ABOUT TWO OR

24  THREE YEARS.

25  **Q**   DOES PENNSYLVANIA HAVE THE SAME OR SIMILAR PROBLEMS WITH

1  PRISON GANGS THAT CALIFORNIA HAS?

2  **A**   NO.

3  **Q**   DOES PENNSYLVANIA USE DORMITORY-STYLE HOUSING FOR ITS

4  INMATES?

5  **A**   VERY LITTLE.  WE HAVE DORMITORIES, YES, BUT WE ARE MOSTLY

6  CELLS, AND THE INSTITUTIONS -- THERE'S MAYBE A DORMITORY IN EACH

7  OF OUR FACILITIES, A SMALLER DORMITORY OR TWO, TO HANDLE THE

8  MINIMUM SECURITY INMATES.  BUT SHORT OF THAT, WE -- EVERYTHING

9  ELSE IS CELLS.

10  **Q**   WHAT ARE THE SIZE OF YOUR DORMITORY FOR MINIMUM SECURITY IN

11  THIS CASE?

12  **A**   PROBABLY THE BIGGEST WE HAVE RUNS ABOUT 190, 200, I THINK.

13  **Q**   WE'VE BRIEFLY DISCUSSED PREVIOUSLY THE SB 618 PROGRAM THAT'S

14  BEING IMPLEMENTED DOWN IN SAN DIEGO.  YOU ARE FAMILIAR WITH

15  THAT, SIR?

16  **A**   I AM FAMILIAR WITH THAT, YES.

17  **Q**   DO YOU AGREE THAT IS A -- THAT TYPE OF PROGRAM HAS GREAT

18  POTENTIAL FOR REDUCING RECIDIVISM?

19  **A**   ABSOLUTELY.  I WOULD FULLY SUPPORT A PROGRAM LIKE THAT 618

20  IN SAN DIEGO.  IT'S AN EXCELLENT PROGRAM.  I MEAN, THEY'RE DOING

21  THE RISK AND NEEDS RIGHT UP FRONT IN THE COUNTY.  I'M HOPING --

22  THEY EVEN HAVE THAT AVAILABLE FOR THE JUDGE.  IT'S GREAT IF YOU

23  CAN DO THAT KIND OF ASSESSMENT SO THE JUDGE HAS IT AT

24  SENTENCING.

25          AND THEY'RE WORKING CLOSELY WITH THE CALIFORNIA

1  DEPARTMENT OF CORRECTIONS, GETTING THESE PEOPLE AND DEVELOPING A

2  REENTRY PROGRAM RIGHT UP FRONT, GETTING THEM THROUGH THEIR

3  PROGRAMS IN THE PRISON, GETTING THEM BACK OUT, KEEPING THEM

4  LOCALLY.  THEY DON'T EVEN GO TO THE RECEPTION CENTERS.  I THINK

5  THEY GO AND DO THE RECEPTION CENTER WORK IN COUNTY JAIL.  THEN

6  THEY SEND THEM TO THE PRISON THAT'S A LOCAL PRISON.  THEN THEY

7  KEEP IN CLOSE CONTACT WITH THEM.  THEY ACTUALLY TRANSPORT BACK

8  OUT.  THEY GIVE THEM THESE SERVICES WE TALKED ABOUT.  I'M FULLY

9  SUPPORTIVE OF A PROGRAM LIKE THAT.

10 **Q**   YOU WOULD AGREE THEN THAT THAT IS A WAY TO ENSURE PUBLIC

11 SAFETY WHILE REDUCING THE PRISON POPULATION?

12 **A**   THAT IS CERTAINLY ONE WAY THAT CAN IMPROVE PUBLIC SAFETY AND

13 REDUCE THE PRISON POPULATION, NO QUESTION THAT FITS IN WITH THE

14 KINDS OF THINGS THE EXPERT PANEL TALKED ABOUT, THE KINDS OF

15 THINGS DR. AUSTIN TALKED ABOUT, AND THE KINDS OF THINGS THAT I

16 WOULD SUPPORT.

17 **Q**   ONE OF THE THINGS YOU WOULD NOT SUPPORT IS SIMPLE EARLY

18 RELEASE WITHOUT ANY PROGRAMMING OR WITHOUT ANY INCREASE IN

19 RESOURCES TO PROVIDE FOR THE INDIVIDUALS BEING RELEASED TO THE

20 COMMUNITY CORRECT?

21 **A**   I WOULD SAY THAT'S GENERALLY SOMETHING THAT I DON'T CARE FOR

22 THAT AS MUCH, BECAUSE IT DOESN'T IMPROVE PUBLIC SAFETY.  BUT AS

23 WE TALKED ABOUT, I THINK ADDRESSING MY DIRECT, THE RESEARCH SAYS

24 IT DOESN'T REALLY HURT PUBLIC SAFETY.  IT DOESN'T INCREASE THE

25 CRIME RATE, DOESN'T INCREASE RECIDIVISM.  BUT I REALLY PREFER

1  PROGRAMS THAT ARE DOING THINGS TO HELP IMPROVE THINGS RATHER

2  THAN JUST KEEP THE STATUS QUO.  SO I WOULD BE MORE SUPPORTIVE OF

3  THESE OTHER PROGRAMS THAT WE TALKED ABOUT THAN JUST EARLY OR

4  JUST DIRECT RELEASE OF INMATES, YES.

5  Q   AT YOUR DEPOSITION AT PAGE 70, YOU STATED -- I WANT TO KNOW

6  IF YOU STILL AGREE WITH THIS, SPEAKING ABOUT EARLY RELEASE

7  PROGRAMS, OR SIMPLE EARLY RELEASE TO LOWER THE PRISON

8  POPULATION, AT LINE NINE:

9           "I DON'T AGREE WITH THOSE KIND OF PROGRAMS,

10          YOU KNOW.  I THINK IT SENDS A HORRIBLE MESSAGE

11          TO THE PUBLIC THAT WE CAN'T, YOU KNOW, MEET OUR

12          NEEDS OF WHAT WE'RE DOING."

13  A   RIGHT.  I STILL AGREE WITH THAT.  I THINK IT SENDS A BAD

14  MESSAGE TO THE PUBLIC.  I THINK IT SENDS A BAD MESSAGE TO THE

15  VICTIM.  BUT ON THE OTHER SIDE, IT DOESN'T HURT THE CRIME RATE

16  OR THE RECIDIVISM RATE BECAUSE YOU ARE ONLY LETTING SOMEBODY OUT

17  A FEW MONTHS EARLY.  BUT I WOULD PREFER, AS I SAID ON DIRECT, TO

18  DO THIS WITH SERVICES, IF YOU ARE GOING TO DO IT, OR DO IT IN

19  SOME OTHER DIFFERENT WAY.

20  Q   AS YOU SAID ON DIRECT, AND I THINK YOU SAID ALSO AT YOUR

21  DEPOSITION, IT CERTAINLY DOESN'T ENHANCE PUBLIC SAFETY, CORRECT?

22  A   NO, IT DOESN'T TO DO THAT.  I AGREE WITH THAT.

23  Q   IN FACT, WHILE IT DOES NOT INCREASE THE RECIDIVISM RATES OR

24  THE CRIME RATE, YOU ARE AWARE THAT THERE HAVE BEEN STUDIES THAT

25  INDIVIDUALS WHO ARE RELEASED EARLY WILL COMMIT MORE CRIMES

1   DURING THAT WINDOW PERIOD THAN THEY WOULD HAVE BEEN IN CUSTODY

2   HAD THEY NOT BEEN RELEASED EARLY, CORRECT?

3   **A**    NO, I'M NOT FAMILIAR WITH PROGRAMS -- WITH THINGS THAT SAY

4   THAT.  WHAT I THINK I'M FAMILIAR WITH IS WHAT DR. AUSTIN WAS

5   PROPOSING OR SAYING WAS A POSSIBILITY IN HIS REPORT WHERE, IF

6   YOU LET MORE PEOPLE OUT, YOU INCREASE THE AT-RISK POPULATION

7   EVEN IF THE CRIME RATE DOESN'T GO UP AND THE RECIDIVISM RATES

8   DOESN'T GO UP; YOU MIGHT HAVE A SLIGHT INCREASE IN THE OVERALL

9   NUMBERS CRIME BECAUSE YOU HAVE MORE PEOPLE THAT ARE POTENTIALLY

10  AT RISK.  THAT'S WHAT I WOULD SAY IS A POSSIBILITY, WHICH CAN BE

11  MITIGATED BY PROVIDING SERVICES AND RESOURCES.

12  **Q**    HAVE YOU SEEN AN ARTICLE ENTITLED, "RELEASING INMATES EARLY

13  HAS A COSTLY HUMAN TOLL," DEALING WITH EARLY RELEASE FROM L.A.

14  COUNTY JAIL AND THE ADDITIONAL CRIMES COMMITTED?

15  **A**    NO.

16  **Q**    FOR THE RECORD, THAT'S DEFENDANT'S EXHIBIT 1212.

17           SIR, WERE YOU AWARE OF THE EARLY PAROLE OF JAIL

18  INMATES IN PHILADELPHIA THAT SHOWED SUBSTANTIAL NUMBER OF CRIMES

19  COMMITTED BY THAT POPULATION BACK IN 1986 WHEN THEY WERE EARLY

20  RELEASED?

21  **A**    NO, I'M NOT FAMILIAR WITH THAT STUDY.

22  **Q**    WOULD IT CHANGE YOUR OPINION IF YOU WERE TO KNOW THAT WHEN

23  9,732 INMATES IN PHILADELPHIA WERE RELEASED EARLY DUE TO

24  OVERCROWDING, THAT THEY COMMITTED 79 MURDERS, 90 RAPES, 701

25  BURGLARIES, 959 ROBBERIES AND 2,215 DRUG CRIMES DURING THE TIME

1  THAT THEY SHOULD HAVE BEEN REMAINED IN CUSTODY?  WOULD THAT

2  CHANGE YOUR OPINION?

3  **A**   I WOULD HAVE TO LOOK AT THE STUDY AND SEE WHAT IT

4  SPECIFICALLY SAYS AND LOOK AT THE WHOLE THING AND WHAT THEY WERE

5  COMPARING IT AGAINST TO KNOW WHETHER IT WOULD HAVE ANY IMPACT ON

6  MY OPINION.

7          **MR. MITCHELL:**  THANK YOU.  I HAVE NO FURTHER

8  QUESTIONS.

9          **JUDGE HENDERSON:**  REDIRECT.

10              **REDIRECT EXAMINATION BY MR. SPECTER**

11 **BY MR. SPECTER**

12 **Q**   FIRST QUESTION ABOUT THE PAROLEES WHO SHOT TWO POLICE

13 OFFICERS THAT YOU TESTIFIED ABOUT.  DID THAT HAVE ANYTHING TO DO

14 WITH OVERCROWDING OR EARLY RELEASE OR ANYTHING ASSOCIATED WITH

15 SOMETHING OTHER THAN THE NORMAL PAROLE SYSTEM?

16 **A**   NO.  IN FACT, THE ONE OFFENDER WAS SERVING A SIX TO

17 TWELVE-YEAR SENTENCE AND HAD SERVED TEN OF THE TWELVE YEARS WHEN

18 HE HAD BEEN RELEASED.  SO HE CERTAINLY WASN'T RELEASED EARLY.

19 HE WAS RELEASED FAR OVER HIS MINIMUM SENTENCE, AND I THINK THE

20 CONCERN IN THE COMMUNITY WAS, WAS PAROLE PROPERLY SUPERVISING

21 THIS PERSON WHEN HE WAS RELEASED.  THAT WAS THE CONCERN.

22 **Q**   YOU ARE AWARE FROM YOUR PARTICIPATION IN THE EXPERT PANEL OF

23 THE -- WELL, FROM -- ARE YOU AWARE FROM YOUR PARTICIPATION AS A

24 MEMBER OF THE EXPERT PANEL ABOUT WHETHER OR NOT CALIFORNIA

25 PRISONERS HAVE -- THERE ARE ENOUGH CALIFORNIA PRISONERS WITH

1  SUBSTANCE ABUSE NEEDS TO BENEFIT FROM SUBSTANCE ABUSE

2  PROGRAMMING THAT WOULD HAVE AN EFFECT ON REDUCING THE

3  POPULATION?

4  **A**  ABSOLUTELY.  YOU KNOW, TYPICALLY, WHAT YOU FIND IS CLOSE TO

5  70 PERCENT OF THE INMATES IN A PRISON SYSTEM, AND I DON'T THINK

6  CALIFORNIA IS ALL THAT DIFFERENT, HAVE SUBSTANCE ABUSE NEEDS.

7  AND WE'VE DONE STUDIES ON SOME OF OUR THERAPEUTIC COMMUNITIES,

8  AND ACTUALLY NOT US, BUT WE WORKED IN PARTNERSHIP WITH

9  PROFESSORS WHO HAVE DONE STUDIES FROM UNIVERSITIES AND FOUND

10  THAT OUR SUBSTANCE ABUSE PROGRAMS SUBSTANTIALLY REDUCED THE

11  RECIDIVISM RATES FOR PEOPLE WHO GOT INVOLVED IN THOSE PROGRAMS.

12        SO VERY HIGH PERCENTAGE OF INMATES HAVE A NEED FOR

13  SUBSTANCE ABUSE PROGRAMS.  THOSE PROGRAMS HAVE SHOWN TO BE

14  EFFECTIVE IN REDUCING RECIDIVISM.

15        **MR. SPECTER:**  NO FURTHER QUESTIONS.

16        **MR. MELLO:**  NOTHING FURTHER HERE.

17        **MR. MITCHELL:**  AND NOTHING FURTHER.

18        **JUDGE HENDERSON:**  THANK YOU FOR REAPPEARING,

19  DR. BEARD.  YOU'RE EXCUSED.

20        **THE WITNESS:**  THANK YOU.  THANK YOU.

21        **JUDGE HENDERSON:**  OKAY.  WE'LL TAKE OUR MORNING

22  RECESS FOR 15 MINUTES.  COURT'S ADJOURNED.

23              (RECESS TAKEN.)

24        **JUDGE HENDERSON:**  YOU MAY CALL YOUR NEXT WITNESS,

25  COUNSEL.

1      **MR. GALVAN:** THANK YOU. PLAINTIFFS CALL JAMES

2  GILLIGAN, M.D.

3                    **JAMES GILLIGAN**

4  HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

5  DULY SWORN AND EXAMINED AS FOLLOWS:

6      **THE CLERK:** PLEASE HAVE A SEAT AND STATE AND SPELL

7  YOUR FULL NAME FOR THE RECORD.

8      **THE WITNESS:** MY NAME IS JAMES GILLIGAN, SPELLED

9  G-I-L-L-I-G-A-N.

10     **MR. GALVAN:** YOUR HONOR, DR. GILLIGAN'S

11 QUALIFICATIONS ARE SET FORTH IN HIS REPORT, WHICH IS COLEMAN

12 DOCUMENT NUMBER 3170, WHICH WE OFFER INTO EVIDENCE AT THIS TIME.

13 WE ALSO OFFER HIS REBUTTAL REPORT, WHICH IS COLEMAN DOCUMENT

14 3172.

15     IF I MAY QUICKLY LAY THE FOUNDATION FOR HIS

16 EXPERTISE?

17     DR. GILLIGAN IS A BOARD CERTIFIED PSYCHIATRIST AND

18 PROFESSOR AT NEW YORK UNIVERSITY. HE HAS 40 YEARS OF EXPERIENCE

19 IN MENTAL HEALTH TREATMENT IN PRISON, JAILS, MENTAL HOSPITALS,

20 CIVIL MENTAL HOSPITALS, COURT CLINICS, AND COMMUNITY MENTAL

21 HEALTH, AND HIS EXPERIENCE IN ESTABLISHING AND RUNNING THE

22 MASSACHUSETTS PRISON MENTAL HEALTH SERVICES UNDER FEDERAL COURT

23 SUPERVISION AND SERVING AS MEDICAL DIRECTOR OF THE MENTAL HEALTH

24 IN MASSACHUSETTS. HIS SCIENTIFIC RESEARCH FOCUSES ON THE CAUSES

25 AND PREVENTION OF VIOLENCE, INCLUDING IN CALIFORNIA AND

1  INTERNATIONALLY.  HE HAS BEEN QUALIFIED AS AN EXPERT IN NUMEROUS

2  PROCEEDINGS REGARDING CORRECTIONAL MENTAL HEALTH AND FORENSIC

3  PSYCHIATRY.

4           AT THIS TIME, THE PLAINTIFFS ASK THE COURT FIND THAT

5  DR. GILLIGAN IS AN EXPERT IN PRISON PSYCHIATRY AND THE PROVISION

6  OF MENTAL HEALTHCARE IN PRISONS, THE CAUSES AND PREVENTION OF

7  VIOLENCE AND THE RELATIONSHIP BETWEEN MENTAL ILLNESS AND

8  VIOLENCE.

9           **JUDGE HENDERSON:**  WE FIND HE IS SO QUALIFIED.

