VOL 9

PAGES 1665 – 1887

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

```
RALPH COLEMAN, ET AL.,            )
                                  )
            PLAINTIFFS,           )
                                  )
  VS.                             ) NO. CIV S-90-0520 LKK JFM
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  ) THREE-JUDGE COURT
            DEFENDANTS.           )
                                  )
_____
                                  )
MARCIANO PLATA, ET AL.,           )
                                  )
            PLAINTIFFS,           )
                                  )
VS.                               ) NO. C 01-1351 TEH
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  )
            DEFENDANTS.           )
_____)
```

### *TRANSCRIPT OF PROCEEDINGS*

SAN FRANCISCO, CALIFORNIA
TUESDAY, DECEMBER 9, 2008

(APPEARANCES ON FOLLOWING PAGES)


*REPORTED BY:*   JOAN MARIE COLUMBINI, CSR 5435, RPR
                DEBRA L. PAS, CSR 11916, CRR, RMR, RPR
                OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**            PRISON LAW OFFICE
                             1917 FIFTH STREET
                             BERKELEY, CALIFORNIA  94710
                             **DONALD SPECTER, ESQUIRE**
                             **REBEKAH EVENSON, ESQUIRE**


                             ROSEN, BIEN & GALVAN, LLP
                             315 MONTGOMERY STREET, TENTH FLOOR
                             SAN FRANCISCO, CALIFORNIA 94104
                     BY:  **MICHAEL W. BIEN, ESQUIRE**
                          **ERNEST GALVAN, ESQUIRE**


                             K&L GATES
                             FOUR EMBARCADERO CENTER
                             SUITE 1200
                             SAN FRANCISCO, CALIFORNIA 94111
                     BY: **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**                CARROLL, BURDICK & MCDONOUGH
                             44 MONTGOMERY STREET, SUITE 400
                             SAN FRANCISCO, CALIFORNIA  94104
                     BY: **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**           STATE OF CALIFORNIA
                             DEPARTMENT OF JUSTICE
                             OFFICE OF THE ATTORNEY GENERAL
                             1300 I STREET, SUITE 125
                             P.O. BOX 944255
                             SACRAMENTO, CALIFORNIA  94244
                     BY:  **LISA A. TILLMAN, ESQUIRE**


                             STATE OF CALIFORNIA
                             DEPARTMENT OF JUSTICE
                             OFFICE OF THE ATTORNEY GENERAL
                             455 GOLDEN GATE AVENUE, SUITE 11000
                             SAN FRANCISCO, CALIFORNIA  94102
                     BY: **KYLE A. LEWIS, ESQUIRE**


                             HANSON BRIDGETT
                             425 MARKET STREET, 26TH FLOOR
                             SAN FRANCISCO, CALIFORNIA  94105
                     BY:  **PAUL MELLO, ESQUIRE**
                          **S. ANNE JOHNSON, ESQUIRE**


(APPEARANCES CONTINUED ON FOLLOWING PAGE)

**APPEARANCES (CONTINUED):**


**FOR DISTRICT ATTORNEY**      THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**                COUNTY OF RIVERSIDE
                               82-675 HIGHWAY 111, FOURTH FLOOR
                               INDIO, CALIFORNIA  92201
                   BY:   **WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**             AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**                580 CALIFORNIA STREET, 15TH FLOOR
                               SAN FRANCISCO, CALIFORNIA  94104
                   BY:   **TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT**        JONES & MAYER
**INTERVENORS**                3777 NORTH HARBOR BOULEVARD
                               FULLERTON, CALIFORNIA  92835
                   BY:   **KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS**     OFFICE OF THE COUNTY COUNSEL
                               COUNTY OF SANTA CLARA
                               70 WEST HEDDING STREET
                               NINTH FLOOR, EAST WING
                               SAN JOSE, CALIFORNIA  95110
                   BY:   **THERESA FUENTES, ESQUIRE**


**FOR THE COUNTY OF**          OFFICE OF MICHAEL P. MURPHY
**SAN MATEO**                  COUNTY COUNSEL, SAN MATEO COUNTY
**INTERVENORS**                HALL OF JUSTICE AND RECORDS
                               400 COUNTY CENTER, 6TH FLOOR
                               REDWOOD CITY, CALIFORNIA 94063-1662
                   BY:   **CAROL L. WOODWARD, ESQUIRE**

 1  **TUESDAY, DECEMBER 9, 2008**                      9:20 O'CLOCK A.M.

 2                        **P R O C E E D I N G S**

 3

 4          **JUDGE HENDERSON:**  OKAY.  LET'S GET GOING.  CALL YOUR

 5  NEXT WITNESS.

 6          **MR. MELLO:**  GOOD MORNING, YOUR HONORS.  PAUL MELLO

 7  FOR DEFENDANTS.  DEFENDANTS ARE CALLING MATTHEW CATE, THE

 8  SECRETARY FOR THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

 9  REHABILITATION, AND HE'S IN THE HALLWAY.  WE ARE GETTING HIM.

10          **MR. SPECTER:**  HE FLED THE JURISDICTION.

11                      **MATTHEW L. CATE,**

12  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANTS WAS FIRST

13  DULY SWORN AND EXAMINED AS FOLLOWS:

14          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

15  RECORD.

16          **THE WITNESS:**  MATTHEW L. CATE.  M-A-T-T-H-E-W, LAST

17  NAME IS C-A-T-E.

18          **MR. MELLO:**  YOUR HONORS, SECRETARY CATE HAS SUBMITTED

19  A TRIAL AFFIDAVIT IN THIS MATTER.  IT'S MARKED AS DEFENDANT'S

20  EXHIBIT 1000.  ON NOVEMBER 17TH, DEFENDANTS SUBMITTED MINOR

21  REVISIONS TO THAT TRIAL AFFIDAVIT TO CORRECT A FEW EXHIBIT

22  NUMBERS.  SECRETARY CATE'S EDUCATIONAL AND PROFESSIONAL

23  BACKGROUND ARE SUMMARIZED IN PARAGRAPHS 2 TO 4 OF THAT TRIAL

24  AFFIDAVIT.

25  ///

1          **DIRECT EXAMINATION BY MR. MELLO**

2     **BY MR. MELLO**

3     **Q**    GOOD MORNING, SECRETARY CATE.

4     **A**    GOOD MORNING.

5     **Q**    WHEN WERE YOU APPOINTED AS THE SECRETARY OF THE CALIFORNIA

6     DEPARTMENT OF CORRECTIONS AND REHABILITATION?

7     **A**    MAY 16TH OF THIS YEAR.

8     **Q**    OKAY.  IMMEDIATELY PRIOR TO THAT POINT, WHAT POSITION DID

9     YOU HOLD?

10    **A**    I WAS THE INSPECTOR GENERAL FOR THE STATE OF CALIFORNIA.

11    **Q**    AND CAN YOU GENERALLY DESCRIBE WHAT YOUR RESPONSIBILITIES

12    WERE IN THAT POSITION?

13    **A**    I WAS -- AS INSPECTOR GENERAL, I WAS RESPONSIBLE FOR THE

14    OVERSIGHT OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION,

15    INCLUDING AUDITING ITS SYSTEMS, INVESTIGATING MISCONDUCT BY

16    SENIOR PERSONNEL, AND OVERSEEING THE OFFICER DISCIPLINE PROCESS.

17    **Q**    AND YOU SERVED ON THE CALIFORNIA REHABILITATION OVERSIGHT

18    BOARD, ALSO REFERRED TO AS CROB, FROM 2007 UNTIL YOUR

19    APPOINTMENT, CORRECT?

20    **A**    I'M ACTUALLY STILL A MEMBER OF THE REHABILITATION OVERSIGHT

21    BOARD.  I SERVED AS ITS CHAIR IN MY CAPACITY AS THE INSPECTOR

22    GENERAL, AND I'M CURRENTLY A MEMBER OF THE BOARD IN MY CAPACITY

23    AS SECRETARY.

24    **Q**    WHAT WERE YOUR RESPONSIBILITIES AS CHAIRMAN OF CROB?

25    **A**    I LEAD THE BOARD, AND ITS RESPONSIBILITIES WERE TO OVERSEE

1  THE REHABILITATIVE EFFORTS THAT WERE UNDERWAY AT CDCR AND THEN

2  TO REPORT ON THE QUALITY OF THOSE EFFORTS TO THE LEGISLATURE

3  BIANNUALLY.

4  Q    AND HOW, IF AT ALL, HAS YOUR, OTHER THAN YOUR POSITION AS

5  CHAIRMAN OF THAT BOARD, HAS YOUR ROLE CHANGED WITH RESPECT TO

6  CROB NOW AS SECRETARY OF THE DEPARTMENT?

7  A    I'M SIMPLY ONE OF THE MEMBERS OF THE BOARD AS OPPOSED TO

8  BEING ITS CHAIR.

9  Q    AS PART OF YOUR DUTIES SINCE MAY OF 2006, YOU'VE BECOME

10  FAMILIAR WITH THE ACTIVITIES OF THE DEPARTMENT BEFORE YOUR

11  APPOINTMENT, CORRECT?

12  A    YES, OF COURSE.

13  Q    AND AS PART OF YOUR DUTIES AS BOTH THE INSPECTOR GENERAL AND

14  SINCE BECOMING SECRETARY OF THE DEPARTMENT, YOU WERE AND BECAME

15  FAMILIAR WITH THE ACTIVITIES OF THE PLATA RECEIVER?

16  A    THAT'S TRUE, YES.

17  Q    AS WELL AS THE COLEMAN SPECIAL MASTERS?

18  A    YES.

19  Q    OKAY.  CDCR PUBLISHES WEEKLY POPULATION REPORTS, CORRECT?

20  A    WE DO.

21  Q    OKAY.  LET'S PULL UP DEFENDANTS' 1203.

22                    (DOCUMENT DISPLAYED.)

23  BY MR. MELLO

24  Q    SECRETARY CATE, DOES THIS APPEAR TO BE PORTIONS OF THE

25  AUGUST 27, 2008 POPULATION REPORT?

1   **A**   IT DOES.

2   **Q**   OKAY.  AND THE REPORT SHOWS THAT AS OF AUGUST 27TH, 2008,

3   CDCR'S TOTAL INMATE POPULATION WAS 172,057, CORRECT?

4   **A**   THAT'S CORRECT.

5   **Q**   ARE ALL OF THOSE 172,057 INMATES HOUSED IN CDCR PRISONS?

6   **A**   NO.

7   **Q**   OKAY.  HOW MANY AS OF AUGUST 27TH, 2008 WERE HOUSED IN CDCR

8   PRISONS?

9   **A**   AS YOU CAN SEE FROM THE REPORT, 156,352 AT THAT TIME.

10  **Q**   OKAY.  AND WHERE ARE THE OTHER ALMOST 16,000 INMATES IN

11  CDCR'S CUSTODY HOUSED?

12  **A**   CDCR ALSO RUNS A CAMP PROGRAM, WHICH ARE UNLOCKED PROGRAMS,

13  COMMUNITY CORRECTIONAL FACILITIES, AND WE HAVE A NUMBER OF

14  INMATES THAT ARE IN OUT-OF-STATE FACILITIES.  DMH HOLDS A SMALL

15  NUMBER OF -- DEPARTMENT OF MENTAL HEALTH HAS A NUMBER OF OUR

16  INMATES, AND THERE'S A SMATTERING OF INMATES IN LOCKED COMMUNITY

17  PROGRAMS.

18  **Q**   WHAT ARE COMMUNITY CORRECTIONAL CENTERS OR FACILITIES?

19  **A**   THEY'RE LOW CUSTODY FACILITIES, TYPICALLY FOR INMATES

20  SERVING NO MORE THAN 18 TO 24 MONTHS WHO HAVE COMMITTED AN

21  OFFENSE THAT ALLOWS THEIR CUSTODY LEVEL TO BE SUCH THAT THEY CAN

22  BE APPROPRIATELY HOUSED IN THAT LESS SECURE FACILITY.  THEY'RE

23  RUN BY EITHER TYPICALLY A PRIVATE PRISON OR A COMMUNITY

24  CONTRACTING WITH A -- DOING THE -- I'M SORRY -- A

25  COMMUNITY-LIKE, CITY OR COUNTY, OR PRIVATE PRISON RUNNING THOSE

1  FACILITIES.

2  **Q**    AND I BELIEVE YOU TESTIFIED THOSE ARE LOW LEVEL, LOW RISK

3  OFFENDERS, CORRECT?

4  **A**    THAT'S RIGHT.

5  **Q**    AND ARE THOSE FACILITIES OVERPOPULATED OR OVERCROWDED?

6  **A**    NO.

7  **Q**    OKAY.  AND YOU BRIEFLY MENTIONED THE CAMPS.  WHAT ARE THE

8  CAMPS?

9  **A**    THE CAMPS ARE, AS I SAID, THEY'RE A PROGRAM THAT CDCR RUNS

10 TO TRAIN INMATES FOR FIREFIGHTING AND TO HANDLE OTHER

11 EMERGENCIES IN CALIFORNIA, AND AS THE NAME IMPLIES, THEY'RE

12 CAMPS WITH DORM SETTINGS, AND INMATES ARE TRAINED AND EXERCISED

13 IN THESE VOCATIONS, AND IN SOME CAMPS THEY ALSO RECEIVE DRUG AND

14 ALCOHOL TREATMENT.

15 **Q**    DO THE CAMPS ALSO HOUSE LOW LEVEL, LOW RISK OFFENDERS?

16 **A**    THEY DO.

17 **Q**    AND ARE INDIVIDUALS WHO HAVE BEEN CONVICTED OF SEX CRIMES OR

18 ARSON OR KIDNAPPING OR CRIMES OF THAT SORT ALLOWED IN CAMPS?

19 **A**    NO, THEY WOULD BE INELIGIBLE.

20 **Q**    AND DO YOU HAVE ANY IDEA WHAT IMPACT, IF ANY, A PRISON

21 RELEASE ORDER THAT TARGETED LOW LEVEL, LOW RISK OFFENDERS WOULD

22 HAVE ON THE POPULATIONS OF COMMUNITY CORRECTION CENTERS?

23 **A**    IN GENERAL, WE HAVE DIFFICULTY FILLING THE AVAILABLE SLOTS

24 IN CAMPS AND IN THE COMMUNITY CORRECTIONAL FACILITIES AND

25 MODIFIED COMMUNITY CORRECTIONAL FACILITIES.  SO I GUESS IT WOULD

1    EXACERBATE THAT ISSUE.

2    Q    DO YOU HAVE ANY IDEA WHAT, IF ANY, IMPACT A PRISON RELEASE

3    ORDER THAT TARGETED LOW LEVEL, LOW RISK OFFENDERS WOULD HAVE ON

4    YOUR FIRE CAMPS?

5    A    SAME IMPACT.

6    Q    ARE YOU FAMILIAR WITH CDCR PRISON CENSUS DATA REPORT AS OF

7    JUNE 30TH, 2008, WHICH I'LL PUT UP, WHICH IS DEFENDANT'S TRIAL

8    EXHIBIT 1255?

9    A    YES.

10            (DOCUMENT DISPLAYED.)

11   BY MR. MELLO

12   Q    I'LL TAKE YOU TO TABLE ONE OF THAT REPORT.  WHAT DOES TABLE

13   ONE TELL US ABOUT THE COMPOSITION OF CDCR'S INMATE POPULATION?

14   A    WELL, IT SETS OUT THE VARIOUS PERCENTAGES OF INMATES WHO ARE

15   RETURNED FOR ONE OF FOUR REASONS AS OF JUNE 30TH, 2008.  AND

16   IT -- AT THAT TIME 63.5 PERCENT OF CDCR INMATES WERE THERE AS A

17   RESULT OF A NEW ADMISSION.  ANOTHER 25.2 PERCENT WERE PAROLE

18   VIOLATERS.  AND "WNT" STANDS FOR WITH NEW TERM.  IT MEANS THEY

19   HAVE BEEN CONVICTED OF A NEW OFFENSE.  AND THEN 9.2 PERCENT

20   WOULD BE PAROLE VIOLATERS WHO WERE RETURNED TO CUSTODY WITHOUT A

21   NEW OFFENSE.  AND THEN, AGAIN, THE SMALL 2.1 PERCENT WERE THOSE

22   WHO WERE STILL PENDING REVOCATION.

23   Q    SECRETARY CATE, THERE'S BEEN TESTIMONY -- A LOT OF TESTIMONY

24   WITH RESPECT TO THE TERM TECHNICAL PAROLE VIOLATERS.  DOES THAT

25   11.3 OR -- PARDON ME -- 11. 3 PERCENT, IS THAT THE PERCENT OF

1   TECHNICAL PAROLE VIOLATERS ON THAT CHART?

2   **A**   WELL, I HAVEN'T BEEN PRIVY TO ALL THE TESTIMONY.

3   **Q**   RIGHT.

4   **A**   BUT I CAN TELL YOU THAT NATIONWIDE THE GENERAL UNDERSTANDING

5   OF A TECHNICAL VIOLATION IS CONDUCT COMMITTED BY A PAROLEE

6   THAT'S MISCONDUCT BECAUSE OF THEIR PAROLE STATUS BUT THAT WOULD

7   BE LEGAL FOR -- OR AT LEAST NOT A CRIMINAL VIOLATION FOR SOMEONE

8   WHO WAS NOT ON PAROLE.

9           SO FOR EXAMPLE, ASSOCIATING WITH A KNOWN GANG MEMBER

10  OR BEING UNDER THE INFLUENCE OF ALCOHOL, SOMETHING LIKE THAT, IS

11  TYPICALLY -- MISSING AN APPOINTMENT WITH YOUR PAROLE AGENT.

12  THOSE ARE THINGS THAT WITH -- FROM WHICH ONE COULD BE REVOKED

13  BUT A CITIZEN WHO'S NOT ON PAROLE COULD NOT.  THAT'S MY

14  UNDERSTANDING OF A TECHNICAL PAROLE VIOLATION.

15          OF THE PERCENTAGES YOU SEE HERE, THERE WILL BE A

16  BLEND OF THOSE WHO ARE RETURNED FOR TECHNICAL VIOLATIONS AS I'VE

17  JUST DEFINED THEM, AND THOSE WHO ARE RETURNED FOR -- BASED UPON

18  A DETERMINATION BY THE PAROLE AGENT OR DETERMINATION BY THE

19  BOARD THAT THEY HAVE COMMITTED A FELONY OR MISDEMEANOR OFFENSE

20  BUT THEY DIDN'T GO THROUGH TRIAL.  SO I GUESS THE ANSWER IS --

21  SHORT ANSWER IS IT'S A MIX OF BOTH PROBABLY.

22  **Q**   BUT THE VAST MAJORITY OF THOSE INDIVIDUALS WHO ARE RETURNED

23  ARE NOT FOR TECHNICAL VIOLATIONS, CORRECT?

24  **A**   THAT'S TRUE.

25          **THE CLERK:**  TEN MINUTES, COUNSEL.

1          **MR. MELLO:**  THANK YOU.

2          **THE CLERK:**  FIVE MINUTES.

3          **MR. MELLO:**  FIVE MINUTES?

4   **BY MR. MELLO**

5   **Q**    DOES CDCR'S PRISON CENSUS DATA REPORTS REPORT OR KEEP

6   INFORMATION REGARDING THE OFFENSES FOR WHICH INMATES ARE SERVING

7   TIME IN CDCR INSTITUTIONS?

8   **A**    YES.

9   **Q**    OKAY.  WE'LL LOOK AT TABLE 3 OF 1255.  AS OF JUNE 30TH,

10  2008, WHAT PERCENTAGE OF CDCR'S INMATES WERE IN CUSTODY FOR

11  CRIMES AGAINST PERSONS?

12  **A**    52.6 PERCENT.

13  **Q**    WHAT PERCENTAGE OF INMATES ARE IN CUSTODY FOR EITHER

14  HOMICIDE, ROBBERY, OR BURGLARY?

15  **A**    MY RECOLLECTION IS IT'S ABOUT A THIRD.

16  **Q**    OKAY.  WHAT CATEGORY OF OFFENSES -- WHAT'S THE SINGLE MOST

17  SIGNIFICANT SOURCE OF INCREASE IN POPULATION BETWEEN '97 AND

18  2007?

19  **A**    CRIMES AGAINST PERSON SHOWED THE GREATEST INCREASE DURING

20  THAT TIME PERIOD.

21  **Q**    OKAY.  DO YOU KNOW WHAT ROLE CONVICTIONS FOR DRUG OFFENSES

22  PLAYED IN THE INCREASE IN THE PRISON POPULATION BETWEEN 1997 AND

23  2007?

24  **A**    FROM MY RECOLLECTION LOOKING AT THE DATA IS, AS OUR

25  POPULATION WENT UP, THE PERCENTAGE OF INMATES SENT TO PRISON FOR

1  DRUG CRIMES DECREASED.

2  **Q**   DO YOU KNOW ANY OF THE REASONS FOR THAT?

3  **A**   I WOULD IMAGINE THAT --

4          **JUDGE KARLTON:**  NO, YOU CAN'T IMAGINE.  GIVE US YOUR

5  BEST JUDGMENT.

6          **THE WITNESS:**  RIGHT.  POOR USE OF TERM THERE.

7          MY BEST JUDGMENT IS THAT DRUG COURTS, PROP 36, THOSE

8  KIND OF ACTIVITIES HAVE MADE THE DIFFERENCE.

9  **BY MR. MELLO**

10 **Q**   DO YOU HAVE AN UNDERSTANDING OF WHAT PERCENTAGE OF FELONY

11 CONVICTIONS IN CALIFORNIA RESULT IN A PRISON SENTENCE?

12 **A**   I'M SORRY.  COULD YOU REPEAT THAT?

13 **Q**   DO YOU KNOW WHAT PERCENTAGE OF FELONY CONVICTIONS IN

14 CALIFORNIA RESULT IN A PRISON SENTENCE?

15 **A**   ABOUT 20 PERCENT.

16 **Q**   AND DO YOU KNOW WHAT PERCENTAGE OF FELONS ARE SENTENCED TO

17 PRISON BY STATE COURTS NATIONWIDE, HOW WE COMPARE NATIONALLY?

18 **A**   I KNOW WE ARE FAR LESS.  I DON'T RECALL THE EXACT NUMBER

19 NATIONWIDE.  BETWEEN 40 AND 50 PERCENT, AS I RECALL, BUT, AGAIN,

20 I'M NOT QUITE SURE.

21 **Q**   DO YOU KNOW WHETHER CALIFORNIA'S AVERAGE PRISON SENTENCE IS

22 BELOW NATIONAL AVERAGE AS WELL?

23 **A**   IT IS.

24 **Q**   AND I'VE HEARD THAT -- OR, STRIKE THAT.

25          DOES IT SOUND RIGHT TO YOU THAT THE AVERAGE PRISON

1  SENTENCE IS APPROXIMATELY 47 MONTHS IN CALIFORNIA?

2  **A**   YES.

3  **Q**   AND DOES IT SOUND RIGHT TO YOU THAT THE AVERAGE PRISON

4  SENTENCE NATIONALLY IS ABOUT 57 MONTHS?

5  **A**   YES.

6  **Q**   OKAY.  IT'S ALSO TRUE -- OR IS IT TRUE THAT CALIFORNIA

7  INMATES ALSO SERVED LESS TIME IN PRISON THAN PRISONERS

8  NATIONALLY, CORRECT?

9  **A**   THAT'S TRUE.

10  **Q**   AND THEY SERVE APPROXIMATELY EIGHT MONTHS ON AVERAGE LESS

11  THAN THE NATIONAL AVERAGE, CORRECT?

12  **A**   CORRECT.

13  **Q**   SECRETARY CATE, TO YOUR UNDERSTANDING, WHAT IS THE SINGLE

14  MOST SIGNIFICANT FACTOR THAT ACCOUNTS FOR CALIFORNIA'S LARGE

15  PRISON POPULATION?

16  **A**   I THINK CALIFORNIA'S LARGE POPULATION OF CITIZENS, OF

17  RESIDENTS IS PROBABLY THE LARGEST FACTOR.

18  **Q**   AND, AGAIN, THERE'S BEEN TESTIMONY IN THIS CASE THAT CRIME

19  RATES HAVE GONE DOWN NATIONALLY.  DO YOU BELIEVE THAT TO BE TRUE

20  AS WELL?

21  **A**   THAT'S MY UNDERSTANDING.

22  **Q**   DESPITE THAT FACT THE CALIFORNIA PRISON POPULATION HAS

23  INCREASED OVER TIME, CORRECT?

24  **A**   IT HAS.

25  **Q**   OKAY.  AND IS THAT INCREASE IN PRISON POPULATION DUE MOSTLY

1   TO INCREASE IN POPULATION IN THE STATE OF CALIFORNIA?

2           **MR. SPECTER:**  OBJECTION.  LACKS FOUNDATION, CALLS FOR

3   EXPERT OPINION AND BEYOND COMPETENCE OF THIS WITNESS.

4           **JUDGE HENDERSON:**  IT'S CONSISTENT WITH THE TESTIMONY

5   HE'S GIVEN.  HE MAY GIVE HIS BEST UNDERSTANDING.

6           **THE WITNESS:**  I KNOW CALIFORNIA'S POPULATION HAS BEEN

7   GROWING ABOUT TWO PERCENT A YEAR, AND THE PRISON POPULATION OVER

8   THE LAST TEN YEARS HAS GROWN AT ABOUT ONE PERCENT.

9   **BY MR. MELLO**

10  **Q**   AND, SECRETARY CATE, HAS THE DEPARTMENT UNDER YOUR

11  LEADERSHIP BEGAN TAKING STEPS, OR ALREADY BEGUN TAKING STEPS

12  WHEN YOU CAME ON BOARD, TO ADDRESS THE CROWDING PROBLEM?

13  **A**   YES.

14  **Q**   WHAT MEASURES HAVE YOU TAKEN AND ARE YOU TAKING?

15  **A**   WELL, AS YOU SAID, I THINK THE DEPARTMENT UNDERTOOK MANY OF

16  THESE BEFORE I WAS APPOINTED.  I THINK THE MOST SIGNIFICANT ARE

17  THE PAROLE REFORM.  WE NOW HAVE A VALIDATED RISK ASSESSMENT

18  TOOL, MEANING WE CAN ASSESS THE RISK OF PAROLEES WHO ARE

19  RETURNING TO THE COMMUNITY, AND WITH THAT WE'VE ESTABLISHED A

20  PAROLE VIOLATION DECISION MAKING INSTRUMENT, WHICH ALLOWS AGENTS

21  AND THE BOARD OF PAROLE HEARING DEPUTY COMMISSIONERS TO MAKE

22  BETTER INFORMED DECISIONS ABOUT WHICH PAROLEES SHOULD BE

23  RETURNED TO THE COMMUNITY FOR PROGRAM AND WHICH SHOULD BE

24  RETURNED TO CUSTODY.  I THINK THAT'S GOING TO HELP OUR

25  POPULATION.

1        WE ARE INCREASING OUR EFFORTS TOWARDS UTILIZING OUR

2   PROGRAMS IN PRISONS, OUR REHABILITATIVE PROGRAMS, AND HAVE SHOWN

3   GREAT SUCCESS, AT LEAST IN THE LAST SIX MONTHS OF INCREASING THE

4   UTILIZATION OF THOSE PROGRAMS.  AND WE'RE ADDING DRUG TREATMENT

5   BEDS AS WELL FOR THAT PURPOSE.  AND, FINALLY, WE ARE SENDING, AT

6   THIS POINT, ABOUT 5,600 -- WE'VE SENT 5,600 INMATES OUT OF STATE

7   WHICH HAS RESULTED IN CLEARING ABOUT 17 GYMS AND SIX DAYROOMS.

8        **THE CLERK:**  TIME'S UP, COUNSEL.

9        **MR. MELLO:**  COUPLE MORE?

10  **BY MR. MELLO**

11  **Q**   HAVE THERE ALSO BEEN EFFORTS TOWARD -- DIRECTED TOWARDS

12  CONSTRUCTION?

13  **A**   OH, YES.  WE HAVE SUBMITTED FOUR WHAT WE CALL IN-FILL

14  PROJECTS, BUT THEY'RE BASICALLY PRISON EXPANSION PROJECTS, TO

15  THE DEPARTMENT OF FINANCE.  DEPARTMENT OF FINANCE HAS FORWARDED

16  THREE OF THOSE TO THE JOINT LEGISLATIVE BUDGET COMMITTEE FOR

17  REVIEWED AS WELL.

18        THE NORTHERN CALIFORNIA REENTRY FACILITY HAS BEEN

19  SUBMITTED TO THE LEGISLATURE FOR THEIR REVIEW.  WE'RE WAITING

20  FOR EITHER A -- THE GO-AHEAD FROM THE ATTORNEY GENERAL'S OFFICE

21  THAT WE CAN GET A CLEAN BOND OPINION OR A FIX FROM THE

22  LEGISLATURE TO ASSEMBLY BILL 900, WHICH WOULD ALLOW US TO BEGIN

23  THOSE CONSTRUCTION PROJECTS.

24        WE'RE ALSO WORKING WITH COMMUNITIES TO GET AN OPTION

25  OR PURCHASE LAND ON WHICH WE CAN BUILD APPROXIMATELY 3,000

1  REENTRY BEDS.  THAT PROCESS IS GOING ON THROUGH -- I THINK IT'S

2  SIX DIFFERENT -- EXCUSE ME -- 12 DIFFERENT COMMUNITIES AT THIS

3  TIME.  SO I THINK THOSE ARE THE PRIMARY EFFORTS.

4  **Q**   AND ARE YOUR -- ARE CDCR'S EFFORTS TO REDUCE ITS INMATE

5  POPULATION DRIVEN BY THE EFFORT TO REACH A PARTICULAR POPULATION

6  NUMBER?

7  **A**   NO.  WE'RE TRYING TO USE THE BEST CORRECTIONAL PRACTICE AND

8  SCIENCE TO REDUCE OUR POPULATION SAFELY, BUT THERE'S NO

9  PARTICULAR NUMBER THAT WE'RE TRYING TO REACH.  I MEAN, I THINK

10 THAT THE ADMINISTRATION'S GOAL AND MY GOAL IS TO GET RID OF WHAT

11 WE CALL NON-TRADITIONAL BEDS OR BAD BEDS, MEANING BEDS IN GYMS

12 OR BEDS IN DAYROOMS.  THEY MAKE OUR BUSINESS MORE DIFFICULT.

13 **Q**   HAVE YOU BEEN SUCCESSFUL IN ELIMINATING SOME OF THOSE

14 NON-TRADITIONAL BEDS?

15 **A**   LARGELY THROUGH OUR OUT-OF-STATE PROGRAM, WE HAVE BEEN ABLE

16 TO REDUCE OUR NUMBER FROM APPROXIMATELY 20,000 TO JUST UNDER

17 14,000 NOW.

18 **Q**   AND ARE YOU FAMILIAR WITH THE JANUARY BUDGET PROPOSAL WHICH

19 AGAIN HAPPENED BEFORE YOU WERE EVEN SECRETARY WITH RESPECT TO

20 CDCR?

21 **A**   YES.

22 **Q**   AND WHAT WAS THAT BUDGET PROPOSAL, TO YOUR UNDERSTANDING?

23 **A**   AS IT RELATED TO CDCR, THERE WAS -- WELL, THE GOVERNOR

24 PROPOSED A TEN PERCENT ACROSS-THE-BOARD CUT TO DEAL WITH THE

25 BUDGET PROBLEMS IN CALIFORNIA, AND THE SOLUTION FROM CDCR AT

1    THAT TIME WAS THE RELEASE OF 22,000 NON-SERIOUS, NONVIOLENT

2    INMATES BEFORE THEIR TERMS EXPIRED.

3    **Q**    WAS THAT BUDGET PROPOSAL ADOPTED?

4    **A**    NO, IT WAS TAKEN OUT IN WHAT'S KNOWN AS THE MAY REVISION TO

5    THE BUDGET.

6    **Q**    MR. SECRETARY, TO YOUR KNOWLEDGE, HAS THE PROJECTED BUDGET

7    DEFICIT FOR THE STATE OF CALIFORNIA INCREASED SINCE

8    JANUARY 2008?

9    **A**    IT HAS.

10   **Q**    AND DID THE GOVERNOR RECENTLY CONVENE A SPECIAL SESSION OF

11   THE LEGISLATURE TO ADDRESS THIS INCREASED BUDGET DEFICIT OR

12   PROJECTED DEFICIT?

13   **A**    HE CONVENED A SPECIAL SESSION OF THE LAST LEGISLATURE WHICH

14   ENDED NOVEMBER 30TH, AND THERE'S BEEN TALK OF ANOTHER SPECIAL

15   SESSION.  I'M NOT SURE IF IT'S BEEN OFFICIALLY CONVENED, THOUGH.

16   **Q**    OKAY.  ARE YOU FAMILIAR THAT THERE WAS A BUDGET PROPOSAL --

17   STRIKE THAT.

18           WHAT WAS THE FOCUS OF THAT LAST SESSION, TO YOUR

19   KNOWLEDGE, ECONOMICALLY?

20   **A**    WELL, THE FOCUS WAS TO CUT THE BUDGET OR RAISE REVENUE, DO

21   SOMETHING TO BALANCE CALIFORNIA'S FISCAL SITUATION, AND, I MEAN,

22   SO ALL DEPARTMENTS TOOK PART.

23   **Q**    OKAY.  IS IT YOUR UNDERSTANDING THAT THE PROJECTED DEFICIT

24   FOR '07/'08, '08/'09 AND '09/'10 IS BIGGER THAN EVEN

25   ANTICIPATED?

1  **A**   YES, THAT'S TRUE.

2            **MR. MELLO:**  THANK YOU.  NOTHING FURTHER.

3            **JUDGE HENDERSON:**  ANYTHING FROM INTERVENORS WITH THIS

4  WITNESS?

5            **MR. MITCHELL:**  NO, YOUR HONOR.  NO QUESTIONS.

6            **JUDGE HENDERSON:**  OKAY.  CROSS-EXAMINATION.

7                 **CROSS-EXAMINATION BY MR. SPECTER**

8  **BY MR. SPECTER**

9  **Q**   GOOD MORNING.

10  **A**   GOOD MORNING.

11  **Q**   SHORTLY AFTER YOU BECAME SECRETARY, YOU GAVE AN INTERVIEW TO

12  THE RADIO STATION KQED; DO YOU RECALL THAT?

13  **A**   I DO.

14  **Q**   AND I ASKED YOU ABOUT THIS AT YOUR DEPOSITION.  YOU SAID:

15            "WHEN YOU ARE INCARCERATING 10,000 A MONTH

16            AND RELEASING 10,000 A MONTH, 120,000 A YEAR,

17            WHICH IS JUST AN EXTRAORDINARY NUMBER, IT IS A

18            BURDEN ON OUR STAFF, AND MISTAKES GET MADE, AND

19            THAT'S JUST ANOTHER REASON FOR TRYING TO HANDLE

20            OUR OVERCROWDING."

21            THAT'S WHAT YOU SAID, RIGHT?

22  **A**   I DID.

23  **Q**   AND YOU BELIEVE THAT TO BE TRUE?

24  **A**   I DO.

25  **Q**   AND WHEN YOU WERE INSPECTOR GENERAL, YOU WOULD PUT OUT PRESS

1  RELEASES, CORRECT?

2  **A**   CORRECT.

3  **Q**   AND IN APRIL OF 2006, YOU PUT OUT A PRESS RELEASE ABOUT AN

4  AUDIT THAT YOU HAD DONE; IS THAT CORRECT?

5  **A**   I'M SURE IT IS.  I DON'T KNOW WHICH ONE YOU ARE REFERRING

6  TO.

7  **Q**   IT'S THE AUDIT YOU DID OF ALL THE OTHER AUDITS TO DETERMINE

8  WHAT PERCENTAGE OF RECOMMENDATIONS THE CDCR HAD COMPLIED WITH;

9  DO YOU RECALL THAT?

10 **A**   YES, WE CALLED IT THE ACCOUNTABILITY AUDIT.

11 **Q**   RIGHT.  IN THAT PRESS RELEASE YOU SAID:

12              "SEVERELY HAMPERING THE DEPARTMENT'S ABILITY

13          TO ADDRESS ITS PROBLEM, THE INSPECTOR GENERAL

14          NOTED, IS AN INMATE POPULATION THAT HAS PRISONS

15          STRAINING AT ALMOST DOUBLE THE DESIGN CAPACITY."

16          DO YOU RECALL THAT?

17 **A**   YES.

18 **Q**   AND THAT STATEMENT IS TRUE NOW AS WELL, ISN'T IT?

19 **A**   IT IS.  OVERPOPULATION MAKES EVERYTHING WE DO MORE

20 DIFFICULT.

21 **Q**   AND YOU ALSO SAID IN THAT SAME PRESS RELEASE:

22              "AS THE INMATE POPULATION INCREASES,

23          CONTROLLING VIOLENCE, OFFERING EDUCATION,

24          DELIVERING HEALTHCARE, MANAGING OVERCROWDING,

25          AND CONTROLLING COSTS BECOME MORE DIFFICULT."

1                DO YOU RECALL SAYING THAT?

2    **A**   YES.

3    **Q**   THAT'S TRUE NOW AS WELL, CORRECT?

4    **A**   IT IS.

5    **Q**   AND IT'S YOUR POSITION THAT OVERCROWDING NEEDS TO BE REDUCED

6    BECAUSE IT MAKES EVERYTHING EASIER TO DO IN A PRISON, CORRECT?

7    **A**   YES.

8    **Q**   AND BECAUSE IT MAKES EVERYTHING EASIER, IT WILL HAVE AN

9    IMPACT ON THE RECEIVER'S ABILITY TO PROVIDE HEALTHCARE TO

10   PRISONERS, CORRECT?

11   **A**   I THINK IT WILL BE.  OBVIOUSLY, THAT'S FEWER DOCTORS THAT

12   NEED TO BE RECRUITED, FOR EXAMPLE, AND LESS CLINICAL SPACE THAT

13   WOULD HAVE TO BE BUILT, LESS MONEY THAT WOULD NEED TO BE SPENT

14   ON THOSE EXAMINATIONS, ET CETERA.

15   **Q**   SO THE ANSWER TO MY QUESTION IS YES?

16   **A**   YES.

17   **Q**   OKAY.  NOW, YOU BELIEVE YOUR CHARGE AS SECRETARY IS TO

18   ENSURE THAT ANY STRATEGY THE CDCR EMPLOYS TO REDUCE THE PRISON

19   POPULATION DOES NOT CAUSE MORE VICTIMIZATION IN SOCIETY; IS THAT

20   ACCURATE?

21   **A**   THAT'S ONE OF THEM, YES.

22   **Q**   AND YOU BELIEVE THAT THE MEASURE THAT YOU USE IN EVALUATING

23   WHETHER CDCR'S STRATEGIES ARE SAFE IS THEIR EFFECT ON THE

24   OVERALL CRIME RATE, TRUE?

25   **A**   I THINK THAT'S PROBABLY PART OF THE CALCULUS.

1  Q    IT'S THE MAIN CALCULUS, ISN'T IT?

2  A    IT'S DEFINITELY A VERY IMPORTANT CALCULUS, YES.

3  Q    AND WHEN YOU RECOMMEND MEASURES TO REDUCE THE POPULATION TO

4  THE GOVERNOR, YOU DO THAT BELIEVING THAT IT WOULDN'T HAVE AN

5  ADVERSE EFFECT ON THE CRIME RATE; ISN'T THAT TRUE?

6  A    TAKEN AS –– YES, TAKEN AS A WHOLE, TO THE EXTENT YOU CAN

7  REDUCE PRISON POPULATION, PROVIDE ADDITIONAL PROGRAMMING, AND

8  HOPEFULLY REDUCE RECIDIVISM THAT WAY, AND RELEASE THOSE INMATES

9  WHO YOU BELIEVE ARE AT LEAST RISK, OR NOT INCARCERATE THOSE

10 INMATES YOU BELIEVE ARE AT LEAST RISK TO THE COMMUNITY, THOSE

11 ARE THE KINDS OF CONSIDERATIONS YOU WANT TO THINK ABOUT, YEAH.

12 Q    WHEN YOU MAKE A RECOMMENDATION TO THE GOVERNOR, DO YOU MAKE

13 A RECOMMENDATION TO THE GOVERNOR BELIEVING THAT IT WOULD MAKE

14 THE COMMUNITY MORE DANGEROUS?

15 A    NO.

16 Q    SO WHEN YOU MAKE RECOMMENDATIONS TO THE GOVERNOR, YOU

17 BELIEVE IT WOULD MAKE THE COMMUNITY JUST AS SAFE OR SAFER,

18 CORRECT?

19 A    WELL, IT DEPENDS ON THE CIRCUMSTANCES.  WE'RE ALSO

20 CONSTRAINED RIGHT NOW BY OUR BUDGET, AND WE HAVE BEEN FOR THE

21 LAST TWO YEARS, AND SO YOU WANT TO DO THE BEST YOU CAN WITH THE

22 MONEY THAT YOU HAVE TO SPEND.  SO I MEAN, OBVIOUSLY, THE SAFEST

23 THING IS INCARCERATE EVERYONE.  STATE WOULD NEVER BE ABLE TO

24 AFFORD THAT, NOR SHOULD IT.

25 Q    OKAY.  NOW, AS YOU TESTIFIED BEFORE, DEPARTMENT RELEASES

1  OVER 10,000 PRISONERS A MONTH, CORRECT?

2  **A**   CORRECT.

3  **Q**   AND AT THE TIME OF YOUR DEPOSITION, WHICH WAS IN LATE

4  AUGUST, SOME PRISONERS WERE OVERDUE FOR RELEASE BECAUSE THERE

5  WASN'T SUFFICIENT STAFF TO PROCESS THEIR PAPERWORK, CORRECT?

6  **A**   THAT'S TRUE.

7  **Q**   RIGHT.   ABOUT 50 PERCENT OF THE PRISONERS HAVE WALKED OUT OF

8  PRISON HAVING DONE NOTHING BUT LIE ON THEIR BUNK AND WALK ON THE

9  YARD, TRUE?

10  **A**   TRUE.

11  **Q**   IT'S UNREASONABLE TO BELIEVE YOU EXPECT THESE PRISONERS ARE

12  GOING TO COME OUT ANY DIFFERENT THAN HOW THEY CAME IN, EXCEPT

13  FOR PERHAPS HAVING LEARNED HOW TO BE A BETTER CRIMINAL, CORRECT?

14  **A**   THAT'S TRUE.

15  **Q**   SOME OF THE PRISONERS RELEASED ARE RELEASED DIRECTLY FROM

16  SEGREGATION UNITS, CORRECT?

17  **A**   CORRECT.

18  **Q**   THOSE PRISONERS, WHILE THEY ARE IN THE SEGREGATION UNITS,

19  WHEN THEY'RE OUT OF THEIR CELL, THEY'RE IN SHACKLES AND ESCORTED

20  EVERYWHERE THEY GO BECAUSE YOU BELIEVE THEY'RE CONSIDERED

21  DANGEROUS, RIGHT?

22  **A**   CORRECT.

23  **Q**   AND SO WHEN THEY GET RELEASED, THEY'RE TAKEN TO THE GATE IN

24  THOSE SHACKLES AND ESCORTS, CORRECT?

25  **A**   CORRECT.

1  Q   AND THE NEXT -- AND WHEN THEY'RE -- WHEN THEY'RE RELEASED,

2  THEY GET $200 MINUS THE COST OF THE BUS FARE, AND THEY'RE

3  DROPPED OFF AT THE BUS STATION, CORRECT?

4  A   THEY'RE GIVEN FUNDS.  SOME INMATES WHO ARE SERIOUS AND

5  VIOLENT ARE ACTUALLY PICKED UP BY A PAROLE AGENT AND TAKEN TO

6  THEIR COMMUNITY, BUT OTHERWISE YOUR STATEMENT IS CORRECT.

7  Q   AND YOU DON'T BELIEVE THAT IT'S SAFE -- THAT THAT SITUATION

8  IS SAFE FOR THE COMMUNITY, DO YOU?

9  A   THAT'S WHY WE HAVE BEEN ASKING COMMUNITIES TO PARTNER WITH

10 US ON OUR REENTRY PROGRAMS.

11            **JUDGE KARLTON:**  SO THE ANSWER IS YES, THAT THAT

12 PRESENT SYSTEM IS NOT AS SAFE AS YOU COULD MAKE IT?

13            **THE WITNESS:**  THAT'S RIGHT.  RIGHT.

14            **MR. SPECTER:**  THANK YOU.

15 **BY MR. SPECTER**

16 Q   AND YOU BELIEVE THAT THE STATE HAS AN OBLIGATION TO MAKE

17 SURE THAT PRISONERS ARE REINTEGRATED SAFELY INTO THEIR

18 COMMUNITIES, CORRECT?

19 A   TO THE EXTENT POSSIBLE, YES.

20 Q   BUT AT THE PRESENT TIME, YOU CAN'T SATISFY THAT OBLIGATION,

21 CAN YOU?

22 A   NOT TO THE EXTENT THAT WE WOULD LIKE, NO.

23 Q   AND YOU BELIEVE THAT THE STATE HAS AN OBLIGATION TO DO THAT

24 IN A HURRY, DON'T YOU, YOUR WORD?

25 A   I DO.

1  Q   BUT YOU DON'T HAVE ANY PARTICULAR TIMEFRAME IN MIND, DO YOU?

2  A   AS FAST AS POSSIBLE IS THE TIMEFRAME.

3  Q   RIGHT.  OKAY.

4           NOW, WHEN YOU TOOK OVER AS SECRETARY, YOU HAD WHAT'S

5  CALLED AN INTEGRATED STRATEGY TO REDUCE OVERCROWDING, CORRECT?

6  A   THAT'S TRUE.

7  Q   AND THAT WAS IN THE -- THAT WAS DEVELOPED IN THE SPRING OR

8  EARLY SUMMER OF THIS YEAR, RIGHT?

9  A   RIGHT.

10 Q   AND YOU PRESENTED THAT STRATEGY TO THE GOVERNOR, AND HE

11 APPROVED IT, CORRECT?

12 A   CORRECT.  WELL, TO THE GOVERNOR'S OFFICE.

13 Q   GOVERNOR'S OFFICE.  AND IT WAS ONE OF YOUR TOP PRIORITIES

14 WHEN YOU BECAME SECRETARY, RIGHT?

15 A   RIGHT.

16 Q   BECAUSE THAT -- BECAUSE IT WAS A TOP PRIORITY OF YOURS TO

17 REDUCE CROWDING, CORRECT?

18 A   CORRECT.

19 Q   AND AT YOUR DEPOSITION IN AUGUST OF THIS YEAR, YOU TESTIFIED

20 THAT THIS INTEGRATED STRATEGY WAS THE DEPARTMENT'S PRIMARY

21 RESPONSE TO THE OVERCROWDING CRISIS; DO YOU RECALL THAT?

22 A   YES.

23 Q   IS IT STILL THE DEPARTMENT'S PRIMARY RESPONSE TO REDUCING

24 THE OVERCROWDING?

25 A   I'M NOT SURE WHAT YOU MEANT OR I MEANT BY THAT BACK THEN,

1  BUT THAT'S OUR PLAN.  IT IS STILL OUR PLAN.

2  **Q**   OKAY.

3  **A**   IT'S BEEN CHANGED BY CIRCUMSTANCES OVER THE COURSE OF SIX

4  MONTHS A LITTLE BIT, BUT ON THE WHOLE IT'S STILL OUR PLAN.

5  **Q**   OKAY.  BUT THE PLAN DOESN'T HAVE ANY LEVEL TO MEET, ANY

6  POPULATION LEVEL TO MEET, DOES IT?

7  **A**   YOU MEAN A POPULATION GOAL?

8  **Q**   YES.

9  **A**   TO REACH TO?  NO.

10 **Q**   OKAY.  SO PART OF THE PLAN -- THERE ARE SEVERAL COMPONENTS

11 TO THE PLAN.  YOU OUTLINED THEM IN RESPONSE TO MR. MELLO'S

12 QUESTIONS.  PART OF THE PLAN WAS THE CONSTRUCTION OF NEW PRISON

13 BEDS, RIGHT?

14 **A**   RIGHT.

15 **Q**   THAT HAD TWO OR AT LEAST TWO MAJOR SUBPARTS.  ONE IS THE

16 RECEIVER'S TEN THOUSAND BEDS, RIGHT?

17 **A**   THREE SUBPARTS, IF YOU INCLUDE THE RECEIVER, THE IN-FILL

18 PROJECTS, OR THE PRISON EXPANSION AND REENTRY.

19 **Q**   RIGHT.  I WON'T ARGUE WITH YOU ABOUT THE CLASSIFICATION OF

20 MY SUBPARTS, BUT THAT'S RIGHT.

21          SO THE RECEIVER'S TEN THOUSAND BEDS, CORRECT, WAS ONE

22 OF THE COMPONENTS OF THE PLAN?

23 **A**   WE WERE -- WE ADDED THE RECEIVER'S TEN THOUSAND, ASSUMING

24 THAT HE WOULD BE GIVEN THE AUTHORITY TO BUILD THEM.

25 **Q**   AND HE HAS NOT BEEN GIVEN THAT AUTHORITY, THE FUNDS TO BUILD

1  THOSE BEDS, CORRECT?

2  **A**   THAT'S CORRECT.

3  **Q**   AND YOU, THROUGH -- YOU'RE A DEFENDANT IN THE PLATA CASE,

4  YOU KNOW THAT, RIGHT?

5  **A**   YES.

6  **Q**   AND THROUGH -- YOU, THROUGH YOUR ATTORNEY, HAVE GONE TO

7  JUDGE -- THE COURT --

8          **JUDGE KARLTON:**   JUDGE HENDERSON.

9  **BY MR. SPECTER**

10 **Q**   THE SINGLE JUDGE COURT IN PLATA AND OPPOSED THE

11 AUTHORIZATION FOR THE RECEIVER TO RECEIVE $250 MILLION TO

12 CONTINUE HIS WORK ON THOSE FUNDS, CORRECT?

13 **A**   THAT'S TRUE.

14 **Q**   OKAY.  YOU ARE AWARE THAT JUDGE HENDERSON ISSUED AN ORDER

15 FOR THAT 250 -- FOR THE STATE TO PROVIDE THAT $250 MILLION,

16 CORRECT?

17 **A**   YES.

18 **Q**   AND YOU, THROUGH YOUR ATTORNEYS, PETITIONED THE NINTH

19 CIRCUIT FOR A STAY OF THAT ORDER?

20 **A**   THAT'S TRUE.

21 **Q**   AND THE NINTH CIRCUIT GRANTED THAT STAY, CORRECT?

22 **A**   THAT'S TRUE.

23 **Q**   OKAY.  THE OTHER PART OF THE CONSTRUCTION PROJECTS WERE THE

24 IN-FILL AND REENTRY BEDS, CORRECT?

25 **A**   THAT'S RIGHT.

1  **Q**   AND BECAUSE THE LEGISLATURE REFUSED, THERE'S WHAT WE CALL --

2  OR WHAT YOU CALL CLEAN-UP LEGISLATION, CORRECT, THAT WAS BEING

3  PROPOSED IN THE LEGISLATURE?

4  **A**   THAT'S RIGHT.

5  **Q**   AND THAT WAS TO FIX CERTAIN TECHNICAL PROBLEMS THAT HAVE

6  PREVENTED THE MONEY FROM BEING ACTUALLY USED FOR THE PURPOSE BY

7  WHICH IT WAS INTENDED TO BE --

8          **JUDGE KARLTON:**  I THINK HE MEANS AB 900.  IS THAT

9  WHAT YOU MEAN, SIR?

10         **MR. SPECTER:**  YES.  THANK YOU, YOUR HONOR.

11 **BY MR. SPECTER**

12 **Q**   IS THAT RIGHT?

13 **A**   I'M SORRY.  THE QUESTION ABOUT AB 900?

14 **Q**   THE CLEAN-UP LEGISLATION WAS TO ALLOW THE FUNDS THAT WERE

15 APPROPRIATED IN AB 900 TO ACTUALLY BE SPENT, CORRECT?

16 **A**   CORRECT.

17         **JUDGE KARLTON:**  WAIT A MINUTE.  I THOUGHT AB 900 WAS

18 THE BOND MEASURE; IS THAT RIGHT?

19         **THE WITNESS:**  THAT'S RIGHT.

20         **JUDGE KARLTON:**  SO IT WASN'T A QUESTION OF MONEY THAT

21 HAD BEEN ALLOCATED; IT WAS AN AUTHORIZATION TO SELL BONDS.

22         **THE WITNESS:**  CORRECT, AND --

23 **BY MR. SPECTER**

24 **Q**   BUT THEY CAN'T SELL THE BONDS BECAUSE OF TECHNICAL PROBLEMS;

25 IS THAT CORRECT, MR. CATE?

1  **A**   CORRECT.

2  **Q**   AND THE CLEAN-UP LEGISLATION WAS TO, QUOTE, FIX THOSE

3  TECHNICAL PROBLEMS, CORRECT?

4  **A**   THAT'S RIGHT.

5  **Q**   AND BECAUSE THE CLEAN-UP LEGISLATION FAILED, THE STATE

6  CANNOT PAY FOR THE CONSTRUCTION OF THE ADDITIONAL COUNTY JAILS

7  REENTRY FACILITIES AND IN-FILL PROJECTS; ISN'T THAT RIGHT?

8  **A**   NO.

9  **Q**   CAN YOU PULL UP --

10          **JUDGE KARLTON:**  I DON'T KNOW WHETHER THAT MEANS NO,

11  IT'S NOT CORRECT, OR NO, YOU CAN'T PAY FOR IT.

12          **THE WITNESS:**  IT ACTUALLY MEANS NO IN PART TO YOUR

13  QUESTION.  YOU NAMED A NUMBER OF DIFFERENT FACILITIES, AND THE

14  ATTORNEY GENERAL -- IF I COULD JUST CLARIFY.  THE ATTORNEY

15  GENERAL HAS INDICATED THAT THE JAIL FACILITIES CAN BE BUILT BY

16  THE SHERIFF.  HE ISSUED THAT CLEAN BOND -- HE INDICATED THAT A

17  CLEAN BOND OPINION COULD BE ISSUED IN THIS LAST MONTH OR SO.

18  WE'RE STILL WAITING FOR A RESPONSE ON THE REST.

19  **BY MR. SPECTER**

20  **Q**   OKAY.  AND YOU DESCRIBED THE FAILURE OF THE LEGISLATURE TO

21  PASS THE CLEAN-UP LEGISLATION AS A MAJOR SETBACK TO YOUR

22  STRATEGY TO REDUCE OVERCROWDING; DID YOU NOT?

23  **A**   I PROBABLY DID, AND IT WAS -- AND THAT'S WHY WE'RE

24  CONTINUING TO SEEK THOSE FIXES.

25  **Q**   NOW, IN YOUR VIEW, PAROLE REFORM IS ANOTHER PART OF THE

1   INTEGRATED STRATEGY, CORRECT?

2   **A**   CORRECT.

3   **Q**   AND YOU BELIEVE IT CAN BE DONE SAFELY AND REDUCE THE PRISON

4   POPULATION AT THE SAME TIME, CORRECT?

5   **A**   IF DONE CORRECTLY, YES.

6   **Q**   RIGHT.  BUT YOU DON'T KNOW HOW MUCH THE PRISON POPULATION

7   WILL BE REDUCED BY THE PAROLE REFORMS, DO YOU?

8   **A**   I THINK WE ESTIMATED 8,000 AVERAGE DAILY POPULATION IN OUR

9   PRISON OVERCROWDING PLAN, BUT MY BELIEF IS YOU NEED TO DO THE

10  CORRECT REFORMS AND LET THE POPULATION LEVEL WHERE IT WILL AS A

11  RESULT OF DOING THE RIGHT THING AND PAROLE.

12  **Q**   AND THE RIGHT THING, ACCORDING TO YOUR DEPARTMENT, IS TO DO

13  A TWO-YEAR PILOT PROJECT ON THIS PAROLE REFORM, CORRECT?

14  **A**   WE'RE ACTUALLY DOING A 90-DAY PILOT PROJECT IN FOUR

15  DISTRICTS, THEN WE ARE GOING TO ROLL OUT TO THE REMAINDER AT

16  THAT TIME.  WE'LL CONTINUE TO STUDY IT OVER THE REMAINING TWO

17  YEARS, BUT WE'RE GOING FORWARD IN LESS THAN 90.

18  **Q**   CAN YOU PULL UP DEFENDANT'S EXHIBIT 1198, PLEASE, AND GO TO

19  THE SECOND PAGE?

20          (DOCUMENT DISPLAYED.)

21  **BY MR. SPECTER**

22  **Q**   THIS IS A MEMO DATED SEPTEMBER 30TH, 2008, FROM THOMAS

23  HOFFMAN.  WHO IS THOMAS HOFFMAN?

24  **A**   HE'S OUR DIRECTOR OF PAROLE.

25  **Q**   OKAY.  AND YOU SEE THE -- RIGHT UNDER THE LITTLE CHART

1  THERE, IT SAYS "THIS PILOT PROGRAM"?

2  **A**    CORRECT.

3  **Q**    COULD YOU READ THAT FIRST SENTENCE, PLEASE?

4  **A**            "THIS PILOT PROGRAM WILL REMAIN IN EFFECT

5          FOR A 24-MONTH PERIOD FROM NOVEMBER 3, 2008

6          THROUGH NOVEMBER 3, 2010, AT WHICH TIME IT WILL

7          LAPSE BY OPERATION OF LAW OR WILL BE PROMULGATED

8          THROUGH THE ADMINISTRATIVE PROCEDURE ACT."

9  **Q**    THANK YOU.

10 **A**    BUT I THINK THAT'S JUST A MATTER OF SEMANTICS.  THE POINT IS

11 IS THAT WE'RE GOING TO BE ROLLING OUT THE ENTIRE THING AT 90

12 DAYS AND THEN STUDYING IT AND MAKING CHANGES ALONG THE WAY

13 DURING THE COURSE OF THE TWO-YEAR PERIOD.

14 **Q**    OKAY.  AS OF THE END OF AUGUST, WHICH IS WHEN THE COURT HAS

15 HELD THAT WE STOP TALKING ABOUT THE CONDITIONS, THERE WAS ABOUT

16 4,788 OUT-OF-STATE TRANSFER BEDS -- PEOPLE IN OUT-OF-STATE BEDS,

17 CORRECT?

18 **A**    THAT'S RIGHT.

19 **Q**    NOW, IN THE GOVERNOR'S SPECIAL SESSION FOR THE NOVEMBER 2008

20 LEGISLATIVE SPECIAL SESSION, HE RECOMMENDED VARIOUS PRISON

21 POPULATION REDUCING MEASURES, CORRECT?

22 **A**    CORRECT.

23 **Q**    AND THOSE -- DID YOU RECOMMEND THAT HE MAKE THOSE PROPOSALS?

24 **A**    I DEFINITELY WAS CONSULTED AND TOOK PART IN THAT

25 DECISION-MAKING PROCESS.  I BROUGHT SOME OF THOSE IDEAS FORWARD.

1  SOME WERE IDEAS THAT OTHER STAKEHOLDERS HAD BROUGHT FORWARD THAT

2  WE ADOPTED.  SOME WERE IDEAS THAT HAD BEEN BANDIED AROUND

3  BEFORE.

4  **Q**   DID YOU BELIEVE THAT -- DID YOU TELL THE GOVERNOR THAT ANY

5  OF THOSE PROPOSALS SHOULDN'T BE PUT FORWARD BECAUSE YOU DIDN'T

6  BELIEVE THEY WERE SAFE FOR THE COMMUNITY?

7  **A**   I'M SORRY.  CAN YOU REMIND ME WHICH PROPOSALS WE'RE TALKING

8  ABOUT AGAIN?

9  **Q**   THE NOVEMBER 2008 BUDGET PROPOSALS.

10  **A**   OKAY.

11          **JUDGE KARLTON:**  DID YOU RECOMMEND HE NOT ADOPT ANY OF

12  THEM BECAUSE THEY ADVERSELY AFFECTED PUBLIC SAFETY?

13          **THE WITNESS:**  NO.  I RECOMMENDED, IN LIGHT OF THE

14  BUDGET CRISIS WE WERE IN, THIS WAS THE BEST WE COULD DO.

15  **BY MR. SPECTER**

16  **Q**   THOSE RECOMMENDATIONS INCLUDED NO PAROLE SUPERVISION FOR

17  OFFENDERS WITHOUT A CONVICTION FOR A NON-SERIOUS, NONVIOLENT, OR

18  SEXUAL CRIME, CORRECT?

19  **A**   AND THOSE WHO HAD -- IT WAS THOSE WHO WERE NOT CONVICTED FOR

20  NON-SERIOUS, NONVIOLENT, NON-SEX, BUT YOU ALSO HAVE TO HAVE

21  NEVER BEEN CONVICTED OF A SERIOUS, VIOLENT OR SEX CRIME IN YOUR

22  PAST.

23  **Q**   CORRECT.  AND IT ALSO INCLUDED UP TO FOUR MONTHS FOR EACH

24  PROGRAM SUCCESSFULLY COMPLETED BY A PRISONER, CORRECT?

25  **A**   CORRECT.

1  Q   AND SO IF A PRISONER COMPLETED FOUR PROGRAMS, HE COULD GET A

2  YEAR OFF OF HIS SENTENCE UNDER THAT SCHEME IF IT WAS ENACTED,

3  CORRECT?

4  A   WELL, THE DETAILS OF WHETHER THERE WOULD BE A CAP ON THE

5  AMOUNT OF CREDITS YOU COULD EARN WERE TO BE DETERMINED AT A

6  LATER DATE, BUT YOU COULD EARN UP TO THREE MONTHS CREDIT FOR AS

7  YOU DESCRIBED.

8  Q   FOUR MONTHS, I THINK.

9  A   OR FOUR MONTHS, RIGHT.

10  Q   IT WOULD ALSO PROVIDE THAT PRISONERS WOULD GET DAY-FOR-DAY

11  CREDIT, THOSE WHO WERE ELIGIBLE FOR IT, FOR OBEYING THE PRISON

12  RULES, CORRECT?

13  A   CORRECT.

14  Q   THIS WOULD RESULT IN EARLIER RELEASE OF SOME PRISONERS,

15  RIGHT?

16  A   NO.  IT WOULD RESULT IN THEM SERVING LESS TIME, BUT THEY

17  WOULD SERVE THE TIME PRESCRIBED BY LAW.

18  Q   THEY WOULD GET OUT OF PRISON LESS -- THEY WOULD GET OUT OF

19  PRISON EARLIER, WOULDN'T THEY?

20  A   EARLIER THAN THEY WOULD HAVE BEEN, YES.

21  Q   OKAY.  AND YOU ALSO -- THE GOVERNOR ALSO PROPOSED

22  DAY-FOR-DAY CREDIT FOR PRISONERS WHO ARE IN JAIL AWAITING THEIR

23  TRANSFER TO STATE PRISON, CORRECT?

24  A   CORRECT.

25  Q   AND THIS WOULD RESULT IN PRISONERS GETTING OUT OF PRISON

1  EARLIER THAN THEY OTHERWISE WOULD HAVE, RIGHT?

2  **A**   THAT'S RIGHT.

3  **Q**   AND IT ALSO WOULD HAVE PROVIDED ADDITIONAL CREDIT FOR

4  PRISONERS WHO ARE WAITING FOR AN ASSIGNMENT TO A CONSERVATION

5  CAMP, CORRECT?

6  **A**   CORRECT.

7  **Q**   AND THIS WOULD RESULT IN EARLIER RELEASE OF SOME PRISONERS,

8  CORRECT?

9  **A**   EARLIER RELEASE, YES.

10  **Q**   AND HOW MANY CREDITS -- WHAT'S THE RATIO OF CREDITS THAT

11  PRISONERS IN CONSERVATION CAMPS GET NOW?

12  **A**   TWO FOR ONE.

13  **Q**   SO THIS WOULD GIVE THEM POSSIBLY -- THOSE WHO ARE WAITING TO

14  GET INTO CONSERVATION CAMPS, WAS YOUR INTENT TO GIVE THOSE

15  PRISONERS TWO-FOR-ONE CREDITS?

16  **A**   YES.

17  **Q**   SO THEY WOULD GET TWO-FOR-ONE CREDITS EVEN THOUGH THEY

18  WEREN'T WORKING IN THE CAMP; IS THAT RIGHT?

19  **A**   BECAUSE THEY ARE IN THE PROCESS OF BEING TRAINED AND GOING

20  TO THE CAMPS, YES.

21  **Q**   AND YOU ALSO -- OR, I'M SORRY, THE GOVERNOR ALSO PROPOSED

22  INCREASING THE STATUTORY MONETARY THRESHOLD FOR DETERMINING

23  WHETHER PROPERTY CRIMES COULD BE PROSECUTED AS GRAND THEFT,

24  CORRECT?

25  **A**   CORRECT.

1  Q    THAT'S BECAUSE THE STATUTORY LIMIT HASN'T BEEN RAISED

2  SOMEWHERE IN THE 20 YEARS, CORRECT?

3  A    I'M NOT SURE OF THE NUMBER OF YEARS, BUT FOR MANY YEARS,

4  YES.

5  Q    IT HASN'T CAUGHT UP WITH INFLATION, IN OTHER WORDS, RIGHT?

6  A    THAT'S RIGHT.

7  Q    AND THIS WOULD RESULT IN LESS OFFENDERS COMING TO STATE

8  PRISON; ISN'T THAT RIGHT?

9  A    IT WOULD.

10  Q    AND THE NOVEMBER SPECIAL SESSION ENDED WITHOUT ANY

11  LEGISLATIVE ACTION ON THESE PROPOSALS; ISN'T THAT CORRECT?

12  A    THAT'S RIGHT.

13  Q    NOW, BEFORE THE SPECIAL SESSION, YOU MENTIONED, WHEN YOU

14  WERE ON DIRECT EXAMINATION WHEN YOU WERE ASKED, THAT THERE WAS A

15  MAY REVISION TO THE GOVERNOR'S BUDGET IN 2008, CORRECT?

16  A    CORRECT.

17  Q    AND YOU WERE CONSULTING THE GOVERNOR ABOUT THAT MAY REVISION

18  WHEN IT WAS ANNOUNCED, CORRECT, OR BEFORE IT WAS ANNOUNCED,

19  CORRECT?

20  A    YES.

21  Q    AND THAT INCLUDED --

22  A    YEAH.  I WAS GOING TO SAY NOT AS THE SECRETARY, BUT I DID IN

23  MY ROLE AS THE INSPECTOR GENERAL, I DID CONSULT, I THINK, ONCE.

24  Q    AND THAT BUDGET PROPOSAL CONTAINED A PROPOSAL TO PROVIDE FOR

25  SUMMARY PAROLE, CORRECT?

1    **A**   THAT'S RIGHT.

2    **Q**   TELL THE COURT WHAT THAT IS.

3    **A**   IN ESSENCE, THAT PROVIDES THAT SOME PAROLEES WOULD BE PUT ON

4    A BANKED CASELOAD; IN OTHER WORDS, THEY WOULD NOT BE ACTIVELY

5    SUPERVISED BY AN AGENT AND, AS A RESULT, COULDN'T BE RETURNED

6    FOR A TECHNICAL VIOLATION.

7    **Q**   AND THAT WOULD HAVE ALLOWED THE DEPARTMENT TO ALLOCATE ITS

8    RESOURCE -- PAROLE RESOURCES IN A DIFFERENT MANNER, CORRECT?

9    **A**   THAT'S TRUE.

10            **JUDGE KARLTON:**  HOPEFULLY, IN A MORE RATIONAL MANNER.

11            **THE WITNESS:**  I THINK THAT PAROLE RESOURCES COULD BE

12   BETTER ALLOCATED, YES.

13   **BY MR. SPECTER**

14   **Q**   AND IN A MORE EFFECTIVE MANNER AS WELL.

15   **A**   YES.

16   **Q**   OKAY.  AND THE LEGISLATURE DIDN'T ENACT THAT MEASURE EITHER,

17   DID IT?

18   **A**   THEY DID NOT.

19   **Q**   NOW, YOU SUBMITTED A TRIAL AFFIDAVIT IN THIS CASE, RIGHT?

20   **A**   I DID.

21   **Q**   AND AS A LAWYER, YOU UNDERSTOOD THAT IT WAS GOING TO BE YOUR

22   DIRECT TESTIMONY IN THIS COURT?

23   **A**   I THINK AS A LAYMAN I WOULD HAVE UNDERSTOOD THAT.

24   **Q**   OKAY.  AS A LAWYER AND A FORMER INSPECTOR GENERAL, YOU

25   UNDERSTAND HOW IMPORTANT IT IS TO PRESENT THE COURT WITH ALL THE

1   RELEVANT FACTS SO IT CAN MAKE AN APPROPRIATE DECISION?

2   **A**   I THINK ALL THE RELEVANT FACTS THAT SHOULD COME FROM SOMEONE

3   IN MY POSITION, YES.

4   **Q**   OKAY.  SO IN YOUR AFFIDAVIT YOU SAID -- JUST GIVE ME A

5   SECOND HERE.  ONE NUMBER I DIDN'T WRITE DOWN.

6           ON PARAGRAPH 29 OF THAT RE- -- YOU WERE RELYING ON

7   THE SPRING -- I'LL GIVE IT TO YOU A SECOND.  IT'S ON PAGE 12.

8   **A**   OKAY.

9   **Q**   YOU WERE RELYING ON SPRING POPULATION, SPRING 2008

10  POPULATION, PROJECTIONS, AND YOU SAID THAT THE FACTORS BEHIND

11  THE SPRING POPULATION PROJECTIONS WHICH WOULD LEAD TO A

12  REDUCTION; IS THAT RIGHT?

13  **A**   CORRECT.

14  **Q**   YOU SAID THAT IT WOULD RESULT IN A DRAMATIC REVERSAL IN THE

15  PROJECTED POPULATION TREND, RIGHT?

16  **A**   THAT'S TRUE.

17  **Q**   AND THE REVERSAL WAS THAT -- WAS FROM GOING UP; IN OTHER

18  WORDS, YOU WERE SUGGESTING THAT THE TREND WAS GOING DOWN

19  DRAMATICALLY, CORRECT?

20  **A**   THE FALL 2007 PROJECTION HAD THE POPULATION OF THE PRISONS

21  GOING UP DRAMATICALLY, AND THE SPRING PROJECTIONS HAD THEM GOING

22  DOWN, AND THE DIFFERENCE WAS THE DRAMATIC REVERSAL I WAS

23  REFERRING TO HERE.

24  **Q**   OKAY.  NOW I'D LIKE YOU TO PULL UP PLAINTIFF'S 781, PLEASE.

25  CAN YOU GO TO PAGE 12?  AND BLOW THE CHART UP, PLEASE?  CAN YOU

1   MAKE -- OKAY.  MAYBE WE HAVE DIFFERENT PAGE NUMBERS.  GO TO

2   CHART C, PLEASE, I THINK IT WOULD BE ON ONE OF THE NEXT PAGES.

3   YEAH, THERE YOU GO.

4            (DOCUMENT DISPLAYED.)

5   **BY MR. SPECTER**

6   **Q**   SO THIS IS A CHART THAT COMPARES THE SPRING 2008 PROJECTIONS

7   TO THE FALL 2008 PROJECTIONS; DO YOU SEE THAT?

8   **A**   I DO.

9   **Q**   AND YOU SEE THAT ALL OF THE -- WHILE THE SPRING POPULATION

10  PROJECTIONS HAVE THE NUMBERS GOING DOWN, THE FALL PROJECTIONS

11  HAVE THE POPULATION GOING UP, RIGHT?

12  **A**   WELL, IT DEPENDS WHAT YOU'RE REFERRING TO.  BETWEEN 2009 AND

13  2013, THEY WOULD GO DOWN SLIGHTLY.  2014 THEY'D BLIP BACK UP A

14  LITTLE BIT.

15  **Q**   SO, IN OTHER WORDS, IT'S NOT GOING DOWN.  THERE'S NO

16  DRAMATIC REDUCTION IN THE POPULATION UNDER THE FALL PROJECTIONS,

17  RIGHT?

18  **A**   THEY'RE SLIGHTLY HIGHER THAN THE SPRING'S PROJECTION, BUT

19  STILL DRAMATICALLY LOWER THAN THE FALL OF THE PREVIOUS YEAR.

20  **Q**   NOW, YOU MENTIONED IN RESPONSE TO MR. MELLO'S QUESTIONS THAT

21  A NUMBER OF -- A NUMBER OF CRIMES AGAINST THE PERSON WERE

22  HOMICIDE, BURGLARY, AND WHAT WAS THE OTHER CRIME THAT YOU HAD?

23  **A**   I THINK MR. MELLO'S QUESTION WAS THE PERCENTAGE OF

24  CALIFORNIA INMATES WHO WERE SERVING TIME FOR MURDER, ROBBERY OR

25  BURGLARY.

1  Q    OKAY.  AND BURGLARY MAKES UP THE GREATEST PERCENTAGE OF

2  CRIMES IN THAT CATEGORY, CORRECT?

3  A    I'M SORRY.

4  Q    BURGLARY MAKES UP THE GREATEST PERCENTAGE OF CRIMES IN THE

5  PRISON SYSTEM -- IN THAT CATEGORY WITHIN THE PRISON SYSTEM,

6  CORRECT?

7  A    I'M NOT SURE ABOUT THAT.  I KNOW THAT WE HAVE A LOT OF

8  INMATES DOING LIFE FOR MURDER ALSO.

9  Q    SO YOU ALSO MENTIONED THAT THERE WERE PART OF THE -- PART OF

10 YOUR STRATEGY TO REDUCE THE POPULATION IS THROUGH REHABILITATIVE

11 PROGRAMS IN PRISON, CORRECT?

12 A    THAT'S RIGHT.

13 Q    BUT YOU ARE HAVING TROUBLE DOING THAT BECAUSE OF THE

14 OVERCROWDING; ISN'T THAT RIGHT?

15 A    AS I SAID EARLIER, THE OVERCROWDING MAKES EVERYTHING MORE

16 CHALLENGING FOR THE CORRECTIONAL ADMINISTRATOR, YOU KNOW, THE

17 EXAMPLE BEING THAT THE RECEIVER NEEDS A CERTAIN SPACE TO DO

18 CLINICAL WORK, AND OUR PROGRAM, FOR EXAMPLE, WANTS THAT SAME

19 SPACE FOR VOCATIONAL EDUCATION PROGRAM.  THEN YOU'VE GOT TO TRY

20 TO FIND SPACE FOR BOTH SOMEWHERE.  THAT'S A CHALLENGE.

21 Q    IN TERMS OF THAT PART OF YOUR PLAN TO REDUCE OVERCROWDING,

22 YOU CAN'T TELL ME -- YOU DO NOT KNOW HOW MANY PRISON -- HOW

23 MANY -- HOW MUCH OF THE POPULATION CAN BE REDUCED BY WHAT DATE,

24 DO YOU?

25 A    I CAN TELL YOU THAT WHAT OUR PLANS ARE IN EACH OF THOSE

1  CATEGORIES.  I CAN'T TELL YOU EXACTLY WHAT THE RESULT WOULD BE

2  IN THE RECIDIVISM CATEGORY, BUT I CAN TELL YOU THAT WE KNOW

3  ACADEMIC PROGRAMS REDUCE RECIDIVISM WHEN -- BY FIVE PERCENT AND

4  VOCATIONAL BY TWELVE PERCENT, AND YOU CAN EXTRAPOLATE FROM THERE

5  YOU MIGHT SEE SOME RESULT AS A RESULT OF THOSE PROGRAMS.  I

6  DON'T HAVE THOSE NUMBERS IN FRONT OF ME.

7  **Q**  AS YOU SIT HERE TODAY, YOU CAN'T TELL THE COURT, BECAUSE OF

8  THOSE PROGRAMS, HOW MUCH THE PRISON POPULATION WILL BE REDUCED

9  AND BY WHEN?

10 **A**  I DON'T KNOW HOW MANY PEOPLE ARE GOING TO COMMIT CRIMES AND

11 HOW MANY OF THOSE CRIMES THE PROSECUTORS ARE GOING TO PROSECUTE

12 AND HOW MANY OF THOSE SUCCESSFUL PROSECUTIONS WILL RESULT IN A

13 PRISON SENTENCE.  I JUST DON'T RECALL THE INTAKE.

14         **MR. SPECTER:**  NO FURTHER QUESTIONS.  MAYBE I DO.  I'M

15 DONE, YOUR HONOR.

16         **JUDGE HENDERSON:**  DOES CCPOA HAVE ANY QUESTIONS?

17         **MS. LEONARD:**  NO, YOUR HONOR.

18         **JUDGE HENDERSON:**  OKAY.  REDIRECT?

19         **MR. MELLO:**  NO, YOUR HONOR.

20         **JUDGE HENDERSON:**  OKAY.  THANK YOU.

21         **JUDGE KARLTON:**  SIR, MAYBE I MISUNDERSTOOD, BUT FROM

22 YOUR ANSWERS TO MR. MELLO, YOU HAD INDICATED THAT REDUCING THE

23 NUMBER OF PRISONERS WITH LOW LEVEL OR LOW RISK WOULDN'T AFFECT

24 IN ANY SIGNIFICANT WAY THE POPULATION IN THE PRISON INSTITUTIONS

25 BECAUSE THOSE PEOPLE WERE ALREADY IN CAMPS OR COMMUNITY

1  INSTITUTIONS OR OTHERWISE.  DID I UNDERSTAND THAT CORRECTLY OR

2  INCORRECTLY?

3          **THE WITNESS:**  THERE'S A NUANCE THERE THAT I DON'T

4  THINK I EXPRESSED.  WE KNOW THAT OUR CAMPS, OUR COMMUNITY

5  PROGRAMS ARE ALL LEVEL ONE AND TWO INMATES.  SO THEY'RE GOING TO

6  GET -- THEY'RE GOING TO BE HIT THE GREATEST -- THE GREATER

7  PERCENTAGE WOULD COME FROM THOSE AREAS.  THERE ARE STILL INMATES

8  IN THE PRISONS WHO MIGHT BE ELIGIBLE WHO ARE LOW LEVEL AND WHO

9  ALSO HAPPEN TO BE IN THE PRISON, UNFORTUNATELY -- FOR EXAMPLE,

10 MANY OF OUR LEVEL TWO INMATES ARE ACTUALLY SERVING LIFE, SO

11 WOULD PROBABLY NOT BE SUITED FOR THAT KIND OF PROGRAM.  SO THERE

12 WOULD BE A BLENDED REDUCTION, PERHAPS, FROM THE PRISONS, BUT

13 PRIMARILY I THINK FROM THE CAMPS AND THE CCF'S.

14         **JUDGE KARLTON:**  IS IT CORRECT OR INCORRECT THAT YOUR

15 BEST JUDGMENT, AS YOU SIT HERE TODAY -- YOU KNOW, I UNDERSTAND

16 AN AWFUL LOT OF WHAT WE'RE DOING IS AS BEST WE CAN -- IS IT YOUR

17 UNDERSTANDING THAT IF THIS COURT WERE TO ISSUE AN ORDER LIMITING

18 THE NUMBER OF PERSONS IN THE PRISON SYSTEM, AND THE STATE'S

19 APPROACH WAS TO ATTEMPT TO ACHIEVE THAT BY REDUCING THE LOW

20 LEVEL AND LOW RISK, THAT STILL WOULD NOT HAVE AN EFFECT IN THE

21 PRISON SYSTEM BECAUSE MOST OF THOSE PEOPLE ARE NOT IN THE PRISON

22 SYSTEM TO BEGIN WITH -- NOT ALL, BUT MOST ARE NOT IN THE PRISON

23 SYSTEM TO BEGIN WITH?

24         **THE WITNESS:**  I THINK THAT'S -- THE OTHER -- THAT'S

25 TRUE, AND THE OTHER PART THAT I THINK -- BUT IT'S NOT -- THAT'S

1  NOT THE ONLY PLACE WE WOULD SEE REDUCTIONS.

2          I THINK THROUGH PAROLE REFORM, WHICH I'M MOST

3  INTERESTED IN, FRANKLY, BECAUSE I THINK IT'S AN AREA THAT WE CAN

4  REALLY DO A LOT OF GOOD IN, WE WOULD SEE A SIGNIFICANT REDUCTION

5  IN THE CHURNING OF OUR INMATES AT OUR RECEPTION CENTERS.

6          **JUDGE KARLTON:**  OKAY.  I DON'T KNOW WHETHER MY

7  QUESTION INVITES QUESTIONS FROM COUNSEL.  MR. MELLO?

8          **MR. MELLO:**  NO.

9          **JUDGE KARLTON:**  MR. SPECTER?  NOT ONLY, THAT HE

10 DOESN'T EVEN CARE.

11         **MR. SPECTER:**  PARDON ME?

12         **JUDGE HENDERSON:**  WE WERE WONDERING IF JUDGE

13 KARLTON'S QUESTIONS PROMPTED FURTHER QUESTIONS FROM YOU?

14         **MR. SPECTER:**  ACTUALLY, I WAS JUST LOOKING AT ONE OF

15 THE EXHIBITS TO SEE WHETHER THAT IS TRUE OR NOT, AND IF I COULD

16 HAVE JUST A SECOND, I WILL LET YOU KNOW.

17         **JUDGE HENDERSON:**  LET US KNOW WHEN YOU FINISH.

18         **JUDGE REINHARDT:**  WHILE YOU ARE WAITING, MAYBE I

19 CAN -- YOUR TESTIMONY BASICALLY IS YOU COULD SAFELY REDUCE THE

20 POPULATION THROUGH PAROLE REFORMS?

21         **THE WITNESS:**  WE BELIEVE THAT THROUGH EFFECTIVE

22 PAROLE REFORMS WE COULD SAFELY REDUCE THE POPULATION OF THE

23 ENTIRE SYSTEM, WHICH WOULD INCLUDE THE CAMPS AND COMMUNITY

24 CORRECTIONAL FACILITIES, AS WELL AS MARGINALLY IN THE PRISONS,

25 ESPECIALLY IN THE RECEPTION CENTERS, BY AN AMOUNT -- I THINK IN

1    OUR PLAN WE SAID WE ESTIMATED ABOUT 8,000 OVER THE ENTIRE

2    SYSTEM, RECOGNIZING THAT THAT'S ACTUALLY A REDUCTION OF ABOUT

3    PROBABLY 20,000 INDIVIDUALS, BECAUSE EACH OF THE PAROLEES ONLY

4    SERVES ON AVERAGE ABOUT FOUR MONTHS.  SO YOU'D CYCLE -- TO GET

5    AN AVERAGE REDUCTION OF 8,000, YOU'VE GOT TO REDUCE YOUR PAROLE

6    INTAKE BY, YOU KNOW, 24,000 OR SO.

7            **JUDGE REINHARDT:**  AND ARE THOSE PAROLE REFORMS

8    PRESENTLY BEING INSTITUTED?

9            **THE WITNESS:**  YES.  THOSE ARE THE REFORMS THAT I

10   MENTIONED.  USING THE RISK ASSESSMENT TOOL AND THE PAROLE

11   VIOLATION DECISION MAKING INSTRUMENT, I THINK ARE KIND OF BEST

12   PRACTICES IN THIS AREA.  WE'VE ALSO PROPOSED MORE SWEEPING

13   CHANGES, AS A RESULT OF THE BUDGET CRISIS, WHICH HAVE NOT BEEN

14   ADOPTED.

15           **JUDGE REINHARDT:**  AND WOULD THOSE MORE SWEEPING

16   CHANGES -- WOULD REDUCE THE PRISON POPULATION FURTHER?

17           **THE WITNESS:**  IN THE SAME KIND OF CALCULUS.  AGAIN,

18   YOU WOULD HAVE TO NOT REVOKE THREE FOR EVERY ONE PERSON, THAT

19   WOULD BE NOT -- THAT WOULD REDUCE OUR PRISON POPULATION, BUT

20   THERE WOULD BE SOME ADDITIONAL PERCENTAGE OF REDUCTION IN THE

21   PRISON POPULATION.  I JUST DON'T KNOW EXACTLY WHAT THAT WOULD BE

22   AS I SIT HERE.

23           **JUDGE REINHARDT:**  THANK YOU.

24           **JUDGE HENDERSON:**  MR. SPECTER?

25

1   **BY MR. SPECTER**

2   **Q**   WELL, JUST TO LET THE COURT KNOW BACKGROUND INFORMATION, THE

3   CLASSIFICATION OF PRISONERS IS DIVIDED INTO LEVELS ONE THROUGH

4   FOUR, CORRECT?

5   **A**   THAT'S RIGHT.

6   **Q**   WITH ONE BEING THE LOWEST AND FOUR BEING THE HIGHEST, RIGHT?

7   **A**   THAT'S RIGHT.

8   **Q**   THERE ARE THOUSANDS OF LEVEL ONE PRISONERS IN THE CALIFORNIA

9   PRISON SYSTEM, AREN'T THERE?

10  **A**   ON ANY GIVEN DAY THERE ARE, YES.

11  **Q**   AND THERE'S ANOTHER 6,000 OR SO IN COMMUNITY CORRECTIONAL

12  CENTERS, RIGHT?

13  **A**   THAT'S RIGHT.

14  **Q**   AND THOSE ARE LEVEL ONE CRIMINAL CUSTODY, TOO, RIGHT?

15  **A**   THEY ARE.

16  **Q**   AND YOU MENTIONED IN RESPONSE TO MR. MELLO'S QUESTIONS ABOUT

17  THE CONSERVATION CAMPS THAT -- YOU IMPLIED THAT YOU ARE HAVING

18  TROUBLE FILLING THOSE SPOTS?

19          **MR. MELLO:**   OBJECTION.   MISSTATES HIS TESTIMONY.

20          **MR. SPECTER:**   THAT'S WHAT I WAS ASKING.

21          **JUDGE HENDERSON:**   YES, YOU CAN ANSWER THAT.   IS

22  THAT -- WAS THAT YOUR TESTIMONY?

23          **THE WITNESS:**   I THINK MY TESTIMONY WAS IN THOSE AREAS

24  THERE ARE LOW LEVEL INMATES WHERE -- OUR LOW LEVEL INMATES, OUR

25  COMMUNITY CORRECTIONAL CENTERS, WHICH YOU'VE DISCUSSED, AS WELL

1  AS CAMPS, MY OPERATIONAL PEOPLE HAVE INFORMED ME THAT THERE'S A

2  DIFFICULTY IN FILLING THOSE POSITIONS AT SOME TIMES.

3          THOSE INMATES ARE KIND OF WANTED EVERYWHERE BECAUSE

4  THEY ALSO SERVE IN THE MINIMUM SUPPORT FACILITIES, WHICH ARE --

5  WHICH ARE OUTSIDE THE WALLS OF EVERY PRISON AND PROVIDE, AS YOU

6  KNOW, THE CLEAN-UP CREW AND DO ALL THE YARD WORK AND LANDSCAPING

7  AND THOSE KINDS OF THINGS.  SO THERE'S A NEED FOR LEVEL ONE

8  INMATES IN THOSE FACILITIES AS WELL.

9  **BY MR. SPECTER**

10 **Q**   SO EVEN THOUGH YOU HAVE THE NEED, THE GOVERNOR PROPOSED

11 INCREASING THE CREDIT FOR PEOPLE WHO ARE ON THE WAITING LIST TO

12 GET INTO THE CONSERVATION CAMPS, RIGHT?

13 **A**   THAT'S TRUE.

14 **Q**   AND THAT WOULD REDUCE THEIR LENGTH OF STAY WHEN THEY GOT

15 INTO THE CAMP, RIGHT?

16 **A**   THAT'S RIGHT.

17 **Q**   AND ALSO -- YOU KNOW, WE TALKED ABOUT LEVEL ONES, BUT THERE

18 ARE LEVEL TWO PRISONERS AS WELL, AND THAT'S SORT OF THOUGHT OF

19 NOT AS LOW AS ONE, BUT MEDIUM IS THOUGHT OF AS LEVEL THREE,

20 CORRECT?

21 **A**   THEY ARE HIGHER THAN ONE AND LESS THAN THREE, YES.

22 **Q**   WHAT DOES THAT MAKE THEM, LOW OR LOW HIGH?

23          **JUDGE KARLTON:**  IT MAKES THEM TWO.

24          **MR. SPECTER:**  WELL, GOOD POINT.

25

1   BY MR. SPECTER

2   **Q**   THERE ARE THOUSANDS MORE LEVEL TWO PRISONERS IN THE SYSTEM

3   AS WELL; ISN'T THAT RIGHT, MR. CATE?

4   **A**   THAT'S RIGHT.  THERE'S THOUSANDS OF INMATES SERVING LIFE

5   FOR -- WITH THE POSSIBILITY OF PAROLE WHO ARE LEVEL TWO INMATES

6   AND ARE IN PRISONS.  THERE ARE OTHERS WHO ARE LEVEL TWO

7   INMATES -- THE REST OF THE LEVEL TWO INMATES ARE SPREAD

8   THROUGHOUT THE SYSTEM IN THE CAMPS AND IN CCF'S OR IN

9   CORRECTIONAL FACILITIES THEMSELVES.

10  **Q**   RIGHT.  AND, TYPICALLY, THE NON-LIFE PRISONERS HAVE A

11  RELATIVELY SHORT TIME BEFORE THEY'RE RELEASED, RIGHT?

12  **A**   THAT'S RIGHT.

13          **MR. SPECTER:**  OKAY.  NO FURTHER QUESTIONS.  THANK

14  YOU.

15          **MR. MELLO:**  NOTHING, YOUR HONOR.  THANK YOU.

16          **JUDGE HENDERSON:**  OKAY.  THANK YOU VERY MUCH FOR

17  TESTIFYING TODAY, SIR.

18          **THE WITNESS:**  THANK YOU.

19          **JUDGE HENDERSON:**  CALL YOUR NEXT WITNESS.

20          **MR. MELLO:**  WE'RE RETRIEVING THE WITNESS.  IT'S KATHY

21  JETT.

22                       **KATHRYN JETT,**

23  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANTS WAS FIRST

24  DULY SWORN AND EXAMINED AS FOLLOWS:

25          **THE WITNESS:**  KATHRYN JETT, AND I'M THE

 1  UNDERSECRETARY OF --

 2            **THE CLERK:**  SPELL IT, PLEASE.

 3            **THE WITNESS:**  K-A-T-H-R-Y-N, JETT, J-E-T-T.

 4            **MS. JOHNSON:**  UNDERSECRETARY JETT HAS SUBMITTED A

 5  TRIAL AFFIDAVIT IN THIS MATTER WHICH IS DEFENDANT'S EXHIBIT

 6  1004.  HER EDUCATIONAL AND PROFESSIONAL BACKGROUND IS SUMMARIZED

 7  IN PARAGRAPHS 2 THROUGH 5 OF THAT AFFIDAVIT.

 8            <u>**DIRECT EXAMINATION BY MS. JOHNSON**</u>

 9  **BY MS. JOHNSON**

10  **Q**   GOOD MORNING, MS. JETT.

11  **A**   GOOD MORNING.

12  **Q**   YOU ARE THE UNDERSECRETARY OF PROGRAMS FOR THE CALIFORNIA

13  DEPARTMENT OF CORRECTIONS AND REHABILITATION, CORRECT?

14  **A**   YES, I AM.

15  **Q**   WHEN WERE YOU APPOINTED UNDERSECRETARY OF PROGRAMS FOR CDCR?

16  **A**   SEPTEMBER '07.

17  **Q**   IMMEDIATELY PRIOR TO YOUR APPOINTMENT AS UNDERSECRETARY OF

18  PROGRAMS, WHAT WAS YOUR POSITION?

19  **A**   I WAS CHAIRING THE GOVERNOR'S STRIKE TEAM ON REHABILITATION.

20  **Q**   WHAT IS YOUR PRINCIPAL TASK AS UNDERSECRETARY OF PROGRAMS?

21  **A**   YES.  MY PRINCIPAL TASK IS IMPLEMENTING AN EVIDENCE-BASED

22  REHABILITATION SYSTEM THAT'S BASED ON THREE SOURCE DOCUMENTS:

23  GOVERNOR'S STRIKE TEAM, THE DECEMBER REPORT; THE EXPERT PANEL

24  THAT WAS RELEASED IN JUNE OF '07; AND THE PROVISIONS OF ASSEMBLY

25  BILL AB 900.

1   **Q**   AND USING THOSE THREE DOCUMENTS, HAS THE CDCR DEVELOPED ITS

2   OWN PLAN?

3   **A**   YES, WE HAVE.

4   **Q**   OKAY.  LOOKING AT DEFENDANT'S TRIAL EXHIBIT 1184, IS THAT

5   THE CDCR'S ADULT PROGRAMS REHABILITATIVE PROGRAMMING REFORM

6   PROJECT WORK PLAN?

7   **A**   YES, IT IS.

8   **Q**   AND IS THAT THE WORK PLAN THAT YOU ARE WORKING AS

9   UNDERSECRETARY OF PROGRAMS TO IMPLEMENT?

10  **A**   YES, IT IS.

11  **Q**   WHAT DOES THE WORK PLAN PROVIDE FOR?

12  **A**   THE WORK PLAN INTEGRATES OVER 200 TASKS THAT WERE

13  RECOMMENDED TO THE DEPARTMENT THROUGH VARIOUS SOURCES.  IT

14  DEVELOPS A CASE MANAGEMENT SYSTEM THAT WAS RECOMMENDED BY THE

15  EXPERT PANEL THAT IS DESIGNED TO ASSESS THE RISK AND NEEDS OF

16  EACH OFFENDER AS THEY COME INTO OUR INSTITUTIONS, DEVELOP CASE

17  MANAGEMENT PLANS FOR EACH OFFENDER; ALSO DELIVER PROGRAMS,

18  MEASURE INDIVIDUAL PROGRESS, AND PREPARE THE OFFENDERS FOR

19  REENTRY AND EVENTUALLY REINTEGRATING BACK INTO THE COMMUNITY.

20  **Q**   ONE OF THE ELEMENTS THAT YOU IDENTIFIED WAS A RISK AND NEEDS

21  ASSESSMENT?

22  **A**   CORRECT.

23  **Q**   CAN YOU EXPLAIN THAT FIRST ELEMENT, RISK AND NEEDS

24  ASSESSMENT?

25  **A**   SURE.  THE RISK AND NEEDS ASSESSMENT IS BEING DELIVERED

1  THROUGH AN INSTRUMENT THAT'S EVIDENCE BASED CALLED COMPAS.  IT'S

2  A CORRECTIONAL OFFENDER PLACEMENT MANAGEMENT AND ASSESSMENT

3  INSTRUMENT THAT HELPS US LOOK AT THE INDIVIDUAL'S CRIMINOGENIC

4  NEEDS AS WELL AS THEIR RISK TO REOFFEND.  THAT ASSISTS US IN

5  GUIDING THEM THROUGH OUR INSTITUTIONAL SETTINGS TO DELIVER

6  PROGRAMS THAT MEET THEIR NEEDS AND FOLLOW THEM ON OUT TO PAROLE

7  TO MAKE CERTAIN THAT THEY'RE CONTINUING TO ADDRESS THEIR

8  CRIMINOGENIC NEEDS.

9  **Q**   YOU'VE USED THE TERM "CRIMINOGENIC NEED."  COULD YOU EXPLAIN

10 FOR THE COURT WHAT THAT MEANS?

11 **A**   SURE.  CRIMINOGENIC NEED WOULD BE THE DEFICITS THAT THE

12 INDIVIDUAL HAS THAT IS CONTRIBUTING TO THEIR CRIMINAL ACTIVITY.

13 COULD BE SUBSTANCE ABUSE.  IT COULD BE A LEARNING PROBLEM,

14 MENTAL HEALTH PROBLEM, PROBLEMS WITH EMPLOYMENT OR EDUCATION.

15 **Q**   WHAT IS THE STATUS OF THE IMPLEMENTATION OF THIS COMPASS

16 INSTRUMENT?

17 **A**   WE CURRENTLY HAVE PLACED THE COMPASS INSTRUMENT IN ALL OF

18 OUR RECEPTION CENTERS, AND WE'RE ALSO COMPASSING EVERY

19 INDIVIDUAL AS THEY'RE EXITING OUR INSTITUTIONS.

20 **Q**   CAN YOU EXPLAIN THE SECOND ELEMENT YOU MENTIONED, A CASE

21 MANAGEMENT PLAN?

22 **A**   CERTAINLY.  A CASE MANAGEMENT PLAN IS ACTUALLY AN INSTRUMENT

23 THAT IS AUTOMATED AND ACCOMPANIES THE COMPASS RISK ASSESSMENT.

24 IT'S A PLAN THAT WE WOULD IDENTIFY THE PRIORITIES OF PROBLEMS

25 THAT THE OFFENDER HAS AND MOVE THEM THROUGH OUR INSTITUTIONS AND

1  PLACE THEM INTO PROGRAMS THAT ARE EVIDENCE BASED AND DESIGNED TO

2  ADDRESS THAT PROBLEM OR THAT CRIMINOGENIC NEED.

3  **Q**   WHAT STAGES IS THE CDCR'S EFFORT TO IMPLEMENT CASE

4  MANAGEMENT AT?

5  **A**   I WOULD SAY AT ITS INFANCY.  IN THE PAST YEAR WE'VE

6  DEVELOPED THE PLAN.  WE'VE BEEN ABLE TO UTILIZE A PLAN THAT IS

7  AUTOMATED WITHIN THE COMPASS.  WE ARE CURRENTLY IN A RECEPTION

8  CENTER, DEI, AND WE'VE COMPLETED A PILOT THERE IN TRAINING, AND,

9  FOR THE FIRST TIME, CC1'S TO ADMINISTER THOSE PLANS.  BY

10 FEBRUARY '09 WE WILL HAVE CC1'S TRAINED IN ALL 12 OF OUR

11 RECEPTION CENTERS.

12         **JUDGE KARLTON:**  TELL ME WHAT A CC1 IS, PLEASE.

13         **THE WITNESS:**  I'M SORRY.  CORRECTIONAL COUNSELOR ONE.

14 **BY MS. JOHNSON**

15 **Q**   WHAT IS THE FUNCTION OF A CC1?

16 **A**   THEY WILL BE THE CASE MANAGER FOR THE OFFENDERS.  THIS IS A

17 BRAND NEW TASK FOR THAT CLASSIFICATION.

18 **Q**   WHAT IS THE PROOF PROJECT?

19 **A**   THE PROOF PROJECT IS AN ACTUAL -- IT'S A SERIES OF SITES

20 THAT ARE BOTH RECEPTION CENTERS, AN INSTITUTION REENTRY

21 ENVIRONMENT, AND A PAROLE ENVIRONMENT, AND IT'S A TEST SITE THAT

22 WE'RE USING TO TEST WHAT INDIVIDUALS WITHIN THE CORRECTIONAL

23 SYSTEM SHOULD BE DELIVERED WHAT SERVICES TO THE INMATE WITH A

24 PARTICULAR FOCUS ON CASE MANAGEMENT.

25 **Q**   WHAT IS YOUR ROLE IN THE THIRD ELEMENT YOU TALKED ABOUT,

1  WHICH IS DELIVERY OF THE PROGRAMS?

2  **A**   YEAH.  OUR INTEGRATED MASTER PLAN, ACTUALLY, HAS DESIGNED

3  AND IDENTIFIED SIX PROGRAMS THAT WERE RECOMMENDED THROUGH THE

4  EXPERT PANEL REPORT.  SO OUR RESPONSIBILITY IS TO DELIVER THOSE

5  PROGRAMS WITHIN A PRISON SETTING IN ALL 33 INSTITUTIONS.

6         WE'RE RIGHT NOW AT OUR PROOF SITE, WHICH IS SOLANO

7  STATE PRISON.  IN THAT PRISON WE WILL HAVE FULL CASE MANAGEMENT.

8  WE WILL BE ASSIGNING INMATES TO PROGRAMS THAT MEET THEIR

9  CRIMINOGENIC RISKS.  AND WE'LL ALSO BE STARTING UP NEW PROGRAMS

10 AT SOLANO, WHICH IS CRIMINAL THINKING AND ANGER MANAGEMENT.

11 **Q**   CDCR CURRENTLY HAS REHABILITATIVE PROGRAMS IN PLACE,

12 CORRECT?

13 **A**   CORRECT, CORRECT.

14 **Q**   AND HAS IT MADE EFFORTS TO IMPROVE THE UTILIZATION -- WELL,

15 FIRST OF ALL, HAS IT MADE EFFORTS TO ASSESS THE UTILIZATION OF

16 EXISTING PROGRAMS THAT ARE IN PLACE?

17 **A**   YEAH.  OUR PLAN -- AS WE MOVE FORWARD TO IMPLEMENT THE PLAN,

18 IT BECAME VERY APPARENT THAT WE WERE NOT UTILIZING THE EXISTING

19 PROGRAMS WE HAVE.  THE CORRECTIONAL SYSTEM CURRENTLY HAS

20 EDUCATION, VOCATIONAL, AND SUBSTANCE ABUSE PROGRAMS.  WHEN WE

21 LOOKED AT THE UTILIZATION OF THOSE PROGRAMS IT WAS VERY, VERY

22 POOR.  PROBABLY ABOUT 40 PERCENT WAS ON AVERAGE THAT A PROGRAM

23 WAS BEING USED.

24         SO IN OUR PHASE ONE -- WE HAVE SEVERAL PHASES OF

25 IMPLEMENTATION -- WE'VE REQUIRED ALL INSTITUTIONS TO IMPROVE

1  THEIR UTILIZATION OF EXISTING PROGRAMS.

2          AS OF APRIL WE BEGAN TO DO SOME BASELINE MEASURES.

3  WE HAVE BEEN ABLE TO INCREASE THE UTILIZATION OF ACADEMIC

4  PROGRAMS BY ABOUT 34 PERCENT, AND FOR VOCATIONAL PROGRAMS ABOUT

5  40 PERCENT.

6  Q   WHAT IMPEDIMENTS TO UTILIZATION DID YOU IDENTIFY THROUGH THE

7  ASSESSMENT PHASE?

8  A   IT WAS RATHER BALANCED.  THERE WAS ABOUT 50 PERCENT OF THE

9  PROBLEMS HAD TO DO WITH CUSTODY, AND THESE WOULD BE

10 GANG-INVOLVED ISSUES.  AND THE OTHER 50 PERCENT TENDED TO BE

11 ADMINISTRATIVE OR ACADEMIC, THINGS SUCH AS NOT BUDGETING FOR

12 SUBSTITUTE TEACHERS OR DELIVERING PROGRAMS FOUR DAYS A WEEK

13 WHERE WE COULD EASILY EXPAND THAT TO FIVE DAYS A WEEK.

14         ON THE CUSTODY SIDE, IT WAS GANG ISSUES, WHERE THE

15 GANGS WERE REALLY INTIMIDATING OTHER INMATES AND TRYING TO

16 CONTROL WHO WAS GETTING INTO THE ACTUAL PROGRAMS.

17 Q   WHAT DID CDCR DO TO IMPROVE THE UTILIZATION OF EXISTING

18 PROGRAMS IN THE FACE OF GANG ACTIVITY?

19 A   WE CONDUCTED A PROJECT THAT WAS -- ON THE CUSTODY SIDE THAT

20 WAS CALLED OPERATION CHANGING TIDES THAT WENT INTO AN

21 INSTITUTION, IDENTIFIED WHO WERE THE GANG -- THE GANG CALLERS,

22 THE SHOT CALLERS, IF YOU WILL, AND WENT IN, IDENTIFIED THOSE

23 INDIVIDUALS, REMOVED THEM FROM THE YARDS SO THAT INMATES WERE

24 MORE FREE THEN TO VOLUNTEER AND GO INTO PROGRAMS.

25 Q   WERE LOCKDOWNS HAVING AN IMPACT ON PROGRAMMING?

1  **A**  ABSOLUTELY.  LOCKDOWNS, I THINK I'VE LEARNED, IS JUST A

2  CONDITION OF THE ENVIRONMENT.  THEY OCCUR BECAUSE OF TB, BUT

3  THEY ALSO OCCUR BECAUSE THE GANGS WERE CONTROLLING YARDS.  SO

4  THEY KNEW HOW TO CREATE A SITUATION THAT WOULD LOCK AN

5  INSTITUTION DOWN.

6         THOSE HAVE SEEMED TO BE LESS, OR AT LEAST MY

7  EXPERIENCE IS LESS.  I DON'T HAVE DATA TO SUPPORT THAT, BUT WHAT

8  I DO HAVE ARE THE PROVIDERS THAT ARE SERVING OUR INMATES THAT

9  THERE'S LESS COMPLAINTS.  THEY FEEL THE WARDEN IS DOING A BETTER

10 JOB AT GETTING, YOU KNOW, LOWER LEVEL PROGRAMS OPENED, ISOLATING

11 THE REAL TROUBLEMAKERS VERSUS CLOSING THE ENTIRE INSTITUTION

12 DOWN.

13        SO THERE'S MUCH MORE OF AN EFFORT TO -- WHEN THERE IS

14 A LOCKDOWN, TO GET THE PROGRAMMING INMATES BACK TO PROGRAM.

15 **Q**  YOU MENTION --

16        **JUDGE KARLTON:**  I'M SORRY.  DURING A LOCKDOWN, YOU

17 ARE NOW SENDING PEOPLE TO PROGRAMMING; IS THAT WHAT YOU'RE

18 SAYING?

19        **THE WITNESS:**  NO SIR.  WHAT THEY'RE DOING IS -- WHAT

20 THEY'RE DOING IS JUST IDENTIFYING AND ISOLATING THE PROBLEM, AND

21 THEN GOING INTO OTHER INSTITUTIONS OR LOWER LEVEL YARDS AND

22 OPENING UP THE YARDS SO INMATES COULD GO TO PROGRAM.

23 **BY MS. JOHNSON**

24 **Q**  YOU MENTION WARDENS.  DO THE WARDENS HAVE A ROLE IN INMATE

25 PARTICIPATION IN PROGRAMS?

1  A    THEY DO.  I THINK THIS IS SOMETHING THAT WE'RE TRYING TO

2  REALLY EDUCATE THE WARDENS ON.  IT'S ANOTHER SECOND PHASE OF

3  WHAT WE CALL TRACK ONE WHERE WE'RE SETTING UP WHAT ARE

4  PERFORMANCE MEASURES FOR WARDENS.

5         WE GO OUT TO THE INSTITUTION WITH OUR EDUCATIONAL

6  VOCATIONAL STAFF, AND USUALLY CHIEF DEPUTY SECRETARY OF

7  PROGRAMS, AND IDENTIFY FOR THEM WHAT MEASURES WE ARE GOING TO BE

8  LOOKING AT IN TERMS OF ATTENDANCE, AND HELP THEM OVERCOME AND

9  IDENTIFY BARRIERS THAT ARE IMPEDING INMATES' ATTENDANCE IN

10 PROGRAM.

11 Q    ARE YOU WORKING WITH THEM TO BUILD A SYSTEM OF IN-CUSTODY

12 INCENTIVES?

13 A    YEAH, THE WARDENS HAVE MET AND THEY'VE COME UP WITH A SERIES

14 OF RECOMMENDATIONS OF THINGS THAT ARE WITHIN OUR CURRENT

15 AUTHORITY TO INCENTIVIZE PROGRAMS, THINGS LIKE ALLOW INMATES

16 THAT ARE PROGRAMMING TO ACCESS NIGHT YARD, FIRST IN LINE FOR

17 CHOW, GETTING MORE, AS THEY CALL IT, ZOO-ZOOS AND WHAM-WHAMS,

18 WHICH ARE PACKAGES THAT THEY GET INTO THE INSTITUTION.

19         SO LOOKING AT HOW WE CAN REALLY SET UP SOME REWARDS

20 FOR INMATES THAT BEHAVE WELL AND PARTICIPATE IN THE PROGRAMS.

21         THE CLERK:  FIVE MINUTES, COUNSEL.

22 BY MS. JOHNSON

23 Q    HAS CDCR MADE ANY IMPROVEMENTS IN SUBSTANCE ABUSE PROGRAMS?

24 A    VERY MUCH SO.  WE HAVE BEEN ABLE TO RELOCATE SUBSTANCE ABUSE

25 PROGRAMS THAT WERE IN YARDS THAT WERE EXPERIENCING LOCKDOWNS

1  INTO LOWER LEVEL YARDS.  WE HAVE BEEN ABLE TO EXPAND OUR

2  COMMUNITY SUBSTANCE ABUSE CAPACITY BY 1,800 DRUG TREATMENT

3  SLOTS.

4            WE'RE CURRENTLY -- BY THE END OF DECEMBER, WE WOULD

5  HAVE INCREASED OUR CAPACITY FOR PROGRAMS RIGHT AROUND, PROBABLY

6  ABOUT 60,000 SQUARE FOOT THROUGH MODULARS THAT HAVE BEEN

7  DEVELOPED AND THAT ARE BEING PLACED ON EIGHT DIFFERENT

8  INSTITUTIONS IN THE PRISON SYSTEM, AND WE'LL BE SERVING AN

9  ADDITIONAL 2,000 INMATES WITH THOSE TREATMENT SLOTS WITH THE

10 IN-CUSTODY ENVIRONMENT AND ABOUT AN ADDITIONAL 1,300 INMATES OR

11 PAROLEES IN THE COMMUNITY ---

12 **Q**    THE 1,300, IS THAT AFTERCARE?

13 **A**    THAT'S AFTERCARE, YES.  THANK YOU.

14 **Q**    WHAT DOES CDCR HAVE PLANNED FOR THE FIFTH ELEMENT YOU

15 MENTIONED, THE PREPARATION FOR REENTRY INTO THE COMMUNITY?

16 **A**    THERE'S A COUPLE OF THINGS THAT WE'RE LOOKING -- ONE IS A

17 PROGRAM THAT'S A LIFE SKILLS PROGRAM THAT WILL BE GIVEN TO

18 ALL -- ALL OF THE INMATES THAT AREN'T PROGRAMMABLE; IN OTHER

19 WORDS, THEY'RE MEDIUM -- THERE'S HIGH, MEDIUM AND LOW RISK TO

20 REOFFEND.  WE'LL BE FOCUSING OUR REHAB ON THE MEDIUM TO HIGH

21 RISK.  THE LOW RISK TO REOFFEND WILL BE DELIVERED A LIFE SKILLS

22 TRACK THAT IS BASICALLY ADDRESSING FAMILY ISSUES, FINANCIAL

23 ISSUES, AND TRYING TO GET THEIR CRIMINAL PROBLEMS CLEARED UP ON

24 THE OUTSIDE.

25            WE'VE ALSO DEVELOPED A REENTRY CASE PLAN THAT'S

1  SPECIFIC TO ENGAGING THEM WITH THEIR PAROLE AGENT TO PLACE THEM

2  INTO AFTERCARE PROGRAMS ONCE THEY DEPART THE INSTITUTIONS.

3  Q   DO YOU HAVE ANY PRISON-TO-EMPLOYMENT PROGRAMS IN THE WORKS?

4  A   YES, THERE'S -- AB 900 REQUIRED A PRISON-TO-EMPLOYMENT

5  PROGRAM.  WE'VE ADOPTED A TEXAS MODEL BASED ON WHAT THE REHAB

6  STRIKE TEAM RECOMMENDED.  WE ARE CALLING THAT "NEW START."  THAT

7  HAS BEEN FULLY APPROVED THROUGH BUDGET PROCESS, AND WE ARE

8  CURRENTLY HIRING POSITIONS TO FILL THAT PROGRAM.

9       WE ALSO HAVE AN INTERAGENCY AGREEMENT IN PROCESS WITH

10 THE CALIFORNIA WORKFORCE DEVELOPMENT, CWDS, THAT ARE LOCALLY

11 BASED, THAT WILL PRIORITIZE SERVICES TO GET OUR INMATES JOBS

12 WHEN THEY DEPART.  THEY'LL BE ASSISTING US IN ASSESSING WHAT IS

13 THE ACTUAL JOB MARKET FOR WHERE THE OFFENDERS ARE RETURNING TO

14 MAKE CERTAIN THAT WE'RE DELIVERING THOSE VOCATIONAL AND TRAINING

15 PROGRAMS WITHIN OUR INSTITUTION.

16 Q   WHAT IS YOUR ROLE WITH RESPECT TO PROPOSED REENTRY

17 FACILITIES?

18 A   PREDOMINANTLY IN THE PROGRAMMATIC DESIGNS.  WE'VE DESIGNED A

19 SERIES OF PROGRAMS THAT WOULD OPERATE WITHIN A REENTRY

20 ENVIRONMENT.  I ALSO ASSIST IN TALKING WITH COMMUNITIES ABOUT

21 THE OFFENDER POPULATION, THE FACT THAT THEY ARE RETURNING TO

22 COMMUNITIES, TRY TO DEAL WITH SOME OF THE COMMUNITY RESISTANCE

23 TO THESE PROGRAMS, AND BY AND LARGE TO SECURE PROGRAMS FOR THE

24 OFFENDERS ONCE THEY GO OFF ON TO PAROLE.

25 Q   YOU MENTIONED PAROLE.  DO YOU HAVE ANY ROLE WITH RESPECT TO

1    PAROLE?

2    **A**    I DON'T HAVE DIRECT AUTHORITY OVER THE PROGRAMS IN PAROLE,

3    BUT WE WORK COLLABORATIVELY WITH THE PAROLE DIVISION ON

4    PROCURING PROGRAMS FOR PAROLE.

5            WE'RE IN THE PROCESS NOW OF SORT OF OVERHAULING SOME

6    OF THE PAROLE PROGRAMS, TRYING TO GET PROCUREMENT TO BE MORE

7    EVIDENCE-BASED AND, IN THE SAME CASE MANAGEMENT FASHION, TRYING

8    TO GET THE RIGHT PAROLEE TO THE RIGHT PROGRAM THAT'S GOING TO

9    ADDRESS THEIR CRIMINOGENIC NEED.

10            **THE CLERK:**  TIME'S UP, COUNSEL.

11            **MS. JOHNSON:**  JUST A FEW MORE QUESTIONS.

12   **BY MS. JOHNSON**

13   **Q**    DO YOU HAVE ANY ROLE WITH OFFENDERS AFTER THEY ARE

14   DISCHARGED FROM PAROLE?

15   **A**    I DON'T HAVE A ROLE WITH THE OFFENDER ONCE THEY'RE

16   DISCHARGED, BUT I DO, IN MY CAPACITY, HAVE A ROLE IN TERMS OF

17   BUILDING SYSTEMS TO RELATE TO COMMUNITIES.  BY AND LARGE THE

18   STATE HAS SORT OF PUT ASIDE PAROLEES AS A STATE PROBLEM, SO

19   THERE'S VERY FEW PROGRAMS OR PLANNING GROUPS IN A COMMUNITY THAT

20   WELCOMES PAROLEES INTO THE SYSTEM.

21            SO PART OF MY RESPONSIBILITY IS TO COMMUNICATE WITH

22   COMMUNITIES, AND IN THAT VEIN WE ARE SETTING UP SEVEN REGIONS.

23   WE WILL BE HIRING SEVEN REGIONAL ADMINISTRATORS IN THE COMING

24   MONTHS TO HOUSE THOSE REGIONS, TO BEGIN A DIALOGUE WITH

25   COMMUNITIES ON AN ONGOING BASIS ABOUT THE NEED FOR SERVICES FOR

1  PAROLEES, AND TO TRY AND DEAL WITH -- TRY TO OVERCOME

2  COMMUNITIES' PERCEPTION THAT EITHER INMATES NEVER RETURN TO

3  COMMUNITIES OR THAT'S NOT THEIR COMMUNITY THEY'RE RETURNING TO,

4  AND THAT WILL BE THE PRIMARY TASK OF THE REGIONAL

5  ADMINISTRATORS, WILL BE TO ENGAGE COMMUNITIES IN ACCEPTING

6  PAROLEES AND IN FINDING SERVICES FOR THE PAROLEES.

7  Q   IS IT YOUR UNDERSTANDING THAT THERE ARE SUFFICIENT SERVICES

8  IN THE COMMUNITIES TODAY TO SERVE THE EXISTING PAROLE

9  POPULATION?

10  A   NO.  I MEAN, WE'RE DISCHARGING SOME 10,000 PAROLEES A MONTH,

11  AND IT'S -- THERE'S CLEARLY NOT ENOUGH THAT WE HAVE UNDER OUR

12  CONTRACTS TO SECURE PROGRAMS FOR THOSE OFFENDERS.

13  Q   THESE EFFORTS THAT YOU'VE DESCRIBED RELATING TO

14  REHABILITATIVE PROGRAMMING, HOW DO THEY RELATE TO THE REDUCTION

15  OF THE PRISON POPULATION?

16  A   THESE ARE PROGRAMS THAT HAVE BEEN RESEARCHED IN OTHER

17  STATES.  THEY'RE EVIDENCE-BASED PROGRAMS THAT ARE DESIGNED TO

18  REDUCE RECIDIVISM.  SO THROUGH DELIVERY OF PROGRAMS IN A CUSTODY

19  SETTING, INDIVIDUALLY TAILORING THOSE PROGRAMS TO THE OFFENDER

20  NEEDS, THEN OUTCOME OVER TIME WOULD BE THAT THE OFFENDERS --

21  THAT WE WOULD REDUCE THE RECIDIVISM AND THE CHURNING OF INMATES

22  COMING BACK INTO THE SYSTEM.

23  Q   IS THERE A SPECIFIC POPULATION LEVEL YOU ARE ATTEMPTING TO

24  ACHIEVE THROUGH THESE REHABILITATIVE PROGRAMMING MEASURES?

25  A   NO.

1   Q   WOULD YOU RECOMMEND IMPLEMENTING THE REHABILITATIVE

2   PROGRAMMING MEASURES FOR THE PURPOSE OF ACHIEVING A PARTICULAR

3   POPULATION LEVEL WITH ANY PARTICULAR TIME PERIOD?

4   A   IF I UNDERSTAND YOUR QUESTION, NO.  I THINK MY FOCUS IS

5   REALLY IN GETTING EVIDENCE-BASED PROGRAMS IN PLACE IN THE

6   INSTITUTIONS WITH THE OVERALL GOAL OF REDUCING RECIDIVISM.

7   Q   IS PROPER IMPLEMENTATION OF THE REHABILITATIVE MEASURES YOU

8   DESCRIBED IMPORTANT FOR A SAFE REDUCTION IN THE PRISON

9   POPULATION?

10  A   YES, IT IS.  I THINK MOST OF THE EVIDENCE POINTS TO IF

11  YOU -- JUST THROWING PROGRAMS AT AN INMATE ISN'T GOING TO REALLY

12  RESULT IN A REDUCTION OF RECIDIVISM.  IT HAS TO BE THE RIGHT

13  PROGRAM AT THE RIGHT TIME FOR THAT INMATE FOR IT TO BE

14  EFFECTIVE.

15          MS. JOHNSON:  NO FURTHER QUESTIONS.

16          JUDGE HENDERSON:  ANYTHING FROM INTERVENORS?

17          MR. MITCHELL:  NO QUESTIONS.

18          JUDGE HENDERSON:  CROSS-EXAMINATION.

19          MS. EVENSON:  GOOD MORNING, MS. JETT.  GOOD MORNING,

20  YOUR HONORS.

21          JUDGE KARLTON:  IDENTIFY YOUR NAME, COUNSEL.

22          MS. EVENSON:  REBEKAH EVENSON FROM PRISON LAW OFFICE.

23              CROSS-EXAMINATION BY MS. EVENSON

24  BY MS. EVENSON

25  Q   MS. JETT, HAVE YOU EVER WORKED IN A PRISON?

1   **A**   NO, I HAVEN'T.

2   **Q**   AND CAN YOU TELL ME WHAT'S YOUR EDUCATIONAL BACKGROUND?

3   **A**   I HAVE A HIGH SCHOOL DIPLOMA, AND I HAVE -- I'M, IN FACT, A

4   RECOVERING ADDICT WHO WENT THROUGH TREATMENT IN THE '70'S, CAME

5   TO CALIFORNIA AFTER I WAS RECRUITED FOR ONE OF THE -- AN

6   EXEMPLARY PROGRAM IN PENNSYLVANIA, WHERE WE WERE ABLE TO DEAL

7   WITH A LOT OF ETHNIC MINORITIES.  CALIFORNIA WAS HAVING

8   DIFFICULTY WITH THAT, RECRUITED A NUMBER OF US TO COME TO THE

9   STATE.  WHEN I CAME HERE IN 1977, IN FACT, I WORKED FOR THE

10  DEPARTMENT OF ALCOHOL AND DRUG PROGRAMS.

11  **Q**   NOW, MS. JETT, YOUR RESPONSIBILITIES AS UNDERSECRETARY OF

12  PROGRAMS INCLUDE IMPLEMENTING THE RECOMMENDATIONS OF THE EXPERT

13  PANEL, RIGHT?

14  **A**   CORRECT.

15  **Q**   AND IT'S THE DEPARTMENT'S POSITION THAT THE EXPERT PANEL

16  RECOMMENDATIONS SHOULD BE FOLLOWED, RIGHT?

17  **A**   IT WAS THE DEPARTMENT'S POSITION THAT THE EXPERT PANEL

18  PROVIDED US A BLUEPRINT FOR IMPLEMENTING PROGRAMS.  WE ADOPTED

19  ALL BUT ONE RECOMMENDATION OF THE EXPERT PANEL.

20  **Q**   I'D LIKE TO READ FROM YOUR DEPOSITION FROM AUGUST 28TH,

21  2008, PAGE 23, LINE 1.

22           "QUESTION:  IT'S THE DEPARTMENT'S POSITION

23           THAT THE EXPERT PANEL RECOMMENDATION SHOULD BE

24           FOLLOWED?

25           "ANSWER: YES."

1  **A**    MM-HMM.

2  **Q**    NOW, ONE OF THE EXPERT PANEL'S RECOMMENDATIONS WAS THE

3  INCENTIVES TO CREATE -- TO PARTICIPATE IN PROGRAMS YOU

4  DISCUSSED, CORRECT?

5  **A**    CORRECT.

6  **Q**    AND THE DEPARTMENT CURRENTLY PROVIDES, IN ACCORDANCE WITH

7  STATE LAW, GOOD TIME CREDITS FOR INMATES WHO ENGAGE IN WORK

8  PROGRAMS AND EDUCATION PROGRAMS; ISN'T THAT RIGHT?

9  **A**    CORRECT.

10  **Q**    AND THE PURPOSE OF THAT GOOD TIME CREDIT IS TO PROVIDE AN

11  INCENTIVE TO PARTICIPATE IN THE EDUCATION AND WORK PROGRAMS,

12  RIGHT?

13  **A**    CORRECT.

14  **Q**    THAT'S BECAUSE EDUCATION AND WORK PROGRAMS, AS YOU JUST

15  TESTIFIED, CAN REDUCE RECIDIVISM AND REDUCE CRIME, RIGHT?

16  **A**    YES.  ARE YOU SPEAKING OF BRIDGING, THOUGH?  I'M TRYING TO

17  GRASP WHAT YOU'RE REFERRING TO.

18  **Q**    I'M SPEAKING OF IN GENERAL, THE GOOD TIME CREDITS THAT

19  EXIST.  NOW, ONE OF THEM IS BRIDGING, AND CERTAINLY THERE ARE

20  OTHER CREDITS FOR WORK PROGRAMS, CORRECT?

21  **A**    YES, I WAS JUST TRYING TO FOLLOW WHAT YOU'RE REFERRING TO.

22  **Q**    OKAY.  AND NOW, MS. JETT, YOU ARE NOT AWARE OF ANY INCREASE

23  IN CRIME RESULTING FROM ANY OF THE GOOD TIME CREDIT PROGRAMS IN

24  EXISTENCE IN CDCR; IS THAT RIGHT?

25          **MS. JOHNSON:**  LACKS FOUNDATION.

1          **JUDGE HENDERSON:**  OVERRULED.  ARE YOU AWARE?

2          **THE WITNESS:**  NO.

3    **BY MS. EVENSON**

4    **Q**   NOW, MS. JETT, YOU'VE TESTIFIED THAT ONE OF YOUR

5    RESPONSIBILITIES ALSO INCLUDED OVERSEEING THE PROGRAMMING IN THE

6    REENTRY FACILITIES THAT WERE PLANNED AS A RESULT OF AB 900,

7    CORRECT?

8    **A**   CORRECT.

9    **Q**   IT'S YOUR POSITION THAT 130 PERCENT OF DESIGN CAPACITY IS

10   THE MAXIMUM LEVEL OF CROWDING AT WHICH YOU COULD PROVIDE DIRECT

11   SUPERVISION IN THE REENTRY FACILITIES, CORRECT?

12   **A**   I HAVE NO OPINION ON THE DESIGN CAPACITY.  MY FOCUS IN

13   REENTRY IS DELIVERY OF PROGRAMS IN THOSE SETTINGS.  AND THE

14   MAXIMUM IS 500 IN SETTINGS.  SO THOSE -- THAT'S SORT OF THE

15   METRIC I'M USING TO DESIGN THE PROGRAMMING.

16   **Q**   SO IT'S YOUR OPINION THAT THE REENTRY FACILITY SHOULD BE AT

17   A HUNDRED PERCENT OF DESIGN CAPACITY?

18   **A**   THAT'S NOT MY OPINION.  IT'S HOW I'M APPROACHING THE DESIGN.

19   I DON'T HAVE AN OPINION IN TERMS OF DESIGN CAPACITY.  THAT'S NOT

20   MY EXPERTISE.

21   **Q**   OKAY.  I'D LIKE TO TURN YOUR ATTENTION TO PAGE 41 OF YOUR

22   DEPOSITION, LINE 17.

23              "QUESTION:  BUT 130 WOULD BE THE MAXIMUM

24         LEVEL OF OVERCROWDING --

25              "ANSWER:  YEAH.

1            "QUESTION: -- UNDER WHICH YOU COULD PROVIDE

2        THE APPROPRIATE PROGRAMMING?

3            "ANSWER:  THAT WE COULD PROVIDE DIRECT

4        SUPERVISION, WHICH DOESN'T REALLY HAVE ANYTHING

5        TO DO WITH PROGRAMMING, BUT IT HAS TO DO WITH

6        THE CUSTODY MODEL WITHIN A REENTRY."

7    **A**   YES, I THINK THAT WAS A DIFFERENT DISCUSSION.  BUT, YES, IT

8    WOULD LEND ITSELF -- OUR CURRENT INSTITUTIONS ARE NOT REALLY

9    DESIGNED FOR A DIRECT SUPERVISORY MODEL.

10   **Q**   SO 130 PERCENT OF DESIGN CAPACITY IS THE MAXIMUM LEVEL OF

11   CROWDING UNDER WHICH YOU COULD PROVIDE THE APPROPRIATE LEVEL OF

12   SUPERVISION, CORRECT?

13   **A**   YOU KNOW, I REALLY DON'T HAVE THAT OPINION.  I DON'T HAVE A

14   PERSPECTIVE ON DESIGN CAPACITY.

15   **Q**   OKAY.  I'LL TURN YOUR ATTENTION TO THE NEXT PAGE, PAGE 42 OF

16   THE DEPOSITION, LINE 1:

17            "QUESTION:  SO 130 PERCENT OF DESIGN

18        CAPACITY, IN YOUR VIEW, IS THE MAXIMUM LEVEL OF

19        OVERCROWDING AT WHICH YOU COULD PROVIDE

20        APPROPRIATE CUSTODY SUPERVISION?

21            "ANSWER:  THAT IS DIRECT SUPERVISION, WHICH

22        IS A MODEL OF CUSTODY SUPERVISION.  THAT'S THE

23        CONTEXT THAT WE'RE TALKING ABOUT THIS IN."

24   **A**   RIGHT, WHICH IS A LITTLE DIFFERENT.  THAT'S VERY DIFFERENT

25   THAN PROGRAMMING.  IT'S A MODEL OF SUPERVISION WHERE THE

1  FACILITY IS DESIGNED FOR MORE INTERACTION BETWEEN THE STAFF AND

2  THE INMATES, LESS BARRIERS AND SO FORTH, BUT THAT'S NOT

3  NECESSARILY PROGRAM DESIGN.  THAT'S SOMETHING SEPARATE.

4  **Q**   YOU'VE TESTIFIED HERE TODAY THAT CDCR CAN REDUCE ITS PRISON

5  POPULATION BY PROVIDING EVIDENCE-BASED PROGRAMS THAT REDUCE

6  RECIDIVISM, CORRECT?

7  **A**   CORRECT.

8  **Q**   BUT AS OF AUGUST WHEN I TOOK YOUR DEPOSITION, CDCR HAD NO

9  SYSTEM TO PUT THE RIGHT INMATE IN THE RIGHT PROGRAM; ISN'T THAT

10 RIGHT?

11 **A**   AS OF AUGUST WE WERE PROBABLY STILL IMPLEMENTING WITH

12 TEACHERS AT THAT POINT AND HAD NOT DONE OUR PILOT FIELD TEST AT

13 THAT STAGE, WHICH WAS AUGUST, CORRECT, IS THAT YOU'RE --

14 **Q**   IF I COULD REFRESH YOUR RECOLLECTION, AT THAT TIME YOU

15 ACTUALLY DID HAVE A PROOF PROJECT --

16 **A**   RIGHT.

17 **Q**   -- IN PLACE AT SOLANO.

18          I'D LIKE TO TURN YOUR ATTENTION TO PAGE 174 OF YOUR

19 DEPOSITION, LINE 20.

20          "THE WITNESS:  AGAIN, WHERE I'M AT WITH

21          PROGRAMS RIGHT NOW, IT WOULDN'T MATTER -- HOW AM

22          I GOING TO SAY?  WE HAVE NO SYSTEM DESIGNED IN

23          INSTITUTIONS TO DELIVER THE RIGHT INMATE TO THE

24          RIGHT PROGRAM."

25          NOW, ONE THING THAT AB 900 WOULD HAVE DONE WAS TO

1  CLEAR UP PROGRAM SPACE THAT'S NOW BEING USED FOR HOUSING SO YOU

2  COULD DO PROGRAMMING, CORRECT?

3  **A**   THAT'S -- I GUESS I'M NOT CLEAR WHAT YOUR QUESTION IS.

4  **Q**   ONE THING THAT AB 900 WOULD HAVE DONE WOULD BE TO CLEAR

5  UP -- BUILD IN-FILL BEDS THAT WOULD CLEAR UP PROGRAM SPACE WHICH

6  IS NOW BEING USED FOR HOUSING SO YOU COULD DO PROGRAMMING IN

7  THAT SPACE; ISN'T THAT RIGHT?

8  **A**   I THINK THAT WAS THE INTENT OF AB 900; HOWEVER, WE HAVE GONE

9  A SLIGHTLY DIFFERENT DIRECTION, COMBINED WITH, YOU KNOW, THE

10 5,000 CURRENTLY OUT-OF-STATE INMATES THAT WE HAVE, WHICH HAS

11 FREED UP SOME 17 GYMNASIUMS AND, YOU KNOW, NINE OR TEN DAYROOMS,

12 THAT IS PROVIDING SPACE.

13        BUT MORE SO WE HAVE MOVED INTO WHAT IS AN INTEGRATED

14 PROGRAM DESIGN WHEREBY WE'RE USING THE MODULARS, WHICH ARE ABOUT

15 EACH ONE ABOUT 6,700 SQUARE FOOT, DESIGNED WITH OFFICE SPACE AND

16 OPEN ROOMS TO DO CLASSROOMS, AS AN ENVIRONMENT WHERE WE COULD

17 BOTH PROVIDE THE DRUG TREATMENT, BUT WE COULD ALSO PROVIDE SOME

18 OF THE NEW PROGRAMS, THINKING FOR CHANGE, ANGER MANAGEMENT-TYPE

19 PROGRAMS.  SO WE ARE NOT REALLY DEPENDENT ON OTHER SPACE AT THIS

20 STAGE.

21 **Q**   AT THIS STAGE YOU HAVE ABOUT EIGHT MODULES, CORRECT?

22 **A**   CORRECT.

23 **Q**   AND THERE ARE STILL APPROXIMATELY 14,000 UGLY BEDS OR

24 NON-TRADITIONAL BEDS; ISN'T THAT RIGHT?

25 **A**   I BELIEVE.  I'M NOT SURE OF THE NUMBER, BUT I KNOW THAT

1    THERE'S STILL BEDS THAT WE'RE TAKING DOWN, YES.

2    **Q**    THERE ARE STILL NON-TRADITIONAL BEDS THAT ARE BEING USED,

3    ISN'T THAT RIGHT, ABOUT 14,000?

4    **A**    YES, I'M NOT SURE OF THE NUMBER.  YOU ARE CORRECT IN THAT

5    THERE ARE NON-TRADITIONAL BEDS.

6    **Q**    I WOULD LIKE TO PLAY A SHORT CLIP FOR YOU.  THIS IS TAKEN

7    FROM THE GOVERNOR'S WEBSITE.

8                       (VIDEO PLAYED.)

9    **BY MS. EVENSON**

10   **Q**    WHY DON'T WE DO THAT WITH SOUND, THE FULL THING?

11                  (VIDEO PLAYED.)

12                  **JUDGE HENDERSON:**  THIS REFORM MEASURE IS AB 900?

13                  **MS. EVENSON:**  THAT'S CORRECT.  I MEAN, I CAN ASK THE

14   WITNESS BUT --

15                  **THE WITNESS:**  WELL, I THINK AT THE TIME THAT I HAD

16   JUST, I THINK, COME BACK FROM CCI OR CCW, ONE OF THE

17   INSTITUTIONS THAT HAD AND TOURED WITH THE GOVERNOR TRIPLE BUNK

18   ENVIRONMENTS.  THIS IS BEFORE I WENT IN AS UNDERSECRETARY OF

19   PROGRAMS.  ONCE I GOT INTO THE INSTITUTIONS, WE DID TAKE UP A

20   DIFFERENT TACT IN TERMS OF BUILDING ALTERNATIVE SPACE.

21   **Q**    BUT TODAY, MS. JETT, THE DEPARTMENT HASN'T BROKEN GROUND ON

22   ANY NEW CONSTRUCTION UNDER AB 900, ANY NEW IN-FILL BEDS; ISN'T

23   THAT RIGHT?

24   **A**    IN-FILL BEDS, YES.

25   **Q**    OKAY.

1  **A**   WE HAVE LAID EIGHT MODULARS DOWN.  THAT GIVES US ROUGHLY AN

2  ADDITIONAL 6,000 SQUARE FOOT TO PROVIDE PROGRAMS IN THAT WE

3  HAVEN'T HAD IN THE PAST.

4  **Q**   IN EIGHT INSTITUTIONS?

5  **A**   CORRECT.

6  **Q**   AND ARE ALL OF THOSE PRISON SETTINGS OR SOME OF THOSE CAMPS

7  AND OTHER CORRECTIONAL --

8  **A**   THERE'S NO CAM- -- THERE IS ONE CAMP SETTING IN PHASE TWO.

9  I DON'T THINK THERE'S A CAMP SETTING IN PHASE ONE.  THE FIRST

10  2,000 ARE ALL IN BEDS, WITH AN EXCEPTION OF ONE, WHICH IS IN LEO

11  CHESNEY, WHICH IS A COMMUNITY FACILITY.

12  **Q**   SO OUT OF 33 OF YOUR PRISONS -- SORRY, YOUR HONOR.

13           OUT OF 33 OF YOUR PRISONS, THERE ARE NOW SEVEN

14  MODULES?

15  **A**   NO.  THAT'S -- LEO CHESNEY WAS ACTUALLY A NINTH, SO IT'S IN

16  EIGHT PRISON SETTINGS.

17  **Q**   OUT OF 33 PRISON SITES THERE ARE EIGHT MODULES?

18  **A**   RIGHT.  THESE ARE ADDITIONAL.  WE'RE IN 22 PRISONS.

19           **JUDGE KARLTON:**  NOW I AM TOTALLY CONFUSED.  WHEN YOU

20  SAY YOU ARE IN 22 PRISONS, TELL ME WHAT YOU MEAN.

21           **THE WITNESS:**  WE CURRENTLY HAVE OVER 9,000 SLOTS TO

22  TREAT DRUG TREATMENT IN 22 PRISONS.

23           **JUDGE KARLTON:**  OKAY.  AND THAT -- I DON'T

24  UNDERSTAND.  DOES THAT INCLUDE THE EIGHT OR PERHAPS NINE

25  MODULES, OR IN ADDITION TO THE EIGHT OR NINE MODULES?

1          **THE WITNESS:**  IT DOES NOT INCLUDE THE EIGHT MODULARS,

2    THE EIGHT MODULARS BRING US UP TO OVER 12,000 SLOTS.

3    **BY MS. EVENSON**

4    **Q**    AND YET STILL, AS OF AUGUST OF 2008, AT LEAST 50 PERCENT OF

5    ALL PRISONERS DON'T PARTICIPATE IN ANY REHABILITATIVE PROGRAM OR

6    WORK PROGRAMS OR WORK ASSIGNMENT DURING THEIR ENTIRE PRISON

7    TERM; ISN'T THAT RIGHT?

8    **A**    I BELIEVE SO.

9          **THE CLERK:**  FIVE MINUTES, COUNSEL.

10   **BY MS. EVENSON**

11   **Q**    NOW, A KEY ELEMENT OF ENSURING THAT THE RIGHT INMATE GETS

12   INTO THE RIGHT PROGRAM IS ASSESSING THE PROGRAM NEEDS OF EACH

13   INMATE, RIGHT?

14   **A**    CORRECT.

15   **Q**    AND THE FIRST STEP IN ASSESSING NEEDS IS THE COMPASS

16   ASSESSMENT TOOL?

17   **A**    CORRECT.

18   **Q**    AND THE SECOND STEP IS ADMINISTERING A SECONDARY ASSESSMENT;

19   ISN'T THAT RIGHT?

20   **A**    CORRECT.

21   **Q**    AND THE REHABILITATIVE PROGRAMS THEMSELVES, THE SIX

22   EVIDENCE-BASED PROGRAMS THAT YOU DESCRIBED, THOSE PROGRAMS

23   AREN'T EVEN GOING TO BE ON LINE IN ALL THE CDCR INSTITUTIONS

24   UNTIL 2012; ISN'T THAT RIGHT?

25   **A**    I THINK THAT'S THE DATE WHERE WE WOULD HAVE ALL 33

1   INSTITUTIONS ON LINE, YES.

2   **Q**   AND WHEN I SPOKE WITH YOU IN AUGUST, YOU HADN'T EVEN

3   SELECTED SOME OF THE EVIDENCE-BASED PROGRAMS THAT YOU WERE

4   PLANNING TO ROLL OUT IN THE PRISONS, INCLUDING A SEX OFFENDER

5   PROGRAM; ISN'T THAT RIGHT?

6   **A**   EXCLUSIVELY THE SEX OFFENDER PROGRAM.  WE'VE SELECTED THE

7   OTHER PROGRAMS.  SEX OFFENDERS, WE'RE WORKING WITH NIC RIGHT

8   NOW, TRYING TO GET SOME TECHNICAL ASSISTANCE IN DEVELOPING AND

9   LOCATING THE APPROPRIATE PRISONS TO SET FOR THOSE PROGRAMS.

10  **Q**   SO THE OTHER PROGRAMS, ASIDE FROM SEX OFFENDERS, SHOULD ROLL

11  OUT BY 2012, BUT THERE ISN'T EVEN A SCHEDULE FOR ROLLING OUT THE

12  SEX OFFENDER PROGRAM IN ALL OF THE PRISONS; IS THAT RIGHT?

13  **A**   AT THIS STAGE, THERE'S NOT.

14  **Q**   NOW, YOU SAY THAT THE PROGRAMS, ONCE THEY'RE IMPLEMENTED,

15  WILL HAVE DRAMATIC RESULTS IN REDUCING THE PRISON POPULATION,

16  BUT SITTING HERE TODAY, YOU DON'T KNOW WHAT THAT REDUCTION WILL

17  BE, DO YOU?

18  **A**   NO.

19          **MS. EVENSON:**  NOTHING FURTHER.

20          **JUDGE HENDERSON:**  REDIRECT?

21          **MS. JOHNSON:**  DOES CCPOA --

22          **MS. LEONARD:**  NO, YOUR HONOR.

23          **MS. JOHNSON:**  WE HAVE NOTHING FURTHER, YOUR HONOR.

24          **JUDGE HENDERSON:**  OKAY.

25          **JUDGE KARLTON:**  ONE QUESTION.  MY NOTES DON'T MAKE

1  SENSE TO ME, BUT I THINK I KNOW WHAT I MEANT.

2            THE COMPAS ASSESSMENT IS BEING DONE IN RECEPTION

3  CENTERS?

4            **THE WITNESS:**  CORRECT.

5            **JUDGE KARLTON:**  AND WE HAVE BEEN TOLD OVER AND OVER

6  AGAIN BY EVERY WITNESS, PLAINTIFF AND DEFENDANT, THAT THE

7  RECEPTION CENTERS ARE THE MOST OVERCROWDED AND THE LEAST ABLE TO

8  DO ANYTHING.  ARE YOU TELLING US THAT DESPITE THAT FACT, SOMEHOW

9  OR OTHER THE COMPASS PROGRAM IS BEING ADMINISTERED TO EVERY

10 INCOMING INMATE?

11           **THE WITNESS:**  AT THIS MOMENT IT'S NOT TO EVERY

12 INCOMING INMATE, BUT IT IS BEING ADMINISTERED IN RECEPTION

13 CENTER AS REQUIRED BY AB 900.  AB 900 REQUIRED US TO ASSESS

14 EVERY INMATE UPON RECEPTION AND TO USE THAT ASSESSMENT TO PLACE

15 THEM INTO PROGRAM.

16           **JUDGE KARLTON:**  THAT'S NOT BEING DONE BECAUSE OF THE

17 OVERCROWDING.

18           **THE WITNESS:**  WELL, IN LARGE PART IT'S NOT BEING

19 DONE, SIR, BECAUSE WE'RE STILL TRAINING THAT CLASSIFICATION THAT

20 HERETOFORE HAS NOT DELIVERED THAT AS A PART OF THEIR JOB.

21           **JUDGE KARLTON:**  I THINK YOU'VE ANSWERED MY QUESTION.

22           **THE WITNESS:**  THANK YOU.

23           **JUDGE HENDERSON:**  THANK YOU FOR TESTIFYING, MS. JETT.

24 YOU'RE EXCUSED.

25            WE'LL TAKE A 15-MINUTE RECESS AT THIS TIME.

 1                    (RECESS TAKEN.)

 2            **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

 3  WITNESS, COUNSEL.

 4            **MR. LEWIS:**  GOOD MORNING, YOUR HONOR.  KYLE LEWIS FOR

 5  THE STATE DEFENDANTS.

 6            DEFENDANTS NOW CALL THOMAS HOFFMAN.

 7                        **THOMAS HOFFMAN**,

 8  CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

 9  DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

10            **THE WITNESS:**  YES, I DO.

11            **THE CLERK:**  STATE YOUR FULL NAME FOR THE RECORD.

12            **THE WITNESS:**  THOMAS GEORGE HOFFMAN.

13  H-O-F-F-M-A-N.

14                    **DIRECT EXAMINATION**

15  BY MR. LEWIS:

16  Q.  GOOD MORNING, MR. HOFFMAN.

17            **MR. LEWIS:**  YOUR HONOR, DEFENDANTS HAVE SUBMITTED A

18  TRIAL AFFIDAVIT FOR MR. HOFFMAN PREVIOUSLY IDENTIFIED AS EXHIBIT

19  1005, AND I ASK THE COURT TO TAKE IT UNDER SUBMISSION AT THIS

20  TIME.

21            **JUDGE HENDERSON:**  IT WILL BE DONE.

22  BY MR. LEWIS:

23  Q.  MR. HOFFMAN, ARE YOU CURRENTLY EMPLOYED BY THE STATE OF

24  CALIFORNIA?

25  A.  YES, SIR.

1  Q.  WHAT DEPARTMENT DO YOU WORK FOR?

2  A.  CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION.

3  Q.  WHAT IS YOUR CURRENT POSITION WITH CDCR?

4  A.  I'M THE DIRECTOR OF THE DIVISION OF ADULT PAROLE OPERATIONS.

5  Q.  PLEASE INFORM THE COURT OF YOUR PRIOR WORK BEFORE ASSUMING

6  THE ROLE AS DIRECTOR OF PAROLE OPERATIONS?

7  A.  FROM 1975 TO 1994 I WORKED FOR THE CITY OF INGLEWOOD POLICE

8  DEPARTMENT.  I WENT FROM OFFICER TO CAPTAIN THERE.

9            I LEFT INGLEWOOD P.D. IN APRIL OF 1994 TO JOIN THE

10  WEST SACRAMENTO P.D. AS THE THEN CAPTAIN.  ULTIMATELY BECAME THE

11  DEPUTY CHIEF OF POLICE.  I RETIRED IN APRIL OF 2004 AS AN

12  INTERIM CHIEF OF POLICE.

13  Q.  AND HOW LONG HAVE YOU HELD THE POSITION AS DIRECTOR OF THE

14  DEPARTMENT -- OR THE DIVISION OF PAROLE OPERATIONS?

15  A.  TWENTY-EIGHT MONTHS.

16  Q.  HOW MANY PAROLEES ARE CURRENTLY UNDER THE SUPERVISION OF THE

17  DIVISION OF PAROLE OPERATIONS?

18  A.  ABOUT 125,000.

19  Q.  AND ARE THESE PAROLEES BROKEN DOWN INTO DIFFERENT

20  CLASSIFICATIONS OR SERVICE CLASSIFICATIONS?

21  A.  THEY ARE BROKEN -- YES, THEY ARE BROKEN DOWN INTO GROUPS

22  BASED ON THEIR NEEDS.  MENTAL ILLNESSES IS A GROUP.  THERE'S

23  SEXUAL OFFENDERS THAT WE SUPERVISE SPECIFICALLY, GANGSTERS,

24  SECOND STRIKERS.  YOU KNOW, I'LL SAY THE GENERIC POPULATION.

25  ALL OF THEM ARE ORGANIZED IN A WAY THAT REVOLVES AROUND FIRST

1 AND FOREMOST THEIR NEEDS AND THE RISKS THAT THEY REPRESENT TO

2 OUR SOCIETY.

3          AND THEN, SECONDARILY, THE FREQUENCY BY WHICH AGENTS

4 ARE REQUIRED TO CONTACT THEM AND/OR DRUG TEST THEM.

5 **Q.**  THE COURT HAS HEARD THAT PAROLEES ARE SENT BACK TO PRISON

6 FOR VARIOUS REASONS.  COULD YOU DESCRIBE VERY BRIEFLY HOW THE

7 PAROLE REVOCATION PROCESS WORKS?  WHAT HAPPENS TO SEND A PAROLEE

8 BACK TO PRISON?

9 **A.**  TWO THINGS PREDOMINANTLY RESULT IN PAROLEES GETTING INVOLVED

10 IN THE REVOCATION PROCESS:  CONTACT WITH LOCAL LAW ENFORCEMENT

11 THAT BRINGS THEM TO THEIR ATTENTION AND THEN SUBSEQUENTLY TO

12 OURS AND/OR OBSERVED MISCONDUCT BY PAROL AGENTS FREQUENTLY

13 VIOLATING TERMS AND CONDITIONS OF PAROLE.  LIKE, THEY THROW A

14 DIRTY DRUG TEST, OR THEY ARE FOUND IN POSSESSION OF SOMETHING

15 THEY ARE NOT SUPPOSED TO BE FOUND IN POSSESSION OF, OR ANY

16 NUMBER OF THINGS.

17          THEN THERE'S A REPORT THAT'S WRITTEN BY THE AGENT AND

18 FORWARDED TO THE SUPERVISOR.  THEN BASED ON THE RECOMMENDATIONS

19 OF THE AGENT, WHETHER OR NOT IT'S FOR SOME SORT OF REMEDIAL OR

20 NON-CUSTODIAL RESPONSE, OR IT CAN ABOUT HALF OF THE TIME MOVE

21 TOWARDS THE REVOCATION PROCESS, WHICH IS CONTROLLED BY THE BOARD

22 OF PAROLE HEARINGS.

23 **Q.**  AND DOES THE BOARD OF PAROLE HEARINGS FALL UNDERNEATH THE

24 DIVISION OF PAROLE OPERATIONS?

25 **A.**  NO, SIR.

1  Q.  SO IT'S A SEPARATE ENTITY WITHIN CDCR APART FROM YOUR

2  OPERATIONS?

3  A.  YES, SIR.

4  Q.  DO YOU KNOW HOW MANY PAROLE -- I'M SORRY, HOW MANY PAROLE

5  VIOLATIONS THERE ARE IN A GIVEN YEAR, ROUGHLY?

6  A.  IN 2007 THERE WERE A LITTLE OVER 187,000.  I THINK

7  HISTORICALLY 180,000 IS NOT -- WOULD NOT BE AN OVERSTATEMENT.

8  Q.  AND OF THAT, SAY, 180,000, HOW MANY -- OR APPROXIMATELY HOW

9  MANY --

10          **JUDGE KARLTON:**  I'M SORRY.  MAY I INTERRUPT?  I JUST

11  WANDERED.  MY FAULT.

12          125,000 PAROLEES ROUGHLY?

13          **THE WITNESS:**  YES, SIR.

14          **JUDGE KARLTON:**  PRODUCING ABOUT 187,000 VIOLATIONS?

15          **THE WITNESS:**  YES, SIR.

16          **JUDGE KARLTON:**  YOU'RE DOING A GREAT JOB.

17  **BY MR. LEWIS:**

18  Q.  OF THOSE APPROXIMATELY 180,000, HOW MANY ARE ACTUALLY

19  RETURNED OR HOW MANY PAROLEES ARE ACTUALLY RETURNED TO

20  INCARCERATION IN CDCR PER YEAR?

21  A.  ABOUT 68,000 WOULD BE A PRETTY GOOD ESTIMATE.

22  Q.  AND THERE HAS BEEN TESTIMONY REGARDING TECHNICAL; VIOLATIONS

23  OF PAROLE.  WHAT ARE TECHNICAL VIOLATIONS?

24  A.  THAT WOULD BE AN OFFENSE A NON-PAROLEE COULD NOT BE RETURNED

25  TO CUSTODY FOR.  IT WOULD BE SOMETHING LIKE SOMEBODY WHO IS,

1  I'LL SAY, A FREE CITIZEN COULDN'T BE PLACED CUSTODY FOR

2  ABSCONDING, OR FOR SIMPLE POSSESSION OF ALCOHOL, OR FOR NOT

3  OBEYING THE DIRECTIVES OF A PAROLE AGENT.  NOT A MISDEMEANOR AND

4  NOT A FELONY.  TERMS AND CONDITIONS OF PAROLE PREDOMINANTLY.

5  **Q.**  ARE THERE SOME TECHNICAL VIOLATIONS THAT MUST BE REFERRED TO

6  THE BOARD OF PAROLE HEARINGS?

7  **A.**  TECHNICAL VIOLATIONS COMMITTED BY CERTAIN MEMBERS OF THE

8  PAROLEE POPULATION.  1192 OR 667 COMMITMENT OFFENSES, YES, THEY

9  ARE MANDATORILY REFERRED TO THE BOARD.

10 **Q.**  WHICH YOU SAY 1192 OR 667 OFFENSES, COULD YOU DESCRIBE WHAT

11 THOSE ARE FOR THE COURT?

12 **A.**  TWO SECTIONS IN THE PENAL CODE THAT DEFINE CRIMES THAT ARE

13 EITHER SERIOUS AND/OR SERIOUS AND VIOLENT.

14 **Q.**  AND OF THE TECHNICAL VIOLATIONS THAT YOUR DIVISION SEES, DO

15 YOU HAVE ANY IDEA ABOUT WHAT THE APPROXIMATE PERCENTAGE OF THOSE

16 THAT MUST BE REFERRED TO THE BOARD IS?

17 **A.**  WE MANDATORILY REFER ABOUT 50 PERCENT OF THE TOTAL

18 VIOLATIONS THAT COME TO OUR ATTENTION TO THE BOARD OF PAROLE

19 HEARINGS.

20          **JUDGE REINHARDT:**  I THOUGHT TECHNICAL VIOLATIONS YOU

21 SAID WERE ACTIONS FOR WHICH ORDINARY CITIZENS NOT ON PAROLE

22 COULD NOT BE SENT TO PRISON FOR.

23          **THE WITNESS:**  YES, SIR.

24          **JUDGE REINHARDT:**  AND THESE TWO CATEGORIES ARE

25 SERIOUS CRIMES?

1    **THE WITNESS:**  NO, SIR.  IF A PAROLEE HAS A COMMITMENT

2    OFFENSE THAT FALLS UNDER THE DEFINITION OF 1192 AND/OR 667, 2616

3    OF THE CALIFORNIA REGS DEMAND THAT WE REFER THOSE VIOLATIONS TO

4    THE BOARD FOR CONSIDERATION.

5    **JUDGE REINHARDT:**  WHATEVER VIOLATION IT IS, LIKE NOT

6    CALLING IN ON A PARTICULAR DAY?

7    **THE WITNESS:**  I'M SORRY, YOUR HONOR.

8    **JUDGE KARLTON:**  WHATEVER THE VIOLATION IS, YOU MUST

9    REFER TO THE PAROLE AGENCY.

10   **THE WITNESS:**  PER 2616, YES.

11   **JUDGE REINHARDT:**  IF HE DOESN'T SHOW UP FOR AN

12   APPOINTMENT?

13   **THE WITNESS:**  THAT COULD BE.

14   **BY MR. LEWIS:**

15   **Q.**  DO YOU HAVE AN IDEA ABOUT, APPROXIMATELY, HOW MANY TECHNICAL

16   VIOLATIONS OF PAROLE ARE REFERRED TO THE BOARD OF PAROLE

17   HEARINGS BY YOUR AGENTS EACH YEAR?

18   **A.**  THERE'S A NUMBER -- PURE TECHNICAL, ONLY A TECHNICAL

19   VIOLATION.  IN 2007 ABOUT 17,000 PURE TECHNICAL VIOLATIONS.

20   **Q.**  AND DO YOUR PAROLE AGENTS HAVE THE ABILITY TO SIMPLY STOP

21   RESPONDING TO TECHNICAL PAROLE VIOLATIONS?

22   **A.**  NO, SIR.  WE RESPOND TO ANY VIOLATION THAT COMES TO OUR

23   ATTENTION, TECHNICAL OR CRIMINAL.

24   **Q.**  DOES THE LARGE NUMBER OF PAROLEES SUPERVISED BY CDCR

25   SOMETIMES AFFECT YOUR DIVISION'S ABILITY TO MANAGE THE PAROLE

1  POPULATION?

2  **A.**  I DON'T KNOW QUITE HOW TO ANSWER THAT.  IF YOU COULD --

3  **Q.**  DO YOU HAVE A HARD TIME MAKING SURE THAT ALL OF YOUR

4  PAROLEES GET THE SERVICES THEY NEED OR GET THE PROGRAMS THAT

5  THEY NEED BECAUSE OF THE HIGH NUMBER OF PAROLEES THAT YOU HAVE?

6  **A.**  I DON'T KNOW THAT WE COULD EVER HAVE ENOUGH PROGRAMS FOR A

7  POPULATION OF THIS SIZE.  WE ARE WORKING HARD TO EXPAND THE

8  PROGRAM LEVEL, BUT THERE ARE TIMES WHEN PAROLEES COULD MERIT

9  FROM TREATMENT AND TREATMENT IS NOT AVAILABLE.

10  **Q.**  HAS THE DIVISION OF PAROLE OPERATIONS RECENTLY IMPLEMENTED A

11  RISK AND NEEDS ASSESSMENT TO ASSIST IN BETTER MANAGING ITS

12  PAROLEE POPULATION?

13  **A.**  YES.  OVER THE LAST TWO YEARS WE HAVE TAKEN A NUMBER OF

14  STEPS TO, MOST IMPORTANTLY, BRING OURSELVES INTO A POSITION

15  WHERE WE ARE BASING OUR DECISIONS ON RISKS AND NEEDS AND USING

16  EVIDENCE-BASED PRACTICES TO DRAW OUR CONCLUSIONS ABOUT WHAT'S

17  THE BEST OUTCOME FOR A GIVEN PAROLEE AND/OR A GIVEN PAROLEE

18  INVOLVED IN THE REVOCATION PROCESS.

19          THAT INCLUDES THE COMPASS REENTRY PROCESS, WHICH IS

20  ADMINISTERED TO ABOUT 60 PERCENT OF ALL PAROLEES THAT -- OR ALL

21  INMATES THAT ARE DISCHARGED FROM CDCR ON TO PAROLE.

22  **Q.**  YOU MENTIONED THE COMPASS.  SO HOW IS THE COMPASS TOOL USED

23  TO BENEFIT THE PAROLEE POPULATION?

24  **A.**  IT'S EVIDENCE-BASED VALIDATED PROCESS BY WHICH WE ASSESS THE

25  RISK THAT THE PAROLEE REPRESENTS BASED ON THEIR CRIMINAL HISTORY

1   AND NEEDS OF THAT INDIVIDUAL; BE IT EDUCATION, DRUG, ANGER

2   MANAGEMENT, SOCIAL SKILLS, EDUCATION.

3            AND THIS RATHER EXTENSIVE DOCUMENT IS INCLUDED IN THE

4   PRE-PAROLE PLAN PACKAGE THAT GOES TO THE PAROLE AGENT AND HIS

5   SUPERVISOR PRIOR TO THE INMATE BEING RELEASED AND ON PAROLE.  IT

6   PROVIDES US WITH AN OPPORTUNITY TO DEVELOP A PAROLE PLAN THAT IS

7   INDIVIDUAL SPECIFIC AND SENSITIVE TO THE NEEDS AND RISKS OF EACH

8   INDIVIDUAL.

9   **Q.**  IS THERE A RISK THAT A PAROLEE WILL REOFFEND EVEN IF THEY

10  USE THIS TOOL, EVEN IF YOU USE THIS TOOL?

11  **A.**  OH, ABSOLUTELY.  YES.

12  **Q.**  THE COURT HAS HEARD TESTIMONY FROM OTHER -- THAT OTHER

13  STATES USE A PAROLE VIOLATIONS TOOL.  HAS CDCR IMPLEMENTED A

14  PAROLE VIOLATIONS TOOL?

15  **A.**  YEAH.  WE ARE REALLY EXCITED ABOUT IT.  WE HAVE BEEN WORKING

16  ON OUR PAROLE VIOLATION INSTRUMENT WITH THE CENTER FOR EFFECTIVE

17  PUBLIC POLICY SINCE JULY OF 2007.

18           WE WENT THROUGH A VERY DETAILED, INVOLVED PROCESS TO

19  BUILD A TOOL THAT'S SENSITIVE TO THE UNIQUE ENVIRONMENT OF

20  CALIFORNIA PAROLE.

21           WE NOW HAVE THAT TOOL IN A PILOT -- IN A PILOT

22  CAPACITY IN FOUR UNITS, ONE IN EACH OF OUR FOUR REGIONS, AND WE

23  ARE ACTIVELY USING IT NOW.

24           AND A REAL GOOD ADVANTAGE TO THE TOOL IS WE HAVE ALSO

25  EMBEDDED THE CALIFORNIA STATIC RISK ASSESSMENT INTO THE PVDMI

1  PROCESS.  SO WHEN WE ARE FACED WITH A DECISION ABOUT A RESPONSE

2  TO A VIOLATION OR COMMISSION OF A NEW CRIME, WE ARE CONSIDERING

3  THE RISKS THAT THE SPECIFIC PAROLEE REPRESENTS TO OUR

4  COMMUNITIES AND, ALSO, WE ARE -- WE HAVE DETERMINED THE RISK OF

5  THE INCIDENT VIOLATIONS.

6         SO IT'S A TWO-FOLD DECISION-MAKING PROCESS THAT LENDS

7  ITSELF TO GUIDING THE AGENTS TOWARDS CONSISTENT AND

8  PROPORTIONATE RESPONSES TO VIOLATIONS.

9         IT'S A PART OF AN OVERARCHING AGENDA THAT SAYS WE

10  WANT TO MOVE OURSELVES TOWARDS POLICY-DRIVEN RESPONSES TO

11  VIOLATIONS OF PAROLE AND COMMISSIONS OF NEW CRIMES SO THAT WE

12  CAN HAVE A CONSISTENT AND PREDICTABLE AND PROPORTIONATE RESPONSE

13  TO VIOLATIONS FROM ONE END OF OUR STATE TO THE NEXT.

14  Q.  WILL THE PVDMI, OR PAROLE VIOLATIONS TOOL THAT YOU ARE

15  DESCRIBING, WILL IT HELP POSSIBLY PUSH PAROLEES TOWARDS

16  ALTERNATIVE SANCTIONS PROGRAMS OR REMEDIAL PROGRAMS RATHER THAN

17  SEND THEM BACK TO PRISON?

18  A.  YES, BECAUSE WHAT IT DOES IS IT GUIDES OUR AGENTS.  AS WE

19  SIT HERE TODAY, THERE'S ABOUT 2400 AGENTS MAKING THESE DECISIONS

20  THIS MORNING.  IT GUIDES OUR AGENTS AND THEIR SUPERVISORS

21  THROUGH A VERY THOUGHTFUL STRUCTURED PROCESS SO THAT THE FULL

22  RANGE OF ALTERNATIVES AND APPROPRIATE RESPONSES TO VIOLATIONS

23  AND COMMISSIONS OF NEW CRIMES ARE CONSIDERED IN EACH INSTANCE.

24  Q.  WHAT KINDS OF REMEDIAL PROGRAMS ARE AVAILABLE TO PAROLEES?

25  A.  IT RUNS THE GAMUT.  THERE'S ABOUT 100 MILLION IN PROGRAMS

1  FUNDED VIA CDCR IN PAROLE.  THEY INCLUDE SUCH THINGS AS THE DAY

2  REPORTING CENTERS AND LITERACY LABS AND DRUG TREATMENT PROGRAMS

3  AND RESIDENTIAL MULTI-SERVICE CENTERS AND CARE FOR THE MENTALLY

4  ILL.

5          THEN WE ALSO WORK VERY CLOSELY -- SOMETIMES AN UPHILL

6  BATTLE, BUT VERY CLOSELY WITH LOCAL COMMUNITIES AND PRIVATE

7  SERVICE PROVIDERS TO EXPAND THE MENU OF SERVICE THAT WE CAN

8  OFFER THIS LARGE POPULATION OF PAROLEES.

9  **Q.**  HAVE OTHER STATES DEMONSTRATED POSITIVE IMPACTS FROM THE USE

10 OF A PAROLE VIOLATIONS TOOL?

11 **A.**  THE CENTER FOR EFFECTIVE PUBLIC POLICY, WHO ARE THE FOLKS

12 THAT HAVE HELPED US BUILD OURS, HAVE HELPED 33 STATES AND/OR

13 COUNTY PAROLE AND PROBATION OPERATIONS UNDERTAKE A PROCESS, AS I

14 SAID, MORE COMMONLY REFERRED TO AS POLICY-DRIVEN RESPONSES TO

15 VIOLATIONS.  ONE OF THE OUTCOMES IS FREQUENTLY THE DEVELOPMENT

16 OF A DECISION-MAKING INSTRUMENT OF ONE KIND OR ANOTHER.

17          STATES LIKE TEXAS, NEW JERSEY, KANSAS, OHIO, FLORIDA

18 HAVE ALL ENGAGED IN THIS PROCESS AND ALL OF THEM HAVE SEEN A

19 REDUCTION IN THE USE OF THE REVOCATION PROCESS AND IN THE PAROLE

20 ENVIRONMENT, A REDUCTION IN PRISON POPULATIONS AND BETTER

21 OUTCOMES FROM THE PAROLEES.

22 **Q.**  DO YOU BELIEVE THAT THE USE OF THE CALIFORNIA PAROLE TOOL

23 WILL EVENTUALLY RESULT IN LESS RECIDIVISM AND FEWER PAROLE

24 REVOCATIONS IN CALIFORNIA?

25 **A.**  ABSOLUTELY, ABSOLUTELY.

1  Q.  IN YOUR OPINION, WILL THE USE OF A RISK AND NEEDS ASSESSMENT

2  AND THE PAROLE TOOL RESULT IN A DIFFERENT KIND OF CDCR

3  POPULATION AFTER SOME TIME?

4  A.  YES.  IT WILL PROVIDE US WITH AN OPPORTUNITY TO BRING -- AND

5  THIS IS A HUGE STEP FORWARD FOR OUR STATE.  WE WILL BRING

6  SCIENCE AND EVIDENCE-BASED PRACTICES TO WHAT HAS HISTORICALLY

7  BEEN A CLINICAL DECISION ABOUT RISK.  THE RESEARCH VALIDATES

8  THAT THE CLINICAL DECISION OR CONCLUSION ABOUT RISK, YOU GET IT

9  RIGHT ABOUT 50/50, 50 PERCENT OF THE TIME.

10         WHEN YOU INTRODUCE A VALIDATED EVIDENCE BASED TOOL,

11  YOU BRING THAT THRESHOLD UP TO ABOUT 70 PERCENT.  IF YOU ALSO

12  HAVE TALENTED PROFESSIONALS, YOU CAN CONTINUE TO BUMP THAT RATIO

13  UP WHERE THE DECISION CAN BE RIGHT IN EXCESS OF 70 PERCENT OF

14  THE TIME, RECOGNIZING YOU ARE NEVER GOING TO GET 100 PERCENT.

15         **THE CLERK:**  TIME IS UP, COUNSEL.

16         **MR. LEWIS:**  IF I MIGHT ASK A FEW MORE QUESTIONS, YOUR

17  HONORS?

18         **JUDGE REINHARDT:**  LET ME ASK ONE BEFORE YOU CONTINUE,

19  COUNSEL.

20         IN ANSWERING THE LAST TWO QUESTIONS YOU USED THE WORD

21  "EVENTUALLY" AND THEN IN ANOTHER INSTANCE "AFTER SOME TIME."

22         IS THERE ANYTHING WITHIN YOUR OWN EXPERIENCE OR

23  LOOKING AT PROGRAMS FROM OTHER STATES THAT CAN TELL YOU

24  CONCRETELY OR SEMI-CONCRETELY WHEN THESE CHANGES -- WHEN YOU'LL

25  START SEEING THESE CHANGES?

1          **THE WITNESS:** OTHER STATES, YOU KNOW, LIKE KANSAS AND

2    TEXAS, ILLINOIS SEE THE CHANGES QUICKLY. THE CAVEAT FOR

3    CALIFORNIA IS, WE ARE THE GORILLA IN THE CROWD.

4          OHIO, AS AN EXAMPLE. OHIO HAS ABOUT 37,000 PAROLEES

5    THAT THEY SUPERVISE. THEY HAVE JUST RECENTLY COME OUT WITH,

6    JUST IN THE LAST WEEK, THE MOST EXTENSIVE REVIEW OF THE

7    DECISION-MAKING INSTRUMENT PROCESS EVER AND IT VALIDATED THAT

8    THEY'VE EXPERIENCED SIGNIFICANT REDUCTIONS IN REVOCATIONS AND

9    THE USE OF INCARCERATION IN THIS PROCESS VERY QUICKLY.

10         **JUDGE KARLTON:** WHAT DOES "VERY QUICKLY" MEAN? A

11   YEAR? SIX MONTHS? WHAT DOES IT MEAN? I UNDERSTAND THAT YOU

12   DON'T HAVE A PRECISE NUMBER, BUT ROUGH.

13         **THE WITNESS:** YOU ARE GOING TO SEE THE CHANGE

14   VIRTUALLY IMMEDIATELY, RECOGNIZING THAT IT WILL TAKE -- AND THIS

15   IS WHY -- I'M NOT TRYING TO AVOID THE QUESTION BUT, YOU KNOW,

16   WHEN YOU -- WHEN WE RUN THROUGH 70,000 OR 80,000 VIOLATIONS, THE

17   IMPACT OF HAVING A STRUCTURED DECISION-MAKING INSTRUMENT AND

18   ALTERNATIVE SANCTIONS WILL BE RECOGNIZED QUICKLY.

19         I GUESS ONE WAY TO ANSWER YOUR QUESTION, YOUR HONOR,

20   IS WE ARE USING THIS TOOL RIGHT NOW IN FOUR OF OUR UNITS. IN

21   THE FIRST COUPLE OF WEEKS WHEN WE -- OUR AGENTS USED THE TOOL,

22   THEY AGREED WITH THE TOOL -- AND THIS WAS ABOUT 113 CASES. THEY

23   AGREED WITH THE TOOL ALL BUT SIX TIMES, AND THEN THE OUTCOME

24   THAT THAT TOOL RECOMMENDED.

25         AND I THINK WHAT YOU WILL SEE -- I KNOW WHAT YOU WILL

1   SEE QUICKLY IS CONSISTENCY AND CONTINUITY IN THESE RESPONSES AND

2   A NEW FOCUS.  THIS IS -- SOME OF THIS IS CULTURAL, BUT A NEW

3   FOCUS ON RECOGNIZING THAT WHAT PAROLE IS ABOUT IS HELPING FOLKS

4   TO SAFELY AND EFFECTIVELY TRANSITION BACK INTO SOCIETY WHENEVER

5   WE CAN MAKE THAT HAPPEN.

6              **JUDGE REINHARDT:**  HOW LONG WILL IT TAKE BEFORE IT'S

7   IN EFFECT STATE WIDE?

8              **THE WITNESS:**  WE WILL HAVE THIS -- THE PLAN IS TO

9   HAVE THE PVDMI STATE WIDE BEFORE THE END OF NEXT YEAR.

10             OUR STRATEGY AT THE MOMENT -- AND, OBVIOUSLY, ALL OF

11  THIS IS, WE COULD -- WE COULD ACCELERATE THIS, BUT THE PLAN

12  RIGHT NOW IS THAT BEGINNING IN FEBRUARY WE WILL BEGIN TO ROLL

13  THIS TOOL OUT IN FOUR DISTRICTS EVERY 30 TO 45 DAYS.  THERE'S 25

14  DISTRICT IN OUR STATE SYSTEM.  SO WE WOULD ROLL FOUR OUT EVERY

15  30 OR 45 DAYS.  RIGHT NOW PROJECTING THAT BY OCTOBER, MAYBE

16  NOVEMBER -- OCTOBER SEEMS TO BE A PRETTY COMFORTABLE DATE FOR

17  US -- THAT WE WOULD HAVE THE TOOL UP AND OUR AGENTS TRAINED AND

18  EVERYBODY USING IT BY THEN.

19             **JUDGE KARLTON:**  AND THE BUDGET CRISIS AND THE

20  APPARENT DETERMINATION THAT ONE WAY OR ANOTHER EVERY AGENCY IS

21  GOING TO HAVE TO TAKE A HIT WILL DELAY THAT TO SOME DEGREE, AND

22  YOU DON'T KNOW HOW MUCH THAT WILL BE BECAUSE IT DEPENDS ON HOW

23  BADLY YOU ARE HIT?

24             **THE WITNESS:**  YOUR HONOR, I DON'T BELIEVE THAT IT

25  WILL -- IT WILL DELAY THE IMPLEMENTATION OF THE USE OF THE

1  PVDMI, THE PAROLE VIOLATION METRICS.

2          YOU KNOW, THERE COULD BE SOME IMPLICATIONS ON THE

3  AVAILABILITY OF PROGRAMMING.  AND, OBVIOUSLY, ONE OF THE KEY

4  STRENGTHS OF A STRUCTURED DECISION-MAKING PROCESS IS THAT THERE

5  IS AN EFFECTIVE AND A ROBUST MENU OF PROGRAMS AVAILABLE,

6  SOMETHING WE ARE WORKING HARD TO ALSO BUILD EITHER BY OUR OWN

7  RESOURCES AND/OR WORKING CLOSELY WITH COMMUNITIES TO MAKE THE --

8  HELP US HAVE THAT AVAILABLE TO OUR PAROLEE POPULATION.

9          **JUDGE KARLTON:**  IT SEEMS TO ME -- AND I'M NOT A

10 PROFESSIONAL AND YOU WILL HAVE TO TELL ME WHETHER I'M RIGHT --

11 THAT IMPLEMENTATION OF THIS PROGRAM AND THE REDUCTION OF SENDING

12 PEOPLE BACK TO PRISON AND ALL THE REST WOULD ULTIMATELY BE A

13 SIGNIFICANT SAVINGS TO THE STATE; IS THAT RIGHT OR WRONG?

14         **THE WITNESS:**  YES, SIR.  THAT ASSUMPTION WOULD BE

15 CORRECT.  RETURNING OF -- FEWER PEOPLE GOING THROUGH THE

16 INSTITUTIONAL PROCESS WOULD SAVE MONEY.

17 **BY MR. LEWIS:**

18 **Q.**  MR. HOFFMAN, WERE YOU SCHEDULED TO RETIRE FROM CDCR ON

19 NOVEMBER 1ST, 2008?

20 **A.**  YES, SIR.

21 **Q.**  WHY DID YOU CHOOSE TO STAY IN YOUR POSITION AS THE DIRECTOR

22 OF THE DIVISION OF PAROLE OPERATIONS?

23 **A.**  THIS IS THE ULTIMATE HONOR OF A 35-YEAR CAREER.  I BELIEVE

24 IN CDCR AND DAPO.  I BELIEVE WE HAVE POSITIONED OURSELVES WELL,

25 REALLY WELL, TO REALLY MAKE A DIFFERENCE IN WHAT I SEE AS ONE OF

1  THE MOST COMPLICATED, INTERESTING SOCIAL DEBATES OF OUR TIME.

2          I BELIEVE WE CAN MAKE A DIFFERENCE AND THAT WE ARE

3  POSITIONED TO DO THAT NOW.  AND I DIDN'T -- I DIDN'T WANT TO

4  LEAVE AND NOT BE PART OF THAT.

5          AND MY WIFE TOLD ME IF I RETIRED, SHE WOULD BE MAD AT

6  ME, SO...

7          **MR. LEWIS:**  YOUR HONOR, IT IS DEFENDANTS' REQUEST

8  THAT MR. HOFFMAN'S AFFIDAVIT, EXHIBIT 1005, BE MOVED INTO

9  EVIDENCE AT THIS TIME.

10          **JUDGE HENDERSON:**  IT WILL BE.

11              (DEFENDANTS' EXHIBIT 1005 RECEIVED IN

12              EVIDENCE)

13          **MR. LEWIS:**  THANK YOU, YOUR HONOR.  NO FURTHER

14  QUESTIONS.

15          **JUDGE HENDERSON:**  INTERVENORS?

16              **DIRECT EXAMINATION**

17          **MR. MITCHELL:**  BILL MITCHELL FOR THE DEFENDANT

18  INTERVENORS.

19  **BY MR. MITCHELL:**

20  **Q.**  MR. HOFFMAN, GOOD MORNING.

21  **A.**  GOOD MORNING.

22  **Q.**  SIR, IN THE DEVELOPMENT OF THE RISK ASSESSMENT TOOL AND THE

23  DECISION-MAKING INSTRUMENT, YOU HAVE WORKED LONG, LONG HOURS AND

24  A LOT OF TIME IN DEVELOPING THAT INSTRUMENT, TAKING INTO

25  CONSIDERATION A NUMBER OF DIFFERENT FACTORS, INCLUDING RISK

1  ASSESSMENT THAT INVOLVES THE RECIDIVISM FACTOR OF THOSE WHO COME

2  OUT ON PAROLE?

3  **A.** YES, SIR.

4  **Q.** THERE HAS BEEN SOME TESTIMONY IN THIS CASE LOOKING TOWARDS

5  EARLY RELEASE OF A GROUP OF PRISON INMATES THAT ARE, LACK OF A

6  BETTER TERM, CALLED LOW RISK; MEANING THE NON-VIOLENT, NON-SEX

7  OFFENDERS.  ARE YOU AWARE OF THOSE PROPOSALS?

8  **A.** YES, SIR.

9  **Q.** WHAT PERCENTAGE OF THE PRISON POPULATION ARE YOUR NON-SEX,

10 NON-VIOLENT OFFENDERS?

11 **A.** I DON'T KNOW THAT FIGURE OFF THE TOP MY HEAD.  I'M SORRY.

12 **Q.** OKAY.  ARE YOU AWARE OF THE RECIDIVISM RATES THAT ARE

13 ASSOCIATED WITH THAT GROUP OF NON-SEX, NON-VIOLENT OFFENDERS?

14 **A.** THE CALIFORNIA STATIC RISK ASSESSMENT TOOL SAYS THAT ABOUT

15 22 PERCENT OF THE POPULATION WOULD BE LOW RISK, 17 TO

16 22 PERCENT.

17 **Q.** TWENTY-TWO PERCENT OF THE PRISON POPULATION WOULD BE LOW

18 RISK?

19 **A.** YES.

20 **Q.** OKAY.  AND THEN WOULD THAT BE YOUR CRIMINALS OR YOUR

21 OFFENDERS, YOUR INMATES WHO COMMITTED PROPERTY AND DRUG AND

22 NON-VIOLENT CRIMES?

23 **A.** CAN INCLUDE THAT, AND IT CAN INCLUDE SOME PEOPLE WITH A

24 VIOLENT PAST.  THERE ARE PEOPLE WITH A VIOLENT HISTORY THAT WILL

25 SCORE LOW RISK IN THESE TOOLS.

1   Q.  ARE YOU AWARE OF THE RECIDIVISM RATES THAT ARE MEASURED BY

2   CDCR FOR YOUR PROPERTY, DRUG AND NON-VIOLENT OFFENDERS?

3   A.  IN THE LOW RISK POPULATION, ABOUT 17 PERCENT OF THEM WILL

4   RECIDIVATE.

5   Q.  ABOUT 17 PERCENT?

6   A.  YES, SIR.

7   Q.  NOW, THERE'S BEEN SOME TESTIMONY IN THIS CASE THAT OF THE

8   GROUP THAT IS BEING LOOKED AT FOR EARLY RELEASE FROM PRISON,

9   THAT APPROXIMATELY 25 PERCENT OF THAT GROUP, OR THAT POPULATION,

10  WILL COMMIT NEW CRIMES WITHIN THE FIRST FOUR MONTHS OF RELEASE.

11          NOW, IF --

12          JUDGE KARLTON:  DO YOU AGREE WITH THAT NUMBER?

13          THE WITNESS:  I HAVE A NUMBER OF 17 PERCENT IN MY

14  MIND THAT WILL RECIDIVATE IN THE LOW RISK POPULATION.

15          JUDGE REINHARDT:  IN THE FIRST FOUR MONTHS?

16          THE WITNESS:  ACTUALLY, I THINK -- AND DR. CHAPMAN

17  COULD BE HELPFUL HERE, BUT I BELIEVE THAT'S A PREDICTIVE VALUE

18  OF THREE YEARS; THAT WITHIN THE SUBSEQUENT THREE YEARS, THEY

19  WOULD RECIDIVATE VIOLENTLY OR THEY WOULD RECIDIVATE AT ALL.

20  ABOUT 17 PERCENT OF THE TOTAL LOW RISK POPULATION WOULD

21  RECIDIVATE, ABOUT 4 PERCENT OF THAT GROUP VIOLENTLY.

22  Q.  SO ABOUT 4 PERCENT OF THE LOW RISK POPULATION WILL COMMIT

23  VIOLENT CRIMES WHEN THEY RECIDIVATE?

24  A.  ACTUALLY, IT'S A LITTLE LESS THAN THAT.  IT'S 4 PERCENT.

25  17 PERCENT THAT WOULD RECIDIVATE.

1           WHAT WE ARE TRYING TO DO IS -- NOT TRYING TO.  WHAT

2     WE ARE DOING IS MITIGATING RISK AND TRYING TO, THROUGH SCIENCE

3     AND RESEARCH, BREAK DOWN THE POPULATION TO A LOW, MODERATE, HIGH

4     VIOLENT, HIGH DRUG, HIGH PROPERTY CLASSIFICATIONS.

5           **JUDGE REINHARDT:**  YOUR FIGURES COME TO LESS THAN

6     1 PERCENT, YOU SAY?  YOU SAY 4 PERCENT OF 17?

7           **THE WITNESS:**  YES, SIR.

8           **JUDGE REINHARDT:**  SO THE ANSWER TO MR. MITCHELL'S

9     QUESTION WOULD BE 1 PERCENT, LESS THAN 1 PERCENT?

10          **THE WITNESS:**  AND I'M DOING THOSE NUMBERS OFF THE TOP

11    OF MY HEAD.  I'M PRETTY SURE THEY ARE ACCURATE.

12    **BY MR. MITCHELL:**

13    **Q.**  IF I CAN CLARIFY JUST A MOMENT?

14          WHAT PERCENTAGE OF THE LOW RISK POPULATION WOULD BE

15    EXPECTED TO COMMIT VIOLENT CRIMES IF THEY WERE RELEASED?

16    **A.**  ABOUT 4 PERCENT.

17          **JUDGE KARLTON:**  FOUR PERCENT OF THE TOTAL POPULATION

18    OR 4 PERCENT OF THE 17 PERCENT THAT'S GOING TO RECIDIVATE IN ANY

19    EVENT?

20          **THE WITNESS:**  FOUR PERCENT OF THE GROUP THAT WILL

21    RECIDIVATE WILL RECIDIVATE VIOLENTLY.

22          **JUDGE KARLTON:**  THAT'S LESS THAN 1 PERCENT OF THE

23    TOTAL NUMBER.

24          **THE WITNESS:**  ASSUMING I HAVE GOT IT RIGHT, THAT IT'S

25    THE 17 PERCENT -- I WOULD WANT TO CHECK THAT TO BE ENTIRELY

1  ACCURATE, BUT I DO KNOW THAT 4 PERCENT THAT GROUP WOULD

2  RECIDIVATE VIOLENTLY, OR THAT'S WHAT OUR RISK TOOL IS TELLING

3  US.

4  **BY MR. MITCHELL:**

5  **Q.**  THERE HAS BEEN TESTIMONY THAT APPROXIMATELY 10,000 PAROLEES

6  ARE COMING OUT OF CDCR INSTITUTIONS AT THIS TIME, IS THAT

7  CORRECT?

8              **JUDGE KARLTON:**  A MONTH.

9  **BY MR. MITCHELL:**

10  **Q.**  A MONTH?

11  **A.**  YES, SIR.  YES, SIR.

12  **Q.**  WHAT HAS THE EXPERIENCE BEEN IN THE FIELD IN PAROLE WITH

13  YOUR AGENTS IN FINDING SUITABLE TREATMENT, HOUSING AND

14  EMPLOYMENT FOR THIS 10,000 THAT ARE COMING OUT EACH MONTH?

15  **A.**  IT IS A CHALLENGE AND IT REALLY IS COMMUNITY-TO-COMMUNITY.

16  SOME PLACES IT'S EASIER TO DO THAN OTHERS, BUT IT'S A

17  DAY-TO-DAY CHALLENGE.

18  **Q.**  IF WE WERE TO INCREASE THE NUMBER COMING OUT BY 25 PERCENT,

19  ADDING ANOTHER 2500 TO THE 10,000 THAT ARE COMING OUT, DO YOU

20  HAVE AN OPINION AS TO THE ABILITY OF THE COMMUNITY RESOURCES TO

21  ABSORB FOR TREATMENT, HOUSING AND EMPLOYMENT CONSIDERATIONS THAT

22  ADDITIONAL PAROLEE POPULATION?

23  **A.**  I DON'T THINK I WOULD BE ABLE TO PREDICT WHAT THE

24  COMMUNITIES WOULD DO.  I COULD TELL YOU THAT THE DIVISION OF

25  ADULT PAROLE OPERATIONS WOULD NEED ADDITIONAL RESOURCES TO

1  HANDLE, SOUNDS LIKE ABOUT 2500 MORE PAROLEES A MONTH COMING INTO

2  OUR SYSTEM.

3  Q.  ADDITIONAL RESOURCES IN WHAT REGARD?  WHAT WOULD YOU NEED;

4  MORE PAROLE AGENTS, MORE HOUSING, MORE WHAT?

5  A.  YEAH, WE WOULD NEED -- YES.  OUR -- PAROLE IS FINANCED AT 70

6  TO 1.  EVERY 70 PAROLEES THAT COME INTO PAROLE, WE GET AN AGENT

7  FOR THE -- YOU KNOW, NON-SPECIALIZED CASE LOADS.

8          BUT, YES, WE WOULD NEED ADDITIONAL AGENTS SO THAT WE

9  CAN MAINTAIN CASE LOADS WHERE WE ARE.  WE NEED MORE SUPERVISORS.

10  I MEAN, YOU JUST RUN THROUGH THE WHOLE GAMUT OF PERSONNEL AND

11  LOGISTICS AND, OF COURSE, ADDING THAT NUMBER OF PAROLEES INTO

12  THE COMMUNITIES EACH MONTH WOULD FURTHER STRESS AN ALREADY

13  STRESSED INFRASTRUCTURE FOR PROGRAMMING.

14  Q.  THANK YOU, MR. HOFFMAN.  NO FURTHER QUESTIONS.

15          **THE COURT:**  REDIRECT?

16          **JUDGE KARLTON:**  CROSS.

17          **JUDGE HENDERSON:**  I'M SORRY, IT WOULD BE CROSS.

18  THANK YOU, JUDGE.

19          **MR. GALVAN:**  ERNEST GALVAN FOR THE PLAINTIFFS.

20                    <u>**CROSS EXAMINATION**</u>

21  BY MR. GALVAN:

22  Q.  GOOD MORNING, MR. HOFFMAN.

23  A.  GOOD MORNING.

24  Q.  MR. HOFFMAN, YOU WERE JUST TESTIFYING ABOUT THE RESOURCES

25  YOU WOULD NEED IF YOU HAD MORE PAROLEES TO CARE OF.

1    IN YOUR TRIAL AFFIDAVIT YOU CITED THAT THIS DOCUMENT,

2  THE FINAL REPORT OF THE U.C.L.A. EVALUATION OF THE MENTAL HEALTH

3  SERVICES CONTINUING PROGRAM -- AND IF I COULD ZOOM ON THE CHART

4  AT THE TOP THERE -- AND JUST ASK SOME FOUNDATIONAL QUESTIONS.

5                    (DOCUMENT DISPLAYED)

6         THE MENTAL HEALTH SERVICES CONTINUUM PROGRAM IS THE

7  PROGRAM THAT DOES PRE-RELEASE APPOINTMENTS AND BENEFITS PLANNING

8  FOR THE MENTALLY ILL PEOPLE ABOUT TO BE RELEASED FROM PRISON; IS

9  THAT RIGHT?

10 **A.**  YES.

11 **Q.**  AND YOUR DEPARTMENT COMMISSIONED U.C.L.A. TO STUDY THE

12 EFFECTIVENESS OF THAT PROGRAM, IS THAT RIGHT?

13 **A.**  YES, SIR.

14 **Q.**  AND THEN WHAT WE HAVE UP IS PART OF ONE OF THEIR REPORTS

15 THAT THEY PROVIDED TO YOU, IS THAT RIGHT?  JUST A PAGE FROM ONE

16 OF THEM.

17 **A.**  YES, SIR.

18 **Q.**  OKAY.  AND THIS IS AN EXHIBIT NUMBER, DEFENDANTS' 1205.

19 IT'S ONE OF THE EXHIBITS TO YOUR AFFIDAVIT, SIR.

20         AND PART OF THEIR JOB WAS TO TELL YOU WHETHER OR NOT

21 IT WAS COST EFFECTIVE TO INVEST IN ALL THIS PRE-RELEASE PLANNING

22 FOR THE PEOPLE ABOUT TO PAROLE, IS THAT RIGHT?

23         AND SO AS PART OF THE BASIS, THEY MADE THIS CHART FOR

24 YOU.  ESTIMATED DAILY PAROLE COST ON THE SIDE THERE, ABOUT $10.

25 ESTIMATED DAILY INCARCERATION COST FOR A PERSON AT THE ENHANCED

1  OUTPATIENT LEVEL OF CARE AT THE B.O.P., ABOUT $94?

2  **A.**  YES, SIR.

3  **Q.**  ABOUT TEN TIMES MORE TO KEEP SOMEBODY IN PRISON THAN TO TAKE

4  CARE OF THEM ON PAROLE, IS THAT RIGHT?

5  **A.**  IN THIS INSTANCE, YES, SIR.

6  **Q.**  YOU WERE TESTIFYING EARLIER ABOUT THE PROPORTION OF THE

7  VIOLATIONS THAT YOU HAVE TO REFER TO THE BOARD OF PAROLE

8  HEARINGS FOR FORMAL PROCEEDINGS UNDER A REGULATION THAT YOU

9  REFERRED TO AS 2616, TITLE 15?

10  **A.**  YES, SIR.

11  **Q.**  AND THAT'S ALSO KNOWN AS THE ROBIN REGAN REGULATION, IS THAT

12  RIGHT?

13  **A.**  YES, SIR, IT IS.

14  **Q.**  AND THAT'S ONE OF THOSE LAWS -- OR REGULATIONS THAT WE GOT

15  IN CALIFORNIA BECAUSE THERE WAS A HIGH PROFILE MURDER AND

16  SOMEONE DID A CAMPAIGN TO MAKE THAT REGULATION, IS THAT RIGHT?

17          **MR. LEWIS:**  OBJECTION.  LACKS FOUNDATION.

18          **JUDGE KARLTON:**  CAN YOU TELL US IF THAT WAS THE

19  MOTIVATION?

20          **THE WITNESS:**  THAT IS HOW IT'S BEEN CHARACTERIZED TO

21  ME.  I WAS IN LAW ENFORCEMENT AT THE TIME.  I WASN'T TRACKING

22  THE DISCUSSION, BUT THAT'S HOW IT'S BEEN TOLD TO ME.

23  **BY MR. GALVAN:**

24  **Q.**  SO YOUR ANSWER IS YES?

25  **A.**  YES.

1  Q.  AND THAT'S JUST A REGULATION, CORRECT, ADMINISTRATIVE

2  REGULATION?

3  A.  YES, SIR.

4  Q.  AND YOUR ADMINISTRATIVE AGENCY CAN CHANGE REGULATIONS

5  THROUGH A FORMAL PROCESS, IS THAT RIGHT?

6  A.  WE CAN CHANGE A REGULATION, THAT'S TRUE.  THIS IS A

7  REGULATION BY THE BOARD -- OR OF THE BOARD, NOT OF DAPO.

8  Q.  AND ARE YOU AWARE THAT SENATOR GEORGE RUNNER AUTHORED AN

9  INITIATIVE THAT WAS ON THE BALLOT THIS LAST NOVEMBER,

10 PROPOSITION 6, THE SO-CALLED SAVE NEIGHBORHOODS ACT, THAT WOULD

11 HAVE MADE 2616, THE ROBIN REGAN REGULATION A STATUTE?

12 A.  YES, SIR.

13 Q.  AND ARE YOU AWARE THAT THE VOTERS TURNED DOWN THAT

14 PROPOSITION?  THEY VOTED IT DOWN?

15 A.  YES, SIR.

16 Q.  TO YOUR KNOWLEDGE, CALIFORNIA IS ONE OF TWO STATES, RIGHT,

17 THAT TRIES TO PUT EVERYBODY RELEASED FROM PRISON ON PAROLE?

18 A.  CURRENTLY WE ARE THE ONLY STATE.  WE WERE IN COMPANY WITH

19 THE STATE OF ILLINOIS AND ILLINOIS HAS NOW RATCHETED BACK.

20         I THINK AS WE SIT HERE TODAY, THERE ARE ABOUT

21 84 PERCENT OF THE PEOPLE THAT COME OUT OF AN ILLINOIS

22 INSTITUTION WOULD GO ON TO WHAT YOU AND I SEE AS FORMAL PAROLE.

23 Q.  AND SHORTLY AFTER YOU WERE APPOINTED, YOU WENT TO ILLINOIS

24 TO STUDY WHAT THEY WERE DOING THERE IN PAROLE REFORM, IS THAT

25 RIGHT?

1  **A.**  I WENT THERE WITH DR. PETERSILIA, YES, SIR.

2  **Q.**  AND DR. PETERSILIA IS JOAN PETERSILIA, THE HEAD OF THE

3  CENTER FOR EVIDENCE BASED CORRECTIONS AT U.C. IRVINE, IS THAT

4  RIGHT?

5  **A.**  YES, SIR.

6  **Q.**  AND SHE HAS BEEN FREQUENTLY RETAINED BY THE DEPARTMENT OF

7  CORRECTIONS AS A CONSULTANT TO STUDY AND ADVISE THEM ON THEIR

8  PROGRAMS?

9  **A.**  YES, SIR.  AND I TALK TO HER FREQUENTLY.

10  **Q.**  AND SHE ASSISTED YOU WITH THE DEVELOPMENT OF THE PAROLE

11  VIOLATIONS DECISION-MAKING INSTRUMENT, IS THAT RIGHT?

12  **A.**  YES, SIR.  SHE IS A VERY CLOSE CONFIDANTE.

13  **Q.**  AND SO FOR THE -- THE STATUS QUO IN CALIFORNIA RIGHT NOW IS

14  THAT EVERY MONTH -- EVERY MONTH YOU GET ABOUT 10,000 NEW

15  PAROLEES, IS THAT RIGHT?

16  **A.**  YES, SIR.

17  **Q.**  AND YOU HAVE TO SUPERVISE THEM ALL FOR UP -- FOR ROUGHLY

18  THREE YEARS FOR EACH ONE, IS THAT RIGHT?

19  **A.**  WELL, MINIMALLY 13 MONTHS.  MANY OF THEM ARE ON PAROLE FOR

20  UP TO, YOU KNOW, 48 MONTHS, YES.

21            **JUDGE KARLTON:**  EXCUSE ME, MR. GALVAN.

22            WE HEAR A LOT ABOUT PROBATION HAVING BANKED CASES.

23  DOES PAROLE HAVE BANKED CASES?

24            **THE WITNESS:**  NO, YOUR HONOR, NOT AT THE MOMENT,

25  ALTHOUGH THERE ARE ONGOING DISCUSSIONS ABOUT ENGAGING IN THAT

1  CLASSIFICATION.

2  **BY MR. GALVAN:**

3  Q.  AND IT'S YOUR VIEW THAT MAINTAINING SUPERVISION ON THE LOW

4  RISK END OF THAT 10,000 GROUP DOES NOT DO ANYTHING TO PROMOTE

5  PUBLIC SAFETY, IS THAT RIGHT?

6  **A.**  NO, SIR.  WHAT I WOULD SAY IS THAT THE SCIENCE AND EVIDENCE,

7  AND THERE'S LOTS OF IT ALL ACROSS THIS NATION, DOES SUPPORT A

8  CONCLUSION THAT THERE IS A PERCENTAGE OF THE PAROLE POPULATION

9  THAT SHOULDN'T BE SUPERVISED OR SUPERVISED VERY LITTLE; THAT AT

10  THE LOW END OF THE SPECTRUM SUPERVISION IS COUNTER PRODUCTIVE.

11  Q.  WHY IS SUPERVISION COUNTER PRODUCTIVE AT THE LOW END OF THE

12  SPECTRUM?

13  **A.**  I GUESS THE WAY TO DESCRIBE IT, YOU INTRODUCE LOW END

14  OFFENDERS TO HIGH RISK CAREER CRIMINALS AND GANGSTER TYPES, THE

15  TENDENCY IS THAT THE LOW END FOLKS ARE MORE -- I WILL SAY MORE

16  MOTIVATED -- NOT MOTIVATED, BUT MORE INFLUENCED BY THEM THAN THE

17  REVERSE.  BASICALLY, YOU POISON THE POOL.

18  Q.  WHAT DOES FRONT LOADING PAROLE MEAN?

19  **A.**  IT'S A CONCEPT THAT SAYS -- AND THERE'S A LOTS OF RESEARCH

20  BEHIND THIS AS WELL, AND WE ARE VERY MUCH INTERESTED IN THIS;

21  THAT SAYS IF YOU CAN GET TO THE PAROLEE QUICKLY, AND IF YOU --

22  REALLY, IN THE FIRST WEEKS AFTER THEY ARE RELEASED AND GET THEM

23  STABILIZED, HOUSING, HOPEFULLY A JOB, EDUCATIONAL, INCOME,

24  SIMPLE THINGS LIKE DRIVERS LICENSE, SOCIAL SECURITY CARDS, AND

25  THEN YOU DO THAT WELL IN THE FIRST 90 DAYS, RECIDIVISM RATES ARE

1  IMPACTED IMMEDIATELY.

2  **Q.**  AND IT'S YOUR VIEW, ISN'T IT, THAT THE DIVISION OF ADULT

3  PAROLE OPERATIONS, YOUR AGENCY, CANNOT ADOPT A FRONT LOADING

4  STRATEGY IF YOU KEEP SUPERVISING EVERYONE WHO IS RELEASED, IS

5  THAT CORRECT?

6  **A.**  I DON'T KNOW THAT I WOULD WANT TO HAVE IT THAT BLACK AND

7  WHITE.  I THINK THERE ARE OPPORTUNITIES TO FRONT LOAD CERTAIN

8  GROUPS OF PAROLEES IN THIS POPULATION AND BE MORE EFFECTIVE IN

9  THAT WAY.

10          I WOULDN'T WANT TO SAY THAT IT JUST CAN'T HAPPEN IN

11  ANY REGARD.

12          **JUDGE KARLTON:**  IN ANY EVENT, IF YOU HAD 2500 MORE

13  PAROLEES A MONTH, IT WOULD MAKE IT THAT MUCH MORE DIFFICULT TO

14  ADOPT A FRONT LOADING PROGRAM.

15          **THE WITNESS:**  YES, SIR.  IT WOULD COMPROMISE OUR

16  CAPACITY, AND THIS IS ONE OF OUR LONG-TERM -- OUR ULTIMATE GOAL

17  IS TO REDUCE RECIDIVISM IN A SUSTAINABLE WAY.

18          AND, AGAIN, THE SCIENCE SAYS THAT REDUCING RECIDIVISM

19  IN A SUSTAINABLE WAY IS ALL ABOUT SUPERVISING THE MID AND HIGH

20  RANGE OFFENDERS EFFECTIVELY.

21  **BY MR. GALVAN:**

22  **Q.**  AND WHAT DO YOU DO WITH THE LOW RANGE OFFENDERS?

23  **A.**  WELL, AS WE HAVE DISCUSSED -- THERE ARE DISCUSSIONS ABOUT

24  THIS.  YOU KNOW, THERE'S OPPORTUNITIES TO BANK CASES.

25  THERE'S -- OBVIOUSLY, THE VAST MAJORITY OF STATES IN OUR NATION

1  DON'T SUPERVISE THE LOWER RISK OFFENDERS AT ALL.  SOME STATES

2  ARE AS LOW AS 40 OR 50 PERCENT.

3        OHIO, FOR EXAMPLE.  THERE IS A REALLY CONTEMPORARY

4  THOUGHTFUL REPORT THAT'S OUT THAT I FOUND IT A LITTLE DIFFICULT

5  TO READ SOME OF IT BECAUSE IT WAS VERY TECHNICAL, BUT THEY

6  SUPERVISE ABOUT 50 PERCENT OF THE PEOPLE THAT COME OUT OF THEIR

7  INSTITUTIONS.  THERE MAY BE SOME MERIT IN DISCUSSING THAT.

8        **JUDGE REINHARDT:**  DO YOU KNOW WHETHER IN THAT STUDY

9  IF IT SAID ANYTHING ABOUT THE EFFECT ON THE CRIME RATE OF

10 SUPERVISING ONLY 50 PERCENT?

11       **THE WITNESS:**  I WOULD -- I'D HATE TO QUOTE THAT.

12 WHAT I HAVE READ, AND THIS UNFORTUNATELY -- NOT THAT I'M ANY

13 EXPERT, BUT I REALLY DO LOVE THE ACADEMIC ASPECTS OF THE

14 DISCUSSION, THE SCIENCE ABOUT HUMAN BEHAVIOR.

15       SUPERVISING THE MID AND HIGH RANGE POPULATIONS

16 EFFECTIVELY HAS RESULTED IN A DECREASE IN PART ONE CRIMES.

17 STATES HAVE REPORTED THAT REPEATEDLY.  AND TO INCLUDE STATES

18 THAT I THINK WE WOULD SEE AS COMPARATIVE IN SIZE AND SOCIAL

19 AGENDA, LIKE TEXAS.  ILLINOIS ALSO IS CHANGING WHAT THEY ARE

20 DOING, TRYING TO REDUCE THE TOTAL POPULATION OF FOLKS THAT ARE

21 ON PAROLE.

22       SO IT'S -- THIS ISN'T -- THIS ISN'T SOMETHING THAT

23 WOULD BE ENTIRELY UNTESTED, IF DONE THOUGHTFULLY AND WITH THE

24 SCIENCE AND EVIDENCE THAT WE CAN USE.

25                 (DOCUMENT DISPLAYED)

1  **BY MR. GALVAN:**

2  Q.  GOING BACK TO THE STATUS QUO OF WHAT YOU CAN DO RIGHT NOW.

3  I HAVE PUT UP A PAGE OF YOUR DEPOSITION FROM AUGUST, AND IF WE

4  COULD -- IF I COULD DIRECT YOUR ATTENTION TO LINES 10 THROUGH

5  19.  I ASKED YOU:

6              **"QUESTION:**  IS THE RETENTION OF TOO MANY

7              PEOPLE UNDER SUPERVISION ONE OF THE OBSTACLES TO

8              FRONT LOADING SUPERVISION THE WAY YOU HAVE

9              DEFINED IT?

10             **"ANSWER:**  I GUESS THE SHORT ANSWER WOULD BE

11             YES, IT IS.  AGAIN, LOTS OF THINGS GO INTO THAT

12             ANSWER, BUT, OBVIOUSLY, IF YOU HAD A SMALLER

13             POPULATION AND THE CASE LOADS WERE SMALLER AND

14             THERE WERE MORE SERVICES, YOU KNOW, AT THE

15             COMMUNITY LEFT AND SO FORTH, YOU COULD FRONT

16             LOAD PEOPLE MORE EFFECTIVELY, YES, SIR."

17             YOUR FRONT RATIO OF --

18             **JUDGE REINHARDT:**  IS THAT A QUESTION?

19             **MR. GALVAN:**  NO, NO, SIR.

20             **JUDGE REINHARDT:**  YOU DIDN'T ASK HIM WHETHER HE STILL

21  AGREES WITH THAT.

22             **JUDGE KARLTON:**  I WOULD LIKE TO KNOW.  DO YOU STILL

23  AGREE WITH THAT?

24             **THE WITNESS:**  YES, SIR.  THERE'S ALWAYS LOTS OF

25  CAVEATS BECAUSE IT'S SUCH A COMPLEX DISCUSSION AND THERE'S SO

1   MANY VARIABLES, BUT IN VERY SIMPLISTIC TERMS IF YOU HAD FEWER

2   PEOPLE, YOU KNOW, YOU COULD SUPERVISE THEM PERHAPS BETTER.

3           BUT THAT COUNTS ON LOTS OF THINGS.  IT COUNTS ON

4   COMMUNITIES ALLOWING SERVICES TO BE PROVIDED IN THEIR TOWNS AND

5   THE NIMBIISM AND ALL THAT GOES WITH THIS.

6           THIS IS NOT A PROBLEM THAT CAN BE SOLVED SIMPLY BY

7   HAVING FEWER PAROLEES UNDER THE SUPERVISION OF THE STATE.  IT'S

8   A STATE-WIDE SYSTEMATIC ISSUE ABOUT PROGRAMMING AND PAROLEES AND

9   REENTRY.  AND WE HAVE A BIG, BIG PIECE OF THAT RESPONSIBILITY,

10  BUT WE CANNOT SOLVE IT ALONE.  AND THAT'S WHAT I WAS TRYING TO

11  SAY IN THAT ANSWER.

12  **BY MR. GALVAN:**

13  **Q.**  YOUR CURRENT AGENT-TO-PAROLEE RATIO FOR THE GENERAL

14  POPULATION PAROLEE IS 70 TO 1, CORRECT?

15  **A.**  FOR PURPOSES OF FUNDING, YES.  THE REALITY IS IT CAN BE --

16  IT CAN BE GREATER THAN THAT AT THE UNIT LEVEL.

17  **Q.**  AND THE NATIONAL AVERAGE IS CLOSER TO 50 TO 1, IS THAT

18  CORRECT?

19  **A.**  I DON'T KNOW WHAT THE NATIONAL AVERAGE IS.  I DO KNOW THAT

20  THE ASSOCIATION OF PAROLE AND PROBATION AUTHORITIES IS CLOSE TO

21  PUBLISHING A STUDY THAT SAYS, I BELIEVE THE NUMBER IS 53 -- AT

22  53 TO 1.  BEYOND THAT YOU START HAVING A BREAKDOWN IN THE

23  EFFECTIVENESS OF THE AGENT RELATIONSHIP.

24  **Q.**  YOU WORKED WITH DR. PETERSILIA ON A PROGRAM CALLED "EARNED

25  DISCHARGE," IS THAT CORRECT?

1  A.  YES, SIR.

2  Q.  AND "EARNED DISCHARGE" IS AN INCENTIVE PROGRAM THAT REWARDS

3  A PAROLEE WHO MEETS CERTAIN GOALS WITH DISCHARGE AT SIX MONTHS,

4  IS THAT RIGHT?

5  A.  YES.  IT IS PART OF THAT -- WHAT WE HOPE TO BE A SHIFT

6  TOWARDS MORE INCENTIVE-BASED PHILOSOPHY WITH THE PAROLEE

7  POPULATION.

8  Q.  AND IT'S YOUR VIEW THAT THE EVIDENCE SHOWS THAT WHEN YOU

9  PROVIDE INCENTIVES FOR PAROLEES, LIKE THE CHANCE TO GET OFF

10  PAROLE EARLIER, THEY BEHAVE BETTER AND REVOCATIONS GO DOWN; IS

11  THAT RIGHT?

12  A.  THE SCIENCE SUPPORTS THAT CONCLUSION, YES.

13  Q.  AND THE REVOCATIONS GO DOWN NOT BECAUSE YOU ARE NOT CATCHING

14  THEM, BUT BECAUSE THEY BEHAVE BETTER, RIGHT?

15  A.  I WOULD SAY IT'S PROBABLY A LITTLE OF BOTH, BUT, YOU KNOW,

16  WE ARE, AFTER ALL, DEALING WITH HUMAN BEINGS AND I THINK

17  GENERALLY A POSITIVE RELATIONSHIP MOTIVATES PEOPLE MORE THAN

18  PURELY A NEGATIVE PUNITIVE ONE.

19          "EARNED DISCHARGE" WAS BASED IN PART ON THE PAROLEE

20  STEPPING UP AND DOING WHAT IT IS THEY NEED TO DO TO BE

21  LAW-ABIDING FOLKS IN OUR SOCIETY.

22  Q.  AND YOU DID A PILOT IN ORANGE COUNTY LAST YEAR OF "EARNED

23  DISCHARGE," IS THAT RIGHT?

24  A.  YES, SIR.

25  Q.  AND YOU HAD DR. STEVE CHAPMAN, AT THE CDCR OFFICE OF

1  RESEARCH, STUDY THE POPULATION GROUP THAT YOU USED FOR THAT

2  "EARNED DISCHARGE" PILOT, IS THAT RIGHT?

3  **A.**  I DON'T KNOW THAT I UNDERSTAND THE QUESTION, BUT OUR

4  RESEARCH TEAM, DR. CHAPMAN AND, ALSO, DR. PETERSILIA AND THE

5  CENTER FOR EVIDENCE BASED CORRECTIONS WAS INVOLVED IN THE

6  DEVELOPMENT OF AND IN THE SUBSEQUENT MONITORING OF THAT PROCESS.

7  **Q.**  AND YOU GOT A REPORT BACK FROM DR. CHAPMAN THAT CONFIRMED

8  WHAT YOU EXPECTED AS TO THE VERY -- TO THE LOW RATES OF

9  RECIDIVISM, AND SPECIFICALLY VIOLENT RECIDIVISM, IN THE GROUP

10 THAT YOU HAD SELECTED FOR EARNED DISCHARGE, IS THAT RIGHT?

11 **A.**  I DON'T RECALL THE REPORT COMING TO THAT CONCLUSION.  THE

12 EARNED DISCHARGE PROGRAM WAS REALLY -- ULTIMATELY BECAME THE

13 BIRTH PLACE OF THE DISCUSSIONS ABOUT SUMMARY PAROLE.  AND,

14 REALLY, NO PAROLEES WERE DISCHARGED VIA THE EARNED DISCHARGE

15 PROGRAM FOR THE COURSE OF THAT PILOT.

16       BUT INSTEAD -- AND I STILL THINK IT WAS A VERY

17 WORTHWHILE AND FASCINATING DISCUSSION.  THAT PROJECT ENDED UP IN

18 A WIDESPREAD, STATE-WIDE REALLY, DISCUSSION ABOUT SUMMARY

19 PAROLE, A/K/A BANK CASES AND THEIR -- ITS ROLE IN THE PAROLE

20 MANAGEMENT IN OUR STATE.

21       **JUDGE KARLTON:**  I'M SORRY.  I DON'T QUITE UNDERSTAND.

22       THE CONCLUSIONS THAT YOU REACHED CONCERNING THIS

23 PILOT PROGRAM IN ORANGE COUNTY SUPPORTED THE NOTION OF SUMMARY

24 PROBATION FOR AT LEAST CERTAIN PERSONS, NO?

25       **THE WITNESS:**  YOUR HONOR, AS I SIT HERE, I'M NOT --

1  OF COURSE, MAYBE BECAUSE I HAVE GOT SO MANY REPORTS IN MY MIND

2  I'M NOT TRACKING WHAT THE RECOMMENDATIONS WERE IN THAT

3  PARTICULAR REPORT.  I THINK I WOULD BE MISLEADING THE COURT TO

4  SAY THAT.

5          WHAT I WAS SAYING TO THE COURT IS WE BEGAN THE PILOT

6  WITH A GOAL OF HAVING AN EARNED DISCHARGE PROCESS; THAT IF A

7  PAROLEE BEHAVED AND, YOU KNOW, HOUSING AND SO FORTH, AT 180 DAYS

8  WE WOULD REFER THEM TO THE BOARD AND THE BOARD WOULD DISCHARGE

9  THEM.

10          THAT CONCEPT WAS NOT WIDELY EMBRACED BY OUR STAKE

11  HOLDERS -- COUNTY SHERIFFS, D.A.S, POLICE CHIEFS -- AND IN

12  RESPONSE TO THAT, AND I THINK A VERY WORTHWHILE SOCIAL

13  DISCUSSION, THE -- AN ALTERNATIVE WAS SUGGESTED, THAT THE STATE

14  OF CALIFORNIA ENTERTAIN THE IDEA OF EITHER BANKING CASE LOADS OR

15  SUMMARY PAROLE, VERY SIMILAR PROCESSES.  AND SO THAT, THAT

16  DISCUSSION SPARKED BY THIS PILOT CONTINUES TODAY.

17  Q.  IF I COULD SHOW YOU PAGE 83 OF YOUR DEPOSITION.  FOCUSING

18  YOUR ATTENTION TO LINES -- STARTING AT LINES 21 AND THEN WE WILL

19  MOVE TO THE NEXT PAGE.

20          I ASKED YOU REGARDING THAT STUDY:

21          "**QUESTION:**  WHAT RESULT DID YOU GET?"

22          YOU ANSWERED:

23          "**ANSWER:**  BASICALLY THAT OUR GENERAL

24          HYPOTHESIS IS TRUE.  THE LOWER END OFFENDER

25          POPULATION WILL GENERALLY REOFFEND AT ABOUT

1        17 PERCENT OF THE POPULATION."

2              AND THEN MOVING TO THE NEXT PAGE, LINES 1 THROUGH 5.

3   I ASKED YOU:

4              "**QUESTION:**  HOW MUCH OF THAT RECIDIVISM AT

5              17 PERCENT WOULD INVOLVE VIOLENT CRIME?"

6         YOU SAID:

7              "**ANSWER:**  FLOATS.  THREE TO FOUR PERCENT AND

8              THAT'S CONSISTENT WITH THE FINDINGS OF THE

9              WASHINGTON STUDY."

10  **A.**  AND THIS IS BACK TO THE DISCUSSION WE HAD EARLIER ABOUT THE

11  STATIC RISK ASSESSMENT AND ITS VALIDITY IN OUR POPULATION.

12              AND WE -- WE NOW HAVE A STATIC RISK ASSESSMENT TOOL.

13  IT IS VALIDATED TO THE CALIFORNIA POPULATION, WHICH IS A HUGE

14  STEP FORWARD.

15  **Q.**  IN 2007 YOU ISSUED -- YOU AND SECRETARY TILTON ISSUED A

16  MEMORANDUM TO STOP THE PRACTICE OF RETURNING PAROLEES TO CUSTODY

17  FOR PURPOSES OF PSYCHIATRIC TREATMENT, IS THAT RIGHT?

18  **A.**  YES, SIR.

19  **Q.**  AND IT'S YOUR VIEW THAT STOPPING THAT PRACTICE WAS

20  CONSISTENT WITH PUBLIC SAFETY, WASN'T IT?

21  **A.**  YES, SIR.  AND IT ALSO HAD TO DO WITH THE -- THERE WAS A

22  DISCUSSION ABOUT THE FACT WE DIDN'T WANT TO RETURN INMATES INTO

23  A FACILITY THAT WAS ALREADY BEEN DEEMED UNCONSTITUTIONALLY --

24  UNABLE TO PROVIDE A CONSTITUTIONAL LEVEL OF CARE.  IT SEEMED

25  ALMOST COUNTER INTUITIVE.

1  Q.  BUT IT'S TRUE THAT ONE OF YOUR STAFF HAS ESTIMATED THAT

2  ABOUT 6,000 PAROLEES ARE RETURNED TO PRISON EACH YEAR DUE TO

3  TECHNICAL VIOLATIONS OR OTHER CRIMINAL BEHAVIOR THAT CAN RESULT

4  FROM THEIR MENTAL ILLNESS, IS THAT RIGHT?

5  A.  I DON'T HAVE THAT NUMBER ON MY RADAR, BUT IT DOESN'T SOUND

6  LIKE IT WOULD BE TOO WRONG.

7  Q.  I'M SORRY.  I MISSED THE LAST PART OF YOUR ANSWER.

8  A.  IT DOESN'T SOUND LIKE IT WOULD BE WAY OFF.  I MEAN, THERE'S

9  ABOUT 23,000 OR SO INMATES -- OR PAROLEES THAT ARE EITHER EOP OR

10  TRIPLE CMS.  SO THAT FIGURE SOUNDS LIKE IT COULD BE ABOUT RIGHT.

11  Q.  SO YOU AGREE THAT THERE ARE STILL MENTALLY ILL PAROLEES

12  RETURNED TO PRISON FOR TECHNICAL VIOLATIONS THAT COULD BE

13  PREVENTED WITH BETTER ACCESS TO SERVICES; HOUSING, DRUG

14  TREATMENT, MENTAL HEALTH CARE AND THINGS LIKE THAT?

15  A.  I DON'T KNOW THAT I WOULD WANT TO JUMP TO THAT CONCLUSION.

16  THERE ARE FOLKS WHO PROGRAMS WOULD BE BENEFICIAL AND PROGRAMS

17  AREN'T AVAILABLE.

18       IT'S A STATE-WIDE STRUGGLE FOR US.  WE WORK ON THAT

19  LITERALLY EVERY DAY, LITERALLY.

20  Q.  IN YOUR WORK ON THE PROBLEM OF HOW TO DEAL WITH PAROLE

21  REVOCATIONS, YOU HAVE COME TO THE VIEW, HAVEN'T YOU, THAT A

22  LARGE PERCENTAGE OF YOUR POPULATION, PERHAPS 70 PERCENT, JUST

23  CHURNS THROUGH THE SYSTEM THROUGH REPEATED VIOLATIONS.  THEY

24  CYCLE IN AND THEY CYCLE OUT FOR AN AVERAGE TERM OF FOUR MONTHS,

25  ISN'T THAT RIGHT?

1  **A.**  THE AVERAGE TERM IS ABOUT 4.2 MONTHS FOR A REVOCATION AND

2  OUR RECIDIVISM RATES DO RUN ABOUT 70 PERCENT.

3  **Q.**  AND THEN A PERSON WHO CHURNS THROUGH THAT FOR 36 MONTHS, OR

4  THREE YEARS -- OR FOUR YEARS BECAUSE THEY GET THE EXTRA YEAR

5  ADDED ON FOR THEIR VIOLATION TIME, THEN THEY DISCHARGE FROM ALL

6  SUPERVISION BY OPERATION OF LAW, IS THAT CORRECT?

7  **A.**  THAT'S THE REALITY AT THE MOMENT.

8  **Q.**  AND YOU DISCHARGE ABOUT 56,000 PEOPLE A YEAR, IS THAT RIGHT?

9  **A.**  ON AVERAGE ABOUT THAT NUMBER, YES, SIR.

10  **Q.**  AND IT'S YOUR VIEW, ISN'T IT, THAT IF YOU TAKE A PERSON

11  THROUGH THAT HISTORY, WHERE THEY CHURN THROUGH THEIR WHOLE TIME

12  ON PAROLE, THEY DO THE WHOLE TIME IN PRISON, OUT OF PRISON, THAT

13  ALL YOU ARE DOING IS POSTPONING FUTURE VICTIMIZATION AND CRIME?

14

15  **A.**  THAT'S TRUE.  AND I WOULD SAY THAT, YOU KNOW, IT'S IMPORTANT

16  TO UNDERSTAND THAT OUR CULTURE IS IN THE MIDST OF A HUGE CHANGE.

17  WE ARE PART OF A SYSTEM THAT WAS ABOUT -- ALL THROUGH THE

18  CRIMINAL JUSTICE SYSTEM IN CALIFORNIA FOR THE ALMOST 34 YEARS I

19  HAVE BEEN PART OF IT IS LARGELY PUNITIVE.  CERTAINLY THE CDCR

20  AND DAPO SIDE OF THE EQUATION WAS LARGELY PUNITIVE.  AND NOW WE

21  ARE.

22          IT'S A FASCINATING EXPERIENCE TO WATCH REBUILDING A

23  REHABILITATIVE SIDE OF OUR OBLIGATION, BOTH INSIDE AND OUT OF

24  THE INSTITUTIONS.

25          WITH THAT COMES THE STRUGGLE THAT WE HAVE AT THE

1  COMMUNITY LEVEL FOR COUNCILS AND BOARDS AND SO FORTH TO PROVIDE

2  USE PERMITS SO WE CAN PROVIDE REHABILITATIVE PROGRAMS FOR THIS

3  POPULATION, BUT IT -- THE MECHANISMS AND THE WILL AND THE TOOLS

4  TO DO IT ARE IN PLACE.

5  Q.  AND SO YOUR ANSWER TO THE QUESTION ABOUT WHETHER IT'S YOUR

6  VIEW THAT THIS CHURNING PATTERN JUST POSTPONES VICTIMIZATION AND

7  CRIME IS YES, IS THAT RIGHT?

8  **A.**  MY PERSONAL OPINION IS YES.  WE KNOW IT'S NOT WORKING.  I

9  MEAN, AT 70 PERCENT I THINK EVERYBODY UNDERSTANDS WE -- AND THIS

10  IS ONE OF THE REASONS I'M FLATTERED TO BE ANY PART OF THE

11  DISCUSSION.  WE ALL KNOW WE NEED TO CHANGE THE WAY WE ARE

12  THINKING ABOUT THIS PROCESS AND WE ARE ALL ENGAGED IN THAT,

13  INCLUDING PAROLE.

14  **Q.**  THANK YOU.  NO FURTHER QUESTIONS.

15          **JUDGE REINHARDT:**  DOES THE CCPOA HAVE ANY QUESTIONS

16  OF THIS WITNESS?

17          **MS. LEONARD:**  NO, YOUR HONOR.

18          **THE COURT:**  THANK YOU, COUNSEL.

19          REDIRECT?

20          **MR. LEWIS:**  YES, YOUR HONOR.  THANK YOU.  VERY

21  BRIEFLY.  THANK YOU.

22                    **REDIRECT EXAMINATION**

23  **BY MR. LEWIS:**

24  **Q.**  MR. HOFFMAN, THERE WAS TESTIMONY REGARDING THAT THERE WOULD

25  BE A POSSIBLE PRISONER RELEASE ORDER IN THIS CASE.

1          IF THIS PRISONER RELEASE ORDER INCLUDED MENTALLY ILL

2   PAROLEES, WHAT SERVICES DO MENTALLY ILL PAROLEES NEED THAT YOU

3   CURRENTLY ATTEMPT TO PROVIDE THROUGH DAPO RESOURCES?

4   **A.**  IT RUNS THE GAMUT FROM CLINICAL PSYCHOLOGISTS INSIDE OUR

5   UNITS, TO COUNSELORS, TO PROVIDING MEDICATIONS, TO GETTING THEM

6   TO SERVICES OUTSIDE OF OUR UNITS, TO LOCAL SERVICES.

7          AS WE SPEAK, WE ARE WORKING HARD WITH LOCAL SERVICE

8   PROVIDERS IN CITIES AND COUNTIES ACROSS THE STATE TO PROVIDE

9   THESE SERVICES.  WE HAVE GOT ABOUT $9.6 MILLION THAT WE ARE

10  WORKING HARD TO GET VENDORS AND PROVIDERS LINED UP FOR.

11  **Q.**  AND IF ADDITIONAL MENTALLY ILL PAROLEES WERE RELEASED IN THE

12  COMMUNITY AS A RESULT OF A PRISONER RELEASE ORDER, COULD CDCR

13  PROVIDE THE NEEDED SERVICES FOR THIS INCREASED POPULATION WITH

14  ITS CURRENT RESOURCES?

15  **A.**  NO.  THE SAME LOGIC WOULD HOLD TRUE; THAT THIS POPULATION,

16  WHICH IS, OBVIOUSLY AND UNDERSTANDABLY, WORK EXTENSIVE AND

17  SERVICE INTENSIVE WOULD NEED -- WE WOULD NEED ADDITIONAL AGENTS

18  AND, AGAIN, ADDITIONAL PROGRAMMING RESOURCES TO DO -- TO TAKE

19  CARE OF THEM, OR AT LEAST TRY TO.

20  **Q.**  AND IF THESE ADDITIONAL MENTALLY ILL PAROLEES DO NOT RECEIVE

21  THE SERVICES, ARE YOU CONCERNED AND, IN YOUR OPINION, IS THERE A

22  RISK OF INCREASED RECIDIVISM AMONG THEM?

23  **A.**  AGAIN, THE SCIENCE WOULD SUPPORT THAT CONCLUSION, YES.

24          **MR. LEWIS:**  NO FURTHER QUESTIONS, YOUR HONOR.  THANK

25  YOU.

```
 1              MR. MITCHELL:  NO ADDITIONAL QUESTIONS.

 2              THE COURT:  ANYTHING?

 3              MR. GALVAN:  YES, YOUR HONOR.  THANK YOU.

 4                       RECROSS EXAMINATION

 5   BY MR. GALVAN:

 6   Q.  IF A MENTALLY ILL PAROLEE IS PART OF THE GROUP THAT WE WERE

 7   DISCUSSING AT THE END OF THE CROSS, THE GROUP OF 70 PERCENT OF

 8   YOUR PAROLEES THAT JUST CHURNS THROUGH THE BACK AND FORTH INTO

 9   THE SYSTEM AVERAGE OF FOUR MONTHS FOR THE ENTIRE THREE OR FOUR

10   YEARS ON PAROLE, IS IT YOUR OPINION THAT THAT FOUR-MONTH TERM IN

11   PRISON REPEATED OVER AND OVER AGAIN GETS THEM

12   RECIDIVISM-REDUCING TREATMENT?

13   A.  IT DOESN'T SEEM LOGICAL TO ME, SIR.

14   Q.  SO YOUR ANSWER IS NO, IT DOES NOT?

15   A.  MY PERSONAL OPINION?  NO.

16   Q.  IS IT YOUR OPINION THAT THE STATUS QUO, THEN, AS TO THOSE

17   PEOPLE BREEDS RECIDIVISM?

18              MR. LEWIS:  OBJECTION.  VAGUE AND AMBIGUOUS AS TO THE

19   QUESTION.  IF YOU COULD POSSIBLY REPHRASE?

20              JUDGE HENDERSON:  YOU KNOW WHAT "BREED" MEANS.  DOES

21   IT BREED?

22              JUDGE KARLTON:  WHAT WE ARE DOING NOW IS THAT --

23   WELL, YOU'VE INDICATED EARLIER THAT YOU THINK IT DOES.

24              THE WITNESS:  I THINK IF WE DON'T -- THE TREATMENT

25   REDUCES RECIDIVISM IN THIS POPULATION.  THERE IS NO DISPUTING
```

1  THE SCIENCE, AS I READ IT.

2         **MR. GALVAN:**  THANK YOU.  NO FURTHER QUESTIONS.

3         **MR. LEWIS:**  NOTHING, YOUR HONORS.

4         **THE COURT:**  OKAY.  THANK YOU FOR TESTIFYING, MR.

5  HOFFMAN, AND YOU ARE EXCUSED.

6         **THE WITNESS:**  THANK YOU, SIR.

7              (WITNESS EXCUSED.)

8         **THE COURT:**  AND WE WILL TAKE A ONE-HOUR RECESS FOR

9  LUNCH.  COURT IS ADJOURNED.

10              (WHEREUPON AT 12:07  P.M. PROCEEDINGS

11              WERE ADJOURNED FOR NOON RECESS.)

12         **JUDGE HENDERSON:**  OKAY, COUNSEL.  YOU MAY CALL YOUR

13  NEXT WITNESS.

14         **MS. WOODWARD:**  GOOD AFTERNOON, YOUR HONORS.  I'M

15  CAROL WOODWARD, COUNTY COUNSEL FOR SAN MATEO COUNTY.  I'LL CALL

16  AS MY NEXT WITNESS SAN MATEO COUNTY SHERIFF GREG MUNKS.

17         **JUDGE HENDERSON:**  OKAY.

18              **GREGORY MUNKS,**

19  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENORS

20  WAS FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

21         **THE CLERK:**  PLEASE STATE AND SPELL YOUR FULL NAME FOR

22  THE RECORD.

23         **THE WITNESS:**  MY NAME IS GREGORY MUNKS.  SPELLED

24  G-R-E-G-O-R-Y.  LAST NAME IS MUNKS, M-U-N-K-S.

25         **MS. WOODWARD:**  GOOD AFTERNOON, SHERIFF MUNKS.

1    YOUR HONORS, WE HAVE PREVIOUSLY EXCHANGED WITH THE

2   PARTIES AN EXPERT REPORT FROM SHERIFF MUNKS AND ALSO AN EXPERT

3   DECLARATION AND SEVERAL EXHIBITS.  I DO HAVE FOR THE COURT

4   COPIES OF THE REPORT, AND I'M SORRY TO TELL YOU THE DECLARATION

5   IS STILL ON ITS WAY.  IT'S JUST BEING COPIED NOW.

6         **JUDGE KARLTON:**  THAT'S ALL RIGHT.  WE HAVE THE

7   DOCUMENTS.

8         **MS. WOODWARD:**  WOULD THE COURT LIKE THE REPORT?

9         **JUDGE HENDERSON:**  NO THANKS.

10        **MS. WOODWARD:**  THANK YOU.

11              **DIRECT EXAMINATION BY MS. WOODWARD**

12   **BY MS. WOODWARD**

13   **Q**   SHERIFF MUNKS, WOULD YOU TELL US HOW YOU'RE EMPLOYED?

14   **A**   I'M SHERIFF OF SAN MATEO COUNTY.

15   **Q**   HOW LONG HAVE YOU BEEN IN THAT POSITION?

16   **A**   APPROXIMATELY TWO YEARS.

17   **Q**   PRIOR TO THAT, WHAT WAS YOUR EMPLOYMENT?

18   **A**   FOR THE PREVIOUS 13-1/2 YEARS TO THAT I WAS UNDERSHERIFF,

19   SAN MATEO COUNTY.

20   **Q**   HAVE YOU WORKED ELSEWHERE IN LAW ENFORCEMENT?

21   **A**   YES, I SPENT ABOUT TEN YEARS WITH THE CITY OF PALO ALTO

22   POLICE DEPARTMENT, AND PREVIOUS TO THAT I WAS A DEPUTY SHERIFF

23   WITH SAN MATEO COUNTY FOR THREE TO FOUR YEARS.

24   **Q**   HOW LONG HAVE YOU WORKED IN LAW ENFORCEMENT ALTOGETHER?

25   **A**   THIRTY-ONE YEARS.

1  Q    LET ME TALK FOR A MOMENT ABOUT THE SAN MATEO COUNTY

2  SHERIFF'S DEPARTMENT.  WHAT DOES YOUR SHERIFF'S DEPARTMENT DO?

3  A    WE PROVIDE LAW ENFORCEMENT SERVICES TO THE UNINCORPORATED

4  PORTIONS OF SAN MATEO COUNTY.  WE PROVIDE COURT SECURITY IN ALL

5  THE COURTS, SUPERIOR COURT FOR SAN MATEO COUNTY.  I AM THE LEVY

6  AGENT FOR THE COUNTY, ENFORCING ALL THE COURT ORDERS OF THE

7  COUNTY.  WE DO INVESTIGATIVE SERVICES AT SAN FRANCISCO AIRPORT

8  AND THROUGH A NUMBER OF TASK FORCES THAT WE WORK ON WITH FEDERAL

9  AND STATE PARTNERS.  WE ALSO PROVIDE ALL THE CUSTODIAL SERVICES

10 FOR THE COUNTY.  SO I OPERATE ALL THE ADULT CORRECTION

11 FACILITIES IN SAN MATEO COUNTY.

12 Q    HOW MANY EMPLOYEES DOES THE SHERIFF'S OFFICE HAVE?

13 A    APPROXIMATELY 640.

14 Q    AND WHAT'S YOUR BUDGET THIS YEAR FOR THE SHERIFF'S OFFICE

15 OPERATIONS?

16 A    IT'S AROUND $140 MILLION.

17 Q    AND YOU PREPARE AND OVERSEE THAT BUDGET?

18 A    YES.

19 Q    IN YOUR YEARS IN LAW ENFORCEMENT, HAVE YOU HAD AN

20 OPPORTUNITY TO SEE ALL AREAS OF POLICING IN THE LOCAL LEVEL?

21 A    YES.

22          MS. WOODWARD:  YOUR HONORS, I WOULD OFFER SHERIFF

23 MUNKS AS A NONRETAINED EXPERT IN LAW ENFORCEMENT.

24          JUDGE HENDERSON:  WE FIND HIM SO QUALIFIED.

25

**BY MS. WOODWARD**

Q   SHERIFF MUNKS, LET'S TALK FOR A MOMENT ABOUT THE SAN MATEO

COUNTY JAILS.  WHAT JAILS DO YOU OPERATE?

A   I OPERATE THE MAGUIRE CORRECTIONAL FACILITY, WHICH IS OUR

MAIN JAIL, PRIMARILY A MEN'S FACILITY, IN REDWOOD CITY; OUR

WOMEN'S CORRECTIONAL CENTER, WHICH IS OUR WOMEN'S FACILITY, ALSO

IN REDWOOD CITY.  WE HAVE WHAT WE CALL THE MEDIUM SECURITY

TRANSITIONAL FACILITY, WHICH IS LOCATED -- COLOCATED WITH THE

WOMEN'S CORRECTIONAL CENTER ON MAPLE STREET IN REDWOOD CITY.

THAT'S ALSO WHERE WE OPERATE OUR ALTERNATIVE SENTENCING BUREAU,

AGAIN, AT THE MAPLE STREET COMPLEX.

Q   AND HOW MANY BOOKINGS EACH YEAR DO YOU HAVE INTO YOUR JAILS?

A   WE GET ABOUT 18,000 BOOKINGS PER YEAR.

Q   NOW, THERE'S A -- WE'VE HEARD TESTIMONY ABOUT A TERM CALLED

"RATED CAPACITY."  DO YOU UNDERSTAND WHAT THAT TERM MEANS?

A   YES.

Q   WHAT IS RATED CAPACITY?

A   RATED CAPACITY IS THE NUMBER OF BEDS AUTHORIZED BY THE

CALIFORNIA STANDARDS AUTHORITY FOR OUR FACILITIES BASED ON A

NUMBER OF FACTORS, SOME OF WHICH INCLUDE THE SIZE OF THE

FACILITY, YOU KNOW, THE SQUARE FOOTAGE, THINGS LIKE THAT.

Q   OKAY.  DOES THIS TAKE INTO ACCOUNT TITLE 15 REQUIREMENTS FOR

INMATES?

A   YES, TITLE 15, TITLE 24.

Q   WHAT IS THE RATED CAPACITY FOR YOUR JAILS ALL COMBINED?

1  **A**    COMBINED MY RATED CAPACITY IS 834.

2  **Q**    OKAY.  AND WHAT IS YOUR AVERAGE DAILY POPULATION IN YOUR

3  JAILS?

4  **A**    RIGHT NOW, AS OF YESTERDAY, IT WAS 1131.

5  **Q**    AND DOES IT STAY ABOUT THAT LEVEL MOST OF THE TIME?

6  **A**    YES.

7  **Q**    DO YOU KNOW OFFHAND WHAT PERCENTAGE OVER THE RATED CAPACITY

8  YOUR JAILS USUALLY OPERATE?

9  **A**    WE HAVE BEEN IN THE -- RECENT TIMES BEEN AT APPROXIMATELY

10 140 PERCENT OF OUR RATED CAPACITY.

11 **Q**    NOW, BESIDES THE CONCEPT OF RATED CAPACITY FOR JAILS, IS

12 THERE ALSO A CONCEPT CALLED FUNCTIONAL CAPACITY?

13 **A**    YES.

14 **Q**    HOW DO YOU UNDERSTAND THAT?

15 **A**    MY UNDERSTANDING IS THAT THE FUNCTIONAL CAPACITY IS

16 GENERALLY FIVE TO TEN PERCENT BELOW THE RATED CAPACITY.

17 **Q**    EXPLAIN TO ME WHY -- I'M SORRY.  WHAT IS THE FUNCTIONAL

18 CAPACITY?  WHAT'S THE --

19 **A**    FUNCTIONAL CAPACITY IS WHERE THE JAILS SHOULD BE AT AT A

20 POPULATION LEVEL IN ORDER TO RUN PROPERLY.  IT TAKES ACCOUNT

21 HAVING THE ROOM FOR CLASSIFICATION, BEING ABLE TO MOVE INMATES

22 AROUND, KEEP THEM SEPARATED BASED ON CLASSIFICATION, BASED ON

23 NEEDS, BASED ON GANG AFFILIATION.

24        IT ALSO PROVIDES FOR THE PROPER MAINTENANCE AND

25 UPKEEP OF THE FACILITY.  WHEN IT'S ABOVE THAT NUMBER, IT'S

1    DIFFICULT TO EMPTY CELLS OUT IF YOU NEED TO PAINT, CHANGE

2    CARPET, DO THINGS LIKE THAT.

3    **Q**    OKAY.  NOW, IN YOUR OPINION, ARE YOUR JAILS CURRENTLY

4    OVERCROWDED?

5    **A**    YES.

6    **Q**    DO THEY EXCEED THE FUNCTIONAL CAPACITY THAT YOU JUST

7    DISCUSSED?

8    **A**    YES.

9    **Q**    DO THEY EXCEED THE RATED CAPACITY FROM THE STATE?

10   **A**    YES.

11   **Q**    NOW, WHAT PROBLEM IS THERE IN HAVING AN OVERCROWDED JAIL?

12   **A**    THERE'S A NUMBER OF PROBLEMS.  I'VE DESCRIBED SOME OF THEM.

13   THE INABILITY TO PROPERLY SEPARATE AND SEGREGATE INMATES BASED

14   ON CLASSIFICATION.  HAVING TO KEEP INMATES IN AREAS THAT

15   AREN'T -- WEREN'T ORIGINALLY DESIGNED FOR HOUSING.  THAT CREATES

16   PROBLEMS FOR US.

17   **Q**    WILL YOU GIVE ME AN EXAMPLE OF THAT?

18   **A**    WELL, IN SOME OF OUR HOUSING UNITS WE'VE HAD TO CONVERT

19   PROGRAM SPACE TO HOUSING SPACE, AND THAT PROGRAM SPACE WAS

20   DESIGNED FOR CLASSES, FOR TREATMENT, FOR THINGS LIKE THAT.  THAT

21   CREATES A PROBLEM FOR US TWO WAYS, ONE OF WHICH WE'RE NOT ABLE

22   TO PROVIDE THOSE SERVICES BECAUSE THE AREA'S UTILIZED FOR

23   HOUSING, AND, SECONDLY, SINCE THEY WEREN'T DESIGNED FOR HOUSING

24   TO BEGIN WITH, THEY DON'T HAVE TOILET FACILITIES AND THINGS LIKE

25   THAT, SO WE ARE NOT ABLE TO LOCK THE DOORS OF THOSE FACILITIES,

1  SO IT CREATES A SAFETY PROBLEM.

2          WE HAVE AN INCREASING PERCENTAGE OF GANG MEMBERS THAT

3  ARE IN OUR FACILITIES.  THAT CREATES SAFETY CONCERNS.  IF YOU

4  HAVE RIVAL GANG MEMBERS IN THE SAME HOUSING UNIT, THEY HAVE A

5  TENDENCY TO FIGHT EACH OTHER.

6  **Q**   SHERIFF, IF YOU COULD SLOW DOWN A LITTLE BIT?  THE ACOUSTICS

7  ARE PRETTY DIFFICULT HERE.  JUST SLOW DOWN A LITTLE BIT AND TELL

8  ME ABOUT THE GANGS.

9  **A**   OKAY.  I WAS DESCRIBING SOME OF THE PROBLEMS WITH OPERATING

10 THE JAIL WHEN IT IS OVERCROWDED, AND KEY TO THAT IS SAFETY.  AND

11 AS OUR POPULATION OF GANG MEMBERS HAS INCREASED, AND AS OUR

12 POPULATION OR THE PERCENTAGE OF OUR POPULATION OF MENTALLY ILL

13 FOLKS INCREASES, IT CREATES INMATE MANAGEMENT PROBLEMS, SOME OF

14 WHICH ARE DUE TO THE FACT THAT RIVAL GANG MEMBERS NEED TO BE

15 SEPARATED, LIKE GANG MEMBERS CAN'T BE CONCENTRATED TOO MUCH IN

16 ONE HOUSING UNIT.

17         SO TO THE EXTENT WE CAN'T MOVE PEOPLE AROUND THE

18 FACILITY AS IT WAS DESIGNED TO BE RUN, THAT CREATES PROBLEMS FOR

19 US.

20 **Q**   OKAY.  NOW, WHAT IS THE SAN MATEO COUNTY SHERIFF'S OFFICE

21 DOING ABOUT OVERCROWDING IN THE JAILS?

22 **A**   WELL, WE HAVE A PROCESS UNDERWAY NOW, WE ARE EMBARKED ON A

23 JAIL PLANNING PROCESS.  WE PLAN TO BUILD A NEW FACILITY.  ONE OF

24 THE PROBLEMS WITH OUR SYSTEM, WHICH IS DIFFERENT THAN SOME OTHER

25 SYSTEMS, WE'VE LOST CAPACITY OVER THE LAST 15 YEARS.  WE'VE HAD

1  TO CLOSE SOME FACILITIES THAT WERE EITHER OUTDATED OR DUE TO

2  BUDGET CONSTRAINTS.  SO WE'VE HAD A NET LOSS OF BEDS, SO OUR

3  SYSTEM HAS LOST CAPACITY.

4         OUR POPULATION HAS ACTUALLY STAYED FAIRLY CONSTANT

5  OVER THAT PERIOD OF TIME.  WE HAVE A LOW INCARCERATION RATE IN

6  OUR COUNTY.  WE ARE NOT -- OUR POPULATION HAS NOT SEEN A

7  INCREASE LIKE SOME OTHER SYSTEMS HAVE.  SO, WE'RE PLANNING TO

8  BUILD A NEW FACILITY WHICH WILL HELP ALLEVIATE OVERCROWDING.

9  Q    WHEN -- I'M SORRY.

10 A    ABOUT A YEAR AGO WE FORMED A MULTIDISCIPLINARY REENTRY --

11        **MR. SANGSTER:**  EXCUSE ME, YOUR HONOR.  ED SANGSTER

12 FOR THE PLAINTIFFS.  I THINK AT THIS POINT THE ANSWER IS

13 NON-RESPONSIVE TO THE QUESTION.  THE QUESTION WAS ABOUT IMPACTS

14 ON OVERCROWDING.

15        **JUDGE HENDERSON:**  POSE ANOTHER QUESTION.

16 **BY MS. WOODWARD**

17 Q    LET ME ASK YOU, WHEN DO YOU EXPECT THE NEW JAIL TO BE

18 COMPLETED?

19 A    I JUST CAME FROM A MEETING WHERE THEY TOLD ME 2014, BUT I'M

20 PUSHING REALLY HARD FOR SOMETIME IN 2011.

21 Q    WHEN THE NEW JAIL IS COMPLETED, WILL YOU HAVE ENOUGH BEDS TO

22 TAKE CARE OF YOUR CURRENT OVERCROWDING SITUATION?

23 A    YES.

24 Q    OKAY.  WILL YOU HAVE A LOT OF EXTRA BEDS BEYOND THE

25 POPULATION THAT YOU EXPECT?

1   **A**   I ANTICIPATE THAT IF OUR POPULATION STAYS THE SAME, I WOULD

2   HAVE ABOUT A HUNDRED BEDS.

3   **Q**   EXTRA?

4   **A**   YES.

5   **Q**   OKAY.  NOW, IS THERE ANYTHING ELSE THAT THE COUNTY IS

6   DOING -- THAT THE SAN MATEO SHERIFF IS DOING TO ADDRESS THE

7   CURRENT OVERCROWDING SITUATION?

8   **A**   YES.

9   **Q**   WHAT IS THAT?

10  **A**   WE ARE WORKING CLOSELY WITH OUR CRIMINAL JUSTICE PARTNERS TO

11  IDENTIFY INMATES THAT ARE SUITABLE AND ELIGIBLE FOR EARLY

12  RELEASE OR MODIFIABLE SENTENCES INTO COMMUNITY-BASED PROGRAMS.

13  **Q**   DO YOU HAVE SOME ALTERNATIVES TO INCARCERATION GOING ON

14  RIGHT NOW?

15  **A**   YES.

16  **Q**   CAN YOU GIVE US SOME EXAMPLES OF THOSE ALTERNATIVES?

17  **A**   SURE.  STARTING FROM THE VERY BEGINNING OF THE PROCESS,

18  WE -- OUR COUNTY LAW ENFORCEMENT UTILIZED CITE AND RELEASE

19  WHENEVER POSSIBLE NONVIOLENT MISDEMEANORS.  WE ARE HIGHLY

20  ENCOURAGED TO CITE AND RELEASE AND NOT COME TO JAIL TO BEGIN

21  WITH.

22          AS A MATTER OF FACT, I'VE INSTITUTED WHAT'S CALLED A

23  JAIL ACCESS FEE.  SO I CHARGE LOCAL POLICE AGENCIES OR THOSE

24  MISDEMEANOR ARRESTS THAT EXCEED A THREE-YEAR AVERAGE AS A

25  DISINCENTIVE FOR BOOKING MISDEMEANORS.

1  Q    OKAY.  ANY OTHER PROGRAMS?

2  A    YEAH.  I HAVE A LIMIT ON WARRANT ARRESTS.  I WON'T ACCEPT

3  WARRANT ARRESTS FOR SEVENTY-FIVE HUNDRED DOLLARS OR LESS.

4  THERE'S A PROGRAM CALLED FIRST CHANCE WHICH TAKES FIRST TIME

5  DRUNK DRIVERS, AND, RATHER THAN BOOKING THEM INTO JAIL, THEY GO

6  TO FIRST CHANCE.  THAT PROGRAM GETS ABOUT 3,000 BOOKINGS PER

7  YEAR.

8  Q    ALL RIGHT.

9  A    I HAVE WHAT'S CALLED A SHERIFF'S WORK PROGRAM, WHICH IS A

10 OUT-OF-CUSTODY ALTERNATIVE TO JAIL FOR NONVIOLENT PEOPLE

11 SENTENCED TO COUNTY JAIL.  SO RIGHT NOW I'VE GOT ABOUT 450

12 PEOPLE IN THAT PROGRAM.

13          SO ROUGHLY 50 PERCENT OF PEOPLE THAT ARE SENTENCED TO

14 COUNTY JAIL IN SAN MATEO COUNTY ACTUALLY DO THEIR TIME OUTSIDE

15 OF THE COUNTY JAIL.

16 Q    FIFTY PERCENT?

17 A    FIFTY PERCENT, YES.

18 Q    ARE THERE A GOOD NUMBER OF INMATES IN YOUR JAIL RIGHT NOW

19 WHO COULD TAKE PART IN THESE ALTERNATIVE SENTENCING PROGRAMS

20 THAT ARE NOT TAKING ADVANTAGE OF THEM?

21 A    WELL, WHAT WE'VE DONE SINCE LAST YEAR AT THIS TIME WHEN OUR

22 POPULATION WAS EVEN HIGHER THAN IT IS NOW, AND IT WAS AT A -- WE

23 WERE VERY CLOSE TO OUR MAXIMUM BED CAPACITY WHERE WE WOULD HAVE

24 TO START PUTTING PEOPLE ON THE FLOOR OR RELEASE THEM, WE HAVE

25 BEEN WORKING WITH THIS INTERDISCIPLINARY GROUP TO IDENTIFY EVERY

1    INMATE THAT'S ELIGIBLE FOR SOME SORT OF SENTENCE MODIFICATION

2    AND THAT WOULD BE ELIGIBLE AND AMENABLE TO SOME SORT OF

3    TREATMENT PROGRAM IN THE COMMUNITY.

4              WE WERE SUCCESSFUL IN IDENTIFYING A NUMBER OF PEOPLE,

5    GETTING THOSE FOLKS OUT OF CUSTODY.  NOW WE ARE LEFT WITH A VERY

6    SMALL NUMBER OF PEOPLE.  WE TRACK IT ON A MONTHLY BASIS THAT,

7    WERE THERE BEDS AVAILABLE IN THE COMMUNITY, WE COULD MOVE THEM

8    OUT AS WELL.

9    Q    HOW MANY --

10   A    THAT NUMBER HOVERS AROUND 15.

11   Q    FIFTEEN?

12   A    YES.

13   Q    FIFTEEN INMATES COULD GO OUTSIDE OF THE JAIL, BUT THEY CAN'T

14   BE ACCOMMODATED?

15   A    IF THERE WERE GREATER CAPACITY IN THE COMMUNITY.

16   Q    RIGHT.

17   A    TODAY THERE'S -- THAT NUMBER MIGHT VARY 10 TO 20, I MEAN

18   BETWEEN 10 AND 20.  BUT, ROUGHLY, IT RUNS AROUND 15 THAT I COULD

19   GET OUT OF CUSTODY TODAY INTO PROGRAMS.

20   Q    AND THAT'S ALL?

21   A    THAT'S ALL.

22   Q    OKAY.  NOW, THERE'S BEEN -- THE PLAINTIFFS IN THIS CASE HAVE

23   ASKED THAT THE POPULATION OF THE STATE PRISONS BE REDUCED BY

24   SOME 50,000 INMATES.  HAVE YOU BEEN ABLE TO FORM AN OPINION

25   ABOUT WHAT EFFECT ON PUBLIC SAFETY IN SAN MATEO COUNTY A

1  PRISONER RELEASE ORDER OF THAT MAGNITUDE WOULD HAVE?

2  **A**    YES.

3  **Q**    WHAT IS YOUR OPINION?

4  **A**    MY OPINION IS THAT THAT WOULD HAVE A DETRIMENTAL EFFECT ON

5  PUBLIC SAFETY IN MY COMMUNITY.

6  **Q**    WHY IS THAT?

7  **A**    I BASE THAT OPINION ON THE FACT THAT OUR JAIL SYSTEM IS SO

8  SEVERELY OVERCROWDED THAT ANY INCREASE IN NUMBERS OF INMATES

9  INTO MY SYSTEM WOULD CREATE A -- A GREATER CRISIS FOR US.

10  **Q**    IN YOUR OPINION, WOULD A PRISONER RELEASE ORDER OF THAT

11  MAGNITUDE HAVE ANY EFFECT ON THE ALTERNATIVE PROGRAMS YOU

12  MENTIONED?

13  **A**    WELL, THE SYSTEM AS IT IS NOW OPERATES ON A VERY, WHAT I

14  WOULD CALL, THIN MARGIN.  I MEAN, I AM LITERALLY BUMPING UP

15  AGAINST MY MAXIMUM CAPACITY OF BEDS.  OUR SYSTEM IN THE

16  COMMUNITY OF PROVIDING OUTPATIENT, IF YOU WILL, OR

17  OUT-OF-CUSTODY PROGRAMS IS ALREADY AT A MAXIMUM POINT.

18          AS I STATED EARLIER, THERE ARE MORE PEOPLE CURRENTLY

19  IN MY SYSTEM THAT COULD BENEFIT FROM AN OUT-OF-CUSTODY PROGRAM

20  THAN THERE IS CAPACITY IN THOSE PROGRAMS.  SO THAT FACT, COUPLED

21  WITH THE FACT THAT THE COUNTY JAIL IS AN INTEGRAL PART OF THE

22  TOTAL CRIMINAL JUSTICE SYSTEM IN OUR COUNTY, IT'S A NECESSARY

23  OPTION FOR JUDGES WHEN CONSIDERING SENTENCING, IT'S A NECESSARY

24  OPTION FOR LOCAL LAW ENFORCEMENT WHEN THEY ARREST SOMEONE AND

25  WANT TO GET THAT PERSON OFF THE STREET AND OUT OF THE COMMUNITY.

1  SO IT'S NECESSARY FOR ME TO HAVE CAPACITY IN ORDER TO ACCEPT

2  THOSE NEW COMMITMENTS AND THOSE NEW BOOKINGS.

3  **Q**  OKAY.

4  **A**  SO, AGAIN, ANY SIGNIFICANT INCREASE IN THE NUMBER OF PEOPLE

5  IN MY SYSTEM WOULD PRECLUDE ME FROM BEING ABLE TO PERFORM THOSE

6  TWO NECESSARY FUNCTIONS AS PART OF THE CRIMINAL JUSTICE SYSTEM.

7  **Q**  WOULD IT MAKE ANY DIFFERENCE IF THE PRISONER RELEASE ORDER

8  TOOK PLACE OVER A LONG PERIOD OF TIME, SAY, TWO YEARS?

9  **A**  WELL, CERTAINLY -- YES, I WOULD THINK SO.  THE LONGER IT'S

10  SPREAD OUT, THE LESS DRAMATIC, IF YOU WILL, OR THE LESS

11  IMMEDIATE IT WOULD SEEM TO ME, THE IMPACT WOULD BE FELT.

12            **JUDGE HENDERSON:**  EXCUSE ME, COUNSEL.

13            SHERIFF, HAVE YOU MADE ANY ASSUMPTIONS, IF THERE WERE

14  SUCH A RELEASE ORDER, AS TO THE NUMBER OF PEOPLE THAT WOULD COME

15  INTO YOUR COUNTY --

16            **THE WITNESS:**  YES, YOUR HONOR.  WE LOOKED AT THE

17  NUMBERS FIRST BASED ON A 70,000 AND THEN BASED ON 50,000, AND

18  OUR -- AGAIN, THEY'RE BROAD ASSUMPTIONS.  WE ACCOUNT FOR ABOUT

19  1.5 PERCENT OF THE STATE PRISON POPULATION FROM OUR COUNTY.  SO

20  WE WERE LOOKING AT -- IF IT WERE 70,000, WE WERE LOOKING AT

21  AROUND A THOUSAND WOULD BE SAN MATEO COUNTY BOUND, AND THEN

22  PROPORTIONATELY LESS BASED ON THE NUMBER OF RELEASES.

23  **BY MS. WOODWARD**

24  **Q**  OKAY.  AND HAVE YOU FORMED AN OPINION ABOUT WHETHER SOME OF

25  THOSE THOUSAND OR LESS PRISON RELEASEES WOULD END UP IN YOUR

1    JAILS AT SOME POINT?

2    **A**    AGAIN, WE MADE ASSUMPTIONS BASED ON RECIDIVISM RATES FOR

3    INDIVIDUALS COMING OUT OF STATE PRISON WITH OUR OWN RECIDIVISM

4    RATES IN OUR SYSTEM, AND YES, WE DID.

5    **Q**    SO YOU BELIEVE THAT SOME WOULD END UP IN YOUR JAIL?

6    **A**    YES.

7    **Q**    DO YOU HAVE A SENSE OF HOW MANY, SAY, OF THE ONE THOUSAND

8    INMATES INTO YOUR COMMUNITY, HOW MANY OF THOSE WOULD YOU EXPECT

9    TO SEE BACK IN YOUR JAIL?

10   **A**    WELL, AGAIN, JUST APPLYING THOSE BROAD ASSUMPTIONS, IF THERE

11   WERE A THOUSAND WITH A 70 PERCENT RECIDIVISM RATE, AT SOME POINT

12   IN THE FUTURE 700 OF THOSE THOUSAND WOULD REOFFEND.

13   **Q**    NOW, THERE'S ALSO BEEN TESTIMONY IN THIS CASE ABOUT POSSIBLY

14   CLOSING THE PRISON DOORS IN THAT THERE WOULD BE A CAP ON THE

15   PRISON POPULATION SO THAT, FOR INSTANCE, THERE WOULD NOT BE THE

16   ABILITY FOR YOU TO SEND YOUR STATE-SENTENCED INMATES UP TO THE

17   PRISON.  HAVE YOU HAD A CHANCE TO FORM AN OPINION ABOUT WHAT

18   EFFECT THAT OPTION WOULD HAVE ON YOUR COUNTY?

19   **A**    YES.

20   **Q**    WHAT IS YOUR OPINION?

21   **A**    THAT THAT, TOO, WOULD CREATE A SIGNIFICANT PROBLEM WITH OUR

22   SYSTEM.  WE HAVE A NUMBER OF WAYS AND PLACES THROUGH WHICH

23   PEOPLE ENTER OUR SYSTEM, AND THERE'S A NUMBER OF WAYS THAT

24   PEOPLE LEAVE OUR SYSTEM, ONE OF WHICH IS TO STATE PRISON, AND WE

25   SEND ABOUT 30 TO 35 PEOPLE A WEEK TO STATE PRISON.  AND, SO, IF

1    WE WEREN'T ABLE TO SEND THOSE PEOPLE, THAT NUMBER WOULD QUICKLY

2    BACK UP INTO OUR SYSTEM AND ADD TO OUR ALREADY OVERCROWDED

3    POPULATION.

4              **MS. WOODWARD:**  YOUR HONORS, AT THIS TIME, I WOULD ASK

5    THAT THE COURT ACCEPT THE EXHIBITS THAT HAVE BEEN MARKED

6    DEFENDANT INTERVENOR 221, WHICH IS THE DECLARATION OF SHERIFF

7    MUNKS, AND 213, 214, 215 AND 216.  THERE HAVE BEEN NO WRITTEN

8    OBJECTIONS.  PERHAPS PLAINTIFFS MOVE TO OBJECT AT THIS TIME?

9              **MR. SANGSTER:**  JUST A MOMENT.  I'M SORRY.  I DON'T

10   HAVE 216.

11             **JUDGE REINHARDT:**  WHILE YOU'RE WAITING, SHERIFF, DO

12   YOU HAVE A CAP ON YOUR JAIL?

13             **THE WITNESS:**  NO, SIR.

14             **JUDGE REINHARDT:**  WHAT'S BEEN THE EFFECT OF A CAP?

15             **JUDGE KARLTON:**  IF YOU KNOW.

16             **THE WITNESS:**  WHAT WOULD BE THE EFFECT?

17             **JUDGE REINHARDT:**  NO, WHAT HAS BEEN THE EFFECT?

18             **JUDGE KARLTON:**  HE DOESN'T HAVE ONE.

19             **THE WITNESS:**  I DON'T HAVE ONE, SIR.

20             **JUDGE REINHARDT:**  OH, YOU DON'T HAVE ONE?

21             **THE WITNESS:**  NO.

22             **JUDGE REINHARDT:**  OKAY.  THANK YOU.

23             **MR. SANGSTER:**  YOUR HONORS, PLAINTIFFS HAVE NO

24   OBJECTIONS TO THE EXHIBITS.

25             **JUDGE HENDERSON:**  THOSE EXHIBITS WILL BE ADMITTED AT

1    THIS TIME.

2                          DEFENDANT INTERVENORS' EXHIBITS 213, 214,

3                          215, 216, 221 RECEIVED IN EVIDENCE.)

4            **MS. WOODWARD:**  THANK YOU, YOUR HONORS.  THAT'S ALL I

5    HAVE.

6            **JUDGE HENDERSON:**  ALL RIGHT.  DOES THE STATE HAVE ANY

7    QUESTIONS?

8            **MR. LEWIS:**  NO QUESTIONS, YOUR HONOR.

9            **JUDGE HENDERSON:**  OKAY.

10                   **CROSS-EXAMINATION BY MR. SANGSTER**

11           **MR. SANGSTER:**  THANK YOU.  ED SANGSTER FOR THE

12   PLAINTIFFS.

13   **BY MR. SANGSTER**

14   **Q**   SHERIFF MUNKS, YOU WERE TALKING ABOUT THE IMPACT THIS WOULD

15   HAVE TO -- I WANT TO TRY TO PUT IN PERSPECTIVE THROUGH SOME OF

16   THESE QUESTIONS THE ACTUAL CONTENT OF YOUR PAROLEE POPULATION.

17   FIRST OF ALL, HOW MANY PAROLEES ARE THERE CURRENTLY IN SAN MATEO

18   COUNTY?

19   **A**   YOU KNOW, I DO NOT HAVE THAT NUMBER.

20   **Q**   OKAY.  WELL, YOU SAID THAT THERE WERE 18,000 BOOKINGS INTO

21   YOUR JAIL.  IS THAT JUST FOR MAGUIRE CORRECTIONAL CENTER, OR IS

22   THAT TOTAL?

23   **A**   THAT'S TOTAL.  WE HAVE ALL OF OUR BOOKINGS AT MAGUIRE, BOTH

24   MEN AND WOMEN.

25   **Q**   IN A GIVEN YEAR, HOW MANY OF THOSE BOOKINGS ARE PAROLEES?

1  **A**    I WOULD ESTIMATE, I BELIEVE WE GET AROUND 30 TO 50 A MONTH,

2  PAROLEES.

3  **Q**    SO ABOUT 360 A YEAR?

4  **A**    YEAH.

5  **Q**    THREE HUNDRED SIXTY OUT OF EIGHTEEN THOUSAND ARE PAROLEES

6  THAT ARE BEING BOOKED BACK INTO PRISON -- INTO YOUR JAILS?

7  **A**    YES.

8  **Q**    OF THE 360 --

9            **JUDGE KARLTON:**  NOW I'M -- THESE ARE PAROLEES FROM

10  THE STATE PRISON SYSTEM THAT ARE COMING BACK THROUGH YOU --

11            **THE WITNESS:**  NO, SIR.  THESE WOULD BE PAROLEES, NEW

12  ARRESTS COMING IN THROUGH THE BOOKING PROCESS EITHER FOR

13  TECHNICAL VIOLATIONS OR NEW VIOLATIONS.

14            **JUDGE KARLTON:**  THAT'S WHAT I WAS ABOUT TO ASK YOU.

15  SO THAT IF WE WERE -- NOT WE, BUT IF THE STATE WERE TO ELIMINATE

16  TECHNICAL VIOLATIONS BEING RETURNED TO PRISON, DO YOU HAVE ANY

17  ESTIMATE OF WHAT PERCENTAGE OF THE 360 WOULD THEN NOT SHOW UP IN

18  YOUR JAIL?

19            **THE WITNESS:**  I ACTUALLY HAVE A NUMBER IF YOU WOULD

20  LIKE TO ME TO READ IT FROM THIS.

21            **MR. SANGSTER:**  I WOULD.  THAT'S ACTUALLY MY NEXT

22  QUESTION, YOUR HONOR.

23            **THE WITNESS:**  OKAY.  THE AVERAGE IN '06 WAS 487, '07

24  WAS 481.  THOSE ARE THE PAROLEES THAT WERE ARRESTED, AND MY

25  UNDERSTANDING IS ROUGHLY HALF OF THOSE ARE TECHNICAL VIOLATIONS.

1    **BY MR. SANGSTER**

2    **Q**    SO APPROXIMATELY, LET'S CALL IT, 250 A YEAR ARE ARRESTS FOR

3    TECHNICAL VIOLATIONS?

4    **A**    YES.

5    **Q**    OKAY.  THAT'S OUT OF THE 18,000 TOTAL BOOKINGS INTO YOUR

6    JAIL?

7    **A**    CORRECT.

8    **Q**    SO IT'S A FAIRLY SMALL PERCENTAGE OF THE TOTAL BOOKINGS INTO

9    YOUR JAIL, CORRECT?

10    **A**    CORRECT.

11    **Q**    HOW LONG DO THE PAROLEES WHO ARE ARRESTED FOR TECHNICAL

12    VIOLATIONS STAY IN YOUR JAILS?

13    **A**    THEIR AVERAGE LENGTH OF STAY IS ABOUT FOUR DAYS.

14    **Q**    RIGHT.  SO OF THE 200, WHATEVER THE NUMBER IS, ROUGHLY HALF

15    OF YOUR 480 PAROLEES, ABOUT HALF OF THOSE STAY FOUR DAYS?

16    **A**    YES.

17    **Q**    HOW ABOUT THE LENGTH OF TIME FOR THE PAROLEES WHO ARE

18    ARRESTED AND STAY LONGER THAN FOUR DAYS?

19    **A**    WELL, THEY WOULD BE BLENDED INTO OUR AVERAGE LENGTH OF STAY

20    WHICH IS AROUND 21 DAYS FOR OUR TOTAL POPULATION.

21            **JUDGE KARLTON:**  THEY'RE JUST NEW -- THEY'VE JUST

22    COMMITTED NEW CRIMES?

23            **THE WITNESS:**  YES, SIR.

24            **JUDGE KARLTON:**  SO YOU JUST TREAT THEM THE WAY YOU

25    TREAT ANY OF YOUR PEOPLE?

1           **THE WITNESS:** YES, SIR.  OTHER THAN THE FACT THEY

2    AREN'T ELIGIBLE FOR RELEASE LIKE OTHER PEOPLE.

3    **BY MR. SANGSTER**

4    **Q**    SO MY NEXT QUESTION IS, WHAT'S THE AVERAGE LENGTH OF STAY

5    FOR YOUR GENERAL POPULATION?

6    **A**    ABOUT 21 DAYS.

7    **Q**    SO THESE 450, HALF OF THEM STAY IN YOUR JAILS FOR FOUR DAYS,

8    AND THE OTHER HALF STAY FOR ON AVERAGE ABOUT 21 DAYS?

9    **A**    YES, BUT THEY BOTH CONTRIBUTE TO THAT 21-DAY NUMBER.  SO THE

10   TECHNICAL VIOLATERS WHO STAY FOR FOUR DAYS, THEY GO RIGHT AWAY

11   BACK TO THE STATE.  THEY CONTRIBUTE TO THE LOW END OF OUR LENGTH

12   OF STAY.  THE OTHER ONES WHO TEND TO PICK UP THE NEW CHARGES AND

13   HAVE A PAROLE VIOLATION ARE THE ONES THAT CONTRIBUTE TO THE

14   OTHER SIDE OF THAT 21-DAY AVERAGE.

15   **Q**    SO ALTHOUGH YOUR JAIL -- I'M SORRY.  WERE YOU DONE?

16           ALTHOUGH YOUR JAIL IS OVERCROWDED, A VERY, VERY SMALL

17   PERCENTAGE OF THAT OVERCROWDING IS ATTRIBUTABLE TO PAROLEES WHO

18   HAVE BEEN ARRESTED AND RETURNED TO YOUR JAIL, CORRECT?

19   **A**    YEAH.

20   **Q**    YOU REFERRED TO A MAXIMUM BED CAPACITY, BUT I DON'T THINK

21   YOU SAID WHAT THAT CAPACITY IS.

22   **A**    IN THE MAGUIRE CORRECTIONAL FACILITY I BELIEVE IT'S 107.

23   **Q**    WHAT'S YOUR MAXIMUM BED CAPACITY FOR YOUR JAIL SYSTEM?

24   **A**    I DON'T KNOW IF I HAVE THAT NUMBER.  I COULD QUICKLY FIGURE

25   IT FOR YOU.  IT'S 1107 FOR THE MEN.  IT'S ABOUT 160 FOR THE

1  WOMEN, 46 FOR THE MEDIUM SECURITY TRANSITIONAL FACILITY, AND 16

2  FOR WEEKEND OR DORM.  WHATEVER THAT EQUALS WOULD BE OUR MAXIMUM

3  BED.

4  Q    A LITTLE OVER 1,300?

5  A    THAT SOUNDS ABOUT RIGHT.

6  Q    YOU FUNCTIONED DURING 2007 WITH AN ACTUAL AVERAGE DAILY

7  CAPACITY -- EXCUSE ME -- 2007, YOU FUNCTIONED WITH AN AVERAGE

8  DAILY POPULATION OF 1,200?

9  A    THAT'S CORRECT.

10  Q    ALL RIGHT.  SO YOU TEND TO RUN ABOUT 170 INMATES BELOW YOUR

11  MAXIMUM CAPACITY?

12  A    THAT SOUNDS ABOUT RIGHT.

13  Q    ALL RIGHT.  NOW, YOU PROVIDED TO THE COURT AN ESTIMATE OF

14  WHAT YOU THOUGHT IT WAS GOING TO COST SAN MATEO COUNTY IF THERE

15  WAS A PRISONER RELEASE ORDER, AND I WANT TO TALK TO YOU ABOUT

16  SOME OF THE ASSUMPTIONS THAT UNDERLIE THAT ESTIMATE.

17          FIRST OF ALL, YOU WERE ESTIMATING $9 MILLION, RIGHT?

18  A    I ESTIMATED THAT IF I HAD TO SEND 200 INMATES OUT OF COUNTY,

19  IT WOULD COST US ABOUT $9 MILLION.

20  Q    SO YOU WERE TALKING ABOUT SENDING 200 INMATES OUT OF THE

21  COUNTY?

22  A    YES.

23  Q    TWO HUNDRED INMATES ON AVERAGE EVERY DAY?

24  A    YES.

25  Q    ALL RIGHT.  YOU CURRENTLY HAVE 480 ARRESTED PAROLEES IN AN

1  ENTIRE YEAR, BUT YOUR COST IMPACT ANALYSIS THAT YOU DID FOR THIS

2  COURT ASSUMES YOU ARE SENDING 200 PER DAY, AND THAT'S 200 PER

3  DAY OVER AN ENTIRE YEAR, CORRECT?

4  **A**   IT IS 200 PER DAY EVERY DAY.

5  **Q**   SO EVEN THOUGH THE PAROLEES ONLY STAY ON AVERAGE EITHER FOUR

6  DAYS FOR THE TECHNICAL VIOLATIONS OR 21 DAYS FOR OTHER KINDS OF

7  CRIMES, YOU'RE ASSUMING THAT YOU'RE GOING TO BE FACED WITH AN

8  INCREASE OF 200 INMATES PER DAY FOR 365 DAYS A YEAR?

9  **A**   WELL, I WAS TALKING ABOUT THE NET COST OF OPERATING, YOU

10 KNOW, MY SYSTEM IN A SAFE WAY.

11 **Q**   I'M JUST TRYING TO FOCUS ON --

12 **A**   OKAY.

13 **Q**   -- ON WHAT THE IMPACT OF PAROLEES IS GOING TO BE ON YOUR

14 JAIL SYSTEM.  ALL RIGHT?  AND I'M JUST TRYING TO DRILL DOWN ON

15 THAT A LITTLE BIT.

16         SO GIVEN THE FACT THAT YOU ONLY HAVE 480 PAROLEE

17 ARRESTS A YEAR RIGHT NOW, GIVEN THE FACT THAT HALF OF THOSE ARE

18 ONLY IN YOUR JAIL FOR FOUR DAYS ON AVERAGE, WOULD YOU TELL THE

19 COURT HOW YOU CAME UP WITH 200 AVERAGE DAILY POPULATION INCREASE

20 OF 200 OVER THE COURSE OF A YEAR?

21         **JUDGE KARLTON:**  WELL, IT'S MORE THAN THAT, BECAUSE

22 IT'S FILLING ALL THE BEDS THAT HE'S GOT AND THEN SENDING 200

23 PEOPLE AWAY.

24         **MR. SANGSTER:**  THAT'S MY NEXT QUESTION, YOUR HONOR.

25

1  BY MR. SANGSTER

2  Q   WE ALREADY KNOW THERE'S 170 EMPTY BEDS ON AVERAGE, SO I'M

3  JUST TRYING TO -- I'M TRYING TO FIGURE OUT HOW WE GET TO THE --

4          JUDGE KARLTON:  HOW DID YOU GET TO THE 200 A DAY?

5  MAYBE THAT'S THE SIMPLEST THING TO DO.

6          THE WITNESS:  FIRST OF ALL, I THINK YOU ARE REFERRING

7  TO A MEMO THAT WAS PREPARED, CUMULATIVE MEMO FROM THE COUNTY.

8  BY MR. SANGSTER

9  Q   I'M REFERRING TO YOUR DECLARATION THAT YOU SUBMITTED IN

10 CONNECTION WITH YOUR TESTIMONY HERE.

11 A   IS IT OKAY IF I REFER TO THAT?

12 Q   ABSOLUTELY.  WOULD YOU LIKE A COPY OF IT?

13 A   I THINK I HAVE MY -- MY DECLARATION HERE.  WHAT PAGE IS IT?

14          JUDGE REINHARDT:  HE ASKED WHAT --

15 BY MR. SANGSTER

16 Q   PARAGRAPH 16 -- EXCUSE ME.  I GAVE YOU THE WRONG PARAGRAPH.

17 NO, I DIDN'T.  THAT'S THE ONE WHERE YOU REFER TO 200 INMATES.

18 A   MM-HMM.  AGAIN, THAT ESTIMATE WAS BASED ON THE ASSUMPTIONS

19 THAT I REFERRED TO EARLIER, THAT IF THERE WERE A THOUSAND EARLY

20 RELEASED INMATES TO OUR COUNTY.  SO I WASN'T BASING IT ON OUR

21 CURRENT EXPERIENCE WITH THOSE PAROLEES THAT WE HAVE, AND

22 APPLYING THE 70 PERCENT RECIDIVISM RATE, SO IT WAS WHAT I WOULD

23 CHARACTERIZE AS A KIND OF A, YOU KNOW, ASSUMPTION BASED ON NOT

24 HARD FACTS THAT WE'RE DEALING WITH.  IT WAS BASED ON WHAT WOULD

25 HAPPEN IF A THOUSAND PEOPLE WERE RELEASED FROM STATE PRISON WITH

1  A 70 PERCENT RECIDIVISM RATE WHEN YOU TALK ABOUT BOOKINGS VERSUS

2  INMATE POPULATION.  IT'S TWO DIFFERENT THINGS.

3          YOU TAKE THOSE 480 OR WHATEVER PEOPLE THAT ARE BOOKED

4  OVER THE COURSE OF THE YEAR, HALF OF THEM ARE IN FOR FOUR DAYS.

5  THE OTHER HALF ARE IN FOR MANY MORE DAYS, SOME OF WHICH ARE IN

6  FOR OVER A YEAR.  SO THAT IS SOMEWHAT OF A CUMULATIVE NUMBER

7  THAT GROWS UPON ITSELF.  SO IT'S NOT AS THOUGH THOSE NUMBERS ARE

8  JUST COMING AND GOING.  SOME COME, AND SOME GO, AND SOME STAY.

9  **Q**    MY QUESTION IS --

10 **A**    WHEN WE DID THIS CALCULATION WE DIDN'T DO IT BASED ON THE

11 NUMBERS THAT YOU ARE REFERRING TO NOW.  WE DID IT BASED ON THOSE

12 GROSS NUMBERS OF THE WHAT-IF SCENARIO OF A THOUSAND RELEASED.

13 **Q**    WHAT I'M DOING NOW IS TESTING WHETHER YOUR METHODOLOGY IS

14 CONSISTENT WITH YOUR CURRENT EXPERIENCE.  DO YOU AGREE IT'S NOT

15 CONSISTENT WITH YOUR CURRENT EXPERIENCE?

16 **A**    WELL --

17 **Q**    THAT'S A YES OR NO QUESTION, SIR.

18 **A**    COULD YOU REPEAT IT, PLEASE?

19 **Q**    WOULD YOU AGREE THAT THE METHOD YOU USED TO CALCULATE 200

20 INMATES PER DAY FOR A WHOLE YEAR IS NOT CONSISTENT WITH YOUR

21 CURRENT EXPERIENCE WITH PAROLEES?

22 **A**    YES.

23 **Q**    SO YOU'VE CHANGED YOUR ASSUMPTIONS FOR THE PURPOSES OF THIS

24 DECLARATION?

25 **A**    NO.  I BASED MY ASSUMPTIONS FOR THE PURPOSES OF THE

1  DECLARATION ON THOSE KIND OF GROSS ASSUMPTIONS ON A THOUSAND

2  INMATES, 700 -- OR 70 PERCENT RECIDIVISM RATES, 700 NEW

3  OFFENDERS IN MY COMMUNITY, AND TRIED TO BE CONSERVATIVE.  IF I

4  WERE TO DO THAT PROCESS AGAIN, UTILIZING THE NUMBERS THAT YOU'VE

5  TALKED ABOUT, I MAY COME UP WITH A DIFFERENT NUMBER.

6  **Q**   I'M TRYING TO STICK WITH THE NUMBERS YOU USED, SIR.

7  **A**   OKAY.

8  **Q**   I THINK WE'LL MOVE ON.

9          **JUDGE KARLTON:**  WELL, BEFORE YOU MOVE ON, YOU ARE

10  AWARE THAT THE 70 -- I'M SORRY -- THAT THE PAROLE VIOLATERS

11  REPRESENT A SIGNIFICANT NUMBER OF WHAT ARE CALLED TECHNICAL

12  VIOLATERS, DO YOU NOT?

13          **THE WITNESS:**  YES, SIR.

14          **JUDGE KARLTON:**  AND IF THE TECHNICAL VIOLATERS WERE

15  NOT REARRESTED AND NOT GOING BACK TO PRISON, THAT WOULD

16  SUBSTANTIALLY REDUCE THE 70 PERCENT RECIDIVISM RATES THAT YOU'RE

17  TALKING ABOUT, CORRECT?

18          **THE WITNESS:**  YES, THAT WOULD.

19          **JUDGE KARLTON:**  THE ANSWER IS YES.  THAT'S NOT BRAIN

20  SURGERY.

21          **THE WITNESS:**  I WANTED TO MAKE SURE I UNDERSTOOD THE

22  QUESTION.

23          **JUDGE KARLTON:**  DO YOU HAVE -- NEVER MIND.  GO AHEAD.

24  **BY MR. SANGSTER**

25  **Q**   THE NUMBERS YOU SUBMITTED TO THE COURT WERE BASED ON 70,000

1  INMATES RELEASED ESSENTIALLY ALL AT ONCE, CORRECT?

2  **A**   YES.

3  **Q**   HAVE YOU ATTEMPTED TO CALCULATE WHAT THE IMPACT WOULD BE IF

4  THE RELEASE OF PRISONERS OR THE POPULATION REDUCTION, WHATEVER

5  IT WAS, OCCURRED OVER A PERIOD OF YEARS?

6  **A**   WE HAVE NOT ATTEMPTED TO QUANTIFY THAT OR COST THAT.  AS I

7  STATED EARLIER, I THINK THAT WOULD LESSEN THE IMPACT.

8  **Q**   RIGHT.  POTENTIALLY, IT COULD ELIMINATE THE IMPACT FOR YOU,

9  CORRECT, BECAUSE YOU DO HAVE CAPACITY IN YOUR JAILS?

10  **A**   WELL, I WOULD ARGUE THAT I DON'T HAVE CAPACITY IN MY JAILS.

11  **Q**   IT WOULD -- AT ANY RATE, IT WOULD LESSEN THE IMPACT ON YOUR

12  JAILS?

13  **A**   YES.

14  **Q**   IF YOU ADDED 200 INMATES TO YOUR AVERAGE DAILY POPULATION,

15  THAT WOULD BRING YOU BACK TO THE LEVEL THAT YOU EXPERIENCED IN

16  2007?

17  **A**   WELL --

18  **Q**   YES OR NO, SIR.

19  **A**   NO.

20  **Q**   HOW CLOSE --

21  **A**   IF I HAD A HUNDRED --

22  **Q**   HOW CLOSE WOULD IT COME?

23  **A**   ABOUT HALF, HALFWAY THERE.

24  **Q**   HALFWAY THERE, MEANING HALF THE -- YOU MEAN YOU'D HAVE ABOUT

25  A HUNDRED INMATES OVER YOUR LEVEL THAT YOU EXPERIENCED IN 2007?

1    **A**    YEAH.  LAST YEAR AT THIS TIME I WAS ROUGHLY A HUNDRED

2    INMATES MORE THAN I AM NOW.

3    **Q**    SO NOW YOU GOT 1,130, AND YOU SAID THAT'S YOUR NORMAL,

4    1,130?

5    **A**    RIGHT.  NOW, THAT'S WHAT WE'RE OPERATING UNDER.  YOU KNOW,

6    IF YOU LOOK AT IT ON AN ANNUAL BASIS, IT GOES UP AND DOWN.

7    **Q**    OKAY.

8    **A**    BUT IF YOU LOOK AT OUR SYSTEM OVER THE LAST 15 YEARS, IT --

9    I MEAN, WE'RE FAIRLY CONSTANT SYSTEM OF BETWEEN A THOUSAND

10   SOMETHING ON THE LOW END AND 12-SOMETHING ON THE HIGH END.  NOT

11   TALKING ABOUT HUGE SWINGS.

12           **MR. SANGSTER:**  THAT'S ALL THE QUESTIONS I HAVE, YOUR

13   HONOR.

14           **JUDGE HENDERSON:**  DOES CCPOA COUNSEL HAVE ANYTHING?

15           **MS. LEONARD:**  NO, YOUR HONOR.

16           **JUDGE HENDERSON:**  OKAY.  REDIRECT?

17           **MS. WOODWARD:**  YES, YOUR HONORS.  JUST BRIEFLY.

18           **REDIRECT EXAMINATION BY MS. WOODWARD**

19   **BY MS. WOODWARD**

20   **Q**    SHERIFF MUNKS, WHEN MR. SANGSTER REFERRED TO THE MAXIMUM

21   CAPACITY OF YOUR JAIL AND INDICATED YOU HAD EXTRA BEDS, DO YOU

22   HAVE -- ARE YOU ABLE TO SAY THAT YOU ARE OPERATING PROPERLY AT

23   THAT LEVEL OF MAXIMUM CAPACITY?

24   **A**    NO.

25   **Q**    WOULD YOU EXPLAIN THAT?

1          **JUDGE KARLTON:**  HE'S DONE IT SEVERAL TIMES, BECAUSE

2    IF YOU FILL THE BEDS, YOU CAN'T MOVE PEOPLE WHEN IT'S

3    APPROPRIATE TO DO SO.

4          **THE WITNESS:**  YES, SIR.

5          **MS. WOODWARD:**  OKAY.  THAT'S ALL I HAVE.  THANK YOU,

6    YOUR HONORS.

7          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

8          OKAY.  THANK YOU, SHERIFF MUNKS, FOR TESTIFYING.

9    YOU'RE EXCUSED.

10          YOU MAY CALL YOUR NEXT WITNESS.

11          **MS. BARLOW:**  GOOD AFTERNOON, YOUR HONORS.  KIMBERLY

12    HALL BARLOW, JONES & MAYER, ON BEHALF OF THE INTERVENORS, LAW

13    ENFORCEMENT INTERVENORS, CALLING LIEUTENANT STEPHEN M. SMITH.

14                    **STEPHEN M. SMITH,**

15    HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENORS

16    WAS FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

17          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

18    RECORD.

19          **THE WITNESS:**  STEPHEN MICHAEL SMITH, S-M-I-T-H.

20    S-T-E-P-H-E-N.

21          **MS. BARLOW:**  IF IT'S CONVENIENT FOR THE COURT, I HAVE

22    COPIES OF LIEUTENANT SMITH'S DECLARATION.

23                **DIRECT EXAMINATION BY MS. BARLOW**

24    **BY MS. BARLOW**

25    **Q**   GOOD AFTERNOON, LIEUTENANT SMITH.

1  **A**    GOOD AFTERNOON.

2  **Q**    COULD YOU PLEASE STATE YOUR TITLE AND DUTIES?

3  **A**    I'M A LIEUTENANT WITH LOS ANGELES COUNTY SHERIFF'S

4  DEPARTMENT, AND I WORK IN THE CUSTODY SUPPORT SERVICES UNIT.

5  **Q**    WHAT DO YOU DO IN THAT CAPACITY?

6  **A**    I PROVIDE SUPPORT FOR THE TWO SITTING CHIEFS AND THE

7  ASSISTANT SHERIFF AND THE SHERIFF IN MATTERS RELATED TO CUSTODY.

8  WE DO DEATH REVIEWS.  WE DO DATA ANALYSIS AND ANY OF THE OTHER

9  PROJECTS AS THEY COME UP, MAINLY INVOLVING POLICY.

10 **Q**    JUST VERY BRIEFLY SUMMARIZE YOUR BACKGROUND AND EMPLOYMENT

11 AND EDUCATION, PLEASE.

12 **A**    SURE.  I HAVE AN AA DEGREE FROM COMMUNITY COLLEGE, AND I

13 TOOK SEVERAL BUSINESS COURSES TOWARD ACCOUNTING, AND THOSE TYPE

14 OF COURSES, TOWARDS A BUSINESS DEGREE.  MY JOB TITLE?  I'M

15 SORRY.

16 **Q**    HOW LONG HAVE YOU BEEN WITH THE SHERIFF'S DEPARTMENT?

17 **A**    I'M SORRY.  I HAVE BEEN WITH THE SHERIFF'S DEPARTMENT FOR

18 JUST ABOUT 24 YEARS.

19 **Q**    YOU'VE SERVED IN VARIOUS CAPACITIES IN THE SHERIFF'S

20 DEPARTMENT?

21 **A**    YES, I'VE WORKED IN PAROLE, AND IN CUSTODY ENVIRONMENT, AND

22 IN DETECTIVE DIVISION AS WELL.

23 **Q**    CAN YOU TELL US HOW MANY PRISONERS ARE PROCESSED THROUGH LOS

24 ANGELES COUNTY JAIL SYSTEM EVERY YEAR?

25 **A**    BETWEEN 170,000 AND 180,000.

1   Q   DOES LOS ANGELES COUNTY JAIL SYSTEM HAVE ANY COURT-IMPOSED

2   CAPS ON ITS POPULATION?

3   A   YES, IT DOES.

4   Q   CAN YOU EXPLAIN THOSE, PLEASE?

5   A   THE MOST RECENT CAP SAYS WE WILL NOT HAVE ANY FLOOR

6   SLEEPERS.  THERE'S ALSO A CAP AT MEN'S CENTRAL JAIL, A SPECIFIC

7   CAP THAT'S JUST OVER 5,000 INMATES, I BELIEVE, FOR THAT

8   FACILITY.  BUT OUR WORKING CAPACITY, OR THE NUMBER WE TRY TO

9   MAINTAIN OUR INMATE POPULATION AT, IS ABOUT 19,600.

10  Q   NOW, IS THERE A REASON THAT YOU MAINTAIN THAT CAPACITY,

11  19,600?

12  A   YES, WE TRY TO KEEP THAT NUMBER BECAUSE IT ALLOWS US TO --

13  WITH THE BEDS THAT WE HAVE CURRENTLY, WE NEED ABOUT A TEN

14  PERCENT VACANCY FACTOR FOR THE NORTHPOINT SYSTEM TO WORK.  THE

15  NORTHPOINT SYSTEM IS OUR CLASSIFICATION SYSTEM THAT WE USE.

16  Q   AND HOW DOES THE VACANCY FACTOR HELP YOU USE THAT POINT

17  SYSTEM?

18  A   YOU HAVE TO KEEP DISSIMILAR POPULATION APART, POPULATIONS

19  THAT WILL FIGHT, POPULATIONS THAT REQUIRE -- THAT HAVE SPECIFIC

20  NEEDS, AND ALSO KEEP VICTIM POPULATIONS AWAY FROM THE MORE

21  AGGRESSIVE POPULATION.  IT ALSO ALLOWS YOU TO KEEP THEM

22  CLASSIFIED BASICALLY ALONG, YOU KNOW, THE MEDIUMS, HIGHS, AND

23  LOWS.

24  Q   SO DO YOU USE THAT SYSTEM TO ALLOW YOU TO, SAY, SEGREGATE

25  MENTALLY ILL PATIENTS FROM -- OR MENTALLY ILL INMATES FROM OTHER

1  INMATES?

2  **A**    THEY ARE ALSO PUT INTO THAT MATRIX AS WELL.  THERE ARE

3  SEVERAL DIFFERENT POPULATIONS, INCLUDING THE MENTALLY ILL THAT

4  REQUIRE SPECIAL HOUSING.  MEDICAL PATIENTS ARE COHORTED OFTEN TO

5  ALLOW FOR MEDICAL RESOURCES TO BE BROUGHT TO THOSE PATIENTS IN

6  AN EFFICIENT MANNER THAT PROTECTS THE PATIENT.

7  **Q**    IN ADDITION TO USING ANY ADDITIONAL BEDS FOR THOSE REASONS,

8  DO YOU ALSO HAVE TO DO UPGRADES AND MAINTENANCE ON BEDS THAT

9  MIGHT OTHERWISE BE AVAILABLE?

10  **A**    SURE.  AT ANY GIVEN TIME, WE HAVE SEVERAL BEDS THAT ARE JUST

11  COMPLETELY UNAVAILABLE FOR ONE REASON OR ANOTHER.  SOME OF THEM

12  ARE JUST -- IT CAN BE SOMETHING AS SIMPLE AS A BROKEN TOILET OR

13  DOOR THAT DOESN'T WORK, AND THEN YOUR ONGOING MAINTENANCE.

14  WE'RE RETROFITTING CERTAIN PARTS OF THE JAIL RIGHT NOW TO MAKE

15  THE JAIL ADA COMPLIANT.  AND THEN JUST SIMPLE MAINTENANCE

16  PROJECTS, PAINTING, YOU KNOW, FIXING PIPES, THOSE TYPES OF

17  THINGS.

18  **Q**    WE HEARD TESTIMONY FROM A WITNESS EARLIER IN THIS CASE THAT

19  INDICATED THAT LOS ANGELES COUNTY HAD 2,500 UNUSED BEDS THAT

20  COULD BE USED IF WE JUST HAD THE STAFF FOR THEM; IS THAT TRUE?

21  **A**    NOT TO MY KNOWLEDGE, NO.

22  **Q**    ARE ALL YOUR JAIL FACILITIES OPEN?

23  **A**    ALL OF OUR JAIL FACILITIES ARE OPEN CURRENTLY, WITH THE

24  EXCEPTION OF CIVIL GRAND INSTITUTE, WHICH IS ACTUALLY CLOSED.

25  **Q**    WHY IS IT CLOSED?

1  **A**   IT IS NOT INHABITABLE AT THIS TIME.  IT'S GOING TO BE --

2  ACTUALLY IT'S SLATED TO BE RAZED, I BELIEVE, AND A NEW FACILITY

3  PUT THERE.

4  **Q**   WHY ISN'T IT INHABITABLE?

5  **A**   LAST TIME I WAS THERE -- IT HAS ISSUES, EVERYTHING FROM

6  ASBESTOS, AND THE GATES SIMPLY DON'T WORK, THE TOILETS,

7  PLUMBING, THE -- I BELIEVE THE CHILLER DOESN'T WORK, THE AIR

8  CONDITIONING, THOSE TYPE OF THINGS.  THE INFRASTRUCTURE IS JUST

9  NOT THERE.

10 **Q**   IS IT SEISMICALLY SOUND?

11 **A**   IT'S VERY QUESTIONABLE AS FAR AS THAT GOES.

12 **Q**   NOW, IS THERE A PLAN PRESENTLY IN LOS ANGELES COUNTY TO

13 CONSTRUCT ADDITIONAL JAIL BEDS?

14 **A**   YES, THERE IS.

15 **Q**   COULD YOU DESCRIBE THE PLAN?

16 **A**   THE PLAN IS STILL A WORK IN PROGRESS.  THERE'S QUITE OF BIT

17 OF WORK TOWARD THAT.  THERE'S ABOUT 170 -- I'M SORRY --

18 $760 MILLION, ABOUT THREE-QUARTERS OF A BILLION DOLLARS, SET

19 ASIDE FOR BUILDING NEW FACILITIES WITHIN L.A. COUNTY JAIL.  THEY

20 WILL MAINLY REPLACE EXISTING STRUCTURES.  AND WE'RE HOPING TO

21 GET MODEST GAIN OF BETWEEN ONE AND TWO THOUSAND BEDS OUT OF THAT

22 CONSTRUCTION EFFORT.

23 **Q**   WILL THAT BE ENOUGH BEDS TO MEET LOS ANGELES COUNTY'S

24 CURRENT JAIL NEEDS?

25 **A**   NO.

1  Q    HOW MANY WILL IT BE SHORT?

2  A    APPROXIMATELY FIVE THOUSAND BEDS, A LITTLE OVER 5,000 BEDS,

3  I BELIEVE, MINIMUM.

4  Q    NOW, AS A RESULT OF THE ORDER AND CAPACITY ISSUES, DOES THE

5  SHERIFF'S DEPARTMENT TAKE CERTAIN STEPS TO MAINTAIN ITS

6  POPULATION BELOW ITS CAP?

7  A    YES, WE DO.

8  Q    AND I KNOW THAT CHIEF YIM SUBMITTED IN HIS DECLARATION A

9  NUMBER OF THOSE.  SO SETTING ASIDE THOSE THAT CHIEF YIM REFERRED

10 TO IN HIS DECLARATION, ARE THERE EARLY RELEASES THAT OCCUR AS A

11 RESULT OF THE CAPS?

12 A    YES, THERE ARE.

13 Q    COULD YOU DESCRIBE WHAT THOSE ARE?

14 A    RIGHT NOW MEN DO ABOUT 70 PERCENT OF THEIR TIME, AND WOMEN

15 DO ABOUT 10 PERCENT OF THEIR TIME, AND THOSE INDIVIDUALS WHOSE

16 SENTENCES ARE AT THAT LEVEL FOR THE MOST PART ARE RELEASED.

17 THERE ARE SOME EXCEPTIONS TO THAT, BUT, FOR THE MOST PART,

18 SOMEONE WHO SERVES 70 PERCENT OF THEIR TIME, IF THEY'RE MALE, OR

19 10 PERCENT OF THEIR TIME IF THEY'RE FEMALE, ARE RELEASED.

20 Q    SO THAT WOULD BE IN ADDITION TO ANY PROGRAMS LIKE CITE AND

21 RELEASE, AND DUI, DETOXIFICATION, AND SO ON, CORRECT?

22 A    YES, ABSOLUTELY.

23 Q    COULD YOU TELL THE COURT HOW MANY, IF ANY, PRETRIAL

24 DETAINEES WERE RELEASED EARLY IN 2007 AS A RESULT OF CAPACITY

25 LIMITATIONS?

1   A    THERE WERE JUST UNDER 10,000 THAT WERE RELEASED; 9,959, I

2   BELIEVE.

3   Q    HOW ABOUT SENTENCED INMATES IN THE COUNTY FACILITIES, HOW

4   MANY OF THOSE WERE RELEASED EARLY IN 2007 DUE TO CAPACITY

5   LIMITS?

6   A    THERE WERE JUST UNDER 41,000, 40,830, IN THAT NEIGHBORHOOD.

7   Q    SO JUST IN 2007, ABOUT 50,000 PEOPLE WERE RELEASED EARLY

8   FROM LOS ANGELES COUNTY JAILS?

9   A    YES.

10  Q    NOW, LIEUTENANT SMITH, HAVE THERE BEEN IMPACTS TO PUBLIC

11  SAFETY IN THE COMMUNITY AS A RESULT OF THE EXISTING EARLY

12  RELEASES IN LOS ANGELES COUNTY?

13  A    YES.

14  Q    COULD YOU DESCRIBE WHAT THOSE ARE?

15  A    ANY TIME ANYONE IS RELEASED EARLY, YOU ARE GOING TO HAVE AN

16  IMPACT ON PUBLIC SAFETY, PEOPLE THAT ARE -- IF YOU ARE NOT

17  INCARCERATED, YOU HAVE THE ABILITY TO COMMIT CRIMES THAT YOU

18  WOULD NOT OTHERWISE HAVE, BECAUSE THOSE INDIVIDUALS WOULD NOT BE

19  IN THE COMMUNITY AVAILABLE.  THE VICTIMS WOULD NOT BE AVAILABLE

20  TO THE SUSPECTS.  IF FOR NO OTHER REASON THAT ONE IMPACT ALONE,

21  YOU ARE GOING TO HAVE AN IMPACT NO MATTER HOW WELL YOU TRY TO

22  MANAGE THAT.

23  Q    ARE YOU FAMILIAR WITH A LOS ANGELES TIMES STORY ENTITLED,

24  "RELEASING INMATES EARLY HAS A COSTLY HUMAN TOLL"?

25          MS. EVENSON:  OBJECTION.  CALLS FOR HEARSAY.  WE

1   PREVIOUSLY INFORMED COUNSEL WE HAVE OBJECTIONS TO THE

2   INTRODUCTION OF AN L.A. TIMES ARTICLE AS HEARSAY.

3            **MS. BARLOW:**  I'M SIMPLY GOING TO ASK HIM TO CONFIRM

4   THE NUMBERS PUBLISHED IN THIS REPORT.

5            **JUDGE HENDERSON:**  HAS THIS BEEN OFFERED INTO

6   EVIDENCE?

7            **MS. BARLOW:**  NOT YET, YOUR HONOR.

8            **MS. EVENSON:**  WE WOULD OBJECT TO ANY QUESTIONS ASKING

9   THIS WITNESS TO READ NUMBERS OUT OF AN L.A. TIMES ARTICLE.

10           **MS. BARLOW:**  I'M NOT ASKING HIM TO DO THAT, YOUR

11  HONOR.

12           **JUDGE HENDERSON:**  LET'S PROCEED.

13  **BY MS. BARLOW**

14  **Q**   IF WE COULD -- THE REPORT INDICATES THAT 16,000 INMATES,

15  MORE THAN TEN PERCENT OF THOSE RELEASED EARLY, WERE REARRESTED

16  AND CHARGED WITH NEW CRIMES WHILE THEY WERE SUPPOSED TO BE

17  INCARCERATED; IS THAT ACCURATE?

18           **MS. EVENSON:**  OBJECTION.  CALLS FOR HEARSAY.

19           **JUDGE HENDERSON:**  SUSTAINED.  GO ON.

20  **BY MS. BARLOW**

21  **Q**   TO YOUR KNOWLEDGE, LIEUTENANT SMITH, IS IT CORRECT THAT TEN

22  PERCENT --

23           **JUDGE HENDERSON:**  WAIT.  IF WE ARE DOING HIS

24  KNOWLEDGE, LET'S DO IT.

25           **MS. BARLOW:**  THAT'S WHAT I'M DOING --

1          **JUDGE HENDERSON:**  DON'T READ FROM OFF A PAPER.

2          **JUDGE KARLTON:**  TAKE THIS OFF THE SCREEN.  IF YOU

3    WANT TO ASK HIM A QUESTION ABOUT HOW MANY PEOPLE, YOU CAN ASK

4    HIM DIRECTLY, AND IF HE KNOWS, HE CAN SAY THAT, AND IF HE

5    DOESN'T KNOW, HE CAN STAY THAT.

6    **BY MS. BARLOW**

7    **Q**   TO YOUR KNOWLEDGE, SIR, APPROXIMATELY HOW MANY OF THE EARLY

8    RELEASED INMATES WERE REARRESTED AND CHARGED WITH NEW CRIMES

9    DURING EARLY RELEASE PERIOD --

10         **MS. EVENSON:**  OBJECTION.  LACKS --

11   **BY MS. BARLOW**

12   **Q**   -- FOR THE PERIOD OF TIME IN 2003 AND 2004?

13         **JUDGE KARLTON:**  NOW.

14         **MS. EVENSON:**  OBJECTION.  LACKS FOUNDATION.

15         **JUDGE KARLTON:**  LAY A FOUNDATION FIRST.  I DON'T KNOW

16   HOW HE KNOWS.

17   **BY MS. BARLOW**

18   **Q**   LIEUTENANT SMITH, DID YOU DO AN ANALYSIS OF THE NUMBERS OF

19   CRIMES THAT WERE COMMITTED BY EARLY RELEASEES?

20         **JUDGE KARLTON:**  DID YOU PERSONALLY, APPARENTLY; IS

21   THAT WHAT YOU ARE SAYING?

22         **MS. BARLOW:**  NO, DID THE DEPARTMENT DO AN ANALYSIS.

23         **THE WITNESS:**  THE DEPARTMENT DID DO AN ANALYSIS.

24   **BY MS. BARLOW**

25   **Q**   IS THAT PART OF YOUR JOB, TO DO DATA ANALYSIS?

1    **A**   IT IS, BUT THIS WAS NOT OUR PROJECT.  IT WAS DONE BY DATA

2    SYSTEMS BUREAU WHO WORKED FOR US.

3    **Q**   DID YOU VERIFY THE ANALYSIS THAT WAS DONE BY DATA SYSTEMS

4    BUREAU?

5    **A**   YES, WE DID.

6              **JUDGE KARLTON:**  WHO IS DATA SYSTEMS BUREAU?

7              **THE WITNESS:**  THEY WORK FOR US, YOUR HONOR.  THEY ARE

8    THE INDIVIDUALS WHO DO DATA COLLECTION FOR THE SHERIFF'S

9    DEPARTMENT.

10             **JUDGE KARLTON:**  I'M SORRY.  GO AHEAD, SAY IT AGAIN.

11             **THE WITNESS:**  I'M SORRY, SIR.  THEY ARE THE

12   INDIVIDUALS, THEY WORK FOR THE SHERIFF'S DEPARTMENT, AND THEY DO

13   ALL DATA ANALYSIS FOR THE DEPARTMENT RELATING TO CRIME TRENDS --

14             **JUDGE KARLTON:**  THEY ARE EMPLOYEES OF THE SHERIFF'S

15   DEPARTMENT?

16             **THE WITNESS:**  YES, SIR, THEY ARE.

17             **JUDGE KARLTON:**  OKAY.  AND THEIR JOB IS TO DO

18   STATISTICAL ANALYSES?

19             **THE WITNESS:**  YES, SIR.

20             **JUDGE KARLTON:**  THANK YOU.

21             **MS. BARLOW:**  THANK YOU, YOUR HONOR.

22   **BY MS. BARLOW**

23   **Q**   TO YOUR KNOWLEDGE, CAN YOU ESTIMATE THE PERCENTAGE OF THOSE

24   RELEASED EARLY DURING THE PERIOD IN QUESTION?

25             **JUDGE KARLTON:**  SHE DOESN'T MEAN THAT.  WHAT IN DATA

 1  SYSTEMS DETERMINED CONCERNING THE NUMBER OF REARRESTS OF PERSONS

 2  WHO WERE RELEASED EARLY?  THAT'S WHAT YOU WANT TO ASK, ISN'T IT?

 3          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

 4          **THE WITNESS:**  THE ONLY THING THAT I REMEMBER ABOUT

 5  THAT THING, YOUR HONOR, IS -- I HAVE TO COUCH IT THIS WAY, IS

 6  THAT WE DID AN ANALYSIS, WE CONFIRMED THAT THE NUMBERS WERE

 7  ACCURATE IN THE REPORT AS GIVEN, AND THAT SINCE WE HAD -- OUR

 8  OWN DEPARTMENT HAD PROVIDED THOSE NUMBERS TO THE TIMES, OUR

 9  BIG -- THE FOCUS OF WHAT WE DID WAS TO VALIDATE THE NUMBERS WERE

10  ACCURATE, BUT I DO NOT REMEMBER THE NUMBERS PERSONALLY.

11  **BY MS. BARLOW**

12  **Q**   WOULD IT REFRESH YOUR RECOLLECTION, LIEUTENANT SMITH --

13          **JUDGE KARLTON:**  JUST A MINUTE.

14          **MS. BARLOW:**  I'M SORRY, SIR?

15          **JUDGE KARLTON:**  JUST A MINUTE.

16          LET ME TRY AND UNDERSTAND WHAT YOU'RE SAYING.  YOU'VE

17  GOT THESE FOLKS IN THE BUSINESS OF DOING STATISTICAL ANALYSES

18  FOR THE SHERIFF'S DEPARTMENT.

19          **THE WITNESS:**  YES, SIR.

20          **JUDGE KARLTON:**  AND YOU ASK THOSE FOLKS TO MAKE A

21  JUDGMENT CONCERNING HOW MANY PEOPLE WHO WERE EARLY RELEASED

22  COMMITTED OTHER CRIMES DURING THEIR EARLY RELEASE?

23          **THE WITNESS:**  YES, SIR.

24          **JUDGE KARLTON:**  NOT JUST OTHER CRIMES, BUT

25  SPECIFICALLY BY VIRTUE OF THEIR EARLY RELEASE?

 1              **THE WITNESS:**  YES, SIR.

 2              **JUDGE KARLTON:**  AS YOU SIT HERE NOW, YOU HAVE NO -- I

 3    GATHER YOU HAVE NO RECOLLECTION ABOUT THE NUMBERS?

 4              **THE WITNESS:**  THAT'S CORRECT, YOUR HONOR.

 5              **JUDGE KARLTON:**  BUT THOSE NUMBERS WERE TURNED OVER TO

 6    SOME REPORTER SOMEWHERE, AND IT APPEARED IN AN ARTICLE?

 7              **THE WITNESS:**  YES, SIR.

 8              **JUDGE KARLTON:**  AND YOU SOMEHOW OR OTHER CHECKED THAT

 9    ARTICLE TO BE SURE THAT IT WAS ACCURATE?

10              **THE WITNESS:**  YES, SIR, WE WERE ASKED TO LOOK INTO

11    THAT.

12              **JUDGE KARLTON:**  YOU PERSONALLY OR SOMEBODY DID?

13              **THE WITNESS:**  MY UNIT WAS ASKED TO LOOK INTO IT.

14    SERGEANT BLANKS WHO WORKS FOR ME --

15              **JUDGE KARLTON:**  SO ALL YOU KNOW IS WHAT SERGEANT

16    BLANKS TOLD YOU?

17              **THE WITNESS:**  AND WE WENT OVER THE TIMES AT THE TIME.

18              **JUDGE KARLTON:**  THAT'S THE PROBLEM.  I DON'T KNOW

19    WHAT "WE" MEANS.  DID YOU PERSONALLY --

20              **THE WITNESS:**  SERGEANT BLANKS AND I WENT OVER THE

21    NUMBERS.

22              **JUDGE KARLTON:**  I DON'T KNOW WHY I'M DOING YOUR WORK.

23    I'M JUST TRYING TO GET THIS DONE SO WE CAN GET OUT OF HERE

24    BEFORE JULY THE 5TH.  YOU WENT OVER THE NUMBERS WITH SERGEANT

25    BLANKS AND CONCLUDED WHAT?

1          **THE WITNESS:**  THAT THE NUMBERS WERE ACCURATE AS

2   REPORTED.

3          **JUDGE KARLTON:**  ALL RIGHT.  YOU MAY PROCEED.

4          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

5   **BY MS. BARLOW**

6   **Q**   DO YOU HAVE A COPY OF THE ARTICLE IN FRONT OF YOU,

7   LIEUTENANT SMITH?

8   **A**   I DO NOT.  I HAVE AN ARTICLE, BUT I DON'T HAVE IT WITH ME.

9          **MS. BARLOW:**  MAY I APPROACH, YOUR HONOR?

10          **JUDGE HENDERSON:**  YOU MAY.

11   **BY MS. BARLOW**

12   **Q**   WOULD IT REFRESH YOUR RECOLLECTION TO REVIEW THE NUMBERS IN

13   THE REPORT?

14          **JUDGE HENDERSON:**  ANY PARTICULAR PART OF THE REPORT?

15          **MS. BARLOW:**  YES, ON PAGE 1.

16          **JUDGE KARLTON:**  THE QUESTION IS WHETHER -- THAT'S

17   STILL NOT IN EVIDENCE, TAKE IT DOWN.  IT'S REALLY VERY

18   IRRITATING.

19          SIR, WHEN YOU READ IT, DOES IT REFRESH YOUR

20   RECOLLECTION, THE ANSWER TO THAT QUESTION IS YES OR NO.  DO YOU

21   NOW REMEMBER WHAT THE NUMBER IS, OR ARE YOU JUST READING IT OFF

22   OF THE PIECE OF PAPER?

23          **THE WITNESS:**  TO BE HONEST, YOUR HONOR, AS I ALWAYS

24   AM, IT ONLY REFRESHES MY MEMORY ONLY WITH LOOKING AT THE

25   NUMBERS.  I DON'T HAVE AN INDEPENDENT RECOLLECTION OF THE

 1  NUMBERS.

 2          **JUDGE KARLTON:**  GO AHEAD.  DO YOU THINK YOU CAN --

 3  **BY MS. BARLOW**

 4  Q   TO THE BEST OF YOUR KNOWLEDGE, LIEUTENANT SMITH, IS IT TRUE

 5  OUT OF 16,000 INMATES --

 6          **JUDGE KARLTON:**  MA'AM, HE JUST FINISHED SAYING HE

 7  DOESN'T REMEMBER WHAT THE NUMBERS ARE; ALL HE KNOWS IS THAT THIS

 8  IS WHAT WAS WRITTEN AND THAT WHAT WAS WRITTEN WAS, AT THE TIME,

 9  SOMETHING THAT HE HAD VERIFIED.

10          **THE WITNESS:**  YES, SIR.  WE VALIDATED IT.

11          **JUDGE KARLTON:**  NOW THE QUESTION IS WHETHER OR NOT

12  IT'S ADMISSIBLE AS PRIOR RECORDED RECOLLECTION, AND THE ANSWER

13  IS NO, BECAUSE IT'S NOT HIS RECORDED RECOLLECTION.  IT'S -- I

14  DON'T BELIEVE -- WELL, I DON'T SEE HOW -- YOU MUST BE PREPARED

15  FOR THIS OBJECTION.  NO?

16          **MS. BARLOW:**  LET ME JUST TAKE A MINUTE, YOUR HONOR.

17  **BY MS. BARLOW**

18  Q   DO YOU RECALL THE APPROXIMATE NUMBER OF PERSONS WHO WERE

19  REARRESTED DURING THE EARLY RELEASE PERIOD FOR SERIOUS OR

20  VIOLENT CRIMES?

21          **JUDGE KARLTON:**  NOT WHAT'S WRITTEN.  DO YOU RECALL?

22          **THE WITNESS:**  I RECALL THERE WERE 16 MURDERS THAT

23  WERE ARRESTED DURING THAT PERIOD.

24  **BY MS. BARLOW**

25  Q   OKAY.  FROM JUST MURDERS?

1   **A**   FOR MURDERS.

2   **Q**   DO YOU RECALL THE APPROXIMATE PERCENTAGE OF THOSE WHO WERE

3   RELEASED EARLY WERE REARRESTED DURING THE EARLY RELEASE PERIOD?

4   **A**   I BELIEVE IT WAS ABOUT TEN PERCENT.

5   **Q**   AND OF THOSE DO YOU RECALL ABOUT WHAT PERCENTAGE WERE

6   ARRESTED FOR SERIOUS LIFE-THREATENING CRIMES?

7   **A**   NO, MA'AM, I DON'T.

8   **Q**   OKAY.  AS A RESULT OF THE PUBLICATION OF THIS ARTICLE, DID

9   THE SHERIFF'S DEPARTMENT TAKE ANY STEPS TO REASSESS ITS EARLY

10  RELEASE PROGRAMS?

11          **JUDGE KARLTON:**  NOT AS A RESULT OF THIS ARTICLE, BUT

12  AS A RESULT OF THE STUDY DID YOU DO ANYTHING?

13          **THE WITNESS:**  YES, SIR.  AS A RESULT OF THE STUDY WE

14  DID, WE WENT BACK AND LOOKED AT IT.  IT PROVIDED A REAL FIRST

15  GLIMPSE OF WHAT WAS OCCURRING.

16  **BY MS. BARLOW**

17  **Q**   WERE ADDITIONAL STEPS TAKEN TO TRY TO REDUCE THE IMPACTS TO

18  THE COMMUNITY?

19  **A**   YES.

20  **Q**   ALL RIGHT.

21  **A**   SOME OF THESE WERE -- WE HAD LOOKED AT HOW WE WERE DEALING

22  WITH CERTAIN GANG MEMBERS AND HOW WE DEALT WITH THOSE.  WE

23  LOOKED AT DOING SOME ADDITIONAL ASSESSMENTS THROUGH SOME OTHER

24  TOOLS.  WE FOUND THAT ALL THE TOOLS THAT EXISTED WERE SIMPLY TOO

25  CUMBERSOME TO GET THROUGH GIVEN THE NUMBER OF RELEASES THAT WE

1  HAD ON AN ONGOING BASIS.

2  **Q**   IS IT FAIR TO SAY THAT YOU DID AGREE, AFTER LOOKING AT THE

3  DATA, THAT THERE WAS, IN FACT, A NEGATIVE IMPACT TO PUBLIC

4  SAFETY FROM THE EARLY RELEASES?

5  **A**   YES, EVERYONE IN THE DEPARTMENT IS WELL AWARE OF THAT.

6  **Q**   AND SO YOU'RE ATTEMPTING TO REASSESS THAT IN TERMS OF HOW

7  YOU CHOOSE THOSE TO BE RELEASED?

8  **A**   WE WERE TRYING TO MITIGATE TO THE LARGEST EXTENT POSSIBLE

9  THE DAMAGE TO THE COMMUNITY BY AN EARLY RELEASE.

10 **Q**   IN YOUR OPINION, LIEUTENANT SMITH, ARE YOU ABLE TO

11 COMPLETELY MITIGATE IMPACTS TO THE COMMUNITY OF THOSE EARLY

12 RELEASE PROGRAMS?

13 **A**   NO.

14 **Q**   WHY NOT?

15 **A**   THERE SIMPLY IS NOT ENOUGH MONEY AND ALTERNATIVES THAT EXIST

16 TO TAKE CARE OF THE PROBLEMS THAT ARE INHERENT.  ALL ASSESSMENT

17 TOOLS, NO MATTER HOW GOOD THEY ARE, ARE VIEWED IN LARGE, YOU

18 KNOW, NUMBERS AND NEVER CAN REALLY TAKE INTO ACCOUNT ALL ASPECTS

19 OF THE PEOPLE THAT YOU'RE RELEASING.

20          **JUDGE REINHARDT:**  MAY I ASK YOU A QUESTION?  ARE

21 THESE PEOPLE WHO ARE EARLY RELEASED PEOPLE WHO HAVE BEEN

22 SENTENCED TO COUNTY JAIL?

23          **THE WITNESS:**  YES, SIR.

24          **JUDGE REINHARDT:**  AND THE MAXIMUM SENTENCE IS A YEAR?

25          **THE WITNESS:**  YES, SIR, IT IS.

1          **JUDGE REINHARDT:**  ARE THESE PEOPLE WHO COMMITTED

2    MISDEMEANORS?

3          **THE WITNESS:**  YES, SIR, THEY WOULD BE, OR WOBBLERS

4    THAT WERE SENTENCED TO THE COUNTY JAIL.

5          **JUDGE REINHARDT:**  SO THESE PEOPLE WHO ARE RELEASED

6    EARLY HAVE BEEN UP UNTIL THIS TIME MINOR CRIMINALS?

7          **THE WITNESS:**  I WOULD NOT CHARACTERIZE THEM THAT WAY.

8          **JUDGE REINHARDT:**  THE OFFENSE FOR WHICH THEY ARE --

9          **THE WITNESS:**  EVEN THAT IS --

10         **JUDGE REINHARDT:**  ARE MISDEMEANORS?

11         **THE WITNESS:**  THEY A LOT OF TIMES PLED TO

12   MISDEMEANORS IN LIEU OF A FELONY CHARGE, AS WE'RE ALL AWARE OF.

13   SO A LOT OF THEM ARE NOT JUST YOUR -- YOU KNOW, IT'S NOT CANNERY

14   ROW.  A LOT OF THESE ARE ACTUAL --

15         **JUDGE REINHARDT:**  ALL THEY HAVE BEEN CONVICTED OF ARE

16   MISDEMEANORS?

17         **THE WITNESS:**  YES, SIR, THAT'S TRUE.

18         **JUDGE REINHARDT:**  AND THEN THEY GOT OUT OF COUNTY

19   JAIL?

20         **THE WITNESS:**  YES, SIR.

21         **JUDGE REINHARDT:**  AND A LARGE NUMBER OF THEM HAD

22   COMMITTED MURDERS?

23         **JUDGE KARLTON:**  TEN PERCENT.

24         **THE WITNESS:**  TEN PERCENT HAVE COMMITTED OTHER

25   CRIMES, YES, SIR.  THE MURDERS, THERE'S BEEN 16 MURDERS.  SOME

1   OF THOSE WERE, AND I'M NOT SURE OF THE EXACT NUMBER, BUT SOME OF

2   THOSE WERE PREEXISTING MURDER CONVICTIONS THAT THEY WERE

3   ARRESTED FOR AFTER THE FACT.

4           **JUDGE KARLTON:**  SO THEY DIDN'T COMMIT THEM

5   AFTERWARDS; THEY JUST WERE DISCOVERED AFTERWARDS?

6           **THE WITNESS:**  YES, SIR.

7           **JUDGE KARLTON:**  DO YOU KNOW HOW MANY COMMITTED

8   CRIMES -- I'M NOT SURE IT MATTERS, BUT HOW MANY COMMITTED

9   CRIMES?

10          **THE WITNESS:**  NO, SIR, I DON'T KNOW THE EXACT NUMBER.

11  WE KNOW THERE WERE SEVERAL.

12          **JUDGE KARLTON:**  HOW LONG BEFORE THE YEAR, ASSUMING

13  THEY WERE ALL SENTENCED FOR A YEAR, WHICH IS PROBABLY NOT THE

14  CASE AS WELL, RIGHT?

15          **THE WITNESS:**  RIGHT.

16          **JUDGE KARLTON:**  HOW OFTEN -- HOW LONG BEFORE THEY ARE

17  SENTENCED WERE THEY RELEASED?

18          **THE WITNESS:**  IT VARIED.  THEY WERE DOING ABOUT TEN

19  PERCENT OF THEIR TIME AT THAT TIME, SO ON A YEAR, YOU DID ABOUT

20  24 DAYS.

21          **JUDGE REINHARDT:**  I THOUGHT --

22          **THE WITNESS:**  SO, IF YOU GOT SENTENCED TO ONE YEAR,

23  YOU COULD BE OUT AS MUCH AS 300 DAYS EARLY.

24          **JUDGE REINHARDT:**  I THOUGHT YOU SAID THE MEN DID

25  70 PERCENT OF THEIR TIME AND THE WOMEN 10 PERCENT?

1          **THE WITNESS:** THAT'S WHAT WE'RE DOING NOW, YOUR

2    HONOR. AT THE TIME THE ARTICLE WAS WRITTEN, MEN WERE DOING TEN

3    PERCENT OF THEIR TIME. ONE OF THE THINGS WE WERE ABLE TO DO WAS

4    INCREASE THE LENGTH OF INCARCERATION TO THE 70 PERCENT MARK.

5          **JUDGE KARLTON:** SO THESE PEOPLE WERE GETTING OUT IN

6    24 DAYS AND COMMITTING ANOTHER CRIME, AND HAD THEY BEEN HELD 40

7    DAYS INSTEAD OF 24, THEY WOULD GET OUT, AND THEY'D PROBABLY

8    COMMIT ANOTHER CRIME.

9          **THE WITNESS:** THAT'S TRUE, YOUR HONOR. I MEAN,

10   THERE'S NOTHING THAT -- THE ONLY THING IS THEIR OPPORTUNITY HAS

11   JUST BEEN INCREASED BY US RELEASING THEM EARLY, BUT THEIR

12   NATURAL TENDENCY TO COMMIT CRIMES, ESPECIALLY DURING THEIR

13   YOUNGER YEARS, IS -- AS YOU KNOW, THE LONGER YOU KEEP THEM IN,

14   YOU JUST REDUCE THEIR CHANCE OF COMMITTING THE CRIME, BUT ONCE

15   THEY WERE OUT, THEY'RE GOING TO REOFFEND PROBABLY IN SIMILAR

16   NUMBERS. THERE'S SOME INDICATION, SOME OF THE STUDIES, THAT IF

17   THEY'RE IN FOR SLIGHTLY LONGER PERIODS OF TIME, THEY TEND TO NOT

18   REOFFEND AS QUICKLY.

19   **BY MS. BARLOW**

20   **Q**   IN FACT, LIEUTENANT SMITH, DIDN'T YOUR ANALYSIS OF THIS DATA

21   DEMONSTRATE THAT THERE WERE -- THERE WAS A HIGHER PERCENTAGE OF

22   THOSE RELEASED EARLY THAT WERE REARRESTED WITHIN 90 DAYS THAN

23   THOSE THAT DIDN'T GET RELEASED EARLY?

24   **A**   THAT WAS ACTUALLY THE DATA THAT WAS CRUNCHED BY THE L.A.

25   TIMES, NOT THE DEPARTMENT.

1  Q    DID YOUR DEPARTMENT CONCUR WITH THAT DATA?

2  A    THERE WAS NOTHING TO ARGUE IT, NO.

3  Q    OKAY.  NOW, LET'S TALK ABOUT MENTALLY ILL POPULATION IN LOS

4  ANGELES COUNTY JAIL.  THERE ARE MENTALLY ILL PERSONS IN THE

5  JAIL, ARE THERE NOT?

6  A    YES.

7  Q    CAN YOU GIVE US ABOUT APPROXIMATELY WHAT PERCENTAGE OF THE

8  JAIL POPULATION HAS MENTAL HEALTH NEEDS?

9  A    ABOUT 11 PERCENT ARE TREATED CURRENTLY.  WE BELIEVE THE

10 NUMBER MAY BE 16 PERCENT.

11 Q    WHAT DOES THAT WORK OUT IN AVERAGE DAILY POPULATION?

12 A    BETWEEN 2- AND 3,000 INMATES.

13 Q    ARE SERVICES PROVIDED TO THOSE INMATES IN THE LOS ANGELES

14 COUNTY JAIL?

15 A    YES, THEY ARE.

16 Q    WHAT KINDS OF SERVICES?

17 A    THE DEPARTMENT OF MENTAL HEALTH PROVIDES A VARIETY OF

18 SERVICES, EVERYTHING FROM MEDICATION AND VERBAL, YOU KNOW, WORK

19 GROUPS, AND THOSE TYPE OF THINGS, ALL THE WAY THROUGH A FORENSIC

20 INPATIENT AREA FOR THOSE ACUTELY MENTALLY ILL.

21 Q    IS MENTAL HEALTH ABLE TO PROVIDE ALL THE SERVICES THAT THE

22 MENTALLY ILL IN LOS ANGELES COUNTY JAILS NEED?

23 A    NOT AT THIS TIME.

24 Q    ARE THERE PROGRAMS THAT YOU TRY TO USE FOR THE MOST SEVERELY

25 MENTALLY ILL?

1   **A**   YES.

2   **Q**   WHAT ARE THOSE?

3   **A**   ONE OF THE PROGRAMS THAT WE'RE WORKING ON RIGHT NOW IS

4   CALLED THE ARM PROGRAM, ALTERNATIVE RESOURCE MANAGEMENT, WHICH

5   IS TRYING TO GET INDIVIDUALS THAT REQUIRE A HIGH DEGREE OF

6   MEDICAL OR MENTAL HEALTHCARE, OR A COMBINATION OF THAT, INTO

7   COMMUNITY PROGRAMS WHERE THEY CAN BE BETTER TREATED.

8   **Q**   AND IS THAT A HIGH PERCENTAGE, LOW PERCENTAGE?  HOW MUCH OF

9   THAT, OF YOUR POPULATION --

10  **A**   WE'VE ONLY GOTTEN ABOUT 400 PEOPLE THROUGH THAT PROGRAM

11  RIGHT NOW.

12  **Q**   IS IT DIFFICULT TO PLACE PEOPLE IN THESE PROGRAMS?

13  **A**   IT'S DIFFICULT TO GET THEM INTO THE COMMUNITY -- THE

14  COMMUNITY PROGRAMS.  THEY'RE NOT AS MANY PROGRAMS AS ARE REALLY

15  NEEDED, SO THE PROGRAMS TEND TO CHERRY PICK INDIVIDUALS.

16  INDIVIDUALS WHO REQUIRE ASSISTANCE WITH ACTIVITIES OF DAILY

17  LIVING OR WHO REQUIRE MEDICATION, THOSE TYPE OF THINGS, ARE

18  PRECLUDED FROM A LOT OF THE PROGRAMS.  SO PLACEMENT IS DIFFICULT

19  FOR THAT POPULATION.

20  **Q**   NOW, LIEUTENANT SMITH, THE PLAINTIFFS HAVE ASKED THE COURT

21  TO ISSUE AN ORDER THAT WOULD REDUCE THE PRISON POPULATION BY

22  VARIOUS METHODS BY JUST UNDER 52,000 PRISONERS OVER TWO YEARS.

23  HAVE YOU DONE AN ASSESSMENT OF HOW MANY OF THOSE PRISONERS WOULD

24  BE DIVERTED, RELEASED, OR REMOVED FROM PAROLE IN LOS ANGELES

25  COUNTY?

1   **A**   YES.

2   **Q**   HOW MANY?

3   **A**   WE BELIEVE THAT OUR POPULATION WOULD PROBABLY BE ABOUT

4   16,400 OF THOSE.

5   **Q**   AND THAT'S BECAUSE LOS ANGELES COUNTY SENDS WHAT PERCENTAGE

6   OF PRISONERS TO CDCR?

7   **A**   ABOUT 31 PERCENT.  IT VARIES, BUT IT'S BETWEEN 31,

8   33 PERCENT.

9   **Q**   AND IF LOS ANGELES COUNTY WERE TO TAKE ON, WHETHER THROUGH

10  RELEASE, OR DIVERSION, OR ENDING OF PAROLE, AN ADDITIONAL 16,400

11  FELONS, EX-FELONS, WOULD YOU EXPECT IMPACTS FROM THAT IN LOS

12  ANGELES COUNTY?

13  **A**   YES, WE WOULD.

14  **Q**   WHAT WOULD THOSE BE?

15  **A**   JUST CONSERVATIVELY, LOOKING AT THE RETURN-TO-CUSTODY RATE,

16  THAT IN TWO YEARS 67-1/2 PERCENT, USING CDCR'S NUMBER, RETURN TO

17  CUSTODY.  WE WOULD EXPECT TO SEE ABOUT 11,000 OF THOSE BACK

18  THROUGH THE COUNTY JAIL IN ONE FORM OR ANOTHER.  THEY WOULD TEND

19  TO BE SECOND AND THIRD STRIKE INDIVIDUALS, WHICH TRADITIONALLY

20  SERVE OR HAVE LONGER AVERAGE LENGTH OF STAY BECAUSE THEY TEND TO

21  FIGHT THEIR CASES MORE AGGRESSIVELY, AND THAT WOULD HAVE A

22  PRETTY DEVASTATING IMPACT ON OUR SENTENCED POPULATION BECAUSE IT

23  WOULD IMPACT THE NUMBER OF BEDS AVAILABLE FOR THEM.

24          WE BELIEVE IT WOULD EXACERBATE AN ALREADY PROBLEMATIC

25  SITUATION IN L.A. COUNTY BECAUSE WE WOULD HAVE TO TAKE ON THE

1  BURDEN OF THE STATE.  IT'S NOT THAT THESE PEOPLE WOULD GO AWAY

2  OR THAT THEY WOULD -- THAT THEY WOULD BE PICKED UP BY SOME

3  PROGRAM THAT EXISTS CURRENTLY.  THEY WOULD MORE LIKELY END UP IN

4  THE COUNTY JAIL FOR NEW CRIMES.

5  Q    SO YOU SAID THAT WOULD IMPACT YOUR SENTENCED POPULATION.

6  HOW SPECIFICALLY DO YOU BELIEVE IT WOULD IMPACT YOUR SENTENCED

7  POPULATION?

8  A    WE BELIEVE WE WOULD PROBABLY EITHER GO DOWN -- WELL, WE

9  FIGURED THAT BEFORE, WHEN WE DID AN ANALYSIS, IT WOULD DROP US

10 DOWN TO THE TEN PERCENT MARK AGAIN.  WITH THE NEW NUMBER AT

11 52,000, IT PROBABLY PUTS US AT A SENTENCE AS BASICALLY BEING

12 PRESENTENCED AT THAT POINT.

13 Q    SO DOES THAT MEAN YOU DON'T THINK YOU WOULD HAVE ROOM FOR

14 INDIVIDUALS TO STAY IN CUSTODY THAT HAVE BEEN SENTENCED TO

15 COUNTY CUSTODY?

16 A    THE SENTENCED INDIVIDUALS, FOR THE MOST PART, WOULD BE

17 RELEASED IF -- THERE WOULD BE CERTAIN THINGS THAT WE'VE SEEN THE

18 JUDGES DO, WHAT WE EUPHEMISTICALLY CALL A BACA SENTENCE.  THE

19 JUDGES, BECAUSE THEY DON'T WANT THEIR SENTENCE TO BE OVERTURNED,

20 A LOT OF TIMES WILL SIMPLY DEFER SENTENCING SOMEONE UNTIL A

21 LATER DATE, UNTIL THE TIME THEY WANTED THEM TO SERVE.  SO IF

22 THEY WANTED THEM TO DO 90 DAYS OR 180 DAYS IN CUSTODY, THEY

23 SIMPLY RESCHEDULE SENTENCING FOR THAT TIME.

24 Q    BUT ASSUMING THAT THAT RELEASE ORDER, HOWEVER IT'S DONE,

25 RESULTS IN THAT IMPACT, WHERE ARE YOU GOING TO PUT THE PEOPLE?

1   **A**   WE DON'T HAVE ANY ROOM FOR THEM.  THERE'S SIMPLY NO ROOM IN

2   THE INN.  I JUST MEAN THERE'S NO ROOM THERE TO PUT THEM.

3   **Q**   IS THE INABILITY TO KEEP SENTENCED INDIVIDUALS IN COUNTY

4   CUSTODY, IN YOUR VIEW, WOULD THAT HAVE A NEGATIVE IMPACT ON

5   PUBLIC SAFETY, SEPARATE AND APART FROM EARLY RELEASES AND SO ON?

6   **A**   ONE OF THE ADVANTAGES OF HAVING PEOPLE INCARCERATED AND

7   HAVING TO DO SENTENCES IS THEY TEND TO TAKE ON OTHER THINGS.

8   THEY WILL GO INTO PROGRAMS THAT HELP THEM.  A LOT OF THE

9   PROGRAMS REQUIRE A CERTAIN PERIOD OF TIME TO BE EFFECTIVE.  AND

10  SO WHEN YOU DON'T HAVE A SENTENCE HANGING OVER SOMEONE'S HEAD,

11  THEY SIMPLY WON'T GO INTO THE PROGRAMS.  THEY WILL OPT TO DO THE

12  24 DAYS AND I'M OUT, VERSUS THE SIX MONTHS AND GETTING TREATMENT

13  AT THE COUNTY LEVEL FOR MY PROBLEMS, WITH DOMESTIC VIOLENCE AND

14  THOSE TYPE OF PROGRAMS.

15  **Q**   CAN'T YOU JUST PUT THEM ON PROBATION INSTEAD?

16  **A**   AGAIN, THE REALITY IS A LOT OF THOSE PROGRAMS ARE INTENSIVE

17  AND REALLY WORK BEST IN THE ENVIRONMENT WITH THE PERSON WHERE

18  THERE'S SOME REALISTIC MEANS OF KEEPING THE PERSON IN THE

19  PROGRAM.

20          **THE CLERK:**  FIVE MINUTES, COUNSEL.

21          **MS. BARLOW:**  THANK YOU.

22  **BY MS. BARLOW**

23  **Q**   NOW, YOU'VE HEARD ABOUT THE FOUR METHODS THAT ARE PROPOSED

24  TO BRING ABOUT THAT 52,000 REDUCTION.  LET ME JUST SUMMARIZE

25  THEM.  A BETTER PAROLE INSTRUMENT TO REDUCE TECHNICAL VIOLATIONS

1    AND THOSE PRISONERS BEING SENT BACK TO PRISON; DIVERSION OF

2    NONVIOLENT LOW RISK OFFENDERS FROM PRISON BY KEEPING THEM IN

3    COMMUNITIES; REDUCING THE LENGTH OF SENTENCE FOR NONVIOLENT, LOW

4    RISK OFFENDERS BY AN AVERAGE OF FOUR MONTHS; AND REMOVE FROM

5    PAROLE OFFENDERS WITHOUT VIOLATIONS AFTER 12 MONTHS IF THEY'VE

6    SATISFIED THE TERMS OF THEIR PAROLE FOR THAT PERIOD.

7             NOW, THOSE FOUR OPTIONS ARE PROPOSED WITHOUT ANY

8    ADDITIONAL PROGRAMMING TO BE OFFERED IN THE COMMUNITIES OR IN

9    THE PRISONS, AND THE OPINION HAS BEEN OFFERED THAT'S NOT GOING

10   TO HAVE ANY SIGNIFICANT NEGATIVE IMPACT ON PUBLIC SAFETY; DO YOU

11   AGREE WITH THAT?

12   **A**   NO.

13   **Q**   WHY NOT?

14   **A**   NUMBER ONE, I DON'T THINK THERE ARE EXISTING PROGRAMS IN THE

15   COMMUNITY THAT WILL BE ABLE TO ABSORB THESE INDIVIDUALS.

16   TRADITIONALLY, WHEN WE DO RELEASES, WE DO THEM FOR FINANCIAL

17   REASONS, BECAUSE WE'RE EITHER UNWILLING TO PAY THE FREIGHT, IF

18   YOU WILL, FOR THE INDIVIDUALS TO KEEP THEM INCARCERATED OR TO DO

19   THOSE THINGS.

20             THERE'S NO BELIEF ON MY PART THAT THE STATE WILL

21   PROVIDE ADDITIONAL MONIES IN ANY KIND OF MEANINGFUL WAY THAT

22   WILL CONTINUE THE PROGRAMS ON FOR ANYTHING OTHER THAN THE

23   IMMEDIATE -- THE NEAR FUTURE.

24             IT'S NOT DISSIMILAR TO SOME OF THE THINGS WE SAW WITH

25   THE MENTALLY ILL IN CALIFORNIA WHERE WE CLOSED A LOT OF THE

1  INSTITUTIONS YEARS AGO BECAUSE WE BELIEVED THAT MEDICATIONS AND

2  PROGRAMS IN THE COMMUNITY WOULD PICK THAT POPULATION UP AND

3  EVERYONE WHO'S BEEN AROUND THAT HAS SEEN THAT THAT'S NOT BEEN

4  THE CASE, AND NOW WE DON'T EVEN HAVE THE ABILITY TO HELP THOSE

5  INDIVIDUALS.

6          **MS. BARLOW:**  I HAVE NOTHING FURTHER, THANK YOU.

7          **MR. LEWIS:**  NO QUESTIONS, YOUR HONOR.

8          **JUDGE HENDERSON:**  CROSS-EXAMINATION.

9              **CROSS-EXAMINATION BY MS. EVENSON**

10 **BY MS. EVENSON**

11 **Q**   GOOD AFTERNOON, LIEUTENANT SMITH.  I'M REBEKAH EVENSON.

12 **A**   GOOD AFTERNOON.

13 **Q**   I HAVE A COUPLE OF QUESTIONS FOR YOU.  YOU MENTIONED BRIEFLY

14 THAT IN YOUR ROLE AT THE JAIL, YOU HAVE SOME RESPONSIBILITY FOR

15 DEALING WITH THE MENTALLY ILL; IS THAT RIGHT?

16 **A**   YES.

17 **Q**   AND YOU'D AGREE THAT INCARCERATION IS NOT THE APPROPRIATE

18 WAY TO DEAL WITH THE MENTALLY ILL; ISN'T THAT RIGHT?

19 **A**   IN MOST CASES I BELIEVE THAT'S TRUE.

20 **Q**   YOU TESTIFIED EARLIER THAT THERE WERE APPROXIMATELY 50,000

21 EARLY RELEASES, I BELIEVE IT'S IN THE PERIOD BETWEEN 2002 AND

22 2007; IS THAT RIGHT?

23 **A**   NO, IT WAS FOR 2007.

24 **Q**   JUST 2007 ALONE?

25 **A**   YES.

1  Q   AND DURING THAT TIME, THOSE EARLY RELEASES WERE DONE WITHOUT

2  ANY CLASSIFICATION SYSTEM OR RISK ASSESSMENT INSTRUMENT BEING

3  APPLIED TO DETERMINE WHO WAS EARLY RELEASED; IS THAT RIGHT?

4  A   THAT'S CORRECT.  THERE WAS A PROCESS IN PLACE, BUT THERE WAS

5  NOT AN ASSESSMENT TOOL THAT WAS USED.

6  Q   SO YOU MENTIONED THAT DURING THAT TIMEFRAME THERE WERE 16

7  ARRESTS FOR MURDERS; IS THAT RIGHT?

8  A   THAT WAS ACTUALLY THE PREVIOUS PERIOD.  THAT GOES BACK TO

9  THE TIMEFRAME OF THE L.A. TIMES ARTICLE.

10 Q   SO --

11 A   GO AHEAD.

12 Q   SO THE 16 ARRESTS FOR MURDER WASN'T FOR 2007 ALONE?

13 A   NO, MA'AM.  IT WASN'T FOR 2007 AT ALL.

14 Q   THAT WAS FOR THE PRIOR FIVE YEARS; IS THAT RIGHT?

15 A   YES.

16 Q   AND OF THOSE ARRESTS, NOT ALL THOSE PEOPLE WERE CONVICTED;

17 IS THAT RIGHT?

18 A   THAT IS TRUE.

19 Q   DO YOU KNOW WHAT NUMBER WERE CONVICTED?

20 A   NO, MA'AM, I DON'T KNOW THE EXACT NUMBER.

21 Q   AND SOME OF THOSE MURDERS WERE ACTUALLY COMMITTED, YOU

22 TESTIFIED EARLIER, PRIOR TO THE TIME PERIOD DURING WHICH THEY

23 WERE EARLY RELEASED; IS THAT RIGHT?

24 A   YES, THEY WERE DISCOVERED DURING THAT TIMEFRAME.

25 Q   DO YOU KNOW HOW MANY THERE WERE THAT WERE COMMITTED PRIOR?

1   **A**   I BELIEVE THE NUMBER WAS SEVEN, BUT I'M NOT POSITIVE.

2   **Q**   OKAY.  NOW, DURING THE TIMEFRAME -- THE L.A. TIMES ARTICLE

3   COVERED THAT TIMEFRAME FROM, I BELIEVE IT WAS 2002 TO 2007;

4   ISN'T THAT RIGHT?

5               **MS. BARLOW:**  I'M SORRY.  I DIDN'T HEAR THE QUESTION.

6   **BY MS. EVENSON**

7   **Q**   THE TIMEFRAME WAS 2002 TO 2007; IS THAT RIGHT?

8   **A**   NO.  THE ARTICLE ACTUALLY CAME OUT IN 2006, IN MAY OF 2006.

9   **Q**   SO IT WAS COVERING A PERIOD OF ABOUT FOUR YEARS?

10  **A**   YES, APPROXIMATELY.

11  **Q**   AND YOU TESTIFIED ABOUT 2007 THE NUMBER OF EARLY RELEASES

12  WAS 50,000?

13  **A**   YES, IN 2007.

14  **Q**   FOR THE ENTIRE LAST DECADE CRIME RATES HAVE BEEN CONTINUING

15  TO DROP, HAVEN'T THEY?

16  **A**   WE'VE SEEN THEM DROPPING.

17  **Q**   OKAY.  NOW, THE ANALYSIS THAT YOU DID OF THE IMPACTS OF A

18  PRISONER RELEASE ORDER ON THE L.A. COUNTY SYSTEM WHERE YOU

19  INDICATED A CERTAIN PERCENTAGE WOULD BE COMING BACK -- OF

20  PAROLEES WOULD BE COMING BACK THROUGH THE JAIL, THAT ANALYSIS

21  ASSUMED THAT THE RECIDIVISM RATES FOR THE PEOPLE WHO WERE EARLY

22  RELEASED WOULD BE THE SAME, THAT 67.5 PERCENT FIGURE, AS THE

23  RECIDIVISM RATE WOULD BE FOR THE PRISONERS HAD THEY BEEN PAROLED

24  AT THE NORMAL PAROLE DATE; ISN'T THAT RIGHT?

25  **A**   YES.

1  **Q**   AND THAT'S BECAUSE WE KNOW THAT THE RECIDIVISM RATE IS GOING

2  TO REMAIN RELATIVELY CONSTANT REGARDLESS OF WHEN SOMEONE IS

3  RELEASED?

4  **A**   I DON'T AGREE WITH THAT --

5  **Q**   I'D LIKE TO --

6  **A**   -- ANALYSIS.

7  **Q**   DRAW YOUR ATTENTION TO YOUR DEPOSITION, PAGE 28, LINES THREE

8  THROUGH SEVEN.  I CAN READ IT TO YOU.

9  **A**   OKAY.

10 **Q**   IT SAYS:

11            "WE KNOW THAT THE RECIDIVISM RATES OR THE

12            RETURN-TO-JAIL RATE, OR RETURN RATE, YOU KNOW,

13            HOWEVER YOU PARSE IT OUT, IS GOING TO REMAIN

14            RELATIVELY CONSTANT REGARDLESS OF WHEN SOMEONE

15            IS RELEASED."

16            DO YOU RECALL THAT TESTIMONY?

17 **A**   SOMETHING ALONG THAT LINE, YES.

18 **Q**   YOU ALSO TESTIFIED THAT SOME INDIVIDUALS -- SOME -- DO WE

19 HAVE THE RIGHT PAGE UP?  PAGE 28, LINE THREE THROUGH SEVEN --

20 NO, THAT'S NOT.

21            YOU ALSO TESTIFIED DURING YOUR DEPOSITION THAT AND

22 TODAY, AGAIN, THAT DURING SOME TIMEFRAME WOMEN WERE BEING

23 RELEASED AFTER 10 PERCENT OF THEIR SENTENCE AND MEN WERE DOING

24 70 PERCENT OF THEIR SENTENCE, RIGHT?

25            **JUDGE KARLTON:**   THAT'S WHAT THEY'RE DOING NOW?

1              **THE WITNESS:**  THAT'S WHAT THEY'RE DOING NOW, YES,

2  SIR.

3  **BY MS. EVENSON**

4  **Q**    AND YOU DON'T KNOW OF ANY DIFFERENCE IN THE RECIDIVISM RATES

5  FOR PEOPLE WHO DO 10 PERCENT VERSUS 70 PERCENT; ISN'T THAT

6  RIGHT?

7  **A**    NO, WE DON'T TRACK THAT INFORMATION.

8  **Q**    NOW, OF THE 67.5 PERCENT RECIDIVISM RATE, YOU DON'T KNOW

9  WHAT PROPORTION OF THOSE ARE TECHNICAL PAROLE VIOLATERS, DO YOU?

10  **A**    I BELIEVE THE NUMBER IS ABOUT A THIRD AND TWO-THIRDS.  IT'S

11  ABOUT TWO-THIRDS FOR TECHNICAL VIOLATIONS.

12  **Q**    SO OF THE 67.5 PERCENT WHO WOULD RETURN TO YOUR CUSTODY, DID

13  YOU ASSUME THAT TWO-THIRDS ARE TECHNICAL VIOLATERS?

14  **A**    YES.

15  **Q**    AND WHAT PERCENTAGE OF THOSE WHO YOU ESTIMATE WOULD RETURN

16  TO YOUR CUSTODY WOULD BE SECOND OR THIRD STRIKERS?

17  **A**    I'M NOT SURE.

18  **Q**    YOU TESTIFIED EARLIER THAT YOUR CONCERN -- ONE OF YOUR MAJOR

19  CONCERNS ABOUT A POPULATION REDUCTION PLAN THAT COUNSEL

20  EXPLAINED TO YOU WOULD BE THAT THERE WOULDN'T BE ENOUGH MONEY TO

21  RUN THE MENTAL HEALTH PROGRAMS, THE DRUG TREATMENT PROGRAMS, AND

22  THE OTHER KIND OF PROGRAMS YOU WANT TO PROVIDE TO DETAINEES IN

23  L.A. COUNTY; IS THAT RIGHT?

24  **A**    THAT'S TRUE.

25  **Q**    AND THAT'S THE STATUS QUO TODAY; ISN'T THAT RIGHT?

1  **A**   YES, I BELIEVE IT IS.

2  **Q**   NOW, DO YOU UNDERSTAND -- HAS ANYONE TOLD YOU THAT REDUCING

3  THE PRISON POPULATION -- LET ME START OVER.

4        IF SOME OF THE SAVINGS THAT THE STATE WERE ABLE TO

5  REALIZE FROM REDUCING ITS PRISON POPULATION, SOME OF ONE BILLION

6  SAVINGS COULD BE REDIRECTED TO COUNTIES LIKE L.A. COUNTY, THAT

7  WOULD AMELIORATE YOUR CONCERNS, WOULDN'T IT?

8  **A**   I DON'T BELIEVE THAT WOULD HAPPEN, SO I DON'T BELIEVE

9  THAT -- THE PROBLEM IS IF, IN FACT, YOU COULD FORCE THEM TO DO

10 IT, YES.  IF YOU THINK THAT -- IF YOU ARE ASKING ME IF I THINK

11 THEY WOULD DO IT, I HAVE NO BELIEF THEY HAVE ANY INTENTION OF

12 DOING THAT IN THE LONG PERIOD BASED ON MY HISTORY WITHIN L.A.

13 COUNTY AND, IN PARTICULAR, WITH THE SHERIFF'S DEPARTMENT.

14 **Q**   IF THEY WERE FORCED TO, THOUGH, YOUR ANSWER WAS YES,

15 CORRECT?

16 **A**   IF IT WERE SUFFICIENT FUNDING FOR ALL THE PROGRAMS, I

17 BELIEVE THERE WOULD BE BENEFITS, YES.

18 **Q**   IN FACT, IT WOULD IMPROVE PUBLIC SAFETY, WOULDN'T IT?

19 **A**   IN SOME RESPECTS IT WOULD MAKE IT BETTER.

20 **Q**   LIEUTENANT SMITH, I'D LIKE TO SHOW YOU WHAT'S BEEN MARKED AS

21 DEFENDANT INTERVENOR EXHIBIT NO. 613.  CAN WE PULL THAT UP?  FOR

22 YOUR CONVENIENCE, LET ME PROVIDE SOME COPIES TO THE COURT.

23        (DOCUMENT DISPLAYED.)

24        **THE WITNESS:**  IT'S PRETTY SMALL.

25

1  **BY MS. EVENSON**

2  **Q**   DO YOU HAVE A COPY OF THAT?  WOULD YOU LIKE TO SEE A FULL

3  COPY AS WELL?

4  **A**   EITHER WAY.  IF YOU HAVE A FULL COPY OF THIS, THAT WOULD BE

5  FINE.

6          **MS. EVENSON:**  MAY I APPROACH, YOUR HONOR?

7          **JUDGE HENDERSON:**  YOU MAY.

8          **THE WITNESS:**  THANK YOU.

9  **BY MS. EVENSON**

10 **Q**   THIS DOCUMENT APPEARS TO BE A PROFILE OF THE INMATE

11 RECEPTION CENTER DAILY STATISTICS FROM AUGUST 22, 2008.  DO YOU

12 RECOGNIZE THIS DOCUMENT?

13 **A**   YES.

14 **Q**   FROM L.A. COUNTY, CORRECT?

15 **A**   YES, IT IS.

16 **Q**   I'D LIKE JUST TO DRAW YOUR ATTENTION TO THE LINE THAT SAYS:

17 "GRAND TOTAL OF BEDS," IT'S ABOUT HALFWAY DOWN THE PAGE.  AND IT

18 SHOWS THAT OF REGULAR BEDS, THE CAPACITY GRAND TOTAL IS 22,369,

19 THE FUNCTIONAL BEDS TOTAL IS 21,842, THE OCCUPIED TOTAL IS

20 19,774, AND THE AVAILABLE BEDS TOTAL IS 2,625.

21 **A**   YES.

22 **Q**   IS THIS AN ACCURATE DESCRIPTION OF THE SNAPSHOT OF THE

23 POPULATION ON THE DATE FOR WHICH IT'S LISTED?

24 **A**   THE POPULATION ON THAT DATE, THE INMATE COUNT?

25 **Q**   YES.

1   **A**   YES, IT'S 19,774.

2   **Q**   IT'S AN ACCURATE DESCRIPTION OF THE INMATE POPULATION?

3   **A**   OF THE INMATE POPULATION, YES.

4   **Q**   NOW, I'D LIKE TO DRAW YOUR ATTENTION TO A LINE ON THE TOP,

5   THE TOP CHART UP THERE.  IT SHOWS THE NUMBER OF BOOKINGS.  THE

6   TOTAL NUMBER OF BOOKINGS, I BELIEVE IT'S ON THAT DAY, IS 407; IS

7   THAT RIGHT?

8             **JUDGE KARLTON:**  WHERE WOULD WE -- I SEE, YES.

9   **BY MS. EVENSON**

10  **Q**   BOOKINGS TOTALS, DO YOU SEE THAT?

11  **A**   YES, IT IS.

12  **Q**   THAT'S THE DATE -- THAT'S THAT DAY'S BOOKING TOTAL; IS THAT

13  RIGHT?

14  **A**   YES.

15  **Q**   NOW, YOU TESTIFIED EARLIER THERE ARE IN THE RANGE OF 170- TO

16  180,000 BOOKINGS PER YEAR IN THE L.A. COUNTY JAILS; IS THAT

17  RIGHT?

18  **A**   YES.

19  **Q**   AND THAT AMOUNTS TO SOMEWHERE IN THE RANGE OF 450 TO 500

20  BOOKINGS PER DAY, RIGHT?

21  **A**   THEY DON'T COME IN IN THAT FASHION.  THEY WOULD AVERAGE

22  ABOUT THAT.  THEY COME IN ANYWHERE FROM 300 TO 1,100 IN ONE

23  24-HOUR PERIOD OR ONE EVENING.

24  **Q**   SO THE RANGE MIGHT BE AS MUCH AS 700 FROM THE LOW TO THE

25  HIGH?

1  **A**   YES.

2  **Q**   IN A GIVEN DAY?

3          NOW, YOU MENTIONED EARLIER THAT YOUR ESTIMATE OF THE

4  IMPACT FROM A PRISON POPULATION REDUCTION IS BASED ON THE

5  67.5 PERCENT RECIDIVISM RATES, RIGHT?

6  **A**   YES, ON THE RETURN-TO-CUSTODY RATE.

7  **Q**   AND DO YOU UNDERSTAND THAT THIS RETURN-TO-CUSTODY RATE IS --

8  ACTUALLY INVOLVES RETURNS TO PRISON OVER A THREE-YEAR PERIOD?

9  **A**   IT'S A TWO-YEAR -- THE STUDY THAT I SAW IN THE CDCR

10 PUBLISHED QUARTERLY REPORT, IT SAYS RETURN TO CUSTODY WITHIN TWO

11 YEARS.

12 **Q**   OKAY.  THE PARTIES HAVE PREVIOUSLY IDENTIFIED THAT FIGURE AS

13 BEING A THREE-YEAR RETURN-TO-CUSTODY RATE, BUT FOR PURPOSES OF

14 THIS LINE OF QUESTIONING, LET ME JUST DO WITH THE TWO-YEAR RATE.

15 **A**   OKAY.

16 **Q**   ASSUMING YOU ARE CORRECT IT WAS TWO YEARS AND NOT THREE,

17 YOUR ASSUMPTION THEN ABOUT THE 11,000 INDIVIDUALS WHO WOULD COME

18 BACK TO CUSTODY IN L.A. COUNTY, THAT'S 11,000 OVER A TWO-YEAR

19 PERIOD, RIGHT?

20 **A**   YES.

21 **Q**   AND 11,000 PEOPLE OVER A TWO-YEAR PERIOD IS ABOUT 20 PEOPLE

22 A DAY; ISN'T THAT RIGHT?

23 **A**   THAT'S CORRECT.

24          **THE CLERK:**  FIVE MINUTES, COUNSEL.

25

1        **THE WITNESS:**  THE ONLY THING IS THEY WON'T COME IN 20

2  IN A DAY, AS YOU RELEASE THEM.  WE KNOW THEY RETURN TO

3  CUSTODY -- THEY TEND TO RETURN TO CUSTODY QUICKER RATHER THAN

4  LATER.  THAT'S THE TIMEFRAME THAT'S USED, BUT THEY DON'T FALL

5  EVENLY ACROSS THAT SPECTRUM.

6  **BY MS. EVENSON**

7  **Q**    NOR WILL THE POPULATION REDUCTION OCCUR ALL AT ONCE; ISN'T

8  THAT RIGHT?  THE POPULATION REDUCTION BEING PROPOSED IS A

9  TWO-YEAR POPULATION REDUCTION, CORRECT?

10 **A**    SO DEPENDING ON HOW THEY WERE RELEASED, THAT'S HOW WE WOULD

11 EXPECT TO SEE THEM COME BACK.

12 **Q**    BUT ASSUMING THERE WAS A RELEASE OVER A PERIOD OF TWO YEARS,

13 YOU WOULD EXPECT IN THE FOLLOWING TWO YEARS AN AVERAGE RETURN OF

14 APPROXIMATELY 20 INMATES PER DAY?

15 **A**    AN AVERAGE, YES.

16        **MS. EVENSON:**  THANK YOU.

17        **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

18        **MS. LEONARD:**  NO, YOUR HONOR.

19        **JUDGE HENDERSON:**  REDIRECT?

20        **MS. BARLOW:**  THANK YOU, YOUR HONOR.

21        COULD WE PUT UP EXHIBIT DI 501?

22        (DOCUMENT DISPLAYED.)

23        **REDIRECT EXAMINATION BY MS. BARLOW**

24 **BY MS. BARLOW**

25 **Q**    SIR, GOING BACK TO THE NUMBER OF TECHNICAL PAROLE VIOLATERS

1  VERSUS NEW OFFENDERS OR PAROLEES WHO ARE ARRESTED FOR NEW

2  OFFENSE, DID YOU REVIEW THE CDCR DATA FOR 2007?

3  **A**   I DID REVIEW SOME OF THE DATA, YES, FOR THE -- OFF THEIR

4  WEBSITE.

5  **Q**   DO YOU KNOW THE APPROXIMATE NUMBER OF TOTAL FELONS THAT WERE

6  SENT TO CDCR IN 2007?

7  **A**   I DON'T REMEMBER THE EXACT NUMBER, NO.

8  **Q**   DO YOU RECALL THE PERCENTAGE OF THE TOTAL FELONS SENT TO

9  CDCR THAT WERE PAROLE VIOLATERS WITH NEW TERMS?

10  **A**   I'M TRYING TO REMEMBER THE DATA.  I BELIEVE IT WAS -- THERE

11  WAS 14.7 AND 51.9 PERCENT, I BELIEVE, WAS THE BREAKDOWN.

12  **Q**   I'M SORRY?

13  **A**   I THOUGHT THAT THE BREAKDOWN OF THE 67.5 PERCENT, IS THAT

14  WHAT YOU'RE REFERRING TO?

15  **Q**   NO.  I'M ASKING ABOUT THE NUMBER OF FELONS COMMITTED TO CDCR

16  FROM LOS ANGELES COUNTY.

17  **A**   NO, I DON'T KNOW.

18          **MS. BARLOW:**  SINCE HE DOESN'T SEEM TO HAVE IT UP

19  THERE, YOUR HONOR, MAY I APPROACH THE WITNESS?

20          **JUDGE HENDERSON:**  YOU MAY.

21          **JUDGE KARLTON:**  COUNSEL HAS JUST SHOWN YOU A

22  DOCUMENT.  HAVE YOU SEEN THAT DOCUMENT BEFORE, SIR?

23          **THE WITNESS:**  IT WAS IN THE TABLE OF THE ANALYSIS,

24  YES.

25          **JUDGE KARLTON:**  ALL RIGHT.

1              **MS. BARLOW:**  ALL RIGHT.

2    **BY MS. BARLOW**

3    **Q**   SO, LOOKING AT THAT TABLE, DOES THAT REFRESH YOUR

4    RECOLLECTION ABOUT THE TOTAL NUMBER OF FELONS COMMITTED TO CDCR

5    FROM LOS ANGELES COUNTY IN 2007?

6    **A**   YES.

7    **Q**   WHAT WAS THAT NUMBER?

8    **A**   TWENTY-TWO THOUSAND.

9    **Q**   I DON'T THINK WE ARE LOOKING AT THE SAME PAGE.

10              WHAT PAGE DO YOU HAVE UP?  TRY NINE, BATES NINE.

11              SIR, ON PAGE 9, IS THAT THE PAGE THAT DEALS WITH

12   TOTAL FELON COMMISSIONS?

13              **JUDGE HENDERSON:**  I THINK YOU ARE WAITING FOR THE

14   SCREEN.  DO YOU HAVE THE DOCUMENTS?

15   **BY MS. BARLOW**

16   **Q**   IT'S BATES NUMBER 9 AT THE BOTTOM, FROM LOS ANGELES COUNTY?

17   **A**   PAGE 10, PAGE 11, PAGE 20?

18   **Q**   I'M SORRY.  YOU SAID IT WAS 22,000?

19   **A**   YES.

20   **Q**   ALL RIGHT.

21   **A**   THAT'S WHAT I SAID.

22   **Q**   NOW, TAKE A LOOK AT THE --

23              I'LL TRY ON THE ELMO, YOUR HONOR, IF YOU DON'T MIND,

24   SINCE WE'RE HAVING TROUBLE SEEING THIS.

25              SO THESE ARE TOTAL FELON ADMISSIONS CALENDAR YEAR

1  2007, LOS ANGELES?

2          **JUDGE KARLTON:**  IF YOU'VE ASKED HIM SOMETHING THAT

3  YOU WANT ANSWERED, WE CAN'T HEAR YOU, MA'AM.

4          **MS. BARLOW:**  I'M SORRY, YOUR HONOR.

5          IT'S TURNED THE WRONG WAY.

6  **BY MS. BARLOW**

7  **Q**   SO THE TOTAL NEW FELON ADMISSIONS FOR 2007 FROM LOS ANGELES

8  COUNTY WAS 22,800, SO ON, CORRECT?

9  **A**   RIGHT.

10         **JUDGE KARLTON:**  TWENTY-TWO THOUSAND THREE HUNDRED

11  ELEVEN.

12         **THE WITNESS:**  THREE HUNDRED ELEVEN.

13  **BY MS. BARLOW**

14  **Q**   JUST SO YOU CAN SEE THE TOP OF THIS, THIS IS FELON NEW

15  ADMISSIONS.  LOS ANGELES COUNTY WOULD HAVE HAD 14,843 NEW FELON

16  ADMISSIONS TO CDCR?

17  **A**   YES.

18  **Q**   AND THAT REPRESENTS WHAT PERCENTAGE OF THE TOTAL?

19  **A**   ABOUT A THIRD, 31.6 PERCENT.

20  **Q**   SO THEN THE PAROLE VIOLATERS WERE ONE-THIRD.  THAT WAS

21  TWO-THIRDS; IS THAT CORRECT?

22         **JUDGE KARLTON:**  I THOUGHT IT WAS VICE VERSA.

23         **THE WITNESS:**  I THOUGHT IT WAS VICE VERSA.

24         **JUDGE KARLTON:**  IT IS VICE VERSA.

25

1  **BY MS. BARLOW**

2  **Q**   THESE ARE NEW FELON ADMISSIONS?

3         **JUDGE KARLTON:**  RIGHT, 14,000.

4         **MS. BARLOW:**  OUT OF 22?

5         **JUDGE KARLTON:**  NO, IT SAYS THE PERCENTAGE IS 31.

6         **MS. BARLOW:**  THAT'S THE PERCENTAGE OF PRISONERS

7  COMMITTED TO CDCR, NEW FELONS, FROM LOS ANGELES COUNTY.  IT IS

8  NOT THE TOTAL FROM LOS ANGELES COUNTY.

9         **JUDGE KARLTON:**  I'M SORRY.  TELL ME AGAIN WHAT YOU

10 JUST SAID, BECAUSE I MISSED IT.

11        **MS. BARLOW:**  THE PERCENTAGE THAT'S SHOWN THERE IS THE

12 PERCENTAGE OF NEW FELONS ADMISSIONS FROM LOS ANGELES COUNTY FROM

13 CDCR.  IN OTHER WORDS, CDCR RECEIVED 31 PERCENT OF ITS NEW

14 ADMISSIONS FROM LOS ANGELES COUNTY?

15        **JUDGE KARLTON:**  OKAY.

16 **BY MS. BARLOW**

17 **Q**   NOW, REFERRING TO THIS TABLE WHICH IS THE PAROLE VIOLATERS

18 RETURNED WITH A NEW TERM?

19 **A**   YES.

20 **Q**   HOW MANY PAROLE VIOLATERS WERE RETURNED FROM A NEW TERM FROM

21 LOS ANGELES COUNTY TO CDCR IN 2007?

22 **A**   7463.

23 **Q**   ARE THOSE TECHNICAL PAROLE VIOLATERS?

24 **A**   YES, THOSE WOULD BE THE TECHNICAL.

25 **Q**   ALL OF THEM?

1  **A**   THAT'S MY UNDERSTANDING.  THAT WAS A LITTLE BIT BACKWARDS

2  MYSELF.

3  **Q**   YOU WERE ASKED ABOUT THE 21,841 FUNCTIONAL BEDS?

4  **A**   YES.

5  **Q**   WOULD LOS ANGELES COUNTY SHERIFF'S DEPARTMENT BE ABLE TO

6  OPERATE EFFECTIVELY IF YOU FILLED EVERY BED?

7  **A**   NO.

8  **Q**   WOULD YOU HAVE GREATER VIOLENCE IN THE JAIL?

9  **A**   YES.  AND WE HAVE HAD THAT VIOLENCE.

10 **Q**   WHAT OTHER KINDS OF IMPACTS MIGHT YOU HAVE IF YOU FILLED

11 EVERY BED?

12 **A**   WE WOULD EXPECT TO HAVE THE KIND OF VIOLENCE THAT WE'VE HAD

13 IN THE PAST WHERE WE EXCEEDED OUR ABILITY TO HAVE THE INMATES

14 HOUSED PROPERLY.

15 **Q**   SO WOULD YOU EXPECT GREATER VICTIMIZATION OF AT-RISK

16 PRISONERS?

17 **A**   YES, WE WOULD SEE MURDERS.  WE WOULD SEE AN INCREASE IN THE

18 MURDERS, INCREASED INMATE-ON-INMATE VIOLENCE.

19 **Q**   WOULD IT CREATE A GREATER RISK TO YOUR SECURITY SHERIFF'S

20 DEPARTMENT PERSONNEL?

21 **A**   YES.

22 **Q**   AND ALSO TO THE INMATES?

23 **A**   YES.  WHEN YOU PUT MORE AND MORE PEOPLE ON TOP OF EACH

24 OTHER, YOU HAVE INCREASED VIOLENCE.

25         **JUDGE REINHARDT:**  WOULD YOU EXPECT THE SAME RESULTS

1    WITH OVERCROWDING IN A PRISON?

2              **THE WITNESS:**  YES, SIR.

3              **JUDGE REINHARDT:**  IT WOULD BE MORE DANGEROUS FOR THE

4    PRISONERS, THE STAFF, AND YOU WOULD HAVE MORE CRIME COMMITTED IN

5    THE PRISONS?

6              **THE WITNESS:**  YES, SIR.

7              **THE CLERK:**  FIVE MINUTES, COUNSEL.

8              **MS. BARLOW:**  THANK YOU.

9    **BY MS. BARLOW**

10   **Q**   SO MAY I ASK YOU, LIEUTENANT SMITH, IF YOU -- IF LOS ANGELES

11   COUNTY -- BECAUSE YOU ASKED ABOUT THE SPACING OUT OF THESE

12   RELEASES.  IF LOS ANGELES COUNTY WERE TO RECEIVE AN ADDITIONAL

13   2,500 PAROLEES EITHER THROUGH EARLY RELEASE OR DIVERSION OR

14   BEING RELIEVED OF PAROLE PER MONTH -- I'M SORRY -- 2,500 PER

15   MONTH STATEWIDE -- THAT'S 750 LOS ANGELES COUNTY, CORRECT?  WHAT

16   DOES THAT TRANSLATE TO YOU IN TERMS OF CRIME?

17   **A**   WELL, THEY ARE GOING TO COMMIT ADDITIONAL CRIMES.  I MEAN,

18   WHEN THEY'RE OUT, NO MATTER WHO YOU USE, THEY'RE GOING TO

19   CONTINUE THEIR CRIMINAL LIFESTYLE, AT LEAST A LARGE PORTION OF

20   THEM ARE.  AND IF YOU REDUCE THE PENALTIES ASSOCIATED WITH

21   CERTAIN BEHAVIORS, IT'S NOT GOING TO REDUCE THE BEHAVIOR; IT'S

22   ONLY GOING TO -- IT'S -- LIKE IF YOU TELL YOUR KID THERE'S

23   SANCTIONS, AND THEN THE SANCTIONS ARE NEVER IMPOSED OR THEY'RE

24   ONLY PARTIALLY IMPOSED, EVEN CHILDREN UNDERSTAND THAT CONCEPT.

25   **Q**   OKAY.  AND IF YOU HAD -- YOU TOOK OUT THE TECHNICAL PAROLE

1 VIOLATERS, THE STATISTICS TELL US AT LEAST 50 PERCENT OF FELONS

2 ARE GOING TO REOFFEND, FORGETTING THE TECHNICAL VIOLATIONS,

3 PAROLE VIOLATIONS.  WHAT DOES THAT MEAN TO YOU IN TERMS OF THE

4 NUMBER OF CRIMES?

5 **A**    WELL, YOU CAN FIGURE THE MOST CONSERVATIVE NUMBER I'VE EVER

6 HEARD IS THAT FOR EVERY CRIME THAT SOMEBODY IS ARRESTED FOR,

7 THERE ARE PROBABLY EIGHT UNREPORTED, ON AVERAGE, CRIMES.  THAT'S

8 NOT INCONSISTENT WITH THE DATA EVEN FOR PART ONE CRIMES WHERE

9 THE SOLVE RATE IS ABOUT 22 PERCENT.  SO YOU ARE GOING TO HAVE

10 MULTIPLE CRIMES COMMITTED IN THE COMMUNITY BY THE PEOPLE SIMPLY

11 BY THE VIRTUE OF THE FACT THAT THEY'RE THERE AND ABLE TO

12 REOFFEND; WHEREAS, IF THEY WERE INCARCERATED --

13          **JUDGE REINHARDT:**  ARE THESE CRIMES THAT WILL

14 OTHERWISE BE COMMITTED TWO OR THREE MONTHS LATER?

15          **THE WITNESS:**  THEY WOULD BE, EXCEPT THEY ARE GOING TO

16 CONTINUALLY -- THIS IS ONE OF THE THINGS WE'VE SEEN, TOO, IS AS

17 WE -- BECAUSE THE SENTENCES ARE SHORTER, THEY'RE SIMPLY OUT FOR

18 LONGER PERIODS OF TIME DURING THEIR CRIME-PRONE YEARS.  BUT,

19 YES, THEY'RE GOING TO TEND TO DO THE SAME THING.  THERE'S A

20 QUESTION ABOUT WHETHER IT WOULD BE MORE OR THE SAME THERE.

21 CERTAINLY WOULDN'T BE LESS OF IT, THOUGH.  IN OTHER WORDS, IF

22 YOU ONLY TAKE SOMEBODY OUT OF --

23          **JUDGE REINHARDT:**  TAKE THESE 16 MURDERS YOU TOLD US

24 ABOUT.  ASSUMING THEY DID OCCUR AND ASSUMING THEY OCCURRED

25 WITHIN THE PERIOD IN WHICH THEY WERE RELEASED, THEY WOULD HAVE

1    OCCURRED IN ANY EVENT?

2            **THE WITNESS:**  WELL --

3            **JUDGE REINHARDT:**  MAYBE MORE.

4            **THE WITNESS:**  THE TYPE OF BEHAVIOR, THE VICTIM WOULD

5    HAVE BEEN CHANGED.  A LOT OF CRIMES ARE CRIMES OF OPPORTUNITY,

6    SO THE SHOOTING OF THE INDIVIDUAL -- ONE OF THE INDIVIDUALS WAS

7    SHOT BECAUSE HE HAPPENED TO BE THERE.  HE WAS AN AVAILABLE

8    VICTIM WHEN THE INDIVIDUAL HAD HIS OPPORTUNITY TO COMMIT THE

9    CRIME.

10            **JUDGE REINHARDT:**  THAT INDIVIDUAL, YOU THINK, WOULD

11    NOT HAVE HAD AN OPPORTUNITY TO COMMIT A SIMILAR CRIME --

12            **THE WITNESS:**  I THINK THE SUSPECT WOULD HAVE.  THE

13    SUSPECT CERTAINLY WOULD HAVE.  BUT IF HE WERE INCARCERATED FOR

14    LONGER PERIODS OF TIME, EACH TIME HE'S OUT WOULD BE LESS OF THE

15    AGGREGATE TIME.  IN OTHER WORDS, IF HE'S ONLY OUT FOR -- LET'S

16    SAY THEY HAVE A FIVE-YEAR WINDOW TO COMMIT CRIMES, AND AS YOU

17    INCREASE THE WINDOW, IF YOU BELIEVE THAT THEY'RE GOING TO

18    CONTINUE TO ACT IN A CRIMINAL MANNER, YOU ARE GOING TO HAVE --

19    OVER A PERIOD OF TIME, YOU'RE GOING TO HAVE MORE INCIDENCES.

20    THEY'RE GOING TO TEND TO DO THE SAME THING.  IT'S JUST THEY ARE

21    GOING TO BE OUT MORE TO DO THOSE THINGS DURING THOSE CRIME-PRONE

22    YEARS.

23            **JUDGE REINHARDT:**  YOU ARE TALKING ABOUT TWO OR THREE

24    MONTHS EARLIER.  NOW, YOU'RE ASSUMING THAT THE NEXT TIME HE'S

25    ARRESTED FOR MURDER AND SENT TO PRISON, THAT HE WILL GET OUT TWO

1  OR THREE MONTHS EARLIER THEN, TOO?

2         **THE WITNESS:**  JUST DEPENDS ON THE WAY IT WORKS.

3  WHETHER OR NOT -- NOT FOR MURDER, BUT I'M SAYING FOR ALL TYPES

4  OF CRIMES.  IF THAT'S THE SENTENCING GUIDELINES OR THE TERMS ARE

5  SMALLER, YOU ARE JUST GOING TO HAVE MORE OPPORTUNITY DURING

6  THOSE CRIME-PRONE YEARS.

7         **JUDGE KARLTON:**  YOU ARE AWARE -- OR ARE YOU AWARE

8  THAT THE STATISTICAL STUDIES THAT WE'VE HEARD ABOUT SUGGEST THAT

9  WHILE THAT'S NOT AN UNLIKELY CLINICAL JUDGMENT, IT PROBABLY

10 DOESN'T ACCORD WITH WHAT HAPPENS IN THE REAL WORLD.  ARE YOU

11 AWARE THAT WE'VE HEARD TESTIMONY OF THAT NATURE?

12        **THE WITNESS:**  I'M AWARE YOU'VE HEARD TESTIMONY OF

13 THAT NATURE.

14        **JUDGE KARLTON:**  YOU JUST DON'T BELIEVE IT.

15        **THE WITNESS:**  I DON'T BELIEVE IT, AND SO OTHER PEOPLE

16 THAT WE'VE TALKED TO AS WELL ARE OF SIMILAR OPINION.

17        **JUDGE KARLTON:**  HOPEFULLY, WE WILL HEAR FROM THOSE

18 FOLKS.  BUT YOUR BASIS IS THIS IS WHAT I SEE, I THINK THIS IS

19 WHAT I SEE?

20        **THE WITNESS:**  THIS IS WHAT WE SEE, YES, SIR.

21        **MS. BARLOW:**  THANK YOU, YOUR HONOR.  NOTHING FURTHER.

22        **JUDGE HENDERSON:**  LET ME -- REALLY, THIS HAS COME UP

23 BEFORE, AND I'M HAVING TROUBLE GRASPING THE CONCEPT.  I'M

24 LOOKING AT THE L.A. TIMES ARTICLE THAT MS. BARLOW --

25        **JUDGE REINHARDT:**  WHICH IS NOT IN EVIDENCE.

1          **JUDGE HENDERSON:**  OKAY.  HYPOTHETICALLY.

2          **THE WITNESS:**  YES, SIR.

3          **JUDGE HENDERSON:**  JUST TO USE -- SOMEONE SAYS, OKAY,

4    WE GOT TO DO WHAT WE GOT TO DO, AND THEY HAVE BEEN RELEASED

5    EARLY AND WHAT THEY GOT TO DO IS GO TO RIVAL GANG'S TURF, AND

6    THEY DRIVE BY, AND THEY SHOOT SOMEONE.

7          **THE WITNESS:**  YES.

8          **JUDGE HENDERSON:**  YOU'RE SAYING THEY GOT OUT EARLY,

9    AND I DON'T UNDERSTAND IT.  I'M ASSUMING IF THIS PERSON HAD

10   GOTTEN OUT FOUR MONTHS LATER, HE'D HAVE SAID, WE GOT TO DO WHAT

11   WE GOT TO DO, AND WOULD HAVE GOTTEN IN THE CAR AND WOULD HAVE

12   SHOT SOMEONE.

13         **JUDGE KARLTON:**  OR IF IT WAS THAT DATE THEY GOT TO

14   DO, SOME OTHER GANG MEMBER WOULD HAVE GOTTEN IN THE CAR AND SHOT

15   SOMEBODY.

16         **THE WITNESS:**  I WOULD AGREE WITH THAT.  I THINK THERE

17   IS -- THEY ARE GOING TO CONTINUE TO COMMIT CRIME.  THE ONLY

18   THING I'M SAYING IS, AS YOU INCREASE THEIR OPPORTUNITY TO DO

19   THAT BECAUSE YOU ARE SHORTENING THE SENTENCE, YOU ARE JUST

20   GIVING THEM MORE OPPORTUNITY TO COMMIT ADDITIONAL CRIMES.

21         **JUDGE REINHARDT:**  YOU'RE WORRIED ABOUT THE CUMULATIVE

22   LENGTH OF TIME THEY WILL SPEND IN JAIL AS OPPOSED TO THE AMOUNT

23   OF TIME THEY ARE NOT IN JAIL OR IN PRISON, THAT OVER THEIR

24   LIFETIME, INSTEAD OF SPENDING 30 YEARS IN PRISON, THEY'RE ONLY

25   GOING TO SPEND 29, AND, THEREFORE, THEY MAY BE ABLE TO KILL ONE

 1   MORE PERSON?

 2            THE WITNESS:  KIND OF.  I MEAN, IN OUR PARLANCE, THEY

 3   ARE DOING LIFE ON THE INSTALLMENT PLAN, YOU KNOW, SO A LOT OF

 4   THE CRIMINALS ARE CAREER CRIMINALS.  SO EVERY OPPORTUNITY THEY

 5   ARE OUT, THEY ARE GOING TO COMMIT ADDITIONAL CRIMES.  AND SO AS

 6   THEY HAVE MORE AND MORE OPPORTUNITY OR TIME OUT, BECAUSE WE'VE

 7   REDUCED THEIR SENTENCES --

 8            JUDGE REINHARDT:  BUT IT'S REALLY ONLY THE TIME OUT

 9   YOU ARE CONCERNED ABOUT, HOW MUCH TIME ARE THEY IN, HOW MUCH

10   TIME ARE THEY OUT.

11            THE WITNESS:  I THINK THE TWO ARE RELATED, BUT, YES,

12   I SEE WHAT YOU'RE SAYING.

13            JUDGE REINHARDT:  AND THE ODDS ARE IF THEY GET OUT

14   FOUR MONTHS EARLY AND THEY ARE GOING TO COMMIT THAT NEXT CRIME,

15   THEY ARE GOING TO GO IN FOUR MONTHS -- THEY ARE GOING TO GO

16   IN --

17            JUDGE KARLTON:  FOUR MONTHS EARLIER.

18            THE WITNESS:  HOPEFULLY.  THAT ASSUMES, REMEMBER,

19   22 PERCENT.  SO THEY ARE GOING TO COMMIT A FEW CRIMES BEFORE WE

20   GET THEM.

21            JUDGE REINHARDT:  THAT WOULD BE TRUE WHETHER THEY

22   COME OUT EARLY OR LATE.

23            JUDGE KARLTON:  AND THE WHOLE NOTION ABOUT ALL OF

24   THESE UNREPORTED CRIMES, THERE'S NO WAY TO EVEN MEASURE THAT.

25   THAT'S AN ESTIMATE BASED UPON ONE'S GUTS AND GOLLY.

 1          **JUDGE REINHARDT:**  BUT, ALSO, IF YOU ASSUME THAT

 2  THEY'RE GOING TO GO BACK WITHIN SIX MONTHS, THEY'RE GOING TO

 3  COMMIT ONE OF THOSE -- SAY THEY ARE GOING TO COMMIT FIVE CRIMES

 4  AND GET CAUGHT ONCE WITHIN THE FIRST SIX MONTHS THEY START, IT'S

 5  REALLY NOT GOING TO MAKE A LOT OF DIFFERENCE WHETHER THEY START

 6  FOUR MONTHS EARLIER OR FOUR MONTHS LATER, AS FAR AS THE AMOUNT

 7  OF CRIMES THAT ARE COMMITTED.

 8          **THE WITNESS:**  I THINK THE ONLY DIFFERENCE IS, AGAIN,

 9  IT'S THE CUMULATIVE --

10          **JUDGE REINHARDT:**  IT'S THE CUMULATIVE EFFECT OVER A

11  LIFETIME?

12          **THE WITNESS:**  YEAH.  I WOULD NEVER ARGUE WITH YOU.  I

13  AGREE WITH WHAT YOU'RE SAYING.

14          **JUDGE REINHARDT:**  YOU CAN ARGUE WITH ME.

15          **THE WITNESS:**  I WOULDN'T.  I DON'T DISAGREE WITH YOU

16  ON THAT.  THE ONLY THING IS AT THE END THEY ARE JUST GOING TO

17  HAVE MORE OPPORTUNITY BECAUSE WE'VE SHORTENED THE SENTENCE

18  LENGTH.  I MEAN, THAT'S THE IDEA, REALLY, OF THREE STRIKES, IS

19  IF THEY ARE NOT OUT, THEY ARE NOT AVAILABLE TO COMMIT CRIMES.

20          **JUDGE REINHARDT:**  WELL, THERE'S LOTS OF WAYS --

21          **JUDGE KARLTON:**  THAT PERSON RIGHT THERE, MS. TILLMAN,

22  SHE'S VERY DANGEROUS.

23          **THE WITNESS:**  WOULD YOU LIKE ME TO TAKE HER NOW, YOUR

24  HONOR?

25          **JUDGE HENDERSON:**  OKAY.  THANK YOU, COUNSEL.

1          **MS. BARLOW:** THANK YOU, COUNSEL.

2          STATE DEFENDANTS HAVE ANYTHING FURTHER?

3          **MR. LEWIS:** NO QUESTIONS, YOUR HONOR.

4          **JUDGE HENDERSON:** RECROSS.

5          <u>**RECROSS-EXAMINATION BY MS. EVENSON**</u>

6   **BY MS. EVENSON**

7   **Q**    LIEUTENANT SMITH, YOU TESTIFIED THAT YOU COULDN'T OPERATE

8   YOUR JAIL IF -- AT THE 21,800 MARK WHICH IS THE -- IF YOU HAD

9   ACTUALLY FILLED ALL 21,000 OF THOSE AVAILABLE BEDS; IS THAT

10  RIGHT?

11  **A**    WE START TO HAVE PROBLEMS AT THAT LEVEL, YES, SIGNIFICANT

12  PROBLEMS.  THE JAIL IS STILL GOING TO OPERATE.  IT'S NOT LIKE WE

13  GET TO JUST STOP.

14  **Q**    YOU WOULD HAVE SIGNIFICANT PROBLEMS EVEN IF YOU WERE AT A

15  HUNDRED PERCENT OF YOUR CAPACITY?

16  **A**    ABSOLUTELY.  A HUNDRED PERCENT OF YOUR CAPACITY IS REALLY A

17  MISNOMER.  THE INDIVIDUALS THAT DID THE NORTH POINT

18  CLASSIFICATION SYSTEM SAID, YOU'RE AT A HUNDRED PERCENT CAPACITY

19  WHEN YOU ARE AT 90 PERCENT.  YOU NEED A TEN PERCENT VACANCY

20  FACTOR TO JUST FACILITATE MOVEMENT, AND THOSE TYPE OF ISSUES

21  BECAUSE OF THE MARGINS.

22          **JUDGE KARLTON:** THAT WOULD BE TRUE, FOR INSTANCE, OF

23  THE STATE SYSTEM, BUT IT'S AT 200 PERCENT?

24          **THE WITNESS:** ABSOLUTELY TRUE, YOUR HONOR.

25

1  **BY MS. EVENSON**

2  **Q**   YOU ANTICIPATED MY QUESTION, WHICH IS, IF YOU IMAGINE THAT

3  THE L.A. COUNTY JAIL WERE ACTUALLY AT 200 PERCENT OF CAPACITY,

4  IF YOU WERE AT THAT -- IF YOUR JAIL POPULATION WAS THAT HIGH,

5  YOU'D HAVE TO START RELEASING PEOPLE, WOULDN'T YOU?

6  **A**   AND IF I HAD SOMEONE TO RELEASE THEM TO AT THE CITY LEVEL,

7  WE WOULD RELEASE THEM TO THE CITY LEVEL.

8  **Q**   BUT IF YOU WERE -- YOU'RE RELEASING -- YOU'RE RELEASING

9  PEOPLE EARLY NOW WHEN YOU ARE JUST BELOW A HUNDRED PERCENT OF

10 CAPACITY, RIGHT?

11 **A**   YES.

12 **Q**   AND IF YOU WERE AT 200 PERCENT OF CAPACITY, YOU WOULD BE

13 EARLY RELEASING PEOPLE, WOULDN'T YOU?

14 **A**   I WORKED IN THE JAILS WHEN WE WERE BEFORE THE CAP, SO I KNOW

15 WHAT THE SITUATION LOOKS LIKE WHEN YOU ARE AT THAT LEVEL.

16 **Q**   AND YOU WOULD BE RELEASING PEOPLE IF YOU WERE AT THAT LEVEL

17 EVEN THOUGH YOU'D KNOW THAT THERE MIGHT BE CRIME COMMITTED BY

18 THOSE RELEASEES; ISN'T THAT RIGHT?

19          **MS. BARLOW:**  BEYOND THE SCOPE OF REDIRECT.

20          **JUDGE HENDERSON:**  OVERRULED, COUNSEL.

21          **THE WITNESS:**  I'M SORRY, MA'AM?

22 **BY MS. EVENSON**

23 **Q**   YOU'RE RELEASING PEOPLE NOW?

24 **A**   YES.

25 **Q**   EVEN THOUGH YOU KNOW THAT --

1   **A**   THERE WOULD BE NEGATIVE IMPACTS, YES.

2   **Q**   WE WERE BOTH TALKING AT THE SAME TIME, SO I DIDN'T EVEN HEAR

3   WHAT YOU SAID.

4   **A**   I AGREED WITH YOU.

5   **Q**   YOU AGREED WITH ME BEFORE MY SENTENCE WAS FINISHED.

6           YOU'RE RELEASING PEOPLE EARLY NOW EVEN THOUGH YOU

7   BELIEVE THAT MORE CRIME IS COMMITTED BY THOSE INDIVIDUALS WHO

8   ARE RELEASED EARLY?

9   **A**   YES.

10          **MS. EVENSON:**  NOTHING FURTHER.

11          **JUDGE HENDERSON:**  OKAY.  LET'S TAKE A 15-MINUTE

12  RECESS.  COURT'S ADJOURNED.

13          THANK YOU FOR TESTIFYING.

14              (RECESS TAKEN.)

15          **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

16  WITNESS, COUNSEL.

17          **MS. WOODWARD:**  YOUR HONOR, BEFORE THE NEXT WITNESS,

18  MAY I JUST CLARIFY ONE THING?

19          WITH THE WITNESS SHERIFF GREG MUNKS, WHO WAS EARLIER

20  THIS AFTERNOON, I HAD AN ADDITIONAL EXHIBIT, NO. 222, WHICH I

21  UNDERSTAND THERE IS NO -- NO OBJECTION TO ADMITTING, AND I WOULD

22  OFFER THAT NOW.

23          **JUDGE HENDERSON:**  222.

24          **MS. WOODWARD:**  THIS IS THE REPORT OF SHERIFF MUNKS.

25          **JUDGE HENDERSON:**  THAT WILL BE ADMITTED AT THIS TIME.

1              (DEFENDANTS' EXHIBIT222 RECEIVED IN

2              EVIDENCE)

3        **MS. WOODWARD:**  THANK YOU, YOUR HONOR.

4        **MS. BARLOW:**  THANK YOU, YOUR HONORS.  GOOD AFTERNOON

5    AGAIN.

6            THE DEFENDANT INTERVENORS WOULD CALL RICHARD WORD TO

7    THE STAND, PLEASE.

8                        **RICHARD WORD**,

9    CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

10   DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

11       **THE CLERK:**  STATE YOUR FULL NAME FOR THE RECORD.

12       **THE WITNESS:**  RICHARD LAWRENCE WORD, W-O-R-D.

13       **MS. BARLOW:**  THANK YOU, MR. WORD -- CHIEF WORD.

14                   **DIRECT EXAMINATION**

15   **Q.**  COULD YOU STATE YOUR CURRENT JOB TITLE?

16   **A.**  YES.  POLICE CHIEF WITH THE CITY OF VACAVILLE, CALIFORNIA.

17   **Q.**  AND YOU ARE AN INTERVENOR IN THIS CASE?

18   **A.**  I'M SORRY?

19   **Q.**  AN INTERVENOR IN THIS CASE?

20   **A.**  YES.  I'M SORRY.

21   **Q.**  COULD YOU JUST FOR THE COURT VERY BRIEFLY SUMMARIZE YOUR

22   EDUCATIONAL AND WORK EXPERIENCE?

23   **A.**  YES.  I HAVE A BACHELOR OF SCIENCE DEGREE IN BUSINESS

24   ADMINISTRATION AND A MASTER OF PUBLIC ADMINISTRATION DEGREE FROM

25   GOLDEN GATE UNIVERSITY.

1          BEEN IN LAW ENFORCEMENT FOR 24 YEARS, 20 OF THOSE

2   YEARS WITH THE OAKLAND POLICE DEPARTMENT.  I ROSE THROUGH THE

3   RANKS AND BECAME CHIEF THERE IN 1999 AND SERVED AS CHIEF FOR

4   FIVE YEARS UNTIL NOVEMBER OF 2004.

5          I THEN LEFT AND SINCE NOVEMBER OF 2004, I HAVE BEEN

6   CHIEF OF POLICE FOR THE CITY OF VACAVILLE.

7   **Q.**  HOW BIG IS VACAVILLE?

8   **A.**  WE HAVE ABOUT 96,000 POPULATION, GIVE OR TAKE.  I HAVE 183,

9   I BELIEVE, STAFF, BOTH SWORN AND NON-SWORN, CIVILIAN.

10  **Q.**  SO IT'S SMALLER THAN OAKLAND, IS THAT FAIR TO SAY?

11          **JUDGE KARLTON:**  I'M SORRY.  I MISSED THE FIRST --

12          **MS. BARLOW:**  I WAS ASKING HOW BIG VACAVILLE WAS, YOUR

13  HONOR.

14  **BY MS. BARLOW:**

15  **Q.**  NOW, HAVE YOU HAD ANY AFFILIATION WITH THE CALIFORNIA POLICE

16  CHIEFS ASSOCIATION?

17  **A.**  YES, I HAVE.

18  **Q.**  AND COULD YOU DESCRIBE THAT QUICKLY?

19  **A.**  I HAVE BEEN ON THEIR BOARD, I BELIEVE, SINCE 2002.  IN 2007

20  I WAS THE PRESIDENT OF THE CALIFORNIA POLICE CHIEFS ASSOCIATION.

21  I'M STILL AN EXECUTIVE BOARD MEMBER AS THE IMMEDIATE PAST

22  PRESIDENT.

23          **MS. BARLOW:**  ALL RIGHT.  NOW, WE HAVE PROVIDED THE

24  COURT WITH A -- WITH EXTRA COPIES OF CHIEF WORD'S DECLARATION.

25  I DO WANT TO ADVISE THE COURT THAT WE FILED AN ERRATA TODAY TO

1  CORRECT A TYPOGRAPHICAL ERROR ON PAGE FIVE, PARAGRAPH 13, WHERE

2  IT SAYS THERE WERE 2005 ARRESTS IN 2007.  THAT SHOULD BE 205.

3  IT'S CORRECTLY REFLECTED IN PARAGRAPH 12.

4  **BY MS. BARLOW:**

5  **Q.**  ALL RIGHT, CHIEF WORD.  IN YOUR CAREER IN GENERAL AND YOUR

6  JOB, YOUR CURRENT JOB IN PARTICULAR, DO YOU STUDY, ASSESS AND

7  TRY TO ADDRESS PUBLIC REACTION TO CRIME AND CRIME RATES?

8  **A.**  SURE.  YES.

9  **Q.**  OKAY.  AND WHY DO YOU DO THAT?

10 **A.**  WELL, IT'S IMPORTANT IN MY CAPACITY, I HAVE SEEN AS BOTH

11 CHIEF AND CAPTAIN, LIEUTENANT, SERGEANT, OFFICER, THAT YOU NEED

12 THE PUBLIC'S PARTICIPATION AND HELP AND ASSISTANCE TO SOLVE

13 CRIME.  YOU NEED THEM TO REPORT CRIME, TO SERVE AS WITNESSES IN

14 SOME INSTANCES.  AND WITHOUT THEM WE SIMPLY WOULD NOT BE

15 EFFECTIVE AS POLICE OFFICERS AND POLICE AGENCIES.

16 **Q.**  AND IN ADDITION TO DOING THAT AS PART OF YOUR JOB, DO YOU

17 DISCUSS THAT WITH OTHER POLICE CHIEFS AND OTHER LAW ENFORCEMENT

18 OFFICIALS IN YOUR COMMUNITY?

19 **A.**  YES.

20 **Q.**  ARE YOU FAMILIAR AS THE CHIEF OF POLICE OF VACAVILLE WITH

21 THE COMMUNITY RESOURCES THAT ARE AVAILABLE IN SOLANO COUNTY FOR

22 MENTAL HEALTH CARE?

23 **A.**  LARGELY.  I AM KNOWLEDGEABLE OF THAT, YES.

24 **Q.**  WHAT ABOUT DRUG TREATMENT?

25 **A.**  YES.

1  Q.  AND ALCOHOL ABUSE?

2  A.  SOME, YES.

3  Q.  ALL RIGHT.  DOMESTIC VIOLENCE COUNSELING?

4  A.  YES.  WE PROVIDE SOME COUNSELING.  THE POLICE DEPARTMENT

5  FUNDS THAT IN VACAVILLE.

6  Q.  OKAY.  AND SO AS PART OF THAT, YOU ARE FAMILIAR WITH WHAT

7  RESOURCES ARE AVAILABLE IN THE COMMUNITY TO AID PROBATIONERS,

8  PAROLEES, ET CETERA?

9  A.  YES.

10  Q.  NOW, WHILE YOU WERE THE CHIEF OF POLICE IN OAKLAND AND IN

11  YOUR VARIOUS CAPACITIES WITH THE OAKLAND POLICE DEPARTMENT

12  BEFORE THAT, DID YOU DO THE SAME THING THAT YOU DO IN VACAVILLE?

13  YOU STUDY, YOU TALK ABOUT, YOU ASSESS, YOU INVOLVE THE

14  COMMUNITY?

15  A.  YES.

16  Q.  AND JUST SO THE COURT IS CLEAR, WHERE IS VACAVILLE?  WHAT

17  COUNTY IS IT LOCATED IN?

18  A.  IT'S IN THE COUNTY OF SOLANO.

19  Q.  NOW, DOES VACAVILLE HAVE ITS OWN JAIL?

20  A.  IT DOES NOT.

21  Q.  SO WHEN YOU MAKE ARRESTS OF SOMEONE WHO IS GOING TO STAY IN

22  CUSTODY FOR WHATEVER REASON, WHERE DO THEY GO?

23  A.  THEY GO TO THE COUNTY JAIL, THE COUNTY OF SOLANO'S JAIL IN

24  FAIRFIELD, CALIFORNIA.

25  Q.  AND DO YOU KNOW WHAT THE CAPACITY OF SOLANO COUNTY'S JAIL

1  FACILITIES IS?

2  **A.**  I BELIEVE IT'S 1,084.

3  **Q.**  NOW, ARE YOU AWARE OF WHETHER PRISONERS HAVE BEEN RELEASED

4  EARLY, WHETHER PRETRIAL OR POST SENTENCE, FROM SOLANO COUNTY

5  JAIL OVER THE PAST YEAR?

6  **A.**  YES.  THE SHERIFF, SHERIFF GARY STANTON TOLD ME THAT --

7           **MR. SANGSTER:**  OBJECTION, YOUR HONOR.  HEARSAY.

8           **JUDGE HENDERSON:**  IT WOULD BE HEARSAY.

9           **MS. BARLOW:**  I'M SORRY?

10           **JUDGE HENDERSON:**  IT WOULD BE HEARSAY.

11           **MS. BARLOW:**  YES, YOUR HONOR.  HE, AS AN EXPERT

12  WITNESS, IS ENTITLED TO RELY ON HEARSAY.  IT'S JUST LAYING A

13  FOUNDATION FOR HIS OPINIONS.

14           **THE COURT:**  I WILL ALLOW IT AS FOUNDATIONAL.

15           **MS. BARLOW:**  THANK YOU, YOUR HONOR.

16  **BY MS. BARLOW:**

17  **Q.**  I'M SORRY.  COULD YOU FINISH YOUR ANSWER, CHIEF?

18  **A.**  SHERIFF GARY STANTON, THE SOLANO COUNTY SHERIFF, HAS TOLD ME

19  THAT THEY ROUTINELY ACCELERATE RELEASES OF INMATES.

20  **Q.**  HAVE YOU ALSO SEEN THE CSA DATA THAT SHOW YOU THAT THOSE

21  RELEASES ARE OCCURRING FOR BOTH PRETRIAL AND POST TRIAL OR POST

22  SENTENCE DETAINEES?

23  **A.**  YES.

24  **Q.**  DO YOU HAVE AN APPROXIMATION OF THE NUMBER OF PEOPLE

25  RELEASED EARLY FROM SOLANO COUNTY JAIL IN 2007?

1          **MR. SANGSTER:**  OBJECTION.  HEARSAY.

2  **BY MS. BARLOW:**

3  **Q.**  IF YOU KNOW.

4          **MR. SANGSTER:**  OBJECTION.  HEARSAY.

5          **JUDGE KARLTON:**  HOW WOULD HE KNOW?

6          HOW WOULD YOU KNOW?  DO YOU KNOW THE ANSWER TO THAT

7  QUESTION?

8          **THE WITNESS:**  I HAVE SEEN THE DATA.  I BELIEVE IT'S

9  OVER --

10          **MR. SANGSTER:**  YOUR HONOR, I COULDN'T HEAR YOUR

11  RULING, IF THERE WAS ONE.

12          **JUDGE HENDERSON:**  WELL, I ASSUME IT'S CONTINUING

13  FOUNDATIONAL.  IF IT ISN'T --

14          **MR. SANGSTER:**  I THINK IT'S GOING BEYOND FOUNDATIONAL

15  AS TO WHAT THE DETAILS ARE OF THE HEARSAY THAT'S BEEN PROVIDED

16  TO HIM.

17          **MS. BARLOW:**  HE HAS SAID HE HAS SEEN THE DATA

18  HIMSELF, YOUR HONOR.  IT'S NOT HEARSAY.

19          **JUDGE HENDERSON:**  OVERRULED -- WELL, THAT DOES NOT

20  MAKE IT NOT HEARSAY.

21          **JUDGE KARLTON:**  IT'S HEARSAY, BUT IT'S THE KIND OF

22  HEARSAY THAT AN EXPERT CAN RELY ON.

23          **MS. BARLOW:**  YES.  AND IT'S A PUBLIC RECORD AS WELL.

24          **JUDGE KARLTON:**  THAT'S TRUE.

25  **A.**  I BELIEVE WHEN I LOOKED AT THE DATA, IT WAS OVER 4,000 THAT

1  HAD THEIR SENTENCES -- THEY WERE RELEASED EARLY.

2  **BY MS. BARLOW:**

3  Q.  THANK YOU, CHIEF.

4          NOW, HOW MANY PAROLEES ARE CURRENTLY AT SOLANO

5  COUNTY, DO YOU KNOW?

6  A.  ABOUT 2000.

7  Q.  AND HAVE YOU SEEN THE CDCR STATISTICS FOR 2007 THAT TELL YOU

8  HOW MANY PAROLEES WERE RELEASED INTO SOLANO COUNTY IN 2007?

9  A.  I DID SEE THAT DATA.

10 Q.  AND DO YOU RECALL THE APPROXIMATE NUMBER?

11 A.  IT'S OVER A THOUSAND.  I'M NOT SURE OF THE EXACT NUMBER.

12 I'M SORRY.

13 Q.  NOW, IF YOU HAVE ABOUT 2,000 PAROLEES IN SOLANO COUNTY, CAN

14 YOU GIVE US AN ESTIMATE OF HOW MANY OF THEM LIVE OR WORK IN

15 VACAVILLE?

16 A.  WE PROBABLY HAVE ABOUT A THIRD IN VACAVILLE.

17 Q.  AND SO THAT WOULD BE ABOUT 666?

18 A.  YES.

19 Q.  NOW, IN 2007 YOUR DEPARTMENT MADE A NUMBER OF ARRESTS OF

20 PAROLEES FOR VIOLATIONS AND FOR NEW CRIMES, CORRECT?

21 A.  YES.

22 Q.  AND WHAT IS THAT NUMBER?

23 A.  IT WAS 205.

24 Q.  IN VACAVILLE?

25 A.  YES.

1  Q. SO OUT OF PERHAPS 666 PAROLEES IN VACAVILLE IN THAT YEAR,

2  YOU MADE ARRESTS OF 205 OF THEM?

3  A. YES.

4  Q. ABOUT 30 PERCENT?

5  A. YES.

6  Q. NOW, YOU DISCUSS IN YOUR DECLARATION, SO I WON'T ASK YOU TO

7  REPEAT IT, THE FACT THAT YOUR DEPARTMENT DOES COMPLIANCE CHECKS

8  ON A QUARTERLY BASIS FOR PAROLEES AND PROBATIONERS AND YOU ARE

9  ALSO LOOKING AT GANG MEMBERS.

10         CAN YOU TELL ME WHY YOU DO THAT?

11  A. WELL, IN MY EXPERIENCE AND THE EXPERIENCE OF MY OFFICERS, WE

12  HAVE SEEN WHERE THEY ARE OFTEN RESPONSIBLE FOR A LOT OF CRIME

13  THAT'S OCCURRING IN THE CITY, BOTH PROPERTY CRIME AND CRIMES

14  AGAINST PEOPLE.  AND THIS IS A -- AN EFFICIENT, TARGETED,

15  FOCUSED WAY OF KEEPING A LID ON CRIME.

16  Q. NOW, WHEN YOU TALK ABOUT TOTAL NUMBER OF ARRESTS, THE TOTAL

17  NUMBER OF ARRESTS WOULD INCLUDE EVERYTHING FROM A MINOR

18  FIRST-TIME PETTY THEFT TO A MURDER, CORRECT?

19  A. SURE.

20  Q. DO YOU HAVE OCCASION TO -- STRIKE THAT.

21         IS THE REASON THAT YOU TARGET PAROLEES, PROBATIONERS

22  AND GANG MEMBERS BECAUSE THEY COMMIT A HIGH VOLUME OF THE MORE

23  SERIOUS CRIMES?

24  A. YES.

25  Q. NOW, LET'S TALK ABOUT THE IMPACTS FROM A PRISONER RELEASE

1    ORDER.

2              THE PLAINTIFFS HAVE PROPOSED AN ORDER THAT WOULD

3    REDUCE THE PRISON POPULATION OVER THE NEXT TWO YEARS BY 52,000

4    PRISONERS AND PRESUMABLY KEEP IT CAPPED AT ABOUT TWO-THIRDS OF

5    ITS CURRENT POPULATION WITH NO ADDITIONAL RESOURCES OR

6    PROGRAMMING.

7              AND THE PLAINTIFFS -- OR SHOULD I SAY ONE OF THE

8    EXPERTS, AT LEAST, HAS OPINED THAT THAT WOULD HAVE NO

9    SIGNIFICANT IMPACT ON PUBLIC SAFETY.

10             DO YOU AGREE WITH THAT, CHIEF WORD?

11   **A.**   ABSOLUTELY NOT.

12   **Q.**   WHY NOT?

13   **A.**   I CAN'T SEE HOW THAT'S GOOD PUBLIC POLICY OR GOOD FOR PUBLIC

14   SAFETY TO RELEASE THOUSANDS OF INMATES, ESPECIALLY NOW WHEN

15   POLICE DEPARTMENTS ACROSS THE STATE ARE LOSING OFFICERS.

16             I HAVE LOST SOME.  I JUST SPOKE TO A SACRAMENTO

17   CAPTAIN WHO IS LOSING HUNDREDS.

18             THIS IS A HORRIBLE TIME TO DO THAT, TO INCREASE OUR

19   PAROLEE NUMBERS IN OUR COMMUNITIES WITH FEWER POLICE OFFICERS.

20   THERE IS AN EXISTING LACK OF SERVICES, AND WITH NO PROGRAMMING I

21   THINK THAT'S A RECIPE FOR DISASTER.

22   **Q.**   IN YOUR DECLARATION YOU OFFERED AN OPINION THAT A 25 PERCENT

23   REDUCTION IN THE PRISON POPULATION STATE-WIDE WOULD RESULT IN

24   100 ADDITIONAL PAROLEES IN VACAVILLE.

25             WITH THE INCREASE TO 30 PERCENT, THAT WOULD BE ABOUT

1  168 PAROLEES ADDITIONAL IN VACAVILLE?

2  **A.** ROUGHLY, YES.

3  **Q.** NOW, IN YOUR OPINION AND BASED UPON YOUR KNOWLEDGE OF THE

4  COMMUNITY -- JAIL RESOURCES AND COMMUNITY RESOURCES, CAN

5  VACAVILLE ABSORB THAT LEVEL OF RELEASEES, WHETHER THEY ARE

6  DIVERTED OR RELEASED OR TAKEN OFF PAROLE?

7  **A.** I MEAN, I SUSPECT MANY WOULD BE HOMELESS. WE DON'T HAVE THE

8  SERVICES. I IMAGINE MANY ARE NOT EMPLOYABLE OR NOT JOB READY.

9           IN MY EXPERIENCE, MANY USE DRUGS IN PRISON.

10 SMUGGLING IS SOMETHING THAT OCCURS IN THE PRISONS AND SO YOU

11 WOULD HAVE SUBSTANCE ABUSE THAT WOULD CONTINUE UPON THEIR

12 RELEASE. ALCOHOLISM. I MEAN, THE WHOLE LIST OF ISSUES WOULD

13 CONTINUE.

14           AND I THINK THAT RECIDIVISM NOW, IF IT'S 70 PERCENT

15 OVER THREE YEARS, THAT WOULD CERTAINLY CONTINUE. I THINK YOU

16 WOULD STILL HAVE THIS LIFE SENTENCE THAT THEY WOULD SERVE,

17 QUOTE, ON THE INSTALLMENT PLAN. IT WOULD SIMPLY CONTINUE.

18 **Q.** NOW, YOU SAID THAT MANY OF THEM WOULDN'T BE JOB READY. IS

19 THERE A LOT OF JOBS AVAILABLE FOR PAROLEES AND EX-FELONS IN

20 VACAVILLE, TO YOUR KNOWLEDGE?

21 **A.** NO. I WISH THERE WERE MORE, BUT THERE AREN'T ENOUGH, NO.

22 **Q.** YOU WOULD LIKE TO SEE THEM GET EMPLOYED AND GET BACK INTO

23 THEIR COMMUNITIES, CORRECT?

24 **A.** SURE.

25 **Q.** BUT THAT'S NOT HAPPENING?

1   **A.**  NO, IT'S NOT.

2   **Q.**  AND WHAT IS THE -- YOU SAID SOME OF THEM ARE COMING OUT OF

3   PRISON USING DRUGS OR USING ALCOHOL.  HOW DOES THAT IMPACT

4   THEIR -- THEIR RISK WHEN THEY COME OUT?

5   **A.**  IT TENDS TO INCREASE THEIR RISK AND LIKELIHOOD OF

6   REOFFENDING.

7   **Q.**  NOW, WHEN SOMEONE HAS GONE TO STATE PRISON, IN YOUR

8   EXPERIENCE FOR BOTH OAKLAND AND VACAVILLE, ABOUT HOW MANY TIMES

9   HAVE THEY BEEN CONVICTED OF A SERIOUS CRIME BEFORE THEY END UP

10  IN STATE PRISON?

11           **MR. SANGSTER:**  LACKS FOUNDATION.  PERSONAL KNOWLEDGE.

12           **MS. BARLOW:**  BASED ON HIS EXPERIENCE.  IF HE CAN'T

13  ANSWER IT, HE WILL TELL YOU THAT.

14           **JUDGE HENDERSON:**  I WILL ALLOW IT.

15  **A.**  IN MY EXPERIENCE PEOPLE THAT WIND UP IN STATE PRISON WORK

16  HARD TO GET THERE.  THEY COMMIT MANY OFFENSES.  THEY SPEND MANY

17  TIMES IN -- OR TIME, I SHOULD SAY, IN THE COUNTY JAIL BEFORE

18  THEY WIND UP IN STATE PRISON.

19  **BY MS. BARLOW:**

20  **Q.**  NOW, THERE HAS BEEN SOME TESTIMONY THAT MANY OF THOSE FOLKS

21  IN STATE PRISON ARE LOW RISK, NON-VIOLENT MERE DRUG OFFENDERS.

22           DOES THAT CHANGE YOUR OPINIONS ABOUT THERE BEING

23  NEGATIVE IMPACTS TO PUBLIC SAFETY IF YOU RELEASE THEM?

24  **A.**  NO.

25  **Q.**  WHY?

1  **A.**  MANY -- IN OUR STATE PRISONS THERE IS A DRUG CONNECTION TO

2  MANY.  I HAVE SEEN THAT IN VACAVILLE AND IN OAKLAND.

3         AND TO SAY THAT THEY ARE LOWER RISK, THAT MIGHT

4  REFLECT THEIR COMMITMENT OFFENSE, BUT NOT THE OFFENSES THAT THEY

5  HAVE COMMITTED AND MAYBE THEY WEREN'T ARRESTED FOR THOSE.

6         I HAVE SEEN, QUOTE, LOW RISK OFFENDERS IN OAKLAND

7  THAT UPON THEIR RELEASE, THEY IMMEDIATELY ENGAGE IN THE DRUG

8  MARKET.  AND IN ONE STUDY WE DID IN OAKLAND WE FOUND THAT

9  50 PERCENT OF OUR HOMICIDE VICTIMS OR SUSPECTS WERE ON PAROLE OR

10 PROBATION.

11        SO THEY MAY NOT BE VIOLENT OFFENDERS, BUT I CAN TELL

12 YOU, MANY ARE VICTIMIZED.  MANY ARE VICTIMS OF VIOLENT CRIME

13 BECAUSE THEY ARE ENGAGING IN THE DRUG TRADE.

14 **Q.**  SO DOES THE FACT THAT THERE ARE ILLICIT DRUGS INVOLVED RAISE

15 THE RISK OF VIOLENCE IN YOUR MIND?

16 **A.**  SURE.

17 **Q.**  OVER AND ABOVE JUST WHATEVER THEIR OFFENSE COMMITMENT WAS?

18 **A.**  YES.

19 **Q.**  OKAY.  SO WOULD YOU CONSIDER -- OR DO YOU CONSIDER DRUG USE

20 A VICTIMLESS CRIME, CHIEF WORD?

21 **A.**  NO.

22 **Q.**  WHY NOT?

23 **A.**  BECAUSE THERE ARE MANY, MANY PEOPLE IMPACTED BY DRUG USE,

24 NOT JUST THE USER, BUT FAMILIES, SPOUSES, NEIGHBORS; THAT MANY

25 OF THESE DRUG USERS STEAL TO SUPPORT THEIR CRIMES.

1          IT HAS THIS HORRIBLE EFFECT THAT EXTENDS BEYOND THE

2    DRUG USER INTO NEIGHBORHOODS WHERE PEOPLE ARE FEARFUL.  THEY

3    HAVE SEEN THE DRUG USERS.

4          I HAVE SEEN THAT IN OAKLAND WHERE, UNFORTUNATELY,

5    THEY LEARN TO LIVE AROUND DRUG USERS.  THERE IS THIS CODE THAT

6    EXISTS OFTEN WHERE THEY DON'T REPORT, BUT DRUG USERS ARE ALLOWED

7    TO OPERATE IN CERTAIN NEIGHBORHOODS.

8          IT'S NOT GOOD FOR A COMMUNITY, SUCH AS OAKLAND, WHEN

9    YOU NEED WITNESSES TO COME FORWARD AND TO REPORT CRIME.  IT

10   TENDS TO GET WORSE AND THEY LOSE CONFIDENCE IN THE POLICE AND

11   THE POLICE OFFICERS OFTEN LOSE CONFIDENCE IN THEIR ABILITY TO

12   IMPACT CRIME.

13   **Q.**  SO DOES AN INCREASE IN CRIME IN GENERAL, BUT VIOLENT CRIME

14   IN PARTICULAR, HAVE AN IMPACT, YOU SAID, ABOUT A FEAR OR LACK OF

15   CONFIDENCE IN THE COMMUNITY?

16   **A.**  YEAH.  I HAVE SEEN THAT IMPACT, WHERE THERE IS VIOLENT

17   CRIME.  THERE IS CHRONIC CRIME, AND THE POLICE ARE STRUGGLING TO

18   ABATE THAT CRIME.

19          THE COMMUNITY WILL LOSE CONFIDENCE IN POLICE OFFICERS

20   AND THE POLICE DEPARTMENT'S ABILITY TO STEM THAT TIDE, IF YOU

21   WILL.  AND OFFICERS DO, TOO, ALSO LOSE CONFIDENCE IN THEIR

22   ABILITY TO HAVE AN IMPACT.

23   **Q.**  AND IS THE -- DOES THAT FEAR TRANSLATE INTO AN INCREASE IN

24   REPORTED CRIMES, A DECREASE IN REPORTED CRIMES?  DOES IT CHANGE

25   PEOPLE'S BEHAVIOR ABOUT WHETHER OR NOT THEY REPORT CRIMES?

1  **A.**  SURE.  THERE IS A DECREASE WHEN THERE IS FEAR.  WHEN THERE

2  IS A DECREASE IN REPORTING THEN, OF COURSE, CRIME IS LIKELY TO

3  CONTINUE.

4  **Q.**  SO YOU MAY HAVE AN INCREASE IN CRIME, BUT THE REPORTED CRIME

5  GOES DOWN BECAUSE PEOPLE ARE AFRAID?

6  **A.**  OF COURSE.

7  **Q.**  NOW, I WOULD JUST LIKE TO TALK TO YOU BRIEFLY ABOUT WHETHER

8  THE INCREASE IN CRIME, AND PARTICULARLY VIOLENT CRIME, HAS AN

9  IMPACT BEYOND THE ECONOMICS AND THE FEAR THAT YOU TALKED ABOUT.

10         DOES IT HAVE AN IMPACT ON THE BUSINESSES AND OTHERS

11  IN THE COMMUNITY?

12  **A.**  SURE.

13         **MR. SANGSTER:**  OBJECTION.  LACKS FOUNDATION, PERSONAL

14  KNOWLEDGE.  LACKS FOUNDATION, EXPERTISE.  IRRELEVANT.

15         **JUDGE HENDERSON:**  OVERRULED.

16         **MS. BARLOW:**  THANK YOU.

17  **A.**  IT CERTAINLY HAS AN IMPACT ON THE BUSINESS COMMUNITY.  I

18  HAVE TALKED TO BUSINESS OWNERS.  I HAD ONE TELL ME -- HE OWNED A

19  DONUT SHOP AND THEY WOULD OVERRUN HIS DONUT SHOP IN EAST

20  OAKLAND.  SO HE ASKED IF WE WOULD TAKE IT OVER AS A POLICE

21  RESOURCE CENTER, AND WE DID.

22  **BY MS. BARLOW:**

23  **Q.**  NOW, JUST BRIEFLY, I UNDERSTAND THAT THE CITY OF VALLEJO IS

24  ALSO IN SOLANO COUNTY?

25  **A.**  YES.

1  Q.  AND VALLEJO HAS HAD SOME RECENT FINANCIAL TROUBLES, HAS IT

2  NOT?

3  A.  EXTREME, YES.

4  Q.  AND HOW HAS THAT IMPACTED THE POLICE FORCE IN VALLEJO, TO

5  YOUR KNOWLEDGE?

6          MR. SANGSTER:  LACKS FOUNDATION.  CALLS FOR HEARSAY.

7          JUDGE KARLTON:  AT THIS POINT EVERYTHING THAT YOU

8  WOULD BE SAYING WOULD BE ANECDOTAL, WHAT PEOPLE HAD TOLD YOU AND

9  SO FORTH.

10         MS. BARLOW:  WITH RESPECT, YOUR HONOR, AGAIN, IT'S A

11 PUBLIC RECORD, THAT THEY HAVE LAID OFF 30 PERCENT OF THEIR

12 POLICE FORCE.

13         JUDGE KARLTON:  THAT'S TRUE, AND YOU CAN ASK US TO

14 TAKE JUDICIAL NOTICE OF THAT.  YOU ARE ASKING THIS WITNESS TO DO

15 SOMETHING ELSE.

16         MS. BARLOW:  THIS IS JUST FOUNDATIONAL, YOUR HONOR.

17 I WILL ASK HIM TO ASSUME IT, HOW IS THAT, AND WE WILL INTRODUCE

18 THAT EVIDENCE SEPARATELY.

19 BY MS. BARLOW:

20 Q.  CHIEF WORD, IF THE FACTS SHOW AND WE INTRODUCE DOCUMENTS TO

21 SHOW THAT VALLEJO HAD LAID OFF 30 PERCENT OF ITS POLICE FORCE

22 DUE ITS BUDGET CRISIS, HOW DOES THAT AFFECT THE ENTIRE CRIME

23 PICTURE IN YOUR COUNTY, IN THE WHOLE COUNTY?

24 A.  I THINK THAT 30 PERCENT NUMBER, BY THE WAY, IS HIGHER NOW.

25 I THINK THEY HAVE FEWER POLICE OFFICERS THAN WE DO AND THEY HAVE

1  THREE TIMES THE CRIME.

2        SO IT'S NOT GOOD FOR THE COUNTY IF RESOURCES -- FOR

3  EXAMPLE, THE COUNTY SHERIFF EXPENDS MORE OF HIS TIME NOW IN

4  VALLEJO THAN HE WOULD OTHERWISE IN OTHER CITIES IN THE COUNTY

5  ASSISTING OTHER AGENCIES.  SO I THINK IT HAS A NEGATIVE IMPACT

6  ACROSS THE COUNTY BECAUSE THE SHERIFF'S RESOURCES ARE NOW MORE

7  SO FOCUSED IN VALLEJO.

8  Q.  NOW, IF YOU HAVE ADDITIONAL CRIMES COMMITTED BECAUSE YOU

9  HAVE ADDITIONAL OFFENDERS IN THE COMMUNITY THAT AREN'T GETTING

10 APPROPRIATE TREATMENT AND SO ON, ARE THOSE ALL GOING TO RESULT

11 IN ARRESTS?

12 A.  NO.

13 Q.  WHY NOT?

14 A.  MUCH -- THERE IS MANY CRIMES COMMITTED WHERE AN OFFENDER IS

15 NOT CAPTURED.  MAYBE A REPORT IS NOT MADE.  MAYBE A CRIME IS

16 COMMITTED, A REPORT IS MADE, BUT THE OFFENDER SIMPLY GETS AWAY.

17 Q.  AND IF YOU INCREASE THE NUMBER OF CRIMINALS IN THE COMMUNITY

18 AND INCREASE THE NUMBER OF CRIMES, BUT YOU DON'T INCREASE THE

19 NUMBER OF OFFICERS, DOES THAT INCREASE THE RISK THAT YOU WON'T

20 CATCH THOSE CRIMINALS?

21 A.  I THINK SO, YES.

22 Q.  WOULD YOU MEASURE THE IMPACT TO SOCIETY OF A PRISONER

23 RELEASE ORDER BY THE NUMBER OF ARRESTS THAT RESULT OR BY THE

24 NUMBER OF CRIMES THAT ARE COMMITTED?

25 A.  A BETTER MEASURE IS -- ONE MEASURE IS CRIME, BETTER THAN

1   ARREST.

2            POLICE DEPARTMENTS IN CALIFORNIA, THEIR NUMBERS ARE

3   DROPPING NOW.  SO YOU PROBABLY HAVE FEWER ARRESTS TODAY AND WITH

4   MORE -- WITH THIS RELEASE, POTENTIAL RELEASE, I THINK YOU WILL

5   HAVE MORE CRIME AND EVEN FEWER ARRESTS.

6   Q.  THANK YOU VERY MUCH, CHIEF.  I HAVE NO FURTHER QUESTIONS --

7   OH, I TAKE THAT BACK.  I APOLOGIZE.  I MISSED ONE PAGE.

8            **MS. BARLOW:**  HOW AM I DOING ON TIME?

9            **THE CLERK:**  TEN MORE MINUTES.

10            **MS. BARLOW:**  OKAY.  TEN MORE MINUTES.

11   **BY MS. BARLOW:**

12   Q.  JUST QUICKLY, I WANT TO SUMMARIZE FOR YOU THE PROPOSAL AND

13   ASK IF YOU YOU AGREE WITH THIS.

14            "CALIFORNIA CAN REDUCE PRISON ADMISSIONS AND

15            REDUCE LENGTH OF STAY IN A SAFE AND PRACTICAL

16            MANNER IN FOUR WAYS.

17            "ONE, PROVIDE EVIDENCE-BASED PROGRAMMING AND

18            SUPERVISION TO TECHNICAL PAROLE VIOLATORS

19            INSTEAD OF RETURNING THEM TO PRISON.

20            "TWO, DIVERT LOW LEVEL OFFENDERS TO

21            PROBATION AND PAROLE INSTEAD OF PRISON.

22            "THREE, PROVIDE MORE AVENUES FOR PRISONERS

23            TO EARN GOOD TIME CREDITS FOR RELEASE TOWARDS

24            GOOD BEHAVIOR.

25            "FOUR, PROVIDE MORE AVENUES FOR EARLY

1    DISCHARGE FROM PAROLE."

2         THAT'S THE MECHANISM BY WHICH THE PLAINTIFFS PROPOSE

3    TO REDUCE THE PRISON POPULATION BY 52,000 PEOPLE.

4         DO YOU AGREE THAT THAT CAN BE DONE SUCCESSFULLY

5    WITHOUT PROGRAMMING?

6         **MR. SANGSTER:**  OBJECTION.  LACKS FOUNDATION,

7    EXPERTISE.  WITNESS HAS NOT BEEN QUALIFIED TO TESTIFY ON PRISON

8    MANAGEMENT ISSUES.

9         **MS. BARLOW:**  IF I MAY, YOUR HONOR, IN HIS DECLARATION

10   HE MANAGED THE OAKLAND JAIL FOR A SIGNIFICANT PERIOD OF TIME.  I

11   WOULD BE HAPPY TO GO BACK OVER THAT, IF YOU WOULD LIKE.

12        **JUDGE HENDERSON:**  THIS QUESTION DOESN'T --

13        **MR. SANGSTER:**  THIS HAS TO DO WITH THE STATE PRISON

14   SYSTEM.

15        **JUDGE HENDERSON:**  THIS IS A STATE PRISON SYSTEM.

16        **MS. BARLOW:**  NO, SIR.  IT HAS TO DO WITH THE

17   PROGRAMMING IN THE COMMUNITIES.

18        **JUDGE KARLTON:**  WELL, IT HAS TO DO WITH RELEASING

19   PEOPLE FROM PRISON, MA'AM.

20        **MS. BARLOW:**  YES, YOUR HONOR.  AND THE QUESTION I

21   ASKED HIM --

22        **JUDGE KARLTON:**  THERE HAS BEEN A RULING.  WE ARE NOT

23   ARGUING.  THERE HAS BEEN A RULING.

24        **MS. BARLOW:**  I HAVE NOTHING FURTHER.

25        **THE COURT:**  DO THE STATE DEFENDANTS HAVE ANYTHING OF

 1   THIS WITNESS?

 2           **MR. LEWIS:**  NOTHING, YOUR HONOR.

 3           **THE COURT:**  OKAY.  CROSS-EXAMINATION.

 4           **MR. SANGSTER:**  THANK YOU, YOUR HONOR.  ED SANGSTER

 5   FOR THE PLAINTIFFS.

 6                   <u>**CROSS EXAMINATION**</u>

 7   **BY MR. SANGSTER:**

 8   **Q.**  CHIEF WORD, I WANT TO GO BACK TO SOME OF YOUR TESTIMONY AND

 9   TRY AND PUT IN PERSPECTIVE THE IMPACT THAT PAROLEES ARE HAVING

10   ON YOUR POLICE FORCE RIGHT NOW.

11           IS IT CORRECT THAT IN 2007 YOUR DEPARTMENT MADE 3700

12   ARRESTS?

13   **A.**  THAT'S ABOUT RIGHT, YES, SIR.

14   **Q.**  IS IT CORRECT THAT ONLY 205 OF THOSE ARRESTS WERE ARRESTS OF

15   PAROLEES?

16   **A.**  THAT'S CORRECT.

17   **Q.**  SO ABOUT FIVE TO SIX PERCENT OF ALL THE ARRESTS MADE BY YOUR

18   DEPARTMENT WERE ARRESTS OF PAROLEES?

19   **A.**  I BELIEVE THAT'S CORRECT, YES, SIR.

20   **Q.**  WERE SOME OF THOSE ARRESTS OF PAROLEES ARRESTS FOR TECHNICAL

21   VIOLATIONS?

22   **A.**  YES.

23   **Q.**  WHAT PERCENTAGE OF THEM WERE FOR TECHNICAL VIOLATIONS, CHIEF

24   WORD?

25   **A.**  I DON'T HAVE THAT NUMBER.

1   Q.  WELL, WOULD YOU AGREE SOMEWHERE AROUND 50 PERCENT?

2   A.  IT'S APPROXIMATELY CORRECT, I BELIEVE, YES.

3   Q.  ALL RIGHT.  ARE YOU ABLE TO SAY HOW MANY OF THE 205 ARRESTS

4   WERE ARRESTS FOR NEW CRIMES?

5   A.  NO.

6   Q.  OKAY.  YOU TALKED ABOUT DOING COMPLIANCE CHECKS IN

7   VACAVILLE?

8   A.  YES.

9   Q.  I WANT TO TURN YOUR ATTENTION TO THE COMPLIANCE CHECKS.

10          YOUR COMPLIANCE CHECKS INCLUDE, BUT ARE NOT

11   EXCLUSIVELY FOCUSED ON PAROLEES, IS THAT CORRECT?

12   A.  YES.

13   Q.  ABOUT 25 PERCENT OF THE WORK ASSOCIATED IN THESE COMPLIANCE

14   CHECKS IS DIRECTED TOWARDS PAROLEES?

15   A.  WELL, WE TARGET PAROLEES, PROBATIONERS AND VALIDATED GANG

16   MEMBERS, SO MAYBE A THIRD.

17   Q.  SO MAYBE A THIRD -- A THIRD OF THE PEOPLE TARGETED IN THE

18   COMPLIANCE CHECKS ARE PAROLEES?

19   A.  YES.

20   Q.  THESE COMPLIANCE CHECKS TAKE ABOUT ONE TO TWO DAYS OF TIME,

21   IS THAT CORRECT?

22   A.  WHEN WE DO AN ORGANIZED, AS WE SAY, SWEEP OR COMPLIANCE

23   CHECK WITH AGENCIES FROM THROUGHOUT THE COUNTY AND FEDERAL

24   AGENCIES, WE USUALLY SPEND A DAY OR TWO, BUT THERE'S A COUPLE OF

25   WEEKS OF PLANNING AND PREPARATION BEFORE THAT.

1   **Q.**  LET'S JUST BREAK IT DOWN A LITTLE BIT.

2   **A.**  OKAY.

3   **Q.**  THE ACTUAL TIME SPENT OUT DOING THE COMPLIANCE CHECKS IS

4   ABOUT ONE TO TWO DAYS, IS THAT ACCURATE?

5   **A.**  WELL, LET ME BE CLEAR.  WHEN WE DO AN ORGANIZED SWEEP, THERE

6   ARE DAY-TO-DAY CHECKS, STOPS, DETENTIONS, ARRESTS OF PAROLEES

7   MADE BY OFFICERS EVERY DAY IN VACAVILLE.

8   **Q.**  YEAH, BUT I'M TALKING ABOUT THE COMPLIANCE CHECKS YOU

9   REFERRED TO.

10  **A.**  THESE SWEEPS, YEAH.  IT TAKES ONE OR TWO DAYS TO ACTUALLY GO

11  OUT AND DO THE CHECKS, BUT THERE'S PRIOR WORK DONE BEFORE YOU

12  CAN GO OUT AND DO THAT.

13  **Q.**  AND WE ARE GOING DO GET TO THAT, CHIEF WORD.  I JUST WANT TO

14  TAKE THINGS ONE STEP AT A TIME.

15          SO IN WORKING UP TO THIS, THE PREPARATION, HOW MANY

16  PEOPLE ARE INVOLVED IN PREPARATION FOR THE COMPLIANCE CHECKS?

17  **A.**  ONE OR TWO OFFICERS.

18  **Q.**  ALL RIGHT.  HOW MUCH TIME DO THEY SPEND GETTING READY FOR

19  THESE QUARTERLY COMPLIANCE CHECKS?

20  **A.**  THEY SPEND HOURS OVER A TWO-WEEK PERIOD GATHERING DATA.

21  **Q.**  SO YOU HAVE GOT ONE TO TWO OFFICERS SPENDING HOURS GETTING

22  READY FOR THESE COMPLIANCE CHECKS?

23  **A.**  YES.

24  **Q.**  WHAT PERCENTAGE OF THE 205 ARRESTS THAT YOUR DEPARTMENT MADE

25  IN 2007 WERE MADE DURING THE COMPLIANCE CHECKS?

1  **A.**  THAT -- I DIDN'T BREAK THAT DATA OUT, BUT I CAN GET THAT

2  RATHER EASILY.

3  **Q.**  LET'S GO WITH YOUR BEST -- DO YOU HAVE SOME SENSE OF WHAT

4  PERCENTAGE IT WAS?

5  **A.**  I BELIEVE WE MADE LAST YEAR 200 ARRESTS DURING OUR SWEEPS,

6  COMPLIANCE CHECKS.  BUT THAT WOULD INCLUDE PAROLEES AND

7  PROBATIONERS, GANG MEMBERS AND OTHERS DURING THE COURSE OF THESE

8  COMPLIANCE CHECKS.

9  **Q.**  MY QUESTION IS:  DO YOU HAVE SOME SENSE OF WHAT PERCENT OF

10  YOUR 205 ANNUAL ARRESTS WERE MADE DURING THESE QUARTERLY

11  COMPLIANCE CHECKS?

12  **A.**  NO, I'D HAVE TO RESEARCH THAT.

13  **Q.**  DO YOU THINK IT'S AS HIGH AS A THIRD OF ALL THE ARRESTS YOU

14  MADE OF PAROLEES WERE MADE OCCURRING THE COMPLIANCE CHECKS?

15          **MS. BARLOW:**  CALLS FOR SPECULATION.

16          **JUDGE HENDERSON:**  DO YOU HAVE TO SPECULATE TO ANSWER

17  THAT QUESTION?  WE DON'T WANT YOU TO SPECULATE.

18          **THE WITNESS:**  YEAH, I DON'T HAVE AN EXACT ANSWER.

19  I'M SORRY.

20          **JUDGE KARLTON:**  WELL, YOU WOULDN'T DO THE COMPLIANCE

21  CHECKS IF YOU DIDN'T THINK THEY WERE PRODUCTIVE.

22          **THE WITNESS:**  THAT'S RIGHT, SIR.

23          **JUDGE KARLTON:**  SO IT'S NOT UNREASONABLE FOR THE

24  COURT TO BELIEVE THAT A SIGNIFICANT -- STRIKE THAT.

25          IS IT UNREASONABLE FOR THE COURT TO INFER THAT AT

1   LEAST SOME SIGNIFICANT PORTION OF THE PAROLE OR ARREST WERE THE

2   RESULT OF THESE COMPLIANCE CHECKS?

3           **THE WITNESS:**  THAT'S REASONABLE TO INFER.

4   **BY MR. SANGSTER:**

5   **Q.**  SO A SIGNIFICANT PERCENTAGE OF THE 205 PAROLE ARRESTS MADE

6   BY YOUR DEPARTMENT WERE MADE OVER THE COURSE OF FOUR TO EIGHT

7   DAYS?

8   **A.**  NO.  I WOULDN'T -- I WOULDN'T SAY THAT, NO, SIR.

9   **Q.**  YOUR DEPARTMENT IS NOT THE ONLY DEPARTMENT OR THE ONLY FORCE

10  THAT'S INVOLVED IN THESE COMPLIANCE CHECKS, CORRECT?  YOU HAVE

11  PAROLE OFFICERS INVOLVED?

12  **A.**  A FEW, TYPICALLY, YES.

13  **Q.**  DID THE PAROLE OFFICERS MAKE ANY OF THE ARRESTS THAT YOU

14  HAVE COUNTED IN THE 205 ARRESTS?

15  **A.**  THEY PARTICIPATE IN THE ARRESTS.

16  **Q.**  WHAT PERCENTAGE OF THE ARRESTS WERE MADE BY PAROLE OFFICERS

17  PARTICIPATING IN THESE 205 ARRESTS?

18  **A.**  NOT MANY.  IT'S JUST A FEW OFFICERS, FEW PROBATION OFFICERS,

19  AND WE MAY HAVE AS MANY AS 70, 80 TOTAL OFFICERS PARTICIPATING.

20  **Q.**  OKAY.  NOW, I WOULD LIKE TO TURN YOUR ATTENTION TO THE

21  OPINIONS YOU GAVE ABOUT A HYPOTHETICAL RELEASE ORDER.  YOU SAID

22  YOU CONCLUDED THAT THERE WERE ABOUT -- THERE WOULD BE ABOUT 100

23  ADDITIONAL PAROLEES IN VACAVILLE.

24          OKAY.  DO YOU KNOW WHAT I'M TALKING ABOUT NOW?

25  **A.**  I THOUGHT IT WAS HIGHER.  MAYBE 168, I THOUGHT, WAS THE

1   FIGURE IF THE RELEASE WERE 52,000.

2   Q.  YOU THOUGHT IT WOULD BE 168 ADDITIONAL PAROLEES?

3   A.  YES.

4           MR. SANGSTER:  YOUR HONOR, MAY I APPROACH?

5           JUDGE HENDERSON:  YOU MAY.

6   BY MR. SANGSTER:

7   Q.  CHIEF WORD, I WANT TO INVITE YOUR ATTENTION TO YOUR

8   DECLARATION AT PARAGRAPH 21.

9                   (WHEREUPON, DOCUMENT WAS TENDERED

10                     TO THE WITNESS.)

11  Q.  DO YOU HAVE THAT IN FRONT OF YOU, SIR?

12  A.  I DO, YES, SIR.

13  Q.  SO IS THE CORRECT NUMBER 100?

14  A.  IT ASSUMED THAT 25 PERCENT WOULD BE RELEASED EARLY, AND I

15  THOUGHT MISS BARLOW'S QUESTION ASSUMED A HIGHER RELEASE ORDER, A

16  HIGHER PERCENTAGE.

17  Q.  WELL, THE DECLARATION THAT YOU HAVE GAVE TO THE COURT ABOUT

18  THE IMPACT ON YOUR DEPARTMENT, IN THAT DECLARATION YOU ESTIMATED

19  THAT IT WOULD BE 100 -- PERHAPS 100 ADDITIONAL PAROLEES IN

20  VACAVILLE, CORRECT?

21          MS. BARLOW:  MISSTATES THE TESTIMONY, YOUR HONOR.

22  THAT'S IF 25 PERCENT.

23          JUDGE HENDERSON:  IT CORRECTLY STATES PARAGRAPH 21.

24          MS. BARLOW:  IT'S QUALIFIED, THOUGH, IS THE POINT.

25          JUDGE HENDERSON:  I UNDERSTAND THAT.

1  **A.**  THAT'S WHAT I TESTIFIED TO, ASSUMING 25 PERCENT WERE

2  RELEASED EARLY.

3  **BY MR. SANGSTER:**

4  **Q.**  OKAY.  SO IF I SPREAD THOSE 100 ADDITIONAL ARRESTS OVER TWO

5  YEARS, WE ARE TALKING ABOUT 50 PAROLE ARRESTS A YEAR?  EITHER 50

6  OR 80, DEPENDING ON WHICH NUMBER YOU ARE PICKING?

7  **A.**  WELL, YOU'RE SPEAKING OF ARRESTS, AND I -- THIS SPEAKS TO

8  PEOPLE RELEASED AND NOT ARRESTS NECESSARILY.

9  **Q.**  OKAY.  I MISSPOKE.  SO YOU ARE TALKING ABOUT AN ADDITIONAL

10  50 PAROLEES A YEAR TO 80 PAROLEES A YEAR, CORRECT?

11  **A.**  YES.  ASSUMING THIS IS CORRECT, 25 PERCENT ARE RELEASED

12  EARLY.

13  **Q.**  THANK YOU.  AND YOU GOT 52 OFFICERS ASSIGNED TO PATROL,

14  CORRECT?

15  **A.**  I DID.  NOT ANY LONGER.

16  **Q.**  HOW MANY DO YOU HAVE NOW?

17  **A.**  FORTY-EIGHT.

18  **Q.**  SO --

19  **A.**  AND MY STAFFING IS FROZEN.

20  **Q.**  SO IF YOU ASSUME A 25 PERCENT REDUCTION IN THE PRISON

21  POPULATION AND YOU ASSUME THAT THAT REDUCTION IS SPREAD OUT OVER

22  TWO YEARS, THOSE 48 OFFICERS WOULD HAVE TO DEAL WITH THE ISSUES

23  CREATED BY ABOUT FOUR ADDITIONAL PAROLEES A MONTH, IS THAT

24  RIGHT?

25  **A.**  YOU ASSUME -- NO, IT'S NOT CORRECT.

1  Q.  IN WHAT RESPECT IS IT INCORRECT, SIR?

2  A.  THEY DO A LOT MORE AND I'M HAVING -- I HAVE FEWER PEOPLE

3  DOING MORE WORK, SIR.

4  Q.  I'M NOT TALKING ABOUT ADJUSTING YOUR WORK FORCE DOWN.  I'M

5  TRYING TO GET SOME SENSE OF HOW MANY OFFICERS YOU HAVE TO DEAL

6  WITH THE NUMBER OF PAROLEES IN YOUR TOWN?

7  A.  I HAVE A DECLINING NUMBER.

8  Q.  IT'S CURRENTLY AT 48?

9  A.  AND DECLINING, YES, SIR.

10  Q.  SO --

11          **JUDGE HENDERSON:**  I THOUGHT YOU SAID IT'S FROZEN.

12          **THE WITNESS:**  AS PEOPLE LEAVE, YOUR HONOR, I CANNOT

13  BACKFILL.

14  **BY MR. SANGSTER:**

15  Q.  WELL, I DON'T KNOW WHAT IT'S GOING TO DECLINE TO, SO LET'S

16  JUST STICK WITH THE 48.

17          SO THOSE 48 OFFICERS WOULD HAVE TO DEAL WITH

18  APPROXIMATELY FOUR ADDITIONAL PAROLEES PER MONTH?

19  A.  I DON'T UNDERSTAND FOUR PER MONTH.  I'M SORRY.

20  Q.  I'M TRYING TO BREAK DOWN YOUR -- YOUR CONCLUSION ABOUT THE

21  IMPACT ON YOUR POLICE FORCE.

22          **JUDGE HENDERSON:**  I THINK THE MATH -- 48 ARE

23  RELEASED.  YOU DIVIDE 12 MONTHS INTO THAT, THAT'S FOUR A MONTH.

24  IS THAT WHAT YOU DON'T UNDERSTAND?

25          **THE WITNESS:**  OKAY.

1    **JUDGE KARLTON:** I THINK THAT'S -- THAT'S WHAT YOU ARE

2  SAYING?

3    **MR. SANGSTER:** YES.

4    **MS. BARLOW:** WITH RESPECT, YOUR HONOR, THE 48 DOESN'T

5  MATCH ANY NUMBER THAT IS IN EVIDENCE.

6    **JUDGE HENDERSON:** WELL, WE ARE ALONG THAT ROAD, SO

7  LET'S CONTINUE.

8  **BY MR. SANGSTER:**

9  **Q.** SO IS THAT ACCURATE, SIR, THAT YOUR --

10    **JUDGE KARLTON:** WELL, THE MATH IS ACCURATE.

11    **MR. SANGSTER:** WELL, I'M TRYING TO -- THE MATH -- THE

12  MATH IS WHAT IT IS, BUT I'M TRYING TO SEE IF THE WITNESS IS

13  GOING TO TELL ME THAT THE MATH SOMEHOW DOES NOT ACCURATELY

14  REFLECT THE IMPACT ON HIS FORCE.

15  **BY MR. SANGSTER:**

16  **Q.** DOES THE MATH ACCURATELY REFLECT THE IMPACT ON YOUR FORCE?

17  **A.** IT DOES NOT.

18  **Q.** IN WHAT RESPECT DOES IT NOT?

19  **A.** YOU ARE ASSUMING A PAROLEE -- I DON'T MATCH OFFICERS TO

20  PAROLEES IN SOME RATIO, SOME NEAT RATIO. I WISH IT WERE THAT

21  NEATLY DONE, BUT IT'S NOT DONE THAT WAY, AND IT CAN'T BE.

22  **Q.** BUT YOU ARE -- YOUR OFFICERS DEAL WITH MANY THINGS OTHER

23  THAN PAROLEES?

24  **A.** ABSOLUTELY.

25  **Q.** AND THE VAST MAJORITY OF THE ARRESTS THEY HAVE TO MAKE ARE

1    NOT OF PAROLEES?

2    **A.**  BUT THE IMPACT OF A PAROLEE'S ACTIVITIES EXTEND FAR BEYOND

3    SIMPLY MAKING AN ARREST.  THEY GO -- THEY DO A LOT TO GO TO

4    STATE PRISON.  THEY COMMIT CRIMES FOR WHICH THEY ARE NOT

5    ARRESTED FOR.

6              SO THE IMPACT IS SIMPLY BEYOND ONE OFFICER, ONE

7    PAROLEE, AND ONE ARREST.

8    **Q.**  AND THAT IMPACT IS GOING TO BE GENERATED BY ABOUT FOUR

9    ADDITIONAL PEOPLE A MONTH?

10   **A.**  I THINK THE IMPACT GOES BEYOND FOUR ADDITIONAL PEOPLE PER

11   MONTH.

12   **Q.**  IN EVALUATING THE IMPACT OF A PRISONER RELEASE ORDER OR

13   ANYTHING THAT WOULD RESULT IN POPULATION REDUCTION, ONE OF THE

14   THINGS YOU WOULD WANT TO KNOW IS THE CHARACTERISTICS OF THE

15   PEOPLE BEING RELEASED, IS THAT CORRECT?

16   **A.**  YES, SIR.

17   **Q.**  BECAUSE THE CHARACTERISTICS OF THE PEOPLE BEING RELEASED

18   WOULD HAVE A SUBSTANTIAL IMPACT ON THEIR LIKELIHOOD TO REOFFEND;

19   THAT'S YOUR EXPERIENCE?

20   **A.**  YES, SIR.

21   **Q.**  YOU'D WANT TO KNOW IF THEY WERE CLEAN AND SOBER?

22   **A.**  YES.

23   **Q.**  YOU'D WANT TO KNOW IF THEY HAD HOUSING?

24   **A.**  YES.

25   **Q.**  YOU'D WANT TO KNOW IF THEY HAD FAMILY SUPPORT?

1   **A.** YES.

2   **Q.** WHETHER THEY HAD THE ABILITY TO READ?

3   **A.** YES, SIR.

4   **Q.** YOU WOULD WANT TO KNOW WHAT THEIR JOB PROSPECTS WERE?

5   **A.** YES.

6   **Q.** AND UNTIL YOU KNOW THOSE THINGS, YOU CAN'T QUITE FULLY

7   ANALYZE WHAT THE IMPACT OF A RELEASE OF A GROUP OF PAROLEES IS

8   GOING TO BE, RIGHT?

9   **A.** I WOULD SAY SO, YES.  AND THERE'S SOME OTHER FACTORS, BUT,

10  YES, YOU ARE RIGHT.

11  **Q.** ARE THERE THINGS THAT CAN BE DONE FOR PRISONERS AFTER THEY

12  HAVE BEEN RELEASED FROM PRISON TO MITIGATE THE IMPACT ON PUBLIC

13  SAFETY?

14  **A.** I THINK THERE ARE SOME THINGS THAT CAN BE DONE, YES, SIR.

15  **Q.** WHAT?

16  **A.** FOR THE LONGER TERM, IT MAY TAKE SOME TORT OF TRANSITION.

17  THEY USED TO CALL THEM HALFWAY HOUSES.  I THINK SOME SORT OF

18  TRANSITION WOULD HELP.

19          IN OAKLAND, I MENTIONED THIS TO YOU BEFORE, WE

20  LAUNCHED A POLICE AND CORRECTIONS TEAM WHERE WE WOULD MEET WITH

21  PAROLEES UPON THEIR RELEASE TO MAKE SURE THEY WERE INFORMED OF

22  SOME LOCAL SERVICES AVAILABLE.  WE ALSO MET WITH FAMILIES, BUT I

23  THINK HAVING -- PRIOR TO RELEASE, I THINK PRISONERS NEED A PLAN,

24  A PAROLE PLAN AND I THINK THAT'S LACKING, TOO.

25  **Q.** AND THAT HELPS THEM SUCCEED IN THE COMMUNITY?

1  **A.**  I THINK SO.  IT'S BEEN MY EXPERIENCE.

2          **MR. SANGSTER:**  THAT'S ALL THE QUESTIONS I HAVE, YOUR

3  HONOR.

4          **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

5          **MS. LEONARD:**  NO, YOUR HONOR.

6                      **REDIRECT EXAMINATION**

7  **BY MS. BARLOW:**

8  **Q.**  OKAY.  CHIEF, YOU INDICATE IF THE RELEASE ORDER IS 52,000

9  THERE WOULD BE 168 ADDITIONAL PAROLEES RELEASED TO YOUR SPECIFIC

10 COMMUNITY TO VACAVILLE -- NOT THE WHOLE COUNTY, JUST TO

11 VACAVILLE -- OVER THAT TWO-YEAR PERIOD?

12 **A.**  YES.

13 **Q.**  AND THAT'S SEVEN PER MONTH.  BUT THAT DOESN'T MATTER.  IT'S

14 THE CUMULATIVE IMPACT, CORRECT?

15          **JUDGE KARLTON:**  MA'AM, ARE YOU TESTIFYING?  I WILL

16 HAVE YOU SWORN.

17          **MS. BARLOW:**  NO.

18 **BY MS. BARLOW:**

19 **Q.**  IS IT THE CUMULATIVE IMPACT, CHIEF WORD, OR IS IT JUST THIS

20 PARTICULAR PAROLEE TODAY?

21 **A.**  IT IS A CUMULATIVE IMPACT.  IT'S BEYOND SIMPLY ONE PERSON

22 AND ONE CRIME OR ONE POLICE OFFICER, YES.

23 **Q.**  IS IT ALSO THE CUMULATIVE IMPACT OF THE NUMBER OF CRIMES THE

24 PAROLEES --

25          **JUDGE KARLTON:**  MA'AM, YOU HAVE GOT TO -- WELL, GO

1  AHEAD.  JUST DO IT.  LET'S GET IT OVER WITH.

2          **MS. BARLOW:**  HE IS AN EXPERT, YOUR HONOR, BUT I'LL BE

3  HAPPY TO --

4          **JUDGE KARLTON:**  LET'S GET IT OVER WITH.  GO AHEAD.

5  **BY MS. BARLOW:**

6  **Q.**  IN TERMS OF THE INFORMATION YOU WOULD WANT TO KNOW, THE

7  CHARACTER, THE STATUS AND SO ON, YOU HAVE A FAIR IDEA OF WHAT

8  YOU ARE DEALING WITH WHEN YOU HAVE PAROLEES COMING BACK INTO

9  VACAVILLE, CORRECT?

10  **A.**  SURE.

11  **Q.**  ARE A LARGE NUMBER OF THEM SUBSTANCE ABUSERS?

12  **A.**  YES.

13  **Q.**  ARE A LARGE NUMBER OF THEM GAINFULLY EMPLOYED?

14  **A.**  NO.

15  **Q.**  ARE A LARGE NUMBER OF THEM SAFELY HOUSED WITH LOVING

16  FAMILIES?

17  **A.**  NO.

18  **Q.**  SO YOU DON'T REALLY NEED A LOT OF SPECIFIC INFORMATION TO

19  KNOW THAT 168 OF THEM ARE GOING TO CAUSE A PROBLEM FOR YOUR

20  COMMUNITY, CORRECT?

21  **A.**  THAT'S CORRECT.

22          **MS. BARLOW:**  I HAVE NOTHING FURTHER, YOUR HONOR.

23                  **RECROSS EXAMINATION**

24  **BY MR. SANGSTER:**

25  **Q.**  CHIEF WORD, HOW MANY PAROLEES ARE RELEASED INTO VACAVILLE

1  EVERY MONTH?

2  **A.**  I DON'T HAVE THE EXACT NUMBERS NOW.  I'M NOT SURE.

3  **Q.**  DO YOU HAVE AN APPROXIMATE NUMBER?

4  **A.**  WOW, THERE ARE --

5  **Q.**  I COULDN'T HEAR YOU, I'M SORRY.

6  **A.**  I WOULD HAVE TO GUESS.  I WON'T GUESS.

7  **Q.**  I DON'T WANT YOU TO GUESS.

8           DO YOU HAVE ANY KNOWLEDGE ABOUT HOW MANY PEOPLE ON

9  PAROLE ARE RELEASED FROM PAROLE?  IN OTHER WORDS, THEIR PAROLE

10 IS TERMINATED EVERY MONTH?

11 **A.**  IT'S A -- I BELIEVE IT'S A HIGH PERCENTAGE OF THOSE ON

12 PAROLE, MORE THAN HALF.

13          **MR. SANGSTER:**  THAT'S ALL THE QUESTIONS I HAVE, YOUR

14 HONOR.

15          **JUDGE HENDERSON:**  OKAY.  THANK YOU, CHIEF WORD.  YOU

16 ARE EXCUSED.

17          **THE WITNESS:**  THANK YOU.

18               (WITNESS EXCUSED.)

19          **JUDGE HENDERSON:**  OKAY.  THAT LOOKS LIKE WE HAVE OUR

20 WITNESSES FOR THE DAY.  OKAY.  WE WILL RESUME TOMORROW AT 9:15.

21          LET ME SHARE WITH YOU, AND MY COLLEAGUES SHOULD

22 SUPPLEMENT THIS, THE COURT'S THINKING AT THIS POINT.  WE ARE

23 STILL HOPEFUL OF FINISHING BY DECEMBER 19TH, BUT IT'S NOT CLEAR

24 FOR A NUMBER OF REASONS, INCLUDING AT LEAST ONE OF THE DAYS YOU

25 PRESENTED CONTEMPLATES 11 HOURS OF TESTIMONY AND THAT AIN'T

1    GOING TO HAPPEN, AS WE KNOW.

2            SO AT THIS POINT WE ARE ASSUMING THAT WE ARE GOING TO

3    NEED SOME TIME, PERHAPS AS MUCH AS A WEEK, BEYOND DECEMBER 19TH.

4    IF THAT HAPPENS, I AM THE MOST FORTUNATE ONE UP HERE BECAUSE I

5    HAVE A HALF A CASELOAD.  JUDGE REINHARDT HAS TO GET BACK TO LOS

6    ANGELES AND TAKE CARE OF HIS OTHER JOB, AS DOES JUDGE KARLTON.

7            WHAT WE WILL DO IS HAVE THEM CHECK THEIR CALENDAR AND

8    WE WILL CONSULT AND FIND A PERIOD OF TIME TO FINISH THE CASE.

9    AT THIS POINT WE SIMPLY DON'T KNOW WHEN THAT WILL BE, BUT YOU

10   SHOULD KNOW THAT WE EXPECT YOU TO BE AVAILABLE.  WE ARE NOT

11   GOING TO NEGOTIATE THE TIME WE COME BACK.  WE WANT TO MAKE THAT

12   CLEAR.

13           **JUDGE KARLTON:**  AND YOU MUSTN'T ASSUME THAT WE WILL

14   BE ABLE TO GIVE YOU A WEEK.  IT MAY BE A DAY HERE AND A DAY

15   THERE, AND YOU GUYS ARE JUST GOING TO HAVE TO BE READY TO GO.

16           **MR. SANGSTER:**  YOUR HONOR, JUST TO ADVISE THE COURT,

17   I MEAN, WE -- I AM IN THE PROCESS OF WORKING ON STIPULATIONS AS

18   TO TESTIMONY OF A NUMBER OF WITNESSES.  WE CURRENTLY HAVE, I

19   THINK, AGREEMENTS ON TWO WITNESSES.  I EXPECT AGREEMENTS ON

20   PROBABLY SIX TO EIGHT TOTAL.

21           MY ESTIMATE IS IT'S GOING TO SHAVE A DAY OFF OF THE

22   TIME, AND --

23           **JUDGE KARLTON:**  THE MORE, THE MERRIER.

24           **JUDGE HENDERSON:**  WE CERTAINLY ENCOURAGE THAT.

25           **MR. SANGSTER:**  I UNDERSTAND THAT, AND I KNOW YOU

1   CAN'T PLAN AROUND THAT.

2           I THINK IN TERMS OF THE THINKING, WHAT'S GOING TO

3   HAPPEN IS A NUMBER OF THESE WITNESSES ARE NOT GOING TO BE CALLED

4   AS SCHEDULED.  AND THE 11-HOUR DAY IS NOT GOING TO BE 11 HOURS.

5   AND, OBVIOUSLY, WE WON'T KNOW UNTIL WE GET THAT --

6           **JUDGE KARLTON:**  I PROMISE YOU IT WOULDN'T BE ANYHOW.

7           **MR. SANGSTER:**  I UNDERSTAND, BUT I THINK WE ARE GOING

8   TO LOSE WITNESSES BY THE TIME WE GET THERE.

9           **JUDGE REINHARDT:**  THE SOONER YOU CAN LET US KNOW THAT

10  YOU WILL BE IN A POSITION REASONABLY TO CONCLUDE ON THE 19TH,

11  THE BETTER IT WILL BE FOR EVERYONE.

12          TO ME, FROM LOOKING AT THE LIST, AS IF WHAT YOU ARE

13  DOING IS ABSOLUTELY CORRECT, THAT IT'S NOT -- SHOULDN'T BE

14  NECESSARY TO HEAR A LOT OF TESTIMONY FROM A FAIR NUMBER OF

15  PEOPLE ON THAT LIST.

16          SO I CERTAINLY, FOR ONE, AM STILL HOPEFUL THAT WE ARE

17  GOING TO CONCLUDE THIS ON THE 19TH AND THAT EVERYONE ELSE IS

18  GOING TO MAKE EVERY EFFORT TO SEE THAT WE CONCLUDE THIS ON THE

19  19TH.

20          THAT MAY NOT INCLUDE FINAL ARGUMENT, WHICH WE ARE

21  PLANNING ON HEARING THAT.  WOULD BE EASY TO FIND A DAY TO DO.  A

22  LOT EASIER THAN FINDING A TIME TO HAVE TRIAL DAYS.

23          SO I HOPE EVERYONE WILL CONTINUE TO MAKE EVERY EFFORT

24  TO CONCLUDE THIS BY THE 19TH, AND WE WILL BE HAPPY TO BE OF

25  WHATEVER ASSISTANCE WE CAN IN PERSUADING YOU TO DO THAT.

1    **JUDGE KARLTON:**  LET ME ADD ABOUT THIS QUESTION.  IT'S

2   CONTEMPLATED THAT WE ARE GOING TO HAVE FROM YOU FOLKS PROPOSED

3   FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND I WOULD LIKE AT

4   SOME POINT, DOESN'T HAVE TO BE TODAY OBVIOUSLY, SOME IDEA ABOUT

5   HOW LONG THAT'S GOING TO TAKE TO GATHER TOGETHER.

6          BUT I THINK JUDGE REINHARDT'S POINT IS QUITE SERIOUS.

7   YOU FOLKS OUGHT TO KNOW, AT LEAST FOR THIS JUDGE, FINAL ARGUMENT

8   MAY BE VERY IMPORTANT IN OUR DECIDING WHAT WE ARE GOING TO DO,

9   AND THAT SHOULD BE A -- AN IMPORTANT POINT IN YOUR PREPARATION.

10    **JUDGE REINHART:**  THAT DOESN'T SEEM LIKELY THAT WON'T

11   BE BY THE 19TH, BUT THAT'S NOT A PROBLEM.  WE CAN THEN FIND A

12   MUTUALLY CONVENIENT DATE FOR THAT KIND OF ARGUMENT.

13    **JUDGE KARLTON:**  SURE.

14    **MR. SPECTER:**  THAT'S FINE, YOUR HONORS.

15          I WOULD JUST ASK THAT IF YOU -- WHEN YOU DON'T

16   NEGOTIATE WITH US AND YOU JUST TELL US WHAT DAYS WE ARE GOING TO

17   HAVE IF WE HAVE TO GO PAST THE 19TH -- I AGREE WITH MY

18   CO-COUNSEL, BY THE WAY, THAT I THINK WE MIGHT BE ABLE TO MAKE

19   IT.  I CERTAINLY HOPE WE DO -- THAT YOU LET US KNOW AS EARLY AS

20   POSSIBLE WHAT THE FINAL ARGUMENT DAY WOULD BE.

21          BECAUSE WE HAVE THOUGHT, JUDGE KARLTON, THAT YOU

22   MIGHT WANT PROPOSED FINDINGS AND CONCLUSIONS, WE HAVE ALREADY

23   STARTED THE PROCESS OF WORKING ON THEM AND WE -- THE MORE

24   ADVANCE -- THE MORE WE KNOW WHAT THE SCHEDULE IS, THE HARDER WE

25   WORK, OR WHAT.

1            **JUDGE KARLTON:**  I HOPE THAT YOUR PROPOSED FINDINGS

2   WILL CITE TO THE APPROPRIATE EVIDENCE TO HELP US ORGANIZE WHAT

3   IS REALLY A VERY DIFFICULT BODY OF EVIDENCE.

4            **MR. SPECTER:**  IF THEY DIDN'T, THEY WOULDN'T BE VERY

5   HELPFUL TO YOU.

6            **JUDGE KARLTON:**  THEY WOULD NOT.

7            **JUDGE REINHART:**  IF WE FINISH BY THE 19TH, WE CAN

8   AGREE UPON A TIME FOR CLOSING ARGUMENT THAT'S CONVENIENT TO

9   EVERYBODY.  THAT MAY NOT BE SO EASY TO FIND A DATE THAT'S

10  CONVENIENT, BUT WE CAN WORK -- WORK SOMETHING OUT THAT EVERYONE

11  IS AGREEABLE TO FOR THE CLOSING ARGUMENT.

12           IF THERE IS MORE TESTIMONY, THAT'S GOING TO BE MUCH

13  MORE DIFFICULT.  IT'S GOING TO BE VERY DIFFICULT FOR THE THREE

14  OF US TO FIND A DATE.  WE WILL LET YOU KNOW AS SOON AS WE FIND

15  IT, BUT YOU MAY NOT LIKE IT.

16           **MR. SPECTER:**  WELL, I WILL LIKE IT.  I DON'T KNOW IF

17  ANYBODY ELSE WILL.

18           BUT IN THE BEGINNING OF THE TRIAL YOU MENTIONED THE

19  GLIMMER OF A POSSIBILITY OF GOING INTO THE NEXT WEEK.  I WOULD

20  RATHER GET IT OVER WITH AND THEN --

21           **JUDGE KARLTON:**  CAN'T PROMISE YOU THAT AT ALL.

22           **MR. SPECTER:**  OKAY.

23           **JUDGE REINHART:**  YOU MEAN, MORE DAYS THAN THE WEEK OF

24  THE 18TH OR 19TH?

25           **MR. SPECTER:**  I DON'T THINK THAT'S POSSIBLE.

1          **JUDGE REINHART:**  I DON'T THINK THAT'S VERY REALISTIC.

2   CHRISTMAS EVE IS, WHAT, WEDNESDAY NIGHT THE NEXT WEEK?

3          **MR. SPECTER:**  CHRISTMAS EVE?

4          **JUDGE REINHARDT:**  YES.

5          **MR. SPECTER:**  YES.

6          **JUDGE REINHART:**  I ASSUME YOU ARE NOT PROPOSING WE DO

7   THIS CHRISTMAS EVE.

8          **MR. SPECTER:**  I'M JEWISH.  I DON'T CARE.

9          **JUDGE REINHART:**  OR HANUKKAH, THE SAME DAY OR THE DAY

10  BEFORE MAYBE.

11         **MR. SPECTER:**  I WOULD RATHER BE HOME ON CHRISTMAS

12  EVE, BUT THERE IS NO PROHIBITION AGAINST WORKING ON HANUKKAH, AS

13  YOU PROBABLY KNOW.

14         **JUDGE REINHART:**  YOU'RE ONLY TALKING ABOUT TWO DAYS.

15  WITH THE TRAVEL PROBLEMS --

16         **MR. SPECTER:**  I UNDERSTAND.  I'M JUST RAISING --

17         **JUDGE REINHARDT:**  LET'S SEE WHAT WE CAN DO ON THE

18  19TH.

19         **JUDGE KARLTON:**  LET'S ALL WORK VERY HARD TO GET IT

20  DONE BY THE 19TH.

21         **JUDGE HENDERSON:**  WE WILL DO OUR BEST TO ACCOMMODATE

22  YOU.  IF WE DON'T, THE REASON I SAID IT THE WAY I DID, IS THAT I

23  DON'T WANT ALL OF THESE PLAYERS TO GO OUT AND START MAKING

24  COMMITMENTS.  THAT'S WHAT WON'T WORK.

25          SO I'M JUST SAYING BE AVAILABLE.  WE WILL DO

1    EVERYTHING WE CAN TO MAKE IT WORK.

2              **MR. SPECTER:**  THAT SOUNDS GOOD.  THANK YOU VERY MUCH.

3              **JUDGE HENDERSON:**  OKAY.

4                        (WHEREUPON AT 4:07 P.M. FURTHER PROCEEDINGS

5                         IN THE ABOVE-ENTITLED CAUSE WAS ADJOURNED

6                         UNTIL WEDNESDAY, DECEMBER 10, 2008 AT 9:15

7                         A.M.)

8

9                             -   -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

**DEFENDANT'S WITNESSES**                            **PAGE**    **VOL.**

3
**MATTHEW L. CATE**

4
DIRECT EXAMINATION BY MR. MELLO               1669      9

5   CROSS-EXAMINATION BY MR. SPECTER           1689      9

6

**KATHRYN JETT**

7
DIRECT EXAMINATION BY MS. JOHNSON             1710      9

8   CROSS-EXAMINATION BY MS. EVENSON           1722      9

9

**THOMAS HOFFMAN**

10
DIRECT EXAMINATION BY MR. LEWIS               1734      9

11  DIRECT EXAMINATION BY MR. MITCHELL         1748      9
    CROSS-EXAMINATION BY MR. GALVAN            1753      9

12  REDIRECT EXAMINATION BY MR. LEWIS          1769      9
    RECROSS-EXAMINATION BY MR. GALVAN          1771      9

13

14  **GREGORY MUNKS**

15  DIRECT EXAMINATION BY MS. WOODWARD         1773      9
    CROSS-EXAMINATION BY MR. SANGSTER          1787      9

16  REDIRECT EXAMINATION BY MS. WOODWARD       1797      9

17

**STEPHEN M. SMITH**

18
DIRECT EXAMINATION BY MS. BARLOW              1798      9

19  CROSS-EXAMINATION BY MS. EVENSON           1823      9
    REDIRECT EXAMINATION BY MS. BARLOW         1832      9

20  RECROSS-EXAMINATION BY MS. EVENSON         1845      9

21

**RICHARD WORD**

22
DIRECT EXAMINATION BY MS. BARLOW              1848      9

23  CROSS-EXAMINATION BY MR. SANGSTER          1866      9
    REDIRECT EXAMINATION BY MS. BARLOW         1877      9

24  RECROSS-EXAMINATION BY MR. SANGSTER        1878      9

25

1                          **I N D E X**

2

3  **DEFENDANT'S EXHIBITS**            **IDEN**   **VOL.**   **EVID**   **VOL.**

4  1005                                                    1748      9

5

6

7  **DEFENDANT INTERVENORS' EXHIBITS**   **IDEN**   **VOL.**   **EVID**   **VOL.**

8  213                                                     1787      9

9  214                                                     1787      9

10 215                                                     1787      9

11 216                                                     1787      9

12 221                                                     1787      9

13 222                                                     1848      9

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

WE, JOAN MARIE COLUMBINI AND DEBRA L. PAS, OFFICIAL
REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF
CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN
CIV S-90-0520 LKK JPM P, RALPH COLEMAN, ET AL V. ARNOLD
SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD
SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND
REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION
INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND
TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF
FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID
TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE
COURT FILE.

/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR

S/ DEBRA L. PAS

DEBRA L. PAS, CSR 11916, CRR, RMR, RPR

TUESDAY, DECEMBER 9, 2008