VOL 10

PAGES 1888 - 2095

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, ET AL.,           )
                                 )
            PLAINTIFFS,          )
                                 )
  VS.                            ) NO. CIV S-90-0520 LKK JFM
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 ) THREE-JUDGE COURT
            DEFENDANTS.          )
                                 )
_____)

MARCIANO PLATA, ET AL.,          )
                                 )
            PLAINTIFFS,          )
                                 )
VS.                              ) NO. C 01-1351 TEH
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 )
            DEFENDANTS.          )
_____)

**TRANSCRIPT OF PROCEEDINGS**

SAN FRANCISCO, CALIFORNIA
TUESDAY, DECEMBER 10, 2008


REPORTED BY:  JOAN MARIE COLUMBINI, CSR 5435, RPR
              DEBRA L. PAS, CSR 11916, CRR, RMR,
              OFFICIAL COURT REPORTERS - U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**        PRISON LAW OFFICE
                         1917 FIFTH STREET
                         BERKELEY, CALIFORNIA  94710
                         **SARA NORMAN, ESQUIRE**
                         **ALISON HARDY, ESQUIRE**
                         **DONALD SPECTER, ESQUIRE**
                         **REBEKAH EVENSON, ESQUIRE**


                         ROSEN, BIEN & GALVAN, LLP
                         315 MONTGOMERY STREET, TENTH FLOOR
                         SAN FRANCISCO, CALIFORNIA 94104
                  BY:  **MICHAEL W. BIEN, ESQUIRE**
                       **JANE KAHN, ESQUIRE**


                         K&L GATES
                         FOUR EMBARCADERO CENTER
                         SUITE 1200
                         SAN FRANCISCO, CALIFORNIA 94111
                    BY: **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**             CARROLL, BURDICK & MCDONOUGH
                         44 MONTGOMERY STREET, SUITE 400
                         SAN FRANCISCO, CALIFORNIA  94104
                    BY: **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**        STATE OF CALIFORNIA
                         DEPARTMENT OF JUSTICE
                         OFFICE OF THE ATTORNEY GENERAL
                         1300 I STREET, SUITE 125
                         P.O. BOX 944255
                         SACRAMENTO, CALIFORNIA  94244
                  BY:  **LISA A. TILLMAN, ESQUIRE**


                         STATE OF CALIFORNIA
                         DEPARTMENT OF JUSTICE
                         OFFICE OF THE ATTORNEY GENERAL
                         455 GOLDEN GATE AVENUE, SUITE 11000
                         SAN FRANCISCO, CALIFORNIA  94102
                    BY: **KYLE A. LEWIS, ESQUIRE**


(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**　　　　　　HANSON BRIDGETT
　　　　　　　　　　　　　　425 MARKET STREET, 26TH FLOOR
　　　　　　　　　　　　　　SAN FRANCISCO, CALIFORNIA  94105
　　　　　　　**BY:  PAUL MELLO, ESQUIRE**
　　　　　　　　　　　　　　S. ANNE JOHNSON, ESQUIRE


**FOR DISTRICT ATTORNEY**　　THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**　　　　　　　COUNTY OF RIVERSIDE
　　　　　　　　　　　　　　82-675 HIGHWAY 111, FOURTH FLOOR
　　　　　　　　　　　　　　INDIO, CALIFORNIA  92201
　　　　　　　**BY:  WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**　　　　　AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**　　　　　　　580 CALIFORNIA STREET, 15TH FLOOR
　　　　　　　　　　　　　　SAN FRANCISCO, CALIFORNIA  94104
　　　　　　　**BY:  TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT**　　　JONES & MAYER
**INTERVENORS**　　　　　　　3777 NORTH HARBOR BOULEVARD
　　　　　　　　　　　　　　FULLERTON, CALIFORNIA  92835
　　　　　　　**BY:  KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS**　OFFICE OF THE COUNTY COUNSEL
　　　　　　　　　　　　　　COUNTY OF SANTA CLARA
　　　　　　　　　　　　　　70 WEST HEDDING STREET
　　　　　　　　　　　　　　NINTH FLOOR, EAST WING
　　　　　　　　　　　　　　SAN JOSE, CALIFORNIA  95110
　　　　　　　**BY:  THERESA FUENTES, ESQUIRE**


**FOR SONOMA COUNTY**　　　　COUNTY OF SONOMA
**INTERVENORS**　　　　　　　575 ADMINISTRATION DRIVE, ROOM 105A
　　　　　　　　　　　　　　SANTA ROSA, CALIFORNIA  95403
　　　　　　　**BY: ANNE L. KECK, ESQUIRE**


**FOR THE COUNTY OF**　　　　OFFICE OF MICHAEL P. MURPHY
**SAN MATEO**　　　　　　　　COUNTY COUNSEL, SAN MATEO COUNTY
**INTERVENORS:**　　　　　　HALL OF JUSTICE AND RECORDS
　　　　　　　　　　　　　　400 COUNTY CENTER, 6TH FLOOR
　　　　　　　　　　　　　　REDWOOD CITY, CALIFORNIA 94063-1662
　　　　　　　**BY:  CAROL L. WOODWARD, ESQUIRE**

1               **P R O C E E D I N G S**

2   **DECEMBER 10, 2008**                           **9:21 A.M.**

3

4           **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

5   WITNESS WHEN YOU ARE READY, COUNSEL.

6           **MR. MELLO:**  THANK YOU, YOUR HONORS.  PAUL MELLO FOR

7   DEFENDANTS.

8           DEFENDANTS CALL SCOTT KERNAN, UNDERSECRETARY OF

9   OPERATIONS FOR THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

10  REHABILITATION.

11                  **SCOTT KERNAN**,

12  CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

13  DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

14          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

15  RECORD.

16          **THE WITNESS:**  MY NAME IS SCOTT KERNAN, K-E-R-N-A-N.

17          **MR. MELLO:**  UNDERSECRETARY KERNAN HAS SUBMITTED A

18  TRIAL AFFIDAVIT IN THIS MATTER, WHICH IS DEFENDANT'S EXHIBIT

19  1002, ON NOVEMBER 17TH.  WE FILED MINOR REVISIONS TO CORRECT IN

20  EXHIBIT NUMBERS IN THAT TRIAL AFFIDAVIT.

21          UNDERSECRETARY KERNAN'S EDUCATION AND PROFESSIONAL

22  BACKGROUND IS SUMMARIZED IN PARAGRAPHS TWO AND THREE OF HIS

23  TRIAL AFFIDAVIT.

24

25

**DIRECT EXAMINATION**

**BY MR. MELLO:**

**Q.**  GOOD MORNING, MR. KERNAN.

**A.**  GOOD MORNING.

**Q.**  WHEN WERE YOU APPOINTED UNDERSECRETARY OF OPERATIONS FOR THE

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITION?

**A.**  ON OCTOBER 14, 2008.

**Q.**  IMMEDIATELY PRIOR TO YOUR APPOINTMENT AS UNDERSECRETARY,

WHAT WAS YOUR POSITION?

**A.**  I WAS THE CHIEF DEPUTY SECRETARY OF ADULT OPERATIONS.

**Q.**  AND HOW MANY YEARS HAVE YOU WORKED FOR THE DEPARTMENT OF

CORRECTIONS?

**A.**  25 YEARS.

**Q.**  OKAY.  HAS THE CALIFORNIA -- HAS THE CALIFORNIA IN STATE

PRISON POPULATION DECLINED IN THE LAST TWO YEARS?

**A.**  YES, SIR.

**Q.**  BY APPROXIMATELY HOW MUCH?

**A.**  BY PROBABLY SOMEWHERE BETWEEN 5,000 AND 6,000.

**Q.**  OKAY.  IN THE PAST YEAR OR SO HAS CDCR REDUCED THE NUMBER OF

NON-TRADITIONAL BEDS IN ITS INSTITUTIONS AS WELL?

**A.**  YES, SIR.

**Q.**  AND BY APPROXIMATELY HOW MUCH?

**A.**  BY ABOUT 5,000.

          **JUDGE REINHARDT:**  WHILE MR. MELLO IS HAVING A DRINK.

IS THE NUMBER OF PRISONERS REDUCED, IS THAT THE RESULT OF

1  SENDING THEM OUT OF STATE OR DOES THAT INCLUDE OTHER REASONS?

2          **THE WITNESS:**  I'M SORRY, SIR.  I DIDN'T UNDERSTAND

3  YOU.

4          **JUDGE REINHARDT:**  I SAID, THE NUMBER OF PRISONERS

5  REDUCED, IS THAT THE RESULT ENTIRELY OR PRIMARILY OF SENDING

6  THEM OUT OF STATE?

7          **THE WITNESS:**  NO, SIR.

8          **JUDGE KARLTON:**  THERE'S 5,000 REAL REDUCTION.

9          **THE WITNESS:**  YES, SIR.

10  **BY MR. MELLO:**

11  **Q.**  MR. KERNAN, AT SOME POINT CDCR HAD A HIGH NUMBER, OR HIGHEST

12  LEVEL NUMBER OF NON-TRADITIONAL BEDS IN ITS INSTITUTIONS,

13  CORRECT?

14  **A.**  YES, SIR.

15  **Q.**  AND WHEN WAS THAT?

16  **A.**  AUGUST, 2007.

17  **Q.**  AND APPROXIMATELY, JUST APPROXIMATELY, HOW MANY

18  NON-TRADITIONAL BEDS WERE IN YOUR INSTITUTIONS AT THAT TIME?

19  **A.**  ABOUT 19,600.

20  **Q.**  AND DOES CDCR PROJECT TO FURTHER REDUCE ITS USE OF

21  NON-TRADITIONAL BEDS IN THE FUTURE?

22  **A.**  YES, SIR.

23  **Q.**  AND BY HOW MANY?

24  **A.**  BY APPROXIMATELY 5,000 ON OUR CURRENT INMATE ACTIVITY

25  SCHEDULE.  THAT'S THE PLANNING DOCUMENTS.  SO 5,000 MORE BEDS

1  HAVE COME DOWN BETWEEN NOW AND JULY.

2  **Q.**  OF 2009?

3  **A.**  YES, SIR.

4  **Q.**  AND JUDGE REINHARDT ASKED THIS QUESTION.  AS OF AUGUST 29,

5  2008, CDCR HAD TRANSFERRED APPROXIMATELY 4800 INMATES TO

6  OUT-OF-STATE INSTITUTIONS, CORRECT?

7  **A.**  YES, SIR.

8  **Q.**  DOES CDCR PLAN TO TRANSFER ADDITIONAL INMATES TO

9  OUT-OF-STATE INSTITUTIONS?

10  **A.**  YES, SIR.

11  **Q.**  HOW MANY MORE ARE CURRENTLY PLANNED TO BE TRANSFERRED UNDER

12  CURRENT PLANS?

13  **A.**  A TOTAL OF 8,000, APPROXIMATELY 8,000 WE CURRENTLY HAVE

14  CONTRACTED.  WE ARE GOING TO HAVE 6,000 OUT BY TOMORROW.

15          **JUDGE KARLTON:**  I'M SORRY.  I JUST MISSED THE

16  QUESTION.  MY FAULT, MR. MELLO.

17          8,000 MORE OR 8,000 TOTAL?

18          **THE WITNESS:**  8,000 TOTAL.

19  **BY MR. MELLO:**

20  **Q.**  MR. KERNAN, HAS CDCR MADE EFFORTS IN THE LAST FEW YEARS TO

21  INCREASE CUSTODY STAFFING TO MEET ITS NEEDS?

22  **A.**  YES, SIR.

23  **Q.**  AND SPECIFICALLY WHAT HAVE YOU DONE AND WHAT HAVE YOU

24  ACCOMPLISHED IN THAT REGARD?

25  **A.**  WELL, THE RECEIVER'S OFFICE ADDED 600 POSITIONS LAST YEAR

1   AND ARE GOING TO ADD 1800 THIS YEAR.  SO ABOUT 2400 ADDITIONAL

2   CORRECTIONAL OFFICERS DEDICATED SOLELY FOR THE ACCESS TO CARE

3   UNITS, TO USE THE RECEIVER'S WORDS.

4           AND THAT'S TO PROVIDE SERVICES TO THE INMATES, TAKING

5   THEM OUT OF THE PRISON, GETTING THEM TO MEDICAL APPOINTMENTS AND

6   MENTAL HEALTH APPOINTMENTS WITHIN THE PRISON.

7   Q.  IN ADDITION TO THE RECEIVER'S EFFORTS TO GET THE

8   CORRECTIONAL OFFICERS, AS FAR AS HEALTHCARE ACCESS TEAMS, HAS

9   CDCR ALSO INCREASED ITS -- ITS CORRECTIONAL OFFICER STAFF

10  SEPARATE AND APART FROM THE RECEIVER'S EFFORTS?

11  A.  YES, SIR.  I THINK IT WAS A LITTLE MORE THAN A YEAR AGO

12  WE -- OR I ANTICIPATED OR I PROJECTED WE HAVE ABOUT A 2,000

13  CORRECTIONAL OFFICER SHORTAGE, AND WE HAD WIDESPREAD OVERTIME

14  AND WE WERE DIFFICULTY AT ALMOST ALL OF OUR PRISONS.

15          TODAY WE HAVE LITERALLY FILLED UP ALL OF OUR PRISONS

16  WITH CORRECTIONAL STAFFING AND WE HAVE -- NORMALLY, THIS IS THE

17  SEASON FOR IT, AND WE ARE GOING TO CANCEL THE JANUARY ACADEMY

18  BECAUSE WE ARE ACTUALLY OVERFILLED AT THIS POINT.

19  Q.  I'M GOING TO PULL UP DEFENDANT'S EXHIBIT 1235, PAGE EIGHT,

20  PLEASE.

21                  (DOCUMENT DISPLAYED)

22  Q.  AND THIS IS A CHART THAT WAS PREPARED AND IT DEMONSTRATES

23  CORRECTIONAL OFFICER NUMBERS, BOTH ESTABLISHED POSITIONS AND

24  FILLED POSITIONS OVER TIME; CORRECT, MR. KERNAN?

25  A.  YES, SIR.

1  Q.  AND YOUR OFFICE PROVIDED THE DATA FOR THAT CHART, CORRECT?

2  A.  YES, SIR.

3  Q.  AND IF YOU LOOK AT THE INFORMATION FOR AUGUST OF 2008, THERE

4  APPEARS TO BE A GAP IN THE NUMBER OF FILLED POSITIONS AND

5  ESTABLISHED POSITIONS; DO YOU SEE THAT?

6  A.  YES, SIR.

7  Q.  AND I BELIEVE YOU TESTIFIED A MOMENT AGO THAT THERE WAS

8  EFFECTIVELY NO VACANCIES IN YOUR -- IN YOUR FACILITIES.

9          CAN YOU EXPLAIN TO ME HOW THAT IS IN LIGHT OF THE

10 FACT THAT THERE APPEARS TO BE A GAP?

11 A.  AT THE PRISON LEVEL THE CORRECTIONAL OFFICER VACANCIES ARE

12 SUPPLEMENTED WITH PIES, RETIRED ANNUITANTS AND THE SORT AND THE

13 USE OF OVER TIME.  SO THE SMALL GAP THAT YOU SEE THERE IS

14 ADDRESSED THROUGH THOSE MEANS.

15          **JUDGE KARLTON:**  WHAT'S A PIE, SIR?

16          **THE WITNESS:**  PERMANENT INTERMITTENT EMPLOYEE, AN

17 EMPLOYEE THAT'S NOT FULL -- TIME STATUS.  WE CAN CALL THEM IN

18 WHEN WE NEED THEM.

19 **BY MR. MELLO:**

20 Q.  HAVE THERE BEEN IMPROVEMENTS IN THE PAST SEVERAL YEARS WITH

21 RESPECT TO MEDICAL AND CLINICAL POSITIONS?

22 A.  YES, SIR.

23 Q.  OKAY.  LET'S LOOK AT, AGAIN, EXHIBIT 1235, PAGE TWO.

24          (DOCUMENT DISPLAYED)

25 Q.  LOOKING AT EXHIBIT 1235, FROM OCTOBER OF 2003 TO JUNE 2008

1   THERE HAS BEEN AN INCREASE IN THE NUMBER OF CHIEF PHYSICIANS AND

2   SURGEONS, CORRECT?

3   **A.**  YES, SIR.

4   **Q.**  CAN YOU TELL US WHAT THE INCREASE HAS BEEN?

5   **A.**  IN OCTOBER '03 THERE WAS 10 FILLED POSITIONS.  IN JUNE OF

6   '08 THERE WAS 26.

7   **Q.**  AND HAS SIMILAR INCREASES IN STAFFING OCCURRED WITH RESPECT

8   TO PHYSICIANS?  GO TO THE NEXT PAGE.

9          **JUDGE KARLTON:**  BEFORE YOU LEAVE THIS PAGE -- CAN YOU

10  GO BACK TO THAT FOR A MOMENT?

11         **MR. MELLO:**  YES.

12         **JUDGE KARLTON:**  SIR, I AM NOT -- I'M NOT SURE THAT I

13  KNOW WHAT I'M LOOKING AT.

14         THE CHIEF PHYSICIAN AND SURGEON STAFFING, I THINK

15  WHAT I'M READING IS THAT UNDER WHATEVER STANDARD YOU ARE USING

16  THERE SHOULD BE 35 AND THERE ARE 28; IS THAT RIGHT?

17         **THE WITNESS:**  YES, SIR.

18         **JUDGE KARLTON:**  OKAY.  THANK YOU.

19  **BY MR. MELLO:**

20  **Q.**  MR. KERNAN, GOING TO THAT, WHO WOULD BEST BE ABLE TO EXPLAIN

21  THE WAY THAT THE INSTITUTIONS ARE DEALING WITH THE GAP IN FILLED

22  POSITIONS AND ESTABLISHED POSITIONS?

23  **A.**  IF I UNDERSTOOD YOUR QUESTION, THE GAP IN SERVICES ARE

24  ADDRESSED THROUGH CONTRACT DOCTORS.  AND, TRULY, THIS IS

25  INDICATIVE OF THE RECEIVER'S EFFORTS.

1        I MEAN, CERTAINLY THE -- ALL THE CLINICAL STAFFING IS

2   NOT UNDER MY AUTHORITY.  THIS WAS PREPARED BY MY STAFF AND I

3   UNDERSTAND IT, BUT THE RECEIVER HAS BEEN THE ONE THAT HAS MADE

4   THESE GREAT INCREASES IN MEDICAL STAFFING.

5   Q.  AND WOULD THE RECEIVER BE ABLE TO EXPLAIN BETTER THAN YOU

6   THE DIFFERENCE BETWEEN THE ESTABLISHED POSITIONS AND THE FILLED

7   POSITIONS?

8   A.  YES, SIR.

9   Q.  I WANT TO TAKE YOU TO THE NEXT PAGE WITH RESPECT TO

10  PHYSICIAN STAFFING.

11                  (DOCUMENT DISPLAYED)

12  Q.  HAS THE NUMBER OF PHYSICIANS CHANGED AS A RESULT OF THE

13  EFFORTS OF THE RECEIVER, AS YOU TESTIFIED?

14  A.  YES, SIR.

15  Q.  AND DOES THAT CHART INDICATE THAT FROM A LOW OF NOVEMBER,

16  2007 WHERE THERE WERE 165 PHYSICIANS, THERE ARE NOW 228

17  PHYSICIANS IN NOVEMBER OF 2008?

18  A.  YES, SIR.

19  Q.  AND, AGAIN, YOU COULDN'T EXPLAIN THE DIP -- OR MAYBE YOU

20  CAN, MR. KERNAN.

21        DO YOU HAVE ANY UNDERSTANDING AS TO THE DIP IN THE

22  NUMBER OF PHYSICIANS AND SURGEONS IN THE DEPARTMENT SINCE

23  OCTOBER OF -- OR SINCE MAY OF 2005?

24  A.  AGAIN, IT WOULD BE ANECDOTAL.  THIS IS CLEARLY IN THE

25  RECEIVER'S AREA, BUT HAVING WORKED AROUND IT, IT WAS ABOUT THE

1  TIME THAT THE RECEIVER CAME IN.  HE GOT RID OF SOME DOCTORS THAT

2  WEREN'T PROVIDING APPROPRIATE CARE.  AGAIN, COMPLETELY OUT OF MY

3  EXPERTISE.  AND THEN HAS BEEN HIRING STAFF AT A PROLIFIC RATE IN

4  FILLING THE POSITIONS IN THE PRISONS.

5  **Q.**  ISN'T IT TRUE, MR. KERNAN, THAT THE RECEIVER'S OFFICE IS

6  ALSO PROVIDING PRIMARY CARE PROVIDERS BY WAY OF PHYSICIAN'S

7  ASSISTANTS AND NURSE PRACTITIONERS?

8  **A.**  YES.

9            **MR. FAMA:**  OBJECTION.  LEADING.

10           **JUDGE HENDERSON:**  OVERRULED.

11 **BY MR. MELLO:**

12 **Q.**  SO LET'S GO THERE NEXT.

13           **JUDGE HENDERSON:**  LET ME ASK, DOES THIS CHART MEAN

14 THAT IN OCTOBER OF 2003, THAT BOTTOM LINE, THERE WERE MORE

15 PHYSICIANS THAN AUGUST OF THIS YEAR?

16           **MR. MELLO:**  IT DOES MEAN THAT, YOUR HONOR.  IT MEANS

17 THERE WERE MORE FILLED INMATE -- MORE PHYSICIANS AND SURGEONS IN

18 THE DEPARTMENT IN OCTOBER OF 2004 THAN TODAY.

19           **JUDGE KARLTON:**  2003.

20           **MR. MELLO:**  PARDON ME, 2003.

21           AND I BELIEVE THAT IN THE RECEIVER'S REPORTS, WHICH

22 ARE EVIDENCE IN THE CASE, HE EXPLAINS THE DIP AND MR. KERNAN

23 JUST ALLUDED TO IT.  I THINK HE USED THE WORD -- ONE OF THE

24 RECEIVERS MAY HAVE USED THE WORD "CLEANING HOUSE."

25           **JUDGE HENDERSON:**  OKAY, OKAY.

1        **MR. MELLO:**  AND THEN I BELIEVE MR. KERNAN INDICATED

2   THAT THEY ARE USING OTHER PHYSICIAN EXTENDERS OR SUBSTITUTES BY

3   WAY OF PHYSICIAN'S ASSISTANTS AND NURSE PRACTITIONERS, WHICH ARE

4   THE NEXT CHART.

5   **BY MR. MELLO:**

6   Q.  HAS THERE BEEN AN INCREASE IN THE NUMBER OF PHYSICIAN'S

7   ASSISTANTS FROM OCTOBER OF 2003 TILL THE END OF AUGUST, 2008?

8   A.  YES, SIR.

9   Q.  AND CAN YOU STATE THAT FOR THE RECORD, PLEASE?

10  A.  IN APRIL THERE WAS ONE FILLED POSITION, AND IN AUGUST OF

11  2008 THERE'S 13.

12  Q.  OKAY.  LET'S GO TO THE NEXT CHART.  IT'S WITH RESPECT TO

13  NURSE PRACTITIONERS.

14                  (DOCUMENT DISPLAYED)

15  Q.  AGAIN, HAVE THERE BEEN INCREASES IN THE NUMBER OF NURSE

16  PRACTITIONERS, FILLED THE NURSE PRACTITIONER POSITIONS IN THE

17  DEPARTMENT SINCE OCTOBER 2003?

18  A.  YES, SIR.

19  Q.  CAN YOU STATE WHAT THOSE IMPROVEMENTS HAVE BEEN?

20  A.  IN OCTOBER 2003 THERE WERE SEVEN, AND IN AUGUST 2008 THERE

21  WAS 44.

22  Q.  LET'S GO TO THE NEXT CHART, REGISTERED NURSES.

23        **JUDGE KARLTON:**  WAIT.  YOU GO TOO FAST, MR. MELLO.

24  PLEASE PUT THAT BACK UP.  I JUST WANT TO MAKE SURE I UNDERSTAND

25  WHAT I'M LOOKING AT.

1          MR. KERNAN, AS I READ THIS, AND I'M NOT SURE IF I'M

2    READING IT RIGHT, SOMEHOW OR OTHER THE STAFFING NUMBERS -- LET

3    ME -- CAN I BACK OFF FOR A MINUTE?

4          DO YOU KNOW HOW THE STAFFING NUMBERS ARE ASCERTAINED;

5    THAT IS, HOW IS IT ESTABLISHED THAT YOU NEED THE 72.13 IN AUGUST

6    OF 08; DO YOU KNOW?

7          **THE WITNESS:**  YES, SIR.  THOSE NUMBERS WERE DERIVED

8    FROM THE RECEIVER'S STAFF.  THEY IDENTIFIED THE POSITIONS THEY

9    NEEDED.

10         **JUDGE KARLTON:**  AND YOU DON'T KNOW HOW THEY DECIDED

11   THAT.  I MEAN, MAYBE WE SHOULD BECAUSE -- OH, NO.  IT'S IN YOUR

12   REPORT.  IT'S NOT MINE.  IT'S -- I DON'T KNOW.

13         ANYHOW, THE ANSWER IS THEY -- THEY HAVE GOT A FORMULA

14   WHICH YOU ARE NOT FAMILIAR WITH.

15         **THE WITNESS:**  I -- I THINK THERE ARE SPECIFIC RATIOS,

16   BUT I'M CERTAINLY NOT AN EXPERT.

17         **JUDGE KARLTON:**  FAIR ENOUGH.  FAIR ENOUGH.

18         AND DO YOU KNOW WHY, AGAIN, THERE'S THIS RATHER

19   DRAMATIC DECLINE TO MAY OF '07 AND THEN A SMALL DIP IN THE

20   FILLED POSITIONS?  DO YOU HAVE ANY IDEA WHY THAT IS SO?

21         **THE WITNESS:**  JUST FROM WORKING OUT AT THE PRISONS

22   DURING MUCH OF THIS TIME, THERE WAS AN EFFORT TO HIRE NURSE

23   PRACTITIONERS IN LIEU OF THE PHYSICIANS THAT WE WERE HAVING A

24   HARD TIME FILLING.  AND SO THERE WAS INCREASED AUTHORIZED

25   POSITIONS TO OFFSET THE VACANCIES IN DOCTORS.

1          **JUDGE KARLTON:**  THANK YOU.

2          **MR. MELLO:**  THANK YOU.

3  **BY MR. MELLO:**

4  Q.  THE NEXT CHART, RNS.

5               (DOCUMENT DISPLAYED)

6  Q.  SAME QUESTION.  HAS THERE BEEN AN INCREASE IN THE NUMBER OF

7  REGISTERED NURSES OVER THE YEARS?

8  A.  YES, SIR.  FROM OCTOBER '03 THERE WERE ABOUT 760, TO AUGUST

9  OF 2008 OF 1556.

10 Q.  AND, MR. KERNAN, THE BOTTOM LEFT-HAND CORNER OF THAT

11 DOCUMENT, IT INDICATES THE SOURCE OF THE INFORMATION, CORRECT?

12 A.  YES, SIR.

13 Q.  AND THAT'S INFORMATION THAT WAS RECEIVED FROM THE STATE

14 CONTROLLER'S OFFICE, CORRECT?

15 A.  YES, SIR.

16 Q.  THE INFORMATION WAS THEN PROVIDED TO YOUR DEPARTMENT, WHO

17 ANALYZED IT AND PROVIDED THE INFORMATION FOR THESE CHARTS,

18 CORRECT?

19 A.  CORRECT, SIR.

20 Q.  AND THOSE WERE EFFORTS THAT YOUR DEPARTMENT DOES IN ITS

21 ORDINARY COURSE OF BUSINESS, CORRECT?

22 A.  YES, SIR.

23 Q.  LET'S GO TO LICENSED VOCATIONAL NURSES, WHICH IS THE NEXT

24 CHART.

25               (DOCUMENT DISPLAYED)

1  Q.  HAS THE NUMBER OF LVNS GONE UP OVER TIME, TOO?

2  A.  YES, SIR.

3  Q.  AND WILL YOU EXPLAIN HOW -- IN TERMS OF NUMERICALLY HOW THEY

4  HAVE GONE UP OVER TIME?

5  A.  IN MAY 2007 THERE WAS FOUR, AND IN AUGUST 2008 THERE WAS 937

6  APPROXIMATELY.

7  Q.  MR. KERNAN, YOU ARE AWARE OF THE TERM OR KNOW WHAT THE TERM

8  MTA MEANS, CORRECT?

9  A.  YES, SIR.

10  Q.  AND WHAT DOES MTA MEAN FOR THE COURTS?

11  A.  IT'S A MEDICAL TECHNICAL ASSISTANT.  IT WAS A COMBINED

12  CLASS, IF YOU WILL, OF A CORRECTIONAL OFFICER AND AN LVN.

13  Q.  AND DID THE RECEIVER MAKE ANY DECISIONS WITH RESPECT TO

14  MTAS?

15  A.  HE ABOLISHED THE CLASS.

16  Q.  OKAY.  AND WERE MTAS SIMILAR TO LVNS IN SOME RESPECTS?

17  A.  IN MANY RESPECTS, YES.

18  Q.  AND DO YOU KNOW -- SO AT SOME POINT THE RECEIVER ABOLISHED

19  MTAS, CORRECT?

20  A.  YES, SIR.

21  Q.  AND DO YOU KNOW WHEN THAT WAS, APPROXIMATELY?

22  A.  I WOULD SAY IT WOULD BE SOMEWHERE BETWEEN MAY 07 AND

23  AUGUST 08.  I'M SORRY, I'M NOT SURE OF THE EXACT DATE.

24  Q.  AND DO YOU KNOW THE NUMBER OF MTAS THAT TOOK LVN POSITIONS

25  WITH THE DEPARTMENT?

 1  **A.**  I REALLY -- I REALLY DON'T.  I WAS INVOLVED IN THE PROCESS

 2  AND THE TRANSITION.  MANY DID GO TO LVNS.  SOME TOOK

 3  CORRECTIONAL OFFICER JOBS.  OTHER LEFT STATE SERVICE, RETIRED.

 4  **Q.**  SO YOU DON'T KNOW HOW MANY OF THE INCREASES IN NUMBER OF

 5  LVNS ARE THE RESULT OF THE ELIMINATION OF THE MTA POSITION, DO

 6  YOU?

 7  **A.**  NO, SIR.

 8          **THE CLERK:**  FIVE MINUTES, COUNSEL.

 9          **MR. MELLO:**  THANK YOU.

10          **JUDGE KARLTON:**  I NOTE, AS AN EXAMPLE -- I'M HAVING

11  TROUBLE TRYING TO UNDERSTAND WHAT THE CHART IS.  AND I RECOGNIZE

12  THAT, YOU KNOW, YOU REALLY DON'T HAVE DIRECT INFORMATION BECAUSE

13  THIS IS RECEIVER'S JUDGMENTS.

14          BUT IN JULY OF '08 THE RECEIVER THOUGHT IT NECESSARY

15  TO HAVE ROUGHLY 1,150, AND THE NEXT FIGURE IN AUGUST IS DOWN

16  ONE.  DO YOU HAVE ANY IDEA HOW THAT HAPPENED?

17          **THE WITNESS:**  BECAUSE OF THE FRACTIONAL PYS.  I THINK

18  IT'S JUST PROBABLY A TECHNICAL ADJUSTMENT.

19          **JUDGE KARLTON:**  OKAY.

20  **BY MR. MELLO:**

21  **Q.**  I BELIEVE YOU TESTIFIED TO THIS EARLIER, BUT THERE IS A GAP

22  IN MANY OF THESE CHARTS BETWEEN FILLED POSITIONS AND ESTABLISHED

23  POSITIONS, CORRECT?

24  **A.**  YES, SIR.

25  **Q.**  AND WHAT IS YOUR UNDERSTANDING AS TO HOW THOSE MEDICAL

1  PHYSICIANS ARE BEING -- OR THOSE GAPS ARE BEING FILLED FOR

2  MEDICAL PERSONNEL?  WHAT'S YOUR UNDERSTANDING, IF AT ALL?

3  **A.**  THEY ARE BEING FILLED BY USEFUL REGISTRY STAFF AND OVERTIME.

4  **Q.**  AND YOU SPECIFICALLY COULDN'T TELL US HOW MUCH THAT GAP IS

5  FILLED FOR EACH CATEGORY OF CLINICIANS THAT WE TALKED ABOUT, CAN

6  YOU?

7  **A.**  I COULDN'T SAY EXACTLY.  I DO KNOW IF THERE IS AN RN

8  POSITION ON A HOUSING UNIT, FOR EXAMPLE, AND THERE IS NOT A

9  STAFF MEMBER TO BE THERE FOR THAT, THEY WILL USE OVERTIME OR A

10 REGISTRY STAFF MEMBER TO FILL IT.  THE POSITIONS ARE NOT LEFT

11 UNFILLED.

12             THERE IS A GAP IN THE POSITIONS, BUT THERE IS NOT A

13 GAP IN THE WORKLOAD AT THE PRISONS.  THOSE POSITIONS FILLED.

14 **Q.**  BUT WITH SPECIFICITY -- THE RECEIVER WOULD KNOW WITH

15 SPECIFICITY THE LEVEL OF THE GAP IF ANY THAT REMAINS, CORRECT?

16 **A.**  MUCH BETTER THAN I, YES, SIR.

17 **Q.**  HAVE THERE ALSO BEEN INCREASES IN MENTAL HEALTH CARE

18 STAFFING IN THE LAST -- IN THE LAST 10 OR SO YEARS IN THE

19 DEPARTMENT?

20 **A.**  YES, SIR.

21 **Q.**  OKAY.  AND WE HAVE HAD TESTIMONY FROM OTHER WITNESSES WHO

22 HAVE TALKED ABOUT SOME OF THOSE IMPROVEMENTS OR INCREASES IN

23 STAFFING, BUT I WANT TO TAKE YOU TO PAGE TWO OF THE EXHIBIT WITH

24 RESPECT TO PSYCH TECHS.

25             **MR. FAMA:**  WHAT EXHIBIT?

1            MR. MELLO:  THIS IS 12351, PAGE TWO, I BELIEVE.

2  BY MR. MELLO:

3  Q.  HAS THERE BEEN AN INCREASE IN THE NUMBER OF PSYCH TECHS

4  BETWEEN JULY 1994 AND SEPTEMBER 2008?

5  A.  YES, FROM 18 TO 492.

6  Q.  IN ADDITION TO INCREASES IN MENTAL HEALTH STAFF, HAVE THERE

7  BEEN IMPROVEMENTS IN THE ROLE OF CUSTODY STAFF AND THE DELIVERY

8  OF MENTAL HEALTH CARE BY CDCR TO ITS INMATES AT CURRENT

9  POPULATION LEVELS?

10  A.  I THINK SIGNIFICANT ENHANCEMENTS.

11  Q.  CAN YOU DESCRIBE SOME OF THOSE?

12  A.  I THINK THAT THERE IS INCREASED TRAINING FOR OUR

13  CORRECTIONAL OFFICERS.  HAVING WORKED THE PRISONS FOR MANY OF

14  THE YEARS, I HAVE SEEN A SIGNIFICANT INCREASE IN THE STAFF

15  MEMBERS' UNDERSTANDING OF INMATES WITH MENTAL ILLNESS, REFERRALS

16  TO MENTAL HEALTH PROFESSIONALS, REVIEW OF DISCIPLINARY REPORTS

17  FOR INMATES THAT HAVE A MENTAL ILLNESS, TRAINING ON SUICIDE

18  PREVENTION, CPR, INCREASED REVIEW OF INCIDENTS AND, YOU KNOW,

19  EVALUATION OF HOW WE CAN BETTER EVALUATE OUR POLICIES AND

20  PRACTICES IN REGARDS TO THE MENTAL HEALTH POPULATION.

21  Q.  YOU TESTIFIED ABOUT SUICIDE TRAINING.  HAVE THERE BEEN ANY

22  SPECIFIC IMPROVEMENTS WITH RESPECT TO PREVENTION OF -- OR

23  EFFORTS TO REDUCE SUICIDES IN YOUR PRISONS?

24  A.  THERE HAS BEEN POLICY CHANGES.  FOR EXAMPLE, WHEN AN

25  OFFENDER IS PLACE INDEED AD SEG THERE IS A PLACARD PLACED ON HIS

1  CELL FRONT SO THAT STAFF IS AWARE THAT HE IS A NEW ARRIVAL INTO

2  THE AD SEG UNIT.

3          THERE'S INCREASED MONITORING BY CORRECTIONAL STAFF.

4  THEY DO 30-MINUTE CHECKS AND ARE TO DOCUMENT THOSE CHECKS.

5          THERE HAS BEEN SOME PHYSICAL PLANT MODIFICATIONS TO

6  BETTER PREVENT SUICIDE.  BETTER ACCESS TO YARDS, GETTING INMATES

7  OUT FOR ACTIVITIES.

8          CERTAINLY, MORE PROGRAMMING WITHIN THE PRISON AND THE

9  MENTAL HEALTH PROFESSIONALS.  GETTING THE OFFENDER TO GROUP AND

10 THOSE KIND OF THINGS HAS CERTAINLY INCREASED.

11 **Q.**  YOU SPOKE ABOUT PHYSICAL PLANT CHANGES.  HAVE THERE ALSO

12 BEEN SPECIFIC, TO YOUR KNOWLEDGE, SOME PHYSICAL PLANT OR SOME

13 BUILDING WITH RESPECT TO -- OR CONSTRUCTION EFFORTS WITH RESPECT

14 TO SUICIDE PREVENTION?

15 **A.**  WELL, THERE'S A COURT-APPROVED PLAN.  I THINK WE HAVE -- I

16 THINK LAST I LOOKED, IT'S BEEN SOME TIME, ABOUT 600 CELLS THAT

17 HAVE BEEN MODIFIED TO TAKE AWAY THE EXTRA BUNK AND REDUCE THE

18 AMOUNT OF HARDWARE THAT AN OFFENDER COULD HURT THEMSELF WITH.

19 SOME MESHING ON THE SCREENS, FROM LARGE MESHING TO SMALL

20 MESHING, TO PREVENT THEM FROM ATTACHING A SHEET OR OTHER ITEM TO

21 HURT THEMSELVES.

22          **JUDGE KARLTON:**  EXCUSE ME.

23              (DISCUSSION HELD OFF THE RECORD.)

24 **BY MR. MELLO:**

25 **Q.**  MR. KERNAN, HAS CDCR MADE IMPROVEMENTS IN CONNECTION WITH

1   THE CONSTRUCTION OF SMALL MANAGEMENT YARDS FOR ADMIN -- AD SEG

2   UNITS?

3   **A.** YES, SIR.

4   **Q.** GENERALLY, TO YOUR KNOWLEDGE, WHAT HAVE THEY DONE IN THAT

5   REGARD?

6   **A.** I THINK WE HAVE ABOUT 600 OF THEM CONSTRUCTED. THERE'S

7   SOME -- AN ADDITIONAL AMOUNT THAT CERTAINLY WILL BE CONSTRUCTED.

8   WHILE NOT IN MY COMPLETE PURVIEW, THE FACILITY MANAGEMENT STAFF

9   DIVISION OF OUR DEPARTMENT IS REALLY RESPONSIBLE FOR THAT, BUT I

10  -- I THINK THEY HAVE GOT ABOUT 600 OF THEM DONE SO FAR.

11  **Q.** ARE THERE PLANS TO BUILD MORE?

12  **A.** YES, SIR.

13  **Q.** DOES THE DIVISION OF ADULT INSTITUTIONS ALSO USE IN SOME

14  INSTANCES DOUBLE CELLING OF UNITS IN ADMINISTRATIVE SEGREGATION

15  UNITS AS A TECHNIQUE FOR REDUCING SUICIDE?

16  **A.** CERTAINLY. IT'S MY EXPERIENCE THAT INMATES THAT ARE DOUBLE

17  CELLED ARE LESS LIKELY TO DO IT. FINDING A COMPATIBLE CELL MATE

18  IS ABSOLUTELY A MEANS THAT WE ATTEMPT AND I HAVE ATTEMPTED TO

19  JOINT TWO INMATES UP SO THAT THEY KEEP AN EYE ON EACH OTHER.

20  **Q.** MR. KERNAN, WE ARE GOING TO PULL OUT DEFENDANT'S EXHIBIT

21  1092, WHICH I BELIEVE IS THE RECEIVER'S MAY '07 OVERCROWDING

22  REPORTS. SPECIFICALLY 42 AND 43.

23          FIRST OF ALL, HAVE YOU IN THE PAST REVIEWED THE

24  RECEIVER'S OVERCROWDING REPORT FROM MAY OF 2007?

25  **A.** YES, SIR.

1  Q.  IN THAT REPORT ON PAGES 42 AND 43, THE RECEIVER WROTE:

2              "TO SUMMARIZE, THOSE WHO BELIEVE THE

3              CHALLENGES FACED BY THE PLAN OF ACTION ARE

4              UNCOMPLICATED AND WHO THINK THAT POPULATION

5              CONTROLS WILL SOLVE CALIFORNIA'S PRISONS

6              HEALTHCARE PROBLEMS ARE SIMPLY WRONG.

7              POPULATION LIMITS MAY HELP EFFECTUATE A MORE

8              TIMELY AND COST EFFECTIVE REMEDIAL PROCESS.

9              HOWEVER, THE CURE TO EXISTING HEALTHCARE

10             PROBLEMS WILL BE DIFFICULT AND COSTLY TO

11             IMPLEMENT REGARDLESS OF POPULATION CONTROL

12             EFFORTS."

13             MR. KERNAN, DO YOU AGREE THAT THE -- THAT

14  OVERCROWDING IS NOT THE BIGGEST IMPEDIMENT TO THE RECEIVER'S

15  DELIVERY OF QUALITY CORRECTIONAL MEDICAL CARE TO CALIFORNIA'S

16  INMATE PATIENTS?

17             MR. FAMA:  OBJECTION.  STEVE FAMA FOR THE PLAINTIFF

18  CLASS.  THIS IS OUTSIDE MR. KERNAN'S EXPERTISE, OR IT HASN'T

19  BEEN ESTABLISHED.

20             LACK OF FOUNDATION.  ALSO, HE WAS NOT DESIGNATED AS A

21  WITNESS REGARDING THESE PHASE ONE ISSUES.

22             MR. MELLO:  I BELIEVE THIS IS A SECOND HALF PHASE ONE

23  ISSUE, WHETHER THERE IS ALTERNATIVE THINGS THAT CAN BE DONE.

24             I DON'T BELIEVE HE IS GOING DO PRIMARY CAUSE.  I

25  BELIEVE HE IS SAYING WHETHER IT IS OR IT ISN'T.  AND I BELIEVE

 1  THAT --

 2              **JUDGE HENDERSON:**  WHAT IS OR ISN'T?

 3          **MR. MELLO:**  I BELIEVE THAT YOU CAN DO THINGS -- AND

 4  HE HAS ALREADY TESTIFIED TODAY ABOUT MANY THINGS YOU CAN DO TO

 5  IMPROVE MEDICAL CARE, INCLUDING STAFFING.

 6          **JUDGE KARLTON:**  THE QUESTION THAT WAS OBJECTED TO,

 7  HOWEVER, MR. MELLO --

 8          **MR. MELLO:**  I CAN REASK THE QUESTION, IF YOU WOULD

 9  LIKE.

10          **JUDGE KARLTON:**  PERHAPS YOU SHOULD.

11  **BY MR. MELLO:**

12  **Q.**  DO YOU BELIEVE THAT THE RECEIVER CAN CONTINUE TO IMPROVE

13  MEDICAL CARE IN THE FACE OF POPULATION PRESSURES?

14          **MR. FAMA:**  OBJECTION.  LACKS FOUNDATION.

15          **JUDGE HENDERSON:**  I'M GOING TO LET HIM ANSWER THAT.

16  **A.**  I DO NOT THINK HE OVERCROWDING IS THE PRIMARY MEANS.  I

17  AGREE WITH THE DOCUMENT AND THE FACTS, TALKED TO MR. HAGAR AND

18  THE RECEIVER STAFF.

19          **MR. FAMA:**  MOTION TO STRIKE THAT ANSWER.

20          **JUDGE HENDERSON:**  GRANTED.

21  **BY MR. MELLO:**

22  **Q.**  OKAY.  DO YOU BELIEVE THAT MEDICAL CARE CAN BE IMPROVED

23  THROUGH THE MEANS THAT YOU HAVE TESTIFIED ABOUT TODAY --

24  STAFFING, CUSTODY, ET CETERA -- IN LIGHT OF THE POPULATION

25  PRESSURES?

1  **A.**  ABSOLUTELY, YES.

2  **Q.**  AND YOU HAVE BEEN WITH THE DEPARTMENT FOR MORE THAN 25

3  YEARS, CORRECT?

4  **A.**  YES, SIR.

5  **Q.**  FOR HOW MANY OF THOSE YEARS HAS THE DEPARTMENT USED

6  NON-TRADITIONAL BEDS?

7  **A.**  I THINK FOR ALL 25 YEARS WE HAVE HAD SOME LEVEL OF

8  NON-TRADITIONAL BEDS.

9  **Q.**  IN FACT, IN APRIL OF 2004 YOU HAD MORE THAN 14,000

10  NON-TRADITIONAL BEDS, CORRECT?

11  **A.**  YES, SIR.

12  **Q.**  AND HOW DOES THAT COMPARE TO THE NUMBER OF NON-TRADITIONAL

13  BEDS CURRENTLY IN THE DEPARTMENT?

14  **A.**  IT'S VERY CLOSE.  IN FACT, WE HAVE A LITTLE BIT LESS NOW.

15  **Q.**  OKAY.  AND DO YOU ALSO HAVE PLANS TO HAVE APPROXIMATELY

16  9,000 NON-TRADITIONAL BEDS BY THE END OF JUNE, 2009?

17  **A.**  YES, SIR.  WE HAVE 5,000 ON THE CURRENT SCHEDULE TO GO DOWN.

18  **Q.**  DO YOU HAVE ANY REASON TO BELIEVE THAT THAT CURRENT SCHEDULE

19  WILL NOT BE MET?

20  **A.**  NOT AT ALL.

21           **MR. MELLO:**  NOTHING FURTHER, YOUR HONORS.  THANK YOU.

22           **THE COURT:**  INTERVENORS HAVE ANYTHING?

23           **MR. MITCHELL:**  NO QUESTIONS.

24           **THE COURT:**  CROSS?

25           **MR. FAMA:**  THANK YOU, YOUR HONORS.  STEVE FAMA FOR

1  THE PLAINTIFF CLASS.  GOOD MORNING.

2                    **CROSS EXAMINATION**

3  **BY MR. FAMA:**

4  **Q.**  GOOD MORNING, MR. KERNAN.

5  **A.**  GOOD MORNING, SIR.

6  **Q.**  IF I COULD JUST A HALF SECOND TO STRAIGHTEN MY FILES.

7                    (BRIEF PAUSE.)

8  **Q.**  MR. KERNAN, ANOTHER TERM FOR NON-TRADITIONAL BEDS IS BAD

9  BEDS, RIGHT?

10  **A.**  YES, SIR.

11  **Q.**  AND YOU, YOURSELF, USE THE TERM BAD BEDS, CORRECT?

12  **A.**  YES, SIR.

13  **Q.**  AND SOME PEOPLE CALL BAD BEDS UGLY BEDS, RIGHT?

14  **A.**  YES, SIR.

15  **Q.**  BAD BEDS ARE BEDS IN AREAS NEVER INTENDED OR DESIGNED TO

16  HOUSE INMATES, RIGHT?

17  **A.**  YES, SIR.

18  **Q.**  AND HOUSING INMATES IN THESE NON-TRADITIONAL OR BAD BEDS

19  PRESENTS SERIOUS SAFETY CONCERNS FOR BOTH INMATES AND STAFF,

20  CORRECT?

21          **MR. MELLO:**  OBJECTION.  OUTSIDE THE SCOPE.

22          PAUL MELLO.  OUTSIDE THE SCOPE OF HIS DIRECT

23  TESTIMONY AND HIS TRIAL AFFIDAVIT.

24          **JUDGE HENDERSON:**  WELL, HE IS EXPANDING CONSIDERABLY

25  ON THE NOTION OF BEDS, WHICH WAS THE THING YOU CLOSED ON.  I

1  WILL ALLOW IT.

2  **BY MR. FAMA:**

3  Q.  AND AREAS NEVER INTENDED OR DESIGNED TO HOUSE INMATES THAT

4  HAVE BAD BEDS IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

5  REHABILITATION INCLUDE GYMNASIUMS AND DAYROOMS, RIGHT?

6  A.  YES, SIR.

7  Q.  GOVERNOR SCHWARZENEGGER PROCLAIMED A STATE OF EMERGENCY

8  REGARDING CALIFORNIA PRISON CROWDING ON OCTOBER 4, 2006,

9  CORRECT?

10  A.  YES, SIR.

11  Q.  THE EMERGENCY OVERCROWDING PROCLAMATION, IN PART, WAS BASED

12  ON CDCR'S USE OF NON-TRADITIONAL BEDS, CORRECT?

13  A.  YES, SIR.

14  Q.  AT THE TIME THE GOVERNOR ISSUED THE EMERGENCY PROCLAMATION,

15  THERE WERE APPROXIMATELY 17,500 NON-TRADITIONAL BEDS BEING USED,

16  CORRECT?

17  A.  I THINK THAT'S RIGHT.

18  Q.  IN THE MONTHS AFTER THE GOVERNOR'S EMERGENCY PROCLAMATION,

19  THE CDCR INCREASED THEIR USE OF NON-TRADITIONAL BEDS, CORRECT?

20  A.  NO, SIR.

21  Q.  THAT'S NOT CORRECT, MR. KERNAN?

22  A.  MAYBE I'M MISUNDERSTANDING THE QUESTION.

23  Q.  IN THE MONTHS AFTER THE GOVERNOR ISSUED THE EMERGENCY

24  PROCLAMATION IN OCTOBER, 2006, THE NUMBER OF BAD BEDS,

25  NON-TRADITIONAL BEDS USED IN THE DEPARTMENT OF CORRECTIONS

1  INCREASED, CORRECT?

2  **A.**  I'M NOT SURE -- THERE'S 5,000 LESS THAN DURING THAT PERIOD

3  OF TIME TODAY.  SO I'M NOT SURE IF YOU SAY THAT THEY ARE

4  INCREASING, IF THERE WAS A --

5          **JUDGE KARLTON:**  NO, NO, NO, NO.  THERE WAS AN

6  INCREASE, IS WHAT HAD FAMA IS SAYING.  WAS THERE AN INCREASE

7  WHICH HAS NOW BEEN REDUCED?

8          **JUDGE HENDERSON:**  AFTER THE GOVERNOR ISSUED HIS

9  PROCLAMATION, DID BAD BEDS INCREASE IN THAT PERIOD THEREAFTER?

10          **THE WITNESS:**  I WOULD HAVE TO TAKE A LOOK.  IF THEY

11  DID -- IT WAS AT AN ALL-TIME HIGH OF 19,600 OR SO, AND TODAY IT

12  SITS AT BELOW FOURTEEN.

13          SO THERE MIGHT HAVE BEEN A MOMENTARY INCREASE, BUT

14  WITH A NUMBER OF EFFORTS, PAROLE REFORM, AB 900, OUT-OF-STATE

15  BEDS, WE HAVE BEEN ABLE TO REDUCE THAT DOWN TO ITS CURRENT

16  LEVEL.

17  **BY MR. FAMA:**

18  **Q.**  AND, MR. KERNAN, THAT ALL-TIME HIGH OF 19,500-AND-SO BEDS

19  TOOK PLACE IN AUGUST, 2007, CORRECT?

20  **A.**  I THINK SO, YES.

21  **Q.**  THE DEPARTMENT OF CORRECTIONS' PLAN TO CONTINUE REDUCING THE

22  NUMBER OF BAD BEDS THAT ARE USED IS DEPENDENT UPON MANY THINGS,

23  CORRECT?

24          **JUDGE KARLTON:**  ON WHAT?

25          **MR. FAMA:**  MANY THINGS.  EXCUSE ME, YOUR HONOR.

1  **BY MR. FAMA:**

2  **Q.**  MR. KERNAN?

3  **A.**  YES, SIR.

4  **Q.**  AND THAT WOULD INCLUDE CONTINUING THE OUT-OF-STATE TRANSFERS

5  OF INMATES TO CONTRACTED PRIVATELY-RUN CORRECTIONAL FACILITIES,

6  CORRECT?

7  **A.**  AMONG OTHER THINGS, YES.

8  **Q.**  AND IT ALSO DEPENDS UPON THE NUMBER OF PEOPLE THAT THE

9  DEPARTMENT OF CORRECTIONS -- EXCUSE ME, THE NUMBER OF PEOPLE WHO

10  ARE INMATES THAT THE DEPARTMENT OF CORRECTIONS RECEIVES,

11  CORRECT?

12  **A.**  YES, SIR.

13  **Q.**  LINDA BARNETT IS THE CHIEF OF OPERATIONS SUPPORT FOR THE

14  CDCR DIVISION OF ADULT INSTITUTIONS, RIGHT?

15  **A.**  YES.

16  **Q.**  YOU SUPERVISE OR MANAGE HER WORK, CORRECT?

17  **A.**  I'M SEVERAL LEVELS ABOVE, BUT YES.

18  **Q.**  ON NOVEMBER 26, 2008, MS. BARNETT ISSUED A MEMORANDUM

19  ENTITLED "EMERGENCY REVISION OF NOVEMBER 2008 AND DECEMBER 2008

20  INSTITUTION ACTIVATION SCHEDULES AND ISSUANCE OF JANUARY 2009

21  INSTITUTION ACTIVATION SCHEDULES," CORRECT?

22  **A.**  I DON'T KNOW.

23          **MR. FAMA:**  YOUR HONOR, MAY I APPROACH THE WITNESS?

24          **JUDGE HENDERSON:**  YOU MAY.

25

 1                    (WHEREUPON, DOCUMENT WAS TENDERED

 2                    TO THE WITNESS.)

 3           **JUDGE KARLTON:**  IS THIS PRESENTLY IN EVIDENCE, SIR?

 4           **MR. FAMA:**  IT IS NOT.  IT HAS BEEN MARKED P-839.

 5   **BY MR. FAMA:**

 6   **Q.**  MR. KERNAN, I HAVE HANDED YOU A DOCUMENT THAT'S ENTITLED

 7   ACROSS THE TOP "MEMORANDUM" AND HAS THE DATE NOVEMBER 26, 2008.

 8           IF YOU COULD TURN TO THE THIRD PAGE OF THAT --

 9           **JUDGE KARLTON:**  FIRST OF ALL, HAVE YOU EVER SEEN THIS

10   DOCUMENT?

11           **THE WITNESS:**  I WAS CC'D ON IT, SIR.  I DON'T RECALL

12   SEEING IT BEFORE.

13           **JUDGE KARLTON:**  BUT YOU WERE CC'D ON IT?

14           **THE WITNESS:**  YES.

15           **JUDGE KARLTON:**  AND IN THE DEPARTMENT IF YOU'RE CC'D,

16   YOU WOULD GET IT.

17           **THE WITNESS:**  AND THIS IS A DOCUMENT I WOULD

18   REGULARLY GET IN THE COURSE OF MY BUSINESS.

19           **MR. FAMA:**  I WOULD MOVE THIS INTO EVIDENCE.

20           **JUDGE HENDERSON:**  ADMITTED.

21                    (PLAINTIFFS' EXHIBIT 839 RECEIVED IN

22                    EVIDENCE)

23   **BY MR. FAMA:**

24   **Q.**  AND AS YOU SAID, MR. KERNAN, YOU WERE SENT A COPY OF THIS

25   MEMO, CORRECT?

1  **A.**  YES, SIR.

2  **Q.**  IN FACT, YOU WERE THE FIRST CC LISTED, CORRECT?

3  **A.**  YES, SIR.

4  **Q.**  AND COPIES WERE ALSO SENT TO ALL CDCR PRISONS WARDENS,

5  RIGHT?

6  **A.**  YES, SIR.

7  **Q.**  AND TO ALL HEALTHCARE MANAGERS, TOO?

8  **A.**  YES, SIR.

9  **Q.**  AND A WHOLE LOT OF OTHER PEOPLE?

10  **A.**  YES, SIR.

11  **Q.**  IN THE MEMO ON THE FIRST PAGE IN THE FIRST PARAGRAPH

12  MS. BARNETT WROTE, QUOTE:

13        "DUE TO THE POPULATION BEING SIGNIFICANTLY

14        ABOVE FULL PROJECTIONS, MANY DEACTIVATIONS THAT

15        WERE PREVIOUSLY SCHEDULED HAVE BEEN POSTPONED AT

16        THIS TIME."

17        CORRECT?

18  **A.**  YES, SIR.

19  **Q.**  AND AMONG THE MATTERS POSTPONED AND LISTED IN MS. BARNETT'S

20  MEMO WERE DEACTIVATIONS OF HUNDREDS OF BAD BEDS AND DAYROOMS AND

21  GYMS, CORRECT?

22  **A.**  YES, SIR.

23  **Q.**  AND THAT WOULD INCLUDE, FOR EXAMPLE, UNDER JANUARY, 2009, ON

24  THE SECOND PAGE, 100 BEDS IN THE ASP, OR AVENAL STATE PRISON'S

25  FACILITY GYM, CORRECT?

1  **A.** YES, SIR.

2  **Q.** AND 175 BEDS IN THE CALIFORNIA CORRECTIONAL INSTITUTION, OR

3  CCI GYM, RIGHT?

4  **A.** YES, SIR.

5  **Q.** AND 180 BEDS IN THE CENTINELA, OR CEN, FACILITY B DAYROOM,

6  RIGHT?

7  **A.** YES, SIR.

8  **Q.** EARLIER THIS YEAR TRANSFERS TO THE OUT-OF-STATE

9  PRIVATELY-CONTRACTED-FOR PRISON FACILITY IN MISSISSIPPI FROM THE

10 CALIFORNIA DEPARTMENT OF CORRECTIONS WERE STOPPED, CORRECT?

11 **A.** YES.

12 **Q.** AND THEY WERE STOPPED FOLLOWING THE IDENTIFICATION OF

13 MEDICAL DEFICIENCIES AT THAT MISSISSIPPI PRISON, CORRECT?

14 **A.** YES, SIR.

15 **Q.** THAT MISSISSIPPI PRISON IS CALLED TALLAHATCHIE OR SOMETHING,

16 CORRECT?

17 **A.** YES, SIR.

18 **Q.** DO YOU KNOW THE NAME?

19 **A.** I JUST KNOW IT AS TALLAHATCHIE.

20 **Q.** TALLAHATCHIE, LIKE THE BRIDGE, RIGHT?

21 **A.** RIGHT.

22 **Q.** AND AMONG THE MEDICAL ISSUES OR DEFICIENCIES IDENTIFIED WERE

23 SOME INVOLVING A DEATH OF A CALIFORNIA DEPARTMENT OF CORRECTIONS

24 ASTHMA PATIENT, RIGHT?

25 **A.** I DON'T KNOW THAT I COULD SAY THAT.  THE RECEIVER'S OFFICE

1  IS THE ONE WHO HAD SOME ISSUES, AND I DON'T KNOW IF THAT WAS THE

2  SINGULAR REASON.

3          WE HAVE WORKED THROUGH IT AND THE RECEIVER HAS SINCE

4  AUTHORIZED THE RETURN OF THAT FACILITY AND WE ARE SENDING

5  INMATES THERE TODAY.

6  Q.  THERE WAS AN ASTHMA-RELATED DEATH OF A CALIFORNIA DEPARTMENT

7  OF CORRECTIONS PRISONER AT THE TALLAHATCHIE, MISSISSIPPI

8  FACILITY, CORRECT?

9  A.  YES, SIR.

10 Q.  AND YOU WERE ON THE PLANE THAT TOOK THE FIRST CDCR INMATES

11 TO THE MISSISSIPPI FACILITY, CORRECT?

12 A.  YES, SIR.

13 Q.  YOU WANTED TO SEE THE MISSISSIPPI FACILITY, RIGHT?

14 A.  YES, SIR.

15 Q.  AND YOU ACTUALLY WENT TO AND SAW IT, RIGHT?

16 A.  CORRECT.

17 Q.  AND YOU DIDN'T IDENTIFY ANY MEDICAL DEFICIENCIES WHILE YOU

18 WERE THERE, CORRECT?

19 A.  NO, SIR.

20 Q.  DEFICIENCIES REGARDING MEDICAL PROTOCOLS, DOCTORS

21 PRESCRIBING MEDICATION, AMBULANCE SERVICES, THINGS LIKE THAT ARE

22 COMPLETELY OUT OF YOUR EXPERTISE, CORRECT?

23 A.  YES, SIR.

24 Q.  IN MAY OF 2007, MR. KERNAN, YOU STATED UNDER OATH THAT THE

25 EMERGENCY CONDITIONS CAUSED BY NON-TRADITIONAL BEDS SHOULD BE

1  ELIMINATED IN 2009, CORRECT?

2  **A.**  YES, SIR.

3  **Q.**  AND ALTHOUGH YOU ARE HOPEFUL TO END THE USE OF ALL BAD BEDS

4  SOON, YOU CAN'T PUT A DATE ON SOON BECAUSE YOUR HOPE IS BASED ON

5  THE REFORMS OF AB 900, THE BUILDING OF REENTRY FACILITIES,

6  PAROLE REFORMS AND THE RECEIVER'S 10,000 BEDS; AND NONE OF THOSE

7  THINGS HAVE HAPPENED YET, CORRECT?

8  **A.**  I THINK YOU SAID AB 900.  CERTAINLY, SOME ASPECTS OF AB 900

9  HAVE, BUT I THINK GENERALLY THE ANSWER TO THAT QUESTION IS, YES,

10 THOSE THINGS ARE STILL BEING WORKED THROUGH.

11 **Q.**  WHEN WILL ALL NON-TRADITIONAL BAD BEDS IN THE DEPARTMENT OF

12 CORRECTIONS BE PUT TO AN END, MR. KERNAN?

13 **A.**  I HAVE NO WAY OF KNOWING THAT.

14 **Q.**  THE DEPARTMENT OF CORRECTIONS HAS NOT SCHEDULED ANY

15 ADDITIONAL DEACTIVATION OF BAD BEDS BEYOND THE 5,000 THAT YOU

16 SAY ARE CURRENTLY SCHEDULED TO BE DEACTIVATED BY MID TO LATE

17 2009, CORRECT?

18 **A.**  WE WILL SCHEDULE AS -- IT'S A VERY FLUID SITUATION, BUT AS

19 WE MOVE FORWARD, IT'S VERY LIKELY THAT WE WOULD INCLUDE

20 ADDITIONAL BAD BEDS COMING DOWN.

21 **Q.**  MR. KERNAN, PERHAPS I WASN'T CLEAR WITH MY QUESTION.

22          THE DEPARTMENT OF CORRECTIONS HAS NOT SCHEDULED ANY

23 ADDITIONAL DEACTIVATIONS BEYOND THOSE THAT YOU TESTIFIED TO IN

24 ANSWER TO MR. MELLO'S QUESTIONS, CORRECT?

25 **A.**  NO, SIR.

1  Q.  MR. KERNAN, YOU DON'T KNOW THE AMOUNT OF BAD BEDS THAT WILL

2  BE DEACTIVATED IN THE NEXT YEAR AND THE PRISONER POPULATION THAT

3  CORRESPONDINGLY WOULD BE DECREASED DUE TO PAROLE REDUCTION

4  STRATEGIES, CORRECT?

5  A.  I DON'T KNOW AN EXACT NUMBER, NO, SIR.

6  Q.  AND YOU DO NOT KNOW HOW MANY FEWER INMATES WILL BE RECEIVED

7  BY CDCR ONCE THE DECISION-MAKING PAROLE MATRIX IS IMPLEMENTED

8  STATE WIDE, CORRECT?

9  A.  NO, SIR.

10  Q.  THE DEPARTMENT OF CORRECTIONS, AS PART OF THE BUDGET PROCESS

11  THIS PAST YEAR, EVALUATED REDUCING THE NUMBER OF LOW

12  NON-SERIOUS, NON-VIOLENT OFFENDERS, CORRECT?

13  A.  YES, SIR.

14  Q.  AND THE DEPARTMENT OF CORRECTIONS PUT FORWARD A PROPOSAL TO

15  RELEASE ABOUT 20,000 LOW RISK OFFENDERS 20 MONTHS BEFORE THE END

16  OF THEIR TERM, CORRECT?

17  A.  YES, SIR.

18  Q.  YOU WORKED ON THAT PROPOSAL, RIGHT?

19  A.  YES, SIR.

20  Q.  YOU DEVELOPED ESTIMATES, IDENTIFIED THE POPULATION, LOOKED

21  AT THE SPECIFIC CRIMES THAT WOULD MAKE UP THE NON-SERIOUS,

22  NON-VIOLENT OFFENSE GROUP, THINGS OF THAT NATURE, CORRECT?

23  A.  YES, SIR.

24  Q.  WHEN THE CDCR PROPOSED THIS EARLY RELEASE OF 20,000

25  PRISONERS, IT WASN'T TRYING TO ENDANGER PUBLIC SAFETY, RIGHT?

1  **A.** OF COURSE NOT, NO.

2  **Q.** HAVING MORE STAFF, CORRECTIONAL AND MEDICAL STAFF, WITHOUT A

3  REDUCTION IN THE NUMBER OF PRISONERS DOESN'T DO ANYTHING IF

4  THERE ARE PROBLEMS WITH SPACE FOR CLINICS AND THE STAFF TO WORK

5  THEM, RIGHT?

6  **A.** IF THERE'S NOT CORRESPONDING MODIFICATIONS TO THE PHYSICAL

7  PLAN, I THINK I WOULD AGREE WITH THAT, YES.

8  **Q.** THE RECEIVER'S PLAN FOR CONSTRUCTION HAS TWO PARTS; THE

9  CONSTRUCTION OF TREATMENT AND OFFICE SPACE AT EXISTING PRISONS,

10 AND THE BUILDING OF UP TO 10,000 BEDS AT NEW FACILITIES, RIGHT?

11 **A.** YES, SIR.

12 **Q.** THE RECEIVER HAS NOT RECEIVED THE FUNDING HE HAS REQUESTED

13 FOR HIS PLANS FOR THE CONSTRUCTION OF HEALTHCARE TREATMENT AND

14 OFFICE SPACE IN EXISTING PRISONS, RIGHT?

15 **A.** I DON'T BELIEVE HE HAS RECEIVED ALL OF THE FUNDING.  I THINK

16 THAT THERE'S ALREADY BEEN A NUMBER OF PHYSICAL PLAN

17 MODIFICATIONS, MODIFICATIONS OF SPACE IN THE PRISONS AT THE

18 RECEIVER'S REQUEST INTENDING TO ENHANCE DELIVERY OF MEDICAL CARE

19 TO THE PRISONERS.

20 **Q.** IS IT YOUR TESTIMONY, MR. KERNAN, THAT THE RECEIVER CAN GO

21 FORWARD TODAY WITH ALL PLANS THAT HE HAS MADE AND SHARED WITH

22 THE DEPARTMENT OF CORRECTIONS FOR UPGRADING CLINIC AND MEDICAL

23 -- HEALTHCARE-RELATED SPACE AT THE INSTITUTIONS?

24 **A.** NO.  MY TESTIMONY IS AS THEY HAVE WENT THROUGH THE PRISONS

25 AND IDENTIFIED JUST THOSE MODIFICATIONS, THAT THEY HAVE MADE

1  OTHER CHANGES.  FOR EXAMPLE, TAKE SPACE WHERE CORRECTIONAL

2  OFFICERS ARE CURRENTLY -- HAVE THEIR OFFICES AND HE HAS ORDERED

3  THAT THAT BE A CLINIC AREA, OR -- JUST AS AN EXAMPLE.  AND HE

4  HAS DONE THAT AND IT HASN'T COST ANY MONEY TO DO THOSE

5  MODIFICATIONS IN THE PRISONS.  AND HE HAS WENT TO ALL 33, I

6  BELIEVE.

7  **Q.**  BUT FOR THOSE PROJECTS THAT WOULD COST MONEY, THE RECEIVER

8  HAS NOT RECEIVED THE FUNDING THAT HE HAS REQUESTED, CORRECT?

9  **A.**  YES.

10  **Q.**  AND THE RECEIVER HAS NOT RECEIVED THE FUNDING FOR THE 10,000

11  -- UP TO 10,000 HEALTHCARE BEDS, FACILITIES THAT HE HAS

12  PROPOSED, CORRECT?

13  **A.**  NOT YET, SIR, NO.

14  **Q.**  AND YOU ARE AWARE THAT THE DEFENDANTS IN THE PLATA CASE HAVE

15  OPPOSED THE RECEIVER'S MOTION FOR AN ORDER THAT WOULD REQUIRE

16  THE DEFENDANTS TO PAY HIM AT LEAST SOME OF THE MONEY NEEDED FOR

17  THE 10,000 BED FACILITY PROJECT AND THE EXISTING PRISON

18  TREATMENT AND OFFICE SPACE UPGRADE PROGRAM, RIGHT?

19  **A.**  I'M AWARE, YES.

20  **Q.**  AND, MR. KERNAN, YOU ARE AWARE OF THE DEFICIENCIES IN SPACE,

21  MEDICAL AND HEALTHCARE SPACE AT PARTICULAR PRISONS, CORRECT?

22          **JUDGE KARLTON:**  YOU MEAN, HIS PERSONAL OPINION?

23          **MR. FAMA:**  NO --

24          **JUDGE KARLTON:**  HIS UNDERSTANDING OF WHAT THE

25  RECEIVER SAYS OR WHAT?

1          **MR. FAMA:**  I'M ASKING HIS PERSON.

2          **JUDGE KARLTON:**  WELL --

3          **MR. FAMA:**  WELL, THAT WAS --

4          **JUDGE KARLTON:**  IF THAT'S THE QUESTION OF HIS

5    OPINION, I SUPPOSE IT'S APPROPRIATE.  I'M -- I'M NOT SURE IT'S

6    APPROPRIATE, BUT LET'S GET OVER WITH IT.

7          DO YOU HAVE AN OPINION AS TO WHETHER THE SPACE IS

8    PRESENTLY ADEQUATE?

9          **THE WITNESS:**  I MEAN, AT SOME PLACES IT MAY NOT BE

10   ADEQUATE.  IT'S MY OPINION THAT AT MANY OF THE PRISONS, BOTH THE

11   MEDICAL AND MENTAL HEALTH AND CUSTODY STAFF HAVE WORKED TOGETHER

12   TO MAKE THE BEST OF THE CIRCUMSTANCES.

13          SO IT'S PRETTY HARD FOR ME TO SAY IF IT'S ADEQUATE OR

14   NOT.

15   **BY MR. FAMA:**

16   **Q.**  DO YOU KNOW, MR. KERNAN, THAT THE RECEIVER HAS REPORTED THAT

17   AT THE RECEPTION CENTER WEST FACILITY AT THE CALIFORNIA

18   INSTITUTION FOR MEN, THAT THERE ARE THREE PHYSICIANS SEEING

19   PATIENTS IN A SINGLE ROOM?

20   **A.**  I'M NOT AWARE OF THAT.  IT DOESN'T SURPRISE ME THOUGH, SIR.

21   **Q.**  AND ARE YOU AWARE THAT AT THAT SAME FACILITY, THE RECEPTION

22   CENTER WEST AT THE CALIFORNIA INSTITUTION FOR MEN IN CHINO, THAT

23   THE RECEIVER'S MASTER PLAN REPORTS THAT THERE IS A ROOM IN WHICH

24   FIVE REGISTERED NURSES SEE INMATE PATIENTS WITH NO VISUAL OR

25   AUDIO PRIVACY FOR ANYONE?

1   **A.**   I'M NOT AWARE THAT SPECIFICALLY, NO.

2   **Q.**   DO YOU HAVE ANY INFORMATION THAT WOULD CONTRADICT THAT?

3   **A.**   NO.

4   **Q.**   AND DO YOU HAVE A PLAN, MR. KERNAN, AS THE DIRECTOR OF ADULT

5   INSTITUTION OPERATIONS TO FIX THOSE TWO PROBLEMS AT THE

6   RECEPTION CENTER WEST AT CIM?

7   **A.**   THE OLD DESIGN PRISONS, ESPECIALLY CIM, THEY ARE VERY OLD

8   FACILITIES.  THERE ARE PLANS, FACILITY PLANS TO EFFECT -- IT

9   WOULDN'T BE UNDER MY DIRECT EXPERTISE OF FACILITY MANAGEMENT

10  STAFF, BUT, YES, I BELIEVE THERE'S PLANS BOTH FOR PLATA AND FOR

11  COLEMAN TO IMPROVE AND OPTIMIZE CLINICAL SPACE FOR STAFF AT ALL

12  OF OUR FACILITIES.

13  **Q.**   AND THOSE ARE THE PLANS DEVELOPED BY THE RECEIVER AND SHARED

14  AND SIGNED OFF BY THE DEPARTMENT OF CORRECTIONS, CORRECT?

15  **A.**   I THINK THAT THERE'S AN ANALYSIS GOING ON CURRENTLY TO

16  REVIEW THE EFFICACY OF THOSE IMPROVEMENTS.

17          SO WHEN YOU SAY SIGN OFF, I'M NOT SURE THAT THE

18  DEPARTMENT HAS SIGNED OFF ON ALL OF THE IMPROVEMENTS THAT THE

19  RECEIVERS PROPOSED.

20  **Q.**

21          **MR. FAMA:**  ALL RIGHT.  CAN I ASK MR. JONES TO BRING

22  UP THE SECOND -- THE FIRST AND SECOND PAGE OF DEFENDANTS' 1226,

23  PLEASE?

24                  (DOCUMENT DISPLAYED)

25

1  **BY MR. FAMA:**

2  **Q.**  AND THAT FIRST PAGE THERE SAYS: "HEALTHCARE FACILITY

3  IMPROVEMENT PROGRAM, CALIFORNIA STATE PRISON, CALIFORNIA

4  INSTITUTION FOR MEN, MASTER PLAN REPORT," MR. KERNAN?

5  **A.**  YES, SIR.

6  **Q.**  AND THAT SECOND PAGE, THERE IS A BUNCH OF -- WELL, THERE'S

7  ABOUT A HALF DOZEN SIGNATURES, CORRECT?

8  **A.**  YES, SIR.

9  **Q.**  AND SOME OF THOSE SIGNATURES YOU RECOGNIZE AS THE CALIFORNIA

10  DEPARTMENT OF CORRECTIONS, PARTICULARLY THERE ON THE LAST

11  SIGNATURE LINE, CORRECT?

12          **MR. MELLO:**  JUST A BELATED OBJECTION.  I BELIEVE THIS

13  DOCUMENT IS UNDER SEAL.

14          **JUDGE KARLTON:**  I'M SORRY.  WHAT?

15          **MR. MELLO:**  I BELIEVE THIS DOCUMENT IS UNDER SEAL,

16  YOUR HONOR.

17          **JUDGE KARLTON:**  WE ARE IN TRIAL.  THERE'S NOTHING WE

18  CAN DO ABOUT IT.

19          **MR. MELLO:**  I BELIEVE THERE IS AN ORDER IN THE PLATA

20  CASE THAT THIS PARTICULAR DOCUMENT IS UNDER SEAL.

21          **JUDGE REINHARDT:**  DOES IT MATTER IF IT'S JUST A COVER

22  AND SIGNATURE PAGE?

23          **MR. MELLO:**  I DON'T KNOW.  I JUST KNOW THERE IS AN

24  ORDER THAT THE DOCUMENT IS UNDER SEAL.

25          **MS. JOHNSON:**  THE FOOTER ACTUALLY NOTES THAT IT'S

 1  UNDER PROTECTIVE ORDER.

 2            **JUDGE KARLTON:**  THERE IS A STIPULATION THAT THIS HAS

 3  WAS TO BE UNDER SEAL?

 4            **MR. MELLO:**  I DON'T BELIEVE THAT THIS ISSUE HAS BEEN

 5  RESOLVED.

 6            THIS WAS DONE AT THE REQUEST OF THE RECEIVER'S

 7  OFFICE, THAT THIS PARTICULAR DOCUMENT BE HELD UNDER SEAL AND I

 8  BELIEVE ALL PARTIES SIGNED OFF ON THAT.

 9            **JUDGE HENDERSON:**  ARE YOU GOING INTO ANY OTHER

10  PORTIONS OF THIS?

11            **MR. FAMA:**  I DON'T BELIEVE SO, YOUR HONOR.  IT'S

12  SIMPLY TO ASK MR. KERNAN WHETHER THE DEPARTMENT HAS SIGNED OFF

13  ON THIS PARTICULAR FACILITY PLAN.

14  **A.**  I WOULD SAY THE QUESTION TO THAT IS NO, NOT ON THE A

15  HEADQUARTERS LEVEL.  YOU HAVE THE WARDEN AND SOME OF THE STAFF

16  AT THE PRISON THAT SIGNED OFF.  THEN YOU HAVE A SERGEANT IN THE

17  FACILITIES MANAGEMENT DIVISION THAT SIGNED OFF, BUT THAT HAS NOT

18  BEEN APPROVED BY A DEPUTY DIRECTOR AT OUR FACILITY PLANNING

19  DIVISION, AND CERTAINLY HASN'T BEEN SIGNED OFF BY THE SECRETARY.

20  **BY MR. FAMA:**

21  **Q.**  I UNDERSTAND WHAT YOU ARE SAYING.

22            THIS IS A RECEIVER AND AT LEAST SO FAR DEPARTMENT OF

23  CORRECTIONS PLAN FOR CIM?

24  **A.**  THIS IS WHAT I WAS TALKING ABOUT, WHERE THE RECEIVER STAFF

25  WERE GOING INTO THE PRISONS, EVALUATING WHAT IMPROVEMENTS CAN BE

1  MADE, WORKING WITH THE CORRECTIONAL STAFF OR THE STAFF AT THE

2  PRISON AND COMING TO SOME UNDERSTANDING ON THE IMPROVEMENTS,

3  YES.

4  **Q.**  AND THE RECEIVER -- DO YOU AS THE ADULT -- EXCUSE ME, THE

5  DIRECTOR FOR OPERATIONS -- DO I HAVE YOUR TITLE RIGHT

6  MR. KERNAN?  I'M SORRY.

7  **A.**  NO, SIR.  I'M AN UNDERSECRETARY.

8  **Q.**  UNDERSECRETARY FOR OPERATIONS FOR THE ADULT DIVISION OF THE

9  CALIFORNIA DEPARTMENT OF CORRECTIONS, IS THAT RIGHT?

10  **A.**  ADULT AND JUVENILE.

11  **Q.**  ADULT AND JUVENILE.

12          DO YOU HAVE A PLAN SEPARATE FROM THE RECEIVER'S

13  EFFORTS TO REMEDIATE; THAT IS, TO FIX THE LACK OF ADEQUATE SPACE

14  AT THE RECEPTION CENTER WEST HEALTHCARE CLINIC AT CIM?

15  **A.**  I COULDN'T SAY THAT SPECIFICALLY.  AGAIN, IT'S NOT UNDER MY

16  EXPERTISE, FACILITY MANAGEMENT.  WE HAVE A MULTITUDE OF

17  IMPROVEMENTS, CAPITAL OUTLAY PLANS, THAT ARE APPROVED BY FINANCE

18  AND THEN PROCESSED FOR IMPROVEMENTS ALL OVER THE STATE.

19          SO I COULDN'T SAY SPECIFICALLY ABOUT CIM WITHOUT

20  REFERRING BACK TO SOME DOCUMENTS TO SEE WHAT SPECIFICALLY WE

21  WERE PLANNING FOR CIM.

22  **Q.**  ALL RIGHT.  SO AS YOU SIT HERE TODAY, YOU DON'T -- YOU CAN'T

23  TELL ME THAT YOU DO, CORRECT?

24  **A.**  NO, SIR.

25  **Q.**  WITH REGARDS TO THE --

1          **JUDGE KARLTON:** CAN WE TAKE THIS DOWN NOW?

2          **MR. FAMA:** YES, TAKE IT DOWN. I'M SORRY, YOUR HONOR.

3          MR. JONES?

4               (DOCUMENT REMOVED FROM DISPLAY.)

5          **MR. FAMA:** THANK YOU VERY MUCH.

6  **BY MR. FAMA:**

7  **Q.** MR. KERNAN, THERE WERE SOMEWHERE AROUND 900 TO 1,000 MTA

8  POSITIONS ELIMINATED BY THE RECEIVER, RIGHT?

9  **A.** THAT SOUNDS ABOUT RIGHT. IT'S BEEN SOME TIME SINCE I SAW

10 THE ACTUAL NUMBERS.

11 **Q.** IN YOUR TRIAL AFFIDAVIT, MR. KERNAN, YOU MENTIONED THAT

12 ADMINISTRATIVE SEGREGATION INMATES CAN USE TELEVISIONS AND

13 APPLIANCES FOR DIVERSION, CORRECT?

14 **A.** I WOULD SAY THAT -- YES. THE ANSWER TO THAT IS YES.

15 **Q.** YOU DON'T KNOW HOW MANY CDCR ADMINISTRATIVE SEGREGATION

16 UNITS HAVE THE INFRASTRUCTURE CAPABILITY THAT WOULD PERMIT

17 PRISONERS TO USE TVS AND OTHER APPLIANCES, CORRECT?

18 **A.** NO, SIR.

19 **Q.** THE DEPARTMENT OF CORRECTIONS NEWER PRISON ADMINISTRATIVE

20 SEGREGATION UNITS DO NOT HAVE THE ELECTRICAL CAPACITY TO PERMIT

21 PRISONERS TO USE ELECTRICAL APPLIANCES, CORRECT?

22 **A.** YES, SIR. AND I BELIEVE THAT DECISION WAS A RESULT OF

23 SUICIDE, THE ISSUES OF GETTING ELECTROCUTED AND THAT. SO THE

24 NEWER FACILITIES DO NOT HAVE THE OUTLETS.

25 **Q.** AND MANY OF THE OLDER PRISONS HAVE THE SAME ISSUES, RIGHT?

1  **A.**  YES.  MANY OF THE 270 DESIGNED PRISONS -- WHEN I WAS THE

2  WARDEN AT MULE CREEK, FOR EXAMPLE, WE HAD OUTLETS AND WE WERE

3  ABLE TO PERMIT TELEVISIONS.  I THINK AT CSP SACRAMENTO I WAS

4  NOT.

5  **Q.**  IN YOUR TRIAL AFFIDAVIT, MR. KERNAN, YOU DISCUSSED WHAT I

6  WOULD CHARACTERIZE AS A FOUR-POINT PROGRAM, REDUCTION PROGRAM

7  FOR CLASSIFICATION SCORES OF PRISONERS WHO HAVE MENTAL HEALTH

8  CONDITIONS, RIGHT?

9  **A.**  YES, SIR.

10 **Q.**  THAT FOUR-POINT PROGRAM IS NOT DESIGNED TO REDUCE THE

11 PRISONER POPULATION, CORRECT?

12 **A.**  NO, SIR.  THE --

13 **Q.**  THANK YOU.

14 **A.**  OKAY.

15 **Q.**  THE DEPARTMENT OF CORRECTIONS HOUSES PRISONERS IN CAMPS IN

16 COMMUNITY CORRECTIONS FACILITIES, CORRECT?

17 **A.**  YES.

18 **Q.**  PRISONERS IN THOSE CDCR CAMPS AND COMMUNITY FACILITIES ARE

19 TRANSPORTED TO ONE -- TO ONE OR MORE OF THE 33 CDCR PRISONS FOR

20 THEIR NORMAL ROUTINE MEDICAL CARE NEEDS AND ARE PROVIDED THOSE

21 SERVICES AT THOSE PRISONS, CORRECT?

22 **A.**  YES.

23 **Q.**  AND THOSE PRISONS WHICH RECEIVE THOSE INMATES ONCE A WEEK,

24 THEY GET A BUS FROM THE COMMUNITY FACILITIES OR CAMPS WITH

25 PRISONERS THAT REQUIRE A CHECKUP FROM A NURSE OR DOCTOR, RIGHT?

1  **A.**  YES.

2  **Q.**  TRANSFERRING PRISONERS OUT OF STATE WILL IMPROVE ACCESS TO

3  MEDICAL CARE FOR PRISONERS WHO REMAIN IN THE CDCR PRISONS IN

4  STATE, CORRECT?

5  **A.**  I THINK GENERALLY THAT'S PROBABLY FAIR TO SAY, ALTHOUGH I

6  DON'T THINK IT'S CONCLUSIVE.

7  **Q.**  THE REDUCTION OF POPULATION AT CDCR INSTITUTIONS WILL PERMIT

8  MEDICAL STAFF TO FOCUS RESOURCES ON A SMALLER POPULATION, RIGHT?

9  **JUDGE KARLTON:**  YES, AND THE COLOR BLUE IS BLUE.

10  **A.**  YES.

11  **BY MR. FAMA:**

12  **Q.**  AND, IN ADDITION, A REDUCED INMATE POPULATION WILL EASE

13  PRISON LIVING ENVIRONMENTS AND DECREASE VIOLENCE AND PERMIT

14  MEDICAL STAFF TO FOCUS ON NON-EMERGENT SERVICES IN EXISTING

15  PRISONS, RIGHT?

16  **A.**  PRESUMABLY, YES.

17  **Q.**  MR. KERNAN, IN ANSWER TO ONE OF MR. MELLO'S QUESTIONS, YOU

18  INDICATED THAT THE RECEIVER'S STAFF WOULD BE IN A BETTER

19  POSITION TO PROVIDE CERTAIN INFORMATION, RIGHT?

20  **A.**  YES, SIR.

21  **Q.**  YOU TALK REGULARLY WITH THE RECEIVER'S STAFF, CORRECT?

22  **A.**  YES, SIR.

23  **Q.**  AND YOU ASK QUESTIONS OF THE RECEIVER'S STAFF WHEN YOU TALK

24  TO THEM?

25  **A.**  YES, SIR.

1  Q.  HAVE YOU ASKED THE RECEIVER'S STAFF ABOUT THE GAPS IN

2  STAFFING, MEDICAL STAFFING?

3  A.  NOT LATELY.

4  Q.  WITH REGARD TO CORRECTIONAL OFFICER STAFFING IN THE

5  DEPARTMENT OF CORRECTIONS, MR. KERNAN, IT'S TRUE THAT THE

6  DEPARTMENT STAFFING PATTERNS PROVIDE FOR TWO CORRECTIONAL

7  OFFICER POSITIONS TO WATCH OVER 200 OR SO PRISONERS IN A DORM

8  SETTING, CORRECT?

9  A.  ARE YOU TALKING ABOUT JUST THE STAFF ASSIGNED TO THE GYM OR

10  ALL THE ADDITIONAL STAFF THAT PROVIDE SERVICES AND EMERGENCY

11  RESPONSE AND THAT IN THERE?

12        LIKE MOST OF THE HOUSING UNITS, THERE'S ONE OR TWO

13  DEPENDENT ON THE TIME OF DAY OF THE SHIFT WHERE YOU WOULD HAVE A

14  CORRECTIONAL OFFICER SOLELY ASSIGNED TO THE HOUSING UNIT, BUT

15  THERE'S A BUNCH OF SUPPORT STAFF, OBVIOUSLY, THAT CAN RESPOND.

16  Q.  THANK YOU, MR. KERNAN.

17        **JUDGE REINHARDT:**  MR. KERNAN, YOU TESTIFIED ABOUT THE

18  20,000 PRISONERS YOU RECOMMENDED BE RELEASED.

19        **THE WITNESS:**  YES, SIR.

20        **JUDGE REINHARDT:**  DID YOU CONSIDER IN MAKING THAT

21  RECOMMENDATION THE EFFECT ON PUBLIC SAFETY?

22        **THE WITNESS:**  YES, SIR.

23        **JUDGE REINHARDT:**  AND DID YOU CONCLUDE THAT IT WOULD

24  OR WOULD NOT JEOPARDIZE PUBLIC SAFETY?

25        **THE WITNESS:**  GIVEN THE EXTENT OF THE BUDGET

1  SITUATION, AND IT WAS A BUDGET PROPOSAL, IT WAS CERTAINLY BETTER

2  THAN LETTING MORE INMATES OUT THAT HAD SERIOUS OR VIOLENT

3  OFFENSES.

4         NOTHING IS FOR CERTAIN.  CERTAINLY, EVEN A LOW LEVEL

5  OFFENDER CAN COMMIT A SERIOUS CRIME, BUT IT WAS THE BEST

6  SITUATION THAT WE HAD GIVEN THE BUDGET PROPOSAL.

7         **JUDGE REINHARDT:**  I DON'T QUITE UNDERSTAND.  WHY DID

8  THE BUDGET PROPOSAL REQUIRE YOU TO RELEASE PRISONERS?

9         **THE WITNESS:**  THE DEPARTMENT AT THAT POINT IN TIME --

10  AND THIS WAS LAST YEAR'S PROPOSAL, NOT THIS YEAR'S PROPOSAL --

11  WAS IN A BUDGET DEFICIT AND WE WERE ASKED TO COME UP WITH A

12  SIGNIFICANT AMOUNT OF MONEY, AND THE ONLY WAY THAT YOU CAN COME

13  UP WITH A SIGNIFICANT AMOUNT OF MONEY IN A SYSTEM THAT HAD

14  RECEIVED STAFFING CUTS FOR SOME PERIOD OF TIME IS TO EITHER

15  RELEASE OFFENDERS OR QUIT SUPERVISING THEM ON PAROLE.

16         SO THAT PARTICULAR PROPOSAL, WHICH WAS SUMMARILY

17  DISMISSED BY THE LEGISLATURE, WAS TO RELEASE LOW END OFFENDERS.

18  THAT WOULD HAVE LET OUT CAMP INMATES AND CCFS AND THE LOWER END

19  OFFENDERS AND NOT REALLY HELP ANYTHING IN THE PRISON PROPER.

20         BUT IN THAT SENSE, I THINK IT WAS A BETTER ANSWER

21  THAN LETTING OUT SOME OF THE MORE SERIOUS AND VIOLENT OFFENDERS

22  IN THE PRISONS.

23         **JUDGE REINHARDT:**  IS IT YOUR TESTIMONY THAT IF YOU

24  DON'T RECEIVE AN ADEQUATE BUDGET, YOU HAVE NO ALTERNATIVE BUT TO

25  RELEASE SOME TYPE OF PRISONERS?

1            **THE WITNESS:**  UNLESS YOU CAN REDUCE THE POPULATION,

2    THE OTHER MEANS THAT WE ARE ATTEMPTING TO NOW.  THE CONSTRUCTION

3    OF ADDITIONAL CAPACITY OR THROUGH PAROLE REFORM, WHERE WE ARE

4    NOT SUPERVISING SOME PAROLEES AND LETTING THEM OFF SOONER IF

5    THEY SHOW POSITIVE BEHAVIOR.

6            WE CAN REDUCE THE AMOUNT OF PAROLE POPULATION THAT

7    WOULD STOP THE CHURNING INTO THE SYSTEM AND, IN FACT, I THINK

8    HAS LED TO THE DECREASE IN BAD BEDS THAT WE HAVE CURRENTLY TO

9    SOME DEGREE.

10            WE HAVE INCREASED 6,000 DISCHARGES OF OFFENDERS IN

11    THE LAST YEAR THAT -- BASED ON A POLICY DECISION TO HAVE

12    SUPERVISORS MAKE THE DECISION RATHER THAN INDEPENDENT PAROLE

13    STAFF.

14            SO THOSE ARE THE KIND OF MEANS THAT WE ARE CURRENTLY

15    REDUCING THE POPULATION TODAY.

16            **JUDGE REINHARDT:**  AND ONE OF THOSE MEANS, YOU SAY, IS

17    EITHER DO THE PAROLE REFORM AND REDUCE THE NUMBER OF PRISONERS

18    THAT WAY OR BUILD MORE PRISONS, WHICH YOU ALSO CAN'T DO WITHOUT

19    INCREASING THE BUDGET.

20            **THE WITNESS:**  YES, SIR.

21            **JUDGE HENDERSON:**  LET'S MAKE SURE CCPOA DOESN'T HAVE

22    ANYTHING.

23            **MS. LEONARD:**  NO, YOUR HONOR.

24            **MR. MELLO:**  BRIEF REDIRECT.

25

1                      <u>REDIRECT EXAMINATION</u>

2    **BY MR. MELLO:**

3    **Q.**  MR. KERNAN, THE FUNDS FOR AB 900 HAVE BEEN ALLOCATED, BUT

4    THE BONDS HAVEN'T BEEN SOLD, CORRECT?

5    **A.**  THAT'S MY UNDERSTANDING, YES.

6    **Q.**  SO IT WOULD NOT INCREASE THE BUDGET.  IT REQUIRES A --

7              **MR. FAMA:**  EXCUSE ME, YOUR HONORS AND MR. MELLO.  I

8    APOLOGIZE.

9              COULD YOU PLEASE SPEAK INTO THE MICROPHONE.  I DIDN'T

10   HAIR THAT FIRST QUESTION?

11             **MR. MELLO:**  OKAY.  I APOLOGIZE.

12   **BY MR. MELLO:**

13   **Q.**  DID YOU HEAR MY QUESTION, MR. KERNAN?

14   **A.**  YES.

15             **MR. FAMA:**  CAN YOU SPEAK IN THE MIC?

16             **MR. MELLO:**  STILL CAN'T HEAR ME?  I THINK MY WHOLE

17   TEAM WOULD SAY THAT'S NEVER A PROBLEM USUALLY.  SO I APOLOGIZE.

18   **BY MR. MELLO:**

19   **Q.**  MR. KERNAN, YOU TESTIFIED YOU WERE ASKED ABOUT THE FOUR

20   POINTS MEMO, CORRECT?

21   **A.**  YES, SIR.

22   **Q.**  CAN YOU EXPLAIN FOR THE COURT WHAT FOUR POINTS WAS ABOUT?

23   **A.**  IN OUR CLASSIFICATION PROCESS, INMATES THAT HAD A PRIOR

24   MENTAL ILLNESS WERE ASSESSED FOUR ADDITIONAL POINTS ON THEIR

25   CLASSIFICATION SYSTEM.

1           THE CLASSIFICATION SYSTEM IS WHAT WE USE TO DETERMINE

2    WHERE THE INMATE IS PLACED.  SO INMATES THAT HAD A PRIOR MENTAL

3    HEALTH CONDITION WERE PLACED IN ARGUABLY HIGHER LEVELS OF

4    CUSTODY THAN SOME THOUGHT.

5           SO THROUGH SOME DISCUSSIONS WITH THE SPECIAL MASTER

6    AND ATTORNEYS, THE DEPARTMENT REMOVED THE FOUR POINTS AND NO

7    LONGER ASSESSES THE FOUR POINTS ON OFFENDERS FOR THE SOLE

8    PURPOSE OF HAVING A PRIOR MENTAL HEALTH CONDITION.

9           **JUDGE KARLTON:**  YOU ARE AWARE, ARE YOU NOT, SIR, THAT

10   THE SPECIAL MASTER'S STRONG SUGGESTION TO YOU THAT THAT BE DONE

11   WAS THE RESULT OF THE COURT INDICATING TO THE SPECIAL MASTER

12   THAT THIS WAS BIZARRE AND SOMEBODY HAD TO DO SOMETHING OR I

13   WOULD.

14          **THE WITNESS:**  IT WASN'T PUT JUST LIKE THAT TO ME, BUT

15   I CERTAINLY UNDERSTOOD FROM THE SPECIAL MASTER'S ROLE AND

16   PLAINTIFFS' COUNSEL THAT THERE WAS STRONG FEELINGS.

17          THIS HAD BEEN GOING ON FOR SOME TIME, BUT WE MADE

18   A -- I THINK A COMMON SENSE DECISION AS A DEPARTMENT AND WE'VE

19   REMOVED THE FOUR POINTS.

20   **BY MR. MELLO:**

21   **Q.**  IT'S BEEN CHANGED AND IT'S NO LONGER OCCURRING, CORRECT?

22   **A.**  THAT'S CORRECT.

23   **Q.**  MR. KERNAN, THERE WAS TESTIMONY WITH RESPECT TO THE

24   RECEPTION CENTER AT CIM, CORRECT?

25   **A.**  YES, SIR.

1  Q.  AND ARE YOU AWARE OF ANY INMATES SUFFERING ADVERSE MENTAL

2  HEALTH CONSEQUENCE OR MEDICAL CONSEQUENCE AS A RESULT OF THE

3  RECEPTION CENTER SITUATION THAT WAS DESCRIBED DURING YOUR

4  CROSS-EXAMINATION?

5          **MR. FAMA:**  OBJECTION.  LACK OF FOUNDATION.

6          **JUDGE KARLTON:**  HE ASKED HIM WHETHER HE KNOWS.

7          **JUDGE HENDERSON:**  ARE YOU AWARE?  ARE YOU AWARE   OF

8  --

9          **THE WITNESS:**  NO, SIR.

10  **BY MR. MELLO:**

11  Q.  HIS HONOR, JUDGE REINHARDT, ASKED YOU ABOUT THE JANUARY

12  PROPOSAL THAT YOU TESTIFIED ABOUT, THE BUDGET PROPOSAL FROM LAST

13  YEAR, CORRECT?

14  A.  YES, SIR.

15  Q.  AND, TO YOUR KNOWLEDGE, WAS THAT JANUARY PROPOSAL IN THE MAY

16  REVISE?

17          **JUDGE REINHARDT:**  WAS IT WHAT?

18  **BY MR. MELLO:**

19  Q.  WAS THAT PROPOSAL TO RELEASE 22,000 INMATES 20 MONTHS EARLY,

20  DID IT MAKE IT INTO THE MAY REVISE?

21  A.  NO, SIR.

22  Q.  AND WHAT IS THE MAY REVISE?  I BELIEVE TWO OF THE COURT KNOW

23  WHAT IT IS, BUT HIS HONOR MAY NOT.

24  A.  AGAIN, A LITTLE OUT OF MY EXPERTISE BUDGET, BUT MAY REVISE

25  IS THE GOVERNOR'S APPROVED BUDGET MOVING FORWARD.

1  Q.  SO IT NEVER EVEN MADE IT TO THE BUDGET THAT WENT TO THE

2  LEGISLATURE, CORRECT?

3  A.  NO, SIR.

4  Q.  AND YOU WERE ASKED ABOUT THE FACILITY IN MISSISSIPPI AND THE

5  TEMPORARY HOLD ON TRANSFERS OF INMATES TO THAT FACILITY,

6  CORRECT?

7  A.  YES, SIR.

8  Q.  AND WHAT'S THAT FACILITY AGAIN?

9  A.  TALLAHATCHIE.

10  Q.  TALLAHATCHIE.  AND DID THE RECEIVERS'S OFFICE EVER EVALUATE

11  WHETHER INMATES COULD GO THERE SAFELY FROM A MEDICAL

12  PERSPECTIVE?

13  A.  YES.  THERE IS A MENTAL HEALTH AND MEDICAL SCREENING OF ALL

14  OFFENDERS THAT GO TO THE FACILITY.  MR. HAGAR JUST REVISED THAT.

15          **JUDGE KARLTON:**  THERE ISN'T A MENTAL HEALTH -- WELL,

16  THERE MAY BE, BUT CLASS MEMBERS IN COLEMAN DO NOT GO.

17          **THE WITNESS:**  CORRECT, SIR.  SO ANYBODY -- THOSE

18  OFFENDERS ARE BEING SCREENED FOR OUT OF STATE.  IF THEY ARE PART

19  OF THE COLEMAN CLASS, THEY ARE NOT SENT.  THAT'S WHAT I MEANT BY

20  SCREENING.

21          BUT ADDITIONALLY, THERE'S MEDICAL EVALUATION OF THE

22  OFFENDERS AND THEY MUST MEET A CRITERIA BEFORE THEY ARE

23  PERMITTED TO GO.

24  **BY MR. MELLO:**

25  Q.  AND THE RECEIVER'S OFFICE, WHILE IT PLACED A HOLD ON SENDING

1 INMATES THERE, IT'S NOW LIFTED THAT HOLD, CORRECT?

2 **A.**  YES, SIR.

3 **Q.**  AND YOU CAN CONTINUE TO SEND INMATES THERE, CORRECT?

4 **A.**  YES, SIR.

5 **Q.**  AND IS THAT BECAUSE THE RECEIVER'S OFFICE DETERMINED THAT IT

6 WAS ACCEPTABLE TO SEND PRISONERS THERE?

7 **A.**  YES, SIR.

8 **Q.**  YOU WOULDN'T HAVE CONTINUED TO SEND PRISONERS TO THAT

9 INSTITUTION IF THE RECEIVER'S OFFICE CONTINUED TO HAVE A HOLD ON

10 IT, WOULD YOU?

11 **A.**  NO, SIR.

12 **Q.**  HOW MANY GYMS AND DAYROOMS HAVE BEEN OPENED UP AS A RESULT

13 OF THE DEPARTMENT'S EFFORTS TO REDUCE NON-TRADITIONAL BEDS IN

14 THE LAST SEVERAL YEARS?

15 **A.**  YOU ARE STRETCHING MY MEMORY A LITTLE BIT, BUT I THINK

16 SOMEWHERE BETWEEN 16, 19 FULL GYMNASIUMS HAVE BEEN REDUCED, AND

17 I'M NOT SURE OF THE NUMBER OF DAYROOMS.

18 **Q.**  SOME NUMBER OF DAYROOMS HAVE ALSO BEEN OPENED UP, CORRECT?

19 **A.**  YES, SIR.

20 **Q.**  AND PLAINTIFFS WERE ASKING FOR THE RELEASE OF 52,000

21 INMATES -- PARDON ME.  A REDUCTION IN YOUR POPULATION BY 52,000

22 INMATES OVER A TWO-YEAR PERIOD OF TIME IN THIS CASE.

23          MR. KERNAN, HAS THAT PROPOSAL EVER BEEN MADE IN A

24 BUDGET PROPOSAL AND MAY REVISE BY THE DEPARTMENT OF CORRECTIONS

25 OR THE GOVERNOR'S OFFICE?

1  **A.**  NO, SIR.

2  **Q.**  THANK YOU, NOTHING FURTHER.

3          **MR. MITCHELL:**  NO QUESTIONS.

4          **MR. FAMA:**  NO FURTHER QUESTIONS.

5          **JUDGE KARLTON:**  MAY I ASK ONE THAT MAY BE OUTSIDE OF

6  YOUR EXPERTISE, AND THAT'S PERFECTLY OKAY.

7          ONE OF THE CHARTS THAT YOU SHOWED US HAD -- AND I

8  SHOULD KNOW THE ANSWER TO THIS AND I DON'T -- HAD 23 CHIEF

9  PSYCHIATRISTS, BUT YOU'VE GOT 33 PRISONS.  WHAT HAPPENED TO THE

10  OTHER 10?

11          **THE WITNESS:**  I BELIEVE THEY ARE USING OTHER CLASSES

12  FOR THEM, AND THAT'S JUST THE -- THE TITLE THEY MAY BE USING.

13  AND IT IS OUTSIDE OF MY EXPERTISE, BUT THEY MAY BE USING A

14  PSYCHIATRIST THAT'S NOT ON THE LIST YET FOR CHIEF PSYCHIATRIST

15  OR SOMETHING OF THE LIKE?

16          **JUDGE KARLTON:**  ALL RIGHT.

17          **JUDGE HENDERSON:**  OKAY.  THANK YOU FOR TESTIFYING,

18  MR. KERNAN.  WE WILL TAKE A 15-MINUTE RECESS.

19                  (BRIEF RECESS HELD IN THE PROCEEDINGS.)

20          **JUDGE HENDERSON:**  YOU MAY CALL YOUR NEXT WITNESS WHEN

21  YOU'RE READY, COUNSEL.

22          **MS. JOHNSON:**  GOOD MORNING, YOUR HONORS.  DEFENDANTS

23  CALL JAMES MARQUART.

24                  **JAMES MARQUART, PH.D.**

25  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANTS WAS FIRST

1  DULY SWORN AND EXAMINED AS FOLLOWS:

2          **JUDGE HENDERSON:**  BEFORE WE BEGIN, WE ARE AWARE OF

3  THE OBJECTIONS TO CERTAIN PARTS OF THE DECLARATION HERE, AND

4  CONSISTENT WITH PREVIOUS RULINGS, WE'LL TAKE THAT UNDER

5  ADVISEMENT.  SO PROCEED.

6          **THE CLERK:**  PLEASE STATE AND SPELL YOUR NAME FOR THE

7  RECORD.

8          **THE WITNESS:**  JAMES W. M-A-R-Q-U-A-R-T.

9          **MS. JOHNSON:**  DEFENDANTS HAVE SUBMITTED THREE EXPERT

10  REPORTS BY DR. MARQUART WHICH ARE MARKED AS DEFENDANT'S EXHIBIT

11  1022, 1023 AND 1024.  DEFENDANTS NOW OFFER THESE EXHIBITS INTO

12  EVIDENCE.

13          DR. MARQUART'S QUALIFICATIONS ARE DESCRIBED ON PAGES

14  ONE THROUGH THREE OF HIS FIRST REPORT, DEFENDANT'S EXHIBIT 1022,

15  AND HIS CURRICULUM VITAE WHICH IS ATTACHED AS EXHIBIT A TO THAT

16  REPORT.

17          **DIRECT EXAMINATION BY MS. JOHNSON**

18  BY MS. JOHNSON

19  **Q**  GOOD MORNING, DR. MARQUART.

20  **A**  GOOD MORNING.

21  **Q**  YOU HAVE A PH.D., CORRECT?

22  **A**  YES, MA'AM.

23  **Q**  WHAT FIELD IS YOUR PH.D. IN?

24  **A**  IT'S IN SOCIOLOGY.

25  **Q**  YOU ARE A PROFESSOR AT THE UNIVERSITY OF TEXAS AT DALLAS?

1  **A**  YES, MA'AM.

2  **Q**  WHAT IS THE DEPARTMENT YOU ARE IN AT U.T. DALLAS?

3  **A**  I'M ALSO THE CHAIR OF THE CRIMINOLOGY PROGRAM THERE.

4  **Q**  FOR HOW MANY YEARS HAVE YOU BEEN A PROFESSOR?

5  **A**  SINCE 1983, SO 25 YEARS.

6  **Q**  BEFORE YOU BECAME A PROFESSOR, DID YOU WORK AT ONE POINT AS

7  A CORRECTIONAL OFFICER IN TEXAS?

8  **A**  YES, MA'AM, I DID.

9  **Q**  WHAT YEARS DID YOU DO THAT?

10  **A**  1981 THROUGH 1983.

11  **Q**  WHAT TYPE OF FACILITY DID YOU WORK AS A CORRECTIONAL

12  OFFICER?

13  **A**  IT WAS THE EASTHAM UNIT WITHIN THE TEXAS PRISON SYSTEM, AND

14  IT WAS A FACILITY FOR ABOUT 3,200 INMATES OVER THE AGE OF 25.

15  THEY HAD BEEN IN THE PENITENTIARY THREE OR MORE TIMES.  THEY

16  WERE ALSO ESCAPE RISKS, AND, MOST NOTABLY, MALCONTENTS FROM

17  OTHER FACILITIES WITHIN THE PRISON SYSTEM.

18  **Q**  WHAT DO YOU MEAN WHEN YOU SAY "MALCONTENT"?

19  **A**  WELL, I GUESS IN PRISON PARLANCE THAT'S PEOPLE WHO COULD NOT

20  GET ALONG AT OTHER FACILITIES, HAD LENGTHY HISTORIES OF

21  DISCIPLINARY PROBLEMS, DISOBEDIENCE.  BASICALLY, COULDN'T GET

22  ALONG AT ANOTHER TEXAS PRISON FACILITY.

23  **Q**  WAS THE *RUIZ VERSUS ESTELLE* CASE GOING ON IN TEXAS WHEN YOU

24  WORKED AS A CORRECTIONAL OFFICER THERE?

25  **A**  YES, MA'AM, IT WAS.

1  Q   AS A CRIMINOLOGIST, HAVE YOU STUDIED A VARIETY OF

2  CORRECTIONAL ISSUES?

3  A   YES, MA'AM.

4  Q   COULD YOU NAME SOME OF AREAS OF RESEARCH?

5  A   I'VE LOOKED AT CAPITAL PUNISHMENT WITHIN THE STATE.  I HAVE

6  LOOKED AT HOW THE PRISON SYSTEM HAS CHANGED AS A RESULT OF LEGAL

7  INTERVENTION OR THE IMPACT OF LEGAL INTERVENTION ON THE PRISON

8  SYSTEM, PRISON PROGRAMMING; LOOKED AT SOME ISSUES PERTAINING TO

9  THE -- TO HEALTHCARE ISSUES OF INMATES, PRISON VIOLENCE, GANG

10 ACTIVITY, GANG BEHAVIOR, AND THEN PROBABLY MOST RECENTLY WE HAVE

11 BEEN INVOLVED IN LOOKING AT IN CELL -- IN-CELL INTEGRATION.

12 Q   WHEN YOU SAY "IN-CELL INTEGRATION," ARE YOU REFERRING TO

13 RACIAL INTEGRATION?

14 A   YES, MA'AM.

15 Q   HAVE YOU DONE WORK ON THE PREDICTIONS OF FUTURE

16 DANGEROUSNESS OF OFFENDERS?

17 A   YES, MA'AM.

18 Q   IN CONNECTION WITH THE *RUIZ VERSUS ESTELLE* CASE, WAS A

19 PRISON CAP IMPOSED IN THE TEXAS STATE PRISON SYSTEM?

20 A   YES, MA'AM, IT WAS.

21 Q   DID YOU STUDY THE IMPACT OF THAT PRISON CAP ON HARRIS

22 COUNTY, TEXAS?

23 A   YES, MA'AM.

24 Q   CAN YOU EXPLAIN WHAT YOU DID?

25 A   WELL, HARRIS COUNTY IS HOUSTON, AND WE WERE, MYSELF AND

1  SEVERAL OTHER COLLEAGUES, WERE ASKED TO, YOU KNOW, TAKE A LOOK

2  AT SOME GENERAL ISSUES PERTAINING TO THIS CAP, AS TO HOW IT

3  MIGHT IMPACT OR WOULD IMPACT IN THE HARRIS COUNTY CRIMINAL

4  JUSTICE SYSTEM, MOST NOTABLY THE JAIL ITSELF.

5          SO WHAT WE DID IS WE EXAMINED THE NUMBER OF PEOPLE ON

6  PROBATION, OR AT THAT TIME -- WELL, NOW IT'S CALLED COMMUNITY

7  SUPERVISION.  BUT, BASICALLY, WE LOOKED AT, YOU KNOW, IF YOU PUT

8  A CAP IN OR IF YOU REDUCE THE FLOW INTO THE PRISON SYSTEM, WHAT

9  IS THAT GOING TO DO BACKSTREAM WITHIN THE SYSTEM, AND THAT IS

10 WHAT WOULD BE THE IMPACT OF SOMETHING LIKE THAT ON THE JAIL.

11         SO, LIKE I SAID, WE LOOKED AT CELL SPACE WITHIN THE

12 JAIL, WHAT THAT WOULD -- WHAT WOULD HAPPEN THERE IF YOU HAD A

13 BACKFLOW OF A NUMBER OF STATE INMATES WITHIN THE COUNTY JAIL

14 FACILITY ITSELF, WHAT WOULD HAPPEN THERE, WHAT ARE THE POTENTIAL

15 IMPACTS ON COMMUNITY SUPERVISION AND CORRECTIONS.

16 **Q**   DID YOU HAVE AN OPPORTUNITY TO ASSESS THE ACTUAL IMPACTS FOR

17 HARRIS COUNTY?

18 **A**   WE DID EXAMINE SOME OF THAT.  LIKE I SAID, WE LOOKED AT --

19 WE ALSO EXAMINED THE CRIME RATES AT THE SAME TIME.  SO IT WAS A

20 GENERAL STUDY ABOUT, YOU KNOW, POTENTIAL IMPACTS OF SOMETHING

21 LIKE THIS ON MORE BROADLY WITHIN THE CJ COMMUNITY IN HARRIS

22 COUNTY.

23         **JUDGE KARLTON:**  HOW LONG AFTER THE IMPOSITION OF THE

24 CEILING DID YOU ENGAGE IN YOUR STUDY, DOCTOR, ROUGHLY?  IT

25 DOESN'T HAVE TO BE EXACT.

 1            **THE WITNESS:**  PROBABLY WITHIN TWO YEARS.

 2   BY MS. JOHNSON

 3   **Q**    DO YOU PRESENTLY HAVE A CONTRACT TO ASSIST THE CALIFORNIA

 4   DEPARTMENT OF CORRECTIONS WITH THE *JOHNSON* CASE?

 5   **A**    YES, MA'AM.

 6   **Q**    CAN YOU BRIEFLY EXPLAIN THE *JOHNSON* CASE AND YOUR ROLE?

 7   **A**    WELL, THE *JOHNSON* CASE IMPACTED IN-CELL INTEGRATION WITHIN

 8   THE DIAGNOSTIC FACILITIES OR THE INTAKE FACILITIES, AND WHAT

 9   HAPPENED IN THAT CASE IS, YOU KNOW, YOU ARE GOING TO HAVE TO

10   CREATE A PLAN TO BEGIN TO INTEGRATE CELL SPACE WITHIN THOSE

11   INTAKE FACILITIES.  WE HAD EXAMINED THAT IN THE STATE OF TEXAS

12   FOR MANY YEARS, AND SO WE WERE RETAINED BY THE PRISON SYSTEM TO

13   LOOK AT THEIR PLAN AND HELP THEM WITH WHAT MIGHT HAPPEN WHEN YOU

14   ROLL OUT OR YOU ENGAGE AND DEVELOP AN IN-CELL INTEGRATION PLAN,

15   WHAT ARE THE POTENTIAL IMPACTS AND THE CONSEQUENCES OF SOMETHING

16   LIKE THAT WITHIN THE PRISON SYSTEM.

17            WE DID -- SO WE'VE HELPED THEM BY REVIEWING THEIR

18   PLAN, PROVIDING THEM WITH INFORMATION ABOUT POTENTIAL IMPACTS

19   AND CONSEQUENCES OF THAT WITHIN CALIFORNIA.  WE VISITED A NUMBER

20   OF FACILITIES HERE.  AND WE ALSO WERE INVOLVED IN HELPING TO

21   TRAIN INTAKE OFFICERS AT SEVERAL FACILITIES IN TERMS OF COUNTING

22   AND BOOKKEEPING AND THINGS OF THAT NATURE ON AN ACTUAL IN-CELL

23   INTEGRATION PLAN.

24            **JUDGE REINHARDT:**  SO ARE YOU SAYING YOUR ROLE WITH

25   CALIFORNIA WAS ADVISING THE STATE HOW TO IMPLEMENT THE DECISION?

 1          **THE WITNESS:**  WELL, YOU KNOW, WE ARE HELPING THEM TO

 2   EVALUATE THE ULTIMATE OUTCOME OF THAT.  THAT'S WHAT WE ARE

 3   HELPING THEM WITH.

 4          **JUDGE REINHARDT:**  JUST OUT OF CURIOSITY, YOU

 5   TESTIFIED IN OVER 20 DEATH PENALTY TRIALS?

 6          **THE WITNESS:**  YES, SIR.

 7          **JUDGE REINHARDT:**  WAS THAT ALWAYS FOR ONE SIDE OR THE

 8   OTHER OR A MIXTURE?

 9          **THE WITNESS:**  ALL OF THOSE MY DEATH PENALTY ACTIVITY

10   HAS BEEN FOR THE DEFENSE.

11          **JUDGE REINHARDT:**  FOR THE INDIVIDUAL DEFENDANT, YOU

12   MEAN, NOT FOR THE STATE?

13          **THE WITNESS:**  I'VE TESTIFIED IN INDIVIDUAL CASES OF

14   PEOPLE WHO ARE GOING TO TRIAL FOR CAPITAL MURDER, AND THEN I

15   USUALLY ALWAYS HAVE TESTIFIED FOR THE DEFENDANT.

16          **JUDGE REINHARDT:**  THANK YOU.

17          **THE WITNESS:**  BOTH IN THE STATE OF TEXAS, IN

18   COLORADO, AND THEN ONE FEDERAL CASE.

19          **MS. JOHNSON:**  INTERESTING.  WE WERE JUST ABOUT TO

20   TOUCH ON THAT, YOUR HONOR.

21          **JUDGE REINHARDT:**  I WAS JUST CURIOUS, NOT THAT IT HAS

22   ANYTHING TO DO WITH THIS CASE.

23   BY MS. JOHNSON

24   Q   WITH RESPECT TO YOUR WORK ON THE PREDICTABLY OF FUTURE

25   DANGEROUSNESS OF OFFENDERS, WHAT HAVE YOU DONE?

1   **A**    THAT LEADS TO, YOU KNOW, THESE CAPITAL CASES, BECAUSE IN THE

2   STATE OF TEXAS, THE KEY ISSUE IS WHETHER OR NOT SOMEBODY

3   CONSTITUTES A CONTINUING THREAT TO SOCIETY.  SO THE JURY MUST

4   ANSWER THAT PARTICULAR QUESTION.

5           SO WHAT WE DID WAS TO LOOK AT PEOPLE WHO CAME TO --

6   WERE CONVICTED OF CAPITAL MURDER AND THEN THE JURY SAID YES, YOU

7   KNOW, THEY GOT THE DEATH SENTENCE, SO THEY WENT TO DEATH ROW.

8   SO A JURY SAID THEY WERE GOING TO BE A CONTINUING THREAT TO

9   SOCIETY.  THEN WE FOUND ANOTHER GROUP OF INDIVIDUALS THAT WERE

10  CONVICTED OF CAPITAL MURDER BUT THE JURY SAID, NO, THAT THESE

11  PEOPLE WERE NOT -- WOULD NOT CONSTITUTE A CONTINUING THREAT TO

12  SOCIETY.

13          SO YOU GOT TWO GROUPS OF PEOPLE, ONE WHERE THE JURY

14  SAID YES, THEY ARE GOING TO BE A THREAT.  THE SECOND BATCH IS

15  NO, THE JURY SAID, WE DON'T BELIEVE THEY ARE GOING TO BE A

16  THREAT.  AND WE SIMPLY TRACKED THEIR BEHAVIOR BOTH IN PRISON ON

17  A VARIETY OF ISSUES, ASSAULTING STAFF, DOING SERIOUS THINGS IN

18  PRISON.  SO WHEN WE LOOKED AT THE BEHAVIOR OF THOSE GROUPS OVER

19  TIME FOR ABOUT 12 OR 14 OR 15 YEARS --

20  **Q**    WHAT DID YOU CONCLUDE?

21  **A**    THAT ASSESSING -- YOU KNOW, THE ACCURACY OF THESE KINDS OF

22  PREDICTIONS ARE -- IT'S TOUGH.  I MEAN, IT'S VERY DIFFICULT

23  TO -- YOU KNOW, THERE'S NO ONE HUNDRED PERCENT ACCURACY IN THESE

24  CASES.

25          MOST OF THE PEOPLE THAT WERE PREDICTED NOT TO BE

 1  DANGEROUS –– AGAIN, ABOUT 70 TO 80 PERCENT OF THEM WERE NOT.

 2  OKAY?  SO THEY DID NOT CONSTITUTE A CONTINUING THREAT TO

 3  SOCIETY.  SO IN THOSE CASES THE JURY IS RIGHT.  BUT THE POINT

 4  IS, IF YOU LINE UP TEN PEOPLE AND YOU TRY TO PICK OUT OUT OF THE

 5  TEN, YOU KNOW, WHICH ONES WILL NOT BE A –– FOR SURE BE A

 6  CONTINUING THREAT, I DON'T BELIEVE THAT CAN BE DONE.

 7          **JUDGE REINHARDT:**  WHENEVER YOU TESTIFIED IN THOSE

 8  DEATH PENALTY CASES, YOU TESTIFIED TO THE EFFECT THAT THE

 9  DEFENDANT WOULD NOT BE A FUTURE DANGER?

10          **JUDGE KARLTON:**  OR THAT YOU COULDN'T TELL.

11          **THE WITNESS:**  THAT YOU CANNOT TELL.  THEY TRY TO GET

12  ME TO DO HYPOTHETICALS BUT I DON'T ENGAGE IN HYPOTHETICALS.

13          **JUDGE REINHARDT:**  NO.  WHEN YOU TESTIFIED FOR THE

14  DEFENDANT, IT WAS TO PERSUADE THE JURY THAT HE WAS NOT A DANGER

15  OR THAT YOU COULDN'T TELL WHETHER HE WAS A DANGER?

16          **THE WITNESS:**  THAT YOU CANNOT TELL THAT.  IT'S VERY

17  DIFFICULT, BECAUSE IN SOME CASES WHERE THE JURY SAID, YES, THESE

18  PEOPLE ALL WERE GOING TO BE A CONTINUING THREAT, THAT THREAT DID

19  NOT MATERIALIZE.

20          **JUDGE REINHARDT:**  NO, NO, BUT YOU DIDN'T TESTIFY

21  AFTER THE JURY VERDICT, DID YOU?  YOU TESTIFIED TO TRY TO

22  PERSUADE THE JURY OF SOMETHING ABOUT THE DEFENDANT?

23          **THE WITNESS:**  RIGHT.  WHAT I TRY TO DO IS –– MY

24  NAIVETE WAS TO EDUCATE THE JURY TO THE IDEA THAT PREDICTIONS OF

25  FUTURE DANGEROUSNESS, WHETHER YES OR NO, IT'S A VERY DIFFICULT

1   THING TO DO, AND MORE LIKELY THAN NOT IF YOU SAY THEY'RE GOING

2   TO BE A DANGER, THAT THAT'S NOT GOING TO MATERIALIZE.  THE VAST

3   MAJORITY OF PEOPLE THAT ARE PREDICTED TO BE DANGEROUS,

4   TYPICALLY, IT DOES NOT MATERIALIZE.

5            **JUDGE REINHARDT:**  UNDER THAT THEORY, THEY WOULD NEVER

6   IMPOSE THE DEATH PENALTY IN TEXAS IF THEY BELIEVED YOU?

7            **THE WITNESS:**  THAT'S RIGHT.

8            **JUDGE HENDERSON:**  COULD YOU JUST CLARIFY, WHEN YOU

9   SAY "A DANGER TO SOCIETY," AS I HEARD YOU TALKING, I -- AND

10  PEOPLE BEING IMPOSED THE DEATH PENALTY, THE IMAGE FOR ME IS

11  THESE ARE PEOPLE WHO ARE GOING TO BE IN PRISON AT LEAST FOR THE

12  REST OF THEIR LIFE, SO THAT'S THE SOCIETY THEY WOULD HAVE.  WHAT

13  DO YOU MEAN WHEN YOU SAY A DANGER TO SOCIETY?  PRISON SOCIETY?

14  OUTSIDE, SHOULD THEY BE RELEASED?  OR BOTH TOGETHER, OR

15  SOMETHING ELSE.

16           **THE WITNESS:**  THAT'S AN INTERESTING ISSUE, AND THAT

17  ALWAYS COMES UP, THAT IT IS BOTH SOCIETIES.  SO -- BECAUSE AT

18  THE TIME THAT I DID TESTIFY, THESE CAPITAL DEFENDANTS COULD BE

19  RELEASED AFTER 40 YEARS.  SO IF THEY WERE -- THEY BEHAVE AND

20  THEY DID WELL, THERE WAS ALWAYS THE POTENTIAL THAT THEY COULD BE

21  PAROLED, AND I THINK THAT'S WHERE THE JURY WAS REALLY FRIGHTENED

22  OF THE FACT THAT WOULD HAPPEN.  BUT WHAT I WOULD TRY TO, QUOTE,

23  EDUCATE THE JURY ABOUT WAS THE IDEA THAT IT'S BOTH IN PRISON, IN

24  THAT SOCIETY, BECAUSE INMATES ARE EXPOSED TO WEAPONS, THEY ARE

25  EXPOSED TO FREE WORLD PEOPLE, AND SECURITY STAFF, AND SHOULD

1    THEY EVER BE RELEASED, YOU KNOW, BACK OUT HERE AGAIN.  BOTH

2    WORLDS.

3              **JUDGE KARLTON:**  THIS SHOWS THE JUDGES ARE REALLY

4    INTERESTED IN -- HAS NOTHING TO DO WITH THIS CASE, BUT IT'S VERY

5    INTERESTING.

6              **THE WITNESS:**  IT WAS ALL BY ACCIDENT, TOO.

7              **JUDGE REINHARDT:**  DID YOU EVER HAVE ANY LUCK

8    PERSUADING THE JURIES THAT YOU CAN'T PREDICT, SO YOU SHOULDN'T

9    EXECUTE THEM?

10             **THE WITNESS:**  YES, SIR.  IT WAS VERY INTERESTING,

11   BECAUSE WHEN I TESTIFIED, IT WAS USUALLY -- ON THE OTHER SIDE,

12   THE PROSECUTION WOULD BRING IN A PSYCHIATRIST, JAMES GRIGSON.

13   HE WAS DR. DEATH.  UNFORTUNATELY, I GOT THE MONIKER OF DR. LIFE.

14   I THINK SIX OR SEVEN OF THEM THE JURY SAID NO, BUT MOST OF THEM

15   THE JURY SAID THAT WE DON'T BELIEVE ANYTHING YOU HAD TO SAY, AND

16   I THINK THE VAST MAJORITY OF PEOPLE I TRIED TO HELP HAVE ALREADY

17   BEEN EXECUTED.

18             **JUDGE REINHARDT:**  FORTUNATELY, FOR YOU, YOU DON'T

19   HAVE A JURY HERE; YOU HAVE JUDGES.

20             **THE WITNESS:**  PARDON ME?

21             **JUDGE REINHARDT:**  I SAID FORTUNATELY FOR YOU, YOU

22   DON'T HAVE A JURY HERE; YOU HAVE JUDGES.

23             **THE WITNESS:**  THAT'S TRUE.

24   BY MS. JOHNSON

25   Q    IS IT TRUE, DR. MARQUART, THAT EVEN WITHIN GROUPS OF

1  INDIVIDUALS WHO ARE IDENTIFIED AS LOW RISK, RECIDIVISM CAN BE

2  EXPECTED TO OCCUR?

3  **A**   YES.  YES, MA'AM.

4  **Q**   SO THE ISSUE WE WERE JUST TALKING ABOUT IS NOT ABOUT THE

5  GROUP, IT'S ABOUT PICKING WHICH INDIVIDUAL WITHIN A GROUP MIGHT

6  BE EXPECTED TO RECIDIVATE?

7  **A**   THAT IS EXACTLY RIGHT.

8  **Q**   ARE YOU FAMILIAR WITH RESEARCH ON THE EFFECTS OF PRISON

9  CROWDING?

10  **A**   YES, MA'AM.

11  **Q**   IN YOUR OPINION, IS THERE A CLEAR -- IS THERE CLEAR EVIDENCE

12  THAT OVERCROWDING OF A PRISON BY ITSELF AUTOMATICALLY LEADS TO

13  VIOLENCE?

14  **A**   IT HAS NOT BEEN ESTABLISHED THAT IS ONE HUNDRED PERCENT

15  TRUE, BUT A SEARCH IS STILL OPEN ON THAT POINT.

16         **JUDGE KARLTON:**  IN YOUR VIEW, IS THERE A

17  PREPONDERANCE OF OPINION AS TO THAT MATTER, WHETHER CLEARLY

18  ESTABLISHED OR NOT?

19         **THE WITNESS:**  IT DEPENDS.  I'M NOT TRYING TO WAFFLE

20  ON IT.  IT'S JUST AT THIS POINT IN TIME IT IS STILL A GRAY AREA

21  AS TO THAT POINT.

22         **JUDGE KARLTON:**  SO THE ANSWER IS NO?

23         **THE WITNESS:**  NO.  AT THIS POINT I WOULD SAY NO.

24         **JUDGE REINHARDT:**  YOU SAID IT'S NOT ESTABLISHED THAT

25  IT'S A HUNDRED PERCENT, TRUE?

 1           **JUDGE KARLTON:**  WE UNDERSTAND THAT.  THAT'S WHY I

 2  ASKED YOU WHETHER THERE WAS A PREPONDERANT OPINION.

 3           **JUDGE REINHARDT:**  NO, THAT'S NOT THE SAME QUESTION

 4  I'M ASKING.

 5           YOU DIDN'T SAY THERE'S A HUNDRED PERCENT VIEW ON --

 6  SIMILARITY OF VIEW; YOU SAID IT'S NOT ESTABLISHED IT'S A HUNDRED

 7  PERCENT TRUE.

 8           **THE WITNESS:**  THAT IS CORRECT.

 9           **JUDGE REINHARDT:**  IS ANYTHING ESTABLISHED THAT'S A

10  HUNDRED PERCENT TRUE?

11           **THE WITNESS:**  NO, SIR.  THAT IS HUMAN BEHAVIOR.

12           **JUDGE REINHARDT:**  RIGHT.

13           **THE WITNESS:**  AND THAT'S WHAT WE'RE DEALING WITH

14  HERE.  A LOT OF IT IS ART, AND IT'S NOT SCIENCE.

15           **JUDGE REINHARDT:**  BUT YOU COULDN'T SAY IN ALMOST ANY

16  QUESTION IN LIFE THAT IT'S A HUNDRED PERCENT TRUE, COULD YOU?

17           **THE WITNESS:**  THAT IS CORRECT.

18  BY MS. JOHNSON

19  **Q**   CAN YOU EXPLAIN SOME OF THE FACTORS FROM WHICH PRISON

20  VIOLENCE RESULTS?

21  **A**   IT COULD BE THE SIZE OF THE SECURITY STAFF; THE TRAINING OF

22  SECURITY STAFF; THE TYPES AND CHARACTERISTICS OF THE OFFENDER

23  POPULATION; PRESENCE OR ABSENCE OF GANG ACTIVITY; PROGRAMMING;

24  SIMPLE ACTIVITIES; POTENTIALLY EVEN THE ARCHITECTURE OF THE

25  ENVIRONMENT.

 1          SO ALL OF THESE THINGS CAN PLAY INTO IT, AND THEY'RE

 2   PROBABLY ALL OF THEM RELATED IN SOME WAY, YOU KNOW, THAT LEAD TO

 3   VIOLENCE.  PRESENCE OR ABSENCE OF CONTRABAND, THESE SORTS OF

 4   THINGS.

 5   **Q**   HAVE YOU ALSO IN YOUR RESEARCH LOOKED AT THE POSSIBLE LINK

 6   BETWEEN CROWDING AND SUICIDE?

 7   **A**   I'VE REVIEWED THE LITERATURE.

 8   **Q**   IN YOUR OPINION, IS THERE A CLEAR LINK BETWEEN CROWDING AND

 9   SUICIDE IN PRISON?

10   **A**   IT'S STILL AN OPEN QUESTION.  YOU CAN'T SAY ONE HUNDRED

11   PERCENT FOR SURE THAT THIS CAUSED, YOU KNOW, THIS PRISON

12   HOMICIDE, OR THIS ACTIVITY, OR A SUICIDE.  IT'S -- THE DEBATE IS

13   ONGOING.

14   **Q**   IN YOUR FIRST REPORT YOU REFER TO IMPOSITION OF A POPULATION

15   CAP AT 158 PERCENT OF DESIGN CAPACITY, OR A CAP OF APPROXIMATELY

16   132 -- 132,500 INMATES BY 2012.  AND ACCORDING TO THE FIGURES

17   YOU USED, THAT WOULD CALL FOR THE RELEASE OF ROUGHLY 30,000

18   INMATES FROM PRISONS AND CAMPS IN CALIFORNIA?

19   **A**   YES.

20   **Q**   ARE YOU AWARE THAT PLAINTIFFS ARE CURRENTLY SEEKING TO SET

21   THE PRISON POPULATION AT 130 PERCENT DESIGN CAPACITY WITHIN TWO

22   YEARS, CALLING FOR A REDUCTION IN THE POPULATION OF ABOUT 52,000

23   WITHIN A TWO-YEAR PERIOD?

24   **A**   YES, MA'AM.

25   **Q**   IS THE PROPOSED POPULATION REDUCTION I DESCRIBED A MORE

1   EXTREME POPULATION REDUCTION THAN YOU CONTEMPLATED IN YOUR

2   REPORTS?

3   A   YES, MA'AM, IT IS.

4   Q   DO THE OPINIONS IN YOUR REPORTS REGARDING THE POSSIBLE

5   ADVERSE IMPACTS OF A POPULATION REDUCTION STILL HOLD TRUE IN

6   LIGHT OF THE EVEN LARGER POPULATION REDUCTION PLAINTIFFS NOW

7   SEEK?

8   A   YES, MA'AM.

9   Q   IN FORMING YOUR OPINIONS REGARDING THE POSSIBLE ADVERSE

10  IMPACTS OF A COURT-IMPOSED PRISON POPULATION REDUCTION IN

11  CALIFORNIA, DID YOU LOOK AT THE IMPACT OF POPULATION REDUCTION

12  MEASURES IN TEXAS IN THE 1980'S?

13  A   YES, MA'AM.

14  Q   DO YOU BELIEVE THAT TEXAS IS SIMILAR TO CALIFORNIA IN WAYS

15  THAT ARE RELEVANT TO ASSESSING THE LIKELY IMPACT OF A PRISON

16  POPULATION CAP IN CALIFORNIA?

17  A   YES, MA'AM, I DO.

18  Q   CAN YOU EXPLAIN THOSE RELEVANT FACTORS?

19  A   WELL, I THINK BOTH ARE LARGE POPULATED STATES.  BOTH OF THEM

20  ARE ETHNICALLY DIVERSE.  LARGE PRISON POPULATIONS, PRISON

21  POPULATIONS IN FACILITIES THAT ARE DISTRIBUTED ACROSS THE STATE

22  PRESENCE OF GANG ACTIVITY, BUDGETS, SECURITY STAFF SIZE, THEY

23  ARE VERY COMPARABLE.  AND BETWEEN THE FEDERAL BUREAU OF PRISONS

24  AND THE CALIFORNIA PRISON SYSTEM AND THE TEXAS PRISON SYSTEM,

25  THOSE ARE THE THREE LARGEST AND PROBABLY MOST COMPLEX PRISON

1  ORGANIZATIONS, WITHOUT A DOUBT, IN THE UNITED STATES.

2  **Q**   WHEN YOU LOOKED AT THE IMPACT OF POPULATION REDUCTION

3  MEASURES IN TEXAS IN THE 1980'S, WHAT DID YOU FIND?

4  **A**   WELL, IT IMPACTED THE STATE CRIMINAL JUSTICE SYSTEM IN A

5  VARIETY OF WAYS.  WHEN THEY IMPLEMENTED THE CAP, IT BEGAN TO

6  MOVE PRISONERS, STATE FELONS, BACK INTO THE COUNTY JAILS.  SO

7  THAT HAPPENED.  SO THE STATE -- YOU KNOW, THE COUNTY JAIL

8  POPULATIONS INCREASED.

9       THAT LED TO INTENSE LITIGATION ON THE PART OF

10  COUNTIES AGAINST STATE TO GET THOSE PEOPLE OUT OF -- OUT OF THE

11  COUNTY FACILITIES BECAUSE THEY DID NOT HAVE RESOURCES TO DEAL

12  WITH ALL OF THOSE PEOPLE.  SO, YOU KNOW, WE LOOKED AT THAT.

13       IT ALSO LED TO A -- AT THE BACK END, ON THE OTHER

14  SIDE OF THE PRISON, BECAUSE THAT'S THE WAY, YOU KNOW, I THINK

15  ABOUT IT -- IT'S A LOT LIKE HYDRAULICS.  SO, YOU KNOW, ON THE

16  FRONT END, YOU ARE TALKING ABOUT MOVING PEOPLE BACK INTO THE

17  COUNTY UPSTREAM, AND ON THE BACK END OF THE PRISON, YOU KNOW, TO

18  DEAL WITH THE POPULATION WAS TO OPEN UP, YOU KNOW, LITERALLY

19  OPEN THE BACK DOOR AND ALLOW PEOPLE TO HAVE SPEED-UPS IN TERMS

20  OF PAROLE AND THOSE SORTS OF THINGS TO COME BACK INTO THE

21  COMMUNITIES.  SO WE DID LOOK AT THAT.

22       AND THE OTHER INTERESTING THING THAT HAPPENED IS BY

23  SPEEDING UP THE RELEASE OF THE POPULATION, WE WERE ASKED TO

24  EXAMINE THE PROGRAMMING WITHIN THE SCHOOL DISTRICT WITHIN THE

25  PRISON SYSTEM AND FOR GEDS AND OTHER KINDS OF EDUCATIONAL

1  PROGRAMMING, AND THE LONG OF IT IS -- OR I GUESS THE SHORT OF IT

2  IS, TO GET A DEGREE, TO GET YOUR GED, IT TAKES -- LET'S JUST SAY

3  IT TAKES 12 MONTHS TO GET THAT GED.  SO YOU HAVE TO BE EXPOSED

4  TO THAT PROGRAM FOR THAT PERIOD OF TIME.  BUT BY SPEEDING UP THE

5  POPULATION TO GET THEM OUT TO MEET THAT CAP, THE EXPOSURE TO THE

6  PROGRAMMING LIKE THAT, PEOPLE WERE LITERALLY BEING PAROLED OUT

7  WITHIN THREE TO FOUR MONTHS.  SO THEY SIMPLY WERE NOT SPENDING

8  ENOUGH TIME OR HAVING ACCESS OR BEING EXPOSED TO THE PROGRAMS TO

9  HAVE COMPLETION TIME.

10          SO THOSE PEOPLE WERE LITERALLY IN A QUEUE AND THEN

11  CHURNED OUT AND THEN ADDED TO THE PROBLEM ON THE BACK END.

12  **Q**  DID TEXAS EXPERIENCE AN UPSURGE IN CRIME AT THE SAME TIME IT

13  WAS IMPLEMENTING THESE POPULATION REDUCTION MEASURES?

14  **A**  WE LOOKED AT THAT IN THE HARRIS COUNTY AREA, AND THE CRIME

15  RATE DID GO UP.  AND ANOTHER REASON WHY IT WENT UP IS BECAUSE OF

16  THE DENSITY OF HALFWAY HOUSES THAT WERE IN THAT PARTICULAR

17  COMMUNITY.  MORE HALFWAY HOUSES WERE THERE; ERGO, IF YOU HAVE TO

18  PUT MORE PAROLEES INTO THAT COMMUNITY WITHOUT THE RESOURCES FOR

19  ADEQUATE SUPERVISION, AND THAT'S BASICALLY WHAT ENDED UP

20  HAPPENING.

21          **JUDGE HENDERSON:**  CAN I JUST, WAS THIS CAP IMPOSED BY

22  JUDGE JUSTICE IN *RUIZ*?

23          **THE WITNESS:**  IT WAS RELATED TO THAT, BUT THE

24  LEGISLATURE IMPOSED THE CAP, AND IT WAS SET AT 95 PERCENT.

25

1  BY MS. JOHNSON

2  **Q**   DID ADDITIONAL ARRESTS, CONVICTIONS, AND PRISON COMMITMENTS

3  OCCUR AS A RESULT OF THE PRISON POPULATION CAP?

4  **A**   PARDON ME?

5  **Q**   DID ADDITIONAL ARRESTS, CONVICTIONS AND PRISON COMMITMENTS

6  OCCUR BECAUSE OF THE PRISON POPULATION CAP?

7  **A**   RIGHT, BECAUSE THE PEOPLE KEEP GOING OUT THE BACK DOOR AND

8  CHURNING RIGHT INTO THE FRONT DOOR AGAIN.

9  **Q**   DO YOU, BASED ON YOUR RESEARCH, ATTRIBUTE SOME OF THE

10 UPSURGE IN CRIME TO THE INCREASE IN THE NUMBER OF PAROLEES

11 RELEASED AS A RESULT OF THE PRISON POPULATION CAP?

12 **A**   I DO.  SOME PORTION OF IT WAS, THE EXACT UNKNOWN AT THIS

13 POINT IN TIME.  BUT THE ISSUE IS, YOU KNOW, WHEN YOU RELEASE

14 THOSE PEOPLE BACK INTO THAT COMMUNITY WITHOUT PROPER

15 SUPERVISION, LIKE I SAID, AND THE DENSITY OF HALFWAY HOUSES AND

16 PLACES LIKE THAT IN HARRIS COUNTY, YOU HAD AN OVERAGE OF

17 OFFENDERS IN THAT COMMUNITY, AND THAT LED TO INCREASING CRIME ON

18 THE STREETS.

19         ONE OF THE THINGS WE DID DO FOR HARRIS COUNTY WAS TO

20 TAKE -- RELATED TO THE HALFWAY HOUSE ISSUE WAS TO TAKE A LOOK AT

21 THE KINDS OF EQUALITY OF THE OFFENDER THAT WENT INTO THE PRISON

22 SYSTEM AND THEN WHAT THEY GOT ON THE BACK END, OKAY, AS A RESULT

23 OF, YOU KNOW, THESE PEOPLE GOING IN AND COMING OUT AGAIN BECAUSE

24 OF THE PRESENCE OF THESE HALFWAY HOUSES.

25         AND THE CUSTODY LEVEL, OR THE CRIMINAL LEVEL, I

1   GUESS, IF YOU WANT TO CALL IT THAT, THEY SENT IN A QUALITY OF

2   INMATE, THEY WERE GETTING WORSE IN RETURN AS A RESULT OF THE

3   HALFWAY HOUSES THAT WERE IN THE COMMUNITY, WHICH POSED A PUBLIC

4   SAFETY ISSUE IN THAT PARTICULAR AREA.

5   **Q**   ARE THERE ANY LESSONS YOU HAVE DRAWN FROM THE EXAMPLE OF

6   TEXAS IN THE 1980'S?

7   **A**   YES, MA'AM.

8   **Q**   COULD YOU IDENTIFY THOSE FOR US, PLEASE?

9   **A**   WELL, AGAIN, IT'S -- THE IMPOSITION OF CAPS IS -- TO DEAL

10  WITH THE PRISON POPULATION ISSUE, IT'S EXTREMELY COMPLEX.  AND,

11  YOU KNOW, IF YOU ARE GOING -- IF THAT'S GOING TO HAPPEN, THERE

12  ARE DOWNSTREAM AND UPSTREAM IMPACTS OF ALL THIS.  IT'S ALL

13  INTERCONNECTED.

14          SO BY STOPPING THE -- PUTTING THE BRAKES ON THE FRONT

15  DOOR, THAT'S GOING TO CREATE UPSTREAM ISSUES IN TERMS OF

16  ACTIVITY WITHIN THE COUNTY JAILS.  YOU KNOW, THE POLICE ARE NOT

17  GOING TO STOP ARRESTING PEOPLE.  PEOPLE ARE NOT GOING TO STOP

18  COMMITTING CRIME.  AND THE COURTS ARE GOING TO CONTINUE TO

19  CONVICT PEOPLE, AND THEY HAVE TO HAVE A PLACE TO GO IN THE JAIL.

20  SO ALL THAT'S GOING ON.  BUT THEN WHEN THEY DO COME BACK IN, YOU

21  KNOW, THERE HAS TO BE EFFORTS TO MAINTAIN PROGRAMMING TO DEAL

22  WITH THEM SO THEY CAN GO BACK OUT AGAIN.

23          SO IT IS AN EXTREMELY COMPLEX ISSUE, AND IT LEADS TO

24  LOTS OF THINGS BACK OR UPSTREAM WITHIN LOCAL CRIMINAL JUSTICE

25  ENVIRONMENTS.

1   Q    IN YOUR OPINION, WHEN A STATE IS CONSIDERING A PRISON

2   POPULATION REDUCTION, IS IT IMPORTANT TO HAVE SUFFICIENT LOCAL

3   CRIMINAL JUSTICE RESOURCES TO HANDLE ANY ADDITIONAL WORKLOAD?

4   A    YES, MA'AM.

5   Q    IS IT YOUR OPINION THAT IT'S ALSO IMPORTANT TO HAVE PROPER

6   COMMUNITY SUPPORT SYSTEMS IN PLACE BEFORE LARGE NUMBERS OF

7   ADDITIONAL PRISONERS ARE DIVERTED OR RELEASED?

8   A    YES.

9   Q    WHAT TYPE OF COMMUNITY SUPPORT SYSTEMS ARE YOU REFERRING TO?

10  A    WELL, THE IDEA IS, YOU KNOW, WE DON'T WANT ANY OF THESE

11  PEOPLE TO COME BACK.  THAT'S THE ULTIMATE GOAL, AND WHATEVER WE

12  CAN DO TO SLOW THAT DOWN, THAT'S THE BEST THING.  SO HOUSING,

13  EMPLOYMENT, SUBSTANCE ABUSE TRAINING.  AND, AGAIN, PROPER --

14  AND, YOU KNOW, SUPERVISION WHILE THEY ARE ON PAROLE.

15           I MEAN, THE GOAL SHOULD BE TO SET ALL THIS UP SO THEY

16  DO NOT RETURN, AND ANYTHING THAT WE CAN DO IN TERMS OF THOSE

17  SORTS OF THINGS, FINDING THEM A JOB, FINDING THEM ADEQUATE

18  HOUSING, SUBSTANCE ABUSE PROGRAMMING.  ANY OF THESE KINDS OF

19  THINGS TO REDUCE THE OPPORTUNITY THAT THEY ARE GOING TO COME

20  BACK, THE BETTER OFF WE ARE GOING TO BE.

21  Q    BASED ON YOUR UNDERSTANDING OF THE RESEARCH IN CALIFORNIA,

22  IS THE OPPORTUNITY FOR EMPLOYMENT PARTICULARLY IMPORTANT FOR THE

23  SUCCESS OF PAROLEES?

24  A    YES.

25  Q    YOU REFER TO SOME RESEARCH IN YOUR REPORT BY FRANK WILLIAMS

1   ON CALIFORNIA PAROLEES.  ARE YOU FAMILIAR WITH THAT?

2   **A**   YES, MA'AM.

3   **Q**   CAN YOU EXPLAIN THAT, BRIEFLY?

4   **A**   THEY LOOKED AT PAROLEES IN CALIFORNIA, PAROLEES AND THEIR

5   ACCESS OR THEIR ABILITY TO FIND HOUSING, ADEQUATE HOUSING, WHEN

6   THEY COME BACK TO THE COMMUNITY.  AND, AGAIN, THEY FOUND THAT --

7   THAT THEY WENT BACK INTO THE COMMUNITIES, AND THEY FACED THE,

8   QUOTE, THE NORMAL HISTORICAL PROBLEMS THAT PAROLEES FACE, NOT

9   ONLY IN THIS STATE, BUT ACROSS THE COUNTRY, THROUGHOUT THE

10  WORLD, ACROSS TIME AND SPACE, THAT IT'S EXTREMELY DIFFICULT TO

11  FIND HOUSING, ADEQUATE HOUSING, AND IT'S ALSO DIFFICULT TO FIND

12  A DECENT JOB THAT YOU ARE GOING TO BE ABLE TO HAVE SO THEY WON'T

13  COME BACK.

14         SO, AT THE SAME TIME THEY ARE ALSO COMPETING WITH

15  PEOPLE, NON-CRIMINAL FOLKS OUT HERE IN THE COMMUNITY AS WELL, SO

16  THERE'S A LOT OF COMPETITION FOR JOBS, HOUSING, AND SO ON AND SO

17  FORTH.  THAT'S WHAT THEY RAN INTO, YOU KNOW, WHEN THEY GOT

18  RELEASED.

19  **Q**   WOULD YOU EXPECT THOSE BARRIERS TO EMPLOYMENT AND HOUSING TO

20  BE WORSE IN A DOWNTURNED ECONOMY?

21  **A**   THAT'S A GOOD QUESTION AND SOMETHING WE COULD PROBABLY TAKE

22  A LOOK AT.  BUT MY IDEA -- OR THE VIEW IS, YEAH, IT PROBABLY

23  WOULD, BECAUSE YOU'RE COMPETING WITH PEOPLE, YOU KNOW,

24  NON-CRIMINAL TYPES OUT HERE, AND THOSE THAT CHECK THE BOX THAT

25  THEY HAVE A CRIMINAL HISTORY, THEY'RE THE LAST TO GET HIRED.

1  Q    IN YOUR OPINION, IS THE AVAILABILITY OF MENTAL HEALTHCARE TO

2  RELEASED MENTALLY ILL OFFENDERS IMPORTANT FOR THEIR SUCCESS IN

3  THE COMMUNITY?

4  A    YES, IT IS.

5  Q    IN THAT REGARD, DID YOU LOOK AT WHAT CDCR'S EXPERT PANEL HAD

6  TO SAY ABOUT MENTALLY ILL OFFENDERS?

7  A    YES, MA'AM.

8  Q    IF WE COULD PULL UP PAGE 13?

9  A    I LEFT MY THING OVER THERE.  COULD I GO BACK --

10  Q    WE CAN PUT IT ON THE SCREEN.

11         **JUDGE KARLTON:**  IT WILL BE ON THE SCREEN RIGHT THERE.

12  BY MS. JOHNSON

13  Q    PAGE 13 OF YOUR THIRD REPORT.

14         YOU QUOTED --

15  A    YES, MA'AM.

16  Q    THE EXPERT PANEL.  CAN YOU READ THAT FOR US?  CAN YOU?  DO

17  YOU HAVE YOUR GLASSES?

18  A    I GOT IT NOW.  YOU WANT ME TO READ THE WHOLE THING?

19  Q    SURE.

20  A    (AS READ)   "ONCE THE OFFENDER LEAVES THE CORRECTIONAL

21              SYSTEM, THEN HE OR SHE MUST OBTAIN THESE

22              SERVICES -- "

23              YOU KNOW, MENTAL HEALTH SERVICES IN THE COMMUNITY.

24              " -- IF THEY EXIST.  IN THE CASES WHERE THE

25              NEEDED SERVICES DO EXIST, RELEASED OFFENDERS

 1              OFTEN DON'T HAVE THE RESOURCES REQUIRED TO

 2              OBTAIN THEM.  THIS LEADS TO THE OFFENDER

 3              BECOMING PHYSICALLY OR MENTALLY DESTABILIZED AND

 4              OFTEN RESULTS IN HIM OR HER BEING RETURNED TO

 5              PRISON AFTER BEING CONVICTED OF COMMITTING A NEW

 6              CRIME OR VIOLATING ONE OR MORE PAROLE

 7              CONDITIONS.  WE BELIEVE IT WOULD BE IN THE BEST

 8              INTEREST OF CALIFORNIA TO ENSURE THAT RELEASED

 9              OFFENDERS HAVE ACCESS TO THE MEDICATIONS THEY

10              NEED TO MANAGE THEIR MENTAL HEALTH DISORDERS

11              AND/OR PHYSICAL AILMENTS, AS WELL AS ACCESS TO

12              HOUSING AND JOB ASSISTANCE SERVICES."

13   Q    WHAT IMPACT DID THIS HAVE ON YOUR OPINION?  WHY DID YOU

14   QUOTE IT?

15   A    YOU KNOW, I BELIEVE THAT, YOU KNOW, THERE'S A PERCENTAGE OF

16   INMATES THAT DO HAVE MENTAL HEALTH NEEDS, AND THOSE ONES ARE

17   PROBABLY GOING TO BUMP INTO THE CRIMINAL JUSTICE SYSTEM FAR MORE

18   FREQUENTLY THAN OTHER OFFENDERS.  THOSE ARE THE ONES THAT ARE

19   GOING TO NEED THE KINDS OF SERVICES IN THE COMMUNITY.

20           AND, AGAIN, THE IDEA IS WE DON'T WANT THEM TO COME

21   BACK.  SO IF YOU HAVE ADEQUATE SERVICES ON THE STREETS, THEY CAN

22   GET ACCESS TO THAT, THE GOAL IS THE LESS LIKELY, WE WOULD HOPE,

23   THAT THEY'RE GOING TO RETURN.

24   Q    AND ABSENT THOSE SERVICES, WHAT IMPACT DOES THE PRISON

25   POPULATION REDUCTION MEASURES HAVE?

1   **A**   WELL, IF THEY DON'T HAVE IT, THEY'RE MORE LIKELY, AGAIN, TO

2   BUMP INTO POLICE AGENCIES AND END UP IN JAILS.

3   **Q**   DR. MARQUART, WHAT IS YOUR OPINION WITH RESPECT TO

4   PLAINTIFFS' PROPOSALS REGARDING TECHNICAL PAROLE VIOLATERS?

5           **MR. SPECTER:**  OBJECTION.  VAGUE IN TERMS OF WHAT

6   PLAINTIFFS' PROPOSALS ARE.

7           **JUDGE HENDERSON:**  LET'S STATE WHAT IT IS OR WHAT HIS

8   UNDERSTANDING IS.

9           **THE WITNESS:**  WOULD YOU --

10  BY MS. JOHNSON

11  **Q**   YOU READ DR. AUSTIN'S REPORTS, CORRECT?

12  **A**   YES, MA'AM.

13  **Q**   AND YOU ARE AWARE THAT DR. AUSTIN MADE PROPOSALS WITH

14  RESPECT TO, I THINK, NOT REVOKING --

15          **JUDGE KARLTON:**  NOT SENDING BACK TO PRISON.

16  BY MS. JOHNSON

17  **Q**   NOT SENDING BACK TO PRISON -- WELL, VARIOUS PROPOSALS WITH

18  RESPECT TO THE CLASS OF PEOPLE WE REFER TO AS TECHNICAL PAROLE

19  VIOLATERS.  ARE YOU FAMILIAR WITH THAT CONCEPT?

20  **A**   YES, MA'AM.

21  **Q**   OKAY.  AND DID YOU HAVE -- I DON'T WANT TO SAY -- I DON'T

22  WANT TO BE ARGUMENTATIVE.

23          WHAT WAS YOUR TAKE ON DR. AUSTIN'S APPROACH TO THE

24  ISSUE OF TECHNICAL PAROLE VIOLATERS?

25  **A**   THERE'S A SIZEABLE PORTION OF THEM THAT HAVE BEEN RETURNED

1    FOR CRIMINAL ACTIVITY, SO THAT NEEDS TO BE FACTORED INTO ANY

2    DECISION MAKING AS WELL.  IT'S NOT AS IF, YOU KNOW, A TECHNICAL

3    VIOLATER IS -- YOU KNOW, THE TYPICAL STEREOTYPE IS MAYBE THEY

4    MISSED A CURFEW OR THEY FAILED TO CALL IN.  BUT IN THIS

5    PARTICULAR POOL OF OFFENDERS, A LARGE PERCENTAGE OF THEM ARE

6    UNDER SOME KIND OF REVIEW FOR CRIMINAL ACTIVITY.

7              **THE CLERK:**  FIVE MINUTES, COUNSEL.

8    BY MS. JOHNSON

9    **Q**   IN YOUR OPINION, CAN THE NEED TO ADHERE TO SPECIFIC EXTERNAL

10   TIMELINES HAVE AN ADVERSE IMPACT ON A STATE'S ABILITY TO SAFELY

11   REDUCE ITS PRISONER POPULATION?

12   **A**   YES, MA'AM.

13   **Q**   CAN YOU EXPLAIN THAT?

14   **A**   WELL, AGAIN, IT'S THE -- YOU KNOW, IF YOU PUT IN PLACE A

15   HARD AND FAST DEADLINE THAT SOMETHING LIKE THIS HAS TO HAPPEN,

16   YOU KNOW, I BELIEVE THAT HAVING A QUOTA LIKE THAT, OR A TIMELINE

17   YOU ARE DEALING WITH, A RUSH FACTOR, YOU KNOW, WE ARE GOING TO

18   HAVE TO GET THIS DONE NO MATTER WHAT, YOU KNOW, I BELIEVE

19   ERRORS -- THE POTENTIAL FOR ERRORS CAN BE MADE WHEN RUNNING UP A

20   HARD AND FAST DEADLINE IF THE RESOURCES AND THESE OTHER THINGS

21   ARE NOT PUT IN PLACE.

22   **Q**   BASED ON THE DOCUMENTATION YOU REVIEWED IN FORMING YOUR

23   OPINIONS AND YOUR EXPERIENCE, DO YOU BELIEVE THAT CALIFORNIA HAS

24   SUFFICIENT LOCAL CRIMINAL JUSTICE RESOURCES TODAY TO SAFELY

25   HANDLE THE PRISON REDUCTION PLAINTIFFS PROPOSE?

1  **A**   NO, MA'AM, I DON'T.

2  **Q**   BASED ON THE DOCUMENTATION YOU REVIEWED IN FORMING YOUR

3  OPINIONS AND YOUR EXPERIENCE, DO YOU BELIEVE THAT CALIFORNIA HAS

4  SUFFICIENT LOCAL COMMUNITY RESOURCES AND SERVICES TODAY TO

5  SAFELY HANDLE THE PRISON REDUCTION PLAINTIFFS PROPOSE?

6  **A**   BASED ON THE REPORTS THAT WERE PROVIDED TO ME AND THE

7  INFORMATION THAT I'VE READ, IT IS NOT IN PLACE.

8           **JUDGE REINHARDT:**  DO YOU BELIEVE THAT THEY HAVE THE

9  FACILITIES -- WITH RESPECT TO THE LAST TWO QUESTIONS, YOU

10 ANSWERED IT WITH RESPECT TO INCREASING THE NUMBER OF PAROLEES.

11 DO YOU BELIEVE THOSE ITEMS ARE ADEQUATE FOR THE CURRENT NUMBER

12 OF PAROLEES?

13          **THE WITNESS:**  FROM WHAT I READ AND THE INFORMATION

14 PROVIDED TO ME, IT DOESN'T APPEAR THAT IT IS ADEQUATE AT THIS

15 POINT IN TIME.  I MEAN --

16          **JUDGE REINHARDT:**  FOR THE ONES THAT ARE CURRENTLY

17 RELEASED.

18          **THE WITNESS:**  THAT'S RIGHT.  BECAUSE THEIR RECIDIVISM

19 RATE APPEARS TO BE 60 TO 70 PERCENT OF THESE PEOPLE ARE COMING

20 BACK, SO THEY'RE NOT GETTING SOMETHING ON THE STREETS TO HELP

21 THEM TO MAKE IT.

22          **JUDGE KARLTON:**  THEY ARE NOT GETTING ANYTHING IN

23 PRISON TO HELP THEM MAKE IT EITHER.

24          **THE WITNESS:**  THAT'S THE OTHER SIDE OF THE COIN, YOU

25 ARE EXACTLY RIGHT.  THEY ARE NOT GETTING IT ON BOTH SIDES.  THEY

1    ARE ILL EQUIPPED AND ILL PREPARED UPON RELEASE, AND THEY'RE

2    GOING TO --

3              **JUDGE KARLTON:**  AND THAT WOULD BE TRUE --

4              **JUDGE REINHARDT:**  WHETHER OR NOT YOU RELEASE

5    ADDITIONAL PAROLEES, IT'S TRUE.

6              **THE WITNESS:**  PARDON ME.

7              **JUDGE REINHARDT:**  WHETHER OR NOT YOU RELEASE

8    ADDITIONAL PAROLEES, IT'S TRUE.

9              **THE WITNESS:**  THAT IS CORRECT.

10             **JUDGE REINHARDT:**  AND THESE ARE ALL PEOPLE WHO ARE

11   GOING TO BE RELEASED A FEW MONTHS LATER UNDER THE PLAINTIFFS'

12   PROPOSAL.

13             **THE WITNESS:**  THAT IS CORRECT.

14             **JUDGE REINHARDT:**  SO YOU ARE GOING TO FACE THAT SAME

15   PROBLEM, ONLY A FEW MONTHS LATER.

16             **THE WITNESS:**  RIGHT.  AND, YOU KNOW, IF YOU GO

17   THROUGH WITH IT, THEN YOU ARE ADDING LITERALLY TENS OF THOUSANDS

18   OF MORE PEOPLE ON TOP OF THE EXISTING PROBLEM THAT WE HAVE RIGHT

19   NOW.

20             **JUDGE KARLTON:**  THE QUESTION OF WHETHER OR NOT PUBLIC

21   SAFETY IS BEING SERVED TURNS ON THE FACT THAT IT DOESN'T MATTER

22   WHAT WE DO.  AS LONG AS WE CONTINUE WITH A SYSTEM THAT HAS NO

23   SERVICES, MEANINGFUL SERVICES IN PRISON AND INSUFFICIENT

24   MEANINGFUL SERVICES OUT OF PRISON, WE'LL CONTINUE TO HAVE THIS

25   RECIDIVISM RATE?

1        **THE WITNESS:** YES, SIR.

2        **JUDGE KARLTON:** SO, IN EFFECT, IT DOESN'T MAKE ANY

3   DIFFERENCE?

4        **THE WITNESS:** WELL, I HATE TO ADMIT THAT, BUT THAT'S

5   THE CASE.

6   BY MS. JOHNSON

7   **Q**   IN YOUR OPINION, WITHOUT THE NECESSARY PROGRAMS AND

8   COMMUNITY RESOURCES IN PLACE, WOULD THE POPULATION REDUCTION

9   MEASURES PLAINTIFFS PROPOSE ACTUALLY RESULT IN A REDUCTION OF

10  THE PRISON POPULATION?

11  **A**   WELL, IT WILL REDUCE THEM ON THE FRONT END, BUT, ULTIMATELY,

12  YOU ARE GOING TO -- IT'S COMPOUND INTEREST ON THE BACK END.

13  THERE IS -- LIKE WE JUST GOT DONE TALKING ABOUT HERE, A LARGE

14  NUMBER OF THOSE PEOPLE ARE GOING TO COME BACK.

15  **Q**   DR. MARQUART, ARE YOU FAMILIAR WITH THE LITERATURE ON THE

16  RELATIONSHIP BETWEEN INCARCERATION RATES AND CRIME RATES?

17  **A**   YES, MA'AM.

18  **Q**   IN YOUR OPINION, CAN IT BE CONCLUDED WITH CERTAINTY THAT

19  THERE IS NO RELATIONSHIP BETWEEN HIGHER INCARCERATION RATES AND

20  LOWER CRIME RATES?

21  **A**   NO, MA'AM, IT CANNOT.

22  **Q**   CAN YOU EXPLAIN THAT?

23  **A**   YOU KNOW, IN MY VIEW, THERE IS SOME RELATIONSHIP BETWEEN

24  INCARCERATION AND CRIME AND CRIME RATES.  THAT'S WHY WE BUILD

25  THESE INSTITUTIONS, TO KEEP THESE PEOPLE, THESE CRIMINALS, OFF

 1  THE STREETS.

 2              **JUDGE KARLTON:**  WE DO ALL KINDS OF THINGS --

 3              **THE WITNESS:**  WE DO.

 4              **JUDGE KARLTON:**  -- THAT DON'T MAKE ANY SENSE.  THE

 5  FACT THAT WE DO THEM DOESN'T MAKE THEM -- ISN'T EVIDENCE THAT

 6  WHAT WE'RE DOING MAKES SENSE; TRUE?

 7              **THE WITNESS:**  THAT'S CORRECT.

 8              **JUDGE KARLTON:**  GO AHEAD.  I'M SORRY.

 9  BY MS. JOHNSON

10  **Q**   SO ARE YOU RELYING ON SOMETHING OTHER THAN THE EXISTENCE OF

11  THE INCARCERATION POLICIES TO CONCLUDE THAT THERE IS A

12  RELATIONSHIP BETWEEN HIGHER INCARCERATION RATES AND LOWER CRIME

13  RATES?

14  **A**   IF YOU TAKE A LOOK AT WHAT'S HAPPENED IN MY OWN HOME STATE,

15  THERE HAS BEEN A DECLINE IN CRIME AT THE SAME TIME THAT, YOU

16  KNOW, WE ENGAGED IN EXPANSION OF THE PRISON POPULATION.  THAT

17  DID HAPPEN, BUT TO WHAT EXTENT, YOU KNOW, THE CRIME RATE, THE

18  DROP IN THAT, CAN BE COMPLETELY ATTRIBUTED TO THE EXPANSION OF

19  THE PRISON SYSTEM IS STILL AN OPEN QUESTION, BUT THERE IS SOME

20  CONNECTION.

21              **JUDGE KARLTON:**  WE'VE HEARD REPEATEDLY IN THIS TRIAL

22  THAT CRIME RATES, DESPITE WHAT THE PUBLIC BELIEVES, ARE BEING

23  REDUCED ALL OVER THE COUNTRY, WHETHER YOU INCREASE THE

24  POPULATION OR DECREASE, IT SEEMS TO HAVE NOTHING TO DO WITH THE

25  CRIME RATE.  YOU DON'T BELIEVE THAT THAT'S TRUE?

1          **THE WITNESS:**  I THINK THERE IS SOME RELATIONSHIP

2   BETWEEN INCARCERATION AND CRIME.

3          **JUDGE KARLTON:**  ON WHAT BASIS DO YOU BELIEVE THAT,

4   DOCTOR?

5          **THE WITNESS:**  ON THE THINGS THAT I'VE READ, AND BASED

6   ON MY OWN PERSONAL EXPERIENCE OF REVIEWING WHAT'S HAPPENED IN

7   OUR OWN PARTICULAR STATE.

8          **JUDGE REINHARDT:**  DO YOU DISAGREE WITH THE TESTIMONY

9   WE'VE HEARD THAT THE CRIME RATE HAS GENERALLY DECREASED OVER

10  WHATEVER PERIOD OF TIME, NINE YEARS, TEN YEARS, THAT IT'S

11  DECREASED GENERALLY ACROSS THE COUNTRY?

12         **THE WITNESS:**  IT HAS GONE DOWN GENERALLY, I WOULD

13  AGREE.

14         **JUDGE REINHARDT:**  AND HAS IT GONE DOWN MORE, IN YOUR

15  EXPERIENCE, IN THE STATES THAT HAVE INCARCERATED A HIGHER

16  PERCENTAGE OF PEOPLE?

17         **THE WITNESS:**  I CAN TELL YOU IN MY OWN STATE --

18         **JUDGE REINHARDT:**  YES, THAT I UNDERSTAND.

19         **THE WITNESS:**  -- IT'S GONE DOWN.  BUT, AGAIN, I'M NOT

20  GOING TO SAY THAT I'M GOING TO ATTRIBUTE, YOU KNOW, ONE HUNDRED

21  PERCENT THAT THAT'S THE CASE.

22         **JUDGE KARLTON:**  HOW ABOUT TEN?  HOW ABOUT TEN

23  PERCENT?  HOW ABOUT FIVE PERCENT?

24         **THE WITNESS:**  IT MAY BE FIVE OR TEN PERCENT.

25         **JUDGE KARLTON:**  WE DON'T KNOW?

1          **THE WITNESS:**  THAT IS CORRECT.  THAT IS CORRECT.

2          **JUDGE KARLTON:**  IT'S ALL SPECULATION.

3          **THE WITNESS:**  YES, SIR.

4          **JUDGE KARLTON:**  BUT STATES THAT HAVE REDUCED THE

5  LENGTH OF INCARCERATION HAVE HAD THE SAME REDUCTIONS AT THE SAME

6  RATES AS TEXAS OR ANY OTHER STATE, ROUGHLY, I MEAN THERE MAY BE

7  MINOR DIFFERENCES.

8          **THE WITNESS:**  YES, SIR.

9          **JUDGE KARLTON:**  ALL RIGHT.  OKAY.  ALL RIGHT.  GO

10 AHEAD, MA'AM.

11         **MS. JOHNSON:**  I DON'T HAVE ANY FURTHER QUESTIONS.

12         **JUDGE HENDERSON:**  THANK YOU.  INTERVENORS?

13         **MR. MITCHELL:**  YES, BRIEFLY.

14              **DIRECT EXAMINATION BY MR. MITCHELL**

15         **MR. MITCHELL:**  BILL MITCHELL FOR THE DEFENDANT

16 INTERVENORS.

17 BY MR. MITCHELL

18 **Q**   GOOD MORNING, DR. MARQUART.

19 **A**   GOOD MORNING.

20 **Q**   DR. MARQUART, IN YOUR REPORT, IN YOUR CONCLUSION PARAGRAPH

21 10 ON PAGE 19 --

22         **JUDGE REINHARDT:**  IS THIS THE FIRST REPORT?

23         **MR. MITCHELL:**  I'M SORRY, IT IS -- IT'S HIS -- I

24 BELIEVE IT IS HIS FIRST REPORT, THE ONE THAT'S DATED 9/22/08,

25 PARAGRAPH NUMBER 10.

1          **JUDGE REINHARDT:**  THANK YOU.

2          **MS. JOHNSON:**  THAT'S ACTUALLY HIS THIRD REPORT, YOUR

3  HONORS.

4          **MR. MITCHELL:**  THANK YOU, COUNSEL.

5          **JUDGE REINHARDT:**  LET ME FIND IT.  YOU SAY IT'S

6  PARAGRAPH 10?

7          **MR. MITCHELL:**  PARAGRAPH 10, PAGE 19.

8                  (DOCUMENT DISPLAYED.)

9  BY MR. MITCHELL

10 **Q**   YOU WRITE, DOCTOR, "IN CONCLUSION," I'LL PARAPHRASE PART OF

11 THAT, THAT THERE WILL BE CRIMINAL ACTIVITY AND THERE WILL BE

12 VICTIMS, RELATING TO A PRISONER REDUCTION OR PRISONER RELEASE

13 ORDER, CORRECT?

14 **A**   YES, SIR.

15 **Q**   YOU STATE THAT THE -- ONLY THE EXACT AMOUNT OF SUCH BEHAVIOR

16 REMAINS UNKNOWN.  THERE'S BEEN SOME TESTIMONY HERE AND A

17 PROPOSAL HAS BEEN MADE THAT THIS COURT SHOULD IMPLEMENT A

18 POPULATION CAP SET AT 130 PERCENT OF DESIGN CAPACITY WHICH

19 WOULD, IN EFFECT, WARRANT A RELEASE OF 52,000 INMATES OVER A

20 TWO-YEAR PERIOD, AND IF THAT INVOLVES THE RELEASE OF

21 APPROXIMATELY 2,200 INMATES PER MONTH THAT WOULD BE RELEASED

22 EARLY, EARLIER THAN COMPLETING THEIR ENTIRE TERMS, WOULD YOU

23 EXPECT THAT A CERTAIN PERCENTAGE OF THOSE WOULD COMMIT CRIMES

24 DURING THAT EARLY RELEASE PERIOD?

25 **A**   YES, SIR.

1  Q    THERE'S BEEN TESTIMONY RANGING FROM 17 PERCENT TO 25 PERCENT

2  OF THIS EARLY RELEASE CLASS, IF IT INVOLVES LOW LEVEL OFFENDERS,

3  WOULD RECIDIVATE AND COMMIT CRIMES?

4          **JUDGE KARLTON:**  WELL, THAT ISN'T QUITE THE SAME

5  THING, AS WE'VE LEARNED, TO OUR DISMAY.  RECIDIVISM INCLUDES ALL

6  OF THE TECHNICAL VIOLATIONS AS WELL.  SO THERE'S SOME SUGGESTION

7  THAT RECIDIVISM RATES WOULD BE INCREASED.  THAT IS THE BEST WE

8  CAN SAY, RIGHT?

9          **MR. MITCHELL:**  LET ME CLARIFY THEN.

10  BY MR. MITCHELL

11  Q    EARLIER IN YOUR TESTIMONY YOU MENTIONED THE 70 PERCENT

12  RECIDIVISM RATE, AND IT'S BEEN TESTIFIED IN THIS COURTROOM THAT

13  THAT INVOLVES REOFFENSES, NEW CRIMES AND TECHNICAL PAROLE

14  VIOLATERS.  IS THAT YOUR UNDERSTANDING OF THE 70 PERCENT

15  RECIDIVISM RATE THAT'S BEEN DOCUMENTED IN CALIFORNIA?

16  A    YES, SIR.

17  Q    HYPOTHETICALLY, AND I BELIEVE THERE HAS BEEN TESTIMONY FROM

18  DR. AUSTIN AND THOMAS HOFFMAN, THAT IF YOU HAVE REOFFENSE RATE

19  OF 17 PERCENT, AND A REOFFENSE RATE MEANING COMMITTING A NEW

20  CRIME, OF 25 PERCENT OF THIS GROUP THAT IS RELEASED EARLY, THOSE

21  WOULD EQUATE TO A CERTAIN NUMBER OF NEW CRIMES PER MONTH BY THIS

22  EARLY RELEASE CLASS, CORRECT?

23  A    THAT IS CORRECT.

24  Q    AND IF WE USE THE 17 PERCENT FIGURE APPLIED TO APPROXIMATELY

25  2,100 INMATES BEING RELEASED PER MONTH, WOULD YOU AGREE THAT

1  WOULD INVOLVE APPROXIMATELY 368 NEW CRIMES BEING COMMITTED BY

2  THAT GROUP?

3          **MR. SPECTER:**  OBJECTION.  THAT MISSTATES THE

4  TESTIMONY.  IT'S -- IT'S NOT NEW CRIMES IN THE SENSE THAT THERE

5  WOULD BE CRIMES THAT WEREN'T GOING TO BE COMMITTED BEFORE.  SO I

6  THINK THE HYPOTHETICAL, IF IT'S BASED ON THE PRIOR TESTIMONY, HE

7  NEEDS TO CLARIFY THAT THESE WOULD HAVE BEEN CRIMES THAT WOULD BE

8  COMMITTED ONCE THOSE PAROLEES WOULD BE RELEASED ANYWAY.

9          **JUDGE REINHARDT:**  THE QUESTION, AS I UNDERSTAND IT,

10 IS, IN THIS PARTICULAR PERIOD THERE WOULD BE THESE CRIMES, WHICH

11 MIGHT OTHERWISE BE COMMITTED LATER.  THAT'S A DIFFERENT THING.

12 BUT THE QUESTION IS ONLY WOULD THESE CRIMES BE COMMITTED IN THIS

13 PERIOD.

14         **MR. SPECTER:**  WELL, IF THAT'S THE QUESTION -- IF

15 THAT'S HOW HE UNDERSTANDS THE QUESTION, I WILL WITHDRAW MY

16 OBJECTION, BUT THAT'S NOT HOW I UNDERSTOOD THE QUESTION.

17         **JUDGE REINHARDT:**  DID I ACCURATELY STATE YOUR

18 QUESTION?

19         **MR. MITCHELL:**  YES.

20 BY MR. MITCHELL

21 **Q**  I BELIEVE I'M LOOKING AT CRIMES COMMITTED DURING THE EARLY

22 RELEASE PERIOD WHEN THE INDIVIDUAL WOULD HAVE BEEN IN CUSTODY

23 BUT FOR HIS EARLY RELEASE, CERTAIN NUMBER OF CRIMES WILL BE

24 COMMITTED DURING THAT EARLY RELEASE WINDOW.  DR. AUSTIN PUT IT

25 AT 25 PERCENT.  I BELIEVE MR. HOFFMAN PUT IT FOR A LOW LEVEL OR

1  LOW RISK OFFENDER AT 17 PERCENT.  USING THE LESSER NUMBER OF

2  17 PERCENT, THAT EQUATES TO APPROXIMATELY 368 NEW CRIMES DURING

3  THE EARLY RELEASE WINDOW; WOULD YOU AGREE WITH THAT?

4          **JUDGE KARLTON:**  "NEW CRIMES" IS WHAT CAUSES THE

5  OBJECTION.  JUST CRIMES.  LEAVE IT AT THAT FOR THE TIME BEING.

6          **MR. SPECTER:**  I'M SORRY TO OBJECT AGAIN,

7  MR. MITCHELL.

8          **JUDGE KARLTON:**  HE'S TAKEN BACK THE WORD "NEW."

9          **MR. SPECTER:**  I'M NOT TALKING ABOUT THAT.  NOW I

10 WOULD LIKE MR. MITCHELL TO EXPLAIN WHERE DR. AUSTIN SAID THAT

11 25 PERCENT WOULD --

12         **JUDGE KARLTON:**  I DON'T REMEMBER THAT EITHER.

13         **MR. SPECTER:**  SO I THINK IT'S NOT BASED ON THE

14 TESTIMONY.

15 BY MR. MITCHELL

16 **Q**  GOING WITH THE 17 PERCENT FIGURE THAT I'M BASING THE

17 ESTIMATES FOR THE HYPOTHETICAL ON, IF 17 PERCENT OF THE EARLY

18 RELEASE CLASS COMMIT NEW CRIMES, THAT WOULD EQUATE, WOULD YOU

19 AGREE, TO APPROXIMATELY 368?

20         **JUDGE REINHARDT:**  I DON'T KNOW THE DIFFERENCE BETWEEN

21 CRIMES AND NEW CRIMES.  ANY CRIME THAT WASN'T COMMITTED BY THE

22 SAME PERSON PREVIOUSLY, THE IDENTICAL OFFENSE WOULD BE -- A NEW

23 CRIME IS A CRIME.

24         **MR. MITCHELL:**  A NEW CRIME FOR WHICH THEY COULD BE

25 PROSECUTED FOR, YOUR HONOR.

1          **JUDGE REINHARDT:**  IF THEY COMMIT A CRIME DURING THAT

2    PERIOD, THAT'S NOT AN OLD CRIME.  IT'S A NEW CRIME.

3          **MR. MITCHELL:**  CORRECT.

4          **JUDGE REINHARDT:**  SO "NEW" DOESN'T ADD ANYTHING, AND

5    THIS WHOLE DISCUSSION ISN'T WORTH IT.

6          **MR. MITCHELL:**  AGREE.

7          **JUDGE REINHARDT:**  IF YOU CAN DO IT WITHOUT "NEW" --

8          **MR. MITCHELL:**  I'M SORRY I ADDED THAT WORD THAT

9    CAUSED THAT CONFUSION.

10          **JUDGE KARLTON:**  DO YOU HAVE ANY IDEA WHAT WE'RE

11    DOING?

12          **JUDGE REINHARDT:**  WE'RE ENTERTAINING OURSELVES.

13          **JUDGE KARLTON:**  YOU MAY BE.

14          **JUDGE REINHARDT:**  I DON'T SEE THE DIFFERENCE BETWEEN

15    A NEW CRIME AND A CRIME.

16    BY MR. MITCHELL

17    **Q**   IF 2,100 INDIVIDUALS ARE RELEASED EARLY BEFORE THE

18    COMPLETION OF THEIR TERMS, WE CAN EXPECT THAT A CERTAIN

19    PERCENTAGE OF THEM WILL REOFFEND AND COMMIT A CRIME DURING THAT

20    PERIOD, THAT WINDOW THAT THEY'RE RELEASED EARLY FROM PRISON,

21    CORRECT?

22    **A**   YES, SIR.

23    **Q**   IF 17 PERCENT OF THE 2,100 COMMIT A CRIME DURING THAT EARLY

24    RELEASE WINDOW, THAT EQUATES TO APPROXIMATELY 350 TO 360 CRIMES

25    DURING THAT EARLY RELEASE PERIOD?

1    **A**   YES, SIR.

2    **Q**   DO YOU AGREE THESE ARE CRIMES THAT WOULD NOT HAVE OCCURRED

3    BUT FOR THE FACT THAT THEY ARE NOW OUT OF CUSTODY --

4            **JUDGE REINHARDT:**  THEY WOULD NOT HAVE OCCURRED DURING

5    THAT PERIOD.

6            **MR. MITCHELL:**  CORRECT.

7            **THE WITNESS:**  THAT IS CORRECT.

8            **JUDGE KARLTON:**  BUT THEY WOULD HAVE OCCURRED, JUST A

9    COUPLE MONTHS LATER.

10           **THE WITNESS:**  YES.  THEY HAVE OCCURRED, YES.

11   BY MR. MITCHELL

12   **Q**   AND THAT GOES TO TESTIMONY THAT WE'VE HAD HERE, THAT EARLY

13   RELEASE DOES NOT INCREASE THE RECIDIVISM RATE OF THE INDIVIDUALS

14   WHO ARE RELEASED.  THEY'RE GOING TO REOFFEND WHEN THEY'RE OUT AT

15   A CERTAIN RATE, CORRECT?

16   **A**   THEY ARE.

17   **Q**   BUT THE CRIMES THAT THEY COMMIT, ADDRESSING THE EARLY

18   RELEASE WINDOW, WOULD YOU AGREE, WOULD NOT HAVE OCCURRED BUT FOR

19   THE EARLY RELEASE?

20   **A**   THAT IS CORRECT.

21           **JUDGE REINHARDT:**  YOU MEAN WOULD NOT HAVE OCCURRED AT

22   THAT PARTICULAR POINT IN TIME?

23           **MR. MITCHELL:**  CORRECT.

24           **JUDGE KARLTON:**  AT THAT POINT.  BUT WOULD HAVE

25   OCCURRED SEVERAL MONTHS LATER.

1              **THE WITNESS:**  DOWNSTREAM.

2   BY MR. MITCHELL

3   **Q**   AND IF THEY ARE STILL OUT OF CUSTODY, THERE'S MORE CRIMES

4   BEING COMMITTED THEN?

5   **A**   THAT'S RIGHT.  CRIMES THAT ARE REPORTED, AND THEN THERE'S

6   ALSO THOSE WE MAY NOT EVEN BE AWARE OF.

7              **JUDGE REINHARDT:**  WHICH WILL BE TRUE SEVERAL MONTHS

8   LATER ALSO THEN.  SO THEY'LL COMMIT THE SAME NUMBER OF CRIMES

9   WHICHEVER TIME THEY'RE RELEASED.

10  BY MR. MITCHELL

11  **Q**   NOW, THERE'S BEEN TESTIMONY --

12  **A**   BUT WE ARE ARTIFICIALLY RELEASING THOSE PEOPLE.  WE ARE

13  ACTING AS IF THAT ARTIFICIAL --

14             **JUDGE KARLTON:**  ARTIFICIALLY DOESN'T MAKE -- SIR, I

15  MEAN, DR. AUSTIN HAS MADE THIS POINT WITH SOME FERVOR THAT THERE

16  ISN'T ANY PROPER IMPRISONMENT TERM THAT WE CAN SAY HE SHOULDN'T

17  HAVE BEEN RELEASED EARLIER THAN THAT, BECAUSE ALL OF THESE TERMS

18  ARE ESSENTIALLY ARBITRARY.  DO YOU AGREE WITH THAT?

19             **THE WITNESS:**  YES.

20             **JUDGE KARLTON:**  ALL RIGHT.

21  BY MR. MITCHELL

22  **Q**   THERE'S BEEN TESTIMONY THAT A CERTAIN PERCENTAGE, BETWEEN

23  THREE AND FOUR PERCENT OF THE CRIMES COMMITTED DURING THE EARLY

24  RELEASE WINDOW BY THE INDIVIDUALS WHO ARE EARLY RELEASED WILL BE

25  VIOLENT CRIMES.  WOULD YOU AGREE WITH THE THREE TO FOUR PERCENT?

1   **A**   SOME PORTION OF THEM WILL BE A VIOLENT CRIME, YES.

2              **JUDGE KARLTON:**  YOU DON'T KNOW WHETHER IT'S THREE OR

3   FOUR PERCENT?

4              **THE WITNESS:**  I DON'T KNOW, BUT SOME PERCENTAGE OF

5   THEM WILL.  THERE WILL BE THE VICTIMS OF VIOLENT CRIME, YES.

6   BY MR. MITCHELL

7   **Q**   WOULD YOU AGREE THAT THE HIGHER LEVEL RISK, THE MORE

8   DANGEROUS THE OFFENDERS ARE THAT ARE RELEASED EARLY, THE GREATER

9   THE NUMBER OF VIOLENT CRIMES THAT WILL BE OCCASIONED BY EARLY

10  RELEASE?

11  **A**   I WOULD BE VERY CONCERNED ABOUT THAT.  I WOULD BE.

12  **Q**   YOU WOULD AGREE WITH -- THE NUMBERS WOULD GO UP?

13  **A**   THE PROPENSITY IS THERE, YES.

14  **Q**   THE NUMBER OF CRIMES COMMITTED DURING THAT EARLY RELEASE

15  WINDOW REPRESENT REAL IMPACT TO REAL VICTIMS, DO THEY NOT?

16  **A**   THAT IS CORRECT.

17  **Q**   REGARDLESS OF THE STATISTICAL SIGNIFICANCE IT HAS ON THE

18  RECIDIVISM RATE, REAL PEOPLE WILL SUFFER THE CONSEQUENCES OF

19  REAL CRIME?

20  **A**   THAT'S RIGHT.  I MEAN, BECAUSE YOU -- YOU KNOW, WE'RE ALWAYS

21  TALKING ABOUT THE AGGREGATE OR A TWO PERCENT HERE OR A

22  THREE PERCENT THERE, BUT, YOU KNOW, WHEN YOU'RE DEALING WITH

23  LITERALLY HUNDREDS OF THOUSANDS OF PEOPLE, YOU KNOW, THAT ONE

24  PERCENT TRANSLATES INTO REAL, REAL HUMAN BEINGS, OF WHICH THERE

25  WILL BE VICTIMS, YES.

1  Q   AND DID YOU SEE THAT HAPPEN IN TEXAS?

2  A   YES, WE DID.

3          **MR. MITCHELL:**  I HAVE NOTHING FURTHER.

4          **JUDGE HENDERSON:**  CROSS-EXAMINATION.

5              **CROSS-EXAMINATION BY MR. SPECTER**

6  BY MR. SPECTER

7  Q   GOOD MORNING, DR. MARQUART.

8  A   GOOD MORNING.

9  Q   WE MET AT YOUR DEPOSITION, REMEMBER?

10  A   PARDON ME?

11  Q   WE MET -- I'M DONALD SPECTER.  WE MET AT YOUR DEPOSITION?

12  A   YES, SIR.

13  Q   YOU AGREE THAT CROWDING CONTRIBUTES TO VIOLENCE, DON'T YOU?

14  A   IT IS AN ELEMENT.  IT'S A VARIABLE.  IT'S A FACTOR.

15  Q   YOU AGREE THAT CROWDING CONTRIBUTES TO VIOLENCE, DON'T YOU?

16  A   IT'S A FACTOR THAT I WOULD LOOK AT.  IT'S A VARIABLE IN THE

17  MIX.

18          **JUDGE KARLTON:**  DOES THAT MEAN YES OR NO?

19          **THE WITNESS:**  I'M NOT GOING TO SAY IT'S A VARIABLE.

20  AGAIN, I'M A SCIENTIST.  IT'S A VARIABLE THAT'S IN THE MIX.

21  THAT'S WHAT I DO.  I LOOK TO SEE THE CONTRIBUTION OF THAT TO

22  VIOLENCE.

23          **JUDGE REINHARDT:**  ARE YOU SAYING IT CONTRIBUTES TO

24  VIOLENCE?

25          **THE WITNESS:**  IT'S A FACTOR OR VARIABLE THAT I WOULD

1  LOOK AT.  I'M NOT GOING TO SAY THAT IT AUTOMATICALLY LEADS TO

2  VIOLENCE.  I'M NOT GOING TO SAY THAT.

3  BY MR. SPECTER

4  **Q**   I'M GOING TO READ FROM YOUR DEPOSITION, DR. MARQUART, PAGE

5  142, LINES NINE THROUGH TEN.

6              "QUESTION:  CROWDING CONTRIBUTES TO

7          VIOLENCE?

8              "ANSWER:  YES, SIR."

9  **A**   YES.

10 **Q**   OKAY.

11 **A**   IT'S SOMETHING THAT I WOULD LOOK AT, YES.

12         **JUDGE HENDERSON:**  I THINK THAT'S CONFUSING.  LET'S

13 ASSUME THAT YOU LOOK AT IT.

14         **THE WITNESS:**  MM-HMM.

15         **JUDGE HENDERSON:**  COULD YOU THEN REACH A CONCLUSION

16 ONE WAY OR ANOTHER IT DOES CONTRIBUTE OR IT DOESN'T?

17         **THE WITNESS:**  IT -- IT'S A COMPLEX -- IT SOUNDS, YOU

18 KNOW, AGAINST COMMON SENSE.  I UNDERSTAND THAT.  BUT IT'S -- YOU

19 KNOW, IT IS A -- IT'S A VARIABLE AMONG MANY THAT I WOULD TAKE A

20 LOOK AT.  THAT'S ALL I'M TRYING TO SAY.  I'M NOT SAYING THAT IT

21 IS ONE HUNDRED PERCENT RELATED TO VIOLENCE.  IT IS --

22         **JUDGE KARLTON:**  SIR --

23         **THE WITNESS:**  IT IS IN THE MIX.

24         **JUDGE KARLTON:**  SIR, I DON'T KNOW THAT IT MATTERS,

25 BUT THIS SEEMS TO ME TO BE A FAIRLY STRAIGHTFORWARD QUESTION.

1    TO LOOK AT SOMETHING DOESN'T ANSWER THE QUESTION ABOUT AFTER

2    WHEN YOU LOOK AT IT, IT EITHER IS A CONTRIBUTING FACTOR OR IT

3    ISN'T.

4              **JUDGE REINHARDT:**  OR YOU DON'T KNOW.

5              **JUDGE KARLTON:**  OR YOU DON'T KNOW.

6              SO THE QUESTION IS, YES, YOU LOOK AT IT.  WHEN YOU

7    LOOK AT IT, WHAT DO YOU DISCOVER?  IS IT A FACTOR, OR IS IT NOT,

8    OR IS THE ANSWER I DON'T KNOW?

9              **THE WITNESS:**  IT'S A FACTOR.

10             **JUDGE REINHARDT:**  WHAT DOES A FACTOR MEAN?  DOES A

11   FACTOR MEAN IF IT'S FACTOR, DOES IT CONTRIBUTE?

12             **THE WITNESS:**  IT IS AN IMPORTANT VARIABLE TO EXAMINE.

13             **JUDGE REINHARDT:**  I GUESS THE PROBLEM IS WE'RE NOT

14   SCIENTISTS.

15             **JUDGE KARLTON:**  WE ARE NOT INTERESTED IN ABSTRACT

16   EXAMINATIONS.  IT WOULD HELP US, CONCEIVABLY, MAYBE NOT, IT

17   WOULD HELP US TO KNOW WHETHER OR NOT CROWDING AND OVERCROWDING,

18   PARTICULARLY OVERCROWDING AT THE RATE IN CALIFORNIA, IS

19   CONTRIBUTING TO VIOLENCE WITHIN THE SYSTEM IS MAKING PEOPLE

20   DESENSITIZED TO VIOLENCE SO THEY ARE LIKELY TO COMMIT CRIME OF

21   VIOLENCE WHEN THEY GO OUT, THOSE SORTS OF THINGS.

22             **THE WITNESS:**  THAT IS THE QUESTION -- THAT HAS --

23   WHAT YOU'RE SAYING THERE HAS NOT BEEN REACHED CONCLUSIVELY.

24   WHAT CROWDING DOES IN THAT ENVIRONMENT -- WHAT CROWDING DOES IN

25   AN ENVIRONMENT LIKE THAT, IN MY OPINION, IS THAT IT REDUCES --

 1  IT CREATES THIS TREMENDOUS SENSE OF TRANSIENCY IN THAT

 2  ENVIRONMENT.  OKAY?  PEOPLE COME IN.  THEY GO OUT.  AND INSIDE

 3  THESE CELL BLOCKS WHERE YOU HAVE LOTS OF PEOPLE, IT IMPACTS THE

 4  STAFF'S ABILITY TO REALLY KNOW WHO ALL THOSE INMATES ARE WITHIN

 5  THAT PARTICULAR CELL BLOCK.  SO IN THAT SENSE, YOU KNOW, YOU

 6  BEGIN -- IT IMPACTS THE SOCIAL CONTROL SIDE, AND I'M NOT TRYING

 7  TO BE ABSTRACT OR ACADEMIC ABOUT IT.

 8          IT LEADS TO THE -- IT CREATES AN INABILITY ON THE

 9  SIDE OF THE STAFF TO KNOW WHO'S IN THAT CELL BLOCK, WHO LIVES

10  THERE, WHO IS INVOLVED IN ACTIVITIES.  IT IMPACTS ON YOUR

11  ABILITY TO KNOW WHO'S IN THERE, WHICH ALSO LEADS TO THE, ON THE

12  INMATE'S SIDE, TAKING MATTERS INTO THEIR OWN HANDS TO SOLVE

13  THEIR OWN DISPUTES.  THAT'S WHAT IT DOES.

14          SO DOES IT LEAD TO, YOU KNOW, SUICIDE AND THOSE KINDS

15  OF THINGS, WE DON'T KNOW.  WE DON'T KNOW THAT CONCLUSIVELY THAT

16  THAT'S THE CASE.

17          **JUDGE KARLTON:**  WE DON'T KNOW IT CONCLUSIVELY, BUT WE

18  DON'T KNOW ANYTHING CONCLUSIVELY.  WE ARE NOT EVEN SURE THAT I'M

19  NOT DREAMING.  BUT WE'VE GOT TO MAKE SOME JUDGMENTS ABOUT WHAT

20  THE EVIDENCE SEEMS TO SUGGEST OR SEEMS TO DO MORE THAN SUGGEST,

21  AND I SUPPOSE -- I DON'T MEAN TO BE TAKING THIS AWAY FROM YOU,

22  MR. SPECTER, BUT I DON'T UNDERSTAND THE WITNESS'S TESTIMONY AT

23  ALL.

24          **MR. SPECTER:**  THAT WOULD BE FINE, YOUR HONOR, AND I

25  CAN MOVE ON.

1    **JUDGE KARLTON:**  YOU ANSWERED A QUESTION, APPARENTLY,

2    AT DEPOSITION FAIRLY STRAIGHTFORWARDLY.  I DON'T KNOW WHETHER

3    YOU ARE RETREATING FROM THAT STRAIGHTFORWARD ANSWER OR NOT.  LET

4    ME ASK THAT QUESTION.

5            AS YOU LOOK AT IT NOW, DO YOU THINK THAT WAS AN

6    ACCURATE PIECE OF TESTIMONY?

7    **THE WITNESS:**  WHAT I WANT TO SAY IS THAT CROWDING IS

8    A FACTOR, THAT IT DOES CONTRIBUTE IN SOME SENSE TO VIOLENCE.

9    THE EXACT PERCENTAGE --

10    **JUDGE KARLTON:**  WE UNDERSTAND THAT.  WE UNDERSTAND

11    THAT WE WON'T BE ABLE TO TIE IT DOWN TO 17.4 PERCENT.

12    **THE WITNESS:**  OKAY.

13    **JUDGE KARLTON:**  EVERYBODY AGREES TO THAT.  THE

14    QUESTION IS, IS IT A SIGNIFICANT CONTRIBUTING FACTOR?

15    **THE WITNESS:**  IT IS A -- IT IS A CONTRIBUTING FACTOR.

16    **JUDGE KARLTON:**  IS IT A SIGNIFICANT CONTRIBUTING --

17    **THE WITNESS:**  THAT I DO NOT KNOW.

18    **JUDGE KARLTON:**  FAIR ENOUGH.

19    BY MR. SPECTER

20    **Q**   IN THAT VEIN, AND I HOPE THIS DOESN'T CONFUSE MATTERS MORE,

21    BUT YOU TALKED ABOUT THE RISE IN CRIME IN HARRIS COUNTY AS A

22    RESULT OF THE POPULATION CAP, CORRECT?

23    **A**   YES, SIR.

24    **Q**   AND THAT WAS A LEGISLATIVELY IMPOSED POPULATION CAP, IF I

25    UNDERSTAND YOUR TESTIMONY CORRECTLY?

1   **A**   YES, SIR.

2           **JUDGE KARLTON:**  AND YOU COULD ATTRIBUTE -- THIS IS

3   INTERESTING.  YOU COULD ATTRIBUTE THE RISE IN CRIME TO THE

4   RELEASE OF THE PRISONERS.  YOU DIDN'T HAVE ANY PROBLEM DOING

5   THAT?  IS THAT RIGHT?

6           **THE WITNESS:**  YES, SIR.

7           **JUDGE KARLTON:**  AND WHY IS THAT DIFFERENT -- I MEAN,

8   THERE YOU ACTUALLY CAME TO A CONCLUSION, ASTONISHING AS THAT

9   SOUNDS.  WHY WERE YOU UNABLE TO DO THE SAME WITH THE QUESTION OF

10  WHETHER CROWDING CONTRIBUTES TO VIOLENCE?

11          **THE WITNESS:**  BECAUSE IT'S A COMPLEX ISSUE THAT I'M

12  STILL -- IN MY MIND, IT'S NOT RESOLVED.

13          **JUDGE KARLTON:**  BUT IT'S A COMPLEX ISSUE AS TO WHY

14  PEOPLE COMMIT CRIMES AT ALL.

15          **THE WITNESS:**  THAT'S TRUE.

16          **JUDGE KARLTON:**  WE DON'T KNOW.  MAYBE THE PAROLE

17  RELEASE HAD NOTHING TO DO WITH IT; IT HAD TO DO WITH ALL THESE

18  OTHER COMPLEX FACTORS.

19          **THE WITNESS:**  YES, SIR, IT'S A POSSIBILITY, YES.

20  BY MR. SPECTER

21  **Q**   SO YOU DON'T KNOW, DR. MARQUART, HOW MUCH, IF ANY, OF THE

22  RISE IN THE CRIME IN HARRIS COUNTY WAS ATTRIBUTABLE TO THE

23  POPULATION --

24          **JUDGE KARLTON:**  IF ANY.

25

1   BY MR. SPECTER

2   **Q**   IF ANY, WAS ATTRIBUTABLE TO THE POPULATION CAP AND THE

3   SUBSEQUENT RELEASE, DO YOU?

4   **A**   AGAIN, LIKE I SAID, WHEN WE LOOKED AT IT, YOU KNOW, I

5   BELIEVE THAT PART OF IT IS ATTRIBUTABLE TO THAT.

6   **Q**   YOU DON'T KNOW WHAT PART OF IT IS ATTRIBUTABLE --

7   **A**   I CAN'T PUT A PERCENTAGE ON IT, NO, SIR.

8   **Q**   BECAUSE IT'S A COMPLEX ISSUE, ISN'T THAT RIGHT?

9   **A**   THAT'S RIGHT.

10  **Q**   OKAY.  YOU HAVE A CONTRACT TO WORK FOR THE DEPARTMENT OF

11  CORRECTIONS INDEPENDENT OF THE COMPENSATION YOU ARE RECEIVING

12  HERE FOR YOUR TESTIMONY TODAY, RIGHT?

13  **A**   YES, SIR.

14  **Q**   THAT'S ABOUT $120,000?

15  **A**   I BELIEVE SO.

16  **Q**   NOW, YOU WORKED IN THE TEXAS PRISON SYSTEM FOR A COUPLE OF

17  YEARS AS CORRECTIONAL OFFICER; IS THAT RIGHT?

18  **A**   YES, SIR.

19  **Q**   YOU WERE AT EASTHAM?  YOU WERE AT EASTHAM?

20  **A**   YES, SIR.

21  **Q**   AND YOU USED THE TERM "MALCONTENT" TO DESCRIBE PRISONERS IN

22  THAT UNIT.  THEY CALL THEM -- THEY CALL PRISON UNITS IN TEXAS,

23  RIGHT?

24  **A**   THAT'S TRUE.

25  **Q**   AND YOU USED THE WORD "MALCONTENT" TO REFER TO THE PRISONERS

1  IN THAT UNIT?

2  **A**   THAT WAS BY THE -- THAT'S THE SYSTEM'S OWN DESIGNATION FOR

3  THE --

4  **Q**   THAT'S AN OFFICIAL DESIGNATION --

5  **A**   YES.

6  **Q**   -- BY THE TEXAS PROGRAM.  OKAY.

7           YOU ALSO TESTIFIED THAT AT THE TIME YOU WERE WORKING

8  IN THE TEXAS PRISON SYSTEM, THE FEDERAL COURT IN THE *RUIZ* CASE

9  HAD FOUND THE CONDITIONS IN THOSE UNITS, INCLUDING EASTHAM,

10  UNCONSTITUTIONAL, CORRECT?

11  **A**   YES, SIR.

12  **Q**   THAT WAS IN PART JUDGE JUSTICE -- THAT WAS JUDGE JUSTICE'S

13  CASE, RIGHT?

14  **A**   YES, SIR.

15  **Q**   AND HE CONCLUDED THAT THE CONDITIONS WERE UNCONSTITUTIONAL

16  IN PART BECAUSE OF THE BRUTALITY THAT THE PRISONERS HAD TO

17  ENDURE IN THAT UNIT, CORRECT?

18  **A**   YES, SIR.

19  **Q**   YOU DISAGREED WITH THE COURT'S FINDINGS, DIDN'T YOU?

20  **A**   PARDON ME?

21  **Q**   YOU DISAGREED WITH THE JUDGE'S FINDINGS, DIDN'T YOU?

22  **A**   IN SOME ISSUES I DID.

23  **Q**   YEAH.  BECAUSE AS FAR AS YOU WERE CONCERNED, IT WASN'T LIKE

24  DACHAU OR AUSCHWITZ; ISN'T THAT CORRECT?

25  **A**   THAT'S CORRECT.

1   Q   AND THEY WEREN'T -- NEVER MIND.  I DON'T THINK I HAVE TO --

2           SO INSTEAD OF RELEASING PRISONERS THROUGH A CAP, YOU,

3   IN YOUR FIRST PRELIMINARY REPORT, RECOMMENDED THAT THE STATE'S

4   PLAN BE FOLLOWED; IS THAT CORRECT?

5   A   YES, SIR.

6   Q   AND ONE OF THE RECOMMENDATIONS FROM THE STATE'S PLAN WAS TO

7   IMPLEMENT THE PROVISIONS OF AB 900, REMEMBER THAT?

8   A   I BELIEVE SO.

9   Q   AT YOUR DEPOSITION YOU DIDN'T KNOW -- YOU COULDN'T RECALL

10  WHAT AB 900 WAS; DO YOU RECALL THAT?

11  A   I BELIEVE IT WAS IN -- IN-FILL.  BUT THE SPECIFICS, NO, SIR.

12  Q   YOU ASKED ME TO SEE THE DOCUMENT, DIDN'T YOU?  YOU DIDN'T

13  KNOW WHAT AB 900 WAS, RIGHT?

14  A   IF THAT'S IN THE DEPOSITION, YES, SIR.

15  Q   OKAY.  IT ALSO TALKS ABOUT SAYING -- DO YOU KNOW WHAT AB 900

16  IS TODAY?

17  A   I GUESS I'M STILL AT THE SAME STATE.  NO, SIR.

18  Q   IT ALSO SAYS THAT YOU RECOMMEND THAT THE STATE FOLLOW

19  THROUGH ON WHAT YOU CALL THE CONSTRUCTION AGREEMENT; DO YOU

20  RECALL THAT IN YOUR REPORT?

21  A   YES, SIR.

22  Q   WHAT CONSTRUCTION AGREEMENT WERE YOU REFERRING TO?

23  A   DORMITORIES, IN-FILL, CREATION OF ADDITIONAL BED SPACE.

24  Q   I SEE.  DID THAT HAVE ANYTHING TO DO WITH THE RECEIVER'S

25  10,000 BEDS?  DO YOU KNOW ABOUT THAT?

1  **A**    PROBABLY.

2  **Q**    DO YOU KNOW ABOUT THE RECEIVER'S 10,000 BEDS?

3  **A**    I DO RECALL THAT.

4  **Q**    IS THAT PART OF WHAT YOU CALLED THE CONSTRUCTION AGREEMENT

5  OR NOT?

6  **A**    IT MAY HAVE BEEN.

7  **Q**    IT'S YOUR WORD, IS IT OR NOT?

8  **A**    I GUESS IT IS.

9  **Q**    OKAY.  DID YOU KNOW THAT THE DEFENDANT IN THIS CASE, MATTHEW

10  CATE -- DO YOU KNOW WHO MATTHEW CATE IS?

11  **A**    NO, SIR.

12  **Q**    HE'S A SECRETARY OF THE DEPARTMENT OF CORRECTIONS.

13  **A**    OH, YEAH.  OKAY.

14  **Q**    DID YOU KNOW THAT THE DEFENDANT MATTHEW CATE CAME INTO

15  THIS -- JUDGE HENDERSON'S COURT TO OPPOSE THE COURT ORDER FOR

16  MONEY TO AUTHORIZE PART OF THE 10,000 BEDS?

17  **A**    I DID NOT.

18  **Q**    OKAY.  DOES IT STRIKE YOU AS STRANGE THAT THE HEAD OF THE

19  DEPARTMENT OF CORRECTIONS WOULD COME INTO COURT TO OPPOSE PART

20  OF HIS OWN PLAN?

21          **MS. JOHNSON:**  THIS IS ARGUMENTATIVE, YOUR HONORS.

22          **JUDGE HENDERSON:**  SUSTAINED.

23  BY MR. SPECTER

24  **Q**    YOUR REPORT ALSO SUGGESTS THAT THE PRISON POPULATION BE

25  REDUCED BY 30,000 ILLEGAL ALIENS; DO YOU RECALL THAT PART OF

1  YOUR REPORT?

2  **A**   YES, SIR.

3  **Q**   AND --

4          **JUDGE KARLTON:**  WHY WOULD YOU DO THAT SINCE VIOLENCE

5  HAS -- SINCE OVERCROWDING HAS NO EFFECT UPON ANYTHING,

6  APPARENTLY?

7          **THE WITNESS:**  WELL, IF WE'RE TRYING TO CREATE

8  ADDITIONAL BED SPACE, THAT MIGHT BE A POTENTIAL AVENUE.

9          **JUDGE KARLTON:**  SO THAT YOU DON'T BELIEVE IT WOULD BE

10  NECESSARY, BUT IF THAT'S WHAT PEOPLE WANT TO DO, THAT'S A WAY TO

11  DO IT?

12          **THE WITNESS:**  IT'S ONE WAY.

13          **JUDGE KARLTON:**  RIGHT.

14          **THE WITNESS:**  YES, SIR.

15          **JUDGE KARLTON:**  OKAY.

16  BY MR. SPECTER

17  **Q**   DO YOU KNOW OF ANY LEGAL AUTHORITY WHEREBY CALIFORNIA COULD

18  SHIP ITS 30,000 ILLEGAL ALIENS TO SOME OTHER JURISDICTION?

19          **MS. JOHNSON:**  THAT CALLS FOR A LEGAL OPINION AND

20  CONCLUSION WHICH IS FAR BEYOND THE EXPERTISE OF THIS PERSON WITH

21  A PH.D.

22          **JUDGE HENDERSON:**  THE QUESTION IS, DOES HE KNOW OF

23  ANY AUTHORITY.

24          **JUDGE KARLTON:**  RIGHT.  HE'S PERFECTLY FREE TO SAY

25  NO.  IT'S ALL RIGHT.

 1          **MS. JOHNSON:**  HE'S NOT QUALIFIED TO DISCUSS LEGAL

 2  AUTHORITIES, YOUR HONOR.

 3          **JUDGE HENDERSON:**  HE'S QUALIFIED TO TELL US WHAT HE'S

 4  AWARE OF.  THAT'S WHAT THE QUESTION IS.

 5          **THE WITNESS:**  CAN YOU REPEAT THE QUESTION, PLEASE?

 6  BY MR. SPECTER

 7  **Q**    DO YOU KNOW OF ANY LEGAL AUTHORITY THAT WOULD ALLOW THE

 8  DEPARTMENT OF CORRECTIONS TO SHIP 30,000 ILLEGAL ALIENS TO

 9  ANOTHER JURISDICTION?

10  **A**    WELL, AGAIN I'M BASING, YOU KNOW -- MY KNOWLEDGE AND OPINION

11  ON THAT IS BASED ON WHAT I'VE OBSERVED IN MY OWN HOME STATE, AND

12  IT WAS BASED ON THAT.

13  **Q**    WELL, ACTUALLY --

14  **A**    AND IF YOU DEPORT RIGHT OUT OF THE PRISON SYSTEM IN THE

15  STATE.  ALL I DID WAS MENTION THAT AS ONE POTENTIAL WAY AS

16  FINDING, IDENTIFYING ADDITIONAL CELL SPACE.

17  **Q**    OKAY.  NOW, IN YOUR PRELIMINARY REPORT ON PAGE 24 IT SAYS:

18              "A PRISONER RELEASE ORDER WILL HAVE UNTOLD

19          PUBLIC SAFETY CONSEQUENCES."

20          DO YOU RECALL WRITING THAT?

21  **A**    YES, SIR.

22  **Q**    AND YOU MEANT THAT YOU DIDN'T KNOW WHAT THE CONSEQUENCES

23  WOULD BE, NOT THAT IT WOULD BE SOME DISASTER, CORRECT?

24  **A**    YES, SIR.

25  **Q**    OKAY.  NOW, YOU UNDERSTAND THAT JUDGE KARLTON AND JUDGE

1  HENDERSON HAVE IN THEIR RESPECTIVE CASES FOUND CONDITIONS IN

2  CALIFORNIA'S PRISON UNCONSTITUTIONAL BECAUSE OF INADEQUATE

3  HEALTHCARE; DO YOU NOT?

4  **A**   YES, SIR.

5  **Q**   AND YOU KNOW THAT UNCONSTITUTIONAL PRISON CONDITIONS BECAUSE

6  OF A LACK OF HEALTHCARE WOULD POSE A SIGNIFICANT RISK OF HARM TO

7  PRISONERS, CORRECT?

8  **A**   YES, SIR.

9  **Q**   AND YOUR OPINION IS THAT THE STATE HAS TO PROTECT THE

10 PRISONERS FROM HARM AS MUCH AS IT DOES THE PUBLIC; ISN'T THAT

11 TRUE?

12 **A**   THAT'S TRUE.

13 **Q**   OKAY.  NOW, IN YOUR OPINION, THE POPULATION REDUCTION IN

14 TEXAS THAT THE LEGISLATURE AUTHORIZED ACCELERATED THE STATE'S

15 ABILITY TO BRING THE SYSTEM UP TO CONSTITUTIONAL LEVELS; ISN'T

16 THAT CORRECT?

17 **A**   IT HELPED, YES, SIR.

18 **Q**   OKAY.  AND IN TERMS OF POPULATION REDUCING METHODS, WE

19 DISCUSSED A LOT OF THOSE AT YOUR DEPOSITION; DO YOU RECALL THAT

20 TESTIMONY?

21 **A**   MM-HMM.  YES, SIR.

22 **Q**   YOU ARE NOT OPPOSED TO ADVANCING GOOD TIME CREDITS TO

23 PRISONERS WHO CONFORM TO PRISON RULES AND REGULATIONS, CORRECT?

24 **A**   THAT IS TRUE.  SHOULD THEY DO WELL IN THE PRISON ENVIRONMENT

25 IT'S A POSSIBILITY THEY CAN BE GIVEN THAT, YES.

1  Q    YOU ARE NOT OPPOSED TO USING RISK ASSESSMENT FOR PRISONERS

2  WHO ARE RELEASED, CORRECT?

3  A    THAT'S CORRECT.

4  Q    AND YOU KNOW THAT RIGHT NOW PRISONERS ARE RELEASED WITHOUT

5  ANY KIND OF RISK ASSESSMENT, RIGHT?

6  A    THAT'S CORRECT.

7  Q    AND SO IF THEY USE THE RISK ASSESSMENT TO DETERMINE THE

8  EARLY RELEASE, IT WOULD ACTUALLY BE SAFER THAN THE CURRENT

9  SYSTEM, RIGHT?

10  A    IT'S A TOOL THAT ONE CAN USE, YES.

11  Q    SO I WAS RIGHT; IT WOULD BE SAFER, RIGHT?

12  A    IT'S A TOOL TO IDENTIFY POTENTIAL PEOPLE THAT CAN BE

13  RELEASED, RIGHT.

14  Q    IT WOULD BE SAFER?  YES OR NO.

15        **JUDGE KARLTON:**  SAFER TO RELEASE PEOPLE AFTER HAVING

16  ANALYZED THEM UNDER A TOOL THAN JUST RELEASING THEM OUT ON THE

17  STREET WITHOUT IT.

18        **THE WITNESS:**  THAT IS CORRECT.

19        **MR. SPECTER:**  THANK YOU.

20  BY MR. SPECTER

21  Q    AND YOU AGREE ALSO THAT PAROLE SUPERVISION CAN BE USED

22  SELECTIVELY FOR HIGH RISK OFFENDERS, RIGHT?

23  A    THAT'S CORRECT.

24  Q    AND YOU AGREE THAT CRIMES COMMITTED BY PAROLEES SHOULD BE

25  PROSECUTED RATHER THAN THROUGH THE ADMINISTRATIVE PAROLE

1  VIOLATION PROCESS, RIGHT?

2  **A**   THAT IS CORRECT.

3  **Q**   AND YOU AGREE THAT PAROLEES SHOULD RECEIVE SUBSTANCE ABUSE

4  EDUCATION AND JOB TRAINING, RIGHT?

5  **A**   YES, SIR.

6  **Q**   AND YOU AGREE THAT THE STATE SHOULD DIVERT TECHNICAL PAROLE

7  VIOLATERS AND LESS SERIOUS PROPERTY AND DRUG CRIMES, RIGHT?

8  **A**   IT WOULD BE A GOOD THING, YES.

9  **Q**   AND YOU SUPPORT REDUCING THE PRISON POPULATION THROUGH

10 PAROLE REFORM, CORRECT?

11 **A**   CAN YOU REPEAT THE QUESTION, PLEASE?

12 **Q**   YOU SUPPORT REDUCING THE PRISON POPULATION THROUGH PAROLE

13 REFORM, CORRECT?

14 **A**   THAT'S ONE WAY TO MANAGE IT, YES.

15 **Q**   SO IF YOU DID USE PAROLE REFORM -- YOU KNOW THAT BACK END

16 THING YOU WERE TALKING ABOUT WITH THE HYDRAULICS AND DIFFERENT

17 DOORS?

18 **A**   YES, SIR.

19 **Q**   SO IF THEY COMMITTED A CRIME AND YOU HAD PAROLE REFORM, IT

20 WOULD NOT HAVE THE -- IF YOU HAD PAROLE REFORM, EVEN THOUGH THEY

21 WERE COMMITTING CRIMES AT THE SAME RATE, IT WOULD RESULT IN LESS

22 PEOPLE COMING BACK INTO THE PRISON SYSTEM; ISN'T THAT TRUE?

23 **A**   IT'S A POSSIBILITY.

24 **Q**   ISN'T THAT TRUE?

25 **A**   IT'S A POSSIBILITY.

1  Q   EVERYTHING IN LIFE IS A POSSIBILITY, CORRECT?

2  A   THAT IS CORRECT.

3  Q   SO YOUR ANSWER DOESN'T HAVE VERY MUCH MEANING.  SO I'M

4  ASKING YOU TO BE A LITTLE MORE DEFINITIVE IF YOU CAN.

5  A   CAN YOU REPEAT THE QUESTION ONE MORE TIME?

6  Q   SURELY.

7          THAT WOULD RESULT -- IF THE PRISONERS KEPT COMMITTING

8  CRIMES AT A CERTAIN RATE BUT YOU HAD PAROLE REFORM, IT WOULD

9  RESULT IN LESS PRISONERS COMING BACK INTO THE SYSTEM; ISN'T THAT

10 TRUE?

11 A   ONE WOULD HOPE THAT THAT'S THE CASE.

12 Q   AND IN YOUR ESTIMATION, IN YOUR OPINION, THE STATE SHOULD

13 USE MULTIPLE METHODS AT THE SAME TIME, SUCH AS REFORMING PAROLE,

14 EARLY RELEASES, AND EVEN CHANGING THE SENTENCING STRUCTURE IN

15 ORDER TO REDUCE THE POPULATION, RIGHT?

16 A   THAT'S RIGHT.

17 Q   AND AS A GENERAL MATTER, IT'S YOUR OPINION THAT THE

18 CALIFORNIA PRISON POPULATION CAN BE REDUCED WITHOUT ADVERSELY

19 AFFECTING PUBLIC SAFETY; IS THAT RIGHT?

20 A   WE HAVE TO PUT IN THE PROPER TOOLS AND ASSESSMENT

21 TECHNIQUES, AS WELL AS WHAT I'VE TALKED ABOUT BEFORE IN MY

22 REPORTS AND HERE, THAT PROGRAMMING INSIDE, EVIDENCE-BASED

23 PROGRAMMING ON THE INSIDE, AS WELL AS HAVING THE PROPER

24 RESOURCES ON THE OUTSIDE IN TERMS OF HOUSING, JOBS, ACCESS TO

25 SUBSTANCE ABUSE, YOU KNOW, ALL THAT.

1          **JUDGE HENDERSON:** ACCESS TO SUBSTANCE --

2          **THE WITNESS:** -- ABUSE PROGRAMS. YEAH, WE DON'T WANT

3    TO HAVE THEM HAVE ACCESS TO SUBSTANCE ABUSE, RIGHT.

4          BUT ACCESS TO PROGRAMMING AND THE THINGS THAT ARE

5    GOING TO HELP THEM TRANSITION BACK TO THE COMMUNITY, ALL OF THAT

6    TOGETHER, ONE WOULD HOPE THAT WOULD HELP, YES.

7    BY MR. SPECTER

8    Q    YOU HAVE CERTAIN QUESTIONS -- YOU BELIEVE CERTAIN QUESTIONS

9    HAVE TO BE ANSWERED ABOUT ANY POPULATION REDUCING PLAN, CORRECT?

10   A    YES, SIR.

11   Q    SUCH AS WHO WOULD BE RELEASED UNDER WHAT CONDITIONS AND THE

12   LIKE, RIGHT?

13   A    YES, SIR.

14   Q    YOU ARE CONFIDENT, THOUGH, THAT IF ALL THE KEY STAKEHOLDERS

15   GOT TOGETHER, RATIONAL EFFECTIVE DECISIONS CAN BE MADE SO A SAFE

16   PLAN CAN BE DEVELOPED; ISN'T THAT TRUE?

17   A    IT WOULD HELP, YES, SIR.

18   Q    IT WOULD MORE THAN HELP. YOU SAID IN YOUR DEPOSITION YOU

19   WERE CONFIDENT IT COULD BE DONE.

20   A    YES, SIR.

21   Q    YOU AGREE THAT THE LENGTH -- WE'VE TALKED A LITTLE BIT ABOUT

22   THIS. YOU AGREE THE LENGTH OF INCARCERATION IS NOT RELATED TO

23   RECIDIVISM; ISN'T THAT TRUE?

24   A    I GUESS SO, YES.

25   Q    SO THAT MEANS THAT REDUCING THE LENGTH OF STAY IN PRISON IS

1  NOT GOING TO RESULT IN ANY MORE CRIMES THAN IF THE PRISONER

2  STAYED IN PRISON AN ADDITIONAL PERIOD OF TIME, CORRECT?

3  **A**   BUT THEY NEED TO GET -- MY POINT IS THAT YOU CAN RELEASE --

4  WE CAN SPEED UP THE TIME AT WHICH THEY ARE GOING TO BE RELEASED.

5  BUT, YOU KNOW, THEY NEED TO GET ACCESS TO PROGRAMS WHILE THEY'RE

6  INSIDE SO THAT THEY ARE EXPOSED TO THOSE PROGRAMS, AND ONCE

7  THEY'RE RELEASED, WE DON'T WANT THEM TO COME BACK.

8          **JUDGE REINHARDT:**  IS IT ANY DIFFERENT IF THEY ARE

9  RELEASED A FEW MONTHS EARLIER OR LATER?  THEY STILL NEED ALL

10 THOSE SAME THINGS EITHER WAY; IS THAT RIGHT?

11         **THE WITNESS:**  IT'S THAT WHEN THEY -- THE TIME THAT

12 THEY WERE SPED UP, THEY DID NOT GET ACCESS, FULL ACCESS, TO THE

13 PROGRAMS THAT WERE IN PLACE WITHIN THE PRISON SYSTEM.  SO BY

14 SPEEDING THEM UP, THEY ARE NOT GETTING EXPOSED TO THE COMPLETE

15 RUN OF PROGRAMS.

16         **JUDGE REINHARDT:**  BUT YOUR TESTIMONY WAS THEY SHOULD

17 HAVE FULL ACCESS TO THESE PROGRAMS, AND I SAID, THAT'S TRUE

18 WHETHER THEY ARE RELEASED A FEW MONTHS EARLIER OR NOT UNLESS YOU

19 KNOW THAT THEY NOW GET FULL ACCESS.

20         **JUDGE KARLTON:**  YOU KNOW THEY DON'T.

21         **THE WITNESS:**  YES, SIR.

22         **JUDGE KARLTON:**  AND YOU KNOW THAT AT LEAST ONE OF THE

23 REASONS THEY DON'T IS BECAUSE THE PRISONS ARE SO OVERCROWDED

24 THAT THEY DON'T HAVE SPACE TO PROVIDE PROGRAMS?

25         **THE WITNESS:**  YES, SIR.

1          **JUDGE KARLTON:**  WELL, OKAY.  THE ANSWERS ARE OBVIOUS,

2  EXCEPT IF YOU CAN'T DECIDE ANYTHING.  GO AHEAD.

3  BY MR. SPECTER

4  **Q**   OKAY.  I WOULD LIKE TO READ FROM YOUR DEPOSITION,

5  DR. MARQUART, PAGE 172, LINES THREE THROUGH EIGHT.  YOU'LL SEE

6  IT ON YOUR SCREEN.  DO YOU SEE IT?

7  **A**   YES, SIR.

8  **Q**   (AS READ)  "SO IF THE LENGTH OF STAY IS NOT RELATED

9              TO RECIDIVISM, THAT MEANS THAT IF YOU REDUCE

10             THE LENGTH OF STAY, THE PRISONER IS NOT GOING

11             TO BE COMMITTING ANY MORE CRIMES THAN HE WOULD

12             IF HE STAYED IN ANOTHER YEAR OR SIX MONTHS,

13             WHATEVER IT IS, RIGHT?"

14                "ANSWER: YES, SIR."

15          THAT WAS YOUR TESTIMONY THEN, CORRECT?

16  **A**   YES, SIR.

17  **Q**   THAT'S YOUR OPINION NOW, RIGHT?

18  **A**   YES, SIR, BASED ON MY DEPOSITION.

19  **Q**   SO, YOU HAVEN'T EXAMINED THE PAROLE SYSTEM IN CALIFORNIA,

20  HAVE YOU?

21  **A**   NO, SIR.

22  **Q**   SO YOU DON'T KNOW WHETHER WHATEVER CALIFORNIA IS DOING IS

23  MAXIMIZING ITS USE OF ITS EXISTING RESOURCES; DO YOU?

24  **A**   NO, SIR.

25  **Q**   SO IT'S POSSIBLE -- WELL --

1              **JUDGE KARLTON:**  ANYTHING IS POSSIBLE.

2              **MR. SPECTER:**  ANYTHING IS POSSIBLE, SO I WITHDRAW

3   THAT QUESTION.

4   BY MR. SPECTER

5   **Q**   SO YOU DON'T KNOW WHAT THE IMPACT OF AN EARLY RELEASE

6   PROPOSAL WOULD BE, DO YOU, DR. MARQUART?

7   **A**   I THINK, BASED ON WHAT I HAVE SEEN IN MY OWN HOME STATE, I

8   THINK I HAVE SOME DEGREE OF INKLING INTO THAT.

9   **Q**   OKAY.

10             **THE CLERK:**  YOU HAVE FIVE MINUTES, COUNSEL.

11  BY MR. SPECTER

12  **Q**   OKAY.  I WOULD LIKE TO READ FROM YOUR DEPOSITION STARTING AT

13  PAGE 223, LINES 23, WE ARE GOING TO GO ON TO THE NEXT PAGE.

14             "WHY DO YOU DISAGREE -- "

15             "QUESTION:  WHY DO YOU DISAGREE?  WHAT'S THE

16             BASIS OF YOUR DISAGREEMENT?

17             "ANSWER:  WELL, THE BASIS OF MY

18             DISAGREEMENT -- "

19             **JUDGE REINHARDT:**  DISAGREEMENT WITH WHAT?

20             **JUDGE KARLTON:**  RIGHT.

21             **MR. SPECTER:**  OKAY.  I'LL START AT LINE 16 OF

22  PAGE 223.

23             "I BELIEVE DR. AUSTIN TESTIFIED THAT HE

24             WOULD GUARANTEE THAT THERE WOULD BE NO

25             SIGNIFICANT IMPACT ON RECIDIVISM BY AN EARLY

1       RELEASE."

2           **JUDGE REINHARDT:**  PRIOR RECIDIVISM.

3           **MR. SPECTER:**  "PRIOR RECIDIVISM BY AN EARLY

4       RELEASE ORDER.  IS THAT YOUR RECOLLECTION OF WHAT

5       HIS TESTIMONY IS?

6               "YES, SIR.

7               "DO YOU AGREE OR DISAGREE WITH THAT

8       STATEMENT?

9               I DISAGREE WITH THE STATEMENT.

10              "QUESTION:  WHY DO YOU DISAGREE?  WHAT'S THE

11      BASIS OF YOUR DISAGREEMENT?

12              "ANSWER:  WELL, THE BASIS OF MY DISAGREEMENT

13      WITH THAT IS IF WE LOOK AT THE HISTORICAL LEVEL

14      OF RECIDIVISM AND RETURN AND THE LACK OF

15      PROGRAMMING IN THE COUNTIES, NO WAY ANYBODY CAN

16      STATE ONE HUNDRED PERCENT THAT THERE WILL BE NO

17      IMPACT; THAT IS SIMPLY AN IMPOSSIBILITY.  THERE

18      WILL BE AN IMPACT.  IT'S SIMPLY THE MAGNITUDE OF

19      THAT WE DON'T KNOW."

20      THAT WAS YOUR TESTIMONY, CORRECT?

21          **JUDGE KARLTON:**  GOES ON TO SAY:

22              "SO THAT YOU CANNOT SAY IT IS BEYOND THE

23      REALM OF EXPERTISE TO SAY THAT THERE WILL BE, TO

24      SAY DECISIVELY, ANY CONCLUSION THAT THERE WILL

25      BE AN IMPACT?"

1            **MS. JOHNSON:**  NO IMPACT.

2            **MR. SPECTER:**  NO IMPACT.

3            **JUDGE KARLTON:**  THAT THERE WILL BE NO IMPACT, EXCUSE

4   ME.

5            **MR. SPECTER:**  THANK YOU, YOUR HONOR.

6            **JUDGE REINHARDT:**  I'M REALLY NOT SURE WHERE YOU'RE

7   GOING WITH THIS.  IT SEEMS TO ME ALL THESE QUESTIONS HAVE BEEN

8   ASKED AND ANSWERED ALREADY BY THIS WITNESS.

9            **MR. SPECTER:**  OKAY, YOUR HONOR.

10           **JUDGE REINHARDT:**  IF YOU HAVE SOMETHING YOU THINK

11  WILL BE HELPFUL, DON'T LET ME DISCOURAGE YOU.  I'M HAVING

12  TROUBLE SEEING WHAT YOU ARE ADDING TO THIS DISCUSSION.  IF YOU

13  ARE -- YOU KNOW MORE THAN I DO ABOUT WHAT YOU WANT TO ASK, SO

14  DON'T LET ME DISCOURAGE YOU.

15           **MR. SPECTER:**  I'M ALMOST DONE ANYWAY.  LET ME JUST

16  REVIEW MY NOTES FOR 30 SECONDS, AND I'LL SEE IF I CAN BE OF MORE

17  HELP.

18  BY MR. SPECTER

19  **Q**   YOU COMMENTED ON THE AVAILABILITY OF SERVICES TO PAROLEES,

20  RIGHT?

21  **A**   YES, SIR.

22  **Q**   YOU DON'T KNOW WHETHER PAROLEES ARE EVEN ELIGIBLE FOR SOME

23  OF THE SERVICES YOU MENTIONED, DO YOU?

24  **A**   THAT'S TRUE, TOO.

25  **Q**   AGE IS AN IMPORTANT FACTOR IN DETERMINING WHETHER A PERSON

1    IS GOING TO BE -- IS AN IMPORTANT RISK FACTOR IN DETERMINING

2    PROPENSITY OF AN OFFENDER TO CONTINUE TO COMMIT CRIMES, ISN'T

3    IT?

4    **A**    YES, SIR.

5    **Q**    AND ONE OTHER POINT.  YOU AGREE THAT THERE'S NO CORRELATION

6    BETWEEN THE RATE OF INCARCERATION IN CALIFORNIA AND THE RATE OF

7    VIOLENT CRIME IN CALIFORNIA, DO YOU NOT?

8    **A**    PARDON ME?

9    **Q**    YOU AGREE THAT THERE IS NO CORRELATION BETWEEN THE RATE OF

10   INCARCERATION IN CALIFORNIA AND THE RATE OF VIOLENT CRIME,

11   CORRECT?

12   **A**    I DON'T UNDERSTAND THE QUESTION.

13   **Q**    THERE'S THE RATE OF INCARCERATION, CORRECT?

14   **A**    YES, SIR.

15   **Q**    AND ONE OF YOUR CHARTS ALSO LOOKED AT THE RATE OF VIOLENT

16   CRIME.  DO YOU REMEMBER THAT FROM YOUR REPORT?

17   **A**    YES, SIR.

18   **Q**    AND YOU AGREED IN YOUR DEPOSITION THAT THERE'S NO

19   CORRELATION BETWEEN THE RATE OF INCARCERATION AND THE RATE OF

20   VIOLENT CRIME.  DO YOU AGREE WITH THAT STILL TODAY?

21   **A**    IF I COULD CHECK MY REPORT, I WOULD LIKE TO SEE THAT.

22   **Q**    PUT UP PAGE 213 OF THE DEPOSITION, PLEASE.  LINES 11 THROUGH

23   13:

24             "QUESTION:  SUGGESTING THAT THE RISE IN

25             INCARCERATION RATE DOESN'T CORRELATE WITH THE

1              VIOLENT CRIME RATE, RIGHT?

2                   "ANSWER:  YES, SIR."

3              DO YOU SEE THAT?

4    **A**    IF IT'S IN MY DEPOSITION, YES, SIR.

5    **Q**    AND YOU ALSO AGREED THAT CALIFORNIA'S CRIME RATE IS ROUGHLY

6    ON A PAR WITH THE NATIONAL AVERAGE, RIGHT?

7    **A**    YES, SIR.

8    **Q**    IT'S HIGHER THAN NEW YORK, RIGHT?

9    **A**    I THINK SO.

10   **Q**    AND SOMEWHAT HIGHER THAN ILLINOIS, RIGHT?

11   **A**    IT MAY BE.

12   **Q**    AND SINCE NEITHER OF THESE STATES HAS INCREASED ITS PRISON

13   POPULATION AS MUCH AS CALIFORNIA, IT WOULD BE A MISTAKE TO

14   CONCLUDE THAT THE DECLINE IN THE CALIFORNIA CRIME RATE IS A

15   RESULT OF ITS INCARCERATION POLICIES; ISN'T THAT TRUE?

16   **A**    IT MIGHT BE.

17   **Q**    YOU SAID, YES, IT WAS, AT YOUR DEPOSITION.

18   **A**    I SAID IT WAS?  OKAY.  YES.

19            **MR. SPECTER:**  OKAY.  THAT'S ALL THE QUESTIONS I HAVE.

20            **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

21            **MS. LEONARD:**  NO, YOUR HONOR.

22            **JUDGE HENDERSON:**  OKAY.  REDIRECT?

23            **MS. JOHNSON:**  NOTHING, YOUR HONOR.

24            **JUDGE HENDERSON:**  INTERVENORS?

25            **MR. MITCHELL:**  NO REDIRECT.

1          **JUDGE HENDERSON:**  OKAY.  WE'LL RECESS FOR LUNCH FOR

2   ONE HOUR.

3          **JUDGE KARLTON:**  DR. MARQUART.

4          **JUDGE HENDERSON:**  YOU'RE EXCUSED.  THANK YOU FOR

5   TESTIFYING.

6                    (LUNCHEON RECESS TAKEN.)

7          **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

8   WITNESS WHEN YOU ARE READY, COUNSEL.

9          **MR. SPECTER:**  PLAINTIFFS RECALL TO THE STAND JOSEPH

10  LEHMAN.

11                    **<u>JOSEPH LEHMAN</u>,**

12  CALLED AS A WITNESS FOR THE PLAINTIFF HEREIN, HAVING BEEN FIRST

13  DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

14          **THE WITNESS:**  JOSEPH LEHMAN, L-E-H-M-A-N.

15                    **<u>DIRECT EXAMINATION</u>**

16  BY MR. SPECTER:

17  **Q.**  MR. LEHMAN, YOU TESTIFIED HERE BEFORE A FEW WEEKS AGO,

18  RIGHT?

19  **A.**  YES, I DID.

20  **Q.**  AND YOU WERE THE SECRETARY OF CORRECTIONS IN THREE STATES,

21  WASHINGTON, MAINE AND PENNSYLVANIA, IS THAT RIGHT?

22  **A.**  YES, THAT'S CORRECT.

23  **Q.**  AND YOU WERE ALSO A MEMBER OF THE EXPERT PANEL, CORRECT?

24  **A.**  THAT IS CORRECT.

25  **Q.**  AND CALIFORNIA ALSO ASKED YOU TO SERVE AS A MEMBER OF THE

1  STRIKE TEAM TO IMPLEMENT THE RECOMMENDATION OF THE EXPERT PANEL,

2  IS THAT RIGHT?

3  **A.**  THAT'S RIGHT.

4  **Q.**  IN WASHINGTON AND PENNSYLVANIA, DID THOSE STATES WHILE YOU

5  WERE THERE IMPLEMENT POPULATION REDUCING MEASURES OR CONTROLLING

6  MEASURES?

7  **A.**  YES, THEY DID.

8  **Q.**  IN WASHINGTON THAT MEANT CHANGE IN THE LAW REGARDING

9  TECHNICAL PAROLE VIOLATORS, ISN'T THAT RIGHT?

10  **A.**  YES, IT DID.  THE LAW WAS CHANGED TO PRECLUDING TECHNICAL

11  VIOLATORS FROM COMING BACK TO PRISONS.

12         **JUDGE REINHARDT:**  CAN WE HAVE THE DEFINITION OF

13  TECHNICAL VIOLATORS, TECHNICAL VIOLATIONS AS FAR AS THOSE STATES

14  WERE CONSIDERED?  I'M NOT SURE THAT THAT MEANS THE SAME THING TO

15  EVERYBODY.

16         **MR. SPECTER:**  THAT'S A GOOD QUESTION.

17  **BY MR. SPECTER:**

18  **Q.**  WHO WAS CONSIDERED A TECHNICAL -- WHO WAS CONSIDERED A

19  TECHNICAL VIOLATOR IN WASHINGTON OR WHAT TYPES OF --

20  **A.**  THAT WOULD BE ANY INDIVIDUAL UNDER SUPERVISION WHO, IN FACT,

21  VIOLATED ONE OF THE CONDITIONS OF THEIR SUPERVISION.

22  **Q.**  SO IT WOULD BE SOMEBODY WHO DIDN'T COMMIT A NEW CRIME, IS

23  THAT RIGHT?

24  **A.**  THAT'S CORRECT.  NON-CRIMINAL BEHAVIOR.

25  **Q.**  AND THOSE INDIVIDUALS WOULD NOT BE SENT BACK TO PRISONS, IS

1    THAT --

2    **A.**   THAT IS CORRECT.

3    **Q.**   INSTEAD, WHAT WOULD HAPPEN TO THEM?

4    **A.**   THEY WERE -- THEY WERE -- THERE WAS A MATRIX IN TERMS OF THE

5    VIOLATIONS, THE NATURE OF THE VIOLATIONS.

6              DEPENDING ON THE NATURE OF THE VIOLATION, THERE WAS

7    GRADUATED SANCTIONS THAT MIGHT BE IMPOSED.  IF IT WAS A SERIOUS

8    VIOLATION RELATED TO THEIR PAST CRIMINAL BEHAVIOR THEY, IN FACT,

9    MIGHT DO SOME JAIL TIME.

10   **Q.**   AND WOULD SOME OF THE OTHER SANCTIONS BE THAT THEY WOULD

11   PARTICIPATE IN SOME SORT OF PROGRAMS?

12   **A.**   THEY MIGHT BE ORDERED TO BE INVOLVED IN A TREATMENT PROGRAM.

13   THEY MAY BE ORDERED TO REPORT TO A DAY REPORTING CENTER.  THERE

14   ARE A NUMBER OF NON-CONFINEMENT SANCTIONS.

15   **Q.**   OKAY.  AND IN WASHINGTON WAS A RISK ASSESSMENT USED FOR

16   PAROLEES?

17   **A.**   YES.

18   **Q.**   AND WHAT WAS IT USED FOR?

19   **A.**   WE USED AN ACTUARIAL BASED INSTRUMENT THAT WOULD DEFINE THE

20   LIKELIHOOD, RISK OF SOMEBODY REOFFENDING.

21   **Q.**   AND ONCE THAT YOU HAD INFORMATION WHAT -- WHAT DID YOU DO

22   WITH IT?

23   **A.**   WELL, WE WERE FACED, I THINK, IN WASHINGTON, LIKE ANY OTHER

24   SYSTEM, WITH THE RECOGNITION THAT NOT ALL OFFENDERS ARE THE

25   SAME, JUST LIKE NOT ALL PEOPLE ARE THE SAME.

1              AND THE CRITICAL ISSUE IN TERMS OF A LOT OF RESOURCES

2  TO ADDRESS THOSE OFFENDERS WAS TO -- TO ADDRESS -- USE THOSE

3  RESOURCES DILIGENTLY ON THOSE OFFENDERS WHO REPRESENT THE

4  HIGHEST RISK.  SO WE WANTED TO ASSESS WHO THOSE OFFENDERS WERE.

5  **Q.**  OKAY.  SO THAT WHEN THEY GOT OUT ON PAROLE, YOU COULD

6  ALLOCATE YOUR RESOURCES ACCORDINGLY, IS THAT RIGHT?

7  **A.**  YES.  IN FACT, IN -- IN WASHINGTON THE ISSUE BECAME APPARENT

8  WHEN -- WE WERE, LIKE ANY STATE, HAD LIMITED RESOURCES.

9              SO THE QUESTION BECAME, HOW CAN WE BEST USE THE

10  LIMITED RESOURCES WE HAVE?  WE GOT TOGETHER WITH PROSECUTORS,

11  WITH VICTIM COMMUNITY, WITH LAW ENFORCEMENT AND BASICALLY CAME

12  UP IN TERMS OF THE OFFENDER ACCOUNTABILITY ACT WITH A RISK BASED

13  SYSTEM.

14  **Q.**  AND DID THIS RISK BASED SYSTEM -- WHEN DID THE RISK

15  ASSESSMENT, WHEN WAS IT DONE?  IN WHAT STAGE OF THE OFFENDER'S

16  PROGRESS OF THE CRIMINAL JUSTICE SYSTEM?

17  **A.**  WELL, AT THE VERY BEGINNING.  WHEN THE INDIVIDUAL CAME --

18  FOR EXAMPLE, THE STATUTES IN WASHINGTON MANDATED THAT THE COURTS

19  TAKE INTO CONSIDERATION RISK IN SENTENCING.

20              IT CERTAINLY WAS DONE IN RELATION TO PEOPLE COMING

21  EITHER ON PAROLE OR PROBATION.  IT WAS EVEN DONE IN THE PRISON

22  SYSTEM.

23  **Q.**  AND IN THAT RESPECT WASHINGTON CHANGED ITS METHOD BY WHICH

24  IT AWARDED PRISONERS CREDITS, IS THAT RIGHT?

25  **A.**  THAT IS CORRECT.

1  Q.  AND HOW DID THE AWARDING OF CREDITS INTERACT WITH THE RISK

2  SYSTEM?

3  A.  A STATUTE WAS PLACED WHERE WE WOULD BE AUTHORIZED TO

4  ALLOCATE A GREATER AMOUNT OF GOOD TIME AND EARNED TIME TO THOSE

5  OFFENDERS WHO WERE LOW RISK OFFENDERS, AND A LESS AMOUNT OF GOOD

6  TIME -- FOR EXAMPLE, 50 PERCENT, ON THOSE WHO WERE LOW RISK.

7  HIGH RISK OFFENDERS WOULD ONLY RECEIVE A THIRD OFF.

8  Q.  I SEE.  AND DID THE WASHINGTON CREDIT METHOD CHANGE FOR

9  PRISONERS WHO WERE PARTICIPATING -- WHO WERE CONFORMING THEIR

10 CONDUCT TO THE RULES AND PARTICIPATING IN PROGRAMS?

11 A.  YES.  ACTUALLY, WE HAD TWO FORMS OF CREDITS.  ONE WAS GOOD

12 TIME, THAT WAS WHERE THEY WOULD BE ACTUALLY ABIDING BY THE RULE

13 OF THE PRISON AND BEHAVING THEMSELF.  THE OTHER WAS AN EARNED

14 TIME CREDIT, AND THAT EARNED TIME WAS THOSE INDIVIDUALS WHO WERE

15 COMPLYING WITH THE PROGRAM REQUIREMENTS WITHIN PRISON.

16 Q.  AND WERE THESE CREDIT -- CHANGES IN THE CREDIT STRUCTURE

17 MADE RETROACTIVE?

18 A.  YES, THEY WERE.  WHEN THEY WERE IMPLEMENTED.

19 Q.  OKAY.  NOW, PENNSYLVANIA, DID THEY MAKE ANY CHANGES TO THE

20 CRIMINAL SENTENCING STRUCTURE?

21 A.  YES.  IN FACT, PENNSYLVANIA, LIKE WASHINGTON AND LIKE

22 CALIFORNIA, WAS A DETERMINATIVE SYSTEM.  THE SENTENCING

23 GUIDELINE STRUCTURE, THAT GUIDELINE STRUCTURE IN PENNSYLVANIA

24 INITIALLY PROVIDED FOR ONLY TOTAL CONFINEMENT.

25          SO IT WAS ALTERED.  THE SENTENCING GUIDELINES

1  COMMISSION AND SUBSEQUENT LEGISLATURE ALTERED IT TO INCLUDE

2  INTERMEDIATE SANCTIONS AND GRADUATED SANCTIONS IN THE COMMUNITY.

3  **Q.**  SO THAT MEANT THAT MORE OFFENDERS WERE DIVERTED TO THE

4  COMMUNITY, IS THAT RIGHT?

5  **A.**  THAT'S RIGHT.

6  **Q.**  AND DOES THE STATE DO ANYTHING TO ENCOURAGE COUNTIES TO

7  PROVIDE ALTERNATIVE SANCTIONS IN THE COMMUNITY?

8  **A.**  YES.  ACTUALLY, WE FUNDED -- WE GAVE RESOURCES TO THOSE

9  COUNTIES THAT WOULD CREATE PROGRAMS TO, IN FACT, DIVERT

10  OFFENDERS TO THE COUNTY SYSTEM.

11  **Q.**  HOW WELL DID THAT WORK, IF IT WORKED AT ALL?

12  **A.**  NO, IT DID WORK.  IT DID WORK.  IN FACT, THE COUNTIES WANTED

13  TO PARTICIPATE IN THE PROCESS BECAUSE THEY WANTED TO ENSURE THAT

14  THOSE OFFENDERS IN THE COMMUNITY WOULD HAVE VIABLE PROGRAMS THAT

15  WITH MAKE A DIFFERENCE.

16  **Q.**  THE COUNTIES WERE SATISFIED WITH THE PROGRAM?

17  **A.**  YES, THEY WERE.

18  **Q.**  DID ANY OF THESE POPULATION REDUCING MEASURES THAT YOU HAVE

19  DESCRIBED IN BOTH STATES ENDANGER THE COMMUNITIES IN YOUR

20  OPINION?

21  **A.**  NO, THEY DID NOT.

22  **Q.**  DO YOU BELIEVE THERE WAS ANY MEASURABLE IMPACT ON PUBLIC

23  SAFETY, ADVERSE IMPACT?

24  **A.**  NO ADVERSE IMPACT.

25  **Q.**  DO YOU BELIEVE IT HAD A -- WHAT'S THE OPPOSITE OF ADVERSE?

1                **JUDGE KARLTON:**  POSITIVE.

2    **A.**  A POSITIVE EFFECT.

3    **BY MR. SPECTER:**

4    **Q.**  THANK YOU.  A POSITIVE EFFECT?

5    **A.**  YES.  IN WASHINGTON, THE WASHINGTON STATE INSTITUTE FOR

6    PUBLIC POLICY REVIEWED THE IMPACT ON AN ONGOING BASIS.  THEY

7    ACTUALLY WERE MANDATED WHEN THE OFFENDER ACCOUNTABILITY ACT WAS

8    PASSED TO DO A FULL STUDY IN 2010.  THEY DID INTERIM STUDIES AND

9    ALL THE INTERIM STUDIES HAVE INDICATED POSITIVE PROGRESS.

10   **Q.**  NOW --

11               **JUDGE KARLTON:**  PLEASE TELL ME WHAT "POSITIVE

12   PROGRESS" IS?

13               **THE WITNESS:**  IN OTHER WORDS, IT WAS NOT HAVING A

14   DELETERIOUS EFFECT ON CRIME.

15               **JUDGE KARLTON:**  ONE ARGUMENT THAT CAN BE MADE IS THAT

16   GIVEN CALIFORNIA'S PRESENT SYSTEM WITH ITS INABILITY TO PROVIDE

17   MEANINGFUL PROGRAMS IN THE PRISON SYSTEM, IF WE REDUCE THE

18   SIGNIFICANT WEIGHED POPULATION, WE MIGHT -- SO THAT WE COULD

19   PROVIDE PROGRAMS, WE MIGHT ACTUALLY BE IMPROVING PUBLIC SAFETY.

20               **THE WITNESS:**  AND I AGREE EMPHATICALLY WITH THAT.

21   AND, IN FACT, THE RESEARCH INDICATES THAT IF YOU CAN PROVIDE

22   PROGRAMMING AND -- THERE'S EVIDENCE BASED PROGRAM YOU CAN

23   PROVIDE WITHIN THE INSTITUTIONAL ENVIRONMENT THAT WILL, IN FACT,

24   REDUCE THE LIKELIHOOD THAT THEY WILL REOFFEND.  AND IT BECOMES

25   EVEN MORE POWERFUL IF THERE IS AFTER CARE PROGRAMS ONCE THEY ARE

1   IN THE COMMUNITY.

2   **BY MR. SPECTER:**

3   **Q.**  THANK YOU.

4            NOW, AS A MEMBER OF THE EXPERT PANEL, YOU AND OTHERS

5   ON THE PANEL MADE VARIOUS RECOMMENDATIONS TO CHANGE THE WAY

6   CREDITS WERE AWARDED IN CALIFORNIA, CORRECT?

7   **A.**  THAT IS CORRECT.

8   **Q.**  AND THEY WOULD BE SIMILAR TO WHAT YOU DESCRIBED IN

9   WASHINGTON, RIGHT, ACROSS THE BOARD FOR GOOD BEHAVIOR?

10  **A.**  A FLAT ACROSS THE BOARD IN TERMS OF THE PRISONER'S

11  WILLINGNESS TO ABIDE BY THE RULES OF THE INSTITUTION.

12           THE PURPOSE OF THE CREDITS WERE TO INFLUENCE THE

13  BEHAVIOR OF THE OFFENDER THAT WAS IN PRISON.  ON THE ONE HAND,

14  IT WAS IN TERMS OF GOOD BEHAVIOR, AVOIDING BAD BEHAVIOR.  ON THE

15  OTHER HAND, IT WAS EARNED TIME CREDITS, AND THAT WAS ACTUALLY

16  BEING INVOLVED IN THOSE REHABILITATIVE PROGRAMS THAT WERE LIKELY

17  TO REDUCE THE RECIDIVISM.

18  **Q.**  AND THE PANEL ALSO MADE RECOMMENDATIONS ABOUT THE PAROLE

19  SYSTEM, CORRECT?

20  **A.**  THAT'S CORRECT.

21  **Q.**  AND ONE WAS TO HAVE A RISK ASSESSMENT INSTRUMENT, RIGHT?

22  **A.**  YES, YES.

23  **Q.**  AND ANOTHER WAS A SET OF ALTERNATIVE SANCTIONS FOR PAROLE

24  VIOLATORS, CORRECT?

25  **A.**  THAT IS CORRECT.

1  Q. AND THAT'S ON A MATRIX, RIGHT?

2  A. ACTUALLY, WE RECOMMENDED IN THE EXPERT PANEL REPORT A

3  VIOLATION MATRIX THAT EXISTS IN VARIOUS JURISDICTIONS, INCLUDING

4  WASHINGTON, WHERE YOU MAKE A DISTINCTION BETWEEN THE NATURE OF

5  THE BEHAVIOR, THE VIOLATING BEHAVIOR.

6          THE VIOLATING BEHAVIOR THAT WAS NOT RELATED TO THEIR

7  PAST CRIMINAL BEHAVIOR WAS TREATED WITH GRADUATED SANCTIONS.

8  THOSE THAT WERE MORE SERIOUS IN TERMS OF THE MATRIX WAS TREATED

9  WITH SANCTIONS LIKE, FOR EXAMPLE, WITHIN THE JAIL.

10 Q. PARDON ME?  I DIDN'T HEAR THAT LAST --

11 A. SANCTIONS OF TIME WITHIN THE JAIL, OR THE COUNTY SYSTEM.

12 Q. OKAY.  ALL RIGHT.

13          AND THE PANEL ALSO MADE RECOMMENDATIONS ABOUT WHO

14 SHOULD BE PLACED ON PAROLE SUPERVISION, RIGHT?

15 A. THAT'S CORRECT.  ONCE AGAIN, SIMILAR TO WASHINGTON.  IN

16 WASHINGTON LOW AND MODERATE RISK -- LOW RISK OFFENDERS ARE NOT

17 SUPERVISED BY THE STATE.  THEY JUST DON'T HAVE ANY SUPERVISION.

18

19          IN THE RESEARCH -- IT'S BASED ON RESEARCH, AND THE

20 RESEARCH SAYS THAT, IN FACT, IF YOU DON'T PROVIDE SUPERVISION,

21 THERE IS A MORE POSITIVE OUTCOME THAN IF YOU DO PROVIDE

22 SUPERVISION TO THOSE LOW RISK OFFENDERS.

23 Q. AND THE PANEL ALSO RECOMMENDED THE EARLY TERMINATION OF

24 PAROLE FOR CERTAIN UNDER -- UNDER CERTAIN CONDITIONS, CORRECT?

25 A. THAT'S CORRECT.

1  Q.  AND DO YOU BELIEVE THAT'S AN APPROPRIATE POLICY?

2  A.  THE PANEL WAS RECOGNIZING THAT SIMILAR TO CREDITS, WHEN YOU

3  DO PRISON AND YOU ARE TRYING TO INFLUENCE THEIR BEHAVIOR,

4  RELATIVE CONDUCT OR PROGRAMMING, THAT SAME SYSTEM SHOULD EXIST

5  IN THE COMMUNITY.  WHEN YOU SUPERVISE THEM, IS TO PROVIDE SOME

6  ABILITY TO, IN FACT, INCENTIVIZE THEIR INVOLVEMENT IN PROGRAMS

7  IN THE COMMUNITY AND REWARD THEM FOR IT.

8  Q.  AND YOU HAD EXPERIENCE WITH SIMILAR POLICIES IN WASHINGTON,

9  CORRECT?

10  A.  THAT'S CORRECT.

11  Q.  AND WHAT EFFECT DID THOSE HAVE?

12  A.  BENEFICIAL EFFECTS.  I MEAN, THE -- THE ROLE OF THE

13  CORRECTIONS DEPARTMENT IN ANY SYSTEM IS TO REDUCE THE LIKELIHOOD

14  THAT THEY WOULD REOFFEND.  AND I THINK YOU NEED -- YOU NEED THE

15  CAPACITY TO, IN FACT, CONFINE THEM WHEN APPROPRIATE.

16            YOU NEED THE CAPACITY TO INTERVENE IN THEIR LIFESTYLE

17  AND THEIR THINKING IN TERMS OF REDUCING THE RISKS THAT THEY WILL

18  REOFFEND, AND YOU NEED TO HAVE A SYSTEM OF REWARDS AND SANCTIONS

19  RELATIVE TO THAT PROCESS.

20  Q.  AND DID THE PANEL BELIEVE THAT THROUGH THE USE OF THESE

21  MEASURES, CALIFORNIA'S PRISON POPULATION COULD BE REDUCED

22  WITHOUT ADVERSELY AFFECTING PUBLIC SAFETY?

23  A.  ABSOLUTELY.

24  Q.  AND YOU AGREE WITH THAT?

25  A.  I EMPHATICALLY AGREE WITH THAT.

1   Q.  NOW, WE HAVE HEARD TESTIMONY FROM VARIOUS LAW ENFORCEMENT

2   OFFICIALS FROM THE COMMUNITY, AND I EXPECT WE WILL HEAR MORE OF

3   IT IN THE COMING DAYS, THAT PUTTING MORE PAROLEES IN THE

4   COMMUNITY WILL ENDANGER THE PUBLIC.

5           WHAT'S YOUR RESPONSE TO THAT?

6   A.  MY RESPONSE TO THAT WOULD BE THAT WOULD ONLY BE TRUE IF YOU

7   SELECTED THOSE OFFENDERS ON A RANDOM BASIS AND YOU JUST LET

8   PEOPLE OUT WITHOUT REGARD TO AN ASSESSMENT OF THEIR RISK.

9           IF YOU, IN FACT, ASSESS PEOPLE OF THE RISK TO

10  REOFFEND AND YOU, IN FACT, LET PEOPLE OUT OF PRISON WHO ARE LOW

11  RISK OFFENDERS YOU AND PROVIDE A PROGRAM FOR THEM WITHIN THE

12  CONTEXT OF THE PRISON AND COMMUNITY, THEN I DON'T THINK THAT YOU

13  ARE GOING TO HAVE A DELETERIOUS EFFECT IN TERMS OF CRIME.

14  Q.  DO YOU BELIEVE THAT THE CURRENT OVERCROWDING CONDITIONS IN

15  CALIFORNIA'S PRISONS HAVE ANY EFFECT ON PUBLIC SAFETY?

16  A.  ABSOLUTELY.

17  Q.  WHAT EFFECT?

18  A.  WELL, THE SYSTEM IS SO OVERCROWDED THAT YOU -- THERE'S ONLY

19  ONE TERM YOU CAN USE.  IT'S CRIMINOGENIC.  IN THE SENSE THAT

20  WHAT IT DOES IS IT PRODUCES CRIME.

21          IT CROWDS PEOPLE INTO AN ENVIRONMENT.  IT DOESN'T

22  HAVE THE CAPACITY TO SORT THEM, I THINK REALISTICALLY, IN TERMS

23  OF CLASSIFICATION, IN TERMS OF THEIR RISK, OR THE CAPACITY TO

24  PROVIDE TREATMENT PROGRAMS THAT WOULD REDUCE THE LIKELIHOOD.

25          SO WHAT THEY DO IS THEY JUST CRAM EVERYBODY TOGETHER

1  AND IT BECOMES CRIMINOGENIC.  IT BECOMES A CRIME SCHOOL.

2  **Q.**  AND YOU TESTIFIED A COUPLE WEEKS AGO THAT OVERCROWDING WAS

3  THE PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS, AND WE ARE

4  NOT GOING TO REVISIT THAT HERE.

5        BUT CAN YOU THINK OF ANY TYPE OF COURT ORDER, OTHER

6  THAN ONE TO REDUCE THE POPULATION, THAT WOULD ALLOW FOR THE

7  RESOLUTION OF THE CONSTITUTIONAL VIOLATIONS THAT NOW EXIST?

8  **A.**  THAT HAS TO BE A PREREQUISITE TO DOING ANYTHING ELSE.  YOU

9  HAVE TO DO THAT FIRST.

10  **Q.**  AND WHAT DO YOU SAY TO THE LOCAL LAW ENFORCEMENT OFFICIALS'

11  CLAIM THAT IF WE REDUCE THE POPULATION, IT WILL HARM THEIR

12  COMMUNITIES AND THE LOCAL CRIMINAL JUSTICE SYSTEM?

13  **A.**  I THINK THAT WHAT YOU HAVE TO DEVELOP IN HERE, IN

14  CALIFORNIA, IS A MORE COLLABORATIVE APPROACH.  I MEAN, WHEN WE

15  DID CHANGES, THE TYPE OF WHICH YOU HAVE BEEN ASKING ME ABOUT IN

16  WASHINGTON STATE, WE DIDN'T DO THEM INDEPENDENT OF THE REST OF

17  THE CRIMINAL JUSTICE SYSTEM.

18        WE -- WE WORKED WITH PROSECUTORS.  WE WORKED WITH LAW

19  ENFORCEMENT.  WE WORKED WITH THE VICTIM COMMUNITY, AND WE CAME

20  TOGETHER AND WE SAID, OKAY, WE CAN'T BE ALL THINGS TO ALL

21  OFFENDERS.  EVERYBODY IN THE SYSTEM RECOGNIZE YOU HAVE LIMITED

22  RESOURCES IN TERMS OF YOUR CAPACITY TO DO THAT.  AND WE BROUGHT

23  THEM TOGETHER.  THERE WAS A CONSENSUS.  LET'S PAY ATTENTION TO

24  THE HIGH RISK FOLKS.  LET'S DO WHAT WE CAN IN TERMS OF

25  INFLUENCING THEIR BEHAVIOR AND MONITORING THEM AND IN TAKING

1  CARE OF THAT BUSINESS.  TO THEM IT MADE SENSE.

2  Q.  SO WOULD IT BE FAIR TO SAY THAT YOU WERE ABLE TO ALLAY THEIR

3  FEARS?

4  A.  WELL, WE HAD TO BE IN PARTNERSHIP.  WE USED COUNTY SPACE AND

5  WE PAID FOR IT.  I THINK THAT'S A RESPONSIBLE THING TO DO.

6  Q.  AND AFTER THOSE PROGRAMS WERE IMPLEMENTED, WAS THERE A HUE

7  AND CRY AGAINST THE PROGRAMS?

8  A.  NO, THERE WAS NOT.

9  Q.  SO THEY WERE RELATIVELY SATISFIED WITH THE SITUATION?

10  A.  ONCE AGAIN, I CAN ONLY DESCRIBE IT AS IT WAS A PARTNERSHIP.

11  WE DIDN'T DO THIS INDEPENDENT OF THE REST OF THE CRIMINAL

12  JUSTICE SYSTEM.

13  Q.  THANK YOU, MR. LEHMAN.  NO FURTHER QUESTIONS.

14          **JUDGE REINHARDT:**  MR. LEHMAN, WHAT DO YOU DO IF THE

15  COUNTIES SAY THEY DON'T HAVE SPACE IN THE JAILS AND THEY DON'T

16  HAVE FUNDS TO DEVELOP ADEQUATE PROGRAMS FOR EMPLOYMENT, FOR

17  HOUSING, FOR REHABILITATION, AND THEY CAN'T ABSORB THESE PEOPLE

18  INTO THE PROGRAMS THAT THEY HAVE, WHICH ARE NOT ADEQUATE AS OF

19  NOW ANYWAY?

20          **THE WITNESS:**  YEAH.  I THINK THERE'S -- IN

21  PENNSYLVANIA WE ACTUALLY PROVIDED FUNDING BECAUSE WE RECOGNIZE

22  --

23          **JUDGE REINHARDT:**  IS THIS ALL DEPENDENT ON THE STATES

24  PROVIDING FUNDING TO THE COUNTIES?

25          **THE WITNESS:**  NO.  IN WASHINGTON WE DIDN'T PROVIDE

1  FUNDING TO THE COUNTIES.

2           **JUDGE REINHARDT:**  BUT THE COUNTIES DIDN'T TELL YOU IN

3  WASHINGTON THAT THEY DIDN'T HAVE THE FUNDS TO DO ANY OF THIS.

4           **THE WITNESS:**  BUT IN WASHINGTON -- IF, FOR EXAMPLE,

5  YOU HAD A -- WE HAD A MAJOR COUNTY THAT DIDN'T HAVE ANY SPACE IN

6  THEIR COUNTY JAIL, WE RECOGNIZED THAT.  IN THAT INSTANCE WE

7  WOULD BRING THEM TO ONE OF OUR FACILITIES.

8           I MEAN, ONCE AGAIN, IT WASN'T -- WE DIDN'T ACT

9  INDEPENDENT OF THOSE ENTITIES.  WE ACTED WITH THEM.

10          **JUDGE REINHARDT:**  I UNDERSTAND THAT, BUT IF THE

11  COUNTIES DON'T HAVE ROOM IN THEIR FACILITIES, THEY DON'T HAVE

12  FUNDS FOR THE PROGRAMS THAT ARE NECESSARY FOR THE PEOPLE WHO

13  COME OUT OF PRISON, HOW DO YOU DO IT IF THE COUNTIES SAY, WE

14  CAN'T ABSORB THESE PAROLEES AND WE CAN'T PROVIDE THEM WITH

15  PROGRAMS THAT WOULD ASSURE PUBLIC SAFETY?

16          **THE WITNESS:**  WELL, I WAS WORKING IN SEVERAL

17  DIFFERENT ENVIRONMENTS.  LET ME DEAL WITH WASHINGTON.

18          IN WASHINGTON WE WERE A UNIFIED SYSTEM.  WE HAD FRONT

19  END PROBATION.  WE HAD PRISONS AND WE HAD PAROLE.  SO IN THOSE

20  INSTANCES WE WERE THE RESOURCE.  WE HAD TO PROVIDE THE PROGRAMS.

21          IN PENNSYLVANIA, WE -- WE WENT TO THE LEGISLATURE AND

22  WE ALLOCATED RESOURCES TO THE COUNTIES.

23          NOW, BACK TO YOUR QUESTION ON SPACE, WHICH IS A

24  SEPARATE ISSUE.  IN WASHINGTON THERE WAS MUCH MORE OF A

25  PARTNERSHIP.  IN FACT, THE FUNDING FOR CAPITAL EXPENDITURES IN

1  TERMS OF COUNTY JAILS WAS PROVIDED AT ONE PERIOD OF TIME BY THE

2  STATE.

3          BUT IN THOSE COUNTIES THAT DIDN'T HAVE THE SPACE TO

4  DEAL WITH TECHNICAL VIOLATORS THAT NEEDED TO BE INCARCERATED FOR

5  SHORT PERIODS OF TIME, WE BROUGHT THEM INTO OUR SYSTEM.

6          **JUDGE REINHARDT:**  BUT HERE WE DON'T HAVE ROOM IN THE

7  STATE SYSTEM, AND THEY DON'T HAVE ROOM IN THE COUNTY SYSTEM.

8          AND I CAN THINK OF LOTS OF THINGS YOU CAN SAY, BUT AS

9  TO YOUR PROPOSAL THAT IF WE HAVE MORE PAROLEES, THAT WOULD HELP,

10 ASSUMING THAT THE COUNTIES CAN PROVIDE THESE PROGRAMS OR THAT

11 THE STATES -- THE STATE WILL GIVE THE COUNTY THE FUNDS TO DO

12 THAT.

13         WHAT IF NEITHER OF THOSE THINGS HAPPEN?  IF THE

14 COUNTIES DON'T HAVE ADEQUATE PROGRAMS AND THE STATE IS NOT

15 WILLING TO GIVE THEM THE MONEY?

16         **JUDGE KARLTON:**  BECAUSE THE STATE IS GOING BROKE.

17         **THE WITNESS:**  WELL, I THINK THAT'S -- NOT ONLY

18 CALIFORNIA, THAT'S THE TIMES IN MANY STATES.

19         I HAVE TO GO BACK TO THE -- THE REALITY IS THE FIRST

20 STEP THAT HAS TO OCCUR IS YOU HAVE TO REDUCE THE POPULATION.

21 YOU HAVE TO REDUCE THE OVERCROWDING.  THAT'S THE PREREQUISITE TO

22 DOING ANYTHING.

23         **JUDGE REINHARDT:**  NOW, EVEN IF -- LET'S JUST STOP

24 THERE FOR A MOMENT.

25         LET'S SAY THAT YOUR CHOICE IS TO KEEP THE POPULATION

1  AS IT IS OR TO REDUCE THE POPULATION WHERE THE COUNTIES ARE

2  GOING TO BE UNABLE TO DO ANYTHING FOR THE PEOPLE.  WHICH IS MORE

3  DANGEROUS?

4          **THE WITNESS:**  WELL, IN THE FIRST RULE, IN TERM OF THE

5  COMMUNITY SIDE, I WOULD DO THAT ON A RISK BASED -- I WOULD NOT

6  -- FOR EXAMPLE, IN WASHINGTON AND IN CALIFORNIA I THINK YOU CAN

7  DO THAT.

8          IF YOU HAD AN ACTUARIAL RESEARCH BASED INSTRUMENT

9  THAT ASSESSED RISK, AND YOU WOULD TAKE THE LOW RISK PEOPLE AND

10 YOU WOULD OSTENSIBLY PUT THEM ASIDE.  YOU DON'T SUPERVISE THEM.

11 YOU HAVE REDUCED THE COST OF THE PROGRAM SIGNIFICANTLY IN DOING

12 THAT.

13         IN WASHINGTON -- IF YOU LOOK AT THE PROPORTION OF

14 PEOPLE THAT WERE IN THOSE CATEGORIES THAT WEREN'T SUPERVISED,

15 YOU ARE TALKING ABOUT 36 PERCENT OF THE POPULATION.

16         IN WASHINGTON, IT WAS CONFRONTED WITH THE SAME

17 QUESTION I THINK CALIFORNIA HAS.  YOU HAVE GOT LIMITED

18 RESOURCES.  HOW ARE YOU GOING TO EXPEND THEM?  AND ON WHAT

19 PRINCIPLES ARE YOU GOING TO EXPEND THEM?  ON WHAT BASIS ARE YOU

20 GOING TO MAKE DECISIONS THAT THESE PEOPLE NEED TO BE ATTENDED

21 TO, AND THESE WE CAN AFFORD NOT TO.

22         **JUDGE REINHARDT:**  I UNDERSTAND YOUR POINT THAT YOU

23 DON'T HAVE TO SUPERVISE THEM.  BUT WE HAVE ALSO HAD TESTIMONY

24 THAT WHAT YOU NEED TO DO IS GIVE THEM PROGRAMS THAT WILL HELP

25 THEM ADJUST TO THE COMMUNITY, THAT WILL HELP THEM WITH

 1  EMPLOYMENT, THAT WILL HELP THEM PSYCHOLOGICALLY, THAT WILL GIVE

 2  THEM DRUG PROGRAMS.

 3          WHAT YOU CAN'T -- WHAT IF THE COUNTIES CAN'T DO ANY

 4  OF THAT AND THE STATE DOESN'T HAVE THE MONEY TO HELP THE

 5  COUNTIES?  THEN WHERE ARE WE?

 6          **THE WITNESS:**  WELL, I'M GOING ON -- I'M NOT GOING TO

 7  OPERATE ON THE PRINCIPLE THAT THE STATE DOESN'T HAVE RESOURCES,

 8  BECAUSE I THINK THE STATE CAN BE MORE LOGICAL IN THEIR USE OF

 9  THEIR EXISTING RESOURCES.

10          SO IF I SAID TO THE STATE, YOU ARE GOING TO NO LONGER

11  SUPERVISE THESE PEOPLE, YOU HAVE COMMITTED RESOURCES, YOU WERE

12  COMMITTING TO THEM.  YOU CAN TAKE THOSE RESOURCES AND DECIDE TO

13  SPEND THEM DIFFERENTLY AND MORE EFFECTIVELY.

14          IN FACT, THE RESEARCH SAYS, DON'T TREAT THOSE LOW

15  RISK; TREAT THE HIGH RISK.  THAT'S WHAT THE RESEARCH SAYS.

16          **JUDGE REINHARDT:**  SO YOU WOULD TAKE THE FUNDS THAT

17  YOU WOULD SAVE BY THE CHANGES YOU RECOMMEND --

18          **THE WITNESS:**  ABSOLUTELY.

19          **JUDGE REINHARDT:**  -- AND GIVE THOSE TO THE COUNTIES

20  TO PROVIDE SERVICES?

21          **THE WITNESS:**  I THINK YOU CAN DO THAT.  WELL --

22          **JUDGE KARLTON:**  THERE IS A QUESTION ABOUT WHETHER WE

23  CAN ORDER THAT.

24          **THE WITNESS:**  RIGHT, RIGHT.

25          **JUDGE KARLTON:**  SOME DAY WHEN WE GET TO ORAL

1  ARGUMENT, THAT'S ONE OF THE THINGS WE ARE GOING TO HAVE TO TALK

2  ABOUT.

3         **MR. SPECTER:**  OR WE WILL TRY AND ANSWER THAT FOR YOU,

4  OR IT'S A CHOICE THAT THE STATE COULD MAKE, ONE OR THE OTHER.

5         **JUDGE REINHARDT:**  WELL, WE WON'T WORRY ABOUT IT NOW,

6  BUT I JUST WANTED TO UNDERSTAND WHAT THE TESTIMONY WAS BECAUSE

7  IT'S GENERALLY ON THE ASSUMPTION THAT THE COUNTIES WILL DO THIS.

8  AND CERTAINLY LISTENING TO THE COUNTY'S TESTIMONY, THEY FEEL

9  THAT THEY DON'T HAVE THE ABILITY TO DO THAT.

10         AND THE ANSWER YOU WOULD GIVE IS TO USE THE FUNDS

11  THAT THE STATE WOULD SAVE.

12         **JUDGE KARLTON:**  AT LEAST SOME PORTION OF IT.

13         **JUDGE REINHARDT:**  AND DIVERT THAT TO THESE PROGRAMS.

14         **THE WITNESS:**  THAT'S CORRECT.

15         **MR. SPECTER:**  I'M SORRY, JUDGE.  ARE YOU FINISHED?

16         **JUDGE REINHARDT:**  NO, NO.  THANK YOU.

17  **BY MR. SPECTER:**

18  **Q.**  SO YOU ESSENTIALLY WOULD REALLOCATE THE EXISTING RESOURCES,

19  CORRECT?

20  **A.**  YES.  AND YOU REALLOCATE THEM BASED ON THE POPULATION YOU

21  ARE GOING TO WORK WITH AND WHO HAS TO DO THE WORK.

22  **Q.**  AND YOU HAVE READ DR. AUSTIN'S REPORT?

23  **A.**  YES --

24  **Q.**  OR REPORTS?

25         HE SAYS THAT YOU COULD SAVE ABOUT A BILLION DOLLARS

1    FROM REDUCING THE POPULATION.

2            ASSUMING THAT'S TRUE, WOULD YOU AGREE THAT THAT'S A

3    GOOD -- THAT WOULD BE MONEY WELL SPENT TO GIVING THE COUNTIES AT

4    LEAST A PORTION OF THAT MONEY?

5    **A.**  YES, I DO.  AND I AGREE WITH JIM -- JIM AUSTIN IS A

6    RESEARCHER.  I HAVE WORKED WITH JIM IN ALL THREE JURISDICTIONS

7    THAT I HAVE BEEN SECRETARY FOR.

8            THE REALITY IS THAT YOU CAN DO THESE THINGS AND YOU

9    CAN DO THEM SAFELY.

10   **Q.**  THANK YOU.  NO FURTHER QUESTIONS.

11           **JUDGE HENDERSON:**  OKAY.  CROSS-EXAMINATION?

12                        **CROSS EXAMINATION**

13   **BY MS. JOHNSON:**

14   **Q.**  GOOD AFTERNOON, MR. LEHMAN.

15   **A.**  GOOD AFTERNOON.

16   **Q.**  YOU HAVE SERVED AS SECRETARY OR COMMISSIONER OF CORRECTIONS

17   FOR THREE STATES, IS THAT RIGHT?

18   **A.**  THAT'S CORRECT.

19   **Q.**  THOSE STATES ARE PENNSYLVANIA, MAINE AND WASHINGTON STATE?

20   **A.**  THAT'S CORRECT.

21   **Q.**  YOU ENDED YOUR TENURE AS SECRETARY IN PENNSYLVANIA IN 1995,

22   CORRECT?

23   **A.**  SAY THAT AGAIN?

24   **Q.**  YOU ENDED YOUR TENURE AS SECRETARY IN PENNSYLVANIA IN 1995?

25   **A.**  THAT'S CORRECT.

1  Q.  WHEN YOU WERE SECRETARY IN PENNSYLVANIA, THE LARGEST OVERALL

2  PRISON POPULATION FOR THE ENTIRE STATE WAS UNDER 20,000,

3  CORRECT?

4  A.  I BELIEVE THAT'S CORRECT.

5  Q.  YOU DO NOT RECALL WHAT PENNSYLVANIA'S INCARCERATION RATE WAS

6  WHEN YOU WERE SECRETARY, CORRECT?

7  A.  I DON'T RECALL THAT RIGHT NOW, NO.

8  Q.  ON PAGE NINE OF YOUR REPORT, PARAGRAPH 18 YOU WROTE:

9              "IN PENNSYLVANIA THE STATE MADE CHANGES TO

10             SENTENCING GUIDELINES TO ALLOW FOR RESTORATIVE

11             AND INTERMEDIATE SANCTIONS, SUCH AS FINES,

12             RESTITUTION, PROBATION, RESIDENTIAL TREATMENT

13             PROGRAMS AND HOUSE ARREST.  PART OF THE INTENT

14             OF THESE CHANGES WAS TO REDUCE THE NUMBER OF

15             OFFENDERS WHO WERE SENT TO STATE PRISON.  IN MY

16             OPINION AND EXPERIENCE, THESE CHANGES DID NOT

17             RESULT IN ANY INCREASED HARM TO THE PUBLIC.  IN

18             FACT, IN GENERAL THEY BENEFITED BOTH THE

19             COMMUNITY AND THE OFFENDER."

20             DO YOU SEE THAT?

21  A.  I SEE THAT.

22  Q.  YOU DO NOT RECALL BY HOW MUCH THESE CHANGES REDUCED THE

23  PRISON POPULATION IN PENNSYLVANIA, DO YOU?

24  A.  I DON'T KNOW THE -- I DON'T HAVE THE SPECIFICS, BUT I KNOW

25  IT DID.

1  Q.  YOU DO NOT WHO HOW THE DEMOGRAPHICS OF PENNSYLVANIA'S PRISON

2  POPULATION WHEN YOU WERE SECRETARY COMPARED TO THE DEMOGRAPHICS

3  OF CALIFORNIA'S PRISON POPULATION TODAY, DO YOU?

4  A.  I THINK -- IN GENERAL TERMS I THINK THERE ARE SOME

5  DIFFERENCES THAT WE COULD SPEAK TO.

6  Q.  YOU WERE COMMISSIONER OF MAINE CORRECTIONS FROM 1995 TO

7  1997, CORRECT?

8  A.  THAT'S CORRECT.

9  Q.  WHEN YOU WERE COMMISSIONER IN MAINE, THE LARGEST OVERALL

10 PRISON POPULATION FOR THE ENTIRE STATE, THE STATE'S PRISON

11 POPULATION WAS 1400, CORRECT?

12 A.  THAT'S CORRECT.  UH-HUH.

13 Q.  YOU WERE SECRETARY OF CORRECTIONS IN WASHINGTON STATE FROM

14 1997 TO 2005, CORRECT?

15 A.  THAT'S CORRECT.

16 Q.  THE STATE'S PRISON POPULATION WHEN YOU WERE SECRETARY IN

17 WASHINGTON WAS UNDER 14,000, CORRECT?

18 A.  THAT'S CORRECT.

19 Q.  ON PAGE EIGHT, PARAGRAPH 15 OF YOUR REPORT YOU WROTE:

20        "WHILE I WAS SECRETARY" -- AND THIS IS OF

21        WASHINGTON STATE, I BELIEVE -- "WE WERE DIRECTED

22        BY THE LEGISLATURE TO INSTITUTE A SYSTEM FOR

23        PAROLEES THAT ALLOCATED PAROLE RESOURCES BASED

24        ON RISK THAT AN OFFENDER WOULD COMMIT A NEW

25        CRIME AS MEASURED BY A RISK INSTRUMENT.  IN THIS

1          SYSTEM LOW RISK PAROLEES AND PROBATIONERS WERE

2          NOT SUPERVISED AT ALL.  THIS ALLOWED THE

3          DEPARTMENT OF CORRECTIONS TO CONCENTRATE ITS

4          RESOURCES ON THOSE PAROLEES MOST LIKELY TO

5          COMMIT SERIOUS CRIMES IN THE FUTURE."

6          YOU CANNOT SPECIFY WHICH CRIMES WERE IDENTIFIED AS

7   SERIOUS CRIMES, CAN YOU?

8   **A.**  SERIOUS CRIMES ARE DEFINED LEGALLY WITHIN THE STATUTES OF

9   THE STATE OF WASHINGTON.

10  **Q.**  YOU DON'T KNOW WHAT THOSE CRIMES ARE, CORRECT?

11  **A.**  WELL, THEY ARE ESSENTIALLY THE VIOLENT CRIMES.

12  **Q.**  I WOULD LIKE TO PULL UP PAGES -- YOUR DEPOSITION TRANSCRIPT,

13  PAGE 120, LINE 16 THROUGH 18.

14  **A.**  OKAY.

15               (DOCUMENT DISPLAYED)

16          **"QUESTION:**CAN YOU SPECIFY FOR ME WHICH

17          CRIMES WERE IDENTIFIED AS SERIOUS CRIMES?

18          **"ANSWER:**NOT SPECIFICALLY."

19  **A.**  THAT WAS CORRECT.  I DON'T KNOW EACH CATEGORY OF CRIME OR

20  OFFENSE.

21  **Q.**  IN THE NEXT SENTENCE YOU WROTE:

22          "IN MY EXPERIENCE ONLY A HANDFUL OF THE LOW

23          RISK OFFENDERS WHO WERE NOT SUPERVISED WERE

24          SUBSEQUENTLY CONVICTED OF VIOLENT CRIMES AND

25          THOSE WERE FOR ASSAULTS WITHOUT A MAJOR INJURY."

1  A.  THAT'S CORRECT.

2  Q.  THERE WASN'T JUST ONE REPORT THAT SUMMARIZED THE INCIDENTS

3  OF LOW OFFENDERS WHO WERE NOT SUPERVISED AND WHO WERE

4  SUBSEQUENTLY CONVICTED OF VIOLENT CRIMES DURING YOUR TENURE AS

5  SECRETARY, WAS THERE?

6  A.  I'M SORRY.  I DON'T UNDERSTAND THE QUESTION.

7  Q.  THERE WASN'T A REPORT THAT YOU READ --

8  A.  AN OFFICIAL REPORT?  NO.

9  Q.  WHEN YOU WRITE "ASSAULT WITHOUT A MAJOR INJURY," YOU DO NOT

10  KNOW THE DEFINITION OF "MAJOR INJURY," DO YOU?

11  A.  NO.  I ACTUALLY -- WELL, THERE WASN'T A REPORT.  I DID

12  REVIEW DATA RELATIVE TO THOSE INDIVIDUALS THAT WERE LOW RISK,

13  THAT WERE NOT SUPERVISED, THAT WERE COMING BACK TO PRISON.

14        MY COMMENT THERE WAS IN RELATION TO THE DATA THAT WAS

15  GIVEN TO ME IN -- AND IN TERMS OF THE INITIAL HISTORY OF THOSE

16  OFFENDERS WHO WERE NOT SUPERVISED.

17  Q.  OKAY.  BUT MY QUESTION WAS:  WHEN YOU USE THE TERM "ASSAULT

18  WITHOUT A MAJOR INJURY," THE TERM YOU USED IN YOUR REPORT,

19  CORRECT?

20  A.  I WAS -- THE MOST SERIOUS -- WHEN I REVIEWED THAT DATA, THE

21  MOST SERIOUS OFFENSE WAS AN ASSAULT.  IT WAS -- THIS WAS A

22  REPORT.  AND THE ASSAULT INDICATED THERE WAS AN INJURY, BUT IT

23  WAS NOT A LIFE-THREATENING INJURY OR A DELETERIOUS INJURY.

24  Q.  LIFE THREATENING.

25  A.  RIGHT.  IT WASN'T A PERMANENT -- IT DIDN'T PERMANENTLY

 1  DISABLE THE PERSON.

 2  **Q.**  YOU DO NOT WHO HOW THE DEMOGRAPHICS OF CALIFORNIA'S ADULT

 3  PAROLEE POPULATION COMPARED TO THE DEMOGRAPHICS OF WASHINGTON

 4  STATE'S ADULT PAROLEE POPULATION WHILE YOU WERE SECRETARY THERE,

 5  DO YOU?

 6  **A.**  I KNOW THAT THERE ARE SOME SIMILARITIES AND DIFFERENCES IN

 7  GENERAL.  I KNOW THAT CALIFORNIA IN TERMS OF QUANTITATIVELY

 8  CERTAINLY HAS A LARGER NUMBER OF HISPANICS.  ALTHOUGH WASHINGTON

 9  STATE HAS A LARGE NUMBER OF HISPANICS.

10          I THINK WASHINGTON -- WASHINGTON HAS A MIXED ETHNIC

11  OFFENDER POPULATION IN TERMS OF ASIAN AND PACIFIC RIM, IN

12  ADDITION TO HISPANIC AND CAUCASIAN.

13  **Q.**  DID YOU KNOW WHEN WE TOOK YOUR DEPOSITION IN THIS CASE HOW

14  CALIFORNIA'S PAROLEE POPULATION COMPARED TO WASHINGTON STATE'S

15  PAROLEE POPULATION, MR. LEHMAN?

16  **A.**  SPECIFICALLY, NO, I DID NOT.

17  **Q.**  OKAY.  SO THAT WAS SOMETHING YOU DIDN'T KNOW WHEN YOU WROTE

18  YOUR REPORT EITHER, CORRECT?

19  **A.**  IN TERMS OF THE SPECIFIC MAKEUPS OF THE POPULATION OR

20  DIFFERENCES, NO.

21  **Q.**  SO THAT'S SOMETHING YOU HAVE EDUCATED YOURSELF ON SINCE THE

22  DEPOSITION, MR. LEHMAN?

23  **A.**  I HAVE BECOME MORE INFORMED.

24  **Q.**  IN THE NEXT SENTENCE YOU WROTE:

25          "IN ADDITION, ANOTHER LAW DIVERTED CERTAIN

```
 1              CATEGORIES OF LOW RISK FELONS TO THE COUNTY BY

 2              PROHIBITING THE COURTS FROM SENTENCING THEM TO

 3              PRISON."

 4              WHEN YOU WROTE THAT, YOU DID NOT KNOW HOW MANY SUCH

 5   LOW RISK FELONS WERE CONVICTED IN WASHINGTON STATE IN ANY GIVEN

 6   YEAR WHILE YOU WERE SECRETARY, DID YOU?

 7   A.  NO, I DID NOT RECALL THAT.

 8   Q.  YOU ALSO DID NOT KNOW WHAT PERCENTAGE OF CONVICTIONS IN

 9   WASHINGTON STATE SUCH LOW RISK FELONS MADE UP, YOU DID?

10   A.  NO, I DID NOT.

11   Q.  AND WHEN YOU WROTE THAT, YOU DID NOT KNOW HOW MANY

12   EQUIVALENT LOW RISK FELONS CALIFORNIA HAS CONVICTED IN THE LAST

13   YEAR, DID YOU?

14   A.  NO, I DID NOT.

15   Q.  WHEN YOU WROTE YOUR REPORT, YOU DID NOT KNOW FOR THE PERIOD

16   OF TIME YOU WERE SECRETARY OF THE WASHINGTON STATE DEPARTMENT OF

17   CORRECTIONS WHAT PERCENTAGE OF PEOPLE CONVICTED OF FELONIES

18   WASHINGTON STATE INCARCERATED, DID YOU?

19   A.  THE INCARCERATION RATE?

20   Q.  THE PERCENTAGE OF PEOPLE CONVICTED OF FELONS THAT WERE

21   INCARCERATED?

22   A.  SPECIFICALLY, NO.

23   Q.  WHEN YOU WROTE YOUR REPORT, YOU ALSO DID NOT KNOW WHAT

24   PERCENTAGE OF PEOPLE CONVICTED OF FELONS -- FELONIES THAT

25   CALIFORNIA INCARCERATES?
```

 1  **A.**  NO, I DID NOT.

 2  **Q.**  AND DO YOU KNOW WHETHER CALIFORNIA'S COUNTIES CURRENTLY HAVE

 3  THE RESOURCES TO DEAL WITH FELONS WHO ARE -- WHO MIGHT BE

 4  DIVERTED TO THE COUNTIES RATHER THAN BEING SENTENCED TO PRISON?

 5  **A.**  SPECIFICALLY, NO, I DO NOT.

 6  **Q.**  ON PAGE EIGHT, PARAGRAPH 16 YOU WROTE THAT:

 7          "THE POLICIES OF TECHNICAL PAROLE VIOLATORS

 8          NOT GOING BACK TO PRISON AND DIVERSION OF

 9          CERTAIN LOW RISK FELONS, QUOTE, CONTROLLED THE

10          PRISON POPULATION WHILE NOT HAVING ANY

11          SIGNIFICANT ADVERSE EFFECT ON PUBLIC SAFETY, END

12          QUOTE."

13  **A.**  YES, I DID.

14  **Q.**  THIS STATEMENT IS BASED ON THE CONCLUSION OF AN

15  INTERDISCIPLINARY GROUP THAT MET REGARDING THE IMPLEMENTATION OF

16  THOSE POLICIES, CORRECT?

17  **A.**  THAT'S CORRECT.

18  **Q.**  THAT INTERDISCIPLINARY GROUP DID NOT ISSUE A FORMAL REPORT,

19  DID IT?

20  **A.**  NO.  THAT WAS ACTUALLY A GROUP THAT MET MONTHLY WITH THE

21  SHERIFFS AND POLICE CHIEFS, THE PROSECUTORS, THE GOVERNOR'S

22  CRIMINAL JUSTICE DIVISION IN THE DEPARTMENT OF CORRECTIONS AND

23  THE ATTORNEY GENERAL'S OFFICE.

24  **Q.**  THAT INTERDISCIPLINARY GROUP DID NOT PERFORM AN EMPIRICAL

25  STUDY, DID IT?

1  **A.**  NO, IT DID NOT, BUT EVERYBODY -- EVERYBODY IN THAT GROUP

2  AGREED THAT THE SYSTEM WAS WORKING.  WHICH, BY THE WAY, I THINK

3  WAS SUBSEQUENTLY BEARED OUT BY THE REPORTS OF THE WASHINGTON

4  STATE INSTITUTE FOR PUBLIC POLICY.

5  **Q.**  ON PAGE EIGHT, PARAGRAPH 17 OF YOUR REPORT YOU CITE TO A

6  REPORT BY THE WASHINGTON STATE INSTITUTE FOR PUBLIC POLICY

7  ENTITLED "EVIDENCE BASED PUBLIC POLICY OPTIONS TO REDUCE FUTURE

8  PRISON CONSTRUCTION, CRIMINAL JUSTICE COSTS AND CRIME RATES,"

9  PUBLISHED IN OCTOBER, 2006?

10  **A.**  THAT'S CORRECT.

11  **Q.**  YOU WERE SECRETARY FOR WASHINGTON STATE WHEN THIS REPORT WAS

12  BEING PREPARED, CORRECT?

13  **A.**  NO, I WAS NOT -- OH, WHEN IT WAS BEING PREPARED?  YES, I'M

14  SORRY.

15  **Q.**  IN YOUR REPORT YOU STATE THAT:

16          "THE REPORT NOTED MANY PROGRAMS THAT CAN BE

17           INSTITUTED IN THE COMMUNITY AND IN PRISON THAT

18           EFFECTIVELY REDUCE RECIDIVISM, SOME BY AS MUCH

19           AS 18 TO 20 PERCENT, THEREBY LOWERING THE PRISON

20           POPULATION AND THE COST OF PUNISHMENT."

21          BUT IN THIS REPORT THAT YOU CITE, THE OCTOBER 2006

22  REPORT, THE WASHINGTON STATE INSTITUTE FOR PUBLIC POLICY WAS

23  FOCUSED ON KEEPING THE WASHINGTON STATE PRISON POPULATION FROM

24  GROWING MORE, NOT REDUCING THE NUMBER OF PEOPLE INCARCERATED IN

25  WASHINGTON STATE AT THE TIME, CORRECT?

 1  **A.**  AT THAT TIME, YES.

 2          **MS. JOHNSON:**  WE HAVE A COPY OF THAT REPORT.  I'M

 3  GOING TO PROVIDE IT TO YOUR HONORS.

 4                  (WHEREUPON, DOCUMENT WAS TENDERED

 5                   TO THE COURTS.)

 6          **MS. JOHNSON:**  AND IF I MAY APPROACH THE WITNESS?

 7          **JUDGE HENDERSON:**  YOU MAY.

 8          **JUDGE KARLTON:**  IS THE REPORT IN EVIDENCE?

 9          **MS. JOHNSON:**  IT IS NOT YET.

10          **THE COURT:**  DO YOU PROPOSE TO HAVE IT MARKED, MA'AM.

11          **MS. JOHNSON:**  THIS IS TO BE DEFENDANT'S 1331.  (

12                  (DEFENDANTS' EXHIBIT 1331 MARKED FOR

13                   IDENTIFICATION)

14          **JUDGE HENDERSON:**  DEFENDANTS WHAT?  13--

15          **MS. JOHNSON:**  31.

16          **JUDGE HENDERSON:**  FOR IDENTIFICATION.

17  BY MS. JOHNSON:

18  **Q.**  I'M GOING TO TRY A NEW TECHNOLOGY HERE.  OLD TECHNOLOGY, BUT

19  --

20          **JUDGE KARLTON:**  BEFORE YOU DO THAT, IS THIS THE

21  DOCUMENT THAT YOU HAVE BEEN REFERRING TO IN YOUR REPORT?

22          **THE WITNESS:**  THE ONE WHICH WAS REFERRED TO -- THAT

23  THE COUNSEL JUST REFERRED TO, YES.

24          **JUDGE KARLTON:**  DO YOU WANT TO MOVE IT INTO EVIDENCE?

25          **MS. JOHNSON:**  I DON'T WANT TO MOVE THE ENTIRE

1  DOCUMENT INTO EVIDENCE, YOUR HONOR.  WE ARE GOING TO LOOK AT A

2  COUPLE OF ITEMS ON IT.

3         **JUDGE KARLTON:**  THE RULE OF THE ENTIRETY SAYS THAT IF

4  YOU ARE GOING TO MOVE PARTS IN, YOU'RE GOING TO MOVE IT ALL IN.

5  NOW, WHAT DO YOU WANT TO DO?  I DON'T CARE.

6         **MS. JOHNSON:**  OKAY.  I WILL MOVE THE WHOLE DOCUMENT

7  INTO EVIDENCE THEN, YOUR HONOR.

8         **JUDGE KARLTON:**  RECEIVED.

9         **JUDGE HENDERSON:**  OKAY.  31 WILL BE ADMITTED AT THIS

10 TIME.

11                   (DEFENDANTS' EXHIBIT 1331 RECEIVED IN

12                   EVIDENCE)

13        **JUDGE KARLTON:**  FOR RULE OF COMPLETENESS, I'M SORRY.

14                   (DOCUMENT DISPLAYED)

15 **BY MS. JOHNSON:**

16 **Q.**  OKAY.  IF YOU LOOK AT THE PARAGRAPH THERE IN THE SIDEBAR

17 THAT STARTS "TO GAUGE."

18 **A.**  TO GAUGE, YES.

19 **Q.**  IT STATES:

20             "TO GAUGE THE EFFECT PRISON HAS ON CRIME

21             RATES.  WE UPDATED OUR ECONOMETRIC STUDY ON HOW

22             STATE INCARCERATION RATES AFFECT COUNTY CRIME

23             RATES IN WASHINGTON.  WE ESTIMATED A FIXED

24             EFFECTS MODEL WITH COUNTY LEVEL PANEL DATA FROM

25             1982 TO 2004, CONTROLLING FOR CHANGES IN POLICE

1          LEVELS, LOCAL JAIL RATES, THE ECONOMY, AGE AND

2          ETHNIC DEMOGRAPHICS, POPULATION DENSITY, CRIME

3          REPORTING RATES, AND COUNTY FIXED EFFECTS.

4               "WE FOUND THAT A 10 PERCENT INCREASE OR

5          DECREASE IN THE INCARCERATION RATE LEADS TO A

6          STATISTICALLY SIGNIFICANT 3.3 PERCENT DECREASE

7          OR INCREASE IN CRIME RATES."

8          WHEN YOU FORMED YOUR OPINIONS REGARDING THE

9   POSSIBILITY OF A SAFE REDUCTION OF CALIFORNIA'S PRISON

10  POPULATION, WERE YOU AWARE OF THIS CONCLUSION BY THE WASHINGTON

11  STATE INSTITUTE FOR PUBLIC POLICY?

12  **A.**  YES, I WAS.

13  **Q.**  WERE YOU AWARE THAT THE WASHINGTON STATE INSTITUTE FOR

14  PUBLIC POLICY STATED THAT AS OF 2006, WASHINGTON'S PRISON

15  INCARCERATION RATE STANDS AT ABOUT SIX ADULT INCARCERATED PER

16  1,000?

17  **A.**  THAT'S CORRECT.  THE REPORT ALSO SAID THAT THEY HAD GONE

18  BEYOND THE POINT OF EFFECTIVENESS.  THERE WERE DIMINISHING

19  RETURNS.

20          **JUDGE KARLTON:**  I'M SORRY.  WHAT?

21          **THE WITNESS:**  IN FACT, THE INSTITUTE TESTIFIED IN

22  WASHINGTON BEFORE A LEGISLATURE BASICALLY SAYING, YES, THE

23  DEPARTMENT HAS, IN FACT, INCARCERATED MORE PEOPLE, BUT AS THIS

24  REPORT DEMONSTRATES, THERE IS A POINT IN WHICH YOU INCARCERATE

25  MORE AND MORE PEOPLE WHEN YOU ARE ACTUALLY GETTING DIMINISHING

1  RETURNS FROM THAT INVESTMENT.  AND THAT WAS THE POINT OF THEIR

2  REPORT AND TESTIMONY IN WASHINGTON.

3          **JUDGE KARLTON:**  SO THE -- YOU ARE SAYING THAT THE

4  STUDY FOUND THAT INCREASING INCARCERATION WAS HAVING AN ADVERSE

5  EFFECT -- AND I'M ASKING YOU.  I'M NOT TELLING YOU.  I'M NOT

6  SURE I KNOW WHAT YOU ARE --

7          **THE WITNESS:**  ACTUALLY, THE RESEARCHER WAS SAYING

8  THAT AN INCREASE IN INCARCERATION OF 10 PERCENT ACTUALLY REDUCED

9  CRIME.  BUT THEY SAID GOING BEYOND THAT, THERE IS DIMINISHING

10 RETURNS.  YOU DON'T GET THE SAME RETURNS RELATIVE TO THAT

11 INVESTMENT.

12         **JUDGE KARLTON:**  BUT YOU STILL GET SOME BENEFIT.

13         **THE WITNESS:**  YOU GET SOME BENEFIT, BUT THE ACTUAL

14 TESTIMONY OF THE INSTITUTE BEFORE THE WASHINGTON STATE

15 LEGISLATURE IS THAT WASHINGTON HAD GONE BEYOND THAT POINT IN

16 THAT IT WAS NOT COST EFFECTIVE TO BE INCARCERATING MORE PEOPLE.

17 THAT'S WHAT THEIR TESTIMONY WAS.

18         **JUDGE KARLTON:**  I RECOGNIZE THAT WE HAVE A PROBLEM,

19 WHICH IS DIFFERENT THAN WHAT YOU ARE TALKING ABOUT.  WE HAVE AN

20 OBLIGATION TO TAKE INTO ACCOUNT PUBLIC SAFETY.

21         EVEN IF THERE IS A DIMINISHED RETURN, WAS THERE A

22 CONTINUED BENEFICIAL RETURN, HOWEVER DIMINISHED IT WAS, FROM

23 INCARCERATING PEOPLE?

24         **THE WITNESS:**  YES, BUT THE OTHER -- THE POINT OF THE

25 REPORT, I THINK AS ITS TITLE SAYS, IS THAT EVIDENCE BASED PUBLIC

1   POLICY OPTIONS DO REDUCE THE NEEDS FOR FUTURE CONSTRUCTION.

2           SO THE POINT OF THE REPORT WAS TO LOOK AT THE

3   EVIDENCE BASED PROGRAMS ON A NATIONAL BASIS TO SEE WHICH REDUCED

4   RECIDIVISM, SUGGESTING TO CERTAINLY WASHINGTON AT THAT POINT IN

5   TIME, THAT IF THEY WERE TO USE THESE PROGRAMS, THEY WOULD LIKELY

6   REDUCE RECIDIVISM AND REDUCE INCARCERATION.

7   **BY MS. JOHNSON:**

8   **Q.**  SO WASHINGTON PRISON'S INCARCERATION RATE WAS ABOUT SIX

9   ADULTS INCARCERATED PER 1,000.  THAT'S THE SAME AS ABOUT 600 PER

10  100,000, CORRECT?

11  **A.**  I'M NOT A STATISTICIAN, BUT GO AHEAD.

12  **Q.**  IS THAT A YES?

13  **A.**  I'M NOT SURE.

14  **Q.**  SIX PER 1,000 IS THE SAME AS 600 PER 100,000.

15  **A.**  OKAY.

16  **Q.**  IF YOU SCALE IT UP, RIGHT?

17  **A.**  OKAY.

18  **Q.**  OKAY.  ARE YOU AWARE THAT CALIFORNIA'S INCARCERATION RATE IS

19  ABOUT 475 PER 100,000 RESIDENTS OR EVEN LESS?

20  **A.**  I THINK I WAS AWARE OF THAT, YES.

21  **Q.**  ARE YOU AWARE THAT PLAINTIFFS' PROPOSE A REDUCTION OF

22  CALIFORNIA'S PRISON POPULATION OF ABOUT 52,000 OVER TWO YEARS?

23  **A.**  YES.

24  **Q.**  ARE YOU AWARE THAT SUCH A REDUCTION IN THE PRISON POPULATION

25  IN CALIFORNIA WOULD RESULT IN ABOUT A 30 PERCENT REDUCTION IN

1  CALIFORNIA'S INCARCERATION RATE?

2  **A.**  I WOULD HOPE SO.

3  **Q.**  ON PAGE SEVEN AT PARAGRAPH 14 OF YOUR REPORT YOU WROTE:

4              "IN WASHINGTON STATE PAROLE WAS ABOLISHED IN

5              1984 AND THE LAW WAS CHANGED SO THAT OFFENDERS

6              COULD NOT BE SENT TO PRISON FOR PROBATION

7              VIOLATIONS.

8              "AND THEN FROM 1984 TO 1986 THE COURT MADE

9              CERTAIN CHANGES TO THE SENTENCING LAWS

10             RETROACTIVE AND INCREASED THE AMOUNT OF CREDITS

11             THAT PRISONERS WERE ENTITLED TO, CREATING A

12             SITUATION THAT CAUSED PRISONERS TO BE RELEASED

13             EARLY IN A RELATIVELY SHORT PERIOD OF TIME.

14             THIS EARLY RELEASE DID NOT HAVE ANY SIGNIFICANT

15             IMPACT ON THE CRIME RATE OR THE RATE OF

16             RECIDIVISM."

17  **A.**  THAT'S CORRECT.

18  **Q.**  WHEN THESE REFORMS WERE IMPLEMENTED, YOU WERE A COMMAND

19  MANAGER FOR A CLUSTER OF PRISONS IN THE MONROE AREA OF

20  WASHINGTON STATE, IS THAT CORRECT?

21  **A.**  THAT'S CORRECT.

22  **Q.**  YOU WERE NOT RESPONSIBLE IN ANY WAY FOR STUDYING THE EFFECTS

23  OF THE POLICY CHANGES REFERRED TO IN PARAGRAPH 14 OF YOUR

24  REPORT, WERE YOU?

25  **A.**  NO, I WAS NOT.

1  Q.  WHEN YOU PREPARED YOUR REPORT, YOU HAD NOT REVIEWED ANY DATA

2  THAT SUPPORTS THE RESULTS OF THE 20-YEAR -- 20-YEAR-OLD POLICY

3  CHANGE YOU DESCRIBED IN WASHINGTON STATE, HAD YOU?

4  A.  NO.  BUT I WAS AWARE OF THE -- I GUESS I'M NOT UNDERSTANDING

5  YOUR QUESTION.  I MEAN, I WAS AWARE OF WHAT HAPPENED.

6  Q.  YOU WROTE YOUR REPORT 20 YEARS LATER, RIGHT?

7  A.  RIGHT.

8  Q.  AND YOU HADN'T REVIEWED ANY DATA TO SUPPORT WHAT YOU STATED

9  IN YOUR REPORT.

10        AROUND THE TIME YOU WROTE YOUR REPORT, YOU HADN'T

11  REVIEWED ANY DATA --

12  A.  NO.  OTHER THAN TALKING TO PEOPLE IN THE SYSTEM, YES.

13  Q.  YOUR STATEMENT ABOUT THE RESULTS OF THE 20-YEAR-OLD POLICY

14  CHANGE IN WASHINGTON STATE WAS ALL FROM MEMORY, CORRECT?

15  A.  AND DISCUSSIONS WITH PEOPLE, YES.

16  Q.  YOU DO NOT KNOW -- LET ME REPHRASE THAT.

17        AT THE TIME YOU WROTE YOUR REPORT YOU DID NOT KNOW

18  HOW MANY ADULT PRISONERS THERE WERE IN THE WASHINGTON STATE

19  SYSTEM IN 1984, DID YOU?

20  A.  SPECIFICALLY, NO.

21  Q.  AT THE TIME YOU WROTE YOUR REPORT, YOU DID NOT KNOW, OF

22  THOSE PRISONERS, HOW MANY WERE RELEASED EARLY UNDER THE POLICIES

23  YOU DESCRIBE IN PARAGRAPH 14, DID YOU?

24  A.  IN TERMS OF QUANTITATIVE TERMS, NO.

25  Q.  AND AT THE TIME YOU WROTE YOUR REPORT, YOU DID NOT KNOW WHAT

1    DEMOGRAPHIC MAKEUP OF THE ADULT PRISON POPULATION OF WASHINGTON

2    STATE WAS IN 1984, DID YOU?

3    **A.**  ONLY IN GENERAL TERMS.

4              **JUDGE REINHARDT:**  I THINK HE ANSWERED THAT QUESTION

5    BEFORE, DIDN'T HE, ABOUT THE DEMOGRAPHIC POPULATION?

6              **MS. JOHNSON:**  WE'RE DEALING WITH DIFFERENT TIME

7    PERIODS, YOUR HONOR.  HE WAS SECRETARY OF WASHINGTON MUCH MORE

8    RECENTLY THAN AT THE TIME THAT THIS POLICY CHANGE THAT OCCURRED

9    20 YEARS BEFORE.  SO.

10             PREVIOUSLY WE HAD ESTABLISHED THAT HE DOESN'T KNOW

11   DURING THE TIME PERIOD HE WAS SECRETARY HOW THAT COMPARES.  THIS

12   IS 20 YEARS BEFORE.

13             **JUDGE REINHARDT:**  OKAY.

14   **BY MS. JOHNSON:**

15   **Q.**  OKAY.

16   **A.**  IN THE 19 YEARS WHEN THAT WAS OCCURRING, IT WAS WHEN THE

17   STATE WENT FROM AN INDETERMINATE SENTENCING SYSTEM TO A

18   DETERMINATE SENTENCING SYSTEM.

19             THE INITIAL RESULT OF THAT WAS A SIGNIFICANT

20   REDUCTION IN PRISON COMMITMENTS.

21   **Q.**  AT THE TIME YOU WROTE YOUR REPORT, YOU DID NOT KNOW IF THERE

22   WERE ANY DIFFERENCES IN THE MAKEUP OF THE CURRENT ADULT PRISON

23   POPULATION IN CALIFORNIA AND THE ADULT PRISON POPULATION OF

24   WASHINGTON STATE IN 1984, DID YOU?

25   **A.**  NOT IN 1984.

1  Q.  ON PAGE SEVEN, PARAGRAPH 13 OF YOUR REPORT YOU WROTE:

2              "THE EXPERT PANEL REPORT ALSO RECOMMENDED

3         THAT THE PRISON POPULATION BE REDUCED THROUGH

4         THE MORE AGGRESSIVE USE OF IN-PRISON CREDITS,

5         THE EARLY DISCHARGE OF SOME PAROLEES, AND THE

6         SELECTIVE USE OF PAROLE FOR ONLY CERTAIN

7         OFFENDERS.  THE PANEL FOUND, AND I CONCUR, THAT

8         IF IMPLEMENTED PROPERLY, THESE MEASURES WOULD

9         REDUCE THE PRISON POPULATION WITHOUT ANY

10        SIGNIFICANT ADVERSE EFFECT ON CRIME IN THE

11        COMMUNITY."

12        WHEN YOU SAY THAT IF IMPLEMENTED PROPERLY IT IS NOT

13 GOING TO HAVE A SIGNIFICANT ADVERSE EFFECT, SUGGESTS THAT IT

14 COULD, IF IMPLEMENTED IMPROPERLY, HAVE A SIGNIFICANT ADVERSE

15 EFFECT, CORRECT?

16 A.  WELL, THE ASSUMPTION "PROPERLY" ASSUMES THAT, IN FACT, YOU

17 HAVE A DEFINED POLICY AND PROCEDURES THAT IS IMPLEMENTED

18 APPROPRIATELY; THAT IS, IN FACT, MONITORED TO ASSURE THAT IT'S

19 IMPLEMENTED APPROPRIATELY.

20        I THINK THAT'S BASIC BUSINESS IN TERMS OF

21 CORRECTIONS.  YES.  AND I THINK IF PROPERLY IMPLEMENTED, IT HAS

22 THOSE POTENTIAL EFFECTS.

23 Q.  AND IF NOT PROPERLY IMPLEMENTED, IT COULD HAVE ADVERSE

24 EFFECTS?

25 A.  THAT'S TRUE IN LIFE.  IN ANYTHING.

1              **JUDGE REINHARDT:**  ANYTHING IS POSSIBLE.

2              **THE WITNESS:**  YES.  ANYTHING IS POSSIBLE.

3              **JUDGE KARLTON:**  ALMOST ANYTHING IS POSSIBLE SEVERAL

4    TIMES.

5    **BY MS. JOHNSON:**

6    **Q.**  WHEN YOU WROTE THAT, "IF IMPLEMENTED PROPERLY, THESE

7    MEASURES WOULD REDUCE THE PRISON POPULATION WITHOUT ANY

8    SIGNIFICANT ADVERSE EFFECT ON CRIME IN THE COMMUNITY," BY

9    "SIGNIFICANT," YOU MEANT STATISTICALLY SIGNIFICANT, CORRECT.

10   **A.**  YES.

11   **Q.**  WHEN YOU WROTE THAT STATEMENT, YOU COULD NOT DEFINE THE

12   MEANING OF "STATISTICAL SIGNIFICANCE," COULD YOU?

13   **A.**  NO.  AND, ACTUALLY, I WOULD TURN TO SOMEBODY LIKE JIM

14   AUSTIN, WHO IS A STATISTICIAN AND RESEARCHER AND ASK JIM, YOU

15   KNOW, HOW DO YOU DETERMINE THIS AND HOW DO WE MEASURE IT?

16   **Q.**  YOU BELIEVE THAT THERE IS PROBABLY A DIFFERENCE BETWEEN

17   SAYING NO SIGNIFICANT ADVERSE EFFECT AND SAYING NO ADVERSE

18   EFFECT, CORRECT?

19   **A.**  I DON'T KNOW WHAT NO ADVERSE EFFECT IS.  THE FACT IS, WE

20   IMPLEMENTED THESE POLICIES.  THEY WORKED.  IT WAS THE CONSENSUS

21   OF THE PEOPLE THAT IMPLEMENTED THEM, INCLUDING PROSECUTORS AND

22   SHERIFFS.

23              I DON'T KNOW WHAT "ADVERSE" MEANS IN THAT CONTEXT.

24   IT WORKED.  THAT'S ALL I CAN SAY.

25              **MS. JOHNSON:**  CAN WE HAVE PAGE 110, LINES 3 THROUGH 6

1  OF HIS DEPOSITION TESTIMONY, PLEASE?

2                    (DOCUMENT DISPLAYED)

3  **Q.**  (READING)

4            **"QUESTION:**IS THERE A DIFFERENCE BETWEEN ANY

5            SIGNIFICANT ADVERSE EFFECT AND NO ADVERSE

6            EFFECT?

7            **"ANSWER:**THERE PROBABLY IS."

8  **A.**  YEAH.  I -- ONCE AGAIN, ALL I CAN SAY IS I DON'T KNOW WHAT

9  "NO ADVERSE EFFECT" MEANS.  I KNOW WHAT I DID.  I KNOW HOW WE

10  MEASURED.  I KNOW WHAT THE CONSENSUS WAS OF THE PEOPLE IN THE

11  SYSTEM.  AND IT WORKED.  THAT'S ALL I CAN SAY.

12  **Q.**  YOU DID NOT MAKE AN ASSESSMENT OF THE NUMBER OF PRISONERS BY

13  WHICH CALIFORNIA NEEDS TO REDUCE ITS PRISON POPULATION TO

14  RESOLVE THE OVERCROWDING CRISIS, DID YOU?

15  **A.**  I DIDN'T PERSONALLY, BUT I KNOW OTHERS HAVE.

16  **Q.**  YOU HAVE NEVER BEEN INVOLVED WITH A STATE PRISON SYSTEM THAT

17  ATTEMPTED TO REDUCE ITS PRISON POPULATION BY OVER 50,000

18  PRISONERS WITHIN A TWO-YEAR PERIOD, HAVE YOU?

19  **A.**  NO, I HAVE NOT.

20            **THE CLERK:**  FIVE MINUTES, COUNSEL.

21  **BY MS. JOHNSON:**

22  **Q.**  WHEN CONCLUDING THAT THE SENTENCING GUIDELINES YOU WOULD

23  RECOMMEND CALIFORNIA IMPLEMENT WOULD NOT HAVE A NEGATIVE IMPACT

24  ON PUBLIC SAFETY, YOU CANNOT SPEAK IN TERMS OF A GUARANTEE, CAN

25  YOU?

1 **A.**  NOBODY CAN SPEAK IN A GUARANTEE.  I'M TALKING ABOUT IF YOU

2 IMPLEMENT IT IN A RATIONAL, THOUGHTFUL WAY USING RISK

3 ASSESSMENTS, THAT YOU WILL, IN FACT, HAVE THE POSITIVE EFFECTS

4 THAT YOU WANT TO HAVE.  WHAT ELSE CAN I SAY?

5         **MS. JOHNSON:**  NO FURTHER QUESTIONS.

6         **THE COURT:**  INTERVENORS?

7         **MS. WANG:**  TERESA WANG FOR THE DEFENDANT INTERVENORS.

8         **JUDGE KARLTON:**  I'M SORRY.  I DIDN'T GET THE NAME.

9         **MS. WANG:**  TERESA WANG.

10                 **DIRECT EXAMINATION**

11 **BY MS. WANG:**

12 **Q.**  HOW ARE YOU, MR. LEHMAN?  JUST A COUPLE QUESTIONS.

13         YOU MENTIONED THE REFORM ENACTED IN WASHINGTON STATE

14 AND PENNSYLVANIA STATE AND MAINE WHILE YOU WERE -- SORRY.

15         YOU DISCUSSED IN YOUR REPORT THE REFORMS ENACTED IN

16 WASHINGTON, PENNSYLVANIA AND MAINE, CORRECT?

17 **A.**  PREDOMINANTLY PENNSYLVANIA AND WASHINGTON, YES.

18 **Q.**  PREDOMINANTLY PENNSYLVANIA AND WASHING.  AND NONE OF THE

19 REFORMS THAT WERE ENACTED IN THOSE STATES WERE ENACTED IN AN

20 ATTEMPT TO ADDRESS MEDICAL AND MENTAL HEALTHCARE DEFICIENCIES IN

21 THOSE SYSTEMS, WERE THEY?

22 **A.**  THEY WEREN'T DONE SPECIFICALLY FOR THAT, BUT CERTAINLY IN

23 PENNSYLVANIA THERE WAS AN ATTEMPT TO ADDRESS ISSUES RELATIVE TO

24 MENTAL HEALTH AND MEDICAL TREATMENT IN THE PRISON SYSTEM, ALONG

25 WITH THE -- THE CHANGES WITHIN THE PRISON SYSTEM.

1    Q.  AND IN PENNSYLVANIA, THERE WAS A LAWSUIT BROUGHT AGAINST

2    THAT SYSTEM FOR INADEQUACIES IN MENTAL HEALTH CARE?

3    A.  THIS WAS A LAWSUIT, YES.

4    Q.  I THINK YOU DISCUSSED THIS THE FIRST TIME AROUND IN PHASE

5    ONE.

6    A.  RIGHT.

7    Q.  AS A RESULT OF THE SETTLEMENT REACHED IN THAT LAWSUIT, NO

8    PRISONERS WERE RELEASED EARLY FROM THE PENNSYLVANIA SYSTEM OF

9    CORRECTIONS, IS THAT CORRECT?

10   A.  YES.  THAT WAS NOT -- THAT WAS NOT THE ISSUE THAT WAS BEING

11   ADDRESSED BY THE LAWSUIT.

12   Q.  SO THE PENNSYLVANIA CORRECTIONAL SYSTEM WAS ABLE TO ADDRESS

13   THE INADEQUACIES IN MEDICAL AND MENTAL HEALTH CARE THROUGH, I

14   BELIEVE IT WAS --

15            JUDGE KARLTON:  OTHER MEANS.

16   BY MS. WANG:

17   Q.  OTHER MEANS, INCLUDING TRANSFER OF 800 PRISONERS TO THE

18   FEDERAL PRISON SYSTEM, REFORMING AND REBUILDING MEDICAL

19   BUILDINGS IN THE PENNSYLVANIA CORRECTION SYSTEM, IS THAT

20   CORRECT?

21   A.  AND CREATING A CENTRALIZED MANAGEMENT SYSTEM FOR MENTAL

22   HEALTH AND HEALTHCARE.

23   Q.  BUT NOT A PRISONER RELEASE ORDER?

24   A.  RIGHT.

25   Q.  OKAY.  THANK YOU.  NO FURTHER QUESTIONS.

1      **THE COURT:**  REDIRECT?

2      **MR. SPECTER:**  NO, YOUR HONOR.

3      **THE COURT:**  OKAY.  THANK YOU FOR TESTIFYING, DOCTOR.

4  YOU ARE EXCUSED.

5                    (WITNESS EXCUSED.)

6      **JUDGE HENDERSON:**  CALL YOUR NEXT WITNESS.

7                    (BRIEF PAUSE.)

8      **MS. BARLOW:**  DEFENDANT INTERVENORS CALL RICHARD

9  CONKLIN.

10                    **RICHARD CONKLIN,**

11  CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

12  DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

13      **THE WITNESS:**  RICHARD CONKLIN, CONKLIN.

14                    **DIRECT EXAMINATION**

15  BY MS. BARLOW:

16  Q.  GOOD AFTERNOON, MR. CONKLIN.

17      **MR. SANGSTER:**  WOULD YOU PLEASE SPEAK INTO THE

18  MICROPHONE, PLEASE?

19      **THE WITNESS:**  I WILL TRY.

20  BY MS. BARLOW:

21  Q.  MR. CONKLIN, COULD YOU STATE YOUR JOB TITLE, PLEASE?

22  A.  IT'S DETENTIONS CHIEF, LICENSED MENTAL HEALTH CLINICS FOR

23  THE SAN DIEGO SHERIFF'S DEPARTMENT.

24      **MS. BARLOW:**  ALL RIGHT.  FOR THE COURT'S EDIFICATION,

25  MR. CONKLIN'S BACKGROUND AND EDUCATION AND EXPERIENCE IS

1  DESCRIBED IN GREAT DETAIL IN HIS DECLARATION, PARAGRAPHS 1

2  THROUGH 14.

3  **BY MS. BARLOW:**

4  **Q.**  COULD YOU JUST SUMMARIZE FOR THE COURT, MR. CONKLIN, THOSE,

5  YOUR BACKGROUND AND EXPERIENCE?

6  **A.**  YES.  I BEGAN MY CAREER IN THE MID-70'S AS A CHILD AND

7  ADOLESCENT PSYCHOTHERAPISTS AT CHILDREN'S HOSPITAL IN SAN DIEGO,

8  AND OVER THE YEARS MOVED INTO SUPERVISION AND ADMINISTRATION,

9  AND WHILE I WAS THERE DID A NUMBER OF CONTRACT MENTAL HEALTH

10  PROGRAMS WITH SAN DIEGO COUNTY AND EITHER WROTE OR WAS INVOLVED

11  IN WRITING AND IMPLEMENTING OF A NUMBER OF GRANTS, SCHOOL-BASED

12  PROGRAMS AND MULTI-DISCIPLINARY TREATMENT TEAMS AT SCHOOLS.

13          I LEFT CHILDREN'S HOSPITAL IN 1993 AND WAS A PROGRAM

14  ADMINISTRATOR FOR A PARTIAL HOSPITAL PROGRAM IN THE BAY AREA FOR

15  A YEAR.

16          I THEN RETURNED TO SAN DIEGO AS CHIEF OF SOCIAL WORK

17  FOR THE CHILD AND ADOLESCENT PSYCHIATRIC HOSPITAL AT U.C.S.D.

18          FOLLOWING A YEAR THERE, I MOVED TO SCRIPPS MEMORIAL

19  HOSPITAL, WHERE I WAS THE DIRECTOR OF THE BEHAVIORAL HEALTHCARE

20  CENTER, WHICH INVOLVED ADMINISTERING A 30 BED LPS PSYCHIATRIC

21  HOSPITAL, CO-DIRECTING THE MACDONALD RECOVERY CENTER,

22  SUPERVISING A CONTRACT FOR A PARTIAL HOSPITAL PROGRAM AND

23  DESIGNING AND IMPLEMENTING AN ADOLESCENT DRUG TREATMENT PROGRAM,

24  OUTPATIENT DRUG TREATMENT PROGRAM.

25          I LEFT THAT POSITION, JOINED COUNTY MENTAL HEALTH

1 WORKING IN THE JAILS SINCE 1996 AS A SENIOR PSYCHIATRIC SOCIAL

2 WORKER.  AND IN 1999 WHEN THE SHERIFF'S DEPARTMENT TOOK OVER

3 RESPONSIBILITY FOR THOSE MENTAL HEALTH PROGRAMS, CAME TO WORK

4 FOR THE SHERIFF'S DEPARTMENT, WAS PROMOTED TO CHIEF SHORTLY

5 THEREAFTER.

6          DURING THAT TIME, I WAS A CLINICAL DIRECTOR FOR THE

7 MENTALLY ILL OFFENDER CRIME REDUCTION INITIALLY AND THEN PROGRAM

8 DIRECTOR FOR THAT, AND THEN LATER WROTE A GRANT FOR A FEDERAL

9 LIFE SKILLS PROGRAM IN THE JAIL.

10          FOR THREE YEARS I SUPERVISED THE CORRECTIONAL

11 COUNSELING PROGRAMS IN THE SEVEN JAIL SYSTEM, AS WELL AS THE

12 MENTAL HEALTH PROGRAMS.

13          AND THEN IN 2006 RETURNED TO THE MEDICAL SERVICES

14 DEPARTMENT, WHERE I WROTE ANOTHER GRANT FOR A MENTALLY ILL

15 OFFENDER CRIME REDUCTION PROGRAM, WHICH WE WERE AWARDED.

16 PARTICIPATED ON AN EXECUTIVE STEERING COMMITTEE TO DESIGN THE

17 SELECTION CRITERIA AND PARTICIPATED AS A MEMBER OF THE GRANT

18 READERS TO AWARD THE 21 WARDS THAT WERE AWARDED IN THAT YEAR,

19 AND PRESENTLY SERVE AS THE SUBJECT MATTER EXPERT AND STAFF

20 SUPPORT FOR SHERIFF COLANDER IN HIS ROLE AS A COMMISSIONER ON

21 THE OVERSIGHT AND ACCOUNTABILITY COMMISSION OVERSEEING THE

22 IMPLEMENTATION OF THE MENTAL HEALTH SERVICES ACT.

23 Q.  THANK YOU.

24          I WOULD LIKE TO TALK ABOUT SOME OF THE ALTERNATIVES

25 YOU REFERRED TO IN YOUR DECLARATION.  THE FIRST THAT YOU MENTION

1  IS IN PARAGRAPHS 15 AND 16, THE IMPORTANCE OF GETTING BENEFITS

2  IN PLACE PRIOR TO RELEASE FROM JAIL OR A PRISON FACILITY.  WHAT

3  DOES THAT ENTAIL EXACTLY?

4  **A.**  IT ENTAILS THE ABILITY TO GET PEOPLE WHO MEET THE CRITERIA,

5  THE ELIGIBILITY CRITERIA FOR SOCIAL SECURITY BENEFITS, SOCIAL

6  SECURITY DISABILITY BENEFITS AND SO ON, SO THEY CAN OBTAIN

7  FUNDING TO MAINTAIN BASICALLY THEIR ACTIVITIES OF DAILY LIVING,

8  FOOD, CLOTHING AND SHELTER ONCE THEY ARE RELEASED FROM CUSTODY.

9          IN ADDITION, ONE OF THE OTHER MAJOR CHALLENGES IS

10  GETTING IDENTIFICATION.  IT'S VERY, VERY DIFFICULT AND ALMOST

11  IMPOSSIBLE FOR A RELEASED INMATE TO FIND LODGING OR DO ANY OTHER

12  KIND OF BUSINESS WITHOUT A VALID IDENTIFICATION.

13          BECAUSE THE FEDERAL SOCIAL SECURITY ADMINISTRATION

14  DOESN'T ACCEPT APPLICATIONS, EXCEPT VERY PRELIMINARY

15  APPLICATIONS WHEN SOMEONE IS IN JAIL, AND BECAUSE OF THE SHORT

16  DURATION OF TIME THAT PEOPLE ARE IN JAIL, WE ARE NOT SUCCESSFUL

17  AT ALL IN GETTING BENEFITS IN PLACE PRIOR TO SOMEONE LEAVING

18  JAIL.

19          SIMILARLY WITH THE DEPARTMENT OF MOTOR VEHICLES.

20  THEY HAVE DECLINED TO ACCEPT ANY VERIFICATION OF IDENTITY FROM

21  THE SHERIFF'S DEPARTMENT AND, THEREFORE, PEOPLE WHO LOSE THEIR

22  IDENTIFICATION -- WHICH HAPPENS FAIRLY FREQUENTLY WITH SERIOUSLY

23  AND PERSISTENTLY MENTALLY ILL WHO ARE HOMELESS, THEY LOSE THEIR

24  BELONGINGS -- THEN THEY, AGAIN, ARE OUT ON THE STREET WITHOUT

25  THE ABILITY TO BASICALLY DO BASIC DAILY LIVING BUSINESS.

1   Q.  NOW, ARE YOU FAMILIAR WITH THE PROGRAMS THAT PROVIDE FOR

2   THAT VERY KIND OF SERVICE IN STATE PRISONS?

3   A.  I HAVE SEEN SOME PILOT PROGRAMS.  I WITNESSED A PILOT

4   PROGRAM AT THE DONOVAN PRISON A FEW YEARS AGO IN SAN DIEGO.

5   AND, OF COURSE, WE ARE DOING THAT WITH THE CENTRAL 618 REENTRY

6   PROGRAM THAT'S PART OF THE INITIATIVE IN SAN DIEGO COUNTY.

7   Q.  IF IT'S NOT BEEN SUCCESSFUL FOR YOU AT THE COUNTY LEVEL, WHY

8   WOULD IT BE SUCCESSFUL FOR YOU AT THE STATE PRISON LEVEL?

9   A.  WELL, THE MAIN ISSUE IS GETTING ENOUGH RECORDS AND HAVING

10  ENOUGH TIME TO TRANSACT BUSINESS WITH THOSE INSTITUTIONS.

11          AND IN ADDITION TO THAT, PROGRAMS SUCH AS THE ONES

12  THAT I WITNESSED AT THE STATE PRISON AND OUR 618 PROGRAM HAS

13  FUNDING AVAILABLE TO IT.  SO THE FUNDS ARE NOT AVAILABLE IN A

14  LOCAL JAIL SYSTEM TO OBTAIN BIRTH CERTIFICATES.  AND THE

15  DURATION OF TIME IS SO SHORT, THAT VERY SELDOM IS THERE TIME TO

16  CONTACT OTHER STATES, OBTAIN BIRTH RECORDS AND SO ON.

17  Q.  TO YOUR KNOWLEDGE, WOULD THERE HAVE TO BE SIGNIFICANT

18  CHANGES IN INFRASTRUCTURE INFORMATION GATHERING TOOLS IN PRISON

19  TO IMPLEMENT A PROGRAM THAT COULD PROVIDE THAT SERVICE TO PRISON

20  INMATES LEAVING CUSTODY?

21  A.  NOT TO MY KNOWLEDGE.  I BELIEVE IT'S BEING DONE.

22  Q.  AND YOU INDICATED YOU SAW THE PROGRAM IN R.J. DONOVAN.  IN

23  THE PRISONS DO THEY HAVE IMMEDIATE ACCESS TO THE SOCIAL SECURITY

24  ADMINISTRATION, FOR EXAMPLE?

25  A.  WHAT I OBSERVED SEVERAL YEARS AGO AT DONOVAN WAS A PROJECT

1  THAT WAS ESTABLISHED BETWEEN SAN DIEGO STATE UNIVERSITY AND

2  DONOVAN STATE PRISON, AND THEY HAD INTERNET ACCESS TO OBTAIN

3  RECORDS AND THAT SEEMED TO BE WORKING QUITE WELL.

4  **Q.**  AND YOU SAID THAT THE BENEFIT OF DOING THAT IS YOU CAN --

5  YOU CAN GET SOMEBODY IMMEDIATELY ONTO BENEFITS WHEN THEY COME

6  OUT, IF THEY ARE ELIGIBLE?

7  **A.**  BENEFITS ARE IN PLACE.  I WOULD NEVER USE THE WORD

8  "IMMEDIATELY" WITH FEDERAL GOVERNMENT, AND SOCIAL SECURITY IN

9  PARTICULAR.  BUT BENEFITS CAN BE ARRANGED.

10          THERE'S TIME WHEN PEOPLE ARE IN PRISON TO GATHER THE

11  FAIRLY EXTENSIVE DOCUMENTATION THAT'S REQUIRED TO PROVE THE

12  PERSON MEETS THOSE DISABILITY CRITERIA.

13  **Q.**  AND THAT ALLOWS THEM TO GAIN HOUSING AND OTHER SERVICES MORE

14  SPEEDILY AFTER THEY --

15  **A.**  YEAH, THEY ARE FUNDED.  THEY HAVE THE ABILITY TO RENT

16  MOTELS, OR BOARD AND CARES, OR WHATEVER OTHER SERVICES THEY

17  NEED.

18  **Q.**  ALL RIGHT.  THANK YOU.

19          NOW, YOU MENTIONED THE MENTALLY ILL OFFENDER

20  PROGRAMS.  COULD YOU BRIEFLY DESCRIBE THE MENTALLY ILL OFFENDER

21  PROGRAMS THAT YOU HAVE IMPLEMENTED IN SAN DIEGO COUNTY?

22  **A.**  MENTALLY ILL OFFENDER CRIME REDUCTION PROGRAM WAS A PROGRAM

23  FUNDED BY THE STATE LEGISLATURE AND IT WAS -- IN SAN DIEGO IT

24  WAS A $5 MILLION PROGRAM.  I BELIEVE THERE WAS $45 MILLION FOR

25  THE INITIAL PROGRAMS STATE WIDE.

1           THE INITIAL PROGRAMS BEGAN IN ABOUT 1999.  THE

2    PROGRAM WAS FUNDED FROM 1998 THROUGH 2003.  AND IT WAS DESIGNED

3    TO REDUCE CRIME, COST AND CROWDING IN COUNTY JAILS ASSOCIATED

4    WITH THE INCARCERATION OF MENTALLY ILL PEOPLE.

5           SO THERE WERE ABOUT, AS I SAID, 25 PROGRAMS FUNDED IN

6    CALIFORNIA INITIALLY.  THERE WERE A VARIETY OF MODELS.  THE MOST

7    COMMON ELEMENT WAS THE USE OF WHAT'S CALLED ASSERTIVE COMMUNITY

8    TREATMENT PROGRAMS.  ABOUT HALF OF THEM, AS I RECALL, ALSO

9    IMPLEMENTED MENTAL HEALTH COURTS AS A PART OF THAT PROGRAM.

10           AND THIS WAS AN EXPERIMENTAL DESIGN.  THE STATE

11    REQUIRED RESEARCH TO BE DONE.  AND SO THERE WERE EXPERIMENTAL

12    AND CONTROL GROUPS IN ALL OF THE PROGRAMS, AND THEN THE STATE

13    BOARD OF CORRECTIONS THAT WAS ADMINISTERING THIS ALSO HAD THEIR

14    RESEARCH DEPARTMENT COMPILE AND COMBINE ALL OF THE RESEARCH THAT

15    WAS DONE IN THE 25 PROGRAMS TO PRODUCE A REPORT TO THE

16    LEGISLATURE.

17    **Q.**  THE PROGRAM THAT YOU IMPLEMENTED IN SAN DIEGO COUNTY WAS

18    CALLED CONNECTIONS?

19    **A.**  CORRECT.

20    **Q.**  COULD YOU DESCRIBE FOR THE COURT KIND OF HOW THE PROGRAM

21    WORKED?

22    **A.**  THE PROGRAM WORKED IN THAT WE IDENTIFIED PEOPLE WHO MET THE

23    PROGRAM CRITERIA WHILE THEY WERE IN CUSTODY.  THAT WAS A

24    REQUIREMENT OF ALL OF THE PROGRAMS.  IT HAD TO BE FOR PEOPLE WHO

25    ARE IN COUNTY JAILS.

1          SO OUR PROGRAM ELIGIBILITY CRITERIA WERE THEY HAD TO

2    BE IN JAIL.  THE PERSON HAD TO HAVE COMMITTED A FELONY CRIME

3    AND, THEREFORE, BE ON FORMAL PROBATION.  THEY HAD TO HAVE AXIS 1

4    DIAGNOSIS, A DSM MANUAL, WHICH MEANS THEY HAVE BEEN DIAGNOSED

5    WITH A SIGNIFICANT SERIOUS MENTAL ILLNESS, AND THEY HAD TO HAVE

6    WHAT'S CALLED A GAF SCORE, GLOBAL ASSESSMENT OF FUNCTIONING

7    SCORE OF 50 OR LESS, WHICH MEANS A PERSON'S DAILY FUNCTIONING IS

8    SEVERELY IMPAIRED.

9    **Q.**  SO YOU ARE TALKING ABOUT SEVERAL MENTALLY ILL PEOPLE?

10   **A.**  SEVERELY MENTALLY ILL, YEAH.

11          SO THE PROGRAM WOULD ENGAGE WITH THOSE PEOPLE WHILE

12   THEY WERE IN CUSTODY.  IT WAS A TERM ON CONDITION OF THEIR

13   PROBATION THAT THEY WERE ASSIGNED TO A TEAM.  THE TEAMS WERE

14   COMPRISED OF A SOCIAL WORKER THAT WORKED FOR OUR DEPARTMENT, A

15   DEPUTY PROBATION OFFICER AND A CORRECTIONAL DEPUTY PROBATION

16   OFFICER.  AND THEY USED WHAT IS CALLED ASSERTIVE COMMUNITY

17   TREATMENT PRINCIPLES.  IT WASN'T A FULL FIDELITY -- THEY CALL IT

18   ACT, A-C-T, PROGRAM, BUT IT WAS BASED ON THE PRINCIPLES OF

19   ASSERTIVE COMMUNITY TREATMENT, WHICH MEANS ESSENTIALLY PROVIDING

20   THE PERSON WHATEVER THEY NEED TO FUNCTION WELL.

21          SO, FOR EXAMPLE, SOMEONE MIGHT BE ARRESTED IN THE

22   SUMMERTIME AND BE IN A T-SHIRT AND SHORTS AND GET OUT IN JANUARY

23   AND NEED CLOTHING.  SO THEY WOULD BE FURNISHED CLOTHING.

24          WE HAD FLEXIBLE FUNDING TO GET THEM IMMEDIATE HOUSING

25   WHILE WE WOULD THEN APPLY FOR SSI AND OTHER BENEFITS AND ONCE

1  THOSE WERE IN PLACE, THEN WE DIDN'T USE THE WRAP-AROUND FUNDING.

2          BUT BASICALLY, THESE TEAMS SUPERVISED AND

3  SUCCESSFULLY BROKERED THESE INDIVIDUALS IN TO COMMUNITY'S MENTAL

4  HEALTH AND OTHER PSYCHOSOCIAL SUPPORT SERVICES IN THE COMMUNITY

5  SO THAT THEY HAD THE TREATMENT.

6          THE TEAMS ALSO WERE SUPPLEMENTED BY PSYCHIATRISTS AND

7  EMPLOYMENT SPECIALISTS.

8          SO THERE WAS A HEAVY EMPHASIS ON PSYCHOSOCIAL

9  REHABILITATION AND GETTING PEOPLE BACK.  IF THEY WERE AT ALL

10 ABLE TO WORK, GETTING THEM EMPLOYED AT LEAST ON A PART-TIME

11 BASIS.

12 **Q.**  SO THESE FOLKS THAT WERE ELIGIBLE IN THE PROGRAM, YOU SAID

13 THEY WERE ALL ON FORMAL PROBATION.  SO WAS THIS A CONDITION OF

14 THEIR PROBATION?

15 **A.**  YES, IT WAS A CONDITION OF THEIR PROBATION.  THEY WERE

16 ASSIGNED TO A PROBATION OFFICER WHO WAS PART OF THE CONNECTIONS

17 PROGRAM.

18          WE HAD FIVE SERVICE TEAMS, EACH SERVING 30 CLIENTS.

19 AND SO THE PROBATION OFFICER HAD CASE CARRYING RESPONSIBILITY

20 FOR THOSE 30 INDIVIDUALS THAT WERE ON HIS PARTICULAR TEAM.

21 **Q.**  OKAY.  AND WHAT KIND OF OUTCOMES DID YOU HAVE?  YOU SAID YOU

22 HAD -- IT WAS A STUDY.  SO I ASSUME THERE WAS A GROUP THAT

23 DIDN'T GET THE TREATMENT AND THERE WAS A GROUP THAT DID?

24 **A.**  THAT'S CORRECT.

25 **Q.**  WHAT HAPPENED?

1  **A.**  WELL, THE TREATMENT-AS-USUAL GROUP WERE JUST REFERRED OUT

2  INTO COMMUNITY RESOURCES AS A NORMAL IN MENTAL HEALTH SERVICES

3  IN THE JAILS.  THE OTHERS GOT THE HIGHER INTENSITY AND CLOSER

4  SUPERVISION.

5         PART OF THE STUDY WAS TO DEMONSTRATE -- AND THE

6  RESEARCH WAS DONE BY THE SAN DIEGO ASSOCIATION OF GOVERNMENTS

7  CRIMINAL JUSTICE RESEARCH DEPARTMENT.  PART OF THE STUDY WAS TO

8  DEMONSTRATE THAT THE TWO POPULATIONS WERE ALIKE, AND IT DIDN'T

9  SHOW THAT THEY WERE VIRTUALLY ALIKE IN TERMS OF AGE, GENDER,

10 TYPE OF CRIME COMMITTED, SO ON AND SO FORTH.

11        WHAT WE FOUND WAS THAT THE OUTCOMES ACROSS THE BOARD

12 IN ALL OF THE --

13        **JUDGE KARLTON:**  WAIT, WAIT.  LET'S GO BACK.

14        PART OF THE STUDY WAS TO DEMONSTRATE, AND THE

15 RESEARCH WAS DONE BY THE SAN DIEGO, ET CETERA.

16        PART OF THE STUDY WAS TO DEMONSTRATE THAT THE TWO

17 POPULATIONS WERE ALIKE AND IT DIDN'T SHOW -- AND IT DIDN'T SHOW

18 THEY WERE VIRTUALLY ALIKE.  YOU ACTUALLY SAID IT DID SHOW.

19        **THE WITNESS:**  YES, I MAY HAVE MISSPOKE.  THANK YOU.

20        **JUDGE KARLTON:**  I DON'T THINK YOU DID.  I THINK BOTH

21 THE REPORTER AND I MISCAUGHT YOU.

22 **BY MS. BARLOW:**

23 **Q.**  SO THE POPULATIONS WERE ALIKE.

24 **A.**  RIGHT.  SO THAT WAS ONE OF THE THINGS WE WANTED TO

25 DEMONSTRATE TO SHOW THAT THE -- THAT THE PROGRAM COULD ACCOUNT

1  FOR THE DIFFERENCES IN OUTCOMES.

2          THERE WERE A LOT OF WHAT WERE CALLED COMMON DATA

3  ELEMENTS.  AND I DON'T REMEMBER THEM ALL, BUT IN GENERAL WHAT WE

4  SAW WAS THAT PEOPLE WERE MORE COMPLIANT WITH OUTPATIENT

5  TREATMENT AND OTHER TREATMENT.

6          IN SOME CASES THEY HAD TO GO INTO CLOSED, LOCKED

7  PSYCHOSOCIAL REHABILITATION MENTAL HEALTH PROGRAMS.  FOR THE

8  MOST PART THEY WERE ENGAGED IN COMMUNITY MENTAL HEALTH PROGRAMS.

9          THEY HAD GREATER SATISFACTION, THE CLIENTS.  AND THE

10 REASON THAT'S IMPORTANT IS THAT THE MORE SATISFIED A PERSON IS

11 WITH THE TREATMENT THEY ARE RECEIVING, THE MORE LIKELY IT IS

12 THAT THEY ARE GOING TO CONTINUE THAT TREATMENT AND REMAIN

13 STABLE.

14         THERE WERE A LOWER NUMBER OF ARRESTS IN THE

15 EXPERIMENTAL GROUP AND WHEN A PERSON WAS ARRESTED, THEY SPENT

16 SIGNIFICANTLY LESS TIME IN CUSTODY.

17 Q.  DID THEY ALSO GET ARRESTED FOR LESS SERIOUS CRIMES?

18 A.  I BELIEVE THAT'S CORRECT.  I DON'T REMEMBER EXACTLY, BUT I

19 -- I BELIEVE IT WAS A LOWER LEVEL OF OFFENSE AND LESS TIME IN

20 CUSTODY, IF MEMORY SERVES.

21 Q.  YOU MENTIONED THAT THERE WAS A PAROLE -- PROBATION OFFICER

22 CARRYING THE CASELOAD OF 30 OF THESE FOLKS.

23         WAS THERE ANYTHING DIFFERENT ABOUT THE PROBATION

24 OFFICER'S ROLE IN THIS GROUP THAN THERE IS TYPICALLY?

25 A.  YEAH.  IT WAS A SIGNIFICANTLY DIFFERENT ROLE.  AND ONE OF

1    THE PROGRAM DESIGN ELEMENTS WAS EXPRESSLY STATED IN BOTH OF OUR

2    GRANTS TO BEGIN TO TRANSFORM THE ROLE OF THE PROBATION OFFICER,

3    SO THAT HIS ROLE RATHER THAN BEING WHAT THEY OFTEN WOULD EXPRESS

4    AS SIMPLY BEING THE EYES AND EARS OF THE COURT, MEANING THEY

5    WOULD OBSERVE THEIR PROBATIONERS AND REPORT TO THE COURT ANY

6    PROBATION VIOLATIONS, WHICH WOULD THEN RESULT IN FURTHER

7    SANCTIONS.

8            THE DESIGN OF THE CONNECTIONS PROGRAM WAS TO HAVE AN

9    INTEGRATED TEAM AND BEGIN TO TRANSFORM THE ROLE OF THE PROBATION

10   OFFICER INTO ONE WHO WAS HELPFUL AND, IN PART, RESPONSIBLE FOR

11   ENSURING THE PROBATIONER BEING ABLE TO SUCCESSFULLY COMPLY WITH

12   THE TERMS OF PROBATION.

13           SO IT WAS KIND OF A CULTURE SHIFT PROFESSIONALLY AND

14   IT WAS TRUE IN MOST OF THE PROGRAMS THROUGHOUT THE STATE THAT

15   HAD PROBATION INVOLVEMENT.

16   **Q.**  SO IF THIS TYPE OF PROGRAM WERE TO BE EXPANDED TO ALLOW FOR

17   THE SERIOUSLY MENTALLY ILL THAT IT WORKS WITH TO REDUCE THEIR

18   RATE OF RECIDIVISM AND REDUCE THEIR NON-COMPLIANCE WITH THEIR

19   PROGRAM, WOULD YOU NEED MORE PROBATION OFFICERS THAN WHAT WE

20   TYPICALLY HAVE NOW?

21   **A.**  YES.  ONE OF THE THINGS THAT HAPPENED IN SAN DIEGO IS THAT

22   BECAUSE THE FUNDING WAS LOST FROM THE STATE, THE SHERIFF'S

23   DEPARTMENT DIDN'T HAVE THE BUDGET TO CONTINUE THE MENTAL HEALTH

24   WORKERS AND THE PROGRAM.

25           HOWEVER, THE PROBATION DEPARTMENT WAS SO POSITIVELY

1  IMPRESSED WITH THE OUTCOME OF THIS, THAT THEY DID SUSTAIN WHAT

2  THEY CAME TO CALL THE MENTALLY ILL OFFENDER UNIT.  AND THESE ARE

3  PROBATION OFFICERS WHO WE TRAINED IN THE CONNECTIONS PROGRAM WHO

4  REALLY SUCCESSFULLY TRANSFORMED THAT ROLE.  AND THEY CARRY A

5  SMALLER CASELOAD.  SO I BELIEVE THERE ARE THREE CASE LOADS,

6  CARRYING ONLY 40 EACH.

7  **Q.**  FOR THE MENTALLY ILL PATIENTS?

8  **A.**  FOR THE MENTALLY ILL OFFENDERS.  THOSE WERE ONLY THE ONES

9  WHO GET INTO THE PROGRAM.  THEY HAVE MANY MORE MENTALLY ILL

10  OFFENDERS IN THE PROBATION DEPARTMENT THAN THE SMALL UNIT CAN

11  ACCOMMODATE.

12  **Q.**  NOW, YOU --

13          **JUDGE KARLTON:**  WHEN WAS THE PROGRAM FULLY FUNDED AND

14  WHEN DID YOU LOSE THE FUNDING FROM THE STATE, IF YOU CAN RECALL?

15          **THE WITNESS:**  FROM 1998 TO 2003 IT WAS FULLY FUNDED,

16  AND THEN THE SECOND GRANT WAS FUNDED IN 2007.

17          **JUDGE KARLTON:**  AND WHEN WAS THE BALL LOST?

18          **THE WITNESS:**  IN DECEMBER OF 2007 WE CLOSED THE

19  SECOND PROGRAM, BECAUSE THE STATE FUNDING WAS WITHDRAWN.

20  **BY MS. BARLOW:**

21  **Q.**  WHEN YOU CLOSED THAT PROGRAM, WHERE DID THE PARTICIPANTS GO?

22  **A.**  THE PARTICIPANTS WENT INTO A PROGRAM CALLED CENTER STAR ACT,

23  OR ASSERTIVE COMMUNITY TREATMENT.  AND THIS IS ONE OF THE NEW

24  PROGRAMS THAT IS FUNDED UNDER THE MENTAL HEALTH SERVICES ACT.

25  IT'S A CRIMINAL JUSTICE PROGRAM.

1          IT'S LIMITED TO ONLY 111 CLIENTS AND IT'S WHAT'S

2    CALLED A FULL-SERVICE PARTNERSHIP.  SO IT IS A HIGH FIDELITY ACT

3    OR ASSERTIVE COMMUNITY TREATMENT PROGRAM THAT IS FUNDED THROUGH

4    THE MENTAL HEALTH SERVICES ACT.

5          THEY DO HAVE A PROBATION OFFICER ASSIGNED TO THAT

6    PROGRAM, BUT HE IS NOT A CASE CARRYING OFFICER.  HE IS MORE OR

7    LESS A LIAISON TO THE PROBATION DEPARTMENT FOR A SUBSET OF

8    CLIENTS IN THAT PROGRAM WHO ARE ON PROBATION.

9          THE DIFFERENCE BEING THAT NOT EVERYBODY IN THE NEW

10   CENTER STAR ACT PROGRAM IS ON PROBATION, ONLY SOME ARE.  AND

11   IT'S NOT FOR PEOPLE WHO ARE IN JAIL.  IT'S A MORE BROADLY

12   DEFINED TARGET POPULATION, WHICH IS PEOPLE WHO ARE EITHER

13   INVOLVED IN THE CRIMINAL JUSTICE SYSTEM OR WHO WERE AT RISK FOR

14   BECOMING INVOLVED IN THE CRIMINAL JUSTICE SYSTEM.

15   **Q.**  AND IS THAT PROGRAM FULL?

16   **A.**  YES.  IT WAS FULL ALMOST IMMEDIATELY.

17   **Q.**  OKAY.  NOW, YOU INDICATE IN YOUR REPORT THAT THE NUMBER OF

18   MENTALLY ILL IN LOCAL AND STATE PRISON OR JAIL FACILITIES IS

19   INCREASING?

20          **JUDGE KARLTON:**  IS IT PRISON OR JAIL, WHICH?

21          **MS. BARLOW:**  BOTH.

22          **JUDGE KARLTON:**  BOTH.

23   **BY MS. BARLOW:**

24   **Q.**  DO YOU HAVE AN OPINION AS TO WHY.?

25          **JUDGE REINHARDT:**  COULD I HEAR THE QUESTION AGAIN?

1  I'M SORRY.

2          **MS. BARLOW:**  CERTAINLY.  THE WITNESS'S EXPERT

3  DECLARATION INDICATES THAT BOTH PRISONS AND JAILS ARE INCREASING

4  IN THE NUMBER OF MENTALLY ILL WHO ARE IN THOSE FACILITIES.  AND

5  I'M JUST ASKING HIM WHY THAT -- WHY THAT'S HAPPENING IN HIS

6  OPINION.

7          **JUDGE REINHARDT:**  THANK YOU.

8  **A.**  BROADLY IT'S CALLED TRANSINSTITUTIONALIZATION.  AND WHAT

9  THAT MEANS IS THAT WITH THE DECLINE IN HOSPITAL BEDS FOR

10 MENTALLY ILL PEOPLE, THEY ARE GETTING FEWER SERVICES IN THE

11 COMMUNITY AND AS A RESULT, THEIR FUNCTIONING DECLINES TO WHERE

12 MANY OF THEM COMMIT CRIMES.  AND THAT'S INCREASED PRISONS AND

13 JAIL POPULATIONS THROUGHOUT THE UNITED STATES, NOT JUST IN

14 CALIFORNIA.

15 **BY MS. BARLOW:**

16 **Q.**  ALL RIGHT.  NOW, MR. CONKLIN, IN YOUR OPINION, IF WE SIMPLY

17 LET OUT MENTALLY ILL INMATES FROM PRISON, WHICH WOULD BE PART OF

18 THE POPULATION PLAINTIFFS PROPOSE TO EITHER RELEASE OR DIVERT,

19 AND SIMPLY ASK THEM OR EXPECT THEM TO OBTAIN MENTAL HEALTHCARE

20 TREATMENT ON THEIR OWN, ARE THEY GOING TO DO THAT?

21 **A.**  MY IMPRESSION WOULD BE NO, AND MY OPINION WOULD BE NO BASED

22 ON MY EXPERIENCE.  I THINK THERE IS A QUALITATIVE DIFFERENCE

23 BETWEEN THE PEOPLE -- THE POPULATION OF MENTALLY ILL PEOPLE WHO

24 ARE LIKELY TO AND ABLE TO AVAIL THEMSELVES OF PUBLIC MENTAL

25 HEALTH SERVICES.

1          THOSE ARE PEOPLE WHO, IN MY EXPERIENCE, ARE NOT

2    NEARLY AS SEVERELY DISABLED AS THE MENTALLY ILL POPULATION WHO

3    RUNS AFOUL OF THE CRIMINAL JUSTICE SYSTEM AND ENDS UP IN EITHER

4    JAIL OR PRISON.

5          **JUDGE REINHARDT:** IS THAT WHAT'S HAPPENING NOW WHEN

6    PEOPLE ARE LET OUT OF PRISON?

7          **THE WITNESS:** I'M SORRY, YOUR HONOR. I DIDN'T HEAR

8    THAT.

9          **JUDGE REINHARDT:** IS THAT WHAT IS HAPPENING NOW WHEN

10   PEOPLE ARE LET OUT OF PRISON?

11         **THE WITNESS:** I CAN'T SPEAK FIRSTHAND TO PAROLEES OR

12   PEOPLE THAT ARE RELEASED FROM PRISON.

13         MY EXPERIENCE IS AT THE COUNTY JAIL LEVEL, AND WE SEE

14   A FAIR NUMBER OF WHAT WE TERM FREQUENT FLIERS, PEOPLE WHO ARE

15   RELEASED AND SOON BACK IN JAIL.

16         **JUDGE KARLTON:** BECAUSE OF MENTAL ILLNESS.

17         **THE WITNESS:** BECAUSE THEY COMMIT A CRIME, WHICH I

18   BELIEVE IS HIGHLY ASSOCIATED WITH THEIR MENTAL ILLNESS, AND

19   THEIR INABILITY TO FUNCTION, AND THEIR NON-COMPLIANCE WITH

20   MENTAL HEALTH CARE.

21   **BY MS. BARLOW:**

22   Q.  SO IF MENTALLY ILL ARE SIMPLY LET OUT AND THEY ARE NOT GOING

23   TO SEEK CARE ON THEIR OWN, IS THIS GOING TO HAVE AN IMPACT ON

24   BOTH PUBLIC SAFETY AND ON THOSE MENTALLY ILL?

25         **JUDGE HENDERSON:** IS THAT A GIVEN, THAT THEY WON'T

1  SEEK HELP ON THEIR OWN?

2          **MS. BARLOW:**  THE POPULATION THAT ENDS UP IN -- HE IS

3  SAYING --

4          **JUDGE HENDERSON:**  OKAY.

5          **MS. BARLOW:**  -- THAT POPULATION DOESN'T SEEK IT ON

6  THEIR OWN.

7  **A.**  WOULD YOU RESTATE THE QUESTION, PLEASE?

8  **BY MS. BARLOW:**

9  **Q.**  I CERTAINLY COULD.

10         IS THERE AN IMPACT TO BOTH PUBLIC SAFETY AND TO THE

11  MENTALLY ILL PEOPLE THEMSELVES FROM THEIR NON-PARTICIPATION IN

12  MENTAL HEALTH CARE TREATMENT?

13  **A.**  YES.  MY EXPERIENCE IS THAT THOSE PEOPLE HAVE VERY DIFFICULT

14  LIVES ON THE STREET.  THEY ARE UNTREATED.  THEY DO COMMIT

15  QUALITY OF LIFE CRIMES, YOU KNOW, LOW LEVEL FELONIES OR

16  MISDEMEANORS.  SOMETIMES THEY ARE VICTIMS.

17         **JUDGE REINHARDT:**  THAT'S WHAT I WAS ASKING YOU.  IS

18  THAT WHAT HAPPENS NOW WITH PEOPLE WHO ARE LET OUT OF PRISON?

19         **JUDGE KARLTON:**  HE DOESN'T KNOW ABOUT PRISON.  HE

20  ONLY KNOWS ABOUT JAILS.

21         **JUDGE REINHARDT:**  SO YOU DON'T KNOW WHAT WILL HAPPEN

22  WITH THE PEOPLE WHO ARE LET OUT OF PRISON IF THERE WERE MORE LET

23  OUT?

24         **THE WITNESS:**  I WOULD FEEL FAIRLY COMFORTABLE

25  GENERALIZING MY EXPERIENCE IN A COUNTY JAIL ALSO TO THE PRISON,

1  AND THAT IS THAT IF A PERSON IS SEVERELY MENTALLY ILL, IS NOT

2  VERY FUNCTIONAL, THE PEOPLE THAT WE SEE IN THAT CONDITION THAT

3  LEAVE JAIL DON'T SEEK SERVICES AND FREQUENTLY END UP GETTING

4  REARRESTED.

5            AND I WOULD IMAGINE THE SAME COULD BE SAID OF THE

6  STATE PRISONERS.  ALTHOUGH I DON'T DEAL WITH STATE PRISONERS, I

7  DEAL WITH COUNTY JAIL INMATES.

8            **JUDGE REINHARDT:**  I'M TRYING TO SEE WHAT IS THE

9  DIFFERENCE IF PEOPLE ARE LET OUT FOUR MONTHS EARLIER OR FOUR

10  MONTHS LATER?  YOU ARE STILL GOING TO HAVE THE IDENTICAL

11  PROBLEM, RIGHT?

12            **THE WITNESS:**  I SUPPOSE ALL THINGS BEING EQUAL, IF --

13  IF THEY DIDN'T HAVE SUPPORT SERVICES AND TRANSITION, YEAH, THE

14  OCCURRENCE OF THEIR DETERIORATION WOULD PROBABLY BE SIMILAR.

15            **JUDGE KARLTON:**  WE HAVE RECEIVED TESTIMONY THAT MANY

16  -- IT'S NOT CLEAR TO ME HOW MANY, BUT MANY OF THE SEVERELY

17  MENTALLY ILL FOLKS -- WHAT DO YOU CALL IT?  NOT WITHDRAWN.  THEY

18  WERE --

19            **JUDGE REINHARDT:**  DECOMPENSATED?

20            **JUDGE KARLTON:**  THEY WERE NOT OVERT.  THEY WITHDREW.

21  THEY DIDN'T INVOLVE THEMSELVES IN SOCIETY THE WAY ORDINARY

22  PAROLEES WOULD.  AND THAT THEY, IN EFFECT, BY VIRTUE OF THAT

23  CHARACTERISTIC MIGHT WELL NOT BE COMING INTO CONTACT WITH LAW

24  ENFORCEMENT AFTER THEY WERE RELEASED.  IT WAS DESCRIBED AS

25  COUNTERINTUITIVE, BUT THAT WAS THE REALITY.

1          DO YOU HAVE A -- I UNDERSTAND YOU DON'T DO PRISONS,

2   BUT IN TERMS OF THE JAILS, DO YOU HAVE A RESPONSE TO THAT

3   CHARACTERIZATION?

4          **THE WITNESS:**  CERTAINLY.  WITHDRAWAL WOULD BE A

5   CLINICAL MANIFESTATION OF SEVERAL DIFFERENT TYPES OF MAJOR

6   MENTAL ILLNESS, AND I DON'T THINK THAT IN AND OF ITSELF, IN MY

7   VIEW, IS TERRIBLY SIGNIFICANT BECAUSE WHAT IT REPRESENTS IS IT

8   REPRESENTS A WORSENING OF A PERSON'S MENTAL HEALTH CONDITION.

9   AND, YOU KNOW, DEPENDING UPON THE DIAGNOSIS A PERSON CAN BECOME

10  WITHDRAWN AND THEN PSYCHOTIC AND THEN THE BEHAVIOR CHANGES.

11         SO CERTAINLY IF A PERSON IS IN THE PHASE OF THEIR

12  ILLNESS WHERE THEY ARE ISOLATING AND WITHDRAWING, THEY WOULD

13  PROBABLY SUFFER PERSONALLY, BUT THEY WOULDN'T BE ACTIVELY

14  SEEKING OUT OR COMMITTING CRIMES.

15         WE SEE IN OUR COMMUNITY POLICING OR PSYCHIATRIC

16  EMERGENCY RESPONSE TEAMS WHO RESPOND TO CITIZEN COMPLAINTS TO

17  INTERVENE WITH PEOPLE LIKE THAT WHO ARE ON THE STREET, WHO ARE

18  HOMELESS, WHO ARE WITHDRAWN, IN MANY CASES DELUSIONAL AND

19  REPRESENTING A CONCERN TO THE COMMUNITY, AND THEN THEY CALL THE

20  POLICE TO INTERVENE WITH THAT PERSON.

21  **BY MS. BARLOW:**

22  **Q.**  THANK YOU.

23         MR. CONKLIN, ONE WITNESS TESTIFIED THAT IN THIS CASE

24  THAT SOME SEVERELY MENTALLY ILL PEOPLE COULD BE BETTER OFF ON

25  THE STREETS THAN IN PRISON; DO YOU AGREE WITH THAT?

1  **A.**  NO, I DON'T AGREE WITH THAT AT ALL.

2  **Q.**  WHY NOT?

3  **A.**  BECAUSE THEIR QUALITY OF LIFE IS HORRIBLE ON THE STREETS.

4  THEY ARE VICTIMS OF CRIMES.  THEY DON'T -- THEY DON'T HAVE THE

5  NORMAL SUPPORT AND LIVING ENVIRONMENT THAT THEY ARE ENTITLED TO

6  AS A CITIZEN.  THEY DON'T RECEIVE THE CARE THAT THEY NEED.

7          YOU KNOW, MENTAL ILLNESS IS AN ILLNESS.  IT'S LIKE

8  SAYING, YOU KNOW, WE JUST WON'T TREAT DIABETICS BECAUSE THEY

9  WILL BE FINE IF THEY DON'T GET THEIR INSULIN.  IT'S A MEDICAL

10  CONDITION.  THEY ARE CITIZENS OF OUR STATE AND THEY DESERVE

11  TREATMENT.

12          **JUDGE REINHARDT:**  YOU KNOW, WE HAVE A LOT OF HOMELESS

13  PEOPLE EVERYWHERE.  AT LEAST IN LOS ANGELES, WE HAVE A REALLY

14  HIGH NUMBER WHO ARE LIVING ON THE STREETS, WHO -- I THINK A

15  MAJORITY, IF NOT SUBSTANTIAL MAJORITY, ARE MENTALLY ILL.

16          WOULD YOU RECOMMEND THAT THEY BE PUT IN JAIL OR

17  PRISON RATHER THAN ALLOWED OUT BECAUSE THAT WOULD BE BETTER FOR

18  THEM?

19          **THE WITNESS:**  NO.  I THINK THAT THE ALTERNATIVE IS

20  EMBODIED IN THE MENTAL HEALTH SERVICES ACT, WHICH IS TRYING TO

21  -- AND, IN FACT, IS DEVELOPING PROGRAMS BASED ON WHAT WAS FOUND

22  WITH THE ASSERTIVE COMMUNITY TREATMENT PROGRAMS DEVELOPING WHAT

23  ARE CALLED FULL SERVICE PARTNERSHIPS WHERE HOUSING AND

24  WRAP-AROUND SERVICES AND PSYCHIATRIC CARE IS PROVIDED TO THEM.

25          **JUDGE REINHARDT:**  ABSOLUTELY.  I WISH WE COULD GET

1  THOSE PROGRAMS AND SERVICES FOR THE PEOPLE WHO ARE MENTALLY ILL

2  WHO ARE OUT ON THE STREETS NOW, BUT UNFORTUNATELY THEY ARE NOT

3  FORTHCOMING.

4          **THE WITNESS:**  I THINK THEY ARE FORTHCOMING, WITH

5  RESPECT.  I THINK THAT YOU SEE MORE OF THESE TYPES OF PROGRAMS

6  BEING DEVELOPED THROUGH THE MENTAL HEALTH SERVICES ACT.

7          I KNOW IN SAN DIEGO COUNTY WE ARE DEVELOPING PROGRAMS

8  THAT HAVE MORE OF A PARTNERSHIP BETWEEN OUR PUBLIC SAFETY GROUP,

9  OUR POLICE AGENCIES, OUR PROBATION DEPARTMENT, AND I THINK THAT

10 IS CERTAINLY ONE OF THE CHALLENGES AND OPPORTUNITIES.

11         BECAUSE WHAT WE FOUND WITH THE CONNECTIONS PROGRAM IS

12 WHEN YOU HAVE THE ACCOUNTABILITY AND THE AUTHORITY OF A

13 PROBATION OFFICER, YOU CAN INFLUENCE THAT PATIENT'S

14 PARTICIPATION IN MENTAL HEALTH CARE.

15         SO THAT'S ONE OF THE REASONS WHY WE HAVE RETAINED THE

16 MENTALLY ILL OFFENDER UNIT.  YOU KNOW, THEY CAN'T MAKE SOMEBODY

17 TAKE MEDICATION AND COMPLY WITH MENTAL HEALTH TREATMENT, BUT

18 WITH THE SUPPORT AND THE ENCOURAGEMENT AND THE DIRECTION, THERE

19 IS A MUCH HIGHER COMPLIANCE.

20         YOU ALSO SEE THAT POSITIVE OUTCOME AND, IN FACT,

21 LOWER COSTS OVERALL ASSOCIATED WITH AREAS WHERE THEY HAVE MENTAL

22 HEALTH COURTS.  THAT'S ANOTHER THING THAT WE ARE INVOLVED IN

23 PROPOSING TO OUR SUPERIOR COURT IN SAN DIEGO.  WE ARE GOING TO

24 MAKE A PRESENTATION IN JANUARY PROPOSING THE IMPLEMENTATION OF A

25 MENTAL HEALTH COURT IN SAN DIEGO.

1          **JUDGE REINHARDT:** WOULDN'T THAT WORK JUST AS WELL FOR

2    PEOPLE COMING OUT OF PRISON?

3          **THE WITNESS:** THE WAY MENTAL HEALTH COURTS ARE

4    DESIGNED, THEY ARE PREDOMINANTLY COMMUNITY COURTS FOR PEOPLE WHO

5    ARE COMMITTING CRIMES AT THE LOCAL LEVEL. THE HIGHER LEVEL

6    FELONIES AND VIOLENT CRIMES TYPICALLY ARE NOT ACCEPTED BY MENTAL

7    HEALTH COURTS.

8          **JUDGE REINHARDT:** EVEN WHEN THEY COME OUT OF PRISON?

9          **THE WITNESS:** YES. THEY -- THEY -- THEY ENCOUNTER

10   PEOPLE AT THE BEGINNING OF THEIR CRIMINAL ACT RATHER THAN WHEN

11   THEY ARE REENTERING COMMUNITY FROM PRISON. THAT'S HOW THE

12   MENTAL HEALTH COURTS HAVE BEEN DESIGNED.

13         **JUDGE REINHARDT:** WELL, SHOULDN'T THEY BE CHANGED SO

14   THAT THEY WOULD PROVIDE THESE SERVICES TO PEOPLE COMING OUT OF

15   PRISON?

16         **THE WITNESS:** THAT WOULD PROBABLY BE A GOOD IDEA. I

17   HAVE BEEN WORKING SINCE 2004 JUST TO GET ONE STARTED TO CATCH

18   THEM ON THE WAY IN.

19   **BY MS. BARLOW:**

20   **Q.** ALL RIGHT. JUST BRIEFLY, THE MENTAL HEALTH SERVICES ACT

21   THAT YOU MENTIONED, DOES THAT PROVIDE SERVICES TO PAROLEES?

22   **A.** NO. PAROLEES ARE NOT ELIGIBLE FOR PROGRAMS FUNDED UNDER THE

23   MENTAL HEALTH SERVICES ACT.

24   **Q.** BUT YOU ALSO MENTIONED THAT YOU WERE IMPLEMENTING SOME

25   PROGRAMS UNDER THAT ACT, PARTICULARLY IN SAN DIEGO COUNTY?

1    **A.**  I'M SORRY, MISS BARLOW.  I COULDN'T HEAR THAT.

2    **Q.**  YOU MENTIONED THERE WERE PROGRAMS BEING IMPLEMENTED AND, IN

3    FACT, THE OAC, WHICH IS THE COMMISSION THAT OVERSEES THE

4    IMPLEMENTATION OF THE MENTAL HEALTH SERVICES ACT, CORRECT?

5    **A.**  YES.

6    **Q.**  HAVE THEY JUST TAKEN STEPS TO DEVELOP PROGRAMS SPECIFICALLY

7    FOR PEOPLE WITH CO-OCCURRING DISORDERS?

8    **A.**  THAT'S CORRECT.  THE OVERSIGHT AND ACCOUNTABILITY COMMISSION

9    FUNCTIONS BY ESTABLISHING PARTICULAR WORK GROUPS UNDER THE

10   LEADERSHIP OF -- OR THE CHAIRMANSHIP, RATHER, OF ONE OR MORE OF

11   THE COMMISSIONERS.

12            AND COMMISSIONERS PATING AND GOULD CO-CHAIRED A WORK

13   GROUP ON CO-OCCURRING DISORDERS.  WHAT THEY DID ABOUT OVER 18

14   MONTHS WAS TO INTERVIEW SUBJECT MATTER EXPERTS AND SURVEY THE

15   LITERATURE AND SO ON.  AND THEY RECOMMENDED LAST MONTH TO THE

16   OVERSIGHT AND ACCOUNTABILITY COMMISSION THE ADOPTION OF THEIR

17   REPORT AND THE COMMISSION DID UNANIMOUSLY ACCEPT THOSE

18   RECOMMENDATIONS.

19            AND WHAT IT ESSENTIALLY ADDRESSED IS THE FACT THAT IN

20   CALIFORNIA THE CRIMINAL JUSTICE SYSTEM, THE ALCOHOL AND DRUG

21   SYSTEM, THE MENTAL HEALTH SYSTEM ARE NOT INTEGRATED IN SUCH A

22   WAY THAT THEY CAN EFFECTIVELY INTERVENE WITH PEOPLE WITH

23   CO-OCCURRING DISORDERS.

24            AND THE -- THE COIN OF THE REALM, IF YOU WILL, IS

25   THAT CO-OCCURRING DISORDERS, MEANING A SIGNIFICANT SUBSTANCE

1  ABUSE PROBLEM AND A SERIOUS MENTAL ILLNESS, ARE TO BE THE

2  EXPECTATION RATHER THAN THE EXCEPTION BECAUSE IT IS SO

3  PREVALENT.

4  **Q.**  AND SO --

5  **A.**  WHAT --

6  **Q.**  I'M SORRY.

7  **A.**  EXCUSE ME.  SO WHAT WILL HAPPEN NEXT, SINCE THE COMMISSION

8  ADOPTED THAT, THEN COMMISSIONER PATING WILL CONVENE HIS NEW

9  SERVICE WORK GROUP, WHICH WILL DIRECT COUNTIES TO DEVELOP THESE

10 INTEGRATED PROGRAMS AS A PART OF THE PREVENTION AND EARLY

11 INTERVENTION PHASE OF THE PROGRAMS THEY DEVELOP FUNDED BY THE

12 MENTAL HEALTH SERVICES ACT.

13          **JUDGE KARLTON:**  AND, AGAIN, THIS IS NOT RELEVANT TO

14 PAROLEES.

15          **THE WITNESS:**  THAT'S CORRECT.

16          **JUDGE KARLTON:**  CAN I ASK YOU:  IS IT RELEVANT TO

17 PEOPLE WHO HAVE BEEN ARRESTED FOR FELONIES, TO DIVERT THEM FROM

18 THE CRIMINAL JUSTICE SYSTEM OR IS THAT -- THE FELONY SIMPLY

19 OUTSIDE OF THE PROGRAM?

20          **THE WITNESS:**  NO.  IT WOULD BE INCLUSIVE OF SOME

21 FELONIES, PROBABLY.  AND THAT WOULD REALLY BE DEPENDING UPON --

22 EXCUSE ME, DEPENDENT UPON THE LOCAL COMMUNITY.

23          DIFFERENT COMMUNITIES HAVE DIFFERENT LEVELS OF

24 TOLERANCE FOR WHAT LEVEL OF CRIME THEY WILL ACCEPT IN THESE

25 DIVERSION PROGRAMS.

1  **BY MS. BARLOW:**

2  **Q.** AS A RESULT OF THE COMMISSION'S ACTION, COUNTIES ARE GOING

3  TO BE DIRECTED TO CREATE PROGRAMS TO DEAL WITH CO-OCCURRING

4  DISORDERS, MENTALLY ILL AND SUBSTANCE ABUSE, CORRECT?

5  **A.** YES, BUT MORE SPECIFICALLY TO PAY ATTENTION TO REENTRY FROM

6  JAILS AND PRISONS.

7          SO THERE IS YET A CHALLENGE THERE THAT IT'S NOT

8  CERTAIN HOW IT'S GOING TO BE MET SPECIFICALLY WITH PAROLEES,

9  BECAUSE BY DEFINITION THEY ARE NOT INCLUDED IN THE ACT, BUT THE

10  COMMISSIONERS RECOGNIZED THAT THIS HAS AN IMPACT ON LOCAL

11  COMMUNITIES WHEN YOU HAVE NUMBERS OF PEOPLE.

12          WHETHER THEY ARE RETURNING TO THE COMMUNITY FROM THE

13  JAIL, OR WHETHER THEY ARE RETURNING TO THE COMMITTEE FROM A

14  PRISON, YOU HAVE PEOPLE WHO ARE IMPAIRED COMING BACK TO LIVE IN

15  YOUR COMMUNITY WHO ARE IN NEED OF SERVICES AND ARE IN A SYSTEM

16  THAT IS NOT NECESSARILY INTEGRATED.

17  **Q.** SO IS IT FAIR TO SAY THAT YOU THINK THAT TYPE OF A PROGRAM

18  CAN RESULT IN A BETTER OUTCOME FOR THESE CO-OCCURRING DISORDERED

19  OFFENDERS?

20  **A.** YES, THAT'S BEEN MY EXPERIENCE WITH THE CONNECTIONS PROGRAM,

21  OUR CENTER STAR PROGRAM.

22  **Q.** SO THAT WOULD RESULT IN BOTH A DECREASE IN RISK TO PUBLIC

23  SAFETY AND AN IMPROVEMENT IN THE LIVES OF THESE PEOPLE?

24  **A.** YES.

25          **JUDGE REINHARDT:** I'M JUST A LITTLE CONFUSED. I

 1  THOUGHT YOU FIRST SAID IN ANSWER TO COUNSEL'S QUESTION THAT THEY

 2  ARE NOT -- PAROLEES ARE NOT ELIGIBLE.  AND NOW I UNDERSTOOD YOU

 3  TO SAY THEY ARE BEING TREATED ALONG WITH --

 4          **JUDGE KARLTON:**  NO, NOT ARE, BUT HOPEFULLY IN THE

 5  FUTURE WILL BE.

 6          **THE WITNESS:**  THAT'S CORRECT.  HOPEFULLY, IN THE

 7  FUTURE.

 8          WHAT THE COMMISSIONERS RECOGNIZED WAS THAT THERE IS

 9  AN IMPACT ON THE COMMUNITY --

10          **JUDGE REINHARDT:**  IS THERE A LEGAL BARRIER TO IT AT

11  THE MOMENT?

12          **THE WITNESS:**  YES.  THE LEGISLATION, PROPOSITION 63,

13  THE WAY IT WAS INITIALLY STRUCTURED AND WRITTEN EXPRESSLY

14  EXCLUDES PAROLEES.  THOSE MENTAL HEALTH SERVICES ARE PROVIDED IN

15  WHAT ARE CALLED PAROLE OUTPATIENT CLINICS.

16          **JUDGE REINHARDT:**  IT WOULD TAKE A STATUTORY CHANGE

17  THEN?

18          **THE WITNESS:**  THAT'S MY UNDERSTANDING, YES.

19  **BY MS. BARLOW:**

20  **Q.**  ONCE THOSE MODELS ARE DEVELOPED TO HAVE -- TO TREAT THE

21  CO-OCCURRING DISORDER OFFENDERS, EVEN IF THERE IS NO STATUTORY

22  CHANGE, SIMILAR PROGRAMS COULD BE DEVELOPED FOR PAROLEES THROUGH

23  PAROLE, CORRECT?

24          **JUDGE KARLTON:**  SURE THAT COULD HAPPEN.  EVERYBODY

25  COULD GET WELL AND WE'D NEVER BE HERE.

1            **MS. BARLOW:**  I'M SORRY, YOUR HONOR.  I'M NOT ASKING

2    HIM TO SPECULATE.  I'M JUST ASKING IF THAT PROGRAM COULD WORK

3    WITH THAT TYPE OF PROBLEM.

4            **THE WITNESS:**  I BELIEVE SO, YES.

5    **BY MS. BARLOW:**

6    **Q.**  ALL RIGHT.  THANK YOU.

7            NOW, YOU MENTIONED -- YOU GO INTO SOME DISCUSSION IN

8    YOUR DECLARATION REGARDING SB 618 BECAUSE YOU WERE INVOLVED IN

9    THE CREATION OF THE PROGRAM, BUT WE HAVE HEARD FROM ANOTHER

10   WITNESS ON THAT ISSUE.  SO I JUST REALLY WANT TO ASK YOU ONE

11   QUESTION ABOUT IT.

12           IN YOUR PROFESSIONAL OPINION AS A MENTAL HEALTH

13   CLINICIAN AND DIRECTOR OF PROGRAMMING FOR THE JAILS, DO YOU

14   BELIEVE THAT REDUCING SENTENCES OF THOSE PARTICIPATING IN

15   SB 618 WOULD IMPACT THEIR SUCCESS?

16   **A.**  I BELIEVE IT WOULD.  THE 618 PROGRAM WAS DESIGNED SO THAT

17   THERE IS AN ASSESSMENT OF RISKS AND NEEDS.  THERE'S THE

18   DEVELOPMENT OF A LIFE PLAN.

19           THEN THE DELAYS IN THE RECEPTION CENTER, PROCESS

20   CENTERS AT THE PRISONS ARE BYPASSED AND THOSE PEOPLE CAN GO

21   DIRECTLY INTO REHABILITATION PROGRAMMING.  ONCE THEY COMPLETE

22   THEIR SENTENCE AND COMPLETE THOSE IN-PRISON REHABILITATION

23   PROGRAMS, THEN THERE'S A CONTINUATION, AN ALTERATION OR UPDATING

24   OF THE LIFE PLAN TO REFLECT THOSE SUCCESSES, AND THEN CASE

25   MANAGEMENT AND SUPPORT WHEN THEY COME INTO THE COMMUNITY.

1          SO IT'S MY BELIEF THAT THE INTEGRATION OF BOTH

2   INSTITUTIONAL PROGRAMMING AND THE CASE MANAGEMENT AND REENTRY

3   SUPPORT IS WHAT MAKES FOR THE SUCCESSES THAT ARE BEING SEEN IN

4   THE 618 PROGRAM.

5          **THE CLERK:**  FIVE MINUTES, COUNSEL.

6          **MS. BARLOW:**  THANK YOU.

7   **BY MS. BARLOW:**

8   **Q.**  NOW, THE PRISON RELEASE ORDER THAT HAS BEEN PROPOSED BY

9   PLAINTIFFS AND THEIR EXPERTS INCLUDES SEVERAL WAYS OF REDUCING

10  THE PRISON POPULATION.  ONE OF THOSE INVOLVES SHORTENING THE

11  LENGTH OF SENTENCES FOR CERTAIN LOW RISK OFFENDERS BY FOUR

12  MONTHS.

13         DO YOU HAVE AN OPINION AS TO WHETHER THAT WILL HAVE A

14  NEGATIVE IMPACT OR POSITIVE IMPACT ON PUBLIC SAFETY?

15         **JUDGE KARLTON:**  I DIDN'T UNDERSTAND.  THIS WITNESS

16  DOES NOT DEAL WITH PRISON -- WITH PRISONS.  HE DEALS WITH JAILS.

17         **MS. BARLOW:**  WE ARE TALKING ABOUT ADDING PEOPLE INTO

18  THE COMMUNITY, YOUR HONOR.  THAT'S WHAT I'M ASKING HIM ABOUT.

19         **JUDGE KARLTON:**  OH, I SEE.  MAYBE YOU CAN ANSWER

20  THAT.  I DON'T KNOW.

21  **A.**  I'M SORRY WOULD YOU RESTATE THAT, PLEASE.

22  **BY MS. BARLOW:**

23  **Q.**  PART OF THE PROPOSAL IS TO REDUCE LENGTH OF STAY FOR CERTAIN

24  PRISONERS BY FOUR MONTHS, AND THAT THOSE FOLKS WOULD COME BACK

25  INTO THE COMMUNITIES FOUR MONTHS EARLIER WITH NO PROGRAMMING.

1          DO YOU HAVE AN OPINION AS TO WHETHER THAT WILL HAVE

2    AN IMPACT ON PUBLIC SAFETY?

3          **MR. SANGSTER:**  OBJECTION.  NO FOUNDATION.

4          **JUDGE HENDERSON:**  I WILL ALLOW IT.

5    **BY MS. BARLOW:**

6    **Q.**  GO AHEAD.

7    **A.**  I THINK IT WOULD NEGATIVELY IMPACT THE COMMUNITY BECAUSE I

8    THINK WITHOUT THE SUPPORTS AND WITHOUT THE TREATMENT AND SO ON,

9    WHAT WE SEE AT A LOCAL LEVEL -- AND I WOULD EXTRAPOLATE THAT TO

10   THE PRISON SYSTEM -- WE SEE A NUMBER OF PEOPLE WHO DON'T AVAIL

11   THEMSELVES OF SERVICES, WHO DO REPEAT OTHER OFFENSES AND COME

12   BACK INTO JAIL.

13         **JUDGE REINHARDT:**  WHY DO YOU THINK THAT IF THEY CAME

14   FOUR MONTHS EARLIER, IT WOULD BE ANY DIFFERENT THAN IF THEY CAME

15   FOUR MONTHS LATER?

16         **THE WITNESS:**  I TOOK THE QUESTION TO MEAN THEY WERE

17   GETTING OUT WITHOUT COMPLETING SUPPORTIVE TREATMENT IN THE

18   PRISON.

19         **JUDGE KARLTON:**  AS IF THERE WERE SUPPORTIVE TREATMENT

20   IN THE PRISON.

21         **THE WITNESS:**  YES, SIR.

22         **JUDGE KARLTON:**  YOU ASSUME THAT.

23         **THE WITNESS:**  I DO.

24         **JUDGE KARLTON:**  IF IT TURNS OUT TO BE FANTASY, DOES

25   IT MAKE ANY DIFFERENCE?

1          **THE WITNESS:**  I WOULDN'T KNOW HOW TO ANSWER THAT.

2          **JUDGE KARLTON:**  FAIR ENOUGH.  THAT'S THE POINT.

3  **BY MS. BARLOW:**

4  Q.  MR. CONKLIN, ARE THERE SUFFICIENT RESOURCES FOR THE DRUG

5  TREATMENT FOR THOSE EXISTING IN SAN DIEGO COUNTY RIGHT NOW?

6          **MR. SANGSTER:**  VAGUE AND AMBIGUOUS.  PRISONERS OR

7  PAROLEES OR BOTH?

8  **BY MS. BARLOW:**

9  Q.  EXISTING PEOPLE.

10          **MR. SANGSTER:**  STILL VAGUE AND AMBIGUOUS, YOUR HONOR.

11          **JUDGE KARLTON:**  I DON'T KNOW WHAT "EXISTING PEOPLE"

12  MEANS.

13  **BY MS. BARLOW:**

14  Q.  FOR THOSE WHO NEED DRUG TREATMENT FOR THOSE WHO LIVE IN SAN

15  DIEGO COUNTY RIGHT NOW, ARE THERE SUFFICIENT RESOURCES TO

16  PROVIDE THAT TREATMENT TO THEM?

17          **MR. SANGSTER:**  LACKS FOUNDATION.  PERSONAL KNOWLEDGE

18  AND EXPERTISE.

19          **JUDGE HENDERSON:**  YOU'RE SHIFTING TO DRUG OFFENDERS

20  NOW RATHER THAN MENTAL HEALTH.

21          **MS. BARLOW:**  BOTH OF THOSE ARE WITHIN HIS AREA OF

22  EXPERTISE, YOUR HONOR, AS HE EXPLAINED AT LENGTH IN HIS

23  DECLARATION.

24          HE HAS DEVELOPED BOTH DRUG PROGRAMS.  HE ALSO MOVES

25  PEOPLE OUT OF THE JAIL INTO THESE COMMUNITY DRUG PROGRAMS.

1      **MR. SANGSTER:**  I THINK THE QUESTION WAS ASKED ABOUT

2  THE GENERAL POPULATION, NOT OFFENDERS, YOUR HONOR.  AND THAT'S

3  MY OBJECTION.

4      MY CROSS-EXAMINATION IS GOING TO BE VERY DIFFERENT IF

5  HE STARTS TESTIFYING ABOUT THE GENERAL POPULATION.

6      **MS. BARLOW:**  HE HAS ALREADY DONE THAT IN HIS

7  DEPOSITION, SO THEY ARE PREPARED FOR THIS.

8      **JUDGE KARLTON:**  WHETHER HE DID IN HIS DEPOSITION OR

9  NOT IS NOT THE POINT.

10      THE QUESTION IS -- WHY DON'T YOU JUST REPHRASE IT TO

11  PRISONERS OF SOME KIND.  I THINK YOU AVOID THE PROBLEM.

12      **MS. BARLOW:**  THAT'S FINE.

13      **JUDGE KARLTON:**  MAYBE NOT, I DON'T KNOW.

14  **BY MS. BARLOW:**

15  **Q.**  MR. CONKLIN, TO YOUR KNOWLEDGE, ARE THERE SUFFICIENT DRUG

16  TREATMENT RESOURCES AVAILABLE FOR THOSE WHO NEED IT IN ORDER TO

17  AVOID COMMITTING CRIME IN SAN DIEGO COUNTY?

18      **MR. SANGSTER:**  SAME OBJECTION.

19      **JUDGE HENDERSON:**  OVERRULED.  HE CAN ANSWER IT.

20  **A.**  NO, THEY ARE NOT.

21  **BY MS. BARLOW:**

22  **Q.**  AND ARE THERE SUFFICIENT RESOURCES FOR MENTAL HEALTH

23  TREATMENT IN SAN DIEGO COUNTY FOR THOSE WHO NEED MENTAL HEALTH

24  CARE?

25      **MR. SANGSTER:**  SAME OBJECTION.

1    **A.**  NO.

2              **JUDGE KARLTON:**  TO AVOID COMMITTING CRIME.

3    **BY MS. BARLOW:**

4    **Q.**  WHETHER IT'S TO AVOID COMMITTING A CRIME OR NOT, ARE THERE

5    SUFFICIENT RESOURCES IN THE COUNTY?

6    **A.**  NO, THERE ARE NOT.

7    **Q.**  NOW, WE HAVE HEARD FROM OTHER WITNESSES THAT THERE'S A

8    NATIONAL SHORTAGE OF MENTAL HEALTH PROFESSIONALS.  IS THAT TRUE

9    IN SAN DIEGO COUNTY AS WELL?

10   **A.**  YES.

11   **Q.**  AND TO YOUR UNDERSTANDING, IS THERE A PARTICULAR SHORTAGE

12   FOR ANY CATEGORY OF MENTAL HEALTH CARE WORKER?

13   **A.**  IT'S PRETTY MUCH ACROSS THE BOARD, AND IT'S TRUE THROUGHOUT

14   THE STATE OF CALIFORNIA, NOT JUST SAN DIEGO COUNTY.

15              ONE OF THE ELEMENTS OF THE MENTAL HEALTH SERVICES ACT

16   AND ONE OF THE GROUPS THAT FUNCTIONS IN THE OVERSIGHT AND

17   ACCOUNTABILITY COMMISSION IS A GROUP FOCUSED SPECIFICALLY ON

18   WORK FORCE DEVELOPMENT.

19              SO IN ORDER TRANSFORM THE MENTAL HEALTH SYSTEM, IT'S

20   RECOGNIZED AND VERY WELL DOCUMENTED THAT THERE'S A SHORTAGE,

21   PARTICULARLY OF PSYCHIATRISTS.  AND WHEN YOU DEAL WITH SOMEONE

22   WHO HAS A SEVERE AND PERSISTENT MENTAL ILLNESS, THAT'S A

23   TREATABLE MENTAL -- EXCUSE ME, A TREATABLE MEDICAL DISORDER.

24   IT'S A BRAIN DYSFUNCTION.  SO --

25              **JUDGE REINHARDT:**  I THINK COUNSEL ASKED YOU WHETHER

1   IT WAS TRUE EVERYWHERE IN THE COUNTRY.  MAYBE THAT WAS JUST

2   PRELIMINARY TO YOUR QUESTION, BUT IT IS TRUE THAT THERE IS A

3   SHORTAGE EVERYWHERE IN THE COUNTRY, ISN'T IT?

4           **THE WITNESS:**  YES.

5           **MS. BARLOW:**  I JUST -- THERE WAS A SUGGESTION THAT

6   SOME COMMUNITIES HAVE ENOUGH RESOURCES EVEN THOUGH THERE IS A

7   NATIONWIDE SHORTAGE, YOUR HONOR.  I WAS JUST ADDRESSING THAT

8   POINT.

9           **JUDGE REINHARDT:**  WELL, HE SAID THERE IS A SHORTAGE

10  IN SAN DIEGO AND THERE IS A SHORTAGE NATIONALLY.

11          **MS. BARLOW:**  YES.

12          **JUDGE REINHARDT:**  AND I DON'T KNOW WHY COUNSEL IS SO

13  DISTURBED BY THE QUESTION.  THE ANSWER IS OBVIOUS.

14          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

15  **BY MS. BARLOW:**

16  Q.  NOW, THERE IS A PROPOSAL TO RELEASE SOME PAROLEES FROM

17  PAROLE EARLIER THAN THEY WOULD OTHERWISE BE RELEASED.  IN OTHER

18  WORDS, I THINK IT'S A SUGGESTION THAT IF THEY ARE SUCCESSFUL FOR

19  12 MONTHS, THAT THEY BE RELEASED FROM PAROLE.

20          DO YOU BELIEVE THAT WOULD HAVE A NEGATIVE IMPACT ON

21  PUBLIC SAFETY?

22          **JUDGE KARLTON:**  THAT REALLY DOES APPEAR TO BE WELL

23  BEYOND HIS EXPERTISE.  THAT'S A QUESTION OF PAROLE.  I'M SORRY,

24  I SHOULDN'T OBJECTING.

25          **MR. SANGSTER:**  YOU SPOKE BEFORE I COULD, YOUR HONOR.

 1  AND YOU OBJECTED SO ELOQUENTLY.

 2          OBJECTION, LACKS FOUNDATION.

 3      **JUDGE KARLTON:**  OVERRULED.  WE WILL VOTE NOW.

 4      **MR. SANGSTER:**  I MUST NEED THESE THINGS FIXED, YOUR

 5  HONOR (INDICATING).

 6  **BY MS. BARLOW:**

 7  **Q.**  IN YOUR OPINION, DOES COMMUNITY SUPERVISION OF EX-FELONS,

 8  WHETHER IT'S BY PAROLE OR PROBATION, HAVE AN IMPACT ON THEIR

 9  SUCCESS IN THE COMMUNITY?

10      **MR. SANGSTER:**  OBJECTION.  LACKS FOUNDATION.

11  EXPERTISE.

12      **JUDGE KARLTON:**  IT'S NOT WHAT HE DOES.

13      **MS. BARLOW:**  HE IS VERY FAMILIAR WITH PROBATION, YOUR

14  HONOR.

15      **JUDGE HENDERSON:**  LAY THE FOUNDATION THEN.

16      **JUDGE KARLTON:**  THE QUESTION IS PAROLE.

17      **MS. BARLOW:**  PAROLE AND PROBATION.

18      **JUDGE KARLTON:**  YOU DON'T DO PAROLE AT ALL, IS WHAT I

19  BELIEVE YOU SAID, IS THAT RIGHT?

20      **THE WITNESS:**  THAT'S CORRECT, YOUR HONOR.

21  **BY MS. BARLOW:**

22  **Q.**  IN CONNECTION WITH SB 618, DO YOU PUT TOGETHER THAT PROGRAM,

23  AND THAT INVOLVES DOOR-TO-DOOR, RIGHT?  FROM THE FRONT END OUT

24  THROUGH THE PRISON AND BACK INTO THE COMMUNITY?

25  **A.**  YES.

1  **Q.** AND SO THE TEAMS THAT WORK ON THAT ARE PROBATION, PAROLE,

2  LAW ENFORCEMENT, MENTAL HEALTH, CORRECT?

3  **A.** YES, THAT'S CORRECT.

4  **Q.** ALL RIGHT.  DO YOU HAVE, BASED UPON THAT EXPERIENCE, AN

5  OPINION ABOUT WHETHER SUPERVISION IN THE COMMUNITY IS AN

6  IMPORTANT COMPONENT, WHETHER IT'S BY A PROBATION OFFICER OR A

7  PAROLE OFFICER?

8  **A.** MY EXPERIENCE IN THE EFFICACY AND THE EFFECTIVENESS OF

9  COMMUNITY SUPERVISION WAS SPECIFICALLY WITH THE CONNECTIONS

10 PROGRAM.  AND THAT REALLY WAS THE BASIS -- THE SUCCESS OF THAT

11 PROGRAM WAS THE BASIS FOR THE DESIGN THAT WE WENT INTO WITH THE

12 SB 618 WHEN WE DESIGNED THE PROGRAM, WAS TO TAKE THOSE SAME

13 ELEMENTS OF COMMUNITY SUPERVISION AND SUPPORT.  IT'S SIMPLY

14 APPLIED TO A DIFFERENT POPULATION.

15         **JUDGE KARLTON:**  IT ISN'T JUST A DIFFERENT POPULATION,

16 IS IT?  I'M ASKING YOU, NOT TELLING YOU.  I JUST REALIZED LIKE I

17 SOUNDED LIKE I WAS TELLING YOU.

18         THESE ARE PEOPLE WHO SPENT TIME IN PRISON.  IF THEY

19 WERE LOW LEVEL OFFENDERS, THEY WERE MIXING WITH HIGH LEVEL

20 OFFENDERS.  WE HAVE HAD TESTIMONY THAT THAT INEVITABLY CHANGES

21 THEIR CRIMINALISTIC SOMETHING-OR-OTHER.

22         SO IT'S REALLY -- I'M ASKING YOU, ISN'T THAT

23 SIGNIFICANTLY DIFFERENT THAN SOMEBODY WHO IS COMING OUT OF JAIL,

24 WHICH IS WHAT THE CONNECTIONS PROGRAM WAS ABOUT?

25         **THE WITNESS:**  IF I UNDERSTAND THE QUESTION, YOUR

1  HONOR, THEN THE -- YOUR QUESTION GOES TO WHETHER OR NOT A PERSON

2  SPENDING A GREATER PERIOD OF TIME IN PRISON IS LIKELY TO ADAPT

3  TO A HIGHER LEVEL OF CRIMINALITY THAN SOMEONE IN A JAIL?

4          **JUDGE KARLTON:**  AND, THEREFORE, TO ESSENTIALLY BE A

5  DIFFERENT PROBLEM THAN THE PROBLEM PRESENTED BY THE PEOPLE THAT

6  WERE DEALT WITH IN CONNECTIONS.

7          **THE WITNESS:**  I DON'T KNOW THAT I COULD SAY THAT

8  STATEMENT, YOU KNOW, BECAUSE I THINK THERE ARE SO MANY ELEMENTS

9  THAT GOES INTO A PERSON'S LIFE DEVELOPMENT AND DEVELOPMENT OF

10  CRIMINALITY OR WHATEVER, YOU KNOW, PRIOR THEIR EVER GETTING

11  CAUGHT, WHETHER THEY GO TO JAIL OR PRISON.  I DON'T KNOW THAT

12  PRISON IS THE INCUBATOR OF CRIMINALITY.

13          **JUDGE KARLTON:**  I WANT YOU TO ASSUME FOR A MOMENT

14  THAT THE TESTIMONY THAT WE HAVE RECEIVED HERE BY ALMOST

15  EVERYBODY IS THAT PRISONS BREED CRIMINALITY.

16          DOES THAT -- I MEAN, I THINK I KNOW THE ANSWER, BUT

17  MAYBE YOU HAVE A DIFFERENT VIEW.  DOES THAT MAKE THAT PERSON A

18  DIFFERENT PROBLEM THAN THE PROBLEM THAT YOU FACED WITHIN THE

19  CONNECTIONS PROGRAM?

20          **THE WITNESS:**  I WOULD SAY YES.  WHEN YOU LOOK AT THE

21  LITERATURE ABOUT RISK ASSESSMENT OF PEOPLE, CRIMINAL RISK AND

22  NEED ASSESSMENT, ONE OF THE FACTORS THAT NEGATIVELY INFLUENCES

23  CRIMINAL BEHAVIOR IS WHAT THEY CALL A DYNAMIC FACTOR, SOMETHING

24  THAT CAN BE CHANGED, AND THAT IS ASSOCIATION WITH CRIMINAL

25  PEERS.

1  BY MS. BARLOW:

2  Q.  ALL RIGHT.  I JUST HAVE A COUPLE QUICK FOLLOW-UP QUESTIONS

3  REGARDING THAT RISK ASSESSMENT ISSUE.

4         IT'S BEEN SUGGESTED THAT IF WE DO THE RIGHT KIND OF

5  RISK ASSESSMENT, WE CAN ELIMINATE ANY RISK TO PUBLIC SAFETY FROM

6  EITHER LETTING --

7         **JUDGE KARLTON:**  YOU MEAN, SUBSTANTIAL RISK.

8         **MS. BARLOW:**  YEAH.

9  BY MS. BARLOW:

10  Q.  BY LETTING PEOPLE OUT OR SHORTENING THEIR SENTENCES OR --

11  YOU KNOW, BY FOUR MONTHS OR BY TAKING THEM OFF PAROLE EARLIER.

12         DO YOU HAVE AN OPINION ABOUT THE RISK ASSESSMENT

13  APPROACH?

14  A.  I DO.

15  Q.  AND WHAT IS THAT?

16  A.  RISK ASSESSMENT IS QUITE LIMITED.  THERE ARE MAYBE 20 TO 25

17  RISK ASSESSMENT INSTRUMENTS.  VARIOUS PRIVATE COMPANIES PUBLISH

18  THESE THINGS.  AND JOAN PETERSILIA, WHO HEADS THE CRIMINALITY --

19  I FORGOT THE TITLE OF HER INSTITUTE, IT'S AT U.C. IRVINE -- HAS

20  OPINED AND HAS STATED THAT THE HIGHEST LEVEL OF PREDICTABILITY

21  OF RISK INSTRUMENTS IS FOR THE LOWEST LEVEL OF CRIMINAL

22  BEHAVIOR.

23         SO THEY ARE HIGHLY PREDICTIVE OF THINGS THAT ARE

24  RELATIVELY UNIMPORTANT, SUCH AS THE LIKELIHOOD THAT A PERSON

25  WILL FAIL TO APPEAR FOR FUTURE COURT DATE.  THEY ARE HIGHLY

1  PREDICTIVE.

2          THEY ARE VIRTUALLY USELESS, IN HER OPINION, FOR

3  THINGS LIKE SERIOUS FELONY CRIMES OR MURDERS.  THERE'S NOT A

4  VERY STRONG CORRELATION WITH THOSE RISK ASSESSMENT INSTRUMENTS

5  FOR THOSE MORE SERIOUS TRANSGRESSIONS.

6  Q.  AND YOUR UNDERSTANDING OF THE LITERATURE SUPPORTS THAT?

7  A.  YES.

8  Q.  THANK YOU.  I HAVE NOTHING FURTHER, YOUR HONOR.

9          MS. BARLOW:  I DO WANT TO ASK ONE CLARIFYING QUESTION

10  OF THE COURT, WHICH IS SOME OF THE FOLKS HAVE BEEN SORT OF

11  MOVING IN THE DECLARATIONS.  I WAS UNDER THE IMPRESSION THAT

12  THEY WERE ALREADY IN AND I DON'T NEED TO DO THAT?

13          JUDGE HENDERSON:  THAT'S TRUE.

14          MS. BARLOW:  THANK YOU.  I JUST WANTED TO CLARIFY

15  THAT.

16          THE COURT:  LET'S TAKE A 15-MINUTE RECESS BEFORE WE

17  GO TO THE CROSS.

18              (BRIEF RECESS HELD IN THE PROCEEDINGS.)

19          JUDGE HENDERSON:  OKAY.  I GUESS STATE DEFENDANTS

20  DON'T HAVE ANYTHING OF THIS WITNESS?

21          MS. TILLMAN:  NO QUESTIONS, YOUR HONOR.  THANK YOU.

22          JUDGE HENDERSON:  OKAY.  MR. SANGSTER.

23          MR. SANGSTER:  ED SANGSTER FOR THE PLAINTIFFS, YOUR

24  HONOR.

25  ///

1          **CROSS-EXAMINATION BY MR. SANGSTER**

2    BY MR. SANGSTER

3    **Q**    MR. CONKLIN, WE FINISHED OFF YOUR EXAMINATION, I HEARD YOU

4    TESTIFYING ABOUT RISK ASSESSMENT TOOLS.  WHAT TRAINING HAVE YOU

5    HAD IN THE USE OF RISK ASSESSMENT TOOLS?

6    **A**    THROUGH THE PROBATION DEPARTMENT WE HAD SOME GENERAL

7    TRAINING ABOUT RISK ASSESSMENT TOOLS.

8    **Q**    WHAT DO YOU MEAN BY "GENERAL TRAINING"?

9    **A**    BEING TAUGHT BY CONSULTANTS, EXPERIENCED PROBATION OFFICERS,

10   USING LSI AND LSIR.

11   **Q**    HOW MUCH GENERAL TRAINING HAVE YOU HAD IN RISK ASSESSMENT

12   TOOLS?

13   **A**    PROBABLY FOUR HOURS SPECIFICALLY.  I WAS NOT SPECIFICALLY

14   ADMINISTERING THEM.

15   **Q**    SO BESIDES THAT FOUR HOURS OF GENERAL TRAINING IN RISK

16   ASSESSMENT TOOLS, WHAT EXPERIENCE DID YOU HAVE THAT ALLOWED YOU

17   TO COMMENT ON THE FACT THAT THE RISK ASSESSMENT TOOLS WERE

18   USELESS IN PREDICTING CERTAIN BEHAVIORS?

19   **A**    NO DIRECT EXPERIENCE.

20   **Q**    WHAT DO YOU MEAN, "NO DIRECT EXPERIENCE"?

21   **A**    I HAVEN'T USED --

22   **Q**    YOU HAVE NO EXPERIENCE AT ALL?

23   **A**    I HAVEN'T USED RISK ASSESSMENT TOOLS.  I HAVE BEEN IN

24   DISCUSSIONS WITH PEOPLE WHO ARE EXPERT IN THE AREA.  THAT'S WHAT

25   I WAS COMMENTING ON.

1  Q   SO YOU WERE COMMENTING ON MS. PETERSILIA.  YOU WERE JUST

2  TELLING US WHAT YOU READ IN HER REPORT?

3  A   NO.  I WAS RELATING A PERSONAL CONVERSATION I HAD WITH HER

4  LAST FRIDAY.

5  Q   SO IT WASN'T EVEN A STUDY, IT'S JUST YOU TALKED TO HER, AND

6  NOW YOU ARE REPEATING FOR US WHAT SHE TOLD YOU?

7  A   SHE WAS RELATING WHAT HER STUDIES HAVE FOUND.

8          MR. SANGSTER:  YOUR HONOR, I'D MOVE TO STRIKE THE

9  TESTIMONY AS BEING HEARSAY, LACKING FOUNDATION.  YOUR HONOR

10  PERMITTED IT OVER MY OBJECTION, BUT IT'S COMPLETE HEARSAY.

11          JUDGE REINHARDT:  WHY CAN'T SOMEBODY INTRODUCE THE

12  STUDY IF THEY WANT US TO RELY ON --

13          JUDGE KARLTON:  WHY CAN'T THEY CALL MS. PETERSILIA?

14          MR. SANGSTER:  SHE'S THE MOST MENTIONED WITNESS IN

15  THE TRIAL.

16          JUDGE REINHARDT:  IF YOU DON'T WANT TO CALL HER AND

17  YOU WANT US TO RELY ON WHAT HER STUDY SAYS, WOULDN'T YOU

18  INTRODUCE HER STUDY, RATHER THAN HAVE A WITNESS SAY HE TALKED TO

19  HER AND SHE SAID THIS IS WHAT'S IN THE STUDY?

20          MR. SANGSTER:  BY SOMEBODY WHO HAD FOUR HOURS OF

21  TRAINING.

22          MS. BARLOW:  IF I COULD RESPOND, YOUR HONOR?  THE

23  WITNESS DID TESTIFY THAT'S ALSO REFLECTED IN THE OTHER

24  LITERATURE.

25          JUDGE REINHARDT:  HE JUST ANSWERED THE REASON HE

 1  REPEATED ABOUT MS. PETROSELLI, OR WHATEVER HER NAME IS, IS SHE

 2  SAID TO HIM, THIS IS WHAT'S IN MY STUDY.  I WAS SUGGESTING IF

 3  YOU WANTED US TO CONSIDER WHAT'S IN HER STUDY, I THINK YOU WOULD

 4  INTRODUCE THE STUDY INSTEAD OF HAVING THE WITNESS SAY THIS IS

 5  WHAT SHE SAYS IS IN HER STUDY.

 6              **JUDGE KARLTON:**  ASSUMING SOMEBODY WOULD INTRODUCE IT.

 7              ANYWAY, THERE'S A MOTION TO STRIKE, JUDGE HENDERSON.

 8              **JUDGE HENDERSON:**  GRANTED.

 9  BY MR. SANGSTER

10  **Q**   YOU TALKED ABOUT A SHORTAGE OF MENTAL HEALTH PRACTITIONERS

11  IN SAN DIEGO COUNTY.  IS IT EASIER OR HARDER TO HIRE MENTAL

12  HEALTH PRACTITIONERS TO WORK IN INCARCERATION SETTINGS THAN IN

13  THE COMMUNITY HEALTH HOSPITALS?

14  **A**   IN OUR DEPARTMENT IT'S BEEN QUITE DIFFICULT TO HIRE MENTAL

15  HEALTH PRACTITIONERS, AND PART OF THE REASON IS THAT WE HAVE A

16  VERY STRICT SECURITY BACKGROUND CHECK THAT DISALLOWS CERTAIN

17  APPLICANTS.

18  **Q**   SO THE SHORTAGE OF MENTAL HEALTH PRACTITIONERS IS EVEN

19  GREATER FOR YOUR JAILS THAN IT IS IN THE COMMUNITY AT LARGE?

20  **A**   NO.  I'M FULLY STAFFED IN THE JAILS WITHIN MY BUDGET.

21  **Q**   JUST MORE DIFFICULT TO HIRE?

22  **A**   YES.

23  **Q**   YOU TALKED ABOUT YOUR CONCERNS OF RELEASING PAROLEES WITHOUT

24  ANY SERVICES, AND I WANT TO FOLLOW UP ON THAT.

25              IS IT CORRECT YOU HAVE NO INFORMATION RIGHT NOW ABOUT

1   THE SERVICES THAT ARE BEING PROVIDED TO MENTALLY ILL PAROLEES AT

2   THE TIME OF THEIR RELEASE?

3   **A**   NO, THAT'S NOT CORRECT.

4   **Q**   OKAY.  WELL, WHAT INFORMATION DO YOU HAVE ABOUT THE SERVICES

5   THAT ARE BEING PROVIDED RIGHT NOW?

6   **A**   I PARTICIPATE IN A COMMITTEE THAT HAS ONE OF THE REGIONAL

7   PAROLE ADMINISTRATORS IN THAT, AND HE SHARES IN THOSE MEETINGS

8   WHAT'S GOING ON WITH HIS PAROLE CASELOAD.

9   **Q**   SO YOUR INFORMATION IS BASED ON WHAT HE TELLS YOU IN THOSE

10  MEETINGS?

11  **A**   THAT'S CORRECT.

12  **Q**   WELL, ARE THERE SERVICES BEING PROVIDED TO PAROLEES --

13  MENTALLY ILL PAROLEES AT THIS TIME, SIR?

14  **A**   YES.

15  **Q**   SO YOUR OPINIONS ARE ASSUMING THAT THOSE SERVICES WILL

16  CONTINUE TO BE PROVIDED OR NOT BE PROVIDED?

17  **A**   I ASSUME THE PAROLE OUTPATIENT CLINICS WILL CONTINUE TO

18  EXIST.

19  **Q**   SO WHEN YOU WERE TALKING ABOUT THE PUBLIC SAFETY IMPACT OF

20  RELEASING MENTALLY ILL PAROLEES WITH NO SERVICES, WERE YOU

21  INCLUDING THE FACT THAT THEY WERE GOING TO BE TREATED BY THE

22  PAROLE OUTPATIENT CLINICS?

23  **A**   I'M SORRY.  I DON'T UNDERSTAND THE QUESTION.

24  **Q**   WHEN YOU WERE TALKING ABOUT THE LACK OF SERVICES FOR

25  PAROLEES IF THIS COURT GRANTS A PRISONER RELEASE ORDER, WERE YOU

1  TAKING INTO ACCOUNT THE FACT THAT THERE ALREADY ARE SOME

2  SERVICES BEING PROVIDED TO PAROLEES?

3  **A**   I BELIEVE I WAS, YES.  I KNOW THAT THEY DO HAVE THOSE

4  CLINICS.  I DON'T KNOW HOW MANY PAROLEES DO OR DON'T GO TO THEM.

5  **Q**   DO YOU KNOW WHAT SERVICES THOSE CLINICS PROVIDE?

6  **A**   YEAH, THEY PROVIDE MEDICATION MANAGEMENT AND SOME LIMITED

7  CASE MANAGEMENT.  SOME OF THE CLINICS HAVE SOCIAL WORK STAFF.

8  **Q**   ALL RIGHT.  I WANT TO TALK TO YOU ABOUT WHAT YOU CALLED YOUR

9  FREQUENT FLIERS.  THESE ARE THE PEOPLE THAT COME BACK TO YOUR

10  JAIL REPEATEDLY BECAUSE OF DIFFICULTIES WITH THEIR MENTAL

11  ILLNESS.  DO YOU HAVE THAT IN MIND?

12  **A**   THEY COME BACK TO JAIL BECAUSE OF CRIMES THEY COMMIT AND

13  THEY GET ARRESTED, AND THEY HAVE A MENTAL ILLNESS AND SUBSTANCE

14  ABUSE PROBLEMS.

15  **Q**   I GUESS WHAT I WAS TRYING TO FIGURE OUT IS, SIR, ARE YOU

16  SAYING THEY'RE COMING BACK -- STRIKE THAT -- THE CRIMES THEY

17  WERE COMMITTING WERE CAUSED BY THEIR MENTAL ILLNESS, OR IS

18  THIS -- OR ARE YOU JUST SAYING THEY COME BACK AND THEY ARE

19  MENTALLY ILL?

20  **A**   I WAS SAYING THE LATTER.  I DON'T KNOW WHAT CAUSES THEIR

21  CRIME.

22  **Q**   OKAY.  I WANT TO TALK ABOUT WHAT YOU DESCRIBED IN YOUR

23  DECLARATION AS A VERY SIMPLE ALTERNATIVE TO A PRISONER RELEASE

24  ORDER, AND YOU REMEMBER YOUR VERY SIMPLE ALTERNATIVE?

25  **A**   I'M AFRAID I DON'T RECALL THAT PART OF THE DECLARATION.

1  Q   WELL, DO YOU REMEMBER DESCRIBING THAT YOU THOUGHT ONE

2  ALTERNATIVE WAS TO PROVIDE THESE TRANSITIONAL SERVICES FOR

3  MENTALLY ILL PAROLEES TO FIND THEM SERVICES BEFORE THEY WERE

4  RELEASED?

5  A   YES, SIMILAR TO THE CONNECTIONS PROGRAM, I BELIEVE THAT'S

6  WHAT I HAD IN MIND.

7  Q   YOU THINK THAT WOULD HAVE A SIGNIFICANT IMPACT ON THE

8  RECIDIVISM OF MENTALLY ILL PAROLEES?

9  A   YES, SIR, I DO.

10  Q   THAT'S JUST BASED ON WHAT YOU'VE OBSERVED IN JAILS, RIGHT?

11  A   NO, SIR.  IT'S BASED ON WHAT WE'VE OBSERVED WITH THE TWO

12  DIFFERENT CONNECTIONS PROGRAMS AND WITH OUR CENTER STAR ACT

13  PROGRAM, WHERE WE HAVE PEOPLE THAT ARE INVOLVED IN THE CRIMINAL

14  JUSTICE SYSTEM WHO DO GET COMPREHENSIVE WRAPAROUND SERVICES AND

15  CASE MANAGEMENT, AND THEY DON'T REOFFEND TO THAT HIGH DEGREE.

16          **JUDGE KARLTON:**  I EXPECT NOW -- NOW THAT I HEAR THIS,

17  I AM CONFUSED.  I THOUGHT YOU TOLD ME, MAYBE I'M WRONG, THAT THE

18  CONNECTION PROGRAM WAS NOT -- THAT PERSONS INVOLVED IN FELONIES

19  WERE NOT GOING TO BE SERVICED IN THE CONNECTION PROGRAM; IS THAT

20  WRONG?

21          **THE WITNESS:**  I BELIEVE WHAT I WAS TALKING ABOUT,

22  YOUR HONOR, WAS THE MENTAL HEALTH COURT THAT WE HOPE TO

23  ESTABLISH AND THAT --

24          **JUDGE KARLTON:**  OKAY.  THEY'RE NOT GOING TO BE THERE.

25  AS TO THE CONNECTIONS PROGRAM, WERE YOU DEALING WITH FELONS

 1  THEN?

 2              **THE WITNESS:**  YES.

 3              **JUDGE KARLTON:**  OKAY.  PEOPLE WHO HAVE BEEN TO PRISON

 4  OR WERE DIVERTED ONE WAY OR ANOTHER?

 5              **THE WITNESS:**  IN SOME CASES THEY HAD BEEN TO PRISON

 6  AND THEY WERE BACK FROM PRISON; THEY WERE IN JAIL AS A RESULT OF

 7  A NEW CRIME.  IN OTHER CASES THEY WERE JUST COUNTY JAIL

 8  PRISONERS.

 9              **JUDGE KARLTON:**  BUT THE PROGRAM WAS NOT AT ALL

10  DESIGNED TO DEAL WITH PAROLEES AS PAROLEES?

11              **THE WITNESS:**  NO, IT WAS FOR PROBATIONERS

12  SPECIFICALLY.

13              **JUDGE KARLTON:**  THAT'S WHAT I THOUGHT I HEARD YOU

14  SAY.

15  BY MR. SANGSTER

16  **Q**   BUT ESSENTIALLY WHAT YOU'RE TALKING ABOUT IS JUST LINING UP

17  SERVICES FOR THESE PEOPLE BEFORE THEY'RE ACTUALLY RELEASED FROM

18  INCARCERATION, CORRECT?

19  **A**   WHAT I'M TALKING ABOUT IS BEGINNING THE SERVICES WHILE

20  THEY'RE STILL INCARCERATED AND TRANSITIONING THEM INTO THE

21  COMMUNITY WITH THOSE SERVICES CONTINUING.

22  **Q**   SO WHAT'S YOUR SENSE OF HOW LONG IT TAKES TO GET ALL THOSE

23  THINGS SET UP FOR A MENTALLY ILL PERSON?

24              **MS. BARLOW:**  VAGUE AND AMBIGUOUS AS TO "ALL THOSE

25  THINGS."

 1  BY MR. SANGSTER

 2  **Q**   WELL, THE TRANSITIONAL SERVICES YOU WERE TALKING ABOUT THAT

 3  WOULD HELP A MENTALLY ILL INMATE SUCCEED IN THE COMMUNITY, IS

 4  THIS SOMETHING THAT CAN BE SET UP IN A WEEK.  DOES IT TAKE A

 5  YEAR?  HOW LONG DOES IT TAKE?

 6  **A**   I DON'T KNOW HOW LONG IT WOULD TAKE THE STATE TO PUT

 7  SOMETHING LIKE THAT IN PLACE.  THAT WOULD BE DEPENDENT UPON --

 8  SOMEBODY WHO WORKS FOR CDCR COULD TELL YOU ABOUT THEIR TIME

 9  LINES AND SO ON.

10  **Q**   OKAY.  WELL, IS THERE ANY REASON THAT THOSE SERVICES, THOSE

11  TRANSITIONAL SERVICES, CAN'T BE PROVIDED EVEN IF THIS COURT IS

12  GOING TO ORDER THAT SOME OF THESE PEOPLE BE RELEASED A LITTLE

13  BIT EARLY FROM THEIR SENTENCE?

14  **A**   IS THERE A REASON THEY COULD NOT BE PROVIDED?

15  **Q**   YEAH, YEAH.

16  **A**   I DON'T KNOW WHETHER THE STATE COULD OR COULDN'T.  I'M NOT

17  IN A POSITION TO COMMENT ON WHAT THEY COULD OR COULD NOT DO.

18  **Q**   SO ARE YOU SAYING YOU DON'T FEEL AS THOUGH YOU'RE IN A

19  POSITION TO COMMENT ABOUT WHETHER YOUR ALTERNATIVE WOULD WORK

20  FOR PAROLEES?

21  **A**   NO, I DIDN'T SAY THAT.

22          **JUDGE HENDERSON:**  THE DIFFERENCE BETWEEN WOULD WORK

23  IF IMPLEMENTED AND CAN IT BE IMPLEMENTED --

24          **MR. SANGSTER:**  I GUESS THAT'S WHAT I'M TRYING TO

25  GATHER IS --

1          **JUDGE REINHARDT:**  THE QUESTION IS IF YOU SAY THAT'S

2   AN ALTERNATIVE, IS IT AN ALTERNATIVE THAT THE STATE CAN PROVIDE,

3   OR IS IT NOT AN ALTERNATIVE AT ALL?

4          **THE WITNESS:**  I BELIEVE IF THE STATE WANTED TO DO

5   COMMUNITY REENTRY PROGRAMMING, THEY COULD DO IT.  THERE ARE MANY

6   MODELS THROUGHOUT THE NATION THAT DEMONSTRATE THAT.  OUR

7   CONNECTIONS PROGRAM WAS ONE EXAMPLE OF SUCH A REENTRY AND

8   TRANSITION PROGRAM.

9          **JUDGE REINHARDT:**  DOES THAT ANSWER YOUR QUESTION, OR

10  ARE YOU ASKING HIM HOW MUCH TIME --

11         **MR. SANGSTER:**  CLOSE ENOUGH.

12         **JUDGE KARLTON:**  IT REALLY ISN'T BECAUSE I STILL DON'T

13  KNOW WHAT WE'RE DOING.  YES, THE STATE, I THINK YOU'VE

14  TESTIFIED, THE STATE COULD; THERE'S NO PRESENT REASON TO BELIEVE

15  THAT THEY WOULD.  IS THAT FAIR?

16         **THE WITNESS:**  I THINK THAT'S A FAIR STATEMENT.  I'M

17  NOT AWARE OF ANYTHING THAT THE STATE CDCR IS DOING, BUT THAT

18  DOESN'T MEAN THEY ARE NOT DOING IT.  I JUST DON'T KNOW.

19  BY MR. SANGSTER

20  **Q**   YOU THINK IT WOULD BE A GOOD THING, BUT YOU DO NOT KNOW IF

21  IT'S FEASIBLE; IS THAT CORRECT?

22  **A**   I DON'T KNOW WHETHER IT'S FEASIBLE OR NOT.  THAT'S UP TO THE

23  DEPARTMENT OF CORRECTIONS.

24         **MR. SANGSTER:**  I DON'T HAVE ANY FURTHER QUESTIONS FOR

25  THE WITNESS, YOUR HONOR.

1          **MS. BARLOW:**  I CAN'T SEE HER.  DOES CCPOA HAVE ANY

2    QUESTIONS?

3          **MS. LEONARD:**  NO FURTHER QUESTIONS, YOUR HONOR.

4          **JUDGE HENDERSON:**  OKAY.  I DIDN'T HAVE MY GLASSES ON.

5          **MS. BARLOW:**  I DIDN'T SEE HER EITHER, YOUR HONOR.

6          **JUDGE REINHARDT:**  SHE'S GETTING FARTHER AND FARTHER

7    AWAY WITH EACH WITNESS.  I DON'T BLAME YOU.

8              **REDIRECT EXAMINATION BY MS. BARLOW**

9    BY MS. BARLOW

10   **Q**   I THINK THERE MIGHT HAVE BEEN SOME CONFUSION, MR. CONKLIN,

11   BETWEEN TWO DIFFERENT ALTERNATIVES YOU TALKED ABOUT IN YOUR

12   REPORT.  ONE WAS THE TYPE OF CONNECTIONS PROGRAM WHERE YOU GO

13   FROM BEGINNING TO END, AND THE OTHER ONE WAS A PROGRAM WHERE YOU

14   GET BENEFITS IN PLACE FOR FOLKS, AND YOU TALKED ABOUT THE FACT

15   THAT THERE ARE ALREADY SOME MODELS OF THAT, YOU'VE SEEN THAT

16   HAPPEN IN STATE PRISONS, CORRECT?

17   **A**   I SAW ONE SUCH PROGRAM PROBABLY THREE OR FOUR YEARS AGO AT

18   DONOVAN PRISON IN SAN DIEGO.

19   **Q**   SO JUST TO CLARIFY FOR THE COURT, THAT'S TWO DIFFERENT

20   ALTERNATIVES YOU TALKED ABOUT.  ONE IS A STATE PRISON TYPE OF

21   IMPLEMENTATION OF YOUR CONNECTIONS PROGRAM.  ANOTHER IS GETTING

22   FOLKS LINED UP FOR BENEFITS SO THAT THEY CAN LIVE APPROPRIATELY

23   IN THE COMMUNITY WHEN RELEASED, CORRECT?

24   **A**   WE DID DISCUSS THOSE TWO THINGS SEPARATELY.  OPTIMALLY THEY

25   WOULD BE PART OF THE SAME PROGRAM.

1   Q    RIGHT.

2           NOW, IN TERMS OF THE NEED FOR ADDITIONAL MENTAL

3   HEALTH SERVICES, YOU WERE ASKED ABOUT THE SERVICES THAT PAROLEES

4   ARE GETTING, AND YOU INDICATED THAT THEY ARE GETTING SOME MENTAL

5   HEALTH SERVICES, THROUGH PAROLE, THROUGH OUTPATIENT CLINICS AND

6   SO ON.  IF NO ADDITIONAL SERVICES WERE -- NO ADDITIONAL PAROLE

7   OFFICERS, NO ADDITIONAL MENTAL HEALTH SERVICES, WOULD YOU EXPECT

8   THAT THAT ADDITIONAL BURDEN OF MORE PAROLEES WOULD CAUSE THEM TO

9   GET LESS TREATMENT, NOT MORE?

10          MR. SANGSTER:  OBJECTION.  LACKS FOUNDATION, CALLS

11  FOR SPECULATION.

12          MS. BARLOW:  THIS IS DIRECTLY IN RESPONSE TO

13  CROSS-EXAMINATION.

14          JUDGE HENDERSON:  I'M GOING TO ALLOW IT.

15          THE WITNESS:  I'M SORRY.  WOULD YOU RESTATE THE

16  QUESTION?

17  BY MS. BARLOW

18  Q    IF -- IN THE PAROLE CLINICS THAT YOU TALKED ABOUT WHERE

19  PAROLEES CAN COME IN AND GET MENTAL HEALTHCARE, THERE'S NO

20  PROPOSAL TO EXPAND THAT WHEN YOU LET THESE PAROLEES OUT.  SO

21  WOULD YOU EXPECT THAT THERE MIGHT BE AN OVERALL REDUCTION IN THE

22  AMOUNT OF MENTAL HEALTHCARE THAT PAROLEES WOULD GET?

23          MR. SANGSTER:  OBJECTION.  ASSUMES FACTS NOT IN

24  EVIDENCE.

25          JUDGE HENDERSON:  WHAT IT REALLY DOES IS IT ASKS HIM

 1  THE SAME QUESTION THAT YOU CAN ARGUE TO US, BECAUSE --

 2          **JUDGE KARLTON:**  IT'S SILLY.

 3          **MS. BARLOW:**  ALL RIGHT.

 4          **JUDGE HENDERSON:**  IT'S NOT HIS EXPERTISE.  YOU CAN

 5  ARGUE THAT BASED ON THE EVIDENCE.

 6          **JUDGE KARLTON:**  IT MAY BE TRUE, BUT --

 7          **MS. BARLOW:**  THANK YOU, YOUR HONOR.  I'LL MOVE ON.

 8  BY MS. BARLOW

 9  **Q**   WITH RESPECT TO THE COMMUNITY MENTAL HEALTH PROGRAMS IN

10  GENERAL, WOULD THE COUNTY OF SAN DIEGO MENTAL HEALTH PROGRAMS BE

11  ABLE TO EXPAND IF ADEQUATE FUNDING AND STAFFING WOULD BE

12  PROVIDED?

13          **MR. SANGSTER:**  OBJECTION.  LACKS FOUNDATION, PERSONAL

14  KNOWLEDGE, EXPERTISE.  GOES BEYOND THE WITNESS'S --

15          **JUDGE KARLTON:**  IT MAY GO BEYOND THE

16  CROSS-EXAMINATION.  DO YOU WANT TO TRY THAT ONE?

17          **MR. SANGSTER:**  YES, YOUR HONOR.  THAT'S WHAT I MEANT

18  TO SAY.  IT GOES BEYOND THE SCOPE.

19          **MS. BARLOW:**  I HAVE NOTHING FURTHER, YOUR HONOR.

20          **MR. SANGSTER:**  NO RECROSS, YOUR HONOR.

21          **JUDGE HENDERSON:**  OKAY.  THANK YOU FOR TESTIFYING,

22  MR. CONKLIN.  YOU'RE EXCUSED.

23          **THE WITNESS:**  YOU'RE WELCOME.

24          **JUDGE HENDERSON:**  AND THAT IS IT FOR TODAY.

25          **JUDGE REINHARDT:**  WE HAVE AN EXTRA HOUR WE CAN KEEP

 1   TALKING IF WE WANT.

 2           **MR. BIEN:**  YOUR HONOR, JUST FOR THE RECORD, JOAN

 3   PETERSILIA HAS WRITTEN A REPORT FOR GOVERNOR SCHWARZENEGGER

 4   DATED DECEMBER 2007.  IT'S PLAINTIFF'S EXHIBIT 113, WHICH TALKS

 5   ABOUT, AMONG OTHER THINGS, RISK ASSESSMENT INSTRUMENTS AND ...

 6           **JUDGE KARLTON:**  113?

 7           **MR. BIEN:**  YES.

 8           **JUDGE KARLTON:**  THERE WE ARE.

 9           **JUDGE HENDERSON:**  OKAY.  COURT IS ADJOURNED UNTIL

10   9:15 TOMORROW.

11                   (PROCEEDINGS ADJOURNED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **SCOTT KERNAN** | | |
| DIRECT EXAMINATION BY MR. MELLO | 1892 | 10 |
| CROSS-EXAMINATION BY MR. FAMA | 1912 | 10 |
| REDIRECT EXAMINATION BY MR. MELLO | 1935 | 10 |
| **JAMES W. MARQUART, PH.D.** | | |
| DIRECT EXAMINATION BY MS. JOHNSON | 1941 | 10 |
| DIRECT EXAMINATION BY MR. MITCHELL | 1970 | 10 |
| CROSS EXAMINATION BY MR. SPECTER | 1979 | 20 |
| **RICHARD CONKLIN** | | |
| DIRECT EXAMINATION BY MS. BARLOW | 2043 | 10 |
| CROSS-EXAMINATION BY MR. SANGSTER | 2081 | 10 |
| REDIRECT EXAMINATION BY MS. BARLOW | 2090 | 10 |

| PLAINTIFF'S WITNESSES | | |
|---|---|---|
| **JOSEPH LEHMAN** | | |
| DIRECT EXAMINATION BY MR. SPECTER | 2003 | 10 |
| CROSS-EXAMINATION BY MS. JOHNSON | 2021 | 10 |
| DIRECT EXAMINATION BY MS. WANG | 2041 | 10 |

–   –   –   –

| PLAINTIFF'S EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 839 | | | 1916 | 10 |

| DEFENDANTS' EXHIBITS | | | | |
|---|---|---|---|---|
| 1331 | 2030 | 10 | 2031 | 10 |

## CERTIFICATE OF REPORTER

WE, JOAN MARIE COLUMBINI AND DEBRA L. PAS, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK JPM, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.


/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR


S/ DEBRA L. PAS

DEBRA L. PAS, CSR 11916, CRR, RMR, RPR

WEDNESDAY, DECEMBER 10, 2008