VOL 11

PAGES 2096 – 2291

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, ET AL.,           )
                                 )
          PLAINTIFFS,            )
                                 )
  VS.                            ) NO. CIV S-90-0520 LKK JFM
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 ) THREE-JUDGE COURT
          DEFENDANTS.            )
                                 )
_____

MARCIANO PLATA, ET AL.,          )
                                 )
          PLAINTIFFS,            )
                                 )
VS.                              ) NO. C 01-1351 TEH
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 )
          DEFENDANTS.            )
_____)

*TRANSCRIPT OF PROCEEDINGS*

SAN FRANCISCO, CALIFORNIA
THURSDAY, DECEMBER 112008

(APPEARANCES ON FOLLOWING PAGES)


*REPORTED BY:*  JOAN MARIE COLUMBINI, CSR 5435, RPR
                DEBRA L. PAS, CSR 11916, CRR, RMR, RPR
                OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                           1917 FIFTH STREET
                           BERKELEY, CALIFORNIA  94710
                    BY:  **DONALD SPECTER, ESQUIRE**
                         **REBEKAH EVENSON, ESQUIRE**
                         **STEVEN FAMA, ESQUIRE**
                         **AMY WHELAN, ESQUIRE**


                           ROSEN, BIEN & GALVAN, LLP
                           315 MONTGOMERY STREET, TENTH FLOOR
                           SAN FRANCISCO, CALIFORNIA 94104
                    BY:  **MICHAEL W. BIEN, ESQUIRE**


                           K&L GATES
                           FOUR EMBARCADERO CENTER
                           SUITE 1200
                           SAN FRANCISCO, CALIFORNIA 94111

                     BY: **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**              CARROLL, BURDICK & MCDONOUGH
                           44 MONTGOMERY STREET, SUITE 400
                           SAN FRANCISCO, CALIFORNIA  94104
                    BY: **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**         STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           1300 I STREET, SUITE 125
                           P.O. BOX 944255
                           SACRAMENTO, CALIFORNIA  94244
                    BY:  **LISA A. TILLMAN, ESQUIRE**


                           STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           455 GOLDEN GATE AVENUE, SUITE 11000
                           SAN FRANCISCO, CALIFORNIA  94102
                     BY: **KYLE A. LEWIS, ESQUIRE**


(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**          HANSON BRIDGETT
                           425 MARKET STREET, 26TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94105
                      BY:  **PAUL MELLO, ESQUIRE**
                           **S. ANNE JOHNSON, ESQUIRE**


**FOR DISTRICT ATTORNEY**   THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**             COUNTY OF RIVERSIDE
                           82-675 HIGHWAY 111, FOURTH FLOOR
                           INDIO, CALIFORNIA  92201
                      BY:  **WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**          AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**             580 CALIFORNIA STREET, 15TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94104
                      BY:  **TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT**     JONES & MAYER
**INTERVENORS**             3777 NORTH HARBOR BOULEVARD
                           FULLERTON, CALIFORNIA  92835
                      BY:  **KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS**  OFFICE OF THE COUNTY COUNSEL
                           COUNTY OF SANTA CLARA
                           70 WEST HEDDING STREET
                           NINTH FLOOR, EAST WING
                           SAN JOSE, CALIFORNIA  95110
                      BY:  **THERESA FUENTES, ESQUIRE**


**FOR SONOMA COUNTY**       COUNTY OF SONOMA
**INTERVENORS**             575 ADMINISTRATION DRIVE, ROOM 105A
                           SANTA ROSA, CALIFORNIA  95403
                      BY:  **ANNE L. KECK, ESQUIRE**

1   **THURSDAY, DECEMBER 11, 2008**                    9:23 O'CLOCK A.M.

2

3                           **P R O C E E D I N G S**

4

5           **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

6   WITNESS, COUNSEL.

7           **MR. SANGSTER:**  GOOD MORNING, YOUR HONOR.  ED SANGSTER

8   FOR THE PLAINTIFFS.  THE PLAINTIFFS CALL DR. BARRY KRISBERG.

9                           **BARRY KRISBERG,**

10  HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

11  DULY SWORN AND EXAMINED AS FOLLOWS:

12          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

13  RECORD.

14          **THE WITNESS:**  MY NAME IS BARRY KRISBERG, B-A-R-R-Y,

15  K-R-I-S-B-E-R-G.

16              **DIRECT EXAMINATION BY MR. SANGSTER**

17  **BY MR. SANGSTER**

18  **Q**   GOOD MORNING, DR. KRISBERG.  WOULD YOU GIVE THE COURT A VERY

19  BRIEF SUMMARY OF YOUR EDUCATIONAL BACKGROUND?

20  **A**   I RECEIVED A BACHELOR'S FROM THE UNIVERSITY OF PENNSYLVANIA,

21  GOT A MASTER'S FROM THE SAME SCHOOL IN CRIMINOLOGY, AND,

22  ULTIMATELY, A PH.D. IN SOCIOLOGY FROM PENN.

23  **Q**   WOULD YOU GIVE THE COURT A VERY BRIEF SUMMARY OF YOUR CAREER

24  IN CRIMINOLOGY?

25  **A**   AFTER GETTING MY DEGREE, I CAME OUT AND TAUGHT AT THE

1    UNIVERSITY OF CALIFORNIA BERKELEY IN WHAT WAS THEN THE SCHOOL OF

2    CRIMINOLOGY, WENT ON TO WORK FOR THE NATIONAL COUNCIL ON CRIME

3    AND DELINQUENCY WHERE I'M STILL EMPLOYED.  THAT BEGAN IN 1976.

4            I'VE ALSO HAD A NUMBER OF ADJUNCT EDUCATIONAL

5    APPOINTMENTS DURING THAT PERIOD, MOST RECENT ONE AT THE LAW

6    SCHOOL AT U.C. BERKELEY.

7    **Q**   WHAT IS THE NATIONAL CENTER ON CRIME AND DELINQUENCY?

8    **A**   NATIONAL COUNCIL ON CRIME AND DELINQUENCY.

9    **Q**   NATIONAL COUNCIL ON CRIME AND DELINQUENCY.

10   **A**   IT IS THE NATION'S OLDEST CRIMINAL JUSTICE RESEARCH

11   ORGANIZATION.

12   **Q**   HAVE YOU PUBLISHED ANY BOOKS ON THE SUBJECT OF CRIMINOLOGY?

13   **A**   YES, I HAVE.

14   **Q**   HOW MANY?

15   **A**   FOUR BOOKS.

16   **Q**   HAVE YOU AUTHORED ANY PEER-REVIEWED ARTICLES IN THE FIELD OF

17   CRIMINOLOGY?

18   **A**   YES, QUITE A NUMBER OF OVER THE YEARS.

19   **Q**   HAVE YOU RECEIVED ANY AWARDS FOR YOUR WORK IN THE FIELD OF

20   CRIMINOLOGY?

21   **A**   YES, IN 1993 I WAS SELECTED BY THE AMERICAN SOCIETY OF

22   CRIMINOLOGY FOR THE AUGUST VOLLMER AWARD WHICH IS --

23   **Q**   HOW SIGNIFICANT IS THAT AWARD?

24   **A**   IT'S THEIR HIGHEST AWARD FOR CONTRIBUTIONS TO CRIMINAL

25   JUSTICE.  I'VE ALSO BEEN SELECTED BY THE JESSIE BALL DUPONT FUND

1   AS THEIR GRANTEE OF THE YEAR, AND SOME OTHER AWARDS AS WELL.

2   **Q**   HAVE YOU BEEN ASKED TO PROVIDE ANY TRAINING TO CALIFORNIA

3   COUNTIES IN THE FIELD OF CRIMINOLOGY?

4   **A**   YES, I HAVE.

5   **Q**   WOULD YOU BRIEFLY DESCRIBE THAT?

6   **A**   PRINCIPALLY, MY RESEARCH, MY TRAINING HAS INVOLVED TRAINING

7   PROBATION STAFF, AND, IN SOME CASES, JAIL STAFF ON ISSUES

8   RELATED TO CLASSIFICATION AND EFFECTIVE SUPERVISION STRATEGIES.

9   **Q**   WHAT STUDIES OF CALIFORNIA PRISONS HAVE YOU BEEN INVOLVED

10  WITH?

11  **A**   I PROBABLY BEEN INVOLVED IN EVERY MAJOR LEGISLATIVELY

12  MANDATED STUDY OF THE CALIFORNIA PRISONS SINCE 1980.  THE FIRST

13  ONE, I ACTUALLY DIRECTED A STUDY FOR THE LEGISLATURE ON

14  ALTERNATIVES TO THE PRISON SYSTEM.  SUBSEQUENT TO THAT, I WAS

15  APPOINTED TO THE BLUE RIBBON COMMISSION ON INMATE POPULATION

16  MANAGEMENT, WHICH WAS DURING GOVERNOR DEUKMEJIAN'S

17  ADMINISTRATIONS.  MORE RECENTLY I WAS APPOINTED TO BE PART OF AN

18  EXPERT PANEL ON PRISONER REHABILITATION IN CDCR.  SO, AGAIN MOST

19  OF THE MAJOR EFFORTS I HAVE BEEN INVOLVED IN.

20  **Q**   HAVE YOU FORMED ANY OPINIONS ABOUT THE IMPACT THAT PRISON

21  POPULATION REDUCTION IN CALIFORNIA WOULD HAVE ON PUBLIC SAFETY?

22  **A**   YES, I HAVE.

23  **Q**   WHAT IS YOUR OPINION?

24  **A**   MY OPINION IS THAT, DONE PROPERLY, THERE IS NO REASON TO

25  THINK THAT THAT RELEASE OF PRISONERS FROM THE CALIFORNIA PRISONS

1  OUGHT TO HAVE ANY ADVERSE EFFECT ON PUBLIC SAFETY.

2  **Q**    WHAT DID YOU DO IN ORDER TO FORM YOUR OPINION?

3  **A**    MY OPINION IS BASED ON A COUPLE OF -- I GUESS THREE MAJOR

4  COMPONENTS.  ONE IS I DID AN EXHAUSTIVE REVIEW OF RESEARCH

5  HAVING TO DO WITH EARLY ACCELERATED RELEASE FROM OTHER STATE

6  PRISON SYSTEMS OVER THE LAST 20 YEARS.

7  **Q**    LET ME JUST STOP YOU THERE.  THOSE WERE STUDIES OF WHAT

8  ACTUALLY HAPPENED, NOT WHAT PEOPLE WERE PREDICTING WOULD HAPPEN;

9  IS THAT CORRECT?

10  **A**    THAT'S CORRECT.

11  **Q**    GO ON.  WHAT ELSE DID YOU DO?

12  **A**    SECONDLY, I LOOKED AT DATA FROM APPROXIMATELY 22 CALIFORNIA

13  COUNTIES THAT OVER THE LAST TEN YEARS HAD RELEASED APPROXIMATELY

14  1.7 MILLION INMATES BASED ON COURT ORDERED RELEASES, AND I

15  LOOKED AT THAT AS IT WAS RELATED TO CRIME TRENDS IN THE STATE.

16            FINALLY, I HAVE BEEN REVIEWING A NUMBER OF STUDIES

17  AND REPORTS, INCLUDING THE REPORT OF THE EXPERT PANEL,

18  INDICATING THE MOST EFFECTIVE STRATEGIES TO BOTH SELECT PEOPLE

19  FOR RELEASE AND ALSO MANAGE THEM IN THE COMMUNITY.

20  **Q**    NOW, I WANT TO TURN YOUR ATTENTION TO YOUR REVIEW OF THE

21  STUDIES OF WHAT ACTUALLY HAPPENED WHEN THERE WAS EFFORTS TO

22  REDUCE PRISON POPULATION.  SO LET'S TALK ABOUT THE STUDIES OF

23  THE OTHER JURISDICTIONS.  HOW MANY JURISDICTIONS DID YOU STUDY?

24  **A**    I LOOKED AT NINE AMERICAN STATES, CITY OF PHILADELPHIA, AND

25  ALSO CANADA.

1  Q   HOW DID YOU SELECT THOSE JURISDICTIONS?

2  A   I LOOKED AT -- WELL, USING THE RESOURCES OF THE NATIONAL

3  CRIMINAL JUSTICE REFERENCE SERVICE, THE NATIONAL INSTITUTE OF

4  CORRECTIONS INFORMATION CENTER, THE BANCROFT LIBRARY AT U.C.

5  AND, ALSO, THE RUTGERS NCCD JAMES COTTON LIBRARY, WHICH ARE

6  PRETTY MUCH THE EXHAUSTIVE LITERARY SOURCES, I ATTEMPTED TO

7  ASSEMBLE EVERY ARTICLE THAT WAS DONE ON ACCELERATED EARLY

8  RELEASE FROM ROUGHLY THE 1980'S ON UP.

9  Q   DID YOU FIND ANY ARTICLES ON THAT TOPIC THAT YOU DID NOT

10 CONSIDER?

11 A   NO, NONE THAT WERE -- I MEAN, MY CRITERIA IS IT HAD TO BE

12 REAL RESEARCH, NOT OPINIONS, AND IT HAD TO HAVE SOME DATA THAT

13 YOU COULD ANALYZE.

14 Q   DID YOU HAVE ANY PERSONAL INVOLVEMENT IN STUDYING POPULATION

15 REDUCTION IN ANY OF THOSE JURISDICTIONS?

16 A   YES, I WAS INVOLVED AS WELL AS THE SUPERVISOR AND ALSO AS A

17 CO-WORKER IN A STUDY THAT I THINK YOU'VE HEARD ABOUT, THAT JIM

18 AUSTIN TALKED ABOUT, IN ILLINOIS, THE STUDY OF FORCED RELEASE IN

19 THE ILLINOIS DEPARTMENT OF CORRECTIONS.

20 Q   WHAT WAS STUDIED IN CONNECTION WITH THE OTHER JURISDICTIONS

21 THAT YOU REVIEWED?

22 A   ESSENTIALLY, I WAS LOOKING AT TWO THINGS.  ONE WAS

23 SUMMARIZING THE INFORMATION ON WHETHER OR NOT THE RECIDIVISM

24 RATES OF PEOPLE RELEASED EARLY, HOW THAT COMPARED TO PEOPLE

25 RELEASED AT THE END OF THEIR REGULAR TERMS.  I ALSO COLLECTED

1   SOME DATA FROM THE FBI TO SEE WHETHER OR NOT DURING THE PERIOD

2   IN WHICH THE RELEASE PRACTICES WERE TAKING PLACE, THERE WERE ANY

3   CRIME TREND PATTERNS.

4   Q    WHAT CONCLUSIONS DID YOU REACH AS A RESULT OF YOUR STUDIES

5   OF THESE OTHER JURISDICTIONS?

6   A    WITH RESPECT TO RECIDIVISM --

7            JUDGE KARLTON:  WELL, BEFORE YOU GO THERE, WE'VE

8   HAD -- WE'VE NOW LEARNED THAT RECIDIVISM MEANS DIFFERENT THINGS

9   TO DIFFERENT PEOPLE.  WHAT DO YOU MEAN BY IT WHEN YOU TALK ABOUT

10  RECIDIVISM?

11           THE WITNESS:  WELL, IN THESE STUDIES, JUDGE, THEY

12  USED A VARIETY.  TYPICALLY, THE MEASURE WAS PAROLE FAILURE,

13  RETURN TO PRISON.  THAT WAS THE MOST TYPICAL MEASURE USED.  IN A

14  COUPLE OF THEM THEY LOOKED AT ARRESTS, BUT IT WAS MOSTLY FAILURE

15  ON PAROLE.

16           JUDGE KARLTON:  DOES THAT MEAN, WHEN YOU SAY "FAILURE

17  ON PAROLE," WHAT HAS BEEN REFERRED TO HERE AS TECHNICAL

18  VIOLATIONS OF PAROLE?

19           THE WITNESS:  IN MOST OF THESE STUDIES, IT INCLUDED

20  BOTH MEASURES, NEW OFFENSES AND TECHNICAL VIOLATIONS.

21           JUDGE KARLTON:  THANK YOU, SIR.

22  BY MR. SANGSTER

23  Q    LET ME FOLLOW UP ON JUDGE KARLTON'S QUESTION.

24           WHY IS IT SIGNIFICANT TO LOOK AT THE RECIDIVISM RATES

25  WHEN YOU ARE TRYING TO EVALUATE THE IMPACT ON PUBLIC SAFETY?

1  **A**  I THINK THE KEY ISSUE IS WHETHER OR NOT, BY RELEASING

2  INMATES EARLY, ONE SEES AN INCREASE IN THE CRIMINAL BEHAVIOR

3  THEY ENGAGE IN, AS COMPARED TO PERSONS WHO ARE RELEASED

4  NORMALLY.

5  **Q**  DID YOU FIND ANY JURISDICTIONS DURING THE COURSE OF YOUR

6  REVIEW THAT ACTUALLY REDUCED RECIDIVISM RATES AS A RESULT OF

7  POPULATION REDUCTION?

8  **A**  YES.  MOST OF THE STUDIES FOUND NO DIFFERENCE, BUT WHAT WE

9  FOUND IN A STUDY OF THE PHILADELPHIA JAIL SYSTEM IN WHICH THEY

10  MADE PROVISIONS FOR DRUG TREATMENT RESOURCES, THAT, IN THAT

11  CASE, THOSE EARLY PAROLED PHILADELPHIA JAIL INMATES WHO

12  PARTICIPATED IN DRUG TREATMENT DID BETTER THAN THOSE THAT DID

13  NOT PARTICIPATE IN DRUG TREATMENT.

14       THE OTHER SIGNIFICANT STUDY WAS IN FLORIDA WHERE THE

15  STATE CREATED A PROGRAM CALLED COMMUNITY CONTROL, IN WHICH, IN

16  LIEU OF GOING TO PRISON, YOU WOULD HAVE INTENSIVE SUPERVISION

17  AND INTENSIVE SERVICES.  AND ON THAT STUDY, WHICH WAS ACTUALLY

18  DONE BY NCCD STAFF, AGAIN UNDER MY GENERAL SUPERVISION, THE

19  STUDY SHOWED THAT THE INMATES UNDER THIS COMMUNITY CONTROL

20  PROGRAM HAVE MUCH LOWER RECIDIVISM RATES THAN THOSE THAT HAD

21  BEEN RELEASED FROM FLORIDA PRISONS NORMALLY.

22  **Q**  NOW, I THINK THE COURT HAS HEARD, AND IS GOING TO HEAR, THE

23  OPINIONS OF SOME WITNESSES THAT RELEASING PRISONERS EARLY WILL

24  SOMEHOW REDUCE THE DETERRENT EFFECT OF PRISON.  WHAT DOES YOUR

25  DATA FROM THE STUDIES SHOW ABOUT THE IMPACT OF EARLY RELEASE ON

1  RECIDIVISM?

2  **A**    WELL, FIRST OF ALL, THE RESEARCH ON DETERRENCE SUGGESTS THAT

3  MARGINAL REDUCTIONS IN SANCTIONS ARE NOT GOING TO LIKELY HAVE AN

4  EFFECT.   THAT IT IS THE CERTAINTY OF PUNISHMENT AND THE

5  QUICKNESS WITH WHICH PENALTIES ARE BROUGHT TO BEAR HAS A MUCH

6  BIGGER EFFECT.   THERE'S A PRETTY LARGE CONSENSUS THAT MINOR

7  REDUCTIONS ARE NOT GOING TO MAKE A BIG DIFFERENCE.

8  **Q**    BASED ON YOUR STUDIES OF THE RESULTS OF PRISON POPULATION IN

9  THESE 14 OTHER JURISDICTIONS, AS WELL AS YOUR OWN EXPERIENCE,

10  WOULD THERE BE AN ADVERSE IMPACT ON PUBLIC SAFETY IF THIS COURT

11  ORDERED THE STATE OF CALIFORNIA TO REDUCE ITS PRISON POPULATION?

12  **A**    I DON'T BELIEVE SO, PROVIDED THAT THE PLAN THAT EMERGED WAS,

13  YOU KNOW, FOLLOWED, SENSIBLE SCREENING AND GOOD SUPERVISION

14  STRATEGIES, AND, WHERE POSSIBLE, RESOURCES WERE AVAILABLE, LIKE

15  DRUG TREATMENT SERVICES.

16  **Q**    YOU SAID --

17           **JUDGE REINHARDT:**   WHAT IF THERE WERE NO RESOURCES

18  AVAILABLE?

19           **THE WITNESS:**   WELL, THERE'S RESEARCH INDICATING THAT

20  YOU CAN SLIGHTLY REDUCE RECIDIVISM RATES SIMPLY BY BETTER

21  SCREENING AND TEACHING PAROLE OFFICERS HOW TO BETTER SUPERVISE

22  OFFENDERS.   THERE'S STUDIES FROM FLORIDA, WISCONSIN, AND SOUTH

23  CAROLINA INDICATING THAT SIMPLY TRAINING PAROLE OFFICERS ON HOW

24  TO DO A BETTER JOB WILL GET YOU A NET REDUCTION IN THOSE

25  RECIDIVISM RATES.   YOU WILL GET ADDITIONAL REDUCTION IF, IN

1   ADDITION TO THAT, YOU WERE ABLE TO PROVIDE RESOURCES.

2            **MR. SANGSTER:**  I WANT TO MAKE SURE, IF I COULD FOLLOW

3   UP ON YOUR QUESTION, JUDGE REINHARDT.

4   **BY MR. SANGSTER**

5   **Q**   THE QUESTION, I THINK, IS IN ORDER TO AVOID AN ADVERSE

6   IMPACT ON PUBLIC SAFETY, DO THESE PROGRAMS HAVE TO BE IN PLACE

7   BEFORE THE COURT CAN REDUCE THE PRISON POPULATION?

8   **A**   NO.

9   **Q**   WHY NOT?

10  **A**   AGAIN, IN A NUMBER OF THE JURISDICTIONS THAT I LOOKED AT,

11  WASHINGTON, WISCONSIN, AND OTHERS, THESE PROGRAMS DID NOT EXIST

12  AT THE TIME OF THE ACCELERATED RELEASE OF INMATES, AND, AGAIN,

13  THERE WAS -- THE RECIDIVISM RATES WERE ESSENTIALLY IDENTICAL

14  AND, AGAIN, NO DISCERNIBLE CHANGES IN CRIME PATTERNS.

15           **JUDGE KARLTON:**  MAY I INTERRUPT FOR A MOMENT?

16  YESTERDAY WE HEARD SOME TESTIMONY WHICH, THE WITNESS, HAVING

17  REVIEWED APPARENTLY MUCH THE SAME MATERIAL, I GATHER, SAID YOU

18  COULDN'T MAKE ANY CONCLUSIVE JUDGMENT ABOUT ANYTHING, THAT THE

19  MATERIAL WAS TOO -- I'M NOT CLEAR EXACTLY WHY YOU COULDN'T, BUT,

20  IN ANY EVENT, HE WAS VERY FIRM ABOUT NOT BEING ABLE TO MAKE A

21  CONCLUSIVE DETERMINATION ABOUT ANYTHING.

22           IS YOUR REVIEW OF THE MATERIAL OF THE SAME JUDGMENT?

23  I MEAN, OBVIOUSLY IT'S NOT.  YOU SEEM TO BELIEVE THAT THE

24  MATERIAL CLEARLY POINTS ONE WAY OR ANOTHER.

25           **THE WITNESS:**  WELL, MY CONCLUSION IS BASED ON THE

1  FACT THAT, LOOKING AT THESE 14 SEPARATE AND DISTINCT ARTICLES,

2  DISSERTATION, AND STATE AGENCY REPORTS, THEY'RE ALL IN THE SAME

3  DIRECTION, AND IN SOME CASES SO -- IN SOCIAL SCIENCE, WE WOULD

4  CALL THIS A META ANALYSIS, WHEN YOU FIND 14 STUDIES AND THEY ARE

5  ALL REACHING THE SAME CONCLUSION.

6           THERE'S AT LEAST ONE STUDY WHICH, ALTHOUGH A BIT

7  DATED, I THINK IS INTERESTING.

8           CALIFORNIA IN THE 1970'S ENGAGED IN AN EXPERIMENT,

9  WHICH, AGAIN, IS SORT OF THE GOLD STANDARD OF RESEARCH, IN WHICH

10 RANDOM -- BASED ON A RANDOM SAMPLING BASIS SOME INMATES FROM THE

11 CALIFORNIA DEPARTMENT OF CORRECTIONS WERE RELEASED SIX MONTHS

12 EARLY.  AND THE RESEARCH DONE BY THE CALIFORNIA DEPARTMENT OF

13 CORRECTIONS UNIT SHOWED NO DIFFERENCE BASED ON THAT.

14          NOW, IT'S PRETTY RARE TO GET RANDOMIZED EXPERIMENTS

15 LIKE THAT, BUT WHAT WE HAVE IN THESE 14 STUDIES IS A PRETTY

16 BROAD RANGE, DIFFERENT METHODS, DIFFERENT APPROACHES, BUT ALL

17 REACHING THE SAME CONCLUSION.

18 **BY MR. SANGSTER**

19 **Q**   NOW I WANT TO TURN YOUR ATTENTION TO YOUR STUDY OF WHAT'S

20 ACTUALLY HAPPENED IN CALIFORNIA.  YOU SAID YOU STUDIED THE

21 IMPACTS OF POPULATION CONTROL IN COUNTY JAILS IN CALIFORNIA.

22 HOW MANY COUNTIES DID YOU STUDY?

23 **A**   THE NUMBER VARIED FROM 20 TO 24 DEPENDING ON TIME PERIODS.

24 I TRIED TO LOOK AT A TEN-YEAR TIME PERIOD, A FIVE-YEAR TIME

25 PERIOD, AND THE LAST THREE YEARS.  SO SOMETIMES I DIDN'T HAVE

1  THE DATA FOR ALL THOSE YEARS.

2  **Q**   WHAT WAS THE SOURCE OF THE INFORMATION THAT YOU STUDIED IN

3  CONNECTION WITH CALIFORNIA JAIL RELEASES?

4  **A**   THE DATA ON COURT-ORDERED JAIL RELEASES CAME FROM WHAT'S NOW

5  CALLED THE CORRECTIONS STANDARDS AUTHORITY.  IT WAS SUBMITTED BY

6  THE COUNTIES TO CSA, AND I PULLED IT RIGHT OFF THE WEBSITE OF

7  CSA.

8  **Q**   DID YOU ALSO REVIEW ANY INTERROGATORY RESPONSES THAT WERE

9  PROVIDED BY PARTIES TO THIS LITIGATION?

10 **A**   YES, I DID.

11 **Q**   DID YOU REVIEW ANY INFORMATION ABOUT THE CRIME RATE IN THE

12 COUNTIES -- LET ME JUST END IT THERE.  DID YOU REVIEW ANY

13 INFORMATION ABOUT THE CRIME RATES IN THE COUNTIES YOU STUDIED?

14 **A**   YES, I DID.  I CONTACTED THE CALIFORNIA DEPARTMENT OF

15 JUSTICE AND WAS ABLE TO ASSEMBLE DATA ON SERIOUS CRIMES THAT, AS

16 PART ONE OFFENSES, IN EACH OF THESE COUNTIES FOR ALL THOSE

17 YEARS.

18          AND BECAUSE THESE WERE JAIL INMATES, I ALSO WANTED TO

19 LOOK AT MISDEMEANOR CRIME TRENDS.  MISDEMEANORS, AS YOU KNOW,

20 AREN'T REPORTED AS CONSISTENTLY.  SO IN THE CASE OF

21 MISDEMEANORS, I LOOKED AT TRENDS IN MISDEMEANOR ARRESTS FOR THE

22 SAME PERIOD OF TIME.

23 **Q**   NOW, DID YOU CONSIDER YOUR STUDY OF CALIFORNIA STUDY --

24 CALIFORNIA COUNTIES TO BE AS RIGOROUS AS THE OTHER STUDIES THAT

25 YOU REFERRED TO IN OTHER JURISDICTIONS?

1  **A**   NO, IT WAS NOT AS RIGOROUS.  THE OTHER STUDIES INVOLVED

2  INDIVIDUAL CASES RANDOMLY SAMPLED FROM RELEASES.  IN THIS

3  INSTANCE, I WAS SIMPLY LOOKING AT AGGREGATE INFORMATION, TOTAL

4  NUMBERS, RELEASES EACH YEAR, AND LOOKING AT THAT IN RELATIONSHIP

5  TO TOTAL NUMBERS OF CRIMES.

6  **Q**   IS THE INFORMATION THAT YOU GAIN FROM STUDYING CALIFORNIA

7  COUNTIES NONETHELESS HELPFUL IN ANALYZING THE IMPACT OF

8  COURT-ORDERED POPULATION REDUCTIONS IN JAILS?

9  **A**   I BELIEVE IT IS, BECAUSE, FOR EXAMPLE, LOOKING AT THE

10 TEN-YEAR PERIOD, 21 COUNTIES, WHAT WE SEE IS OVER 1.7 MILLION

11 INMATES WERE RELEASED FROM CALIFORNIA JAILS DURING THIS PERIOD

12 OF TIME.  AGAIN, THOSE COUNTIES, SPECIFICALLY DUE TO

13 OVERCROWDING ORDERS DURING THAT SAME PERIOD OF TIME, THE NUMBER

14 OF CRIMES IN CALIFORNIA WENT DOWN BY 18 -- IN THOSE COUNTIES

15 WENT DOWN BY 18 PERCENT, SERIOUS CRIMES.  AND ALSO MISDEMEANOR

16 ARRESTS WENT DOWN BY 18 PERCENT IN THOSE SAME PLACES.

17         **JUDGE KARLTON:**  BUT AT LEAST ONE ARGUMENT WE WILL

18 HEAR, APPARENTLY, IS THAT MISDEMEANOR ARRESTS WENT DOWN BECAUSE

19 THE SHERIFF AND POLICE HAD NO PLACE TO PUT THEM; THE JAILS WERE

20 SO OVERCROWDED.  CAN YOU REALLY RELATE THE DOWNWARD TREND ON

21 CRIME AND THE REDUCTION IN MISDEMEANOR ARRESTS TO THE CAP THAT

22 HAD BEEN PLACED ON THE COUNTIES?

23         **THE WITNESS:**  I WOULDN'T GO THERE.  I WOULD BE FAR

24 MORE CONFIDENT THAT -- THAT JAIL CAPS WOULD NOT AFFECT CRIMES

25 REPORTED TO THE POLICE, THE MOST SERIOUS CRIMES, RAPE, ROBBERY,

1  AGGRAVATED ASSAULT, CAR THEFT, ET CETERA.  THERE'S NO REASON

2  THAT PEOPLE STOP REPORTING CRIMES TO THE POLICE.

3              **JUDGE KARLTON:**  THAT'S WHY I SAID MISDEMEANANTS.

4          **THE WITNESS:**  YEAH.  THE ONLY REASON I LOOKED AT

5  MISDEMEANANTS IS, I GUESS THE ARGUMENT IS SINCE MOST JAIL

6  RELEASEES ARE MOST LIKELY TO BE MISDEMEANANTS, I WANTED TO SEE

7  WHETHER OR NOT THERE WAS A SUDDEN INCREASE IN MISDEMEANANT CRIME

8  IN THE STATE, AND THERE WAS NOT.

9  **BY MR. SANGSTER**

10 **Q**  YOU SAID YOU STUDIED 1.7 MILLION PEOPLE RELEASED OVER A

11 TEN-YEAR PERIOD.  DID YOU ALSO STUDY THE NUMBER OF PEOPLE WHO

12 WERE RELEASED FROM CALIFORNIA COUNTIES DURING THE FIVE-YEAR

13 PERIOD BETWEEN 2001 AND 2006?

14 **A**  YES, I DID, AND DURING THAT PERIOD, A LITTLE OVER

15 THREE-QUARTERS OF A MILLION INMATES WERE RELEASED FROM -- I HAVE

16 DATA ON 22 COUNTIES.  AND DURING THAT PERIOD OF TIME REPORTED IN

17 THOSE COUNTIES WAS ESSENTIALLY UNCHANGED.

18         FOR THE LAST THREE YEARS, 2004 TO 2006, THERE WERE

19 OVER 400,000 INMATES RELEASED BASED ON COURT ORDERS FROM THESE

20 COUNTIES, AND DURING THAT PERIOD OF TIME THE NUMBER OF REPORTED

21 CRIMES DECLINED BY SEVEN PERCENT.

22 **Q**  DID ALL OF THE COUNTIES SHOW CONSISTENT RESULTS?

23 **A**  NO.  ONE OF THE THINGS I DID WAS LOOK AT EACH ONE OF THESE

24 COUNTIES INDIVIDUALLY TO LOOK AT THESE TRENDS AND PUT THEM

25 TOGETHER.

1  Q   WHAT DID YOU FIND AS A RESULT OF LOOKING AT THEM

2  INDIVIDUALLY?

3  A   WHAT I FOUND IS THERE WERE SOME VARIATIONS, BUT THERE WAS NO

4  CONSISTENT PATTERN.  RELEASE DIDN'T LEAD TO A CRIME REDUCTION,

5  BUT IT CERTAINLY DID NOT LEAD TO A CRIME INCREASE.

6          WHAT I FOUND, FOR EXAMPLE, WAS, YOU KNOW, LET'S TAKE

7  THE LAST THREE YEARS.  I FOUND 13 COUNTIES WHERE RELEASES WERE

8  UP AND CRIME WAS DOWN.  THERE WERE ANOTHER EIGHT COUNTIES IN

9  WHICH CRIME WAS DOWN AND RELEASES WERE DOWN.  AND THEN THERE

10 WERE THREE WHERE RELEASES WERE ACTUALLY UP AND CRIME WENT UP.

11          WE ALSO -- I ALSO LOOKED SEPARATELY AT LOS ANGELES,

12 ORANGE, AND SAN DIEGO TO SEE WHETHER OR NOT THIS TREND HAD

13 ANYTHING TO DO WITH THE LARGER COUNTIES, AND, AGAIN, NO

14 CONSISTENT PATTERN.  WHEN YOU PUT THIS ON A SCATTER DIAGRAM AND

15 YOU LOOK AT THESE THINGS FROM A STATISTICAL POINT OF VIEW,

16 THERE'S JUST NO DISCERNIBLE PATTERN.

17 Q   WHAT OPINIONS DID YOU REACH AS A RESULT OF YOUR STUDY OF

18 COURT-ORDERED POPULATION REDUCTIONS IN CALIFORNIA COUNTIES?

19 A   THAT IT DID NOT APPEAR TO HAVE ANY ADVERSE EFFECT ON CRIME

20 IN CALIFORNIA.

21 Q   MY PRIOR QUESTIONS HAVE BEEN RETROSPECTIVE, IN OTHER WORDS,

22 DEALING WITH WHAT'S ACTUALLY HAPPENED IN THE PAST AND BEEN

23 OBSERVED.  NOW I WANT TO TURN YOUR ATTENTION FOR A MOMENT TO

24 YOUR OPINIONS ABOUT WHAT WOULD HAPPEN IN THE FUTURE IN THIS

25 CASE.

 1            **JUDGE REINHARDT:**  MAY I ASK ONE QUESTION ABOUT THE

 2  PAST?

 3            DID THOSE FIGURES FROM THE PAST SHOW ANYTHING ABOUT

 4  WHETHER PAROLE CONTINUED FOR A LENGTHY PERIOD OR WHETHER IT WAS

 5  TERMINATED AFTER ONE YEAR OR WHETHER CERTAIN CRIMES WERE NOT

 6  SUBJECTED TO PAROLE AT ALL?

 7            **THE WITNESS:**  IF YOU GO THROUGH THE 14 JURISDICTIONS,

 8  THERE'S A VARIETY OF PATTERNS, NO CONSISTENT PATTERN.  SOME

 9  STATES, FOR EXAMPLE, LIKE ILLINOIS, HAD NO PAROLE DURING THE

10  PERIOD OF TIME.  OTHERS WOULD INSTITUTE INTENSIVE PAROLE, LIKE

11  FLORIDA DID.  OTHERS HAD MINIMAL PAROLE.  SO I THINK THERE'S NO

12  CONSISTENT PATTERN IN TERMS OF WHAT THEY DID WITH --

13            **JUDGE REINHARDT:**  COULD YOU TELL ANYTHING -- COULD

14  YOU OBSERVE ANY DIFFERENCE BETWEEN THE STATES THAT WENT TO

15  INTENSIVE PAROLE ON THE ONES THAT HAD NO PAROLE AT ALL?  WERE

16  THERE ANY DIFFERENCES IN THE RATES?

17            **THE WITNESS:**  WELL, AGAIN, THE LARGER FINDING IS THAT

18  THERE'S NO PARTICULAR DIFFERENCE.  THE ONE STUDY WHICH I THINK

19  WOULD INDICATE THAT INTENSIVE SUPERVISION, THE FLORIDA EXAMPLE,

20  DID PRODUCE REDUCTIONS IN RECIDIVISM RATES FROM INMATES WHO

21  OTHERWISE WOULD HAVE SERVED OVER A YEAR IN FLORIDA PRISONS, BUT

22  DURING THIS PERIOD OF TIME WERE ACTUALLY SERVING ONLY ABOUT A

23  MONTH OR TWO IN JAIL AND THEN RELEASED UNDER INTENSIVE

24  SUPERVISION.

25

1  **BY MR. SANGSTER**

2  **Q**   I WANT TO FOLLOW UP ON JUDGE REINHARDT'S QUESTION.  DOES

3  PAROLE MAKE ANY DIFFERENCE IN IMPROVING PUBLIC SAFETY?

4  **A**   YES.

5  **Q**   HOW SO?

6  **A**   IF DONE PROPERLY WITH PAROLE OFFICERS PROPERLY TRAINED IN

7  TERMS OF SUPERVISION, PAROLE OFFICERS ASSISTING INMATES IN

8  ADDRESSING ISSUES, LIKE HAVING ACCESS TO HOUSING AND WHAT HAVE

9  YOU, CAN MAKE A DIFFERENCE, YES.

10  **Q**   ALL RIGHT.  NOW, IS IT POSSIBLE FOR A COURT ORDER REDUCING

11  PRISON POPULATION TO ACTUALLY IMPROVE PUBLIC SAFETY?

12  **A**   COULD YOU REPEAT THAT QUESTION?

13  **Q**   IS IT POSSIBLE FOR A COURT ORDER EVER --

14          **JUDGE KARLTON:**  ANYTHING IS POSSIBLE.  WHAT IS YOUR

15  BEST JUDGMENT?  ASK HIM THAT.

16          **MR. SANGSTER:**  LET ME REPHRASE THE QUESTION.

17          **JUDGE KARLTON:**  THAT'S WHAT WE HAD YESTERDAY.

18          **MR. SANGSTER:**  I APOLOGIZE FOR THAT.

19  **BY MR. SANGSTER**

20  **Q**   WHAT WOULD IT TAKE FOR A COURT-ORDERED POPULATION REDUCTION

21  TO IMPROVE PUBLIC SAFETY IN CALIFORNIA?

22  **A**   I WOULD ANSWER THAT BY GOING BACK TO THE REPORT OF THE

23  EXPERT PANEL ON REDUCING INMATE RECIDIVISM RATES.  IT WAS THE

24  OVERWHELMING CONSENSUS OF THAT PANEL THAT CALIFORNIA COULD MAKE

25  A SIGNIFICANT DIFFERENCE IN REDUCING ITS VERY HIGH RECIDIVISM

1  RATE, BUT THAT WAS REALLY DEPENDENT UPON A SIGNIFICANT REDUCTION

2  IN CROWDING THAT, UNDER THE EXISTING LEVELS OF CROWDING, THAT

3  PANEL DID NOT THINK IT WAS REALISTIC TO THINK THAT MUCH PROGRESS

4  COULD BE MADE IN TERMS OF REDUCING RECIDIVISM RATES.

5  **Q**   I WANT TO ASK YOU A HYPOTHETICAL.  I WANT YOU TO ASSUME THAT

6  THERE HAS BEEN TESTIMONY FROM A COUNTY SHERIFF WHO RUNS THE

7  JAIL.  I WANT YOU TO ASSUME THAT THAT SHERIFF TESTIFIED

8  APPROXIMATELY FIVE PERCENT OF THE BOOKINGS INTO HIS JAIL

9  CONSISTED OF PAROLEES.  I WANT YOU TO ASSUME THERE'S BEEN

10 TESTIMONY FROM A CHIEF OF POLICE THAT SOMEWHERE LESS THAN FIVE

11 PERCENT OF THE ARRESTS BY HIS DEPARTMENT CONSISTED OF PAROLEES.

12 HOW WOULD THOSE FACTS, IF TRUE, COMPARE TO NATIONAL NORMS?

13 **A**   THOSE FACTS ARE PROBABLY A LITTLE BIT HIGHER OF WHAT I'M

14 AWARE OF, BUT THERE HAVE BEEN TWO STUDIES BY THE BUREAU OF

15 JUSTICE STATISTICS THAT LOOKED AT COHORTS OF RELEASED PRISONERS

16 AND THEN USED FBI DATA TO LOOK AT HOW MANY OF THEM WERE ARRESTED

17 IN THE SUBSEQUENT THREE-YEAR PERIOD, AND THOSE NUMBERS WERE

18 SOMETHING IN THE RANGE OF THREE PERCENT --

19 **Q**   ALL RIGHT.

20 **A**   -- OF THREE PERCENT OF THE ARRESTS IN THOSE STATES WERE

21 ATTRIBUTABLE TO PEOPLE WHO HAD BEEN RELEASED FROM PRISONS DURING

22 THAT --

23 **Q**   WHAT DOES THE FACT THAT SUCH A LOW PERCENTAGE OF THE PEOPLE

24 BEING ARRESTED ARE PAROLEES TELL YOU ABOUT THE IMPACT OF COURT

25 ORDERED POPULATION REDUCTION ON PUBLIC SAFETY?

1  **A**  THAT, IN GENERAL, A MODEST REDUCTION IN TIME SERVED WOULD

2  NOT HAVE A BIG EFFECT ON PUBLIC SAFETY.

3              **THE CLERK:**  FIVE MINUTES, COUNSEL.

4  **BY MR. SANGSTER**

5  **Q**  THERE HAS BEEN TESTIMONY FROM SOME LAW ENFORCEMENT WITNESSES

6  AND OTHER WITNESSES THAT COURT-ORDERED POPULATION REDUCTION OF

7  THE PRISONS WOULD HAVE A NEGATIVE IMPACT ON PUBLIC SAFETY.

8  YOU'VE JUST TESTIFIED THAT IT WOULD NOT HAVE A NEGATIVE IMPACT

9  ON --

10             **JUDGE REINHARDT:**  HE TESTIFIED IT WOULD NOT HAVE A

11  BIG EFFECT.

12             **MR. SANGSTER:**  LET ME CLARIFY THAT.

13  **BY MR. SANGSTER**

14  **Q**  IS IT YOUR TESTIMONY THAT IT WOULD NOT HAVE A BIG EFFECT ON

15  PUBLIC SAFETY OR THAT IT WOULD HAVE NO EFFECT ON PUBLIC SAFETY?

16  **A**  I BELIEVE DONE PROPERLY, IT WOULD HAVE NO EFFECT ON PUBLIC

17  SAFETY.

18             **JUDGE REINHARDT:**  THAT WAS WHAT HE SAID.

19             **MR. SANGSTER:**  NOW I CLARIFIED IT.

20  **BY MR. SANGSTER**

21  **Q**  HOW DO YOU RECONCILE THE TWO POSITIONS?  HOW DOES THIS COURT

22  FIGURE OUT WHICH IS THE MORE -- WHICH IS THE CORRECT OPINION?

23  **A**  WELL, FIRST OF ALL, THE RESEARCH THAT I'M TALKING ABOUT

24  REFERS TO WHAT ACTUALLY HAPPENED IN A NUMBER OF JURISDICTIONS,

25  SO IT'S NOT HYPOTHETICAL, IT'S WHAT WE ACTUALLY OBSERVED, AS

1  WELL AS THE CALIFORNIA JAIL RELEASE EXAMPLE.

2          SECONDLY, I'M NOT SURPRISED THAT LAW ENFORCEMENT

3  OFFICIALS MIGHT HAVE THIS VIEW.  FOR THE LAST 25 TO 30 YEARS IN

4  THE MEDIA AND VARIOUS POLITICAL CONTESTS, WE'VE HEARD THAT

5  RELEASING INMATES WOULD ENDANGER PUBLIC SAFETY, AND THE RESEARCH

6  I'M DESCRIBING IS NOT EASILY IN THE PUBLIC DOMAIN.  I MEAN I HAD

7  TO WORK PRETTY HARD TO ASSEMBLE THIS.

8          I WAS STRUCK WHEN I PRESENTED SOME OF THIS RESEARCH

9  EARLIER UNDER THE AUSPICES OF THE CALIFORNIA LIBRARY, AND CHIEF

10  RICHARD WARD WHO IS NOW THE CHIEF OF VACAVILLE AND WAS THE

11  FORMER PRESIDENT.

12          **JUDGE KARLTON:**  HE TESTIFIED HERE.

13          **THE WITNESS:**  RIGHT.  AND IT WAS INTERESTING THAT

14  CHIEF WARD DIDN'T DISPUTE THE DATA BUT JUST SAID HE WAS

15  SURPRISED BY IT.

16          SO I THINK MANY POLICE OFFICERS, POLICE CHIEFS

17  HAVEN'T BEEN NECESSARILY EXPOSED TO THIS DATA.  THE NATURE OF

18  THEIR WORK IS THEY TEND TO RESPOND TO THE SPECIFIC INCIDENTS IN

19  THEIR JURISDICTIONS, ANECDOTES OF WHAT'S GOING ON.  I WOULDN'T

20  EXPECT MANY OF THEM TO BE EMBROILED IN THE RESEARCH AND

21  STATISTICS OF THIS.

22          **MR. SANGSTER:**  THAT'S ALL THE QUESTIONS I HAVE, YOUR

23  HONOR.

24          **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

25          **MS. LEONARD:**  NO, YOUR HONOR.

1          **JUDGE HENDERSON:**  CROSS-EXAMINATION.

2          <u>**CROSS-EXAMINATION BY MS. TILLMAN**</u>

3   **BY MS. TILLMAN**

4   **Q**   GOOD MORNING, DR. KRISBERG.

5   **A**   GOOD MORNING.

6   **Q**   I WANT TO BE SURE WE UNDERSTAND YOUR PROFESSIONAL

7   BACKGROUND.  A GOOD PORTION OF YOUR PROFESSIONAL BACKGROUND HAS

8   BEEN DEDICATED TO THE JUVENILE CORRECTIONS AREA, CORRECT?

9   **A**   THAT IS CORRECT.

10  **Q**   AND AT LEAST 75 PERCENT OF YOUR PUBLISHED ARTICLES ADDRESS

11  JUVENILE OFFENDER ISSUES, CORRECT?

12  **A**   YES.

13  **Q**   YOU ARE A COURT-APPOINTED SUBJECT MATTER EXPERT IN THE

14  PENDING JUVENILE CLASS ACTION CASE CALLED *FARRELL VERSUS*

15  *DEPARTMENT OF CORRECTIONS*, CORRECT?

16  **A**   YES.

17  **Q**   AND THAT CASE SOLELY INVOLVES JUVENILE OFFENDERS, CORRECT?

18  **A**   YES.

19  **Q**   YOUR WORK IN THE *FARRELL* CASE DOES NOT ENCOMPASS THE MEDICAL

20  CARE PROVIDED TO JUVENILE OFFENDERS, DOES IT?

21  **A**   NO.

22  **Q**   NOR DOES IT INVOLVE THE MENTAL HEALTHCARE PROVIDED TO

23  JUVENILE OFFENDERS, DOES IT?

24  **A**   NO.

25  **Q**   AND YOU SPEND ABOUT A THIRD OF YOUR PROFESSIONAL TIME

1  WORKING ON THAT CASE, CORRECT?

2  **A**  YES.

3  **Q**  IN FACT, THE TIME SPENT CONSULTING ON THIS CASE HAS BEEN

4  PRETTY LIMITED, HASN'T IT?

5  **A**  YES.

6  **Q**  YOU HAVEN'T TOURED ANY DEPARTMENT OF CORRECTIONS AND

7  REHABILITATION FACILITIES IN PREPARING YOUR REPORT, HAVE YOU?

8  **A**  NOT FOR PREPARING MY REPORT, BUT I CERTAINLY HAVE TOURED

9  FACILITIES, YES.

10  **Q**  NOW, YOU SERVE AS THE PRESIDENT OF THE NATIONAL COUNCIL ON

11  CRIME AND DELINQUENCY, CORRECT?

12  **A**  YES.

13  **Q**  AND YOU'VE WORKED WITH THAT NATIONAL COUNCIL ON CRIME AND

14  DELINQUENCY SINCE 1977, CORRECT?

15  **A**  SEVENTY-SIX, YES.

16  **Q**  THANK YOU.

17            A GOOD PORTION OF WHAT THE NATIONAL COUNCIL ON CRIME

18  AND DELINQUENCY DOES IS PERFORM RESEARCH ON PRISON ISSUES,

19  RIGHT?

20  **A**  YES.

21  **Q**  AND SO WHEN MR. SPECTER OF PLAINTIFFS' COUNSEL ASKED YOU TO

22  LOOK AT THE IMPACT OF SENTENCING REFORMS, PAROLE REFORMS, AND

23  DIVERSION OF DEPARTMENT OF CORRECTION AND REHABILITATION INMATES

24  TO COUNTY PROGRAMS, YOU UNDERTOOK TO DO RESEARCH ON THAT ISSUE,

25  CORRECT?

1    **A**   YES, BUT I'VE ALSO DONE EXTENSIVE RESEARCH ON ADULT

2    CORRECTIONS IN CALIFORNIA.

3    **Q**   YOU ALSO HAD HELP, DIDN'T YOU, FROM A RESEARCH ASSOCIATE

4    WITHIN THE NATIONAL COUNCIL ON THIS MATTER?

5    **A**   THAT'S CORRECT.

6    **Q**   AND HER NAME WAS -- WAS IT CAROLINA GUZMAN?

7    **A**   CAROLINA GUZMAN, YES.

8    **Q**   SO YOU AND YOUR RESEARCH ASSOCIATE, CAROLINA GUZMAN, DID A

9    REVIEW OF THE LITERATURE CONCERNING VARIOUS EFFECTS OF THE

10   PRISON -- I'M SORRY.

11           YOU AND YOUR RESEARCH ASSOCIATE, CAROLINA GUZMAN, DID

12   A REVIEW OF THE LITERATURE CONCERNING VARIOUS EFFECTS, IF ANY,

13   OF EARLY RELEASE FROM PRISONS IN OTHER STATES AND OTHER

14   LOCALITIES, CORRECT?

15   **A**   YES.

16   **Q**   AND IN DOING THAT REVIEW OF THE PUBLISHED LITERATURE ON SUCH

17   PROGRAMS, THERE WAS NO INTENTION OF CHALLENGING ANY OF THE

18   UNDERLYING METHODOLOGY OF ANY OF THESE ARTICLES OR STUDIES THAT

19   WERE DONE, CORRECT?

20   **A**   I REVIEWED EACH AND EVERY ARTICLE AND CERTAINLY COULD SPEAK

21   TO THE METHODOLOGY USED IN EACH ONE OF THESE ARTICLES, YES.

22           **JUDGE KARLTON:**  THE QUESTION, I SUPPOSE, IS SOMEWHAT

23   DIFFERENT.  WERE YOU SATISFIED THAT THE -- WELL, I DON'T KNOW.

24           IN YOUR REVIEW OF THE MATERIAL, WHAT OPINION DID YOU

25   HAVE, IF ANY, AS TO THE LEGITIMACY OF THE CRITERIA THAT WERE

1  BROUGHT TO BEAR AND THE METHODOLOGY USED?

2         **THE WITNESS:**  OVERALL, I WOULD SAY THAT THE

3  METHODOLOGY WAS QUITE REASONABLE.  MOST OF THESE STUDIES -- IN

4  THE CASE OF THREE OF THESE STUDIES WERE DONE BY MY ORGANIZATION

5  UNDER MY SUPERVISION.  IN OTHER INSTANCES THEY WERE DONE BY

6  RESEARCH BUREAUS WITHIN THE STATES, AND THEY USED METHODS WHICH

7  I WOULD DESCRIBE AS QUITE CUSTOMARY TO DO THESE KINDS OF

8  ANALYSIS.

9         IN MOST CASES THESE STAFF WERE REQUESTED TO DO THIS

10 EITHER ON BEHALF OF THE LEGISLATURE OR ON BEHALF OF THE GOVERNOR

11 OF THOSE STATES.

12 **BY MS. TILLMAN**

13 **Q**   YOU ASSUME THE DATA REPORTED IN THE STUDIES TO BE CORRECT;

14 IS THAT RIGHT?

15 **A**   YES.

16 **Q**   NOW, IN DOING THAT RESEARCH FOR PEER REVIEW-VIEWED ARTICLES,

17 YOU RECOGNIZE THAT THERE IS NO STATE THAT HAS AS LARGE A PRISON

18 POPULATION AS CALIFORNIA, CORRECT?

19 **A**   THAT'S CORRECT.

20 **Q**   IN FACT, YOU'VE CONSULTED WITH OTHER STATES ON PRISON

21 ISSUES, AND THE TWO STATES IN WHICH YOU PERFORMED THAT

22 CONSULTATION WORK, LET'S SEE, THEY'RE ILLINOIS AND NEW YORK,

23 CORRECT?

24 **A**   ACTUALLY, I MADE A QUICK LIST.  MY EXPERIENCE ON THE ADULT

25 SIDE IN TERMS OF CONSULTATION HAS INCLUDED ILLINOIS, THE

1  DISTRICT OF COLUMBIA, HAWAII.  THE STATE OF FLORIDA, I WAS ASKED

2  BY GOVERNOR CHILDS TO ASSIST HIM WHEN HE TOOK OVER TO LOOK AT

3  THE FLORIDA SYSTEM.

4          I'VE DONE EXTENSIVE CONSULTATION FOR THE NATIONAL

5  INSTITUTE OF CORRECTIONS AND DID A MASTER PLAN FOR THE NEVADA

6  PRISON SYSTEM AS WELL.  AGAIN, AS I'VE INDICATED, I'VE DONE A

7  NUMBER OF STUDIES OF THE CALIFORNIA PRISON SYSTEM.

8  **Q**   WHEN YOU WERE A CONSULTANT FOR THE STATE OF ILLINOIS, THE

9  PRISON POPULATION AT THAT TIME WHEN YOU CONSULTED WAS, IN

10 ILLINOIS, 45,000, CORRECT?

11 **A**   THAT'S CORRECT.

12 **Q**   AND WHEN YOU WERE A CONSULTANT FOR NEW YORK CITY, THE JAIL

13 POPULATION WAS FAR LESS THAN WHAT YOU SAW IN THE STATE OF

14 ILLINOIS, CORRECT?

15 **A**   THAT'S RIGHT.

16 **Q**   NOW, THE SAMPLE GROUPS THAT WERE ADDRESSED IN THE 14 PEER

17 REVIEW-VIEWED ARTICLES THAT YOU AND YOUR RESEARCH ASSOCIATE

18 CULLED WERE VARYING SIZES, CORRECT?

19 **A**   YES.

20 **Q**   THEIR ARTICLE ON THE WASHINGTON PROGRAM ADDRESSED A SAMPLE

21 OF 1,674 INMATES, CORRECT?

22 **A**   YES.

23 **Q**   AND THE ARTICLE ON A CALIFORNIA PROGRAM ADDRESSED A SAMPLE

24 OF -- A SAMPLE OF 637 INMATES, CORRECT?

25 **A**   YES.

1          **JUDGE KARLTON:**  I DON'T KNOW WHAT IT'S DOING UP,

2    DOCTOR; DON'T WORRY ABOUT IT.

3          **THE WITNESS:**  OKAY.

4    **BY MS. TILLMAN**

5    **Q**   YOUR ARTICLE ON THE COLORADO RELEASE ADDRESSED A SAMPLE OF

6    126 INMATES, CORRECT?

7    **A**   YES.

8    **Q**   THE ARTICLE ON THE TEXAS RELEASE ADDRESSED A SAMPLE OF 2,072

9    INMATES, CORRECT?

10   **A**   YES.

11   **Q**   AND THE ARTICLE ON THE WISCONSIN RELEASE ADDRESSED A SAMPLE

12   OF 892 RELEASED INMATES?

13   **A**   YES.

14   **Q**   THE ARTICLE ON THE ILLINOIS RELEASE ADDRESSED 1,600 IN THE

15   SAMPLE SIZE, CORRECT?

16   **A**   YES.

17   **Q**   NONE OF THE IDENTIFIED 14 PEER-REVIEWED ARTICLES ADDRESSED A

18   RELEASE OF SOME 50,000 INMATES, DID THEY?

19   **A**   FIRST OF ALL, IF I CAN CORRECT ONE THING?  NOT EVERY ONE OF

20   THESE ARTICLES WAS PEER-REVIEWED.  SOME OF THESE WERE PRODUCED

21   BY RESEARCH DIVISIONS WHICH AREN'T NECESSARILY SUBJECT -- I

22   MEAN, THERE WAS PROBABLY SOME PEER REVIEW, BUT NOT IN THE

23   ACADEMIC SENSE OF IT.

24          BUT IN MOST INSTANCES THOSE NUMBERS REPRESENT RANDOM

25   SAMPLES SO THAT YOU CAN ESTIMATE TO THE FULL RELEASE POPULATION

1  BASED ON THOSE RANDOM SAMPLES.  IN OTHER CASES, THESE ARE

2  SMALLER STATES.  ON THE OTHER HAND, WHAT I WOULD SAY IS THAT AS

3  PART OF THE EXPERT PANEL, ONE OF THE MOST SIGNIFICANT THINGS AS

4  PART OF THE EXPERT PANEL.

5          **MS. TILLMAN:**  I'M GOING TO FILE -- THIS WITNESS IS

6  NON-RESPONSIVE TO THE QUESTIONS, YOUR HONORS.  I'D LIKE TO

7  STRIKE THAT TESTIMONY.  I THINK THE QUESTION WAS SIMPLE.  NONE

8  OF THE IDENTIFIED 14 PEER-REVIEWED ARTICLES ADDRESSED A RELEASE

9  OF 50,000 INMATES.

10         **JUDGE KARLTON:**  HE DOESN'T AGREE THEY WERE ALL

11 PEER-REVIEWED.  WHY DON'T YOU JUST SAY THE 14 ARTICLES?

12         **MS. TILLMAN:**  FAIR ENOUGH.

13 **BY MS. TILLMAN**

14 **Q**   NONE OF THE IDENTIFIED ARTICLES ADDRESSED A RELEASE OF

15 50,000 INMATES, CORRECT?

16 **A**   THAT'S CORRECT.

17 **Q**   THANK YOU.

18         NOW, WHEN CONSIDERING THE IMPACT OF RELEASE OF

19 DEPARTMENT OF CORRECTIONS AND REHABILITATION INMATES ON PUBLIC

20 SAFETY, YOU WOULD LOOK AT WHETHER THE INMATE IS MENTALLY ILL,

21 WOULDN'T YOU, BECAUSE MENTAL ILLNESS CAN INCREASE THE LIKELIHOOD

22 OF RECIDIVISM?

23         **JUDGE KARLTON:**  THAT'S AN ASSUMPTION.  WE'VE HAD

24 TESTIMONY THAT'S NOT SO.  I'M NOT SAYING IT IS TRUE OR ISN'T

25 TRUE, BUT WE'VE HAD AT LEAST THAT TESTIMONY INDICATING THAT'S

1    NOT SO.

2              **MS. TILLMAN:**  LET ME BACKTRACK.

3              **JUDGE KARLTON:**  BEFORE WE BACKTRACK, DO YOU HAVE AN

4    OPINION AS TO WHETHER THE RELEASE OF MENTALLY ILL INMATES ON A

5    LARGE SCALE BUT RELATIVELY EARLY WOULD HAVE AN EFFECT ON PUBLIC

6    SAFETY?

7              **THE WITNESS:**  I DON'T HAVE AN OPINION ON THAT.

8              **JUDGE KARLTON:**  FAIR ENOUGH.

9    **BY MS. TILLMAN**

10   **Q**   YOU WOULD AGREE THAT MENTAL ILLNESS DOES CONSTITUTE A FACTOR

11   THAT CAN INCREASE THE LIKELIHOOD OF RECIDIVISM IN A PAROLEE,

12   CORRECT?

13   **A**   MOST OF THE RESEARCH ON RISK FACTORS INCLUDES MENTAL HEALTH

14   BUT NOT AS A MAJOR FACTOR IN TERMS OF RECIDIVISM RATES.

15   **Q**   BUT IT IS A FACTOR, ISN'T IT?

16   **A**   YES.

17   **Q**   AND YOU WOULD AGREE ALSO THAT DRUG DEPENDENCY INCREASES THE

18   LIKELIHOOD OF RECIDIVISM AMONGST PAROLEES, DOESN'T IT?

19   **A**   YES.

20   **Q**   AND WHEN A PAROLEE PRESENTS WITH BOTH MENTAL ILLNESS AND

21   DRUG DEPENDENCY, THERE IS AN EVEN HIGHER LIKELIHOOD OF

22   RECIDIVISM, ISN'T THERE?

23   **A**   I DON'T KNOW THAT TO BE TRUE.

24   **Q**   LOOKING AT PAGE 54 OF YOUR DEPOSITION THAT WAS TAKEN IN

25   SEPTEMBER, I BELIEVE, 2008, LINE 2?

```
 1              MR. SANGSTER:  YOUR HONOR, MAY I ASK THIS BE TAKEN

 2   DOWN UNTIL I HAVE A CHANCE TO REVIEW THE TRANSCRIPT AND FIND OUT

 3   IF IT'S PROPER?

 4              JUDGE KARLTON:  YES.

 5              MR. SANGSTER:  I'M SORRY.  IT'S PAGE 54?

 6              MS. TILLMAN:  PAGE 54, LINE 2.

 7              MR. SANGSTER:  NO OBJECTION, YOUR HONOR.

 8              JUDGE HENDERSON:  PROCEED.

 9              MS. TILLMAN:  THANK YOU.

10   BY MS. TILLMAN

11   Q   I BELIEVE IN YOUR DEPOSITION YOU WERE ASKED, QUOTE:

12              "IF THESE TWO FACTORS WERE CO-OCCURING WHERE

13              A PERSON IS BOTH MENTALLY ILL AND DRUG

14              DEPENDENT, DO THEY HAVE AN EVEN HIGHER

15              LIKELIHOOD OF RECIDIVISM THAN IF THEY JUST HAD A

16              SINGLE FACTOR AT PLAY, WHETHER IT BE DRUG

17              DEPENDENCE OR MENTAL ILLNESS?

18              "ANSWER:  YES."

19   A   I DID SAY THAT, AND -- BUT THE CONTEXT WOULD BE THAT --

20   Q   I DON'T THINK THERE'S A PENDING QUESTION.

21              JUDGE HENDERSON:  HE CAN EXPLAIN.

22              THE WITNESS:  DO YOU WANT ME TO EXPLAIN?

23              THERE'S BEEN A LOT OF RESEARCH ON RISK FACTORS

24   ASSOCIATED WITH RECIDIVISM, AND USUALLY THE MOST IMPORTANT RISK

25   FACTORS THAT EMERGE HAVE TO DO WITH THE PRIOR RECORD OF THE
```

1  PERSON WHO IS BEING RELEASED, WHETHER OR NOT -- THE AGE AT WHICH

2  THEY ENTERED THE SYSTEM INITIALLY, THE CRIMES THAT THEY

3  COMMITTED.  SO WHILE IT IS CERTAINLY TRUE THAT RECIDIVISM AND

4  MENTAL HEALTH ADD TO THAT, WITHIN AN OVERALL RISK ASSESSMENT

5  THEY'RE NOT NECESSARILY THE MOST IMPORTANT FACTORS.  THEY ARE A

6  FACTOR, AND MY ANSWER WAS YES BECAUSE THEY ARE A FACTOR, BUT

7  THEY WOULDN'T BE THE DRIVING RISK FACTOR.

8  **BY MS. TILLMAN**

9  **Q**   YOU WOULD AGREE THEN THAT ANY RELEASE ORDER SHOULD HAVE A

10  COMPONENT OF EXAMINING THE RISK OF RECIDIVISM POSED BY EACH

11  INDIVIDUAL INMATE SUBJECT TO THAT RELEASE, WOULDN'T YOU?

12  **A**   YES, I'D RECOMMEND THAT.

13  **Q**   AND THAT KIND OF EXAMINATION WOULD BE NECESSARY TO ENSURE A

14  MINIMAL ADVERSE EFFECT ON PUBLIC SAFETY, WOULDN'T IT?

15  **A**   YES.

16  **Q**   I'M RECALLING YOUR DEPOSITION.  I BELIEVE YOU INDICATED THAT

17  IN THE ILLINOIS PROGRAM THAT YOU STUDIED --

18          **MR. SANGSTER:**  OBJECTION.  IMPROPER IMPEACHMENT, YOUR

19  HONOR.

20          **JUDGE HENDERSON:**  I'M NOT SURE IT'S IMPEACHMENT.

21          **MR. SANGSTER:**  SHE'S READING HIM HIS PRIOR STATEMENT.

22          **MS. TILLMAN:**  ACTUALLY I'M NOT READING.

23          **MR. SANGSTER:**  DO YOU RECALL IN YOUR DEPOSITION YOU

24  TESTIFIED?

25          **JUDGE REINHARDT:**  THAT'S NOT WHAT SHE SAID ON THIS

1   QUESTION.

2          **JUDGE KARLTON:**  I KEEP ASKING PEOPLE WHY DON'T THEY

3   JUST ASK THE QUESTION?  SEE WHAT THE GUY SAYS.  IF HE SAYS THE

4   SAME THING, YOU DON'T HAVE TO READ THE DEPOSITION.  IF HE

5   DOESN'T, YOU CAN READ IT.  I DON'T UNDERSTAND WHAT EVERY -- I

6   MEAN, IT'S NOT JUST THE DEFENDANTS.  THE PLAINTIFFS DO THE SAME

7   THING.  NONE OF IT MAKES ANY SENSE.  IT'S EASIER FOR US TO LET

8   YOU DO IT AND GET ON WITH YOUR LIFE.  GO AHEAD.

9   **BY MS. TILLMAN**

10  **Q**   ISN'T IT CORRECT THAT IN THE ILLINOIS PROGRAM YOU STUDIED

11  REGARDING THE RELEASE OF INMATES EARLY, AS THEY SAY, THE WARDENS

12  WERE SIMPLY ASKED TO FLAG THOSE INDIVIDUAL INMATES THAT THEY

13  THOUGHT POSED A RISK TO THE COMMUNITY?

14  **A**   THE WAY THE ILLINOIS FORCED RELEASE PROGRAM WORKED WAS THAT

15  A LIST WAS GENERATED OF THOSE INMATES WHO WERE MOST LIKELY TO BE

16  RELEASED ANYWAY, AND SO A LIST WAS GENERATED OF THE NUMBER OF

17  INMATES POTENTIALLY TO BE RELEASED, AND THEN WARDENS WERE ASKED

18  TO LOOK AT THOSE NAMES AND BASICALLY COME UP WITH ANY REASONS

19  THAT THEY BELIEVED THAT THOSE INMATES SHOULD NOT BE RELEASED.

20  **Q**   AND THIS PROGRAM OCCURRED BEFORE THE ONSET OF THE MORE

21  RECENT PHENOMENON OF THE TECHNOLOGY OF A SCIENTIFIC RISK

22  ASSESSMENT AND SCREENING TOOLS, CORRECT?

23  **A**   THAT'S RIGHT.

24  **Q**   SO YOU WOULD WANT TO GO BEYOND THE SIMPLE FLAGGING OF INMATE

25  CASES BY WARDENS AND USE A SCIENTIFIC TOOL TO MEASURE THE RISK

1   POSED BY EACH INDIVIDUAL CANDIDATE FOR RELEASE, WOULDN'T YOU?

2   **A**   TEN YEARS AGO I DID A STUDY FOR THE CALIFORNIA DEPARTMENT OF

3   CORRECTIONS IN WHICH I RECOMMENDED THAT THE DEPARTMENT OF

4   CORRECTIONS ADOPT A RISK ASSESSMENT INSTRUMENT IN HELPING THEM

5   MAKE PAROLE DECISIONS AND IN ALLOCATING THEIR SUPERVISION

6   RESOURCES.  SO, YES, I BELIEVE THAT.

7   **Q**   THAT KIND OF RISK ASSESSMENT TOOL HAS BEEN DEVELOPED BY YOUR

8   ORGANIZATION, HASN'T IT?

9   **A**   WE HAVE ONE.  THERE ARE OTHERS OUT THERE.  YES.

10  **Q**   AND THE TOOL THAT WAS DEVELOPED BY YOUR ORGANIZATION IS

11  CALLED?

12  **A**   THE CORRECTIONAL ASSESSMENT AND INTERVENTION SYSTEM.

13  **Q**   AND EVEN WITH THAT TOOL, THERE IS ALWAYS SOME RISK OF

14  RECIDIVISM, ISN'T THERE?

15  **A**   YES.

16  **Q**   AND THE TOOL THAT'S BEEN DEVELOPED BY YOUR ORGANIZATION, THE

17  CORRECTIONAL ASSESSMENT INTERVENTION SYSTEM, IS SIMILAR TO THE

18  ONE DEVELOPED BY THE DEPARTMENT OF CORRECTIONS AND

19  REHABILITATION CALLED COMPAS, ISN'T IT?

20  **A**   IT'S REASONABLY SIMILAR.  THERE'S TWO BIG DIFFERENCES.  THE

21  COMPAS INSTRUMENT HAS MANY MORE ITEMS ASSOCIATED WITH IT, AND,

22  AS I INDICATED EARLIER, THE INSTRUMENT I'M TALKING ABOUT HAS

23  ACTUALLY BEEN USED ON PAROLEES IN FLORIDA, SOUTH CAROLINA, AND

24  WISCONSIN.  AND WE FOUND THAT WHEN PAROLE OFFICERS USE IT, THEY

25  GET BETTER RESULTS.

1  Q   SO THE TOOL THAT WAS DEVELOPED BY YOUR ORGANIZATION, THE

2  CORRECTIONAL ASSESSMENT INTERVENTION TOOL, WAS NOT USED TO

3  DETERMINE WHETHER TO RELEASE AN INMATE EARLY, CORRECT?

4  A   THAT'S CORRECT.

5  Q   AND, IN FACT, FLORIDA AND SOUTH CAROLINA NO LONGER USE THAT

6  TOOL, DO THEY?

7  A   THAT'S CORRECT.

8  Q   AND THE TECHNOLOGY OF RISK AND SCREENING TOOLS IS SO RECENT

9  THAT IT WAS NOT PART OF ANY OF THE 14 STUDIES THAT WERE REVIEWED

10 AND CULLED BY YOU AND YOUR ASSOCIATE, CORRECT?

11 A   IN SEVERAL OF THESE STUDIES THE RESEARCH STAFF ACTUALLY

12 LOOKED AT RISK FACTORS AND ATTEMPTED TO IDENTIFY WHAT WERE THE

13 FACTORS LIKELY TO IDENTIFY THE PEOPLE WHO SUCCEEDED IN EARLY

14 RELEASE VERSUS NOT, AND IN MANY OF THEM SUGGESTED THAT GOING

15 FORWARD THIS WOULD BE A GOOD ADDITION.  AGAIN, MANY OF THESE

16 STUDIES WERE DONE BEFORE THIS TECHNOLOGY IS ANYWHERE NEAR IT IS

17 TODAY.

18 Q   IT'S A RECENT PHENOMENON OVER THE PAST TWO YEARS THESE TYPE

19 OF TOOLS HAVE COME INTO BEING; IS THAT CORRECT?

20 A   MAYBE FIVE YEARS, YES.

21 Q   WHEN YOU WERE DEPOSED IN SEPTEMBER 2008, YOU HAD NO

22 INFORMATION ON THE NUMBER OF INMATES WITHIN THE DEPARTMENT OF

23 CORRECTIONS AND REHABILITATION THAT WOULD QUALIFY AS LOW RISK

24 OFFENDERS USING EVEN THE TOOL DEVELOPED BY YOUR ORGANIZATION,

25 THE CORRECTIONAL ASSESSMENT INTERVENTION SYSTEM TOOL, RIGHT?

1   **A**   THAT'S CORRECT.

2   **Q**   IN FACT, AT THE TIME OF YOUR DEPOSITION, YOU HAD NO

3   INFORMATION THAT EVEN JUST 15,000 INMATES WOULD QUALIFY AS LOW

4   RISK OFFENDERS UNDER THE CORRECTIONAL ASSESSMENT INTERVENTION

5   SYSTEM TOOL DEVELOPED BY YOUR ORGANIZATION, CORRECT?

6   **A**   YES.

7   **Q**   YOU HAVE NO INFORMATION THAT EVEN 15,000 INMATES WOULD

8   QUALIFY AS LOW RISK OFFENDERS UNDER THE COMPAS TOOL FOR PURPOSES

9   OF RELEASE, DO YOU?

10  **A**   I KNOW THAT THE DEPARTMENT HAS BEEN ADMINISTERING COMPAS,

11  AND SO THE DATA IS PROBABLY KNOWABLE AT THIS POINT.  I DON'T

12  HAVE IT.

13  **Q**   WHEN IT COMES TO SELECTING INMATES FOR EARLY RELEASE, A

14  FACTOR IN THAT DETERMINATION SHOULD BE THE OFFENSE FOR WHICH

15  THEY WERE COMMITTED, CORRECT?

16  **A**   YES.

17  **Q**   AND SO YOU WOULD RECOMMEND FIRST EXCLUDING CERTAIN OFFENDERS

18  FROM ANY RELEASE BASED UPON THEIR CONVICTION OFFENSE, LIKE SEX

19  OFFENDERS, CORRECT?

20  **A**   YES.

21  **Q**   VIOLENT OFFENDERS, PEOPLE WHO HAVE COMMITTED HOMICIDE, RAPE,

22  THAT TYPE OF THING, CORRECT?

23  **A**   YES.

24  **Q**   AND YOU WOULD ALSO LOOK AT THE AMOUNT OF TIME LEFT ON A

25  PRISONER'S SENTENCE, WOULDN'T YOU?

1   **A**   YES.

2   **Q**   YOU WOULD THEN USE A RISK ASSESSMENT TOOL TO FURTHER INFORM

3   ANY DECISION ON WHICH INMATES SHOULD BE RELEASED, WOULDN'T YOU?

4   **A**   IT WOULD BE ONE OF THE DECISIONS, ONE OF THE PARTS OF THAT

5   DECISION, YES.

6   **Q**   NOW, YOU AGREE THAT A POTENTIAL CONSEQUENCE OF A PRISONER

7   RELEASE ORDER IS THAT SOME INMATES WHO ARE RELEASED WILL

8   RECIDIVATE?

9   **A**   THAT'S CORRECT.

10   **Q**   AND THAT RECIDIVISM RATE COULD BE AS HIGH AS 70 PERCENT,

11   COULDN'T IT, DEPENDING UPON THE AVAILABILITY OF COMMUNITY

12   RESOURCES, PAROLE SUPERVISION, HOW THE PERSON WAS SELECTED FOR

13   RELEASE, CORRECT?

14   **A**   SEVENTY PERCENT IS THE CURRENT RECIDIVISM RATE OF PEOPLE

15   RELEASED FROM CALIFORNIA PRISONS.

16   **Q**   AND ISN'T IT TRUE THAT EVEN IF YOU CAN SELECT A GROUP OF LOW

17   RISK OFFENDERS WITHIN THE DEPARTMENT OF CORRECTIONS AND

18   REHABILITATION FOR EARLY RELEASE, THE LIKELIHOOD OF RECIDIVISM

19   ABSENT ANY SUPPORT IN THE COMMUNITY AND ABSENT ANY SPECIAL

20   PAROLE SUPERVISION TECHNIQUES AND TRAINING, THE SAFEST BET WOULD

21   BE THAT THE RECIDIVISM RATE WOULD BE THE SAME?

22   **A**   I DON'T ACCEPT THE PREMISE OF THAT QUESTION, BECAUSE I DON'T

23   THINK IT WOULD BE RESPONSIBLE PUBLIC POLICY TO HAVE NO

24   SELECTION, HAVE NO TRAINING OF PAROLE OFFICERS TO SUPERVISE

25   THEM, AND CERTAINLY EFFORT SHOULD BE MADE TO CREATE SOME

1   RESOURCES.  I GUESS I DON'T FOLLOW THE LOGIC OF THAT QUESTION.

2   **Q**   WHAT I'M SUGGESTING IS YOU MAKE SOME ASSUMPTIONS.  IF YOU

3   SELECT A GROUP OF LOW RISK OFFENDERS FOR EARLY RELEASE, WHAT

4   REMAINS OF THEIR LIKELIHOOD OF RECIDIVISM ABSENT ANY SUPPORT IN

5   THE COMMUNITY, ABSENT ANY SPECIAL PAROLE SUPERVISION TECHNIQUES

6   IN THE COMMUNITY.  YOU WOULD AGREE THAT THE SAFEST BET IS THE

7   RECIDIVISM RATE REMAINS THE SAME, WOULDN'T YOU?

8   **A**  IF ONE IS SELECTING LOW RISK INMATES, YOU WOULD EXPECT THE

9   RECIDIVISM RATE WOULD BE LOWER BECAUSE THAT 70 PERCENT RATE

10  CONSISTS OF PEOPLE WITH MUCH HIGHER RISK AND PEOPLE WITH LOWER

11  RISK.

12          FOR EXAMPLE, IF WE WERE TO FOCUS IN ON WOMEN INMATES

13  WHO, BY AND LARGE, REPRESENT A LOWER RISK OF RECIDIVISM, YOU

14  WOULD GET A LOWER RECIDIVISM RATE.

15  **Q**   IN LOOKING AT PAGE 85 OF YOUR DEPOSITION YOU WERE ASKED THAT

16  QUESTION AT LINE 10.  I'LL GIVE PLAINTIFF COUNSEL AN OPPORTUNITY

17  TO TAKE A LOOK.

18          **MR. SANGSTER:**  OKAY.  NO OBJECTION.

19          **MS. TILLMAN:**  YOU WERE ASKED:

20          "QUESTION:  ACTUALLY, I'M JUST -- I'M TRYING

21          NOT TO GIVE YOU ANY VARIABLES.  I'M JUST SAYING

22          THAT YOU CAN SELECT A GROUP OF LOW RISK

23          OFFENDERS WITHIN CDCR FOR EARLY RELEASE, WHAT

24          REMAINS OF THEIR LIKELIHOOD OF RECIDIVISM ABSENT

25          ANY SUPPORT IN THE COMMUNITY, ABSENT ANY SPECIAL

1          PAROLE SUPERVISION TECHNIQUES?

2               "ANSWER:  BASED ON THE STUDIES THAT I

3          REVIEWED, SORT OF THE SAFEST BET WOULD BE THAT

4          THE RECIDIVISM RATE WOULD BE THE SAME."

5          **JUDGE KARLTON:**  SIR, I'M NOT SURE WHAT THAT QUESTION

6  ASKS.  IT APPEARS TO ASK WHETHER THE RECIDIVISM RATE AMONG LOW

7  RISK OFFENDERS WOULD REMAIN THE SAME, AND YOUR ANSWER TO THAT IS

8  YES?

9          **THE WITNESS:**  YES.

10          **JUDGE KARLTON:**  BUT IF THE QUESTION IS THE TOTAL

11  RECIDIVISM RATE, YOUR ANSWER IS PROBABLY NO, BECAUSE LOW RISK

12  OFFENDERS HAVE A LOWER RATE OF RECIDIVISM?

13          **THE WITNESS:**  THAT'S CORRECT.

14          **JUDGE KARLTON:**  SPEAK INTO THE MICROPHONE.

15          **THE WITNESS:**  I'M SORRY.  THAT IS CORRECT.

16          WHAT I BELIEVE WHAT I WAS REFERRING TO IN THAT

17  DEPOSITION WAS COMPARING LOW RISK OFFENDERS TO LOW RISK

18  OFFENDERS.  IF THE ONLY VARIABLE IS THAT ONE GROUP WOULD GET OUT

19  OF PRISON A LITTLE BIT EARLIER -- WHICH, BY THE WAY, I POINT OUT

20  WE HAVE BEEN DOING IN THIS STATE FOR 25 YEARS.  WE HAVE BEEN

21  CHANGING GOOD TIME CREDIT LAWS.

22          IT'S ACTUALLY TRUE THAT 30 -- OVER THE LAST 30 YEARS,

23  THE AMOUNT OF TIME SERVED IN THE CALIFORNIA PRISONS FOR BURGLARY

24  HAS ACTUALLY GONE DOWN FROM WHERE IT WAS WHEN DETERMINATE

25  SENTENCING WAS STARTED.  SO WE HAVE BEEN RUNNING THAT EXPERIMENT

1  OVER THE LAST 30 YEARS, A NUMBER OF LAWS, CHANGING TIME SERVED.

2  AND, AGAIN, DURING THAT PERIOD OF TIME THE OVERALL TREND HAS

3  BEEN DOWNWARD PARTICULARLY.  BURGLARY RATES HAVE BEEN VERY

4  SHARPLY DOWN IN THE STATE OF CALIFORNIA.

5  **BY MS. TILLMAN**

6  **Q**   IF I MIGHT JUST CLARIFY THE RECORD AND GOING BACK A LITTLE

7  BIT?

8           IN YOUR DEPOSITION YOU WERE ASKED "IF THESE TOOLS,"

9  REFERRING TO THE SCREENING TOOLS.

10              "...WERE USED TO SELECT A GROUP OF CDCR

11              INMATES FOR EARLY RELEASE, WOULD THE TOOLS

12              RESULT IN A REDUCTION OF THE RECIDIVISM RATE

13              FROM 70 PERCENT TO A DIFFERENT NUMBER FOR THIS

14              PARTICULAR GROUP?"

15           AND YOU RESPONDED:

16              "IF THAT SELECTION WAS ALSO COMBINED WITH

17              RESPONDING TO THE SUPERVISION STRATEGIES."

18           SO THE RECIDIVISM RATE STAYS THE SAME, DOESN'T IT,

19  EVEN WITH A LOW RISK GROUP, UNLESS YOU HAVE PAROLE SUPERVISION

20  STRATEGIES AT PLAY, CORRECT?

21  **A**   WHAT I WAS SUGGESTING THERE IS THAT IF YOUR -- I MEAN, FIRST

22  OF ALL, YOU'RE INCREASING YOUR CHANCES OF NOT AFFECTING PUBLIC

23  SAFETY BY SELECTING LOW RISK PEOPLE.  BUT WHAT I WAS SUGGESTING

24  IS, IF THEN YOU TEACH PAROLE OFFICERS HOW TO DO A GOOD JOB IN

25  SUPERVISION, THE NUANCES OF SUPERVISING DIFFERENT KINDS OF

1    OFFENDERS, YOU ARE GOING TO GET EVEN BETTER RESULTS.

2    Q    YOU WOULD AGREE THAT EVEN OFFENDERS WHO ARE CLASSIFIED AS

3    HAVING A LOW RISK OF REARREST REQUIRE SOME REENTRY PROGRAMMING,

4    SOME HEALTHCARE SUPPORT, SOME JOB SUPPORT TO SUCCESSFULLY

5    REINTEGRATE INTO THE COMMUNITY, CORRECT?

6    A    YES.

7    Q    AND YOU WOULD AGREE THAT POST-RELEASE OPPORTUNITIES LIKE

8    EMPLOYMENT, HOUSING, POSITIVE FAMILY SUPPORT, CAN ALSO REDUCE

9    RECIDIVISM RATES?

10   A    YES.

11   Q    YOU WOULD AGREE THAT IN THE PHILADELPHIA STUDY INVOLVING THE

12   EARLY PAROLE OF JAIL INMATES, IT WAS SHOWN THAT ADDING IN

13   COMMUNITY-BASED DRUG TREATMENT SERVICES INCREASED THE PROPORTION

14   OF SUCCESS ON PAROLE AMONGST THOSE INMATES FROM 66 TO

15   78 PERCENT, CORRECT?

16   A    YES.

17   Q    SO TO AVOID A 70 PERCENT RECIDIVISM RATE WITH DEPARTMENT OF

18   CORRECTION AND REHABILITATION INMATES, YOU WOULD RECOMMEND,

19   WOULDN'T YOU, THAT THERE EXISTS AND BE MADE AVAILABLE TO THIS

20   GROUP OF RELEASED INMATES DRUG TREATMENT CENTERS?

21   A    WELL, AGAIN, I WANT TO REITERATE THAT I BELIEVE IMPROVED

22   SUPERVISION STRATEGIES ALONE WOULD PRODUCE SOME REDUCTION IN

23   RECIDIVISM RATES, AND IN THE CASE OF FLORIDA WE FOUND THAT TO BE

24   AS MUCH AS ONE-THIRD REDUCTION, EVEN WITH NO ADDITIONAL

25   RESOURCES PUT INTO IT.

1          I WOULD SAY THE ADDITION OF THOSE RESOURCES WOULD

2   DRIVE THOSE RECIDIVISM RATES DOWN EVEN MORE.

3   **Q**   AND I THINK, AS YOU EXPLAINED IN YOUR DEPOSITION, IF YOU

4   WANTED TO ENSURE THAT THIS SELECT GROUP OF OFFENDERS DID NOT

5   HAVE A 70 PERCENT RECIDIVISM RATE, YOU WOULD RECOMMEND THAT

6   THERE BE DRUG TREATMENT CENTERS AVAILABLE TO THEM, WOULDN'T YOU?

7   **A**   YES.

8   **Q**   NOW, YOU DON'T KNOW THE PRESENT CAPACITY OF COMMUNITY DRUG

9   TREATMENT CENTERS FOR PAROLEES WITHIN CALIFORNIA, DO YOU?

10  **A**   I DO NOT.

11  **Q**   BUT YOU KNOW THAT THE TYPE OF DRUG TREATMENT NECESSARY TO

12  ENSURE A REDUCTION IN THE CRIMINALITY OF PAROLEES WOULD PROBABLY

13  BE A RANGE OF DIFFERENT THERAPIES, CORRECT?

14  **A**   THAT'S RIGHT.

15          **JUDGE REINHARDT:**  MAY I ASK YOU A QUESTION HERE,

16  DOCTOR?

17          THESE STRATEGIES YOU ARE RECOMMENDING, ARE THEY ANY

18  DIFFERENT THAN THE STRATEGIES YOU WOULD RECOMMEND IF THEY GOT

19  OUT A FEW MONTHS LATER?

20          **THE WITNESS:**  NO, THEY WOULDN'T BE ANY DIFFERENT.

21          **JUDGE REINHARDT:**  BUT YOU WOULD RECOMMEND THESE

22  STRATEGIES WHENEVER THEY GOT OUT?

23          **THE WITNESS:**  THAT'S CORRECT.  I MEAN --

24          **JUDGE REINHARDT:**  AND THEY WOULD HAVE THE SAME EFFECT

25  ON THE RECIDIVISM RATE IF THEY GOT OUT THREE MONTHS LATER OR

1   FOUR MONTHS LATER THAN THEY WOULD HAVE NOW?

2          **THE WITNESS:**  THIS WOULD BE MY OPINION, AND I THINK

3   IT WAS THE OPINION OF THE EXPERT PANEL AS WELL.

4          THE THING I WOULD SAY IS, IN LOOKING AT THIS ISSUE,

5   WE ALWAYS HAVE TO KEEP IN MIND THAT THE DEPARTMENT IS RELEASING

6   140,000 INMATES EVERY YEAR, AND SO WHATEVER ADDITIONAL RELEASES

7   HAVE TO BE PUT IN THE CONTEXT OF WHAT IS ALREADY HAPPENING AND

8   WHO IS ALREADY BEING RELEASED.

9          **JUDGE KARLTON:**  THAT RAISES A VERY TROUBLING QUESTION

10  FOR ME.  I DON'T WANT TO SPEAK FOR MY COLLEAGUES.

11         THE STATE OF CALIFORNIA HAS KNOWN FOR MANY YEARS THAT

12  WHAT IT IS DOING IS ESSENTIALLY FAILING.  THE PAROLE RATE IS AT

13  70 PERCENT, AND NOBODY IN HIS RIGHT MIND THINKS THAT'S

14  SUCCESSFUL.  BUT THE STATE HAS MAINTAINED THAT IN THE FACE OF

15  REPEATED STUDIES WHICH DEMONSTRATE THAT WHAT THEY'RE DOING

16  DOESN'T WORK AND SOMETHING ELSE MIGHT.  BUT THAT'S A POLITICAL

17  OPINION -- I MEAN A POLITICAL JUDGMENT.  THEY'VE MADE THE

18  JUDGMENT THAT DESPITE WHAT THE EXPERTS SAY, THEY'D RATHER JUST

19  HAVE PEOPLE COMMITTING CRIMES.

20         WHEN WE ARE ASKED TO CONSIDER PUBLIC SAFETY, I'M NOT

21  QUITE SURE WHAT THAT MEANS.  THE STATUTE REQUIRES -- AND I HAVE

22  TO HONEST, LOOK FORWARD THE ORAL ARGUMENT, TO THE FINAL

23  ARGUMENTS, WHEN SOMEBODY WILL TELL ME WHAT IT MEANS.  BUT WHAT

24  WE HAVE IS A STATE WHICH DOESN'T CARE.  DOESN'T THAT SUGGEST --

25  WHEN I SAY IT DOESN'T CARE, I MEAN ITS PUBLIC POLICY IS THAT IT

1    DOESN'T CARE.

2            DOESN'T THAT SUGGEST THAT THE EFFECT ON PUBLIC SAFETY

3    IN THIS STATE BECAUSE OF ITS PUBLIC POLICY IS SIMPLY -- WELL,

4    THAT'S NOT A QUESTION FOR YOU AT ALL.  EXCUSE ME.  THAT'S A

5    QUESTION FOR US.  I'M JUST THINKING OUT LOUD.  EXCUSE ME.

6            PARDON ME, MS. TILLMAN.

7    **BY MS. TILLMAN**

8    **Q**   WE WERE TALKING ABOUT DRUG TREATMENT CENTERS.  IN TERMS OF

9    THE DRUG TREATMENT NEEDS OF THE PAROLEES, YOU WOULD RECOMMEND,

10   WOULDN'T YOU, SOME SORT OF A RANGE OF DRUG TREATMENT CENTERS

11   WITH EITHER CLASSROOM SESSIONS, POSSIBLY GROUP SESSIONS,

12   POSSIBLY EVEN INPATIENT INSTITUTIONAL PROGRAMS FOR SOME

13   PAROLEES, RIGHT?

14   **A**   THAT'S CORRECT.

15           **JUDGE REINHARDT:**  ARE YOU TALKING ABOUT ALL PAROLEES

16   WHENEVER THEY COME OUT OR JUST THIS GROUP AS OPPOSED TO THE

17   OTHER PAROLEES?

18           **MS. TILLMAN:**  WE WERE TALKING GENERALLY ABOUT ANY

19   PAROLEES.

20           **JUDGE REINHARDT:**  OKAY.  THANK YOU.

21   **BY MS. TILLMAN**

22   **Q**   YOU DON'T KNOW HOW MANY DRUG TREATMENT CENTERS SHOULD BE

23   ESTABLISHED TO EVEN SERVE THE PRESENT POPULATION OF PAROLEES

24   WITHIN THE STATE OF CALIFORNIA, DO YOU?

25   **A**   I DON'T KNOW THAT, NO.

1  Q    NOW, WHEN A PAROLEE COMES OUT OF PRISON, YOUR RECOMMENDATION

2  IS THAT THEY HAVE HOUSING SUPPORT, CORRECT?

3  A    YES.

4  Q    AND THAT WOULD BE NECESSARY TO HELP REDUCE THE 70 PERCENT

5  RECIDIVISM RATE, CORRECT?

6  A    THE RESEARCH WOULD INDICATE THAT IT WOULD HELP, YES.

7  Q    AND AT THIS TIME THE ONLY HOUSING PROGRAMS THAT YOU ARE

8  AWARE OF FOR ASSISTING PAROLEES IN OBTAINING HOUSING UPON THEIR

9  REENTRY INTO SOCIETY ARE IN SANTA BARBARA COUNTY, ALAMEDA

10  COUNTY, SAN DIEGO COUNTY, SAN MATEO, AND SAN FRANCISCO?

11  A    AND ALAMEDA COUNTY.  I DON'T KNOW IF YOU MENTIONED THAT.

12  Q    I THINK I MENTIONED THAT, YES.

13  A    YES.

14          THE OTHER THING I CAN TELL YOU, I KNOW THIS BECAUSE

15  MY SON WORKS FOR THEM, A NATIONAL ORGANIZATION CALLED THE

16  CORPORATION FOR SUPPORT OF HOUSING, WHICH IS AN ORGANIZATION

17  THAT DESIGNS -- THAT HELPS FUND HOUSING FOR VULNERABLE

18  POPULATIONS IS VERY EXTENSIVELY INVOLVED NOW IN LOS ANGELES IN

19  DEVELOPING HOUSING FOR PAROLEES; IN FACT.  DEVELOPING HOUSING

20  FOR PAROLEES IS THE LEADING ACTIVITY OF THE CALIFORNIA BRANCH OF

21  THIS ORGANIZATION RIGHT NOW.

22  Q    TO AVOID A 70 PERCENT RECIDIVISM RATE, YOU WOULD ALSO

23  RECOMMEND THAT OFFENDERS HAVE SOME SORT OF TRANSITIONAL REENTRY

24  PROGRAM TO HELP THEM HONE THEIR JOB SEEKING SKILLS, THEIR

25  INTERVIEW SKILLS, HELP THEM SOLVE ISSUES ABOUT ACCESSING JOBS

1  AND HOUSING AND MEDICAL CARE, CORRECT?

2  **A**   YES.

3  **Q**   YOU DON'T KNOW HOW MANY PAROLEES ARE GAINFULLY EMPLOYED

4  TODAY, DO YOU?

5  **A**   I DO NOT.

6  **Q**   AND YOU DON'T KNOW WHAT PROPORTION OF THE PRESENT PAROLE

7  POPULATION IS EVEN QUALIFIED FOR COMMON LABORER JOBS, DO YOU?

8  **A**   I DO NOT.

9  **Q**   YOU DON'T KNOW WHAT PROPORTION OF THE PRESENT PAROLE

10  POPULATION IS QUALIFIED TO WORK IN A SKILLED PROFESSION, DO YOU?

11  **A**   NO.

12  **Q**   YOU HAVE NO REASON THEN TO QUESTION THE STATEMENT MADE IN

13  DR. MARQUART'S REPORT THAT ONLY 20 PERCENT OF THE PAROLEES

14  SUPPORT THEMSELVES THROUGH EMPLOYMENT IN THE FIRST YEAR AFTER

15  RELEASE, CORRECT?

16  **A**   I HAVE NO WAY OF EVALUATING THAT.

17       **JUDGE HENDERSON:**  I'M WONDERING ABOUT THE CONTINUITY

18  OF THAT QUESTION.  IT SEEMS TO ME THAT DR. MARQUART'S FINDING AS

19  TO HOW MANY SUPPORT THEMSELVES IS DIFFERENT FROM HOW MANY ARE

20  QUALIFIED FOR CERTAIN KINDS OF JOBS.  I DON'T SEE THE

21  CONNECTIONS THERE.

22       **MS. TILLMAN:**  I THINK THE QUESTION WAS ALONG THE

23  LINES OF HOW MANY PAROLEES WHO ARE EMPLOYED, GAINFULLY EMPLOYED,

24  SUPPORT THEMSELVES THROUGH --

25       **JUDGE HENDERSON:**  YOU ASKED HOW MANY WERE QUALIFIED.

1          **THE WITNESS:** CAN I COMMENT ON THAT?

2          **MS. TILLMAN:** I RECOGNIZE THAT. I THINK I WAS TRYING

3 TO INDICATE, TO THE EXTENT THERE IS STATISTICS OUT THERE, WE

4 KNOW THAT, AT LEAST FROM DR. MARQUART, ONLY 20 PERCENT OF THE

5 PAROLEES ARE GAINFULLY EMPLOYED. WE DON'T HAVE ANY INFORMATION

6 ABOUT HOW MANY MIGHT NEED REENTRY PROGRAMS BECAUSE WE DON'T KNOW

7 HOW MANY ARE SKILLED OR UNSKILLED.

8          **JUDGE KARLTON:** DR. MARQUART INDICATED WE CAN'T KNOW

9 ANYTHING.

10          **JUDGE HENDERSON:** ALSO, I GUESS WHAT'S BOTHERING ME,

11 MS. TILLMAN, IS MANY PEOPLE DON'T SEEK JOBS. SO THIS

12 INFORMATION DOESN'T TELL US WHO THOSE ARE. WE JUST KNOW WHO

13 HAVE JOBS. WE DON'T KNOW HOW MANY GO UP TO BURGER KING AND SAY,

14 I'M READY TO FLIP BURGERS, AND THOSE WHO DON'T WANT TO DO THAT.

15          **JUDGE KARLTON:** THE WITNESS WANTED TO COMMENT FURTHER

16 ON HIS ANSWER.

17          **THE WITNESS:** WELL, I MEAN, FIRST OF ALL, THERE ARE

18 WELL-ESTABLISHED PROGRAMS THAT SERVE PEOPLE COMING OUT OF PRISON

19 THAT EQUIP THEM WITH THESE SKILLS. FOR EXAMPLE, THE DELANCEY

20 STREET PROGRAM IN SAN FRANCISCO IS ONE EXAMPLE.

21          SECONDLY, I HAPPEN TO KNOW BECAUSE I HAVE BEEN

22 PARTICIPATING IN A NUMBER OF MEETINGS THAT WITHIN CALIFORNIA,

23 THE PHILANTHROPIC COMMUNITY HAS BEEN EXTENSIVELY INVOLVED IN NOW

24 PROMOTING PROGRAMS SUPPORTING PAROLEES FOR EMPLOYMENT WITHIN THE

25 COMMUNITY.

1          AND, FINALLY, I WOULD LOOK AT SAN DIEGO COUNTY WHICH

2    REALLY HAS AN EXEMPLAR PROGRAM OF PROVIDING EMPLOYMENT SERVICES

3    IN SAN DIEGO FOR PEOPLE COMING OUT OF CALIFORNIA PRISONS.  I

4    HAVE DONE THE RESEARCH MYSELF.  BY THE ACCOUNTS OF THE

5    CALIFORNIA ENDOWMENT, THE RESULTS OF THIS SAN DIEGO COUNTY

6    EMPLOYMENT PROGRAM HAS BEEN VERY SUCCESSFUL.

7    **BY MS. TILLMAN**

8    **Q**    YOU DON'T KNOW HOW MANY REENTRY PROGRAMS ARE NEEDED TO

9    SUPPORT THE PRESENT PAROLE POPULATION, DO YOU?

10   **A**    I DON'T KNOW AT THIS POINT, BUT IT'S CERTAINLY KNOWABLE.

11   **Q**    YOUR OPINION IS THAT A PRISONER RELEASE ORDER, IF DONE

12   PROPERLY, WILL NOT HAVE AN ADVERSE EFFECT ON THE PUBLIC SAFETY,

13   CORRECT?

14   **A**    YES.

15   **Q**    WHEN YOU SAY "DONE PROPERLY," WOULDN'T IT BE CORRECT THAT

16   YOU MEAN THAT THERE MUST BE PROPER SCREENING OF THE INDIVIDUALS

17   WHO ARE CANDIDATES FOR A RELEASE?

18   **A**    YES.

19   **Q**    AND WHEN YOU SAY "DONE PROPERLY," WOULDN'T YOU AGREE THAT

20   THERE MUST BE TRAINING OF THE PAROLE OFFICERS IN THE FIELD TO

21   ENABLE EFFECTIVE SUPERVISION OF THESE RELEASED PAROLEES?

22   **A**    YES.

23   **Q**    AND WHEN YOU SAY "DONE PROPERLY," YOU WOULD AGREE THAT THERE

24   MUST BE COMMUNITY PROGRAMS TO SUPPORT THE PAROLEES IN THEIR

25   MENTAL HEALTH NEEDS, THEIR MEDICAL NEEDS, THEIR JOB NEEDS, THEIR

1  HOUSING NEEDS?

2  **A**   THE LAST ISSUE WOULD BE AN IDEAL, YES.

3           **MS. TILLMAN:**  THANK YOU, NOTHING FURTHER.

4           **JUDGE HENDERSON:**  INTERVENORS.

5           **MR. MITCHELL:**  YES, YOUR HONOR.

6           **MR. SPECTER:**  EXCUSE ME.  WE DIDN'T HEAR HIS LAST

7  ANSWER.

8           **MR. SANGSTER:**  COULD WE HAVE THE LAST QUESTION AND

9  ANSWER READ BACK?  THE VOICES DROPPED.

10               (RECORD READ)

11           **CROSS-EXAMINATION BY MR. MITCHELL**

12           **MR. MITCHELL:**  GOOD MORNING.  BILL MITCHELL,

13  DEFENDANT INTERVENORS.

14  **BY MR. MITCHELL**

15  **Q**   GOOD MORNING, DR. KRISBERG.  IS IT DR. KRISBERG?

16  **A**   DR. KRISBERG.

17  **Q**   DOCTOR, YOU WERE HIRED OR RETAINED IN THIS CASE, I BELIEVE

18  IT WAS, IN JULY OR AUGUST OF THIS YEAR.

19  **A**   IN JULY, YES.

20  **Q**   AND YOU WERE TASKED OR ASKED TO GIVE AN OPINION WHETHER

21  ACCELERATED RELEASE WOULD ENDANGER PUBLIC SAFETY?

22  **A**   YES.

23  **Q**   THAT WAS YOUR SOLE ROLE OF -- THAT WAS A REQUEST THAT WAS

24  MADE OF YOU, WILL ACCELERATED RELEASE ENDANGER PUBLIC SAFETY?

25  **A**   YES.

1  Q   AND YOU HAD ALREADY, OVER THE COURSE OF YOUR CAREER, STUDIED

2  ACCELERATED RELEASE QUITE EXTENSIVELY AND PUBLISHED IN THAT

3  AREA, CORRECT?

4  A   I HADN'T -- WELL, IN THE LAST COUPLE OF YEARS WE PUBLISHED A

5  LITERATURE REVIEW, BUT, YES, I'VE -- I WAS PERSONALLY INVOLVED

6  IN THE INITIAL RESEARCH IN ILLINOIS THAT DR. AUSTIN SPOKE ABOUT.

7  Q   THIS IS A TOPIC THAT YOU HAVE BEEN INVOLVED IN GOING BACK

8  INTO THE 1980'S?

9  A   THAT'S CORRECT.

10 Q   WHEN WE TALK ABOUT THE TERM "ENDANGER PUBLIC SAFETY," CAN WE

11 DEFINE THAT AS INCREASING CRIME AND VICTIMIZATION?

12 A   YES.

13 Q   SO IF WE'RE LOOKING TO DETERMINE WHETHER ACCELERATED RELEASE

14 IS GOING TO ENDANGER PUBLIC SAFETY, WE WOULD LIKE TO KNOW

15 WHETHER THE ACCELERATED RELEASE PROPOSAL WILL INCREASE CRIME AND

16 VICTIMIZATION; IS THAT CORRECT?

17 A   YES.

18 Q   WHEN WE'RE LOOKING TO DETERMINE WHETHER OR NOT PUBLIC SAFETY

19 IS ENDANGERED BY AN EARLY RELEASE, IS IT TRUE THERE ARE A NUMBER

20 OF DIFFERENT MEASURES WE CAN LOOK AT, SUCH AS WHETHER OR NOT IT

21 INCREASES THE CRIME RATE?

22 A   YES.

23 Q   SUCH AS WHETHER OR NOT IT INCREASES THE RECIDIVISM RATE OF

24 THE INDIVIDUALS RELEASED?

25 A   YES.

1  Q    SUCH AS WHETHER OR NOT IT INCREASES THE OCCURRENCE OF CRIMES

2  IN THE COMMUNITY?

3  A    YES.

4  Q    DO YOU AGREE, DOCTOR, THAT STUDIES -- RESEARCH HAS SHOWN

5  THAT THE INCARCERATION OF HABITUAL CRIMINALS WILL REDUCE THE

6  CRIME RATE?

7  A    CAN YOU REPEAT THAT QUESTION?

8  Q    LET ME REPHRASE IT FOR YOU.

9           WOULD YOU AGREE THAT INCREASED INCARCERATION OF

10 HABITUAL CRIMINALS WILL AND HAS REDUCED CRIME RATES?

11 A    THE RESEARCH ON THAT WOULD SUGGEST IT SORT OF DEPENDS UPON

12 THE POINT IN THEIR CAREERS; YOU KNOW, IN OTHER WORDS, IF YOU

13 CAN -- IF YOU ARE FORTUNATE ENOUGH TO GET A HABITUAL CRIMINAL

14 EARLY IN THEIR CARRIER, YES, IT WOULD.  BUT IF YOU ARE LOCKING

15 SOMEBODY UP TOWARDS THE END WHEN THEY ARE SORT OF AGING OUT AND

16 NO LONGER COMMITTING AS MANY CRIMES, THAT RESULT IS MARGINAL.

17          CERTAINLY, THE RAND CORPORATION, WHICH HAS BEEN THE

18 LEADING GROUP ON THAT ISSUE, HAS RAISED SERIOUS QUESTIONS ABOUT

19 WHETHER OR NOT, PER SE, WE CAN IDENTIFY HABITUAL CRIMINALS, AND,

20 SECONDLY, WHETHER OR NOT INCARCERATING THEM WILL HAVE MUCH OF AN

21 EFFECT.

22 Q    WOULD YOU AGREE THAT INDIVIDUALS WHO HAVE DEMONSTRATED A

23 PROCLIVITY FOR CRIME, AMASSING THREE OR MORE FELONY CONVICTIONS,

24 DEMONSTRATE THAT THEY MIGHT BE HABITUAL CRIMINALS?

25          **JUDGE KARLTON:**  I SUPPOSE THAT DEPENDS ON HOW YOU

1  DEFINE HABITUAL CRIMINALS.  IF YOU DEFINE THEM AS THREE OR MORE,

2  THE ANSWER IS YES.  IF YOU DEFINE THEM AS FIVE OR MORE, THE

3  ANSWER IS NO.

4          **THE WITNESS:**  YOU KNOW, THERE'S A WHOLE SCIENCE OF

5  CRIMINOLOGY THAT HAS BEEN TRYING TO LOOK AT THIS ISSUE.  I SAY

6  IT'S INCONCLUSIVE IN TERMS OF HOW YOU DRAW THE LINE ON THIS.

7  **BY MR. MITCHELL**

8  **Q**   GETTING TO THAT POINT THEN, HABITUAL CRIMINALS, HOW WOULD

9  YOU CLASSIFY -- HOW WOULD YOU DEFINE WHAT IS OR WHAT IS NOT A

10 HABITUAL CRIMINAL, WHETHER IT'S VIOLENT OR NONVIOLENT

11 PROPERTY-TYPE CRIMES?

12 **A**   I WOULD USE BEHAVIOR AS THE INDICATOR.  IT IS EXCEEDINGLY

13 DIFFICULT TO LOOK OUT INTO THE FUTURE AND MAKE THESE

14 PREDICTIONS.

15         WE KNOW FROM MOST OF THE STUDIES OF WHAT ARE CALLED

16 CRIMINAL CAREERS, THAT MOST OFFENDERS ACTUALLY SLOW DOWN, AGE

17 OUT, ACTUALLY REDUCE THEIR CRIMINAL BEHAVIOR.  THERE'S EXTENSIVE

18 RESEARCH INDICATING THAT MOST OFFENDERS ARE GOING TO BE

19 COMMITTING LESSER CRIMES, AND A LOT OF IT HAS TO DO WITH THE AGE

20 CYCLE.

21         CERTAINLY, IF WE WERE TALKING ABOUT YOUNG MEN IN

22 THEIR 20'S, I WOULD BE A LOT -- YOU KNOW, I THINK YOU WOULD BE

23 BETTING ON CONTINUED CRIME BEHAVIOR.  IF WE WERE LOOKING AT

24 PEOPLE IN THEIR 50'S AND 60'S, YOU WOULD BE BETTING ON SOMETHING

25 ELSE.

1  Q    WITH AGE AS A CONTROLLING FACTOR, WOULD YOU AGREE THAT PAST

2  BEHAVIOR IS A GOOD INDICATOR OF RISK TO REOFFEND?

3  A    THE FACTORS -- NOT NECESSARILY.  THE FACTORS THAT ARE MOST

4  PREDICTIVE HAVE TO DO WITH THE OFFENSE, THE SEVERITY OF THE

5  OFFENSE THE PERSON HAS COMMITTED, THE AGE AT WHICH THEY

6  INITIALLY ENTER THE SYSTEM.  SO THOSE ARE MUCH MORE TELLING.

7  SOMEBODY'S ASSOCIATION WITH OTHER CRIMINALS, CRIMINAL PEERS, IS

8  A VERY POWERFUL PREDICTOR OF THIS.

9  Q    LET ME SEE IF I CAN DEFINE THIS TERM "HABITUAL CRIMINAL" A

10  LITTLE CLEARER THEN.

11        WOULD YOU AGREE THAT SOMEONE WHO COMMITS THREE OR

12  MORE FELONY CRIMES WITHIN A TEN-YEAR PERIOD MIGHT BE A HABITUAL

13  CRIMINAL?

14  A    THEY MIGHT BE, YES.

15        **JUDGE REINHARDT:**  AND THEY MIGHT NOT BE.  IS THAT

16  WHAT THAT MEANS?  THEY MIGHT BE, THEY MIGHT NOT BE?

17  **BY MR. MITCHELL**

18  Q    WOULD THEY BE, IN YOUR OPINION?

19        **JUDGE KARLTON:**  NO, NO.  THE QUESTION IS DIRECTED TO

20  DR. KRISBERG.

21        IS THREE YEARS -- I'M SORRY -- THREE CRIMES WITHIN

22  TEN YEARS A DEMONSTRATION OF HABITUAL -- I THINK IS THE WORD YOU

23  USED.

24        **MR. MITCHELL:**  A HABITUAL CRIMINAL.

25        **THE WITNESS:**  WE HAVE BEEN HAVING THAT DEBATE IN

1  CALIFORNIA OVER THE LAST TEN YEARS, AND I THINK IT'S REALLY

2  DRIVEN BY WHAT THOSE OFFENSES ARE.  YOU KNOW, FOR EXAMPLE, IF

3  SOMEBODY -- YOU KNOW, WE THINK ABOUT THE THREE STRIKES

4  CONVERSATION.  IF THE LAST STRIKE IS A VERY MINOR CRIME, I STOLE

5  A VIDEO FROM A VIDEO STORE, THEN I WOULD NOT NECESSARILY VIEW

6  THAT AS AN INDICATION OF A HABITUAL CRIMINAL.  IF WE ARE TALKING

7  ABOUT THREE ARMED ROBBERIES, THAT'S WHOLE DIFFERENT STORIES.

8  **BY MR. MITCHELL**

9  **Q**   SO WE CAN HAVE HABITUAL VIOLENT CRIMINALS, AND WE CAN HAVE

10  HABITUAL NONVIOLENT PROPERTY CRIMINALS, CORRECT?

11  **A**   YES.

12  **Q**   SO THREE VIOLENT CRIMES, YOU WOULD AGREE, WITHIN A TEN-YEAR

13  PERIOD WOULD QUALIFY SOMEONE AS A HABITUAL CRIMINAL?

14  **A**   YES.

15  **Q**   WHAT ABOUT THREE PROPERTY NONVIOLENT CRIMES WITHIN A

16  TEN-YEAR PERIOD, WOULD YOU CLASSIFY THAT PERSON AS AN HABITUAL

17  NONVIOLENT PROPERTY CRIMINAL?

18  **A**   THAT TERM DOESN'T HAVE A LOT OF SCIENTIFIC MEANING TO ME.  I

19  WOULD BE LOOKING AT OTHER RISK FACTORS.  IF YOU ARE ASKING ME TO

20  MAKE A PROJECTION GOING FORWARD AS TO WHAT THAT BEHAVIOR WOULD

21  BE, I'D WANT TO KNOW A NUMBER OF OTHER THINGS ABOUT THAT

22  INDIVIDUAL IF I WERE SITTING ON A PAROLE BOARD OR I WAS MAKING A

23  DECISION ABOUT THAT PERSON.

24  **Q**   IN LOOKING AT YOUR STUDIES AND YOUR OPINION, I BELIEVE IT'S

25  YOUR OPINION, CORRECT ME IF I'M WRONG, THAT EARLY RELEASE

1  LOWERED RECIDIVISM RATES WHEN LOW RISK OFFENDERS WERE TARGETED,

2  ESPECIALLY DRUG AND PROPERTY OFFENDERS?

3  **A**   THAT'S CORRECT.

4  **Q**   SO WHEN WE ARE LOOKING AT TARGETING LOWER RISK INDIVIDUALS,

5  WE WANT TO MAKE SURE THAT WE'RE NOT EARLY RELEASING HIGH RISK

6  INDIVIDUALS, CORRECT?

7  **A**   YES.

8  **Q**   AND WOULD YOU AGREE THAT THE COMMISSION OF THREE OR MORE

9  FELONY CRIMES WITHIN A TEN-YEAR PERIOD WOULD QUALIFY SOMEONE AS

10  HIGH RISK?

11  **A**   I WOULD NOT AGREE WITH THAT.  I DON'T THINK THERE'S A

12  SCIENTIFIC STANDARD THAT SAYS THREE OR MORE WITHIN TEN YEARS

13  LEADS TO HIGH RISK.  AGAIN, I WOULD DEPEND UPON -- YOU KNOW,

14  THERE'S SUBSTANTIAL RESEARCH THAT'S DONE BY PETER GREENWOOD OF

15  THE RAND CORPORATION.  ALFRED BLOOMSTEIN AT CARNEGIE-MELLON HAS

16  DONE EXTENSIVE RESEARCH ON THIS.  SO I WOULD -- IN ORDER TO FORM

17  THOSE DEFINITIONS, I WOULD LOOK AT THE BEST RESEARCHERS IN THE

18  COUNTRY AND FIGURE OUT WHERE THEY WOULD MAKE THOSE CUTOFF

19  POINTS.

20  **Q**   WHAT NUMBER OF FELONY CONVICTIONS WITHIN A TEN-YEAR PERIOD

21  WOULD DISQUALIFY SOMEONE FROM EARLY RELEASE, IN YOUR OPINION?

22  **A**   I DON'T HAVE AN OPINION ON THAT.

23  **Q**   TEN OR MORE?

24  **A**   TEN OR MORE, I WOULD PROBABLY SAY YES.

25  **Q**   WHAT ABOUT FIVE IN TEN YEARS?

1  **A**  AGAIN, IN REACHING THAT DECISION, I WOULD WANT TO KNOW THE

2  NATURE OF THOSE OFFENSES, HOW SERIOUS THEY WERE.  WE WANT TO

3  KNOW THE CIRCUMSTANCES.  AND I'D ALSO WANT TO KNOW QUITE A BIT

4  ABOUT THAT INDIVIDUAL IN TERMS OF WHILE THEY WERE INCARCERATED,

5  WERE THEY PARTICIPATING IN PROGRAMS OR NOT?  DID THEY HAVE A JOB

6  WHEN THEY WERE RELEASED?

7           I MEAN, THERE WOULD BE A WHOLE SERIES OF THINGS THAT

8  I WOULD I THINK REASONABLY WANT TO TAKE INTO CONSIDERATION IN

9  FORMING THIS ISSUE OF RISK OF FUTURE BEHAVIOR.

10  **Q**  AS A BOTTOM LINE, WOULD YOU AGREE THAT SOMEONE WHO HAS THREE

11  OR MORE FELONY CONVICTIONS, HAS GREATER RISK OF REOFFENDING THAN

12  SOMEONE WHO DOES NOT HAVE THREE OR MORE FELONY CONVICTIONS?

13  **A**  YES.

14  **Q**  NOW, IN YOUR REVIEW OF THE LITERATURE AND THE STUDIES IN THE

15  ACCELERATED RELEASE AREA, YOU CITED IN YOUR REPORT, I BELIEVE

16  YOU SAID TEN DIFFERENT STUDIES, CORRECT?

17  **A**  WHAT I SAID, THE TOTAL NUMBER OF STUDIES THAT I HAVE

18  COLLECTED HERE THERE ARE 14 STUDIES, SOME OF THEM ARE MULTIPLE

19  FOR JURISDICTIONS.  IT'S NINE STATES, AND THE COUNTRY OF CANADA,

20  AND THERE'S ONE WHICH IS THE CITY OF PHILADELPHIA.

21  **Q**  YOU SELECTED THOSE FROM A WIDE VARIETY OF DIFFERENT STUDIES,

22  DIFFERENT ARTICLES THAT COMMENT ON AND LOOKED AT ACCELERATED

23  RELEASE, CORRECT?

24  **A**  OUR GOAL WAS TO ASSEMBLE EVERY ARTICLE ON ACCELERATED

25  RELEASE WHICH, IN FACT, CONSTITUTED RESEARCH AND CONTAINED DATA

1   ABOUT THAT.  SO, FOR EXAMPLE, WE EXCLUDE OPINION PIECES OR

2   ARTICLES ON JURISPRUDENCE WHICH SPOKE TO THESE ISSUES.

3          SO, TO MY KNOWLEDGE, THOSE WERE THE 14 THAT EMERGED

4   FROM A PRETTY THOROUGH LITERATURE REVIEW ON ACTUAL EMPIRICAL

5   STUDIES OF WHAT HAPPENED IN THESE STATES.

6   **Q**   IN ORDER TO INFORM YOUR OPINION, DID YOU TAKE INTO

7   CONSIDERATION, EVEN THOUGH YOU MAY HAVE REJECTED IT, ARTICLES

8   THAT EXAMINED THE EXPERIENCE OF EARLY RELEASE IN VARIOUS

9   JURISDICTIONS SUCH AS IN LOS ANGELES OR IN PHILADELPHIA?

10  **A**   AGAIN, I'VE CERTAINLY READ SOME ARTICLES WRITTEN, BUT I

11  WAS -- THE STANDARD WE APPLIED WAS AN EMPIRICAL STUDY.

12  **Q**   THERE'S BEEN TESTIMONY IN THIS CASE REGARDING A LOS ANGELES

13  TIMES STUDY OF RELEASING INMATES EARLY IN LOS ANGELES DURING

14  A --

15          **JUDGE HENDERSON:**  LOS ANGELES TIMES STUDY?

16          **MR. MITCHELL:**  LOS ANGELES TIMES STUDY.  IT WAS

17  REFERENCED IN TESTIMONY I BELIEVE THE DAY BEFORE YESTERDAY.

18          **MR. SANGSTER:**  THERE WAS AN OBJECTION SUSTAINED, AND

19  IT'S IMPROPER TO FORMULATE A HYPOTHETICAL BASED ON --

20          **JUDGE HENDERSON:**  RIGHT.  I WAS EVEN ADMONISHED FROM

21  REFERRING TO THAT STUDY, IF YOU'LL RECALL.

22          **MR. MITCHELL:**  I AM NOT BRINGING OUT ANY DETAILS OF

23  THE STUDY.  I AM ASKING IF HE LOOKED AT IT AND CONSIDERED IT.

24  I'M NOT GETTING INTO ANY OF THE DETAILS, IF I MAY.

25          **JUDGE HENDERSON:**  QUESTION IS, DID YOU LOOK AT A

1  STUDY AND CONSIDER A STUDY THAT THE COURT HAS FOUND NOT RELEVANT

2  TO THIS PROCEEDING?

3           **THE WITNESS:**  I DON'T BELIEVE I'VE DONE THAT, NO.

4  **BY MR. MITCHELL**

5  **Q**   IN ORDER TO INFORM YOUR OPINION, YOU WANTED TO TAKE IN AS

6  MUCH INFORMATION AS POSSIBLE REGARDING THE ACTUAL EXPERIENCE OF

7  EARLY RELEASE PROCEDURES THROUGHOUT MOST JURISDICTIONS IN THE

8  UNITED STATES, CORRECT?

9  **A**   WITH SPECIFIC REFERENCE TO RECIDIVISM RATES AND CRIME RATES,

10  YES.

11  **Q**   LOOKING AT THE ILLINOIS STUDY THAT YOU ACTUALLY SUPERVISED

12  AND PARTICIPATED IN IN 1986, I BELIEVE THAT STUDY WAS PUBLISHED,

13  CORRECT?

14  **A**   THAT'S CORRECT.

15  **Q**   THAT WAS PUBLISHED BY YOUR ORGANIZATION THAT YOU ARE

16  PRESIDENT OF, THE NATIONAL COUNCIL ON --

17  **A**   CRIME AND DELINQUENCY, YES.  IT WAS DONE -- THE GRANT WAS

18  THE NATIONAL INSTITUTE OF JUSTICE, WHICH IS THE RESEARCH ARM OF

19  THE JUSTICE DEPARTMENT, FUNDED THE STUDY, AND, ULTIMATELY, WE

20  PUBLISHED IT IN A JOURNAL CALLED CRIME AND DELINQUENCY, WHICH IS

21  A PEER-REVIEWED AND HIGHLY REGARDED ACADEMIC JOURNAL.

22  **Q**   EARLY RELEASE SUBSTANTIALLY ACCELERATED THE AMOUNT OF CRIME

23  SUFFERED BY THE PUBLIC, THAT WAS A STATEMENT FROM THAT STUDY.

24  YOU STILL AGREE WITH THAT?

25  **A**   YES.  IN THE SENSE THAT IT ADVANCED THE DATES AT WHICH

1    CRIMES WERE COMMITTED.  IT DIDN'T CHANGE THE OVERALL VOLUME OF

2    CRIMES COMMITTED IN THE STATE OF ILLINOIS.  QUITE THE OPPOSITE.

3    BUT IT DID MEAN THAT CRIMES THAT LIKELY WOULD HAVE BEEN

4    COMMITTED BY THOSE SAME PEOPLE JUST SIMPLY HAPPENED A MONTH OR

5    TWO EARLIER.

6    Q    ALTHOUGH THE PRISON SYSTEM WOULD DIRECTLY BENEFIT FROM

7    LOWERED PRISON POPULATIONS, THE PUBLIC MUST ALSO SUFFER THE

8    INCREASED EFFECTS OF ACCELERATED PRISON RELEASES THAT IN TURN

9    CAN JEOPARDIZE PUBLIC SAFETY.  DO YOU AGREE WITH THAT?

10   A    WOULD YOU REPEAT THAT SENTENCE?  I KNOW I DIDN'T WRITE THAT

11   SENTENCE.  IS THAT A SENTENCE FROM THE ARTICLE YOU ARE REFERRING

12   TO?

13   Q    AT PAGE 405.

14                "ALTHOUGH THE PRISON SYSTEM WOULD DIRECTLY

15             BENEFIT FROM LOWERED PRISON POPULATIONS, THE

16             PUBLIC MUST ALSO SUFFER THE INCREASED EFFECTS OF

17             ACCELERATED PRISON RELEASES THAT, IN TURN, CAN

18             JEOPARDIZE PUBLIC SAFETY."

19   A    I'M NOT SURE I AGREE WITH THAT STATEMENT.

20   Q                "ONE CAN ALSO QUESTION HOW A WELL-PUBLICIZED

21             EARLY RELEASE PROGRAM MIGHT ADVERSELY AFFECT

22             GENERAL DETERRENCE."

23             DO YOU AGREE WITH THAT STATEMENT FROM THE ARTICLE?

24   A    NO, I DO NOT.

25   Q                "IF IT BECOMES COMMON KNOWLEDGE AMONG THE

1            PUBLIC THAT THE STATE IS REDUCING PRISON TERMS,

2            THEN MARGINAL OFFENDERS MIGHT BE MORE INCLINED

3            TO ENGAGE IN CRIMINAL ACTIVITIES."

4            DO YOU AGREE WITH THAT STATEMENT FROM THE ARTICLE?

5  **A**   NO.  AGAIN, THAT'S A HYPOTHETICAL STATEMENT.  I THINK MY

6  GOAL HAS BEEN TO FOCUS IN ON WHAT ACTUALLY HAPPENED.  AGAIN, IN

7  CALIFORNIA, THERE HAVE BEEN REPEATED TIMES WHEN THE LEGISLATURE

8  HAS INCREASED GOOD TIME CREDITS, TO MAKE SOME EFFECT ON THE

9  PRISON OVERCROWDING.  IT'S BEEN PUBLICIZED TO THE EXTENT THAT

10 THESE THINGS ARE PUBLICIZED, AND WE SAW NO EVIDENCE THAT THAT

11 ALONE CHANGED CRIME COMMITTING PATTERNS IN THE STATE.

12           **JUDGE KARLTON:**  MR. MITCHELL, LET ME INTERRUPT FOR A

13 MINUTE.

14           THE QUOTATION IS --

15           **MR. SANGSTER:**  JUDGE KARLTON, I CAN'T HEAR YOU.  I

16 APOLOGIZE.

17           **JUDGE KARLTON:**  MY APOLOGIES.

18           IF IT BECOMES COMMON KNOWLEDGE AMONG THE PUBLIC THAT

19 THE STATE IS REDUCING PRISON TERMS, THEN MARGINAL OFFENDERS

20 MIGHT BE MORE INCLINED TO ENGAGE IN CRIMINAL ACTIVITIES.  YOU

21 SAID YOU DON'T AGREE WITH THAT.  ANYTHING IS POSSIBLE.  THIS IS

22 A "MIGHT" STATEMENT.

23           **THE WITNESS:**  THAT'S CORRECT.

24           **JUDGE KARLTON:**  AND THAT'S WHY YOU WERE SAYING YOU

25 DON'T AGREE WITH IT?

1           **THE WITNESS:**  THAT'S RIGHT.

2           I MEAN, IT'S POSSIBLE THAT SOME PEOPLE MIGHT, BUT I

3    THINK, IN MY EXTENSIVE CAREER OF RESEARCHING AND INTERVIEWING

4    PERSONS WHO HAVE BEEN EXTENSIVELY INVOLVED IN CRIME, I DON'T

5    FIND THAT THEY SPEND A LOT OF TIME, YOU KNOW, LOOKING AT THE

6    PENAL CODE OR TRYING TO FIGURE OUT WHAT THE PENALTIES ARE.  IN

7    FACT, MOST OF THEM THINK THEY ARE NEVER GOING TO GET CAUGHT.

8    SO, DETERRENCE, MINOR CHANGES IN PENALTIES, AGAIN, THERE'S NOT

9    MUCH EVIDENCE THAT THEY HAVE A BIG EFFECT.

10          **JUDGE REINHARDT:**  THERE ARE TWO DIFFERENT QUESTIONS.

11          ONE IS WHAT YOU JUST ADDED IN YOUR ANSWER A MINOR

12   CHANGE.  AND THE OTHER I THINK THE QUESTION THAT COUNSEL -- THE

13   QUOTATION THAT HE READ WAS NOT LIMITED TO A MINOR CHANGE, BUT IT

14   HAD TO DO WITH WHETHER, IF THE PUBLIC BECOMES AWARE THAT

15   PENALTIES ARE BEING REDUCED, SAY FROM 80 YEARS TO TEN YEARS, IT

16   MIGHT BE ONE ANSWER.  IF IT'S FROM SIX MONTHS TO FIVE MONTHS, IT

17   MIGHT BE A DIFFERENT ANSWER.  THE QUESTION SEEMED TO BE A

18   GENERAL QUESTION, NOT RELATED TO EITHER A SHORT REDUCTION OR A

19   LONG REDUCTION.

20          AS YOU SAY, THERE'S BEEN A DEBATE EVER SINCE I CAN

21   REMEMBER ABOUT WHETHER LONG SENTENCES HAVE -- HOW MUCH OF A

22   DETERRENT EFFECT LONG SENTENCES HAVE.  THIS IS THE SAME DEBATE

23   IF YOU SHORTEN SENTENCES, WHAT EFFECT DOES THAT HAVE ON THE

24   COMMISSION OF CRIME.  BUT I THINK WHAT'S RELEVANT TO US IS

25   WHETHER YOU SHORTEN SENTENCES FOR A VERY SHORT PERIOD, AND I

1  DON'T KNOW WHETHER YOUR ANSWER IS --  IT WOULD SEEM THE QUESTION

2  RELATED TO JUST THE GENERAL PHILOSOPHICAL ISSUE OF WHETHER

3  LENGTHY SENTENCES REDUCES CRIME, WHICH IS AN INTERESTING DEBATE,

4  LIKE WHETHER WE OUGHT TO HAVE THREE STRIKES LAWS.

5          I THINK WHAT'S MOST HELPFUL TO US IS WHETHER THESE

6  QUESTIONS COULD BE ANSWERED IN TERMS OF THE KIND OF ISSUE WE

7  FACE, WHICH IS SHORT REDUCTIONS.

8          I DON'T KNOW WHETHER THAT'S A SPEECH, OR A QUESTION,

9  OR MAYBE SOME DESIRE TO HAVE QUESTIONS RELATE -- I THINK THE

10 QUESTION WAS A FAIR QUESTION, WHETHER THE REPORT -- YOU AGREE

11 WITH THE PART OF THE REPORT THAT TELLS US THAT IF THE PUBLIC IS

12 AWARE YOU ARE ONLY GETTING A ONE-YEAR SENTENCE INSTEAD OF A

13 50-YEAR SENTENCE, DOES THAT HAVE AN EFFECT ON CRIME.  BUT WHAT I

14 THINK -- TO HAVE SOME EFFECT ON US WOULD BE WHETHER A REDUCTION

15 OF A SENTENCE BY A COUPLE OF MONTHS WOULD HAVE AN EFFECT ON

16 CRIME.

17         **THE WITNESS:**  WELL, I THINK THAT'S WHERE I AM --

18 THAT'S WHAT I'M TRYING TO COMMUNICATE.  I DO NOT BELIEVE THAT

19 SMALL REDUCTIONS IN SENTENCES ARE GOING TO HAVE AN EFFECT ON

20 CRIME RATES.  THEY HAVEN'T, IN FACT.  THE EVIDENCE IS PRETTY

21 CLEAR THAT THEY HAVE NOT.

22         AND THE QUESTION, AGAIN, WHETHER BROAD PUBLIC

23 KNOWLEDGE OF THIS IS GOING TO HAVE AN EFFECT, YOU KNOW, AGAIN I

24 COME BACK TO THE FACT THAT EVERY YEAR THE LEGISLATURE MEETS,

25 EVERY YEAR THE LEGISLATURE CHANGES PENALTIES.  THINGS THAT WERE

1  FELONIES BECOME WOBBLERS.  WE SENTENCE PEOPLE TO JAIL THAT USED

2  TO GO TO STATE PRISON.  THIS IS PUBLICIZED IN THE NEWSPAPERS.

3  THERE'S NO EVIDENCE THAT THOSE CHANGES HAVE INCREASED CRIME IN

4  THIS STATE.

5          **JUDGE REINHARDT:**  YOU MIGHT ASK THE SAME QUESTION

6  ABOUT THREE STRIKES, HAS THAT INCREASED OR DECREASED CRIME, BUT

7  THAT'S NOT A PROBLEM IN THIS CASE.

8  **BY MR. MITCHELL**

9  **Q**   DR. KRISBERG, WHEN THIS STUDY WAS SUPERVISED BY YOU BACK IN

10  1986 AND IT WAS PUBLISHED, DID YOU AGREE WITH IT THEN?

11  **A**   THE GENERAL CONCLUSIONS OF THE STUDY, YES.  ALTHOUGH THE

12  AUTHOR WAS JAMES AUSTIN AND I CERTAINLY DIDN'T SUBSCRIBE TO EACH

13  AND EVERY WORD THAT JIM WROTE IN THAT REPORT, THAT WAS HIS

14  ARTICLE.

15  **Q**   AND YOU CITED THAT STUDY -- THIS STUDY IN THE MATERIALS YOU

16  PROVIDED IN YOUR REPORT TO THIS COURT, CORRECT?

17  **A**   THAT'S CORRECT.

18  **Q**   AND IN THAT REPORT YOU INDICATED THAT THIS EARLY RELEASE

19  PROCEDURE OPERATING BETWEEN 1980 TO 1983 INVOLVED THE EARLY

20  RELEASE OF OVER 21,000 INMATES FROM THE ILLINOIS DEPARTMENT OF

21  CORRECTIONS, CORRECT?

22  **A**   THAT'S CORRECT.

23          **MR. SANGSTER:**  MISSTATES -- HE SAID IT WAS

24  MR. AUSTIN'S STUDY, NOT HIS STUDY.

25          **JUDGE KARLTON:**  HE SUPERVISED, APPARENTLY; IS THAT

1  RIGHT, SIR?

2          **THE WITNESS:**  THAT'S RIGHT.  JAMES AUSTIN WORKED FOR

3  ME AT THE TIME, YES.

4  **BY MR. MITCHELL**

5  **Q**   AND THAT EARLY RELEASE PROCEDURE IN ILLINOIS INVOLVED THE

6  RELEASE OF THAT 21,000 INMATES 90 DAYS PRIOR TO THE EXPIRATION

7  OF THEIR TERMS.  SO WE ARE TALKING ABOUT A 90-DAY REDUCTION IN

8  THEIR TERMS?

9  **A**   YES.

10  **Q**   AND THAT WAS EFFECTIVE IN REDUCING THE PRISON POPULATION BY

11  TEN PERCENT?

12  **A**   YES.

13  **Q**   TWENTY-FIVE HUNDRED INMATES?

14  **A**   YES.  IF I COULD ADD?  PART OF THE REASON IT ONLY HAD THAT

15  EFFECT WAS THAT DURING THAT PERIOD OF TIME, THE LEGISLATURE WAS

16  ENACTING OTHER LAWS THAT WERE ACTUALLY INCREASING TIME SERVED,

17  AND SO THERE WERE COUNTERVAILING FORCES THAT LED TO AN INCREASE

18  IN THE ILLINOIS PRISON POPULATION DURING THAT PERIOD AND

19  THEREAFTER.

20  **Q**   AND YOU CITED IN YOUR REPORT THAT THOSE WHO HAD BEEN

21  RELEASED EARLY AS A GROUP HAD A LOWER RECIDIVISM RATE,

22  42 PERCENT, COMPARED TO THE FULL TERMERS WHO HAD A 49 PERCENT

23  RECIDIVISM RATE?

24  **A**   THAT'S CORRECT.

25  **Q**   AND THAT IS OFFERED AS EVIDENCE THAT ACCELERATED RELEASE

1  DIDN'T ENDANGER PUBLIC SAFETY BECAUSE IT DIDN'T LEAD TO AN

2  INCREASE IN THEIR RECIDIVISM RATE; IT ACTUALLY LOWERED THEIR

3  RECIDIVISM RATE?

4  **A**  WELL, IN THAT STUDY WE CONCLUDED, FIRST, THAT THE RECIDIVISM

5  RATES WERE EITHER THE SAME OR LOWER, WHICH IS WHAT THOSE NUMBERS

6  SUGGEST.  SECONDLY, THAT, IN FACT, DURING THE YEARS THAT EARLY

7  RELEASE WAS OPERATING, ACCORDING TO THE FBI, THE CRIME RATE OF

8  ILLINOIS WAS DECLINING.  SO THAT WAS ANOTHER KEY CASE OF THIS --

9         **JUDGE REINHARDT:**  IS THAT CAUSE AND EFFECT?

10        **THE WITNESS:**  NO.  I WOULD NOT SAY IT'S CAUSE AND

11  EFFECT, BUT, CERTAINLY, IT'S HARD TO CONCLUDE THAT IF CRIME IS

12  GOING DOWN THAT THIS IS HAVING A --

13        **JUDGE REINHARDT:**  MAYBE IT WOULD HAVE GONE DOWN

14  FARTHER.  WE KEEP HEARING ABOUT CRIME GOING DOWN NO MATTER WHAT

15  YOU DO, OR CRIME GOING UP NO MATTER WHAT YOU DO, AND IT GOES

16  DOWN, APPARENTLY, NATIONALLY WHETHER STATES GET TOUGHER OR MORE

17  LENIENT AND THEN IT GOES UP.

18        **JUDGE KARLTON:**  WE HAVEN'T HEARD ABOUT GOING UP.

19        **JUDGE REINHARDT:**  WE HAVEN'T HEARD ABOUT IT YET.

20        **JUDGE KARLTON:**  WE COULD INFER THAT -- JUST AS

21  SENSIBLE HUMAN BEINGS, THAT SOMEHOW THE CRIME RATE IS UNRELATED.

22  I MEAN, IS THAT REALLY TRUE, THE CRIME RATE IS UNRELATED?

23        **JUDGE REINHARDT:**  TO ANYTHING?

24        **JUDGE KARLTON:**  WELL, PARTICULARLY TO THE NUMBER OF

25  PEOPLE INCARCERATED AND THE LENGTH OF TIME THEY'RE INCARCERATED.

1    **THE WITNESS:**  I WOULDN'T SAY IT'S UNRELATED.  IF YOU

2  DID SOMETHING DRAMATIC LIKE OPENED THE DOORS AND LET EVERYBODY

3  OUT, IT MIGHT HAVE AN EFFECT; YOU KNOW, IF YOU DECLARED MASS

4  AMNESTY, THAT MIGHT HAVE AN EFFECT.

5    **JUDGE REINHARDT:**  OR IF YOU LOCKED EVERYBODY UP.

6    **THE WITNESS:**  RIGHT, WHICH WOULD BE ANOTHER EXAMPLE.

7  I MEAN, THERE CERTAINLY HAVE BEEN NATIONS LIKE THE FORMER SOVIET

8  UNION THAT LOCKED UP EXTRAORDINARY AMOUNTS OF PEOPLE BUT STILL

9  HAD VERY HIGH RATES OF CRIMINAL BEHAVIOR.

10    I'D REFER YOU TO PROFESSOR FRANKLIN ZIMRING'S

11  EXCELLENT BOOK, "THE GREAT AMERICAN CRIME DECLINE," WHERE HE

12  LOOKS EXHAUSTIVELY AT ALL KINDS OF THEORIES THAT MIGHT HAVE

13  ACCOUNTED FOR THIS DRAMATIC CRIME DROP AND CONCLUDES PRETTY

14  CONVINCINGLY THAT CORRECTIONS POLICIES DIDN'T HAVE A BIG EFFECT

15  ON IT, BUT, FOR EXAMPLE, EFFECTIVE LAW ENFORCEMENT CAN HAVE A

16  VERY -- DID HAVE A POSITIVE EFFECT ON THIS ISSUE.

17    ONE OF THE THINGS THAT I ALWAYS POINT TO IS THAT NEW

18  YORK CITY, WHICH HAS THE MOST DRAMATIC DECLINE IN CRIME OF ANY

19  CITY AND ABOVE ALL THE OTHER CITIES DURING THIS PERIOD OF TIME,

20  DURING THE PERIOD AT WHICH CRIME RATES WERE DROPPING

21  PRECIPITOUSLY IN NEW YORK, NEW YORK CITY WAS ACTUALLY SENDING

22  FEWER PEOPLE TO ITS JAILS AND COMMITTING FEWER PEOPLE TO STATE

23  PRISONS.  IT SEEMS PRETTY CLEAR TO THE RESEARCHERS THAT HAVE

24  LOOKED AT IT THAT IT'S NOT ONLY BETTER POLICING, BUT LARGELY

25  BETTER POLICING HAD A MAJOR EFFECT ON THE CRIME DROP.

1          AND, SIMILARLY, SAN DIEGO, IN THIS STATE, SAN DIEGO

2    EXPERIENCED THE BIGGEST DROP OF ANY COUNTY DURING THIS LAST TEN

3    YEARS IN TERMS OF CRIME RATE.  AGAIN, IF YOU LOOK AT THE

4    INCARCERATION PATTERNS OF SAN DIEGO, IT IS NOT THE HIGHEST

5    INCARCERATION PLACE IN THE STATE BY ANY MEANS, AND I THINK MOST

6    CRIMINOLOGISTS WOULD CONCLUDE IT WAS MORE EFFECTIVE POLICING

7    THAT HAD A BIGGER EFFECT.

8    **BY MR. MITCHELL**

9    **Q**   YOU THINK HOW EXPENSIVE IT IS TO LIVE THERE MIGHT HAVE

10   SOMETHING TO DO WITH IT ALSO?

11   **A**   ARE YOU REFERRING TO NEW YORK OR SAN DIEGO?

12   **Q**   REFERRING TO SAN DIEGO.

13          DEMOGRAPHICS ALSO PLAY A FACTOR.  INCOME LEVELS AND

14   SUCH CAN PLAY A FACTOR IN THE LEVEL OF CRIME.  LOOK AT ORANGE

15   COUNTY, SAN MATEO.  THEY ALL HAVE LOW CRIME RATES TOO, DON'T

16   THEY?

17          **JUDGE REINHARDT:**  HOW ABOUT PARTY AFFILIATION?

18   REPUBLICANS IN ORANGE COUNTY, LESS CRIME?

19          **JUDGE KARLTON:**  MY COLLEAGUE HAS SAID, THE THING THAT

20   COMES OUT OF THIS TRIAL IS WE DON'T KNOW ANYTHING ABOUT WHAT

21   CAUSES CRIME.

22          **JUDGE REINHARDT:**  THAT AND THAT EVERYTHING IS

23   POSSIBLE.

24          **JUDGE KARLTON:**  EVERYTHING IS POSSIBLE.

25          **THE WITNESS:**  WELL, WHEN REPORTERS ASK ME ABOUT

1  CHANGING CRIME PATTERNS, I ALWAYS SAY IF I COULD RELIABLY ANSWER

2  THAT QUESTION, I WOULD TRY TO BE IN THE STOCK MARKET.  WE ARE

3  TALKING ABOUT HUMAN BEHAVIOR WHICH, WITH ITS INHERENT

4  UNPREDICTABLY, I THINK GOOD PUBLIC POLICY IS YOU DO EVERYTHING

5  YOU CAN TO REDUCE RISK, BUT I DON'T THINK THERE'S ANY SUCH THING

6  AS ZERO RISK IN LIFE.

7  **BY MR. MITCHELL**

8  **Q**   DR. KRISBERG, ONE THING WE CAN SAY FOR CERTAIN IS THAT

9  CRIMES COMMITTED BY INDIVIDUALS WHO ARE RELEASED EARLY WOULD NOT

10 HAVE OCCURRED BUT FOR THE FACT THAT THEY WERE RELEASED EARLY,

11 CORRECT?

12 **A**   NO, I WOULDN'T SAY THAT.  WHAT I WOULD SAY IS THE CRIME

13 COMMITTED BY SOMEBODY EARLY IS GOING TO HAVE A DIFFERENT VICTIM

14 THAN WHEN THEY ARE GOING TO BE RELEASED, LET'S SAY 90 DAYS

15 LATER.  SO IT CHANGES TIME, PLACE AND POTENTIAL VICTIM, BUT IT

16 DOESN'T NECESSARILY ALTER WHETHER OR NOT THE CRIME WOULD OCCUR.

17          AND IF YOU PLAY THIS OUT OVER 12 MONTHS OR 18 MONTHS,

18 AS MANY OF THESE STUDIES HAVE DONE, THE ACTUAL NUMBER OF CRIMES

19 COMMITTED BY PEOPLE IS THE SAME.

20 **Q**   WHEN WE LOOKED AT THE ILLINOIS STUDY DURING THE TIME PERIOD

21 1980 TO 1983 INVOLVING THE INDIVIDUALS WHO WERE RELEASED EARLY,

22 THERE WERE 4,504 CRIMES THAT OCCURRED WITHIN THE EARLY RELEASE

23 WINDOW; DO YOU RECALL THAT PART OF THE STUDY?

24 **A**   YES, I DO.

25          **THE CLERK:**  FIVE MINUTES, COUNSEL.

1  **BY MR. MITCHELL**

2  **Q**    THOSE EARLY RELEASE CRIMES INCLUDED 23 HOMICIDES, 32 RAPES,

3  681 ROBBERIES, 2,571 ASSAULTS, 262 ARSONS, AND 2472 BURGLARIES;

4  IS THAT CORRECT?

5  **A**    YES.

6  **Q**    FROM THE REPORT?

7  **A**    IF IT'S IN THE REPORT, I'D SAY YES.  I'M SURE IT'S CORRECT.

8  **Q**    NOW, EVEN THOUGH WE CAN -- I HATE TO USE THE WORD

9  "SPECULATE" -- THAT THOSE OR SIMILAR CRIMES WOULD HAVE OCCURRED

10  WHEN THESE INDIVIDUALS GOT OUT AFTER SERVING THEIR FULL TERM, WE

11  KNOW FOR A FACT THAT THESE CRIMES DID OCCUR DURING THE PERIOD

12  THAT THEY WOULD HAVE BEEN IN CUSTODY BUT FOR THE 90 DAYS CREDITS

13  THAT WERE GIVEN TO THEM TO GET OUT EARLY, CORRECT?

14  **A**    YES.  AND I THINK GOVERNOR JIM THOMPSON INSTITUTED THIS

15  POLICY BECAUSE THERE WERE ALSO DEATHS AND RIOTS THAT WERE TAKING

16  PLACE IN THE ILLINOIS PRISONS, AND HE WAS EQUALLY CONCERNED

17  ABOUT THE SAFETY OF STAFF AND THE SAFETY OF PEOPLE WHO WORKED

18  FOR HIM.  SO EARLY RELEASE WAS -- ACTUALLY, IT WAS CALLED FORCED

19  RELEASE IN ILLINOIS -- WAS IMPLEMENTED AS AN EMERGENCY MEASURE

20  BECAUSE THE GOVERNOR WAS QUITE CONCERNED ABOUT THE SAFETY OF THE

21  PRISONS.

22  **Q**    NOW, YOUR COLLEAGUE, DR. AUSTIN, REFERRED TO THIS UNDER THE

23  HEADING "THE DARK SIDE OF EARLY RELEASE" IN HIS STUDY THAT YOU

24  CITED IN YOUR EXPERT REPORT IN THIS CASE; DO YOU RECALL THAT

25  PORTION?

1  **A**   YES.

2  **Q**   IT STATED THERE THAT:

3          "EARLY RELEASE MEANS THAT CRIMES THAT WOULD

4       NOT HAVE BEEN COMMITTED BY RELEASED PRISONERS

5       HAD THEY SERVED THEIR FULL TERMS ARE NOW LIKELY

6       TO TAKE PLACE."

7          THAT'S A CORRECT STATEMENT, ISN'T IT?

8  **A**   YES.

9  **Q**   "ASSESSING THE COST OF EARLY RELEASE MUST GO BEYOND A

10  SIMPLISTIC CALCULATION OF RECIDIVISM RATES FOR RELEASED

11  PRISONERS"; DO YOU AGREE WITH THAT?

12  **A**   YES, I DO.

13  **Q**   THAT IS SOMETHING IMPORTANT FOR THIS COURT TO TAKE INTO

14  CONSIDERATION IN ITS DECISION IN THIS CASE, ISN'T IT?

15  **A**   WELL, WHAT I'M HOPING IS THAT AS THE COURT CONSIDERS THE

16  URGENT NEED TO REDUCE THE POPULATION IN THE DEPARTMENT OF

17  CORRECTIONS -- AND, AGAIN, I REFER YOU TO THE EXPERT PANEL WHICH

18  INDICATED THAT SUBSTANTIAL REDUCTIONS IN RECIDIVISM ARE UNLIKELY

19  TO OCCUR WITHOUT REDUCING THE POPULATION -- I WOULD ASSUME THAT

20  YOU WOULD COME UP WITH A PLAN THAT WOULD -- OR AGREE TO A PLAN

21  THAT WOULD INCLUDE DIVERSION OF SOME LOW RISK PEOPLE FROM THE

22  PRISON SYSTEM, WOULD INCLUDE GOOD TIME CREDITS, NOT UNLIKE WHAT

23  THE GOVERNOR HAS RECENTLY PROPOSED IN HIS BUDGET MEASURE, AND

24  MAYBE SOME ACCELERATED RELEASE AS PART OF THAT.

25          SO I'M -- AT LEAST IN MY OWN MIND, I'M NOT ASSUMING

1    THAT ACCELERATED RELEASE BY ITSELF WOULD BE THE ONLY PART OF THE

2    PLAN.  IT WOULD BE CERTAINLY SOMETHING I WOULD ADVISE FOR FOR

3    RELIEVING WHAT I WOULD DESCRIBE AS EMERGENCY CIRCUMSTANCES IN

4    SOME OF THE PRISONS.

5    Q    SIR, IN THE STUDY THAT YOU SUPERVISED, IT STATES:

6              "ONE MUST ALSO ATTEMPT TO ACCOUNT FOR THE

7               REAL FINANCIAL LOSSES ATTRIBUTIVE TO EARLY

8               RELEASE RELATED CRIMES, SUCH AS PROPERTY LOSS

9               AND DAMAGE, AS WELL AS MEDICAL EXPENSES

10              RESULTING FROM CRIMES OF VIOLENCE.  FINALLY,

11              NON-PECUNIARY COSTS, SUCH AS PSYCHOLOGICAL HARM

12              OR CHANGES IN THE VICTIM'S LIFESTYLE AS A RESULT

13              OF THE CRIMES INFLICTED, ARE EXAMPLES OF

14              DIFFICULT TO MEASURE BUT EQUALLY SIGNIFICANT

15              CONSEQUENCES OF AN EARLY RELEASE POLICY."

16              IS IT STILL YOUR OPINION THAT THESE FACTORS --

17              **JUDGE KARLTON:**  THE QUESTION IS WHETHER IT EVER WAS

18   HIS OPINION.  THAT'S DR. AUSTIN --

19              **MR. MITCHELL:**  I'M SORRY FOR MISPHRASING THAT.

20   **BY MR. MITCHELL**

21   Q    WOULD YOU AGREE WITH THAT STATEMENT STILL?

22   A    I BELIEVE EFFECTIVE VICTIM ASSISTANCE PROGRAMMING CAN MORE

23   THAN BUFFER THOSE IMPACTS, AND WE KNOW THIS HAS BEEN A

24   DIFFICULTY IN THIS STATE, BUT CERTAINLY IF CALIFORNIA WERE TO

25   HAVE AN EFFECTIVE AND WELL-ADMINISTERED VICTIM ASSISTANCE

1  PROGRAM, I THINK THOSE MEASURABLE COSTS, WHICH BY AND LARGE FOR

2  MOST OFFENDERS ARE MINOR PROPERTY LOSSES, CAN BE HANDLED.

3          FOR THOSE EXPERIENCING MORE SIGNIFICANT PSYCHOLOGICAL

4  IMPACTS, THERE ARE KNOWN TECHNOLOGIES OF COUNSELING AND SUPPORT

5  FOR VICTIMS THAT CERTAINLY COULD BE PART OF THIS EQUATION.

6  **Q**   YOUR EXPERT REPORT, SIR, WENT ON TO LIST, FURTHER,

7  ACCELERATED RELEASE PROVISION IN ILLINOIS IN 1990 WHERE THEY

8  INCREASED THE LENGTH OF TIME UP TO 180 DAYS, THEY LET PEOPLE OUT

9  180 DAYS EARLY STARTING IN 1990, CORRECT?

10  **A**   THAT'S CORRECT.

11  **Q**   AND THE STUDY THAT YOU NOTED IN YOUR REPORT EXAMINED 4,640

12  CASES AND SAW NO INCREASE IN THE RECIDIVISM RATE?

13  **A**   THAT'S RIGHT.

14  **Q**   AND YOU ALSO POINTED OUT THAT CRIME RATES DECLINED BETWEEN

15  '93 AND '96; IS THAT CORRECT?

16  **A**   YES.  THAT'S A MORE RECENT PERIOD.  I MEAN, THE IMPORTANT

17  THING IS THAT ILLINOIS SUBSEQUENTLY TRANSFORMED THE FORCED

18  RELEASE PROGRAM INTO AN EXPANDED GOOD TIME CREDITS STATUTE, AND

19  EXTENDED THE AMOUNT OF GOOD TIME CREDIT THAT INMATES COULD GET,

20  AND EVEN TODAY HAS INSTITUTED THAT POLICY.

21          SO WHERE THEY'RE NO LONGER USING FORCED RELEASE,

22  THEY'RE USING A PROGRAM THAT INVOLVES ACTUALLY GREATER GRANTING

23  OF TIME, AND THAT'S BEEN GOING UP UNTIL THE PRESENT.  AND,

24  AGAIN, ILLINOIS' OVERALL CRIME PATTERNS LOOK LIKE MOST OF THE

25  COUNTRY.

1  Q   DR. KRISBERG, ISN'T IT TRUE THAT IN THE YEAR FOLLOWING THE

2  EARLY RELEASE INCREASE OF UP TO 180 DAYS, THAT THE CRIME RATE

3  ACTUALLY INCREASED TO 1,039 PER 100,000 OF POPULATION?

4  A   THAT'S CORRECT, AND WE SEE YEAR-TO-YEAR INFLUXES IN THOSE

5  CRIME RATES.  THAT'S NOT UNUSUAL.

6  Q   SO YOU ARE NOT ATTRIBUTING THE REDUCTION OR DECLINE IN CRIME

7  BETWEEN '93 AND '96 THAT YOU CITED IN YOUR REPORT TO THE EARLY

8  RELEASES THAT TOOK PLACE IN 1990, ARE YOU?

9  A   NO.  I'M NOT ARGUING THAT EARLY RELEASE REDUCES THE CRIME

10  RATE, BUT I'M SUGGESTING THAT THERE'S NO EVIDENCE THAT IT'S

11  ACTUALLY INCREASED THE CRIME RATE.

12  Q   BUT YOU CITED THAT DECLINE IN THE CRIME RATE IN YOUR EXPERT

13  REPORT REGARDING ACCELERATED RELEASE?

14  A   WELL, AGAIN, IF ONE GOES ACROSS 14 STUDIES, ONE SEES A

15  CONSISTENT PATTERN OF EITHER NO CHANGE OR REDUCTIONS IN CRIME

16  RATES IN VIRTUALLY IN ALL OF THOSE JURISDICTIONS DURING THAT

17  PERIOD OF TIME.

18  Q   IN LOOKING AT THE WASHINGTON STATE STUDY THAT YOU HAD IN

19  YOUR REPORT BETWEEN 1969 AND 1984, 1,674 PRISONERS WERE

20  RELEASED; IS THAT CORRECT?

21  A   YES.

22  Q   AND THEY STUDIED THE --

23        MR. SANGSTER:  YOUR HONOR, EXCUSE ME.  I UNDERSTOOD

24  WE WERE UNDER TIME LIMITS IN CONNECTION WITH OUR EXAMINATIONS,

25  AND BY MY CALCULATION WE ARE OVER THE TIME.  I UNDERSTAND THE

1  COURT ASKED SOME QUESTIONS, BUT I THINK WE ARE WELL OVER THE

2  TIME.

3         **MR. MITCHELL:**  I DON'T HAVE THAT MUCH MORE.  I'D ASK

4  FOR ADDITIONAL TIME.

5         **JUDGE HENDERSON:**  ARE WE UNDER TIME LIMITS?

6         **MR. SANGSTER:**  MY UNDERSTANDING --

7         **JUDGE REINHARDT:**  I THINK THEY'RE GENERAL AGREEMENTS

8  ON TIME, BUT WE'RE A GENERALLY VERY TOLERANT GROUP, AND WE'RE

9  NOT GOING TO ENFORCE ANYTHING STRICTLY.

10        **MR. MITCHELL:**  THANK YOU, YOUR HONORS.

11        **JUDGE KARLTON:**  SPEAK FOR YOURSELF.

12 **BY MR. MITCHELL**

13 **Q**   AND THEY LOOKED AT, I BELIEVE, SIX EARLY RELEASE EFFORTS IN

14 THAT TIME PERIOD?

15 **A**   THAT'S CORRECT.

16 **Q**   AND ALTHOUGH, AS YOU NOTED IN YOUR STUDY OF THE FIRST TWO

17 RELEASE EFFORTS THAT OCCURRED, THAT THEIR RECIDIVISM RATE

18 DECLINED, WASN'T IT TRUE THAT THE OFFENDERS IN THE THIRD RELEASE

19 HAD SIGNIFICANTLY HIGHER RECIDIVISM RATES THAN THE COMPARISON

20 GROUP?

21 **A**   THAT'S RIGHT.  AND THE STATE OF WASHINGTON THEN TIGHTENED UP

22 THEIR CRITERIA, AND THE RATE WENT DOWN AGAIN IN SUBSEQUENT --

23 **Q**   CORRECT, BECAUSE DIDN'T THEY ATTRIBUTE THAT HIGHER

24 RECIDIVISM RATE IN THE THIRD RELEASE WAS MOST LIKELY DUE TO A

25 HIGHER PERCENTAGE OF HABITUAL OFFENDERS BEING INCLUDED IN THE

1  EARLY RELEASE?

2  **A**   IT'S WHAT THE AUTHOR INDICATED.  YOU KNOW, I'D LIKE TO DO A

3  MORE IN-DEPTH ANALYSIS TO VERIFY THAT OPINION.

4  **Q**   YOU DIDN'T DO AN IN-DEPTH ANALYSIS TO CITE IT IN YOUR EXPERT

5  REPORT?

6  **A**   I RELIED ON THE PUBLISHED REPORT THAT YOU ARE REFERRING TO.

7  **Q**   IN REFERRING TO THE CALIFORNIA STUDY THAT YOU CITED IN YOUR

8  REPORT FROM 1970, WAS A STUDY DONE BY THE -- CDC AT THAT TIME,

9  WASN'T IT?

10  **A**   RIGHT, RESEARCH COMMISSION.

11  **Q**   AND THAT INVOLVED EARLY RELEASE BETWEEN MARCH AND AUGUST OF

12  1970 WHERE HALF OF THE INDIVIDUALS WERE RELEASED 6.6 MONTHS

13  EARLY?

14  **A**   YES.

15  **Q**   YOU STATE IN YOUR REPORT THAT THERE WAS NO SIGNIFICANT

16  DIFFERENCE ON RETURN-TO-CUSTODY RATES?

17  **A**   THAT'S CORRECT.

18  **Q**   ISN'T IT TRUE THAT THE ACTUAL STUDY SHOWS THAT AT 12 MONTHS

19  OF FOLLOW-UP, THE EARLY RELEASE GROUP HAD A PAROLE FAILURE RATE

20  OF 34.4 PERCENT COMPARED TO 8.2 PERCENT FOR THE CONTROL GROUP?

21  **A**   THAT'S RIGHT, BUT THE STATISTICAL TEST THAT WAS APPLIED BY

22  THE AUTHORS SUGGESTED THAT THAT DIFFERENCE WAS NOT A

23  STATISTICALLY SIGNIFICANT DIFFERENCE AND ACTUALLY WAS, YOU KNOW,

24  NOT UNLIKE WHEN WE LOOK AT ELECTION POLLS AND WE TALK ABOUT THE

25  MARGIN OF ERROR.  IN OTHER WORDS, THAT DIFFERENCE WAS WITHIN THE

1  MARGIN OF ERROR.

2  Q    DIDN'T THE STUDY ALSO INDICATE THAT AT 24 MONTHS AFTER

3  RELEASE -- EXCUSE ME -- THE PAROLE FAILURE RATE WAS 47.4 PERCENT

4  FOR THE EARLY RELEASE GROUP AND 39.5 PERCENT FOR THE CONTROL

5  GROUP?

6  A    YES, AND I BELIEVE THAT THE DIFFERENCE WAS MOSTLY AN

7  INCREASE IN PAROLE FAILURE DUE TO TECHNICAL VIOLATIONS.

8  Q    SO WHEN YOU INDICATE THAT THERE WAS NO SIGNIFICANT

9  DIFFERENCE ON RETURN-TO-CUSTODY RATES BETWEEN THE TWO GROUPS,

10  THERE WAS A SIX POINT DIFFERENCE IN THE FIRST 12 MONTHS AND

11  ALMOST AN 11 POINT DIFFERENCE IN THE 24 MONTHS, BUT THAT WAS

12  ATTRIBUTED TO BEING INSIGNIFICANT?

13  A    THE STATISTICAL MEASURE APPLIED BY THE AUTHORS, WHICH WAS

14  APPROPRIATE, LOOKED AT THAT DIFFERENCE, AND CONCLUDED THAT,

15  BASED ON THAT SAMPLE, THAT DIFFERENCE COULD HAVE OCCURRED BY

16  CHANCE.  SO, YES, AGAIN, JUST LIKE MARGIN OF ERROR, WE HAVE LOTS

17  OF POLITICAL POLLS, AND THEY VARY OVER TIME.

18         SO, THE AUTHORS OF THAT ARTICLE CONCLUDED, HAD THEY

19  PICKED A DIFFERENT SAMPLE AND MEASURED IT, THEY MIGHT HAVE COME

20  UP WITH OTHER RESULTS, BUT THERE WAS NOT A STATISTICAL

21  DIFFERENCE BETWEEN THOSE TWO GROUPS.

22  Q    DR. KRISBERG, YOU PARTICIPATED IN A TASK FORCE ON CALIFORNIA

23  PRISON CROWDING BACK IN AUGUST OF 2006, CORRECT?

24  A    EXCUSE ME?

25  Q    DID YOU PARTICIPATE IN A TASK FORCE ON CALIFORNIA PRISON

1 CROWDING IN 2006?

2 **A** YES, I WAS ASKED BY THE CALIFORNIA SENATE TO ORGANIZE SUCH A

3 TASK FORCE AND TO PROVIDE RECOMMENDATIONS DURING AN EMERGENCY

4 SESSION CALLED BY THE GOVERNOR ON PRISON OVERCROWDING.

5 **Q** YOU RECALL YOUR PARTICIPATION IN THAT?

6 **A** OH, YES.

7 **Q** THAT WAS A PUBLISHED STUDY, CORRECT?

8 **A** YES.

9 **Q** THE PURPOSE OF THE STUDY WAS TO OFFER SOME POLICY AND

10 PROGRAM OPTIONS TO BE CONSIDERED IN A SPECIAL SESSION OF THE

11 LEGISLATURE ON SEVERE PROBLEMS IN CALIFORNIA PRISONS, CORRECT?

12 **A** THAT'S CORRECT.

13 **Q** AND THE GROUP THAT WAS ASSEMBLED, YOURSELF INCLUDED, PUT

14 TOGETHER PROPOSALS FOR REFORM TO ADDRESS THE CROWDING PROBLEM IN

15 CALIFORNIA PRISONS?

16 **A** YES.

17 **Q** THEY INVOLVED THE CALIFORNIA PAROLE SYSTEM AND RECOMMENDED

18 REFORMS TO THAT?

19 **A** YES.

20 **Q** THEY INVOLVED REDUCING WOMEN'S IMPRISONMENT IN CALIFORNIA TO

21 COMMUNITY CORRECTIONAL CENTERS, CORRECT?

22 **A** YES.

23 **Q** AND CREATING A NEW STATE/LOCAL PARTNERSHIP?

24 **A** YES.

25 **Q** AND ALSO CREATING A CALIFORNIA SENTENCING COMMISSION?

1  **A**   YES.

2  **Q**   IN THE ENTIRETY OF THIS REPORT IN 2006, THERE WAS NO

3  RECOMMENDATION FOR ANY EARLY RELEASE PROCEDURES IN THIS REPORT,

4  WAS THERE?

5  **A**   THAT'S CORRECT, BECAUSE THE LEGISLATIVE LEADERSHIP WAS

6  INTERESTED IN PROPOSALS THAT COULD BE PUT FORWARD IMMEDIATELY,

7  THAT WERE PRACTICAL, WERE VETTED BY A NATIONAL TEAM OF EXPERTS,

8  AND SO WE DIDN'T SPEND A LOT OF TIME LOOKING AT EARLY RELEASE

9  PER SE.  WE WERE LOOKING FOR, YOU KNOW, WHAT IS SOMETIMES

10 REFERRED TO AS THE LOW HANGING FRUIT IN THE SITUATION.

11         **MR. MITCHELL:**  THANK YOU, DR. KRISBERG.

12         **JUDGE REINHARDT:**  DOCTOR, I HAVE A QUESTION.  YOU

13 KNOW, WHATEVER WE DO, WHATEVER WE TRY TO CONCLUDE ABOUT THE

14 EFFECT OF THINGS IS SPECULATIVE.  IT'S SPECULATIVE AS TO WHAT

15 PEOPLE WILL DO IF THEY'RE RELEASED EARLY, HOW MANY CRIMES

16 THEY'LL COMMIT.  WE ARE NOT TALKING ABOUT A GROUP THAT HAS

17 ALREADY BEEN RELEASED.  SO WE'RE GOING TO SPECULATE ABOUT HOW

18 MANY CRIMES THEY WILL COMMIT DURING THE EARLY PERIOD.  OR WE

19 HAVE TO SPECULATE ABOUT HOW MANY CRIMES THEY WILL COMMIT AND

20 WHEN IF THEY'RE NOT RELEASED EARLIER.

21         **THE WITNESS:**  RIGHT.

22         **JUDGE REINHARDT:**  SO IT'S ALL SPECULATIVE, BUT IF WE

23 ARE GOING TO SPECULATE, HOW -- ARE YOU CAPABLE OF GIVING US

24 SPECULATION OR IS IT -- EXCUSE ME.  I SHOULDN'T ASK YOU.  IS

25 THERE SOMEBODY WHO CAN TELL US OVER HOW LONG A PERIOD THE SAME

1  NUMBER OF CRIMES WILL HAVE BEEN COMMITTED?

2          **JUDGE KARLTON:**  LET'S NOT USE THE WORD "SPECULATE."

3  OUR BEST JUDGMENT.

4          **JUDGE REINHARDT:**  HOW MANY CRIMES WILL BE COMMITTED

5  BY THE GROUP RELEASED EARLY AND THE GROUP NOT RELEASED EARLY IF

6  THERE'S AN EARLY RELEASE, OVER WHAT PERIOD WILL IT EQUAL OUT, IF

7  THAT'S WHAT YOU'RE TELLING US?  IT INVOLVES THE QUESTION OF IF

8  THE POPULATION IS REDUCED WILL THERE BE FEWER PEOPLE COMING OUT

9  LATER?  HOW DO WE FIND OUT?  I ASSUME YOU TELL US THERE WILL BE

10  MORE CRIMES COMMITTED DURING THE PERIOD OF EARLY RELEASE.

11          AT SOME POINT, WILL THE TOTAL NUMBER OF CRIMES TO

12  HAVE BEEN COMMITTED, WHETHER THERE'S EARLY RELEASE OR NOT BE THE

13  SAME, AND WHEN WOULD THAT BE?

14          **THE WITNESS:**  I MEAN, IT'S A VERY -- WHAT YOU ARE

15  ASKING FOR IS TO DO A STUDY WHICH WOULD INVOLVE KNOWING EXACTLY

16  WHO THOSE CURRENT INMATES ARE AND KNOWING SOMETHING ABOUT THEIR

17  RISK LEVELS.

18          BUT I WANT TO REITERATE TO YOU THAT THE EXPERT PANEL,

19  WHICH CONSISTED OF PROBABLY THE TOP NAMES IN CORRECTIONS IN THIS

20  COUNTRY, CONCLUDED NOT ONLY THAT IT WAS ESSENTIAL TO RELEASE TO

21  REDUCE THE POPULATION, BUT CAME UP WITH A PLAN THAT WAS PUT

22  TOGETHER BY MIKE JACOBSON, WHO'S BEEN THE HEAD OF CORRECTIONS IN

23  NEW YORK CITY, AND OTHERS, THAT WE VIRTUALLY UNANIMOUSLY AGREED

24  TO, WHICH INDICATED THAT BY MODEST GOOD TIME CREDIT EXPANSIONS,

25  THAT IS RETURNING WHERE THEY WERE WHEN GOVERNOR WILSON WAS THE

1   GOVERNOR, MODEST PAROLE REFORMS, AND I WOULD ADD SOME VERY

2   PRUDENT DIVERSION, YOU KNOW.

3            FOR EXAMPLE, WE HAVE 17,000 PEOPLE WHO ENTER

4   CALIFORNIA PRISONS WHO ARE PROBATION VIOLATERS.  THEY STAY AN

5   AVERAGE OF EIGHT MONTHS.  MOST PROBATION LEADERS IN THIS STATE

6   WOULD SAY WITH ADEQUATE RESOURCES, WE COULD MANAGE THEM IN THE

7   COUNTIES, BECAUSE THE MOST SERIOUS CRIME THEY COMMITTED WAS A

8   PROBATION VIOLATION.

9            SO I THINK OUR CONCLUSION WAS SOME COMBINATION OF

10  THOSE STRATEGIES WOULD MORE THAN DO THE JOB AND WOULD FREE UP

11  THE DOLLARS THAT WOULD PAY FOR THE --

12           **JUDGE REINHARDT:**  DOCTOR, I DON'T WANT TO INTERRUPT

13  YOU, BUT ONE OF THE ISSUES WE'RE REQUIRED TO CONSIDER IS THE

14  EFFECT ON PUBLIC SAFETY.  NOW, THAT DOESN'T MEAN WHAT'S WISE

15  PENAL POLICY, AND IT DOESN'T MEAN WHAT'S THE EFFECT GOING TO BE

16  ON PEOPLE IN THE PRISON.  WE HAVE TO TRY TO EVALUATE WHAT THE

17  EFFECT IS GOING TO BE ON THE COMMUNITY IF THESE PROGRAMS ARE

18  ADOPTED.  AND, AS I UNDERSTOOD YOUR TESTIMONY EARLIER, THE SAME

19  NUMBER OF CRIMES WOULD BE COMMITTED, ONLY OVER A DIFFERENT

20  PERIOD OF TIME?

21           **JUDGE KARLTON:**  LET ME --

22           **JUDGE REINHARDT:**  MY QUESTION IS QUITE CLEAR.

23           **JUDGE KARLTON:**  I DON'T THINK --

24           **JUDGE REINHARDT:**  DO YOU --

25           **JUDGE KARLTON:**  RIGHT NOW WE ARE RELEASING 10,000

 1  INMATES A MONTH, APPARENTLY?

 2          **THE WITNESS:**  THAT'S CORRECT.

 3          **JUDGE KARLTON:**  IF WE ORDER A QUICK RELEASE, WE ARE

 4  GOING TO INCREASE THAT TO SOME NUMBER, 12,500 OR WHATEVER.

 5  THOSE PEOPLE WOULD ALL BE COMMITTING THE SAME CRIMES THAT THEY'D

 6  BE COMMITTING IF THEY WERE LET LOOSE SEVERAL MONTHS LATER, BUT

 7  AT THE TIME WE RELEASE THEM, WE ARE NOW HAVING -- I THINK THIS

 8  IS WHAT JUDGE REINHARDT IS SAYING.

 9          **JUDGE REINHARDT:**  A SURGE WE CALL IT.

10          **JUDGE KARLTON:**  WE'RE HAVING A SURGE.  ISN'T THAT

11  RIGHT, OR IS IT RIGHT?

12          **THE WITNESS:**  IT MIGHT BE A VERY SHORT PERIOD OF

13  TIME, BUT IT WOULD DEPEND UPON WHETHER OR NOT PAROLE OFFICERS

14  WHO WOULD BE SUPERVISING THESE FOLKS WOULD BE GETTING

15  APPROPRIATE TRAINING TO DO THAT AND THE RIGHT STEPS WERE TAKEN

16  TO SUPERVISE THEM, THAT SURGE WOULD VIRTUALLY DISAPPEAR, I

17  THINK.

18          **JUDGE REINHARDT:**  ALL RIGHT.  LET'S ASSUME THERE'S --

19  NOTHING'S GOING TO CHANGE AS FAR AS PAROLE OFFICERS, AS FAR AS

20  COMMUNITY SERVICES, THAT THEY'LL RECEIVE THE SAME AMOUNT OF

21  PAROLE OR LESS TRAINING OR SUPERVISION IF THEY'RE RELEASED

22  EARLIER.  LET'S ASSUME CONDITIONS ARE THE SAME AS THEY ARE NOW

23  AND AS THEY WOULD BE IF THEY WERE RELEASED THREE MONTHS LATER.

24          THE QUESTION IS, JUDGE KARLTON PUT MORE SQUARELY, OR

25  MORE SPECIFICALLY, IF INSTEAD OF RELEASING 10,000 PEOPLE NEXT

1   MONTH, YOU RELEASED 12,000, AND, THEREFORE, THERE WILL BE MORE

2   CRIME COMMITTED IN THAT PARTICULAR MONTH, THAT'S -- BECAUSE YOU

3   ARE HAVING A LARGER GROUP RELEASED WITHIN ONE MONTH OR WITHIN

4   TWO MONTHS, THE CRIME THAT WOULD HAVE BEEN CREATED -- COMMITTED

5   LATER IS BEING COMMITTED EARLIER.  BUT, AS I UNDERSTOOD YOUR

6   TESTIMONY, OVER SOME PERIOD OF TIME IT WOULD BE THE SAME TOTAL

7   NUMBER OF CRIMES COMMITTED?

8            **THE WITNESS:**  THAT'S CORRECT.

9            **JUDGE REINHARDT:**  OVER WHAT PERIOD OF TIME WOULD THAT

10  BE?  IS THERE A WAY TO TELL WITH THE KIND OF PROPOSAL FOR EARLY

11  RELEASE, IS THERE A WAY TO DETERMINE WITHIN WHAT PERIOD OF TIME

12  THE TOTAL NUMBERS OF CRIMES WOULD BE THE SAME?

13           **THE WITNESS:**  I BELIEVE THAT THAT NUMBER COULD BE

14  CALCULATED.  I MEAN, OBVIOUSLY, I CAN'T DO IT HERE, BUT I THINK,

15  DEPENDING -- IF YOU COULD TELL ME HOW MANY PEOPLE, WHO THEY ARE,

16  WHAT THEIR BACKGROUNDS ARE, WHAT THEIR RISK LEVELS ARE, I THINK

17  ONE COULD COME UP WITH A PRETTY GOOD ESTIMATE OF THAT NUMBER

18  ALONE.

19           AGAIN, I SEE NO REASON TO ACCEPT THE PREMISE THAT YOU

20  WOULD MAKE SUCH AN ORDER WITH NOTHING BEING DONE, BECAUSE,

21  AGAIN, WE KNOW THAT JUST SIMPLY BETTER SUPERVISION WOULD --

22  MIGHT WIPE OUT THAT NET INCREASE.

23           **JUDGE REINHARDT:**  WITHOUT THE TIME -- LET ME ASK YOU,

24  IS IT YOUR TESTIMONY THAT WITH AN EARLY RELEASE PROGRAM AND

25  WITHOUT CHANGING THE PAROLE SYSTEM OR THE AID IN THE COMMUNITY,

1  IS IT YOUR TESTIMONY THAT ALTHOUGH THERE WOULD BE MORE CRIME IN

2  A PARTICULAR EARLY PERIOD, THAT OVER A LONGER PERIOD OF TIME,

3  THE NUMBER OF CRIMES COMMITTED WOULD BE THE SAME?

4         **THE WITNESS:**  YES.  THE NUMBER OF CRIMES COMMITTED

5  ATTRIBUTED TO PAROLEES WOULD BE THE SAME.

6         **JUDGE KARLTON:**  AND IN THIS REGARD, THE SUGGESTION

7  THAT WE CAN ORDER OTHER THINGS IS NOT CLEAR TO ME.  MAYBE WE

8  CAN, WE'LL TALK, IF WE EVER GET TO FINAL ARGUMENT, WHICH I

9  DOUBT, WE COULD TALK ABOUT ALL OF THAT.

10        **JUDGE REINHARDT:**  WE KEEP ASKING QUESTIONS.

11        **JUDGE KARLTON:**  BUT THERE'S NO EVIDENCE THAT THIS

12  STATE HAS THE SLIGHTEST INTEREST IN REDUCING CRIME BY DOING THE

13  KINDS OF THINGS THAT YOUR PANEL AND EVERY PRECEDING PANEL,

14  EXCEPT ONE FOUND BY MR. MITCHELL, HAS SUGGESTED.  SO IF WE JUST

15  SAY TO THE STATE, CUT ANOTHER 2,500 PEOPLE LOOSE, THEY MAY WELL

16  JUST SAY, FINE, WE'LL JUST LET THEM OUT AND THEY'LL KILL HOWEVER

17  MANY PEOPLE THEY WANT TO KILL.

18        **THE WITNESS:**  WELL, FIRST OF ALL, JUDGE, I DON'T

19  DETECT THAT ATTITUDE ON THE PART OF OUR CORRECTIONAL LEADERSHIP.

20  AND THE OTHER THING I HAVE TO TELL YOU IS I HAVE BEEN WORKING IN

21  A NUMBER OF COUNTIES, AND WHAT IS GOING ON IN CALIFORNIA IN

22  SEVERAL COUNTIES IS A REALIZATION AT THE COUNTY LEVEL THAT THEY

23  BEAR A RESPONSIBILITY FOR PAROLEES.

24        SO WHAT WE'RE SEEING IS TREMENDOUS INNOVATION TAKING

25  PLACE IN A NUMBER OF PLACES IN WHICH OFFICIALS, INCLUDING IN

 1  THIS COUNTY, ARE FORMING REENTRY COUNCILS, ARE SCRUTINIZING THE

 2  FULL RANGE OF SERVICES BEING OFFERED LOCALLY, BECAUSE TIP

 3  O'NEILL USED TO SAY ALL REENTRY -- ALL POLITICS IS LOCAL.

 4  REENTRY AND SUCCESS OF INMATES IS ULTIMATELY A LOCAL ISSUE.

 5          THE KINDS OF THINGS THAT PEOPLE NEED TO SUCCEED ALL

 6  HAPPEN NOT BECAUSE OF, YOU KNOW, ULTIMATELY STATE POLICY, BUT

 7  WHAT GOES ON IN THEIR COMMUNITIES.  AND WHAT IS CERTAINLY

 8  HAPPENING IN THIS STATE ACROSS THIS STATE IS AN INTEREST IN THE

 9  PART OF BOARDS OF SUPERVISORS, SHERIFFS, PROBATION, AND POLICE

10  IN SHORING UP THE LOCAL LEVEL RESPONSE TO THIS.

11          SO I'M ACTUALLY VERY ENCOURAGED THAT AS WE LOOK

12  AROUND THE STATE, WE ARE SEEING LOTS OF MODELS OF COMMUNITIES

13  TAKING GREATER RESPONSIBILITY FOR THIS AND SUCCEEDING.

14          **JUDGE KARLTON:**  AND THAT RAISES THE NEXT QUESTION,

15  WHICH IS, WE'RE GOING TO GET SOME MORE EVIDENCE FROM COUNTIES

16  WHICH SAY THAT IF WE JUST CUT PEOPLE LOOSE, THOSE PROGRAMS WILL

17  BE OVERWHELMED.

18          **JUDGE REINHARDT:**  I THINK IT'S NOT REALLY A QUESTION

19  OF WHAT THE MOTIVE IS, WHETHER IT'S DISINTEREST OR WHETHER IT'S

20  LACK OF FUNDS, WHICH THERE IS IN THIS STATE, AS YOU KNOW, A REAL

21  LACK OF FUNDS FOR ALL KINDS OF ISSUES, EDUCATION, WELFARE,

22  EVERYTHING, NOT JUST PRISONS.  IT'S NOT JUST -- WHETHER THERE'S

23  A DESIRE OR NOT REALLY DOESN'T MATTER.  WHAT MATTERS IS, I THINK

24  WE HAVE TO ASSUME THAT THERE AREN'T GOING TO BE EXTRA FUNDS TO

25  IMPROVE THESE OTHER CONDITIONS.

1        AND I'M SURE THE COUNTIES ALSO HAVE A GREAT DESIRE TO

2   DO WHAT THEY CAN, WHETHER THEY ARE ABLE TO, AS JUDGE KARLTON

3   SAID.  WE'VE HAD TESTIMONY FROM COUNTIES ALREADY THAT THEY SAY

4   THEY'RE NOT ABLE TO DO THIS FOR PAROLEES, THAT THEIR PROGRAMS

5   CAN'T BE ADJUSTED TO THAT.

6        BUT I THINK FROM THE ANSWERS TO THE QUESTIONS WE'RE

7   GETTING, WE CAN'T ASSUME PROGRAMS WILL BE IMPROVED OR THERE WILL

8   BE MONEY AVAILABLE.

9        **THE WITNESS:**  HERE'S WHAT I WOULD SAY, JUDGE, IF I

10  WAS THE HEAD OF THE DEPARTMENT OF CORRECTIONS, OR IF I WAS THE

11  SHERIFF, WHAT I WOULD ASSUME IS THAT I COULD PUT IN PLACE THOSE

12  PROGRAMS FASTER AND CHEAPER THAN TRYING TO BUILD ADDITIONAL

13  CAPACITY TO ADDRESS THIS ISSUE.  SO I THINK THE ISSUE IS HOW

14  FAST CAN I GET IT DONE AND WHAT WOULD BE THE COST, BECAUSE THE

15  COST OF GETTING THESE PROGRAMS IN PLACE WOULD BE A FRACTION OF

16  CONSTRUCTION AND OPERATION OF ADDITIONAL CAPACITY.

17       **JUDGE REINHARDT:**  WELL, AS AN ALTERNATIVE, WHICH IS

18  DO NOTHING AND LEAVE PEOPLE IN PRISONS WITH THE GROWING

19  POPULATION.

20       **JUDGE KARLTON:**  WHICH AFFECTS ADVERSELY, WE ARE TOLD,

21  PUBLIC SAFETY AS WELL, BECAUSE WE SEND LOW LEVEL PEOPLE IN TO

22  MIX WITH HABITUAL CRIMINALS AND OTHER BAD GUYS, AND THEY COME

23  OUT WORSE OFF.

24       **THE WITNESS:**  IT WAS THE OPINION OF THE EXPERT PANEL,

25  AGAIN, THESE NATIONALLY RENOWNED FOLKS THAT I WAS PRIVILEGED

1  WORK WITH, THAT THE SEVERE OVERCROWDING IN CALIFORNIA PRISONS IS

2  LEADING TO TREMENDOUS LEVELS OF VIOLENCE, IS INHIBITING THE

3  CAPACITY TO DELIVER REHABILITATION SERVICES.

4          SO I THINK REDUCING THE CROWDING AND CUTTING DOWN ON

5  THE VIOLENCE AND ACTUALLY INTRODUCING REHABILITATION SHOULD

6  BRING THAT CALIFORNIA RECIDIVISM RATE DOWN TO MUCH MORE WHAT

7  WE'RE SEEING IN OTHER STATES, WHICH IS A MUCH, MUCH SMALLER

8  RECIDIVISM LEVEL.

9          **JUDGE HENDERSON:** NOTHING FURTHER FROM --

10         **MR. SANGSTER:** NO, YOUR HONOR.

11         **JUDGE HENDERSON:** OKAY. THANK YOU FOR TESTIFYING,

12  DR. KRISBERG. WE'LL TAKE A 15-MINUTE RECESS AT THIS TIME.

13                   (RECESS TAKEN.)

14         **JUDGE HENDERSON:** CALL THE NEXT WITNESS, COUNSEL.

15         **MS. KECK:** GOOD MORNING, YOUR HONORS. ANN KECK,

16  DEPUTY COUNTY COUNSEL ON BEHALF OF THE SONOMA COUNTY

17  INTERVENORS, AND I WOULD LIKE TO CALL DAVID BENNETT TO THE

18  STAND.

19         **JUDGE HENDERSON:** STEP FORWARD AND BE SWORN IN,

20  MR. BENNETT.

21                   **DAVID BENNETT**,

22  CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, HAVING BEEN

23  FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

24         **THE WITNESS:** I DO.

25         **THE CLERK:** PLEASE HAVE A SEAT. STATE AND SPELL YOUR

 1   FULL NAME FOR THE RECORD.

 2           **THE WITNESS:** DAVID BENNETT, B-E-N-N-E-T-T.

 3           **MS. KECK:** YOUR HONOR, AS AN INITIAL HOUSEKEEPING

 4   MATTER, I WANTED TO CASE TO THE COURTS' ATTENTION THAT WE JUST

 5   YESTERDAY FILED A DIFFERENT EXHIBIT C TO MR. BENNETT'S EXPERT

 6   REPORT FILED ON OCTOBER 15TH.  WE REALIZED FOR THE FIRST TIME

 7   THAT WE HAD FILED A DRAFT REPORT RATHER THAN A FINAL REPORT.

 8           SO WHAT I HAVE DONE -- WE FILED THEM WITH THE COURT.

 9   WE HAVE ALSO PROVIDED COPIES TO THE COURT CLERK, AS WELL AS

10   COURTESY COPIES TO THE COURT, OF EACH OF HIS TWO REPORTS WITH

11   THE ATTACHMENTS, ONE DATED AUGUST 15, THE SECOND ONE DATED

12   OCTOBER 16TH.

13           AND ACCORDING TO THE COURTS' PROCESS, WE WOULD LIKE

14   TO MOVE THEM INTO EVIDENCE.  I HAVE RECEIVED NO OBJECTIONS TO

15   ANY PORTION OF HIS REPORTS AT THIS TIME.

16           **JUDGE HENDERSON:** MAY I ASSUME THERE IS NONE?

17           **MS. KECK:** PARDON ME, YOUR HONOR?

18           **JUDGE HENDERSON:** I WAS SPEAKING TO PLAINTIFFS.

19           **MS. EVERSON:** NO, YOUR HONOR.

20           **THE COURT:** OKAY.  THEY WILL BE ADMITTED AT THIS

21   TIME.

22           (DEFENDANTS' EXHIBIT C RECEIVED IN EVIDENCE)

23

24

25

1                    **DIRECT EXAMINATION**

2  **BY MS. KECK:**

3  **Q.**  MR. BENNETT, CAN YOU PLEASE BRIEFLY EXPLAIN YOUR BACKGROUND

4  AND EXPERTISE IN THE CORRECTIONS AREA?

5  **A.**  I'M A CRIMINAL JUSTICE CONSULTANT.  I BEGAN MY CAREER

6  WORKING IN SALT LAKE COUNTY, WHERE I ENCOUNTERED AN OVERCROWDED

7  JAIL AND BEGAN A PROGRAM TO MANAGE THE LOCAL COUNTY JAIL

8  POPULATION.  I RAN THAT PROGRAM FOR FIVE YEARS, ACTUALLY BECAME

9  A MODEL, AND THEN I BEGAN CONSULTING.

10                  AND FOR THE LAST 30 YEARS I HAVE BEEN TRAVELING

11  AMERICA.  I HAVE WORKED WITH SEVERAL HUNDRED COUNTIES IN 40

12  STATES ON JAIL OVERCROWDING, JAIL POPULATION MANAGEMENT, JAIL

13  PLANNING ISSUES.

14                  WHEN I BEGAN MY CONSULTING CAREER, I DID WORK FOR THE

15  UNITED STATES DEPARTMENT OF JUSTICE ON THE JAIL OVERCROWDING

16  JAIL DETAINEE PROJECT WHERE WE WORKED WITH ROUGHLY 75 COUNTIES

17  THROUGHOUT THE UNITED STATES.

18                  DURING THE COURSE OF MY CAREER, I HAVE DONE A LOT OF

19  CONSULTING WORK FOR THE NATIONAL INSTITUTE OF CORRECTIONS, WHICH

20  IS PART OF THE JUSTICE DEPARTMENT, AND I AM THE AUTHOR OF THE

21  *JAIL CAPACITY FORECAST WORKBOOK* THAT THE JUSTICE DEPARTMENT

22  PROVIDES TO COUNTIES GOING THROUGH THE JAIL PLANNING PROCESS.

23  **Q.**  WHEN YOU PROVIDE CONSULTANT SERVICES TO COUNTIES, WHAT TYPES

24  OF SERVICES DO YOU PROVIDE TO THEM?

25  **A.**  WELL, IT VARIES, BUT MY BASIC WORK IS TO GO INTO A

1  JURISDICTION AND PUT TOGETHER A MASTER PLAN; TO SPEND TIME WITH

2  THE LOCAL OFFICIALS, THE JUDGES, THE PROSECUTORS, THE DEFENSE

3  ATTORNEYS, PROBATION OFFICERS, LAW ENFORCEMENT; AND TO COLLECT

4  DATA; TO TAKE A LOOK AT WHAT HAPPENS TO DEFENDANTS FROM THE

5  POINT OF ARREST ON THROUGH ADJUDICATION; TO GO AHEAD AND

6  UNDERSTAND WHO IT IS THAT'S BEING HELD IN A COUNTY JAIL.

7           THAT PROCESS TAKES ABOUT SIX MONTHS.  AT THE

8  CONCLUSION OF THAT, I GENERALLY CONDUCT A FULL-DAY CRIMINAL

9  JUSTICE SYMPOSIUM WHERE WE TRY TO SHUT DOWN THE COURTS FOR THAT

10 DAY AND HAVE ALL OF THE LOCAL OFFICIALS COME AND TAKE A LOOK AT

11 THEIR CRIMINAL JUSTICE SYSTEM, TO TAKE A LOOK AT HOW THE SYSTEM

12 IS FUNCTIONING WHERE THERE MIGHT BE DELAYS AND PROBLEMS, AND TO

13 CONSIDER A SERIES OF RECOMMENDATIONS TO BETTER MANAGE THE

14 CRIMINAL JUSTICE SYSTEM.

15 **Q.**  APPROXIMATELY HOW MANY COUNTIES ACROSS THE UNITED STATES

16 HAVE YOU PROVIDED SUCH CONSULTING SERVICES TO?

17 **A.**  AT ONE LEVEL OR ANOTHER UP OVER A COUPLE HUNDRED COUNTIES.

18 **Q.**  AND HAVE YOU PROVIDED SERVICES TO ANY COUNTIES IN

19 CALIFORNIA?

20 **A.**  I HAVE WORKED IN EIGHT COUNTIES IN CALIFORNIA.

21 **Q.**  DID SONOMA COUNTY ENGAGE YOU AS AN EXPERT CONSULTANT WITH

22 RESPECT TO ITS CRIMINAL JUSTICE SYSTEM?

23 **A.**  YES, THEY DID.

24 **Q.**  WHAT HAVE YOU DONE FOR SONOMA COUNTY?

25 **A.**  AS I EXPLAINED EARLIER, I CONDUCTED MY NORMAL PROCESS AND I

1    WENT AHEAD AND PUT TOGETHER A MASTER MANUAL.  I CONDUCTED A

2    FULL-DAY CRIMINAL JUSTICE SYMPOSIUM IN AUGUST OF 2007.

3              SINCE THAT TIME I HAVE BEEN WORKING WITH COUNTY

4    OFFICIALS TO IMPLEMENT THE RECOMMENDATIONS THAT CAME OUT OF THAT

5    STUDY.  WE ARE IN THE PROCESS OF MAKING SIGNIFICANT CHANGES IN

6    THE DAY-TO-DAY OPERATION OF SONOMA COUNTIES CRIMINAL JUSTICE

7    SYSTEM.

8    **Q.**  COULD YOU PERHAPS BRIEFLY EXPLAIN TO THE COURT THE TYPES OF

9    REFORMS THAT YOU RECOMMENDED FOR SONOMA COUNTY AND THAT IT'S

10   CURRENTLY ENGAGED IN?

11   **A.**  SONOMA COUNTY, NOT UNLIKE A LOT OF OTHER COUNTIES IN

12   AMERICA, HAS A VERY INEFFICIENT CRIMINAL JUSTICE PROCESS, AND WE

13   HAVE DOCUMENTED THAT PROCESS.  WE HAVE DOCUMENTED THE IMPACT

14   THAT THE INEFFICIENCIES HAVE ON JAIL POPULATION, BUT MORE

15   IMPORTANTLY, DOCUMENTED THE IMPACT THAT THE INEFFICIENCIES HAVE

16   ON THE OVERALL CRIMINAL JUSTICE SYSTEM PROCESS.

17             I HAVE BEEN WORKING WITH THE COURT THAT'S TAKEN THE

18   LEADERSHIP IN THIS ROLE, AS WELL AS WITH ALL OF THE KEY AGENCIES

19   OF THE SYSTEM, AND WE ARE PUTTING IN PLACE -- IT KICKS OFF

20   JANUARY 5TH -- AN EARLY CASE RESOLUTION PROGRAM.

21             RATHER THAN HAVING ALL CASES THAT ENTER SONOMA COUNTY

22   SPREAD OUT AMONGST FIVE DIFFERENT FELONY DEPARTMENTS AND FIVE

23   DIFFERENT DEPARTMENTS HANDLING THE FRONT END OF THE SYSTEM AND

24   THEN THE CASES PROCEEDING AS THEY WILL THROUGH THE PROCESS, WE

25   ARE CENTRALIZING THAT.  WE ARE GOING TO TAKE ALL NEW FELONY

1  ARRESTS.  THEY ARE GOING TO ALL COME INTO ONE COURTROOM.  THE

2  DISTRICT ATTORNEY AND THE PUBLIC DEFENDER HAVE ASSIGNED SENIOR

3  COUNSEL TO THAT COURTROOM, AND THE GOAL IS TO RESOLVE THE CASES

4  EARLIER.

5          THE MANTRA IS *SAME JUSTICE SOONER* AND WE HAVE

6  COMMITMENTS FROM THE LOCAL OFFICIALS TO DO THAT, SO THAT WE CAN

7  ACHIEVE THE ADJUDICATION THAT WOULD BE SOUGHT -- THAT WOULD BE

8  ACHIEVED ANYWAY, BUT AT A MUCH EARLIER POINT IN TIME.

9          SO THAT WE ARE ADDING THE CREDIBILITY BACK INTO THE

10 SYSTEM.  WE ARE REDUCING WHAT HAS BECOME EPIDEMIC IN THAT

11 JURISDICTION OF PROBLEMS OF FAILURES TO APPEAR, OF INDIVIDUALS

12 GETTING REARRESTED WHILE CASES ARE BEING RESOLVED.  WE ARE ABLE

13 TO TELL VICTIMS AND WITNESSES OF CRIME THAT THE CASE HAS BEEN

14 RESOLVED AND THE DEFENDANT HAS BEEN SENTENCED.

15          SO THAT'S THE GOALS OF THE PROGRAM.  I HAVE BEEN VERY

16 SUCCESSFUL IN SETTING THAT MODEL UP IN OTHER JURISDICTIONS AND

17 IT BEGINS THE 5TH OF JANUARY IN SONOMA COUNTY.

18 **Q.**  AND WHAT WOULD YOU DESCRIBE AS BEING THE ULTIMATE RESULT OF

19 THAT, OF THAT PROGRAM?

20 **A.**  THE OVERALL GOAL IS TO CHANGE BEHAVIOR, TO CHANGE

21 DEFENDANTS' BEHAVIOR.

22          THE GOAL IS THAT THE BEHAVIOR THAT CAUSED THE

23 INDIVIDUAL TO COME IN CONTACT WITH THE SYSTEM IN THE FIRST PLACE

24 DOESN'T HAPPEN AGAIN.  WHEN WE ARE ABLE TO DO THAT SUCCESSFULLY

25 AT THE LOCAL LEVEL, AND WHAT WE ARE GOING TO SEE IN SONOMA

1   COUNTY IS A REDUCTION IN THE NUMBER OF PEOPLE HEADING INTO THE

2   CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, BECAUSE

3   WE ARE DEALING WITH THE INDIVIDUALS.  WE ARE TAKING CARE OF THE

4   ADJUDICATION PROCESS.

5            ALONG THE WAY WE ARE ALSO PUTTING IN PLACE SOME NEW

6   PROGRAMS.  WE ARE PUTTING IN SOME INNOVATIVE PROGRAMS SO THAT

7   WHEN IT COMES TIME FOR PUNISHMENT OF THE OFFENDERS, WE CAN

8   PUNISH THEM IN A MORE EFFECTIVE MANNER THAT WILL IMPACT THE

9   NUMBER OF PEOPLE THAT ULTIMATELY GO ON TO THE PRISON SYSTEM.

10  **Q.**  DID SONOMA COUNTY ALSO ENGAGE YOU TO TESTIFY AS AN EXPERT

11  WITH RESPECT TO A PRISONER RELEASE ORDER IN THIS CASE?

12  **A.**  YES.

13  **Q.**  CAN YOU DESCRIBE FOR THE COURT GENERALLY WHAT TYPE OF

14  INFORMATION YOU RELIED UPON IN FORMULATING AN OPINION IN THIS

15  MATTER?

16  **A.**  WELL, I HAVE DONE A LOT OF READING.  I HAVE READ, I BELIEVE,

17  ALL OF THE EXPERT REPORTS THAT HAVE BEEN ENTERED INTO EVIDENCE

18  IN THIS CASE.  I HAVE READ A LOT OF THE BACKGROUND DOCUMENTATION

19  OF THE PREVIOUS STUDIES THAT HAVE BEEN DONE FOR THE STATE OF

20  CALIFORNIA.

21            THROUGHOUT MY CAREER -- CALIFORNIA, OF COURSE, IS A

22  VERY LARGE STATE AND I HAVE ALWAYS KEPT UP ON WHAT'S HAPPENING

23  IN CALIFORNIA AND MY WORK WITHIN THE EIGHT COUNTIES THAT I HAVE

24  WORKED IN WITHIN THE STATE.

25            SO I FEEL PRETTY COMFORTABLE THAT I'VE ABSORBED -- I

1  HAVE READ AND ABSORBED A LOT OF INFORMATION ABOUT THE ISSUES IN

2  THIS CASE.

3  **Q.**  DO YOU UNDERSTAND THAT THE PLAINTIFFS IN THIS CASE ARE

4  SEEKING AN ORDER THAT WOULD REQUIRE THE STATE TO REDUCE ITS

5  PRISON POPULATION BY APPROXIMATELY ONE-THIRD, AN AMOUNT OF ABOUT

6  52,000 INMATES, WITHIN A PERIOD OF TWO YEARS?

7  **A.**  YES.

8  **Q.**  IN YOUR OPINION, WHAT WOULD BE THE EFFECT OF A PRISON

9  POPULATION CAP ON PUBLIC SAFETY AND LOCAL CRIMINAL JUSTICE

10 SYSTEMS?

11 **A.**  I DON'T THINK I'M OVERSTATING IT WHEN I SAY IT WOULD BE

12 ABSOLUTELY DEVASTATING.  THE CRIMINAL JUSTICE SYSTEM, AS IT'S

13 STRUCTURED TODAY, RELIES UPON INTEGRITY.

14         ALREADY THERE HAS BEEN A LOT OF INTEGRITY IN THE

15 CRIMINAL JUSTICE PROCESS; NOT JUST IN CALIFORNIA, BUT IN MANY

16 JURISDICTIONS THROUGHOUT THE UNITED STATES.  WE OPERATE WITH A

17 SYSTEM OF RULES, AND IN THIS INSTANCE A STATE AND A SYSTEM OF

18 LAWS.

19         WHEN AN INDIVIDUAL IS CONVICTED AND THE COURT DULY

20 DELIBERATES AND SENTENCES AN OFFENDER TO TIME, WHETHER IT'S TIME

21 IN A COUNTY JAIL OR TIME IN A STATE PRISON, AND THEN SIMPLY

22 USING SOME TYPE OF FORMULA, EITHER A SHERIFF OF A COUNTY JAIL OR

23 THE SECRETARY OF THE DEPARTMENT OF CORRECTIONS RELEASES THAT

24 INDIVIDUAL EARLY WITHOUT THERE BEING ANY RELATIONSHIP BETWEEN

25 EITHER THE INDIVIDUAL'S BEHAVIOR OR THEIR WORK OUT IN THE

1  COMMUNITY, THEN WHAT IS AT STAKE HERE IS THE OVERALL INTEGRITY

2  OF THE PROCESS.

3          WE CAN'T BUILD ENOUGH BEDS AND LOCK ENOUGH PEOPLE UP

4  FOR A LONG ENOUGH PERIOD OF TIME TO IMPACT THE CRIME RATES.  WE

5  HAVE TO RELY UPON THE INTEGRITY OF THE PROCESS.  AND SO SIMPLY

6  RELEASING INDIVIDUALS FROM PRISON EARLY IS GOING TO HAVE A

7  SIGNIFICANT IMPACT UPON THAT INTEGRITY ISSUE AND ON EVERYTHING

8  THAT WE ARE DOING IN THE CRIMINAL JUSTICE SYSTEM.

9  **Q.**  BUT DO YOU BELIEVE THAT IT'S POSSIBLE TO REDUCE THE PRISON

10 POPULATION SAFELY AND EFFECTIVELY?

11 **A.**  ABSOLUTELY.

12 **Q.**  AND HOW -- HOW WOULD YOU SAY THAT COULD BE DONE?

13 **A.**  A WELL-THOUGHT-OUT PLAN NEEDS TO BE IMPLEMENTED, A PLAN THAT

14 HAS THREE PRIMARY AREAS, THAT COVERS THREE PRIMARY AREAS.

15         FIRST OF ALL, THE INTRODUCTION INTO THE SYSTEM, THE

16 EXPANSION, THE USE OF PROGRAMS THAT ARE BASED ON EVIDENCE-BASED

17 PRACTICES.

18         SECOND OF ALL, THE USE OF A RISK AND NEEDS ASSESSMENT

19 IN ORDER TO SET PAROLE SUPERVISION CONDITIONS.

20         AND, FINALLY, THE IMPLEMENTATION.  I KNOW THERE HAS

21 BEEN SOME WORK IN THIS AREA, BUT IT HAS NOT BEEN IMPLEMENTED.

22 THE IMPLEMENTATION OF A STRUCTURED SANCTIONS PROCESS FOR BOTH

23 PROBATION AND PAROLE VIOLATORS.

24 **Q.**  I WOULD LIKE TO HAVE YOU EXPLAIN MORE OF EACH OF THESE TO

25 THE COURT IN TURN, SO LET ME ADDRESS YOUR ATTENTION TO THE FIRST

1   PART OF THE PLAN THAT YOU JUST STATED, THE PROGRAMS NEED TO BE

2   INSTITUTED.

3          COULD YOU EXPLAIN FOR THE COURT WHAT YOU MEAN BY THAT

4   AND WHAT WOULD BE THE IMPACT OF THAT RECOMMENDATION?

5          **JUDGE REINHARDT:**  CAN I ASK YOU ONE QUESTION HERE?

6          WHEN YOU SAY COULD YOU REDUCE THE POPULATION WITH

7   YOUR PROGRAMS, ARE YOU -- ARE YOU SAYING YOU COULD REDUCE IT BY

8   50,000?  AND IF SO, OVER HOW LONG A PERIOD?

9          **THE WITNESS:**  YOUR HONOR, I DON'T HAVE A NUMBER OR A

10  TIME PERIOD.  I'M PROPOSING A PROCESS AND A STRUCTURE IN WHICH

11  TO REDUCE THAT PRISON POPULATION.

12         A LOT OF WORK IS GOING TO HAVE TO BE DONE IN ORDER TO

13  PUT IN PLACE THE SPECIFICITY AND AS I CONTINUE TALKING, TO PUT

14  IN PLACE THE NEEDED PARTNERSHIP BETWEEN THE STATE OF CALIFORNIA

15  AND ITS COUNTIES TO CARRY THIS OUT.

16         **JUDGE KARLTON:**  FOLLOWING JUDGE REINHARDT'S QUESTION,

17  IS THERE ANY WAY THAT YOU UNDERSTAND THAT WE CAN REDUCE THE

18  POPULATION SO AS TO AFFECT THE ABILITY OF THE SYSTEM TO PROVIDE

19  ADEQUATE MEDICAL AND MENTAL HEALTH HEALTHCARE WITHOUT RELEASING

20  PEOPLE?

21         **THE WITNESS:**  MY UNDERSTANDING OF THE OVERCROWDING

22  SITUATION IN THE PRISON SYSTEM IS THAT IT ABSOLUTELY WILL

23  REQUIRE THE RELEASE OF INMATES IN THE FACILITIES IN ORDER TO BE

24  ABLE TO PROVIDE THAT LEVEL OF CARE THAT'S REQUIRED.

25         **JUDGE KARLTON:**  SO THAT SOME FORM OF A PRISON RELEASE

1   ORDER WILL BE REQUIRED SOMEHOW?

2          **THE WITNESS:**  YES.  WHAT I'M TALKING ABOUT HERE THIS

3   MORNING, AND AS I WALK INTO THE THREE PARTS OF THIS PLAN, IS NOT

4   JUST A RELEASE ORDER, BUT THE DEVELOPMENT AND THE INTRODUCTION

5   OF A PLAN THAT A BYPRODUCT WILL BE A MANAGED PRISON POPULATION.

6          **JUDGE KARLTON:**  GO AHEAD.

7   **BY MS. KECK:**

8   **Q.**  LET ME DIRECT YOUR ATTENTION TO THE FIRST PART OF THE PLAN

9   THAT YOU MENTIONED, WHICH IS THE PROGRAMS NECESSARY TO SUPPORT

10  THE RELEASE.

11         COULD YOU PLEASE EXPLAIN TO THE COURT WHAT IT IS YOU

12  MEAN BY THAT?

13  **A.**  IT'S A COMBINATION OF PROGRAMS.  RIGHT NOW THERE ARE SOME

14  PROGRAMS THAT CDCR OFFERS.  THERE'S VERY LITTLE INCENTIVE FOR

15  PRISONERS TO PARTICIPATE IN THE PROGRAMS.

16         THERE'S NO LINKAGE WHATSOEVER WITH THE PROGRAMS THAT

17  THEY PARTICIPATE IN WHILE IN THE INSTITUTION, AND THEY ARE

18  RELEASED BACK OUT INTO THE COMMUNITY.

19         THERE IS NO STRUCTURED PROCESS FOR MAKING SURE THAT

20  THE BASIC ISSUES THAT WE ARE DEALING WITH IN A CORRECTIONAL

21  SYSTEM ARE BEING ADDRESSED; THE ALCOHOL, DRUG, MENTAL HEALTH

22  ISSUES; THE LACK OF EDUCATION AND THE PROBLEMS WITH EMPLOYMENT

23  ISSUE; THE HOUSING ISSUES.

24         THERE IS NO PUTTING TOGETHER OF A PLAN.  THERE IS

25  HOLDING INDIVIDUALS IN THE PRISON SYSTEM AND RELEASING THEM.

1  THERE'S INDIVIDUALS THAT VIOLATE THEIR PAROLE.  THEY COME BACK

2  IN AND SIMPLY ROTATE BACK THROUGH THE SYSTEM AGAIN.

3           WE ARE NOT USING EVIDENCE-BASED PRACTICES IN ORDER TO

4  PROPERLY ADDRESS THE INDIVIDUAL'S BASIC SENSE OF NEEDS.

5           SPECIFICALLY, ONE OF THE PRIMARY FUNCTIONS THAT I'M

6  RECOMMENDING, AGAIN IDEALLY WITH A PARTNERSHIP BETWEEN THE STATE

7  AND THE COUNTIES, IS TO PUT IN PLACE A COMMUNITY CORRECTIONS

8  PLAN, A COMMUNITY CORRECTIONS PLAN THAT STEPS OFFENDERS DOWN

9  FROM PRISON BACK OUT INTO THE COMMUNITY; THAT ALLOWS THEM TO

10 PARTICIPATE IN PROGRAMS WITHIN THE INSTITUTION AND THEN THEY ARE

11 LINKED WITH PROGRAMS DIRECTLY INTO THE COMMUNITY, WHERE WE ARE

12 MOVING THE INDIVIDUALS THROUGH A PROCESS.

13          THAT'S DEVELOPING PROGRAMS BASED UPON EVIDENCE-BASED

14 PRACTICES.

15 **Q.**  AND SO WHAT YOU JUST DESCRIBED IS A SYSTEM, BASICALLY

16 CONTINUING PROGRAMS THAT WOULD START IN THE PRISON AND THEN GO

17 OUT IN THE COMMUNITY?

18 **A.**  EXACTLY.  THE RESEARCH IS VERY CLEAR ON THIS, THAT EVEN IN A

19 SYSTEM WHERE YOU HAVE VERY GOOD PROGRAMS WITHIN THE INSTITUTION,

20 UNLESS THERE IS A SPECIFIC LINKAGE WITH -- AND IT'S FORMALLY

21 KNOWN AS REENTRY.

22          UNLESS THERE IS A SPECIFIC LINKAGE WITH THAT

23 INDIVIDUAL'S RELEASE BACK OUT INTO THE COMMUNITY, THE PROGRAMS

24 ARE FOR NAUGHT.

25          AND THAT'S WHAT WE HAVE HERE IN THE STATE OF

1   CALIFORNIA.  WE HAVE SOME PROGRAMS.  INDIVIDUALS DON'T

2   NECESSARILY HAVE AN INCENTIVE TO PARTICIPATE IN THEM, BUT THEN

3   THERE ISN'T THE LINKAGE WHEN THEY ARE RELEASED BACK OUT INTO THE

4   COMMUNITY.

5   **Q.**  LET ME DRAW YOUR ATTENTION TO THE SECOND ELEMENT THAT YOU

6   MENTIONED, WHICH THE PAROLE SUPERVISION ISSUE AND PROBATION

7   SUPERVISION.

8            COULD YOU EXPLAIN TO THE COURT WHAT YOUR

9   RECOMMENDATIONS ARE IN THAT REGARD?

10  **A.**  IN THE LAST FEW YEARS, FINALLY, WE HAVE SOME VALIDATED RISK

11  AND NEEDS INSTRUMENTS THAT ARE AVAILABLE TO HELP US IN

12  CORRECTIONS.  THOSE RISK AND NEEDS INSTRUMENTS NEED TO BE

13  APPLIED TO EACH AND EVERY OFFENDER RELEASED ON PAROLE.

14            INDIVIDUALS THAT ARE RELEASED, THE LEVEL OF

15  SUPERVISION, THE PROGRAMS THAT THEY RECEIVE NEED TO BE BASED ON

16  THE RESULTS OF THAT RISK AND NEEDS ASSESSMENT, ALONG WITH WHAT'S

17  HAPPENED WITHIN THE INSTITUTION.

18            THERE ARE GOING TO BE INDIVIDUALS WHO ARE RELEASED ON

19  PAROLE WHO NEED A MINIMAL AMOUNT OF ATTENTION AND/OR CAN BE

20  RELEASED WITHOUT PAROLE.  SHORT PERIOD OF TIME, RELEASE, DONE.

21            THERE ARE GOING TO BE OTHER INDIVIDUALS THAT NEED

22  INTENSIVE SUPERVISION AND NEED IT FOR A LONGER PERIOD OF TIME.

23  IF WE ARE GOING TO BE SUCCESSFUL WITH THE GOAL THAT I STATED

24  EARLIER OF THE -- THAT THE BEHAVIOR THAT CAUSED THE INDIVIDUAL

25  TO COME IN CONTACT WITH THE SYSTEM IN THE FIRST PLACE DOESN'T

1  HAPPEN AGAIN, THEN WE NEED TO INDIVIDUALLY TAILOR HOW WE HANDLE

2  AND ADDRESS THAT SPECIFIC INDIVIDUAL'S NEEDS AND PROBLEMS.

3  **Q.**  ARE THERE EXAMPLES CURRENTLY IN THE STATE OF CALIFORNIA

4  WHERE THIS TYPE OF INDIVIDUAL ASSESSMENT AND ADDRESSING THE

5  SPECIFIC NEEDS OF THE POPULATION IS BEING CONDUCTED CURRENTLY?

6  **A.**  WELL, SONOMA COUNTY IS IN THE PROCESS OF IMPLEMENTING THE

7  USE OF A RISK AND NEED ASSESSMENT THROUGHOUT ITS ENTIRE SYSTEM.

8  IT COMES ONLINE THIS NEXT WEEK ON THE JUVENILE SYSTEM, AND IN

9  MARCH ON THE ADULT SYSTEM, WITH THAT RISK AND NEEDS ASSESSMENT

10  AS BEING APPLIED TO THE INDIVIDUALS IN THE LOCAL CRIMINAL

11  JUSTICE SYSTEM TO HELP DETERMINE, EITHER AT THE JUVENILE LEVEL

12  OR THE ADULT LEVEL, THE LEVEL OF SUPERVISION AND THE PROGRAMS

13  THAT THE INDIVIDUALS ARE GOING TO BE INVOLVED WITH.

14          CDCR HAS DONE SOME DIFFERENT THINGS WITH RISK AND

15  NEEDS ASSESSMENTS.  IT'S IN THE PROCESS.  IT'S GROWING.  IT'S

16  HAPPENING.  IT JUST HASN'T BEEN FULLY IMPLEMENTED AND THERE

17  HASN'T BEEN THAT FORMAL LINKAGE WITH THE LEVEL AND AMOUNT OF

18  SUPERVISION OF INDIVIDUALS RELEASED ON PAROLE.

19  **Q.**  AND WHEN YOU TALK ABOUT THERE BEING STRUCTURED SANCTIONS, IS

20  THE ONLY SANCTIONS YOU ARE REFERRING TO JUST A RETURN TO PRISON

21  IF THERE IS A VIOLATION OF PAROLE OR IS IT SOMETHING MORE?

22  **A.**  WE NEED TO DO A LOT MORE.  WHAT WE HAVE LEARNED -- AND WE

23  KNEW THIS ALL ALONG, BUT DRUG COURT HAS TAUGHT IT TO US AGAIN.

24          IT'S NOT THE SEVERITY OF THE SANCTION THAT'S

25  IMPORTANT.  WHAT'S IMPORTANT IS THE CERTAINTY AND THE IMMEDIACY

1  OF IT.  THAT AN OFFENDER WHO IS OUT, EITHER ON PROBATION OR

2  PAROLE, THAT THERE IS AN UNDERSTANDING, THERE ARE CERTAIN RULES,

3  THERE ARE CERTAIN CONDITIONS THAT HAVE TO BE FOLLOWED.  THERE

4  HAS TO BE THE ABILITY TO MONITOR THOSE CONDITIONS AND THEN THERE

5  HAS TO BE THE CONSEQUENCE FOR THEIR ACTIONS.

6         WE DON'T JUST SIMPLY WAIT TILL THE LEVEL OF FAILURE

7  RISES TO THE LEVEL, WHETHER A ZERO TOLERANCE PROGRAM IS IN PLACE

8  OR PROBATION AND PAROLE OFFICERS HAVE SOME DISCRETION AS TO WHEN

9  TO VIOLATE THE OFFENDER, VIOLATE THEM AND SIMPLY RETURN THEM TO

10 PRISON, HAVE THEM HELD ON WHAT THE DATA TELLS US AN AVERAGE OF

11 120 DAYS, CIRCULATE THEM THROUGH THE PROCESS BACK OUT AGAIN.

12         WE NEED TO HAVE MEANINGFUL, IMMEDIATE, CERTAIN

13 SANCTIONS.  AND IT DOESN'T HAVE TO BE A RETURN TO PRISON.  WE

14 CAN DEVELOP SANCTIONS AT THE LOCAL LEVEL.  WE CAN KEEP

15 INDIVIDUALS LOCALLY IN THIS PARTNERSHIP BETWEEN THE STATE OF

16 CALIFORNIA AND IT'S COUNTIES.  WE CAN HAVE A MORE EFFECTIVE

17 SANCTION WITHOUT INTERRUPTING INDIVIDUAL'S LIVES AND RETURNING

18 THEM TO PRISON.

19 **Q.**  WHY WOULD A PRISON POPULATION REDUCTION PLAN THAT CONTAINS

20 THE THREE ELEMENTS YOU DESCRIBE SIGNIFICANTLY LOWER PRISON

21 POPULATION?  WHY DO YOU BELIEVE THEY WOULD BE EFFECTIVE?

22 **A.**  BECAUSE WE ARE INTERRUPTING THE CYCLE OF CRIME.  WE ARE

23 BECOMING INVOLVED WITH THE INDIVIDUAL, WITH THEIR ISSUES AND

24 WITH THEIR PROBLEMS.

25         NO LONGER ONE SIZE FITS ALL.  NO LONGER SIMPLY TAKING

1  A LOOK AT THE DEFENDANT'S PRIOR CRIMINAL HISTORY, TAKING A LOOK

2  AT THE INSTANT OFFENSE AND COMING UP WITH A SENTENCE THAT IS

3  THEN ADMINISTERED AND THE INDIVIDUAL HELD FOR SOME MAGIC PERIOD

4  OF TIME AND THEN RELEASED ON PAROLE.

5          WE ARE BEGINNING THE PROCESS OF HAVING INDIVIDUALS

6  EARN THEIR WAY TO BE RELEASED, OF STEPPING THEM DOWN OUT OF THE

7  INSTITUTION BACK OUT INTO THE COMMUNITY.

8          WE ARE PUTTING IN PLACE A SYSTEM THAT HAS THE

9  NECESSARY ACCOUNTABILITY, HAS THE NECESSARY CONSEQUENCES, AND IS

10 TRULY A MUCH BETTER SYSTEM IN PRESERVING PUBLIC SAFETY.

11 **Q.** ABSENT THIS TYPE OF A PLAN, WHAT WOULD BE THE EFFECT OF A

12 PRISONER RELEASE ORDER ON COUNTIES IF THERE WAS A POPULATION CAP

13 THAT WAS INSTITUTED AS THE PLAINTIFF SO REQUESTS?

14 **A.** HERE IS MY CONCERN.  THE SYSTEM IS ALREADY BROKEN.  THERE IS

15 NO QUESTION ABOUT IT.  WE CAN TAKE A LOOK AT THE HIGH CRIME RATE

16 OF PEOPLE WHO ARE RELEASED ON PAROLE COMING BACK INTO THE

17 INSTITUTION.

18          WHETHER THIS IS A SHORT TERM BLIP, I HAVE -- I CAN'T

19 -- I DON'T FULLY UNDERSTAND THE MATH THAT HAS GONE INTO THE

20 RECOMMENDATION OF A SHORT TERM EXPEDITED RELEASE OF OFFENDERS

21 BACK OUT INTO THE COMMUNITY THAT'S GOING TO BRING THE OVERALL

22 PRISON POPULATION DOWN TO MORE MANAGEABLE LEVELS.

23          BUT BE THAT AS IT MAY, WHEN WE ARE TALKING ABOUT THE

24 RELEASE UNDER THIS CURRENT BROKEN SYSTEM, OF ONE-THIRD OF ITS

25 POPULATION BACK OUT INTO THE COMMUNITY, WE ARE GOING TO HAVE

1  PROBLEMS.  WE ARE GOING TO HAVE INCREASED RECIDIVISM, INCREASED

2  PRESSURE COMING BACK IN.

3           AND HERE IS MY CONCERN.  ONCE AGAIN, THREE SPECIFIC

4  ISSUES.

5           ONE IS, WE HAVE GOT A TERRIBLY OVER TAXED LOCAL

6  CRIMINAL JUSTICE SYSTEM.  AND THIS IS BEFORE THE BUDGET CUTS OF

7  THE LAST SIX MONTHS OR YEAR HAVE TAKEN HOLD.

8           WE HAVE NOT ENOUGH JUDGES ON THE BENCH.  CLEARLY, NOT

9  ENOUGH PROSECUTORS, PUBLIC DEFENDERS, PROBATION OFFICERS TO DO

10  THE BUSINESS OF THE LOCAL CRIMINAL JUSTICE SYSTEM.  IT IS

11  ALREADY STRETCHED AS THIN AS IT POSSIBLY CAN THROUGHOUT THE

12  STATE AND IN MOST JURISDICTIONS THROUGHOUT THE COUNTRY.

13           NOW THAT WE HAVE HAD THIS ECONOMIC TURNDOWN, WE HAVE

14  HAD BUDGET CUTS, WE HAVE HAD ALL OF THAT IMPACT AND THAT

15  TIGHTENING ON THE CRIMINAL JUSTICE SYSTEM AND, YET, WE STILL

16  HAVEN'T FELT WHAT I HAVE FEAR IS ALREADY IN THE PIPELINE, AND

17  THAT'S AN INCREASE IN THE CRIME RATE.  THAT'S AN INCREASE IN

18  CRIMES THAT ARE COMMITTED AS A RESULT OF THE THIS ECONOMIC

19  TURNDOWN AND WE, WITH TODAY'S SYSTEM, DON'T HAVE THE RESOURCES

20  AT THE LOCAL LEVEL TO HANDLE IT.

21           I AM CONCERNED ON THE INTEGRITY ISSUE THAT I SPOKE

22  ABOUT EARLIER.  WITH OUR LOCAL PRETRIAL SERVICES PROGRAMS THAT

23  RELEASE INDIVIDUALS FROM JAIL PRIOR TO TRIAL, OUR LOCAL

24  PROBATION EFFORTS ARE GOING TO BE COMPROMISED BECAUSE

25  INDIVIDUALS -- BECAUSE OF JAIL OVERCROWDING, BECAUSE OF HAVING

1   TO RELEASE INDIVIDUALS AND NOT HAVE THE APPROPRIATE SERVICES IN

2   THE COMMUNITY.  THEY DON'T EXIST TODAY.

3           SECOND POINT, TO THAT ISSUE OF THE INSTITUTIONS.

4   THIRTY-TWO OF CALIFORNIA'S COUNTY JAILS ARE UNDER SOME TYPE OF A

5   CAP.  THE LARGEST HORROR STORY THROUGHOUT AMERICA OF JAIL

6   OVERCROWDING IS RIGHT HERE IN THIS STATE, IN LOS ANGELES COUNTY.

7   THE NUMBER OF PRISONERS THAT ARE TURNED OUT BY THE LOS ANGELES

8   COUNTY SYSTEM REFLECT THAT BROKEN SYSTEM I SPOKE ABOUT EARLIER,

9   THAT LACK OF INTEGRITY.

10          WITH SUCH A RETURN OF 50,000 PRISONERS BACK TO THE

11  COMMUNITIES OF CALIFORNIA WITHOUT THE IMPLEMENTATION OF A PLAN

12  SUCH AS I HAVE PROPOSED, WILL TAX THE LOCAL SYSTEMS BEYOND

13  BELIEF.  THEY CANNOT HANDLE THE INCREASED NUMBERS OF

14  INDIVIDUALS.  THE RESULT BEING MORE OF THE SAME.  MORE

15  INDIVIDUALS RELEASED, NOT HAVING THE CONSEQUENCES, NOT HAVING

16  THE ACCOUNTABILITY, HAVING INCREASED RECIDIVISM, INCREASED

17  CRIME, INDIVIDUALS RETURNING BACK TO THE SYSTEM.

18          AND FINALLY, OUR PROGRAMS.  CALIFORNIA HAS LED THE

19  NATION WITH THE IMPLEMENTATION OF PROGRAMS IN LIEU OF

20  INCARCERATION.  WE CAN GO BACK INTO THE EARLY 1900S IN SONOMA

21  COUNTY WITH THE CALIFORNIA HUMAN DEVELOPMENT CORPORATION TO

22  TODAY, THE WORK THAT IT DOES IN THE LOCAL CRIMINAL JUSTICE

23  SYSTEM.  I WOULD LOVE TO CHALLENGE ANYBODY IN THIS COURTROOM TO

24  COME SPEND A DAY WITH THE STAFF OF THAT PROGRAM AND SEE HOW --

25  IT'S NOT THE DOLLARS THEY GET PAID.  IT'S THE HEART THAT THEY

1  BRING TO THEIR WORK.  IT'S THE WORK THAT THEY GET UP IN THE

2  MORNING FOR THAT THEY ARE EXCITED TO DO, TO WORK WITH THE

3  CLIENTS OF THE CRIMINAL JUSTICE SYSTEM.

4          THE PROBLEM IS, THERE IS NOT ENOUGH SLOTS.  THEY

5  DON'T EXIST.  AND THOSE PROGRAMS, THOSE NETWORKS ARE BECOMING

6  TAXED AND STRAINED TO THE BREAKING POINT.  AND UNLESS THOSE

7  PROGRAMS ARE EXPANDED, UNLESS MORE SLOTS BECOME AVAILABLE, THE

8  IMPLEMENTATION OF A RELEASE ORDER IS GOING TO FAIL AND IT'S

9  GOING TO HIT HARDEST ON THE LOCAL CRIMINAL JUSTICE SYSTEMS.

10 **Q.**  THERE HAVE BEEN SOME EXPERTS THAT HAVE TESTIFIED IN THIS

11 PROCEEDING THAT THERE WOULD BE -- IF A PRISONER RELEASE ORDER

12 WERE TO BE ENTERED, EVEN WITHOUT INCREASING PAROLE SUPERVISION,

13 EVEN WITHOUT A STRUCTURED SANCTIONS POLICY, AND EVEN WITHOUT

14 INCREASING THE FUNDING OR RESOURCES AVAILABLE TO THE COMMUNITIES

15 TO DO COMMUNITY OUTPUT, THAT A RELEASE ORDER WOULD NOT EFFECT

16 PUBLIC SAFETY NOR LEAD TO AN INCREASE IN RECIDIVISM OR A CHANGE

17 IN -- YEAH, LEAD TO AN INCREASE IN RECIDIVISM.  DO YOU AGREE

18 WITH THAT?

19 **A.**  I DO NOT.  THE SYSTEM IS BROKEN TODAY AND BECAUSE IT'S SO

20 BROKEN IS WHY WE HAVE THE RECIDIVISM PROBLEMS THAT WE HAVE IN

21 THE LOCAL CRIMINAL JUSTICE SYSTEMS.

22          SUCH A PLAN SIMPLY RESHUFFLES THE DECK.  IT SIMPLY

23 CONTINUES TO TURN INDIVIDUALS OUT OF THE INSTITUTION WITHOUT THE

24 NECESSARY LEVELS OF SUPERVISION AND PROGRAMMING TO CHANGE

25 BEHAVIOR.  AND WHEN WE DO THAT, WE ADD THAT TO TODAY'S ALREADY

1  BROKEN SYSTEM WITH RESOURCES STRETCHED BEYOND THEIR MEANS, THIS

2  RESHUFFLING OF THE DECK WILL JUST COMPOUND THE PROBLEMS AND NOT

3  BRING ABOUT THE CHANGES IN BEHAVIOR THAT I SPOKE ABOUT AT THE

4  BEGINNING.

5          **JUDGE REINHARDT:**  MAY I ASK YOU, YOU BELIEVE THAT

6  THESE THREE STEPS WOULD RESOLVE THE PROBLEM.  WHAT IS STOPPING

7  THE STATES AND THE COUNTIES FROM IMPLEMENTING THOSE THREE STEPS?

8          **THE WITNESS:**  THAT'S A GREAT QUESTION.  I DON'T KNOW.

9  I DON'T KNOW WHY THERE HASN'T BEEN A LOOK AT -- WE HAVE

10 CERTAINLY OF ENOUGH STUDIES.

11         THE STATE HAS BEEN -- BEEN THE BENEFICIARY OF SOME OF

12 THE BEST EXPERTS IN THIS COUNTRY PUTTING TOGETHER STUDIES AND

13 DOCUMENTING THE NATURE OF THE PROBLEM.

14         THEY STARTED TO IMPLEMENT PIECES OF THIS, BUT THEY

15 HAVEN'T GRASPED THE WHOLE PROBLEM.  THEY HAVEN'T MADE THE

16 COMMITMENT THAT NEEDS TO BE MADE TO TRULY CHANGING BEHAVIOR.

17 TRULY GETTING OUT IN FRONT OF THIS PROBLEM.

18         IT WAS TOO EASY FOR TOO LONG TO EITHER -- WHEN TIMES

19 WERE GOOD TO JUST BUILD PRISONS.  WHEN THEY WEREN'T SO GOOD,

20 JUST OVERCROWD THEM.

21         THIS PLAN FORCES THE SYSTEM TO COME TO GRIPS WITH ITS

22 ISSUES AND PUT IN PLACE MEANINGFUL CHANGES THAT WILL HAVE A

23 LASTING BENEFIT.

24         **JUDGE REINHARDT:**  AND ALL OF THESE STEPS REQUIRE THE

25 EXPENDITURE OF SUBSTANTIAL SUMS OF MONEY BY THE STATE AND THE

1    COUNTIES.

2            **THE WITNESS:** IT DOES, BUT IT'S MY OPINION THAT THE

3    STATE IS ALREADY SPENDING SUBSTANTIAL AMOUNTS OF DOLLARS IN ITS

4    INEFFECTIVE BROKEN CRIMINAL JUSTICE AND CORRECTIONS SYSTEM; THAT

5    BY REPRIORITIZING ITS DOLLARS, BY RETARGETING AND WORKING ON

6    UPSTREAM ISSUES SO THAT WE GET OUT AHEAD OF THE PROBLEM, THAT'S

7    THE ONLY WAY THAT WE ARE GOING TO BE ABLE TO SOLVE THIS PROBLEM

8    WITHOUT CATASTROPHE.

9            **JUDGE REINHARDT:** AND HOW LONG IF YOUR STEPS WERE IN

10   EFFECT -- ARE YOU SAYING IF THESE STEPS WERE IN EFFECT, THEN

11   50,000 PRISONERS COULD BE RELEASED?

12           **THE WITNESS:** I'M SAYING THAT IF THIS PLAN WERE

13   ADOPTED BY THE STATE OF CALIFORNIA, THAT THE POPULATION COULD BE

14   BROUGHT DOWN IN A SYSTEMATIC WAY WITHOUT HAVING TO ENTER A

15   RELEASE ORDER.

16           **JUDGE KARLTON:** I THOUGHT YOU JUST SAID -- NEVER

17   MIND.

18   **BY MS. KECK:**

19   **Q.** PERHAPS YOU SHOULD CLARIFY TO THE COURT. ARE YOU

20   RECOMMENDING AS PART OF YOUR PROGRAM THAT THERE BE A POPULATION

21   CAP OR OTHER GENERAL RELEASE ORDER ENTERED WITH RESPECT TO THE

22   STATE PRISON POPULATION?

23   **A.** I UNDERSTAND IT'S A $64,000 QUESTION HERE THIS MORNING.

24           **JUDGE REINHARDT:** WELL, TO ANSWER THE COURT, THE

25   CAP -- IF YOUR PROGRAM WOULD BRING IT DOWN, WHAT HARM WOULD

1    THERE BE TO A CAP, IF THAT WOULD BE THE EFFECT ANYWAY?

2              **THE WITNESS:**  THE ISSUE -- AND THE ISSUE I THINK THAT

3    JUDGE KARLTON WAS REACTING TO WAS MY COMMENT EARLIER ABOUT

4    WITHIN THE INSTITUTIONS, THE PROVIDING OF THE NECESSARY

5    CONSTITUTIONAL MEDICAL AND MENTAL HEALTH SERVICES CAN'T BE

6    PROVIDED WITH TODAY'S OVERCROWDING.

7              IT'S GOING TO TAKE SOME TIME TO IMPLEMENT MY PLAN.

8    IT'S GOING TO TAKE SOME TIME TO PUT THIS IN PLACE, THE OVERALL

9    PLANNING PROCESS AS WELL AS THE IMPLEMENTATION, ONCE THE

10   PLANNING HAS BEEN DONE.

11             AND SO WE ARE KIND OF BETWEEN A ROCK AND A HARD SPOT

12   RIGHT NOW BECAUSE WE HAVE THE OVERCROWDING AT THE LEVEL THAT WE

13   HAVE.  WE HAVE THE DIFFICULTIES WITHIN THE INSTITUTION, AND WE

14   DON'T HAVE THE MECHANISMS IN THE COMMUNITY TO HAVE -- TO

15   IMPLEMENT A RELEASE ORDER IN SUCH A WAY THAT IT'S NOT GOING TO

16   IMPACT THE LOCAL SYSTEMS.

17   **BY MS. KECK:**

18   **Q.**  WOULD A POPULATION CAP BY ITSELF BE SUFFICIENT TO BOTH

19   RESOLVE THE PROBLEMS AT THE OVERCROWDING AT THE STATE PRISON

20   LEVEL AS WELL AS ADDRESS THE CONCERNS IN THE COMMUNITY?

21   **A.**  WELL, CLEARLY, A POPULATION CAP WILL ADDRESS THE

22   OVERCROWDING IN THE STATE PRISON.

23             WHETHER -- DEPENDING UPON HOW THE CAP IS IMPLEMENTED,

24   EITHER THE FRONT DOOR IS GOING TO BE CLOSED OR THE BACK DOOR IS

25   GOING TO OPEN UP.  IN ANY EVENT, IT'S GOING TO HAVE A NEGATIVE

1   IMPACT ON THE LOCAL COUNTY JAILS, BECAUSE RIGHT NOW INDIVIDUALS

2   SENTENCED TO STATE PRISON MOVE IN AND OUT OF THE COUNTY JAIL

3   VERY QUICKLY.

4          IN SONOMA COUNTY 1200 PEOPLE LAST YEAR MOVED THAT

5   ROUTE FROM COUNTY JAIL INTO CDCR.

6          **JUDGE REINHARDT:**  YOU ARE SAYING THAT A CAP WOULD NOT

7   HAVE AN ADVERSE EFFECT IF THE STATES AND COUNTIES WOULD ADOPT

8   YOUR THREE STEPS?

9          **THE WITNESS:**  CORRECT.

10         **JUDGE REINHARDT:**  WHICH THEY CAN DO?

11         **THE WITNESS:**  CORRECT.

12  **BY MS. KECK:**

13  **Q.**  AND PERHAPS IT WOULD BE MORE PRECISE TO SAY THAT, MR.

14  BENNETT, DID YOU PROVIDE SOME SPECIFIC IMPLEMENTATION PROGRAMS

15  IN THE EXPERT REPORT DATED AUGUST 15?

16  **A.**  YES.

17  **Q.**  AND ARE THESE THE THREE ELEMENTS THAT WE JUST DISCUSSED OR A

18  SUMMARY OF THOSE SPECIFIC RECOMMENDATIONS THAT YOU HAD MADE?

19  **A.**  THEY ARE, WITH ONE EXCEPTION THAT I HAVE LEFT OFF SO FAR

20  HERE THIS MORNING.  AND THIS GETS TO THE HEART OF WHAT WE ARE

21  DOING.

22         ULTIMATELY A SENTENCING COMMISSION NEEDS TO BE

23  CONVENED AND TAKE A LOOK AT THE DISPARITY OF SENTENCES AT THE

24  LOCAL LEVEL INTO THE STATE PRISON SYSTEM.  IT IS -- THE

25  DISPARITY IS SHOCKING.

1          WHEN WE ARE TALKING ABOUT LONG TERM SYSTEMIC CHANGE,

2   CALIFORNIA NEEDS TO A A LOOK AT THIS PROBLEM.  IT NEEDS TO

3   UNDERSTAND WHERE THE SENTENCING SCHEME IS BROKEN IN THIS SYSTEM,

4   HOW IT OPERATES DIFFERENTLY THROUGHOUT THE STATE AND THEN

5   OVERALL SENTENCING GUIDELINES NEED TO BE DEVELOPED.

6   **Q.**  YOU DO UNDERSTAND, MR. BENNETT, THAT THIS COURT DOES NOT

7   HAVE THE POWER TO ORDER THE LEGISLATURE TO CHANGE THE SENTENCING

8   GUIDELINES, IS THAT CORRECT?

9   **A.**  I DO UNDERSTAND THAT.  HOWEVER, WHEN WE ARE TALKING ABOUT

10  LONG TERM SYSTEMIC CHANGES, THESE STEPS NEED TO BE TAKEN.

11          **MS. KECK:**  THANK YOU.

12          **THE COURT:**  OKAY.  WE ARE GOING TO TAKE OUR LUNCH

13  RECESS AT THIS TIME.  THE COURT IS ADJOURNED FOR AN HOUR.

14                  (WHEREUPON AT 12:17 P.M. PROCEEDINGS

15                  WERE ADJOURNED FOR NOON RECESS.)

16          **JUDGE HENDERSON:**  I GUESS BEFORE WE GO INTO CROSS,

17  ANYTHING FROM STATE DEFENDANTS?

18          **MR. LEWIS:**  NO QUESTIONS, YOUR HONOR.

19          **THE COURT:**  OKAY, CROSS-EXAMINATION.

20          **MS. EVENSON:**  GOOD AFTERNOON, YOUR HONOR.  GOOD

21  AFTERNOON, MR. BENNETT.  REBECCA EVENSON FOR PLAINTIFFS.

22              **CROSS-EXAMINATION BY MS. EVENSON**

23  **BY MS. EVENSON**

24  **Q.**  MR. BENNETT, YOUR LAWYER ASKED YOU WHAT THE EFFECT WOULD BE

25  OF REDUCING THE POPULATION BY 52,000 OVER TWO YEARS, AND YOU

1  SAID IT WOULD BE ABSOLUTELY DEVASTATING.  WHEN YOU SAID THAT,

2  YOU DIDN'T MEAN IT WOULD BE ABSOLUTELY DEVASTATING TO REDUCE THE

3  POPULATION USING THE METHODS THAT YOU DESCRIBED IN YOUR REPORT,

4  RIGHT?

5  **A.**  CORRECT.

6          **MS. EVENSON:**  NOTHING FURTHER.

7          **JUDGE KARLTON:**  MR. BENNETT, ONE THING THAT YOU SAID

8  WAS ABSOLUTELY NECESSARY WAS A PROGRAM, ADEQUATE PROGRAM,

9  PRERELEASE PROGRAM IN THE PRISONS, IS THAT RIGHT?

10         **THE WITNESS:**  YES.

11         **JUDGE KARLTON:**  ARE YOU AWARE THAT ALMOST NO ADEQUATE

12  PROGRAMMING IS GOING ON BECAUSE THERE IS NO SPACE?

13         **THE WITNESS:**  CORRECT.

14         **JUDGE KARLTON:**  SO IN ORDER TO OBTAIN THE PROGRAM

15  THAT YOU ARE TALKING ABOUT, YOU HAVE GOT TO RELEASE ENOUGH

16  PEOPLE AT LEAST TO GET THE SPACE?

17         **THE WITNESS:**  IT'S A DIFFICULT CONFLICT BECAUSE OF

18  THAT ISSUE, AND TAKING A LOOK AT THE PICTURES FROM THE

19  INSTITUTIONS OF THE INCREDIBLE OVERCROWDING IN SPACES THAT ARE

20  SUPPOSED TO BE PROGRAM SPACES.  IT'S A VERY DIFFICULT, DAUNTING

21  TASK AHEAD.

22         **JUDGE KARLTON:**  I'M GLAD YOU THINK YOU HAVE A

23  DAUNTING TASK.  WHAT DO WE DO?  WE HAVE GOT TO LET PEOPLE OUT

24  JUST TO GET THE SPACE TO GET THE PROGRAMMING THAT YOU SAY IS

25  NECESSARY TO MAKE THIS WORK.

1        **THE WITNESS:**  WHAT I WOULD LIKE, IN THE BEST OF ALL

2   POSSIBLE WORLDS, AND I REALIZE THE COURT HAS BEEN WORKING ON

3   BOTH OF THESE CASES FOR A LONG PERIOD OF TIME, BUT IN AN IDEAL

4   WORLD, TO BE ABLE TO EITHER DIRECT OR TO HAVE A COMMITMENT FROM

5   THE STATE OF CALIFORNIA TO WORK WITH ITS COUNTIES ON PUTTING

6   TOGETHER A PLAN THAT IS CERTAIN AND IMMEDIATE, JUST LIKE WHEN I

7   TALK ABOUT WITH SANCTIONS UPON DEFENDANTS, TO PUT TOGETHER A

8   PLAN THAT IS CERTAIN AND IMMEDIATE AND -- BECAUSE THEY ARE

9   RELEASING PEOPLE NOW.  THEY ARE RELEASING THEM THROUGH THIS

10  PAROLE PROCESS, SANCTIONING PEOPLE FOR 120 DAYS, DOING NOTHING,

11  ROLLING THEM THROUGH THE SYSTEM AND BACK OUT AGAIN, THAT IF

12  THERE WERE PROGRAMS IN THE COMMUNITY THAT THEY WERE ROLLING THEM

13  TO, WE COULD START TO HAVE AN IMPACT.

14       **JUDGE KARLTON:**  SO THAT YOU WOULD, AS A FIRST STEP,

15  MODIFY THE PROGRAM THAT EXISTS NOW, WHICH IS SIMPLY TO TAKE

16  TECHNICAL VIOLATORS, HAVE THEM SIT IN PRISON FOR THREE OR FOUR

17  MONTHS WITHOUT ANYTHING BEING DONE, AND THEN LETTING THEM BACK

18  OUT.  THAT CLEARLY SIMPLY MAKES NO SENSE.

19       **THE WITNESS:**  CORRECT.

20       **JUDGE KARLTON:**  ALL RIGHT.

21       **JUDGE HENDERSON:**  ALL RIGHT.  THANK YOU VERY MUCH FOR

22  TESTIFYING.  IF WE HAD KNOWN IT WOULD BE THIS SHORT, WE WOULD

23  HAVE DONE THIS BEFORE LUNCH.  THANK YOU VERY MUCH.  YOU ARE

24  EXCUSED.

25       **THE WITNESS:**  THANK YOU.

1          **THE COURT:**  YOU MAY CALL YOUR NEXT WITNESS.

2          **MS. WHELAN:**  YOUR HONORS, WE RECALL DR. PABLO

3     STEWART.

4          **JUDGE HENDERSON:**  YOU ARE STILL UNDER OATH.

5          **MS. WHELAN:**  FOR THE RECORD, WE PREVIOUSLY OFFERED

6     BOTH OF DR. STEWART'S EXPERT REPORTS INTO EVIDENCE IN THIS CASE,

7     INCLUDING COLEMAN DOCKET NUMBERS 3217, WHICH WAS HIS NOVEMBER 9

8     --

9          **JUDGE KARLTON:**  OTHER THAN TAKING OUR TIME, WHY ARE

10    YOU REPEATING IT?

11         **MS. WHELAN:**  SORRY, JUST FOR THE RECORD.  I CAN MOVE

12    ON.

13         **JUDGE KARLTON:**  I'M SORRY, I DIDN'T MEAN TO SPEAK

14    SHARPLY.  EXCUSE ME.

15              **DIRECT EXAMINATION BY MS. WHELAN**

16    **BY MS. WHELAN**

17    **Q.**  DR. STEWART, ONE OF THE ISSUES THAT YOU EVALUATED IN THIS

18    CASE WAS WHETHER OTHER RELIEF, MEANING RELIEF OTHER THAN

19    POPULATION REDUCTION MEASURES, COULD SUCCEED IN REMEDYING THE

20    CONSTITUTIONAL VIOLATIONS IN THE DELIVERY OF MEDICAL AND MENTAL

21    HEALTH CARE.  WHAT DID YOU CONCLUDE?

22    **A.**  I CONCLUDED THAT, DUE TO THE EXTREME NATURE OF THE

23    OVERCROWDING, WHICH NEGATIVELY IMPACTS ALL ASPECTS OF THE MENTAL

24    HEALTH AND MEDICAL CARE SYSTEM THAT IS CURRENTLY CAUSING COLEMAN

25    CLASS MEMBERS NEEDLESS SUFFERING, AS WELL AS DEATH, THAT THE

1  ONLY REMEDY THAT WOULD HELP THE SYSTEM TO MOVE INTO

2  CONSTITUTIONAL COMPLIANCE WOULD BE A POPULATION REDUCTION.

3  **Q.**  AND COULD YOU EXPLAIN THE SPECIFIC FINDINGS YOU MADE THAT

4  LED YOU TO THAT CONCLUSION?

5  **A.**  THERE WAS A COUPLE FINDINGS THAT LED ME TO THAT CONCLUSION.

6  THERE WERE TWO OF THOSE THAT -- EXCUSE ME, THIS SOUNDS A LITTLE

7  FUNNY FROM HERE.  IS THIS ALL RIGHT?

8          **JUDGE KARLTON:**  IT'S ALL RIGHT FOR ME.

9          **JUDGE HENDERSON:**  IT'S OKAY.

10         **THE WITNESS:**  EXCUSE ME.

11         TWO OF THE FINDINGS THAT I BASE THAT OPINION ON WERE

12  ALSO TWO OF THE FINDINGS THAT I BASED MY OPINIONS THAT

13  OVERCROWDING IS A PRIMARY CAUSE OF THE CONSTITUTIONAL

14  VIOLATIONS, AND THAT IS THE PERSISTENCE OF THE VIOLATIONS AFTER

15  YEARS OF VERY CLOSE COURT MONITORING.

16         AND, ALSO, THE SPECIAL MASTER HAS STATED IN SEVERAL

17  PLACES THAT THE PROGRESS THAT WAS MADE EARLY ON IN THE COLEMAN

18  MATTER HAS BEEN UNDERMINED BY CURRENT POPULATION PRESSURES THAT

19  EXIST.

20  **BY MS. WHELAN**

21  **Q.**  AND DEFENDANTS ARGUE IN THIS CASE THAT THEY HAVE PLANS TO

22  FIX ALL OF THESE PROBLEMS.  HAVE YOU HAD AN OPPORTUNITY TO

23  REVIEW THOSE PLANS?

24  **A.**  YES, I HAVE.

25  **Q.**  CAN YOU EXPLAIN BRIEFLY WHY YOU DO NOT THINK THOSE PLANS

1    WILL ADEQUATELY SOLVE THE CRISIS?

2    **A.**   WELL, THE MAIN REASON IS THAT THESE PLANS WILL TAKE YEARS TO

3    IMPLEMENT, IF THEY ARE EVEN ABLE TO BE IMPLEMENTED AT ALL, GIVEN

4    THE CURRENT DEGREE OF THE POPULATION PRESSURES.

5            SO THE COLEMAN CLASS MEMBERS ARE SUFFERING NOW.

6    THEY'RE -- AND ANY PLANS THAT WOULD COME ONLINE YEARS DOWN IN

7    THE FUTURE WOULDN'T DO ANYTHING TO ADDRESS THAT ISSUE.

8            SO IT'S MY OPINION THAT THE ONLY REMEDY, SINCE

9    OVERCROWDING, IN MY OPINION, IS THE PRIMARY CAUSE OF THE

10   CONSTITUTIONAL VIOLATIONS, THAT ANY REMEDY WOULD NECESSARILY

11   NEED TO INCLUDE A POPULATION REDUCTION.

12   **Q.**   YOU DISCUSS IN YOUR REPORT YOUR BELIEF THAT THE STATE MUST

13   MAKE SUBSTANTIAL REDUCTIONS IN THE PRISONER POPULATION.  DO YOU

14   HAVE AN OPINION ABOUT WHAT TARGET POPULATION SHOULD BE ACHIEVED

15   FROM A MEDICAL AND A MENTAL HEALTH PERSPECTIVE?

16   **A.**   FROM A MEDICAL AND A MENTAL HEALTH PERSPECTIVE, AND -- I

17   HAVE RUN JAIL MEDICAL SITUATION PROGRAMS, AND MENTAL HEALTH

18   PROGRAMS NECESSARILY NEED TO BE RUN AT UNDER 100 PERCENT SO

19   YOU'RE ABLE TO RESPOND TO THE GIVEN NEEDS OF A SYSTEM ON ANY

20   GIVEN DAY.  YOU NEED TO MOVE PEOPLE QUICKLY INTO A MENTAL HEALTH

21   CRISIS BED.  YOU NEED TO MOVE SOMEONE TO AN ACUTE CARE BED.

22           SO ANY POPULATION REDUCTION THAT WOULD OCCUR WOULD

23   HAVE TO BE OF SUFFICIENT QUANTITY TO ALLOW THE MENTAL HEALTH

24   UNITS TO EXIST AT LESS THAN 100 PERCENT OF DESIGN CAPACITY.

25   **Q.**   YOU ALSO STATE IN YOUR AUGUST 15 REPORT THAT COLEMAN CLASS

1  MEMBERS SHOULD BE INCLUDED IN ANY POPULATION REDUCTION MEASURES.

2  CAN YOU EXPLAIN WHY YOU REACHED THAT CONCLUSION?

3  **A.**  I REACHED THAT CONCLUSION FOR SEVERAL REASONS.  ONE, TO ME,

4  IT'S VERY OBVIOUS.  THE COLEMAN CLASS MEMBERS ARE BEING RELEASED

5  FROM THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

6  EVERY DAY.  THOUSANDS OF COLEMAN CLASS MEMBERS ARE RELEASED FROM

7  PRISON EVERY YEAR.

8          IF YOU TAKE THE NUMBER THAT I REVIEWED FOR

9  APPROXIMATELY 130,000 DISCHARGES FROM THE CDCR IN A GIVEN YEAR

10 AND ASSUMING A 21 PERCENT INCIDENCE OF THE COLEMAN CLASS

11 MEMBERS, THAT'S 25,000 PEOPLE, GIVE OR TAKE, OF COLEMAN CLASS

12 MEMBERS THAT ARE CURRENTLY BEING RELEASED FROM THE CDCR.

13         AND AN ADDITIONAL ASPECT IS, YOU KNOW, THERE IS THIS

14 NOTION THAT EXISTS THAT SOMEHOW THE MENTALLY ILL, AND THAT'S HOW

15 I HEAR IT REFERRED TO, AS THE MENTALLY ILL OR SOMEHOW -- SOMEHOW

16 POSE A RISK TO THE SAFETY IN THE COMMUNITY OR GREATER RISK OF

17 COMMITTING VIOLENCE.  AND, FIRST OF ALL, THERE IS NO -- THERE IS

18 NO COHORT OF THE MENTALLY ILL.

19         WITHIN THIS BIG GROUP, THERE IS ANY NUMBER OF

20 DIFFERENT TYPES OF MENTALLY ILL PEOPLE.  AND IT'S VERY CLEAR

21 FROM MY PERSONAL EXPERIENCE, AS WELL AS REVIEWING THE

22 LITERATURE, THAT PEOPLE WHO ARE RECEIVING PROPER MENTAL HEALTH

23 TREATMENT POSE NO GREATER RISK TO THE COMMUNITY AS NOT.

24 **Q.**  AND IN TERMS OF THE RELIEF THAT PLAINTIFFS ARE SEEKING HERE,

25 WHICH IS APPROXIMATELY A 50,000 PRISONER POPULATION REDUCTION

1   OVER THE COURSE OF TWO YEARS, COULD YOU EXPLAIN WHAT EFFECT THAT

2   WOULD HAVE ON THE COLEMAN CLASS?

3   **A.**  WELL, IF WE TAKE JUST THE 50,000 NUMBER, AND GIVEN THAT

4   APPROXIMATELY 21 PERCENT ARE COLEMAN CLASS MEMBERS, THE CDCR

5   POPULATION, THEN THAT MEANS OUT OF THIS 50,000 REDUCTION, 10,000

6   WOULD BE COLEMAN CLASS MEMBERS.  AND OUT OF THE COLEMAN CLASS

7   MEMBERS, THE OVERWHELMING MAJORITY, 85 PERCENT, ARE IN THE 3CMS

8   LEVEL.  SO THAT WOULD CORRESPOND TO 8,500 PEOPLE FROM THE 3CMS.

9           AND THE 3CMS LEVEL CURRENTLY IN THE DEPARTMENT OF

10  CORRECTIONS RECEIVE, QUITE FRANKLY, MINIMAL CARE.  THEY ARE SEEN

11  OCCASIONALLY FOR MEDICATIONS.  THEY MAY HAVE A CASE MANAGER

12  VISIT.  AND THAT WOULD TRANSLATE TO THE COMMUNITY AS NEEDING

13  SIMILAR LEVELS OF TREATMENT, MEDICATION MANAGEMENT POSSIBLY,

14  MAYBE SOME SORT OF CASE MANAGEMENT SERVICES.  THAT WOULD BE THE

15  EXTENT THAT THEY WOULD NEED.

16  **Q.**  WHAT ABOUT IN TERMS OF CLASS MEMBERS AT THE ENHANCED

17  OUTPATIENT OR DMH LEVELS OF CARE?

18  **A.**  AGAIN, LOOKING AT THE NUMBERS THAT CURRENTLY EXIST, THE EOP

19  LEVEL OF CARE IS 13 PERCENT OF THE COLEMAN CLASS, AND IN A

20  50,000 PRISONER REDUCTION, THAT WOULD MEAN 1,300 PEOPLE.  AND

21  THAT WOULD BE 1,300 PEOPLE POSSIBLY RELEASED -- WOULD BE

22  RELEASED OVER A PERIOD OF TWO YEARS.

23           CURRENTLY, IN THE STATE OF CALIFORNIA, LOOKING AT THE

24  DMH WEBSITE FOR ITS MOST CURRENT DATA, THERE'S OVER 658,000

25  PEOPLE RECEIVING MENTAL HEALTH SERVICES AT THE COUNTY LEVEL, AND

1   OUT OF THOSE 658,000 PEOPLE, OVER 69,000 RECEIVE ANY SORT OF DAY

2   SERVICES, DAY TREATMENT-TYPE LEVEL THAT IS ROUGHLY EQUIVALENT TO

3   THE EOP.

4          WE ARE TALKING 650 PEOPLE ADDED TO THAT COHORT OF

5   OVER 69,000 IN A GIVEN YEAR.  I THINK THAT THEY CAN BE

6   INCORPORATED INTO THE CURRENT SYSTEM AS IT EXISTS, EVEN WITHOUT

7   ANY AUGMENTATION.

8          AND THEN IF YOU LOOK AT THE DMH LEVEL OF CARE, AGAIN,

9   THAT'S AROUND TWO PERCENT OF THE COLEMAN CLASS.  THAT

10  CORRESPONDS IN THIS 50,000 PRISONER REDUCTION NUMBER TO 200

11  PEOPLE.

12         NOW, ASSUMING THAT ONCE THEY ARE RELEASED FROM PRISON

13  OVER THE COURSE OF TWO YEARS THESE 200 PEOPLE WOULD CONTINUE TO

14  REQUIRE INITIATE CARE, AND I DON'T THINK YOU CAN NECESSARILY

15  ASSUME THAT, ONCE THEY ARE REMOVED FROM THE VERY DIFFICULT

16  CONDITIONS THAT THEY ARE IN NOW, IT'S VERY REASONABLE TO SUSPECT

17  THAT THEIR MENTAL HEALTH CONDITIONS WOULD IMPROVE.

18         BUT EVEN ASSUMING 200, WE ARE TALKING ABOUT 100

19  ADDITIONAL PEOPLE OVER THE STATE OF CALIFORNIA IN A GIVEN YEAR

20  THAT CURRENTLY TREATS OVER 43,000 PEOPLE IN INPATIENT CARE IN A

21  GIVEN YEAR, THAT'S 100 IN A SYSTEM THAT CURRENTLY TREATS 43,000.

22  Q.  YOU ALSO STATE IN YOUR AUGUST 15, 2008 REPORT THAT IF THE

23  STATE INCREASES RESOURCES TO IMPROVE MENTAL HEALTH SERVICES ON

24  PAROLE AND IN THE COMMUNITIES, IT WOULD ACTUALLY IMPROVE PUBLIC

25  SAFETY.  CAN YOU EXPLAIN WHAT YOU MEAN?

**A.**  WELL, IN THINKING ABOUT WHAT THE STATE CURRENTLY DOES AND

WHAT THE STATE COULD DO TO ENHANCE PUBLIC SAFETY, THERE ARE

THINGS THAT THEY COULD DO PRIOR TO RELEASE.  THE CURRENT PROGRAM

GUIDE, THE REVISED PROGRAM GUIDE THAT DETERMINES WHAT SORT OF

CARE PEOPLE GET IN THE COLEMAN CLASS STATES THAT PRERELEASE

PLANNING SHOULD OCCUR PRIOR TO A PERSON'S RELEASE.

NOW, I AGREE.  THAT'S A VERY GOOD THING.  THAT SHOULD

BE CONTINUED.  THAT SHOULD BE AUGMENTED.  AND PRERELEASE

PLANNING MEANS PREPARING PEOPLE FOR RELEASE, ESTABLISHING

CLINICAL CONNECTIONS ON THE OUTSIDE PRIOR TO RELEASE, MECHANISMS

TO ENSURE THAT PEOPLE DO REALIZE THESE OUTPATIENT APPOINTMENTS.

IT ALSO INCLUDES A PROVISION FOR A 30-DAY SUPPLY OF MEDICATION.

AGAIN, THESE ARE VERY IMPORTANT THINGS THAT THE STATE

IS DOING, AND I THINK IF THEY CONTINUE TO DO THAT AND ENSURE

THAT WOULD HAPPEN, THAT WOULD GO TOWARD IMPROVING COMMUNITY

SAFETY.

AND, FINALLY, I KNOW THIS EXISTS NOW, BUT IT

CERTAINLY COULD BE IMPROVED, AND THAT IS HELPING COLEMAN CLASS

MEMBERS APPLY FOR BENEFITS, EITHER SOCIAL SECURITY BENEFITS,

VETERANS ADMINISTRATION BENEFITS, THAT WOULD THEN GIVE THEM A

SOURCE OF INCOME TO PROVIDE FOR OUTPATIENT CARE PRIOR TO BEING

RELEASED.  THOSE ARE THE THINGS THAT CAN OCCUR PRIOR TO RELEASE.

AND THEN IF YOU LOOK AT THOSE THINGS THAT CAN OCCUR

AFTER RELEASE, THERE IS A CURRENT SYSTEM OF PAROLE OUTPATIENT

CLINIC THAT CERTAINLY COULD BE AUGMENTED, THAT CERTAINLY COULD

 1   RECEIVE HELP IN IMPROVING THEIR ABILITY TO CARE FOR PAROLEES.

 2   THEY'RE EXAMPLES THAT EXIST WHERE A PAROLE OUTPATIENT CLINIC AND

 3   CONTRACT FOR LOCAL PROVIDERS TO PROVIDE DAY SERVICES, CASE

 4   MANAGEMENT SERVICES.  AND THIS SORT OF THINKING CAN BE DONE VERY

 5   CREATIVELY TO HAVE THE PAROLE OUTPATIENT TAKE ADVANTAGE OF THE

 6   INFRASTRUCTURE THAT ALREADY EXISTS IN PROVIDING MENTAL HEALTH

 7   CARE IN THE COMMUNITY.

 8   **Q.**  AND IN TERMS OF THE COMMUNITIES THEMSELVES WHERE PEOPLE MAY

 9   EITHER RETURN OR BE DIVERTED THROUGH A RELEASE ORDER, WHAT KIND

10   OF INFRASTRUCTURE AND SERVICES EXIST IN COMMUNITY MENTAL HEALTH

11   TODAY?

12   **A.**  WELL, AS I MENTIONED EARLIER, BASED ON THE MOST CURRENT DATA

13   FROM DMH, THERE ARE OVER 658,000 PEOPLE RECEIVING MENTAL HEALTH

14   CARE AT THE COUNTY LEVEL THROUGHOUT THE STATE IN A GIVEN YEAR.

15   THAT IS SUPPORTED BY A COMPREHENSIVE NETWORK OF OUTPATIENT

16   CLINICS, DAY TREATMENT CENTERS, DAY HOSPITALS, CASE MANAGEMENT

17   PROGRAMS AS WELL AS INITIATE PROGRAMS THAT ARE ALREADY IN PLACE.

18          NOTHING NEEDS TO BE RECREATED.  IT'S ALREADY THERE.

19   IT CERTAINLY COULD RECEIVE HELP.  IT CERTAINLY COULD ALWAYS

20   BENEFIT FROM INCREASED RESOURCES.  BUT THE SYSTEM IS ALREADY IN

21   PLACE.

22          AND, AGAIN, WE LOOKED AT THE NUMBERS IN THIS

23   10,000 -- IN THE 50,000 REDUCTION, PRISONER POPULATION

24   REDUCTION, 10,000 OF THEM BEING COLEMAN CLASS MEMBERS,

25   THEORETICALLY, THAT WOULD BE 8,500 AT THE OUTPATIENT LEVEL,

1    ANOTHER 1,300 AT MAYBE THE DAY TREATMENT LEVEL, AND 200 AT THE

2    INPATIENT, AGAIN, SPREAD OUT OVER TWO YEARS IN A SYSTEM THAT

3    TREATS 658,000.

4    Q.  THE INTERVENORS IN THIS CASE, SOME OF THEM HAVE EXPRESSED

5    CONCERNS ABOUT PROVIDING CARE TO THE ADDITIONAL PEOPLE WHO WOULD

6    EITHER REMAIN IN THE COMMUNITIES THROUGH DIVERSION PROGRAMS, OR

7    WHO MIGHT OTHERWISE RETURN TO THE COUNTIES THROUGH POPULATION

8    REDUCTION MEASURES.

9           YOU HAVE EXTENSIVE EXPERIENCE IN COMMUNITY MENTAL

10   HEALTH.  DO YOU THINK THOSE CONCERNS ARE WARRANTED?

11   A.  WELL, YOU KNOW, AGAIN, LOOKING AT IT FROM THE PERSPECTIVE OF

12   A COMMUNITY MENTAL HEALTH PROVIDER, AS I WAS AND I CONTINUE TO

13   BE, YOU CERTAINLY ARE PROTECTIVE OF YOUR CURRENT CLIENTS.  YOU

14   ARE PROTECTIVE OF WHAT YOU ARE DOING NOW, AND ANY POTENTIAL

15   INCREASE IN PATIENT POPULATION WOULD GET YOUR ATTENTION.

16          SO I CAN UNDERSTAND THEIR INITIAL CONCERN, BUT I,

17   QUITE FRANKLY, THINK IT'S OVERSTATED.

18          AND, YOU KNOW, THE BENEFIT -- ONE OF THE BENEFITS,

19   HOPEFULLY, NOT THE ONLY ONE, OF BEING AROUND A LONG TIME IS THAT

20   YOU SEE THINGS COME AND GO, AND THIS IS THE MOST CURRENT

21   MANIFESTATION OF THE COMMUNITY MENTAL HEALTH PROTESTING THAT,

22   OH, THIS NEW COHORT OF PATIENT IS GOING TO RUIN OUR SYSTEM.

23          YOU KNOW, I FIRST SAW THIS IN THE LATE '70'S, EARLY

24   '80'S WITH THE VIETNAM VETERAN POPULATION.  COMMUNITY MENTAL

25   HEALTH WAS COMPLAINING ALL THESE PEOPLE WERE TOO SICK, THEY

1  ABUSE DRUGS, THEY ARE GOING TO BE TOO VIOLENT, WE DON'T HAVE

2  ENOUGH SERVICES FOR THEM, AND IF WE ARE FORCED TO TREAT THEM,

3  BOY, ALL HELL IS GOING TO BREAK LOOSE.  WELL, IT DIDN'T.  AND

4  THAT WAS THE FIRST EXAMPLE.

5          YOU KNOW, THERE HAS BEEN OTHER EXAMPLES THROUGHOUT MY

6  CAREER WHERE THE COMMUNITY MENTAL HEALTH MAKES A WHOLE BIG FUSS

7  ABOUT TREATING PEOPLE THAT HAVE CONCURRENT SUBSTANCE ABUSE

8  PROBLEMS.  YOU KNOW, THE SAME EXAMPLES ARE GIVEN.  IT'S GOING TO

9  OVERWHELM OUR SYSTEM.  WE DON'T HAVE ENOUGH RESOURCES; THEY ARE

10 TOO VIOLENT; WE CAN'T CARE FOR THEM ADEQUATELY; PUBLIC SAFETY IS

11 GOING TO GO DOWN THE TUBES.  AND, IN FACT, IT DIDN'T.

12         RIGHT NOW THE STANDARD OF CARE IS THAT PEOPLE WITH

13 MENTAL HEALTH AND SUBSTANCE ABUSE PROBLEMS ARE TREATED

14 CONCURRENTLY IN THE COMMUNITY MENTAL HEALTH SYSTEM.

15         SO I CAN UNDERSTAND ON ONE LEVEL.  I CAN UNDERSTAND

16 THEIR DEGREE OF CONCERN, AS I WOULD BE.  BUT I THINK IT'S, QUITE

17 FRANKLY, OVERSTATED.

18 Q.  AND DEFENDANTS HAVE ARGUED IN THIS CASE THAT THE REDUCTION

19 THAT PLAINTIFFS SEEK, AGAIN APPROXIMATELY 50,000 OVER THE COURSE

20 OF TWO YEARS, WILL NOT BENEFIT THE COLEMAN CLASS.  DO YOU AGREE

21 WITH THAT?

22 A.  I WHOLEHEARTEDLY DISAGREE WITH THAT.

23 Q.  AND CAN YOU EXPLAIN WHY?

24 A.  A SIGNIFICANT REDUCTION, IF WE LOOK AT 50,000 AS AN EXAMPLE,

25 50,000 PEOPLE REDUCED FROM THE CURRENT CDCR POPULATION WOULD

 1  HAVE A SIGNIFICANT IMPACT ON THE COLEMAN CLASS.

 2           JUST FOR EXAMPLE, THERE ARE GENERAL POPULATION YARDS

 3  AT SALINAS VALLEY STATE PRISON THAT HAVE BASICALLY BEEN IN

 4  LOCKDOWN FOR SEVERAL YEARS BECAUSE THERE'S TOO MANY INMATES AND

 5  THERE'S NOT ENOUGH GUARDS TO SAFELY GUARD THEM.  SO THEY LOCK

 6  EVERYBODY UP IN THEIR CELLS, AND AMONG THAT GROUP OF PEOPLE THAT

 7  ARE LOCKED DOWN ARE COLEMAN CLASS MEMBERS, THAT, WHEN I

 8  INTERVIEWED, TALKED ABOUT THE EXTREME STRESS AND THE WORSENING

 9  OF THEIR MENTAL ILLNESS BECAUSE OF THEIR BEING LOCKED DOWN.

10           ANOTHER IMMEDIATE RELIEF THAT WOULD BE ACCRUED FOR

11  COLEMAN CLASS MEMBERS, IF THERE WERE THE 50,000 INMATE

12  POPULATION REDUCTION WOULD BE, HOPEFULLY, THE ELIMINATION OF

13  THESE HORRIBLE DORMITORIES THAT EXIST IN DAYROOMS, IN GYMS, IN

14  CORRIDORS AND HALLWAYS WHERE COLEMAN CLASS MEMBERS ARE CURRENTLY

15  HOUSED.

16           AND I CERTAINLY OBSERVED, AND IT WAS CONFIRMED BY THE

17  SPECIAL MASTER, THAT THERE'S SO MANY PEOPLE THAT IT EXACERBATES

18  THE PEOPLE THAT STARTED OFF WITH MENTAL ILLNESS, AND IT CREATES

19  NEW MENTAL ILLNESS.  SO ANY POPULATION REDUCTION WOULD HAVE --

20  IMMEDIATELY HAVE A BENEFICIAL EFFECT ON THE COLEMAN CLASS.

21  **Q.**  AND WHAT ABOUT IN TERMS OF DEFENDANT'S PLANS TO FIX SOME OF

22  THESE PROBLEMS, HOW WOULD THE REDUCTION AFFECT THOSE PLANS?

23  **A.**  WELL --

24           **MS. TILLMAN:**  OBJECTION.  ASKED AND ANSWERED.

25           **JUDGE HENDERSON:**  OVERRULED.

1           **THE WITNESS:**  LOOK AT THE DIFFERENT ASPECTS OF THE

2    PLANS, THE BED PLANS, FOR EXAMPLE, THE CONSTRUCTION PLANS.  THE

3    POPULATION AT LARGE FEEDS IN TO THE SYSTEM THAT THEN REQUIRES

4    INPATIENT CARE.

5           SO IF YOU LOOK AT THE NUMBERS FOR MENTAL HEALTH

6    CRISIS BED REFERRALS FROM JULY AND AUGUST OF THIS YEAR, A

7    SIGNIFICANT NUMBER WERE FROM 3CMS AND, ALSO, OVER 40 PERCENT AND

8    AROUND 10 PERCENT GIVE OR TAKE WERE FROM THE GENERAL POPULATION.

9           IF YOU LOWER THE GENERAL POPULATION, IF YOU LOWER THE

10   NUMBERS, THERE ARE LESS PEOPLE THAT WOULD BE REQUIRING MENTAL

11   HEALTH CRISIS BEDS, AND THEN MENTAL HEALTH CRISIS BEDS ARE THEN

12   FEEDING INTO THE INTERMEDIATE CARE FACILITIES WHICH THEN FEED

13   INTO THE ACUTE CARE.  IT WOULD HAVE THIS CASCADING POSITIVE

14   EFFECT BY LOWERING POPULATION.

15           AND IT MAY, QUITE FRANKLY, BE THE ONLY REMEDY THAT'S

16   GOING TO HELP THE STATE MEET THEIR REQUIREMENTS FOR ADEQUATE

17   NUMBER OF BEDS AT DIFFERENT LEVELS OF CARE.

18   **BY MS. WHELAN**

19   **Q.**  YOU ALSO TALKED ABOUT RECEPTION CENTERS BEING A PROBLEM BUT

20   COULD YOU TALK ABOUT HOW A REDUCTION MAY ASSIST THOSE, AS WELL

21   AS THE MAIN LINE INSTITUTIONS?

22   **A.**  THE RECEPTION CENTERS -- THE RECEPTION CENTER THAT I TOURED

23   WAS DVI.  AND IT WAS -- I DON'T HAVE THE RIGHT ADJECTIVE HOW

24   CROWDED IT WAS.  I BELIEVE IT WAS OPERATING AT OVER 200 PERCENT

25   DESIGN CAPACITY.

1          PEOPLE WERE STUCK THERE.  THEY COULDN'T MOVE OUT OF

2     THE RECEPTION CENTER.  IT WAS EOPS -- I BELIEVE THERE WAS 5- TO

3     700 EOPS IN THE RECEPTION CENTERS THAT ARE WAITING TO BE PLACED

4     BECAUSE THERE'S JUST TOO MANY PEOPLE.  A POPULATION REDUCTION

5     WOULD HELP THAT.

6          I MEAN -- AND THE COURT IS VERY AWARE BY THEIR

7     APPROVAL OF THIS RECEPTION CENTER EOP PROGRAM.  IT RECOGNIZES

8     HOW PEOPLE ARE GETTING STUCK THERE BECAUSE THERE'S JUST, QUITE

9     FRANKLY, TOO MANY PEOPLE.  SO, AGAIN, AN OVERALL POPULATION

10    REDUCTION WOULD HELP RELIEVE THAT.  IF THAT WERE RELIEVED, THEN

11    THE STAFF THAT ARE CURRENTLY IN THE RECEPTION CENTERS, WHICH ARE

12    VERY STAFF-INTENSIVE PROGRAMS, COULD BE REDEPLOYED TO AREAS

13    WHERE THERE'S STAFF SHORTAGES.  SO THAT WOULD AGAIN HAVE ANOTHER

14    POSITIVE EFFECT ON THE COLEMAN CLASS.

15    Q.  WHAT ABOUT IN TERMS OF ACCESS TO CARE IN THE MAINLINE

16    INSTITUTIONS AS WELL?

17    A.  AGAIN, AS I WAS SAYING, THERE'S JUST TOO MANY PEOPLE TRYING

18    TO ACCESS CARE.  THERE'S TOO MANY 3CMS.  THERE'S GP INMATES THAT

19    ARE TRYING TO ACCESS MENTAL HEALTH CRISIS BEDS, WHICH THEN HAVE

20    THIS CASCADING EFFECT ON THE ENTIRE SYSTEM.  SO THE POPULATION

21    REDUCTION WOULD SIGNIFICANTLY IMPROVE THE CARE PROVIDED TO

22    COLEMAN CLASS MEMBERS.

23    Q.  AND IN TERMS OF THE WAITING LISTS THAT CURRENTLY EXIST FOR

24    CARE, ARE YOU FAMILIAR WITH THOSE LISTS?

25    A.  YES, I AM.

1  Q.  AND CAN YOU TALK ABOUT HOW THOSE MAY ALSO BE AFFECTED BY A

2  REDUCTION THAT WE ARE TALKING ABOUT IN THIS CASE?

3  A.  IF WE JUST CONSIDER THE EOP WAITING LIST, THERE'S

4  APPROXIMATELY 1,000 PEOPLE WAITING FOR EOP PLACEMENTS.  ON THIS

5  50,000 REDUCTION, AGAIN, 13 PERCENT EOPS, THAT EQUATES TO 1,300

6  PEOPLE.  OVER THE COURSE OF TWO YEARS, WHERE MY UNDERSTANDING

7  THIS REDUCTION WOULD OCCUR, YOU WOULD BE ABLE TO ONCE AND FOR

8  ALL ELIMINATE THE WAITING LIST FOR THE EOP.

9              RIGHT NOW THERE'S -- WHEN I DID MY TOURS OF SALINAS

10 VALLEY AND THE VACAVILLE PSYCHIATRIC PROGRAMS, THERE WERE OVER

11 160, 170 PEOPLE WAITING FOR INTERMEDIATE CARE BEDS.  THERE WAS,

12 ON A GIVEN DAY THAT I WAS TOURING THE VACAVILLE PSYCHIATRIC

13 PROGRAM, THERE WAS AN ADDITIONAL 15 PEOPLE WAITING FOR ACUTE

14 CARE PLACEMENT.

15             SO IF WE WOULD REDUCE THE NUMBERS ACCORDINGLY, WE

16 WOULD ONCE AND FOR ALL BE ABLE TO CATCH UP ON THE WAITING LIST,

17 AND, AS I SAID, HOPEFULLY CREATE THESE MENTAL HEALTH PROGRAMS

18 THAT ARE RUNNING NOT AT 100 PERCENT, BUT SOMEWHAT LESS, SO THAT

19 THEY WOULD BE ABLE TO RESPOND TO THE NEEDS OF THE SYSTEM ON A

20 GIVEN DAY, RATHER THAN HAVING TO HOUSE PEOPLE IN THESE MOHUS

21 OHUS AND AD-SEG OVERFLOWS BECAUSE THEY CAN'T ACCESS APPROPRIATE

22 LEVELS OF CARE.

23             MS. WHELAN:  THANK YOU, DR. STEWART.

24             THE COURT:  ANYTHING FROM CCPOA?

25             MS. LEONARD:  NO, YOUR HONOR.

1   **THE COURT:** CROSS-EXAMINATION?

2   **MS. TILLMAN:** THANK YOU, YOUR HONOR.

3   **CROSS EXAMINATION**

4   BY MS. TILLMAN:

5   **Q.** GOOD AFTERNOON, DOCTOR.

6   **A.** GOOD AFTERNOON.

7   **Q.** I WANTED TO MAKE SURE YOU HAD YOUR WATER IN PLACE BEFORE WE

8   STARTED.

9   **A.** YES, THANK YOU.

10  **Q.** DOCTOR, YOU HAVE NO INDEPENDENT OPINION, DO YOU, ON THE

11  NUMBER OF INMATES THAT NEED TO BE REMOVED FROM THE DEPARTMENT OF

12  CORRECTIONS AND REHABILITATION IN ORDER TO HELP THE DEPARTMENT

13  OF CORRECTIONS AND REHABILITATION ACHIEVE THE CONSTITUTIONAL

14  REQUIREMENTS OF AN ADEQUATE MEDICAL CARE SYSTEM, CORRECT?

15  **A.** WELL, NO, THAT'S NOT CORRECT. AS I JUST TESTIFIED, IT'S MY

16  OPINION THAT A POPULATION REDUCTION WOULD HAVE TO BE OF A

17  SIGNIFICANT NUMBER TO ALLOW THE MENTAL HEALTH UNITS WITHIN THE

18  CDCR TO OPERATE AT LESS THAN 100 PERCENT CAPACITY. THAT IS MY

19  OPINION.

20  **Q.** BUT YOU ACTUALLY DON'T KNOW WHAT PARTICULAR NUMBER OF

21  INMATES WOULD HAVE TO BE RELEASED IN ORDER TO ACHIEVE THOSE

22  CONSTITUTIONAL REQUIREMENTS, DO YOU?

23  **A.** I DON'T HAVE A PARTICULAR NUMBER IN MIND, NO.

24  **Q.** AND, IN FACT, YOU HAVE NO INDEPENDENT OPINION AS TO WHAT IS

25  THE APPROPRIATE CAPACITY FOR THE DELIVERY OF MENTAL HEALTH CARE

1    WITHIN THE DEPARTMENT OF CORRECTIONS AND REHABILITATION, DO YOU?

2            **JUDGE KARLTON:**  SAME QUESTION, SAME ANSWER.  HOW IS

3    THE QUESTION DIFFERENT, MISS TILLMAN?

4            **MS. TILLMAN:**  I BELIEVE WE ARE ADDRESSING CAPACITY AS

5    OPPOSED TO THE NUMBER OF INMATES THAT NEED TO BE RELEASED.

6            **THE WITNESS:**  CAN YOU SAY THE QUESTION AGAIN, PLEASE,

7    BECAUSE I THOUGHT IT WAS THE SAME QUESTION ALSO?

8    **BY MS. TILLMAN:**

9    Q.  IN FACT, YOU HAVE NO INDEPENDENT OPINION, DO YOU, AS TO WHAT

10   IS THE APPROPRIATE CAPACITY FOR THE DELIVERY OF CONSTITUTIONALLY

11   ADEQUATE MENTAL CARE, DO YOU?

12   **A.**  HOW IS THAT DIFFERENT FROM POPULATION CAPACITY?  I DON'T

13   UNDERSTAND.

14   **Q.**  IN TERMS OF CAPACITY, WE'RE ASKING DO YOU HAVE AN OPINION AS

15   TO WHAT THE MAXIMUM OPERABLE CAPACITY OF THE DEPARTMENT OF

16   CORRECTIONS AND REHABILITATION IS FOR CONSTITUTIONALLY ADEQUATE

17   MENTAL HEALTH CARE TO BE DELIVERED?

18   **A.**  SORRY, I BELIEVE I ALREADY ANSWERED.  I DON'T HAVE A

19   PARTICULAR NUMBER IN MIND.  BUT MY OPINION IS THAT THE

20   POPULATION WOULD HAVE TO BE AT A LEVEL WHERE THE MENTAL HEALTH

21   UNITS WERE ABLE TO BE RUN AT LESS THAN 100 PERCENT OF CAPACITY.

22   **Q.**  ISN'T IT CORRECT THAT IN YOUR DEPOSITION, YOU MENTIONED

23   MAXIMUM OPERABLE CAPACITY OF 140 TO 140 PERCENT TO SECURELY

24   HOUSE AND PROVIDE EFFECTIVE PROGRAMMING FOR CDCR INMATES?

25            **MS. WHELAN:**  OBJECTION.  CAN WE HAVE THE PAGE

 1  REFERENCE?

 2          **MS. TILLMAN:**  THAT WOULD BE THE SEPTEMBER '08

 3  DEPOSITION AT PAGE 206, LINES 1 THROUGH 24.

 4          **THE WITNESS:**  AND YOUR QUESTION, PLEASE?

 5          **MS. TILLMAN:**  I'M WAITING FOR PLAINTIFF COUNSEL TO

 6  CHECK THE CITE.

 7              (BRIEF PAUSE.)

 8          **JUDGE KARLTON:**  ARE YOU OBJECTING, MA'AM, OR NOT?

 9  YOU DON'T HAVE THE DEPOSITION.

10          **MR. BIEN:**  YOU CAN PUT IT UP.

11  **BY MS. TILLMAN**

12  **Q.**  AND WE ARE LOOKING AT 206 OF YOUR DEPOSITION FROM

13  SEPTEMBER 2008 WHERE YOU INDICATED THE MAXIMUM OPERABLE CAPACITY

14  IS DEFINED AS 140 TO 145 PERCENT.  DO YOU RECALL THAT TESTIMONY?

15  **A.**  YES.

16  **Q.**  AND YOU RELIED UPON THE FINDING OF THE INDEPENDENT REVIEW

17  PANEL FOR THAT 140 TO 145 PERCENT MAXIMUM OPERABLE CAPACITY

18  NUMBER, CORRECT?

19  **A.**  I REMEMBER SPEAKING OF THAT, YES.

20  **Q.**  AND YOU OPINED THAT THE RECOMMENDATION THAT WAS INDICATED IN

21  THAT INDEPENDENT REVIEW PANEL REPORT WAS PROVIDED BY WARDENS WHO

22  PARTICIPATED IN THE STUDIES OF THAT PANEL, CORRECT?

23  **A.**  I DON'T SEE IT IN THE PAGE HERE, BUT I BELIEVE SO.

24          **JUDGE KARLTON:**  IT SAYS WHATEVER IT SAYS, MA'AM.

25

1    **BY MS. TILLMAN**

2    **Q.** EVEN AT THE MAXIMUM OPERABLE CAPACITY OF 140 TO 145 PERCENT,

3    THE DEPARTMENT OF CORRECTIONS AND REHABILITATION WILL STILL HAVE

4    TO OBTAIN AN ADEQUATE NUMBER OF COMPETENT MENTAL HEALTH

5    CLINICIANS TO STAFF THE FACILITIES, CORRECT?

6    **A.** YES.

7    **Q.** AND YOU HAVE NO OPINION TODAY, DO YOU, AS TO WHAT PARTICULAR

8    NUMBER OF MENTALLY ILL INMATES CAN BE SERVED IN AN ADEQUATE

9    FASHION WITH THE EXISTING MENTAL HEALTH BEDS, STAFF, INFORMATION

10   TECHNOLOGY, PHARMACY, RECORD KEEPING AND MANAGEMENT SERVICES

11   AVAILABLE WITHIN THE DEPARTMENT OF CORRECTIONS AND

12   REHABILITATION, DO YOU?

13   **A.** IF I HAVE A NUMBER IN MIND OF THE PEOPLE THAT CAN CURRENTLY

14   BE TREATED AT A CONSTITUTIONAL LEVEL OF CARE GIVEN THE CURRENT

15   STATE OF THE STAFF, TREATMENT BASE, ET CETERA ET CETERA?

16   **Q.** I THINK THE QUESTION WAS YOU HAVE NO OPINION AS TO WHAT

17   PARTICULAR NUMBER OF MENTALLY ILL INMATES CAN BE SERVED IN AN

18   ADEQUATE FASHION WITH THE EXISTING MENTAL HEALTH BEDS, STAFF,

19   INFORMATION TECHNOLOGY, PHARMACY, RECORDKEEPING, AND MANAGEMENT

20   SERVICES CURRENTLY AVAILABLE WITHIN THE DEPARTMENT OF

21   CORRECTIONS AND REHABILITATION, DO YOU?

22   **A.** I DO NOT HAVE A NUMBER IN MIND, NO, YOU ARE CORRECT.

23   **Q.** NOW, AT THE TIME OF YOUR DEPOSITION IN SEPTEMBER 2008, YOU

24   WERE NOT AWARE OF ANY PLANS FOR A REDUCTION OF EVEN JUST 15,000

25   INMATES, CORRECT?

 1   **A.**  I'M SORRY.  COULD YOU SAY THAT AGAIN, PLEASE?

 2   **Q.**  AT THE TIME OF YOUR DEPOSITION IN AUGUST 2008, YOU WERE NOT

 3   AWARE THAT PLAINTIFFS HAD PROPOSED AN IMMEDIATE REDUCTION OF

 4   15,000 INMATES FROM THE DEPARTMENT OF CORRECTIONS' POPULATION,

 5   CORRECT?

 6   **A.**  I'M SORRY.  I WASN'T AWARE THAT THE PLAINTIFFS HAD REQUESTED

 7   AN IMMEDIATE 15,000 POPULATION REDUCTION?

 8   **Q.**  CORRECT.

 9   **A.**  I'M NOT FAMILIAR WITH THAT NUMBER.

10   **Q.**  ASSUMING A REDUCTION OF THE CDCR PRISON POPULATION BY EVEN

11   JUST 15,000 INMATES, WOULDN'T IT BE CORRECT THAT YOU HAVE NO

12   OPINION AS TO WHAT PARTICULAR NUMBER OF COLEMAN CLASS INMATES

13   SHOULD BE A PART OF THAT 15,000 RELEASE TO ENSURE THAT THE ORDER

14   AND THE RELEASE EFFECTIVELY ADDRESSES THE IMPEDIMENT TO A

15   CONSTITUTIONALLY ADEQUATE MENTAL HEALTH CARE SYSTEM?

16   **A.**  BASED ON THIS 15,000 NUMBER THAT I HAVEN'T HEARD OF?  I'M

17   NOT SURE.

18   **Q.**  SO YOU HAVE NO OPINION, IS THAT CORRECT?

19   **A.**  I'M NOT SURE WHAT YOUR QUESTION IS.

20          **JUDGE KARLTON:**  ASSUME THAT SOMEBODY HAS SUGGESTED

21   IMMEDIATELY 15,000.  DO YOU HAVE AN OPINION AS TO WHAT

22   PERCENTAGE OF THOSE PEOPLE SHOULD BE COLEMAN CLASS CLIENTS SO AS

23   TO AMELIORATE THE PRESENT CONDITIONS?

24          **THE WITNESS:**  IT'S MY OPINION, YOUR HONOR, THAT THE

25   COLEMAN CLASS SHOULD BE INCLUDED IN THE POPULATION REDUCTION AT

1  THE RELATIVE PERCENTAGE THAT THEY ARE OF THE OVERALL POPULATION.

2          **JUDGE KARLTON:**  AND EACH INCREMENT IS HELPFUL EVEN IF

3  IT DOESN'T SOLVE THE PROBLEM?

4          **THE WITNESS:**  I BELIEVE SO, YES, YOUR HONOR.

5          **MS. TILLMAN:**  MAY I READ FROM HIS DEPOSITION AT PAGE

6  240, LINE 21, TO 241, LINE 2?

7                  (DOCUMENT DISPLAYED)

8  **BY MS. TILLMAN**

9  **Q.**  YOU WERE ASKED AT YOUR DEPOSITION IN SEPTEMBER 2008.

10          "**QUESTION:**  OF THE 15,000 INMATES, WHAT

11          NUMBER WOULD HAVE TO BE COLEMAN CLASS MEMBERS IN

12          ORDER TO ENSURE THAT THE RELEASE ORDER

13          EFFECTIVELY ADDRESSES THE OVERCROWDING THAT

14          CAUSES IMPEDIMENTS TO CONSTITUTIONALLY ADEQUATE

15          MENTAL HEALTH CARE?"

16          **JUDGE KARLTON:**  EVEN IF THE PLAINTIFFS DON'T

17  OBJECT -- GO AHEAD, GO AHEAD.

18          **MS. TILLMAN:**

19          "**ANSWER:**  I DON'T HAVE A PARTICULAR NUMBER

20          IN MIND."

21  **BY MS. TILLMAN**

22  **Q.**  IN FACT, SIR, THE REMOVAL OR REDUCTION OF INMATES WILL NOT

23  IMMEDIATELY RESULT IN CONSTITUTIONAL COMPLIANCE, WILL IT?

24  **A.**  THE REDUCTION OF THE OVERALL POPULATION OF THE CDCR, IN MY

25  OPINION, IS THE ONLY WAY THAT YOUR CLIENT CAN EVEN HAVE A CHANCE

1  OF ACHIEVING -- PROVIDING CONSTITUTIONALLY ADEQUATE CARE.

2  **Q.**  YOU WOULD CALL IT THE FIRST STEP OR FIRST INTERVENTION, BUT

3  WORK WOULD STILL REMAIN TO BE DONE, CORRECT?

4  **A.**  WHAT I HAVE TESTIFIED TO IS THAT OVERCROWDING IS A PRIMARY

5  CAUSE OF THE CONSTITUTIONAL VIOLATIONS.  SO AS IT IS A PRIMARY

6  CAUSE, IT NECESSARILY WOULD NEED TO BE THE PRIMARY REMEDY.  BUT

7  IT'S NOT THE ENTIRE REMEDY.

8          YOUR CLIENT WOULD STILL HAVE TO PROVIDE ADEQUATE

9  NUMBER OF BEDS, STAFF, TREATMENT SPACE, SMALL MANAGEMENT YARDS,

10  ET CETERA, ET CETERA.

11  **Q.**  I UNDERSTAND YOU HAVE TESTIFIED THAT YOU SUPPORT THE RELEASE

12  OF COLEMAN CLASS MEMBERS AS PART OF ANY PRISONER RELEASE ORDER,

13  CORRECT?

14  **A.**  YES.

15  **Q.**  AND NOW THE COLEMAN CLASS, AS YOU HAVE DESCRIBED, HAS

16  ESSENTIALLY INMATES WITH SERIOUS MENTAL DISORDERS, CORRECT?

17  **A.**  SOME OF THEM DO, YES.

18  **Q.**  THESE ARE PEOPLE WHO WILL HAVE AXIS I DISORDER, RIGHT?

19          **JUDGE KARLTON:**  THEY ARE ALL AXIS 1, CORRECT?

20          **THE WITNESS:**  THAT'S CORRECT, YOUR HONOR.

21  **BY MS. TILLMAN:**

22  **Q.**  AND THEY WILL HAVE A GLOBAL ASSESSMENT FUNCTION OF LESS THAN

23  50, CORRECT?

24  **A.**  NOT ALL OF THEM.

25  **Q.**  MANY?

1  **A.**  NO.  THE MAJORITY OF THEM -- IF YOUR CLIENT IS APPROPRIATELY

2  USING THE REVISED PROGRAM GUIDE, THEN THE OVERWHELMING MAJORITY

3  OF COLEMAN CLASS MEMBERS WOULD HAVE A GLOBAL ASSESSMENT OF

4  FUNCTIONING GREATER THAN 50.

5  **Q.**  IN THE INMATES WHO PRESENTLY RECEIVE COORDINATED CLINICAL

6  CASE MANAGEMENT SERVICES, THAT'S THE LOWEST LEVEL OF SERVICE

7  AVAILABLE WITHIN THE DEPARTMENT OF CORRECTIONS, IF THOSE

8  INDIVIDUALS ARE RELEASED TO THE COMMUNITY, ISN'T IT YOUR OPINION

9  THAT THESE INDIVIDUALS WHO RECEIVE THIS CORRECTIONAL CLINICAL

10  CASE MANAGEMENT CARE WILL STILL NEED TREATMENT THAT PARALLELS

11  WHAT THEY RECEIVE WITHIN THE STATE PRISONS?

12  **A.**  SOME OF THEM CERTAINLY WILL.  SOME OF THEM WILL NEED THE

13  SAME LEVEL OF CARE, WHICH IS MEDICATION MANAGEMENT, MAYBE AN

14  OCCASIONAL COUNSELOR VISIT IS WHAT THEY GET CURRENTLY, IF THEY

15  ARE LUCKY IN THE CDCR.

16          HOWEVER, THERE -- IN MY OPINION, THERE WOULD BE A

17  NUMBER OF THE 3CMS MEMBERS WHO, ONCE REMOVED FROM THE STRESS OF

18  AN OVERCROWDED PRISON SITUATION, MAY NOT REQUIRE ANY MENTAL

19  HEALTH CARE AT ALL.

20  **Q.**  AND THERE ARE THOSE MEMBERS OF WHAT YOU CALL THE 3C, THE

21  COORDINATED CLINICAL CASE MANAGEMENT SERVICES GROUP, WHO WOULD

22  ACTUALLY NEED ASSISTANCE IN ACCESSING COMMUNITY MENTAL HEALTH

23  SERVICES, SUBSTANCE ABUSE TREATMENT IN THE COMMUNITY, HOUSING IN

24  THE COMMUNITY, BENEFITS AND EMPLOYMENT IN THE COMMUNITY,

25  CORRECT?

1  **A.**  YES.

2  **Q.**  AND THEN THE NEXT HIGHER STEP OF CARE, THE ENHANCED

3  OUTPATIENT PROGRAM, PATIENTS WITHIN THE DEPARTMENT OF

4  CORRECTIONS WILL POSSIBLY -- WILL NEED TREATMENT PERHAPS, DAY

5  TREATMENT PROGRAMS YOU CALL THEM, RIGHT?

6  **A.**  POSSIBLY.

7  **Q.**  AND SOME ENHANCED OUTPATIENT PROGRAM PATIENTS WILL ACTUALLY

8  NEED EVEN MORE CARE THAN THAT IN THE COMMUNITY; THEY WILL NEED

9  BOARD AND CARE HOUSING OR OTHER RESIDENTIAL FACILITIES, CORRECT?

10  **A.**  WELL, SEE, AGAIN, YOU ARE FALLING INTO THAT TRAP OF

11  CONSIDERING DIFFERENT CATEGORIES AS ALL THE SAME.  THE EOP LEVEL

12  OF CARE, SOME OF THEM WOULD REQUIRE DAY SERVICES.  SOME OF THEM

13  MAY REQUIRE ONLY OUTPATIENT SERVICES.  SOME MAY REQUIRE BOARD

14  AND CARE HOMES.  OTHERS THAT ARE CURRENTLY AT THE EOP LEVEL OF

15  CARE MAY REQUIRE NO MENTAL HEALTH CARE.

16              I ENCOUNTERED IN MY TOURS, SPEAKING WITH STAFF, THAT

17  BECAUSE OF HOW BAD THE 3CMS SYSTEM CURRENTLY IS, THEY MAINTAIN

18  THEIR PATIENTS AT THE EOP LEVEL BECAUSE IF THEY GO TO THE 3CMS,

19  THEY WILL GET NOTHING.  AND SO THERE ARE PEOPLE THAT ARE

20  CURRENTLY BEING HELD AT THE EOP LEVEL OF CARE THAT TECHNICALLY

21  COULD BE TREATED AT A LOWER LEVEL OF CARE.

22  **Q.**  AND WOULDN'T YOU AGREE THAT THERE ARE SOME ENHANCED

23  OUTPATIENT PROGRAM PATIENTS WITHIN THE DEPARTMENT OF CORRECTIONS

24  WHO ARE AWAITING INPATIENT CARE AND SO NEED, ACTUALLY, INPATIENT

25  CARE IF THEY ARE RELEASED TODAY, CORRECT?

1  **A.**  YES.

2  **Q.**  AND AS PART OF THE CARE OF A PERSON WITH A SERIOUS MENTAL

3  DISORDER, A COLEMAN PATIENT, YOU WOULD EXPECT THAT SOME OF THESE

4  COLEMAN PATIENTS WOULD, BECAUSE THEY HAVE A SERIOUS MENTAL

5  DISEASE, EXPERIENCE EPISODES OF ILLNESS THAT REQUIRES

6  PSYCHIATRIC HOSPITAL STAYS, CORRECT?

7  **A.**  THERE WILL BE A CERTAIN POPULATION OF ANY COLEMAN CLASS

8  MEMBERS THAT WILL REQUIRE HOSPITALIZATION, YES.

9  **Q.**  AND YOU DON'T KNOW WHAT PERCENTAGE OF COLEMAN CLASS MEMBERS

10  WHO ARE PRESENTLY HOUSED IN INPATIENT INTERMEDIATE CARE AND

11  INPATIENT ACUTE CARE SETTINGS WOULD NEED TO BE HOUSED IN SIMILAR

12  SETTINGS IN THE COMMUNITY IF THEY WERE SUBJECT TO A PRISONER

13  RELEASE ORDER TODAY, DO YOU?

14  **A.**  WELL, I -- I HAVE A PRETTY GOOD ESTIMATE.  AS I MENTIONED

15  EARLIER, THE PEOPLE WHO ARE CURRENTLY HOUSED IN DMH LEVEL OF

16  CARE, WHICH IS INTERMEDIATE CARE, AS WELL AS ACUTE CARE, MAKE UP

17  TWO PERCENT OF THE COLEMAN CLASS.  SO IF WE ARE LOOKING AT A

18  50,000 POPULATION REDUCTION, AND IF WE INCLUDED COLEMAN CLASS IN

19  THE SAME PERCENTAGE THAT THEY EXIST IN THE OVERALL CDCR

20  POPULATION, THAT'S 200 PEOPLE OVER THE COURSE OF A COUPLE YEARS.

21  SO THAT WOULD BE MY ANSWER TO YOUR QUESTION.  INTERMEDIATE.

22          **MS. TILLMAN:**  I WOULD LIKE TO DRAW THE COURT'S

23  ATTENTION TO PAGE 282 OF THE DEPOSITION OF DR. STEWART ON

24  DECEMBER 18, 2008.  THAT'S PAGE 282, LINES 12 THROUGH 22.

25

1  **BY MS. TILLMAN**

2  Q.  AND YOU WERE ASKED AT THAT DEPOSITION:

3           **"QUESTION:**  CAN YOU PROVIDE ME WITH A GOOD

4           FAITH ESTIMATE OF THE PERCENTAGE OF THESE

5           COLEMAN CLASS MEMBERS WHO ARE PRESENTLY HOUSED

6           IN INTERMEDIATE CARE AND ACUTE CARE SETTINGS AND

7           WHO WOULD NEED TO BE HOUSED IN SIMILAR SETTINGS

8           IN THE COMMUNITY IF THEY ARE SUBJECT TO A

9           PRISONER RELEASE ORDER?"

10           THERE WAS AN OBJECTION.

11           "VAGUE AND AMBIGUOUS, ASSUMES FACTS NOT IN

12           EVIDENCE."

13           AND THE WITNESS STATED:

14           **"ANSWER:**  I DON'T HAVE A PARTICULAR NUMBER

15           IN MIND.

16           "SIR, YOU ALSO -- LET ME STRIKE THAT.

17           "SIR, YOU DON'T KNOW WHAT PERCENTAGE OF THE

18           COLEMAN POPULATION WILL NEED ONGOING MEDICATION

19           SUPPORT THROUGHOUT THEIR LIVES, DO YOU?"

20  A.  I DO NOT KNOW WHAT PERCENTAGE OF THE COLEMAN CLASS WOULD

21  NEED ONGOING MEDICATION MANAGEMENT?

22  Q.  CORRECT.  THAT'S THE QUESTION.

23  A.  AGAIN, I DON'T HAVE A PARTICULAR NUMBER IN MIND.  I CAN

24  ESTIMATE IT BASED ON THE PERCENTAGE OF PEOPLE AT DIFFERENT

25  LEVELS OF CARE.

1  Q.  NOW, YOU WOULD AGREE THAT SOME PORTION OF THE COLEMAN CLASS

2  MEMBERS HAVE CO-OCCURRING SUBSTANCE ABUSE ISSUES, CORRECT?

3  A.  CORRECT.

4  Q.  AND YOU WOULD AGREE THAT EVEN JUST A REDUCTION OF -- WELL,

5  LET ME STRIKE THAT.

6          YOU HAVE ALREADY TESTIFIED TODAY THAT THE REDUCTION

7  BY 50,000 INMATES WITH SOME PORTION OF THAT 50,000 INCLUDING

8  COLEMAN CLASS MEMBERS, WOULD REQUIRE THE AUGMENTATION OF CURRENT

9  COMMUNITY MENTAL HEALTH SYSTEMS TO CARE FOR THESE MENTALLY ILL

10  INDIVIDUALS, WOULDN'T IT?

11  A.  NO.  I BELIEVE MY TESTIMONY WAS THAT BASED ON THE LARGE

12  NUMBER THAT ARE CURRENTLY TREATED IN THE COMMUNITY MENTAL HEALTH

13  SYSTEM, 658,000, THAT THE ADDITION OF A RELATIVELY SMALL NUMBER

14  THAT WE ARE TALKING ABOUT HERE COULD BE ADEQUATELY TREATED GIVEN

15  CURRENT -- THE CURRENT SYSTEM.  AND I BELIEVE I ALSO SAID THAT I

16  BELIEVE THAT THE SYSTEM COULD BE AUGMENTED ALSO, BUT I BELIEVE

17  THAT THEY CAN BE TREATED WITHOUT ANY AUGMENTATION.

18  Q.  ISN'T THAT CORRECT THAT EVEN JUST THE ROUGHLY 15,000 INMATES

19  FROM THE DEPARTMENT OF CORRECTIONS AND REHABILITATION, WITH SOME

20  PORTION OF THAT 15,000 CONSISTING OF COLEMAN CLASS MEMBERS,

21  WOULD REQUIRE AN AUGMENTATION OF THE CURRENT HEALTH SYSTEMS IN

22  THE COMMUNITIES TO CARE FOR THESE MENTALLY ILL INDIVIDUALS?

23  A.  I DON'T BELIEVE THAT.

24  Q.  I WOULD LIKE TO READ FROM YOUR DEPOSITION, PAGE 236.  AND

25  THIS IS THE SEPTEMBER 2008 DEPOSITION.  236 LINE 17 THROUGH 236

 1  LINE SEVEN.

 2                      (DOCUMENT DISPLAYED)

 3  Q.  AT PAGE 236, LINE 17 YOU WERE ASKED:

 4              "**QUESTION:**  DO YOU HAVE ANY OPINIONS

 5          REGARDING ANY SORT OF PROTOCOL THAT SHOULD BE

 6          FOLLOWED IF THERE IS AN IMMEDIATE REDUCTION OF

 7          15,000 INMATES WITH SOME PORTION OF THOSE

 8          CONSISTING OF COLEMAN CLASS MEMBERS?

 9              "**ANSWER:**  A PROTOCOL REGARDING WHAT?

10              "**QUESTION:**  TO PROVIDE ANY SORT OF MENTAL

11          HEALTH CARE TO COLEMAN CLASS MEMBERS WHO ARE

12          RELEASED?

13              "**ANSWER:**  ANY INCREASE OF MENTALLY ILL

14          INDIVIDUALS IN THE COMMUNITY WOULD NECESSARILY

15          REQUIRE AN AUGMENTATION OF THE CURRENT SYSTEMS

16          THAT EXIST IN THE COMMUNITY TO DEAL WITH

17          MENTALLY ILL INDIVIDUALS, AND THAT WOULD BE

18          COMMUNITY MENTAL HEALTH.  IT WOULD BE IN THE

19          AREA OF PAROLE AND MENTAL HEALTH.  THOSE AREAS

20          WOULD CERTAINLY NEED AUGMENTATION."

21              NOW, SIR, YOU HAVE NO OPINION, DO YOU, ON WHETHER OR

22  NOT THE PAROLE OUTPATIENT CLINICIANS ARE SUFFICIENT -- I'M

23  SORRY, ON WHETHER OR NOT THE PAROLE OUTPATIENT CLINICS ARE

24  SUFFICIENT IN NUMBER AND STAFF TO HANDLE A RELEASE ORDER OF EVEN

25  JUST 15,000 INMATES WITH SOME 20 PERCENT OF THAT GROUP

1   CONSISTING OF COLEMAN PATIENTS, CORRECT?

2   **A.**  I TESTIFIED TODAY.  I SAID THAT THE PAROLE OUTPATIENT CLINIC

3   COULD CERTAINLY BENEFIT FROM AUGMENTATION.

4   **Q.**  YOU ARE NOT FAMILIAR WITH WHAT NUMBER OF PAROLE OUTPATIENT

5   CLINICS ARE CURRENTLY AVAILABLE, ARE YOU?

6   **A.**  I AM NOT.

7   **Q.**  AND EVEN WITH A RELEASE ORDER CONSISTING OF ONLY 15,000

8   INMATES WITH SOME 20 PERCENT OF THAT GROUP CONSISTING OF COLEMAN

9   PATIENTS, YOU WOULD RECOMMEND THAT THE COUNTIES RECEIVING A

10  LARGER PORTION OF, SAY, THAT 20 PERCENT, OR 3,000 OF THE 15,000

11  RELEASED GROUP, RECEIVE AUGMENTED RESOURCES, RIGHT?

12  **A.**  I AGREE THAT THEY CERTAINLY COULD BENEFIT FROM AUGMENTED

13  RESOURCES.  THERE IS NO QUESTION ABOUT THAT.

14          **JUDGE KARLTON:**  I TAKE IT THAT'S TRUE EVEN IF YOU

15  DON'T GIVE THEM AN EXTRA SINGLE PERSON FROM OUT OF THE PRISONS.

16          **THE WITNESS:**  ABSOLUTELY RIGHT, YOUR HONOR.  THEY

17  COULD BENEFIT FROM AUGMENTED RESOURCE THIS AFTERNOON.

18  **BY MR. TILLMAN:**

19  **Q.**  NOW, YOU ARE NOT AWARE OF ANY COUNTY IN THE STATE OF

20  CALIFORNIA THAT LACKS THE RESOURCES TO SUPPORT A COUNTY HOSPITAL

21  FOR THE CARE OF THE INDIGENT, ARE YOU?

22  **A.**  CAN YOU SAY THAT QUESTION AGAIN, PLEASE?

23  **Q.**  YOU ARE NOT AWARE OF ANY COUNTY IN THE STATE OF CALIFORNIA

24  THAT LACKS RESOURCES TO SUPPORT A COUNTY HOSPITAL FOR THE CURE

25  OF THE INDIGENT, ARE YOU?

1          **JUDGE HENDERSON:** LACKS RESOURCES?  WHAT DOES THAT

2     MEAN?  LACKS MONEY --

3          **MS. TILLMAN:** WOULD IT HELP IF I REPHRASED.  CAN I

4     REPHRASE?

5          **JUDGE HENDERSON:** I DIDN'T UNDERSTAND.

6     **BY MS. TILLMAN:**

7     **Q.** YOU ARE NOT AWARE OF ANY COUNTY IN THE STATE OF CALIFORNIA

8     THAT DOES NOT HAVE A COUNTY HOSPITAL TO PROVIDE CARE FOR THE

9     INDIGENT, CORRECT?

10    **A.** I AM NOT AWARE OF THAT.  YES, YOU ARE CORRECT.

11    **Q.** AND SO YOU HAVE NOT HAD THE CHANCE TO REVIEW THE REPORT OF

12    MR. GRAVES WHERE IT'S INDICATED THAT THERE ARE ONLY 19 PUBLIC

13    HOSPITALS STATE WIDE FOR THE CARE OF THE INDIGENT, CORRECT?

14    **A.** I HAVEN'T REVIEWED THAT REPORT.

15    **Q.** YOU HAVE MENTIONED THE NEED TO ENSURE PAROLEE ACCESS TO

16    VETERANS ADMINISTRATION BENEFITS.

17          DO YOU ACTUALLY KNOW THE NUMBER OF COLEMAN CLASS

18    MEMBERS WHO ARE ELIGIBLE AND COULD ACCESS THOSE MENTAL HEALTH

19    PROGRAMS WITHIN THE VETERANS ADMINISTRATION?

20    **A.** I DO NOT.

21    **Q.** YOU REALLY DON'T KNOW THE RECIDIVISM RATES OF THE COLEMAN

22    CLASS MEMBERS, DO YOU?

23    **A.** THE ACTUAL RECIDIVISM RATE?  I KNOW THAT OVER 100,000 --

24    130,000 PEOPLE ARE COMING AND GOING EVERY YEAR.

25    **Q.** WHEN YOU SPEAK OF 130,000, IS THAT A RECIDIVISM RATE THAT

1   YOU ARE REFERRING TO?

2   **A.**   THAT'S THE NUMBER OF RELEASES.  AND SINCE THE POPULATION IS

3   SLOWLY GOING UP OVER THE YEARS, I WOULD IMAGINE THEY HAVE THAT

4   MANY ADMISSIONS ALSO.

5            **MS. TILLMAN:**  IF I MIGHT DIRECT THE COURT'S ATTENTION

6   TO PAGE 270 OF DR. STEWART'S DEPOSITION IN SEPTEMBER, 2008, LINE

7   17 THROUGH 23.

8                    (BRIEF PAUSE.)

9            **MS. WHELAN:**  OKAY.

10  **BY MS. TILLMAN:**

11  **Q.**  AND THERE YOU WERE ASKED:

12            "**QUESTION:**  DO YOU HAVE ANY UNDERSTANDING AS

13            TO THE RECIDIVISM RATES OF COLEMAN CLASS

14            MEMBERS?

15            "**ANSWER:**  NOT OF COLEMAN CLASS MEMBERS."

16            DOCTOR, YOU DON'T KNOW IF COLEMAN CLASS MEMBERS WITH

17  CO-OCCURRING SUBSTANCE ABUSE ISSUES HAVE A HIGHER RATE OF

18  RECIDIVISM, DO YOU, THAN THE GENERAL POPULATION OF CDCR INMATES?

19  **A.**  NO.

20  **Q.**  NOW, YOU HAVE RECOMMENDED THE DIVERSION OF MENTALLY ILL

21  OFFENDERS AWAY FROM STATE PRISON, CORRECT?

22  **A.**  YES.

23  **Q.**  AND THAT DIVERSION WOULD BE IN THE FORM OF PROGRAMS WITH

24  SUPERVISED MENTAL HEALTH CARE, CORRECT?

25  **A.**  THAT WOULD BE PART OF IT.

1  Q.  YOU HAVE NEVER TOURED ANY SUCH FACILITIES, HAVE YOU?

2  A.  I'M VERY FAMILIAR WITH THOSE.  I HAVE TOURED MANY PROGRAMS

3  THAT PROVIDE MENTAL HEALTH CARE THAT INCLUDE PAROLEES IN THAT

4  POPULATIONS.

5          MS. TILLMAN:  IF I MIGHT DIRECT THE COURT'S ATTENTION

6  TO PAGE 274 OF THE SEPTEMBER, 2008 DEPOSITION OF DR. STEWART,

7  PAGE 274 LINES 22 THROUGH 23.

8          MS. WHELAN:  JUST THOSE TWO LINES?  I DON'T THINK

9  THAT GIVES -- SHOWS ANYTHING.

10          JUDGE KARLTON:  WE ARE GOING TO HAVE TO LOOK AT IT --

11  YOUR OBJECTION IS IT'S NOT IMPEACHING?

12          MS. WHELAN:  IT'S NOT IMPEACHING.

13          MS. TILLMAN:  I BELIEVE IT IS.

14          JUDGE KARLTON:  HANG ON.  JUDGE HENDERSON IS GOING TO

15  LOOK AT IT IF YOU PUT IT UP AND MAKE A DECISION FOR ALL OF US

16  WHETHER OR NOT IT CAN BE READ INTO THE RECORD.

17          MS. TILLMAN:  THANK YOU.

18              (DOCUMENT DISPLAYED)

19          JUDGE HENDERSON:  NOT THAT.  HAVE YOU TOURED SUCH

20  FACILITIES?

21          MS. TILLMAN:  I PUT IT IN CONTEXT.  I THINK IF WE GO

22  TO THE PREVIOUS QUESTION AT LINE 6 THROUGH -- AND THE ANSWER

23  GOES THROUGH 21 ON THE SAME PAGE.

24              (BRIEF PAUSE.)

25          JUDGE HENDERSON:  OKAY.  YOU MAY ANSWER.

1          **JUDGE KARLTON:**  EXCEPT START AT THE TOP SO THAT IT

2   MAKES SENSE.

3          **MS. TILLMAN:**  THANK YOU, YOUR HONOR.

4   **BY MS. TILLMAN:**

5   **Q.**  STARTING AT LINE 6 ON PAGE 274, THE QUESTION:

6              "**QUESTION:**  ALL THAT I'M SAYING IS THAT YOU

7              INDICATE AT PARAGRAPH 145, QUOTE, IF A DIVERSION

8              OF INDIVIDUALS WITH MENTAL ILLNESS FROM PRISON

9              CAN BE DONE WITHOUT ADVERSELY AFFECTING PUBLIC

10             SAFETY, WHAT DIVERSION PROGRAMS ARE YOU

11             REFERENCING IN THAT STATEMENT?

12             "**ANSWER:**  PROGRAMS THAT WOULD ORDER PEOPLE

13             INTO TREATMENT, PROGRAMS THAT WOULD INCLUDE CASE

14             MANAGEMENT SERVICES, SUPPORTIVE HOUSING

15             SERVICES, MEDICATION MANAGEMENT SERVICES, WHERE

16             THE MENTAL HEALTH CARE WOULD BE SUPERVISED AND

17             NOT JUST LEFT UP TO THE INDIVIDUAL.  THESE SORTS

18             OF SUPERVISED MENTAL HEALTH PROGRAMS HAVE BEEN

19             SHOWN TO ENSURE THAT PEOPLE REMAIN COMPLIANT

20             WITH THE TREATMENT AND STAY OUT OF TROUBLE WITH

21             THE CRIMINAL JUSTICE SYSTEM.

22             "**QUESTION:**  HAVE YOU TOURED SUCH FACILITIES?

23             "**ANSWER:**  NO."

24          **JUDGE HENDERSON:**  I'M NOT SURE.  HIS ANSWER WAS THAT,

25   "I HAVE TOURED MANY FACILITIES WHICH INCLUDE."  SO I'M NOT SURE

```
 1   THAT --
 2              JUDGE KARLTON:  WE WILL DECIDE WHETHER IT MAKES ANY
 3   DIFFERENCE.
 4              JUDGE HENDERSON:  YEAH.
 5   BY MS. TILLMAN:
 6   Q.  OKAY.  IN FACT, DOCTOR, YOU HAVE NOT ACTUALLY ANY KNOWLEDGE
 7   OF WHETHER OR NOT SUCH DIVERSION PROGRAMS ARE AVAILABLE WITHIN
 8   ANY COUNTY OF THE STATE OF CALIFORNIA, ARE YOU?
 9   A.  THE PROGRAMS THAT ARE DESCRIBED THERE ARE AVAILABLE.  I KNOW
10   THEY ARE AVAILABLE IN SAN FRANCISCO COUNTY.
11              THESE ARE PROGRAMS THAT ARE WIDELY AVAILABLE,
12   MEDICATION MANAGEMENT, CASE MANAGEMENT PROGRAMS.  THESE ARE
13   AVAILABLE IN MOST COUNTIES THAT I'M FAMILIAR WITH.
14   Q.  GOING BACK TO YOUR DEPOSITION OF SEPTEMBER, 2008, PAGE 274,
15   LINE 24.  YOU WERE ASKED THAT SAME QUESTION.  GOING ONTO PAGE
16   275, YOUR ANSWER IS AT LINE WHAT.
17                      (DOCUMENT DISPLAYED)
18   Q.  YOU WERE ASKED --
19              MS. TILLMAN:  MAY I READ IT?
20              MR. BIEN:  YES, GO AHEAD.
21   BY MS. TILLMAN:
22   Q.  (READING)
23              "QUESTION:  ARE YOU AWARE OF THE
24              AVAILABILITY OF SUCH DIVERSION PROGRAMS WITHIN
25              ANY COUNTY OF CALIFORNIA?
```

1          **"ANSWER:**  I AM NOT AWARE."

2          DOCTOR, ISN'T THAT CORRECT THAT YOU HAVE NOT SEEN ANY

3   SUCH PROGRAMS IN THE UNITED STATES?

4   **A.**  IN THE UNITED STATES?

5   **Q.**  YES.

6   **A.**  I AM NOT AWARE OF A PARTICULAR PROGRAM AS DESCRIBED THAT WE

7   JUST READ THAT HAS ALL THOSE ELEMENTS.

8          WHAT MY TESTIMONY WAS IS THAT I'M VERY AWARE THAT THE

9   DIFFERENT ELEMENTS OF THESE PROGRAMS EXIST THROUGHOUT THE STATE

10  OF CALIFORNIA.  I'M NOT AWARE OF A PARTICULAR PROGRAM.  YOU ARE

11  ABSOLUTELY CORRECT.

12  **Q.**  SO EVEN WITH THIS FIRST INTERVENTION, AS YOU HAVE CALLED IT,

13  OF REDUCING THE POPULATION OF THE DEPARTMENT OF CORRECTIONS AND

14  REHABILITATION, THERE WOULD STILL NEED TO BE DONE ADDITIONAL

15  STEPS TO IMPROVE THE MENTAL HEALTH CARE PROVIDED TO THE

16  DEPARTMENT OF CORRECTIONS PATIENTS, CORRECT?

17  **A.**  YES.

18  **Q.**  AND EVEN WITH THIS FIRST STEP OR FIRST INTERVENTION OF

19  POPULATION REDUCTION BY WAY OF A RELEASE, THE RELEASE SHOULD BE

20  ACCOMPANIED BY AUGMENTED COMMUNITY RESOURCES FOR PAROLEES IN

21  ORDER TO ENSURE THEIR SUCCESSFUL REINTEGRATION INTO SOCIETY,

22  CORRECT?

23  **A.**  I BELIEVE THAT'S ABSOLUTELY TRUE; THAT THE PAROLEES COULD

24  BENEFIT FROM AUGMENTED SERVICES TO HELP THEIR CHANCES OF --

25  DECREASE THEIR CHANCES OF BEING RETURNED TO PRISON.

1          **MS. TILLMAN:**  THANK YOU.  NOTHING FURTHER.

2          **THE COURT:**  NOTHING FROM INTERVENORS?

3          **MS. WANG:**  TERESA WANG FOR THE DEFENDANT INTERVENORS.

4                    **DIRECT EXAMINATION**

5  **BY MS. WANG:**

6  **Q.**  GOOD AFTERNOON, DR. STEWART.

7  **A.**  GOOD AFTERNOON.

8  **Q.**  I JUST HAVE A COUPLE QUESTIONS FOR YOU.

9          DURING YOUR DIRECT TESTIMONY, YOU REFERRED TO THE

10  CONCERNS OF COMMUNITY MENTAL HEALTH CARE PROVIDERS ABOUT A

11  POTENTIAL PRISONER RELEASE ORDER AS POSSIBLY OVERSTATED, IS THAT

12  CORRECT?

13  **A.**  YES.

14  **Q.**  AND YOU CITED AS AN EXAMPLE YOUR WORK WITH RETURNING VIETNAM

15  VETERANS AND THE COMMUNITY MENTAL HEALTH CARE PROVIDERS CONCERNS

16  ABOUT THAT?

17  **A.**  YES, I DID.

18  **Q.**  AND YOU WOULD AGREE, WOULDN'T YOU, THAT THERE ARE A

19  DIFFERENT SET OF CONCERNS THAT WOULD CONFRONT A COMMUNITY MENTAL

20  HEALTH CARE PROVIDER IN TERMS OF AN VETERAN POPULATION VERSUS A

21  RETURNING CRIMINAL OFFENDER POPULATION?

22  **A.**  NOT NECESSARILY.

23  **Q.**  DO YOU BELIEVE THAT THERE ARE CONCERNS ABOUT COORDINATING

24  WITH PROBATION, PAROLE, CORRECTIONAL OFFICERS THAT WOULDN'T BE

25  ENCOUNTERED WITH A RETURNING VETERAN POPULATION?

1  **A.**  THE NEED TO COORDINATE.  OBVIOUSLY, WITH PAROLE WAS NOT AN

2  ISSUE WHEN I REFERRED TO THE VETERAN POPULATION.  YES, YOU ARE

3  CORRECT.

4  **Q.**  AND YOU WOULD AGREE THAT INADEQUATELY TREATING EVEN ONE

5  MENTALLY ILL OFFENDER WHO WAS RETURNING TO THE COMMUNITY MENTAL

6  HEALTH CARE PROGRAM OR DIVERTED INTO THE COMMUNITY MENTAL HEALTH

7  CARE PROGRAM COULD HAVE POTENTIALLY ADVERSE EFFECTS ON PUBLIC

8  SAFETY, WOULDN'T YOU?

9  **A.**  I'M SORRY.  COULD YOU SAY THAT AGAIN, PLEASE?

10  **Q.**  SURE.  YOU WOULD AGREE THAT INADEQUATELY TREATING EVEN ONE

11  MENTALLY ILL OFFENDER WHO WAS RETURNING TO THE COMMUNITY

12  HEALTHCARE PROGRAM OR DIVERTED INTO THE COMMUNITY MENTAL HEALTH

13  CARE PROGRAM COULD HAVE POTENTIALLY ADVERSE EFFECTS ON PUBLIC

14  SAFETY, WOULDN'T YOU?

15  **A.**  I AGREE, BUT I WOULD HOPE THAT THE KNOWLEDGE OF THAT IS

16  KNOWN BY MORE THAN JUST ME.  IT'S KNOWN BY THE COMMUNITY MENTAL

17  HEALTH PEOPLE, WHOSE RESPONSIBILITY IT IS TO TREAT INDIVIDUALS

18  IN THEIR COUNTY, AND THAT THEY WOULDN'T GO OUT OF THEIR WAY TO

19  PROVIDE INADEQUATE CARE.  THEY WOULD DO WHAT THEY COULD IN A

20  CREATIVE WAY USING THE RESOURCES THEY HAVE AVAILABLE TO THEM NOW

21  TO PROVIDE ADEQUATE CARE TO ENHANCE PUBLIC SAFETY.

22  **Q.**  BUT YOU AGREE THAT THESE -- THESE COMMUNITY HEALTHCARE

23  PROGRAMS ARE QUITE UNDER FUNDED, DON'T YOU?

24  **A.**  I DON'T THINK I SAID THEY WERE QUITE UNDER FUNDED.

25  **Q.**  HOW ABOUT UNDER FUNDED?

1  **A.**  I THINK THAT THEY LACKED CREATIVITY IN HOW TO DO THEIR JOB

2  BETTER.

3          **JUDGE KARLTON:**  THE QUESTION IS JUST FUNDING.  ARE

4  YOU SAYING THAT YOU THINK THAT THE FUNDING WOULD BE ADEQUATE IF

5  THEY WERE SMARTER ABOUT HOW TO SPEND IT?

6          **THE WITNESS:**  I BELIEVE THAT, YOUR HONOR.

7          **JUDGE KARLTON:**  OH, ALL RIGHT.

8  **BY MS. WANG:**

9  **Q.**  HOWEVER IN PARAGRAPH 135 OF YOUR SECOND REPORT, YOU DO SAY

10 THAT -- YOU ACKNOWLEDGE THAT THESE PROGRAMS ARE UNDER FUNDED, IS

11 THAT CORRECT?

12 **A.**  YEAH.  AND I THINK WE HAVE SAID IT HERE TODAY MANY TIMES.

13 CERTAINLY, IT WOULD BE MY -- IF I COULD DECIDE THAT, THE

14 COMMUNITY MENTAL HEALTH PROGRAMS COULD RECEIVE ENHANCED FUNDING.

15          **MS. WANG:**  NO FURTHER QUESTIONS, YOUR HONOR.

16          **THE COURT:**  REDIRECT?

17          **MS. WHELAN:**  NOTHING FURTHER.

18          **THE COURT:**  OKAY.  THANK YOU FOR REAPPEARING,

19 DR. STEWART.

20          **THE WITNESS:**  THANK YOU, YOUR HONOR.

21          **JUDGE HENDERSON:**  YOU ARE EXCUSED.

22                    (WITNESS EXCUSED.)

23          **JUDGE HENDERSON:**  YOU MAY CALL YOUR NEXT WITNESS.

24          **MS. FUENTES:**  GOOD AFTERNOON, YOUR HONORS.  THERESA

25 FUENTES FROM THE COUNTY OF SANTA CLARA.

1         THE DEFENDANT INTERVENORS CALL GARY GRAVES TO THE

2    STAND.

3         **MS. MORRIS:**  YOUR HONOR, BEFORE MR. GRAVES STARTS

4    TESTIFYING, I WOULD LIKE TO MAKE AN OBJECTION TO HIS TRIAL

5    DECLARATION WHICH WAS SUBMITTED AND APPEARS TO BE SOMETHING OF A

6    SUPPLEMENTAL REPORT, PARTICULARLY TO THE EXTENT THAT IT OPINES

7    ON PUBLIC SAFETY, WHICH WAS NOT ONE OF THE SUBJECTS LISTED IN

8    THE EXPERT DISCLOSURE THAT HE WOULD BE TESTIFYING REGARDING.

9         **JUDGE HENDERSON:**  DO YOU WANT TO RESPOND TO THAT?

10        **MS. FUENTES:**  YES, YOUR HONOR.

11        MR. GRAVES IS A HYBRID EXPERT AND FACT WITNESS, AND

12   HIS DECLARATION CONTAINS SOME FACTUAL INFORMATION AND, ALSO,

13   SOME INFORMATION AND HIS OPINIONS, HIS EXPERT OPINION ON PUBLIC

14   SAFETY.

15        HIS ORIGINAL EXPERT REPORT ALSO ADDRESSES THE ISSUES

16   OF PUBLIC SAFETY AND IMPACTS TO THE COUNTY IN GENERAL.

17        **THE COURT:**  WE WILL FOLLOW THE SAME RULE WE HAVE

18   BEEN.  THE OBJECTION IS PRESERVED.

19                       **GARY GRAVES**,

20   CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

21   DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

22        **GARY GRAVES:**  GARY GRAVES, G-R-A-V-E-S.

23        **MS. FUENTES:**  MR. GRAVES HAS SUBMITTED AN EXPERT

24   REPORT AND DECLARATION, WHICH HAVE BEEN MARKED AS --

25        **JUDGE KARLTON:**  WE HAVE ALL AGREED THAT THOSE MATTERS

1    ARE BEFORE THE COURT.  THEY WILL BE RECEIVED AT THE END WHEN WE

2    GO THROUGH ALL THE OBJECTIONS.  PLEASE DON'T DO THIS ANY MORE.

3             EVERYBODY.  BELIEVE US.  WE KNOW THAT THEY HAVE BEEN

4    TENDERED.

5             I'M SORRY.  I DON'T MEAN TO SPEAK SHARPLY, BUT THIS

6    IS JUST DRIVING ME CRAZY.

7             **MS. FUENTES:**  OKAY.  I WAS JUST POINTING OUT FOR THE

8    RECORD WHERE HIS EXPERT REPORT DECLARATION CAN BE FIND AND THE

9    EXHIBITS THAT ARE REFERENCED IN THAT REPORT.

10                        **DIRECT EXAMINATION**

11   **BY MS. FUENTES:**

12   **Q.**  MR. GRAVES, WHERE ARE YOU CURRENTLY EMPLOYED?

13   **A.**  SANTA CLARA COUNTY.

14   **Q.**  WHAT IS YOUR CURRENT POSITION AT SANTA CLARA COUNTY?

15   **A.**  CURRENTLY I AM THE ACTING COUNTY EXECUTIVE.

16   **Q.**  AND CAN YOU BRIEFLY SUMMARIZE YOUR EDUCATION AND BACKGROUND?

17   **A.**  I HAVE A B.A. IN ECONOMICS AND POLITICAL SCIENCE FROM

18   BUCKNELL UNIVERSITY, A MASTER'S IN PUBLIC ADMINISTRATION FROM

19   THE STATE UNIVERSITY OF NEW YORK AT ALBANY.  I HAVE ALSO BEEN

20   TRAINED AT THE HARVARD EXECUTIVE MANAGEMENT PROGRAM.

21             CURRENTLY, AS I SAID, I AM THE ACTING COUNTY

22   EXECUTIVE FOR SANTA CLARA COUNTY.  I HAVE BEEN WITH THE COUNTY

23   FOR APPROXIMATELY 25 YEARS.  I HAVE -- I STARTED THERE AS THE

24   BUDGET DIRECTOR IN 1984, BECAME A DEPUTY COUNTY EXECUTIVE IN

25   APPROXIMATELY 1997, DURING THAT TIME ALSO MAINTAINING

1  RESPONSIBILITY FOR RESOURCE ALLOCATION, AND BECAME THE ASSISTANT

2  COUNTY EXECUTIVE I BELIEVE IN 2002.

3           PRIOR TO THAT I WAS -- WORKED FOR THE NEW YORK CITY

4  OFFICE OF MANAGEMENT AND BUDGET, WHERE I WAS THE PRINCIPAL

5  BUDGET ANALYST FOR APPROXIMATELY FIVE YEARS RESPONSIBLE FOR

6  POLICE SERVICES.

7  Q.  WHEN DID YOU BECOME THE ACTING COUNTY EXECUTIVE?

8  A.  NOVEMBER 1ST OF THIS YEAR.

9  Q.  CAN YOU BRIEFLY DESCRIBE YOUR DUTIES AS THE ACTING COUNTY

10 EXECUTIVE AND PRIOR TO THAT AS THE ASSISTANT COUNTY EXECUTIVE?

11 A.  OBVIOUSLY, AS THE ACTING COUNTY EXECUTIVE, I AM RESPONSIBLE

12 FOR THE MANAGEMENT OF SANTA CLARA COUNTY AND ALL OF THE

13 FUNCTIONS AND RESPONSIBILITIES WITHIN THAT.  I REPORT DIRECTLY

14 TO THE BOARD OF SUPERVISORS AND AM RESPONSIBLE FOR CARRYING OUT

15 THE BOARD'S DIRECTIVES REGARDING POLICIES.  ALSO, RESPONSIBLE

16 FOR THE MANAGEMENT OF THE COUNTY'S BUDGET.

17          AS THE ASSISTANT COUNTY EXECUTIVE, I WAS FOCUSED ON

18 THE INTERNAL MANAGEMENT, THE DAY-TO-DAY OPERATIONS OF THE

19 COUNTY.  I HAD SPECIFIC RESPONSIBILITY FOR THE OVERSIGHT OF THE

20 BUDGET PROCESS, RESOURCE ALLOCATION, AND SEVERAL DEPARTMENTS,

21 INCLUDING FACILITIES AND FLEET, PROCUREMENT AND, ALSO, A VARIETY

22 OF OTHER SPECIAL PROJECTS.

23 Q.  WHAT IS SANTA CLARA COUNTY'S POPULATION?

24 A.  THE POPULATION CURRENTLY IS APPROXIMATELY 1.7 MILLION.

25 Q.  AND HOW IS THAT COMPARED TO OTHER CALIFORNIA COUNTIES IN

1 TERMS OF THE SIZE OF THE POPULATION?

2 **A.** CURRENTLY I BELIEVE WE WERE THE SIXTH LARGEST COUNTY IN THE

3 STATE OF CALIFORNIA.

4 **Q.** WHAT IS SANTA CLARA COUNTY'S TOTAL BUDGET?

5 **A.** THE TOTAL BUDGET IS APPROXIMATELY $4 BILLION. THE GENERAL

6 FUND BUDGET IS APPROXIMATELY 2.2 BILLION.

7 **Q.** CAN YOU JUST EXPLAIN WHAT THE GENERAL FUND IS?

8 **A.** THE GENERAL FUND IS SORT OF THE GENERAL RESPONSIBILITIES OF

9 THE COUNTY, INCLUDING ALL NON-SPECIAL REVENUE OR ENTERPRISE

10 FUNDS. SO IT INCLUDES THINGS LIKE THE MAJOR CORE FUNCTIONS OF

11 THE COUNTY; SOCIAL SERVICES, PUBLIC SAFETY, HEALTH, ANY

12 ADMINISTRATIVE FUNCTIONS OF THE COUNTY.

13         AND IN TERMS OF -- TO GO BEYOND THAT, THE HOSPITAL,

14 OUR HOSPITAL SYSTEM IS A SEPARATE FUND. SO THAT'S IN ADDITION

15 TO THAT, AS WELL AS SPECIAL REVENUE FUNDS; THINGS LIKE ROADS,

16 LIBRARY, PARKS AND RECREATION, THAT KIND OF THING.

17 **Q.** SOMEWHAT IS THE COUNTY'S CURRENT FISCAL SITUATION?

18 **A.** THE COUNTY'S CURRENT FISCAL SITUATION IS RATHER DIRE. WE

19 JUST ON TUESDAY MADE A PRESENTATION TO THE BOARD INDICATING A

20 PROJECTED DEFICIT IN THE CURRENT YEAR OF $220 MILLION. THIS

21 WILL BE THE EIGHTH CONSECUTIVE YEAR OF DEFICITS WITHIN THE

22 COUNTY. WE ARE PROJECTING DEFICITS INTO THE FUTURE.

23         WE HAVE CLOSED GAPS OVER THOSE EIGHT YEARS OF

24 APPROXIMATELY $1.2 BILLION, HAVE IMPLEMENTED REDUCTIONS OR WILL

25 IMPLEMENT REDUCTIONS IN DEPARTMENTS SPECIFICALLY TOTALING ABOUT

1  600 MILLION.

2          SO WE ARE REALLY OPERATING VERY MUCH AT THE MINIMUM

3  LEVEL IN TERMS OF MANY OF THE SERVICES THAT WE ARE REQUIRED TO

4  PROVIDE.

5  **Q.**  WHAT SERVICES HAVE BEEN CUT?

6  **A.**  REDUCTIONS REALLY HAVE BEEN IMPLEMENTED IN EVERY SERVICE

7  AREA WITHIN THE COUNTY; PUBLIC SAFETY, SOCIAL SERVICES, HEALTH

8  THE ADMINISTRATION, THE GENERAL GOVERNMENT DEPARTMENT.  EVERY

9  DEPARTMENT HAS TO REDUCE THEIR LEVEL OF SERVICE BECAUSE COUNTIES

10  REALLY HAVE NO REVENUE RAISING AUTHORITY, SO THE ONLY OPTIONS WE

11  HAVE WHEN THERE IS A GAP BETWEEN REVENUES AND EXPENDITURES IS

12  REDUCING EXPENDITURES.  THAT'S REALLY THE ONLY OPTION WE HAVE.

13  **Q.**  HAS THERE BEEN ANY CUTS TO THE MENTAL HEALTH DEPARTMENT'S

14  BUDGET?

15  **A.**  THERE HAS BEEN SIGNIFICANT CUTS IN MENTAL HEALTH.  IN SANTA

16  CLARA COUNTY MENTAL HEALTH IS A PRIOR AND AS A RESULT OF THAT, A

17  LOT OF DISCRETIONARY FUNDING HAS BEEN ALLOCATED WHEN FUNDING HAS

18  BEEN AVAILABLE.

19          AND, OBVIOUSLY, WHEN WE ARE -- OUR RESOURCES ARE

20  LIMITED.  WE HAVE TO GO TO THOSE PLACES WHERE DISCRETIONARY

21  FUNDS EXIST.  SO MENTAL HEALTH HAS BEEN AN AREA THAT HAS

22  RECEIVED PRETTY SIGNIFICANT CUTS.

23  **Q.**  BY "SIGNIFICANT," WHAT NUMBERS ARE YOU TALKING ABOUT?

24  **A.**  I WOULD SAY OVER THE LAST EIGHT YEARS, WITHOUT HAVING THE

25  DETAIL IN FRONT OF ME, MENTAL HEALTH REDUCTIONS HAVE EXCEEDED

1  $30 MILLION.  WE HAVE BEEN FORCED TO REALLY LOOK AT THE -- AT

2  THE CLIENTS THAT WE CAN SERVE.  SO THE LESS ACUTE CLIENTS WE NO

3  LONGER CAN SERVE.

4          IN FACT, OVER THE LAST EIGHT YEARS I BELIEVE THAT WE

5  HAVE BEEN FORCED TO NO LONGER PROVIDE SERVICES TO ROUGHLY 4,000

6  CLIENTS AS A RESULT OF THE FACT THAT WE HAVE HAD TO -- OR FOCUS

7  OUR -- OUR SERVICES ON THOSE THAT ARE MORE ACUTELY ILL.

8  Q.  DOES THE STATE'S CURRENT BUDGET CRISIS IMPACT THE COUNTY AT

9  ALL?

10  A.  IT ABSOLUTELY DOES.  I MEAN, COUNTIES ARE REALLY AGENTS OF

11  THE STATE.  WE REALLY ARE THE SERVICE PROVIDERS FOR MANY STATE

12  PROGRAMS.

13          IN FACT, ABOUT 35 PERCENT OF OUR REVENUE COMES FROM

14  THE STATE.  SO ANY TIME THE STATE IS IN A REDUCTION MODE, THE

15  IMPLICATIONS ARE SIGNIFICANT FOR COUNTIES.  SPECIFICALLY, EVEN,

16  OBVIOUSLY, TO A MUCH GREATER EXTENTS THAN CITIES.

17          SO WHEN THE STATE IS LOOKING AT A DEFICIT, AS YOU

18  PROBABLY HAVE READ ABOUT, OF $28 BILLION, THE IMPLICATIONS TO US

19  ARE VERY GRAVE, ESPECIALLY AFTER WE HAVE BEEN THROUGH EIGHT

20  YEARS OF REDUCTIONS.

21  Q.  CAN YOU TELL US BRIEFLY, GENERALLY, HOW THE COUNTY IS

22  FUNDED?

23  A.  COUNTIES RELY FOR MORE THAN HALF OF THE REVENUE FROM THE

24  STATE AND FEDERAL GOVERNMENT.  IN OUR CASE, IN SANTA CLARA

25  COUNTY, WE GET ABOUT 55 PERCENT OF OUR REVENUES FROM THE STATE

1    AND FEDERAL GOVERNMENT.

2              AS A RESULT OF THAT, IN MANY WAYS WE REALLY DON'T

3    DETERMINE OUR OWN PRIORITIES AS A RESULT OF THAT AND OUR OWN

4    DESTINY.

5              SO THE REST OF THOSE FUNDS THAT WE RECEIVE ARE THINGS

6    LIKE PROPERTY TAX.  THE OTHER 45 PERCENT INCLUDE THINGS LIKE

7    PROPERTY TAX, FEES, AND OTHER REVENUES THAT INCLUDE THINGS LIKE

8    MEDICAID TYPE OF REVENUE.

9              SO IN GENERAL THE CRITICAL ISSUE FOR US IS THAT, YOU

10   KNOW, OVER HALF OF OUR REVENUES ARE COMING FROM STATES AND

11   FEDERAL GOVERNMENTS AND DECISIONS ABOUT THOSE REVENUES REALLY

12   ARE BEING MADE OUTSIDE OF THE COUNTY SEAT, IN EFFECT.

13   **Q.**  SO HOW MUCH DISCRETION DOES THE COUNTY HAVE IN DETERMINING

14   HOW MUCH MONEY TO ALLOCATE TOWARDS CERTAIN PROGRAMS AND

15   SERVICES?

16   **A.**  THE AMOUNT OF DISCRETION THAT THE LOCAL BOARD OF SUPERVISORS

17   HAS REALLY HAS DECLINED.  I MEAN, AT THIS POINT IN TIME OUT OF

18   OUR $2.2 BILLION BUDGET, WE BELIEVE THAT THERE'S ROUGHLY

19   $500 MILLION THAT THE BOARD HAS IN TERMS OF DISCRETION.

20             SO WHEN WE ARE LOOKING AT A REDUCTION THIS YEAR, AS I

21   HAVE INDICATED, OF 220 MILLION, THAT'S REALLY A DRAMATIC IMPACT

22   ON OUR ABILITY TO PROVIDE SERVICES.

23             OBVIOUSLY, WHEN YOU LOOK AT 220 AS IT RELATES TO THE

24   TOTAL BUDGET OF 2.2 BILLION, IT DOESN'T SEEM AS LARGE, BUT WHEN

25   WE ARE REALLY LOOKING AT WHAT WE DO CONTROL, IT IS A VERY

1  SIGNIFICANT IMPACT.  OBVIOUSLY, AFTER EIGHT YEARS OF HAVING TO

2  REDUCE BUDGETS, WE ARE REALLY DOWN TO VERY FEW CHOICES.

3  Q.  AND WHAT TYPE OF PROGRAMS AND SERVICES DOES THE COUNTY USE

4  WITH ITS DISCRETIONARY GENERAL FUND DOLLARS?

5  A.  WELL, THOSE DOLLARS ARE REALLY FOCUSED ON PUBLIC SAFETY

6  BECAUSE THE WAY IN WHICH COUNTIES ARE FUNDED, HEALTH, SOCIAL

7  SERVICES, THINGS ALONG THOSE LINES ARE OFTEN SIGNIFICANTLY

8  REIMBURSED BY STATE AND FEDERAL DOLLARS.

9          PUBLIC SAFETY IS DEFINED REALLY AS A LOCAL

10 RESPONSIBILITY, SO THE MAJORITY OF THOSE DISCRETIONARY FUNDS DO

11 FLOW INTO THAT PARTICULAR FUNCTIONAL AREA.

12          AT THE SAME TIME THE OTHER -- WHAT DISCRETIONARY

13 FUNDING IS LEFT REALLY IS ALLOCATED BASED ON THE BOARD'S

14 PRIORITIES.

15          IN OUR COUNTY THE BOARD HAS SET AS A VERY STRONG

16 PRIORITY THE FUNDING OF OUR SAFETY NET.  SO WE ARE LOOKING AT

17 ALLOCATING AS MUCH FUNDING AS POSSIBLE TO ENHANCE MENTAL HEALTH,

18 DRUG AND ALCOHOL, PUBLIC HEALTH, THOSE KINDS OF SERVICES.

19 Q.  IS THAT WHAT YOU MEAN BY SAFETY NET?

20 A.  YES.  THAT'S WHAT WE MEAN BY THE SAFETY NET.

21 Q.  THE AMOUNT OF MONEY THAT YOU PUT INTO THE SAFETY NET

22 SERVICES, IS IT ENOUGH TO COVER THE SERVICES THAT ARE NEEDED BY

23 THE RESIDENTS OF SANTA CLARA COUNTY?

24 A.  WELL, CLEARLY, AT THIS POINT WE DON'T BELIEVE THAT IT IS.

25 WHEN YOU LOOK AT WAITING LISTS IN PROGRAMS LIKE DRUG AND

1  ALCOHOL, YOU LOOK AT THE FACT THAT WE NO LONGER ARE ABLE TO

2  SERVE ALL OF THE RESIDENTS THAT REALLY PRESENT THEMSELVES FOR

3  THINGS LIKE MENTAL HEALTH SERVICES, OBVIOUSLY, THOSE ARE THE

4  AREAS WHERE WE HAVE GREAT CONCERNS IN TERMS OF THE OVERALL

5  HEALTH AND WELFARE OF OUR COMMUNITY.

6          AND WHAT HAPPENS IS -- IS THAT BY NOT BEING ABLE TO

7  REALLY ALLOCATE FUNDING TO THINGS LIKE PREVENTION AND TO TREAT

8  THE PEOPLE THAT PERHAPS AREN'T AS SICK, WE END UP SEEING THOSE

9  PEOPLE PRESENT THEMSELVES IN OUR MORE ACUTE ENVIRONMENTS LIKE,

10 FOR INSTANCE, THE EMERGENCY ROOM OR EMERGENCY MENTAL HEALTH

11 FACILITY AND EVEN IN OUR JAIL, BECAUSE THESE ARE THE PEOPLE THAT

12 MAY BE OFFENDING BECAUSE THEY DECOMPENSATE BECAUSE THEY ARE NOT

13 GETTING THE SERVICES THAT THEY NEED.

14 Q.  AND THESE ARE PEOPLE THAT ARE OUT IN THE COMMUNITY THAT ARE

15 NOT GETTING SERVICES?  YOU'RE SAYING YOU SEE THEM IN YOUR JAILS

16 AND IN THE EMERGENCY ROOMS?

17 A.  ABSOLUTELY.  AT THIS POINT THAT'S EXACTLY WHAT WE ARE

18 SEEING.

19 Q.  SO WHAT HAPPENS WHEN THE COUNTY HAS TO ALLOCATE MONEY

20 TOWARDS JAILS AND EMERGENCY ROOMS AND TREATING MORE ACUTELY ILL

21 INDIVIDUALS?

22 A.  WELL, TO THE EXTENT TO WHICH THOSE REQUIREMENTS -- BECAUSE

23 THOSE ARE MANDATES THAT WE HAVE, WE HAVE -- WE HAVE TO PROVIDE

24 THOSE SERVICES.  WE HAVE TO -- WHEN INDIVIDUALS ARE BROUGHT TO

25 US BY THE CITY POLICE DEPARTMENTS INTO OUR JAIL, WE HAVE TO

1  HOUSE THEM.  WHEN KIDS ARE BROUGHT INTO THE JUVENILE HALL, WE

2  HAVE TO HOUSE THEM.  AND SAME THING WITH ACUTE MENTAL HEALTH.

3          WE DON'T HAVE A LOT OF CHOICE IN THOSE SITUATIONS.

4  SO AS THOSE POPULATIONS INCREASE, WE ARE FORCED TO REDUCE OUR

5  ALLOCATION OF FUNDING TO PROGRAMS LIKE PREVENTION.  AND SO BY --

6  AND OTHER TYPES OF SERVICES SIMILAR TO THAT.

7          SO IN THOSE KINDS OF CIRCUMSTANCES, WE ARE OFTEN

8  FACED WITH THIS CONTRADICTION BECAUSE WE KNOW THAT FUNDING

9  PREVENTION MAKES SENSE.  HOWEVER, WHEN THE RESOURCES ARE

10 DECLINING, WE HAVE TO MEET OUR MANDATES, AND THOSE MANDATES ARE

11 REALLY TAKING CARE OF THE ABSOLUTELY MOST SICK OR PEOPLE THAT

12 HAVE BROKEN THE LAW.

13          SO OUR DISCRETION REALLY HAS DECLINED SUBSTANTIALLY

14 AND WE ARE LEFT WITH VERY FEW CHOICES, AS I INDICATED BEFORE.

15 Q.  YOU MENTIONED MANDATED SERVICES.  ARE THOSE SERVICES THAT

16 ARE REQUIRED BY SOME TYPE OF LAW TO PROVIDE?

17 A.  YES.  THOSE ARE THINGS THAT ARE EITHER IN STATUTE OR THERE'S

18 A MANDATE THAT HAS BEEN PUT IN EFFECT BY THE STATE THAT REQUIRES

19 EITHER A CERTAIN SERVICE BE PROVIDED, AN ENTITLEMENT, OR A

20 CERTAIN TYPE OF SERVICE WHERE THE SERVICE LEVEL MIGHT BE --

21 THERE MAY BE SOME VARIATION IN THE SERVICE LEVEL, BUT WE HAVE TO

22 PROVIDE THAT PARTICULAR SERVICE.

23 Q.  ARE THOSE MANDATED SERVICES, DOES THE STATE PROVIDE FUNDING

24 FOR THOSE SERVICES?

25 A.  THE STATE PROVIDES FUNDING IN SOME CASES, BUT IN MANY CASES

1  THOSE MANDATES ARE NOT FULLY FUNDED.

2          AN EXAMPLE THAT YOU MIGHT BE FAMILIAR WITH IS THE

3  PROP 36, OR WHAT'S KNOWN AS THE SACPA PROGRAM, DRUG SERVICES FOR

4  INMATES.  THAT WAS AN INITIATIVE THAT WAS PASSED SEVERAL YEARS

5  AGO IN WHICH THERE WAS FUNDING ATTACHED TO IT BEFORE A LIMITED

6  AMOUNT OF TIME.  WHAT'S HAPPENED IS IS THAT BECAUSE WE BELIEVE

7  THAT THIS IS A PROGRAM THAT WORKS BECAUSE IT -- IT REALLY TAKES

8  INMATES, POTENTIAL INMATES, AND PUTS THEM INTO TREATMENT AS

9  OPPOSED TO JUST BEING PUT INTO -- INTO THE JAIL.  THAT'S A

10 SITUATION THAT WE THINK MAKES SENSE BECAUSE THESE INDIVIDUALS

11 ARE GETTING TREATMENT FOR REALLY WHAT IS AN ILLNESS.

12         THE COUNTY HAS, IN FACT, ALLOCATED DISCRETIONARY

13 DOLLARS IN THE PLACE OF REALLY WHAT SHOULD BE FUNDING FROM THE

14 STATE, BECAUSE THIS WAS AN INITIATIVE PASSED BY THE PEOPLE.  AT

15 THIS POINT IN TIME, YOU KNOW, THE COUNTY IS PUTTING BETWEEN A

16 HALF AND TWO-THIRDS OF THE FUNDING FOR THIS PROGRAM WHICH WAS,

17 IN FACT, SOMETHING THAT WAS THRUST UPON US THROUGH THIS PROP 36

18 INITIATIVE.

19         SO, YOU KNOW, FROM AN OVERALL PERSPECTIVE, YOU KNOW,

20 OUR COUNTY HAS SEEN POSITIVE RESULTS FROM THIS PROGRAM.  OUR

21 COMPLETION RATE IS AMONG THE HIGHEST IN THE STATE AT AROUND

22 56 PERCENT.

23         AND SO THIS IS JUST AN EXAMPLE OF A PROGRAM WHERE WE

24 ARE BEING FORCED TO PUT DISCRETIONARY FUNDING INTO THAT PROGRAM

25 INSTEAD OF GETTING THE FULL FUNDING FROM THE STATE.

1  Q.  AND BY SACPA, YOU MEAN THE SUBSTANCE ABUSE AND CRIME

2  PREVENTION ACT OF 2000?

3  A.  THAT'S WHAT I MEAN, YEAH.

4  Q.  AND YOU SAID THAT PROGRAM IS SUCCESSFUL IN SANTA CLARA

5  COUNTY?

6  A.  IT IS.  WE BELIEVE IT'S SUCCESSFUL, AND THE COURT AND

7  ADMINISTRATION HAVE REALLY GOTTEN TOGETHER AND ARE COMMITTED TO

8  THE PROGRAM BECAUSE IT DOES TAKE INMATES OUT OF THE PRISON --

9  OUT OF OUR JAIL SYSTEM AND PUTS THEM INTO TREATMENT, WHICH WE

10  THINK IS A MUCH MORE REASONABLE WAY.  IT POTENTIALLY OFFERS THEM

11  THE ABILITY TO REHABILITATE, AS OPPOSED TO RECIDIVATE.

12  Q.  AND DID YOU SAY THAT THE STATE PROVIDES ONLY ABOUT ONE-THIRD

13  OF THE FUNDING FOR THAT PROGRAM?

14  A.  ONE-THIRD OF THE FUNDING THAT'S REALLY REQUIRED TO MAKE THAT

15  PROGRAM WORK.

16  Q.  AND THE COUNTY ALLOCATES ITS OWN DISCRETIONARY MONEY TO MAKE

17  UP THE DIFFERENCE?

18  A.  THAT'S CORRECT.

19  Q.  IS THE COUNTY ABLE TO SERVE ALL OF THE PEOPLE WHO WOULD

20  BENEFIT FROM THAT PROGRAM?

21  A.  WHAT HAPPENS IS, IS THAT, YOU KNOW, AS INDIVIDUALS COME

22  THROUGH THAT PROGRAM BASED ON THE MANDATE, YOU KNOW, THERE ARE

23  ISSUES IN TERMS OF HOW LONG THEY MAY HAVE TO WAIT TO ACTUALLY

24  GET INTO TREATMENT, BECAUSE THERE AREN'T ENOUGH RESOURCES TO

25  TREAT EVERYBODY IN THE TIME FRAME THAT WE WOULD LIKE TO SEE.

1   AND SO THERE ARE WAITING LISTS.  THERE ARE -- INMATES ARE

2   SPENDING MORE TIME IN JAIL THAN THEY SHOULD BECAUSE THEY HAVE TO

3   WAIT FOR A BED TO BECOME AVAILABLE.

4            AND WHAT'S OF GREATER CONCERN IS THE FACT THAT THE

5   STATE CONTINUES TO REDUCE THE RESOURCES ALLOCATED TO THE SACPA

6   PROGRAM.  SO AT THIS POINT IN TIME WE DON'T HAVE THE FLEXIBILITY

7   TO CONTINUE TO ALLOCATE THOSE DISCRETIONARY RESOURCES, SO WE ARE

8   BEING FORCED TO REDUCE THE BEDS AVAILABLE FOR THAT PROGRAM.

9   **Q.**  SO WHAT HAPPENS WHEN THE COUNTY HAS TO APPLY ITS OWN FUNDS

10  TOWARDS THE SACPA PROGRAM?

11  **A.**  WELL, BASICALLY WHAT IT MEANS IS THAT THAT'S FUNDING THAT IS

12  NOT ABLE TO BE ALLOCATED TO OTHER IMPORTANT PREVENTION PROGRAMS,

13  WHETHER THEY BE IN MENTAL HEALTH OR SOCIAL SERVICES, WRAP-AROUND

14  SERVICES, WHATEVER THEY MIGHT BE.

15           OBVIOUSLY, WHEN WE HAVE TO COVER A MANDATE, THOSE

16  FUNDS ARE NOT AVAILABLE FOR LOCAL PRIORITIES.

17  **Q.**  SO FOR THE -- WHAT ABOUT THE PEOPLE WHO ARE NOT OFFENDING?

18  ARE THEY ABLE TO ACCESS SERVICES?

19  **A.**  OF COURSE, THAT'S ANOTHER ISSUE.  THE ISSUE OF THE FACT THAT

20  MUCH OF THE MONEY THAT'S BEING PUT FORWARD NOW, EVEN THROUGH

21  THINGS LIKE THE MENTAL HEALTH SERVICES ACT AND OTHER NEW

22  FUNDING, IS REALLY BEING ALLOCATED TO OR COMING FROM THE STATE

23  IN THE FORM OF PROGRAMS IN THE CRIMINAL JUSTICE AREA.  SO YOUR

24  AVERAGE PERSON WHO MIGHT HAVE A SUBSTANCE ABUSE ISSUE OR MENTAL

25  HEALTH ISSUE, THERE IS LESS BEDS OR THERE'S LESS SERVICES

1  AVAILABLE.  AND WE ARE CONCERNED BECAUSE THAT REALLY IS AN

2  EQUITY ISSUE AS WE SEE IT.

3  **Q.**  DID YOU FORM AN OPINION AS TO WHAT IMPACT, IF ANY, A STATE

4  PRISONER POPULATION REDUCTION WOULD HAVE ON THE COUNTY OF SANTA

5  CLARA?

6  **A.**  I DID.

7  **Q.**  AND WHAT WAS YOUR OPINION?

8  **A.**  OBVIOUSLY, WE HAVE GREAT CONCERNS ABOUT IF, IN FACT, THESE

9  INDIVIDUALS WERE TO COME INTO OUR COMMUNITY IN TERMS OF OUR

10  ABILITY TO EITHER PROVIDE SERVICES OR TO THE EXTENT TO WHICH,

11  IF, IN FACT, THERE WAS A CAP AND WE WERE UNABLE TO TRANSPORT

12  THESE PRISONERS INTO THE STATE SYSTEM, HOW THAT WOULD IMPACT OUR

13  JAIL SYSTEM AND OUR ABILITY TO PROVIDE SERVICES.

14  **Q.**  WILL THE COUNTY SUFFER ANY TYPE OF HARDSHIP IF THE PRISONERS

15  WERE RELEASED INTO THE COMMUNITY?

16  **A.**  CERTAINLY WITHOUT ADDITIONAL RESOURCES, WE THINK WE ARE

17  DEFINITELY AT RISK.  I MEAN, EVEN THOUGH WE ARE NOT UNDER COURT

18  ORDER, OUR JAIL IS GETTING VERY CLOSE TO BE FULL.  WE HAVE VERY

19  LITTLE FLEXIBILITY AND WE BELIEVE THAT TO ANY EXTENT IN WHICH

20  THERE WOULD BE ADDITIONAL INMATES OR ADDITIONAL INDIVIDUALS WHO

21  WOULD BE COMING INTO THE COMMUNITY OR THAT WE COULD NOT TRANSFER

22  TO THE STATE, THAT THAT WOULD CREATE A VERY DIFFICULT SITUATION

23  FOR US.

24  **Q.**  WOULD YOUR OPINION CHANGE IF THE STATE WERE TO PROVIDE THE

25  COUNTIES WITH FUNDING TO PAY FOR SERVICES FOR RELEASED

 1  PRISONERS?

 2  **A.**  I --

 3          **MS. MORRIS:**  COULD YOU SPEAK UP?  I'M HAVING A HARD

 4  TIME HEARING YOU.

 5  **BY MS. FUENTES:**

 6  **Q.**  WOULD YOUR OPINION CHANGE IF THE STATE WERE TO PROVIDE

 7  COUNTIES WITH FUNDING TO PAY FOR SERVICES AND PROGRAMS FOR

 8  RELEASED PRISONERS?

 9  **A.**  I THINK CLEARLY THE IMPACT OF ADDITIONAL RESOURCES IN TERMS

10  OF LOOKING AT WAYS THAT WE CAN ADDRESS THIS PROBLEM, YOU KNOW,

11  CERTAINLY WOULD MAKE A DIFFERENCE.  WHAT THAT DIFFERENCE WOULD

12  BE IS SORT OF HARD TO DETERMINE AT THIS POINT IN TIME.

13          CLEARLY, OUR CONCERN IS, AND WE HAVE SEEN THIS BEFORE

14  WITH REALIGNMENT PROGRAMS, YOU KNOW, WHERE THE STATE HAS, IN

15  FACT, PROVIDED FUNDING UP FRONT AND THEN HAVE LEFT US WITH A

16  PROGRAM IN PLACE AND THEN ELIMINATED THE FUNDING.

17          THE LEVEL OF TRUST BETWEEN THE COUNTY AND THE STATE

18  IS PROBABLY AT AN ALL TIME LOW.  WE JUST DON'T TRUST THE STATE.

19  THEY HAVE NOT MADE GOOD ON THEIR PROMISES.  SO FROM THAT

20  PERSPECTIVE, YOU KNOW, WE WOULD LOOK AT THIS, YOU KNOW, VERY

21  CAREFULLY.  I THINK THAT THAT REALLY WOULD BE A MAJOR CONCERN

22  FOR US.

23  **Q.**  DO YOU HAVE ANY OTHER CONCERNS?

24  **A.**  WELL, I THINK THAT WHEN WE LOOK AT THE CAPACITY OF OUR

25  SYSTEMS IN TERMS OF MENTAL HEALTH PROVIDERS, DRUG AND ALCOHOL

1  PROVIDERS, TO ACTUALLY BE IN A POSITION TO HAVE ENOUGH

2  RESOURCES, LITERALLY, TO PROVIDE THE SERVICE, YOU KNOW, THAT

3  DEFINITELY IS A CONCERN AS WELL.

4          WE JUST ARE -- WE AT THIS POINT ARE UNSURE DEPENDING

5  ON HOW EITHER A RELEASE OR A -- A CAP WOULD WORK, HOW THAT WOULD

6  IMPACT OUR SYSTEM'S ABILITY TO TREAT THESE INDIVIDUALS.

7  **Q.**  OKAY.  THANK YOU.

8          **THE COURT:**  ANYTHING FROM STATE DEFENDANTS?

9          **MR. LEWIS:**  NO QUESTIONS, YOUR HONOR.

10          **THE COURT:**  CROSS-EXAMINATION?

11          **MS. MORRIS:**  MARIE MORRIS FROM ROSEN, BIEN AND GALVAN

12  ON BEHALF OF THE PLAINTIFFS.

13          **JUDGE REINHARDT:**  COULD YOU SPEAK UP A LITTLE BIT?

14          **MS. MORRIS:**  CERTAINLY.

15                        **CROSS EXAMINATION**

16  **BY MS. MORRIS:**

17  **Q.**  MR. GRAVES, YOUR EXPERTISE IS IN BUDGETING AND RESOURCE

18  ALLOCATION, CORRECT?

19  **A.**  THAT'S CERTAINLY WHERE I HAVE SPENT MOST OF MY CAREER, YES.

20  **Q.**  YOU DON'T HAVE ANY EDUCATION OR TRAINING IN CRIMINAL

21  JUSTICE, DO YOU?

22  **A.**  I DON'T HAVE AN EDUCATION, BUT I HAVE SPENT SEVERAL YEARS

23  OVERSEEING THAT OPERATION FROM A MANAGEMENT PERSPECTIVE.

24  **Q.**  NOT WITHIN THE CRIMINAL JUSTICE SYSTEM, BUT IN TERMS OF

25  COUNTY MANAGEMENT?

1  **A.**  THAT'S CORRECT.

2  **Q.**  OKAY.  AND YOUR RESUME DOESN'T LIST ANY EMPLOYMENT WITH ANY

3  MENTAL HEALTH SERVICES PROVIDERS, IS THAT CORRECT?

4  **A.**  THAT'S CORRECT.

5  **Q.**  OR WITH ANY PUBLIC HEALTHCARE PROVIDER?

6  **A.**  THAT'S CORRECT.

7  **Q.**  OR WITH ANY SUBSTANCE ABUSE TREATMENT PROVIDER?

8  **A.**  THAT'S CORRECT.

9  **Q.**  OR WITH ANY HOMELESS OR HOUSING SERVICES PROVIDER?

10  **A.**  THAT'S CORRECT.

11  **Q.**  OR WITH A CORRECTIONAL FACILITY OR SYSTEM?

12  **A.**  THAT'S CORRECT.

13  **Q.**  YOU KNOW THAT THE VIOLENT CRIME RATE IN SANTA CLARA COUNTY

14  HAS DECREASED SINCE 1997, DON'T YOU?

15  **A.**  IN TERMS OF ITS DECREASE FROM WHEN TO WHEN?

16  **Q.**  FROM 1997 TO THE PRESENT.

17  **A.**  I DON'T KNOW THAT AND, CERTAINLY, THAT'S NOT BEEN WHAT'S

18  REPORTED IN TERMS OF WHERE THE CRIME RATE HAS BEEN MOVING IN THE

19  LAST SEVERAL MONTHS.

20  **Q.**  OKAY.  TO BE FAIR, I ONLY HAVE STATISTICS THROUGH 2006.

21       **MS. MORRIS:**  AND IF YOU COULD GO AHEAD AND PUT UP THE

22  CRIME RATE STATISTICS FOR SANTA CLARA COUNTY?

23       **JUDGE HENDERSON:**  ARE YOU BOTH TALKING ABOUT THE SAME

24  THING?  YOUR QUESTION ASKED ABOUT VIOLENT CRIME RATE.  YOUR

25  ANSWER WAS CRIME RATE.  I ASSUME THOSE ARE DIFFERENT CRIMES.

1          **MS. FUENTES:**  I WOULD LIKE TO IMPOSE AN OBJECTION

2    THAT THE EXPERT IS NOT QUALIFIED.  HE IS NOT AN EXPERT OF

3    CRIMINAL JUSTICE.

4          **JUDGE HENDERSON:**  SHE IS ASKING HIS KNOWLEDGE OF THIS

5    FACT FOR NOW.

6          **MS. MORRIS:**  AND THIS IS IMPEACHMENT ON HIS ASSERTION

7    IN HIS TRIAL DECLARATION ABOUT THE IMPACT ON PUBLIC SAFETY OF

8    RELEASING PEOPLE WITHOUT APPROPRIATE SERVICES AND HOUSING.

9                      (DOCUMENT DISPLAYED)

10         **JUDGE KARLTON:**  IS THIS AN EXHIBIT?

11         **MS. MORRIS:**  THIS WILL BE AN IMPEACHMENT EXHIBIT.

12         **JUDGE KARLTON:**  IS IT IN EVIDENCE NOW?

13         **MS. MORRIS:**  IT IS NOT CURRENTLY IN EVIDENCE.

14         **JUDGE KARLTON:**  DO YOU HAVE ANYTHING ABOUT THIS

15   DOCUMENT?  HAVE YOU EVER SEEN IT?

16         **MS. FUENTES:**  I DON'T HAVE A COPY OF THIS EITHER.

17         **THE WITNESS:**  I HAVE NOT SEEN THIS DOCUMENT BEFORE.

18         **JUDGE HENDERSON:**  IF HE HASN'T SEEN, IT'S REALLY HARD

19   TO IMPEACH HIM ON IT.

20         **JUDGE KARLTON:**  AND NOBODY IS TESTIFYING TO THE TRUTH

21   OF THE DOCUMENT.

22         **MS. MORRIS:**  THIS IS -- I COULD REQUEST JUDICIAL

23   NOTICE FOR THIS.  THIS IS A -- FROM THE -- THE ATTORNEY

24   GENERAL'S -- CALIFORNIA ATTORNEY GENERAL'S CRIMINAL JUSTICE

25   STATISTICS CENTER.  I CAN PASS IT.

1      **MS. FUENTES:**  YOUR HONOR, I OBJECT TO THE DOCUMENT.

2   I STILL DON'T HAVE A COPY OF IT AND THE WITNESS HASN'T SEEN IT.

3      **JUDGE HENDERSON:**  YOUR OFFER IS THAT THIS DOCUMENT

4   DID IMPEACH MR. GRAVES?

5      **MS. MORRIS:**  MR. GRAVES IN HIS DECLARATION STATES

6   THAT:

7           "RELEASING PAROLEES WITHOUT HOUSING,

8           SUBSTANCE ABUSE, MENTAL HEALTH AND HEALTHCARE

9           SERVICES WILL HAVE A SIGNIFICANT NEGATIVE

10          IMPACTS TO PUBLIC SAFETY."

11          AND SO I WANT TO EXPLORE WITH HIM THE EFFECT THAT

12   RELEASING PAROLEES HAS IN THE PAST HAD ON PUBLIC SAFETY.

13          **JUDGE HENDERSON:**  EXPLORING WITH HIM IS DIFFERENT

14   FROM IMPEACHING HIM.

15          **JUDGE KARLTON:**  I SUPPOSE YOU CAN ASK HIM A QUESTION,

16   BUT IF HE HAS NEVER SEEN THE DOCUMENT AND HE DOESN'T KNOW ABOUT

17   IT.  I DON'T KNOW...

18          **JUDGE HENDERSON:**  WELL, LET'S SEE WHERE YOU ARE

19   GOING.  EXPLORE WITH HIM THIS.

20   **BY MS. MORRIS:**

21   **Q.**  ARE YOU AWARE OF HOW MANY VIOLENT CRIMES THERE WERE IN

22   1997 --

23   **A.**  NO.

24   **Q.**  -- IN SANTA CLARA COUNTY?

25   **A.**  ARE YOU ASKING ME IF BEFORE I HAVE SEEN THIS DOCUMENT WAS I

1  AWARE OF THE NUMBER OR BY LOOKING AT THIS DOCUMENT CAN I TELL

2  YOU THE NUMBER?

3  **Q.**  WERE YOU AWARE OF THE NUMBER PREVIOUS TO LOOKING AT THIS

4  DOCUMENT?

5  **A.**  NO.

6  **Q.**  DOES THE 9,307 NUMBER SEEM LIKE LIKELY TO BE CORRECT TO YOU

7  FROM YOUR KNOWLEDGE IN THE COUNTY GOVERNMENT?

8          **MS. FUENTES:**  OBJECTION, YOUR HONOR.

9  **A.**  NO, THAT --

10          **JUDGE HENDERSON:**  YOU CAN ANSWER THAT.

11  **A.**  NO.  I AM NOT FAMILIAR WITH THAT SORT OF LEVEL OF DETAIL

12  THAT YOU ARE REFERRING TO.

13  **BY MS. MORRIS:**

14  **Q.**  SO YOU ARE NOT ACTUALLY FAMILIAR WITH THE CRIME RATES IN SAN

15  MATEO -- SORRY, SANTA CLARA COUNTY?

16  **A.**  NOT SPECIFICALLY.

17  **Q.**  OKAY.

18          **JUDGE REINHARDT:**  WHY DON'T YOU ASK HIM ON WHAT BASIS

19  HE HAS STATED THAT THE CRIME RATE HAS BEEN INCREASING?

20          **JUDGE KARLTON:**  ACTUALLY, ANSWER JUDGE REINHARDT'S

21  QUESTION.  WE DON'T HAVE TO PUT IT THROUGH THE WITNESS.

22          I MEAN, IF YOU DIDN'T KNOW WHAT IT WAS IN THE PAST,

23  HOW CAN YOU KNOW IT'S GOING UP NOW?

24          **THE WITNESS:**  I THINK THE OPINION THAT I WAS PUTTING

25  FORWARD WAS THAT IF, IN FACT, THERE WAS A SIGNIFICANT ADDITIONAL

1  NUMBER OF INDIVIDUALS COMING FROM THE STATE SYSTEM, THAT THAT

2  WOULD BE A LOGICAL EXPECTATION THAT WE WOULD HAVE.

3            **JUDGE KARLTON:**  FIRST OF ALL, SIR, WHAT YOU SAID WAS

4  THAT IT'S GOING UP IN THE LAST COUPLE OF MONTHS.  LET'S TAKE

5  THAT FIRST AND THEN WE WILL TALK ABOUT LOGIC LATER.

6            DO YOU HAVE ANY BASIS FOR YOUR OPINION THAT THE CRIME

7  RATE IS RISING IN THE LAST COUPLE OF MONTHS?

8            **THE WITNESS:**  I'M NOT FAMILIAR -- THAT WASN'T WHAT I

9  THOUGHT THAT I HAD SAID.  I THOUGHT IN MY DECLARATION, NO

10 EXPECTATION --

11           **JUDGE KARLTON:**  I'M TALKING ABOUT WHAT YOU SAID HERE.

12 OKAY.  THE ANSWER IS NO, YOU DON'T HAVE ANY.

13 **BY MS. MORRIS:**

14 **Q.**  DO YOU HAVE ANY BASIS BESIDES YOUR THOUGHTS FOR YOUR

15 ASSERTION IN YOUR DECLARATION THAT THE RELEASE OF PAROLEES WOULD

16 LEAD TO AN INCREASE IN -- WOULD HAVE A NEGATIVE IMPACT ON PUBLIC

17 SAFETY?

18 **A.**  AGAIN, THE OPINION THAT I PUT FORWARD WAS THAT THE

19 EXPECTATION IF, IN FACT, THERE WAS A RELEASE OF INDIVIDUALS THAT

20 HAD NOT RECEIVED SERVICES THAT -- AND HAD VERY LITTLE REASON OR

21 OPPORTUNITY FOR EMPLOYMENT, THAT KIND OF THING, OUR EXPECTATION

22 WOULD BE THAT WOULD HAVE AN IMPACT ON PUBLIC SAFETY.

23 **Q.**  DO YOU HAVE ANY BASIS FOR THAT EXPECTATION?  THAT'S MY

24 QUESTION.

25 **A.**  IN FACT?  NO.  I DON'T HAVE A SPECIFIC FACT TO PUT FORWARD,

1   NO.

2   **Q.**   THANK YOU.

3          I WOULD LIKE TO GO OVER A COUPLE OF THE NUMBERS IN

4   THE REPORT THAT YOU SUBMITTED.  YOU STARTED -- YOU HAD A COUPLE

5   OF DIFFERENT ESTIMATES FOR A POPULATION REDUCTION MEASURE FROM

6   THE PRISONS, AND ONE OF YOUR NUMBERS WAS 3500 --

7   **A.**   THAT'S CORRECT.

8   **Q.**   -- CORRECT?

9          AND THIS -- MY UNDERSTANDING IS THAT YOU GOT THIS

10  USING THE LEGISLATIVE ANALYSTS OFFICE DOCUMENT REGARDING A

11  SUPERVISION TRANSFER THAT THEY PUT FORWARD DURING THE BUDGETING

12  PROCESS THIS SPRING, CORRECT?

13  **A.**   THAT'S CORRECT.

14  **Q.**   AND THE LAO, THE LEGISLATIVE ANALYSTS OFFICE, THEY SUCCEEDED

15  THAT 71,000 PEOPLE, PAROLEES, BE TRANSFERRED FROM STATE PAROLE

16  TO COUNTY SUPERVISION, CORRECT?

17  **A.**   YES.

18  **Q.**   AND SO YOU USED THE NUMBER OF 3.6 PERCENT, WHICH IS THE

19  PROPORTION OF PRISONERS IN CDCR THAT COME FROM SANTA CLARA

20  COUNTY, AND APPLIED THAT 3.6 PERCENT TO THE 71,000, IS THAT

21  CORRECT?

22  **A.**   I BELIEVE THAT'S CORRECT.

23  **Q.**   AND THAT'S HOW YOU CAME UP WITH THE 3,500?

24  **A.**   UMM, I THINK THAT IN THAT PARTICULAR CASE -- I DON'T KNOW

25  THAT IT WAS 3.6 PERCENT NOW THAT I'M THINKING.

1          THERE WERE TWO ESTIMATES THAT WE WERE MAKING.  ONE

2    WAS IF THERE WAS A POPULATION CAP.  AND OUR DEPARTMENT OF

3    CORRECTIONS, WE ASKED THEM TO GIVE US AN ESTIMATE IF THERE WAS A

4    POPULATION CAP WHAT, IN FACT, WOULD BE THE IMPACT.

5          AND I THINK IN TERMS OF THE PAROLE REALIGNMENT, I

6    THINK WE USED A DIFFERENT -- A DIFFERENT PERCENTAGE.  GENERALLY

7    SANTA CLARA COUNTY IS 5 PERCENT.  WE USED 5 PERCENT AS THE

8    PERCENTAGE FIGURE.  SO I THINK IN THE CASE OF THE PAROLE

9    REALIGNMENT, WE WERE JUST USING THAT FIGURE TO COME UP WITH A

10   GENERAL ROUGH ESTIMATE SO THAT WE COULD CALCULATE WHAT THE

11   IMPACTS WOULD BE.

12          **JUDGE KARLTON:**  WAIT.  5 PERCENT OF WHAT?  OF THE

13   TOTAL POPULATION OF CALIFORNIA?

14          **THE WITNESS:**  IN TERMS OF DETERMINING THE IMPACT OF

15   PAROLE REALIGNMENT?  YES.  5 PERCENT IS THE NUMBER THAT WE

16   GENERALLY USE.  THAT'S THE FIGURE THAT'S APPLICABLE TO SANTA

17   CLARA COUNTY; 5 PERCENT OF POPULATION, 5 PERCENT OF THE BUDGET,

18   WHATEVER IT MIGHT BE.  5 PERCENT IS WHAT OUR SHARE IS GENERALLY.

19          **JUDGE KARLTON:**  MR. GRAVES, I DON'T UNDERSTAND YOUR

20   TESTIMONY.  PLEASE FORGIVE ME.

21          YOU HAVE GOT THE NUMBER 5 PERCENT AS IT RELATES TO

22   SOMETHING.  WHAT DOES IT RELATE TO?

23          **THE WITNESS:**  RELATES TO THE POPULATION.

24          **JUDGE KARLTON:**  ALL RIGHT.

25

1  **BY MS. MORRIS:**

2  **Q.**  THE POPULATION OF SANTA CLARA COUNTY TO THE POPULATION OF

3  CALIFORNIA?

4  **A.**  THAT'S CORRECT.

5  **Q.**  OKAY.  THAT 71,000 THAT YOU STARTED AT, THAT WAS NOT

6  PROPOSED BY THE PLAINTIFFS AT ANY POINT TO YOUR KNOWLEDGE, WAS

7  IT?

8  **A.**  NO.

9  **Q.**  THAT ACTUALLY CAME FROM THE LAO, STATE GOVERNMENT OFFICE?

10  **A.**  THAT'S CORRECT.

11  **Q.**  OKAY.  AND THAT'S ALSO A PROPOSAL ABOUT PAROLE REALIGNMENT,

12  CORRECT?

13  **A.**  THAT'S CORRECT.

14  **Q.**  SO THAT'S ABOUT TRANSFERRING RESPONSIBILITY FOR SUPERVISION

15  OF PEOPLE IN THE COMMUNITY, CORRECT?

16  **A.**  THAT'S CORRECT.

17  **Q.**  SO IT'S NOT PARTICULARLY ABOUT ADDING ADDITIONAL PEOPLE INTO

18  THE COMMUNITY?

19  **A.**  WELL, I BELIEVE THAT THEIR PROPOSAL WAS A WAY IN WHICH TO

20  REDUCE THE JAIL POPULATION AT THE STATE LEVEL, SO THAT'S WHY WE

21  BELIEVED THAT IT WAS A PARALLEL CIRCUMSTANCE SUBSTANCES.

22          WHAT WE WERE SIMPLY TRYING TO DO WAS PROVIDE

23  INFORMATION ABOUT WHAT THE IMPACT THAT WOULD BE, AND THAT WAS

24  SOMETHING THAT WE BELIEVED WAS PARALLEL TO WHAT IS BEING

25  DISCUSSED IN THIS CASE.

1          IT CERTAINLY WAS NOT, AS YOU INDICATED, A PROPOSAL

2    FROM THE PLAINTIFFS, BUT IT WAS AN EXAMPLE OF A WAY IN WHICH TO

3    REDUCE JAIL POPULATION.

4    Q.  BUT IT WOULD NOT -- THE SIMPLE EFFECT OF TRANSFERRING --

5          **JUDGE KARLTON:**  SIR, YOU UNDERSTAND THAT PAROLEES ARE

6    PEOPLE WHO ARE OUTSIDE OF THE PRISON?

7          **THE WITNESS:**  I DO UNDERSTAND THAT.

8          **JUDGE KARLTON:**  SO WHEN YOU TALK ABOUT TRANSFERRING

9    PAROLE SUPERVISION, YOU ARE TALKING ABOUT TRANSFERRING

10   SUPERVISION OF PEOPLE WHO ARE NO LONGER IN PRISON.

11         **THE WITNESS:**  THAT'S CORRECT.

12         **JUDGE KARLTON:**  AND YOU THINK THAT'S PARALLEL TO WHAT

13   WE ARE CONCERNED WITH HERE?

14         **THE WITNESS:**  WELL, THE LAO'S PROPOSAL WAS A WAY IN

15   WHICH TO RELEASE PEOPLE FROM THE STATE PRISON ON TO PAROLE.

16         **JUDGE KARLTON:**  OKAY.

17   **BY MS. MORRIS:**

18   Q.  OKAY.  I WOULD LIKE TO LOOK A LITTLE BIT AT THE 1500 NUMBER,

19   SORT OF THE BOTTOM END OF YOUR ESTIMATION.

20         THAT WAS BASED ON AN ASSUMPTION OF A RELEASE OF

21   40,000 PEOPLE FROM CDCR, CORRECT?

22   A.  YES.

23   Q.  AND YOU MULTIPLIED THAT 40,000.  THAT'S WHERE YOU MULTIPLIED

24   IT BY 3.6, CORRECT?

25   A.  THAT'S CORRECT.

1  Q. AND THAT'S HOW YOU CAME UP WITH THE 1500?

2  A. YES.

3  Q. I ACTUALLY WANT TO GO TO A DIFFERENT NUMBER. LET'S LOOK AT

4  WHAT PLAINTIFF'S PROPOSAL ACTUALLY IS, WHICH IS THAT AS IT

5  APPLIES TO CDCR, PLAINTIFFS ARE PROPOSING A PHASED REDUCTION OF

6  THE POPULATION IN CDCR BY 52,000 INMATES.

7          SO I HAVE -- I HAVE TAKEN THAT 52,000, MULTIPLIED IT

8  BY 3.6 PERCENT, AS I WAS UNDERSTANDING THAT WAS YOUR

9  METHODOLOGY, AND I CAME UP WITH 1,872; DOES THAT SOUND ABOUT

10 RIGHT TO YOU?

11 A. THAT SOUNDS ABOUT RIGHT.

12 Q. OKAY. AND UNDER PLAINTIFF'S PROPOSAL THAT WOULD BE DONE

13 OVER THE COURSE OF 24 MONTHS. SO I DIVIDED THAT 1872 BY 24 AND

14 I CAME UP WITH 78 SOMETHING -- I CAME UP WITH 78, OKAY?

15 A. UH-HUH.

16 Q. SO WHAT WE ARE PROPOSING IS AN ADDITION OF 78 PAROLEES

17 RETURNING TO SANTA CLARA COUNTY EVERY MONTH, OKAY.

18          SO I WOULD JUST LIKE TO WALK THROUGH SOME OF THE

19 THINGS WE TALKED ABOUT -- YOU TALK ABOUT IN YOUR REPORT USING

20 THAT NUMBER.

21          FIRST OF ALL, YOU TESTIFIED THAT THE POPULATION OF

22 SANTA CLARA COUNTY IS 1.7 MILLION ABOUT?

23 A. THAT'S CORRECT.

24 Q. SO AN ADDITION OF 78 PEOPLE EVERY MONTH FROM CDCR, THAT

25 WOULD ACTUALLY INCREASE THE POPULATION BY -- MY ESTIMATE IS

1  .004 PERCENT; DOES THAT SOUND RIGHT?

2  **A.**  IF YOU LOOK AT IT THAT WAY, YES.

3          **JUDGE REINHARDT:**  004 PERCENT PER MONTH?

4          **MS. MORRIS:**  UH-HUH.

5  **BY MS. MORRIS:**

6  **Q.**  DO YOU KNOW HOW MANY PAROLEES THERE ARE IN SANTA CLARA

7  COUNTY TODAY?

8  **A.**  NOT OFF THE TOP OF MY HEAD, NO.

9  **Q.**  DO YOU USUALLY KNOW HOW MANY THERE ARE IN SANTA CLARA

10  COUNTY?

11  **A.**  THAT'S NOT A NUMBER THAT I NORMALLY KEEP TRACK OF ON A

12  WEEKLY BASIS AS I WOULD, FOR INSTANCE, OUR JAIL POPULATION.

13  **Q.**  OKAY.  DO YOU KNOW IF IT'S THE SAME NUMBER OF PAROLEES

14  COMING BACK TO SANTA CLARA COUNTY EVERY SINGLE MONTH?

15  **A.**  NO, I WOULDN'T KNOW THAT.

16  **Q.**  SO YOU WOULDN'T KNOW IF THERE WERE, SAY, 300 OR 400 OR 500

17  COMING BACK ANY PARTICULAR MONTH?

18  **A.**  NOT UNLESS I LOOKED AND PURSUED THAT INFORMATION.

19  **Q.**  BUT YOU DON'T LOOK AND PURSUE THAT INFORMATION?

20  **A.**  NOT NORMALLY, NO.

21  **Q.**  OKAY.  UNDER CALIFORNIA LAW PERSONS WHO ARE SENT FROM SANTA

22  CLARA COUNTY TO CDCR, THEY ARE GOING TO PAROLE BACK TO SANTA

23  CLARA COUNTY IN GENERAL, CORRECT?

24  **A.**  YES.

25  **Q.**  AND PAROLE VIOLATORS WHO ARE IN SANTA CLARA COUNTY AND ARE

1  SENT BACK TO CDCR FOR A PAROLE VIOLATION, THEY ARE GOING TO BE

2  SENT BACK TO SANTA CLARA COUNTY AFTER THEY FINISH THEIR

3  REVOCATION TERM, CORRECT?

4  **A.**  YES.

5  **Q.**  AND PEOPLE IN CDCR FROM OTHER COUNTIES ARE GENERALLY NOT

6  GOING TO BE RETURNED TO SANTA CLARA COUNTY, CORRECT?

7  **A.**  AS FAR AS I KNOW, YES.

8  **Q.**  DO YOU UNDERSTAND THAT AS TO THOSE PEOPLE THAT ARE IN CDCR,

9  PLAINTIFFS'S PROPOSAL WOULD ONLY RESULT IN PEOPLE BEING RELEASED

10 A FEW MONTHS EARLY?

11 **A.**  I HAVE A GENERAL SENSE OF WHAT YOUR PROPOSAL IS, YES.

12 **Q.**  AND DO YOU UNDERSTAND THAT AS FAR AS PEOPLE WHO ARE IN CDCR,

13 THE PROPOSAL IS ONLY TO RELEASE PEOPLE A FEW MONTHS EARLY?

14 **A.**  I DON'T KNOW SPECIFICALLY HOW MANY MONTHS EARLY, BUT I -- I

15 UNDERSTAND THAT GENERALLY THE PROPOSALS HAVE BEEN PEOPLE TOWARDS

16 THE END OF THEIR TERM.

17 **Q.**  SO YOU WOULD UNDERSTAND, ALSO, THAT PLAINTIFFS ARE NOT

18 PROPOSING THAT PEOPLE WHO WOULD NOT BE PAROLING EVER BE

19 RELEASED, CORRECT?

20 **A.**  YES.

21 **Q.**  SO THESE 78 ADDITIONAL PAROLEES THAT WE HAVE BEEN TALKING

22 ABOUT, THOSE ARE PEOPLE THAT WOULD BE RETURNING TO SANTA CLARA

23 COUNTY AT SOME POINT IN THE RELATIVELY NEAR FUTURE IN ANY EVENT,

24 CORRECT?

25 **A.**  YES.

1  Q.  YOU MAKE THE CLAIM IN YOUR EXPERT REPORT THAT THE RELEASE OF

2  THE CDCR PRISONERS WOULD OVERWHELM SANTA CLARA COUNTY'S

3  CORRECTIONAL FACILITIES.

4          AT THE TIME THAT YOU WROTE YOUR REPORT, SANTA CLARA

5  COUNTY HAD 643 EMPTY BEDS, CORRECT?

6  A.  THAT IS CORRECT.

7  Q.  AND TODAY THERE ARE MORE THAN 900 EMPTY BEDS, AREN'T THERE?

8  A.  TODAY I BELIEVE THAT THE LAST FIGURE THAT I SAW WAS -- I

9  BELIEVE IT WAS AROUND 700.  IT WAS CAPACITY.  I THINK OUR

10 POPULATION, THE LAST I LOOKED, WAS AROUND 4600.

11         MS. MORRIS:  OKAY.  COULD YOU PUT UP THE DAILY

12 POPULATION STATISTICS?  OR I CAN DISTRIBUTE THEM.

13         MS. FUENTES:  CAN WE HAVE SOME FOUNDATION FOR THIS

14 DOCUMENT?

15         MS. MORRIS:  THIS IS THE SANTA CLARA COUNTY

16 DEPARTMENT OF CORRECTIONS WEBSITE DAILY POPULATION.

17         MS. FUENTES:  WHICH DAY?

18         MS. MORRIS:  TODAY.

19              (WHEREUPON, DOCUMENT WAS TENDERED

20               TO THE COURTS, COUNSEL AND THE WITNESS.)

21         MS. MORRIS:  WE WOULD LIKE TO MARK THIS AS

22 EXHIBIT 841.

23         JUDGE HENDERSON:  IT WILL BE SO MARKED FOR

24 IDENTIFICATION.

25

1                    (PLAINTIFFS' EXHIBIT 841 MARKED FOR

2                    IDENTIFICATION)

3          **JUDGE KARLTON:**  DO YOU WANT TO MOVE IT IN, MA'AM,

4   BECAUSE YOU ARE GOING TO ASK SOME QUESTIONS ABOUT IT?

5          **MS. MORRIS:**  YES.  I WOULD LIKE TO MOVE IT INTO

6   EVIDENCE, PLEASE.

7          **JUDGE HENDERSON:**  IT WILL BE ADMITTED AT THIS TIME.

8                    (PLAINTIFFS' EXHIBIT 841 RECEIVED IN

9                    EVIDENCE)

10  **BY MS. MORRIS:**

11  Q.  SORRY.  IT'S NOT GOING TO BE SHOWN ON THE BIG SCREEN, BUT WE

12  CAN ALL LOOK AT IT.

13          ARE YOU FAMILIAR WITH THE DOCUMENT THAT HAS BEEN NOW

14  IDENTIFIED AS EXHIBIT 841?

15  **A.**  IT'S NOT A -- THAT'S NOT THE FORM THAT I SEE THIS

16  INFORMATION IN.  I DON'T GO TO THE WEBSITE TO GET THIS

17  INFORMATION.  INFORMATION IS PRESENTED TO ME ON A WEEKLY BASIS.

18  Q.  DO YOU HAVE ANY REASON TO BELIEVE THIS IS NOT FROM THE SANTA

19  CLARA COUNTY WEBSITE?

20  **A.**  THE ONLY THING I WOULD SAY IS THIS IS DIFFERENT FROM THE

21  INFORMATION THAT I WOULD SEE, SO I DON'T KNOW EXACTLY WHAT THE

22  BASIS FOR THIS IS.  IF THERE IS SOME ADDITIONAL INMATE

23  POPULATION THAT'S NOT INCLUDED, I DON'T KNOW THAT.

24          **JUDGE HENDERSON:**  WHEN YOU SAY "DIFFERENT," DO YOU

25  MEAN FORMAT OR THE NUMBERS THAT YOU SEE?

1    **THE WITNESS:** THE NUMBERS. AS I INDICATED, I BELIEVE

2    THE NUMBERS -- AND, AGAIN, I LOOKED AT THIS ON MONDAY. I WOULD

3    SAY THAT THE NUMBERS THAT I WAS LOOKING AT WAS SOMEWHERE BETWEEN

4    4500 -- 4550 AND 4600.

5         SO THIS SURPRISES ME, BUT, OBVIOUSLY, IT'S ON THE

6    WEBSITE. SO, AGAIN, I DON'T KNOW IF INFORMATION THAT'S

7    PRESENTED THERE IS DIFFERENT FROM WHAT I SEE.

8    **BY MS. MORRIS:**

9    **Q.** OKAY. BUT YOU BELIEVE THAT THIS IS --

10   **A.** I BELIEVE, CERTAINLY, THAT IF THIS IS ON THE WEBSITE, THAT

11   THAT'S CERTAINLY WHAT'S BEEN REPORTED.

12        AND ALL I COULD TELL YOU ASK THAT IT IS SLIGHTLY

13   DIFFERENT. I MEAN, WE ARE NOT TALKING ABOUT A SUBSTANTIAL

14   DIFFERENCE, BUT IT IS SLIGHTLY DIFFERENT FROM THE INFORMATION

15   THAT I SAW EARLIER THIS WEEK.

16   **Q.** AND THE INFORMATION THAT YOU SAW EARLIER THIS WEEK, YOU

17   THINK WAS AROUND --

18   **A.** 4550 TO 4600 WAS THE NUMBER THAT I RECALL.

19   **Q.** AND THE TOTAL CAPACITY OF THE SANTA CLARA COUNTY

20   CORRECTIONAL FACILITIES IS 5,380, CORRECT?

21   **A.** THAT'S CORRECT.

22   **Q.** SO WHETHER IT'S -- WHETHER IT'S WHAT THE WEBSITE SAYS OR

23   WHAT YOU RECALL FROM EARLIER THIS WEEK, YOU ARE IN THE RANGE OF

24   700 TO 900 EMPTY BEDS CURRENTLY?

25   **A.** THAT IS CORRECT.

1  Q.  BUT IT'S IMPORTANT TO HAVE FREE BEDS IN THE PRISON -- IN THE

2  JAIL SYSTEM, ISN'T IT?

3  A.  IT IS.  GENERALLY, THE EXPECTATION IS THAT 15 PERCENT

4  VACANCY RATE IS NECESSARY BECAUSE OF ISSUES AROUND THINGS LIKE

5  CLASSIFICATION.  INMATES CAN'T ALL BE HOUSED IN THE SAME

6  LOCATIONS.  SO IT'S IMPORTANT TO HAVE THAT FLEXIBILITY, YES.

7  Q.  OKAY.  YOU STATED DURING YOUR DEPOSITION THAT YOUR ASSERTION

8  THAT THE JAIL SYSTEM WOULD BE OVERWHELMED WAS BASED, IN PART, ON

9  AN ASSUMPTION THAT EVERY SINGLE PERSON WHO WAS RELEASED FROM

10  CDCR WOULD SPEND SOME TIME IN THE SANTA CLARA COUNTY

11  CORRECTIONAL FACILITIES, CORRECT?

12  A.  I DON'T RECALL SAYING THAT.  I THINK THAT THE ASSUMPTIONS

13  THAT WE MADE WERE BASED ON A SIGNIFICANT RELEASE AT ONE TIME OR

14  BASED ON A CAP THAT WOULD PREVENT US FROM TRANSPORTING PEOPLE TO

15  THE STATE SYSTEM.

16  Q.  SO IF THERE WAS A PHASED RELEASE OF SOMEWHERE AROUND 78

17  PEOPLE PER MONTH, DO YOU THINK THAT WOULD OVERWHELM THE JAIL

18  SYSTEM?

19  A.  I THINK THE CONCERN THERE, OBVIOUSLY, WOULD BE THE

20  CUMULATIVE EFFECT.  YOU KNOW, CLEARLY 78 PEOPLE, YOU KNOW, IN

21  ONE MONTH IS NOT GOING TO OVERWHELM US, BUT THE CUMULATIVE

22  EFFECT, I THINK, IS CERTAINLY WHAT WE WOULD BE CONCERNED ABOUT.

23          AS I INDICATED BEFORE, YOU KNOW, IN TERMS OF THE

24  KINDS OF DEFICITS AND THE KINDS OF PRESSURES THAT WE ARE FACING

25  IN OUR SITUATION, ANY KIND OF INCREASE IN THE DEMAND FOR SERVICE

 1  OR IN THE NEED TO HOUSE ADDITIONAL INDIVIDUALS IS GOING TO HAVE

 2  AN IMPACT.  THERE IS NO QUESTION ABOUT THAT IN MY MIND.

 3          **THE CLERK:**  FIVE MINUTES, COUNSEL.

 4  **BY MS. MORRIS:**

 5  **Q.**  SANTA CLARA RENT OUT BEDS TO OTHER ENTITIES, THE FEDERAL AND

 6  STATE GOVERNMENT, CORRECT?

 7  **A.**  THAT IS CORRECT.

 8  **Q.**  AND SOME OTHER COUNTIES?

 9  **A.**  MENTAL HEALTH BEDS TO OTHER COUNTIES.

10  **Q.**  AND IT'S ABOUT 400 BEDS TOTAL THAT THEY ARE RENTING OUT?

11  **A.**  400 IS AROUND THE CENSUS.  THAT WAS THE LAST INFORMATION

12  THAT I SAW.  IT IS NOT ABSOLUTELY RECENT, BUT I THINK THAT'S IN

13  THE BALLPARK.

14  **Q.**  AND SANTA CLARA COUNTY HAS CLOSED SOME OF ITS JAIL BEDS,

15  HASN'T IT?

16  **A.**  THAT'S CORRECT.

17  **Q.**  APPROXIMATELY FIVE HOUSING UNITS?

18  **A.**  I THINK THAT'S CORRECT, YES.

19  **Q.**  OKAY.  MR. GRAVES, YOU THINK THAT SANTA CLARA COUNTY HAS

20  MORE EFFECTIVE SUBSTANCE ABUSE TREATMENT PROGRAMS FOR PEOPLE

21  THAT ARE IN CONTACT WITH THE CRIMINAL JUSTICE SYSTEM THAN CDCR

22  DOES, CORRECT?

23  **A.**  YES.

24  **Q.**  AND YOU THINK YOU DO A GOOD JOB WITH DIVERSION PROGRAMS,

25  LIKE PROP 36, USING THOSE INSTEAD OF JAIL, CORRECT?

1  **A.**  YES.

2  **Q.**  AND THAT THOSE OFFER THE POSSIBILITY OF REHABILITATION AND

3  HAVE -- AND THAT WOULD HAVE A POSITIVE IMPACT ON PUBLIC SAFETY,

4  CORRECT?

5  **A.**  YES.

6  **Q.**  OKAY.  HAS THE COUNTY ASKED FOR ADDITIONAL MONIES FOR PROP

7  36?

8  **A.**  YES.

9  **Q.**  AND WHAT HAPPENED?

10 **A.**  WE DIDN'T RECEIVE THEM.

11 **Q.**  YOU ESTIMATED THAT 70 PERCENT OF ALL PEOPLE COMING OUT OF

12 CDCR HAVE SUBSTANCE ABUSE PROBLEMS THAT WOULD BENEFIT FROM

13 TREATMENT, CORRECT?

14 **A.**  YES.

15 **Q.**  YOU DON'T KNOW HOW MANY PAROLEES CURRENTLY ACCESS SUBSTANCE

16 ABUSE TREATMENT THROUGH THE COUNTY PROVIDERS, DO YOU?

17 **A.**  HOW MANY CURRENT PAROLEES?

18 **Q.**  UH-HUH.

19 **A.**  NO, I DON'T KNOW THAT.

20 **Q.**  OKAY.  AND YOU DON'T KNOW WHAT PERCENTAGE OF PAROLEES

21 CURRENTLY ACCESS SUBSTANCE ABUSE TREATMENT THROUGH THE COUNTY

22 PROVIDERS?

23 **A.**  I DON'T KNOW THAT.

24 **Q.**  ASSUMING THAT THE 70 PERCENT IS CURRENT, SOME OF THEM WOULD

25 BE LIKELY TO GET HELP THROUGH NON-COUNTY PROVIDERS, WOULDN'T

1  THEY?

2  **A.**  I'M NOT SURE THAT -- I CAN ANSWER THAT IN TERMS OF WHAT

3  MEANS THAT THEY WOULD HAVE.

4        GENERALLY SPEAKING, THIS POPULATION, MY ASSUMPTION

5  WOULD BE, WOULD BE PURSUING SERVICES THROUGH THE PUBLIC SECTOR.

6        **JUDGE KARLTON:**  WELL, THROUGH THE PUBLIC SECTOR, BUT

7  YOU KNOW THAT PAROLE SUPERVISION IS DONE PRESENTLY BY THE STATE.

8        **THE WITNESS:**  YES.

9        **JUDGE KARLTON:**  AND IF THERE ARE PAROLE SUBSTANCE

10  ABUSE PROGRAMS, THAT'S PROVIDED BY THE STATE.

11        **THE WITNESS:**  IF THEY -- IF THOSE PROGRAMS ARE

12  AVAILABLE, THEN, CERTAINLY, THEY COULD ACCESS THEM THROUGH

13  THERE.

14  **BY MS. MORRIS:**

15  **Q.**  AND THERE'S ALSO N.A., CORRECT?

16  **A.**  UH-HUH.  YES.

17  **Q.**  AND A.A.  AND THERE ARE SOME PRIVATE PROVIDERS AS WELL.

18  AREN'T THERE?

19  **A.**  THERE -- I'M SURE THERE'S PRIVATE PROVIDERS.  AGAIN, THE

20  ISSUE IS THE MEANS OF THE INDIVIDUAL THAT IS COMING OUT OF THE

21  STATE SYSTEM.  I THINK THAT'S REALLY THE QUESTION.

22  **Q.**  BUT YOU DON'T HAVE ANY SPECIFIC INFORMATION ABOUT HOW MANY

23  PEOPLE CURRENTLY OR IN THE FUTURE WOULD ACCESS NON-COUNTY

24  PROVIDERS FOR SUBSTANCE ABUSE TREATMENT?

25  **A.**  ALL I CAN TELL YOU IS THAT THE DEMAND CURRENTLY EXCEEDS THE

1  SUPPLY.  SO ANY ADDITIONAL PEOPLE, EVEN IF THEY WERE ONE, THEN

2  THAT WOULD PRESENT A PROBLEM FOR US.

3  Q.  OKAY.  AND YOU ALSO THINK THAT SANTA CLARA COUNTY DOES A

4  GOOD JOB OF PROVIDING MENTAL HEALTH CARE TO THOSE PEOPLE THAT IT

5  PROVIDES SERVICES TO, DON'T YOU?

6  A.  YES.

7  Q.  BUT THERE AREN'T CURRENTLY ENOUGH RESOURCES?

8  A.  THAT'S CORRECT.

9  Q.  YOU STATED THAT SANTA CLARA COUNTY HAS GOTTEN MONEY THROUGH

10 THE MENTAL HEALTH SERVICES ACT, CORRECT?

11 A.  YES.

12 Q.  ISN'T IT TRUE THAT 50 PERCENT OF THE MENTAL HEALTH SERVICES

13 PROVIDER -- SERVICES ACT FUNDS ARE DEDICATED TO FULL SERVICE

14 PARTNERSHIPS?

15 A.  I BELIEVE THAT'S CORRECT.

16 Q.  OKAY.  AND THOSE ARE THE INTENSIVE SERVICES THAT THE PEOPLE

17 WHO ARE THE MOST IN NEED OF ASSISTANCE NEED TO ACCESS, CORRECT?

18 A.  YES.

19 Q.  OKAY.  AT THE SAME TIME THAT SANTA CLARA COUNTY HAS BEEN

20 RECEIVING THESE ADDITIONAL FUNDS THROUGH THE MENTAL HEALTH

21 SERVICES ACT, SANTA CLARA COUNTY HAS BEEN CUTTING THE OTHER

22 FUNDING, THE DISCRETIONARY GENERAL FUND FUNDING, FOR THE MENTAL

23 HEALTH SERVICES IN THE COUNTY, CORRECT?

24 A.  YES.

25 Q.  SO IF SOME OF THAT MONEY HAD NOT BEEN TAKEN AWAY, THERE

1  WOULD BE MORE MONEY AVAILABLE, WOULDN'T THERE NOT?

2  **A.**  THERE WOULD HAVE BEEN, YES.

3  **Q.**  OKAY.

4  **A.**  AND THEREIN LIES THE PROBLEM.

5  **Q.**  YOU DON'T KNOW HOW MANY PAROLEES CURRENTLY ACCESS MENTAL

6  HEALTH HEALTHCARE THROUGH THE COUNTY SERVICES, DO YOU?

7  **A.**  NO.

8  **Q.**  AND YOU DON'T KNOW WHAT PERCENTAGE OF PAROLEES CURRENTLY

9  ACCESS MENTAL HEALTHCARE THROUGH THE COUNTY?

10  **A.**  NO.

11  **Q.**  YOU -- ACTUALLY, YOU ALSO DON'T HAVE ANY ESTIMATES AS TO

12  WHAT PERCENTAGE OF PEOPLE COMING OUT OF CDCR BECOME HOMELESS, DO

13  YOU?

14  **A.**  NO.  I THINK THE INFORMATION THAT I PROVIDED WAS BASED ON A

15  SURVEY THAT WE DO ON AN ANNUAL BASIS THAT INDICATED THAT ROUGHLY

16  10 PERCENT OF THE PEOPLE WHO WERE SURVEYED INDICATED THAT THEIR

17  LAST -- THE LAST PLACE THAT THEY HAD SLEPT WAS IN A JAIL.  SO

18  THAT IS THE NUMBER THAT WE ARE ASSUMING IN TERMS OF THE

19  POTENTIAL IMPACT.

20  **Q.**  SO YOU ARE ASSUMING -- MY UNDERSTANDING OF THAT IS THAT

21  10 PERCENT OF THE HOMELESS PEOPLE CAME FROM CRIMINAL JUSTICE?

22  **A.**  YES.

23  **Q.**  THAT'S NOT TO SAY THAT 10 PERCENT OF THE PEOPLE COMING OUT

24  OF CRIMINAL JUSTICE ARE HOMELESS, CORRECT?

25  **A.**  THAT'S CORRECT.

1  Q.  OKAY.

2  A.  I THINK THE POINT THAT IS IMPORTANT THERE IS THAT THE ISSUE

3  IS, IS -- TO THE EXTENT TO WHICH THE HOMELESS POPULATION IS

4  INCREASING, THAT, AGAIN, IS ANOTHER STRAIN ON OUR -- ON THE

5  SERVICES THAT WE PROVIDE THAT WE DON'T HAVE THE SERVICES TO

6  SUPPORT.

7  Q.  YOU ALSO DON'T HAVE ANY ESTIMATES OF WHAT PERCENTAGE OF

8  PEOPLE COMING OUT OF PRISON OR OUT OF CDCR ARE REQUESTING PUBLIC

9  ASSISTANCE, CORRECT?

10  A.  NO, I DON'T HAVE THAT INFORMATION.

11  Q.  AND YOU DON'T HAVE ANY ESTIMATE AS TO HOW MANY PEOPLE THAT

12  MIGHT BE RELEASED IN A PRISONER RELEASE ORDER WOULD BE

13  REQUESTING PUBLIC ASSISTANCE OR BECOME HOMELESS?

14  A.  I DON'T HAVE THAT SPECIFIC INFORMATION.  AGAIN, THE ISSUE IS

15  TO THE EXTENT TO WHICH ANY OF THOSE INDIVIDUALS WERE TO TRY TO

16  PURSUE SERVICES, THAT'S WHERE OUR CONCERNS ARE.

17  Q.  YOU DON'T HAVE ANY ESTIMATES TO WHAT PERCENT OF PEOPLE

18  COMING OUT OF CDCR ARE UNINSURED FOR MEDICAL INSURANCE, CORRECT?

19  A.  I DON'T HAVE ANY SPECIFIC INFORMATION, BUT MY ASSUMPTION

20  WOULD BE IT WOULD BE A SIGNIFICANT NUMBER.

21  Q.  BUT YOU DON'T HAVE ANY SPECIFIC INFORMATION?

22  A.  I DON'T HAVE ANY FACTS TO BACK THAT UP.

23  Q.  AND YOU DON'T HAVE ANY ESTIMATES AS TO WHAT PERCENT OF

24  PEOPLE COMING OUT OF CDCR ARE UNINSURED AND ACCESSING COUNTY

25  PUBLIC HEALTH?

 1  **A.**  CORRECT.

 2          **JUDGE KARLTON:**  HE DOESN'T KNOW IF PUBLIC HEALTH ARE

 3  BEING ACCESSED.  HE DOESN'T KNOW HOW MANY -- GO AHEAD AND

 4  ANSWER.  I'M JUST GETTING FRUSTRATED.  GO AHEAD.

 5  **A.**  THAT'S CORRECT.

 6  **BY MS. MORRIS:**

 7  **Q.**  AND YOU DON'T HAVE ANY ESTIMATE OF HOW MANY PEOPLE WHO MIGHT

 8  BE RELEASED IN AN ORDER -- IN A POPULATION REDUCTION ORDER, HOW

 9  MANY OF THOSE WOULD BECOME -- WOULD BE UNINSURED AND NEED TO

10  ACCESS PUBLIC HEALTH?

11  **A.**  THAT'S CORRECT.

12  **Q.**  NO FURTHER QUESTIONS.  THANK YOU.

13          **JUDGE HENDERSON:**  LET'S TAKE OUR AFTERNOON RECESS FOR

14  15 MINUTES.  COURT IS ADJOURNED.

15                  (WHEREUPON THERE WAS A BRIEF

16                   RECESS IN THE PROCEEDINGS.)

17          **JUDGE HENDERSON:**  PROCEED WHEN YOU'RE READY, COUNSEL.

18          **MS. FUENTES:**  YOUR HONOR, WAS THERE A RULING ON

19  WHETHER OR NOT THE CRIMINAL JUSTICE STATISTICS CENTER DOCUMENT

20  IS ADMITTED INTO EVIDENCE?

21          **MR. BIEN:**  I COULDN'T HEAR.

22          **MS. FUENTES:**  I ASKED WHETHER OR NOT THERE WAS A

23  RULING ON WHETHER OR NOT THE CRIMINAL JUSTICE STATISTICS

24  DOCUMENT WAS ADMITTED INTO EVIDENCE?

25          **JUDGE HENDERSON:**  I BELIEVE WE ADMITTED IT, DIDN'T

1    WE?

2              **REDIRECT EXAMINATION BY MR. FUENTES**

3    **BY MS. FUENTES**

4    **Q**   I WOULD LIKE TO ASK YOU, MR. GRAVES, A QUESTION ABOUT THAT

5    DOCUMENT.  DO YOU STILL HAVE IT THERE?

6    **A**   THIS ONE?  IT WAS ON THE SCREEN, BUT --

7              **MS. FUENTES:**  MAY I APPROACH THE WITNESS?

8              **JUDGE HENDERSON:**  YOU MAY.

9    **BY MS. FUENTES**

10   **Q**   MR. GRACE, WHEN YOU WERE TALKING ABOUT THE CRIME RATE IN

11   SANTA CLARA COUNTY, YOU MENTIONED THAT YOU THOUGHT IT HAD GONE

12   UP.  WERE YOU REFERRING TO PROPERTY CRIMES OR VIOLENT CRIMES?

13             **MS. MORRIS:**  I'M SORRY.  I CAN'T HEAR.

14             **JUDGE HENDERSON:**  REPEAT THE QUESTION.

15   **BY MS. FUENTES**

16   **Q**   MR. GRACE, WHEN YOU WERE ASKED THE QUESTION ABOUT CRIME

17   DECREASING IN SANTA CLARA COUNTY AND YOU SAID YOU THOUGHT IT

18   INCREASED, WHAT TYPE OF CRIMES WERE YOU REFERRING TO?

19             **JUDGE REINHARDT:**  I THOUGHT HE SAID VIOLENT CRIMES,

20   DIDN'T HE?

21             **MS. FUENTES:**  I DON'T THINK IT WAS CLEAR, YOUR HONOR.

22   THAT'S WHY I'M TRYING TO CLARIFY.

23             **JUDGE REINHARDT:**  EITHER HE SAID VIOLENT OR HE

24   DIDN'T.  I THOUGHT THAT'S WHAT HE SAID, AND I THINK THE QUESTION

25   THEN WAS -- I ASKED HIM ABOUT IT -- MAYBE THE QUESTIONER

1  MISUNDERSTOOD, TOO, BUT I THINK SHE SAID YOU SAID VIOLENT

2  CRIMES.

3          **JUDGE HENDERSON:**  I REMEMBER POINTING OUT THAT

4  PLAINTIFF'S COUNSEL WAS TALKING ABOUT CRIMES, AND HE WAS TALKING

5  ABOUT VIOLENT CRIMES, AND HE AGREED.

6  **BY MS. FUENTES**

7  **Q**  IS THAT CORRECT?

8  **A**  THAT CERTAINLY -- I MEAN, BECAUSE I HADN'T SEEN THE

9  DOCUMENT, I THOUGHT WE WERE TALKING ABOUT CRIMES IN GENERAL.  I

10 WASN'T BEING SPECIFIC IN TERMS OF VIOLENT OR --

11         **JUDGE REINHARDT:**  NOT WITH THE DOCUMENT, BUT DO YOU

12 RECALL WHAT YOUR TESTIMONY WAS ORIGINALLY WHEN YOU SAID --

13         **THE WITNESS:**  I WAS REFERRING TO JUST CRIME IN

14 GENERAL.  I WASN'T REFERRING TO SPECIFICS, BECAUSE I -- AGAIN,

15 THIS ISN'T THE KIND OF DATA THAT I'M LOOKING AT ON A REGULAR

16 BASIS.

17         YOU KNOW, CLEARLY, FOR US, THE CONCERN THAT WE HAVE,

18 YOU KNOW, IS REGARDING, YOU KNOW, PROPERTY CRIMES, ESPECIALLY IN

19 THIS ECONOMIC ENVIRONMENT, AND THAT'S -- I THINK WHEN WE LOOK

20 AT, YOU KNOW, THE CRIME STATISTICS, AND, YOU KNOW, EVEN THESE

21 CRIME STATISTICS THROUGH 2006, CERTAINLY DEMONSTRATE THAT

22 PROPERTY CRIMES HAVE INCREASED, AT THE SAME TIME RECOGNIZING

23 THAT -- I THINK, AS THE OTHER POINT BEING MADE, THAT VIOLENT

24 CRIMES WERE DECREASING.

25         BUT IN THIS ECONOMIC ENVIRONMENT, ESPECIALLY, IT SORT

1  OF EXACERBATES THE CONCERN WE HAVE AROUND A RELEASE OF

2  ADDITIONAL INDIVIDUALS, IF THEY HAVE A PROPENSITY IN THAT

3  DIRECTION, THAT PROPERTY CRIME RISING IS AN ISSUE AND IS A

4  CONCERN.

5  **BY MS. FUENTES**

6  Q   AND THEN THE DOCUMENT YOU ARE LOOKING AT, YOU'RE SAYING IT

7  SHOWS THAT PROPERTY CRIMES HAVE INCREASED FROM 1997 TO 2006?

8           **MS. MORRIS:**  OBJECTION.  LACK OF FOUNDATION.  HE

9  TESTIFIED HE WASN'T FAMILIAR WITH THIS DOCUMENT.

10           **JUDGE KARLTON:**  THE ATTORNEY IS ASKING THE WITNESS TO

11  READ THE DOCUMENT, BECAUSE, AFTER ALL, WE CAN'T.

12           **THE WITNESS:**  YES.  ACCORDING TO THE DOCUMENT, THE

13  PROPERTY CRIMES HAVE INCREASED BETWEEN 1997 AND 2006.

14           **MS. FUENTES:**  THANK YOU.

15           **JUDGE HENDERSON:**  I'M CONFUSED.  WE'VE LET THIS

16  DOCUMENT IN, AND I'M WONDERING IF IT'S NOT A MISTAKE.  IT WAS

17  LET IN FOR THE PURPOSE OF HAVING THIS WITNESS LOOK AT IT AND SAY

18  THAT SOUNDS RIGHT.

19           **MS. FUENTES:**  I THOUGHT IT WAS LET IN BECAUSE THEY

20  ASKED HIM QUESTIONS ABOUT IT TO PROVE THAT THE CRIME RATES HAD

21  GONE DOWN IN SANTA CLARA COUNTY.

22           **JUDGE HENDERSON:**  LET'S GO ON.

23           **JUDGE REINHARDT:**  I DON'T THINK IT MAKES A LOT OF

24  DIFFERENCE.

25           **JUDGE HENDERSON:**  IT DOESN'T.  GO ON.  GO ON.  WE'RE

1  OKAY.

2  **BY MS. FUENTES**

3  **Q**    ARE YOU -- DO YOU RECEIVE INFORMATION REGARDING THE DAILY

4  POPULATION AT THE DEPARTMENT OF CORRECTION?

5  **A**    I DON'T RECEIVE IT ON A DAILY BASIS.  I RECEIVE IT ONCE A

6  WEEK ON MONDAY.

7  **Q**    AND ARE YOU FAMILIAR WITH WHETHER THE POPULATION IN THE JAIL

8  CHANGES ON A DAY-TO-DAY BASIS?

9  **A**    YES, I AM FAMILIAR WITH THAT.

10  **Q**    AND WHEN YOU RENDERED YOUR OPINIONS IN YOUR EXPERT REPORT

11  AND YOU WERE TALKING ABOUT THE IMPACTS TO SANTA CLARA COUNTY ON

12  A RELEASE OF PRISONERS, YOU WEREN'T JUST REFERRING TO -- WERE

13  YOU JUST REFERRING TO THE NUMBER OF PEOPLE THAT WOULD BE

14  RELEASED, OR ARE YOU REFERRING ALSO TO A POPULATION CAP?

15          **MS. MORRIS:**  I'M SORRY.  I CAN'T HEAR AGAIN.

16  **BY MS. FUENTES**

17  **Q**    IN YOUR OPINIONS PROVIDED IN YOUR REPORT, WERE THEY BASED ON

18  A POPULATION RELEASE FROM STATE PRISON, OR WAS IT ALSO BASED ON

19  A POPULATION CAP?

20  **A**    WELL, WHAT WE WERE LOOKING AT WERE BOTH OF THOSE AS

21  POTENTIAL OUTCOMES.  AND SO, TO THE EXTENT TO WHICH, YOU KNOW,

22  ONE OR THE OTHER OR BOTH ARE ORDERED, OBVIOUSLY, THE IMPACTS

23  WILL RESULT.  IF THERE'S SOME KIND OF A RELEASE, PLUS A

24  POPULATION CAP, YOU KNOW, THAT OBVIOUSLY WOULD PRESENT

25  SIGNIFICANT -- MORE PROBLEMS TO US BASED ON THE FACT THAT WE

1    WOULD HAVE PEOPLE COMING INTO THE COMMUNITY, ADDITIONAL PEOPLE;

2    PLUS, WE WOULD NOT HAVE THE ABILITY TO TRANSFER PEOPLE FROM OUR

3    SYSTEM INTO THE STATE SYSTEM.

4    Q    AND THAT RAISES A CONCERN FOR THE COUNTY?

5    A    THAT DOES RAISE A CONCERN.

6    Q    WHY?

7    A    WELL, AGAIN, BECAUSE OF THE CUMULATIVE EFFECT AND THE FACT

8    THAT OUR SYSTEMS RIGHT NOW ARE SO GREATLY STRAINED, WE -- YOU

9    KNOW, IT APPEARS THAT WE HAVE SOME FLEXIBILITY, BUT THAT

10   FLEXIBILITY, YOU KNOW, CLEARLY WILL DISAPPEAR VERY QUICKLY IF,

11   IN FACT, WE ARE UNABLE TO TRANSFER PRISONERS TO THE STATE

12   SYSTEM.

13            **MS. FUENTES:**  NOTHING FURTHER, THANK YOU.

14            **JUDGE HENDERSON:**  RECROSS?

15                 **RECROSS-EXAMINATION BY MS. MORRIS**

16   **BY MS. MORRIS**

17   Q    MR. GRAVES, IN YOUR REPORT YOU STATE THAT SANTA CLARA COUNTY

18   IS VERY EFFECTIVE AT MANAGING ITS JAIL POPULATION, CORRECT?

19   A    WE ARE EFFECTIVE BECAUSE WE HAVE BEEN VERY PROACTIVE.

20   Q    AND PART OF THAT BEING PROACTIVE MEANS DEVELOPING DIVERSION

21   PROGRAMS, CORRECT?

22   A    THAT'S CORRECT.

23            **MS. MORRIS:**  NO FURTHER QUESTIONS.

24            **MS. FUENTES:**  NOTHING FURTHER.

25            **JUDGE HENDERSON:**  THANK YOU FOR APPEARING AND

 1  TESTIFYING, MR. GRAVES.  YOU'RE EXCUSED.

 2          YOU MAY CALL YOUR NEXT WITNESS.

 3          **MS. FUENTES:**  YOUR HONOR, DEFENDANT INTERVENORS HAD

 4  PLANNED TO CALL CHARLENE SILVA, WHO IS A HEALTH DIRECTOR AT SAN

 5  MATEO COUNTY.  THE PARTIES HAVE REACHED A STIPULATION THAT WOULD

 6  ELIMINATE THE NEED FOR HER TO TESTIFY LIVE TODAY.

 7          **JUDGE REINHARDT:**  DO YOU WANT TO TALK TO THEM ABOUT

 8  HAVING WITNESSES AVAILABLE?

 9          **JUDGE KARLTON:**  DOES THAT MEAN THERE ARE NO MORE

10  WITNESSES TODAY?

11          **MS. FUENTES:**  THAT'S CORRECT, YOUR HONOR.

12          **JUDGE KARLTON:**  THE IDEA OF GETTING THE STIPULATIONS

13  WAS SO WE WOULD BE ABLE TO TAKE UP A NEW WITNESS, NOT THAT WE'D

14  BREAK EARLY.

15          **MS. FUENTES:**  YOUR HONOR, THE TIME THAT WAS ALLOTTED

16  FOR THESE WITNESSES, THE TOTAL TIME TODAY WAS SEVEN HOURS AND

17  FIFTY-FIVE MINUTES.  SO, ORIGINALLY, YESTERDAY WHEN WE REACHED

18  THE STIPULATION, WE THOUGHT IT WOULD TAKE THE ENTIRE DAY OR

19  MORE.

20          **JUDGE REINHARDT:**  YESTERDAY WE BROKE AN HOUR EARLY,

21  TOO.

22          **JUDGE KARLTON:**  WE CAN'T DO THIS, FOLKS.

23          **JUDGE REINHARDT:**  IT'S JUST A GENERAL RULE WHOEVER IS

24  ON SHOULD BE PREPARED WITH THE NEXT WITNESS IN CASE ANYTHING

25  HAPPENS, WHATEVER IT IS.

```
 1           JUDGE KARLTON:  BETTER THAT THAT WITNESS BE

 2  INCONVENIENCED THAN THIS COURT KEEP BREAKING EARLY AND NOT BEING

 3  ABLE TO DISPOSE OF THE CASE.  I'M NOT TALKING TO YOU PERSONALLY.

 4  I'M TALKING TO ALL OF YOU.

 5           I THINK WE ARE GOING TO ESTABLISH A RULE THAT YOU ARE

 6  TO -- WHOEVER IS PUTTING ON WITNESSES, THERE BE ONE MORE WITNESS

 7  PREPARED TO BE PUT ON THAN YOU THINK YOU NEED TO, AND IF THAT

 8  WITNESS IS INCONVENIENCED, I'M TERRIBLY SORRY, BUT WE'VE GOT TO

 9  GET THIS DONE.

10           JUDGE REINHARDT:  AND THAT'S GOING TO BE THAT

11  WITNESS'S OPPORTUNITY TO TESTIFY, AND IF THE WITNESS ISN'T HERE

12  WHEN THE WITNESS IS DUE, THAT'S THE WAY IT GOES.

13           JUDGE HENDERSON:  COURT IS ADJOURNED UNTIL 9:15

14  TOMORROW.

15           JUDGE KARLTON:  WE GOT TO TALK ABOUT SOMETHING ELSE.

16  WE WERE IN THE MIDST OF A CROSS-EXAMINATION OF DR. AUSTIN.  YOUR

17  CROSS-EXAMINATION, HOW MUCH MORE DO YOU HAVE; DO YOU KNOW?

18           MS. BARLOW:  YES, YOUR HONOR.  I BELIEVE I HAVE ABOUT

19  A HALF AN HOUR.

20           JUDGE KARLTON:  YOU HAVE ABOUT A HALF HOUR?

21           MS. BARLOW:  YES.

22           JUDGE KARLTON:  IS ANYBODY ELSE QUESTIONING?

23           MR. MELLO:  THEN IT WOULD BE REDIRECT.

24           JUDGE HENDERSON:  HOW MUCH DO YOU GUYS HAVE?

25           MS. EVENSON:  WE'VE ESTIMATED ABOUT 15 MINUTES BASED
```

1  ON THE CROSS SO FAR.

2           **JUDGE KARLTON:**  SO MAYBE A HALF HOUR.

3           I THINK, I'M NOT SURE, I'M ASKING, WAS DR. AUSTIN'S

4  HOUR INCLUDED IN THE ESTIMATE TO GET US TO THE 19TH OR NOT?

5           **MS. BARLOW:**  I BELIEVE IT WAS, YOUR HONOR.

6           **JUDGE KARLTON:**  OH, OKAY.  OKAY.  GREAT.

7           **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

8           **MS. EVENSON:**  HE'S SCHEDULED ON THE 18TH.

9           **MS. BARLOW:**  HE'S SCHEDULED ON THE 18TH, AND WE DID

10  INCLUDE THAT TIME, YOUR HONOR.

11                     (PROCEEDINGS ADJOURNED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>**I N D E X**</u>

2

3

4    <u>**PLAINTIFFS' WITNESSES**</u>                          <u>PAGE</u>    <u>VOL.</u>

5    <u>**BARRY KRISBERG, PH.D.**</u>

6    DIRECT EXAMINATION BY MR. SANGSTER              2099     11
     CROSS-EXAMINATION BY MS. TILLMAN               2118     11
7    CROSS-EXAMINATION BY MR. MITCHELL              2144     11

8    <u>**PABLO STEWART**</u>

9    DIRECT EXAMINATION BY MS. WHELAN               2207     11
     CROSS-EXAMINATION BY MS. TILLMAN               2221     11
10   DIRECT EXAMINATION BY MS. WANG                 2241     11

11   <u>**DEFENANTS' WITNESSES**</u>

12   <u>**DAVID BENNETT**</u>

13   DIRECT EXAMINATION BY MS. KECK                 2183     11
     CROSS-EXAMINATION BY MS. EVENSON               2204     11

14

15   <u>**GARY GRAVES**</u>

16   DIRECT EXAMINATION BY MS. FUENTES              2245     11
     CROSS-EXAMINATION BY MS. MORRIS                2259     11
17   REDIRECT EXAMINATION BY MS. FUENTES            2283     11
     RECROSS-EXAMINATION BY MS. MORRIS              2287     11
18                         -   -   -   -

19   <u>**PLAINTIFF'S EXHIBITS**</u>      <u>IDEN</u>    <u>VOL.</u>    <u>EVID</u>    <u>VOL.</u>

20   841                         2273    11     2273     11

21   <u>**DEFENDANT'S EXHIBITS**</u>

22   C                                           2182     11

23

24

25

## CERTIFICATE OF REPORTER

WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK JPM, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.


/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR


S/ DEBRA L. PAS

DEBRA L. PAS, CSR 11916, CRR, RMR, RPR

THURSDAY, DECEMBER 11, 2008