VOL 12

PAGES 2292 – 2503

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, ET AL.,            )
                                  )
          PLAINTIFFS,             )
                                  )
  VS.                             ) NO. CIV S-90-0520 LKK JFM
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  ) THREE-JUDGE COURT
          DEFENDANTS.             )
                                  )
_____

MARCIANO PLATA, ET AL.,           )
                                  )
          PLAINTIFFS,             )
                                  )
VS.                               ) NO. C 01-1351 TEH
                                  )
ARNOLD SCHWARZENEGGER, ET AL.     )
                                  )
          DEFENDANTS.             )
_____)

### *TRANSCRIPT OF PROCEEDINGS*

SAN FRANCISCO, CALIFORNIA
FRIDAY, DECEMBER 12, 2008

(APPEARANCES ON FOLLOWING PAGES)


*REPORTED BY:*  JOAN MARIE COLUMBINI, CSR 5435, RPR
               DEBRA L. PAS, CSR 11916, CRR, RMR, RPR
               OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                           1917 FIFTH STREET
                           BERKELEY, CALIFORNIA  94710
                  BY:  **SARA NORMAN, ESQUIRE**
                       **ALISON HARDY, ESQUIRE**
                       **DONALD SPECTER, ESQUIRE**
                       **REBEKAH EVENSON, ESQUIRE**


                           ROSEN, BIEN & GALVAN, LLP
                           315 MONTGOMERY STREET, TENTH FLOOR
                           SAN FRANCISCO, CALIFORNIA 94104
                  BY:  **MICHAEL W. BIEN, ESQUIRE**
                       **JANE KAHN, ESQUIRE**


                           K&L GATES
                           FOUR EMBARCADERO CENTER
                           SUITE 1200
                           SAN FRANCISCO, CALIFORNIA 94111
                  BY:  **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**              CARROLL, BURDICK & MCDONOUGH
                           44 MONTGOMERY STREET, SUITE 400
                           SAN FRANCISCO, CALIFORNIA  94104
                  BY:  **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**         STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           1300 I STREET, SUITE 125
                           P.O. BOX 944255
                           SACRAMENTO, CALIFORNIA  94244
                  BY:  **LISA A. TILLMAN, ESQUIRE**


                           STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           455 GOLDEN GATE AVENUE, SUITE 11000
                           SAN FRANCISCO, CALIFORNIA  94102
                  BY:  **KYLE A. LEWIS, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**    HANSON BRIDGETT
           425 MARKET STREET, 26TH FLOOR
           SAN FRANCISCO, CALIFORNIA  94105
      **BY: PAUL MELLO, ESQUIRE**
           S. ANNE JOHNSON, ESQUIRE


**FOR DISTRICT ATTORNEY** THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**     COUNTY OF RIVERSIDE
           82-675 HIGHWAY 111, FOURTH FLOOR
           INDIO, CALIFORNIA  92201
      **BY: WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**   AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**     580 CALIFORNIA STREET, 15TH FLOOR
           SAN FRANCISCO, CALIFORNIA  94104
      **BY: TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT** JONES & MAYER
**INTERVENORS**     3777 NORTH HARBOR BOULEVARD
           FULLERTON, CALIFORNIA  92835
      **BY: KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS** OFFICE OF THE COUNTY COUNSEL
           COUNTY OF SANTA CLARA
           70 WEST HEDDING STREET
           NINTH FLOOR, EAST WING
           SAN JOSE, CALIFORNIA  95110
      **BY: THERESA FUENTES, ESQUIRE**


**FOR SONOMA COUNTY**  COUNTY OF SONOMA
**INTERVENORS**     575 ADMINISTRATION DRIVE, ROOM 105A
           SANTA ROSA, CALIFORNIA  95403
     **BY: ANNE L. KECK, ESQUIRE**


**FOR THE COUNTY OF**  OFFICE OF MICHAEL P. MURPHY
**SAN MATEO**      COUNTY COUNSEL, SAN MATEO COUNTY
**INTERVENORS:**    HALL OF JUSTICE AND RECORDS
           400 COUNTY CENTER, 6TH FLOOR
           REDWOOD CITY, CALIFORNIA 94063-1662
      **BY: CAROL L. WOODWARD, ESQUIRE**

```
 1  FRIDAY, DECEMBER 12, 2008                9:20 O'CLOCK A.M.

 2

 3                        P R O C E E D I N G S

 4

 5          MR. MITCHELL:  GOOD MORNING, YOUR HONORS.  ONE QUICK

 6  QUESTION BEFORE WE GET STARTED.

 7          WE HAVE TWO WITNESSES SCHEDULED THIS MORNING,

 8  DISTRICT ATTORNEY BONNIE DUMANIS FROM SAN DIEGO AND ROD PACHECO

 9  FROM RIVERSIDE COUNTY.  BOTH ARE DEFENDANT INTERVENOR PARTIES IN

10  THIS ACTION.  I WAS WONDERING, DOES THE WITNESS EXCLUSION ORDER

11  APPLY TO THEM PRIOR TO THEIR TESTIMONY?

12          JUDGE HENDERSON:  NO ONE HAS EVER MADE A WITNESS

13  EXCLUSION ORDER.  THERE'S NOT ONE EXISTING AT THIS TIME.

14          MR. SPECTER:  YES, THERE IS, YOUR HONOR.

15          JUDGE KARLTON:  I HAVE NO RECOLLECTION OF IT.

16          JUDGE REINHARDT:  I DO.  I REMEMBER.

17          JUDGE HENDERSON:  OKAY.

18          JUDGE REINHARDT:  YOU SAID THAT WE ALWAYS DO THAT.

19          JUDGE HENDERSON:  OKAY.  I MAY HAVE.  I DON'T

20  REMEMBER.  BUT THAT'S THE RULE.

21          MR. MITCHELL:  I ASSUMED THERE WAS A WITNESS

22  EXCLUSION ORDER.  I WAS JUST WONDERING, DOES IT APPLY TO PARTY

23  DEFENDANTS WHO HAVE INTERVENED IN THIS ACTION?

24          JUDGE HENDERSON:  YES, IT WOULD.

25          MR. MITCHELL:  THANK YOU, YOUR HONOR.
```

 1            **MS. BARLOW:**  THANK YOU VERY MUCH, YOUR HONOR.  THE

 2   LAW ENFORCEMENT INTERVENORS CALL JERRY DYER TO THE STAND.

 3            **JUDGE HENDERSON:**  STEP FORWARD AND BE SWORN IN, SIR.

 4                         **JERRY DYER,**

 5   HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANTS WAS FIRST

 6   DULY SWORN AND EXAMINED AS FOLLOWS:

 7            **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

 8   RECORD.

 9            **THE WITNESS:**  MY NAME IS JERRY DYER.  FIRST NAME IS

10   J-E-R-R-Y.  LAST NAME IS D-Y-E-R.

11            **MS. BARLOW:**  JUST ONE QUICK NOTATION FOR THE COURT.

12   WE DID FILE AN AMENDED DECLARATION FOR MR. DYER, CHIEF DYER,

13   YESTERDAY WITH A VERY MINOR CHANGE IN PARAGRAPH 23, AND WE ADDED

14   NUMBERING AND PAGE NUMBERS TO MAKE IT EASIER FOR THE COURT TO

15   REFERENCE THE PARTICULAR SECTIONS, AND SO I HAVE COPIES OF THOSE

16   HERE.

17            THE AMENDED REPORT WAS SENT TO COUNSEL YESTERDAY, AND

18   I DID ADVISE MS. EVENSON IN COURT BEFORE WE LEFT HERE YESTERDAY

19   THAT THE CHANGES WOULD BE MADE.  UNFORTUNATELY, THERE WERE TWO

20   MINOR OMISSIONS THAT WERE ACCIDENTAL FROM THIS VERSION THAT WERE

21   IN THE ORIGINAL VERSION OF THE REPORT.  ONE WAS A SINGLE

22   SENTENCE THAT APPEARS AT THE BEGINNING OF PARAGRAPH 23 --

23            **MR. SPECTER:**  EXCUSE ME, YOUR HONOR, BUT BEFORE

24   MS. BARLOW GETS TO TALK ABOUT WHAT SHOULD OR SHOULD NOT BE IN

25   THE NEW REPORTS, I HAVE A -- EXCUSE ME, MAY I USE THE MIC SO THE

1  JUDGES CAN HEAR?

2         I HAVE A STRONG OBJECTION TO HER SUBMITTING A REVISED

3  REPORT AS -- IN SUCH AN UNTIMELY MANNER.  WE GOT NOTICE THAT IT

4  WAS -- I GOT NOTICE -- AND SHE KNEW I WAS GOING TO BE THE ONE TO

5  CROSS-EXAMINE MR. DYER.  I GOT NOTICE AT 6:07 P.M. BY AN E-MAIL

6  AND THEY FILED THE DECLARATION -- THE AMENDED REPORT SHORTLY

7  THEREAFTER, MAKING --

8         **JUDGE HENDERSON:**  LET ME INTERRUPT YOU.  LET'S TALK

9  ABOUT PREJUDICE, NOT JUST TIME.  WHAT --

10        **JUDGE REINHARDT:**  I WOULD SAY --

11        **MR. SPECTER:**  IT MAKES SUBSTANTIVE CHANGES.

12        **JUDGE REINHARDT:**  I WOULD ALSO SAY, I DON'T THINK

13 IT'S A LEGITIMATE OBJECTION THAT SHE GAVE IT TO MS. EVENSON, WHO

14 IS ONE OF YOUR ASSOCIATES RATHER THAN TO YOU.

15        **MR. SPECTER:**  MY OBJECTION IS THAT THE REPORTS WERE

16 DUE ON SEPTEMBER 15TH.

17        **JUDGE REINHARDT:**  OKAY, THAT'S A LEGITIMATE

18 OBJECTION, BUT NOT THAT -- MS. EVENSON IS AN ABLE REPRESENTATIVE

19 OF YOURS.

20        **MS. BARLOW:**  MAY I --

21        **MR. SPECTER:**  I WASN'T -- I WASN'T -- ANYWAY, MY

22 OBJECTION --

23        **JUDGE REINHARDT:**  LET'S GET TO THE MERITS.

24        **MR. SPECTER:**  MY OBJECTION IS THAT IT'S UNTIMELY.  MY

25 OBJECTION IS ALSO THAT IT'S PREJUDICIAL.

1          **JUDGE REINHARDT:**  HOW IS IT PREJUDICIAL?

2          **MR. SPECTER:**  BECAUSE THEY ARE MAKING SUBSTANTIVE

3    CHANGES TO THE REPORT AFTER THE DEPOSITION.  THEY ARE TRYING TO

4    CLEAR UP AN ERROR THAT HE MADE IN HIS ORIGINAL REPORT.

5          **JUDGE KARLTON:**  IF EVERYBODY AGREES THAT IT'S AN

6    ERROR -- YOU KNOW, YOU PEOPLE ALL THINK THAT YOU'RE ACHIEVING

7    SIGNIFICANT IMPEACHMENT WHEN YOU SHOW SOMEBODY SAID SOMETHING

8    CARELESSLY.  I DON'T KNOW ABOUT MY COLLEAGUES, I THINK MOST OF

9    THAT IS A WASTE OF TIME, BUT I -- YOU KNOW, IT'S YOUR CASE; YOU

10   DO WHATEVER YOU WANT TO DO.

11         BUT, MS. BARLOW, I NOW HAVE A DIFFERENT QUESTION --

12         **MS. BARLOW:**  YES.

13         **JUDGE KARLTON:**  -- WHICH IS THAT IT ASSERTS THAT

14   THERE IS A SUBSTANTIVE CHANGE.  YOU HAD INDICATED THAT THERE WAS

15   SIMPLY AN ERROR IN THE TYPING OR SOMETHING.

16         **MS. BARLOW:**  WELL, THE CHANGE THAT WAS MADE, YOUR

17   HONOR, WAS TO WHAT APPEARS IN THE COPY YOU HAVE IN FRONT OF YOU,

18   THE VERY FIRST SENTENCE OF PARAGRAPH 23.  THE SENTENCE THAT I

19   WAS ABOUT TO READ TO YOU WHEN MR. SPECTER INTERRUPTED WAS

20   ACTUALLY IN THE ORIGINAL REPORT, AND IT WAS DELETED

21   INADVERTENTLY WHEN THEY MADE THE AMENDED DOCUMENT --

22         **JUDGE KARLTON:**  NO, NO.  YOU MISUNDERSTOOD.

23   MR. SPECTER IS SAYING THE SO-CALLED AMENDED REPORT IS

24   SUBSTANTIVELY DIFFERENT.

25         **MS. BARLOW:**  AND IT IS IN ONE VERY MINOR RESPECT,

1   YOUR HONOR.  AND, AGAIN, THIS WAS RAISED AT THE DEPOSITION.  THE

2   WITNESS INDICATED IT APPEARED TO BE AN ERROR AND HE WAS GOING TO

3   CHECK ON IT.  SO THE ONE CHANGE IS, INSTEAD OF SAYING

4   UNEMPLOYMENT IS 2.5 TIMES HIGHER IN FRESNO THAN IN COMPARABLE

5   SIZE CITIES IN CALIFORNIA, IT WAS SUPPOSED TO SAY 2.5 PERCENT

6   HIGHER THAN UNEMPLOYMENT RATE IN CALIFORNIA AS A WHOLE.  AND

7   THAT WAS THE ONLY SUBSTANTIVE CHANGE THAT WAS MADE.

8          **JUDGE REINHARDT:**  IS THAT THE ONLY SUBSTANTIVE

9   CHANGE, MR. SPECTER?

10         **MR. SPECTER:**  THAT'S THE MAJOR SUBSTANTIVE CHANGE.

11         **JUDGE REINHARDT:**  YOU KNOW, IT DOESN'T SEEM TO ME HE

12  MADE A MISTAKE ABOUT THE UNEMPLOYMENT RATE IS HARDLY CRITICAL OF

13  THE ISSUES IN THIS CASE.

14         **MR. SPECTER:**  I DON'T MIND IF YOU STRIKE THAT.  I

15  THINK THE WHOLE THING IS IRRELEVANT.  IT SHOULD BE STRICKEN.

16  BUT, I MEAN, WE MADE A MOTION --

17         **JUDGE REINHARDT:**  WE ARE NOT STRIKING ANYTHING.

18  WE'VE LISTENED TO A LOT OF IRRELEVANT TESTIMONY.

19         **JUDGE KARLTON:**  BOY, IF WE STRUCK ALL THE IRRELEVANT

20  TESTIMONY IN THIS CASE, WE'D HAVE BEEN DONE LAST WEEK.

21         **MR. SPECTER:**  I MEAN, IF YOU DON'T STRIKE IT, I HAVE

22  TO DEAL WITH IT.  SO THAT'S ALL I'M SAYING.

23         **JUDGE KARLTON:**  THEN DEAL WITH IT.

24         **JUDGE REINHARDT:**  DEAL WITH IT.

25         IS IT A VERY CONTROVERSIAL ISSUE, WHAT THE

 1   UNEMPLOYMENT RATE IN FRESNO IS?

 2              **MR. SPECTER:**  NO.

 3              **JUDGE HENDERSON:**  IT'S NOT GOING TO INFORM MY RULING.

 4              **MR. SPECTER:**  IN THAT CASE, I UNDERSTAND.  THAT'S

 5   FINE.

 6              **JUDGE HENDERSON:**  OKAY.  LET'S PROCEED.

 7            **MS. BARLOW:**  THANK YOU.

 8              THE SENTENCE THAT SHOULD HAVE BEEN AT THE BEGINNING

 9   OF PARAGRAPH 23 THAT WAS OMITTED WAS VERY SHORT:

10                  "FRESNO HAS THE GREATEST CONCENTRATION OF

11                  URBAN POVERTY IN THE NATION."

12              I'M NOT SURE WHY MY STAFF THOUGHT THAT WAS SUPPOSED

13   TO BE DELETED.  THAT WAS IN THE ORIGINAL REPORT.

14            **JUDGE REINHARDT:**  THAT'S NOT GOING TO MATTER

15   TREMENDOUSLY EITHER TO THE OUTCOME OF THIS CASE.

16            **MS. BARLOW:**  IT WAS IN THE ORIGINAL REPORT, YOUR

17   HONOR.  I JUST WANTED TO LET YOU KNOW.

18              FINALLY, ON PAGE 7, THE SECOND LINE UNDER INCIDENT

19   NUMBER 3, THE WORD "NOT" WAS INADVERTENTLY OMITTED IN THE

20   AMENDED VERSION, AND THEY'RE CORRECTING THAT TODAY.

21              SO WITH THAT, IF I MAY PROCEED?

22            **JUDGE HENDERSON:**  YOU MAY.

23                  <u>**DIRECT EXAMINATION BY MS. BARLOW**</u>

24   BY MS. BARLOW

25   Q   CHIEF DYER, COULD YOU STATE YOUR JOB TITLE FOR THE RECORD,

1   PLEASE?

2   **A**   POLICE CHIEF, CITY OF FRESNO.

3   **Q**   AND COULD YOU JUST BRIEFLY DESCRIBE YOUR BACKGROUND,

4   EDUCATION FOR THE COURT?

5   **A**   I HAVE BEEN THE POLICE CHIEF SINCE AUGUST 1ST OF 2001, AND I

6   HAVE BEEN EMPLOYED WITH THE FRESNO POLICE DEPARTMENT SINCE 1979,

7   MAY 1ST OF 1979.  I CURRENTLY HAVE A BACHELOR OF SCIENCE DEGREE

8   IN CRIMINOLOGY FROM FRESNO STATE UNIVERSITY AND A MASTER'S

9   DEGREE IN MANAGEMENT FROM CAL POLY POMONA.

10          DURING THE COURSE OF MY CAREER I WORKED A VARIETY OF

11  ASSIGNMENTS AND WORKED MY WAY UP THROUGH THE RANKS IN VARIOUS

12  TACTICAL ASSIGNMENTS, NARCOTICS SUPERVISOR, SWAT SUPERVISOR,

13  DISTRICT COMMANDER, DEPUTY CHIEF, ASSISTANT CHIEF.  SO A VARIETY

14  OF ASSIGNMENTS OVER THE YEARS THAT'S GIVEN ME A GREAT DEAL OF

15  EXPERIENCE.

16  **Q**   DO YOU HAVE ANY AFFILIATION WITH THE CALIFORNIA POLICE

17  CHIEFS ASSOCIATION?

18  **A**   I'M CURRENTLY THE PRESIDENT OF THE CALIFORNIA POLICE CHIEFS

19  ASSOCIATION THAT REPRESENTS SOME 338 POLICE CHIEFS IN THE STATE

20  OF CALIFORNIA.

21          **MS. BARLOW:**  FOR THE COURT'S REFERENCE, IN THE MORE

22  DETAILED DESCRIPTION OF CHIEF DYER'S BACKGROUND AND EDUCATION

23  ARE IN PARAGRAPHS 1 THROUGH 13 OF THE REPORT.

24  BY MS. BARLOW

25  **Q**   IN YOUR CAPACITY AS CHIEF, CHIEF DYER, AND IN YOUR EARLIER

1  EMPLOYMENT, HAVE YOU HAD ONGOING AND REGULAR CONTACT WITH

2  PAROLEES IN THE CITY OF FRESNO?

3  **A**   YES.

4  **Q**   AND CAN YOU JUST SUMMARIZE A LITTLE BIT ABOUT HOW YOU'VE HAD

5  THAT KIND OF CONTACT, IN WHAT CONTEXT?

6  **A**   PRIOR TO BEING A CHIEF?

7  **Q**   FOR YOUR CAREER.

8  **A**   EARLY ON IN MY CAREER, I SPENT FIVE YEARS AS A POLICE

9  OFFICER IN THE CENTRAL POLICING DISTRICT.  I WAS ASSIGNED TO

10 CENTRAL.  IT WAS THE HIGHEST CONCENTRATION OF PAROLEES IN THE

11 CITY OF FRESNO.  SO I DEALT WITH THEM ON A NIGHTLY BASIS.

12          SINCE THAT TIME I WAS ASSIGNED AS A -- TO A STREET

13 NARCOTICS ENFORCEMENT TEAM WHICH DEALT WITH THE SIGNIFICANT

14 NUMBER OF INDIVIDUALS THAT WERE INVOLVED IN DRUGS, TO INCLUDE

15 PEOPLE ON PAROLE.  ALSO, WAS THE SERGEANT OF A PAROLE TACTICAL

16 TEAM, AND OUR JOB WAS TO FOCUS ON THOSE INDIVIDUALS THAT WERE

17 CONTRIBUTING TO CRIME WITHIN OUR COMMUNITY, CAREER CRIMINALS.

18 AND ALSO SERVED AS A SERGEANT TO A MAJOR NARCOTICS UNIT DEALING

19 WITH DRUG OFFENDERS AND OFTENTIMES INDIVIDUALS THAT HAD BEEN

20 RELEASED ON PAROLE.

21          THEN AS A -- IN MY CAPACITY AS A STAFF OFFICER, AS A

22 DISTRICT COMMANDER IN THE SOUTHEAST POLICING DISTRICT,

23 FREQUENTLY WAS INVOLVED IN THE ANALYSIS OF CRIME TRENDS THAT

24 WERE OCCURRING WITHIN THAT POLICING DISTRICT TRYING TO DETERMINE

25 WHO, IN FACT, WAS RESPONSIBLE FOR THOSE CRIMES.  IT WAS DURING

1    THAT TIME THAT WE REALIZED A LARGE NUMBER OF THOSE INDIVIDUALS

2    COMMITTING CRIMES WERE INDIVIDUALS THAT WERE EITHER ON PROBATION

3    OR PAROLE, INDIVIDUALS WE REFERRED TO AS TEN PERCENTERS.  TEN

4    PERCENT OF THE PEOPLE COMMIT A LARGE PERCENTAGE OF CRIME.  THOSE

5    WERE THE INDIVIDUALS WE FOCUSED ON.

6            AND THEN LATER AS THE POLICE CHIEF I DEVELOPED WHAT

7    WAS REFERRED TO IN OUR DEPARTMENT AS THE CRIME VIEW SYSTEM, AND

8    THAT IS FREQUENT ANALYSIS OF CRIME WITHIN OUR CITY TO DETERMINE

9    WHO, IN FACT, IS RESPONSIBLE FOR COMMITTING CERTAIN TYPES OF

10   CRIMES, WHAT THEIR MOTIVES ARE, WHAT THEIR -- THE TIMES OF DAY,

11   THE DAYS OF WEEK THAT THEY'RE COMMITTING THOSE CRIMES.  SO

12   EXTENSIVE RESEARCH IN TERMS OF ANALYSIS OF CRIME.

13   **Q**   ALL RIGHT.  SO EVEN TODAY YOU CONTINUE TO BE INVOLVED IN

14   WHAT'S GOING ON WITH PAROLEES IN YOUR COMMUNITY?

15   **A**   VERY HANDS ON IN THAT ANALYSIS, YES.

16   **Q**   ARE YOU FAMILIAR WITH THE CASELOAD AND SERVICES PROVIDED BY

17   THE PAROLE OFFICERS IN THE CITY OF FRESNO?

18   **A**   I'M SORRY.  I DIDN'T HEAR THAT.

19   **Q**   I'M SORRY.  ARE YOU FAMILIAR WITH THE CASELOAD AND SERVICES

20   PROVIDED BY PAROLE TO THE PAROLEES IN FRESNO?

21   **A**   YES.

22   **Q**   DO YOU KNOW HOW MANY PAROLEES THERE ARE IN FRESNO AT THE

23   CURRENT TIME?

24            **MR. SPECTER:**  FOUNDATION, YOUR HONOR.

25            **JUDGE HENDERSON:**  LAY A FOUNDATION FOR THIS

1    KNOWLEDGE.

2              **MS. BARLOW:**  ALL RIGHT.  WELL, WE HAVE CDCR DATA.  WE

3    COULD PUT UP EXHIBIT DI 633.

4              (DOCUMENT DISPLAYED.)

5              **JUDGE KARLTON:**  IS THAT THE BASIS OF YOUR

6    UNDERSTANDING?

7              **THE WITNESS:**  YES.

8    BY MS. BARLOW

9    **Q**   DO YOU ALSO HAVE INDEPENDENT UNDERSTANDING OF WHAT THE

10   APPROXIMATE NUMBER IS?

11   **A**   YES.

12             **JUDGE KARLTON:**  HOW WOULD HE DO THAT?  DO YOU THINK

13   HE GOES OUT AND COUNTS PAROLEES EVERY DAY?

14   BY MS. BARLOW

15   **Q**   CHIEF DYER, WOULD YOU EXPLAIN HOW YOU KNOW HOW MANY PAROLEES

16   THERE ARE IN FRESNO --

17   **A**   WE TRACK THE -- WE STAY IN CLOSE CONTACT WITH THE LOCAL

18   PAROLE OFFICE TO FIND OUT HOW MANY PAROLEES ARE WITHIN OUR

19   JURISDICTION AT ANY GIVEN TIME.  THAT NUMBER FLUCTUATES

20   SIGNIFICANTLY.

21             YOU KNOW, ONE OF THE OTHER THINGS THAT WE TRACK IS

22   FIND OUT HOW MANY ADMINISTRATIVE PLACEMENTS HAVE BEEN ALLOWED TO

23   OCCUR WITHIN OUR CITY, MEANING THAT FOLKS HAVE BEEN PLACED FROM

24   OTHER JURISDICTIONS INTO OUR CITY.

25             SO WE DO TRY TO KEEP A VERY CONSISTENT LOOK IN TERMS

1  OF PAROLED PAROLEES WITHIN OUR CITY.

2  **Q**   ALL RIGHT.  AND --

3          **JUDGE HENDERSON:**  LET ME INTERRUPT.

4          WHAT'S AN EXAM OF A PAROLEE BEING PLACED IN YOUR

5  JURISDICTION FROM ANOTHER JURISDICTION?  HOW DOES THAT WORK?

6          **THE WITNESS:**  A GOOD EXAMPLE MIGHT BE, WE HAD ONE

7  HERE RECENTLY WHERE AN INDIVIDUAL HAD COMMITTED A CRIME IN

8  ANOTHER JURISDICTION.  SO THAT WAS HIS COUNTY OF COMMITMENT

9  OFFENSE.  HE WAS PLACED INTO PRISON.  HE WAS RELEASED TO THAT

10 JURISDICTION, OR WAS GOING TO BE, BUT HE HAD MADE THREATS TO THE

11 PAROLE AGENT, AND SO THEY FELT THAT THAT INDIVIDUAL WOULD BE

12 BETTER SUITED IN ANOTHER JURISDICTION.  HE WAS THEN PLACED INTO

13 OUR JURISDICTION.

14          ANOTHER EXAMPLE MIGHT BE WHERE, IF AN INDIVIDUAL

15 COMMITS A HEINOUS CRIME IN ANOTHER COUNTY AND THE VICTIM, THE

16 PREVIOUS VICTIM, COMES FORWARD AND ASKS THAT THAT PERSON NOT BE

17 PLACED BACK INTO THAT JURISDICTION, THEY WILL ADMINISTRATIVELY

18 PLACE THAT INDIVIDUAL INTO ANOTHER COUNTY.  SOMETIMES THEY GET

19 PUSHED BACK AND FORTH, BUT, GENERALLY, WE TRY TO MONITOR THAT SO

20 IT DOESN'T BECOME TOO MUCH.

21          **JUDGE HENDERSON:**  THANK YOU.

22 BY MS. BARLOW

23 **Q**   NOW, IF WE COULD, ON EXHIBIT -- I'M SORRY.  YOU EXPLAINED

24 WHY YOU KNOW THE NUMBER.  WHAT'S THE NUMBER OF PAROLEES

25 CURRENTLY APPROXIMATELY IN FRESNO?

1   **A**   JUST UNDER 5,000 PAROLEES IN THE -- IN FRESNO.

2   **Q**   IS THAT THE COUNTY, AND THERE'S A SMALLER NUMBER IN THE

3   CITY?

4   **A**   WELL, THAT'S THE COUNTY OF FRESNO.  GENERALLY, ABOUT 80 TO

5   85 PERCENT OF THE PAROLEES LIVE WITHIN THE CITY OF FRESNO,

6   ALTHOUGH A MUCH HIGHER NUMBER OF THOSE INDIVIDUALS FREQUENT THE

7   CITY OF FRESNO ON A DAILY BASIS.

8   **Q**   ALL RIGHT.  AND IF I COULD REFER TO EXHIBIT 633, ON THE LINE

9   THAT IS FOR FRESNO, IF WE COULD HIGHLIGHT THAT?

10           CHIEF, DOES THAT REFLECT ACCURATELY ABOUT WHAT YOU

11  HAD AT THE END OF 2007 IN TERMS OF PAROLEES?

12  **A**   YES.

13  **Q**   AND THAT'S 3.9 PERCENT OF THE CDCR POPULATION, CORRECT?

14  **A**   THAT'S CORRECT.

15  **Q**   NOW, DO YOU HAVE AN OPINION BASED UPON YOUR INTERACTION WITH

16  PAROLE OFFICERS AND PAROLEES IN YOUR COMMUNITY AS TO THE

17  ADEQUACY -- I'M SORRY -- THE AMOUNT OF SUPERVISION OF PAROLEES,

18  IF IT'S ADEQUATE?

19  **A**   YES.

20  **Q**   WHAT IS THAT OPINION?

21  **A**   WELL, IT'S -- THE LEVEL OF SUPERVISION OF PAROLE -- PAROLEES

22  IN OUR COMMUNITY IS NOT ADEQUATE.  IN FACT, CURRENTLY, EACH

23  PAROLE AGENT SUPERVISES APPROXIMATELY ONE HUNDRED INDIVIDUALS

24  THAT ARE ON PAROLE, ALTHOUGH THAT NUMBER VARIES WITH INDIVIDUALS

25  THAT PERHAPS ARE THIRD STRIKERS.  THAT NUMBER WOULD CHANGE IN

1  TERMS OF WHAT THE LEVEL OF SUPERVISION IS.

2          I BELIEVE THE CASELOAD FOR THAT IS -- SEX OFFENDERS

3  ARE SUPERVISED AT A RATIO OF 1-TO-20, AND I BELIEVE THIRD

4  STRIKERS ARE SUPERVISED AT A RATE OF ONE PAROLE AGENT FOR 40

5  PAROLEES.

6  **Q**  ALL RIGHT.  SO YOU THINK IT'S INADEQUATE.  IS THAT BASED

7  UPON FUNDING, STAFFING, THE NUMBER OF PAROLE AGENTS, THE

8  CASELOAD?

9  **A**  WELL, THAT NUMBER HAS INCREASED SIGNIFICANTLY OVER THE

10  YEARS, THE RATIO.  I CAN REMEMBER WHEN THE NUMBER OF PAROLEES

11  BEING SUPERVISED BY AN AGENT WAS FAR LESS.

12  **Q**  NOW, DO YOU HAVE AN OPINION ABOUT THE SERVICES THAT ARE

13  PROVIDED TO PAROLEES IN FRESNO?

14  **A**  YES.

15  **Q**  WHAT IS THAT OPINION?

16  **A**  BASED ON -- BASED ON THE -- MY EXPERIENCE IN FRESNO, THE

17  SERVICES BEING PROVIDED FOR INDIVIDUALS GETTING OUT OF PRISON IS

18  NOT ADEQUATE.  THERE ARE NOT ENOUGH FACILITIES FOR TREATMENT,

19  ESPECIALLY FOR THOSE INDIVIDUALS THAT ARE ADDICTED TO DRUGS, NOT

20  ONLY FOR PEOPLE GETTING OUT OF PRISON, BUT FOR PEOPLE THAT ARE

21  ON PROBATION IN OUR COUNTY.

22          AND I'VE ALSO SEEN THAT -- IT'S BEEN MY EXPERIENCE

23  THAT EVEN WITH THE SERVICE PROVIDERS BEING AVAILABLE, MANY OF

24  THE INDIVIDUALS GETTING OUT OF PRISON CHOOSE NOT TO TAKE

25  ADVANTAGE OF THOSE SERVICE PROVIDERS.

1  **Q**   ALL RIGHT.  NOW, YOU PUT TOGETHER A PAROLE APPREHENSION TEAM

2  IN FRESNO THAT YOU TALKED ABOUT IN YOUR REPORT WHEN YOU BECAME

3  CHIEF.  WHY DID YOU DO THAT?

4  **A**   I RECOGNIZED EARLY ON THAT SUPPRESSION OR ENFORCEMENT WASN'T

5  GOING TO BE THE ANSWER.  WE WERE NOT GOING TO ARREST OUR WAY OUT

6  OF OUR CRIME PROBLEM.  I STILL BELIEVE THAT, AND I BELIEVE THERE

7  HAS TO BE A BALANCED APPROACH, AND THAT IS STRONG ENFORCEMENT,

8  WHAT YOU REFER TO AS THE HAMMER, BUT THERE ALSO HAS TO BE THE

9  TREATMENT PREVENTION-INTERVENTION SIDE, WHICH WE REFER TO AS THE

10 HOPE.  SO IT'S THE HAMMER, THE ENFORCEMENT, THAT PROVIDES AN

11 UNCOMFORTABLE ENVIRONMENT FOR MANY OF THESE INDIVIDUALS TO SEEK

12 TREATMENT.  IT PROVIDES THE INCENTIVE FOR THESE INDIVIDUALS TO

13 SEEK TREATMENT, TO SEEK COUNSELING, TO TRY TO CHANGE THEIR LIFE.

14 **Q**   AND YOU TALK ABOUT HOPE.  DID YOU ESTABLISH ANY PROGRAMS TO

15 WORK ON THAT SIDE?

16 **A**   WE -- AS PART OF OUR -- I WORKED WITH PAROLE.  INITIALLY, WE

17 DID NOT HAVE AN ORIENTATION PROGRAM IN FRESNO.  OTHER CITIES

18 DID, AND SO I CONTACTED FOLKS IN THE CALIFORNIA DEPARTMENT OF

19 CORRECTIONS IN SACRAMENTO TO TRY TO DETERMINE WHY WE DID NOT

20 HAVE SOMETHING LIKE THAT IN FRESNO.

21        THEY SAID THERE WAS A LACK OF FUNDING.  I SAID I

22 WOULD HELP OUT, PROVIDE WHATEVER RESOURCES WE COULD, AND WE DID.

23 AND TODAY WE HAVE A VERY EFFECTIVE ORIENTATION PROGRAM WHERE ON

24 A VERY FREQUENT BASIS, EITHER EVERY OTHER WEEK OR EVERY WEEK

25 WHEN INDIVIDUALS ARE RELEASED FROM PRISON, THEY COME TO AN

1  ORIENTATION.  SERVICE PROVIDERS ARE THERE, WHETHER IT BE FOR JOB

2  SKILLS, JOB PLACEMENT, COUNSELING, ALL OF THOSE THINGS ARE MADE

3  AVAILABLE TO INDIVIDUALS GETTING OUT OF PRISON.  AS I SAID

4  EARLIER, MANY OF THEM CHOOSE NOT TO TAKE ADVANTAGE OF THOSE

5  SERVICES.

6  **Q**  ALL RIGHT.  NOW, YOU MENTIONED THE CRIME VIEW PROGRAM THAT

7  YOU STARTED ALSO.  HAS THE DATA AND INTELLIGENCE GATHERED IN

8  THAT PROGRAM ALLOWED YOU TO REACH ANY CONCLUSIONS ABOUT THE ROLE

9  OF PAROLEES IN CRIME IN FRESNO?

10 **A**  OUR CRIME VIEW MEETINGS FOR ME -- I'M PARTICIPATING ON A

11 MONTHLY BASIS -- AND THAT IS THAT ALL OF OUR COMMANDERS COME

12 TOGETHER.  WE REVIEW VERY DETAILED, TIMELY, ACCURATE CRIME DATA

13 IN TERMS OF WHERE CRIME IS BEING COMMITTED, WHO'S COMMITTING

14 THAT CRIME, AND ONE OF THE THINGS THAT I HAVE EXPERIENCED IN

15 THOSE MEETINGS IS THAT THERE IS A REOCCURRING THEME, AND THAT

16 REOCCURRING THEME IS THERE ARE A LARGE PERCENTAGE OF INDIVIDUALS

17 IN OUR COMMUNITY COMMITTING CRIMES THAT ARE ON PAROLE AND/OR ON

18 PROBATION, AND, SO, THAT IS A REOCCURRING THEME THAT HAS COME

19 UP.

20     OUR FOCUS HAS BEEN ON GANGS, DRUGS, AND PAROLE

21 VIOLATERS, BECAUSE WE KNOW THOSE INDIVIDUALS CONTRIBUTE TO A

22 LARGE PERCENTAGE OF CRIME.  WE KNOW IN OUR EXPERIENCE AND IN OUR

23 RESEARCH THAT ABOUT TEN PERCENT OF THE PEOPLE COMMIT A MINIMUM

24 OF 50 PERCENT OF THE CRIMES.  SO WE TRY TO TARGET THOSE TEN

25 PERCENTERS, AND PAROLEES AND GANG MEMBERS MAKE UP A LARGE

 1  PERCENTAGE OF THAT TEN PERCENT.

 2            **JUDGE HENDERSON:**  COULD I INTERRUPT, COUNSEL?

 3            YOU'VE MENTIONED, I BELIEVE AT LEAST TWICE, CHIEF,

 4  THAT TEN PERCENT OF THE SERVICES ARE PEOPLE ARE ON PROBATION OR

 5  ON PAROLE, AND YOU'VE MENTIONED -- BUT THEN YOUR FOCUS IS ON

 6  PAROLE AND YOU SEEM NOT TO WORRY ABOUT PROBATION.  IS THAT A

 7  CORRECT PERCEPTION, AND WHY IS THAT, IF SO?

 8            **THE WITNESS:**  WE ACTUALLY FOCUS ON BOTH.  WE DO

 9  PROBATION SWEEPS.  WE DO PAROLE SWEEPS.  WE TARGET THOSE

10  INDIVIDUALS IN OUR COMMUNITY THAT WE BELIEVE TO BE INVOLVED IN

11  CRIME ACTIVITY, PEOPLE THAT ARE NOT IN COMPLIANCE WITH THEIR

12  PAROLE CONDITIONS.  AND SO, YES, IT IS BOTH PROBATION AND

13  PAROLE.  I'VE PROBABLY FOCUSED MORE HERE ON THE PAROLE SIDE

14  SINCE THIS IS --

15            **JUDGE HENDERSON:**  FINE.

16            **MS. BARLOW:**  THANK YOU.

17  BY MS. BARLOW

18  **Q**   IN YOUR REPORT AT PAGE 3 YOU GAVE A SUMMARY OF THE TYPES OF

19  CRIMES WHICH -- THE COMMITMENT CRIMES FOR PAROLEES RELEASED INTO

20  FRESNO.  COULD YOU TELL US WHERE THAT DATA IS DRAWN FROM?

21  **A**   WHAT ARE YOU REFERRING TO?

22            **JUDGE KARLTON:**  THE LONG LIST ON PAGE 3 OF VARIOUS

23  CRIMES --

24            **MS. BARLOW:**  IT'S IN PARAGRAPH 15.  IT'S ACTUALLY NOW

25  ON PAGE -- PAGE NUMBERED 4.  I APOLOGIZE.

 1          **THE WITNESS:** COULD YOU REPEAT THE QUESTION THERE?

 2          **JUDGE KARLTON:** SHE WANTS TO KNOW WHERE THAT DATA IS

 3 DRAWN FROM.

 4          **THE WITNESS:** THAT WAS INFORMATION THAT WAS

 5 PROVIDED -- PROVIDED TO OUR DEPARTMENT FROM A LOCAL PAROLE

 6 SUPERVISOR, DAN RENAREA (PHONETIC). HE WORKS OUT OF THE FRESNO

 7 OFFICE. WE HAD ASKED FOR A SNAPSHOT IN TIME. WE KNEW THAT THIS

 8 PRISONER RELEASE ISSUE WAS A VERY SIGNIFICANT ISSUE AND THAT IT

 9 MIGHT -- THAT IT MIGHT HAVE A SIGNIFICANT IMPACT ON OUR

10 COMMUNITY. SO WE HAD ASKED FOR WHAT WOULD THAT MEAN IF SOME

11 40,000 -- AT THE TIME THE NUMBER 40,000 WAS BEING DISCUSSED --

12 IF 40,000 INMATES WERE RELEASED INTO OUR COMMUNITY, WHAT WOULD

13 THAT MEAN.

14          AT THAT TIME HE PUT TOGETHER A LOOK AT THREE MONTHS

15 OF RECENT INDIVIDUAL -- INDIVIDUALS THAT WERE RECENTLY RELEASED

16 INTO OUR COMMUNITY, AND THERE WAS ABOUT 120 PER MONTH THAT WERE

17 BEING RELEASED, AND HE PROVIDED US WITH A RAW NUMBER OF WHAT

18 THOSE COMMITMENT OFFENSES WERE FOR THOSE 120. AND BASED ON

19 THOSE RAW NUMBERS OVER THAT THREE-MONTH PERIOD, WE EQUATED THOSE

20 TO PERCENTAGES. SO, FOR EXAMPLE, 12.5 PERCENT OF THE 120 THAT

21 WERE RELEASED HAD AN ORIGINAL COMMITMENT OFFENSE FOR AUTO THEFT.

22          **MS. BARLOW:** OKAY.

23          **THE WITNESS:** THAT'S WHERE WE GOT THAT DATA.

24          **JUDGE REINHARDT:** THIS IS NOT DATA FOR THE KINDS OF

25 PEOPLE WHO WOULD BE RELEASED UNDER PLAINTIFFS' PROPOSAL? THIS

1    IS DATA AS TO THOSE WHO ARE CURRENTLY BEING RELEASED?

2              **THE WITNESS:**  YES, SIR.  BUT THE ONES THAT WE FOCUSED

3    ON WERE THE -- WHAT HAVE BEEN RECENTLY BEING REFERRED TO AS LOW

4    LEVEL OFFENDERS, DRUG POSSESSION AND PROPERTY CRIMES.  THOSE

5    TYPES WERE THE ONES THAT MADE UP THE -- PRIMARILY THE LIST,

6    ALTHOUGH THERE WAS A SMALL PERCENTAGE OF SEX OFFENSES IN THERE

7    AS WELL, BUT THAT WAS KIND OF THE MAKEUP OF WHO HAD BEEN

8    RELEASED IN OUR COMMUNITY.

9    BY MS. BARLOW

10   **Q**   SO THE PURPOSE IN PUTTING THIS INFORMATION IN HERE IS JUST

11   TO SORT OF EXPLAIN HOW YOU -- WHAT YOU WERE LOOKING AT WHEN YOU

12   CAME TO YOUR CONCLUSIONS?

13             **JUDGE KARLTON:**  HE DIDN'T DO IT FOR THAT PURPOSE.  HE

14   APPARENTLY HAD IT DRAWN FOR USE IN THIS TRIAL, CORRECT?

15             **THE WITNESS:**  INITIALLY, NOT FOR THE TRIAL.  BUT

16   EVENTUALLY WE USED IT FOR THIS TRIAL, YES, SIR.

17             **JUDGE KARLTON:**  NO.  I WANT TO HONE IN ON WHAT YOU

18   WERE DOING.  IT WAS USED FOR PURPOSES OF BEING PREPARED TO COME

19   TO THIS TRIAL AND TESTIFY AS YOU HAVE?

20             **THE WITNESS:**  INITIALLY, SIR, IT WAS USED FOR THE

21   SETTLEMENT DISCUSSIONS THAT WE WERE INVOLVED IN, YES.

22             **JUDGE KARLTON:**  FINE.  BUT IT WAS ALL INVOLVED IN

23   THIS LITIGATION?

24             **THE WITNESS:**  YES.

25             **JUDGE KARLTON:**  YOU WOULDN'T HAVE DONE IT OTHERWISE?

1              **THE WITNESS:**  THAT'S CORRECT.  YES.

2              **MS. BARLOW:**  THANK YOU.

3    BY MS. BARLOW

4    **Q**   YOU MAKE A REFERENCE IN YOUR REPORT TO THOSE BEING SENTENCED

5    AS CAREER CRIMINALS, AND YOU TALKED ABOUT THE TEN PERCENTERS.

6    AND YOU SAID IN YOUR REPORT THAT THOSE BEING SENTENCED TO STATE

7    PRISON ARE CAREER CRIMINALS.  WHAT'S THE BASIS FOR THAT OPINION?

8    **A**   IT'S BEEN MY EXPERIENCE OVER THE YEARS THAT INDIVIDUALS THAT

9    COMMIT CRIMES ON THEIR FIRST OFFENSE, OR EVEN SECOND OFFENSE,

10   CRIMES SUCH AS BURGLARY, AUTO THEFT, GENERALLY WHAT HAPPENS IS

11   THOSE INDIVIDUALS ARE EITHER DEFERRED INTO SOME FORM OF A

12   TREATMENT PROGRAM, THEY'RE PLACED ON PROBATION, THEY ARE

13   SENTENCED TO LOCAL TIME, BUT, GENERALLY, THOSE INDIVIDUALS ARE

14   NOT SENTENCED TO STATE PRISON.  AND IT ISN'T UNTIL THOSE

15   INDIVIDUALS HAVE GONE THROUGH THE SYSTEM SEVERAL TIMES THAT

16   THEY -- A DECISION IS MADE TO SENTENCE THOSE PEOPLE TO PRISON.

17   **Q**   NOW, IN YOUR REPORT YOU ALSO TALK ABOUT 10 PERCENT OF

18   OFFENDERS COMMITTING 80 PERCENT OF CRIME, AND YOU REFER TO

19   STUDIES.  WERE THERE PARTICULAR STUDIES THAT YOU REFERENCED?

20   **A**   THERE WAS DIFFERENT STUDIES -- I DON'T HAVE THEM IN FRONT OF

21   ME, BUT I'VE REFERENCED THEM AND PROVIDED THEM -- THAT WE LOOKED

22   AT, AND WE USED A CONSERVATIVE ESTIMATE INITIALLY, THAT 10

23   PERCENT COMMITTED 50 PERCENT OF THE CRIME.  THERE HAVE BEEN SOME

24   STUDIES THAT SHOW THAT UPWARDS OF 80 PERCENT OF THE CRIME,

25   ESPECIALLY FOR THE CRIMES OF BURGLARY AND ROBBERY, 10 PERCENT OF

1  THE PEOPLE COMMIT 80 PERCENT OF THOSE CRIMES AND, YES.

2          **JUDGE KARLTON:**  TEN PERCENT OF THE PEOPLE OR TEN

3  PERCENT OF THE PEOPLE CONVICTED?

4          **THE WITNESS:**  TEN PERCENT OF THE PEOPLE THAT WE COME

5  IN CONTACT WITH AND ARREST ARE RESPONSIBLE FOR THOSE, SO I DON'T

6  KNOW IF THAT HAS BEEN TAKEN FURTHER.

7          **JUDGE KARLTON:**  TEN PERCENT OF THOSE ARRESTED, IN

8  YOUR VIEW, COMMIT UPWARDS OF 80 PERCENT OF THE CRIMES IN YOUR

9  COMMUNITY?

10          **THE WITNESS:**  THAT'S CORRECT.

11          **JUDGE HENDERSON:**  I UNDERSTOOD, AND IT MAY BE THE

12  SAME THING THAT YOU CALL TEN PERCENTERS, THOSE ON PROBATION OR

13  ON PAROLE?

14          **THE WITNESS:**  THEY MAKE UP -- THEY'RE A PART OF THAT

15  TEN PERCENT, YES, SIR.

16          **JUDGE HENDERSON:**  THEY'RE A PART OF IT?

17          **THE WITNESS:**  YES, SIR.

18  BY MS. BARLOW

19  **Q**   ALL RIGHT.  AND DID YOU DERIVE THAT INFORMATION FROM

20  "RATIONAL CHOICE AND CRIMINAL BEHAVIOR," THAT 10 PERCENT COMMIT

21  80 PERCENT OF THE CRIME?

22  **A**   WHAT WAS THE QUESTION?  I'M SORRY.

23  **Q**   IF WE COULD PUT UP EXHIBIT NO. 636, THE TEN PERCENT OF

24  CRIMINALS RESPONSIBILITY FOR 80 PERCENT.  YOU SAID YOU RELIED ON

25  A STUDY.  WAS THAT "RATIONAL CHOICE AND CRIMINAL BEHAVIOR"?

1   **A**   YES, IT IS.

2   **Q**   IS THAT CONSISTENT WITH YOUR EXPERIENCE IN THE FIELD?

3   **A**   YES, IT IS.

4   **Q**   NOW, YOU ALSO SAY IN YOUR REPORT THAT THE AVERAGE INMATE HAS

5   COMMITTED 12 CRIMES BEFORE THEIR CURRENT ARREST.  WHAT WAS THE

6   SOURCE FOR THAT INFORMATION?

7   **A**   THERE WAS A RAND STUDY THAT WAS CONDUCTED, AND I BELIEVE IT

8   OCCURRED IN TWO STATES, ONE OF THEM BEING, I BELIEVE, WISCONSIN,

9   THE OTHER NEW JERSEY.  AND IN ONE OF THOSE, ONE OF THE STUDIES,

10  IT SHOWED THAT BEFORE AN INDIVIDUAL WAS EVER ARRESTED, AND THIS

11  WAS THE YEAR BEFORE BEING INCARCERATED, THEY HAD COMMITTED 15

12  FELONY CRIMES, AND THERE WAS ANOTHER STUDY THAT STATED THAT THEY

13  HAD COMMITTED 12, AND THAT WAS SELF REPORTED FOR INDIVIDUALS

14  THAT HAD BEEN CONVICTED.

15  **Q**   WE'VE HEARD FROM OTHER WITNESSES THAT THOSE NUMBERS ARE

16  HIGHLY INFLATED.  DO YOU AGREE WITH THAT?

17  **A**   NO, I DO NOT.

18  **Q**   AND WHY NOT?

19  **A**   I THINK GENERALLY THERE'S -- QUITE OFTEN, I SHOULD SAY, THAT

20  THOSE NUMBERS ARE PROBABLY UNDERREPORTED.  AND THERE HAS BEEN

21  OTHER STUDIES THAT SHOW THAT THOSE NUMBERS ARE UNDERREPORTED,

22  THAT IN SOME CASES INDIVIDUALS ARE COMMITTING HUNDREDS OF CRIMES

23  BEFORE THEY'RE EVER APPREHENDED, AND WHAT I PREPARED FOR MY

24  REPORT WAS A VERY CONSERVATIVE ESTIMATE.

25  **Q**   ALL RIGHT.  THANK YOU.

1        **MS. BARLOW:**  NOW, WE DO HAVE, YOUR HONORS, EXHIBIT

2   653 AND 637, IF WE COULD PUT UP THE FIRST PAGE 653?

3        (DOCUMENT DISPLAYED.)

4   BY MS. BARLOW

5   **Q**   IS THIS ONE OF THE ARTICLES THAT CONTAINS THE DATA YOU

6   RELIED ON FOR THIS INFORMATION?

7   **A**   THERE WAS AN NIJ STUDY THAT WAS CONDUCTED THAT SHOWED A

8   LARGE NUMBER OF CRIMES IN ADDITION TO THE RESEARCH THAT WE

9   PROVIDED FROM THE RAND STUDY.

10  **Q**   IF WE COULD JUST PUT UP THE NEXT PAGE, SECOND PARAGRAPH

11  UNDER "ANNUAL OFFENDER RATES"?

12  **A**   I THINK IT WOULD BE THE NEXT PARAGRAPH.

13  **Q**   WELL, THIS ONE -- I'M SORRY.

14       THAT INCLUDED INMATES FROM CALIFORNIA, CORRECT?

15  **A**   THAT'S CORRECT.

16  **Q**   OKAY.  AND THEN, YES, THE PARAGRAPH UNDER "THE TABLE

17  REPRESENTS".  OKAY.

18       "WHEN SUMMED ACROSS APPROPRIATE CATEGORIES,

19       THE STUDY FOUND THAT INMATES AVERAGE BETWEEN 187

20       AND 287 CRIMES PER YEAR, EXCLUSIVE OF DRUG

21       DEALS."

22       WAS YOUR CALCULATION ABOUT THE NUMBER OF CRIMES

23  COMMITTED ALSO EXCLUSIVE OF DRUG DEALS?

24  **A**   THE RESEARCH THAT I RELIED ON, YES, IT WAS EXCLUSIVE OF DRUG

25  ARRESTS, DRUG CRIMES.

1   Q    AND ALSO NUMBER 637?

2              (DOCUMENT DISPLAYED.)

3   BY MS. BARLOW

4   Q    IS THIS ALSO ONE OF THE STUDIES -- OR SUMMARIES OF A STUDY

5   THAT YOU RELIED UPON?

6   A    YES.

7   Q    IF WE COULD GO TO BATES PAGE 200, PARAGRAPH BEGINNING

8   "THIRD"?  THIS IS A RECITATION OF THE RAND STUDY SHOWING 15

9   CRIMES EXCLUDING DRUG CRIMES, CORRECT?

10             AND THEN IN THE NEXT TWO PARAGRAPHS DOWN -- I'M

11  SORRY.  IS THAT CORRECT, CHIEF?

12  A    YES.

13  Q    AND ALSO WERE YOU LOOKING AT THE STUDIES REFERENCED HERE

14  FROM NEW JERSEY AND WISCONSIN?

15  A    THAT'S CORRECT.

16             **THE CLERK:**  FIVE MINUTES, COUNSEL.

17  BY MS. BARLOW

18  Q    NOW, IF YOU COULD TELL US WHY YOU BELIEVE, CHIEF, THAT THE

19  REDUCTION IN PRISON POPULATION OF 52,000 THAT'S PROPOSED IS

20  GOING TO CREATE A PUBLIC SAFETY HAZARD; COULD YOU TELL US WHY

21  THAT IS?

22             **JUDGE HENDERSON:**  FOR FRESNO?

23             **MS. BARLOW:**  I'M SORRY?

24             **JUDGE HENDERSON:**  FOR FRESNO?

25             **MS. BARLOW:**  ACTUALLY, YOUR HONOR, HIS REPORT TALKS

1   ABOUT FRESNO AND THE CENTRAL VALLEY.

2           **JUDGE HENDERSON:**  OKAY.

3           **THE WITNESS:**  THE -- WHEN INDIVIDUALS ARE RELEASED

4   FROM PRISON, THERE IS A HIGH LIKELIHOOD THAT THEY ARE GOING TO

5   CONTINUE IN THEIR CRIMINAL LIFESTYLE.  IN FACT, IN CALIFORNIA I

6   BELIEVE THAT NUMBER IS 70 PERCENT OR GREATER THAT RECIDIVATE.

7   AND WHEN WE LOOK AT IF 52,000 INMATES ARE RELEASED BACK INTO OUR

8   COMMUNITY, DEPENDING ON THAT TIMEFRAME, WE HAVE INFORMATION THAT

9   ABOUT 3.9 PERCENT OF THOSE INDIVIDUALS WOULD MORE THAN LIKELY BE

10  PLACED IN FRESNO COUNTY.  OF THOSE, ABOUT 80 PERCENT WOULD COME

11  INTO THE CITY OF FRESNO, MINIMUM MAYBE 80 PERCENT.  THAT WOULD

12  BE JUST OVER 1,600 INMATES RELEASED BACK INTO THE CITY OF FRESNO

13  PREMATURELY.  IF WE FURTHERED WHAT WE'VE ALREADY SAID, THAT

14  THERE IS A 70 PERCENT LIKELIHOOD THAT THEY WOULD REOFFEND --

15          **JUDGE KARLTON:**  NO.  THAT THEY WOULD RECIDIVATE.

16          **THE WITNESS:**  -- RECIDIVATE.  AND IF WE LOOK AT THE

17  FACT THAT THOSE INDIVIDUALS WOULD LIKELY COMMIT AT MINIMUM 12

18  CRIMES BEFORE THEY WERE APPREHENDED, THAT WOULD MEAN THERE WOULD

19  BE A SUBSTANTIAL NUMBER OF CRIMES COMMITTED IN THE CITY OF

20  FRESNO, UPWARDS OF 13,000 CRIMES OVER THAT THREE-YEAR PERIOD.

21          **JUDGE REINHARDT:**  THAT WOULD BE COMMITTED PREMATURELY

22  AS OPPOSED TO COMMITTING THEM SEVERAL MONTHS LATER.

23          **THE WITNESS:**  YES, SIR.  THEY WOULD BE COMMITTED AT

24  SOME POINT DURING THAT THREE-YEAR PERIOD.  I DON'T KNOW -- YOU

25  KNOW, I KNOW THAT THERE'S --

1      **JUDGE KARLTON:**  THOSE PEOPLE THEY'RE TALKING ABOUT

2  RELEASING ARE GOING TO BE RELEASED A COUPLE OF MONTHS LATER IN

3  ANY EVENT.  THEY ARE GOING TO BE IN YOUR COMMUNITY IN EXACTLY

4  THE SAME NUMBERS, IN ANY EVENT, AND THEY ARE GOING TO COMMIT THE

5  SAME NUMBER CRIMES, IF THEY COMMIT CRIMES, IN ANY EVENT.

6      **THE WITNESS:**  THAT IS A POSSIBILITY.  I DON'T REALLY

7  KNOW --

8      **JUDGE REINHARDT:**  WELL, IT'S POSSIBILITY THEY WON'T

9  COMMIT CRIMES AT ALL.

10     **JUDGE KARLTON:**  AT ALL.

11     **JUDGE REINHARDT:**  ANYTHING IS A POSSIBILITY.

12     **THE WITNESS:**  YES, SIR.

13     **JUDGE REINHARDT:**  WE'VE GONE THROUGH THIS, SEVERAL

14 DAYS OF TRIAL, THAT ANYTHING IS A POSSIBILITY.  BUT BEYOND IT

15 BEING A POSSIBILITY, CAN YOU SAY THAT THIS IS A PROBABILITY, AT

16 LEAST, THAT THEY WILL COMMIT CRIMES AND THAT THEY WILL BE

17 DELAYED OR ADVANCED BY A COUPLE OF MONTHS, BUT YOU WILL HAVE THE

18 SAME NUMBER OF CRIMES IN YOUR COMMUNITY?

19     **THE WITNESS:**  I UNDERSTAND THAT, SIR.  I DO AGREE

20 THAT THOSE CRIMES WILL BE ACCELERATED.

21     **JUDGE REINHARDT:**  THEY WILL BE COMMITTED EARLIER

22 RATHER THAN THREE MONTHS LATER.

23     **THE WITNESS:**  THAT'S CORRECT.

24 BY MS. BARLOW

25 **Q**   IF I MAY, THE EARLY RELEASE PORTION IS ONLY PART OF THE

1  PROPOSAL.  IT'S TO REDUCE 52,000 ENTIRELY, AND THOSE PEOPLE

2  WOULD NOT JUST BE RELEASED INTO YOUR COMMUNITY.  THEY WOULD BE

3  STAYING IN YOUR COMMUNITY, AT LEAST SOME OF THEM.

4          THE COURT HAS HEARD TESTIMONY THAT THERE'S GOING TO

5  BE A MINIMAL AND INSIGNIFICANT IMPACT FROM EITHER THE EARLY

6  RELEASE OR THE DIVERSION OR TAKING PEOPLE OFF PAROLE.  DO YOU

7  AGREE WITH THAT?

8  **A**   NO, I DO NOT.

9  **Q**   WHY NOT?

10 **A**   WELL, IF YOU ARE ONE OF THE VICTIMS THAT ARE GOING TO BE

11 VICTIMIZED BY ONE OF THESE INDIVIDUALS, THAT IMPACT IS NOT

12 MINIMAL.  IT MAY BE MINIMALLY -- OR MINIMAL IN THE EYES OF SOME

13 WHO ARE JUST LOOKING AT STATISTICS AND NOT LOOKING AT THE

14 PERSONAL IMPACT THAT IS OCCURRING TO THESE INDIVIDUALS THAT ARE

15 HAVING THEIR HOMES BROKEN INTO; THE FACT THAT SENIORS MAY HAVE

16 THEIR HOUSES BROKEN INTO; THE IMPACT THAT THAT HAS ON THAT

17 INDIVIDUAL PSYCHOLOGICALLY; THE FACT THAT SOMEBODY HAS INVADED

18 THEIR HOME; SOMEONE HAS, AS I'VE REFERRED TO IN A FEW EXAMPLES,

19 HAD THEIR IDENTITY STOLEN BY THESE INDIVIDUALS; SOMEONE THAT HAS

20 BEEN CARJACKED BY SOMEBODY --

21          **JUDGE REINHARDT:**  YOU KNOW, I DON'T THINK IT'S

22 NECESSARY TO RUN THROUGH THE WHOLE RANGE OF CRIMES.

23          **THE WITNESS:**  SURE.

24          **JUDGE REINHARDT:**  NOR TO SUGGEST THAT PEOPLE ARE

25 INSENSITIVE TO THE VICTIMS OF CRIMES.

1          **THE WITNESS:** RIGHT.

2          **JUDGE REINHARDT:** THAT'S REALLY NOT THE ISSUE.

3          MAYBE WE SHOULD BE SENSITIVE TO THE PEOPLE WHO WILL

4     NOT BE VICTIMIZED OR BURGLARIZED BECAUSE THESE PEOPLE HAVE BEEN

5     SENT BACK TO JAIL THREE MONTHS EARLIER AND THEN THE OTHER PEOPLE

6     ARE NOT GOING TO BE THE VICTIMS. WE ARE SENSITIVE TO THOSE

7     PEOPLE EQUALLY. SO SOME BENEFIT, SOME LOSE. IT'S A QUESTION OF

8     WHICH PEOPLE ARE VICTIMIZED.

9          IF YOU ARE FORTUNATE ENOUGH TO ESCAPE CRIME BECAUSE

10    IT WAS COMMITTED THREE MONTHS EARLIER, YOU'RE THE BENEFICIARY.

11    IF YOU ARE THE VICTIM BY TIME BECAUSE THEY WERE THREE MONTHS

12    EARLIER, YOU'RE THE LOSER. BUT AS YOU TESTIFIED, IT'S THE SAME

13    NUMBER OF VICTIMS THAT WE'RE TALKING ABOUT.

14         **THE WITNESS:** WELL, SIR, I BELIEVE THAT THOSE CRIMES

15    WOULD OCCUR EARLIER.

16         **JUDGE KARLTON:** WE AGREE. EVERYBODY AGREES. I DON'T

17    KNOW -- I THINK EVEN THE PLAINTIFFS MAY AGREE. I DON'T KNOW,

18    BUT THE ISSUE IS -- NEVER MIND. THIS IS JUST RHETORICAL.

19         **MS. BARLOW:** IF I COULD JUST --

20         **JUDGE REINHARDT:** YOU ASKED ABOUT DIVERSION --

21         **JUDGE KARLTON:** THIS IS JUST RHETORIC.

22         **JUDGE REINHARDT:** -- AND NOT HAVING AS MANY PEOPLE

23    UNDER PAROLE. AS I UNDERSTOOD YOUR TESTIMONY, ONE OF THE

24    REASONS FOR THE CRIME IS BECAUSE PAROLE OFFICERS ARE OVERWORKED,

25    THEY HAVE TOO HIGH A CASELOAD, AND THEY CAN'T PROVIDE THE KINDS

1  OF SERVICES THAT WILL HELP PREVENT THE CRIME.

2           NOW, IF YOU GAVE MORE INTENSIVE PAROLE -- THIS IS A

3  QUESTION.  IF YOU GAVE MORE INTENSIVE PAROLE TO THE PEOPLE WHO

4  ARE MORE LIKELY TO COMMIT CRIMES AND REDUCED THE PAROLE FOR THE

5  ONES THAT DON'T PRESENT AS SERIOUS A RISK, WOULD THAT BE HARMFUL

6  OR WOULD IT HURT THE COMMUNITY?

7           **THE WITNESS:**  THE HIGHER LEVEL OF SUPERVISION AND

8  ACCOUNTABILITY THAT'S PROVIDED TO INDIVIDUALS THAT HAVE BEEN

9  RELEASED FROM PRISON PROVIDES THAT PERSON WITH A HIGHER

10 LIKELIHOOD OF SUCCEEDING BECAUSE IT TAKES AWAY THEIR ANONYMITY.

11 IT ALLOWS FOR FREQUENT DRUG TESTING.  IT ALLOWS FOR THEM TO KNOW

12 THEY ARE BEING WATCHED.  THEY ARE OPEN TO BEING SEARCHED BY LAW

13 ENFORCEMENT, AND THEREFORE, IT DOES TAKE AWAY THEIR ANONYMITY

14 AND THEIR ABILITY IN SOME CASES TO FEEL THEY CAN GET AWAY WITH

15 CRIME.  SO, YES, SUPERVISION AND ACCOUNTABILITY ARE VERY

16 IMPORTANT.

17          **JUDGE REINHARDT:**  THE QUESTION REALLY IS, IS IT

18 POSSIBLE, TO USE THE COMMON PHRASE THESE DAYS -- ONE OF THE

19 PLAINTIFFS' PROPOSALS IS TO GIVE MORE SUPERVISION TO THOSE MORE

20 LIKELY TO COMMIT CRIMES AND TO ELIMINATE SUPERVISION FOR THOSE

21 WHO ARE LESS LIKELY, THEREBY ALLOWING THE PAROLE OFFICERS TO

22 GIVE MORE ATTENTION AND SUPERVISION TO THOSE MORE LIKELY TO

23 COMMIT CRIMES.  IS THAT GOOD OR BAD?

24          **THE WITNESS:**  WELL, OBVIOUSLY, IT WOULD BE GOOD FOR

25 THOSE INDIVIDUALS THAT ARE GOING TO GET MORE SUPERVISION.

1  UNFORTUNATELY, FOR THOSE INDIVIDUALS THAT ARE NOT GOING TO GET

2  SUPERVISED, ALTHOUGH SOME OF THEM MAY NOT REENGAGE IN CRIMINAL

3  ACTIVITY JUST BECAUSE THEY'VE CHOSEN TO CHANGE THEIR LIFE,

4  UNFORTUNATELY, I -- BASED ON MY EXPERIENCE, THE VAST MAJORITY OF

5  THOSE INDIVIDUALS WILL CONTINUE WITH THAT LIFESTYLE IF THEY ARE

6  NOT SUPERVISED ACCORDINGLY OR HELD ACCOUNTABLE.

7          **JUDGE REINHARDT:**  DO THEY ALL REQUIRE THE SAME DEGREE

8  OF SUPERVISION?

9          **THE WITNESS:**  I DO NOT BELIEVE SO.

10         **JUDGE REINHARDT:**  SOME MAY REQUIRE LESS AND SOME

11  MORE?

12         **THE WITNESS:**  THAT'S CORRECT, BUT I DO BELIEVE THAT

13  THEY ALL DESERVE SOME LEVEL OF SUPERVISION OR ACCOUNTABILITY.

14         **JUDGE REINHARDT:**  ALL FOR THE SAME PERIOD OF TIME?

15  IS IT NECESSARY TO SUPERVISE ALL PAROLEES TO THE SAME DEGREE OR

16  THE SAME AMOUNT OF TIME?

17         **THE WITNESS:**  I DON'T BELIEVE SO.

18         **JUDGE KARLTON:**  THIS IS A QUESTION FAR REMOVED FROM

19  WHAT OUR CONCERNS ARE, I SUPPOSE, BUT SINCE EVERYBODY IS TALKING

20  ABOUT IT AS IF IT WERE AN ISSUE FOR US, I WANT TO RAISE IT WITH

21  YOU.

22         CALIFORNIA HAS THE HIGHEST RECIDIVISM RATE IN THE

23  UNITED STATES.  WITHOUT DOUBT THE SYSTEM THAT WE NOW HAVE FAILS.

24  ISN'T PUBLIC SAFETY GOING TO BE CHANGED, I MEAN EFFECTIVELY

25  IMPROVED, IF WE CHANGE THE UTTERLY FAILED SYSTEM THAT WE'RE NOW

1    USING?

2              **THE WITNESS:**  YES, SIR, I AGREE WITH YOU TOTALLY.

3              **JUDGE KARLTON:**  NOW, I DON'T KNOW WHAT THAT MEANS.

4    WITH THE GREATEST RESPECT, I SUSPECT YOU DON'T EITHER, BECAUSE

5    NONE OF US DO.  THE EXPERTS, THE ACADEMIC EXPERTS THAT WE HAVE

6    HEARD -- WELL, I SHOULDN'T SAY THAT.  LET ME EXPLORE SOME OTHER

7    QUESTIONS THAT WERE RAISED BY LAW ENFORCEMENT OFFICERS.

8              THERE IS A PROBLEM, APPARENTLY -- IS THERE IN YOUR

9    VIEW A PROBLEM OF SENDING LOW LEVEL OFFENDERS TO PRISON BECAUSE

10   THEY MIX WITH SERIOUS OFFENDERS AND BECAUSE, BY VIRTUE OF

11   THAT -- I'M SORRY, I'VE FORGOTTEN THE PHRASE USED BY ONE OF YOUR

12   PREDECESSORS -- THEY BECOME MORE RECEPTIVE TO COMMITTING SERIOUS

13   CRIMES?  DO YOU BELIEVE THAT TO BE TRUE?

14             **THE WITNESS:**  I BELIEVE THAT WHEN INDIVIDUALS, THE

15   LONGER THEY ARE -- IN CASES BY PLACING AN INDIVIDUAL THAT

16   COMMITS A PROPERTY CRIME WITH AN INDIVIDUAL THAT'S COMMITTED

17   ROBBERIES, THERE IS A POTENTIAL FOR THAT PERSON THAT'S COMMITTED

18   ROB- -- BURGLARIES TO PERHAPS ESCALATE THEIR LEVEL OF CRIMES,

19   YES.

20             **JUDGE KARLTON:**  IF WE HAVE TO CHANGE THE SYSTEM --

21   ALL RIGHT?  YOU'RE THE SECOND LAW ENFORCEMENT OFFICER, THE OTHER

22   FELLOW SAID HE THOUGHT THAT WAS CERTAINLY GOING TO HAPPEN.  BUT,

23   IN ANY EVENT, THAT SUGGESTS THAT AT LEAST AT SOME LEVEL THE

24   APPROPRIATE PLACE TO OPERATE IS IN TRYING TO SEGREGATE ONE GROUP

25   OF CRIME -- CRIMINALS FROM ANOTHER.  WE CAN'T DO THAT IN TODAY'S

1  PRISONS BECAUSE THEY ARE SO OVERCROWDED, PEOPLE ARE JUST SITTING

2  IN BUNKS, AND THEY DON'T DO ANYTHING.

3         **THE WITNESS:**  YES.

4         **JUDGE KARLTON:**  THAT'S NOT -- AS A PUBLIC POLICY

5  MATTER -- AGAIN, IT DOESN'T HAVE ANYTHING TO DO WITH WHAT

6  WE'RE -- IT DOESN'T DIRECTLY HAVE ANYTHING TO DO WITH WHAT WE'RE

7  CONCERNED WITH, BUT, YOU KNOW, WE OUGHT TO BE CONCERNED WITH

8  THAT -- THEY CAN'T DO THAT BECAUSE THERE'S NO ROOM IN THE INN.

9  EVERYBODY, APPARENTLY -- WELL, LET ME ASK YOU.  DO YOU AGREE IT

10 IS IMPORTANT, IN ATTEMPTING TO REDUCE RECIDIVISM, TO PROVIDE

11 APPROPRIATE PROGRAMMING TO PEOPLE WHO ARE IN PRISON?

12        **THE WITNESS:**  ABSOLUTELY.

13        **JUDGE KARLTON:**  OKAY.  WE CAN'T DO THAT, EVERYBODY

14 AGREES, BECAUSE THERE'S NO PLACE AT THE INN?

15        **THE WITNESS:**  YES.

16        **JUDGE KARLTON:**  NOW, IF YOU CAN'T CLASSIFY PROPERLY

17 BECAUSE THERE'S NO PLACE AT THE INN, AND YOU CAN'T PROVIDE

18 PROGRAMS BECAUSE THERE'S NO PLACE IN THE INN, INEVITABLY, YOU

19 GET 70 PERCENT RECIDIVISM.  DOESN'T THAT SUGGEST THAT WE'VE GOT

20 TO DO SOMETHING THAT, AS A MATTER OF PUBLIC POLICY, AGAIN NOT

21 PERHAPS OUR RESPONSIBILITY, THAT WE'VE GOT TO DO SOMETHING TO

22 PROVIDE A SYSTEM THAT PERMITS FOR PROPER CLASSIFICATION AND FOR

23 PROPER PROGRAMMING?

24        **THE WITNESS:**  YES.

25        **JUDGE REINHARDT:**  LET ME GO BEYOND JUDGE KARLTON'S

1    QUESTION, BECAUSE HE SUGGESTS IT MAY NOT HAVE ANYTHING TO DO

2    DIRECTLY WITH WHAT WE ARE CONCERNED WITH.  BUT I WOULD TAKE IT

3    FROM YOUR TESTIMONY THAT IT DOES HAVE SOMETHING TO DO DIRECTLY

4    WITH WHAT WE'RE CONCERNED WITH, BECAUSE ONE OUR ISSUES IS PUBLIC

5    SAFETY, AND YOU ARE TESTIFYING IN AGREEMENT WITH MANY OTHERS

6    THAT IT'S HARMFUL TO PUBLIC SAFETY TO CONTINUE THE KIND OF

7    SYSTEM WITH OVERCROWDING, WITHOUT THE PROPER PROGRAMMING, AND

8    THAT CAN AFFECT, WITHOUT THE PROPER SEGREGATION, ALL OF THE

9    CONSEQUENCES OF OVERCROWDING, YOU SEEM TO AGREE, IS HARMFUL TO

10   THE PUBLIC SAFETY, AND SO WE HAVE TO WEIGH THAT ALONG WITH THE

11   OTHER IMMEDIATE IMPACTS ON PUBLIC SAFETY.

12          **THE WITNESS:**  I WOULD LIKE TO RESPOND, IF I COULD, TO

13   ALL THOSE, IF I CAN REMEMBER THEM ALL.

14          THERE IS A POTENTIAL FOR PEOPLE THAT GET

15   INCARCERATED, THAT COMMIT LOWER LEVEL OFFENSES LIKE AUTO THEFT

16   AND BURGLARY, TO BECOME EDUCATED IN PRISON AND THEN GO OUT AND

17   COMMIT MORE SERIOUS TYPES OF CRIMES.

18          **JUDGE KARLTON:**  IT'S ALSO DESCRIBED AS SOMETHING --

19   I'M SORRY, I DON'T REMEMBER.

20          **JUDGE REINHARDT:**  LIKE CRIMINALIZING.

21          **JUDGE HENDERSON:**  CRIMINALIZING.

22          **THE WITNESS:**  BUT GENERALLY WHAT I HAVE FOUND, AT

23   LEAST IN MY EXPERIENCE, THAT PEOPLE GET COMFORTABLE COMMITTING A

24   CERTAIN TYPE OF CRIME.  FOR EXAMPLE, IT'S NOT UNCOMMON FOR US TO

25   SEE INDIVIDUALS THAT WE ARREST AND SEND TO PRISON FOR COMMITTING

1  WINDOW SMASH BURGLARIES OF BUSINESSES.  WHEN THEY GET OUT, THERE

2  IS A LIKELIHOOD FOR THEM TO GO BACK AND COMMIT BUSINESS

3  BURGLARIES THAT ARE WINDOW SMASHES.  THEY KEEP THEIR SAME

4  MOTIVE, MOTIVE OF OPERATION OR MODUS OPERANDI.  THEY KEEP THE

5  SAME TYPE OF CRIME, AND FORTUNATELY FOR US IN LAW ENFORCEMENT,

6  THAT HELPS US SOLVE THOSE CRIMES.

7          ON OCCASION THEY DO CHANGE, BUT GENERALLY THEY KEEP

8  THEIR SAME TYPE OF CRIMES THEY COMMIT, BUT THEY BECOME SMARTER

9  AT HOW TO GET AWAY WITH THOSE CRIMES.

10         **JUDGE KARLTON:**  I MUST RESPECTFULLY SAY I HAVE BEEN

11  SENTENCING PEOPLE FOR 30 YEARS, AND I WAS IN THE STATE SYSTEM

12  FOR TWO.  WE SENT AN ENORMOUS NUMBER OF PEOPLE FOR THE HIGH

13  CRIME OF STUPIDITY.

14         **THE WITNESS:**  YES, SIR, I AGREE WITH THAT.

15         **JUDGE KARLTON:**  AND, YOU KNOW, PEOPLE -- WELL, ALL

16  RIGHT.  I'M SORRY.

17         **JUDGE REINHARDT:**  THAT WAS ONLY ONE ASPECT OF IT.

18         THE OTHER ASPECT IS YOU WOULD HOPE IF THINGS WORKED

19  WELL, THAT PEOPLE WOULD COME OUT OF PRISON LESS LIKELY TO COMMIT

20  CRIMES INSTEAD OF MORE LIKELY, AND THAT'S WHY SO MANY OF THE

21  WITNESSES WHO SAID WE WANT AN INTEGRATED PROGRAM WHERE YOU

22  STARTED EDUCATING THEM, YOU KNOW, REHABILITATING THEM IN THE

23  PRISON, AND THEN WHEN THEY GET OUT THERE SHOULD BE COMMUNITY

24  PROGRAMS AVAILABLE.  THE OBJECTIVE OF LAW ENFORCEMENT IS TO

25  REDUCE THE NUMBER OF CRIMES COMMITTED.  AND WHAT JUDGE KARLTON

1    WAS SAYING WAS THAT THE TESTIMONY IS THAT WITH THE EXTENT OF THE

2    OVERCROWDING, NOT ONLY ARE THEY MIXED WITH OTHER TYPES OF

3    CRIMINALS THEY SHOULDN'T BE, BUT THEY DON'T RECEIVE THE PROGRAMS

4    THAT WILL ALLOW THEM TO BE, OR ENCOURAGE THEM TO BE LAW ABIDING

5    WHEN THEY COME OUT.  THEY HAVE NO MORE INTEREST IN BEING LAW

6    ABIDING THAN WHEN THEY WENT IN.

7            **JUDGE KARLTON:**  LESS.

8            **JUDGE REINHARDT:**  LESS.  ONE OF THE REASONS FOR THAT

9    IS WE AREN'T ABLE TO USE THEIR TIME IN PRISON TO TRY TO MAKE

10   THEM MORE LAW ABIDING.

11           **THE WITNESS:**  I DO AGREE WITH YOU.  IT'S BEEN -- I

12   REALLY BELIEVE THAT WE HAVE TO PROVIDE TREATMENT INSIDE OF THE

13   PRISONS, WHICH WE ALL KNOW TODAY IS NOT OCCURRING, BUT WE ALSO

14   HAVE TO, WHEN THEY GET RELEASED FROM PRISON, PROVIDE THEM A

15   FACILITY THAT THEY CAN REINTEGRATE INTO OUR SOCIETY, SIMILAR TO

16   REENTRY FACILITIES LIKE WE'RE OPENING UP IN FRESNO, AND -- BUT

17   IT HAS TO BE, I BELIEVE, A GRADUAL PROCESS.

18           TO TAKE A PERSON FROM PRISON AND THEN SIMPLY PLACE

19   HIM INTO A COMMUNITY, THAT INDIVIDUAL IS DOOMED FOR FAILURE

20   UNLESS THEY GO THROUGH A PROCESS.  AND I BELIEVE THE MOST

21   SUCCESSFUL PROCESS IS SOME FORM OF A REENTRY FACILITY IN LOCAL

22   COMMUNITIES THAT ALLOW FOR THE ONGOING TREATMENT OF THESE

23   INDIVIDUALS AND MONITORING AND THEN GRADUALLY RELEASE THEM INTO

24   OUR COMMUNITIES WITH OTHER SANCTIONS AND ACCOUNTABILITY.

25           **JUDGE KARLTON:**  YESTERDAY WE HAD A PERSON FROM SONOMA

1  COUNTY -- WELL, WORKING WITH SONOMA COUNTY TO DEVELOP -- HE

2  ARGUED, AND PERHAPS TRUTHFULLY, TO DEVELOP A MORE RATIONAL

3  CRIMINAL SYSTEM, AT THE END OF WHICH THE CROSS-EXAMINATION WAS,

4  ONE, TELL ME, IF YOU DID ALL THE GOOD THINGS THAT YOU SAID WE

5  COULD DO, WOULD YOU OPPOSE THE PROGRAM AND HE SAID NO.  THEN I

6  ASKED HIM, WHY AREN'T WE DOING ALL THESE THINGS, AND HIS ANSWER

7  WAS, I DON'T KNOW.

8          **JUDGE REINHARDT:**  WELL, HE ALSO SAID YOU CAN'T TRUST

9  THE STATE.

10          **JUDGE KARLTON:**  WELL, THAT'S ANOTHER -- THIS IS

11  SOMEBODY ELSE WHO SAID THAT, WHICH IS PROBABLY TRUE, TOO.

12          WHEN WE -- I DON'T -- I WAS NOW ABOUT TO ASK YOU TO

13  SHARE OUR PAIN, WHICH IS REALLY STUPID.

14          **THE WITNESS:**  NO, THANK YOU.  I'LL KEEP THE ROBE OFF.

15          **JUDGE KARLTON:**  WE ALL AGREE THAT SOMETHING HAS GOT

16  TO BE DONE, AND NOBODY KNOWS HOW TO DO IT.

17          GO AHEAD.

18          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

19  BY MS. BARLOW

20  **Q**   CHIEF DYER, WAS THERE A SURGE IN PAROLEES RELEASED TO FRESNO

21  IN 2005?

22  **A**   I DON'T KNOW WITHOUT LOOKING AT A REFERENCE SHEET.  THAT

23  NUMBER DOES FLUCTUATE FROM MONTH-TO-MONTH, YEAR-TO-YEAR.  I'D

24  HAVE TO LOOK AT THAT.

25  **Q**   RIGHT.  DO YOU RECALL IN YOUR DEPOSITION BEING ASKED BY

1  MR. SPECTER ABOUT THE BRIDGING PROGRAM AND THE NUMBER OF

2  PAROLEES BEING RELEASED AS A RESULT OF THAT PROGRAM IN 2005

3  GOING UP?

4  **A**  I DO.

5  **Q**  OKAY.  DID YOU EXPERIENCE ANY NEGATIVE IMPACTS FROM THE

6  ADDITIONAL PAROLEES THAT YOUR COMMUNITY RECEIVED IN 2005?

7  **A**  2005 WAS THE ONLY YEAR IN THE LAST SIX-PLUS YEARS THAT WE

8  HAD AN INCREASE IN VIOLENT CRIME IN OUR CITY.  2002, '3 AND '4

9  WE HAD DECREASES.  2005 WE HAD, I BELIEVE, AN 11-1/2 PERCENT

10  INCREASE IN VIOLENT CRIME IN OUR CITY.  AND IN 2006 THAT NUMBER

11  DECREASED, AS WELL AS 2007.

12  **Q**  DID YOU ALSO HAVE AN INCREASE IN PROPERTY CRIMES IN 2005?

13  **A**  I WOULD --

14  **Q**  WOULD IT REFRESH YOUR RECOLLECTION TO PUT THE DATA UP ON

15  THE --

16  **A**  IN 2005 WE HAD A SLIGHT -- ACCORDING TO OUR RECORDS, WE HAD

17  A SLIGHT DECREASE, 3.7 PERCENT, IN PROPERTY CRIME IN 2005.  IN

18  FACT, WE HAVE BEEN FORTUNATE TO HAVE SIX OUT OF THE LAST SEVEN

19  YEARS DECREASES.  UNFORTUNATELY, THIS YEAR WE ARE SEEING A

20  SIGNIFICANT UPTAKE IN PROPERTY CRIME IN OUR CITY.

21  **Q**  NOW, WHAT ABOUT THE NUMBER OF FELONY ARRESTS, DID THAT ALSO

22  GO UP IN 2005?

23  **A**  THE NUMBER OF FELONY ARRESTS HAS GROWN INCREMENTALLY EACH

24  YEAR SINCE 2001, AND I BELIEVE WE'RE UPWARDS OF 18,000 FELONY

25  ARRESTS A YEAR IN OUR CITY.

1  Q   NOW, YOU TESTIFIED THAT THERE WERE, AT LEAST AS OF THE END

2  OF 2007, JUST UNDER 5,000 PAROLEES IN THE ENTIRE COUNTY, ABOUT

3  80 PERCENT OF THOSE IN THE CITY OF FRESNO.  HOW MANY PAROLEES

4  DID YOU ARREST IN 2007?

5  A   I BELIEVE THE NUMBER, IT WAS OVER ABOUT 6,200, I BELIEVE.  I

6  CAN REFER -- 6,453 PAROLEES WERE ARRESTED IN 2007.

7  Q   WHAT PERCENTAGE OF YOUR FELONY ARRESTS IN 2007 WAS THAT?

8  A   APPROXIMATELY 30 PERCENT.

9  Q   NOW, IN TERMS OF THE PROPOSAL TO --

10         JUDGE KARLTON:  I'M SORRY.  I'M JUST BEING STUPID.  I

11 DON'T UNDERSTAND WHAT YOU JUST SAID.  THERE ARE 6,000 PLUS OR

12 MINUS PAROLEES IN THE ENTIRE -- SO ENTIRE COUNTY.  I'M SORRY.  I

13 MISUNDERSTOOD TESTIMONY.  I UNDERSTAND NOW.  GO AHEAD.

14         MS. BARLOW:  HE WAS TALKING ABOUT HOW MANY ARRESTS

15 WERE MADE OF PAROLEES.

16         JUDGE KARLTON:  I UNDERSTAND NOW.

17 BY MS. BARLOW

18 Q   NOW, YOU TALKED ABOUT REMOVING PEOPLE FROM PAROLE AND HOW

19 YOU COULD PERHAPS REDUCE THE PROVISION OF SOME FOLKS.  WHAT'S

20 THE IMPORTANCE OF MAINTAINING PAROLE FROM A LAW ENFORCEMENT

21 PERSPECTIVE?

22 A   THE PAROLE STATUS IS A TOOL THAT WE USE IN LAW ENFORCEMENT,

23 BUT I THINK FOR THE INDIVIDUAL ON PAROLE, IT IS A MEASURE OF

24 ACCOUNTABILITY THAT STILL REQUIRES THEM TO DO -- TO PROVIDE

25 PAROLE AGENTS THEIR RECORD OF RESIDENCE, WHERE THEY LIVE.

1        SO THEY ARE NOT ABLE TO HAVE THAT ANONYMITY.  IT

2   REQUIRES THEM TO DO DRUG TESTING IN MOST CASES.  THERE'S

3   CONDITIONS IN TERMS OF WHO THEY CAN ASSOCIATE OR WHERE THEY CAN

4   BE.  ALL OF THOSE THINGS ALLOW THESE FOLKS TO CONTINUE TO BE

5   SUCCESSFUL.

6        THE BENEFIT FOR LAW ENFORCEMENT IS THAT IT ALLOWS US

7   THE OPPORTUNITY WHEN WE HAVE CRIME SPREES, OR SPIKE IN CRIMES,

8   OR CRIME TRENDS THAT ARE ELEVATING, THAT WE CAN THEN LOOK AT

9   THOSE INDIVIDUALS THAT ARE ON PAROLE, PERHAPS WITHIN A GIVEN

10  AREA, PERHAPS THAT HAVE A PRIOR COMMITMENT OFFENSE FOR THE

11  PARTICULAR CRIME WE'RE LOOKING AT, AND TO PAY VISITS TO THOSE

12  INDIVIDUALS, AND TO, IN SOME CASES, REMOVE THEM FROM OUR

13  COMMUNITY IF, IN FACT, THEY ARE IN VIOLATION OF THEIR PAROLE.

14       THE OTHER BENEFIT FOR US, IN THE AREA OF GANGS WE USE

15  IT VERY MUCH, WHENEVER WE HAVE A GANG SHOOTING OR A SERIES OF

16  SHOOTINGS AND THERE'S RETALIATION THAT'S GOING TO OCCUR, WE WILL

17  THEN LOOK AT THOSE INDIVIDUALS THAT ARE IN GANGS OR PEOPLE ON

18  PAROLE, AND WE WILL GO OUT AND TAKE AWAY THEIR ANONYMITY SO

19  THERE IS NO RETALIATION.  SO IT'S A VERY EFFECTIVE TOOL FOR US

20  IN LAW ENFORCEMENT.

21       **JUDGE REINHARDT:**  YOU COMBINED TWO THINGS, GANGS AND

22  PAROLE.  YOU SAID FOR THE GANGS YOU CAN LOOK AT THE PEOPLE IN

23  GANGS, WHETHER OR NOT THEY ARE ON PAROLE.

24       **THE WITNESS:**  YES, WE TRY TO TARGET THOSE -- WHEN I

25  SAY "TARGET THOSE INDIVIDUALS," THOSE ARE THE INDIVIDUALS WE

 1  LOOK AT IN ORDER TO --

 2          **JUDGE REINHARDT:** TO INVESTIGATE?

 3          **THE WITNESS:** TO INVESTIGATE, TO PAY A VISIT TO, TO

 4  FREQUENT THOSE NEIGHBORHOODS, WHATEVER THE CASE MAY BE.

 5          **JUDGE REINHARDT:** SO THAT'S PART OF A GANG PROGRAM

 6  THAT YOU HAVE IN YOUR CITY?

 7          **THE WITNESS:** YES. WE HAVE A VERY, VERY EFFECTIVE

 8  GANG PROGRAM THAT WE TRY TO BALANCE WITH SUPPRESSION AND

 9  PREVENTION-INTERVENTION, YES.

10          **MS. BARLOW:** JUST A COUPLE MORE.

11  BY MS. BARLOW

12  **Q** YOU MENTIONED SOME ECONOMIC IMPACTS FROM CRIME IN YOUR

13  COMMUNITY. DID YOU RELY, IN PART, UPON ANY STUDY THAT WAS DONE

14  IN FRESNO REGARDING THAT ISSUE?

15          **MR. SPECTER:** I OBJECT TO THIS LINE OF QUESTIONING.

16  HE'S NOT AN ECONOMIST. THERE'S NO FOUNDATION HE HAS ANY

17  EXPERTISE IN THIS AREA.

18          **JUDGE HENDERSON:** I WILL SUSTAIN THE FOUNDATIONAL

19  OBJECTION WITHOUT PREJUDICE.

20          **MS. BARLOW:** THEY MADE A MOTION IN LIMINE TO EXCLUDE

21  HIS TESTIMONY ON THE SAME GROUNDS, WHICH WAS ALREADY DENIED BY

22  THE COURT.

23          **JUDGE KARLTON:** I DON'T KNOW WHY WE DENIED IT, BUT

24  YOU GOT A RULING NOW.

25          **JUDGE REINHARDT:** ARE YOU SURE WE DIDN'T RESERVE IT?

1    **MS. BARLOW:**  NO, IT WAS DENIED, YOUR HONOR.

2  BY MS. BARLOW

3  **Q**    COULD YOU EXPLAIN, CHIEF DYER, IN YOUR EXPERIENCE, WHAT THE

4  RELATIONSHIP BETWEEN CRIME --

5    **JUDGE KARLTON:**  NO, MA'AM.  THE OBJECTION WAS

6  SUSTAINED WITHOUT PREJUDICE.  THAT MEANS LAY A FOUNDATION.

7    **MS. BARLOW:**  THAT'S WHAT I'M TRYING TO DO, YOUR

8  HONOR.

9    **JUDGE KARLTON:**  EXCUSE ME.  I MISUNDERSTOOD.

10  BY MS. BARLOW

11  **Q**    DO YOU HAVE ANY EXPERIENCE, CHIEF DYER, THAT HELPS YOU TO

12  DETERMINE THE RELATIONSHIP BETWEEN CRIME IN YOUR COMMUNITY AND

13  ECONOMIC IMPACTS TO THE COMMUNITY?

14  **A**    YES.

15  **Q**    COULD YOU EXPLAIN WHAT THAT IS?

16  **A**    WELL, TWO AREAS, ONE BEING THAT OF EXPERIENCE BACK IN THE

17  '90'S, LATE '80'S AND '90'S, WE EXPERIENCED A SIGNIFICANT

18  INCREASE IN CRIME IN OUR COMMUNITY.  IN FACT, CRIME WAS OUT OF

19  CONTROL.  AND WE KNOW THAT IT WAS ALSO DURING THAT TIME, AS WE

20  SPOKE WITH CITIZENS IN OUR COMMUNITY, THAT THERE WAS AN

21  INCREDIBLE AMOUNT OF FEAR THAT FOLLOWED AS A RESULT OF THAT

22  CRIME.  CRIME RATES, THE MEDIA COVERAGE OF THAT CRIME, AND

23  PEOPLE WERE FEARFUL TO COME OUTDOORS.  PEOPLE WERE FEARFUL TO

24  WALK IN THEIR NEIGHBORHOODS.  PEOPLE WERE FEARFUL TO GO OUT INTO

25  SHOPPING CENTERS, ESPECIALLY DURING THE EVENING HOURS.

1          AND SO THERE WAS A DIRECT IMPACT BETWEEN CRIME AND

2   FEAR AND, ULTIMATELY, A PERSON'S ABILITY TO GO OUT AND TO SPEND

3   MONEY AND -- IMPACTS OUR TAX BASE IN THE CITY OF FRESNO.  AND WE

4   WERE LATER ABLE TO CONFIRM THAT FEELING WITH A STUDY THAT WE

5   COMMISSIONED A COUPLE YEARS AGO.

6          **MR. SPECTER:**  I RENEW MY OBJECTION, YOUR HONOR.  HE'S

7   MAKING ECONOMIC CONCLUSIONS WITHOUT ANY BASIS OR EXPERTISE OR

8   FACTUAL BASIS TO SHOW THAT THOSE CONCLUSIONS ARE RELIABLE.

9          **JUDGE HENDERSON:**  I'M GOING TO RULE THAT THE

10  OBJECTION GOES TO THE WEIGHT OF THIS, WHETHER IT'S ONE POUND OR

11  ONE MILLIGRAM.

12         **MS. BARLOW:**  I UNDERSTAND.

13         **MR. SPECTER:**  PARDON ME, YOUR HONOR.

14         **JUDGE HENDERSON:**  THE OBJECTION GOES TO THE WEIGHT OF

15  THIS TESTIMONY.

16         **MR. SPECTER:**  OKAY.

17  BY MS. BARLOW

18  **Q**   ARE THERE ALSO STUDIES THAT SUPPORT THE NOTION THAT FEAR AND

19  CRIME LEAD TO ECONOMIC DOWNTURNS IN COMMUNITIES?

20  **A**   THAT'S CORRECT.

21  **Q**   AND THAT'S BEEN YOUR ACTUAL EXPERIENCE IN FRESNO?

22         **JUDGE REINHARDT:**  I GUESS WE COULD ALL AGREE CRIME IS

23  NOT GOOD FOR SOCIETY IN MANY, MANY RESPECTS.

24         **JUDGE KARLTON:**  WE'LL STIPULATE TO THAT.

25         **JUDGE REINHARDT:**  AND HAS AN ADVERSE EFFECT ON THE

1  COMMUNITY WHEN WE HAVE CRIME.

2           **MS. BARLOW:**  IF I COULD JUST ASK THE WITNESS TO

3  AUTHENTICATE THIS REPORT THAT WAS PREPARED FOR THE CITY ON THAT

4  ISSUE.

5  BY MS. BARLOW

6  **Q**   MR. DYER?

7  **A**   YES.

8           **MS. BARLOW:**  IF WE COULD PUT UP EXHIBIT 641, THE

9  FIRST PAGE, 228.  I'M SORRY.  HERE.  I'LL PUT THE FIRST PAGE UP

10 ON THE ELMO.

11          (DOCUMENT DISPLAYED.)

12 BY MS. BARLOW

13 **Q**   IS THAT THE REPORT THAT YOU TALKED ABOUT?

14 **A**   YES.

15 **Q**   AND THAT WAS DONE FOR THE CITY OF FRESNO?

16 **A**   YES.  WE WERE CONSIDERING A PUBLIC SAFETY SALES TAX, AND WE

17 WANTED TO DEMONSTRATE THE IMPACT BETWEEN INCREASING LEVELS OF

18 OFFICERS AND DECREASED CRIME TO THAT OF INCREASED ECONOMIC

19 GROWTH.

20 **Q**   ALL RIGHT.

21          **JUDGE KARLTON:**  DID YOU GET YOUR INCREASE, SALES TAX

22 INCREASE?

23          **THE WITNESS:**  WE DIDN'T GO FORTH WITH IT.  NO, WE DID

24 NOT.

25          **JUDGE KARLTON:**  AND YOU DIDN'T BECAUSE YOU FIGURED IT

1   COULDN'T PASS?

2            **THE WITNESS:** THAT'S CORRECT.

3            **JUDGE KARLTON:** THAT TELLS US A LOT ABOUT HOW PEOPLE

4   WANT CRIME PREVENTED BUT ARE ABSOLUTELY UNWILLING TO MAKE IT

5   HAPPEN.

6            **THE WITNESS:** ABSOLUTELY TRUE.

7   BY MS. BARLOW

8   **Q**   I'M SORRY.  YOU HAD PUT UP THE OTHER PAGE, AND I HAD YOU

9   SWITCH IT.  SORRY.

10  **A**   I BELIEVE IT IS PAGE 10.

11  **Q**   I BELIEVE IT IS PAGE 10.  IF YOU COULD JUST HIGHLIGHT THAT

12  AREA?

13           **MR. SPECTER:** I'M GOING TO ALSO OBJECT TO THIS LINE

14  OF QUESTIONING BECAUSE IT'S IRRELEVANT, YOUR HONOR.  THE

15  QUESTIONS BEFORE YOU ARE ABOUT PUBLIC SAFETY.  THE PLRA DOESN'T

16  SAY ANYTHING ABOUT ECONOMIC IMPACT.

17           **MS. BARLOW:** IT'S LARGELY FOUNDATIONAL, YOUR HONOR.

18           **JUDGE HENDERSON:** TO WHAT?  TO PUBLIC SAFETY?

19           **MS. BARLOW:** WELL, ONE OF THE THINGS THAT THE CHIEF

20  WOULD TESTIFY TO, I'LL MAKE AN OFFER OF PROOF, IS THAT FEAR

21  LEADS TO A REDUCTION IN REPORTING OF CRIME.

22           **JUDGE REINHARDT:** THAT'S NOT WHAT HE'S TESTIFYING

23  ABOUT.

24           **JUDGE KARLTON:** THIS DOESN'T HAVE ANYTHING TO DO WITH

25  THAT.  YOU CAN ASK HIM DIRECTLY --

 1              **MS. BARLOW:**  IT DOES, YOUR HONOR.  IT TALKS ABOUT

 2  CRIME LEADING TO MISTRUST AND FEAR, WHICH, IN TURN, LEADS TO --

 3              **JUDGE KARLTON:**  WHATEVER.

 4              **JUDGE HENDERSON:**  DOES CRIME LEAD TO MISTRUST AND

 5  FEAR?

 6              **THE WITNESS:**  ABSOLUTELY.

 7              **JUDGE HENDERSON:**  AND DOES THAT LEAD TO SOMETHING

 8  BEYOND THAT?  AND IF SO, WHAT IS IT?

 9              **THE WITNESS:**  IN MANY COMMUNITIES IT LEADS TO PEOPLE

10  NOT LEAVING THEIR HOMES, NOT GOING OUT AND FREQUENTING SHOPPING

11  MALLS.

12              **JUDGE KARLTON:**  SHE WANTS YOU TO SAY IT LEADS TO --

13              **JUDGE REINHARDT:**  AN ECONOMIC DOWNTURN, ALMOST AS BAD

14  AS WHAT WE'RE SUFFERING NOW.

15              **JUDGE KARLTON:**  SHE WANTS YOU TO TELL US THAT

16  SOMETHING WE DON'T KNOW, THAT THAT WILL --

17              **MS. BARLOW:**  I ONLY WANT HIM TO TELL YOU WHAT HE

18  THINKS IS THE TRUTH, YOUR HONOR.

19              **JUDGE KARLTON:**  YEAH, RIGHT.  WHETHER OR NOT THAT

20  LEADS TO THE REDUCTION OF REPORTING CRIME IN YOUR VIEW.

21              **THE WITNESS:**  DOES IT LEAD TO A REDUCTION IN

22  REPORTING OF CRIME?

23              **JUDGE KARLTON:**  I THINK THAT'S WHAT SHE WAS TRYING TO

24  GET AT.

25              **MS. BARLOW:**  FEAR IN THE COMMUNITY.

1          **THE WITNESS:**  I BELIEVE THERE IS COUPLE OF AREAS

2     WHERE A LACK OF TRUST AND FEAR IN A COMMUNITY CAN LEAD TO A

3     REDUCED REPORTING.  GENERALLY, THAT MIGHT BE WHERE ILLEGAL

4     IMMIGRANTS ARE AFRAID TO REPORT CRIME BECAUSE THEY ARE AFRAID OF

5     BEING DEPORTED.

6          BUT, ALSO, THERE ARE THOSE INDIVIDUALS OUT THERE -- I

7     KNOW WE EXPERIENCED IT IN THE '90'S.  WE HAD SO MANY PROPERTY

8     CRIMES THAT WERE OCCURRING THAT WE FINALLY REALIZED THAT PEOPLE

9     WERE NOT REPORTING CRIME TO US BECAUSE IT WAS OCCURRING SO OFTEN

10    AND IT WASN'T WORTH IT EVEN FOR THEIR INSURANCE BECAUSE THEIR

11    DEDUCTIBLE WAS SO HIGH.

12         SO WE KNOW THE NUMBER OF CRIMES REPORTED AREN'T

13    ALWAYS ACCURATE IN THAT SENSE.

14         **MS. BARLOW:**  NOW, QUICKLY, YOUR HONORS, THERE WAS

15    RAISED AN OBJECTION TO SOME SUMMARIES THAT ARE IN CHIEF DYER'S

16    REPORT OF CERTAIN CRIMES THAT OCCURRED AS A RESULT OF PAROLEES

17    IN THE COMMUNITY.

18         **JUDGE HENDERSON:**  ARE THOSE OBJECTIONS IN WRITING?

19         **MS. BARLOW:**  THEY ARE IN WRITING, YOUR HONOR, AND

20    I -- WE HAVE INCLUDED IN OUR EXHIBITS THE REDACTED COPIES OF THE

21    REPORTS IN QUESTION.  I HAVE --

22         **JUDGE KARLTON:**  WELL, DO YOU CONCEDE THE OBJECTION IS

23    WELL TAKEN?

24         **MS. BARLOW:**  WELL, NO, I DON'T, YOUR HONOR,

25    BECAUSE --

1          **JUDGE KARLTON:**  ALL RIGHT.

2          **MS. BARLOW:**  THAT'S PART OF --

3          **JUDGE KARLTON:**  I DON'T NEED A SPEECH.  I NEED A YES

4   OR A NO.  I'LL ASK FOR A SPEECH WHEN I GET -- EXCUSE ME.  I'M

5   SORRY.  WE HAVE BEEN AT THIS A LOT OF DAYS AND SOMETIMES I LOSE

6   MY TEMPER.  I APOLOGIZE.

7          **MS. BARLOW:**  IT'S OKAY, YOUR HONOR.  IN YOUR POSITION

8   I MIGHT DO THE SAME.

9          **JUDGE REINHARDT:**  I WON'T LOSE MY TEMPER.

10          **JUDGE KARLTON:**  YOU WANT TO OFFER THESE IF THE

11   OBJECTIONS ARE SUSTAINED, IS THAT WHAT YOU WANT TO DO?

12          **MS. BARLOW:**  ALL I WANTED TO DO WAS HAVE HIM

13   AUTHENTICATE THAT THOSE ARE, IN FACT, THE REPORTS HE SUMMARIZED

14   IN HIS EXPERT REPORT.

15          **MR. SPECTER:**  I'LL STIPULATE TO THAT.  I'LL STIPULATE

16   TO THE AUTHENTICITY OF THOSE DOCUMENTS.  BUT I STILL OBJECT TO

17   THE ADMISSION OF THE DOCUMENTS.  THEY'RE BEING OFFERED FOR THE

18   TRUTH, AND THEY'RE DOUBLE HEARSAY.

19          **MS. BARLOW:**  IF I MAY?

20   BY MS. BARLOW

21   **Q**   CHIEF DYER, ARE THESE REPORTS PREPARED BY YOUR -- WE'RE

22   REFERRING TO THE REPORTS IN EXHIBIT DI 624 -- PREPARED BY YOUR

23   OFFICERS IN THE ORDINARY COURSE OF THEIR DUTIES?

24   **A**   THAT'S CORRECT.

25   **Q**   AND THESE ARE OFFICIAL REPORTS OF THE FRESNO POLICE

1    DEPARTMENT?

2    **A**    YES.

3    **Q**    SO THESE ARE OFFICIAL RECORDS?

4    **A**    YES, THEY ARE.

5    **Q**    AND YOUR OFFICERS HAVE A LEGAL DUTY TO ACCURATELY RECORD AND

6    REPORT WHAT THEY OBSERVE AND WHAT THEY'RE TOLD DURING

7    INVESTIGATIONS?

8    **A**    THAT'S CORRECT.

9              **MS. BARLOW:**  THEY'RE OFFICIAL RECORDS, YOUR HONOR.

10   WE WOULD OFFER THEM.

11             **JUDGE KARLTON:**  ALL OF THESE OBJECTIONS WILL BE –– IF

12   WE EVER GET THERE, WILL BE RESOLVED WHEN WE TRY AND FIGURE OUT

13   WHAT TO DO.

14             **JUDGE HENDERSON:**  AND THEY WILL BE ADMITTED AT THIS

15   TIME WITH THAT UNDERSTANDING.

16             **MS. BARLOW:**  THANK YOU, YOUR HONOR.

17             **JUDGE KARLTON:**  NO, THEY ARE NOT ADMITTED OVER

18   OBJECTION, BECAUSE WE ARE GOING TO DECIDE WHETHER THE OBJECTION

19   IS GOOD OR NOT.

20             **JUDGE HENDERSON:**  I STAND CORRECTED.

21             **MS. BARLOW:**  I DO HAVE UNREDACTED COPIES FOR THE

22   COURT IF YOU WOULD LIKE THEM.

23             **JUDGE KARLTON:**  GO AHEAD.

24   BY MS. BARLOW

25   **Q**    FINALLY, CHIEF DYER, YOU MENTION IN YOUR REPORT THAT YOU

1  BELIEVE THAT NOT ONLY WILL FRESNO HAVE SIGNIFICANT IMPACTS FROM

2  THE PROPOSED RELEASE ORDER, BUT THAT OTHER CENTRAL VALLEY CITIES

3  WILL HAVE ALSO SIMILAR IMPACTS.  CAN YOU TELL US WHAT IS THE

4  BASIS FOR YOUR BELIEF THAT THE OTHER CENTRAL VALLEY CITIES WILL

5  SUFFER COMPARABLE TO FRESNO?

6  **A**   THERE IS A LOT OF SIMILARITIES BETWEEN CITIES THAT ARE

7  ADJACENT TO ONE ANOTHER IN THE CENTRAL VALLEY, WHETHER THAT BE

8  STOCKTON, MODESTO, MERCED, VISALIA.  WE HAVE HISTORICALLY HAD

9  HIGH CONCENTRATION OF POVERTY, HIGH CONCENTRATION OF

10 UNEMPLOYMENT.  WE HAVE A HIGH FREQUENCY OF METHAMPHETAMINE USE

11 AND PRODUCTION.  AND THE DEMOGRAPHICS ARE VERY SIMILAR IN MANY

12 OF OUR CITIES.

13          SO WHEN THAT IS TAKEN INTO CONSIDERATION, WE KNOW

14 THAT -- AND JUST THE CONVERSATIONS THAT I HAVE HAD AS THE

15 PRESIDENT OF THE CALIFORNIA POLICE CHIEFS, IN SPEAKING WITH

16 CHIEFS THROUGHOUT THE STATE, AND OUR ASSOCIATION FRESNO/MADERA

17 CHIEFS ASSOCIATION, WE KNOW THAT THE IMPACT BASED ON ALL THAT

18 INFORMATION IS GOING TO BE VERY SIMILAR TO WHAT WE SEE IN

19 FRESNO, ALTHOUGH FRESNO WILL BE ON A MUCH GREATER SCALE BECAUSE

20 OF OUR POPULATION DENSITY.

21 **Q**   ALL RIGHT.  AND DO YOU WORK WITH THE OTHER CENTRAL VALLEY

22 CITIES ON A REGULAR BASIS?

23 **A**   I DO.

24 **Q**   IN WHAT CAPACITY?

25 **A**   IN MY CAPACITY, NUMBER ONE, AS THE PRESIDENT OF CALIFORNIA

1  POLICE CHIEFS, I INTERACT FREQUENTLY WITH A NUMBER OF CHIEFS

2  THROUGHOUT THE STATE, BUT ALSO CENTRAL VALLEY.  AND, ALSO, I AM

3  THE -- CURRENTLY I'M THE CHAIR OF THE CENTRAL VALLEY HIDTA, HIGH

4  INTENSITY DRUG TRAFFICKING AREA, AND THAT IS FROM BAKERSFIELD TO

5  SACRAMENTO, AND SO I FREQUENTLY MEET WITH CHIEFS AND SHERIFFS

6  AND FEDERAL AND STATE OFFICIALS REGARDING DRUG TRAFFICKING AND

7  OTHER TYPES OF SIMILAR CONCERNS.

8          **JUDGE REINHARDT:**  MAY I ASK YOU A QUESTION ABOUT YOUR

9  TESTIMONY ABOUT THE VALLEY?  I HAD THE IMPRESSION FROM WHAT YOU

10 WERE TESTIFYING TO THAT YOU THINK THE PROBLEMS IN FRESNO ARE

11 WORSE THAN THE PROBLEMS IN THE REST OF THE STATE; THAT YOU HAVE

12 THE HIGHEST PROBLEM RATES FOR VARIOUS REASONS.

13         YOU'RE PRESIDENT OF THE STATEWIDE CHIEFS OF POLICE

14 ASSOCIATION.  WOULD THAT EXPERIENCE -- WITH THAT EXPERIENCE,

15 WOULD YOU TESTIFY THAT -- I MEAN, IS IT YOUR BELIEF THAT THE

16 OTHER AREAS IN THE STATE ARE -- AT LEAST WILL HAVE AT LEAST NO

17 GREATER IMPACT THAN THERE WILL BE IN FRESNO?

18         **JUDGE KARLTON:**  IF THERE'S RELIEF --

19         **THE WITNESS:**  I THINK IT'S GOING TO DEPEND ON

20 JURISDICTION.  SOME JURISDICTIONS ARE POSITIONED VERY WELL WHERE

21 THEY DO NOT HAVE VERY MUCH CRIME, THEREFORE, THEY WOULD NOT.

22         **JUDGE REINHARDT:**  MY QUESTION IS THE OPPOSITE.  ARE

23 YOU SATISFIED THAT THERE WILL BE NO OTHER AREA THAT WILL HAVE A

24 GREATER ADVERSE IMPACT?

25         **THE WITNESS:**  I COULDN'T SAY THAT.  I CAN TELL YOU

1  THAT -- I WOULD SAY THAT FRESNO WOULD HAVE ONE OF THE GREATER

2  IMPACTS, JUST BASED ON THE NUMBER OF PAROLEES THAT WE ARE -- OR

3  INDIVIDUALS THAT WE ARREST AND SEND TO PRISON.  WE'RE GOING TO

4  GET ABOUT FOUR PERCENT OF THOSE PEOPLE RELEASED.

5          **JUDGE REINHARDT:**  NO, NO.  I DON'T NEED ALL THE

6  EXPLANATIONS.  THE QUESTION REALLY IS, BECAUSE YOU ARE HEAD OF

7  THE STATEWIDE CHIEFS OF POLICE, AND YOU HAVE TESTIFIED YOU HAVE

8  SERIOUS PROBLEMS IN FRESNO, THE UNEMPLOYMENT, ALL OF THE THINGS

9  THAT LEAD TO CRIME, AND YOU'VE TESTIFIED TO THE LARGE NUMBER OF

10 PAROLEES YOU GET, I HAVE THE IMPRESSION AS YOU WERE TESTIFYING

11 THAT YOU THOUGHT YOURS WERE AT LEAST -- YOURS WERE AT LEAST, IF

12 NOT THE MOST SERIOUS PROBLEM, THAT AT LEAST THERE WERE NO OTHER

13 AREAS THAT HAD MORE SERIOUS PROBLEMS THAN YOURS.

14         **THE WITNESS:**  YOU KNOW, I COULDN'T SAY THAT.  FOR

15 EXAMPLE, THE CITY OF STOCKTON, THEY GOT SOME SERIOUS ISSUES.

16 RIVERSIDE HAS SOME SERIOUS ISSUES.

17         **JUDGE REINHARDT:**  EVERYBODY HAS SERIOUS ISSUES.  YOU

18 HAVE SERIOUS ISSUES.

19         **THE WITNESS:**  WE HAVE SERIOUS ISSUES, TOO.  THE ONE

20 I'M MOST FAMILIAR WITH, YOUR HONOR, IS FRESNO, AND I DO BELIEVE

21 WE WOULD HAVE SIGNIFICANT ISSUES IN FRESNO AS A RESULT OF IT.

22         **JUDGE REINHARDT:**  SO YOU ARE NOT TESTIFYING THAT

23 FRESNO'S PROBLEMS ARE MORE SERIOUS THAN ANYBODY ELSE'S?

24         **THE WITNESS:**  NO.  WE WOULD BE AT THE HIGH END OF THE

25 SPECTRUM, BUT THERE MAY BE OTHERS THAT ARE IN WORSE SHAPE THAN

1  WE WOULD BE.  HOPEFULLY NOT.

2          **JUDGE KARLTON:**  ALL THINGS ARE POSSIBLE.

3  BY MS. BARLOW

4  **Q**   FINALLY, CHIEF, THE -- YOU TALKED ABOUT UNEMPLOYMENT.  THE

5  CURRENT UNEMPLOYMENT RATE IN FRESNO IS 11.4 PERCENT; IS THAT

6  CORRECT?

7  **A**   THE MOST RECENT STUDY, I BELIEVE IN THE LAST MONTH OR SO,

8  SHOWED IT AT ABOUT 11.4 PERCENT UNEMPLOYMENT.

9          **MS. BARLOW:**  WE DO HAVE AN EXHIBIT, YOUR HONOR,

10  THAT'S PUBLIC RECORD FROM EDD THAT SHOWS BOTH THE CURRENT FRESNO

11  AND STATE, AND WE'LL OFFER THAT AS A PUBLIC RECORD AT AN

12  APPROPRIATE TIME.

13          AT THIS POINT, I HAVE NOTHING FURTHER.

14          **JUDGE HENDERSON:**  ANYTHING FROM STATE DEFENDANTS?

15          **MR. LEWIS:**  YES, YOUR HONOR.  GOOD MORNING.  KYLE

16  LEWIS FOR THE STATE DEFENDANTS.

17          **DIRECT EXAMINATION BY MR. LEWIS**

18  BY MR. LEWIS

19  **Q**   GOOD MORNING, CHIEF DYER.

20  **A**   GOOD MORNING, SIR.

21  **Q**   CHIEF, IN YOUR REPORT YOU WROTE THAT FOR EVERY ONE CRIME

22  THAT A PERSON IS CAUGHT FOR, THEY MIGHT COMMIT AS MANY AS 12

23  ADDITIONAL CRIMES?

24  **A**   THAT'S CORRECT.

25  **Q**   WOULD YOU AGREE THAT WHILE A PERSON IS IN PRISON, THEY ARE

1    INCAPACITATED IN THE SENSE --

2                **JUDGE KARLTON:**  SIR, IF YOU THINK WE DON'T UNDERSTAND

3    THAT, THEN YOUR CONTEMPT FOR THE COURT IS SHOCKING.  OBVIOUSLY,

4    PEOPLE IN PRISON ARE NOT COMMITTING CRIMES OUTSIDE OF PRISON.

5                **MR. LEWIS:**  YES, YOUR HONOR.  I'M ATTEMPTING TO LAY A

6    FOUNDATION FOR MY FURTHER QUESTIONS.

7    BY MR. LEWIS

8    **Q**    WHILE A PERSON IS IN PRISON, THEY ARE INCAPACITATED AND NOT

9    ABLE TO COMMIT CRIMES OUTSIDE OF PRISON, CORRECT?

10   **A**    YES, SIR.

11   **Q**    IF A PERSON IS ON THE STREETS AND GETS CAUGHT FOR ONLY ONE

12   OF THEIR CRIMES AND THERE'S 12 OTHER ONES OUT THERE THAT HAVE

13   BEEN COMMITTED, WOULD YOU SAY THOSE AGGREGATE CRIMES AFFECT

14   PUBLIC SAFETY?

15   **A**    YES, SIR.

16   **Q**    IF A PERSON IS RELEASED FROM PRISON EARLY, AS IN THIS CASE

17   THERE ARE -- THERE'S A PRISONER RELEASE ORDER ON THE TABLE

18   POTENTIALLY FOR RELEASE OF A VARIETY OF OFFENDERS OVER A

19   24-MONTH PERIOD -- IF A PERSON IS RELEASED EARLY FROM PRISON, DO

20   THEY HAVE AN OPPORTUNITY TO COMMIT ADDITIONAL CRIMES BEFORE THEY

21   WOULD HAVE OTHERWISE?

22                **JUDGE KARLTON:**  SIR -- I'M SORRY, GENTLEMEN.  I DON'T

23   WANT TO -- BUT THIS IS ABSURD.  THIS ISN'T EVEN YOUR FINAL

24   ARGUMENT.  THIS IS SELF-EVIDENT STUFF.

25                **MR. LEWIS:**  YOUR HONOR, I'M ASKING THE WITNESS ABOUT

1   A STATEMENT THAT WAS MADE IN HIS REPORT AND AS EXPERTISE AS A

2   POLICE CHIEF OF A LARGE CITY IN CALIFORNIA.

3            **JUDGE REINHARDT:**  THAT PEOPLE WHO ARE NOT IN PRISON

4   ARE ABLE TO COMMIT CRIMES --

5            **JUDGE KARLTON:**  AND PEOPLE THAT ARE --

6            **JUDGE REINHARDT:**  THEY WOULDN'T BE ABLE TO COMMIT IF

7   THEY'RE IN PRISON.

8            **JUDGE KARLTON:**  WE GOT THAT.  WE UNDERSTOOD THAT.

9          **MR. LEWIS:**  THANK YOU, YOUR HONOR.

10  BY MR. LEWIS

11  **Q**   CHIEF DYER, WOULD AN EARLY RELEASE OF PRISONERS ALLOW FOR AN

12  ADDITIONAL OPPORTUNITY TO COMMIT CRIME?

13  **A**   YES, SIR.

14  **Q**   DURING THE WINDOW THAT THE PRISONERS WOULD HAVE BEEN

15  RELEASED, THE THREE-MONTH WINDOW THEY MIGHT HAVE BEEN RELEASED

16  EARLY, COULD THEY HAVE COMMITTED AN ADDITIONAL 12 CRIMES FOR

17  EVERY ONE THEY WERE CAUGHT FOR?

18            **JUDGE KARLTON:**  ANYTHING IS POSSIBLE.

19          **MR. SPECTER:**  OBJECTION TO THE WORD "ADDITIONAL."

20  IT'S VAGUE FOR ALL THE REASONS JUDGE REINHARDT --

21            **JUDGE REINHARDT:**  HE ALREADY TESTIFIED THAT, YES,

22  THEY WOULD COMMIT CRIMES DURING THAT PERIOD, AND IF THEY WEREN'T

23  RELEASED, THEN THEY WOULD COMMIT THEM THREE MONTHS LATER.

24            **JUDGE KARLTON:**  YOU KNOW, WE ARE REALLY ANXIOUS TO

25  LET YOU PUT ON YOUR CASE.  THIS IS SUCH A COMPLICATED PROBLEM,

1  BUT TO STATE THE OBVIOUS, AND THEN RESTATE IT, AND THEN RESTATE

2  IT, AND THEN -- IT'S JUST A PROFOUND WASTE OF TIME.  THIS IS

3  CUMULATIVE.  YOU GOT ANYTHING NEW THAT YOU WANT TO ASK?

4           **MR. LEWIS:**  THANK YOU, YOUR HONOR.  I'LL BE SEATED

5  NOW.

6           CROSS-EXAMINATION?  DO YOU WANT TO TAKE BREAK?  OKAY.

7  WE'LL TAKE A 15-MINUTE RECESS.

8                (RECESS TAKEN.)

9           **JUDGE HENDERSON:**  YOU MAY PROCEED WITH CROSS WHEN YOU

10 ARE READY, COUNSEL.

11          **MR. SPECTER:**  THANK YOU, YOUR HONOR.

12                **CROSS EXAMINATION**

13 **BY MR. SPECTER:**

14 **Q.**  GOOD MORNING, MR. DYER.

15 **A.**  GOOD MORNING, MR. SPECTER.

16 **Q.**  AS I UNDERSTAND YOUR POSITION, IT'S THAT A PRISONER RELEASE

17 ORDER WOULD RESULT IN MORE PAROLEES IN YOUR CITY AND COUNTY FOR

18 SOME PERIOD OF TIME, CORRECT?

19 **A.**  THAT'S CORRECT.

20 **Q.**  AND THIS WOULD DRAMATICALLY INCREASE THE CRIME IN YOUR

21 COMMUNITY, IS THAT RIGHT?

22 **A.**  THAT'S CORRECT.

23 **Q.**  AND SO YOU WOULD EXPECT THAT AS THE NUMBER OF PAROLEES

24 INCREASE, THE CRIME RATE WOULD INCREASE, RIGHT?

25 **A.**  GENERALLY, YES.

1  Q.  BUT THAT HASN'T HAPPENED, HAS IT?  IN FACT -- WELL, LET ME

2  ASK YOU THIS.  BETWEEN 2003 AND 2007 -- REMEMBER WE WENT THROUGH

3  THIS DURING YOUR DEPOSITION?

4  A.  YES.

5  Q.  (CONTINUING) -- THERE WAS A 28 PERCENT INCREASE IN THE

6  NUMBER OF PAROLEES AND CRIME WENT DOWN DURING THAT PERIOD,

7  RIGHT?

8  A.  ALL BUT 2005.

9  Q.  RIGHT.  AND SO WHAT I DID -- YOU ESTIMATE THAT THERE ARE

10  GOING TO BE ABOUT 1900 PAROLEES FROM A PRISONER RELEASE ORDER,

11  RIGHT?

12  A.  THAT WAS BASED ON THE INITIAL NUMBER OF 40,000, YES.

13  Q.  SO WE'LL TAKE AROUND 2000 WOULD BE A FAIR ESTIMATE?  YES?

14  A.  YES.

15  Q.  OKAY.

16          MR. SPECTER:  COULD WE PLEASE HAVE THE FIRST TABLE?

17              (DOCUMENT DISPLAYED)

18  BY MR. SPECTER:

19  Q.  SO, MR. DYER, THIS IS A CHART BASED ON THE NUMBER OF

20  PAROLEES, NEW ADDITIONAL PAROLEES WHICH ARE RELEASED TO THE

21  COUNTY OF FRESNO, AND IT ALSO HAS THE VIOLENT CRIME RATES.

22          MS. BARLOW:  I'M SORRY, YOUR HONOR.  I'M GOING TO

23  OBJECT.  I DON'T KNOW WHERE THIS DOCUMENT CAME FROM.  I'VE NEVER

24  SEEN IT BEFORE.  I DON'T KNOW WHO PREPARED IT.  I DON'T KNOW

25  WHERE IT CAME FROM.

1          **MR. SPECTER:**  WE PREPARED IT, YOUR HONOR.

2          **MS. BARLOW:**  IT ALSO MISSTATES THE EVIDENCE.  THE

3  CDCR DATA DOES NOT SHOW 5992 PAROLEES RELEASED IN 2007 TO FRESNO

4  COUNTY.  SO I DON'T KNOW THAT ANY OF THESE NUMBERS ARE ACCURATE.

5          **MR. SPECTER:**  I'M GOING TO ASK HIM TO MAKE CERTAIN

6  ASSUMPTIONS AND WE CAN WORRY ABOUT THE ACCURACY OF THE

7  ASSUMPTIONS AT A LATER POINT.

8          **JUDGE HENDERSON:**  PROCEED.  AND YOU CAN REVISIT IT,

9  COUNSEL, ON REDIRECT.

10          **MR. SPECTER:**  IF YOU CAN HIGHLIGHT THE ROWS 94 TO 95,

11  PLEASE?  BOTH ROWS?

12  **BY MR. SPECTER:**

13  Q.  BETWEEN 94 AND 95 THERE WERE AN ADDITIONAL 2068 PAROLEES

14  RELEASED TO FRESNO --

15          **MS. BARLOW:**  EXCUSE ME, COUNSEL.  CAN I HAVE A HARD

16  COPY THAT CHART?

17                      (WHEREUPON DOCUMENT WAS TENDERED

18                        TO COUNSEL.)

19          **JUDGE KARLTON:**  MR. SPECTER, THIS WHOLE LINE OF

20  QUESTIONING MAY BECOME JUST IRRELEVANT.  WHERE DID YOU GET THE

21  FIGURES THAT YOU PUT INTO THIS CHART?

22          **MR. SPECTER:**  WE'RE PREPARED TO SUBMIT THAT THESE ARE

23  ALL FROM THE STATE ATTORNEY GENERAL'S OFFICE WEBSITE AND THE

24  CDCR WEBSITE.  AND ALL THE WE DID WAS PUT IT ON A SPREADSHEET

25  AND HAVE IT DO SOME CALCULATIONS.

1          **JUDGE KARLTON:**  ALL RIGHT.

2  **BY MR. SPECTER:**

3  **Q.**  SO IF YOU SEE 94 AND 95 AND YOU TRUST MY MATH, THERE ARE AN

4  ADDITIONAL 2,068 PAROLEES IN FRESNO.  YET, BETWEEN THOSE TWO

5  TIMES VIOLENT CRIME WENT DOWN 7.14 PERCENT AND PROPERTY CRIME

6  WENT DOWN 6.09 PERCENT.  DO YOU SEE THAT, MR. DYER?

7  **A.**  YES.

8  **Q.**  AND THE SAME THING BETWEEN 2002 AND 2007.  THERE ARE AN

9  ADDITIONAL 2,148 PAROLEES IN FRESNO, AND VIOLENT CRIME WENT DOWN

10  ALL THE YEARS EXCEPT FOR 2005, DIDN'T IT?

11          **MR. MELLO:**  YOUR HONOR, PAUL MELLO FOR THE STATE

12  DEFENDANTS.

13          I WOULD JUST LIKE TO INTERPOSE AN ADDITIONAL

14  OBJECTION FOR LACK OF FOUNDATION.

15          ARE ALL OF THESE HYPOTHETICAL QUESTIONS IN LIGHT OF

16  THE FACT THAT NONE OF THIS DATA HAS BEEN ESTABLISHED FOR THE

17  COURT AND FOR THE PARTIES?

18          **JUDGE REINHARDT:**  I THOUGHT IT WAS ALL ON THE

19  ASSUMPTION THAT THESE WERE ACCURATE.

20          **MR. SPECTER:**  RIGHT.

21          **JUDGE KARLTON:**  YOU ARE GOING TO SUPPLY US WITH SOME

22  KIND OF PROOF THAT YOU DIDN'T JUST MAKE THOSE NUMBERS UP?

23          **MR. SPECTER:**  I WAS GOING TO SUPPLY THEM WITH IT

24  FIRST AND IF THEY OBJECTED, WE'LL PUT THE PERSON WHO PREPARED IT

25  ON THE STAND AND SHE CAN EXPLAIN EXACTLY IT HOW IT WENT.

1          BUT I HOPE WHEN THEY GET TO QUESTION HER, THEY CAN --

2  THERE WON'T BE ANY MORE OBJECTIONS, JUST LIKE WE HAVE DONE IN

3  OTHER EXHIBITS THAT THEY HAVE REQUESTED THAT WE...

4          **JUDGE HENDERSON:**  PROCEED.

5  **BY MR. SPECTER:**

6  **Q.**  SO MY QUESTION WAS, MR. DYER, EVEN THOUGH THERE WAS AN

7  INFLUX OF PAROLEES ABOUT THAT -- DURING THAT TIME, THERE WERE --

8  CRIME WENT DOWN IN ALL THE YEARS EXCEPT 2005, ISN'T THAT RIGHT?

9  **A.**  YES.

10  **Q.**  OKAY.  SO, IN FACT, YOU HAVE A PAGE ON THE FRESNO WEBSITE,

11  DO YOU NOT, THE POLICE DEPARTMENT WEBSITE?

12  **A.**  YES.

13  **Q.**  AND YOU CLAIM THAT FRESNO HAS ENJOYED THE LOWEST CRIME IN 43

14  YEARS, ISN'T THAT RIGHT?

15  **A.**  THAT'S CORRECT.

16  **Q.**  ALL RIGHT.  SO NOW I WOULD LIKE TO SHOW YOU A POWERPOINT

17  DEMONSTRATION, WHICH IS ALL WE DO ON THESE POWERPOINTS IS THE

18  SPREADSHEET MAKES SOME OF THESE CHARTS INTO GRAPHS.

19          (DOCUMENT DISPLAYED)

20          **JUDGE KARLTON:**  AGAIN, YOU ARE GOING TO SOMEHOW OR

21  OTHER EITHER SATISFY THE DEFENDANTS OR PUT THE PERSON ON THE

22  STAND?

23          **MR. SPECTER:**  YES, YOUR HONOR.

24          **MR. MELLO:**  YOUR HONORS, PAUL MELLO ONE LAST TIME.

25          CAN WE JUST HAVE A STANDING OBJECTION FOR LACK OF

```
 1   FOUNDATION WITH RESPECT TO ALL OF THESE SO I DON'T HAVE TO KEEP

 2   ON OBJECTING?

 3             MS. BARLOW:  AND JOIN.

 4             JUDGE HENDERSON:  YES.

 5   BY MR. SPECTER:

 6   Q.  SO THIS CHART, THE PINK LINE ARE THE NEW PAROLEES AND IT'S

 7   ADJUSTED FOR POPULATION, AND THE DARKER LINE IS THE VIOLENT

 8   CRIME RATE.

 9             SO AS YOU SEE -- DO YOU SEE, MR. DYER --

10             JUDGE REINHARDT:  COUNSEL, THIS JUST CONFIRMS MY

11   THEORY OF STATISTICS, ECONOMIC STATISTICS, BECAUSE UNDER THIS

12   THEORY WE OUGHT TO GIVE THEM AS MANY PAROLEES AS POSSIBLE AND WE

13   WILL REALLY DROP THE CRIME RATE.

14             MR. SPECTER:  HE MADE THE SAME POINT DURING THE

15   DEPOSITION.

16             THE WITNESS:  YOU READ MY DEPOSITION.

17             JUDGE REINHARDT:  THAT SHOWS YOU WHAT THE FIGURES ARE

18   WORTH.

19             MR. SPECTER:  IT DOES REBUT HIS POINT, YOUR HONOR --

20             JUDGE REINHARDT:  YOU ARE DOING THE RIGHT THING.

21             MR. SPECTER:  OKAY.  IT'S GOOD TO KNOW.

22             JUDGE REINHARDT:  I'M SAYING WHAT YOU ARE PROVING IS

23   QUITE CLEAR; THAT THE MORE PAROLEES YOU HAVE, THE LESS CRIME

24   RATE.

25             MR. SPECTER:  I DON'T PRETEND THAT THERE IS A CAUSAL
```

1  RELATIONSHIP, BUT MR. DYER DOES, I THINK.

2           AND IF YOU WOULD NOW GO TO THE PROPERTY CRIME RATE

3  FOR FRESNO?

4                    (DOCUMENT DISPLAYED)

5           **MR. MELLO:**  OBJECTION.  VAGUE AS TO "NEW PAROLEE

6  RATES," "PROPERTY CRIME RATES."  I DON'T UNDERSTAND WHAT THAT

7  MEANS.  I DON'T KNOW IF THE WITNESS DOES.

8           **JUDGE HENDERSON:**  DO YOU UNDERSTAND THE QUESTION,

9  CHIEF DYER?

10          **THE WITNESS:**  NO, I DO NOT.

11 **BY MR. SPECTER:**

12          **MR. SPECTER:**  YOU KNOW WHAT THE CRIME RATES ARE, MR.

13 DYER, DON'T YOU?

14 **A.**  WHAT THE CRIME RATES ARE?

15 **Q.**  YOU KNOW WHAT A CRIME RATE IS?

16          **JUDGE KARLTON:**  WHAT THE TERM MEANS.

17 **A.**  OH, YES, I DO.

18 **BY MR. SPECTER:**

19 **Q.**  AND YOU KNOW THAT CRIME RATES ARE SEGREGATED INTO TWO

20 CATEGORIES, VIOLENT CRIME AND PROPERTY CRIME?

21 **A.**  THAT'S CORRECT.

22 **Q.**  THE YELLOW CHART THERE IS A -- THE YELLOW LINE IS AN

23 ILLUSTRATION OF THE PROPERTY CRIME RATE TAKEN FROM THE ATTORNEY

24 GENERAL'S DATA; DO YOU UNDERSTAND THAT?

25 **A.**  YES.

1  Q.  THE PAROLEE RATE, NEW PAROLEE RATE IS A FUNCTION OF THE

2  NUMBER OF PAROLEES IN FRESNO ADJUSTED FOR THE POPULATION.  SO AS

3  IT SAYS, IT'S A RATE PER 100,000 OF THE POPULATION.

4            SO WHAT WE DID, WE WANTED TO DO IS TO MAKE SURE --

5            **MS. BARLOW:**  I'M GOING TO OBJECT AGAIN TO FOUNDATION,

6  YOUR HONOR.

7            **JUDGE KARLTON:**  YOU HAVE GOT A STANDING -- YOU'VE GOT

8  A STANDING OBJECTION.  YOU DON'T HAVE TO KEEP SAYING IT.

9            **JUDGE REINHARDT:**  I DON'T UNDERSTAND.  WHEN YOU SAY

10 "NEW PAROLEE RATE" --

11           **MR. SPECTER:**  THAT'S THE ADDITIONAL PAROLEES WHO ARE

12 ENTERING THE COUNTY.

13           **JUDGE REINHARDT:**  SO THAT'S NOT THE TOTAL NUMBER OF

14 PAROLEES IN THE COUNTY, WHICH WOULD BE THE SAME SORT OF THING.

15 **A.**  WELL, THOSE ARE THE NUMBERS RELEASED, IS THAT CORRECT.

16 **BY MR. SPECTER:**

17 **Q.**  RELEASED.

18 **A.**  THAT MEANS IT COULD BE THE SAME PERSON RELEASED FIVE TIMES

19 THAT YEAR, YES.

20 **Q.**  IT COULD BE.

21 **A.**  IT IS.

22 **Q.**  TOTAL FELONS PAROLED AND REPAROLED FROM AN INSTITUTION BY

23 REGION AND COUNTY.

24 **A.**  YES.

25 **Q.**  RIGHT.

1          **JUDGE REINHARDT:** YOU CAN BE PAROLED FROM PRISON FIVE

2   TIMES IN ONE YEAR?

3          **THE WITNESS:** YES, SIR.  WE HAVE CURRENTLY -- IN 2007

4   I THINK WE HAD 5,000 PAROLEES IN FRESNO COUNTY.  WE ARRESTED

5   6,453, MEANING THAT WE ARRESTED THE SAME PAROLEES IN MANY CASES

6   OVER AND OVER.  IN FACT, THE EXAMPLE I GAVE --

7          **JUDGE REINHARDT:** NO, NO.  I UNDERSTAND THE PAROLEES,

8   BUT HAVE THEY BEEN PAROLED BETWEEN EACH ARREST?

9          **JUDGE KARLTON:** OR ARE THEY BEING PUT ON PROBATION OR

10  WHATEVER?

11         **THE WITNESS:** YOU CAN ARREST SOMEONE AND THEY WILL DO

12  TWO MONTHS IN PRISON AND THEN BE REPAROLED.

13         **JUDGE REINHARDT:** FIVE TIMES IN A YEAR?

14         **THE WITNESS:** YES.

15         **JUDGE REINHARDT:** WELL, WHAT KIND OF A SYSTEM IS

16  THAT?  I MEAN...

17         **JUDGE KARLTON:** THEY HAVE GOT NO PLACE TO PUT THEM.

18         **JUDGE REINHARDT:** DOES THAT MAKE SENSE TO PUT THOSE

19  PEOPLE IN PRISON FOR TWO MONTHS AT A TIME?

20         **THE WITNESS:** IN MANY RESPECTS, BECAUSE THEY ARE NOT

21  COMMITTING CRIME DURING THOSE TWO MONTHS, YES.

22         **JUDGE REINHARDT:** THERE IS NOTHING BETTER YOU CAN DO

23  WITH THEM THAN SEND THEM TO PRISON FOR TWO MONTHS?  I MEAN, THE

24  WHOLE IDEA IS THE PRISON SYSTEM.

25         **THE WITNESS:** I THINK UNDER THE CURRENT SYSTEM THERE

1   MAY NOT BE, BUT THERE CERTAINLY COULD BE, YES.

2           **JUDGE REINHARDT:**  DO YOU HAVE FIGURES FOR THE TOTAL

3   NUMBER OF PAROLEES?

4           **MR. SPECTER:**  YES.

5   **BY MR. SPECTER:**

6   Q.  AND I WAS GOING TO ASK MR. DYER IF HE KNOWS, AND I BELIEVE

7   HE DOES, THAT THE TOTAL NUMBER OF PAROLEES IN FRESNO HAS

8   INCREASED OVER THE YEARS, HAS IT NOT, MR. DYER?

9   A.  HAS INCREASED?

10  Q.  YES.  LIVING IN YOUR COUNTY.  I MEAN, IT'S GONE FROM ABOUT

11  4,000 IT'S NOW UP ABOUT 5,000, RIGHT?

12  A.  I WOULD HAVE TO TAKE A LOOK AT THAT.  I THOUGHT THE NUMBER

13  WAS FAIRLY CONSISTENT AND MAY HAVE EVEN DECREASED.

14          **MR. SPECTER:**  OKAY.  WE WILL WE WILL PROVIDE THAT

15  INFORMATION TO THE COURT.

16  **BY MR. SPECTER:**

17  Q.  I BELIEVE THAT -- WELL, ANYWAY, I BELIEVE THAT THE CHARTS

18  THAT WE HAVE BEEN SHOWING YOU SHOW THAT THE NUMBER OF PAROLEES

19  IN THE COUNTY HAS INCREASED --

20          **MR. MELLO:**  OBJECTION.  COUNSEL IS TESTIFYING.

21          **MS. BARLOW:**  AGREED.  ARGUMENTATIVE.

22          **JUDGE REINHARDT:**  LET ME ASK ONE MORE QUESTION.

23          YOU ARE SAYING THAT THE NUMBER OF PAROLEES ISN'T

24  INCREASING?  AND SO THAT RELEASING THE PAROLEES EARLIER IS NOT

25  GOING TO REALLY CHANGE THE NUMBER OF PAROLEES?

1          **THE WITNESS:**  THE NUMBER OF PAROLEES IN OUR COMMUNITY

2     FROM MONTH-TO-MONTH, YEAR-TO-YEAR CHANGES.  I DON'T KNOW WHAT

3     THOSE TOTALS NUMBERS ARE TODAY VERSUS WHAT HE IS REFERRING TO IN

4     1995.  I DON'T KNOW WHAT THOSE -- WHAT 1995 WAS.

5          I DON'T HAVE THOSE -- I THINK THAT'S WHAT HE IS

6     ASKING ME, DID IT CHANGE BETWEEN 1995 AND 2007.

7     **BY MR. SPECTER:**

8     **Q.**  YES.

9     **A.**  I DON'T KNOW BECAUSE I DON'T KNOW WHAT 1995 WAS.  OTHER THAN

10    WHAT YOU SHOWED ME HERE, THAT WAS I THINK 6,000 OR --

11    **Q.**  ALMOST 6,000 IN 2007.

12    **A.**  SO IF THAT'S THE CASE THERE WERE 6,000 IN '95.  TODAY

13    THERE'S 5,000.  SO IT WOULD HAVE GONE DOWN.

14    **Q.**  WELL, OKAY.  I WON'T ARGUE WITH YOU ABOUT THE FIGURES SINCE

15    I DON'T HAVE THE TABLE HERE, BUT --

16    **A.**  OKAY.

17    **Q.**  -- WE WILL PROVIDE THAT TO THE COURT LATER.

18          **MS. BARLOW:**  MOVE TO STRIKE, YOUR HONOR, AS

19    ARGUMENTATIVE.

20          **JUDGE REINHARDT:**  HE SAID HE IS GOING TO PROVIDE IT

21    TO THE COURT LATER.

22          **JUDGE HENDERSON:**  OVERRULED.

23          **MR. MELLO:**  WITHOUT THE OPPORTUNITY FOR --

24          **JUDGE KARLTON:**  OVERRULED.  SIT DOWN.  LET'S GET THIS

25    DONE.

1          **MR. MELLO:**  THANK YOU, YOUR HONOR.

2  **BY MR. SPECTER:**

3  **Q.**  IN YOUR -- WELL, YOU TESTIFIED ON DIRECT EXAMINATION THAT

4  FRESNO DOESN'T HAVE ALL THE RESOURCES IT NEEDS TO PROVIDE THE

5  SERVICES TO THE PAROLEES IN YOUR CITY, RIGHT?

6  **A.**  IT'S MY BELIEF THAT THERE'S INSUFFICIENT TREATMENT

7  FACILITIES IN FRESNO, YES.

8  **Q.**  BUT YOU HAVEN'T REQUESTED MORE RESOURCES FROM THE STATE

9  GOVERNMENT FOR THESE RESOURCES IN THE LAST THREE YEARS, HAVE

10 YOU?

11 **A.**  NO.  I PERSONALLY HAVE NOT, NO.

12 **Q.**  AND YOU HAVEN'T REQUESTED IT FROM YOUR COUNTY BOARD OF

13 SUPERVISORS EITHER, HAVE YOU?

14 **A.**  NO, I HAVE NOT.

15 **Q.**  THE JAIL IN YOUR COUNTY IS UNDER SOME SORT OF COURT ORDER TO

16 RELEASE PRISONERS AT 100 PERCENT OF CAPACITY, ISN'T THAT RIGHT?

17 **A.**  YES.

18 **Q.**  AND SINCE 1995 THE SHERIFF HAS RELEASED OVER 26,210

19 PRISONERS, IS THAT RIGHT?

20 **A.**  I DON'T KNOW THAT TO BE THE NUMBER, BUT I KNOW YOU SHARED

21 THAT WITH ME.

22 **Q.**  RIGHT.  IT WAS FROM THE SHERIFF'S OWN RESPONSES TO THE

23 INTERROGATORIES.  DO YOU REMEMBER THAT?

24          **MS. BARLOW:**  ASSUMES FACTS NOT IN EVIDENCE.

25

1  **BY MR. SPECTER:**

2  **Q.**  AND YOU DIDN'T EVEN KNOW THAT THE SHERIFF HAD RELEASED THAT

3  MANY PRISONERS FROM JAIL UNTIL I SHOWED YOU THAT FIGURE, DID

4  YOU?

5          **MS. BARLOW:**  ASSUMES FACTS NOT IN EVIDENCE.  LACKS

6  FOUNDATION.

7          **JUDGE HENDERSON:**  IS THAT CORRECT, CHIEF DYER?

8          **JUDGE KARLTON:**  PLEASE READ THE -- IF THERE IS AN

9  ARGUMENT ABOUT WHETHER IT'S ACCURATE, THE THING TO DO IS TO GET

10 THE INTERROGATORY AND READ IT TO THE COURT, AND THEN IT'S IN

11 EVIDENCE, AND THESE PEOPLE WILL STOP OBJECTING.  OTHERWISE, THEY

12 ARE NOT -- THEY ARE NOT INAPPROPRIATELY OBJECTING, MR. SPECTER.

13         **MR. SPECTER:**  YES, YOUR HONOR.  OKAY.  LET'S MOVE ON.

14 **BY MR. SPECTER:**

15 **Q.**  YOU HAVE IN YOUR REPORT INFORMATION PROVIDED TO -- WELL,

16 YOUR REPORT, THE SUBSTANTIVE PORTIONS OF YOUR REPORT WERE

17 WRITTEN BY YOUR CHIEF DEPUTY, ISN'T THAT RIGHT?

18 **A.**  THAT'S CORRECT.

19 **Q.**  AND YOU HAVE IN YOUR REPORT THAT SOME INFORMATION ABOUT HOW

20 THIS INCREASE OF PAROLEES INTO YOUR COUNTY WOULD AFFECT THE

21 SUPERIOR COURT, CORRECT?

22 **A.**  THAT'S CORRECT.

23 **Q.**  AND THAT WAS INFORMATION THAT A SUPERIOR COURT JUDGE TOLD TO

24 YOUR CHIEF DEPUTY, IS THAT CORRECT?

25 **A.**  THAT'S CORRECT.

1  **Q.**  AND THEN YOUR CHIEF DEPUTY TOLD IT TO YOU, RIGHT?

2  **A.**  PLACED IT IN THE REPORT, YES.

3  **Q.**  PLACED IT IN THE REPORT.  BUT NEITHER YOU OR YOUR CHIEF

4  DEPUTY DID ANYTHING TO VERIFY THIS INFORMATION, DID YOU?

5  **A.**  THAT'S CORRECT.

6          **MR. SPECTER:**  I MOVE TO STRIKE THAT PORTION OF HIS

7  REPORT --

8          **MS. BARLOW:**  WITH RESPECT, YOUR HONOR --

9          **MR. SPECTER:**  -- AS HEARSAY.

10          **MS. BARLOW:**  I'M SORRY.  COULD I RESPOND?

11          **JUDGE HENDERSON:**  I THOUGHT YOU WERE.

12          **MS. BARLOW:**  HE IS AN EXPERT YOUR HONOR.  HE IS

13  ENTITLED TO RELY ON HEARSAY STATEMENTS AS THE BASIS FOR HIS

14  OPINIONS THAT THERE WILL BE AN IMPACT TO HIS CITY AND IN HIS

15  COUNTY AND TO HIS OPERATIONS.  THAT'S ALL IT'S OFFERED FOR, IS

16  FOUNDATION.

17          **JUDGE REINHARDT:**  I THOUGHT IT WAS OFFERED TO SHOW

18  WHAT THE EFFECT ON THE JUDICIAL SYSTEM WOULD BE.  ISN'T THAT THE

19  POINT YOU ARE OBJECTING TO?

20          **MR. SPECTER:**  I CAN'T HEAR YOU, YOUR HONOR.

21          **JUDGE REINHARDT:**  ARE YOU OBJECTING TO THE PART THAT

22  SHOWS YOU THE EFFECT ON THE JUDICIAL SYSTEM?

23          **MR. SPECTER:**  YOUR HONOR, HE HAS NO EXPERTISE IN

24  THAT.  THERE IS NO FOUNDATION FOR IT, AND IT'S BASED ON ONE

25  STATEMENT THAT A JUDGE MADE TO SOMEBODY UNDER HIS COMMAND.

1        **THE WITNESS:**  THAT'S NOT TOTALLY TRUE.

2        **JUDGE HENDERSON:**  TELL US WHAT'S TOTALLY TRUE.

3        **THE WITNESS:**  I HAVE HAD CONVERSATIONS WITH A NUMBER

4   OF NUMBER OF JUDGES WITHIN OUR COUNTY REGARDING HOW THE -- WE DO

5   NOT HAVE ENOUGH JUDGES AND COURTS TO HANDLE THE CURRENT CASE

6   LOADS.  WE KNOW THAT FOR CERTAIN.

7        WE HAVE ADDED VERY FEW JUDGES OVER THE YEARS IN

8   FRESNO AND, YET, THE CASELOAD INCREASES.  SO WE KNOW THAT ANY

9   ADDITIONAL WORKLOAD IS GOING TO OVERBURDEN IT FURTHER.  THAT IS

10  FIRSTHAND EXPERIENCE THROUGH CONVERSATIONS THAT I HAVE HAD.

11        THIS WAS A RECENT CONVERSATION FOR THE PURPOSE OF

12  THIS REPORT.

13        **JUDGE REINHARDT:**  IF THE CRIME RATE GOES DOWN -- WE

14  ALL KNOW THAT THERE'S A PROBLEM WITH NOT ENOUGH JUDGES

15  EVERYWHERE.  AND IF THE CRIME RATE GOES DOWN BECAUSE WE HAVE

16  MORE PAROLEES, THAT WOULD BE GOOD FOR THE COURT, WOULDN'T IT?

17        **THE WITNESS:**  I DON'T KNOW.  I'D HAVE TO ANALYZE

18  THAT.

19        **MR. SPECTER:**  ANYWAY --

20        **JUDGE REINHARDT:**  I GUESS THERE ARE A LOT OF WAYS WE

21  COULD REDUCE THE NUMBER OF CRIMINAL CASES AND THAT CERTAINLY

22  WOULD MAKE THE JOB OF JUDGES EASIER.

23        **JUDGE KARLTON:**  IT'S IN AND WHATEVER VALUE WE WILL

24  PLACE ON IT, WE WILL PLACE ON IT.  WE HAVE ESTABLISHED THE

25  SOURCE AND THE NATURE.  LET'S GO.

1          **MR. SPECTER:** RIGHT.

2  **BY MR. SPECTER:**

3  **Q.** AND THE SAME THING APPLIES TO THE DISTRICT ATTORNEY.  THAT'S

4  BASED ON A STATEMENT THE DISTRICT ATTORNEY MADE TO YOU.  YOU

5  DIDN'T DO ANY INDEPENDENT VERIFICATION OF HER STATEMENTS OR

6  CONDUCT A STUDY OR YOU NEVER WORKED IN THE DISTRICT ATTORNEY'S

7  OFFICE.

8          **JUDGE REINHARDT:** WE ARE GOING TO HAVE ENOUGH

9  DISTRICT ATTORNEYS HERE LATER.  YOU CAN GO THROUGH IT WITH THEM.

10          **MR. SPECTER:** I WAS TRYING TO MAKE IT QUICK.

11          **JUDGE REINHARDT:** YOU KNOW, I THINK WE CAN -- THIS IS

12  ALL ACCEPTED FOR THE WEIGHT AND WHEN WE DECIDE THAT, WE WILL

13  CONSIDER WHETHER THE -- HAVING SOME HUNDRED MORE PAROLEES IS

14  GOING TO MAKE THE JOB OF TRIAL JUDGES MORE DIFFICULT.

15          **MR. SPECTER:** YES, YOUR HONOR.

16          **JUDGE REINHARDT:** OKAY.

17  **BY MR. SPECTER:**

18  **Q.** GOING BACK TO THE JAIL, THE SHERIFF RECENTLY RELEASED 72

19  PRISONERS FROM THE JAIL, ISN'T THAT RIGHT?

20  **A.** YES.

21  **Q.** AND THAT WAS BECAUSE SHE DIDN'T BELIEVE SHE HAD RECEIVED

22  ENOUGH FUNDS FROM THE COUNTY, CORRECT?

23          **MS. BARLOW:** I'M SORRY.  I CAN'T HEAR YOU MR.

24  SPECTER.  CAN YOU SPEAK UP?

25

1  BY MR. SPECTER:

2  Q.  THAT'S BECAUSE THE SHERIFF BELIEVED SHE DIDN'T HAVE ENOUGH

3  FUNDS FROM THE COUNTY TO OPERATE THE JAIL AT THAT LEVEL, IS THAT

4  RIGHT?

5          MS. BARLOW:  CALLS FOR SPECULATION AS TO WHAT THE

6  SHERIFF BELIEVED.

7          JUDGE HENDERSON:  LAY A FOUNDATION.

8  BY MR. SPECTER:

9  Q.  THAT'S WHAT SHE SAID TO YOU, ISN'T THAT CORRECT?

10  A.  THAT'S WHAT SHE SAID TO ME, AND PUBLICLY THAT FUNDING WASN'T

11  PROVIDED SUFFICIENTLY ENOUGH TO ALLOW HER TO HAVE ENOUGH

12  CORRECTIONAL OFFICERS IN THE JAIL.  THEREFORE, SHE HAD TO CLOSE

13  DOWN A FLOOR.

14  Q.  AND SUBSEQUENT TO THAT, THE COUNTY BOARD OF SUPERVISORS, DID

15  THEY GIVE HER ANY ADDITIONAL FUNDS TO RUN THE JAIL?

16  A.  THEY DID PROVIDE ADDITIONAL FUNDS.

17  Q.  NOW, AS YOU SAID BEFORE, THE SHERIFF IS RELEASING PRISONERS

18  ONCE THE JAIL REACHES 100 PERCENT OF CAPACITY, RIGHT?

19  A.  YES.

20  Q.  AND, YET, YOU ARE HERE OPPOSING A POPULATION RELEASE ORDER

21  FROM PRISONS AND YOU KNOW THAT THE POPULATION OF THE PRISONS IS

22  CLOSE TO 200 PERCENT OF CAPACITY, CORRECT?

23  A.  TO MY KNOWLEDGE, FRESNO COUNTY HAS NOT RELEASED INMATES

24  BASED ON THAT HUNDRED PERCENT CAPACITY IN MANY YEARS.

25          THE FIGURES YOU PROVIDED WERE PRIMARILY FROM THE 90'S

 1   WHEN THEY -- PRIOR TO THEM CONSTRUCTING A NEW JAIL.

 2   **Q.** I SEE. AND YOU TOURED SOME OF THE PRISONS, HAVE YOU NOT?

 3   **A.** I HAVE.

 4   **Q.** AND YOU SAW SOME OF THE OVERCROWDED CONDITIONS?

 5   **A.** I HAVE.

 6          **MS. BARLOW:** IT'S BEYOND THE SCOPE OF HIS

 7   DESIGNATION.

 8          **JUDGE KARLTON:** WELL, ACTUALLY, I RAISED THE QUESTION

 9   WITH HIM.

10          **MR. SPECTER:** THIS IS GOING TO BE RESPONSIVE TO SOME

11   OF THE THINGS JUDGE REINHARDT WAS ASKING HIM.

12   **BY MR. SPECTER:**

13   **Q.** I'M GOING TO ASK YOU TO MAKE CERTAIN ASSUMPTIONS, CHIEF.

14          PLEASE ASSUME THAT THE COURTS WERE TO FIND THAT

15   OVERCROWDING IS THE PRIMARY CAUSE OF THE CONSTITUTIONAL

16   VIOLATIONS REGARDING HEALTHCARE, OKAY?

17   **A.** OKAY.

18   **Q.** AND ALSO ASSUME THAT THE CONSTITUTIONAL VIOLATIONS ARE

19   CAUSING SERIOUS HARM TO PRISONERS, SERIOUS INJURY AND SOMETIMES

20   DEATH, OKAY?

21   **A.** OKAY.

22   **Q.** ALSO ASSUME THAT THE STATE CANNOT EXPAND ITS CAPACITY

23   THROUGH BUILDING MORE PRISONS, CORRECT -- I MEAN, ASSUME THAT,

24   PLEASE, OKAY?

25   **A.** OKAY.

1  Q.  SO IN YOUR OPINION, UNDER THESE CIRCUMSTANCES, SHOULD THE --

2  ANY REDUCTION OF THE POPULATION OCCUR, PRISON POPULATION OCCUR?

3          **MS. BARLOW:**  I'M SORRY, YOUR HONOR.  THIS IS WELL

4  BEYOND THE SCOPE OF DESIGNATION OF HIS.

5          **JUDGE KARLTON:**  ACTUALLY, IT CORRESPONDS TO QUESTIONS

6  BOTH JUDGE REINHARDT AND I HAVE ASKED.

7          YOU MAY ANSWER, SIR.  IT'S JUST ANOTHER VARIANCE IN

8  WHAT WE HAVE ALREADY DISCUSSED, BUT...

9  **A.**  THE QUESTION OF ME IS -- AND I WILL STATE THIS IN MY BELIEF,

10 EXPERIENCE, OPINION.

11         WHETHER OR NOT AN INDIVIDUAL BELONGS IN PRISON OR A

12 LOCAL JAIL OR ANOTHER FACILITY THAT KEEPS HIM OUT OF OUR

13 COMMUNITY IS THE ANSWER.

14         WHETHER OR NOT THEY REMAIN IN PRISON -- OBVIOUSLY,

15 THE PRISONS ARE FULL, BUT THAT DOESN'T MEAN THERE CANNOT BE

16 OTHER INSTITUTIONS THAT WOULD HOUSE THOSE INDIVIDUALS AND KEEP

17 OUR COMMUNITY SAFE AT A LESSER EXPENSE THAN PRISONS.

18 **Q.**  WELL, ASSUME THERE ARE NOT THOSE OTHER SPACES.  THEN WHAT

19 WOULD YOU DO?  WHAT WOULD YOU --

20         **JUDGE KARLTON:**  THIS IS NOT FEASIBLE, COUNSEL.

21         **MR. SPECTER:**  OKAY.  FINE.

22 **BY MR. SPECTER:**

23 **Q.**  ASSUMING THAT THE COURT WERE TO ISSUE AN ORDER TO REDUCE THE

24 POPULATION, WHAT MEASURES WOULD YOU RECOMMEND BE DONE, BE TAKEN?

25 **A.**  IF THERE WERE A PRISONER RELEASE ORDER?

1  Q.  HOW IN YOUR OPINION SHOULD IT BE STRUCTURED?

2          **MR. MELLO:**  OBJECTION.  CALLS FOR A LEGAL CONCLUSION.

3          **JUDGE REINHARDT:**  WELL, I THOUGHT ONE OF THE THINGS

4  WE ARE TRYING TO EXPLORE IN THIS PHASE IS, ARE THERE

5  ALTERNATIVES TO A PRISONER RELEASE ORDER?  WHAT ARE THE REMEDIES

6  IF WE FIND A VIOLATION?  WHAT SHOULD BE DONE?

7          IT DOESN'T HAVE TO BE A PRISONER RELEASE ORDER.  AND

8  HERE WE HAVE ONE OF THE THINGS WE ARE SUPPOSED TO CONSIDER IS

9  LAW ENFORCEMENT.  IS THERE SOME REASON THAT YOU DON'T WANT US TO

10 HEAR WHAT MIGHT SOLVE THIS PROBLEM?

11          I ASSUME THE STATE IS GOING TO HAVE AN ARGUMENT AT

12 SOME POINT ABOUT HOW WE CAN SOLVE THIS PROBLEM WITHOUT THE

13 PRISONER RELEASE ORDER.  OR IF THERE IS A PRISONER RELEASE

14 ORDER, WHAT HAS THE LEAST IMPACT ON LAW ENFORCEMENT?

15          **MR. MELLO:**  I BELIEVE THE HYPOTHETICAL ASSUMED A

16 PRISONER RELEASE ORDER.  IT DIDN'T ASK FOR ALTERNATIVES TO A

17 PRISONER RELEASE ORDER.  THAT'S NUMBER ONE.

18          AND, NUMBER TWO, I BELIEVE THAT THERE IS ALREADY

19 EVIDENCE AS TO THE ALTERNATIVES IN THE RECORD IN THE CASE THAT

20 WERE SET FORTH BY DEFENDANTS AND SOME OF THE DEFENDANT

21 INTERVENOR WITNESSES.

22          **JUDGE REINHARDT:**  THERE MAY BE EVIDENCE, BUT, YOU

23 KNOW, WHAT WE HAVE TO CONSIDER IS WHAT -- WHAT IS GOOD FOR LAW

24 ENFORCEMENT?  WHAT HAS THE LEAST IMPACT ON LAW ENFORCEMENT?

25          **JUDGE KARLTON:**  AND THE FACT THAT THERE'S SOME

1   EVIDENCE DOESN'T REALLY DEMONSTRATE, DESPITE PROFESSOR

2   MARQUARDT, THAT EVEN THOUGH WE DON'T HAVE TO CONCLUSIVELY DECIDE

3   SOMETHING, THAT SOME THINGS ARE MORE LIKELY THAN OTHERS.

4           SIR, CAN YOU ANSWER THE QUESTION?

5           **THE WITNESS:** I THINK I CAN.

6           **JUDGE KARLTON:** I DIDN'T ASK THIS QUESTION, BUT AS I

7   SAID, YOU HAVE TO SHARE OUR PAIN.  BUT, APPARENTLY, MR. SPECTER

8   DOESN'T CARE WHETHER YOU SHARE OUR PAIN OR NOT.

9           THE QUESTION IS:  IF YOU HAD YOUR DRUTHERS, IF YOU

10  HAD TO DO SOMETHING BECAUSE THE CONSTITUTION REQUIRED YOU TO

11  ABOUT THE FACT THAT THE PRISONS ARE IN THE CONDITION THEY ARE

12  IN, WHAT WOULD YOU DO?

13          **THE WITNESS:**  I WOULD AVOID A PRISONER RELEASE ORDER

14  AT ALL COSTS AND IF THERE WAS GOING TO BE A NEED TO DOWNSIZE THE

15  PRISON POPULATION, I WOULD DO EVERYTHING IN MY POWER TO TRY TO

16  DO IT AT THE FRONT END THROUGH DIVERSION.  AND THAT IS DIVERTING

17  THE NUMBER OF INDIVIDUALS THAT ARE SENT FROM LOCAL JURISDICTIONS

18  TO PRISON, BUT STILL HAVING THE FUNDING AT THE LOCAL

19  JURISDICTION TO PUT THOSE INDIVIDUALS IN FACILITIES THAT ARE

20  CONTROLLED BY LOCAL GOVERNMENT FOR THE PURPOSE OF TREATMENT,

21  PREVENTION, REHABILITATION.

22          BUT I DO NOT BELIEVE THE ALTERNATIVE IS TO SIMPLY

23  ALLOW THEM TO REMAIN IN THE COMMUNITIES AND COMMIT CRIMES.  I

24  DON'T THINK THAT IS FAIR TO THE COMMUNITY.  IT'S NOT FAIR TO THE

25  INDIVIDUAL.

1              BUT I DO THINK LOCAL DIVERSION OVER A PERIOD OF TIME

2   COULD BE AN ALTERNATIVE IN LIEU OF RELEASING PRISONERS EARLY

3   FROM PRISON.

4   **BY MR. SPECTER:**

5   **Q.**  AND A LOCAL DIVERSION, WOULD YOU SAY THAT WOULD IMPROVE

6   PUBLIC SAFETY IF THEY WERE PROVIDED PROGRAMS?

7   **A.**  IT WOULD HAVE THE POTENTIAL TO, IF THE FACILITIES WERE IN

8   PLACE AND IF IT WAS DONE OVER A PERIOD OF TIME.

9              THE FEAR WOULD BE NOT TO TRY TO ACCELERATE IT TO THE

10  POINT WHERE LARGE NUMBERS OF PEOPLE WOULD SOMEHOW BE FORCED INTO

11  INADEQUATE TREATMENT PROGRAMS AND FACILITIES.  THAT WOULD BE THE

12  CONCERN.

13  **Q.**  OKAY.  NO FURTHER QUESTIONS, YOUR HONOR.

14          **THE COURT:**  ANYTHING FROM -- NOTHING FROM -- OH,

15  ANYTHING FROM CCPOA?

16          **MS. LEONARD:**  NO, YOUR HONOR.

17          **THE COURT:**  REDIRECT?

18          **MS. BARLOW:**  JUST VERY BRIEFLY, YOUR HONOR.

19                      **REDIRECT EXAMINATION**

20  **BY MS. BARLOW:**

21  **Q.**  CHIEF DYER, DO YOU MEET REGULARLY WITH THE DISTRICT

22  ATTORNEY'S OFFICE REGARDING THE CASES YOU SEND TO THEM FOR

23  FILING?

24  **A.**  YES.

25  **Q.**  AND SO YOU HAVE A PRETTY FAIR UNDERSTANDING, DO YOU NOT, OF

1  HOW MUCH STAFF THEY HAVE AND HOW MANY CASES THEY ACTUALLY FILE

2  FOR YOU?

3  **A.**  I DO.

4  **Q.**  WHAT'S YOUR CURRENT RATE OF NON-FILING ON CHARGES YOU SEND

5  TO THE DISTRICT ATTORNEY'S OFFICE?

6  **A.**  AS OF LAST MONTH, IT WAS 27 PERCENT OF THE CASES THAT WE HAD

7  FILED THAT WAS FELONIES AND MISDEMEANORS THAT WERE NOT FILED

8  UPON.

9         WHEN YOU REMOVE THE -- THE NON-SIGNIFICANT

10  MISDEMEANORS, SUCH AS DRIVING ON A SUSPENDED LICENSE AND SO

11  FORTH, THAT NCF RATE IS MUCH HIGHER.

12  **Q.**  SO WOULD YOU ANTICIPATE THAT ASSUMING MORE CRIME WAS

13  COMMITTED IN THE COMMUNITY, AS YOU HAVE PREDICTED AS A RESULT OF

14  AN ORDER, AND YOU WERE ABLE TO APPREHEND THOSE CRIMINALS, THAT

15  WOULD YOU NEED TO SEND MORE CASES FOR FILING TO THE DISTRICT

16  ATTORNEY'S OFFICE?

17  **A.**  ARE YOU ASKING IF THERE WAS NO PAROLE?

18  **Q.**  RIGHT.  IF WE HAD -- NO.  IF THERE WAS AN ORDER ENTERED AND

19  THEY --

20  **A.**  WELL, TWO THINGS COULD HAPPEN.  IF -- IF INDIVIDUALS WERE

21  RELEASED BACK INTO OUR COMMUNITY EARLY AND THEY REOFFEND, THE

22  OPTION FOR THE DISTRICT ATTORNEY IS TO NOT FILE THOSE CASES AND

23  ALLOW THEM TO SIMPLY HAVE THEIR PAROLE VIOLATED AND SENT BACK TO

24  PRISON, WHICH HAPPENS FREQUENTLY IN OUR COMMUNITIES BECAUSE OF

25  AN OVERBURDENED D.A. SYSTEM.

1          BUT IF THEY DID NOT HAVE PAROLE, THEN, YES, THAT

2    WOULD CAUSE THEM TO HAVE TO TAKE FORTH THAT NEW CASE.  SO IT

3    WOULD INCREASE, OBVIOUSLY, THE WORKLOAD OF OUR DISTRICT

4    ATTORNEYS SIGNIFICANTLY.

5    **Q.**  WOULD YOU EXPECT A CHANGE IN THE WAY OF THE CASES ARE

6    SELECTED FOR PROSECUTION AS A RESULT?

7          **JUDGE KARLTON:**  NOW, THAT IS BEYOND THE SCOPE OF HIS

8    EXPERTISE.

9    **BY MS. BARLOW:**

10   **Q.**  DO YOU DISCUSS AND MEET REGULARLY WITH THE D.A. --

11         **JUDGE KARLTON:**  I HAVE HEARD ALL THAT STUFF.

12         **MS. BARLOW:**  ALL RIGHT.  I HAVE NOTHING FURTHER.

13   THANK YOU, YOUR HONOR.

14         **THE COURT:**  ANYTHING FROM THE STATE DEFENDANTS?

15         **MR. MELLO:**  NO.

16         **MR. LEWIS:**  NOTHING, YOUR HONOR.

17         **THE COURT:**  ANY FURTHER CROSS?

18         **MR. SPECTER:**  NO.

19         **JUDGE HENDERSON:**  THANK YOU, CHIEF DYER, FOR

20   TESTIFYING.

21         CALL YOUR NEXT WITNESS?

22         **MR. MITCHELL:**  DISTRICT ATTORNEY RODRIC PACHECO,

23   RIVERSIDE COUNTY.

24

25

1                        **RODRIC PACHECO,**

2    CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

3    DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4              **THE WITNESS:**  I DO.

5              **THE CLERK:**  STATE YOUR NAME AND SPELL YOUR FULL NAME

6    THE RECORD.

7              **THE WITNESS:**  RODRIC ANTHONY PACHECO.  R-O-D-R-I-C,

8    A-N-T-H-O-N-Y, P-A-C-H-E-C-O.

9                        **DIRECT EXAMINATION**

10   **BY MR. MITCHELL:**

11   **Q.**  GOOD MORNING.  BILL MITCHELL WITH THE DEFENDANT INTERVENORS.

12            MR. PACHECO, SIR, GOOD MORNING.  COULD YOU BRIEFLY

13   GIVE US A SYNOPSIS OF YOUR SERVICE, YOUR PUBLIC SERVICE, YOUR

14   CAREER AND YOUR EDUCATION?

15   **A.**  SURE.  I GRADUATED FROM THE UNIVERSITY OF CALIFORNIA AT

16   RIVERSIDE IN 1980.  I THEN WENT TO THE UNIVERSITY OF SAN DIEGO

17   SCHOOL OF LAW, GRADUATING IN 1983.

18            I CLERKED A COUPLE OF SUMMERS WITH A FIRM CALLED

19   SPRAGUE, MILLIGAN AND BESWICK IN THE CITY OF SAN BERNADINO.  DID

20   CIVIL WORK AND CRIMINAL DEFENSE.

21            I THEN PASSED THE BAR DECEMBER 13, 1983.  SOUGHT

22   EMPLOYMENT AS A DEPUTY DISTRICT ATTORNEY AND WAS HIRED AT THE

23   RIVERSIDE COUNTY DEPUTY DISTRICT ATTORNEY'S OFFICE AND STARTED

24   MAY 21ST, 1984.

25            I SERVED AS A DEPUTY DISTRICT ATTORNEY UNTIL

1  DECEMBER 2ND, 1996, WHEN I ASSUMED OFFICE AS A STATE ASSEMBLYMAN

2  FOR THE WESTERN PORTION OF THE RIVERSIDE COUNTY, 64TH ASSEMBLY

3  DISTRICT.  I SERVED THREE TERMS, TWO YEARS APIECE.

4          I THEN RETURNED TO THE DISTRICT ATTORNEY'S OFFICE IN

5  RIVERSIDE COUNTY DECEMBER 2ND, 2002.  CAME BACK AS A CHIEF

6  DEPUTY DISTRICT ATTORNEY.  IT'S A SENIOR MANAGEMENT POSITION.  I

7  MOVED UP.  I WAS PROMOTED WITHIN, WHAT WAS IT, ABOUT NINE MONTHS

8  TO A YEAR TO ASSISTANT DISTRICT ATTORNEY, WHICH WAS THE SECOND

9  HIGHEST POSITION IN THE OFFICE.

10          THEN RAN FOR AND WON THE ELECTION IN JUNE OF 2006 FOR

11 DISTRICT ATTORNEY.  ASSUMED OFFICE JANUARY 1ST OF 2007 AS THE

12 ELECTED DISTRICT ATTORNEY.

13 **Q.**  DURING YOUR TIME, APPROXIMATELY 12 YEARS OR MORE, AS A LINE

14 PROSECUTOR, DID YOU BECOME FAMILIAR WITH AND EXPERIENCED IN ALL

15 ASPECTS OF CRIMINAL JUSTICE FROM THE PROSECUTION STANDPOINT FROM

16 THE INVESTIGATION OF CASES, CASE PROCESSING, NEGOTIATING

17 SETTLEMENTS, GOING THROUGH TRIALS AND SENTENCING DETERMINATIONS?

18 **A.**  YES.

19 **Q.**  DID YOU LEARN THE DISTINCTIONS BETWEEN PROBATION AND PRISON

20 AND WHAT MAKES SOMEONE ELIGIBLE FOR EITHER OF THOSE?

21 **A.**  YES.

22 **Q.**  DID YOU BECOME FAMILIAR WITH WHEN PROBATION WOULD BE

23 APPROPRIATE AS OPPOSED TO PRISON?

24 **A.**  YES.

25 **Q.**  DURING YOUR EXPERIENCE AS AN ADMINISTRATOR IN THE DISTRICT

1  ATTORNEY'S OFFICE AND NOW AS A DISTRICT ATTORNEY, ARE YOU

2  FAMILIAR WITH RUNNING A LARGE PROSECUTION OFFICE?

3  **A.**  YES.  OUR OFFICE IS THE -- IN TERMS OF PERSONNEL, IS THE

4  THIRD LARGEST IN THE STATE OF CALIFORNIA AND ABOUT THE TENTH IN

5  THE NATION.

6  **Q.**  AS THE DISTRICT ATTORNEY OF RIVERSIDE COUNTY, ARE YOU

7  RESPONSIBLE NOT ONLY FOR BUDGET, HIRING AND FIRING OF PEOPLE,

8  BUT ALSO ALLOCATING RESOURCES TO WHERE THEY WILL BEST SERVE

9  PUBLIC SAFETY?

10  **A.**  ALL OF THOSE THINGS AND MANY MORE.

11  **Q.**  AS THE DISTRICT ATTORNEY, ARE YOU INVOLVED IN DEALING WITH

12  ISSUES THAT TOUCH UPON RECIDIVISM, EARLY RELEASES OF INMATES

13  FROM JAILS, ISSUES SUCH AS THAT?

14  **A.**  YES.  BECAUSE OF THE NATURE AND DYNAMICS OF OUR PARTICULAR

15  COUNTY, YES.

16  **Q.**  CAN YOU TELL US WHAT YOUR LEGISLATIVE EXPERIENCE, WHAT THAT

17  BROUGHT TO THE TABLE FOR YOU AS FAR AS PUBLIC SAFETY ISSUES ARE

18  CONCERNED?

19  **A.**  I SERVED ON A NUMBER OF COMMITTEES WHEN I WAS IN THE STATE

20  LEGISLATURE.  THE EDUCATION COMMITTEE I SERVED AS A

21  VICE-CHAIRMAN.  AT ONE POINT I SERVED AS A VICE-CHAIRMAN ON THE

22  TRANSPORTATION COMMITTEE.  SERVED ON THE PUBLIC SAFETY

23  COMMITTEE.  SERVED ON THE BUDGET COMMITTEE.

24         THE BUDGET COMMITTEE IS A VERY LARGE COMMITTEE IN THE

25  STATE ASSEMBLY AND IS BROKEN DOWN INTO SUBCOMMITTEES.  THE

1  SUBCOMMITTEES DEAL WITH DIFFERENT SPECIALTIES OR AREAS OF THE

2  BUDGET.  THE SUBCOMMITTEE THAT I SAT ON DEALT WITH STATE

3  AGENCIES.  SO I WAS VERY FAMILIAR WITH THINGS THAT STATE

4  AGENCIES WERE DOING, BOTH IN TERMS OF PROCUREMENT AND PRACTICES

5  AND THINGS LIKE THAT.

6          PROBABLY VOTED ON SEVERAL THOUSAND BILLS A YEAR AND

7  WERE FAMILIAR WITH SEVERAL THOUSAND BILLS A YEAR.

8          HAD A LOT OF EXPERIENCE WORKING WITH A GOVERNOR PETE

9  WILSON IN HIS LAST TWO YEARS ON CORRECTIONAL ISSUES THAT

10 IMPACTED OUR COUNTY IN RIVERSIDE.

11         I WORKED ON A NUMBER OF ISSUES WITH GOVERNOR DAVIS'

12 STAFF AND GOVERNOR DAVIS HIMSELF AS WELL AND, OF COURSE, THE

13 LEGISLATORS BOTH IN THE SENATE AND ASSEMBLY.

14 **Q.**  WERE YOU INVOLVED AT ALL WITH PRISON CONSTRUCTION ISSUES?

15 **A.**  YES.  IN MY FIRST TERM WE HAD AN ESCAPE, I BELIEVE IT WAS

16 APRIL OF 1997, FROM ONE OF OUR PRISONS IN RIVERSIDE COUNTY

17 CALLED CALIFORNIA REHABILITATION CENTER.

18         I THEN WORKED CLOSELY WITH THE GOVERNOR'S STAFF,

19 GOVERNOR WILSON'S STAFF TO ENGAGE IN CONSTRUCTION OF FACILITIES

20 AT THAT PARTICULAR PRISON TO LESSEN THE CHANCES OF ESCAPE.

21 **Q.**  IN YOUR EFFORTS AS THE ELECTED DISTRICT ATTORNEY, DO YOU

22 ATTEMPT TO STAY INFORMED REGARDING ISSUES THAT MIGHT IMPACT YOUR

23 EFFECTIVE PROVISION OF PROSECUTORIAL SERVICES TO THE COUNTY OF

24 RIVERSIDE?

25 **A.**  YES.  IT'S CRITICAL THAT I DO THAT, SO THAT WE CAN SEE

1  TRENDS COMING AND THEN PREPARE FOR THEM, BOTH WITH PERSONNEL AND

2  OTHER RESOURCES AND, ALSO, WITH STRUCTURING OR RESTRUCTURING OUR

3  OFFICE, WHICH HAS BEEN FAIRLY CONSTANT SINCE THE TIME I STARTED

4  THERE IN 1984.  OFFICE HAS GROWN QUITE A BIT.

5          **MR. MITCHELL:**  I ASK THAT THE WITNESS BE ACCEPTED BY

6  THE COURT AS EXPERT IN THE AREA OF PROSECUTORIAL ENFORCEMENT OF

7  THE LAWS AND CRIMINAL JUSTICE.

8          **JUDGE HENDERSON:**  HE WILL BE.

9          **MR. MITCHELL:**  THANK YOU.

10 **BY MR. MITCHELL:**

11 **Q.**  MR. PACHECO, DID YOU BECOME AWARE AT SOME POINT THAT A THREE

12 JUDGE PANEL HAD BEEN CONVENED IN ORDER TO CONSIDER A PRISONER

13 RELEASE ORDER IN THE STATE OF CALIFORNIA?

14 **A.**  YES, I DID.

15 **Q.**  WHEN YOU BECAME AWARE OF THAT, WHAT ACTIONS DID YOU TAKE AND

16 WHY?

17 **A.**  I'M TRYING TO REMEMBER THE SEQUENCE OF IT.  I MAY JUMBLE

18 THAT A LITTLE BIT, BUT BASICALLY I SPOKE TO A NUMBER OF OTHER

19 ELECTED DISTRICT ATTORNEYS.  I SOUGHT THEIR COUNSEL, GUIDANCE.

20 PROVIDED MY OWN SUGGESTIONS.

21          WE FORMED A GROUP THAT AGREED TO INTERVENE IN THIS

22 LAWSUIT.  WE DID THAT BECAUSE WE WERE CONCERNED ABOUT THE

23 RELEASE, DRAMATIC RELEASE OF TENS OF THOUSANDS OF STATE INMATES

24 IN AN EARLY RELEASE PROGRAM AND, ALSO, A CAP THAT MAY BE CREATED

25 ON THE PRISON SYSTEM ITSELF.

1  Q.  AND HAVE YOU STUDIED OR RESEARCHED ARTICLES AND/OR STUDIES

2  THAT EXAMINED THE TOPICS OF EARLY RELEASE, OVERCROWDING IN THE

3  PRISON AND RECIDIVISM ISSUES?

4  A.  YES.

5  Q.  HAVE YOU FORMED AN OPINION AS TO WHETHER OR NOT A PRISONER

6  RELEASE ORDER WOULD HAVE AN ADVERSE IMPACT ON PUBLIC SAFETY?

7  A.  I HAVE NOT ONLY ON PUBLIC SAFETY, BUT ALSO THE OPERATION OF

8  THE CRIMINAL JUSTICE SYSTEM AS WELL, AT LEAST IN RIVERSIDE

9  COUNTY.

10 Q.  NOW, IN RIVERSIDE COUNTY ARE THE JAILS OPERATING UNDER A

11 POPULATION CAP AT THIS TIME?

12 A.  THEY ARE.  IT'S A FEDERAL CONSENT DECREE, I BELIEVE, THAT

13 DATES BACK TO 1993.  THE POPULATION IS CAPPED AT ABOUT 3640 BEDS

14 THAT CAN BE FILLED OR PRISONERS THAT CAN EXIST IN THAT JAIL AT

15 ANY ONE TIME.

16 Q.  AND WHAT EFFORTS ARE BEING MADE IN RIVERSIDE COUNTY TO

17 RESOLVE THE PROBLEMS THAT ARISE FROM THE POPULATION CAP?

18 A.  WELL, JAIL CONSTRUCTION FOR ONE.  THERE IS A -- THE BOARD OF

19 SUPERVISORS IS PROCEEDING IN THE CONSTRUCTION OF AN EXTREMELY

20 LARGE HUB JAIL THAT WOULD HOUSE, APPROXIMATELY, 7200 JAIL

21 INMATES.  THAT IS ESTIMATED TO COST WELL OVER $500 MILLION IN

22 ITS CONSTRUCTION.

23         THE LAND HAS BEEN PURCHASED.  THE ARCHITECT, I

24 BELIEVE, HAS ALSO BEEN SELECTED AND THEY ARE CURRENTLY HOLDING

25 HEARINGS IN RIVERSIDE COUNTY ESPECIALLY AS OF LATE.

1              THERE ARE OTHER THINGS BEING DONE AS WELL.  SOME OF

2    THEM POSITIVE.  SOME OF THEM NOT SO POSITIVE.

3    **Q.**  ARE THE OVERCROWDING ISSUES IN RIVERSIDE COUNTY, DO THEY

4    RESULT IN INDIVIDUALS BEING EARLY RELEASED FROM THE COUNTY JAIL

5    AT THIS TIME?

6    **A.**  A FEW YEARS AGO -- I DON'T KNOW IF THIS WAS DONE WHILE I WAS

7    IN SACRAMENTO --

8              **MR. SANGSTER:**  OBJECTION.  NONRESPONSIVE.

9              **JUDGE HENDERSON:**  HOW DO WE KNOW IT WAS DONE A FEW

10   YEARS AGO?

11             **JUDGE KARLTON:**  GO AHEAD.

12             **THE WITNESS:**  THANK YOU.

13   **A.**  A FEW YEARS AGO THE SHERIFF, THEN-SHERIFF BOB DOYLE, STARTED

14   AN EARLY RELEASE PROGRAM.  I'M NOT SURE WHEN THAT BEGAN BECAUSE

15   I WAS GONE FOR SIX YEARS IN SACRAMENTO.

16             BUT I KNOW OF AT LEAST A FEW YEARS AGO THEY LET OUT A

17   FEW HUNDRED THE FIRST YEAR, A FEW THOUSAND THE SECOND YEAR, AND

18   LAST YEAR 6,001 INMATES WERE EARLY RELEASED IN RIVERSIDE COUNTY.

19   **Q.**  WHAT TYPE OF ADVERSE IMPACTS HAS THAT HAD ON THE

20   ADMINISTRATION OF JUSTICE IN RIVERSIDE COUNTY?

21   **A.**  WELL, IT'S HAD A -- WE HAVE A LOT OF DYNAMICS IN RIVERSIDE

22   COUNTY.  THIS HAS EXACERBATED THOSE DYNAMICS AND CREATED NEW

23   ONES.

24             FOR EXAMPLE, WE HAVE SEEN THAT THE FAILURES TO APPEAR

25   ON THE PRISONERS THAT ARE EARLY RELEASED HAVE BECOME MORE

1  FREQUENT AND MORE ROUTINE.  AND CASES GET CONTINUED, THOSE CASES

2  GET CONTINUED AND CLOG THE SYSTEM.  OUR SYSTEM IS ALREADY

3  CONGESTED, BUT IT BECAUSE MORE CONGESTED WHEN YOU HAVE FOLKS

4  FAILING TO APPEAR ON EARLY RELEASES.

5          WE HAVE SEEN CRIME INCREASE IN VARIOUS CATEGORIES,

6  IDENTITY THEFT.  RIVERSIDE COUNTY IS THE -- I BELIEVE NATIONWIDE

7  THE NUMBER TWO REGION IN THE NATION FOR IDENTITY THEFT OFFENSES,

8  THAT IS A FAIRLY RECENT OCCURRENCE, AND OTHER THINGS SUCH AS

9  THAT.

10          ALSO, SUCH NEW OFFENSES THAT WOULD NOT HAVE BEEN

11  COMMITTED HAD THEY NOT BEEN EARLY RELEASED AS WELL.

12 Q.  THERE HAS BEEN A PROPOSAL OR ONE ASPECT OF A PROPOSAL FOR A

13  PRISONER RELEASE ORDER IN THIS CASE WHERE THE POPULATION OF THE

14  STATE PRISON SYSTEM WOULD BE SET AT 130 PERCENT OF DESIGN

15  CAPACITY, WHICH WOULD SET A POPULATION OF APPROXIMATELY 104,000

16  TO BE ACHIEVED WITHIN TWO YEARS.

17          ONE WAY OF ACHIEVING THAT WOULD BE JUST TO RELEASE

18  INMATES EARLIER THAN THE COMPLETION OF THEIR TERMS.  THIS COULD

19  RESULT IN OVER A TWO-YEAR PERIOD, HYPOTHETICALLY IF IT DOES, AN

20  INCREASE OF APPROXIMATELY 2500 PAROLEES BEING RELEASED EARLY

21  EACH MONTH.

22          ARE YOU AWARE OF THAT PROPOSAL?

23 A.  YES.

24 Q.  ARE YOU AWARE THAT THAT MAY INCREASE THE NUMBER OF PAROLEES

25  BEING RETURNED TO RIVERSIDE COUNTY ON A MONTHLY BASIS?

1  **A.**  YES.

2  **Q.**  IN LOOKING AT THE MATH AND THE PERCENTAGE OF PAROLEES THAT

3  COME TO RIVERSIDE AT THIS TIME, BEING APPROXIMATELY 6.6 PERCENT

4  BASED UPON CDCR STATS FROM 2007, IS IT YOUR UNDERSTANDING THAT

5  RIVERSIDE MAY SEE AN ADDITIONAL 150 TO 165 PAROLEES BEING

6  RETURNED TO RIVERSIDE EACH MONTH IF AN EARLY RELEASE PROPOSAL

7  LIKE THAT TOOK PLACE?

8  **A.**  I KNOW WE WILL HAVE A SIGNIFICANT NUMBER OF PAROLEES THAT

9  ARE RELEASED BACK TO RIVERSIDE COUNTY THROUGH THE EARLY RELEASE

10  PROGRAM.  I'M NOT SO GOOD WITH MATH.  THAT'S WHY I'M A LAWYER.

11  BUT THOSE FIGURES SOUND ABOUT RIGHT.

12  **Q.**  WOULD YOU HAVE AN OPINION AS TO WHETHER OR NOT AN INCREASE

13  IN THE NUMBER OF PAROLEES COMING TO RIVERSIDE WOULD HAVE AN

14  ADVERSE BEING IMPACT ON PUBLIC SAFETY IN THE AREA OF OCCURRENCE

15  OF NEW CRIMES?

16  **A.**  I WOULD.

17  **Q.**  WHAT WOULD THAT OPINION BE?

18  **A.**  I THINK WE HAVE SEEN -- WE DON'T HAVE TO SPECULATE SO MUCH,

19  IF AT ALL.

20          WE HAVE SEEN IN OTHER JURISDICTIONS, LIKE FLORIDA,

21  ILLINOIS, PHILADELPHIA, LOS ANGELES, WHERE EARLY RELEASE

22  PROGRAMS HAVE BEEN INSTITUTED EITHER ON A STATE-WIDE LEVEL OR ON

23  A LOCAL LEVEL -- LIKE, FOR EXAMPLE, LOS ANGELES -- THAT EARLY

24  RELEASE PROGRAMS HAVE CERTAIN EFFECTS.

25          ONE IS TO REDUCE THE POPULATION OR TO REDUCE THE

1   GROWTH IN THE POPULATION IN CUSTODIAL FACILITIES.

2           THE OTHER EFFECTS THEY TEND TO HAVE ARE TO SHOW

3   INCREASES IN CRIME, VIOLENT CRIME AS WELL AS NON-VIOLENT CRIME.

4   THEY TEND TO SPIKE AND GO UP IN VARIOUS PERCENTAGES.  MORE

5   PEOPLE ARE VICTIMIZED.  MORE PEOPLE ARE INJURED.  SOME ARE EVEN

6   MURDERED.

7           THOSE STATISTICS, WHILE IN SMALLER NUMBERS IN CERTAIN

8   INSTANCES, ARE STILL SIGNIFICANT TO ME.  IT WOULD BE A DRASTIC

9   STEP, A FORM OF EARLY RELEASE PROGRAM OR CAP ON THE SYSTEM.

10  **Q.**  THERE HAS BEEN TESTIMONY IN THIS CASE TO INDICATE THAT THE

11  INCREASE IN THE NUMBER OF CRIMES COMMITTED BY INDIVIDUALS WHO

12  ARE EARLY RELEASED WOULD BE SUBSTANTIALLY INSIGNIFICANT AND

13  AMOUNT TO LESS THAN 1 PERCENT OF OVERALL ARRESTS IN A PARTICULAR

14  AREA; ARE YOU AWARE OF THOSE?

15  **A.**  I AM.

16  **Q.**  IS IT STILL YOUR OPINION THAT IT WOULD BE AN ADVERSE IMPACT

17  ON PUBLIC SAFETY IN THE COMMUNITY EVEN THOUGH THE NUMBER OF NEW

18  CRIMES COMMITTED BY THIS EARLY RELEASE POPULATION IS SO

19  SIGNIFICANTLY SMALL, LESS THAN ONE PERCENT?

20  **A.**  ASSUMING THAT ACTUALLY IS THE ANSWER, THAT IS A CORRECT

21  GUESS SO TO SPEAK, THAT THE NUMBERS ARE NOT LARGER THAN THAT, IT

22  WOULD STILL BE A SIGNIFICANT IMPACT ON PUBLIC SAFETY.

23  **Q.**  WHY IS THAT?

24  **A.**  WELL, I WOULD COMPARE IT TO SOME OF THE FINDINGS THAT THIS

25  COURT HAS MADE REGARDING THE PRISON SYSTEM.  THIS COURT

1  IDENTIFIED THAT AT LEAST DURING A CERTAIN TIME PERIOD THAT THERE

2  WERE 34 DEATHS IN THE PRISON SYSTEM THAT WERE -- THAT THEY WERE

3  EXTREMELY CONCERNED ABOUT.  I SHARE THAT CONCERN THAT THE COURT

4  HAD.

5          THAT'S A RELATIVELY SMALL NUMBER.  YOU COULD SAY

6  STATISTICALLY INSIGNIFICANT, TO USE THAT PHRASE FROM SOMEBODY

7  ELSE.  BUT IT'S A SIGNIFICANT -- THOSE ARE SIGNIFICANT ACTIONS

8  ON HUMAN BEINGS.

9          IN ANOTHER STUDY THERE WAS 23 MURDERS THAT THEY

10 BELIEVED WERE A RESULT OF -- I BELIEVE THAT WAS MR. AUSTIN.

11 THAT'S A STATISTICALLY INSIGNIFICANT NUMBER, BUT STILL 23 PEOPLE

12 WERE MURDERED AS A RESULT OF THE EARLY RELEASE PROGRAM.

13         I THINK BOTH OF THOSE THINGS ARE BAD AND ABHORRENT

14 AND SHOULD BE AVOIDED.

15 **Q.** YOU WROTE IN YOUR DECLARATION THAT THE FIRST RULE IN TRYING

16 TO FIX SOME OF THE PROBLEMS IN THE CRIMINAL JUSTICE SYSTEM IS TO

17 DO NO HARM.

18         IN YOUR OPINION, WHAT CAN BE DONE TO RESOLVE THE

19 OVERCROWDING ISSUE AND PROTECT PUBLIC SAFETY AT THE SAME TIME OR

20 CAN IT BE DONE?

21 **A.** I THINK IT CAN BE DONE.  IF THE COURT DOESN'T MIND ME

22 EXPOUNDING A LITTLE BIT, IT'S A RATHER LONG ANSWER.

23         NUMBER ONE, I THINK THE COURT'S ACTION IN APPOINTING

24 A RECEIVER WAS PROVIDENTIAL, TO USE THAT TERM.  THEY WERE

25 RIGHTFULLY VERY FRUSTRATED WITH CDCR, CALIFORNIA DEPARTMENT OF

1  CORRECTIONS AND REHABILITATION, AND THEY TOOK AN EXCEPTIONAL

2  STEP, WHICH WAS A GOOD STEP.

3          THE RECEIVER, AS I UNDERSTAND, HAS MADE SIGNIFICANT

4  PROGRESS IN RESOLVING MANY OF THE CONSTITUTIONAL VIOLATIONS IN

5  THE STATE PRISON SYSTEM.  VIOLATIONS THAT I WOULD SAY, IN MY

6  OPINION, ARE NOT RELATED OR WOULD NOT BE SOLVED BY AN EARLY

7  RELEASE PROGRAM OR A CAP IN THE STATE PRISON SYSTEM.

8          SO THAT'S ONE PART OF IT.  THE OTHER PART OF IT IS

9  THERE NEED TO BE SOME LEGISLATIVE FIXES TO AB 900, WHICH WAS A

10 BILL PASSED, I BELIEVE, LAST YEAR THROUGH THE LEGISLATURE SIGNED

11 BY THE GOVERNOR INTO LAW.  I UNDERSTAND THERE IS ONE PART THAT

12 RECENTLY WHERE THE ATTORNEY GENERAL CERTIFIED THAT BONDS COULD

13 BE RELEASED FOR THE CONSTRUCTION OF REENTRY FACILITIES IN

14 VARIOUS PARTS OF CALIFORNIA, WHICH WOULD AID THOSE INDIVIDUALS.

15 IT WOULD ALSO INCREASE THE SIZE AND CAPACITY OF CDCR, WHICH

16 WOULD BE A GOOD THING AND RELIEVE OVERCROWDING.

17         IN ADDITION TO THAT, THOUGH, THERE ARE A NUMBER OF

18 OTHER THINGS THAT I THINK I WOULD ENCOURAGE SOMEONE TO DO.  AND

19 THAT IS, THE DEPARTMENT OF CORRECTIONS NEEDS TO HAVE A MUCH MORE

20 SIGNIFICANT OPERATION WHEN IT COMES TO PAROLE AND THE DELIVERY

21 OF ASSISTANCE TO PEOPLE WHO ARE ON PAROLE.

22         CURRENTLY THEY ARE OVERWHELMED WITH THE NUMBER OF

23 FOLKS THAT ARE ON PAROLE AND, IN MY OPINION, CANNOT MEANINGFULLY

24 PROVIDE ASSISTANCE IN ANY SIGNIFICANT WAY TO THESE INDIVIDUALS

25 THAT ARE BEING RELEASED FROM PRISON ON A DAILY BASIS.

1          SO THOSE, THOSE -- THAT SYSTEM, THAT DELIVERY SYSTEM,

2   IF YOU WILL, FROM PAROLE NEEDS TO BE IMPROVED AND FUNDED.

3          THE LOCAL PROBATION DEPARTMENTS, RIVERSIDE COUNTY TO

4   USE AS ONE EXAMPLE, ARE OVERWHELMED.  THE PROBATION -- DEPUTY

5   PROBATION OFFICERS IN OUR COUNTY ROUTINELY HAVE OVER 800-PLUS

6   FOLKS ON THEIR INDIVIDUAL CASE LOADS.  THEY CANNOT MEANINGFULLY

7   ASSIST THOSE PEOPLE WHILE THEY ARE ON PROBATION.

8          WHEN YOU FAIL TO ASSIST THESE FOLKS THAT ARE IN GREAT

9   NEED FOR SERVICES, JOB TRAINING, DRUG TREATMENT, ET CETERA, THEY

10  TEND TO REOFFEND.  WHEN THEY REOFFEND, SOME OF THE OFFENSES ARE

11  TECHNICAL VIOLATIONS, A DIRTY TEST, A DRUG TEST.  OR THEY ARE

12  VERY SIGNIFICANT.  UP TO AND INCLUDING MURDER.  THAT DOESN'T

13  HELP THE SYSTEM ANY.  IT DOESN'T HELP THE INDIVIDUAL THAT'S ON

14  PAROLE OR PROBATION.

15         THERE ARE OTHER THINGS THAT CAN BE DONE AS WELL.  THE

16  CONSTRUCTION OF NEW PRISONS, THAT NEEDS TO OCCUR.  I BELIEVE

17  THIS COURT HAS ENCOURAGED THE LEGISLATURE AND THE GOVERNOR TO DO

18  THAT, TO CONSTRUCT AT LEAST SEVEN NEW PRISON FACILITIES

19  THROUGHOUT THE STATE OF CALIFORNIA TO INCREASE CAPACITY.  THAT

20  NEEDS TO BE DONE.

21         AS OUR POPULATION GROWS IN CALIFORNIA, OF COURSE, THE

22  POPULATION IN OUR STATE PRISONS WILL GROW, AS THE POPULATIONS IN

23  OUR SCHOOLS AND THE POPULATIONS THAT UTILIZE TRANSPORTATION

24  SYSTEMS, ET CETERA.

25         SO THOSE ARE ALL THINGS THAT SHOULD BE DONE AND CAN

1  BE DONE AND ARE IN VARIOUS PHASES OF BEING DONE.

2  Q.  DO YOU BELIEVE THAT INCREASING THE FUNDING TO PROBATION

3  SERVICES CAN INCREASE THE EFFECTIVENESS OF PROBATION AND LEAD TO

4  AN ACTUAL REDUCTION IN THE NUMBERS THAT ARE GOING INTO PRISON?

5  A.  ABSOLUTELY.  IF YOU HAVE MORE PROBATION OFFICERS -- I MEAN,

6  IT'S A FAIRLY SIMPLISTIC, YOU KNOW, FORMULA, I GUESS.

7          BUT WHEN YOU HAVE MORE PROBATION OFFICERS, THEY HAVE

8  MORE TIME TO SPEND WITH THE FOLKS THAT ARE ON PROBATION; TO HELP

9  THEM FIND JOBS, TO HELP COUNSEL THEM, TO CHOOSE A BETTER PATH

10 RATHER THAN THE WRONG ONE.  AND RECIDIVISM CAN AND SHOULD GO

11 DOWN IN THOSE INSTANCES.

12         WHEN DO YOU THE OPPOSITE, WHEN YOU DON'T PROVIDE

13 SUFFICIENT OR MEANINGFUL FUNDING FOR THOSE PROGRAMS, THEN

14 RECIDIVISM WILL GO UP.

15 Q.  IT'S BEEN PROPOSED THAT ALTERNATIVE SANCTIONS IN THE FORM OF

16 LESSER ALTERNATIVES THAN CUSTODY SHOULD BE APPLIED TO TECHNICAL

17 PAROLE VIOLATORS; THOSE THAT AREN'T ARRESTED FOR COMMITTING NEW

18 CRIMES, THOSE THAT ARE MERELY ARRESTED OR TAKEN INTO CUSTODY FOR

19 VIOLATING TERMS OF THEIR PAROLE.

20         DO YOU AGREE THAT TECHNICAL PAROLE VIOLATORS,

21 ALTERNATIVE SANCTIONS MIGHT BE WARRANTED FOR A PERCENTAGE OF

22 THAT POPULATION?

23 A.  DEPENDS ON WHAT THE SANCTIONS ARE.  IT IS IMPORTANT THAT

24 THEY FOLLOW THE RULES GIVEN TO THEM BY THE DEPARTMENT OF

25 CORRECTIONS WHILE THEY ARE ON PAROLE.  IT DEPENDS.

1          NEW OFFENSES ARE DIFFERENT, OF COURSE, AND YOU ARE

2     NOT ASKING ME ABOUT THAT, BUT IT DEPENDS ON WHAT THOSE

3     ALTERNATIVE SANCTIONS ARE.

4          I THINK WHATEVER PATH IS TAKEN, THE ULTIMATE GOAL IS

5     TO MAKE SURE THAT THIS PERSON IS A LAW ABIDING PRODUCTIVE MEMBER

6     OF SOCIETY.  SO WHATEVER PATH GETS US THERE EFFECTIVELY IS

7     PROBABLY A GOOD IDEA.

8     Q.  IT'S COME UP DURING THIS TRIAL THAT THERE IS A PRACTICE

9     AMONG DISTRICT ATTORNEYS OFFICES OF ALLOWING A PAROLE VIOLATION

10    TO TAKE PLACE IN LIEU OF PROSECUTION ON A NEW CRIME.  ARE YOU

11    AWARE OF THOSE ALLEGATIONS?

12    A.  YES.  YOU APPRISED ME OF THOSE, I BELIEVE, YESTERDAY.

13    Q.  AND TO YOUR KNOWLEDGE, DOES THAT OCCUR?

14    A.  WELL, I MEANT IN MY TIME SINCE --

15          MR. SANGSTER:  OBJECTION, YOUR HONOR.  I'M GOING TO

16    OBJECT, UNLESS HE IS ANSWERING BASED ON HIS PERSONAL KNOWLEDGE.

17          IF IT'S THE HEARSAY HE HEARD FROM SOMEBODY ELSE, IT'S

18    NOT PROPER EVEN FOR AN EXPERT.

19          JUDGE KARLTON:  IT'S PERFECTLY PROPER FOR YOU TO

20    DISCUSS WHAT GOES ON IN RIVERSIDE.

21          THE WITNESS:  I WOULD BE HAPPY TO DO THAT.  THANK

22    YOU, YOUR HONOR.

23    A.  SINCE I STARTED IN 1984, IT HAS NEVER BEEN THE PRACTICE OF

24    THE RIVERSIDE COUNTY DISTRICT ATTORNEYS OFFICE TO DO THAT.

25          ONE, IT WAS NEVER A POLICY DECISION BY THE OFFICE.

```
 1   IT WAS NEVER A PRACTICE THAT WAS INSTITUTED BY THE OFFICE.  AND

 2   IN ADDITION TO THAT, IT'S NOT POSSIBLE.

 3          PEOPLE THAT ARE ARRESTED AND A PAROLE HOLD IS PLACED

 4   ON THEM ARE IN CUSTODY.  THAT REQUIRES OUR OFFICE TO FILE, WHEN

 5   THEY ARE IN CUSTODY, WITHIN 48 HOURS.

 6          WE HAVE NO MECHANISM TO GET ANY INFORMATION FROM THE

 7   DEPARTMENT OF CORRECTIONS AS TO WHETHER OR NOT THEY WERE

 8   VIOLATED LATER.  SO WE MAKE A DECISION AT THAT TIME WHETHER OR

 9   NOT THEY HAVE COMMITTED A CRIME BEYOND A REASONABLE DOUBT AND

10   WHETHER OR NOT WE CAN PROVE IT BEYOND A REASONABLE DOUBT.

11          IT'S IRRELEVANT, AND ALWAYS HAS BEEN IN RIVERSIDE

12   COUNTY, WHETHER THEY HAVE A PAROLE HOLD OR A PAROLE VIOLATION OR

13   WHATEVER.  WE FILE IT.  I'M AWARE OF NO COUNTY THAT DOES IT

14   DIFFERENTLY.

15   Q.  EXCUSE ME ONE MOMENT.  I LOST MY TRAIN OF THOUGHT.

16          OH, IN CONSIDERING THE ISSUES THAT THIS COURT MUST

17   ADDRESS, THE IDEA OF A POPULATION CAP ON THE STATE PRISON, AND

18   OVER AND ABOVE A RELEASE OF INDIVIDUALS EARLY FROM PRISON, THE

19   IMPACT THAT A POPULATION CAP MIGHT HAVE ON THE ADMINISTRATION OF

20   JUSTICE, PROSECUTION OF CASES IN RIVERSIDE COUNTY.  IF THERE WAS

21   A CAP ON THE STATE PRISON SYSTEM, DO YOU ANTICIPATE THAT THERE

22   MIGHT BE A BACKLOG OF STATE PRISON INMATES IN THE COUNTY JAIL

23   UNABLE TO BE TRANSPORTED TO PRISON BECAUSE OF THE POPULATION

24   CAP?

25   A.  YES, AS WELL AS MANY OTHER MANIFESTATIONS OF THAT CAP.
```

1  Q.  IF THAT DID MATERIALIZE WHERE THE NUMBER OF PRISON INMATES

2  BEING COMMITTED FROM RIVERSIDE COUNTY COULD NOT BE TRANSPORTED

3  IN A TIMELY MANNER TO CDCR INSTITUTIONS, WHAT WOULD THAT DO TO

4  FURTHER IMPACT AND ADVERSELY AFFECT RIVERSIDE COUNTY JAIL AND

5  CRIME IN THE COMMUNITY?

6  A.  WELL, IT WOULD IMPACT OUR PUBLIC SAFETY AND IT WOULD IMPACT

7  THE OPERATION OF OUR CRIMINAL JUSTICE SYSTEM.

8          IT WOULD IMPACT PUBLIC SAFETY BECAUSE THE NUMBER OF

9  PEOPLE THAT ARE IN OUR JAILS WOULD -- THE COMPOSITION OF OUR

10 JAILS WOULD CHANGE.

11         TODAY ABOUT 80 PERCENT OF THE FOLKS IN OUR JAIL

12 SYSTEM IN RIVERSIDE COUNTY ARE PRETRIAL DETAINEES, THOSE FOLKS

13 WAITING FOR TRIAL.  THE REST ARE FOLKS THAT HAVE BEEN SENTENCED

14 OR BEING HELD FOR A VARIETY OF SMALL THINGS.  THEY MAY BE

15 WITNESSES, FOR EXAMPLE, THAT ARE BEING HELD, THINGS LIKE THAT.

16         IF YOU INCLUDE FOLKS THAT ARE SENTENCED TO STATE

17 PRISON BUT THAT CANNOT GO, THEN ALL OF THOSE FOLKS WILL QUICKLY

18 BE CROWDED OUT.

19         OUR JAIL CONSTRUCTION IN RIVERSIDE COUNTY HAS NOT

20 KEPT UP WITH OUR ASTRONOMICAL GROWTH.  RIVERSIDE COUNTY'S

21 POPULATION IS THE FASTEST GROWING POPULATION IN THE STATE OF

22 CALIFORNIA, AND THE SECOND FASTEST GROWING IN THE NATION AND HAS

23 BEEN FOR MANY YEARS.

24         WE HAVE GONE -- WHEN I STARTED IN 1984, WE HAD ABOUT

25 500,000 PEOPLE IN THE COUNTY, AND NOW WE HAVE OVER 2.1 MILLION.

1   OUR COUNTY HAS GROWN DRAMATICALLY.

2           IF A CAP IS CREATED, IF THAT DOMINO FALLS, THEN IT

3   TILL HIT OTHER DOMINOES.  THE OTHER DOMINO THAT IT HITS IN OUR

4   COUNTY, IS OUR JAIL WILL SOON BE FILLED WITH FOLKS THAT ARE

5   WAITING OR SERVING THEIR SENTENCE FOR STATE PRISON COMMITMENTS.

6   IT WILL THEN NOT HAVE THE OPPORTUNITY -- OUR JAIL SYSTEM WILL

7   NOT HAVE THE OPPORTUNITY TO HAVE PEOPLE SERVING TIME.  THOSE

8   PEOPLE WILL BE EARLY RELEASED EVEN MORE THAN THEY ALREADY ARE IN

9   OUR COUNTY.

10          IN ADDITION TO THAT, THE FOLKS THAT ARE PRETRIAL

11  DETAINEES WILL AT SOME POINT BE RELEASED EVEN MORE THAN THEY

12  ALREADY ARE.  THOSE FOLKS WILL COMMIT NEW CRIMES THAT WOULD NOT

13  HAVE BEEN COMMITTED BEFORE BECAUSE THEY WOULD HAVE BEEN IN

14  CUSTODY.

15          IN ADDITION TO THAT, OUR JAIL COMPOSITION HAS ALREADY

16  CHANGED RATHER DRAMATICALLY OVER THE LAST TEN YEARS.  IT HAS

17  BECOME MUCH MORE SERIOUS OFFENDERS THAT ARE BEING HELD FOR

18  PRETRIAL DETAINEES.

19          THE JAIL SYSTEM WILL HAVE TO START RELEASING GANG

20  MEMBERS THAT ARE BEING PROSECUTED FOR ATTEMPTED MURDER AND

21  MURDER AND SEXUAL PREDATORS, ET CETERA.  THOSE FOLKS TEND TO

22  COMMIT VERY VIOLENT ACTS ON THE POPULATION.  SO THAT WILL BE

23  IMPACTED.

24          IT WILL SLOW DOWN THE COURT SYSTEM EVEN MORE THAN

25  IT'S ALREADY CONGESTED.  THE COURT SYSTEM IN RIVERSIDE COUNTY

1  HAS BEEN DESCRIBED AS HAVING CULTURE CONTINUANCES THAT ALL OF US

2  ARE TRYING TO BREAK.  THIS WILL ONLY EXACERBATE THAT NOW THAT

3  PEOPLE WHO ARE NORMALLY IN CUSTODY THAT HAD A MOTIVE OR

4  INCENTIVE TO GO TO TRIAL ARE NOW OUT OF THAT CUSTODY AND HAVE

5  LITTLE INCENTIVE TO GO TO TRIAL.

6            SHOULD INCREASE OUR FAILURES TO APPEAR AS WELL,

7  INCREASE THE NUMBER OF CONTINUANCES THOSE CASES HAVE.  THAT WILL

8  ALSO INCREASE THE NUMBER OF WARRANTS THAT ARE PUT INTO OUR

9  SYSTEM.  THAT WILL ALSO INCREASE THE NUMBER OF OFFICERS THAT

10 NEED TO SERVE THOSE WARRANTS.  IF WE FAIL TO SERVE THOSE

11 WARRANTS, THEN WHEN THEY ARE FINALLY ARRESTED YEARS LATER, THERE

12 IS A LEGITIMATE DUE PROCESS MOTION THAT WILL BE FILED AND THOSE

13 CASES CAN AND PROBABLY WILL BE DISMISSED.

14            SO THERE ARE MANY DOMINOES THAT WILL FALL WITH A CAP

15 IN OUR STATE PRISON SYSTEM, AT LEAST IN RIVERSIDE COUNTY.

16 **Q.** CAN YOU GIVE US A SPECIFIC OR A CASE EXAMPLE OF HOW AN EARLY

17 RELEASE SYSTEM NOW IS IMPACTING CRIME IN RIVERSIDE?

18 **A.** THERE'S A NUMBER OF EXAMPLES I WOULD GIVE.  FORGIVE ME IF I

19 DON'T RECALL THE EXACT NAMES OF THE INDIVIDUALS, BUT IN ONE

20 INSTANCE WE HAVE A CASE WHERE A WOMAN WAS –– OR IS BEING

21 PROSECUTED FOR A GRAND THEFT TYPE OF OFFENSE, AN EMBEZZLEMENT

22 OFFENSE.  SHE IS A PERFECT CANDIDATE FOR EARLY RELEASE FROM OUR

23 JAIL SYSTEM.  SHE HAS BEEN EARLY RELEASED.  EVERY TIME SHE IS

24 EARLY RELEASED AFTER HER INITIAL ARRAIGNMENT, SHE FAILS TO

25 APPEAR AT THE PRELIMINARY HEARING.  AT SOME POINT SHE GETS

1  ARRESTED, IS BROUGHT BACK IN, ARRAIGNED AND EARLY RELEASED

2  AGAIN.  IT HAS TAKEN US ABOUT SEVEN YEARS AND WE STILL HAVEN'T

3  GOTTEN HER TO PRELIMINARY HEARING.

4          THERE IS ANOTHER CASE WHERE AN INDIVIDUAL --

5  RELATIVELY RECENTLY IN THE LAST, I THINK, YEAR OR SO, WHO WAS

6  RELEASED AND COMMITTED NEW -- A NEW CRIME.  ACTUALLY, FAILED TO

7  APPEAR ABOUT TWO DAYS BEFORE HE COMMITTED AN ATTEMPTED MURDER.

8  HE IS A GANG MEMBER.  HE WAS LATER PROSECUTED FOR THAT AND WAS

9  GIVEN 12 YEARS IN STATE PRISON.  THAT'S A CRIME THAT NEVER WOULD

10 HAVE OCCURRED IF HE HAD STAYED IN CUSTODY IN HIS ORIGINAL CASE,

11 WHICH WAS A LOW LEVEL FELONY.  BUT OUR JAIL SYSTEM KICKED HIM

12 AND RELEASED HIM EARLY AND HE FAILED TO APPEAR A NUMBER OF TIMES

13 AND THEN WOULD GET PICKED UP ON A WARRANT AND THEN FINALLY

14 COMMITTED A NEW OFFENSE.

15          THOSE TWO ANECDOTES ARE BECOMING MORE COMMON AND NOT

16 SO ANECDOTAL, BUT MORE ROUTINE.

17 **Q.**  HOW DO EARLY RELEASES AND POPULATION REDUCTION ORDERS, HOW

18 DO THEY IMPACT THE INTEGRITY OF THE CRIMINAL JUSTICE SYSTEM?

19 **A.**  WELL --

20          **MR. SANGSTER:**  OBJECTION.  VAGUE AND AMBIGUOUS.

21          **JUDGE KARLTON:**  YOU MAY ANSWER.

22          **THE WITNESS:**  THANK YOU.

23 **A.**  IF THE COURT DOESN'T MIND, I HAVE FOUR CHILDREN AND, YOU

24 KNOW, IF --

25          **MR. SANGSTER:**  OBJECTION.  NONRESPONSIVE.

1          **JUDGE HENDERSON:**  PROCEED, MR. PACHECO.

2          **THE WITNESS:**  THANK YOU.

3  **A.**  WE HAVE VARIOUS PUNISHMENTS THAT WE IMPOSE ON THEM WHEN THEY

4  VIOLATE THE RULES OF THE HOUSE, SO TO SPEAK.  IF THEY DO NOT

5  FEEL SOME CONSEQUENCES, THEY TEND TO REPEAT THOSE OFFENSES WITH

6  GREATER FREQUENCY.

7          IT'S NO DIFFERENT.  THEY ARE HUMAN BEINGS, LIKE

8  ADULTS.  IF YOU FAIL TO LIVE UP TO THE CONSEQUENCES YOU CLAIM,

9  THEY WILL SUFFER.

10          CRIMINALS WILL REPEAT THOSE OFFENSES AND MORE.  THEY

11 WILL IDENTIFY THAT THE SYSTEM CANNOT AND WILL NOT HOLD THEM

12 ACCOUNTABLE.  IF YOU TELL SOMEBODY YOU ARE GOING TO STATE PRISON

13 FOR TWO YEARS, THAT YOU ARE SENTENCED TO STATE PRISON AND THEY

14 DON'T GO, THEY ARE EARLY RELEASED AND THEY DON'T EVEN ACTUALLY

15 TAKE A BUS TO STATE PRISON, THAT'S GOING TO SEND A VERY POWERFUL

16 MESSAGE AND DIMINISH THE ABILITY OF THE SYSTEM TO CORRECT ITS

17 MOST DIFFICULT MEMBERS OF SOCIETY.

18          IT HAS ANOTHER EFFECT.  AT SOME POINT THE PUBLIC WHO

19 SEES THIS PROBLEM, SPIKES IN CRIME AND OTHER -- SOME OF THE

20 PROBLEMS I HAVE MENTIONED, WILL LOSE CONFIDENCE IN THE SYSTEM

21 AND THAT WILL HAVE A DELETERIOUS EFFECT AS WELL.  THOSE ARE JUST

22 SOME OF THE PROBLEMS.

23          **JUDGE REINHARDT:**  COUNSEL, IT'S NOW ALMOST DOUBLE THE

24 TIME YOU ESTIMATED.

25          **MR. MITCHELL:**  ONE MORE QUESTION?

1          **JUDGE REINHARDT:**  SURE.

2  **BY MR. MITCHELL:**

3  **Q.**  DESPITE THE CONGESTION IN THE COURTS AND IN THE JAILS IN

4  RIVERSIDE COUNTY AND THE GROWTH OF THE POPULATION IN RIVERSIDE

5  COUNTY BEEN SUCCESSFUL IN MAINTAINING A LOWERING CRIME RATE.  TO

6  WHAT DO YOU ATTRIBUTE THAT?

7  **A.**  CAN YOU REPEAT THAT?  I'M SORRY.

8  **Q.**  CRIME RATES FOR VIOLENT CRIME ESPECIALLY HAVE CONSISTENTLY

9  BEEN GOING DOWN IN RIVERSIDE COUNTY, IS THAT CORRECT?

10  **A.**  THEY HAVE.

11  **Q.**  HOW DO YOU ACCOUNT FOR THAT?

12          **JUDGE REINHARDT:**  MAYBE BECAUSE IT'S THEY HAVE SUCH

13  AN EXCELLENT DISTRICT ATTORNEY.

14          **THE WITNESS:**  THEY HAVE BEEN GOING DOWN LONGER THAN I

15  WAS THERE, YOUR HONOR.

16  **A.**  I WOULD MAKE TWO OBSERVATIONS, AND I'M SURE THERE ARE MANY

17  OTHER REASONS AS WELL.

18          ONE, THE DISTRICT ATTORNEYS OFFICE IN RIVERSIDE

19  COUNTY SINCE JANUARY OF 1983 HAS BEEN A VERY AGGRESSIVE

20  PROSECUTORIAL AGENCY, ESPECIALLY ON VIOLENT CRIME.  THE FORMER

21  DISTRICT ATTORNEY MADE THAT ONE OF THE HALLMARKS OF HIS TENURE,

22  AND HE HAS BEEN VERY AGGRESSIVE.  THAT'S THE CULTURE IN WHICH I

23  WAS RAISED AS A PROSECUTOR AND IN WHICH YOU WERE RAISED.  SO OUR

24  OFFICE HAS ALWAYS TAKEN THAT VERY SERIOUSLY AND TAKEN GREAT

25  STEPS TO PUSH THAT VIOLENT CRIME DOWN.

1          THE OTHER THING I WOULD POINT TO IS SOMETHING THAT IS

2   MENTIONED IN PERIODICALS AND ARTICLES FROM COLUMNISTS AND THINGS

3   LIKE THAT THAT I HAVE SEEN WITH MY OWN EYES, AND THAT IS THE

4   EFFECT OF THREE STRIKES.  THE THREE STRIKES LAW IN CALIFORNIA.

5          OUR VIOLENT CRIME RATE IS ABOUT HALF OF WHAT IT WAS

6   IN 1993, APPROXIMATELY.  THAT BEGAN GOING DOWN ALMOST AS SOON AS

7   THE LAW WAS PASSED IN MARCH OF 1994 AND THEN REAFFIRMED BY THE

8   VOTERS IN NOVEMBER OF '94.  THAT HAS HAD A DRAMATIC EFFECT.  WE

9   SEE IT WITH THE INDIVIDUALS WHEN THE OFFICE MAKES -- OR THE

10  INDIVIDUALS IN OUR OFFICE MAKE DECISIONS TO PROSECUTE THE THREE

11  STRIKES CASES.  THEY HAVE LONG LISTS OF CRIMES THAT THEY HAVE

12  COMMITTED.  WITH THOSE FOLKS OUT OF THE COMMUNITY, THEY ARE NOT

13  REOFFENDING IN THE COMMUNITY AND SO OUR CRIME RATE TENDS TO GO

14  DOWN.

15         IN OUR OFFICE WE TEND TO FOCUS ON PEOPLE WITH VIOLENT

16  CRIME IN THEIR HISTORY, AS WELL AS THE CURRENT OFFENSE IN ORDER

17  TO DISCOURAGE THEM FROM COMMITTING MORE CRIMES IN OUR COMMUNITY.

18  Q.  ARE YOU AWARE OF EVIDENCE THAT INDICATES THAT AGGRESSIVE

19  PROSECUTORIAL STRATEGIES, SUCH AS ARE EMPLOYED IN RIVERSIDE, ARE

20  EFFECTIVE IN REDUCING VIOLENT CRIMES?

21          **JUDGE KARLTON:**  SIR --

22          **JUDGE REINHARDT:**  YOU HAVE --

23          **JUDGE HENDERSON:**  YOU NOW HAVE MORE QUESTIONS AND

24  DOUBLED YOUR TIME ESTIMATE.

25          **MR. MITCHELL:**  TRYING TO TAKE ADVANTAGE.  THANK YOU.

1    NO FURTHER QUESTIONS.

2                **THE COURT:**  ANYTHING FROM THE STATE DEFENDANTS?

3            **MR. LEWIS:**  NOTHING, YOUR HONOR.

4            **THE COURT:**  CROSS-EXAMINATION?

5            **MR. SANGSTER:**  YES, YOUR HONOR.  ED SANGSTER FOR THE

6    PLAINTIFFS.

7                        **CROSS EXAMINATION**

8    **BY MR. SANGSTER:**

9    **Q.**  MR. PACHECO, WHEN YOU WERE TESTIFYING, YOU WERE TALKING

10   ABOUT EARLY RELEASES CAUSING FAILURES TO APPEAR.

11           ARE YOU EQUATING EARLY RELEASES WITH PRETRIAL

12   RELEASES?

13   **A.**  YES.  THE EARLY RELEASES IN RIVERSIDE COUNTY.

14   **Q.**  SO WHEN YOU ARE TALKING ABOUT AN EARLY RELEASE AND THE

15   IMPACT ITS HAVING, YOU ARE TALKING ABOUT THE RELEASE ON SOMEBODY

16   WHO HAS NOT YET BEEN SENTENCED, IS THAT CORRECT?

17           **JUDGE KARLTON:**  NOT YET BEEN CONVICTED.

18   **BY MR. SANGSTER:**

19   **Q.**  EXCUSE ME.  NOT YET BEEN CONVICTED.

20   **A.**  IT INCLUDES THAT GROUP, AS WELL AS POTENTIALLY THE GROUP

21   THAT WOULD BE INCLUDED IF THE COURT ORDERED A -- AS YOU HAVE

22   REQUESTED.

23   **Q.**  HOW LONG HAS YOUR JAIL BEEN IN THE WORKS, THE NEW JAIL?

24   **A.**  UMM, THE NEW JAIL BECAME THE NUMBER ONE PRIORITY FOR THE

25   BOARD OF SUPERVISORS IN FEBRUARY OF 2007.

1  Q.  AND HAS CONSTRUCTION STARTED ON THAT JAIL YET?

2  A.  NO, BUT THE LAND -- I'M SORRY, BEING NONRESPONSIVE.  NO,

3  CONSTRUCTION HAS NOT STARTED.

4  Q.  SO THE LAND HAS BEEN PURCHASED, BUT CONTRACTS HAVEN'T YET

5  BEEN LET FOR THE JAIL?

6  A.  THE LAND HAD BEEN PURCHASED.  THE PROJECT HAS BEEN PLANNED.

7  I BELIEVE THE ARCHITECT HAS BEEN HIRED.  THEY ARE GOING THROUGH

8  PUBLIC HEARINGS NOW, WITH THE COMMENSURATE OBJECTIONS BY LOCAL

9  FOLKS, AND THEY ARE MOVING EXPEDITIOUSLY.  THE MONEY HAS BEEN

10 SET ASIDE, THE $350 MILLION-PLUS HAS BEEN IN THE BANK FOR SOME

11 TIME.

12 Q.  WHAT'S THE ESTIMATED DATE FOR COMPLETION OF THIS JAIL THAT

13 BECAME A PRIORITY IN FEBRUARY OF '07?

14 A.  ACCORDING TO THE FACILITIES MANAGEMENT DIRECTOR AND THE

15 OTHER OFFICIALS I HAVE SPOKEN TO ABOUT THE JAIL, HAD MANY

16 CONVERSATIONS, THE PROJECTED COMPLETION DATE IS 2012.

17 Q.  SO FIVE YEARS FROM THE TIME IT BECAME A PRIORITY UNTIL THE

18 TIME IT'S EXPECTED TO BE COMPLETED, IS THAT RIGHT?

19 A.  APPROXIMATELY.  IT MIGHT BE TOWARDS THE END OF 2012, SO IT

20 MIGHT BE A LITTLE MORE THAN FIVE YEARS.

21 Q.  ONE OF THE THINGS YOU REFERRED TO IN YOUR TESTIMONY WAS THE

22 PRISON CONSTRUCTION ASSOCIATED WITH AB 900 WAS AN ALTERNATIVE TO

23 A PRISONER RELEASE ORDER IN THIS CASE; DO YOU REMEMBER THAT?

24 A.  YES, SIR.

25 Q.  AND AS OF TODAY, NO FUNDS HAVE BEEN AUTHORIZED FOR THE

1  CONSTRUCTION OF THAT PRISON, IS THAT CORRECT?

2          **JUDGE KARLTON:**  NOT ONLY THAT, BUT NO BONDS HAVE BEEN

3  SOLD YET.

4          **THE WITNESS:**  NO BONDS HAVE BEEN SOLD YET, THAT'S

5  CORRECT.

6  **BY MR. SANGSTER:**

7  **Q.**  AND THE LEGISLATURE STILL HAS NOT ENACTED THE CLEAN-UP

8  LEGISLATION THAT'S BEEN DISCUSSED FOR CLOSE TO A YEAR?

9  **A.**  MY UNDERSTANDING IT'S TWO ISSUES; ONE OF WHICH IS THE

10  LEGISLATURE, THE OTHER OF WHICH IS THE ATTORNEY GENERAL'S

11  OFFICE.

12  **Q.**  I WAS ASKING ABOUT THE LEGISLATURE.

13  **A.**  I'M SORRY.  COULD YOU REPEAT THE QUESTION?

14  **Q.**  IS IT TRUE THAT THE CLEAN-UP LEGISLATION NECESSARY TO GET AB

15  900 GOING HAS BEEN IN PROCESS FOR CLOSE TO A YEAR AND HASN'T YET

16  PASSED?

17  **A.**  WELL, LEGISLATION HAS NOT PASSED.  I'M NOT SURE IT'S

18  NECESSARY.  THERE'S A DISAGREEMENT ABOUT THAT.

19          **JUDGE KARLTON:**  AND TO -- NEVER MIND.  JUST GO.

20  **BY MR. SANGSTER:**

21  **Q.**  OKAY.  YOU TALKED ABOUT THE NEED TO INCREASE REHABILITATION

22  EFFORTS BY THE STATE?

23  **A.**  YES, SIR.

24  **Q.**  THAT NEED HAS BEEN AN APPARENT FOR SOME TIME?

25  **A.**  IT HAS.

1  Q.  THAT'S BEEN APPARENT TO THE LEGISLATURE FOR SOME TIME?

2  A.  I BELIEVE SO YES, SIR.

3  Q.  THE LEGISLATURE HAS FAILED TO INCREASE THE REHABILITATION

4  PROGRAMS DURING THAT TIME?

5  A.  THEY HAVE IN SOME SMALL INSTANCES, BUT NOT A GENERAL

6  OVERHAUL OF THOSE SYSTEMS, CORRECT.

7  Q.  SO THE LEGISLATURE HAS BEEN AWARE OF AN ALTERNATIVE TO A

8  PRISONER RELEASE ORDER, BUT HAS FAILED TO ACT ON IT?

9  A.  CAN I GET SOME CLARIFICATION ON THE LEGISLATURE?  WHAT YOU

10  MEAN BY THE LEGISLATURE?  EVERY MEMBER OF THE LEGISLATURE?

11          **JUDGE KARLTON:**  THE BODY AS A WHOLE.

12          **THE WITNESS:**  I WOULDN'T SAY THAT THE BODY AS A WHOLE

13  WAS AWARE OF ALL OF THOSE CONDITIONS AND, THEREFORE, FAILED TO

14  ACT.  INDIVIDUAL MEMBERS MAY HAVE BEEN AND WERE.

15          **JUDGE KARLTON:**  BUT THAT'S THE WAY THE LEGISLATURE

16  ALWAYS WORKS.  MAYBE IT DOESN'T ANY MORE.  THIRTY YEARS AGO WHEN

17  I HAD SOMETHING TO DO WITH IT IT DID.

18          THE WAY THE LEGISLATURE USED TO WORK, AND MAYBE IT

19  DOESN'T ANY MORE, WERE THAT SPECIFIC COMMITTEES BECAME THE

20  CONDUIT FOR ALL LEGISLATION AND THE MEMBERS OF THOSE COMMITTEES

21  WERE EXPECTED TO ACT FOR THE LEGISLATURE AS A WHOLE IN MAKING

22  DECISIONS ABOUT WHAT OUGHT TO BE DONE FOR THE PUBLIC.

23          WAS THAT NOT YOUR EXPERIENCE WHEN YOU WERE IN THE

24  LEGISLATURE, SIR?

25          **THE WITNESS:**  THAT WAS NOT MY EXPERIENCE, YOUR HONOR.

1    IT WAS DIFFERENT.

2         **JUDGE KARLTON:**  HOW DID IT WORK THEN?  EVERYBODY HAD

3    TO BECOME EXPERT IN EVERYTHING?

4         **THE WITNESS:**  WELL, IN 1996 TO 2002 WHEN I SERVED,

5    INDIVIDUAL MEASURES WOULD BE DRIVEN BY INDIVIDUALS.

6         AND SO, FOR EXAMPLE, THE LAST PRISON CONSTRUCTED IN

7    THE STATE OF CALIFORNIA WAS APPROVED WHILE I WAS IN THE

8    LEGISLATURE.  I BELIEVE THAT'S CORCORAN 2.  THAT WAS DRIVEN BY

9    AN ASSEMBLYMAN OUT OF THE CENTRAL VALLEY.

10        IT WAS NOT, TO BE QUITE CANDID WITH YOU, THE WILL OF

11   THE MAJORITY OF THAT BODY THAT THAT PRISON GET CONSTRUCTED.  IN

12   FACT, I BELIEVE THERE WAS SIGNIFICANT OPPOSITION TO IT, BUT

13   BECAUSE OF THE WORK THAT HE DID BOTH WITH THE THEN GOVERNOR

14   WILSON -- EXCUSE ME, NOT GOVERNOR WILSON, GOVERNOR DAVIS AND

15   OTHER MEMBERS, THAT MEASURE PASSED AND THE PRISON WAS

16   CONSTRUCTED.

17        SO IT WASN'T THE COMMITTEE, IF YOU WILL, THAT WAS

18   ACTING.  IT WAS AN INDIVIDUAL.  SO WE HAVE SEEN PERFORMANCE DONE

19   AT LEAST DURING MY TIME ON THAT BASIS.

20        **JUDGE REINHARDT:**  I DON'T QUITE UNDERSTAND.  IF THE

21   LEGISLATURE IS NOT AWARE OF THIS PROBLEM, WHAT DOES IT TAKE TO

22   MAKE THE LEGISLATURE AWARE OF THE PROBLEM?

23        **THE WITNESS:**  I BELIEVE YOU HAVE MADE THEM AWARE OF

24   THE PROBLEM, AND I WOULD DARE SAY THAT 120 OF THEM ARE NOW AWARE

25   OF THE PROBLEM.

1              BUT IN 1996 TO 2002 WHEN I WAS THERE, I WOULD NOT SAY

2    THAT THE OVERWHELMING MAJORITY OF FOLKS WERE AWARE THAT THERE

3    WAS A SIGNIFICANT PROBLEM.

4              **JUDGE REINHARDT:**  SINCE THEY HAVE BECOME AWARE

5    BECAUSE OF THIS COURT, WHAT HAVE THEY DONE TO SOLVE THE PROBLEM.

6              **THE WITNESS:**  AB 900 WAS, I BELIEVE, A FAIRLY RARE

7    OCCURRENCE.  THE MAJORITY, AT LEAST WHEN I WAS THERE, WAS

8    OPPOSED TO PRISON CONSTRUCTION.

9              SO ALLOWING A BILL TO PASS THAT ALLOWED PRISON

10   CONSTRUCTION, AB 900 PRISON FACILITIES WAS A SIGNIFICANT STEP BY

11   THE LEGISLATURE.  I THINK IT WAS THIS COURT THAT SPURRED THEM TO

12   DO IT, TO BE QUITE FRANK WITH YOU, AND OVERCAME THEIR NATURAL

13   INCLINATION AGAINST PASSING SUCH A BILL.

14             **JUDGE KARLTON:**  NOTHING HAS BEEN DONE.  THE MONEY HAS

15   NOT BEEN ALLOCATED, FUNDING HAS NOT -- NEVER MIND.  GO AHEAD.

16             **JUDGE REINHARDT:**  WELL, FOR INSTANCE, YOU DID TALK

17   ABOUT THE NEED FOR MORE PAROLE AND PROBATION OFFICERS.  I DON'T

18   REMEMBER WHICH FIGURES YOU USED FOR PAROLE OR PROBATION, BUT

19   WITH THAT BEING AN IMPORTANT ALTERNATIVE, HAS ANYTHING BEING

20   DONE TO PROVIDE ADDITIONAL FUNDING FOR THAT?

21             **THE WTNESS:**  IN THE LEGISLATURE?

22             **JUDGE REINHARDT:**  YES.

23             **THE WTNESS:**  I'M NOT AWARE OF ANYTHING RECENTLY IN

24   THAT RESPECT.

25             IN FACT, I BELIEVE THAT THE FUNDING HAS GONE THE

1  WRONG WAY FOR THOSE, THOSE AGENCIES.

2           BUT THERE ARE -- I'M SORRY, I'M ADDING.  THERE ARE

3  OTHER ISSUES DEALING WITH THAT, AND THAT IS THE INADEQUACY AND

4  EFFECTIVENESS THAT GOES ON IN THAT ORGANIZATION.  THAT HAS

5  NOTHING TO DO WITH THE LEGISLATURE.

6           **JUDGE REINHARDT:**  CAN THE COURT COUNT ON ALL THOSE

7  PROBLEMS BEING CORRECTED, FUNDING COMING FORWARD, THE CDCR WHICH

8  IS QUITE CRITICAL OF OPERATING MORE EFFICIENTLY.

9           **THE WITNESS:**  THE COURT IDENTIFIED A NUMBER OF

10  CONSTITUTIONAL VIOLATIONS IN ITS ORDERS AND IN ITS OPINIONS.  IT

11  IS MY OPINION THAT THE OVERWHELMING MAJORITY OF THOSE VIOLATIONS

12  HAVE LITTLE, IF ANYTHING, TO DO WITH OVERCROWDING.  MAYBE ONE OR

13  TWO OF THEM DO.

14           IF I MAY GIVE AN EXAMPLE TO THE COURT?  A FACTUAL

15  EXAMPLE THAT WAS CITED BY THE COURT WAS A DENTIST THAT WAS NOT

16  SANITARY AND WAS USING THE SAME GLOVES TO LOOK IN THE MOUTHS OF

17  PRISONER AFTER PRISONER.  THAT'S NOT AN OVERCROWDING ISSUE;

18  THAT'S A MALPRACTICE ISSUE.

19           **JUDGE REINHARDT:**  I'M ASKING YOU REALLY ABOUT

20  PHASE 2.  I'M SURE YOU ARE FAMILIAR WITH WHERE WE ARE IN THIS

21  TRIAL.

22           **THE WITNESS:**  YES, SIR.

23           **JUDGE REINHARDT:**  THE FIRST PHASE, WHICH I GATHER YOU

24  ARE NOT HERE TO TESTIFY ABOUT SINCE WE ARE IN PHRASE 2, WAS

25  ABOUT WHETHER OVERCROWDING WAS A CAUSE.

1          BUT NOW LOOKING AT THE REMEDY PHASE, THAT'S WHAT I

2     WAS REALLY ASKING YOU ABOUT.  AND I WANT TO SEE WHAT HOPE THERE

3     IS FOR SOME REMEDY.  YOU SAY THERE ARE ALTERNATIVES TO PRISONER

4     RELEASE ORDERS.  THAT'S A VERY BROAD TERM.

5          BUT YOUR SUGGESTIONS WERE, I THOUGHT, THAT WE NEEDED

6     MORE PAROLE OFFICERS, MORE PROBATION OFFICERS, BUILD MORE

7     PRISONS.  ARE ANY OF THOSE THINGS IMMEDIATE PROSPECTS?  WHAT IS

8     THE STATUS OF ANY OF THOSE THINGS?

9          JUDGE KARLTON SAID YOU SEEM TO AGREE THAT THERE

10    HASN'T BEEN ANYTHING DONE OTHER THAN TO PASS PROPOSITION --  AB

11    900.  NO FUNDING HAS BEEN MADE AVAILABLE.

12          **THE WITNESS:**  IF I MAY?

13          **JUDGE REINHARDT:**  YES, PLEASE.

14          **THE WITNESS:**  I DON'T BELIEVE IT'S A QUESTION OF A

15    LACK OF CAPACITY OR, AS THE COURT HAS MENTIONED IN ONE OF ITS

16    DOCUMENTS, TRAINED INCAPACITY IN THE LEGISLATURE.

17          THE LEGISLATURE CAN ACT VERY QUICKLY.  IN MY FIRST

18    YEAR THERE THERE WAS A $1 BILLION TAX CUT IN A MATTER OF HOURS

19    THAT WAS PASSED.

20          **JUDGE KARLTON:**  CUTTING TAXES THEY ARE VERY GOOD AT.

21    IT'S A QUESTION OF RAISING MONEY AND SPENDING IT IN WAYS THAT

22    ARE PERCEIVED NOT TO GET VOTES.

23          **THE WITNESS:**  I SAW THAT DONE AS WELL, YOUR HONOR.

24    IN THE EXPENDITURE PART WE HAD NUMEROUS BILLS THAT WOULD COME UP

25    AT THE LAST MINUTE.  THE LEGISLATURE CAN ACT VERY QUICKLY AND

1   HANDLE THOSE MATTERS.

2          TO ANSWER THE COURT'S QUESTION, I BELIEVE THE COURT'S

3   INTERVENTION CAN RESOLVE MANY, IF NOT MOST, OF THE

4   CONSTITUTIONAL VIOLATIONS THROUGH ITS USE OF THE RECEIVER, AND

5   THAT CAN BE DONE.  AND THOSE ARE NOT NECESSARILY CONNECTED TO

6   THE OVERCROWDING.

7          **JUDGE KARLTON:**  THE RECEIVER SAID HE NEEDS -- I'M

8   SORRY, I DON'T REMEMBER.  $8 MILLION, $8 BILLION, WHATEVER THE

9   NUMBER IS.

10         **THE WITNESS:**  8 BILLION.

11         **JUDGE KARLTON:**  AND THAT HE NEEDED SEVERAL MILLION

12  DOLLARS IN THE NEXT YEAR, AND THE LEGISLATURE HAS NOT PROVIDED

13  ANY OF THAT MONEY.  THAT'S THE REAL WORLD, ISN'T IT?

14         **THE WITNESS:**  YES.

15         **JUDGE KARLTON:**  SO WHATEVER THE ABSTRACT

16  POSSIBILITIES ARE -- AND WHETHER WE HAVE AS MUCH CONFIDENCE AS

17  YOU DO IS ANOTHER MATTER, BUT WHATEVER THE ABSTRACT

18  POSSIBILITIES ARE, THERE IS A REAL WORLD OUT THERE.

19         **THE WITNESS:**  I DON'T KNOW THAT YOU -- THE COURT AND

20  I ARE THAT FAR APART ABOUT THE LEGISLATURE.

21         **JUDGE REINHARDT:**  AS YOU UNDOUBTEDLY KNOW, ALSO, WHEN

22  JUDGE HENDERSON'S RECEIVER ASKED FOR A COMPARATIVELY SMALL

23  AMOUNT OF MONEY TO GET STARTED, THE STATE REFUSED TO PAY AND

24  APPEALED TO THE NINTH CIRCUIT.

25         SO HOW CAN WE HAVE ANY CONFIDENCE THAT THE STATE

1   WANTS TO IMPLEMENT THIS?

2          **JUDGE KARLTON:**  OR ANYTHING.

3          **THE WITNESS:**  SO MUCH OF WHAT OCCURS IN SACRAMENTO,

4   AGAIN, BASED ON MY EXPERIENCE IN SACRAMENTO, DEALS WITH THE

5   MANNER IN WHICH YOU DO SOMETHING AS OPPOSED TO THE SUBJECT

6   MATTER.  THE SUBJECT MATTER CAN EVOKE VARIOUS EMOTIONS AND

7   THINGS LIKE THAT THAT CAN OPERATE AS OBSTACLES, BUT IT'S THE

8   MANNER IN WHICH I WOULD USE THE CURRENT DISCUSSIONS OR LACK

9   THEREOF THAT ARE GOING ON BEYOND THE GOVERNOR AND BUDGET

10  PROBLEMS.  THEY CAN'T SEEM TO MEET OR REACH A MEANINGFUL

11  RESOLUTION, AND I BELIEVE IT'S BECAUSE OF THE MANNER OF THE

12  DISCUSSIONS THAT ARE PRECLUDING THAT RESOLUTION.

13  **BY MR. SANGSTER:**

14  **Q.**  SO IF THIS COURT SAYS "PRETTY PLEASE," YOU THINK ALL THE

15  SOLUTIONS WOULD BE FORTHCOMING?

16  **A.**  I WOULDN'T SUGGEST THAT, COUNSEL.

17          **MR. SANGSTER:**  I HAVE NO FURTHER QUESTIONS, YOUR

18  HONOR.

19          **JUDGE HENDERSON:**  REDIRECT?

20          **MR. MITCHELL:**  NO REDIRECT.

21          **JUDGE HENDERSON:**  OKAY.  THANK YOU VERY MUCH.

22          **THE WITNESS:**  THANK YOU.

23                  (WITNESS EXCUSED.)

24          **JUDGE HENDERSON:**  OKAY.  WE ARE GOING TO RECESS FOR

25  LUNCH.

1        IT SEEMS WORTH OBSERVING THAT WE HAVE WHAT APPEARS TO

2   BE SEVEN HOURS AND 45 MINUTES OF TESTIMONY LINED UP FOR ONE,

3   TWO, THREE, FOUR, FIVE, SIX, SEVEN WITNESSES.  WE HAVE FINISHED

4   TWO.  WE ARE NOT LIKELY TO FINISH, AND WE ENCOURAGED YOU TO HAVE

5   PEOPLE READY.  I CAN'T IMAGINE -- TAKE THAT IN MIND.

6        **JUDGE REINHARDT:**  OR TO STIPULATE TO THEIR TESTIMONY.

7        **JUDGE HENDERSON:**  OR STIPULATE TO THEIR TESTIMONY.

8   BUT ANYWAY, COURT IS IN RECESS FOR AN HOUR.

9        DO YOU HAVE SOMETHING?

10       **MS. WOODWARD:**  YES, YOUR HONOR.  I WAS GOING TO

11  MENTION TO THE COURT THAT THE TESTIMONY OF MR. BOSCH IS GOING TO

12  COME IN BY STIPULATION IN LIEU OF LIVE TESTIMONY, WHICH WE

13  REACHED LAST NIGHT.  I'M SORRY WE DIDN'T REACH IT SOONER.

14       **JUDGE HENDERSON:**  OKAY.  THANK YOU.

15       **MS. WOODWARD:**  SO HE IS NOT ON THE LIST ANY MORE

16  TODAY.

17       **MR. SANGSTER:**  AS IS THE TESTIMONY OF MISS JOHNSON.

18       **MS. WOODWARD:**  I'M SORRY.  THAT'S CORRECT.

19  MISS JOHNSON ALSO HAS BEEN SUBMITTED IN LIEU OF LIVE TESTIMONY.

20  SHE IS THIS AFTERNOON.

21       **JUDGE HENDERSON:**  I DON'T SEE A MISS JOHNSON ON THIS

22  LIST.

23       **MS. WOODWARD:**  SHE MAY ALREADY HAVE BEEN TAKEN OFF.

24       **JUDGE HENDERSON:**  IT'S NOT ON THE LIST WE WERE GIVEN.

25  OKAY COURT IS ADJOURNED FOR AN HOUR.

1              (WHEREUPON AT 12:06 P.M. PROCEEDINGS

2          WERE ADJOURNED FOR NOON RECESS.)

3      **THE REPORTER:**  GOOD AFTERNOON.

4      **JUDGE HENDERSON:**  BEFORE WE START, AND WE'LL DO THAT

5  IN JUST A MINUTE, COUNSEL, WE COLLECTIVELY UP HERE HAVE VERY

6  SERIOUS CALENDARING PROBLEMS AFTER THE 19TH.  WE'RE GOING TO ASK

7  YOU TO GIVE US ANOTHER, WHEN WE RECONVENE NEXT WEEK, WHAT WE

8  THINK WOULD BE A MORE REALISTIC SCHEDULE FOR THE REST OF THE

9  TRIAL.  WITH THE ESTIMATES TODAY, EVEN TAKING INTO ACCOUNT THE

10 QUESTIONING BY THE COURT, ARE NOT AS HELPFUL AS THEY MIGHT BE,

11 SO WE ARE GOING TO ASK YOU TO DO THAT.  RECALL THAT NEXT WEEK WE

12 HAVE TWO MORE DAYS, THE 18TH AND THE 19TH.  AFTER THAT WE HAVE

13 DIRE PROBLEMS IF WE DON'T FINISH.

14          WE ARE GOING TO HAVE TO LOOK AT OUR CALENDARS, WHICH

15 ARE OBVIOUSLY DIFFERENT FROM EACH OTHER'S, AND PATCH TOGETHER A

16 SCHEDULE THROUGH THE HOLIDAYS, AND WE'RE GOING TO INSIST THAT

17 YOU BE AVAILABLE UNTIL WE CAN FIGURE OUT WHAT THAT IS.  AND ONE

18 FURTHER THING YOU SHOULD KNOW THAT, FOR TODAY, WE ARE GOING TO

19 END AT 4:15.

20          SO, WITH THAT, YOU CAN BEGIN, MR. MITCHELL.

21      **JUSTICE REINHARDT:**  IF YOU WOULD GET THE SCHEDULES IN

22 ON WEDNESDAY IN WRITTEN FORM, AND THEN, AS JUDGE HENDERSON SAID,

23 IF WE DON'T FINISH ON THE 19TH, UNDER YOUR SCHEDULES IT DOESN'T

24 LOOK LIKE IT SHOULD TAKE MORE THAN ANOTHER DAY OR TWO AT THE

25 MOST.

```
 1            JUDGE KARLTON:  I DON'T AGREE WITH THAT, BUT GO

 2    AHEAD.

 3            JUSTICE REINHARDT:  LOOKING AT YOUR SCHEDULES, I

 4    DON'T THINK IT'S GOING TO TAKE MORE THAN A DAY OR TWO ONCE YOU

 5    REALLY ELIMINATE THE ONES YOU CAN ELIMINATE.  IT WOULD BE NICE

 6    TO HEAR FROM EVERY DISTRICT ATTORNEY IN EVERY COUNTY THAT THEY

 7    ARE GOING TO SUFFER MORE OR LESS THAN ONE IN THE OTHER COUNTY,

 8    OR EVERY SHERIFF CAN TELL US THAT, BUT REALLY, I THINK IF WE

 9    COULD JUST GET REPRESENTATIVE TESTIMONY, THEN I THINK WE CAN --

10    IF WE DON'T FINISH ON THE 19TH, I THINK WE CAN FINISH IN A DAY

11    OR TWO.

12            WHAT JUDGE HENDERSON IS SAYING IS DON'T MAKE ANY

13    PLANS OVER THE HOLIDAYS BECAUSE WE EXPECT ALL OF YOU TO BE HERE

14    ON WHATEVER DAY OR SO WE CAN WORK OUT TO FIND A DAY OR TWO OVER

15    THE HOLIDAYS.  SO I HOPE NOBODY IS GOING ANYWHERE BECAUSE WE

16    EXPECT YOU HERE IF YOU DON'T FINISH.

17            MR. MELLO:  ONE QUESTION OF CLARIFICATION, YOUR

18    HONOR.  DID YOU SAY YOU WANT NEXT WEDNESDAY THE SCHEDULE OR NEXT

19    MONDAY?

20            JUDGE HENDERSON:  I SAID MONDAY.

21            JUSTICE REINHARDT:  I'M SORRY.  I THOUGHT YOU DIDN'T

22    GIVE THEM A DAY.

23            JUDGE HENDERSON:  WEDNESDAY IS FINE.

24            MR. MELLO:  THANK YOU, YOUR HONOR.

25            JUDGE HENDERSON:  YES, YOU MAY BEGIN, MR. MITCHELL.
```

 1           **MR. MITCHELL:**  THANK YOU, YOUR HONOR.  WE CALL SAN

 2  DIEGO COUNTY DISTRICT ATTORNEY BONNIE DUMANIS TO THE STAND.

 3                      **BONNIE DUMANIS,**

 4  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENORS

 5  WAS FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

 6           **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

 7  RECORD.

 8           **THE WITNESS:**  MY NAME IS BONNIE DUMANIS, B-O-N-N-I-E,

 9  D-U-M-A-N-I-S.

10            **DIRECT EXAMINATION BY MR. MITCHELL**

11  **BY MR. MITCHELL**

12  **Q**   COULD YOU BRIEFLY TELL US YOUR LEGAL EXPERIENCE AND OFFICIAL

13  POSITIONS THAT YOU HAVE HELD?

14  **A**   DO YOU WANT MY EDUCATIONAL BACKGROUND OR JUST THE LEGAL

15  EXPERIENCE?

16  **Q**   HOW ABOUT BOTH?

17  **A**   OKAY.  I GOT MY UNDERGRADUATE DEGREE IN 1973 FROM THE

18  UNIVERSITY OF MASSACHUSETTS IN AMHERST WITH A SPECIAL BA IN

19  SOCIOLOGY.  I WENT TO WESTERN STATE UNIVERSITY, GRADUATED IN

20  1976.  IT'S NOW KNOWN AS THOMAS JEFFERSON.  BECAME A DEPUTY DA.

21  WORKED IN THE DISTRICT ATTORNEY'S OFFICE AS A DEPUTY DA FROM

22  1978 UNTIL 1990, WHEN I WAS APPLY TO THE COURT AS A JUVENILE

23  COURT, SUPERIOR COURT JUVENILE COURT REFEREE.  SERVED THERE FOR

24  FOUR YEARS, WHEN I WAS ELECTED TO THE MUNICIPAL COURT IN SAN

25  DIEGO.  TOOK OFFICE IN 1995, RAN FOR THE SUPERIOR COURT IN 1998,

1  WAS ELECTED TO THE SUPERIOR COURT, WHERE I WAS ELECTED AND THEN

2  APPOINTED, AND THEN THE COURT UNIFIED.

3          I SERVED ON THE SUPERIOR COURT UNTIL, I'M NOT SURE

4  EXACTLY WHEN, BUT I RAN FOR DISTRICT ATTORNEY AND WAS ELECTED.

5  IN JANUARY OF '03 I TOOK OFFICE.  AS A JUDGE IN THE SUPERIOR

6  COURT AND IN THE MUNICIPAL COURTS, I STARTED THE DRUG COURT IN

7  DOWNTOWN SAN DIEGO AND SPENT FIVE YEARS OUT OF THE TEN YEARS ON

8  THE JUVENILE COURT.

9  Q   AS A PROSECUTOR DID YOU GAIN -- BECOME EXPERIENCED IN ALL

10 ASPECTS OF CRIMINAL JUSTICE FROM A PROSECUTION POINT OF VIEW,

11 FROM INVESTIGATION OF CASES THROUGH NEGOTIATING SETTLEMENT,

12 PRESENTING TRIALS AND THROUGH SENTENCING?

13 A   YES, I PRETTY MUCH HANDLED THE GAMUT.

14 Q   ALL TYPES OF CASES FROM --

15 A   FROM CHILD SUPPORT, WELFARE FRAUD, TO MURDERS, RAPES,

16 ROBBERIES, AND EVERYTHING IN BETWEEN.

17 Q   AND FROM A JUDICIAL EXPERIENCE, DID YOU HAVE THAT SAME TYPE

18 OF WIDE RANGES OF CASES THAT YOU HANDLED, AND WHAT WERE THEY?

19 A   YES, I DID TRIALS FOR COUPLE OF YEARS, BUT A LOT OF WHAT I

20 DID WAS CALENDARS THAT INVOLVED THE RESOLUTION OF CASES, THE

21 SENTENCING OF DEFENDANTS, AND I WAS ALWAYS IN CRIMINAL AND

22 HANDLED EVERYTHING FROM THE MISDEMEANOR CALENDAR TO THE FELONY

23 CALENDAR, AND IN THE JUVENILE COURT WE -- I HANDLED ABOUT A

24 THOUSAND CASES A YEAR.

25 Q   WHAT'S THE SIZE OF THE SAN DIEGO COUNTY DISTRICT ATTORNEY'S

1  OFFICE, THE OFFICE THAT YOU NOW MANAGE?

2  **A**   WE HAVE ROUGHLY 310 DEPUTY DISTRICT ATTORNEYS, 150

3  INVESTIGATORS THAT ARE SWORN PEACE OFFICERS, ABOUT A THOUSAND

4  EMPLOYEES TOTAL.

5  **Q**   THE SECOND LARGEST PROSECUTION OFFICE IN THE STATE?

6  **A**   YES, IT IS.

7  **Q**   I TAKE IT YOU'VE BECOME FAMILIAR WITH MANY OF THE ISSUES

8  THAT CONFRONT THE PROSECUTION OF CRIMINAL CASES IN THE CRIMINAL

9  JUSTICE SYSTEM, THE ISSUES THAT RANGE FROM OVERCROWDING OF YOUR

10 JAILS TO RECIDIVISM AND ISSUES SUCH AS THAT?

11 **A**   YES.

12 **Q**   AT SOME POINT YOU BECAME AWARE THAT THE THREE-JUDGE PANEL IN

13 THIS CASE WAS CONVENED IN ORDER TO DETERMINE WHETHER OR NOT A

14 PRISONER RELEASE ORDER SHOULD ISSUE TO REMEDY THE OVERCROWDING

15 THAT EXISTS, OR TO DETERMINE WHETHER OR NOT OVERCROWDING IS A

16 PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS OF INADEQUATE

17 HEALTHCARE AND MENTAL HEALTHCARE IN THE PRISONS; YOU ARE AWARE

18 OF THAT?

19 **A**   YES.

20 **Q**   YOU UNDERSTAND THESE PROCEEDINGS ARE HERE TO DETERMINE

21 WHETHER OR NOT A PRISONER RELEASE ORDER SHOULD ISSUE SHOULD THEY

22 DETERMINE THAT OVERCROWDING IS A PRIMARY CAUSE OF THE

23 VIOLATIONS?

24 **A**   YES.  AS THE DISTRICT ATTORNEY AND THE PRESIDENT OF THE

25 CALIFORNIA DISTRICT ATTORNEYS' ASSOCIATION, I AM VERY CONCERNED

1    WITH THE PUBLIC SAFETY IMPLICATIONS OF A PRISON RELEASE ORDER.

2    **Q**    HAVE YOU FORMED AN OPINION AS TO WHETHER OR NOT AN

3    ACCELERATED RELEASE OF PRISONERS SUCH AS HAS BEEN PROPOSED IN

4    THIS CASE WOULD HAVE AN ADVERSE IMPACT ON CRIMINAL JUSTICE AND

5    THE ADMINISTRATION OF JUSTICE AND PUBLIC SAFETY IN THE COMMUNITY

6    OF SAN DIEGO?

7    **A**    YES, I HAVE FORMED AN OPINION.

8    **Q**    WHAT IS THAT OPINION?

9    **A**    THE OPINION IS THAT IT WOULD BE ADVERSE.  I THINK THAT WE

10   WILL SEE MORE CRIMES BEING COMMITTED.  WE WILL ALSO SEE

11   PRISONERS THAT ARE COMING OUT OF PRISON WITH NO RESOURCES, AND

12   THEY WILL BE SET UP FOR FAILURE.  AND I SEE AN IMPACT ON OUR

13   CURRENT PROGRAM WHICH IS SB 618, THAT HAS BEEN THUS FAR VERY

14   SUCCESSFUL, AND WHICH I THINK REALLY PROVIDES A GOOD FRAMEWORK

15   AND TEMPLATE FOR HOW WE CAN SUCCEED IN STOPPING THE REVOLVING

16   DOOR.

17   **Q**    BASED UPON YOUR EXPERIENCE AS A PROSECUTOR AND YOUR JUDICIAL

18   EXPERIENCE, DO YOU BELIEVE THAT THERE ARE VIABLE ALTERNATIVES TO

19   REDUCING CROWDING IN THE PRISONS OTHER THAN A RELEASE ORDER?

20   **A**    YES, I DO.

21   **Q**    WHAT ARE SOME OF THOSE?

22   **A**    WELL, I KNOW THAT THE DEPUTY DISTRICT ATTORNEY, LISA

23   RODRIGUEZ, SPOKE WITH YOUR HONORS EARLIER THIS WEEK, I BELIEVE,

24   ABOUT OUR PROGRAM SB 618.  I THINK THAT PROGRAM HAS BEEN WELL

25   RESEARCHED AND HAS ALL THE FUNDAMENTALS THAT EXPERTS ACROSS THE

1  NATION SAY ARE NECESSARY IN TERMS OF STOPPING PEOPLE FROM

2  REVOLVING IN THE CRIMINAL JUSTICE SYSTEM, AND A LOT OF THAT

3  COMES FROM MY EXPERIENCE AS A DRUG COURT JUDGE AS WELL IN THE

4  JUVENILE COURT.  AND SO I CAN GO THROUGH THE ENTIRE PROCESS, IF

5  YOU LIKE.

6         **JUDGE KARLTON:**  IT'S BEEN DONE ONCE, MA'AM.  YOU

7  DON'T HAVE TO DO IT AGAIN.

8         **MR. MITCHELL:**  THANK YOU, YOUR HONOR.

9  **BY MR. MITCHELL**

10 **Q**   DO YOU BELIEVE THAT THE SB 618, IF FULLY IMPLEMENTED AND

11 EXPANDED, COULD REALIZE A SIGNIFICANT REDUCTION IN THE PRISON

12 POPULATION OVER A PERIOD OF TIME?

13 **A**   YES, I DO, AND PART OF THE REASON WHY IT WOULD SIGNIFICANTLY

14 REDUCE, I THINK, THE POPULATION IS BECAUSE IN THE LOCAL AREA,

15 FOR INSTANCE RIGHT NOW, THE ASSESSMENT THAT OCCURS BY PROBATION

16 AND A LOCAL REPRESENTATIVE FROM THE DEPARTMENT OF CORRECTIONS

17 AND REHABILITATION PUTS THAT AT THE FRONT END.

18         SO AT THE FRONT END WE'RE ACTUALLY DOING THE

19 CLASSIFICATION.  WE ARE ASSESSING THEM FOR DRUG TREATMENT, FOR

20 MENTAL HEALTH, FOR ALL OF THOSE THINGS THAT THEY'RE GOING TO

21 NEED IN PRISON.  AND, MOST IMPORTANTLY, WE HAVE THE

22 PARTICIPATION OF THE PRISONER IN THAT PROCESS, SO THEY HAVE THIS

23 LIFE PLAN THAT GOES WITH THEM.

24         BUT THE KEY TO THIS WHOLE THING IS THEY THEN DON'T

25 HAVE TO SPEND SO MUCH TIME IN THE RECEPTION CENTERS IN THE

1  DEPARTMENT OF CORRECTIONS WHERE THEY LANGUISH WITHOUT

2  PROGRAMMING, WHERE THEY ARE FORCED TO FIT INTO A POPULATION THAT

3  MIXES THE REAL VIOLENT PEOPLE WITH THOSE WHO AREN'T NECESSARILY

4  VIOLENT, AND IT FORCES THEM TO JOIN GANGS AND DO ALL THOSE

5  THINGS, AND THAT'S WHERE PEOPLE ARE HURT MORE SIGNIFICANTLY.

6        SO IT'S THAT PORTION THAT IS REALLY -- EXCUSE ME --

7  CRITICAL.  BUT ALSO PROGRAMMING IN THE PRISON IS CRITICAL AS

8  WELL AS THE CASE MANAGEMENT SYSTEM WHERE YOU HAVE SOMEONE THAT

9  IS FOLLOWING THEM FROM THE PRISON SYSTEM, AS WELL AS SOMEBODY

10 FROM THE COMMUNITY THAT COMES IN TO FOLLOW THEM BEFORE -- IF YOU

11 RELEASE PRISONERS AS THEY DO NOW.

12        **MR. SANGSTER:**  YOUR HONOR, I OBJECT AT THIS POINT.

13 IT'S LONG SINCE NON-RESPONSIVE, AND THIS IS CUMULATIVE.  THIS IS

14 THE SAME STUFF COVERED BY MS. RODRIGUEZ EARLIER.

15        **JUSTICE REINHARDT:**  WHEN WAS THIS BILL PASSED?

16        **THE WITNESS:**  THE BILL WAS PASSED, I BELIEVE, IN

17 2005, AND WE BEGAN THE PROGRAM IN 2006.

18        **JUSTICE REINHARDT:**  HOW MANY PEOPLE -- YOU ARE NOT

19 THE ONLY ONE COVERED BY THIS?

20        **THE WITNESS:**  YES, WE ARE ONLY COUNTY COVERED BY

21 THIS.

22        **JUSTICE REINHARDT:**  NO, NO, THE BILL, UNDER THE BILL.

23        **THE WITNESS:**  UNDER THE BILL, YOUR HONOR, YES, YOU'RE

24 CORRECT.  THREE COUNTIES ARE ALLOWED TO DO IT.  WE ORIGINALLY

25 ATTEMPTED TO GET ALL COUNTIES.  IT WAS THE LEGISLATURE THAT

1    DETERMINED THAT WE SHOULD START WITH THREE COUNTIES, BUT THERE

2    IS THE AVAILABILITY THAT THREE COUNTIES COULD DO IT RIGHT NOW.

3            **JUDGE KARLTON:**  THERE'S ONLY ONE COUNTY DOING IT NOW?

4            **JUSTICE REINHARDT:**  IT'S NOW BEEN AT LEAST THREE

5    YEARS SINCE WE'VE HAD THIS PROGRAM AND YOU COVERED 200 PEOPLE?

6            **THE WITNESS:**  RIGHT NOW WE HAVE MORE THAN 400 PEOPLE

7    IN THE PROGRAM AT VARIOUS ASPECTS.  ONLY, I BELIEVE, A LITTLE

8    OVER 70 HAVE ACTUALLY COME OUT OF CUSTODY AT THIS POINT.  BUT AS

9    WE PLANNED, WE ARE TRYING TO INCREASE THE NUMBERS.  WE STARTED

10   OUT SMALL, AGAIN, TO WORK OUT ALL THE PROBLEMS, AND WE INTEND TO

11   INCREASE, OF COURSE, AS TIME GOES ON.

12           **JUSTICE REINHARDT:**  ARE YOU FROM MASSACHUSETTS

13   ORIGINALLY?

14           **THE WITNESS:**  I PARK THE CAR IN THE HARVARD YARD.  I

15   CERTAINLY AM, YOUR HONOR.

16           **JUSTICE REINHARDT:**  THE REASON I WAS ASKING YOU THE

17   QUESTION, OF COURSE, IS WE'RE TALKING ABOUT A SOLUTION TO A

18   CONSTITUTIONAL PROBLEM THAT EXISTS CURRENTLY, AND IF, IN THREE

19   YEARS, THIS PROGRAM HAS BEEN APPLIED TO ONLY 400 PEOPLE AND ONLY

20   70 OF WHOM HAVE COME OUT OF PRISON, THAT -- HOW LONG DO YOU

21   THINK IT WOULD TAKE FOR A STATEWIDE PROGRAM TO REALLY BE

22   IMPLEMENTED THAT WOULD SOLVE THIS PROBLEM?

23           **JUDGE KARLTON:**  ASSUMING THAT THE LEGISLATURE WOULD

24   EVER PROVIDE THE FUNDS.

25           **THE WITNESS:**  WELL, WE DON'T GET ANY FUNDS FROM THE

1  LEGISLATURE IN SAN DIEGO RIGHT NOW.  OUR FUNDS COME FROM THE

2  FUNDS FROM THE DEPARTMENT OF CORRECTIONS AND REHABILITATION,

3  BECAUSE, IN ESSENCE, WE ARE DOING THEIR JOB IN THE LOCAL

4  COMMUNITY.

5          **JUDGE KARLTON:**  BUT FOR THE CDCR TO BE ABLE TO PAY

6  FOR THE ENTIRE COMMUNITY FOR ALL THE STATES, THEY WOULD HAVE TO

7  GET THE MONEY FROM THE LEGISLATURE BECAUSE THEY DON'T HAVE FUNDS

8  TO DO THAT NOW.  THEY MAY HAVE ONE OR TWO, I DON'T THINK THEY

9  GOT TWO EITHER, BUT FOR ONE ANYHOW.

10          **THE WITNESS:**  THEY MAY.  I THINK THEY COULD PROBABLY

11  TAKE IT FROM THEIR BUDGET BECAUSE WE'RE DOING THEIR FUNCTIONS.

12          WHAT YOUR HONOR IS ASKING, I THINK, IS -- I THINK NOW

13  THAT WE HAVE THE TEMPLATE -- WHY IT TOOK SO LONG, PART OF IT WAS

14  THE PROCESS OF PUTTING IT TOGETHER WITH THE COMMUNITY AND

15  WORKING -- THIS WAS A FIRST TIME IT EVER HAPPENED.

16          AND NOW WE HAVE THE TEMPLATE, AND WE KNOW WHAT WE'RE

17  DOING, AND WE COULD TAKE THAT ACROSS THE STATE, I THINK, VERY

18  EASILY.  IT STILL IS GOING TO TAKE SOME TIME, AND, YOU KNOW, THE

19  HOPE WOULD BE THAT WE COULD ALSO GET PROGRAMMING WITHIN THE

20  DEPARTMENT OF CORRECTIONS, AND PERHAPS THE COURT COULD ORDER

21  THAT PROGRAMMING, BUT I THINK WE COULD DO -- WITHIN A TWO-YEAR

22  PERIOD I THINK WE COULD DO IT.

23          **JUDGE KARLTON:**  MA'AM, WE HAVE BEEN TOLD OVER AND

24  OVER AGAIN TWO THINGS.  ONE, THAT THE SYSTEM IS SO OVERCROWDED

25  THAT THERE'S NO PRACTICAL WAY TO PROVIDE ADEQUATE PROGRAMMING IN

1  THE PRISONS.  IN LIGHT OF THAT, IT'S NECESSARY TO GET PEOPLE OUT

2  OF PRISONS JUST TO PROVIDE SPACE FOR PROGRAMMING.  NEVER MIND.

3  I MADE THE SPEECH.

4          GO AHEAD.  ASK YOUR QUESTION, MR. MITCHELL.

5  **BY MR. MITCHELL**

6  **Q**   WHAT EFFORTS ARE THE DISTRICT ATTORNEYS DOING TO EXPAND

7  SB 618 OR OTHER ALTERNATIVES TO REDUCE PRISON POPULATION?

8  **A**   WELL, WE HAVE HAD --

9          **MR. SANGSTER:**  OBJECT, YOUR HONOR.  I OBJECT ON

10 SB 618 TO THE EXTENT IT'S ALREADY BEEN COVERED BY ANOTHER

11 WITNESS FROM THIS COUNTY.  IF IT'S THE OTHER ALTERNATIVES, FINE.

12         **JUDGE KARLTON:**  THE QUESTION NOW IS WHAT ARE DISTRICT

13 ATTORNEYS DOING STATEWIDE, AND THAT IS A NEW TOPIC.

14         YOU MAY ANSWER, MA'AM, PLEASE.

15         **THE WITNESS:**  ALTHOUGH SB 618 IS THE ONLY PRISON

16 REENTRY PROGRAM RIGHT NOW, THERE ARE TWO OTHER REENTRY PROGRAMS

17 AT THE LOCAL LEVEL WHICH HELP IN CUTTING OFF THE SUPPLY, SO TO

18 SPEAK, TO THE PRISON.  KAMALA HARRIS IN SAN FRANCISCO HAS THE

19 BACK-ON-TRACK PROGRAM, WHICH TAKES YOUNGER OFFENDERS AND HOOKS

20 THEM UP WITH JOBS, AND I THINK IT'S GOODWILL INDUSTRIES, AND

21 ALSO HAS THEM APPEAR BEFORE THE COURT.  I THINK JUDGE HENDERSON

22 IS FAMILIAR WITH THAT PROGRAM.

23         **JUDGE HENDERSON:**  I SAT ON THAT COURT FOR A NUMBER OF

24 YEARS, YES.

25         **THE WITNESS:**  AND IT'S VERY SUCCESSFUL.

 1          AS WELL AS IN SANTA BARBARA, THERE IS A REENTRY

 2   PROGRAM THAT WORKS WITH THE COMMUNITY IN THE LOCAL AREA, AS

 3   WELL.

 4          SINCE I HAVE BECOME THE PRESIDENT, WE HAVE A NEW

 5   COMMITTEE THAT WAS FORMED JUST A COUPLE OF MONTHS AGO FOR

 6   REENTRY.  KAMALA HARRIS AND CHRISTIE STANLEY, THE ELECTED

 7   DISTRICT ATTORNEYS OF BOTH OF THOSE AREAS, ARE THE CHAIRS, THE

 8   COCHAIRS, OF THAT COMMITTEE, AND WE HAVE ALREADY SCHEDULED IN

 9   JANUARY OF THIS YEAR FOR OUR WINTER RETREAT A WORKSHOP ON

10   REENTRY.

11          AND WE'VE ALSO HEARD FROM ABOUT THREE OR FOUR

12   COUNTIES ALREADY IN SAN DIEGO, AT LEAST ONE OF WHICH HAS COME

13   AND OBSERVED US IN SAN DIEGO, THAT ARE ACTUALLY INTERESTED IN

14   THE SB 618 PROGRAM.

15          WHEN WE BEGAN THE SB 618, WE STARTED -- JUDGE

16   MILLIKEN, WHO WAS THE PRESIDING JUDGE OF THE JUVENILE COURT AT

17   THE TIME THAT I HAD SERVED THERE, WE WENT TO THE BOARD OF

18   DIRECTORS OF THE CALIFORNIA DISTRICT ATTORNEYS' ASSOCIATION FOR

19   THEIR SUPPORT ON SB 618, AND TO A PERSON THEY EMBRACED THE

20   PROGRAM AND THE CONCEPT OF TRYING TO KEEP PEOPLE FROM GOING BACK

21   TO PRISON AND FOCUS OUR RESOURCES VERY MUCH LIKE THE DRUG COURT

22   IN THAT AREA.

23          SO WE ARE MOVING ALONG.  THAT HAS BEEN ONE OF THE

24   MAJOR FOCUSES OF MY PRESIDENCY AS THE CALIFORNIA DISTRICT

25   ATTORNEYS' ASSOCIATION AND ONE THAT I WOULD LIKE TO SEE, OF

1  COURSE, SUCCEED.

2  **BY MR. MITCHELL**

3  **Q**   AN ISSUE CAME UP DURING THESE PROCEEDINGS WHERE IT WAS

4  INDICATED IF THERE WERE INCREASED FUNDING PROVIDED TO PROBATION,

5  LOCAL PROBATION OFFICES AROUND THE STATE, THAT THEY COULD COME

6  UP WITH MORE EFFECTIVE EVIDENCE-BASED PROGRAMS THAT WOULD PROVE

7  INSTRUMENTAL IN KEEPING PEOPLE OUT OF PRISON IF THEY WERE FULLY

8  FUNDED.  DO YOU AGREE WITH THAT OPINION?

9  **A**   YES, I THINK NATIONWIDE THERE HAVE BEEN -- AND JUST IN

10  CALIFORNIA, OVER 15 STUDIES THAT BASICALLY HAVE ALL THE

11  COMPONENTS OF SB 618 IN IT.  WE KNOW WHAT WE NEED TO DO.  WE

12  JUST HAVE TO DO IT.

13            **JUDGE KARLTON:**  AND WE'VE KNOWN IT FOR YEARS.

14            **THE WITNESS:**  I THINK THAT'S ACCURATE, YOUR HONOR.

15            **JUDGE KARLTON:**  AND WE HAVEN'T DONE IT FOR YEARS.

16            **THE WITNESS:**  WELL, SOME PEOPLE HAVEN'T DONE IT.

17            **JUDGE KARLTON:**  THE STATE OF CALIFORNIA HASN'T DONE

18  IT.

19            **THE WITNESS:**  I AGREE.  IT'S -- WHAT WAS THE PHRASE?

20  TRAINED INCAPACITY.  I CALL IT BUREAUCRACY, BUT IT IS TRUE THAT

21  WE'VE EVEN EXPERIENCED IN OUR TIME DOING THIS DIFFICULTIES IN

22  WINDING OUR WAY THROUGH THE BUREAUCRACY OF THE DEPARTMENT OF

23  CORRECTIONS AND REHABILITATION IN MAKING THINGS HAPPEN.

24            **JUDGE REINHARDT:**  AS ONE OF THE LOCAL WITNESSES TOLD

25  US YESTERDAY, YOU JUST CAN'T TRUST THE STATE.

 1          **THE WITNESS:**  WELL, I DON'T KNOW THAT I WANT TO GO

 2    THAT FAR.

 3          **JUDGE REINHARDT:**  THAT WAS ONE COUNTY HEARD FROM.

 4          **THE WITNESS:**  IT'S -- I CAN UNDERSTAND THIS COURT'S

 5    FRUSTRATION WITH WHAT HAS HAPPENED IN THE PAST, AND, CERTAINLY,

 6    WE ARE CONCERNED ABOUT THE MEDICAL SITUATION WITH THE PRISONERS

 7    AND, CERTAINLY HAVE READ A LOT OF INFORMATION, THE COURT ORDER

 8    AND THAT SORT OF THING, AND SO I -- AS YOUR HONOR SAID, IT HAS

 9    BEEN MANY, MANY YEARS, I KNOW, AND SO I UNDERSTAND THE

10    FRUSTRATION.  I ONLY HOPE THAT THE COURT WILL CONSIDER THAT THE

11    ANSWER TO THE FRUSTRATION ISN'T RELEASING PRISONERS WITHOUT

12    GIVING THEM THE TOOLS TO DO WHAT THEY NEED TO DO.  OTHERWISE, WE

13    ARE GOING TO SET THEM UP FOR FAILURE, AND WE WILL HAVE MORE

14    CRIME.

15    **BY MR. MITCHELL**

16    **Q**   IF THERE WERE INCREASED EFFECTIVE PROGRAMS AVAILABLE THROUGH

17    PROBATION ON THE LOCAL LEVEL, WOULD JUDGES BE INCLINED TO

18    UTILIZE THOSE AND AVOID SENDING INDIVIDUALS AMENABLE TO

19    REHABILITATION TO PROBATION RATHER THAN PRISON?

20    **A**   YES.  AS A FORMER JUDGE AND FAMILIAR WITH THE CRIMINAL

21    JUDGES IN SAN DIEGO, AND WATCHING IT NOW AS WELL, WE DON'T

22    GENERALLY SEND SOMEONE THAT HASN'T FAILED ON PROBATION ABOUT

23    FOUR TIMES, FOUR TO FIVE TIMES, TO PRISON NOW LOCALLY.  IF WE

24    HAD ADDITIONAL PROGRAMS, WE CERTAINLY WOULD PUT THEM IN THE

25    ADDITIONAL PROGRAMS, BUT WE HAVE RIGHT NOW ONLY ONE THOUSAND

1  SPOTS FOR REHABILITATION, BASICALLY, FOR SUBSTANCE ABUSE,

2  AVAILABLE TO US IN THE COMMUNITY, AND THAT'S FOR ADULT PROBATION

3  FOR PAROLE PROGRAMS, AS WELL AS FOR WOMEN'S PROGRAMS WITH

4  CHILDREN.

5          SO IF WE HAD A LOT OF PRISONERS THAT CAME OUT INTO

6  THE COMMUNITY, WE WOULD HAVE NO, VIRTUALLY NO SERVICES TO

7  PROVIDE THEM WITHOUT A PERIOD OF TIME FOR TRYING TO SET THOSE

8  PROGRAMS UP.

9  **Q**   YOU PROVIDED OR CREATED SOME CHARTS THAT INDICATE WHAT THAT

10  IMPACT ON THE PROGRAM SB 618 WOULD BE OF EARLY RELEASE; IS THAT

11  CORRECT?

12  **A**   YES, I DID.

13  **Q**   AND I'M SHOWING YOU WHAT'S BEEN MARKED AS DI 513 --

14          **MR. SANGSTER:**  OBJECTION, YOUR HONOR.  CUMULATIVE.

15  MS. RODRIGUEZ WAS ASKED AND TESTIFIED ABOUT THE IMPACT OF THIS

16  ON 618.

17          **MR. MITCHELL:**  I BELIEVE THERE WAS SOME CONFUSION AS

18  TO WHAT THE ACTUAL 618, AND MS. DUMANIS, AS A CREATOR OF SB 618,

19  HAS TAKEN THE STEPS TO CLARIFY WHAT THE ACTUAL IMPACT WOULD BE.

20          **JUDGE HENDERSON:**  PROCEED.

21          **THE WITNESS:**  AS YOU LOOK AT THIS DIAGRAM, WHAT IT

22  SHOWS YOU IS THE DIFFERENCE BETWEEN A REGULAR INMATE AND INMATE

23  THAT COMES TO THE COURT FROM SB 618, AND, AS YOU SEE IN THE

24  REGULAR INMATE, THEY RECEIVE THEIR PRESENTENCING, PROBATION DOES

25  A REPORT, BUT THAT REPORT DOESN'T HAVE ANY ASSESSMENTS, REALLY,

1    AND THERE'S A SENTENCING HEARING.  IN SB 618 THERE'S AN

2    ASSESSMENT, THERE'S A LIFE PLAN, AND THAT ASSESSMENT INCLUDES

3    RISK AND NEEDS.

4            AND I THINK THAT'S ONE OF THE THINGS THAT IS VERY

5    IMPORTANT IN SB 618, AND THAT IS, WE OFTEN TEND TO LOOK AT THE

6    CRIME TO DETERMINE WHETHER OR NOT WHAT THE PERSON PLED GUILTY

7    TO -- OR THE HIGHEST CHARGE THAT THEY'VE DONE AND WHETHER OR NOT

8    THAT MAKES THEM A HIGH RISK, WHEN, IN FACT, WHAT YOU NEED TO

9    LOOK AT IS THE CRIMINOGENIC FACTORS AND THEIR CRIMINAL THINKING

10   IN TERMS OF WHETHER THEY'RE A HIGH RISK.  AND NOT EVERYBODY IS A

11   HIGH RISK WITH HIGH NEEDS.  SOME PEOPLE ARE A LOW RISK WITH LOW

12   NEEDS, WHICH MEANS THEY DON'T NEED A LOT OF PROGRAMMING.

13           SO WE LEARN THAT ABOUT THE INMATE FROM THE BEGINNING,

14   AND WE HAVE THIS PLAN THAT GOES WITH THEM TO THE DEPARTMENT OF

15   CORRECTIONS.

16           IN THE PLAN RIGHT NOW THE WAY A PRISONER WOULD BE

17   HANDLED, THAT PRISONER WOULD GO TO THE CORRECTIONS -- TO THE

18   RECEPTION CENTER AND WOULD THEN LANGUISH FOR ABOUT 90 DAYS

19   BEFORE THEY GO ON TO POSSIBLE PROGRAMMING.

20           IN OUR PROGRAM, THE CASE MANAGER IS ASSIGNED IN THE

21   PRISONS.  THEY WORK TO MAKE SURE THAT THESE PEOPLE GET THE

22   PROGRAMS AND THEY FOLLOW THEM.  THEY NEED SOME ACCOUNTABILITY IN

23   THIS PROCESS.  THEY -- IN THE REGULAR PROCESS, THE INMATE AWAITS

24   RELEASE FROM PRISON, OFTENTIMES NOT HAVING ANY PROGRAMMING, AND

25   OUR -- SIX MONTHS BEFORE OUR CASE MANAGER FROM THE COMMUNITY

1   COMES IN AND HELPS THEM PREPARE SOCIAL SECURITY, DRIVER'S

2   LICENSE, ALL THOSE KINDS OF THINGS THAT ARE NEEDED ONCE THEY GET

3   OUT.  AND RIGHT NOW THE INMATE WITHOUT THE PROGRAMMING IS

4   RELEASED WITH $200 AND A BUS TICKET, AND THEY ARE RELEASED OUT

5   INTO THE COMMUNITY AND IN PAROLE.

6           ON SB 618 THEY ARE MET RIGHT AT THE DOOR OF THE

7   PRISONS.  THEY PICK UP THE INMATE, AND THEY TAKE THAT INMATE TO

8   A RESIDENCE, GET THEM INTO PROGRAMMING AND HAVE THEM

9   ACCOUNTABLE.

10          AND AS YOU CAN SEE, THESE TWO --

11          **MR. SANGSTER:**  YOUR HONOR, I OBJECT TO THIS NARRATIVE

12   ANSWER.  COUNSEL REPRESENTED THE PURPOSE OF THIS WAS TO CLARIFY

13   ISSUES IN 618, AND WE ARE COVERING EXACTLY THE SAME PRESENTATION

14   MS. RODRIGUEZ GAVE US.

15          **THE WITNESS:**  I'M GETTING TO THE POINT WHERE IT DOES

16   THAT, IF YOUR HONORS WOULD ALLOW ME TO PROCEED.

17          **JUDGE HENDERSON:**  GO ON, BUT LET ME SAY BEFORE, AND

18   THIS IS NOT PERSONAL TO YOU, BUT ONE REASON WE ARE ASKING FOR

19   NEW MORE REALISTIC ESTIMATES, WE CAN'T MANAGE A TRIAL.  YOU

20   ESTIMATED 15 MINUTES.  YOU ARE TEN MINUTES OVER, YOU WERE TWICE

21   OVER ON -- WE CAN'T DO OUR JOBS OF MANAGING A TRIAL DURING A

22   HOLIDAY WITH THIS KIND OF --

23          **MR. MITCHELL:**  I CAN FINISH IN FIVE MINUTES IF I'M

24   ALLOWED TO, YOUR HONOR.

25          **THE WITNESS:**  THE BOTTOM LINE IS WHAT IT SHOWS IS

1    THAT THE POOL OF PEOPLE, BOTH THOSE THAT HAVE RECEIVED NO

2    PROGRAMMING AND HAVE NO PLANNING, ARE GOING TO FUNNEL INTO THE

3    VERY SAME PROGRAMS THAT WE HAVE NOW.  SO THOSE 1,000 SPOTS THAT

4    ARE -- AND THE RESOURCES FOR VOCATION, EMPLOYMENT, MEDICAL, AND

5    REHAB, HOUSING, AND MENTAL HEALTH, ARE GOING TO BE -- BOTH SETS

6    OF PEOPLE ARE GOING TO GO IN THERE, AND IF YOU STOP THE PERSON

7    BEFORE THEY HAVE FINISHED THEIR PROGRAMMING IN PRISON, IT ALSO

8    SETS THEM UP FOR FAILURE.

9    **BY MR. MITCHELL**

10   **Q**    SHOWING YOU QUICKLY DI 514, DOES THIS ILLUSTRATE SOME OF

11   THOSE IMPACTS THAT YOU'RE DISCUSSING?

12   **A**    YES, IT DOES.  THE IMMEDIATE IMPACTS ARE WHAT I THINK THE

13   COURT IS INTERESTED IN, AND THAT IS -- THAT, AS I SAID,

14   INSUFFICIENT TIME TO COMPLETE AND PREPARE FOR THEIR RELEASE,

15   PUTTING THEM INTO THE POPULATION, NOT HAVING ENOUGH PEOPLE IN

16   OUR SB 618 TO TAKE ON THAT POPULATION IN SAN DIEGO, AND NOT

17   ENOUGH COMMUNITY RESOURCES THAT WILL BE AVAILABLE.

18            **MR. MITCHELL:**  THANK YOU.

19            **THE WITNESS:**  THERE WAS ONE OTHER SLIDE.

20            **MR. SANGSTER:**  THERE'S NO QUESTION PENDING.

21            **JUDGE KARLTON:**  HE'S TRYING TO DO WHAT HE PROMISED TO

22   DO.

23            **THE WITNESS:**  OKAY.

24            **JUDGE KARLTON:**  YOU'RE BEING --

25            **MR. MITCHELL:**  THANK YOU, YOUR HONOR.

1          **JUDGE HENDERSON:**  STATE DEFENDANT HAVE ANY QUESTIONS?

2          **MR. MELLO:**  NO QUESTIONS.

3          **JUDGE HENDERSON:**  CROSS-EXAMINATION.

4          **MR. SANGSTER:**  NO CROSS, YOUR HONOR.

5          **JUDGE HENDERSON:**  WE'RE GAINING TIME.  OKAY.  THANK

6   YOU VERY MUCH.

7          **THE WITNESS:**  THANK YOU VERY MUCH.

8          **MS. FUENTES:**  GOOD AFTERNOON.  THERESA FUENTES FROM

9   SANTA CLARA COUNTY.  THE DEFENDANT INTERVENORS CALL DR. NANCY

10  PENA TO THE STAND.

11                        **NANCY PENA,**

12  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENORS,

13  WAS FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

14          **THE WITNESS:**  NANCY DANE PENA.

15          **JUDGE KARLTON:**  SPELL YOUR LAST NAME, MA'AM.

16          **THE WITNESS:**  P-E-N-A.

17              **DIRECT EXAMINATION BY MS. FUENTES**

18  **BY MS. FUENTES**

19  **Q**   DR. PENA, WHERE ARE YOU CURRENTLY EMPLOYED?

20  **A**   SANTA CLARA COUNTY.

21  **Q**   WHAT IS YOUR CURRENT POSITION?

22  **A**   I'M THE DIRECTOR OF MENTAL HEALTH DEPARTMENT FOR SANTA CLARA

23  VALLEY HEALTH AND HOSPITAL SYSTEM.

24  **Q**   CAN YOU BRIEFLY DESCRIBE YOUR EDUCATION AND PROFESSIONAL

25  BACKGROUND?

1  **A**    YES, I HAVE A PH.D. IN CLINICAL PSYCHOLOGY, WHICH I RECEIVED

2  FROM CALIFORNIA SCHOOL OF PROFESSIONAL PSYCHOLOGY IN 1980.  I

3  HAVE BEEN WORKING IN PUBLIC MENTAL HEALTH SINCE ABOUT 1978.

4  **Q**    HOW LONG HAVE YOU BEEN EMPLOYED WITH THE COUNTY OF SANTA

5  CLARA?

6  **A**    SINCE 1985.

7  **Q**    CAN YOU BRIEFLY DESCRIBE WHAT YOUR ROLE IS, WHAT YOUR DUTIES

8  HAVE BEEN WITH THE COUNTY OF SANTA CLARA?

9          **MS. TILLMAN:**  IF I COULD ASK THE WITNESS TO RAISE HER

10  VOICE.

11          **THE WITNESS:**  AND I CAN'T HEAR YOU VERY WELL.

12          **MS. FUENTES:**  THE ACOUSTICS ARE --

13          **THE WITNESS:**  THANK YOU.  CAN YOU SAY IT AGAIN?

14          **JUDGE KARLTON:**  WHAT DO YOU DO FOR A LIVING?

15          **THE WITNESS:**  I AM THE DIRECTOR OF MENTAL HEALTH, AND

16  THAT'S THE PUBLIC MENTAL HEALTH SYSTEM IN SANTA CLARA COUNTY.  I

17  HAVE BEEN IN THAT ROLE SINCE 2000.  PRIOR TO THAT, I WAS THE

18  DEPUTY DIRECTOR FOR FOUR YEARS, AND PRIOR TO THAT, ALL THE WAY

19  BACK TO 1985, I WAS RESPONSIBLE FOR CHILDREN'S SERVICES,

20  INTENSIVE CHILDREN'S SERVICES, AND ACUTE PSYCHE SERVICES.

21  **BY MS. FUENTES**

22  **Q**    OKAY.  HOW MANY MENTALLY ILL PERSONS DOES THE COUNTY SERVE

23  THROUGH YOUR DEPARTMENT?

24  **A**    APPROXIMATELY 17,000 TO 19,000 A YEAR.

25  **Q**    DOES THAT NUMBER REPRESENT EVERYBODY THAT SEEKS MENTAL

1  HEALTH TREATMENT IN THE COUNTY?

2  **A**   NO.  WE ESTIMATE ON AVERAGE ABOUT 30 PERCENT OF THOSE WHO

3  CALL FOR SERVICES OR SEEK SERVICES ACTUALLY ARE SCREENED IN TO

4  RECEIVE SERVICE.

5  **Q**  SO ARE YOU SAYING YOU'RE ONLY ABLE TO PROVIDE SERVICES TO

6  30 PERCENT OF THE PEOPLE WHO SEEK THEM?

7  **A**   YES.

8  **Q**  AND --

9      **JUDGE KARLTON:**  ONLY ABLE TO OR ONLY CHOOSE TO?  DO

10 YOU HAVE RESOURCES TO DO MORE BUT DON'T DO IT?

11     **THE WITNESS:**  WE DO NOT HAVE RESOURCES.

12     **JUDGE KARLTON:**  I DO NOT KNOW WHAT SCREENING -- WHAT

13 ARE YOU SCREENING FOR THAT GETS 30 PEOPLE IN AND 70 PERCENT OF

14 THE PEOPLE OUT?

15     **THE WITNESS:**  WE SCREEN ON TWO CRITERIA, ONE BEING

16 FINANCIAL AND INSURANCE, ABILITY TO PAY, BUT, PRIMARILY, WHETHER

17 OR NOT THEY HAVE OTHER RESOURCES.  AND THEN THE OTHER CRITERIA

18 IS THEIR PSYCHIATRIC NEED.  AND SO AS OUR RESOURCES DIMINISH, WE

19 BECOME MORE RESTRICTIVE IN TERMS OF PSYCHIATRIC NEED, ATTENDING

20 TO THOSE WHO HAVE MOST EMINENT AND URGENT NEED.

21     **JUDGE REINHARDT:**  WHEN YOU SAY THE RESOURCES ARE

22 DIMINISHED, DO YOU MEAN FINANCIAL RESOURCES?

23     **THE WITNESS:**  CORRECT.

24     **JUDGE REINHARDT:**  IF THE COUNTY WERE TO GIVE YOU MORE

25 MONEY, YOU WOULD SEE MORE PEOPLE?

1          **THE WITNESS:** CORRECT. CONCEIVABLY, IF INFLATION IS

2 NOT CONSUMING RESOURCES, BUT THAT IS CONCEIVABLE, YES.

3 **BY MS. FUENTES**

4 **Q** DO YOU HAVE THE CAPACITY -- TO FOLLOW UP ON JUDGE

5 REINHARDT'S QUESTION, DO YOU HAVE THE CAPACITY TO SEE MORE

6 PEOPLE IF YOU HAD THE MONEY TO DO SO?

7 **A** IF WE HAD MORE RESOURCES, YES, WE DO. UNFORTUNATELY, IT'S

8 NOT GOING IN THAT DIRECTION RIGHT NOW IN OUR COUNTY.

9 **Q** WHICH DIRECTION IS IT GOING IN?

10 **A** THE RESOURCES THAT WE HAVE ARE THOSE THAT ARE PROVIDED BY

11 THE COUNTY GENERAL FUND, AND THOSE ARE DISCRETIONARY DOLLARS,

12 AND THOSE ARE BEING ELIMINATED PRETTY MUCH STEADILY FOR THE LAST

13 SIX YEARS.

14 **Q** HAVE YOU HAD ANY CUTS THIS YEAR?

15 **A** YES. ACTUALLY, THIS PAST WEEK -- THIS WEEK, I BELIEVE IT

16 WAS THE 12TH, WE RECEIVED ANOTHER -- THE BOARD APPROVED A

17 REDUCTION OF ABOUT FOUR MILLION OUT OF MY DEPARTMENT AS A RESULT

18 OF THE STATE BUDGET, IMPACT OF THE STATE BUDGET ON OUR

19 DEPARTMENT.

20 **Q** AND HOW MUCH HAVE YOUR CUTS BEEN SO FAR ALTOGETHER THIS

21 FISCAL YEAR?

22 **A** UP UNTIL THIS PAST WEEK, THERE HAD BEEN 45 MILLION REMOVED

23 OUT OF OUR DEPARTMENT BUDGET, AND WITH THIS ADDITIONAL

24 FOUR MILLION -- WE ARE COMING BACK FOR A MID-YEAR REVIEW THE END

25 OF JANUARY.

1          I HAVE TO ALSO RECONCILE AN EIGHT MILLION DOLLAR

2    SHORTFALL.  I HAVE -- AND THEN I ALSO HAVE A TARGET THAT I HAVE

3    BEEN ASSIGNED OF 22-1/2 MILLION TO BE EFFECTIVE JULY 1, 2009.

4          **JUDGE REINHARDT:**  YOU SAY THIS IS BECAUSE -- YOU SAID

5    IMPACT.  IT WAS AN IMPACT OR IMPASSE, DID YOU MEAN?

6          **THE WITNESS:**  IMPACT.

7          **JUDGE REINHARDT:**  IMPACT OF THE STATE BUDGET, AND WE

8    DON'T HAVE A BUDGET?

9          **THE WITNESS:**  THIS WAS THE BUDGET THAT WAS PASSED IN

10   SEPTEMBER, AND NOW WE'RE BACK IN SESSION AGAIN, IS MY

11   UNDERSTANDING, AND THERE WILL LIKELY BE ANOTHER IMPACT AS A

12   RESULT OF THAT THAT COMES TO THE COUNTIES.  AND THEN WE'RE

13   USUALLY DIRECTED BY THE COUNTY EXECUTIVE TO ASSESS WHAT THAT

14   IMPACT IS AND TO PROVIDE REMEDIES, WHICH ARE USUALLY REDUCTIONS.

15   **BY MS. FUENTES**

16   **Q**   CAN YOU TELL US GENERALLY WHAT KIND OF SERVICES THE MENTAL

17   HEALTH DEPARTMENT PROVIDES?

18   **A**   THE COUNTY PROVIDES EVERYTHING FROM EMERGENCY PSYCHIATRIC

19   SERVICE, TO OUTPATIENT CARE, TO INPATIENT CASE MANAGEMENT,

20   RESIDENTIAL TREATMENT, ALL THE WAY TO LONG-TERM SKILLED NURSING,

21   AND, ACTUALLY, STATE HOSPITAL CARE, WHICH WE'RE REQUIRED TO

22   PURCHASE FROM THE STATE.

23   **Q**   AND, GENERALLY, YOU HAD MENTIONED THAT YOU HAVE TO TRIAGE.

24   WHAT DID YOU MEAN BY THAT, AND WHO'S ABLE TO ACCESS SERVICES

25   FROM THE COUNTY?

1  **A**  WELL, WE HAVE SEVERAL POPULATIONS THAT WE ARE REQUIRED TO

2  ADDRESS.  THE ENTITLEMENT POPULATIONS THAT WE ARE REQUIRED TO

3  SERVE IN OUR CONTRACT WITH THE STATE DEPARTMENT OF MENTAL HEALTH

4  ARE MEDICAID BENEFICIARIES, THE COUNTY PROGRAMS, THE MANAGED

5  CARE, MENTAL HEALTH MANAGED CARE, PROGRAMS FOR MEDICAID

6  BENEFICIARIES.

7          SO MEDICAID BENEFICIARIES COME TO THE COUNTY FOR

8  THEIR MENTAL HEALTH SERVICES.  THAT'S ONE POPULATION ENTITLED

9  FOR SERVICES, IF THEY MEET OUR MEDICAL NECESSITY CRITERIA.

10          THE SECOND POPULATION THAT'S AN ENTITLEMENT GROUP IS

11  SPECIAL EDUCATION STUDENTS WHO ARE ENTITLED UNDER SPECIAL

12  EDUCATION LAW TO RECEIVE MENTAL HEALTH SERVICES, AND THAT IS

13  ANOTHER MANDATE THAT WE FULFILL THROUGH THE COUNTY PUBLIC

14  SYSTEM.

15          WE ARE REQUIRED FOR THOSE WHO COME TO US UNDER LPS,

16  LANTERMAN-PETRIS-SHORT, WHERE THEY'RE UNDER INVOLUNTARY

17  DETENTION.  WE ALSO MUST SERVE THEM IF THEY COME TO OUR

18  EMERGENCY ROOM.

19          AND THEN WITH THE RESOURCES THAT ARE REMAINING, WE

20  ARE THE SAFETY NET FOR THOSE WHO ARE UNINSURED OR UNABLE TO

21  PURCHASE INSURANCE.

22  **Q**  ARE YOU AWARE OF THE NEEDS OF THE MENTALLY ILL INDIVIDUALS

23  COMING FROM THE COUNTY JAIL?

24  **A**  YES.

25  **Q**  WHAT ARE THOSE NEEDS?

1  **A**    SIGNIFICANT.  I DO NOT RUN THE CUSTODY HEALTH AND MENTAL

2  HEALTH SERVICES; HOWEVER, WE DO HAVE A RELATIONSHIP.  IT IS PART

3  OF THE HEALTH AND HOSPITAL SYSTEM THAT I WORK FOR, SO IT'S A

4  SISTER DEPARTMENT IN THE AGENCY I WORK FOR, AND WE ARE FAMILIAR

5  WITH THE NEEDS OF THE POPULATION THERE.

6         THE MENTAL HEALTH NEEDS ARE ACTUAL FULLY FUNDED

7  THROUGH MY BUDGET, WHICH GOES TO THE DEPARTMENT OF CUSTODY

8  HEALTH SERVICES, AND THEY PROVIDE THE MENTAL HEALTHCARE.  ABOUT

9  20 PERCENT OF THE POPULATION IN OUR JAIL SYSTEM ARE RECEIVING

10 PSYCHIATRIC MEDICATION SERVICES AND CONSIDERED TO BE MENTAL

11 HEALTH CLIENTS.

12 **Q**    WHAT ARE THEIR NEEDS ONCE THEY'RE RELEASED FROM JAIL; DO YOU

13 KNOW?

14 **A**    WELL, ALL OF THOSE WHO ARE RECEIVING MEDICATION PRESCRIBED

15 FROM THE CUSTODY SETTING ARE IN NEED OF ONGOING MENTAL HEALTH

16 TREATMENT, AND SO I WOULD SAY A HUNDRED PERCENT OF THOSE WHO

17 RECEIVE CARE IN THE JAIL SYSTEM ARE IN NEED OF CARE AS THEY

18 EXIT.

19 **Q**    DO THEY NEED ANYTHING BESIDES MEDICATIONS, IN YOUR OPINION?

20 **A**    YES.

21 **Q**    WHAT IS THAT?

22 **A**    CASE MANAGEMENT, MEANING CONNECTING WITH SERVICES AND

23 FACILITATION OF LINKAGE TO SERVICE, AS WELL AS ASSISTANCE IN

24 OTHER AREAS OF THEIR LIVES.  OUTPATIENT THERAPY, RESIDENTIAL

25 TREATMENT, SUBSTANCE ABUSE TREATMENT.  ABOUT 75 PERCENT ALSO

1  HAVE CONCURRENT CONDITIONS WHERE THEY HAVE A MENTAL HEALTH AND A

2  SUBSTANCE ABUSE PROBLEM.

3  **Q**   YOU SAID RESIDENTIAL.  DID YOU MEAN HOUSING OR --

4  **A**   ACTUALLY HOUSING IS A HUGE NEED, BUT I WAS SPEAKING ABOUT

5  RESIDENTIAL TREATMENT, WHICH IS TREATMENT FOR THOSE WHO REALLY

6  REQUIRE 24-HOUR CARE.

7  **Q**   BUT YOU ALSO SAY THEY DO NEED HOUSING?

8  **A**   YES.  HOUSING IS A HUGE NEED.

9  **Q**   OKAY.  DO YOU HAVE ANY INFORMATION AS TO WHETHER STATE

10 PRISONERS WOULD HAVE THOSE SAME TYPES OF NEEDS THAT YOU'RE

11 SEEING FROM PEOPLE FROM THE COUNTY JAIL?

12 **A**   THE INFORMATION THAT I HAVE IS REALLY FROM TWO SOURCES, BOTH

13 OF THEM COMING FROM THE CDCR; ONE, IN CONVERSATIONS THAT I'VE

14 HAD RECENTLY IN THE LAST YEAR WITH REPRESENTATIVES FROM CDCR AS

15 WE HAVE WORKED ON A COLLABORATIVE RELATIONSHIP FOR THE COUNTY TO

16 SERVE PAROLEES IN OUR MENTAL HEALTH SYSTEM.  AND THE OTHER IS A

17 DOCUMENT THAT WAS PRESENTED BY CDCR IN THE PAST YEAR OR SO.

18         IT DOES APPEAR, IN FACT, IN SPEAKING TO THEM AND

19 LOOKING AT THEIR DATA, THAT THEY DO HAVE A SIMILAR POPULATION OR

20 A SIMILAR LEVEL OF NEED IN THE POPULATION THAT WE DO IN OUR JAIL

21 POPULATION.

22 **Q**   SO THAT WOULD BE MEDIATION AND SUPPORT AND HOUSING AND ALL

23 THE THINGS THAT YOU'VE MENTIONED?

24 **A**   AND A HIGH INCIDENCE OF CONCURRENT PROBLEMS WITH SUBSTANCE

25 ABUSE AND MENTAL ILLNESS.

1  Q    ARE YOU AWARE OF WHETHER ANY STATE PAROLEES USE THE COUNTY

2  MENTAL HEALTH SYSTEM?

3  A    YES.  AS A MATTER OF FACT, WHEN WE WERE DIALOGUING ABOUT THE

4  POSSIBILITY OF THE CDCR CONTRACTING WITH THE COUNTY TO PROVIDE

5  SERVICES FOR PAROLEES WHO NEEDED A HIGHER LEVEL OF CARE THAN

6  THEIR OUTPATIENT SYSTEM COULD PROVIDE, WE WERE DISCUSSING WHAT

7  THEY WANTED TO PURCHASE, AND THAT INCLUDED SOME THERAPEUTIC

8  HOUSING, MEANING SUPPORTED HOUSING WITH TREATMENT, AND INTENSIVE

9  TREATMENT BEYOND OUTPATIENT.

10         WE DISCUSSED THE NEED OF THEIR POPULATION TO UTILIZE

11 EMERGENCY AND INPATIENT CARE.  EXCUSE ME.  AND WE DISCUSSED THE

12 POTENTIAL FOR THEM TO REIMBURSE US FOR ACUTE INPATIENT CARE.

13         THEY PROVIDED US WITH A LIST OF APPROXIMATELY ONE

14 HUNDRED PAROLEES WHO ARE RECEIVING -- WERE ENROLLED IN THEIR

15 OUTPATIENT SERVICES, AND WE CROSSED THOSE WITH OUR DATABASE AND

16 DETERMINED THAT 60 PERCENT -- OR 60 OUT OF A HUNDRED OF THE

17 CLIENTS THAT THEY SERVED HAD ALSO BEEN SERVED IN OUR SYSTEM

18 THROUGH OUR EMERGENCY DEPARTMENT OR OUR JAIL, MENTAL HEALTH UNIT

19 OR INPATIENT CARE.

20 Q    WHAT DID YOU ATTRIBUTE THAT TO, THE 60 PERCENT USING YOUR

21 JAIL OR YOUR EMERGENCY FACILITY?

22 A    THE ACUITY OF THEIR CONDITIONS, AND IT DOES APPEAR THAT THEY

23 DO HAVE A CLIENT POPULATION WHICH WAS REALLY THE REASON WHY THEY

24 WERE COMING TO US, THAT THEY CANNOT MEET THEIR NEEDS WITH JUST

25 OUTPATIENT SERVICES.

1  Q    IN YOUR OPINION, WHAT, IF ANYTHING, HAPPENS TO MENTALLY ILL

2  INDIVIDUALS WHO DO NOT HAVE THEIR NEEDS MET?

3  A    WELL, AS ANYBODY WHO HAS A HEALTH CONDITION THAT'S

4  UNTREATED, THERE'S A HIGH LIKELIHOOD OF DETERIORATION.  AND WE

5  DO SEE THAT WITH INDIVIDUALS WHO HAVE SERIOUS MENTAL ILLNESS,

6  THAT THEY DO HAVE A DETERIORATION OF THEIR MENTAL CONDITION OR

7  THEIR STATUS, THEIR MENTAL STATUS IT'S OFTEN CALLED.  SO YOU

8  WILL SEE AN IMPACT ON THEIR BEHAVIOR, THEIR JUDGMENT, THEIR USE

9  OF SUBSTANCES TO SEEK IN THEIR OWN ATTEMPTS TO ADDRESS THEIR

10 SYMPTOMS.  BUT, BASICALLY, AN INCREASE IN PROBLEMATIC SYMPTOMS

11 THAT GET IN THE WAY OF THEIR BEING ABLE TO FUNCTION EFFECTIVELY

12 IN SOCIETY.

13 Q    HAVE YOU SEEN AN INCREASED USE IN PSYCHIATRIC CRISIS AND

14 URGENT CARE IN THE COUNTY IN THE LAST YEAR?

15 A    IN THE LAST YEAR IN URGENT CARE WE HAVE ACTUALLY A NEW

16 SERVICE THAT WE'VE JUST CREATED, AND THE REASON THAT WE CREATED

17 THAT SERVICE IS THAT WE WERE RECOGNIZING THAT WE HAD A

18 SIGNIFICANT NUMBER OF PEOPLE WHO WERE SEEKING SERVICE IN OUR

19 EMERGENCY ROOM.  IT'S NOT UNLIKE WHAT IS HAPPENING IN THE

20 HEALTHCARE ARENA AS WELL, WHERE INDIVIDUALS WHO DON'T HAVE

21 INSURANCE, SO THEY DON'T HAVE A BENEFIT, WILL GO TO AN EMERGENCY

22 ROOM FOR THEIR SERVICE.

23        SO WE WERE FINDING THAT WE WERE USING A VERY

24 EXPENSIVE SERVICE TO MEET THE NEEDS OF A POPULATION THAT WAS

25 USING US AS THEIR SAFETY NET.  SO WE CREATED URGENT CARE

1  ADJACENT TO OUR SAFETY NET.  IT IS ACTUALLY JUST A FEW MONTHS

2  OLD, AND AS WE HAVE OPENED THAT, WE HAVE SEEN A SIGNIFICANT

3  INCREASE IN THE NUMBER OF PEOPLE WHO ARE COMING TO US.

4         WE'VE RESTRICTED THE USE OF THE URGENT CARE ONLY TO

5  POLICE JURISDICTION TO BEGIN WITH BECAUSE WE REALLY HAVE BEEN

6  ATTEMPTING TO RESPOND TO THE COMMUNITY DEMAND FOR SERVICES, AND

7  PARTICULARLY FROM THE POLICE AND LAW ENFORCEMENT.

8  Q  DO YOU BELIEVE THAT UNTREATED MENTALLY ILL INDIVIDUALS IN

9  THE COMMUNITY POSE A RISK TO PUBLIC SAFETY?

10 A  I BELIEVE THEY CAN -- YES, I DO BELIEVE THEY CAN.

11 Q  AND WHY IS THAT?

12 A  BECAUSE WHEN INDIVIDUALS HAVE MENTAL -- MENTAL CONDITIONS OR

13 PSYCHIATRIC CONDITIONS, THEY OFTEN HAVE SIGNIFICANT IMPAIRMENT

14 IN JUDGMENT.  THEY HAVE BEHAVIOR THAT IS OFTEN IMPULSIVE OR

15 DISINHIBITED.

16        SO IT IS NOT UNCOMMON TO SEE INDIVIDUALS WHO HAVE

17 UNTREATED MENTAL ILLNESS IN THE COMMUNITY WITH BEHAVIOR THAT IS

18 EITHER UNSAFE TO THEMSELVES OR OTHERS OR PERCEIVED TO BE SUCH,

19 THAT THERE IS CONCERN ABOUT THEIR SAFETY OR THE SAFETY OF

20 OTHERS.  AND, IN FACT, THERE ARE INSTANCES OF INDIVIDUALS WHO DO

21 HARM OTHERS AS A RESULT OF DECOMPENSATION OR PSYCHIATRIC

22 ILLNESS.

23 Q  DO YOU SEE -- IN YOUR OPINION, IS THERE A RELATIONSHIP

24 BETWEEN POLICE INVOLVEMENT AND PSYCHIATRIC DECOMPENSATION?

25 A  IS THERE A RELATIONSHIP?

1  Q   YES.

2  A   WELL, THE RELATIONSHIP THAT I'M AWARE OF IS THAT WHEN THE

3  PUBLIC IS CONCERNED ABOUT THE BEHAVIOR OF INDIVIDUALS, WHETHER

4  IT BE FROM ANTI-SOCIAL BEHAVIOR OR BIZARRE BEHAVIOR IN THE

5  COMMUNITY, THE POLICE ARE THE ONES WHO ARE CALLED AND ASKED TO

6  INTERVENE, AND OFTENTIMES THEY ARE RESPONDING TO SITUATIONS

7  WHERE THEY'RE DEALING WITH INDIVIDUALS WHO HAVE MENTAL

8  ILLNESSES, AND THIS IS WHAT HAS BEEN REPORTED TO US BY LAW

9  ENFORCEMENT AND REQUESTED OF US BY LAW ENFORCEMENT AS WE HAVE

10  TRIED TO RESPOND TO THEIR NEEDS.

11  Q   I'M SORRY.  WHAT HAS LAW ENFORCEMENT REQUESTED?

12  A   ADDITIONAL SERVICES FOR THOSE IN THE COMMUNITY, IN

13  PARTICULAR, TO IMMEDIATE URGENT RESPONSE, MOBILE RESPONSE.

14          I THINK IDEALLY LAW ENFORCEMENT IN OUR AREA WOULD

15  LOVE IF WE COULD HAVE SERVICES SIMILAR TO WHAT THEY HAVE IN SAN

16  DIEGO, THE PSYCHIATRIC EMERGENCY RESPONSE, WHERE MENTAL HEALTH

17  PROFESSIONALS ARE PARTNERED WITH POLICE.  WE JUST DON'T HAVE

18  THAT CAPACITY TO BE ACTUALLY IN THE FIELD RESPONDING WITH POLICE

19  OFFICERS IN THE COMMUNITY.

20  Q   DID YOU FORM AN OPINION AS TO WHAT IMPACT, IF ANY, STATE

21  PRISONER POPULATION REDUCTION WOULD HAVE ON THE COUNTY OF SANTA

22  CLARA?

23  A   DID I FORM AN OPINION?

24  Q   YES.

25  A   YES.

1  Q   WHAT IS THAT OPINION?

2  A   THAT IT WOULD BE A NEGATIVE IMPACT ON OUR COMMUNITY AND, I

3  WOULD SAY, MOST COMMUNITIES IN CALIFORNIA.

4  Q   WHY IS THAT?

5  A   BECAUSE WE DO NOT HAVE IN OUR LOCAL COMMUNITIES THE

6  RESOURCES TO BE ABLE TO RESPOND TO THE NEEDS OF THIS POPULATION.

7  WE JUST DO NOT HAVE THE CAPACITY TO RESPOND TO THE INFLUX OF ANY

8  NEW POPULATION RIGHT NOW.  AND, UNFORTUNATELY, WE ARE

9  EXPERIENCING SOCIAL CONDITIONS RIGHT NOW IN CALIFORNIA, IF NOT

10 THE WHOLE COUNTRY, WHERE THERE ARE MORE AND MORE INDIVIDUALS WHO

11 ARE IN AN ECONOMIC SITUATION WHERE THEY NEED TO RELY ON THE

12 PUBLIC SERVICE SECTOR TO GET THEIR NEEDS MET.

13 Q   WELL, THERE ARE SOME EXPERTS THAT HAVE TESTIFIED IN THIS

14 CASE THAT BELIEVE THAT SOME OF THE CONCERNS OF THE COUNTIES ARE

15 OVERSTATED.  WOULD YOU AGREE WITH THAT?

16 A   NO.

17 Q   AND WHY NOT?

18 A   BECAUSE WE HAVE EVIDENCE IN TERMS OF THE RECIDIVISM RATES,

19 MEANING INDIVIDUALS WHO HAVE MENTAL ILLNESS, TEND TO HAVE

20 RECIDIVISM RATES THAT ARE FAIRLY SIGNIFICANT, SO THEY'RE

21 RETURNING TO CUSTODY SETTINGS.  THEY'RE CONTINUING TO HAVE

22 CONTACT WITH LAW ENFORCEMENT IN THE COMMUNITY, AND WE ARE NOT

23 REALLY ABLE TO PROVIDE THE LEVEL OF INTERVENTION THAT IS REALLY

24 NEEDED, I THINK, TO AVOID THAT.

25          I DO BELIEVE IT'S AVOIDABLE.  I JUST DON'T BELIEVE WE

1    HAVE THE RESOURCES TO PROVIDE THE KIND OF SUPPORT AND SERVICES

2    THAT ARE NEEDED TO AVOID THAT.

3              **MS. FUENTES:**  THANK YOU.

4              **MR. LEWIS:**  NOTHING, YOUR HONOR.

5              **JUDGE HENDERSON:**  OKAY.  CROSS-EXAMINATION.

6                   <u>**CROSS-EXAMINATION BY MS. MORRIS**</u>

7              **MS. MORRIS:**  MARIA MORRIS.  GOOD AFTERNOON, DR. PENA.

8    MARIA MORRIS FOR PLAINTIFFS.

9    **BY MS. MORRIS**

10   **Q**    THE CURRENT BUDGET FOR THE SANTA CLARA COUNTY DEPARTMENT OF

11   PUBLIC HEALTH, ACCORDING TO YOUR DECLARATION, IS $250 MILLION?

12   **A**    CORRECT.

13   **Q**    AND IN FISCAL YEAR 2006, IT WAS $190 MILLION, CORRECT?

14   **A**    I DO NOT HAVE THAT IN FRONT OF ME, BUT IT SOUNDS ABOUT

15   RIGHT, YES.

16   **Q**    YOU USED ESTIMATES IN YOUR REPORT OF BETWEEN 1,500 AND 3,500

17   PEOPLE RETURNING TO SANTA CLARA COUNTY; DO YOU RECALL THAT?

18   **A**    YES.

19   **Q**    AND THESE WERE ESTIMATES THAT WERE JUST GIVEN TO YOU; YOU

20   DID NOT CALCULATE THEM, CORRECT?

21   **A**    CORRECT.

22   **Q**    IN YOUR DECLARATION YOU EXPLAINED THAT THE 3,500 NUMBER YOU

23   GOT FROM USING THE STATE LEGISLATIVE ANALYSIS PROPOSAL TO

24   RELEASE 71,000 ADULT OFFENDERS FROM STATE TO LOCAL PRISON,

25   RESULTING IN APPROXIMATELY 3,500 INDIVIDUALS COMING TO SANTA

1  CLARA COUNTY, AND YOU CITE TO THE COUNTY EXHIBIT R.  DOES THAT

2  SOUND FAMILIAR TO YOU?

3  **A**   YES.

4  **Q**   HOW DID YOU BECOME AWARE THAT THE LAO WAS PROPOSING TO

5  RELEASE 71,000 PEOPLE FROM STATE TO LOCAL PRISONS?

6  **A**   I BELIEVE THROUGH COUNSEL.

7  **Q**   OKAY.  DID THEY JUST TELL YOU ABOUT IT?

8  **A**   I'M ASSUMING THAT IT WAS IN THE CONTEXT OF DESCRIBING TO ME

9  THE CASE IN THE CASE THAT I WOULD BE ASKED TO TESTIFY ABOUT.

10 **Q**   OKAY.  DO YOU UNDERSTAND THAT THAT'S A PAROLE REALIGNMENT

11 PROPOSAL THAT WAS MADE?

12 **A**   I AM AWARE THAT THERE IS A PAROLE REALIGNMENT PROPOSAL THAT

13 WAS MADE IN ADDITION TO THIS PARTICULAR CASE, YES.

14 **Q**   BUT THAT -- THAT THE LAO REPORT WAS A PAROLE REALIGNMENT

15 PROPOSAL; DO YOU RECALL THAT?

16 **A**   I UNDERSTAND THAT IF YOU ARE TELLING ME NOW.

17 **Q**   BUT YOU DIDN'T UNDERSTAND IT AT THE TIME?

18 **A**   IT MAY BE, VERY WELL.

19 **Q**   OKAY.  DO YOU UNDERSTAND THE DIFFERENCE BETWEEN RELEASING

20 PRISONERS AND TRANSFERS OF SUPERVISION OF PAROLEES?

21 **A**   TRANSFERRING SUPERVISION OF PAROLEES, I BELIEVE I

22 UNDERSTAND.

23 **Q**   WHAT WOULD TRANSFERRING SUPERVISION MEAN?

24 **A**   I AM ASSUMING THAT YOU ARE TALKING ABOUT TRANSFERRING

25 SUPERVISION FROM THE STATE AND STATE PAROLE SYSTEM TO A LOCAL --

1  A LOCAL OR ANOTHER JURISDICTION.

2  Q   THAT'S MY UNDERSTANDING AS WELL.  SO THOSE ARE PEOPLE THAT

3  ARE ALREADY IN THE COMMUNITY, CORRECT?

4  A   I WOULD ASSUME.

5  Q   OKAY.  I'D LIKE TO -- WITHDRAWN.

6        DO YOU UNDERSTAND THAT UNDER CALIFORNIA LAW, WHEN

7  PEOPLE COME OUT OF THE CDCR, THEY'RE RETURNED TO THE COUNTY THAT

8  THEY WERE SENT TO CDCR FROM?

9  A   I'M SORRY.  I COULDN'T HEAR YOU.

10  Q   DO YOU UNDERSTAND THAT UNDER CALIFORNIA LAW, WHEN PEOPLE

11  COME OUT OF CDCR, THEY'RE GENERALLY RETURNED TO THE COUNTY FROM

12  WHICH THEY WERE SENT TO CDCR FROM?

13  A   YES, I AM AWARE OF THAT.

14  Q   AND DO YOU UNDERSTAND THAT, AS TO THOSE PEOPLE IN CDCR,

15  PLAINTIFF'S PROPOSAL WOULD ONLY RESULT IN THEM BEING RELEASED A

16  FEW MONTHS EARLY?

17  A   I DO UNDERSTAND THAT.

18  Q   AND YOU UNDERSTAND THAT PLAINTIFFS ARE NOT PROPOSING THAT

19  PEOPLE WHO WOULD NOT OTHERWISE BE PAROLED BE RELEASED; DO YOU

20  UNDERSTAND THAT AS WELL?

21  A   I DO UNDERSTAND THAT.

22  Q   OKAY.  SO YOU UNDERSTAND THEN THAT UNDER PLAINTIFFS'

23  PROPOSAL, THE PEOPLE THAT WOULD BE RELEASED TO SANTA CLARA

24  COUNTY WOULD JUST BE PEOPLE WHO WOULD BE COMING BACK TO SANTA

25  CLARA COUNTY A FEW MONTHS LATER REGARDLESS OF THIS LITIGATION?

1   **A**   I DO UNDERSTAND THAT.  I HAVE READ THAT.

2   **Q**   OKAY.  PLAINTIFFS HAVE PROPOSED A RELEASE OF 52,000 PEOPLE

3   FROM CDCR, AND 3.6 PERCENT OF THAT, WHICH IS THE SANTA CLARA

4   COUNTY PROPORTION OF THE PRISONERS, WOULD BE 1,872 PEOPLE.  AND

5   PLAINTIFFS HAVE PROPOSED THIS BE DONE OVER TWO YEARS; EVERY

6   MONTH A GROUP OF PEOPLE BEING RELEASED.  SO THAT BREAKS DOWN TO

7   AN AVERAGE OF 78 PEOPLE PER MONTH.

8   **A**   I UNDERSTAND THAT.

9   **Q**   OKAY.  AND YOU ESTIMATE THAT 20 PERCENT OF THE PEOPLE COMING

10  OUT OF CDCR WOULD BE MENTALLY ILL, CORRECT?

11  **A**   I ESTIMATE THAT, YES.

12  **Q**   SO 20 PERCENT OF 78 IS ROUGHLY 15 PEOPLE PER MONTH, CORRECT?

13  **A**   IF YOU SAY SO, I WILL ACCEPT YOUR MATH.

14  **Q**   OKAY.  YOU DON'T KNOW THE BREAKDOWN OF LEVELS OF NEED FOR

15  MENTAL HEALTHCARE AMONG THE PEOPLE IN CDCR AROUND COMING OUT OF

16  CDCR, CORRECT?

17  **A**   NO, I DO NOT.

18  **Q**   AND YOU DON'T KNOW THE BREAKDOWN OF LEVELS OF MENTAL

19  HEALTHCARE NEED AMONG THE MENTALLY ILL PAROLEES THAT ARE ALREADY

20  IN YOUR COMMUNITY, CORRECT?

21  **A**   I DON'T.

22  **Q**   YOU DON'T KNOW HOW MANY OF THE PEOPLE -- OF THE PAROLEES

23  THAT ARE ALREADY IN SANTA CLARA COUNTY THAT ARE MENTALLY ILL,

24  HOW MANY OF THEM NEED A HIGH LEVEL OF CARE OR A LOW LEVEL OF

25  CARE; YOU DON'T KNOW THAT INFORMATION, DO YOU?

1  **A**   NO, NOT OTHER THAN -- AND I WASN'T GIVEN PRECISE STATISTICS

2  ABOUT IT THAN -- OTHER THAN WHAT THE CDCR HAS EXPLAINED TO US IN

3  TERMS OF THEIR CASELOAD IN OUR COMMUNITY AND THE NEED THAT

4  THEY'RE ATTEMPTING TO MEET.

5  **Q**   OKAY.  WHEN THEY WERE TALKING TO YOU ABOUT THE NEED THAT

6  THEY WERE ATTEMPTING TO MEET WITH YOUR ASSISTANCE, THEY WERE

7  TALKING ABOUT THE MOST SEVERELY MENTALLY ILL PEOPLE, WEREN'T

8  THEY?

9  **A**   YES.

10 **Q**   WAS THAT LIST OF 100 INDIVIDUALS YOU MENTIONED, WAS THAT A

11 GROUP OF THE PEOPLE FOR WHOM THEY WERE LOOKING FOR SERVICES

12 THROUGH YOU?

13 **A**   YES.

14 **Q**   SO THOSE WOULD HAVE BEEN SOME OF THE MOST SEVERELY MENTALLY

15 ILL PAROLEES ALREADY, CORRECT?

16 **A**   I AM ASSUMING, BUT I DON'T RECALL IF THEY ACTUALLY STATED

17 THAT TO ME, BUT I'M ASSUMING THAT'S THE POPULATION THEY WERE

18 TALKING ABOUT.

19 **Q**   OKAY.  ALL RIGHT.

20        YOU SAID THAT CURRENTLY YOUR DEPARTMENT SERVES 17,000

21 TO 19,000 CLIENTS PER YEAR?

22 **A**   CORRECT.

23 **Q**   BUT YOU DON'T KNOW EXACTLY HOW MANY?

24 **A**   IT CHANGES EVERY YEAR.

25 **Q**   IT CHANGES EVERY YEAR.  OKAY.  SO THAT'S BETWEEN ROUGHLY

1   1,400 AND 1,600 CLIENTS EVERY MONTH?

2   **A**   NO.   IN TERMS OF WHO WE SERVE?   WE -- OF THE 17- TO 19,000,

3   WE HAVE SORT OF AN -- THAT'S OUR ANNUAL NUMBER SERVED, BUT AT

4   ANY ONE TIME WE CAN BE SERVING UP TO 12,000 INDIVIDUALS WHO ARE

5   OPEN AND RECEIVING ONGOING SERVICES.

6            SO YOU HAVE PEOPLE ENROLLING AND DISCHARGING, AND

7   THAT ADDS TO THE DYNAMIC CAPACITY THAT WE HAVE IN A YEAR, AND

8   THEN WE HAVE A STATIC CASELOAD AT A MOMENT IN TIME.

9   **Q**   OKAY.   ALL RIGHT.   YOU SAID THAT CURRENTLY YOUR DEPARTMENT

10  CAN SERVE ONLY ABOUT 30 PERCENT OF THE PEOPLE WHO CALL AND ASK

11  FOR SERVICES, CORRECT?

12  **A**   YES.

13  **Q**   SO THAT MEANS IF YOU GOT 17- TO 19,000 PEOPLE THAT YOU ARE

14  SERVING, AND THAT'S ABOUT 30 PERCENT, MY CALCULATION IS THAT

15  THAT'S ABOUT 35,000 PEOPLE IN SANTA CLARA COUNTY WHO ARE GOING

16  UNTREATED EVERY YEAR, CORRECT?

17            **JUDGE KARLTON:**   OR GOING TO SOMEPLACE ELSE WHERE THEY

18  COULD GET INSURED AID OR SO FORTH.

19            **THE WITNESS:**   OR SO FORTH, YES.

20  **BY MS. MORRIS**

21  **Q**   SO SOME OF THEM ARE UNTREATED, AND SOME OF THEM MAY BE

22  SEEKING OUT SERVICES ELSEWHERE?

23  **A**   CORRECT.

24  **Q**   AND YOU SAID THAT YOUR DEPARTMENT PERFORMS A TRIAGE THAT'S

25  FINANCIAL AND BASED ON PSYCHIATRIC NEED?

1   **A**   YES.

2   **Q**   OKAY.  IS YOUR STAFF TRAINED IN HOW TO DO INTAKE SCREENINGS?

3   **A**   YES.

4   **Q**   AND DO YOU DO OUTCOME STUDIES TO SEE WHAT HAPPENS WITH SOME

5   OF THE PEOPLE WHO ARE NOT ACCEPTED INTO YOUR SERVICES?

6   **A**   I'M NOT SURE WE WOULD BE ABLE TO DO THAT.  HOW WOULD WE HAVE

7   THE STATISTICS?  WE DON'T HAVE CONTACT WITH THOSE PEOPLE, SO I

8   DON'T KNOW WHAT KIND OF OUTCOME STUDY WE COULD DO.

9           **JUDGE KARLTON:**  THE ANSWER IS, AS OF NOW, FORGETTING

10  THE QUESTION, WHETHER THAT'S A LACK OF IMAGINATION, THE QUESTION

11  IS WHETHER YOU ARE PERFORMING AS SUCH A STUDY.  AND THE ANSWER

12  IS NO?

13          **THE WITNESS:**  CORRECT.

14  **BY MS. MORRIS**

15  **Q**   SO, YOU DON'T KNOW HOW MANY OF THOSE PEOPLE BECOME HOMELESS,

16  THE PEOPLE THAT YOU SAY NO TO?

17  **A**   NO, I DO NOT, NO.

18          **JUDGE HENDERSON:**  NOT HAVING STUDIED IT, YOU DON'T

19  KNOW ANYTHING ABOUT IT?

20          **JUDGE KARLTON:**  PLEASE DON'T ASK HER FIVE QUESTIONS

21  ABOUT WHAT SHE DIDN'T KNOW.  IT'S ESTABLISHED THEY DIDN'T DO A

22  STUDY.

23  **BY MS. MORRIS**

24  **Q**   SO YOU DON'T KNOW THE PUBLIC SAFETY OUTCOME OF THOSE PEOPLE

25  YOU SAY NO TO?

1   **A**   OF -- BASED ON A STUDY OF INDIVIDUALS THAT WE'VE TURNED

2   AWAY, WHICH WAS YOUR QUESTION, I DO NOT.

3   **Q**   OKAY.

4   **A**   I MEAN, IF YOU WOULD LIKE ME TO SPEAK TO IT, I DO KNOW ABOUT

5   PEOPLE WHO REPEATEDLY COME TO OUR SYSTEM AND ARE EVENTUALLY

6   HOSPITALIZED, OR THEY WILL COME BACK.  SO IF THEY COME BACK

7   AFTER REPEATED ATTEMPTS TO GET IN, IT'S USUALLY AT A HIGHER

8   LEVEL OF CARE.

9   **Q**   BUT IF THEY DON'T COME BACK, YOU DON'T KNOW THAT?

10  **A**   I DO NOT.

11  **Q**   SO IF THERE WERE 15 PEOPLE RETURNING TO SANTA CLARA COUNTY A

12  FEW MONTHS EARLIER EVERY MONTH FOR THE NEXT COUPLE OF YEARS AND

13  THEY NEEDED MENTAL HEALTHCARE OR THEY FELT THEY NEEDED MENTAL

14  HEALTHCARE, THEY, TOO, WOULD GO THROUGH YOUR SCREENING PROCESS,

15  CORRECT, IF THEY CALLED?

16  **A**   IF THEY WERE INSTRUCTED TO OR ELECTED TO, YES.

17  **Q**   AND YOU COULDN'T TURN THEM AWAY JUST FOR BEING A PAROLEE,

18  CORRECT?

19  **A**   IF THEY WERE ENROLLED IN THE PAROLE OUTPATIENT SERVICE, WE

20  WOULD REFER THEM THERE.

21  **Q**   I'M SORRY.  I DIDN'T UNDERSTAND THAT ANSWER.

22  **A**   IF THEY WERE CLIENTS OF THE PAROLE OUTPATIENT SERVICES, WE

23  WOULD TURN THEM AWAY BACK TO THEIR PAROLE OUTPATIENT SERVICE.

24  **Q**   IS THAT BECAUSE YOU BELIEVE THEY'RE GETTING APPROPRIATE

25  TREATMENT THROUGH THE PAROLE OUTPATIENT CLINIC?

1  **A**    THAT WOULD MEAN THEY WERE IN TREATMENT.  I WOULDN'T HAVE A

2  JUDGMENT ABOUT WHETHER IT WAS APPROPRIATE.

3  **Q**    IF THEY WEREN'T GETTING TREATMENT THROUGH A PAROLEE

4  OUTPATIENT CLINIC, THEY WOULD JUST GO THROUGH THE SCREENING,

5  JUST THE WAY EVERYONE ELSE DOES?

6  **A**    THEY WOULD.

7  **Q**    AND IF THEY WERE SUFFICIENTLY SICK, ESSENTIALLY, THEN THEY

8  WOULD GET ACCEPTED INTO YOUR PROGRAMS, AND IF THEY WERE NOT,

9  THEY'D BE TURNED AWAY?

10  **A**    IF THEY HAD INSURANCE, THEY WOULD BE TURNED AWAY.  IF THEY

11  WERE SUFFICIENTLY SICK WITH NO INSURANCE, THEY WOULD BE

12  ACCEPTED.

13  **Q**    OKAY.  SO, ESSENTIALLY, THEY WOULD BE TREATED LIKE EVERYBODY

14  ELSE OF THE 55 OR SO THOUSAND PEOPLE THAT CALL YOU EVERY YEAR?

15  **A**    THEY WOULD BE.

16  **Q**    OKAY.  YOU DON'T KNOW HOW MANY PAROLEES THERE ARE IN SANTA

17  CLARA COUNTY NOW, DO YOU?

18  **A**    I DO NOT.

19  **Q**    AND YOU DON'T KNOW HOW MANY ARE ACCESSING DMH SERVICES NOW

20  IN SANTA CLARA COUNTY?

21  **A**    I DO NOT.

22  **Q**    SANTA CLARA COUNTY -- DURING YOUR DEPOSITION, YOU DISCUSSED

23  TWO LEVELS OF CARE PROVIDED BY DMH AS AN OUTPATIENT MODEL OF

24  CARE AND A FULL SERVICE PARTNERSHIP MODEL, CORRECT?

25          **MS. FUENTES:**  EXCUSE ME, YOUR HONOR.  THE QUESTION IS

1  A LITTLE VAGUE.  I THINK THE WITNESS MIGHT THINK DMH MIGHT BE

2  THE STATE DEPARTMENT AS OPPOSED TO COUNTY.  MAYBE SHE COULD

3  CLARIFY?

4  **BY MS. MORRIS**

5  Q    IN FACT, I WAS TALKING ABOUT THE COUNTY DEPARTMENT OF MENTAL

6  HEALTH, AND YOU WERE AS WELL?

7  **A**    I HAVE BEEN UP TO NOW.

8  Q    AS HAVE I.

9  **A**    OKAY.

10  Q    YOUR OUTPATIENT SERVICE IS A TRADITIONAL CASE MANAGEMENT

11  MODEL INVOLVING PSYCHIATRIC MEDICATION AND MINIMAL CASE

12  MANAGEMENT, CORRECT?

13  **A**    THE OUTPATIENT SERVICE, YES.

14  Q    AND THAT'S WHAT YOU PROVIDE FOR; THAT'S SORT OF THE BULK OF

15  WHAT YOUR DEPARTMENT DOES, CORRECT?

16  **A**    NO, I WOULDN'T SAY IT'S THE BULK, BUT IN OUTPATIENT SERVICES

17  IT'S THE BULK OF OUTPATIENT.

18  Q    AND THAT'S MAYBE AN HOUR OF CASE MANAGEMENT A MONTH, AND

19  MAYBE SOMETIMES SEEING A PSYCHIATRIST; IS THAT --

20  **A**    VIRTUALLY ALWAYS SEEING A PSYCHIATRIST.  ALMOST A HUNDRED

21  PERCENT OF OUR CLIENTS ARE ON PSYCHIATRIC MEDICATION IN THE

22  ADULT SYSTEM.

23  Q    SO THAT COULD BE ONCE-A-MONTH PSYCHIATRY OR --

24  **A**    USUALLY IT'S ONCE EVERY SIX WEEKS TO TWELVE WEEKS, ACTUALLY.

25  Q    OKAY.  AND THEN THE FULL SERVICE PARTNERSHIP IS A

1  COMPREHENSIVE MULTI-DISCIPLINARY APPROACH THAT HAS HOUSING AND

2  24-HOUR ACCESS TO TREATMENT AND CASE MANAGEMENT AND FUNDING THAT

3  CAN BE USED FOR BENEFITS FOR HOUSING OR HELPING WITH EMPLOYMENT,

4  CORRECT?

5  **A**   CORRECT.

6  **Q**   AND THESE KINDS OF SERVICES, THESE FULL SERVICE

7  PARTNERSHIPS, THOSE ARE NOT INTENDED FOR PEOPLE WHO CAN BE

8  SERVED IN THE OUTPATIENT MODEL OF TREATMENT, CORRECT?

9  **A**   CORRECT.

10  **Q**   AND IT'S AN EXPENSIVE WAY OF CARING FOR PEOPLE, CORRECT?

11  **A**   YES, YES.

12  **Q**   IT COSTS APPROXIMATELY $19,000 A YEAR IN SANTA CLARA COUNTY?

13  **A**   APPROXIMATELY, YES.

14  **Q**   HOWEVER, THIS IS LESS EXPENSIVE THAN EMERGENCY CARE, ISN'T

15  IT?

16  **A**   FREQUENT EMERGENCY CARE, YES.

17  **Q**   IT'S USED ON A SMALL NUMBER OF PEOPLE, CORRECT?

18  **A**   EXCUSE ME?

19  **Q**   IT'S USED FOR A FAIRLY SMALL NUMBER OF PEOPLE?

20  **A**   CORRECT.

21  **Q**   SANTA CLARA HAS ONLY BETWEEN 300 AND 350 OF THESE SPACES?

22  **A**   YES.

23  **Q**   AND 175 PEOPLE OF THOSE -- 175 OF THOSE ARE FOR PEOPLE

24  COMING OUT OF THE JAIL SYSTEM; IS THAT CORRECT?

25  **A**   YES.

1  Q   AND YOU HAVE CURRENTLY BETWEEN 2,000 AND 2,500 PEOPLE IN

2  NEED OF ONGOING PSYCHIATRIC SERVICES LEAVING THE COUNTY JAIL

3  EVERY YEAR, CORRECT?

4  A   THAT'S WHAT WE HAVE ESTIMATED, YES.

5  Q   OKAY.  AND YOU THINK THOSE PEOPLE HAVE, IN GENERAL, THE SAME

6  LEVEL OF NEED AS PEOPLE THAT WOULD BE COME OUT OF CDCR?  THAT'S

7  YOUR ESTIMATION?

8  A   THAT IS THE ESTIMATION, YES.

9  Q   THOSE 175 BEDS AREN'T JUST FOR THE PEOPLE COMING OUT OF THE

10 JAIL, BUT THEY ARE ALSO FOR PEOPLE INVOLVED WITH THE CRIMINAL

11 JUSTICE SYSTEM IN SANTA CLARA COUNTY THAT ARE NOT GOING TO JAIL,

12 CORRECT, IF THEY MEET THE OTHER CRITERIA?

13 A   MOST OF THEM ARE, IF NOT CURRENTLY INCARCERATED WHEN THEY'RE

14 REFERRED, THEY HAVE RECENTLY BEEN INCARCERATED.

15 Q   OKAY.  SO TAKING THAT 2,000 A YEAR FIGURE, AND YOU'VE ONLY

16 GOT 175 BEDS, SO THAT'S ONLY SPACE FOR LESS THAN TEN PERCENT OF

17 THE PEOPLE THAT ARE COMING OUT OF THE JAIL SYSTEMS, CORRECT?

18 A   IN THIS LEVEL OF SERVICE, YES.

19 Q   AND SO THE OTHER PEOPLE THAT ARE COMING OUT THE JAIL SYSTEM

20 THAT HAVE ONGOING PSYCHIATRIC NEEDS, THEY'RE EITHER BEING

21 TREATED AS OUTPATIENTS OR GETTING TREATMENT SOMEWHERE ELSE OR

22 THEY'RE GOING UNTREATED, CORRECT?

23 A   CORRECT.

24 Q   WOULD YOU LIKE TO HAVE MORE FSP'S, FULL SERVICE

25 PARTNERSHIPS?

1    **A**    WOULD I LIKE TO HAVE MORE CAPACITY TO SERVE THEM?

2    **Q**    MM-HMM.

3    **A**    YES, I WOULD.

4    **Q**    YOU HAD DISCUSSIONS WITH THE STATE REGARDING CONTRACTING FOR

5    SOME OF THESE SAME TYPES OF SERVICES FOR STATE PAROLEES,

6    CORRECT?

7    **A**    CORRECT.

8    **Q**    AND OUT OF -- IT WAS SPECIFICALLY FOR THE FULL SERVICE

9    PARTNERSHIP POSITIONS?

10    **A**    YES, AND THERAPEUTIC HOUSING COMBINED.

11    **Q**    OKAY.  IN SEPTEMBER OF THIS YEAR, YOU WERE CLOSE TO HAVING

12    AN AGREEMENT FOR 30 OF THESE SLOTS FOR THE STATE, CORRECT?

13    **A**    YES.

14    **Q**    AND AT THAT TIME YOU HAD BEEN IN DISCUSSION WITH THE STATE

15    ABOUT THIS POSSIBLE CONTRACT FOR ABOUT SIX MONTHS?

16    **A**    WE HAD BEEN IN DISCUSSION FOR ABOUT SIX MONTHS?

17    **Q**    MM-HMM.

18    **A**    I CAN'T RECALL EXACTLY, BUT IT WAS AT LEAST SIX MONTHS.

19    **Q**    OKAY.  AND AT THAT POINT, WHEN THE CONTRACT WAS CLOSE TO

20    DONE, YOU THOUGHT THAT IT WOULD TAKE APPROXIMATELY -- IT MIGHT

21    TAKE APPROXIMATELY SIX MONTHS TO GET ANOTHER OF THESE -- TO GET

22    THESE 30 BEDS READY AND GOING, CORRECT?

23    **A**    CORRECT.

24    **Q**    AND YOU THOUGHT THAT TEN OF THEM WERE GOING TO BE READY BY

25    NOVEMBER?

1    **A**    CORRECT.  THAT'S WHAT I STATED.

2    **Q**    I'M SORRY?

3    **A**    THAT'S WHAT I STATED; THEY'RE NOT READY, BUT THAT WAS OUR

4    PLAN.

5    **Q**    OKAY.  AND YOU THINK -- YOU THOUGHT THAT WAS GOING TO BE

6    POSSIBLE --

7    **A**    I DID.

8    **Q**    WAS IT JUST A CONTRACTING PROBLEM?

9    **A**    MULTIPLE PROBLEMS HAVE OCCURRED, BUT THE CONTRACT ISN'T

10   SIGNED, AND THE FACILITY ISN'T READY, AND WE'VE HAD FREEZES

11   BECAUSE OF BUDGET CUTS, AND THEY HAD PROBLEMS BECAUSE OF THE

12   STATE BUDGET SITUATION.  SO THERE HAVE BEEN HANG-UPS ALONG THE

13   WAY.

14   **Q**    THE STATE'S GOING TO BE PAYING FOR THE FULL SERVICE BEDS --

15   **A**    YES.

16   **Q**    -- WHEN IT HAPPENS, CORRECT?  ARE THEY GOING TO BE PAYING

17   THE $19,000, ROUGHLY?

18   **A**    YES.

19   **Q**    ARE YOU AWARE THAT THAT IS APPROXIMATELY $24,000 LESS PER

20   YEAR THAN THE AVERAGE COST OF $43,000 PER FOR INCARCERATING

21   SOMEONE?

22            **MS. FUENTES:**  OBJECTION.  LACK OF FOUNDATION.

23            **JUDGE HENDERSON:**  ARE YOU AWARE OF IT, YES OR NO?

24            **JUDGE KARLTON:**  THERE'S BEEN NO DISPUTE ABOUT THAT

25   FIGURE.  IT IS ESTIMATED THAT, AT LEAST AS FAR AS MENTALLY ILL

1  PRISONERS ARE CONCERNED, IT FIGURES ABOUT $43,000.  ARE YOU

2  AWARE OF THAT, MA'AM?

3            **THE WITNESS:**  I DO BELIEVE I AM AWARE OF THAT.  I'VE

4  HEARD THAT FIGURE.

5            **JUDGE REINHARDT:**  ARE YOU AWARE OF THE DIFFERENCE

6  BETWEEN 43,000 AND 19,000?

7            **THE WITNESS:**  I SURE HOPE SO, BUT I'M GETTING OLD.

8            **MS. MORRIS:**  I WOULD HAVE SKIPPED THAT ONE.

9  **BY MS. MORRIS**

10 **Q**   WHEN YOU WERE WRITING YOUR REPORT AND OPINING THAT SANTA

11 CLARA COUNTY COULDN'T ABSORB AN INFLUX OF MENTALLY ILL PAROLEES,

12 YOU BELIEVED THAT A LARGE OR SOME SUBSTANTIAL PROPORTION OF THE

13 MENTALLY ILL PAROLEES WOULD NEED CARE AT AN EQUIVALENT OF THE

14 FULL SERVICE PARTNERSHIP LEVEL, CORRECT?

15 **A**   I AM ASSUMING THAT.

16 **Q**   HOWEVER, THE PEOPLE THAT ARE -- ONLY NINE PERCENT OF THE

17 PEOPLE THAT ARE COMING OUT OF THE JAIL RIGHT NOW, OF THE

18 MENTALLY ILL PEOPLE COMING OUT OF THE JAIL, ARE RECEIVING THAT

19 LEVEL OF CARE?

20 **A**   ONLY -- EXCUSE ME?

21 **Q**   ABOUT NINE PERCENT?

22 **A**   NINE PERCENT?

23 **Q**   MM-HMM.

24 **A**   THAT'S A CAPACITY ISSUE AND NOT RELATED TO THE NEED.

25 **Q**   BUT THAT IS THE SITUATION RIGHT NOW?

1   **A**   YOU'RE SPEAKING ABOUT THE SLOTS, THE 175 SLOTS THAT WE HAVE

2   FOR THIS LEVEL OF CARE?

3   **Q**   YES.

4   **A**   CORRECT.

5   **Q**   OKAY.  YOUR FIGURES ON RECIDIVISM CAME FROM THE STATE,

6   CORRECT?

7   **A**   YES.

8   **Q**   AND THEY CAME FROM THE -- WHAT'S BEEN MARKED SANTA CLARA

9   COUNTY'S EXHIBIT O, THE CDCR DIVISION OF ADULT PAROLE

10  OPERATIONS, MENTALLY ILL PAROLEE POPULATION REPORT OF MARCH 28,

11  2008; IS THAT --

12  **A**   YES.

13  **Q**   ACCORDING TO THAT CHART, THE EOP -- THE RECIDIVISM RATE FOR

14  PEOPLE WHO ARE AT THE EOP LEVEL OF CARE DROPS 12 PERCENTAGE

15  POINTS, FROM 75 PERCENT TO 63 PERCENT, IF THERE'S ANY PAROLE

16  OUTPATIENT CLINIC CONTACT, CORRECT?

17  **A**   I DO NOT HAVE IT IN FRONT OF ME, UNFORTUNATELY, AND I JUST

18  CANNOT ANSWER.

19            (DOCUMENT DISPLAYED.)

20            **MS. MORRIS:**  MAY I APPROACH THE WITNESS?

21            **JUDGE HENDERSON:**  YOU MAY.

22  **BY MS. MORRIS**

23  **Q**   IS THIS DOCUMENT THAT YOU ARE LOOKING AT, WHICH WAS MARKED

24  AS PLAINTIFF'S -- OR AS SANTA CLARA COUNTY'S EXHIBIT O AND IS

25  NAMED, "THE DIVISION OF ADULT PAROLE OPERATIONS MENTALLY ILL

1  PAROLEE POPULATION," MARCH 28TH, 2008, IS THIS THE DOCUMENT YOU

2  RELIED ON TO DETERMINE THE RECIDIVISM RATES THAT YOU TALK ABOUT

3  IN YOUR REPORT?

4  **A**   YES.

5          **MS. FUENTES:**  EXCUSE ME, YOUR HONOR.  JUST FOR THE

6  RECORD, IT'S NOW MARKED AS DEFENDANT INTERVENOR EXHIBIT 323.

7          **JUDGE KARLTON:**  THANK YOU, MA'AM.

8          **MS. MORRIS:**  SORRY, I WAS USING THE WRONG LIST.

9  **BY MS. MORRIS**

10 **Q**   IF YOU TURN TO PAGE 4 OF THIS DOCUMENT, THERE IS A CHART IN

11 THE MIDDLE OF THE PAGE THAT TALKS ABOUT RECIDIVISM RATES OF

12 MENTALLY ILL PAROLEES, DO YOU SEE THAT?

13 **A**   YES.

14 **Q**   AND FOR EOP, WHICH ARE THE PORTION OF THE PAROLE -- WELL,

15 THE PORTION OF THE CDCR POPULATION AT A HIGHER LEVEL OF MENTAL

16 HEALTHCARE, IT GIVES A RECIDIVISM RATE FOR PAROLEES WITHOUT POC

17 CONTACT PRIOR TO THE PAROLEE BEING RETURNED TO CUSTODY OF

18 75 PERCENT; DO YOU SEE THAT?

19 **A**   YES.

20 **Q**   AND FOR PAROLEES WITH POC CONTACT PRIOR TO BEING RETURNED TO

21 CUSTODY, THAT RATE DROPS TO 63 PERCENT, CORRECT?

22 **A**   CORRECT.

23 **Q**   SO, IN FACT, THE RECIDIVISM RATE DROPS BY 12 PERCENTAGE

24 POINTS JUST WITH CONTACT WITH PAROLEE OUTPATIENT CLINICS,

25 CORRECT?

1    **A**   IT APPEARS SO.

2    **Q**   AND, SIMILARLY, FOR THE 3CMS, THE LOWER LEVEL OF MENTAL

3    HEALTHCARE IN CDCR, THAT RATE DROPS FROM 77 PERCENT WITHOUT POC

4    CONTACT TO 54 PERCENT WITH POC CONTACT?

5    **A**   CORRECT.

6    **Q**   SO THAT IS A DROP OF 23 PERCENTAGE POINTS JUST WITH POC --

7    WITH PAROLE OUTPATIENT CLINIC CONTACT?

8    **A**   YES.

9    **Q**   WOULD YOU EXPECT THAT IF SOME OF THESE PEOPLE WERE ABLE TO

10   ACCESS FULL SERVICE PARTNERSHIPS, THAT THAT RECIDIVISM RATE

11   WOULD DROP EVEN FARTHER?

12   **A**   YOU KNOW, I REALLY DON'T KNOW, BECAUSE I'M NOT SURE THAT

13   THIS EOP POPULATION IS WHAT WE ARE TALKING ABOUT IN TERMS OF

14   POPULATION THAT WOULD BE IN A FULL-SERVICE PARTNERSHIP.  I JUST

15   DON'T KNOW IF THEY HAVE THE SAME LEVEL OF PSYCHIATRIC ILLNESS OR

16   NEED.

17   **Q**   OKAY.  WOULD YOU EXPECT FOR WHOEVER -- WHATEVER PAROLEES

18   ENTERED INTO A FULL SERVICE PARTNERSHIP PROGRAM BEING ELIGIBLE

19   FOR IT, WOULD YOU EXPECT THEIR RECIDIVISM RATE TO DROP AS WELL?

20   **A**   I WOULD.

21   **Q**   OKAY.  ONE LAST QUESTION.

22           IN YOUR REPORT YOU TALK ABOUT A SNAPSHOT THAT WAS

23   TAKEN OF -- A METAPHORICAL SNAPSHOT OF 175 MENTALLY ILL INMATES

24   IN THE MAIN JAIL IN SANTA CLARA COUNTY.

25   **A**   YES.

1  Q   YOU DON'T KNOW ANYTHING ABOUT HOW THOSE PARTICULAR 175

2  MENTALLY ILL --

3          **JUDGE HENDERSON:**  YOU LOST A THOUSAND DOLLARS,

4  BECAUSE JUDGE KARLTON SAID HE WAS GOING TO GIVE A THOUSAND

5  DOLLARS TO THE FIRST ATTORNEY WHO SAID "ONE MORE QUESTION" AND

6  ACTUALLY ASKED ONE MORE, BUT HE PROBABLY WON'T DO IT NOW.  GO

7  ON.

8          **MR. MELLO:**  I HAVE ONE MORE QUESTION.

9  **BY MS. MORRIS**

10 Q   YOU DON'T KNOW HOW THOSE PARTICULAR 175 MENTALLY ILL INMATES

11 WERE CHOSEN, CORRECT?

12 A   I DO NOT.

13 Q   SO YOU DON'T KNOW IF THEY WERE THE MOST ILL OR THE MOST

14 RECIDIVISTIC OR WHATEVER?

15 A   NO, IT WAS A SAMPLE THAT THEY LOOKED AT OUT OF THE OPEN

16 CASELOAD, BUT I DON'T KNOW ANYTHING FURTHER BEYOND THAT.

17          **MS. MORRIS:**  NO FURTHER QUESTIONS.

18          **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

19          **MS. LEONARD:**  NO, YOUR HONOR.

20          **JUDGE HENDERSON:**  ANY REDIRECT?

21          **MS. FUENTES:**  I HAVE ONE QUESTION.

22          **THE WITNESS:**  DO I GET PAID A THOUSAND --

23          **REDIRECT EXAMINATION BY MS. FUENTES**

24          **JUDGE HENDERSON:**  OFFER LAPSED UPON MY ANNOUNCEMENT.

25

1  BY MS. FUENTES

2  Q   THE NUMBERS MS. MORRIS MENTIONED, THAT THE RESULT OF THE

3  RELIEF THAT THEY'RE SEEKING WOULD BE 15 MENTALLY ILL PAROLEES

4  RETURNING TO SANTA CLARA COUNTY, IS THAT A PROBLEM FOR SANTA

5  CLARA COUNTY, IF YOU HAD 15 PER MONTH MENTALLY ILL PAROLEES

6  COMING INTO THE COUNTY?

7  A   YES, IT IS A PROBLEM.  AS I THINK I STATED IN MY REPORT, WE

8  HAVE HAD TO ELIMINATE OUR WAITING LIST ONCE WE HIT 500.  WE

9  DECIDED WE WOULD NO LONGER HAVE A WAITING LIST.  SO FOR US TO

10  ADD ANOTHER 15 INDIVIDUALS, ALONG WITH EVERY OTHER POPULATION

11  THAT IS NOW APPEARING TO BE COMING TO OUR DOOR MORE AND MORE

12  FREQUENTLY, I THINK THAT WHAT WE ARE EXPECTING TO EXPERIENCE IS

13  A GREATER AND GREATER POOL OF NEED THAT IS GETTING LESS AND LESS

14  ACCESS TO SERVICES.

15          I BELIEVE THAT THAT IS A PROBLEM, BECAUSE I THINK IT

16  CREATES CONDITIONS IN THE COMMUNITY THAT WILL INEVITABLY LEAD TO

17  SEVERE NEGATIVE IMPACT ON PUBLIC SAFETY.  THAT'S MY OPINION.

18          **MS. FUENTES:**  THANK YOU.

19          **RECROSS-EXAMINATION BY MS. MORRIS**

20  BY MS. MORRIS

21  Q   IF THOSE 15 PAROLEES RETURNED FOUR MONTHS FROM NOW INSTEAD

22  OF TODAY, WOULD THAT BE ESSENTIALLY THE SAME PROBLEM?

23  A   IF THEY RETURNED FOUR MONTHS FROM NOW AS OPPOSED TO TODAY,

24  IT WOULD BE A PROBLEM ON THAT DAY, AS OPPOSED TO EVERY MONTH

25  THAT WE DEAL WITH 15, BUT IT WOULD BE -- ARE YOU SAYING WOULD

1  THE PROBLEM CHANGE?

2  **Q**   RIGHT.

3  **A**   IT JUST DEPENDS ON HOW YOU LIKE YOUR PROBLEMS, DRAWN OUT OR

4  ONE BIG DOSE.

5          **JUDGE KARLTON:**  THE ANSWER IS IT'S THE SAME PROBLEM

6  YOU'VE GOT NOW OR THREE MONTHS FROM NOW OR WHENEVER THEY'RE

7  RELEASED, RIGHT?

8          **THE WITNESS:**  YEP.

9          **JUDGE KARLTON:**  SEE HOW SIMPLE THE QUESTION IS?

10          **JUDGE HENDERSON:**  THANK YOU VERY MUCH FOR TESTIFYING,

11  MS. PENA.  YOU'RE EXCUSED.  YOU MAY CALL YOUR NEXT WITNESS.

12          **MS. WANG:**  GOOD AFTERNOON, YOUR HONORS.  THERESA WANG

13  FOR THE LEGISLATOR INTERVENORS.  THE LEGISLATOR INTERVENORS CALL

14  FORMER ASSEMBLY MEMBER TODD SPITZER TO THE STAND.

15                          **TODD SPITZER**

16  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENOR WAS

17  FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

18          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

19  RECORD.

20          **THE WITNESS:**  TODD, T-O-D-D, SPITZER, S-P-I-T-Z-E-R.

21              **DIRECT EXAMINATION BY MS. WANG**

22  **BY MS. WANG**

23  **Q**   GOOD AFTERNOON, MR. SPITZER.

24  **A**   GOOD AFTERNOON.

25  **Q**   CAN YOU BRIEFLY DESCRIBE FOR ME YOUR EDUCATIONAL BACKGROUND

1  AND WORK HISTORY?

2  **A**   MY EDUCATIONAL BACKGROUND, I HAVE A BACHELOR'S DEGREE FROM

3  UCLA, A MASTER'S DEGREE FROM THE UNIVERSITY OF CALIFORNIA

4  BERKELEY, MY LAW DEGREE FROM THE UNIVERSITY OF CALIFORNIA

5  HASTINGS COLLEGE OF THE LAW.

6            I HAVE A POST CERTIFICATE FROM THE STATE OF

7  CALIFORNIA AS A PEACE OFFICER.  I WAS A PEACE OFFICER FOR LOS

8  ANGELES POLICE DEPARTMENT FOR TEN YEARS FROM 1990 TO 2000.

9            I HAVE BEEN A PROSECUTOR IN THE ORANGE COUNTY

10  DISTRICT ATTORNEY'S OFFICE FROM -- SIX YEARS FROM 1990 TO 1996,

11  A COUNTY SUPERVISOR FOR SIX YEARS AFTER THAT, BEEN A MEMBER OF

12  THE STATE LEGISLATURE FOR SIX YEARS, AND NOW I'M A PROSECUTOR

13  AGAIN IN THE ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE.

14  **Q**   AND FROM WHAT TIME DID YOU SERVE AS ASSEMBLYMAN?

15  **A**   I WAS IN THE STATE LEGISLATURE FROM 1992 TO NOVEMBER 30TH OF

16  THIS YEAR.  I'M SORRY, 2002 TO NOVEMBER 30TH OF THIS YEAR.

17  **Q**   DURING YOUR TIME IN THE CALIFORNIA STATE ASSEMBLY DID YOU

18  SERVE ON ANY COMMITTEES?

19  **A**   YES, I WAS A MEMBER OF THE PUBLIC SAFETY COMMITTEE FOR FOUR

20  YEARS AND FOR THE LAST ABOUT YEAR AND A HALF, COULD BE TWO

21  YEARS, I WAS THE CHAIRMAN OF THE SELECT COMMITTEE THAT OVERSEES

22  OUR STATE PRISONS.

23  **Q**   AND WHAT WERE YOUR RESPONSIBILITIES IN THAT POSITION AS HEAD

24  OF THE SELECT COMMITTEE?

25  **A**   I WAS THE ONLY REPUBLICAN TO CHAIR A COMMITTEE.  MY

1  RESPONSIBILITIES WERE MORE ON PAPER THAN IN ACTUALITY.  SO WHAT

2  I TOOK ON AS MY JOB WAS TO DO THE BEST I COULD AS A MEMBER OF

3  THE MINORITY PARTY TO TRY TO OVERSEE THE SUCCESSFUL DRAFTING AND

4  PASSAGE OF LEGISLATION THAT WOULD HELP DEAL WITH OUR PRISON

5  OVERCROWDING SYSTEM, AND ALSO WORK AND NEGOTIATE WITH ALL THE

6  PARTIES, MANY OF THEM PRESENT AND PART OF THIS LITIGATION, TO

7  TRY TO SEE IF WE COULD CRAFT, IN CONJUNCTION WITH THE

8  LEGISLATURE AND THE DEPARTMENT OF CORRECTIONS AND THE

9  ADMINISTRATION, REMEDIES TO HELP WITH OUR PRISON OVERCROWDING

10 AND RECIDIVISM PROBLEM WITHOUT AN EARLY RELEASE FROM STATE

11 PRISON OR INTERVENTION BY THE FEDERAL COURT.

12 **Q**   AND WHEN YOU REFER TO THAT LEGISLATION, ARE YOU SPEAKING OF

13 ASSEMBLY BILL 900?

14 **A**   AB 900 WAS PROBABLY THE KEY CENTRAL LEGISLATION THAT WE

15 ENDED UP IN EFFECTUATING AND PASSING, ALTHOUGH THERE'S OBVIOUSLY

16 OTHER ANCILLARY PIECES OF LEGISLATION THAT ADMITTEDLY WAS

17 PROBABLY THE KEY PIECE OF LEGISLATION THAT I PUT ALL MY EGGS IN

18 THAT BASKET, YES.

19 **Q**   WHAT IS AB 900?

20 **A**   AB 900 WAS LEGISLATION, ABOUT A $7 BILLION PACKAGE, THAT WAS

21 DESIGNED TO HELP WITH INCREASED CAPACITY IN OUR COUNTY JAILS,

22 BUILD ADDITIONAL CAPACITY IN OUR STATE PRISON SYSTEM TO

23 ALLEVIATE OVERCROWDING, TO BUILD REENTRY FACILITIES IN LOCAL

24 COMMUNITIES IN ORDER TO ALLOW INMATES WHO WERE COMING BACK IN

25 PROBABLY THEIR LAST 12 TO 18 MONTHS OF INCARCERATION, TO SERVE

1  THEIR TIME IN THE LOCAL COMMUNITIES, WHAT I WOULD CALL INTENSIVE

2  REHABILITATION.

3          THOSE ARE PROBABLY THE PRIMARY COMPONENTS OF THAT

4  LEGISLATION.

5  **Q**   IS AB 900 AN ALTERNATIVE TO A PRISONER RELEASE ORDER?

6  **A**   I THINK THAT AS A LEGISLATOR AND LOOKING AT IT FROM, I

7  THINK, THE PERSPECTIVE OF THE LEGISLATURE I WAS SERVING WITH, WE

8  WERE VERY AWARE OF THE THREAT OF LITIGATION AND THE THREAT OF AN

9  EARLY RELEASE ORDER AS A RESULT OF ANY LITIGATION, AND WE WERE

10 DEEPLY MOTIVATED TO DO WHAT WE COULD AS MEMBERS OF THE

11 LEGISLATURE TO PASS LEGISLATION IN AB 900 SO THAT WE WOULD NOT

12 HAVE EARLY RELEASE.

13         BUT IN ALL FAIRNESS, IT WASN'T ALWAYS ABOUT EARLY

14 RELEASE.  IT WAS ALWAYS ABOUT TRYING TO DO THE RIGHT THING.  WE

15 HAVE A TERRIBLE OVERCROWDING PROBLEM IN CALIFORNIA.  WE ALL KNOW

16 THAT.  I HAVE BEEN IN MANY OF OUR PRISONS, AND IT'S, IN MY

17 OPINION, RELATIVELY INHUMANE.

18         SECONDLY, WE HAVE TO DO A MUCH BETTER JOB AT HOW WE

19 ARE DEALING WITH PRISONERS WHILE THEY'RE IN CUSTODY, AND OUR

20 RECIDIVISM RATE IS COMPLETELY UNACCEPTABLE.  SO IT WASN'T JUST

21 SAYING, HEY, HOW DO WE STOP EARLY RELEASE.  IT WAS INTENDED TO

22 BE A COMPREHENSIVE PACKAGE TO SAY ONCE AND FOR ALL THAT WE WERE

23 NOT GOING TO ACCEPT THE STATUS QUO OF HOW WE DEAL WITH PRISONS

24 AND INCARCERATION, REHABILITATION IN THE STATE OF CALIFORNIA.

25 **Q**   HAVE THE BEDS AUTHORIZED BY AB 900 BEEN BUILT YET?

1  **A**   TO MY KNOWLEDGE, THERE HAS BEEN NO NEW CONSTRUCTION ON ANY

2  OF OUR EXISTING PRISONS IN CALIFORNIA.  IT'S ALSO MY

3  UNDERSTANDING THAT THERE ARE SOME REENTRY FACILITIES, ONE HERE

4  IN SAN FRANCISCO.  I BELIEVE SANTA BARBARA HAS ONE.  BUT AS

5  ALLOWED BY AB 900, I BELIEVE THE ANSWER IS NO.

6  **Q**   WHY NOT?

7  **A**   WELL, BELIEVE ME, I HAVE WRITTEN ABOUT THIS.  I HAVE OPINED

8  ABOUT IT.  I FINGERPOINTED A LOT AT THIS.  I KNOW THE BENCH IS

9  VERY FRUSTRATED.  I KNOW MANY OF THE PARTY LITIGANTS ARE

10  FRUSTRATED.  I AM VERY FRUSTRATED.

11         IN MY OPINION, WHEN WE PASSED AB 900, I BELIEVE IN

12  MAY OF 2007, IT WAS WITH THE UNDERSTANDING IT WAS GOING TO BE

13  IMPLEMENTED FORTHWITH.  IT IS COMPLETELY UNACCEPTABLE TO ME,

14  ALTHOUGH I'M NOW A RETIRED LEGISLATOR, THAT AB 900 HAS NOT BEEN

15  SUCCESSFULLY IMPLEMENTED.  IT'S UNACCEPTABLE.

16         **JUDGE KARLTON:**  THE QUESTION IS WHY WAS IT NOT

17  IMPLEMENTED?

18         **THE WITNESS:**  I WOULD ARGUE, YOUR HONOR, THERE'S

19  SEVERAL FACTORS.  I BELIEVE THE CALIFORNIA DEPARTMENT OF

20  CORRECTIONS HAS DRAGGED ITS FEET ON THE IMPLEMENTATION OF AB

21  900.  AND I BELIEVE THAT THE ATTORNEY GENERAL OF THE STATE OF

22  CALIFORNIA, JERRY BROWN, HAS NOT PLAYED THE KIND OF LEADERSHIP

23  ROLE THAT IS NECESSARY TO ENSURE THAT HIS OFFICE, WHICH IS

24  RESPONSIBLE FOR ISSUING A CLEAN BOND OPINION AT SOME POINT WITH

25  RESPECT TO THE AB 900 BONDS, THAT THAT OPINION AND THE WORK

1   RELATED THERETO TO HONE DOWN TO THE SATISFACTION OF THE

2   LEGISLATURE SO THAT AB 900 COULD BE IMPLEMENTED.

3          IN OTHER WORDS, WHEN WE PASSED AB 900, WE BELIEVED

4   THAT IT WAS GOING TO BE IMPLEMENTED FORTHWITH.  NOTHING HAPPENED

5   FOR ALMOST A YEAR.  THEN WE WERE TOLD BY THE ADMINISTRATION

6   DURING OUR SETTLEMENT NEGOTIATIONS, WHICH WERE SANCTIONED BY

7   THIS COURT, AND I WAS PARTY TO THAT, WE WERE TOLD PRETTY MUCH

8   HAPHAZARDLY AND BY QUITE SURPRISE THAT AB 900 COULD NOT BE

9   IMPLEMENTED BECAUSE THE ATTORNEY GENERAL HAD NOT ISSUED A CLEAN

10  BOND OPINION.  MUCH TO MY CHAGRIN AND SHOCK AND SURPRISE, THAT

11  WAS NOT DISCLOSED BY THE ADMINISTRATION --

12         **JUDGE REINHARDT:**  BY "THE ADMINISTRATION," YOU MEAN

13  JERRY BROWN, THE ATTORNEY GENERAL?

14         **THE WITNESS:**  BY THE GOVERNOR'S OFFICE.  THE

15  GOVERNOR'S OFFICE NEVER TOLD US THAT THERE WERE ANY PROBLEMS

16  WITH THE IMPLEMENTATION OF AB 900 SUBSEQUENT TO THE TIME THAT

17  THE LEGISLATURE PASSED AB 900.  AND WHEN WE WERE IN SETTLEMENT

18  NEGOTIATIONS, AND I FOUND OUT THAT FACT, I --

19         **MS. TILLMAN:**  OBJECTION, YOUR HONOR.  I BELIEVE THE

20  SETTLEMENT DISCUSSIONS ARE NOT TO BE DISCLOSED DURING THIS

21  PROCEEDING.

22         **JUDGE REINHARDT:**  WELL, HE'S NOT TALKING ABOUT WHAT

23  HAPPENED BETWEEN THE PARTIES.  HE'S TALKING ABOUT WHAT HE WAS

24  TOLD.  BY WHOM WERE YOU TOLD THIS?  IF HE LEARNED SOMETHING FROM

25  THE GOVERNOR OR THE ATTORNEY GENERAL --

1            **JUDGE KARLTON:**  THAT WOULD BE DIFFERENT.  THAT'S

2    OUTSIDE OF --

3            **JUDGE HENDERSON:**  DID YOU LEARN THIS FROM THE

4    GOVERNOR SEPARATELY?

5            **THE WITNESS:**  I LEARNED IT FROM THE GOVERNOR'S LEGAL

6    COUNSEL, ANDREA HOCH.

7            **JUDGE KARLTON:**  YOU LEARNED IT IN THE COURSE OF THE

8    SETTLEMENT NEGOTIATIONS?

9            **THE WITNESS:**  NO, NO, OUTSIDE THE SETTLEMENT

10   NEGOTIATIONS.

11           **JUDGE HENDERSON:**  OKAY.  PROCEED.

12           **THE WITNESS:**  AND SO I LEARNED THAT OUTSIDE THE

13   SETTLEMENT NEGOTIATIONS AND BROUGHT THAT TO THE SETTLEMENT

14   DISCUSSIONS, AND I WON'T, OF COURSE, TALK ABOUT THAT.

15           **JUDGE REINHARDT:**  YOU CAN'T.

16           **THE WITNESS:**  HOWEVER, IT WAS -- I THINK IT WAS AN

17   AMAZING DECLARATION THAT THERE WAS SOME FACTS, SOME LEGAL

18   HURDLE, THAT WAS INHIBITING THE ABILITY TO FLOAT AND LEVERAGE

19   THE AB 900 BONDS WITHOUT COMING BACK TO THE LEGISLATURE AT THE

20   EARLIEST POSSIBLE MOMENT AND TELLING US THAT WE HAD A PROBLEM.

21   IT'S KIND OF LIKE NASA, YOU HAVE A PROBLEM.  NO ONE TOLD US.

22   BECAUSE I WAS HIGHLY MOTIVATED TO GET MOVING AS QUICKLY AS

23   POSSIBLE.

24           SO THEN I SAT DOWN WITH THE ATTORNEY GENERAL

25   ONE-ON-ONE, NOT IN THE SETTLEMENT NEGOTIATIONS.  IT WAS DURING

1  THE PEACE OFFICER MEMORIAL CEREMONY, AND THE ATTORNEY GENERAL

2  AND I HAD SOME TIME TO HAVE A CONVERSATION, AND I TALKED TO THE

3  ATTORNEY GENERAL, AND I EXPLAINED TO HIM THAT THE IMPLEMENTATION

4  OF AB 900 WAS CRITICAL, AND IT WAS LAGGING, AND I FELT IT WAS

5  IRRESPONSIBLE.  AND I ASKED HIM AND IMPLORED UPON HIM TO TAKE A

6  LEADERSHIP ROLE IN AB 900.  HE TOLD ME HE WOULD GO BACK TO HIS

7  OFFICE AND TALK TO HIS MANAGEMENT, DEPUTIES, PERSONNEL, AND THAT

8  HE WOULD GET BACK TO ME.

9          SUBSEQUENT TO THAT -- THEN AFTER, I THINK EVERYBODY

10  WELL KNOWS, AND IT'S PART OF THE RECORD, THERE WAS SOME

11  QUOTE/UNQUOTE CLEAN-UP LEGISLATION TO AB 900, WHICH THE

12  LEGISLATURE DID NOT PASS, AND THE REASON -- THAT WAS THE SAME

13  NIGHT THAT MR. KELSO'S REQUEST FOR RECEIVER BEDS WAS PART OF THE

14  PACKAGE.  AND I INQUIRED THAT NIGHT OF MS. HOCH OF THE

15  GOVERNOR'S OFFICE WHETHER OR NOT JERRY BROWN HAD ISSUED ANY KIND

16  OF DECLARATION THAT THE AB 900 FIX, NOW WE ARE CALLING IT THE

17  CLEAN-UP TO AB 900, WHETHER EVERYBODY IN THE CHAIN OF COMMAND

18  WAS SATISFIED THAT IF WE PASSED THIS LEGISLATION, THE CLEAN-UP

19  LEGISLATION TO AB 900, THE ORIGINAL AB 900, WOULD THIS GET

20  AB 900 OFF THE DIME, BECAUSE I WANTED TO VOTE FOR MR. KELSO'S

21  BEDS, BUT I ALSO WANTED TO KNOW I WAS GETTING THE BENEFIT OF THE

22  BARGAIN OF AB 900 ALMOST A YEAR LATER.

23          THE ATTORNEY GENERAL DID NOT CALL ME BACK.  THEY

24  TRIED TO PUT ME IN TOUCH WITH A DEPUTY ATTORNEY GENERAL OR

25  ASSISTANT ATTORNEY GENERAL, AND I MADE IT VERY CLEAR THAT WAS

1    NOT GOOD ENOUGH.  I WANTED TO KNOW FROM THE ATTORNEY GENERAL

2    HIMSELF IF HE WAS GOING TO -- IF HE WAS SATISFIED THAT THE

3    AB 900 FIX WOULD ACTUALLY MOVE AB 900 FORWARD, AND I NEVER GOT

4    AN ANSWER TO THAT QUESTION.  AND THAT IS WHY WE DID NOT PASS THE

5    AB 900 FIX, BECAUSE I MADE IT CLEAR TO MY CAUCUS THAT WE WERE

6    NOT GOING TO FASHION AN AB 900 FIX AND GIVE MR. KELSO HIS BEDS

7    UNLESS WE KNEW WE WERE GOING TO GET THE FUNDING FOR AB 900,

8    BECAUSE, AGAIN -- AND I KNOW NOW I'M BEING REDUNDANT --

9              **JUDGE KARLTON:**  DON'T BE.

10             **THE WITNESS:**  DON'T BE.  I'M SORRY.  THEN I'LL STOP.

11   **BY MS. WANG**

12   **Q**   YOU MENTIONED MR. KELSO'S BEDS.  IS PERMITTING MR. KELSO,

13   THE RECEIVER, TO CONTINUE HIS WORK ALSO AN ALTERNATIVE TO A

14   PRISONER RELEASE ORDER?

15   **A**   I BELIEVE IT WAS AUGUST OF THIS YEAR.  THE ANSWER IS YES.

16   IN AUGUST OF THIS YEAR, I ATTENDED A PRESS CLUB MEETING IN

17   SACRAMENTO.  I DID THIS WHEN MR. SILLEN WAS THE RECEIVER, AND HE

18   SPOKE IN SACRAMENTO, AND I DID IT WHAT -- MR. KELSO WAS THE

19   RECEIVER.  I PERSONALLY WENT TO THE SACRAMENTO PRESS CLUB TO

20   HEAR THEM SPEAK.  MR. KELSO WAS UNEQUIVOCAL THAT IF HE GOT

21   HIS -- LET ME REPHRASE THAT.  MR. KELSO WAS UNEQUIVOCAL IN

22   RESPONSE TO A QUESTION.

23             **MR. BIEN:**  OBJECTION, CALLS FOR HEARSAY.

24             **JUDGE KARLTON:**  NOT FOR THE TRUTH OF THE MATTER.

25   IT'S WHAT WAS SAID WHICH INFLUENCED THIS WITNESS'S CONDUCT,

1    APPARENTLY.  YOU MAY ANSWER.  I ASSUME THAT'S RIGHT.

2              **THE WITNESS:**  IT'S FOR THE EFFECT IT HAD ON ME, YOUR

3    HONOR.  THANK YOU.

4              SO I SAT THERE AND HEARD MR. KELSO INDICATE THAT THE

5    QUESTION WAS SOMETHING TO THE EFFECT OF, DOES THE NUMBER -- THE

6    POPULATION IN PRISON -- DOES THE NUMBER OF INMATES HAVE AN

7    IMPACT ON WHETHER OR NOT YOU BELIEVE YOU CAN DELIVER

8    CONSTITUTIONAL HEALTHCARE?  AND MR. KELSO SAYS, I CAN DELIVER

9    CONSTITUTIONAL HEALTHCARE IRRESPECTIVE OF THE NUMBER OF INMATES

10   THAT ARE PRESENTLY HOUSED OR WILL BE HOUSED IN THE FUTURE IN OUR

11   PRISON SYSTEM.  AND I SAT THERE LITERALLY DUMBFOUNDED, BECAUSE

12   THAT WAS NOT THE THEORY OR THE LINE I HAD ALWAYS BEEN TOLD AS A

13   MEMBER OF THE STATE LEGISLATURE.

14             I WAS ALWAYS TOLD THAT THERE WAS A RELATIONSHIP

15   BETWEEN THE NUMBER OF INMATES AND THE ABILITY TO DELIVER

16   CONSTITUTIONAL HEALTHCARE.

17             AND SO WHEN I HEARD THAT, THAT COMPLETELY

18   CORROBORATED AND WENT TO THE HEART OF THE MATTER FOR ME THAT IF

19   WE DID AB 900 FIX, WITH ITS COMPONENTS THAT I'VE ALREADY

20   OUTLINED, AND WE DID, MR. KELSO, ON BEHALF OF THE COURT, THE

21   RECEIVER BEDS, THAT ALL THOSE TAKEN TOGETHER WOULD -- WE WOULD

22   HAVE THE ABILITY TO DEAL WITH BOTH OVERCROWDING, REHABILITATION,

23   AND THE ABILITY TO DEAL WITH THE CONSTITUTIONAL ISSUES OF THE

24   DELIVERY OF HEALTHCARE.

25             **JUDGE REINHARDT:**  MR. SPITZER, SUPPOSE YOU HAD BEEN

 1  TOLD, AS WE HAVE, BY EVERY EXPERT THAT'S COME IN TO TESTIFY FROM

 2  ACROSS THE COUNTRY, THAT THE OVERCROWDING IS THE PRIMARY CAUSE

 3  OF THE CONSTITUTIONAL VIOLATION, AND THAT IT IS NOT ONLY

 4  RELEVANT, BUT THE ACTUAL MAJOR CAUSE OF THE NUMBER OF PEOPLE IN

 5  PRISON?

 6          **JUDGE HENDERSON:**  EVERY PLAINTIFFS' EXPERT.

 7          **JUDGE REINHARDT:**  WE HAVE ONE PERSON WHO SAID

 8  ANYTHING IS POSSIBLE.  BUT DISCOUNTING HIM, EVERY NATIONAL

 9  EXPERT, ALL OF WHOM SERVED CALIFORNIA, BEEN APPOINTED BY THIS

10  GOVERNOR, PREVIOUS GOVERNOR, ALL OF WHOM ARE NATIONALLY

11  RECOGNIZED EXPERTS, WOULD THAT PUT YOU BACK ORIGINALLY WHERE YOU

12  WERE ORIGINALLY, TO THE UNDERSTANDING THAT OVERCROWDING DOES

13  HAVE AT LEAST AN EXTREMELY SUBSTANTIAL EFFECT ON THE ABILITY TO

14  DELIVER CONSTITUTIONALLY ADEQUATE HEALTHCARE?

15          **MR. MELLO:**  IF I MAY RESPECTFULLY INTERPOSE AN

16  OBJECTION FOR THE RECORD, THAT THAT MISSTATES EVIDENCE IN THE

17  CASE.

18          **JUDGE REINHARDT:**  CERTAINLY.

19          **JUDGE KARLTON:**  YOU MAY.

20          **THE WITNESS:**  YOUR HONOR, I'D ANSWER THE QUESTION FOR

21  THE RECORD, THERE'S TWO MAJOR INCIDENTS THAT OCCURRED THAT

22  INFLUENCED ME.  ONE WAS MR. KELSO'S COMMENTS THAT I TESTIFIED

23  TO.  THE OTHER WAS A LETTER TO SENATOR MACHADO FROM JUDGE

24  HENDERSON WITH RESPECT TO WHAT HIS OPINION WAS ABOUT THE PASSAGE

25  OF THE RECEIVER BEDS AND WHAT, IF ANY, IMPACT THAT WOULD HAVE ON

1   THE PENDING LITIGATIONS, YOU KNOW, THE PENUNDRA TO PENUNDRA OF

2   CASES THAT ARE LITIGATED, BEING LITIGATED AND HAVE BEEN

3   LITIGATED.

4           I TOOK THOSE TWO REPRESENTATIONS, ONE FROM JUDGE

5   HENDERSON AND ONE FROM MR. KELSO, TO SAY TO ME AS A MEMBER OF

6   THE LEGISLATURE AT THAT TIME THAT, IF WE PASS THE RECEIVER BEDS

7   AND IF WE DID THE AB 900 FIX, THAT TAKEN TOGETHER, THOSE WOULD

8   ADDRESS THE CONSTITUTIONAL ISSUES AND WOULD NOT RESULT IN EARLY

9   RELEASE.

10          **JUDGE KARLTON:**  MEANWHILE, OF COURSE, NEITHER HAS

11  BEEN DONE.

12          **THE WITNESS:**  NEITHER?  I'M SORRY, YOUR HONOR.

13          **JUDGE KARLTON:**  NEITHER AB 900 CLEAN-UP BILL, NOR THE

14  BEDS FOR THE RECEIVER, NEITHER HAVE BEEN DONE.

15          **THE WITNESS:**  YOU ARE ABSOLUTELY CORRECT, AND I

16  TESTIFIED AS SUCH.  THAT'S WHY I, IF I MAY, YOUR HONOR, IN MY

17  OPINION, THERE'S ONE -- ONE LYNCHPIN THAT WILL UNBREAK THE LOG

18  JAM ON WHETHER OR NOT WE MOVE FORWARD IN THE STATE OF CALIFORNIA

19  TOWARDS A REMEDY SHORT OF EARLY RELEASE.  AND IF I MAY, FOR THE

20  RECORD, IT'S SIMPLE.

21          IF THE ATTORNEY GENERAL WOULD COME FORWARD AND TELL

22  US WHY TO DATE HE'S BEEN UNWILLING TO ISSUE A CLEAN BOND OPINION

23  ON AB 900 AND TELL THAT TO THE LEGISLATURE, THAT WOULD END THE

24  CRISIS, AND THE LEGISLATURE WOULD MOVE FORWARD.

25          WE WERE PREPARED TO VOTE THAT NIGHT FOR THE AB 900

1   FIX AND FOR MR. KELSO'S BEDS, AND BUT FOR THE FACT WE COULD NOT

2   GET AN ANSWER, A LEGITIMATE ANSWER AND REPRESENTATION FROM THE

3   ATTORNEY GENERAL, THAT IS WHY WE HAVE NOT VOTED TO FIX AB 900.

4           **JUDGE KARLTON:**  MR. SPITZER, YOU CAN SPEAK ABOUT WHY

5   YOU DIDN'T VOTE FOR IT, AND I'LL ACCEPT YOUR REPRESENTATION THAT

6   THAT'S WHY YOU DIDN'T.  YOU CAN'T SPEAK FOR ANYBODY ELSE'S

7   REASON FOR NOT.  THEY MAY BE JUST PEOPLE WHO WANT TO SAY NO TO

8   ANY SOLUTION.  THEY MAY BE PEOPLE, LIKE IN THE PRESENT BUDGET

9   CRISIS, WHO ARE UNWILLING TO BITE THE BULLET.  THERE MAY BE ALL

10  KINDS OF REASONS THAT PEOPLE ARE NOT DOING IT.  WHAT WE KNOW IS

11  IT'S NOT BEING DONE, CORRECT?

12          **THE WITNESS:**  CORRECT.

13          **JUDGE HENDERSON:**  CAN I ASK YOU, MR. SPITZER, IN YOUR

14  SIX YEARS IN THE ASSEMBLY IS THAT --

15          **THE WITNESS:**  YES, SIR.

16          **JUDGE HENDERSON:**  IS THIS BEHAVIOR BY THE ATTORNEY

17  GENERAL UNUSUAL, OR DOES THIS HAPPEN -- HAS THIS HAPPENED IN

18  OTHER BOND MEASURES, WHERE YOU JUST DON'T GET AN OPINION, OR IS

19  THIS UNUSUAL?

20          **THE WITNESS:**  YOUR HONOR, WITH RESPECT TO BOND

21  OPINIONS, THERE'S CLEARLY A POINT IN TIME WHERE A BOND OPINION

22  IS ISSUED.  BUT I WILL CONTRAST THE BEHAVIOR, FOR EXAMPLE, OF

23  JERRY BROWN AS AGAINST BILL LOCKYER.  MR. LOCKYER WAS A

24  PROACTIVE AGENT WHEN HE WAS AN ATTORNEY GENERAL, JUST LIKE HE IS

25  AS THE TREASURER.

1           AS YOU KNOW, WE ARE GOING THROUGH A CRISIS, AND

2    MR. LOCKYER IS PLAYING A SIGNIFICANT ROLE IN TRYING TO RESOLVE

3    THE ISSUE IN THE STATE OF CALIFORNIA.  WHEN I MET WITH THE

4    ATTORNEY GENERAL EARLIER IN THE YEAR AND HE INDICATED TO ME THAT

5    HE WAS GOING TO GO BACK AND GET BRIEFED AND THEN DECIDE WHAT, IF

6    ANY, ROLE HE WAS GOING TO TAKE, AND THEN THE LEGISLATURE NEVER

7    HEARD FROM THE ATTORNEY GENERAL, AND TO DATE HAS NOT HEARD FROM

8    THE ATTORNEY GENERAL, I AM BESIDE MYSELF WHY THE TOP LAW

9    ENFORCEMENT OFFICER IS NOT TAKING A PROACTIVE ROLE IN TRYING TO

10   DEAL WITH THE PRISON OVERCROWDING CRISIS.  AS THIS BENCH KNOWS,

11   THE ATTORNEY GENERAL IS THE LITIGATOR ON CRIMINAL CASES IN THE

12   STATE OF CALIFORNIA.  THE ATTORNEY GENERAL'S DEPUTIES ARE THE

13   ONES THAT ARGUE ON APPEAL WHETHER OR NOT SOMEBODY SHOULD REMAIN

14   INCARCERATED.

15           **JUDGE REINHARDT:**  I THINK WE DO KNOW WHAT THE

16   ATTORNEY GENERAL DOES, AND I THINK MR. LOCKYER IS GOING TO BE

17   GRATEFUL FOR YOUR ENDORSEMENT.  I THINK YOU MADE YOUR POINT

18   ABOUT JERRY BROWN, AND I DON'T KNOW --

19           **JUDGE KARLTON:**  OBVIOUSLY, THE ENTIRE PRISON PROBLEM

20   RESTS UPON HIS LAP.

21           **JUDGE REINHARDT:**  WELL, THERE ARE A LOT OF OTHERS.

22   YOU'VE CERTAINLY EXPLAINED HIS -- PART OF HIS ROLE, WHICH IS --

23   IN THIS CASE, AND THERE ARE OTHERS WHO, AS JUDGE KARLTON POINTS

24   OUT REGULARLY, ARE RESPONSIBLE AS WELL.

25           **JUDGE KARLTON:**  OR IRRESPONSIBLE.

1        **JUDGE REINHARDT:**  I DON'T KNOW.  NO POINT ASKING YOU

2   HOW DO WE GO FROM HERE, BECAUSE NOBODY KNOWS WHETHER ANYTHING IS

3   EVER GOING TO HAPPEN THE WAY --

4        **JUDGE KARLTON:**  WHAT WE'RE FACED WITH IS A

5   POTENTIAL -- WELL, AN UNCONSTITUTIONAL CONDITION, WHICH IS --

6   POTENTIALLY IN THIS CASE WILL BE RESOLVED AS A PRIMARY CAUSE

7   BEING OVERCROWDING.  MEANWHILE ALL OF THESE POLITICAL JUDGMENTS

8   AND POLITICAL MACHINATIONS ARE GOING ON, AND PEOPLE ARE NOT

9   RECEIVING THE CARE THAT THEY REQUIRE.

10        THERE'S NO GUARANTEE AS YOU SIT HERE, YOU'RE OUT OF

11   THE LEGISLATURE NOW, BUT THERE IS NO GUARANTEE THAT ANYBODY WILL

12   DO ANYTHING UNLESS THIS COURT DOES SOMETHING EXTREMELY SERIOUS.

13        **JUDGE REINHARDT:**  YOU KNOW, THE PROBLEM IS YOU CAN

14   TELL US WHAT THE LEGISLATURE OUGHT TO DO AND WHETHER OR NOT --

15        **JUDGE KARLTON:**  AND WHAT THE ATTORNEY GENERAL OUGHT

16   TO DO.

17        **JUDGE REINHARDT:**  WHO KNOWS WHETHER ANY OF THEM ARE

18   GOING TO DO ANYTHING.  AS ONE OF THE WITNESSES FROM THE COUNTY

19   SAID YESTERDAY, A COUNTY, AND I SAID THIS BEFORE.  ONE OF THE

20   WITNESSES FROM THE COUNTY SAID, WE CAN'T TRUST STATE.  WELL,

21   THAT IS ONE OF THE THINGS THAT SEEMS TO BE COMING OUT OF THIS

22   TRIAL, WHETHER IT IS THE ATTORNEY GENERAL, THE LEGISLATURE,

23   WHOEVER HAPPENS TO BE RESPONSIBLE.

24        AS YOU KNOW THE STATE'S ON APPEAL NOW TRYING TO BLOCK

25   JUDGE HENDERSON IN HIS CASE FROM GETTING MONEY TO TRY TO SOLVE

1   THIS PROBLEM.  WHY SHOULD WE HAVE ANY EXPECTATION THAT ANYBODY

2   IS GOING TO REALLY DO ANYTHING IN THE FORESEEABLE FUTURE --

3           **THE WITNESS:**  YOUR HONOR, I APPRECIATE THE QUESTION.

4   I CAN SAY --

5           **JUDGE REINHARDT:**  -- WITHOUT A COURT ORDER?

6           **THE WITNESS:**  WELL, I CAN SAY THIS:  ON THE NIGHT THE

7   QUESTION WAS PRESENTED ON THE CLEAN UP ON AB 900 AND THE KELSO

8   BEDS, THE LEGISLATURE WAS PREPARED AND THE VOTES WERE THERE FOR

9   THAT VOTE, BUT FOR THE FACT THAT WE DID NOT KNOW WHETHER OR NOT

10  THE ATTORNEY GENERAL, BUT FOR THE FACT WE PASSED THE CLEAN-UP,

11  WAS GOING TO SAY THAT THAT WAS ADEQUATE.  SO I CAN ONLY

12  REPRESENT THE FOLLOWING:  THERE WAS A MOMENT IN TIME WHEN THE

13  VOTES WERE THERE.

14          NOW, UNDER THE PRESENT CONDITION STATE, IT IS

15  SPECULATION, AND WE ALL KNOW IT'S SPECULATION ABOUT WHAT, IF

16  ANYTHING, THE LEGISLATURE IS GOING TO DO OR NOT DO.  BUT I CAN

17  TELL YOU THIS, NO ONE IN THE STATE LEGISLATURE WANTS TO BE

18  RESPONSIBLE FOR THE EARLY RELEASE OF PRISONERS IN THE STATE OF

19  CALIFORNIA.

20          **JUDGE KARLTON:**  AND IF WE TELL THEM THAT THEY WILL

21  BE, THEY'LL SAY, IT'S NOT US, IT'S THOSE CRAZY GUYS IN BLACK

22  ROBES.  THAT'S WHAT THEY ARE GOING TO DO, BECAUSE THAT'S

23  THEIR -- THAT'S THEIR LIFE.  THAT'S WHAT THEY'RE SUPPOSED TO DO,

24  I GOT TO GET ELECTED, LET SOMEBODY ELSE --

25          **JUDGE REINHARDT:**  IT'S NOT JUST THE LEGISLATURE.

1  IT'S OTHER PUBLIC OFFICIALS WHO WILL SAY THAT.

2          **JUDGE KARLTON:**  OF COURSE.

3          **JUDGE REINHARDT:**  BECAUSE THEY HAVE POLITICAL

4  AMBITIONS.

5          **JUDGE KARLTON:**  IT'S ALWAYS SOMEBODY ELSE'S

6  RESPONSIBILITY.

7          **THE WITNESS:**  JUDGES, I AGREE, AND I'M WORRIED NOW

8  THAT IF COURT WILL ORDER THIS REMEDY, THAT'S EXACTLY WHAT WILL

9  HAPPEN.  THE LEGISLATORS WILL STAND UP AND SAY THEY PASSED AB

10 900 SO THEY WILL HAVE CLEAN HANDS, AND THEY WILL BE ABLE TO

11 POINT THE FINGER AT THE COURT.  IT'S THE LEGISLATURE'S

12 RESPONSIBILITY TO SOLVE THIS PROBLEM.

13         **JUDGE KARLTON:**  YOU HAVE NO IDEA, I THINK, BECAUSE, I

14 DON'T SUSPECT ANYBODY WHO ISN'T SITTING WHERE JUDGE HENDERSON

15 AND JUDGE REINHARDT AND I ARE SITTING, THE RELUCTANCE WITH WHICH

16 WE WILL DO AS THE PLAINTIFFS HAVE ASKED.  I DON'T THINK THEY

17 UNDERSTAND EITHER.  BUT THERE COMES A POINT IN WHICH -- YOU

18 KNOW, I'VE ASKED ALMOST EVERY WITNESS FROM THE DEFENSE SIDE,

19 TELL ME WHAT YOU THINK I OUGHT TO DO.

20         **THE WITNESS:**  I CAN TELL YOU FOR -- FIRST, IF YOU LET

21 ME, I WOULD SAY ONE THING.  EITHER ON THE COURT'S OWN MOTION,

22 ORDER THE PARTIES HAVE THE ATTORNEY GENERAL TO COME HERE UNDER

23 OATH AND ANSWER THE QUESTION, WHAT IS IT GOING TO TAKE FOR YOU

24 TO ISSUE -- WHAT IS YOUR ISSUE WITH AB 900?

25         I MEAN, WE CAN'T GET HIM TO DO IT AT THE REQUEST OF

1    THE LEGISLATORS, SO HE SHOULD BE COMPELLED TO COME HERE UNDER

2    SUBPOENA AND TELL US WHY HE HAS BEEN OUT OF ACTION, MISSING IN

3    ACTION ON THE WHOLE ISSUE OF AB 900, AND I THINK ONCE YOU GET AN

4    ANSWER TO THAT QUESTION, ASSUMING HE SAYS, IF I HAD A THROUGH Z,

5    I WOULD BE WILLING TO ISSUE A CLEAN BOND OPINION, THEN THERE ARE

6    NO MORE BUMPS IN THE ROAD, AND ONLY THE LEGISLATURE WILL BE TO

7    BLAME IF IT DOESN'T TAKE THESE REMEDIES INTO EFFECT.

8              **JUDGE REINHARDT:**  AFTER WE DO THAT, WE HAVE TO

9    SUBPOENA EACH MEMBER OF THE LEGISLATURE AND FIND OUT WHY THEY

10   DON'T DO THINGS.

11             **JUDGE KARLTON:**  RIGHT.

12             **JUDGE REINHARDT:**  WE CAN'T OPERATE THAT WAY, I'M

13   AFRAID.

14             **JUDGE KARLTON:**  YOU MAY NOT RECALL, BUT A COLLEAGUE

15   OF JUDGE HENDERSON'S AND MYSELF IN LOS ANGELES SAID HE WANTED

16   THE ATTORNEY GENERAL PERSONALLY TO BE PRESENT, AND HE SAID SOME

17   OTHER VERY BAD THINGS, BUT HE SAID THAT AS WELL, AND THAT FELLOW

18   IS NOW ON THE HOUSE JUDICIARY COMMITTEE, THAT FORMER ATTORNEY

19   GENERAL, AND HE'S NEVER FORGOTTEN THAT HE HAD TO GO TO LOS

20   ANGELES BECAUSE SOME CRAZY FEDERAL JUDGE ORDERED HIM TO.

21             **JUDGE REINHARDT:**  ANYWAY IT'S -- YOU KNOW, IT'S NOT

22   EASY TO FIND OUT WHO TO BLAME, AND EVERYBODY BLAMES SOMEONE

23   ELSE, BUT THE END RESULT IS THE STATE DOESN'T DO ANYTHING, AND

24   WE CAN'T COME TO A DECISION ON THE BASIS THAT MAYBE POLITICIANS

25   WILL BE MORE INTERESTED IN SAFETY THAN THEY ARE IN ELECTION.  WE

1  CAN'T ASSUME THAT, AND WE JUST HAVE TO, YOU KNOW, ASSUME THAT

2  AFTER ALL THESE YEARS WHEN NOBODY HAS ACTUALLY DONE ANYTHING,

3  THAT WE HAVE TO ACT ON THE BASIS THAT NOBODY IS GOING TO DO

4  ANYTHING.

5          AND, AS YOU KNOW, IN ADDITION TO THAT, ALL THESE

6  THINGS DO COST MONEY, ASIDE FROM THE BOND MONEY.  EVERYTHING

7  COSTS MONEY.  THERE'S NO MONEY TO SPEND FOR ANYTHING THESE DAYS.

8  WE ARE GOING TO CUT EDUCATION.  WE ARE GOING TO CUT BASIC RIGHTS

9  TO PEOPLE.  BASIC ENTITLEMENTS AND HEALTH WE ARE GOING TO CUT

10 BENEFITS FOR.  WHY WOULD ANYBODY THINK THEY ARE GOING TO SPEND

11 MORE MONEY FOR PRISONERS?

12          **THE WITNESS:**  YOUR HONOR, THE ANSWER TO THAT QUESTION

13 IS I THINK THAT THE LEGISLATURE HAD THE POLITICAL WILL, BUT JUST

14 LIKE THE COURTS WHO HAS CHARGED MR. KELSO AND OTHER RECEIVERS

15 WITH CERTAIN DUTIES -- AND YOU WANT TO KNOW, FOR EXAMPLE, THERE

16 WAS A CHANGE IN THE RECEIVER, MR. SILLEN AND MR. KELSO, BECAUSE

17 THE COURT AT SOME TIME FELT THEY NEEDED TO MAKE A CHANGE FOR

18 CERTAIN REASONS.  SAME THING HERE.  THE LEGISLATURE NEEDS TO

19 KNOW IT'S GETTING WHAT IT BARGAINED FOR WHEN IT MAKES ITS VOTE.

20          **JUDGE KARLTON:**  YOU KNOW, SIR --

21          **THE WITNESS:**  YES, SIR.

22          **JUDGE KARLTON:**  -- THE FACT OF THE MATTER IS -- I

23 SHOULDN'T SAY THAT.  WE HAVE HAD REPEATED TESTIMONY THAT THE

24 STATE PRISONS ARE CRIMINOGENIC.  THEY PRODUCE CRIMINALS.  THEY

25 ARE A DANGER TO PUBLIC SAFETY.

1          NOW, IF I WERE A LEGISLATOR AND I WAS TOLD THAT WHAT

2    I WAS RESPONSIBLE FOR IS PRODUCING CRIMINALS, I'D DO SOMETHING

3    ABOUT IT.  NOW, I FIND -- I'M SORRY.  IT'S NOT YOUR DOING.  I

4    MEAN, IT IS YOURS TOO, BUT, YOU KNOW --

5          **JUDGE REINHARDT:**  NO MORE THAN ANYONE ELSE'S IN THE

6    LEGISLATURE.

7          I THINK SOME PEOPLE HAVE TRIED HARD AND SOME HAVEN'T,

8    AND YOU KNOW WHO THEY ARE.

9          **MS. WANG:**  IF I COULD?  IF I MAY, YOUR HONORS?

10         **JUDGE HENDERSON:**  PROCEED.

11   **BY MS. WANG**

12   **Q**   SO ASSUMING FOR THE MOMENT THAT THE COURT IS SERIOUSLY

13   CONSIDERING ISSUING A PRISONER RELEASE ORDER, WHAT EFFECT WOULD

14   SUCH A MEASURE HAVE ON PUBLIC SAFETY?

15   **A**   I'M REALLY CONCERNED ABOUT THE FACT THAT THE INMATES -- NOW

16   I'M BACK IN COURT DEALING WITH A LOT OF THESE INDIVIDUALS WHO

17   HAVE PRISON PRIORS, 667(A) PRIORS, FIVE-YEAR PRIORS

18   667.(5)(B)(1) PRIORS.  THEY HAVE BEEN OUT OF THE JOINT.  IT'S

19   NOT ALL DRUG POSSESSION.  IT'S NOT PEOPLE CHURNING THROUGH

20   BECAUSE THEY KEEP GOING BACK FOR DRUGS.  THEY ARE GOING BACK FOR

21   VIOLENT FELONIES AND SERIOUS FELONIES.

22         WHAT I'M VERY CONCERNED ABOUT WHEN WE HAVE THEM AS A

23   CAPTIVE AUDIENCE, WE ARE NOT INFLUENCING THEIR BEHAVIOR.  IF YOU

24   LET THEM OUT EARLY, YOU CUT INTO THE TIME YOU TRY TO INFLUENCE

25   THEM.

1          **JUDGE KARLTON:**  SIR, THE PROBLEM WITH THAT IS WE HAVE

2    BEEN TOLD REPEATEDLY THERE'S NO SPACE FOR PROGRAMMING WITHIN THE

3    PRISON, SO THEY ARE NOT -- THEY CERTAINLY ARE GETTING AN

4    EDUCATION, BUT IT'S NOT THE EDUCATION THAT SENSIBLE PEOPLE WOULD

5    WANT.

6          **THE WITNESS:**  BUT, YOUR HONOR, WE KNOW NOW THE

7    DEPARTMENT OF CORRECTIONS IS CUTTING PAROLE TO 13 MONTHS IN MOST

8    INSTANCES.  THE REENTRY FACILITIES WERE SUPPOSED TO GRAB A LOT

9    OF THOSE BODIES AND TAKE THEM INTO THE COMMUNITY WHERE THEY ARE

10   GOING TO BE RELEASED ON PAROLE AND DO WHAT ALL THE MODELS HAVE

11   SHOWN, THAT WHEN YOU ARE BEING TREATED CLOSE TO THE COMMUNITY

12   YOU ARE GOING TO EVENTUALLY BE RETURNED TO AND YOUR FAMILY AND

13   CHILDREN ARE THERE, YOUR PROBABILITY OF SUCCESS IS GREATER.  SO

14   I THINK THE MODEL IS A VERY GOOD MODEL.

15          WE ALSO HAVE DONE SUBSTANTIAL NUMBER OF OUT-OF-STATE

16   TRANSFERS.  THAT'S HELPED ALLEVIATE A LOT OF THE GYM DAYBEDS SO

17   THAT WE COULD HAVE THAT ROOM.  BUT ARE WE THERE YET?  OF COURSE

18   NOT.

19          THAT'S WHY I AM SAYING WE NEEDED AB 900, AND WE NEED

20   AB 900 TO GET TO THE POINT WHERE WE DON'T HAVE TO JUST DO A

21   BLANKET RELEASE.

22          I MEAN, L.A. COUNTY UNDER THIS SCENARIO IS LOOKING AT

23   30,000 INMATES AT ONE TIME COMING BACK INTO THAT COMMUNITY.  HOW

24   IN THE WORLD IS L.A. COUNTY GOING TO DEAL WITH THAT?  IN ONE

25   FELL SWOOP?  I MEAN, THE IMPACT ON COUNTIES, EVEN PHASED IN, IS

1    GOING TO BE SUBSTANTIAL.

2              AND AS YOU KNOW, AND AS WE ALL KNOW, SOCIAL SERVICES

3    AND MENTAL HEALTH SERVICES ARE PASSED THROUGH THROUGH

4    REALIGNMENT MONEY.  IT'S NOT GENERAL FUND MONEY.  IT'S GENERALLY

5    STATE MONEY.  IF THE STATE IS NOT GOING TO FUND IT, YOU ARE

6    GOING TO HAVE THOUSANDS OF PAROLEES IN THE COMMUNITY WHO HAVE

7    ABSOLUTELY NO SAFETY NET, AND THEY WILL COMMIT CRIMES.  THEY ARE

8    COMMITTING CRIMES, ONE, BECAUSE SOME HAVE A PROPENSITY, IT'S A

9    LIFESTYLE, AND OTHERS BECAUSE THEY ARE RECEIVING NO SERVICES.

10             SO IF WE ARE GOING TO DO IT, WE BETTER FIGURE OUT HOW

11   TO DO IT AND HOW TO DO IT SMART, AND WHAT I'M AFRAID OF IS -- WE

12   HAVE A HORRIBLE TRACK RECORD OF DOING IT SMART.  SO THE QUESTION

13   BECOMES, IF WE DO IT -- THAT'S WHY, I KNOW WE CAN'T TALK ABOUT

14   THE SETTLEMENT, BUT I WAS VERY PROUD OF THE WORK WE DID IN THE

15   SETTLEMENT DISCUSSIONS BECAUSE THERE WAS --

16             **JUDGE KARLTON:**  AND THAT DIDN'T TAKE EITHER.  AB 900

17   HASN'T TAKEN.  MR. KELSO'S BEDS HASN'T TAKEN.  THE SETTLEMENT

18   HASN'T TAKEN, AND HERE WE ARE.

19             **THE WITNESS:**  MR. KELSO'S BEDS, THOUGH, YOUR HONOR,

20   WILL TAKE.  THERE ARE THE VOTES FOR IT.  WE HAVE NO OBJECTION AS

21   LONG AS WE KNOW WE GET AB 900.  I MEAN, I KNOW THE COURT -- I

22   THINK THE COURTS KNOW, AND THE RECORD PROBABLY IS REPLETE WITH

23   THIS, I MEAN, I'VE WRITTEN EXTENSIVELY ABOUT MY FRUSTRATION

24   DATING BACK A YEAR AND A HALF AGO.  IT'S UNACCEPTABLE.

25             I HAVE BEEN ON YOUR TEAM, YOU KNOW, AND I HAVE BEEN

1  TRYING TO DRIVE THIS ISSUE.  BUT I KNOW MY COLLEAGUES WILL NOT

2  VOTE -- IT'S KIND OF LIKE THE AUTO BAILOUT.  PEOPLE ARE NOT

3  GOING TO VOTE UNTIL THEY KNOW WHAT IT MEANS.  WE DON'T KNOW WHAT

4  AB 900 MEANS, AND THE ATTORNEY GENERAL NEEDS TO TELL US HE'S

5  OKAY WITH IT.

6         **JUDGE REINHARDT:**  YOU SEE, TO TAKE AUTO BAILOUT, THE

7  PRESIDENT TOLD THE MINORITY WHAT HE WANTED.  ALMOST EVERYBODY

8  AGREED, EXCEPT A FEW PEOPLE, YOU KNOW, IN ONE OF THE HOUSES.

9  YOU KNOW, YOU DON'T KNOW THAT WON'T HAPPEN WITH THE PRISONS.

10 YOUR HOUSE WAS REASONABLE ON THE AUTO BAILOUT BILL, THE HOUSE OF

11 REPRESENTATIVES, LIKE THE ASSEMBLY, BUT THEY COULDN'T DELIVER

12 THE SENATE.  SO YOU DON'T KNOW WHAT THE SENATE IS GOING TO DO,

13 THE STATE SENATE.

14        **JUDGE KARLTON:**  AND YOU DON'T KNOW WHAT EVEN YOUR

15 COLLEAGUES, YOUR PAST COLLEAGUES, WILL DO NOW THAT THE STATE IS

16 IN ABSOLUTE FINANCIAL DISASTER.

17        **JUDGE REINHARDT:**  BUT LET ME SAY ONE THING TO YOU,

18 WHATEVER HAPPENS IN THIS TRIAL, WHAT IT'S ALL -- WHEN ALL THE

19 EVIDENCE IS OVER AND THE TESTIMONY IS OVER, OR WE COME TO SOME

20 KIND OF DECISION, THE BEST SOLUTION TO THE PROBLEM AND THE ONE

21 THAT WE WANT IS WHAT YOU TALKED ABOUT.

22        **JUDGE KARLTON:**  FOR THE LEGISLATURE --

23        **JUDGE REINHARDT:**  WE STILL WANT A SETTLEMENT BETWEEN

24 ALL THE PARTIES WHO ARE INVOLVED IN OUR PRIOR EFFORTS TO GET A

25 SETTLEMENT.  I MEAN, THAT'S STILL THE BEST SOLUTION, AND IF YOU

1 HAVE ANY IDEAS -- YOU DON'T HAVE TO TELL THEM NOW, BUT IF YOU

2 HAVE ANY IDEAS ABOUT WHETHER A SETTLEMENT CAN BE BROUGHT ABOUT

3 IN THIS CASE, YOU'LL BE A HERO.  YOU'LL BE THE OPPOSITE OF THE

4 PERSON YOU THINK IS PREVENTING THIS FROM GOING FORWARD.

5          **THE WITNESS:**  YOUR HONOR, IF I COULD, FOR THE RECORD,

6 I THINK THIS PART -- I JUST WANT TO SAY THIS BEFORE I'M EXCUSED;

7 AND THAT'S THE FOLLOWING:  IF THE COURT MAKES AN EARLY RELEASE

8 ORDER, IT ABSOLUTELY PROVIDES THE ULTIMATE EXCUSE FOR THE

9 LEGISLATURE AND THE PUBLIC NOT TO DO ANYTHING.

10          **JUDGE KARLTON:**  YOU ARE RIGHT ABOUT THAT.

11          **THE WITNESS:**  SO WHAT HAPPENS IS ANY POTENTIAL

12 PROGRESS THAT WE MAY HAVE MADE AND ANY HOPE THAT WE HAVE TO

13 ACTUALLY REFORM CORRECTIONS AND BE A MODEL, AS OPPOSED TO, YOU

14 KNOW, AN EXAMPLE NO ONE WANTS TO FOLLOW, WHICH WE OBVIOUSLY ARE

15 IN THAT STATE TODAY, THEN WE ARE GOING TO LOSE ANY

16 OPPORTUNITY -- WHICH IS WHY I RESPECT THE FACT THAT THE COURT

17 GAVE TIME WHEN I STOOD WHERE MS. WANG IS NOW AND ASKED FOR SOME

18 MORE TIME, AND YOU WERE KIND ENOUGH TO GIVE IT TO ME TO TRY TO

19 CONTINUE TO WORK --

20          **JUDGE KARLTON:**  WE WEREN'T BEING KIND.  WE THOUGHT,

21 WE STILL THINK, THAT'S THE APPROPRIATE RESULT.  WE JUST AT SOME

22 POINT HAVE TO GIVE UP.

23          **THE WITNESS:**  IF THE COURT ORDERS THIS, YOUR HONOR,

24 IF THE COURT ORDERS THIS REMEDY, I AM ABSOLUTELY CONFIDENT WE

25 WILL NEVER EVER GET BACK THE PSYCHE OF THINKING OF CORRECTIONS

1  DIFFERENTLY IN THE STATE OF CALIFORNIA, AND WE WILL MOVE AWAY

2  FROM A REHABILITATION MODEL TO A MODEL JUST LIKE YOU SAID, YOUR

3  HONOR, WE GIVE UP, AND WE ARE JUST GOING TO CHURN MORE INMATES

4  IN AND OUT BECAUSE WE ARE GOING TO PUT THEM IN THE SYSTEM.  THEY

5  ARE GOING TO GET OUT AND THEY ARE GOING TO DO WHATEVER, AND THEY

6  WILL PROBABLY GO BACK AND THE SYSTEM WILL NEVER IMPROVE.

7          THAT'S WHY I THOUGHT, WOW, WE FINALLY HAVE AN

8  OPPORTUNITY, BUT WE JUST NEED THE RIGHT LEADERSHIP.  THERE'S

9  SOME PLAYERS IN THIS ALGORITHM WHO HAVE NOT STEPPED UP TO

10 PARTICIPATE IN THE SIGNIFICANT WAY THAT THEY NEED TO

11 PARTICIPATE, AND I'D IMPLORE THE COURT TO HEAR FROM THEM BEFORE

12 THE COURT ORDERS A REMEDY.  I JUST THINK IT'S IMPORTANT TO HEAR

13 FROM SOME OF THE MOST CRITICAL ACTORS WHO CAN ACTUALLY INFLUENCE

14 THIS WHO HAVE BEEN SILENT, AND THAT'S WHY I CAME TODAY TO

15 TESTIFY.

16          **JUDGE REINHARDT:**  IT'S CERTAINLY NOT SOLELY THE

17 ATTORNEY GENERAL.  I MEAN, I DON'T -- I'M NOT AGREEING OR

18 DISAGREEING WITH YOUR STATEMENTS AS TO HIS RESPONSIBILITY, BUT

19 THERE ARE CERTAINLY A LOT OF OTHER PARTIES THAT ARE GOING TO

20 HAVE TO AGREE TO SOME SOLUTION, AND I DON'T KNOW THAT WE CAN

21 SUBPOENA THEM ALL IN HERE TO DISCUSS IT, BUT WE CAN -- WE'VE

22 GIVEN ONE OPPORTUNITY FOR SETTLEMENT DISCUSSION.  MAYBE IF THE

23 PARTIES KNOW THE ALTERNATIVE IS A PRISON RELEASE ORDER AND THAT

24 THAT'S VERY CLEAR, MAYBE WITH A LITTLE MORE DISCUSSION, YOU CAN

25 SOLVE IT.  WHAT I THINK YOU'RE SAYING IS SOME OF THE PLAYERS

1  WILL BE HAPPY TO HAVE US DO THAT BECAUSE THEN THEY CAN SAY, ALL

2  RIGHT, THE COURT DID IT, MAYBE THAT'S WHAT THEY WANT.  I THINK,

3  IN FACT, I KNOW SOME WHO DO WANT THAT.

4         **THE WITNESS:**  I AGREE.  I AGREE WITH THAT.

5         **JUDGE HENDERSON:**  LET ME ASK A QUESTION, MR. SPITZER,

6  AND I MAY SHOW MY NAIVETE.  CERTAINLY IN THE STATE COURT SYSTEM,

7  IF A JUDGE SITS ON A RULING TOO LONG, THEY DON'T GET PAID.  IS

8  THERE ANY DEVICE THAT WILL GET THE ATTORNEY GENERAL TO DO WHAT I

9  PERCEIVE IS HIS JOB, WHICH IS TO RENDER AN OPINION ON THE BOND?

10 IS THERE ANYTHING THAT CAN --

11        **THE WITNESS:**  YOU KNOW, YOUR HONOR, I'M GLAD YOU

12 ASKED ME THAT QUESTION.  I MEAN, I THINK THE ATTORNEY GENERAL

13 HONESTLY IS TRYING TO DO EVERYTHING HE CAN RIGHT NOW TO STAY OUT

14 OF HARM'S WAY ON ANY CONTROVERSIAL ISSUES BECAUSE OF HIS

15 POLITICAL FUTURE AND AMBITION.

16        THIS IS A TOUGH ISSUE.  STEPPING UP ON THE

17 CORRECTIONS ISSUE AND TAKING A POSITION IS A HUGE POLITICAL

18 RISK.  I MEAN, I'M BACK IN THE DA'S OFFICE.  WHEN I TALK ABOUT

19 REENTRY FACILITIES IN MY COMMUNITY IN THE CITY I LIVE IN, I WENT

20 TO THE CITY COUNCIL TO ADVOCATE FOR REENTRY FACILITIES, I

21 THOUGHT THEY WERE GOING TO RUN ME OUT OF TOWN BECAUSE I THINK A

22 REENTRY FACILITY IS THE RIGHT THING TO DO.

23        SO DID I PUT MYSELF IN HARM'S WAY?  ABSOLUTELY.  BUT

24 ISN'T THAT WHAT THIS IS ALL ABOUT IN THE END, TO TAKE THE RISK?

25        SO I'M NOT SAYING THE ATTORNEY GENERAL HAS TO SAY HE

1   WILL ISSUE A CLEAN BOND OPINION.  ALL THE ATTORNEY GENERAL NEEDS

2   TO SAY TO THE LEGISLATURE IS, THESE ARE THE FACTORS I NEED IN

3   THE LEGISLATION FOR THE AB 900 FIX, CLEAN-UP, AND IF IT CONTAINS

4   THESE PROVISIONS, I'M MORE THAN LIKELY OR I'M MORE LIKELY THAN

5   NOT GOING TO ISSUE A BOND OPINION TO WALL STREET SO WE CAN

6   LEVERAGE THESE BONDS.  THAT'S ALL WE NEED.  THAT'S ALL WE NEED,

7   YOUR HONOR.

8           **MS. WANG:**  MR. SPITZER, I JUST HAVE A FEW MORE

9   QUESTIONS TO WRAP UP.

10          **JUDGE HENDERSON:**  MORE THAN ONE THOUGH, RIGHT?

11  **BY MS. WANG**

12  **Q**   JUST TO BE CLEAR, WHAT IS MARCY'S LAW, OTHERWISE KNOWN AS

13  THE CRIME VICTIMS BILL OF RIGHTS OF 2008?

14  **A**   MARCY'S LAW WAS PASSED BY THE VOTERS IN THE LAST GENERAL

15  ELECTION HERE IN THE STATE.  THE CONSTITUTION NOW IN THE STATE

16  OF CALIFORNIA HAS BEEN AMENDED.  THE PEOPLE OF THE STATE OF

17  CALIFORNIA HAVE NOW SAID IN THE CALIFORNIA CONSTITUTION THAT

18  EARLY RELEASE IS NOT A REMEDY THAT CAN BE USED IN THE STATE OF

19  CALIFORNIA, AND THAT THE LEGISLATURE, BY CONSTITUTIONAL LAW, IS

20  NOW STATUTORILY -- ACTUALLY CONSTITUTIONALLY REQUIRED TO FULLY

21  FUND OUR PRISON SYSTEM IN ORDER TO STOP ANY POTENTIAL EARLY

22  RELEASE, AND THE VOTERS PASSED THAT BY A SEVEN PERCENT MARGIN ON

23  THE NOVEMBER 4TH BALLOT.

24          **MS. WANG:**  I GUESS I ONLY HAD ONE FURTHER QUESTION.

25          **JUDGE REINHARDT:**  TOO BAD YOU PASSED UP THE CHANCE TO

```
 1  GET A THOUSAND DOLLARS.

 2            MS. WANG:  I KNOW.  THANK YOU ANYWAY.

 3            JUDGE KARLTON:  NO, IT'S BEEN WITHDRAWN.

 4            JUDGE HENDERSON:  IT'S BEEN WITHDRAWN.

 5            MS. WANG:  THANK YOU, MR. SPITZER, NO FURTHER

 6  QUESTIONS.

 7            JUDGE KARLTON:  STATE DEFENDANTS HAVE ANYTHING?

 8            MR. MELLO:  NO, YOUR HONOR.

 9            JUDGE HENDERSON:  CROSS-EXAMINATION?

10            MR. BIEN:  NO, YOUR HONOR.

11            JUDGE HENDERSON:  WOULD YOU -- OKAY.  THANK YOU VERY

12  MUCH, MR. SPITZER.

13            MS. FUENTES:  YOUR HONOR, WE SHOULD HAVE MR. GARNER

14  HERE, BUT I WAS WONDERING IF WE COULD TAKE A BREAK FIRST.

15            JUDGE HENDERSON:  OKAY.  WE'LL TAKE A 15-MINUTE

16  RECESS.

17                 (RECESS TAKEN.)

18            MS. FUENTES:  THE DEFENDANT INTERVENORS CALL

19  MR. ROBERT GARNER TO THE STAND.

20                 ROBERT GARNER,

21  CALLED AS A WITNESS FOR THE DEFENDANT INTERVENORS HEREIN,

22  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

23  FOLLOWS:

24            THE WITNESS:  I DO.

25            THE CLERK:  PLEASE HAVE A SEAT.
```

1          STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

2          **THE WITNESS:**  MY NAME IS ROBERT GARNER, R-O-B-E-R-T,

3   G-A-R-N-E-R.

4                        **DIRECT EXAMINATION**

5   **BY MS. FUENTES:**

6   **Q.**  MR. GARNER, WHERE ARE YOU CURRENTLY EMPLOYED?

7   **A.**  SANTA CLARA COUNTY.

8   **Q.**  AND WHAT IS YOUR POSITION THERE?

9   **A.**  I'M DIRECTOR OF THE DEPARTMENT OF ALCOHOL AND DRUG SERVICES.

10  **Q.**  HOW LONG HAVE YOU HAD THAT POSITION?

11  **A.**  AS IT'S EVOLVED, ABOUT 38 YEARS.

12  **Q.**  CAN YOU BRIEFLY DESCRIBE YOUR EDUCATION AND PROFESSIONAL

13  BACKGROUND?

14  **A.**  YES.  I HAVE A B.A. FROM STANFORD UNIVERSITY AND OVER THE

15  COURSE OF THE 38 YEARS HAVE TAKEN A LOT OF CLASSES AND COURSES,

16  BUT THERE IS NO ADVANCED DEGREE.  JUST THE TRAINING AS A

17  PROFESSION.

18  **Q.**  AND WHAT POSITIONS HAVE YOU HAD IN THE COUNTY OF SANTA

19  CLARA?

20  **A.**  WELL, IT STARTED WITH JUST BEING AN ANALYST IN THE COUNTY

21  EXECUTIVE'S OFFICE.  I WAS ASSIGNED TO THIS AREA OF DRUG ABUSE

22  COORDINATION, THAT EVOLVED INTO WHAT IT IS TODAY, WHICH ALCOHOL

23  AND DRUG COMBINED.

24          FOR A SHORT TIME I WAS THE COUNTY'S ADMINISTRATOR

25  GUARDIAN, THE PUBLIC ADMINISTRATOR GUARDIAN FOR ABOUT A YEAR AND

1  A HALF, AND I STARTED AND FOR A SHORT TIME HEADED THE OFFICE OF

2  CRIMINAL JUSTICE PLANNING FOR THE COUNTY.

3  Q.  ARE YOU CURRENTLY INVOLVED WITH ANY PROFESSIONAL

4  ASSOCIATIONS?

5  A.  YES.  THERE'S THE STATE ASSOCIATION OF COUNTY AND ALCOHOL

6  AND DRUG PROGRAM ADMINISTRATORS, WHICH IS THE OFFICIAL STATE

7  TITLE OF MY JOB.

8  Q.  OKAY.  HOW MANY DRUG AND ALCOHOL CLIENTS DOES THE COUNTY

9  SERVE THROUGH YOUR DEPARTMENT?

10  A.  IT'S ABOUT 8,000 A YEAR.

11  Q.  DOES THE COUNTY HAVE A DRUG TREATMENT COURT?

12  A.  YES, IT DOES.  IT HAS SEVERAL OF THEM.

13  Q.  CAN YOU EXPLAIN THOSE, PLEASE?

14  A.  YES.  IT'S A STANDARD MODEL WHERE UNDER THE LAW THERE, IT'S

15  POSSIBLE FOR THE COURT TO HAVE DIVERSION FROM INCARCERATION INTO

16  TREATMENT AND OTHER ACTIVITIES.  IF THE CLIENT ATTENDS AND IS

17  SUCCESSFUL, HE WOULD ESSENTIALLY DISCHARGE HIS OBLIGATION.

18        WE HAVE STAFF IN THESE COURTS.  WE DO THE

19  ASSESSMENTS.  THEY ARE ALL DIFFERENT.  THERE'S WHAT'S CALLED

20  PROPOSITION 36 COURT.  THAT'S A SPECIFIC STATE LAW THAT HAS

21  CERTAIN REQUIREMENTS.  THERE IS A DRUG DEPENDENCY COURT THAT'S

22  LINKED TO THE CHILD WELFARE SYSTEM.  THERE IS A MENTAL HEALTH

23  COURT FOR INDIVIDUALS WHO HAVE AN ALCOHOL, DRUG AND MENTAL

24  HEALTH PROBLEM, THINGS LIKE THAT.

25  Q.  AND ARE THESE COURTS GENERALLY DIVERSIONARY FROM KEEPING

1   PEOPLE OUT OF COUNTY JAIL?

2   **A.**   YES, THEY ARE.

3   **Q.**   AND DO YOU KNOW HOW MANY OF THE 8,000, APPROXIMATELY,

4   CLIENTS THAT YOU HAVE COME FROM THOSE COURTS?

5   **A.**   I DON'T KNOW HOW MANY COME FROM THE COURTS, BUT WE HAVE OVER

6   70 PERCENT ARE CLIENTS WHO ARE IN SOME WAY A CRIMINAL JUSTICE

7   LINK.   THEY ARE EITHER FROM THE DRUG COURT OR THEY HAVE SOME

8   KIND OF A CRIMINAL JUSTICE OBLIGATION.   THEY ARE ON PROBATION OR

9   PAROLE OR SOMETHING LIKE THAT.

10  **Q.**   DOES THE COUNTY PROVIDE SERVICES TO PAROLEES?

11  **A.**   YES, WE DO.

12  **Q.**   AND HOW ELSE ARE CLIENTS -- HOW ELSE DO CLIENTS COME TO YOU

13  FROM THE CRIMINAL JUSTICE IF THEY DON'T COME FROM THE COURTS?

14  **A.**   YOU MAY HAVE A CLIENT ON PROBATION AND THE PROBATION

15  DEPARTMENT STRONGLY RECOMMENDS THAT THEY ENGAGE IN TREATMENT.

16          YOU MIGHT HAVE SOMEONE WHO IS ON STATE PAROLE, BUT

17  NOT COMING THROUGH A PAROLE PROGRAM.   SO THERE ARE LOTS OF WAYS

18  OUTSIDE OF HAVING A SPECIFIC REFERRAL FROM THE COURT.

19  **Q.**   AND HOW MUCH IS YOUR DEPARTMENT'S BUDGET?

20  **A.**   JUST OVER $50 MILLION.

21  **Q.**   HAVE YOU HAD ANY CUTS THIS YEAR?

22  **A.**   YES.   WE HAD ONE IN MID YEAR AS A RESULT OF THE STATE BUDGET

23  BEING LATE OF ABOUT 800,000 AND IN THE UPCOMING YEAR THAT STARTS

24  JULY 1 WE HAVE A REDUCTION TARGET OF $9 MILLION.

25  **Q.**   THAT'S FOR FISCAL YEAR 2010?

1  **A.**  YES.

2  **Q.**  GENERALLY, WHAT KIND OF SERVICES DOES YOUR DEPARTMENT

3  PROVIDE?

4  **A.**  IT PROVIDES A WHOLE CONTINUUM OF SERVICES BEGINNING ON ONE

5  SIDE WITH PREVENTION -- WHAT IS KNOWN AS PREVENTION,

6  SCHOOL-BASED AND COMMUNITY-BASED, THINGS LIKE THAT.

7           IT HAS WHAT'S CALL EARLY INTERVENTION, SORT OF THE

8  INITIAL SIGNS OF DRUG USE AND TRYING TO INVOLVE YOURSELVES EARLY

9  SO IT DOESN'T PROGRESS.

10          A RANGE OF TREATMENT, EVERYTHING FROM WHAT'S CALLED

11  LOW LEVEL, MAYBE OUTPATIENT COUNSELING, LOW LEVEL COUNSELING ON

12  THROUGH RESIDENTIAL TREATMENT, METHADONE MAINTENANCE.  WE HAVE

13  SPECIALTY PROGRAMS FOR PREGNANT ADDICTS, PARENTING ADDICTS,

14  ADOLESCENT TREATMENT AND THINGS LIKE THAT.

15  **Q.**  HOW ARE THESE SERVICES PAID FOR?

16  **A.**  A VARIETY OF FUNDING SOURCES; MOST OF THEM PUBLIC, STATE AND

17  FEDERAL WITH SOME COUNTY GENERAL FUND.  SMALL AMOUNT OF

18  INSURANCE AND CLIENT FEES.

19  **Q.**  AND WHAT ABOUT THE FUNDING FOR THOSE PROGRAMS?

20  **A.**  EXCUSE ME?

21  **Q.**  WHERE DOES THE FUNDING COME FROM FOR THOSE PROGRAMS?

22          **JUDGE KARLTON:**  THAT'S WHAT HE JUST SAID.

23  **A.**  STATE AND FEDERAL AND COUNTY, AND THEN SOME CLIENT FEES,

24  VERY LITTLE INSURANCE.

25

1  **BY MS. FUENTES:**

2  **Q.**  AND FROM THE STATE AND THE FEDERAL WHAT DO THEY FUND?  IS

3  THERE ANYTHING IN PARTICULAR?

4  **A.**  SOMETIMES THEY ARE SPECIFIC GRANTS FOR THINGS.  THERE IS A

5  GRANT, FOR EXAMPLE, THAT FUNDS A PART OF A SPECIFIC DRUG COURT.

6  THE FEDERAL MONEY COMES IN A BLOCK GRANT AND PARTS OF THE BLOCK

7  GRANT WILL BE FOR, AS AN EXAMPLE, PREVENTION OR HIV SERVICES,

8  AND A CERTAIN PART OF ALL THAT FUNDING IS DISCRETIONARY.

9           **JUDGE REINHARDT:**  WHAT PERCENTAGE ROUGHLY COMES FROM

10  THE STATE?

11           **THE WITNESS:**  I'M GOING TO HAVE TO GUESS --

12           **JUDGE KARLTON:**  NOT GUESS, YOUR BEST ESTIMATE.

13           **THE WITNESS:**  THANK YOU.  I'M SORRY.  MY BEST

14  ESTIMATE IS SIX TO EIGHT MILLION OF THE FIFTY.

15           **JUDGE REINHARDT:**  THANK YOU.

16  **BY MS. FUENTES:**

17  **Q.**  AND WHAT PERCENTAGE OF YOUR BUDGET IS THAT?

18  **A.**  TWELVE TO WHATEVER TIMES TWO WOULD BE.

19  **Q.**  AND HOW MUCH OF YOUR BUDGET IS COUNTY DISCRETIONARY FUNDS,

20  DO YOU KNOW?

21  **A.**  WE HAVE ABOUT $20 MILLION OF THE 50 MILLION IS COUNTY

22  GENERAL FUND.

23  **Q.**  AND DO YOU KNOW WHAT THE BULK OF THAT MONEY PAYS FOR IN YOUR

24  DEPARTMENT?

25  **A.**  WELL, WE USE IT ACROSS ALL OF THE SERVICES.  SO I CAN'T

1   REALLY ANSWER THAT ANY MORE SPECIFICALLY THAN THAT.

2   **Q.**  DOES THE COUNTY -- WHAT IS THE COUNTY'S CURRENT CAPACITY TO

3   PROVIDE DRUG AND ALCOHOL SERVICES TO PEOPLE WHO NEED THEM?

4   **A.**  WELL, AS I SAY, WE TREAT ABOUT 8,000 CLIENTS A YEAR.  WE

5   HAVE WAITING LISTS IN ALL OF THE TREATMENT MODALITIES.

6            WE DON'T REALLY CONSCIOUSLY TURN PEOPLE AWAY.  WHAT

7   HAPPENS IS IF THEY CAN'T GET IN, THEY DON'T STAY AND KEEP

8   TRYING.  SO -- BUT WE ACTUALLY SEE 8,000 A YEAR ROUGHLY.

9   **Q.**  CAN YOU EXPLAIN THAT A LITTLE BIT?  YOU SAY THEY COME IN,

10  BUT THEY KEEP TRYING?

11  **A.**  SURE.  WE HAVE WAITING LISTS FOR THOSE WHO APPLY AND ARE --

12  WE AREN'T ABLE TO ACTUALLY ACCEPT THEM IN THE MOMENT.  BUT

13  ADDICTION AND DEPENDENCE IS A CHRONIC AND RELAPSING BRAIN

14  DISEASE, AND THESE ARE CLIENTS WHO ARE NOT HIGHLY MOTIVATED TO

15  START WITH.

16           SO TO BE ON A WAITING LIST AND STAY THERE, THEY HAVE

17  TO CALL IN REGULARLY, FOR EXAMPLE, AND THEY AREN'T REAL GOOD AT

18  THAT.  SO THEY GET LOST AND THE WORD GETS OUT THAT YOU CAN'T GET

19  IN OR THEY TRY OUR PHONE SYSTEM AND CAN'T GET THROUGH AND THEN

20  THEY STOP TRYING.

21           SO MY GUESS IS THAT, YOU KNOW, WHEN YOU LOOK AT THE

22  WAITING LIST, IT'S THE WAITING LIST OF THOSE WHO ARE STRONG

23  ENOUGH OR HAVE ENOUGH INCENTIVE TO WANT TO KEEP TRYING UNTIL

24  THEY GET IN.  AND MY GUESS IS THOSE NEEDING IT WHO AREN'T IN IS

25  A GREATER NUMBER.

1  Q. AND WHAT HAPPENS TO THE PEOPLE WHO DON'T PUT THEMSELVES ON

2  THE WAITING LIST? WHAT DO THEY DO, DO YOU KNOW?

3  A. WELL, IT'S, YOU KNOW, A CHRONIC RELAPSE IN CONDITION AND IT

4  GETS WORSE WITHOUT TREATMENT. AND SO I WOULD SAY FOR THE VAST

5  MAJORITY OF THEM WHO CONTINUE TO USE, THEY GET WORSE IN THEIR

6  ADDICTION.

7            THEY CERTAINLY ARE IN RISK OF ARREST BECAUSE IT'S A

8  CRIMINAL ACT BY DEFINITION. THEY AREN'T TAKING CARE OF

9  THEMSELVES, SO YOU GET A WHOLE RANGE OF ATTENDANT HEALTH

10 PROBLEMS; THINGS LIKE THAT.

11 Q. DO YOU KNOW IF THE COUNTY'S JAIL POPULATION HAS BEEN REDUCED

12 AT ALL IN LIGHT OF THE DIVERSIONARY DRUG COURT PROGRAMS THAT WE

13 JUST DISCUSSED?

14 A. YES. ACTUALLY, AFTER PROPOSITION 36, WHICH WAS A STATE

15 INITIATIVE FOR ESSENTIALLY DRUG DIVERSION FROM JAIL, WE WERE

16 ABLE TO SHOW, AND I THINK EVERYONE IN THE CRIMINAL JUSTICE

17 SYSTEM AGREED, THAT THE JAIL POPULATION HAD BEEN REDUCED ABOUT

18 21 PERCENT AS A RESULT OF THAT.

19            AND THERE WERE -- THERE WERE OTHER DIVERSION PROGRAMS

20 GOING ON. SO IT'S HARD TO ISOLATE IT, BUT I THINK THERE WAS

21 COMMON AGREEMENT THAT WAS THE CAUSE OF IT.

22 Q. SO DO YOU THINK THE PROPOSITION 36 PROGRAM IN SANTA CLARA

23 COUNTY IS SUCCESSFUL?

24 A. I THINK SO.

25 Q. HOW MUCH FUNDING DO YOU RECEIVE FROM THE STATE FOR YOUR

1   PROPOSITION 36 PROGRAM?

2   **A.**   ABOUT 6 MILLION A YEAR.   ABOUT A QUARTER OF THAT AND A

3   LITTLE MORE GOES TO PROBATION AND THE REST GOES INTO TREATMENT.

4   **Q.**   IS THAT ENOUGH TO SERVE ALL THE CLIENTS THAT ARE ELIGIBLE

5   FOR PROP 36?

6   **A.**   NO.   WE HAVE TO SPEND A GREAT DEAL MORE THAN THAT.   LAST I

7   CHECKED IT WAS ABOUT $8 MILLION OF MONEY FROM OUR OTHER FUNDING

8   SOURCES TO TREAT PROPOSITION 36 CLIENTS, BECAUSE THE PROP 36

9   FUNDING WASN'T ADEQUATE TO MEET THEIR NEEDS.

10  **Q.**   DOES THE COUNTY HAVE THE ABILITY TO PROVIDE IMMEDIATE

11  TREATMENT TO PRISONERS WHO MAY BE RELEASED UNDER A PRODUCT?

12  **A.**   I'M SORRY.   I COULDN'T HEAR ALL THAT.

13  **Q.**   YOU ARE AWARE THAT THIS COURT IS CONSIDERING WHETHER TO

14  ISSUE A PRISONER RELEASE ORDER, CORRECT?

15  **A.**   YES.

16  **Q.**   WOULD THE COUNTY IMMEDIATELY BE ABLE TO PROVIDE TREATMENT TO

17  PRISONERS WHO ARE SUBJECT TO THAT RELEASE?

18  **A.**   NO.

19  **Q.**   WHY NOT?

20  **A.**   AS I SAID, WE ARE FULL AND HAVE WAITING LISTS.   SO UNLESS

21  THERE ARE RESOURCES TO EXPAND TREATMENT, THEY WOULD HAVE TO GET

22  IN LINE, WAIT.

23  **Q.**   DO YOU BELIEVE THAT THE INABILITY OF THE COUNTY TO

24  IMMEDIATELY TREAT THE INDIVIDUALS WOULD POSE A RISK TO PUBLIC

25  SAFETY?

1  **A.**  I THINK SO.  FROM MY EXPERIENCE, THESE INDIVIDUALS -- THIS

2  IS A POPULATION THAT'S HEAVILY INVOLVED IN CRIMINAL ACTIVITY.

3  NOT JUST THE CRIME OF DRUG USE AND RELATED THINGS, BUT THE CRIME

4  RELATED TO THAT, WHICH IS PROPERTY CRIME PRIMARILY AND THINGS

5  LIKE THAT.  SO THEY ARE CERTAINLY AT RISK FOR REARREST.

6  **Q.**  DID YOU FORM AN OPINION AS TO WHAT IMPACT, IF ANY, A

7  PRISONER POPULATION REDUCTION WOULD HAVE ON THE COUNTY OF SANTA

8  CLARA?

9  **A.**  YES.  IF THEY END UP IN THE COUNTY, FROM ALL OF THE EVIDENCE

10  I HAVE SEEN AND HAVING TALKED TO OFFICIALS, IT'S, AGAIN, ABOUT

11  TWO-THIRDS, OR 70 PERCENT, OF THE INMATE POPULATION HAVE SERIOUS

12  DRUG AND ALCOHOL PROBLEMS.  SO WHATEVER NUMBER COMES TO THE

13  COUNTY, THAT PERCENTAGE, I WOULD EXPECT, TO BE ACTIVELY USING

14  AND WOULD BE AT RISK AS I DESCRIBED.

15  **Q.**  WHAT PERCENTAGE -- IN YOUR OPINION, WHAT PERCENTAGE OF

16  PEOPLE BEING RELEASED FROM JAIL WOULD HAVE SUBSTANCE ABUSE OR

17  DRUG ABUSE PROBLEMS?

18          **JUDGE KARLTON:**  FROM JAIL OR FROM PRISON?

19  **A.**  FROM PRISON?

20  **BY MS. FUENTES:**

21  **Q.**  FROM PRISON, YES.

22          **MR. SANGSTER:**  OBJECTION.  PERSONAL KNOWLEDGE,

23  EXPERTISE.

24  **BY MS. FUENTES:**

25  **Q.**  IF YOU KNOW.  DO YOU KNOW?

1  A.  NO, I DON'T KNOW.  NO ONE DOES.

2  Q.  DO YOU HAVE AN OPINION AS TO WHAT PERCENTAGE OF INDIVIDUALS

3  RELEASED FROM PRISON WOULD HAVE -- WOULD HAVE SUBSTANCE ABUSE OR

4  DRUG ABUSE PROBLEMS?

5          MR. SANGSTER:  LACKS FOUNDATION.  PERSONAL KNOWLEDGE.

6  EXPERTISE.

7          JUDGE REINHARDT:  DIDN'T HE JUST ASK IF HE KNEW.

8          JUDGE KARLTON:  THAT'S THE SAME QUESTION I THINK.

9          JUDGE HENDERSON:  HOW DOES THAT DIFFER FROM THE

10 PREVIOUS QUESTION?

11          MS. FUENTES:  I'M ASKING HIM IF HE KNOWS BASED ON HIS

12 OPINION, HIS EXPERTISE.

13          JUDGE HENDERSON:  WELL, HOW DOES IT DIFFER FROM THE

14 PREVIOUS QUESTION OF WHETHER HE KNEW?

15 BY MS. FUENTES:

16 Q.  ALL RIGHT.  WELL, LET'S ASK IT THIS WAY.

17          DO YOU KNOW IN THE COUNTY JAIL WHAT PERCENTAGE OF

18 INDIVIDUALS HAVE SUBSTANCE ABUSE PROBLEMS?

19 A.  ABOUT 70 PERCENT.

20 Q.  AND DO YOU HAVE ANY REASON TO BELIEVE THAT THAT WOULD BE THE

21 SAME PERCENTAGE IN THE STATE PRISON POPULATION?

22          JUDGE KARLTON:  THAT --

23 A.  I'M ASSUMING IT WOULD BE THE SAME.  A CRIMINAL JUSTICE

24 POPULATION GENERALLY IS ABOUT THAT FIGURE.

25          MR. SANGSTER:  MOVE TO STRIKE.  NONRESPONSIVE.

1  SPECULATION.

2          **JUDGE HENDERSON:**  I'M GOING TO ALLOW IT.  IT GOES TO

3  THE WEIGHT OF HIS BELIEF AND EXPERIENCE.

4  **BY MS. FUENTES:**

5  **Q.**  SO THE PLAINTIFFS HAVE BEEN PROPOSING A RELEASE OF 52,000

6  PRISONERS OVER A PERIOD OF TWO YEARS.  IF 52,000 WERE RELEASED

7  OVER A PERIOD OF TWO YEARS AND LET'S ASSUME 70 PERCENT OF THOSE

8  HAD SUBSTANCE ABUSE PROBLEMS, WOULD THE COUNTY BE ABLE TO

9  PROVIDE SERVICES TO THOSE INDIVIDUALS?

10          **JUDGE REINHARDT:**  TO ALL 52,000?

11          **JUDGE KARLTON:**  HE ALREADY SAID THAT THE ANSWER IS NO

12  TO ANY NUMBER.

13  **A.**  THE ANSWER IS NO.

14          **JUDGE KARLTON:**  HOW MANY TIMES DO YOU WANT TO ASK

15  THAT QUESTION, COUNSEL, BEFORE YOU CAUSE THE COURT TO SAY

16  SOMETHING UNPLEASANT.

17          **MS. FUENTES:**  WELL, THANK YOU.  YOU ANSWERED THE

18  QUESTION FOR HIM.

19  **BY MS. FUENTES:**

20  **Q.**  THE ANSWER IS NO?

21  **A.**  YES.

22  **Q.**  OKAY.

23  **A.**  YES, THE ANSWER IS NO.

24          **JUDGE HENDERSON:**  AND IT WAS NO EARLIER WHEN SHE

25  ASKED YOU THE SAME QUESTION, RIGHT?

1  **BY MS. FUENTES:**

2  Q.  AND, IN YOUR OPINION, IF THE COUNTY HAD TO PROVIDE -- THERE

3  ARE CERTAIN MANDATED SERVICES THAT HAVE TO BE PROVIDED TO

4  CRIMINAL JUSTICE OFFENDERS, IS THAT RIGHT?

5  **A.**  THERE'S SOME, YES.

6  Q.  AND WHAT ARE THOSE MANDATED SERVICES?

7  **A.**  THERE IS A MANDATE UNDER PROPOSITION 36 THAT ANY CLIENT WHO

8  IS ELIGIBLE HAS TO BE OFFERED TREATMENT, AND SO THAT'S A

9  MANDATED SERVICE.

10       THE OTHER MANDATES ARE REALLY TIED TO GRANTS WHERE

11  THERE'S A FUNDING REQUIREMENT.  THE FUNDING IS FOR A SPECIFIC

12  POPULATION OR A SPECIFIC SERVICE.

13  Q.  DOES THE COUNTY ALSO SERVE PEOPLE WHO ARE NOT CRIMINAL

14  JUSTICE OFFENDERS?

15  **A.**  YES.

16  Q.  AND WOULD THERE BE ANY IMPACT TO THOSE PEOPLE'S ABILITY TO

17  OBTAIN SERVICES IF THE COUNTY WERE TO PROVIDE SERVICES -- DEVOTE

18  ITS RESOURCES MORE TO CRIMINAL JUSTICE OFFENDERS?

19  **A.**  YES.  TO THE EXTENT THAT MORE OF THE CLIENTS ARE CRIMINAL

20  JUSTICE CLIENTS AND COMPETING FOR A FIXED NUMBER OF TREATMENT

21  SLOTS, THEN THOSE WHO ARE NOT CRIMINAL JUSTICE CLIENTS WOULD

22  HAVE A HARDER TIME GETTING IN.

23  Q.  WHAT IF THERE WERE A POPULATION CAP IMPOSED ON THE STATE

24  PRISON AND THE COUNTY JAILS WERE NOT ABLE TO SEND PRISONERS TO

25  THE STATE PRISON.  WOULD THAT HAVE ANY IMPACT ON YOUR DRUG AND

1  ALCOHOL DEPARTMENT?

2  **A.**  YES, IT WOULD.  BECAUSE THEN YOU WOULD HAVE A SITUATION

3  WHERE ACTIVELY USING DRUG ADDICTS WHO ARE ARRESTED STAY ON THE

4  STREET BASICALLY OR THEY END UP IN A COUNTY JAIL SITUATION.

5  THEN WE GET, YOU KNOW, DIVERSION FROM OUR OWN COUNTY SYSTEM.

6  BUT IF WE DON'T HAVE RESOURCES, THEN THEY AREN'T IN TREATMENT.

7  **Q.**  THANK YOU.

8  **A.**  YOU ARE WELCOME.

9              **THE COURT:**  ANYTHING FROM STATE DEFENDANTS?

10             **MR. MELLO:**  NO, YOUR HONOR.

11             **THE COURT:**  OKAY.  CROSS-EXAMINATION.

12                      **CROSS EXAMINATION**

13  **BY MR. SANGSTER:**

14  **Q.**  ED SANGSTER FOR THE PLAINTIFFS.

15             MR. GARNER, I WANT TO FOCUS ON THE 70 PERCENT FIGURE.

16             **MR. SANGSTER:**  AND JUST FOR THE COURTS' INFORMATION,

17  I'M GOING TO CROSS EXAMINE HIM ON ONE ISSUE THAT WAS NOT COVERED

18  IN DIRECT, BUT IS PART OF THE DECLARATION THAT WAS SUBMITTED.

19             **JUDGE HENDERSON:**  OKAY.

20  **BY MR. SANGSTER:**

21  **Q.**  YOU TALKED ABOUT 70 PERCENT OF THE PEOPLE COMING OUT OF

22  PRISON HAVING DRUG AND ALCOHOL PROBLEMS, AND YOUR ESTIMATES WERE

23  BASED ON THAT 70 PERCENT FIGURE, CORRECT?

24  **A.**  YES.

25  **Q.**  THESE ARE THE MONETARY ESTIMATES OF HOW MUCH IT WOULD COST

1  THE COUNTY?

2  **A.**  YES.

3  **Q.**  DO YOU KNOW WHAT PERCENTAGE OF INMATES COMING OUT OF THE

4  PRISON CURRENTLY USE YOUR AGENCY'S SERVICES?

5  **A.**  CURRENTLY COMING OUT?  I DON'T KNOW.

6  **Q.**  WELL, DO YOU HAVE -- DO YOU KNOW WHAT PERCENTAGE OF THE

7  PEOPLE COMING OUT OF THE PRISONS AT THIS POINT ARE USING YOUR

8  AGENCY'S SERVICES?

9            **JUDGE KARLTON:**  HE JUST SAID NO.

10           **MR. SANGSTER:**  HE SAID HE DIDN'T KNOW THE NUMBER, SO

11 I'M ASKING.

12 **A.**  NO.

13           **JUDGE HENDERSON:**  YOUR FIRST QUESTION WAS WHAT

14 PERCENTAGE COMING OUT.  THE SECOND ONE WAS WHAT?

15           **MR. SANGSTER:**  I INTENDED TO ASK AS A FIRST QUESTION

16 WHAT NUMBER, AND I GUESS I DIDN'T AND ASKED TWO QUESTIONS THE

17 SAME.  SO I APOLOGIZE.

18 **BY MR. SANGSTER:**

19 **Q.**  YOUR COST ESTIMATE IS BASED ON CERTAIN ASSUMPTIONS ABOUT THE

20 TIMING OF THE RELEASE?

21 **A.**  YES AND NO.  THE COST IS BASED ON THE ACTUAL COST OF

22 TREATING A CRIMINAL JUSTICE POPULATION IN THE COUNTY.  IF IT'S

23 TIED TO THE STATE RELEASE, THEN YOU ARE RIGHT, I DON'T KNOW HOW

24 MANY AT ANY GIVEN TIME.  SO IN THAT SENSE THE ANSWER IS NO.  I

25 WOULDN'T KNOW.

1  Q.  DO YOU KNOW WHETHER THE LENGTH OF TIME SERVED IN STATE

2  PRISONS EFFECTS THE NEED FOR SERVICES BY YOUR AGENCY WHEN THE

3  PEOPLE ARE RELEASED?

4  A.  NO, I DON'T KNOW.

5  Q.  IS IT TRUE THAT THE COSTS THAT YOUR AGENCY WILL INCUR AS A

6  RESULT OF TREATING PAROLEES WILL BE INCURRED AT SOME POINT

7  ANYWAY REGARDLESS OF WHEN THEY ARE RELEASED?

8  A.  I DON'T KNOW THAT.  I'M ASSUMING A CERTAIN NUMBER WOULD END

9  UP IN YOUR SYSTEM OVER TIME ANY WAY, YES.

10 Q.  DO YOU HAVE ANY REASON TO BELIEVE THE PERCENTAGE, WHATEVER

11 IT IS, WOULD BE DIFFERENT IF THIS COURT REDUCED THE PRISONERS

12 SENTENCES BY THREE MONTHS?

13 A.  I DON'T KNOW.

14 Q.  YOU TALKED IN YOUR DECLARATION ABOUT CERTAIN FINANCIAL

15 IMPACTS TO THE COUNTY, AND I WANT TO ASK YOU A LITTLE BIT MORE

16 ABOUT THE REIMBURSEMENTS.

17        YOU SAID YOU GOT $6 MILLION TO $8 MILLION FROM THE

18 STATE.  HOW MUCH DO YOU GET FROM THE FEDERAL GOVERNMENT?

19 A.  THE COUNTY IS ABOUT 20 MILLION AND IF THE STATE IS SIX TO

20 EIGHT -- I'D HAVE TO LOOK AT THE NUMBERS, YOU UNDERSTAND THAT'S

21 AN OPINION -- SO THE REST IS A COMBINATION OF FEDERAL AND THEN

22 FEES AND INSURANCE.

23 Q.  AND DOES THE COUNTY GET ANY REIMBURSEMENTS FROM THE STATE

24 FOR PROVIDING SERVICES TO PAROLEES?

25 A.  YES.  THERE IS STATE PROGRAM UNDER STATE PAROLE IN THE BAY

1  AREA.  IT'S CALLED THE BAY AREA SERVICES NETWORK, WHERE WE HAVE

2  A CONTRACT WITH STATE PAROLE, ROUGHLY $1 MILLION.  THEY SEND US

3  THE CLIENTS WHO ARE ON PAROLE AND WE PROVIDE THE TREATMENT WITH

4  THOSE FUNDS.

5  **Q.**  SO WHAT PERCENTAGE OF THE MONEY THAT YOU SPEND TREATING

6  PAROLEES NOW GETS REIMBURSED BY THE STATE?

7  **A.**  ALL I'M SURE OF -- ALL I KNOW ABOUT THAT AMOUNT OF ROUGHLY

8  $1 MILLION THAT'S INVOLVED IN THE CONTRACT WITH PAROLE.

9        WHAT I DO NOT KNOW IS HOW MANY PEOPLE ON PAROLE JUST

10 COME INTO THE SYSTEM.

11        **JUDGE KARLTON:**  SETTING ASIDE THOSE FOLKS WHO WANDER

12 IN, CAN YOU TELL US WHAT PERCENTAGE OF THE COST OF TREATING

13 THOSE PERSONS IN THIS BAY AREA SYSTEM IS PAID FOR BY THE STATE?

14        **THE WITNESS:**  ALL OF THE BASIC CLIENTS ARE STATE

15 FUNDED.  THEY'RE A STATE PAROLE CONTRACT.

16        **JUDGE KARLTON:**  SO 100 PERCENT.

17        **THE WITNESS:**  YES.

18 **BY MR. SANGSTER:**

19 **Q.**  WHEN YOU WERE PROVIDING THE COURT WITH AN ESTIMATE OF THE

20 FINANCIAL IMPACT ON THE COUNTY, WERE YOU TAKING INTO ACCOUNT THE

21 FACT THAT THE COUNTY CURRENTLY GETS REIMBURSED FOR SERVICES

22 PROVIDED TO PAROLEES?

23 **A.**  YES.  I LOOKED AT THE TOTAL COST.  IT WASN'T A REVENUE

24 ISSUE.  IT'S WHAT IS THE COST OF PROVIDING TREATMENT IN SANTA

25 CLARA COUNTY.  AND WE DIVIDED IT BY THE NUMBER OF TREATMENT

1  EPISODES AND THEN WE GET A COST PER TREATMENT EPISODE.  THAT'S

2  HOW I ARRIVED AT IT.

3  Q.  I'M STILL TRYING TO DRILL DOWN A LITTLE BIT AND FIGURE OUT,

4  THAT'S THE TOTAL COST.  SO THAT -- BUT THE COUNTY GETS

5  REIMBURSED A PORTION OF THAT TOTAL COST?

6          **JUDGE KARLTON:**  THE COUNTY GETS 100 PERCENT OF THE

7  PEOPLE ON THE STATE CONTRACT.

8          **THE WITNESS:**  THAT'S RIGHT.

9          **JUDGE KARLTON:**  AND AS TO OTHER PEOPLE THAT YOU MAY

10 BE TREATING, YOU DON'T KNOW WHO THEY ARE, YOU DON'T KNOW HOW

11 MANY, IF ANY.

12         **THE WITNESS:**  I THINK WE HAVE TWO DIFFERENT ISSUES.

13         ONE IS THE COST ISSUE, WHICH I EXPLAINED HOW WE

14 ARRIVED AT THAT.  WHO PAYS FOR IT?  IN THIS CASE UNDER BASIN

15 IT'S 100 PERCENT STATE FUNDING THROUGH STATE PAROLE.

16 **BY MR. SANGSTER:**

17 Q.  ALL RIGHT.  SO THE STATE PAYS FOR THE PAROLEES THAT YOU

18 TREAT?

19 **A.**  UNDER THAT CONTRACT, YES.

20         **MR. SANGSTER:**  NO FURTHER QUESTIONS.

21         **THE COURT:**  ANYTHING FROM CCPOA?

22         **MS. LEONARD:**  NO, YOUR HONOR.

23         **THE COURT:**  REDIRECT?

24         **MS. FUENTES:**  NO, YOUR HONOR.  I HAVE NO REDIRECT.

25         **JUDGE HENDERSON:**  OKAY.  THANK YOU VERY MUCH,

1  MR. GARNER.  YOU ARE EXCUSED.

2                    (WITNESS EXCUSED.)

3          **JUDGE KARLTON:**  THAT'S IT.

4          **JUDGE HENDERSON:**  IS THAT IT?

5          AGAIN, REMEMBER TO GET US THOSE NEW ESTIMATES BY

6  WEDNESDAY AND WE WILL RESUME THIS TRIAL NEXT THURSDAY AT 9:15.

7  COURT IS ADJOURNED.

8                    (WHEREUPON AT 3:42 P.M. FURTHER PROCEEDINGS

9                     IN THE ABOVE-ENTITLED CAUSE WAS ADJOURNED

10                    UNTIL THURSDAY, DECEMBER 18, 2008 AT 9:15

11                    A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              **I N D E X**

3

4      **DEFENDANT INTERVENOR WITNESSES**              **PAGE**   **VOL.**

       **JERRY DYER**
5
       DIRECT EXAMINATION BY MS. BARLOW              2300     12
6      CROSS-EXAMINATION BY MR. SPECTER              2348     12
       REDIRECT EXAMINATION BY MS. BARLOW            2369     12
7

8      **RODRIC PACHECO**

9      DIRECT EXAMINATION BY MR. MITCHELL            2372     12
       CROSS-EXAMINATION BY MR. SANGSTER             2395     12
10

11     **BONNIE DUMANIS**

12     DIRECT EXAMINATION BY MR. MITCHELL            2408     12

13

14     **NANCY PENA**

       DIRECT EXAMINATION BY MS. FUENTES             2424     12
15     CROSS-EXAMINATION BY MS. MORRIS               2437     12
       REDIRECT EXAMINATION BY MS. FUENTES           2455     12
16     RECROSS-EXAMINATION BY MS. MORRIS             2456     12

17

18     **TODD SPITZER**

       DIRECT EXAMINATION BY MS. WANG                2457     12
19

20     **ROBERT GARNER**

21     DIRECT EXAMINATION BY MS. FUENTES             2485     12
       CROSS-EXAMINATION BY MR. SANGSTER             2497     12
22

23

24

25

1

2

3                      **CERTIFICATE OF REPORTER**

4

5          WE, JOAN MARIE COLUMBINI AND DEBRA L. PAS, OFFICIAL

6   REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

7   CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

8   CIV S-90-0520 LKK JPM, RALPH COLEMAN, ET AL V. ARNOLD

9   SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD

10  SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND

11  REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

12  INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

13  TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

14  FILING.

15          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

16  TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

17  COURT FILE.

18

19                  /S/ JOAN MARIE COLUMBINI

20          JOAN MARIE COLUMBINI, CSR 5435, RPR

21

22                  S/ DEBRA L. PAS

23          DEBRA L. PAS, CSR 11916, CRR, RMR, RPR

24              MONDAY, DECEMBER 15, 2008

25