VOL 13

PAGES 2504 – 2718

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, ET AL.,           )
                                 )
          PLAINTIFFS,            )
                                 )
  VS.                            ) NO. CIV S-90-0520 LKK JFM
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 ) THREE-JUDGE COURT
          DEFENDANTS.            )
                                 )
_____

MARCIANO PLATA, ET AL.,          )
                                 )
          PLAINTIFFS,            )
                                 )
VS.                              ) NO. C 01-1351 TEH
                                 )
ARNOLD SCHWARZENEGGER, ET AL.    )
                                 )
          DEFENDANTS.            )
_____)

***TRANSCRIPT OF PROCEEDINGS***

SAN FRANCISCO, CALIFORNIA
THURSDAY, DECEMBER 18, 2008

(APPEARANCES ON FOLLOWING PAGES)


*REPORTED BY:*  JOAN MARIE COLUMBINI, CSR 5435, RPR
             DEBRA L. PAS, CSR 11916, CRR, RMR, RPR
             OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                           1917 FIFTH STREET
                           BERKELEY, CALIFORNIA  94710
                           **DONALD SPECTER, ESQUIRE**
                           **REBEKAH EVENSON, ESQUIRE**

                           ROSEN, BIEN & GALVAN, LLP
                           315 MONTGOMERY STREET, TENTH FLOOR
                           SAN FRANCISCO, CALIFORNIA 94104
                    BY:  **MICHAEL W. BIEN, ESQUIRE**
                         **JANE KAHN, ESQUIRE**
                         **ERNEST GALVAN, ESQUIRE**

                           K&L GATES
                           FOUR EMBARCADERO CENTER
                           SUITE 1200
                           SAN FRANCISCO, CALIFORNIA 94111
                     BY: **EDWARD P. SANGSTER, ESQUIRE**
                         **FRED HEATHER, ESQUIRE**

**FOR CCPOA**               CARROLL, BURDICK & MCDONOUGH
                           44 MONTGOMERY STREET, SUITE 400
                           SAN FRANCISCO, CALIFORNIA  94104
                     BY: **NATALIE LEONARD, ESQUIRE**

**FOR DEFENDANTS**          STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           1300 I STREET, SUITE 125
                           P.O. BOX 944255
                           SACRAMENTO, CALIFORNIA  94244
                    BY:  **LISA A. TILLMAN, ESQUIRE**

                           STATE OF CALIFORNIA
                           DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           455 GOLDEN GATE AVENUE, SUITE 11000
                           SAN FRANCISCO, CALIFORNIA  94102
                     BY: **KYLE A. LEWIS, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**          HANSON BRIDGETT
                           425 MARKET STREET, 26TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94105
               BY:  **PAUL MELLO, ESQUIRE**
                    **S. ANNE JOHNSON, ESQUIRE**


**FOR DISTRICT ATTORNEY**   THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**             COUNTY OF RIVERSIDE
                           82-675 HIGHWAY 111, FOURTH FLOOR
                           INDIO, CALIFORNIA  92201
               BY:  **WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**          AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**             580 CALIFORNIA STREET, 15TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94104
               BY:  **TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT**     JONES & MAYER
**INTERVENORS**             3777 NORTH HARBOR BOULEVARD
                           FULLERTON, CALIFORNIA  92835
               BY:  **KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS**  OFFICE OF THE COUNTY COUNSEL
                           COUNTY OF SANTA CLARA
                           70 WEST HEDDING STREET
                           NINTH FLOOR, EAST WING
                           SAN JOSE, CALIFORNIA  95110
               BY:  **THERESA FUENTES, ESQUIRE**


**FOR THE COUNTY OF**       OFFICE OF MICHAEL P. MURPHY
**SAN MATEO**               COUNTY COUNSEL, SAN MATEO COUNTY
**INTERVENORS:**            HALL OF JUSTICE AND RECORDS
                           400 COUNTY CENTER, 6TH FLOOR
                           REDWOOD CITY, CALIFORNIA 94063-1662
               BY:  **CAROL L. WOODWARD, ESQUIRE**

```
 1   THURSDAY, DECEMBER 18, 2008                    9:22 O'CLOCK A.M.

 2

 3                        P R O C E E D I N G S

 4

 5            JUDGE HENDERSON:  OKAY.  GOOD MORNING.  ARE WE READY

 6   TO GO?

 7            MR. SANGSTER:  YES, YOUR HONOR.  ED SANGSTER FOR THE

 8   PLAINTIFFS.

 9            IF I MAY ADDRESS THE COURT BRIEFLY REGARDING THE

10   WITNESS SCHEDULE?

11            JUDGE HENDERSON:  CERTAINLY.

12            MR. SANGSTER:  THERE ARE TWO WITNESSES ON THE COURT'S

13   LIST THAT IT RECEIVED AS TO WHOM THERE HAVE NOW BEEN

14   STIPULATIONS REACHED CONCERNING THEIR TESTIMONY.  THE

15   STIPULATIONS HAVE BEEN AGREED ON, BUT THERE WAS NOT ENOUGH TIME

16   TO FILE THEM, SO THOSE WILL BE FILED LATER TODAY OR TONIGHT BUT

17   THE WITNESSES ARE MICHAEL JAMES AND DUANE BAY.

18            JUDGE HENDERSON:  OKAY.

19            JUDGE REINHARDT:  EXCUSE ME.  ONE MINUTE.  WHAT ARE

20   THE NAMES AGAIN?

21            MR. SANGSTER:  MICHAEL JAMES AND DUANE BAY.

22            JUDGE HENDERSON:  B-A-Y.

23            MR. SANGSTER:  B-A-Y.

24            JUDGE HENDERSON:  GREAT.  THANK YOU.

25            I WAS JUST ASKED.  THIS IS TODAY'S LIST, AND JUST
```

1   GIVE US A BEST ESTIMATE, WHEN DO YOU THINK WE WILL FINISH?

2            **MR. SANGSTER:**  THIS CASE?

3            **JUDGE HENDERSON:**  YES.

4            **MR. SANGSTER:**  TOMORROW BEFORE NOON.

5            **JUDGE HENDERSON:**  OKAY.

6            **MR. SANGSTER:**  YOUR HONOR, A LOT OF PEOPLE SPENT A

7   LOT OF TIME OVER THE LAST 48 HOURS REACHING STIPULATIONS ON

8   TESTIMONY, AND THE COURT'S RECORD HAS, I THINK, PROBABLY SIX OR

9   SEVEN WITNESSES RESOLVED.  SO I THINK EVERYBODY MADE AN EFFORT

10  TO GET THIS THING --

11           **JUDGE HENDERSON:**  YOU OBVIOUSLY DID.

12           **MR. SANGSTER:**  MY ESTIMATE IS NOON TOMORROW.

13           **JUDGE HENDERSON:**  OKAY.  MUCH APPRECIATED.  WE WON'T

14  KNOW WHAT TO DO WITH OUR TIME.

15           **JUDGE KARLTON:**  I'LL FIGURE IT OUT.

16           **JUDGE REINHARDT:**  WE CAN READ ALL THE THINGS THAT

17  HAVE BEEN SUBMITTED.

18           **MR. SANGSTER:**  I GUESS THE OTHER ISSUE THAT DID COME

19  UP, WHEN IT BECAME APPARENT THAT THE SCHEDULE WAS GOING TO BE

20  ABBREVIATED IS THAT COUNSEL DID NOT WANT TO BE FACED WITH A

21  REQUEST FOR CLOSING ARGUMENTS TOMORROW.

22           **JUDGE HENDERSON:**  OH, NO.

23           **MR. SANGSTER:**  THAT'S FINE.

24           **JUDGE HENDERSON:**  WE'LL GIVE YOU A DATE FOR CLOSING

25  ARGUMENT.

1          **JUDGE REINHARDT:**  WE MIGHT BE WILLING TO DISCUSS IT

2    WITH YOU.

3          **MR. SANGSTER:**  CURRENTLY, WE THINK WE HAVE THREE

4    WITNESSES ON -- THE DEFENSE HAS THREE WITNESSES -- OR TWO

5    WITNESSES, THE PLAINTIFFS HAVE A REBUTTAL WITNESS, FOR TOMORROW.

6    SO EVEN IF SOMEBODY FROM TODAY SLOPS OVER, I DON'T SEE ANY

7    CHANCE WE ARE NOT GOING TO FINISH TOMORROW.

8          **JUDGE HENDERSON:**  THANK YOU.  YOU MAY BEGIN.  CALL

9    YOUR WITNESS WHEN YOU ARE READY.

10          **MR. LEWIS:**  GOOD MORNING, YOUR HONORS.  KYLE LEWIS ON

11   BEHALF OF THE STATE DEFENDANTS.  DEFENDANTS NOW CALL GALE

12   BATAILLE.

13                          **GALE BATAILLE**

14   HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANTS WAS FIRST

15   DULY SWORN AND EXAMINED AS FOLLOWS:

16          **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

17   RECORD.

18          **THE WITNESS:**  MY NAME IS GALE BATAILLE, G-A-L-E, LAST

19   NAME B-A-T-A-I-L-L-E.

20          **MR. LEWIS:**  GOOD MORNING, MS. BATAILLE.

21          FOR THE COURT'S KNOWLEDGE MS. BATAILLE'S EXPERT

22   REPORTS WERE FILED AND MARKED AS TRIAL EXHIBIT 1025 AND 1026,

23   AND HER QUALIFICATIONS ARE SET FORTH IN HER CURRICULUM VITAE

24   WHICH IS EXHIBIT A TO 1025.

25   ///

1              **DIRECT EXAMINATION BY MR. LEWIS**

2  **BY MR. LEWIS**

3  **Q**    MS. BATAILLE, WHAT IS YOUR CURRENT POSITION?

4  **A**    CURRENTLY, I'M A CONSULTANT WITH SEVERAL STATEWIDE

5  ORGANIZATIONS, THE CALIFORNIA MENTAL HEALTH DIRECTORS

6  ASSOCIATION AND THE CALIFORNIA INSTITUTE FOR MENTAL HEALTH.

7  **Q**    ARE YOU ALSO A MEMBER OF A JUDICIAL COUNCIL COMMITTEE?

8  **A**    YES.  I SERVE ON THE CALIFORNIA JUDICIAL COUNCIL'S CRIMINAL

9  JUSTICE AND MENTAL HEALTH TASK FORCE, WHICH IS CHARGED WITH

10 COMING UP WITH SOME BETTER SOLUTIONS TO THE CRIMINALIZATION OF

11 MENTALLY ILL FOLKS IN THIS STATE.

12 **Q**    AND IN THE COURSE OF THAT COMMITTEE AND THOSE OTHER

13 CONSULTANCIES YOU WORK ON, WHAT ARE YOUR DUTIES GENERALLY?

14 **A**    IN TERMS OF THE JUDICIAL COUNCIL COMMITTEE, I ACTUALLY SERVE

15 ON TWO TASK FORCES WITHIN THE COMMITTEE, ONE OF THEM ON

16 CO-OCCURRING DISORDERS, AND THE OTHER ON REENTRY OR EARLY

17 POST-ADJUDICATION SERVICES.

18          WITH THE CALIFORNIA MENTAL HEALTH DIRECTORS

19 ASSOCIATION, MY PRIMARY ROLE WITH THEM IS AS CONSULTANT ON

20 CRIMINAL JUSTICE POLICY ISSUES.

21 **Q**    AND PRIOR TO YOUR WORK WITH THOSE ORGANIZATIONS, DID YOU

22 WORK FOR ANY MENTAL HEALTH DEPARTMENT IN THE STATE OF

23 CALIFORNIA?

24 **A**    I WORKED FOR THREE MENTAL HEALTH DEPARTMENTS AND ONE PRIVATE

25 NONPROFIT AGENCY.  I SERVED AS DEPUTY DIRECTOR FOR ALCOHOL, DRUG

1   ABUSE AND MENTAL HEALTH SERVICES FOR NINE YEARS IN CONTRA COSTA

2   COUNTY.  I SERVED AS MENTAL HEALTH DIRECTOR FOR SOLANO COUNTY,

3   AND I SERVED AS MENTAL HEALTH DIRECTOR IN SAN MATEO COUNTY.

4   EARLY IN MY EXPERIENCE I RAN A SMALL RESIDENTIAL TREATMENT

5   FACILITY IN ALAMEDA COUNTY.

6   **Q**   WHAT IS YOUR EDUCATIONAL BACKGROUND?

7   **A**   I HAVE A BA WITH HONORS IN PSYCHOLOGY FROM OBERLAND SCHOOL,

8   AND I HAVE A MASTER'S DEGREE IN SOCIAL WORK FROM SAN FRANCISCO

9   STATE UNIVERSITY.

10  **Q**   YOU WERE RETAINED AS AN EXPERT FOR DEFENDANTS IN THIS CASE

11  REGARDING THE POTENTIAL EFFECTS OF A CALIFORNIA PRISONER RELEASE

12  ORDER ON COUNTY-BASED COMMUNITY MENTAL HEALTH SYSTEMS AND

13  MENTALLY ILL PERSONS THAT IT SERVES, CORRECT?

14  **A**   YES, I HAVE -- WAS.

15  **Q**   AND WHAT IS YOUR OPINION REGARDING THE POTENTIAL IMPACT OF A

16  PRISONER RELEASE ORDER ON CALIFORNIA'S COUNTY-BASED MENTAL

17  HEALTH SYSTEMS AND THE PERSONS IT SERVICES?

18  **A**   MY OPINION IS THAT A -- PARTICULARLY ANY KIND OF ACCELERATED

19  RELEASE ORDER WOULD HAVE A DETRIMENTAL IMPACT, NOT ONLY ON THE

20  INDIVIDUALS RELEASED, BUT ON THE COUNTY, AND, I WOULD ASSUME,

21  STATE PAROLE OUTPATIENT SYSTEMS UNLESS THERE IS SUBSTANTIAL

22  AVAILABILITY OF INCREASED FUNDING AND INCREASED SERVICES, AS

23  WELL AS, REALLY, THE CAPACITY TO PLAN AND FULLY EXECUTE THOSE

24  SERVICES.

25          I CAN SAY MORE, BUT CALIFORNIA'S MENTAL HEALTH SYSTEM

1   AT THIS POINT IS REALLY IN A CRISIS IN TERMS OF ITS CAPACITY TO

2   SERVE THE INDIVIDUALS WITH SERIOUS MENTAL ILLNESS THAT ARE

3   ALREADY IN THE MENTAL HEALTH SYSTEMS OR SEEKING SERVICES, AND

4   THAT INCLUDES CHILDREN AND YOUTH AS WELL AS ADULTS AND OLDER

5   ADULTS.

6   Q   AND WITHOUT THE ADDITIONAL RESOURCES OR PLANNING THAT YOU

7   DESCRIBE, ARE YOU CONCERNED THAT THERE WILL BE ADVERSE

8   CONSEQUENCES FOR EITHER THE RELEASED PRISONERS WITH MENTAL

9   ILLNESSES OR MEMBERS OF THE PUBLIC WHO HAVE MENTAL ILLNESS?

10  A   YES, I AM CONCERNED ABOUT THAT, THE IMPACT ON RELEASED

11  PRISONERS.  I THINK WE'VE LEARNED SOME LESSONS IN THE LAST,

12  HOPEFULLY, 30 YEARS.

13          WHEN WE LOOK AT WHO CONSTITUTES THE MAJORITY OF THE

14  HOMELESS POPULATION IN THIS STATE AND NATIONALLY, AT LEAST A

15  THIRD OF THEM HAVE SERIOUS MENTAL ILLNESS, AND USUALLY THEY HAVE

16  CO-OCCURRING SUBSTANCE ABUSE DISORDERS.  AND I'VE SEEN

17  STATISTICS THAT 25 TO A THIRD PERCENT EASILY HAVE HAD EXPERIENCE

18  IN AND OUT OF THE JUSTICE SYSTEM.  SO MANY OF THOSE FOLKS WHO --

19  ARE ALREADY PEOPLE THAT HAVE CYCLED THROUGH THE CRIMINAL JUSTICE

20  SYSTEM.

21          IN TERMS OF THE -- LET ME SEE IF I GET THE SECOND

22  PART OF THE QUESTION.  IN TERMS OF MENTAL HEALTH SYSTEMS AND THE

23  FOLKS WHO ACCESS THEM IN CALIFORNIA, WE ALREADY HAVE A SITUATION

24  WHERE THERE ARE VARIABLE RESOURCES AROUND THIS STATE, BUT IN

25  MANY SYSTEMS, THERE IS NOT THE CAPACITY TO SERVE IN A TIMELY

1    MANNER PEOPLE WITH VERY SERIOUS MENTAL ILLNESSES WHO NOW SEEK

2    SERVICES.  AND SOMETIMES THERE ARE WAITING LISTS.  MANY PEOPLE

3    SIMPLY ARE NOT ABLE TO BE SERVED IN THE PUBLIC SYSTEM AS THEY --

4    IF THEY ARE ASSESSED AS NOT HAVING THE HIGHEST LEVEL NEED.

5    OTHERS WHO EVEN HAVE HIGH LEVEL NEEDS MAY NEED TO WAIT FOR, YOU

6    KNOW, SEVERAL MONTHS TO GET AN APPOINTMENT WITH A PSYCHOLOGIST

7    OR PSYCHIATRIST.  SO THERE'S REALLY A CAPACITY ISSUE CURRENTLY

8    IN THE MENTAL HEALTH SYSTEM.

9    Q    IN YOUR EXPERT REPORT, YOU ASSUME A PRISONER RELEASE ORDER

10   ON ROUGHLY THE LEVEL OF 15,000 OFFENDERS?

11   A    YES.

12   Q    ARE YOU AWARE THE PLAINTIFFS HAVE NOW ASKED FOR A PRISONER

13   RELEASE ORDER THAT COULD SEEK UP TO 52,000 EARLY OFFENDERS BEING

14   RELEASED OVER A 24-MONTH PERIOD?

15   A    YES, I AM.

16   Q    WITHOUT ADDITIONAL PLANNING AND RESOURCES YOU MENTIONED

17   EARLIER IN YOUR OPINION, WOULD A PRISONER RELEASE ORDER OF THE

18   50,000 MAGNITUDE STILL RESULT IN THE ADVERSE CONSEQUENCES YOU

19   DESCRIBED?

20   A    IN MY OPINION, I DESCRIBED WHAT I FELT WERE SIGNIFICANT

21   ADVERSE CONSEQUENCES FOR A LOWER LEVEL RELEASE.  THEREFORE, IF

22   THERE IS A 50,000-PLUS RELEASE OF PRISONERS, I WOULD EXPECT THAT

23   THE CONSEQUENCES AND THE CONCERNS WOULD BE GREATER.

24   Q    IN FORMING YOUR OPINIONS, YOU ASSUME THAT APPROXIMATELY

25   20 PERCENT OF A PRISONER RELEASE ORDER WOULD BE COLEMAN CLASS

1  MEMBERS PENCILING OUT TO ABOUT 10,000 OFFENDERS, CORRECT?

2  **A**   YES, I DID.

3  **Q**   ARE THERE ANY OTHER ANTICIPATED CHARACTERISTICS THAT MAY BE

4  PRESENT IN THE MENTALLY ILL OFFENDER POPULATION THAT CONCERN YOU

5  IN TERMS OF THEIR FACTORS AND THEIR BACKGROUND OR THEIR HISTORY?

6  **A**   THE MENTALLY ILL OFFENDER POPULATION IN -- AND THIS IS

7  REALLY VERY COMMON KNOWLEDGE THAT'S BEEN DOCUMENTED IN RESEARCH,

8  BUT IS ALSO DOCUMENTED BY FOLKS WHO WORK WITH THIS POPULATION,

9  HAS A EXTRAORDINARILY HIGH RATE OF SUBSTANCE ABUSE.

10         THE STATE DIRECTOR OF MENTAL HEALTH RECENTLY IN A

11  STATE JUDICIAL COUNCIL MEETING SAID HE THOUGHT IT WAS

12  90 PERCENT.  I WOULD SAY THE MOST CONSERVATIVE RESEARCH SHOWS

13  SOMEWHERE IN THE NEIGHBORHOOD OF 70 TO 75 PERCENT.

14         WHEN YOU COMBINE SERIOUS MENTAL ILLNESS AND SUBSTANCE

15  ABUSE, YOU HAVE -- FIRST OF ALL, IT -- SUBSTANCE ABUSE TENDS TO

16  BE A HUGE FACTOR IN ADDITIONAL PSYCHIATRIC CRISES AND WILL CAUSE

17  DECOMPENSATION IN THE MENTAL HEALTH POPULATION.  IN ADDITION,

18  SUBSTANCE ABUSE IS CLEARLY, AND I THINK THIS IS COMMON

19  KNOWLEDGE, IS CLEARLY A HUGE FACTOR IN CRIMES THAT ARE

20  COMMITTED.

21  **Q**   DOES A CO-OCCURRING SUBSTANCE ABUSE OR USE DISORDER CAUSE A

22  MENTALLY ILL PERSON TO REQUIRE MORE SERVICES OR CARE?

23  **A**   THAT IS PROBABLY THE MOST CHALLENGING POPULATION THAT WE

24  SERVE IN PUBLIC MENTAL HEALTH, AND, FRANKLY, WE ARE REALLY JUST

25  BEGINNING TO TOUCH EFFECTIVELY SERVING THAT POPULATION.  WHAT WE

1    DO KNOW -- AND THIS IS THROUGH THE INITIAL SUBSTANCE ABUSE AND

2    MENTAL HEALTH SERVICES ADMINISTRATION, AND MANY OTHER RESEARCH

3    STUDIES IS, IS THAT SIMPLY SETTING UP A SYSTEM FOR TREATING

4    SUBSTANCE ABUSE AND HAVING ANOTHER SYSTEM FOR TREATING MENTAL

5    ILLNESS AND EXPECTING THOSE INDIVIDUALS TO GO BACK AND FORTH

6    BETWEEN THOSE SYSTEMS SEEKING CARE DOESN'T WORK WELL AT ALL.

7    MANY OF THEM JUST SIMPLY DO NOT GET CARE.  SO WE NEED TO

8    INTEGRATE, PARTICULARLY FOR THE MOST SERIOUSLY MENTAL ILL FOLKS,

9    WHICH, WITHIN THE CALIFORNIA PRISON SYSTEM, IS THE EOP

10   POPULATION, YOU NEED TO REALLY PROVIDE SERVICES THAT ARE

11   INTEGRATED TO BE EFFECTIVE.

12   Q    IN YOUR EXPERIENCE, DO PERSONS EXITING THE CRIMINAL JUSTICE

13   SYSTEM EITHER IN JAIL OR PRISON, DO THEY SEEK SERVICES FROM

14   PUBLIC MENTAL HEALTH ORGANIZATIONS?

15            **MR. GALVAN:**  OBJECTION.  NO FOUNDATION.

16            **JUDGE HENDERSON:**  LAY A FOUNDATION, COUNSEL.

17            **MR. LEWIS:**  THANK YOU, YOUR HONOR.

18   **BY MR. LEWIS**

19   Q    IN YOUR 27 YEARS AS WORKING IN VARIOUS LEVELS OF COUNTY

20   ORGANIZATIONS, DID YOU EVER HAVE A CHANCE TO STUDY OR OBSERVE

21   THE NUMBER OF PERSONS EXITING THE CRIMINAL JUSTICE SYSTEM THAT

22   MIGHT BE USING YOUR VARIOUS COUNTY SERVICES?

23   A    I HAVE NEVER DONE A FORMAL STUDY, BUT IT IS CERTAINLY WITHIN

24   MY EXPERIENCE THAT INDIVIDUALS WHO ARE ON STATE PAROLE DO SEEK

25   SERVICES PERIODICALLY IN THE PUBLIC MENTAL HEALTH SYSTEM.

1   ACTUALLY, MANY OF THEM, WE WILL ONLY FIND OUT LATER, ACTUALLY

2   ARE ON PAROLE, SO WE DON'T NECESSARILY KNOW WHEN THEY COME IN

3   THE DOOR BECAUSE THEY SOMETIMES WOULD PREFER TO USE THE PUBLIC

4   MENTAL HEALTH SYSTEM THAN PAROLE OUTPATIENT.  IT DEPENDS ON THE

5   INDIVIDUAL.

6   **Q**   DO YOU HAVE AN OPINION REGARDING, I GUESS, THE AMOUNT OF

7   SUPERVISION OR TREATMENT SERVICES THAT SHOULD BE MADE AVAILABLE

8   TO THE MOST HIGHLY NEEDING CRIMINAL MENTALLY ILL OFFENDERS

9   COMING OUT, SUCH AS THE EOP OR HIGH LEVELS OF CARE YOU

10  DESCRIBED?

11  **A**   YES, I DO.  THE EOP POPULATION -- AND THEN THERE IS SOME

12  MORE SEVERELY DISTURBED POPULATIONS THAT REALLY REQUIRE

13  INTENSIVE INPATIENT CARE.  BUT THE EOP POPULATION IN GENERAL

14  NEEDS STRUCTURED CARE AND NEEDS CARE THAT DOESN'T DEPEND ON THEM

15  VOLUNTARILY REMEMBERING AND KEEPING APPOINTMENTS AND VOLUNTARILY

16  GOING OUT AND FINDING THEIR OWN HOUSING.  THEY REALLY NEED WHAT

17  WE TEND TO CALL IN MENTAL HEALTH INTENSIVE WRAPAROUND SERVICES.

18  ACTUALLY, THAT'S BEEN RECOGNIZED IN THE WORK THAT WAS DONE IN

19  CALIFORNIA, REALLY FOLLOWING UP ON -- EXCUSE ME -- THE AB 900

20  PRISON REFORM LEGISLATION.

21          THERE HAVE BEEN SEVERAL BILLS THAT HAVE BEEN

22  INTRODUCED, AND VETOED, I THINK BECAUSE OF FINANCIAL ISSUES, BUT

23  WERE INTRODUCED BY SENATOR STEINBERG THAT REALLY FUNDED THOSE

24  KINDS OF INTENSIVE WRAPAROUND SERVICES, AND THEY ARE -- THEY

25  PROBABLY COST ON AN AVERAGE PER INDIVIDUAL $15 TO $30,000 A YEAR

1  AND REALLY NEED 24-HOUR AVAILABILITY OF CARE.

2  **Q**   ARE YOU FAMILIAR WITH CDCR'S MENTAL HEALTH PAROLEE

3  OUTPATIENT CLINICS?

4  **A**   YES, I WOULD NOT SAY I HAVE, YOU KNOW -- I HAVEN'T GONE IN

5  AND OUT OF THOSE CLINICS A LOT, BUT I AM FAMILIAR WITH THE

6  SYSTEM.

7  **Q**   BASED ON YOUR EXPERIENCE, ARE THE PAROLEE OUTPATIENT CLINICS

8  ABLE TO MEET THE NEEDS OF AN ADDITIONAL 10,000 PERSONS THAT MAY

9  BE RELEASED AS A RESULT OF THIS PRISONER RELEASE ORDER REQUIRING

10 MENTAL HEALTHCARE?

11 **A**   NO.  WHAT I CAN COMMENT ON AT THIS POINT IS THAT VERY MUCH

12 WITHIN MY EXPERIENCE, AND PARTICULARLY WHEN I WAS DIRECTOR IN

13 SOLANO COUNTY AND IN SAN MATEO COUNTY IN THE LAST 18 YEARS, IT

14 WAS NOT AT ALL UNCOMMON FOR PAROLE OUTPATIENT CLINICS TO ATTEMPT

15 TO REFER INDIVIDUALS WHO NEEDED MORE INTENSIVE CARE TO OUR

16 SYSTEM.

17         IT WAS ALSO NOT UNCOMMON FOR THEM TO SAY TO A

18 PAROLEE, AS BY SELF-REPORT THAT WE HEARD FROM THE PAROLEE, GO ON

19 OVER TO COUNTY MENTAL HEALTH AND SEE IF YOU CAN GET IN THE DOOR.

20 IT WAS COMMONLY KNOWN AND HAPPENS.

21 **Q**   DOES THIS LACK OF ACCESS BY PAROLEES TO PAROLEE OUTPATIENT

22 CARE CAUSE YOU CONCERN IN TERMS OF THE EFFECTS IT MIGHT HAVE ON

23 COUNTY HEALTH SYSTEMS?

24 **A**   YES, IT DOES.  AND LET ME GIVE A LITTLE BIT MORE SPECIFICS.

25         THE ADULT OUTPATIENT PAROLE SYSTEM HAS DONE VARIOUS

1    REPORTS.  THE ONE THAT I'VE MOST RECENTLY SEEN WAS, I BELIEVE,

2    MARCH OF 2008, AND THAT REPORT DISCUSSES BOTH RATES OF

3    RECIDIVISM FOR THE COLEMAN CLASS OF MENTALLY ILL PRISONERS AND

4    PAROLEES, AND IT ALSO LAYS OUT STAFFING RATIOS THAT ARE

5    CURRENTLY IN THOSE CLINICS.  AND HAVING WORKED IN COUNTY MENTAL

6    HEALTH SYSTEMS FOR, AS I SAID, 28 YEARS, I'M VERY FAMILIAR WITH

7    WHAT ARE GENERALLY ACCEPTED CASELOAD OF STAFFING, AND I, QUITE

8    FRANKLY, WAS A BIT SURPRISED AT THE KINDS OF RATIOS THAT

9    CURRENTLY EXIST.

10           FOR EXAMPLE, I BELIEVE THAT THERE IS -- FOR EVERY 570

11   PAROLEES WHO ARE ALREADY CLASSIFIED AS MENTALLY ILL, THERE'S ONE

12   PSYCHIATRIST.  SO IT'S A ONE TO ABOUT A 570 RATIO CASELOAD.

13   SIMILAR KIND OF SIZE FOR PSYCHOLOGISTS.  AND A ONE TO, I THINK,

14   170, -75 FOR SOCIAL WORKERS WHO WOULD HELP TO MANAGE THE CASES.

15   THAT IS DRAMATICALLY HIGHER THAN ANY CASELOAD THAT CAN

16   EFFECTIVELY WORK WITH FOLKS, IN MY EXPERIENCE, IN THE PUBLIC

17   MENTAL HEALTH SYSTEM.

18           ONE OF THE THINGS THAT REPORT DOCUMENTS IS THAT THERE

19   IS AN INCREASE IN RECIDIVISM RATE IF THERE IS NOT IMMEDIATE

20   CONTACT WITH TREATMENT AND INTENSIVE FOLLOW-UP.  SO -- THERE'S

21   BEEN A UCLA RESEARCH STUDY ON THE PAROLE OUTPATIENT CONTINUUM

22   THAT BASICALLY DOCUMENTS THAT AS THE FREQUENCY OF CONTACT AND

23   THE IMMEDIACY OF CONTACT GOES UP, THE RECIDIVISM RATE DROPS, AND

24   THE REVERSE IS TRUE.

25   Q   AND DO COUNTY MENTAL HEALTH-BASED SYSTEMS HAVE THE CAPACITY

1    TO MEET AN ADDITIONAL INFLUX OF MENTALLY ILL OFFENDERS THAT

2    MIGHT NOT BE ABLE TO GET CARE AT THE POC'S?

3    **A**    I WOULD SAY THAT THAT IS ABSOLUTELY NOT WITHIN THE CAPACITY

4    OF COUNTY MENTAL HEALTH SYSTEMS CURRENTLY.  I'VE ALREADY STATED

5    THAT COUNTY MENTAL HEALTH SYSTEMS ARE STRUGGLING WITH BEING ABLE

6    TO MEET THE CAPACITY OF THE MOST SERIOUSLY MENTALLY ILL

7    POPULATION CURRENTLY, AND THAT IS NOT -- LET ME JUST ADD THAT'S

8    NOT JUST A MATTER OF HAVING ENOUGH MONEY TO DO IT, BUT LITERALLY

9    WHETHER THERE ARE ENOUGH TRAINED PROFESSIONALS OUT THERE TO

10   BRING IN -- EVEN IF WE HAD THE MONEY, THERE ARE NOT ENOUGH

11   PSYCHIATRISTS IN THE STATE, AND THAT'S ONE OF THE MOST CRITICAL

12   SHORTAGES FOR NURSES IN THE MENTAL HEALTH SYSTEM.  THERE ARE

13   SIGNIFICANT VACANCY RATES.

14           I'M FAIRLY FAMILIAR WITH THAT BECAUSE I'VE ALSO DONE

15   WORK ON WHAT WE CALL THE WORKFORCE CAPACITY CRISIS IN

16   CALIFORNIA.

17   **Q**    IN ADDITION TO NOT HAVING STAFFING, ARE THERE ALSO FUNDING

18   PROBLEMS FOR LOCAL COUNTY MENTAL HEALTH SYSTEMS?

19   **A**    YES.  I'M NOT GOING TO -- UNLESS YOU WANT ME TO, I WON'T GO

20   INTO ALL THE FUNDING STREAMS THAT FUND THE PUBLIC MENTAL HEALTH

21   SYSTEM, BUT JUST TO SAY THAT ONE OF THE KEY STREAMS OF FUNDING

22   IS BASED ON CALIFORNIA'S SALES TAX AND VEHICLE LICENSE FEES, AND

23   WE ALL KNOW WHAT'S GOING ON IN THE ECONOMY RIGHT NOW.  THAT'S

24   TAKEN A NOSEDIVE AND, FRANKLY, HAS NOT GROWN OVER THE LAST

25   DECADE AND A HALF SINCE THAT'S BEEN IN PLACE TO KEEP UP WITH

1  WHAT THE ACTUAL COST OF DOING BUSINESS OVER THAT TIME IS.

2  **Q**   IN ONE OF YOUR EXPERT REPORTS YOU HIGHLIGHT THE IMPORTANCE

3  OF ADEQUATE PLANNING TO HAVE MENTAL HEALTH SERVICES IN PLACE

4  PRIOR TO A RELEASE OF COLEMAN CLASS MEMBERS.  WHAT WOULD SUCH

5  PLANNING ENTAIL?

6  **A**   I DID CITE THAT, AND, IN MY OPINION, DOING ADEQUATE PLANNING

7  MEANS ASSESSING -- AND I THINK THERE'S SOME DATA TO HELP WITH

8  THIS, BUT ASSESSING WHERE THE ANTICIPATED RELEASES WILL BE

9  GROUPED, I GUESS, IF YOU WANT TO SAY THAT, SO THAT, FOR EXAMPLE,

10  WE KNOW THAT L.A., RIVERSIDE, SAN BERNADINO AND SAN DIEGO

11  COUNTY, IF YOU TAKE THOSE FOUR COUNTIES TOGETHER, THEY WOULD

12  HAVE OVER 50 PERCENT OF THE RELEASED PAROLEES IN THE STATE.

13  CURRENTLY DUE, AND ONE CAN ANTICIPATE THAT ANY ADDITIONAL,

14  RELEASE WOULD HAVE A SIMILAR KIND OF PERCENTAGE IMPACT.

15        AND SO WE REALLY NEED TO LOOK AT THOSE LARGER

16  COUNTIES AND WHAT IT WOULD TAKE FOR THEM TO HAVE CAPACITY TO

17  WORK WITH A PAROLE OUTPATIENT SYSTEM AND PROVIDE SERVICES THAT

18  MAY NOT BE FEASIBLE WITHIN THE CURRENT PAROLE OUTPATIENT SYSTEM.

19  SO THAT'S ONE PART OF THE PLANNING.  IT ALSO SIMPLY TAKES TIME

20  TO, BASED ON YOUR ASSESSMENT OF THE NEEDS, TO -- IT TAKES TIME

21  TO DETERMINE WHAT PROGRAMS NEED TO COME UP AND TO PUT THEM IN

22  PLACE.  AND I THINK THAT IF I'VE HAD A FAULT AS A MENTAL HEALTH

23  DIRECTOR IN MY CAREER IT'S BECAUSE I HAVE ALWAYS BEEN OVERLY

24  OPTIMISTIC ABOUT HOW QUICKLY WE CAN BRING PROGRAMS UP AND

25  OPERATIONAL.

1              BUT I BELIEVE IT WOULD BE OPTIMISTIC, IN MY USUALLY

2    OPTIMISTIC FRAME, TO HAVE A PLAN AND PROGRAMS UP AND OPERATING

3    ANY MORE QUICKLY, AND THIS IS ASSUMING THE FINANCING IS THERE

4    AND GUARANTEED, BUT I THINK IT WOULD BE OPTIMISTIC IF WE SAID IT

5    WOULD TAKE A YEAR TO 18 MONTHS, AND, FRANKLY, I HAVE A GRAVE

6    CONCERN THAT EVEN WITH THE BEST PLANS AND EVEN WITH FINANCING,

7    WE WOULD NOT BE ABLE TO FILL THE STAFFING NEEDS THAT ARE

8    REQUIRED.  THE STATE PRISON SYSTEM HAS STRUGGLED WITH THAT.  THE

9    COUNTY MENTAL HEALTH SYSTEMS IN CALIFORNIA ABSOLUTELY STRUGGLE

10   WITH THAT.

11   **Q**   YOU MENTION CALIFORNIA'S CURRENT BUDGET IMPASSE AND CRISIS.

12   ARE YOU AWARE OF ANY POTENTIAL REDUCTIONS TO MENTAL HEALTH

13   SERVICES OR FUNDINGS THAT ARE BEING CONSIDERED?

14   **A**   I AM AWARE THAT THERE ARE VARIOUS DISCUSSIONS AFOOT IN THE

15   LEGISLATURE TO TRY TO TAKE SOME OF THE DESIGNATED MENTAL HEALTH

16   FUNDING THAT DOES EXIST THROUGH FUNDING THAT CAME THROUGH

17   PROP 63.  I THINK THAT, YEAH, THERE ARE DISCUSSIONS GOING ON.

18   **Q**   IN YOUR EXPERIENCE, DO MENTALLY ILL PERSONS SOMETIMES BECOME

19   HOMELESS?

20   **A**   I THINK -- ABSOLUTELY.  I THINK WE KNOW THAT AT LEAST A

21   THIRD OF THE MENTALLY ILL -- OF THE HOMELESS POPULATION HAS

22   MENTAL ILLNESS, AND MANY, MANY POLICY AND RESEARCH STUDIES

23   REALLY TIE THAT TO THE PROCESS OF DEINSTITUTIONALIZING, THE

24   CLOSING OF STATE HOSPITALS, AND THE FAILURE IN CALIFORNIA AND

25   NATIONALLY TO PUT SERVICES IN PLACE, PARTICULARLY HOUSING, AND

1 TREATMENT SERVICES THAT WOULD KEEP THOSE FOLKS OFF THE STREET.

2 **Q** HOW LONG DOES IT TAKE TO SET UP THOSE KINDS OF SERVICES, IN

3 YOUR EXPERIENCE?

4 **A** WELL, I MEAN, ONE OF THE ISSUES WITH TREATMENT SERVICES, I

5 THINK I'VE ADDRESSED A COUPLE OF TIMES, YOU HAVE TO HAVE THE

6 STAFF TO PROVIDE THE TREATMENT. AND CURRENTLY, PARTICULARLY

7 WITH PSYCHIATRY, NURSING, AND SOCIAL WORK, THERE SIMPLY ARE NOT

8 ENOUGH STAFF BEING PRODUCED IN CALIFORNIA, AND IT'S NOT BEEN

9 FEASIBLE TO RECRUIT VERY MANY FOLKS FROM OUT OF THE STATE

10 BECAUSE OF THE COST OF LIVING. THAT'S ONE AREA.

11          IN ADDITION, QUITE FRANKLY, THE PUBLIC MENTAL HEALTH

12 SYSTEM HAS NOT HAD ITS PRIMARY FOCUS -- REALLY, I THINK WE HAVE

13 BEEN LOOKING AT THAT MORE IN THE LAST FEW YEARS, BUT I DON'T

14 BELIEVE THAT ALL OF THE STAFF THAT EXIST IN THE SYSTEM RIGHT NOW

15 ARE NECESSARILY TRAINED IN PROVIDING THE MOST EFFECTIVE

16 EVIDENCE-BASED PRACTICES FOR A POPULATION THAT HAS CRIMINAL

17 JUSTICE EXPERIENCE. SO THAT'S AN ISSUE.

18          AND I JUST LOST THE SECOND PART OF YOUR QUESTION.

19 I'M SORRY.

20 **Q** YOU ARE RIGHT. I DID ASK IT EARLIER. THANK YOU.

21          COULD A PRISONER RELEASE ORDER THAT RELEASES SOME

22 MENTALLY ILL OFFENDERS CAUSE MEMBERS OF THE GENERAL PUBLIC TO

23 LOSE THEIR ACCESS TO MENTAL HEALTHCARE?

24 **A** I BELIEVE IT COULD HAVE A VERY SIGNIFICANT EFFECT ON THE

25 ACCESS THAT THE GENERAL PUBLIC HAS TO THE ALREADY UNDERFUNDED

1   MENTAL HEALTH SYSTEM, AND THAT IS BECAUSE IN A COMMUNITY THE

2   PUBLIC MENTAL HEALTH SYSTEM HAS AN ABSOLUTE OBLIGATION TO

3   RESPOND TO PEOPLE WITH SERIOUS MENTAL ILLNESS, INCLUDING

4   CHILDREN, BUT ALSO TO BE RESPONSIVE WHEN THERE IS A -- WHEN AN

5   INDIVIDUAL POSES A DANGER TO HIM OR HERSELF OR OTHERS, AND SO

6   THE PUBLIC MENTAL HEALTH SYSTEM REALLY ACTS AS A LOCAL SAFETY

7   NET FOR THAT KIND OF RISK MANAGEMENT IN A COUNTY.

8          AND I THINK IT WOULD BE ABSOLUTELY PREDICTABLE AND

9   EXPECTED THAT IF THERE WERE, YOU KNOW, AN INFLUX OF FOLKS WHO

10  NEEDED CARE AND WERE DEEMED TO POSE A HIGHER RISK OF ANY KIND OF

11  DANGER TO SELF OR OTHERS, THE PUBLIC MENTAL HEALTH SYSTEM WOULD

12  BE UNDER TREMENDOUS PRESSURE FROM THEIR GOVERNING BODY, WHICH IS

13  THE BOARD OF SUPERVISORS, TO PRIORITIZE THOSE FOLKS.  THAT MEANS

14  OTHER FOLKS DON'T GET SERVICES.

15  Q   DO YOU HAVE AN OPINION REGARDING THE NEED TO PLAN AND

16  PROVIDE FOR RESOURCES FOR THE SUPERVISION AND TREATMENT,

17  REHABILITATION FOR THESE MENTALLY ILL OFFENDERS AND WHAT WOULD

18  HAPPEN IF IT ISN'T PROVIDED?

19          **JUDGE KARLTON:**  THERE ARE TWO QUESTIONS.  TAKE THEM

20  ONE AT A TIME, COUNSEL.

21          **MR. LEWIS:**  THANK YOU, YOUR HONOR.  I REALIZE THAT.

22  **BY MR. LEWIS**

23  Q   IF THE PLANNING AND RESOURCES THAT YOU'RE DISCUSSING

24  REGARDING SUPERVISION AND TREATMENT REHABILITATION NEEDS OF BOTH

25  THE PUBLIC AND MENTALLY ILL OFFENDERS AREN'T PROVIDED, WHAT ARE

1    YOU AFRAID ABOUT?  WHAT'S GOING TO HAPPEN?

2    **A**   I'M CONCERNED, I GUESS, FROM A VARIETY OF PERSPECTIVES.  ONE

3    IS I THINK IT WILL CAUSE HARM TO THE INDIVIDUALS THAT ARE

4    RELEASED INTO THE COMMUNITY.  YOU KNOW, THEY ARE PERPETRATORS.

5    THAT'S WHY THEY ARE IN THE PRISON SYSTEM.  BUT THEY ALSO ARE

6    OFTEN VICTIMS.  AND I BELIEVE THAT UNTREATED, OR INADEQUATELY

7    TREATED, THOSE INDIVIDUALS WILL, IN ALL LIKELIHOOD -- FOR SURE

8    THEY WILL BE ON THE STREETS MORE.  I THINK THERE IS A RISK OF

9    SUICIDE AND DEATH, BUT IN ADDITION TO THAT, MY EXPERIENCE IS

10   THAT LOCAL POLICE JURISDICTIONS AND THE SHERIFF'S DEPARTMENT AND

11   COUNTIES END UP HAVING TO PUT THOSE PEOPLE IN LOCAL JAILS FOR A

12   VARIETY OF OFFENSES.

13            AND RIGHT NOW WE HAVE A SITUATION IN CALIFORNIA WHERE

14   JAILS ARE -- MOST JAILS ARE DRAMATICALLY OVERCROWDED AND QUITE

15   FRANKLY TREATMENT OF MENTALLY ILL INDIVIDUALS IN JAIL IS NOT

16   ADEQUATE AND HAS NOT BEEN DEEMED ADEQUATE IN MANY, MANY

17   JURISDICTIONS.  SO I THINK IT BACKS UP THE LOCAL JAIL SYSTEM.

18   AND IF THERE IS ANY KIND OF CAP OR REDUCTION IN THE ABILITY OF

19   JAILS TO MOVE PEOPLE INTO THE STATE PRISON SYSTEM, THEN YOU'VE

20   GOT -- WHAT YOU'VE DONE IS ESSENTIALLY TRANSFERRED A SIGNIFICANT

21   PROBLEM TO THE LOCAL LEVEL, AND THE LOCAL LEVEL DOES NOT HAVE

22   RESOURCES OR CAPACITY TO RESPOND TO THAT.  I KNOW THAT -- I

23   WON'T CITE COUNTIES, BUT I KNOW VERY SPECIFICALLY OF COUNTY

24   JAILS WHERE THEY ARE FAR IN EXCESS OF THEIR CAPACITY.  SO THAT

25   WAS PART ONE.

1          IN TERMS OF THE GENERAL PUBLIC AND -- I THINK THAT

2    WAS ANOTHER PART OF THE QUESTION.  YOU KNOW, THERE IS CONCERN --

3    I HAVE TWO KINDS OF CONCERNS.  ASIDE FROM IT PUSHING FOLKS WHO

4    NEED CARE TO A POINT WHERE THEY CAN'T GET CARE IN THE GENERAL

5    PUBLIC, THERE IS ALSO, AND I DON'T THINK IT'S QUANTIFIABLE

6    EASILY, BUT THERE IS SOME INCREASED RISK -- AND I'VE JUST LOOKED

7    AT SOME RECENT STATISTICS FROM THE BUREAU OF JUSTICE STATISTICS

8    DIVISION WHERE THERE IS -- THERE IS SOME DOCUMENTATION THAT

9    THERE IS ACTUALLY INCREASED RISK OF VIOLENT RECIDIVISM.

10         NOW I HAVE BEEN AN ADVOCATE ALL MY LIFE, OR ALL MY

11   PROFESSIONAL CAREER, FOR BEING ABLE TO PLACE INDIVIDUALS IN THE

12   COMMUNITY WHO HAVE MENTAL ILLNESS, AND THE RESPONSIBILITY OF

13   COMMUNITY TO TREAT AND CARE FOR THOSE INDIVIDUALS, AND I HAVE

14   CERTAINLY ADVOCATED THAT THE GENERAL MENTALLY ILL POPULATION IS

15   NO MORE RISK OF VIOLENCE IN YOUR COMMUNITY THAN ANYONE ELSE IN

16   THE GENERAL POPULATION.

17         SO I WANT TO BE REALLY CLEAR THAT I THINK, WITH

18   ADEQUATE TREATMENT AND WITH ADEQUATE SUPERVISION, INDIVIDUALS

19   CAN BE PLACED IN THE COMMUNITY AND CAN BE CARED FOR IN A WAY

20   THAT DOESN'T DRAMATICALLY RAISE COMMUNITY RISK.  WITHOUT

21   ADEQUATE TREATMENT, PARTICULARLY SUBSTANCE ABUSE TREATMENT,

22   COMBINED WITH PSYCHIATRIC TREATMENT, THERE IS SOME INCREASED

23   RISK.

24         AND PART OF MY CONCERN IS THAT WE'VE HAD A VERY

25   DIFFICULT TIME IN CALIFORNIA REALLY GETTING COMMUNITIES TO

1   ACCEPT PSYCHIATRIC TREATMENT IN THE COMMUNITY.  YOU KNOW, I CAN

2   TELL YOU MANY STORIES, AND I WON'T, BUT PERSONAL EXPERIENCE

3   WHERE I'VE HAD -- IN ONE SITUATION WHERE AN ENTIRE CITY COUNCIL

4   WAS THREATENED WITH RECALL OVER AN EFFORT TO PUT A HOMELESS/

5   MENTALLY ILL PROGRAM IN THE COMMUNITY.  WHEN YOU ADD THAT THE

6   INDIVIDUAL HAS HAD SOME CRIMINAL JUSTICE HISTORY, IT'S

7   DRAMATICALLY MORE DIFFICULT TO SITE THOSE PROGRAMS WHEN YOU'VE

8   GOT A COMMUNITY THAT'S NOT WILLING TO ACCEPT WHAT I THINK IS

9   REALLY A COMMUNITY RESPONSIBILITY, AND YOU DON'T HAVE ADEQUATE

10  PLANS AND SERVICES IN PLACE, I THINK THERE IS INCREASED RISK.

11          IF FOLKS DON'T GET TREATMENT, THERE'S AN INCREASED

12  RISK OF RECIDIVISM, AND THERE IS SOME INCREASED RISK OF

13  RECIDIVISM THAT IS HARMFUL BASED ON HARMFUL ACTS.

14          **MR. LEWIS:**  THANK YOU, MS. BATAILLE.  NO FURTHER

15  QUESTIONS, YOUR HONORS.

16          **JUDGE HENDERSON:**  INTERVENORS?

17          **MS. FUENTES:**  NO QUESTIONS, YOUR HONOR.

18          **JUDGE HENDERSON:**  CROSS-EXAMINATION.

19          **MR. GALVAN:**  THANK YOU, YOUR HONORS.  ERNEST GALVAN

20  FOR THE PLAINTIFFS.

21              **CROSS-EXAMINATION BY MR. GALVAN**

22  **BY MR. GALVAN**

23  Q   GOOD MORNING, MS. BATAILLE.

24  A   GOOD MORNING.

25  Q   THE PRINCIPAL BASIS FOR YOUR OPINIONS IS YOUR EXPERIENCE AS

1  A MENTAL HEALTH DIRECTOR AND AS A PROFESSIONAL FOR 28 YEARS IN

2  THE FIELD; IS THAT RIGHT?

3  **A**   WELL, ACTUALLY, IT'S MORE LIKE -- I HATE TO ADMIT, IT'S MORE

4  LIKE 35 TO 37 YEARS.  I HAVE BEEN IN COUNTY MENTAL HEALTH AS

5  DIRECTOR OR DEPUTY DIRECTOR FOR 28 YEARS.

6  **Q**   MOST RECENTLY IN SAN MATEO WHERE YOU RETIRED AS MENTAL

7  HEALTH DIRECTOR IN JANUARY 2008?

8  **A**   YES.

9  **Q**   SAN MATEO HAD A GOOD MENTAL HEALTH PROGRAM?

10  **A**   I THINK IT'S RECOGNIZED AS ONE OF THE BETTER ONES IN THE

11  STATE, AND IN THE COUNTRY, ACTUALLY.

12  **Q**   YOU HAD A RANGE OF SERVICES TAILORED TO YOUR RANGE OF

13  CLIENTS?

14  **A**   YES, WE DID.

15  **Q**   SO YOU HAD ONE LEVEL OF SERVICE CALLED THE INTENSIVE LEVEL

16  OF SERVICE?

17  **A**   THAT WOULD BE A NONTECHNICAL NAME FOR IT, YES.

18  **Q**   WHAT'S THE TECHNICAL NAME?

19  **A**   WELL, ONE TECHNICAL NAME THAT WE'RE USING NOW IN CALIFORNIA

20  IS CALLED FULL-SERVICE PARTNERSHIPS.

21  **Q**   COULD YOU DESCRIBE FOR THE COURT BRIEFLY WHAT THAT LEVEL OF

22  SERVICE ENTAILED?

23  **A**   YES.  IT IS -- IT IS A SERVICE WHERE WE REALLY TAILOR THE

24  TREATMENT SERVICES TO THE INDIVIDUAL NEEDS OF THE PARTICIPANT OR

25  THE CLIENT.  THE STAFFING RATIO IS GENERALLY ONE-TO-TEN OR

1  ONE-TO-15 AT THE MOST.  YOU MAKE SURE THAT THERE IS CRISIS

2  RESPONSE CAPABILITY.  WE DON'T WAIT FOR INDIVIDUALS TO COME INTO

3  A CLINIC.  YOU GO OUT AND MEET AND WORK WITH THEM WHEREVER THEY

4  ARE.

5          SUPPORTED EMPLOYMENT SERVICES IS CRITICAL.  HOUSING

6  SERVICES, AND IT'S NOT JUST GETTING SOMEBODY AN APARTMENT, BUT

7  REALLY DOING WHATEVER IT TAKES TO WORK WITH THEM ON KEEPING

8  THEIR LIVING SITUATION IS VERY CRITICAL.  AND THEN, CLEARLY,

9  TREATMENT SERVICES.  SO ALL OF THOSE THINGS ARE PART OF WHAT ONE

10  DOES.

11  Q    THEN YOU ALSO HAD AN OUTPATIENT LEVEL OF SERVICE?

12  A    YES, WE DID.

13  Q    COULD YOU DESCRIBE THAT FOR THE COURT, PLEASE?

14  A    OUTPATIENT CARE BASICALLY INCLUDED CASE MANAGEMENT SERVICES,

15  PSYCHIATRIC SERVICES, NURSING SERVICES AND THERAPEUTIC SERVICES.

16  AND, AGAIN, YOU WOULD TAILOR THE MIX OF THOSE SERVICES DEPENDING

17  ON THE NEED OF THE PERSON.  I WOULD SAY THAT PROBABLY, AND I'M

18  ESTIMATING HERE, BUT I THINK PROBABLY 95 PERCENT OF THE ADULT

19  OUTPATIENT TREATMENT SYSTEM CLIENTS REQUIRE PSYCHIATRIC

20  MEDICATIONS AND NEED MONITORING FOR THAT.

21          THE INTENSITY OF THERAPEUTIC SERVICES REALLY DEPENDS.

22  AND SOME OF THOSE ARE INDIVIDUALS, SOME OF THOSE ARE GROUPS.

23  THAT REALLY DEPENDS ON THE PARTICULAR NEEDS OF THE INDIVIDUAL.

24          I WOULD SAY, IN GENERAL, THERE HAS NEVER BEEN

25  SUFFICIENT STAFFING TO PROVIDE THE INTENSITY OF THE THERAPEUTIC

1  AND THE CASE MANAGEMENT SERVICES THAT I THINK FOLKS WOULD SAY

2  WAS APPROPRIATE.  WE'VE ALWAYS BEEN LOW ON THAT.  THAT'S IN ONE

3  OF THE BEST SYSTEMS, IN ONE OF THE BEST STAFF SYSTEMS.

4  **Q**   THEN YOU ALSO HAD AN LPS CONSERVATORSHIP LEVEL OF CARE?

5  **A**   LPS CONSERVATORSHIP IS A LEGAL STATUS, AND THE CARE WOULD

6  DEPEND ON WHAT THE INDIVIDUAL CONSERVATEE NEEDED.  SO SOME OF

7  THOSE INDIVIDUAL CONSERVATEES ARE ACTUALLY PLACED IN 24-HOUR

8  FACILITIES, SUBACUTE SKILLED NURSING KINDS OF FACILITIES.  SOME

9  ARE IN THE COMMUNITY, AND YOU CLEARLY HAVE TO PROVIDE CASE

10 MANAGEMENT AND SOMEWHAT MORE INTENSIVE SERVICES FOR THAT GROUP,

11 AND, CLEARLY, THE HOUSING OF -- THE HOUSING SERVICES FOR THOSE

12 FOLKS IS VERY IMPORTANT.

13 **Q**   THEN YOU HAD THE IMD LEVEL, WHICH I BELIEVE STANDS FOR

14 INSTITUTIONS FOR MENTALLY DISABLED, SUBACUTE?

15 **A**   THAT'S SUBACUTE SKILLED NURSING, IMD.  I KIND OF GROUPED

16 THEM TOGETHER FOR YOU.

17 **Q**   YOU HAD SOME CONTRACTS WITH PRIVATE PROVIDERS FOR THE BEDS

18 FOR THOSE IMD'S?

19 **A**   YES.  ALL OF THE IMD BEDS THAT SAN MATEO COUNTY USED ARE

20 PRIVATELY CONTRACTED.

21 **Q**   YOU HAVE A FACILITY CALLED CORDILLERAS UNDER CONTRACT,

22 60-BEDS, SOMEWHERE IN THERE?

23 **A**   CORDILLERAS.

24 **Q**   SOME OF THOSE BEDS ARE LOCKED; IS THAT RIGHT?

25 **A**   YES.  THERE'S A COMBINATION OF LOCKED BEDS AND SOME

1   RESIDENTIAL BOARD AND CARE BEDS IN THE FACILITY.

2   Q    WHEN YOU WERE THERE, IS IT CORRECT TO SAY THE SAN MATEO

3   MENTAL HEALTH SYSTEM SERVED ABOUT 10,000 CLIENTS IN A GIVEN

4   YEAR?

5   A    SOMEWHAT MORE THAN THAT.  TEN TO 11,000.

6   Q    TEN TO 11,000?

7   A    MM-HMM.

8   Q    TO BREAK DOWN THE LEVELS OF CARE, IS IT CORRECT TO SAY ABOUT

9   25 PERCENT WERE THE INTENSIVE LEVEL?

10  A    YOU KNOW, WHEN YOU TALK ABOUT INTENSIVE LEVEL, IF YOU ARE

11  SAYING 25 PERCENT THAT HAD SOME ACUTE INPATIENT CARE, I WOULD

12  NOT SAY 25 PERCENT AT ANY POINT IN TIME RECEIVED THE INTENSIVE

13  LEVEL.

14          THE FULL SERVICE PARTNERSHIP LEVEL THAT WE TALKED

15  ABOUT, WE HAD, AT THE TIME I LEFT, JUST SLIGHTLY OVER A HUNDRED

16  SLOTS --

17  Q    OKAY.

18  A    -- FOR 10,000-PLUS CLIENTS --

19  Q    WHEN YOU WERE --

20  A    -- IN THE ADULT SYSTEM.

21  Q    WHEN YOU WERE PREPARING YOUR BUDGET FOR SAN MATEO COUNTY AND

22  YOU HAD TO LAY OUT FOR THE BOARD OF SUPERVISORS HOW MANY PEOPLE

23  YOU SERVED AT EACH LEVEL OF CARE, ABOUT 25 PERCENT WERE IN THE

24  INTENSIVE LEVEL; IS THAT RIGHT?

25  A    I'M TRYING TO REMEMBER THE STATISTIC, AND I DON'T KNOW WHAT

1  YOU ARE REFERRING TO.  THAT WOULD SEEM CORRECT.  I DON'T HAVE

2  THAT STATISTIC IN MY HEAD OFF THE TOP --

3           **MR. GALVAN:**  COULD WE, MR. JONES, PUT UP THE SAN

4  MATEO BUDGET DOCUMENT?

5           **JUDGE REINHARDT:**  "IT WOULD SEEM CORRECT," ISN'T THAT

6  GOOD ENOUGH?

7           **MR. GALVAN:**  YES, YOUR HONOR.

8  **BY MR. GALVAN**

9  **Q**   TWENTY-FIVE PERCENT WOULD SEEM CORRECT?

10 **A**   TWENTY-FIVE PERCENT WOULD SEEM CORRECT IF YOU THINK ABOUT

11 WHAT CONSTITUTES THAT 25 PERCENT.  I'VE JUST SAID OF THAT

12 25 PERCENT, THE MOST INTENSIVE LEVEL, WITH THE LOW STAFFING

13 RATIO, THE FULL-SERVICE PARTNERSHIPS ARE -- THE LAST I COUNTED,

14 AND IT'S BEEN A YEAR, THERE WERE ONLY ABOUT A HUNDRED OF THOSE

15 FOR ADULTS.

16           ALSO REMEMBER THAT THE EOP LEVEL OF CARE IN THE

17 STATE, AT LEAST IN TERMS OF THINKING ABOUT --

18           **MR. GALVAN:**  MOVE TO STRIKE AS NON-RESPONSIVE, YOUR

19 HONOR.

20           **JUDGE REINHARDT:**  PUT UP THE CHART.  I'M SORRY.  SHE

21 SAID -- YOU ASKED HER WHAT SHE REPORTED TO THE BOARD OF

22 SUPERVISORS.  YOU SAID, WASN'T IT 25 PERCENT?  SHE SAID IT SEEMS

23 CORRECT.  NOW IF YOU WANT TO PROVE IT TO HER, GO AHEAD.

24           (DOCUMENT DISPLAYED.)

25

1   **BY MR. GALVAN**

2   **Q**   COULD WE FOCUS ON THE TOP, TOP ROW THERE?

3            DO YOU REMEMBER THESE CHARTS FROM WHEN YOU WERE THE

4   HEAD OF THE --

5   **A**   YES, I DO.  I DO.

6   **Q**   SO IS IT FAIR TO SAY THAT ABOUT 2,400 YOU REPORTED TO THE

7   BOARD AS AT THE INTENSIVE LEVEL OF SERVICE IN FISCAL YEAR

8   '05/'06?

9   **A**   THAT'S CORRECT.

10  **Q**   AND THEN ABOUT 75 PERCENT OF YOUR CLIENTS WERE AT THE

11  OUTPATIENT LEVEL; IS THAT CORRECT?

12  **A**   YES, BUT LET ME CLARIFY.

13           OUTPATIENT COULD BE ONE CONTACT WITH AN EMERGENCY OR

14  HOT LINE.  THE 25 PERCENT WOULD GET SOMEBODY IN THE 25 PERCENT

15  LEVEL MAYBE THREE DAYS OF HOSPITALIZATION, AND MOST OF THE TIME

16  THEY'RE REALLY GETTING OUTPATIENT SERVICES.  SO IT'S VERY

17  DIFFICULT TO QUANTIFY AT THIS HIGH LEVEL.

18           IT IS NOT CORRECT TO ASSUME THAT IN SAN MATEO,

19  25 PERCENT OF EVERYONE IN THAT CURRENT SYSTEM COULD GET A REALLY

20  INTENSIVE LEVEL OF CARE.  THAT'S ANYBODY WHO DURING THE COURSE

21  OF THE YEAR TOUCHED A 24-HOUR FACILITY.

22  **Q**   OKAY.  AND THAT'S ABOUT 25 PERCENT OF YOUR 10,000, 11,000?

23  **A**   TOUCHED A 24-HOUR FACILITY OR RECEIVED FULL SERVICE

24  PARTNERSHIP, YES, THAT'S CORRECT.

25  **Q**   SO USING ROUND NUMBERS, ABOUT 2,500 PEOPLE EXPERIENCED SOME

1  SERVICES AT THE INTENSIVE LEVEL?

2  **A**   YES.

3  **Q**   OUT OF YOUR 10,000, ABOUT 7,500 PEOPLE EXPERIENCED SOME

4  SERVICES AT THE OUTPATIENT LEVEL?

5  **A**   THAT SOUNDS CORRECT, AND OF THOSE MANY OF THOSE ARE CHILDREN

6  AND YOUTH.

7  **Q**   AND A FEW HUNDRED RECEIVED SOME SERVICES AT THE LPS LEVEL OR

8  IMD LEVEL?

9  **A**   YES, THAT NUMBER IS FAIRLY CONSISTENT, AND THAT IS NOT A

10 DIFFERENT LEVEL.  THAT IS A DIFFERENT LEGAL STATUS.  THOSE

11 INDIVIDUALS MIGHT BE RECEIVING OUTPATIENT CARE.  THEY MIGHT ALSO

12 BE RECEIVING INPATIENT CARE.  THAT'S JUST HOW MANY FOLKS IN A

13 YEAR WERE ON AN LPS CONSERVATORSHIP.

14 **Q**   OKAY.  WE'RE DONE WITH THIS CHART.

15         IN REACHING YOUR OPINIONS FOR THIS TRIAL, YOU DIDN'T

16 TOUR ANY OF THE STATE PRISONS, DID YOU?

17 **A**   NO, I DID NOT TOUR PRISONS FOR THIS, NO.

18 **Q**   AND YOU HAVEN'T BEEN IN ANY STATE PRISONS WITHIN THE LAST

19 FEW YEARS, HAVE YOU?

20 **A**   NOT WITHIN THE LAST COUPLE OF YEARS, NO.

21 **Q**   IN FACT, YOU'VE ONLY BEEN TO ONE STATE PRISON, SAN QUENTIN?

22 **A**   ACTUALLY, I KNOW YOU ASKED ME THAT IN MY DEPOSITION, AND,

23 ACTUALLY, I WASN'T THINKING AT THAT TIME, BUT I'VE ALSO BEEN IN

24 VACAVILLE BECAUSE I WAS DIRECTOR OF MENTAL HEALTH IN SOLANO

25 COUNTY.

1  Q    AND YOU DON'T HOLD YOURSELF OUT AS AN EXPERT ON ANYTHING

2  ABOUT THE INTERNAL OPERATION OF THE PRISONS, DO YOU?

3  A    NO.  AND THAT ISN'T WHAT I WAS RETAINED FOR.

4  Q    YOU ARE NOT PROVIDING THE COURT WITH ANY OPINIONS AT ALL

5  ABOUT MENTAL HEALTHCARE IN THE PRISONS; IS THAT RIGHT?

6  A    THAT'S NOT MY INTENTION, NO.

7  Q    I'D LIKE TO READ YOU A SHORT STATEMENT AND ASK YOU IF YOU

8  AGREE WITH IT.

9             "SOME PEOPLE MAY ARGUE THAT THE BASIC

10            BUILDING BLOCKS OF AN EFFECTIVE MENTAL HEALTH

11            SYSTEM ARE LACKING IN MANY COMMUNITIES, AND,

12            THEREFORE, EFFORTS TO REDUCE THE

13            OVERREPRESENTATION OF PEOPLE WITH MENTAL ILLNESS

14            IN THE CRIMINAL JUSTICE SYSTEM ARE FUTILE.  THIS

15            ARGUMENT IS NOT PERSUASIVE.  EVEN THEN, MOST

16            UNDERFUNDED MENTAL HEALTH SYSTEMS CAN WORK TO

17            IMPROVE SERVICES TO INDIVIDUALS WITH THE

18            GREATEST NEED, INCLUDING THE GROUP OF PEOPLE

19            WITH SERIOUS AND PERSISTENT MENTAL DISORDERS WHO

20            HAVE FREQUENT INTERACTION WITH THE CRIMINAL

21            JUSTICE SYSTEM.  SUCH EFFORTS REQUIRE CLOSE

22            COLLABORATION BETWEEN THE MENTAL HEALTH AND

23            CRIMINAL JUSTICE SYSTEMS."

24            DO YOU AGREE WITH THAT STATEMENT?

25  A    IF THE SUMMATION OF THE STATEMENT IS THAT LOCAL SYSTEMS,

1  EVEN THOUGH THEY ARE UNDERRESOURCED AND UNDERFUNDED, COULD

2  IMPROVE SERVICES TO FOLKS INVOLVED IN THE CRIMINAL JUSTICE

3  SYSTEM THROUGH COLLABORATION, ABSOLUTELY.  THAT'S WHAT MANY,

4  MANY CALIFORNIA SYSTEMS ARE TRYING TO DO, AND THAT'S ACTUALLY

5  WHAT WE ARE TRYING TO HELP PROVIDE INPUT ON THROUGH THE STATE

6  JUDICIAL COUNCIL.  MENTAL HEALTH COURTS, COLLABORATIONS WITH

7  PROBATION DEPARTMENTS, ALL OF WHICH WE WERE ABLE TO DO IN SAN

8  MATEO COUNTY, AND WITH LOCAL POLICE DEPARTMENTS, ABSOLUTELY

9  IMPROVE SERVICES.  THEY DON'T ABSOLUTELY, THOUGH, ADDRESS A LACK

10 OF CAPACITY TO PROVIDE SERVICES TO EVERYONE WHO NEEDS THEM,

11 INCLUDING THE MOST SERIOUSLY MENTALLY ILL.

12 **Q**   YOU TESTIFIED ABOUT HOW COUNTY MENTAL HEALTH PRIORITIZES

13 SERVICES AND HOW, IF THERE'S A PRISONER RELEASE ORDER, THERE'S

14 THE DANGER THEY WOULD PRIORITIZE SERVICES TO THE RELEASED

15 MENTALLY ILL PRISONERS AT THE EXPENSE OF THE GENERAL PUBLIC?

16 **A**   YES, I DID.

17 **Q**   AND YOU KNOW THAT 10,000 PEOPLE PER MONTH ARE RELEASED RIGHT

18 NOW FROM CALIFORNIA PRISONS TO THE COMMUNITIES?

19 **A**   YES, I DO.

20 **Q**   AND YOU KNOW THAT USING THE 20 PERCENT ESTIMATE, ABOUT 2,000

21 OF THEM ARE PERSONS WITH MENTAL ILLNESS MEMBERS OF THE COLEMAN

22 CLASS?

23 **A**   THAT ARE NEWLY RELEASED EACH MONTH.

24 **Q**   THAT ARE NEWLY RELEASED EACH MONTH.

25 **A**   BECAUSE THE TOTAL PAROLE OUTPATIENT SYSTEM MONTHLY AVERAGE

1    IS MORE LIKE 22,5-, 23,000 OF MENTALLY ILL, SO YOU ADD -- SO

2    IT'S 2,000 A MONTH NEW WITHIN THAT SYSTEM.

3    **Q**   YES.  YOU ARE AWARE THAT 2,000 A MONTH NEW COME INTO YOUR

4    COMMUNITIES?

5    **A**   YES.

6    **Q**   FROM THE PRISON SYSTEM?

7    **A**   YES.

8    **Q**   DO THE MENTAL HEALTH DIRECTORS PRIORITIZE THEM FOR SERVICE

9    NOW?

10   **A**   CURRENTLY, IN CALIFORNIA THERE'S SOME VARIABILITY, BUT,

11   TRADITIONALLY, IN CALIFORNIA, IT'S BASICALLY OPERATED AS A

12   PARALLEL SYSTEM.  SO THAT, IN GENERAL, PAROLEES RECEIVE THEIR

13   CARE, AND HAVE RECEIVED THEIR CARE, FROM THE PAROLE OUTPATIENT

14   SYSTEM.

15          THE PROBLEM, I THINK, THAT CDCR, AND IS BECOMING MORE

16   RECOGNIZED, IS THE PAROLE OUTPATIENT SYSTEM DOES NOT PROVIDE THE

17   FULL RANGE OF INTENSIVE SERVICES THAT ARE NEEDED FOR THE HIGHEST

18   RISK PAROLEES.  THAT'S WHY CDCR IS ATTEMPTING TO DEVELOP

19   SERVICES VIA COUNTIES AND CONTRACT AGENCIES TO PROVIDE THAT FULL

20   SERVICE PARTNERSHIP, THAT INTENSIVE LEVEL OF CARE.

21          **JUDGE KARLTON:**  I'M NOT SURE YOU'VE ANSWERED THE

22   QUESTION.  THE QUESTION WAS ABOUT 10,000 PEOPLE ARE BEING

23   RELEASED OF WHICH ABOUT 20-PLUS PERCENT ARE COLEMAN CLASS

24   MEMBERS.  DOES THE COMMUNITY TODAY PRIORITIZE IN FAVOR OF THOSE

25   PEOPLE AS AGAINST POPULATION IN GENERAL?

1          **THE WITNESS:**  THANK YOU, YOUR HONOR.  THE ANSWER IS

2   GENERALLY, NO, NOT THE PUBLIC MENTAL HEALTH SYSTEM.

3   **BY MR. GALVAN**

4   **Q**   AND YOU ARE AWARE THAT OTHER STATES, INCLUDING TEXAS AND

5   PENNSYLVANIA, HAVE USED POPULATION CAPS TO REDUCE THEIR PRISON

6   POPULATIONS, AREN'T YOU?

7   **A**   I JUST MISSED -- SAY THAT AGAIN, A LITTLE MORE SLOWLY.

8   **Q**   YOU ARE AWARE THAT OTHER STATES, INCLUDING TEXAS AND

9   PENNSYLVANIA, HAVE USED POPULATION CAPS TO REDUCE THEIR PRISON

10  POPULATION, AREN'T YOU?

11  **A**   I -- NOT SPECIFICALLY AWARE OF WHAT PENNSYLVANIA DID.  I DO

12  KNOW THAT OTHER STATES HAVE USED POPULATION CAPS, YES.

13  **Q**   IN YOUR STUDY FOR PREPARING FOR YOUR TESTIMONY TODAY, YOU

14  DIDN'T FIND ANY EVIDENCE, DID YOU, THAT PENNSYLVANIA, TEXAS, OR

15  ANY OTHER STATE STOPPED SERVING CHILDREN IN ITS COMMUNITY MENTAL

16  HEALTH SYSTEM BECAUSE OF THE POPULATION REDUCTIONS?

17  **A**   I'M HAVING TROUBLE WITH THAT QUESTION.  I DID NOT DELVE

18  INTO, NOR HAVE I SEEN -- I HAVE NOT SEEN THE PENNSYLVANIA

19  RESEARCH.  PERHAPS I SHOULD HAVE.  BUT I HAVEN'T -- I'M REALLY

20  GROUNDING MY TESTIMONY ON WHAT I KNOW IS CURRENTLY AVAILABLE IN

21  CALIFORNIA'S PUBLIC MENTAL HEALTH SYSTEM, AND THE CAPACITY

22  AROUND THAT, AND THE UNDERCAPACITY TO SERVE ADEQUATELY, AS

23  EVIDENCED BY RECIDIVISM RATES IN THE PAROLE OUTPATIENT SYSTEM.

24  **Q**   AS YOU SIT HERE TODAY, YOU HAVE NO EVIDENCE THAT ANY OTHER

25  STATE THAT HAS REDUCED ITS PRISON POPULATION THROUGH A CAP HAS

1   HAD TO STOP SERVING MEMBERS OF THE GENERAL PUBLIC IN ITS

2   COMMUNITY MENTAL HEALTH SYSTEM, DO YOU?

3               **MR. LEWIS:**  OBJECTION.  LACK OF FOUNDATION.

4               **JUDGE HENDERSON:**  ASK IF SHE HAS ANY SUCH EVIDENCE.

5               **JUDGE KARLTON:**  JUST ASK WHETHER SHE'S AWARE.  EITHER

6   SHE IS OR SHE ISN'T.

7               **THE WITNESS:**  I AM NOT AWARE OF SPECIFIC EVIDENCE,

8   ALTHOUGH TEXAS HAS A SYSTEM THAT I HOPE CALIFORNIA DOES NOT WANT

9   TO EMULATE.

10              **MR. GALVAN:**  MOVE TO STRIKE THE LATTER PART AS

11  NON-RESPONSIVE.

12              **JUDGE HENDERSON:**  OVERRULED.

13  **BY MR. GALVAN**

14  Q   YOUR ASSUMPTIONS ABOUT THE IMPACT OF A RELEASE INCLUDED THE

15  GENERAL 20 PERCENT ASSUMPTION OF CLASS MEMBERSHIP, MENTAL

16  ILLNESS AMONG ANY GIVEN COHORT OF CALIFORNIA PRISONERS, RIGHT?

17  A   YES.

18  Q   AND YOU FURTHER NOTED THAT ABOUT 15 PERCENT OF THAT SMALLER

19  NUMBER, 15 PERCENT OF THE 20 PERCENT, WOULD BE AT THE ENHANCED

20  OUTPATIENT LEVEL OF CARE?

21  A   YES.

22  Q   ABOUT 85 PERCENT WOULD BE AT 3CMS, OR CCCMS, LEVEL OF CARE?

23  A   YES.  AS SOMEONE IS CLASSIFIED IN THE PRISON, THAT'S WHAT

24  CARRIES THROUGH WHEN THEY'RE PLACED IN OUTPATIENT PAROLE STATUS.

25  ALTHOUGH, I WOULD SAY AT LEAST DR. STEWART QUESTIONED WHETHER

1  THAT WAS ENTIRELY ACCURATE WITHIN THE PRISON BECAUSE HE TALKED

2  ABOUT THERE BEING FOLKS IN THE PRISON WHO WERE UNDERCLASSIFIED.

3  **Q**  REGARDLESS OF DR. STEWART, YOU USED THOSE NUMBERS IN

4  REACHING YOUR OPINIONS, CORRECT?

5  **A**  I DID.  I DID.

6  **Q**  AND YOU'VE GONE OVER THE -- YOUR AWARENESS THAT WE'RE

7  SEEKING A REDUCTION OF 52,000 PRISONERS OVER TWO YEARS, THAT'S

8  RIGHT?

9  **A**  YES.

10  **Q**  SO APPLYING THOSE PERCENTAGES, 20 PERCENT TO 52,000, YOU GET

11  ABOUT 10,400, RIGHT?

12  **A**  YES.  THAT'S APPROXIMATELY WHAT I WOULD ASSUME.

13  **Q**  OKAY.  STRETCHING IT OVER TWO YEARS, 5,200 PER YEAR, RIGHT?

14  **A**  YES.

15  **Q**  OKAY.

16  **A**  YEAH, I WOULD ASSUME THAT.  YEAH, I WOULD.

17  **Q**  YOU ARE AWARE THAT, ACCORDING TO THE STATE DEPARTMENT OF

18  MENTAL HEALTH'S CLIENT AND SERVICE INFORMATION SYSTEM, THE

19  COUNTY MENTAL HEALTH SYSTEM SERVED OVER 658,000 PERSONS IN

20  FISCAL '05, '06?

21  **A**  YES, I AM.  THAT'S ANY CONTACT.  THAT COULD BE A SINGLE

22  CONTACT TO A 24-HOUR LINE.

23  **Q**  BUT IT'S ALSO YOUR OPINION THAT USING THAT BIG STATEWIDE

24  AGGREGATE DATA IS NOT AS HELPFUL AS IT COULD BE TO THE COURT; IS

25  THAT RIGHT?

 1  **A**    YES, IT IS MY OPINION.

 2  **Q**    IT'S BETTER TO FOCUS ON THE COUNTY BY COUNTY IMPACT, RIGHT?

 3  **A**    I THINK YOU NEED TO LOOK AT BOTH, BUT I THINK THAT IN TERMS

 4  OF WHERE SERVICES ARE GROUNDED IS COUNTY BY COUNTY, AND THERE

 5  ARE AREAS OF THE STATE THAT ARE PARTICULARLY STRUGGLING WITH

 6  RESOURCES, INCLUDING THE ABILITY TO ATTRACT STAFF.  THOSE HAPPEN

 7  TO BE IN THE AREAS THAT SOME OF THE PRISONS ARE IN CALIFORNIA.

 8  **Q**    YOUR DIRECT EXPERIENCE IS THREE COUNTIES, CONTRA COSTA,

 9  SOLANO, AND SAN MATEO, RIGHT?

10  **A**    AND ALAMEDA.

11  **Q**    AND ALAMEDA?

12  **A**    YES.

13  **Q**    AND MOST RECENTLY SAN MATEO?

14  **A**    YES.

15  **Q**    SO LET'S LOOK AT THE IMPACT ON SAN MATEO.  SO YOU ARE AWARE

16  THAT WHEN THOSE PRISONERS COME OUT EVERY MONTH, 10,000 OR SO,

17  ONE PERCENT OF THEM GO TO SAN MATEO; IS THAT RIGHT?

18  **A**    YES.  YES.

19  **Q**    ONE PERCENT IS A GOOD EASY NUMBER TO WORK WITH.

20          SO USING OUR 5,200 PER YEAR THAT A POPULATION

21  REDUCTION WOULD CAUSE TO EITHER GO TO SAN MATEO A LITTLE EARLIER

22  OR BE DIVERTED AND STAY IN SAN MATEO, ONE PERCENT IS 520 PER

23  YEAR; IS THAT RIGHT?

24  **A**    MM-HMM.

25  **Q**    OKAY.  AND THEN DIVIDING THAT BY -- I'M SORRY, 520 OVER THE

1  TWO YEARS.  I EXAGGERATED.

2  **A**   OVER THE TWO YEARS, BUT ARE YOU ASSUMING THAT THAT'S A

3  CONSTANT NUMBER, BECAUSE, YOU KNOW, I THINK THERE WILL BE

4  POPULATION BULGES THAT COME AND GO.

5  **Q**   FOR --

6  **A**   BECAUSE IT DEPENDS ON HOW PEOPLE MOVE OFF OF PAROLE AS WELL,

7  CORRECT?

8          **JUDGE KARLTON:**  WE KNOW THAT 10,000 A MONTH ARE BEING

9  RELEASED, AND COUNSEL IS SUGGESTING TO YOU THAT WE USE THE SAME

10 SYSTEM.  THERE'S NO REASON TO THINK IT WON'T BE.

11 **BY MR. GALVAN**

12 **Q**   I'M GOING TO USE THE SAME WAY OF ESTIMATING IMPACT.

13         **JUDGE KARLTON:**  JUST A MINUTE.  IS THAT A REASONABLE

14 ASSUMPTION?

15         **THE WITNESS:**  I THINK THAT'S REASONABLE WITH THE

16 PROVISO THAT, YOU KNOW, THAT -- I DON'T KNOW THE POPULATION CAN

17 BE ASSUMED TO BE STEADY, SO YOU HAVE CAPACITY ISSUES AT TIME TO

18 TIME.  THAT'S ALL.

19         **JUDGE KARLTON:**  I KNOW YOU CAN'T KNOW THAT.  I'M JUST

20 SAYING AS A REASONABLE ASSUMPTION.  I'M TRYING TO UNDERSTAND

21 WHAT IT IS YOU'RE SAYING, MA'AM.

22         **THE WITNESS:**  YES, YOUR HONOR.

23         **JUDGE KARLTON:**  AS A REASONABLE ASSUMPTION, IT IS NOT

24 UNREASONABLE AND, INDEED, MOST LIKELY THAT ANY INCREASE CAUSED

25 BY ORDER OF THIS COURT WOULD FOLLOW THE PATTERN THAT HAS EXISTED

 1  UP UNTIL NOW?

 2          **THE WITNESS:**  I THINK THAT'S A REASONABLE ASSUMPTION,

 3  YOUR HONOR.

 4  **BY MR. GALVAN**

 5  **Q**   SO GOING BACK TO THE 520 NEW PAROLEES OF ANY KIND, MENTALLY

 6  ILL, NOT MENTALLY ILL, JUST THE WHOLE GROUP, OVER TWO YEARS --

 7  I'M GOING TO CUT THAT BY A YEAR, 260, WHICH IS HALF -- EACH YEAR

 8  SAN MATEO WOULD GET 260 NEW PAROLEES OF ANY KIND; IS THAT RIGHT?

 9  IN ADDITION TO WHAT THEY NORMALLY GET; IS THAT RIGHT?

10  **A**   YES.  FOLLOWING THAT LOGIC, YES.

11  **Q**   DIVIDING 260 BY 12 MONTHS, WE GET A RATE OF 22 PER MONTH

12  EXTRA PAROLEES IN SAN MATEO, RIGHT?

13  **A**   OKAY.  I'M NOT QUITE FOLLOWING YOUR LOGIC, BECAUSE I THINK

14  YOU -- THAT'S ASSUMING THAT 22 GO OFF EVERY MONTH.

15  **Q**   NO.  I WOULD LIKE -- WHAT I WOULD LIKE TO DO -- I WANT TO

16  USE YOUR METHODOLOGY.  YOUR METHODOLOGY IN YOUR REPORTS, AND

17  TELL ME IF I'M WRONG, WAS TO EXAMINE THE IMPACT OF PEOPLE

18  ARRIVING, AND PUTTING ASIDE FOR THE SAKE OF SIMPLICITY AND

19  EVERYONE UNDERSTANDS, THE IMPACT OF PEOPLE LEAVING PAROLE,

20  CORRECT?

21  **A**   WHAT I THINK YOU NEED TO LOOK AT IS AN ESTIMATE OF HOW MANY

22  ADDITIONAL OVER ANY POINT IN TIME WOULD BE ON THE PAROLE SYSTEM,

23  AND I'M JUST TRYING TO FOLLOW THE LOGIC TRAIN WITH YOU.  SO IF

24  YOU'RE INCREASING THE NUMBER OF FOLKS ON PAROLE OVER A ONE-YEAR

25  PERIOD, THEN I WOULD THINK YOU DON'T JUST ASSUME THAT THERE'S

1  ONLY 22 ON ANY SINGLE MONTH.  I THINK YOU HAVE A CUMULATIVE

2  EFFECT YOU'RE INCREASING THE TOTAL NUMBER OF PEOPLE.

3         **JUDGE KARLTON:**  BUT A CERTAIN NUMBER ARE GOING OFF

4  AND ALL KINDS OF THINGS ARE GOING ON?

5         **THE WITNESS:**  YEAH, YEAH, YEAH.

6         WHY DON'T YOU CONTINUE WITH YOUR LOGIC, AND I'LL -- I

7  THINK I KNOW WHERE YOU ARE DRIVING, WHICH -- I WON'T MAKE THE

8  ASSUMPTION.  I'LL LET YOU LEAD ME TO THE ASSUMPTION, SIR.

9  **BY MR. GALVAN**

10 **Q**   SO WHEN SAN MATEO GETS ITS 260 EXTRA PAROLEES PER YEAR, IT

11 IS REASONABLE TO PROJECT THAT THOSE WILL DIVIDE UP BY THE MONTHS

12 INTO 22 PER MONTH, CORRECT?

13 **A**   I'M GOING TO HAVE TO SAY I WILL FOLLOW YOUR LOGIC.  I DON'T

14 NECESSARILY AGREE THAT'S THE EXACT NUMBER.

15 **Q**   IS 260 DIVIDED BY 12 ROUGHLY 22?

16 **A**   I UNDERSTAND THAT.  BUT I DON'T BELIEVE --

17        **JUDGE HENDERSON:**  HOW ABOUT MEDIAN NUMBER OVER THE

18 YEAR OR SOMETHING THAT?

19        **THE WITNESS:**  THAT'S WHAT I'M TRYING TO GET AT, YOUR

20 HONOR.

21        **MR. GALVAN:**  ESTABLISHING THAT IT'S THE MEDIAN NUMBER

22 OVER THE YEAR IS GOING TO BE 22 PER MONTH OF ALL PAROLEES OF ANY

23 DIAGNOSIS, AND THEN APPLYING THE ONE-FIFTH PROPORTION,

24 20 PERCENT PROPORTION, OF COLEMAN CLASS MEMBERS, THEN IT'S FAIR

25 TO SAY THAT SAN MATEO COULD EXPECT AN EXTRA FOUR TO FIVE COLEMAN

1  CLASS MEMBERS PER MONTH AS A RESULT OF A 52,000 OVER A TWO-YEAR

2  POPULATION REDUCTION, CORRECT?

3  **A**   I AM NOT COMFORTABLE WITH FOLLOWING THAT TRAIN OF LOGIC WITH

4  YOU, AND I WILL TELL YOU WHY.  BECAUSE I DON'T BELIEVE THAT

5  PEOPLE NEED ONE MONTH OF CARE.  I THINK YOU'RE INCREASING -- IF

6  YOU SAID TO ME OVER THE COURSE OF A YEAR, THERE ARE 260

7  ADDITIONAL COLEMAN CLASS MEMBERS ON TOP OF THE EXISTING GROUP OF

8  OUTPATIENT PAROLEES, AND OF THAT 260, 20 PERCENT OF THEM ARE

9  LIKELY TO NEED COLEMAN LEVEL CARE --

10          **MR. GALVAN:**  OBJECTION.  NON-RESPONSIVE AND

11  MISCHARACTERIZES THE EVIDENCE.  THE 260 ARE THE TOTAL NUMBER OF

12  PAROLEES.  I'LL MOVE ON FROM THIS AREA.

13  **BY MR. GALVAN**

14  **Q**   WHEN YOU WERE WORKING IN YOUR SECOND REPORT ON THIS MATTER,

15  YOU REACHED OUT TO YOUR COLLEAGUES IN THE CALIFORNIA MENTAL

16  HEALTH DIRECTORS ASSOCIATION FOR HELP; IS THAT RIGHT?

17  **A**   I REACHED OUT FOR TWO SPECIFIC --

18  **Q**   I'M SORRY.  IT'S A YES OR NO QUESTION, MA'AM.  YOU REACHED

19  OUT FOR HELP?

20  **A**   AFTER MY -- AFTER MY EXPERT OPINION, YES, I HAD A

21  CONVERSATION WITH THEM, BUT IT WAS AFTER THE EXPERT OPINION WAS

22  RENDERED.

23  **Q**   TO BE MORE PRECISE, AFTER YOUR FIRST EXPERT OPINION, AFTER

24  HAVING WRITTEN YOUR SECOND REBUTTAL REPORT, YOU REACHED OUT TO

25  HELP FOR THEM; IS THAT RIGHT?

1  **A**   SPECIFICALLY ASKING FOR --

2  **Q**   YES OR NO.  JUST YES OR NO, MA'AM.

3  **A**   I CAN ONLY GIVE YOU A YES, BUT, AND IT IS A YES, BUT.

4  **Q**   YOU ARE PRESENTLY A CONSULTANT TO THE CALIFORNIA MENTAL

5  HEALTH DIRECTORS ASSOCIATION?

6  **A**   YES, I AM.

7  **Q**   AND YOU HELPED THEM WRITE THEIR POSITION PAPERS ON

8  CORRECTION REFORM; IS THAT RIGHT?

9  **A**   YES, I DID.

10  **Q**   YOU HELPED WRITE THEIR POSITION PAPER ON THE LEGISLATIVE

11  ANALYST'S OFFICE PROPOSAL TO REALIGN 70,000 PAROLEES TO COUNTY

12  PROBATION; IS THAT RIGHT?

13  **A**   YES, I DID.

14  **Q**   AND YOU HAVE -- YOU TAKE SOME OF THE CREDIT FOR DEFEATING

15  THAT PROPOSAL, RIGHT?

16  **A**   I TAKE NO CREDIT.

17  **Q**   OKAY.  AND THE CALIFORNIA MENTAL HEALTH DIRECTORS

18  ASSOCIATION --

19          **JUDGE KARLTON:**  HOW ABOUT RESPONSIBILITY?

20          **THE WITNESS:**  I WAS ONE OF A GROUP OF PROBABLY 25 OR

21  30 INDIVIDUALS WHO WERE WORKING WITH A CSAC COMMITTEE, AND THAT

22  POSITION WAS CSAC'S POSITION, SO I WAS ONE VOICE IN THAT.

23  THAT'S WHY I DIDN'T TAKE CREDIT.  I AGREED WITH THE POSITION, I

24  WILL SAY THAT, AND THE CONCERN WAS --

25          **JUDGE KARLTON:**  NOBODY ASKED YOU, MA'AM.

 1  **BY MR. GALVAN**

 2  **Q**   THE MENTAL HEALTH DIRECTORS ASSOCIATION IS A REGISTERED

 3  LOBBYING ASSOCIATION; IS THAT RIGHT?

 4  **A**   YES, IT IS.

 5  **Q**   WHEN YOU WERE ASKING FOR HELP, YOU SPECIFICALLY ASKED FOR

 6  HELP FROM THREE PEOPLE, CORRECT?  DON KINGDON IS ONE OF THEM?

 7  **A**   YES.

 8  **Q**   HE'S THE ASSISTANT DIRECTOR OF THE ASSOCIATION?

 9  **A**   YES.

10  **Q**   AND NANCY PENA, P-E-N-A, IS ANOTHER?

11  **A**   PENA?  SHE IS A MENTAL HEALTH DIRECTOR IN CALIFORNIA.

12  **Q**   YOU ASKED FOR HER HELP?

13  **A**   I ASKED TO DISCUSS AN ISSUE ON *VALDIVIA* WITH THEM.

14  **Q**   AND PATRICIA RYAN, THE EXECUTIVE DIRECTOR, YOU ASKED HER FOR

15  HELP?

16  **A**   I ASKED TO HAVE A CONVERSATION.

17          **MR. GALVAN:**  COULD WE LOOK AT BAT 551, MR. JONES,

18  WHICH IS GOING TO BE MARKED AS PA 43?

19          (DOCUMENT DISPLAYED.)

20  **BY MR. GALVAN**

21  **Q**   YOU ASKED HER FOR HELP IN AN E-MAIL ON OR ABOUT AUGUST 21ST;

22  IS THAT RIGHT?

23  **A**   I DON'T REMEMBER THE DATE, BUT THAT COULD EASILY BE CORRECT.

24  **Q**   IF WE COULD ZOOM IN ON THE MIDDLE PORTION, ORIGINAL MESSAGE,

25  UNDER "THANKS, PAT"?  DOWN TO THE VERY BOTTOM THERE.

1          DO YOU RECALL SENDING A MESSAGE WITH THAT SUBJECT

2    LINE, "REALLY WOULD LIKE BRIEF TIME TO TALK RE: COLEMAN ISSUES"?

3    **A**   YES, I DO.

4    **Q**   YOUR QUESTION TO THEM, AND I'LL JUST READ IT INTO THE RECORD

5    WAS:

6               "HI, PAT AND DON.  AS I GET DEEPER INTO

7               ASSERTIONS RELATED TO THE COLEMAN SUIT, I

8               ANTICIPATE INCREASED PRESSURES AND QUESTIONS

9               ABOUT THE ROLE AND RESPONSIBILITY OF COUNTY

10              PUBLIC MENTAL HEALTH SYSTEMS TO SERVE PAROLEES.

11              I HAVE TO DO RESPONSES TO SEVERAL PLAINTIFFS'

12              EXPERT WITNESS REPORTS BY THE END OF WEDNESDAY

13              AUGUST 27 AND WOULD LIKE A CHANCE TO DISCUSS

14              SOME OF THESE ISSUES WITH YOU, ESPECIALLY OUR

15              POSITION THAT COUNTY MENTAL HEALTH IS NOT

16              RESPONSIBLE FOR TREATMENT OF INDIVIDUALS WHO ARE

17              ON ACTIVE PAROLE STATUS, ASIDE FROM THE

18              PROHIBITION UNDER MHSA.  I THINK I WILL BE

19              CHALLENGED ON THIS AND WILL NEED TO IDENTIFY

20              CODE CITATIONS, HISTORY, ET CETERA, AND THIS IS

21              IN LIGHT OF CONTINUED, ALTHOUGH PERHAPS

22              WEAKENING, ASSERTIONS FROM CDCR ABOUT OUR

23              RESPONSIBILITY TO TREAT ALL OF OUR RESIDENTS."

24              WHEN YOU WERE ASKING FOR HELP WITH "OUR POSITION,"

25    WERE YOU ASKING FOR THAT HELP -- WAS "OUR POSITION" THE MENTAL

1    HEALTH DIRECTOR'S ASSOCIATION OR YOUR POSITION AS CDCR'S EXPERT

2    IN THIS CASE?

3    **A**    I WAS ATTEMPTING TO GET CLARIFICATION AS TO THE

4    HISTORICAL -- WHEN I SAID THERE HAVE BEEN HISTORICALLY TWO

5    PARALLEL SYSTEMS, THE ADULT OUTPATIENT PAROLE SYSTEM AND THE

6    PUBLIC MENTAL HEALTH SYSTEM, WHAT I WAS ATTEMPTING TO GET WAS

7    CLARIFICATION ABOUT THE CONSISTENCY ACROSS CALIFORNIA, FRANKLY,

8    THAT PUBLIC MENTAL HEALTH SYSTEMS GENERALLY HAVE NOT ACCEPTED

9    ACTIVE PAROLEES INTO THE PUBLIC MENTAL HEALTH SYSTEM, OTHER THAN

10   FOR CRISIS PSYCHIATRIC EMERGENCY CARE, AND SO THAT'S THE, QUOTE,

11   POSITION I WAS REFERRING TO.

12   **Q**    AND --

13   **A**    THAT'S REALLY HISTORICAL PRACTICE.

14   **Q**    YOU WERE ASKING THEM FOR SOME CODE CITATIONS.  DID YOU FIND

15   ANY CODE CITATIONS?

16   **A**    THERE ARE -- NO, IT'S REALLY PRACTICE AND NOT CODE

17   CITATIONS.

18   **Q**    SO AS YOU SIT HERE TODAY, YOU STILL DON'T KNOW OF ANY

19   AUTHORITY IN THE LAW FOR COUNTY MENTAL HEALTH DIRECTORS TO DENY

20   SERVICE TO PAROLEES, DO YOU?

21   **A**    TO MY KNOWLEDGE, THERE IS NOT LEGAL AUTHORITY.  THERE IS

22   HISTORICAL PRECEDENT AND PRACTICE.

23            **JUDGE KARLTON:**  THERE'S ALSO HISTORICAL -- NEVER

24   MIND.  GO AHEAD.

25

1   **BY MR. GALVAN**

2   **Q**   AND YOU ARE AWARE, AREN'T YOU, THAT THERE HAS BEEN TESTIMONY

3   IN THIS TRIAL THAT PAROLEES, THOUSANDS OF THEM, ARE RETURNED TO

4   PRISON EACH YEAR BECAUSE THEY CAN'T GET ACCESS TO MENTAL HEALTH

5   SERVICES IN THE COMMUNITY?

6   **A**   I HAVE NOT HEARD THE TESTIMONY FOR THE TRIAL, BUT I WOULD

7   NOT BE SURPRISED AT THAT BEING TESTIMONY.

8   **Q**   SO YOU WOULDN'T BE SURPRISED IF IT WERE TRUE THAT THOUSANDS

9   OF PAROLEES ARE RETURNED TO PRISON EACH YEAR BECAUSE THEY CANNOT

10  ACCESS CARE IN THE COMMUNITY?

11  **A**   MY UNDERSTANDING IS THAT THERE IS CERTAINLY A FACTOR IN

12  RETURNING THAT HAS TO DO WITH LACK OF ACCESS TO TREATMENT, BOTH

13  SUBSTANCE ABUSE AND MENTAL HEALTH TREATMENT.  MENTAL HEALTH --

14  AND I WOULD REMIND YOU THERE ARE MANY PEOPLE IN CALIFORNIA THAT

15  ARE SERIOUSLY MENTALLY ILL THAT DO NOT HAVE ACCESS TO ADEQUATE

16  TREATMENT, INCLUDING PEOPLE INVOLVED IN THE CRIMINAL JUSTICE

17  SYSTEM.

18  **Q**   AND YOU'VE SAID IN YOUR REPORTS THAT UNDER THE REALIGNMENT

19  STATUTE, YOUR COUNTY MENTAL HEALTH OBLIGATION IS TO PROVIDE

20  SERVICES TO THE EXTENT RESOURCES ARE AVAILABLE, CORRECT?

21  **A**   YES, I DID.  I DID.

22  **Q**   AND RESOURCES ARE LIMITED, CORRECT?

23  **A**   RESOURCES ARE PROBABLY ABOUT 50 PERCENT OF WHAT THE NEED IS.

24  **Q**   OKAY.  WHEN RESOURCES ARE LIMITED YOU EMPLOY TRIAGE TO

25  DECIDE WHERE TO USE YOUR RESOURCES, RIGHT?

1  **A**    YES, THAT IS WHAT SYSTEMS DO.

2  **Q**    AND ONE ELEMENT OF YOUR TRIAGE SYSTEM IS TO ASK WHETHER THE

3  PATIENT HAS OTHER RESOURCES TO GET CARE, CORRECT?

4  **A**    YES.

5  **Q**    FOR EXAMPLE, IF A PATIENT HAS PRIVATE INSURANCE, YOU MIGHT

6  NOT SERVE THEM DIRECTLY, BUT HELP LINK THEM UP WITH THEIR

7  INSURANCE; IS THAT RIGHT?

8  **A**    YES, ABSOLUTELY.

9  **Q**    AND WHEN A PAROLEE COMES IN FOR SERVICE AND PARTICIPATES IN

10 YOUR -- IN COUNTY MENTAL HEALTH TRIAGE, ONE OF THE DECISIONS

11 MADE IS THAT THAT PERSON HAS ANOTHER RESOURCE FOR SERVICE,

12 CORRECT?

13 **A**    YES, YES.

14 **Q**    AND THAT RESOURCE FOR SERVICE IS THE PAROLE OUTPATIENT

15 CLINIC, CORRECT?

16 **A**    RIGHT.  AS I SAID, PRACTICE HAS BEEN THAT GENERALLY PEOPLE

17 WHO ARE ON PAROLE ARE -- GO TO THE PAROLE OUTPATIENT SYSTEM.

18 THEY DON'T GENERALLY COME, WITH SOME EXCEPTIONS, TO THE PUBLIC

19 MENTAL HEALTH SYSTEM WHILE THEY WERE ON PAROLE.

20 **Q**    IF A PAROLEE COMES TO THE MENTAL HEALTH SYSTEM OR COMMUNITY

21 MENTAL HEALTH SYSTEM, AND THEY NEED SOMETHING BEYOND POC CARE,

22 THEY NEED SOME KIND CRISIS CARE, YOU STILL HAVE TO TRIAGE THEM,

23 RIGHT?

24 **A**    IF AN INDIVIDUAL REQUIRES PSYCHIATRIC EMERGENCY SERVICES,

25 YES, YOU HAVE TO TRIAGE ANYONE WHO COMES IN.

1   **Q**   AND IF AFTER THE PSYCHIATRIC EMERGENCY SERVICES, THEY NEED

2   CONTINUED HIGH LEVEL SERVICES, DOES COUNTY MENTAL HEALTH

3   CONTINUE TO SERVE THEM?

4   **A**   I WOULD ANSWER THAT THE PRACTICE HAS TYPICALLY BEEN THAT,

5   NO, AND LET ME CLARIFY ONE PIECE.  THE -- CURRENTLY, IN

6   CALIFORNIA, THE MOST INTENSIVE LEVEL OF CARE, WHICH IS THE

7   FULL-SERVICE PARTNERSHIPS, ARE FUNDED THROUGH THE MENTAL HEALTH

8   SERVICES ACT, AND THAT SPECIFICALLY PRECLUDES PAROLEES, SO THAT

9   THERE REALLY ISN'T CAPACITY IN TERMS OF THE FUNDING THAT IS

10  AVAILABLE FOR THOSE MOST INTENSIVE SERVICES TO SERVE PAROLEES.

11  **Q**   SO, THEREFORE, A MENTAL HEALTH DIRECTOR WHO FELT HE HAD TO

12  PRIORITIZE RELEASED PRISONERS WOULD NOT HAVE THE OPTION OF

13  PRIORITIZING THEM FOR SERVICES FUNDED BY THE MENTAL HEALTH

14  SERVICES ACT, CORRECT?

15  **A**   NOT, NO.

16  **Q**   HE WOULD HAVE TO CONTINUE SERVING THE GENERAL PUBLIC,

17  CORRECT?

18  **A**   YES, YES, OF WHOM THERE ARE MORE THAN -- MORE PEOPLE THAN

19  SERVICES ARE AVAILABLE.

20  **Q**   AND ISN'T IT CORRECT, TO YOUR KNOWLEDGE, THAT THE MENTAL

21  HEALTH SERVICES ACT FUNDING CONSTITUTES ABOUT 1.5 BILLION OUT OF

22  OVER $5 BILLION IN THE COMMUNITY MENTAL HEALTH BUDGET?

23  **A**   THAT SOUNDS CORRECT, YES.

24  **Q**   ISN'T IT YOUR UNDERSTANDING THAT ABOUT 3.8 BILLION COMES

25  FROM THE REALIGNMENT FUNDS; ISN'T THAT CORRECT?

1   **A**    NO.  IT'S A COMBINATION OF REALIGNMENT AND MEDICAID.  ABOUT

2   HALF OF THAT IS ACTUALLY MEDICAID.  FEDERAL MEDICAID, FEDERAL

3   MEDICAID DOLLARS.  REALIGNMENT PULLS THE MEDICAID MATCH IN.

4   **Q**    YOU WROTE IN YOUR REPORTS ABOUT THE BRONZAN-MCCORQUODALE

5   ACT, IS THAT --

6   **A**    YES, SIR.

7   **Q**    AND THE BRONZAN-MCCORQUODALE ACT IS THE REALIGNMENT ACT,

8   CORRECT?

9   **A**    YES.  THOSE ARE THE AUTHORS OF THE LEGISLATION.

10  **Q**    YOU ARE AWARE OF THAT ONE SECTION OF THE REALIGNMENT ACT

11  SAYS THAT FOR PURPOSES OF ORGANIZING OUTREACH AND TREATMENT

12  OPTIONS, TO THE EXTENT RESOURCES ARE AVAILABLE, THE TARGET

13  POPULATION INCLUDES, BUT IS NOT LIMITED TO, PERSONS ARRESTED OR

14  CONVICTED OF CRIMES; AREN'T YOU?

15  **A**    THAT IS ALWAYS PART OF THE TARGET POPULATION.  IT HAS NOT

16  TYPICALLY BEEN INTERPRETED TO MEAN PAROLEES, BECAUSE THERE ARE

17  RESOURCES FOR PAROLEES.

18  **Q**    WHAT ARE THOSE RESOURCES FOR PAROLEES, TO YOUR KNOWLEDGE?

19  **A**    I'M SORRY.  SAY THAT AGAIN.

20  **Q**    WHEN YOU SAY THERE ARE RESOURCES FOR PAROLEES, WHAT

21  RESOURCES FOR PAROLEES DID YOU, AS A COUNTY MENTAL HEALTH

22  DIRECTOR, EXPECT THEM TO ACCESS WHEN THEY HAD A NEED FOR CARE

23  BEYOND WHAT THE PAROLE OUTPATIENT CLINIC COULD PROVIDE?

24  **A**    COUNTY MENTAL HEALTH SYSTEMS DID NOT IN GENERAL PROVIDE

25  INTENSIVE SERVICES TO PAROLEES.  I KEEP SAYING THAT.  BUT I'M

1   NOT SAYING IT'S A GOOD THING.  I'M SAYING WHAT HAS BEEN THE

2   CASE.

3   Q   THE QUESTION WAS SLIGHTLY DIFFERENT.  THE QUESTION IS WHEN

4   YOU WERE A COUNTY MENTAL HEALTH DIRECTOR --

5   A   MM-HMM.

6   Q   YOU TESTIFIED A MOMENT AGO THAT PAROLEES -- YOU DIDN'T

7   CONSIDER THEM TO BE WITHIN THAT STATUTE I READ YOU BECAUSE THEY

8   HAD ACCESS TO OTHER SERVICES, RIGHT?  YOU JUST TESTIFIED TO

9   THAT, CORRECT?

10  A   I WOULD -- WHAT I WOULD TESTIFY TO, IS THAT THE

11  UNDERSTANDING?

12          JUDGE KARLTON:  NO, MA'AM, THAT'S NOT THE QUESTION.

13          THE WITNESS:  ALL RIGHT.  LET ME TRY TO HEAR THE

14  QUESTION BETTER.  CAN YOU REPEAT THE QUESTION, PLEASE?

15  BY MR. GALVAN

16  Q   YOU TESTIFIED THAT YOU DID NOT CONSIDER PAROLEES TO BE

17  WITHIN THE DEFINITION FROM THE ACT THAT I READ YOU BECAUSE THEY

18  HAD ACCESS TO OTHER SERVICES?  YES OR NO?

19  A   YES.

20  Q   OKAY.  WHAT WAS YOUR UNDERSTANDING AS TO WHAT -- WHEN YOU

21  WERE A MENTAL HEALTH DIRECTOR, TO WHAT THEIR ACCESS TO SERVICES

22  ACTUALLY WAS IF THEY HAD A NEED FOR CARE GREATER THAN WHAT THE

23  PAROLE OUTPATIENT CLINIC COULD PROVIDE?

24  A   MY UNDERSTANDING, AS A MENTAL HEALTH DIRECTOR, WAS THAT WAS

25  SPECIFICALLY THE STATE OF CALIFORNIA'S RESPONSIBILITY, TO

1  PROVIDE WHATEVER SERVICES WERE NECESSARY TO INDIVIDUALS WHO WERE

2  ON STATE PAROLE, AND THAT IT WAS NOT A RESPONSIBILITY OF THE

3  PUBLICLY FUNDED MENTAL HEALTH SYSTEM.

4          **JUDGE KARLTON:**  MA'AM, THE QUESTION WAS NOT WHOSE

5  RESPONSIBILITY IT WAS, NOR ANY OF THE OTHER THINGS YOU JUST

6  MENTIONED.  DID YOU HAVE A UNDERSTANDING THAT THERE WERE OTHER

7  MENTAL HEALTH FACILITIES AVAILABLE TO PAROLEES WHO NEEDED MORE

8  THAN POC?  YES OR NO.

9          **THE WITNESS:**  YES.

10          **JUDGE KARLTON:**  AND WHAT WERE THEY?

11          **THE WITNESS:**  THEY WERE POC AND ANY STATE DEPARTMENT

12  OF MENTAL HEALTH FACILITIES, SUCH AS SUBACUTE CARE OR -- THAT

13  WAS BASICALLY IT.  AND PERHAPS CONTRACTED SERVICES THROUGH THE

14  STATE DEPARTMENT OF CORRECTIONS.

15  **BY MR. GALVAN**

16  **Q**   DID YOU TAKE ANY STEPS WHEN YOU WERE A MENTAL HEALTH

17  DIRECTOR TO CONFIRM THAT, YOUR UNDERSTANDING THAT THOSE PATIENTS

18  COULD GET INTO THE DEPARTMENT OF MENTAL HEALTH HOSPITALS WAS

19  ACTUALLY TRUE?

20  **A**   NO.  WE STRUGGLED TO GET JAIL -- JAIL INMATES INTO STATE

21  MENTAL HEALTH FACILITIES.

22  **Q**   AS TO PEOPLE ON PAROLE, DID YOU TAKE ANY STEPS TO CONFIRM

23  WHETHER IT WAS ACTUALLY TRUE THAT THEY HAD ACCESS TO OTHER

24  SERVICES DIRECT THROUGH THE DEPARTMENT OF MENTAL HEALTH?  YES OR

25  NO?

1    **A**   THAT WAS NOT MY FOCUS, NO.

2    **Q**   AND -- READING FROM YOUR OPINION, I MEAN YOUR FIRST REPORT,

3    YOU WROTE THAT YOUR OPINION IS THAT THE RECEIVER'S CONSOLIDATED

4    HEALTHCARE -- HEALTH FACILITIES, HEALTHCARE FACILITIES,

5    CONSOLIDATED HEALTHCARE FACILITIES ARE A, QUOTE, MORE REASONABLE

6    AND CONSIDERED ALTERNATIVE TO THE IMPACT OF OVERCROWDING THAN A

7    POTENTIAL PRISONER RELEASE.  IS THAT STILL YOUR OPINION TODAY?

8    **A**   I -- IF THAT WERE CARRIED FORWARD, I DO BELIEVE IT WOULD

9    PROVIDE BETTER CARE WITHIN THE PRISON, BUT YOU STIPULATED TO ME

10   THAT'S NOT MY AREA OF EXPERT OPINION.

11   **Q**   I'M SORRY.  SO YOU DON'T HAVE ANY OPINION TODAY AS TO

12   WHETHER THE CONSOLIDATED FACILITIES --

13   **A**   I HAVE AN OPINION.  I HAVE AN OPINION.

14   **Q**   IT'S WHAT I READ, ISN'T IT?

15   **A**   YES.

16   **Q**   OKAY.  AND YOU ASSUMED THAT THE CONSOLIDATED HEALTHCARE

17   FACILITIES WOULD BE BUILT IN A COUPLE OF YEARS, CORRECT?

18   **A**   I BELIEVE IT WAS PROJECTED TO TAKE, I THINK, THREE TO FIVE

19   YEARS.

20   **Q**   YOUR SENSE WHEN YOU WROTE YOUR REPORTS IS THAT THE STATE IS

21   QUITE COMMITTED TO BUILDING THE HEALTHCARE FACILITIES, CORRECT?

22   **A**   AT THE TIME I WROTE THE INITIAL OPINION, I BELIEVE THAT

23   THERE WAS SOME LEVEL OF COMMITMENT ON THE PART OF THE STATE.

24   **Q**   WHEN YOU WROTE THE ORIGINAL OPINION, YOUR SENSE WAS THAT THE

25   STATE IS MOVING RAPIDLY TOWARDS BUILDING THE CONSOLIDATED

1  HEALTHCARE FACILITIES, CORRECT?

2  **A**   MY UNDERSTANDING WAS THAT THERE WERE ACTIVE DISCUSSIONS

3  GOING ON.  I DON'T MAKE ASSUMPTIONS ABOUT HOW RAPIDLY THE STATE

4  MOVES OR DOESN'T MOVE.

5  **Q**   CAN WE -- I WILL JUST READ YOU FROM YOUR DEPOSITION RATHER

6  THAN PUTTING IT UP.

7                  "QUESTION:  DID YOU MAKE ANY ASSUMPTION

8            ABOUT WHEN THESE 5,000 BEDS WOULD BE OPEN?

9                  "ANSWER: I BELIEVE, BUT I CANNOT RECOLLECT

10            EXACTLY, THAT THERE WERE SOME PROJECTIONS WITHIN

11            THE NEXT COUPLE OF YEARS THEY WERE TRYING TO GET

12            THEM DEVELOPED."

13            FURTHER DOWN:

14                  "MY SENSE IS THAT THEY ARE COMMITTED TO

15            GETTING THIS DONE, BUT BEYOND THAT, I KNOW IT'S

16            TOUGH TO DO IN-FILL, AND IT'S TOUGH TO DO

17            CONSTRUCTION.  MY SENSE IS THAT THE STATE IS

18            MOVING RAPIDLY FOR THE STATE."

19  **A**   THAT'S WHAT I SAID, YES.

20  **Q**   IF YOU LEARNED NOW THAT THE STATE IS NOW SAYING THAT THEY

21  WILL NOT BUILD THE CONSOLIDATED HEALTHCARE FACILITIES, WOULD YOU

22  WANT TO KNOW WHAT THE STATE HAS PROPOSED INSTEAD FOR THE COLEMAN

23  CLASS?

24  **A**   I WOULD BE INTERESTED.

25  **Q**   OKAY.  AND YOU TESTIFIED YOU CURRENTLY REPRESENT THE HEALTH

1   DIRECTORS ASSOCIATION ON A NUMBER OF COMMITTEES, CORRECT?

2   **A**   I THINK I CITED SEVERAL COMMITTEES, YES.

3   **Q**   DID YOU LEARN IN YOUR WORK FOR THE HEALTH DIRECTORS

4   ASSOCIATION THAT THE STATE IS NOW FIGHTING THE 5,000 BEDS FOR

5   THE COLEMAN CLASS?

6   **A**   I AM AWARE THAT THAT HAS HAPPENED, YES.

7   **Q**   AND SINCE YOU ARE INTERESTED, DID YOU FIND OUT WHAT

8   REASONABLE ALTERNATIVES THE STATE IS PROPOSING IN LIEU OF THE

9   RECEIVER'S BEDS?

10  **A**   IN THE LAST SEVERAL MONTHS I HAVE NOT PURSUED THAT QUESTION.

11  **Q**   DID YOUR ATTORNEYS PROVIDE YOU WITH ANY INFORMATION ON THAT

12  QUESTION?

13  **A**   NOT THAT I RECALL SPECIFICALLY.  I BELIEVE THAT THEY ARE

14  REALLY MAKING EFFORTS TO DO MORE IN-FILL AND ALSO TO USE AN

15  EXISTING STATE MENTAL HOSPITAL FACILITY.

16  **Q**   I'M SORRY.  WHICH EXISTING STATE MENTAL HOSPITAL FACILITY IS

17  THAT?

18  **A**   I'M SORRY?  WHAT?

19  **Q**   WHICH EXISTING STATE MENTAL HOSPITAL FACILITY?

20  **A**   I DIDN'T SAY, BUT IF YOU WERE ASKING ME THE QUESTION, I CAN

21  SAY WHAT I'M AWARE OF AS A POSSIBILITY.

22          **JUDGE KARLTON:**  ANYTHING IS POSSIBLE.  ACTUALLY, WE

23  HAD SOMEBODY WHO SAID ANYTHING IS NOT POSSIBLE.  BUT --

24  **BY MR. GALVAN**

25  **Q**   WOULD YOU CHANGE YOUR OPINION NOW ABOUT REASONABLE

1  ALTERNATIVES NOW THAT YOU KNOW THE CONSOLIDATED HEALTHCARE

2  FACILITIES ARE NOT GOING FORWARD?

3  **A**   MY BELIEF IS THAT THERE IS CAPACITY IN THE STATE IN

4  POTENTIALLY THE STATE MENTAL HOSPITAL SYSTEM THAT MIGHT BE USED

5  FOR THAT.  I'M NOT CLAIMING THAT IS MY AREA OF EXPERTISE.  I AM

6  AWARE OF THE CAPACITY.

7  **Q**   YOU WOULD NOT DRAW THE CONCLUSION, WOULD YOU, THAT

8  INDIVIDUALS WITH MENTAL ILLNESS MAY BE BETTER OFF IN PRISON THAN

9  IN THE COMMUNITY?

10  **A**   I WOULD DRAW THE CONCLUSION THAT IT REALLY DEPENDS ON WHERE

11  IN THE COMMUNITY.  IF ONE IS HOMELESS AND IS SERIOUSLY PSYCHOTIC

12  AND USING DRUGS, I DON'T THINK THAT'S A GOOD SITUATION IN THE

13  COMMUNITY.  IF ONE IS IN THE PRISON, I'M CERTAINLY NOT GOING TO

14  BE AN ADVOCATE FOR EXISTING CONDITIONS IN THE PRISON, BUT AT

15  LEAST ONE HAS HOPEFULLY A BED AND IS RECEIVING MEDICATIONS AND

16  IS UNDER SOME SUPERVISION.

17          **JUDGE KARLTON:**  IF THAT ISN'T TRUE, IF THAT ISN'T

18  TRUE, WHAT IS YOUR ANSWER?

19          **THE WITNESS:**  MY ANSWER IS THAT BOTH ARE REALLY

20  TERRIBLE SITUATIONS.

21  **BY MR. GALVAN**

22  **Q**   HYPOTHETICALLY, IF YOU ASSUME THAT THE -- THAT THIS COURT

23  HAS DECIDED THAT THERE MUST BE A POPULATION REDUCTION --

24  HYPOTHETICALLY?

25  **A**   YES.

1  Q    AND THAT THE COURT IS GOING TO ORDER A CAP HYPOTHETICALLY,

2  POPULATION CAP?  AND PLEASE FURTHER ASSUME THAT NO ADDITIONAL

3  RESOURCES ARE PROVIDED TO COMMUNITIES FOR MENTAL HEALTHCARE, AND

4  ASSUME THAT ONE OF THE METHODS THAT THE STATE, YOUR CLIENT,

5  CHOOSES TO USE --

6          **JUDGE KARLTON:**  NOT HER CLIENT.  I SEE.  BECAUSE

7  SHE'S BEEN CALLED BY THE STATE.  ALL RIGHT.

8  **BY MR. GALVAN**

9  Q    ASSUME ONE OF THE METHODS THE STATE CHOOSES TO USE IS PAROLE

10  A CERTAIN PERCENTAGE OF THE POPULATION SEVERAL MONTHS EARLIER

11  THAN THEY WOULD OTHERWISE BE PAROLED, IS IT YOUR OPINION THAT

12  UNDER THOSE CONDITIONS, THE MENTALLY ILL SHOULD BE EXCLUDED FROM

13  THAT POPULATION REDUCTION PLAN?

14  **A**    MY POSITION HAS BEEN AND CONTINUES TO BE THAT IT IS

15  CRITICALLY IMPORTANT THAT WE PLAN FOR AND PROVIDE THE

16  APPROPRIATE -- IT MAY NOT BE WHAT WE ALL WANT IN THE WORLD, BUT

17  SOME LEVEL OF APPROPRIATE CARE FOR MENTALLY ILL PEOPLE THAT ARE

18  COMING OUT OF THE CORRECTIONAL SYSTEM.  I THINK WE HAVE A

19  RESPONSIBILITY.  AND I THINK THAT THERE HAVE BEEN DEMONSTRATED

20  OVER AT LEAST 30 YEARS WHAT THE CONSEQUENCES ARE OF NOT TREATING

21  THESE FOLKS IN THE COMMUNITY.

22  Q    SO UNDER THE ASSUMPTION I STATED THEN, IT IS YOUR OPINION

23  THAT THE MENTALLY ILL SHOULD BE INCLUDED IN SUCH A POPULATION

24  REDUCTION PLAN?

25  **A**    I DIDN'T STATE AN OPINION ONE WAY OR THE OTHER ON THAT.

1  **Q**   DO YOU HAVE AN OPINION ONE WAY OR ANOTHER ON THAT?

2  **A**   I CAN -- YOU ARE GOING TO FIND THIS SOMEWHAT NON-RESPONSIVE.

3  I THINK WE HAVE A RESPONSIBILITY, AND I THINK THE STATE HAS A

4  RESPONSIBILITY, TO PLAN FOR THOSE INDIVIDUALS THAT WE KNOW NEED

5  SUPERVISION AND A LEVEL OF CARE IN THE COMMUNITY.  OTHERWISE, WE

6  ARE SETTING THEM UP FOR SERIOUS CONSEQUENCES AND WE ARE SETTING

7  COMMUNITIES UP FOR THAT.

8          **JUDGE REINHARDT:**  DO YOU KNOW WHETHER THE STATE IS

9  NOW FULFILLING THAT RESPONSIBILITY FOR THE PAROLEES IT IS

10 RELEASING?

11         **THE WITNESS:**  I DON'T BELIEVE THAT IT'S ADEQUATE, NO.

12         **JUDGE REINHARDT:**  SO WHENEVER THE PAROLEES ARE

13 RELEASED INTO THE COMMUNITY, THERE ARE THE PROBLEMS YOU HAVE

14 DESCRIBED?

15         **THE WITNESS:**  YES, I HAVE, YES.  SO IF YOU ADD MORE

16 INDIVIDUALS INTO THE COMMUNITY --

17         **JUDGE REINHARDT:**  NO, I DIDN'T ASK YOU THAT QUESTION.

18         **THE WITNESS:**  OKAY.  SORRY.

19         **JUDGE REINHARDT:**  WE COULD GET INTO A LONG DISCUSSION

20 ABOUT WHETHER THREE OR FOUR MONTHS CHANGES THE PROBLEM, AND WE

21 ARE NOT GOING TO DO THAT, AT LEAST NOT FROM ME, MAYBE FROM ONE

22 OF COUNSEL.  BUT I JUST WANTED TO ASK YOU WHETHER IT'S YOUR

23 POSITION THAT THE STATE IS NOW FAILING TO PROVIDE WHAT'S

24 NECESSARY TO THE PAROLEES THEY RELEASE INTO THE COMMUNITY.

25         **THE WITNESS:**  IT IS MY POSITION THAT THE STATE IS

1  NOW -- IS NOT PROVIDING APPROPRIATE SERVICES, AND I THINK THE

2  STATE WOULD PROBABLY AGREE WITH ME, IN THE COMMUNITY.

3            **JUDGE KARLTON:**  AND, IN ANY EVENT, UNDER THE FEDERAL

4  STATUTES, IT PROBABLY WOULD VIOLATE FEDERAL LAW TO DISCRIMINATE

5  AGAINST THE MENTALLY ILL IN THEIR RELEASE POLICY, WOULDN'T IT?

6  YOU MAY NOT KNOW THAT.

7            **THE WITNESS:**  I WOULD UNDERSTAND THAT WOULD BE THE

8  CASE, YES, SIR.

9            **JUDGE KARLTON:**  IT'S AN IMPOSSIBLE SITUATION.

10  **BY MR. GALVAN**

11  **Q**   IT'S YOUR OPINION A CAP WOULD HURT LOCAL COMMUNITIES BECAUSE

12  THEY WOULD HAVE TO SERVE OFFENDERS THAT WOULD HAVE OTHERWISE

13  BEEN SENT TO STATE PRISON, CORRECT?

14  **A**   WHAT I HAVE SAID IS THERE IS NOT ADEQUATE CAPACITY AT THIS

15  POINT, AND THAT IF ONE INCREASES THE DEMAND, PARTICULARLY FOR

16  VULNERABLE PEOPLE, YOU HAVE EVEN LESS CAPACITY.  SO WE HAVE A

17  CONUNDRUM.  WE HAVE A PROBLEM THAT WE NEED TO ADDRESS.

18            **JUDGE REINHARDT:**  DO YOU HAVE ANY IDEA HOW TO ADDRESS

19  THE PROBLEM IF THE STATE IS NOT GOING TO SPEND ANY MORE MONEY?

20            **THE WITNESS:**  I DON'T HAVE ANY GREAT ANSWERS.  I

21  BELIEVE THAT THERE IS A NEED TO TAKE A LOOK AT THE SYSTEMS AS

22  THEY NOW EXIST AND THAT THERE MAY BE SOME WAYS -- THINKING ABOUT

23  THE REPORT FROM THE -- THE EXPERT OPINION THAT CAME OUT WHEN THE

24  AB 900 LEGISLATION WAS PASSED, THERE ARE SOME RECOMMENDATIONS

25  WITHIN THAT THAT HAVE TO DO WITH ASSESSING FOLKS WITH LOWER

 1  LEVEL NEEDS AND FOLKS WITH HIGHER LEVEL NEEDS AND REALLY TYING

 2  THE RESOURCES TO THOSE.

 3          I DON'T THINK THERE IS AN EASY ANSWER HERE.  I MEAN,

 4  IF YOU ASK ME AS SOMEONE WHO HAS DEDICATED THEIR LIFE TO HAVING

 5  MORE ADEQUATE SERVICES FOR PEOPLE WITH SERIOUS MENTAL ILLNESS,

 6  WE NEED ADDRESS THAT FOR PAROLEES.  WE NEED ADDRESS IT FOR

 7  PEOPLE THAT COULD BECOME INVOLVED IN THE CRIMINAL JUSTICE

 8  SYSTEM.  BUT I DON'T THINK THERE ARE ANY EASY ANSWERS.  I THINK

 9  RESOURCES ARE PART OF IT.  REALLY HAVING SOME PERIOD OF TIME TO

10  ENGAGE IN VERY FOCUSED PLANNING, MAYBE.

11          **JUDGE REINHARDT:**  YOU DON'T THINK THE STATE HAS HAD A

12  REASONABLE PERIOD OF TIME TO DO THAT WITH ALL OF THE REPORTS

13  THAT HAVE BEEN ISSUED BY EXPERTS, BY THE DEUKMEJIAN COMMISSION?

14  I DON'T KNOW HOW MANY ORDERS HAVE BEEN ISSUED BY MY TWO

15  COLLEAGUES HERE.  AND THE STATE?

16          **JUDGE KARLTON:**  AND HERE WE ARE.

17          **JUDGE REINHARDT:**  YEAH, HERE WE ARE.  WHAT IS A

18  REASONABLE PERIOD OF TIME?  FROM WHEN TO WHEN?  HASN'T THE STATE

19  ALREADY HAD A REASONABLE PERIOD OF TIME?

20          **THE WITNESS:**  I BELIEVE, FROM WHAT I HAVE SEEN FROM

21  THE STATE, AT LEAST IN THE LAST COUPLE OF YEARS THAT THERE

22  ARE -- HAVE BEEN -- THERE HAS BEEN MORE PLANNING THAT IS MORE

23  EFFECTIVE THAN I'VE SEEN IN -- PRIOR TO THAT, AND I THINK

24  THERE ACTUALLY -- THERE ARE SOME PLANS AFOOT, INCLUDING

25  NEGOTIATING, FRANKLY, WITH COUNTIES TO PROVIDE SOME MORE

1  INTENSIVE SERVICES.

2              **JUDGE KARLTON:**  AND THE TRUTH IS, AS I -- MAYBE YOU

3  DON'T KNOW -- THAT ALMOST EVERYTHING THAT'S BEEN DONE IN THE

4  MENTAL HEALTH FIELD FOR PRISONERS IS THE RESULT OF ORDERS FROM

5  THE COURT.  YOU ARE AWARE OF THAT?

6              **THE WITNESS:**  I AM AWARE OF THAT, YES.

7              **JUDGE KARLTON:**  AND THE MOST LIKELY WAY OF GETTING

8  THE STATE TO DO ANYTHING, WHICH MAY NOT BE POSSIBLE AT ALL, IS

9  FOR THE COURT TO PUT THE STATE ON THE CROSS.

10             **MR. LEWIS:**  RESPECTFULLY, YOUR HONOR, I MUST OBJECT

11 TO THAT AS BEYOND THE WITNESS'S --

12             **JUDGE KARLTON:**  YOUR OBJECTION IS WELL NOTED.

13             **MR. LEWIS:**  THANK YOU.

14             **JUDGE KARLTON:**  I'M ASKING YOU.  IS THERE ANY HOPE OF

15 THE STATE DOING ANYTHING IF THIS COURT DOESN'T REQUIRE THE STATE

16 TO DO SOMETHING?

17             **THE WITNESS:**  MY BELIEF IS THAT THE STATE IS IN THE

18 PROCESS NOW AND IS MAKING PROPOSALS NOW TO DO SOMETHING, BECAUSE

19 I THINK THAT THERE HAS BEEN A CUMULATIVE EFFECT OF THESE YEARS

20 THAT YOU ALL HAVE BEEN STRUGGLING WITH THIS ISSUE AS THE COURT.

21             **JUDGE REINHARDT:**  ARE ANY OF THE PROPOSALS OF WHICH

22 YOU ARE AWARE, DO ANY OF THEM INVOLVE THE STATE EXPENDING MORE

23 MONEY?

24             **THE WITNESS:**  ONLY ONE, YOUR HONOR, AND THAT IS THAT

25 THERE IS MONEY THAT WAS IDENTIFIED WITHIN AB 900 FOR INTENSIVE

1  SERVICES TO THE EOP POPULATION, AND I AM AWARE THAT THE STATE

2  HAS ACTUALLY IDENTIFIED SOME ADDITIONAL RESOURCES TO GO OUT AND

3  DO SOME CONTRACTS WITH COUNTIES OR PRIVATE NONPROFIT AGENCIES TO

4  PROVIDE THOSE SERVICES.  SO THAT -- I MEAN, I THINK THAT IS THE

5  GOOD NEWS IN THIS, IS THAT THEY ALREADY ARE DOING THAT, AND I

6  THINK WITH A LITTLE BIT MORE TIME, THEY WOULD BE ABLE, NOT TO

7  PUT EVERYTHING THAT'S NEEDED WITHIN THE EXISTING DOLLARS, BUT TO

8  PUT SOME REALLY CORE MISSING SERVICES IN.  YES.

9          **JUDGE REINHARDT:**  HAVE YOU RECEIVED ANY OF THOSE

10  FUNDS YET?

11          **JUDGE KARLTON:**  SHE'S NO LONGER DIRECTOR.

12          **THE WITNESS:**  WHEN I WAS IN SAN MATEO UP UNTIL A YEAR

13  AGO, WE HAD BEGUN THE DISCUSSION OF THAT, AND I DO UNDERSTAND

14  THAT THERE ARE SEVERAL COUNTIES THAT ARE VERY CLOSE TO SIGNING

15  CONTRACTS.

16          **MR. GALVAN:**  NO FURTHER QUESTIONS, YOUR HONORS.

17          **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

18          **MS. LEONARD:**  NO, YOUR HONOR.

19          **JUDGE HENDERSON:**  REDIRECT?

20          **MR. LEWIS:**  NO, YOUR HONOR.

21          **JUDGE HENDERSON:**  THANK YOU VERY MUCH FOR APPEARING

22  AND TESTIFYING.  YOU ARE EXCUSED.  AND WE'LL TAKE A 15-MINUTE

23  RECESS.

24              (RECESS TAKEN.)

25          **THE CLERK:**  COURT IS BACK IN SESSION.

1          **JUDGE HENDERSON:**  ALL RIGHT.  YOU MAY CALL YOUR NEXT

2    WITNESS.

3          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

4          PLAINTIFFS' WITNESS, DR. JAMES AUSTIN, IS RESUMING

5    THE STAND.  CONTINUED CROSS EXAMINATION.

6          **THE COURT:**  I REMIND YOU YOU ARE STILL UNDER OATH,

7    SIR.

8          **THE WITNESS:**  YES, SIR.

9                          **JAMES AUSTIN**,

10   CALLED AS A WITNESS FOR THE PLAINTIFF HEREIN, HAVING BEEN

11   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

12   FOLLOWS:

13                   **CROSS-EXAMINATION RESUMED**

14   **BY MS. BARLOW:**

15   **Q.**  GOOD MORNING, DR. AUSTIN.

16   **A.**  GOOD MORNING.

17   **Q.**  I JUST WANT TO COVER A COUPLE OF QUICK QUESTIONS WITH

18   RESPECT TO SOME OF YOUR PROPOSALS.

19          NOW YOU INDICATED THAT DIVERSION COULD EQUAL UP TO A

20   YEAR LESS OF TIME SERVED FOR SOME OF THE DIVERTERS OR OFFENDERS

21   THAT YOU ARE PROPOSING, CORRECT?

22   **A.**  I'M SORRY.  I DIDN'T HEAR THE FIRST PART OF YOUR QUESTION.

23          **MS. EVENSON:**  COULD YOU SPEAK LOUDER, PLEASE?

24          **MS. BARLOW:**  I'M SORRY.  I THOUGHT I WAS SPEAKING

25   QUITE LOUDLY, BUT I WILL SPEAK LOUDER.

 1  **BY MS. BARLOW:**

 2  **Q.**  YOU INDICATED THAT DIVERSION COULD EQUAL UP TO A YEAR OF

 3  TIME LESS SERVED'S BY THOSE OFFENDERS THAT GET DIVERTED UNDER

 4  YOUR PROPOSAL, CORRECT?

 5  **A.**  NO, I DON'T THINK I'M SAYING THAT.

 6  **Q.**  IN YOUR AUGUST 15, '08 REPORT, PARAGRAPHS 59 AND 60 --

 7  **A.**  IS THAT THE DIVERSION OF THE SHORT-TERM SENTENCE PEOPLE?

 8  **Q.**  THIS IS THE DIVERSION, SIR, THAT YOU ARE REFERRING TO, I

 9  BELIEVE.

10  **A.**  WELL, I THINK THERE ARE TWO DIVERSION RECOMMENDATIONS; ONE

11  IS DIVERSION OF THE TECHNICAL PAROLE VIOLATORS.

12  **Q.**  THAT IS NOT THE ONE I'M TALKING ABOUT, SIR.

13  **A.**  THE OTHER ONE IS PEOPLE THAT ARE SENTENCED 24 MONTHS OR

14  LESS.  THAT'S THEIR SENTENCE FOR CERTAIN CRIMES.

15           SO, YES, THEY ARE BASICALLY SERVING, IT LOOKS LIKE,

16  ABOUT AN AVERAGE OF ABOUT SEVEN MONTHS IN THE CDCR.

17  **Q.**  BUT YOU COULD DIVERT SOMEBODY FOR UP TO A YEAR UNDER YOUR

18  PROPOSAL, CORRECT?

19  **A.**  THEY COULD AVOID AS MUCH OF A YEAR OF INCARCERATION.

20  **Q.**  THANK YOU.

21           AND YOU HAVE INDICATED THAT THAT PARTICULAR

22  METHODOLOGY, THE DIVERSION ONE, WOULD ULTIMATELY REDUCE AN

23  APPROXIMATELY $12,500 -- 12,500 POPULATION REDUCTION?

24  **A.**  APPROXIMATELY, UNDER THOSE CIRCUMSTANCES THAT ARE DISCUSSED

25  IN THE PRIOR MODEL, YES.

1  **Q.**  AND I THINK I HEARD YOU CORRECTLY LAST TIME INDICATE THAT

2  YOU REALLY CAN'T GET TO THE REDUCTION OF 52,000 PRISONERS UNLESS

3  YOU REACH INTO, FOR EARLY RELEASE, THE SECOND STRIKERS AND MAYBE

4  EVEN SOME LIFERS, CORRECT?

5  **A.**  THE 50,000 CAN BE ACHIEVED.  I WOULD SAY YOU DON'T HAVE TO

6  GO TO THE LIFERS TO GET THE 50,000 -- THE 50,000 POPULATION

7  REDUCTION.

8          BUT THE PEOPLE THAT ARE SPECIFIED IN THE MODEL, YOU

9  WOULD HAVE TO GO BEYOND THAT GROUP AND THAT WOULD INCLUDE SECOND

10  STRIKERS.

11  **Q.**  OKAY.  SO IF THERE IS A CAP IMPOSED ON THE STATE PRISON

12  SYSTEM SEPARATE AND APART FROM ANY RELEASE OR DIVERSION ORDER,

13  WE'D HAVE TO BE ABLE TO TAKE SECOND STRIKERS OUT IN ORDER TO

14  REACH THAT CAP, THE CAP THAT'S PROPOSED BY PLAINTIFFS, CORRECT?

15  **A.**  THE WAY I WOULD PHRASE IT IS THAT THE SECOND STRIKERS ARE

16  COMING OUT NOW, SO THERE IS NO CHANGE IN THE NUMBER OF SECOND

17  STRIKERS BEING RELEASED TO THE COMMUNITY.

18          THE ONLY THING THAT WOULD CHANGE FOR SECOND STRIKERS,

19  WOULD BE THEY WOULD SERVE A SMALLER PROPORTION OF THEIR

20  SENTENCE, BECAUSE THEY ARE MANDATED NOW TO SERVE 80 PERCENT OF

21  THEIR SENTENCES.

22  **Q.**  LET'S TALK ABOUT YOUR REDUCTION IN LENGTH OF SENTENCE.

23          **JUDGE KARLTON:**  CAN I INTERRUPT FOR A MOMENT?

24          ARE YOU, THEREFORE, TELLING US THAT FOR US TO BE

25  SUCCESSFUL, WE HAVE TO IN SOME WAY VOID A PORTION OF

1  CALIFORNIA'S SENTENCING LAW?

2          **THE WITNESS:**  TO REACH THE NUMBER OF 50,000, YES.

3  YOU WOULD HAVE TO MODIFY THE SENTENCING LAW.

4          **JUDGE REINHARDT:**  YOU WOULD HAVE TO RELEASE THEM

5  EARLIER THAN THEY ARE NOW BEING RELEASED?  ARE THEY NOW BEING

6  HELD FOR THE FULL -- IS IT 15 YEARS FOR THE SECOND STRIKER?

7          **THE WITNESS:**  EIGHT.  THEY ARE ACTUALLY DOING MORE

8  THAN THE 80 PERCENT.  SO PART OF THE RECOMMENDATIONS WOULD TAKE

9  CARE OF THAT PROBLEM.  THEY ARE DOING MORE THAN 80 PERCENT.  THE

10  50 PERCENT ARE DOING MORE THAN THE 50 PERCENT.  SO THE

11  RECOMMENDATIONS DEAL WITH THAT ISSUE AND YOU WOULD GO UNDER THAT

12  --

13          **JUDGE REINHARDT:**  YOU SAID DOING MORE THAN THE

14  80 PERCENT OR LESS -- WAIT.  THE STATUTE SAYS 15 YEARS, CORRECT?

15          **JUDGE KARLTON:**  IT SAYS 80 PERCENT.

16          **JUDGE REINHARDT:**  THE STATUTE SAYS 80 PERCENT OF 15

17  YEARS?

18          **THE WITNESS:**  YES, YOUR HONOR, BECAUSE SECOND

19  STRIKERS HAVE TO DO 80 PERCENT OF THE SENTENCE THAT'S IMPOSED.

20          **JUDGE KARLTON:**  15 YEARS OR MORE.

21          **JUDGE REINHARDT:**  ALL RIGHT.  LET'S SAY THE MINIMUM

22  IS 15 YEARS, RIGHT?

23          **THE WITNESS:**  NO.

24          **JUDGE REINHARDT:**  NO, OKAY.

25          **THE WITNESS:**  SECOND STRIKERS DO NOT HAVE A 15 YEAR.

1  THEY ARE MORE IN THE FIVE TO EIGHT YEAR RANGE IN GENERAL.

2          **JUDGE REINHARDT:**  AND IS IT IN THAT STATUTE, THE

3  SECOND STRIKE STATUTE, THAT SAYS THEY GET 80 PERCENT OR IS THERE

4  A SEPARATE STATUTE THAT SAYS 80 PERCENT?

5          **THE WITNESS:**  YOUR HONOR, I'M NOT FAMILIAR WITH THE

6  EXACT, BUT IT'S IN THE STATUTE THAT REQUIRES THEM TO DO 80 --

7  THE SECOND STRIKERS BASICALLY FOR THE SENTENCE THAT IS IMPOSED,

8  THEY DOUBLE THE SENTENCE AND THEN THEY HAVE TO DO 80 PERCENT OF

9  THAT SENTENCE THAT'S IMPOSED, LESS THE JAIL CREDITS THAT THEY

10 RECEIVE FROM THE COURT.

11         **JUDGE REINHARDT:**  DO THEY GET ANY PRISONS CREDITS?

12         **THE WITNESS:**  I'M SORRY, YOUR HONOR?

13         **JUDGE REINHARDT:**  DO THEY GET ANY PRISON CREDITS?

14 OKAY.  I WILL FIND OUT SOME OTHER WAY.

15         **THE WITNESS:**  THAT'S OKAY.  I DIDN'T HEAR THE

16 QUESTION.  I WILL ANSWER IT.

17         **JUDGE REINHARDT:**  YOU ARE NOT THE ONE TO ASK THE

18 QUESTION, I DON'T THINK.  IT'S A QUESTION OF WHAT THE STATUTES

19 ARE.  I CAN FIND OUT THE ANSWER TO THAT.  OKAY.

20         HOW MUCH WOULD THE REDUCTION BE BELOW THE 80 PERCENT?

21         **THE WITNESS:**  I WOULD -- BASICALLY THE REDUCTION

22 WOULD GO SOMEWHERE IN THE NEIGHBORHOOD FROM 80 PERCENT SERVED TO

23 SOMETHING LIKE 65 TO 70 PERCENT SERVED.

24         SO IT WOULD -- IT WOULD NOT GO DOWN TO THE 50 PERCENT

25 LEVEL, BUT YOU WOULD BE IN THAT RANGE OF SERVING 65 TO

1   70 PERCENT OF THE SENTENCE IMPOSED RATHER THAN THE 80 PERCENT.

2         AND YOU WOULD ALSO -- IF I JUST MIGHT ADD.  THE OTHER

3   PART IS -- IS THAT BECAUSE OF THE ANOMALIES OF THE WORK

4   INCENTIVE PROGRAMS, PEOPLE DON'T GET THE FULL BENEFIT OF THAT.

5   IT'S KIND OF COMPLICATED, BUT THE RECOMMENDATION WOULD DEAL WITH

6   THAT, ALSO.

7         SO THAT, THAT'S WHAT THE -- BUT THE OVERALL EFFECT

8   WERE TO TAKE THAT 80 PERCENT DOWN TO SOMEWHERE IN THE RANGE OF

9   65 TO 70 PERCENT OF SENTENCE IMPOSED.

10        **JUDGE REINHARDT:**  AND DOES THAT ANSWER THE -- WHEN

11  YOU SAY THAT'S WHAT YOU WOULD HAVE TO DO, IS THAT THE ONLY WAY

12  YOU CAN END UP WITH A A CAP OR ARE THERE OTHER ALTERNATIVES

13  RELATING TO TAKING PEOPLE IN TO THE PRISON?

14        **THE WITNESS:**  THERE ARE OTHER ALTERNATIVES.  YOU

15  KNOW, BASICALLY THE WAY I WOULD APPROACH IT IS THE STATE OR THE

16  COURT WOULD DECIDE WHAT IS THE APPROPRIATE POPULATION SIZE AND

17  ONCE -- ONCE WE KNOW WHAT THAT IS, THEN WE CAN LOOK AT THE

18  VARIOUS WAYS OF ACHIEVING THAT EITHER THROUGH THE DIVERSION OR

19  CHANGING THE LENGTH OF STAY.

20        SO THERE'S A LOT OF THINGS THAT ARE ON THE TABLE THAT

21  COULD BE LOOKED AT THAT COULD GET YOU TO THE 50,000.

22        AND WHEN I SAY THE SECOND STRIKERS, IT IS

23  CONCEIVABLE, I GUESS, THAT COULD YOU AVOID THE SECOND STRIKERS,

24  BUT YOU WOULD HAVE TO DO SOME THINGS DIFFERENTLY.  IT ALL

25  DEPENDS ON WHAT THE NUMBER IS THAT THE COURT COMES UP WITH.

1          **JUDGE REINHARDT:**  YOU WERE GIVEN THE NUMBER, I THINK,

2   FROM COUNSEL.  TAKING THAT NUMBER, ARE YOU SAYING THERE ARE

3   OTHER WAYS TO ACHIEVE THAT NUMBER, OTHER THAN BY INCLUDING THE

4   SECOND STRIKERS?

5          **THE WITNESS:**  THERE ARE OTHER WAYS, BUT I WOULD -- I

6   WOULD --

7          **JUDGE REINHARDT:**  THEY ARE NOT YOUR RECOMMENDATION?

8          **THE WITNESS:**  NO, BECAUSE --

9          **JUDGE REINHARDT:**  YOU DON'T HAVE TO GIVE ME AN

10  EXPLANATION.  I'M SAYING, THERE ARE OTHER WAYS OF REACHING THE

11  CAP WITHOUT RELEASING THE SECOND STRIKERS.

12         **THE WITNESS:**  THERE ARE OTHER WAYS.

13         **JUDGE REINHARDT:**  THEY ARE NOT THE WAYS THAT YOU

14  WOULD RECOMMEND.

15         **THE WITNESS:**  THAT'S CORRECT, SIR.

16         **MS. BARLOW:**  THANK YOU, YOUR HONOR.

17  **BY MS. BARLOW:**

18  **Q.**  ALL RIGHT.  SPECIFIC, DR. AUSTIN, OF THE REDUCTION IN LENGTH

19  OF SENTENCE THAT YOU RECOMMEND.  INITIALLY IN YOUR TESTIMONY

20  LAST TIME YOU DESCRIBED THIS OPTION AS A RECOMMENDATION THAT,

21  QUOTE:

22              "THE STATE INCREASE THE NUMBER OF CREDITS

23              THAT PRISONERS CAN EARN FOR PARTICIPATION IN

24              PROGRAMS OR BEING IN COMPLIANCE WITH A CASE

25              MANAGEMENT PLAN."

1          THEN LATER IN YOUR TESTIMONY YOU SAID THERE WAS

2   ACTUALLY NO NEED TO ADD PROGRAMMING FOR THIS FORM -- REFORM TO

3   BE IMPLEMENTED, CORRECT?

4   **A.**  YES, THAT'S CORRECT.

5   **Q.**  SO YOU ARE NOT ACTUALLY RECOMMENDING INCREASED CREDITS FOR

6   ACHIEVING PROGRAMMING.  YOU ARE JUST RECOMMENDING REDUCTION IN

7   SENTENCE PERIOD, CORRECT?

8   **A.**  NO.  AGAIN, THE -- THERE IS NO CHANGE IN THE SENTENCE.  I

9   DON'T WANT TO BE PICKY, BUT THE SENTENCES ARE STAYING THE SAME.

10  **Q.**  YOU ARE RECOMMENDING THAT THEY BE RELEASED SOONER THAN THEY

11  OTHERWISE WOULD BE?  THEIR SENTENCES BE SHORTENED, YES?  THEIR

12  LENGTH OF STAY BE SHORTENED?

13  **A.**  THE LENGTH OF STAY WOULD BE REDUCED, AND IT COULD BE REDUCED

14  BY REWARDING PRISONERS FOR EITHER PARTICIPATION IN PROGRAMS, AS

15  IS BEING RECOMMENDED BY THE GOVERNOR NOW, AND/OR BEING COMPLIANT

16  WITH A CASE MANAGEMENT PLAN.

17          IT'S IMPORTANT THAT I STATE THAT THERE ARE

18  SIGNIFICANT NUMBERS OF PRISONERS THAT ARE LOW RISK IN THE

19  CALIFORNIA PRISON SYSTEM WHO DON'T REQUIRE TO COMPLETE A

20  PROGRAM, BUT WHAT THEY ARE REQUIRED TO DO IS COMPLY WITH RULES

21  AND REGULATIONS.  THEY WOULD ALSO BE REWARDED FOR THAT KIND OF

22  BEHAVIOR.

23  **Q.**  NOW, SIR, YOU ESTIMATE THAT THE REDUCTION OF POPULATION BY

24  DIVERSION OF 12,500, AND THERE WOULD BE ADDITIONAL ARRESTS AT

25  THE RATE OF 26 PERCENT FOR THAT GROUP.

1        AND THEN YOU ALSO INDICATED THAT THE -- FOR THE GROUP

2   THAT YOU WOULD SHORTEN THEIR LENGTH OF STAY, THAT THERE WOULD

3   ALSO BE REOFFENSE AND REARREST RIGHTS FOR THAT GROUP.

4        AND YOU HAVE INDICATED IN YOUR REPORT THAT EACH OF

5   THOSE IS LESS THAN ONE PERCENT ARREST RATE.

6        BUT WOULDN'T IT BE FAIR TO SAY THAT WE SHOULD

7   AGGREGATE ALL OF THE ARRESTS FOR EACH OF THE FOUR GROUPS OF

8   PEOPLE YOU ARE RECOMMENDING TO COME UP WITH WHAT THE ARREST RATE

9   IS AND NOT SINGLE THEM OUT BY PROPOSED ALTERNATIVE?

10  **A.**  YEAH.  WHEN THE FINAL PROPOSAL IS DEVELOPED, YOU COULD DO A

11  CALCULATION THAT PUTS IT ALL TOGETHER.

12        WHAT'S IMPORTANT, AGAIN, TO UNDERSTAND THOUGH.  LET'S

13  SAY THE STATE DECLINES TO DO THE DIVERSION OF THE SHORT-TERM

14  PRISONERS.  THEN THEY BECOME ELIGIBLE FOR THE CREDIT TIME

15  BECAUSE THEY ARE NOT BEING DIVERTED.  THEY ARE COMING INTO THE

16  PRISON SYSTEM.  SO YOU PICK UP A LOT OF GAINS.

17        AND I DON'T WANT TO BE COMPLICATED, BUT WHEN YOU GET

18  THE VARIOUS -- THESE RECOMMENDATIONS GOING, THEY ALL NEED TO BE

19  PUT TOGETHER, BUNDLED TOGETHER, SO YOU CAN SEE WHAT WE CALL THE

20  INTERACTIVE EFFECTS.  YOU CAN'T PUT THEM SEPARATELY,

21  SIDE-BY-SIDE.  THE WHOLE THING HAS TO BE PACKAGED, AND THEN

22  ESTIMATED, AND THEN YOU CAN COME UP WITH WHAT YOU THINK ARE THE

23  CALCULATIONS OF AVERTED, ARRESTS AND THINGS LIKE THAT.

24  **Q.**  AND YOU HAVEN'T DONE THAT IN YOUR REPORT, HAVE YOU?

25  **A.**  I HAVE NOT DONE THAT, NO.

1  Q. ALL RIGHT. LET'S TALK FOR A MOMENT ABOUT THE PROPOSAL TO

2  REDUCE THE LENGTH OF PAROLE FOR COMPLIANT PAROLEES.

3          ISN'T IT TRUE, SIR, THAT YOU HAVE OPINED THAT THAT

4  PROPOSAL WOULD HAVE A NEGLIGIBLE EFFECT ON THE PRISON

5  POPULATION?

6  A. I DON'T KNOW IF I OPINED THAT --

7  Q. WELL, IT'S IN PARAGRAPH 52 OF YOUR NOVEMBER 9, 2007 REPORT.

8  YOU SAY -- YOU ARE SPEAKING OF THE PROPOSAL TO END PAROLE FOR

9  CERTAIN PAROLEES WHO COMPLETE 13 MONTHS OF SUCCESSFUL PROPOSAL.

10          "AS I STATED IN THAT PRIOR DECLARATION, THAT

11          PLAN WILL HAVE A NEGLIGIBLE EFFECT ON THE PRISON

12          POPULATION."

13 A. YEAH. I DON'T THINK IT WOULD HAVE ANY IMPACT ON INCREASE.

14 IT WOULD PROBABLY LOWER THE PRISON POPULATION BASED ON THE

15 EXPERIENCE IN OTHER COURTS. I JUST WANTED TO MAKE THAT CLEAR.

16 Q. YOU WENT ON TO SAY, SIR.

17          "EVEN IF THEY WERE READMITTED TO TECHNICAL

18          VIOLATIONS, THEIR SHORT PERIOD OF IMPRISONMENT,

19          THREE MONTHS OR LESS, WOULD HAVE VIRTUALLY NO

20          EFFECT ON THE CURRENT 170,000 PRISON

21          POPULATION."

22          CORRECT?

23 A. IT WOULD NOT AGGRAVATE IT, NO.

24 Q. NOW, YOU ALSO INDICATED IN BOTH YOUR REPORT AND IN YOUR

25 TESTIMONY THAT, QUOTE:

1              "WE GET A LOWER REVOCATION RATE BECAUSE WE

2         HAVE CREATED AN INCENTIVE FOR THE PAROLEES TO

3         CONFORM AND BEHAVE."

4              DON'T YOU REALLY JUST GET A LOWER REVOCATION RATE

5    BECAUSE THEY ARE NOT ON PAROLE, SO THEY CAN'T BE REVOKED?

6    **A.**  WELL, THAT STATEMENT IS, AGAIN, BASED ON THE RESEARCH WE

7    HAVE BEEN DOING IN NEVADA.  WE HAVE BEEN VERY SUCCESSFUL IN THAT

8    STATE WHERE WE INSTITUTED THIS POLICY AND REVOCATION RATES

9    DROPPED.  THE THREE-YEAR RECIDIVISM RATES DIDN'T CHANGE.

10   **Q.**  DIDN'T CHANGE?

11   **A.**  THEY DID NOT CHANGE.  WE DID FOLLOW-UP ANALYSIS OF THAT.

12   THE PAROLE OFFICIALS THINK IT'S GREAT.  IT PROVIDES AN

13   INCENTIVE, LIKE ANYONE ELSE, TO CONFORM.  SO IT SEEMS TO WORK

14   PRETTY WELL.

15   **Q.**  NOW, I JUST WANT TO MAKE SURE I HAVE THE NUMBERS CORRECT,

16   BECAUSE WE KEEP HEARING THAT SOMETHING LIKE TWO-THIRDS OF THE

17   PEOPLE BEING RETURNED TO PRISON ARE ON TECHNICAL VIOLATIONS,

18   BUT, IN FACT, IT'S 21 PERCENT, RIGHT?

19   **A.**  I DON'T RECALL THE 21 PERCENT.  I BELIEVE THERE IS

20   130-SOME-THOUSAND ADMISSIONS, AND THERE IS ABOUT SOME 65,000 TO

21   70,000 TECHNICAL VIOLATORS COMING IN EACH YEAR.

22   **Q.**  YOUR EARLIER TESTIMONY, SIR, INDICATED THAT OF THE

23   APPROXIMATELY 69,000 REVOCATIONS OF PAROLE, 14,500 WERE PURELY

24   TECHNICAL.  THAT'S 21 PERCENT, RIGHT?

25   **A.**  WELL, THOSE ARE -- BUT THE 14,000 IS FOR PURELY, PURELY

1   TECHNICAL --

2   **Q.**  THAT'S WHAT I ASKED.  PURELY TECHNICAL, 21 PERCENT, RIGHT?

3   **A.**  NO.  I JUST WANT TO, IF I MAY.  THE 67,000 ARE CALLED

4   TECHNICAL PAROLE VIOLATORS BY THE STATE OF CALIFORNIA.  THEY ARE

5   COMING IN BECAUSE THEIR PAROLE STATUS HAS BEEN REVOKED.

6   **Q.**  BUT OF THAT NUMBER ONLY 21 PERCENT ARE PURELY TECHNICAL.

7   THE OTHERS HAVE COMMITTED A NEW CRIME OR BEEN RETURNED FOR A NEW

8   CRIME, CORRECT?

9   **A.**  NO THAT'S NOT CORRECT.  YOU CAN SAY THEY HAVE BEEN ARRESTED,

10  BUT --

11  **Q.**  I'M JUST TELLING YOU WHAT YOU SAID BEFORE, SIR.  ARE YOU

12  SAYING IT DIFFERENT NOW?

13  **A.**  I'M SAYING -- I'M TELLING YOU WHAT I'M SAYING NOW, YES,

14  WHICH IS THEY HAVE BEEN ARRESTED.  I'M NOT SAYING THEY HAVE

15  COMMITTED CRIMES.

16  **Q.**  YOU INDICATE IN YOUR REPORT THAT THE DIVERSION OF TECHNICAL

17  PAROLE VIOLATORS THAT YOU RECOMMEND WOULD REDUCE THE POPULATION

18  BY, QUOTE, AT LEAST 6500 OR AS MUCH AS 9500 AT ANY GIVEN TIME.

19          HOWEVER, IN TESTIMONY BEFORE THIS COURT YOU SAID IT

20  WAS 10 TO 15,000 INMATES.  WHICH IS CORRECT?

21  **A.**  CAN YOU POINT TO THE...

22  **Q.**  CERTAINLY.  YOUR REPORT IS PARAGRAPH 55 OF YOUR AUGUST 15TH

23  REPORT.

24  **A.**  WHAT PARAGRAPH IS IT?

25  **Q.**  55.

1   **A.**   OH.  THAT'S THE CDCR EXPERT PANEL ESTIMATE.

2   **Q.**   WELL?

3   **A.**   THAT'S THE ESTIMATE THAT WAS PRODUCED BY OUR EXPERTS, CDCR.

4   **Q.**   AND YOU DISAGREE WITH THAT?

5   **A.**   NO.  JUST THAT THAT NUMBER WAS BASED ON DIFFERENT NUMBERS

6   THAT WE HAD GOTTEN FROM THE DEPARTMENT OF CORRECTIONS.

7           AS PART OF MY WORK IN THIS TRIAL, WE GOT UPDATED

8   NUMBERS FROM THE DEPARTMENT.  THEY RAN NEW RUNS FOR ME, SO...

9   **Q.**   ACTUALLY, SIR, WHERE IS THAT DATA?  I HAVEN'T SEEN THAT DATA

10  IN ANY REPORT YOU HAVE ISSUED; THIS HIGHER NUMBER, THE 10 TO

11  15,000.

12  **A.**   WHERE  ARE YOU SHOWING THE 10,000 TO 15,000.

13  **Q.**   YOU TESTIFIED TO THAT, SIR, LAST TIME.  I CAN QUOTE YOUR

14  TESTIMONY, IF YOU WOULD LIKE.  THIS IS ON PAGE 126 OF THE COURT

15  REPORTER'S TRANSCRIPT OF PROCEEDINGS FROM DECEMBER THE 4TH.  AND

16  THIS WAS IN RESPONSE TO A QUESTION FROM THE COURT ABOUT WHETHER

17  THE REDUCTION HE PROPOSED WAS MODERATE OR NOT.

18           **"THE WITNESS:**  WELL, FOR CITIES.  IT'S A LOT

19               EASIER TO REDUCE THAT POPULATION THAN IF I GO TO

20               RHODE ISLAND, WHICH I THINK HAS AN INCARCERATION

21               RATE OF 185 PER 100,000.

22           "SO THAT'S MY POINT.  I GUESS, YES, IT'S

23               SIGNIFICANT.  IT'S LARGE.

24           "IF YOU ARE ASKING AND WHEN I SAY MODERATE,

25               THE NUMBER ONE THING THAT WILL WORK HERE -- I

1              MEAN, THE TECHNICAL VIOLATION THING TO ME IS,

2              THAT BUYS YOU, DEPENDING ON HOW YOU DO IT,

3              10,000 TO 15,000 INMATES RIGHT THERE."

4  **A.**  CAN I SEE IT?

5  **Q.**  I JUST READ RIGHT OUT OF THE TRANSCRIPT, SIR.  THAT'S WHAT

6  YOU TESTIFIED PREVIOUSLY.  I THINK THE RECORD SPEAKS FOR ITSELF.

7              I'M JUST ASKING YOU --

8              **JUDGE HENDERSON:**  WE DON'T HAVE A QUESTION.  WHY

9  DON'T YOU -- LET'S SEE THE QUESTION AND THE ANSWER.

10             **MS. BARLOW:**  I'M SORRY, YOUR HONOR.

11             **JUDGE HENDERSON:**  YOU READ HIS ANSWER.  THE QUESTION

12 THAT PROMPTED IT MIGHT BE HELPFUL.

13             **MS. BARLOW:**  IT WAS ACTUALLY A COUPLE OF QUESTIONS,

14 THE FIRST ONE WAS FROM JUDGE KARLTON.

15                 "**QUESTION:**EXCUSE ME, DOCTOR.  WHATEVER THE

16                 REASON, THERE IS A VERY LARGE NUMBER OF PEOPLE

17                 IN  THE CALIFORNIA SYSTEM.  AND THE QUESTION IS

18                 WHETHER A REDUCTION OF SOME 52,000 OVER A COUPLE

19                 OF YEARS OR WHATEVER IS, I'M SORRY, A MODERATE

20                 LOWERING OF THE PRISON POPULATION."

21             "**THE WITNESS:**  WELL, STATISTICALLY IT'S

22                 ABOUT A 30 PERCENT OR SO DECLINE.  SO THAT'S

23                 SUBSTANTIAL, THAT'S LARGE.

24                 "FOR EXAMPLE, I'M WORKING IN THE STATE OF

25                 LOUISIANA, WHICH HAS THE HIGHEST INCARCERATION

 1              RATE IN THE WORLD.

 2                  "**JUDGE HENDERSON:**  I THOUGHT D.C. DID, BUT

 3              THAT'S ALL RIGHT.

 4                  "**THE WITNESS:**  WELL, FOR CITIES," ET CETERA.

 5              SO THAT'S THE ENTIRE CONTEXT OF THE QUESTION.  THE

 6  POINT WAS THAT THE WITNESS TESTIFIED 10,000 TO 15,000 WOULD BE

 7  REDUCED.

 8              **JUDGE REINHARDT:**  WHAT WAS THE QUESTION THAT ELICITED

 9  THAT RESPONSE?

10              **MS. BARLOW:**  HIS REPORT INDICATES IT'S 6500 TO 9500.

11  I'M TRYING TO FIND OUT WHAT THE REAL NUMBER IS, SIR.

12              **JUDGE REINHARDT:**  I STILL DON'T UNDERSTAND WHAT THE

13  QUESTION WAS.

14              **THE WITNESS:**  JUST FOR THE RECORD, THE 6500 TO 9500

15  IS FROM THE EXPERT PANEL REPORT.  I WAS PART OF THE PANEL, BUT

16  THAT'S NOT MY REPORT.

17              I MEAN, I SUPPORT THAT NUMBER.  I THINK WE ARE

18  TALKING SOMETHING IN THAT RANGE, BUT YOU KNOW THE DEVIL IS IN

19  THE DETAILS.

20              **JUDGE KARLTON:**  IN ANY EVENT, THERE IS NO REASON TO

21  -- WELL, I MEAN IF THIS COURT -- NEVER MIND.  GO AHEAD.

22              **MS. BARLOW:**  I'M JUST TRYING TO SEE HOW WE GET TO THE

23  NUMBERS, YOUR HONOR.

24              **JUDGE KARLTON:**  THAT MAY BE UP TO THE STATE OF

25  CALIFORNIA.

1          **MS. BARLOW:**  IT MAY.

2   **BY MS. BARLOW:**

3   **Q.**  NOW, LET'S JUST TALK MAINLY ABOUT IMPACTS ON LOCAL JAIL

4   CROWDING OF THE PROPOSALS YOU HAVE MADE.

5          IT'S TRUE, IS IT NOT, SIR, THAT ONE OF THE THINGS

6   THAT DROVE ADMISSIONS UP OF TECHNICAL PAROLE VIOLATORS TO THE

7   STATE PRISONS IN THE 80'S WAS A DECISION BY THE BOARD OF PRISON

8   TERMS TO ACCOMMODATE LOCAL COUNTY OFFICIALS BY ADMITTING PAROLE

9   VIOLATORS WHO OTHERWISE WOULD HAVE REMAINED IN THE LOCAL JAIL

10  PENDING REVOCATION HEARING, AND THIS WAS DONE TO REDUCE THE JAIL

11  POPULATION AND JAIL OVERCROWDING?

12  **A.**  YES, THAT WAS PART OF THE REASON.

13  **Q.**  NOW, IT'S ALSO TRUE, ISN'T IT, SIR, THAT UNDER YOUR

14  PROPOSALS THE RESULT WOULD BE THAT MORE PEOPLE WILL BE HELD IN

15  THE JAILS?

16  **A.**  NO, IT WOULD NOT.

17  **Q.**  ALL RIGHT.  I WOULD LIKE TO REFER TO THE WITNESS'S

18  DEPOSITION VOLUME 2, PAGE 425, LINES -- IT'S PAGE 425.  THE

19  QUESTION BEGINS AT LINE 11.

20          "**QUESTION:**SO YOU DON'T BELIEVE THERE WOULD

21          BE A NEED FOR A CAP ON THE STATE PRISON

22          POPULATION?"

23          AND THEN MISS EVENSON INTERJECTED AN OBJECTION,

24  MISCHARACTERIZES THE TESTIMONY.

25          "**THE DEPONENT:**  THE CAP IS REALLY THE

1             ARTIFACT OF THE ADMISSION AND RELEASE STRING.

2             SO I THINK YOU SAID IF THEY PUT A CAP, THERE

3             WOULD BE A BACKUP IN THE COUNTY JAIL SYSTEM

4             BECAUSE OF THAT CAP, RIGHT?  AND THAT WOULD NOT

5             HAPPEN.  THERE IS NO NEED FOR THAT

6             MATHEMATICALLY.  THE SAME NUMBER OF PEOPLE GO IN

7             AND THE SAME NUMBER OF PEOPLE GO OUT.  ACTUALLY,

8             IF WE DIVERT PEOPLE, THERE WOULD BE MORE PEOPLE

9             BEING HELD IN THE COUNTY."

10  **A.**  THERE WOULD BE MORE PEOPLE UNDER SUPERVISION.

11            **MS. EVENSON:**  OBJECTION.  THAT ISN'T WHAT HE JUST

12  SAID.  CAN YOU JUST FINISH HIS SENTENCE THAT YOU WERE READING

13  FOR THE RECORD?

14  **BY MS. BARLOW:**

15  **Q.**  (READING)

16            "BUT THERE WOULD BE NO CHANGE.  THERE WOULD

17            BE NO NEED TO BACK UP PEOPLE IN THE COUNTY JAILS

18            BECAUSE OF THE PRISON POPULATION CAP."

19            THAT'S WHAT YOU TESTIFIED, RIGHT?

20  **A.**  RIGHT.

21  **Q.**  BUT THERE WOULD BE MORE PEOPLE HELD IN THE JAILS UNDER YOUR

22  DIVERSION PROPOSAL?  THAT'S WHAT YOU JUST --

23  **A.**  WHEN I SAY HELD, THEY ARE IN THE SUPERVISION OF THE COUNTY.

24  I DIDN'T SAY HELD IN THE JAILS.  HELD IN THE COUNTY.  THAT'S

25  WHAT I MEANT BY THAT.

1   Q.  OKAY.  WELL, YOU SAID JAILS, SIR.  SO NOW YOU ARE SAYING YOU

2   MEAN -- MEANT SOMETHING ELSE?

3          **MS. EVENSON:**  OBJECTION.  ARGUMENTATIVE.

4   MISCHARACTERIZES THE TESTIMONY.

5          **JUDGE HENDERSON:**  SUSTAINED.

6   **BY MS. BARLOW:**

7   **Q.**  NOW, IF WE HAVE A CAP ON THE STATE PRISON POPULATION AT

8   APPROXIMATELY 103,000, WHICH IS WHAT THE PLAINTIFFS HAVE

9   REQUESTED OF THIS COURT, AND WE HAVE JAILS ALL OVER THE STATE

10  RELEASING PEOPLE EARLY BECAUSE OF LACK OF CAPACITY, RIGHT?  YOU

11  ARE AWARE OF THAT?

12  **A.**  I'M AWARE OF A REPORT THAT SAYS THEY ARE RELEASING PEOPLE

13  EARLY, YES.

14  **Q.**  OKAY.  SO IF YOU ASSUME, SIR, THAT 32 OUT OF THE 58 COUNTIES

15  ARE OPERATING UNDER EITHER CSA, CAPACITY CAPS OR COURT IMPOSED

16  CAPS?

17  **A.**  OKAY.

18  **Q.**  AND WE HAVE 103,000 POPULATION CAP AT THE STATE PRISON

19  LEVEL --

20  **A.**  YES.

21  **Q.**  -- IT'S YOUR BELIEF THAT NONE OF THOSE PEOPLE ARE GOING TO

22  BE SITTING IN COUNTY JAIL MORE THAN THEY ARE TODAY?

23  **A.**  THAT'S CORRECT.

24          **JUDGE REINHARDT:**  WHAT IS THE REASON FOR THAT?

25          **THE WITNESS:**  UMM, AGAIN, WHAT WE ARE DOING IS WE ARE

1  -- ALL WE ARE DOING IS CHANGING THE PERIOD OF TIME THAT THEY ARE

2  IN THE STATE PRISON SYSTEM.  SO IT'S NOT CHANGING THE NUMBER OF

3  PEOPLE THAT ARE GOING INTO THE SYSTEM OR THE NUMBER OF PEOPLE

4  GOING OUT OF THE PRISON SYSTEM.

5          SO THE JAILS NOW EXPERIENCE THOSE PEOPLE COMING OUT

6  OF THE PRISON SYSTEM WHO GET VIOLATED AND THEN THEY GO INTO THE

7  PRISON SYSTEM.  SO THAT FLOW IS NOT CHANGED AT ALL.  IT'S LIKE

8  -- THE WAY I TRIED TO DESCRIBE IT, IT'S LIKE YOU HAVE A RIVER.

9  YOU HAVE A DAMN.  THE DAMN ARE THE LENGTH OF STAY.  CALIFORNIA

10 HAS A HIGH DAMN NOW.

11         WATER SPILLS OVER THAT DAMN NOW.  THAT'S THE PEOPLE

12 GOING INTO THE JAILS.

13         WE TAKE THAT DAMN DOWN A LITTLE BIT.  WHEN YOU TAKE

14 IT DOWN, THERE IS THIS SURGE OF WATER, BUT THEN AT SOME POINT IT

15 EQUALIZES AGAIN AND THE FLOW IS EXACTLY WHAT IT IS CURRENTLY.

16         SO IT'S NOT GOING TO CHANGE THE NUMBER OF PEOPLE.  IT

17 HAPPENS OVER, LIKE, A YEAR TO TWO YEARS.  EVERYTHING IS THEN

18 BROUGHT BACK TO WHERE IT IS RIGHT NOW IN TERMS OF THE FLOW OF

19 PEOPLE.

20         THE EXPERIENCE OF THE PRISONER IS CHANGED, BUT THE

21 FLOW OF PEOPLE HAS NOT CHANGED.  SO THAT MEANS THE BOOKINGS AND

22 REARREST RATES ARE EXACTLY WHAT THEY ARE TODAY.

23         **JUDGE KARLTON:**  THE FACT OF THE MATTER IS AT LEAST

24 DURING THE YEAR OR TWO THERE IS A SIGNIFICANT IMPACT ON JAIL

25 POPULATION.

1    **THE WITNESS:**  IT'S NOT -- YOUR HONOR, THE TABLE THAT

2    I SHOWED SAID THERE IS THIS SURGE.  AND I TALK ABOUT THAT SURGE

3    AND I CALCULATE THE INCREASE IN BOOKINGS INTO THE JAIL, AND IT'S

4    LESS THAN ONE PERCENT OR ABOUT ONE PERCENT, SOMETHING LIKE THAT.

5    SO THAT'S THE AMOUNT.

6          AND I DO A LOT OF WORK WITH JAILS AND --

7    **JUDGE REINHARDT:**  BUT YOU ALSO SAID, AS I UNDERSTOOD

8    IT, THAT IT WOULD GO BACK TO WHERE IT WAS.  IF THE PRISON

9    POPULATION IS REDUCED, WOULDN'T IT GO TO A LOWER RATE AFTER THE

10   POPULATION WAS REDUCED?

11         IN OTHER WORDS, YOU WOULDN'T HAVE THE SAME NUMBER OF

12   PEOPLE COMING OUT, THAT YOU GET OF A POPULATION, SAY, 103,000 AS

13   YOU WOULD HAVE COMING OUT IF THE POPULATION WERE 160,000 OR

14   170,000.

15   **THE WITNESS:**  YOUR HONOR, THE WAY IT WORKS, YOU HAVE

16   THE BASIC EQUATION.  I'M TRYING TO EXPLAIN THIS.

17         SAY, YOU HAVE, I DON'T KNOW, A HUNDRED -- LET'S SAY,

18   YOU HAVE 50,000 PEOPLE COMING IN TO A PRISON SYSTEM A YEAR AND

19   THEY SPEND THREE YEARS.  THAT MEANS 50,000 TIMES THREE IS A

20   PRISON POPULATION OF 150,000.

21         IF YOU CUT IT TO TWO YEARS, SAME NUMBER OF PEOPLE

22   GOING IN, 50,000, TWO YEARS, YOU NOW HAVE A PRISON POPULATION OF

23   100,000.  SAME NUMBER OF PEOPLE GOING OUT.  SAME PEOPLE GETTING

24   ARRESTED.  SAME PEOPLE GOING TO THE JAILS.

25         ALL YOU HAVE CHANGED IS THE POOL THAT THEY ARE IN.

1  THEY ARE SERVING TWO YEARS INSTEAD OF THREE YEARS.  SO THE BASIC

2  MATH IS ADMISSIONS TIMES LENGTH OF STAY PRODUCES A PRISON

3  POPULATION.

4          SO YOU CAN HAVE, WE WILL TALK ABOUT SOME STATES

5  PROBABLY LATER ON.  ILLINOIS, FOR EXAMPLE, HAS A LENGTH OF STAY

6  OF 1.2 YEARS.  MICHIGAN HAS A LENGTH OF STAY OF FOUR YEARS.

7  THEY HAVE DIFFERENT NUMBERS OF PEOPLE COMING IN.  THEY PRODUCE

8  ABOUT THE SAME POPULATION, BUT VERY DIFFERENT PHILOSOPHY,

9  PURPOSE ABOUT WHO COMES IN AND HOW LONG THEY STAY.

10          BUT YOU ARE NOT CHANGING THE -- IT'S VERY IMPORTANT

11  PEOPLE UNDERSTAND YOU ARE NOT CHANGING THE NUMBER OF PEOPLE THAT

12  ARE COMING OUT OF THE PRISON SYSTEM.

13          NOW, THERE WOULD BE A CHANGE IN MY POLICY OF THAT ON

14  A DIVERSION OF THE TECHNICAL VIOLATORS.  THEY WOULD NOT BE GOING

15  IN AND OUT FOR TWO OR THREE MONTHS.  THAT'S DONE PURPOSELY TO

16  UNCLOG THE RECEPTION CENTERS.  SO THOSE PEOPLE -- IF YOU GET

17  THOSE PEOPLE NOT GOING BACK INTO PRISON FOR TWO TO THREE MONTHS,

18  THEN THE TOTAL RELEASES OUT OF THE PRISON SYSTEM WOULD DROP BY

19  ABOUT 30,000.  THAT WOULD BE A GREAT THING BECAUSE NOW YOU HAVE

20  GOT A RECEPTION CENTER PROCESS THAT WOULD WORK PROPERLY.

21          **JUDGE REINHARDT:**  WELL, SO THE ANSWER IS YES.  YOU

22  WOULD HAVE FEWER PEOPLE COMING OUT MONTHLY, ANNUALLY --

23          **THE WITNESS:**  YES.

24          **JUDGE REINHARDT:**  -- IF YOUR PROGRAM WERE ADOPTED.

25          **THE WITNESS:**  THAT'S CORRECT, YOU WOULD BECAUSE OF

1  THE TECHNICALS.

2          AND THAT'S THE ONLY THING THAT'S UNIQUE ABOUT

3  CALIFORNIA IS THIS TECHNICAL, THAT FLOW THING.  IF YOU LOOK AT

4  THE NEW COURT COMMITMENTS AND THE PEOPLE THAT COME TO THE COURTS

5  AND GET CONVICTED FOR A NEW CRIME AS A PAROLE VIOLATOR, THAT

6  FLOW LOOKS PRETTY GOOD.  THAT LOOKS PRETTY TYPICAL OF A STATE

7  THAT I WORK WITH.  BUT IT'S THAT TECHNICAL THING THAT'S CAUSING

8  THIS HUGE FLOW OF PEOPLE OUT.

9          BUT ON THE LENGTH OF STAY ISSUE, AGAIN, NO EFFECT ON

10  THE NUMBER OF PEOPLE BEING RELEASED OR EXPERIENCING PRISON NOW.

11  SAME NUMBERS GO IN.  SAME NUMBERS COME OUT.  SAME NUMBERS WOULD

12  GET ARRESTED AND BOOKED INTO THE JAILS.  IT HAS NO IMPACT ON THE

13  JAILS AT ALL.  THE COURT'S -- YOU KNOW, IT'S INCONSEQUENTIAL.

14          **JUDGE REINHARDT:**  THANK YOU.

15  **BY MS. BARLOW:**

16  **Q.**  SO YOU ARE SAYING, SIR, THAT EVEN THOUGH YOUR PROPOSAL IS TO

17  DIVERT 12,500 CRIMINALS ON THE FRONT END FROM COMING INTO STATE

18  PRISON --

19  **A.**  WAS THAT NEW COURT COMMITMENTS YOU ARE TALKING ABOUT?  SHORT

20  SENTENCES?

21  **Q.**  YES.

22          AND YOU ARE ALSO PROPOSING TO DIVERT, SAY, 14,000,

23  10,000 TECHNICAL PAROLE VIOLATORS FROM COMING BACK INTO CUSTODY

24  IN -- AT THE PRISON SYSTEM AT LEAST, THEY ARE JUST GOING TO BE

25  IN THE WIND?  THEY ARE NOT GOING TO BE IN THE COUNTY JAILS?  YOU

 1  ARE NOT GOING TO DIVERT THEM TO ANY KIND OF COUNTY JAIL CUSTODY

 2  PROGRAM?

 3  **A.**  THE TECHNICAL PAROLE VIOLATORS NOW GO IN AND SPEND ABOUT 30

 4  DAYS IN THE COUNTY JAIL WAITING FOR THEIR HEARINGS TO BE TAKEN

 5  CARE OF.

 6          IF WE DIVERT THEM THROUGH THE PROCESS, AGAIN, WHICH

 7  THE STATE OF CALIFORNIA IS NOW BEGINNING TO IMPLEMENT, WHICH IS

 8  A VIOLATION MATRIX, THEY WOULD PROBABLY SPEND LESS TIME IN THE

 9  COUNTY JAILS.  THEY WOULDN'T BE SPENDING THAT FULL 30 DAYS.

10  SOME MIGHT NOT EVEN GO GOT COUNTY JAILS.

11          SO THE COUNTIES WOULD GET RELIEF ON THAT.  AND,

12  AGAIN, WE ARE DIVERTING PEOPLE THAT THE DEPARTMENT WOULD SAY WE

13  CAN HANDLE.  WE CAN HANDLE THEM IN DIFFERENT WAYS.

14          AND SO THAT'S AN EXAMPLE WHERE THE BOOKINGS INTO THE

15  JAIL WOULD BE REDUCED --

16  **Q.**  THAT'S FINE --

17  **A.**  -- FOR THE -- FOR THE PEOPLE.

18  **Q.**  THAT'S NOT WHAT THE DEPARTMENT IS SAYING THOUGH, SIR.  THEY

19  ARE NOT SAYING THEY CAN HANDLE THOSE PEOPLE.

20  **A.**  I'M NOT AWARE OF THOSE STATEMENTS.

21  **Q.**  ALL RIGHT.  LET'S TALK A MINUTE ABOUT THE -- YOUR

22  CALCULATIONS THAT LESS THAN ONE PERCENT IMPACT.

23          YOU CORRECTED YOUR ARREST FIGURES FOR LOS ANGELES

24  COUNTY -- I'M JUST USING THAT ONE BECAUSE THAT'S WHAT I HAVE,  I

25  THINK -- TO 390,829 ARRESTS, CORRECT?

1  **A.**  YES.

2  **Q.**  YOU CUT IT IN HALF, RIGHT?

3  **A.**  YES.

4  **Q.**  NOW, I JUST DID SOME SIMPLE MATH HERE.  AND I'M NOT -- DON'T

5  PROFESS TO BE A MATHEMATICIAN.  I KNOW YOU'RE A STATISTICIAN AND

6  MATHEMATICIAN AND ALL THOSE THINGS, SO PLEASE CORRECT ME IF I'M

7  WRONG.

8           FOUR MONTHS WORTH OF THAT, ONE QUARTER OF A YEAR OF

9  THOSE ARRESTS IS 97,707; DOES THAT SOUND RIGHT TO YOU?

10  **A.**  I DON'T KNOW.  I DON'T KNOW WHAT YOU ARE REFERRING TO.

11  **Q.**  YOU HAD AN ANNUAL NUMBER OF ARRESTS FOR LOS ANGELES COUNTY

12  OF 390,829 IN YOUR CHARTS.  AND THAT'S THE STARTING POINT OF HOW

13  YOU CALCULATED YOUR LESS THAN ONE PERCENT, RIGHT?

14  **A.**  CORRECT.

15  **Q.**  SO NOW I'M ASKING IF WE TAKE ONE QUARTER OF A YEAR, THE FOUR

16  MONTHS THAT YOU ARE TALKING ABOUT DOING THIS DOUBLING -- DOUBLE

17  RELEASES, RIGHT?  IF WE TAKE FOUR MONTHS OF THAT WHOLE ARREST

18  DATA, WE GET 97,707 ARRESTS, RIGHT?

19  **A.**  NO.  I DON'T KNOW WHAT YOU ARE DOING THERE.

20           **JUDGE REINHARDT:**  ONE PROBLEM IS THAT FOUR MONTHS IS

21  NOT A QUARTER OF A YEAR.

22           **JUDGE HENDERSON:**  IT'S A THIRD OF A YEAR.

23           **MS. BARLOW:**  I'M SORRY.  A THIRD OF A YEAR.

24  **BY MS. BARLOW:**

25  **Q.**  THEN IT'S MORE THAN THAT, RIGHT?  IT'S 130,000?

1  **A.**  A THIRD OF 390 IS WHATEVER IT IS.

2  **Q.**  130,000, RIGHT, GIVE OR TAKE?  IS THAT FAIR?

3  **A.**  I DON'T KNOW IF -- IT'S A THIRD.  WHATEVER THE THIRD IS, IS

4  WHAT IT IS.

5  **Q.**  NOW, I JUST WANT TO ASK YOU, IF WE TOOK OUT THE JUVENILE

6  ARRESTS THAT YOU SAID YOU INCLUDED IN THAT FIGURE AND THE

7  MISDEMEANOR ARRESTS, BECAUSE ALL THESE PEOPLE ARE GOING TO BE

8  FELONY ARRESTS, RIGHT?

9  **A.**  NO.

10  **Q.**  NO?

11  **A.**  NO.

12  **Q.**  IF THEY ARE ON PAROLE AND THEY GET ARRESTED, IT'S A FELONY?

13  **A.**  NO.  YOU CAN BE ARRESTED FOR A MISDEMEANOR.

14  **Q.**  I WANT YOU TO ASSUME THEY ARE ALL FELONIES.

15  **A.**  I DON'T WANT TO ASSUME THAT.  WHY WOULD I ASSUME THAT?

16  **Q.**  IF YOU ARREST SOMEBODY ON PAROLE FOR A PAROLE VIOLATION,

17  IT'S A FELONY; ARE YOU AWARE OF THAT?

18  **A.**  I'M NOT AWARE OF THE WAY YOU ARE -- NO.  IF I'M ARRESTED FOR

19  TRESPASSING --

20  **Q.**  AND YOU ARE ON PAROLE, YES.

21  **A.**  IS THE TRESPASSING A FELONY?

22  **Q.**  IF YOU ARE ON PAROLE AND YOU GET ARRESTED FOR A VIOLATION OF

23  PAROLE, THAT'S A FELONY.

24  **A.**  THAT'S A FELONY.  BUT YOU HAVE TO UNDERSTAND WHAT WE ARE

25  LOOKING AT -- YOU ARE TRYING TO GET RID OF ALL THE MISDEMEANOR

1  ARRESTS, WHICH IS THE BULK OF THE ARRESTS, BOTH OF PAROLEES AND

2  ITS CITIZENS IN GENERAL.

3  **Q.**  DON'T YOU AGREE, SIR --

4  **A.**  AND THAT --

5  **Q.**  -- THAT WE SHOULD BE --

6  **A.**  IT DOESN'T --

7  **Q.**  -- RECONSIDERING THE SERIOUS CRIMES?

8            **JUDGE KARLTON:**  MA'AM, MA'AM, MA'AM.  LET THE WITNESS

9  ANSWER AND THEN YOU CAN ASK ANY QUESTION YOU LIKE.

10 **A.**  IF YOU LOOK AT THE ATTORNEY GENERAL'S REPORT, THERE IS NOT A

11 CATEGORY THAT SAYS "PAROLEE ARRESTED, FELONY."  THAT'S NOT A

12 CATEGORY THEY USE.  THEY USE THINGS LIKE BURGLARY, ROBBERY,

13 THINGS LIKE THAT.

14 **BY MS. BARLOW:**

15 **Q.**  THAT'S WHAT I'M TRYING TO GET A SENSE OF, SIR.  HOW MANY

16 FELONIES -- YOU THINK THE MISDEMEANORS AREN'T IMPORTANT, SO

17 LET'S TALK ABOUT FELONIES.

18            HOW MANY OF THESE PEOPLE ARE GOING TO COMMIT

19 FELONIES?

20 **A.**  WELL, THE DATA THAT THE DEPARTMENT PROVIDED TO ME DOES NOT

21 GIVE A -- I TAKE THAT BACK.  THERE IS A CODE THERE, THAT I GUESS

22 ONE COULD TRY AND DETERMINE ACCORDING TO CALIFORNIA LAW IS THAT

23 A FELONY LEVEL ARREST OR NOT, BUT I HAVE NOT CALCULATED THAT.

24 **Q.**  SO YOU DON'T KNOW HOW MANY OF THESE FOLKS WOULD, IN FACT, BE

25 ARRESTED FOR FELONIES?

1  **A.**  I DON'T KNOW THAT NUMBER, NO.

2  **Q.**  NOW, LET'S TALK ABOUT THE CAREER CRIMINAL VERSUS THE

3  NON-CAREER CRIMINAL.

4  **A.**  OKAY.

5  **Q.**  YOUR TESTIMONY LAST TIME WAS IT COULD BE UP TO 20 PERCENT?

6  10 TO 20 PERCENT OF THE CRIMINALS THAT WE HAVE ARE, QUOTE,

7  CAREER CRIMINALS, RIGHT?

8  **A.**  TECHNICALLY THAT'S -- WHAT I SAID WAS THAT BASED ON THE RAND

9  STUDIES OF CALIFORNIA, THEY ESTIMATED SOMEWHERE IN THE

10  NEIGHBORHOOD OF 15 TO 20 PERCENT OF THE PERSONS BEING SENTENCED

11  TO CALIFORNIA PRISONS BACK IN THE 1970'S WERE PEOPLE THAT

12  COMMITTED LARGE NUMBERS -- THEY SELF-REPORTED LARGE AMOUNTS OF

13  CRIMES AND THEY CALLED THEM THE CAREER CRIMINALS.

14  **Q.**  OKAY.  IN RESPONSE TO A QUESTION FROM MISS JOHNSON AT YOUR

15  PRIOR TESTIMONY --

16          **JUDGE REINHARDT:**  WHICH PRIOR TESTIMONY?

17          **MS. BARLOW:**  ON DECEMBER THE 4TH.

18  **BY MS. BARLOW:**

19  **Q.**  JUST ONE SECOND, LET ME FIND THE PAGE.  I BELIEVE IT'S PAGE

20  227, STARTING AT LINE 16.

21          "**QUESTION:**LET'S TALK A MOMENT ABOUT HIGH

22          RISK OFFENDERS.  YOU SAID ONLY 10 PERCENT OF

23          OFFENDERS ARE HIGH RISK.  DO YOU REMEMBER THAT?

24  **A.**  YES.

25  **Q.**  (READING)

1    **"ANSWER:** IN THAT NEIGHBORHOOD; 10, 10, 15.

2         IT DEPENDS ON THE STATE.  TEN MAYBE AS MANY AS

3         20."

4    **Q.**  SO 10 TO 20 PERCENT?

5         **JUDGE HENDERSON:**  IS HIGH RISK THE SAME AS CAREER

6    CRIMINAL?

7         **JUDGE KARLTON:**  I THOUGHT THEY ARE THE SAME.

8         DID YOU UNDERSTAND HIGH RISK TO EQUATE WITH CAREER

9    CRIMINAL?  MAYBE THEY DO.  I DON'T KNOW.

10        **THE WITNESS:**  WELL, THE HIGH RISK WOULD REFER TO

11   PEOPLE IF THEY ARE RELEASED FROM PRISON ARE VERY LIKELY TO

12   RECIDIVATE.  THE CAREER CRIMINAL IS --

13        **JUDGE KARLTON:**  THEY ARE GETTING RELEASED.

14        **THE WITNESS:**  WELL, THERE ARE CAREER CRIMINALS THAT

15   AREN'T EVEN BEING CAUGHT.  AND SO, YEAH.

16        WELL, I WILL LET HER.  GO HEAD.

17   **BY MS. BARLOW:**

18   **Q.**  WOULD YOU AGREE THAT THE CAREER CRIMINALS ARE THE HIGHEST

19   RISK?  CAN WE AGREE TO THAT?

20   **A.**  YES.

21        **JUDGE HENDERSON:**  BUT CAN WE HAVE A RULE THAT IF YOU

22   ARE GOING TO IMPEACH, USE THE SAME TERMINOLOGY.  IT MAY BE

23   DIFFERENT, "HIGH RISK" AND "CRIMINAL."

24        SO IF YOU ARE GOING TO ASK A QUESTION --

25        **MS. BARLOW:**  I WILL CERTAINLY TRY, YOUR HONOR.

1    **JUDGE HENDERSON:**  -- IMPEACH WITH THE SAME LANGUAGE.

2    **MS. BARLOW:**  I WASN'T AWARE THAT THE WITNESS WAS

3  GOING TO MAKE A DISTINCTION ABOUT THAT.

4    **JUDGE KARLTON:**  AND I'M NOT AWARE OF WHAT WE ARE

5  TALKING ABOUT.

6    I HAD UNDERSTOOD, BUT I MAY BE WRONG, THAT YOU WERE

7  NOT ADVOCATING THE RELEASE OF PERSONS FOUND TO BE CAREER

8  CRIMINALS WITHIN THE MEANING OF THE CALIFORNIA STATUTE.  IS THAT

9  RIGHT OR WRONG, SIR?

10    **THE WITNESS:**  I WAS TALKING ABOUT HIGH RISK PEOPLE,

11  PEOPLE THAT ARE LIKELY TO RECIDIVATE.

12    **JUDGE KARLTON:**  I UNDERSTAND.  BUT THIS IS ALL

13  LEADING TO A GREAT DEAL OF CONFUSION.  ANSWER MY QUESTION, IF

14  YOU CAN.

15    **THE WITNESS:**  YES, SIR.

16    **JUDGE KARLTON:**  ARE YOU ADVOCATING AS PART OF YOUR

17  PROGRAM THE RELEASE OF CAREER CRIMINALS?

18    **THE WITNESS:**  NO.  I WOULD NOT ADVOCATE THE RELEASE

19  OF A CAREER CRIMINAL.

20    **JUDGE KARLTON:**  WHERE ARE YOU GOING, MA'AM?

21  **BY MS. BARLOW:**

22  **Q.**  DO YOU KNOW HOW MANY CRIMES HAVE BEEN COMMITTED BY EACH OF

23  THE INDIVIDUALS THAT ARE SENTENCED TO STATE PRISON ON AVERAGE

24  PRIOR TO THEIR BEING SENTENCED TO STATE PRISON?

25  **A.**  WELL, THERE'S -- HOW MANY HAVE BEEN COMMITTED?  IS THAT WHAT

1  YOU ARE ASKING?

2  **Q.**  UH-HUH.

3  **A.**  I WOULD SAY THE CORRECT ANSWER, NO ONE KNOWS.  AGAIN, IF YOU

4  BASE IT ON THE RESEARCH OF THE RAND CORPORATION, THE VAST

5  MAJORITY OF PEOPLE THAT COME TO PRISON COMMIT VERY FEW CRIMES

6  BEFORE COMING TO PRISON, AND A SMALL NUMBER HAVE COMMITTED A LOT

7  OF CRIMES.

8          BUT THAT STUDY HAS BEEN REVIEWED WITH SOME SKEPTICISM

9  BY A NUMBER OF SCHOLARS, BUT THAT'S BASICALLY WHAT THAT RESEARCH

10  SHOWS; THAT MOST PRISONERS COMMIT VERY FEW CRIMES PER YEAR.

11  **Q.**  LET'S TALK ABOUT SOME SPECIFIC CRIMES.  THE RAND STUDY, YOU

12  AGREE, INDICATED THAT IN CALIFORNIA THE -- THOSE WHO COMMIT

13  ROBBERY HAVE AN ANNUAL OFFENSE RATE OF 50, RIGHT?  FIFTY

14  ROBBERIES.  BURGLARY HAS AN ANNUAL OFFENSE RATE OF 102.

15  **A.**  AGAIN, LET ME RESTATE -- YOU ARE TAKING THE AVERAGE, OKAY.

16  AND THE NATIONAL ACADEMY OF SCIENCES DID A REANALYSIS OF THAT

17  DATA.

18          AND RAND CORPORATION AGREES WITH THIS ANALYSIS; THAT

19  MOST OF THE PRISONERS ARE DOING -- THE PRISONERS SAID THEY HAD

20  COMMITTED NO CRIMES, ONE OR TWO OR THREE CRIMES.

21          THEN THEY HAD THESE PEOPLE OUT THERE SAYING THEY WERE

22  COMMITTING HUNDREDS OF CRIMES A YEAR BASED ON SELF-REPORT

23  SURVEYS TO INTERVIEWS AT THE RECEPTION CENTERS.

24          THAT'S HOW THIS WAS DONE.  IT'S SELF-REPORT BY

25  PRISONERS TO RESEARCHERS.  AND THEY GET THIS INCREDIBLY SKEWED

1  REACTION OR RESULT, WHICH IS THAT FIVE OR TEN PERCENT SAY THEY

2  ARE COMMITTING RUNS HUNDREDS OF CRIMES A YEAR, BUT THE VAST

3  MAJORITY IS SAYING THEY ARE DOING NONE, ONE, TWO OR THREE.

4          SO WHEN YOU GIVE THAT 50, YOU KNOW, THAT'S A

5  STATISTICAL THING YOU ARE DOING, WHICH IS SUGGESTING THEY ARE

6  ALL DOING 50 TO 100 CRIMES.  NO, IT'S JUST THE OPPOSITE.  THE

7  VAST MAJORITY ARE INVOLVED ONLY IN EPISODIC CRIMES.

8          THE RAND CORPORATION CONCLUDED THAT YOU COULD LOWER

9  PRISON POPULATIONS ACROSS THE COUNTRY BY JUST FOCUSING ON THOSE

10 HIGH END CAREER CRIMINALS.  AND THAT WAS THEIR ORIGINAL

11 PROPOSAL.

12         THEY THEN IN A SUBSEQUENT STUDY FOUND THEY COULDN'T

13 DO THAT BECAUSE THE PEOPLE THEY THOUGHT THAT WERE COMMITTING 50

14 TO 100, 200 CRIMES PER YEAR, IN FACT, WHEN RELEASED DID NOT.

15 AND THEY RECANTED THEIR FINDINGS AND SAID THE CAREER CRIMINAL

16 CANNOT BE PREDICTED BASED ON THEIR RESEARCH METHODS.

17         **JUDGE KARLTON:**  SIR, WE HAVE HEARD FROM TWO LAW

18 ENFORCEMENT FOLKS NUMBERS LIKE 12 CRIMES ARE COMMITTED BEFORE

19 ANYBODY IS ARRESTED.  IS THERE, AS FAR AS YOU KNOW, ANY RESEARCH

20 THAT SUPPORTS THAT ASSERTION?

21         **THE WITNESS:**  NO.

22         **JUDGE KARLTON:**  OKAY.

23         **THE WITNESS:**  OKAY.

24         **MS. BARLOW:**  COULD WE PUT UP --

25         **JUDGE REINHARDT:**  ARE ALL THOSE FIGURES, THE HIGH

1  ONES AND THE LOW ONES, BASED ON WHAT THE PEOPLE ON THEIR WAY TO

2  PRISON SAY THEY DID?

3          **THE WITNESS:**  THEY ARE BASED EXCLUSIVELY ON AN

4  INTERVIEW THAT LITERALLY WAS DONE WITH RAND AND DEJULIO DID.

5  THEY INTERVIEWED PRISONERS COMING TO THE RECEPTION CENTERS AND

6  THEY ASKED THEM IN THE LAST 18 MONTHS HOW MANY OF THESE

7  FOLLOWING CRIMES DID YOU COMMIT.

8          **JUDGE REINHARDT:**  AND THEN YOU SAY WHEN THEY WERE

9  RELEASED, THEY DIDN'T COMMIT CRIMES, AT LEAST THAT WE KNOW

10 ABOUT.  WHAT ABOUT THE TWO, TWO TO THREE?  THE ONES WHO SAID, I

11 ONLY COMMITTED ONE OR TWO CRIMES.  IS THERE ANY DATA AS TO WHAT

12 THEY DID WHEN THEY GOT OUT?

13          I MEAN, IS THERE ANY REASON TO BELIEVE THEIR

14 STATEMENTS ARE ANY MORE RELIABLE THAN THE ONES WHO SAID I

15 COMMITTED 50 CRIMES?

16          **THE WITNESS:**  THEY DID NOT FIND THAT THERE WAS A

17 CORRELATION BETWEEN WHAT THEY THOUGHT WERE HIGH AND LOW BASED ON

18 THE SELF-REPORT DATA.

19          **JUDGE REINHARDT:**  IN OTHER WORDS, ALL OF THIS IS

20 PRETTY WORTHLESS.

21          **THE WITNESS:**  SOME HAVE REACHED THAT CONCLUSION, YOUR

22 HONOR.

23          **JUDGE KARLTON:**  DO YOU HAVE AN OPINION AS TO WHETHER

24 IT IS OF ANY USE AT ALL?

25          **THE WITNESS:**  MY OPINION IS IT'S NOT.  AND IT'S ALSO

1  THE OPINION OF OTHER SCHOLARS WHO HAVE DONE REANALYSIS OF THE

2  DATA.

3          **MS. BARLOW:**  IF WE COULD PUT UP THE EXHIBIT?  THIS

4  IS --

5          **MS. EVENSON:**  IS THIS AN EXHIBIT, COUNSEL?

6          **MS. BARLOW:**  IT IS AN EXHIBIT, YES.

7          **MS. EVENSON:**  WHAT EXHIBIT IS IT?

8          **MS. BARLOW:**  IT IS -- LET'S SEE.  IT'S DI-6 -- SHOOT.

9  I DON'T SEEM TO HAVE THE REFERENCE RIGHT HERE.

10         **MS. EVENSON:**  WHAT IS THE NAME OF THE DOCUMENT?

11         **MS. BARLOW:**  THIS IS FROM "MAKING CONFINEMENT

12 DECISIONS."

13 **A.**  IS THAT FROM MR. ZEDLEWSKI?

14 **BY MS. BARLOW:**

15 **Q.**  ED ZEDLEWSKI, NATIONAL INSTITUTE OF JUSTICE.  YOU ARE

16 FAMILIAR WITH THAT, RIGHT?

17 **A.**  VERY FAMILIAR WITH IT.

18         **MS. BARLOW:**  IF YOU COULD PUT TABLE 1 UP ON THE

19 SCREEN?

20         **JUDGE KARLTON:**  WELL, THERE SEEMS TO BE SOME DOUBT AS

21 TO WHETHER IT'S --

22         **MS. BARLOW:**  IT IS AN EXHIBIT, YOUR HONOR.  IT HASN'T

23 BEEN ADMITTED YET, BUT IT IS --

24         **JUDGE KARLTON:**  WELL, NOTHING HAS BEEN ADMITTED.  WE

25 STILL HAVE TO GO THROUGH THAT YET.  COUNSEL WANTS TO KNOW WHAT

 1    THE EXHIBIT NUMBER IS.

 2            **MS. BARLOW:**  IT'S UP ON THE SCREEN, AND I WILL GIVE

 3    HER THE NUMBER, YOUR HONOR.  SORRY.  THE COPY I HAVE DOESN'T

 4    HAVE IT ON.

 5            **MR. SPECTER:**  WITHOUT THE EXHIBIT NUMBER, THEN WE

 6    CAN'T...

 7            **MS. BARLOW:**  IF YOU GIVE ME A MOMENT, THEN I WILL GET

 8    IT FROM THE LIST.

 9            **JUDGE KARLTON:**  IF YOU FOLKS AGREE THAT IT IS AN

10    EXHIBIT --

11            **MS. EVENSON:**  I DON'T KNOW IF IT IS AN EXHIBIT OR

12    WHETHER IT'S BEEN OBJECTED TO.

13            **JUDGE REINHARDT:**  IT DOESN'T MATTER IF IT'S BEEN

14    OBJECTED TO.  EVERYTHING HAS BEEN OBJECTED TO.

15            **JUDGE HENDERSON:**  CAN YOU SHOW HER THE ONE YOU ARE

16    LOOKING AT?

17            **MS. BARLOW:**  YES.  IT'S DI-653.  MY APOLOGIES FOR NOT

18    HAVING THAT IMMEDIATELY AVAILABLE.

19            **MS. EVENSON:**  YOU HAVEN'T PROVIDED IT.

20            **MS. BARLOW:**  I HAVE PROVIDED IT.  YOU HAVE BEEN

21    PROVIDED WITH DISKS AND PDFS OF ALL OF THESE DOCUMENTS.

22            WE ARE JUST GOING TO LOOK AT THIS ONE TABLE THAT YOU

23    WILL SEE ON YOUR SCREEN.

24            IF WE COULD PUT UP TABLE 1, PLEASE?

25                    (DOCUMENT DISPLAYED)

1  **BY MS. BARLOW:**

2  **Q.** SO THIS IS A TABLE SHOWING INMATE ANNUAL OFFENSE RATES.

3  THIS IS FROM THE RAND CORPORATION, RIGHT?

4  **A.** YES.

5  **Q.** AND IF WE LOOK AT THE COLUMN FOR CALIFORNIA, IT INDICATES

6  INMATE ANNUAL OFFENSE RATES FOR ROBBERY WERE 50.  THAT'S 50

7  AVERAGE --

8  **A.** YES, THAT'S CORRECT.

9  **Q.** -- CORRECT?

10          AND FOR BURGLARY 102?

11  **A.** THAT IS CORRECT.

12  **Q.** ASSAULT, EIGHT.  MISCELLANEOUS VEHICLE THEFT, 30.

13  MISCELLANEOUS THEFT 222.  FORGERY --

14          **JUDGE REINHARDT:** THIS IS PER PRISON, IS THAT RIGHT?

15          **MS. BARLOW:** YES, YOUR HONOR, ON AVERAGE.

16          **JUDGE REINHARDT:** PEOPLE ARE PRETTY BUSY.

17  **BY MS. BARLOW:**

18  **Q.** DRUG DEALS IS A PRETTY HIGH NUMBER.

19          BUT ISN'T IT TRUE, SIR, THAT SOME STUDIES IN TAKING

20  OUT DRUG DEALS STILL COME UP WITH AN AVERAGE 12 TO 15 ATTORNEY

21  CRIMES PER ARRESTEE ON AVERAGE?

22  **A.** USING THESE NUMBERS?

23  **Q.** USING VARIOUS STUDIES, WISCONSIN, WASHINGTON D.C., THE RAND

24  STUDY, CALIFORNIA, TEXAS, MICHIGAN.

25  **A.** CAN I ADD SOMETHING HERE?

1  Q.  IS IT TRUE OR ISN'T IT, SIR?

2  A.  WELL, THESE NUMBERS ARE WHAT YOU ARE BASING IT ON.  THE

3  ACTUAL -- WHEN YOU LOOKED AT REPORTED CRIMES TO ARRESTS, IT'S

4  NOT AT THAT LEVEL AT ALL.  IT VARIES.  IT CAN BE AS HIGH AS

5  EIGHT-TO-ONE, TWO-TO-ONE, REPORTED CRIMES TO ARREST.

6          I WAS JUST GOING TO ADD THAT THERE IS AN INTERESTING

7  STUDY BY PROFESSOR ZIMMERING AT THE UNIVERSITY OF CALIFORNIA.

8  HE TOOK THESE NUMBERS AND -- BASICALLY WHAT HE DID IS HE TOOK

9  THESE NUMBERS OF CRIMES BEING COMMITTED PER YEAR AND HE APPLIED

10 IT TO THE INCREASE IN THE PRISON POPULATION.  AND HE SAID IF YOU

11 USE THESE NUMBERS AND APPLY IT, THE COUNTRY WOULD HAVE RUN OUT

12 OF CRIME IN THE MID 1980'S, WHICH JUST KIND OF POINTED OUT THAT

13 THESE NUMBERS ARE FICTITIOUS.  THEY DON'T MAKE ANY SENSE.

14 Q.  WELL, SIR, YOU TESTIFIED LAST TIME THAT EVEN IN YOUR OWN

15 ILLINOIS STUDY, YOU REPORT THE NUMBER OF CRIMES FOR HIGH RISK

16 INMATES IN EXCESS OF 250 PER YEAR?

17 A.  I TESTIFIED THAT?

18 Q.  YES, SIR, YOU DID.

19 A.  COULD YOU READ THAT TO ME?

20 Q.  IT'S FROM YOUR *CRIME AND DELINQUENCY REPORT*.  DO YOU NOT

21 RECALL THAT?

22 A.  OKAY.  WHAT PAGE?

23 Q.  THIS IS EXHIBIT 785, DI-785.

24          **JUDGE REINHARDT:**  IS THE EXHIBIT HIS STUDY?

25          **MS. BARLOW:**  YES, SIR.

1              **JUDGE REINHARDT:**  THANK YOU.

2              **JUDGE KARLTON:**  AND WHAT PAGE DO YOU WANT TO REFER

3    HIM TO?

4              **MS. BARLOW:**  OF THE PUBLICATION, IT'S PAGE 454.  AND

5    THAT BEARS BATES STAMP AT THE BOTTOM 03658.

6    **BY MS. BARLOW:**

7    **Q.**  NOW, YOU SAY IN HERE, DO YOU NOT, SIR:

8              "A MINORITY OF OFFENDERS ARE HIGH RISK

9              INMATES WHO SHOULD BE INCARCERATED BEYOND THEIR

10             CURRENT SENTENCE LENGTHS BECAUSE THEY ARE VERY

11             LIKELY TO COMMIT LARGE NUMBERS OF CRIMES UPON

12             RELEASE, IN EXCESS OF 250 PER YEAR."

13             RIGHT?

14   **A.**  NO.  I'M SUMMARIZING GREENWOOD AND ABRAMSON, WHICH IS THE

15   RAND STUDY.

16   **Q.**  SO YOU DON'T AGREE WITH THAT?

17   **A.**  PARDON?

18   **Q.**  YOU DON'T AGREE WITH THAT?

19   **A.**  NO.  I'M JUST -- THAT'S THE LITERATURE REVIEW, PART OF THE

20   STUDY, AND I'M CITING WHAT THEY -- WHAT THEY SAID.  THAT'S WHY

21   IT'S -- THEY ARE REFERENCED.  IT IS THE RAND STUDY.

22   **Q.**  WELL, DO YOU KNOW, SIR, WHAT IS THE AVERAGE AMOUNT OF CRIME

23   THAT EACH PERSON IN PRISON HAS COMMITTED OR WOULD COMMIT IN A

24   YEAR?

25   **A.**  WELL, AGAIN, I DON'T THINK CRIMINOLOGISTS HAVE A -- YOU

1  KNOW, BESIDES FOLLOWING THEM AND OBSERVING THAT, I DON'T THINK

2  ANYONE HAS A GOOD HANDLE ON IT.

3          BUT THE NUMBERS THAT GREENWOOD AND ABRAMSON CAME UP

4  WITH HAS BEEN SHOWN TO BE EXCESSIVE.  THE NATIONAL ACADEMY OF

5  SCIENCES DID A REANALYSIS AND SAID THEY WERE EXCESSIVE.

6          THEY DON'T MAKE SENSE GIVEN THE AMOUNT OF

7  INCARCERATION THAT'S INCREASED.  IF THESE WERE THE ACTUAL

8  NUMBERS THAT PRISONERS WERE COMMITTING, AGAIN, WE WOULD HAVE RUN

9  OUT OF CRIME.

10         SO THAT HASN'T HAPPENED, SO SOMETHING, OBVIOUSLY, IS

11  VERY WRONG WITH THESE ESTIMATES.  AND IT'S NOT IS SOME --

12 **Q.**  ALL RIGHT.  IS --

13 **A.**  IF I MIGHT.

14         IT'S LIMITED TO THESE HIGH END OFFENDERS THAT WERE

15  SAYING THAT THEY WERE COMMITTING HUNDREDS OF CRIMES A YEAR.

16  THAT'S THE PROBLEM EVERYONE THINKS WITH THE DATA.

17 **Q.**  SIR.  I'M -- I'M NOT SURE YOU ARE AWARE BECAUSE YOU,

18  OBVIOUSLY, YOU WEREN'T HERE, BUT THERE HAS BEEN TESTIMONY IN

19  THIS CASE THAT AT LEAST IN ONE JURISDICTION AS MUCH AS 25

20  PERCENT OF FELONY ARRESTS IN A SINGLE YEAR WERE OF PEOPLE ON

21  PAROLE.

22         DOES THAT HAVE ANY IMPACT ON YOUR CONCLUSIONS THAT

23  YOU ARE GOING TO HAVE LESS THAN A ONE PERCENT IMPACT ON ARRESTS

24  IF YOU EARLY RELEASE?

25 **A.**  I'D HAVE TO SEE, YOU KNOW, THE DATA AND THE ANALYSIS TO

1  COMMENT ON IT.

2  **Q.**  I WOULD LIKE TO MOVE ON TO COST SAVINGS, BECAUSE YOU HAVE

3  INDICATED THAT WE ARE GOING TO SAVE BILLIONS OF DOLLARS A YEAR

4  IF WE DO THE PROGRAM YOU RECOMMEND.

5  **A.**  I ESTIMATED YOU WOULD SAVE APPROXIMATELY $1 BILLION A YEAR.

6  **Q.**  A BILLION DOLLARS A YEAR, RIGHT?

7  **A.**  AND THAT WAS ALSO THE ESTIMATE OF THE EXPERT PANEL.

8  **Q.**  NOW, I THINK THE STATE IS NOW PROJECTING IS IT, WHAT,

9  $45 BILLION DEFICIT NEXT YEAR?

10          YOU TESTIFIED THAT DOING WHAT YOU RECOMMEND ACTUALLY

11  GENERATES MONEY.  IT DOESN'T GENERATE MONEY.  IT JUST STOPS YOU

12  FROM SPENDING MONEY YOU DON'T ALREADY HAVE, RIGHT?

13  **A.**  IT WOULD DEPEND ON HOW THE STATE CHOOSES TO USE THOSE

14  AVERTED COSTS.

15  **Q.**  WELL, IF WE HAVE GOT A $45 BILLION DEFICIT, WE SAVE A

16  BILLION, WE JUST HAVE A $44 BILLION DEFICIT, RIGHT?

17          **MS. EVENSON:**  OBJECTION.  BEYOND THE SCOPE AND

18  ARGUMENTATIVE.

19          **MS. BARLOW:**  HE DID TALK ABOUT SAVINGS.

20          **JUDGE REINHARDT:**  IT'S A BILLION DOLLARS ONE WAY OR

21  THE OTHER.  WHAT'S THE DIFFERENCE?

22  **BY MS. BARLOW:**

23  **Q.**  OKAY.  THAT BILLION DOLLAR SAVINGS DOESN'T TAKE INTO ACCOUNT

24  AT ALL ANY OF THE COSTS OF THE CRIMES THAT GET COMMITTED DURING

25  AN EARLY RELEASE OR ON DIVERSION OR AFTER RELEASE FROM PAROLE

1  EARLY; ANY OF THOSE, RIGHT?

2  **A.**  IT DOES TAKE THAT INTO ACCOUNT.

3  **Q.**  IT DOES?

4  **A.**  YES.

5  **Q.**  AND HOW DID YOU CALCULATE THAT?  I DIDN'T SEE THAT IN YOUR

6  REPORT.

7  **A.**  WELL, THOSE COSTS -- THOSE COSTS OF VICTIMIZATION ARE

8  OCCURRING NOW.  SO THE CALIFORNIA DATA THAT I'M USING IS LOOKING

9  AT PEOPLE THAT ARE BEING RELEASED NOW BY THE DEPARTMENT AND IT

10 REFLECTS ON PEOPLE BEING ARRESTED AND WHAT THOSE COSTS ARE BEING

11 ARRESTED, ET CETERA.

12         IF YOU ADOPT MY POLICIES, THOSE SAME COSTS OCCUR,

13 JUST THAT THE TIMING OF EVERYTHING IS CHANGING SLIGHTLY.

14         SO THERE IS NO DIFFERENCE IN THE NUMBER OF PEOPLE

15 BEING ARRESTED.  THERE IS NO DIFFERENCE IN THE VICTIMIZATION

16 GOING ON.

17         I THINK THE LAST TIME I TALKED, YOUR HONOR, I MIGHT

18 GET VICTIMIZED INSTEAD OF YOU, BUT, YOU KNOW, IT'S STILL GOING

19 TO BE THAT ONE VICTIMIZATION.

20         SO IT'S A ZERO SUM GAME BECAUSE WE ARE JUST MODESTLY

21 MOVING AROUND, YOU KNOW, THE PERIOD OF INCARCERATION.

22 **Q.**  WELL, DIDN'T YOU INDICATE IN YOUR STUDY FROM ILLINOIS THAT

23 IF YOU ACCELERATE THE RATE OF RELEASE, THAT YOU ACCELERATE OR

24 INCREASE THE HARM TO THE COMMUNITY?

25 **A.**  WELL, THE REPORT -- THERE WERE TWO REPORTS I DID IN

1  ILLINOIS, BUT THE FIRST ONE WAS TRYING TO GET AT THAT ISSUE

2  BECAUSE THAT WAS A CONCERN, OBVIOUSLY.

3          IF WE START -- AND THAT WAS THE CONCERN OF GOVERNOR

4  THOMPSON AND HIS STAFF.  THEY DID WHAT IS CALLED FORCED RELEASE

5  AT THAT TIME.  WAS THEIR HARM TO PUBLIC SAFETY AND --

6  **Q.**  WELL, SIR --

7          **JUDGE HENDERSON:**  LET HIM FINISH HIS ANSWER.

8  **A.**  MY CONCLUSION, FINAL ANALYSIS IS, NO, THERE WAS NO HARM TO

9  PUBLIC SAFETY; THAT THE PROGRAM WAS COST EFFECTIVE.

10          BASED ON THAT, THE LEGISLATURE CHANGED THE SENTENCING

11  LAWS.  ABOUT SIX YEARS LATER THEY DOUBLED THE AMOUNT OF TIME

12  SERVED.

13          I DID ANOTHER STUDY, SAME RESULTS.  AND THEN RECENTLY

14  THEY HAVE ADDED MORE GOOD TIME.

15          AND SO ILLINOIS IS PROBABLY A GOOD EXAMPLE TO LOOK

16  AT, JUST LIKE CALIFORNIA.  BOTH STATES WENT FROM INDETERMINATE

17  TO DETERMINATE.  ILLINOIS OVER A PERIOD OF YEARS ADJUSTED ITS

18  SENTENCING LAWS TO REDUCE THE PERIOD OF STAY.  NET RESULT TODAY

19  IS THEIR CRIME RATE IS THE SAME AS CALIFORNIA'S.  BOTH OF THEM

20  HAVE COME DOWN, BUT ILLINOIS HAS AN INCARCERATION RATE ABOUT

21  ONE-THIRD THAT OF CALIFORNIA.  SO WHAT ILLINOIS HAS DONE HAS

22  WORKED PRETTY WELL FOR THEM.

23  **BY MS. BARLOW:**

24  **Q.**  SIR, YOU SAID IN YOUR REPORT AND I QUOTE:

25          "ASSUMING THAT RELEASED INMATES HAVE A

1          CERTAIN PROBABILITY OF COMMITTING NEW CRIME,

2          ACCELERATING THE NUMBER OF RELEASES INCREASED

3          THE AMOUNT OF CRIME BEYOND THE LEVELS ONE WOULD

4          HAVE EXPERIENCED HAD EARLY RELEASE NOT EXISTED."

5          ARE YOU TELLING US RIGHT NOW YOU THAT DIDN'T REALLY

6   MEAN THAT OR THAT'S NOT WHAT IT REALLY SAYS?

7          **MS. EVENSON:**  COUNSEL, WHERE ARE YOU READING FROM,

8   PLEASE?

9          **MS. BARLOW:**  THIS IS PAGE 408 OF HIS ILLINOIS STUDY

10  BATES STAMPED 3612.

11         **JUDGE HENDERSON:**  THE QUESTION IS, ARE YOU SAYING YOU

12  DIDN'T REALLY MEAN THAT OR SOMETHING ELSE?

13         **MS. BARLOW:**  HE HAS JUST TOLD YOU THAT THAT'S NOT

14  WHAT REALLY HAPPENED.  YEAH.  THAT'S THE QUESTION.

15         **JUDGE HENDERSON:**  DO YOU HAVE THE QUESTION IN MIND?

16  **BY MS. BARLOW:**

17  **Q.**  DID I QUOTE YOU ACCURATELY, SIR?

18  **A.**  YES, YOU DID.

19         **MS. EVENSON:**  CAN HE PLEASE FINISH?

20         **MS. BARLOW:**  YOU CAN DO THAT ON REDIRECT, COUNSEL.

21         **MS. EVENSON:**  YOU ARE QUOTING HIM OUT OF CONTEXT.

22         **MS. BARLOW:**  I READ THE ENTIRE SENTENCE.

23         **MS. EVENSON:**  COULD YOU READ THE CONTEXT OF IT,

24  PLEASE?

25         **MS. BARLOW:**  I THINK YOU CAN DO THAT.

 1           **JUDGE KARLTON:**  MA'AM, MA'AM.  YOU DON'T ARGUE WITH

 2   COUNSEL.  COUNSEL HAS OBJECTED.  WHAT IS THE OBJECTION?

 3           **MS. EVENSON:**  THE OBJECTION IS THAT IT IS INCOMPLETE.

 4   AND TO COMPLETE THE QUESTION, THE ENTIRE PASSAGE NEEDS TO BE

 5   READ INTO THE RECORD.

 6           **JUDGE HENDERSON:**  READ THE ENTIRE PASSAGE FOR

 7   COMPLETENESS.

 8           **MS. BARLOW:**  WELL, AND I DON'T KNOW IF SHE MEANS THE

 9   ENTIRE PARAGRAPH OR THE ENTIRE PAGE.

10           **JUDGE HENDERSON:**  TELL US WHAT YOU MEAN.

11           **MS. EVENSON:**  THE FOLLOWING SENTENCE.

12           **THE COURT:**  WHO YOU READ THAT, PLEASE?

13           **MS. BARLOW:**  IT'S ALREADY TESTIFIED TO.

14   **BY MS. BARLOW:**

15   **Q.**  (READING)

16           "USING THIS METHOD IT WAS ESTIMATED THAT

17           LESS THAN ONE PERCENT, 4500 ARRESTS, OF ALL

18           SIMILARLY RECORDED ARRESTS FOR ALL OF ILLINOIS

19           WERE ATTRIBUTED TO EARLY RELEASE FROM 1980 TO

20           1983."

21           HE HAS ALREADY SAID THAT.  I'M NOT TRYING TO CHANGE

22   THAT.

23           **JUDGE KARLTON:**  THANK YOU, MA'AM.

24           **MS. BARLOW:**  YOU ARE WELCOME.

25

1  BY MS. BARLOW:

2  Q.  MOVING ON TO THE NEXT PAGE OF YOUR REPORTS FROM YOUR

3  ILLINOIS STUDY.  THIS IS PAGE 409, BATES 3613.

4          MS. BARLOW:  IF WE COULD PUT THE LAST TWO PARAGRAPHS

5  ON THAT PAGE UP, PLEASE?

6              (DOCUMENT DISPLAYED)

7  BY MS. BARLOW:

8  Q.  AND I WOULD JUST LIKE TO READ THIS TO YOU, IF I COULD, SIR.

9          "HOWEVER IN THE EYES OF POLICE, PROSECUTORS,

10          JUDGES AND THE PUBLIC, EARLY RELEASE WAS

11          ANYTHING BUT A SUCCESS.  POLICE AND PROSECUTORS

12          WORKED TO IMPROVE CONVICTION RATES AND JUDGES

13          FOLLOWED THE NEWLY ENACTED LAWS THAT REQUIRE

14          LONGER SENTENCES.  MOREOVER, A CONFUSED AND

15          OFTEN ANGRY PUBLIC FINDS IT DIFFICULT TO

16          UNDERSTAND WHY THOUSANDS OF INMATES ARE BEING

17          DISCHARGED EARLY WHILE CITIZENS CONTINUE TO BE

18          VICTIMIZED AT INTOLERABLE LEVELS AND THEY TAKE

19          ALSO COMFORT IN KNOWING THAT THESE PRISONERS

20          WOULD HAVE BEEN RELEASED WITHIN A FEW MONTHS IN

21          THE EARLY RELEASE PROGRAM.

22          "WHEN VIEWED AS A LONG TERM SOLUTION TO

23          PRISON CROWDING, EARLY RELEASE IS A POOR

24          SUBSTITUTE FOR A MORE PERMANENT, RATIONAL AND

25          COST EFFECTIVE SENTENCING POLICY.  IT PROVIDES

1              AN EXCESSIVE AMOUNT OF DISCRETION FOR

2              CORRECTIONAL ADMINISTRATORS, VIOLATES PRINCIPLES

3              OF EQUITY AND CERTAINTY IN SENTENCING AS ASSUMED

4              BY THE COURT, AND INCREASES THE ALREADY LOW

5              REGARD HELD FOR THE CRIMINAL JUSTICE SYSTEM BY

6              THE PUBLIC."

7              DO YOU STILL AGREE WITH THAT, SIR?

8  **A.**  YES.  AND I JUST WANT TO ADD --

9  **Q.**  I DON'T HAVE A QUESTION PENDING NOW.  YOU HAVE ANSWERED MY

10 QUESTION.  THANK YOU.

11             **MS. EVENSON:**  OBJECTION.

12             **JUDGE HENDERSON:**  IT CAN BE REVIEWED.  YOU CAN GET TO

13 IT ON REDIRECT, COUNSEL.

14             **MS. EVENSON:**  YES.

15             **JUDGE KARLTON:**  IF YOU FEEL COMPELLED.  THERE IS

16 NOTHING WRONG.  GO AHEAD.

17 **BY MS. BARLOW:**

18 **Q.**  SO YOU AGREE THAT EARLY RELEASE --

19             **JUDGE KARLTON:**  MA'AM, HE AGREES WITH THE ENTIRE

20 SENTENCE.

21             **JUDGE REINHARDT:**  HE AGREES IT'S A BETTER SOLUTION

22 THAN EARLY RELEASE, WHICH IS TO CHANGE OUR CRIMINAL LAWS OR OUR

23 SENTENCING LAWS, OR YOU CAN BUILD PRISONS OR DO ALL KINDS OF

24 THINGS.

25             BUT GIVEN THE PRESENT CIRCUMSTANCES, WHAT'S THE BEST

1  SOLUTION?

2          **MS. BARLOW:**  WELL, I APPRECIATE THAT, YOUR HONOR,

3  BUT --

4          **JUDGE KARLTON:**  YOU DON'T APPRECIATE IT.  PLEASE GO

5  FORWARD.

6          **MS. BARLOW:**  I DO.  I'M TRYING TO.

7  **BY MS. BARLOW:**

8  **Q.**  BUT YOU AGREE, SIR, THAT EARLY RELEASE IS ONLY A SHORT-TERM

9  REMEDY FOR OVERCROWDING, RIGHT?

10 **A.**  I'M SORRY?

11 **Q.**  EARLY RELEASE IS ONLY A SHORT-TERM REMEDY FOR OVERCROWDING,

12 RIGHT?

13 **A.**  YES.  IT'S NOT A POLICY THAT I ENDORSE.

14 **Q.**  AND, IN FACT, YOU CHARACTERIZED IT IN THIS STUDY AS AN

15 EMERGENCY ONLY OPTION, CORRECT?

16 **A.**  YEAH.  IN THE CIRCUMSTANCE, THE DIRECTOR OF CORRECTIONS, HE

17 NOTED TWO YEARS BEFORE THEY HAD A VERY BLOODY PRISON RIOT WHERE

18 THEY LOST STAFF.  STAFF WERE KILLED AND HE SAID HE DID NOT WANT

19 TO TOLERATE A CROWDED PRISON SYSTEM BECAUSE IT WAS DANGEROUS AND

20 THEY HAD JUST GONE THROUGH A PRISON RIOT.  AND  HE --

21 **Q.**  AND DID YOU -- I'M SORRY.  I DIDN'T MEAN TO INTERRUPT.  I

22 THOUGHT YOU WERE FINISHED.  I APOLOGIZE.  GO AHEAD AND FINISH.

23 **A.**  HE THOUGHT, YOU KNOW, THE BEST WAY WOULD BE FOR THE

24 LEGISLATURE TO CORRECT IT; BUT IF THEY DON'T CORRECT IT, HE HAD

25 NO CHOICE BUT TO USE WHAT POWERS HE HAD TO KEEP THE PRISON

1  SYSTEM SAFE.  AND THAT'S WHY HE DID IT.

2  **Q.**  ALL RIGHT.  WOULD YOU AGREE WITH ME, SIR, THAT ASSESSING THE

3  COSTS OF EARLY RELEASE MUST GO BEYOND SIMPLY CALCULATING THE

4  RECIDIVISM RATE FOR THE RELEASEES?

5  **A.**  YES.

6  **Q.**  WE HAVE TO CONSIDER THE HARM TO THE COMMUNITY, THE LOSS AND

7  DAMAGE CAUSED BY EARLY RELEASE CRIME AND SO ON, CORRECT?

8  **A.**  YES.

9  **Q.**  NOW, IN YOUR STUDY ON PAGE 478 YOU SAID:

10               "AS THE EARLY RELEASE WINDOW EXPANDS, SO

11               DOES THE AMOUNT OF CRIME ATTRIBUTABLE TO THE

12               EARLY RELEASE PROGRAM."

13          AND YOU GO ON TO TALK ABOUT MEDIAN DAYS.

14               "IN 1980 ONLY ONE-TENTH OF THE FELONY

15               ARRESTS WERE ATTRIBUTED TO EARLY RELEASE

16               COMPARED TO FIVE-TENTHS OF ONE PERCENT IN 1982."

17          SO IT'S TRUE THAT AS THE MORE PEOPLE YOU EARLY

18  RELEASE, THE HIGHER THE RATES GO, RIGHT?

19          **MS. EVENSON:**  OBJECTION.  YOU ARE MISREAD THE QUOTE

20  THAT YOU WERE READING, COUNSEL.

21          **MS. BARLOW:**  I'M SORRY.  I DON'T THINK I DID.

22          **MS. EVENSON:**  YOU SAID ONE-TENTH OF FELONY ARRESTS.

23  YOU MEANT ONE-TENTH OF ONE PERCENT.

24          **MS. BARLOW:**  I APOLOGIZE.

25

1  **BY MS. BARLOW:**

2  **Q.**  ONLY ONE-TENTH OF ONE PERCENT OF THE FELONY ARRESTS WERE

3  ATTRIBUTABLE TO EARLY RELEASE COMPARED TO FIVE-TENTHS OF ONE

4  PERCENT IN 1982.

5        SO IT'S MAGNIFIED FIVE FOLD AS YOU INCREASE THE EARLY

6  RELEASE, CORRECT?

7  **A.**  TECHNICALLY WHAT'S GOING ON, THIS IS THE INCREASE DURING THE

8  TIME THAT YOU CHANGED THE POLICY.  AND ONCE THE EFFECT OF THE

9  POLICY HAVE TAKEN AHOLD, THEN THIS INCREASE DOES OCCUR.

10        BUT, YES, I'M SAYING IT'S LESS THAN ONE PERCENT OF

11  THE ARRESTS.  IN ILLINOIS COULD BE ATTRIBUTED AND AS YOU

12  INCREASE, YOU KNOW, THE AMOUNT OF TIME THAT PEOPLE ARE BEING --

13  HAVING THEIR TIME REDUCED, YOU HAVE AN INCREASE.

14        **JUDGE KARLTON:**  AND, SIR, IF WE WERE TO ORDER THE

15  COUNTY -- THE STATE TO RELEASE 150,000 OR 145,000 OR SOME NUMBER

16  LIKE THAT, IT'S STILL LESS THAN ONE PERCENT IN YOUR VIEW?

17        **THE WITNESS:**  RELEASE IN THEIR VIEW --

18        **JUDGE KARLTON:**  THEY ARE TALKING ABOUT A HUNDRED

19  AND --

20        **MR. SPECTER:**  FIFTY, YOUR HONOR.

21        **MS. BARLOW:**  52,000.

22        **JUDGE KARLTON:**  52,000.

23        **THE WITNESS:**  I HAVEN'T DONE THAT CALCULATION, YOUR

24  HONOR.  BUT BASED ON ALL THE WORK THAT I HAVE DONE ELSEWHERE, IT

25  WOULD REPRESENT A VERY SMALL FRACTION, SOMEWHERE IN THE

1    ONE PERCENT RANGE PROBABLY.

2              YOU KNOW, AGAIN, A LOT DEPENDS ON HOW YOU DO IT.  AND

3    YOU COULD JUST DO IT ON A RANDOM BASIS WITHOUT RISK ASSESSMENT,

4    WITHOUT KIND OF PROPERLY PREPARING THE SYSTEM FOR THIS.  YOU

5    COULD HAVE SOME ADVERSE AFFECTS, BUT I'M CONFIDENT THAT YOU

6    COULD DO IT AND NOT HAVE ANY IMPACT, NEGATIVE IMPACT ON CRIME

7    RATES OR PUBLIC SAFETY.  THAT'S MY OPINION.

8              **JUDGE REINHARDT:**  AND YOU ARE ALSO SAYING THERE ARE

9    BETTER WAYS TO DO THIS.

10             **THE WITNESS:**  YES.  I MEAN, THE --

11             **JUDGE REINHARDT:**  THAT WOULD REQUIRE THE STATE TO

12   PASS LEGISLATION.

13             **THE WITNESS:**  IN MY OPINION, YES.  THERE NEEDS TO BE

14   SOME CHANGES IN THE SENTENCING LAWS, BUT THERE WOULD ALSO HAVE

15   TO BE SOME CHANGES IN WHICH THE CDCR OPERATES AND PREPARES

16   PRISONERS FOR RELEASE AND THE PAROLE DIVISION DOES ITS WORK.

17             THERE'S A NUMBER OF ADMINISTRATIVE CHANGES.  AND,

18   AGAIN, THESE ARE PRETTY WELL DETAILED IN THE EXPERT PANEL

19   REPORT.

20             **JUDGE REINHARDT:**  THE STATE HAS BEEN ADVISED HOW IT

21   COULD AVOID A PRISON RELEASE ORDER BY THE EXPERTS IT APPOINTED?

22             **THE WITNESS:**  I'M SORRY, YOUR HONOR?

23             **JUDGE REINHARDT:**  THE STATE HAS BEEN ADVISED HOW IT

24   COULD AVOID A PRISONER RELEASE ORDER BY THE EXPERTS IT HAS

25   APPOINTED?

1          **THE WITNESS:**  HOW IT COULD AVOID?  I DON'T --

2          **JUDGE REINHARDT:**  WHAT IT COULD DO TO SOLVE THE

3   PROBLEM WITHOUT A PRISONER RELEASE ORDER?

4          **THE WITNESS:**  WELL, THE EXPERT PANEL -- THE EXPERT

5   PANEL --

6          **JUDGE REINHARDT:**  HAS ADVISED THE STATE.

7          **THE WITNESS:**  THAT IT DID NEED TO CHANGE SENTENCING

8   LAWS.

9          **JUDGE KARLTON:**  RIGHT.  AND JUDGE REINHARDT SAID, THE

10  EXPERT PANEL HAS ADVISED THE STATE AS TO WHAT IT OUGHT TO DO.

11         **THE WITNESS:**  YES.

12         **JUDGE KARLTON:**  AND IF THE STATE HAD ADOPTED ALL OF

13  THOSE RECOMMENDATIONS, WE WOULDN'T BE HERE TODAY.

14         **THE WITNESS:**  ABSOLUTELY.

15         **JUDGE REINHARDT:**  AND THE STATE HAS CHOSEN NOT TO DO

16  THAT, TO ADOPT THOSE RECOMMENDATIONS.

17         **THE WITNESS:**  THAT'S AN INTERESTING POINT, YOUR

18  HONOR, BECAUSE --

19         **JUDGE REINHARDT:**  WELL IT DOESN'T, DOES IT?

20         **THE WITNESS:**  IT WAS THEN SECRETARY TILTON, WHO -- I

21  HAVE A COPY OF HIS LETTER, WHO THEN ENDORSED ALL THE

22  RECOMMENDATIONS.

23         THE ONLY QUESTION HE HAD WAS THE ESTIMATES THAT WERE

24  BEING PROVIDED, AND THEY HAD ME COME IN AND GO OVER THE

25  ESTIMATES AND REAFFIRM THEM.

```
 1              BUT I HAVE IN MY POSSESSION A LETTER FROM SECRETARY

 2    TILTON ENDORSING ALL THE RECOMMENDATIONS OF THE EXPERT PANEL.

 3              JUDGE KARLTON:  AND THE STATE HASN'T DONE IT?

 4              THE WITNESS:  THAT'S CORRECT.

 5    BY MS. BARLOW:

 6    Q.  THANK YOU.  IF I COULD GET BACK TO THESE RATES HERE, JUST A

 7    COUPLE MORE QUESTIONS.

 8              YOU INDICATE IN YOUR REPORT THAT:

 9                 "THE NUMBER OF ARRESTS GENERATED BY EARLY

10                 RELEASE WAS HIGHEST IN 1982 AT A PERIOD DURING

11                 WHICH BOTH THE RELEASE RATE AND LENGTH OF THE

12                 WINDOW WERE GREATEST."

13              SO THE MORE YOU RELEASE AND THE LONGER A PERIOD OF

14    TIME THEY GET LET OUT EARLY, THE HIGHER THE CRIME RATE OR ARREST

15    RATE GOES, RIGHT?  THE ARREST RATE, RIGHT?  I DON'T WANT TO

16    CONFUSE YOU BECAUSE WE KNOW THAT THERE IS MORE CRIME THAN

17    ARRESTS.

18    A.  DURING THAT IMPLEMENTATION PERIOD?

19    Q.  RIGHT.  SO AND ILLINOIS, JUST TO MAKE SURE WE PUT THIS ALL

20    THIS IN CONTEXT, RELEASED 21,000 PRISONERS OVER THREE YEARS,

21    RIGHT?

22    A.  IN THAT TIME PERIOD.  IT'S DONE A LOT MORE SINCE THEN

23    OBVIOUSLY.

24    Q.  WE ARE TALKING ABOUT WHAT'S HERE IN YOUR REPORT.

25              AND YOU DID AN ANALYSIS THAT INDICATED THAT THOSE
```

1  4,000-PLUS ARRESTS RESULTED IN 30,610 CRIMES FROM -- DURING THE

2  EARLY RELEASE PERIOD, CORRECT?

3  **A.**  NO.  WHAT I'M DOING THERE, I'M ESTIMATING USING A PROCEDURE

4  THAT WAS SUGGESTED BY PROFESSOR BLOOMSTEIN, WHO WAS AN ADVISOR

5  TO THE PROJECT.

6        SO WHAT I'M DOING, I'M TAKING AN APPROACH THAT PEOPLE

7  SUGGESTED TO ME TO TRY AND ESTIMATE THE AMOUNT OF CRIMES.

8  **Q.**  THAT'S WHAT I THOUGHT I SAID, BUT --

9        **JUDGE KARLTON:**  NO, YOU DIDN'T.

10  **A.**  YOU ARE KIND OF SAYING THESE CRIMES DID OCCUR.  WE HAVE NO

11  IDEA IF THESE CRIMES DID OCCUR.

12        AND I WAS JUST GOING TO ADD, IN MY 1993 REPORT WE

13  ACTUALLY WENT IN TO THESE ARRESTS AND AUDITED THEM AND FOUND

14  THAT THE CRIMES WERE NOT OCCURRING IN A LARGE NUMBER OF THEM.

15        SO THE METHODOLOGY TO DETERMINE HOW MUCH CRIME THEY

16  WERE COMMITTING WAS FLAWED.  WE DID THE BEST WE COULD, BUT IT'S

17  NOT ANYWHERE CLOSE TO WHERE YOU COULD SAY THAT THIS NUMBER OF

18  ARRESTS ARE PRODUCING THIS AMOUNT OF CRIMINAL ACTIVITY.

19  **BY MS. BARLOW:**

20  **Q.**  YOU DID ESTIMATE, THOUGH, BASED ON YOUR ANALYSIS AT THE TIME

21  THAT THOSE 4,511 EARLY RELEASEES GENERATED 30,610 CRIMES, HALF

22  OF WHICH WERE NOT REPORTED TO THE POLICE, RIGHT?

23  **A.**  I DID NOT SAY THEY GENERATED.  I SAID BASED ON THIS

24  ESTIMATION PROCEDURE.

25  **Q.**  ALL RIGHT.  IT SAYS:

1          "THIS ESTIMATED TECHNIQUE PRODUCED A TOTAL

2          OF 30,610 CRIMES OF WHICH" --

3          **JUDGE KARLTON:**  MA'AM, HE HAS ALREADY SAID HE USED

4  SOMEBODY ELSE'S METHOD AND ATTEMPTED TO DETERMINE THE NUMBER OF

5  CRIMES THAT WOULD BE PERMITTED.  HE CAME TO THAT NUMBER.  THREE

6  YEARS LATER HE DID A STUDY THAT DIDN'T OCCUR.

7          WHAT MORE DO YOU WANT?  I KNOW YOU DON'T LIKE HIS

8  ANSWER.  THAT'S HIS ANSWER.

9  **BY MS. BARLOW:**

10  **Q.**  WELL, WHEN YOU DID THIS ESTIMATION, YOU DID NOT ADD ANY --

11  MAKE ANY ADJUSTMENTS FOR THE POSSIBILITY THAT THERE WERE

12  MULTIPLE OFFENDERS INVOLVED, RIGHT?  AND THAT WOULD HAVE

13  INCREASED THE AMOUNT OF CRIME YOU PROJECTED, CORRECT?

14  **A.**  I THINK ON PAGE 495 I TALKED ABOUT, QUOTE.

15          "IF WE HAD USED THE ESTIMATE OF BLOOMSTEIN

16          PICONE" -- WHICH IS WHAT I'M REFERRING TO --

17          "FOR MULTIPLE OFFENDERS THE AMOUNT OF CRIME

18          ATTRIBUTABLE TO EARLY RELEASE WOULD HAVE

19          DOUBLED" --

20  **Q.**  DOUBLED, RIGHT?

21  **A.**  SO I DID TAKE IT INTO ACCOUNT.

22  **Q.**  NOW, YOU ALSO -- WHEN YOU DID YOUR CALCULATION OF COST

23  SAVINGS AS A RESULT OF THE ILLINOIS RELEASE -- EARLY RELEASE

24  PROGRAM, YOU ESTIMATED THAT THE SAVINGS WAS $1,400 PER INMATE?

25          **MS. EVENSON:**  COUNSEL, WHERE ARE YOU READING FROM?

1  **A.**  I THINK ON PAGE 496, FIRST PARAGRAPH, IT SAYS SAVINGS WAS

2  APPROXIMATELY $1,505 PER RELEASED EARLY INMATE.

3  **BY MS. BARLOW:**

4  **Q.**  WOULD YOU TAKE A LOOK AT THE -- I'M SORRY.  WHICH PAGE WAS

5  THAT, SIR?

6  **A.**  PARDON?

7  **Q.**  WHICH PAGE IS IT?

8  **A.**  IT'S ON PAGE 496 OF THE REPORT.  IT'S THE FIRST PARAGRAPH

9  SUMMARY ASSAULT, THE LAST STATEMENT.

10  **Q.**  BUT THE TABLE ABOVE THAT ACTUALLY HAS THE OTHER NUMBER,

11  RIGHT, ON THAT PAGE?

12  **A.**  YES, I SEE THAT.  THEY ARE PROBABLY, YOU KNOW -- IT'S ABOUT

13  THE SAME; 1,480, 1,505.

14  **Q.**  IT'S AROUND $1,500 PER, RIGHT?

15          AND IN REACHING THAT CONCLUSION YOU TRIED TO

16  CALCULATE THE -- SOME ECONOMIC COSTS ASSOCIATED WITH THE CRIMES

17  THAT WOULD BE OR WERE COMMITTED, CORRECT?

18  **A.**  YES.

19  **Q.**  ALL RIGHT.  AND YOU FIGURED WHAT THAT COST WOULD BE AND THEN

20  YOU SUBTRACTED THE AMOUNT OF INSURANCE PROCEEDS THAT PEOPLE WERE

21  ABLE TO RECOVER TO COVER THEFTS AND DAMAGE AND SO ON, RIGHT?

22  **A.**  I DON'T KNOW IF IT WAS IN THIS STUDY OR THE SUBSEQUENT ONE.

23  **Q.**  IT'S ON PAGE 493.

24  **A.**  493?

25  **Q.**  UH-HUH.

1  **A.**  OKAY.  SO, YEAH.  WHAT WE ARE DOING HERE IS WE ARE TAKING

2  DATA FROM -- THIS IS IMPORTANT, FROM THE NATIONAL CRIME SURVEY.

3        SO THIS IS WHAT'S CALLED IN OUR LANGUAGE AN

4  ECOLOGICAL FALLACY, WHERE YOU TAKE INFORMATION FROM SOMETHING

5  ELSE AND YOU APPLY IT TO PEOPLE THAT MAY OR MAY NOT BE IN THAT

6  OTHER DATA SET.

7        SO WE ARE TAKING THAT VICTIM LOSSES FROM NCSS AND

8  APPLYING IT TO -- TO THESE CRIMES BASED ON WHAT'S IN THE

9  NATIONAL CRIME SURVEY VICTIM LOSSES.

10 **Q.**  RIGHT.  BUT WHAT I'M ASKING YOU, SIR, IS --

11 **A.**  AND THAT CRIME SURVEY -- YEAH, THEY ESTIMATE THAT 36 PERCENT

12 OF ALL THOSE LOSSES ARE RECOVERED BY THE VICTIM.

13 **Q.**  AND THAT INCLUDED COVERAGE BY -- FOR MEDICAL CLAIMS AND

14 INSURANCE COVERAGE, RIGHT?

15 **A.**  RIGHT.

16 **Q.**  SO, BUT THAT WAS A LOSS TO SOMEBODY.  IT MAY NOT HAVE BEEN

17 JUST A LOSS TO THE VICTIM, IF AN INSURANCE COMPANY, FOR EXAMPLE,

18 HAD TO PAY, RIGHT?

19 **A.**  YES.  THE INSURANCE COMPANY WOULD HAVE REIMBURSED THEM.

20 **Q.**  NOW, YOU TESTIFIED PREVIOUSLY THAT CALIFORNIA HAD ONE OF THE

21 LOWER RECIDIVISM RATES IN THE '60S AND THE '70S, AND THAT IS

22 PART OF WHY WE HAD SUCH A LOW PRISON POPULATION AT THE TIME?

23 **A.**  NO, THAT'S NOT WHY YOU HAD A LOW PRISON POPULATION AT THE

24 TIME, BUT YOU DID HAVE A LOW RECIDIVISM RATE.

25 **Q.**  NOW, YOU ARE AWARE, THOUGH, THAT INDEX CRIME DOUBLED IN

1   CALIFORNIA?  THE RATE OF INDEX CRIMES COMMITTED IN CALIFORNIA

2   DOUBLED FROM 1965 TO 1975?

3   **A.**   I WILL TAKE IT AT YOUR WORD.  I KNOW IT INCREASED

4   DRAMATICALLY.

5   **Q.**   AND THAT INCREASE IS PART OF WHAT FUELED LAWS ABOUT

6   DETERMINATE SENTENCING, AND USE A GUN GO TO JAIL, AND SECOND AND

7   THIRD STRIKES AND SO ON, RIGHT?

8           **MS. EVENSON:**  OBJECTION.  CALLS FOR INSPECTION.

9           **JUDGE HENDERSON:**  SUSTAINED.

10  **BY MS. BARLOW:**

11  **Q.**  AFTER THOSE LAWS WERE PASSED, THE CRIME -- VIOLENT CRIME

12  RATES WENT DOWN, RIGHT?  THOSE INDEX CRIMES?

13  **A.**   THE CRIME RATES STARTED.  THEY PEAKED IN CALIFORNIA AND

14  ELSEWHERE ABOUT 1980.  AND THEN IN 1994, 1995 THEY STARTED TO

15  DECLINE.

16  **Q.**  NOW, ARE YOU FAMILIAR WITH THE -- WITH STEVEN LEAVITT?

17  STEVEN LEAVITT?

18  **A.**   STEVEN LEAVITT?  I THINK --

19  **Q.**   UNIVERSITY OF CHICAGO?

20  **A.**   YEAH.  HE'S THE ONE THAT TALKED ABOUT THE RELATIONSHIP

21  BETWEEN ABORTION AND CRIME?

22  **Q.**  WELL, THAT'S NOT WHAT I'M ASKING ABOUT.

23  **A.**  WELL --

24          **JUDGE HENDERSON:**  ARE YOU FAMILIAR WITH HIM, IS THE

25  QUESTION.

1  **BY MS. BARLOW:**

2  **Q.**  ARE YOU FAMILIAR WITH HIM?

3  **A.**  I'M FAMILIAR WITH HIM.

4  **Q.**  NOW, LEAVITT FOUND THAT SLOWING THE PRISON POPULATION BY 13

5  TO 19 PERCENT CAUSED AN INCREASE IN VIOLENT CRIME OF EIGHT --

6  APPROXIMATELY 8 PERCENT AND IN PROPERTY CRIMES OF APPROXIMATELY

7  6 PERCENT.

8          DO YOU DISAGREE WITH THAT?

9  **A.**  YES.

10 **Q.**  LET'S TALK ABOUT A POPULATION CAP HERE.  IS IT TRUE, SIR,

11 THAT YOU WOULD NOT RECOMMEND THAT THE COURT SET A CAP

12 ARTIFICIALLY WITHOUT CHANGING ADMISSION AND RELEASE PRACTICES?

13 **A.**  WELL, I WOULD -- YEAH, I WOULD -- YOU WOULD HAVE TO CHANGE

14 -- YES, THE SENTENCING RELEASE PRACTICES, YEAH.  THE SAME THINGS

15 I HAVE RECOMMENDED, THOSE ARE THE THINGS THAT YOU WANTED TO --

16     **JUDGE KARLTON:**  THE QUESTION IS MORE PROFOUND.  IF WE

17 DON'T ORDER THOSE THINGS, SHOULD WE HAVE A PRISON RELEASE ORDER?

18     **JUDGE REINHARDT:**  I DIDN'T UNDERSTAND --

19     **JUDGE KARLTON:**  OR WE CAN'T --

20     **THE WITNESS:**  YOU WOULD HAVE CHAOS, CHAOS AT THAT

21 POINT.

22     **JUDGE REINHARDT:**  DO YOU BELIEVE THAT'S UP TO THE

23 COURT OR TO THE STATE IF --

24 **BY MS. BARLOW:**

25 **Q.**  I BELIEVE YOU INDICATED --

```
 1           JUDGE REINHARDT:  (CONTINUING) -- THERE IS A CAP?

 2   WHO IS -- I MEAN, I DON'T KNOW WHETHER YOU ARE CAPABLE OF

 3   ANSWERING THIS QUESTION, BUT IF THERE IS A PRISONER RELEASE

 4   ORDER, WHETHER THAT SHOULD BE LEFT UP TO THE STATE TO CREATE THE

 5   CHAOS OR THE COURT HAS TO TELL THE STATE HOW TO DO IT?

 6           I THINK THAT'S REALLY A QUESTION FOR US, BUT IF YOU

 7   HAVE GOT AN OPINION ON IT, YOU CAN CERTAINLY EXPRESS IT.

 8   A.  MY OPINION IN CALIFORNIA, COMPARED TO OTHER STATES I WORK

 9   IN, IS I THINK THE COURT HAS TO ORDER IT AND WOULD THEN FORCE --

10   THAT WOULD FORCE THE STATE, YOU KNOW, TO MAKE THE CHANGES IT

11   NEEDS TO CHANGE TO AVOID THE CHAOS.

12   Q.  DO YOU RECALL TESTIFYING, SIR, THAT WITHOUT A CHANGE IN

13   POLICIES AND PRACTICES, A POPULATION CAP WOULD CREATE A BIG

14   PROBLEM?

15           JUDGE KARLTON:  HE JUST SAID CHAOS.

16   BY MS. BARLOW:

17   Q.  CAP, POPULATION CAP.  I'M SORRY.

18   A.  IT WOULD BE A CHAOTIC SITUATION.

19   Q.  AND YOU WOULD NOT WANT TO HAVE THE COURT ISSUE AN ORDER THAT

20   WOULD RESULT IN A SUDDEN DROP IN THE POPULATION OR LARGE

21   RELEASE, CORRECT?

22   A.  WELL, WOULD NOT RECOMMEND THAT.  AGAIN, I'M HOPING.  I WOULD

23   ASSUME THAT A REASONABLE PLAN WOULD BE DEVELOPED THAT WOULD MEET

24   THAT CAP REQUIREMENT.

25           I THINK THAT'S VERY DOABLE.  THAT'S BEEN DONE IN
```

1  OTHER PLACES AND COULD BE DONE HERE.

2  **Q.**  WELL, YOU THINK -- YOU AGREE, SIR, THAT IT TAKES SOME TIME

3  TO PUT TOGETHER A REASONABLE PLAN, CORRECT?

4  **A.**  IT WOULD NOT TAKE LONG IN CALIFORNIA TO DO THIS, NO.

5  **Q.**  NOW, DO YOU AGREE THAT IF THE COURT WERE TO ESTABLISH SOME

6  KIND OF LIMITATION ON THE PRISON POPULATION EITHER BY A CAP OR

7  SOME OTHER MEANS, THAT THERE SHOULD BE PERIODIC MONITORING OF

8  THAT AND SEE HOW IT'S AFFECTING NOT ONLY THE POPULATION, BUT THE

9  CRIME RATES AND THE PROVISION OF MEDICARE AND MENTAL HEALTH CARE

10  IN THE PRISONS?

11  **A.**  YES, I WOULD AGREE WITH YOU.

12          **JUDGE REINHARDT:**  YOU MEAN, YOU WANT THE COURT TO

13  RETAIN JURISDICTION --

14          **MS. BARLOW:**  I THINK THAT'S WHAT HE WANTS, SIR.

15  **BY MS. BARLOW:**

16  **Q.**  NOW, YOU WOULD YOU HAVE TO SEE THE SPECIFICS OF ANY PROPOSED

17  ORDER TO DETERMINE WHETHER IT WOULD OR WOULDN'T NEGATIVELY

18  IMPACT PUBLIC SAFETY, CORRECT?

19  **A.**  I'M SORRY.  I JUST WANT TO MAKE SURE I UNDERSTOOD THE

20  QUESTION.

21  **Q.**  YOU WOULD HAVE TO LOOK AT THE SPECIFICS OF AN ORDER TO

22  DETERMINE IF IT WOULD OR WOULD NOT HAVE A NEGATIVE SAFETY

23  IMPACT?

24  **A.**  WELL, THE WAY I WOULD SEE IT HAPPENING, THE COURT MIGHT

25  ORDER, THIS IS THE CAP AND WOULD GIVE THE STATE, YOU KNOW, 30 TO

```
 1  60 DAYS TO COME BACK WITH THE PLAN THAT WILL MEET THAT CAP.

 2  THAT'S PROBABLY ENOUGH TIME NECESSARY TO DEVELOP THE PLAN --

 3            JUDGE REINHARDT:  THE QUESTION IS, WOULD YOU THEN

 4  WANT TO HAVE THE COURT MONITOR THAT PLAN TO SEE HOW IT'S

 5  WORKING?  WOULD YOU LIKE TO HELP US BY MONITORING IT AND BEING

 6  AN EXPERT THAT THE COURT RETAINS TO SEE THAT THE PLAN IS BEING

 7  IMPLEMENTED PROPERLY BY THE STATE, IS THE WAY I UNDERSTAND THE

 8  QUESTION.

 9            MS. BARLOW:  THAT'S NOT WHAT I'M ASKING ACTUALLY,

10  BUT, CERTAINLY, THE COURT IS FREE TO ASK THAT QUESTION IF IT

11  WISHES TO.

12            JUDGE REINHARDT:  I THOUGHT THAT WAS PRETTY CLOSE.

13  YOU ASKED HIM IF HE WOULD REVIEW THE PLAN PERIODICALLY TO SEE IF

14  IT WAS WORKING.

15  BY MS. BARLOW:

16  Q.  YOU INDICATED IN YOUR DEPOSITION THAT YOU WOULD HAVE TO SEE

17  THE SPECIFICS OF AN ORDER BEFORE YOU COULD SAY ONE WAY OR THE

18  OTHER THAT IT WOULD HAVE A NEGATIVE IMPACT ON PUBLIC SAFETY; DO

19  YOU REMEMBER THAT?

20  A.  WELL, I DON'T KNOW IF I SAID THAT OR NOT, BUT WHAT I'M

21  SAYING IS THAT IF THE COURT ORDERS A POPULATION LIMIT, THEN THE

22  NEXT PLAN IS, OKAY, HOW DO WE ACHIEVE THAT AND HOW DO WE ACHIEVE

23  THAT SAFELY AND IN A REASONABLE MANNER?  AND THAT'S WHEN THE

24  PLAN IS PUT TOGETHER.

25            THEN THE PLAN, I ASSUME, WOULD GO BACK TO THE COURT
```

1  FOR ITS REVIEW AND YOU WOULD PUT IN PLACE PROPER CONTROLS TO

2  MAKE SURE THAT THAT PLAN IS BEING IMPLEMENTED OR NEEDS TO BE

3  MODIFIED TO MAKE SURE THAT THINGS ARE GOING AS INTENDED.

4        SO THAT'S A WAY IT -- THAT'S USUALLY THE WAY I WORK.

5  YOU KNOW, I'M USUALLY -- I'M NOT WORKING IN THIS KIND OF A

6  SITUATION.  USUALLY THE STATE HAS -- WE NEED TO LOWER OUR

7  POPULATION OR WE NEED TO DO THIS, SHOW US HOW TO DO IT.  I COME

8  UP WITH A PLAN.  THEY LOOK AT THEIR LAWS AND POLICIES, THEY MAKE

9  ADJUSTMENTS AND THEN WE GO FORWARD WITH A PARTNERSHIP.  THAT'S

10 HOW IT WORKS BEST.

11 **Q.**  SO YOU WOULD NEED TO HAVE THE SPECIFICS BEFORE YOU COULD

12 DEFINITIVELY OPINE ABOUT EFFECTS ON PUBLIC SAFETY?

13 **A.**  YES.

14 **Q.**  NOW, IF YOU REMEMBER WHEN I DEPOSED YOU THE SECOND TIME, I

15 DIDN'T -- I WASN'T THERE FOR THE FIRST ONE.

16 **A.**  I DO REMEMBER YOU.

17 **Q.**  YES, I'M SURE YOU DO.

18        AND I ASKED YOU TO MAKE SOME ASSUMPTIONS:  THAT THERE

19 WAS A POPULATION CAP IMPOSED BY THE COURT OF 103,000, AND THAT

20 THE COUNTY JAILS WERE ESSENTIALLY FULL, AND TO TELL ME THEN

21 UNDER THOSE CIRCUMSTANCES DO YOU THINK THIS WOULD BE AN IMPACT

22 TO PUBLIC SAFETY.  AND YOU DIDN'T WANT TO ANSWER MY QUESTION

23 THEN.  YOU TOLD ME THAT WAS A SILLY ASSUMPTION TO MAKE.

24        I'M ASKING YOU NOW, IF THERE IS A CAP IMPOSED BY THE

25 COURT OF 103,000, THE COUNTY JAILS ARE FULL AND RELEASING PEOPLE

1   ALREADY EARLY BECAUSE THEY DON'T HAVE CAPACITY, IT'S STILL YOUR

2   OPINION THAT THERE IS GOING TO BE NO NEGATIVE IMPACT ON PUBLIC

3   SAFETY?

4   **A.**   IF THEY ADOPT MY RECOMMENDATIONS.  IF THEY DON'T ADOPT THE

5   RECOMMENDATIONS, THEN THERE WOULD BE A PROBLEM.

6            **MS. BARLOW:**  I HAVE NOTHING FURTHER.

7            **THE COURT:**  LET'S TAKE OUR ONE HOUR LUNCH RECESS.

8   COURT IS ADJOURNED.

9                    (WHEREUPON AT 12:26 P.M. PROCEEDINGS

10                    WERE ADJOURNED FOR NOON RECESS.)

11           **JUDGE HENDERSON:**  OKAY.  YOU MAY PROCEED, COUNSEL.

12           **JUSTICE REINHARDT:**  WE HAVE CROSS AND DIRECT --

13           **JUDGE HENDERSON:**  EXCUSE ME.  WE JUST HAD DEFENDANT

14  INTERVENOR CROSS.

15           **MS. EVENSON:**  THE STATE DID THEIR CROSS-EXAMINATION

16  WHEN HE WAS LAST HERE.

17           **THE COURT:**

18           **JUDGE HENDERSON:**  OKAY.  THAT'S RIGHT. REDIRECT THEN.

19           **MS. EVENSON:**  REBEKAH EVENSON FOR PLAINTIFFS.

20           **REDIRECT EXAMINATION BY MS. EVENSON**

21  **BY MS. EVENSON**

22  **Q**   GOOD AFTERNOON, DR. AUSTIN.

23  **A**   GOOD AFTERNOON.

24           **JUDGE KARLTON:**  I LIKE WHAT HE SAID.  HE DIDN'T SAY

25  "GOOD AFTERNOON"; HE SAID "AFTERNOON."

1  **BY MS. EVENSON**

2  **Q**   DR. AUSTIN, WHEN YOU TESTIFIED JUST NOW, YOU MENTIONED THAT

3  YOU DON'T ENDORSE EARLY RELEASE.  WHEN YOU'RE TALKING ABOUT

4  EARLY RELEASE, ARE YOU REFERRING TO GOOD TIME CREDITS?

5  **A**   NO, I'M NOT.

6         **JUSTICE REINHARDT:**  WHEN YOU SAY YOU DON'T ENDORSE

7  IT, I THOUGHT YOU MEANT THAT WAS NOT YOUR FIRST CHOICE, AS

8  COMPARED TO NO CHANGE IN THE PRISONS.

9         **THE WITNESS:**  CORRECT.  I SAY EARLY RELEASE IS --

10         **JUSTICE REINHARDT:**  YOU ENDORSE IT.

11         **THE WITNESS:**  IT'S SORT OF LIKE CRISIS MANAGEMENT

12  APPROACH TO SOLVING A PROBLEM.  GOOD TIME CREDITS SHOULD NOT BE

13  EQUATED TO EARLY RELEASE.  IT'S NORMAL IN MOST STATES' SYSTEMS

14  THAT YOU HAVE GOOD TIME CREDITS.  THAT'S PART OF THE LAW, PART

15  OF THE PROCESS THEY USE TO REGULATE THE PRISONER POPULATION.

16  **BY MS. EVENSON**

17  **Q**   IN YOUR EXPERT REPORTS, YOU CALCULATED AN ESTIMATE OF THE

18  IMPACTS OF A PRISON POPULATION REDUCTION BASED ON DATA THAT YOU

19  RECEIVED FROM CDCR.  IS THE DATA YOU RECEIVED RELIABLE TO

20  SUPPORT THE CONCLUSIONS THAT WERE IN YOUR REPORT?

21  **A**   YES, IT IS.

22  **Q**   IN ANALYZING THE DATA, DR. AUSTIN, YOU ASSUMED THAT

23  PRISONERS WHOSE LENGTH OF STAY WAS SHORTENED WOULD HAVE THE SAME

24  RECIDIVISM RATE -- WOULD HAVE THE SAME RECIDIVISM RATE AS

25  CURRENT PAROLEES, AND, UNDER THAT SCENARIO, THERE WOULD BE LESS

1  THAN ONE PERCENT INCREASE IN ARRESTS, RIGHT?

2  **A**   YES.

3  **Q**   AND YOU DID THE CALCULATION ON -- YOU REDID THE CALCULATION

4  ON THE STAND USING THE CORRECTED FIGURE 8 FROM YOUR REPORT, AND

5  STILL FOUND INCREASE IS IN THE RANGE OF .3 -- 3/10THS OF ONE

6  PERCENT, RIGHT?

7  **A**   CORRECT.

8  **Q**   THE MODEL SHOWING 3/10THS OF ONE PERCENT INCREASE, THAT

9  ASSUMES THAT THE RECIDIVISM RATES FOR THE RELEASEES, OR THE

10  GROUP OF WHOSE LENGTH OF STAY IS SHORTENED, IS THE SAME AS THE

11  RECIDIVISM RATE AS THE CURRENT RELEASEES, RIGHT?

12  **A**   THAT'S CORRECT.

13  **Q**   BUT IF THE GROUP WHO WAS SUBJECTED TO THE SHORTENED LENGTH

14  OF STAY, THE NEW GROUP OF -- OR THE SHORTENED LENGTH OF STAY

15  GROUP, IF THAT GROUP DIDN'T INCLUDE HIGH-RISK PRISONERS, WHAT

16  WOULD THAT DO TO YOUR MODEL?

17  **A**   IT WOULD REDUCE THE RECIDIVISM RATE, AND, THEREFORE, REDUCE

18  THE ESTIMATED NUMBER OF ARRESTS THAT WOULD OCCUR DUE TO THE

19  POLICY ONCE IT WAS BEING IMPLEMENTED.

20          SO, BASICALLY, IF YOU HAVE ANY KIND OF SCREENING

21  GOING ON THERE, YOU PULL OUT THE HIGH RISK PEOPLE.  THEY WOULD

22  NOT BE BENEFITING FROM THE REDUCTIONS, AND, THEREFORE, MY

23  ESTIMATE WOULD ACTUALLY BE LOWER THAN WHAT IT IS RIGHT NOW?

24          **JUSTICE REINHARDT:**  LOWER FROM THE .3?

25          **THE WITNESS:**  YES.

1  BY MS. EVENSON

2  Q    WHEN YOU WERE HERE LAST, JUDGE KARLTON ASKED YOU A QUESTION

3  ABOUT WHETHER YOUR PROPOSED POPULATION REDUCTION METHODS WOULD

4  IMPACT RECEPTION CENTERS ONLY, OR WHETHER IT WOULD ALSO HAVE A

5  BROADER IMPACT ON THE OTHER CDCR PRISONS.  DO YOU HAVE A

6  RESPONSE TO THAT QUESTION?

7            MS. BARLOW:  ASKED AND ANSWERED.

8            MS. EVENSON:  LET ME JUST REPHRASE.

9  BY MS. EVENSON

10 Q    AT THE TIME YOU SAID YOU WOULD HAVE TO GIVE IT FURTHER

11 THOUGHT.  DO YOU HAVE A RESPONSE TO THAT QUESTION?

12 A    YES.  YES, AND, BASICALLY, I THINK YOU ASKED, YOUR HONOR,

13 THE EXTENT THAT THIS WOULD EFFECT THE 3CMS AND THE EOP

14 POPULATIONS, CURRENTLY THERE ARE ABOUT 33-, 34,000 IN THOSE TWO

15 CATEGORIES.

16            I LOOKED AT THE CHARACTERISTICS SINCE MY LAST

17 TESTIMONY OF THE 3CMS AND EOP -- THE BIG GROUP IS 3CMS GROUP --

18 TO SEE IF THEIR RISK CHARACTERISTICS ON RECIDIVISM RATE LOOK

19 DIFFERENT THAN OTHER INMATES.  THEY DO NOT.  THEY ARE MATERIALLY

20 THE SAME.

21            SO BASED ON THAT ASSUMPTION, PLUS TAKING INTO ACCOUNT

22 THAT APPROXIMATELY TEN PERCENT OF THAT POPULATION IS IN THE

23 AD-SEG UNITS AND, THEREFORE, PROBABLY WOULD NOT BENEFIT FROM A

24 REDUCTION IN LENGTH OF STAY, I'M ESTIMATING THAT THE POPULATION

25 OF ABOUT 33,000 WOULD DROP DOWN TO 26,500, SOMETHING LIKE THAT.

1   SO THERE WOULD BE A REDUCTION IN THOSE POPULATIONS, PRETTY MUCH

2   COMMENSURATE TO THE REDUCTION IN NON-3CMS/EOP POPULATIONS, WITH

3   SOME CAVEATS FOR AD-SEG POPULATIONS.

4           THE OTHER POINT I WOULD MAKE IS THE DIVERSION OF

5   TECHNICAL VIOLATERS AND THE DIVERSION OF SHORT SENTENCES, THAT

6   THAT WILL GREATLY BENEFIT THE RECEPTION CENTERS.  SO THAT WOULD

7   CLEAR UP THAT CLOGGING THERE.  THE LENGTH OF STAY ON THE GOOD

8   TIME CREDITS WOULD AFFECT THE OUTSIDE FACILITIES.  ONCE THE

9   INMATES GO THROUGH RECEPTION AND ARE RESIDING, THEY WOULD

10  BENEFIT THERE.  SO THE POPULATIONS WOULD BE DROPPING AT BOTH THE

11  RECEPTION CENTERS AND AT THE NON-RECEPTION CENTER FACILITIES.

12  **Q**   AND WOULD THE REDUCTION IN THE POPULATION IMPACT THE WAIT

13  LIST FOR EOP AND 3CMS BEDS?

14  **A**   IT APPARENTLY WOULD, BECAUSE I UNDERSTAND THE CAPACITY NOW

15  IS ABOUT 28,500, ROUGHLY.  SO WITH THE POPULATION REDUCTION OF

16  6- TO 7,000, IT WOULD DROP DOWN 26,000, SO YOU WOULD HAVE EXCESS

17  BED CAPACITY FOR THE 3CMS.  IT WOULD BE LIKE 90, 91 PERCENT

18  CROWDED.

19          SO MY ASSUMPTION THEN IS THAT THE WAITING LIST WHICH

20  WE NOW HAVE WOULD EVAPORATE AT SOME POINT.

21          **MS. EVENSON:**  THANK YOU, DR. AUSTIN.

22          **THE COURT:**  ANYTHING FURTHER?  OKAY.  THANK YOU FOR

23  REAPPEARING, DR. AUSTIN.  YOU'RE EXCUSED.  CALL YOUR NEXT

24  WITNESS.

25          **MS. BARLOW:**  GOOD AFTERNOON, YOUR HONORS.  THE LAW

1  ENFORCEMENT INTERVENORS CALL CHIEF ALEXANDER YIM TO THE STAND.

2                    **ALEXANDER R. YIM,**

3  HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENORS

4  WAS FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

5           **THE CLERK:**  STATE YOUR FULL NAME AND SPELL YOUR LAST

6  NAME.

7           **THE WITNESS:**  ALEXANDER R. YIM.  A-L-E-X-A-N-D-E-R.

8  R.  LAST NAME Y-I-M.

9            **DIRECT EXAMINATION BY MS. BARLOW**

10          **MS. BARLOW:**  THANK YOU, CHIEF YIM.

11 **BY MS. BARLOW**

12 **Q**   COULD YOU STATE YOUR JOB TITLE, PLEASE, AND BY WHOM YOU ARE

13 EMPLOYED?

14 **A**   DIVISION CHIEF WORKING FOR L.A. COUNTY SHERIFF'S DEPARTMENT.

15 **Q**   WHICH DIVISION ARE YOU CHIEF OF?

16 **A**   CORRECTIONAL SERVICES DIVISION.

17 **Q**   DOES LIEUTENANT STEPHEN SMITH WORK FOR YOU?

18 **A**   HE ACTUALLY WORKS FOR -- THERE'S TWO DIVISIONS WITHIN THE

19 CUSTODY ENVIRONMENT FOR L.A. COUNTY SHERIFF'S DEPARTMENT.

20 LIEUTENANT SMITH WORKS FOR BOTH DIVISIONS.

21          **MS. BARLOW:**  FOR THE COURT'S BENEFIT THE CHIEF'S

22 EDUCATION, BACKGROUND AND EXPERIENCE ARE DETAILED IN PARAGRAPHS

23 ONE THROUGH SEVEN OF HIS DECLARATION.

24 **BY MS. BARLOW**

25 **Q**   COULD YOU JUST FOR THE COURT DESCRIBE BRIEFLY YOUR EDUCATION

1    BACKGROUND AND EXPERIENCE?

2    **A**    TWENTY-SIX YEAR VETERAN OF THE SHERIFF'S DEPARTMENT, HAVE A

3    BACHELOR OF SCIENCE DEGREE ISSUED BY CAL STATE UNIVERSITY LONG

4    BEACH.

5    **Q**    AND YOU HAVE BEEN IN VARIOUS CAPACITIES WITH THE LOS ANGELES

6    SHERIFF'S DEPARTMENT?

7    **A**    THAT'S CORRECT.  PROBABLY 22 YEARS OF THAT AS PATROL,

8    DETECTIVE DIVISION.  SHORTER TIME, OBVIOUSLY, FOR THE CUSTODY

9    ENVIRONMENT.

10   **Q**    AND WHEN WERE YOU PROMOTED TO CHIEF OF YOUR DIVISION?

11   **A**    APRIL OF 2008.

12   **Q**    ARE YOU OPERATING THE LOS ANGELES COUNTY JAILS UNDER A

13   COURT-ORDERED CAP PRESENTLY?

14   **A**    PARDON ME?  I'M SORRY.

15   **Q**    ARE THE LOS ANGELES COUNTY JAILS OPERATING UNDER A

16   COURT-ORDERED CAP?

17   **A**    YES.

18   **Q**    YOU TAKE VARIOUS STEPS TO ENSURE THAT YOU CAN MANAGE YOUR

19   POPULATION, CORRECT?

20   **A**    YES.

21   **Q**    NOW, SOME OF THOSE PROGRAMS HAVE BEEN DESCRIBED AS EARLY

22   OUTS OR EARLY RELEASE, AND OTHERS YOU HAVE A CBAC PROGRAM?  YOU

23   ALSO HAVE PROGRAMS THAT ALLOW FOR PROGRAMMING OR REFERRAL,

24   CORRECT?

25   **A**    THAT'S CORRECT.

1  **Q**  ALL RIGHT.  SO WE'LL TRY TO GET INTO SOME OF THOSE.

2          FIRST OF ALL, WHEN YOU FIRST BEGAN AS CHIEF, ABOUT

3  HOW MUCH TIME WERE SENTENCED INMATES SPENDING IN CUSTODY?

4  **A**  WELL, IN APRIL OF 2008, THEY WERE DOING AT LEAST 70 PERCENT,

5  THE MALES, AND FOR FEMALES AT LEAST TEN PERCENT.

6  **Q**  BUT YOU'RE AWARE THAT THERE WAS A PERIOD OF TIME WHEN MALES

7  WERE ONLY DOING ABOUT TEN PERCENT, CORRECT?

8  **A**  THAT'S CORRECT.  THAT'S WHEN I ARRIVED IN DIVISION AS

9  COMMANDER IN 2004.

10  **Q**  IT'S MY UNDERSTANDING THAT WOMEN CURRENTLY SERVE ABOUT TEN

11  PERCENT OF THEIR SENTENCES; IS THAT RIGHT?

12  **A**  AT LEAST TEN PERCENT, YES.

13  **Q**  NOW, SINCE 1993, HOW MANY INMATES HAVE BEEN RELEASED EARLY

14  FOR LACK OF CAPACITY IN THE LOS ANGELES COUNTY JAILS?

15  **A**  I THINK THE FIGURE WAS 770,000.

16  **Q**  AND CAN YOU GIVE ME OR ADVISE THE COURT WHAT PERCENTAGE OF

17  THE PRISONERS CURRENTLY IN YOUR JAIL POPULATION ARE SERVING OUT

18  LOCAL SENTENCES VERSUS PRETRIAL DETAINEES?

19  **A**  USUALLY AVERAGE AROUND 10 TO 12 PERCENT.

20  **Q**  SO 10 TO 12 PERCENT ARE SERVING OUT SENTENCES?

21  **A**  THAT'S CORRECT.

22  **Q**  AND, THEREFORE, THE REMAINDER ARE PRETRIAL DETAINEES?

23  **A**  THAT'S CORRECT.

24  **Q**  ARE THERE DIFFERENCES, TO YOUR UNDERSTANDING, BETWEEN THE

25  POPULATIONS THAT YOU HOUSE IN YOUR JAIL AND THE STATE PRISON

1   POPULATION AS A WHOLE?

2   **A**   I BELIEVE THEY ARE YOUNGER.  THEY SERVE A SHORTER PERIOD OF

3   TIME.  I THINK THE AVERAGE LENGTH OF STAY IS AROUND 42 DAYS.

4   AND, GENERALLY SPEAKING, THEY ARE IN -- INTO THE COUNTY JAIL

5   MORE THAN ONCE BEFORE THEY GO TO STATE PRISON.

6   **Q**   LET'S TALK ABOUT YOUR ALTERNATIVES TO CUSTODY PROGRAMS THAT

7   YOU EMPLOY TO MAINTAIN YOUR JAIL CAPS.  THE CBAC PROGRAM IS

8   COMMUNITY-BASED ALTERNATIVES TO CUSTODY?

9   **A**   THAT'S CORRECT.

10  **Q**   OR COMMITMENT, RATHER, RIGHT?

11  **A**   THAT'S CORRECT.

12  **Q**   YOU MENTION THAT IN YOUR REPORT.  DO YOU CONSIDER THAT AN

13  EARLY-RELEASE PROGRAM?

14  **A**   NO, I DON'T CONSIDER THAT EARLY RELEASE.  I CONSIDER THAT AN

15  ALTERNATIVE TO DOING YOUR TIME IN A JAIL BED.

16  **Q**   OKAY.  THAT'S ABOUT A -- FIVE PERCENT OF YOUR POPULATION ARE

17  IN THAT PROGRAM, THE CBAC PROGRAM?

18  **A**   LET'S SEE.  TODAY?  AS OF YESTERDAY IT WAS ABOUT A THOUSAND

19  OUT OF THE 18,600 INMATES.

20  **Q**   OKAY.  NOW, YOU REFER TO A SPECIFIC INCIDENT INVOLVING A

21  CBAC COMMITTEE, I GUESS WE WOULD CALL THEM, WHERE THEY WERE OUT

22  ON THAT ALTERNATIVE PROGRAM.  WAS THAT SOME SORT OF MONITORING

23  PROGRAM; DO YOU RECALL?

24  **A**   I CAN'T REMEMBER WHAT COMMUNITY-BASED ALTERNATIVE CUSTODY

25  PROGRAM HE WAS ON, BUT I BELIEVE IT WAS WORK RELEASE.

1  Q   AND THAT INMATE COMMITTED MURDER WHILE HE WAS ON WORK

2  RELEASE?

3  A   THAT'S CORRECT.

4  Q   OTHERWISE YOU AREN'T REALLY AWARE OF ANY NEGATIVE IMPACTS

5  FROM THAT PARTICULAR PROGRAM, THE CBAC PROGRAM?

6  A   YES.

7  Q   OKAY.  I'M SORRY.  I DIDN'T PHRASE THAT VERY WELL, DID I?

8          **JUDGE REINHARDT:**  THAT WAS A PERFECT QUESTION.  YOU

9  AREN'T AWARE?  HE SAID, YES, I'M NOT AWARE.

10 **BY MS. BARLOW**

11 Q   OKAY.  LET'S TALK ABOUT OTHER THAN THE CBAC PROGRAM.  FIRST

12 I WANT YOU TO DESCRIBE A LITTLE BIT THE KIND OF PROGRAMMING YOU

13 HAVE TO DO FOR YOUR LOS ANGELES COUNTY JAIL INMATES.

14          WHAT KIND OF PROGRAMMING DO YOU DO IN THE LOS ANGELES

15 COUNTY?

16 A   WE HAVE EDUCATIONAL PROGRAMS.  WE HAVE POSITIVE DECISION

17 MAKING, MORAL RECOGNITION, DRUG AND ALCOHOL PROGRAMMING,

18 DOMESTIC VIOLENCE PROGRAMMING AND PROGRAMMING FOR VETERANS TO

19 NAME A FEW.  THERE'S OTHERS.

20 Q   AND THE PURPOSE OF THOSE PROGRAMS?

21 A   I BELIEVE TO REHABILITATE THE INMATES WHILE THEY ARE IN

22 CUSTODY.

23 Q   OKAY.  NOW, IS IT EASIER -- OR -- STRIKE THAT.

24          ARE YOU ABLE TO PROGRAM ALL THE PRETRIAL FOLKS, OR

25 CAN YOU ONLY DO PROGRAMMING EFFECTIVELY WITH THE SENTENCED

1   POPULATION?

2   **A**   I BELIEVE THERE'S A SMALL PROPORTION OF PEOPLE THAT ARE

3   PRESENTENCE THAT ARE INVOLVED IN SOME OF OUR PROGRAMS, BUT IT'S

4   REALLY TARGETED AT THE SENTENCED POPULATION.

5   **Q**   OKAY.  NOW, WHEN YOU BECAME CHIEF IN APRIL OF THIS YEAR,

6   WERE YOU AWARE THAT THERE HAD BEEN SOME DATA ANALYSIS DONE THAT

7   SHOWED SOME RATHER NEGATIVE IMPACTS FROM THE EARLY RELEASE AS IT

8   WAS PREVIOUSLY CONSTITUTED AT THE LOS ANGELES COUNTY SHERIFF

9   DEPARTMENT?

10  **A**   I WAS AWARE OF AN L.A. TIMES ARTICLE, BUT THE ACTUAL NUTS

11  AND BOLTS OF THAT ARTICLE, NO, I WAS NOT.

12  **Q**   OKAY.  SO YOU WEREN'T AWARE THAT THE DEPARTMENT HAD ACTUALLY

13  DONE AN ANALYSIS OF THAT DATA, CORRECT?

14  **A**   I WAS AWARE THAT L.A. TIMES REQUESTED INFORMATION FROM THE

15  SHERIFF'S DEPARTMENT.

16  **Q**   NOW, SINCE YOUR DEPOSITION WAS TAKEN IN AUGUST, DID YOU

17  BECOME AWARE OF THE DATA ANALYSIS THAT WAS DONE BY YOUR

18  SHERIFF'S DEPARTMENT?

19  **A**   YES.

20  **Q**   AND CAN YOU DESCRIBE TO YOUR UNDERSTANDING WHAT THAT DATA

21  ANALYSIS INVOLVED?

22         **MR. HEATHER:**   YOUR HONOR, OBJECTION ON PROBABLY FOUR

23  OF FIVE GROUNDS.  LACK OF FOUNDATION.  I THINK THE TESTIMONY

24  WOULD BE INCONSISTENT WITH THREE OF THE PRIOR RULINGS IN THIS

25  COURT, ONE OF WHICH I AM AWARE OF FROM THE RECORD AND TWO OF

 1  WHICH I MAY HAVE --

 2          **JUDGE HENDERSON:** YOU ONLY NEED TO WIN ON ONE, AND

 3  LACK OF FOUNDATION WILL DO IT.

 4          **MR. HEATHER:** THE LACK OF FOUNDATION IS --

 5          **JUDGE HENDERSON:** NO. FINE. YOU PROBABLY OUGHT TO

 6  STOP TALKING NOW.

 7  **BY MS. BARLOW**

 8  **Q** COULD YOU EXPLAIN, CHIEF YIM, WHAT YOU KNOW ABOUT THE WAY

 9  DATA ANALYSIS WAS PREPARED AND HOW YOU KNOW IT?

10          **JUDGE KARLTON:** IT APPEARS, TO THIS JUDGE, AND I

11  DON'T WANT TO SPEAK FOR THE PANEL, THAT WHAT YOU'RE SEEKING TO

12  DO IS GET BEFORE THE COURT AN ANALYSIS THAT THE CHIEF HAD

13  NOTHING TO DO WITH BUT HE'S READ SINCE COMING ABOARD. AM I

14  RIGHT?

15          **MS. BARLOW:** YES, YOUR HONOR. AS PART OF HIS -- AS

16  PART OF THE SCOPE AND DUTIES OF BECOMING THE CHIEF.

17          **JUDGE KARLTON:** SO HE'S READ IT. WHAT DIFFERENCE

18  DOES IT MAKE? THE QUESTION IS WHETHER IT'S PROPERLY BEFORE US.

19  I BELIEVE HE READ IT. YOU DID READ IT?

20          **THE WITNESS:** YES, SIR.

21          **JUDGE KARLTON:** I BELIEVE YOU DID.

22          **THE WITNESS:** THANK YOU.

23          **JUDGE KARLTON:** SO WHAT?

24          **MS. BARLOW:** LIEUTENANT SMITH --

25          **JUDGE KARLTON:** YOU ARE GOING ON BEYOND THAT. GO

1  AHEAD.

2          **MS. BARLOW:**  LIEUTENANT SMITH HAS ALREADY TESTIFIED

3  TO THE MANNER IN WHICH THE DATA WAS PREPARED AND ANALYZED, YOUR

4  HONOR.

5          **JUDGE KARLTON:**  SO WHY ARE WE ASKING HIM?

6          **THE WITNESS:**  I AM JUST TRYING TO LAY FOUNDATION FOR

7  HOW HE KNOWS ABOUT THE DATA.  WE'VE ALREADY LAID FOUNDATION FOR

8  THE DATA ITSELF.  I'M GOING TO HAVE HIM TESTIFY ABOUT WHAT THE

9  DATA SHOWED.

10          **JUDGE HENDERSON:**  HOW DO YOU KNOW ABOUT THE DATA?  GO

11  RIGHT TO IT.  DO YOU KNOW ABOUT THE DATA?

12          **THE WITNESS:**  YES.  AFTER READING IT.

13          **JUDGE HENDERSON:**  THAT'S YOUR COMPLETE KNOWLEDGE OF

14  IT?

15          **THE WITNESS:**  YES, YOUR HONOR.

16  **BY MS. BARLOW**

17  **Q**   DID YOU REVIEW THE DATA WITH LIEUTENANT SMITH?

18  **A**   THAT'S CORRECT.

19  **Q**   DID YOU REVIEW THE UNDERLYING DATA?

20  **A**   I'M SORRY?

21  **Q**   DID YOU REVIEW THE --

22          **JUDGE KARLTON:**  NO, WE ARE NOT GOING TO DO THIS.  I'M

23  SORRY.  EXCUSE ME.

24          **JUDGE HENDERSON:**  GO ON.  GO ON.

25          **JUDGE KARLTON:**  SIR, ASKING QUESTIONS -- IF IT IS

1    BEFORE US, IT'S BEFORE US.  HE'S GOT NOTHING MORE TO DO WITH IT.

2    YOU MAY PROCEED.  I PROMISE YOU YOU CAN ARGUE TO YOUR HEART'S

3    CONTENT, IF WE EVER GET TO FINAL ARGUMENT, BUT HE SIMPLY SAID I

4    READ IT.  THAT'S SO WHAT.  HE'S READ IT.  IF HE HAS DONE

5    SOMETHING IN RESPONSE TO IT, FINE, ASK HIM WHAT HE'S DONE.

6              **MS. BARLOW:**  I WOULD LIKE TO LAY THE FOUNDATION FOR

7    WHAT WAS DONE, YOUR HONOR, AS A RESULT.

8              **JUDGE KARLTON:**  MAY I RULE?

9              **JUDGE HENDERSON:**  YES, PLEASE.

10             **JUDGE KARLTON:**  GO ON TO THE NEXT QUESTION.

11             **MS. BARLOW:**  THAT'S FINE.

12   **BY MS. BARLOW**

13   **Q**   IN THE ANALYSIS OF CRIME STATISTICS, CAN YOU TELL ME WHAT

14   THE NUMBER OF EARLY RELEASEES WAS FOR THE PERIOD FROM 2002 TO

15   2006?

16             **JUDGE KARLTON:**  ACCORDING TO THIS DOCUMENT.

17             **THE WITNESS:**  APPROXIMATELY 148,000.

18   **BY MS. BARLOW**

19   **Q**   OF THAT 148,000, LIEUTENANT SMITH PREVIOUSLY TESTIFIED THAT

20   A LITTLE OVER TEN PERCENT WERE REARRESTED WHILE ON EARLY

21   RELEASE.  IT'S FOUNDATION.

22             **MR. HEATHER:**  OBJECTION, YOUR HONOR.  IT'S HEARSAY.

23   HE HAS NO PERSONAL KNOWLEDGE OF THESE FACTS.  HE IS CALLED AS AN

24   EXPERT.  AND NOT ONLY DID HE NOT DISCUSS THIS IN HIS DEPOSITION,

25   BUT HE MADE NO REFERENCE TO IT IN HIS TRIAL TRANSCRIPT -- IN HIS

1   TRIAL DECLARATION.  AND, IN FACT, IN BOTH HIS DEPOSITION AND HIS

2   TRIAL DECLARATION -- AND CAN YOU PUT UP PAGE 48 OF HIS

3   DEPOSITION --

4           **MS. BARLOW:**  YOUR HONOR, THIS IS INAPPROPRIATE IN AN

5   OBJECTION.

6           **MR. HEATHER:**  HE STATES, YOUR HONOR, THAT HE IS AWARE

7   OF ONLY A SINGLE MURDER AND A SINGLE INCIDENT IN WHICH AN EARLY

8   RELEASEE HAS HAD A NEGATIVE IMPACT ON PUBLIC SAFETY, AND HE IS

9   AWARE OF NO STUDY, NO REPORT IN WHICH THERE ARE INSTANCES OF

10  OTHER EXAMPLES OF NEGATIVE IMPACT ON PUBLIC SAFETY, AND THIS IS

11  KIND OF RUDIMENTARY SANDBAGGING FOR HIM.

12          **JUDGE HENDERSON:**  DON'T DO THAT, COUNSEL.

13          **MR. HEATHER:**  FOR HIM TO COME IN HERE NOW --

14          **JUDGE HENDERSON:**  DON'T DO THAT, COUNSEL.

15       **MR. HEATHER:**  I APOLOGIZE.

16          **JUDGE KARLTON:**  WE HAVE A LOT OF TROUBLE WITH LAWYERS

17  NOT LISTENING TO THE COURT.

18          **MR. HEATHER:**  I APOLOGIZE.

19          **JUDGE KARLTON:**  I'M AFRAID IT'S GETTING LATER, AND WE

20  ARE GETTING IRRITATED.  NOTHING PERSONAL, COUNSEL.

21          **MR. HEATHER:**  SORRY.

22          **JUDGE HENDERSON:**  SIT DOWN.  YOU MADE YOUR OBJECTION.

23  I'M SUSTAINING IT.  BUT DO NOT MAKE TALKING OBJECTIONS ANYMORE.

24  RELEVANT, WHATEVER IT IS.  LET'S NOT HAVE THESE SPEECHES.

25          THE OBJECTION IS SUSTAINED.

 1          **MS. BARLOW:**  MAY I ATTEMPT TO LAY FOUNDATION FOR

 2 THE --

 3          **JUDGE KARLTON:**  THE OBJECTION WAS SUSTAINED.

 4          **MS. BARLOW:**  I UNDERSTAND THAT, YOUR HONOR.  IT'S AN

 5 OFFICIAL RECORD OF HIS DEPARTMENT, AND HE'S IN CHARGE OF THE

 6 DEPARTMENT.

 7          **JUDGE KARLTON:**  I KNOW YOU HAVE TERRIBLE TROUBLE

 8 HEARING.  THE OBJECTION WAS SUSTAINED.  GO ON.

 9 **BY MS. BARLOW**

10 **Q**  DO YOU KNOW HOW MANY PEOPLE ON EARLY RELEASE BETWEEN 2002

11 AND 2006 WERE ARRESTED FOR SERIOUS CRIMES, CHIEF YIM?

12          **MR. HEATHER:**  SAME OBJECTION.

13          **JUDGE KARLTON:**  THE OBJECTION IS SUSTAINED.  I'M

14 SORRY.  I JUST CAN'T STAND IT.

15          **MS. BARLOW:**  YOUR HONORS, IF I WASN'T GIVEN AN

16 OPPORTUNITY TO RESPOND TO THE OBJECTIONS, HE IS AN EXPERT AND

17 ENTITLED TO RELY UPON THE DATA COMPILED BY HIS SUBORDINATES, AND

18 THE DOCUMENTS THAT ARE OFFICIAL RECORDS OF --

19          **JUDGE HENDERSON:**  YOUR OBJECTION IS PRESERVED FOR

20 APPELLATE RECORD, COUNSEL.  LET'S GO.

21          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

22 **BY MS. BARLOW**

23 **Q**  CHIEF YIM, TO YOUR KNOWLEDGE, WERE STEPS TAKEN TO CHANGE THE

24 RELEASE POLICIES AS A RESULT OF THE DATA SHOWING THAT THERE WAS

25 HARM TO THE COMMUNITY AS A RESULT OF THOSE RELEASES?

1    **A**    YES.

2    **Q**    WHAT WERE THOSE STEPS?

3    **A**    THE MALE POPULATION IS NOW DOING AT LEAST 70 PERCENT.

4    FEMALE POPULATION REMAINS AT TEN PERCENT.  AND THERE WAS AN

5    ADDITIONAL CHECK IMPLEMENTED PRIOR TO RELEASING ANYBODY EARLY.

6    **Q**    BUT EVEN THOSE STEPS DON'T ALWAYS STOP PEOPLE FROM

7    COMMITTING CRIMES WHILE THEY WERE ON EARLY RELEASE, CORRECT?

8    **A**    THAT'S CORRECT.

9    **Q**    NOW, YOU REFER TO THE MENTALLY ILL IN YOUR JAILS.  DO YOU

10   HAVE A LARGE POPULATION OF MENTALLY ILL IN THE LOS ANGELES

11   COUNTY JAILS?

12   **A**    THAT'S CORRECT.

13   **Q**    AND COULD YOU -- I KNOW COUNSEL ASKED YOU AT YOUR DEPOSITION

14   WHETHER YOU THOUGHT THEY BELONGED IN JAIL.

15   **A**    WELL, THE ACUTE AND THE SUB ACUTE PROBABLY WOULD BE A

16   BETTER -- SECURE, BUT NOT A JAIL ENVIRONMENT SO THAT THEY COULD

17   RECEIVE TREATMENT, MORE OUT OF CELL TIME, THINGS OF THAT NATURE.

18   **Q**    DO YOU TRY TO PLACE THOSE PEOPLE IN PROGRAMS SO THEY ARE NOT

19   IN THE JAIL WHERE POSSIBLE?

20   **A**    WELL, THE ACTUAL HANDLING OF THE MENTALLY ILL WITHIN L.A.

21   COUNTY JAIL IS HANDLED BY DEPARTMENT OF MENTAL HEALTH.  I

22   BELIEVE THEY MAKE EVERY ATTEMPT TO DO THAT.  I CAN'T REALLY

23   SPEAK FOR THEM.

24   **Q**    OKAY.  NOW, DO YOU BELIEVE THAT ALL MENTALLY ILL PEOPLE WHO

25   COMMIT CRIMES SHOULD NOT BE IN JAIL?

1  A  WELL, IF SOMEBODY IS FUNCTIONING, TECHNICALLY MENTALLY ILL

2  BUT FUNCTIONING, AND TAKING THEIR MEDICATION, AND IS ABLE TO

3  FUNCTION, YOU KNOW, APPROPRIATELY, AND HAS COMMITTED A VIOLENT

4  CRIME, I THINK THEY BELONG IN JAIL.

5          **MS. BARLOW:**  I HAVE NOTHING FURTHER, YOUR HONOR.

6          **JUDGE HENDERSON:**  ANYTHING FROM STATE DEFENDANTS?

7          **MS. TILLMAN:**  NOTHING, YOUR HONOR.  THANK YOU.

8          **JUDGE HENDERSON:**  CROSS.

9              **CROSS-EXAMINATION BY MR. HEATHER**

10 **BY MR. HEATHER**

11 **Q**  GOOD AFTERNOON.  MY NAME IS FRED HEATHER FROM K&L GATES ON

12 BEHALF OF PLAINTIFFS.

13          CHIEF, I AM GOING TO ASK YOU JUST A FEW QUESTIONS YOU

14 DISCUSSED ON DIRECT, I BELIEVE.  I HAD SOME TROUBLE HEARING.

15          BUT THE DIFFERENCES OF THE POPULATION IN THE L.A.

16 COUNTY JAILS -- AND I DIDN'T HEAR YOU MENTION THAT ONE

17 DIFFERENCE, WHICH I THINK YOU TESTIFIED ABOUT BEFORE, IS THAT

18 THE L.A. COUNTY JAILS HAVE A FAIRLY HIGH PROPORTION OF GANG

19 MEMBERS AS COMPARED WITH THE POPULATION OF OTHER COUNTIES; IS

20 THAT CORRECT?

21 **A**  I DON'T KNOW WHAT OTHER --

22          **MS. BARLOW:**  I'M SORRY.  THE POPULATION OF OTHER

23 COUNTIES?

24          **JUDGE KARLTON:**  THAT'S WHAT HE SAYS.

25          **MS. BARLOW:**  THE QUESTION WAS THE STATE VERSUS THE

1    COUNTIES.

2    **BY MR. HEATHER**

3    **Q**    I'M ASKING YOU, IS IT YOUR OPINION, SIR, THAT THE GANG

4    POPULATION OF THE L.A. COUNTY JAILS IS A FACTOR THAT IS

5    DIFFERENT THAN THE POPULATION OF THAT OF OTHER COUNTIES?

6              **MS. BARLOW:**  BEYOND THE SCOPE.

7              **THE WITNESS:**  COULD YOU REPEAT THAT?

8              **MR. HEATHER:**  LET ME REPHRASE IT.

9    **BY MR. HEATHER**

10   **Q**    DO YOU RECALL STATING IN YOUR DECLARATION THE FOLLOWING

11   STATEMENT, AND I CAN PROVIDE A COPY OF MY READING IT TO YOU IF

12   MY READING IT DOES NOT REFRESH YOUR RECOLLECTION:

13              "ALTHOUGH THE OVERALL LOS ANGELES COUNTY

14              POPULATION JAIL IS LIKELY MORE VIOLENT THAN MANY

15              COUNTY JAILS DUE TO THE LARGE NUMBER OF GANG

16              MEMBERS."

17              DO YOU RECALL MAKING THAT STATEMENT?

18   **A**    YES.

19   **Q**    OKAY.  SO THE POPULATION OF THE L.A. COUNTY JAILS IS MORE

20   VIOLENT THAN OTHER COUNTIES, IN PART BECAUSE L.A. COUNTY HAS A

21   HIGH POPULATION OF GANG MEMBERS WITHIN THE JAIL; IS THAT

22   CORRECT?

23   **A**    YES.

24   **Q**    OKAY.  NOW, YOU DISCUSSED ON DIRECT THE FACT THAT THERE WERE

25   A NUMBER OF PROGRAMS THAT WERE ALTERNATIVES TO INCARCERATION OR

1  EARLY RELEASE PROGRAMS, AND I THINK THEY INCLUDED THERE'S BOOK

2  AND RELEASE PROCEDURES WHERE PEOPLE ARE NOT INCARCERATED AT ALL,

3  CORRECT?

4  **A**  YES.

5  **Q**  ELECTRONIC MONITORING?  THE MEN DO AN AVERAGE OF 70 PERCENT,

6  THE WOMEN AN AVERAGE OF TEN PERCENT, AND THEY'RE RELEASED, THAT

7  PERCENTAGE BEFORE THEIR NORMAL RELEASE DATE.  AND IT WAS YOUR

8  TESTIMONY IN YOUR DEPOSITION THAT IN YOUR DECLARATION THAT IT IS

9  YOUR VIEW THAT OTHER THAN THE ONE MURDER OF WHICH YOU WERE AWARE

10 WHEN YOU TESTIFIED, YOU DO NOT BELIEVE THAT THERE WERE ANY

11 NEGATIVE IMPACTS TO PUBLIC SAFETY FROM ANY OF THOSE EARLY

12 RELEASE PROGRAMS OR ALTERNATIVES TO INCARCERATION; IS THAT

13 CORRECT?

14         **MS. BARLOW:**  OBJECTION.  MISSTATES TESTIMONY OF THE

15 WITNESS, BOTH IN DEPOSITION AND IN THE REPORT.

16         **MR. HEATHER:**  IS THAT CORRECT?

17         **JUDGE HENDERSON:**  WAS THAT A CORRECT STATEMENT OR WAS

18 IT NOT?

19         **THE WITNESS:**  YES.

20         **JUDGE KARLTON:**  YES, IT WAS A CORRECT STATEMENT?

21         **THE WITNESS:**  YES.

22 **BY MR. HEATHER**

23 **Q**  AND I BELIEVE YOU ALSO TESTIFIED IN BOTH YOUR DEPOSITION AND

24 IN YOUR DECLARATION THAT THAT VIEW WAS A VIEW THAT WAS SHARED BY

25 SHERIFF LEE BACA AND THE OTHER SENIOR MEMBERS OF THE SHERIFF'S

1  DEPARTMENT; IS THAT CORRECT?  LET ME REPHRASE THAT.

2          I BELIEVE YOU TESTIFIED THAT NO SENIOR MEMBER OF THE

3  SHERIFF'S DEPARTMENT OF LOS ANGELES COUNTY WAS OF THE VIEW THAT

4  THESE EARLY RELEASE PROGRAMS OR ALTERNATIVES TO INCARCERATION

5  SHOULD BE TERMINATED BECAUSE OF A NEGATIVE IMPACT ON PUBLIC

6  SAFETY; IS THAT WHAT YOU STATED UNDER OATH?

7          **MS. BARLOW:**  INCORRECTLY STATES --

8          **JUDGE HENDERSON:**  WAS IT WHAT YOU STATED?  IT WAS OR

9  IT WASN'T.

10          **THE WITNESS:**  I DON'T RECALL EXACTLY SAYING THAT.

11          **JUDGE HENDERSON:**  THERE WE GO.

12          **MR. HEATHER:**  AGAIN, I'LL READ IT TO YOU.  I CAN

13  PROVIDE A COPY MOMENTARILY.

14          **JUDGE KARLTON:**  WHAT ARE YOU READING FROM?

15  **BY MR. HEATHER**

16  **Q**   FROM PARAGRAPH 21 OF YOUR TRIAL DECLARATION, CHIEF YIM,

17  DATED OCTOBER 30TH.  YOU STATE -- AND I'LL READ THAT PARAGRAPH

18  IN IT IS ENTIRETY, IT'S ONLY THREE SENTENCES.

19          "THESE PROGRAMS," AND WE'RE TALKING ABOUT THE EARLY

20  RELEASE PROGRAMS.

21          **MS. BARLOW:**  THAT'S INCORRECT.

22  **BY MR. HEATHER**

23  **Q**   (READING)

24          "THESE PROGRAMS HAVE ASSISTED ME IN

25          MAINTAINING CAP COMPLIANCE.  THERE IS ONE

1          INSTANCE WHERE AN INMATE WAS RELEASED TO A CBAC

2          PROGRAM AND COMMITTED A MURDER.  IN THAT ONE

3          INSTANCE, THESE PROGRAMS HAVE CREATED HARM TO

4          PUBLIC SAFETY IN LOS ANGELES COUNTY.  TO MY

5          KNOWLEDGE, NONE OF THE SENIOR PEOPLE CURRENTLY

6          IN THE SHERIFF'S DEPARTMENT RECOMMEND THAT ANY

7          OF THESE PROGRAMS BE TERMINATED BECAUSE OF A

8          PERCEIVED THREAT TO PUBLIC STATEMENT (SIC)."

9          DO YOU RECALL MAKING THAT STATEMENT UNDER OATH IN

10   YOUR DECLARATION?

11          **MS. BARLOW:**  YOUR HONOR, HE'S MISCHARACTERIZING AND

12   LEAVING OUT AN IMPORTANT PART.  HE'S TALKING THE FIVE PERCENT

13   ALTERNATIVE PROGRAMS, NOT THE RELEASE.

14          **JUDGE HENDERSON:**  READ THE REST.  TELL HIM WHAT ELSE

15   TO READ FOR COMPLETENESS.

16          **MS. BARLOW:**  STARTING FROM PARAGRAPH 17.

17          **MR. HEATHER:**  I'LL READ THE ENTIRE THING, YOUR HONOR.

18          "APPROXIMATELY FIVE PERCENT OF L.A. COUNTY

19          INMATES ARE GOVERNED BY ALTERNATIVE PROGRAMS

20          SUCH AS ELECTRONIC MONITORING, CONFINING PEOPLE

21          OUTSIDE THE JAIL FACILITIES WITH WHATEVER

22          RESTRICTIONS THE MONITORING PROGRAM HAS.  THE

23          WORK RELEASE PROGRAM IS A FREE PROGRAM AND IT

24          DOES NOT COST THE INMATE OR THE COUNTY ANY

25          FUNDS.

1          "WE SUPPLY A FORCE OF 660 COUNTY INMATES WHO

2     ARE DEEMED LOW RISK TO 152 WORK SITES THROUGHOUT

3     THE COUNTY.  THESE INMATES DO NOT RETURN TO JAIL

4     FACILITIES AFTER THE WORK DAY BECAUSE THEY ARE

5     IN A PROGRAM WHERE THEY ARE ALLOWED TO LIVE

6     OUTSIDE THE JAIL FACILITIES.

7          "IF YOU TALK TO THE RECIPIENTS OF THE FREE

8     LABOR, THEY WILL SAY THE PROGRAM IS WORKING

9     WELL.  IF YOU LOOK AT THE NONCOMPLIANCE RATE,

10    THE INMATES THAT DO NOT SHOW UP, THERE MAY BE AN

11    ARGUMENT THAT THE PROGRAM IS NOT WORKING AS WELL

12    AS IT SHOULD BE.

13         "THE ELECTRONIC MONITORING PROGRAM ALLOWS

14    PEOPLE WHO BELONG IN JAIL, THE HIGH RISK SERIOUS

15    FELONS, TO HAVE A BED IN THE JAIL SYSTEM.  IT

16    ALSO PROVIDES A MECHANISM FOR LOW RISK INMATES

17    WHO WERE DOING LITTLE TO NO JAIL TIME IN PRIOR

18    YEARS, SUCH AS 2004, TO PAY THEIR DEBT TO

19    SOCIETY BUT OUTSIDE THE JAIL SYSTEM.  WEEKENDERS

20    SERVE THEIR JAIL SYSTEM -- SENTENCE ON WEEKENDS

21    IN OUR FACILITIES.  THAT HELPS THE CAP SITUATION

22    BY NOT HAVING THEM TAKE UP BEDS DURING THE WEEK.

23    IF THERE ARE NO FREE BEDS WHEN THE WEEKEND

24    ARRIVES, THE WEEKENDERS CANNOT COME IN.

25         "DURING THE WEEK IT GIVES ME SOME DISCRETION

1          TO IMPOSE SOME JAIL PUNISHMENT, BUT IT GIVES ME

2          THE DISCRETION NOT TO HAVE THEM CAUSE A CAP

3          PROBLEM.

4              "STATION TRUSTEES ARE INMATE WORKERS

5          PROVIDED TO OUR 23 PATROL STATIONS.  IT IS FREE

6          LABOR WITH THE INMATES BEING HOUSED AT THE

7          INDIVIDUAL PATROL STATIONS.  STATION TRUSTEES

8          BEDS ARE NOT CONSIDERED JAIL BEDS FOR PURPOSES

9          OF CAP COMPLIANCE.  THESE PROGRAMS HAVE ASSISTED

10         ME IN MAINTAINING CAP COMPLIANCE."

11         AND THEN THE COMPLETION OF THE PARAGRAPH THAT I READ

12 EARLIER.

13         **MS. BARLOW:**  AND I WANT TO RENEW THE OBJECTION.

14 THAT'S NOT EARLY RELEASE.

15         **JUDGE HENDERSON:**  OVERRULED.  DO YOU STILL AGREE WITH

16 THAT STATEMENT?

17         **THE WITNESS:**  YES.  I DO.

18         **MS. BARLOW:**  FINE.

19 **BY MR. HEATHER**

20 Q    DO YOU STILL BELIEVE NONE OF THE SENIOR PEOPLE CURRENTLY IN

21 THE SHERIFF'S DEPARTMENT RECOMMEND THAT ANY OF THESE PROGRAMS BE

22 TERMINATED BECAUSE OF A PERCEIVED THREAT TO PUBLIC SAFETY?

23         **JUDGE KARLTON:**  TO THE DEGREE THAT YOU KNOW.

24         **THE WITNESS:**  WE DO THIS TO MAINTAIN OUR CAP.  AS FAR

25 AS WHAT IT -- HOW IT AFFECTS THE COMMUNITIES, THAT IS NOT PART

 1  OF THE DECISION MAKING.  I HAVE NEVER BEEN ORDERED BY A SENIOR

 2  MEMBER OF THE SHERIFF'S DEPARTMENT TO DISCONTINUE THESE PROGRAMS

 3  BECAUSE WE ARE UNDER FEDERAL COURT DECREE TO KEEP OUR POPULATION

 4  DOWN.  THAT'S THE PURPOSE OF THOSE COMMUNITY BASED ALTERNATIVES

 5  TO CUSTODY --

 6  **BY MR. HEATHER**

 7  **Q**   SO ALL THOSE STATEMENTS WERE TRUE, TO THE BEST OF YOUR

 8  KNOWLEDGE, AT THE TIME YOU MADE THEM?

 9  **A**   YES.

10  **Q**   AND THEY ARE TRUE TODAY, TO THE BEST OF YOUR KNOWLEDGE?

11  **A**   BEST OF MY KNOWLEDGE, YES.

12  **Q**   THANK YOU, CHIEF.

13          BY THE WAY, IS LIEUTENANT SMITH WHAT YOU WOULD

14  CONSIDER A SENIOR OFFICER OF THE SHERIFF DEPARTMENT?

15  **A**   MIDDLE MANAGEMENT.

16  **Q**   OKAY.  NOT A SENIOR OFFICERS?

17  **A**   NO.

18  **Q**   AND YOU ARE?

19  **A**   YES, I GUESS THEY ARE.  MAY I HAVE JUST A MOMENT, YOUR

20  HONOR?

21          **JUDGE REINHARDT:**  YOU HAVE BEEN UNDER COURT DECREE,

22  FEDERAL COURT DECREE, SINCE 1970'S?

23          **THE WITNESS:**  I BELIEVE IT WAS IN THE '80'S, YOUR

24  HONOR, AND THEN WE HAD A JUDGE PREGERSON IMPOSED AN ADDITIONAL

25  DEPOPULATION EFFORT BACK IN '06.

1    **MR. HEATHER:**  I HAVE NO FURTHER QUESTIONS.  THANK

2    YOU.

3          **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

4          **MS. LEONARD:**  NO, YOUR HONOR?

5          **JUDGE HENDERSON:**  REDIRECT?

6          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

7              **REDIRECT EXAMINATION BY MS. BARLOW**

8    **BY MS. BARLOW**

9    **Q**   CHIEF YIM, WHEN YOU WERE TALKING ABOUT THE FACT THAT YOU --

10   OTHER THAN THE ONE MURDER THAT YOU REFERRED TO, YOU WEREN'T

11   AWARE OF NEGATIVE IMPACTS FROM THE CBAC PROGRAM.  YOU'RE REALLY

12   JUST TALKING ABOUT THOSE PROGRAMS, NOT THE EARLY RELEASE,

13   CORRECT?

14   **A**   THAT'S CORRECT.

15   **Q**   AND YOU MADE CHANGES IN THE WAY THAT TIME WAS SERVED BY

16   SENTENCED INMATES BECAUSE YOU BELIEVED THAT THE EARLY RELEASE

17   PROGRAM HAD CAUSED AN IMPACT TO PUBLIC SAFETY, CORRECT?

18   **A**   THAT'S CORRECT.

19   **Q**   AND THE TESTIMONY THAT YOU GAVE AT YOUR DEPOSITION THAT

20   SINCE NOW MALE PRISONERS DO 70 PERCENT OF THEIR TIME, YOU ARE

21   MORE COMFORTABLE WITH THAT PROGRAM THAN WHAT EXISTED PREVIOUSLY,

22   CORRECT?

23   **A**   THAT'S CORRECT.

24   **Q**   NOW, IN ALSO IN THE DEPOSITION YOU INDICATED TO COUNSEL THAT

25   THE MORE PEOPLE YOU RELEASE AND THE EARLIER YOU RELEASE THEM,

1  THE MORE RISK THERE IS TO THE PUBLIC, CORRECT?

2  **A**   YES.

3  **Q**   ALL RIGHT.  AND DID YOU COME TO THAT OPINION FOR ANY

4  PARTICULAR REASON?  I MEAN, WHAT IS IT THAT LEADS YOU TO BELIEVE

5  THAT?

6              **JUDGE KARLTON:**   TWENTY-EIGHT YEARS AS BEING --

7              **THE WITNESS:**   YEAH.  AS A POLICE OFFICER, I THINK THE

8  ULTIMATE GOAL WOULD BE A HUNDRED PERCENT OF THEIR SENTENCE, AND

9  THE LIKELIHOOD OF THEM REOFFENDING, IT GOES UP THE LESS TIME

10 THEY SERVE.

11             **JUDGE REINHARDT:**   IF THEY STAY IN JAIL PRISON LONGER

12 THAN THEIR SENTENCE, WE WOULD ALSO BE SAFER, RIGHT?  IF WE COULD

13 KEEP EVERYBODY IN PRISON FOR LIFE, THE CRIME RATE WOULD GO DOWN?

14             **THE WITNESS:**   I USED TO BELIEVE JUST LOCKING THEM UP

15 WAS THE SOLUTION, BUT I THINK OFFERING THEM PROGRAMS WHILE

16 THEY'RE IN CUSTODY AND WHEN THEY GET OUT IS A BETTER SOLUTION.

17             **JUDGE REINHARDT:**   DO YOU KNOW WHETHER IN PRISON, IF

18 YOU LET THEM OUT THREE OR FOUR MONTHS EARLIER, THEY WOULD HAVE

19 LESS -- THEY WOULD HAVE NOT COMPLETED THE PROGRAMS THAT THEY'RE

20 SUPPOSED TO COMPLETE?

21             **THE WITNESS:**   I DON'T UNDERSTAND YOUR QUESTION.

22             **JUDGE REINHARDT:**   WELL, ARE YOU SAYING -- IS IT YOUR

23 TESTIMONY THAT IF THEY WERE LET OUT OF PRISON THREE OR FOUR

24 MONTHS EARLIER, THEY WOULD NOT HAVE COMPLETED THE PROGRAMS?

25             **THE WITNESS:**   NO, I'M NOT SMART ENOUGH TO REACH THAT

1  CONCLUSION, YOUR HONOR.

2      **JUDGE KARLTON:**  AND IF THE CONDITIONS IN THE PRISONS

3  NOW ARE SUCH THAT, IN FACT, PROGRAMMING FOR THE MAJORITY OF

4  PRISONERS DOESN'T REALLY EXIST, I MEAN IT'S THERE IN THEORY, BUT

5  NOBODY CAN DO ANYTHING, YOU WOULD REGARD THAT AS A THREAT TO

6  PUBLIC SAFETY?

7      **THE WITNESS:**  IF YOU ARE GOING TO RELEASE THEM TO THE

8  STREET PRIOR TO THAT PROGRAMMING, YES.

9      **JUDGE REINHARDT:**  BUT IF THEY ARE NOT GOING TO HAVE

10  THE PROGRAM WHEN THEY ARE THERE AT ALL, IT'S A THREAT TO RELEASE

11  THEM WITHOUT THE PROGRAMS?

12      **THE WITNESS:**  RIGHT.

13      **JUDGE KARLTON:**  AND THAT WOULD BE TRUE WHETHER YOU

14  RELEASED THEM EARLY OR RELEASED THEM LATE?

15      **THE WITNESS:**  RIGHT.

16      **JUDGE REINHARDT:**  AND IF YOU COULD GIVE PROGRAMS IN

17  THE PRISONS, IF YOU COULD GET MORE SPACE, YOU WOULD WANT TO DO

18  THAT?

19      **THE WITNESS:**  YES, SIR.  SHERIFF BACA HAS DONE IT

20  ALREADY SINCE '96.

21      **JUDGE REINHARDT:**  I WAS SURPRISED ABOUT THE PROGRAMS

22  HE DESCRIBED, BECAUSE I KNOW IF YOU HAVE PRISONERS -- WELL,

23  DETAINEES, WHATEVER YOU CALL THEM, IN JAIL, YOU HAVE THEM

24  SLEEPING ON THE FLOOR BECAUSE THERE WASN'T ENOUGH SPACE.

25      **THE WITNESS:**  NOT ANY LONGER.

1          **JUDGE REINHARDT:**  NOT ANY LONGER?

2          **THE WITNESS:**  NO, SIR.

3          **JUDGE REINHARDT:**  BUT YOU DO HAVE SPACE FOR PROGRAMS?

4          **THE WITNESS:**  YES, SIR, WE DO.

5          **JUDGE REINHARDT:**  AND ONE OF THE WAYS YOU DO THAT IS

6   BY RELEASING PEOPLE FROM JAIL?

7          **THE WITNESS:**  THAT LEADS TO THAT AVAILABILITY, YES,

8   BUT IT'S A MATTER OF WILL.  SHERIFF BACA HAS TAKEN MONEY OUT OF

9   HIS BUDGET, PERSONNEL DEDICATED OUT OF HIS BUDGET, AND IT'S JUST

10  THE WILL TO CREATE THESE PROGRAMS.

11         **JUDGE KARLTON:**  BUT YOU CAN'T DO IT AT ALL IF YOU

12  DON'T HAVE ANY SPACE?

13         **THE WITNESS:**  IT'S VERY HARD, YOUR HONOR.

14         **JUDGE REINHARDT:**  IF THE STATE DOESN'T HAVE THE WILL

15  TO DO THIS, IT'S NOT GOING TO GET DONE, RIGHT?

16         **THE WITNESS:**  YOUR HONOR, I'M JUST A DEPUTY SHERIFF

17  FOR L.A. COUNTY.

18  **BY MS. BARLOW**

19  **Q**   CHIEF, DO YOU BELIEVE THAT IF 52,000 PRISONERS WERE RELEASED

20  INTO THE COMMUNITIES, EITHER THROUGH DIVERSION OR SHORTENING OF

21  SENTENCES, OR BY REMOVING THEM FROM PAROLE AND LOWERING PRISON

22  POPULATION, THAT WILL HAVE A NEGATIVE IMPACT ON PUBLIC SAFETY IN

23  LOS ANGELES?

24         **MR. HEATHER:**  OBJECTION.  BEYOND THE SCOPE.

25         **JUDGE HENDERSON:**  SUSTAINED.

1          **MS. BARLOW:** WELL, HE WAS ASKED ABOUT THE SAFETY OF

2  THE RELEASE PROGRAMS, YOUR HONOR.

3  **BY MS. BARLOW**

4  **Q**   DO YOU BELIEVE THAT THAT RELEASE WOULD HAVE AN IMPACT ON

5  YOUR PROGRAMMING?

6          **JUDGE KARLTON:** MA'AM -- I'M SORRY.  GO AHEAD.

7          **JUDGE HENDERSON:** GO ON.

8          **MR. HEATHER:** SAME OBJECTION.

9          **JUDGE HENDERSON:** I THINK WHAT HE WAS GOING TO SAY,

10 IT'S IMPROPER PROCEDURE FOR YOU TO RULE ON THE OBJECTION AND

11 MOVE FORWARD WITHOUT THE COURT'S PARTICIPATION.

12         **MS. BARLOW:** MY APOLOGIES.  I DIDN'T MEAN TO DO THAT,

13 YOUR HONOR.  I APOLOGIZE.

14         **JUDGE KARLTON:** THE OBJECTION NOW IS IT'S BEYOND

15 SCOPE OF REDIRECT.

16         **MS. BARLOW:** THIS IS REDIRECT.  HE WAS ASKING ABOUT

17 THE CBAC PROGRAM.

18         **JUDGE KARLTON:** I MEAN RECROSS.  EXCUSE ME.  AND

19 NOBODY TALKED ABOUT RELEASES FROM PRISON EXCEPT TO THE EXTENT

20 THAT MY QUESTIONS IMPLIED THAT.  THE OBJECTION IS SUSTAINED.

21         **MS. BARLOW:** WITH RESPECT, I SHOULD BE ABLE TO FOLLOW

22 UP ON THE COURTS' QUESTION AS WELL.

23         **JUDGE KARLTON:** OBJECTION IS SUSTAINED.  YOU MAY

24 PROCEED.

25         **MS. BARLOW:** THANK YOU, YOUR HONOR.

 1  **BY MS. BARLOW**

 2  **Q**   CHIEF YIM, THE PROGRAMMING THAT YOU DO PROVIDE, ARE YOU

 3  GOING TO BE ABLE TO CONTINUE TO DO THAT IF YOU ARE HAVING TO

 4  RELEASE MORE PEOPLE EARLY?

 5  **A**   I'M SORRY.  YOU ARE SAYING?

 6  **Q**   THE PROGRAMMING THAT'S PROVIDED TO YOUR SENTENCED INMATES,

 7  ARE YOU GOING TO BE ABLE TO CONTINUE TO DO THAT IF YOU HAVE TO

 8  LET THEM GO AND HOLD MORE PRETRIAL DETAINEES?

 9  **A**   I THINK IT WOULD BE VERY DIFFICULT IF WE DIDN'T HAVE THE

10  ROOM.

11          **MS. BARLOW:**  THANK YOU.  I HAVE NOTHING FURTHER.

12          **JUDGE KARLTON:**  IN THAT REGARD, CHIEF, I DON'T KNOW

13  WHAT TO MAKE OF IT, YOU'RE SAYING THAT THE AVERAGE PERSON WHO'S

14  IN YOUR JAIL IS SERVING 40 DAYS?

15          **THE WITNESS:**  FORTY-TWO DAYS, YES, SIR.

16          **JUDGE KARLTON:**  FORTY-TWO DAYS.  AND BELIEVE THAT

17  EVEN THOUGH IT'S 42 DAYS, YOU ARE ABLE TO PROVIDE SOME BENEFITS

18  BY VIRTUE OF PROGRAMMING?

19          **THE WITNESS:**  YOUR HONOR, ONE DAY OF PROGRAMMING IS

20  BETTER THAN NOTHING.

21          **JUDGE KARLTON:**  OKAY.  I THINK THAT ANSWERS THE

22  QUESTION.

23          **MR. HEATHER:**  NOTHING FURTHER.  THANK YOU.

24          **JUDGE HENDERSON:**  ANY FURTHER CROSS?

25          **MR. HEATHER:**  NO, YOUR HONOR.

1          **JUDGE HENDERSON:**  THANK YOU, CHIEF.

2          **THE WITNESS:**  HAVE A WONDERFUL CHRISTMAS.

3          **JUDGE HENDERSON:**  YOU, TOO.

4          OKAY.  YOU MAY CALL YOUR NEXT WITNESS.

5          **MS. BARLOW:**  LAW ENFORCEMENT INTERVENORS CALL SHERIFF

6   SHERIFF ADAM CHRISTIANSON.

7                        **ADAM CHRISTIANSON,**

8   HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENORS

9   WAS FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

10          **THE CLERK:**  PLEASE STATE AND SPELL YOUR FULL NAME FOR

11  THE RECORD.

12          **THE WITNESS:**  MY NAME IS SHERIFF ADAM

13  C-H-R-I-S-T-I-A-N-S-O-N.

14              **DIRECT EXAMINATION BY MS. BARLOW**

15  **BY MS. BARLOW**

16  **Q**   THANK YOU, SHERIFF.  YOU ARE SHERIFF OF WHAT COUNTY?

17  **A**   STANISLAUS COUNTY.

18  **Q**   HOW LONG HAVE YOU BEEN SHERIFF OF STANISLAUS COUNTY?

19  **A**   SINCE JUNE OF 2006.

20          **MS. BARLOW:**  FOR THE COURT'S REFERENCE, PARAGRAPHS

21  ONE THROUGH TWELVE OF THE DECLARATION OF THE WITNESS CONTAIN

22  DETAILED BACKGROUND AND EMPLOYMENT HISTORY.

23  **BY MS. BARLOW**

24  **Q**   SHERIFF CHRISTIANSON -- I'M GOING TO ASK YOU PUT UP DI 619.

25  COULD YOU JUST -- WHILE HE'S PUTTING THAT UP, COULD YOU JUST

1  GIVE US A BRIEF SUMMARY OF YOUR BACKGROUND AND HISTORY?

2  **A**   YES, MA'AM.  I HAVE BEEN IN W ENFORCEMENT FOR 20 YEARS.

3  OVER THE COURSE OF THAT 20 YEARS, I HAVE WORKED BOTH AS POLICE

4  OFFICER AND DEPUTY SHERIFF.  I'VE HELD SUPERVISORY AND COMMAND

5  LEVEL POSITIONS THROUGHOUT THE ORGANIZATION UP TO AND INCLUDING

6  THE RANK OF LIEUTENANT.  I HAVE BEEN IN CHARGE OF MULTIPLE

7  SPECIALTY TEAMS.  ALSO DID TIME IN HOMELAND SECURITY DOING

8  EMERGENCY RESPONSE PLANNING.  AND IN 2005 WAS WHEN I ELECTED TO

9  RUN FOR SHERIFF.

10 **Q**   OKAY.  DO WE HAVE THE -- I'M STILL WAITING FOR THAT, SO I'LL

11 MOVE ON.  WE'LL COME BACK TO IT.

12            NOW, ARE YOU, AS SHERIFF, ARE YOU INVOLVED IN ANY

13 PROFESSIONAL ORGANIZATIONS?

14            (DOCUMENT DISPLAYED.)

15            **JUDGE KARLTON:**  IT'S UP NOW.

16            **MS. BARLOW:**  THANK YOU.

17 **BY MS. BARLOW**

18 **Q**   THIS IS DEFENDANT'S -- DEFENDANT INTERVENOR'S EXHIBIT 619.

19 IS THIS YOUR CURRICULUM VITAE, SHERIFF CHRISTIANSON?

20 **A**   YES, MA'AM.

21 **Q**   THANK YOU.

22            ARE YOU ON -- AFFILIATED WITH ANY PROFESSIONAL

23 ASSOCIATIONS IN YOUR CAPACITY AS SHERIFF?

24 **A**   I AM AFFILIATED WITH MULTIPLE PROFESSIONS, MOST

25 PREDOMINANTLY CALIFORNIA STATE SHERIFFS' ASSOCIATION.

1  Q   ARE YOU ON THE BOARD OF DIRECTORS OF THE CALIFORNIA STATE

2  SHERIFFS' ASSOCIATION?

3  A   YES, MA'AM.

4  Q   NOW, THE ASSOCIATION DOESN'T -- PERFORMS A NUMBER OF

5  FUNCTIONS, I THINK WE'VE ALREADY HAD SOME TESTIMONY ABOUT THAT,

6  BUT DOES ONE OF THE THINGS THE ASSOCIATION DO IS COMPILE DATA

7  FROM SHERIFF'S DEPARTMENTS ALL OVER THE STATE?

8  A   YES.

9  Q   AND DO THEY COMPILE DATA REGARDING JAIL CAPACITIES AND CAP

10 ORDERS AND SO ON?

11 A   YES, THEY DO.

12 Q   AND SINCE YOU HAVE BEEN ON THE BOARD, ARE YOU FAMILIAR WITH

13 THE WAY THOSE ARE PREPARED?

14 A   YES, I AM.

15 Q   COULD YOU DESCRIBE FOR THE COURT HOW THOSE REPORTS ARE

16 PREPARED BY THE STATE SHERIFFS' ASSOCIATION?

17 A   IN THIS PARTICULAR CASE, STAFF AT THE STATE SHERIFFS'

18 ASSOCIATION, LED BY THE EXECUTIVE DIRECTOR AND THE LEGISLATIVE

19 REPRESENTATIVES, ASKED THE 85 SHERIFFS TO COMPILE DATA SPECIFIC

20 TO EACH ONE OF THEIR AGENCIES.  THAT DATA WAS FORWARDED TO THE

21 STATE SHERIFFS' ASSOCIATION OFFICES IN SACRAMENTO WHERE THE DATA

22 WAS COMPILED AND PUBLISHED BACK OUT TO THE SHERIFF.

23 Q   ALL RIGHT.  SO OTHER THAN DATA ERRORS THAT MAY HAVE COME

24 FROM WITHIN A DEPARTMENT, THEN WHAT THE REPORT SHOWS IS A

25 SUMMARY OF ALL THE DATA THAT WAS RECEIVED FROM THE SHERIFFS

1   AROUND THE STATE?

2   **A**   THAT IS CORRECT.  AND MOST OF THE DATA, ESPECIALLY WITH

3   REGARD TO JAIL BEDS AND THOSE TYPES OF THINGS IS STRAIGHT FROM

4   CSA.  MOST OF IT WAS ACCURATE.

5   **Q**   THE CSA IS CORRECTIONS STANDARDS AUTHORITY?

6   **A**   YES, MA'AM.

7   **Q**   IF WE COULD ASK THAT EXHIBIT DI 774 BE PUT UP?

8           (DOCUMENT DISPLAYED.)

9   **BY MS. BARLOW**

10  **Q**   AND THIS COMPILATION YOU WERE TALKING ABOUT, DOES THAT

11  HAPPEN ON AN ANNUAL BASIS?  THAT HAPPENS ON AN ANNUAL BASIS?

12  **A**   IT DOES, YES.

13  **Q**   THIS IS DI 774, IF YOU COULD --

14          **MR. SANGSTER:**  YOUR HONOR, I'M GOING TO OBJECT.  THIS

15  IS BEYOND THE SCOPE OF THE WITNESS'S DISCLOSED TESTIMONY.  THE

16  COURT ORDERED A DECLARATION BE FILED, AND THIS WAS NOT PART OF

17  THE WITNESS'S DECLARATION.

18          **MS. BARLOW:**  WITH RESPECT, WE WERE TOLD WE WOULD BE

19  ALLOWED LIVE TESTIMONY IN ADDITION TO THAT.  I DON'T KNOW WHAT

20  WOULD BE THE POINT OF HAVING LIVE TESTIMONY IF THEY CAN ONLY SAY

21  WHAT'S IN THE DECLARATION.

22          **JUDGE HENDERSON:**  GO ON.  PROCEED.

23          **MS. BARLOW:**  HE'S JUST AUTHENTICATING THE DOCUMENT.

24  **BY MS. BARLOW**

25  **Q**   IF YOU COULD TAKE A LOOK AT THIS DOCUMENT, SIR, DOES THIS

1  APPEAR TO YOU TO BE THE 2007 COMPILATION OF CSSA DATA?

2  **A**   YES, IT IS.

3  **Q**   IN PARTICULAR, IF WE COULD REFER TO -- THIS IS PAGE 3025

4  THROUGH 3029, I BELIEVE.  SO THIS DATA SHOWS COURT-ORDERED CAPS

5  AND CAPACITIES?

6  **A**   IT DOES.

7  **Q**   AND IT ALSO SHOWS EARLY RELEASES FROM JAILS, CORRECT?

8  **A**   YES, MA'AM.

9  **Q**   ALL RIGHT.  THANK YOU.

10          NOW, IN YOUR JAIL -- HOW BIG IS YOUR JAIL, BY THE

11  WAY?  STANISLAUS COUNTY JAIL, HOW BIG IS IT?

12  **A**   I HAVE THREE FACILITIES IN STANISLAUS COUNTY.  A PRIMARY

13  JAIL, A PUBLIC SAFETY CENTER, WHICH IS OUR NEWEST FACILITY, AND

14  AN HONOR FARM WHICH IS LOCATED IN THE WEST PART OF THE COUNTY.

15  **Q**   AND YOU OPERATE UNDER JAIL CAP, DO YOU NOT?

16  **A**   I DO.

17  **Q**   WHAT DO YOU DO TO COMPLY WITH THAT JAIL CAP?

18  **A**   UNDER THE COURT ORDER, *STANISLAUS VERSUS RODRIGUEZ,* I HAVE A

19  COURT ORDERED CAP OF 1,492.  IN ORDER TO STAY UNDER THAT CAP,

20  THERE'S A NUMBER OF DIFFERENT JAIL ALTERNATIVES, PROGRAMS THAT

21  WE PARTICIPATE IN SO THAT WE CONTROL OUR DAILY INMATE

22  POPULATION.

23  **Q**   AND WHAT KINDS OF PROGRAMS ARE THEY?

24  **A**   I HAVE A HOST OF PROGRAMS THAT ARE ATTACHED TO VARIOUS

25  DISCIPLINES IN THE COMMUNITY, SUCH AS EDUCATION, FAITH-BASED

1  CHARITABLE, CIVIC, BUSINESS.  PRIMARILY, IT FOCUSES ON

2  VOCATIONAL OPPORTUNITIES, EDUCATION, JOB TRAINING.  AND THEY'RE

3  ALL -- THERE ARE ALSO SOME PROGRAMS THAT INVOLVE PARENTING

4  SKILLS, CHILD CARE, DRUG REHABILITATION, MENTAL HEALTH, OR

5  MENTALLY ILL OFFENDER SERVICES.  AND, AGAIN, THOSE ARE ALL

6  PARTNERSHIPS WITH OTHER DISCIPLINES IN THE COUNTY.

7  **Q**   NOW, DO YOU HAVE AN OPINION AS TO WHETHER THE PROGRAMS IN

8  YOUR JAIL CAN BE EXPANDED BEYOND WHAT YOU OFFER NOW?

9  **A**   THEY COULD BE IF THERE WERE ADDITIONAL FUNDING OPPORTUNITIES

10 AVAILABLE SO THAT I COULD HIRE THE STAFF AND THE INFRASTRUCTURE

11 I NEED TO SUPPORT EXPANSION OF THOSE PROGRAMS.

12 **Q**   DO YOU SEE ANY MONEY COMING TO YOU RIGHT NOW TO DO THAT?

13 **A**   OH, NO.  THE STATE HAS TAKEN MONEY AWAY FROM ME.  AND RIGHT

14 NOW I'M LOOKING AT POTENTIALLY CUTTING SERVICES TO THE COMMUNITY

15 AND A REDUCTION IN FORCE BECAUSE OF OUR CURRENT BUDGET CRISIS.

16          **JUDGE REINHARDT:**  I'M SORRY.  I MISSED SOMETHING

17 HERE.  YOU GAVE US FIGURES FOR THE NUMBER OF PEOPLE THAT HAVE TO

18 BE RELEASED DUE TO A CAP ON JAIL POPULATION?

19          **THE WITNESS:**  YES, YOUR HONOR.

20          **JUDGE REINHARDT:**  NOW, THOSE PEOPLE ARE NOT GETTING

21 THE PROGRAMS YOU OFFER?

22          **THE WITNESS:**  WHAT I TRY TO DO, YOUR HONOR, IS I TRY

23 TO TAKE THOSE PEOPLE THAT I'M FORCED TO EARLY RELEASE AND GET

24 THEM INTO PROGRAMS THAT ARE OUT-OF-CUSTODY PROGRAMS.

25          **JUDGE REINHARDT:**  AND THE ONES WHO ARE IN JAIL DO OR

1  DO NOT GET THOSE PROGRAMS?

2          **THE WITNESS:**  THEY DO, YOUR HONOR.  I HAVE MULTIPLE

3  PROGRAMS THAT ARE AVAILABLE TO THOSE WHO ARE IN MY CUSTODY.

4          **JUDGE REINHARDT:**  SO WHETHER THEY ARE IN OR OUT, THEY

5  GET THE PROGRAM?

6          **THE WITNESS:**  WE OFFER THOSE SERVICES, YES, SIR.

7  **BY MS. BARLOW**

8  **Q**   NOW, SHERIFF, DO YOU KNOW HOW MANY -- WHAT PERCENTAGE OF

9  YOUR BOOKINGS LAST YEAR WERE OF PAROLEES?

10 **A**   I DO.

11 **Q**   WHAT WAS THAT PERCENTAGE?

12 **A**   IN 2007, I BELIEVE WE RELEASED -- OR WE SENT APPROXIMATELY

13 1,800 BACK TO CDCR.

14 **Q**   DO YOU KNOW WHAT PERCENTAGE OF YOUR TOTAL BOOKINGS WERE

15 REPRESENTED BY PAROLEES?

16          **JUDGE KARLTON:**  THAT'S WHAT HE SAID, I THOUGHT.

17          **MS. BARLOW:**  HE SAID THERE WERE 1,800 SENT BACK.  I

18 WAS ASKING FOR THE PERCENTAGE.

19          **THE WITNESS:**  I DON'T KNOW WHAT PERCENTAGE OF MY

20 TOTAL BOOKINGS, NO, NOT WITHOUT LOOKING IT UP.  I CAME HERE

21 TODAY WITH A LOT OF NUMBERS.  SO I'LL TRY KEEP THEM STRAIGHT.

22 **BY MS. BARLOW**

23 **Q**   IT'S OKAY.

24          NOW, THE PLAINTIFFS' PROPOSAL IS THAT THE COURT

25 DIVERT OR RELEASE 52,000 PRISONERS FROM STATE PRISON.  AND THE

1  CDCR DATA TELLS ME THAT STANISLAUS COUNTY GETS .14 OF THOSE?

2  **A**   CORRECT.

3  **Q**   OKAY.  SO DO YOU BELIEVE THAT THAT --

4           **JUDGE REINHARDT:**  HOW MANY IS 1.4?

5           **MS. BARLOW:**  IT WORKS OUT TO 728, YOUR HONOR.

6           **JUDGE REINHARDT:**  SEVEN HUNDRED TWENTY-EIGHT, THAT'S

7  OVER TWO YEARS?

8           **MS. BARLOW:**  YES, YOUR HONOR.

9           **JUDGE REINHARDT:**  THANK YOU.

10 **BY MS. BARLOW**

11 **Q**   DO YOU BELIEVE, SIR, THAT THE REINTRODUCTION OF THESE FOLKS

12 INTO YOUR COMMUNITY, 728 OF THEM OVER A TWO-YEAR PERIOD, OVER

13 AND ABOVE WHAT YOU HAVE NOW AND WHAT'S COMING OUT ON A REGULAR

14 BASIS, IS GOING TO HAVE AN IMPACT ON YOUR ABILITY TO PERFORM LAW

15 ENFORCEMENT SERVICES IN STANISLAUS COUNTY?

16 **A**   YES, I DO.

17 **Q**   COULD YOU DESCRIBE WHAT YOU BELIEVE THAT IMPACT WILL BE?

18 **A**   WELL, I BELIEVE THERE'S CERTAINLY AN OPERATIONAL IMPACT FOR

19 ME.  IF I HAVE TO SUDDENLY BECOME RESPONSIBLE FOR ADDITIONAL

20 PEOPLE WHO REQUIRE SOME TYPE OF REHABILITATIVE OR VOCATIONAL

21 SERVICES, CERTAINLY THERE'S AN IMPACT TO THE COMMUNITY BECAUSE

22 WE KNOW THAT A CERTAIN NUMBER ARE GOING TO REOFFEND, ALTHOUGH I

23 THINK THERE'S SOME DEBATE ABOUT EXACTLY WHAT THAT NUMBER IS.

24 BUT, CERTAINLY, BASED UPON OUR EXPERIENCE AND OUR NUMBERS AND

25 THE STAFFING LEVELS WE HAVE BASED UPON, YOU KNOW, THE OPERATION

1  AND THEN THE BOOKINGS AND THE INMATES WHO COME THROUGH THE

2  SYSTEM, WE KNOW THAT THERE'S GOING TO BE A CERTAIN PERCENTAGE

3  THAT ARE GOING TO COME BACK TO US.

4  Q   NOW, DO YOU KNOW -- YOU SAID YOU SENT 1,800 PAROLEES BACK TO

5  PRISON LAST YEAR.  DO YOU KNOW HOW MANY PAROLEES YOU HAD?

6  A   WELL, I CAN TELL YOU WHAT I HAVE RIGHT NOW TODAY.

7  Q   OKAY.

8  A   AND WE CAN, YOU KNOW, FACTOR THAT OUT OR AVERAGE THAT OUT

9  OVER A TWO-YEAR PERIOD OF TIME.  BUT RIGHT NOW, TODAY,

10  12 PERCENT OF MY INMATE POPULATION ARE PAROLEES.  I THINK THAT

11  WORKS OUT TO BE 152 OUT OF 1270.  THAT'S THE NUMBER OF PEOPLE I

12  HAVE IN CUSTODY TODAY.

13          **JUDGE KARLTON:**  AND THOSE ARE PEOPLE YOU HAVE IN

14  CUSTODY BY VIRTUE OF HAVING BEEN VIOLATED FOR ONE REASON OR

15  ANOTHER?

16          **THE WITNESS:**  CORRECT, YOUR HONOR, OR THEY'VE PICKED

17  UP A NEW OFFENSE.

18          **JUDGE KARLTON:**  OKAY.  CAN YOU TELL ME HOW MANY -- DO

19  YOU KNOW HOW MANY ARE NEW OFFENSES AND HOW MANY ARE TECHNICAL

20  VIOLATIONS?

21          **THE WITNESS:**  OUT OF 152 WE DIDN'T BREAK THAT DAWN.

22          **JUDGE KARLTON:**  FAIR ENOUGH.

23  **BY MS. BARLOW**

24  Q   NOW, YOU SAID THERE WOULD BE AN IMPACT.  ARE YOU ABLE TO

25  QUANTIFY THE IMPACT OF THE ADDITIONAL 728 PAROLEES THAT YOU

1    WOULD RECEIVE?

2    **A**    WELL, IF YOU BREAK IT DOWN OVER THE TWO-YEAR TIME PERIOD,

3    THAT'S ABOUT 30 A MONTH BASED UPON THE, YOU KNOW, THE 70 PERCENT

4    RECIDIVISM RATE.  POTENTIALLY, I'M GOING TO SEE 21 OF THE 30

5    COME BACK TO ME.  IF WE SPREAD THAT OUT, IF YOU BREAK IT CLEAR

6    DOWN, I THINK IT ENDS UP BEING .5 PER DAY FOR THE TWO-YEAR

7    PERIOD OF TIME.

8           MOST OF THESE FOLKS DON'T STAY FOR ONE DAY, SO

9    THERE'S GOING TO BE AN IMPACT ON MY ABILITY TO HOUSE THEM.  AND

10   IF YOU HAVE TO HOUSE THEM BECAUSE THEY ARE REPEAT OFFENDERS OR

11   THE OFFENSES THEY'VE COMMITTED ARE MORE SEVERE THAN MY LOWER

12   RISK INMATE POPULATION, I'M GOING TO HAVE TO ACCELERATE OR

13   POTENTIALLY INCREASE MY EARLY RELEASE NECESSITY SO THAT I'M NOT

14   IN VIOLATION OF THE COURT-ORDERED CAP.

15   **Q**    OKAY.  NOW, DO YOU KNOW WHAT PERCENTAGE OF FOLKS IN YOUR

16   JAILS TODAY ARE THERE FOR FELONY ARRESTS AS OPPOSED TO

17   MISDEMEANORS?

18   **A**    I DO.  AS OF TODAY, 90 PERCENT ARE FELONIES, AND THE REST

19   ARE BROKEN DOWN INTO MISDEMEANANTS AND THE PAROLEES I TOLD YOU

20   ABOUT, AND THERE'S ABOUT EIGHT PERCENT OF MY POPULATION TODAY

21   ARE MENTALLY ILL OFFENDERS.

22   **Q**    IS THAT NORMAL, OR DO YOU -- I MEAN, IS IT -- EIGHT PERCENT

23   IS ABOUT YOUR NORMAL FOR MENTALLY ILL OFFENDERS?

24   **A**    IT RUNS ANYWHERE FROM EIGHT PERCENT TO TEN PERCENT, BUT WE

25   KNOW THAT ABOUT 44 PERCENT RIGHT NOW ARE RECEIVING SOME TYPE OF

1  SERVICES THROUGH THE BEHAVIORAL HEALTH AND RECOVERY SERVICES,

2  OUR PARTNERSHIP WITH THE COUNTY, THE COURTS IN STANISLAUS

3  COUNTY, BECAUSE WE HAVE A MENTALLY ILL COURT PROGRAM WHERE WE

4  ARE ACTIVELY ENGAGED IN TRYING TO PROPERLY SUPERVISE, PROVIDE

5  SERVICES AND MEDICATE THESE FOLKS SO THAT I DON'T GET THEM BACK

6  THROUGH THE JAIL SYSTEM AGAIN.

7  **Q**    NOW, I KNOW IN YOUR REPORT -- DECLARATION, YOU WERE

8  CONCERNED ABOUT AN AVERAGE DAILY POPULATION INCREASE?

9  **A**    CORRECT.

10 **Q**    AND THERE WAS SOME SUGGESTION THAT THAT MIGHT BE AS HIGH AS

11 100 TO 200 PER DAY?

12 **A**    CORRECT.

13 **Q**    HOW DO YOU -- HOW CAN YOU ASSESS WHAT THE IMPACT TO YOUR

14 DAILY POPULATION IS?

15 **A**    WELL, I SAT DOWN WITH MY CORRECTION STAFF, THE DIVISION

16 CAPTAIN AND MY LIEUTENANTS, THE MANAGERS, AND WE TOOK

17 STATISTICAL DATA FOR THE LAST 3 YEARS BASED UPON THE NUMBER OF

18 BOOKINGS WE RECEIVED THAT INVOLVED PAROLEES OR STATE PRISON

19 INMATES WHO EITHER WERE BACK ON A TECHNICAL VIOLATION OR A NEW

20 OFFENSE, AND THEN WE TOOK THAT AND LOOKED AT THE DATA WHERE WE

21 SENT THEM BACK TO DVI.

22        SO IT WAS A STATISTICAL AVERAGE BASED ON THOSE THREE

23 YEARS WHERE WE THOUGHT THAT, BASED UPON -- AND I THINK WE WERE

24 USING THE NUMBER 40,000 -- IF THERE WERE 40,000 RELEASED, HOW

25 MANY POTENTIALLY WOULD WE SEE BACK IN STANISLAUS COUNTY.  THAT'S

1  HOW WE CAME TO THOSE NUMBERS THAT WE REFERRED TO OR THAT WERE

2  REFERRED TO IN MY DECLARATION.

3  Q    SO THOSE AVERAGE DAILY POPULATION INCREASES REPRESENT LESS

4  THAN TEN PERCENT OF WHAT'S PROPOSED TO BE RELEASED BACK INTO

5  YOUR COUNTY?

6  A    YES.

7  Q    OKAY.  NOW, IF THERE IS A CAP IMPOSED BY THE COURT ON THE

8  PRISON POPULATION AND YOU ALREADY HAVE A CAP ON YOUR COUNTY JAIL

9  POPULATION, WHAT WILL YOU DO WITH THOSE PRISONERS WHO YOU WOULD

10 OTHERWISE SEND TO STATE PRISON THAT YOU CAN'T SEND?

11 A    I WOULD SUSPECT I WOULD HAVE NO OTHER CHOICE BUT TO KEEP

12 THEM IN MY CUSTODY.  AND, AGAIN, AS PREVIOUSLY MENTIONED, I

13 WOULD HAVE TO ACCELERATE OR CHANGE MY EARLY RELEASE CRITERIA SO

14 THAT, AGAIN, I DON'T BUMP UP AGAINST MY COURT-ORDERED CAP.

15 Q    SO IS THAT PART OF HOW YOU ARRIVED AT THE POTENTIAL IMPACTS

16 BECAUSE OF A LONGER STAY?

17 A    THAT, AND THE FACT THAT RIGHT NOW WE HAVE A JAIL

18 OVERCROWDING PROBLEM, AND I HAVE FACILITIES THAT WERE BUILT IN

19 THE '50'S THAT ARE FAILING, AND WE ARE IN THE PROCESS OF TRYING

20 TO EXPAND OUR FACILITIES.

21       WE JUST COMPLETED A NEEDS ASSESSMENT.  WE ARE IN THE

22 PROGRAMMING PHASE RIGHT NOW WITH A FIRM CALLED KRAUT AND SEIDA

23 (PHONETIC).  THEY CAME IN AND LOOKED AT EVERYTHING AND PROVIDED

24 US WITH A VERY CLEAR PICTURE OF THE NUMBER OF BEDS THAT I NEED

25 TO MEET CAPACITY OR DEMAND, IN ADDITION TO THE NUMBER OF STAFF

```
 1   THAT I NEED TO ENSURE THAT THOSE FACILITIES ARE A SAFE AND

 2   SECURE ENVIRONMENT FOR BOTH THE INMATES AND OUR STAFF.

 3           SO RIGHT NOW, TODAY, THOSE -- THE TOTAL -- THE TOTAL

 4   AMOUNT OF BEDS THAT I NEED IMMEDIATELY ARE 420 MEDIUM TO MAXIMUM

 5   SECURITY BEDS, BUT THE WHOLE PROGRAM GOES UP -- BUMPS ME UP TO

 6   2,200 BEDS TO MEET THE CURRENT DEMAND.

 7           JUDGE KARLTON:  I'M SORRY.  I'VE FORGOTTEN, WHAT DO

 8   YOU HAVE NOW?

 9           THE WITNESS:  RIGHT NOW I'M CAPPED AT 1,492.

10           JUDGE KARLTON:  AND THE SUGGESTION BY THESE PEOPLE

11   WHO STUDIED YOUR PROGRAM IS YOU GOT TO GO UP TO --

12           THE WITNESS:  TWENTY TWO HUNDRED.

13           JUDGE REINHARDT:  DID THEY TELL YOU HOW TO GET THE

14   MONEY?

15           THE WITNESS:  WELL, YOUR HONOR, CONCRETE AND STEEL IS

16   VERY EXPENSIVE, SO IT'S A PHASED -- THAT'S WHY IT'S A PHASED

17   PROJECT, AND IN PHASE ONE WE ARE LOOKING AT 420 MEDIUM TO

18   MAXIMUM SECURITY BEDS.

19           JUDGE KARLTON:  AND HAVE THEY TOLD YOU HOW TO GET THE

20   MONEY FOR THEM?

21           THE WITNESS:  NO, YOUR HONOR, THEY HAVEN'T.  THIS IS

22   GOING TO BE A CHALLENGE.

23   BY MS. BARLOW

24   Q   ASSUMING YOU GET THE MONEY FOR THAT, SHERIFF, WHAT TIMEFRAME

25   ARE YOU LOOKING AT IN TERMS OF BUILDING THAT OUT?
```

1  A    I HOPE TO HAVE THE PROJECT COMPLETED WITHIN THREE YEARS, BUT

2  GIVEN OUR CURRENT ECONOMIC CLIMATE AND THE ECONOMIC UNCERTAINTY,

3  I'M PROBABLY GOING TO PUMP THAT TO FOUR OR FIVE BEFORE WE GET IT

4  DONE.

5  Q    SO IN THE MEANTIME, IF THERE'S A PRISONER RELEASE ORDER, AND

6  YOU GET 728 OVER TWO YEARS AND THEY DO REOFFEND --

7  A    TO SOME EXTENT THERE WILL BE AN IMPACT, YES, AND WE WILL

8  HAVE TO MITIGATE THAT.

9  Q    AND THIS 2,200 BED RECOMMENDATION DIDN'T TAKE INTO ACCOUNT

10  ANY ADDITIONAL PRISONERS FROM A PRISON POPULATION REDUCTION, DID

11  IT?

12  A    NO.  THAT WASN'T EVEN PART OF THE DESIGN OR PROCESS IN WHAT

13  WE'RE DOING NOW.

14  Q    OKAY.  NOW, WITH RESPECT TO THOSE PROGRAMS THAT YOU TALKED

15  ABOUT, ESPECIALLY FOR THE MENTALLY ILL, WOULD YOU EXPECT AN

16  IMPACT TO THOSE PROGRAMS FROM A PRISON RELEASE ORDER IN THIS

17  CASE?

18  A    WELL, CERTAINLY I HAVE ALREADY BEEN IMPACTED.  THE STATE'S

19  BUDGET ELIMINATED A ONE-MILLION-DOLLAR GRANT THAT WE RECEIVED

20  FOR THE MENTALLY ILL OFFENDER GRANT PROGRAM, AND JUST BECAUSE

21  THE FUNDING GOES AWAY DOESN'T MEAN THE PROBLEM GOES AWAY.  SO

22  WHAT I DID WAS I FOUND A WAY, USING EXISTING APPROPRIATIONS, TO

23  MAINTAIN STRENGTH OF THE PROGRAM BECAUSE IT IS SO IMPORTANT.  IT

24  DIRECTLY IMPACTS OUR DAILY INMATE POPULATION AND RECIDIVISM IN

25  THAT PARTICULAR GROUP OF OFFENDERS.

1  Q   AND YOU SAID 44 PERCENT OF THOSE ARE --

2  A   RIGHT NOW ARE RECEIVING SOME TYPE OF MENTAL HEALTHCARE

3  SERVICES BECAUSE OF OUR PARTNERSHIPS WITH THE COURTS, PROBATION,

4  AND THE MENTAL -- THE MENTAL HEALTH, FOR EXAMPLE, IN STANISLAUS

5  COUNTY, WHICH IS STANISLAUS BEHAVIORAL HEALTH AND RECOVERY

6  SERVICES PROGRAM.

7  Q   NOW, IF YOU -- I'M SORRY.  STRIKE THAT.

8          YOU MENTIONED THAT THE CURRENT BUDGET SITUATION MAY

9  INVOLVE HAVING TO CUT BACK ON YOUR STAFFING?

10  A   THE CURRENT BUDGET SITUATION IS BLEAK.  THE COUNTY ISSUED MY

11  BASE ALLOCATION IN THE CURRENT FISCAL YEAR WITH A THREE PERCENT

12  REDUCTION BUILT IN.  THEY JUST TOLD US LAST TUESDAY AT

13  5:00 O'CLOCK I HAVE TO CUT ANOTHER 2.8 PERCENT OF MY BUDGET.  MY

14  OVERALL OPERATING BUDGET IS $93 MILLION.  THEY'RE ASKING ME TO

15  CUT MONEY FROM MY BUDGET THAT I SIMPLY DON'T HAVE.  THE ONLY WAY

16  TO MEET THAT EXPECTATION IS START CUTTING SERVICES TO THE

17  COMMUNITY OR COME UP WITH A REDUCTION-IN-FORCE POLICY.

18          THE LAST THING I WANT TO DO IS REDUCE MY ABILITY TO

19  PROPERLY HOUSE AND MAINTAIN PEOPLE WHO POTENTIALLY POSE A RISK

20  OR THREAT TO THE PUBLIC.  SO, UNFORTUNATELY, THAT MEANS THE

21  OPERATIONS SIDE OF THE HOUSE IS WHERE IT'S GOING TO GET THAT

22  FIRST.  THAT USUALLY INVOLVES CIVILIAN STAFF AND, HOPEFULLY NOT,

23  DEPUTY SHERIFFS.

24  Q   WOULD THAT REDUCTION, DO YOU THINK, IMPAIR YOUR ABILITY TO

25  RESPOND TO ANY ADDITIONAL CRIME WHICH COULD RESULT FROM AN EARLY

 1  RELEASE?

 2  **A**    ABSOLUTELY.  EVERY DAY IS A CHALLENGE, AND THERE'S ALWAYS

 3  GOING TO BE THE CHALLENGE IN MITIGATING PUBLIC SAFETY AND

 4  FINDING SOLUTIONS ON HOW TO PROTECT THE COMMUNITY.

 5           **JUDGE REINHARDT:**  ANY CUT TO YOUR BUDGET FOR ANY SIDE

 6  IS GOING TO AFFECT PUBLIC SAFETY?

 7           **THE WITNESS:**  YES, SIR.

 8           **MS. BARLOW:**  IF I COULD JUST TAKE A MOMENT?

 9           (PAUSE IN PROCEEDINGS.)

10  **BY MS. BARLOW**

11  **Q**    NOW, SHERIFF, DO YOU HAVE A COPY OF YOUR REPORT THERE IN

12  FRONT OF YOU, OR YOUR DECLARATION, RATHER?

13  **A**    I DO.

14  **Q**    IF YOU COULD REFER TO EXHIBIT 2, COULD YOU TELL US WHAT THIS

15  IS?

16  **A**    WHAT --

17  **Q**    EXHIBIT 2 OF YOUR DECLARATION?  IF YOU DON'T HAVE IT, I

18  CAN --

19  **A**    I'M LOOKING AT THE DECLARATION.  I'M TRYING TO FIND EXHIBIT

20  NUMBER 2.

21           **MS. BARLOW:**  MAY I APPROACH, YOUR HONOR?

22           **JUDGE HENDERSON:**  YOU MAY.

23           **THE WITNESS:**  THAT WOULD HELP.  THANK YOU.

24  **BY MS. BARLOW**

25  **Q**    COULD YOU DESCRIBE WHAT EXHIBIT 2 IS AND HOW IT WAS

1  PREPARED?

2  **A**   THIS WAS DONE AT MY DIRECTION.  AGAIN, THE CAPTAIN IN CHARGE

3  OF MY ADULT DETENTION DIVISION, WHICH WAS CORRECTIONS, AND MY

4  LIEUTENANTS, AND I ASKED THEM TO COME UP WITH WHAT THEY THOUGHT

5  WOULD BE THE IMPACTS WITH REGARD TO ANY DECISION ON A PRISONER

6  RELEASE ORDER, AND THIS WAS THEIR IMPACT REPORT TO ME.

7  **Q**   DID YOU REVIEW THE REPORT WITH THEM?

8  **A**   I DID.  I ACTUALLY SAT DOWN AND WORKED WITH THEM ON IT.

9  **Q**   AND DO YOU CONCUR IN THE ASSESSMENT THAT THEY MADE?

10  **A**   ABSOLUTELY.

11  **Q**   EXHIBIT 3 TO YOUR DECLARATION?

12  **A**   COULD YOU MAYBE FIND THAT ONE AGAIN?  CAN YOU DIRECT ME TO

13  IT SO WE DON'T WASTE THE COURT'S TIME?

14          **MS. BARLOW:**  MAY I APPROACH, YOUR HONOR?

15          **THE WITNESS:**  THANK YOU.

16  **BY MS. BARLOW**

17  **Q**   COULD YOU DESCRIBE WHAT EXHIBIT 3 IS?

18  **A**   YEAH.  THESE ARE THE RECOMMENDATIONS THAT WE WANTED TO

19  SUBMIT, BECAUSE I BELIEVE THAT PARTNERSHIPS ARE VERY IMPORTANT

20  AND THAT PARTNERSHIPS ARE A CRITICAL PART OF SOLUTIONS.  AND SO

21  I WANTED TO PROVIDE SOME SOLUTIONS THAT I THOUGHT WOULD WORK IN

22  MITIGATING WHAT'S BEFORE THE COURT.

23  **Q**   OKAY.  CAN I GET THE DECLARATION BACK?

24  **A**   I FOUND IT IN MINE, THANK YOU.

25  **Q**   THANKS.

1          IS IT FAIR TO SAY, SHERIFF CHRISTIANSON, THAT THE

2   SIZE OF THE PROPOSED ORDER OF 52,000 PRISONERS CAUSES YOU

3   GREATER CONCERN THAN EVER BEFORE?

4   **A**   IT DOES.

5   **Q**   AND DO YOU BELIEVE THAT YOU HAVE THE RESOURCES TO HANDLE THE

6   IMPACTS FROM THAT?

7   **A**   I DON'T.

8   **Q**   DO YOU BELIEVE YOUR COMMUNITY HAS THE RESOURCES TO HANDLE

9   THE IMPACTS FROM THAT?

10  **A**   NO, I DO NOT.

11          **MS. BARLOW:**  THANK YOU.  I HAVE NOTHING FURTHER.

12          **MS. TILLMAN:**  NO QUESTIONS, YOUR HONOR.  THANK YOU.

13          **JUDGE HENDERSON:**  THANK YOU.  CROSS?

14          **MR. SANGSTER:**  THANK YOU, YOUR HONOR.  ED SANGSTER

15  FOR THE PLAINTIFFS.

16              **CROSS-EXAMINATION BY MR. SANGSTER**

17  **BY MR. SANGSTER**

18  **Q**   I WANT TO FOLLOW UP ON A COUPLE OF POINTS.

19          FIRST OF ALL, YOU WERE ASKED HOW MANY BOOKINGS THERE

20  WERE OF PAROLEES?

21  **A**   YES.

22  **Q**   IN 2007 THAT WAS ABOUT 1,800?

23  **A**   YES, SIR.

24  **Q**   AND THE TOTAL NUMBER OF ARRESTS, YOU DIDN'T KNOW THE

25  PERCENTAGE, BUT THE TOTAL NUMBER OF BOOKINGS IN 2007 WAS 26,000?

1   **A**   THAT SOUNDS ABOUT RIGHT, WITHOUT REFERRING BACK TO THE

2   DOCUMENTATION.

3   **Q**   SO YOUR PAROLEE BOOKINGS WERE LESS THAN TEN PERCENT OF YOUR

4   TOTAL BOOKINGS?

5   **A**   CORRECT.

6   **Q**   NOW, ON DIRECT, YOU WERE ANSWERING QUESTIONS UNDER THE

7   ASSUMPTION THAT THERE WOULD BE 728 INMATES RETURNED TO YOUR

8   COUNTY.  THAT'S A DIFFERENT NUMBER THAN YOU USED IN YOUR TRIAL

9   DECLARATION, RIGHT?

10  **A**   IT WAS.

11  **Q**   WHAT NUMBER DID YOU USE IN YOUR TRIAL DECLARATION?

12  **A**   AGAIN, IN SITTING DOWN WITH MY CAPTAINS AND MY STAFF, WE

13  BASED OUR NUMBERS ON THE NUMBER OF ACTIVE -- OR THE NUMBER OF

14  BOOKINGS INVOLVING PAROLEES OR PEOPLE WHO HAD BEEN TO PRISON AND

15  THE NUMBER WE SENT BACK.

16          WHAT YOU REFER TO AS 728 IS WHAT CDCR IS TELLING ME

17  THAT STANISLAUS COUNTY HAS RECEIVED BACK, THE 1.4 PERCENT THAT

18  WAS REFERRED TO EARLIER.

19  **Q**   RIGHT.  IN YOUR TRIAL DECLARATION, YOU EXPRESSED THE OPINION

20  THAT A PRISONER RELEASE ORDER WOULD RESULT IN 200 TO 400

21  PAROLEES COMING BACK -- ADDITIONAL PAROLEES COMING BACK TO YOUR

22  COUNTY?

23  **A**   CORRECT.

24  **Q**   WHAT DID YOU DO TO ARRIVE AT THE 200 TO 400 NUMBER?

25  **A**   WE LOOKED AT THE NUMBER OF PAROLEES THAT WE WERE TRACKING

1   THAT WERE COMING BACK OR REOFFENDING THAT WE ACCEPTED INTO OUR

2   SYSTEM, AND EITHER ON NEW OFFENSES OR TECHNICAL VIOLATIONS, AND

3   THEN THOSE THAT WERE SENT BACK.

4   Q   SO DID YOU USE THE SAME PROCESS TO COME UP WITH THE 200 TO

5   400 ESTIMATE AS YOU DID TO COME UP WITH THE 758 ESTIMATE?

6   A   CLEARLY NOT.  THE NUMBERS ARE DIFFERENT.

7   Q   WHICH IS MORE RELIABLE?

8   A   WELL, IT DEPENDS ON WHOSE DATA YOU ARE LOOKING AT, WHETHER

9   WE ARE USING OUR DATA AND METHODOLOGY OF COMING UP WITH AN

10  ESTIMATE OR CDCR'S NUMBER AND THEIR METHODOLOGY OF COMING UP

11  WITH A NUMBER.  EITHER WAY THERE'S A NUMBER.  WE JUST HAVE TO

12  MEET IN THE MIDDLE.

13  Q   THE NUMBER YOU USED FROM YOUR OWN PERSONAL EXPERIENCE --

14  EXCUSE ME.  THE NUMBER YOU CAME UP WITH FROM YOUR PERSONAL

15  EXPERIENCE IN STANISLAUS COUNTY WAS 200 TO 400?

16  A   CORRECT.  THAT'S WHAT I SAID IN THE DECLARATION.  THAT WAS

17  BASED UPON THAT THREE YEARS' WORTH OF DATA THAT WE LOOKED AT IN

18  THE NUMBER OF PAROLEES THAT WENT BACK TO CDCR.

19  Q   I WANT TO TALK ABOUT HOW YOU GET FROM THE 200 TO 400 UP TO

20  THE AVERAGE DAILY POPULATION INCREASE IN YOUR JAIL.  OKAY?

21          THE AVERAGE DAILY POPULATION INCREASE IN YOUR JAIL

22  THAT YOU PROJECT IS 100 TO 200?

23  A   REPEAT THE QUESTION.

24  Q   PART OF IT WAS JUST TRANSITIONING, TELLING YOU WHERE I WAS

25  GOING.  I'M GOING TO TALK TO YOU ABOUT THE AVERAGE DAILY

1   POPULATION INCREASE.

2   **A**    THAT WE POTENTIALLY SEE BECAUSE OF A RELEASE ORDER?

3   **Q**    YES.

4   **A**    OKAY.

5   **Q**    THE NUMBER IS 100 TO 200, RIGHT?

6   **A**    OKAY.

7   **Q**    SO, IN A SENSE -- IN ESSENCE, YOU'RE SAYING ONE OUT OF EVERY

8   TWO PAROLEES IS GOING TO END UP IN YOUR JAIL AND INCREASE YOUR

9   AVERAGE DAILY POPULATION?

10  **A**    WELL, WHETHER YOU BASE THE NUMBERS ON OUR STATISTICS OR

11  CDCR'S STATISTICS, WE KNOW THAT WE'RE GOING TO GET A CERTAIN

12  NUMBER OF PEOPLE BACK IN THE COMMUNITY.

13  **Q**    WELL, AGAIN, I'M JUST FOCUSING ON THE OPINION YOU GAVE UNDER

14  PENALTY OF PERJURY WHEN YOU SUBMITTED YOUR DECLARATION FOR THIS

15  CASE.

16          **MS. BARLOW:**  BASED ON A 40,000 PERSON PRISONER

17  RELEASE ORDER.

18  **BY MR. SANGSTER**

19  **Q**    CAME UP WITH -- OKAY.  I WANT TO FIND OUT -- I WANT TO

20  EXPLORE HOW YOU COME UP WITH ROUGHLY ONE OUT OF EVERY TWO

21  PAROLEES ENDING UP INCREASING YOUR AVERAGE DAILY POPULATION?

22          **JUDGE KARLTON:**  LET'S STOP THERE.  DO YOU AGREE IT'S

23  ONE OUT OF EVERY TWO?

24          **THE WITNESS:**  I WOULD, YOUR HONOR, I THINK THAT'S A

25  REASONABLE ESTIMATE.

1          **JUDGE KARLTON:**  ALL RIGHT.  NOW YOU CAN GO AHEAD.

2  **BY MR. SANGSTER**

3  **Q**   HOW LONG ARE PAROLEES IN YOUR JAIL?

4  **A**   DEPENDS UPON WHY THEY ARE IN MY CUSTODY.

5  **Q**   ON AVERAGE, HOW LONG ARE YOUR INMATES IN YOUR JAIL ON

6  AVERAGE, GENERAL POPULATION?

7  **A**   IT'S ALL OVER THE BOARD.  IT DEPENDS UPON WHETHER OR NOT

8  THEY HAVE REOFFENDED AND THEIR CRIMINAL HISTORY --

9          **JUDGE KARLTON:**  NO.  HE'S SAYING FORGETTING ABOUT

10  PAROLEES.  GENERALLY, HOW MANY PEOPLE?  HOW LONG DOES YOUR

11  GENERAL POPULATION REMAIN IN JAIL?  IS THAT YOUR QUESTION,

12  COUNSEL?

13          **MR. SANGSTER:**  YES, SIR.

14          **THE WITNESS:**  I DON'T HAVE A SPECIFIC ANSWER FOR YOU,

15  YOUR HONOR, I DON'T HAVE THOSE STATISTICS.

16  **BY MR. SANGSTER**

17  **Q**   IT'S LESS THAN A YEAR, CORRECT?

18  **A**   AGAIN, I CAN TELL YOU THAT RIGHT NOW, TODAY, 90 PERCENT OF

19  MY INMATES ARE IN ON FELONY CHARGES.  WHERE THEY COME OUT OF THE

20  SYSTEM, THERE'S A NUMBER OF DIFFERENT CONTRIBUTING FACTORS, FROM

21  THE NEW OFFENSE OR REOFFENSE, FROM WARRANTS, TO THE COURT'S

22  DECISION, TO PROBATION'S DECISION.  THERE'S A NUMBER OF

23  DIFFERENT THINGS THAT -- OR DIRECTIVES THAT DICTATE TO US HOW

24  LONG THEY STAY.

25  **Q**   SO THE -- I GUESS THE BOTTOM LINE IS YOU JUST DON'T KNOW?

1  **A**   YOU ARE ABSOLUTELY CORRECT.  WE DON'T TRACK THAT DATA.

2  **Q**   ALL RIGHT.  SO TAKING YOUR ESTIMATE OF 200 TO 400, HOW DID

3  YOU GET TO THE 100 TO 200 PER AVERAGE DAILY POPULATION INCREASE?

4  **A**   WE BASE THAT AMOUNT ON THE NEW NUMBERS THAT CDCR WAS GIVING

5  US ABOUT WHAT THEIR STATISTICS WERE.  AT THE TIME WE LOOKED AT

6  OUR NUMBERS WE DIDN'T HAVE THEIRS.

7  **Q**   OKAY.  BUT -- I KNOW WHAT NUMBERS YOU LOOKED AT.  I WANT YOU

8  TO TELL THE COURT HOW YOU GOT THERE.  WHAT PROCESS DID YOU

9  FOLLOW?

10  **A**   WE TOOK THREE YEARS' WORTH OF OUR DATA, AND WE PROJECTED

11  WHAT WE THOUGHT WOULD COME BACK TO STANISLAUS COUNTY BASED ON

12  THE KNOWN NUMBERS THAT WE HAVE, AND THAT'S HOW WE THOUGHT WE

13  WOULD GET ANYWHERE FROM 200 TO 400 PER YEAR BACK IN STANISLAUS

14  COUNTY.

15  **Q**   THEN YOU TOOK SOME SET OF NUMBERS TO COME UP WITH A 100 TO

16  200 INCREASE IN THE AVERAGE DAILY POPULATION, AND WHAT I WANT TO

17  FIND OUT IS HOW YOU GOT FROM THE 200 TO 400 COMING BACK TO YOUR

18  COUNTY, TO INCREASING YOUR AVERAGE DAILY POPULATION BY 100 TO

19  200?

20         **MS. BARLOW:**  ASKED AND ANSWERED.

21         **JUDGE HENDERSON:**  OVERRULED.  CAN YOU TELL US THAT,

22  SHERIFF?

23         **THE WITNESS:**  AGAIN, MR. SANGSTER, I'M NOT SURE THAT

24  I UNDERSTAND WHERE YOU'RE GOING.  I GAVE YOU A SET OF NUMBERS

25  BASED UPON WHAT MY STAFF PULLED TOGETHER IN A DECLARATION.

1          **JUDGE KARLTON:**  IS YOUR ANSWER --

2          **THE WITNESS:**  CDCR GIVES US NEW NUMBERS.  HERE WE

3  ARE.

4          **JUDGE KARLTON:**  IS YOUR ANSWER, THAT'S WHAT MY STAFF

5  CAME UP WITH, AND I REALLY CAN'T TELL YOU HOW THEY CAME UP WITH

6  THAT NUMBER?

7          **THE WITNESS:**  THAT WOULD BE APPROPRIATE, YOUR HONOR.

8          **MR. SANGSTER:**  NO FURTHER QUESTIONS, YOUR HONOR.

9          **JUDGE KARLTON:**  I HAVE -- MAY NOT HAVE ANYTHING TO DO

10  WITH ANYTHING, BUT I'M NOT CLEAR.

11          IF IT IS CORRECT THAT YOU ESTIMATED 100 TO 200 BASED

12  ON YOUR OWN NUMBERS AND DOUBLE THAT BASED UPON CDCR'S NUMBERS --

13  IS THAT ESSENTIALLY RIGHT?

14          **THE WITNESS:**  THE LOWER NUMBERS, YOUR HONOR, ARE

15  BASED UPON WHAT CDCR IS TELLING US COMES BACK.  OUR HIGHER

16  NUMBERS ARE BASED UPON WHAT WE -- BASED UPON WHAT WE SENT BACK.

17          **JUDGE KARLTON:**  I THINK IT'S VICE VERSA.

18          **THE WITNESS:**  OKAY.

19          **JUDGE KARLTON:**  THIS IS NOT UNIMPORTANT.  I'M REALLY

20  TRYING TO UNDERSTAND.  I HAD UNDERSTOOD THAT IT WENT UP BECAUSE

21  CDCR'S NUMBERS WERE GREATER THAN YOURS.  IS THAT WRONG OR RIGHT,

22  IF YOU KNOW?  IF YOU DON'T, YOU KNOW --

23          **THE WITNESS:**  WHAT I'M GOING OFF OF, YOUR HONOR, IS

24  THAT 1.4 PERCENT.  THAT'S WHAT THEY'RE TELLING US CAME BACK.  IT

25  SEEMS THOSE NUMBERS ARE MORE ACCURATE THAN OURS.

1          **JUDGE KARLTON:**  AND IF THOSE NUMBERS INDICATE A

2    HIGHER RETURN, DOES THAT MEAN -- I'M ASKING YOU, NOT TELLING

3    YOU -- DOES THAT MEAN THAT THERE ARE A SUBSTANTIAL NUMBER OF

4    PAROLEES THAT YOU DON'T SEE BECAUSE YOU DIDN'T EVEN KNOW THEY

5    WERE BEING RETURNED TO THE COUNTY?

6          **THE WITNESS:**  YES, YOUR HONOR, THAT WOULD BE A FACTOR

7    AS WELL.

8          **JUDGE HENDERSON:**  YOU SAID 1.4.  DID YOU MEAN THAT,

9    OR DID YOU MEAN .14?

10          **THE WITNESS:**  1.4 PERCENT OF CDCR'S POPULATION COMES

11    BACK TO STANISLAUS COUNTY.

12          **JUDGE HENDERSON:**  OKAY.

13          **REDIRECT EXAMINATION BY MS. BARLOW**

14          **MS. BARLOW:**  ONE QUICK FOLLOW-UP QUESTION, YOUR

15    HONOR.

16    **BY MS. BARLOW**

17    **Q**   CHIEF, WHEN YOU DID THE ANALYSIS AND CALCULATIONS THAT ARE

18    REFLECTED IN YOUR DECLARATION, THAT WAS ON THE ASSUMPTION THAT

19    THE RELEASE ORDER WOULD BE 40,000, NOT 52, CORRECT?

20    **A**   THAT'S CORRECT.

21          **MS. BARLOW:**  I HAVE NOTHING FURTHER.

22          **JUDGE HENDERSON:**  THANK YOU FOR TESTIFYING, SHERIFF

23    CHRISTIANSON.  YOU ARE EXCUSED.

24          **THE WITNESS:**  THANK YOU, YOUR HONOR.

25          **JUDGE HENDERSON:**  CALL YOUR NEXT WITNESS.

1        **MS. BARLOW:**  LAW ENFORCEMENT INTERVENORS CALL SHERIFF

2   MARTIN RYAN.

3                        **MARTIN RYAN**

4   HAVING BEEN CALLED AS A WITNESS BY THE DEFENDANT INTERVENORS

5   WAS FIRST DULY SWORN AND EXAMINED AS FOLLOWS:

6            **THE CLERK:**  SPELL AND STATE YOUR FULL NAME FOR THE

7   RECORD.

8            **THE WITNESS:**  MY NAME IS MARTIN RYAN.  FIRST NAME

9   M-A-R-T-I-N.  LAST NAME IS RYAN, R-Y-A-N.

10              <u>**DIRECT EXAMINATION BY MS. BARLOW**</u>

11  **BY MS. BARLOW**

12  **Q**   THANK YOU, SHERIFF.

13            WHAT COUNTY ARE YOU SHERIFF OF?

14  **A**   I'M THE SHERIFF/CORONER OF AMADOR COUNTY.

15  **Q**   HOW BIG IS AMADOR COUNTY?

16  **A**   WE HAVE A POPULATION OF 38,000, INCLUDING THE STATE PRISON

17  POPULATION, AND SQUARE MILES ABOUT 640.

18           **MS. BARLOW:**  FOR THE COURT'S REFERENCE, THE WITNESS'S

19  DECLARATION, PARAGRAPHS 1 THROUGH 9, CONTAIN A SUMMARY OR DETAIL

20  OF HIS BACKGROUND, AND DEFENDANT'S EXHIBIT 623 IS HIS CURRICULUM

21  VITAE.

22           DO YOU HAVE ANY OBJECTION TO THAT?

23           **MR. SANGSTER:**  NO OBJECTIONS.

24           **MS. BARLOW:**  THANK YOU.

25

1  **BY MS. BARLOW**

2  **Q**   COULD YOU DESCRIBE, SHERIFF, JUST BRIEFLY YOUR HISTORY AND

3  BACKGROUND FOR THE COURT?

4  **A**   CERTAINLY.  I STARTED MY CAREER IN 1975 AS THE CHIEF

5  INVESTIGATOR FOR THE AMADOR COUNTY DISTRICT ATTORNEY'S OFFICE.

6  I THEN WENT TO THE CALIFORNIA DEPARTMENT OF JUSTICE, WHERE I

7  SPENT THE NEXT 25 YEARS WORKING MY WAY UP THE RANKS THROUGH THAT

8  TIME.  SPENT THE LAST SEVEN YEARS AS THE CHIEF OF THE ATTORNEY

9  GENERAL'S BUREAU OF INVESTIGATION.  RETIRED IN 2005 FROM THAT

10 POSITION TO RUN FOR SHERIFF OF AMADOR COUNTY.

11         **JUDGE REINHARDT:**  YOU FORGET TO ASK HIM WHERE HE WENT

12 TO SCHOOL.

13         **JUDGE KARLTON:**  SHE'S GOING TO.

14         **MS. BARLOW:**  NO, IT'S IN THE CV, I THINK.

15         **JUDGE REINHARDT:**  IT WASN'T IN THE OTHERS?

16         **MS. BARLOW:**  I JUST WANTED A SUMMARY, YOUR HONOR.

17         **JUDGE KARLTON:**  LET'S GO ON.

18 **BY MS. BARLOW**

19 **Q**   COULD YOU DESCRIBE WHAT YOUR DUTIES ARE AS SHERIFF/CORONER

20 OF AMADOR COUNTY?

21 **A**   YES.  I'M RESPONSIBLE FOR PUBLIC SAFETY FOR THE COUNTY.  I'M

22 ALSO SERVING AS THE CORONER; RESPONSIBLE FOR CRIMINAL

23 INVESTIGATIONS; THE JAIL FACILITY; CIVIL PROCESS SERVING; AND

24 GENERAL LAW ENFORCEMENT.

25 **Q**   ALL RIGHT.  NOW -- SO, DO YOU WORK WITH THE POLICE

1  DEPARTMENTS THAT ARE WITHIN YOUR CITY -- WITHIN YOUR COUNTY,

2  RATHER?

3  **A**   YES, VERY MUCH SO.

4  **Q**   DO YOU PROVIDE SERVICES FOR ANY OF THE CITIES WITHIN THE

5  COUNTY, OTHER THAN GENERAL COUNTY?

6  **A**   WE HAVE TWO CONTRACT CITIES THAT WE PROVIDE SERVICE TO.

7  **Q**   AND THOSE ARE WHICH CITIES?

8  **A**   THE CITIES OF PLYMOUTH AND THE CITY OF AMADOR CITY.

9  **Q**   YOU HAVE A JAIL FACILITY IN AMADOR COUNTY?

10 **A**   YES.

11 **Q**   WHAT IS YOUR JAIL CAPACITY, RATED CAPACITY?

12 **A**   OUR RATED CAPACITY IS 76 BEDS; 65 MALE BEDS, 11 FEMALE BEDS.

13 **Q**   NOT VERY BIG, IS IT?

14 **A**   NO, MA'AM.

15 **Q**   OKAY.  AT THE PRESENT TIME DO YOU KNOW WHAT PERCENTAGE OF

16 PEOPLE ARE BEING HELD IN YOUR JAIL ON FELONY CHARGES OR -- ON

17 FELONY CHARGES?  SORRY.

18 **A**   THE LAST NUMBER I HAD WAS 80 PERCENT WERE FELONS AWAITING

19 SENTENCING OR SENTENCED.

20 **Q**   AND THEN ARE YOU AT OR ABOVE CAPACITY, OR ARE YOU BELOW

21 CAPACITY WITH RESPECT TO EITHER --

22 **A**   WE GENERALLY, ON AVERAGE, HISTORICALLY RUN BETWEEN 10 TO

23 15 PERCENT ABOVE CAPACITY.  THEN, IN ADDITION TO THAT, ANOTHER

24 TEN PERCENT ON AVERAGE ARE ON OUR WORK RELEASE, HOME ELECTRONIC

25 MONITORING, OTHER METHODS TO KEEP THEM OUT OF THE FACILITY.

1  Q    AND, CURRENTLY, ARE YOU ABOVE CAPACITY FOR YOUR FEMALE

2  INMATES?

3  A    AS OF TODAY, WE HAVE 11 FEMALE BEDS, I HAVE 23 FEMALES IN

4  THE FACILITY.

5  Q    HAVE YOU HAD TO TAKE STEPS TO ADDRESS THE OVERAGE, IF YOU

6  WILL?

7  A    WE HAVE -- AS I SAID EARLIER, WE DO HOME ELECTRONIC

8  MONITORING, WORK FURLOUGH PROGRAMS, CITATION-RELEASE, SHERIFF'S

9  PAROLE, ALL THE AVENUES THAT ARE AVAILABLE TO US WE TRY TO

10 UTILIZE.

11 Q    OKAY.  DO YOU EVER EXPAND THE WOMEN PRISONERS INTO ANOTHER

12 PORTION OF THE JAIL IF THEY GET TOO BIG?

13 A    REGULARLY.  THAT'S THE PROBLEM WE HAVE.  WE HAVE SO MANY

14 HOUSING UNITS.  NORMALLY, THE FEMALES TAKE UP ONE.  THEY ARE NOW

15 TAKING UP TWO.  SO WE ARE COMPACTING THE MALE PRISONERS INTO THE

16 THREE REMAINING AREAS.

17 Q    DOES THAT IMPACT YOUR ABILITY TO SEGREGATE YOUR PRISONERS

18 FOR SAFETY REASONS?

19 A    ABSOLUTELY.

20 Q    LET'S TALK ABOUT YOUR STAFFING.  YOU'RE -- FOR THE JAIL AT

21 LEAST.  WE'LL JUST TALK ABOUT THAT FOR A MINUTE.

22        WHAT'S YOUR CURRENT STAFFING LEVEL AT THE JAIL?  ARE

23 YOU AT WHAT YOUR AUTHORIZED POSITIONS ARE, OR ARE YOU BELOW?

24 A    WE ARE DOWN IN THOSE POSITIONS.  I WAS AUTHORIZED 20

25 CORRECTIONAL OFFICERS.  I'M DOWN A COUPLE OF POSITIONS THERE.

 1  I'M DOWN TWO EXTRA HELP TRANSPORT OFFICERS.  I'M DOWN TWO

 2  SERGEANT POSITIONS OUT OF SIX.

 3  **Q**   ARE THERE -- DO YOU KNOW WHAT THE REASON IS THAT YOU ARE

 4  DOWN OFFICERS?

 5  **A**   I'M SORRY?

 6  **Q**   WHAT'S THE REASON THAT YOU ARE DOWN?

 7  **A**   RETIREMENTS.  THE BUDGET IS SUCH WE HAVE BEEN FROZEN FOR ANY

 8  VACANCIES THAT OCCUR, AS WELL AS POSITIONS THAT HAVE BEEN

 9  DEFUNDED BY THE BOARD OF SUPERVISORS.

10          **JUDGE KARLTON:**  I'M SORRY.  DEFUNDED BY?

11          **THE WITNESS:**  THE BOARD OF SUPERVISORS.

12  **BY MS. BARLOW**

13  **Q**   AND IN YOUR VIEW, IS THE CAPACITY OF YOUR JAIL ADEQUATE FOR

14  YOUR NEEDS?

15  **A**   NO, MA'AM, IT'S NOT.  AS A MATTER OF FACT, THE RECENT JAIL

16  NEEDS ASSESSMENT WE DID IN OUR EFFORTS TO ACQUIRE ASSEMBLY BILL

17  900 FUNDING FOR LOCAL JAIL FACILITY RATED OUR NEED AT 165 BEDS

18  FOR THE YEAR 2010.

19  **Q**   ONE HUNDRED SIXTY-FIVE BEDS?

20  **A**   YES, MA'AM.

21  **Q**   SO THAT'S 90 SOME MORE THAN YOU ALREADY HAVE, RIGHT?

22  **A**   THAT'S CORRECT.

23  **Q**   AND I'M ASSUMING THAT IF YOU HAD ADDITIONAL BEDS, YOU

24  WOULDN'T NEED TO USE SOME OF THE ALTERNATIVE PROGRAMS YOU TALKED

25  ABOUT?

1   **A**   HOPEFULLY, FOR A WHILE UNTIL WE GET CAUGHT UP WITH

2   POPULATION, YES.

3   **Q**   AND IF YOU HAD THOSE ADDITIONAL BEDS -- WELL, FIRST OF ALL,

4   HOW LONG DO YOU THINK IT MIGHT BE BEFORE YOU GET THOSE

5   ADDITIONAL BEDS?

6   **A**   IT'S IFFY AT THIS POINT.  PART OF ASSEMBLY BILL 900 PROCESS

7   WAS PARTICIPATION IN A REENTRY FACILITY IN ORDER TO BE QUALIFIED

8   TO EVEN GET CONSIDERED FOR THE LOCAL JAIL CONSTRUCTION FUNDS.

9   WE DID GET CONDITIONAL FUNDING BASED UPON OUR PARTICIPATION IN

10  REENTRY WITH SAN JOAQUIN AND CALAVERAS COUNTIES, BUT THE CONCERN

11  FOR THE BOARD NOW, THE 25 PERCENT MATCH OF OUR $30 MILLION

12  PROJECT, WHEN THEY ARE IN THE PROCESS OF LAYING PEOPLE OFF,

13  WHERE THAT MONEY IS GOING TO COME FROM.

14  **Q**   SO EVEN IF YOU -- EVEN IF ALL THE AB 900 WENT FORWARD, YOU

15  MIGHT NOT BE ABLE TO MEET YOUR MATCH?

16  **A**   THAT IS A VERY REAL POSSIBILITY.

17  **Q**   OKAY.  SO OUTSIDE OF THE JAIL ARE YOU DOWN IN YOUR STAFFING

18  AT ALL?

19  **A**   YES, WE ARE.

20  **Q**   AND WHAT KIND OF -- AT WHAT LEVEL ARE YOU DOWN?

21  **A**   I HAVE AN ALLOCATED NUMBER OF DEPUTY SHERIFFS AT 32.  I

22  HAVE -- BY THE END OF THIS YEAR, I'M GOING TO HAVE, I BELIEVE,

23  FIVE VACANCIES IN THOSE AREAS.  WITH THAT, AGENCY WIDE, AT THE

24  END OF THE YEAR, I'M GOING TO BE DOWN 15 POSITIONS OUT OF 116,

25  ASSUMING NO FURTHER CUTS.

1  Q   CAN YOU ASSUME NO FURTHER CUTS?

2  A   WHAT'S THAT?

3  Q   CAN YOU ASSUME NO FURTHER CUTS?

4  A   NO, BECAUSE WE DON'T KNOW YET WHAT THE STATE OF CALIFORNIA

5  IS GOING TO DO TO OUR FUNDING SOURCES.

6  Q   OKAY.  NOW, YOU GET A PARTICULAR KIND OF FUNDING FOR A SMALL

7  COUNTY, RIGHT, CALLED RURAL CRIMES FUNDING?

8  A   WE GET A HALF MILLION DOLLARS ANNUALLY, ALONG WITH THE OTHER

9  36 SMALLEST COUNTIES IN THE STATE, TO ASSIST US WITH OUR RURAL

10 CRIME ISSUES, A HALF MILLION DOLLARS.

11 Q   IS THAT RURAL CRIMES FUNDING ON THE CHOPPING BLOCK FOR THE

12 CURRENT BUDGET?

13 A   VERY MUCH SO.  IN ALL THE NEGOTIATIONS WE HAVE BEEN

14 FOLLOWING, IT IS ZERO BALANCE AND OUT.

15 Q   SO IF THAT MONEY IS LOST, WHAT KIND OF AN IMPACT IS THAT

16 GOING TO HAVE ON YOUR STAFFING?

17 A   WE ARE IN DEEP TROUBLE.  I HAVE A $14-MILLION BUDGET THAT'S

18 BEING CUT REGULARLY AS WE SPEAK NOW.  THAT'S A HALF MILLION

19 DOLLARS OUT OF THAT 14, IN ADDITION TO THE $300,000 IN COPS

20 MONIES THAT WE GET AS WELL THAT'S ALSO UNDER ATTACK, AND I COULD

21 BE DOWN 800,000.

22 Q   LET'S TALK AGAIN ABOUT THE AB 900 REENTRY PROGRAM.  IN

23 CONNECTION WITH THAT PROGRAM, DID YOU ASSIST IN PREPARING A

24 PROPOSAL TO CDCR WITH RESPECT TO THE CREATION OF A REENTRY

25 PROGRAM?

1  **A**   YES.

2  **Q**   AND YOU SAID THAT WAS JOINTLY WITH AMADOR -- I'M SORRY --

3  WITH SAN JOAQUIN AND CALAVERAS COUNTIES; IS THAT CORRECT?

4  **A**   THAT'S CORRECT.

5  **Q**   HOW IS THAT -- EXACTLY WHAT WAS THE PROCESS BY WHICH YOU

6  WERE ASSESSING WHAT YOU WOULD NEED TO DO TO CREATE A REENTRY

7  FACILITY?

8          **MR. SANGSTER:**  OBJECTION.  IRRELEVANT.  OBJECTION.

9  IRRELEVANT.

10         **JUDGE HENDERSON:**  GO ON.  YOU CAN ANSWER.

11         **THE WITNESS:**  THE REASON FOR THE REENTRY WAS TO TRY

12  TO GET SOME TRAINING AND COUNSELING TO PEOPLE COMING OUT OF CDCR

13  THAT WOULD BE RETURNING TO THE THREE COUNTIES SO THEY WOULD BE

14  BETTER PREPARED TO ENTER SOCIETY AND BE SUCCESSFUL, THEREBY

15  CUTTING DOWN THE RECIDIVISM RATE.

16         **MR. SANGSTER:**  MOVE TO STRIKE.  NON-RESPONSIVE.

17         **JUDGE HENDERSON:**  OVERRULED.

18  **BY MS. BARLOW**

19  **Q**   WILL YOU MEET WITH CDCR AND EVALUATE DATA TO DETERMINE WHAT

20  THE NEEDS MIGHT BE OF PEOPLE COMING BACK INTO A REENTRY

21  FACILITY?

22  **A**   YES.

23  **Q**   DID THEY PROVIDE YOU WITH WHAT'S CALLED COMPAS ASSESSMENT

24  DATA AS PART OF THAT PROCESS?

25  **A**   YES, THEY DID.

1   Q    IF WE COULD PUT UP DI 647?

2            MR. SANGSTER:  YOUR HONOR, WE HAVE -- I UNDERSTAND

3   SOME OF THE OBJECTIONS ARE RESERVED, BUT WE'VE OBJECTED TO THIS

4   ON THE GROUNDS IT'S HEARSAY AND AN IMPROPER COMPILATION.  THE

5   UNDERLYING DATA WAS NEVER PROVIDED.

6            MS. BARLOW:  THESE ARE REPORTS FROM CDCR, AND

7   MR. LEWIS HAS INDICATED TO ME THESE ARE OFFICIAL RECORDS OF

8   CDCR, YOUR HONOR.  IF WE NEED TO CALL SOMEBODY OR GET A

9   DECLARATION, I GUESS WE CAN DO THAT, BUT THAT SEEMS --

10           MR. SANGSTER:  THE DEFENDANTS HAVE ACTUALLY AGREED

11  THAT THESE ARE ONLY TO BE CONSIDERED FOR A LIMITED PURPOSE.

12           MS. BARLOW:  THAT'S ALL I'M ASKING HIM ABOUT.

13           JUDGE KARLTON:  LET'S FIND OUT WHAT THE LIMITED

14  PURPOSE IS.

15           MR. SANGSTER:  THE LIMITED PURPOSE IS TO SHOW THERE

16  IS, IN FACT, A RISK ASSESSMENT PROGRAM IN PLACE.

17           JUDGE HENDERSON:  WOULD YOU AGREE WITH THAT?

18           MS. BARLOW:  THAT'S NOT WHAT THIS WITNESS GOT THEM

19  FOR.

20           JUDGE HENDERSON:  HE SAID THERE WAS AN AGREEMENT THAT

21  THESE WOULD BE INTRODUCED FOR A LIMITED PURPOSE.  HE STATED HIS

22  UNDERSTANDING.  DO YOU DISAGREE?

23           MS. BARLOW:  NOBODY ASKED ME ABOUT SUCH AN AGREEMENT,

24  YOUR HONOR.  IT'S THE FIRST I HEARD OF IT.

25           JUDGE HENDERSON:  WHO DID YOU ENTER INTO THE

1   AGREEMENT WITH?

2         **MR. SANGSTER:**  MAY I LET MS. EVENSON RESPOND ON THIS,

3   YOUR HONOR?  I KNOW IT'S MY WITNESS, BUT SHE'S THE ONE WHO

4   HANDLED THIS.

5         **JUDGE HENDERSON:**  OKAY.

6         **MS. EVENSON:**  JUST BRIEFLY, YOUR HONOR.  DEFENDANTS

7   OFFERED THIS SAME EXHIBIT, AND PLAINTIFFS OBJECTED, AND IN THE

8   MEET AND CONFER PROCESS, AND I BELIEVE A FINAL DOCUMENT WAS

9   FILED WITH THE COURT, WITH RESPECT TO THE OBJECTIONS, AND THE

10  RESPONSES TO OBJECTIONS TO DEFENDANT'S EXHIBITS, AND IN THAT

11  DOCUMENT MY UNDERSTANDING IS THAT DEFENDANTS AGREED TO THE USE

12  OF THESE DOCUMENTS ONLY FOR THE VERY LIMITED PURPOSE TO SHOW

13  THAT THEY WERE DOING THE RISK ASSESSMENT, BUT NOT FOR THE TRUTH

14  OF THE MATTERS CONTAINED IN THEM.

15        **MS. BARLOW:**  I AM NOT OFFERING THEM FOR THE TRUTH OF

16  THE MATTERS CONTAINED IN THEM, YOUR HONOR.

17        **JUDGE HENDERSON:**  ARE YOU OFFERING THEM TO SHOW THEY

18  ARE DOING THE RISK ASSESSMENT?

19        **MS. BARLOW:**  NO, YOUR HONOR.  IT HAS TO DO WITH AB

20  900 REENTRY AND HOW HE FORMED HIS OPINIONS IN THIS MATTER, THE

21  INFORMATION THAT HE WAS USING.

22        **JUDGE KARLTON:**  I DON'T UNDERSTAND.  MS. EVENSON SAID

23  "THE DEFENDANTS."  BUT YOU SAY YOU DIDN'T KNOW ANYTHING ABOUT

24  IT.

25        **JUDGE REINHARDT:**  SHE SAID THE STATE.

1          **JUDGE KARLTON:**  NO, SHE DIDN'T.  SHE SAID "THE

2   DEFENDANTS."

3          **MS. BARLOW:**  YOUR HONOR, I'VE NEVER SEEN SUCH A

4   STIPULATION.  I HAVE NEVER BEEN ASKED TO AGREE TO ONE.  THAT MAY

5   HAVE BEEN ENTERED INTO WITH RESPECT TO PHASE ONE.  I DON'T KNOW.

6          **MR. LEWIS:**  YOUR HONOR, IF I MIGHT?  KYLE LEWIS FOR

7   THE STATE DEFENDANTS.

8          THIS DOCUMENT THAT'S UP RIGHT NOW IS ACTUALLY NOT A

9   DEFENDANT DOCUMENT.  THIS IS DEFENDANT INTERVENOR DOCUMENT.

10          COMPAS DATA WAS RELEASED.  IT WAS RELEASED TO SHOW

11   THE CAPABILITIES OF THE SYSTEM.  THERE IS NO INDICATION THAT

12   IT'S INACCURATE FOR ANY REASON WHATSOEVER.  IT WAS VERIFIED BY

13   TOM HOFFMAN.  IT IS IN HIS AFFIDAVIT.

14          BUT THIS INFORMATION RIGHT HERE THAT IS BEING RELIED

15   UPON APPARENTLY BY THE WITNESS IS IN THE CONTROL OF THE WITNESS

16   AND THE DEFENDANT INTERVENOR, NOT THE STATE.  THIS IS A

17   COMPLETELY DIFFERENT EXHIBIT THAN THAT WAS --

18          **JUDGE KARLTON:**  ARE YOU TELLING ME THAT THE STATE

19   DOESN'T VERIFY THIS IS A DOCUMENT OF THE STATE?

20          **MR. LEWIS:**  IT'S NOT A STATE DEFENDANT --

21          **JUDGE KARLTON:**  I BELIEVE THAT.  IT'S LATE IN THE

22   AFTERNOON, AND I'M REALLY STARTING TO LOSE IT.

23          SIR, DO YOU -- ARE YOU NOT PREPARED TO SAY THAT THIS

24   DOCUMENT WAS PREPARED BY THE STATE?

25          **MR. LEWIS:**  THIS DOCUMENT RIGHT HERE, TO MY

 1  KNOWLEDGE, WAS NOT PREPARED BY THE STATE.  THIS DOESN'T EVEN

 2  HAVE OUR -- THE EXHIBIT NUMBER ON IT IS NOT OUR EXHIBIT NUMBER.

 3          **JUDGE HENDERSON:**  LET'S TAKE THIS OFF THE SCREEN AND

 4  MOVE ON.

 5  **BY MS. BARLOW**

 6  **Q**   SHERIFF RYAN, DID YOU RECEIVE THIS DOCUMENT FROM CDCR?

 7  **A**   YES, MA'AM.

 8  **Q**   AND WHAT WAS THE PURPOSE OF THE DOCUMENT, TO YOUR

 9  UNDERSTANDING?

10  **A**   IT WAS RECEIVED IN CONNECTION WITH THE REENTRY FACILITY TO

11  TRY TO IDENTIFY RISK ASSOCIATED WITH THOSE COMING OUT OF THE

12  FACILITY THAT THE REENTRY PIECE WOULD HAVE TO IDENTIFY AND

13  TREAT.

14  **Q**   SO FOR PURPOSES OF PLANNING WHAT YOU WOULD DO IN A REENTRY

15  FACILITY, THAT'S WHY YOU GOT THE DATA?

16  **A**   THE SORT OF SERVICES THAT WOULD BE REQUIRED, YES.

17  **Q**   OKAY.  AND THEN DID YOU RECEIVE FURTHER DATA LATER?

18          THAT DOCUMENT, YOUR HONOR, ON 647 WAS FROM AUGUST OF

19  '07.

20          IS THAT CORRECT?

21  **A**   TO THE BEST OF MY RECOLLECTION, YES.

22  **Q**   AND DID YOU RECEIVE ADDITIONAL DATA OF A SIMILAR NATURE FROM

23  CDCR AFTER THAT DATE?

24  **A**   I RECEIVED TWO ADDITIONAL COMPAS ASSESSMENTS IN 2008.

25  **Q**   OKAY.

1          COULD WE PUT UP 468, PLEASE?

2          **JUDGE HENDERSON:** ARE WE GOING TO HAVE THE SAME

3   PROBLEM?

4          **MS. BARLOW:** I JUST WANT TO HAVE HIM IDENTIFY IT,

5   YOUR HONOR. WE CAN ARGUE ABOUT ITS ADMISSIBILITY LATER.

6          **JUDGE KARLTON:** I'M GOING TO ASK AGAIN. 648 -- PUT

7   IT UP SO HE CAN LOOK AT IT. IT SEEMS TO ME WHAT -- WELL, NEVER

8   MIND.

9          **MR. LEWIS:** THIS DOES APPEAR TO BE A COMPAS

10  ASSESSMENT, YOUR HONOR, BUT IT IS NOT INFORMATION PRODUCED BY

11  THE STATE DEFENDANTS IN THE COURSE OF DISCOVERY.

12         **JUDGE KARLTON:** I BELIEVE THAT. MY QUESTION IS

13  DIFFERENT. IS THIS A DOCUMENT PRODUCED BY THE STATE?

14         **MR. LEWIS:** YES, IT IS, YOUR HONOR.

15         **JUDGE KARLTON:** AND YOU GOT IT FROM THE STATE?

16         **THE WITNESS:** YES, YOUR HONOR.

17         **MS. BARLOW:** MAY I PROCEED? THANK YOU, YOUR HONOR.

18  **BY MS. BARLOW**

19  **Q**   AND WAS THIS DATA ALSO PART OF HOW YOU WERE EVALUATING WHAT

20  TO DO WITH THE FOLKS WHO MIGHT END UP IN A REENTRY FACILITY IN

21  AMADOR COUNTY?

22  **A**   YES, MA'AM.

23  **Q**   DID YOU USE THIS DATA, AS WELL AS THE PRIOR DATA, IN

24  FORMULATING SOME OF YOUR OPINIONS ABOUT THE IMPACT OF A PRISON

25  RELEASE ORDER?

1          **JUDGE KARLTON:**  THAT'S BEGGING TO HAVE THAT TESTIMONY

2    STRICKEN.

3          YOU USED THIS DATA TO MAKE YOUR DECISIONS ABOUT WHAT

4    YOU NEEDED TO DO, RIGHT?

5          **THE WITNESS:**  YOUR HONOR, I USED ALL THREE REPORTS

6    COMBINED, YES, SIR.

7          **JUDGE KARLTON:**  ALL RIGHT.  NOW WE HAVE A PROBLEM.

8          **MS. BARLOW:**  IF WE COULD PUT UP 649, PLEASE?

9          **MR. SANGSTER:**  SAME OBJECTION, YOUR HONOR.

10          **JUDGE HENDERSON:**  PROCEED.  YOU'LL HAVE A RUNNING

11   OBJECTION ON THIS AREA.

12          **JUDGE KARLTON:**  LET'S FIND OUT WHAT THE STATE SAYS.

13          **MR. LEWIS:**  YES, YOUR HONOR.  IT APPEARS TO BE A CDCR

14   DOCUMENT, BUT IT WAS NOT PRODUCED BY THE STATE DEFENDANTS.

15          **JUDGE KARLTON:**  BUT YOU RECEIVED THIS DOCUMENT FROM

16   CDCR?

17          **THE WITNESS:**  YES, YOUR HONOR.

18          **MS. BARLOW:**  FINALLY, IF WE COULD PUT UP 650?

19          (DOCUMENT DISPLAYED.)

20   **BY MS. BARLOW**

21   **Q**   NOW, THIS IS A -- PURPORTS TO BE, AND I'LL ASK MR. LEWIS TO

22   CONFIRM, STATEWIDE SUMMARY OF COMPAS RISK ASSESSMENT DATA,

23   CORRECT?

24   **A**   YES, MA'AM.

25   **Q**   AND YOU USED JUST THE PORTION RELATING TO AMADOR COUNTY IN

1  YOUR OPINIONS, CORRECT?

2  **A**   THAT'S CORRECT.

3  **Q**   ALL RIGHT.

4           **MS. BARLOW:**  DO YOU WANT HIM TO CONFIRM THIS IS A

5  STATE DOCUMENT, YOUR HONOR?

6           **JUDGE KARLTON:**  I THINK THIS HAS COME IN BEFORE, HAS

7  IT NOT?  NO?  BUT THERE'S NO OBJECTION, SO LET'S GO ON.

8           **MR. SANGSTER:**  THERE WAS AN OBJECTION, YOUR HONOR.  I

9  THOUGHT I HAD A STANDING OBJECTION.

10          **JUDGE HENDERSON:**  I HAVE SAID HE HAD A STANDING

11  OBJECTION.

12          **JUDGE KARLTON:**  I DIDN'T UNDERSTAND THERE WAS AN

13  OBJECTION.

14          **MR. LEWIS:**  YOUR HONOR, IF I COULD CLARIFY?  THIS WAS

15  A DOCUMENT THAT WAS PRODUCED.  IT IS ON STATE DEFENDANTS'

16  CURRENT EXHIBIT LIST.  THIS IS ONE OF THE COMPAS DOCUMENTS.  THE

17  OTHER ONES WERE NOT PRODUCED BY THE STATE DEFENDANTS.

18          **JUDGE KARLTON:**  WE'LL HAVE TO SORT IT OUT IN DUE

19  COURSE, MA'AM.  YOU MAY PROCEED.

20  **BY MS. BARLOW**

21  **Q**   NOW, WITHOUT KNOWING THAT THE STATE PRODUCED THESE, BUT

22  WITHOUT BEING ABLE TO TELL -- SAY PERSONALLY THAT THE DATA IN

23  THEM IS CORRECT, WHAT DID YOU USE THE DATA FOR?

24  **A**   I TRIED TO TAKE A LOOK AT WHAT THE NUMBERS WERE FOR AMADOR

25  COUNTY WITH REGARDS TO THE RISK THAT WE COULD EXPECT FROM PEOPLE

1  RELEASED FROM STATE PRISON INTO OUR COMMUNITY AND THE SORT OF

2  SUPPORT MECHANISMS THAT THEY WOULD NEED.

3  **Q**   OKAY.  AND DID YOU USE OTHER DATA IN TRYING TO ASSESS WHAT

4  KIND OF IMPACTS THERE WOULD BE?

5  **A**   THE OTHER DATA HAPPENED TO BE THE STAFFING LEVELS OF THE

6  OTHER AGENCIES THAT WOULD BE IMPACTED BY THE RELEASE.

7  **Q**   AND YOUR HISTORY WITH PAROLEES IN GENERAL, IS THAT SOMETHING

8  YOU ALSO CONSIDERED?

9  **A**   YES, MA'AM.

10  **Q**   DO YOU KNOW HOW MANY PAROLEES YOU HAD IN AMADOR COUNTY IN

11  APPROXIMATELY 2007/2008 TIMEFRAME?

12  **A**   WHEN I CHECKED THE WEBSITE, THE NUMBERS FOR JUNE --

13          **MR. SANGSTER:**  EXCUSE ME, YOUR HONOR.  LACKS

14  FOUNDATION, PERSONAL KNOWLEDGE AND THE ANSWER WAS

15  NON-RESPONSIVE.

16          **JUDGE HENDERSON:**  WHOSE WEBSITE DID YOU CHECK?

17          **THE WITNESS:**  IT WAS CDCR'S AND PAROLE'S WEBSITE,

18  YOUR HONOR.

19          **JUDGE HENDERSON:**  WE'VE ALLOWED THIS IN THE PAST.  GO

20  ON.

21  **BY MS. BARLOW**

22  **Q**   GO AHEAD.  YOU CAN ANSWER THE QUESTION.  WHAT DID YOU

23  DETERMINE FROM THAT?

24  **A**   I LOST MY TRAIN OF THOUGHT NOW.

25  **Q**   HOW MANY PAROLEES DID YOU HAVE IN AMADOR COUNTY?

1  **A**  WE HAD, ACCORDING TO THE JUNE '07 REPORT, 151 PAROLEES.

2  **Q**  AND HOW MANY PAROLEES WERE ARRESTED IN AMADOR COUNTY IN

3  2007?

4  **A**  WE HAD A TOTAL OF 74 ARRESTS.

5  **Q**  AND HOW MANY OF THOSE PAROLEES -- HOW MANY PAROLEES TOTAL

6  WERE ARRESTED ON NEW CHARGES IN 2007?

7  **A**  THERE WERE 43.

8  **Q**  NOW, HAVE YOU COME TO A CONCLUSION ABOUT HOW MANY PERSONS

9  YOU WOULD GET BACK INTO AMADOR COUNTY, EITHER THROUGH DIVERSION,

10 EARLY RELEASE, OR ANY OF THE OTHER METHODOLOGIES PROPOSED BY

11 PLAINTIFFS, IF 52,000 PEOPLE ARE REDUCED FROM THE PRISON

12 POPULATION?

13 **A**  BASED ON OUR ONE PERCENT OF THE STATE PRISON POPULATION, I

14 EXPECT TO GET 52.

15          **JUDGE HENDERSON:**  DO YOU HAVE ONE PERCENT OF THE

16 STATE'S PRISON POPULATION, SIR?

17          **THE WITNESS:**  YES, YOUR HONOR.

18          **JUDGE HENDERSON:**  AMADOR COUNTY HAS ONE PERCENT?

19          **THE WITNESS:**  (NODS HEAD.)

20          **JUDGE HENDERSON:**  I'M JUST ASKING.

21          **THE WITNESS:**  YES, YOUR HONOR.

22          **JUDGE HENDERSON:**  OKAY.

23 **BY MS. BARLOW**

24 **Q**  THAT'S 52 ADDITIONAL TO THE 150 OR SO YOU HAVE NOW?

25 **A**  THAT WOULD BE MY UNDERSTANDING, YES.

1  Q    AND DO YOU EXPECT THAT 52 PEOPLE RELEASED INTO YOUR

2  COMMUNITY, ON TOP OF WHAT YOU ALREADY HAVE, OVER THE SPACE OF

3  TWO YEARS IS GOING TO HAVE AN IMPACT ON LAW ENFORCEMENT OR CRIME

4  IN THE COMMUNITY?

5  A    ABSOLUTELY.  THAT'S A 25 PERCENT INCREASE OVER TWO YEARS IN

6  OUR CURRENT PAROLEE POPULATION.

7  Q    TWENTY-FIVE PERCENT INCREASE OVER TWO YEARS?

8  A    YES.

9  Q    I'M SURE PLAINTIFFS' COUNSEL IS GOING TO ASK YOU, SO I'M

10 JUST GOING TO ASK YOU MYSELF.  FIFTY-TWO PEOPLE DOESN'T SEEM

11 LIKE THAT MANY PEOPLE, SHERIFF.

12         **JUDGE HENDERSON:**  THAT'S NOT A BASIS FOR YOU

13 QUESTIONING, TO ANTICIPATE --

14         **JUDGE KARLTON:**  I MEAN, IF YOU HAVE A QUESTION, YOU

15 CAN ASK.

16         **MS. BARLOW:**  I'M ASKING.  I'M JUST ASKING.

17         **JUDGE HENDERSON:**  THE EDITORIAL, YOU DON'T HAVE TO DO

18 THAT.

19         **MS. BARLOW:**  I APOLOGIZE.

20 **BY MS. BARLOW**

21 Q    COULD YOU EXPLAIN TO THE COURT WHY YOU THINK THERE WILL BE

22 AN IMPACT EVEN IF IT'S ONLY 52 PEOPLE?

23 A    BASED ON THE RESOURCES AVAILABLE TO DEAL WITH THAT

24 POPULATION, NOT ONLY WITHIN MY PARTICULAR AGENCY, BUT AS FAR AS

25 THE DISTRICT ATTORNEY, THE COURT'S BEHAVIORAL HEALTH, PROBATION,

1   ALL THE PEOPLE THAT WILL BE IMPACTED, THEY'RE SHORT STAFFED AND

2   LOSING STAFF AS WE SPEAK, AND WE DON'T HAVE ENOUGH, REALLY, TO

3   HAVE A GOOD HANDLE ON THE NUMBER OF PEOPLE WE HAVE CURRENTLY.

4   Q    SO IF YOU GOT 52 CUMULATIVELY, WHAT KIND OF RECIDIVISM RATE

5   WOULD YOU EXPECT FOR THEM?

6   A    BASED ON THE DATA THAT I LOOKED AT, WE ARE LOOKING AT ABOUT

7   60 PERCENT RECIDIVISM OF THOSE PEOPLE.

8   Q    SO 60 PERCENT OF 52, WHAT DOES THAT DO TO YOUR JAIL

9   POPULATION?

10  A    CONSIDERING 10 TO 15 PERCENT OVER ALREADY, NOT KNOWING WHAT

11  THE POPULATION IS GOING TO DO IN THE NEXT TWO YEARS DURING THE

12  COURSE OF THIS, WE ARE GOING TO BE EXCESSIVELY OVER.  I WOULD

13  EXPECT THAT MY NUMBER OF FELON POPULATION, THE PERCENTAGE WOULD

14  GO UP OVER 80 PERCENT.  WE WOULD BE RELEASING MORE AND MORE

15  SIGNIFICANT OFFENDERS IN THE COMMUNITY.

16  Q    SHERIFF, DID YOU MEAN TO SAY .1 PERCENT OF THE POPULATION --

17  A    I'M SORRY  .1 PERCENT.  I APOLOGIZE.

18  Q    ONE-TENTH OF ONE PERCENT?

19           **JUDGE HENDERSON:**  OKAY.  THANK YOU.

20  **BY MS. BARLOW**

21  Q    BACK UP.  HOW EXACTLY WAS THE COMPAS DATA THAT WAS SPECIFIC

22  TO AMADOR COUNTY RELEVANT TO YOUR ASSESSMENT OF THE IMPACTS?

23  A    WHAT I DID WAS I TOOK THE DATA, TOOK THE PERCENTAGES THAT

24  CAME OUT OF THERE THAT I COULD ANTICIPATE AND APPLIED THAT TO

25  OUR NUMBERS.  USING THAT, I CAME UP WITH AN APPROXIMATION OF THE

1  NEEDS OF THOSE INDIVIDUALS, AND ALSO THE RECIDIVISM RISK.

2  **Q**   SO YOU WERE -- AND IF I'M WRONG TELL ME.  YOU WERE

3  ANTICIPATING THAT PEOPLE THAT MIGHT GET RELEASED EARLY THROUGH A

4  CAP OR OTHER KIND OF ORDER WOULD BE SIMILAR TO WHAT CDCR WAS

5  PROPOSING TO GO INTO REENTRY FACILITIES?

6  **A**   THAT IS CORRECT.  I KNOW THAT EVEN WITHOUT THE REENTRY

7  FACILITIES, THE PEOPLE THAT ARE GETTING RELEASED CURRENTLY,

8  BASICALLY, GET A BUS TICKET AND $200.  THEY HAVE NO REENTRY,

9  WHICH WOULD BE VERY SIMILAR TO WHAT WE ARE LOOKING AT WITH THIS

10  POPULATION, IF I UNDERSTAND IT CORRECTLY.

11  **Q**   OKAY.  AND DID THAT DATA INFORM YOUR DECISION ABOUT HOW MUCH

12  OF AN IMPACT YOU MIGHT HAVE?

13  **A**   IT DID, IN A LOT OF DIFFERENT AREAS.

14  **Q**   AND IS THAT DESCRIBED IN YOUR DECLARATION?

15  **A**   YES, MA'AM, IT IS.

16        **MS. BARLOW:**  I HAVE NOTHING FURTHER.  THANK YOU.

17        **JUDGE HENDERSON:**  OKAY.  ANYTHING FROM STATE

18  DEFENDANT?

19        **MR. LEWIS:**  NOTHING, YOUR HONOR.  THANK YOU.

20        **JUDGE HENDERSON:**  OKAY.  CROSS-EXAMINATION.

21        **MR. SANGSTER:**  THANK YOU, YOUR HONOR.  ED SANGSTER

22  FOR THE PLAINTIFFS.

23        **JUDGE KARLTON:**  WILL YOU LIFT THAT MICROPHONE, SIR?

24  THANK YOU.

25        **MS. BARLOW:**  I APOLOGIZE FOR BEING SO SHORT.

1                **CROSS-EXAMINATION BY MR. SANGSTER**

2    **BY MR. SANGSTER**

3    **Q**   IS THE 52 PEOPLE BASED ON ONE PERCENT OR .1 PERCENT?

4    **A**   .1 PERCENT.

5    **Q**   OKAY.  YOU SAID THAT YOUR JAIL IS REGULARLY OVERCAPACITY BY

6    10 TO 15 PERCENT.  WHAT KINDS OF PROBLEMS DOES THAT CREATE FOR

7    YOU?

8    **A**   IT CREATES CLASSIFICATION -- NOT CLASSIFICATION, BUT

9    SEGREGATION ISSUES FOR US.  IT CREATES SAFETY ISSUES, NOT ONLY

10   FOR STAFF, BUT INMATES ALIKE.  IT CAUSES US DIFFICULTY WITH

11   REGARDS TO PROVIDING PROGRAMMING.  IT CAUSES US PROBLEMS IN

12   STAFFING WHEN WE HAVE TO PULL PEOPLE OUT TO TRANSPORT TO COURT.

13   THERE'S A LOT OF --

14   **Q**   SO YOU START ENCOUNTERING SAFETY ISSUES AT 10 TO 15 PERCENT

15   ABOVE RATED CAPACITY?

16   **A**   THEY ARE AGGRAVATED AT THAT LEVEL.  THEY ARE ALWAYS EXISTING

17   IN A FACILITY.  THERE'S ALWAYS A DANGER INVOLVED.

18   **Q**   OKAY.  YOU TALKED ABOUT THE NUMBER OF ARRESTS THAT WERE MADE

19   OF PAROLEES.  WHAT WAS THAT NUMBER?

20   **A**   THE NUMBER WAS 74 FOR 2007.

21   **Q**   AND HOW MANY PEACE OFFICERS IN AMADOR COUNTY MAKE ARRESTS,

22   THAT IS, ARE BOOKED INTO THE AMADOR COUNTY JAIL?

23   **A**   I'VE GOT 50 STAFF, INCLUDING MYSELF.  THE POLICE DEPARTMENT

24   IN IONE HAS SEVEN, INCLUDING THE CHIEF.  THE POLICE DEPARTMENT

25   IN JACKSON HAS 11, INCLUDING THE CHIEF.  AND I BELIEVE THE

1  POLICE DEPARTMENT IN SUTTER CREEK HAS EIGHT, INCLUDING THE

2  CHIEF.  AND HIGHWAY PATROL IS ALSO THERE.

3  **Q**   ALL RIGHT.  SO YOU'VE GOT ROUGHLY 70 PEOPLE, PLUS THE

4  HIGHWAY PATROL, MAKING ARRESTS THAT ARE BOOKED INTO AMADOR

5  COUNTY JAILS?

6  **A**   ASSUMING WE ARE FULLY STAFFED, THAT IS CORRECT.  ACTUALLY,

7  SOME OF THOSE ARE NOT -- SOME OF THOSE OFFICERS THAT WE HAVE ARE

8  ASSIGNED TO COURT RESPONSIBILITY, OR ASSIGNED TO ADMINISTRATION,

9  OR ASSIGNED TO A NARCOTICS TASK FORCE.

10 **Q**   WHAT I WANT TO GIVE THIS COURT IS SOME SENSE OF HOW MANY

11 PEOPLE ARE MAKING THE ARRESTS IN AMADOR COUNTY.

12 **A**   PATROL STAFF -- EXCUSE ME.  PATROL STAFF IS ALLOCATED AT 32

13 LESS COURT SECURITY STAFF.  I WOULD SAY 30, 30 DEPUTIES ON THE

14 ROAD CERTAIN SHIFTS.

15 **Q**   SO 50 PEOPLE MAKING THE ARRESTS, PLUS THE HIGHWAY PATROL?

16 **A**   THAT'S MY BEST ESTIMATE, YES, SIR.

17 **Q**   IN THE COURSE OF THE YEAR, THOSE 50 PEOPLE ARRESTED 74

18 PAROLEES?

19 **A**   YES, SIR.

20 **Q**   DID THE 74 PAROLEES INCLUDE ARRESTS BY PAROLE AGENTS?

21 **A**   I DIDN'T SEE ANY ON THE PRINTOUT.  I TAKE THAT BACK.  I

22 BELIEVE THERE WAS ONE.

23 **Q**   WELL, YOU TOLD THE COURT ON DIRECT THAT THERE WERE 43

24 ARRESTS OF PAROLEES DURING THE COURSE OF THE YEAR, AND I TAKE IT

25 THAT'S 43, WHICH THE ROUGHLY 50 OFFICERS --

1  **A**  THOSE ARE 43 OF THE 74 ON FRESH CHARGES IN ADDITION TO

2  THE --

3  **Q**  IS THE NUMBER 43 OR 23?

4  **A**  THE NUMBER IS 43.

5  **Q**  IN 2007 THE NUMBER IS 43?

6  **A**  YES.

7  **Q**  I'D LIKE TO SHOW YOU A COPY OF YOUR DECLARATION.

8        **MS. BARLOW:**  WE ISSUED AN ERRATA TO THE DECLARATION

9  THAT COUNSEL WAS NOTIFIED ABOUT.

10       **MR. SANGSTER:**  I'M SORRY.

11       **JUDGE HENDERSON:**  SHE SAID SHE ISSUED AN ERRATA WHICH

12 WAS SERVED TO YOU THAT WOULD CORRECT, I ASSUME, WHATEVER YOU

13 WERE ABOUT TO DO.

14       **MR. SANGSTER:**  OKAY.

15 **BY MR. SANGSTER**

16 **Q**  DO YOU REMEMBER SEEING AN ERRATA -- SIGNING SOMETHING, SIR,

17 THAT CORRECTED YOUR DECLARATION FROM 23 TO 43?

18 **A**  I DON'T RECALL IF I SIGNED IT OR NOT.  THERE'S A DISCUSSION

19 ABOUT IT WITH COUNSEL, BUT I DON'T RECALL IF IT SIGNED IT.

20 **Q**  AT ANY RATE, THE TOTAL NUMBER OF ARRESTS OF PAROLE --

21       **JUDGE KARLTON:**  YOU MIGHT AS WELL DO WHATEVER YOU

22 WERE GOING TO DO, AND THEN COUNSEL WILL DEMONSTRATE THE ERRATA

23 SHEET.

24       **MR. SANGSTER:**  AT 20 ARRESTS, YOUR HONOR.  I THINK

25 I'M GOING TO MOVE ON.  IT'S A DIFFERENCE BETWEEN 23 AND 43 --

1          **JUDGE REINHARDT:**  IT'S NOT EARTHSHAKING, RIGHT?

2          **MR. SANGSTER:**  PARDON ME?

3          **JUDGE REINHARDT:**  IT'S NOT GOING TO BE DECISIVE IN

4    THIS CASE.

5          **MR. SANGSTER:**  THAT'S -- I JUST WANTED TO GET THE

6    CORRECT NUMBER.

7          **JUDGE REINHARDT:**  GO AHEAD.  THAT'S FINE.

8    **BY MR. SANGSTER**

9    **Q**   AT ANY RATE, HOW MANY TOTAL ARRESTS ARE BOOKED INTO AMADOR

10   COUNTY JAIL?

11   **A**   WE HAD -- I DID THE FELONY COUNT THE OTHER DAY.  I HAVE 876

12   FELONIES IN 2007.

13   **Q**   HOW MANY TOTAL ARRESTS?

14   **A**   I DON'T HAVE THAT NUMBER OFF THE TOP OF MY HEAD.

15   **Q**   ARE YOU ABLE TO TELL US WHETHER IT'S -- THE TOTAL NUMBER IS

16   DOUBLE THE NUMBER OF FELONY ARREST?

17   **A**   I CANNOT.

18   **Q**   AT ANY RATE, THE NUMBER OF PAROLEE ARRESTS WAS A VERY SMALL

19   PERCENTAGE OF THE BOOKING OF THE TOTAL ARRESTS; YOU WOULD AGREE

20   WITH THAT?

21   **A**   THE 74 ARRESTS REPRESENT, I BELIEVE, EIGHT AND A HALF

22   PERCENT OF THE TOTAL FELONY ARRESTS, YES.

23   **Q**   ALL RIGHT.  JUST THE FELONY ARRESTS?

24   **A**   CORRECT.

25   **Q**   NOW, IN YOUR DECLARATION YOU TALKED ABOUT THE IMPACT ON THE

 1   LOCAL PROSECUTORS.

 2   **A**   RIGHT.

 3   **Q**   THERE'S SEVEN CRIMINAL PROSECUTORS?

 4   **A**   I JUST TALKED TO THE DA, AND HE'S DOWN TO SIX WITH THE

 5   BUDGET CUTS.

 6   **Q**   AND SO THEY ARE DOING -- AT LEAST AT THE TIME YOU SIGNED

 7   YOUR DECLARATION TWO MONTHS AGO, THEY WERE DOING CLOSE TO 400

 8   CASES APIECE?

 9   **A**   THAT'S CORRECT.

10   **Q**   AND SO IF EVERY NEW CRIME COMMITTED BY A PAROLEE WAS

11   PROSECUTED, THOSE PROSECUTIONS WOULD AMOUNT TO ABOUT ONE PERCENT

12   OF THE PROSECUTORS' CASELOAD?

13           **MS. BARLOW:**  ASSUMES FACTS NOT IN EVIDENCE, THAT THEY

14   ARE ALL GOING TO BE ARRESTED EACH TIME THEY COMMIT A CRIME.

15           **JUDGE KARLTON:**  IT'S NOT AN OBJECTION.

16           **MS. BARLOW:**  IT ASSUMES FACTS NOT IN EVIDENCE.

17           **JUDGE HENDERSON:**  OVERRULED.  YOU MAY ANSWER THE

18   QUESTION.

19           **THE WITNESS:**  WOULD YOU REPEAT THE QUESTION, SIR?

20   **BY MR. SANGSTER**

21   **Q**   THERE'S ABOUT 3,000 PROSECUTIONS ONGOING AT ANY ONE TIME,

22   RIGHT?

23   **A**   THAT'S CORRECT.

24   **Q**   AND EVEN IF YOU -- EVEN IF EVERY SINGLE PAROLEE WAS

25   PROSECUTED ALL AT THE SAME TIME, THE PROSECUTIONS OF PAROLEES

1    WOULD BE TAKING UP LESS THAN ONE PERCENT OF THE PROSECUTORS'

2    CASELOAD, RIGHT?

3    **A**    ASSUMING THEY ONLY COMMIT ONE.

4    **Q**    ASSUMING WHAT?

5    **A**    ASSUMING THEY ONLY COMMIT ONE CRIME AND ARRESTED ONCE, YES.

6    **Q**    YOU ALSO TALKED ABOUT THE IMPACT ON PROBATION IN YOUR

7    DECLARATION.  THERE ARE 14 PROBATION OFFICERS?

8    **A**    THEY HAVE BEEN CUT TO 11.

9    **Q**    OKAY.  YOU HAVE -- HOW MANY PEOPLE ARE ON PROBATION IN

10   AMADOR COUNTY RIGHT NOW?

11   **A**    I DO NOT HAVE THAT NUMBER.

12   **Q**    DO YOU REMEMBER TELLING THE COURT IN YOUR DECLARATION THAT,

13   AT LEAST WHEN THERE WERE 14 OF THEM, THERE WERE 300 CASES PER

14   PROBATION OFFICER?

15   **A**    THAT NUMBER, IT WAS THE NUMBER I GAVE YOU AT THE TIME, YES.

16   **Q**    ALL RIGHT.  SO NOW IT'S GONE UP BECAUSE YOU HAVE FEWER

17   PROBATION OFFICERS?

18   **A**    RIGHT.  THEY ARE DISTRIBUTING THE 900 ADDITIONAL THROUGH 11

19   PEOPLE.

20   **Q**    THE NUMBER OF PEOPLE ON PROBATION IN YOUR COUNTY DWARFS THE

21   NUMBER OF PEOPLE ON PAROLE, DOESN'T IT?

22   **A**    THAT'S A FAIR STATEMENT, YES.

23            **MR. SANGSTER:**  THAT'S ALL THE QUESTIONS I HAVE FOR

24   THIS WITNESS, YOUR HONOR.

25            **JUDGE HENDERSON:**  ANYTHING FROM CCPOA?

1          **MS. LEONARD:**  NO, YOUR HONOR.

2          **JUDGE HENDERSON:**  REDIRECT?

3                    **REDIRECT BY MS. BARLOW**

4  **BY MS. BARLOW**

5  **Q**    JUST SO I CAN CLEAR THIS UP FOR THE RECORD, SHERIFF, WE HAD

6  DISCUSSION ABOUT THAT 23 NUMBER, AND IT WAS AN ERROR ON MY PART,

7  AND I ISSUED AN ERRATA.  I DIDN'T ASK YOU TO SIGN ANYTHING,

8  RIGHT?

9  **A**    NO, I DON'T HAVE A RECOLLECTION THAT YOU DID.

10  **Q**    BUT THE CORRECT NUMBER IS 43?

11  **A**    THE CORRECT NUMBER IS 43.  THE NUMBER 23 WAS DRAWN FROM THE

12  WRONG DATABASE.

13  **Q**    OKAY.

14  **A**    IT GAVE FAULTY INFORMATION.

15          **MS. BARLOW:**  GREAT.  THANK YOU VERY MUCH.  I HAVE

16  NOTHING FURTHER.

17          **JUDGE HENDERSON:**  THANK YOU FOR APPEARING AND

18  TESTIFYING, SIR.  YOU'RE EXCUSED.  OKAY.

19          I ASSUME THAT'S IT.

20          **MR. SPECTER:**  ISN'T THAT ENOUGH?

21          **JUDGE KARLTON:**  NO.

22          **MR. SANGSTER:**  MR. MACINTOSH I THOUGHT WAS ON

23  SCHEDULE FOR TODAY, AND THEN THERE IS AN EVIDENTIARY ISSUE

24  THAT --

25          **JUDGE KARLTON:**  MR. MACINTOSH IS NOT ON ANY LIST,

1  SIR.

2            **JUDGE REINHARDT:**  NOT ON OUR LIST.

3            WE'LL, WE'RE HERE.  IS MR. MACINTOSH HERE?

4            **MR. SANGSTER:**  SOMETHING HAS CHANGED, YOUR HONOR, AND

5  I WASN'T AWARE OF IT.

6            I GUESS THAT'S IT.  I HAD ONE MORE WITNESS ON THE

7  LIST, BUT THERE IS AN EVIDENTIARY ISSUE THAT MS. BARLOW AND I

8  WOULD LIKE TO BRING TO THE COURT'S ATTENTION.

9            **JUDGE HENDERSON:**  OKAY.

10           **MS. BARLOW:**  I'LL LET YOU --

11           **MR. SANGSTER:**  WE HAVE A WITNESS COMING TOMORROW

12 SCHEDULED FROM ORANGE COUNTY.  THERE'S A FAIRLY NARROW

13 EVIDENTIARY ISSUE THAT'S GOING TO DETERMINE WHETHER THE WITNESS

14 COMES OR NOT, AND YOUR HONORS EARLIER SAID TO BRING TO YOUR

15 ATTENTION WHETHER --

16           **JUDGE KARLTON:**  JUST TELL US WHAT THE PROBLEM IS.

17           **MR. SANGSTER:**  OKAY.  THE WITNESS IS COMING TO TRY

18 AND AUTHENTICATE THE TRANSCRIPT OF A SPEECH GIVEN BY THE ORANGE

19 COUNTY SHERIFF TO THE BOARD OF SUPERVISORS.  THE WITNESS DIDN'T

20 GIVE THE SPEECH.  IT'S OUR POSITION THAT THERE'S NO FOUNDATION

21 FOR THIS AS AN OFFICIAL RECORD, AND SO WE'VE ENDED UP IN AN

22 IMPEDIMENT, AND THE SOLE ISSUE -- WE HAD OFFERED TO STIPULATE TO

23 THIS WITNESS'S TESTIMONY WITHOUT OBJECTION -- WELL, NO, THERE

24 WAS -- THAT WAS THE OBJECTION, AND SO WE'RE FACED WITH THIS

25 WITNESS COMING FOR THIS --

1              **JUDGE KARLTON:**  WHY WOULD IT BE RELEVANT THAT THE

2     SHERIFF MADE A SPEECH TO THE BOARD OF SUPERVISORS?

3              **MS. BARLOW:**  IT'S THE RECORD, YOUR HONOR, AND THE

4     RECORD CONTAINS DATA -- THE OFFICIAL RECORD FROM THE SHERIFF'S

5     DEPARTMENT CONTAINS DATA ABOUT CRIMES THAT OCCURRED DURING EARLY

6     RELEASE IN ORANGE COUNTY.  THAT'S WHAT THEY DON'T WANT YOU TO

7     SEE.

8              **JUDGE KARLTON:**  AND YOU ARE NOT CALLING THE SHERIFF

9     OR SOMEBODY TO DEMONSTRATE THESE DOCUMENTS; YOU JUST WANT TO

10    INTRODUCE A SPEECH?

11             **MS. BARLOW:**  NO, IT'S NOT A SPEECH, ACTUALLY, YOUR

12    HONOR.  IT'S A POWERPOINT PRESENTATION THAT WAS PREPARED TO GO

13    ALONG WITH THE SPEECH, AND IT'S -- FORMS THE BASIS OF ANOTHER

14    WITNESS'S OPINIONS FROM ORANGE COUNTY, BECAUSE OF IMPACTS OF

15    EARLY RELEASE THAT HAD OCCURRED PREVIOUSLY.  IT'S A PUBLIC

16    RECORD AND --

17             **JUDGE KARLTON:**  NOT EVERYTHING THAT'S SAID TO THE

18    BOARD OF SUPERVISORS QUALIFIES IT -- QUALIFIES AS A PUBLIC

19    RECORD IN THE SENSE THAT, YES, THAT OCCURRED.

20             **MS. BARLOW:**  YES.

21             **JUDGE KARLTON:**  THE QUESTION IS WHETHER IT'S TRUE OR

22    NOT.

23             **MS. BARLOW:**  WELL, YOUR HONOR, THE WITNESS WOULD

24    TESTIFY, IF CALLED, THAT THE DATA IN -- THE EARLY RELEASE DATA

25    WAS FROM INFORMATION DERIVED FROM THE SHERIFF'S DEPARTMENT'S

1  RECORDS.  IT WAS COMPILED BY SHERIFF'S DEPARTMENT STAFF.

2          **JUDGE HENDERSON:**  WHO IS THIS PERSON?

3          **MS. BARLOW:**  MR. DOSTAL IS THE EXECUTIVE DIRECTOR OF

4  THE SHERIFF'S DEPARTMENT.  HE HANDLES THE FINANCIAL MATTERS FOR

5  THE SHERIFF'S DEPARTMENT.

6          **JUDGE REINHARDT:**  I ASSUME IT'S THE FORMER SHERIFF'S

7  SPEECH.

8          **MS. BARLOW:**  WELL, IT'S STILL THE SHERIFF'S

9  DEPARTMENT, YOUR HONOR.  IT HAPPENS TO HAVE A DIFFERENT SHERIFF

10 NOW.

11         **JUDGE REINHARDT:**  IT DOESN'T MATTER WHOSE SPEECH IT

12 IS.  IT'S THE FORMER SHERIFF.

13         **MS. BARLOW:**  YES, IT WAS THE FORMER SHERIFF'S, YOUR

14 HONOR.  IT WAS PRIOR TO THE EXPANSION OF THE MUSIC FACILITY, AND

15 IT'S PART OF WHAT LED TO THE EXPANSION --

16         **JUDGE REINHARDT:**  PRIOR TO RESIGNATION OF THE SHERIFF

17 OR HIS REMOVAL.

18         **MS. BARLOW:**  YES, YOUR HONOR.

19         **JUDGE KARLTON:**  COULD WE TALK FOR JUST A MOMENT?  I

20 THINK I'M JUST VERY TIRED, AND I'VE STOPPED THINKING.

21             (DISCUSSION HELD OFF THE RECORD.)

22         **JUDGE REINHARDT:**  WHAT IS IT YOU WANT TO INTRODUCE?

23 IS IT JUST THE SPEECH OR YOU WANT TO INTRODUCE A POWERPOINT?

24         **MS. BARLOW:**  IT'S A WRITTEN DOCUMENT, YOUR HONOR,

25 THAT WAS PREPARED BY THE SHERIFF'S DEPARTMENT IN THE ORDINARY

```
 1  COURSE OF SHERIFF'S DEPARTMENT OFFICIALS TO PRESENT TO THE BOARD

 2  OF SUPERVISORS INFORMATION ABOUT EARLY RELEASE CRIME STATISTICS

 3  THAT LED TO A REQUEST TO EXPAND THE COUNTY'S JAILS FACILITIES.

 4  IT FORMS THE BASIS FOR ANOTHER WITNESS'S, MR. JAMES, TESTIMONY,

 5  AS TO WHY HE BELIEVES THERE WILL BE NEGATIVE IMPACTS IF THERE IS

 6  A PRISON RELEASE ORDER.

 7           JUDGE REINHARDT:  BECAUSE HE HEARD THIS OR READ THIS

 8  REPORT OR --

 9           MS. BARLOW:  YES, YOUR HONOR.

10           MR. SCHUMANN:  HE COULDN'T HAVE READ IT BECAUSE IT'S

11  A POWERPOINT.

12           MS. BARLOW:  IT'S A PRINTOUT OF THE POWERPOINT, YOUR

13  HONOR.

14           JUDGE KARLTON:  OKAY.  AND HE'S READ THE PRINTOUT?

15           MS. BARLOW:  AND HE'S ALSO REVIEWED THE UNDERLYING

16  DATA.

17           JUDGE KARLTON:  WHY DON'T YOU JUST CALL HIM?

18           MS. BARLOW:  WE STIPULATED TO HIM BECAUSE I EXPECTED

19  WE WOULD HAVE TO AUTHENTICATE THE DOCUMENT THROUGH MR. DOSTAL.

20  IT'S HIS DECLARATION THAT IT'S ATTACHED TO.

21           JUDGE KARLTON:  WHO IS COMING IN TO TALK ABOUT

22  WHATEVER IT IS YOU ARE GOING TO TALK ABOUT, NOT MR. DOSTAL, BUT

23  THE NEXT GUY?

24           MS. BARLOW:  MR. JAMES HAS BEEN SUBMITTED ON HIS

25  DECLARATION.
```

 1           **JUDGE KARLTON:**  OKAY.  SO HE'S NOT COMING IN; YOU

 2  JUST WANT HIM, WHATEVER HIS TESTIMONY IS.

 3           **MS. BARLOW:**  HE RELIED ON THE DOCUMENT.

 4           **JUDGE KARLTON:**  NO, NO.  I'M WITH YOU.

 5           **MS. BARLOW:**  YES.

 6           **JUDGE KARLTON:**  I'M JUST ASKING, IS HE COMING IN?

 7           **MS. BARLOW:**  NO.

 8           **JUDGE KARLTON:**  WON'T YOU STIPULATE THAT HE

 9  REVIEWED -- YOU WON'T, I GATHER.  HOW CAN YOU -- DOES HE SAY IN

10  HIS DECLARATION THAT'S ADMITTED INTO EVIDENCE THAT HE REVIEWED

11  THE DOCUMENT AND IT REFLECTS WHAT THE UNDERLYING DATA SAYS?

12           **MS. BARLOW:**  MR. DOSTAL'S DECLARATION REFERS TO IT,

13  AND I OFFERED, IN LIGHT OF THE FOUNDATIONAL OBJECTION THAT

14  COUNSEL HAD, AS TO WHETHER OR NOT IT WAS A PUBLIC RECORD.

15           **JUDGE KARLTON:**  FORGETTING --

16           **MS. BARLOW:**  AN OFFICIAL RECORD.  WE OFFERED TO

17  PROPOSE AN ADDITIONAL --

18           **JUDGE KARLTON:**  I'M JUST ASKING A DIFFERENT QUESTION.

19           **MS. BARLOW:**  OKAY.

20           **JUDGE KARLTON:**  APPARENTLY, MR. JAMES, HIS

21  DECLARATION SAYS HE'S LOOKED AT THIS DOCUMENT AND HE'S LOOKED AT

22  THE DATA THAT WAS THE BASIS OF THIS DOCUMENT; IS THAT RIGHT?

23           **MS. BARLOW:**  NO, YOUR HONOR.  HE REFERS TO THE

24  PROBLEMS FROM EARLY RELEASE PREVIOUSLY AS PART OF THE BASIS FOR

25  HIS OPINION.

1          **JUDGE KARLTON:**  I THOUGHT YOU JUST TOLD ME --

2          **MS. BARLOW:**  YES, HE REFERS TO THE DOCUMENT IN HIS

3  DECLARATION.  IT'S NOT ATTACHED TO HIS DECLARATION.  IT WAS TO

4  BE AUTHENTICATED BY THE OTHER WITNESS.

5          **JUDGE KARLTON:**  HE LOOKED AT THE DOCUMENT?

6          **MS. BARLOW:**  YES.

7          **JUDGE KARLTON:**  HE LOOKED AT THE UNDERLYING DATA?

8          **MS. BARLOW:**  YES.

9          **JUDGE KARLTON:**  AND HE'S PREPARED TO SAY THE

10  UNDERLYING DATA WHICH WAS DRAWN FROM THE SHERIFF'S DEPARTMENT IS

11  ACCURATELY REFLECTED IN THE DOCUMENT?

12          **MS. BARLOW:**  MR. DOSTAL IS PROPOSED SAY THAT.

13          **JUDGE KARLTON:**  MR. JAMES NEVER LOOKED AT THE

14  UNDERLYING --

15          **MS. BARLOW:**  HE DIDN'T LOOK AT THE UNDERLYING DATA;

16  MR. DOSTAL DID.

17          **JUDGE KARLTON:**  I'M TOO TIRED TO UNDERSTAND.  I'LL DO

18  WHATEVER YOU SAY.

19          **MS. BARLOW:**  ONE SUGGESTION THAT COUNSEL HAD WAS THAT

20  WE -- I CAN SUBMIT A SUPPLEMENTAL DECLARATION FROM MR. DOSTAL

21  EXPLAINING THE MANNER IN WHICH THE DATA WAS COMPILED AND

22  PREPARED, AND WE CAN RESOLVE IT THAT WAY.  I WANTED TO DO THAT

23  BY STIPULATION, BUT COUNSEL THOUGHT WE SHOULD BRING THIS ISSUE

24  TO THE COURT.

25          **JUDGE KARLTON:**  IF SHE PREPARES A DECLARATION FROM

1   MR. DOSTAL, OR WHOEVER, AND SAYS, I LOOKED AT THE DOCUMENT, I

2   LOOKED AT THE UNDERLYING DATA, THE DOCUMENT REPRESENTS A CORRECT

3   COMPILATION OF THE UNDERLYING DATA, WOULD YOU STILL OBJECT?

4           **MR. SANGSTER:**  PROBABLY NOT, YOUR HONOR.

5           **JUDGE KARLTON:**  WHY DON'T YOU JUST DO THAT?

6           **MS. BARLOW:**  I WOULD BE HAPPY TO, YOUR HONOR.

7           **JUDGE KARLTON:**  ALL RIGHT.

8           **MS. BARLOW:**  THANK YOU.

9           **JUDGE KARLTON:**  I DON'T KNOW WHAT I JUST DID BUT. . .

10          **JUDGE HENDERSON:**  SO, WE HAVE HOW MANY WITNESSES

11  TOMORROW?

12          **MS. BARLOW:**  YOUR HONOR, I BELIEVE THERE ARE -- I

13  HAVE ONE WITNESS, AND I BELIEVE THERE IS ONE -- I HAVE ONE

14  WITNESS TOMORROW, AND I BELIEVE IF -- SINCE WE'VE RESOLVED

15  MR. DOSTAL, AND I BELIEVE THERE IS A REBUTTAL WITNESS.  IS THAT

16  IT.

17          **MR. SANGSTER:**  THREE WITNESSES.

18          **MS. BARLOW:**  THREE WITNESSES.

19          **MS. JOHNSON:**  YOUR HONORS, THERE MAY BE --

20          **JUDGE HENDERSON:**  THREE ALL TOGETHER OR THREE PLUS

21  HER ONE?

22          **MR. SANGSTER:**  MY UNDERSTANDING IS THREE TOTAL.

23          **JUDGE REINHARDT:**  THE STATE HAS HOW MANY?

24          **MS. JOHNSON:**  PLAINTIFFS ARE SEEKING TO ADMIT AN

25  EXHIBIT 842 THAT WAS PREPARED BY SOMEONE IN THEIR OFFICE, WHICH

1    WE OBJECT TO ON NUMEROUS GROUNDS, INCLUDING HEARSAY.  IF THEY

2    CONTINUE TO CONTINUE TO ATTEMPT TO ADMIT THAT DOCUMENT, WE ASK

3    THEY PRESENT THE PERSON WHO PREPARED THE DOCUMENT, WHICH IS A

4    COMPLEX DATA COMPILATION, SEVERAL PAGES TO TESTIFY.

5            **JUDGE HENDERSON:**  I JUST HAD NODDING FROM MR. BIEN

6    INDICATING THEY ARE PREPARED TO DO THAT.

7            **MR. BIEN:**  YES.

8            **JUDGE KARLTON:**  IS THAT ONE OF THE THREE WITNESSES?

9            **MR. SANGSTER:**  NO, I'M SORRY, YOUR HONOR.  THAT'S A

10   FOURTH.

11           **JUDGE KARLTON:**  THAT'S A FOURTH.  BUT IF WE CAN DO

12   THE SAME THING, WE ARE DOING WITH MR. DOSTAL.

13           **MS. JOHNSON:**  YOUR HONORS, WE WANT TO QUESTION THIS

14   WITNESS LIVE.  IT IS THEIR OWN AGENT; IT'S NOT A THIRD PARTY.

15           **MR. BIEN:**  THAT'S FINE.

16           **JUDGE KARLTON:**  THIS GUY IS AN AGENT OF THE SHERIFF'S

17   DEPARTMENT, APPARENTLY.

18           **MS. JOHNSON:**  THIS IS PLAINTIFF'S COUNSEL'S AGENT,

19   YOUR HONOR.  IT WAS SOMEONE IN THEIR OFFICE.  IT WAS A DOCUMENT

20   PREPARED BY PLAINTIFFS' COUNSEL.

21           **JUDGE REINHARDT:**  ALL RIGHT.  SO WE HAVE THAT WITNESS

22   AND SENATOR RUNNER, I ASSUME?  AND WHO IS THE THIRD WITNESS?

23           **MS. BARLOW:**  DON MEYER, YOLO COUNTY CHIEF PROBATION

24   OFFICER.

25           **JUDGE REINHARDT:**  THAT'S IT?

1              **MR. MELLO:**  AREN'T PLAINTIFFS CALLING SHERIFF

2   HENNESSY?

3              **JUDGE KARLTON:**  WHAT?

4              **MR. BIEN:**  AND SHERIFF HENNESSY.

5              **JUDGE REINHARDT:**  FROM SAN FRANCISCO?

6              **MR. BIEN:**  HE'S THE REBUTTAL WITNESS FOR PLAINTIFF.

7              **JUDGE KARLTON:**  THAT'S FOUR WITNESSES NOW.

8              **JUDGE REINHARDT:**  THAT'S NOT BAD.  IT WILL BE

9   INTERESTING.

10             **JUDGE HENDERSON:**  OKAY.  COURT IS ADJOURNED.

11                    (PROCEEDINGS ADJOURNED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **GALE BATAILLE** | | |
| DIRECT EXAMINATION BY MR. LEWIS | 2510 | 13 |
| CROSS-EXAMINATION BY MR. GALVAN | 2526 | 13 |
| | | |
| **PLAINTIFF'S WITNESSES** | | |
| **JAMES AUSTIN (RESUMED)** | | |
| CROSS-EXAMINATION BY MS. BARLOW (RESUMED) | 2565 | 13 |
| REDIRECT EXAMINATION BY MS. EVENSON | 2626 | 13 |
| | | |
| **DEFENDANT INTERVENOR'S WITNESSES** | | |
| **ALEXANDER R. YIM** | | |
| DIRECT EXAMINATION BY MS. BARLOW | 2631 | 13 |
| CROSS-EXAMINATION BY MR. HEATHER | 2643 | 13 |
| REDIRECT EXAMINATION BY MS. BARLOW | 2651 | 13 |
| **ADAM CHRISTIANSON** | | |
| DIRECT EXAMINATION BY MS. BARLOW | 2657 | 13 |
| CROSS-EXAMINATION BY MR. SANGSTER | 2674 | 13 |
| REDIRECT EXAMINATION BY MS. BARLOW | 2681 | 13 |
| | | |
| **MARTIN RYAN** | | |
| DIRECT EXAMINATION BY MS. BARLOW | 2682 | 13 |
| CROSS-EXAMINATION BY MR. SANGSTER | 2702 | 13 |
| REDIRECT EXAMINATION BY MS. BARLOW | 2708 | 13 |

–  –  –  –

1

2

3                    **CERTIFICATE OF REPORTERS**

4

5          WE, JOAN MARIE COLUMBINI AND DEBRA L. PAS, OFFICIAL

6   REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

7   CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

8   CIV S-90-0520 LKK JPM, RALPH COLEMAN, ET AL V. ARNOLD

9   SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD

10  SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND

11  REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

12  INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

13  TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

14  FILING.

15          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

16  TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

17  COURT FILE.

18

19                    /S/ JOAN MARIE COLUMBINI

20              JOAN MARIE COLUMBINI, CSR 5435, RPR

21

22                    S/ DEBRA L. PAS

23          DEBRA L. PAS, CSR 11916, CRR, RMR, RPR

24              THURSDAY, DECEMBER 18, 2008

25