VOL 14

PAGES 2719 – 2866

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, ET AL.,          )
                                )
          PLAINTIFFS,           )
                                )
  VS.                           ) NO. CIV S-90-0520
                                )
ARNOLD SCHWARZENEGGER, ET AL.   )
                                ) THREE-JUDGE COURT
          DEFENDANTS.           )
                                )
_____

MARCIANO PLATA, ET AL.,         )
                                )
          PLAINTIFFS,           )
                                )
VS.                             ) NO. C 01-1351 TEH
                                )
ARNOLD SCHWARZENEGGER, ET AL.   )
                                )
          DEFENDANTS.           )
_____)

**TRANSCRIPT OF PROCEEDINGS**

SAN FRANCISCO, CALIFORNIA
FRIDAY, DECEMBER 19, 2008

*REPORTED BY:  JOAN MARIE COLUMBINI, CSR 5435*
*              DEBRA L. PAS, CSR 11916, CRR, RMR, RPR*
*              OFFICIAL COURT REPORTERS US DISTRICT COURT*

**APPEARANCES:**

**FOR PLAINTIFFS**          PRISON LAW OFFICE
                            1917 FIFTH STREET
                            BERKELEY, CALIFORNIA  94710
                            **SARA NORMAN, ESQUIRE**
                            **ALISON HARDY, ESQUIRE**
                            **DONALD SPECTER, ESQUIRE**
                            **REBEKAH EVENSON, ESQUIRE**


                            ROSEN, BIEN & GALVAN, LLP
                            315 MONTGOMERY STREET, TENTH FLOOR
                            SAN FRANCISCO, CALIFORNIA 94104
                        BY:  **MICHAEL W. BIEN, ESQUIRE**


                            K&L GATES
                            FOUR EMBARCADERO CENTER
                            SUITE 1200
                            SAN FRANCISCO, CALIFORNIA 94111
                        BY: **EDWARD P. SANGSTER, ESQUIRE**


**FOR CCPOA**               CARROLL, BURDICK & MCDONOUGH
                            44 MONTGOMERY STREET, SUITE 400
                            SAN FRANCISCO, CALIFORNIA  94104
                        BY: **NATALIE LEONARD, ESQUIRE**


**FOR DEFENDANTS**          STATE OF CALIFORNIA
                            DEPARTMENT OF JUSTICE
                            OFFICE OF THE ATTORNEY GENERAL
                            1300 I STREET, SUITE 125
                            P.O. BOX 944255
                            SACRAMENTO, CALIFORNIA  94244
                        BY:  **LISA A. TILLMAN, ESQUIRE**


                            STATE OF CALIFORNIA
                            DEPARTMENT OF JUSTICE
                            OFFICE OF THE ATTORNEY GENERAL
                            455 GOLDEN GATE AVENUE, SUITE 11000
                            SAN FRANCISCO, CALIFORNIA  94102
                        BY: **KYLE A. LEWIS, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**         HANSON BRIDGETT
                          425 MARKET STREET, 26TH FLOOR
                          SAN FRANCISCO, CALIFORNIA  94105
                    BY: **PAUL MELLO, ESQUIRE**
                        **S. ANNE JOHNSON, ESQUIRE**


**FOR DISTRICT ATTORNEY**  THE DISTRICT ATTORNEY'S OFFICE
**INTERVENORS**            COUNTY OF RIVERSIDE
                          82-675 HIGHWAY 111, FOURTH FLOOR
                          INDIO, CALIFORNIA  92201
                    BY: **WILLIAM E. MITCHELL, ESQUIRE**


**FOR LEGISLATOR**         AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**INTERVENORS**            580 CALIFORNIA STREET, 15TH FLOOR
                          SAN FRANCISCO, CALIFORNIA  94104
                    BY: **TERESA WANG, ESQUIRE**


**FOR LAW ENFORCEMENT**    JONES & MAYER
**INTERVENORS**            3777 NORTH HARBOR BOULEVARD
                          FULLERTON, CALIFORNIA  92835
                    BY: **KIMBERLY HALL BARLOW, ESQUIRE**


**FOR COUNTY INTERVENORS**  OFFICE OF THE COUNTY COUNSEL
                          COUNTY OF SANTA CLARA
                          70 WEST HEDDING STREET
                          NINTH FLOOR, EAST WING
                          SAN JOSE, CALIFORNIA  95110
                    BY: **THERESA FUENTES, ESQUIRE**


**FOR SONOMA COUNTY**      COUNTY OF SONOMA
**INTERVENORS**            575 ADMINISTRATION DRIVE, ROOM 105A
                          SANTA ROSA, CALIFORNIA  95403
                    BY: **ANNE L. KECK, ESQUIRE**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES (CONTINUED):**

**FOR THE COUNTY OF**      OFFICE OF MICHAEL P. MURPHY
**SAN MATEO**              COUNTY COUNSEL, SAN MATEO COUNTY
**INTERVENORS:**          HALL OF JUSTICE AND RECORDS
                        400 COUNTY CENTER, 6TH FLOOR
                        REDWOOD CITY, CALIFORNIA 94063-1662
          **BY:  CAROL L. WOODWARD, ESQUIRE**

**FOR LEGISLATOR**       AKIN, GUMP, STRAUSS, HAUER
**INTERVENORS:**            & FELD, LLP
                        580 CALIFORNIA STREET, SUITE 1500
                        SAN FRANCISCO, CALIFORNIA 94104
          **BY:  CHAD STEGEMAN, ESQ.**

_ _ _ _

1                       **P R O C E E D I N G S**

2   **DECEMBER 19, 2008**                                **9:20 A.M.**

3

4              **JUDGE HENDERSON:**  OKAY.  IF YOU ARE READY TO BEGIN,

5   YOU MAY CALL YOUR NEXT WITNESS, COUNSEL.

6              **MR. STEGEMAN:**  GOOD MORNING, YOUR HONORS.  MY NAME IS

7   CHAD STEGEMAN FROM AKIN, GUMP, STRAUSS, HAUER AND FELD ON BEHALF

8   OF THE LEGISLATOR INTERVENORS, AND WE CALL TO THE STAND SENATOR

9   GEORGE RUNNER.

10                       **SENATOR GEORGE RUNNER**,

11  CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

12  DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

13             **THE WITNESS:**  I DO.

14             **THE CLERK:**  PLEASE HAVE A SEAT.  STATE AND SPELL YOUR

15  FULL NAME.

16             **THE WITNESS:**  GEORGE RUNNER.  G-E-O-R-G-E.

17  R-U-N-N-E-R.

18                       **DIRECT EXAMINATION**

19  **BY MR. STEGEMAN:**

20  **Q.**  GOOD MORNING, SENATOR.

21  **A.**  GOOD MORNING.

22  **Q.**  CAN YOU PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND AND

23  TRAINING?

24  **A.**  I WENT TO A LOCAL HIGH SCHOOL IN MY DISTRICT.  GRADUATED THE

25  UNIVERSITY OF REDLANDS, BACHELOR OF SCIENCE IN BUSINESS

1   ADMINISTRATION, AND DID SOME GRADUATE WORK WITH AZUA PACIFIC

2   UNIVERSITY SPECIALIZING IN NON-PROFIT ORGANIZATIONS.

3   **Q.**   AND CAN YOU GIVE US A BRIEF EMPLOYMENT HISTORY SINCE YOU

4   GRADUATED COLLEGE?

5   **A.**   I WAS INVOLVED IN LOCAL CHURCH WORK.   THEN FOUNDED A PRIVATE

6   SCHOOL, DID THAT FOR A NUMBER OF YEARS AND ENDED UP

7   CEO/EXECUTIVE DIRECTOR OF THAT PROGRAM, AND DID THAT UP TIL MY

8   FULL-TIME EMPLOYMENT WITH THE LEGISLATURE, BEING ELECTED TO THE

9   LEGISLATURE.

10  **Q.**   CAN YOU GIVE US A HISTORY OF YOUR PARTICIPATION IN

11  CALIFORNIA POLITICS?

12  **A.**   SURE.   I WAS FIRST ELECTED TO THE LANCASTER CITY COUNCIL IN

13  1992 AND SERVED THERE AS A COUNCIL MEMBER.

14          THEN IN THAT CITY YOU ROTATED AND BECAME VICE MAYOR

15  AND THEN MAYOR.

16          RAN FOR THE STATE LEGISLATURE IN 1996.   WAS ELECTED

17  TO THE ASSEMBLY IN 1996.   SERVED THERE FOR MY SIX-YEAR TERM.   I

18  WAS OUT FOR TWO AND THEN WAS ELECTED TO THE CALIFORNIA STATE

19  SENATE.

20  **Q.**   DURING YOUR TENURE AS A CALIFORNIA ASSEMBLY MEMBER, WERE YOU

21  A MEMBER OF ANY COMMITTEES?

22  **A.**   VARIOUS COMMITTEES A MEMBER OF.   MOST SIGNIFICANTLY IN

23  REGARDS TO SOME OF THE ISSUES HERE I WOULD GUESS WOULD BE THE

24  ISSUES OF INVOLVEMENT AS MEMBER OF APPROPRIATIONS, BUT ALSO VICE

25  CHAIR OF BUDGET DURING FOUR OF THOSE YEARS.

1          SO INVOLVED WITH NEGOTIATIONS, ISSUES WITHIN THE

2     BUDGET PROCESS DURING THOSE FOUR YEARS.

3     Q.   AND IN THE NEGOTIATIONS AND YOUR EXPERIENCE WITH THE BUDGET

4     ON THAT COMMITTEE, DID YOU EVER HAVE TO ADDRESS PRISON OR

5     CORRECTIONS ISSUES OR EXPENDITURES?

6     A.   CERTAINLY.  YOU KNOW, IT IS A SIGNIFICANT PART, BOTH IN

7     REGARDS TO EXPENDITURES AND POLICY DISCUSSIONS.  SO, CERTAINLY,

8     THAT WAS A PART OF THE DISCUSSIONS THAT WOULD TAKE PLACE DURING

9     THAT TIME.

10    Q.   AND IN YOUR EXPERIENCE AS A SENATOR, DO YOU PARTICIPATE OR

11    SIT ON ANY COMMITTEES?

12    A.   YES.  I AM ALSO SITTING ON APPROPRIATIONS IN THERE.  I AM

13    ALSO ON BANKING AND FINANCE, IN ENVIRONMENTAL QUALITY.  THEN

14    ALSO, IN FACT, IN THIS LAST TWO WEEKS SERVING ON A BUDGET

15    SUBCOMMITTEE TO WHICH CORRECTIONS IS A PART OF.

16    Q.   DO YOU HOLD ANY POSITIONS WITH THE REPUBLICAN PARTY?

17    A.   WITHIN THE SENATE, I AM THE CAUCUS CHAIR.  I HAVE SERVED IN

18    THAT ROLE FOR THE LAST FOUR YEARS, WAS RECENTLY REELECTED TO

19    THAT ROLE FOR THE REPUBLICAN SENATE.

20    Q.   WHEN DID YOU FIRST BECOME INTERESTED IN THE CALIFORNIA

21    CORRECTIONAL SYSTEM?

22    A.   WELL, MY FIRST EXPOSURE, I GUESS, AND INVOLVEMENT WAS WHEN I

23    WAS ON THE CITY COUNCIL, THE PRISON IN THE ANTELOPE VALLEY,

24    WHICH IS THE ONLY PRISON IN L.A. COUNTY, WAS BUILT AND WAS

25    OPENED.  AND SO WE HAD INVOLVEMENT ON A LOCAL LEVEL BECAUSE THE

1  -- THAT PRISON SITS IN THE CITY OF LANCASTER.  SO CERTAINLY WAS

2  FAMILIAR WITH WORKING WITH THE OPERATIONAL ASPECTS OF THE PRISON

3  AND, AGAIN, THE THINGS THAT TAKE PLACE IN PRISONS AND INVOLVED

4  WITH THE LEGISLATURE AT THAT TIME IN THE OPENING OF THAT PRISON.

5  THAT WOULD BE IN THE -- PROBABLY 1994, IN THAT TIME.

6           SO THAT WAS MY FIRST EXPOSURE, I GUESS, TO

7  INVOLVEMENT WITHIN THE PRISON SYSTEM AND PARTICULARLY, I GUESS,

8  AS A LOCAL ELECTED OFFICIAL.

9  **Q.**  DO YOU KNOW WHAT A PRISONER RELEASE ORDER IS IN THE CONTEXT

10 OF THIS LITIGATION?

11 **A.**  I'M FAMILIAR WITH THE FACT THAT THERE'S A DISCUSSION THAT IS

12 TAKING PLACE.

13 **Q.**  CAN YOU DESCRIBE SOME ALTERNATIVES TO A PRISONER RELEASE

14 ORDER?

15 **A.**  YES.  I THINK THERE ARE MANY OPTIONS THAT COULD BE LOOKED

16 AT.  CERTAINLY, I'M CONCERNED ABOUT THE FACT.

17          AND THE REASON WHY I THINK ALTERNATIVES NEED TO TAKE

18 PLACE IS I DO BELIEVE THAT THERE IS A PUBLIC RISK THAT WOULD

19 TAKE -- COULD TAKE -- WILL TAKE PLACE WHEN IT IS THAT WE WOULD

20 HAVE THE EARLY RELEASE, PREMATURE RELEASE OF INDIVIDUALS PRIOR

21 TO FULFILLING THEIR WHOLE TERM.

22          THE ALTERNATIVES THAT I BELIEVE WOULD BE OUT THERE

23 WOULD BE CERTAINLY LOOKING AT THE INVOLVEMENT, BOTH THE COST AND

24 THE RESPONSIBILITY THE STATE OF CALIFORNIA TAKES ON FOR THOSE

25 WHO ARE IN OUR PRISON SYSTEMS THAT I BELIEVE ARE OF FEDERAL

1  RESPONSIBILITY.

2          SO I BELIEVE ONE OF THE ISSUES THAT CERTAINLY COULD

3  HELP US RELIEVE OUR SITUATION IS BOTH -- WHETHER IT BE REVENUE

4  FROM THE FEDERAL GOVERNMENT TO HELP OFFSET SOME OF THE COSTS SO

5  THAT WE COULD DO THE KINDS OF THINGS WE NEED TO DO IN THE

6  PRISONS IN ORDER TO MAKE THEM A MORE SUCCESSFUL PLACE FOR

7  REHABILITATION OR TAKING RESPONSIBILITY.  ACTUALLY, TAKING

8  CONTROL OF A NUMBER OF PRISONERS; THAT I BELIEVE INMATES THAT

9  ARE CLEARLY RESPONSIBILITY FOR THE FEDERAL GOVERNMENT.  THAT

10 CERTAINLY WOULD BE ONE OF THE ALTERNATIVES.

11         I BELIEVE THERE IS OTHER ALTERNATIVES THAT ARE

12 CERTAINLY OUT THERE, SUCH AS A MORE ROBUST PROGRAM DEALING MORE

13 SUCCESSFULLY WITH OUR PAROLEES.

14         I THINK CALIFORNIA HAS A VERY DIFFICULT AND BROKEN

15 PAROLE SYSTEM.  THE NUMBERS THAT AT LEAST I'M AWARE OF SHOW THAT

16 CALIFORNIA IS THE ONLY STATE THAT ACTUALLY SENDS MORE

17 INDIVIDUALS TO PRISON FROM PAROLE THAN WE DO FROM COURT.  AND AS

18 A RESULT OF THAT, A LOT OF OUR PRISON ISSUES IN REGARDS TO BEDS,

19 LACK OF BEDS AT TIMES OR BEDS IN BAD PLACES IS A RESULT OF A

20 BROKEN PAROLE SYSTEM.

21         I BELIEVE THAT ONE OF THE WAYS THAT WE CAN HELP TAKE

22 CARE OF THAT IS TO CHANGE THE PAROLE.  I HAVE INTRODUCED

23 LEGISLATION THAT WOULD CREATE KIND OF A MIDDLE GROUND FOR

24 REVOCATION SO THAT RATHER THAN GOING BACK TO PRISON, YOU WOULD

25 FIND YOURSELF UNDER HOUSE ARREST WITH GPS MONITORING.

1          THOSE KIND OF ISSUES, THEN, WOULD HELP YOU THEN

2    SUCCEED, BE MORE SUCCESSFUL.  IF YOU WERE THEN IN KIND OF A DRUG

3    REHAB PROGRAM OR LIVING WITH FAMILY OR WERE ACTUALLY WORKING,

4    RATHER THAN GOING BACK TO PRISON FOR A FEW MORE MONTHS, LOSING

5    ALL THAT CONTACT.  I BELIEVE THAT'S A MORE SUCCESSFUL PROGRAM.

6          THE OTHER ISSUE IS I THINK WE HAVE TO HAVE A MORE

7    ROBUST, BETTER REHABILITATION SYSTEM.  THE FACT IS THAT I DON'T

8    THINK WE PREPARE INDIVIDUALS WELL ENOUGH WHEN THEY GO BACK INTO

9    SOCIETY.

10          WE ALSO OFFER THIS -- IN FACT, DISCUSSED THIS WEEK AN

11   ADDITIONAL PROGRAM, WHICH IS A MORE AGGRESSIVE MENTORING SYSTEM

12   PROGRAM.  I THINK THAT WE NEED TO HELP INMATES LEARN HOW TO LIVE

13   SUCCESSFULLY OUTSIDE, AND I THINK THAT THERE ARE A LOT OF WAYS

14   WE CAN DO THAT.  CERTAINLY, A MENTORING PROGRAM IS AN IMPORTANT

15   PART OF THAT.

16          SO I THINK THERE'S LOTS OF ALTERNATIVES THAT WE HAVE

17   TO GO TO THAT CAN BE FAR MORE SUCCESSFUL AND LESS OF A THREAT TO

18   SOCIETY.

19   Q.  NOW, YOU MENTIONED THERE WERE PRISONERS THAT WERE THE

20   RESPONSIBILITY OF THE FEDERAL SYSTEM.  CAN YOU DESCRIBE WHAT YOU

21   MEAN BY THAT?

22   A.  WELL, RIGHT NOW, OBVIOUSLY, CALIFORNIA IS UNIQUE IN TERMS OF

23   ITS, I GUESS, LOCATION.  AS A RESULT OF THAT, WE DO HAVE A LARGE

24   PORTION OF THOSE WHO ARE HERE IN THE UNITED STATES ILLEGALLY,

25   WHO HAVE FOUND THEMSELF THEN COMMITTING CRIMES AND, THEREFORE,

1  IN PRISON.  AND WE IN CALIFORNIA CERTAINLY HAVE A LARGE NUMBER

2  OF THOSE.

3           I THINK ONE NUMBER FROM THE FEDERAL GOVERNMENT THAT

4  I'M AWARE OF WAS AROUND 30,000 INMATES.  ANOTHER -- I THINK I

5  HEARD SENATOR FEINSTEIN TALK ABOUT THE FACT THAT THERE ARE ABOUT

6  22,000 WHO ARE ON ICE HOLDS IN CALIFORNIA STATE PRISONS.

7           SO I THINK THAT THAT'S A DISPROPORTIONAL NUMBER THAT

8  WE HAVE COMPARED TO OTHER STATES.  AND, AGAIN, THAT FALLS

9  DIRECTLY ON THE SHOULDERS AND RESPONSIBILITIES.

10           THAT IS SOME REIMBURSEMENT FOR THE FEDERAL

11  GOVERNMENT, BUT IT IS INCREDIBLY MEAGER AND DOES NOT GO NEARLY

12  TO THE COST OF WHAT IT IS THAT WE HAVE.

13  **Q.**  YOU MENTIONED THAT PAROLE IS BROKEN?

14  **A.**  UH-HUH.

15  **Q.**  CAN YOU DESCRIBE ANY STEPS THE LEGISLATURE HAS TAKEN IN

16  RECENT -- IN THE LAST COUPLE WEEKS, FOR INSTANCE, TO ADDRESS

17  PAROLE ISSUES OR PAROLE REFORM?

18  **A.**  WELL, I GUESS I WILL DIVIDE THAT INTO TWO DIFFERENT PARTS.

19  ONE IS, LIKE I SAID, THIS WEEK WE HAVE INTRODUCED IN THE PAST,

20  LAST YEAR AND THIS WEEK IT WAS DEBATED IN REGARDS TO LEGISLATION

21  THAT WOULD CREATE SOME KIND OF A PLACE TO WHERE REVOCATIONS

22  WOULDN'T -- THOSE WHO WERE REVOCATED WOULDN'T NECESSARILY GO

23  BACK TO PRISONS; THAT THERE COULD BE A HOUSE ARREST PROGRAM,

24  MONITORING LIMITED ACCESS SO THAT RELATIONSHIPS COULD STILL

25  CONTINUE.

1           WE, IN OUR ESTIMATE -- OR, ACTUALLY, IN THE

2    LEGISLATIVE ANALYST'S ESTIMATE WAS THAT THAT WOULD AFFECT ABOUT

3    15,000 CURRENT PAROLEES WOULD BE SUCCESSFUL IN THAT PROGRAM AND

4    OPENING UP -- IN FACT, THE NUMBER THAT THE AO HAD IDENTIFIED WAS

5    IT WOULD PROBABLY OPEN UP ABOUT 35,000 TO 40,000 BEDS IN CURRENT

6    PRISONS IF THAT WOULD ACTUALLY BE IMPLEMENTED.  SO THAT'S

7    CERTAINLY AN ISSUE THAT'S BEING TALKED ABOUT.  I THINK IT HAS

8    SOME GOOD AND BROAD SUPPORT AT THAT POINT.

9           I THINK THE PROBLEM THAT WE HAVE RIGHT NOW IN THE

10   STATE OF CALIFORNIA IS ONE OF THE ISSUES WE ARE TRYING TO DO IS

11   SOLVE OUR BUDGET CRISIS WITH CORRECTIONS SAVINGS, AND I THINK

12   THAT THAT IS, INDEED, A MISTAKE.

13           I DON'T DOUBT THAT WE COULD HAVE MORE SUCCESSFUL,

14   MORE EFFICIENT AND EFFECTIVE CORRECTION PROGRAMMING AND EVEN

15   SAVE SOME MONEY, BUT I THINK IT CANNOT BE AT THE LOSS OF

16   PROGRAMS FOR REHABILITATION AND OTHER KIND OF SYSTEMS THAT WILL

17   PROTECT THE PUBLIC.

18           ONE IN PARTICULAR THAT WAS PASSED THIS WEEK -- I WENT

19   TO THE -- IT PASSED YESTERDAY AND HAS BEEN SENT DOWN TO THE

20   GOVERNOR IS THE TRUNCATING OF PAROLE TIME -- THE LEGISLATURE

21   PASSED, I DID NOT SUPPORT IT, I THINK IT HAS OTHER PROBLEMS

22   ATTACHED TO IT -- WHICH AUTOMATICALLY SHORTENED -- WHICH WILL

23   AUTOMATICALLY SHORTEN PAROLE TO SIX MONTHS, AND IT WILL BE

24   APPLIED TO ALL SERIOUS AND NON-VIOLENT OFFENDERS, WHICH IS ABOUT

25   75,000 OUT OF THE 120,000 PAROLEES THAT WE HAVE.  AND WHAT THE

1   IDEA IS THAT IF THEY HAVE SUCCESSFULLY GONE THROUGH PAROLE,

2   SUCCESS BEING MEASURED THAT THEY ARE NOT IN REVOCATION, THEY

3   WOULD THEN BE IMMEDIATELY RELEASED FROM PAROLE.  WE ESTIMATE --

4   WE ARE WORKING WITH CORRECTIONS.  WE ESTIMATE THAT THAT WOULD

5   PROBABLY BE AN IMMEDIATE RELEASE OF ABOUT 50,000 PAROLEES WHO

6   WOULD THEN LEAVE SUPERVISION.

7            NOW, AND THE WAY THE OTHER PART OF THAT ISSUE WOULD

8   BE APPLIED, AND THAT IS ALL INMATES COMING OUT OF PRISON RIGHT

9   NOW WOULD BE UNDER THAT SAME REQUIREMENT OR RULE AND SO,

10  THEREFORE, IF THEY SUCCESSFULLY SERVE SIX MONTHS WITHOUT ANY

11  KIND OF A -- WITHOUT BEING UNDER REVOCATION, THEN THEY WOULD BE

12  IMMEDIATE RELEASED.

13           AGAIN, I THINK THAT IS A BACKWARDS SYSTEM.  I THINK

14  IT'S A WAY TO SAVE MAYBE SOME MONEY SHORT TERM, MAYBE FOR THE

15  STATE.  I THINK IT SHIFTS COSTS BACK TO THE COUNTIES WHO WOULD

16  THEN END UP HAVING TO FIND THESE INDIVIDUALS AND PUT THEM

17  THROUGH A LOCAL JUSTICE SYSTEM.

18           BUT I THINK THE WORSE THING THAT IT DOES IS IT

19  DOESN'T HELP THE PAROLEE SUCCEED.  YOU ARE TAKING INDIVIDUALS

20  AND RATHER THAN INVESTING TIME, MENTORING THOSE KIND OF PROGRAMS

21  AND HELPING THEM SUCCEED IN THEIR ADJUSTMENT BACK TO SOCIETY,

22  YOU ARE TRUNCATING IT.  AND AS A RESULT OF THAT, I THINK THAT'S

23  OF GREAT CONCERN IN REGARDS TO BOTH THEN THE PUBLIC SAFETY, HOW

24  SUCCESSFUL THESE INDIVIDUALS CAN BE WHEN THEY COME BACK INTO

25  SOCIETY, BUT, ALSO, WHAT THAT DOES TO THOSE INDIVIDUALS,

1  POTENTIAL VICTIMS OUT THERE AS A RESULT OF THEM NOT BEING

2  PREPARED.

3  **Q.**  NOW, SENATOR, ARE YOU FAMILIAR WITH ASSEMBLY BILL 900?

4  **A.**  YES.

5  **Q.**  WOULD YOU SAY THAT IS AN ALTERNATIVE TO A PRISONER RELEASE

6  ORDER?

7  **A.**  ABSOLUTELY.  YES.  ASSEMBLY BILL 900 WAS DONE ALMOST TWO

8  YEARS AGO NOW AS A RESULT OF THE GOVERNOR'S IDENTIFICATION THAT

9  WE, INDEED, HAD SOME CROWDING ISSUES AND NEEDED TO GET SOME

10  THINGS STRAIGHTENED OUT IN REGARDS TO BEDS WITHIN THE PRISONS.

11           THE LEGISLATURE IN A BIPARTISAN PASSION PASSED THAT.

12  IT WAS A SERIES OF REPLACING WHAT WE WOULD CALL BAD BEDS, BEDS

13  THAT WERE IN PLACES LIKE HALLWAYS, CLASSROOMS, THAT HAVE TWO

14  PROBLEMS.

15           NUMBER ONE, THE PROBLEM IS THAT IT DOES NOT PROVIDE

16  -- IT TAKES THE SPACE AWAY THAT SHOULD BE THERE FOR

17  REHABILITATION AND, IN ADDITION TO THAT, IT PUTS INMATES IN

18  UNSAFE PLACES AND, THEREFORE, PUTS AT RISK THE EMPLOYEES WHO ARE

19  WORKING IN THOSE CONDITIONS.

20           SO AB 900 WAS TO GO AHEAD AND TAKE CARE OF SOME OF

21  THOSE BEDS AND DO THE IN-FILL, IF YOU WILL, FOR THOSE BEDS.

22           THE OTHER ISSUE THAT IT IS, IT CREATES ANOTHER KIND

23  OF A SYSTEM OF REENTRY, WHICH THE CONCEPT IS TO MOVE INMATES

24  CLOSER TO WHERE IT IS THAT THEY ARE GOING TO BE RELEASED WITH

25  MORE INTENSIVE PROGRAMMING IN THE LAST PARTS OF THEIR

1  INCARCERATION.  THEORY BEING THAT IF THEY ARE THEN GOING THROUGH

2  THAT, THAT THEY WILL BE MORE SUCCESSFUL THEN IN THEIR RELEASE.

3  SO THAT ALSO CREATED A NUMBER OF BEDS IN THAT PROCESS.

4           SO THAT'S WHAT AB 900 DID.  IT ALSO, I THINK, CREATED

5  -- IT ALSO ADDED SOME ADDITIONAL DOLLARS FOR SOME -- I BELIEVE

6  DEALING WITH SOME BEDS AND SOME PROGRAMMING, PROBABLY JUST BEDS,

7  AND FACILITIES FOR SOME ISSUES WITHIN HEALTHCARE ISSUES, MENTAL

8  HEALTH AND, I THINK, SOME DENTAL SOME OF THOSE ISSUES WERE ALSO

9  PART OF THAT.  THAT WAS THE PACKAGE THAT WAS IN 900.

10 **Q.** HAS AB 900 BEEN IMPLEMENTED?

11 **A.** NO.  PARTS OF IT HAVE BEEN.  THERE'S BEEN SOME GENERAL FUND

12 DOLLARS THAT HAVE BEEN MADE AVAILABLE IN SOME SMALL PORTION, MY

13 UNDERSTANDING IS; BUT OVERALL, NO.

14           THERE HAVE BEEN SOME DISCUSSIONS IN REGARDS TO THE

15 ABILITY, BECAUSE OF THE CHANGES THAT HAVE TAKEN PLACE IN REGARDS

16 TO SOME OF THE LANGUAGE IN AB 900, THERE IS AN OPINION THAT HAS

17 BEEN, AT LEAST, THOUGHT.  AND I GUESS I HAVE GOT TO BE HONEST

18 WITH YOU, I HAVE NEVER SEEN A WRITTEN OPINION THAT SAID THIS.

19 AND IT'S UNCLEAR EXACTLY WHERE, FOR INSTANCE, THE ATTORNEY

20 GENERAL IS ON THE ISSUE.  TO ME, IT'S UNCLEAR.  THAT HAS MADE IT

21 SO THAT THE ABILITY TO SELL THOSE BONDS HAVE BEEN IMPEDED.

22           NOW OVER THE LAST FEW MONTHS MY UNDERSTANDING IS THAT

23 THE BOND PORTION RELATING TO THE REENTRY FACILITIES HAS BEEN

24 CLARIFIED AND THAT THERE SEEMS TO BE THE ABILITY TO GO OUT AND

25 SELL BONDS IN ORDER TO GET THOSE FACILITIES BUILT AND MOVE

1  FORWARD WITH THOSE.

2           THE ONES THAT IT SOUNDS TO ME THAT ARE NOW AT LEAST

3  BEING -- NEEDING THE CLEAN-UP LANGUAGE, IS RELATED TO THE IDEA

4  OF THE IN-FILL BEDS.  MY UNDERSTANDING IS THAT'S BECAUSE WITHIN

5  THE LEGISLATION ITSELF, IT DESIGNATED A LEVEL OF BED THAT WAS

6  NECESSARY.  AND I THINK IT IDENTIFIED A LOWER LEVEL BED, WHEN IN

7  REALITY THE NEED IS A HIGHER LEVEL BED.  AS A RESULT OF THAT,

8  THERE WAS CONCERN THAT THE LANGUAGE WOULD NOT -- CREATED A

9  PROBLEM WHEN YOU ACTUALLY WERE GOING TO SELL THOSE BONDS AND

10 WHAT YOU WERE ACTUALLY GOING TO CONSTRUCT.

11          NOW, AS OF YESTERDAY THE LEGISLATURE -- THERE WAS

12 NUMEROUS ATTEMPTS THROUGH THE YEAR TO DO THE CLEAN UP LANGUAGE

13 THAT WAS NECESSARY IN ORDER TO MOVE THE WHOLE BOND FORWARD OR

14 MOVE THE SELLING OF THAT BOND FORWARD.  ALL THOSE,

15 UNFORTUNATELY, BECAUSE THE ATTEMPTS TO TRY TO REFERENCE OTHER

16 THINGS FAILED, BUT THIS -- DURING THIS LAST WEEK AND AS OF

17 YESTERDAY, THE LEGISLATURE DID PASS THE CLEAN-UP TO AB 900, AND

18 THAT, APPARENTLY, AS FAR AS WHAT THEY ARE TELLING US, WHAT THE

19 ADMINISTRATION IS TELLING US NOW, IS -- OPENS THE DOOR FOR THOSE

20 BONDS TO BE SOLD.

21 Q.  GREAT.  WOULD YOU CONSIDER AN INCREASE IN THE NUMBER OF

22 OUT-OF-STATE TRANSFERS OF INMATES TO BE ANOTHER ALTERNATIVE TO

23 PRISONER RELEASE ORDER?

24 A.  I THINK, AGAIN, LOOKING AT OTHER ALTERNATIVES, SUCH AS OTHER

25 LOCATIONS, I THINK ARE REASONABLE ISSUES FOR US TO LOOK AT.  I

1  THINK THAT ANY RELIEF THAT WE CAN CREATE, AND THAT CERTAINLY, I

2  THINK, IS A REASONABLE ALTERNATIVE THAT NEEDS TO BE EXPLORED.

3          I'M NOT FAMILIAR RIGHT NOW WITH WHAT THE NUMBER IS.

4  I HAVE JUST NOT HEARD IT LATELY IN REGARDS TO HOW MANY ARE

5  ACTUALLY OUT OF STATE RIGHT NOW, BUT I THINK THAT IS A

6  REASONABLE ISSUE FOR US TO LOOK AT.  IT IS A WAY FOR US TO ALSO

7  LOOK AT HOW IT IS THAT WE CAN MAINTAIN PRISON POPULATION WITHOUT

8  HAVING TO LOOK AT THE ALTERNATIVE OF EARLY RELEASE.

9  Q.  ALL RIGHT.  THANK YOU, SENATOR.  I HAVE NO FURTHER QUESTIONS

10  AT THIS TIME.

11          **THE COURT:**  STATE DEFENDANTS, ANYTHING?

12          **MR. MELLO:**  NO, YOUR HONOR.

13          **THE COURT:**  CROSS-EXAMINATION?

14          **MR. HEATHER:**  THANK YOU, YOUR HONOR.

15                    **CROSS EXAMINATION**

16  BY MR. HEATHER:

17  Q.  SENATOR RUNNER, IF I --

18          **JUDGE REINHARDT:**  DO YOU WANT TO GIVE YOUR NAME FOR

19  THE RECORD?

20          **MR. HEATHER:**  FRED HEATHER FROM K&L GATES.

21  BY MR. HEATHER:

22  Q.  SENATOR, IS IT CORRECT WHEN AB 900 WAS PASSED, IN ORDER FOR

23  IT TO BE FULLY IMPLEMENTED THERE WOULD NEED TO BE WHAT I BELIEVE

24  YOU TERMINATE AN AB 900 FIX ALSO PASSED BY THE LEGISLATURE THAT

25  WOULD ALLOW THE SALE OF SOME $7 BILLION IN BONDS, IS THAT

1  CORRECT?

2  **A.**  NO.  WHEN IT WAS PASSED, IT WOULD -- WHEN IT WAS FIRST

3  PASSED, THAT WAS NOT IDENTIFIED AS A NEED.  IT WAS ONLY

4  SUBSEQUENT TO THE FACT THAT THERE APPEARED TO BE SOME CHANGES IN

5  REGARDS TO THE KINDS OF BEDS THAT WERE BEING LOOKED AT THAT

6  REQUIRED THEN THE FIXED AB 900.

7            SO FOR MONTHS, MAYBE EVEN A YEAR AFTER THE PASSAGE OF

8  900, THE ASSUMPTION WAS THAT EVERYTHING WAS OKAY TO MOVE

9  FORWARD.

10 **Q.**  AND AB 900 WAS LEGISLATION THAT WAS PROPOSED IN RESPONSE TO

11 A CONCERN BY YOU AND PERHAPS OTHER LEGISLATURES THAT ABSENT SUCH

12 LEGISLATION, THIS COURT MAY ACT TO DETAIL WITH THE PRISON

13 OVERCROWDING PROBLEM IN CALIFORNIA, IS THAT CORRECT?

14 **A.**  YOU KNOW, I THINK MY RECOLLECTION IS THAT IT WAS A CONCERN

15 THAT WE HAD THAT, A, WE HAD A SAFETY ISSUE; THAT WE HAD INMATES

16 THAT WERE IN PLACES THAT THEY SHOULDN'T BE IN REGARDS TO, YOU

17 KNOW, THE HALLWAYS, THE GYMNASIUMS, THOSE KIND OF PLACES.  AND

18 AS A RESULT OF THAT, THERE WAS NOT EFFECTIVE -- IT IMPEDED THE

19 ABILITY TO DO THE KINDS OF PROGRAMMING THAT WAS NECESSARY.

20            THERE WAS ALWAYS A CONCERN BACK THERE, YES, THAT WE

21 HAD SEEN TOO MANY EXAMPLES OF STATE -- OF COUNTY JAIL SYSTEMS

22 WHERE THE FEDERAL COURT HAD STEPPED IN AND PUT CAPS AND LIMITED

23 THEN THE POPULATIONS.

24            AND SO, YES, ONE OF THE ISSUES THAT WE WERE CONCERNED

25 ABOUT, WHY IS IT WE NEEDED TO MOVE FORWARD, WAS IN ORDER TO BE A

1   PREVENTIVE STEP IN THAT PROCESS.

2   Q.  OKAY.  SO BY IMPLEMENTING AND FIXING ULTIMATELY AB 900 SO

3   THAT THE FUNDING WOULD BE AVAILABLE TO DO WHAT AB 900

4   CONTEMPLATES, YOU BELIEVE THAT THAT WOULD BE AN ALTERNATIVE TO

5   THIS COURT TAKING ACTION, IS THAT CORRECT?

6   A.  YES.

7   Q.  AND THE FIX FOR AB 900, I BELIEVE, WAS CONTAINED IN SB 1750,

8   IS THAT CORRECT?

9   A.  WELL, AT ONE TIME IT WAS.  THAT WAS A BILL GIVEN AT ONE

10  TIME.  I THINK THAT'S A BILL THAT I BELIEVE I AUTHORED.  WE HAD

11  LANGUAGE IN THERE.  THAT WAS A BILL THAT I HAD AUTHORED.

12          SINCE THEN THE ATTEMPTS TO FIX 900 HAVE COME THROUGH

13  OTHER VARIOUS LEGISLATIVE TOOL PIECES SINCE -- LIKE I SAID, UP

14  TO YESTERDAY.  AND I DO NOT KNOW THE BILL NUMBER FOR YESTERDAY'S

15  FIX THAT WAS ACTUALLY THEN PASSED BY THE LEGISLATURE AND SENT TO

16  THE GOVERNOR.

17  Q.  BECAUSE IN YOUR TRIAL DECLARATION, SENATOR RUNNER, YOU

18  REFERRED TO SB 1705 AND THAT THAT WOULD PROVIDE THE FIX TO   AB

19  900?