10              **DIRECT EXAMINATION BY MR. GALVAN**

11  **BY MR. GALVAN**

12  **Q**   DR. GILLIGAN, YOU WERE ASKED TO FORM AN OPINION ABOUT THE

13  IMPACT ON PUBLIC SAFETY OF A PRISON POPULATION REDUCTION THAT

14  COULD INCLUDE PRISONERS WITH MENTAL ILLNESS.  WHAT DID YOU

15  CONCLUDE?

16  **A**   CONCLUDED THAT INCLUDING MENTALLY ILL PRISONERS IN THAT

17  GROUP WOULD POSE NO INCREASED RISK TO PUBLIC SAFETY.  THIS IS

18  BASED ON RESEARCH DONE THROUGHOUT THE UNITED STATES AND OTHER

19  COUNTRIES, AS WELL AS SPECIFICALLY IN CALIFORNIA.  THERE ARE

20  MANY STUDIES ABOUT RECIDIVISM AMONG MENTALLY ILL AND

21  NON-MENTALLY ILL PAROLEES, AND THE CONSENSUS FROM THESE STUDIES

22  CONSISTENTLY IS THAT THE MENTALLY ILL ARE EITHER NO MORE LIKELY

23  TO COMMIT VIOLENT CRIMES AFTER DISCHARGE, OR ARE SIGNIFICANTLY

24  LESS LIKELY TO COMMIT VIOLENT ACTS WHEN THEY RETURN TO THE

25  COMMUNITY, AS COMPARED WITH NON-MENTALLY ILL PAROLEES.

1  Q   WHEN YOU USE THE WORD "RECIDIVISM," HOW DO YOU USE THAT

2  WORD?  WHAT DO YOU MEAN BY THAT?

3  A   "RECIDIVISM" IS A TERM THAT COULD REFER TO A HUGE VARIETY OF

4  DIFFERENT OUTCOMES.  I THINK A DISTINCTION NEEDS TO BE MADE

5  BETWEEN A REVOCATION OF PAROLE FOR, QUOTE, TECHNICAL VIOLATIONS

6  OF PAROLE CONDITIONS, SUCH AS A MENTALLY ILL PAROLEE MISSING AN

7  APPOINTMENT WITH A PSYCHIATRIST, AS COMPARED WITH REVOCATION OF

8  PAROLE BECAUSE THE PAROLEE HAS COMMITTED A NEW CRIME, EITHER A

9  VIOLENT CRIME OR PROPERTY CRIME OR WHATEVER.  SO IT'S A TERM

10 THAT'S AMBIGUOUS AND IS OFTEN, I THINK, MISUSED AS IF IT ALWAYS

11 REFERRED TO THE SAME THING.

12        ONE DISTINCTION BETWEEN THE MENTALLY ILL PAROLEES AND

13 THE NON-MENTALLY ILL IN CALIFORNIA SPECIFICALLY, IS THAT THE

14 MENTALLY ILL PAROLEES ARE SIGNIFICANTLY -- THAT'S STATISTICALLY

15 SIGNIFICANTLY LESS LIKELY TO RETURN TO PRISON BECAUSE OF A NEW

16 OFFENSE, THAT IS OF COMMITTING AN ACT THAT COULD BE REGARDED AS

17 A CRIME OR PROSECUTED AS A CRIME, AS COMPARED THE NON-MENTALLY

18 ILL PAROLEES.  WHEN THEY DO COMMIT A CRIME, THEY ARE NO MORE

19 LIKELY THAN THE NON-MENTALLY ILL TO COMMIT A VIOLENT CRIME.

20 Q   IN THE MATERIAL YOU LOOKED AT REGARDING CALIFORNIA MENTALLY

21 ILL PAROLEES, WERE THERE PARTICULAR TYPES OF REASONS THEY TENDED

22 TO RETURN TO PRISON?

23 A   YES.  THE MENTALLY ILL PAROLEES WERE SIGNIFICANTLY MORE

24 LIKELY THAN THOSE NON-MENTALLY ILL TO BE RETURNED FOR PURELY

25 TECHNICAL VIOLATIONS, RATHER THAN BEHAVIOR THAT, UNDER OTHER

1  CONDITIONS, WOULD BE IN ANY WAY CONSIDERED CRIMINAL.

2  **Q**    ARE THERE ANY EXAMPLES OF TECHNICAL VIOLATIONS WHICH ARE

3  PARTICULARLY SUSCEPTIBLE?

4  **A**    I'M SORRY.  COULD YOU REPEAT?

5  **Q**    ARE THERE ANY EXAMPLES OF TECHNICAL VIOLATIONS TO WHICH

6  PAROLEES WITH MENTAL ILLNESS ARE PARTICULARLY SUSCEPTIBLE OR

7  MORE LIKELY TO COMMIT?

8  **A**    YES.  WHEN I MENTIONED JUST SIMPLY MISSING AN APPOINTMENT OR

9  IN SOME OTHER WAY NOT COMPLYING WITH TREATMENT, WHICH IS -- BY

10  THE WAY, THAT'S A CONDITION WHICH HAS BEEN REPEATEDLY DESCRIBED

11  BY OFFICIALS WITHIN THE PAROLE DEPARTMENT IN CALIFORNIA AS VERY

12  FREQUENTLY A PRODUCT OF THE MENTAL ILLNESS ITSELF, THAT IS, THE

13  MENTALLY ILL PAROLEE IS TOO DISORGANIZED OR TOO PARANOID,

14  WHATEVER IT MIGHT BE, TO PARTICIPATE IN THE TREATMENT, YOU KNOW,

15  EXACTLY AS REQUIRED.

16  **Q**    WERE YOU ALSO ASKED TO LOOK AT THE LINKS BETWEEN MENTAL

17  ILLNESS AND VALID PREDICTERS OF FUTURE VIOLENCE?

18  **A**    YES.  AS I SAID, WITHIN THE PAROLE POPULATION, THE MENTALLY

19  ILL ARE NO MORE LIKELY THAN THE NON-MENTALLY ILL TO COMMIT

20  FUTURE VIOLENCE.  THERE'S ACTUALLY SOME EVIDENCE THAT THE MORE

21  SEVERELY MENTALLY ILL PAROLEES ARE ACTUALLY LESS LIKELY THAN THE

22  NON-MENTALLY ILL, THEY'RE JUST TOO DISORGANIZED OR SOCIALLY

23  WITHDRAWN.

24            THE MORE IMPORTANT POINT, THOUGH, I THINK IN RESPONSE

25  TO YOUR QUESTION, IS THAT THE PREDICTERS OF FUTURE VIOLENCE,

1    THAT IS, THE RISK FACTORS THAT PREDICT VIOLENCE IN THE FUTURE,

2    ARE THE SAME BOTH FOR THE MENTALLY ILL AND NON-MENTALLY ILL

3    PAROLEES.

4              FOR EXAMPLE, FUTURE RISK FACTORS THAT PREDICT

5    VIOLENCE ARE AGE, SEX, SUBSTANCE ABUSE, ACCESS TO WEAPONS, PRIOR

6    CRIMINAL HISTORY, CERTAIN KINDS OF PERSONALITY DISORDERS, WHICH

7    ARE NOT AXIS I MENTAL DISORDERS, AND I WOULD SAY THE GENERAL

8    CATEGORY OF SOCIOECONOMIC HARDSHIP, POVERTY, HOMELESSNESS,

9    THINGS OF THAT SORT.

10   **Q**    YOU WERE ALSO ASKED FOR AN OPINION ABOUT HOW CALIFORNIA

11   COULD IMPROVE UPON THE STATUS QUO REGARDING PUBLIC SAFETY AND

12   THE CURRENT FLOW OF MENTALLY ILL PAROLEES FROM THE PRISON

13   SYSTEM.  WHAT DID YOU CONCLUDE WITH REGARD TO THAT?

14   **A**    THAT ONE OF THE MOST IMPORTANT THINGS THE STATE OF

15   CALIFORNIA COULD DO WOULD BE TO REDUCE THE CHURNING OF PAROLEES

16   AND DISPROPORTIONATELY, THAT MEANS MENTALLY ILL ONES, FROM THE

17   COMMUNITY AND INTO THE PRISON AND BACK AGAIN, SORT OF SHORT

18   PERIODS IN EACH PLACE, WHICH DISRUPTS EVERY KIND OF

19   REINTEGRATION INTO THE THERAPEUTIC OR REHABILITATIVE ACTIVITY

20   AND SO ON.

21              THE MAIN THINGS I'D EMPHASIZE, THOUGH, IN TERMS OF

22   PRACTICES THAT WOULD IMPROVE PUBLIC SAFETY WOULD BE TO MAKE SURE

23   THAT EVERY PAROLEE LEAVING THE PRISON, THERE WAS A SIGNIFICANT

24   PRERELEASE PLANNING, STARTING, HOPEFULLY, MONTHS BEFORE THEY

25   LEAVE; SECONDLY, ASSURING THEY HAVE ACCESS TO CARE WHEN THEY

1    RETURN TO THE COMMUNITY; THIRDLY, MAKING SURE THEY HAD ACCESS TO

2    TREATMENT FOR DUAL DIAGNOSIS PROBLEMS, THAT IS, PEOPLE WHO ARE

3    BOTH MENTALLY ILL AND HAVE SUBSTANCE ABUSE PROBLEMS, TO MAKE

4    SURE THEY CAN ACTUALLY GET THAT TREATMENT, AND, FOURTHLY, TO

5    INCREASE, I'D SAY, COORDINATION WITH COMMUNITY MENTAL HEALTH

6    PROVIDERS TO GET THEM INVOLVED IN THE TREATMENT PROCESS WITH A

7    RETURNED PAROLEE.

8    Q    YOU REFERRED EARLIER TO STATEMENTS OF CALIFORNIA OFFICIALS

9    REGARDING THE CHURNING PHENOMENON.  WERE THERE ANY PARTICULAR

10   STATEMENTS FROM HIGH LEVEL OFFICIALS?

11   A    ABSOLUTELY.  I COULD MENTION THE -- WELL, MR. KERNAN'S

12   COMMENTS THAT WE HAVE ON VIDEO.

13   Q    WHAT WERE --

14   A    AND MR. TILTON.

15   Q    WHEN YOU MENTION MR. TILTON'S COMMENTS, WE CAN PLAY THAT FOR

16   THE COURT.  IF YOU LOOK -- OR YOU CAN TELL ME, ALSO.  WHAT IS

17   THE SIGNIFICANCE, BEFORE WE DO THAT, OF WHAT YOU SAW FROM

18   MR. TILTON?

19   A    WELL, THE SIGNIFICANCE IS THAT THE MENTALLY ILL WHO ARE IN

20   PRISON ARE, IN MANY CASES, THERE SIMPLY BECAUSE ACCESS TO MENTAL

21   HEALTH HAS NOT BEEN MADE -- MENTAL HEALTHCARE HAS NOT BEEN MADE

22   AVAILABLE IN THE COMMUNITY.  IN OTHER WORDS, THE PRISONS IN

23   CALIFORNIA, AS IN MANY OTHER STATES, HAVE A SIGNIFICANT NUMBER

24   OF PRISONERS WHO ARE IN PRISON PRIMARILY BECAUSE THEY ARE

25   MENTALLY ILL AND THEY CAN'T GET TREATMENT ELSEWHERE.  SO THE

1  PRISONS ARE BEING TREATED AS THE DE FACTO MENTAL HOSPITAL

2  SYSTEM.

3  **Q**   I'D LIKE TO SHOW YOU THAT STATEMENT AND ASK YOU IF IT'S THE

4  ONE YOU WERE REFERRING TO.  COULD WE LOOK AT, ROLL, PLAINTIFF'S

5  EXHIBIT 361, 361?  PLAINTIFF'S EXHIBIT 361?  IT WILL NEED SOUND.

6                    (VIDEO PLAYED.)

7  **BY MR. GALVAN**

8  **Q**   IS THAT THE VIDEO YOU WERE REFERRING TO?

9  **A**   YES.

10 **Q**   YOU MENTIONED A STATEMENT BY SCOTT KERNAN, MR. KERNAN.  I'D

11 LIKE TO SHOW YOU THAT AND ASK YOU IF THAT'S THE ONE YOU ARE

12 REFERRING TO.  THAT IS P 360.

13              WE CAN COME BACK TO THAT.  I'M GOING TO MOVE FORWARD

14 TO ONE OF THE OTHER THINGS THAT YOU WERE ASKED TO OPINE ABOUT.

15              YOU WERE ALSO ASKED TO WRITE A -- I'M SORRY -- YOU

16 WERE ALSO ASKED TO WRITE A SECOND REPORT, A REBUTTAL REPORT,

17 REGARDING THE IMPACTS OF A POPULATION REDUCTION ON COMMUNITY

18 MENTAL HEALTH SERVICES IN CALIFORNIA.  HOW DID YOU GO ABOUT

19 FORMING YOUR OPINIONS IN THAT AREA?

20 **A**   WELL, FIRST OF ALL, I REVIEWED THE ACTUAL CLASSIFICATION OF

21 PRISONERS AS TO THEIR MENTAL HEALTH STATUS AND THE NUMBERS

22 INVOLVED, AND IT APPEARED TO ME THAT IT WOULD BE VERY EASY TO

23 EXAGGERATE THE IMPACT OF DISCHARGING MENTALLY ILL PRISONERS ON

24 THE COUNTY AND MENTAL HEALTH SYSTEM IF THE ONE DOESN'T ACTUALLY

25 LOOK AT THE RELATIVELY SMALL NUMBERS INVOLVED.

1    COULD WE LOOK AT FIGURE ONE, WHICH SHOWS THE NUMBER

2  OF PAROLEES DISCHARGED IN RECENT YEAR, 2006, I BELIEVE?

3                (DOCUMENT DISPLAYED.)

4        **THE WITNESS:**  WHAT THAT SHOWS IS THAT IN 2006 THERE

5  WERE ROUGHLY 135,000 RELEASES TO PAROLE, OF WHICH ABOUT

6  20 PERCENT, OR ROUGHLY 27,000, WERE OF PEOPLE WHO HAD BEEN

7  CLASSIFIED IN NEED OF MENTAL HEALTH SERVICES WITHIN THE CDCR.

8  OF THOSE, THE VAST MAJORITY, ALMOST 24,000, WERE AT THE LOWEST

9  LEVEL OF MENTAL ILLNESS OF A 3CMS GROUP, WHICH IS CLASSIFIED AS

10  REALLY NOT NEEDING ANY INPATIENT TREATMENT, OR EVEN PARTICULARLY

11  INTENSIVE OUTPATIENT TREATMENT.  THESE ARE PEOPLE THAT COULD

12  EASILY BE HANDLED IN A COMMUNITY MENTAL HEALTH SYSTEM WITH

13  APPOINTMENTS, YOU KNOW, FROM EVERY ONE TO THREE MONTHS, MAYBE

14  ONE APPOINTMENT.  MANY OF THEM WON'T EVEN NEED CONTINUING

15  TREATMENT.

16        THE NEXT MORE SEVERELY DISTURBED ARE THE EOP, OR

17  ENHANCED OUTPATIENT POPULATION, WHICH IS ABOUT 2,400 OF THIS

18  GROUP.  BUT THESE ARE ALSO CLASSIFIED AS PEOPLE WHO DO NOT NEED

19  INPATIENT TREATMENT.  THEY DON'T NEED MENTAL HOSPITALIZATION.

20  THEY SPECIFICALLY ARE PEOPLE WHO ARE MANAGEABLE ON AN OUTPATIENT

21  BASIS.  SO THESE ARE PEOPLE THAT MIGHT BE PATIENTS IN A

22  COMMUNITY MENTAL HEALTH CLINIC.

23        THERE'S A MUCH SMALLER NUMBER OF THAT, A LITTLE OVER

24  600, WHO NEED EITHER A CRISIS BED OR A DMH HOSPITALIZATION.