20  A.  UH-HUH.

21  Q.  AND IN PARAGRAPH 16 OF YOUR DECLARATION YOU STATED:

22          "AS AN ALTERNATIVE TO A PRISONER RELEASE

23          ORDER, THIS COURT SHOULD MAKE WHATEVER ORDER IS

24          LAWFUL AND NECESSARY IN ORDER FOR AB 900 TO BE

25          FULLY IMPLEMENTED PRIOR TO ISSUING ANY PRISONER

1          RELEASE ORDER."

2          AND THAT WAS SIGNED ON OCTOBER 30TH.

3  **A.**  RIGHT.

4  **Q.**  THAT WAS YOUR POSITION AT THAT TIME?

5  **A.**  RIGHT.

6  **Q.**  NOW, ARE YOU SAYING THAT BETWEEN OCTOBER 30TH AND TODAY

7  THERE HAS BEEN A DIFFERENT PIECE OF LEGISLATION --

8  **A.**  YES.

9  **Q.**  (CONTINUING) -- THAT HAS BEEN INTRODUCED?

10  **A.**  YES.

11  **Q.**  YOU DON'T RECALL THE BILL NUMBER?

12  **A.**  YES.

13  **Q.**  AND THAT BILL HAS BEEN PASSED BY THE FULL LEGISLATURE?

14  **A.**  YES.

15  **Q.**  AND THAT PROVIDES FOR HOW MANY DOLLARS WORTH OF BONDS TO BE

16  ISSUED?

17  **A.**  WELL, IT'S -- MY UNDERSTANDING IS THAT IT'S THE FULL FIX FOR

18  AB 900.

19          NOW, I HAVE GOT TO ALSO -- THERE IS -- AN ASSUMPTION

20  HAS DEVELOPED SINCE THEN ALSO THAT NOT ALL $8 BILLION OF THE 900

21  BOND WAS ACTUALLY IN QUESTION ANY MORE; THAT THE PORTION OF THE

22  DOLLARS THAT COULD BE USED FOR REENTRY FACILITIES WAS, INDEED,

23  NOT IMPEDED BY THE NEEDED LANGUAGE TO FIX.

24          SO SUBSEQUENT -- SINCE THE DISCUSSIONS OF OCTOBER,

25  THERE HAS BEEN, I THINK, THROUGH MY UNDERSTANDING WITH THE

1  ATTORNEY GENERAL'S OFFICE AND ALSO WITH THE GOVERNOR'S OFFICE,

2  THROUGH NEGOTIATIONS THAT HAVE BEEN GOING ON WITH THE SHERIFFS,

3  THAT THEY NOW BELIEVE THAT THE PORTION OF 900 DIDN'T NEED TO BE

4  FIXED THAT DEALT WITH THE ISSUE OF REENTRY FACILITIES.

5         NOW, THE PORTION THAT STILL DIDN'T NEED TO BE FIXED

6  WAS THE PORTION OF CORRECTING WHAT WE WOULD CALL THE BAD BEDS,

7  THE IN-FILL.  THAT PORTION STILL NEEDED TO BE FIXED.  AND THAT'S

8  THE -- AND SO THE FIX THAT WAS DONE YESTERDAY FIXED THAT, THAT

9  PARTICULAR PORTION.

10        I CAN'T TELL -- I DO NOT RECALL HOW MANY DOLLARS WENT

11  TO THE REENTRY FACILITIES AND HOW MANY DOLLARS THEN WENT TO THE

12  EXISTING BEDS IN THE PRISONS.

13  **Q.**  DO YOU KNOW WHAT THE TOTAL DOLLAR AMOUNT OF THAT FIX WAS?

14  **A.**  WELL, AGAIN, THE TOTAL AMOUNT WOULD BE IN THE ORIGINAL 900.

15  WE DIDN'T CHANGE ANY AMOUNTS IN THE FIX.  THE TOTAL AMOUNT IN

16  900 WAS, I THINK, 7.5 OR $8 BILLION, SOMEWHERE IN THAT

17  NEIGHBORHOOD.

18  **Q.**  DOES THE LEGISLATION THAT WAS PASSED YESTERDAY COMPEL ANYONE

19  TO ISSUE THOSE BONDS -- MAKE THE EFFORT TO SELL THOSE BONDS

20  FORTHWITH, OR ARE THERE OTHER STEPS THAT HAVE TO BE TAKEN BEFORE

21  AN ATTEMPT IS MADE TO SELL THOSE BONDS?

22  **A.**  THE FIX THAT WAS DONE YESTERDAY ENABLES THE NORMAL PROCESS

23  FOR THE SALE OF BONDS TO MOVE FORWARD.

24         **JUDGE KARLTON:**  ASSUMING THAT THE GOVERNOR SIGNS IT.

25         **THE WITNESS:**  ASSUMING THAT THE GOVERNOR SIGNS IT.

1           **JUDGE KARLTON:**  DO WE KNOW IF THERE IS ANY INDICATION

2   THAT THE GOVERNOR WILL SIGN IT?

3           **THE WITNESS:**  THE INDICATION RIGHT NOW IS THAT THE

4   GOVERNOR IS NOT COMPELLED TO SIGN A PORTION OF WHAT WAS DONE

5   YESTERDAY.  HE CAME OUT AND SAID THAT HE DID NOT LIKE A SERIES

6   OF ISSUES THAT WERE DONE IN REGARDS TO SOME OF THE BUDGET FIXES,

7   BUT HE DID NOT -- HE DID NOT MAKE A STATEMENT IN REGARDS TO

8   THOSE PARTICULAR ISSUES, IN REGARDS TO THAT PARTICULAR BILL OF

9   900.

10          **JUDGE REINHARDT:**  DIDN'T HE SAY HE WAS GOING TO VETO

11  THE BILL?

12          **THE WITNESS:**  I THINK THE GOVERNOR SAID -- AGAIN, I

13  DON'T THINK -- I LISTENED TO THE GOVERNOR, HIS STATEMENT.  I

14  THINK THE GOVERNOR SAID HE WAS NOT GOING TO SIGN THE BUDGET

15  PORTIONS OF THE BILL.

16          WE PASSED -- I THINK THERE WERE 14 OR 15 BILLS THAT

17  WENT TO THE GOVERNOR.  AND I'M UNCLEAR AS TO WHETHER OR NOT HE

18  -- AND AS HE WENT THROUGH HIS DIALOGUE IN REGARDS TO HIS

19  CONCERNS, THEY WERE NOT RELATIVE TO THIS ISSUE.

20          **JUDGE REINHARDT:**  BUT IS THIS FIX IN A PORTION OF THE

21  BILL?

22          **THE WITNESS:**  NO.  THE 900 FIX WAS IN A SEPARATE

23  BILL.

24          **JUDGE KARLTON:**  AS WE SIT HERE TODAY, WE DON'T -- OF

25  COURSE, THE GOVERNOR ISN'T COMPELLED TO DO ANYTHING.  LET'S

1    START THERE.

2            **THE WITNESS:**  RIGHT.

3            **JUDGE KARLTON:**  AS WE SIT HERE NOW, WE DON'T KNOW --

4    AFTER SEVERAL YEARS, TWO, THREE YEARS OF THE LEGISLATURE HAVING

5    DIFFICULTY PASSING 900, WE NOW ARE UNCERTAIN THAT THE GOVERNOR

6    IS GOING TO SIGN AT LEAST THE SIGNIFICANT PORTION OF IT.

7            **THE WITNESS:**  WELL, I THINK WHAT WE KNOW TODAY IS THE

8    LEGISLATURE HAS ACTED ON THE 900 FIX.  THAT'S WHAT WE KNOW

9    TODAY.

10            NOW, I CAN'T TELL YOU WHAT THE GOVERNOR IS GOING TO

11    DO.  I CAN'T TELL YOU WHAT THE MIX OF THAT IS IN THE REST OF THE

12    BILLS THAT ARE BEFORE HIM.

13            BUT I CAN TELL YOU THAT THE LEGISLATURE HAS NOW ACTED

14    AS IT HAS NOT DONE IN THE PAST IN A 900 FIX.

15            **JUDGE KARLTON:**  AND AT LEAST -- WELL, EVEN IF THE

16    GOVERNOR WERE TO SIGN THAT, WHICH IS -- SIGN THE LEGISLATION,

17    WHICH IS APPARENTLY NOT CLEAR, WE THEN HAVE TO GET A CLEAN BILL,

18    OR WHATEVER IT'S CALLED, FROM THE ATTORNEY GENERAL, WHO HAS SO

19    FAR BEEN RELUCTANT TO SAY ANYTHING ABOUT AB 900.

20            **THE WITNESS:**  MY UNDERSTANDING THAT THIS IS, INDEED,

21    THE LANGUAGE THAT HAS BEEN WORKED ON BETWEEN THE ADMINISTRATION

22    AND THE ATTORNEY GENERAL'S OFFICE.

23            **JUDGE KARLTON:**  AND HAVE YOU EVER HAD AN EXPERIENCE

24    IN WHICH PEOPLE CHANGED THEIR MIND?

25            **THE WITNESS:**  OFTEN.

1    **BY MR. HEATHER:**

2    **Q.** SENATOR, YOU SAID THAT THE BOND ISSUE WILL NOW GO THROUGH

3    THE NORMAL PROCESS. DOES PUBLIC WORKS HAVE TO PASS ON THE

4    ABILITY TO ISSUE BONDS?

5    **A.** WELL, AGAIN, I'M NOT GOING TO PRETEND TO BE UNDERSTANDING

6    ABOUT WHAT HAPPENS IN THE TERMS OF THE PROCESS THAT TAKES PLACE

7    FOR THE BOND TO BE ISSUED, BUT I THINK, CLEARLY, THE HURDLE THAT

8    HAD BEEN IDENTIFIED IN REGARDS TO THE LANGUAGE THAT THE

9    LEGISLATURE WAS NOT PASSING HAS BEEN NOW PASSED.

10   **Q.** ARE YOU AWARE THAT PUBLIC WORKS HAS STATED THAT NO NEW BONDS

11   WILL BE ABLE TO BE ISSUED AT THIS TIME?

12   **A.** YES. I BELIEVE THAT IS A VERY -- THAT IS A TEMPORARY

13   SITUATION WHICH WILL BE QUICKLY RELIEVED.

14   **Q.** SENATOR, LET ME TURN MY ATTENTION TO SOME OTHER ASPECTS OF

15   THIS CASE.

16         I BELIEVE YOU -- IS IT YOUR VIEW THAT RECIDIVISM IN

17   THE STATE OF CALIFORNIA IS A THREAT TO PUBLIC SAFETY?

18   **A.** YES.

19   **Q.** AND IT IS YOUR VIEW THAT OVERCROWDING IS THE CHIEF CAUSE OF

20   RECIDIVISM?

21         **MR. STEGEMAN:** OBJECTION. THAT'S BEYOND THE SCOPE OF

22   THE DIRECT AND HIS TESTIMONY.

23         **JUDGE HENDERSON:** OVERRULED.

24         **JUDGE KARLTON:** THAT MEANS THAT YOU HAVE TO ANSWER

25   SIR.

1          **THE WITNESS:**  I'M SORRY.

2  **A.**  REPEAT THE QUESTION, PLEASE.

3  **BY MR. HEATHER:**

4  **Q.**  SENATOR, IT'S YOUR BELIEF, IS IT NOT, THAT RECIDIVISM IS

5  CHIEFLY CAUSED BY OVERCROWDING?

6  **A.**  RECIDIVISM IS CHIEFLY CAUSED BY OVERCROWDING.  I BELIEVE

7  THAT THE -- THAT OVERCROWDING IS A -- IS A FACTOR IN, IN MAKING

8  CALIFORNIA HAVE A HIGHER RECIDIVISM RATE.

9  **Q.**  DO YOU RECALL STATING IN YOUR DECLARATION THAT CALIFORNIA'S

10  EXTRAORDINARILY HIGH RECIDIVISM RATE IS LARGELY THE CAUSE OF

11  CURRENT CROWDING CONDITIONS?

12  **A.**  IF THAT'S WHAT I SAID, YEAH.  I GUESS WE CAN -- I MEAN,

13  WHETHER I SAID CHIEFLY OR ADDITIVE, IT CERTAINLY IS A PART OF

14  THE PROBLEM.

15  **Q.**  AND ADDING MORE BEDS WITHOUT ADDING THE REHABILITATIVE

16  ASPECTS OF AB 900 OR SOME OTHER SOLUTION, NAMELY EDUCATION, THE

17  ABILITY TO MONITOR PEOPLE WHEN THEY ARE ON PAROLE, ASSIST THEM

18  WITH JOBS, ASSIST THEM WITH DRUG TREATMENT, ASSIST THEM IN

19  COUNSELING, SIMPLY ADDING MORE BEDS, THERE IS NO STUDY YOU ARE

20  AWARE OF, IS THERE, THAT SAYS THAT THAT ALONE WOULD REDUCE THE

21  RATE OF RECIDIVISM IN CALIFORNIA?

22  **A.**  I DON'T -- YOU ARE RIGHT.  I WOULD SAY IF YOU SIMPLY ADDED

23  BEDS, YOU PROBABLY WOULD NOT CHANGE.  YOU WOULD JUST BE MOVING

24  -- I ASSUME THE IDEA THERE IS YOU ARE JUST MOVING PEOPLE FROM

25  HALLWAYS TO CELLS.

1  Q.  AND IT IS YOUR VIEW, IS IT NOT, THAT ABSENT THE ISSUANCE OF

2  NEW BONDS THROUGH AB 900 OR OTHER SOURCES OF FUNDING TO PROVIDE

3  THE REHABILITATIVE SERVICES THAT THAT LEGISLATION CALLS FOR, IT

4  HAS BEEN YOUR VIEW, HAS IT NOT, THAT THERE ARE ADEQUATE SERVICES

5  AVAILABLE FOR REHABILITATION, BUT THAT YOUR VIEW IS THAT THEY

6  ARE NOT BEING PROPERLY ALLOCATED AND USED AT THIS TIME, IS THAT

7  CORRECT?

8  A.  I BELIEVE THAT THERE ARE SERVICES THAT ARE INADEQUATE AND

9  FACILITIES IS A PART OF THAT PROBLEM.

10          MR. HEATHER:  I'M SORRY.  COULD YOU READ THAT BACK?

11                  (WHEREUPON THE RECORD WAS READ

12                  AS REQUESTED.)

13  BY MR. HEATHER:

14  Q.  ALL RIGHT.  BUT I BELIEVE IT HAS ALSO BEEN YOUR VIEW THAT

15  THE EXISTING SERVICES THAT HAVE BEEN AVAILABLE HAVE NOT BEEN

16  ADEQUATELY UTILIZED, IS THAT CORRECT?

17  A.  I'M STRUGGLING WITH THE IDEA "QUALITY UTILIZED."  I DO

18  BELIEVE, FOR INSTANCE, AND ONE OF THE ISSUES IN AB 900 WAS THE

19  WHOLE CONCEPT OF REENTRY FACILITIES, WHICH THE WHOLE PREMISE OF

20  THAT KIND OF PROGRAM WAS A FACILITIES ROOTED IN THE IDEA OF

21  HELPING INMATES SUCCEED THROUGH AGGRESSIVE PROGRAMMING IN THOSE

22  FACILITIES.

23          SO, YOU KNOW, THOSE WERE MORE THAN JUST BEDS.  THOSE

24  WERE ALSO PROGRAM-ORIENTED FACILITIES.

25  Q.  SENATOR, IF THE GOVERNOR DOES NOTE SIGN THE LEGISLATION THAT

 1  WAS JUST PASSED FOR AB 900 OR OTHER IMPEDIMENTS DEVELOP THAT

 2  PREVENT THAT LEGISLATION FROM BEING FULLY IMPLEMENTED, THEN THE

 3  LEGISLATURE WOULD BE FREE TO GO BACK AND MAKE ANOTHER EFFORT TO

 4  DEAL WITH WHAT YOU CONSIDER THE CRISIS IN THE PRISON SYSTEM, IS

 5  THAT CORRECT?

 6  **A.**  YES.  YES.  THE LEGISLATURE OUGHT TO CONTINUE TO DEAL WITH

 7  WHAT IT IS THAT WE BELIEVE SHOULD BE DONE IN ORDER TO HELP THE

 8  MORE SUCCESSFUL SYSTEM.

 9  **Q.**  UNTIL YESTERDAY, AT LEAST WITH RESPECT TO AB 900, THE

10  LEGISLATURE HAS NOT TAKEN ADEQUATE ACTION TO FIX AB 900 OR ALLOW

11  THE SALE OF BONDS?

12  **A.**  THE LEGISLATURE FAILED IN ITS ATTEMPTS TO MOVE THAT BILL

13  FORWARD.

14  **Q.**  AND I BELIEVE IT'S BEEN YOUR TESTIMONY THAT DURING THAT TIME

15  OF FAILURE, AB 900 WAS NOT A MONEY PROBLEM, IT WAS A POLICY

16  PROBLEM; DO YOU RECALL --

17  **A.**  YES, YES.  IT WAS NOT A MONEY PROBLEM.  IT WAS A POLICY

18  PROBLEM, BUT NOT IN THE SENSE OF THE POLICY OF AB 900.

19          THE FACT IS THAT THERE WAS EFFORTS TO ALWAYS LINK AB

20  900 FIXES TO OTHER ISSUES THAT WERE UNRELATED TO THE 900.

21  **Q.**  GIVEN OUR INABILITY TO PREDICT THE FUTURE AND WHETHER THIS

22  LEGISLATION WILL BE FULLY IMPLEMENTED OR NOT, LET ME ASK YOU,

23  YOU DO BELIEVE THAT YOUR HIGHEST DUTY AS A LEGISLATURE IS TO

24  UPHOLD AND DEFEND THE CONSTITUTION OF THE UNITED STATES,

25  CORRECT?

1  **A.**  I DO.

2  **Q.**  AND YOU DO UNDERSTAND THAT THERE HAVE BEEN ORDERS IN THIS

3  COURT WHICH HAVE FOUND CERTAIN CONDITIONS IN THE PRISONS OF THE

4  STATE OF CALIFORNIA TO BE UNCONSTITUTIONAL, IS THAT CORRECT?

5  **A.**  I UNDERSTAND THAT.

6  **Q.**  AND, YET, YOU HAVE SAID THAT YOU PERSONALLY DON'T AGREE WITH

7  THOSE DECISIONS?

8  **A.**  THAT'S CORRECT.

9  **Q.**  AND CAN YOU TELL ME -- AND YOU ARE NOT SURE, GIVEN YOUR

10  DISAGREEMENT WITH THE DECISIONS OF THIS COURT, WHETHER YOU ARE

11  OBLIGATED AS A LEGISLATURE TO IMPLEMENT CHANGES THAT WOULD BE

12  NECESSARY TO FIX THE CONDITIONS WHICH THIS COURT HAS FOUND TO BE

13  UNCONSTITUTIONAL, IS THAT CORRECT?

14  **A.**  NO, I DON'T BELIEVE THAT WOULD BE CHARACTERIZING HOW I WOULD

15  FEEL.  I BELIEVE WHAT WE -- I FEEL LIKE I MAY DISAGREE WITH THE

16  CONCEPT THAT WE HAVE AN UNCONDITIONAL OR UNCONSTITUTIONAL LEVEL

17  OF CARE.

18          I MAY DISAGREE WITH THAT OPINION AND I DON'T HAVE ANY

19  DIFFICULTY USING WHATEVER FORUMS THAT ARE NECESSARY IN ORDER TO

20  DEBATE AND DISCUSS AND APPEAL THAT PROCESS BECAUSE I -- I

21  DISAGREE WITH IT.

22          AND I CERTAINLY ALSO WOULD SAY THAT, QUITE FRANKLY

23  EVEN IF IT -- EVEN IF THAT WAS THE FINDING THAT WHEN THAT TOOK

24  PLACE NUMBERS OF YEARS AGO, THAT CERTAINLY IT IS IRRELEVANT

25  TODAY GIVING THE FACT THAT THE STATISTICS ARE SO OVERWHELMING OF

 1  THE IMPROVEMENT THAT'S TAKEN PLACE WITHIN THE CURRENT SYSTEM.

 2  **Q.**  ONE LAST QUESTION, SENATOR.  I THINK I CAN DO THIS IN ONE

 3  QUESTION.

 4           IN LIGHT OF YOUR VIEW THAT -- AND PRIOR TESTIMONY

 5  THAT AB 900 WAS PROPOSED BECAUSE OF THE CONCERN THAT THIS COURT

 6  MIGHT OTHERWISE ACT, AND BECAUSE AB 900 WAS INTENDED TO ADDRESS

 7  THE PROBLEMS IN THE LACK OF REHABILITATION IN THE PRISON SYSTEM

 8  THAT CONTRIBUTE TO RECIDIVISM AND A THREAT TO PUBLIC SAFETY, AND

 9  GIVEN THAT THERE IS NO CERTAINTY AS WE TALK TODAY ABOUT WHETHER

10  OR NOT THE LEGISLATION THAT WAS PASSED YESTERDAY WILL, IN FACT,

11  LEAD TO THE SALE OF BONDS SUFFICIENT TO PROVIDE THE FACILITIES

12  AND SERVICES THAT AB 900 CONTEMPLATES, IS IT MORE LIKELY THAT --

13  IS IT MORE LIKELY THAT THE COMPULSION ON THE LEGISLATURE TO DO

14  SOMETHING WILL BE GREATER IF THIS COURT DOES ACT THAN IF IT

15  FAILS TO ACT AND THIS CASE GOES AWAY?

16           **MR. STEGEMAN:**  OBJECTION.  THAT'S A COMPOUND

17  QUESTION.

18           **MR. HEATHER:**  I WILL WITHDRAW IT.  NO FURTHER

19  QUESTIONS.

20           **THE WITNESS:**  THANK YOU.

21           **THE COURT:**  CCPOA HAVE ANYTHING OF THE SENATOR?

22           **MS. LEONARD:**  NO, YOUR HONOR.

23           **THE COURT:**  REDIRECT?

24           **MR. STEGEMAN:**  I HAVE JUST A COUPLE OF ADDITIONAL

25  QUESTIONS.

1                        **REDIRECT EXAMINATION**

2    **BY MR. STEGEMAN:**

3    **Q.**  SENATOR, YOU MENTIONED THAT PORTIONS OF AB 900 CAN BE

4    IMPLEMENTED AT THIS TIME.

5              COULD THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

6    REHABILITATION AND THE RECEIVER IMPLEMENT THAT PORTION OF    AB

7    900 THAT CONSTRUCTS REENTRY FACILITIES?

8    **A.**  I'M UNCLEAR TO THE RELATIONSHIP THAT THE RECEIVER WOULD HAVE

9    IN THAT DECISION, BUT I -- YEAH, I WOULD BELIEVE THAT ISSUES CAN

10   -- THAT CONSTRUCTION AND PLANS CAN MOVE FORWARD NOW.

11             AND THAT PORTION OF IT THAT -- IN MY UNDERSTANDING

12   THAT IS ABLE TO BE DONE IS CURRENTLY IN PROGRESS.  NEGOTIATIONS

13   ARE GOING ON WITH COUNTIES IN REGARDS TO THOSE REENTRY

14   FACILITIES, WHICH IS THAT PORTION OF THE FUNDING.

15   **Q.**  AND A PRIMARY FOCUS OF THESE REENTRY FACILITIES IS

16   REHABILITATIVE, EDUCATIONAL, JOB PLACEMENTS --

17   **A.**  THE WHOLE PURPOSE --

18   **Q.**  (CONTINUING) -- IS THAT CORRECT?

19   **A.**  THE WHOLE PURPOSE OF THAT KIND OF FACILITY IS TO MOVE THE

20   INMATE CLOSER TO WHERE IT IS THAT THEY ARE GOING TO BE RELEASED

21   IN ORDER TO THEN BEGIN TO CREATE RELATIONSHIPS WITH SERVICES AND

22   TRAINING IN ORDER THEN TO HAVE SUCCESSFUL INTEGRATION TO

23   SOCIETY.

24   **Q.**  THANK YOU, SENATOR.  WE HAVE NO FURTHER QUESTIONS.

25              **JUDGE KARLTON:**  SENATOR?

1        **THE WITNESS:** YES.

2        **JUDGE KARLTON:** WE HAVE BEEN TOLD SEVERAL TIMES THAT

3 IT'S APPROXIMATELY FIVE YEARS FROM THE DATE THAT YOU AGREE TO

4 START DOING SOMETHING FOR ANYTHING TO BE BUILT. ARE YOU AWARE

5 OF THAT?

6        **THE WITNESS:** I GUESS I'M NOT AWARE OF THAT.

7        **JUDGE KARLTON:** SETTING ASIDE WHAT THE RECEIVER MIGHT

8 DO BECAUSE THE COURT WOULD OVERRULE STATE LAW, BUT IT WOULD

9 REQUIRE PLANNING AND GOING BACK AND GETTING THE PLANNING DONE --

10 WELL, THERE ARE JUST ALL THESE REASONS.

11        **THE WITNESS:** I WOULD DISAGREE WITH THAT,

12 PARTICULARLY TWO AREAS.

13        ONE IS THE -- AGAIN, YOU CAN PROBABLY TALK TO PEOPLE

14 WHO WOULD BE MORE HELPFUL, PARTICULARLY ON THE ISSUE OF THE

15 LOCAL FACILITIES BECAUSE THAT WAS A BIG -- MY UNDERSTANDING IS

16 THAT THE COUNTIES -- THERE ARE A NUMBER OF COUNTIES THAT ARE

17 READY TO MOVE VERY QUICKLY IN REGARDS TO BUILDING OF THEIR

18 FACILITIES.

19        THE OTHER ISSUE WE ARE TALKING ABOUT IS THE IN-FILL

20 COMPLETION.

21        **JUDGE KARLTON:** THAT'S ACTUALLY WHAT I WAS TALKING

22 ABOUT.

23        **THE WITNESS:** NO. THE IN-FILL SHOULD NOT BE THE --

24 SHOULD NOT HAVE THAT KIND OF A TIME DELAY. YOU ARE TALKING

25 ABOUT WITHIN EXISTING FACILITIES. YOU ARE NOT ACQUIRING

1  PROPERTIES.  I DON'T BELIEVE IT WOULD TAKE THAT LONG.

2          **JUDGE KARLTON:**  OKAY.  LET'S ASSUME -- LET'S SET THAT

3  ASIDE.

4          YOU DON'T BELIEVE IT'S SO, BUT YOU, OBVIOUSLY, HAVE

5  NOT DONE ANY WORK TO FIND OUT HOW LONG IT WILL TAKE, IS THAT

6  FAIR TO SAY?

7          **THE WITNESS:**  NO.  I HAVE ACTUALLY HAD CONVERSATIONS

8  WITH CONTRACTORS --

9          **JUDGE KARLTON:**  NOT THE PEOPLE THAT YOU HAVE TO WORRY

10  ABOUT.  YOU HAVE TO WORRY ABOUT THE VERY ELABORATE SYSTEM THAT

11  THE STATE OF CALIFORNIA HAS TO BUILD ANYTHING.

12          **THE WITNESS:**  I HAVE CONVERSATIONS WITH CONTRACTORS

13  WHO HAVE WORKED IN THAT SYSTEM, WHO BELIEVE THEY COULD DO A MUCH

14  FASTER PRODUCT DELIVERY IN THE SAME.  I HAVE HAD THOSE

15  CONVERSATIONS WITH CORRECTIONS.

16          **JUDGE KARLTON:**  ALL RIGHT.  AS TO THE REENTRY

17  FACILITIES, AT LEAST IN THEORY, THE IDEA WAS TO GET THEM AS

18  CLOSE TO THE CITIES THAT THEY WOULD BE RELEASED IN AS YOU COULD.

19          **THE WITNESS:**  UH-HUH.

20          **JUDGE KARLTON:**  ARE YOU AWARE THAT THERE HAS BEEN

21  SIGNIFICANT DIFFICULTIES IN THE CITY, IN THE LARGE STATES --

22  STRIKE THAT.

23          IN THE STATES CONTAINING LARGE CITIES LOCATING AND

24  CITING THE SO-CALLED REENTRY FACILITIES?

25          **THE WITNESS:**  YES.  I UNDERSTAND THAT THAT'S ALWAYS A

1   HURDLE.  IN FACT, I TOURED A FACILITY IN NEVADA WHICH WAS VERY

2   CLOSE TO DOWNTOWN.  I WAS IMPRESSED THAT THE CITY AND COUNTY

3   ACTUALLY DID THAT AND MOVED FORWARD WITH THAT PROGRAM.

4             **JUDGE KARLTON:**  THEY MANAGED TO DO IT.

5             AND ARE YOU AWARE THAT EVEN IN RELATIVELY RURAL

6   COUNTIES, THERE IS DIFFICULTY PLACING THE -- SITING THE REENTRY

7   FACILITIES IF THEY WERE TO BE BUILT NEAR THE POPULATION CENTERS

8   OF THE MORE RURAL COUNTIES?

9             **THE WITNESS:**  I GUESS, GENERALLY SPEAKING, I'M AWARE

10  THAT IT IS ALWAYS A CHALLENGE TO SITE A FACILITY.

11            **JUDGE KARLTON:**  ALL RIGHT.  THANK YOU.  NO FURTHER

12  QUESTIONS.

13            MY QUESTIONS ARE MY QUESTIONS OF COUNSEL.  HANG ON,

14  YOU ARE NOT FIRST.

15            **MR. HEATHER:**  SORRY.

16            **MR. STEGEMAN:**  NO FURTHER QUESTIONS, YOUR HONOR.

17  THANK YOU.

18            **MR. HEATHER:**  I HAVE ONE QUESTION, YOUR HONOR.

19                    **<u>RECROSS EXAMINATION</u>**

20  **BY MR. HEATHER:**

21  Q.  SENATOR, THIS IS INFORMATION I HAVE JUST RECEIVED.  I WANT

22  TO SEE IF IT'S CORRECT.

23            IS IT TRUE THAT THE AB 900 FIX IS -- IS, QUOTE,

24  DOUBLE JOINTED TO THE REVENUE PACKAGE OF BILLS ENACTED

25  YESTERDAY, WHICH THE GOVERNOR HAS SAID HE IS GOING TO VETO AND,

1 THEREFORE, HE WILL VETO THIS LEGISLATION.

2 **A.**  MY UNDERSTANDING IS THAT IT -- THE WAY THAT THE LANGUAGE

3 WAS, THAT 900 -- IF THOSE REVENUE BILLS DID NOT GO INTO EFFECT

4 -- QUITE FRANKLY, I'M NOT SURE.

5         THERE WAS A -- THERE WAS A GREAT DEAL OF CONFUSION

6 DURING SOME OF THE DEBATE AS TO WHETHER OR NOT THOSE WERE DONE,

7 THOSE WERE JOINED IN THAT WAY.

8         IN FACT, I ASKED THE SPECIFIC QUESTION ON THE FLOOR,

9 WHETHER OR NOT THAT WAS, INDEED, TAKING PLACE.  AND THE ANSWER

10 THAT I GOT FROM THE AUTHOR WAS, IT WAS UNCLEAR AS TO WHETHER IT

11 WAS ACTUALLY IN THE BILL OR WHETHER OR NOT THE BONDS WOULDN'T BE

12 SOLD SIMPLY BECAUSE THE REVENUES, BACK TO THE DISCUSSION THAT

13 YOU HAD EARLIER IN REGARDS TO THE ABILITY FOR THE BONDS TO BE

14 SOLELY BECAUSE OF THE PUBLIC WORKS.  SO I -- SORRY, I GUESS I'M

15 UNCLEAR.

16         I GUESS THE POINT THAT I WOULD WANT TO MAKE IS THAT,

17 CLEARLY, THE HURDLE IN THE PAST HAS BEEN THE LEGISLATURE'S SIDE

18 IS GETTING THAT BILL OUT.  CLEARLY THE LEGISLATURE HAS DONE

19 THAT.

20         **JUDGE KARLTON:**  IT'S DONE SOMETHING.

21 **A.**  CLEARLY, THE LEGISLATURE HAS DONE THAT.

22         CLEARLY, IF THERE IS AN ISSUE BETWEEN THE GOVERNOR

23 AND THEN THIS -- THE PACKAGE OF BILLS THAT HAVE BEEN SENT TO HIM

24 AND HE VETOES THE BILLS OR VETOES A BILL, AS A RESULT OF THAT

25 THE 900 CAN'T BE DONE, CLEARLY THE LEGISLATURE NO LONGER HAS A

1  PROBLEM WITH THE IMPLEMENTATION OF THE 900 FIX LANGUAGE.  AND

2  THAT WILL BE RESOLVED, BECAUSE EVENTUALLY IT WILL BE RESOLVED IN

3  REGARDS TO WHAT ITS PROBLEMS ARE WITH THE OTHER REVENUE ISSUES

4  AND BILLS IN THE STATE BUDGET.

5  **Q.**  ALTHOUGH THERE WILL BE OTHER LEGISLATURES SITTING WHEN THE

6  NEW DEBATE OCCURS?

7  **A.**  NO, NO.  THIS IS THE CURRENT LEGISLATURE THAT SITS.

8  **Q.**  OKAY.  NO FURTHER QUESTIONS.  THANK YOU.

9          **MR. STEGEMAN:**  NO FOLLOW-UP.

10          **JUDGE HENDERSON:**  THANK YOU FOR TESTIFYING.

11              (WITNESS EXCUSED.)

12          **MS. BARLOW:**  GOOD MORNING, YOUR HONORS.  THE LAW

13  ENFORCEMENT INTERVENORS CALL CHIEF DON MEYER TO THE STAND.

14              **DONALD MEYER,**

15  CALLED AS A WITNESS FOR THE DEFENDANT HEREIN, HAVING BEEN FIRST

16  DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

17          **THE WITNESS:**  DON MEYER.

18          **MS. BARLOW:**  COULD YOU SPELL YOUR LAST NAME FOR THE

19  COURT REPORTER.

20          **THE WITNESS:**  M-E-Y-E-R.

21          **MS. BARLOW:**  THANK YOU.

22              **DIRECT EXAMINATION**

23  BY MS. BARLOW:

24  **Q.**  CHIEF MEYER, COULD YOU TELL THE COURT WHAT YOUR TITLE IS,

25  PLEASE?

1  **A.**  CHIEF PROBATION OFFICER OF YOLO COUNTY.

2          **MS. BARLOW:**  AND FOR THE COURT'S REFERENCE, THE

3  EXPERIENCE AND BACKGROUND OF THE WITNESS ARE CONTAINED IN

4  PARAGRAPHS 1 THROUGH 14 OF HIS DECLARATION.  THE CURRICULUM

5  VITAE IS ALSO AN EXHIBIT, DI-622.

6          ANY OBJECTION, COUNSEL?

7          **MS. SANGSTER:**  MS. BARLOW, I CAN'T HEAR WHAT YOU ARE

8  SAYING.

9          **MS. BARLOW:**  I'M ASKING IF YOU OBJECT TO THE

10  ADMISSION IF HIS CURRICULUM VITAE.

11          **MR. SANGSTER:**  NO.

12          **MS. BARLOW:**  THANK YOU.

13          **MS. SANGSTER:**  YOUR HONOR, I WOULD APPRECIATE IT IF

14  COUNSEL WOULD SPEAK CLOSER TO THE MICROPHONE.

15          **MS. BARLOW:**  I'M SORRY.  THAT'S FINE.  I WOULD BE

16  HAPPY TO DO THAT.  I WAS GETTING SOME FEEDBACK, SO I STEPPED

17  BACK A LITTLE BIT.

18  **BY MS. BARLOW:**

19  **Q.**  CHIEF, HOW MANY YEARS HAVE YOU BEEN DOING PROBATION

20  SERVICES?

21  **A.**  HOW MANY YEARS?  FORTY-TWO.

22  **Q.**  ALL RIGHT.  BEYOND THAT, LET'S JUST GET RIGHT TO THE MEAT OF

23  THIS.

24          WHAT KIND OF A PROBATION CASELOAD DOES THE YOLO

25  COUNTY PROBATION DEPARTMENT CARRY?

1  **A.**  ON THE ADULT SIDE, WE HAVE ABOUT A THOUSAND OR SO CURRENTLY

2  THAT ARE CONVICTED FELONS ON PROBATION.

3  **Q.**  I'M SORRY.  HOW MANY?

4  **A.**  PARDON?

5  **Q.**  HOW MANY?

6  **A.**  ABOUT A THOUSAND.

7  **Q.**  OKAY.  AND ON THE JUVENILE SIDE?

8  **A.**  THERE WOULD BE EIGHT -- A LITTLE OVER 800.

9  **Q.**  OKAY.  YOUR CASELOAD AS OF TWO MONTHS AGO WAS 3,728?

10 **A.**  I'M JUST TALKING ABOUT THE ACTIVE ONES WE SUPERVISE.  IT

11 DOESN'T INCLUDE THE 20 TO 100 THAT WE DON'T SEE AT ALL.

12 **Q.**  OKAY.  WHAT'S YOUR TOTAL CASELOAD THAT INCLUDES THOSE THAT

13 ARE ON PROBATION THAT YOU DON'T SUPERVISE?

14 **A.**  ADULT AND JUVENILE?

15 **Q.**  YES.

16 **A.**  ABOUT 5,000.

17 **Q.**  OKAY.  AND THE ADULT POPULATION IS ABOUT HOW MUCH?

18 **A.**  IT'S ALMOST 4,000 AS OF TODAY.

19 **Q.**  OKAY.  NOW, HOW MANY -- LET'S JUST TALK ABOUT THE ADULT

20 POPULATION FOR A MOMENT.  HOW MANY OF THE ADULTS THAT ARE ON

21 PROBATION, WHETHER SUPERVISED OR NOT, ARE FELONS?

22 **A.**  ALL BUT PROBABLY FIVE OR SIX.