25  THAT'S OF THE ENTIRE 135,000 WHO WERE DISCHARGED UNDER THE

1    STATUS QUO IN 2006.

2              IF WE LOOKED AT A SPECIFIC -- IF WE COULD LOOK AT

3    FIGURE TWO, WE COULD SEE WHAT THIS WOULD AMOUNT TO IF WE WERE

4    TALKING ABOUT, SAY A RELEASE OF 30,000 PEOPLE INTO PAROLE TO

5    JUST TO DECREASE THE PRISON POPULATION BY THAT MUCH.

6              WHAT YOU CAN SEE IS THAT THE NUMBER OF PEOPLE WHO

7    WOULD NEED INPATIENT TREATMENT IN THIS GROUP, THE CRISIS BED AND

8    DMH, AT THE TOP WOULD BE ABOUT 143 PEOPLE, AND ONLY A LITTLE

9    OVER 500 WOULD NEED EVEN REGULAR OUTPATIENT TREATMENT OF THE EOP

10   GROUP.

11             NOW, I WOULD MENTION THAT THE COUNTY MENTAL HEALTH

12   SYSTEM IN CALIFORNIA AS IT IS NOW OPERATING HAS APPROXIMATELY

13   658,000 PATIENTS.  THAT'S 658,000.  OF THOSE OVER 43,000 NEED

14   24-HOUR-A-DAY CARE.  SO WHAT WE'RE TALKING ABOUT IS ADDING TO

15   THAT POPULATION OF 24,000 MAYBE 140 WHO WOULD NEED OUTPATIENT

16   CARE, AND OF THE 658,000, WE'RE TALKING ABOUT, MAYBE 6,000 THAT

17   WOULD BE, YOU KNOW, AN INCREASED POPULATION, AGAIN, THE VAST

18   MAJORITY OF WHOM WOULD NEED ONLY MINIMAL MENTAL HEALTH CARE.

19             SO I EMPHASIZE THAT BECAUSE I THINK IT'S IMPORTANT

20   NOT TO EXAGGERATE THE IMPACT OR THE STRESS THE DIFFICULTY THAT

21   THE COUNTY AND STATE MENTAL HEALTH SYSTEMS WOULD HAVE IF THESE

22   MENTALLY ILL PAROLEES WERE ACTUALLY BEING TAKEN CARE OF BY THE

23   MENTAL HEALTH SYSTEM RATHER THAN BEING PLACED IN PRISON, WHICH

24   ARE, OF COURSE, THE WORST POSSIBLE LOCATION FOR SOMEONE WHO'S

25   MENTALLY ILL.

1  Q    IN DOING IN THE ANALYSIS, DID YOU CONDUCT A COUNTY-BY-COUNTY

2  REVIEW?

3  A    NO, I LOOKED JUST AT THE STATE -- STATE FIGURES AS A WHOLE.

4  Q    ARE YOU SAYING THAT, IN YOUR OPINION, THE CALIFORNIA

5  COMMUNITY MENTAL HEALTH SYSTEM HAS ALL THE FUNDING THAT IT

6  NEEDS?

7  A    NO.  I MEAN, I DON'T PRETEND TO BE AN EXPERT ON THAT

8  SUBJECT, BUT FROM WHAT I HAVE BEEN TOLD, WHAT I'VE READ, I

9  CONTINUALLY HEAR THAT THE COUNTY MENTAL HEALTH SYSTEM IS

10  UNDERFUNDED AND UNDERSTAFFED, ACCORDING AT LEAST TO THE JUDGMENT

11  OF THE PEOPLE WHO WORK IN THAT SYSTEM.

12  Q    AND IN LOOKING AT THE STATEMENTS IN THE DEFENSE EXPERT

13  REPORTS ON COMMUNITY MENTAL HEALTH, DID YOU FORM ANY OPINIONS

14  ABOUT THEIR DISCUSSION OF THE RESOURCE PROBLEMS?

15  A    THE REPRESENTATIVES FROM THE COUNTY MENTAL HEALTH SYSTEM.

16  Q    I'M THINKING PARTICULARLY OF THE DEFENSE EXPERTS.

17  A    YES.

18  Q    MS. BATAILLE AND THE COUNTY EXPERTS?

19  A    THEY WERE MAKING THE POINT REPEATEDLY THAT THEY FELT THE

20  COUNTIES' MENTAL HEALTH SYSTEM, SINCE IT IS UNDERFUNDED, COULD

21  NOT AFFORD TO TREAT MORE PATIENTS.  WHAT I WOULD -- WHAT I THINK

22  IS WORTH NOTICING, THOUGH, IS THAT ACTUALLY WHAT THE STATE OF

23  CALIFORNIA IS DOING NOW WITH THIS POPULATION OF MENTALLY ILL

24  PAROLEES IS VASTLY MORE EXPENSIVE THAN TAKING CARE OF THEM

25  WITHIN THE MENTAL HEALTH SYSTEM WOULD BE.

1    FOR EXAMPLE, A CRUDE ESTIMATE OF THE COST TO THE

2  STATE OF EACH INMATE IN A PRISON, THE COST OF HAVING THAT PERSON

3  IN PRISON IS AT LEAST $43,000 A YEAR.  NOW MY UNDERSTANDING IS

4  THAT INPATIENT HOSPITAL IN A MENTAL HOSPITAL, THE HIGHEST LEVEL,

5  THE MOST INTENSIVE LEVEL OF INPATIENT CARE IN THIS STATE IS MORE

6  ON THE ORDER OF $30,000.  I MEAN, IN OTHER WORDS, IT'S NOT JUST

7  THAT TREATING THE MENTALLY ILL IN PRISONS IS NOT JUST -- IT'S

8  INEFFECTIVE AND INAPPROPRIATE AS A MENTAL HEALTH SETTING.

9  PRISONS ARE NOT MENTAL HEALTH HOSPITALS.  THESE ARE THE WORST

10 POSSIBLE ENVIRONMENTS FOR THE MENTALLY ILL.

11   IT'S ALSO TRUE IT COSTS MORE MONEY TO HAVE THEM

12 THERE.  THE STATE IS SPENDING MUCH MORE MONEY TO HAVE PEOPLE IN

13 A MUCH WORSE ENVIRONMENT.  AS FAR AS THE EXPENSE PART OF IT

14 GOES, IT SEEMS TO ME THE QUESTION IS NOT WHETHER THE STATE CAN

15 AFFORD TO TREAT THE MENTALLY ILL WITHIN THE MENTAL HEALTH

16 SYSTEM, RATHER THAN THE PRISONS, IT'S CAN THE STATE AFFORD NOT

17 TO DO THAT.  I MEAN, THIS IS A HUGE DRAIN ON PUBLIC RESOURCES

18 WHICH IS TOTALLY COUNTERPRODUCTIVE.

19 **Q**   WHAT DID YOU FIND IN THE DEFENSE REPORTS TO TAKE ACCOUNT OF

20 THE STATUS QUO IN YOUR FIGURE ONE, THAT THESE COUNTIES ARE NOW

21 RECEIVING THIS FLOW OF 26-, 27,000 MENTALLY ILL PAROLEES EACH

22 YEAR?

23 **A**   THESE ARE PEOPLE WHO WIND UP IN THE COMMUNITY, I MEAN,

24 PRESUMABLY, THE COUNTY MENTAL HEALTH SYSTEMS ARE ALREADY HAVING

25 TO DEAL WITH.

1          BUT LET ME QUALIFY THAT.  THAT'S THE WAY IT SHOULD

2   BE.

3          WHAT IS HAPPENING IS THAT THE MENTALLY ILL PAROLEES

4   ARE BEING DENIED ACCESS, AS I UNDERSTAND IT, ARE BEING DENIED

5   ACCESS TO MENTAL HEALTH TREATMENT IN THE COUNTY SYSTEM PRECISELY

6   BECAUSE THEY'RE PAROLEES.

7          SO THE PAROLE DEPARTMENT, OF COURSE, HAS PAROLE

8   OUTPATIENT CLINICS, BUT I'VE SEEN MANY REPORTS FROM WITHIN THE

9   PAROLE DEPARTMENT ITSELF STATING THAT PAROLE OFFICERS CANNOT GET

10  THEIR PAROLEES PLACED FOR INPATIENT TREATMENT IN THE MENTAL

11  HEALTH SYSTEM AND, THEREFORE, HAVE TO RETURN THEM TO PRISON FOR

12  TREATMENT, FOR MENTAL HEALTH TREATMENT; IN OTHER WORDS, THEY ARE

13  FORCED INTO A POSITION OF USING THE PRISONS AS IF THEY WERE

14  MENTAL HOSPITALS, WHICH I CAN'T REPEAT TOO OFTEN THEY ARE NOT.

15          **MR. GALVAN:**  THANK YOU.  NO FURTHER QUESTIONS UNTIL

16  REDIRECT.

17          **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?  I ASSUME YOU

18  HAVE NO QUESTIONS OF THIS WITNESS?

19          **MS. LEONARD:**  NO, YOUR HONOR.

20          **JUDGE HENDERSON:**  OKAY.  CROSS?

21          **MR. LEWIS:**  GOOD MORNING, YOUR HONORS.  KYLE LEWIS

22  FOR THE STATE DEFENDANTS.

23              **CROSS-EXAMINATION BY MR. LEWIS**

24  **BY MR. LEWIS**

25  **Q**   GOOD MORNING, DR. GILLIGAN.

1  **A**    GOOD MORNING.

2  **Q**    REGARDING YOUR QUALIFICATIONS, YOU WERE LAST EMPLOYED AS --

3  IN TERMS OF IN WORKING IN A CORRECTIONAL SYSTEM, YOU WERE LAST

4  EMPLOYED IN 1992 AS THE MEDICAL DIRECTOR OF RIDGEWATER STATE

5  HOSPITAL IN MASSACHUSETTS; IS THAT CORRECT?

6  **A**    THAT'S THE LAST TIME I WORKED IN AN ADMINISTRATIVE POSITION.

7  I HAVE, HOWEVER, WORKED AS A RESEARCHER, AS A CONSULTANT, AS A

8  SUPERVISOR, TEACHER, YOU KNOW, MANY DIFFERENT ROLES IN PRISON

9  SYSTEMS SINCE THEN.

10 **Q**    PARDON ME.  HAVE YOU EVER SINCE 1992 BEEN EMPLOYED BY A

11 STATE AGENCY OR A STATE CORRECTIONS DEPARTMENT TO WORK IN A

12 PRISON HOSPITAL OR IN AN ADMINISTRATIVE SETTING FOR PRISON

13 MENTAL HEALTH CARE?

14 **A**    NO, NO.

15 **Q**    HAVE YOU EVER TOURED A CDCR FACILITY?

16 **A**    NO, I HAVE NOT TOURED THEM.

17 **Q**    AND HAVE YOU EVER BEEN IN ANY OF THE STATE MENTAL HOSPITALS

18 IN THE STATE OF CALIFORNIA OPERATED BY THE DEPARTMENT OF MENTAL

19 HEALTH?

20 **A**    NO, I HAVE NOT.

21 **Q**    AT YOUR DEPOSITION IT WAS YOUR TESTIMONY THAT YOU UNDERSTOOD

22 PLAINTIFFS WERE PROPOSING TO HAVE THE COURT ORDER AN IMMEDIATE

23 RELEASE OF 15,000 OFFENDERS, CORRECT?

24         **MR. GALVAN:**  OBJECTION.  IT MISSTATES THE TESTIMONY.

25 THE DEPOSITION IS 300 PAGES LONG.

1          **MR. LEWIS:**  VERY WELL.  COULD WE PLEASE PULL UP PAGE

2     42?

3     **BY MR. LEWIS**

4     **Q**   DOCTOR, IF YOU COULD LOOK AT YOUR SCENE TO YOUR RIGHT?

5          **JUDGE KARLTON:**  THERE'S NOTHING GOING ON AT THE

6     MOMENT, BUT SOMEDAY THERE WILL BE.

7     **BY MR. LEWIS**

8     **Q**   IF YOU COULD -- I'LL READ THAT LINE.

9               "I THINK WHAT I'M TRYING TO GET AT IS, DID

10              ANYONE EVER INFORM YOU THAT PLAINTIFFS HAVE

11              INDICATED IN INTERROGATORY RESPONSES THE

12              PROPOSAL TO HAVE THE COURT ORDER AN IMMEDIATE

13              RELEASE OF 15,000 OFFENDERS?

14              "ANSWER: WELL, I'VE CERTAINLY HEARD THAT

15              FIGURE."

16          DO YOU RECALL BEING TOLD ABOUT A 15,000 PERSON

17     RELEASE POSSIBLY?

18          **JUDGE KARLTON:**  IMMEDIATE RELEASE.

19          **THE WITNESS:**  PARDON ME?

20          **JUDGE KARLTON:**  IMMEDIATE RELEASE.  THE QUESTION IS

21     WHETHER YOU RECALL NOW.

22          **THE WITNESS:**  YEAH, I DON'T RECALL THE DISTINCTION,

23     FOR EXAMPLE, BETWEEN IMMEDIATE OR SPREAD OVER A CERTAIN PERIOD

24     OF TIME.

25          **MR. LEWIS:**  VERY WELL.

1          **THE WITNESS:**  BUT I'VE HEARD FIGURES OF 15,000.  I

2    DON'T REMEMBER EXACTLY WHERE, BUT MY UNDERSTANDING IS WE'RE

3    TALKING ABOUT SOMETHING ON THAT ORDER.

4    **BY MR. LEWIS**

5    **Q**   AND DO YOU REMEMBER OR DO YOU RECALL TESTIFYING THAT THERE

6    WOULD BE A PROPORTIONAL NUMBER OF COLEMAN CLASS MEMBERS WITHIN

7    THAT 15,000 OFFENDER RELEASE?

8    **A**   YEAH, I MEAN, THAT'S BEEN MY ASSUMPTION.  THAT'S BEEN MY

9    UNDERSTANDING.

10   **Q**   ARE YOU AWARE THAT PLAINTIFFS ARE NOW SEEKING A PRISONER

11   RELEASE ORDER TO ENCOMPASS A RELEASE OF OVER 50,000 INMATES?

12          **MR. GALVAN:**  OBJECTION.  MISSTATES THE EVIDENCE.

13          **MR. LEWIS:**  IT'S STATED IN THEIR OPENING TRIAL BRIEF,

14   YOUR HONOR.

15          **JUDGE KARLTON:**  OVER A PERIOD OF TIME.

16          **MR. LEWIS:**  OVER A PERIOD OF TIME, BUT IT IS STILL

17   50,000, YOUR HONOR.

18          **MR. GALVAN:**  FURTHER, IT MISCHARACTERIZES WHAT WE'RE

19   SEEKING.  IT'S NOT A RELEASE.  IT'S A POPULATION REDUCTION,

20   WHICH COULD BE ACHIEVED MANY DIFFERENT WAYS SHORT OF RELEASE.

21          **JUDGE HENDERSON:**  AND THE QUESTION IS DOES

22   DR. GILLIGAN RECALL THAT?

23          **MR. LEWIS:**  IS HE AWARE THAT THE PLAINTIFFS ARE NOW

24   SEEKING OR HAVE ASKED FOR A RELEASE OR POPULATION REDUCTION THAT

25   WILL RESULT IN THE RELEASE OR REDUCTION OF 50,000 PEOPLE AS

1  OPPOSED TO 15,000.

2          **JUDGE HENDERSON:**  I AM GOING TO ALLOW IT.  ARE YOU

3  AWARE OF THAT?

4  **BY MR. LEWIS**

5  **Q**  ARE YOU AWARE OF THAT, DOCTOR?

6  **A**  I HAVEN'T HEARD THAT PARTICULAR FIGURE, BUT I WILL TAKE IT

7  INTO ACCOUNT AS WE TALK.

8  **Q**  SO IF THE PLAINTIFFS WERE SEEKING A RELEASE OF 50,000, WOULD

9  SUCH RELEASE ALSO INCLUDE A PROPORTIONAL NUMBER OF COLEMAN CLASS

10  MEMBERS?

11  **A**  THAT'S NOT FOR ME TO DECIDE.  THAT'S FOR OTHER PEOPLE TO

12  DECIDE.  WHAT I WAS TRYING TO SHOW WITH THE FIGURES I SHOWED WAS

13  SIMPLY WHAT THE EFFECT WOULD BE IF IT WERE PROPORTIONAL.

14  **Q**  VERY WELL.  THEREFORE, A PROPOSED RELEASE ORDER OF OVER

15  50,000 OFFENDERS WOULD POTENTIALLY PLACE MORE MENTALLY ILL

16  INMATES IN CALIFORNIA COMMUNITIES THAN YOU ACCOUNTED FOR IN

17  EITHER YOUR AUGUST 15TH OR AUGUST 27TH, 2008 REPORTS; ISN'T THAT

18  CORRECT?

19  **A**  IF YOU ARE TALKING ABOUT 50,000, THAT WOULD BE MORE THAN I

20  HAD TALKED ABOUT.  IT STILL COULD BE DISCUSSED.

21  **Q**  THAT WOULD BE MORE THAN THE 140 YOU WERE TALKING ABOUT IN

22  YOUR DIRECT TESTIMONY A FEW MINUTES AGO?

23  **A**  SURE.  THE 140 WAS BASED ON 30,000, SO MAYBE THAT WOULD

24  RAISE IT TO, OH, MAYBE 240.

25  **Q**  THANK YOU.

1        YOU ACKNOWLEDGE THAT THERE ARE SOME OFFENDERS WITHIN

2  CALIFORNIA -- WITHIN THE -- I'M SORRY -- THE CALIFORNIA PRISON

3  SYSTEM WHO HAVE MENTAL ILLNESS AND DO POSE A RISK OF DANGER TO

4  THEMSELVES AND OTHERS IN THE COMMUNITY BASED ON THEIR CONDUCT,

5  CORRECT?

6  **A**  I WOULD ASSUME THAT WOULD BE THE CASE, SURE.