23 **Q.**  AND YOU JUST INDICATED THAT THEY ARE NOT ALL ACTIVELY

24 SUPERVISED.  YOU HAVE GOT ABOUT A THOUSAND THAT ARE BEING

25 ACTIVELY SUPERVISED, OR LESS THAN THAT?

1    **A.**  CORRECT.

2    **Q.**  AND WHY ARE YOU NOT ACTIVELY SUPERVISING ALL 4,000 OF THEM?

3    **A.**  WE HAVE APPROXIMATELY 10 PROBATION OFFICERS AND ONE VACANT

4    POSITION FOR ALL THOSE CASES.  FOUR OF THOSE ARE MANDATED TO

5    SUPERVISE PROPOSITION 36 CASES.  IT'S CATEGORICAL MONEY.  THE

6    REMAINING SIX ARE FOR ALL THE REMAINDER OF THE CASES.

7             SO THAT'S ABOUT 300 PROP 36 CASES, AND THAT WOULD BE

8    ABOUT 3700 OTHER CASES, AND THEN WE CHOOSE TO SUPERVISE THE

9    HIGHEST RISK.

10   **Q.**  OKAY.  NOW, WE HAVE HEARD BEFORE ABOUT BANKED --

11   **A.**  YES.

12   **Q.**  -- CASE LOADS.

13             IS THAT WHAT YOU ARE TALKING ABOUT, THE ONES THAT

14   AREN'T BEING SUPERVISED?

15   **A.**  YES.

16   **Q.**  NOW, DO YOU ALSO HAVE A PORTION OF YOUR CASELOAD THAT IS,

17   WHAT WE SAY, IN THE WIND OR UNACCOUNTED FOR?

18   **A.**  YEAH.  SOMEWHERE BETWEEN SEVEN AND 800 WARRANTS AT ANY GIVEN

19   TIME.

20   **Q.**  AND SO YOU DON'T KNOW WHERE THOSE PROBATIONERS ARE?

21   **A.**  CORRECT.

22   **Q.**  NOW, YOU PUT IN YOUR DECLARATION --

23             **MS. BARLOW:**  AND I BELIEVE IT'S PARAGRAPH 26 FOR

24   COUNSEL'S REFERENCE.

25             **MR. SANGSTER:**  I COULDN'T HEAR YOU, COUNSEL.

1      **MS. BARLOW:**  IT'S PARAGRAPH 26, FOR COUNSEL'S

2  REFERENCE.

3  **BY MS. BARLOW:**

4  Q.  THAT YOLO COUNTY SENT 404 PEOPLE TO PRISON IN 2007?

5  A.  YES.

6  Q.  OKAY.  NOW, I THINK THERE WAS A LITTLE CONFUSION ABOUT THAT

7  PARAGRAPH AND WHAT IT MEANS TO SAY.  SO HOW MANY TECHNICAL

8  PAROLE -- SORRY, PROBATION VIOLATIONS DID THE DEPARTMENT DO IN

9  2007?

10  A.  IT WAS ABOUT 41 PERCENT OF THAT TOTAL, WHATEVER THAT NUMBER

11  IS, 160 SOMETHING.

12  Q.  AND THAT'S FOR PEOPLE WHO WENT TO PRISON?

13  A.  YEAH, JUST FOR DIRTY URINE TEST, NOT COMPLETING TREATMENT

14  PROGRAMS, NOT DOING SOME OF THE SPECIAL CONDITIONS OF PROBATION.

15  Q.  NOW, WAS THAT ALL OF THE PEOPLE WHO VIOLATED PROBATION --

16  A.  NO.

17  Q.  (CONTINUING) -- THAT WENT TO PRISON?

18  A.  NO.

19  Q.  DO YOU KNOW WHAT PROPORTION IT IS?

20  A.  YEAH.  IT'S ABOUT 27 PERCENT WENT TO PRISON.

21  Q.  SO YOU HAD A MUCH LARGER NUMBER OF ACTUAL PROBATION

22  VIOLATIONS, YOU JUST SENT 27 PERCENT OF THEM TO PRISON?

23  A.  CORRECT.

24  Q.  WE HAVE HEARD ABOUT TECHNICAL VIOLATIONS QUITE A BIT.

25  PERHAPS YOU COULD EXPLAIN TO THE COURT FOR PROBATION VIOLATION

1  WHY YOU WOULD SEND A TECHNICAL PROBATION VIOLATOR TO PRISON?

2  **A.**  IT'S USUALLY SOMEONE THAT HAS HAD THEIR PROBATION VIOLATED

3  ANYWHERE FROM TWO TO FOUR TIMES FOR A VARIETY OF REASONS.

4  AGAIN, DIRTY TESTS, THEY HAVEN'T DONE NOT TREATMENT PROGRAMS

5  THAT THE COURT HAD ORDERED THEM TO, OR THEY ABSCONDED AND WE

6  COULDN'T FIND THEM, OR THEY MAY HAVE BEEN INVOLVED IN A NEW

7  CRIME AND THE D.A. PLEA BARGAINED THAT OUT AND THEY FILE A

8  TECHNICAL VIOLATION BASED ON THE NEW ARREST, BUT NOT THE

9  CONVICTION.

10 **Q.**  NOW, DO YOU CONSIDER THOSE WHO GET SENT TO PRISON FOR

11 VIOLATING PROBATION ON A TECHNICAL VIOLATION LOW RISK?

12 **A.**  NO.

13 **Q.**  WHY NOT?

14 **A.**  ANYBODY THAT WE SENT TO PRISON, IF YOU RISK THEM OUT, THEY

15 ARE GOING TO SCORE IN THE MODERATE HIGH, HIGH AREA, AND THEY

16 FAIL JUST ABOUT EVERY PROGRAM OR THEY SIMPLY REFUSE TO COME IN.

17 THEY WON'T SEE THE PROBATION OFFICER, GET INVOLVED IN ANY SORT

18 OF MEANINGFUL REHABILITATION.

19 **Q.**  NOW, ONE OF THE THINGS YOUR DEPARTMENT DOES IS WRITE

20 PRESENTENCE REPORTS, CORRECT?

21 **A.**  YES.

22         **JUDGE HENDERSON:**  CAN I GO BACK A MINUTE?

23         **MS. BARLOW:**  OF COURSE.

24         **JUDGE HENDERSON:**  YOU DON'T CONSIDER THEM LOW RISK,

25 BUT YOU DO CONSIDER THEM FOR THOSE SAME REASONS HIGH RISK OR HOW

1    DO YOU CONSIDER THEM?

2              **THE WITNESS:**  YOU MEAN, THE ONES THAT GO TO PRISON?

3              **JUDGE HENDERSON:**  THE ONES THAT YOU SEND BACK FOR

4    TECHNICAL VIOLATIONS.

5              **JUDGE KARLTON:**  YOU MEAN THE PROBATIONS, THEY HAVEN'T

6    BEEN TO PRISON YET.

7              **JUDGE HENDERSON:**  I MISUNDERSTOOD.  THANK YOU.

8              **THE WITNESS:**  YES.

9    **BY MS. BARLOW:**

10   **Q.**  SO JUST TO CLARIFY THERE.  THEY ARE FELONS, BEEN PLACED ON

11   PROBATION, HAVE VIOLATED SEVERAL TIMES AND THEN YOU SEND THEM TO

12   PRISON?

13   **A.**  YES.

14   **Q.**  AND YOU DON'T CONSIDER THEM LOW RISK?

15   **A.**  NO.

16   **Q.**  YOUR DEPARTMENT WRITES REPORTS?

17   **A.**  YES.

18   **Q.**  AND THAT'S PART OF ITS STATUTORY TASK, CORRECT?

19   **A.**  YES.

20   **Q.**  AND THOSE REPORTS CONTAIN WHAT?

21   **A.**  THE SUMMARY OF THE OFFENSE OR THE VIOLATION, ANY OTHER

22   PERTINENT FACTORS; WHAT THE STATUTES REQUIRE US TO COVER, YOU

23   KNOW, WHERE THEY LIVE, WHO THEY LIVE WITH, IF THEY ARE EMPLOYED,

24   IF THEY PAID RESTITUTION, AND AN EVALUATION AS TO WHAT'S THE

25   MOST APPROPRIATE RECOMMENDATION TO KEEP AND WHETHER TO KEEP THEM

1  IN THE COMMUNITY OR NOT.

2  Q.  ABOUT HOW MANY FELONS ARE KEPT IN THE COMMUNITY VERSUS SENT

3  TO PRISON?

4  A.  OH, PROBABLY 95 PERCENT, AT LEAST.  MOST OF THE FELONS ARE

5  KEPT AT THE LOCAL LEVEL.

6  Q.  SO IT WOULD NOT BE TYPICAL FOR YOU TO SEND A PROBATION

7  VIOLATION -- A PROBATIONER WHO VIOLATES TO PRISON ON A FIRST

8  VIOLATION?

9  A.  VERY UNUSUAL.

10  Q.  OKAY.  NOW, AMONG YOUR POPULATION OF PROBATIONERS DO YOU

11  HAVE SOME WHO REQUIRE RESIDENTIAL CARE?

12  A.  YES.

13  Q.  AND WHAT DO YOU DO WITH THEM?

14  A.  WE HAVE A LIST OF A RESIDENTIAL CARE, AND IT'S MAINLY

15  SALVATION ARMY IN THE BAY AREA HERE, AS A MATTER OF FACT.  AND

16  THEY ARE IN JAIL AND THEY HAVE COMMITTED THAT THEY WANT TO GET

17  SOME SORT OF TREATMENT.  SO IN ORDER TO -- ONE OF THE REASONS

18  THEY WANT TO GO THERE, SOME OF THEM, IS TO GET OUT OF JAIL, TO

19  START TREATMENT.  SO WE THEN TRANSPORT THEM AND SUPERVISE THEM.

20  Q.  NOW, ARE THERE ENOUGH BEDS THAT YOU CAN PLACE SOMEBODY IN A

21  RESIDENTIAL FACILITY AS SOON AS THEY REQUEST IT?

22  A.  NO.

23  Q.  IS THERE A WAITING TIME THAT YOU NORMALLY HAVE TO --

24  A.  YES, GENERALLY FROM A WEEK TO TWO WEEKS.

25  Q.  OKAY.  NOW, LET'S TALK ABOUT -- AGAIN, WE KEEP HEARING ABOUT

1  PROPOSALS HERE TO DIVERT AND RELEASE LOW RISK PRISONERS FROM

2  PRISON.  SO LET'S TALK ABOUT HOW THEY GET TO PRISON.

3          ABOUT WHAT PERCENTAGE OF PEOPLE WHO GO TO PRISON DO

4  YOU DEAL WITH AS PROBATIONERS BEFORE THEY EVER GET SENT TO

5  PRISON?

6  **A.**  MY BEST ESTIMATE WOULD BE ABOUT 90 PERCENT OF THEM, AS HIGH

7  AS 90.

8  **Q.**  SO FOR SOMEONE TO GO TO PRISON ON, LET'S SAY, A PROPERTY

9  CRIME, WOULD THEY HAVE BEEN THROUGH THE PROBATION SYSTEM BEFORE?

10  **A.**  YEAH, MAYBE AS EARLY STARTING ON THE JUVENILE SIDE AND THEY

11  HAVE A RELATIVELY LONG HISTORY.  IT'S UNUSUAL TO RECOMMEND A

12  PROPERTY CRIME GO TO PRISON THE FIRST TIME.

13  **Q.**  SO WHEN SOMEBODY DOES GO TO PRISON AND IT'S FOR A PROPERTY

14  CRIME, CAN WE ASSUME THAT THEY HAVE ALREADY BEEN THROUGH THE

15  SYSTEM SEVERAL TIMES?

16  **A.**  YES.

17          **JUDGE KARLTON:**  SET ASIDE ASSUME.  WE CAN CONCLUDE

18  THAT IT'S LIKELY THEY'VE GONE THROUGH THE SYSTEM SEVERAL TIMES.

19          **THE WITNESS:**  YES.

20          **MS. BARLOW:**  THANK YOU, YOUR HONOR.

21  **BY MS. BARLOW:**

22  **Q.**  AND, AGAIN, THOSE WHO DO GET SENT TO PRISON -- WE ARE NOT

23  TALKING NOW ABOUT PROBATIONERS, BUT PRISONERS -- DO YOU CONSIDER

24  THOSE THAT ARE IN PRISON LOW RISK?

25  **A.**  NO.

1  **Q.**  NOW, PROPERTY CRIMES HAVE A PRETTY LOW CLEARANCE RATE,

2  CORRECT?

3  **A.**  PROBABLY SINGLE DIGIT.  IF YOU LOOK AT, I THINK, THE DOJ AND

4  THE FBI STATS, IT'S LESS THAN 10 PERCENT.

5  **Q.**  SO WHAT THAT MEANS IS THAT MOST PROPERTY CRIMES DON'T EVEN

6  GET INVOLVED, IS THAT RIGHT?

7  **A.**  CORRECT.

8  **Q.**  NOW, DO YOU SOMETIMES HAVE PEOPLE WHO ARE ON FELONY

9  PROBATION AND PAROLE AT THE SAME TIME?

10  **A.**  THAT'S A POSSIBILITY, YES.

11  **Q.**  NOW, LET'S TALK ABOUT PART OF THE PLAINTIFFS' PROPOSAL THAT

12  INVOLVES DIVERSION.  THE PROPOSAL IS TO DIVERT FROM -- PEOPLE

13  FROM BEING SENT TO PRISON BACK INTO THE LOCAL COMMUNITIES.  I

14  BELIEVE THE NUMBER THAT'S PROPOSED IS ABOUT 12,500.  AND THEY

15  ARE REFERRED TO IN THE PLAINTIFFS' EXPERT ANALYSTS AS LOW RISK.

16          DO YOU BELIEVE THAT THE PEOPLE THAT ARE PROPOSED TO

17  BE DIVERTED INTO THE COMMUNITY AWAY FROM PRISON ARE, IN FACT,

18  LOW RISK?

19  **A.**  NO --

20          **MR. SANGSTER:**  OBJECTION, YOUR HONOR -- EXCUSE ME.

21  OBJECTION, YOUR HONOR.  LACKS FOUNDATION.  HER HYPOTHETICAL

22  PRESUPPOSES AN AWARENESS OF WHAT THE PLAINTIFFS' EXPERTS CALL

23  HIGH RISK.  THERE HAS BEEN NO FOUNDATION THAT THIS WITNESS IS

24  AWARE OF THAT.

25          **JUDGE KARLTON:**  SETTING ASIDE YOUR EXPERT'S

 1  DETERMINATION, DO YOU HAVE AN OPINION AS TO WHETHER THEY ARE LOW

 2  RISK?

 3          **THE WITNESS:**  YES, SIR.  THEY MIGHT BE LOW LEVEL

 4  CRIMES, BUT THEY ARE NOT LOW RISK.

 5  **BY MS. BARLOW:**

 6  Q.  WOULD IT BE -- LET ME STRIKE THAT.

 7          THE TOTAL PROPOSED REDUCTION IS 52,000 PRISONERS.  DO

 8  YOU BELIEVE, SIR, THAT THERE ARE 52,000 LOW RISK PRISONERS IN

 9  THE STATE OF CALIFORNIA?

10  A.  AWARE?

11  Q.  DO YOU BELIEVE THERE ARE 52,000 LOW RISK PRISONERS IN   THE

12  --

13          **JUDGE KARLTON:**  NOW IF YOU WANTED TO OBJECT THAT IT

14  CALLS FOR SPECULATION.

15          **MR. SANGSTER:**  OBJECTION.  LACKS FOUNDATION.  CALLS

16  FOR SPECULATION.

17          **JUDGE KARLTON:**  YOU CAN ASK HIM WHETHER OR NOT THE

18  PEOPLE HE SENDS FROM YOLO IS, BUT UNLESS YOU HAVE SOME MAGIC WAY

19  OF KNOWING WHAT EVERYBODY ELSE IS DOING.

20  A.  NO.  THE ONES THAT WE SEND TO PRISON WERE, IN OUR

21  ESTIMATION, HIGH RISK AND THEY FAILED PRETTY MUCH EVERYTHING WE

22  PUT THEM THROUGH OR THE CRIME THEY HAVE COMMITTED IS SO SERIOUS

23  AND IT'S MANDATED THEY GO TO PRISON AND THEY ARE NOT ON

24  PROBATION ANYWAY.

25  **BY MS. BARLOW:**

1  Q.  NOW, IF SOME OF THESE HIGH RISK PEOPLE THAT WOULD OTHERWISE

2  GO TO PRISON OR GET RELEASED EARLY FROM PRISON END UP BACK WITH

3  YOLO COUNTY, WHAT ARE YOU GOING TO DO WITH THEM?

4  A.  PROBABLY BANK THEM.

5          JUDGE KARLTON:  WELL, ACTUALLY, YOU ARE NOT GOING TO

6  DO ANYTHING BECAUSE IT'S PAROL'S PROBLEM NOT, YOURS.

7          MS. BARLOW:  WELL, WITH RESPECT, YOUR HONOR, I THINK

8  DR. AUSTIN --

9          JUDGE KARLTON:  JUST A MINUTE.

10          IS THAT RIGHT, SIR?

11          THE WITNESS:  THEY WOULD NOT GO ON A PROBATION

12  CASELOAD.  THEY WOULD GO ON PAROLE.

13          JUDGE KARLTON:  AND IF PEOPLE ARE DIVERTED, WOULD

14  THEY BE ON YOUR CASELOAD OR ON PAROL, OR THAT WOULD BE SOMETHING

15  THAT YOU WORKED OUT?

16          THE WITNESS:  YOU KNOW I'M NOT SURE.  IF THEY ARE

17  DIVERTED AT THE LOCAL LEVEL, THEY WOULD BE ON OUR CASE LOAD.  IF

18  IT'S FROM THE STATE, IT WOULD BE ON A PAROLE CASELOAD.

19          JUDGE KARLTON:  OKAY.

20  BY MS. BARLOW:

21  Q.  SO IF WE ASSUME THAT A DIVERSION ORDER WOULD HAVE THESE

22  PEOPLE PLACED ON PROBATION RATHER THAN PROPOSAL, THEY WOULD BE

23  ON YOUR CASELOAD?

24  A.  YES.

25  Q.  AND IF YOU GOT THEM, YOU SAID YOU WOULD BANK THEM?

1  **A.**  YES.

2  **Q.**  WHY?

3  **A.**  WE GET APPROXIMATELY FOUR NEW CASES OF CONVICTED FELONS

4  EVERY DAY, AND THERE ARE TWO THAT SUCCESSFULLY COMPLETE

5  PROBATION OUT THE OTHER AGAIN.

6          SO WE JUST DON'T HAVE THE RESOURCES.  SO ALMOST ALL

7  THE NEW CASES THAT COME IN, UNLESS WE TAKE SOMEBODY ELSE THAT'S

8  HIGH RISK AND MOVE THEM TO A BANK LOAD, THEY ARE GOING TO BE

9  BANKED.

10 **Q.**  SO YOU ARE SUPERVISING ONLY HIGH RISK PEOPLE NOW, AND R AND

11 YOU CAN'T REALLY DO ANY MORE, IS THAT WHAT YOU ARE SAYING?

12 **A.**  YES.  THAT'S BEEN THE CASE FOR AT LEAST A DECADE, IF NOT

13 LONGER.

14 **Q.**  OKAY.  NOW, YOU MENTIONED YOUR CURRENT STAFFING IN TERMS OF

15 PROBATION OFFICERS.  ARE YOU EXPECTING ANY REDUCTION IN THAT

16 STAFFING?

17 **A.**  YES.  WE ARE GOING TO -- WE ARE GOING TO LOSE TWO P.O.

18 POSITIONS FROM THE ADULT DIVISION GOING TO THE JUVENILE DIVISION

19 BECAUSE THE MONEY IS CATEGORIAL ON JUVENILE AND WE GET REVENUE

20 IF WE FILL THEM.

21          AND I SUSPECT WE MAY LOSE ANOTHER FOUR TO SIX IF THE

22 -- IN THE STATE BUDGET AND COUNTY BUDGET.  WE MAY BE DOWN TO

23 ZERO OR ONE PROBATION OFFICER TO SUPERVISE THE 4,000 PEOPLE.

24 **Q.**  AND WHY CAN'T YOU JUST MOVE SOME OF THE PEOPLE THAT ARE

25 SUPERVISING THE PROP 36 PEOPLE?

1  **A.**  IT'S CATEGORICAL MONIES.  IT'S ONLY -- THEY ARE ONLY TO

2  SUPERVISE THOSE CASES REFERRED TO THEM.  THE MONEY ONLY ALLOWS

3  THEM TO SUPERVISE PROP 36 CASES.

4  **Q.**  SO YOU CAN'T MOVE THAT MONEY TO HAVE PEOPLE BEING SUPERVISED

5  THAT ARE HIGH RISK FELONS?

6  **A.**  UNLESS WE WANT TO RETURN THE MONEY TO THE STATE.

7  **Q.**  LET'S TALK A LITTLE ABOUT THE DIFFERENCE BETWEEN THE

8  JUVENILE CASELOAD AND HOW YOU MANAGE THEM AND THE ADULT

9  CASELOAD.  YOU MENTIONED THAT MORE RESOURCES ARE DEVOTED TO

10 JUVENILES IN YOUR DECLARATION, COULD YOU --

11 **A.**  YES.

12 **Q.**  -- EXPLAIN TO THE COURT?

13 **A.**  YES.

14 **Q.**  HOW MUCH -- WHAT'S THE DIFFERENCE?

15 **A.**  WELL, WE HAVE ACTUALLY RESOURCES THAT -- A NUMBER OF

16 SUBVENTION MONIES THAT HAVE COME FROM THE STATE AND SOME FROM

17 THE FEDS, AND NOT MUCH KIND OF GENERAL FUND, BUT IT ALLOWS US TO

18 GET INTO EVIDENCE-BASED PROGRAMS IN A BIG WAY.  WE JUST FINISHED

19 OUR FIRST YEAR OF THAT AND IT'S RESULTED IN DEVELOPING PROGRAMS

20 AND RISK NEEDS ASSESSMENTS AND CASE MANAGEMENT SYSTEMS.

21          AND AS A RESULT OF THAT, WE REDUCED THE JUVENILE HALL

22 POPULATION BY OVER 50 PERCENT, OUT-OF-HOME PLACEMENTS BY AT

23 LEAST A THIRD, AND REDUCED THE NUMBER OF PEOPLE ON JUVENILE

24 PROBATION PROBABLY BY HALF.

25 **Q.**  SO THAT PROGRAMMING YOU WERE TALKING ABOUT, THAT WAS JUST

1  FOR YOUR JUVENILE POPULATION?

2  **A.**  YES.

3  **Q.**  AND IS THAT MONEY REQUIRED TO BE SPENT ON JUVENILES?

4  **A.**  YES.

5  **Q.**  AND ABOUT HOW MUCH ARE YOU SPENDING ON A JUVENILE IN YOLO

6  COUNTY?

7  **A.**  2700, 2800 PER CASE.

8  **Q.**  ALL RIGHT.  YOU HAVE -- NOW, YOU HAVE, I THINK YOU SAID,

9  FOUR OR FIVE TIMES MORE, APPROXIMATELY, ADULTS THAN JUVENILES --

10  **A.**  YES.

11  **Q.**  (CONTINUING) -- ON PROBATION.

12         AND HOW MUCH MONEY IS BEING SPENT ON ADULTS?

13  **A.**  LESS THAN $700.

14  **Q.**  EACH?

15  **A.**  YES.

16  **Q.**  COULD YOU DO MORE IF YOU HAD MORE MONEY?

17  **A.**  PARDON?

18         **MR. SANGSTER:**  I COULDN'T HEAR THE QUESTION.

19  **BY MS. BARLOW:**

20  **Q.**  COULD YOU DO MORE IF YOU HAD MORE MONEY?

21  **A.**  YES.  THERE'S REAL EVIDENCE FROM WASHINGTON STATE AND

22  MISSOURI AND SOME OTHER STATES THAT HAVE GONE TO EVIDENCE-BASED

23  PROGRAMMING WITH STABLE FUNDING THAT YOU CAN REDUCE PRISON

24  POPULATIONS.  PROBATION, JAIL SPACE, ALL THOSE THINGS WITH THE

25  RIGHT TREATMENT.  AND CALIFORNIA JUST HASN'T DONE THAT ON THE

1  ADULT SIDE.

2  Q.  NOW, ONE OF THE ISSUES THAT HAS BEEN DISCUSSED QUITE A BIT

3  AS WELL IS DOING PROGRAMMING IN PRISON.  YOU ARE TALKING ABOUT

4  PROGRAMMING AT THE LOCAL LEVEL, RIGHT?

5  A.  AT THE COMMUNITY LEVEL, YES.

6  Q.  AND DO YOU BELIEVE THAT PROGRAMMING AT THE LOCAL LEVEL IS

7  MORE EFFECTIVE THAN PROGRAMMING IN PRISON?

8  A.  YES, I DO.  I THINK THE SOONER YOU START WITH THE

9  PROGRAMMING, THE BETTER IT IS TO REHABILITATE SOMEBODY.

10         THE WAY THE SYSTEM WORKS, IT'S INCREMENTAL.  THE

11  DEEPER YOU GO IN THE HARDER IT IS TO GET OUT.

12         AND THE BIG PROBLEM THAT WE HAVE IS THERE REALLY

13  AREN'T ANY QUALITY EVIDENCE BASED PROGRAMS IN MOST COUNTIES FOR

14  ADULTS.

15  Q.  WHAT KIND OF PROGRAMS ARE THERE?

16  A.  SALVATION ELEMENTARY, N.A.A.A., SOME -- A LITTLE BIT OF

17  MENTAL HEALTH STUFF BUT IT'S LONG WAITING LISTS.

18  Q.  NOW, I WANT YOU TO ASSUME THAT WE COULD FIND SOME LOW RISK

19  PEOPLE FROM YOLO COUNTY IN PRISON.  JUST ASSUME THAT FOR THE

20  SAKE OF ARGUMENT.  AND SOME NUMBER ARE DIVERTED EITHER DIRECTLY

21  INTO THE COMMUNITY WITHOUT SUPERVISION OR TO PROBATION.  YOU

22  ALREADY SAID YOU DON'T HAVE ROOM IN PROBATION.

23         IS THERE ROOM IN JAILS FOR THEM IF THEY NEED TO BE

24  CONFINED?

25  A.  NO.  THERE IS A CONSENT DECREE AND YOLO HAS ONE FOR QUITE A

1  NUMBER OF YEARS.  I BELIEVE IT'S WHEN THEY GET TO 85 PERCENT,

2  THEY HAVE TO START RELEASING.

3  Q.  AND ARE THEY RELEASING REGULARLY, DO YOU KNOW?

4  A.  YES.  SOMETIMES ON A DAILY BASIS.

5  Q.  NOW, ARE THOSE RELEASES FROM THE COUNTY FACILITY IMPACTING

6  YOUR WORKLOAD AT ALL OR YOUR CASES?

7  A.  NO, THEY ARE NOT.  YOU MEAN, ARE THEY --

8  Q.  I MEAN, IF YOU HAD SOMEBODY IN THE FACILITY AND THEY WERE

9  RELEASED, IS THAT IMPACTING YOUR ABILITY TO GET COMPLIANCE FROM

10  YOUR PROBATIONERS?

11            MR. SANGSTER:  I OBJECT.  THE QUESTION IS VAGUE AND

12  AMBIGUOUS.

13            JUDGE KARLTON:  I DIDN'T UNDERSTAND IT EITHER.

14            MS. BARLOW:  I WILL START AGAIN.

15  BY MS. BARLOW:

16  Q.  YOU INDICATE THAT PEOPLE ARE CURRENTLY BE RELEASED

17  PRACTICALLY ON A DAILY BASIS FROM THE JAIL?

18  A.  CORRECT.

19  Q.  ARE SOME OF THOSE PEOPLE THAT HAVE BEEN ARRESTED FOR

20  PROBATION VIOLATIONS?

21  A.  YES.

22  Q.  DO YOU BELIEVE THAT HAVING THEM RELEASED EARLY BECAUSE OF A

23  CAP IN THE JAIL IS HAVING AN IMPACT ON YOUR ABILITY TO SUPERVISE

24  THEM?

25  A.  YES.  IF WE COULD GET THEM INTO TREATMENT AND GET THEM CLEAN

1  FIRST, THEY HAVE TO BE CLEAN, AND THEN WE WORK ON GETTING THEM

2  SOBER, CLEAN AND SOBER TOTALLY.  IF IT'S A DRUG ISSUE AND ANY

3  OTHER ISSUES, YOU KNOW.

4          AND THE DIFFICULT THING IS THAT WE DON'T HAVE A LOT

5  OF AVAILABILITY OF THOSE PROGRAMS LOCALLY.

6          **JUDGE REINHARDT:**  AND THAT CAUSES MORE CRIME.

7      **THE WITNESS:**  IT DOES BECAUSE THEY GET DEEPER INTO

8  THE LIFESTYLE.  I MEAN, MY EXPERIENCE IN THIS BUSINESS HAS BEEN

9  THAT BEHAVIOR ESCALATES OVER TIME.  IT MIGHT START SMALL, BUT IT

10  DOESN'T STAY SMALL.  THAT'S PROPERTY OFFENDERS AND CRIMES OF

11  VIOLENCE.  IT'S CERTAINLY TRUE WITH DOMESTIC VIOLENCE.

12          **JUDGE REINHARDT:**  IT SOUNDS LIKE FROM ALL THE

13  TESTIMONY THE GREATEST CAUSE OF INCREASED CRIME IS THE FAILURE

14  OF THE STATE AND LOCAL COMMUNITIES TO SPEND ENOUGH MONEY ON

15  THESE PROGRAMS.

16          **THE WITNESS:**  WELL, IT'S A HUGE ISSUE FOR US, YEAH.

17  IT'S UNFORTUNATE THAT A FELLOW NAMED MARTINSON WROTE A REPORT

18  WAY BACK WHEN SAYING NOTHING WORKS, AND OUR SOCIETY AND CULTURE

19  BOUGHT INTO THAT.

20          AND IT'S TRUE THERE ARE PROGRAMS THAT DO WORK AND

21  THERE'S EVIDENCE AND DATA THAT SHOWS THAT THEY DO, BUT IN

22  CALIFORNIA THEY HAVEN'T BEEN FUNDED.

23          **JUDGE REINHARDT:**  SO THE BEST WAY TO REDUCE CRIME

24  WOULD BE TO FUND ALL THESE PROGRAMS?

25          **THE WITNESS:**  YOU WOULD HAVE TO HAVE A PRETTY BIG

1  INFUSION OF MONEY TO FUND THE PROGRAMS.  MUCH CHEAPER, HOWEVER,

2  THAN SENDING THEM TO PRISON.

3  **BY MS. BARLOW:**

4  **Q.**  IF WE DID THAT, IF WE HAD PROGRAMS, SOME SORT OF EITHER

5  STATE-WIDE OR COUNTY-BY-COUNTY THAT'S FUNDED BY THE STATE, THE

6  PROGRAMMING, DO YOU BELIEVE THAT THAT COULD REDUCE THE PRISON

7  POPULATION?

8  **A.**  YES.

9  **Q.**  BY ABOUT HOW MUCH?

10  **A.**  I THINK CONSERVATIVELY ABOUT 30 PERCENT.

11  **Q.**  AND HOW LONG WOULD IT TAKE TO PUT TOGETHER A SYSTEM EITHER

12  COUNTY-BY-COUNTY OR STATE-WIDE TO PROVIDE THE KIND OF EVIDENCE

13  BASED PROGRAMMING YOU HAVE DESCRIBED?

14  **A.**  I THINK --

15          **JUDGE KARLTON:**  PROVIDING THE MONEY IS THERE.

16          **MS. BARLOW:**  THAT'S CORRECT.

17  **A.**  I WOULD SAY PROBABLY A MINIMUM OF TWO YEARS AND MAXIMUM OF

18  FIVE.

19          **JUDGE REINHARDT:**  AND HOW WOULD YOU SUGGEST GOING

20  ABOUT GETTING THAT MONEY?

21          **THE WITNESS:**  THAT'S THE -- I THINK SENATOR RUNNER

22  WAS IN HERE, WE HAD TALKS WITH ALL THE LEGISLATORS AND IT'S

23  NEARLY -- BEEN NEARLY IMPOSSIBLE FOR US FOR DECADES.  WE JUST

24  HAVE NOT BEEN ABLE TO CONVINCE ANYBODY TO --

25          **JUDGE REINHARDT:**  FOR THEM TRYING TO RESOLVE THE

1  PROBLEM AND SEE WHAT THE ALTERNATIVES ARE, WE HAVE NO BASIS FOR

2  THINKING THERE IS GOING TO BE MONEY PROVIDED.

3          **THE WITNESS:**  I HAVE NO FAITH THERE IS GOING TO BE

4  MONEY ABSENT SOMEBODY ORDERING THEM TO FUND LOCALS OR THE

5  LEGISLATORS GETTING TOGETHER AND SAYING WE ARE GOING TO MAKE

6  THIS A PRIORITY?

7          **JUDGE REINHARDT:**  DO YOU THINK WE OUGHT TO ORDER THEM

8  TO DO THAT?

9          **JUDGE KARLTON:**  ASSUMING THAT WE COULD.

10          **JUDGE REINHARDT:**  THERE IS NO WAY OF SOLVING IT

11  UNLESS SOMEBODY ORDERS THEM.

12          **THE WITNESS:**  THAT WOULD BE GREAT AND IT WOULD REDUCE

13  PRISON, BUT --

14          **JUDGE REINHARDT:**  IF WE CAN'T, WE CAN ASSUME THAT

15  IT'S NOT GOING TO BE THERE AND THESE PROGRAMS ARE NOT REASONABLE

16  ALTERNATIVES.

17          **THE WITNESS:**  THAT'S CORRECT.

18  **BY MS. BARLOW:**

19  **Q.**  CHIEF, GETTING BACK TO THE DIVERSION PROPOSAL FOR JUST A

20  MOMENT.  DO YOU BELIEVE IT IS A GOOD IDEA TO DIVERT PEOPLE WHO

21  WOULD OTHERWISE GO TO STATE PRISON INTO -- BACK INTO THE LOCAL

22  COMMUNITIES?

23  **A.**  ABSENT ANY EFFECTIVE TREATMENT, NO.  I THINK THERE WOULD

24  JUST BE A LOT MORE VICTIMS AND PUBLIC SAFETY IS COMPROMISED.

25  **Q.**  NOW, THE PLAINTIFFS HAVE REQUESTED A CAP, A MAXIMUM OF

1  INMATES IN THE STATE PRISON.

2         AND IF A CAP WERE IMPOSED, AND YOU HAVE INDICATED

3  THAT THEY ARE GETTING RELEASED ALREADY FROM THE COUNTY JAIL,

4  WHAT ALTERNATIVE SANCTIONS WOULD BE ABLE TO YOU FOR YOUR

5  PROBATION VIOLATORS IF THERE IS NO ROOM AT THE JAIL AND THERE IS

6  NO ROOM AT THE PRISON?

7  **A.** THERE WOULD BE FEWER, I THINK, WITH THE -- WITH THE PAROLEES

8  OR WHOEVER IS DIVERTED COMING OUT IN THE COMMUNITY, IF THEY END

9  UP TAKING SOME OF THE -- WHAT LITTLE TREATMENT IS AVAILABLE.

10 **Q.** AND WHAT ABOUT SANCTIONS FOR VIOLATING PROBATION?  IN OTHER

11 WORDS, SOMETIMES DO YOU SEND THEM BACK TO LOCAL CUSTODY IF THEY

12 VIOLATE PROBATION?

13 **A.** YES.  BUT A GOOD PORTION OF THEM GET RELEASED AFTER A PERIOD

14 OF TIME BECAUSE ONLY 15 PERCENT OF THE INMATES AT THE COUNTY

15 JAIL IN YOLO ARE SENTENCED PRISONERS.  85 PERCENT ARE PENDING

16 COURT.

17 **Q.** SO WHAT DO YOU DO BESIDES SENDING SOMEBODY TO PRISON OR JAIL

18 IF THEY VIOLATE THEIR PROBATION?

19 **A.** WELL, THERE ARE WORK PROGRAMS AND WHAT HAPPENS IS THE JAIL

20 CAN ALLOW THEM TO GO DO AN ADULT WORK PROGRAM, WHICH WE OPERATE.

21 YOU CAN ENCOURAGE THEM TO GET INVOLVED IN TREATMENT AND THOSE

22 SORTS OF THINGS.

23        BUT BEYOND THAT THERE AREN'T REALLY ANY SANCTIONS

24 WHERE IF YOU NEED A LOCKED FACILITY OR FACILITY WHERE THEY CAN'T

25 GET AWAY AND GET DRUGS OR CONTINUE THEIR RUN-AWAY BEHAVIOR, IT

1  MAKES IT DIFFICULT.

2           **JUDGE KARLTON:**  WELL, IT MAKES IT IMPOSSIBLE.

3           **THE WITNESS:**  WELL, OKAY.

4  **BY MS. BARLOW:**

5  **Q.**  LET'S TALK FOR A MOMENT ABOUT THE PAROLEES IN YOLO COUNTY.

6  NOW, WHAT'S THE APPROXIMATE NUMBER OF PAROLEES?

7  **A.**  ABOUT 800.

8  **Q.**  NOW, OBVIOUSLY, THAT'S A MUCH SMALLER NUMBER THAN THE NUMBER

9  OF PROBATIONERS THAT YOU HAVE THERE?

10  **A.**  CORRECT.

11  **Q.**  ARE THESE COMPARABLE POPULATIONS, THE PAROLEES AND THE

12  PROBATIONERS?

13  **A.**  IN THE SENSE THAT THEY MAY HANG OUT TOGETHER, BECAUSE IT'S

14  NOT UNCOMMON FOR US TO COME ACROSS PAROLEES AT PROBATIONER'S

15  HOUSES; BUT WE ALWAYS CONSIDER PAROLEES A MUCH HIGHER RISK.

16  **Q.**  AND WHY IS THAT?