7  **Q**   IF THESE MENTALLY ILL OFFENDERS DO POSE THAT RISK, YOU

8  RECOMMEND THEY DO NOT BE RELEASED INTO THE COMMUNITY, CORRECT?

9  **A**   IT DEPENDS WHAT YOU MEAN BY "THE COMMUNITY."  IF WE'RE

10 REGARDING THE MENTAL HEALTH SYSTEM AS PART OF THE COMMUNITY, THE

11 MENTAL HEALTH SYSTEM AS IT EXISTS OUTSIDE OF PRISON, THEN I

12 WOULD EXPECT THAT MANY OF THESE INDIVIDUALS COULD BE PERFECTLY

13 APPROPRIATELY AND SAFELY MANAGED, INDEED, IN, SAY, THE MENTAL

14 HEALTH SYSTEM.

15 **Q**   SO IF YOU KNEW OF INMATES THAT POSED A RISK OF DANGER TO

16 THEMSELVES OR OTHERS IN THE COMMUNITY, YOU WOULD RECOMMEND

17 THEY'D BE RELEASED INTO, SAY, COMMUNITY MENTAL HEALTH CARE?

18 **A**   WELL, YES, IN THE SENSE THAT I WOULD -- WHEN I TALKED ABOUT

19 PRERELEASE PLANNING, THAT'S PART OF WHAT I HAD IN MIND.

20        I MEAN, I WOULD THINK THAT ANY WELL-RUN PRISON MENTAL

21 HEALTH SYSTEM WOULD HAVE AS PART OF ITS JOB THE TASK OF

22 EVALUATING DEPARTING INMATES OR PEOPLE SCHEDULED FOR RELEASE

23 INTO THE COMMUNITY AS TO WHETHER OR NOT THEY WERE DANGEROUS TO

24 OTHERS OR THEMSELVES BY REASON OF MENTAL ILLNESS AND TO THEN

25 MAKE APPROPRIATE TREATMENT REFERRAL PLANS.  I MEAN, THAT'S WHAT

1  I DID IN MASSACHUSETTS.  I WOULD ASSUME PEOPLE WOULD DO THAT IN

2  CALIFORNIA.

3  Q    AND YOU TESTIFIED AT YOUR DEPOSITION THAT 70 PERCENT OF THE

4  MENTALLY ILL AND NON-MENTALLY ILL PRISONERS IN CDCR HAVE SOME

5  KIND OF SUBSTANCE ABUSE DISORDER, CORRECT?

6  A    IT'S VERY HIGH WITH BOTH GROUPS, SURE.

7  Q    DID YOU TESTIFY TO THAT?  DO YOU RECALL THAT FIGURE?

8  A    I DON'T RECALL TESTIFYING TO IT, BUT I WOULD AGREE WITH THAT

9  ASSUMPTION.  IT'S A HIGH LEVEL OF SUBSTANCE ABUSE, BOTH WITHIN

10 THE NON-MENTALLY ILL PRISONERS AND THE MENTALLY ILL PRISONERS.

11 SUBSTANCE ABUSE ITSELF, AS I SAID, IS A RISK FACTOR IN AND OF

12 ITSELF.

13 Q    THANK YOU.

14        YOU ALSO TESTIFIED THAT PRISONERS, BOTH MENTALLY ILL

15 AND NON-MENTALLY ILL, WHO HAVE BEEN CONVICTED OF A CRIME

16 INVOLVING GREAT BODILY HARM TO ANOTHER PERSON DEMONSTRATE

17 GREATER RISK THAT THEY WILL BE VIOLENT TOWARDS THEMSELVES OR

18 OTHERS IN THE FUTURE, CORRECT?

19 A    YES.

20 Q    AND YOU ALSO TESTIFIED THAT PRISONERS WHO HAVE A HISTORY OF

21 VIOLENCE OR SUBSTANCE ABUSE REGARDLESS OF THEIR MENTAL ILLNESS

22 OR LACK THEREOF ARE MORE LIKELY TO COMMIT VIOLENCE, CORRECT?

23 A    YES, THEY ARE MORE LIKELY THAN PEOPLE IN THE SAME CLASS THAT

24 ARE NOT SUBSTANCE ABUSERS.

25 Q    BASED ON YOUR TESTIMONY, AT LEAST 70 PERCENT OF THE MENTALLY

1  ILL OFFENDERS WHO MAY BE RELEASED FROM CDCR FACILITIES ARE

2  LIKELY TO COMMIT VIOLENCE, CORRECT?

3  **A**    NO.  I'M SAYING THEY ARE SIMPLY MORE LIKELY TO DO SO THAN

4  THE MENTALLY ILL WHO ARE NOT SUBSTANCE ABUSERS, BUT THE ACTUAL

5  OCCURRENCE OF VIOLENCE, YOU COULD EXPECT, WOULD BE QUITE LOW IN

6  BOTH GROUPS.  I'M TALKING ABOUT A RELATIVE DIFFERENCE BETWEEN

7  SUBSTANCE-ABUSING MENTALLY ILL AND NON-SUBSTANCE-ABUSING

8  MENTALLY ILL.  THE VAST MAJORITY OF THEM NEVER COMMIT ANY

9  VIOLENCE.

10  **Q**    REGARDLESS, IT'S STILL 70 PERCENT OF THE BOTH MENTALLY ILL

11  AND NON-MENTALLY ILL HAVE A SUBSTANCE ABUSE DISORDER, WHICH YOU

12  TESTIFIED WILL INDICATE A GREATER RISK OF VIOLENCE?

13  **A**    YEAH, BUT THE QUESTION IS GREATER RISK THAN WHO?  I'D SAY,

14  YES, THEY ARE MORE LIKELY TO COMMIT ACTS OF VIOLENCE THAN PEOPLE

15  WHO ARE NOT SUBSTANCE ABUSERS.  BUT IN AND OF ITSELF, THIS IS

16  ONE RISK FACTOR AMONG MANY.  MY POINT IS IT'S THE SUBSTANCE

17  ABUSE THAT'S THE RISK FACTOR, NOT THE MENTAL ILLNESS.

18  **Q**    NOW, ACCORDING TO THE DIAGNOSTIC AND STATISTICAL MANUAL OF

19  MENTAL ILLNESS, FOURTH EDITION, ALSO KNOWN AS DSM-IV, I BELIEVE,

20  COMMON AXIS II DISORDERS INCLUDE PERSONALITY DISORDERS THAT

21  MIGHT ENCOMPASS ANTI-SOCIAL PERSONALITY DISORDERS, NARCISSISTIC

22  PERSONALITY DISORDERS, AVOIDANT PERSONALITY DISORDERS, TO NAME A

23  FEW, CORRECT?

24  **A**    YES.

25  **Q**    IN FACT, AN AXIS II PERSONALITY DISORDER IS THE MOST COMMON

1  PSYCHIATRIC DIAGNOSIS IN PRISONS AND JAILS, CORRECT?

2  **A**    AXIS II, I WOULD AGREE.

3  **Q**    AND YOU ALSO TESTIFIED THAT A SUBSTANTIAL PORTION OF THE

4  PRISON POPULATION HAVE AN AXIS II PERSONALITY DISORDER, CORRECT?

5  **A**    NOW, THERE I'M TALKING ABOUT PRIMARILY THE NON-MENTALLY ILL

6  PRISONERS.  TO BE CLEAR WITH YOU ABOUT THIS, WHAT I'M SAYING

7  ABOUT THE MENTALLY ILL PRISONERS, PEOPLE IN PRISON AND ARE

8  MENTALLY ILL.

9         THOSE WHO ARE DANGEROUS TO THEMSELVES OR OTHERS BY

10 REASON OF THEIR MENTAL ILLNESS, IN MY EXPERIENCE, HAVE GENERALLY

11 HAD AN AXIS II DISORDER IN ADDITION TO THEIR PSYCHOTIC DISORDER;

12 HOWEVER, THERE ARE MENTALLY ILL PEOPLE IN THE PRISONS -- I MEAN,

13 I HAVE CERTAINLY ABUNDANT EVIDENCE FROM CALIFORNIA FIGURES, AND

14 I KNOW THIS FROM MY OWN EXPERIENCE IN THE MASSACHUSETTS PRISON

15 SYSTEM, MENTALLY ILL PEOPLE WIND UP IN PRISON WHO ARE NOT

16 NECESSARILY PARTICULARLY DANGEROUS TO OTHERS, BUT WIND UP IN

17 PRISON BECAUSE OF THE FAILINGS OF THE MENTAL HEALTH SYSTEM.  IN

18 OTHER WORDS, THE PRISONS HAVE BECOME THE DE FACTO MENTAL HEALTH

19 CARE SYSTEM IN CALIFORNIA AND THROUGHOUT THE UNITED STATES.

20 **Q**    DO THE ANTI-SOCIAL PERSONALITY DISORDERS THAT WE TALKED

21 ABOUT, DO THEY DIMINISH THE CAPACITY OF A PERSON TO HOLD DOWN A

22 JOB OR DO A STEADY JOB, DO A STEADY WORK?

23 **A**    YEAH, THEY OFTEN INTERFERE WITH PEOPLE'S BEHAVING IN SUCH A

24 WAY AS TO MAINTAIN REGULAR EMPLOYMENT.

25 **Q**    SO DOES EITHER HAVING AN AXIS II PERSONALITY DISORDER OR NOT

1  BEING ABLE TO HOLD A JOB CONSTITUTE AN INDEPENDENT RISK FACTOR

2  FOR VIOLENT BEHAVIOR?

3  **A**    I WOULD SAY SO, YES.

4  **Q**    IS IT EITHER-OR OR BOTH?

5  **A**    BOTH.  I MEAN, THEY COULD BE -- THEY FUNCTION INDEPENDENTLY

6  OF EACH OTHER AS RISK FACTORS.  I WOULD ADD ALL OF THOSE RISK

7  FACTORS ARE ACTUALLY MORE PREDICTIVE OF VIOLENCE THAN MENTAL

8  ILLNESS AS SUCH.

9  **Q**    TURNING TO AXIS I DISORDERS, WOULD YOU AGREE THOSE ARE

10  SERIOUS MENTAL DISORDERS, LIKE SCHIZOPHRENIA, THAT REQUIRE

11  ONGOING MEDICATION AND TREATMENT AND A WHOLE HOST OF REMEDIES?

12  **A**    WELL, THEY CERTAINLY REQUIRE ONGOING TREATMENT.  NOW THE

13  QUESTION OF HOW INTENSIVE THAT TREATMENT NEEDS TO BE CAN VARY

14  ENORMOUSLY.

15          I MEAN, FOR EXAMPLE -- I MEAN I MYSELF, YOU KNOW,

16  CURRENTLY STILL MANAGE THE TREATMENT OF PEOPLE I'VE SEEN SINCE I

17  WAS A FIRST YEAR RESIDENT.  I MIGHT SEE THEM ONCE EVERY THREE

18  MONTHS.  THEY ARE STABLE IN THE COMMUNITY.  THE ONGOING

19  RELATIONSHIP STABILIZES THEM.  BUT, IN OTHER WORDS, THIS IS NOT

20  NECESSARILY EXTREMELY LABOR INTENSIVE.

21  **Q**    SO SCHIZOPHRENIA IS A MORE SERIOUS LIFELONG ILLNESS?

22  **A**    YES.  IN THAT SENSE IT'S COMPARABLE TO HIGH BLOOD PRESSURE,

23  DIABETES OR OTHER MEDICAL CONDITIONS THAT REQUIRE LIFELONG

24  TREATMENT.

25  **Q**    AND SCHIZOPHRENIA CAN ALSO AFFECT THE ABILITY OF A PERSON TO

1 HOLD DOWN A JOB OR HAVE STEADY EMPLOYMENT?

2 **A**   YES.  IT OFTEN INTERFERES WITH THE CAPACITY TO HOLD DOWN A

3 JOB.

4 **Q**   AND IF A SCHIZOPHRENIC OFFENDER IS RELEASED ON PAROLE

5 WITHOUT A JOB WAITING FOR THEM, WITHOUT SUPPORT STRUCTURE,

6 FAMILY, OR PLACE TO STAY, THEY COULD WIND UP ON THE STREET,

7 CAN'T THEY?

8 **A**   EXACTLY.  I MEAN, THAT'S PRECISELY WHY I THINK PRERELEASE

9 PLANNING IS SO IMPORTANT, INCLUDING, FOR EXAMPLE, GETTING SOCIAL

10 SECURITY PAYMENTS.  IF SOMEBODY CAN'T HOLD DOWN A JOB, THEY MAY

11 NEED SOCIAL SECURITY INCOME SUPPLEMENTS.

12 **Q**   AND THESE KINDS OF SCHIZOPHRENIC OFFENDERS CAN UNFORTUNATELY

13 ALSO END UP DECEASED, CAN'T THEY?

14 **A**   YES.

15 **Q**   BECAUSE THEY EITHER GET PREYED UPON BY OTHERS, THEY COMMIT

16 SUICIDE, OR SOMETIMES DON'T TAKE CARE OF THERE OWN SELVES?

17 **A**   THOSE ARE CERTAINLY THE RISKS ONE WOULD BE MOST CONCERNED

18 ABOUT IN TREATING THIS POPULATION.

19 **Q**   AND SCHIZOPHRENIC OFFENDERS SUCH AS THESE CAN ALSO

20 MATRICULATE IN LOCAL HOSPITALS FOR A VARIETY OF EMERGENCY

21 MEDICAL CARE NEEDS, CORRECT?

22 **A**   YES.

23 **Q**   AND BECAUSE SCHIZOPHRENIA IS A CHRONIC CONDITION, ANY

24 COMMUNITY SUPPORT FOR OFFENDERS RELEASED WITH THIS ILLNESS WOULD

25 HAVE TO BE A VERY LONG COMMITMENT, WOULDN'T IT?

1  **A**   YES.  AS I SAID, MOST PEOPLE WITH THAT PARTICULAR ILLNESS

2  ARE GOING TO NEED TREATMENT PROBABLY THROUGHOUT THEIR LIFETIME,

3  BUT THE INTENSITY OF IT CAN VARY ENORMOUSLY.  AS I SAID, I SEE

4  PEOPLE NOW THAT, YOU KNOW, I MAY SPEND A SHORT AMOUNT OF TIME

5  ONCE EVERY THREE MONTHS, AND THEY'RE PERFECTLY STABLE.

6  **Q**   AND YOU TESTIFIED THAT MENTALLY ILL OFFENDERS SHOULD BE

7  DIVERTED AWAY FROM PRISON AND TOWARDS MENTAL HEALTH CARE AND

8  MENTAL HEALTH DEPARTMENTS SUCH AS THE ONES IN LOCAL COUNTIES OR

9  DEPARTMENT OF MENTAL HEALTH FOR CARE, CORRECT?

10 **A**   I THINK THAT WOULD BE A GOOD IDEA.  I THINK IT WOULD IMPROVE

11 THE QUALITY OF CARE AND THE SAFETY OF THE PUBLIC.

12 **Q**   YET YOU ARE -- YOU ARE NOT AWARE IF THERE IS ANY COUNTY IN

13 THE STATE OF CALIFORNIA THAT PROVIDES SUCH DIVERSIONARY MEDICAL

14 CARE TO MENTALLY ILL OFFENDERS, ARE YOU?

15 **A**   WELL, MY UNDERSTANDING IS THEY SPECIFICALLY EXCLUDE

16 PAROLEES.

17         **JUDGE KARLTON:**  WE ARE TALKING ABOUT DIVERTING THEM,

18 SO THEY NEVER GO INTO PRISON, I THINK THAT WAS THE QUESTION.

19         **MR. LEWIS:**  YES, YOUR HONOR.  THANK YOU.

20         **THE WITNESS:**  I SEE.  ASK THE QUESTION AGAIN, PLEASE.

21 **BY MR. LEWIS**

22 **Q**   YOU ARE NOT AWARE IF THERE'S ANY COUNTY IN THE STATE THAT

23 PROVIDES SUCH DIVERSIONARY MENTAL HEALTH CARE TO MENTALLY ILL

24 OFFENDERS, ARE YOU?

25 **A**   NO, I'M NOT.

1  Q    AND YOU ARE NOT AWARE OF THE AVAILABILITY OF FUNDING OR

2  RESOURCES TO HANDLE THE INCREASED STRAIN OF THESE DIVERSION

3  PROGRAMS OR GREATER LOCAL MENTAL HEALTH PROGRAMS ON THE LOCAL

4  COMMUNITIES, ARE YOU?

5  A    NO.

6  Q    DO YOU AGREE THAT SOMETIMES PEOPLE COME INTO PRISON BECAUSE

7  THEY MAY BE TOO DISORGANIZED TO EVER MAKE AN APPOINTMENT WITH A

8  PAROLE AGENT TO GET THEIR CARE?

9        **JUDGE KARLTON:**  NOW YOU ARE CONFUSING ME, EVEN IF YOU

10  DON'T CONFUSE THE DOCTOR.  YOU ARE NOW TALKING ABOUT PAROLEES,

11  NOT DIVERSIONARY --

12        **MR. LEWIS:**  YES, YOUR HONOR.

13        **JUDGE KARLTON:**  ALL RIGHT.

14  **BY MR. LEWIS**

15  Q    WOULD YOU AGREE THAT SOMETIMES THERE MIGHT BE SOME PAROLEES

16  WHO ARE TOO DISORGANIZED BECAUSE OF SOME OF THEIR AXIS DISORDERS

17  TO MAKE AN APPOINTMENT WITH A PAROLE AGENT SO THEY CAN'T EVEN

18  GET CARE?

19  A    SURE.

20  Q    AND THEY'RE OFTEN SICK WHEN THEY COME IN BECAUSE THEY CAN'T

21  GET ACCESS TO CARE IN THE COMMUNITY?

22  A    YEAH, I WOULD EXPECT THAT.

23  Q    AND SO EVEN IF THE CARE IS AVAILABLE, THERE'S NO GUARANTEE

24  THAT THESE MENTALLY ILL OFFENDERS WHO HAVE BEEN RELEASED FROM

25  PRISON WILL CHOOSE TO OBTAIN THE MENTAL HEALTH CARE FROM THEIR

1    LOCAL COMMUNITY PROVIDERS, IS THERE?

2    **A**    NO, SOMETIMES THEY DO NOT.

3    **Q**    SO A PERSON COULD SIMPLY CHOOSE NOT TO GET MEDICAL CARE --

4    OR MENTAL CARE -- I'M SORRY -- MENTAL HEALTH CARE?

5    **A**    YES, BUT IF THEY WERE MAKING THAT CHOICE BECAUSE OF THEIR

6    MENTAL HEALTHNESS, IT MIGHT BE APPROPRIATE FOR A PSYCHIATRIST TO

7    EVALUATE THEM AS TO WHETHER OR NOT THEY MIGHT NEED INVOLUNTARY

8    TREATMENT, THAT IS, TREATMENT TO BE COMMITTED TO A HOSPITAL

9    BECAUSE THEY'RE MENTAL ILLNESS PRECLUDED THEM OF BEING AWARE OF

10   THEIR NEED FOR TREATMENT.

11           **JUDGE KARLTON:**    IN ANY EVENT, DOCTOR, I THINK YOU

12   HAVE SAID SEVERAL TIMES -- WELL, I KNOW YOU HAVE -- SEVERAL

13   TIMES THAT PRISONS ARE THE WORST PLACE FOR SERIOUSLY MENTALLY --

14   MENTAL ILLNESS.  YOU'VE GOT A GUY WHO'S BEEN PAROLED.  HE'S BEEN

15   IN PRISON FOR HOWEVER LONG, HE'S PAROLED, HE'S REACHED THE PLACE

16   WHERE THEY HAVE GOT TO LET HIM GO OR WHATEVER.  HE'S OUT ON THE

17   STREET.  HE'S AS ILL AS THE QUESTION SUGGESTS.  YOUR VIEW IS

18   SENDING HIM BACK TO PRISON IS NOT AN APPROPRIATE THING TO DO?

19           **THE WITNESS:**  YES, YOUR HONOR.