17  **A.**  BECAUSE OF THEIR PRIOR RECORD AND ALL OF THE THINGS THAT

18  MAKE YOU RISK -- OR ANTI-SOCIAL THINKING; THE DRUG ABUSE, THE

19  ALCOHOL ABUSE THE LONG CRIMINAL HISTORY.

20  **Q.**  NOW, YOU PUT IN YOUR DECLARATION THAT THERE WERE 295 NEW

21  PAROLEES RELEASED INTO YOLO COUNTY IN 2007 AND 641 REPAROLED.

22  CAN YOU ADVISE THE COURT WHAT'S THE DIFFERENCE THERE?

23  **A.**  WELL, THAT MEANS THE FIRST PAROLE IS THE FIRST TIME THEY

24  WENT TO PRISON AND GOT OUT, AND THE REPAROLE MEANS THAT THEY

25  VIOLATED PAROLE AND THEN WERE SENT OUT AGAIN.

1    Q.  TWO-THIRDS OF THOSE PAROLED INTO YOLO COUNTY LAST YEAR HAVE

2    ALREADY BEEN RETURNED TO PRISON AT LEAST ONCE?

3    A.  LOOKS THAT WAY, YES.

4    Q.  AND DO YOU RECALL WHAT PERCENTAGE OF THE CDCR POPULATION IS

5    FROM YOLO COUNTY?

6    A.  SIX-TENTHS OF ONE PERCENT OR SOMETHING LIKE THAT.

7    Q.  SO IF A RELEASE ORDER OR CAP IS IMPOSED THAT WOULD REDUCE

8    THE PRISON POPULATION BY 52,000, HOW MANY IS THAT FOR YOLO

9    COUNTY?

10   A.  THAT WOULD BE PROBABLY AROUND 300.

11   Q.  I THINK YOU SAID 60 FOR EACH 10,000, IS THAT RIGHT?

12   A.  YES.

13   Q.  SO IF I DO MY MATH, THAT'S ABOUT 312, IS THAT RIGHT?

14   A.  YES.

15   Q.  OKAY.  NOW, WE HAVE HEARD A LOT ABOUT RECIDIVISM AND WHAT IT

16   MEANS AND WHAT IT DOESN'T MEAN.

17          I WOULD LIKE YOU TO ASSUME, IF YOU WOULD, THAT ONLY

18   HALF OF THOSE FOLKS RECIDIVATE AFTER THEY RETURN TO THE

19   COMMUNITY IN, SAY, THE FIRST YEAR OR TWO YEARS.

20          WHAT KIND OF IMPACT MIGHT THAT HAVE TO THE PROGRAMS

21   AND SERVICES THAT YOU PROVIDE AND THAT YOU ACCESS FOR YOUR

22   PROBATIONERS?

23          **MR. SANGSTER:**  OBJECTION.  LACKS FOUNDATION.  THERE

24   HAS BEEN NO TESTIMONY --

25          **JUDGE KARLTON:**  YOUR BEST ESTIMATE, YOUR BEST

1   ESTIMATE AS TO THE EFFECTS, SIR.

2   **A.**  CLEARLY FROM A SYSTEM-WIDE STANDPOINT, THERE WOULD BE JUST

3   SOME MORE COURT HEARINGS, MORE D.A. INVOLVEMENT, MORE PUBLIC

4   DEFENDER.  WE WILL HAVE TO WRITE MORE REPORTS.

5           SOME OF THEM MAY GET A GRANT OF PROBATION.  THERE

6   WILL BE MORE PEOPLE RELEASED FROM JAIL BECAUSE THEY ARE LIKELY

7   TO BE DETAINED AT THE JAIL AND NOT BE ONE OF THE ONES RELEASED

8   ON A CONSENT DECREE.

9   **BY MS. BARLOW:**

10  **Q.**  THERE HAS BEEN TESTIMONY BEFORE THE COURT THAT SHORT

11  SENTENCES ARE NOT VERY EFFECTIVE.

12          IN YOUR VIEW, ARE SHORT SENTENCES TO PRISON FOR

13  PROBATION VIOLATORS OR PAROLE VIOLATORS, DO THEY HAVE ANY

14  MEANINGFUL IMPACTS?

15          **MR. SANGSTER:**  OBJECTION.  ASSUMES FACTS NOT IN

16  EVIDENCE.  MISSTATES THE TESTIMONY.

17          **JUDGE HENDERSON:**  MISSTATES IT IN THE SENSE THAT

18  THERE'S NOT BEEN --

19          **MR. SANGSTER:**  COUNSEL'S PREFACE TO THE QUESTION

20  PRESUPPOSED TESTIMONY THAT I DON'T BELIEVE HAS BEEN GIVEN IN

21  THIS COURT.

22          **JUDGE KARLTON:**  TAKE OUT THE PRE.  TAKE OUT THE

23  INTRODUCTION.

24  **BY MS. BARLOW:**

25  **Q.**  DO YOU BELIEVE THAT SHORT PRISON STAYS FOR PROBATION

1  VIOLATORS OR PAROLE VIOLATORS DON'T DO ANYTHING?

2          **JUDGE KARLTON:**  NOBODY SAYS THAT.  GO AHEAD.  ANSWER

3  IT.

4  **A.**  I THINK THEY DO SOMETHING, AND IT MAKES IT WORSE ACTUALLY.

5  **BY MS. BARLOW:**

6  **Q.**  IF SOMEBODY VIOLATES PAROLE AND THEY GO BACK TO PRISON, IS

7  THERE ANY POSITIVE IMPACT FROM THEM BEING IN PRISON?

8  **A.**  WHEN I TOURED THE PRISONS WITH THE INTERVENORS SOME TIME

9  AGO, I WAS ACTUALLY SHOCKED ABOUT HOW ALMOST NOTHING POSITIVE IS

10  GOING ON, HOW CROWDED IT WAS.

11          IT'S AN ISSUE THAT -- THAT IT SEEMS LIKE THEY PRODUCE

12  ADDITIONAL CRIMINAL BEHAVIOR.

13          **JUDGE KARLTON:**  SEVERAL TIMES DURING THIS TRIAL

14  PRISONS HAVE BEEN CHARACTERIZED AS CRIMINOGENIC.  DO YOU AGREE

15  WITH THAT, SIR?

16          **THE WITNESS:**  ALL THE STUDIES SAY, THE RESEARCH SAYS

17  IF YOU USE CUSTODY AS YOUR MAJOR SANCTION AND NOTHING ELSE, IT

18  DOES INCREASE CRIMINAL BEHAVIOR, ABSENT ANY EFFECTIVE PROGRAMS

19  IN THE PLACES THAT YOU PUT THEM.

20          IF YOU HAVE GOOD QUALITY EVIDENCE-BASED PROGRAMS, YOU

21  CAN --

22          **THE WITNESS:**  GOD WILLING AND THE RIVER DON'T RISE,

23  RIGHT?

24  **BY MS. BARLOW:**

25  **Q.**  ARE THERE ANY INCAPACITATION EFFECTS FROM SENDING VIOLATORS

1  TO PRISON?

2  **A.** OH, YES.  CLEARLY, YES.

3  **Q.** AND ARE THOSE POSITIVE FOR THE PUBLIC SAFETY?

4  **A.** YES.

5          **JUDGE KARLTON:** THEY ARE IMMEDIATELY POSITIVE.

6          **THE WITNESS:** YEAH.  DURING THE TIME THEY ARE THERE,

7  THEY CAN'T COMMIT CRIMES OUT ON THE STREETS.

8          **JUDGE KARLTON:** WE DIDN'T KNOW THAT WITHOUT THAT

9  QUESTION, MA'AM.  IT'S REALLY IMPORTANT.

10         **MS. BARLOW:** I'M SORRY, YOUR HONOR.  I'M NOT TRYING

11 TO BELABOR IT.

12         **JUDGE KARLTON:** I KNOW.  YOU HAVE CONTEMPT FOR US.

13 YOU MAY PROCEED.

14         **MS. BARLOW:** THANK YOU.

15 **BY MS. BARLOW:**

16 **Q.** NOW, WHAT ABOUT THE ABILITY -- YOU SAID SOMETHING ABOUT

17 GETTING THEM CLEAN AND SOBER SO THEY CAN GET INTO PROGRAMMING.

18         IS THERE SOME POTENTIALLY POSITIVE IMPACT FROM

19 INCARCERATION OF VIOLATORS TO GET THEM CLEAN AND SOBER?

20 **A.** YEAH.  IT ASSISTS YOU WITH THAT SO THAT THEY THINK A LITTLE

21 BIT CLEARER, BUT YOU HAVE GOT TO GET THEM PRETTY IMMEDIATELY IN

22 A TREATMENT PROGRAM, NOT WAIT MONTHS AND YEARS.

23 **Q.** AND DO THOSE EFFECTIVE PROGRAMS EXIST CURRENTLY IN YOLO

24 COUNTY?

25 **A.** NO.

1  Q.  ONE OF THE OTHER ISSUES THAT HAS COME UP QUITE A BIT IS THE

2  IDEA OF PROPERTY CRIMES VERSUS VIOLENT CRIMES.

3        DO YOU BELIEVE THAT PROPERTY CRIMES ARE MINOR IN

4  NATURE?  ARE THEY SERIOUS STILL EVEN THOUGH THEY MIGHT NOT

5  INVOLVE THE ACTUAL PHYSICAL INJURY OF A PERSON?

6  A.  WELL, FIRST, HOME RESIDENTIAL BURGLARIES ARE STRIKES.

7  THAT'S VERY SERIOUS.  MOST OF THEM DON'T INVOLVE SOMEBODY BEING

8  IN THE HOME.  THAT'S VERY SERIOUS AND THEY ARE ALMOST -- VERY

9  FEW OF THEM ARE EVER SOLVED, SO IT REALLY HAS A PRETTY

10 DEVASTATING EFFECT ON THE COMMUNITY AND THE VICTIMS THEMSELVES.

11 Q.  AND AUTO THEFT, I THINK, IS ONE OF THE ONES THAT KEEPS BEING

12 REFERRED TO.

13 A.  YES.

14 Q.  AND THAT HAS A PRETTY HIGH RECIDIVISM RATE.  DO YOU CONSIDER

15 AUTO THEFT A MINOR CRIME?

16        MR. SANGSTER:  YOUR HONOR, I OBJECT.  THE QUESTION IS

17 VAGUE AND AMBIGUOUS.  CALLS FOR --

18        JUDGE REINHARDT:  IT'S NOT VAGUE OR AMBIGUOUS.  IT'S

19 TOTALLY UNNECESSARY, WHETHER THIS WITNESS CONSIDERS AUTO THEFT A

20 MAJOR OR MINOR CRIME.

21        IT ISN'T TERRIBLY RELEVANT TO THIS HEARING.  EVERYONE

22 CAN HAVE HIS OWN OPINION AS TO WHETHER IT'S A MAJOR OR MINOR

23 CRIME.

24        WE HAVE GOT SO MANY WITNESSES SAYING THE SAME THING,

25 YOU KNOW, FROM COUNTY A TO COUNTY B TO COUNTY C.  IF ONE PERSON

1   FROM THE PROBATION OFFICE IN COUNTY A THINKS IT'S SERIOUS,

2   ANOTHER IN COUNTY B THINKS IT'S SERIOUS, I MEAN...

3           **JUDGE KARLTON:**  SERIOUS RELEVANT TO WHAT?  IT'S

4   CLEARLY NOT AS SERIOUS AS KILLING SOMEONE.

5           **THE WITNESS:**  RIGHT.

6           **JUDGE KARLTON:**  SO IT ALL ULTIMATELY COMES DOWN TO

7   SOME QUESTION OF, COMPARED TO WHAT?  WOULD YOU AGREE WITH THAT,

8   SIR?

9           **THE WITNESS:**  YES.

10  **BY MS. BARLOW:**

11  **Q.**  NOW, DO YOU DEAL WITH HE MENTALLY ILL PROBATIONERS AS WELL?

12  **A.**  WE HAVE A FAIRLY HIGH PERCENTAGE OF THOSE, YES.

13  **Q.**  AND IF A RELEASE ORDER INCLUDED THE MENTALLY ILL, ARE THERE

14  MENTALLY ILL PROGRAMS AVAILABLE FOR PEOPLE ON PAROLE OR OFF

15  PAROLE IN YOUR COUNTY?

16  **A.**  THE COUNTY ALCOHOL DRUG MENTAL HEALTH PROGRAM WHICH WOULD --

17  HAD SOME PROGRAMS, THEY JUST LAID OFF 30 -- AT LEAST 30 PEOPLE

18  THIS PAST FISCAL YEAR AND THEY MAY HAVE TO LAY OFF SOME MORE.

19          AND THEN THE PRIVATE AGENCIES, IT'S A FEE BASIS

20  USUALLY OR THEY HAVE TO CLAIM MEDICAL, AND THERE'S VERY FEW OF

21  THOSE TO DEAL WITH ADULTS.

22  **Q.**  OKAY.  AND WE HAVE BEEN TOLD THAT MOST MENTALLY ILL PEOPLE

23  ARE NOT DANGEROUS.  IS THAT YOUR EXPERIENCE WITH THE MENTALLY

24  ILL THAT YOU DEAL WITH IN YOLO COUNTY?

25  **A.**  DEPENDENT ON THE CATEGORY OF -- PARANOID SCHIZOPHRENICS ARE

1  PRETTY FRIGHTENING FOLKS IF THEY ARE NOT ON MEDICATION AND IF

2  HAVE A HISTORY OF VIOLENCE.  THEY OFTEN WILL END UP IN JAIL,

3  HAVE QUITE A FEW CRISES AND GET RELEASED, GET ON PROBATION,

4  VIOLATE, NOT GO TO TREATMENT, NOT TAKE THEIR MEDICATION AND

5  REPEATEDLY VIOLATE AND END UP GOING TO PRISON.

6  **Q.**  IS IT YOUR EXPERIENCE THAT MENTALLY ILL OFFENDERS LIKE

7  NON-MENTALLY ILL OFFENDERS WILL GO THROUGH THE PROBATION CYCLE

8  SEVERAL TIMES BEFORE THEY ARE SENT TO PRISON?

9  **A.**  YEAH.  IT'S NOT SOMEBODY THAT WE WANT TO RECOMMEND TO GO TO

10  PRISON, BECAUSE IT SEEMS TO BE THAT WHAT CAUSES THE -- BEHIND

11  THE CRIMINAL BEHAVIOR IS THEIR MENTAL HEALTH.  THEY ARE NOT

12  INHERENTLY CRIMINAL.

13  **Q.**  SO IF THEY COME BACK OUT INTO YOUR COMMUNITY AND THERE ARE

14  NO PROGRAMS FOR THEM, WHERE WILL THEY END UP?

15  **A.**  IN JAIL.

16          **JUDGE REINHARDT:**  AND IF THEY DON'T GET PROPER

17  TREATMENT WHILE THEY ARE IN PRISON, WHERE ARE THEY GOING TO END

18  UP?

19          **THE WITNESS:**  I DON'T RUN THE PRISONS.

20          **JUDGE REINHARDT:**  I DIDN'T ASK YOU IF YOU RUN THE

21  PRISON.

22          IF THEY DON'T GET THAT TREATMENT, WHEREVER THEY ARE,

23  INCLUDING PRISONS --

24          **JUDGE KARLTON:**  AND THEY COME BACK OUT.

25          **THE WITNESS:**  IF I CAN SHARE A PERSONAL STORY ABOUT

1    THE MENTALLY ILL.

2            MY COUSIN'S SON DEVELOPED PARANOID SCHIZOPHRENIA IN

3    HIS LATE TEENS.  HE IS A BIG GUY.  HE GOT INVOLVED IN -- HE

4    ENDED UP BEING IN BOARD/CARE FACILITIES, REALLY BIZARRE

5    BEHAVIOR, SUSPICIOUS OF EVERYTHING, COULDN'T BE AROUND ANYBODY,

6    YOU KNOW, TURNED OFF THE ELECTRICITY ALL THE TIME.

7            HE ROBBED A TACO BELL.  NOT WITH A WEAPON, JUST

8    STRONG ARM.  HE GOT FELONY PROBATION, FIVE YEARS.  HE WOULDN'T

9    TAKE HIS MEDICATION.  HE WOULDN'T GO TO TREATMENT.  HE WAS

10   VIOLATED A NUMBER OF TIMES, BROUGHT BACK OUT, ENCOURAGED TO GET

11   IN TREATMENT.  CAN'T FORCE HIM TO TAKE HIS MEDICATION.  CAN'T

12   FORCE HIM TO GO TO TREATMENT.  PUT HIM BACK IN JAIL.  SO FOUR OR

13   FIVE TIMES.

14           DURING THAT TIME, HE ALSO DID A SECOND ROBBERY OF THE

15   SAME TACO BELL.  AND THEN HE WENT TO PRISON.  AND HE WAS IN

16   PRISON FOR SEVERAL YEARS, WAS RELEASED, HAD HIS PAROLE VIOLATED

17   FOUR OR FIVE TIMES.  HE TERMED OUT.  HE IS NOW OUT HOMELESS IN

18   SOUTH SACRAMENTO.

19           **JUDGE KARLTON:**  AND HE WILL GO BACK TO PRISON AT SOME

20   POINT.

21           **THE WITNESS:**  HE WILL GET ARRESTED AND --

22           **JUDGE KARLTON:**  BECAUSE HE DOESN'T GET ANY TREATMENT

23   UP THERE EITHER.

24           **THE WITNESS:**  ABSOLUTELY.

25           **JUDGE REINHARDT:**  THAT'S A NICE NOTE ON WHICH TO END

1   THIS TRIAL.  SO NOBODY HAS A SOLUTION, SO WE MIGHT AS WELL KEEP

2   GOING.

3              **MS. BARLOW:**  I JUST HAVE A FEW MORE QUESTIONS YOUR

4   HONOR.

5   **BY MS. BARLOW:**

6   **Q.**  NOW, CHIEF, YOU INDICATED IN YOUR DECLARATION THAT YOU DO

7   NOT BELIEVE A CAP SHOULD BE IMPOSED ON THE PRISON POPULATION.

8   CAN YOU TELL THE COURT WHY?

9   **A.**  I THINK FROM A PUBLIC SAFETY STANDPOINT AND THE FACT THAT

10  THERE ARE REALLY NO SERVICES AVAILABLE TO THE LOCAL FOLKS, THE

11  LIMITED ONES THAT WE DO USE I THINK WOULD BE SHIFTED TO THE ONES

12  COMING OUT ON PAROLE, IF THEY COULD GET THEM, IF THEY WOULD GO.

13             **JUDGE REINHARDT:**  DO YOU FEEL THE SAME WAY ABOUT A

14  CAP ON THE JAIL?

15             **THE WITNESS:**  THAT'S SIMILAR, THE SAME THING.

16             **JUDGE REINHARDT:**  AND WHAT'S HAPPENING IS ALL THE

17  COUNTIES HAVE CAPS ON THE JAILS.  SO THAT MEANS THERE SHOULD BE

18  OVERCROWDING IN THE PRISONS.

19             **THE WITNESS:**  WELL, MY IMPRESSION IS THAT MOST OF THE

20  JAILS THAT HAVE CONSENT DECREES, THEY DO NOT HAVE PRETRIAL

21  SERVICES OR OTHER PROGRAMS.  THEY DO NOT DO RISK NEEDS

22  ASSESSMENTS ON FOLKS.  THEY DON'T SUPERVISE THEM.

23             THAT WHOLE AREA WOULD HELP IMMENSELY WITH JAIL

24  OVERCROWDING, BUT THEN YOU HAVE GO GOT TO HAVE THOSE PROGRAMS

25  AND ALL THE TREATMENT THAT GOES WITH IT.

1          **JUDGE KARLTON:**  AND IN A PERFECT WORLD WE WOULDN'T BE

2  HERE.  EVEN IN AN IMPERFECT WORLD, BUT BETTER THAN THE ONE WE

3  HAVE GOT.

4          **THE WITNESS:**  YES.

5          **JUDGE REINHARDT:**  AND WITH ENOUGH LEADERSHIP AND

6  WILL.

7          **JUDGE KARLTON:**  AND WILL, AND MONEY.

8          **JUDGE REINHARDT:**  WELL, YOU WOULD HAVE MONEY IF YOU

9  HAD LEADERSHIP AND WILL.

10         **JUDGE KARLTON:**  THAT'S TRUE.

11         **MS. BARLOW:**  JUST ONE LAST QUESTION.

12         **JUDGE KARLTON:**  SORRY.  I DIDN'T MEAN TO AGREE WITH

13  YOU.

14  **BY MS. BARLOW:**

15  **Q.**  DO YOU BELIEVE THAT THE MODEL THAT YOU HAVE -- THAT'S BEEN

16  USED TO BRING YOUR JUVENILE CUSTODIAL RATE DOWN COULD BE

17  SUCCESSFULLY USED FOR THE ADULT POPULATION?

18  **A.**  YEAH.  THE SIMILAR -- IF YOU LOOK AT THE WASHINGTON STATE

19  INSTITUTE OF PUBLIC POLICY, AND THERE'S A WHOLE STACK OF THINGS,

20  THERE IS CLEAR EVIDENCE THAT IT DOES REDUCE PRISON, JAIL,

21  PROBATION, PROBATION, PAROLE.  AND IT IS ABOUT THE EVIDENCE

22  BASED, NOT COGNITIVE BEHAVIOR PROGRAMS.  SO, YES, IT WOULD DO

23  THAT.

24  **Q.**  AND THE MODEL IS ALREADY THERE.  YOU JUST HAVE TO --

25  **A.**  THEY ARE ON THE SHELF.  YOU CAN BUY THEM.  YOU TRAIN YOUR

1   PEOPLE IN THEM AND YOU STICK TO THE FIDELITY OF THE PROGRAM AND

2   YOU HAVE TO MAKE SURE THAT -- THAT IT'S DONE THE WAY THAT IT

3   WAS -- THE RESEARCH INDICATES THAT IT NEEDS TO BE DELIVERED AND

4   YOU WILL GET GOOD RESULTS.

5   Q.   THANK YOU.  I HAVE NOTHING FURTHER.

6               **JUDGE HENDERSON:**  ANYTHING FROM STATE DEFENDANTS?

7               **MR. MELLO:**  NO, YOUR HONOR.

8               **THE COURT:**  CROSS-EXAMINATION.

9                         **CROSS EXAMINATION**

10  **BY MR. SANGSTER:**

11  **Q.**   ED SANGSTER FOR THE PLAINTIFFS.  GOOD MORNING, CHIEF MEYER.

12

13  **A.**   GOOD MORNING.

14  **Q.**   YOU TALKED ABOUT THE UNDER FUNDING OF PROBATION AND I WANT

15  TO FOLLOW UP ON THAT.  WHAT'S THE SOURCE OF YOUR FUNDING; STATE,

16  COUNTY OR BOTH?

17  **A.**   ADULT OR JUVENILE OR BOTH?

18  **Q.**   ADULT.

19  **A.**   IT'S ALMOST ALL COUNTY GENERAL FUND, EXCEPT PROP 36.

20  **Q.**   AND YOU HAVE BEEN A PROBATION OFFICER IN A NUMBER OF

21  DIFFERENT COUNTIES, CORRECT?

22  **A.**   YES, YES.

23  **Q.**   AND HAS ADEQUATE FUNDING OF PROBATION BEEN A PROBLEM IN ALL

24  OF THOSE COUNTIES?

25  **A.**   YES.

1  Q.  HOW LONG HAS IT BEEN A PROBLEM THAT PROBATION SERVICES HAVE

2  NOT BEEN ADEQUATELY FUNDED BY THE COUNTIES?

3  A.  IT STARTED INITIALLY WITH PROP 13, BUT THE BIG IMPACT WAS

4  THE COCAINE EPIDEMIC IN THE EARLY 80'S.  THAT JUST SWAMPED

5  PROBATION DEPARTMENTS.

6  Q.  SO WHAT'S BEEN THE EFFECT OF THE INADEQUATE FUNDING OF

7  PROBATION SERVICES ON RECIDIVISM?

8  A.  SAY THAT AGAIN?

9  Q.  WHAT'S BEEN THE EFFECT OF THE INADEQUATE FUNDING OF

10  PROBATION SERVICES ON RECIDIVISM?

11  A.  OH, IT WOULD MEAN THAT THEY WOULD BE ALLOWED TO ROAM AROUND

12  AND DO WHATEVER THEY DO WITHOUT BEING IN TREATMENT OR

13  SUPERVISION, SO IT GOES UP.

14  Q.  IN YOUR OPINION, HAS IT GONE UP SIGNIFICANTLY BECAUSE OF THE

15  INADEQUACY OF PROBATION FUNDING?

16  A.  I DON'T KNOW THE EXACT FIGURES, BUT MY GUESS WOULD BE YES.

17  Q.  YOU THINK THAT THE STATE OF ADULT PROBATION IN CALIFORNIA IS

18  DISMAL?

19  A.  YES.

20  Q.  AND THE COUNTY GOVERNMENTS HAVE, WHILE YOU HAVE BEEN A

21  PROBATION OFFICER, ALLOWED THE PROBATION SERVICES TO DETERIORATE

22  TO THAT DISMAL STATE, RIGHT?

23          MS. BARLOW:  I'M GOING TO OBJECT THAT COUNSEL

24  PREVIOUSLY INDICATED HE WAS NOT GOING TO ALLOW THE WITNESS TO

25  TESTIFY BEYOND YOLO COUNTY.  SO I THINK WE SHOULD STICK TO THAT.

1          **JUDGE HENDERSON:**  WHAT'S YOUR OBJECTION?

2          **MS. BARLOW:**  THE OBJECTION IS IT'S BEYOND THE SCOPE.

3          **JUDGE KARLTON:**  HE HAS NOW ESTABLISHED HE WORKED IN A

4  WHOLE BUNCH OF COUNTIES.  YOU HADN'T DONE THAT.

5          **MS. BARLOW:**  IT WAS IN THE DECLARATION, YOUR HONOR.

6          **JUDGE KARLTON:**  YOU MAY PROCEED, COUNSEL.

7          **JUDGE HENDERSON:**  YOU MAY ANSWER THE QUESTION.

8  **A.**  REPEAT IT AGAIN.

9  **BY MR. SANGSTER:**

10 **Q.**  I HAVE FORGOTTEN IT.  I APOLOGIZE IF I END UP REPEATING ONE.

11         YOU HAVE OBSERVED COUNTY GOVERNMENTS ALLOW THE

12 PROBATION SERVICES TO DETERIORATE, RIGHT?

13 **A.**  NO, I DON'T KNOW THAT THEY ALLOWED IT.  IT'S JUST BECAUSE OF

14 THE WAY THINGS ARE FUNDED.

15         IN PARTICULAR, YOLO COUNTY GETS THE LOWEST PROPERTY

16 TAX RATE OF ANY COUNTY IN THE STATE.  IS IT A HIGHER PRIORITY

17 THAN SOME OTHER SERVICES?  NO.  IN THE CRIMINAL JUSTICE SYSTEM

18 IS IT AT OR NEAR THE BOTTOM?  YES.

19 **Q.**  WELL, YOU HAVE SEEN PROBATION SERVICES DETERIORATE TO THE

20 POINT WHERE THERE IS ALMOST NO REHABILITATION GOING ON AT THE

21 LOCAL LEVEL, IS THAT CORRECT?

22 **A.**  CORRECT.

23         **JUDGE KARLTON:**  THAT'S TRUE IN YOUR COUNTY.

24         **THE WITNESS:**  YES.

25

1  **BY MR. SANGSTER:**

2  **Q.**  WELL, IT'S TRUE OF THE OTHER COUNTIES YOU HAVE BEEN IN AS

3  WELL, RIGHT?

4  **A.**  ON THE ADULT SIDE.  BUT I HAVE BEEN OUT OF SACRAMENTO FOR

5  FIVE YEARS.  I KNOW THEY HAVE DONE SOMETHING, BUT HALF --

6  STATEWIDE I THINK 56 PERCENT OF ALL CONVICTED ADULT FELONS ARE

7  IN BANK LOADS.

8  **Q.**  THAT MEANS THEY ARE GETTING NO -- NO PROBATION OVERSIGHT

9  EFFECTIVELY?

10  **A.**  EXCEPT WHEN YOU FILE A VIOLATION.

11  **Q.**  YOU ARE THE PRESIDENT ELECT OF THE CALIFORNIA PROBATION

12  OFFICERS ASSOCIATION?

13  **A.**  YEAH, THE CHIEF PROBATION OFFICERS OF CALIFORNIA.

14  **Q.**  I TAKE IT YOU ARE FAMILIAR WITH THE ISSUES THAT ARE BEING

15  ENCOUNTERED STATEWIDE?

16  **A.**  I'M LEARNING.

17          **JUDGE KARLTON:**  AND IT AIN'T A GREAT EXPERIENCE, IS

18  THAT RIGHT?

19          **THE WITNESS:**  WELL, IT'S CHALLENGING AND I ENJOYED IT

20  SO FAR.

21  **BY MS. SANGSTER:**

22  **Q.**  I TAKE IT YOU WOULD AGREE THAT THERE ARE MORE CRIMES BEING

23  COMMITTED NOW BECAUSE OF THE UNDER FUNDING OF PROBATION

24  SERVICES?

25  **A.**  THAT'S A -- I THINK WE COULD REDUCE THE CRIME RATE, YES, IF

1   WE HAD THE RIGHT SERVICES AT THE LOCAL LEVEL.

2   **Q.**  HOW SIGNIFICANT HAS THE INADEQUATE FUNDING OF PROBATION

3   SERVICES BEEN ON THE LEVELS OF CRIME?

4   **A.**  I DON'T KNOW THAT I CAN ANSWER THAT ONE.

5   **Q.**  DO YOU BELIEVE THAT THE UNDER FUNDING OF PROBATION SERVICES

6   HAS CONTRIBUTED TO THE OVER POPULATION OF THE STATE PRISONS?

7   **A.**  WELL, IF YOU -- IF YOU DON'T GET THEM IN TREATMENT, CLEARLY,

8   AND YOU SEND 30 PERCENT MORE THAN WHAT YOU THINK NEED TO GO,

9   THEN YES.

10          **JUDGE REINHARDT:**  SO THE ANSWER IS YES, RIGHT?

11          **THE WITNESS:**  YEAH.

12  **BY MS. SANGSTER:**

13  **Q.**  NOW, YOU MENTIONED I THINK IT WAS 168 FELONS SENT TO STATE

14  PRISON FOR VIOLATION OF PROBATION; IS THAT THE RIGHT NUMBER?

15  **A.**  YES.

16  **Q.**  YOU BELIEVED THAT THAT NUMBER COULD BE DRAMATICALLY REDUCED

17  IF PROBATION SERVICES WERE ADEQUATELY FUNDED?

18  **A.**  YES.

19  **Q.**  SO THERE IS, IN YOUR MIND, AN OPTION FOR DRAMATICALLY

20  AFFECTING THE NUMBER OF PEOPLE GOING TO STATE PRISONS THAT'S

21  RIGHT BEFORE THE COUNTY GOVERNMENT AND, THAT'S FUND PROBATION

22  SERVICES?

23          **JUDGE KARLTON:**  THAT ASSUMES THAT THE COUNTY

24  GOVERNMENT HAS ANY MONEY.

25          **THE WITNESS:**  THAT'S THE PROBLEM, IS THEY DON'T HAVE

1  MONEY.  WE ARE GOING TO -- WE ARE GOING TO BE 18 MILLION IN THE

2  HOLE NEXT YEAR IN YOLO COUNTY.

3  **BY MS. SANGSTER:**

4  Q.  BECAUSE THE VOTERS OF YOLO COUNTY WILL NOT VOTE TO INCREASE

5  THE TAXES TO PAY FOR IT, RIGHT?

6            **MS. BARLOW:**  CALLS FOR SPECULATION.

7            **JUDGE REINHARDT:**  HOW DOES THAT --

8            **JUDGE KARLTON:**  THAT'S LIKE THE QUESTIONS ABOUT

9  WHETHER OR NOT PEOPLE ARE INCAPACITATED WHEN THEY ARE IN PRISON.

10  IF THEY DON'T HAVE THE MONEY, THEY DON'T HAVE THE MONEY --

11            **JUDGE REINHARDT:**  IF THEY HAVEN'T VOTED FOR THE

12  MONEY, YOU CAN'T RAISE THE TAKES TAXES.

13            **MS. SANGSTER:**  THE OPTIONS OF MONEY IS NOT COMING OUT

14  OF A VACUUM, YOUR HONOR.  IT'S COMING BECAUSE OF CHOICES THAT

15  PEOPLE ARE MAKING.

16            **JUDGE KARLTON:**  IS THAT RIGHT?

17            **MS. BARLOW:**  I THINK COUNSEL IS TESTIFYING NOW.

18            **JUDGE REINHARDT:**  MAYBE IN ARGUMENT SOMEBODY COULD

19  TELL US HOW YOU GET MORE MONEY.

20            **JUDGE KARLTON:**  SOME DAY WILL GET TO THE ARGUMENT,

21  GOD WILLING AND THE RIVER DON'T RISE.

22            ENOUGH.  WE WILL GO ON WITH THIS FOREVER.  DO YOU

23  HAVE A SENSIBLE QUESTION TO ASK, COUNSEL?

24            **MR. SANGSTER:**  YES, I DO, YOUR HONOR.

25            **JUDGE KARLTON:**  ALL RIGHT.

1   **BY MR. SANGSTER:**

2   **Q.**   I WANT TO TALK ABOUT COMMUNITY CORRECTIONS.   THAT WAS ONE OF

3   THE ALTERNATIVES THAT YOU HAVE SUGGESTED TO THIS COURT AS AN

4   ALTERNATIVE FOR AVOIDING A PRISONER RELEASE ORDER.   OKAY?

5   **A.**   YES.

6   **Q.**   AND YOU REFERRED IN YOUR DECLARATION TO A PARTICULAR STATUTE

7   THAT THE LEGISLATURE HAD ENACTED?

8   **A.**   YES.

9   **Q.**   WHAT'S THAT STATUTE?

10  **A.**   8050 OF THE PENAL CODE.

11  **Q.**   DO YOU KNOW HOW LONG AGO THAT WAS ENACTED?

12  **A.**   IT'S BEEN 10 TO 20 YEARS, IN THAT RANGE I THINK.

13  **Q.**   AND IN YOUR MIND IF THE STATE HAD FUNDED THE COMMUNITY

14  CORRECTIONS ACT, WOULD THAT HAVE HAD AN IMPACT ON CRIME?

15  **A.**   IT WOULD HAVE, BUT I THINK INITIALLY ABSENT -- THAT WAS IN

16  WAS AT A TIME WHEN THERE WEREN'T EVIDENCE BASED AND DATA

17  SUGGESTS WHAT YOU REALLY NEED TO DO WITH OFFENDERS.

18          THAT WOULD HAVE BEEN DURING THE TIME THAT YOU

19  WOULDN'T HAVE SEEN THE KIND OF QUALITY YOU WOULD HAVE, PROMISING

20  PRACTICE AND GOOD PROGRAMS.   AND YOU WOULD SEE A REDUCTION, BUT

21  PROBABLY NOT AS HIGH AS YOU WOULD WITH THE EVIDENCE BASED.

22  **Q.**   RIGHT.   BUT THE POINT IS FOR 20 YEARS THERE HAS BEEN A LAW

23  ON THE BOOK THAT WOULD, IN YOUR MIND, SIGNIFICANTLY REDUCE

24  CRIME?

25  **A.**   CERTAINLY WOULD HELP.

1  Q.  AND THE ONLY THING THAT'S BEEN MISSING IS THE STATE TO

2  PROVIDE FUNDING?

3  A.  YES.

4          MR. SANGSTER:  NO FURTHER QUESTIONS.

5          JUDGE HENDERSON:  OKAY.  REDIRECT?

6          MS. SANGSTER:  JUST VERY BRIEFLY.

7          JUDGE REINHARDT:  YOU SAY THAT EVERY TIME.

8          MS. BARLOW:  I'M SORRY, YOUR HONOR.  I'M TRYING TO BE

9  BRIEF.  WE STIPULATED TO MULTIPLE WITNESSES TO TRY TO SPEED THIS

10 UP.

11         JUDGE REINHARDT:  I KNOW.  YOU HAVE DONE WELL ON

12 THAT.  WE WILL SEE IF YOU ARE JUST BRIEFLY.

13         MS. BARLOW:  I WILL.

14         JUDGE REINHARDT:  OKAY.

15                    REDIRECT EXAMINATION

16 BY MS. BARLOW:

17 Q.  NOW THAT COUNSEL HAS ESTABLISHED YOUR STATEWIDE EXPERTISE,

18 DO YOU BELIEVE WE HAVE 52,000 LOW RISK PRISONERS IN STATE

19 PRISON?

20 A.  WHAT?

21 Q.  52,000 LOW RISK PRISONERS IN STATE PRISON?

22         MR. SANGSTER:  LACKS FOUNDATION.

23         JUDGE HENDERSON:  "YES" OR "NO."

24 A.  NO.

25

1  **BY MS. BARLOW:**

2  Q.  THANK YOU.

3         **JUDGE KARLTON:**  SIR, I WANT TAKE TO TAKE YOU INTO AN

4  ENTIRELY DIFFERENT SUBJECT MATTER, WHICH WILL INVITE QUESTIONS

5  FROM COUNSEL, I'M SURE.

6         YOLO COUNTY HAS BEEN -- MAYBE YOU DON'T KNOW, IT'S

7  OUTSIDE YOUR FIELD, BUT I ASSUME IT'S COMMON KNOWLEDGE.

8         YOLO COUNTY HAS BEEN HAVING A STRUGGLE TRYING TO FIND

9  AN APPROPRIATE PLACE TO SITE THE REENTRY PROGRAM, CORRECT?

10        **THE WITNESS:**  I HAVE BEEN AT SEVERAL OF THOSE

11 MEETINGS, YES.

12        **JUDGE KARLTON:**  THE STATE -- THE COUNTY DESPERATELY

13 WANTS TO FIND SUCH A SITE BECAUSE IT WILL PERMIT THEM TO

14 INCREASE THEIR JAIL POPULATION IN A SIGNIFICANT WAY.  THAT'S THE

15 CARROT FOR THE STICK, RIGHT?

16        **THE WITNESS:**  CORRECT.