20           **JUDGE KARLTON:**    IS IT APPROPRIATE FROM SOCIETY'S

21   POINT OF VIEW BECAUSE IT REDUCES THE RISK OF CRIME, VIOLENT --

22   LET'S START WITH VIOLENT -- VIOLENT CRIME?

23           **THE WITNESS:**    WELL, LET ME SAY I DON'T THINK IT WOULD

24   BE APPROPRIATE COMPARED WITH A BETTER SOLUTION, WHICH WOULD

25   BE -- I MEAN, I DON'T KNOW WHAT MIGHT BE COMPARABLE IN

1    CALIFORNIA.

2              FOR EXAMPLE, IN MASSACHUSETTS WE SET UP A COURT

3    CLINIC SYSTEM WHERE EACH OF THE STATE DISTRICT COURTS WOULD HAVE

4    A COURT CLINIC SO THE COURT COULD REFER SOMEBODY WHO WAS

5    ARRAIGNED FOR -- BECAUSE OF BEING CHARGED WITH A CRIME FOR

6    PSYCHIATRIC EVALUATION AND COULD BE DIVERTED IMMEDIATELY OUT OF

7    THE CRIMINAL JUSTICE SYSTEM INTO THE MENTAL HEALTH SYSTEM,

8    DEPENDING ON THE -- YOU KNOW, THE OUTCOME OF THE EVALUATION.

9    **BY MR. LEWIS**

10   **Q**   ARE YOU AWARE OF ANY SIMILAR COURTS LIKE THE ONE YOU ARE

11   DESCRIBING HERE IN CALIFORNIA?

12   **A**   NO, NO, I'M NOT.  THAT'S WHY I SAY I'M SPEAKING OF WHAT MY

13   OWN EXPERIENCE WAS AND WHAT WOULD STRIKE ME AS AT LEAST A

14   PERFECTLY FEASIBLE ALTERNATIVE.  I THINK IT WOULD BE PREFERABLE

15   IN TERMS OF BOTH THE NEEDS OF THE MENTALLY ILL AND PROTECTING

16   THE PUBLIC.

17   **Q**   SO IF YOU'RE AWARE THAT SOME OF THOSE COURTS OR COURTS

18   SIMILAR TO THAT OPERATE IN THE STATE OF CALIFORNIA IN SOME

19   COUNTIES, YOU WOULD SEE THAT AS A POSITIVE DEVELOPMENT OR A GOOD

20   THING?

21   **A**   YES.

22   **Q**   HAVE YOU EVER VISITED A PAROLE OUTPATIENT CLINIC?

23   **A**   NO, I HAVE NOT.  I JUST READ ABOUT THEM.

24   **Q**   HAVE YOU EVER PERFORMED AN INDEPENDENT ANALYSIS OF THE

25   SERVICES PROVIDED BY A CDCR PAROLE OUTPATIENT CLINIC?

1   **A**   NO.

2   **Q**   YOU HAVEN'T PERFORMED AN INDEPENDENT ANALYSIS OF CDCR'S

3   PRERELEASE PLANNING PROGRAMS, HAVE YOU?

4   **A**   NOT MY OWN INDEPENDENT ONE, NO, JUST REVIEWED WHAT'S BEEN

5   REPORTED.

6   **Q**   AND YOU'VE NEVER PERFORMED ANY INDEPENDENT ANALYSIS OF THE

7   MENTAL HEALTH STAFFING NEEDED TO PROVIDE TIMELY MEDICAL -- OR

8   TIMELY COMPETENT MENTAL HEALTH SERVICES TO THE PRESENT

9   POPULATION OF MENTALLY ILL PAROLEES IN CALIFORNIA, HAVE YOU?

10  **A**   I'M NOT QUITE SURE WHAT YOU'RE REFERRING TO EXACTLY.  SAY IT

11  AGAIN.

12  **Q**   HAVE YOU EVER PERFORMED AN INDEPENDENT ANALYSIS OF THE

13  STAFFING NEEDED TO PROVIDE COMPETENT MENTAL HEALTH CARE TO THE

14  CURRENT MENTALLY ILL PAROLEE POPULATION IN CALIFORNIA?

15  **A**   NO, NOT SPECIFICALLY LIMITED TO CALIFORNIA.  I MEAN, I'M

16  JUST RELYING ON MY LIFELONG EXPERIENCE OF HAVING TO ARRANGE, YOU

17  KNOW, FOR APPROPRIATE STAFFING FOR TREATMENT OF MENTALLY ILL

18  POPULATION WHO GET INTO TROUBLE WITH THE LAW.

19  **Q**   BUT YOU HAVEN'T DONE IT SPECIFICALLY?

20  **A**   I HAVEN'T DONE IT SPECIFICALLY WITH RESPECT TO CALIFORNIA.

21  **Q**   THANK YOU.

22  **A**   NO.

23  **Q**   YOU'VE TESTIFIED THAT THERE IS PROBLEMS WITH ACCESS TO

24  MENTAL HEALTHCARE IN VERY RURAL OR VERY POOR COMMUNITIES,

25  CORRECT?

1  **A**  AGAIN?  SAY IT --

2  **Q**  I'M SORRY.

3         YOU'VE TESTIFIED THAT THERE ARE PROBLEMS WITH ACCESS

4  TO MENTAL HEALTH CARE IN RURAL OR VERY POOR COMMUNITIES,

5  CORRECT?

6  **A**  I DON'T RECALL REFERRING SPECIFICALLY TO POOR COMMUNITIES.

7  I UNDERSTAND THAT IN RURAL COMMUNITIES IT CAN OFTEN BE DIFFICULT

8  FOR MENTAL HEALTH INSTITUTIONS, WHETHER INPATIENT OR OUTPATIENT,

9  TO HIRE SUFFICIENT NUMBERS OF MENTAL HEALTH PROFESSIONALS.  THE

10 DIFFICULTIES IN THE POOR COMMUNITY MIGHT BE DUE MORE TO WHETHER

11 THE POOR HAVE ENOUGH MONEY TO PAY FOR WHATEVER TREATMENT THEY

12 NEED THAT THEY NEED TO PAY FOR OUT OF THEIR OWN POCKET.

13 **Q**  VERY WELL.  COULD YOU PLEASE PULL UP PAGE 72, LINE 14?

14 WE'LL CONTINUE ON TO PAGE 73, LINE 6.

15        DOCTOR, I'M GOING TO READ THIS, AND I'D LIKE YOU TO

16 READ ALONG WITH ME, IF POSSIBLE.

17            "NOW, IS YOUR UNDERSTANDING AS A

18            PSYCHIATRIST AND AS AN EXPERT IN THIS CASE THAT

19            THERE IS ANY SORT OF SHORTAGE OF PSYCHIATRISTS

20            WITHIN THE UNITED STATES TO SERVE MENTALLY ILL

21            PATIENTS OF ANY SORT?

22          "ANSWER: YOU MEAN WITHIN THE PRISONS OR JUST

23            IN THE COMMUNITY IN GENERAL?

24            "IN GENERAL.

25          "ANSWER:  WITHIN THE COMMUNITY IN GENERAL, I

1           DO NOT BELIEVE THAT -- I WANT TO SAY THAT

2           WHATEVER SHORTAGES OF ACCESS TO MENTAL

3           HEALTHCARE EXIST, AND THEY DO EXIST IN SOME

4           COMMUNITIES, ARE DUE TO AFTER AN OVERALL

5           NATIONAL SHORTAGE OF PSYCHIATRISTS.  I MEAN, I

6           THINK THERE ARE MARKED DISCREPANCIES IN ACCESS

7           TO THE MENTAL HEALTHCARE IN SOME COMMUNITIES,

8           EITHER VERY RURAL COMMUNITIES OR VERY POOR

9           COMMUNITIES.  IT'S PART OF A LARGER PROBLEM, I

10          THINK, IN AMERICA, SORT THE FINANCING OF

11          HEALTHCARE IN GENERAL."

12          DOCTOR, DO YOU REMEMBER MAKING THAT STATEMENT AT YOUR

13 DEPOSITION REGARDING THE POOR COMMUNITIES?

14 **A**   NOT SPECIFICALLY, BUT IT CERTAINLY SEEMS CONSISTENT WITH

15 WHAT I REMEMBER.  WHAT I WAS TRYING TO SAY JUST NOW, AS TO BE A

16 LITTLE BIT CLEAR, WHAT I MEANT ABOUT THE DISTINCTION BETWEEN

17 RURAL AND POOR --

18          **JUDGE KARLTON:**  COUNSEL, I DON'T UNDERSTAND WHAT YOU

19 HAVE JUST DONE.  PLAINTIFFS DON'T OBJECT.  NOBODY OBJECTS.  THIS

20 HAPPENS ALL THE TIME, BUT AT SOME POINT I'M GOING TO GET

21 FRUSTRATED.  DO YOU THINK THAT WAS IMPEACHING, OR WHAT WAS IT

22 THAT YOU WERE READING?

23          **MR. LEWIS:**  NO, YOUR HONOR.  I WAS TRYING TO REFRESH

24 HIS RECOLLECTION, AND MY QUESTIONS WILL DEVELOP IT.

25          **THE WITNESS:**  I WAS JUST SAYING IN EITHER OF THOSE

1  SETTINGS, YOU MIGHT HAVE MORE TROUBLE THAN USUAL IN HIRING

2  PEOPLE.  PARTICULARLY POOR COMMUNITIES WOULD HAVE AN ADDITIONAL

3  PROBLEM.  GETTING ACCESS EVEN TO, QUOTE, FREE CARE SOMETIMES

4  COSTS MONEY, JUST TO GET TO THE CLINIC, AND POOR PEOPLE

5  SOMETIMES JUST CAN'T AFFORD IT.

6  **BY MR. LEWIS**

7  **Q**   ARE THESE PROBLEMS SOMETIMES THE RESULT OF A GAP OF

8  DISTRIBUTION OF PSYCHIATRISTS WHO PREFER TO WORK IN LARGE CITIES

9  OR AFFLUENT NEIGHBORHOODS, AS OPPOSED TO DISADVANTAGED OR

10  IMPOVERISHED NEIGHBORHOODS?

11  **A**   ABSOLUTELY.  I THINK THAT CAN BE ONE FACTOR THAT CONTRIBUTES

12  TO THE MALDISTRIBUTION OF MENTAL HEALTH CARE IN AMERICA AND IN

13  CALIFORNIA.

14  **Q**   ISN'T IT TRUE THAT A LARGE PORTION OF THE CDCR POPULATION

15  AND, THUS, A CORRESPONDINGLY LARGE PORTION OF THE MENTALLY ILL

16  POPULATION IS ALSO DRAWN FROM IMPOVERISHED AREAS?

17  **A**   I WOULD SAY.

18  **Q**   ARE YOU AWARE THAT CALIFORNIA OFFENDERS MUST BE PAROLED TO

19  THEIR COUNTY OF COMMITMENT UPON RELEASE FROM PRISON?

20  **A**   THAT WOULDN'T SURPRISE ME.  I KIND OF WOULD ASSUME THAT.

21  **Q**   SO IF A MENTALLY ILL PERSON COMMITS A CRIME IN AN

22  IMPOVERISHED AREA, HE OR SHE WILL BE RETURNED TO AN AREA LACKING

23  MENTAL HEALTH CARE SERVICES?

24            **JUDGE REINHARDT:**  YOU ARE TALKING ABOUT IMPOVERISHED

25  COUNTIES.

1       **MR. LEWIS:**  IMPOVERISHED COUNTIES, YES, SIR.

2       **THE WITNESS:**  NOT NECESSARILY TOTALLY LACKING, BUT

3  LET'S SAY IN RELATIVE TERMS, PRESUMABLY -- IT WOULDN'T SURPRISE

4  ME IF THEY HAD A LESS RICH ARRAY OF RESOURCES.

5  **BY MR. LEWIS**

6  **Q**  SO SOME OF THE IMPOVERISHED AREAS FROM WHICH CDCR DRAWS ITS

7  POPULATION MAY NOT HAVE VERY GOOD ACCESS TO MENTAL HEALTHCARE,

8  CORRECT?

9  **A**  AS COMPARED WITH THOSE WHO ARE MORE AFFLUENT, MORE CENTRALLY

10 LOCATED IN MORE POPULAR LOCATIONS.

11 **Q**  IF THEY DON'T HAVE MENTAL HEALTHCARE, I GUESS, ON THE

12 OUTSIDE, THEY COULD POSSIBLY COME IN THEN WITH SOME MENTAL

13 HEALTH ISSUES?

14 **A**  YOU MEAN COME INTO THE PRISON?

15 **Q**  YES.

16 **A**  OH, ABSOLUTELY.

17 **Q**  AT YOUR DEPOSITION PAGE 38, LINE 6 THROUGH 12 YOU WERE ASKED

18 THE FOLLOWING:

19      **JUDGE KARLTON:**  NOW, I'M GOING TO STOP THIS.  I WANT

20 TO KNOW WHY YOU ARE READING IT BEFORE YOU DO IT.  WE'RE JUST

21 SPENDING A LOT OF TIME, IT SEEMS TO ME.  JUST TELL ME WHAT

22 YOU'RE DOING.

23      **MR. LEWIS:**  YOUR HONOR, I'M GOING TO ASK HIM ABOUT --

24 NOW I'M GOING TO ASK ABOUT THE 15,000 PERSON RELEASE HE WAS

25 INFORMED ABOUT EARLIER THAT WAS SUPPOSED TO BE PART OF HIS

1  DEPOSITION TESTIMONY, AND, OBVIOUSLY, AS WE'VE TALKED ABOUT

2  BEFORE, HE TESTIFIED HE DIDN'T KNOW ABOUT 50,000, SO WE ARE

3  TRYING TO EXTRAPOLATE OUT THE NUMBERS NOW, YOUR HONOR.

4          **JUDGE KARLTON:**  WHAT IS THIS ABOUT?  WHY DON'T YOU

5  ASK HIM FIRST AND FIND OUT WHETHER HE AGREES WITH YOU.  WE DON'T

6  NEED TO DO THIS YET.

7          **MR. LEWIS:**  THANK YOU, YOUR HONOR.

8          **JUDGE HENDERSON:**  AS BEST I CAN TELL.

9          **MR. LEWIS:**  THANK YOU, YOUR HONOR.

10 **BY MR. LEWIS**

11 **Q**   DOCTOR, DO YOU RECALL TESTIFYING THAT THERE WAS --

12          **JUDGE KARLTON:**  IT'S HOPELESS.  DO WHAT YOU WANT.

13          **MR. LEWIS:**  THANK YOU, YOUR HONOR.

14          **JUDGE KARLTON:**  ASK THE QUESTION.  DON'T ASK ABOUT

15 WHAT HE TESTIFIED.  ASK THE QUESTION, AND SEE WHAT HIS ANSWER

16 IS, AND SEE WHETHER YOU HAVE TO GO THROUGH ALL OF THIS.

17          **JUDGE REINHARDT:**  WHAT IS IT YOU WANT TO KNOW?

18          **JUDGE KARLTON:**  WHAT DO YOU WANT TO KNOW?

19          **MR. LEWIS:**  YOUR HONOR, I'M GOING TO RESTRUCTURE MY

20 QUESTION TO COMPLY WITH YOU.  THANK YOU.

21 **BY MR. LEWIS**

22 **Q**   DOCTOR, DO YOU KNOW OF ANY GOOD EVIDENCE THAT DEMONSTRATES A

23 LIKELY INCREASE IN THE RISK OF DANGER TO THE PUBLIC RESULTING

24 FROM A PRISONER RELEASE ORDER OF 15,000 PEOPLE?

25 **A**   NO.

1  Q    WHAT ARE SOME OF THE FACTORS THAT WOULD INDICATE A GREATER

2  RISK OF VIOLENCE AMONG PEOPLE RELEASED FROM PRISON; COULD IT BE

3  ATTACHED TO ECONOMIC FACTORS?

4  A    WELL, ABSOLUTELY, BUT LET ME PUT IT IN CONTEXT.  WHAT WE

5  HAVE BEEN TALKING ABOUT SO FAR, WE HAVE BEEN FOCUSING MOSTLY ON,

6  YOU KNOW, INDIVIDUALS, AS TO WHETHER THEY AS INDIVIDUALS WOULD

7  BE LIKELY TO BE INCREASED RISK OF DANGER TO THE PUBLIC, BUT THE

8  FACT IS THE INCREASES AND DECREASES IF WE TAKE, SAY, THE MURDER

9  RATE AS AN INDEX OF DANGER TO THE PUBLIC, INCREASES AND

10  DECREASES IN THE MURDER RATE HAVE LITTLE OR NOTHING TO DO IN

11  AMERICA -- I'M LOOKING BACK OVER THE LAST CENTURY AND MORE --

12  WITH THE NUMBERS OF PEOPLE IN PRISONS.  THEY ARE MUCH MORE

13  AFFECTED BY LARGE SOCIAL CONDITIONS OFTEN OF AN ECONOMIC NATURE.

14        FOR EXAMPLE, DURING THE GREAT DEPRESSION, THE MURDER

15  RATE IN AMERICA SKYROCKETED TO THE HIGHEST LEVEL IT HAD EVER

16  BEEN UP TO THAT POINT.  THE MURDER RATE THEN WENT DOWN ONCE

17  ROOSEVELT GOT ELECTED AND THE NEW DEAL GOT STARTED AND PEOPLE

18  STARTED GETTING EMPLOYED AND MORE HOPE.

19        ACTUALLY, I SHOULD MENTION BOTH SUICIDE AND HOMICIDE.

20  THEY BOTH SKYROCKETED AND CAME DOWN JUST AS ABRUPTLY.  THAT HAD

21  NOTHING TO DO WITH THE NUMBER OF PEOPLE IN EITHER PRISONS OR

22  MENTAL HEALTH HOSPITALS, NOR WITH THE RATE OF MENTAL ILLNESS, OR

23  THE PERCENT OF THE POPULATION THAT WAS MENTALLY ILL.

24        THE MAIN FACTORS THAT AFFECT PUBLIC SAFETY ARE NOT

25  THIS POPULATION OR WHETHER WE PUT THEM IN PRISON OR IN MENTAL

1   HOSPITALS OR SOME OTHER TREATMENT.  THE MAIN FACTORS THAT AFFECT

2   PUBLIC SAFETY ARE MUCH LARGER SORT OF POLITICAL AND ECONOMIC

3   FACTORS THAT COULD BE UNDERSTOOD HISTORICALLY.

4   **Q**   SO THEY COULD BE RELATED TO ECONOMIC FACTORS, AGE

5   DISTRIBUTION IN THE POPULATION, LEVEL OF RACIAL DISCRIMINATION

6   PRESENCE IN THE SOCIETY?

7   **A**   SURE, ALL THOSE THINGS.  MANY OF THEM ARE MUCH MORE

8   IMPORTANT THAN WHETHER OR NOT A SPECIFIC INDIVIDUAL IS MENTALLY

9   ILL.  I MEAN, THAT'S A POOR PREDICTER OF VIOLENCE.  THESE OTHER

10  THINGS CAN BE POWERFUL PREDICTERS OF VIOLENCE.

11  **Q**   IN REACHING YOUR CONCLUSION ABOUT THE LEVEL OF VIOLENCE THAT

12  MAY RESULT FROM THE RELEASE OF 15,000 OR 50,000 OFFENDERS FROM

13  CDCR FACILITIES, DID YOU EVER PERFORM AN ANALYSIS OF THE

14  ECONOMIC FACTORS, AGE DISTRIBUTION IN THE POPULATION, OR LEVEL

15  OF DISCRIMINATION SPECIFIC TO CALIFORNIA?

16  **A**   NOT SPECIFIC TO CALIFORNIA.  I KNOW A LOT ABOUT THIS ON A

17  NATIONAL LEVEL, AND I CERTAINLY KNOW IT IN MASSACHUSETTS.

18  **Q**   BUT YOU DIDN'T DO IT SPECIFICALLY FOR CALIFORNIA?