17        **JUDGE KARLTON:**  AND WHAT'S HAPPENED IS NOW THEY ARE

18 TALKING ABOUT LOCATING A REENTRY PROGRAM AWAY FROM WEST

19 SACRAMENTO, AWAY FROM THE POPULATION CENTERS THAT THE PRISONERS

20 WILL ULTIMATELY RETURN TO, CORRECT?

21        **THE WITNESS:**  THAT'S IN MADISON, YEAH, A SMALL

22 COMMUNITY.

23        **JUDGE KARLTON:**  AND MADISON IS UP IN ARMS.

24        **THE WITNESS:**  WELL, NOT ALL OF THEM, BUT MOST VOCAL,

25 YES.

1          **JUDGE KARLTON:**  ALL RIGHT.  HAS THAT PROBLEM EVEN

2    BEEN SOLVED YET.

3          **THE WITNESS:**  NO, IT HAS NOT.

4          **JUDGE KARLTON:**  WELL, OKAY.  THAT SAYS WHAT I THINK

5    NEEDS TO BE ESTABLISHED.

6          HAS MY QUESTIONS INVITED QUESTIONS OF COUNSEL?

7          **MS. BARLOW:**  NO.  THANK YOU, YOUR HONOR.

8          **MR. SANGSTER:**  NO, YOUR HONOR.

9          **JUDGE HENDERSON:**  THANK YOU FOR TESTIFYING, SIR, YOU

10   ARE EXCUSED.

11         **THE WITNESS:**  YOU ARE WELCOME.

12              (WITNESS EXCUSED.)

13         **JUDGE HENDERSON:**  AND WE WILL TAKE A 15-MINUTE

14   RECESS.

15              (BRIEF RECESS HELD IN THE PROCEEDINGS.)

16         **JUDGE HENDERSON:**  YOU MAY CALL YOUR NEXT WITNESS.

17         **MR. SPECTER:**  I BELIEVE THAT WE ARE AT THE END OF THE

18   DEFENDANT'S AND THE INTERVENOR DEFENDANT'S WITNESSES, AND SO WE

19   ARE CALLING OUR SOLE REBUTTAL WITNESS, YOUR HONOR.

20         **JUDGE KARLTON:**  BEFORE YOU DO THAT, DO YOU REST,

21   FOLKS?

22         **MR. MITCHELL:**  DEFENDANT INTERVENORS REST.

23         **MR. MELLO:**  I DON'T BELIEVE PLAINTIFFS HAVE.

24         **JUDGE KARLTON:**  IF THEY DIDN'T.

25         **JUDGE REINHARDT:**  NO, THEY RESTED.

1          **MR. SPECTER:**  YOU ARE RESTING FOR ME?

2          **JUDGE HENDERSON:**  WE REST THEM.

3          **JUDGE KARLTON:**  ARE YOU RESTING, PLEASE?  THAT CAN'T

4    BE A COMPLICATED PROBLEM.

5          **MS. JOHNSON:**  WE ARE CALLING -- IF THEY CONTINUE TO

6    PROPOSE AND THE COURT IS GOING TO ALLOW CONSIDERATION OF THIS

7    DOCUMENT, 842, TO COME INTO EVIDENCE WE ARE GOING TO BE CALLING

8    A WITNESS FROM THEIR OFFICE.

9          **JUDGE KARLTON:**  THAT'S A REBUTTAL.

10          **MR. SPECTER:**  THAT'S OUR REBUTTAL, YOUR HONORS.

11          **JUDGE KARLTON:**  JUST TELL ME.

12          **MR. MELLO:**  IF PLAINTIFFS HAVE RESTED, THEN WE'VE

13    RESTED.

14          **JUDGE KARLTON:**  THANK YOU.  REBUTTAL.

15          **MR. SPECTER:**  PLAINTIFFS CALL MICHAEL HENNESSEY AS A

16    REBUTTAL WITNESS.

17          **MR. MITCHELL:**  BEFORE WE GET STARTED, BILL MITCHELL

18    FOR THE DEFENDANT INTERVENORS.  I'D ASK THAT THE COURT, IN AN

19    ATTEMPT TO PERHAPS SHORTEN THESE PROCEEDINGS, SHOULD REQUIRE AN

20    OFFER OF PROOF TO DETERMINE WHETHER OR NOT --

21          **JUDGE HENDERSON:**  WE SHOULD HAVE DONE THAT A MONTH

22    AGO.  WE ARE NOT GOING TO START THIS ON THE LAST WITNESS,

23    COUNSEL.

24                    **MICHAEL HENNESSEY,**

25    HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

1    DULY SWORN AND EXAMINED AS FOLLOWS:

2            **THE WITNESS:**  MY NAME IS MICHAEL HENNESSEY

3    H-E-N-N-E-S-S-E-Y.

4            **DIRECT EXAMINATION BY MR. SPECTER**

5    BY MR. SPECTER

6    Q    MR. HENNESSEY, WHAT DO YOU DO?

7    A    I'M THE SHERIFF OF THE CITY AND COUNTY OF SAN FRANCISCO.

8    Q    HOW LONG HAVE YOU BEEN THE SHERIFF?

9    A    TWENTY-NINE YEARS.

10   Q    WHAT ARE YOUR RESPONSIBILITIES AS THE SHERIFF?

11   A    PRIMARILY, TO RUN THE COUNTY JAIL SYSTEM, TO PROVIDE

12   SECURITY TO THE COURTROOMS AND OTHER CIVIC BUILDINGS, AND TO

13   ENFORCE CIVIL JUDGMENTS.

14   Q    WHAT'S THE CAPACITY OF THE JAIL SYSTEM IN SAN FRANCISCO?

15   A    2,040.

16   Q    AND HOW MANY PRISONERS ARE IN THE JAILS NOW?

17   A    THIS MORNING THERE WERE ABOUT 1930.

18   Q    AND UNDER YOUR ADMINISTRATION HOW MANY PRISONERS HAVE BEEN

19   IN THE JAILS; DID YOU EVER CALCULATE THAT?

20   A    WELL OVER A MILLION.

21   Q    YOU UNDERSTAND THAT THE RELIEF THAT PLAINTIFFS ARE ASKING IN

22   THIS CASE IS TO REDUCE THE PRISON POPULATION BY 52,000 PRISONERS

23   OVER A TWO-YEAR PERIOD, RIGHT?

24   A    YES.

25   Q    IN YOUR OPINION, WOULD A REDUCTION OF THIS MANY PRISONERS

1   REQUIRE YOU TO RELEASE PRISONERS IN YOUR JAIL EARLY?

2   **A**   I DON'T THINK IT WOULD BE A SIGNIFICANT FACTOR, NO.

3   **Q**   DO YOU OPERATE PROGRAMS THAT ARE DESIGNED TO REDUCE THE

4   POPULATION OF YOUR JAILS?

5   **A**   YES, MANY.

6   **Q**   CAN YOU DESCRIBE SOME OF THE PROGRAMS FOR PRETRIAL

7   DETAINEES, PLEASE?

8   **A**   YES.  FOR PRETRIAL DETAINEES, WE HAVE AN OWN RECOGNIZANCE

9   PROGRAM WE FUND, WHICH ALLOWS PEOPLE TO GO OUT BASICALLY ON

10  THEIR WORD BECAUSE OF THEIR TIES IN THE COMMUNITY.  WE HAVE A

11  CITATION-RELEASE PROGRAM WHICH IS AUTHORIZED UNDER STATE LAW FOR

12  MINOR OFFENDERS, MISDEMEANOR OFFENDERS.  WE HAVE AUGMENTED THAT

13  WITH A PROGRAM CALLED THE SECOND LOOK PROGRAM WHICH GOES AND

14  INTERVIEWS ANY MISDEMEANANT THAT WAS NOT CITED OUT TO SEE IF

15  WHATEVER DISQUALIFIED THEM FROM CITATION-RELEASE CAN BE

16  CORRECTED AND THEY CAN BE CITED OUT LATER.

17          WE HAVE A HOMELESS RELEASE PROGRAM TO FIND HOMELESS

18  PEOPLE WHO DO NOT HAVE A HOME, SO, THEREFORE, WE CAN'T HAVE AN

19  ADDRESS TO CITE THEM, BUT WE WORK WITH SOCIAL WORKERS TO

20  IDENTIFY THEM AND BRING THEM INTO CUSTODY.

21          OBVIOUSLY, WE ALSO HAVE A BAIL SYSTEM.

22  **Q**   AND DO THOSE PROGRAMS RESULT IN THE RELEASE OF PRISONERS WHO

23  OTHERWISE WOULDN'T HAVE BEEN RELEASED FROM THE JAIL BEFORE THEIR

24  TRIAL?

25  **A**   YES.  MOST MISDEMEANANTS ARE RELEASED FROM CUSTODY EXCEPT

1   THOSE WHO HAVE A WARRANT FOR THEIR ARREST AND THAT PROHIBITS

2   THEM FROM BEING RELEASED.

3   **Q**   AND YOU ALSO HAVE PROGRAMS FOR SENTENCED PRISONERS, DO YOU

4   NOT?

5   **A**   YES.

6   **Q**   CAN YOU DESCRIBE THOSE, PLEASE?

7   **A**   WELL, WE HAVE IN-CUSTODY PROGRAMS, BUT TO PROVIDE EDUCATION

8   AND DRUG TREATMENT, BUT THE PROGRAMS THAT ARE RELATED TO

9   RELEASING PRISONERS, WE OPERATE A COUNTY PAROLE SYSTEM, WHICH

10  CAN EITHER HEAR INDIVIDUAL CASES OR, IN OUR CASE, WE NOW HAVE A

11  STANDING ORDER THAT ALLOWS US TO RELEASE SENTENCED PRISONERS UP

12  TO 30 DAYS EARLY WITHOUT TAKING THEM BEFORE THE COUNTY PAROLE

13  BOARD.

14          WE HAVE A WORK ALTERNATIVE PROGRAM WHICH IS, ASSUMING

15  THE SENTENCING JUDGE DOESN'T OBJECT, A PERSON CAN WORK OFF THEIR

16  SENTENCE BY WORKING EIGHT HOURS A DAY DOING STREET CLEANING AND

17  THINGS LIKE THAT.  FOR EACH DAY THEY WORK, THEY GET CREDIT FOR

18  ONE DAY IN JAIL.

19          WE HAVE ELECTRONIC MONITORING PROGRAMS WHERE PEOPLE

20  ARE EITHER FORCED TO STAY IN THEIR HOME EXCEPT WHEN THEY ARE

21  SPECIFICALLY PERMITTED TO GO OUT OF THEIR HOME.  WE HAVE ALSO A

22  VERSION OF THAT WHERE PEOPLE WEAR GPS MONITORING WHICH ALLOW

23  THEM TO GO TO WORK, AND WE CAN MONITOR THEIR WHEREABOUTS.

24          I THINK THOSE ARE THE PRIMARY ONES.

25          **JUDGE REINHARDT:**   ARE THESE ALL MISDEMEANANTS?

1           **THE WITNESS:** NO. ALMOST OF ALL OF OUR SENTENCED

2    PRISONERS HAVE BEEN CONVICTED OF FELONIES. THEY HAVE HAD THEIR

3    STATE PRISON SUSPENDED, AND THEY'VE BEEN PUT IN COUNTY JAIL AS A

4    CONDITION OF PROBATION, BUT IT'S MOSTLY FELONY COMMITMENTS.

5    BY MR. SPECTER

6    **Q**    TO SOMEWHAT STATE THE OBVIOUS, THESE PROGRAMS PUT MORE

7    OFFENDERS IN THE COMMUNITY; IS THAT RIGHT?

8    **A**    YES. TODAY I HAVE 300 PEOPLE SERVING THEIR SENTENCES WHO

9    ARE NOT IN CUSTODY.

10   **Q**    AND HAVE YOU FOUND THAT THE IMPLEMENTATION OR THE OPERATION

11   OF THESE PROGRAMS HAS REDUCED THE SAFETY TO THE COMMUNITY?

12   **A**    NO, I DON'T BELIEVE IT HAS.

13   **Q**    JAIL PRISONERS RECEIVE GOOD TIME CREDITS AGAINST THEIR

14   PRISON SENTENCE; ISN'T THAT RIGHT?

15   **A**    YES, SENTENCES ARE REDUCED BY APPROXIMATELY ONE-THIRD.

16   **Q**    RIGHT. AND THEY'RE ALSO -- THEY ALSO GET CREDITS AGAINST

17   THEIR JAIL SENTENCE AS WELL, CORRECT, IF THEY'RE SENTENCED TO

18   JAIL FOR A MISDEMEANOR AS A CONDITION OF PROBATION?

19   **A**    YES. THAT'S GOOD TIME, WORK TIME CREDIT. APPROXIMATELY

20   ONE-THIRD OF THEIR SENTENCE IS REDUCED, ASSUMING THEY DO NOT

21   HAVE DISCIPLINARY INFRACTIONS WHILE IN CUSTODY.

22   **Q**    RIGHT. THAT'S FOR BOTH PRETRIAL AND POST-SENTENCE

23   CONFINEMENT, CORRECT?

24   **A**    THEY ACCUMULATE THE CREDITS BASED ON BOTH PRETRIAL AND THEIR

25   SENTENCE TIME, BUT IT ONLY APPLIES, OBVIOUSLY, TO SENTENCED

1  PRISONERS.

2  **Q**   NOW, THERE WAS A COURT PROCEEDING SEVERAL YEARS AGO WHICH

3  PUT A CAP ON THE SAN FRANCISCO COUNTY JAIL, RIGHT?

4  **A**   YES.

5  **Q**   AND DID YOU EVER HAVE TO RELEASE PRISONERS BEFORE THEIR

6  SENTENCE WAS COMPLETED AS A RESULT OF THAT CAP?

7  **A**   YES.

8  **Q**   AND HOW DID YOU DO THAT?

9  **A**   JUDGE ORRICK HAD APPOINTED A SPECIAL MASTER WHO WAS

10  OVERSEEING OUR COUNTY JAIL POPULATION FOR, OH, A DECADE OR MORE,

11  AND HE GAVE US -- GAVE ME AUTHORITY TO RELEASE PRISONERS AS

12  NEEDED TO MEET OUR CAPACITY ON A SCALE WHICH WAS FIRST TO

13  RELEASE SENTENCED PRISONERS TEN PERCENT BEFORE THEIR RELEASE

14  DATE.  IF THAT DIDN'T CURE THE DEFECT, THEN 20 PERCENT BEFORE

15  THE RELEASE DATE, AND CONTINUING ON AT TEN PERCENT INTERVALS

16  UNTIL THE SENTENCED POPULATION OR THE OVERALL JAIL POPULATION

17  WAS ATTAINED.

18  **Q**   AND JUST WHO WAS THE SPECIAL MASTER IN THAT CASE?

19  **A**   IT WAS ALLAN BREED.

20  **Q**   SO THIS CONSENT OR THIS JUDGMENT FROM JUDGE ORRICK RESULTED

21  IN THE EARLY RELEASE OF PRISONERS.  ABOUT HOW MANY PRISONERS

22  WERE RELEASED ON THIS PROGRAM?

23  **A**   WELL, VIRTUALLY EVERY SENTENCED PRISONER OVER A NUMBER OF

24  YEARS, SO SEVERAL THOUSAND.

25  **Q**   OKAY.  AND WAS THERE A PUBLIC OUTCRY FROM THE EARLY RELEASE

1   OF THESE SENTENCED PRISONERS?

2   **A**   NO.   THERE WAS CONCERN, AND THERE WAS SOME INVESTIGATIVE

3   REPORTER LOOKING AT IT, BUT THERE WASN'T ANY PARTICULAR PUBLIC

4   OUTCRY.

5   **Q**   NOW, OF THE OFFENDERS WHO WERE RELEASED UNDER THIS PROGRAM,

6   DO YOU KNOW OF ONE WHO EVER COMMITTED A SERIOUS CRIME DURING THE

7   PERIOD WHEN THEY WOULD OTHERWISE HAVE BEEN INCARCERATED?

8   **A**   NO.

9   **Q**   NOW, JUST MOVING AWAY FROM THE EARLY RELEASE PROGRAM THAT

10  WAS IMPLEMENTED IN THE PAST, IN TERMS OF RELEASING PRISONERS

11  TODAY, DO YOU DO ANYTHING DIFFERENTLY FOR MENTALLY ILL

12  PRISONERS?

13  **A**   WE HAVE HAD A CASE MANAGEMENT PROGRAM FOR MENTALLY ILL

14  OFFENDERS ON EITHER LOCAL PRISONERS OR STATE PAROLEES.   THE

15  FUNDING, HOWEVER, FOR THAT PROGRAM NO LONGER EXISTS.

16  **Q**   WHEN IT WAS OPERATING WAS IT EFFECTIVE?

17  **A**   YES.   THE PEOPLE -- THE PEOPLE WHO HAD SERIOUS AND

18  PERSISTENT MENTAL ILLNESSES WHO WERE INVOLVED IN THE CRIMINAL

19  JUSTICE SYSTEM WHO HAD CASE MANAGERS WERE ALMOST NEVER

20  REARRESTED.

21  **Q**   YOU HAVE A PROGRAM IN YOUR JAIL CALLED NOVA, RIGHT?

22  **A**   YES.

23  **Q**   N-O-V-A, WHAT DOES THAT STAND FOR?

24  **A**   IT STANDS FOR THE NO VIOLENCE ALLIANCE.

25  **Q**   WHAT KIND OF OFFENDERS ARE ELIGIBLE FOR THIS PROGRAM?

1  **A**   THIS IS A PROGRAM DESIGNED TO PROVIDE CASE MANAGEMENT

2  SERVICES EXCLUSIVELY TO PRISONERS WITH VIOLENT CRIMINAL RECORDS.

3  **Q**   WHEN YOU SAY "VIOLENT CRIMINAL RECORDS," WHAT KIND OF

4  OFFENSES DO YOU TAKE IN THAT PROGRAM?

5  **A**   WELL, MOST ANY KIND, BUT CURRENTLY ON THE PROGRAM WE HAVE

6  PEOPLE FOR ASSAULT WITH A DEADLY WEAPON, MURDER, RAPE,

7  KIDNAPPING, BATTERY, DOMESTIC VIOLENCE.

8  **Q**   THANK YOU.  CAN YOU PLEASE DESCRIBE WHAT THAT PROGRAM DOES

9  AND WHAT ITS PURPOSE IS AND HOW IT OPERATES?

10  **A**   YES, WE IDENTIFY PEOPLE THROUGH OUR CLASSIFICATION SYSTEM

11  WHO HAVE A VIOLENT RECORD WHO ARE GOING TO BE GETTING OUT AND

12  ASK THEM IF THEY WOULD LIKE TO BE PART OF A CASE MANAGEMENT

13  PROGRAM.  SO WE PROVIDE THEM WITH A CASE MANAGER WHO SEES WHAT

14  TYPES OF HELP OR ASSISTANCE THEY NEED, AND THEN WE HAVE A

15  FLEXIBLE FUND WHICH WE CAN DRAW ON TO PROVIDE SERVICES SUCH AS

16  HOUSING, DRUG TREATMENT, EMPLOYMENT, TRAINING, EDUCATION, WORK

17  CLOTHES, OR THINGS LIKE THAT.

18          **JUDGE KARLTON:**  WHERE DOES THE MONEY COME FROM?

19          **THE WITNESS:**  INITIALLY, IT CAME DIRECTLY FROM OUR

20  BOARD OF SUPERVISORS, AND THEN, SINCE THAT TIME, WE HAVE BEEN

21  CONTRACTED WITH THE STATE OF CALIFORNIA TO PROVIDE THESE

22  SERVICES TO A GROUP OF STATE PAROLEES.

23  BY MR. SPECTER

24  **Q**   SO HOW MANY STATE PAROLEES ARE IN -- ARE THEY FROM SAN

25  QUENTIN, THE NEAREST PRISON?

1 **A**   MOST OF THEM ARE FROM SAN QUENTIN.  WE HAVE HAD PEOPLE FROM

2 SOLEDAD AND ELSEWHERE.  WE GO INTO THE PRISONS THEMSELVES AND

3 INTERVIEW PEOPLE AND SIGN THEM UP, AND WHEN THEY GET OUT, WE

4 PROVIDE THE CASE MANAGEMENT FOR THEM.

5 **Q**   JUST SO IT'S CLEAR IN THE RECORD, YOU PROVIDE -- THIS NOVA

6 PROGRAM BOTH WORKS FOR PAROLEES FROM THE STATE PRISON SYSTEM AND

7 FROM THE COUNTY JAIL; IS THAT CORRECT?

8 **A**   YEAH.  WE HAVE A CONTRACT WITH CDCR TO PROVIDE THIS SERVICE.

9 **Q**   OKAY.  AND HOW LONG HAS THIS PROGRAM BEEN OPERATING?

10 **A**   THE LOCAL VERSION OF IT HAS BEEN OPERATING ABOUT 2-1/2

11 YEARS, AND THE STATE VERSION OF IT HAS BEEN OPERATING FOR ABOUT

12 A YEAR AND A HALF.

13 **Q**   AND HAS IT BEEN SUCCESSFUL IN REDUCING --

14 **A**   WELL, YES, WE'VE DONE A STUDY ON IT.  WE HAVE HAD AN

15 EVALUATION DONE ON THE PROGRAM.

16 **Q**   DID YOU DO THAT STUDY OR AN INDEPENDENT PERSON DO THE STUDY?

17 **A**   WE HAD AN INDEPENDENT CONTRACTOR COME IN AND DO THE STUDY.

18 **Q**   OKAY.  WHAT WERE THE RESULTS OF THE STUDY?

19 **A**   THE RESULTS SHOWED THAT -- AND WE DID, OBVIOUSLY, A

20 COMPARISON GROUP WHO HAD SIMILAR BACKGROUNDS -- AND OF THE

21 COMPARISON GROUP ABOUT 68 PERCENT WERE REARRESTED WITHIN THE

22 FIRST YEAR, AND OF THE NOVA GROUP IT WAS 36 PERCENT.  SO WE

23 PRETTY MUCH CUT REARRESTS IN HALF AND THAT WAS JUST ARRESTS.

24 THE CONVICTIONS, THE STUDY GROUP HAD ABOUT A 20 PERCENT

25 CONVICTION RATE AND THE NOVA GROUP HAD ABOUT A FIVE PERCENT

1  CONVICTION RATE.

2  **Q**   THAT WAS FOR VIOLENT OFFENDERS, CORRECT?

3  **A**   THE PARTICIPANTS ARE ALL VIOLENT OFFENDERS.  ALMOST NONE OF

4  THE NEW CRIMES WERE VIOLENT CRIMES.

5  **Q**   WHAT IS THE COST OF THE PROGRAM FOR BOTH THE PRISONERS AND

6  THE COUNTY JAIL?

7  **A**   WE SPEND ABOUT $3,000 PER PARTICIPANT FOR EACH PARTICIPANT

8  AS A GROUP.  THE CDCR PEOPLE ARE A LITTLE MORE INTENSIVE.  WE

9  SPEND ABOUT $4,000 PER PERSON FOR THE CDCR PARTICIPANTS PER

10 PERSON PER YEAR.

11 **Q**   THANK YOU.

12          **JUDGE REINHARDT:**  IS THIS A PILOT PROGRAM BY THE

13 STATE?

14          **THE WITNESS:**  YES, IT IS A PILOT PROGRAM, YOUR HONOR,

15 THAT THE STATE PUT OUT A REQUEST FOR PROPOSALS FOR

16 INTER-GOVERNMENTAL PARTNERSHIPS FOR CRIME REDUCTION, AND WE

17 PROPOSED THIS BECAUSE WE'D ALREADY BEEN RUNNING IT, OUR LOCAL

18 VERSION.  SO WE WERE GRANTED $1.2 MILLION FROM THE STATE TO TAKE

19 STATE PAROLEES AND PUT THEM IN THIS PROGRAM.

20          **JUDGE REINHARDT:**  IS IT AVAILABLE TO OTHER COUNTIES?

21          **THE WITNESS:**  NO, AT THIS POINT, NO, IT'S JUST A SAN

22 FRANCISCO PROGRAM.

23          **JUDGE REINHARDT:**  ARE YOU SUPPOSED TO REPORT BACK ON

24 THE SUCCESS OF THE PILOT PROGRAM?

25          **THE WITNESS:**  YES.

1  BY MR. SPECTER

2  Q    DO YOU HAVE ANY AGREEMENTS WITH THE CDCR TO HOUSE ANY STATE

3  PRISONERS FOR REENTRY PURPOSES?

4          MS. BARLOW:  I'M SORRY, COUNSEL.  I COULDN'T HEAR

5  YOUR QUESTION.

6  BY MR. SPECTER

7  Q    DO YOU HAVE ANY AGREEMENTS WITH THE CDCR TO HOUSE ANY

8  PRISONERS FOR REENTRY PURPOSES?

9  A    YES, WE HAVE A CONTRACT THAT WAS NEGOTIATED WITH -- BETWEEN

10 ME AND OUR DISTRICT ATTORNEY AND CDCR TO SET UP A REENTRY

11 PROGRAM FOR STATE PRISONERS TO SERVE THEIR LAST 12 MONTHS IN THE

12 SAN FRANCISCO COUNTY JAIL, OR THEY WOULD BE PROVIDED WITH

13 IN-CUSTODY SERVICES, AND THEN THE DISTRICT ATTORNEY WOULD SET UP

14 A POST-RELEASE REENTRY COURT PROGRAM AND PROVIDE SERVICES POST

15 RELEASE.

16 Q    AND THE AIM OF THAT IS TO REDUCE THE RECIDIVISM OF THESE

17 OFFENDERS; IS THAT CORRECT?

18 A    YES, AND IT WOULD ALSO HAVE THE BENEFIT OF REDUCING STATE

19 PRISON POPULATION SOMEWHAT.

20 Q    RIGHT.  WHEN DID YOU SIGN THAT AGREEMENT OR CONTRACT?

21 A    WE SIGNED THE CONTRACT ABOUT 60 DAYS AGO.

22 Q    HOW MANY PRISONERS ARE IN YOUR JAIL FOR THIS PURPOSE?

23 A    NONE AT THIS POINT.

24 Q    OKAY.  DO YOU KNOW WHY NOT?  HAVE YOU ASKED FOR THEM?

25 A    WE WERE ACTUALLY SET TO START THIS MONTH, BUT WE WERE CALLED

1   BY A REPRESENTATIVE OF CDCR WHO SAID THEY DIDN'T CURRENTLY HAVE

2   FUNDING FOR IT SO THEY WOULD HOPE TO START IN JULY WHEN THEY GOT

3   A NEW BUDGET.

4   Q    JULY OF '09?

5   A    JULY OF '09, YES, THAT'S CORRECT.

6   Q    DO YOU INCARCERATE ANY PAROLEES WHO HAVE BEEN ARRESTED FOR

7   PAROLE VIOLATIONS WITHOUT A NEW CRIME IN YOUR JAIL?

8   A    WE DON'T ACCEPT PAROLEES TO BE BOOKED INTO OUR CUSTODY WHO

9   HAVE NO LOCAL CHARGES.

10  Q    OKAY.  DO YOU KNOW WHAT HAPPENS TO THESE PAROLEES WHO ARE

11  ARRESTED?

12  A    THEY ARE EITHER TAKEN TO A STATE FACILITY, SUCH AS SAN

13  QUENTIN OR DVI, DEUEL VOCATIONAL INSTITUTE.  ON SOME OCCASIONS

14  THEY HAVE BEEN TAKEN TO THE ALAMEDA COUNTY JAIL, AND ON SOME

15  OCCASIONS I HAVE BEEN TOLD THEY HAVE JUST BEEN RELEASED.

16  Q    WHAT'S THE REASON FOR THEM JUST BEING RELEASED?

17  A    I WAS TOLD BY A PAROLE OFFICER THAT IT WAS JUST TOO TIME

18  CONSUMING TO DRIVE ALL THE WAY TO DVI AND BACK.

19  Q    DVI IS IN TRACY, CALIFORNIA, RIGHT?

20  A    YES, IT'S IN TRACY.

21  Q    TWO MORE QUESTIONS.

22          YOU KNOW THAT THESE PROCEEDINGS ARE BEING HELD

23  BECAUSE THE COURTS, JUDGE KARLTON, JUDGE HENDERSON, IN THEIR

24  RESPECTIVE CASES HAVE HELD THAT THE CONDITIONS IN THE STATE

25  PRISONS ARE UNCONSTITUTIONAL BECAUSE OF INADEQUATE HEALTHCARE?

1  **A**   YES, THAT'S WHAT I HAVE BEEN TOLD.

2  **Q**   NOW, ASSUMING -- I WANT YOU TO ASSUME THAT OVERCROWDING IS

3  THE PRIMARY CAUSE OF THESE CONSTITUTIONAL VIOLATIONS AND THE

4  STATE CAN'T REDUCE CROWDING BY EXPANDING THE CAPACITY OF THE

5  PRISON SYSTEM.  WHAT DO YOU THINK THE COURT SHOULD DO IN THIS IN

6  THESE -- IN THAT CIRCUMSTANCE?

7          **MR. MITCHELL:**  OBJECT, YOUR HONOR, AS CALLING FOR

8  IMPROPER OPINION ON HIS PART, LACK OF FOUNDATION.

9          **MS. JOHNSON:**  WAS NOT DISCLOSED AS AN EXPERT OR

10 TREATED AS AN EXPERT.

11          **JUDGE KARLTON:**  HE'S A REBUTTAL WITNESS.  THE

12 OBJECTION IS OVERRULED.  YOU MAY PROCEED.

13          **MS. JOHNSON:**  WE WERE REQUIRED TO DISCLOSE REBUTTAL

14 EXPERT WITNESSES, YOUR HONOR.

15          **JUDGE HENDERSON:**  YOU MAY ANSWER THAT QUESTION,

16 SHERIFF.

17          **THE WITNESS:**  WELL, MY EXPERIENCE HAS BEEN THAT

18 PEOPLE SHOULD STAY WITHIN THEIR CAPACITY, SO I WOULD EXPECT THAT

19 CDCR WOULD HAVE TO FIND A WAY TO STAY WITHIN THEIR CAPACITY

20 OR -- EXPAND THEIR CAPACITY OR STAY WITHIN THEIR CAPACITY.

21          **MR. SPECTER:**  THANK YOU, NO FURTHER QUESTIONS.

22          **JUDGE HENDERSON:**  CCPOA?

23          **MS. LEONARD:**  NO, YOUR HONOR.

24          **JUDGE HENDERSON:**  CROSS?

25          **MR. MELLO:**  MR. MITCHELL IS GOING TO GO FIRST FOR

1  DEFENDANTS.

2              **JUDGE HENDERSON:**  OKAY.

3                  **CROSS-EXAMINATION BY MR. MITCHELL**

4  BY MR. MITCHELL

5  **Q**   GOOD MORNING, SHERIFF HENNESSEY.

6  **A**   GOOD MORNING.

7  **Q**   BILL MITCHELL, DEFENDANT INTERVENORS.

8        SIR, SAN FRANCISCO COUNTY JAIL HAD TO GO THROUGH A

9  FEDERAL COURT TRIAL IN ORDER TO LOWER ITS POPULATION, DIDN'T IT?

10 **A**   YES.

11 **Q**   ARE YOU CURRENTLY WORKING UNDER A COURT-ENFORCED CAP AT THIS

12 TIME?

13 **A**   NO.

14 **Q**   YOUR WEBSITE LISTS THE CAPACITY OF YOUR COUNTY JAILS AS

15 2,200, BUT YOU TESTIFIED HERE TODAY IT WAS 2,040.  CAN YOU

16 EXPLAIN THE DISTINCTION OR THE DIFFERENCE?

17 **A**   NO, NOT REALLY.  THE WEBSITE MUST BE INCORRECT.

18 **Q**   SO YOUR CAPACITY IS 2,040?

19 **A**   YES.

20 **Q**   AT THIS TIME ARE YOU AWARE OF WHAT THE PERCENTAGE OF

21 PRETRIAL DETAINEES IS IN YOUR COUNTY JAIL?

22 **A**   IT'S GENERALLY BETWEEN 75 AND 80 PERCENT.

23 **Q**   WHAT PERCENTAGE IS SENTENCED PRISONERS?

24 **A**   THE REMAINDER.

25 **Q**   SO YOU ARE NOT HOUSING ANY FEDERAL PRISONERS?  YOU ARE NOT

1  HOUSING ANY OTHER TYPE OF INMATES OTHER THAN PRETRIAL DETAINEES

2  AND SENTENCED PRISONERS?

3  **A**    THAT'S CORRECT.  WE OCCASIONALLY -- WE WILL OCCASIONALLY

4  HAVE PEOPLE -- OR REGULARLY HAVE PEOPLE WHO HAVE HAD THEIR LOCAL

5  CHARGES DROPPED BUT HAVE A PAROLE HOLD, AND THERE WILL BE A CDCR

6  PERSON WHO HAS YET TO BE PICKED UP.

7  **Q**    WHAT PERCENTAGE OF YOUR PRETRIAL DETAINEES HAVE PAROLE HOLDS

8  OR 3056 HOLDS?

9  **A**    A VERY SMALL PERCENTAGE.  I'M NOT SURE.  BUT I WOULD GUESS

10 NO MORE THAN TEN PERCENT.

11 **Q**    THE NUMBER OF PAROLEES IN YOUR COUNTY, ARE YOU AWARE OF HOW

12 MANY PAROLEES YOU HAVE IN YOUR COUNTY?

13 **A**    YES, GENERALLY, IT IS IN BETWEEN 2,000 AND 2,500.

14 **Q**    THE CDCR STATS SHOW THAT ABOUT 1,800 PAROLEES WERE REPAROLED

15 BACK TO SAN FRANCISCO IN 2007.  ARE YOU AWARE OF THAT FIGURE?

16 **A**    NO.

17 **Q**    WOULD THAT FIGURE REPRESENT THOSE PAROLEES WHO HAVE VIOLATED

18 THEIR PAROLE AND THEN WERE RERELEASED BACK TO SAN FRANCISCO?

19 **A**    I DON'T KNOW.  THAT'S WHAT IT SOUNDS LIKE.

20 **Q**    YOU INDICATED THAT YOU HAVE A PROGRAM DESIGNED TO REDUCE

21 VIOLENCE THAT COUNSELS AND PROVIDES CASE MANAGERS TO BOTH

22 PROBATION, SENTENCED, FELONY DEFENDANTS, AND TO PAROLEES COMING

23 OUT OF STATE PRISON; IS THAT CORRECT?

24 **A**    THAT'S CORRECT.

25 **Q**    PERHAPS I MISUNDERSTOOD, BUT ARE THERE ACTUALLY AT THIS TIME

1  PAROLEES THAT ARE INVOLVED IN THAT PROGRAM?

2  **A**  YES.

3  **Q**  HOW MANY?

4  **A**  I THINK TODAY WE HAVE 75.

5  **Q**  THAT'S BEEN ONGOING FOR ABOUT A YEAR AND A HALF?

6  **A**  THAT'S CORRECT.

7  **Q**  YOU INDICATED THERE WAS A STUDY THAT WAS DONE OF RECIDIVISM

8  FOR INDIVIDUALS INVOLVED IN THIS PROGRAM?

9  **A**  YES.  YES.

10  **Q**  WHO CONDUCTED THAT STUDY?

11  **A**  PARDON ME?

12  **Q**  WHO CONDUCTED THE STUDY?

13  **A**  AN ORGANIZATION CALLED PENDERGRASS & AND ASSOCIATES.

14  **Q**  HAS IT BEEN PUBLISHED?

15  **A**  YES.

16  **Q**  WHERE?

17  **A**  I DON'T KNOW.  I MEAN, IT WAS -- IT'S IN WRITING.  IT'S IN A

18  BINDER.  IT WASN'T PUBLISHED IN ANY TRADE MAGAZINE OR ANYTHING

19  LIKE THAT.  IT'S AVAILABLE TO THE PUBLIC.

20  **Q**  IT IS AVAILABLE TO THE PUBLIC?

21  **A**  YES.

22  **Q**  IF I CONTACTED YOU LATER, YOU COULD SEND ME A COPY?

23  **A**  I WOULD BE HAPPY TO.

24  **Q**  THANK YOU.

25          YOU ARE AWARE, I'M SURE, THAT SAN FRANCISCO CITY AND

1  COUNTY HAS THE HIGHEST VIOLENT CRIME RATE OF ALL THE COUNTIES IN

2  THE STATE OF CALIFORNIA, AREN'T YOU?

3  A    NO.

4  Q    DOES IT SURPRISE YOU TO LEARN THAT IT'S THE HIGHEST VIOLENT

5  CRIME RATE AS OF 2006 IN THE BUREAU OF JUSTICE STATISTICS?

6  A    YES, IT WOULD SURPRISE ME.

7  Q    DO YOU MAKE ATTEMPTS AS A SHERIFF TO DESIGN AND IMPLEMENT

8  PROGRAMS TO PROVIDE FOR PUBLIC SAFETY?

9  A    YES.

10  Q    AND IN DOING THAT, DO YOU LOOK TO MEASURES OF WHAT LEVEL OF

11  SERVICES YOU ARE PROVIDING TO THE COUNTY?  DO YOU LOOK FOR

12  RESULTS?

13  A    YES.

14  Q    NOW, IF THE VIOLENT CRIME RATE IS THE HIGHEST AND IT'S BEEN

15  GOING UP IN SAN FRANCISCO OVER THE LAST FEW YEARS ACCORDING TO

16  THE DPS STATISTICS, WOULD THAT INDICATE TO YOU THAT PERHAPS THE

17  MEASURES YOU ARE EMPLOYING AREN'T ACTUALLY WORKING?

18  A    NO.

19  Q    WHY NOT?

20  A    WELL, ASSUMING THAT YOUR SUPPOSITION IS CORRECT, I WOULD

21  NEVERTHELESS SUGGEST THAT THE PROGRAMS THAT WE HAVE HAVE KEPT

22  THE RATE OF INCREASE LOWER THAN IT WOULD HAVE BEEN WITHOUT THOSE

23  PROGRAMS.

24  Q    HOW MANY SENTENCED PRISONERS' PROBATION ARE INVOLVED IN YOUR

25  PROGRAM?

1    **A**    WHICH PROGRAM?  ALL OF THEM?