19  **A**   NO.  I MEAN, FOR EXAMPLE, ASSESSING THE SOCIOECONOMIC STATUS

20  OF CALIFORNIA PRISON INMATES, NO, I DID NOT DO AN INDEPENDENT

21  ANALYSIS OF THAT SORT OF THING.

22  **Q**   YOU ASSUME THAT THERE ARE PUBLIC MENTAL HEALTH HOSPITALS,

23  MENTAL HEALTH CENTERS AND MENTAL HEALTH CLINICS IN CALIFORNIA

24  COMMUNITIES WHERE PAROLEES CAN ACCESS MENTAL HEALTH CARE, DON'T

25  YOU?

1  **A**   NO.  MY UNDERSTANDING IS PAROLEES WERE EXCLUDED FROM ACCESS

2  TO THE COUNTY MENTAL HEALTH SYSTEM, AND THAT WAS PART OF THE

3  PROBLEM.

4  **Q**   DO YOU KNOW HOW MANY PUBLIC MENTAL HEALTH HOSPITALS THERE

5  ARE IN CALIFORNIA?

6  **A**   I HAVE A MAP THAT SHOWS SEVERAL RIGHT HERE, BUT I'VE SEEN

7  ATASCADERO AND ALL THE OTHERS.

8  **Q**   DO YOU KNOW THE TOTAL CAPACITY OF CALIFORNIA'S PUBLIC MENTAL

9  HEALTH HOSPITALS?

10 **A**   I DON'T KNOW WHAT IT IS CURRENTLY.  I COULD LOOK IT UP.  I

11 JUST DON'T KNOW IT OFF THE TOP OF MY HEAD.

12 **Q**   DID YOU CONSIDER THAT IN REACHING YOUR OPINIONS TODAY?

13 **A**   NO.

14 **Q**   DID YOU CONSIDER THE AMOUNT OF SERVICES AVAILABLE TO

15 MENTALLY ILL PERSONS IN GENERAL FROM THE CALIFORNIA MENTAL

16 HEALTH SYSTEM?

17 **A**   NO.  WHAT I'M TRYING TO GET AT IS, THAT IF THE EXISTING

18 RESOURCES ARE INADEQUATE TO TREAT THE MENTALLY ILL IN

19 CALIFORNIA, THEN IT WOULD BE BOTH MORE EFFECTIVE FROM A CLINICAL

20 STANDPOINT AND MORE ECONOMICAL FROM A FINANCIAL STANDPOINT FOR

21 THE STATE OF CALIFORNIA TO DIVERT SOME OF ITS FINANCE RESOURCES

22 FROM THE PRISON TO THE MENTAL HEALTH AND PERHAPS ADDING

23 RESOURCES TO BOTH THE COUNTY AND THE STATE MENTAL HEALTH

24 PROVIDING SYSTEM.

25 **Q**   WOULD YOU AGREE THERE'S A RISK OF RECIDIVISM THAT EXISTS

1   WITH THE RELEASE OF 15,000 OR 50,000 INMATES?

2   **A**   WELL, I MEAN, ANY TIME AN INMATE IS RELEASED, THERE'S A RISK

3   OF RECIDIVISM, SURE.

4   **Q**   WOULD YOU ALSO AGREE THERE'S A RISK THAT A RELEASED OFFENDER

5   MAY COMMIT AN ACT OF BODILY HARM ON ANOTHER PERSON WHILE ON

6   PAROLE?

7   **A**   THERE IS ALSO THAT RISK.

8            **MR. LEWIS:**   THANK YOU, DR. GILLIGAN.

9            I HAVE NO FURTHER QUESTIONS, YOUR HONORS.

10           **JUDGE HENDERSON:**   THANK YOU, COUNSEL.

11           ANYTHING FROM INTERVENORS?

12           **MS. FUENTES:**   GOOD MORNING, I'M THERESA FUENTES FROM

13   SANTA CLARA COUNTY ON BEHALF OF DEFENDANT INTERVENORS.

14                **CROSS-EXAMINATION BY MS. FUENTES**

15   **BY MS. FUENTES**

16   **Q**   DR. GILLIGAN, DO YOU AGREE THAT MENTALLY ILL PRISONERS WHO

17   WILL BE RELEASED OR DIVERTED FROM PRISON UNDER A POPULATION

18   REDUCTION WILL NEED ACCESS TO SOME SORT OF MENTAL HEALTH

19   TREATMENT IN THE COMMUNITY?

20   **A**   I WOULD THINK SO, AND I WOULD CERTAINLY RECOMMEND IT.

21   **Q**   THAT WOULD BE WHETHER THEY'RE 3CMS OR EOP; IT WOULD JUST

22   DEPEND ON THE LEVEL OF TREATMENT THAT THEY NEED?

23   **A**   YES.   THE IMPORTANT THING I WANT TO EMPHASIZE IS SIMPLY HOW

24   HIGHLY VARIABLE THAT IS, AS I WAS TRYING TO SAY, FROM THE MOST

25   INTENSIVE TO THE LEAST INTENSIVE.

1  Q   I THINK YOU SAID, IN YOUR OPINION, THE 3CMS WOULD NEED MAYBE

2  SOME APPOINTMENTS WITH MENTAL HEALTH PROFESSIONALS AND ACCESS TO

3  MEDICATIONS?

4  A   I WOULD ASSUME THAT MOST OR ALL OF THEM WOULD NEED THAT AT

5  SOME POINT, BUT I WOULD ALSO NOT BE SURPRISED IF MANY OF THEM

6  DID NOT NEED IT ON -- ON AN ONGOING BASIS.

7  Q   BUT YOU DON'T HAVE ANY IDEA WHAT THE ACTUAL NUMBERS WOULD BE

8  OF WHO WOULD NEED MEDICATIONS IN THE COMMUNITY?

9  A   I DON'T THINK ANYBODY COULD PREDICT THAT IN ADVANCE.  I JUST

10 THINK THE APPROPRIATE THING THE MENTAL HEALTH SYSTEM COULD DO IS

11 TO RESPOND TO WHATEVER THE NEED WOULD TURN OUT TO BE.

12 Q   IT WOULD DEPEND ON WHAT THEIR NEEDS ARE OUT IN THE

13 COMMUNITY?

14 A   THESE COULD VARY FROM ONE TIME TO ANOTHER EVEN WITHIN THE

15 SAME PERSON, OF COURSE.

16 Q   AND DO YOU AGREE THAT THE MENTALLY ILL RELEASED PRISONERS

17 WOULD NEED SOME SORT OF HOUSING, ACCESS TO HOUSING?

18 A   I WOULD -- WELL, I WOULD CERTAINLY RECOMMEND IT.  I DON'T

19 RECOMMEND HOMELESSNESS FOR ANYBODY.

20 Q   AND SOME SORT OF SUPPORT STRUCTURE AS PART OF THEIR

21 TREATMENT REGIMEN?

22 A   AGAIN, THE NEED FOR THIS WOULD VARY ENORMOUSLY.  I THINK ALL

23 INMATES LEAVING PRISONS, WHETHER THEY'RE MENTALLY ILL OR NOT,

24 REALLY, THEY BENEFIT, AND PUBLIC SAFETY BENEFITS FROM THEIR

25 HAVING A LOT OF HELP IN GETTING REINTEGRATED INTO THE COMMUNITY

1  WITH ADEQUATE HOUSING, EMPLOYMENT, OR AT LEAST INCOME, A BASE,

2  AND SO FORTH.

3  Q    OKAY.  AND DO YOU AGREE THAT CALIFORNIA COUNTIES DO NOT

4  CURRENTLY HAVE FUNDS OR RESOURCES TO PROVIDE ANY OF THOSE TYPE

5  OF SERVICES TO PRISONERS WHO WOULD BE DIVERTED OR RELEASED UNDER

6  A POPULATION REDUCTION?

7  A    I DON'T KNOW HOW THIS RELATES TO THEIR RESOURCES.  MY

8  UNDERSTANDING, THOUGH, IS THAT THEY, THE PAROLEES, ARE SIMPLY

9  EXCLUDED FROM ACCESS TO THE COUNTY MENTAL HEALTH SYSTEMS.

10 THAT'S WHY THE PAROLE OFFICERS OFTEN HAVE TO SEND THEM BACK TO

11 PRISON.

12 Q    SO THEY ARE NOT RECEIVING TREATMENT IN THE COMMUNITY, IS

13 THAT WHAT YOU'RE SAYING?

14 A    THAT'S MY UNDERSTANDING.

15 Q    SO WHAT ABOUT MENTALLY ILL INDIVIDUALS WHO ARE DIVERTED OR

16 ARE NOT ABLE TO BE SENT TO PRISON BECAUSE OF A POPULATION CAP,

17 WHAT ABOUT THOSE?

18 A    WELL, IF THE COUNTY MENTAL HEALTH SYSTEM WOULD THEN AGREE TO

19 PROVIDE THEM TREATMENT, I WOULD THINK THAT WOULD BE THE

20 APPROPRIATE RESPONSE.

21 Q    WHAT IF THE COUNTIES DON'T HAVE ANY FUNDS OR RESOURCES TO

22 PROVIDE THE TREATMENT?

23 A    WELL, I WOULD SAY THAT WOULD CREATE A SITUATION THAT THE

24 CITIZENS OF CALIFORNIA WOULD HAVE TO DEAL WITH.  I MEAN, THAT'S

25 WHY CALIFORNIA HAS A GOVERNMENT AND A LEGISLATURE AND AN

1   EXECUTIVE BRANCH AND SO ON.  THAT'S WHAT THEY EXIST FOR.

2   **Q**   WELL, DO YOU AGREE IT WOULD IMPACT PUBLIC SAFETY IF THERE

3   WERE MENTALLY ILL INDIVIDUALS, OFFENDERS WHO WERE UNABLE TO

4   ACCESS ANY SORT OF MENTAL HEALTH TREATMENT IN THE COMMUNITY?

5   **A**   WELL, I THINK IT -- THERE WOULD BE AN ADVERSE EFFECT ON

6   PUBLIC SAFETY IF ANY RELEASED PRISON INMATE DID NOT HAVE ACCESS

7   TO THE SERVICES THEY NEEDED IN THE COMMUNITY.  THAT WOULD

8   INCLUDE THE MENTALLY ILL AND THE NON-MENTALLY ILL, ALL OF WHOM

9   NEED ONE KIND OF SERVICE OR ANOTHER.

10          BUT WHAT I'M TRYING TO GET AT IS RIGHT NOW THE

11  RESOURCES OF THE STATE -- AND, OBVIOUSLY, THEY'RE ALWAYS FINITE,

12  THEY'RE LIMITED RESOURCES -- ARE DISPROPORTIONATELY PUT AT THE

13  SERVICE OF THE PRISON SYSTEM, IN PART BECAUSE THE PRISON SYSTEM

14  IS TAKING CARE OF PEOPLE THAT THE MENTAL HEALTH SYSTEM 50 YEARS

15  AGO WOULD HAVE TAKEN CARE OF DIRECTLY.

16          IF WE ARE GOING TO -- IF THE PRISON POPULATION IS

17  GOING TO DECREASE AND A CERTAIN NUMBER OF MENTALLY ILL PEOPLE

18  WILL BE IN THE COMMUNITY, THIS MIGHT BE AN HISTORICAL TIME FOR

19  THE STATE AND OTHER STATES IN THIS COUNTRY TO THINK OF

20  REDISTRIBUTING RESOURCES FROM THE PRISON SYSTEM BACK INTO THE

21  MENTAL HEALTH SYSTEM.

22          **JUDGE REINHARDT:**  DOCTOR, ARE YOU SAYING IT'S MORE

23  DANGEROUS FOR THE SAFETY OF THE COMMUNITY TO CONTINUE THE PRISON

24  SYSTEM THE WAY IT IS THAN TO RELEASE THESE PEOPLE WITH ADEQUATE

25  TREATMENT?

1          **THE WITNESS:**  ABSOLUTELY.  I REALLY THINK -- I THINK

2  THE STATUS QUO IS MORE DANGEROUS THAN RELEASING PEOPLE, ASSUMING

3  THAT, YOU KNOW, THE CITIZENS OF THIS STATE AND THE MENTAL HEALTH

4  PROFESSIONALS AND SO ON ARE WILLING TO RESPOND TO THIS, YOU

5  KNOW, IN WAYS THAT ARE APPROPRIATE AND NECESSARY.  AGAIN, I'VE

6  INDICATED FROM THE FIGURES THAT I PROJECTED ONTO THE SCREEN WHAT

7  A RELATIVELY SMALL NUMBER OF PEOPLE WE'RE TALKING ABOUT IN A

8  MENTAL HEALTH SYSTEM THAT IS ALREADY TAKING CARE OF AT LEAST

9  658,000 PATIENTS.

10          **JUDGE KARLTON:**  LET ME FOLLOW UP FROM JUDGE

11  REINHARDT'S QUESTION.  WHAT WE'RE DOING NOW, IN YOUR VIEW, IS

12  DANGEROUS FOR PUBLIC SAFETY, IN YOUR VIEW?

13          **THE WITNESS:**  YES, THAT'S WHAT I'M TALKING ABOUT.

14          **JUDGE KARLTON:**  AND YOUR VIEW, AS I UNDERSTAND IT, IS

15  EVEN A RELEASE OF AS MANY AS 50,000 PEOPLE, GIVEN THE RELATIVELY

16  SMALL NUMBER OF MENTAL HEALTH PEOPLE WHO WOULD BE RELEASED JUST

17  IF YOU JUST FOLLOW THE AVERAGE, WILL NOT HAVE A SUBSTANTIAL

18  INCREASE IN THE DANGER TO THE PUBLIC WHICH EXISTS TODAY?

19          **THE WITNESS:**  YES, YOUR HONOR.

20          **JUDGE KARLTON:**  BUT THAT IF THE STATE WERE TO DIVERT

21  FUNDS FROM THE PRISONS TO THE COMMUNITY, AMONG OTHER REASONS

22  BECAUSE THEY WOULD NOT NEED AS MUCH FUNDS FOR MENTAL HEALTH IN

23  THE COMMUNITY IN THE PRISONS, THAT WOULD, IN YOUR VIEW, HAVE A

24  SUBSTANTIAL BENEFICIAL -- I DON'T KNOW SUBSTANTIAL -- A

25  BENEFICIAL EFFECT ON PUBLIC SAFETY?

1    **THE WITNESS:**  YES.

2    **JUDGE KARLTON:**  IS THERE ANY WAY FOR YOU TO

3  QUANTIFY -- AND THE ANSWER MAY BE NO, I UNDERSTAND THAT.  IS

4  THERE ANY WAY FOR YOU TO QUANTIFY THE BENEFIT IN TERMS OF COST?

5    **THE WITNESS:**  YES, I MEAN, I COULD AT LEAST REFER TO

6  SOME FIGURES THAT I THINK WOULD BE RELEVANT IN MAKING SUCH AN

7  ASSESSMENT.  I ALSO MENTIONED A CRUDE ESTIMATE OF THE COST TO

8  THE STATE FOR EACH PRISONER IN THE PRISON SYSTEM IS COSTING

9  ROUGHLY $43,000 PER YEAR.  THAT MAY ACTUALLY BE AN

10  UNDERESTIMATE.

11    THE FIGURES THAT I'VE HEARD WITH RESPECT TO REALLY

12  FULL SCALE INPATIENT MENTAL HOSPITAL TREATMENT ARE MORE ON THE

13  ORDER OF $30,000.  AND FOR OUTPATIENT TREATMENT I'VE HEARD

14  FIGURES -- AGAIN, I'M TALKING ABOUT IN CALIFORNIA -- ARE FIGURES

15  OF AVERAGES OF MAYBE $4,500 A YEAR, WHICH IS ROUGHLY ONE-TENTH

16  AS MUCH AS IT COST TO KEEP SOMEBODY IN PRISON.

17    SO WHAT I'M SAYING IS I'M VERY AWARE AND VERY

18  SENSITIVE TO THE FACT THAT ANY STATE'S RESOURCES FINANCIALLY ARE

19  LIMITED.  THEY'RE FINITE.  WHAT I'M TRYING TO SAY IS I THINK THE

20  KIND OF CHANGE THAT WE'RE TALKING ABOUT HERE, NOT ONLY WOULD BE

21  BETTER FOR THE MENTALLY ILL, WOULD NOT ONLY BE, I THINK, AN

22  IMPROVEMENT IN PUBLIC SAFETY, IT WOULD ACTUALLY SAVE THE

23  TAXPAYERS MONEY.

24  **BY MS. FUENTES**

25  Q    WELL, DO YOU AGREE THERE'S NO GUARANTEE THAT THE COUNTIES

1   WILL RECEIVE THE FUNDINGS TO PROVIDE THOSE SERVICES?

2   **A**   I UNDERSTAND THAT.   THAT'S ALWAYS THE RISK IN A DEMOCRACY.