2    **Q**    THE STOP THE VIOLENCE WITH THE CASE MANAGERS.

3    **A**    TWO HUNDRED FIFTY MINUS SEVENTY-FIVE.  ONE HUNDRED

4    SEVENTY-FIVE APPROXIMATELY.

5    **Q**    DO YOU KNOW WHAT PERCENTAGE OF THE PAROLEES THAT COME OUT OF

6    STATE PRISON THAT RETURN TO SAN FRANCISCO ARE HOMELESS?

7    **A**    NO, I DON'T.

8    **Q**    WOULD YOU AGREE THAT HOMELESSNESS IS A FACTOR THAT PLAYS A

9    VERY LARGE ROLE IN PAROLEES REOFFENDING AND BEING RECOMMITTED

10   BACK INTO PRISON EITHER FOR PAROLE VIOLATIONS OR FOR NEW CRIMES?

11   **A**    YES.

12   **Q**    ARE YOU AWARE OF STUDIES THAT HAVE SHOWN THAT BETWEEN 50 AND

13   60 PERCENT -- EXCUSE ME ONE MOMENT.  LET ME GET THE FIGURE

14   RIGHT -- THAT 30 TO 50 PERCENT OF THE PAROLEES ARE ESTIMATED TO

15   BE HOMELESS IN SAN FRANCISCO?

16   **A**    I'M NOT AWARE OF THAT STUDY, NO.

17   **Q**    YOU MENTION THAT DUE TO THE CAP ON THE JAIL, THERE WAS EARLY

18   RELEASES THAT HAD TO TAKE PLACE, AND DID YOU SAY THAT THERE WERE

19   THOUSANDS OF EARLY RELEASES?

20   **A**    YES.

21   **Q**    WERE THESE INDIVIDUALS THAT YOU PLACED EARLY ON TO COUNTY

22   PAROLE OR WERE THEY SIMPLY RELEASED FROM THE JAIL WITHOUT

23   SUPERVISION?

24   **A**    THERE WERE A NUMBER OF CATEGORIES.  SOME WERE RELEASED ON

25   COUNTY PAROLE.  SOME WERE RELEASED TEN PERCENT EARLY, FOR

1  EXAMPLE, WITHOUT ANY SUPERVISION.  AND THERE IS A PENAL CODE

2  SECTION WHICH ALLOWS THE SHERIFF TO RELEASE PEOPLE FIVE DAYS

3  EARLY FROM A SENTENCE IF THE PRISONER COUNT IS LARGER THAN THE

4  BED COUNT, AND WE'VE USED THAT ON OCCASION.  YOU HAVE TO GET A

5  SUPERIOR COURT ORDER, AND THOSE PEOPLE ARE ALSO RELEASED WITHOUT

6  SUPERVISION.

7  Q    DO YOU KEEP RECORDS ON THOSE THAT YOU EARLY RELEASE?

8  A    RECORDS OF WHAT KIND?

9  Q    WELL, WHEN THEY'RE RELEASED.

10  A    YES.

11  Q    AND DO YOU KEEP RECORDS OF IF AND WHEN THEY MAY GET

12  REARRESTED?

13  A    NO, WE DON'T HAVE A RESEARCH CAPABILITY OF FOLLOWING THAT.

14  Q    SO THEN YOU WOULDN'T BE ABLE TO DETERMINE WHAT THEIR

15  RECIDIVISM RATE IS THEN?

16  A    OF THAT GROUP, NO.

17  Q    SO ANYONE THAT'S EARLY RELEASED, YOU COULDN'T TELL US IF

18  THEY REOFFENDED AND WERE BOOKED BACK INTO THE JAIL?

19  A    NOT UNLESS THEY ARE PART OF A PROGRAM WHERE IT'S AN

20  EVALUATION.

21  Q    THE EARLY RELEASES DUE TO YOUR CAP ON YOUR JAIL HAVE BEEN

22  TAKING PLACE FOR HOW MANY YEARS NOW?

23  A    THEY ARE NOT TAKING PLACE AT ALL NOW, BUT THEY TOOK PLACE

24  FOR THREE OR FOUR YEARS PRIOR TO US OPENING A NEW JAIL TWO YEARS

25  AGO.  SO I GUESS THEY WERE PROBABLY TAKING PLACE FROM IN THE

1  EARLY –– IN THEIR EARLY YEARS OF 2000.

2  Q   NOW, THE PAROLE SERVICES THAT SAN FRANCISCO IS NOW PROVIDING

3  AND SOME OF THE NEW MEASURES THAT YOU HAVE SPOKEN ABOUT, CDCR IS

4  ACTIVELY INVOLVED AND ENGAGED WITH SAN FRANCISCO CITY AND COUNTY

5  IN TRYING TO INCREASE PROGRAMS FOR PAROLEES, CORRECT?

6  A   YES, IN TWO SPECIFIC PROGRAMS, YES.

7  Q   AND FROM YOUR ACTIVE INVOLVEMENT IN THOSE PROGRAMS, IT'S

8  BEEN CLEAR TO YOU THAT THE CDCR AUTHORITIES ARE ON EASILY

9  ATTEMPTING TO REDUCE THE RECIDIVISM OF THE PAROLEES, CORRECT?

10           MR. SPECTER:  THAT CALLS FOR STATE OF MIND OF THE ––

11           JUDGE HENDERSON:  I CAN'T HEAR YOU, COUNSEL.

12           MR. SPECTER:  OBJECTION.  THAT CALLS FOR STATE OF

13  MIND OF OTHER PEOPLE.  IT WOULD BE SPECULATIVE.

14           JUDGE KARLTON:  IT ASKS WHAT HIS EVALUATION OF THE

15  RELATIONSHIP IS, AND THAT'S AN APPROPRIATE QUESTION.

16           THE WITNESS:  YES, YOUR HONOR.  I WOULD SAY THAT CDCR

17  HAS BEEN VERY SOLICITOUS IN WORKING WITH MY DEPARTMENT ON THESE

18  REENTRY PROGRAMS AND HAS BEEN VERY ENTHUSIASTIC IN GETTING THE

19  PROGRAMS STARTED AND FUNDED AND PERSONS PLACED IN IT, EXCEPT

20  WHEN THEY RUN OUT OF MONEY.

21  BY MR. MITCHELL

22  Q   THE CASE MANAGER PROGRAM THAT YOU SAY –– THEY'RE INTENDING

23  TO START IN JULY OF 2009 NOW?

24  A   THAT'S THE CURRENT PROPOSAL THAT I HAVE BEEN TOLD, YES.

25  Q   THAT TYPE OF PROGRAM YOU WOULD –– WOULD YOU BELIEVE WOULD

1  HOLD GREAT POTENTIAL FOR GOOD RESULTS?  I MEAN, IF YOU GOT THAT

2  KIND OF SOCIAL WORKER TYPE, CASE MANAGER ACTIVELY INVOLVED WITH

3  INDIVIDUALS WITH HOUSING WITH EMPLOYMENT AND ASSISTING THEM TO

4  BE SUCCESSFUL ON PAROLE, IT'S GOING TO REDUCE RECIDIVISM, RIGHT?

5  **A**  IT SHOULD, YES.

6          **MR. MITCHELL:**  I HAVE NO FURTHER QUESTIONS.

7          **JUDGE HENDERSON:**  STATE DEFENDANTS?

8          **MR. MELLO:**  NO FURTHER QUESTIONS.

9          **JUDGE HENDERSON:**  REDIRECT?

10         **MR. SPECTER:**  NO, YOUR HONOR.

11         **JUDGE HENDERSON:**  THANK YOU, SHERIFF, FOR APPEARING

12 AND TESTIFYING.

13         **THE WITNESS:**  THANK YOU.

14         **JUDGE HENDERSON:**  YOU'RE EXCUSED.

15         **MS. EVENSON:**  GOOD MORNING, YOUR HONORS.  AS COUNSEL

16 INDICATED EARLIER, PLAINTIFFS ARE PROPOSING TO INTRODUCE AN

17 EXHIBIT.  WE MARKED IT AS P 842.  WE PROVIDED COPIES OF THIS THE

18 BEGINNING OF THE WEEK TO DEFENSE COUNSEL AND PROVIDED TO THEM --

19 THIS IS A COMPILATION OF DATA THAT'S PUBLICLY AVAILABLE ON STATE

20 GOVERNMENT WEBSITES, WHICH WE PUT INTO EXCEL SPREADSHEETS AND

21 THEN INTO GRAPHS COMPARING PAROLEES AND CRIME RATES IN

22 CALIFORNIA AND IN SELECTED CALIFORNIA COUNTIES, AND WE ARE

23 OFFERING THIS AS A REBUTTAL EXHIBIT.

24         WE PROVIDED THE DATA UNDERLYING IT AND ALL THE

25 SOURCES OF THE DATA TO ALL COUNSEL, AND WE UNDERSTAND THAT

1  THERE'S AN OBJECTION.  WE HAVEN'T RECEIVED ANY WRITTEN

2  OBJECTIONS, BUT WE WERE ASKED TO BRING THE MEMBER OF OUR STAFF

3  WHO ACTUALLY COMPILED THE DATA TO COURT TO ANSWER QUESTIONS,

4  ALTHOUGH WE ARE NOT QUITE SURE WHAT THE OBJECTIONS ARE.

5         WE MADE HER AVAILABLE ALSO EARLIER IN THE WEEK, AND

6  DEFENSE COUNSEL QUESTIONED HER FOR ABOUT AN HOUR, BUT WE HAVEN'T

7  HEARD THE PRECISE OBJECTIONS.

8         **MS. JOHNSON:**  THAT'S NOT TRUE, YOUR HONOR.

9         **JUDGE KARLTON:**  THAT DOESN'T MATTER.

10        **MS. JOHNSON:**  THE OBJECTION -- THE FIRST OBJECTION TO

11  CONSIDER, THIS IS HEARSAY.  THERE IS NO EXCEPTION FOR ATTORNEY

12  WORK PRODUCT FOR THE HEARSAY RULE.  THIS IS NOT A PUBLIC RECORD.

13  IT'S NOT AN OFFICIAL PUBLICATION.

14        **JUDGE KARLTON:**  IT'S A COMPILATION.  DO YOU HAVE --

15  YOU HAVE AN OBJECTION TO THE MANNER IN WHICH IT WAS DONE?

16        **MS. JOHNSON:**  YES, YOUR HONOR, WE DO HAVE OBJECTIONS

17  TO THAT.  BUT IT IS NOT A PROPER COMPILATION THAT CAN BE

18  CONSIDERED BY THIS COURT AS EVIDENCE.  IT IS NOT -- IT DOES NOT

19  FALL WITHIN ANY KNOWN HEARSAY EXCEPTION.  IT IS ATTORNEY WORK

20  PRODUCT DONE UNDER THE DIRECTION OF DON SPECTER AND REBEKAH

21  EVENSON.

22        **JUDGE KARLTON:**  THAT OBJECTION IS OVERRULED.  IF YOU

23  HAVE AN OBJECTION TO THE FACT THAT IT HAS BEEN COMPILED

24  INAPPROPRIATELY, PLEASE PROCEED.

25        **MS. JOHNSON:**  WELL, YOUR HONOR, FIRST OF ALL, IT'S A

1   COMPILATION.  COMPILATIONS ARE NOT LAY TESTIMONY.  THIS HAS NOT

2   BEEN COMPILED BY --

3            **JUDGE KARLTON:**  MA'AM, I REALLY HAVE A LOT OF

4   PROBLEMS WITH PEOPLE WHO DON'T UNDERSTAND THAT THE COURT HAS

5   RULED.

6            IF YOU HAVE OBJECTIONS TO THE MANNER OF COMPILATION

7   AND, ALSO, AS TO WHETHER OR NOT IT ACTUALLY REFLECTS THE

8   SOURCES, THAT'S APPROPRIATE, AND I WILL MORE THAN HAPPILY HEAR

9   YOUR QUESTION IF THAT IS YOUR BASIS.  OTHERWISE, I AM TOLD --

10           WELL, ACTUALLY, YOU ARE RIGHT ABOUT ONE OTHER THING,

11  AND THAT IS THAT IT ISN'T THEIR BURDEN, IT'S YOUR BURDEN, TO PUT

12  THE WITNESS ON TO SAY HOW IT WAS DONE AND WHAT IT IS.  YOUR

13  TESTIMONY AS TO WHAT IT IS IS INSUFFICIENT.

14           **MS. EVENSON:**  WE ARE PREPARED TO DO THAT, YOUR HONOR,

15  UNDERSTANDING THERE'S AN OBJECTION.  SO WE'LL CALL NOOR DAWOOD

16  TO THE STAND.

17                        **NOOR DAWOOD**

18  HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

19  DULY SWORN AND EXAMINED AS FOLLOWS:

20           **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

21  RECORD.

22           **THE WITNESS:**  MY NAME IS NOOR DAWOOD, N-O-O-R

23  D-A-W-O-O-D.

24  ///

25  ///

1        **DIRECT EXAMINATION BY MS. EVENSON**

2    BY MS. EVENSON

3    Q    GOOD MORNING, MS. DAWOOD.

4             I WOULD LIKE TO APPROACH THE WITNESS AND SHOW HER

5    WHAT'S BEEN MARKED AS 842.

6             BEFORE WE BEGIN, MS. DAWOOD, ARE YOU FAMILIAR WITH

7    THE EXCEL PROGRAM?

8    A    YES, I AM.

9    Q    AND HAVE YOU WORKED WITH EXCEL BEFORE?

10   A    YES, I HAVE.

11   Q    CAN YOU DESCRIBE HOW LONG -- HOW MANY YEARS YOU'VE WORKED

12   WITH THE EXCEL PROGRAM?

13   A    SURE.  SINCE I WAS VERY YOUNG, MAYBE IN MIDDLE SCHOOL, I

14   LEARNED HOW TO USE IT.  BUT IN COLLEGE I WORKED AS A RESEARCH

15   ASSISTANT AND AS HEAD RESEARCH ASSISTANT IN VARIOUS PSYCHOLOGY

16   LABS AT STANFORD UNIVERSITY, AND I HAD TO CHART DATA AND PUT US

17   INTO GRAPHS THEN.

18            AND THEN SINCE MY TIME AT THE PRISON LAW OFFICE, I

19   HAVE BEEN ASKED ON VARIOUS OCCASIONS SINCE BEGINNING THERE TO DO

20   PROJECTS WHERE I HAD TO USE EXCEL AND CHART GRAPHS.

21   Q    YOU GRADUATED FROM STANFORD UNIVERSITY?

22   A    YES.

23   Q    WHEN WAS THAT?

24   A    THAT WAS IN 2004.

25   Q    AND YOU ARE CURRENTLY EMPLOYED AT THE PRISON LAW OFFICE?

1   **A**   YES.

2   **Q**   WHEN DID YOU START WORKING AT THE PRISON LAW OFFICE?

3   **A**   I STARTED THERE IN JUNE 2005.

4   **Q**   AND AS PART OF YOUR DUTIES AT THE PRISON LAW OFFICE, DID YOU

5   COMPILE THE DOCUMENT THAT HAS BEEN MARKED AS P 842?

6   **A**   YES.

7   **Q**   I WOULD LIKE TO TURN YOUR ATTENTION TO THE LAST PAGE OF THE

8   DOCUMENT.  DID YOU WRITE THAT PAGE?

9   **A**   YES, I DID.

10  **Q**   AND CAN YOU DESCRIBE WHAT IT IS?

11  **A**   THE SOURCES PAGE.

12  **Q**   YES.

13  **A**   YES.  THIS PAGE LISTS THE VARIOUS SOURCES FROM WHICH I TOOK

14  DATA AND PUT IT INTO AN EXCEL SPREADSHEET, AND THESE ARE ALL

15  SOURCES THAT ARE PUBLIC RECORDS FROM VARIOUS GOVERNMENT

16  WEBSITES.

17  **Q**   IS THERE ONE DOCUMENT HERE THAT WASN'T AVAILABLE ON A

18  WEBSITE?

19  **A**   YES.

20  **Q**   WHAT WAS THAT?

21  **A**   THAT WAS CRIME DATA BETWEEN THE YEARS OF 1990, AND THE

22  DOCUMENT SPANS TO 1999.  BUT ONLINE THE DATA WAS ONLY AVAILABLE

23  STARTING IN 1997, SO I HAD TO REQUEST FROM THE STATE DEPARTMENT

24  OF JUSTICE FOR THEM TO SEND ME DATA PRIOR TO 1997.  SO THAT'S A

25  DOCUMENT THAT I HAVE.

1  Q   AND HOW DID YOU GET THAT DOCUMENT?

2  A   I'M SORRY?

3  Q   HOW DID YOU GET THE DATA FROM 1990 TO '99?

4  A   SOMEONE AT THE DEPARTMENT OF JUSTICE E-MAILED ME THAT

5  DOCUMENT, AND I COPIED THE DATA DIRECTLY FROM THAT DOCUMENT INTO

6  THE EXCEL SPREADSHEET.

7  Q   CAN YOU DESCRIBE HOW YOU CREATED THE GRAPHS THAT APPEAR ON

8  EXHIBIT P 842?

9  A   SURE.  SO FIRST I LOOKED AT CRIME DATA, SPECIFICALLY VIOLENT

10 CRIME RATE PER HUNDRED THOUSAND OF THE POPULATION STATEWIDE FOR

11 COUNTIES, AND ALSO THE PROPERTY CRIME RATE FOR STATEWIDE AND

12 COUNTIES PER HUNDRED THOUSAND OF THE POPULATION, AND I PUT

13 THAT -- I COPIED EACH DATA SET FROM THE DOCUMENTS THAT I HAD

14 GOTTEN FROM THE DEPARTMENT OF JUSTICE INTO A GRAPH.

15       AND THEN I LOOKED AT PAROLEE DATA, BOTH THE NEW

16 RELEASES ANNUALLY FOR THE STATE AND FOR COUNTIES, AND ALSO THE

17 PAROLEE CENSUS, THE TOTAL PAROLE POPULATION ANNUALLY FOR THE

18 STATE AND COUNTIES, AND I COPIED THAT DATA INTO A GRAPH.  THE

19 TOTAL PAROLE CENSUS WAS NOT AVAILABLE PRIOR TO 2003 FOR

20 COUNTIES, SO I JUST USED 2003 TO 2007 FOR COUNTIES IT WAS

21 AVAILABLE FOR THE STATE.

22       I ALSO USED THE -- LOOKED AT THE POPULATION OF

23 CALIFORNIA AND THE POPULATION IN COUNTIES ANNUALLY FOR THE YEARS

24 I LOOKED AT AND PASTED THAT INTO A GRAPH -- INTO THE EXCEL

25 SPREADSHEET AS WELL, AND I HAD TO DO THAT BECAUSE THE PAROLEE --

1  THE NEW AND TOTAL PAROLEE RATE WAS NOT CALCULATED, SO -- PER

2  HUNDRED THOUSAND AS THE CRIME RATE WAS.  SO I ENTERED A

3  CALCULATION IN THE -- A FORMULA INTO THE EXCEL SPREADSHEET WHICH

4  CALCULATED THAT FOR ME.

5           AND THEN EXCEL HAS AN AUTOMATIC GRAPH MAKER, AND I

6  USED THAT TO MAKE -- TO TURN THAT DATA INTO CHARTS -- INTO

7  GRAPHS.

8  Q   AND AFTER YOU ENTERED ALL OF THE DATA THAT YOU SAY YOU

9  RECEIVED FROM WEBSITES OR FROM GOVERNMENT AGENCIES INTO THE

10 EXCEL SPREADSHEETS, DID YOU DO ANYTHING TO ENSURE IT WAS

11 ACCURATE?

12 A   YES, I WENT BACK AND DOUBLE CHECKED EVERY NUMBER THAT I HAD

13 USED.

14 Q   AND IS EXHIBIT P 842 A PRODUCT OF THAT PROCESS?

15 A   YES.

16           MS. EVENSON:  I HAVE NOTHING FURTHER.  THANK YOU.

17           CROSS-EXAMINATION BY MS. JOHNSON

18 BY MS. JOHNSON

19 Q   MS. DAWOOD, DO I HAVE THAT RIGHT?

20 A   YES.

21 Q   YOU HAVE A BACHELOR'S IN DEVELOPMENTAL PSYCHOLOGY; IS THAT

22 CORRECT?

23 A   YES.

24 Q   IS THAT SIMILAR TO CHILD PSYCHOLOGY?

25 A   YES.

1  Q   IS THAT THE ONLY DEGREE THAT YOU HAVE?

2  A   YES.

3  Q   HAVE YOU EVER BEEN EMPLOYED TO DO DATA COMPILATION OTHER

4  THAN BY THE PRISON LAW OFFICE AND DURING YOUR UNDERGRADUATE

5  STUDIES?

6  A   NO.

7  Q   AND YOU TOOK A STATISTICS CLASS IN COLLEGE, RIGHT?

8  A   YES.

9  Q   COULD WE LOOK AT THE FIRST PAGE OF P 842, PLEASE, THE SECOND

10 VERSION?  VERSION TWO.  THERE WAS TWO VERSIONS OF THIS, CORRECT?

11 A   I'M SORRY?

12 Q   YOU CREATED TWO VERSIONS OF THIS P 842.  THERE WAS A FIRST

13 VERSION.  THEN YOU CORRECTED DATA JUST A COUPLE OF NIGHTS AGO,

14 CORRECT?

15 A   WE CORRECTED SOURCES.

16 Q   YOU ACTUALLY CHANGED POPULATION DATA, CORRECT?

17 A   OH, BECAUSE OF THE UPDATE, YES.  BECAUSE THE DEPARTMENT OF

18 FINANCE, I -- WHEN I WAS CHANGING THE SOURCES, I SAW THAT ONE OF

19 THE DEPARTMENT FINANCE CHARTS WITH POPULATION WAS DIFFERENT, SO

20 I CALLED THE DEPARTMENT OF FINANCE, AND THEY TOLD ME JUST THAT

21 DAY THEY HAD UPDATED THEIR CHARTS TO REFLECT 2008 DATA, AND WHEN

22 THEY DO THAT, THEY GO BACK AND CHANGE THE ESTIMATES FOR PRIOR

23 YEARS.  SO I UPDATED THE DATA TO REFLECT THAT.

24 Q   SO WE ARE GOING TO LOOK AT THE SECOND VERSION, THE FIRST

25 PAGE, PLEASE.  THIS CHART SAYS "CALIFORNIA, PAROLEES AND VIOLENT

1  CRIME RATE, 1990 THROUGH 2007," CORRECT?

2  **A**  YES.

3  **Q**  AND ON THE RIGHT-HAND SIDE THERE'S KIND OF A -- I'LL CALL IT

4  MAGENTA COLOR THAT SAYS "TOTAL NUMBER OF PAROLEES PER 100,000 OF

5  CALIFORNIA POPULATION," RIGHT?

6  **A**  YES.

7  **Q**  AND THAT MATCHES -- THAT'S A LEGEND TO EXPLAIN THE MAGENTA

8  LINE, CORRECT?

9  **A**  YES.

10  **Q**  AND THEN THE SECOND ITEM IN THE LEGEND SAYS, "VIOLENT CRIME

11  RATE," WHICH IS KIND OF A PURPLE COLOR, I'LL SAY.  DO YOU AGREE

12  WITH THAT?

13  **A**  I'LL SAY IT'S BLUE.

14  **Q**  OKAY.  BLUE.  "VIOLENT CRIME RATE PER 100,000 OF CALIFORNIA

15  POPULATION," AND THAT'S TO REPRESENT -- THAT'S THE LEGEND FOR

16  THE BLUE LINE ON THE CHART, RIGHT?

17  **A**  YES.

18  **Q**  OKAY.

19        **JUDGE REINHARDT:**  I'M A LITTLE CONFUSED BY FIRST AND

20  SECOND.  THE PAGE WE HAVE IS THE FIRST PAGE, RIGHT?

21        **MS. JOHNSON:**  THE FIRST PAGE OF THE SECOND VERSION.

22  THEY HAD SENT US A PRIOR VERSION --

23        **JUDGE REINHARDT:**  THAT'S WHAT WE RECEIVED.

24        **MS. JOHNSON:**  I'M HOPING YOU RECEIVED THE UPDATED

25  VERSION.

1      **JUDGE REINHARDT:**  YES.  I ASSUME SO.  THAT'S WHAT I'M

2  TRYING TO FIND OUT.  WE ARE TALKING ABOUT THE FIRST PAGE OF THE

3  SECOND VERSION?

4      **MS. JOHNSON:**  THAT'S CORRECT, WHICH I BELIEVE IS THE

5  EXHIBIT BEING OFFERED IN EVIDENCE.  I JUST WANTED TO CLARIFY FOR

6  OUR DISPLAYER THAT THEY HAVE TWO VERSIONS.  I WANTED TO MAKE

7  SURE HE UNDERSTOOD TO PRESENT THE SECOND VERSION.

8      **JUDGE REINHARDT:**  OKAY.

9      **MS. JOHNSON:**  OKAY.

10  BY MS. JOHNSON

11  **Q**   SO THE PAROLEES AND VIOLENT CRIME RATE -- SO THE

12  MAGENTA-COLORED ONE IS KIND OF THE HIGHER LINE, AND THAT

13  REPRESENTS THE TOTAL NUMBER OF PAROLEES PER 100,000 OF

14  CALIFORNIA POPULATION, CORRECT?

15  **A**   YES.

16  **Q**   THERE'S A HORIZONTAL AXIS ON THIS CHART WHICH IS SOMETIMES

17  CALLED THE X AXIS IN GRAPHS, RIGHT?

18  **A**   YES.

19  **Q**   AND THE X AXIS REPRESENTS THE YEARS '90 THROUGH 2007,

20  CORRECT?

21  **A**   YES.

22  **Q**   THIS CHART ACTUALLY HAS TWO Y AXES, CORRECT, WHICH ARE THE

23  VERTICAL AXES?

24  **A**   RIGHT.

25  **Q**   RIGHT.  SO THE TOTAL NUMBER OF PAROLEES PER 100,000 IS

1  ACTUALLY CORRELATING TO THE LEFT Y AXIS, AND YOU INDICATED THAT

2  BY TOTAL PAROLEE RATE ON THE LEFT-HAND SIDE, CORRECT?

3  **A**   RIGHT.

4  **Q**   SO WHEN YOU WANT TO READ THIS CHART, YOU DON'T WANT TO

5  CORRELATE -- WHEN YOU ARE READING LEFT TO RIGHT, YOU NEED TO

6  MAKE SURE WHEN YOU ARE READING THE TOTAL NUMBER OF PAROLEES THAT

7  YOU ARE NOT READING THE RIGHT-HAND Y AXIS, RIGHT?  THAT WOULD

8  MAKE IT LOOK LIKE TOTAL NUMBER OF PAROLEES PER 100,000 WAS OVER

9  ONE THOUSAND PER 100,000 IN 2007, CORRECT?

10 **A**   RIGHT.

11 **Q**   OKAY.  SO WHAT YOU NEED TO DO IS YOU NEED TO READ BACK OVER

12 TO THE LEFT-HAND SIDE AND SEE THAT, ACTUALLY, THE TOTAL NUMBER

13 OF PAROLEES IS SOMEWHERE BETWEEN 325 AND 350 PER 100,000,

14 CORRECT?

15 **A**   IN WHAT YEAR DID YOU SAY?

16 **Q**   JUST THE ENDPOINT 2007?

17 **A**   YES.

18 **Q**   LOOKING AT ENDPOINT --

19 **A**   BETWEEN 125 --

20        **JUDGE KARLTON:**  PLEASE STOP FOR JUST A MOMENT.

21        YOU MAY PROCEED.  I FRANKLY, MA'AM, DON'T UNDERSTAND

22 WHAT YOU'RE SAYING.  I'M HOPEFUL --

23        **MS. JOHNSON:**  I'M TRYING TO MAKE IT CLEAR.  I THINK

24 THE CHART ITSELF IS CONFUSING, YOUR HONORS.  THAT'S WHAT I WAS

25 TRYING TO SEE, IF WE COULD DRAW FROM TESTIMONY A WAY TO

1  UNDERSTAND THE CHART BETTER.  IT'S NOT UNUSUAL TO SEE A DOUBLE-Y

2  AXIS CHART.

3  BY MS. JOHNSON

4  Q   SO THE TOTAL NUMBER OF PAROLEES -- LET'S TAKE TWO DATA

5  POINTS.  LET'S TAKE THE FIRST DATA POINT AND LAST DATA POINT,

6  BECAUSE THOSE ARE THE EASIER TO -- TO SEE.

7  A   OKAY.

8  Q   WE'RE GOING TO LOOK AT THE TOTAL NUMBER OF PAROLEES PER

9  100,000 OF CALIFORNIA POPULATION, AND WE ARE GOING TO TAKE THE

10  FIRST DATA POINT, WHICH IS FOR 1990, AND WE ARE GOING TO TAKE

11  THE LAST DATA POINT, WHICH IS FOR 2007, AND I -- JUST GOING TO

12  STEP THROUGH HOW WE READ THAT LINE FOR TO CLARIFY FOR THE COURT.

13          THE FIRST DATA POINT FOR 1990 WHICH IS THE MAGENTA

14  LINE, THE GENERALLY HIGHER LINE, INDICATES SOMEWHERE BETWEEN 225

15  AND 250 PAROLEES FOR THE WHOLE STATE OF CALIFORNIA PER 100,000

16  POPULATION, CORRECT?

17  A   YES.

18  Q   OKAY.  NOW, THE LAST DATA POINT WHICH IS ON THE 2007 LINE,

19  THE FURTHEST MOST RIGHT LINE INDICATES SOMEWHERE BETWEEN 325 AND

20  350 PAROLEES FOR THE ENTIRE STATE OF CALIFORNIA PER 100,000

21  POPULATION, CORRECT?

22  A   YES.

23  Q   OKAY.

24          **JUDGE REINHARDT:**  NOW I'M LOST.  I THOUGHT IT WAS 350

25  FOR EACH HUNDRED THOUSAND PEOPLE IN CALIFORNIA.

1          **JUDGE KARLTON:**  THAT'S WHAT SHE JUST SAID.

2          **JUDGE REINHARDT:**  NO.  SHE SAID THE TOTAL POPULATION.

3          **JUDGE KARLTON:**  NO, NO, NO.  PER THOUSAND.

4          **MS. JOHNSON:**  PER 100,000.  IT'S IN THE LEGEND RIGHT

5     THERE.  I'M SORRY.  I MIGHT HAVE MISSPOKEN.  I DIDN'T MEAN TO

6     MISSPEAK.

7          **JUDGE KARLTON:**  I DIDN'T HEAR YOU IF YOU DID.

8     BY MS. JOHNSON

9     **Q**   WE WERE TALKING ABOUT RATES.  I THINK YOU HAVE PUT THE RATES

10    IN SIMILAR TERMS.  SO THE RATE OF PAROLEES IS IN EQUIVALENT

11    TERMS AS THE RATE OF VIOLENT CRIME, CORRECT?  IT'S A NUMBER PER

12    100,000, CORRECT?

13    **A**   YES.

14    **Q**   OKAY.  SO THE RATE OF PAROLEES IN 1990 IN CALIFORNIA WAS A

15    LITTLE OVER 225 PER 100,000, AND IN 2007 IT WAS A LITTLE OVER

16    325 PER 100,000, CORRECT?

17    **A**   RIGHT.

18    **Q**   RIGHT.  NOW, THE VIOLENT CRIME RATE, WHICH IS WHAT YOU WOULD

19    IDENTIFY AS THE BLUE LINE, WHICH IS THE GENERALLY LOWER LINE ON

20    THE CHART, IS TRACKED TO THE RIGHT-HAND Y AXIS, RIGHT?

21    **A**   RIGHT.

22    **Q**   AND THAT RIGHT-HAND Y AXIS STARTS AT 400, AND IT GOES TO

23    1,200; IT'S BASICALLY THE TOP HALF OF THE LEFT-HAND Y AXIS,

24    ISN'T IT?

25    **A**   YES.

1  Q   SO, IN REALITY, EVEN THOUGH THE CHART MAKES IT SEEM AS IF

2  THE VIOLENT CRIME RATE IS LOWER THAN THE PAROLEE RATE, THE

3  REALITY IS THE VIOLENT CRIME RATE IS HIGHER IN EVERY POINT ON

4  THAT CHART THAN THE PAROLEE RATE, CORRECT?

5          **MS. EVENSON:**  OBJECTION.  ARGUMENTATIVE AND WAY

6  BEYOND THE SCOPE.  MY UNDERSTANDING WAS THE WITNESS WAS OFFERED

7  TO AUTHENTICATE THE MEANS FOR COMPILING THE DOCUMENT.

8          **JUDGE KARLTON:**  PART OF THE PROBLEM IS WE DON'T

9  UNDERSTAND IT WITHOUT THIS PRECISE CROSS-EXAMINATION.  I DEFER

10 TO MY COLLEAGUES, BUT I BELIEVE THAT OBJECTION SHOULD BE

11 OVERRULED.

12         **JUDGE HENDERSON:**  YES.

13         **JUDGE KARLTON:**  PLEASE PROCEED, MA'AM.

14 BY MS. JOHNSON

15 Q   OKAY.  SO THE VIOLENT CRIME RATE PER 100,000 OF CALIFORNIA,

16 EVEN THOUGH VISUALLY ON THIS CHART LOOKS AS IF IT'S LOWER THAN

17 THE NUMBER OF PAROLEES, IS ACTUALLY NUMERICALLY HIGHER, CORRECT?

18 A   CORRECT.

19 Q   SO THE VIOLENT CRIME RATE IN CALIFORNIA, LOOKING AT THE

20 BLUE, JUST STARTING THROUGH THE SAME THING WE DID FOR THE RATE

21 OF PAROLEES, LET'S START IN 1990, THE FIRST DATA POINT, AND WE

22 NEED TO READ THAT DATA POINT, NOT TO THE NUMBER THAT'S RIGHT

23 THERE AT IT, THE 225 NUMBER --

24         **JUDGE HENDERSON:**  ON THE OTHER SIDE, OVER THERE

25 AROUND 1,100.  I THINK HELPING US UNDERSTAND THIS, WHICH I

1  DIDN'T, IS FINE, BUT YOU ARE NOW ARGUING, IT SEEMS TO ME --

2          **MS. JOHNSON:**  I'M TRYING TO CLARIFY.

3          **JUDGE KARLTON:**  DO ME A FAVOR.  LET HER DO IT.

4          **JUDGE HENDERSON:**  GO ON.  WE DO UNDERSTAND, WHICH WE

5  DIDN'T BEFORE YOU RAISED THIS, THAT THE BLUE LINE RELATES TO THE

6  GRAPH ON THE RIGHT, OR WHATEVER WE CALL IT; THE MAGENTA LINE

7  RELATES TO THE GRAPH ON THE LEFT.

8          **JUDGE KARLTON:**  RIGHT.

9          **MS. JOHNSON:**  OKAY.

10 BY MS. JOHNSON

11 **Q**  AND THE -- SO THE VIOLENT CRIME RATE PER 100,000 IN 1990 WAS

12 SOMEWHERE BETWEEN 7- AND 800 PER 100,000; IS THAT CORRECT?  NO,

13 I'M SORRY.  I MIS- -- I'M SORRY.

14          THE VIOLENT CRIME RATE WAS SOMEWHERE BETWEEN 1,000

15 AND 1,100 IN 1990, CORRECT?

16 **A**  RIGHT.

17 **Q**  AND THEN THE VIOLENT CRIME RATE WAS AROUND 500 PER 100,000

18 IN 2007, CORRECT?

19 **A**  RIGHT.

20 **Q**  AND THAT NUMBER, 500, IS HIGHER THAN ANY POINT ON THE

21 PAROLEE LINE, CORRECT?

22 **A**  RIGHT.

23          **MS. JOHNSON:**  SO IF WE COULD, YOUR HONORS --

24 BY MS. JOHNSON

25 **Q**  IF THE X -- IF THE Y AXIS HADN'T BEEN SPLIT UP INTO TWO

1  DIFFERENT SIDES OF THIS CHART AND HAD JUST BEEN DONE ON A

2  CONTINUOUS CHART FROM, LET'S SAY, 100 TO 1,200, THE VIOLENT

3  CRIME RATE LINE WOULD ACTUALLY AT EVERY POINT BE HIGHER THAN THE

4  PAROLEE LINE, CORRECT?

5  **A**   RIGHT.

6          **MS. JOHNSON:**  OKAY.  JUST TO CLARIFY THAT POINT, I

7  WOULD LIKE TO DEMONSTRATE THAT WITH THE WITNESS.

8          **JUDGE HENDERSON:**  DEMONSTRATE WHAT SHE JUST ADMITTED

9  WAS CORRECT?

10          **MS. JOHNSON:**  I'M NOT SURE UNLESS YOU SEE IT VISUALLY

11  IT'S GOING TO BE CLEAR WHAT I MEAN.

12          **JUDGE KARLTON:**  BEFORE YOU DO THAT, WHY DID YOU MAKE

13  IT TWO Y AXES?

14          **THE WITNESS:**  SURE.  I'M HAPPY TO EXPLAIN THAT.

15          THE INTENTION OF FORMING THESE CHARTS WAS TO COMPARE

16  HOW THE PAROLEE RATE CHANGED WITH HOW THE VIOLENT CRIME RATE

17  CHANGED.  WERE WE TO HAVE THE Y AXIS, JUST ONE Y AXIS, GOING

18  FROM 0 TO 1,200, OR, IN SOME CASES, IN CERTAIN COUNTIES WHERE

19  THEY HAVE VERY HIGH CRIME RATES, FROM 0 TO 1,500 OR ALMOST

20  2,000, WE WOULDN'T BE ABLE TO ACTUALLY SEE THE CHANGE IN THESE

21  LINES.  THEY WOULD LOOK ALMOST FLAT, ESPECIALLY THE PAROLEE

22  RATE.

23          **JUDGE KARLTON:**  THAT WOULD REFLECT THE REALITY.