3   **Q**   SO THE RESULT MAY VERY WELL BE THAT THERE ARE JUST MORE

4   UNTREATED OFFENDERS IN THE COMMUNITY?

5   **A**   IF THE STATE DECIDED THAT'S WHAT THE STATE WANTED, THAT'S

6   WHAT THE STATE WOULD GET.

7                **MS. FUENTES:**   THANK YOU.

8                **JUDGE HENDERSON:**   REDIRECT.

9                **REDIRECT EXAMINATION BY MR. GALVAN**

10  **BY MR. GALVAN**

11  **Q**   ON CROSS THERE WAS A LOT OF DISCUSSION OF RISK IN VARIOUS

12  WAYS.   ARE MENTALLY ILL OFFENDERS MORE RISKY THAN OTHER

13  OFFENDERS WHEN THEY'RE RELEASED?

14  **A**   NO.

15  **Q**   WHY NOT?

16  **A**   THE LIKELIEST EXPLANATION IS THAT PEOPLE SUFFERING FROM THE

17  SEVERE MENTAL DISORDERS, THE AXIS I DISORDERS, WHICH IS WHAT

18  WE'RE PRIMARILY TALKING ABOUT HERE, ARE MORE LIKELY TO BE

19  SOCIALLY WITHDRAWN THAN THEY ARE TO BE SOCIALLY AGGRESSIVE.

20  THEY'RE MORE LIKELY TO BE DISORGANIZED THAN THEY ARE TO BE

21  CAPABLE OF CARRYING OUT A -- YOU KNOW, A COMPLEX CRIME, YOU

22  KNOW, LIKE ROBBING A BANK OR WHATEVER, AND I MEAN, EVEN PEOPLE

23  WHO ARE VERY PARANOID ARE MORE LIKELY TO RESPOND WITH FEAR AND

24  WITHDRAWAL THAN THEY ARE WITH ATTACK.

25                SO I THINK IT'S -- I REALIZE IT'S SOMEWHAT

1   COUNTERINTUITIVE.  MOST PEOPLE ARE SURPRISED WHEN THEY HEAR WHAT

2   THE RESEARCH HAS SHOWN, IS THAT MENTALLY ILL OFFENDERS ARE

3   ACTUALLY EITHER NO MORE DANGEROUS OR IN MANY CONTEXTS

4   SIGNIFICANTLY LESS DANGEROUS THAN THE NON-MENTALLY ILL PAROLEES

5   OR DISCHARGED PRISONERS, BUT THE FACT IS I THINK THERE ARE

6   UNDERSTANDABLE REASONS WHY THAT'S THE CASE.

7   **Q**   THERE WAS ALSO DISCUSSION ON CROSS REGARDING DIAGNOSTIC

8   CATEGORIES IN THE DSM-IV AND THE DISTRIBUTION BETWEEN AXIS I AND

9   AXIS II.  AND I KNOW IN WORKING ON YOUR REPORT YOU LOOKED AT THE

10  COLEMAN PROGRAM GUIDE WHICH HAS THE CLASS DEFINITION.  DOES THE

11  COLEMAN -- THE LIST OF DIAGNOSES YOU SAW FOR THE COLEMAN CLASS

12  DEFINITION, DOES IT INCLUDE AXIS II DISORDERS?

13  **A**   NO, IT SPECIFICALLY DOES NOT.  IT IS LIMITED TO AXIS I.

14  **Q**   AND AXIS II DISORDERS, I THINK YOU'VE WRITTEN, ARE VERY

15  COMMONLY -- OR THEY ARE MODAL -- THEY'RE MODAL IN PRISON.  WHAT

16  DOES THAT WORD "MODAL" MEAN?

17          **JUDGE KARLTON:**  FIRST OF ALL, DO YOU AGREE THEY ARE

18  MODAL?

19          **THE WITNESS:**  YES, I DO.

20  **BY MR. GALVAN**

21  **Q**   WHAT DOES MODAL MEAN?

22  **A**   IT'S THE -- IF YOU WERE DRAWING A NORMAL DISTRIBUTION CURVE,

23  IT WOULD BE THE TOP OF THE CURVE.  THAT PRISONERS ARE -- THE

24  AVERAGE PRISONER YOU SEE IN PRISONS IS LIKELY TO HAVE A

25  PERSONALITY DISORDER.

1        NOW, LET ME BE CLEAR ABOUT THIS DIAGNOSTIC CATEGORY.

2   IT'S A DESCRIPTION OF PERSONALITY PATTERNS, OR YOU MIGHT SAY

3   CHARACTER PATTERNS.  IT'S SOMETIMES CALLED A PERSONALITY

4   DISORDER, SOMETIMES A CHARACTER DISORDER.

5        CHARACTER -- YOU KNOW, THE GREEK WORD FOR CHARACTER

6   IS ETHOS.  OUR WORD IS ETHICS.  CHARACTER DISORDERS IS FAILURE

7   OF CHARACTER.  THESE ARE PEOPLE DEFINED IN TERMS OF, YOU MIGHT

8   SAY, A FAILURE OF MORAL DEVELOPMENT AND ARE ALMOST BY DEFINITION

9   PEOPLE WHO ENGAGE IN CRIMINAL BEHAVIOR.

10       I MEAN, THE WAY DSM-IV DEFINES ANTI-SOCIAL

11  PERSONALITY DISORDER IS ESSENTIALLY A DESCRIPTION OF A CAREER

12  CRIMINAL, SO IT'S HARDLY SURPRISING THAT MOST OF THE PEOPLE IN

13  PRISONS WOULD -- COULD BE DESCRIBED ACCORDING TO THAT CONCEPT OF

14  CHARACTER.

15  Q   SO IF THIS WERE A VERY BIG ROOM AND I TOOK THE WHOLE PRISON

16  POPULATION, 172,000, AND I PUT THE COLEMAN CLASS MEMBERS ON THAT

17  SIDE AND I PUT THE NON-COLEMAN CLASS MEMBERS ON THAT SIDE --

18           **JUDGE KARLTON:**  IT WOULD BE VERY CROWDED.

19           **MR. GALVAN:**  THAT'S THE POINT.

20  **BY MR. GALVAN**

21  Q   AND I PUT A WALL BETWEEN THEM.  IF WE WERE ON -- I DON'T

22  REMEMBER WHAT SIDE I PUT THE NON-COLEMAN CLASS MEMBERS ON.

23  LET'S SAY THAT SIDE, THE RIGHT SIDE FROM WHERE YOU ARE -- WE

24  WENT INTO THAT GROUP AND WE MEASURED THE PREVALENCE OF AXIS II

25  DISORDERS IN THE NON-MENTALLY ILL, NON-COLEMAN CLASS MEMBERS,

1    WHAT WOULD WE FIND?

2    **A**    I WOULD THINK, I MEAN, BASED ON 40 YEARS OF EXPERIENCE

3    WORKING WITH PEOPLE IN THESE POPULATIONS, THAT THE VAST MAJORITY

4    OF THEM COULD BE -- HOW DO I SAY?  THEY WOULD MEET THE CRITERIA

5    FOR THE DIAGNOSIS OF AXIS II DISORDER AND OFTEN WOULD BE MORE

6    THAN ONE.

7    **Q**    WE'RE TALKING ABOUT NON-COLEMAN SIDE OF THE ROOM?

8    **A**    YES.

9    **Q**    IF THEN WE WENT TO THE COLEMAN SIDE OF THE ROOM WHERE THE

10   MENTALLY ILL PEOPLE ARE, WOULD WE FIND ANY DIFFERENT INCIDENCE

11   OF AXIS II THERE?

12   **A**    YES, I THINK IT WOULD BE MUCH LOWER.  THE TWO KINDS OF

13   DIAGNOSIS CAN COEXIST.  I WOULD SAY, WHEN THEY DO, YOU ARE

14   LIKELY TO BE DEALING WITH A MORE DANGEROUS PERSON, BUT MANY

15   MENTALLY ILL PEOPLE DON'T MEET THE --

16   **Q**    SO IF I UNDERSTAND YOUR TESTIMONY, THE NON-MENTALLY ILL,

17   NON-COLEMAN SIDE OF THE ROOM, WE WERE GOING TO FIND MORE

18   AXIS II?

19   **A**    YES.

20   **Q**    AND WE ARE GOING TO FIND LESS AXIS II ON THE MENTALLY ILL

21   SIDE?

22   **A**    YES.  I THINK MOST PSYCHIATRISTS WOULD AGREE WITH THAT.  I

23   DON'T THINK I'M FAR OUT IN SAYING THAT.

24   **Q**    SO IF YOU WERE DESIGNING A DIVERSION PROGRAM TO MAXIMIZE

25   PUBLIC SAFETY AND YOU CONSIDERED AXIS II A RISK FACTOR, YOU

1  WOULDN'T GET ANY BENEFIT BY ADDING A FILTER FOR COLEMAN CLASS

2  MEMBERSHIP?

3  **A**  NO.

4  **Q**  THERE'S ALSO SOME TESTIMONY ABOUT SCHIZOPHRENIA ON

5  CROSS-EXAMINATION, AND, YOU KNOW, THE VARIOUS PROBLEMS THAT GO

6  WITH THAT IN TERMS OF EMPLOYABILITY.  IS SCHIZOPHRENIA A COMMON

7  DIAGNOSIS AMONG THE AXIS I, OR IS IT UNCOMMON?

8  **A**  NO.  THE LIFETIME PREVALENCE OF SCHIZOPHRENIA IN THE

9  POPULATION AS A WHOLE IS GENERALLY CONSIDERED TO BE ABOUT ONE

10 PERCENT, AND THE -- IN PRISONS THE PERCENTAGE OF PEOPLE WITH

11 AXIS I DISORDERS, THAT WOULD INCLUDE MORE THAN JUST

12 SCHIZOPHRENIA, ALSO MOOD DISORDERS AND SO FORTH, IS PROBABLY

13 ABOUT FOUR PERCENT.  THERE'S A HIGHER AVERAGE, BUT STILL WE ARE

14 TALKING ABOUT FOUR PERCENT VERSUS THE REMAINING 96 PERCENT.

15         **JUDGE KARLTON:**  SIR, I DON'T UNDERSTAND.  I HAVE BEEN

16 TOLD, AND I HAVE BEEN BEHAVING ACCORDINGLY, THAT THE COLEMAN

17 CLASS CONSTITUTES ABOUT 20 OR GREATER, 20 TO 30, PERCENT OF THE

18 PRISON POPULATION.  NOW YOU ARE TELLING ME IT'S FOUR PERCENT.

19         **THE WITNESS:**  OKAY, NO, NO.  I'M SORRY I WAS

20 CONFUSING YOU BY NOT BEING SPECIFIC ENOUGH -- OR ALL OF THE

21 WHOLE COURT.

22         SCHIZOPHRENIA ALONE IS CERTAINLY THE -- IT IS

23 RELATIVELY RARE AMONG MENTAL ILLNESSES.  IF YOU ARE CONSIDERING

24 ALL THE AXIS I DIAGNOSES, THEY CERTAINLY WOULD BE MORE THAN ONE

25 PERCENT.  IF YOU ADD THEM ALL TOGETHER IN THE POPULATION, YOU

1  WOULD BE TALKING ABOUT NOT ONE PERCENT AS SCHIZOPHRENIA, BUT

2  PROBABLY SOMEWHERE BETWEEN FOUR AND FIVE PERCENT.  IF YOU

3  MULTIPLY THAT BY FOUR, YOU GET THE -- ROUGHLY THE PERCENTAGE OF

4  THE PRISON POPULATION THAT'S MENTALLY ILL, WHICH WOULD -- YOU

5  KNOW, IT'S GENERALLY CONSIDERED AS SOMEWHERE BETWEEN 15 AND

6  20 PERCENT.

7  **BY MR. GALVAN**

8  **Q**   SO IF WE TOOK THAT 15 TO 20 PERCENT, THAT'S THE COLEMAN

9  POPULATION IN THE PRISON, THE PORTION THAT ARE DIAGNOSED WITH

10 SCHIZOPHRENIA WOULD BE FAIRLY SMALL?

11 **A**   YES.  THAT'S RIGHT.

12 **Q**   WHEN YOU -- IN YOUR CAPACITIES IN MASSACHUSETTS AS A

13 PRACTITIONER OF CORRECTIONAL MENTAL HEALTH, DID YOU HAVE

14 OCCASION TO TESTIFY IN PROCEEDINGS TO PREVENT RELEASE OF PERSONS

15 BASED ON MENTAL HEALTHNESS?

16 **A**   OH, FREQUENTLY.

17 **Q**   THESE WERE INDIVIDUAL PEOPLE?

18 **A**   YES.

19 **Q**   IN YOUR SYSTEM YOU HAD A MEANS OF GETTING SOMEONE CIVILLY

20 COMMITTED ON THE WAY OUT THE DOOR FROM PRISON?

21 **A**   ABSOLUTELY.

22 **Q**   AND IN FORMING YOUR OPINIONS IN THIS CASE, HAVE YOU REVIEWED

23 THE PROVISIONS OF THE CALIFORNIA MENTALLY DISORDERED OFFENDERS

24 ACT?

25 **A**   YES.

1  **Q**   WHAT'S YOUR UNDERSTANDING OF THE POWERS THAT IT GIVES THE

2  CORRECTIONS DEPARTMENT?

3  **A**   WELL, THE CORRECTIONS DEPARTMENT DOES HAVE WAYS UNDER THE

4  LAW OF ASSESSING PRISONERS WHO ARE SCHEDULED FOR RELEASE FROM

5  PRISON AS TO WHETHER OR NOT THEY SHOULD BE CONSIDERED DANGEROUS

6  TO THEMSELVES OR OTHERS BY REASON OF MENTAL ILLNESS.  IF THAT IS

7  THE DETERMINATION, THERE ARE MEANS AVAILABLE TO HAVE THEM --

8  WELL, I'LL SAY TO PETITION THE COURT TO COMMIT THEM FOR

9  TREATMENT INVOLUNTARILY IF THEY DON'T AGREE TO DO IT VOLUNTARILY

10 FOR INPATIENT MENTAL HOSPITALIZATION, BOTH FOR THEIR TREATMENT

11 AND FOR THE SAFETY OF THE PUBLIC.

12 **Q**   AND I KNOW IN YOUR DEPOSITION THERE WAS SOME QUESTIONS ABOUT

13 DID YOU KNOW THE EXACT NAME OF THE LANTERMAN-PETRIS-SHORT ACT.

14 ARE YOU GENERALLY AWARE THAT THE 50 STATES ADOPTED CIVIL

15 COMMITMENTS STATUTES?

16 **A**   OH, YES.

17 **Q**   AND CALIFORNIA HAS ONE?

18 **A**   YES.

19 **Q**   ARE YOU AWARE THAT THE DEPARTMENT CAN, ON A SHOWING OF

20 PROBABLE CAUSE, TAKE AN ABOUT-TO-BE-RELEASED PERSON AND SEND

21 THEM TO THE CIVIL COMMITMENT PROCESS?

22 **A**   YES.

23 **Q**   REGARDING THE KNOWN RISK FACTORS THAT YOU'VE TESTIFIED

24 ABOUT, SUCH AS PRIOR VIOLENCE AND SUBSTANCE ABUSE, DO YOU HAVE

25 OPINIONS ABOUT THE USE OF ANY KINDS OF RISK AND NEEDS TOOLS WHEN

1  CONTEMPLATING EITHER DIVERSIONARY STRATEGIES OR RELEASE

2  STRATEGIES?

3          **MR. LEWIS:**  OBJECTION, YOUR HONOR.  IT'S BEYOND THE

4  SCOPE OF THE CROSS.  RISK NEEDS WERE NEVER ADDRESSED.

5          **MR. GALVAN:**  THE CROSS SPENT A LOT OF TIME ON RISK

6  FACTORS, SUBSTANCE ABUSE, PRIOR HISTORY OF VIOLENT FELONIES.

7          **MR. LEWIS:**  BUT NOT RISK AND NEEDS ANALYSIS, NOT THE

8  TOOLS.

9          **JUDGE HENDERSON:**  I WILL ALLOW IT, COUNSEL.  REPEAT

10 THE QUESTION.

11         **MR. GALVAN:**  YES.  THANK YOU.

12 **BY MR. GALVAN**

13 **Q**   IN YOUR WORK IN GENERAL, DO YOU HAVE AN OPINION ABOUT THE

14 USE OF TOOLS, ACTUARIAL TOOLS, TO MEASURE RISK AND NEEDS IN

15 PREDICTING -- DEALING WITH CORRECTIONAL POPULATIONS?

16 **A**   YES.  I KNOW THESE TOOLS ARE AVAILABLE.  THEY'RE, I MEAN,

17 CONTINUALLY BEING CREATED AND PERFECTED, AND IN MANY CASES THEY

18 ARE -- AND AN ATTEMPT, I THINK, TO KIND OF SYSTEMATIZE, THE KIND

19 OF THING WE USED TO DO JUST CLINICALLY IN ASSESSING PEOPLE

20 FOR -- YOU KNOW, PRIOR TO THEIR DISCHARGE FROM PRISON.  BUT

21 DOING IT ON AN ACTUARIAL BASIS CAN ALSO IMPROVE THE PREDICTIVE

22 POWER OF THE PRERELEASE, YOU KNOW, PLANNING WHICH IS WHAT I

23 RECOMMENDED EARLIER IN MY TESTIMONY.

24 **Q**   THERE WAS SOME CROSS-EXAMINATION ABOUT DID YOU KNOW THE

25 TOTAL CAPACITY OF THE DEPARTMENT OF MENTAL HEALTH STATE HOSPITAL

1  SYSTEM AND IN FORMING YOUR OPINION, EVEN IF YOU DIDN'T CONSIDER

2  THE TOTAL CAPACITY, DID YOU CONSIDER THE 800 EMPTY BEDS AT

3  COALINGA STATE HOSPITAL?

4  **A**  AT COALINGA, YES, ABSOLUTELY.