24          **THE WITNESS:**  THAT WOULD REFLECT THE DIFFERENCE

25  BETWEEN THE TWO RATES.  THAT WOULD NOT REFLECT HOW THE TWO RATES

1   CHANGED OVER TIME.

2            **JUDGE REINHARDT:**  ANOTHER WAY TO DO THIS IS IN BARS,

3   WOULD THAT SOLVE THE PROBLEM?  IF SHE DID IT IN BARS --

4            **MS. JOHNSON:**  YOUR HONORS, THIS IS NOT MY EVIDENCE,

5   AND I AM NOT PREPARED TO SAY HOW SHE CAN FIX THE PROBLEM.

6            **JUDGE REINHARDT:**  THERE ARE VARIOUS WAYS TO SHOW

7   FIGURES.  SOMETIMES THEY'RE MISLEADING, SOMETIMES THEY ARE NOT,

8   BUT THEY ARE THE SAME FIGURES.  I'M JUST WONDERING IF WE

9   TRANSLATED THESE INTO BARS --

10           **MS. JOHNSON:**  I'M ACTUALLY NOT GOING TO CLAIM TO BE

11  AN EXPERT IN DATA COMPILATION.

12           **JUDGE KARLTON:**  YOU'VE DONE A REMARKABLE JOB.

13           **MS. JOHNSON:**  IF I COULD JUST PROCEED, I THINK IT

14  WILL MAKE IT CLEARER TO REPRESENT VISUALLY WHAT WE WERE JUST

15  TALKING ABOUT VERBALLY, YOUR HONORS.

16           **JUDGE KARLTON:**  DO YOU HAVE ONE OF THOSE MICROPHONES,

17  MADAM CLERK, THAT SHE CAN SPEAK INTO WHILE MOVING AROUND?

18  MOBILES, I THINK THEY'RE CALLED.

19  BY MS. JOHNSON

20  **Q**   OKAY.  ALSO, JUST TO QUICKLY POINT OUT, ON THE LEFT-HAND

21  CHART, YOU DID THE SCALE IN 25 POINT INCREMENTS AND ON THE

22  RIGHT-HAND CHART YOU DID IT IN 100 POINT INCREMENTS, CORRECT?

23  **A**   RIGHT.

24  **Q**   THE USE OF THE DIFFERENT SCALE OF INCREMENTS IS GOING TO

25  MAKE THE DIFFERENCE IN THE POINTS LOOK DIFFERENT VISUALLY, ISN'T

1    IT?

2    **A**   NOT THE POINTS.  THE POINTS DON'T LOOK DIFFERENT VISUALLY.

3    **Q**   I'M SORRY.  YOU ARE RIGHT.

4         THE SLOPE IS GOING TO LOOK DIFFERENT USING THE

5    DIFFERENT INCREMENTS, ISN'T IT?

6    **A**   NO.

7    **Q**   WELL, ISN'T THAT WHAT YOU JUST SAID, BECAUSE IT MADE IT --

8    IF YOU USE A LARGER SCALE, IT MAKES THE LINE LOOK RELATIVELY

9    FLAT, SO YOU WANT TO USE A SMALLER SCALE?

10   **A**   I'M SORRY.  I THOUGHT YOU WERE REFERRING TO THE INCREMENTS

11   BETWEEN THE NOTED DATA POINTS ON THE LEFT-HAND SIDE, THE NOTED

12   SCALE.

13   **Q**   RIGHT.  I'M TALKING ABOUT ON THE LEFT-HAND SIDE, YOU GO 100,

14   125, 150, 175, WHICH HAS MORE DETAIL AND -- THAN THE RIGHT-HAND

15   SIDE, WHICH YOU GO IN 100 POINT INCREMENTS?

16   **A**   THAT DOESN'T CHANGE HOW THE LINES APPEAR OR THE POINTS ON

17   THE LINES.  THE REASON WHY I DID THAT IS BECAUSE THE SPACE

18   BETWEEN 100 AND 400 IS MUCH SMALLER THAN BETWEEN 400 AND 1200.

19   SO JUST TO PROVIDE FURTHER DETAIL.

20   **Q**   OKAY.  THE TOTAL NUMBER OF PAROLEES I'M GOING TO REPRESENT

21   IN A PURPLISH COLOR.  WE'LL REPRESENT THE TOTAL NUMBER OF CRIME

22   RATE IN A BLUISH COLOR.  I'M GOING TO PICK THREE DATA POINTS.

23   I'M GOING TO PICK THE TWO END ONES AND THE MOST SEVERE ONE IN

24   THE MIDDLE, SO WE CAN GET A GENERAL SLOPE IF NOT THE CURVE OF

25   THE LINE.  I'LL POINT OUT ON HERE WHERE I WANT TO PUT IT.  IF

1  YOU AGREE THAT SEEMS FAIRLY ACCURATE, A ROUGH REPRESENTATION,

2  LET ME KNOW, OKAY?

3            LET'S TAKE THE TOTAL NUMBER OF PAROLEES PER 100,000.

4  IN 1990 THAT WAS A LITTLE OVER 225; CORRECT?

5  A    SURE.

6  Q    ON MY CHART HERE, I'VE ROUGHED UP, THERE'S A 200 TO 300,

7  WHICH IS THE SAME SCALE WE ARE USING ON THE RIGHT-HAND SIDE,

8  RIGHT?  SO THERE'S 200 TO 300, SO I'D SAY 225 IS ABOUT RIGHT

9  HERE.  SO I PUT THE 225 FOR 1990 ABOUT RIGHT HERE, CORRECT?

10 A    MAYBE A LITTLE HIGHER.

11 Q    OKAY.  HOW ABOUT RIGHT THERE?

12 A    OKAY.

13 Q    OKAY.  THAT'S THE TOTAL NUMBER OF PAROLEES.

14            AND THEN IT LOOKS LIKE IT PEAKED AROUND 2000, IT

15 LOOKS LIKE; WOULD YOU AGREE WITH THAT?

16 A    YEAH.

17 Q    SO IF I PICK A POINT AROUND 2000, AND IT PEAKED AT AROUND

18 350, WOULD YOU BASICALLY AGREE WITH THAT?  I KNOW WE ARE WORKING

19 WITH ROUGH NUMBERS.  THAT WOULD BE ABOUT RIGHT HERE, CORRECT?

20 A    CORRECT.

21 Q    ABOUT 350.

22            AND THEN THE LAST DATA POINT IS 2007, AND THAT WAS

23 3- -- SOMEWHERE JUST ABOVE 325, RIGHT?

24 A    RIGHT.

25 Q    OKAY.  AND I -- 2007 WE'LL PUT IT RIGHT HERE.  I DID ONLY

1  2006.  2007 WILL COME RIGHT HERE.  ABOUT 325, WOULD YOU AGREE

2  THAT'S ABOUT ABOVE 325?

3  **A**  YES.

4  **Q**  SO JUST AS A ROUGH, THE PAROLEE LINE WOULD LOOK LIKE THIS

5  CONNECTING THESE THREE POINTS, ROUGHLY, CORRECT?

6  **A**  MM-HMM.

7           **JUDGE KARLTON:**  THAT'S YES, MA'AM?

8           **THE WITNESS:**  OH, YES.

9  BY MS. JOHNSON

10 **Q**  NOW, THE TOTAL NUMBER OF VIOLENT CRIMES ON THIS SINGLE Y

11 AXIS IS GOING TO BE ABOVE THE TOTAL NUMBER OF PAROLEES, AND THAT

12 IS -- WE'RE STARTING AT ABOUT 1,100 IN 1990; IS THAT RIGHT?

13 **A**  MAYBE ABOVE 1,100.  1,150.

14 **Q**  1,150 IN 1990.

15           AND THE LOWEST POINT -- WELL, ACTUALLY, LET'S PICK

16 THE -- IT KIND OF BREAKS THERE AROUND 1999; IS THAT RIGHT?  YOU

17 SEE LIKE A LITTLE BREAK?

18 **A**  YES.

19 **Q**  AND THAT'S AROUND 600?

20 **A**  YES.

21 **Q**  WOULD YOU AGREE WITH THAT?

22           SO YOU WANT TO JUST SAY 1999 IS AROUND 600, SO THAT

23 WOULD BE AROUND HERE, RIGHT?  ABOUT?  1999, 600, A LITTLE BIT

24 HERE.  WOULD YOU AGREE WITH THAT?

25 **A**  YES.

1  Q   AND THEN THE LAST DATA POINT IS 500 IN 2007.  THE LAST DATA

2  POINT, 500.  OKAY.  THAT'S WHAT THIS -- SO THE CRIME RATE

3  ACTUALLY LOOKS SOMETHING LIKE THAT USING A SINGLE Y AXIS,

4  CORRECT?

5  A   YES.

6  Q   SO IF YOU HAD USED A SINGLE Y AXIS, WHAT I'VE JUST DRAWN IS

7  WHAT THIS CHART WOULD ACTUALLY LOOK LIKE, CORRECT?

8  A   YES.

9       MS. JOHNSON:  OKAY.  COULD WE MARK THIS, YOUR HONORS?

10 IT'S GOING TO BE DEFENDANT'S 1332.

11      JUDGE HENDERSON:  IT WILL BE MARKED AS DEFENDANT'S

12 1332 FOR IDENTIFICATION.

13           (DEFENDANT'S EXHIBIT 1332 MARKED FOR

14            IDENTIFICATION.)

15 BY MS. JOHNSON

16 Q   THIS ISSUE OF USING TWO Y AXES INSTEAD OF A SINGLE J AXIS IS

17 FOUND IN EVERY SINGLE ONE OF YOUR CHARTS, IS IT NOT?

18 A   YES.

19 Q   SO WE COULD GO THROUGH THIS PROCESS, AND WE'RE GOING TO FIND

20 IN EVERY SINGLE ONE OF YOUR CHARTS THAT EVEN THOUGH YOU VISUALLY

21 REPRESENTED THAT THE CRIME RATE IS ACTUALLY LOWER THAN THE

22 PAROLE RATE, THE CRIME RATE IS ACTUALLY HIGHER, AND IF YOU DID A

23 SINGLE Y AXIS, IT WOULD SHOW UP ON THE CHART THAT WAY SO THE

24 LINES DON'T ACTUALLY INTERSECT?

25 A   YES.

1  Q    OKAY.

2          MS. JOHNSON:  I HAVE ANOTHER EXAMPLE I COULD GIVE IF

3  THE COURT NEEDS ANY FURTHER CLARIFICATION.

4          JUDGE KARLTON:  I DON'T.

5          JUDGE HENDERSON:  NO, I DON'T.

6          MS. JOHNSON:  WITH RESPECT TO THE FRESNO COUNTY

7  THOUGH OR SAN DIEGO COUNTY -- I LEFT MY THINGS RIGHT HERE.

8          JUDGE REINHARDT:  DO YOU HAVE ANY -- ARE YOU

9  CHALLENGING IN ANY WAY THE ACCURACY OF THE DATA?

10          MS. JOHNSON:  THE DATA IS NOT IN EVIDENCE, YOUR

11  HONOR, AND WE HAVEN'T HAD AN OPPORTUNITY TO GO THROUGH ALL THE

12  DATA POINTS.  THE DATA -- THE UNDERLYING DATA ITSELF IS NOT IN

13  EVIDENCE.  THIS IS HER REPRESENTATION OF WHAT THE UNDERLYING

14  DATA IS.  THERE WERE 48 PAGES OF THIS DOCUMENT.

15          JUDGE REINHARDT:  ALL RIGHT.

16          MS. JOHNSON:  AND WE HAVEN'T HAD A CHANCE TO VERIFY

17  EVERY SINGLE DATA POINT.

18          JUDGE REINHARDT:  THAT'S A DIFFERENT OBJECTION.  I'M

19  TRYING TO FIND OUT WHAT YOUR OBJECTION IS TO THE FORM IN WHICH

20  THIS IS PRESENTED AND YOU THINK IT'S MISLEADING.

21          JUDGE KARLTON:  YEAH.

22          JUDGE REINHARDT:  OKAY.

23          JUDGE KARLTON:  THAT IS RIGHT, RIGHT?

24          MS. JOHNSON:  I DO BELIEVE IT IS MISLEADING, YOUR

25  HONORS.  I BELIEVE EVERY SINGLE ONE OF THESE 48 CHARTS IS

 1  VISUALLY MISLEADING.

 2          **JUDGE KARLTON:**  WITH THE EXCEPTION OF -- WITH THE

 3  EXCEPTION OF THE DATA, WHATEVER THE DATA IS, YOU BELIEVE THE

 4  CHARTS AS CREATED AND AS TENDERED TO THE COURT MISLEAD AS TO

 5  WHAT -- THAT IS, IF YOU VISUALLY EXAMINE THEM WITHOUT

 6  UNDERSTANDING THAT THESE TWO AXES MAKE THE DIFFERENCE, YOU

 7  BELIEVE IT TO BE MISLEADING.

 8          **MS. JOHNSON:**  I DO, YOUR HONOR.

 9          **JUDGE REINHARDT:**  OKAY.  THAT'S FINE.  IS THERE

10  ANYTHING ELSE?

11          **MS. JOHNSON:**  ONE OTHER THING.

12  BY MS. JOHNSON

13  Q   YOU TALK ABOUT -- A COUPLE OF OTHER THINGS.

14          ON THE SAN DIEGO CHART, YOU -- IF WE CAN PULL UP THE

15  SAN DIEGO?  IT IS AROUND PAGE 21, I THINK.

16          **JUDGE KARLTON:**  PAROLEES AND VIOLENT CRIME RATE?

17  BY MS. JOHNSON

18  Q   THE PAROLEES AND VIOLENT CAME RATE, NOT THE NEW PAROLEES.

19  IF WE GO TO THE PAROLEES AND VIOLENT CAME RATE, WHICH IS A

20  COUPLE PAGES AHEAD OF THIS ONE, I THINK, MEANING IT'S PRIOR.  GO

21  BACK.

22          **JUDGE KARLTON:**  RIGHT THERE.

23          **MS. JOHNSON:**  THERE WE GO, PAROLEES AND VIOLENT CRIME

24  RATE.

25

1  BY MS. JOHNSON

2  Q    IF YOU LOOK AT THIS CHART HERE, THE SCALE ON THE Y AXIS ON

3  THE LEFT-HAND SIDE SAYS 100 TO 400, AND THE SCALE ON THE Y AXIS

4  ON THE RIGHT-HAND SIDE SAYS 200 TO A THOUSAND.  THE NUMBERS,

5  HOWEVER, ON -- LET'S SEE IF I'VE GOT THIS RIGHT.

6           WE FIGURED OUT THE NUMBER OF PAROLEES TRACKED TO THE

7  LEFT-HAND SIDE, RIGHT?  AND THE CRIME RATE TRACKS TO THE

8  RIGHT-HAND SIDE.  SO THE CRIME RATE IS ACTUALLY SOMEWHERE

9  BETWEEN 400 AND 500 ON THIS CHART, RIGHT?

10  A    YES.

11  Q    BUT THE LEFT-HAND Y AXIS ENDS AT 400?

12  A    YES.

13  Q    SO WOULD IT REALLY HAVE BEEN THAT HARD TO JUST BUMP THAT

14  CHART UP A COUPLE MORE POINTS TO CAPTURE THE 400 TO 500 RANGE SO

15  THAT THE CRIME RATE WOULD HAVE BEEN INDICATED ABOVE THE NUMBER

16  OF PAROLEES RATHER THAN BELOW?

17  A    I'M SORRY.  WHAT ARE YOU ASKING?

18  Q    I'M ASKING, WHY YOU WOULD END YOUR LEFT-HAND AXIS AT 400

19  WHEN YOUR NEXT -- WHEN THE DATA POINT YOU'RE COMPARING IT TO FOR

20  VIOLENT CRIME IS IN THE 400 RANGE?

21  A    I DID THAT BECAUSE I WANTED AT ALL CHARTS TO BE CONSISTENT.

22  SO ALL THE CHARTS FOR PAROLEES VERSUS CRIME RATE HAVE A SPAN ON

23  THE LEFT-HAND SIDE OF 300 AND A SPAN ON THE LEFT -- ON THE

24  RIGHT-HAND SIDE OF 800.  I JUST KEPT THEM ALL CONSISTENT.  I

25  DIDN'T WANT TO CHANGE FROM ONE --

1  Q   CONSISTENT, IF SOMEWHAT, PERHAPS, MISLEADING.

2          WITH RESPECT TO THE NEW PAROLEE NUMBERS, YOU HAVE

3  DEFINITIONS AT THE END OF YOUR CHART.  YOU DEFINE TOTAL

4  PAROLEES -- ACTUALLY, YOU DON'T DEFINE NEW PAROLEES.  YOUR

5  CHARTS SAY "NEW PAROLEES AND VIOLENT CRIME RATE," BUT YOUR

6  DEFINITIONS DON'T INCLUDE A DEFINITION OF NEW PAROLEE.

7  A   THE HEADING OF EACH CHART IS EITHER "PAROLEES" OR "NEW

8  PAROLEES."

9  Q   RIGHT.  BUT WHAT I'M -- IN YOUR DEFINITIONAL SECTION YOU

10 DON'T DEFINE WHAT A NEW PAROLEE IS?

11 A   OH, I SEE.  YES.  I'M SORRY.  THIS IS FROM A PREVIOUS

12 VERSION.  IT SHOULD SAY "NEW PAROLEES" INSTEAD OF "TOTAL

13 PAROLEES AND RERELEASES TO PAROLE."

14 Q   WHERE DID YOU GET THE DEFINITION FOR TOTAL PAROLEES AND

15 RERELEASES TO PAROLE, THE DEFINITION ITSELF, NOT THE NUMBERS,

16 THE DEFINITION FROM?

17 A   THIS IS FROM THE CHART THAT I TOOK THIS DATA FROM.

18 Q   WHICH CHART IS THAT?

19 A   SOURCE NUMBER SEVEN AND SIX.

20 Q   SOURCE NUMBER FOR STATEWIDE OR COUNTY?  YOU HAVE --

21 A   I'M SORRY.  STATEWIDE IT'S SIX, AND COUNTY IT'S ALSO SIX AND

22 SEVEN.

23 Q   SO THAT WOULD BE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

24 REHABILITATION CALIFORNIA PRISONERS AND PAROLEES, 1990 AND 2007;

25 IS THAT CORRECT?

1  **A**   YES.  I'M SORRY.  IT'S ONLY SIX IN THE COUNTY CHARTS, NOT

2  SEVEN.

3  **Q**   IS THE TITLE OF THE SOURCE THAT I JUST READ TO YOU ACCURATE?

4  **A**   YES.

5  **Q**   OKAY.  CALIFORNIA PRISONERS AND PAROLEES, IS IT YOUR

6  UNDERSTANDING THAT TOTAL PAROLEES AND RERELEASES TO PAROLE IS

7  DEFINED IN THAT DOCUMENT SOMEWHERE?

8  **A**   NO, IT'S NOT.  BUT THE HEADING I BELIEVE SAYS SOMETHING LIKE

9  PAROLED OR REPAROLED INDIVIDUALS.

10  **Q**   SO YOU DIDN'T GET THAT DEFINITION FROM THE DOCUMENT ITSELF,

11  CORRECT?

12  **A**   NO, NOT THE ENTIRE DEFINITION.

13  **Q**   YOU JUST KIND OF INTERPRETED THE DOCUMENT TO COME UP WITH

14  WHAT YOU THOUGHT THE DEFINITION WAS?

15  **A**   I DIDN'T TAKE ANY INTERPRETATION.  I TOOK THOSE WORDS

16  PAROLED OR REPAROLED.  IT WAS A CDC DOCUMENT.  SO I SAID FROM A

17  CDCR INSTITUTION.  AND THEN I HAD DONE PER A HUNDRED THOUSAND OF

18  THE COUNTY OR STATEWIDE POPULATION, SO I ADDED THAT PIECE ON.

19  **Q**   BUT YOU WROTE, QUOTE:

20          "THE DEFINITION IS, QUOTE, INDIVIDUALS

21          PAROLED OR REPAROLED FROM A CDCR INSTITUTION TO

22          THE STATE OR IDENTIFIED COUNTY PER 100,000 OF

23          THE COUNTY OR STATEWIDE POPULATION IN A GIVEN

24          YEAR."

25          SO YOU ADDED THE "PER 100,000," BUT YOU'RE SAYING --

```
 1   WHERE DID YOU GET THE DEFINITIONS "INDIVIDUALS PAROLED OR

 2   REPAROLED FROM A CDCR INSTITUTION TO THE STATE OR IDENTIFIED

 3   COUNTY"?

 4   A   THE PAROLED OR REPAROLED SECTION WAS IN THAT DOCUMENT.

 5   Q   WAS THE --

 6   A   I ADDED THE WORD "INDIVIDUALS."

 7   Q   SO DO YOU KNOW WHETHER THE INFORMATION YOU WERE LOOKING AT

 8   FOR PAROLES AND REPAROLES IS ACTUALLY INSTANCES OF PAROLE SUCH

 9   THAT AN INDIVIDUAL COULD BE COUNTED MULTIPLE TIMES IN A GIVEN

10   YEAR OR IF IT'S JUST AN INDIVIDUAL?

11             MS. EVENSON:  OBJECTION.

12             THE WITNESS:  I BELIEVE IT'S --

13             MS. EVENSON:  BEYOND THE SCOPE.

14             JUDGE HENDERSON:  OVERRULED.

15             THE WITNESS:  I BELIEVE THAT IT'S INSTANCES OF

16   PAROLE, AND THAT'S WHAT I INTENDED BY THIS DEFINITION.

17             JUDGE KARLTON:  WHY DO YOU BELIEVE THAT?

18             THE WITNESS:  BECAUSE DON AND REBEKAH EXPLAINED TO ME

19   WHAT THAT MEANT.

20   BY MS. JOHNSON

21   Q   "DON AND REBEKAH" BEING PLAINTIFFS' COUNSEL IN THIS MATTER?

22   A   YES.

23             MS. JOHNSON:  OKAY.  I DON'T HAVE ANY FURTHER

24   QUESTIONS, YOUR HONOR.  WE RENEW OUR OBJECTIONS TO THIS PIECE OF

25   EVIDENCE, SUCH THAT IT IS.
```

 1          **JUDGE HENDERSON:**  WE'LL RULE THAT THIS IS ADMISSIBLE

 2  AS A WAY OF SHOWING THE FIGURES THAT PLAINTIFFS WISH TO SHOW --

 3          **JUDGE KARLTON:**  HOW MUCH WEIGHT TO BE GIVEN IS

 4  SOMETHING --

 5          **JUDGE HENDERSON:**  IT'S A MATTER OF WEIGHT.  THE

 6  OBJECTIONS GO TO THE WEIGHT.

 7          I AM ALSO, UNLESS MY COLLEAGUES HAVE TROUBLE WITH

 8  THIS, I'M GOING TO ALLOW DEFENSE COUNSEL TO INTRODUCE A BAR

 9  GRAPH OR SOMETHING THAT --

10          **JUDGE KARLTON:**  IF YOU WANT.

11          **JUDGE HENDERSON:**  IF YOU WANT.  YOU DON'T HAVE TO.  I

12  THINK THERE WOULD BE A GREATER WORRY IF IT WERE A JURY.  I THINK

13  WE'RE GOING TO BE ABLE TO SEE -- BEFORE YOU POINTED IT OUT, IT

14  WAS MISLEADING.  BUT I THINK NOW THAT WE UNDERSTAND WHAT THEY'RE

15  TRYING TO DO, I THINK THE COURT CAN SORT THAT OUT.  BUT WE

16  INVITE YOU TO INTRODUCE BARS OR OTHER CHARTS THAT SHOW THE SAME

17  DATA IN A DIFFERENT FORM.

18          **MS. BARLOW:**  IF I MAY, YOUR HONOR, ON BEHALF OF AT

19  LEAST MY CLIENTS, I NEVER RECEIVED A COPY OF THE UNDERLYING DATA

20  THAT I COULD REVIEW FROM PLAINTIFFS' COUNSEL EVEN THOUGH I

21  REQUESTED IT.

22          **JUDGE HENDERSON:**  I'LL ASK COUNSEL TO FURNISH THAT.

23          **MS. EVENSON:**  I'M SORRY?

24          **JUDGE HENDERSON:**  I'LL ASK YOU TO FURNISH THAT TO --

25          **MS. EVENSON:**  YES, YOUR HONOR.  WE E-MAILED IT TO

1    MS. BARLOW, AND SHE INDICATED SHE COULDN'T OPEN THE E-MAIL SO, I

2    PROVIDED HER WITH HARD COPIES IN COURT TODAY.

3              **MS. BARLOW:**  I'M SORRY, YOUR HONOR.  I MEAN THE

4    ACTUAL UNDERLYING DATA.  THIS IS JUST A SUMMARY THAT THEY

5    PREPARED OF THE UNDERLYING DATA.  IT IS NOT THE UNDERLYING DATA.

6              **JUDGE HENDERSON:**  AS I UNDERSTAND, THE UNDERLYING

7    DATA IS PUBLIC RECORD.

8              **MS. JOHNSON:**  THERE ARE ELEMENTS OF IT THAT ARE VERY

9    DIFFICULT TO FIND, ACTUALLY.  THERE ARE SOME THAT ARE NOT THAT,

10   AS SHE TESTIFIED, THEY CALLED, AND THEY WERE SENT TO HER.  WE

11   RECEIVED THOSE FROM PLAINTIFFS' COUNSEL, SO THEY OBVIOUSLY

12   SHOULD MAKE THEM AVAILABLE TO THE OTHER PARTIES.

13             **MS. EVENSON:**  WE HAVE MADE THAT AVAILABLE TO ALL

14   COUNSEL.  WE CAN REPROVIDE IT.

15             **JUDGE HENDERSON:**  OKAY.  REPROVIDE IT.

16             OKAY.  WE ARE GOING TO TAKE A LUNCH RECESS AT THIS

17   POINT, AND WE'RE GOING TO GET OUR CALENDARS TOGETHER AND DISCUSS

18   DATES.

19             **JUDGE KARLTON:**  I WANT TO NOTE SOMETHING.  IS THERE

20   ANY FURTHER EVIDENCE FROM ANYBODY FOR ANYTHING?

21             **MR. SANGSTER:**  THERE'S AN EVIDENTIARY ISSUE, YOUR

22   HONOR, THAT I NEED MAKE A MOTION.  IT CAN BE DONE AFTER LUNCH.

23   IF YOU WANT, I CAN --

24             **JUDGE REINHARDT:**  MAKE IT NOW.

25             **MR. SANGSTER:**  MR. MCINTOSH WAS LISTED AS A WITNESS

1   AND PROVIDED A TRIAL DECLARATION AND DID NOT TESTIFY, AND WE

2   MOVE TO STRIKE THE DECLARATION.

3           **MS. FUENTES:**  THERESA FUENTES FOR THE COUNTY

4   INTERVENORS.

5           GIVEN THIS COURT'S RULING STRIKING THE SURVEY THAT

6   MR. MCINTOSH PREPARED, WE DECIDED NOT CALL HIM AS A WITNESS.

7           **JUDGE KARLTON:**  SO YOU ARE SATISFIED TO STRIKE THE

8   AFFIDAVIT?

9           **MS. FUENTES:**  IN LIGHT OF THE RULING EXCLUDING THE

10  SURVEY QUESTION.

11          **JUDGE HENDERSON:**  MOTION WILL BE GRANTED.

12          **MS. WANG:**  YOUR HONORS, TERESA WANG ON BEHALF OF THE

13  LEGISLATOR INTERVENORS.

14          IN VIEW OF YOUR QUESTION JUST NOW, WE WILL BE

15  SUBMITTING A SUPPLEMENTAL TRIAL AFFIDAVIT OF FORMER ASSEMBLYMAN

16  SPITZER FOLLOWING UP ON HIS TESTIMONY LAST FRIDAY BEFORE THE

17  COURT.

18          **JUDGE KARLTON:**  WHY?

19          **JUDGE HENDERSON:**  WHY?  HE TESTIFIED.  WHAT WOULD BE

20  SUPPLEMENTAL?

21          **JUDGE KARLTON:**  BY THE WAY, LET'S GET HER OFF THE

22  STAND.

23          **JUDGE HENDERSON:**  YES.  YOU CAN STEP DOWN.

24          **MS. WANG:**  FORMER ASSEMBLYMAN SPITZER SPOKE WITH THE

25  ATTORNEY GENERAL FOLLOWING HIS TESTIMONY IN COURT ON FRIDAY

1   REGARDING SOME OF HIS CONCERNS ABOUT FOLLOW-UP ON AB 900, AND WE

2   WOULD JUST LIKE TO ENTER SOME -- A SUPPLEMENTAL AFFIDAVIT

3   CHRONICLING THAT CONVERSATION.

4           **JUDGE KARLTON:**  YOU'D WANT TO QUESTION HIM AND SO

5   FORTH?  NO.

6           **JUDGE HENDERSON:**  OKAY.  MOTION IS DENIED.

7           **MS. WANG:**  THANK YOU, YOUR HONOR.

8           **JUDGE KARLTON:**  ALL RIGHT.

9           **JUDGE HENDERSON:**  OKAY.  WE ARE GOING TO RECESS FOR

10  AN HOUR AND COME BACK AND TALK ABOUT DATES FOR CLOSING ARGUMENT.

11  YOU SHOULD GIVE US --

12          **JUDGE KARLTON:**  ALSO FOR BRIEFING.

13          **JUDGE HENDERSON:**  BRIEFING AND FINDINGS OF FACT.  YOU

14  SHOULD GIVE US A SENSE OF HOW LONG YOU THINK IT WOULD TAKE TO

15  GET US FINDINGS OF FACT, WHETHER YOU WANT TO GIVE YOUR ARGUMENT

16  BEFORE YOU DO THAT OR AFTER.

17          **MR. SPECTER:**  I WANT TO PROPOSE A SUGGESTION FOR YOU

18  TO CONSIDER DURING YOUR LUNCH BREAK, THAT'S ALL, BECAUSE IT HAS

19  TO DO WITH THE VERY FACTS THAT YOU'RE CONCERNING.

20          **JUDGE HENDERSON:**  OKAY.

21          **MR. SPECTER:**  THAT IS, IN TERMS OF ARGUMENT, I WAS

22  GOING TO PROPOSE THAT SINCE THERE ARE GOING TO BE FINDINGS OF

23  FACT AND CONCLUSIONS OF LAW, WHICH, HOPEFULLY, FROM OUR POINT OF

24  VIEW, WILL BE AS EXHAUSTIVE AND METICULOUS AS THEY CAN, THE

25  ARGUMENT, I WOULD SUGGEST, WOULD BE -- AT THE ARGUMENT I WOULD

1  LIKE TO ANSWER THE QUESTIONS THAT YOU HAVE REGARDING THE

2  PROPOSALS AND THE FINDINGS AND THE RELIEF.

3          SO I KNOW, JUDGE HENDERSON, IN MANY OF YOUR LAW AND

4  MOTION MOTIONS YOU PROVIDE QUESTIONS TO THE PARTIES TO ARGUE,

5  AND IF IT'S SOMETHING THAT YOU WOULD CONSIDER DOING HERE, I

6  THINK IT WOULD BE MOST USEFUL FOR US TO DIRECT OUR ENERGIES TO

7  TO ANSWERING YOUR QUESTIONS THAN US GIVING A SPEECH ABOUT KIND

8  OF SUMMARIZING THE ARGUMENTS.  THAT'S ALL.

9          **JUDGE HENDERSON:**  OKAY.  WE ARE ADJOURNED FOR AN

10 HOUR.

11              (LUNCHEON RECESS TAKEN.)

12         **JUDGE HENDERSON:**  WE ARE GOING TO BEGIN WITH THE

13 DIFFICULT TASK OF SCHEDULING THE REST OF THIS MATTER.  LET'S

14 BEGIN BY HEARING FROM COUNSEL AS TO YOUR ESTIMATES OF HOW LONG

15 IT WILL TAKE YOU TO GET US FINDINGS OF FACT, PROPOSED FINDINGS

16 OF FACT.

17         **MR. MELLO:**  MR. SPECTER, COUNSEL HAVE MET AND

18 CONFERRED.  THIS IS PAUL MELLO FOR DEFENDANTS.

19         **MR. SPECTER:**  DON SPECTER.

20         **MR. MELLO:**  WE HAVE COME UP WITH A PROPOSAL TO DO

21 FINDINGS OF FACT AND CONCLUSIONS OF LAW TO THE COURT BY

22 JANUARY 23RD.

23         **JUDGE HENDERSON:**  OKAY.

24         **MR. MELLO:**  AND THEN WITH A PROPOSED ARGUMENT, I

25 BELIEVE -- TELL ME IF I'M WRONG -- HAVING ARGUMENT THE WEEK OF

1  FEBRUARY 3RD, IF IT WORKS WITH THE COURT.

2              **JUDGE KARLTON:**  NOTHING WORKS.

3              **JUDGE REINHARDT:**  I MEANT TO BRING MY CALENDAR IN.

4              **JUDGE KARLTON:**  WE CAN SEND ONE OF THEM IN.

5              **JUDGE REINHARDT:**  DO YOU WANT TO GO GET MY CALENDAR?

6              **JUDGE KARLTON:**  LET ME ASK YOU ANOTHER QUESTION.

7              MR. SPECTER HAS SUGGESTED THAT WE PROVIDE YOU WITH

8  QUESTIONS ABOUT THE THINGS THAT ARE TROUBLING US.  MY FIRST

9  RESPONSE IS EVERYTHING IS TROUBLING ME.  I CAN'T SPEAK FOR MY

10 COLLEAGUES.

11             **MR. SPECTER:**  ANYTHING IS POSSIBLE AND EVERYTHING IS

12 TROUBLING YOU, RIGHT?

13             **JUDGE KARLTON:**  THAT'S RIGHT.  AND MAYBE, THE JUDGES

14 HAVE THOUGHT WE COULD GET TOGETHER SOMETIME IN THE NEXT WEEK OR

15 TWO, GOD WILLING AND THE RIVER DON'T RISE, AND SEND YOU A LIST.

16             BUT WHAT WE ARE CONCERNED WITH IS THAT YOU GUYS WILL

17 THEN THINK THAT'S ALL YOU'VE GOT TO TALK ABOUT.  AND WE DON'T

18 HAVE ANY IDEA THAT WE EVEN KNOW ALL THE THINGS THAT ARE

19 TROUBLING US.

20             **MR. SPECTER:**  WELL, CAN I ELABORATE ON WHAT MY IDEA

21 WAS?

22             MY IDEA IS THAT YOU WOULD SEND US THAT LIST AFTER YOU

23 SAW OUR PROPOSED FINDINGS AND CONCLUSIONS OF LAW, WHICH THAT

24 WILL DISTILL SOME OF THE LEGAL ISSUES AND SOME OF THE EVIDENCE.

25             AND, YOU KNOW, THERE ARE LOTS OF SORT OF ISSUES OF

 1  FIRST IMPRESSION IN THIS CASE.  SO I THOUGHT THAT IT WOULD BE  A

 2  --

 3              JUDGE KARLTON:  THAT'S A POSSIBILITY, TOO.

 4          MR. SPECTER:  THAT WOULD BE THE MOST USEFUL FOR YOU

 5  AND US.

 6              JUDGE KARLTON:  MR. MELLO, DO YOU AN ISSUE?

 7          MR. MELLO:  I WOULD NOT BE OPPOSED TO RECEIVING

 8  PROPOSED QUESTIONS IN THE REPORT.  HOWEVER, I WOULD LIKE TO MAKE

 9  A CLOSING STATEMENT.

10              JUDGE HENDERSON:  BOTTOM LINE, WE WILL DO THAT.

11          MR. MELLO:  SO A TYPICAL CLOSING STATEMENT I WOULD

12  LIKE TO DO, BUT, OF COURSE, IF THE COURT HAS QUESTIONS, WE WILL

13  TRY TO ADDRESS THOSE, AND I HAVE SEEN THIS COURT ASK QUESTIONS.

14          JUDGE KARLTON:  SOME OF THESE THINGS ARE SO

15  INTIMATELY TIED, AT LEAST IN MY MIND, THAT I DON'T -- I HAVE

16  PROBLEMS TRYING TO SEGREGATE THINGS OUT.

17          I'M VERY WORRIED IF I SAY TO YOU -- OBVIOUSLY, ONE OF

18  MY CONCERNS IS WE ARE TALKING ABOUT PUBLIC SAFETY AND WHETHER

19  YOU THINK SO OR NOT, SIR, IT'S A SERIOUS ISSUE IN THIS CASE.

20  BUT THAT IS TIED, AT LEAST IN MY MIND, TO THE FACT THAT THE

21  PRESENT -- THE BEST EVIDENCE IS THAT THE PRESENT PRISON SYSTEM

22  IS CRIMINOGENIC ITSELF.  AND I'M NOT CLEAR -- I'M NOT AT ALL

23  CLEAR HOW YOU PARSE OUT THOSE QUESTIONS.

24          SO I HAVE THIS FEAR THAT I'M GOING TO ASK YOU A

25  QUESTION AND YOU ANSWER IT BECAUSE YOU ARE GOOD LAWYERS AND YOU

1    WON'T REALLY GET WHAT'S SO TROUBLING.

2            **MR. SPECTER:**  I HAVE NEVER KNOWN YOU TO BE SHY ABOUT

3    ASKING US WHAT IS TROUBLING YOU.

4            BUT THAT'S WHAT I SEE THE -- I WOULD RATHER HAVE AN

5    ARGUMENT LIKE THAT WHERE IT'S MORE OF A DIALOGUE ABOUT THE

6    QUESTIONS THAT ARE TROUBLING YOU THAN ME GIVING A SPEECH

7    SUMMARIZING THE EVIDENCE THAT I HAVE ALREADY PROVIDED TO YOU IN

8    WRITTEN FORM.  OTHERS MAY HAVE DIFFERENT STYLES --

9            **JUDGE REINHARDT:**  THERE IS NO REASON YOU CAN'T DO

10    BOTH.

11            **MR. SPECTER:**  THAT'S TRUE.

12            **MR. MELLO:**  THAT'S WHAT I WAS SUGGESTING.

13            **JUDGE REINHARDT:**  RIGHT.  YOU WOULD HAVE A CLOSING

14    ARGUMENT, BUT IT WOULD NOT BE JUST LIKE A CLOSING ARGUMENT TO A

15    JURY.  IT WOULD BE -- WE ARE COMBINED, THE COURT HERE, AND SO IT

16    WOULD INCLUDE QUESTIONS FROM THE COURT DURING THE ARGUMENT.

17            **MR. SPECTER:**  YES, YOUR HONOR.