5  **Q**  AND HOW DID THE PRESENTATION OF THOSE BEDS AFFECT YOUR

6  OPINION?

7  **A**  WELL, IT SEEMS TO ME THAT THERE CLEARLY ARE MORE THAN ENOUGH

8  BEDS AVAILABLE FOR WHAT THE PROJECTED NEED FOR THEM WOULD BE

9  BASED ON THE CHARTS THAT I SHOWED ON THE SCREEN.

10 **Q**  THEN THERE WAS ALSO CROSS-EXAMINATION REGARDING WHETHER YOU

11 DID AN INDEPENDENT STUDY OF THE STAFFING NEEDS FOR THE PAROLE

12 OUTPATIENT CLINIC SYSTEM, AND YOU TESTIFIED YOU DIDN'T.  DID YOU

13 REVIEW DOCUMENTS FROM THE CORRECTIONS DEPARTMENT OF THEIR OWN

14 ANALYSES?

15 **A**  YES.

16 **Q**  OKAY.  I'D LIKE TO SHOW ONE OF THOSE IF I COULD, P 715,

17 P 715.

18                     (DOCUMENT DISPLAYED.)

19 **BY MR. GALVAN**

20 **Q**  AND IN YOUR SCIENTIFIC WORK, DO YOU FIND THAT EXPERTS LIKE

21 YOURSELF GENERALLY FIND IT A USEFUL THING TO REVIEW THE

22 DOCUMENTS BY WHICH AN AGENCY OR CORRECTIONS DEPARTMENT HAS

23 QUANTIFIED ITS NEEDS AND RESOURCES?

24 **A**  YES, THAT'S A GOOD PLACE TO BEGIN.

25 **Q**  DO YOU REMEMBER LOOKING AT THE DOCUMENT THAT'S ON THE SCREEN

1  NOW, WHICH IS PLAINTIFF'S EXHIBIT 715, WITH THE TITLE "DIVISION

2  OF ADULT PAROLE OPERATIONS"?

3                    (INTERRUPTION BY THE COURT REPORTER.)

4         **THE WITNESS:**  YES, I DO.

5  **BY MR. GALVAN**

6  **Q**   JUST FOR THE COURT REPORTER, DO YOU REMEMBER LOOKING AT THIS

7  DOCUMENT ON THE SCREEN RIGHT NOW, P 715, DIVISION OF ADULT

8  PAROLE OPERATIONS?

9  **A**   MM-HMM.  YES, I DO.

10 **Q**   IF WE COULD TURN IN A FEW PAGES IN THIS DOCUMENT, PLEASE, TO

11 PAGE 4?

12        IF WE COULD ZOOM INTO THE CHART, PLEASE?

13        DO YOU REMEMBER REVIEWING THAT, HOW THE MENTALLY ILL

14 PAROLE POPULATION BROKE DOWN IN CALIFORNIA PAROLE --

15 **A**   YES.

16 **Q**   IF WE GO TO THE CHART ON THE NEXT PAGE, PLEASE, PAGE 5?  DO

17 YOU REMEMBER LOOKING AT THESE STAFFING RATIOS FOR THE PAROLE

18 OUTPATIENT CLINIC?

19 **A**   YES, I DO.

20 **Q**   IN YOUR OPINION, DO THEY NEED MORE HELP?

21 **A**   I'M SORRY?  WHAT?

22 **Q**   DO THEY NEED MORE HELP?

23        **MR. LEWIS:**  LACK OF FOUNDATION, OBJECTION.

24        **MR. GALVAN:**  I WITHDRAW THE QUESTION.

25

 1  **BY MR. GALVAN**

 2  **Q**   IN YOUR OPINION, ARE THEY ADEQUATELY STAFFED?

 3          **MR. LEWIS:**  SAME OBJECTION.

 4          **JUDGE HENDERSON:**  OVERRULED.

 5          IS THE QUESTION WHETHER, AFTER REVIEWING THIS

 6  DOCUMENT AND THESE CHARTS, IS IT HIS OPINION THAT THEY'RE

 7  ADEQUATELY STAFFED OR INADEQUATELY STAFFED; IS THAT YOUR

 8  QUESTION?

 9          **MR. GALVAN:**  YES, YOUR HONOR.

10          **THE WITNESS:**  MY OPINION, LOOKING AT THESE NUMBERS,

11  WOULD BE THAT THEY ARE INADEQUATE CURRENTLY.  I WOULD LIKE TO

12  SEE THEM BEEFED UP.

13          **MR. GALVAN:**  IF WE COULD LOOK -- IF WE COULD ZOOM OUT

14  ON THAT PAGE AND ZOOM BACK IN THREE PARAGRAPHS DOWN, PLEASE?

15  THE PARAGRAPH THAT STARTS "EACH YEAR," JUST THAT EACH YEAR

16  PARAGRAPH?

17          **THE WITNESS:**  YEAH.

18  **BY MR. GALVAN**

19  **Q**   THIS PARAGRAPH, FOR THE RECORD, SAYS:

20              "EACH YEAR OVER 6,000 PAROLEES SUFFERING

21              FROM SERIOUS MENTAL ILLNESS ARE RETURNED TO

22              PRISON FOR PERIODS RANGING FROM A FEW MONTHS UP

23              TO ONE FULL YEAR OR LONGER IF THEY RECEIVE A NEW

24              TERM.  THIS IS PRIMARILY DUE TO TECHNICAL

25              VIOLATIONS OR OTHER CRIMINAL BEHAVIOR, BUT CAN

1        RESULT FROM THEIR MENTAL ILLNESS.  MANY OF THE

2        PROBLEMS EXHIBITED BY THESE INDIVIDUALS, WHEN

3        NON-COMPLIANT WITH THEIR PAROLE CONDITIONS, ARE

4        RELATED TO THE DISORGANIZATION PRODUCED BY THEIR

5        MENTAL ILLNESS."

6        DID YOU CONSIDER THAT STATEMENT BY THE CDCR IN

7   REACHING YOUR OPINIONS?

8   **A**   ABSOLUTELY.  I WOULD GIVE A LOT OF WEIGHT TO THAT.

9   **Q**   IF WE COULD LOOK AT P 757 AS WELL?  DO YOU RECALL LOOKING AT

10  THESE TYPES OF BUDGET PLANNING DOCUMENTS LIKE THIS BUDGET CHANGE

11  PROPOSAL?

12  **A**   YOU KNOW, I'M -- I CAN'T SAY I'M AS FAMILIAR -- I

13  REVIEWED -- I REVIEWED DOZENS, IF NOT HUNDREDS, OF DOCUMENTS

14  OVER THE PAST FEW MONTHS.  THIS I'M VERY FAMILIAR WITH WHAT YOU

15  WERE JUST SHOWING.  THIS I DON'T RECALL AS SPECIFICALLY.

16  **Q**   IF WE --

17  **A**   I MAY WELL HAVE REVIEWED IT THIS SUMMER, BUT I -- YOU KNOW.

18  **Q**   IF WE MOVE FORWARD IN THAT DOCUMENT TO THE -- JUST,

19  ACTUALLY, THE NEXT PAGE THAT HAS TEXT?  AND THE FIRST PARAGRAPH,

20  JUST BY WAY OF REFRESHING YOUR RECOLLECTION, DO YOU RECALL THIS

21  MATERIAL ABOUT THE -- THE SENTENCE HERE, "THE CALIFORNIA

22  DEPARTMENT OF CORRECTIONS AND REHABILITATION IS REQUESTING FOUR

23  PERMANENT FULL-TIME POSITIONS AND NO FUNDS FOR FISCAL YEAR

24  '07/'08, AND $6,000,037 FOR FY '08/'09, ONGOING TO ENHANCE

25  MENTAL HEALTH REHABILITATIVE AND STABILIZATION SERVICES FOR THE

1   MENTALLY ILL OFFENDER ADULT POPULATION.  AND FOR FY '08/'09,

2   FUNDING WILL BE PROVIDED OUT OF THE $50 MILLION APPROPRIATED FOR

3   INMATE AND PAROLE PROGRAMS IN AB 900.

4           **THE WITNESS:**  OKAY.  I WOULD THINK --

5           **JUDGE KARLTON:**  WELL, YOU READ IT.  APPARENTLY, HE

6   WANTS TO KNOW WHETHER YOU READ IT BEFORE.

7   **BY MR. GALVAN**

8   **Q**   OR WHETHER YOU HAVE A PRESENT RECOLLECTION NOW AS --

9           **JUDGE REINHARDT:**  HE'S READ IT NOW.  SO WHY DON'T YOU

10  ASK HIM SOMETHING ABOUT IT.

11          **MR. GALVAN:**  I'LL SHIFT TO A WHOLE OTHER AREA, YOUR

12  HONOR.

13  **BY MR. GALVAN**

14  **Q**   DO YOU RECALL IN GENERAL THE TOPIC OF AB 900, ASSEMBLY BILL

15  900?

16  **A**   YES, THAT WE --

17          **JUDGE REINHARDT:**  PRISON REFORM, IS THAT THE TOPIC

18  YOU ARE INTERESTED IN, THE GENERAL TOPICS?

19          **MR. GALVAN:**  NO, MORE SPECIFICALLY, THE STRATEGIES IN

20  AB 900 TO ENHANCE SERVICES FOR MENTALLY ILL PAROLEES.

21          **THE WITNESS:**  THAT THEY'RE ALREADY STEPS INCLUDED IN

22  AB 900 TO SOLVE SOME OF THESE PROBLEMS.

23  **BY MR. GALVAN**

24  **Q**   REGARDING THE CROSS-EXAMINATION ON -- OF IMPOVERISHED AREAS

25  AND THE DIFFICULTIES IN RECRUITMENT, IN YOUR PROFESSIONAL

1  EXPERIENCE, ARE THERE DIFFICULTIES IN RECRUITING CLINICIANS TO

2  WORK IN PRISONS?

3  **A**   YES.

4  **Q**   HOW WOULD YOU COMPARE THOSE DIFFICULTIES TO THE DIFFICULTIES

5  EXPERIENCED IN GETTING PEOPLE TO WORK IN IMPOVERISHED AREAS?

6  **A**   I WOULD SAY THEY'RE MUCH GREATER.  THEY'RE MUCH GREATER.  AS

7  HARD AS IT IS TO GET PEOPLE WORKING IN IMPOVERISHED AREAS, I

8  WOULD SAY IT'S STILL MUCH EASIER THAN TO GET PEOPLE TO WORK IN

9  PRISONS.

10          I MEAN, I SAY -- AGAIN, I SAY THAT ON THE BASIS OF

11  HAVING BEEN -- WHERE MY JOB WAS TO, YOU KNOW, HIRE AND FIRE AND

12  RECRUIT MENTAL HEALTH PROFESSIONALS IN A VARIETY OF SETTINGS,

13  AND WE HAD NOT NEARLY AS MUCH TROUBLE IN EVEN -- SOME OF THE

14  POORER AREAS OF BOSTON THAN WE DID GETTING PEOPLE TO WORK IN THE

15  PRISONS.

16  **Q**   WHY?

17  **A**   PRISONS ARE SCARY TO MOST PEOPLE.

18          **JUDGE KARLTON:**  AND THE POPULATION AREN'T REALLY NICE

19  FOLKS, AND YOU GOT CUSTODY TO DEAL WITH AND --

20          **THE WITNESS:**  AND THE LIST IS ENDLESS.  I MEAN, THEY

21  ARE IN MANY PLACES DEGRADING TO WALK INTO.  STAFF ARE

22  HUMILIATED.  I HAD STAFF MEMBERS OF MINE WHO WOULD BE STRIP

23  SEARCHED.  THE DIFFICULTIES ARE TREMENDOUS.  THERE ARE REAL

24  DANGERS.  I HAD STAFF MEMBERS WHO, YOU KNOW, GOT BROKEN JAWS AND

25  BROKEN NOSES, ATTEMPTED RAPES.

1      **MR. LEWIS:**  OBJECTION.  WE ARE GETTING IRRELEVANT

2  HERE, YOUR HONOR.

3      **JUDGE REINHARDT:**  TEDIOUS.

4      **MR. LEWIS:**  THANK YOU.

5      **MR. GALVAN:**  ONE FINAL AREA.

6  **BY MR. GALVAN**

7  **Q**   JUDGE KARLTON ASKED YOU SOME QUESTIONS ABOUT THE

8  COST/BENEFIT ANALYSIS.  DO YOU RECALL REVIEWING THE UCLA REPORTS

9  ON THE TRANSITIONAL CASE MANAGEMENT PROGRAM AND PRERELEASE

10 PLANNING?

11     **MR. LEWIS:**  OBJECTION.  BEYOND SCOPE.  TRANSITIONAL

12 CASE MANAGEMENT WAS NEVER RAISED, YOUR HONORS.

13 **BY MR. GALVAN**

14 **Q**   DO YOU RECALL READING THE STUDY ABOUT THE TRANSITIONAL CASE

15 MANAGEMENT PROGRAM THAT SPECIFICALLY FOUND THAT EVERY DOLLAR

16 SPENT ON THAT PROGRAM --

17     **MR. LEWIS:**  PARDON ME, COUNSEL.  I BELIEVE THERE'S AN

18 OBJECTION.  I'M SORRY IF I DIDN'T HEAR A RESPONSE, YOUR HONOR.

19     **JUDGE HENDERSON:**  HE'S POSING ANOTHER QUESTION NOW.

20     **JUDGE KARLTON:**  I RAISED THE QUESTION OF

21 COST/BENEFIT.  IT'S NOT CLEAR TO ME IT INVITES OTHER QUESTIONS

22 OF COUNSEL, I SUPPOSE.

23     **JUDGE REINHARDT:**  WHAT'S THE NEW QUESTION?

24     **JUDGE HENDERSON:**  THAT'S THE NEW QUESTION.

25

1  **BY MR. GALVAN**

2  **Q**    DO YOU RECALL REVIEWING THE UCLA STUDY OF THE PRERELEASE

3  PLANNING PROGRAM, KNOWN AS TRANSITIONAL CASE MANAGEMENT, THAT

4  FOUND THAT EVERY DOLLAR SPENT ON THAT PROGRAM SAVED MORE MONEY

5  IN REDUCING THE DAYS IN PRISON BY GETTING MENTALLY ILL PAROLEES

6  HOOKED UP WITH THEIR APPOINTMENTS?

7  **A**    YES.  PARTICIPATING IN MENTAL HEALTH TREATMENT INCREASES THE

8  LIKELIHOOD THAT PAROLEES WILL SUCCESSFULLY ADJUST IN THE

9  COMMUNITY AND NOT HAVE TO BE RETURNED TO PRISON.  IN FACT, THERE

10  ARE MANY DIFFERENT STUDIES SHOWING THE LONG RUN BENEFIT TO THE

11  TAXPAYER FAR OUTWEIGHS THE COST OF ANY NUMBER OF PROGRAMS THAT

12  ENHANCE THE TREATMENT OF PRISONERS, WHETHER THEY'RE MENTALLY ILL

13  OR NON-MENTALLY ILL.

14          **MR. GALVAN:**  NO FURTHER QUESTIONS.  THANK YOU.

15          **JUDGE HENDERSON:**  RECROSS.

16          **MR. LEWIS:**  NONE, YOUR HONOR.

17          **MS. FUENTES:**  NO, YOUR HONOR.

18          **JUDGE HENDERSON:**  THANK YOU VERY MUCH FOR APPEARING,

19  DR. GILLIGAN, AND WE ARE RECESSED FOR THE DAY UNTIL NEXT TUESDAY

20  AT 9:15.  I'LL REMIND COUNSEL TO GET US THE WITNESS LISTS AND

21  ACCURATE ESTIMATES OF TIME NEXT MONDAY.

22          (PROCEEDINGS ADJOURNED.)

23

24

25

1

2

**I N D E X**

3

**PLAINTIFF'S WITNESSES**                              **PAGE**    **VOL.**

4

**JEFFREY BEARD**

5

DIRECT EXAMINATION BY MR. SPECTER            1546       8
6    CROSS-EXAMINATION BY MR. MELLO               1581       8
     CROSS-EXAMINATIONM BY MR. MITCHELL          1591       8
7    REDIRECT EXAMINATION BY MR. SPECTER          1605       8

8

**JAMES GILLIGAN, M.D.**

9

DIRECT EXAMINATION BY MR. GALVAN             1608       8
10   CROSS-EXAMINATION BY MR. LEWIS               1618       8
     CROSS-EXAMINATION BY MS. FUENTES            1642       8
11   REDIRECT EXAMINATION BY MR. GALVAN           1648       8

12

13                                    -   -   -   -

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      **CERTIFICATE OF REPORTER**

4

5          I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

6    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

7    CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK

8    JPM, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER, AND

9    C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE

10   REPORTED BY ME, CERTIFIED SHORTHAND REPORTER, AND WERE

11   THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING;

12   THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID

13   PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

14          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

15   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

16   COURT FILE.

17

18                      /S/ JOAN MARIE COLUMBINI

19               JOAN MARIE COLUMBINI, CSR 5435, RPR

20                  FRIDAY, DECEMBER 5, 2008

21

22

23

24

25