18            **JUDGE REINHARDT:**  SO IT WOULD BE THAT KIND OF A MIX

19    BETWEEN THE CLOSING ARGUMENT AND AN APPELLATE ARGUMENT.

20            **JUDGE KARLTON:**  MET ME ASK ANOTHER QUESTION -- EXCUSE

21    ME, GO AHEAD.

22            **MR. SPECTER:**  NO, NO.

23            **JUDGE KARLTON:**  WE THINK -- WE ARE TROUBLED.  I WANT

24    YOU TO KNOW, WE ARE TROUBLED IN EVEN HOW TO WRITE AN OPINION

25    THAT MAKES ANY SENSE.

1           PROBABLY BY FEBRUARY -- AS AN EXAMPLE, JUST ONE

2    EXAMPLE JUDGE REINHARDT RAISED AT LUNCH.  BY FEBRUARY SHOULD WE

3    NOT KNOW WHETHER THE GOVERNOR IS SIGNING AB 900 WHAT DIFFERENCE

4    THAT MAKES IN THE CASE -- I'M ASKING YOU, NOT TELLING YOU.

5           **MR. SPECTER:**  THAT'S -- I WOULD OBJECT TO THAT

6    QUESTION AS SPECULATIVE.

7           **JUDGE REINHARDT:**  IT MAY BE DIFFERENT FROM THE WAY IT

8    IS TODAY.  IT MAY NOT BE THIS BILL.  IT MAY BE ANOTHER BILL AND

9    MAYBE THERE WILL NEVER BE A BILL.

10          **MR. SPECTER:**  AND YOU CAN ALWAYS ASK US FOR -- I

11   MEAN, YOU COULD PROBABLY TAKE JUDICIAL NOTICE OF THE FACT THAT

12   THE GOVERNOR SIGNS THE BILL AND --

13          **JUDGE REINHARDT:**  BUT IT'S SOMETHING THAT WILL HAVE A

14   SIGNIFICANT IMPACT, AT LEAST FOR US TO CONSIDER.

15          TO WHAT EXTENT DOES AB 900 AFFECT THE ANSWER TO THESE

16   QUESTIONS?

17          **MR. SPECTER:**  RIGHT.

18          **JUDGE REINHARDT:**  AND IT WILL BE EASIER TO ANSWER IF

19   WE KNOW THE BOND ISSUE HAS BEEN CLEARED UP, ALTHOUGH THAT MAY

20   NOT BE THE END OF THE PROBLEM.

21          BUT, CERTAINLY, ONE OF THE ISSUES IS GOING TO BE --

22   IF WE GET TO PHASE TWO, ONE OF THE ISSUES IS GOING TO BE IS

23   THERE AN ALTERNATIVE REMEDY?  I ASSUME STATE WILL SAY, WELL,  AB

24   900 PROVIDES A SOLUTION, YOU KNOW, TO --

25          **MR. SPECTER:**  IT SEEMS TO ME, YOUR HONOR, IF THE

1    EVIDENCE HAS BEEN -- WE HAVE CLOSED THE EVIDENCE AND WE WILL

2    ARGUE FROM THE EVIDENCE THAT EXISTS IN THE RECORD AND TAKE INTO

3    ACCOUNT ANY NEW DEVELOPMENTS.  I DON'T SEE -- WE CAN'T RETRY THE

4    CASE.

5            **JUDGE KARLTON:**  OH, GOD, NO.

6            **MR. SPECTER:**  SO WE CAN ADDRESS THOSE QUESTIONS IN

7    ARGUMENT BASED ON THE RECORD.

8            **JUDGE REINHARDT:**  AND IN YOUR BRIEFS, BUT IT'S GOING

9    TO BE UNREALISTIC NOT TO CONSIDER, YOU KNOW, THE -- RIGHT NOW AB

10   900, ASIDE FROM WHAT IT DOES, WHICH YOU SHOULD ADDRESS, HOW IT

11   SOLVES IT OR DOESN'T.  RIGHT NOW IT'S -- YOU KNOW, THE BONDS

12   AREN'T BEING SOLD, CAN'T BE SOLD.

13           I DON'T THINK WE CAN ASSUME WHEN WE WRITE OUR OPINION

14   THAT WILL BE THE STATUS OR THAT WE CAN IGNORE THAT.

15           **MR. SPECTER:**  EVEN IF YOU CAN'T IGNORE IT, I MEAN,

16   PART OF -- THIS IS VEERING INTO ARGUMENT A LITTLE BIT, SO IF YOU

17   WANT ME TO STOP, I WILL.

18           **JUDGE REINHARDT:**  NO, NO, NO, NO.  WE ARE NOT GOING

19   TO BE ABLE TO PRETEND THAT IT HASN'T BEEN PASSED AND CLEARED UP

20   IF IT HAS BEEN.

21           **MR. SPECTER:**  NO, I UNDERSTAND THAT.  BUT THE EFFECTS

22   OF THAT, EVEN IF THE GOVERNOR SIGNS CLEAN-UP LEGISLATION IN

23   JANUARY, THE EFFECTS OF THAT ARE GOING TO BE SO LONG TERM -- I

24   MEAN, IT'S NOT GOING TO CLEAR IT UP.

25           **JUDGE KARLTON:**  THOSE ARE ALL THINGS THAT YOU TALK

 1  ABOUT IN ARGUMENT.

 2          **MR. SPECTER:** I KNOW.

 3          **JUDGE REINHARDT:** NO, NO. THAT'S SOMETHING -- OF

 4  COURSE, I MEAN, BUT YOU ARE GOING TO HAVE TO AT SOME POINT

 5  ANSWER THOSE QUESTIONS.

 6          **MR. SPECTER:** YEAH, AND EVEN AFTER YOU ISSUE AN

 7  OPINION ONE WAY OR THE OTHER, SOMETHING ELSE MIGHT HAPPEN, TOO.

 8  THAT'S WHY JUNCTIONS CAN, ARE SORT OF LIVING DOCUMENTS.

 9          **JUDGE KARLTON:** BUT WE ARE IN A DIFFERENT POSITION

10  THAN IF YOU WERE COMING TO ME OR TO JUDGE HENDERSON IN OUR

11  UNDERLYING CASE, BECAUSE YOU CAN JUST SAY, JUDGE, DO SOMETHING.

12          WE ARE THREE OF US. OUR CALENDARS ARE VERY

13  DIFFICULT. YOU KNOW, IT JUST DOESN'T -- YOU KNOW, OF COURSE,

14  WE'LL RESPOND, BUT THE REALITY IS THAT IT'S MUCH MORE DIFFICULT.

15          **MR. SPECTER:** THAT'S WHAT CONGRESS INTENDED I THINK.

16          **JUDGE REINHARDT:** WELL, THERE ARE OTHER RELATED

17  QUESTIONS, FOR INSTANCE, THAT AT SOME POINT YOU SHOULD ADDRESS.

18          FOR EXAMPLE, WE HAVE HAD A LOT OF TESTIMONY ABOUT

19  PROGRAMS THAT WOULD RESOLVE -- EITHER RESOLVE THE PROBLEM OR

20  EVEN IF THERE WERE A PRISONER RELEASE ORDER, IT WOULD BE

21  NECESSARY. I THINK WE NEED TO KNOW FROM EACH SIDE WHAT THEY

22  TAUGHT OF THOSE PROGRAMS AND WHETHER THEY CAN BE FUNDED.

23          AND ONE QUESTION MIGHT BE FOR THE BRIEFS, DOES THE

24  COURT HAVE THE AUTHORITY TO TELL THE STATE EITHER TO SPEND MONEY

25  OR TO DIVERT MONEY THAT THEY SAVE FROM KEEPING PEOPLE IN PRISON,

 1  CAN THAT MONEY BE DIVERTED TO THE COUNTIES, AND HOW MUCH IS

 2  NECESSARY?

 3          I MEAN WE HAVE NO IDEA HOW MUCH IS NECESSARY AT THE

 4  MOMENT.  THIS ARE FIGURES THAT MAY -- FIGURES ABOUT THE COST OF

 5  KEEPING PEOPLE IN PRISON AND THE COST OF PROVIDING THESE

 6  PROGRAMS.

 7          I MEAN, THOSE ARE THE KINDS OF THINGS THAT AT SOME

 8  POINT WE WOULD LIKE TO HAVE YOUR HELP WITH.

 9

10          **JUDGE KARLTON:**  AT LUNCH, FOR INSTANCE, WE HAD A

11  BRIEF DISCUSSION ABOUT WHAT THE EVIDENCE WAS CONCERNING HOW MUCH

12  IT COSTS -- JUST A BASIC QUESTION, HOW MUCH IT COSTS TO KEEP A

13  PRISONER IN PRISON?  AND IT TURNS OUT I HAVE A RECOLLECTION

14  THAT'S DIFFERENT THAN ONE OF MY COLLEAGUE'S RECOLLECTIONS.  SO

15  SOMEBODY HAS GOT TO TELL US THAT.

16          THAT'S WHY I AGREE WITH YOU, WE HAVE GOT TO HAVE THE

17  FINAL ARGUMENT AFTER FINDINGS OF FACT.  BUT I DON'T THINK THAT

18  THERE IS A LOT OF EVIDENCE -- THERE ARE SOME PROGRAMS OUT THERE

19  THAT SAN DIEGO PROGRAM, THE SAN FRANCISCO PROGRAM THAT WE JUST

20  HEARD ABOUT, THE PROPOSAL FROM THE COUNTIES ABOUT DIVERTING

21  PEOPLE.

22          I DON'T THINK WE HAVE -- MAYBE I'M WRONG.  MAYBE WHEN

23  YOU GO THROUGH THE EVIDENCE, IT IS THERE, BUT I DON'T THINK WE

24  HAVE A LOT OF EVIDENCE ABOUT WHAT THE COST OF THOSE PROGRAMS ARE

25  INSTEAD OF, GEE, THEY ARE GOOD PROGRAMS.  MAYBE IT'S IN THERE.

1   I'M NOT SAYING IT ISN'T, BUT I -- I'M CONCERNED THAT WE MAY NOT

2   HAVE A FACTUAL BASIS.

3           **MR. SPECTER:**  AND I UNDERSTAND THAT.  I THINK THAT

4   OUR PROPOSED FORM OF RELIEF WILL TRY TO TAKE THAT INTO ACCOUNT.

5           **JUDGE KARLTON:**  ALL RIGHT.

6           **JUDGE REINHARDT:**  WELL, AND THEN MAYBE THE COUNTIES

7   MAY HAVE ONE IDEA -- I MEAN, AT ONE POINT YOU GET THE IMPRESSION

8   THE COUNTIES WOULD WELCOME FUNDING FOR THESE PROGRAMS.

9           **MR. SPECTER:**  THEY ARE DYING FOR IT.

10          **JUDGE REINHARDT:**  WELL, ARE THEY WILLING TO --

11          **JUDGE KARLTON:**  EXCEPT, BUT THEY AREN'T WILLING TO

12   TRUST THE STATE, AND THERE IS A REASON FOR THAT, TOO,

13   APPARENTLY.

14          **MR. SPECTER:**  RIGHT.

15          **JUDGE REINHARDT:**  ARE THEY WILLING TO TAKE MORE

16   PAROLEES IF THEY GET THE FUNDING FOR THESE PROGRAMS?

17          **MR. SPECTER:**  RIGHT.

18          **JUDGE REINHARDT:**  AND THEY WOULDN'T HAVE TO TRUST THE

19   STATE IF IT WERE PART OF AN ORDER TO DIVERT FUNDS.

20          **JUDGE KARLTON:**  IF WE CAN DO THAT.

21          **MR. SPECTER:**  THAT'S IF YOU CAN DO THAT, AND THAT'S

22   WHAT WE WILL ADDRESS IN THE BRIEFS.  I DON'T HAVE A -- I DON'T

23   WANT TO GIVE YOU AN ANSWER RIGHT NOW.

24          **JUDGE KARLTON:**  SECOND WEEK IN FEBRUARY.  ANY DAY BUT

25   MONDAY OR TUESDAY.  I WILL JUST MAKE IT HAPPEN.

 1           **MR. MELLO:**  I BELIEVE WE ACTUALLY SAID THE FIRST

 2   WEEK.

 3           **JUDGE KARLTON:**  FIRST WEEK, THANK YOU.

 4           **JUDGE REINHARDT:**  WE WILL TRY TO DO THE FIRST WEEK.

 5   WEDNESDAY LOOKS POSSIBLE.

 6           **JUDGE KARLTON:**  TENTATIVELY THE 4TH OF FEBRUARY.  I

 7   SAY "TENTATIVELY" BECAUSE, YOU KNOW, I SAID I WILL PUT ANYTHING

 8   ASIDE, BUT THERE MAY BE THINGS I CAN'T, SO I DON'T KNOW.

 9           **MR. BIEN:**  EXCUSE ME, YOUR HONOR.  JUST A COUPLE OF

10   OTHER HOUSEKEEPING DETAILS.

11           YOU ASKED IF ALL THE EVIDENCE WAS IN, AND I HAVE JUST

12   BEEN CHECKING ON THE LOGISTICS OF THE PHYSICAL COPIES OF THE

13   EXHIBITS AND THE STATE OF THE OBJECTIONS AND JUST A COUPLE OF

14   THINGS WHICH I HAVE TALKED TO COUNSEL ABOUT.

15           WE HAVE STILL SOME ONGOING WITHDRAWAL OF EXHIBITS AND

16   NEGOTIATIONS, AND WE WOULD LIKE TO HAVE TILL EARLY NEXT WEEK TO

17   RESOLVE THAT AND TRY TO GIVE A FINAL LIST OF EXHIBITS BY ALL

18   PARTIES AND FINAL LIST OF OBJECTIONS WITH THE HOPE THAT WE WILL

19   MAKE IT AS CLEAR AND AS LIMITED AS WE CAN.

20           IN ADDITION, AT THAT POINT WE HAVE A NEW DISK THAT

21   WOULD UPDATE THE LISTS AND THE ACTUAL EXHIBITS.

22           WE ALSO WANTED TO ASK THE COURT'S PREFERENCE AS TO

23   DEPOSITION EXCERPTS AND HOW -- IF THE COURT WOULD LIKE THE

24   PARTIES TO SUBMIT THEM IN HARD COPY.

25           **JUDGE KARLTON:**  I BELIEVE THAT ANY DEPOSITION THAT

1   YOU ARE RELYING ON WAS IN EVIDENCE READ INTO THE RECORD, ISN'T

2   THAT RIGHT?

3            **MR. BIEN:**  THAT WAS --

4            **JUDGE KARLTON:**  ONLY FOR IMPEACHMENT?

5            **MR. BIEN:**  FOR ONE, RIGHT.  AND THERE WERE SEVERAL

6   WHERE, FOR EXAMPLE, THE -- THERE WERE SEVERAL REPRESENTATIVE

7   PLAINTIFFS THAT WE HAVE AGREED WOULD COME IN BY DEPOSITION, MR.

8   COLEMAN AND SOME OTHER ONES.  AND THERE IS A FEW OTHER WITNESSES

9   THAT DIDN'T TESTIFY THAT WE WERE SUBMITTING EXCERPTS.

10           AND WE CAN SUBMIT THEM -- OUR PROPOSAL, IF THE COURT

11  WOULD PREFER, WE WOULD JUST SUBMIT THEM IN THE HARD COPY OF THE

12  ACTUAL PAGES, TO GET BOTH PARTIES TOGETHER SUBMITTING THEM LIKE

13  THAT.

14           **JUDGE KARLTON:**  THAT'S FINE.  I DON'T CARE.

15           **JUDGE HENDERSON:**  I'M A HARD COPY KIND OF GUY.

16           **MR. BIEN:**  OKAY.  SO DON'T WE DO THAT.  WE WILL PUT

17  BOTH SIDES' CROSS DESIGNATIONS TOGETHER WITH THE REGULAR IN ONE

18  SET.

19           **MS. BARLOW:**  IF I MAY, YOUR HONOR, WITH RESPECT TO

20  THE TIME FOR THE EXHIBITS.  GIVEN THAT IT'S FRIDAY AFTERNOON AND

21  SOME OF US HAVE A WAYS TO GO, AS I KNOW YOU DO AS WELL, AT LEAST

22  SOME OF YOU DO --

23           **JUDGE HENDERSON:**  MONDAY WILL BE TIME ENOUGH.

24           **MS. BARLOW:**  WELL, WE WONDERED IF WE COULD PERHAPS

25  HAVE UNTIL WEDNESDAY, YOUR HONOR.

1          **JUDGE KARLTON:**  OF COURSE, OF COURSE.  GOES WITHOUT

2     SAYING.

3          **MR. BIEN:**  WE WILL GET EVERYTHING IN.

4          **JUDGE KARLTON:**  WHATEVER YOU NEED.  BETWEEN NOW AND

5     THE FINDINGS -- PROPOSED FINDINGS OF FACT WHATEVER YOU GUYS

6     NEED, JUST SEND US A NOTE AND SAYING, WE HAVE ALL AGREED THAT

7     IT'S WEDNESDAY, THAT IT'S FRIDAY, THAT IT'S TWO WEEKS FROM

8     TUESDAY.  THAT'S FINE.

9          **MS. BARLOW:**  PERFECT.  THANK YOU, YOUR HONOR.

10          **JUDGE REINHARDT:**  ONE OTHER THING TO KEEP IN MIND IN

11    PREPARING WHATEVER YOU ARE PREPARING.  THIS CASE HAS BEEN TRIED

12    ON THE ASSUMPTIONS BY THE DEFENSE THAT THE BURDEN OR WHATEVER

13    HAPPENED WITH ANY KIND OF POTENTIAL RELEASE ORDER WOULD BE THE

14    AMOUNT OF PRISONERS REQUESTED BY THE PLAINTIFFS.  SO ALL THE

15    TESTIMONY HAS BEEN WHAT WOULD THE EFFECT BE OF GRANTING

16    PLAINTIFFS' FULL RELIEF.

17          IT'S POSSIBLE THAT SOME OF THE DEFENSE MIGHT WANT TO

18    GIVE US THEIR IDEAS AT LEAST ABOUT IF THERE WERE AN ORDER, WHAT

19    SHOULD THE NUMBER BE AND WHAT WOULD THE EFFECT OF THAT BE,

20    RATHER THAN JUST LIMITING YOURSELF TO THE IDEA THAT THAT

21    PRISONER RELEASE ORDER WOULD GRANT PLAINTIFFS FULL RELIEF.

22          **JUDGE KARLTON:**  AND I'M CONCERNED, JUST ONE OF THE

23    THOUSANDS OF THINGS THAT I'M CONCERNED ABOUT, THE 130 NUMBER,

24    130 PERCENT IS CONTRARY TO EVERYBODY'S TESTIMONY AS TO WHAT YOU

25    NEED, WHICH IS 95 PERCENT.

1        I GATHER THAT WE WENT TO THE 130 PERCENT BECAUSE THE

2   WITNESS SAID HE THOUGHT THAT WAS POLITICALLY POSSIBLE.  I DON'T

3   KNOW THAT -- I MEAN, AS SERIOUS A THING AS WE ARE GOING TO DO,

4   WE ARE GOING TO HOPE THAT IT WILL SOMEHOW OR OTHER SOLVE THIS

5   PROBLEM.

6        **JUDGE REINHARDT:**  SOMEBODY SAID 140 PERCENT.

7        **JUDGE KARLTON:**  I THOUGHT THEY SAID 130, WHATEVER IT

8   IS.

9        **MR. MELLO:**  I THINK, UNFORTUNATELY -- AND I THINK

10  IT'S ONE OF THE THINGS THAT THE BRIEFING IS GOING TO HAVE TO DO,

11  AS I BELIEVE A LOT OF THOSE PERCENTAGES ARE APPLES AND ORANGES;

12  OPERABLE CAPACITY, DESIGN CAPACITY.  AND SO A LOT OF THE NUMBERS

13  DON'T MATCH UP.

14       WHEN SHERIFF HENNESSY SAID 95 PERCENT OR

15  85 PERCENT -- I'M SORRY, I DON'T KNOW REMEMBER -- I DON'T KNOW

16  IF THAT'S DESIGN CAPACITY.  AND WE HAVE HAD TESTIMONY ABOUT

17  OPERABLE CAPACITY FROM EXPERTS IN THE CASE.  SO I THINK THAT'S

18  ONE OF THE CONFUSING ASPECTS.

19       **JUDGE KARLTON:**  MANY IS CONFUSING.

20       **MR. MELLO:**  WE WILL ADDRESS IT IN OUR BRIEFING AND I

21  BELIEVE IN ARGUMENT.  IT'S APPLES AND ORANGES.

22       **JUDGE REINHARDT:**  FOR INSTANCE, THERE IS ALSO -- WE

23  HAVE BEEN ASSUMING THAT THIS SHOULD TAKE PLACE OVER TWO YEARS

24  BECAUSE THAT'S WHAT THE PLAINTIFF HAS SAID.

25       **JUDGE KARLTON:**  WE ARE NOT BOUND BY WHAT THE

 1  PLAINTIFFS THINK.

 2          **JUDGE REINHARDT:**  AND IT MAY BE THAT SOME OF THIS

 3  WILL HAVE TO BE DISCUSSED AGAIN AFTER WE COME TO A CONCLUSION

 4  AND A PARTIAL ORDER WHERE WE MAY NEED MORE INFORMATION ONCE IT'S

 5  CLEAR THAT IF WE JUST HAVE AN ORDER, WE DON'T KNOW YET WHAT FORM

 6  THAT ORDER WOULD BE, WHETHER IT JUST REACHES A GENERAL

 7  CONCLUSION.  AND IT MAY BE AT THAT POINT MAY NEED A CHANCE TO

 8  GET ADJUSTED TO WHATEVER THAT ORDER IS AND GIVE US SOME

 9  SPECIFICS TO FILL IN FIGURES OR OTHER MATTERS.

10          **JUDGE KARLTON:**  AND ALONG THAT SAME LINE, EVEN IF

11  THERE WERE A RELEASE ORDER, THERE IS A WHOLE QUESTION ABOUT

12  WHAT -- WHAT THE APPROPRIATE ROLL OF THE COURT IS VERSUS THE

13  ROLE OF THE STATE.

14          AND SPEAKING FOR MYSELF AND NOT MY COLLEAGUES, I'M

15  VERY TROUBLED BY THAT.  YOU KNOW, I DON'T HAVE A RECEIVER AND IT

16  ISN'T JUST BECAUSE I'M LAZY.  IT'S GOT SOMETHING TO DO WITH MY

17  PERCEPTION OF WHO IS RESPONSIBLE FOR WHAT.

18          AND EVEN IF THERE WERE AN ORDER, WOULD IT BE

19  APPROPRIATE TO TURN TO THE STATE AND SAY, TELL US, FIRST OF ALL,

20  WHAT IT IS YOU WANT US TO DO.  YOU DON'T WANT US TO DO ANYTHING.

21  ASSUME THAT THAT'S LOST, THAT THERE IS GOING TO BE SOMETHING.

22  IS IT APPROPRIATE AT LEAST TO FIRST TURN TO THE STATE AND SAY,

23  TELL US WHAT YOU THINK YOU CAN DO AND WHAT YOU OUGHT TO DO?

24          **JUDGE REINHARDT:**  WELL, TO PUT IT MAY BE MORE

25  SPECIFICALLY.  SUPPOSE WE DECIDED THERE SHOULD BE A CAP.

1  WITHOUT EVEN DECIDING WHAT THE CAP IS, THERE SHOULD BE A CAP.

2  THEN I THINK WHAT JUDGE KARLTON WAS SAYING, ISN'T IT APPROPRIATE

3  TO SAY TO THE STATE, HOW CAN YOU ACHIEVE THIS CAP AND IN WHAT

4  AMOUNT OF TIME?  WHAT ARE THE WAYS TO GET THERE?  VARIOUS PEOPLE

5  HAVE GIVEN US WAYS.

6         SO THAT MIGHT NOT BE THE FINAL ORDER, BUT IT MIGHT BE

7  AN ORDER THAT GIVES THE STATE THE OPPORTUNITY TO DO WHAT JUDGE

8  KARLTON SAYS; THAT IF WE ARRIVED AT AN ORDER RATHER THAN TELLING

9  THE STATE HOW TO MEET IT, TO LET THE STATE TELL US HOW THEY ARE

10 GOING TO MEET IT.

11         **JUDGE KARLTON:**  IF AT ALL.

12         **MR. MELLO:**  I JUST WANT TO MAKE SURE I HEARD YOU

13 CORRECTLY.  A POTENTIALITY WOULD BE TO ORDER A CAP, BUT NOT TELL

14 US WHAT THAT CAP IS?  BECAUSE THAT SEEMS LIKE THAT WOULD BE

15 DIFFICULT TO...

16         **JUDGE REINHARDT:**  YES, THAT WOULD BE, BUT IT MIGHT BE

17 TO FIRST GIVE YOU AN OPPORTUNITY -- I WOULD HOPE THAT YOU WOULD

18 GIVE US ENOUGH INFORMATION IN THE BRIEFS AND FINDINGS AND OUR

19 DISCUSSIONS TO ALLOW US TO ARRIVE AT A CAP, IF WE DECIDED THERE

20 SHOULD BE A CAP.

21         **MR. MELLO:**  OKAY.  I JUST WANTED TO MAKE SURE I

22 HEARD.

23         **JUDGE REINHARDT:**  PREFERABLY WE WOULD BE ABLE TO TELL

24 YOU IN THE FIRST ORDER WHAT THE CAP IS, IF WE DECIDE THERE

25 SHOULD BE A CAP.  THEN WE WOULD ASK YOU TO TELL US HOW YOU WOULD

1   PROPOSE TO MEET IT RATHER THAN TELLING YOU INITIALLY.

2          **JUDGE KARLTON:**  I'M NOT SAYING IT'S -- IT'S

3   IMPORTANT.  I'M NOT SAYING ANY OF THAT IS FIXED -- TO SAY THE

4   LEAST, IT'S FIXED.

5          BUT ONE THING THAT I WOULD LIKE TO HEAR FROM THE

6   PARTIES IS IN LIGHT OF THE TOTALITY OF THE CIRCUMSTANCES, IS IT

7   REALISTIC FOR US TO TURN TO THE STATE -- IF WE FIND THAT A CAP

8   IS NECESSARY, IS IT REALISTIC TO TURN TO THE STATE AND HOPE THAT

9   THE STATE CAN PROVIDE US WITH A MEANINGFUL WAY OF PROCEEDING?

10  AND IS THAT AN APPROPRIATE THING TO DO?  AND THOSE ARE BOTH

11  VERY, I THINK, DIFFICULT PROBLEMS.

12         **MR. MELLO:**  OKAY.  I THINK I UNDERSTAND.

13         **JUDGE KARLTON:**  YOU UNDERSTAND WHERE WE ARE.

14         **JUDGE REINHARDT:**  THAT'S ONLY IF WE GET TO THAT

15  STAGE.  I ASSUME BEFORE WE GET TO THAT STAGE, WE ARE GOING TO

16  GET ARGUMENTS ABOUT WHY EVEN IF THERE IS A VIOLATION THERE ARE

17  ALTERNATIVE WAYS OF MEETING THAT VIOLATION WITHOUT A CAP.

18         **JUDGE KARLTON:**  ALL OF THOSE THINGS ARE UP IN THE --

19  WELL, I HAVE SAID IT.  EVERYBODY OUGHT TO UNDERSTAND AT LEAST

20  THIS JUDGE THINKS IT'S A VERY COMPLICATED ISSUE.

21         **JUDGE REINHARDT:**  AND EVEN THOUGH WE HAVE A TERM THAT

22  SAYS PRISONER RELEASE ORDER, THAT DOESN'T MEAN THAT ISSUING --

23  IT'S A VERY, VERY BROAD DEFINITION OF PRISONER RELEASE ORDER.

24  IT DOESN'T MEAN THAT THERE IS GOING TO BE AN ORDER THAT SAYS

25  RELEASE PRISONERS.  THERE COULD BE OTHER WAYS OF MEETING A

 1  PRISONER RELEASE ORDER.

 2          IT JUST HAPPENS TO BE AN UNFORTUNATE LABEL FOR ANY

 3  ACTION THE COURT CAN TAKE, BUT IT DOESN'T NECESSARILY INVOLVE

 4  THE RELEASE OF PRISONERS PURSUANT TO AN ORDER.  THAT MAY BE

 5  SOMETHING THAT'S UP TO THE STATE, HOW TO MEET AN ORDER.

 6          **JUDGE KARLTON:**  LET ME SAY THAT ONE OF THE THINGS

 7  THAT IS TROUBLING ME IS ASKING THE STATE IF PROPOSITION 9 SAYS

 8  THAT YOU CAN'T RELEASE ANYBODY IN ORDER TO DEAL WITH

 9  OVERCROWDING, THE STATE I ASSUME IS BOUND BY STATE LAW.

10          **JUDGE REINHARDT:**  UNLESS THERE IS FEDERAL LAW THAT

11  OVERRIDES IT, SUCH AS A COURT ORDER.

12          **JUDGE KARLTON:**  WELL, THAT'S RIGHT.  IF THE COURT

13  ORDERS IT, IT'S ENTIRELY DIFFERENT AND MAYBE THAT'S THE WAY WE

14  DEAL WITH IT, IS SAYING EVEN ASSUMING THE LIMITATIONS OF

15  PROPOSITION NINE, THE COURT IS GOING TO DO SOMETHING, THIS IS

16  THE BEST THAT THE COURT OUGHT TO DO.  MAYBE THAT'S THE WAY TO

17  PROCEED.

18          BUT YOU SEE HOW COMPLICATED ALL OF THE PROBLEMS ARE.

19  AND THEY ALL TEND TO AT LEAST IN MY MIND PULL AGAINST ONE

20  ANOTHER.  IT'S VERY -- WELL...

21          **JUDGE REINHARDT:**  AND IT WILL ALL GET SOLVED THIS

22  SPRING, AT LEAST AT THIS LEVEL.

23          **JUDGE KARLTON:**  ALL RIGHT.

24          **JUDGE HENDERSON:**  OKAY.  SO WE WILL GET YOUR PROPOSED

25  FINDINGS OF FACT AND CONCLUSIONS OF LAW BY JANUARY 23RD.  WE

1  TENTATIVELY HAVE FEBRUARY 4TH, DEPENDING UPON THE JUDGES' --

2  MINE IS OKAY, BUT DEPENDING ON MY COLLEAGUES' CALENDARS, AND I

3  ASSUME WE WOULD GO TO THE 5TH OR THE 6TH.  SO SAVE ALL THREE OF

4  THOSE DAYS AND WE WILL LET YOU KNOW WHICH ONE IT IS FOR CLOSING

5  ARGUMENT.

6          **JUDGE KARLTON:**  AND, YOU KNOW, WITHOUT SUGGESTING

7  THAT ANYBODY HAS DONE ANYTHING WRONG, YOUR OWN ESTIMATES OF HOW

8  LONG IT'S GOING TO TAKE TO ARGUE HAVEN'T BEEN GREAT BOTH WAYS.

9  BUT YOU MIGHT GIVE US SOME INDICATION OF HOW LONG YOU THINK IT'S

10 GOING TO TAKE TO PRESENT YOUR FINAL ARGUMENT.

11         **MR. SPECTER:**  SO YOU ARE GOING TO ISSUE AN ORDER

12 TELLING US THE DATE AND TIME OF THE ORAL ARGUMENT?

13         **JUDGE KARLTON:**  EXACTLY.

14         **JUDGE REINHARDT:**  AND WHY DON'T WE TRY TO ALL GET

15 TOGETHER AND FIGURE OUT IN ADVANCE HOW YOU PLAN ON DIVIDING THE

16 ARGUMENT AND HOW LONG YOU THINK IT WILL TAKE AND SEND US YOUR

17 PROPOSED SCHEDULE, AS LONG AS IT'S ALL WITHIN A DAY.

18         **MR. MITCHELL:**  REGARDING AN ISSUE OF HOW WE ARE GOING

19 TO DIVIDE UP ARGUMENTS, THERE IS GOING TO BE A REQUEST -- I

20 GUESS I'M MAKING THE REQUEST NOW FOR THE INTERVENORS TO HAVE

21 SEPARATE ARGUMENTS AND IF THE --

22         **JUDGE REINHARDT:**  DID YOU SAY SEPARATE ARGUMENT OR

23 ARGUMENTS?

24         **MR. MITCHELL:**  SEPARATE ARGUMENTS FOR THE

25 INTERVENORS.

 1          **JUDGE REINHARDT:**  NO, NO, THE QUESTION ISN'T CLEAR.

 2   ARE YOU PROPOSING MORE THAN ONE ARGUMENT FOR THE INTERVENORS?

 3          **MR. MITCHELL:**  YES, ONE FOR EACH OF THE FIVE GROUPS,

 4   WHICH WOULD BE FIVE SEPARATE DEFENDANT INTERVENOR ARGUMENTS.

 5          **JUDGE REINHARDT:**  WELL, THAT'S PROBABLY LARGELY GOING

 6   TO BE UP TO AND THE STATE TO DETERMINE HOW YOU WANT TO DIVIDE AN

 7   AMOUNT OF TIME.

 8          **JUDGE KARLTON:**  I DON'T KNOW.

 9          **JUDGE REINHARDT:**  WELL, NO, I --

10          **JUDGE KARLTON:**  THAT'S SOMETHING WE HAVE GOT TO TALK

11   ABOUT.

12          **JUDGE REINHARDT:**  FIRST THING IS TO GIVE US A

13   PROPOSED SCHEDULE.  YOU ALL GET TOGETHER AND TELL US HOW YOU

14   THINK IT OUGHT TO BE DONE, AND THEN WE CAN CONSIDER THAT AND

15   THEN YOU WILL HEAR BACK.

16          **MR. MITCHELL:**  VERY WELL.  THANK YOU.

17          **JUDGE KARLTON:**  ANOTHER TROUBLE IS YOU GET FIVE, SIX

18   ARGUMENTS, YOU GET SIX ARGUMENTS TO ANSWER AND WE WILL BE

19   HERE -- WE WILL HAVE ANOTHER TRIAL.

20          **JUDGE REINHARDT:**  FIGURE OUT HOW YOU WOULD ALL DO IT.

21   I MEAN, IT'S NOT SO HARD.  I MEAN, THE AMOUNT OF TIME CAN BE

22   USED IN VARIOUS WAYS.  IT WILL ALL WORK OUT ONCE YOU GET

23   TOGETHER.

24          **MR. MITCHELL:**  WE WILL FIGURE IT OUT.

25          **JUDGE HENDERSON:**  WHEN YOU MAKE THOSE ESTIMATES, THE

1    SYSTEM DOESN'T WORK IF YOU SAY, "WE DON'T REALLY KNOW, SO WE ARE

2    GOING TO ASK FOR TWICE AS MUCH AS WE NEED SO THEY DON'T CUT US

3    OFF."  IT'S NOT GOING TO WORK.  GIVE US -- AS AN OFFICER OF THE

4    COURT, GIVE US YOUR BEST ESTIMATE.  WE ARE GOING TO LET YOU

5    TALK.

6            **JUDGE REINHARDT:**  I DON'T THINK THERE IS GOING TO BE

7    ANY TROUBLE HAVING IT WORK BECAUSE THE COURT OF APPEALS IS VERY

8    SIMPLE.  YOU HAVE A CERTAIN AMOUNT OF TIME.  YOU DIVIDE IT HOW

9    YOU WANT.  AND IT DOESN'T MATTER WHETHER YOU -- IF YOU DON'T TO

10   GO OVER, YOU WON'T HAVE AN AUDIENCE.

11           I THINK YOU FIGURE IF YOU HAVE GOT A DAY AND YOU ARE

12   GOING TO DIVIDE IT UP.  THERE WON'T BE A PROBLEM.  AND IF YOU

13   GIVE US A SCHEDULE THAT SAYS, EIGHT HOURS WORTH OF ARGUMENT,

14   WE'LL SEND YOU ONE BACK THAT GIVES YOU LESS TIME.  I DON'T THINK

15   THERE'S GOING TO BE A PROBLEM BECAUSE YOU TAKE MORE TIME THAN

16   YOU ARE ALLOTTED, YOU WON'T.  OKAY.

17           **JUDGE HENDERSON:**  OKAY.  COURT IS ADJOURNED.

18               (WHEREUPON AT 2:57 P.M. FURTHER PROCEEDINGS

19                IN THE ABOVE-ENTITLED CAUSE WAS ADJOURNED.)

20

21

22

23

24

25

1                        **I N D E X**

2

3  **DEFENDANT'S WITNESSES**                              **PAGE**   **VOL.**

4  **SENATOR GEORGE RUNNER**

5  DIRECT EXAMINATION BY MR. STEGEMEN           2723    14
   CROSS-EXAMINATION BY MR. HEATHER             2735    14
6  REDIRECT EXAMINATION BY MR. STEGEMAN         2748    14
   RECROSS EXAMINATION BY MR. HEATHER           2751    14

7

8  **DONALD MEYER**

9  DIRECT EXAMINATION BY MS. BARLOW             2754    14
   CROSS-EXAMINATION BY MR. SANGSTER            2785    14
10 REDIRECT EXAMINATION BY MS. BARLOW           2792    14

11

   **PLAINTIFF'S WITNESSES**

12
   **MICHAEL HENNESSEY**

13
   DIRECT EXAMINATION BY MR. SPECTER            2796    14
14 CROSS-EXAMINATION BY MR. MITCHELL            2808    14

15

   **NOOR DAWOOD**

16
   DIRECT EXAMINATION BY MS. EVENSON            2818    14
17 CROSS-EXAMINATION BY MS. JOHNSON             2821    14

18

19 **DEFENDANT'S EXHIBIT**           **IDEN**   **VOL.**   **EVID**   **VOL.**

20 1332                                                  2835      14

21

22

23

24

25

**CERTIFICATE OF REPORTERS**


WE, JOAN MARIE COLUMBINI AND DEBRA L. PAS, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK JPM, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.


/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR


S/ DEBRA L. PAS

DEBRA L. PAS, CSR 11916, CRR, RMR, RPR

MONDAY, DECEMBER 22, 2008