1                                          VOLUME 15

2                                          PAGES 2867 - 3098

3                    UNITED STATES DISTRICT COURT

4              FOR THE EASTERN DISTRICT OF CALIFORNIA

5             AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

6    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

7            TO SECTION 2284, TITLE 28 UNITED STATES CODE

8
     RALPH COLEMAN, ET AL,              )
9                                       )
                  PLAINTIFFS,           )
10                                      )
      VS.                               ) NO. CIV S-90-0520 LKK JFM
11                                      )
     ARNOLD SCHWARZENEGGER, ET AL,      )
12                                      ) THREE-JUDGE COURT
                  DEFENDANTS.           )
13                                      )
     _____)
14
     MARCIANO PLATA, ET AL,             )
15                                      )
                  PLAINTIFFS,           )
16                                      )
     VS.                                ) NO. C 01-1351 TEH
17                                      )
     ARNOLD SCHWARZENEGGER, ET AL,      )
18                                      )
                  DEFENDANTS.           )
19   _____)

20                   *TRANSCRIPT OF PROCEEDINGS*

21                     SAN FRANCISCO, CALIFORNIA
                        FEBRUARY 3, 2009
22

23              **(APPEARANCES ON FOLLOWING PAGE)**

24   *REPORTED BY:    DEBRA L. PAS, CSR 11916, CRR, RMR, RPR*
                *OFFICIAL REPORTER - US DISTRICT COURT*
25              *COMPUTERIZED TRANSCRIPTION BY ECLIPSE*

1   **APPEARANCES:**

2   **FOR PLAINTIFFS**            PRISON LAW OFFICE

3                        1917 FIFTH STREET
                       BERKELEY, CALIFORNIA  94710
                       **SARA NORMAN, ESQUIRE**

4                        **ALISON HARDY, ESQUIRE**
                       **DONALD SPECTER, ESQUIRE**

5                        **REBEKAH EVENSON, ESQUIRE**

6                        ROSEN, BIEN & GALVAN, LLP

7                        315 MONTGOMERY STREET, TENTH FLOOR
                       SAN FRANCISCO, CALIFORNIA 94104
                 BY:   **MICHAEL W. BIEN, ESQUIRE**

8

9

10   **FOR CCPOA**                 CARROLL, BURDICK & MCDONOUGH
                       44 MONTGOMERY STREET, SUITE 400
                       SAN FRANCISCO, CALIFORNIA  94104

11                BY: **NATALIE LEONARD, ESQUIRE**

12

13   **FOR DEFENDANTS**           STATE OF CALIFORNIA
                       DEPARTMENT OF JUSTICE
                       OFFICE OF THE ATTORNEY GENERAL

14                        1300 I STREET, SUITE 125
                       P.O. BOX 944255

15                        SACRAMENTO, CALIFORNIA  94244
                 BY:   **LISA A. TILLMAN, ESQUIRE**

16

17                        STATE OF CALIFORNIA
                       DEPARTMENT OF JUSTICE
                       OFFICE OF THE ATTORNEY GENERAL

18                        455 GOLDEN GATE AVENUE, SUITE 11000
                       SAN FRANCISCO, CALIFORNIA  94102

19              BY: **KYLE A. LEWIS, ESQUIRE**

20

21                        HANSON BRIDGETT
                       425 MARKET STREET, 26TH FLOOR
                       SAN FRANCISCO, CALIFORNIA  94105

22                  BY:   **PAUL MELLO, ESQUIRE**
                       S. ANNE JOHNSON, ESQUIRE

23

24        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25

1    **APPEARANCES (CONTINUED):**

2

3    **FOR DISTRICT ATTORNEY**      THE DISTRICT ATTORNEY'S OFFICE
     **INTERVENORS**                COUNTY OF RIVERSIDE
4                                   82-675 HIGHWAY 111, FOURTH FLOOR
                                    INDIO, CALIFORNIA  92201
5                        BY:  **WILLIAM E. MITCHELL, ESQUIRE**

6
     **FOR LEGISLATOR**             AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
7    **INTERVENORS**                580 CALIFORNIA STREET, 15TH FLOOR
                                    SAN FRANCISCO, CALIFORNIA  94104
8                        BY:  **STEVE KAUFHOLD, ESQUIRE**

9
     **FOR LAW ENFORCEMENT**        JONES & MAYER
10   **INTERVENORS**                3777 NORTH HARBOR BOULEVARD
                                    FULLERTON, CALIFORNIA  92835
11                       BY:  **KIMBERLY HALL BARLOW, ESQUIRE**

12
     **FOR COUNTY INTERVENORS**     OFFICE OF THE COUNTY COUNSEL
13                                  COUNTY OF SANTA CLARA
                                    70 WEST HEDDING STREET
14                                  NINTH FLOOR, EAST WING
                                    SAN JOSE, CALIFORNIA  95110
15                       BY:  **THERESA FUENTES, ESQUIRE**

16
     **FOR SONOMA COUNTY**          COUNTY OF SONOMA
17   **INTERVENORS**                575 ADMINISTRATION DRIVE, ROOM 105A
                                    SANTA ROSA, CALIFORNIA  95403
18                      BY:  **ANNE L. KECK, ESQUIRE**

19
     **FOR THE COUNTY OF**          OFFICE OF MICHAEL P. MURPHY
20   **SAN MATEO**                  COUNTY COUNSEL, SAN MATEO COUNTY
     **INTERVENORS:**               HALL OF JUSTICE AND RECORDS
21                                  400 COUNTY CENTER, 6TH FLOOR
                                    REDWOOD CITY, CALIFORNIA 94063-1662
22                       BY:  **CAROL L. WOODWARD, ESQUIRE**

23

24                          -   -   -   -

25

<u>**P R O C E E D I N G S**</u>

**FEBRUARY 3, 2009**                                              **10:03 A.M.**


        **THE CLERK:**  CALLING CIVIL CASE NO. C01-1351 PLATA

VERSUS SCHWARZENEGGER.  CALLING CIVIL CASE NO. S-90-0520,

COLEMAN VERSUS SCHWARZENEGGER.

        APPEARANCES, PLEASE, COUNSEL.

        **MR. SPECTER:**  DONALD SPECTER FROM THE PRISON LAW

OFFICE FOR THE PLAINTIFFS.

        **MR. BIEN:**  MICHAEL BIEN, ROSEN, BIEN & GALVAN, FOR

THE COLEMAN PLAINTIFF CLASS.

        **MS. LEONARD:**  NATALIE LEONARD, CARROLL, BURDICK &

MCDONOUGH FOR THE CALIFORNIA CORRECTIONAL PEACE OFFICERS

ASSOCIATION.

        **MR. MELLO:**  PAUL MELLO, HANSEN BRIDGETT, ON BEHALF OF

THE PLATA DEFENDANTS, ALONG WITH ANNE JOHNSON FROM MY OFFICE.

        **MR. TILLMAN:**  GOOD MORNING.  LISA TILLMAN ON BEHALF

OF THE COLEMAN DEFENDANTS FROM THE OFFICE OF THE ATTORNEY

GENERAL.

        I'M HERE WITH KYLE LEWIS, THE DEPUTY ATTORNEY GENERAL

FROM THE SAME OFFICE.

        **MS. BARLOW:**  GOOD MORNING, YOUR HONORS.  KIMBERLY

HALL BARLOW, JONES AND MAYER, ON BEHALF OF THE LAW ENFORCEMENT

INTERVENORS.

        **MR. MITCHELL:**  GOOD MORNING.  BILL MITCHELL WITH THE

1   RIVERSIDE COUNTY DISTRICT ATTORNEY'S OFFICE ON BEHALF OF THE

2   DISTRICT ATTORNEY INTERVENORS.

3          **MR. KAULFORD:**  GOOD MORNING, YOUR HONORS. STEVE

4   KAUFHOLD FROM AKIN, GUMP, STRAUSS, HAUER AND FELD FOR THE

5   LEGISLATOR INTERVENORS.

6          **MS. FUENTES:**  GOOD MORNING.  THERESA FUENTES FROM

7   SANTA CLARA COUNTY FOR THE SANTA CLARA COUNTY INTERVENORS AND

8   THE COUNTY INTERVENORS.

9          **MS. WOODWARD:**  GOOD MORNING, YOUR HONOR.  CAROL

10  WOODWARD, COUNTY COUNSEL FROM SAN MATEO ON BEHALF OF THE COUNTY

11  INTERVENORS.

12         **MS. KECK:**  GOOD MORNING, YOUR HONOR ANN KECK, DEPUTY

13  COUNTY COUNSEL, ON BEHALF OF THE SONOMA COUNTY INTERVENORS.

14         **JUDGE KARLTON:**  FOLKS, BEFORE WE GET STARTED WITH THE

15  ARGUMENT IN GENERAL, THE COURT HAS DEVELOPED SOME ANXIETY.

16         MR. MELLO, WOULD YOU COME TO THE MICROPHONE FOR A

17  MOMENT?

18         DURING THE INTERIM, THE COURT HAD DISCOVERED

19  *CALIFORNIA CORRECTION PEACE OFFICERS ASSOCIATION VERSUS*

20  *SCHWARZENEGGER, 163 CAL. APP. 4802*.

21         I DON'T KNOW AND SO I'M ASKING YOU, SIR, ARE YOU

22  FAMILIAR WITH THE CASE AND ARE YOU FAMILIAR WITH THE CONTENT?

23         **MR. MELLO:**  I AM NOT.  I AM SURE THAT I CAN GET

24  FAMILIAR IN SOME TIME, BUT I AM NOT.

25         **JUDGE KARLTON:**  I'M GOING TO TELL YOU, SPEAKING FOR

 1  MYSELF, ALTHOUGH I SHARED WITH MY COLLEAGUES MY ANXIETY, IT IS

 2  NOT CLEAR TO ME THAT YOU CAN TAKE THE POSITION YOU HAVE TAKEN

 3  IN THE TRIAL, AND I URGE YOU TO READ THE CASE AND EXPLAIN TO ME

 4  HOW THAT IS POSSIBLE.  AND I LOOK FORWARD TO YOUR ARGUMENT,

 5  INDEED, WHENEVER YOU ARE READ TO RESPOND.

 6          **MR. MELLO:**  AND DOES YOUR HONOR MIND POINTING OUT TO

 7  MYSELF WHY --

 8          **JUDGE KARLTON:**  READ THE CASE.  YOU WILL BE SHOCKED.

 9  READ THE CASE.

10          **MR. MELLO:**  OKAY.  THANK YOU, YOUR HONOR.

11          **JUDGE REINHARDT:**  I'M SAYING THAT THAT SAME

12  SUGGESTION, I ASSUME, APPLIES TO COUNSEL FOR ATTORNEY GENERAL.

13          **JUDGE KARLTON:**  ACTUALLY, YOU'RE RIGHT.

14          ALTHOUGH THE CASE SPECIFICALLY DEALS WITH THE

15  GOVERNOR, IT OCCURRED TO ME, MS. TILLMAN, THAT YOU ALSO

16  REPRESENT THE GOVERNOR.

17          **MS. TILLMAN:**  YES, YOUR HONOR.

18          **JUDGE KARLTON:**  I ASK YOU TO READ THE CASE AS WELL.

19          **MS. TILLMAN:**  I WILL DO SO.  THANK YOU.

20          **JUDGE REINHARDT:**  THANK YOU.

21          GOOD MORNING, EVERYBODY.

22          WELCOME AGAIN TO THIS THREE-JUDGE COURT PROCEEDING IN

23  THIS BEAUTIFUL BUILDING AND BEAUTIFUL COURTROOM.  THE ARGUMENTS

24  ARE BEFORE A MIXED COURT AND WHAT IS A RATHER UNUSUAL

25  PROCEEDING INFREQUENTLY HELD.

1    SO I THOUGHT WE MIGHT BEGIN BY EXPLAINING THAT THE

2  ARGUMENTS ALSO ARE SOMEWHAT MIXED.  THEY ARE IN BETWEEN WHAT

3  YOU WOULD BE DOING IN A DISTRICT COURT AND WHAT YOU WOULD BE

4  DOING IN A COURT OF APPEALS.

5    IN A COURT OF APPEALS, YOU WOULD GET VERY LITTLE TIME

6  TO SPEAK AND MAINLY BE INTERRUPTED AND REQUIRED TO ANSWER

7  QUESTIONS.

8    THAT DOESN'T MEAN WE INTEND TO LIMIT YOUR TIME.  WE

9  CERTAINLY WANT TO HAVE A FULL ARGUMENT OF ALL OF THE ISSUES IN

10  THE CASE, BUT I'M SURE YOU HAVE SEEN FROM THE EARLIER

11  PROCEEDINGS THAT WE DO NOT INTEND TO JUST SIT HERE AND LISTEN.

12    WE ARE INTERESTED IN EXPLORING ISSUES WITH YOU DURING

13  THE CLOSING ARGUMENTS.  SO WITH THAT WELCOME AND INTRODUCTION,

14  WE ARE READY TO HEAR THE CLOSING ARGUMENTS.

15                    **<u>CLOSING ARGUMENT</u>**

16    **MR. SPECTER:**  GOOD MORNING AGAIN.  MY NAME DONALD

17  SPECTER FROM THE PRISON LAW OFFICE.  AS YOU KNOW, I REPRESENT

18  THE PLAINTIFFS IN THIS CASE.

19    **JUDGE KARLTON:**  I'M HAVING A LITTLE TROUBLE HEARING

20  YOU, MR. SPECTER.

21    **MR. SPECTER:**  IS THIS BETTER?

22    **JUDGE REINHARDT:**  A LITTLE BIT.  SPEAK UP.

23    **MR. SPECTER:**  OKAY.

24    **JUDGE REINHARDT:**  THAT'S BETTER.

25    **MR. SPECTER:**  I WILL ADDRESS WHETHER OVERCROWDING IS

 1  THE PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS IN THE PLATA

 2  CASE.

 3         MY COLLEAGUE, MR. BIEN, WILL SPEAK TO THE SAME ISSUE

 4  IN THE COLEMAN CASE.

 5         I WILL ALSO ADDRESS WHETHER THERE IS OTHER RELIEF

 6  THAT COULD RESOLVE THE CONSTITUTIONAL PROBLEMS AND IF NOT,

 7  WHETHER THE COURT SHOULD ISSUE A PRISONER RELEASE ORDER AND IF

 8  SO, WHAT THAT PRISONER RELEASE ORDER SHOULD LOOK LIKE.

 9         AS YOU MENTIONED, JUDGE REINHARDT, THIS IS A MIX OF

10  DISTRICT COURT AND COURT OF APPEAL PROCEEDINGS.  AS SUCH, I DO

11  NOT INTEND TO SUMMARIZE LIKE I WOULD IN A TRIAL.  THE

12  FINDINGS -- THE EVIDENCE, ESPECIALLY SINCE WE FILED WHAT I

13  THINK COULD EASILY BE CALLED AN EXHAUSTIVE SET OF FINDINGS OF

14  FACT AND CONCLUSIONS OF LAW WHERE --

15         **JUDGE REINHARDT:**  COULD YOU TRY ONCE MORE TO FIX THE

16  MICROPHONE?

17         **MR. SPECTER:**  OKAY.  SO I DON'T PLAN ON SUMMARIZING

18  THE EVIDENCE IN FULL AGAIN HERE TODAY.  INSTEAD, I LOOK FORWARD

19  TO ANSWERING THE QUESTIONS THAT YOU MAY POSE.

20         I WOULD LIKE TO EXPLAIN THE SIGNIFICANCE OF CERTAIN

21  RECENT DEVELOPMENTS AND TO RESPOND TO SOME OF THE POINTS MADE

22  IN THE FINDINGS AND CONCLUSIONS SUBMITTED BY MY COLLEAGUES ON

23  THE OTHER SIDE OF THE CASE.

24         YOU MAY RECALL THAT I CONCLUDED MY OPENING STATEMENT

25  WITH THE VIDEO OF GOVERNOR SCHWARZENEGGER DISCUSSING THE

1   HEALTHCARE CRISIS IN CALIFORNIA'S PRISONS AND THE STATE'S

2   RESPONSE TO THAT CRISIS.

3            HE SAID, QUOTE -- I CAN'T DO IT IN THE SAME WAY, BUT

4   HE SAID:

5            "I DON'T BLAME THE COURTS FOR STEPPING IN TO TRY

6        TO SOLVE THE HEALTHCARE CRISIS THAT WE HAVE, THE

7        OVERCROWDING CRISIS THAT WE HAVE, BECAUSE THE FACT OF

8        THE MATTER IS FOR DECADES THE STATE OF CALIFORNIA

9        HASN'T REALLY TAKEN IT SERIOUSLY.  IT HASN'T REALLY

10       DONE SOMETHING ABOUT IT."

11           WELL, RECENT DEVELOPMENTS PROVE ONCE AGAIN THAT THE

12   GOVERNOR WAS RIGHT WHEN HE SAID THOSE REMARKS AND THAT THIS

13   COURT MUST AGAIN STEP IN TO TRY TO SOLVE THE HEALTHCARE CRISIS

14   BECAUSE THE STATE IS INCAPABLE OF DOING SO.

15           RECENT ACTIONS TAKEN BY THE DEFENDANTS, IN OUR

16   OPINION, DESTROY TWO KEY COMPONENTS OF THE STATE'S DEFENSE IN

17   THIS CASE AND LEAVE THEM ONLY WITH THE WEAK ARGUMENT THAT

18   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROOF.

19           FIRST, CENTRAL TO THE STATE'S DEFENSE IN PLATA HAS

20   BEEN THE RECEIVERSHIP.  DEFENDANTS HAVE ARGUED IN THIS

21   PROCEEDING THAT A PRISONER RELEASE ORDER ISN'T NECESSARY

22   BECAUSE THE RECEIVER HAS BEEN AND WILL CONTINUE TO MAKE

23   IMPROVEMENTS.

24           LAST WEEK, HOWEVER, AS YOU PROBABLY KNOW, THE STATE

25   SOUGHT TO TERMINATE THE RECEIVERSHIP IN A MOTION BEFORE

 1   JUDGE HENDERSON.

 2           SO DEFENDANTS NOW ARGUE THAT THE VERY RELIEF THAT

 3   THEY BELIEVE SHOULD SAVE THEM FROM A PRISONER RELEASE ORDER

 4   MUST BE ELIMINATED, NOT, NOT BECAUSE PRISONERS ARE RECEIVING

 5   ADEQUATE CONSTITUTIONAL CARE, BUT BECAUSE THE RECEIVERSHIP,

 6   THEY CLAIM, IS NOT AUTHORIZED BY THE PLRA SEVERAL YEARS AFTER

 7   IT WAS FORMED.

 8           SINCE, IT HAS BEEN THE DEFENDANT'S POSITION THAT A

 9   RECEIVER IS NOT RELIEF WHICH THIS COURT CAN GRANT.  THEY CANNOT

10   ALSO ARGUE THAT THIS IS OTHER RELIEF THAT WOULD REMEDY THE

11   CONSTITUTIONAL VIOLATION IN THIS CASE.

12           AND EVEN IF THE COURT WERE TO CONSIDER SUCH

13   INCONSISTENT POSITIONS, THE RECEIVER'S OPINION THAT CROWDING IS

14   THE PRIMARY CAUSE OF THE HARM MAKES IT CLEAR THAT THIS

15   OPERATION ALONE WILL NOT BE SUFFICIENT TO CAUSE THESE GRAVE

16   CONSTITUTIONAL -- TO CURE THESE GRAVE CONSTITUTIONAL PROBLEMS.

17           SECOND --

18           **JUDGE KARLTON:**  MR. SPECTER, I RECOGNIZE THAT THERE

19   IS A QUESTION OF INHERENT AMBIGUITY, BUT -- WELL, OKAY.  NEVER

20   MIND.  I SEE.  OKAY, NEVER MIND.  GO AHEAD.

21           **MR. SPECTER:**  THANK YOU.

22           SECOND, DEFENDANTS, INCLUDING THE GOVERNOR, HAVE

23   ARGUED THAT ADDITIONAL PRISON CONSTRUCTION THROUGH AB900 AND

24   THE RECEIVER'S 10,000-BED PROJECT WILL RESOLVE THE

25   CONSTITUTIONAL VIOLATIONS.

1          THE GOVERNOR, HOWEVER, HAS VETOED LEGISLATION THAT

2    CONTAINED CLEANUP LANGUAGE NECESSARY TO ALLOW THE AB900 PROCESS

3    TO CONTINUE.

4          AND MR. CATE, ALSO A DEFENDANT IN THIS CASE ALONG

5    WITH THE GOVERNOR, BUT MR. CATE, WHO MADE THE RECEIVER'S

6    10,000-BED PROJECT ONE OF THE CORNERSTONES OF HIS PLAN TO

7    REDUCE CROWDING SOUGHT AND OBTAINED A STAY, PENDING APPEAL,

8    FROM THE NINTH CIRCUIT OF AN ORDER DESIGNED TO ENABLE THE

9    RECEIVER TO CONTINUE THAT VERY PROJECT.

10         THESE RECENT ACTIONS MAKE ONE THING PERFECTLY CLEAR.

11   REGARDLESS OF WHETHER CLEANUP LEGISLATION IS EVER ENACTED OR

12   THE RECEIVER IS ABLE TO PREVAIL ON THE APPEAL FROM

13   JUDGE HENDERSON'S ORDER IN WHICH THE STAY WAS ISSUED, THE COURT

14   CAN HAVE NO CONFIDENCE THAT THE STATE OF CALIFORNIA IS CAPABLE

15   OF SUSTAINING A STRATEGY FOR THE YEARS THAT IT'S GOING TO TAKE

16   TO END THE LIFE-THREATENING CONDITIONS THAT HAVE CONTINUED TO

17   EXIST FOR ALMOST TWO DECADES IN COLEMAN AND THE BETTER PART OF

18   ONE IN PLATA.

19         AS I THINK OUR PROPOSED FINDINGS MAKE CLEAR, THERE

20   SHOULD BE LITTLE DISPUTE THAT CROWDING IS THE PRIMARY CAUSE OF

21   CONSTITUTIONAL VIOLATIONS AT ISSUE HERE.

22         EVERYONE, SAVE PERHAPS DR. THOMAS, ACKNOWLEDGES THAT

23   IT ADVERSELY AFFECTS THE OPERATION OF THE PRISON SYSTEM AND

24   HEALTHCARE IN PARTICULAR.  THE ONLY QUESTION BEFORE THIS COURT

25   IS WHETHER IT IS THE PRIMARY CAUSE.

1           THE RECEIVER ANSWERED THIS QUESTION AFFIRMATIVELY AND

2    IN NO UNCERTAIN TERMS WHEN HE STATED IN HIS MOST RECENT REPORT

3    THAT:

4           "OVERCROWDING IS AND WILL CONTINUE TO BE THE

5        PRIMARY CAUSE OF THE STATE'S INABILITY TO DELIVER

6        CONSTITUTIONALLY ADEQUATE CARE."

7           THIS STATEMENT CLEARS UP ANY POSSIBLE AMBIGUITY ABOUT

8    HIS POSITION ON THIS CRITICAL ISSUE.

9           MR. KELSO'S OPINION IS CONSISTENT WITH THE OPINION OF

10   EVERY OTHER EXPERT WHO TESTIFIED IN THIS SUBJECT, SAVE ONE,

11   DR. THOMAS.

12          WHAT THIS MEANS IS THAT THERE ARE SIMPLY TOO MANY

13   PRISONERS TO TREAT IN THE SPACE THAT'S AVAILABLE.

14          AT AVENAL, FOR EXAMPLE, THERE ARE 7,525 PRISONERS IN

15   SPACES DESIGNED FOR 2,320.  THERE ARE TOO MANY PRISONERS FOR

16   THE PHYSICIANS AND OTHER CLINICAL STAFF TO CARE FOR.

17          THERE IS A 90 PERCENT VACANCY RATE OF THOSE PRIMARY

18   CARE CLINICIANS IN SOME PRISONS, AND OVERALL THERE IS A

19   27 PERCENT VACANCY RATE FOR PRIMARY CARE CLINICIANS IN THE

20   SYSTEM, WHICH IS SIX PERCENTAGE POINTS HIGHER THAN THE VACANCY

21   RATE WAS IN 2006, SHORTLY AFTER THE RECEIVER STARTED.

22          THERE IS NO ROOM TO HOUSE PRISONERS IN THE PRISON

23   WHERE THEY CAN GET THE CARE THEY NEED BECAUSE THERE ARE TOO

24   MANY PEOPLE IN THOSE PRISONS.  THERE ARE TOO MANY MEDICAL

25   RECORDS TO BE WRITTEN, STORED AND RETRIEVED IN A TIMELY MANNER.

1  THERE ARE TOO MANY PRISONERS WHO REQUIRE THE DELIVERY OF

2  MEDICATION.

3          AND AS THE GOVERNOR IMPLICITLY ACKNOWLEDGED IN HIS

4  EMERGENCY PROCLAMATION AND THAT THE CURRENT AND FORMER HEADS OF

5  THE PRISON SYSTEMS OF TEXAS, WASHINGTON, MAINE, PENNSYLVANIA,

6  AND MOST SIGNIFICANTLY CALIFORNIA TESTIFIED, OVERCROWDING IS

7  THE PRIMARY CAUSE OF THE CONTINUING CONSTITUTIONAL VIOLATIONS.

8          THE EVIDENCE IS UNCONTRADICTED THAT PRISONERS ARE

9  MURDERED IN THE DORMITORY SO LARGE THAT NO ONE CAN NOTICE, THAT

10 ANOTHER PRISONER BLED TO DEATH IN A GIGANTIC PRISON DOWN IN THE

11 CENTRAL VALLEY AND ANOTHER ONE STARVED WITHOUT ANYONE NOTICING.

12 STARVED TO DEATH WITHOUT ANYONE NOTICING UNTIL IT WAS TOO LATE.

13         THESE PRISONERS SUFFERED FROM MEDICAL PRACTICES WHICH

14 IN THE RECEIVER'S WORDS ARE, "EXTREME DEPARTURES FROM COMMUNITY

15 STANDARDS OF CARE."  AND MOST SHOCKINGLY, NOBODY REALLY KNOWS

16 THE FULL EXTENT OF THE SUFFERING.

17         BUT DR. SHANSKY'S UNCONTRADICTED TESTIMONY MAKES IT

18 CLEAR THAT THE RECEIVER'S MOST RECENT DEATH REVIEW REPORTS

19 FOUND OVER 200 INSTANCES OF EXTREME DEPARTURES OF CARE IN OVER

20 200 CASES.  AND THAT THOSE EXTREME DEPARTURES FROM CARE ARE

21 JUST THE TIP OF THE ICEBERG.

22         NOW, WHEN TALKING ABOUT DEATHS, IT IS IMPORTANT TO

23 REMEMBER THAT DEATH IS NOT THE CONSTITUTIONAL STANDARD.  THE

24 CONSTITUTIONAL STANDARD IS RISK OF HARM.

25         AND EVEN IF IT WERE THE CONSTITUTIONAL STANDARD, I

1    WANT TO REMIND THE COURT THAT EVEN THOUGH THE MORALITY RATE IS

2    GOING DOWN, THE NUMBER OF DEATHS WHICH WERE POSSIBLY

3    PREVENTABLE IS GOING UP AND THE EXTREME DEPARTURES FROM CARE

4    WHICH GIVE RISE TO THE RISK OF HARM, OF SERIOUS INJURY, ARE

5    EXTREMELY PREVALENT IN THE SYSTEM.

6            DEFENDANT'S MAIN POINT SEEMS TO BE THAT SINCE THERE

7    ARE MANY CAUSES OF THESE PROBLEMS, ONE CANNOT BE THE PRIMARY

8    CAUSE.  THE COURT CORRECTLY RESOLVED THIS ISSUE IN ITS ORDER

9    DENYING SUMMARY JUDGMENT, HOLDING THAT THE EXISTENCE OF A

10   PRIMARY CAUSE DOES NOT MEAN THAT IT IS THE ONLY CAUSE.

11           IN FACT, THE PLAIN LANGUAGE OF THE PLRA IMPLIES THE

12   EXACT OPPOSITE.

13           DEFENDANT'S OTHER CLAIM IS BASED ON UNREASONABLE

14   INFERENCES THAT THEY DRAW FROM DR. SHANSKY'S TESTIMONY.

15   DR. SHANSKY TESTIFIED THEORETICALLY THAT, QUOTE, IT'S POSSIBLE

16   AND, QUOTE, IT'S CONCEIVABLE TO PROVIDE ADEQUATE MEDICAL CARE

17   IN OVERCROWDED PRISONS.

18           FROM THIS, DEFENDANTS ASK THE COURT TO FIND THAT

19   OVERCROWDING IS NOT THE PRIMARY CAUSE OF THE CONSTITUTIONAL

20   VIOLATION IN CALIFORNIA'S PRISONS.

21           AS THE COURT NOTED SEVERAL TIMES DURING TRIAL,

22   ABSTRACT TESTIMONY THAT SOMETHING IS POSSIBLE OR CONCEIVABLE IS

23   OF LITTLE VALUE.

24           DR. SHANSKY TESTIFIED WITHOUT QUALIFICATION THAT AT

25   THE CURRENT TIME, OVERCROWDING IN CALIFORNIA'S PRISONS IS THE

1  PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS.  DEFENDANTS'

2  UNREASONABLE INFERENCES ARE INCONSISTENT WITH THAT CLEAR AND

3  DIRECT TESTIMONY.

4          DEFENDANTS ALSO POINT TO THE FACT THAT AT SOME

5  PRISONS THERE HAVE BEEN IMPROVEMENTS.  THEY NOTE, FOR EXAMPLE,

6  MULE CREEK.  AND THE IMPLICATION FROM THEIR FINDINGS IS THAT --

7  THAT THEY WOULD LIKE YOU TO DRAW -- OR THE INFERENCE THAT THEY

8  WOULD LIKE YOU TO DRAW IS BECAUSE MULE CREEK WAS OVERCROWDED

9  AND THERE HAVE BEEN SOME IMPROVEMENTS, OVERCROWDING ISN'T THE

10  PRIMARY CAUSE.  THE LOGIC THAT THEY SEEK TO USE FAILS BECAUSE

11  IT IS A FAULTY PREMISE.

12          NO WITNESS EXPRESSED AN OPINION THAT THE MEDICAL CARE

13  AT MULE CREEK IS CONSTITUTIONALLY ADEQUATE, BUT THE EVIDENCE

14  THAT THE DEFENDANTS PRESENTED TO THE COURT SHOWS THAT

15  MULE CREEK IS NOT PROVIDING ADEQUATE CARE.

16          FOR EXAMPLE, DEFENDANT'S EXHIBIT 1084, WHICH IS AN

17  INSPECTION CONDUCTED BY THE OFFICE OF THE INSPECTOR GENERAL,

18  FOUND POOR COMPLIANCE WITH MEDICATION POLICIES, INADEQUATE TB

19  PREVENTION POLICIES, INADEQUATE TREATMENT PLANS, INCLUDING

20  THOSE FOR PATIENTS WITH SERIOUS CHRONIC DISEASES.

21          DEFENDANT'S EXHIBIT 1227, WHICH IS THE RECEIVER'S

22  REPORT ON SPACE ISSUES AT MULE CREEK, STATES THAT PRISONERS ARE

23  NOT RECEIVING TIMELY CARE.  THERE IS A BACKLOG OF REQUESTS FOR

24  MEDICAL ATTENTION, CLINIC FUNCTIONS THAT TAKE PLACE IN

25  INAPPROPRIATE AREAS, AND THERE ARE SEVERAL PROBLEMS WITH

1   MEDICATION DISTRIBUTION.

2            ALL THE OVERWHELMING WEIGHT OF THE EVIDENCE SUGGESTS,

3   PROVES THAT OVERCROWDING IS THE PRIMARY CAUSE OF THE CONTINUING

4   CONSTITUTIONAL MEDICAL CARE VIOLATIONS.

5            ASSUMING THAT CROWDING IS THE PRIMARY CAUSE,

6   DEFENDANTS ARGUE THAT A PRISONER RELEASE ORDER IS NOT NECESSARY

7   BECAUSE OTHER RELIEF WILL BE EFFECTIVE IN ACHIEVING THE

8   CONSTITUTIONAL COMPLIANCE.

9            THE BASIS OF THAT ARGUMENT IS THE RECEIVERSHIP,

10  WHICH, AS I HAVE ALREADY EXPLAINED, DEFENDANTS ARE SEEKING TO

11  ABOLISH.

12           IF THEIR MOTION BEFORE JUDGE HENDERSON IS

13  UNSUCCESSFUL, THE QUESTION THEN IS WHETHER THE RECEIVER'S

14  EFFORTS WILL BE SUFFICIENT.

15           BUT IF OVERCROWDING IS THE PRIMARY CAUSE, AS I THINK

16  YOU MUST FIND, THEN IT STANDS TO REASON THAT CROWDING MUST BE

17  ADDRESSED TO REMEDY THE CONSTITUTIONAL VIOLATION.

18           THE OVERWHELMING EVIDENCE AT TRIAL SUPPORTS THIS

19  CONCLUSION MOST NOTABLY FROM THE FORMER SECRETARY OF THE

20  DEPARTMENT OF CORRECTIONS AND REHABILITATION, NOT MISS WOODFORD

21  WHO TESTIFIED HERE, BUT MR. TILTON.  SPEAKING IN PART ABOUT

22  HEALTHCARE, HE ADMITTED, QUOTE:

23           "THAT UNTIL I GET OVERCROWDING REDUCED, THEN I

24       DON'T HAVE THE OPPORTUNITY TO PROVIDE THE PROGRAM

25       THAT I BELIEVE IS MY CHARGE."

1        AGAIN, IF PROBLEMS WERE LIMITED TO A SHORTAGE OF

2   CLINICIANS TO TREAT THE PRISONERS, THERE MIGHT BE AN

3   ALTERNATIVE REMEDY, BUT THAT IS NOT THE PROBLEM.  THE PROBLEM

4   IS THAT THE ENTIRE SYSTEM IS COLLAPSING BECAUSE OF

5   OVERCROWDING.

6        OVERCROWDING CAUSES LOCKDOWNS WHICH, IN TURN, INHIBIT

7   CARE AND CAUSE ILLNESS.  CROWDING CREATES TEXTBOOK SCENARIOS

8   FOR THE SPREAD OF INFECTIOUS DISEASE.  CROWDING ITSELF

9   INCREASES MENTAL ILLNESS AND SUICIDE, AS MR. BIEN WILL TALK

10  ABOUT, AND AS THE EXPERTS, CORRECTIONAL -- FORMER CORRECTIONAL

11  EXPERTS TESTIFIED AT LENGTH, CROWDING MAKES THE PRISON

12  IMPOSSIBLE TO MANAGE.

13        ALL OF THE PLAINTIFFS' CORRECTIONAL EXPERTS

14  TESTIFIED THAT CROWDING IS ESSENTIAL TO REMEDY THE

15  CONSTITUTIONAL VIOLATION, AND THERE WAS LITTLE EVIDENCE ON THE

16  OTHER SIDE OF THAT QUESTION.

17        WHEN ASKED WHAT THE COURT SHOULD DO IF CROWDING WAS

18  FOUND TO BE THE PRIMARY CAUSE, SHERIFF HENNESSY TESTIFIED THAT

19  THE POPULATION SHOULD BE REDUCED.

20        THE TESTIMONY OF OTHER CORRECTIONAL ADMINISTRATORS,

21  SUCH AS MR. TILTON AND MR. CATE, THAT CROWDING ITSELF SEVERELY

22  HAMPERS THE CDCR'S ABILITY TO MANAGE THE PRISON LEADS TO THE

23  REASONABLE INFERENCE THAT CROWDING MUST BE REDUCED IF THERE IS

24  TO BE ANY HOPE OF RESOLVING THESE CRITICAL ISSUES.

25        THE TESTIMONY OF DEFENDANTS' HEALTHCARE EXPERTS, DRS.

1  PACKER AND THOMAS, ALSO SUPPORTS PLAINTIFFS' CASE BECAUSE THEY

2  BOTH TESTIFIED THAT THE SYSTEMS THAT THEY WORKED IN HAVE

3  POPULATION CAPS.

4          THAT BRINGS US TO THE QUESTION OF RELIEF.

5          IF YOU FIND, AS I THINK YOU MUST, THAT NO OTHER

6  RELIEF WOULD BE PROVIDING EFFECTIVE REMEDY, YOU MUST --

7          **JUDGE REINHARDT:**  COUNSEL, LET ME ASK YOU A QUESTION

8  ABOUT YOUR UNDERSTANDING OF THE TERM "RELIEF."  YOU SAID "NO

9  OTHER RELIEF."

10          DO YOU UNDERSTAND THAT TO MEAN TO BE NO OTHER RELIEF

11  THAT MAY BE ORDERED BY THE COURT OR NO OTHER RELIEF IN A

12  BROADER SENSE; THAT THERE IS NOTHING ELSE THAT THE STATE COULD

13  DO TO ABOLISH IT?

14          **MR. SPECTER:**  I THINK THE STATUTE MEANT NO OTHER

15  RELIEF THAT COULD BE ORDERED BY THE COURT.  I THINK IF THERE

16  WERE CIRCUMSTANCES THAT WOULD AMELIORATE THESE OTHER CROWDING

17  CONDITIONS, YOU MIGHT CONSIDER THEM IN THE APPROPRIATE EXERCISE

18  OF YOUR EQUITABLE JURISDICTION, BUT I DON'T THINK -- I DON'T

19  THINK CONGRESS --

20          **JUDGE REINHARDT:**  EXACTLY A LAWYER'S ANSWER.

21          **JUDGE KARLTON:**  HE IS A LAWYER.

22          **JUDGE REINHARDT:**  I CAN TELL.

23          **MR. SPECTER:**  I'D GIVE YOU A MEDICAL ANSWER, BUT I'M

24  NOT QUALIFIED.

25          **JUDGE REINHARDT:**  THE STATUTE SAYS THAT WE CAN ISSUE

1   AN ORDER ONLY IF THE COURT FINDS BY CLEAR AND CONVINCING

2   EVIDENCE THAT NO OTHER RELIEF WILL REMEDY THE VIOLATION OF THE

3   FEDERAL RIGHT.

4            NOW, FOR EXAMPLE, I SUPPOSE LEAVING ASIDE THE TIME

5   ELEMENT, YOU COULD SAY, WELL, IF WE BUILT 100 MORE PRISONS,

6   THAT COULD REMEDY THE VIOLATION.

7            **MR. SPECTER:**  RIGHT.

8            **JUDGE REINHARDT:**  LEAVING ASIDE THE TIME ELEMENT.

9            **MR. SPECTER:**  THE TIME ELEMENT?

10           **JUDGE REINHARDT:**  YES.  THE FACT THAT IT MIGHT TAKE A

11  NUMBER OF YEARS AND THAT THAT MIGHT NOT BE AN ADEQUATE REMEDY.

12           LEAVING THAT ASIDE, LET'S ASSUME IF THE STATE CAME IN

13  AND SAID WE COULD BUILD A THOUSAND PRISONS TOMORROW, WE WILL

14  HAVE THEM ALL SET UP IN WAREHOUSES AND STRING THEM OUT, WOULD

15  THAT BE OTHER RELIEF THAT WOULD REMEDY THE VIOLATION OF THE

16  FEDERAL RIGHT UNDER THE STATUTE THAT SAYS WE CANNOT DO IT

17  UNLESS THERE IS NO OTHER RELIEF?

18           DOES THAT MEAN NO OTHER RELIEF WE CAN ORDER OR NO

19  OTHER RELIEF THAT COULD EXIST IN THE WORLD?

20           **MR. SPECTER:**  WELL, LET ME GIVE YOU A LEGAL ANSWER TO

21  THAT QUESTION.

22           THE STATUTE THAT GUIDES PROSPECTIVE RELIEF IN ANOTHER

23  SECTION, AND IN THAT PROSPECTIVE RELIEF -- I CAN'T REMEMBER THE

24  EXACT LANGUAGE, BUT IT TALKS ABOUT THE TYPE OF INJUNCTIONS,

25  CONSENT DECREES, THOSE TYPE OF THINGS.  SO ONE COULD --

 1          **JUDGE REINHARDT:**  THE SECTION WE WERE READING TALKS

 2   ABOUT TERMINATION OF PROSPECTIVE RELIEF.

 3          YOU CAN SAY YOU DON'T HAVE A POSITION ON THAT

 4   QUESTION IF YOU LIKE.

 5          **MR. SPECTER:**  WELL, OKAY.  I THINK WHAT CONGRESS

 6   MEANT WHEN THEY USED THE TERM "RELIEF" IS THAT THEY MEANT COURT

 7   ORDERED RELIEF.  IF IN YOUR HYPOTHETICAL QUESTION THERE WERE A

 8   THOUSAND PRISONS AVAILABLE TO REDUCE CROWDING TOMORROW --

 9          **JUDGE KARLTON:**  WE COULD ORDER THAT.

10          **MR. SPECTER:**  YEAH.  I DON'T BELIEVE THAT -- I MEAN,

11   I COULD UNDERSTAND THE COURT THINKING, WELL, MAYBE WE SHOULDN'T

12   ORDER -- ISSUE INJUNCTIVE RELIEF AT THIS POINT BECAUSE THE

13   SITUATION IS GOING TO BE RESOLVED TOMORROW.  THAT ISN'T THE

14   CASE TODAY, SO I DON'T REALLY THINK YOU HAVE TO REACH THAT

15   QUESTION.

16          **JUDGE REINHARDT:**  I WAS JUST TRYING TO GIVE YOU SOME

17   EXAMPLES.  YOU DON'T HAVE TO DEAL WITH THE EXAMPLES.  I'M

18   ASKING FOR YOUR CONSTRUCTION IN PARAGRAPH E, WHICH SAYS -- IT

19   REACHES THE HEART OF --

20          **MR. SPECTER:**  HERE IT IS, JUDGE.  I'VE GOT IT.  I'M

21   SORRY TO INTERRUPT YOU.

22          G-9 SAYS:

23          "THE TERM 'RELIEF' MEANS ALL RELIEF IN ANY FORM

24       THAT MAY BE GRANTED OR APPROVED BY THE COURT."

25          **JUDGE REINHARDT:**  SO GRANTED OR APPROVED.  IN OTHER

1  WORDS, RELIEF THAT'S BEYOND OUR JURISDICTION TO GRANT.

2         MR. SPECTER:  RIGHT.

3         JUDGE REINHARDT:  IS NOT --

4         JUDGE KARLTON:  IS NOT CONTEMPLATED BY THE STATE.

5         JUDGE REINHARDT:  RIGHT.  IS NOT INCLUDED IN THE

6  STATUTE WHEN IT SAYS WE CAN'T ORDER A RELEASE ORDER UNLESS WE

7  FIND THAT NO OTHER RELIEF WILL REMEDY THE VIOLATION.  THAT

8  MEANS NO OTHER RELIEF WE CAN GRANT.

9         MR. SPECTER:  YES.

10         JUDGE REINHARDT:  OKAY.

11         JUDGE KARLTON:  CAN I TURN YOUR ATTENTION TO WHERE I

12  THINK YOU ARE GOING ANYHOW, WHICH IS WHAT FORM OF RELIEF?

13         ALTHOUGH THE PROPOSED FINDINGS OF FACT SUBMITTED BY

14  THE PLAINTIFF IS A REMARKABLE DOCUMENT, AND I WANT YOU TO KNOW

15  I REALLY BELIEVE THAT --

16         MR. SPECTER:  THANK YOU.

17         JUDGE KARLTON:  -- ONE ASPECT OF IT IS THE REPEATED

18  ASSERTION THAT THE INTERVENOR'S RESPONSES ARE EXAGGERATED.

19         EVEN IF THEY WERE SOMEWHAT EXAGGERATED, AND I'M NOT

20  EVEN SURE THAT'S TRUE, BUT EVEN IF THEY WERE SOMEWHAT

21  EXAGGERATED, THERE IS NO QUESTION THAT THIS WILL HAVE -- IF WE

22  WERE TO ISSUE A PRISONER RELEASE ORDER, IT WOULD HAVE A

23  PROFOUND EFFECT UPON THE LOCAL COMMUNITIES.

24         IS THAT AN APPROPRIATE CONCERN OF THE COURT?  THAT'S

25  NUMBER ONE.  THAT IS, IS IT SOMETHING WE CAN CONSIDER OR IS IT

 1  -- OUR RESPONSE IS, LOOK, THERE IS A CONSTITUTIONAL VIOLATION.

 2  WE'VE GOT TO DO WHAT WE'VE GOT TO DO.  IT'S UP TO THE STATE AND

 3  COUNTIES TO WORK OUT HOW THAT GETS DONE SO AS TO MINIMIZE THE

 4  CONSEQUENCES.

 5          THAT'S NUMBER ONE.

 6          AND NUMBER TWO, IS IT APPROPRIATE FOR THE COURT IF WE

 7  REACH THIS POINT TO ORDER THE STATE TO AT LEAST SHARE SOME OF

 8  THE SAVINGS THAT IT WILL ACHIEVE?  IS THAT AN APPROPRIATE THING

 9  FOR THIS COURT TO DO?

10          THOSE ARE TWO SEPARATE QUESTIONS.

11          **MR. SPECTER:**  YES, YOUR HONOR.  AND I HAVE PREPARED

12  AN ANSWER AS TO THE SECOND ONE, WHICH I HOPE WILL BE

13  PERSUASIVE.

14          ON THE FIRST POINT, I THINK YOU ABSOLUTELY MUST

15  CONSIDER UNDER THE STATUTE ANY POTENTIAL ADVERSE IMPACT ON

16  PUBLIC SAFETY.

17          **JUDGE KARLTON:**  NO, NOT POTENTIAL.  NOT POTENTIAL.

18  BUT ADVERSE EFFECT UPON PUBLIC SAFETY.

19          **MR. SPECTER:**  YOU ARE RIGHT.  YOU'RE RIGHT.

20          **JUDGE KARLTON:**  THIS IS VERY IMPORTANT.

21          **MR. SPECTER:**  YES.

22          **JUDGE KARLTON:**  GIVEN THE APPARENTLY UNDISPUTED

23  AGREEMENT PLAINTIFFS, DEFENDANTS, EVERYBODY, THAT THE PRESENT

24  PRISON SYSTEM IS CRIMINOGENIC, IT SEEMS TO ME THAT ARGUMENTS

25  ABOUT PUBLIC SAFETY ARE PROBABLY NOT ALL THAT PERSUASIVE.

1           THAT DOESN'T DENY THE REALITY THAT IF WE RELEASE

2   PEOPLE, IT WILL HAVE A VERY PROFOUND EFFECT, VERY PROFOUND, A

3   VERY PROFOUND EFFECT UPON THE COUNTIES' ABILITY TO FUNCTION.

4           **MR. SPECTER:**  RIGHT.

5           **JUDGE KARLTON:**  CAN WE CONSIDER THAT?  OUGHT WE TO

6   CONSIDER THAT?

7           **MR. SPECTER:**  FIRST I WOULD LIKE TO TAKE SOME ISSUE

8   WITH YOUR PREMISE, SINCE THIS IS ARGUMENT.

9           **JUDGE KARLTON:**  ALL RIGHT.

10          **MR. SPECTER:**  AND THEN I WOULD LIKE TO ANSWER YOUR

11  QUESTION AFTER THAT.

12          **JUDGE KARLTON:**  ALL RIGHT.

13          **MR. SPECTER:**  ALL OF THE INFORMATION THAT WE

14  PRESENTED TO YOU, AND SOME OF THE INFORMATION THAT THE STATE

15  PRESENTED TO YOU, SUGGESTS THAT A PRISONER RELEASE ORDER WILL

16  NOT HAVE THE KIND OF PROFOUND IMPACT THAT THE INTERVENORS AND

17  IN SOME RESPECTS THE STATE ARE ARGUING.

18          THIS HAS BEEN DONE ACROSS THE COUNTRY, IN CANADA,

19  IT'S BEEN DONE IN MANY COUNTIES THROUGHOUT CALIFORNIA.  AND IN

20  NONE OF THOSE COUNTIES, NONE OF THOSE STATES, AND IN CANADA AND

21  IN CITIES HAS THE CRIME RATE INCREASED AS A RESULT OF THAT.

22          AND I THINK DR. AUSTIN SHOWED YOU THAT THE IMPACT OF

23  THE ARRESTS OF PAROLEES -- IN OTHER WORDS, THE ADDITIONAL

24  PEOPLE WHO ARE GOING TO COME OUT -- IS NOT GOING TO BE

25  PROFOUND.  IT'S GOING TO BE RELATIVELY, IN MY VIEW,

1  INSIGNIFICANT IN TERMS OF NUMBERS.  REMEMBER --

2          **JUDGE REINHARDT:**  EVEN IF THAT'S NOT SHOWN, IT'S

3  CLEAR THAT SOME OF THE PEOPLE WOULD BE RELEASED WITHOUT

4  RECEIVING SOME OF THE TREATMENT THAT IS DESIRABLE TO MAKE IT

5  POSSIBLE FOR THEIR REENTRY INTO SOCIETY.

6          **MR. SPECTER:**  YES, YOUR HONOR.

7          **JUDGE REINHARDT:**  WHICH THE COUNTIES SHOULD -- A

8  BURDEN THE COUNTIES SHOULD UNDERTAKE, AND WHETHER IT -- EVEN

9  MORE THAN WHETHER IT AFFECTS THE CRIME RATE, IT'S WHETHER THAT

10 PEOPLE WHO ARE BEING RELEASED SHOULD BE TRAINED FOR EMPLOYMENT,

11 SHOULD RECEIVE DRUG TREATMENT, SHOULD RECEIVE OTHER TREATMENT

12 THAT ALLOWS THEM BETTER TO INTEGRATE INTO SOCIETY.

13         AND I THINK JUDGE KARLTON'S QUESTION, HOWEVER YOU

14 VIEW IT, IS WHEN WE KNOW THAT IF THE RELEASE ORDER, WHICH IS A

15 VERY BROAD TERM, WOULD RESULT IN SUBSTANTIAL SAVINGS TO THE

16 STATE, ALL RIGHT, THE QUESTION IS, DOES THE COURT HAVE THE

17 AUTHORITY TO DIVERT SOME OF THOSE SAVINGS OUT OF THE PRISON

18 BUDGET TO -- THE STATE IS NOW HELPING THE COUNTIES IN A SENSE.

19         DO WE HAVE THE AUTHORITY TO DIRECT THE STATE TO

20 DIVERT SOME OF THOSE SAVINGS TO THE COUNTIES?

21         **JUDGE KARLTON:**  AND TO FOLLOW UP PRECISELY WHAT

22 JUDGE REINHARDT IS ASKING YOU TO EXPLORE, IS IT AN APPROPRIATE

23 CONSIDERATION OF OURS -- AN ARGUMENT CAN BE MADE, IT SEEMS TO

24 ME -- I'M NOT SAYING IT SHOULD BE MADE, BUT CAN BE MADE.  LOOK,

25 THAT'S A PROBLEM OF THE STATE AND THE COUNTIES AND THEY ARE

1   GOING TO HAVE TO WORK IT OUT.

2           OUR OBLIGATION IS TO ENSURE ADEQUATE MEDICAL CARE AND

3   ADEQUATE MENTAL HEALTH CARE.  THAT CAN BE ACCOMPLISHED ONLY BY

4   RELEASING THE PRISONERS AND WHATEVER HAPPENS AFTER THAT, AS

5   LONG AS IT DOESN'T SIGNIFICANTLY AFFECT PUBLIC SAFETY, THAT'S A

6   PROBLEM OF THE STATE.  THAT'S AN ARGUMENT THAT CAN BE MADE.

7           IS IT AN APPROPRIATE ARGUMENT?  AND IF IT IS NOT AN

8   APPROPRIATE ARGUMENT, THEN WE COME BACK TO JUDGE REINHARDT'S

9   VERY SERIOUS QUESTION, WHICH IS:  ARE WE CAPABLE OF AND SHOULD

10  WE ORDER THE STATE TO SHARE THE SAVINGS?

11          **MR. SPECTER:**  I WILL ANSWER YOUR QUESTION DIRECTLY.

12  AFTER I ANSWER IT, I WOULD LIKE TO COME BACK TO THE PREMISE OF

13  THE QUESTION AGAIN.

14          THE ANSWER TO THE QUESTION IS NO, I DON'T BELIEVE YOU

15  SHOULD ORDER FUNDING TO THE COUNTIES.  AND LET ME EXPLAIN --

16          AND THE ANSWER TO YOUR QUESTION IS, I THINK THE

17  ARGUMENT THAT YOU MADE IS THE RIGHT ONE AND --

18          **JUDGE KARLTON:**  I'M NOT SAYING --

19          **MR. SPECTER:**  BUT I AM.  I AM --

20          **JUDGE REINHARDT:**  MY QUESTION IS:  DO WE HAVE THE

21  AUTHORITY TO?

22          **MR. SPECTER:**  NO.  I DON'T THINK -- I DON'T THINK YOU

23  HAVE THE AUTHORITY TO.  I DON'T WANT YOU TO.  WE ARE NOT ASKING

24  FOR IT.  AND LET ME --

25          **JUDGE KARLTON:**  WE ARE NOT BOUND BY WHAT YOU ARE

 1  ASKING.  ONE OF THE PROBLEMS --

 2          **JUDGE REINHARDT:**  NOR DO WE PARTICULARLY CARE WHAT

 3  YOU ARE ASKING.

 4          THE QUESTION IS:  IS THAT THE RIGHT AND PROPER THING

 5  TO DO IF YOU GET THE KIND OF ORDER YOU WANT?  SHOULDN'T THE

 6  COUNTIES HAVE SOME ADDITIONAL FUNDING TO TRY TO DETAIL WITH THE

 7  PROBLEM YOU HAVE CREATED?

 8          AND I'M NOT SURE WHY YOU DON'T WANT THE COUNTIES TO

 9  HAVE THE BENEFIT OF THE SAVINGS.

10          **JUDGE KARLTON:**  HE IS SAYING WE DON'T HAVE THE

11  REPORT.

12          **JUDGE REINHARDT:**  HE SAID, "I DON'T WANT YOU TO."

13          **MR. SPECTER:**  NO, I DON'T WANT YOU TO ORDER IT

14  BECAUSE I'M NOT SURE YOU HAVE -- I DON'T THINK YOU HAVE THE

15  AUTHORITY TO DO IT.

16          DO I WANT IT PERSONALLY?  YES.  I THINK EVERYBODY IN

17  THIS ROOM PROBABLY WANTS IT.

18          **JUDGE REINHARDT:**  I'M NOT SURE THAT YOU REPRESENT THE

19  STATE.

20          **MR. SPECTER:**  WELL, I'M NOT SAYING WHAT THEY ARE --

21  REGARDLESS OF THAT, I PERSONALLY THINK IT WOULD BE A RATIONAL

22  THING FOR THE STATE TO DO IF THE STATE IS CONCERNED ABOUT

23  PUBLIC SAFETY.

24          BUT, REMEMBER, THIS CASE IS BEING APPEALED DIRECTLY

25  TO THE SUPREME COURT AND THE SUPREME COURT HAS SAID ON MANY

1  OCCASIONS THAT THE COURT MUST INTRUDE AS LITTLE AS POSSIBLE

2  ONTO STATE CONCERNS, ESPECIALLY ONES SUCH AS CRIMINAL JUSTICE

3  POLICY.

4          AND THE MOST NARROW REMEDY IS FOR YOU TO ORDER THEM

5  TO REDUCE THE POPULATION TO AN ACCEPTABLE LEVEL, AND THEN HOW

6  IT DOES THAT AND WHAT LEVEL OF PUBLIC SAFETY THE STATE WANTS TO

7  SUPPORT THROUGH FUNDING IS A MATTER UP TO THE STATE.

8          **JUDGE REINHARDT:**  WELL, WE ARE SUPPOSED TO CONSIDER

9  THE EFFECTS ON THE PUBLIC SAFETY.  AND SO IT'S NOT ENOUGH TO

10 SAY RELEASE, HAVE A CAP WHICH WOULD RESULT IN THE RELEASE OF

11 PRISONERS.

12         IF THE STATE SAID, WELL, WE'RE GOING TO RELEASE THE

13 40,000 MOST DANGEROUS PRISONERS, THAT WOULD HAVE A FAR GREATER

14 EFFECT ON PUBLIC SAFETY THAN IF THEY DID IT THROUGH SOME PAROLE

15 REFORM EXPERIENCES.

16         I DON'T SEE HOW WE CAN ANSWER THE QUESTION OF THE

17 EFFECT ON PUBLIC SAFETY WITHOUT KNOWING HOW THE STATE WOULD

18 IMPLEMENT THIS ORDER.

19         **JUDGE KARLTON:**  I DON'T WANT TO KEEP INTERRUPTING

20 YOU, BUT THIS IS REALLY THE -- IN MY VIEW, A CRUX QUESTION.

21         I DON'T THINK THAT THERE IS ANY DOUBT THAT WE CAN SAY

22 SOMETHING TO THE STATE IN CONSIDERING A RELEASE ORDER, IF

23 THAT'S WHAT WE ORDER; THAT YOU CONSIDER RELEASING THOSE PERSONS

24 WHO ARE THE LEAST LIKELY TO REPRESENT A DANGER TO THE PUBLIC.

25         I THINK WE CAN SAY YOU'VE GOT TO RELEASE DRUG ADDICTS

1   RATHER THAN MURDERERS.  I THINK WE CAN SAY THAT.

2          **MR. SPECTER:**  YOU CAN SAY, LIKE JUDGE REINHARDT

3   IMPLIED, WHATEVER YOU THINK IS APPROPRIATE.

4          MY ADVICE IS THAT YOU ORDER THE STATE TO COME UP WITH

5   A PLAN.  THE STATE WILL COME UP WITH A PLAN IN CONSULTATION

6   WITH THE PARTIES.

7          IF ANY PARTY BELIEVES THAT THERE ARE OBJECTIONS TO

8   THAT PLAN -- IN OTHER WORDS, THE COUNTY INTERVENORS BELIEVE

9   THAT IT COULD BE DONE IN A SAFER, MORE APPROPRIATE WAY -- THAT

10  WOULD BE THE APPROPRIATE TIME TO RAISE THAT OBJECTION.  IT

11  WOULD ALSO BE THE APPROPRIATE TIME FOR THE COURT TO CONSIDER

12  THE OTHER ISSUES.

13         THE STATE TAKES AS ONE OF ITS FIRST RESPONSIBILITIES,

14  IT SAYS, PUBLIC SAFETY.  SO WOULDN'T THE APPROPRIATE WAY TO

15  HANDLE THIS BE TO GIVE THE STATE THE OPPORTUNITY TO PROVIDE A

16  PLAN THAT IT BELIEVES WILL BE CONSISTENT WITH ITS VIEW OF

17  PUBLIC SAFETY?

18         **JUDGE REINHARDT:**  WELL, I'M NOT SURE.  WE MAY BE

19  GETTING A LITTLE BIT AHEAD, BUT NOT NECESSARILY.  BECAUSE IN

20  ORDER TO DECIDE, ONE SHOULD LOOK TO THE FUTURE AND SEE WHAT IT

21  MEANS.  AND IF WE ARE CONSIDERING THE PUBLIC SAFETY AS AN

22  ISSUE, WE HAVE TO KNOW WHAT THE STATE WOULD DO.

23         WE CAN'T SAY STEP ONE, FOR EXAMPLE, YES, THIS COULD

24  BE DONE IN A MANNER THAT WOULD PROTECT THE PUBLIC SAFETY OR

25  WOULD NOT HAVE CONSIDERATION OF THAT.

 1          AND THIS IS ALL AN ABSTRACT THEORETICAL DISCUSSION,

 2   BUT SUPPOSE WE WERE TO CONCLUDE, YES, WE HAVE HEARD A LOT OF

 3   TESTIMONY AND THIS COULD BE DONE IN A WAY THAT DOES NOT AFFECT

 4   THE PUBLIC SAFETY.  AND THEN WE SAY TO THE STATE, WELL, TELL US

 5   HOW YOU WANT TO DEAL WITH IT.

 6          **MR. SPECTER:**  RIGHT.

 7          **JUDGE REINHARDT:**  AND THE STATE SAYS, WELL, WE WANT

 8   TO RELEASE ALL THE AXE MURDERERS WE CAN FIND, WHICH MAY SOUND

 9   IRRATIONAL.  BUT AT TIMES THE STATE HAS NOT BEEN ENTIRELY

10   RATIONAL.

11          **JUDGE KARLTON:**  INDEED, IF YOU READ MY

12   CORRESPONDENCE, I GET A LETTER A WEEK FROM SOMEBODY WHO IS

13   DOING A LIFE TERM FOR MURDER WHO SAYS, WE ARE THE LEAST LIKELY

14   PEOPLE IN THE WORLD TO RECIDIVATE.

15          **MR. SPECTER:**  AND IT'S NOT IN EVIDENCE, BUT THAT'S,

16   IN FACT, TRUE.

17          **JUDGE REINHARDT:**  ANYWAY, TO GET BACK -- SO YOUR

18   POINT IS WE COULD SAY THAT IT COULD BE DONE.

19          **MR. SPECTER:**  YES.

20          **JUDGE REINHARDT:**  BUT WE HAVE A RESPONSIBILITY FOR

21   PUBLIC SAFETY, WHATEVER WE ORDER.  AND IF WE ORDER A CAP AND

22   THEN THE STATE DECIDES WE ARE GOING TO DO THIS IN A WAY THAT'S

23   DANGEROUS TO THE PUBLIC SAFETY, YOU SAY THAT THAT COMES UP AT

24   THE FINAL STAGE OF THE PROCEEDING AFTER WE HAVE ORDERED A CAP

25   AND ORDERED THE STATE TO REPORT BACK WITH A PLAN.

 1            AND THEN THE OTHER PARTIES WOULD OBJECT, THAT IT

 2   DOESN'T PROTECT THE PUBLIC SAFETY SUFFICIENTLY.  AND THEN WHAT?

 3   THEN DO WE HAVE THE AUTHORITY TO TELL THE STATE HOW TO DO IT?

 4        **MR. SPECTER:**  I DIDN'T BRIEF THAT QUESTION.  I

 5   DON'T -- I DON'T KNOW AT THAT POINT.

 6            YOU KNOW, I THINK AT THIS POINT THAT THE COURSE OF

 7   ACTION THAT WE HAVE SUGGESTED IS THE RIGHT ONE.

 8            IF, IN FACT, THE STATE DOESN'T COME UP WITH AN

 9   ADEQUATE PLAN AND YOU FIND THAT THEY'VE BEEN GIVEN THE

10   OPPORTUNITY TO COME UP WITH AN ADEQUATE PLAN, AND THERE ARE

11   WAYS IN WHICH IT CAN BE DONE SAFELY AND THE STATE CHOOSES NOT

12   TO DO THAT, THEN I MAY VERY WELL REVISE MY ANSWER ABOUT YOUR

13   AUTHORITY.

14        **JUDGE KARLTON:**  JUDGE JACK WEINSTEIN OF THE EASTERN

15   DISTRICT OF NEW YORK AND I'VE HAD THIS ONGOING CONVERSATION.

16   HIS VIEW OF CASES LIKE THIS IS IF THE COURT ORDERS THE REMEDY,

17   IT DOESN'T DO ANYTHING ELSE; AND IF SOMEBODY THINKS THAT THOSE

18   WHO HAVE BEEN ORDERED TO REMEDY FAIL, THEY CAN BRING AN ORDER

19   IN CONTEMPT.

20            YOU KNOW, I HAVE SAID NO, THAT'S NOT THE RIGHT WAY.

21   WELL, OBVIOUSLY, I'VE GOT A SPECIAL MASTER AND BEEN WORKING AT

22   IT FOR A LOT OF YEARS.

23        **JUDGE REINHARDT:**  BUT YOUR ANSWER IS YOU WOULD LIKE

24   TO CONSIDER REVISING YOUR ANSWER WHEN WE GET TO THE --

25        **MR. SPECTER:**  WHEN WE SEE WHAT THE DEFENDANT IS GOING

1   TO DO.

2              **JUDGE REINHARDT:**  SHOULD WE EVER REACH THAT POINT.

3         **MR. SPECTER:**  YES, YOUR HONOR.

4         **JUDGE REINHARDT:**  ALL RIGHT.

5         **MR. SPECTER:**  AND I WANT TO MAKE A COUPLE OF POINTS

6   ABOUT THIS.  IT'S IMPORTANT TO REMEMBER THAT THE STATE IS

7   TRYING TO HAVE IT BOTH WAYS IN THEIR ARGUMENT.

8              THEY ARE SAYING THAT IT WOULD BE DANGEROUS TO LET OUT

9   PRISONERS.  THEY ARE ALSO SAYING THAT THERE ARE THESE METHODS

10  BY WHICH PUBLIC SAFETY CAN BE IMPROVED.  AND THEY ARE ALSO

11  SAYING THAT THE COURT SHOULDN'T ORDER THEM TO PROVIDE FUNDING

12  TO THE LOCAL COMMUNITIES TO MINIMIZE THE EFFECT ON PUBLIC

13  SAFETY.

14             IT SEEMS TO ME THAT IF THIS IS A DECISION THAT'S

15  GOING TO BE LEFT UP TO THE STATE, IN OTHER WORDS, TO DETERMINE

16  HOW MUCH FUNDING THEY'RE GOING TO BE PROVIDING FOR PUBLIC

17  FUNDING TO THE LOCAL COMMUNITIES, THEN IT SHOULD NOT BE A

18  FACTOR IN DECIDING WHETHER OR NOT POPULATION WITH THESE ORDERS

19  SHOULD ISSUE.

20             ON THE OTHER HAND, I STRONGLY URGE THE COURT -- ONE

21  OF THE CASES THAT THE DEFENDANTS CITED, *ANDERSON VERSUS*

22  *REDMOND*, IS A CASE OUT OF DELAWARE, I BELIEVE, IN WHICH THE

23  DISTRICT COURT WAS FACED WITH A SIMILAR SITUATION ON A MUCH

24  SMALLER SCALE.

25             AND IT FOLLOWED THE COURSE OF ACTION THAT WE ARE

1   SUGGESTING, WHICH IS THAT THE COURT ORDER THE STATE TO REDUCE

2   ITS PRISON POPULATION.  AND THEN IT WENT ON TO FIND THAT THERE

3   WERE VARIOUS METHODS BY WHICH THE STATE COULD DO THIS IN A SAFE

4   AND COST-EFFECTIVE MANNER.

5          AND AT THIS STAGE OF THE PROCEEDINGS, THAT'S WHAT I

6   THINK THE APPROPRIATE COURSE OF ACTION WOULD BE FOR THE COURT.

7          **JUDGE HENDERSON:**  SHOULD WE HAVE TO HAVE AN

8   EVIDENTIARY HEARING NOW IF WE MAKE THAT FINDING, THAT THEY

9   COULD IT IN A CERTAIN WAY.  WHAT EXPERTISE WOULD WE BRING TO

10  BEAR TO DO THAT?

11         **MR. SPECTER:**  WELL, I'M TALKING ABOUT NOW.  WE

12  PRESENTED YOU WITH EVIDENCE --

13         **JUDGE KARLTON:**  NO, NO.  ASSUME -- YOU'RE MISSING

14  JUDGE HENDERSON'S POINT.

15         **MR. SPECTER:**  OKAY.

16         **JUDGE KARLTON:**  ASSUMING THAT THE STATE PRESENTS A

17  PLAN.  PLAINTIFFS SAY OR THE COUNTIES SAY OR SOMEBODY SAY, IT'S

18  INADEQUATE FOR REASON A, B OR C.  WHAT DO WE DO THEN?

19         **MR. SPECTER:**  THEN I THINK, YOU KNOW, YOU MAY HAVE TO

20  HAVE AN EVIDENTIARY HEARING IF IT CAN'T BE RESOLVED OTHERWISE.

21  WE DON'T KNOW WHAT POLICY CHOICES THE STATE IS GOING TO MAKE.

22  WE DON'T KNOW WHAT THE FACTS ARE GOING TO BE.  WE DON'T KNOW

23  WHAT THE COUNTIES' ARGUMENTS ARE GOING TO BE.

24         BUT I DO THINK THAT --

25         **JUDGE REINHARDT:**  YOU SUGGEST FOR NOW WE ASSUME THAT

1    IT WOULD -- IF WE ARE SAYING THAT CERTAIN STEPS CAN BE TAKEN,

2    THEY ARE NOT NECESSARILY INVOLVED IN OPENING THE GATES.

3              MR. SPECTER:  YES, YOUR HONOR.

4              JUDGE REINHARDT:  BUT CONSTITUTE A PRISONER RELEASE

5    ORDER, IN THE BROAD SENSE OF THE WORD, WHICH MAY JUST MEAN

6    CHANGING RULES GOVERNING PAROLE OR PROGRAMS IN PRISON.

7              MR. SPECTER:  RIGHT.

8              JUDGE REINHARDT:  IF WE DO THAT NOW, WE SHOULD JUST

9    WAIT AND SEE.  WE SHOULD ASSUME THAT THE STATE COULD COME UP

10   WITH A REASONABLE WAY TO IMPLEMENT THAT, AND THAT WE SHOULD

11   THEN HAVE THE REPORT BACK OR HOPE THAT SHOULD WE ORDER THAT,

12   THAT EVERYONE WILL LOOK AT IT AND SAY WHAT A WONDERFUL SOLUTION

13   THIS AT THE SAME TIME.

14             MR. SPECTER:  WELL, HOWEVER UNLIKELY THAT APPEARS TO

15   ME --

16             JUDGE REINHARDT:  WELL, IT MAY NOT BE.  THE STATE'S

17   OWN REPORTS LAY OUT WHAT COULD BE DONE.

18             MR. SPECTER:  RIGHT.  AND NOT ONLY THAT, BUT IF IT'S

19   DONE IN CONSULTATION WITH OTHER PARTIES, THERE MAY NOT BE AS

20   MUCH DISAGREEMENT ON THAT AS THERE HAS BEEN ON THESE ISSUES

21   HERE TODAY.

22             SO I THINK THE SUPREME COURT MAKES IT PRETTY CLEAR

23   THAT YOU HAVE TO GIVE THE STATE THE FIRST OPPORTUNITY TO DO

24   THESE THINGS.  AND ONCE YOU HAVE GIVEN THEM THAT OPPORTUNITY,

25   THEN YOUR ROLE SORT OF SWITCHES IF IT'S NOT ADEQUATE.

1          **JUDGE HENDERSON:**  AND DO WE ORDER THE STATE TO

2    CONSULT WITH THE PLAINTIFFS OR DO WE ASSUME THAT THEY WILL DO

3    IT?

4          **MR. SPECTER:**  I THINK YOU BETTER ORDER THEM TO DO IT.

5    IT WOULD SOLVE A LOT OF PROBLEMS.

6          AND WHAT WE HAVE ALSO SUGGESTED IN OUR MOTION, IF THE

7    STATE BELIEVES IT A GOOD IDEA AFTER YOUR ORDER ISSUES, IS THAT

8    ON REQUEST OF THE STATE YOU APPOINT AN INDEPENDENT EXPERT UNDER

9    RULE 706 OR 703 --

10         **JUDGE KARLTON:**  THERE IS SOMETHING TO BE SAID THAT

11   THERE ARE ENOUGH EXPERTS TRYING TO GET THE STATE -- NEVER MIND.

12   GO AHEAD.  NEVER MIND.  WHETHER ANOTHER EXPERT WOULD MAKE ANY

13   DIFFERENCE AT SOME POINT, NOT CLEAR AT ALL.

14         **MR. SPECTER:**  CAN I THAT ADDRESS THAT THOUGH?

15         THERE IS NO QUESTION THAT THERE IS ENOUGH REPORTS OUT

16   THERE WITH IDEAS IN IT THAT WE DON'T NEED ANOTHER ONE OF THOSE.

17         WHAT WOULD BE HELPFUL, IN MY VIEW, AND I HOPE THE

18   STATE WOULD AGREE, IS SOMEBODY TO HELP CRUNCH THE NUMBERS,

19   HELP -- SOMEBODY WHO IS EXPERIENCED IN WORKING OUT THESE KIND

20   OF DETAILS WHO WOULD PROVIDE --

21         **JUDGE REINHARDT:**  IF YOU BOTH AGREE THAT WOULD BE

22   HELPFUL, IT WOULD BE NO PROBLEM.

23         **JUDGE KARLTON:**  SURE.

24         **MR. SPECTER:**  THAT WOULD BE GOOD.

25         I'M ALMOST OUT OF THE TIME.  I WAS GOING TO TAKE -- I

```
 1   DIDN'T FINISH --

 2           JUDGE HENDERSON:  DON'T FEEL COMPELLED TO STOP AT

 3   YOUR ESTIMATE.

 4           MR. SPECTER:  SO THEN I WILL GO A LITTLE BIT.

 5           OKAY.  LET ME TELL YOU A LITTLE BIT ABOUT WHY I

 6   BELIEVE THAT THE EVIDENCE SHOWS THAT A PRISONER RELEASE ORDER

 7   WOULD NOT HAVE AN ADVERSE EFFECT ON PUBLIC SAFETY.

 8           AND I THINK YOU CAN DRAW THAT FACTUAL FINDING FROM

 9   BASICALLY THE UNDISPUTED EVIDENCE IN THE CASE.  AND THAT IS, AS

10   I MENTIONED BEFORE --

11           JUDGE REINHARDT:  WHEN YOU SAY "A PRISONER RELEASE

12   ORDER WOULD NOT HAVE AN ADVERSE EFFECT," WHAT TYPE OF PRISONER

13   RELEASE ORDER ARE YOU REFERRING TO?  A "PRISONER RELEASE ORDER"

14   IS A VAST AND BROAD TERM.

15           MR. SPECTER:  I'M REFERRING TO A PRISONER RELEASE

16   ORDER WHICH INCORPORATES MANY, IF NOT ALL, OF THE PROPOSALS

17   THAT THE STATE, THROUGH THE GOVERNOR, HAS ALREADY MADE TO

18   REDUCE THE PRISON POPULATION, SUCH AT DIVERSION, ENHANCED

19   CREDIT EARNING PROCESSES, PAROLE REFORM, PROGRAMS IN BOTH THE

20   COMMUNITY AND IN THE PRISON WHICH HAVE THE EFFECT OF WHAT WE

21   CALL EVIDENCE-BASED PROGRAMS WHICH HAVE BEEN EFFECTIVE REDUCING

22   CRIME.

23           ALL OF THOSE MECHANISMS WHICH THE GOVERNOR HAS

24   PROPOSED, WHICH THE EXPERT PANEL HAS ENDORSED, WHICH OUR

25   EXPERTS HAVE ALSO ENDORSED.  I THINK THAT THE EVIDENCE IS
```

1  OVERWHELMING THAT ALL THE OF THOSE METHODS WOULD BE ABLE TO

2  REDUCE THE POPULATION SIGNIFICANTLY WITHOUT AFFECTING PUBLIC

3  SAFETY.

4          **JUDGE REINHARDT:**  THE PROBLEM IN DISCUSSING THIS

5  ISSUE, EVEN BETWEEN THE PARTIES, IS THAT WE SOMETIMES LOSE

6  TRACK OF THE FACT THAT A PRISONER RELEASE ORDER IS NOT AN ORDER

7  TO RELEASE PRISONERS.

8          **JUDGE KARLTON:**  IT MAY BE, IN ADDITION TO EVERYTHING

9  ELSE.

10          **JUDGE REINHARDT:**  IT COULD BE, BUT IT'S NOT.  WHEN WE

11  SAY A "PRISONER RELEASE ORDER," WE ARE NOT TALKING ABOUT

12  NECESSARILY ABOUT AN ORDER TO RELEASE PRISONERS.

13          FOR INSTANCE, IN THE STATE'S RESPONSE TO OUR QUESTION

14  ABOUT THE GOVERNOR'S BUDGET AND WHAT THE GOVERNOR THOUGHT WAS

15  PROPER FOR THE STATE, THEY SAY, WELL, HE DIDN'T SAY RELEASE

16  PRISONERS.  BUT WHAT HE DID SAY WERE THINGS THAT CONTEMPLATE --

17  THAT CONSTITUTE A PRISONER RELEASE ORDER.

18          **JUDGE KARLTON:**  WITHIN THE MEANING OF THE PLRA.

19          **MR. SPECTER:**  YOU'RE EXACTLY RIGHT, YOUR HONOR.

20  THAT'S AN UNFORTUNATE PHRASE THAT THEY USE TO DEFINE --

21          **JUDGE REINHARDT:**  PEOPLE READING A DECISION ORDERING

22  A PRISONER RELEASE ORDER ASSUME THAT THE ORDER SAYS, OPEN THE

23  DOORS, RELEASE PRISONERS.  THAT'S NOT, I ASSUME, WHAT YOU'RE

24  TALKING ABOUT WHEN YOU SAY THAT IT WOULD NOT PROVIDE A RISK TO

25  THE PUBLIC SAFETY.

1      **MR. SPECTER:** THAT'S EXACTLY RIGHT. A MORE ACCURATE

2 TERM MIGHT BE A POPULATION REDUCING ORDER. ANY METHOD BY WHICH

3 THE POPULATION OF THE PRISON IS REDUCED IS WHAT WE ARE SEEKING.

4      WE ARE AGNOSTIC ON THE MANNER IN WHICH THAT IS DONE.

5 WHAT WE HAVE TRIED TO PRESENT TO YOU IN EVIDENCE ARE WAYS IN

6 WHICH TO ASSURE YOU THAT THESE POPULATION REDUCING MEASURES CAN

7 BE DONE SAFELY.

8      **JUDGE REINHARDT:** WELL, YOU'RE NOT ALL THAT AGNOSTIC

9 BECAUSE YOU WANT US TO PUT IN THE ORDER THAT WHEN THE STATE

10 COMES UP WITH A PLAN, THEY HAVE TO CONSULT WITH YOU, BECAUSE

11 YOU WOULDN'T WANT THEM TO CONSULT WITH YOU IF YOU DIDN'T HAVE

12 ANY VIEWS.

13      **MR. SPECTER:** FAIR ENOUGH.

14      LET ME TELL YOU WHY THAT I BELIEVE THE EVIDENCE SHOWS

15 THAT THESE POPULATION REDUCING MEASURES CAN BE DONE SAFELY.

16      FIRST OF ALL, AS JUDGE KARLTON MENTIONED, PRISONS IN

17 THEIR CURRENT CONDITION ARE THEMSELVES CRIMINOGENIC. IN OTHER

18 WORDS, THEY ARE THEMSELVES ENHANCING CRIME.

19      SECOND OF ALL, THERE IS NO DISPUTE IN THE RECORD THAT

20 THE LENGTH OF INCARCERATION HAS AN EFFECT ON THE CRIME RATE.

21 THEREFORE, IF PRISONERS WERE TO GET A FEW MORE MONTHS' WORTH OF

22 CREDIT, THERE WOULD BE NO EFFECT ON THE CRIME RATE WHETHER THEY

23 STAYED IN PRISON A FEW MONTHS EARLIER OR LONGER.

24      THIRD, THE NUMBER OF PAROLEES. I THINK WE HAVE

25 PROVED WITHOUT CONTRADICTION THAT THE NUMBER OF PAROLEES IN THE

1    COMMUNITY IS NOT CORRELATED WITH THE CRIME RATE.  IN FACT, IN

2    MANY COMMUNITIES SUCH AS FRESNO, FOR EXAMPLE, THE NUMBER OF

3    PAROLEES HAS INCREASED WHILE THE POLICE CHIEF IS BOASTING THAT

4    THE CRIME RATE HAS DROPPED TO ITS LOWEST LEVEL IN 40 SOME-ODD

5    YEARS.

6            AGAIN -- AND PART OF THE REASON FOR THIS IS THAT

7    PAROLEES MAKE UP A VERY, VERY SMALL FRACTION OF THE NUMBER OF

8    PEOPLE WHO ARE ARRESTED.

9            IN CALIFORNIA THERE ARE 1.5 MILLION ARRESTS AND OUT

10   OF THAT ONLY ABOUT 90,000, OR 6 PERCENT, ARE PAROLEES.  AND

11   THOSE INCLUDE ARRESTS FOR PAROLE VIOLATIONS, WHICH ARE NOT

12   NECESSARILY CRIMES, AND FOR MISDEMEANORS.

13           SO WHEN ONE MEASURES THE IMPACT OF SOME MORE

14   PRISONERS ON A COMMUNITY, I BELIEVE, YOUR HONOR, IT'S

15   APPROPRIATE TO SAY THAT THE COUNTIES' AND INTERVENOR'S CONCERNS

16   ARE EXAGGERATED BECAUSE IT'S A FAIRLY SMALL NUMBER WE ARE

17   TALKING ABOUT.

18           AND I REALLY -- IF IT DID -- YOU KNOW, YOU MENTIONED

19   SEVERAL TIMES IN THE TRIAL ABOUT THE EFFECT OF THE ORDER AND

20   THE RESPONSIBILITY THAT YOU BEAR IN DECIDING WHAT THE ORDER IS

21   AND ISN'T.

22           I HAVE ALSO A RESPONSIBILITY AS AN OFFICER OF THE

23   COURT AND AS A CITIZEN OF CALIFORNIA IN MAKING A PROPOSAL.  AND

24   I BELIEVE THE EVIDENCE SHOWS THAT I WOULDN'T BE UP HERE ARGUING

25   THAT IF WE WERE GOING TO -- IF WE ASKED FOR A RELEASE OF 52,000

1  PRISONERS OVER, YOU KNOW, A COURSE OF TWO YEARS AND IT WAS

2  GOING TO HAVE A PROFOUND EFFECT ON PUBLIC SAFETY, I'M NOT SURE

3  I WOULD BE HERE TODAY.

4          I THINK WHAT THE EVIDENCE SHOWS IS THAT THE RELEASE

5  OF PRISONERS WILL CHANGE THE TIME AND CIRCUMSTANCES OF THE

6  OFFENSE, BUT NOT THE NUMBER OF THE OFFENSES.

7          AND WHAT'S INSTRUCTIVE WHEN YOU READ THE LAW

8  ENFORCEMENT INTERVENOR'S FINDINGS, PROPOSED FINDINGS AND

9  CONCLUSIONS WHICH WERE FILED ON FRIDAY, IT'S VERY INSTRUCTIVE

10  BECAUSE THEY MAKE MUCH OF THE FACT THAT IF THESE PRISONERS WERE

11  RELEASED IN AN ACCELERATED WAY, QUOTE, EARLY, THEY WILL COMMIT

12  CRIMES.  SO THERE IS NO DOUBT ABOUT THAT.  WE AGREE WITH THAT.

13          BUT NOWHERE DO THEY CONTRADICT THE EVIDENCE THAT THE

14  TOTAL NUMBER OF CRIMES OVER TIME WILL NOT INCREASE OR THAT THE

15  CRIME RATE WILL NOT INCREASE.

16          AND, IN FACT, EVEN THEIR PROPOSED FINDINGS SUPPORT

17  THIS CONCLUSION, SINCE THEY SAY THAT THE OFFENDERS WILL RETURN

18  TO PRISON AT THE SAME EXACT RATE AS THEY DO NOW.

19          AND PERHAPS THE MOST -- THESE ARE ALL STATISTICS AND

20  THEY ARE SOMEWHAT DRY, BUT I THINK VERY MEANINGFUL.  BUT IF

21  THERE WAS EVER ANY DOUBT ABOUT THESE STATISTICS, I THINK THE

22  MOST PERSUASIVE EVIDENCE ON THIS SUBJECT COMES FROM THE PEOPLE

23  WHO HAVE DONE IT BEFORE.

24          YOU HAVE HEARD FROM FOUR EXPERIENCED CORRECTIONAL

25  ADMINISTRATORS WHO DO OR HAVE DIRECTED FIVE DIFFERENT

1   CORRECTIONAL SYSTEMS.  AND THEY TESTIFIED, WITHOUT DISPUTE,

2   THAT THE PRISONER POPULATIONS CAN BE REDUCED WITHOUT ANY

3   ADVERSE EFFECT ON PUBLIC SAFETY.

4          OF THESE, DR. BEARD, MR. LEHMAN AND SHERIFF

5   HENNESSEY'S TESTIMONY SUPPORT THE NOTION THAT POPULATIONS CAN

6   BE REDUCED WITHOUT SUCH AN EFFECT.

7          AND THERE IS NO EVIDENCE THAT THE EXPERIENCE IN

8   PENNSYLVANIA, WASHINGTON OR SAN FRANCISCO WOULD BE ANY

9   DIFFERENT IF THE COURT WERE TO MAKE THESE ORDERS.

10          IN ADDITION, DR. KRISSBERG'S TESTIMONY SOMEWHAT FLEW

11   UNDER THE RADAR IN THE PROPOSED FINDINGS AND CONCLUSIONS; NOT

12   OURS, BUT THE OTHER SIDE'S.  AND HE STUDIED WHAT ACTUALLY

13   HAPPENED WHEN JURISDICTIONS ACCELERATED THE RELEASE OF

14   PRISONERS.

15          AND AS I MENTIONED BEFORE, THERE ARE 24 COUNTIES HE

16   STUDIED, NINE STATES, CANADA, PHILADELPHIA, AND THE CRIME RATE

17   DIDN'T INCREASE IN ONE OF THEM.  NOW, I THINK THAT TELLS YOU A

18   LOT ABOUT THE IMPACT OF RELEASING PRISONERS.

19          DR. AUSTIN SUPPORTED THE RELEASE.  HE HAS DONE THIS

20   BEFORE IN MANY OTHER JURISDICTIONS.  HE LAID OUT A ROAD MAP FOR

21   HOW THE STATE COULD DO IT, IF IT SO CHOOSES.  AND EACH ONE OF

22   THE MEASURES THAT HE USES ARE SIMILAR TO THOSE OF GOVERNOR AND

23   THE GOVERNOR'S OWN EXPERT PANEL.

24          NOW, THE LAW ENFORCEMENT INTERVENORS PARTICULARLY,

25   AND ALL OF THE DEFENDANTS AND DEFENDANT INTERVENORS TO A

1  CERTAIN EXTENT, MAINTAIN INCONSISTENT POSITIONS.

2          ON THE ONE HAND THEY SAY YOU SHOULDN'T RELEASE

3  PRISONERS BECAUSE THAT WOULD HAVE AN OVERWHELMINGLY BAD EFFECT

4  ON PUBLIC SAFETY.  AND ON THE OTHER HAND, THEY ALL SAY THERE

5  ARE PROGRAMS THAT YOU CAN DO THAT CAN BE DONE SAFELY TO REDUCE

6  THE PRISON POPULATION.

7          AND THEY ARE LISTED IN, YOU KNOW, THINGS SUCH AS DRUG

8  COURT, SENATE BILL 618 IN SAN DIEGO, INTENSIVE PAROLE AND

9  PROBATION SUPERVISION, MENTAL HEALTH SERVICES AND THE LIKE.

10          NOW, THOSE ARE UNDER THE DEFINITION OF A PRISONER

11  RELEASE ORDER.  UNDER THE PLRA, THOSE WOULD BE PRISONER RELEASE

12  ORDERS IF YOU ORDERED THAT.

13          AND I BELIEVE THEY ALSO STAND FOR THE PROPOSITION

14  THAT YOU CAN IMPLEMENT PROGRAMS FOR PRISONERS THAT WOULD BOTH

15  REDUCE THE CROWDING AND NOT HAVE ANY -- WELL, NOT ONLY WILL IT

16  NOT HAVE IMPACT ON PUBLIC SAFETY, BUT I THINK THE EVIDENCE IS

17  UNCONTRADICTED THAT IT WILL IMPROVE PUBLIC SAFETY.

18          **JUDGE HENDERSON:**  I WAS BOTHERED WITH THIS IN THE

19  TRIAL AND I CONTINUE TO BE BOTHERED.

20          THE GOVERNOR SAID TWICE, TO MY KNOWLEDGE, LAST WEEK,

21  YOU AIN'T GOING TO GET ANY MONEY FROM THE GOVERNOR, THE

22  CONTROLLER, OR THE LEGISLATURE.

23          SO WHAT DO WE DO WITH THESE WONDERFUL PROGRAMS IF

24  THERE IS NO MONEY FOR IT?  AND CAN WE ORDER MONEY FOR IT?

25          THIS IS ALL ABOUT MONEY IN MY VIEW.  HOW DO WE DEAL

1   WITH THAT?

2          MR. SPECTER:  WELL, IF I UNDERSTAND YOUR QUESTION

3   CORRECTLY, YOU ARE REFERRING TO THE GOVERNOR'S STATEMENTS THAT

4   HE WASN'T GOING TO SPEND MONEY FOR THE 10,000-BED PROJECT.  IS

5   THAT WHAT YOU ARE --

6          JUDGE HENDERSON:  I READ IT BEYOND THAT.  BUT, YEAH,

7   NOT GOING TO SPEND MONEY FOR...

8          MR. SPECTER:  FOR ALL THESE OTHER.  WELL, FIRST OF

9   ALL --

10         JUDGE REINHARDT:  ARE YOU FAMILIAR WITH THE

11   GOVERNOR'S STATEMENTS?

12         MR. SPECTER:  PARDON ME?

13         JUDGE REINHARDT:  ARE YOU FAMILIAR WITH THE

14   GOVERNOR'S STATEMENTS THAT JUDGE HENDERSON IS REFERRING TO?

15         MR. SPECTER:  GENERALLY, YES.

16         JUDGE REINHARDT:  AND DID YOU READ THEM AS JUDGE

17   HENDERSON?  I'M ASKING A NAIVE QUESTION, UNINFORMED QUESTION.

18         JUDGE HENDERSON READS THOSE STATEMENTS AS APPLYING TO

19   ANY FUNDING UNDER ANY CIRCUMSTANCES FOR THESE TYPES OF ACTIONS,

20   AND TO SOME EXTENT THAT COULD BE CORRECTED WITH THE STATEMENT

21   THAT WE COULD REDUCE THE AMOUNT OF THE BUDGET THAT COULD BE

22   SPENT ON PRISON REFORM.

23         OR DO YOU READ THE STATEMENTS THAT THE GOVERNMENT

24   MADE AS REFERRING ONLY TO GIVING THE MONEY TO THE RECEIVER FOR

25   THOSE PROGRAMS?

1          **MR. SPECTER:**  MY RECOLLECTION --

2          **JUDGE REINHARDT:**  I REALLY SHOULDN'T BE ASKING YOU.

3  I SHOULD BE ASKING THE STATE, WHO REALLY REPRESENTS THE

4  GOVERNOR --

5          **JUDGE KARLTON:**  GOD KNOWS THEY DO.

6          **JUDGE REINHARDT:**  -- WHAT THE GOVERNOR MEANS BY THOSE

7  STATEMENTS.

8          **MR. SPECTER:**  YES, YOUR HONOR.  BUT SINCE I'M HERE, I

9  WILL ANSWER.

10          **JUDGE REINHARDT:**  OF COURSE.

11          **MR. SPECTER:**  I READ THE GOVERNOR'S REMARKS IN A MORE

12  NARROW SENSE, THAT HE WASN'T GOING TO GIVE ANY MONEY TO

13  MR. KELSO FOR HIS PROJECT.  I DON'T KNOW WHETHER THAT'S

14  CORRECT.  I WOULD HAVE TO REREAD THEM, BUT THAT'S MY

15  RECOLLECTION.

16          THE OTHER IMPORTANT POINT ABOUT THIS --

17          **JUDGE REINHARDT:**  CAN I JUST SUGGEST THAT WHEN THE

18  STATE GIVES ITS PRESENTATION, SOMEBODY TRY TO TELL US WHETHER

19  THE GOVERNOR'S POSITION RELATES JUST TO THE RECEIVER OR TO

20  EXPENDITURE OF FUNDS.

21          **JUDGE KARLTON:**  I HAD ANOTHER QUESTION ALONG THE LINE

22  THAT'S DEALING WITH THAT.

23          THE STATE HAS THIS INCREDIBLY SERIOUS FINANCIAL

24  PROBLEM.  ALL THE STATES DO, BUT CALIFORNIA IS WHAT I'M TALKING

25  ABOUT.  APPARENTLY, TEXAS DOESN'T, WHICH IS VERY STRANGE.

1           BUT ANYHOW, ONE THING THAT THE STATE MIGHT SAY -- I

2   DON'T KNOW WHO SPEAKS FOR THE STATE, BUT SOMEBODY SOME DAY WHO

3   ACTUALLY SPEAKS FOR THE STATE COULD SAY, LOOK, WE ARE BROKE.

4   YES, WE WILL SAVE A LOT OF MONEY BY RELEASING PRISONERS.  BUT

5   YOU KNOW WHAT?  THAT'S MONEY THAT WE NEED TO DEAL WITH THIS

6   INCREDIBLE DEFICIT THAT WE HAVE.

7           IS THAT AN APPROPRIATE CONCERN OF THIS COURT OR,

8   AGAIN, IS IT -- YOU KNOW, YOU CAN LOCK UP THE WHOLE POPULATION

9   IF YOU WANT TO AS LONG AS YOU CAN PAY FOR IT AND IF YOU CAN'T

10  PAY FOR IT, YOU'VE GOT TO LET THEM GO.

11          **MR. SPECTER:**  WELL, IT DEPENDS WHAT YOU MEAN BY

12  "CONCERN."  OF COURSE, IT'S AN APPROPRIATE MATTER THAT YOU

13  SHOULD THINK ABOUT AND BE CONCERNED ABOUT.  ANY RESPONSIBLE

14  PERSON WOULD.

15          WHETHER IT'S A DECISION THAT YOU CAN MAKE, I THINK

16  ESSENTIALLY HOW TO ALLOCATE MONEY IN THE STATE IS A POLITICAL

17  DECISION.

18          **JUDGE REINHARDT:**  THAT'S THE QUESTION YOU'RE GOING TO

19  RESERVE FOR LATER.

20          **MR. SPECTER:**  YOU GOT ME.

21          BUT I REALLY DO THINK THAT, YOU KNOW, AS THE EVIDENCE

22  SHOWS, THAT IF YOU REDUCE THE POPULATION BY 50,000, YOU WOULD

23  SAVE APPROXIMATELY A BILLION DOLLARS A YEAR.

24          NOW, ONE COULD ALLOCATE THIS MONEY TO THE COUNTIES,

25  AS I WOULD RECOMMEND IF I WERE THE DECIDER ON THESE ISSUES, OR

1  THEY COULD SAY, NO, PUBLIC SAFETY ISN'T AS IMPORTANT AS SOME

2  OTHER PROGRAM, WHATEVER IT MAY BE.  THERE ARE LOTS OF THEM IN

3  CALIFORNIA.

4          AND SO I THINK, IN ESSENCE, THE SUPREME COURT HAS

5  DIRECTED THAT THE STATE GETS TO MAKE THAT CHOICE, BUT IT IS A

6  CHOICE THAT THE STATE MAKES.  THE STATE DECIDES THE LEVEL OF

7  PUBLIC SAFETY THAT IT WANTS FOR ITS CITIZENS AND IF IT WANTS TO

8  SPEND 80 PERCENT OF ITS REVENUE ON PUBLIC SAFETY, THEN THAT'S

9  WHAT IT DOES.  IF IT WANTS TO SPEND 20 PERCENT --

10          JUDGE REINHARDT:  WE ARE BACK TO WHERE WE STARTED.

11 BUT THEN LET'S ASSUME WE CONCLUDE IF THEY DON'T SPEND MONEY ON

12 THEM AND JUST RELEASE THEM, THEN THAT IS A THREAT TO PUBLIC

13 SAFETY.  BUT IF THEY DO IT PROPERLY, IT'S NOT.

14          MR. SPECTER:  RIGHT.

15          JUDGE REINHARDT:  SO THAT'S WHY YOU WANT TO RESERVE

16 YOUR ANSWER.

17          MR. SPECTER:  WELL, I AM STILL GOING TO RESERVE IT

18 BECAUSE I BELIEVE THAT THE POLITICAL FORCES WILL NOT ALLOW THE

19 GOVERNOR TO RELEASE 50,000 AXE MURDERERS.

20          JUDGE REINHARDT:  NO.  HE WILL TELL THEM TO KEEP THEM

21 LOCKED UP.

22          MR. SPECTER:  RIGHT.  AND SO HE WILL HAVE TO RELEASE

23 SOME.

24          JUDGE REINHARDT:  WELL, THEN MAYBE WE CAN'T RELEASE

25 SOME.

1           **MR. SPECTER:**  HUH?

2           **JUDGE REINHARDT:**  MAYBE WE CAN'T.  MAYBE THEN IT'S

3    TOO GREAT A THREAT TO THE PUBLIC SAFETY.

4           **MR. SPECTER:**  NO, THAT IS NOT TRUE.  THE EVIDENCE

5    SHOWS THAT YOU CAN RELEASE --

6           **JUDGE REINHARDT:**  NO.  I SAID DESPITE YOUR ARGUMENTS

7    ABOUT THE EVIDENCE.  IF THE COURT IS NOT PERSUADED THAT SOMEHOW

8    THE MORE PRISONERS YOU RELEASE, THE GREATER THREAT TO THE

9    PUBLIC SAFETY, IF WE WERE NOT PERSUADED BY THAT ARGUMENT, THEN,

10   ON THE OTHER HAND, WE MIGHT SAY, WELL, WE CAN'T RELEASE ANY

11   BECAUSE IT'S TOO GREAT A THREAT TO THE PUBLIC SAFETY.

12          **JUDGE KARLTON:**  DR. AUSTIN SAID, IF YOU RECALL, AT

13   CROSS-EXAMINATION, DOCTOR, YOU'VE GOT THIS PLAN WHICH IS

14   REALITY TERRIFIC AND WILL TAKE CARE OF ALL THESE PROBLEMS, BUT

15   IF THE PLAN WERE NOT EXECUTED, YOU WOULD OPPOSE THE PROGRAM,

16   THE RELEASE OF PRISONERS, BECAUSE IT WOULD BE CHAOTIC.

17          AND I DON'T KNOW THAT HE AGREED WITH THE FIRST

18   STATEMENT, BUT HE DID SAY IT WOULD BE CHAOTIC.

19          **MR. SPECTER:**  I THINK THAT'S WHAT HE MEANT BY THAT.

20   WHAT I'M TAKING YOUR QUESTION TO MEAN IS THAT HE WOULDN'T -- I

21   RECALL THAT DISCUSSION AND I BELIEVE HE WAS REFERRING TO THE

22   FACT THAT IF YOU OPEN THE DOOR TO LET 52,000 PEOPLE OUT, LIKE

23   SOME OF THE PEOPLE HAVE CHARACTERIZED WHAT WE ARE TRYING TO DO,

24   WHICH WE ARE NOT, THEN IT WOULD BE A CHAOTIC SITUATION.

25          BUT IF YOU DO IT IN A, QUOTE, SCIENTIFIC WAY, I THINK

1    IT WOULDN'T BE CHAOTIC AND IT WOULD BE SAFE.

2         BUT, YOU KNOW, THE EVIDENCE, JUDGE, TO GET BACK TO

3    YOUR EARLIER POINT -- I'M SORRY TO KEEP GOING BACK TO THE

4    EVIDENCE, BUT THE EVIDENCE IS THAT WITHOUT A DIME MORE TO THE

5    LOCAL COMMUNITIES, THIS WOULD NOT HAVE AN ADVERSE IMPACT ON

6    PUBLIC SAFETY.  WITHOUT A DIME.  SO I THINK --

7         **JUDGE KARLTON:**  YOUR ARGUMENT IS WE OUGHT TO JUST

8    OPEN THE PRISON AND LET EVERYBODY OUT BECAUSE IT'S NOT GOING TO

9    AFFECT PUBLIC SAFETY AT ALL.

10        **MR. SPECTER:**  NO.  MY ARGUMENT IS THAT IF YOU DO IT

11   IN THE METHODS THAT WE'VE DESCRIBED AND PUT FORWARD, IT

12   WOULDN'T HAVE ANY IMPACT ON PUBLIC SAFETY.

13        **JUDGE KARLTON:**  THAT'S THE PROBLEM.

14        **MR. SPECTER:**  IT'S A CIRCLE.  I UNDERSTAND.

15        **JUDGE REINHARDT:**  SUPPOSE THE STATE DOESN'T WANT TO

16   DO IT.

17        **MR. SPECTER:**  PARDON ME?

18        **JUDGE REINHARDT:**  WHAT IF THE STATE DOESN'T WANT TO

19   DO IT THE WAY YOU DESCRIBED, THEN IT IS A THREAT TO PUBLIC

20   SAFETY.

21        **MR. SPECTER:**  THEN WE'LL HAVE TO DEAL WITH THAT IN

22   THE EVIDENTIARY HEARING ON THE INJUNCTION.  I CAN'T SAY

23   ANYMORE.  I DON'T HAVE A BETTER ANSWER FOR YOU ON THAT.

24        **JUDGE HENDERSON:**  LET ME ASK YOU ABOUT THE EVIDENCE.

25   YOU MENTIONED THIS SEVERAL TIMES RECENTLY HERE, 50,000 AND

 1  53,000.

 2       WHAT EVIDENCE IN THE RECORD ESTABLISHES THAT

 3  130 PERCENT OF THE TIME THAT THAT IS THE MAGIC NUMBER AT THOSE

 4  CONSTITUTIONAL LEVELS OF MEDICAL AND MENTAL HEALTH THAT CAN BE

 5  PROVIDED?  WHAT IN THE RECORD GIVES THIS NUMBER?

 6       **MR. SPECTER:**  SURE.  WELL, WE TOOK THAT NUMBER FROM

 7  THE DEFENDANTS' OWN DOCUMENTS AND THEIR OWN DEPOSITION

 8  TESTIMONY.  THEY HAD A FACILITIES MASTER PLAN, WHICH IS A

 9  DOCUMENT WHICH THEY USED TO PLAN THEIR CONSTRUCTION OF

10  FACILITIES OVER A FIVE-YEAR PERIOD.  THEY USED THE 130 PERCENT

11  FIGURE IN THAT DOCUMENT.

12       MISS HYSEN, WHO IS IN CHARGE OF THE CONSTRUCTION,

13  TESTIFIED AT DEPOSITION THAT SHE BELIEVED 130 PERCENT WAS

14  APPROPRIATE.  THE STRIKE TEAM WHICH THE STATE FORMED, WHICH

15  MR. LEHMAN WHO TESTIFIED HERE WAS PART OF, ENDORSED THE 130

16  PERCENT NUMBER.

17       AND EVERY EXPERT WHO TESTIFIED, DR. BEARD,

18  MISS WOODFORD, MR. LEHMAN, DR. STEWART, DR. HANEY, THEY ALL

19  BELIEVED THAT 130 PERCENT WOULD ALLOW THE STATE SUFFICIENT ROOM

20  TO RUN THEIR MEDICAL SYSTEM --

21       **JUDGE KARLTON:**  WITH ALL DUE RESPECT, IT HAS BEEN

22  TROUBLING FROM THE DAY THIS CASE ENDED.

23       WHAT I REALLY UNDERSTAND IS YOU NEED 96 PERCENT OF --

24  OR I THINK THAT WAS THE NUMBER -- OF DESIGN CAPACITY TO BE ABLE

25  TO PUT PEOPLE IN APPROPRIATE CLASSIFICATION, MUCH LESS GIVE

1    THEM TREATMENT.

2            MY BEST UNDERSTANDING OF WHAT THE TESTIMONY IS, IS

3    THE 130 PERCENT IS A KIND OF RECOGNITION OF THE POLITICAL

4    REALITY.  AND THAT IS VERY TROUBLING.

5            AGAIN, IS THAT SOMETHING THAT WE OUGHT TO CONSIDER,

6    CAN CONSIDER, SHOULD CONSIDER?

7            **MR. SPECTER:**  WELL, YOUR HONOR, I THINK IT'S

8    IMPORTANT -- IT'S SOMETHING -- YOU CAN CONSIDER THE TESTIMONY

9    OF OTHER FORMER HEADS OF CORRECTIONS ABOUT WHAT THEY BELIEVE IS

10   APPROPRIATE.  I THINK THAT'S SOMETHING THAT'S VERY PERSUASIVE

11   AND CREDIBLE.

12           SECOND OF ALL, IF YOU READ OUR PROPOSAL CAREFULLY,

13   AND YOU MIGHT HAVE MISSED IT IN ALL THE WORDS, WE ARE URGING

14   130 PERCENT FOR, YOU KNOW, SYSTEM-WIDE, BUT THAT THE

15   SPECIALIZED PROGRAMS HAVE TO BE BELOW THEIR PERCENTAGE.

16           **JUDGE KARLTON:**  WHAT THAT REALLY MEANS -- I WANT YOU

17   TO STOP AND THINK ABOUT WHAT WE ARE ORDERING IF WE WERE TO DO

18   WHAT YOU SUGGESTED.

19           THAT MEANS THERE WOULD BE MEDICAL FACILITIES AND

20   MENTAL HEALTH FACILITIES WHICH WOULD BE AT 95 PERCENT OR LESS

21   AND THERE WOULD BE OTHER PRISONS WHICH WOULD BE UP TO

22   200 PERCENT AGAIN, AND WE WOULD HAVE BAD BEDS AGAIN.

23           THE ONLY THING IS WE WOULD BE PROTECTING THE CLASS

24   MEMBERS.  AND MAYBE THAT'S THE APPROPRIATE THING TO DO.  I

25   MEAN, THAT'S WHAT THIS CASE IS ABOUT, BUT IT WOULD BE -- IT

1  WOULD BE DIFFICULT FOR ME TO SAY YES, AND THE HELL WITH

2  EVERYBODY ELSE.

3       **MR. SPECTER:**  WELL, AGAIN, I THINK THAT'S -- THAT'S A

4  VERY IMPORTANT CONCERN AND I THINK THAT IS A CONCERN THAT WOULD

5  NEED TO BE ADDRESSED IN THE STATE'S PLAN.  BECAUSE IF -- YOU'RE

6  RIGHT.  IF THEY WANTED TO OVERFLOW -- OVERCROWD ONE INSTITUTION

7  IN ORDER TO UNDERCROWD ANOTHER, I THINK THAT WOULD BE A

8  PROBLEM.

9       AND I WOULD HOPE THAT AFTER THIS TESTIMONY AND IF WE

10  WERE ABLE TO GET THE KIND OF ORDER FROM YOU WHICH WE ARE

11  SEEKING, THAT THAT WOULDN'T HAPPEN; BUT IF THEY DO, WE WILL

12  ADDRESS IT.

13       **JUDGE REINHARDT:**  LET ME ASK YOU THE QUESTION.  WHAT

14  IS YOUR CO-COUNSEL GOING TO ARGUE?  THERE ARE AREAS --

15       **JUDGE KARLTON:**  HE'S GOING TO DO THE MENTAL HEALTH.

16       **JUDGE REINHARDT:**  WELL, THE PROBLEM WE ARE TALKING

17  ABOUT IN GENERAL SO FAR.

18       BUT DOES HE HAVE ANY PARTICULAR SUBJECTS, OTHER THAN

19  THE FACT THAT IT'S MENTAL HEALTH INSTEAD OF ORDINARY HEALTH?

20       **JUDGE KARLTON:**  PHYSICAL HEALTH.

21       **MR. SPECTER:**  NO, NOT -- I CAN PROVIDE YOU SOME --

22       **JUDGE REINHARDT:**  LET HIM JUST --

23       **JUDGE KARLTON:**  LET MR. BIEN --

24       **JUDGE REINHARDT:**  MAYBE WE WILL TAKE A MORNING RECESS

25  BEFORE THAT.  I WANT YOU TO BE PREPARED TO ANSWER THE QUESTION

```
 1   YOU ARE RAISING WITH COUNSEL.

 2           (WHEREUPON THERE WAS A RECESS IN THE PROCEEDINGS

 3           FROM 11:12 UNTIL 11:33 A.M.)

 4           JUDGE KARLTON:  MR. BIEN, I WANT YOU TO KNOW ALL

 5   THREE JUDGES ARE VERY CONCERNED ABOUT THIS 130, 96, WHERE ALL

 6   THOSE NUMBERS COME FROM, WHETHER THEY MAKE ANY DIFFERENCE, WHAT

 7   THEY REALLY MEAN.  I WOULD LIKE YOU TO HELP US, IF YOU WILL.
```

**CLOSING ARGUMENT**

```
 9           MR. BIEN:  WE OFFERED TESTIMONY, YOUR HONOR, THAT --

10   AND VERY POWERFUL TESTIMONY FROM THE INTERVENORS IN RUNNING

11   THEIR OWN CORRECTIONAL FACILITIES AS TO HOW DIFFICULT IT WAS

12   FOR THEM TO MANAGE A CORRECTIONAL FACILITY APPROPRIATELY

13   WITHOUT EMPTY SPACE.  WE HEARD THAT 90 PERCENT IS FULL,

14   95 PERCENT IS FULL OR 85 PERCENT IS FULL.

15           AND THE REASON IS, TO MANAGE A CORRECTIONAL FACILITY

16   APPROPRIATELY ONE REQUIRES FLEXIBILITY IN CLASSIFICATION TO

17   MOVE PEOPLE, THE APPROPRIATE SECURITY LEVEL, APPROPRIATE

18   FACILITY FOR HEALTHCARE, MENTAL HEALTH CARE.

19           IN LOOKING AT HOW CALIFORNIA HAS BEEN MANAGING ITS

20   SYSTEM AND AT HOW OTHER STATES HAVE MANAGED THEIR SYSTEMS, THE

21   EVIDENCE SHOWS THAT ONE CAN MANAGE CALIFORNIA'S SYSTEM AT A

22   LEVEL ABOVE 100 PERCENT OF DESIGN CAPACITY DESPITE THIS,

23   BECAUSE DESIGN CAPACITY, AS WE UNDERSTAND, IS A SINGLE CELLING

24   CAPACITY.  AND THERE IS SOME DOUBLE CELLING THAT HAS BEEN

25   DESIGNED IN.  THERE'S SOME DOUBLE CELLING THAT IS TOLERABLE.
```

 1           WE ARE AT SUCH AN EXTREME NOW, YOUR HONOR, BEYOND ALL

 2  -- BEYOND THE HISTORY OF CORRECTIONAL OPERATIONS.  WE PUT ON

 3  TESTIMONY --

 4           **JUDGE KARLTON:**  WE KNOW THAT.  WE KNOW THAT.  THE

 5  PROBLEM IS YOU WANT -- LET'S PUT THE -- I'M SORRY.  I DON'T

 6  MEAN TO BE -- WELL, MAYBE I AM.  IT'S A VERY SERIOUS PROBLEM.

 7           OUR CONCERN IS PROVIDING ADEQUATE MEDICAL AND MENTAL

 8  HEALTH.  MISTER -- I'M DOING WELL.  THAT OTHER FELLOW.

 9           **MR. SPECTER:**  SPECTER.

10           **MR. BIEN:**  THAT GUY (INDICATING).

11           (LAUGHTER.)

12           **JUDGE KARLTON:**  YEAH, THAT GUY.  ACKNOWLEDGED THAT

13  YOUR PROPOSAL RECOGNIZES THE NEED FOR MORE LIMITED SPACE FOR

14  MENTAL HEALTH AND PHYSICAL HEALTH FACILITIES, ALTHOUGH WE

15  HAVEN'T BEEN TOLD EXACTLY WHAT THAT MEANS.

16           I DO NOT KNOW, CONTRARY TO WHAT COUNSEL HAS SAID,

17  THAT THE 130 IS SUPPORTABLE IN ANY FASHION OTHER THAN SAYING

18  THE BEST WE CAN GET.  BUT IT IS CLEAR THAT IF IT'S 130 OVERALL

19  AND WE'RE TRYING TO ENSURE ADEQUATE MEDICAL AND MENTAL HEALTH,

20  IT MEANS THEY GET SOME OTHER FIGURE -- 95, 96 PERCENT,

21  WHATEVER -- AND WE ARE BACK WITH 200 PERCENT FOR EVERYBODY

22  ELSE.

23           **MR. BIEN:**  WELL, LET ME GIVE YOU SOME NUMBERS THAT

24  WILL REASSURE YOU ABOUT THAT.

25           OUR REFERENCE TO SPECIALIZED MEDICAL MENTAL HEALTH

1  PROGRAMS, AT THE MOMENT -- UNFORTUNATELY, FOR THE PLATA

2  CLASS -- THERE ARE NO SPECIALIZED BEDS FOR MEDICAL CARE,

3  BESIDES THE CTC'S, THE CORRECTIONAL TREATMENT CENTERS, AND

4  THERE ARE ONLY A COUPLE HUNDRED OF THOSE BEDS.

5         SO WE ARE TALKING ABOUT -- THE ONLY SPECIALIZED BEDS

6  THAT NOW EXIST ARE THE MENTAL HEALTH SPECIALIZED BEDS.  THERE

7  ARE CURRENTLY --

8         **JUDGE KARLTON:**  OF WHICH THERE ARE PRESENTLY

9  SOMETHING LIKE 400 OR 500 SHORT.

10        **MR. BIEN:**  THERE'S 4,000 EOP BEDS RIGHT NOW.  THERE

11  NEEDS TO BE 5,000.  AND THERE ARE, YOU KNOW, SEVERAL HUNDRED

12  MENTAL HEALTH CRISIS BEDS THAT ARE PART OF THOSE CTC'S.  AND

13  THEN THERE ARE THE DMH BEDS, AGAIN, ONLY IN THE HUNDREDS.

14        SO EVEN IF THOSE BEDS WERE KEPT AT 95 PERCENT --

15  AND, BY THE WAY, RIGHT NOW THEY ARE ALREADY, MANY OF THEM ARE

16  KEPT --

17        **JUDGE KARLTON:**  OVER?

18        **MR. BIEN:**  EXCEPT FOR THE EOP.  EOPS ARE OVERCROWDED.

19  THEY ARE SUPPOSED TO BE KEPT AT 150 PERCENT NOW UNDER THE

20  CURRENT STANDARDS.

21        SO, IN OTHER WORDS, WE ARE NOT TALKING ABOUT A

22  TREMENDOUS NUMBER OF BEDS THAT WOULD BE AT THE 95 PERCENT IN

23  SPECIALIZED MEDICAL PROGRAMS.

24        ASSUMING FOR A MOMENT THAT THE SURPRISE THAT HAPPENED

25  IN THE MIDDLE OF OUR TRIAL DIDN'T HAPPEN AND THAT WE WERE GOING

1  TO BE BUILDING 10,000 ABSOLUTELY NECESSARY MEDICAL MENTAL

2  HEALTH BEDS, THOSE WERE ALSO PLANNED NOT TO BE OVERCROWDED.

3  AND I THINK WE WOULD AGREE AND YOU WOULD AGREE, RECEIVER AND

4  MEDICAL PEOPLE AND THE STATE OFFICIALS THAT WORKED ON THOSE

5  BEDS ALSO WOULD AGREE THAT THOSE SHOULD NOT BE OVERCROWDED.

6          BUT WE ARE NOT CONTEMPLATING -- AND WE THINK, WE

7  AGREE, IT WOULD BE INAPPROPRIATE TO BE OPERATING ANY FACILITIES

8  AT 200 PERCENT, BUT WE THINK AT 130 PERCENT THERE WOULD STILL

9  BE -- WHILE THERE MIGHT BE SOME FACILITIES THAT COULD OPERATE A

10 LITTLE HIGHER THAN THAT, IT WOULD STILL BE AN OPERABLE

11 CAPACITY.

12         **JUDGE REINHARDT:**  WELL, THERE ARE TWO QUESTIONS HERE

13 I THINK.

14         ONE, JUDGE KARLTON ASKED A QUESTION AS TO:  IS THERE

15 EVIDENCE TO SUPPORT ANY PARTICULAR FIGURE?

16         AND, SECONDLY, THE QUESTION IS:  SHOULD THERE BE A

17 LIMIT, FOR EXAMPLE?  JUST SUPPOSE WE SIT AT 130 PERCENT.  ARE

18 YOU SUGGESTING THE STATE COULD PUT 200 PERCENT AT SOME PLACES

19 AND GET -- END UP WITH AN AVERAGE OF 130?  SHOULD THERE THEN BE

20 SOME -- ANOTHER FIGURE THAT SAYS NO PARTICULAR INSTITUTION OR

21 FACILITY MAY EXCEED "X" PERCENT?  IS THAT PART OF YOUR

22 PROPOSAL?

23         **MR. BIEN:**  I THINK THAT'S RIGHT.

24         WELL, FIRST, I THINK THERE IS EVIDENCE AS TO THE

25 130 PERCENT.  MR. SPECTER MENTIONED IT.

1          I WOULD ALSO POINT OUT THAT THE DUKMAJIAN COMMISSION,

2    THE INDEPENDENT REVIEW PANEL, DISCUSSED THIS CAPACITY.  THEY

3    CAME UP WITH 145 PERCENT --

4          **JUDGE KARLTON:**  BUT, MR. BIEN, WITH ALL DUE RESPECT

5    TO THE DUKMAJIAN COMMISSION, WHICH I THINK DESERVES A LOT OF

6    RESPECT, AS BEST I CAN TELL, IT'S NOT THAT ANYBODY IS SAYING

7    THAT WORKS WELL.  IT'S THAT PEOPLE ARE SAYING, WE CAN DO THAT.

8    IT'S A POLITICAL JUDGMENT, NOT A -- NOT A CUSTODIAL JUDGMENT,

9    NOT A MEDICAL JUDGMENT.

10         AM I WRONG ABOUT IT?  I WILL BE HAPPY TO BE TOLD I'M

11   WRONG ABOUT IT.

12         **MR. BIEN:**  I THINK THAT EVERYONE OPERATING IN THE

13   PRISON SYSTEM IS UNDER -- ESPECIALLY IN CALIFORNIA FOR THE LAST

14   10, 20 YEARS HAS BEEN OPERATING UNDER TREMENDOUS POLITICAL AND

15   ECONOMIC PRESSURE TO OVERCROWD THE PRISONS AND THEY HAVE MADE

16   AND BEEN PUT IN -- MADE HORRIFIC, TERRIBLE DECISIONS ABOUT

17   OVERCROWDING.

18         AS THE RECEIVER IN HIS REPORT TO JUDGE HENDERSON

19   POINTED OUT, THEY JUST CHANGED THE DEFINITION AGAIN AND AGAIN

20   AS TO WHAT WAS THE MAXIMUM CAPACITY, WHAT WAS THE SAFE

21   CAPACITY, WENT UP AND UP AND UP AND WITHOUT REGARD FOR --

22   CERTAINLY, FOR HEALTHCARE, MENTAL HEALTHCARE, OR THE SAFETY OF

23   THEIR OWN CORRECTIONAL OFFICERS OR STAFF OR PRISONERS.

24         YES, THEY ARE UNDER TREMENDOUS PRESSURE.  YOU KNOW, I

25   DON'T THINK THAT ANYONE CAN GUARANTEE THAT 130 PERCENT, BINGO,

1  IS GOING TO BE PERFECT MENTAL HEALTHCARE, JUST LIKE WE ARE NOT

2  ARGUING THAT A POPULATION REDUCTION IN AND OF ITSELF IS GOING

3  TO SOLVE THE PROBLEMS.  THIS IS A COMPLEX SYSTEM --

4  　　　**JUDGE REINHARDT:**  WELL, LET ME ASK YOU A SIMPLE

5  QUESTION.  DID YOUR EXPERTS OR ANY OF THEM TESTIFY THAT "X"

6  PERCENTAGE IS THE SAFE PERCENTAGE OR A MINIMUM SAFE PERCENTAGE

7  OR, AS JUDGE KARLTON IS SUGGESTING, THEY TESTIFIED ESSENTIALLY

8  THIS IS THE PRACTICAL LEVEL YOU CAN EXPECT TO GET IN A

9  POLITICAL SYSTEM?

10  　　　WAS THERE ANY TESTIMONY BY EXPERTS THAT THIS IS, IN

11  FACT -- I MEAN, NOBODY KNOWS ANYTHING, OF COURSE, BUT DID ANY

12  OF THE EXPERTS SAY, "IN MY OPINION THIS IS A REASONABLY SAFE

13  PERCENTAGE."

14  　　　**MR. BIEN:**  I THINK THAT MANY OF THE EXPERTS, BOTH THE

15  CORRECTIONAL EXPERTS AND THE OTHER MENTAL HEALTH EXPERTS, DID

16  CONSIDER THESE ISSUES AND DID OFFER OPINIONS ON THE SUBJECT.

17  AND WE'VE SUMMARIZED IT IN OUR FINDINGS IN A SECTION ABOUT

18  130 PERCENT.

19  　　　I HAVE TO SAY THAT YOU ARE TALKING ABOUT A PROCESS.

20  WE HAVE 33 DIFFERENT INSTITUTIONS.  WE HAVE INSTITUTIONS BUILT

21  IN THE 19TH CENTURY.  WE HAVE INSTITUTIONS BUILT IN THE LAST 10

22  YEARS.  THERE ARE DIFFERENT UNITS WITH DIFFERENT MISSIONS.

23  JUST LIKE WE ARE TALKING ABOUT MEDICAL AND MENTAL HEALTH UNITS,

24  THERE'S ALSO CAMPS AND THERE'S ALSO LOW SECURITY AND HIGH

25  SECURITY.

1            THE ACTUAL NUMBER THAT WE HAVE GIVEN AS A TARGET FOR

2    THE WHOLE SYSTEM IS THE BEST JUDGMENT OF OUR EXPERTS, WHO ARE

3    CORRECTIONAL EXPERTS FROM AROUND THE COUNTRY, AS TO A NUMBER BY

4    WHICH THEY THINK THE KIND OF MEDICAL AND MENTAL HEALTH

5    PROGRAMMING IS POSSIBLE.

6            WOULD IT BE BETTER AT A LOWER NUMBER?  YES.  THERE IS

7    NO QUESTION IT WOULD BE BETTER AT A LOWER NUMBER, BUT WE ARE

8    NOT ASKING -- WE THINK THAT THE PRESSURE OF THE REALITIES OF

9    THE SYSTEM HAVE TO BE TAKEN INTO ACCOUNT HERE.

10           I MEAN, I CAN'T SAY THAT -- THESE ARE -- THE MEN AND

11   WOMEN WHO TESTIFIED WHO RAN SYSTEMS ALSO WERE REPORTING TO

12   GOVERNORS AND STATE LEGISLATURES.  I MEAN, THERE IS NO

13   SEPARATION FROM THE POLITICAL PRESSURE HERE.

14           **JUDGE KARLTON:**  YOU KNOW, ONE OF THE SCARY THINGS

15   ABOUT WHAT I'M HEARING YOU SAY IS IT MAY BE THAT YOU ARE

16   SUGGESTING THAT THIS THREE-JUDGE COURT THAT HAS A VERY SPECIFIC

17   AND LIMITED FUNCTION IS GOING TO GO ON FOREVER, LIKE JUDGE

18   HENDERSON AND MYSELF.  WELL, WE WILL TRY 130 PERCENT.  IF THAT

19   DOESN'T WORK OUT, WE'LL COME BACK TO THE COURT AND SAY, HOW

20   ABOUT 120 PERCENT?  AND IF THAT DOESN'T WORK, WE WILL TRY 119.

21           I MEAN, THAT'S -- IF THERE IS ONE THING THAT THE PLRA

22   DOESN'T CONTEMPLATE, I THINK, IT'S SOME CONTINUING --

23           **JUDGE REINHARDT:**  I CAN ASSURE YOU, THIS THREE-JUDGE

24   COURT IS NOT GOING TO GO ON THAT WAY.  JUDGE HENDERSON AND

25   JUDGE KARLTON CAN SPEND THE REST OF THEIR LIVES WITH THIS

1  PROBLEM, BUT...

2         **JUDGE HENDERSON:**  NOT WITHOUT YOU.

3         **JUDGE REINHARDT:**  I THINK THIS IS A VERY IMPERFECT

4  SCIENCE AND THESE ARE ESTIMATES, AND I'M WILLING TO ACCEPT

5  ESTIMATES AND NOT BE ASSURED BEYOND A REASONABLE DOUBT THAT

6  IT'S REALLY GOING TO WORK.

7         WE HAVE HAD A LOT OF EXPERTS WHO HAVE GIVEN US THEIR

8  VIEWS.  I THINK JUDGE KARLTON IS RIGHT, THAT THEY ARE

9  INFLUENCED TO SOME EXTENT BY LIVING IN A POLITICAL WORLD.  OF

10  COURSE, WE ARE ABOVE POLITICS.

11         **JUDGE KARLTON:**  OH, YES.

12         **JUDGE REINHARDT:**  WE WON'T BE INFLUENCED BY THAT AND

13  WE'LL DO THE BEST WE CAN.  AND IF IT DOESN'T WORK OUT, THERE

14  WILL BE ANOTHER CASE SOME DAY.

15         **MR. BIEN:**  AND I THINK THAT IN DEFENDANTS' PROPOSED

16  FINDINGS AND CONCLUSIONS OF LAW THEY SAID THAT WE DIDN'T MEET

17  OUR BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT

18  130 PERCENT WAS GOING TO SOLVE ALL THE MEDICAL AND MENTAL

19  HEALTH PROBLEMS.

20         **JUDGE KARLTON:**  AND YOU ARE WILLING TO CONCEDE THAT?

21         **MR. BIEN:**  WELL, THAT IS NOT OUR BURDEN.  THE CLEAR

22  AND CONVINCING EVIDENCE STANDARD APPLIES TO THE PROOF OF

23  PRIMARY CAUSE AND NO OTHER RELIEF.

24         THEN WE ARE AT A STAGE WHERE WE'RE LOOKING AT WHAT IS

25  AN APPROPRIATE INJUNCTION?  WHAT IS AN APPROPRIATE REMEDY?  AND

1   THERE WE ARE IN AN AREA WHERE WE HAVE ALL LIVED FOR TOO MANY

2   YEARS.

3           AND IN TERMS OF TIME, WHAT I'M HERE TO SAY IS THE WAY

4   WE CAN BRING THESE CASES TO A CONCLUSION, WHAT WE HAVE PROVEN

5   IN THIS TRIAL IS THE ONLY POSSIBLE WAY IS TO ISSUE THE ORDER

6   WE'RE REQUESTING.  WE MUST GET THE POPULATION UNDER CONTROL.

7           WE HAVE TRIED EVERYTHING ELSE, AND JUDGE HENDERSON

8   AND JUDGE KARLTON HAVE TRIED EVERYTHING ELSE.  THERE IS NO

9   OTHER WAY OF DOING IT.  THERE IS NO OTHER POSSIBLE RELIEF,

10  WHETHER WE CALL IT RELIEF UNDER THE PLRA OR WE CALL IT SOME

11  OTHER EVENT.

12          WE HAVE PROVEN NOT ONLY THAT THE -- THAT THESE

13  PRISONS ARE CRIMINOGENIC, BUT THEY ARE PATHOGENIC.  THEY ARE

14  GENERATING DISEASE AT THIS LEVEL OF OVERCROWDING.

15          AND JUDGE KARLTON POINTED US TO THE CCPOA DECISION.

16  THE GOVERNOR SAYS THE PRISONS ARE GENERATING DISEASE.  THEY ARE

17  DANGEROUS FOR PUBLIC SAFETY.  WE PUT THAT EVIDENCE IN THE

18  RECORD HERE MANY TIMES FROM THE GOVERNOR, BUT WE PUT IT IN THE

19  RECORD FROM OUR OWN EXPERTS, WHO ARE SAYING THAT THIS LEVEL OF

20  OVERCROWDING IS CREATING INCREASED VIOLENCE, STRESS, MENTAL

21  ILLNESS.  IT'S INCREASING THE DEMAND FOR MEDICAL SERVICES,

22  MENTAL HEALTH SERVICES.  IT'S GENERATING DISEASE.  IT MUST BE

23  REDUCED.  AND THAT'S THE ONLY WAY WE CAN SOLVE THESE PROBLEMS.

24          WHEN WE TALK ABOUT THIS NUMBER OF 130 PERCENT, WHERE

25  IS THE EVIDENCE IN THE RECORD THAT THERE IS SOME OTHER NUMBER?

1   WHERE IS DEFENDANT SHOWING OF SOME NARROWER RELIEF?  WHERE IS

2   THEIR SHOWING THAT THESE PROBLEMS CAN BE SOLVED IN ANY OTHER

3   WAY?

4            ON THE MENTAL HEALTH SIDE WE HAVE ROBIN DEZEMBER --

5            **JUDGE REINHARDT:**  WELL, DIDN'T THE INDEPENDENT REVIEW

6   PANEL RECOMMEND 145 PERCENT?

7            **MR. BIEN:**  THEY DID.  AND THE EVIDENCE THAT WE

8   INTRODUCED IS THAT FROM -- BY CHANCE, ROBIN DEZEMBER HAD A

9   DIFFERENT HAT THEN.  HE WAS CHAIR OF THAT -- HE WAS THEIR CHAIR

10  OF THAT EXECUTIVE STAFF.  I FORGOT HIS TITLE.  AND HE TESTIFIED

11  AT HIS DEPOSITION, WHICH IS IN EVIDENCE, THAT THAT GROUP WAS A

12  GROUP OF WARDENS AND THAT THEY DID NOT TAKE INTO ACCOUNT THE

13  DELIVERY OF MEDICAL AND MENTAL HEALTHCARE IN THEIR ANALYSIS.

14  THAT WAS NOT SOMETHING THAT WAS BEFORE THEM.

15           AND WE INTRODUCED -- THE LOWER NUMBER COMES FROM

16  CONSIDERATION OF THOSE FACTORS AND, IN ADDITION, FROM

17  CONSIDERATION OF THE MORE RECENT ANALYSIS BY THE DEPARTMENT OF

18  ITS OWN CAPACITY BY -- BY DEBRA HYSEN AND OTHERS WHO WERE

19  RESPONSIBLE FOR PLANNING THE IN-FILL BEDS AND OTHER PROGRAMS.

20  THEY KNOW WHAT TO DO.  THEY KNOW --

21           **JUDGE KARLTON:**  NO.  I MEAN, THE TRUTH OF THE MATTER

22  IS THAT WE ARE HERE BECAUSE THERE IS OVERWHELMING EVIDENCE THAT

23  THEY DON'T KNOW WHAT TO DO OR HOW TO DO IT.  I MEAN, THAT'S

24  WHERE WE ARE.  IF I WERE TO RELY UPON THE DEPARTMENT, WE COULD

25  ALL GO HOME.

1          MR. BIEN:  WE ARE ASKING YOU TO DO A DIFFICULT THING,

2   JUDGE KARLTON.

3          I THINK FOR ALL OF US WHO HAVE LIVED THROUGH BROKEN

4   PROMISES AND DESTROYED PLANS AND IN THE MIDDLE OF THIS TRIAL

5   HAVE A DEFENSE BASED ON THE -- WE ARE GOING TO THROW ALL THE

6   MENTAL HEALTH PROBLEMS INTO THE RECEIVER'S HANDS AND THEN BE

7   TOLD THAT WE'VE CHANGED OUR MIND, OF COURSE, OUR FAITH IN THIS

8   SYSTEM IS BROKEN.  AND I UNDERSTAND THAT YOURS IS AND THAT MINE

9   IS, TOO.

10         BUT WE ARE ASKING YOU, AND OUR POSITION IS THAT WE

11  MUST RECORD ALL THAT INFORMATION, MAKE THE FINDINGS ABOUT WHAT

12  WE HAVE LEARNED ABOUT WHAT'S GOING ON IN THE PRISONS, THE

13  APPROPRIATE CAPACITY, THE EFFECTS OF OVERCROWDING, MAKE THE

14  APPROPRIATE FINDINGS ABOUT PUBLIC SAFETY, MAKE THE APPROPRIATE

15  FINDINGS ABOUT WHAT WE HAVE LEARNED ABOUT THE BROKEN

16  RELATIONSHIP BETWEEN OUR STATE AND COUNTY GOVERNMENTS, THE

17  BROKEN RELATIONSHIP BETWEEN D.A.'S AND THE DEPARTMENT OF

18  CORRECTIONS AND PAROLE.

19         I MEAN, WE CAN'T SOLVE ALL THOSE PROBLEMS.  YOU DON'T

20  HAVE THE POWER TO SOLVE ALL THOSE PROBLEMS.

21         AND THESE ARE PROBLEMS THAT, APPARENTLY, OUR PUBLIC

22  OFFICIALS ARE WELL AWARE OF.  THEY HAVE TESTIFIED ABOUT THEM,

23  ARE PERFECTLY FINE TO LIVE WITH DESPITE THE RISK TO PUBLIC

24  SAFETY, DESPITE BUDGET CRISIS.

25         WE CAN'T SOLVE THEM.  YOU DON'T HAVE THE POWER TO

1  SOLVE THEM.

2           HOWEVER, THERE'S SOMETHING THAT WE CAN DO, AND WE ARE

3  ASKING YOU TO DO, THAT CAN MOVE THE STATE OF CALIFORNIA FORWARD

4  AND, HOPEFULLY, HELP EVERYONE.

5           ONE IS, MAKE THE FINDINGS ABOUT WHAT WAS TRIED IN

6  THIS CASE.  THIS CASE WAS AN INVALUABLE LESSON FOR ALL OF US ON

7  THE DYSFUNCTION OF THE STATE OF CALIFORNIA AT THIS VERY MOMENT.

8  AND THE EVIDENCE WAS UNDISPUTED THAT OUR LEADERSHIP IS UNABLE

9  TO MAKE DECISIONS ABOUT THE FUNDAMENTAL THINGS THAT GOVERN THE

10 RELATIONSHIP BETWEEN COUNTIES AND THE STATE, ABOUT HEALTHCARE

11 IN THE COUNTIES, ABOUT WHO IS RESPONSIBLE FOR PROVIDING THINGS.

12 THAT'S TRUE.

13          ON THE OTHER HAND, THE SUPREME COURT HAS MADE CLEAR

14 THAT OUR PUBLIC OFFICIALS MUST BE GIVEN THE OPPORTUNITY TO STEP

15 FORWARD AND TO ADDRESS THIS PROBLEM.

16          ONCE YOU MAKE THE FINDINGS, WE URGE YOU TO ALLOW THE

17 STATE TO COME UP WITH THEIR PLAN IN CONSULTATION WITH THE

18 INTERVENORS, PLAINTIFFS' COUNSEL.  AND I CAN TELL YOU THAT THEY

19 HAVE BEEN DOING THIS PLAN.  THEY HAVE A PLAN.  THE GOVERNOR

20 WENT FORWARD IN THE BUDGET.  HE'S DONE IT FIVE TIMES SINCE

21 2006.  THEY HAVE A PLAN TO DO EXACTLY WHAT WE ARE TALKING

22 ABOUT.

23          MR. AUSTIN --

24          **JUDGE REINHARDT:**  YOU SAY THE GOVERNOR'S BUDGET

25 CONTAINS THE PLAN THAT WOULD SOLVE YOUR PROBLEM?

1         **MR. BIEN:**  THE GOVERNOR'S BUDGET AND THE DEPARTMENT

2   OF CORRECTIONS HAS ANALYZED EACH OF THE VERY MEASURES THAT WE

3   HAVE PUT FORWARD AS PROPOSALS.  THEY HAVE LOOKED AT CHANGES IN

4   PAROLE, WHICH THEY ARE IMPLEMENTING.  SOME OF THEM THEY ARE NOT

5   IMPLEMENTING, BUT THEY HAVE STUDIED THEM ALL.

6         THEY HAVE LOOKED AT CHANGES IN CREDITS.  THEY HAVE

7   LOOKED AT CHANGES IN SENTENCING AND CHANGING THE DEFINITIONS OF

8   VARIOUS CRIMES TO AFFECT WHO IS IN PRISON.

9         **JUDGE KARLTON:**  LET'S TALK ABOUT THAT FOR A MOMENT.

10  IT'S SO FAR DOWN THE LINE, MAYBE WE SHOULDN'T BE TALKING ABOUT

11  IT, BUT IT APPEARS CLEAR THAT UNDER THE PLRA UNDER APPROPRIATE

12  CIRCUMSTANCES THE COURT CAN ORDER A WAIVER OF STATE LAW.

13        DOES THAT INCLUDE, IN YOUR VIEW, REDEFINING THE LEVEL

14  OF CRIME?  USING THE EXAMPLE THAT'S BEEN TALKED ABOUT IN THE

15  TRIAL, ABOUT RAISING THE AMOUNT BEFORE IT BECOMES -- OF A THEFT

16  BEFORE IT BECOMES A FELONY?  DO WE HAVE THE POWER TO DO THAT

17  YOU THINK?

18        **MR. BIEN:**  AT THIS STAGE I DO NOT THINK YOU DO.

19        **JUDGE REINHARDT:**  WE ARE TALKING ABOUT WAY DOWN THE

20  LINE.  ASSUMING THAT THERE IS A CAP, ASSUMING THE STATE SAYS,

21  WE ARE NOT INTERESTED IN DEVELOPING OUR OWN PLAN.

22        **MR. BIEN:**  I THINK THAT THE POWER OF THIS COURT WOULD

23  BE, AT THE LEAST, IN AREAS SUCH AS, YOU KNOW, REDEFINING A

24  CRIME.

25        YOU KNOW, THE MODELS THAT WE HAVE SEEN IN TERMS OF

```
 1   CAPS IS REALLY THE MODEL THAT WE ARE SUGGESTING, WHICH IS THE

 2   COURT SAYS YOU CANNOT OPERATE YOUR PRISONS AT THIS CAPACITY.

 3   PEOPLE ARE DYING.  IT'S UNSAFE.  IT'S BAD FOR PUBLIC SAFETY.

 4         JUDGE REINHARDT:  LET'S GET TO THE POINT.  YOU ARE UP

 5   TO THE POINT IN JUDGE KARLTON'S QUESTION WHERE THERE IS A CAP.

 6   THE STATE HASN'T COME UP WITH A PLAN.  THE GOVERNOR HAS

 7   SUGGESTED A PLAN.

 8         DOES THE COURT HAVE THE AUTHORITY --

 9         JUDGE KARLTON:  BUT THE LEGISLATURE HAS DONE NOTHING.

10         JUDGE REINHARDT:  DOES THE COURT HAVE THE AUTHORITY

11   TO ORDER THE GOVERNOR'S PLAN INTO EFFECT?

12         MR. BIEN:  I THINK IT DOES.  I THINK AT THAT POINT

13   WHEN, IF THE STATE OF CALIFORNIA IS COMING FORWARD.  I MEAN,

14   APPARENTLY, THAT'S THE ONLY WAY THEY OPERATE THESE DAYS.

15         AS JUDGE KARLTON AND JUDGE HENDERSON WILL TELL YOU,

16   JUDGE REINHARDT, THEY WANT TO DO SOMETHING VOLUNTARILY, THEY

17   COME TO THE COURT AND SAY, "PLEASE ORDER ME TO DO THIS."  I

18   JUST DON'T KNOW WHY, BUT THAT'S WHAT THEY DO.

19         SO, APPARENTLY, THE STATE THINKS THAT THAT'S HOW

20   THINGS SHOULD OPERATE.  THEY CAN'T DO ANYTHING ON THEIR OWN.

21         JUDGE REINHARDT:  THE QUESTION IS:  IS THE AUTHORITY

22   -- ASSUME FROM YOUR VIEW OF LIFE --

23         MR. BIEN:  I THINK IF THE GOVERNOR OF THE STATE OF

24   CALIFORNIA AND THE HEAD OF THE DEPARTMENT OF CORRECTIONS COMES

25   AND SAYS, IN ORDER TO COMPLY WITH THIS ORDER TO ESTABLISH
```

1  CONSTITUTIONAL MEDICAL MENTAL HEALTHCARE IN THESE PRISONS AND

2  TO ACHIEVE THE POPULATION LEVEL THAT YOU HAVE REQUESTED, THAT I

3  REQUEST AN ORDER WAIVING STATE LAW "X," I THINK THAT YOU HAVE

4  THE AUTHORITY TO DO THAT.  UNDER THE PLRA IT SAYS YOU DO

5  EXPRESSLY.

6       BUT I THINK THAT THE -- AND THAT, UNFORTUNATELY, MAY

7  BE SOMETHING THAT HAPPENS.

8       JUDGE REINHARDT:  THAT'S WAY DOWN THE LINE.

9       MR. BIEN:  HOPEFULLY, NOT TOO FAR DOWN THE LINE.  I

10  THINK THAT, YOU KNOW --

11       JUDGE KARLTON:  I DON'T THINK YOU UNDERSTAND HOW

12  RELUCTANT WE ARE -- NEVER MIND.  GO AHEAD.

13       MR. BIEN:  WELL --

14       JUDGE REINHARDT:  WELL, SOME MORE THAN OTHERS.

15       MR. BIEN:  YOU KNOW, I THINK THAT -- I DO UNDERSTAND

16  HOW RELUCTANT YOU ARE AND YOU HAVE TO UNDERSTAND HOW RELUCTANT

17  I AM, TOO.

18       I WOULD LIKE TO GET -- WE HAVE CLIENTS, AS WE SIT

19  HERE IN THIS -- AS JUDGE REINHARDT SAID, IN ONE OF THE MOST

20  BEAUTIFUL COURTROOMS IN THE WORLD, IF NOT THE COUNTRY HERE, I

21  HAVE CLIENTS WHO ARE GOING TO DIE IN THE NEXT COUPLE OF DAYS --

22       JUDGE REINHARDT:  WHEN I SAID WE HAVE A LOT, I WASN'T

23  TALKING ABOUT TIME.  I WAS TALKING ABOUT PROCESS.  WE TALKED

24  ABOUT IF YOU WERE TO PREVAIL ON SOME OF THE ISSUES, THE FIRST

25  STEP WOULD BE PROBABLY THE ISSUE OF CAPPING.  I HAVE TO TELL

1   THE STATE TO COME UP WITH A PLAN.

2           WHEN I SAID DOWN THE LINE, I'M TALKING ABOUT AT THAT

3   POINT WE WOULD CONSIDER SOME OF THE ISSUES THAT WE ARE NOW

4   DISCUSSING IN THEORY NOW BECAUSE THEY MIGHT NEVER ARISE.

5           SO I DON'T MEAN IT'S GOING TO TAKE A YEAR, SIX

6   MONTHS, WHATEVER.  IT'S AT THE NEXT STAGE OF THE PROCEEDINGS

7   SHOULD WE REACH IT.

8           **MR. BIEN:**  THAT'S CORRECT, YOUR HONOR, AND WE THINK

9   IT WOULD BE PREMATURE TO REACH THAT QUESTION NOW.

10          **JUDGE REINHARDT:**  ALL RIGHT.  NOW, WHAT'S YOUR NEXT

11  SUBJECT?

12          **MR. BIEN:**  I THINK IN TERMS OF PRIMARY CAUSE AND AS

13  TO THE MENTALLY ILL, WE HAVE COVERED IT.

14          I WILL SAY THAT IN TERMS OF WHAT YOU WILL HEAR, I

15  ASSUME, FROM THE DEFENDANTS IS THAT SOMEHOW -- THERE'S JUST TWO

16  THINGS I WOULD LIKE TO ADDRESS.

17          ONE IS THAT SOMEHOW THE COLEMAN CLASS IS NOT AFFECTED

18  BY OVERCROWDING.  I THINK THAT WE HAVE MADE THE CASE THAT THE

19  COLEMAN CLASS IS AFFECTED IN EVERY WAY AND EVERY DAY BY

20  OVERCROWDING; NOT JUST THE 5,000 THAT DEFENDANTS ADMIT ARE IN

21  THESE BAD BEDS, BUT THE COLEMAN CLASS MEMBERS WHO ARE HOUSED

22  THROUGHOUT THE PRISONS.

23          AND I THINK THAT ONE THING THAT'S IMPORTANT TO

24  REMEMBER HERE IS THAT BOTH THE COLEMAN AND PLATA CLASSES ARE

25  FLUID CLASSES.  EVERY DAY THEIR MEMBERSHIP CHANGES.

1        ANYONE MAY NEED MEDICAL OR MENTAL HEALTHCARE AT A

2    PARTICULAR MOMENT, BUT ONE THING THAT I THINK WE DIDN'T

3    EMPHASIZE THAT I WOULD LIKE TO BRING TO YOUR ATTENTION IS THAT

4    ONE HALF OF THE SUICIDES THAT OCCUR ARE OF NON, QUOTE, COLEMAN

5    CLASS MEMBERS.  IN OTHER WORDS, AT THE TIME THAT THEY WERE --

6    THEY KILLED THEMSELVES, THEY HAD NOT BEEN IDENTIFIED.

7        THE SUICIDE PREVENTION MEASURES THAT ARE MANDATED BY

8    COLEMAN APPLY TO EVERYONE.  THEY APPLY TO ALL PEOPLE IN THE

9    PRISONS.

10        THE MEDICAL PROVISIONS APPLY TO EVERYONE.  THE

11   SCREENING PROVISIONS FOR MEDICAL AND MENTAL HEALTHCARE APPLY TO

12   EVERYONE.

13        THE IDEA THAT SOMEHOW WE CAN PICK OUT THE COLEMAN

14   CLASS OR THE PLATA CLASS AND JUST DO A REMEDY FOR THEM IS A

15   FICTION.  THERE IS NO SUCH GROUP.  IF YOU LEFT THE PRISONS

16   OVERCROWDED AND REMOVED THE MOST SERIOUSLY ILL, FOR EXAMPLE, OF

17   THE COLEMAN AND PLATA CLASSES, THAT WOULD NOT SOLVE THE

18   PROBLEMS OF OVERCROWDING BECAUSE IF YOU STILL LEFT THAT

19   CROWDING, YOU LEFT THOSE HORRIBLE RECEPTION CENTERS, YOU LEFT

20   THE CHURNING OF PAROLE VIOLATORS THROUGH, THE SAME PATHOGENIC

21   SITUATION WOULD REMAIN.  THE SAME CRIMINOGENIC SITUATIONS WOULD

22   REMAIN.  THE SAME PROBLEMS WOULD REMAIN.

23        THE REMEDY MUST BE BROAD.  IN OTHER WORDS, IT HAS TO

24   BE A NARROWLY TAILORED REMEDY, BUT IT WILL NOT WORK -- THE

25   EVIDENCE SHOWS IT WILL NOT WORK UNLESS THERE IS A GENERAL

1  REDUCTION IN THE POPULATION.

2       JUDGE KARLTON ASKED, YOU KNOW, IS IT GOING TO HELP

3  THE COLEMAN CLASS TO HAVE THIS GENERAL REDUCTION?  WE PROVED

4  THROUGH MR. AUSTIN AND THROUGH VARIOUS OTHER MEANS THAT IT WILL

5  HELP.  THE WAIT LIST WILL GO WAY, WAY DOWN.  IF 8,000 OR 9,000

6  COLEMAN CLASS MEMBERS -- IF THE REDUCTION IS FIFTY, FOR

7  EXAMPLE, OVER TWO YEARS, APPROXIMATELY, 8,000 OR 9,000 COLEMAN

8  CLASS MEMBERS WILL BE REMOVED FROM THE PRISONS.  THAT WILL HAVE

9  A TREMENDOUS EFFECT, IF YOU LOOK AT THE STATISTICS, ON THE

10  ABILITY TO DELIVER CARE.  WILL IT SOLVE ALL THE PROBLEMS?  NO.

11       AND I THINK THAT'S THE OTHER DEFENSE YOU ARE GOING TO

12  HEAR.  YOU KNOW, NOT ONE EXPERT FOR THE PLAINTIFF SAID THAT IF

13  YOU DO THE POPULATION REDUCTION, IT WILL BE CONSTITUTIONAL.  OF

14  COURSE NOT.  WE ARE GOING TO NEED -- UNFORTUNATELY, WE ARE

15  GOING TO STILL NEED SOME CONSTRUCTION OF SOME BEDS.  WE ARE

16  STILL GOING TO NEED CLINICIANS TO BE HIRED.

17       THERE'S STILL GOING TO BE CHALLENGES, AS MR. KEATING

18  POINTED OUT, BECAUSE WHEN YOU BUILD A PRISON IN THE MIDDLE OF

19  NOWHERE, PEOPLE TEND NOT TO LIKE TO WORK THERE.

20       ALL THOSE CHALLENGES ARE GOING TO PERSIST.  BUT IT

21  DOESN'T MEAN THAT WE SHOULDN'T DO THIS POPULATION REDUCTION.

22  WITHOUT THE POPULATION REDUCTION, WE WILL NEVER END THESE

23  CASES.

24       **JUDGE REINHARDT:**  YOU MEAN THAT WE CANNOT ORDER A

25  REMEDY THAT WILL SOLVE THE CONSTITUTIONAL PROBLEM?

1           MR. BIEN:  THIS REMEDY WILL BE A STEP.  WITHOUT THIS

2   REMEDY, THE CONSTITUTIONAL PROBLEMS WILL PERSIST.

3           JUDGE REINHARDT:  AND WITH THE REMEDY, THE

4   CONSTITUTIONAL PROBLEMS WILL PERSIST ALSO.

5           MR. BIEN:  NO.  I THINK THAT WE'LL BE ON A -- THEY

6   WILL PERSIST UNTIL THE REMEDY IS IMPLEMENTED AND UNTIL THE REST

7   OF THE ORDERS ARE COMPLIED WITH.

8           BUT THE EVIDENCE IS UNDISPUTED -- DR. PACKER AGREES

9   WITH THIS, EVEN MR. DEZEMBER AGREES WITH THIS -- THAT YOU HAVE

10  TO BRING THE POPULATION DOWN, THAT THERE WILL BE AN IMMEDIATE

11  BENEFIT.

12          ARE WE GOING TO SOLVE EACH AND EVERY PROBLEM THROUGH

13  THIS POPULATION REDUCTION?  NO.  AND I THINK THAT THAT IS --

14  THERE HASN'T BEEN ONE PLAN IN ANY OF THESE CASES THAT ANYONE

15  EVER THOUGHT WAS GOING TO SOLVE EACH AND EVERY PART OF THE

16  PROBLEM.

17          JUDGE KARLTON:  THE ANSWER -- NOT THE ANSWER.  THE

18  STATE OF THE EVIDENCE, AS I UNDERSTAND IT, MR. BIEN, TELL ME,

19  IS THAT YOU CAN'T SOLVE THE PROBLEM WITHOUT SOLVING THE

20  OVERCROWDING, BUT OVERCROWDING IN AND OF ITSELF WILL NOT SOLVE

21  THE PROBLEM.

22          JUDGE REINHARDT:  THAT'S WHAT I UNDERSTAND YOU TO BE

23  SAYING.

24          MR. BIEN:  THAT'S CORRECT.

25          JUDGE REINHARDT:  BUT WHAT I'M ASKING YOU IS, ISN'T

1  THE COURT'S OBLIGATION TO GO BEYOND THAT AND SOLVE THE

2  CONSTITUTIONAL PROBLEMS?

3        **MR. BIEN:**  I THINK SO.  BUT THE THREE-JUDGE COURT, I

4  THINK, MUST ADDRESS THE OVERCROWDING, AND THEN THE --

5        **JUDGE KARLTON:**  GOES BACK TO US.

6        **MR. BIEN:**  AND THEN JUDGE KARLTON AND JUDGE HENDERSON

7  WILL --

8        **THE COURT:**  THAT'S WHAT I'M ASKING YOU.  WHERE DO YOU

9  GET THE IDEA THAT THAT THIS THREE-JUDGE COURT SHOULDN'T RESOLVE

10 THE CONSTITUTIONAL PROBLEM IN ITS ENTIRETY?

11       **JUDGE KARLTON:**  BECAUSE THE STATUTE DEALS WITH

12 OVERCROWDING.

13       **MR. BIEN:**  AS MUCH AS I AGREE THAT WE ARE NOT ASKING

14 THE THREE-JUDGE COURT TO REMAIN FOREVER, I THINK THAT TO THE

15 EXTENT THE THREE-JUDGE COURT'S ORDERS -- WE THINK THERE NEEDS

16 TO BE A CAP, NOT JUST A REDUCTION.

17       **JUDGE REINHARDT:**  WHEN YOU ARE TALKING ABOUT THE --

18 THAT THAT WILL SOLVE THE OVERCROWDING PROBLEM, BUT WILL LEAVE

19 THE CONSTITUTIONAL PROBLEM --

20       **MR. BIEN:**  WELL --

21       **JUDGE REINHARDT:**  -- PARTLY SOLVE, NOT ENTIRELY

22 SOLVE.  THERE ARE OTHER THINGS YOU THINK ARE NECESSARY TO SOLVE

23 THE CONSTITUTIONAL PROBLEM.

24       WHAT I'M ASKING YOU IS:  DO YOU READ THE STATUTE AS

25 SAYING THAT THE THREE-JUDGE COURT'S AUTHORITY STOPS WHEN IT

1  REDUCES THE OVERCROWDING PROBLEM AND LEAVES THE CONSTITUTIONAL

2  PROBLEM STILL EXISTING?

3      **MR. BIEN:**  YOU ARE GOING A LITTLE DOWN THE ROAD.  I

4  THINK THAT THE -- TO ME, I GUESS I'D SAY YES.

5      **JUDGE REINHARDT:**  NO, I'M NOT GOING DOWN THE ROAD.

6      **MR. BIEN:**  I GUESS I WOULD SAY YES.

7      **JUDGE REINHARDT:**  YOU SAID THE RELIEF YOU ARE ASKING

8  FOR IS TO RESOLVE THE OVERCROWDING PROBLEM AND THAT THAT WILL

9  LEAVE MORE PROBLEMS THAT PREVENT -- THAT RESULT IN THE

10  CONSTITUTIONAL PROBLEM CONTINUING.

11      AND I ASKED:  UNDER THE PLRA, WHAT IS THE OBLIGATION

12  OF THE THREE-JUDGE COURT?  IS IT ONLY TO SOLVE OVERCROWDING OR

13  IS IT TO RESOLVE THE CONSTITUTIONAL PROBLEM?

14      **MR. BIEN:**  WELL, THE REMEDY IS NOT ADDRESSED MERELY

15  AT OVERCROWDING.  OVERCROWDING IS THE PRIMARY CAUSE OF THE

16  CONSTITUTIONAL PROBLEMS.

17      SO TO THE EXTENT THAT OVERCROWDING NEEDS TO BE

18  ADDRESSED, THE THREE-JUDGE COURT HAS SPECIAL POWER TO DO THAT.

19      **JUDGE REINHARDT:**  RIGHT.  THAT I UNDERSTAND.  WE ARE

20  ALL IN AGREEMENT THAT WE CAN RESOLVE THE OVERCROWDING PROBLEM.

21  ASSUMING THERE'S AN OVERCROWDING PROBLEM, THE THREE-JUDGE COURT

22  HAS THE AUTHORITY TO RESOLVE THAT.

23      NOW, WHAT I'M ASKING YOU IS:  IS THE THREE-JUDGE

24  COURT LIMITED TO RESOLVING OVERCROWDING AND LEAVING THE

25  CONSTITUTIONAL VIOLATION IN EFFECT?  OR IS THE THREE-JUDGE

1   COURT'S OBLIGATION TO RESOLVE THE OVERCROWDING AND MAKE -- AND

2   CURE THE CONSTITUTIONAL PROBLEM?

3           **JUDGE HENDERSON:**  LET ME BE A LITTLE MORE SPECIFIC,

4   IF I CAN, STEVE.

5           **JUDGE REINHARDT:**  SURE.

6           **JUDGE HENDERSON:**  FOR EXAMPLE, YOU SAID WE ARE STILL

7   GOING TO NEED CONSTRUCTION.  CAN THE THREE-JUDGE COURT DEAL

8   WITH THAT PROBLEM?  WE ARE GOING TO NEED -- THAT'S A STATE

9   CONSTITUTIONAL PROBLEM.  CAN THE THREE-JUDGE COURT ORDER THE

10  CONSTRUCTION AS A PART OF THE REMEDY?

11          **JUDGE REINHARDT:**  I JUST WANT TO KNOW WHAT WE ARE

12  SUPPOSED TO DO.

13          **MR. BIEN:**  I THINK AGAIN -- NOW WE ARE TALKING ABOUT

14  DOWN THE ROAD.  I'M GOING TO PUT ASIDE THE QUESTION THAT IS NOW

15  BEFORE THE NINTH CIRCUIT, WHICH IS WHETHER THE APPEAL ALREADY

16  PERMITS ANY COURT TO ORDER CONSTRUCTION OF ANYTHING.

17  APPARENTLY, THE --

18          **JUDGE REINHARDT:**  WELL, THE PLRA SAYS THAT WE CAN

19  ORDER THIS.  SO LEAVE THAT ONE ASIDE.  IT SAYS:

20          "WHILE NOTHING IN THIS SECTION SHALL BE CONSTRUED

21       TO AUTHORIZE THE COURTS IN EXERCISING THEIR REMEDIAL

22       POWERS TO ORDER THE CONSTRUCTION OF PRISONS."

23          WHATEVER THAT MEANS, THAT'S PART OF WHAT WE ARE DOING

24  I THINK.  WHETHER SOMEONE ELSE CAN, SOME OTHER COURT CAN, BUT

25  AS FAR AS OUR THREE-JUDGE COURT, I'M ASSUMING THAT WE CAN'T DO

 1  THAT; BUT, AS YOU SAID, WHETHER SOME OTHER AUTHORITY CAN DO IT

 2  MAY BE PART OF AN ISSUE BEFORE THE NINTH CIRCUIT OR WHATEVER.

 3          SO LET'S LEAVE ASIDE CONSTRUCTION.  THERE ARE OTHER

 4  THINGS YOU SAY MAY BE NECESSARY.

 5          **MR. BIEN:**  I THINK THAT TO THE EXTENT THAT YOU HAVE

 6  THE PRISONER RELEASE ORDER LANGUAGE, WHICH IS SO BROAD, THAT IF

 7  WE COME DOWN THE ROAD AND THERE IS SOMETHING THAT NEEDS TO BE

 8  DONE THAT'S A PRISONER RELEASE ORDER, THEN THE DISTRICT JUDGES

 9  BY THEMSELVES WILL NOT BE ABLE TO DO THAT.

10          **JUDGE REINHARDT:**  YOU KNOW, I'M ONLY ASKING THIS

11  QUESTION BECAUSE YOU RAISED IT.  YOU SAID TO US, YOU GIVE US

12  THIS PRISONER RELEASE ORDER AND IT WILL NOT SOLVE THE

13  CONSTITUTIONAL PROBLEM.  I DIDN'T SAY IT.  YOU SAID IT.

14          AND THAT LEAVES TWO THINGS THAT HAVE TO BE DONE IN

15  ORDER TO RESOLVE THE CONSTITUTIONAL PROBLEM.

16          **MR. BIEN:**  WHAT I MEANT TO SAY, YOUR HONOR, IS THE

17  POPULATION REDUCTION IS A NECESSARY, BUT NOT SUFFICIENT REMEDY

18  FOR ALL THE VIOLATIONS.

19          **JUDGE REINHARDT:**  ABSOLUTELY.  THAT'S WHAT YOU SAID.

20          **JUDGE KARLTON:**  SEVERAL TIMES.

21          **JUDGE REINHARDT:**  IT IS NOT A SUFFICIENT REMEDY TO

22  SOLVE THE CONSTITUTIONAL PROBLEM.  AND I SAID, WHY SHOULDN'T WE

23  THEN SOLVE THE CONSTITUTIONAL PROBLEM?  IS THAT OUR OBLIGATION?

24  IS THAT OUR AUTHORITY?

25          **MR. BIEN:**  TO THE EXTENT THE PRISONER RELEASE ORDER

1  IS NECESSARY TO SOLVE THE CONSTITUTIONAL VIOLATIONS, I THINK IT

2  WOULD BE --

3       JUDGE REINHARDT:  THAT'S NOT THE QUESTION.  THE

4  QUESTION IS:  WE ALL ASSUME THAT WE ARE HERE TO ISSUE A

5  PRISONER RELEASE ORDER, WHICH YOU TELL US DOES NOT RESULT IN A

6  CONSTITUTIONAL PROBLEM.

7       SO I SAID, ONCE WE ARE HERE, ASSUMING WE ARE GOING TO

8  ISSUE A PRISONER RELEASE ORDER AND IT DOESN'T SOLVE THE

9  CONSTITUTIONAL PROBLEM, UNDER THE PLRA IS IT OUR OBLIGATION OR

10  DO WE HAVE THE AUTHORITY TO GO AHEAD AND SOLVE THE

11  CONSTITUTIONAL PROBLEM?

12       MR. BIEN:  I WOULD HAVE TO SAY THAT IT'S SO -- THAT

13  THE ANSWER IS NO; THAT FIRST YOU NEED TO ALLOW THE REMEDIES TO

14  PROCEED IN THE DISTRICT COURT, TWO SEPARATE DISTRICT COURTS.

15  THAT THESE DISTRICT COURTS HAVE THE POWER.  THEY HAVE THE --

16  THEY HAVE THE ABILITY TO SOLVE THESE PROBLEMS.

17       BUT FOR OVERCROWDING, THESE CASES, IN OUR OPINION,

18  WOULD BE RESOLVED, AND THE -- THE OVERCROWDING IS THE REASON

19  THAT WE ARE A DOZEN YEARS DOWN IN COLEMAN AND IT'S OUR

20  CONTENTION THAT ONCE OVERCROWDING IS RESOLVED AND BROUGHT UNDER

21  CONTROL, THAT THE SEPARATE REMEDIES WILL BE ABLE TO SOLVE THE

22  PROBLEM.

23       JUDGE REINHARDT:  OKAY.  DO YOU HAVE ANYTHING ELSE?

24       MR. BIEN:  I THINK -- I THINK THAT WHEN WE FOCUS

25  ON -- I GUESS I THINK THAT THE REMEDY THAT WE ARE SUGGESTING

 1  WILL ADDRESS THE PROBLEMS AND I THINK THAT -- THAT IT IS -- WE

 2  ARE AT SUCH AN EXTREME LEVEL, UNPRECEDENTED LEVEL OF

 3  OVERCROWDING, THAT THE PICTURES YOU SAW, THE VIDEOS YOU SAW

 4  REALLY ONLY GIVE A TOUCH FOR HOW HORRIFIC THE CONDITIONS ARE.

 5          THESE CONDITIONS MUST BE RESOLVED AND THEY MUST BE

 6  RESOLVED PROMPTLY.  IT CAN BE RESOLVED SAFELY.  IT CAN BE

 7  RESOLVED IN A WAY THAT WILL BOTH BENEFIT THE CITIZENS OF

 8  CALIFORNIA AND IMPROVE PUBLIC SAFETY.  IT CAN BE RESOLVED IN A

 9  MANNER THAT WILL ACTUALLY SAVE MONEY.  THIS IS THE FIRST REMEDY

10  THAT WE HAVE EVER ADVOCATED THAT ACTUALLY WILL COST -- SAVE

11  MONEY TO THE STATE IN THE MIDST OF A FINANCIAL CRISIS.

12          STATES ALL ACROSS THE COUNTRY ARE DOING EXACTLY WHAT

13  WE ARE SAYING RIGHT NOW AS A MATTER OF FISCAL WISDOM.  IT

14  DOESN'T -- WHAT WE ARE DOING IN CALIFORNIA JUST DOESN'T WORK.

15  IT DOESN'T WORK FOR PUBLIC SAFETY.  IT DOESN'T WORK FOR OUR

16  BUDGET.  IT DOESN'T WORK FOR THE PRISONERS, WHICH IS THE REASON

17  WE ARE HERE.  THEY ARE SUFFERING AND DYING AS A RESULT OF

18  FAILED PUBLIC POLICY.  WE NEED TO MOVE FORWARD.

19          AND I REALLY HAVE NOTHING ELSE.  THANK YOU.

20          **JUDGE REINHARDT:**  ALL RIGHT.  THANK YOU VERY MUCH.  I

21  GUESS THERE IS NOTHING FURTHER FROM THE PLAINTIFFS AT THIS

22  POINT.  WE WILL --

23          **JUDGE HENDERSON:**  THE CCPOA.

24          **JUDGE REINHARDT:**  ALL RIGHT.  SO WE WILL HEAR FROM

25  THE INTERVENORS AFTER LUNCH, AND THEN WE WILL HEAR FROM THE

1   DEFENDANTS AND DEFENDANT INTERVENORS.

2           ALL RIGHT.  THE COURT WILL TAKE AN HOUR'S RECESS.

3           (WHEREUPON AT 12:12 P.M. PROCEEDINGS

4            WERE ADJOURNED FOR NOON RECESS.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2  **FEBRUARY 23, 2009**                                **1:15 P.M.**

3

4            (WHEREUPON, PROCEEDINGS WERE RESUMED

5             AFTER NOON RECESS.)

6        **JUDGE HENDERSON:**  CCPOA.

7        **THE COURT:**  YES, YOUR HONOR.

8        **JUDGE REINHARDT:**  WHICH SIDE ARE YOU ON TODAY?

9        **MS. LEONARD:**  THE SIDE WHERE WE HAVE ALWAYS BEEN.

10        IF YOU CAN'T HEAR ME, LET ME KNOW.  IN MY CASE, AT MY

11  TOWERING HEIGHT, I HAVE A MICROPHONE RIGHT OVER MY HEAD.

12                        **CLOSING ARGUMENT**

13        **MS. LEONARD:**  SO FIRST OF ALL, MAY IT PLEASE THE

14  COURT, WE WOULD LIKE TO THANK YOU FOR ALLOWING US TO INTERVENE

15  IN THIS PROCEEDING AND TO GIVE THE VIEWS THAT WE CAN OF BEING

16  INSIDE THE PRISONS EVERY DAY.

17        I'M PLEASED TO KNOW THAT MOST OF WHAT I WAS GOING TO

18  SAY WAS COVERED BY THE PLAINTIFFS AND I THINK ALREADY WELL

19  UNDERSTOOD BY THIS COURT.

20        WE INTERVENED PRIMARILY TO TALK ABOUT THE CONDITIONS.

21  AND THIS IS A CASE WHERE WE KNOW THE SIDE THAT WE ARE ON, AND

22  WE ARE ON THE RIGHT SIDE.  WE TRIED EVERYTHING THAT WE CAN TO

23  DEAL WITH OVERCROWDING IN EVERY SITUATION POSSIBLE, TO NO

24  AVAIL.

25        IT'S BEEN VERY CONFUSING AND WE'VE EFFECTUALLY BEGUN

1  TO TALK ABOUT A CALDRON OF CONTRADICTION IN WHICH THE STATE

2  MAKES ITS DECISIONS.

3          MR. SPECTER VERY CLEARLY COVERED THE CASE OF THE

4  RECEIVER.  THE RECEIVER HAS BEEN THE PANACEA IN THIS CASE, YET

5  THERE IS A PENDING MOTION TO DISSOLVE THE RECEIVERSHIP WE ARE

6  TRYING TO CREATE.  FOR TRYING, FOR EXAMPLE, TO CREATE --

7          **JUDGE REINHARDT:**  DO YOU MEAN THE ACTUAL PANACEA OR

8  THE STATE HAS SAID HE IS A PANACEA?

9          **MS. LEONARD:**  THE STATE HAS SAID HE IS A PANACEA, BUT

10 HE ALSO HAS BIG PLANS.  SIMILARLY, THIS MORNING JUDGE KARLTON

11 MENTIONED THE *CCPOA VERSUS SCHWARZENEGGER*, A CASE IN WHICH WE

12 HAD SOME INVOLVEMENT.

13         AND I'M GOING TO DO SOMETHING I'VE NEVER DONE BEFORE.

14 I HAVEN'T BROUGHT THE BLACKBERRY UP HERE TO TAKE A CALL.  I'M

15 GOING TO READ YOU A QUOTE FROM THAT CASE.  HERE WE HAVE HEARD

16 THE STATE TESTIFY THAT OVERCROWDING IS SOMETHING THAT THEY CAN

17 DEAL WITH AND THAT ONE COULD IMAGINE A SYSTEM IN WHICH

18 CONSTITUTIONAL MEDICAL AND MENTAL HEALTH CARE IS DELIVERED IN A

19 SYSTEM OF OVERCROWDING AND THE RISK OF PUBLIC SAFETY IS JUST

20 TOO GREAT.

21         HOWEVER, THE TRIAL COURT IN THAT CASE INDICATED THAT:

22         "THE OVERCROWDING IS A CRISIS CREATING CONDITIONS

23     OF EXTREME PERIL TO THE SAFETY OF PERSONS AND

24     PROPERTY WITHIN THE STATE WHICH ARE OR ARE LIKELY

25     WILL BE BEYOND THE CONTROL OF ANY SINGLE COUNTY OR

 1        CITY IN CALIFORNIA."

 2              **JUDGE REINHARDT:**  IS THAT THE TRIAL COURT OR COURT OF

 3   APPEALS?

 4              **JUDGE KARLTON:**  THAT'S THE COURT OF APPEALS.

 5        **MS. LEONARD:**  THE COURT OF APPEALS.

 6              WITH THAT BEING ONE OF THE REQUIREMENTS TO ALLOW THAT

 7   PROCLAMATION TO STAND.

 8              NOW, AS TO WHETHER OR NOT IT SHOULD STAND AS A

 9   PROCEDURAL ISSUE, BUT AS I UNDERSTAND IT, THAT WAS THE STATE'S

10   REPRESENTATION AT THAT TIME.

11              AND PERHAPS THE OVERCROWDING CONDITION HAS BECOME

12   MORE CONTROLLABLE FOR THE STATE, BUT WE WOULD BE UNCLEAR AS TO

13   HOW THAT WOULD HAPPEN BECAUSE NOW THE POPULATION IS LARGER THAN

14   IT WAS AT THE TIME THAT THIS CASE WAS FILED AND AT THE TIME THE

15   CASE WAS ARGUED.

16              WHEN I BEGAN, MY INTENTION IN THIS ARGUMENT WAS TO

17   TALK TO THE DEFENDANTS' CONTENTION THAT THE EXPERTS MAY NOT

18   HAVE SEEN ENOUGH OF THE CDCR SYSTEM, MAY HAVE COME ON THE BEST

19   DAY, MAY NOT HAVE VISITED ENOUGH PRISONS.

20              AND WE TRIED TO SHOW YOU IN THIS CASE THAT WE PICKED

21   SIX REPRESENTATIVE MEMBERS, BUT WE REALLY COULD HAVE PLUCKED

22   ANY ONE OF OUR 28,000 MEMBERS AND THEY WE HAVE SEEN THE SAME

23   THING THAT THE EXPERTS SAW IN THIS CASE.

24              I DON'T KNOW THAT I SHOULD TAKE THE COURT'S TIME TO

25   RECOUNT SOME OF THOSE VIGNETTES OR SOME OF THOSE STORIES

1  BECAUSE I THINK YOU ARE WELL AWARE AND YOU UNDERSTAND THE

2  SITUATION IN WHICH WE TOIL.

3          SO I THINK WHAT WE REALLY CAME TO SAY IS THAT

4  OVERCROWDING PERMEATES EVERY ASPECT OF CARE FROM PREVENTION --

5  FROM THE MOMENT THEY ARRIVE, TO THE MOMENT THEIR ISSUES ARE

6  TREATED, TO THE MOMENT THEY DEPART.

7          JUST LIKE ANY COMPLEX PROBLEM, THIS COULD HAVE ANY

8  NUMBER OF SOLUTIONS, BUT WE CAN'T BELIEVE THAT THE STATE IS

9  WILLING TO ACT.  WE HAVE LEARNED THAT THE STATE NEEDS THE

10 LEADERSHIP OF THE FEDERAL COURT.  IT NEEDS THE GUIDANCE OF THE

11 FEDERAL COURT.  IT NEEDS THE OVERSIGHT OF THE FEDERAL COURT TO

12 DO THE RIGHT THINGS.

13         WE SPEND OUR DAYS TRYING TO DO THE RIGHT THING ON

14 SHIFTS AS LONG AS 16 HOURS.  TO GIVE YOU AN EXAMPLE, IF WE WERE

15 TO HAVE A 16-HOUR SHIFT TODAY, OUR ORAL ARGUMENT WOULD EXTEND

16 UNTIL MIDNIGHT.  ANYONE INTERESTED IN THAT?  I DON'T THINK SO.

17         SO WE ASK FOR YOUR GUIDANCE.  WE ASK FOR YOUR

18 SUPPORT.  WE ASK TO HAVE INPUT INTO THE SOLUTION AS IT'S GIVEN

19 AND WE ASK FOR IT NOW.  THANK YOU.

20         **JUDGE REINHARDT:**  THANK YOU, COUNSEL.

21         **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

22                      **CLOSING ARGUMENT**

23         **MR. MELLO:**  GOOD AFTERNOON, YOUR HONORS.  PAUL MELLO

24 OF HANSEN BRIDGETT.

25         **JUDGE KARLTON:**  MR. MELLO, WHO DO YOU REPRESENT?

 1          **MR. MELLO:**  I REPRESENT THE STATE OF CALIFORNIA, THE

 2   NAMED DEFENDANTS IN THE PLATA CASE.

 3          **JUDGE KARLTON:**  AND HOW IS IT THAT YOU ARE

 4   REPRESENTING THE STATE HERE AND TAKING POSITIONS WHICH ARE

 5   CLEARLY CONTRADICTED BY THE STATE'S DECLARATION OF AN EMERGENCY

 6   PROCLAMATION CONFIRMED BY THE STATE COURTS, BECAUSE THERE WAS

 7   AN EMERGENCY OF SUCH A CHARACTER AS TO REQUIRE AND SUPPORT THE

 8   GOVERNOR'S EMERGENCY PROCLAMATION?

 9          **MR. MELLO:**  YOUR HONOR, YOU CITED AND I LOOKED AT

10   BRIEFLY THE CASE, THE CCPOA CASE THAT THIS COURT BROUGHT UP AT

11   THE BEGINNING --

12          **JUDGE KARLTON:**  THERE IS SOMETHING WRONG WITH THE

13   MICROPHONE AGAIN.

14          **MR. MELLO:**  CAN YOU NOT HEAR ME?

15          **JUDGE KARLTON:**  I'M HAVING TROUBLE.

16          **THE CLERK:**  I HAVE NO CONTROL.

17          **JUDGE KARLTON:**  IS IT ON?

18          **THE CLERK:**  YES, IT IS ON.

19          **JUDGE KARLTON:**  ALL RIGHT.  GO AHEAD.

20          **MR. MELLO:**  LET ME TRY AGAIN.

21          YOU CITED THAT CASE.  WE HAVE LOOKED AT THAT CASE.

22   I NOW KNOW THE CASE OR KNOW OF THE CASE.  THAT CASE UPHELD THE

23   GOVERNOR'S AUTHORITY TO ISSUE AN EMERGENCY PROCLAMATION.

24          IN THAT CASE THE GOVERNOR ISSUED AN EMERGENCY

25   PROCLAMATION WITH RESPECT TO OVERCROWDING IN 29 OF 33

 1   INSTITUTIONS.  IT DIRECTLY RELATED TO THE USE OF BAD BEDS IN 29

 2   OF 33 INSTITUTIONS.

 3        IT UPHELD THE EMERGENCY PROCLAMATION WITH RESPECT TO

 4   THAT PROVISION.  THAT EMERGENCY PROCLAMATION DOES NOT DIRECTLY

 5   RELATE TO THE ISSUES IN THIS COURT.

 6        **JUDGE KARLTON:**  AS I SOMETIMES SAY TO LAWYERS WHO ARE

 7   NOT NEARLY AS EXPERIENCED AS YOU ARE, IT ISN'T ENOUGH TO HAVE A

 8   DISTINCTION.  IT'S NECESSARY TO HAVE A DISTINCTION THAT MAKES A

 9   DIFFERENCE.  THE EXISTENCE OF THE CROWDING IS A STATED POLICY

10   OF YOUR CLIENT.

11        **MR. MELLO:**  UNDERSTOOD.

12        **JUDGE KARLTON:**  THAT -- MY INITIAL --

13        **MR. MELLO:**  I CAN SPEAK MORE TO THAT ISSUE IF YOU

14   WOULD LIKE, YOUR HONOR.  THIS IS NOT AN OVERCROWDING LAWSUIT.

15   THAT RELATES TO OVERCROWDING.

16        PLAINTIFFS MUST PROVE BY CLEAR AND CONVINCING

17   EVIDENCE IN THIS CASE THAT OVERCROWDING IS THE PRIMARY CAUSE OF

18   THE UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE.

19        **JUDGE KARLTON:**  YOU ARE PREPARED TO SAY THAT THERE IS

20   THIS TERRIFIC OVERCROWDING THAT THE GOVERNOR HAS RECOGNIZED,

21   INDICATED THAT IT IS DANGEROUS BY VIRTUE OF THE OVERCROWDING,

22   THAT IT CREATES MEDICAL CONDITIONS BY VIRTUE THEREOF, AND

23   THREATENS THE SAFETY OF PEOPLE, BUT THAT SOMEHOW OR OTHER THAT

24   DOES NOT RELATE TO THIS CASE?

25        **MR. MELLO:**  WHAT I'M PREPARED TO SAY IS THAT THE

1    RECORD THAT IS BEFORE THIS THREE-JUDGE PANEL, WHICH I

2    BELIEVE -- I'M A LITTLE BIT CONFUSED BY, BECAUSE I BELIEVE THAT

3    THE RECORD CLOSED ON DECEMBER 19TH AND WE'VE NOW HAD ADDITIONAL

4    ITEMS MOVED INTO EVIDENCE BY PLAINTIFFS' COUNSEL WHICH

5    DEFENDANTS HAVEN'T HAD AN OPPORTUNITY TO REBUT.

6          I'M UNCLEAR AS TO WHAT THE RECORD IS IN FRONT OF THIS

7    COURT.  WE'VE HEARD CITATIONS TO THE RECEIVER'S TENTH REPORT,

8    WHICH THIS COURT VERY SPECIFICALLY TOLD US WHEN DISCOVERY CUT

9    OFF, VERY SPECIFICALLY TOLD US WHEN THE CONDITIONS WERE FIXED,

10   AND VERY SPECIFICALLY TOLD US THAT THE ONLY THING THAT CAN BE

11   CONSIDERED AFTER AUGUST 30TH, 2008 WAS EVIDENCE FROM THE

12   RECEIVER'S NINTH REPORT, NOT HIS TENTH REPORT, AND IF THERE

13   WERE ANY DEVELOPMENTS IN THE LEGISLATURE.  AND, UNFORTUNATELY,

14   THERE HAVEN'T BEEN ANY.

15         I'VE HEARD EVIDENCE WITH RESPECT TO THE GOVERNOR'S

16   VETO.  I WOULD LIKE TO SPEAK TO THAT.  LET'S TALK ABOUT THE

17   VETO.  THE VETO DID, IN FACT -- THE GOVERNOR DID, IN FACT, VETO

18   THE FIX FOR AB900.  AND WHY IS THAT?  THAT IS BECAUSE THE

19   PACKAGE OF BILLS THAT WENT TO THE GOVERNOR WAS LINKED, MEANING

20   HE COULDN'T PICK AND CHOOSE WHICH ONES HE HAD TO VETO OR NOT

21   VETO.  THEY WERE LINKED.  AND THOSE PACKAGE OF BILLS DID NOT

22   ADDRESS THE FISCAL CRISIS AND ECONOMIC EMERGENCY WITH RESPECT

23   TO THE BUDGET.  HE HAD NO CHOICE, AND THAT'S WHAT HE HAS SAID.

24         **JUDGE REINHARDT:**  I THINK THAT POSITION WAS MADE

25   CLEAR AT THE LAST HEARING.  AS I RECALL, IT DOESN'T SOUND NEW

1  TO ME.

2          **MR. MELLO:**  WELL, I DON'T BELIEVE HE VETOED IT AT THE

3  LAST HEARING.  IT HAPPENED AFTERWARDS.

4          **JUDGE REINHARDT:**  WELL, I THOUGHT SOMEBODY EXPLAINED

5  THAT.

6          **MR. MELLO:**  THE VETOES HAPPENED SUBSEQUENTLY TO THE

7  LAST TIME WE WERE TOGETHER, YOUR HONOR.

8          **JUDGE REINHARDT:**  I REMEMBER HEARING THAT IT WAS NOT

9  BECAUSE OF THE -- BECAUSE HE DISAPPROVED OF THE PROVISIONS

10 RELATING TO THAT, BUT BECAUSE IT WAS A -- MAYBE I IMAGINED IT.

11 I THOUGHT I HEARD THAT IN COURT, THAT THE STATE WAS SAYING IT

12 WAS NOT HE DISAPPROVED OF IT.

13         **MR. MELLO:**  CORRECT, BUT IT IS BEING USED AS SOME

14 SORT OF EVIDENCE THAT THE GOVERNOR DOESN'T WANT TO FIX THE

15 AB900.

16         **JUDGE KARLTON:**  NO, NO.

17         **JUDGE REINHARDT:**  IT'S NOT VERY PERSUASIVE --

18         **JUDGE KARLTON:**  THE QUESTION -- GO AHEAD.  IT DOESN'T

19 MATTER.  I DON'T KNOW WHETHER OR NOT YOU CAN ARGUE AS A MATTER

20 OF LAW, WHETHER YOU CAN ARGUE CONTRARY TO THE GOVERNOR'S STATED

21 POSITION.  THAT'S THE FIRST QUESTION.

22         DO YOU HAVE THE AUTHORITY TO CONTRADICT THE

23 GOVERNOR'S FINDINGS OF FACT WHICH UNDERLIE THE PROCLAMATION?

24         **MR. MELLO:**  THE EMERGENCY PROCLAMATION THAT

25 UNDERLIES -- THAT YOU ARE SPEAKING TO DOES NOT SAY AS THIS

1   COURT MUST FIND THAT OVERCROWDING IS A PRIMARY CAUSE OF THE

2   UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE.

3          **JUDGE KARLTON:**  LET'S START AT THE BEGINNING.

4          DO YOU ACKNOWLEDGE THAT THERE IS OVERCROWDING WHICH

5   CREATES DANGERS OF -- I'M SORRY.  I HAVE FORGOTTEN THE

6   LANGUAGE.  BUT GIVES RISE TO DANGERS OF HEALTH, DANGERS FOR

7   BOTH --

8          **MR. MELLO:**  THE GOVERNOR OF THE STATE OF CALIFORNIA

9   ACKNOWLEDGED THAT AND THAT'S WHY HE ISSUED AN EMERGENCY

10  PROCLAMATION --

11         **JUDGE KARLTON:**  DO YOU ACKNOWLEDGE THAT THAT IS TRUE

12  IN THIS CASE?

13         **MR. MELLO:**  THERE IS OVERCROWDING.  THAT'S --

14         **JUDGE KARLTON:**  I'M ASKING A DIFFERENT QUESTION.  LET

15  ME FIND THE LANGUAGE.

16         **JUDGE HENDERSON:**  EMERGENCY SERVICE, THAT MAKES CLEAR

17  THAT IN SITUATIONS OF EXTREME PERIL TO THE PUBLIC WELFARE THE

18  STATE MAY EXERCISE.

19         **JUDGE KARLTON:**  RIGHT.  SPECIFICALLY THE GOVERNOR

20  PROCLAMATION FOUND THAT THE SEVERE PRISON OVERCROWDING CAUSED

21  SUBSTANTIAL RISK TO THE HEALTH AND SAFETY OF THE MEN AND WOMEN

22  WHO WORK INSIDE THESE PRISONS AND THE INMATES WHO ARE HOUSED

23  THEREIN.

24         DO YOU ACKNOWLEDGE THAT?

25         **MR. MELLO:**  OF COURSE.  IT IS THE EMERGENCY

```
 1   PROCLAMATION --

 2            JUDGE KARLTON:  DO YOU ACKNOWLEDGE THE FACT?

 3            MR. MELLO:  YES.  IT'S IN THE EMERGENCY PROCLAMATION.

 4   I HAVE ACKNOWLEDGED THE FACT.  I DO NOT ACKNOWLEDGE NOR HAVE

 5   PLAINTIFFS PROVED THAT THAT OVERCROWDING IS THE PRIMARY CAUSE

 6   OF THE UNCONSTITUTIONAL DELIVERY OF THE HEALTHCARE AND THAT A

 7   PRISONER RELEASE ORDER IS THE ONLY RELIEF THAT WILL REMEDY.

 8            JUDGE REINHARDT:  THOSE ARE TWO DIFFERENT THINGS.

 9            MR. MELLO:  I AGREE.

10            JUDGE REINHARDT:  LET'S TAKE THE FIRST.

11            DO YOU ACKNOWLEDGE THAT THE OVERCROWDING IS A CAUSE

12   OF ILLNESSES, WHATEVER, I DON'T KNOW -- UNFORTUNATELY, I DIDN'T

13   BRING IT IN, BUT THAT THE OVERCROWDING IS THE CAUSE OF THE

14   HEALTH PROBLEMS IN THE PRISON?

15            MR. MELLO:  THAT OVERCROWDING IS THE --

16            JUDGE REINHARDT:  I'M NOT ASKING YOU WHETHER IT'S THE

17   PRIMARY CAUSE.

18            MR. MELLO:  WHETHER IT CONTRIBUTES?

19            JUDGE REINHARDT:  WELL, WHETHER --

20            JUDGE KARLTON:  WELL, WHAT I READ WAS THAT THE

21   GOVERNOR'S PROCLAMATION FOUND THAT SEVERE PRISON OVERCROWDING

22   CAUSED -- CAUSED SUBSTANTIAL RISK TO THE HEALTH AND SAFETY OF

23   THE MEN AND WOMEN WHO WORKED INSIDE THE PRISONS AND THE INMATES

24   HOUSED IN THEM.

25            OR THE PROCLAMATION FURTHER FOUND THAT THERE WAS AN
```

1  INCREASED SUBSTANTIAL RISK TO THE HEALTH AND SAFETY OF CDCR

2  STAFF, INMATES AND THE PUBLIC.

3          **MR. MELLO:**  THAT'S WHAT THE EMERGENCY PROCLAMATION

4  SAYS.

5          **JUDGE KARLTON:**  NO.

6          **JUDGE REINHARDT:**  SO YOU ACKNOWLEDGE THAT THE

7  OVERCROWDING IS A CAUSE?

8          **MR. MELLO:**  CORRECT.

9          **JUDGE REINHARDT:**  AND YOUR ONLY DISAGREEMENT IS IT'S

10 NOT THE PRIMARY CAUSE?

11         **MR. MELLO:**  CORRECT.  I MEAN, THAT STATEMENT IS IN

12 EVIDENCE.  THEY MOVED FOR IT INTO EVIDENCE BEFORE.  WE ARE NOT

13 DISPUTING THE EMERGENCY PROCLAMATION AND WHAT IT SAYS.

14         WHAT WE ARE DISPUTING IS WHETHER PLAINTIFFS MET THEIR

15 BURDEN UNDER THE PLRA.

16         **JUDGE REINHARDT:**  SHOWING THAT IT'S THE PRIMARY

17 CAUSE?

18         **MR. MELLO:**  CORRECT.  AND THAT A PRISONER RELEASE

19 ORDER IS THE ONLY FIX.

20         **JUDGE KARLTON:**  THAT'S A SEPARATE QUESTION.

21         **JUDGE REINHARDT:**  THAT'S A SEPARATE ISSUE.  WE ONLY

22 GET TO THE PRISONER RELEASE ORDER IF IT'S THE PRIMARY CAUSE.

23         **MR. MELLO:**  OF COURSE.

24         **JUDGE REINHARDT:**  SO THE ISSUE, AS FAR AS YOU'RE

25 CONCERNED, IS THAT IT IS A CAUSE OF THE HEALTH PROBLEMS IN THE

 1   PRISONS.

 2           **MR. MELLO:**  WE'VE NEVER DISPUTED THAT OVERCROWDING --

 3           **JUDGE REINHARDT:**  AND YOUR ONLY ISSUE IS WHETHER IT'S

 4   A PRIMARY CAUSE AS OPPOSED TO A CAUSE?

 5           **MR. MELLO:**  YES.

 6           **JUDGE REINHARDT:**  AND THE GOVERNOR'S POSITION IS THAT

 7   IT'S A CAUSE, NOT A PRIMARY CAUSE.

 8           **MR. MELLO:**  WELL, THE GOVERNOR'S POSITION IS SPELLED

 9   OUT IN THE EMERGENCY PROCLAMATION.

10           **JUDGE REINHARDT:**  NO, OUR CURRENT GOVERNOR, AT THIS

11   POINT.

12           **MR. MELLO:**  AT THIS POINT -- WELL, LET ME BACK UP.

13           THE EMERGENCY PROCLAMATION WAS SIGNED IN 2006.  IT

14   WAS BASED UPON CURRENT CONDITIONS.

15           **JUDGE KARLTON:**  RIGHT.  IT'S WORSE NOW.  THERE ARE

16   MORE PRISONERS.

17           **MR. MELLO:**  I DON'T BELIEVE THAT'S TRUE.  I BELIEVE

18   THAT DEFIES THE RECORD IN THIS CASE, THAT IT'S WORSE NOW.

19           **JUDGE KARLTON:**  NO, SIR.  AT THE TIME THAT THE

20   GOVERNOR ANNOUNCED THE PROCLAMATION, THERE WERE 166,148

21   PRISONERS.  THERE ARE MORE NOW.  IS THAT RIGHT?

22           **MR. MELLO:**  THERE MAY BE MORE PRISONERS UNDER THE

23   CARE OF CDCR.  HOWEVER, THE QUESTION IS HOW MANY PRISONERS?

24   BECAUSE WE ARE FOCUSED ON THE 33 ADULT INSTITUTIONS IN STATE,

25   HOW MANY PRISONERS ARE NOW IN ADULT INSTITUTIONS?

1          AND I BELIEVE THAT THE POPULATION IN IN-STATE ADULT

2    INSTITUTIONS HAS GONE DOWN AND ONE OF THE REASONS IT'S GONE

3    DOWN, I BELIEVE, YOUR HONOR, IS BECAUSE OF THE EMERGENCY

4    PROCLAMATION WHICH ALLOWED --

5          **JUDGE KARLTON:**  THERE ARE ONLY 8,000 PEOPLE WHO HAVE

6    BEEN SHIPPED OUT.  THERE ARE ONLY 8,000 PEOPLE.

7          **MR. MELLO:**  I BELIEVE THE EVIDENCE BEFORE THIS COURT

8    IS THAT THE POPULATION IS LOWER NOW AS OF AUGUST 30, 2008 IN

9    THE IN-STATE INSTITUTIONS THAN IT WAS AT THE TIME OF THE

10   EMERGENCY PROCLAMATION.

11         **JUDGE KARLTON:**  ALL RIGHT.

12         **MR. MELLO:**  AND I BELIEVE THAT THE EMERGENCY

13   PROCLAMATION WAS SIGNED IN 2006, AND THAT IT WAS BASED UPON THE

14   CONDITIONS THEN.

15         THAT BEING SAID -- AND I DON'T DISPUTE THAT THE

16   GOVERNOR HAS NOT REPEALED THE EMERGENCY PROCLAMATION, SO

17   MR. SPECTER AND MR. BIEN DON'T NEED TO COME UP AND SAY THAT.

18   IT'S STILL IN EFFECT.

19         **JUDGE KARLTON:**  BUT IT JUST DOESN'T MATTER.

20         **MR. MELLO:**  NO.  THE GOVERNOR HAS NEVER SAID THAT AND

21   I'M NOT SAYING THAT.

22         I'M SAYING THAT PLAINTIFFS HAVE A VERY HIGH AND

23   EXACTING BURDEN TO MEET HERE AND THEY HAVEN'T MET IT.

24         **JUDGE REINHARDT:**  IT WOULD SEEM TO ME, MR. MELLO,

25   THAT IF THE GOVERNOR HAD DECLARED A STATE OF EMERGENCY BECAUSE

1   OF EXTREME PERIL TO LIFE, PROPERTY AND RESOURCES OF THE STATE

2   DUE TO OVERCROWDING AND THAT YOU NEED THIS TO PROTECT THE

3   HEALTH AND SAFETY OF THE PEOPLE, INCLUDING THE INMATES, IT'S

4   PRETTY HARD -- IT'S A HIGH BURDEN --

5           MR. MELLO:  RIGHT.

6           JUDGE REINHARDT:  -- WHEN THAT'S IN EVIDENCE TO SAY

7   THAT THEY HAVE NOT SHOWN THAT THE OVERCROWDING IS A PRIMARY

8   CAUSE OF THIS EXTREME PERIL THAT THE GOVERNOR FOUND.

9           MR. MELLO:  WELL, CAN WE SPEAK TO THE EVIDENCE THAT

10  WAS PRESENTED AT THE TRIAL IN THIS CASE ON THAT VERY ISSUE?

11          JUDGE REINHARDT:  THIS IS PART OF THE GOVERNOR'S

12  PROCLAMATION.

13          MR. MELLO:  RIGHT.  AND I THINK WE'VE SPENT A LOT OF

14  TIME --

15          JUDGE REINHARDT:  I DON'T KNOW THAT THEY NEED ANY

16  MORE THAN THE GOVERNOR'S PROCLAMATION.  WHEN THEY FIND THE

17  STATE OF EMERGENCY EXISTS WITH CONDITION OF EXTREME PERIL TO

18  THE SAFETY OF THE PRISONERS AND THE GUARDS, WHAT MORE DO YOU

19  NEED THAN THAT IF HE SAYS THAT THIS CONDITION CREATES IN ITSELF

20  AN EXTREME STATE OF EMERGENCY -- THE STATE OF EXTREME

21  EMERGENCY?

22          JUDGE KARLTON:  THE PROCLAMATION SAYS -- I MEAN AMONG

23  OTHER THINGS, FOUND -- THE GOVERNOR'S PROCLAMATION FOUND THAT

24  SEVERE PRISON OVERCROWDING CAUSED SUBSTANTIAL RISK TO THE

25  HEALTH AND SAFETY, ET CETERA, ET CETERA.

```
1            WITH SO MANY INMATES HOUSED TOGETHER IN TRIPLE BUNKS,

2   IN LARGE COMMON AREA, THERE EXISTED AN INCREASED SUBSTANTIAL

3   RISK OF VIOLENCE, AN INCREASED SUBSTANTIAL RISK FOR

4   TRANSMISSION OF INFECTIOUS DISEASES, AN INCREASED SUBSTANTIAL

5   RISK DUE TO LINE OF SIGHT PROBLEMS, ET CETERA, ET CETERA.

6            YOU DON'T THINK THAT THAT SAYS THAT IT'S A PRIMARY

7   CAUSE?

8            MR. MELLO:  I DON'T BELIEVE IT SAYS THAT.  AND I

9   BELIEVE THAT THE ONLY THING THAT THAT SAID WITH RESPECT TO

10  MEDICAL CARE DELIVERY IN THIS CASE IS THAT WITH RESPECT TO THE

11  SPREAD OF DISEASE.  THE SAME SPREAD OF DISEASE THAT HAPPENS IN

12  THE HOSPITAL THAT MY WIFE WORKS IN.  THE SAME SPREAD OF DISEASE

13  THAT HAPPENS IN THE HALLWAYS OF BART.  THAT'S THE ONLY THING

14  THAT I THINK SPEAKS TO THE ISSUE IN THIS CASE WHEN WE TALK

15  ABOUT PRIMARY CAUSE.

16           BUT, CLEARLY, THE COURT -- YOUR HONOR DISAGREES WITH

17  ME.  I WOULD BE GLAD TO ADDRESS OTHER FAILINGS IN PLAINTIFFS'

18  CASE, IF YOU WOULD LIKE.

19           JUDGE KARLTON:  GO RIGHT AHEAD.

20           MR. MELLO:  FIRST OF ALL, I BELIEVE THIS COURT HAS TO

21  DECIDE WHETHER TO ISSUE A PRISONER RELEASE ORDER.  THAT'S WHAT

22  IT WAS CONVENED FOR.  THIS COURT MUST DECIDE THAT ON THE RECORD

23  BEFORE THE COURT.

24           AND I BELIEVE MR. BIEN MADE A CRITICAL ADMISSION THAT

25  DEMONSTRATE THAT PLAINTIFFS' REQUESTED RELIEF CANNOT BE MET,
```

1  THAT THEY CANNOT GET THE RELIEF THEY REQUEST.

2        HE HAS ADMITTED TO THIS COURT, AS THE EVIDENCE SHOWS,

3  THAT A PRISONER RELEASE ORDER WON'T REMEDY THE CONSTITUTIONAL

4  VIOLATION AT ISSUE.  THIS IS NOT AN OVERCROWDING CASE.  THE

5  PLRA SAYS SPECIFICALLY WHAT THIS COURT MUST FIND.

6        **JUDGE REINHARDT:**  GO BACK, BECAUSE I ASKED THAT

7  QUESTION, I BELIEVE.

8        IS IT YOUR POSITION THAT IF WE FIND THAT OVERCROWDING

9  IS A PRIMARY CAUSE, THEN WE DO HAVE THE AUTHORITY TO REMEDY THE

10 ENTIRE CONSTITUTIONAL VIOLATION BY DOING MORE THAN ISSUE A

11 PRISONER RELEASE ORDER?

12       **MR. MELLO:**  I BELIEVE THIS COURT WAS CONVENED TO

13 DECIDE WHETHER OR NOT TO ISSUE A PRISONER RELEASE ORDER.  IT

14 WAS NOT CONVENED TO DECIDE OTHER ISSUES.

15       **JUDGE REINHARDT:**  WELL, I DON'T KNOW WHY IT'S

16 CONVENED, BUT THE STATUTE SAYS THAT WE CAN'T ISSUE A PRISONER

17 RELEASE ORDER UNLESS IT'S DUE TO OVERCROWDING, THAT THE

18 CONSTITUTIONAL VIOLATION IS DUE TO THAT.

19       IT DOESN'T SAY -- I'M NOT SUGGESTING WE WANT TO DO

20 ANY MORE, BUT I DON'T THINK IT SAYS THAT THE COURT CANNOT DO

21 MORE THAN ISSUE A PRISONER RELEASE ORDER.

22       **MR. MELLO:**  CAN I BACK UP AND MAKE MY POINT AND THEN

23 COME BACK TO YOUR POINT IF I MAY?

24       THE PLRA SAYS THAT:

25       "THE THREE-JUDGE COURT SHALL ENTER A PRISONER

```
 1        RELEASE ORDER ONLY IF THE COURT FINDS BY CLEAR AND

 2        CONVINCING EVIDENCE THAT PRIMARY CAUSE."

 3             WHICH YOU FOLKS SEEM TO DISAGREE WITH ME.

 4             JUDGE REINHARDT:  NO, NO.  I DON'T DISAGREE WITH YOU.

 5             JUDGE KARLTON:  I DO.

 6           MR. MELLO:  (CONTINUING)

 7             "AND NO OTHER RELIEF WILL REMEDY THE VIOLATION OF

 8        THE FEDERAL RIGHT."

 9             THE VIOLATION OF THE FEDERAL RIGHT THAT MUST BE

10    REMEDIED HERE IS NOT OVERCROWDING.  IT'S DELIVERY OF MEDICAL

11    CARE.

12             MR. BIEN TOLD YOU THAT THE PRISONER RELEASE ORDER HE

13    REQUESTS WILL NOT REMEDY IT.

14             JUDGE KARLTON:  MR. MELLO.  MR. MELLO.  WE ALL AGREE

15    THAT THIS COURT IS NOT IN THE BUSINESS OF -- THIS THREE-JUDGE

16    COURT -- WELL, AND, ALSO, THE PRECEDING COURT IS NOT IN THE

17    BUSINESS OF SOLVING OVERCROWDING.  THAT'S A DIFFERENT LAWSUIT

18    THAT HASN'T BEEN FILED.

19             THE QUESTION THAT IS BEFORE US IS WHETHER OR NOT THE

20    EVIDENCE IS NOT ONLY CLEAR AND CONVINCING, BUT OVERWHELMING

21    THAT THE OVERCROWDING IS THE PRIMARY CAUSE.

22             THE FACT THAT IT BY ITSELF WILL NOT SOLVE THE PROBLEM

23    DOESN'T ANSWER THE QUESTION OF WHETHER IT'S A PRIMARY CAUSE.

24    YOU SEEM TO THINK THAT FOR THERE TO BE A PRIMARY CAUSE IT'S GOT

25    TO SOLVE THE PROBLEM.
```

1          MR. MELLO:  OKAY.  EVEN IF THAT'S WHAT I THINK, I

2   THINK I'M NOW SPEAKING TO THE SECOND PRONG OF THE FIRST CLEAR

3   AND CONVINCING STANDARD.

4          JUDGE KARLTON:  LET'S TAKE THE FIRST PRONG.  DO YOU

5   AGREE OR DISAGREE -- IT'S VERY DIFFICULT BECAUSE I DON'T KNOW

6   WHO YOU REPRESENT.

7              BUT IF YOU AGREE -- DO YOU AGREE OR DISAGREE THAT THE

8   QUESTION OF PRIMARY CARE DOES NOT MEAN -- PRIMARY CAUSE DOES

9   NOT MEAN THAT FINDING OVERCROWDING AND REDUCING OVERCROWDING

10  WOULD END THE ISSUE; THAT IS, THAT THERE WOULD CONTINUE TO BE

11  OTHER CAUSES WHICH HAVE TO BE ADDRESSED AS WELL?

12         MR. MELLO:  I THINK WITH RESPECT TO PRIMARY CAUSE,

13  WHETHER IT'S THE PRIMARY CAUSE OR NOT, MY BELIEF, AND I BELIEVE

14  IT WAS IN OUR MOTION IN LIMINE, THAT PRIMARY CAUSE MEANS JUST

15  THE BIGGEST CAUSE.  I'M NOT SAYING IT HAS TO BE THE ONLY CASE.

16         JUDGE KARLTON:  OKAY.  SO THAT IF IT TURNS OUT THAT,

17  YES, WE FIND IT'S A PRIMARY CAUSE, YES, WE FIND THAT IT WILL

18  NOT IN ITSELF CURE THE CONSTITUTIONAL DEFECT, WE NONETHELESS

19  HAVE NOT ONLY THE POWER, BUT THE OBLIGATION TO SET A CAP.  IS

20  THAT RIGHT?

21         MR. MELLO:  I DISAGREE.

22         JUDGE KARLTON:  THAT'S WHAT I'M ASKING.

23         MR. MELLO:  I BELIEVE THAT IF THIS COURT FINDS, WHICH

24  I THINK IT MUST AND AS MR. BIEN ADMITTED UP HERE A FEW MOMENTS

25  AGO, THAT IT WON'T REMEDY THE CONSTITUTIONAL VIOLATION, THEN IT

1  CAN'T BE A FIX AND YOU DON'T MEET --

2        **JUDGE REINHARDT:**  SIR, IF IT'S THE PRIMARY CAUSE AND

3  THERE ARE TWO OTHER CAUSES --

4        **MR. MELLO:**  CORRECT.

5        **JUDGE REINHARDT:**  -- AND WE CAN ELIMINATE THE PRIMARY

6  CAUSE, THAT BECAUSE THERE ARE OTHER CAUSES WE CAN'T DO

7  ANYTHING?

8        **MR. MELLO:**  I MEAN, THE STATUTE SAYS WHAT THE STATUTE

9  SAYS.  IT SAYS NO OTHER RELIEF WILL REMEDY THE VIOLATION OF THE

10 PRESENT -- OF THE -- OTHER THAN A PRISONER RELEASE ORDER.

11       **JUDGE REINHARDT:**  NO OTHER RELIEF THAT THE COURT IS

12 AUTHORIZED TO GRANT.

13       **MR. MELLO:**  WELL, THAT'S NOT WHAT IT SAYS.  BUT

14 THAT'S MY UNDERSTANDING.

15       **JUDGE REINHARDT:**  WELL, YOUR UNDERSTANDING, NO OTHER

16 RELIEF, WHETHER OR NOT WE CAN GRANT IT.

17       **MR. MELLO:**  RIGHT.  I MEAN, I THINK WHAT THEY MEANT

18 WAS THAT A PRISONER RELEASE ORDER HAD TO CURE THE VIOLATION AND

19 IT'S -- IT'S EVIDENT THAT IT WON'T -- ACCORDING TO PLAINTIFFS,

20 WON'T CURE THE VIOLATION.

21       **JUDGE REINHARDT:**  I THOUGHT WE COULD ONLY DEAL WITH

22 THE OVERCROWDING.  YOU'RE SAYING WE CAN DEAL WITH ALL CAUSES?

23       **MR. MELLO:**  NO.  I'M SAYING THAT IF A PRISONER

24 RELEASE ORDER WILL NOT REMEDY THE MEDICAL CARE DEFICIENCIES

25 THAT ARE ALLEGED IN THE PLATA CASE.

1          **JUDGE REINHARDT:**  THEN WHY WOULD WE BE INVOLVED IN IT

2   IF IT'S ONLY A PRIMARY CAUSE AND THERE ARE OTHER CAUSES?

3          **JUDGE KARLTON:**  THAT'S THE MEANING OF THE EXISTENCE

4   OF OTHER CAUSES.  YOU MAY NOT BE ABLE TO SOLVE THE PROBLEM OF

5   UNCONSTITUTIONAL CONDITIONS BY ELIMINATING THE PRIMARY CAUSE,

6   BUT IF YOU DON'T ADDRESS THE PRIMARY CAUSE, WE CAN NEVER

7   DELIVER SUFFICIENT CONSTITUTIONAL CARE.

8          **MR. MELLO:**  AND I UNDERSTAND THE COURT'S POSITION,

9   BUT I'M SAYING THE STATE'S POSITION IS THAT IF -- IF IT WON'T

10  REMEDY IT, YOU CAN'T ISSUE THE PRISONER RELEASE ORDER.

11          I UNDERSTAND THAT THERE -- THAT IT'S THE COURT'S

12  POSITION THERE ARE MANY CAUSES.  I'M NOT SAYING IT'S THE

13  COURT'S POSITION.  THERE ARE MANY CAUSES.

14          **JUDGE REINHARDT:**  LET'S ASSUME THERE ARE FIVE CAUSES.

15          **MR. MELLO:**  CORRECT.

16          **JUDGE REINHARDT:**  ARE WE AUTHORIZED TO DEAL WITH THE

17  OTHER FOUR CAUSES IN ADDITION TO OVERCROWDING?

18          **MR. MELLO:**  I BELIEVE THIS COURT IS NOT.  THE

19  UNDERLYING PLATA AND COLEMAN COURTS MAY BE AUTHORIZED TO DEAL

20  WITH THOSE OTHER ISSUES.  LET ME GIVE YOU AN EXAMPLE.

21          AS AN EXAMPLE, ONE OF THE THINGS WE HEARD, THAT THERE

22  WERE LINES FOR MEDICATION, FOR DISTRIBUTING MEDICATION.

23          SOMETHING SHORT OF A PRISONER RELEASE ORDER MIGHT BE,

24  STATE, HAVE TWO LINES FOR MEDICATION.  IT MIGHT BE, HIRE MORE

25  PHARMACISTS.  IT MIGHT BE, HIRE MORE NURSES TO DISTRIBUTE

1   MEDICATIONS.

2          I DON'T BELIEVE THIS THREE-JUDGE PANEL CAN DO THAT,

3   BUT I BELIEVE THAT JUDGE HENDERSON COULD IN PLATA OR

4   JUDGE KARLTON.  AND I DON'T REALLY WANT TO SPEAK TO THE COLEMAN

5   ISSUE.

6          JUDGE REINHARDT:  IF WE CAN'T ELIMINATE THE PROBLEM

7   HERE, BUT WE CAN SUBSTANTIALLY REDUCE IT BY DEALING WITH THE

8   OVERCROWDING PROBLEM, THEN THERE ARE OTHER COURTS THAT CAN,

9   COMBINED WITH OURS, RESOLVE THE CONSTITUTIONAL PROBLEM.

10         BUT YOU'RE SAYING TO ME, AS I UNDERSTAND IT, IF WE

11  CAN'T SOLVE IT ALL BY OURSELVES WITHOUT RELYING ON THE OTHER

12  COURTS, THEN WE CAN'T ISSUE AN ORDER.

13         MR. MELLO:  THAT'S THE POSITION THE STATE HAS WITH

14  RESPECT TO THE READING OF THE PLRA.

15         JUDGE REINHARDT:  THAT JUST DOESN'T MAKE ANY SENSE.

16  I MEAN, THAT CAN'T BE.

17         JUDGE KARLTON:  IT'S IMPORTANT, YOU KNOW, TO CONSTRUE

18  STATUTES SO THAT THEY ARE NOT FACIALLY ABSURD.  WHAT YOU HAVE

19  JUST SUGGESTED IS FACIALLY ABSURD.  SO WE HAVE TO REJECT THAT

20  INTERPRETATION.

21         MR. MELLO:  OKAY.

22         JUDGE REINHARDT:  LET'S TRY ANOTHER ONE.

23         MR. MELLO:  OKAY.  AND YOU'VE SAID WE COULD ISSUE --

24  IT'S YOUR OPINION -- OR I DON'T KNOW IF IT'S YOUR OPINION, BUT

25  THIS COURT COULD ISSUE SOMETHING THAT MIGHT BE THE FIRST STEP,

 1  TO USE PLAINTIFFS' WORDS, TOWARDS CURING THE CONSTITUTIONAL

 2  VIOLATIONS.  AND THEN --

 3          **JUDGE REINHARDT:**  I DON'T KNOW THAT I SAID ANYTHING.

 4  I'M ASKING THE QUESTIONS TRYING TO UNDERSTAND THE PARTIES'

 5  POSITION ON THE STATUTE.  AND I CAN'T BELIEVE YOUR POSITION IS

 6  THAT YOU CAN'T ISSUE AN ORDER UNDER THE PLRA UNLESS

 7  OVERCROWDING SOLVES THE ENTIRE PROBLEM, WHETHER OR NOT THE ACT

 8  CONTEMPLATES IT IS ONLY A PRIMARY CAUSE AND THERE MAY BE OTHER

 9  CAUSES.

10          YOU ARE TELLING US, I THINK, THAT IF THERE ARE OTHER

11  CAUSES AND WE CAN'T DEAL WITH THEM, THEN WE CAN'T ISSUE AN

12  ORDER.

13          **JUDGE KARLTON:**  ISN'T THIS REALLY A QUESTION OF WHERE

14  REMEDIES LIE?

15          CONGRESS DECIDED FOR BETTER OR WORSE THAT THE

16  ISSUANCE OF A PRISON CAP IS SO SERIOUS THAT IT OUGHT NOT TO BE

17  DONE BY INDIVIDUAL JUDGES.

18          JUDGE HENDERSON IS NOT ABLE TO ISSUE A PRISON CAP

19  ORDER IN HIS CASE.  I AM NOT ABLE TO ISSUE A PRISON CAP IN MY

20  CASE.  I WOULD BE, BUT FOR THE FACT IS THAT CONGRESS MADE A

21  JUDGMENT, AND IT IS THAT WHEN YOU COME TO THAT ISSUE, IT IS OF

22  SUCH A SERIOUS NATURE AND SUCH AN INTRUSION UPON THE STATE'S

23  ORDINARY PROCESSES THAT IT REQUIRES THREE JUDGES.

24          ISN'T THAT THE RATIONAL EXPLANATION OF HOW WE GOT

25  HERE?

1          **MR. MELLO:**  I GUESS.  I MEAN, I WOULD BE GLAD TO

2   SPEAK TO OTHER ISSUES IN THE CASE BECAUSE CLEARLY YOU DON'T BUY

3   MY INTERPRETATION OF THE STATUTE.  SO I WOULD BE GLAD TO GO TO

4   OTHER REASONS WHY PLAINTIFFS' CLAIMS FAIL IN THIS CASE.

5          **JUDGE REINHARDT:**  OKAY.

6          **MR. MELLO:**  AND I BELIEVE IT WAS JUDGE HENDERSON OR

7   ONE OF YOU THAT TOUCHED UPON THIS ISSUE, AND THAT IS -- AND

8   JUDGE KARLTON'S SPOKEN TO IT, TOO -- THE 130 PERCENT OF DESIGN

9   BED CAPACITY NUMBER, THE 95 PERCENT AT SPECIALTY CENTERS, WHICH

10  CAME UP FOR THE FIRST TIME, FRANKLY, IN THEIR PROPOSED FINDINGS

11  OF FACT AND CONCLUSIONS OF LAW.

12          AND I THINK THE RECORD -- THERE IS NO EVIDENCE BEFORE

13  THIS COURT TYING DESIGN CAPACITY TO THE CONSTITUTIONAL DELIVERY

14  OF MEDICAL CARE.  THERE IS SIMPLY NO EVIDENCE.

15          THERE IS THE DUKMAJIAN REPORTS, THE EXPERT PANEL

16  REPORTS THAT TALK ABOUT PERCENTAGE OF DESIGN BED CAPACITY WITH

17  RESPECT TO THE DELIVERY OF PROGRAMS.  THOSE HAVE NOTHING TO DO

18  WITH THE DELIVERY OF CONSTITUTIONALLY ADEQUATE MEDICAL CARE.

19          THERE IS A COMPLETE ABSENCE IN THE RECORD FROM ANY

20  TESTIMONY THAT SAYS -- WELL, LET ME BACK UP.

21          WE'VE HEARD MANY TERMS, DESIGN CAPACITY AND OPERABLE

22  CAPACITY DURING TRIAL, CORRECT?  AND PLAINTIFFS' EXPERTS, I

23  BELIEVE SIX OF THEM, TESTIFIED THAT YOU COULD OPERATE

24  CONSTITUTIONALLY ADEQUATE MEDICAL CARE SYSTEMS IN PRISONS THAT

25  WERE OVERCROWDED.

1            AND I BELIEVE THAT FOUR EXPERTS TESTIFIED ABOUT

2    OPERABLE CAPACITY.  AND THAT OPERABLE CAPACITY IS THE RELEVANT

3    INDICATOR.  THEY DIDN'T SAY THAT IT WAS TIED TO DESIGN

4    CAPACITY.  THEY SAID, WHAT IS THE OPERABLE CAPACITY?  AT WHAT

5    POPULATION CAN A SYSTEM OPERATE CONSTITUTIONALLY ADEQUATE

6    MEDICAL CARE SYSTEMS?

7            AND THERE IS A COMPLETE ABSENCE IN THE RECORD FROM

8    PLAINTIFFS THAT SAYS WHAT THE OPERABLE CAPACITY OF CDCR'S

9    PRISONS IS, SYSTEM-WIDE, LET ALONE INSTITUTION TO INSTITUTION.

10           LET'S TAKE A HYPOTHETICAL TO ILLUSTRATE THE POINT.

11   IF A JAIL HAD A DESIGN BED CAPACITY OF 20 INMATES, BUT IT ONLY

12   HAD 10 INMATES AND IT ONLY HAD ONE PART-TIME LICENSED

13   VOCATIONAL NURSE, IT DIDN'T HAVE ANY DOCTORS, REGISTERED

14   NURSES, PHYSICIAN'S ASSISTANTS, NURSE PRACTITIONERS, PHARMACY

15   SERVICES, SPECIALTY SERVICES, HOSPITAL SERVICES, WOULD THE

16   POPULATION BE THE SINGLE BIGGEST BARRIER TO CARE TO THOSE 10

17   INMATES?

18           WOULD IT BE THE FACT THAT THERE ARE 10 INMATES IN A

19   PRISON THAT'S DESIGNED FOR 20 INMATES?

20           OR -- AND WOULD THE ONLY WAY TO CURE THE MEDICAL CARE

21   BEING RECEIVED BY THOSE 10 INMATES BE TO GET RID OF NINE OF

22   THOSE INMATES?

23           NO.  IT WOULD BE, WHAT IS HAPPENING AND WHAT IS

24   IMPROVING IN CDCR RIGHT NOW.  AND THAT IS THE HIRING OF

25   DOCTORS, THE HIRING OF NURSES, THE HIRING OF PHYSICIAN

```
 1   EXTENDERS, NURSE PRACTITIONERS, PHYSICIAN'S ASSISTANTS,

 2   IMPROVEMENTS OF PHARMACY SERVICES.  THAT WOULD BE THE REASONS.

 3          AND THERE IS A COMPLETE ABSENCE OF EVIDENCE AS TO

 4   WHAT THE OPERABLE CAPACITY IS WITH RESPECT TO MEDICAL CARE AT

 5   CDCR'S INSTITUTIONS FOR THE DELIVERY OF CONSTITUTIONALLY

 6   ADEQUATE MEDICAL CARE.  THERE IS NO EVIDENCE.

 7          THAT'S NOT MY BURDEN TO PUT IN.  THEY HAD TO PUT IT

 8   IN BY CLEAR AND CONVINCING EVIDENCE.  AND I DON'T BELIEVE THIS

 9   COURT -- YES.

10          JUDGE KARLTON:  MR. MELLO, ACTUALLY THIS BRINGS UP --

11   I WON'T SAY IT.  THIS IS AN IMPORTANT ISSUE AND I FIND IT

12   TROUBLING, BUT THE SUGGESTION WAS MADE -- AND I CAN'T BELIEVE

13   SERIOUSLY, BUT THE SUGGESTION WAS MADE THAT WE FIND THAT THE

14   OVERCROWDING IS A NECESSARY -- IS THE PRIMARY PURPOSE.

15          AND THEN WE SAY TO THE STATE, YOU TELL US WHAT YOU

16   ARE GOING TO DO AND WHY YOU ARE GOING TO DO IT AND HOW YOU ARE

17   GOING TO DO IT.  AND THAT WOULD INCLUDE, I SUPPOSE, IN SOME WAY

18   TYING THE APPROPRIATE LEVEL OF CARE TO THE APPROPRIATE PRISON

19   POPULATION.

20          WHAT THAT SAYS TO ME IS THEY'VE PROVEN THAT THE

21   CONDITIONS ARE SUCH THAT AN ORDER UNDER THE PLRA IS

22   APPROPRIATE, BUT THEY RECOGNIZE THAT IT IS A MULTI --

23   POLYCENTRIC, I THINK IS THE WORD WE USED LAST TIME, PROBLEM

24   THAT IS VERY COMPLEX AND THAT WE OUGHT TO GIVE THE STATE THE

25   FIRST OPPORTUNITY TO DO SO.
```

```
 1        WHAT IS YOUR POSITION AS TO THE PROPRIETY OF TELLING

 2  THE STATE THERE IS NO QUESTION THAT OVERCROWDING IS THE PRIMARY

 3  CAUSE?  THE QUESTION BECOMES ONE OF SOLUTION AND OF WHAT'S THE

 4  PROPER REMEDY, AND THAT WE, AT LEAST INITIALLY, LEAVE TO THE

 5  STATE?

 6        MR. MELLO:  OKAY.  SO IF I UNDERSTAND IT, IF THE

 7  COURT MEANT -- IF THE COURT WAS SATISFIED THAT THE PLRA WAS MET

 8  WITH RESPECT TO PRIMARY CAUSE, ONLY REMEDY -- ONLY RELIEF THAT

 9  WILL REMEDY -- AND THAT THERE IS NOT A SUBSTANTIAL ADVERSE

10  IMPACT UPON PUBLIC SAFETY --

11        JUDGE KARLTON:  RIGHT.

12        MR. MELLO:  -- AND THE ADMINISTRATION OF CRIMINAL

13  JUSTICE, WHICH I CAN ALSO SPEAK TO IF GIVEN THE OPPORTUNITY,

14  THAT I DON'T BELIEVE THEY MEET THAT EITHER; BUT THEN COULD THE

15  COURT FASHION A REMEDY THAT SAYS, STATE, YOU COME UP WITH WHAT

16  THE POPULATION HAS TO BE TO PROVIDE CONSTITUTIONALLY ADEQUATE

17  MEDICAL CARE?

18        I THINK THAT THIS COURT WOULD HAVE TO ISSUE EITHER A

19  -- WOULD HAVE TO ISSUE A PRISONER RELEASE ORDER AND THAT WOULD

20  BE EITHER A CAP OR THE RELEASE OR A REDUCTION PLAN.  IT WOULD

21  HAVE TO GIVE THE STATE A NUMBER.

22        I DON'T THINK THAT THIS COURT CAN JUST SAY, REDUCE

23  YOUR POPULATION.  I THINK THEY HAVE TO GIVE --

24        JUDGE KARLTON:  WHY CAN'T WE?  I MEAN, I DON'T KNOW.

25  I THINK THAT THIS IS A MUCH MORE DIFFICULT PROBLEM THAN THE
```

1   PLAINTIFFS DO.

2          BUT WHY CAN'T THE COURT, CONSISTENT WITH THE VIEW OF

3   THE PLRA THAT THE STATE OUGHT TO BE GIVEN AS MUCH ELBOW ROOM,

4   IF YOU WILL, TO COME UP WITH AN APPROPRIATE PLAN, WHY CAN'T WE

5   SAY, IT'S CLEAR THAT THE FIRST -- THAT ALL THE ELEMENTS HAVE

6   BEEN MET, BUT IT IS ESSENTIALLY THE STATE'S RESPONSIBILITY TO

7   DETERMINE WHAT LEVEL OF CARE, WHAT LEVEL OF POPULATION WILL BE

8   NECESSARY TO REDUCE TO SO THAT ALL OF THE OTHER ISSUES, ALL OF

9   THE OTHER CAUSES CAN ALSO BE ADDRESSED BY THE INDIVIDUAL

10  COURTS?  WHAT IN THE STATUTE SAYS NO, THAT THAT'S NOT SOMETHING

11  YOU CAN DO?

12          MR. MELLO:  WELL, I'LL JUST GO IN REVERSE ORDER, IF I

13  CAN.

14          JUDGE KARLTON:  SURE.

15          MR. MELLO:  FIRST OF ALL, I THINK JUDGE REINHARDT'S

16  CONCERN OF BEING AROUND THIS THREE-JUDGE PANEL, BEING AROUND

17  FOR A LONG TIME --

18          JUDGE KARLTON:  WELL, THAT'S MY CONCERN.

19          MR. MELLO:  OKAY, YOUR CONCERN.  THEN THAT'S A

20  PROBLEM.  BECAUSE YOU THEN ASKED THE STATE -- WHETHER OR NOT

21  THE PLRA AUTHORIZES IT, YOU ASKED THE STATE TO COME UP WITH A

22  PLAN.

23          I DOUBT THAT THE NUMBER THAT THE STATE COMES UP WITH

24  IS GOING TO SATISFY ALL THE PARTIES AND THIS COURT.

25          JUDGE KARLTON:  IT MAY NOT SATISFY IT.

```
 1            MR. MELLO:  RIGHT.

 2            JUDGE KARLTON:  MAY NOT SATISFY IT.  BUT, CERTAINLY,

 3    AS A FIRST STEP IT WOULD APPEAR TO, AT LEAST ARGUABLY, BE

 4    CONSISTENT WITH THE UNDERLYING NOTIONS OF THE PLRA; THAT THIS

 5    IS A STATE PROBLEM AND THE FEDERAL GOVERNMENT ONLY COMES IN

 6    WHEN IT'S SO DESPERATE THAT -- AND THE STATE'S MANIFESTED AN

 7    INCAPACITY TO ADDRESS THE PROBLEM.  SEE WHAT I'M SAYING?

 8            MR. MELLO:  I UNDERSTAND WHAT YOU ARE SAYING.  BUT I

 9    THINK THE COURT WOULD HAVE TO GIVE THE STATE SOME GUIDANCE.

10    EVEN IF IT WAS TIME PARAMETERS, COME UP WITH A PLAN BY "X"

11    DATE.  YOU HAVE TO HAVE A PLAN TO REDUCE YOUR POPULATION.

12            I WOULD THINK IT WOULD HAVE TO SAY BY "X" AMOUNT OVER

13    "X" PERIOD OF TIME.  I DON'T THINK YOU CAN SAY, GET TO A

14    POPULATION THAT GETS YOU CONSTITUTIONAL.

15            BUT I UNDERSTAND YOUR QUESTION.

16            JUDGE KARLTON:  NO, NO.  IS THERE SOMETHING IN THE

17    STATUTE WHICH SUPPORTS YOUR FEELING?  I MEAN -- NEVER MIND WHAT

18    I HAD.  IS THERE SOMETHING IN THE STATUTE WHICH SUPPORTS YOUR

19    FEELING?

20            MR. MELLO:  NO.  I THINK THE PRISON LITIGATION REFORM

21    ACT AND THE DEFINITION OF A PRISONER RELEASE ORDER CONTEMPLATES

22    EITHER CAPPING THE PRISONS OR RELEASING PRISONERS, RIGHT?

23            JUDGE KARLTON:  NO, BUT PART OF THE PROBLEM WITH THE

24    PLRA IS THE EXTRAORDINARY BREADTH OF ORDERS WHICH ARE DESCRIBED

25    AS PRISONER RELEASE ORDERS.
```

1          THAT'S PART OF -- NOT PART OF THE PROBLEM, BUT PART

2    OF THE REALITY.  SO THAT -- AS AN EXAMPLE, ONE THING THAT

3    ARGUABLY WE COULD DO, I'M NOT SUGGESTING WE WOULD, IS SAY YOU

4    CAN'T SEND ANYMORE PAROLE VIOLATORS.  THAT WOULD BE A PRISON

5    RELEASE ORDER -- A PRISONER.

6          MR. MELLO:  IF YOU ISSUED THAT ORDER, YES.

7          JUDGE KARLTON:  YEAH.  NOW, THAT WOULDN'T SET ANY

8    NUMBER.  IT WOULD JUST SAY, YOU CAN'T DO THAT.  AND THAT WOULD

9    CLEARLY BE -- CLEARLY, I DIDN'T MEAN THAT.

10          THAT WOULD BE APPARENTLY AUTHORIZED BY THE STATUTE

11   AND IT WOULDN'T INVOLVE ANY NUMBER IN PARTICULAR.

12          MR. MELLO:  YOU'RE RIGHT.  I DON'T DISAGREE WITH YOU.

13          IF YOU READ THE STATUTE, IT SAYS THE PRISONER RELEASE

14   ORDER IS BASICALLY ANY ORDER THAT HAS THE PURPOSE OR EFFECT OF

15   REDUCING OR LIMITING THE PRISON POPULATION.

16          JUDGE KARLTON:  SURE.

17          MR. MELLO:  AND THAT WOULD HAVE THAT EFFECT.  AND

18   YOU'RE RIGHT THAT IT WOULDN'T NECESSARILY SAY, YOU HAVE TO

19   REDUCE YOUR POPULATION BY 52,000 OVER TWO YEARS.  IT WOULD JUST

20   SAY, YOU CAN'T ADMIT.  THAT WOULD BE A PRISONER RELEASE ORDER.

21          JUDGE KARLTON:  ARE WE IN A PLACE OF BUSINESS -- I

22   DON'T KNOW WHETHER WE ARE -- WHERE YOU WOULD AGREE THAT IF WE

23   GOT TO THAT PLACE, THE COURT, BECAUSE OF THE ODD NATURE OF --

24   ODD.

25          THE COURT, BECAUSE OF THE NATURE OF THE STATUTE,

1  WOULD BE FREE TO TELL THE STATE, YOU'VE GOT TO REDUCE THE

2  POPULATION.  HOW MANY, AND WHAT IS AT LEAST INITIALLY,

3  INITIALLY, YOUR RESPONSIBILITY.  COME BACK IN THREE MONTHS, SIX

4  MONTHS, WHATEVER IT WOULD TAKE, AND TELL US HOW YOU ARE GOING

5  TO DO IT.

6        THEY WANT ME TO SAY, AND MAKE SURE YOU TALK TO THE

7  PLAINTIFFS.  AND I EXPECT THE COUNTIES AT THAT POINT WOULD SAY,

8  AND US, TOO.  AND, CERTAINLY, THAT WOULD BE GOOD PUBLIC POLICY.

9  IT'S NOT CLEAR TO ME THAT THAT WOULD BE NECESSARY.  BUT COULD

10  WE DO THAT?

11        **MR. MELLO:**  COULD YOU MAKE AN ORDER THAT SAYS COME UP

12  WITH A PLAN IN 12 MONTHS TO REDUCE YOUR PRISON POPULATION?  I

13  THREW THAT IN THERE, THE 12 MONTHS.

14        **JUDGE KARLTON:**  THAT'S ALL RIGHT.  I THINK IT'S MORE

15  COMPLICATED.

16        **MR. MELLO:**  I DON'T THINK IT'S SOMETHING WE CAN DO IN

17  60 OR 90 DAYS, OBVIOUSLY.

18        THE QUESTION IS:  COULD THIS COURT ISSUE SUCH AN

19  ORDER?  YES.

20        EXCEPT THIS COURT WAS CONVENED AND THIS CASE IS ABOUT

21  THE DELIVERY OF CONSTITUTIONAL MEDICAL CARE.  SO THERE HAS TO

22  BE A NEXUS BETWEEN POPULATION AND CONSTITUTIONAL CARE.  AND

23  RIGHT NOW THERE IS NO NEXUS BEFORE THIS COURT.  THERE IS NO

24  RELATIONSHIP OF A NUMBER AND CONSTITUTIONAL CARE.

25        **JUDGE KARLTON:**  I UNDERSTAND YOU BELIEVE THAT.  I

```
 1   UNDERSTAND YOU BELIEVE THAT.  AND I RESPECT THE FACT THAT YOU

 2   BELIEVE THAT.  I WANT YOU TO ASSUME THAT AT LEAST ONE OF THE

 3   JUDGES OF THIS COURT THINKS THAT THAT'S PROBABLY NOT THE CASE.

 4          MR. MELLO:  I'M SURPRISED.

 5          JUDGE KARLTON:  THE PROBLEM CONTINUES TO BE WHAT KIND

 6   OF ORDER THE COURT IS AUTHORIZED TO ISSUE, WHAT KIND OF ORDER

 7   THE COURT SHOULD ISSUE.

 8              AND I ASK YOU AGAIN:  IN LIGHT OF WHAT SOME FOLKS

 9   MIGHT THINK IS AN AMBIGUITY IN THE EVIDENCE, WHETHER THE

10   APPROPRIATE THING TO DO -- IS THAT THERE IS AN AMBIGUITY AS TO

11   THE NUMBER.  SOME FOLKS MIGHT THINK THAT.  BUT THERE IS NO

12   AMBIGUITY AS TO THE REALITY THAT OVERCROWDING IS A PRIMARY

13   CAUSE.

14              AT THAT POINT THE QUESTION BECOMES -- TO ME, BECOMES

15   WHO OUGHT TO SOLVE THE PROBLEM, THE PLAINTIFFS, THE COUNTIES OR

16   THE STATE?  AT LEAST TAKE AN INITIAL COUNT.  AND IT SEEMS TO ME

17   IF YOU AGREE WITH ME THAT THE COURT COULD ISSUE SUCH AN ORDER,

18   THAT I THINK CREATES A POSSIBILITY THAT MAYBE MORE CONSISTENT

19   WITH THE NOTIONS THAT UNDERLIE THE ADOPTION OF THE PLRA.

20              ALL RIGHT.  I'M SORRY.  I'M THINKING OUT LOUD NOW.

21   GO AHEAD.

22          JUDGE REINHARDT:  THERE IS NO QUESTION.

23          JUDGE KARLTON:  THERE IS NO QUESTION, YOU'RE RIGHT.

24          JUDGE REINHARDT:  PROCEED.

25          MR. MELLO:  SO, AGAIN -- AND I WILL LEAVE IT BECAUSE
```

1  CLEARLY AT LEAST ONE OF THE JUDGES OF THIS THREE-JUDGE PANEL

2  DISAGREES WITH ME, BUT I BELIEVE THERE IS NO EVIDENCE THAT SAYS

3  WHAT THE NUMBER IS.  AND I DON'T BELIEVE THERE IS ANY EVIDENCE

4  AS TO WHAT THE NUMBER IS OF ANY INSTITUTION EITHER.

5          AND I BELIEVE THAT PLAINTIFFS HAVE TO SHOW BY CLEAR

6  AND CONVINCING EVIDENCE WHAT THE NUMBER HAD TO BE TO PROVIDE

7  CONSTITUTIONAL CARE AND WHAT THE NUMBER HAD TO BE AT EACH

8  INSTITUTION.

9          BUT EVEN IF WE LEAVE THAT ASIDE AND GO TO THE SECOND

10 HALF, LET'S ASSUME PLAINTIFFS HAVE MET THEIR BURDEN OF CLEAR

11 AND CONVINCING EVIDENCE, PRIMARY CAUSE, ONLY FIX.  THEN THIS

12 COURT HAS TO GIVE SUBSTANTIAL WEIGHT TO THE ADVERSE IMPACT ON

13 PUBLIC SAFETY.

14         AND THE ONLY NUMBER THAT WE ARE LEFT TO ANALYZE WHEN

15 MAKING THAT IS THE NUMBER PROPOSED BY PLAINTIFFS, WHICH IS THE

16 RELEASE OF 52,000 OVER TWO YEARS.  AND RELEASE BEING THE

17 REDUCTION IN THE PRISON POPULATION.

18         **JUDGE REINHARDT:**  WE ARE NOT BOUND BY WHAT THE

19 PARTIES WANT.  ONCE YOU DECIDE THAT THERE IS A VIOLATION, THAT

20 THE OVERCROWDING IS A PRIMARY CAUSE, AT THAT POINT IT'S UP TO

21 THE COURT TO FASHION A REMEDY WITH THE ASSISTANCE OF THE

22 PARTIES.  AND MAYBE, AS JUDGE KARLTON SUGGESTS, ASKING THE

23 STATE FIRST WHAT IT WANTS TO DO TO SOLVING THE PROBLEM.

24         BUT, YOU KNOW, THE IDEA THAT THE 52,000 REDUCTION IN

25 THE POPULATION WILL OCCUR OVER A TWO-YEAR PERIOD IS SIMPLY A

1  PROPOSAL FROM THE PLAINTIFFS.

2          MR. MELLO:  UNDERSTOOD.  I WASN'T SUGGESTING

3  OTHERWISE.

4          ALL I WAS SUGGESTING IS THAT THE ONLY WAY THAT WE CAN

5  ANALYZE THE EVIDENCE IN THE CASE IS HINGED TO THAT 52,000

6  NUMBER.  RIGHT.

7          THAT WAS THE NUMBER THAT PLAINTIFFS' OWN EXPERTS

8  TESTIFIED ABOUT.  MR. AUSTIN, AND HE TESTIFIED ABOUT HOW YOU

9  WOULD GET THERE TO 52,000 OVER TWO YEARS.  SO THAT'S THE REASON

10  I WAS REFERENCING IT.

11          JUDGE REINHARDT:  BUT THE PROBLEM IS I THINK WHAT

12  JUDGE KARLTON SUGGESTED, IS THE STATE SHOULD BE ASKED TO TELL

13  US HOW IT WOULD GET THERE, NOT THAT THEY ARE BOUND BY

14  MR. AUSTIN'S VIEW.

15          JUDGE KARLTON:  OR, ALTERNATIVELY, WE FIND OURSELVES

16  IN THE SITUATION IN WHICH THE BEST EVIDENCE IS THE 52,000, AND

17  WE TELL THE STATE THAT APPEARS TO BE THE CASE, WE ARE OPEN TO

18  THE STATE TELLING US WHAT THE ALTERNATIVES ARE IN THE REAL

19  WORLD.  AND THAT HAS THE APPEAL OF -- WELL -- OKAY.

20          MR. MELLO:  SO THEN THE BURDEN GETS TRANSFERRED TO

21  DEFENDANTS TO PROVE UP PLAINTIFFS' CASE AS TO WHAT THAT NUMBER

22  IS THAT'S REQUIRED FOR CONSTITUTIONAL CARE.  AND I BELIEVE THAT

23  FLIES IN THE VERY FACE OF THE PRISONER LITIGATION REFORM ACT.

24          JUDGE HENDERSON:  WHAT IF INSTEAD OF THAT WE ARE

25  GOING TO MAKE FINDINGS OF FACT?  WHAT IF WE SAY -- WE TAKE INTO

 1  ACCOUNT ALL OF THE EVIDENCE AND WE FIND MAYBE TWO TO ONE,

 2  WHATEVER, WE FIND THAT 135 PERCENT IS THE NUMBER NECESSARY.

 3  YOU KNOW, YOU WILL APPEAL IT, BUT BEYOND THAT, WOULD THAT DO IT

 4  TO GET US MOVING FORWARD?

 5       **MR. MELLO:** I THINK IT WOULD HAVE TO BE BASED UPON

 6  THE RECORD IN THE CASE. AND I UNDERSTAND HOW THE COURT COULD

 7  THINK ABOUT CRAFTING SUCH AN ORDER, BUT I THINK IT WOULD -- I

 8  WOULD QUESTION WHERE THE COURT WOULD GET TO THAT 135 PERCENT?

 9       BECAUSE WHAT YOU'VE HEARD IS, YOU KNOW, REPORTS AND

10  EXPERT PANEL REPORTS THAT WERE DONE WITH RESPECT TO PROGRAMMING

11  AND NOT WITH RESPECT --

12       **JUDGE KARLTON:** FACINORI. FACINORI. IF YOU CAN'T

13  DELIVER A PROGRAM BECAUSE OF OVERCROWDING. AND WE HAVE SO MUCH

14  EVIDENCE ABOUT BEING UNABLE TO DELIVER MENTAL HEALTH CARE

15  BECAUSE THERE AREN'T ENOUGH BEDS, THERE AREN'T ENOUGH

16  PSYCHIATRISTS, THERE AREN'T ENOUGH OF ALL OF THESE THINGS, IT

17  FOLLOWS THAT IF 135 PERCENT IS NECESSARY FOR DELIVERY OF

18  PROGRAMS, IT IS THE MINIMUM NECESSARY FOR AT LEAST MENTAL

19  HEALTH CARE, AND I WOULD ASSUME PHYSICAL AS WELL, AND MAYBE

20  IT'S LESS THAN THAT. THERE ARE SOME OF US WHO SUSPECT IT IS.

21       BUT, I MEAN, IF THAT'S THE BEST EVIDENCE THAT WE'VE

22  GOT, THAT'S THE BEST EVIDENCE WE'VE GOT.

23       **MR. MELLO:** AND I UNDERSTAND. I JUST DON'T BELIEVE

24  THAT THAT EVIDENCE IS, FRANKLY, VERY COMPELLING. PROGRAMMING

25  IS QUITE DIFFERENT THAN MEDICAL CARE. AND I CAN'T SPEAK TO THE

```
 1  COLEMAN ISSUES AND I WON'T EVEN TRY TO, BUT LET ME SPEAK TO THE

 2  PLATA ISSUES.

 3           THE DELIVERY OF MEDICAL CARE IN PLATA HAS

 4  UNDOUBTEDLY -- THERE IS NO DISPUTE THAT IT'S IMPROVED

 5  DRAMATICALLY SINCE 2006.  THERE IS SIMPLY NO DISPUTE THAT IT'S

 6  IMPROVED DRAMATICALLY.

 7           AND WHY HAS IT IMPROVED?  BECAUSE WE HAVE MORE

 8  DOCTORS, MORE NURSES, MORE PHARMACY SERVICES, BETTER.  THAT

 9  IT'S IMPROVING.  THERE IS NO DISPUTE THERE.

10           SO THEN HOW DO WE COME UP WITH A NUMBER, AND IS THAT

11  NUMBER -- THOSE IMPROVEMENTS HAVE OCCURRED IN THE VERY FACE OF

12  POPULATION PRESSURES.  THOSE IMPROVEMENTS HAVE OCCURRED.

13           SO HOW COULD WE SAY THAT 135 PERCENT HAS ANY

14  RELEVANCE WHEN THE IMPROVEMENTS HAVE OCCURRED, THE DRAMATIC

15  IMPROVEMENTS HAVE OCCURRED IN THE FACE OF POPULATION PRESSURES?

16  THAT WOULD BE NUMBER ONE.

17           BUT I GUESS I WOULD LIKE TO GET TO THE SECOND HALF OF

18  THE ANALYSIS, IF I MAY, UNLESS THE COURT HAS MORE QUESTIONS.

19           JUDGE REINHARDT:  I HAVE ONE MORE QUESTION.

20           MR. MELLO:  SURE.

21           JUDGE REINHARDT:  WHICH IS, YOU SEEM TO BELIEVE THAT

22  THE REMEDY MUST BE DEVELOPED BY CLEAR AND CONVINCING EVIDENCE.

23           MR. MELLO:  NO, I DON'T BELIEVE SO.

24           JUDGE REINHARDT:  OKAY.

25           JUDGE KARLTON:  OKAY.
```

1        **MR. MELLO:**  I BELIEVE THAT PLAINTIFFS HAVE TO MEET

2   THEIR BURDENS OF PRIMARY CAUSE AND ONLY RELIEF BY CLEAR AND

3   CONVINCING EVIDENCE.  BUT I HAVE NOT SUGGESTED IT, NOR DO I

4   BELIEVE THAT THE PLRA PROVIDES THAT.

5        **JUDGE REINHARDT:**  ALL RIGHT.  NOW, YOUR NEXT POINT.

6        **MR. MELLO:**  WELL, I WAS GOING TO GO TO -- AGAIN,

7   WE'RE STUCK WITH THE 52,000 BECAUSE THAT'S WHAT THE EXPERTS AND

8   DEFENDANT INTERVENORS RELIED UPON WHEN THEY CAME UP WITH THEIR

9   ANALYSIS OF THE ADVERSE IMPACTS OF PUBLIC SAFETY.

10        AND I THINK WE NEED TO SPEAK TO THAT NUMBER ONLY

11   BECAUSE THAT'S WHAT THE EXPERTS RELIED UPON IN COMING UP WITH

12   THAT.  AND THEY GOT TO THAT 52,000 -- LET'S JUST FOCUS ON

13   DR. AUSTIN, OKAY, PLAINTIFFS' EXPERT.

14        DR. AUSTIN SAID TO GET TO 52,000 IN TWO YEARS, THAT

15   YOU CANNOT ACHIEVE A 52,000 REDUCTION IN TWO YEARS UNLESS YOU

16   APPLIED SHORTENED LENGTH OF SENTENCE TO TWO STRIKERS AND

17   LIFERS.

18        **JUDGE KARLTON:**  THIS IS IMPORTANT.  IT'S ALL

19   IMPORTANT.

20        I HAD UNDERSTOOD HIM TO SAY THAT THAT WOULD MAKE IT

21   EASIER AND MORE SIMPLE.  I DIDN'T THINK HE SAID THAT IT WAS

22   NECESSARY.  I THOUGHT --

23        **MR. MELLO:**  NO.  AND WE CITED TO IT IN OUR PROPOSED

24   FINDINGS OF FACT AND CONCLUSIONS OF LAW, I BELIEVE, THAT HE

25   SPECIFICALLY SAID YOU CANNOT GET TO 52,000 IN TWO YEARS UNLESS

 1  YOU DO LIFERS AND SECOND STRIKERS.  PERIOD.  THAT'S THEIR

 2  EXPERTS.

 3         **JUDGE REINHARDT:**  WHAT I DON'T UNDERSTAND ABOUT THIS

 4  ARGUMENT IS WHY YOU THINK WE ARE BOUND JUST BECAUSE THE

 5  PLAINTIFFS SAID TWO YEARS.

 6         IF WE AGREED, SAY, OKAY, DO IT IN THREE YEARS, WE

 7  DON'T HAVE TO ARGUE THIS CASE IN TERMS OF WHAT THE PLAINTIFFS

 8  OR THEIR EXPERTS SAY.

 9         I MEAN, LET'S ASSUME WE WANT TO REDUCE IT BY 52,000.

10  I'M NOT SUGGESTING THAT WE DO, BUT LET'S ASSUME WE DID.  WHY DO

11  WE ONLY LOOK AT WHAT THE EFFECT WOULD BE IN TWO YEARS INSTEAD

12  OF LOOKING AT THE EFFECT IN THREE YEARS ALSO?

13         **MR. MELLO:**  BECAUSE THE COURT HAS ANALYZED THE

14  ADVERSE IMPACT ON PUBLIC SAFETY AND THE EVIDENCE WITH RESPECT

15  TO THAT WAS BASED UPON THE 52,000-FIGURE.  THERE IS NO EVIDENCE

16  AS TO WHAT IT WOULD BE IF YOU CHOSE A FOUR-YEAR PLAN, A

17  FIVE-YEAR PLAN.

18         **JUDGE KARLTON:**  CLEARLY, EVERY TIME THAT WE EXTEND

19  THE PERIOD OF TIME, IT'S FEWER PEOPLE BEING SUBJECT TO RELEASE.

20         **MR. MELLO:**  YES.

21         **JUDGE KARLTON:**  SO THAT IF THERE IS ANY ENDANGERMENT

22  OF PUBLIC SAFETY, AND THERE ARE PLENTY OF EXPERTS WHO TESTIFIED

23  THERE WOULDN'T BE, BUT IF THERE WERE, IT WOULD BE REDUCED BY

24  THE NUMBER OF PEOPLE.  IT WOULD BE REDUCED IF WE EXTENDED IT A

25  YEAR.  RIGHT?

1              **MR. MELLO:**  CORRECT.  IT WOULD BE SOMETHING LESS.

2   THE FIRST IMPACT WOULD BE LESS --

3              **JUDGE KARLTON:**  SO JUDGE REINHARDT'S QUESTION, WHICH

4   IS, WHY DO WE CARE?  YOU KNOW, WE RESPECT THE PLAINTIFFS, BUT

5   LIKE ALL PLAINTIFFS, THEY ARE OVERREACHING.  I DIDN'T SAY THAT.

6              YOU KNOW, WHY WOULD WE FEEL COMPELLED TO SAY IT'S

7   EITHER TWO YEARS OR NOTHING?

8              **MR. MELLO:**  WELL, I DON'T THINK THIS COURT WOULD BE

9   COMPELLED, BUT I THINK THE EVIDENCE BEFORE THE COURT IS THAT

10  THERE WOULD BE A SUBSTANTIAL IMPACT ON PUBLIC SAFETY.

11             I THINK THAT THE EVIDENCE WAS MISCHARACTERIZED

12  EARLIER TODAY WITH RESPECT TO THE ADVERSE IMPACT ON PUBLIC

13  SAFETY.

14             I BELIEVE THAT THE EVIDENCE FROM DR. AUSTIN WAS THAT

15  IF YOU SHORTEN SENTENCES BY -- USE THE SHORTENED -- SHORTEN THE

16  LENGTH OF SENTENCE APPROACH TO HELP REDUCE YOUR POPULATION,

17  THAT IN L.A. COUNTY ALONE THERE WOULD BE 1398 ARRESTS IN THE

18  FIRST FOUR MONTHS OF IMPLEMENTATION.

19             I THINK THE EVIDENCE IS THAT AS PART OF A POPULATION

20  REDUCTION STRATEGY AS PROPOSED BY PLAINTIFFS, WHICH THEY CLAIM

21  WILL NOT HAVE AN ADVERSE IMPACT ON PUBLIC SAFETY, THAT IN THE

22  FIRST YEAR OF THE PROPOSAL YOU WOULD HAVE A REDUCTION IN

23  CALIFORNIA'S PRISON POPULATION BY 12,000 INMATES, BUT AT THE

24  SAME TIME YOU WOULD HAVE 10,400 OF THEM REARRESTED.

25             SO YOU WOULD HAVE A 1700 PERSON DELTA.  THAT'S WHAT

1   DR. AUSTIN TESTIFIED ABOUT.

2        **JUDGE REINHARDT:**  I'M INTERESTED IN EXPLORING

3   VARIOUS METHODS OF GETTING THROUGH A REDUCTION.  I MEAN, THE

4   GOVERNOR HAS PROPOSED SO.  HE SAYS YOU ELIMINATE PAROLE FOR A

5   NUMBER OF --

6        **JUDGE KARLTON:**  THIRTY THOUSAND.

7        **JUDGE REINHARDT:**  WHATEVER IT IS.  HE WANTS TO

8   ELIMINATE PAROLE, WHICH SHOULD HAVE THE EFFECT OF REDUCING THE

9   PRISON POPULATION, FOR WHOMEVER HE WANTED.

10        HE WANTS TO CHANGE THE AMOUNTS FOR WHAT IS FELONY

11   THEFT, WHICH WOULD ALSO BE -- I DON'T SEE WHY WE ARE STUCK WITH

12   WHAT THE PLAINTIFFS' EXPERTS HAVE SUGGESTED.

13        I WOULD BE INTERESTED IN KNOWING WHAT THE GOVERNOR'S

14   POSITION, THE STATE'S POSITION IS ON METHODS YOU CAN USE TO

15   REDUCE THE PRISON POPULATION.

16        **JUDGE KARLTON:**  WE KNOW THAT THE GOVERNOR HAS

17   PROPOSED IN HIS BUDGET 30,000 FOLKS WHO ARE GOING TO BE

18   RELEASED WITHOUT -- AS I UNDERSTAND, MAYBE I DON'T -- WITHOUT

19   PAROLE.

20        NOW, AS YOU STAND HERE TODAY, ARE YOU PREPARED TO SAY

21   THAT THAT'S NOT THE GOVERNOR'S POSITION; I'M HIS LAWYER AND I

22   WILL TELL YOU WHAT HIS POSITION IS?

23        **MR. MELLO:**  NO.  I'M PREPARED TO SAY THAT THE

24   GOVERNOR'S BUDGET PROPOSAL IS THE GOVERNOR'S BUDGET PROPOSAL

25   AND IT SAYS WHAT IT IS.  AND IT'S A BUDGET PROPOSAL IN HARSH

1    ECONOMIC TIMES AND IT INCLUDES MANY CHOICES TO REDUCE SPENDING

2    THAT THE GOVERNOR WOULD NOT OTHERWISE MAKE IN A PERFECT WORLD.

3          **JUDGE KARLTON:**  IF THIS WERE A PERFECT WORLD, WE

4    WOULDN'T BE HERE.

5          **JUDGE REINHARDT:**  WE HAVE TO DEAL WITH THE FACT THAT

6    WE ARE IN AN ECONOMIC CRISIS.

7          **MR. MELLO:**  RIGHT.

8          **JUDGE REINHARDT:**  ALL OF US.  SO WE MIGHT HAVE BETTER

9    WAYS TO REDUCE THE PRISON POPULATION IF THE STATE HAD THE MONEY

10   TO DO IT, BUT THEY DON'T.  AND WE HAVE TO DEAL WITH THE WORLD

11   THAT WE ARE IN, THE SAME WORLD THE GOVERNOR IS IN.

12         **MR. MELLO:**  RIGHT.  AND THAT'S WHY I THINK IT'S

13   IMPORTANT TO ANALYZE THE EVIDENCE WITH RESPECT TO THE ADVERSE

14   IMPACT ON PUBLIC SAFETY.  THIS COURT CANNOT ASSUME ANYTHING BUT

15   THE STATUS QUO WITH RESPECT TO THE EARLY RELEASE OR REDUCTION

16   IN THE PRISON POPULATION.

17         **JUDGE KARLTON:**  I DON'T UNDERSTAND.  I DON'T KNOW

18   WHETHER TO SAY IT'S THE GOVERNOR'S POSITION OR WHOSE POSITION

19   IT IS.  THE GOVERNOR HAS TOLD THE LEGISLATURE, IN EFFECT, WE

20   CAN RELEASE 30,000 PEOPLE WITHOUT ENDANGERING PUBLIC SAFETY.

21         MY QUESTION TO YOU, AND I THOUGHT IT WAS

22   JUDGE REINHARDT'S QUESTION TO YOU:  ARE YOU BOUND BY THAT?  DO

23   YOU AGREE THAT AT LEAST FOR 30,000 PEOPLE, OR WHATEVER THE

24   NUMBER IS --

25         **MR. MELLO:**  YEAH, I'M NOT SURE THAT'S THE PROPOSAL I

```
 1   KNOW OF.

 2            JUDGE KARLTON:  WELL, WHATEVER THE NUMBER IS, THAT

 3   THOSE PEOPLE CAN BE RELEASED WITHOUT ANY DANGER TO PUBLIC

 4   SAFETY, ENDANGERMENT OF PUBLIC SAFETY?

 5            MR. MELLO:  WHAT I THINK I WAS TRYING TO SAY IS THE

 6   GOVERNOR HAS MADE A BUDGET PROPOSAL, OKAY.  HE'S MADE A

 7   PROPOSAL THAT REQUIRES TOUGH DECISIONS, DECISIONS HE WOULDN'T

 8   WANT --

 9            JUDGE REINHARDT:  THAT'S --

10            MR. MELLO:  NO, NO, NO.

11            JUDGE REINHARDT:  WE ALSO HAVE DECISIONS WE WOULDN'T

12   WANT TO MAKE --

13            MR. MELLO:  RIGHT.  HE IS CUTTING SPENDING ON

14   SCHOOLS.  HE'S CONTEMPLATING THINGS HE WOULDN'T OTHERWISE DO,

15   LIKE THIS VERY BUDGET.

16            JUDGE KARLTON:  MR. MELLO.  MR. MELLO.  MY QUESTION

17   IS MUCH NARROWER.  I'M TRYING TO FIND OUT WHETHER OR NOT IT IS

18   THE STATE'S POSITION, WHATEVER YOUR PERSONAL VIEWS ARE AND,

19   INDEED, WHATEVER THE ATTORNEY GENERAL'S PERSONAL VIEWS ARE,

20   THAT IT IS THE STATE'S POSITION THAT "X" NUMBER, WHATEVER THAT

21   NUMBER IS, AS PROPOSED IN THE BUDGET PROPOSAL CAN BE RELEASED

22   WITHOUT ANY ENDANGERMENT OF PUBLIC SAFETY.

23            MR. MELLO:  I GUESS MY ANSWER TO YOU WOULD BE THAT

24   THE BUDGET PROPOSALS ARE THE BUDGET PROPOSALS.  I DON'T KNOW

25   WHICH ONE YOU'RE REFERRING TO.  IF YOU'RE REFERRING TO '08-'09,
```

 1    '09-'10.  I DON'T KNOW WHAT YOU'RE REFERRING TO.

 2          IF YOU ARE REFERRING TO THE MOST RECENT ONE THAT WE

 3    SUBMITTED BRIEFING ON, I BELIEVE OUR POSITION IS CLEAR.  AND IT

 4    SAYS, HERE IS THE BUDGET PROPOSAL.  IT DOESN'T PROPOSE THE

 5    RELEASE OF PRISONERS, THE SAVINGS THAT WE ARE BEING FORCED TO

 6    TRY TO HAVE WITH RESPECT TO PAROLE.

 7          **JUDGE KARLTON:**  SO YOU ARE PREPARED TO SAY THAT THE

 8    GOVERNOR IS PROPOSING TO THE STATE THAT WE ENDANGER PUBLIC

 9    SAFETY.

10          **MR. MELLO:**  NO, I'M NOT.

11          **JUDGE REINHARDT:**  SO YOU WILL AGREE THAT WHATEVER THE

12    GOVERNOR PROPOSED WOULD NOT ENDANGER PUBLIC SAFETY?

13          **MR. MELLO:**  HOWEVER MOTIVATED.

14          **JUDGE REINHARDT:**  ARE YOU WILLING TO SAY THAT

15    WHATEVER THE GOVERNOR PROPOSED WOULD NOT ENDANGER THE PUBLIC

16    SAFETY?

17          **MR. MELLO:**  I AM SURE THAT THE GOVERNOR DID NOT MAKE

18    THE PROPOSAL THAT HE THOUGHT WOULD ENDANGER PUBLIC SAFETY.

19    THAT BEING SAID --

20          **JUDGE REINHARDT:**  OKAY.  SO WE CAN PROCEED FROM

21    THERE, IS WHATEVER HIS PROPOSAL WAS.

22          **MR. MELLO:**  WE CAN PRESUME THAT IT WAS A PROPOSAL

23    THAT WOULD BE DIFFERENT IN THE MAIN REVISE, THAT ISN'T ACTED

24    UPON UNLESS APPROVED BY THE LEGISLATURE.

25          **JUDGE REINHARDT:**  I KNOW.  SOMETIMES THE GOVERNOR, AS

1    YOU SAID BEFORE, WOULD LIKE THE COURT TO DO WHAT THEY AREN'T

2    ABLE TO DO THEMSELVES.  THAT'S ALL CLEAR.  IT DOESN'T MATTER.

3            WE ARE TRYING TO FIND OUT -- I DON'T KNOW WHO THE

4    STATE IS, BUT THE GOVERNOR IS THE DEFENDANT IN THIS CASE AND

5    YOU ARE THE GOVERNOR'S LAWYER, I ASSUME.

6            **JUDGE KARLTON:**  APPARENTLY.

7            **JUDGE REINHARDT:**  AND I ASSUME YOU WERE GOING TO TAKE

8    THE SAME POSITION THAT THE GOVERNOR IS TAKING.  AND THE

9    GOVERNOR, AS I UNDERSTAND IT, HAS TOLD THE LEGISLATURE AND THE

10   PUBLIC THAT CERTAIN ACTIONS WILL NOT ENDANGER THE PUBLIC

11   SAFETY.

12           **MR. MELLO:**  I DON'T BELIEVE THE -- WELL, I BELIEVE I

13   HAVE ANSWERED YOUR QUESTION.  I DON'T BELIEVE THE GOVERNOR

14   WOULD PROPOSE SOMETHING THAT HE THOUGHT WOULD ENDANGER PUBLIC

15   SAFETY.  SO I BELIEVE I HAVE ANSWERED THAT QUESTION.

16           **JUDGE REINHARDT:**  WHAT IS THE GOVERNOR'S PROPOSAL?

17   HOW MANY PEOPLE WOULD -- YOU KNOW WHAT A PRISONER RELEASE ORDER

18   IS.  I'M NOT SAYING HE SAID OPEN THE GATE TO THE PRISONS.  I'M

19   SAYING, HOW MANY PEOPLE?

20           **MR. MELLO:**  YOUR HONORS, WE SUBMITTED BRIEFING

21   REGARDING THE BUDGET PROPOSAL.  IT SAYS WHAT IT SAYS.  IT SAYS

22   THAT THE SAVINGS ARE GOING TO BE ACHIEVED PRIMARILY BY REDUCING

23   THE NUMBER OF INDIVIDUALS WHO ARE ON PAROLE SUPERVISION.

24   THAT'S WHAT IT SAYS.  IT DOESN'T SAY RELEASE PRISONERS.

25           **JUDGE REINHARDT:**  I KNOW THAT.  I JUST SAID IT

 1  DOESN'T SAY RELEASE PRISONERS.  TO WHAT EXTENT WOULD THIS

 2  REDUCE THE PRISON POPULATION?

 3          NOBODY IS SUGGESTING RELEASING PRISONERS, JUST

 4  OPENING THE DOORS.  WHAT WE ARE TRYING TO FIND OUT, THE PRISON

 5  RELEASE ORDER IS REDUCING THE POPULATION, AND TO WHAT EXTENT

 6  WOULD THE GOVERNOR'S PROPOSAL REDUCE THE PRISON POPULATION?

 7          MR. MELLO:  I DON'T BELIEVE THAT THE GOVERNOR'S

 8  PROPOSAL IN THE '09-'10 BUDGET -- AGAIN, IT WAS PRIMARILY WITH

 9  RESPECT TO LESS PAROLE SUPERVISION; YOU KNOW, SOME PEOPLE NOT

10  HAVING PAROLE SUPERVISION, SHORTER SUPERVISION.

11          JUDGE REINHARDT:  THEREFORE, WE WOULDN'T HAVE

12  PAROLEES RETURNING TO PRISONS.

13          MR. MELLO:  PRESUMABLY, THOSE PAROLEES, AS WE HEARD

14  TESTIMONY FROM AT THE TIME OF TRIAL, ARE THE PEOPLE WHO ARE

15  LEAST LIKELY TO REOFFEND AND LEAST LIKELY TO RETURN TO PRISON.

16  SO, THEREFORE, IT'S GOING TO HAVE THE LEAST IMPACT ON THE

17  PRISON POPULATION.

18          JUDGE KARLTON:  NOW, MR. MELLO, I THINK WE HAVE

19  REALLY EXHAUSTED THIS.  YOU'RE UNABLE OR UNWILLING TO RESPOND.

20          THIS GOES BACK IN A SENSE TO THE OTHER ISSUE, WHICH

21  IS LETTING THE STATE TELL US WHAT WOULD BE APPROPRIATE.  THE

22  GOVERNOR MADE A PROPOSAL.  WITHIN THE MEANING OF THE PLRA IT IS

23  CLEARLY A PRISONER RELEASE ORDER.

24          MR. MELLO:  ISSUED BY THIS COURT AS OPPOSED TO IF THE

25  GOVERNOR UNDER HIS AUTHORITY IS THE CHIEF EXECUTIVE OF

1  CALIFORNIA DID IT ON HIS OWN THROUGH ENACTMENT BY THE

2  LEGISLATURE.

3        **JUDGE KARLTON:**  SO THE QUESTION THEN BECOMES -- ONE

4  HOPES AND EXPECTS THAT THE GOVERNOR WOULD NOT PROPOSE SOMETHING

5  WHICH HE THOUGHT WOULD INCREASE PUBLIC -- ENDANGER PUBLIC

6  SAFETY.

7        IF WE SAY, LOOK, STATE, TELL US WHAT TO DO.  THERE IS

8  SORT OF, SO TO SPEAK, A BOTTOM LINE, WHICH IS THERE IS AT LEAST

9  THIS NUMBER OF PEOPLE -- MAYBE IT'S NOT SUFFICIENT.  I DON'T

10  KNOW.  BUT AT LEAST THIS NUMBER OF PEOPLE THAT YOU DON'T HAVE

11  TO WORRY ABOUT, JUDGES.  THAT WILL NOT ENDANGER PUBLIC SAFETY.

12  MAYBE EVERYTHING ELSE WILL, THAT WON'T.  BUT IT WOULD AT LEAST

13  START WITH THE STATE TELLING US WHAT THE STATE BELIEVES CAN BE

14  DONE.

15        I'M NOT -- I THINK WE'VE EXHAUSTED THIS AND THERE'S

16  PROBABLY NO POINT IN PROCEEDING.

17        **MR. MELLO:**  AND I FEAR I WILL REPEAT MYSELF, TOO.

18        IF YOU HAVE ANYTHING ELSE?

19        **JUDGE REINHARDT:**  MAYBE SOME LATER TIME IN THESE

20  PROCEEDINGS WE ARE GOING TO ASK YOU TO GO TO THE GOVERNOR AND

21  FIND OUT WHAT HIS PROPOSAL IS TO RELIEVE THE PRISON POPULATION.

22  YOU DON'T HAVE TO DO IT TODAY.  IT MAY COME LATER.

23        **MR. MELLO:**  I THINK YOU'VE HEARD EVIDENCE AS TO WHAT

24  THE GOVERNOR'S PROPOSAL IS ON THAT:  TRANSFERRING PRISONERS OUT

25  OF STATE, HOPEFULLY IMPLEMENTING AB900, AND OTHER THINGS.  I

 1  BELIEVE YOU'VE HEARD THE PROPOSALS ON THAT.

 2          **JUDGE REINHARDT:**  I SUGGEST LATER, IF THERE HAPPENS

 3  TO BE A CAP PUT ON THE PRISONS, YOU WILL BE ABLE TO COME BACK

 4  AND TELL US --

 5          **MR. MELLO:**  WHAT THE NUMBER IS.

 6          **JUDGE REINHARDT:**  WELL, MAYBE WHAT THE NUMBER IS OR

 7  MAYBE HOW YOU'RE GOING TO GET THAT CAP.

 8          WE'LL NOT BE BUILDING PRISONS.  IF HE IS GOING TO

 9  TELL US BUILD PRISONS, ASK HIM IF HE IS GOT THE MONEY TO BUILD

10  PRISONS.

11          **MR. MELLO:**  I MEAN, THERE ARE MANY OTHER THINGS I

12  WOULD LIKE TO DISCUSS.  I BELIEVE THEY WERE IN THE FINDINGS OF

13  FACT AND CONCLUSIONS OF LAW, BUT I WILL GLADLY HAND OVER THE

14  MICROPHONE TO MISS TILLMAN.

15          **JUDGE REINHARDT:**  IF YOU WOULD LIKE TO DISCUSS OTHER

16  THINGS, THAT'S WHAT I WOULD DO.

17          **MR. MELLO:**  WELL, I THINK THIS COURT HAS SAID THAT IT

18  DOESN'T WANT TO HEAR ME TALK ABOUT THE ANALYSIS OF THE 52,000

19  PRISONER REDUCTION BY PLAINTIFFS AND THE ADVERSE IMPACT ON

20  PUBLIC SAFETY.  AND I BELIEVE THAT --

21          **JUDGE REINHARDT:**  JUST A MINUTE, MR. MELLO.  WE

22  DIDN'T SAY YOU COULDN'T DISCUSS THAT.

23          WE POINTED OUT TO YOU, HOWEVER, THAT THAT'S NOT THE

24  ONLY POSSIBLE PROBLEM.  YOU SHOULD CONSIDER, ALSO, NOT THAT

25  THERE ARE 52,000 REDUCTION IN TWO YEARS.  YOU SHOULD ALSO THINK

1  ABOUT THE FACT THAT IT MIGHT BE A 40,000 REDUCTION IN THREE

2  YEARS, FOR EXAMPLE.

3       WE DON'T KNOW WHAT IT WOULD BE, BUT WE ONLY TALKED

4  ABOUT THE FACT OF A 52,000 REDUCTION IN TWO YEARS BECAUSE

5  THAT'S WHAT THE PLAINTIFF SAYS.

6       **MR. MELLO:**  I THINK WE NEED --

7       **JUDGE REINHARDT:**  WE HAVE TO LOOK AT THE EFFECT ON

8  PUBLIC SAFETY.

9       **MR. MELLO:**  RIGHT.

10      **JUDGE REINHARDT:**  ONE OF THE PROBLEMS IS WE DON'T

11 KNOW WHAT NATURE OF THE PRISONER RELEASE ORDER IS.  WE DON'T

12 KNOW WHAT THE STATE WOULD DO TO COME INTO COMPLIANCE WITH IT.

13      AS I SAID EARLIER, IF THE STATE DECIDED WE ARE GOING

14 TO HAVE TO REDUCE THE POPULATION BY 20,000, SO WE ARE GOING TO

15 REDUCE 20,000 FIRST DEGREE MURDERERS, THEN, AS I SAY, IT MIGHT

16 HAVE SOME REAL EFFECT ON PUBLIC SAFETY.

17      IF THEY SAY WE ARE GOING TO REDUCE THE POPULATION BY

18 LETTING SOME PAROLEES GET OUT A LITTLE EARLY, THAT WOULD HAVE A

19 DIFFERENT EFFECT ON PUBLIC SAFETY.

20      IT'S NOT AN EASY PROBLEM TO RESOLVE AND WE NEED THE

21 STATE'S COOPERATION IN DEALING WITH IT.

22      **MR. MELLO:**  UNDERSTOOD.  I THINK, WITHOUT TALKING

23 ABOUT THE 52,000, WE SHOULD THINK A LITTLE BIT ABOUT

24 CALIFORNIA'S PRISON POPULATION THOUGH.  WE DON'T INCARCERATE

25 FELONS AT AN UNUSUALLY HIGH RATE.  IN FACT, WE ARE ABOUT HALF

 1   THE NATIONAL AVERAGE.

 2           OUR INCARCERATION RATE IS 470 PER 100,000 INMATES,

 3   WHICH IS ABOUT JUST SLIGHTLY ABOVE THE NATIONAL AVERAGE OF 445.

 4   WE DON'T KEEP PEOPLE IN PRISON LONGER THAN OTHER FOLKS.

 5           THE INCREASE IN THE CALIFORNIA PRISON POPULATION

 6   BETWEEN 1997 AND 2007 WAS ALMOST EXCLUSIVELY DUE TO AN INCREASE

 7   IN THE NUMBER OF INDIVIDUALS WHO WERE CONVICTED OF CRIMES

 8   AGAINST PERSON.

 9           AT THE SAME TIME -- BECAUSE WE ARE TALKING ABOUT

10   PEOPLE WITHOUT RISK.  AT THE SAME TIME THE NUMBER OF PEOPLE IN

11   PRISON FOR DRUG OFFENSES HAS GONE DOWN SUBSTANTIALLY, AND

12   THAT'S IN THE RECORD.

13           A HIGHER PERCENTAGE OF CALIFORNIA'S INMATES THAN IN

14   OTHER STATES HAVE 10 OR MORE ARRESTS BEFORE THEY GO TO PRISON.

15           THERE IS EVIDENCE IN THE COURT AS TO WHAT EARLY

16   RELEASE PROGRAMS DID IN LOS ANGELES COUNTY AND OTHER COUNTIES.

17           THERE IS EVIDENCE IN THE COURT OF A RELATIONSHIP

18   BETWEEN INCARCERATION RATES AND CRIME RATES.  I BELIEVE THAT

19   THE RECORD WAS MISSTATED EARLIER.

20           I BELIEVE THAT THERE IS EVIDENCE IN THE RECORD THAT A

21   25 PERCENT REDUCTION IN VIOLENT CRIME THAT HAS OCCURRED IN THE

22   LAST 25 YEARS IS DUE TO INCREASED INCARCERATION, INCREASED

23   PRISON POPULATIONS, MEANING THAT INCAPACITATION HAS AN EFFECT.

24           I BELIEVE THAT THERE WAS EXPERT TESTIMONY RELIED UPON

25   BY ONE OF PLAINTIFFS' EXPERTS, JOE LEHMAN, THAT A 10 PERCENT

1   DECREASE IN THE INCARCERATION RATE LEADS TO A STATISTICALLY

2   SIGNIFICANT 3.3 INCREASE IN CRIME RATES.

3         PLAINTIFFS -- AGAIN, THEIR REQUEST FOR A 52,000

4   REDUCTION WOULD DECREASE THE CRIME RATE BY 25 PERCENT.  SO IF A

5   10 PERCENT INCREASES THE CRIMINAL RATE BY 3.3 PERCENT, WHAT

6   DOES A 25 PERCENT DECREASE DO?

7         WHAT IT MEANS IS THAT THERE IS GOING TO BE MORE CRIME

8   AND THAT THERE IS GOING TO BE AN INCREASE IN THE CRIME RATE IF

9   THERE IS A PRISONER RELEASE ORDER.

10         AND THEN WE HAVE SPOKEN ABOUT DR. AUSTIN.  IN FACT,

11   SECOND AND THIRD STRIKERS, AND IT'S CITED IN THE RECORD AND

12   IT'S NOT IN DISPUTE.  I THINK THAT THE EVIDENCE IS -- AND I

13   WILL LEAVE IT MORE TO THE INTERVENORS -- IS THAT THEY DON'T

14   HAVE THE RESOURCES TO DEAL WITH ADDITIONAL PEOPLE WHO ARE

15   EITHER PAROLED OR DIVERTED.  THEY JUST SIMPLY DON'T HAVE THE

16   RESOURCES.  THE EVIDENCE IS NOW THEY DON'T HAVE THE RESOURCES.

17   WHAT WOULD HAPPEN IN THE FUTURE?

18         THE EVIDENCE IS THE D.A. -- I WON'T SAY WHAT THE

19   D.A.'S WILL SAY.  THE EVIDENCE IS THAT YOU DON'T CATCH A PERSON

20   THE FIRST TIME HE OR SHE COMMITS A CRIME, THE EVIDENCE IS

21   PEOPLE WHO ARE REARRESTED COMMIT MANY MORE CRIMES THAN THEY

22   COMMIT -- MANY MORE CRIMES THAN THE ONE THAT THEY GET CAUGHT

23   FOR.  THERE WAS EVIDENCE IN THE RECORD THAT MANY TIMES MORE, 12

24   TIMES MORE.

25         WE TALKED ABOUT THE L.A. COUNTY EARLY RELEASE

 1  PROGRAM.  THAT WAS A RELEASE BECAUSE OF A POPULATION CAP ON A

 2  JAIL SYSTEM, NOT A PRISON SYSTEM.  NOT A PRISON SYSTEM COMPOSED

 3  OF THE FOLKS THAT I JUST TOLD YOU ABOUT THAT ARE MORE AND MORE

 4  FOR VIOLENT CRIMES, THAT LESS AND LESS ARE FOR DRUG OFFENSES.

 5  THIS IS JUST FROM A JAIL SYSTEM.  THAT BETWEEN 2002 AND 2006

 6  THERE WAS, APPROXIMATELY, 10 PERCENT OF THE FOLKS RELEASED

 7  EARLY FROM COUNTY JAIL IN L.A. COMMITTED ADDITIONAL CRIMES AND

 8  16 WERE ARRESTED FOR MURDER.

 9          THE EVIDENCE IS THAT THE -- BEFORE THIS COURT THE

10  EVIDENCE IS THAT THERE ARE POPULATION CAPS ON 32 PRISONS AND

11  THAT THE POLICE DEPARTMENT --

12          **JUDGE KARLTON:**  THIRTY-TWO JAILS.

13          **MR. MELLO:**  THIRTY-TWO COUNTY JAILS OF THE 58

14  COUNTIES.

15          I HAVE TO ADMIT I'M GETTING A LITTLE TIRED.  I

16  APOLOGIZE.

17          THAT THERE IS A CAP ON THE 32 OF THE 58.  THAT POLICE

18  AND JAIL RESOURCES ARE STRETCHED.  THAT POLICE FORCES ARE BEING

19  CUT AS WE SPEAK.

20          WHAT DOES THIS MEAN IF THERE IS A POPULATION

21  REDUCTION?  SOMETHING -- 52,000 OR SOMETHING ELSE?  WHAT IT

22  MEANS IS THERE WILL BE MORE CRIMINALS ON THE STREET.  THERE

23  WILL BE MORE CRIME BECAUSE YOU DON'T CATCH THEM EVERY TIME AND

24  THERE WILL BE LESS POLICE TO CATCH THEM ANYWAYS.

25          IT MEANS THAT THERE WILL BE LESS D.A.'S TO PROSECUTE

1  THEM AND THERE WILL BE LESS SPACE AT THE LOCAL JAILS TO DEAL

2  WITH THEM.  AND WE'VE ALREADY HEARD THAT THERE AREN'T THE LOCAL

3  RESOURCES TO DEAL WITH THE PROBLEMS.

4          SO I THINK THAT'S WHAT THE EVIDENCE IS.  THE EVIDENCE

5  IS JUST -- IN CLOSING, AND THEN I WILL GLADLY PASS THE MIC ON

6  TO MISS TILLMAN.  THE EVIDENCE IS I DON'T BELIEVE THAT THE

7  PRIMARY CAUSE HAS BEEN MET CLEAR AND CONVINCING.

8          I DON'T BELIEVE THE RECORD SUPPORTS THAT THE RELIEF

9  REQUESTED WILL REMEDY IT.  I DON'T BELIEVE THAT PLAINTIFFS HAVE

10 PROVEN UP WHAT THE POPULATION HAS TO BE.

11         AND I BELIEVE THAT THE EVIDENCE IS QUITE CLEAR THAT

12 THERE WILL BE A SUBSTANTIAL ADVERSE IMPACT ON PUBLIC SAFETY AND

13 TO THE ADMINISTRATION OF CRIMINAL JUSTICE IF THIS PRISONER

14 RELEASE ORDER IS GRANTED.

15         AND I THANK THE COURT FOR ITS TIME AND FOR THE

16 DISCUSSION.  THANK YOU.

17         **JUDGE REINHARDT:**  THANK YOU, MR. MELLO.

18                         **CLOSING ARGUMENT**

19      **MS. TILLMAN:**  GOOD AFTERNOON.  MAY IT PLEASE THE

20 COURT AND COUNSEL.  THANK YOU FOR THIS OPPORTUNITY TO PRESENT A

21 SEPARATE CLOSING STATEMENT ON BEHALF OF THE COLEMAN DEFENDANTS.

22         AT THE START OF THIS CASE, AS YOU MAY RECALL, THE

23 COLEMAN DEFENDANTS DESCRIBED TO YOU THIS CLOSED CIRCUIT NATURE

24 OF THE MENTAL HEALTH CARE SYSTEM DEVELOPED EVEN IN THE CONTEXT

25 OF INCREASED POPULATION PRESSURES SINCE 1994.

1              THEIR PROVISION OF MENTAL HEALTH CARE TO THAT

2    POPULATION OF INMATES WITH SERIOUS MENTAL DISORDERS NOW

3    INVOLVES AN IDENTIFIED AND ESTABLISHED POPULATION OF INMATES.

4              IT NOW INVOLVES THE CARE OF THOSE PATIENTS IN

5    PROGRAMS OR WHAT THEY CALL LEVELS OF CARE ESTABLISHED BY

6    COURT-APPROVED POLICIES AND PROCEDURES.

7              NOW INVOLVES SEPARATE CLINICAL STAFF, FROM

8    PSYCHIATRISTS TO SOCIAL WORKERS, PROVIDING CARE TO THESE

9    INMATES WITH SERIOUS MENTAL DISORDERS.

10             NOW INVOLVES THE DESIGNATED MENTAL HEALTH CARE BEDS

11   THAT PROVIDE SEPARATE HOUSING, OFTEN SEPARATE DINING AND

12   RECREATION AREAS.

13        **JUDGE KARLTON:**  YOU KNOW, MISS TILLMAN, BECAUSE YOU

14   AND I HAVE BEEN THERE, THAT WE'RE OVER 1,000 BEDS -- I'M MAKING

15   THAT NUMBER UP -- BUT RIGHT NOW THAT WE DON'T HAVE FOR MENTALLY

16   ILL PATIENTS.  IF WE LET OUT HOWEVER MANY PEOPLE, WE WOULD HAVE

17   THOSE BEDS.  WE COULD PROVIDE THEM WITH CARE.

18        **MS. TILLMAN:**  I CAN'T AGREE TO THAT, YOUR HONOR.  I

19   BELIEVE THE DEFENDANTS' EVIDENCE ESTABLISHES THAT THAT IS NOT

20   THE CASE.

21             IN FACT, AS YOU KNOW, THE FORMER SPECIAL MASTER,

22   MR. KEATING, INDICATED THAT YOU COULD LET OUT 100,000 INMATES

23   AND YOU WOULD STILL NOT HAVE THE APPROPRIATE BEDS WITH THE

24   APPROPRIATE STAFF TO PROVIDE APPROPRIATE CARE.

25        **JUDGE KARLTON:**  OF COURSE, BUT WE DON'T HAVE BEDS

1  RIGHT NOW.  LITERALLY, THERE WERE TERRIBLY SICK PEOPLE IN

2  GENERAL POPULATION BECAUSE WE DON'T HAVE BEDS.  THAT'S THE

3  REALITY.  CERTAINLY, THEY NEED APPROPRIATE CARE,

4  PHARMACEUTICALS, ET CETERA.

5          BUT RIGHT NOW THE SITUATION IS THERE ARE TERRIBLY

6  SICK PEOPLE IN -- I AGREE WITH WHOEVER THE DEFENDANTS' EXPERT

7  WAS.  THIS ISN'T AS BAD AS AUSCHWITZ, AS IF THAT MATTERED, BUT

8  TERRIBLY SICK PEOPLE WHO DON'T HAVE BEDS.  HOW CAN WE PRETEND

9  THAT THAT'S NOT AN OVERCROWDING PROBLEM?

10         **MS. TILLMAN:**  LET'S TAKE A LOOK AT WHERE THOSE PEOPLE

11 ARE LOCATED THEN.

12         WITH ALL DUE RESPECT TO THIS COURT, WHAT WE SEE IN

13 FRONT OF US IS AN ASSERTION BY THE PLAINTIFFS THAT IT'S THE

14 OVERALL POPULATION OF THE DEPARTMENT OF CORRECTIONS AND

15 REHABILITATION THAT IS THE PRIMARY CAUSE FOR THE CONSTITUTIONAL

16 DEFICIENCIES IN THE MENTAL HEALTH CARE SYSTEM; NAMELY, BEDS.

17         YET, WHEN YOU TAKE A LOOK AT WHERE THE PATIENTS ARE

18 LOCATED, WHEN YOU TAKE A LOOK AT WHERE THEY WERE LOCATED IN

19 1994 --

20         **JUDGE KARLTON:**  I KNOW IT'S SO MUCH BETTER NOW, BUT

21 WHAT WE HAVE ARE -- I'M SORRY, I DON'T HAVE THE FIGURE AT MY

22 FINGERTIPS.  I THOUGHT I DID, BUT I DON'T.

23         THERE IS A SIGNIFICANT NUMBER -- MAYBE IT'S NOT

24 1,000.  I THINK IT IS, BUT WHATEVER IT IS -- FOLKS WHO ARE IN

25 THE GENERAL POPULATION BECAUSE WE DON'T HAVE BEDS FOR THEM.

1          MS. TILLMAN:  AND SO IS THE APPROPRIATE RESPONSE TO

2   THAT, ASSUMING THAT, INDEED, THE SHEER NUMBER OF PEOPLE WITHIN

3   THE CONFINES AND CUSTODY OF CDCR IS SOMEHOW CAUSING THIS

4   DEFICIENCY IN MENTAL HEALTH BEDS FOR SEVERELY MENTALLY

5   DISORDERED INMATES, ASSUMING THAT TO BE THE CASE -- WHICH

6   DEFENDANTS DON'T AGREE TO, BUT WE'LL ASSUME IT ARGUENDO

7   TODAY -- IS IT TRULY THE APPROPRIATE RELIEF TO GO AHEAD AND

8   RELEASE INMATES?

9          WOULD THAT ACTUALLY ENABLE THE CREATION OF THE VERY

10  BEDS THAT THIS COURT WANTS TO SEE ACTIVATED AS SOON AS

11  POSSIBLE?

12         DEFENDANTS ADMIT THAT THAT IS NOT GOING TO PROVIDE

13  THE REMEDY.  PLAINTIFFS' OWN EXPERTS HAVE SAID THAT.  YOU SAW

14  DR. HANEY TESTIFY OVER TWO DAYS.  YOU SAW DR. STEWART TESTIFY

15  OVER TWO DAYS.  EACH OF THEM USED THE SAME WORDS, "IT'S THE

16  FIRST STEP."

17         **JUDGE KARLTON:**  OF COURSE.

18         **MS. TILLMAN:**  IT'S NOT GOING TO -- DR. HANEY SAYS IT

19  BEST.

20         **JUDGE KARLTON:**  OF COURSE.

21         **MS. TILLMAN:**  THERE IS NO MAGIC NUMBER.  A

22  CONSTITUTIONALLY COMPLIANT SYSTEM WILL NOT MAGICALLY APPEAR.

23  WE WILL STILL NEED BEDS AND STAFF.

24         AND, IN FACT, THE VERY ACTIONS THAT WILL BE NECESSARY

25  TO GET THOSE BEDS, TO GET THOSE STAFF ARE ALREADY UNDERWAY.

 1            **JUDGE KARLTON:**  ALL RIGHT.  GO AHEAD.  GO AHEAD.

 2            **MS. TILLMAN:**  THE COLEMAN DEFENDANTS CONTEND THAT THE

 3   PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING UPON CLEAR AND

 4   CONVINCING EVIDENCE THAT THE OVERALL POPULATION OF THE

 5   DEPARTMENT OF CORRECTIONS IS THE PRIMARY CAUSE OF

 6   CONSTITUTIONAL DEFICIENCIES IN THE MENTAL HEALTH CARE SYSTEM.

 7            FURTHER, PLAINTIFFS CANNOT ESTABLISH THAT A PRISONER

 8   RELEASE ORDER WILL RENDER THE MENTAL HEALTH CARE SYSTEM

 9   CONSTITUTIONAL.

10            INDEED, EVEN THE PLAINTIFFS ADMIT THAT THE RELIEF

11   NECESSARY TO RENDER THE MENTAL HEALTH CARE SYSTEM

12   CONSTITUTIONAL IS THE VERY ACTION UNDERTAKEN AND ALREADY

13   UNDERWAY BY THE DEFENDANTS, FROM THE STAFFING OF CLINICAL

14   POSITIONS TO THE BUILDING OF THE MENTAL HEALTH CARE BEDS.  WE

15   HAVE SEEN THE GROWTH IN THOSE BEDS FROM THE FEW HUNDREDS THAT

16   WERE ONLINE IN 1994 TO OVER 30,000 TODAY ONLINE.

17            THE THIRD ELEMENT AND PERHAPS THE MOST HEART-RENDING

18   ELEMENT OF THIS ISSUE IS, OF COURSE, THE ADVERSE IMPACT TO

19   PUBLIC SAFETY BY A PRISONER RELEASE ORDER, PARTICULARLY ONE

20   INVOLVING THE RELEASE OR -- THE INSTITUTIONALIZATION OF

21   MENTALLY ILL INMATES THAT WILL ADVERSELY IMPACT PUBLIC SAFETY

22   AS WELL AS MENTALLY ILL INMATES THEMSELVES.

23            BECAUSE OF THE VARIOUS ASSIGNMENTS THE COURT NETWORK

24   IS NECESSARY FOR THE ONGOING LIFETIME NEEDS FOR THE PSYCHIATRIC

25   CARE AND SUPPORT OF THESE MENTALLY ILL INMATES IS, AT BEST,

1    SHREDDED AND MORE OFTEN THAN NOT NONEXISTENT IN OUR

2    COMMUNITIES.  THE RELEASE OF THE MENTALLY ILL INMATES WILL

3    SERVE TO HARM THEM FURTHER.

4           IN SUM, PLAINTIFFS CANNOT SHOW AND HAVE NOT SHOWN

5    THAT A RELEASE ORDER WILL IN ANY WAY BENEFIT OR ENABLE THE

6    FURTHER DEVELOPMENT OF THE MENTAL HEALTH CARE SYSTEM.

7           KEEP IN MIND THIS MENTAL HEALTH CARE SYSTEM WAS

8    CREATED UPON A MOTIF OF INCLUSION.  IT'S A SERVICE MODEL.  IT'S

9    NOT ABOUT EXCLUDING THOSE IN NEED.

10          AND, CERTAINLY, PLAINTIFFS CAN'T SHOW THAT A RELEASE

11   WILL BENEFIT THOSE INMATES LITERALLY KEPT APART IN SEPARATE

12   HOUSING, IN STRUCTURED THERAPEUTIC ENVIRONMENTS FOR THEIR OWN

13   SAFETY AND STABILIZATION.

14          THIS PRISONER RELEASE ORDER SOUGHT BY PLAINTIFFS MUST

15   BE DENIED AS INTRUSIVE, UNNECESSARY AND ULTIMATELY AS HARMFUL.

16          WE'VE TALKED ABOUT PRIMARY CAUSE.  I DON'T WANT TO GO

17   OVER GROUND THAT WE'VE ALREADY COVERED, BUT LET ME SAY THIS.

18   IT'S MORE THAN A MATTER OF TWO EVENTS HAPPENING AT THE SAME

19   TIME.  THERE MUST BE A LINK, A CAUSAL LINK BETWEEN THE TWO

20   EVENTS.

21          AND HERE IS WHERE PLAINTIFFS' PROOF OF PRIMARY CAUSE

22   IN THE COLEMAN CASE FAILS.  THERE IS SIMPLY NO CAUSAL LINK

23   BETWEEN THE INCREASE IN THE DEFENDANTS' INMATE POPULATION SINCE

24   THE COLEMAN JUDGMENT IN 1994 AND THE STATUS OF THE MENTAL

25   HEALTH CARE SYSTEM TODAY.

1           PLAINTIFFS CANNOT SHOW THE PRIMARY CAUSE BECAUSE

2    DEFENDANTS HAVE SUCCEEDED IN THE DEVELOPMENT OF A MENTAL HEALTH

3    CARE SYSTEM, EVEN AGAINST THIS BACKDROP OF POPULATION GROWTH.

4           PLAINTIFFS' OWN EXPERT, CRAIG HANEY, WHO TESTIFIED AT

5    THE UNDERLYING COLEMAN TRIAL IN 1994, TESTIFIED BACK THEN THAT

6    THERE WAS AN OVERCROWDING SITUATION.  HE TESTIFIED THERE WAS

7    LITERALLY GROUND ZERO, MOONSCAPE, NO MENTAL HEALTH CARE SYSTEM

8    IN A VIABLE FORM AT THE TIME OF THAT TRIAL.

9           HE TESTIFIED THAT ONLY 7.9 PERCENT OF THE POPULATION

10   WAS IDENTIFIED AS NEEDING MENTAL HEALTH CARE.  HE TESTIFIED,

11   AND YOU HEARD DEFENDANTS' WITNESSES, ROBIN DEZEMBER AND CINDY

12   RADAVSKY, TESTIFY THAT THIS SAME FAILURE TO RECOGNIZE MENTAL

13   ILLNESS MEANT ALSO THAT THE STATE PRISONS AND STATE HOSPITALS

14   THEMSELVES WERE NOT BUILT WITH THE MENTALLY ILL IN MIND.

15          IN SUM, THERE WAS NO SCREENING FOR MENTAL ILLNESS.

16   THERE WAS NO TREATMENT FOR MENTAL ILLNESS.  THERE WERE NO BEDS

17   FOR MENTAL ILLNESS IN A FORM THAT ENABLED COMPREHENSIVE AND

18   UNIFORM CARE.  THAT WAS 1994.

19          MOVING FORWARD IN TIME TO 2008, WE HAVE JUST THE

20   REVERSE.  THERE HAS LITERALLY BEEN A SEA CHANGE.  DEFENDANTS

21   NOT ONLY HAVE WORKED WITH THE COLEMAN SPECIAL MASTER TO CREATE

22   A MENTAL HEALTH CARE SYSTEM.  DEFENDANTS RESPECTFULLY SUBMIT

23   THAT THAT MENTAL HEALTH CARE SYSTEM IS NOW IN A FORM THAT IS

24   VIABLE AND IS WORKING TO PROVIDE CARE AND TREATMENT TO MENTALLY

25   ILL INMATES.

1       THERE IS SCREENING AND IDENTIFICATION OF THE MENTALLY

2  ILL.  PLAINTIFFS' EXPERT, DR. HANEY, AGREED WITH THAT.  THERE

3  IS NOW SOME 20 PERCENT OF THE POPULATION OF CDCR IDENTIFIED AS

4  NEEDING AND GETTING THE CARE THAT THEY REQUIRE.

5       IT'S UNDISPUTED THE COLEMAN COURT HAS APPROVED THE

6  POLICIES AND PROCEDURES NECESSARY TO PROVIDE CONSTITUTIONALLY

7  ADEQUATE CARE.

8       MENTAL HEALTH CARE BEDS, THOSE BEDS HAVE GROWN FROM

9  3200 TO SOME 30,000 SINCE 1994.

10  **JUDGE KARLTON:**  AND THERE ARE OVER A THOUSAND PEOPLE

11  WHO DO NOT HAVE MENTAL HEALTH BEDS.

12  **MS. TILLMAN:**  AND DEFENDANTS RESPECTFULLY SUBMIT THAT

13  THEIR RECORD IN THIS CASE SHOWS THAT THEY ARE NOT DELIBERATELY

14  INDIFFERENT TO THAT CONCERN OF THIS COURT.

15       THE TESTIMONY HAS BEEN THAT THERE ARE PLANS.  THERE

16  IS A COMMITMENT TO PROVIDE THOSE BEDS TO --

17  **JUDGE KARLTON:**  YOU KNOW WHAT?  WE'VE GOT WHAT?  I'M

18  GOING TO MAKE THIS UP, BUT THERE ARE THREE -- I BELIEVE, THREE

19  PLANNED BEDS -- THREE PLANS FOR BEDS, 60 AND 20 AND 90 OR

20  SOMETHING.  THEY ARE THREE YEARS AWAY.  THERE IS NO -- THEY ARE

21  NOT SHOVEL READY, TO USE THE GOVERNOR'S PHRASE.  OH, WE ARE NOT

22  ALLOWED TO QUOTE THE GOVERNOR.

23       THAT'S THE REAL WORLD.  AND GETTING THOSE PEOPLE TO

24  BEDS WHERE THEY CAN BE SEGREGATED AND TREATED AND DO ALL THE

25  THINGS THAT THE PLAN CONTEMPLATES SIMPLY REQUIRES THAT THEY BE

1  GIVEN BEDS.  AND WE CAN'T SAY, YOU GIVE THEM BEDS AND, YOU

2  KNOW, YOU FOLKS YOU STAND UP FOR THE REST OF YOUR TERM.  CAN'T

3  DO THAT.

4         MS. TILLMAN:  THE TESTIMONY HAS BEEN, FIRST, FOR

5  THOSE PATIENTS IN THE LOWEST LEVEL OF CARE, THE COORDINATED

6  CLINICAL CASE MANAGEMENT PATIENTS, OR TRIPLE CMS, THE VAST

7  MAJORITY OF THOSE PATIENTS ARE HOUSED IN APPROPRIATE AREAS.

8  THEY ARE PROVIDED CARE --

9         JUDGE KARLTON:  I AGREE.  KEEP IN MIND THERE IS NOT A

10 SINGLE PERSON IN THE COLEMAN CLASS THAT HAS NOT BEEN DESIGNATED

11 AS HAVING AN AXIS I ILLNESS.  THESE ARE NOT PEOPLE WITH -- NOT

12 CRAZY LIKE YOU AND I.  THEY ARE REALLY CRAZY IN WAYS THAT ARE

13 DRAMATICALLY DIFFERENT THAN EVERYBODY ELSE.

14        MS. TILLMAN:  AND THESE ARE CHRONIC AFFLICTIONS THAT

15 ARE INCURABLE, THAT WILL EXPERIENCE, AS MR. RADAVSKY SAID FROM

16 THE DEPARTMENT OF MENTAL HEALTH, EBBS AND FLOWS AND PERIODS OF

17 TIME WHEN THEY WILL NEED INPATIENT CARE AND OTHER PERIODS OF

18 TIME WHERE A STRUCTURED ENVIRONMENT LIKE THAT WHICH IS PROVIDED

19 BY ENHANCED OUTPATIENT PROGRAM BEDS, WHICH ARE SEPARATE FROM

20 THE GENERAL POPULATION, THEY WILL RECEIVE.

21        BUT GETTING BACK TO THOSE PATIENTS WHO CAN ACTUALLY

22 INTEGRATE AT LEAST IN THE GENERAL POPULATION, WHAT WE SEE ARE

23 THE VAST MAJORITY ARE IN TRADITIONAL HOUSING.

24        THERE HAS BEEN NO CRITICISM OF THE FEW THAT ARE IN

25 NON-TRADITIONAL BEDS.  FIND A SPECIAL MASTER.  WHAT WE HEAR IS,

1  ADEQUATE CARE CAN AND HAS BEEN DELIVERED, EVEN IN THOSE AREAS

2  OF OUR PRISONS.

3           BUT TO THE EXTENT THAT THIS COURT IS WORRIED ABOUT

4  THOSE BEDS, THIS COURT HAS RECEIVED TESTIMONY FROM SCOTT KERNAN

5  HIMSELF, WHO IS IN CHARGE OF THE OUT-OF-STATE TRANSFER PROGRAM.

6  YOU'VE HEARD ABOUT THE REDUCTION IN THE NON-TRADITIONAL BEDS

7  AND THE FURTHER REDUCTION IN THE NON-TRADITIONAL BEDS IN THE

8  COMING MONTHS.

9           THE POINT IS, THE DEFENDANTS ARE ACTING TO GET RID OF

10 THOSE NON-TRADITIONAL BEDS.

11          MOVING TO THE ENHANCED OUTPATIENT PROGRAM CARE,

12 YOU'VE HEARD EVIDENCE THAT THERE ARE PATIENTS WHO ARE SEPARATED

13 AND GIVEN A PARTICULAR STRUCTURED ENVIRONMENT BECAUSE OF THEIR

14 NEEDS AS ENHANCED OUTPATIENT PROGRAM PATIENTS.

15          YOU ALSO HEARD EVIDENCE THAT TO THE EXTENT THAT THOSE

16 PATIENTS SOMETIMES HAVE TO WAIT IN RECEPTION FOR THOSE

17 PARTICULAR BEDS, THEY ARE GIVEN THAT VERY CARE IN RECEPTION.

18 IN FACT, THE SPECIAL MASTER HAS FOUND THAT THAT TYPE OF CARE IN

19 THE RECEPTION AREAS IS BEING PERFORMED.

20          IF YOU TAKE A LOOK AT THE 20TH ROUND REPORT, YOU WILL

21 FIND THAT THE SPECIAL MASTER IN SEPTEMBER OF 2008 REPORTED THAT

22 AT SAN QUENTIN'S RECEPTION CENTER, THE ENHANCED OUTPATIENT

23 PROGRAM, RECEPTION PROGRAM, DEMONSTRATED CONTINUED POSITIVE

24 GROWTH DURING THIS MONITORING PERIOD, WITH CASE MANAGER

25 CONTACTS IN A PRIVATE SETTING OCCURRING 90 TO 100 PERCENT OF

 1  THE TIME.  THAT'S AT PAGE 104.

 2          **JUDGE KARLTON:**  WHY IS IT THAT THE SPECIAL MASTER'S

 3  FINAL CONCLUSION, WHICH IS THAT WHATEVER BENEFITS, WHATEVER

 4  PROGRESS WE'VE MADE IN THE LAST 12 YEARS IS LIKELY TO BE

 5  OVERWHELMED BY THE OVERPOPULATION.  WHY ISN'T THAT A MATTER OF

 6  SUFFICIENT CONCERN TO THIS COURT?

 7          **MS. TILLMAN:**  I THINK, YOUR HONOR, THE DEFENDANTS

 8  WOULD SUBMIT THAT THEY ARE TAKING ACTION TO ADDRESS THOSE

 9  CONCERNS OF THIS COURT, AND THAT ACTION INCLUDES PROVIDING CARE

10  EVEN IN SURROUNDINGS THAT PERHAPS ARE NOT COSMETICALLY

11  PLEASING.

12          THE DEFENDANTS WOULD SUBMIT THAT WHETHER IT'S

13  RECEPTION PATIENTS GETTING ENHANCED OUTPATIENT CARE WHILE IN

14  RECEPTION OR WHETHER IT'S PATIENTS WHO CAN ONLY BE PROVIDED

15  APPROPRIATE GROUP THERAPY WHILE PLACED IN A THERAPEUTIC MODULE,

16  THE EIGHTH AMENDMENT IS NOT DETERMINED BY COSMETICS.  IT'S

17  DETERMINED BY WHETHER OR NOT CARE IS BEING DELIVERED.

18          AND THROUGHOUT THE MONITORING REPORT WHAT YOU SEE ARE

19  COMMENTS, OBSERVATIONS, FINDINGS AND CONCLUSIONS THAT CARE,

20  INDEED, IS BEING DELIVERED, EVEN IN DIFFICULT CIRCUMSTANCES

21  THAT SOME PEOPLE WOULD LIKE TO SEE IMPROVED.

22          WHAT WE SEE AT THE DEUEL VOCATIONAL INSTITUTION IS,

23  IS THE COURT FINDING -- THE COURT MONITOR FINDING COMPLIANCE

24  WITH RECEPTION CENTER PROTOCOLS, IS FINDING THAT TRANSFER

25  DEADLINES ARE BEING MET OVER 90 PERCENT OF THE TIME FOR

1  ENHANCED OUTPATIENT INMATES.

2         AT HIGH DESERT RECEPTION CENTER, THE SPECIAL MASTER

3  AGAIN FOUND SUBSTANTIAL COMPLIANCE WITH THE PROGRAM GUIDE

4  REQUIREMENTS.

5         SO WHAT WE SEE IS A PICTURE OF IMPROVEMENT, OF GROWTH

6  OF A MENTAL HEALTH CARE SYSTEM.

7         NOW, GRANTED, THE PATIENTS NEEDING HOSPITAL OR

8  INPATIENT CARE, THERE IS NO QUESTION THAT THEY ARE GETTING

9  CARE.

10         YOU HAD THE OPPORTUNITY, YOU HEARD MISS RADAVSKY FROM

11  THE DEPARTMENT OF MENTAL HEALTH SPEAK TO THE TYPE OF CARE THAT

12  THE DEPARTMENT OF MENTAL HEALTH PROVIDES TO THESE INPATIENT

13  MEMBERS OF THE COLEMAN CLASS.  THEY ARE HOUSED IN SEPARATE

14  AREAS --

15         **JUDGE KARLTON:**  YOU KNOW, MA'AM, EVERY SINGLE

16  IMPROVEMENT, EVERY ONE, IS A RESULT OF A COURT ORDER.  SO

17  NEVERMIND THAT THE DEPARTMENT OF MENTAL HEALTH HAS ENORMOUS

18  DIFFICULTY OBEYING THE MOST BASIC ORDERS OF THE COLEMAN COURT,

19  BUT TO SPEAK OF -- NEVER MIND.  GO AHEAD.  JUST GET IT OVER

20  WITH.  GO AHEAD.

21         **MS. TILLMAN:**  IF I MIGHT RESPOND, YOUR HONOR.  I

22  RECOGNIZE AND I HAVE CAN SEE A CERTAIN LEVEL OF FRUSTRATION.

23  THERE ARE A LOT OF COURT ORDERS THAT HAVE BEEN ISSUED BY THE

24  COLEMAN COURT.  AS MUCH AS THAT MIGHT BE INTERPRETED IN SOME

25  FASHION OR ANOTHER, THERE IS NO QUESTION THAT THE DEFENDANTS

1  HAVE BEEN RESPONSIVE TO THOSE COURT ORDERS, HAVE WORKED WITH

2  THE COLEMAN SPECIAL MASTER ON ITEMS SMALL AND LARGE IN THE

3  DELIVERY OF MENTAL HEALTH CARE.

4         PART OF THAT WORK HAS BEEN DOING THE VERY BEST PLANS

5  THAT YOU SEE NOW BEING ACTIVATED, BEING IMPLEMENTED.  WHETHER

6  IT'S THE SALINAS VALLEY STATE PRISON INPATIENT BEDS THAT ARE

7  GOING TO BE ACTIVATED IN 2009.  ACCORDING TO MISS RADAVSKY,

8  THEY ARE ALMOST DONE.  SHE HOPED FOR ACTIVATION IN FEBRUARY

9  2009.  THAT'S 64 INPATIENT BEDS.

10        OR WHETHER IT'S THE MENTAL HEALTH CRISIS BEDS THAT WE

11 SAW ACTIVATED IN JUNE 2008 AT THE CALIFORNIA MEDICAL FACILITY.

12 CLEARLY, BED PLANNING IS UNDERWAY.  AND ONE OF THE REASONS

13 THOSE BEDS HAVE GOTTEN UNDERWAY AND BED PLANNING IS UNDERWAY IS

14 BECAUSE THE COLEMAN COURT URGED THE DEFENDANTS TO ADOPT A

15 FORECAST METHODOLOGY, A FORECAST METHODOLOGY NOT JUST FOR BEDS,

16 BUT FOR STAFF.

17        THAT'S A CRUCIAL COMPONENT OF PROVIDING FOR THE CARE

18 THAT IS NEEDED, NOT ONLY FOR TODAY, BUT FOR TOMORROW, SO THAT

19 COURT ORDERS WON'T BE NECESSARY.

20        INSTEAD THERE IS AN INTEGRAL MECHANISM WITHIN THE

21 CDCR ADMINISTRATION NOW THAT CAN DETERMINE, BECAUSE OF WORK

22 WITH THE SPECIAL MASTER FROM THE COLEMAN COURT -- CAN DETERMINE

23 WITH VALIDATED METHODOLOGY HOW MANY BEDS ARE GOING TO BE NEEDED

24 IN THE COMING YEARS, WHAT TYPE OF BEDS FOR THE MENTALLY ILL,

25 AND WHAT TYPE OF STAFF WILL BE NECESSARY TO HANDLE THE WORKLOAD

 1  EMANATING FROM THAT CARE OF THOSE MENTALLY ILL PATIENTS.

 2          AND JUST AS A NOTE.  IT HAS TO BE ACKNOWLEDGED BY

 3  THIS COURT.  ROBIN DEZEMBER SAID IT BEST.  THERE HAS BEEN A

 4  HUGE IMPROVEMENT IN THE STAFFING OF MENTAL HEALTH BEDS.

 5          AS MUCH AS HE DESCRIBED THE RECRUITMENT AND PAY

 6  PARITY STRATEGIES THAT WERE ADOPTED WITH THE COURT'S ORDERS AND

 7  WITH THE COURT'S HELP, THERE IS NO QUESTION THE DEFENDANTS

 8  WORKED HARD TO RECRUIT THE VERY STAFF THAT IT HAS, WORKED HARD

 9  TO GET THE POSITIONS ALLOCATED THEY NOW HAVE, TO EXPAND THEIR

10  STAFFING FROM THE HUNDREDS INTO THE THOUSANDS.

11          NOT ONLY HAS CLINICAL STAFFING IMPROVED, BUT THE

12  PICTURE FOR CORRECTIONAL OFFICERS HAS ALSO IMPROVED.  WHAT WE

13  SEE IS A MENTAL HEALTH CARE SYSTEM THAT BRINGS TOGETHER NOT

14  ONLY THE CORRECTIONAL OFFICERS AND THE MENTAL HEALTH CARE

15  CLINICIANS, BUT ALSO THE FACILITY MANAGERS, THE PLANT

16  OPERATIONS PEOPLE.

17          THE CORRECTIONAL OFFICERS, WE KNOW FROM SCOTT

18  KERNAN'S TESTIMONY, FORM AN INTEGRAL PART OF THE

19  INTERDISCIPLINARY MENTAL HEALTH SERVICES TEAM, ESCORTING

20  PATIENTS TO THEIR APPOINTMENTS, MONITORING MENTAL HEALTH

21  PATIENTS WHO ARE AT RISK FOR SUICIDES, CONDUCTING ROUNDS ON

22  MENTALLY ILL INMATES, STAFFING RECREATION YARDS, PARTICIPATING

23  IN TREATMENT DISCUSSIONS, LITERALLY WORKING TO DEVELOP THE PLAN

24  TO PREVENT SUICIDES IN ADMINISTRATIVE SEGREGATION UNITS.

25          THE VERY UNITS THAT DO NOT EXPERIENCE THE

1 NON-TRADITIONAL BEDS THIS COURT IS SO WORRIED ABOUT ARE THE

2 UNITS, OF COURSE, THAT, UNFORTUNATELY, EXPERIENCE THE HIGHEST

3 RATE OF SUICIDES.

4          THANKS TO THIS SUCCESS IN STAFFING THE CORRECTIONAL

5 OFFICERS TO THE POINT WHERE A JANUARY ACADEMY WAS CANCELED.

6 AND AS SCOTT KERNAN SAID, THE PRISONS ARE NOW FULL UP WITH

7 CORRECTIONAL OFFICERS.  THANKS TO THAT SUCCESS, THE SUICIDE

8 PREVENTION PROGRAM IS BEING IMPLEMENTED THROUGHOUT THE SYSTEM.

9          THE PAY PARITY AND STAFFING SUCCESSES OF THE

10 DEPARTMENT OF CORRECTIONS ARE MATCHED BY THE SAME SUCCESSES AS

11 THE DEPARTMENT OF MENTAL HEALTH.  CDCR'S PARTNER IN INPATIENT

12 MENTAL HEALTH CARE NOW HAS A SUFFICIENT NUMBER OF

13 PSYCHIATRISTS, THANKS TO THOSE STRATEGIES.

14          SIMPLY PUT, THERE IS NO REASON TO EXCLUDE THE

15 MENTALLY ILL FROM CARE WITHIN THE DEPARTMENT OF CORRECTIONS AND

16 REHABILITATION BY WAY OF A COURT ORDERED RELEASE WHEN THE

17 RELEASE ITSELF WILL NOT RENDER THE MENTAL HEALTH CARE SYSTEM

18 CONSTITUTIONALLY ADEQUATE, WILL NOT RESULT IN ANY IMPROVEMENTS

19 IN THE MENTAL HEALTH CARE SYSTEM.

20          PLAINTIFFS' OWN EXPERTS, DR. HANEY AND DR. AUSTIN --

21 DR. HANEY AND DR. STEWART SAID IT BEST.  A RELEASE IS ONLY THE

22 FIRST STEP.  THE HARD WORK OF ADMINISTERING A MENTAL HEALTH

23 CARE SYSTEM, REGARDLESS OF THE NUMBER OF INMATES, REGARDLESS OF

24 THE NUMBER OF PATIENTS, WOULD REMAIN.  AND THAT IS ENSURING

25 ADEQUATE STAFFING, ADEQUATE BEDS, ADEQUATE PROGRAMMING.

 1          DR. HANEY AGREED, THERE IS NO MAGIC NUMBER.  IN FACT,

 2    THERE APPEARS TO BE NO EQUILIBRIUM POINT AT ALL.  HE ADMITTED

 3    EVEN A SYSTEM THAT IS OPERATING BELOW ITS RATED CAPACITY COULD

 4    STILL BE CONSTITUTIONALLY DEFICIENT ABSENCE ADEQUATE RESOURCES

 5    FOR MENTAL HEALTH CARE.

 6          SO IN OTHER WORDS, WE COULD GO THROUGH ALL THE WORK

 7    OF RESPONDING TO WHATEVER COURT ORDER FOR A PRISONER RELEASE

 8    MIGHT EMANATE FROM THIS COURT ONLY TO FIND THAT THE WORK

 9    REMAINS OF BUILDING STAFF, BUILDING BEDS, BUILDING THE

10    ADMINISTRATIVE MACHINES TO ENSURE ADEQUATE HEALTH CARE.

11          IT'S CLEARLY NOT ABOUT POPULATION WITHIN THE

12    DEPARTMENT OF CORRECTIONS.  IT'S ABOUT BEDS AND STAFF NEEDED BY

13    ANY HEALTH CARE PROVIDER, BUT CERTAINLY THE LARGEST HEALTH CARE

14    PROVIDER IN THE STATE CORRECTIONAL SYSTEM WITHIN THE

15    UNITED STATES TO CARRY FORTH ITS MISSION OF TREATING THE

16    MENTALLY ILL.

17          THE LEAST INTRUSIVE RELIEF THEN IS TO PERMIT

18    DEFENDANTS TO CONTINUE THEIR ONGOING EFFORTS, HOPEFULLY, UNDER

19    AND WITH THE OVERSIGHT OF THE COLEMAN SPECIAL MASTER.

20          THIS COURT HEARD THE EVIDENCE TIME AND AGAIN FROM

21    DIFFERENT WITNESSES, CINDY RADAVSKY FROM THE DEPARTMENT OF

22    MENTAL HEALTH, ROBIN DEZEMBER FROM THE DEPARTMENT OF

23    CORRECTIONS, SECRETARY CATE, THAT THE MENTAL HEALTH CARE SYSTEM

24    HAS NOT ONLY GROWN IN SIZE AND IN STAFF AND IN COMPLEXITY, BUT

25    MOST IMPORTANTLY IN THE STRENGTH OF ITS MISSION.

1          IT IS NO LONGER IGNORED OR DISREGARDED OR EVEN

2    DISCOUNTED.  IT IS PART OF WHAT THE DEPARTMENT OF CORRECTIONS

3    PROVIDES TO ITS INMATES, TO ITS PATIENTS.

4          THE GROWTH THAT WE'VE SEEN IN THE MENTAL HEALTH CARE

5    SYSTEM HAS OCCURRED BECAUSE THE LEAST INTRUSIVE RELIEF, THE

6    ONGOING EFFORTS OF THE DEFENDANTS TO MEET THE MENTAL HEALTH

7    CARE NEEDS OF THESE PATIENTS WITH THE ASSISTANCE OF THE COLEMAN

8    SPECIAL MASTER IS WORKING.

9          THE COLEMAN SPECIAL MASTER HAS BEEN ABLE TO BROKER

10   NEGOTIATIONS ABOUT THE PROGRAM GUIDE.  HE HAS BEEN ABLE TO

11   SHARE HIS STAFF'S EXPERTISE IN THE DEVELOPMENT OF A NOW

12   APPROVED COURT ORDERED AND IMPLEMENTED SUICIDE PREVENTION

13   PROGRAM.  SHARE HIS STAFF'S EXPERTISE ON FORECAST

14   METHODOLOGIES.  SHARE HIS STAFF'S EXPERTISE ON THE VERY

15   TREATMENT MODALITIES THAT WE NOW PROVIDE TO THE MENTALLY ILL BY

16   WAY OF THE PROGRAM GUIDE.

17          A PRISONER RELEASE ORDER WILL NOT ONLY BE INTRUSIVE,

18   IT WILL NOT SERVE THE INTERESTS OF THE MENTALLY ILL OR THE

19   LOCAL COMMUNITIES.

20          HOW WOULD IT SERVE THE MENTALLY ILL INMATE GETTING

21   STABILIZED IN A DESIGNATED MENTAL HEALTH BED, GETTING

22   MEDICATIONS, GETTING FOOD, GETTING SHELTER?  HOW WOULD IT SERVE

23   THAT MENTALLY ILL INMATE TO BE RELEASED THREE OR FOUR MONTHS

24   EARLIER FROM THEIR ESTABLISHED DATE?  THAT WOULD DEPRIVE THEM

25   OF THREE OR FOUR MONTHS OF TREATMENT THAT MAY WELL STABILIZE,

1   MAY WELL GIVE THEM THE MEDICATIONS NECESSARY TO PUT THEM IN A

2   SPACE, A PLACE WHERE THEY CAN REALLY BE READY TO REINTEGRATE

3   INTO THE COMMUNITY.

4            A MENTALLY ILL INMATE WILL BE -- THE MENTALLY ILL

5   INMATES WILL BE HARMED BY A PRISONER RELEASE ORDER.  WE HAVE

6   ALREADY ACKNOWLEDGED THAT EXPERTS ALL AGREE MENTALLY ILL

7   INMATES WITHIN THE COLEMAN CASELOADS DO NOT HAVE AN ILLNESS

8   THAT WILL BE CURED.

9            IT'S A BIOLOGICAL AND METABOLIC DISEASE THAT THESE

10  INMATES HAVE AND THEY WILL EXPERIENCE DECOMPENSATION EVEN UNDER

11  THE BEST OF CIRCUMSTANCES.  THEY WILL ALWAYS NEED CARE, WHETHER

12  INSIDE THE PRISON OR OUTSIDE THE PRISON.

13           YOU'VE HEARD PLAINTIFFS' EXPERT, DR. STEWART, SAY

14  THAT THEY WOULD EXPERIENCE THE NEED FOR A WIDE RANGE OF

15  PSYCHOTHERAPEUTIC SUPPORT.  SOME MIGHT JUST NEED MEDICATION AND

16  VISITS TO A PSYCHIATRIST TO ENSURE THEIR MEDICATION IS

17  APPROPRIATE.  OTHERS MIGHT NEED TO BE IN A BOARDING CARE HOME

18  OR EVEN A HOSPITAL.

19           ALL AGREED, MENTALLY ILL PAROLEES, LIKE OTHER

20  PAROLEES, WOULD NEED SUPPORT IN OBTAINING HOUSING, JOBS, JOB

21  SKILLS AND, MOST IMPORTANTLY, DRUG TREATMENT.

22           THE EVIDENCE CLEARLY ESTABLISHED THAT AT LEAST

23  70 PERCENT OF THE MENTALLY ILL INMATES HAVE A CO-OCCURRING

24  SUBSTANCE ABUSE DISORDER.  AND, YET, THERE WAS NO EVIDENCE THAT

25  THE CARE THAT IS REQUIRED BY MENTALLY ILL INMATES ONCE PAROLED

1  ACTUALLY EXISTS IN THE COMMUNITY.

2         RATHER, WHAT WE'VE HEARD IS THE EFFORT OF DEFENDANTS

3  TO STRENGTHEN THAT SYSTEM OF THE PAROLE OUTPATIENT CLINICS, TO

4  WORK WITH LOCAL COMMUNITIES TO CREATE PARTNERSHIPS, BUT IT'S

5  NOT THERE YET.

6         IN FACT, ACCORDING TO NANCY PENA AND GAIL BATAILLE,

7  THERE IS NOT EVEN ENOUGH COMMUNITY SUPPORT FOR THE PRESENT

8  PAROLEE POPULATION, NEVER MIND AN ADDITIONAL NUMBER THAT WOULD

9  BE RELEASED UNDER THE PLAINTIFFS' SOUGHT ORDERS.

10         WHAT WE CONSISTENTLY HEARD FROM BOTH THE PLAINTIFFS'

11 EXPERTS, DR. GILLIGAN AND DR. KRISSBERG, WAS UNIFORM.  A

12 PRISONER RELEASE ORDER WILL ONLY BE SUCCESSFUL IF PROPERLY

13 DONE.  THEY CONSISTENTLY SAID IT WOULD HAVE TO BE PROPERLY

14 DONE.

15         WHAT DOES THAT MEAN?  THAT MEANS PROVIDING COMMUNITY

16 SUPPORT UPON RELEASE, DRUG PROGRAMS, JOB SKILL PROGRAMS,

17 HOUSING PROGRAMS.  IN OTHER WORDS, THE VERY SOCIAL SERVICES

18 NETWORK THAT IS SO SHREDDED, SO FLOUNDERING NOW IN OUR PRESENT

19 ECONOMY WOULD HAVE TO BE BUILT UP.  AND THE CREATION OF THAT

20 ADDITIONAL COMMUNITY SUPPORT FOR PAROLEES, EVEN WHEN CONSIDERED

21 BY THE EVER OPTIMISTIC GAIL BATAILLE, WOULD TAKE AT LEAST 18

22 MONTHS.

23         THE MENTALLY ILL INMATE WHO IS RELEASED WITHOUT

24 SUPPORT AND CARE, WITHOUT SUPPORT AND HOUSING AND JOB SKILLS

25 AND DRUG TREATMENT WILL NOT SUCCEED.

1        MISS BATAILLE NOTED AT LEAST A THIRD OF THE HOMELESS

2   PEOPLE WE SEE ON THE STREETS TODAY ARE MENTALLY ILL.

3        DR. GILLIGAN NOTED THE MENTALLY ILL ARE THE ONES WHO

4   GET PREYED UPON ON THE STREET BECAUSE THEY HAVE NO SUPPORT.

5   THEY GO TO THE EMERGENCY ROOM OR ARE USUALLY TAKEN TO THE

6   EMERGENCY ROOM WHEN THEY ARE DECOMPENSATING OR WHEN THEY ARE

7   ASSAULTED BY OTHERS.

8        THEY ARE PLACED IN COUNTY JAILS FOR VARIOUS REASONS.

9   AND THEN THEY ARE SIMPLY SOMETIMES FOUND DEAD ON THE STREETS.

10  ALL BECAUSE THEY DON'T HAVE SUPPORT MECHANISMS IN THE COMMUNITY

11  AT THIS TIME TO ENABLE THE CARE OF THESE MENTALLY ILL PAROLEES.

12       IN CONTRAST, THE MENTALLY ILL PAROLEES GET CARE WHILE

13  THEY'RE WITHIN THE DEPARTMENT OF CORRECTIONS.  THEY GET

14  STABILIZED.  THEY GET SHELTER.  THEY GET MEDICATIONS.

15       DEFENDANTS RESPECTFULLY REQUEST THAT IN LIGHT OF

16  PLAINTIFFS' INABILITY TO ESTABLISH THE PRIMARY CAUSE OF ANY

17  CONSTITUTIONAL DEFICIENCIES THE MENTAL HEALTH CARE SYSTEM IS

18  ARISING FROM THE PRISON POPULATION AND BECAUSE OF THE ADVERSE

19  IMPACT ON THE COMMUNITY AND ON THE MENTALLY ILL BY ANY RELEASE

20  ORDER, THAT PLAINTIFFS' REQUEST SHOULD BE DENIED.

21       THANK YOU.

22       **JUDGE REINHARDT:**  THANK YOU, COUNSEL.

23       THE COURT WILL TAKE A BRIEF AFTERNOON RECESS.

24       (WHEREUPON THERE WAS A RECESS IN THE PROCEEDINGS

25       FROM 2:55 UNTIL 3:16 P.M.)

1    **JUDGE REINHARDT:**  ALL RIGHT.

2                         **CLOSING ARGUMENT**

3        **MR. MITCHELL:**  GOOD AFTERNOON.  BILL MITCHELL FOR THE

4    DISTRICT ATTORNEY DEFENDANT INTERVENORS.  I WOULD LIKE TO THANK

5    THE COURT FOR THIS OPPORTUNITY TO ADDRESS THE COURT AND TO MAKE

6    OUR POSITION KNOWN IN CLOSING IN THIS MATTER.

7             I'M NOT GOING TO ADDRESS THE ISSUES ALREADY ADDRESSED

8    BY DEFENDANTS' COUNSEL IN REGARDS TO WHETHER OR NOT THE

9    EVIDENCE HAS ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE THAT

10   OVERCROWDING IS A PRIMARY CAUSE OR THAT NO OTHER RELIEF WOULD

11   REMEDIATE THE CONSTITUTIONAL DEFICIENCIES.

12            IF THIS COURT DETERMINES THAT THE PLAINTIFFS HAVE MET

13   THEIR BURDEN OF PROOF, THAT OVERCROWDING IS A PRIMARY CAUSE OF

14   THE CONSTITUTIONAL VIOLATIONS AND THAT THERE ARE NO ALTERNATIVE

15   REMEDIES OTHER THAN A PRISONER RELEASE ORDER, THEN THE COURT

16   MUST CONSIDER AND GIVE SUBSTANTIAL WEIGHT TO THE IMPACT

17   EVIDENCE OF THE PROPOSED PRISONER RELEASE ORDERS.

18            THE PRISON LITIGATION REFORM ACT LIMITS RELIEF TO

19   THAT WHICH IS NECESSARY TO CORRECT A VIOLATION OF FEDERAL RIGHT

20   OF PARTICULAR PLAINTIFF OR PLAINTIFFS.

21            A PRISONER RELEASE ORDER THAT INVOLVES EARLY RELEASE

22   OF STATE PRISON INMATES, DIVERSION OF STATE PRISON-BOUND FELONS

23   OR THE SETTING OF A POPULATION CAP ON THE PRISON SYSTEM ARE ALL

24   OVERBROAD AND WILL HAVE SUBSTANTIAL ADVERSE IMPACTS ON PUBLIC

25   SAFETY IN THE OPERATION OF LOCAL CRIMINAL JUSTICE SYSTEMS.

1          **JUDGE REINHARDT:**  WHAT WOULD NOT BE OVERBROAD IF WE

2  DETERMINE THAT THERE SHOULD BE A PRISONER RELEASE ORDER?

3          **JUDGE KARLTON:**  IS THERE ANYTHING?

4          **MR. MITCHELL:**  THAT WOULD NOT BE OVERBROAD?

5          **JUDGE KARLTON:**  YEAH.

6          **MR. MITCHELL:**  ONE SUGGESTION MIGHT BE TO DIRECT

7  ORDERS AT THE PLAINTIFF CLASS MEMBERS, HAVE THEM SEGREGATED

8  INTO FACILITIES WHERE THEIR CONSTITUTIONAL MEDICAL NEEDS AND

9  MENTAL HEALTH CARE NEEDS COULD BE MET AND THAT POPULATION CAPS

10 BE PLACED ON THOSE FACILITIES WHERE THOSE INMATES ARE HOUSED.

11          THAT WOULD BE NARROWLY DRAWN, TAILORED TO REMEDIATE

12 THE CONSTITUTIONAL RIGHTS OF THE AGGRIEVED PLAINTIFF CLASSES

13 AND WOULD NOT IMPACT THE GENERAL POPULATION.  AND THE STATE

14 WOULD HAVE TO COME UP WITH A PLAN TO DEAL WITH THE

15 CONSTITUTIONAL VIOLATIONS FOUND BY THESE COURTS, PLATA AND

16 COLEMAN.

17          NOT DEALING WITH THE OVERCROWDING PLAGUING THE ENTIRE

18 CDCR SYSTEM, WHICH IN THE DISTRICT ATTORNEY INTERVENOR'S

19 POSITION IS NOT BEFORE THIS COURT.

20          **JUDGE REINHARDT:**  I DON'T QUITE FOLLOW.  COULD YOU

21 EXPLAIN AGAIN?

22          WHAT IF WE FOUND THAT OVERCROWDING WAS THE PRIMARY

23 CAUSE OF THE VIOLATION --

24          **MR. MITCHELL:**  PRIMARY CAUSE OF THE DEFICIENCIES IN

25 HEALTHCARE AND MENTAL HEALTH CARE FOR THE PLAINTIFF CLASSES,

1   ORDER THE STATE TO SEGREGATE THOSE PLAINTIFF CLASS POPULATIONS

2   INTO SEPARATE FACILITIES AND HAVE CAPS PLACED ON THE NUMBER OF

3   THOSE PLAINTIFF CLASS THAT'S COULD BE PUT INTO THOSE

4   INSTITUTIONS.

5          **JUDGE HENDERSON:**  PUT THE PHYSICAL HEALTH AND MENTAL

6   HEALTH PEOPLE IN SEPARATE FACILITIES?

7          **JUDGE KARLTON:**  WELL, IN SOME INSTITUTIONS.

8          **MR. MITCHELL:**  I ASSUME THEY WOULD BE.

9          **JUDGE REINHARDT:**  I THOUGHT THAT EVERYBODY IS SUBJECT

10  TO THE -- OH, LET'S SAY THE PHYSICAL HEALTH PROBLEM.

11         **MR. MITCHELL:**  IT'S MY UNDERSTANDING -- AND EXCUSE ME

12  FOR INTERRUPTING -- THAT THE PLATA CLASS DEALS WITH THOSE WITH

13  SEVERE OR SERIOUS MEDICAL ILLNESSES.  AND COLEMAN DEALS WITH

14  SERIOUS SEVERE MENTAL HEALTH DISORDERS.

15         WE ARE NOT DEALING WITH GENERAL POPULATION INMATES

16  WHO ARE OTHERWISE HEALTHY OR HAVE THE FLU OR COLDS OR MINOR

17  INFECTIONS OF SOME SORT.

18         **JUDGE KARLTON:**  WELL, THE PROBLEM AT LEAST FOR -- I

19  MEAN, IT'S NOT TRUE OF COLEMAN FOR OTHER REASONS, BUT WITH

20  PLATA IS THAT EVERY SINGLE INMATE IS POTENTIALLY -- CAN GET

21  SICK.  WE ARE UNABLE PRESENTLY -- OR AT LEAST THE PLAINTIFFS

22  ARGUE, WE ARE UNABLE TO DELIVER ADEQUATE MEDICAL CARE FOR THEM

23  AND THERE IS NO WAY TO SEGREGATE THEM BEFOREHAND.

24         **MR. MITCHELL:**  BUT ONCE THEY WERE IDENTIFIED BY THE

25  MEDICAL STAFF AT THE PARTICULAR PRISON THEY WERE AT AND IT

1   BECAME NECESSARY THAT THEY WERE NEEDED TO BE ATTENDED TO BY A

2   MORE EXPERIENCED OR PROFESSIONAL STAFF, THEY COULD BE

3   TRANSFERRED TO ONE OF THOSE INSTITUTIONS.

4       **JUDGE KARLTON:**  I THINK YOU DON'T QUITE UNDERSTAND

5   WHAT THE PROBLEM IS HERE.

6       **JUDGE REINHARDT:**  I'M A NEWCOMER TO THIS.  SO

7   SOMEBODY GETS SERIOUSLY ILL.  HE IS NOT IDENTIFIED, I THOUGHT,

8   IN THE TIMELY MANNER AND HE IS NOT TREATED IN A TIMELY MANNER

9   BECAUSE OF THE OVERCROWDING.  IS THAT WRONG?

10      **MR. MITCHELL:**  I KNOW WHEN I GET SERIOUSLY ILL, I GO

11  AND I USUALLY HAVE TO WAIT TO GET AN APPOINTMENT.

12      I MEAN, THINGS DON'T HAPPEN OVERNIGHT.  IT TAKES

13  EVALUATION BY A NURSING STAFF AND PHYSICIAN'S ASSISTANTS AND

14  IDENTIFYING WHAT THE NATURE OF THE ILLNESS IS AND THEN IT'S

15  ATTENDED TO BY THE MEDICAL STAFF AS IT NEEDS TO BE ATTENDED TO.

16      AND THAT WAS A SUGGESTION OF SOMETHING MORE NARROWLY

17  TAILORED TO THE PLAINTIFF CLASSES.  EARLY RELEASE, THE EARLY

18  RELEASE MEASURES BEING PROPOSED, WOULD ENDANGER PUBLIC SAFETY

19  BY INCREASING CRIME AND VICTIMIZATION IN THE COMMUNITIES.

20      THE EARLY RELEASE OF STATE PRISON INMATES PRIOR TO

21  THE EXPIRATION OF THEIR SENTENCE TERMS WILL RESULT IN THE

22  COMMISSION OF NEW CRIMES.  THE EVIDENCE HAS SHOWN THAT.  SOME

23  OF WHICH WILL BE VIOLENT AND SERIOUS FELONIES.

24      ACCORDING TO THE PLAINTIFFS' EXPERT, DR. JAMES

25  AUSTIN, 25 PERCENT OF THE PRISONERS THAT WOULD BE RELEASED

1  EARLY FROM PRISON WILL BE CAUGHT AND ARRESTED FOR NEW CRIMES

2  WITHIN THE FIRST FOUR MONTHS OF RELEASE.

3          A NUMBER OF NEW CRIMES THAT GO UNSOLVED --

4          **JUDGE REINHARDT:**  WHENEVER THEY ARE RELEASED.

5          **MR. MITCHELL:**  PARDON?

6          **JUDGE REINHARDT:**  WHETHER THEY ARE RELEASED AT THE

7  END OF THEIR TERMS OR SOMEWHAT EARLIER.

8          **MR. MITCHELL:**  THEY WILL COMMIT NEW CRIMES.  YES,

9  THERE IS A RECIDIVISM RATE OF 25 PERCENT.

10          BUT DR. AUSTIN FOUND, AND HE TESTIFIED AND PUT IT IN

11  HIS REPORT, THAT THERE WILL BE A 25 PERCENT RECIDIVISM RATE IN

12  THAT FIRST FOUR MONTHS OF THAT EARLY RELEASE PERIOD.

13          AND THAT'S WHAT WE ARE TALKING ABOUT HERE.  WILL

14  THERE BE AN IMPACT FROM THE COURT'S ORDER THAT PRISONERS BE

15  RELEASED EARLY?

16          **JUDGE REINHARDT:**  WELL, LET'S SUPPOSE THEY ARE

17  RELEASED FOUR MONTHS LATER.  IT WILL BE AN IDENTICAL IMPACT OR

18  WILL IT BE A DIFFERENT GROUP OF PEOPLE?

19          **MR. MITCHELL:**  NO, IT WOULDN'T BE AN IDENTICAL IMPACT

20  BECAUSE THAT WOULD BE --

21          **JUDGE REINHARDT:**  A DIFFERENT GROUP OF PEOPLE.

22          **MR. MITCHELL:**  THAT WOULDN'T BE AN IMPACT

23  ATTRIBUTABLE TO THE COURT'S ORDER, BECAUSE THEY WOULD BE

24  GETTING OUT AT THE END OF THEIR TERMS.

25          WHAT THE COURT HAS TO TAKE INTO CONSIDERATION IS

1  WHETHER OR NOT ITS ORDER IS GOING TO HAVE AN IMPACT ON

2  INCREASING VICTIMIZATION IN THE COMMUNITIES.  AND IF --

3        **JUDGE REINHARDT:**  ALL RIGHT.  HOLD ON.  HOLD ON.  I

4  WANT TO SEE IF THE FACTS ARE CORRECT.

5        THE IMPACT OF THE COURT ORDER WOULD BE THAT THERE

6  WOULD BE A DIFFERENT GROUP OF VICTIMS WITH THE SAME NUMBER OF

7  CRIMES.

8        **MR. MITCHELL:**  ACCORDING TO DR. AUSTIN AND SOME OF

9  THE OTHER EXPERTS, YES.  WE ARE ACCELERATING THE COMMISSION OF

10 CRIMES.  YOU WANT TO CALL IT DIFFERENT VICTIMS.  IT'S VICTIMS

11 THAT WOULD NOT BE VICTIMS BUT FOR THE EARLY RELEASE.

12       **JUDGE REINHARDT:**  AND THE OTHER VICTIMS ARE SAVED.

13       **MR. MITCHELL:**  NOT NECESSARILY.  YOU ARE ASSUMING

14 THAT THEY GET CAUGHT FOR THEIR FIRST VICTIMS.  AND THEY DON'T

15 ALWAYS GET CAUGHT, THAT'S WHAT THE EVIDENCE SHOWS.

16       **JUDGE REINHARDT:**  NO, BUT SOMEWHERE THEY WILL GET

17 CAUGHT.

18       **MR. MITCHELL:**  WE HOPE SO.  IT JUST DOESN'T ALWAYS

19 HOLD TRUE.

20       **JUDGE REINHARDT:**  IF IT TOOK THEM 12 MONTHS TO GET

21 CAUGHT AND THEN THEY'RE RELEASED IN DECEMBER, AND IT TOOK THEM

22 12 MONTHS TO GET CAUGHT BUT THEY ARE RELEASED IN JUNE, ALL WE

23 ARE TALKING ABOUT IS A DIFFERENT GROUP OF VICTIMS.

24       **MR. MITCHELL:**  AND THE FACT REMAINS, THOUGH, IS THAT

25 THEY ARE OUT OF CUSTODY BECAUSE OF THE COURT ORDER AND CRIMES

1   ARE COMMITTED BY THEM DURING THAT TIME PERIOD.  THAT'S

2   ATTRIBUTABLE TO THE COURT'S ORDER AND THAT'S THE IMPACT THAT

3   THE COURT HAS TO TAKE INTO CONSIDERATION.

4           JUDGE REINHARDT:  THE IMPACT IS THAT A DIFFERENT

5   GROUP OF VICTIMS WILL EXIST.  THE SAME NUMBER OF CRIMES WILL

6   OCCUR, BUT THEY WILL BE OUT EARLIER COMMITTING THOSE CRIMES.

7           JUDGE HENDERSON:  THE IMPACT OF TIMING.

8           MR. MITCHELL:  I THINK THERE IS A DIFFERENCE, YES.

9   I THINK THERE IS AN INCREASE IN CRIME.  IT'S STATISTICALLY

10  INSIGNIFICANT INCREASE IN CRIME, ACCORDING TO DR. AUSTIN, BUT

11  STILL AN INCREASE IN CRIME.

12          THE 1986 STUDY THAT DR. KRISSBERG AND DR. AUSTIN BOTH

13  PARTICIPATED IN SHOWED AN INCREASE IN CRIME.  ALTHOUGH WHEN YOU

14  COMPARE IT TO THE OVERALL CRIME RATE IN THE COMMUNITY, THE

15  OVERALL NUMBER OF CRIMES, THEY CALL IT STATISTICALLY

16  INSIGNIFICANT.

17          BUT IT'S NOT INSIGNIFICANT TO THOSE VICTIMS, THE ONES

18  WHO SUFFER THE 23 MURDERS, THE 212 ROBBERIES.

19          JUDGE REINHARDT:  THOSE 23 MURDERS WOULD OCCUR FOUR

20  MONTHS LATER.

21          MR. MITCHELL:  WELL, THAT'S SPECULATION, YOUR HONOR.

22  I WOULD SUGGEST THAT'S SPECULATION.

23          JUDGE REINHARDT:  WHAT YOU'RE SAYING, EVERYTHING IS

24  SPECULATION.

25          MR. MITCHELL:  NO.  THOSE ARE ACTUAL CRIMES THAT ARE

1   COMMITTED.  WE KNOW THEY ARE COMMITTED BECAUSE WE HAVE ACTUAL

2   VICTIMS, ATTRIBUTABLE ACTIONS TO INMATES THAT ARE RELEASED

3   EARLY.

4         **JUDGE REINHARDT:**  WE TALK ABOUT WHAT THESE PRISONERS

5   WOULD DO.  THAT'S -- WHAT HAPPENED BEFORE MAY NOT BE

6   SPECULATION. BUT WHAT HAPPENED BEFORE IS NOT SPECULATION, THE

7   23 VICTIMS.

8         WHETHER THERE WERE A DIFFERENT SET OF 23 VICTIMS FOUR

9   MONTHS LATER MAY BE SPECULATION.  WHAT'S GOING TO HAPPEN WITH

10  THESE PARTICULAR PRISONERS WHO WERE RELEASED FOUR MONTHS

11  EARLIER IS ALSO SPECULATION.

12        WE JUST HAVE TO SPECULATE.  IF WE THINK THAT ANYBODY

13  THAT GETS OUT -- IN THEORY EVERYONE WHO GETS OUT IS GOING TO

14  COMMIT 12 CRIMES.  SO WHETHER THEY GET OUT IN JANUARY AND

15  COMMIT 12 CRIMES OR THEY GET OUT IN JUNE AND COMMIT 12 CRIMES,

16  THEY ARE STILL GOING TO COMMIT 12 CRIMES.

17        **MR. MITCHELL:**  EXCEPT THE CRIMES THAT THEY COMMIT

18  WHEN YOU LET THEM OUT IN JANUARY ARE ATTRIBUTABLE TO THE

19  COURT'S PRISONER RELEASE ORDER.

20        **JUDGE REINHARDT:**  NO.  WHAT'S ATTRIBUTABLE IS THEY

21  OCCUR EARLIER.  THESE 12 VICTIMS WOULD NOT HAVE BEEN VICTIMS,

22  BUT THE ONES IN JUNE WHO WOULD HAVE BEEN THE VICTIMS ARE LUCKY

23  AND THEY ARE NOT GOING TO BE THE VICTIMS.

24        **JUDGE KARLTON:**  OF COURSE, SOME OF THOSE PEOPLE MAY

25  BE THE VICTIMS IN ANY EVENT.  I MEAN, THE GUY WHO KILLS HIS

1  WIFE, KILLS HIS WIFE IN JUNE OR SEPTEMBER WHENEVER HE GETS OUT.

2      **MR. MITCHELL:**  I THINK MINIMIZING AND RATIONALIZING

3  THAT CRIMES LIKE THIS WITH OTHER VICTIMS WILL BE COMMITTED

4  ANYWAY AT A LATER TIME WHEN THEY GET OUT IS SIMPLY THAT.  IT'S

5  MINIMIZING AND RATIONALIZING.

6      THE CRIME THAT THE STUDIES HAVE SHOWN WILL ACTUALLY

7  OCCUR; THAT CRIMES WILL BE COMMITTED DURING THAT EARLY RELEASE

8  WINDOW, AND THAT HAS TO BE RECOGNIZED AND TAKEN INTO

9  CONSIDERATION.  THOSE VICTIMS ARE REAL VICTIMS.

10      **JUDGE REINHARDT:**  I THINK WE'VE HAD THIS DISCUSSION

11  THROUGHOUT THE TRIAL.

12      **MR. MITCHELL:**  WE HAVE.

13      **JUDGE REINHARDT:**  WE ALL UNDERSTAND EACH OTHER'S

14  VIEWS.

15      **MR. MITCHELL:**  IN FACT, THE PLAINTIFFS' EXPERTS HAVE

16  STATED THAT ALTHOUGH THE PRISON SYSTEM DIRECTLY BENEFITS FROM

17  LOWERED PRISON POPULATIONS, THE PUBLIC ALSO SUFFERS THE

18  INCREASED EFFECTS OF ACCELERATED PRISON RELEASES THAT, IN TURN,

19  CAN JEOPARDIZE PUBLIC SAFETY.

20      THOMAS HOFFMAN FROM CDCR, ADULT PAROLE OPERATIONS,

21  TESTIFIED THAT 4 PERCENT OF THE GROUP OF LOW RISK PAROLEES WHO

22  WOULD BE LET OUT ON EARLY RELEASE ARE GOING TO COMMIT VIOLENT

23  CRIMES.

24      SO WE ARE GOING TO HAVE NOT ONLY COMMISSION OF

25  25 PERCENT OF THOSE RELEASED EARLY, BUT 4 PERCENT OF THOSE,

1  THAT GROUP, AN ESTIMATE BY CDCR'S STATISTICIAN INDICATED THAT

2  4 PERCENT WOULD BE VIOLENT CRIMES.  AND THIS WAS BORNE OUT IN

3  THE 1986 STUDY.

4          **JUDGE REINHARDT:**  DID HE SAY HOW MANY WOULD COMMIT

5  CRIMES IF THEY WERE LET OUT AT THE END OF THE TERM INSTEAD OF

6  FOUR MONTHS EARLIER?

7          **MR. MITCHELL:**  SAME STATISTICS APPLY.

8          AND IN 1986 IN THE ILLINOIS STUDY, THEY SHOWED THAT

9  OUT OF 21,000 INMATES, WHICH IS HALF OF WHAT THE PLAINTIFFS ARE

10 SUGGESTING SHOULD BE RELEASED IN THIS INSTANCE, WITHIN THAT 90

11 DAYS THAT THEY WERE RELEASED EARLY, THERE WERE 4500 NEW

12 ARRESTS, WHICH EQUATED TO, IN ONE ESTIMATE, OF OVER 30,000 NEW

13 CRIMES; BUT 23 HOMICIDES, 32 RAPES, 681 ROBBERIES, 262 ARSONS

14 AND OVER 2400 BURGLARIES ATTRIBUTABLE TO EARLY RELEASE

15 PROGRAMS.

16         DR. AUSTIN, THE PLAINTIFFS' EXPERT, TESTIFIED THAT

17 EARLY RELEASE PROGRAMS ARE ONLY A SHORT-TERM REMEDY FOR

18 OVERCROWDING AND IT'S NOT A POLICY THAT HE ENDORSES.  HE

19 SUGGESTS THAT OTHER MEASURES SHOULD BE USED TO LOWER THE PRISON

20 POPULATION.

21         **JUDGE REINHARDT:**  LIKE WHAT?

22         **MR. MITCHELL:**  PARDON?

23         **JUDGE REINHARDT:**  LIKE WHAT?

24         **MR. MITCHELL:**  THERE'S PROGRAMS SUCH AS THE SB-618

25 RECIDIVISM REDUCTION PROGRAM THAT'S TAKING PLACE IN SAN DIEGO

1  THAT COULD BE IMPLEMENTED STATE-WIDE.  THAT WOULD EFFECTIVELY

2  LOWER THE PRISON POPULATION BY KEEPING PEOPLE FROM COMMITTING

3  NEW CRIMES BY OFFERING --

4         **JUDGE KARLTON:**  CAN WE ORDER THE STATE TO DO THAT?

5  SAY, STOP WHATEVER ELSE YOU ARE DOING.  EVERY COUNTY IN THE

6  STATE OF CALIFORNIA IS TO EMULATE THE SAN DIEGO PROGRAM.  DO WE

7  HAVE THE POWER TO DO THAT?

8         **MR. MITCHELL:**  I THINK THAT THE COURT CAN ORDER CDCR

9  TO IMPLEMENT THOSE TYPES OF PROGRAMS, YES, BECAUSE IT'S A

10 PRISONER RELEASE ORDER, BECAUSE IT INDIRECTLY LOWERS THE NUMBER

11 OF INMATES GOING INTO PRISON.

12        **JUDGE HENDERSON:**  CAN WE ORDER THE STATE TO PAY FOR

13 IT?

14        **JUDGE KARLTON:**  AND ORDER THE STATE TO PAY FOR IT?

15        **MR. MITCHELL:**  WELL, I THINK IF THE COURT ORDERS CDCR

16 TO IMPLEMENT THOSE PROGRAMS UNDER THE PRISONER RELEASE ORDER,

17 IT WOULD BE INCUMBENT UPON THE STATE TO FUND THOSE PROGRAMS,

18 YES.

19        I DON'T THINK THE COURT'S ORDERING ADDITIONAL

20 FUNDING, JUST ORDERING THE STATE TO ENGAGE IN A PARTICULAR

21 PROGRAM, SUCH AS INCREASING CONDUCT CREDITS.

22        **JUDGE KARLTON:**  COUNTIES ARE GOING TO TELL US THAT IF

23 WE DO THAT, IT'S GOING TO BE AN UNFUNDED MANDATE AND THEY DON'T

24 HAVE THE FUNDS TO TAKE CARE OF IT.

25        **MR. MITCHELL:**  CDCR WOULD REALIZE A SAVINGS IN FUNDS

 1  BY THE LIMITED NUMBER, LESSER NUMBER OF INMATES GOING TO

 2  PRISON.  SO THERE WOULD BE FUNDING THERE FOR IT.

 3          **JUDGE KARLTON:**  THE ONLY PROBLEM WITH THAT IS THE

 4  STATE IS BROKE AND ANY DOLLAR THAT THEY SAVE, THEY ARE GOING TO

 5  SAY WE NEED TO REDUCE THE DEFICIT.

 6          **JUDGE REINHARDT:**  YOU KNOW, IT'S AN INTERESTING LEGAL

 7  QUESTION.  ONE OF THE THINGS THAT I WOULD LIKE TO KNOW THE

 8  ANSWER TO IS TO WHAT EXTENT WE CAN ORDER THE STATE TO EXPEND

 9  FUNDS FROM -- EITHER IN GENERAL TO CONDUCT PROGRAMS OR FROM ANY

10  SAVINGS THEY MAKE IN REDUCING PRISON POPULATION?

11          AND I WOULD APPRECIATE ANY LEGAL AUTHORITY ANYBODY

12  HAS ON THAT POINT.

13          **JUDGE KARLTON:**  AS BEST I CAN TELL, THE FINDINGS OF

14  FACT AND CONCLUSIONS OF LAW PROPOSED BY EVERYBODY DOES NOT

15  ADDRESS THE POWER OF THE COURT TO DO THOSE THINGS, AND THAT IS

16  A PROBLEM FOR US AS TO WHAT WE CAN DO.  I MEAN, I KNOW IT'S A

17  LEGAL PROBLEM THAT WE'VE GOT TO SOLVE.

18          **JUDGE REINHARDT:**  WELL, WE MAY ASK FOR YOUR HELP IN

19  SOLVING THAT.

20          **JUDGE KARLTON:**  WE MAY.  WE MAY.

21          **JUDGE REINHARDT:**  THE STATE MAY AGREE THAT WE CAN

22  ORDER THEM TO SPEND MONEY OR EVEN SPEND TO INCREASE ITS BUDGET.

23  IF THEY SAY THAT, THAT WOULD BE VERY HELPFUL.

24          **MR. MITCHELL:**  THE DIVERSION OF STATE PRISON-BOUND

25  INMATES SUGGESTED BY PLAINTIFFS CONCERNS, THE 24 MONTHS OF LESS

1   CUSTODY, SUPERVISION OR PROGRAMS IN THE LOCAL COMMUNITY.

2   WITHOUT INCREASED FUNDING AND SUPPORT OF SUCH ALTERNATIVES WILL

3   RESULT IN THE COMMISSION OF NEW CRIMES IN LOCAL COMMUNITIES AND

4   INCREASED RECIDIVISM.

5           THE DEFENDANTS THAT FALL INTO THE CATEGORIES THAT

6   IT'S SUGGESTED ARE ELIGIBLE FOR THESE LOW RISK OR NON-SERIOUS

7   OFFENDERS BE COMMITTED TO PROBATIONARY TERMS RATHER THAN

8   PROBATION ALL HAVE LONG CRIMINAL RECORDS AND CRIMINAL BEHAVIOR.

9           THE DISTRICT ATTORNEY INTERVENORS READ IN THE

10  TESTIMONY OF DISTRICT ATTORNEY DUMANIS FROM SAN DIEGO COUNTY

11  AND DISTRICT ATTORNEY PACHECO FROM RIVERSIDE COUNTY.

12          ALMOST WITHOUT EXCEPTION, THE NON-SERIOUS,

13  NON-VIOLENT, NON-SEX OFFENDER DEFENDANTS THAT ARE SENT TO

14  PRISON FROM THOSE COUNTIES AND FROM MOST COUNTIES IN THE STATE

15  OF CALIFORNIA HAVE ALREADY FAILED ON PROBATION THREE, FOUR,

16  FIVE, SIX TIMES AND HAVE NUMEROUS FELONY CONVICTIONS.

17          THESE ARE ONES, INDIVIDUALS, DEFENDANTS THAT ARE NOT

18  AMENABLE TO SUPERVISION OR TREATMENT IN THE LOCAL COMMUNITIES.

19  TO SUGGEST THAT THIS GROUP IS NOW ELIGIBLE OR SUITABLE FOR

20  DIVERSION IS MERELY DUMPING ON THE COUNTIES THAT WHICH PROPERLY

21  BELONGS TO THE STATE.

22          **JUDGE REINHARDT:**  WHAT HAPPENS TO THEM IF THEY ARE

23  NOT DIVERTED?

24          **MR. MITCHELL:**  THEY GO TO PRISON.

25          **JUDGE REINHARDT:**  FOR HOW LONG?

 1          MR. MITCHELL:  SOMETIMES 24 MONTHS, ACCORDING TO

 2   THIS, WHICH COULD BE UP TO FOUR YEARS.  24 MONTHS IS ACTUAL

 3   TIME.

 4          JUDGE REINHARDT:  WHAT'S THE GENERAL PRACTICE OF

 5   THESE PEOPLE THAT WE ARE CONCERNED ABOUT?  WHAT WOULD YOU

 6   SAY -- HOW LONG WOULD THEY BE SENT TO PRISON FOR?

 7          MR. MITCHELL:  WELL, I KNOW THAT --

 8          JUDGE REINHARDT:  THE PRACTICAL REALITY, THE CLASS

 9   YOU ARE TALKING ABOUT, WHAT ARE THEY AS AN AVERAGE SENT TO

10   PRISON FOR?

11          MR. MITCHELL:  FOUR YEARS OR LESS.

12          JUDGE REINHARDT:  THE AVERAGE?

13          MR. MITCHELL:  YES.

14          JUDGE REINHARDT:  FOUR YEARS OR LESS?

15          MR. MITCHELL:  OUT OF 4200 INMATES SENT TO PRISON

16   FROM RIVERSIDE COUNTY IN 2007, 3200 WERE FOUR YEARS OR LESS FOR

17   NON-SERIOUS, NON-VIOLENT, NON-SEX OFFENSES.  3200, FOUR YEARS

18   OR LESS.

19          THE ACTUAL TIME THEY ARE SERVING IS TWO YEARS ON A

20   FOUR-YEAR PRISON SENTENCE.  SO THEY ARE IN THERE FOR

21   APPROXIMATELY 18 MONTHS TO TWO YEARS.

22          JUDGE REINHARDT:  THEY KEEP GOING DOWN.  YOU SAID

23   FOUR YEARS, NOW WE ARE DOWN TO TWO, NOW 18 MONTHS.

24          MR. MITCHELL:  I'M TALKING ACTUAL MONTHS.

25          THERE IS A HUGE NUMBER IN OUR PRISON SYSTEM, AND WE

1  HEARD THE EVIDENCE ON THAT, THAT IS CHURNING IN AND OUT, BUT

2  THERE IS NO PROGRAMS AT THE LOCAL LEVEL TO DEAL WITH THEM.

3      **JUDGE KARLTON:**  AND THERE WERE NO PROGRAMS AT THE

4  PRISON LEVEL BECAUSE THERE IS NO PLACE --

5      **MR. MITCHELL:**  CORRECT.  AND THAT'S WHY WE'VE COME UP

6  WITH THE PROGRAM LIKE THE SB-618 PROGRAM TO TRY AND STOP THAT

7  CHURNING, TRY AND STOP THAT RECIDIVISM FROM CONTINUALLY

8  OCCURRING.

9      AND THE DISTRICT ATTORNEYS ARE WORKING TO IMPLEMENT

10 THAT IN OTHER COUNTIES DESPITE WHAT THIS COURT ORDERS AND

11 WHETHER IT INVOLVES THAT OR NOT.

12     **JUDGE HENDERSON:**  YOU KNOW, I'M RETURNING BECAUSE IT

13 SEEMS CRITICAL TO ME.

14     I WAS VERY IMPRESSED WITH THE PROGRAM.  SO IT'S LIKE

15 ASKING US TO DO SOMETHING THAT WON'T HAPPEN.  THAT'S MY

16 CONCERN.  I DON'T KNOW WHAT TO DO.  IF I ADVOCATE THIS AND SAY

17 WONDERFUL, BUT THE MONEY IS NOT THERE AND IT'S NOT GOING TO BE

18 THERE, IS IT A REMEDY AT ALL OR IS IT ILLUSIONARY?

19     **MR. MITCHELL:**  I DON'T KNOW THAT CDCR IS OPPOSED TO

20 IT.  I KNOW THAT I SAW IT AS AN ALTERNATIVE IN THE DEFENDANTS'

21 CONCLUSIONS OF LAW AND FINDINGS OF FACT.

22     **JUDGE KARLTON:**  BUT THE REALITY -- EXCUSE ME, SIR.

23 THE REALITY IS THAT THE STATE SAYS THREE COUNTIES CAN DO THIS

24 EXPERIMENT AND ONLY ONE HAS DONE IT.  WHAT DO WE MAKE OF THAT?

25 WE ARE TALKING ABOUT STATE-WIDE AND ALL THAT THAT WOULD IMPLY.

1           **MR. MITCHELL:**  IT'S THE SAME PROBLEM AS

2  JUDGE HENDERSON NOTED IN HIS FINDINGS OF FACT THAT LED TO THE

3  APPOINTMENT OF THE RECEIVER.  IT'S A LACK OF LEADERSHIP.

4           AND THERE WAS A LEADER IN SAN DIEGO THAT TOOK IT UPON

5  HERSELF TO GET IT STARTED AND NOW IT'S PROVEN THAT IT WORKS.

6  AND NOW IT'S SOMETHING THAT OTHER DISTRICT ATTORNEYS ARE

7  LOOKING INTO GETTING IMPLEMENTED IN THEIR COUNTIES.

8           SO IT IS A LACK OF LEADERSHIP, A LACK OF INITIATIVE

9  TO GET THINGS OFF THE GROUND AND STARTED.

10          **JUDGE REINHARDT:**  IMPLEMENTED WITH STATE FUNDS.

11          **MR. MITCHELL:**  IN SAN DIEGO IT'S IMPLEMENTED WITH

12  STATE FUNDS, YES.  CDCR FUNDS IT.

13          **JUDGE REINHARDT:**  AND YOU WANT LEADERSHIP ON A STATE

14  LEVEL.  ARE YOU A CANDIDATE FOR GOVERNOR?

15          **MR. MITCHELL:**  I DON'T KNOW THAT WE NEED TO GET INTO

16  THAT AT THIS POINT.

17          **JUDGE REINHARDT:**  CAN WE ORDER LEADERSHIP ON A STATE

18  LEVEL?  IT WOULD BE WONDERFUL.

19          **MR. MITCHELL:**  AND I'M NOT ADVOCATING THAT THIS COURT

20  MAKE THAT ORDER REGARDING SB-618.

21          THE COURT WONDERED WHAT TYPE OF PROGRAM WOULDN'T

22  INVOLVE ADVERSE IMPACTS ON PUBLIC SAFETY, AND THAT'S ONE THAT

23  DOES NOT HAVE ADVERSE IMPACTS ON PUBLIC SAFETY.

24          **JUDGE REINHARDT:**  I DON'T THINK THAT WE CAN SAY IT

25  WOULDN'T HAVE AN IMPACT ON PUBLIC SAFETY IF WE HAD LEADERSHIP,

```
 1  THEREFORE, WE ARE GOING TO DO THIS.  WE HAVE TO TALK ABOUT

 2  WHAT'S REALLY GOING TO HAPPEN.

 3          IS THE STATE REALLY GOING TO GIVE US THE MONEY?  IF

 4  THE STATE WILL COME INTO COURT AND PUT UP A BOND OR SOMEHOW

 5  SAY, HERE, WE'VE AUTHORIZED THE MONEY FOR THESE PROGRAMS.

 6  THAT'S A DIFFERENT SITUATION.  BUT TO SAY THE STATE, IF IT ONLY

 7  HAD LEADERSHIP, COULD SOMEHOW AUTHORIZE THE PROGRAM WE ALL KNOW

 8  IT'S NOT GOING TO DO, THAT DOESN'T HELP.

 9          JUDGE KARLTON:  I MEAN, AB900 HAS NOT BEEN CURED IN,

10  WHAT, FOUR YEARS?  I'M MAKING THAT UP.  TWO YEARS.  IT'S NOT

11  LIKE PEOPLE DON'T HAVE GOOD IDEAS.  FOR SOME REASON NOTHING

12  HAPPENS.  WELL, ONE THING HAPPENS.  WE GET MORE AND MORE PEOPLE

13  IN PRISON.

14          BUT, YOU KNOW -- AND THE ARGUMENT ABOUT LETTING THESE

15  FOLKS OUT IS GOING TO CAUSE A PROBLEM, LAW ENFORCEMENT PROBLEM.

16  NOBODY DISPUTES, BEGINNING WITH THE DEFENDANT, THAT THE PRISONS

17  ARE PRESENTLY CRIMINOGENIC.

18          SO WHEN WE SEND THESE PEOPLE TO 18 MONTHS, THEY GO IN

19  AS DRUG USERS OR THEY'VE BOOSTED A CAR OR GOD KNOWS WHAT, WHEN

20  THEY COME OUT THEY'RE GOING TO DO VIOLENT CRIMES.

21          ONE THING, APPARENTLY, IS TRUE.  AND, REALLY, THIS IS

22  AN IMPORTANT THING TO BE TALKING TO THE DISTRICT ATTORNEYS

23  ABOUT.  IF WHAT WE ARE DOING CLEARLY ENDANGERS PUBLIC SAFETY,

24  AND THAT IS APPARENTLY THE UNDISPUTED EVIDENCE, DON'T WE HAVE

25  TO DO SOMETHING DIFFERENT?
```

1          **MR. MITCHELL:**  AGREED.  SOMETHING NEEDS TO BE DONE.

2    AND FOR THE PART -- IF YOU ARE REFERRING TO, DOES THIS COURT

3    NEED TO DO SOMETHING DIFFERENT, THAT THE STATE NEEDS TO DO

4    SOMETHING DIFFERENT.  WITH THE BUDGET CONSTRAINTS AND THE

5    RECIDIVISM AND INCREASED CRIME, YEAH, THE STATE DOES NEED TO DO

6    SOMETHING DIFFERENT.

7          **JUDGE KARLTON:**  AND IF THE STATE HAS BEEN GIVEN YEARS

8    AND YEARS AND THE ONLY THING THAT THEY HAVE DONE IS PERMIT THE

9    PRISON SYSTEM TO GROW COMPLETELY OUT OF CONTROL, THEN WHAT?

10          I MEAN, THERE IS NO EVIDENCE, THERE IS NO EVIDENCE

11    THAT I CAN TELL OF -- WITH ALL DUE RESPECT TO MISS TILLMAN'S

12    SUGGESTION OTHERWISE, THERE IS NO EVIDENCE THAT THE STATE,

13    WITHOUT FEDERAL COURT PRODDING, WILL DO ANYTHING EXCEPT -- I

14    MEAN, AND THERE'S A PROBLEM OF POLITICAL WILL.  NOBODY WANTS TO

15    SAY, OH, I'M SOFT ON CRIME.  ALL THOSE REASONS.

16          YOU KNOW, AND JUST TO ECHO JUDGE REINHARDT, THERE ARE

17    AT LEAST SOME POLITICIANS WHO SAY, LET THE COURTS ORDER US TO

18    DO SOMETHING AND THEN WE WON'T BE RESPONSIBLE FOR ANYTHING.

19    YOU KNOW, WE WILL JUST TO HAVE TO DO IT.

20          WHAT CAN WE DO UNDER THESE CIRCUMSTANCES?

21          **MR. MITCHELL:**  I THINK THE COURT'S POWER IS FURTHER

22    CONSTRAINED AND LIMITED BY THE FACT THAT ANY ORDER HAS TO BE

23    NARROWLY TAILORED TO RE MEDIATING THE CONSTITUTIONAL VIOLATIONS

24    OF THE TWO PLAINTIFF CLASSES AND NOT CURING ALL THE ILLS OF THE

25    PRISON SYSTEM.

```
 1          JUDGE KARLTON:  YOU ARE ABSOLUTELY RIGHT.  YOU ARE

 2   ABSOLUTELY RIGHT.  THIS IS -- YOU KNOW, IT'S NOT A -- WE DON'T

 3   HAVE A GENERAL WRIT TO GO AND CURE EVERY PROBLEM IN THE WORLD.

 4          JUDGE REINHARDT:  MAYBE YOU ARE RIGHT.  ALL WE CAN DO

 5   IS ISSUE A PRISONER RELEASE ORDER AND NOT DO THE KINDS OF

 6   THINGS YOU ARE TALKING ABOUT, LIKE SEEING THESE PROGRAMS ARE

 7   INSTITUTED.

 8          JUDGE KARLTON:  MAYBE THE ANSWER IS IF WE ORDER THE

 9   STATE, TELL THEM, LOOK, THERE IS A CAP -- AND I DON'T KNOW WHAT

10   THAT CAP WOULD BE.  I SUSPECT THERE IS SOME DISAGREEMENT AMONG

11   US.  BUT BE THAT AS IT MAY, AND WE SAY TO THE STATE, THIS IS

12   THE NUMBER OF PEOPLE THAT YOU CAN KEEP IN YOUR PRISONS UNLESS

13   YOU BUILD MORE PRISONS, AND THEN THE STATE WILL BE REQUIRED TO

14   TAKE THE BIT BY THE -- I GUESS YOU DON'T TAKE THE BIT BY THE

15   HORNS.

16          MR. MITCHELL:  THE HORSE BY THE BIT.

17          JUDGE KARLTON:  TO TAKE THE BIT AND SAY, THIS IS WHAT

18   WE ARE GOING TO DO.  MAYBE THAT'S THE BEST THAT WE CAN DO.  AS

19   BAD AS THAT MIGHT BE, MAYBE THAT'S THE BEST WE CAN DO.

20          MR. MITCHELL:  THAT LEAVES IT UP TO THE STATE TO

21   FIGURE OUT HOW IT'S GOING TO FIX THE PROBLEM.

22          THE LAST POINT I WANTED TO MAKE IS REGARDING THE CAP

23   ON THE PRISON POPULATION IN GENERAL.  AND THE EVIDENCE THAT WAS

24   PRESENTED, FOR INSTANCE, AS IN -- IN RIVERSIDE COUNTY JAIL,

25   LIKE MANY OTHER COUNTY JAILS, ALREADY HAVE POPULATION CAPS
```

1   FORCING THE LOCAL AUTHORITIES TO RELEASE INMATES PRIOR TO THE

2   COMPLETION OF THEIR COURT-ORDERED CUSTODY AND TO RELEASE

3   UNQUALIFIED PRETRIAL DETAINEES WITHOUT BAIL.

4           STATISTICS HAVE SHOWN THAT THIS GROUP OF JAIL INMATES

5   HAS A RECIDIVISM RATE.  IN RIVERSIDE IT WAS OVER 28 PERCENT.

6   SHERIFF HENNESSY TESTIFIED THAT EARLY RELEASE MEASURES IN HIS

7   JAIL DIDN'T RESULT IN ANY INCREASED CRIME, BUT ON

8   CROSS-EXAMINATION IT WAS POINTED OUT -- HE POINTED OUT, WELL,

9   THEY DON'T KEEP RECORDS OF THE REARRESTS OF THOSE PEOPLE

10  ANYWAY.  SO HIS TESTIMONY REGARDING THAT MATTER, IT WAS REALLY

11  SOMEWHAT WITHOUT MERIT.

12          **JUDGE REINHARDT:**  LET ME ASK YOU A QUESTION.  YOU

13  HAVE A CAP IN THE COUNTY JAIL?

14          **MR. MITCHELL:**  YES.

15          **JUDGE REINHARDT:**  WHAT'S THE ALTERNATIVE TO THE CAP?

16  WOULD YOU SAY THAT IF YOU GET TO THE POINT WHERE YOU'VE GOT

17  FIVE PEOPLE IN A CELL BUILT FOR ONE, OR GETS TO BE 10 PEOPLE,

18  AT SOME POINT DOESN'T THERE HAVE TO BE A CAP?

19          **MR. MITCHELL:**  AT SOME POINT THE FACILITIES CAN ONLY

20  HOLD SO MANY, WHETHER YOU HAVE HOT BUNKING OR BOATS INSTEAD OF

21  BEDS.

22          **JUDGE REINHARDT:**  WHERE THE FACILITY CAN'T FUNCTION.

23          **JUDGE KARLTON:**  THAT'S WHERE WE ARE NOW WITH THE

24  PRISON SYSTEM, AS BEST I CAN TELL.  WHAT DO WE DO?

25          **MR. MITCHELL:**  THE COURT HEARD FROM THE DISTRICT

1    ATTORNEYS THAT TESTIFIED IN THIS CASE.  THEY SHARE YOUR

2    FRUSTRATION.

3          **JUDGE KARLTON:**  THAT'S EASY.  I DON'T MEAN THAT

4    BADLY.  I MEAN, YOU KNOW --

5          **JUDGE REINHARDT:**  THIS MIGHT BE AN IMPOSSIBLE

6    PROBLEM, BUT HERE WE ARE WITH AN IMPOSSIBLE PROBLEM.

7    OBVIOUSLY, AT SOME POINT THERE HAS TO BE A CAP ON THE PRISON

8    POPULATION, MAYBE FIVE TIMES AS MUCH AS WE NOW HAVE.

9          BUT IN THEORY THERE HAS TO BE A CAP AT SOME POINT.

10   IF -- YOU CAN'T JUST KEEP PUTTING PEOPLE INTO PRISON FOREVER.

11   YOU'VE GOT TO LIMIT IT TO --

12         **MR. MITCHELL:**  WELL, I THINK WHAT'S BEFORE THIS COURT

13   IS THE CONSTITUTIONAL HEALTHCARE AND MENTAL HEALTH CARE AND --

14         **JUDGE REINHARDT:**  YOU SAID -- WE ARE TALKING ABOUT

15   ASSUMING THAT.  YOU WERE SAYING, ASSUMING WE REACHED A POINT

16   WHERE IT'S THE -- WHERE IT IS THE PRIMARY CAUSE, WHERE THERE IS

17   NO OTHER REMEDY.  NOW WHAT DO YOU DO?

18         **JUDGE KARLTON:**  NOW WHAT DO YOU DO?

19         **JUDGE REINHARDT:**  I DON'T KNOW.  YOU SAY, WELL, DON'T

20   YOU DO ANYTHING THAT'S GOING TO CAUSE AN IMPACT ON CRIME.  IF

21   YOU DON'T DO ANYTHING, WHAT?

22         **JUDGE KARLTON:**  IT'S GOING TO CAUSE AN IMPACT ON

23   CRIME.

24         **MR. MITCHELL:**  WELL, IT COMES DOWN TO FUNDING AND IT

25   COMES DOWN TO TIME TO EMPLOY PROGRAMS THAT WILL NOT RESULT IN

1   ADVERSE IMPACTS ON PUBLIC SAFETY IN THE CORRECTIONAL JUSTICE

2   SYSTEM.

3        JUDGE REINHARDT:  AND WHERE DO YOU GET FUNDING FROM

4   THAT?  WHAT'S GOING ON IN THE COUNTRY?  WHAT'S GOING ON IN THE

5   STATE, THE BUDGET?  WHEN CAN YOU EXPECT FUNDING FOR THOSE

6   PROGRAMS?

7        MR. MITCHELL:  THERE IS FUNDING.  IT'S JUST A

8   QUESTION OF PRIORITIES AND WHERE THE MONEY GETS ALLOCATED.

9   THERE IS MONEY THERE FOR PROGRAMS.  THERE'S MONEY THERE FOR

10  SERVICES AND IT'S A QUESTION OF WHERE THE STATE ALLOCATES IT.

11       JUDGE REINHARDT:  IN THE PRISON PROJECT OR ARE WE

12  GOING TO GET FUNDING ELSEWHERE?  WE ARE NOT GOING TO CLOSE THE

13  SCHOOLS.

14       MR. MITCHELL:  THERE'S RESOURCES AVAILABLE AND IT'S A

15  QUESTION OF WHERE THEY GET ALLOCATED.  THOSE ARE DECISIONS THAT

16  ARE MADE IN THE LEGISLATURE AND APPROPRIATIONS.  AND DECISIONS

17  HAVE TO BE MADE OF WHAT'S MORE IMPORTANT, WHAT DO WE HAVE TO

18  DO?

19            IT'S OFTEN BEEN SAID THAT THE NUMBER ONE PRIORITY FOR

20  THE STATE AND FOR THE LOCAL GOVERNMENTS IS ENSURING PUBLIC

21  SAFETY.  AND IF THAT'S TRUE, THEN THOSE FUNDING PRIORITIES HAVE

22  TO BE MADE.

23       JUDGE REINHARDT:  THAT'S AN ARGUMENT YOU HAVE TO MAKE

24  TO THE GOVERNOR AND THE LEGISLATURE, I WOULD THINK.  WHY DON'T

25  YOU COME BACK AND TELL US THAT YOU HAVE GOTTEN THEM -- YOU

1    PERSUADED THEM THAT THEY OUGHT TO DIVERT MONEY FROM THE

2    SCHOOLS.  THEY OUGHT TO DIVERT MONEY FROM PEOPLE WHO ARE DYING

3    BECAUSE THEY CAN'T EAT AND ARE LIVING ON THE STREETS.  YOU

4    PERSUADE THEM THAT THE PRIMARY PROBLEM IS THE PRISONS.  COME

5    BACK WITH THAT MONEY, THEN SURE.

6         **MR. MITCHELL:**  EASIER SAID.

7         **JUDGE KARLTON:**  EXACTLY.

8         **MR. MITCHELL:**  IN CLOSING, THE POTENTIAL ADVERSE

9    CONSEQUENCES OF THE PRISONER RELEASE ORDERS, THE PROPOSED

10   PRISONER RELEASE ORDERS WILL HAVE SUCH ADVERSE IMPACTS ON

11   PUBLIC SAFETY THAT THE COURT SHOULD EITHER DENY THEIR REQUEST

12   FOR A PRISONER RELEASE ORDER OUTRIGHT OR FASHION A MORE

13   NARROWLY TAILORED, LESS INTRUSIVE REMEDY.

14        **JUDGE KARLTON:**  I WANT TO ASK YOU A QUESTION.  I SORT

15   OF WANTED TO ASK EVERYBODY.  UNFORTUNATELY, YOU TURN OUT TO BE

16   THE VICTIM.

17            CAN THE CONGRESS CREATE A STATUTE WHICH SAYS THERE IS

18   A CONSTITUTIONAL VIOLATION AND YOU CAN'T SOLVE IT?

19        **JUDGE REINHARDT:**  I CAN GIVE YOU A COUPLE OF

20   EXAMPLES.

21        **MR. MITCHELL:**  THERE'S A CONSTITUTIONAL VIOLATION

22   THAT CAN'T BE SOLVED?

23        **JUDGE KARLTON:**  NO.  THERE IS A CONSTITUTIONAL

24   VIOLATION, BUT YOU, THE COURTS, ARE PROHIBITED FROM SOLVING IT.

25        **JUDGE REINHARDT:**  YOU HAVEN'T READ THE HABEAS

 1  STATUTE.

 2          **JUDGE KARLTON:**  WE ARE NOT TALKING ABOUT 254.

 3          DOES THE CONGRESS HAVE THE AUTHORITY TO PREVENT THE

 4  COURTS FROM ADDRESSING THE CONSTITUTIONAL VIOLATION?

 5          **MR. MITCHELL:**  CONSTITUTIONAL RIGHTS, FROM MY

 6  UNDERSTANDING OF CONSTITUTIONAL LAW, CAN BE INFRINGED UPON WHEN

 7  THERE ARE COMPELLING STATE CIRCUMSTANCES OR CRITERIA OR A

 8  RATIONAL BASIS FOR SUCH.

 9          AND TO A CERTAIN -- I THINK TO A CERTAIN EXTENT, YES,

10  THERE CAN BE VIOLATIONS OF CONSTITUTIONAL RIGHTS THAT CANNOT BE

11  REMEDIED IN A PARTICULAR PERIOD OF TIME.

12          **JUDGE KARLTON:**  THAT -- USING YOUR EXAMPLE OF

13  REMEDIES, THAT DOESN'T SAY THERE CAN'T BE A REMEDY DEFINES THE

14  CONSTITUTIONAL RIGHT IN THAT FASHION.

15          HERE, THE QUESTION -- APPARENTLY, AT LEAST NOBODY HAS

16  SUGGESTED OTHERWISE.  THE CONSTITUTION REQUIRES THAT IF THE

17  STATE IMPRISONS SOMEBODY, IT PROVIDE A MINIMUM OF

18  CONSTITUTIONALLY ADEQUATE MEDICAL CARE.  SO THAT'S A

19  CONSTITUTIONAL RIGHT THAT EXISTS.

20          NOW, THE QUESTION IS, CAN THE CONGRESS -- DOES THE

21  CONGRESS HAVE THE POWER TO PREVENT A CO-EQUAL BRANCH OF

22  GOVERNMENT WHICH HAS THE OBLIGATION TO PROTECT CONSTITUTIONAL

23  RIGHTS FROM DOING SO, JUST SAYING YOU CAN'T ADDRESS THAT

24  PROBLEM?

25          **MR. MITCHELL:**  I DON'T KNOW THE ANSWER TO THAT

1    QUESTION.

2            **JUDGE KARLTON:**  THAT MAKES TWO OF US.

3            **JUDGE REINHARDT:**  I DO.

4            **JUDGE KARLTON:**  YOU ONLY THINK YOU DO BECAUSE YOU ARE

5    SMARTER THAN I AM.

6            **MR. MITCHELL:**  THANK YOU.

7                        **CLOSING ARGUMENT**

8            **MS. BARLOW:**  GOOD AFTERNOON, YOUR HONORS.  KIMBERLY

9    HALL BARLOW FOR THE LAW ENFORCEMENT INTERVENORS.

10           FIRST, I WANT TO THANK THE COURT FOR ALLOWING US TO

11   PARTICIPATE.  AND I KNOW THE COURT HASN'T ALWAYS APPRECIATED MY

12   APPROACH TO THIS CASE AND I CERTAINLY INTENDED NO DISRESPECT TO

13   THE COURT.

14           I RECOGNIZE THE AWESOME RESPONSIBILITY THAT YOU HAVE

15   HERE AND WE WANTED TO PARTICIPATE BECAUSE IT IS SUCH AN AWESOME

16   RESPONSIBILITY.  AND, FRANKLY, IT'S ONE THAT MY CLIENTS SHARE

17   WITH YOU.

18           I DON'T WANT TO MAKE LIGHT OF THIS, BUT THE REALITY

19   IS THIS IS A ZERO SUM GAME.  YOU HAVE A FIXED NUMBER OF PEOPLE

20   THAT ARE COMMITTING CLAIMS IN THIS STATE.  WE DON'T KNOW WHY.

21   WE SPEND A LOT OF TIME TALKING ABOUT WHY THAT IS, BUT THAT'S

22   THE REALITY.

23           THE ONLY QUESTION IS:  WHERE DO WE PUT THEM?  DO WE

24   KEEP THEM IN PRISONS WHERE THEY GET MAYBE NOT THE LEVEL OF CARE

25   THAT WE WOULD LIKE TO THEM TO GET, OR DO WE LET THEM OUT AND

 1  ALLOW THEM TO CONTINUE VICTIMIZING PEOPLE AT A HIGHER RATE,

 2  GREATER RATE IN A FASTER WAY?

 3          JUDGE REINHARDT:  IT'S SLIGHTLY DIFFERENT.  THE

 4  QUESTION IS NOT DO THEY RECEIVE THE LEVEL OF CARE WE WANT THEM

 5  TO GET.  THE QUESTION IS, IF THEY ARE UNABLE TO PROVIDE THE

 6  CONSTITUTIONALLY REQUIRED CARE, WHAT DO YOU DO?

 7          MS. BARLOW:  WELL, WITH RESPECT, YOUR HONOR, I THINK

 8  THE EVIDENCE DEMONSTRATED THAT THEY CAN DO THAT --

 9          JUDGE REINHARDT:  THAT'S A DIFFERENT QUESTION.  YOU

10  WERE TALKING ABOUT A -- IF YOU WANT TO SHIFT TO THE QUESTION OF

11  IS THERE REALLY A CONSTITUTIONALLY ADEQUATE CARE, THAT'S A

12  DIFFERENT QUESTION.

13          MS. BARLOW:  WELL, I'M NOT DISPUTING.  THE COURT HAS

14  MADE THOSE FINDINGS AND I RECOGNIZE THE COURT'S RULINGS THAT

15  THAT IS NOT REALLY FOR DISPUTE HERE.

16          THE QUESTION IS, WHAT THE CAUSE OF THAT IS, WHAT THE

17  ALTERNATIVES TO A RELEASE ORDER ARE AND, INDEED, WHAT IS A

18  PRISONER RELEASE ORDER THAT THIS COURT HAS THE POWER TO ISSUE.

19          MY CLIENTS, THE LAW ENFORCEMENT REPRESENTATIVES AND

20  OFFICIALS FROM UP AND DOWN THE STATE, FROM LARGE COMMUNITIES,

21  SMALL COMMUNITIES, FROM LOS ANGELES COUNTY, AVENAL COUNTY, THE

22  BIGGEST CONTRIBUTOR AND SMALLER CONTRIBUTOR, THE PROBATION

23  CHIEFS, THEY CAME TO TALK TO YOU.

24          THEY WANTED TO PARTICIPATE IN THIS CASE.  THEY CAME

25  TO TALK TO YOU TRUTHFULLY AND EARNESTLY ABOUT THEIR FEARS.

1  NOW, PLAINTIFFS SAY THOSE FEARS ARE EXAGGERATED.

2         AND I KNOW WE'VE TALKED ABOUT THE DIFFERENCE BETWEEN

3  INCREASING AND ACCELERATING CRIME, BUT IT'S VERY IMPORTANT THAT

4  THE COURT RECOGNIZE DR. AUSTIN'S TESTIMONY WAS THERE WILL BE AN

5  INCREASE.  HE DEEMS IT STATISTICALLY INSIGNIFICANT.

6         BUT YOU ARE NOT STATISTICIANS AND THE PEOPLE THAT ARE

7  GOING TO BE VICTIMS OF THOSE ADDITIONAL CRIMES ARE NOT

8  STATISTICIANS.  AND ALL THEY KNOW IS THEY HAVE BEEN VICTIMIZED.

9         THERE HAS BEEN DISCUSSION ABOUT -- FROM THE LAWYERS

10 AND JUDGES BOTH THAT HAVE BEEN VICTIMIZED BY CRIMES IN THEIR

11 LIVES.  SO HAVE I.

12         I WANT YOU TO CONSIDER FOR A MOMENT THE EXPERIENCE OF

13 BEING A VICTIM AND HOW IT FELT TO YOU AND WHETHER IT WOULD HAVE

14 MATTERED TO YOU THAT THAT PERSON SHOULD HAVE BEEN IN PRISON

15 WHEN THE CRIME AGAINST YOU WAS COMMITTED.

16         WE TALKED ABOUT THE NUMBER OF ARRESTS VERSUS THE

17 NUMBER OF CRIMES VERSUS THE NUMBER OF PRISONERS.  I HAVE BEEN A

18 VICTIM OF 14 CRIMES, SIX OF THEM SERIOUS VIOLENT CRIMES.  OKAY?

19 ONE ARREST.

20         NOW, I'M PROBABLY UNUSUAL, EXCEPT ACCORDING TO

21 DR. AUSTIN, DR. AUSTIN SAYS, KIND OF BLIGHTY I THOUGHT, THE

22 PEOPLE IN THIS COURTROOM ARE A LOT LESS LIKELY TO BE VICTIMIZED

23 BY THESE PEOPLE COMING OUT.  AND HE IS NOT PERSONALLY CONCERNED

24 FOR HIMSELF IF YOU ISSUE A PRISONER RELEASE ORDER.

25         **JUDGE HENDERSON:**  THE PERSONS IN THIS COURT ARE NOT

 1  LIKELY, IS THAT WHAT YOU SAID?

 2         **MS. BARLOW:**  HE SAID THAT WE WERE LESS LIKELY BECAUSE

 3  WE LIVE IN MORE AFFLUENT AREAS.  WE'RE MORE EDUCATED.  AND YOU

 4  KNOW WHAT?  THAT MIGHT BE TRUE.  BUT MY CLIENTS DON'T WORK IN

 5  AFFLUENT AREAS.  THEY WORK IN THE AREAS WHERE CRIME IS HIGH,

 6  WHERE GANGS ARE A PROBLEM, WHERE DRUGS ARE A PROBLEM.

 7         WE HAD TESTIMONY FROM THE HIGHEST-- FROM THE AUTO

 8  THEFT CAPITOL OF THE WORLD, THE METH CAPITAL OF THE WORLD.

 9  THEY ARE DEALING WITH THE PEOPLE WHO WILL BE VICTIMS AND THEY

10  ARE THE ONES WHO HAVE TO STAND THERE AND FACE THESE VICTIMS AND

11  TELL THEM THEY DON'T HAVE ENOUGH RESOURCES, AND TELL THEM,

12  YEAH, THIS GUY GOT OUT OF PRISON EARLY BECAUSE THERE IS NO ROOM

13  AT THE INN.  AND I CAN'T EVEN KEEP HIM LOCKED IN THE COUNTY

14  JAIL BECAUSE THERE IS NO ROOM THERE EITHER.

15         THE PEOPLE THAT ARE GOING TO BE VICTIMS ARE SPOUSES

16  AND CHILDREN AND NEIGHBORS OF THESE FOLKS, BURGLARS, CHILD

17  ABUSERS, SPOUSAL ABUSERS, DRUNK DRIVERS.  THERE WAS EVIDENCE

18  BEFORE YOU THAT ONE OF THE PEOPLE RELEASED EARLY FROM

19  LOS ANGELES COUNTY WAS A DRUNK DRIVER WHO KILLED SOMEBODY.

20         NOW, MAYBE ANOTHER TIME, FOUR MONTHS LATER, HE IS

21  DRIVING DRUNK AND NOBODY IS THERE WHEN HE DRIVES THROUGH THE

22  INTERSECTION.  YOU CAN'T SAY.  YOU JUST CAN'T SAY THAT THERE IS

23  NO IMPACT.  THERE IS AN IMPACT.

24         **JUDGE HENDERSON:**  BUT ISN'T THAT THE NATURE OF THIS

25  PROBLEM?  I WAS THINKING THAT WHEN MISS TILLMAN WAS ARGUING

```
 1   THAT SINCE 1994, 2009 WE HAVE MADE PROGRESS.  AND JUDGE KARLTON

 2   SAID, YES, BUT WE STILL ARE A THOUSAND BEDS SHORT, WHATEVER IT

 3   WAS.  I TEND TO PERSONALIZE.  THERE ARE A THOUSAND PEOPLE WHO

 4   DON'T HAVE IT, WHO ARE VICTIMS.  AND THAT'S THE NATURE OF THIS.

 5           MS. BARLOW:  BUT MY POINT IS THE IMPACT -- FIRST OF

 6   ALL, THERE ARE IMPACTS TO THE PRISONERS, TOO, IF YOU ORDER

 7   EARLY RELEASE, ESPECIALLY THE MENTALLY ILL THAT I WILL TALK

 8   ABOUT.

 9           BUT, FIRST OF ALL, YOU HEARD EVIDENCE THAT NOT ONLY

10   ARE YOU GOING TO HAVE AN ACCELERATED CRIME AND AN INCREASE IN

11   CRIME, WHAT YOU ARE ALSO GOING TO HAVE IS THE CUMULATIVE IMPACT

12   OF THESE PEOPLE GETTING OUT EARLY OVER AND OVER AGAIN.

13           THE TOTAL AMOUNT OF TIME THAT THEY HAVE TO COMMIT

14   CRIMES IN THEIR LIFETIME IS GOING TO BE MUCH GREATER THAN IF

15   YOU ORDERED A CAP.

16           JUDGE REINHARDT:  IT SOUNDS VERY DRAMATIC, BUT THE

17   PROBLEM IS, YOU KNOW, IF YOU WEREN'T TALKING ABOUT GETTING OUT

18   A FEW MONTHS EARLIER, YOU HAVE THE SAME ARGUMENTS WITH

19   PAROLEES.

20           I REMEMBER A MAN WHO GOT ELECTED PRESIDENT BY TALKING

21   ABOUT A PAROLEE WHO WAS LET OUT ON A WEEKEND PASS.  THE PRISON

22   SYSTEM IS THE CRIMINAL SYSTEM.

23           WE DON'T KNOW THAT A TWO-MONTH SENTENCE OR A

24   FOUR-MONTH SENTENCE IS THE IDEAL SENTENCE.  SO SOMEBODY WHO

25   GETS A TWO-YEAR SENTENCE INSTEAD GETS AN 18-MONTH SENTENCE, YOU
```

 1  KNOW, IF OUR LAWS WERE A LITTLE LESS HARSH, THEY WOULD HAVE

 2  GOTTEN OUT SIX MONTHS EARLIER ANYWAY.

 3          SOME OF THEM PROBABLY SHOULD BE IN JAIL FOR LIFE EVEN

 4  THOUGH THEY DIDN'T COMMIT THAT TYPE OF CRIME.  SOME OF THEM

 5  PROBABLY SHOULD BE IN PRISON FOR A TENTH OF THE TIME THAT THEY

 6  ARE THERE.

 7          HOW DO YOU CONTROL THAT AND WHY IS IT THAT IT'S MAGIC

 8  THAT WE'VE GONE TO A PARTICULAR TYPE OF SENTENCING SYSTEM OR

 9  PAROLE SYSTEM?  YOU CHANGE THE PAROLE SYSTEM EITHER BY AN

10  INITIATIVE OR BY A LAW AND IT LET'S PEOPLE OUT EARLY OR LONGER.

11          YOU KNOW, IT'S NOT ONLY THE PAROLE SYSTEM THAT WE

12  HAPPEN TO HAVE AT THE MOMENT THAT SOMEBODY SAYS -- OR SOMEONE

13  ELSE SAYS IT SHOULD BE DIFFERENT, OR YOU MODIFY IT BECAUSE THE

14  PRISONS CAN'T HOLD THEM.

15          AND IT'S UNFORTUNATE THAT ANYBODY IS A VICTIM, BUT

16  YOU CAN'T PREVENT CRIME BY SAYING, WELL, LET'S SENTENCE THEM TO

17  TWO YEARS AND IF HE GETS OUT IN 18 MONTHS, WELL, THAT'S A

18  TERRIBLE THING.  IT'S A VERY HARD THING TO FIX.

19          **MS. BARLOW:**  WELL, WITH RESPECT, YOUR HONOR, I THINK

20  THERE WAS TESTIMONY IN THIS CASE THAT THE INCAPACITATION EFFECT

21  OF IMPRISONMENT DOES HAVE A CRIME REDUCING IMPACT.

22          THERE WAS ALSO TESTIMONY THAT AS THEY GET OLDER, THEY

23  START TO SLOW DOWN, RIGHT?  SO YOU KEEP LETTING THEM OUT WHEN

24  THEY ARE YOUNG, WELL, THEY ARE GOING TO KEEP ON COMMITTING A

25  LOT OF CRIMES.

1          YOU KEEP THEM IN A LITTLE LONGER, MAYBE THEY DEVELOP

2    SOME MATURITY.  MAYBE THEY HAVE AN OPPORTUNITY TO GET SOME

3    PROGRAMMING.  IS THERE ENOUGH?  ABSOLUTELY NOT.

4          **JUDGE KARLTON:**  FROM THIS PARTICULAR SYSTEM, IT IS

5    UNDISPUTED, BOTH THE PLAINTIFFS AND DEFENDANTS AND YOUR CLIENTS

6    EVEN SAID PRISONS ARE CRIMINOGENIC.  THEY TAKE PEOPLE WHO ARE

7    NOT VIOLENT CRIMINALS.  BY THE TIME THEY LEAVE PRISON THEY ARE

8    VIOLENT CRIMINALS.

9          NOW, SOMEHOW OR OTHER WHEN WE TALK ABOUT PUBLIC

10   SAFETY, AND IT'S A HORRIFICALLY COMPLEX PROBLEM.  I DON'T MEAN

11   TO SUGGEST OTHERWISE.  IT'S IMPORTANT TO UNDERSTAND WHAT WE ARE

12   DOING NOW IS ANOTHER DISASTER.  NOT JUST IN TERMS OF FAILURE TO

13   PROVIDE ADEQUATE, CONSTITUTIONALLY ADEQUATE PHYSICAL AND MENTAL

14   HEALTH, BUT WE ARE, IN FACT, CREATING CRIME.

15         AND AT LEAST, ARGUABLY, IF WE HAD FEWER PEOPLE IN

16   PRISON SO THAT WE COULD PROVIDE PROGRAMMING, AT LEAST IN

17   THEORY, SOME OF THOSE FOLKS MIGHT STRAIGHTEN OUT OR FIND THAT

18   THERE IS A BETTER WAY TO DO THINGS OR WHATEVER.

19         GOD KNOWS WHY PEOPLE CREATE CRIMES, PERFORM CRIMES

20   ANYHOW.  BUT, I MEAN, IT ISN'T AS IF WE'VE GOT SOME GOOD SYSTEM

21   NOW THAT WILL PREVENT CRIME AND THAT A COURT ORDER WOULD

22   SOMEHOW OR OTHER DISRUPT THAT SYSTEM.  WE HAVE A SYSTEM THAT'S

23   FAILED.

24         **MS. BARLOW:**  I CAN'T DISAGREE WITH THAT, YOUR HONOR,

25   AND I THINK THAT WE DO HAVE METHODS THAT WE CAN USE.  AND MY

1   CLIENTS, YES, THEY -- I WOULD BE WRONG IF I STOOD UP HERE AND

2   TOLD YOU THAT THEY DIDN'T SAY PRISON IS CRIMINOGENIC.  IT IS.

3          THE PROBLEM IS THAT BEFORE WE SEND PEOPLE TO PRISON,

4   THEY'VE ALREADY COMMITTED SO MANY CRIMES AND FAILED SO MANY

5   TIMES THAT -- YOU KNOW, I'M NOT SUGGESTING WE THROW AWAY THE

6   KEY.

7          WHAT I AM SUGGESTING IS THAT THERE ARE WAYS WE CAN

8   REDUCE THE PEOPLE GOING TO PRISON AND WE CAN REDUCE THE AMOUNT

9   OF CRIME, BUT WE HAVE TO DO IT AT THE FRONT END.

10   **JUDGE KARLTON:**  LET'S TALK ABOUT THAT.  BECAUSE I

11   THINK AN AWFUL LOT OF WHAT YOU WANT TO SAY IS NOT HELPFUL, BUT

12   THIS IS POTENTIALLY VERY HELPFUL.

13          AT LEAST SOME OF YOUR CLIENTS SUGGESTED THAT IF WE

14   JUST GAVE THEM ENOUGH MONEY, THEY COULD DIVERT SOME PERCENTAGE

15   OF PEOPLE FROM PRISON.  AND I'M SORRY, I DON'T HAVE THOSE

16   FIGURES IN FRONT OF ME.  I DON'T KNOW WHAT THEY SAID.  BUT, YOU

17   KNOW, WE CAN FIND IT IN THE RECORD.

18          BUT TO DO THAT, SOMEBODY HAS GOT TO PAY FOR IT.  I

19   MEAN, ONE OF THE THINGS THAT GOES ON IS WE KEEP INCREASING

20   PRISON SENTENCES AND ALL THE REST BY INITIATIVE AND NOBODY ASKS

21   CAN WE PAY FOR IT.

22          AND THE ANSWER IS IF, GOD FORBID, YOU EVER TOLD

23   PEOPLE, YOU KNOW, IT COST 10,000 OR WHATEVER IT IS PER

24   PRISONER, THEY WOULD SAY, LET THEM ALL OUT.  ANYWAY --

25   **JUDGE REINHARDT:**  NO.  YOU TELL THEM THEY WERE GOING

1  TO HAVE TO PAY FOR THE PRISONER, THEY WOULDN'T VOTE FOR IT.

2          **JUDGE KARLTON:**  MY QUESTION TO YOU IS -- YOUR CLIENTS

3  HAVE SUGGESTED THESE DIVERSIONS, AND I GOT VERY EXCITED AT ONE

4  POINT THEN REALIZED IT'S PROBABLY NOT WITHIN OUR POWER.

5          CAN WE, IN YOUR VIEW, MAINTAIN THE SYSTEM THAT WE

6  HAVE NOW?  DO ESSENTIALLY WHAT ONE OF YOUR CLIENTS SUGGESTED,

7  MAINTAIN THE SYSTEM THAT WE HAVE NOW, EXCEPT THAT SOME

8  PERCENTAGE OF PEOPLE WOULD BE DIVERTED BY THESE OTHER PROGRAMS

9  AND ORDER THE STATE TO PAY FOR IT?  CAN WE DO THAT?

10         **MS. BARLOW:**  I BELIEVE YOU CAN, YOUR HONOR.  A

11 PRISONER RELEASE ORDER UNDER THE PLRA IS ANY ORDER THAT HAS THE

12 PURPOSE OR EFFECT OF REDUCING THE PRISON POPULATION.

13         **JUDGE KARLTON:**  THAT'S CERTAINLY A PRISONER RELEASE

14 ORDER.  THE QUESTION IS WHETHER THE FEDERAL COURTS HAVE THE

15 POWER TO ORDER THE STATE TO PAY FOR A PROGRAM WHICH DOESN'T

16 EXIST AT THE MOMENT; TO SAY, PAY FOR THAT.

17         **MS. BARLOW:**  ACTUALLY, THESE PROGRAMS DO EXIST, YOUR

18 HONOR.

19         **JUDGE KARLTON:**  SOME OF THEM DO, SOME OF THEM --

20         **MS. BARLOW:**  THE COMMUNITY CORRECTIONS ACT IS ALREADY

21 IN EXISTENCE, SB-618, THE MENTAL HEALTH SERVICES ACT.

22         **JUDGE KARLTON:**  THAT'S A GOOD POINT.  THERE IS A

23 STATE PROGRAM THAT THE STATE HAS ELECTED NOT TO FUND.  CAN WE

24 ORDER THE STATE -- IS IT YOUR VIEW THAT WE HAVE THE POWER TO

25 ORDER THE STATE TO FUND THE PROGRAM?

1            **MS. BARLOW:**  THAT WOULD BE A PRISONER RELEASE ORDER

2    AND I BELIEVE THE COURT WOULD HAVE THE POWER TO DO THAT.

3            IF THE COURT DOESN'T HAVE THE POWER TO DO THAT, IF

4    THAT'S WHAT YOU CONCLUDE --

5            **JUDGE KARLTON:**  I DON'T KNOW.

6            **MS. BARLOW:**  -- THEN THE PLRA ONLY GIVES YOU THE

7    POWER TO ISSUE, QUOTE, A REAL RELEASE AND/OR A CAP.  AND ALL

8    THESE OTHER PROGRAMS THAT WERE OFFERED TO YOU IN TESTIMONY ARE,

9    IN FACT, VIABLE ALTERNATIVES.

10           **JUDGE REINHARDT:**  NOT VIABLE ALTERNATIVES FOR US TO

11   ORDER.

12           **MS. BARLOW:**  NO, BUT THEY ARE AVAILABLE ALTERNATIVES,

13   YOUR HONOR.  IF YOU CAN'T ORDER THEM --

14           **JUDGE REINHARDT:**  YOU KNOW, THE ACT SAYS WE CAN'T

15   ORDER TAX INCREASES.

16           **MS. BARLOW:**  NO.

17           **JUDGE REINHARDT:**  BUT THAT DOESN'T MEAN WE CAN'T

18   ORDER THE EXPENDITURE OF FUNDS.

19           **MS. BARLOW:**  IN FACT, BOTH OF THESE COURTS HAVE

20   ORDERED MANY EXPENDITURES OF FUNDS IN CONNECTION WITH THESE

21   CASES.

22           **JUDGE KARLTON:**  IN A VERY DIFFERENT CONTEXT.

23           MR. MELLO, I'M SORRY, IT'S NOT FAIR TO YOU, BUT I'M

24   COMING BACK.  I THINK YOU SAID -- NO, I DON'T WANT TO TELL YOU

25   WHAT YOU SAID.

1        TAKING THE PARTICULAR PROGRAM THAT IS BEING REFERRED

2   TO NOW, THE COMMUNITY WHAT?  WHAT IS IT CALLED?

3        **MS. BARLOW:**  IT'S THE COMMUNITY CORRECTIONS ACT, YOUR

4   HONOR.

5        **JUDGE KARLTON:**  CAN WE ORDER THE STATE TO FUND THOSE

6   PROGRAMS?  DO WE HAVE THE POWER?  PLEASE.

7        **MR. MELLO:**  FIRST OF ALL, I BELIEVE THAT WE DID PUT

8   STATEMENTS REGARDING THIS VERY LEGAL ISSUE IN OUR PROPOSED

9   FINDINGS OF FACT AND CONCLUSIONS OF LAW.

10       I BELIEVE WE CITED TO THE *RHEM* CASE, WHICH IS IN OUR

11  PAPERS, WHICH SAID THAT THIS COURT CANNOT ORDER THE

12  APPROPRIATION OF FUNDS.

13       **JUDGE KARLTON:**  THANK YOU.

14       **MR. MELLO:**  HOWEVER, I MEAN, IF THE COURT WOULD LIKE

15  MORE BRIEFING ON THE ISSUE AT SOME POINT, BUT I WOULD BE GLAD

16  TO SIT BACK DOWN.

17       **JUDGE REINHARDT:**  WHEN YOU SAY APPROPRIATION OF

18  FUNDS, APPROPRIATION --

19       **MR. MELLO:**  FRANKLY, I BELIEVE THE CASE WE CITED SAID

20  AND THE ALLOCATION OF FUNDS.  I BELIEVE.  AND IT IS IN OUR

21  PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW.  IT'S ON PAGE

22  51 OF OUR PROPOSALS.

23       **JUDGE REINHARDT:**  WHAT'S THE CITATION?

24       **MR. MELLO:**  507 F.2D 333 PINPOINT 341, IT'S A SECOND

25  CIRCUIT CASE.  AND IT'S PRE-PLRA, JUST SO YOU KNOW, SO IT

1    COMPLICATES IT A LITTLE BIT.  BUT I BELIEVE THAT IT DOES SPEAK

2    TO THIS ISSUE.

3            JUDGE KARLTON:  THANK YOU VERY MUCH.

4        MS. BARLOW:  IN ANY EVENT, YOUR HONOR, I THINK THE

5    POINT THAT WE WERE TRYING TO MAKE WAS THAT THE STATUTE SAYS

6    THAT YOU HAVE THE RIGHT TO ISSUE AN ORDER, ANY ORDER THAT HAS

7    THE PURPOSE OR EFFECT OF REDUCING THE PRISON POPULATION.

8            ALL OF THESE ALTERNATIVES THAT WERE TESTIFIED ABOUT,

9    SB-618, SB-718, THE COMMUNITY CORRECTIONS ACT, THE MENTAL

10   HEALTH SERVICES ACT, THESE WERE ALL AVAILABLE AND VIABLE

11   ALTERNATIVES TO ACTUALLY ORDERING RELEASE OF PRISONERS.

12           JUDGE REINHARDT:  THEY ARE NOT VIABLE UNLESS SOMEBODY

13   CAN FUND THEM.

14           MS. BARLOW:  WITH RESPECT, YOUR HONOR, THEY ARE

15   EITHER GOING TO PAY FOR IT AT THE FRONT END OR THEY'RE GOING TO

16   PAY FOR IT WHEN THEY GET REARRESTED.

17           JUDGE KARLTON:  EVERYBODY AGREES WITH THAT, BUT THE

18   STATE TAKES THE VIEW WE ARE GOING TO DO IT AT THE END.

19           JUDGE REINHARDT:  AS I SAID EARLIER, WE MIGHT WANT

20   FURTHER BRIEFING ON THIS.  WHEN THE STATUTE SAYS YOU CAN'T

21   ORDER TAXES, IT COULD HAVE SAID YOU CAN'T ORDER THE EXPENDITURE

22   OF FUNDS.  IT DIDN'T SAY THAT.  IT SAID YOU CAN'T ORDER TAXES.

23           MS. BARLOW:  RIGHT.

24           JUDGE REINHARDT:  SO I THINK THAT THIS IS A LEGAL

25   ISSUE.

1      **JUDGE KARLTON:**  I THINK THERE IS A FEDERALISM PROBLEM

2  OVER AND ABOVE WHAT THE STATUTE SAYS.  THE STATUTE IS WRITTEN

3  AGAINST THE BACKGROUND AND POWER OF THE COURT.

4      **JUDGE REINHARDT:**  I BELIEVE THE FEDERAL COURT ORDERED

5  IT DURING THE SCHOOL INTEGRATION PERIOD.  ALL I'M SAYING IS THE

6  ISSUE MAY BE WE WILL ONCE AGAIN BE DEFEATED BY CRIMINALISTS,

7  BUT I'M NOT SO SURE OF THAT IN THESE EVENTS.  WE MAY WANT TO

8  HEAR FROM ALL OF YOU ON THAT.

9      IF YOU ALL SAY WE CAN'T ORDER THE STATE TO SPEND ANY

10  MONEY, THEN THAT LIMITS OUR ABILITY TO GIVE THAT KIND OF RELIEF

11  YOU WOULD LIKE AND THE COUNTIES WOULD LIKE AND LAW ENFORCEMENT

12  PEOPLE, THE DISTRICT ATTORNEYS.

13      **JUDGE KARLTON:**  ALTHOUGH, AGAIN, IT IS POSSIBLE FOR

14  US TO SAY, STATE, THIS IS AS MANY PEOPLE AS YOU CAN PUT IN

15  PRISON.  YOU FIGURE IT OUT AND YOU CAN SPEND THE MONEY IF YOU

16  CHOOSE.

17      IN OTHER WORDS, GIVING THE STATE THE OPPORTUNITY, NOT

18  ORDERING THEM TO DO ANYTHING OTHER THAN TO RELEASE PRISONERS

19  BECAUSE MAYBE THAT'S ALL WE CAN DO.  I DON'T KNOW.  I REALLY

20  DON'T KNOW.

21      BUT SAYING TO THE STATE, THAT PROBABLY IS NOT THE

22  BEST WAY OF DOING THINGS.  AND IT'S UP TO YOU NOW TO PROPOSE A

23  PLAN, MAYBE FUNDING ALL OF THE PROGRAMS THAT YOU ARE TALKING

24  ABOUT OR RELEASING SOME PORTION OF PEOPLE OFF OF PAROLE OR

25  WHATEVER.  BUT THAT MAY BE A WAY OF AVOIDING THIS PROBLEM IF IT

1  IS, INDEED, THE PROBLEM THAT MR. MELLO SUGGESTED, WHICH YOU MAY

2  BE RIGHT.  I WOULD NOT BE SURPRISED IF HE IS RIGHT.

3          **MS. BARLOW:**  WELL, AND, AGAIN, YOUR HONOR, WE DIDN'T

4  BRIEF THAT ISSUE SPECIFICALLY, BUT I THINK THE STATUTE SAYS

5  WHAT IT MEANT.

6          IF THE ONLY POWER THIS COURT HAD WAS TO ORDER A CAP

7  OR A RELEASE, I THINK THE STATUTE WOULD HAVE SAID THAT.  THE

8  DEFINITION OF A PRISONER RELEASE ORDER WOULD BE DIFFERENT.

9          **JUDGE KARLTON:**  MAYBE IT WILL BE THAT CONGRESS JUST

10  DIDN'T THINK ABOUT THE FACT THAT, YOU KNOW, IT'S LIKE THE

11  VIOLENCE AGAINST WOMEN ACT, THEY DIDN'T NOTICE THAT.  THEY

12  DIDN'T HAVE THE POWER TO PASS THE STATUTE.

13          **MS. BARLOW:**  THAT DOES HAPPEN, YOUR HONOR.  I'M AWARE

14  OF THAT.

15          **JUDGE KARLTON:**  EVERY ONCE IN A WHILE IT HAPPENS.

16          **JUDGE REINHARDT:**  MORE AND MORE THESE DAYS.

17          **MS. BARLOW:**  YES.

18          THE CUMULATIVE IMPACT IS WHAT I WAS TALKING ABOUT,

19  AND I WANT TO MAKE SURE THAT WE DON'T FORGET THAT THERE WAS

20  TESTIMONY HERE THAT AT A TIME WHEN WE ARE REDUCING THE NUMBER

21  OF POLICE OFFICERS ALL OVER THE STATE, THAT WHEN YOU ISSUE A

22  RELEASE ORDER -- FIRST OF ALL, THEY ARE ONLY LIKELY TO GET

23  CAUGHT ONE OUT OF TEN TIMES ALREADY, TO START WITH, AT STATUS

24  QUO.

25          BUT AS OUR NUMBER OF POLICE OFFICERS GO DOWN AND THE

1  NUMBER OF PAROLEES AND PEOPLE WHO OUGHT TO BE IN PRISON AREN'T

2  IN PRISON, ARE STILL IN THE COMMUNITIES, THE LIKELIHOOD OF THEM

3  GETTING CAUGHT IS GOING TO GO DOWN AS WELL FROM WHAT IT IS NOW.

4  SO WE ARE GOING TO HAVE MORE CRIME.  THERE ARE GOING TO BE MORE

5  VICTIMS.

6         MY PROBATION CHIEFS I THINK SPOKE VERY COMPELLINGLY

7  ABOUT THE EFFORTS THEY MAKE TO TRY AND STEER THESE PEOPLE INTO

8  BETTER LIVES AND GIVE THEM OPPORTUNITIES TO CHANGE THEIR LIVES

9  AND NOT GO TO PRISON.

10         **JUDGE REINHARDT:**  YOU KNOW, AM I WRONG WHEN I KEEP

11  READING THE PAPERS ABOUT ALL THESE POLICE CHIEFS WHO ARE SAYING

12  HOW CRIME RATE IS GOING DOWN THESE DAYS, AND THESE ARE IN

13  PLACES WHERE YOU HAVE CAPS ON THE JAILS?  THEY CAN'T KEEP THEM.

14  THEY ARE LETTING THEM GO OUT AND THE CRIME RATE GOES DOWN.  IS

15  THAT RIGHT?

16         **MS. BARLOW:**  THERE'S NO CORRELATION THERE.  THE CRIME

17  RATE IS GOING DOWN, BUT THAT DOESN'T MEAN THAT THE PEOPLE THAT

18  ARE THE MOST LIKELY TO OFFEND, THAT THEIR CRIME RATE IS GOING

19  DOWN.  THAT'S NOT HAPPENING.

20         **JUDGE REINHARDT:**  THEN IT SHOULD GO UP, IF YOU HAVE

21  MORE AND MORE PEOPLE WHO SHOULD BE IN JAIL OUT ON THE STREETS

22  AND YET THE CRIME RATE IS GOING DOWN.

23         **MS. BARLOW:**  MORE PEOPLE AREN'T COMMITTING CRIMES,

24  BUT THE CRIMINALS ARE COMMITTING MORE CRIMES.  THAT'S WHY THE

25  CRIME RATE IS GOING DOWN AND YET WE STILL HAVE THESE PEOPLE WHO

1  ARE REOFFENDING OVER AND OVER AND OVER AGAIN.

2          **JUDGE REINHARDT:**  THAT'S AN INTERESTING EXPLANATION.

3          **MS. BARLOW:**  IN ANY EVENT, AS MY CLIENT TOLD YOU, IT

4  TAKES A LOT OF HARD WORK TO GET INTO PRISON HERE.  YOU REALLY

5  HAVE TO TRY HARD.  AND INTERESTINGLY ENOUGH, ALTHOUGH PRISON

6  MAY BE CRIMINOGENIC, WE ALSO KNOW THAT THE PEOPLE WHO COMMITTED

7  PERHAPS SOME OF THE MOST VIOLENT CRIMES TO GET INTO PRISON IN

8  THE FIRST PLACE MIGHT BE THE LOWEST RISK TO LET OUT.

9          IT'S A CONUNDRUM AND I'M GLAD I'M NOT SITTING IN THE

10 BLACK ROBE OVER THERE TO TRY TO FIGURE IT OUT.

11         BUT ONE THING WE KNOW FOR SURE, THERE ARE NOT 52,000

12 LOW RISK PRISONERS IN THE STATE OF CALIFORNIA.  THERE JUST

13 AREN'T.  THERE ARE SECOND STRIKERS AND LIFERS THAT YOU HAVE TO

14 GET TO.

15         SO I UNDERSTAND THE COURT'S POSITION THAT THE NUMBER

16 COULD BE LOWER OR THE TIME COULD BE SPREAD OUT, BUT THE REALITY

17 IS THAT THERE AREN'T THAT MANY LOW RISK PEOPLE IN PRISON.

18 THERE AREN'T 30,000.  THERE AREN'T 20,000, BECAUSE THEY HAVE TO

19 WORK SO HARD TO GET THERE IN THE FIRST PLACE.

20         **JUDGE REINHARDT:**  DO YOU KNOW UNDER THE GOVERNOR'S

21 PROPOSAL HOW THEY -- TO WHAT EXTENT WOULD IT REDUCE THE PRISON

22 POPULATION?

23         **MS. BARLOW:**  ARE YOU SPEAKING, YOUR HONOR --

24         **JUDGE REINHARDT:**  PAROLE.

25         **MS. BARLOW:**  OF THE PAROLE?  WELL, FIRST OF ALL, AS

1    FAR AS THE PAROLE, THE IDEA OF RELEASING PEOPLE WITHOUT PAROLE,

2    AS A PRACTICAL MATTER, WE ARE ALREADY DOING THAT BECAUSE THOSE

3    PEOPLE THAT ARE THE LOWEST RISK ARE THE ONES THAT GO INTO THE

4    BANKS.

5              YOU'RE NOT GOING TO SAVE ANY MONEY.  YOU'RE NOT GOING

6    TO SAVE ANYTHING AT ALL BY TAKING THEM OFF PAROLE.  YOU'RE ONLY

7    GOING TO DEPRIVE MY CLIENTS OF THE LAW ENFORCEMENT TOOL THAT

8    THEY MAY NEED IF THAT PERSON IS INVOLVED IN A CRIME.

9              BECAUSE THEY ARE NOT GOING TO ACTIVELY SUPERVISED.

10   THEY'RE NOT GETTING ACTIVELY TREATED.  WE ARE NOT SPENDING A

11   DIME ON THEM.  THEY GET SHOVED INTO A FILE CABINET.

12             THEY ARE ONLY SUPERVISING THAT REALLY HIGH RISK; THE

13   CHILD MOLESTERS, THE VIOLENT CRIMINAL, THE MULTIPLE, MULTIPLE

14   OFFENDERS.  THEY ARE NOT SUPERVISING THE -- YOU LET THEM OUT,

15   THERE IS NO SAVINGS THERE.

16        **JUDGE REINHARDT:**  YOU ARE SAYING THAT PART OF THE

17   PROPOSAL WILL HAVE NO EFFECT AT ALL.

18        **MS. BARLOW:**  I DON'T BELIEVE IT HAS AN EFFECT EXCEPT

19   THAT IT WILL REMOVE A TOOL FROM LAW ENFORCEMENT.  IT'S NOT

20   GOING TO HAVE A FINANCIAL BENEFIT TO THE STATE.  IT'S ONLY

21   GOING TO HAVE A DETRIMENT TO LAW ENFORCEMENT BECAUSE YOU'RE

22   GOING TO DEPRIVE THEM OF A TOOL.

23        **JUDGE REINHARDT:**  WHAT ABOUT THE REST OF THE

24   PROPOSAL?

25        **MS. BARLOW:**  WELL, I'M NOT SURE WHICH PART OF THE

1  PROPOSAL...

2         JUDGE REINHARDT:  WELL, ONE WAY IS TO INCREASE THE

3  AMOUNT FOR THEFT.

4         MS. BARLOW:  YOUR HONOR, I DON'T THINK MY CLIENTS

5  NECESSARILY HAVE A VIEWPOINT ON THAT.  THE FACT OF THE MATTER

6  IS, IF YOU ARE ON PAROLE AND COMMIT ONE OF THOSE CRIMES, IT

7  DOESN'T MATTER WHAT THE STATUTORY AMOUNT IS, IT'S GOING TO BE A

8  FELONY.

9         SO I DON'T KNOW THAT THAT'S GOING TO HAVE A HUGE

10 IMPACT UNLESS YOU DECIDE THAT THERE AREN'T GOING TO BE PAROLEES

11 BEING RETURNED TO PRISON FOR PAROLE VIOLATIONS.

12        JUDGE HENDERSON:  ANY CRIME COMMITTED ON PAROLE IS A

13 FELONY?

14        MS. BARLOW:  IF YOU COMMIT A CRIME WHILE YOU ARE ON

15 PAROLE, IT'S A FELONY TO VIOLATE THE TERMS OF YOUR PAROLE.

16        JUDGE REINHARDT:  ONLY BY CRIMINAL CONDUCT?

17        MS. BARLOW:  I'M SORRY?

18        JUDGE REINHARDT:  ONLY BY CRIMINAL CONDUCT?  YOU SAID

19 TO VIOLATE THE TERMS OF YOUR PAROLE.

20        MS. BARLOW:  IF YOU WERE ARRESTED FOR A VIOLATION,

21 IT'S A FELONY ARREST.  THEY MAY NEVER CHARGE IT AS A FELONY.

22 THEY MAY NOT VIOLATE THAT PERSON, BUT IT IS A FELONY ARREST.

23        AND I THINK THE EVIDENCE WAS THAT REALLY THE NUMBER

24 OF TECHNICAL VIOLATORS OUT OF THAT 70,000 THAT THEY WERE

25 TALKING ABOUT, IT'S ONLY 14,000 WHICH WERE REALLY TECHNICAL.

1  SO THAT'S NOT A VERY BIG NUMBER.

2        MOST OF THOSE PEOPLE THAT ARE GOING BACK TO PRISON

3  FOR VIOLATIONS OF PAROLE ARE GOING BACK BECAUSE OF THE REAL NEW

4  CRIMES.

5        **JUDGE REINHARDT:**  14,000 IS NOT BAD TO START WITH.

6        **MS. BARLOW:**  WELL, OUT OF 70,000, I'M JUST SAYING.

7        **JUDGE REINHARDT:**  WELL, IF YOU TAKE 14,000, WE ARE

8  PART OF THE WAY THERE.

9        **JUDGE KARLTON:**  AND THAT'S CERTAINLY UP TO THE COURT.

10  BUT THE POINT IS, YOU CAN SPREAD IT OUT, YOU CAN REDUCE THE

11  NUMBER, BUT YOU ARE NEVER GOING TO GET RID OF THE IMPACT.

12        PERHAPS ONE OF THE POINTS THAT I REALLY WANT TO

13  EMPHASIZE HERE IS ABOUT THE MENTALLY ILL.  YOU HEARD TESTIMONY

14  FROM ONE WITNESS THAT IF YOU RELEASE MENTALLY ILL PRISONERS AND

15  THEY END UP HOMELESS, THEY ARE GOING TO BE BETTER OFF HOMELESS

16  THAN THEY WOULD BE IN PRISON.  AND THAT'S ABSURD.  THEY AREN'T

17  GOING TO GET THE TREATMENT THAT THEY NEED.

18        **JUDGE KARLTON:**  THERE IS GOOD REASON TO BELIEVE THEY

19  ARE NOT GOING TO GET TREATMENT IN PRISON EITHER.

20        **MS. BARLOW:**  THEY'RE AT LEAST GETTING SOME TREATMENT

21  NOW, YOUR HONOR.  IT MAY NOT BE AS MUCH AS --

22        **JUDGE KARLTON:**  NO, THEY AREN'T.  NOT NECESSARILY.

23  THERE ARE PEOPLE -- NEVER MIND.  GO AHEAD.

24        **MS. BARLOW:**  THE VAST MAJORITY OF THEM ARE GETTING

25  SOME KIND OF TREATMENT.  AND ON THE STREET, BASED UPON THEIR

1    KINDS OF PATHOLOGY THAT MR. CONKLIN DESCRIBED, THEY'RE NOT

2    GOING TO VOLUNTARILY GO OUT AND GET THE TREATMENT THAT THEY

3    NEED.  THEY ARE NOT GOING TO STAY ON THEIR MEDICATION.  THEY'RE

4    GOING TO END UP HOMELESS AND THEY ARE GOING TO BE VICTIMIZED

5    THEMSELF OR THEY'RE GOING TO REVICTIMIZE SOMEONE ELSE AND THEN

6    END UP RIGHT BACK IN PRISON.  SO THIS IS NOT A SOLUTION FOR THE

7    MENTALLY ILL.

8            AND IF YOU TARGETED THE NON-MENTALLY ILL IN ORDER TO

9    PROVIDE BETTER SERVICES TO THE MENTALLY ILL, THEN YOU END UP ON

10    THE OTHER SIDE OF THE PROBLEM BECAUSE YOU ARE NOT NARROWLY

11    TARGETING YOUR REMEDY TO THE PEOPLE WHO ARE SUFFERING THE

12    CONSTITUTIONAL DEPRIVATION.

13            IF YOU PUSH PEOPLE OUT OF PRISON AND THEY REOFFEND

14    AND WE PUT THEM IN THE COUNTY JAIL, YOU ARE GOING TO HAVE TO

15    PUSH SOMEBODY OUT OF THESE COUNTY JAILS.  AND WE ARE ALREADY --

16    WE'VE ALREADY GONE FROM AN 80 PERCENT FELONY -- OR 80 PERCENT

17    MISDEMEANOR AND 20 PERCENT FELONS IN COUNTY JAILS TO THE FLIP

18    SIDE OF THAT.  THERE IS 80 PERCENT FELONS NOW IN OUR COUNTY

19    JAILS AND ONLY 20 PERCENT MISDEMEANOR.  AND THOSE ARE SERIOUS

20    MISDEMEANOR.  BECAUSE THEY ARE NOT KEEPING THOSE PEOPLE.

21    THEY'RE ALREADY LETTING OUT PEOPLE THAT ARE AT THE VERY LOWEST

22    RISK.  THEY ARE CITING AND RELEASING.

23            THEY ARE NOT EVEN KEEP PEOPLE THAT ARE DUI.  THEY ARE

24    LETTING PEOPLE OUT BECAUSE THEY DON'T HAVE ENOUGH ROOM.  THEY

25    ARE LETTING PEOPLE OUT EARLY FROM SENTENCES.  THEY ARE LETTING

1   PEOPLE OUT EARLY ON PRETRIAL.

2           AND IF YOU PUSH PEOPLE DOWN IN THE SYSTEM, WHICH IS

3   WHAT HAPPENS WITH THE PRISONER RELEASE ORDER, WE DON'T HAVE

4   ANYBODY LEFT AT THE COUNTY LEVEL THAT WE CAN CONSIDER LOW RISK

5   TO LET OUT.

6           SOMEBODY -- IF IT'S NOT THE EARLY RELEASE PRISONER,

7   THE PERSON THAT GETS PUSHED OUT OF THE COUNTY FACILITY BECAUSE

8   THERE IS NO ROOM FOR THEM THERE, THOSE PEOPLE ARE GOING TO

9   REOFFEND, TOO.

10          AND WE KNOW THAT THE PROGRAM AT THE COUNTY LEVEL,

11  WE'VE HAD GREAT SUCCESS AND HAD EVIDENCE ABOUT THE SUCCESS IN

12  ORANGE COUNTY AND THE SUCCESS IN L.A. COUNTY FROM PROGRAMMING.

13  WE ALSO KNOW THAT YOU GET VERY BAD RESULTS FROM EARLY RELEASE

14  FROM THOSE FACILITIES.

15          YOU'VE GOT TESTIMONY IN FRONT OF YOU THAT 3240 PEOPLE

16  FROM ORANGE COUNTY WHO WERE EARLY RELEASED IN A THREE-YEAR

17  PERIOD WERE REARRESTED FOR CRIMES COMMITTED DURING THE EARLY

18  RELEASE PERIOD, AND MANY OF THEM WERE VERY SERIOUS CRIMES.

19          TEN PERCENT OF THE EARLY RELEASES FROM LOS ANGELES

20  COUNTY WEREN'T JUST REARRESTED, BUT THEY WERE REARRESTED FOR

21  CRIMES COMMITTED DURING THEIR EARLY RELEASE PERIOD.  AND THE

22  MORE YOU RELEASED THEM, THE HIGHER THE RATE WENT.

23          SO SOMEBODY IS GOING TO END UP BACK IN THE COMMUNITY

24  THAT DOESN'T BELONG THERE, WHETHER IT'S THE PERSON THAT COMES

25  FROM THE PRISON OR THE PERSON THAT GETS PUSHED OUT OF THE

 1  COUNTY JAIL.

 2          AND MY CLIENTS ARE THE ONES GOING TO HAVE TO DEAL

 3  WITH THEM.  NOT DR. AUSTIN, WHO DOESN'T HAVE TO LIVE WITH THE

 4  RESULTS OF WHAT HE RECOMMENDS.  THE MEN AND WOMEN WHO HAVE TO

 5  CONSOLE THE VICTIMS, PUT THEIR LIVES ON THE LINE, ADVISE PEOPLE

 6  WHO AREN'T LISTENING TO THEM, AND STAND BY HELPLESSLY WHILE

 7  MORE PEOPLE ARE VICTIMIZED.

 8          WE KNOW THESE PEOPLE ARE GETTING MORE HARD CORE AT

 9  THE LOCAL LEVEL.  WE SEE IT HAPPENING.  IT'S ONLY GOING TO GET

10  WORSE.

11          WITH RESPECT TO DR. AUSTIN AND HIS STUDIES, I JUST

12  HAVE A COUPLE POINTS TO MAKE.  WE KNOW THAT THE TOTAL ARREST

13  DOESN'T REALLY TELL US VERY MUCH ABOUT THE CRIME THAT'S BEING

14  COMMITTED.  SO HIS ANALYSIS OF THE TOTAL PERCENTAGE OF TOTAL

15  ARRESTS REALLY DOESN'T MEAN ANYTHING, BECAUSE HE IS NOT TALKING

16  ABOUT THE CRIMES THAT ARE COMMITTED.  HE IS JUST TALKING ABOUT

17  THE ARRESTS THAT ARE MADE.

18          HE'S ALSO IGNORING THE ACTUAL EVIDENCE OF THE

19  SEVERITY AND NUMBER OF CRIMES THAT HAVE BEEN DOCUMENTED OF

20  THOSE THAT ARE LET OUT EARLY, AND HE'S IGNORING THE EVIDENCE

21  THAT A LARGE NUMBER OF ARRESTEES THROUGHOUT THE STATE ARE

22  EARLY.

23          IN FRESNO COUNTY IN 2007, 30 PERCENT OF FELONY

24  ARRESTS WERE OF PAROLEES.  NOT LESS THAN 1 PERCENT.

25          **JUDGE REINHARDT:**  I DON'T UNDERSTAND.  WHAT DOES THAT

1  SHOW?  PEOPLE SHOULDN'T BE PUT ON PAROLE OR SHOULD BE KEPT IN

2  JAIL LONGER THAN THE TERMS?

3          **MS. BARLOW:**  IT MEANS THOSE PEOPLE ARE MORE

4  DANGEROUS, YOUR HONOR, THAN THE REST OF THE PEOPLE.  IF --

5  DR. AUSTIN IS TELLING YOU THAT PAROLEES REPRESENT A VERY SMALL

6  FRACTION OF THE TOTAL NUMBER OF ARRESTS.

7          ALL I CAN TELL YOU IS THE DATA BEFORE YOU, THE ACTUAL

8  EVIDENCE, DOES NOT SUPPORT THAT.  THIRTY PERCENT OF FELONY

9  ARRESTS IN FRESNO WERE PAROLEES IN 2007.  THAT'S BECAUSE THEY

10 COMMIT CRIMES.  THAT'S WHAT THEY DO.  THAT'S HOW THEY GOT TO BE

11 PAROLEES IN THE FIRST PLACE.

12         YOU HAVE RECEIVED WRITTEN AND ORAL TESTIMONY FROM 13

13 LAW ENFORCEMENT WITNESSES AND I CAN PUT ON ALL 67 OF THEM IF

14 YOU LET ME BECAUSE THEY ALL WOULD HAVE TOLD YOU THE SAME THING.

15 THEIR COMMUNITIES WILL SUFFER HORRIBLE IMPACTS FROM THE RELEASE

16 ORDER.

17         COULD YOU MAKE IT BETTER WITH FUNDING AND

18 PROGRAMMING?  YOU ABSOLUTELY COULD.  YOU'RE BEING TOLD YOU

19 CAN'T DO THAT.  I BELIEVE THAT YOU CAN BECAUSE THAT WOULD HAVE

20 THE INTENT AND EFFECT OF REDUCING THE PRISON POPULATION.

21         WE COULD USE THE JUVENILE MODEL AS AN ABSOLUTE PROOF

22 THAT YOU CAN REDUCE THE AMOUNT OF PEOPLE IN CUSTODY IF YOU

23 PROGRAM THEM.  THEY'VE DONE IT WITH THE JUVENILES.  THEY CAN DO

24 WITH THE ADULTS.

25         IF YOU REALLY CAN'T MAKE THAT ORDER, THEN YOU HAVE TO

1  LOOK AT THESE AVAILABLE ALTERNATIVES.  MAYBE YOU TELL THE STATE

2  THAT THEY CAN CHOOSE ONE OF THOSE OR ALL OF THOSE.  IF YOU

3  DON'T FEEL THAT YOU CAN ORDER IT, WE KNOW THAT THOSE

4  ALTERNATIVES ARE AVAILABLE.

5          YOU GET THEM THEIR SERVICES BEFORE THEY GET RELEASED.

6  YOU PROVIDE MORE PROBATION.  YOU PROVIDE MORE PROGRAMMING.  YOU

7  IMPLEMENT MENTAL HEALTH COURTS AND DRUG COURTS.  THERE ARE

8  VIABLE ALTERNATIVES TO A PRISONER RELEASE ORDER THAT HAVE NOT

9  BEEN EXHAUSTED.  THEY ARE BEING BUILT AS WE SPEAK.

10         IN SAN DIEGO COUNTY, IN LOS ANGELES COUNTY, IN

11  AMADOR, IN FRESNO, THEY ARE BEING BUILT AS WE SPEAK.  WE SHOULD

12  LET THEM BE BUILT BEFORE WE EVEN THINK ABOUT REDUCING THE

13  PRISON POPULATION BY ONE-THIRD.  THE RISK TO THE PUBLIC AND THE

14  PRISONERS THEMSELVES IS TOO GREAT.

15         I KNOW YOU STRUGGLE WITH THIS DIFFICULT QUESTION AND

16  I INVITE YOU AND, IN FACT, I BEG YOU TO KEEP ON STRUGGLING WITH

17  IT.  BECAUSE IF YOU MAKE A MISTAKE, MANY PEOPLE WILL GET HURT

18  AND PERHAPS WILL DIE.

19         THE ALTERNATIVES ARE AVAILABLE.  THE IMPACTS ARE

20  ENORMOUS.  PLEASE DO THE RIGHT THING.  THANK YOU.

21         **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

22                    **CLOSING ARGUMENT**

23         **MS. WOODWARD:**  GOOD AFTERNOON, YOUR HONORS.  I'M

24  CAROL WOODWARD, COUNTY COUNSEL FOR INTERVENOR SAN MATEO COUNTY,

25  AND I'M SPEAKING ON BEHALF OF THE COUNTY INTERVENORS,

 1  SAN MATEO, SANTA CLARA AND SANTA BARBARA COUNTIES.

 2          ALSO IN THE COURTROOM IS THERESA FUENTES FROM SANTA

 3  CLARA COUNTY, WHO WOULD LIKE TO ADDRESS SOME SPECIFIC THINGS TO

 4  SANTA CLARA.  AND WE WOULD ASK YOU IF IT PLEASES THE COURT THAT

 5  WE BE ALLOWED TO --

 6          JUDGE REINHARDT:  YOU KNOW, THERE ARE A LOT OF

 7  COUNTIES AND THE AGREEMENT WAS THAT EXCEPT FOR ONE COUNTY,

 8  WHICH FOR SOME REASON I CAN'T IMAGINE MANAGED TO CONVINCE US

 9  THEY SHOULD APPEAR SEPARATELY, OTHER THAN THAT, SOMEONE IS

10  SUPPOSED TO SPEAK FOR ALL THE COUNTIES.

11          MS. WOODWARD:  THAT'S CORRECT, YOUR HONOR.  WE

12  ACTUALLY HAD AN IDEA THAT WE COULD SPLIT THE 15 MINUTES AND WE

13  REALLY DO HAVE ONLY ABOUT THAT MUCH, IF THAT'S SOMETHING THE

14  COURT WOULD ENTERTAIN.

15          JUDGE KARLTON:  THAT'S FINE.

16          JUDGE REINHARDT:  TAKE 15 MINUTES AND SPLIT IT AND

17  STICK TO IT, YOU MAY DO THAT.

18          MS. WOODWARD:  THANK YOU, YOUR HONOR.  I WILL TAKE

19  SEVEN-AND-ONE-HALF MINUTES.

20          JUDGE REINHARDT:  I WILL WATCH.

21          MS. WOODWARD:  OKAY.  YOUR HONORS, WHEN THE COUNTIES

22  INTERVENED, THE COURT HAD ALREADY MADE THE DECISION THAT THERE

23  WAS UNCONSTITUTIONAL SITUATIONS IN THE PRISONS, AND WE CAME IN

24  AND HAVE ACTED AS A SOMEWHAT SECONDARY PARTY.

25          WE HAD A SMALL ROLE IN THIS CASE.  WE ARE NOT

1  CONCERNED OR WE ARE NOT PRESENTING EVIDENCE ON WHETHER

2  OVERCROWDING IS THE PRIMARY CAUSE OF THE UNCONSTITUTIONALITY OR

3  SOME OF THE OTHER ISSUES.

4          HOWEVER, THE REASON THAT WE INTERVENED WAS BECAUSE WE

5  NOTICED THAT AT THE TIME THAT THE COURT CONVENED THE

6  THREE-JUDGE PANEL, THE PARTIES WERE ASSUMING THAT AND WERE

7  SAYING THAT THE KINDS OF SOCIAL SERVICES THAT THE PEOPLE BEING

8  RELEASED FROM PRISON MIGHT NEED WOULD BEST BE PROVIDED AT THE

9  COUNTY LEVEL.  AND WE AGREE WITH THAT.

10         WE THINK WE DO A GOOD JOB, BUT WE WERE VERY CONCERNED

11 BECAUSE WE ARE THE PROVIDERS OF LAST RESORT OF ALL OF THESE

12 SERVICES; MENTAL HEALTH FOR INDIGENTS, DRUG AND ALCOHOL,

13 HEALTHCARE, EMERGENCY SERVICES, HOUSING, HEALTH, JOB TRAINING

14 AND ESPECIALLY JAILS.

15         **JUDGE KARLTON:**  MA'AM, I WANT YOU TO ASSUME THAT ALL

16 THREE JUDGES HAVE HEARD THE EVIDENCE AND HAVE ANXIETY

17 CONCERNING THE COUNTIES.

18         LET US ASSUME THE WORST, THAT MR. MELLO'S ANALYSIS IS

19 RIGHT AND WE CANNOT ORDER THE STATE TO SHARE ITS SAVINGS WITH

20 THE COUNTIES.  DO YOU THINK THAT THAT MEANS THAT WE OUGHT TO

21 COUNTENANCE CONTINUED UNCONSTITUTIONAL CONDITIONS?

22         **MS. WOODWARD:**  NO, YOUR HONOR.  I DO NOT THINK SO AT

23 ALL.  AND I AM HERE APOLOGIZING FOR NOT HAVING A COMPLETE

24 SOLUTION TO THIS PROBLEM BY ANY MEANS.

25         **JUDGE KARLTON:**  YOU AREN'T ALONE.

1          **MS. WOODWARD:**  RIGHT.  I, AS I'M SURE THE COURT, HAVE

2  LOST SLEEP OVER THIS TRYING TO FIGURE OUT WHAT THE HECK TO DO.

3  AND AS A COUNTY, AS I SAY, WE ARE LOOKING AT THE SITUATION

4  WITHOUT FUNDING.

5          THE COURT HAS ACKNOWLEDGED THE STATE IS UNLIKELY TO

6  PROVIDE FUNDING FOR THESE SOCIAL SERVICES AND, YET, I -- THE

7  MOST THAT WE CAN DO IN THIS CASE PROBABLY IS TO HELP THE COURT

8  TO REMEMBER THAT WE ARE HERE AND WE HAVE THESE ISSUES AND I

9  JUST --

10          **JUDGE REINHARDT:**  DO YOU HAVE A SUGGESTION FOR US?

11          **MS. WOODWARD:**  WITH REGARD TO HOW TO GET FUNDING TO

12  COME TO THE COUNTIES?

13          **JUDGE REINHARDT:**  NO, ABOUT WHAT TO DO.

14          **MS. WOODWARD:**  YEAH.  WELL, LET ME JUST STATE THAT

15  THE COUNTIES DO NOT HAVE A QUARREL WITH MANY OF THE

16  ALTERNATIVES TO JUST STAYING IN PRISON.  WE DON'T HAVE A

17  QUARREL WITH PAROLE REALIGNMENT OR PAROLE -- SORRY, WHERE THE

18  COURT DOES NOT --

19          **JUDGE KARLTON:**  PUTTING CERTAIN FOLKS OFF OF PAROLE.

20          **MS. WOODWARD:**  EXACTLY.  WE AGREE DIVERSION IS A GOOD

21  IDEA IN MANY CASES.

22          WE ALSO CERTAINLY AGREE THAT THESE EVIDENCE-BASED

23  PROGRAMS WORK.  WE DO THEM IN OUR JAILS AND THEY WORK VERY

24  WELL.

25          AND THE PROBLEM, OF COURSE, AS THE COURT HAS HEARD IN

 1   OUR TESTIMONY, SOME 50 PERCENT OF SAN MATEO COUNTY PRISONERS DO

 2   NOT EVER GO TO JAIL.  THEY STAY OUTSIDE AND DO THESE OTHER

 3   PROGRAMS WITH GOOD SUCCESS.

 4          NOW, THE PROBLEM THAT WE HAVE IS THAT IN THE

 5   COMMUNITY, AS THE COURT HAS ALREADY HEARD, THERE ARE LONG WAIT

 6   LISTS FOR ALL THESE PROGRAMS.  OUR CONCERN IS GLOBAL.

 7          WE LOOK AT THE PEOPLE WHO ARE GOING TO COME OUT AND

 8   WE WORRY ABOUT THEM BECAUSE, AS YOU'VE HEARD ALSO THIS MORNING

 9   AND THIS AFTERNOON, THESE PEOPLE WHO ARE COMING OUT OF JAIL

10   WITH MENTAL HEALTH PROBLEMS ARE FACING A LACK OF CONTINUITY OF

11   CARE BECAUSE THE COUNTY HAS A BIG WAIT LIST FOR THAT SORT OF

12   THING.

13          **JUDGE KARLTON:**  YOU KNOW, THAT'S WHAT I TRIED TO SAY

14   TO YOU, APPARENTLY QUITE UNSUCCESSFULLY.

15          ASSUME THAT THIS COURT, THESE JUDGES, UNDERSTAND YOUR

16   PROBLEM.

17          **MS. WOODWARD:**  YES.

18          **JUDGE KARLTON:**  ASSUME THAT WE ARE FACED WITH A

19   CONSTITUTIONAL CONUNDRUM, WHICH IS THAT WE CAN'T ORDER THE

20   STATE TO DO WHAT ANY COMMON SENSE PERSON WOULD THINK WOULD BE

21   APPROPRIATE IF WE LET THEM OUT.

22          WHAT DO WE DO?  DO WE -- WE CAN'T -- I MEAN, THE

23   SUGGESTION SEEMS TO BE THAT SOMEHOW OR OTHER WE ARE TO

24   COUNTENANCE SOME UNCONSTITUTIONAL CONDITIONS.  THAT CAN'T BE

25   RIGHT.

1          **MS. WOODWARD:**  NO.  THAT CAN'T BE RIGHT, YOUR HONOR,

2    AND IT ALSO CANNOT BE RIGHT TO DO WHAT WE FEARED INITIALLY,

3    BECAUSE WE UNDERESTIMATED THE COURT, AND I WAS EXTREMELY

4    PLEASED TO HEAR THE COURT THIS MORNING COME OUT WITH EXACTLY

5    THE CONCERN THAT WE HAVE.

6          IT ALSO WOULD NOT BE THE SOLUTION TO SAY, LET'S HAVE

7    THE PEOPLE COME OUT INTO THE COMMUNITY WITHOUT DEALING WITH

8    THAT CONCERN, WITHOUT TAKING CARE OF THE FUNDING PROBLEM OR THE

9    NECESSITY FOR GRADUAL INCREASES.

10          WE HAVE THE INFRASTRUCTURE.  THEN, OF COURSE, WE HAVE

11   THE DECOMPENSATION YOU'VE HEARD ABOUT.  PEOPLE BEING HOMELESS,

12   THAT SORT THING.  THEY COMMIT THE CRIMES, THEY GO BACK TO

13   PRISON AND WE ARE BACK TO WHERE WE STARTED.  THAT'S NOT THE

14   SOLUTION EITHER.

15          AS I SAY, I'M SORRY I DON'T HAVE A GOOD SOLUTION OR

16   ANY AT ALL, BUT OUR REASON TO INTERVENE --

17          **JUDGE KARLTON:**  WE BELIEVE YOU.

18          **MS. WOODWARD:**  THE REASON TO INTERVENE AND THE REASON

19   THAT I'M STANDING HERE IS BECAUSE, IN THE WORDS OF OUR BELOVED

20   FORMER HEALTH DIRECTOR CHARLENE SILVA, WE ARE NOT SAYING WE

21   DON'T WANT THESE PEOPLE TO COME INTO OUR COMMUNITY.  WE DO.

22   THEY ARE OUR PEOPLE.  THEY ARE OUR FAMILIES.  THEY BELONG TO

23   US.  THEY SHOULD COME HOME.

24          ALL WE'RE ASKING IS THE COURT HELP US TO FIND A WAY

25   TO SERVE THESE PEOPLE IN A WAY THEY SHOULD BE SERVED.

1    **JUDGE KARLTON:**  GOD WILLING AND THE RIVER DON'T RISE.

2    **MS. WOODWARD:**  YES, EXACTLY.  AN INCOMPLETE SOLUTION,

3  BUT THAT IS WHAT WE ARE ASKING THE COURT.

4    **JUDGE REINHARDT:**  THANK YOU.

5                        **CLOSING ARGUMENT**

6    **MS. FUENTES:**  THANK YOU, YOUR HONORS, FOR LETTING

7  BOTH OF US SPEAK.  I'M THERESA FUENTES FROM SANTA CLARA COUNTY.

8         YOUR HONORS, IF YOU ORDER A POPULATION REDUCTION

9  WITHOUT FUNDING TO THE COUNTIES, YOU WILL BE SHIFTING THE

10  PROBLEM TO THE COUNTIES.  THE COUNTIES WILL HAVE THE

11  RESPONSIBILITY TO DEAL WITH ALL OF THE PEOPLE --

12    **JUDGE REINHARDT:**  DO YOU THINK WE CAN ORDER THE STATE

13  TO GIVE MONEY TO THE COUNTIES FOR PROGRAMS?

14    **MS. FUENTES:**  I HOPE YOU CAN.  WE WOULD LOVE TO HAVE

15  THE MONEY.  WE WOULD LOVE TO HAVE ENFORCEABLE FUNDING.

16         I DON'T HAVE THE ANSWER TO YOUR QUESTION.  THE

17  PLAINTIFFS SAY NO, YOU CAN'T ORDER IT.  THE STATE SAYS NO, YOU

18  CAN'T ORDER IT.

19    **JUDGE REINHARDT:**  WELL, THE PLAINTIFFS WILL

20  RECONSIDER WHEN THEY GET TO THE PRACTICAL PROBLEM.

21    **JUDGE HENDERSON:**  ISN'T THAT THE DILEMMA?  WE'LL BE

22  ORDERING -- WE WILL BE SHIFTING THE PROBLEM TO THE COUNTIES?

23    **MS. FUENTES:**  EXACTLY.

24    **JUDGE HENDERSON:**  IF WE DON'T -- IF WE DO THAT, AS

25  JUDGE KARLTON SAID, WE WILL BE CONTINUING -- WELL, WE WOULD BE

 1  CONFINED TO THESE UNCONSTITUTIONAL AS IT NOW EXISTS.  SO WHAT

 2  DO WE DO?  WE ARE BUILDING WHAT -- HOW DO WE BALANCE THAT?

 3       **MS. FUENTES:**  WELL, I THINK FOR THIS COURT AND

 4  LOOKING AT THE PUBLIC SAFETY, EVERY SINGLE PROPOSAL THAT THE

 5  PLAINTIFFS HAVE PROPOSED FOR SAFELY RELEASING THE POPULATION

 6  INVOLVED MONEY.

 7       DIVERSION, THAT REQUIRES MONEY.  COMMUNITY TREATMENT,

 8  THAT REQUIRES MONEY.  PAROLE REFORM.  ALL OF IT.  AND WE'VE

 9  HEARD HERE, WE KNOW THAT THE STATE WILL NOT PROVIDE FUNDING.

10  I THINK --

11       **JUDGE KARLTON:**  NO, WE DON'T KNOW THAT.  SEE, THERE

12  IS A SOMEWHAT MORE SUBTLE POSTURE.

13       EVEN IF WE ASSUME THAT THE STATE -- THAT WE CANNOT

14  ORDER THE STATE TO FUND IT, WE CAN SAY TO THE STATE -- I'M NOT

15  SAYING WE ARE GOING TO, BUT WE CAN SAY TO THE STATE, THIS IS

16  YOUR CAP.  YOU FIGURE OUT WHAT TO DO.  YOU HAVE A

17  RESPONSIBILITY TO THE COMMUNITIES AND, YOU KNOW, TELL THEM TO

18  GIVE US A PLAN THAT INVOLVES THE SHARING OF SAVINGS.  AND THEN

19  IF THEY DON'T DO IT, I DON'T KNOW WHAT WE DO NEXT.

20       **MS. FUENTES:**  WELL, THAT'S THE PROBLEM.  THAT'S THE

21  DILEMMA WE FACE.

22       THE COUNTIES -- YOU'VE HEARD MR. GRAVES, YOU HAVE TO

23  REMEMBER, TESTIFY THAT WE CAN'T TRUST THE STATE.  NUMEROUS

24  TIMES THE STATE PROMISED US FUNDING AND DIDN'T GIVE IT TO US.

25  YOU KNOW, HE GAVE YOU NUMEROUS EXAMPLES.

1          AND, YOU KNOW, YOU CAN ORDER THE STATE TO COME UP

2    WITH A POPULATION REDUCTION.  THE STATE CAN SAY, ALL RIGHT,

3    FINE.  WE ARE GOING TO RELEASE WHO WE ARE GOING TO RELEASE AND,

4    COUNTIES, YOU DEAL, AND HERE IS NO MONEY AND DO IT.  AND EVEN

5    THE PLAINTIFFS HAVE SAID THAT THAT'S NOT THE SAFE WAY OF

6    REDUCING THE POPULATION.

7          SO I JUST THINK THAT, YOU KNOW, THERE MIGHT -- IT

8    MIGHT VERY WELL BE THAT THERE IS NOT A SAFE WAY TO REDUCE THE

9    POPULATION.

10         **JUDGE KARLTON:**  WHICH THEN BRINGS US TO A QUESTION

11   THAT I'VE ASKED THE DISTRICT ATTORNEY, WHICH IS:  CAN THE

12   CONGRESS PROHIBIT THE FEDERAL GOVERNMENT, THE FEDERAL JUDICIARY

13   FROM RECTIFYING A CONSTITUTIONAL VIOLATION?

14         DO THEY HAVE THE POWER TO SAY WE CAN'T RELEASE THEM

15   BECAUSE RELEASING THEM AD HOC IS DANGEROUS AND YOU CAN'T ORDER

16   THE STATE TO SHARE THE BENEFITS OF THE SAVINGS?

17         **MS. FUENTES:**  WELL, THERE IS A REASON THAT THE PLRA

18   SAID THE COURT MUST GIVE SUBSTANTIAL WEIGHT TO THE PUBLIC

19   SAFETY IMPASSE.  AND IF THERE IS NOTHING YOU CAN DO UNDER THE

20   PLRA, WELL, THEN THERE ARE -- YOU CAN PURSUE OTHER AVENUES IN

21   THE INDIVIDUAL CASES.

22         **JUDGE KARLTON:**  BUT, YOU KNOW, I HAVE BEEN AT IT FOR

23   12 YEARS.  SO BEING TOLD THAT WE OUGHT TO PURSUE IT IN SOME WAY

24   IS -- AS WE FALL UPON, IT'S NOT A SYMPATHETIC ARGUMENT.

25         ALL RIGHT.  I MEAN, THAT MAY BE ANOTHER UNANSWERABLE

1  QUESTION.

2         THANK YOU, MA'AM.  I'M SORRY.  I DIDN'T MEAN TO PLAY

3  YOU.

4         **MS. FUENTES:**  I UNDERSTAND.

5         I DO WANT TO ADDRESS -- I FEEL LIKE I NEED TO ADDRESS

6  SOME OF THE STATEMENTS MADE BY THE PLAINTIFFS IN THEIR FINDINGS

7  OF FACT.  THEY'VE HAD SAID THAT THE COUNTIES HAVE EXAGGERATED

8  THEIR EVIDENCE AND THE IMPACTS TO THE COUNTIES, AND I JUST WANT

9  TO ADDRESS THAT BRIEFLY.

10        I THINK THAT THEY HAVE TO SAY THAT BECAUSE THEY'VE

11 HAD NO EVIDENCE FROM ANY EXPERT THAT REFUTES ANYTHING THAT THE

12 COUNTIES HAVE SAID.  THEY HAVE NO TESTIMONY ABOUT HOW COUNTIES

13 ARE FUNDED, HOW COUNTIES ARE RUN, HOW WE GET OUR MONEY.

14        YOU HEARD TESTIMONY FROM THE COUNTIES THAT WE DON'T

15 HAVE ANY DISCRETION ON HOW WE SPEND OUR FUNDS.  WE HAVE VERY

16 LITTLE DISCRETION.  MORE THAN HALF OF OUR FUNDING COMES FROM

17 STATE AND FEDERAL GOVERNMENT AND WE DON'T HAVE THE AUTHORITY ON

18 HOW TO ALLOCATE IT.

19        PLAINTIFFS HAVE SAID THAT THE STATE AND THE COUNTIES

20 HAVE MADE POLICY DECISIONS NOT TO FUND PROGRAMS, AND I TAKE

21 ISSUE WITH THAT BECAUSE SANTA CLARA COUNTY, FOR ONE, HAS MADE

22 GREAT EFFORTS TO PROVIDE THESE PROGRAMS.

23        THE BOARD OF SUPERVISORS HAS GIVEN -- IT'S A

24 SUBSTANTIAL PRIORITY OF THE BOARD OF SUPERVISORS TO PROVIDE

25 DRUG AND ALCOHOL AND MENTAL HEALTH SERVICES TO RESIDENTS OF

1   SANTA CLARA COUNTY.  IN FACT, WE HAVE A VERY SUCCESSFUL

2   PROGRAM, DRUG TREATMENT PROGRAM IN OUR COUNTY.  AND THERE IS

3   TESTIMONY THAT WE REDUCED OUR TOTAL JAIL POPULATION BY 20

4   PERCENT BECAUSE OF OUR PROGRAM.

5          THE STATE DOESN'T FUND ALL OF THAT.  I THINK THE

6   COUNTY PAYS ONE-HALF, ALMOST ONE-HALF OF THE MONEY ON THE

7   COUNTY'S DISCRETIONARY FUND BECAUSE THE STATE DOESN'T GIVE US

8   ENOUGH MONEY FOR THOSE PROGRAMS.

9          WHAT WILL HAPPEN TO THOSE PROGRAMS IF PAROLEES ARE

10  RELEASED?  I DON'T KNOW.

11         **JUDGE REINHARDT:**  WHAT WILL HAPPEN IF THE STATE SAYS

12  NEXT YEAR, LOOK, WE DON'T HAVE ENOUGH MONEY?

13         **MS. FUENTES:**  WELL, THEY HAVE BEEN DOING THAT

14  GRADUALLY.  RIGHT NOW, AS WE SPEAK, THE STATE IS CUTTING

15  FUNDING TO THE COUNTIES.  THEY'RE CUTTING A LOT OF FUNDING FOR

16  MENTAL HEALTH AND FOR DRUG AND ALCOHOL.  AND WE JUST SERVE LESS

17  AND LESS PEOPLE AND THE WAIT LISTS GET LONGER AND LONGER.

18         A POPULATION REDUCTION WILL JUST REALLY MAKE A BAD

19  SITUATION ENORMOUSLY WORSE.  THAT'S KIND OF WHAT WE ARE STUCK

20  WITH.

21         WE HAVE AN EVER INCREASING POT OF FUNDS TO PROVIDE

22  SERVICES, THAT WE HAVE TO PROVIDE SERVICES FOR EVERYBODY IN THE

23  COMMUNITY.  AND THE MORE PRISONERS THAT GET RELEASED AND GET

24  PUT ONTO THE COUNTIES, THE LESS SERVICES WE ARE ABLE TO GIVE TO

25  THE GENERAL POPULATION AND THE MORE THE SAFETY NET GETS ERODED.

1          AND THAT'S OUR CONCERN AND THAT'S WHY WE INTERVENED,

2    TO POINT OUT TO THE COURT IT REALLY IS SIGNIFICANT.  GRAVE

3    PROBLEMS THAT THE COUNTIES WILL FACE WITH THE PRISON POPULATION

4    ISSUES AND NO FUNDING.

5          **JUDGE REINHARDT:**  THERE IS A GRAVE PROBLEM WITH OR

6    WITHOUT THE PRISONER RELEASE ORDER.

7          **MS. FUENTES:**  IT'S A PROBLEM NOW, YES, AND WE ARE

8    DOING THE BEST WE CAN.

9          **JUDGE REINHARDT:**  IT GETS GRAVER EVERY YEAR.

10          **MS. FUENTES:**  AND IT GETS WORSE EVERY YEAR.

11          **JUDGE REINHARDT:**  OKAY.

12          **MS. FUENTES:**  THANK YOU.

13                    **CLOSING ARGUMENT**

14          **MS. KECK:**  GOOD AFTERNOON, YOUR HONORS.  IT'S ANN

15    KECK, DEPUTY COUNTY COUNSEL OF SONOMA COUNTY.  I REPRESENT IN

16    THIS MATTER NOT ONLY THE COUNTY OF SONOMA, BUT SONOMA COUNTY

17    SHERIFF WILLIAM COGBILL, DISTRICT ATTORNEY STEPHAN PASSALACQUA

18    AND CHIEF PROBATION OFFICER WILLIAM OCHS -- PARDON ME, ROBERT

19    OCHS.

20          AND THE REASON THAT THE COURT ALLOWED US TO INTERVENE

21    AS A SEPARATE GROUP WAS BECAUSE MY CLIENTS HAVE A VERY UNIQUE

22    POSITION.

23          **JUDGE KARLTON:**  I'M GOING TO INTERRUPT.  WE HEARD

24    YOUR CLIENTS.  WE HEARD YOUR EXPERT.  LET'S TALK ABOUT WHERE WE

25    ARE NOW.  YOUR EXPERT REALLY, AS I UNDERSTAND IT, ESSENTIALLY

```
 1   AGREES WITH THE PLAINTIFFS AND WITH THOSE COUNTIES THAT HAVE

 2   SUGGESTED ALL OF THESE PROGRAMS.

 3           IF THE COURT CANNOT ORDER THE STATE TO SHARE SAVINGS,

 4   WHAT ARE WE TO DO?  DON'T TELL US ABOUT ALL THE WONDERFUL

 5   THINGS YOU ARE DOING.  THAT'S BESIDE THE POINT.  WHAT DO WE DO?

 6           MS. KECK:  I UNDERSTAND, YOUR HONOR.  AND THE REASON

 7   THAT WE ARE HERE WAS TO TELL ABOUT THE IMPACTS TO THE LOCAL

 8   COMMUNITY --

 9           JUDGE KARLTON:  WE KNOW ABOUT IT.  WE BELIEVE IN IT.

10   TELL ME WHAT I'M SUPPOSED TO DO.

11           MS. KECK:  AS FAR AS I SEE, THERE ARE REALLY ONLY TWO

12   OPTIONS, YOUR HONOR.  THE FIRST IS TO ENTER A PRISONER RELEASE

13   ORDER THAT WOULD BE CONSISTENT WITH OUR FINDINGS OF FACT AND

14   PROPOSALS FOR RELIEF, WHICH BASICALLY ORDERS THE COURT TO COME

15   UP WITH A PLAN.

16           JUDGE KARLTON:  ORDER THE STATE TO COME UP WITH A

17   PLAN?

18           MS. KECK:  PARDON ME.  ORDER THE STATE TO COME UP

19   WITH A PLAN.

20           THE PROBLEM THAT WE GET AT THAT POINT IS THAT THE

21   PLAN ISN'T SUFFICIENT FOR WHATEVER PURPOSES.  WHAT KIND OF, I

22   WILL TERM IT A HAMMER.  WHAT KIND OF HAMMER CAN THE COURT BRING

23   DOWN IF THE STATE IS UNABLE TO COMPLY WITH THAT?  AND THAT'S

24   WHERE WE COME INTO THE PROBLEM.

25           BECAUSE A PRISON POPULATION CAP AND THE NUMBER THAT
```

 1   THE PLAINTIFFS HAVE SUGGESTED IS DEVASTATING, A RELEASE OF A

 2   THIRD OF THE PRISON POPULATION WOULD JUST BRING UTTER CHAOS IN

 3   THE COMMUNITIES.

 4           YOUR HONOR HAS SUGGESTED THAT PERHAPS WE SHOULD HAVE

 5   BEEN LOOKING AT DIFFERENT NUMBERS AND DIFFERENT TIMES, WHICH

 6   WOULD HAVE MADE US FOCUS ON REALLY A UNIVERSE OF POSSIBILITIES,

 7   BUT I WOULD PRESENT TO THE COURT THAT ALTHOUGH THERE HASN'T

 8   BEEN TESTIMONY ON THIS, TO ANY GREAT EXTENT, REALLY IT IS A

 9   SLIDING SCALE.

10           THERE IS A CERTAIN POINT AT WHICH THE PRISON

11   POPULATION CAP WOULD NOT CAUSE A SIGNIFICANT OR A VERY

12   APPRECIABLE IMPACT ON COMMUNITIES.  IT'S CERTAINLY NOT IN THE

13   NATURE OF THE 50,000 THAT THEY REQUESTED.  IT'S PROBABLY NOT IN

14   THE NATURE OF THE 35,000 THAT WAS THE SECONDARY POSITION THAT

15   DR. AUSTIN CAPPED -- TALKED ABOUT.

16           WE DON'T HAVE ANY KIND OF TESTIMONY AS TO WHAT WOULD

17   BE A NOMINAL IMPACT -- OR A PRISON RELEASE THAT WOULD HAVE A

18   NOMINAL IMPACT ON PUBLIC SAFETY AND THE OPERATION OF CRIMINAL

19   JUSTICE SYSTEMS.

20           AND I WOULD SUBMIT THAT I WOULD -- CONTRARY, I THINK,

21   TO MAYBE SOME OF THE OTHER COUNTY INTERVENORS, I WOULD SUBMIT

22   THAT IF THE COURT IS UNABLE TO COME UP WITH A FIGURE THAT SHOWS

23   THAT THE IMPACT ON THE COUNTIES WOULD BE NEGLIGIBLE AND THAT

24   THE BENEFIT TO BE DERIVED FROM THAT PRISON POPULATION CAP WOULD

25   OUTWEIGH THOSE BAD EFFECTS, THAT THE COURT SHOULD NOT ENTER ANY

```
 1   KIND OF POPULATION CAP.

 2        JUDGE KARLTON:  SO YOUR VIEW IS THAT THE COURT SHOULD

 3   SIMPLY COUNTENANCE AN UNCONSTITUTIONAL CONDITION.  NOBODY IN

 4   THE COUNTY IS PERMITTED TO SPEAK ON ANY PUBLIC ISSUE.  JUST A

 5   STATUTE THAT THE STATE PASSED THAT SAID, IN SONOMA COUNTY

 6   NOBODY CAN SPEAK ON A PUBLIC ISSUE.  AND WE HAVE TO SAY, THAT'S

 7   LIFE.

 8        MS. KECK:  AND, YET, YOUR HONOR HAS ASKED THE

 9   QUESTION AS TO WHETHER OR NOT CONGRESS CAN ORDER THIS COURT NOT

10   TO ENFORCE A CONSTITUTIONAL RIGHT.  AND I WOULD SAY WE NEED TO

11   LOOK TO THE, YOU KNOW, THE SCRUTINY ANALYSIS THAT THE COURTS

12   EMPLOY TO DETERMINE WHETHER OR NOT A LAW CAN CONSTITUTIONALLY

13   INFRINGE ON SOMEONE'S RIGHTS.

14        I MEAN, IN THE JAIL, THE JAIL MANAGEMENT INFRINGES ON

15   CONSTITUTIONAL RIGHTS ON PRACTICALLY A DAILY BASIS.  WE READ

16   PEOPLE'S MAIL.  WE PREVENT THEM FROM BEING FREE TO LEAVE.  BUT

17   THE ANALYSIS APPLIES.  IT'S A RATIONAL RELATIONSHIP TEST WITH

18   RESPECT TO GEO-MANAGEMENT ISSUES THAT ALLOWS THE JAIL TO

19   INFRINGE UPON CONSTITUTIONAL RIGHTS IF THEY HAVE A LEGITIMATE

20   INTEREST.

21        CONGRESS HAS GIVEN THIS COURT --

22        JUDGE KARLTON:  THAT IS NOT THE APPROPRIATE

23   CONSTITUTIONAL ANALYSIS, BUT IT DOESN'T MATTER.  JUST GO AHEAD.

24        MS. KECK:  ASIDE FROM EQUAL PROTECTION ISSUES, WHICH

25   IS STRICTLY -- THE JAIL MANAGEMENT ISSUES ARE SUBJECT TO THE
```

1    RATIONAL RELATIONSHIP TEST.

2            BUT IF YOU GO AND LOOK AT THE STATUTE, CONGRESS HAS

3    GIVEN DIRECTION TO THIS COURT TO TAKE INTO ACCOUNT PUBLIC

4    SAFETY AND OPERATION OF THE CRIMINAL JUSTICE SYSTEMS.

5            AND SO I BELIEVE IT'S INTENDANT UPON THIS COURT TO GO

6    AND WEIGH THE EFFECTS OF THOSE SYSTEMS VERSUS THE

7    CONSTITUTIONAL VIOLATIONS.

8            **JUDGE REINHARDT:**  IT SAYS WE SHOULD CONSIDER THE

9    FEDERAL CIRCUIT ON PUBLIC SAFETY.  IT DOESN'T SAY PUBLIC SAFETY

10   OUTWEIGHS THE CONSTITUTION --

11           **MS. KECK:**  NO.  IT LEAVES TO THIS COURT THE ABILITY

12   TO SAY THAT THE EFFECTS OF PUBLIC SAFETY AND THE OPERATION OF

13   CRIMINAL JUSTICE SYSTEMS ARE MORE WEIGHTY THAN THE SOLVENCY

14   THAT YOU WOULD GET FROM A PRISONER RELEASE ORDER.

15           WE HAVE THE PLAINTIFFS ADMITTING IT'S NOT GOING TO

16   SOLVE THE VIOLATION, BUT IT'S A --

17           **JUDGE KARLTON:**  EVERY DAY, EVERY DAY PEOPLE DIE IN

18   THE PRISONS, DIE IN THE PRISONS BECAUSE OF INADEQUATE HEALTH OR

19   MENTAL HEALTH CARE.  WHAT OUTWEIGHS THAT?

20           **MS. KECK:**  I WISH I COULD COME UP WITH A SOLUTION FOR

21   THAT, YOUR HONOR.  THE EVIDENCE SHOWS THAT YOU WOULD LOSE --

22   THE EVIDENCE THAT THE COUNTIES HAVE GIVEN IS THAT IT WOULD BE

23   CATASTROPHIC ON A COUNTY LEVEL, THAT WE WOULD HAVE FAILURE TO

24   PROVIDE SERVICES.

25           DAVID BENNETT SAYS THAT YOU WOULD HAVE A LOSS OF

1 SYSTEM INTEGRITY.  WE WOULD BASICALLY LOSE THE ABILITY TO HAVE

2 THE CRIMINAL JUSTICE SYSTEM FUNCTION WELL IN THE COUNTY IF YOU

3 WOULD HAVE A POPULATION CAP THAT WOULD BE SO DEVASTATING THAT

4 IT WOULD OVERWHELM THE SYSTEM.  SO WE HAVE, I GUESS, A LOSS OF

5 SYSTEM INTEGRITY --

6          **JUDGE KARLTON:**  I EXAGGERATED.  IT'S EVERY WEEK

7 PEOPLE DIE.

8          **MS. KECK:**  YOUR HONOR, I CERTAINLY DO NOT MEAN TO

9 UNDERMINE THE SEVERITY OF THE CONSTITUTIONAL VIOLATION.  THIS

10 COURT HAS REPEATEDLY SAID HOW GRAVE IT CONSIDERS THE SITUATION.

11          I ALSO DO NOT INTEND TO UNDERMINE THE SEVERITY OF THE

12 OVERCROWDING AND THE FAILURE TO TAKE ACTION TO REMEDY THOSE

13 ISSUES.

14          BUT FROM THE EVIDENCE THAT WAS PRESENTED TO THE

15 COURT, IT DOES NOT APPEAR THAT A POPULATION CAP BY ITSELF IS

16 THE MECHANISM TO GO ABOUT RESOLVING THAT, BECAUSE OF THE LACK

17 OF GUARANTEE THAT THERE WOULD BE ANY KIND OF THE REMEDIAL

18 PROCEDURES THAT EVEN PLAINTIFFS ADMIT WOULD BE NECESSARY --

19          **JUDGE REINHARDT:**  IF YOU CAN'T SOLVE IT WITHOUT DOING

20 THAT, IT MAY NOT SOLVE IT.  BUT YOU HAVE TO DO IT AS YOU'RE

21 GOING TO SOLVE IT.

22          **JUDGE KARLTON:**  YOU CAN'T SOLVE IT WITHOUT...

23          **MS. KECK:**  I UNDERSTAND.  IN FACT, I BELIEVE MY

24 EXPERT, DAVID BENNETT, AGREED THAT THE PROBLEMS ARE IMPOSSIBLE

25 TO SOLVE WITHOUT REDUCING THE -- WITH POPULATION.

1        THE INSTRUCTIONS OF CONGRESS FOR THIS COURT TO LOOK

2   CAREFULLY AT THE PUBLIC SAFETY AND CRIMINAL JUSTICE SYSTEM

3   FACTORS IS I KNOW WHAT IS STUMPING THIS COURT.

4        IF THERE WERE AN EASY ANSWER, EVERY SINGLE ONE OF THE

5   EXPERTS THAT THIS PANEL QUESTIONED WOULD HAVE COME UP WITH THE

6   ANSWER.  BECAUSE I KNOW THAT THIS COURT CHALLENGED VIRTUALLY

7   EVERY EXPERT TO SAY, WHAT DO WE DO IF THERE IS NO EASY ANSWER.

8   THERE IS NO EASY ANSWER, AND FAR BE IT FROM ME TO SAY THAT I

9   HAVE COME UP WITH ONE.

10        BUT THE ISSUE IS THAT WE HAVE RESEARCHED AND THE

11   EVIDENCE THAT WE HAVE PUT IN FRONT OF THE COURT IS THAT SIMPLY

12   A POPULATION CAP WOULD BE DEVASTATING ON OUR LOCAL COMMUNITIES.

13   WE WOULD NOT ONLY FAIL TO BE ABLE TO SERVE THE PEOPLE WHO

14   CURRENTLY ARE SERVING, BUT --

15        **JUDGE REINHARDT:**  SO WHAT IS THE SUGGESTION?  WE DO

16   NOTHING?

17        **MS. KECK:**  WELL, YOUR HONOR, AS I SAID, THERE ARE

18   ISSUES THAT RIGHT NOW WE ARE CAUGHT A LITTLE BIT BETWEEN A ROCK

19   AND HARD PLACE BECAUSE WE HAVE A RELEASE OF 50,000 --

20        **JUDGE REINHARDT:**  NOT NECESSARILY.

21        **MS. KECK:**  OR -- WELL, THEN -- AND MY -- I STARTED

22   OFF IN RESPONDING TO JUSTICE KARLTON'S STATEMENTS BY SAYING

23   THERE IS A SLIDING SCALE HERE.  WE HAVE NOT ADDRESSED A

24   UNIVERSE OF POSSIBILITY.

25        FRANKLY, IT WOULD BE DIFFICULT FOR US AS AN

1    INTERVENOR FOR US TO ADDRESS A UNIVERSE OF POSSIBILITIES.

2             BUT THERE ARE OTHER POSSIBILITIES OUT THERE THAT

3    COULD RESULT IN NOT AS DRAMATIC AN IMPACT ON THE COUNTIES AS A

4    RELEASE OF 50,000.

5             **JUDGE REINHARDT:**  WHY HAVEN'T THOSE POSSIBILITIES

6    BEEN MADE REALITY?  WHAT MAKES YOU THINK THEY ARE GOING TO BE?

7             **MS. KECK:**  WELL, THE STATE HAS GONE AND IMPLEMENTED,

8    I KNOW, A NUMBER OF REFORMS.  MY EXPERT TESTIFIED THAT THERE

9    HAD BEEN A FEW OF THEM THAT HAVE NOT BEEN COMPLETELY

10   IMPLEMENTED, SOME OF THEM HAVE BEEN.  BUT IT MAY BE AWHILE FOR

11   US TO SEE THE RESULTS.

12            **JUDGE REINHARDT:**  HOW LONG HAS JUDGE HENDERSON BEEN

13   WAITING?

14            **MS. KECK:**  PARDON?

15            **JUDGE REINHARDT:**  HOW LONG HAS JUDGE HENDERSON BEEN

16   WAITING?

17            **MS. KECK:**  I GUESS HE HAS BEEN WAITING PROBABLY ABOUT

18   EIGHT YEARS NOW.

19            **JUDGE REINHARDT:**  HOW LONG HAS JUDGE KARLTON BEEN

20   WAITING?

21            **MS. KECK:**  OH, I THINK IT'S PROBABLY ABOUT 17,

22   ALTHOUGH I UNDERSTAND THINGS HAVE BEEN DONE IN THOSE 17 YEARS.

23            **JUDGE REINHARDT:**  AND HOW MUCH LONGER SHOULD WE WAIT

24   AND ALLOW THE CONSTITUTIONAL VIOLATION TO CONTINUE?

25            **MS. KECK:**  I HAVE NO ANSWER TO THAT QUESTION, YOUR

 1   HONOR.

 2        **JUDGE HENDERSON:**  DO I UNDERSTAND YOUR ARGUMENT,

 3   COUNSEL, THAT PLAINTIFF IS ASKING FOR 52,000 AND DOING NOTHING

 4   HERE.  AND WE TRY TO FIND A NUMBER.  THE TEST FOR US IS HOW

 5   IT'S NOW HURTING THE COUNTIES.  I KNOW I'M SIMPLIFYING.  IS

 6   THAT WHAT YOU'RE SUGGESTING?

 7        **MS. KECK:**  I GUESS THE ANSWER IS YES.  THERE IS A --

 8   JUST AS THE COURT WAS ASKING, WHERE DOES IT GET SO BAD IN

 9   OVERCROWDING THAT WE HAVE TO ENTER AN ORDER?

10        YOU CAN TO TURN THAT SAME ARGUMENT ON ITS HEAD.

11   WHERE IS THE LINE ON THE SPECTRUM OF CONTINUUM WHERE WE GET A

12   GOOD BALANCE OF HAVING A RELEASE THAT DOES SOMETHING TO EFFECT

13   THE ABILITY TO PROVIDE CONSTITUTIONALLY ADEQUATE MEDICAL AND

14   MENTAL HEALTH CARE?

15        BUT WE DON'T HAVE THE KIND OF SEVERE IMPACTS THAT WE

16   CAN SEE AT THE COUNTY LEVEL.

17        NOW, AGAIN, IT'S VERY DIFFICULT TO TALK ABOUT THE

18   UNIVERSE OF POSSIBILITIES AND TO PRESENT EVIDENCE ON THIS.  I'M

19   NOT SURE THERE IS EVIDENCE THAT HAS BEEN PRESENTED THAT THE

20   COURT COULD ADEQUATELY GO AND ASSESS THAT KIND OF LINE DRAWING,

21   THE CONTINUUM DETERMINATION.

22        BUT IN THE UNIVERSE OF POSSIBILITIES, THAT IS THE

23   ISSUE.  BUT WE WERE PROVIDED WITH A VERY SPECIFIC REQUEST FOR

24   RELIEF, WHICH WAS THE 50,000, ONE-THIRD PRISON POPULATION

25   RELIEF.  AND SO THAT IS WHAT WE HAD TO TAKE TO OUR CLIENTS, AND

1  THAT IS WHAT WE HAD TO GIVE TO OUR EXPERT TO BE ABLE TO PRESENT

2  TO THE COURT.

3        THERE WAS -- ALTHOUGH THERE WAS TESTIMONY ABOUT SOME

4  LESSER NUMBERS, IT WASN'T PROVIDED TO US IN SUFFICIENT TIME TO

5  PREPARE EXPERT REPORTS ON IT OR GET INFORMATION FROM THE COURT.

6  SO WE HAVE NOT ADDRESSED THE SPECTRUM OF CONTINUUM QUESTION AS

7  TO WHETHER OR NOT OR WHERE.

8        AND I'M ASSUMING THAT THERE IS.  I'M ASSUMING THAT

9  THERE'S A 5,000 RELEASE OF PRISONERS, WHICH MAY GIVE

10  JUDGE KARLTON HIS 1,000 BEDS, BUT THAT IMPACT ON THE 58

11  COUNTIES PROBABLY WOULD NOT BE THAT GREAT.

12        BUT WHERE BETWEEN THE 5,000 RELEASE AND THE 50,000

13  RELEASE WE COULD GET THE PARTIES TO AGREE IS SOMETHING THAT

14  THERE WAS NO TESTIMONY ABOUT.  I'M CERTAINLY NOT GOING --

15     **JUDGE REINHARDT:**  THAT'S WHY WE HAVE SETTLEMENT

16  DISCUSSIONS AND NEGOTIATIONS.

17     **MS. KECK:**  AND WE DID GO THROUGH ABOUT SEVEN MONTHS

18  OF THOSE, YOUR HONOR.

19     **JUDGE REINHARDT:**  THAT WOULD HAVE BEEN A GOOD WAY TO

20  SOLVE THIS PROBLEM.

21     **MS. KECK:**  I WHOLEHEARTEDLY AGREE.

22     **JUDGE KARLTON:**  IT MAY BE THE ONLY WAY.

23     **MS. KECK:**  PARDON ME, YOUR HONOR?

24        AND, YOU KNOW, THIS COURT DOES HAVE ITS HANDS TIED.

25     **JUDGE REINHARDT:**  WELL, THEY ARE NOT ALL THAT TIED.

1          **MS. KECK:**  WELL, TIED WITH RESPECT FROM THE COUNTY'S

2    PERSPECTIVE, AT LEAST, BECAUSE WE HAVE PEOPLE WHO DO WANT TO

3    PROVIDE DIVERSION SERVICES.  WE WANT TO SERVE THESE

4    POPULATIONS.  WE SIMPLY DON'T HAVE THE FUNDING AND ABILITY TO

5    DO SO.  AND ABSENT THAT, THE IMPACT ON US IS TOO GREAT.

6          **JUDGE HENDERSON:**  THANK YOU.

7          I KNOW YOU DON'T SPEAK FOR THE LARGER COUNTIES, BUT

8    ANOTHER DILEMMA -- AND MAYBE YOU HAVE SOME ADVICE ON IT -- IS

9    400 PEOPLE UNDER WHATEVER WE MIGHT DO TO L.A. COUNTY IS NOT

10   SUCH A BIG DEAL.  IT WILL SWAMP THE COUNTY UP NEAR THE OREGON

11   BORDER.

12         HOW DO YOU FEEL WITH THAT IN TRYING TO DO SOMETHING

13   THAT'S REASONABLE?

14         **MS. KECK:**  WELL, YOUR HONOR, THAT IS A DIFFICULT

15   QUESTION.

16         ONE OF THE THINGS THAT HAS COME UP DURING THE COURSE

17   OF THIS IS THAT IT IS THE OBLIGATION OF THE CDCR TO DETERMINE

18   HOW TO RELEASE, HOW TO PAROLE, ET CETERA.

19         I'M NOT SURE THAT THIS COURT WOULD BE IN A POSITION

20   TO BE ABLE TO MAKE SPECIFIC DETERMINATIONS AS TO WHICH TYPES OR

21   HOW MANY INMATES TO RELEASE TO VARIOUS COUNTIES.  AND THE

22   FACTORS THAT YOU HAVE TO GO THROUGH TO ANALYZE THAT, THE RISK

23   NEEDS ASSESSMENT OF THE INMATES, THE POPULATION AND

24   AVAILABILITY OF RESOURCES IN THE COUNTY WOULD, I'M SURE, BE FAR

25   MORE THAN THIS COURT WOULD WANT TO TAKE EVIDENCE ON AND

1    CONSIDER IN THE PROCESS.

2            **JUDGE REINHARDT:**  ALL RIGHT.  I THINK WE HAVE GONE AS

3    FAR AS WE CAN GO.

4            THANK YOU VERY MUCH, COUNSEL.

5        **MS. KECK:**  THANK YOU.

6        **JUDGE REINHARDT:**  HOW MANY INTERVENORS ARE LEFT?

7        **MS. KECK:**  ONE.

8        **MS. BARLOW:**  ONE.

9        **JUDGE REINHARDT:**  ALL RIGHT.  WHO?

10       **MS. KECK:**  THE LEGISLATOR.

11   **JUDGE KARLTON:**  OH, OKAY.

12       **MR. KAUFHOLD:**  GOOD AFTERNOON, YOUR HONORS.

13       **JUDGE REINHARDT:**  HOW COULD WE FORGET YOU?

14                       **CLOSING ARGUMENT**

15       **MR. KAUFHOLD:**  GOOD AFTERNOON, YOUR HONORS.  STEVE

16   KAUFHOLD FROM AKIN, GUMP, STRAUSS, HAUER AND FELD FOR THE

17   LEGISLATIVE INTERVENORS.

18           I KNOW THAT THE HOUR IS GETTING LATE.  I HAVE NO

19   DESIRE TO REPEAT WHAT THE DEFENDANTS HAVE ALREADY SAID OR THE

20   MATERIAL IN OUR PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF

21   LAW.

22           THERE ARE TWO THINGS THAT I WANTED TO ADDRESS FROM

23   YOUR DISCUSSION THIS MORNING WITH THE PLAINTIFFS' COUNSEL AND,

24   IN PARTICULAR, TO GO BACK, JUDGE REINHARDT, TO KIND OF A

25   HYPOTHETICAL OR A QUESTION THAT YOU RAISED.

1              AND ONE OF THE THINGS THAT CAME UP WAS, SAY THERE ARE

2      FIVE CAUSES OF THE DIFFICULTIES THAT ARE FACED.  ONE OF THEM IS

3      OVERCROWDING, BUT THERE'S FOUR OTHER THINGS.  AND WHAT I

4      BELIEVE --

5              **JUDGE REINHARDT:**  AND OVERCROWDING IS THE PRIMARY

6      CAUSE?

7              **MR. KAUFHOLD:**  AND FOR THIS AFTERNOON ONLY, I WILL

8      ASSUME THAT.  THAT'S THE PRIMARY CAUSE, YOUR HONOR.

9              **JUDGE REINHARDT:**  FOR THE HYPOTHETICAL QUESTION.

10             **MR. KAUFHOLD:**  FOR THE HYPOTHETICAL QUESTION, THAT'S

11     RIGHT.

12             I BELIEVE COUNSEL'S RESPONSE WAS, YES, IT'S STILL

13     PROPER TO ENTER A PRISONER RELEASE ORDER IN THE FIRST INSTANCE

14     AS A FIRST STEP.  AND WE THINK, YOUR HONOR, THAT IS 100 PERCENT

15     WRONG; THAT THAT PUTS THE CART BEFORE THE HORSE AND THAT THIS

16     COURT HAS AN OBLIGATION UNDER THE PRISONER LITIGATION REFORM

17     ACT TO TAKE THE PRELIMINARY STEPS, WHETHER IT'S DONE BY THE

18     INDIVIDUAL COURTS IN THE UNDERLYING ACTIONS OR, FRANKLY, I'M

19     NOT SO SURE THAT THIS COURTS HANDS ARE AS TIED AS SOME OF THE

20     OTHER PARTIES THOUGHT IN TERMS OF ORDERING OTHER RELIEF SHORT

21     OF A PRISONER RELEASE ORDER.

22             THOSE OTHER FOUR FACTORS NEED TO BE ADDRESSED --

23             **JUDGE KARLTON:**  COUNSEL, WHAT WE HAVE BEEN TOLD, AT

24     LEAST BY THE PLAINTIFFS' EXPERTS -- AND AS BEST I CAN TELL,

25     NOBODY REALLY DISAGREES -- IS ALL OF THE OTHER THINGS THAT

1    SHOULD BE DONE AND CAN BE DONE WILL FAIL UNLESS THERE IS A

2    PRISONER RELEASE ORDER.

3         I HAVE MADE ORDERS CONCERNING BEDS.  I HAVE MADE

4    ORDERS CONCERNING THE BAY OF PROFESSIONALS.  I HAVE MADE ORDERS

5    CONCERNING THE NUMBER OF CUSTODIAL PERSONS.  ALL OF THOSE

6    THINGS ARE GOING ON.

7         WHAT THE SPECIAL MASTER HAS TOLD ME WHAT NOBODY ELSE

8    HAS DISAGREED WITH IS ALL THE WONDERFUL PROGRESS THAT MISS

9    TILLMAN THINKS IS GOING TO SOMEHOW OR OTHER JUSTIFY WHERE WE

10   ARE NOW WILL FAIL, ARE IN DANGER OF FAILING BECAUSE

11   OVERCROWDING WILL OVERTAKE EVERYTHING.

12        IT'S NOT THAT THESE THINGS CAN'T BE DONE.  IT'S THAT

13   THEY WILL NOT BE EFFECTIVE -- THAT IT APPEARS THAT THEY WILL

14   NOT BE EFFECTIVE UNLESS THERE IS A LIMITATION ON THE NUMBER OF

15   PEOPLE IN THE PRISONS.  THAT'S THE PROBLEM.

16        **MR. KAUFHOLD:**  I THINK I UNDERSTAND THE PROBLEM, YOUR

17   HONOR, AND THE POINT THAT WE WANT TO MAKE 100 PERCENT CLEAR --

18   AND IT MAY BE THAT WHAT YOUR HONOR IS TELLING ME IS THAT THIS

19   HAS BEEN DONE -- IS THAT IF THERE ARE FIVE REMAINING FACTORS

20   THAT NEED TO BE ADDRESSED AND OVERCROWDING IS ONE OF THEM, WE

21   NEED TO DEAL WITH ONE, TWO, THREE AND FOUR FIRST.  THAT'S WHAT

22   THE LITIGATION REFORM ACT REQUIRES.

23        IF YOUR HONOR IS SAYING THAT THEY HAVE ALL BEEN

24   DONE --

25        **JUDGE KARLTON:**  LET'S ASSUME THAT THERE HAVE BEEN --

1  AT LEAST IN MY OPINION, AND I SUSPECT IN JUDGE HENDERSON'S CASE

2  AS WELL, THEY HAVE ALL BEEN -- THERE HAVE BEEN ORDERS ON ALL

3  THE OF THEM.

4           **JUDGE REINHARDT:**  THE STATUTE SAYS THAT WE CAN'T

5  ISSUE A PRISONER RELEASE ORDER UNLESS CROWDING IS THE PRIMARY

6  CAUSE OF THE VIOLATION AND NO OTHER RELIEF WILL REMEDY THE

7  VIOLATION.

8           NOW, I THINK WE ALL AGREE THAT EVEN IF THERE ARE

9  THREE OR FOUR OTHER CAUSES, SOLVING THOSE WILL NOT REMEDY THE

10  VIOLATION, BECAUSE THERE WOULD STILL BE OVERCROWDING.

11          SO YOUR -- IT'S SAFE TO SAY UNDER YOUR THEORY YOU

12  HAVE TO DO THE OTHER CAUSES FIRST, BUT THAT'S NOT WHAT I SEE

13  THE STATUTE AS SAYING.  IT SAYS YOU DO THE OVERCROWDING, IF

14  IT'S A PRIMARY CAUSE, NOT AS LONG AS YOU -- YOU DO IT IF NO

15  OTHER RELIEF WILL REMEDY IT.  AND YOUR OTHER CAUSES WILL NOT

16  REMEDY IT AS LONG AS IT'S OVERCROWDING.

17          **JUDGE KARLTON:**  AS LONG AS THERE IS OVERCROWDING.

18          **MR. KAUFHOLD:**  AND I THINK THE POINT, YOUR HONOR, IS

19  WE ARE VERY CONCERNED ABOUT THOSE TWO ELEMENTS BEING CONFLATED

20  BECAUSE EVEN IF SOMETHING IS THE PRIMARY CAUSE, WE BELIEVE THAT

21  YOU DO NEED TO EXHAUST THOSE OTHER FOUR ISSUES BEFORE YOU WOULD

22  DO A PRISONER RELEASE ORDER BECAUSE WE DON'T KNOW TO A

23  CERTAINTY UNTIL THE OTHER POSSIBILITIES HAVE BEEN KNOCKED OUT

24  WHETHER --

25          **JUDGE KARLTON:**  WE DON'T KNOW FOR CERTAINTY ANYTHING.

1   WE CAN MAKE REASONABLE --

2           **JUDGE REINHARDT:**  I'M SURE WE DO KNOW IF WE SAY IT'S

3   THE PRIMARY CAUSE.  THEN WE DO KNOW THAT THE OTHER CAUSES WILL

4   NOT REMEDY IT.

5           **JUDGE HENDERSON:**  WHY ISN'T IT A REASONABLE READING

6   THAT PLAINTIFFS -- I ASSUME THIS IS WHAT PLAINTIFFS HAVE DONE.

7   THAT, BOY, WE ARE NOT MAKING HEADWAY IN PLATA.  WE ARE NOT

8   MAKING HEADWAY.  JUDGE KARLTON HAS BEEN AT THIS FOR 12 YEARS.

9   WE THINK OVERCROWDING IS THE PRIMARY CAUSE OF OUR TAKING SO

10  LONG.  WE ASK YOU TO CONVENE A THREE-JUDGE COURT.  HERE WE ARE.

11          WHY ISN'T IT A REASONABLE READING OF THE PLRA TO SAY,

12  THREE-JUDGE COURT, HANDLE THAT PROBLEM.  HANDLE THE PRIMARY

13  CAUSE IF YOU FIND IT TO BE SUCH AND THEN LET JUDGE KARLTON AND

14  JUDGE HENDERSON DEAL WITH THOSE OTHERS.

15          **JUDGE REINHARDT:**  UNLESS, UNLESS THE STATUTE SAYS

16  THERE IS OTHER RELIEF THAT WILL REMEDY THE VIOLATION.  IT

17  DOESN'T SAY REDUCE THE VIOLATION.

18          **MR. KAUFHOLD:**  AND THAT IS THE ENTIRE ISSUE THAT WE

19  HAVE, YOUR HONOR.

20          AND, JUDGE HENDERSON, I THINK THIS GETS TO THE POINT

21  THAT YOU ARE MAKING.  YOU CAN'T AUTOMATICALLY ASSUME -- EVEN IF

22  YOU ASSUME PRIMARY CAUSE, YOU CAN'T ASSUME THE ABSENCE OF AN

23  ALTERNATIVE OR THERE WOULD ONLY BE ONE PRONG OF THIS TEST.  WE

24  CAN'T CONFLATE THE TWO AND WE DON'T KNOW WHETHER THESE

25  ALTERNATIVES WILL WORK UNTIL WE ADDRESS THEM.

1          **JUDGE KARLTON:**  COUNSEL, WE DO KNOW.  WE DO KNOW.

2   IT'S NOT LIKE -- YOU COME TO THE CASE NEW.  I HAVE BEEN AT IT

3   12 YEARS OR WHATEVER IT IS, GOD KNOWS, AND JUDGE HENDERSON HAS

4   BEEN AT IT YEARS AND YEARS.  WE HAVE MADE EVERY ORDER THAT A

5   HUMAN BEING CAN THINK OF, AND HERE WE ARE.

6          MY SPECIAL MASTER TELLS ME -- YOU KNOW, COMMON SENSE.

7   MY SPECIAL MASTER TELLS ME THAT WE ARE IN DANGER OF LOSING ALL

8   THE PROGRESS WE MADE ALL THESE YEARS.  WHY?  BECAUSE OF

9   OVERCROWDING.  I MEAN, THAT'S THE END OF THIS FANTASY WORLD.

10  THERE IS A REAL WORLD OUT THERE.

11         YOU KNOW, ANYWAY, I WANT YOU TO ASSUME, SIR, THAT THE

12  COURT HAS NOT BEEN -- HASN'T BEEN ATTEMPTING EVERY OTHER

13  SOLUTION.

14         **MR. KAUFHOLD:**  NOT AT ALL, YOUR HONOR, AND I THINK --

15  I CERTAINLY DON'T MEAN TO UNDERSTATE.

16         I THINK MAYBE THE ACCUSATION WOULD BE THAT WE'RE

17  OVERSTATING THE PROGRESS THAT'S BEEN MADE.

18         BUT COMING TO THE CASE AS SOMEONE NEW, TAKING A LOOK

19  AT THE RECORD AS IT STANDS, IT'S A RECORD OF PROGRESS AT THIS

20  POINT.  AND OUR POINT IS, DON'T GO TO WHAT CONGRESS HAS SAID IS

21  THE LAST RESORT.  IF THERE ARE -- AS COUNSEL HAS SAID, IF YOU

22  GRANT THE RELIEF THAT THEY HAVE ASKED FOR, WE WILL STILL HAVE A

23  HOST OF PROBLEMS.

24         OUR POINT, YOUR HONOR, IS SIMPLY LET'S ADDRESS THE

25  HOST OF OTHER THINGS FIRST.  THAT'S WHAT CONGRESS INTENDED.

1  AND IF YOU BELIEVE THAT THAT'S ALREADY BEEN DONE AS BEST AS

2  POSSIBLY CAN, THEN I'M VERY PREPARED TO MOVE ON TO THE SECOND

3  POINT.

4          **JUDGE KARLTON:**  MOVE ON TO THE SECOND POINT.

5          **JUDGE REINHARDT:**  NOT FOR THAT REASON.  NOT FOR THE

6  REASON YOU GAVE, BUT MOVE ON.

7          **MR. KAUFHOLD:**  THAT'S MR. SPECTER, COUNSEL'S COMMENT,

8  THAT WE SHOULD SIMPLY ACCEPT THE 50- -- I BELIEVE IT'S 52,000

9  NUMBER AND THAT HE IS AGNOSTIC ABOUT HOW THAT TAKES PLACE.

10         **JUDGE REINHARDT:**  I HAVE TO POINT OUT TO HIM HE IS

11 NOT AGNOSTIC IN WHAT HE SAYS.

12         **JUDGE KARLTON:**  HE PRETENDS TO BE AGNOSTIC.

13         **JUDGE REINHARDT:**  HE WANTS TO PARTICIPATE IN THE

14 SOLUTION, SO HE MUST HAVE SOME VIEW.

15         **MR. KAUFHOLD:**  I WOULD THINK SO, TOO, YOUR HONORS.

16 AND IT'S CRITICALLY IMPORTANT TO OUR CLIENTS THAT TO THE EXTENT

17 THAT ANY RELIEF IS ORDERED, THAT IT BE NARROWLY TAILORED; THAT

18 IT BE VERY, VERY TARGETED, PREFERABLY THAT IT BE TARGETED TO

19 THE POINT OF CLASS MEMBERS AND NOT AT THE POPULATION AS A

20 WHOLE.

21         AND I THINK THAT THAT'S ANOTHER THING THAT THE

22 LITIGATION REFORM ACT REQUIRES, IS THAT WHATEVER RELIEF IS

23 CRAFTED BE VERY CAREFULLY TARGETED AT THE AFFECTED INDIVIDUALS

24 AND NOT WITH THE HOPE THAT IF WE TAKE 50,000 PEOPLE OUT OF THE

25 SYSTEM, THAT SOMEHOW IT WILL ALL IMPROVE.

1          **JUDGE REINHARDT:** HOW DO YOU TALK ABOUT THE AFFECTED

2    INDIVIDUALS?  IF THE CASE ONLY WENT ON FOR EIGHT YEARS, FIFTEEN

3    YEARS, THOSE INDIVIDUAL CHANGE.  THE PEOPLE WHO WERE ILL EIGHT

4    YEARS AGO HAVE EITHER DIED, BEEN RELEASED FROM PRISONS, A LOT

5    OF THEM.  THERE'S ANOTHER GROUP WHO ARE NOW IN.  THEY ARE NOT

6    INDIVIDUALS ANY MORE.  THERE ARE MORE PEOPLE BECOMING ILL IN

7    THE PRISONS BECAUSE OF LACK OF CARE.

8          HOW DO YOU TERM THE CLASS?  ISN'T IT A CONSTANTLY

9    CHANGING GROUP OF PEOPLE?

10         **MR. KAUFHOLD:** I THINK IT IS A CONSTANTLY CHANGING

11   GROUP, YOUR HONOR, BUT IT'S NOT NECESSARILY A FAST-SHIFTING

12   IMMEDIATELY CHANGING GROUP.  OUR POINT IS --

13         **JUDGE REINHARDT:** THIS CASE ISN'T BEING RESOLVED

14   RAPIDLY.  IT'S BEING RESOLVED ON AN AVERAGE OF 10 YEARS.

15         **MR. KAUFHOLD:** THAT'S TRUE, YOUR HONOR, AND SOME

16   FLOW -- I BELIEVE THAT'S A TERM THAT PLAINTIFFS' COUNSEL

17   USED -- IN AND OUT OF THE CLASS OVER THAT PERIOD OF TIME IS TO

18   BE EXPECTED.

19         OUR ONLY POINT IS THAT THE RELIEF THAT IS ORDERED

20   SHOULD BE TARGETED DIRECTLY AT THE AFFECTED INDIVIDUALS AND

21   THAT WAS THE POINT THAT I WANTED TO MAKE, YOUR HONOR.

22         **JUDGE HENDERSON:** EFFECT ON THE COUNTIES, IS THAT

23   WHAT YOU ARE SAYING?

24         **MR. KAUFHOLD:** WELL, I THINK IT WOULD BE GREAT IF

25   EVERYTHING COULD BE SOLVED WITHOUT IMPACTING THE COUNTIES, BUT,

1  FRANKLY, WE ARE HERE TALKING ABOUT TWO PLAINTIFF CLASSES, NOT

2  ABOUT THE COUNTIES.

3      **JUDGE REINHARDT:**  THE POINT, AS I UNDERSTAND THIS

4  CASE -- SOMEBODY ELSE MENTIONED THIS, TOO.  THE FACT THAT THE

5  PRISON IS OVERCROWDED -- ASSUME THAT THIS IS THE SOLUTION; THAT

6  THE OVERCROWDING HAS AN EFFECT ON PEOPLE IN THE PRISON WHO THEN

7  -- WHO HAVE HEALTH PROBLEMS.

8      NOW, IN ORDER TO AVOID THE HEALTH PROBLEMS WHICH ARE

9  CAUSED BY OVERCROWDING, YOU HAVE TO REDUCE THE OVERCROWDING.

10  AND THAT'S WHAT AFFECTS THE CLASS OF PEOPLE WHO BECOME ILL OR

11  ARE ILL.

12      **MR. KAUFHOLD:**  I THINK THERE ARE TWO DIFFERENT THINGS

13  THERE, YOUR HONOR, AND IT DEPENDS.

14      IF YOU BELIEVE IT IS OVERCROWDING THAT IS THE DIRECT

15  CAUSE THAT'S MAKING PEOPLE SICK, I UNDERSTAND YOUR POINT.

16      IF THE POINT IS PEOPLE DEVELOP CHRONIC MEDICAL

17  PROBLEMS AND THEY DON'T GET SEEN QUICKLY ENOUGH OR THERE AREN'T

18  ENOUGH SPECIALISTS, THERE ARE DIFFERENT POSSIBILITIES.  AND I

19  THINK IT DEPENDS ON WHETHER YOU BELIEVE THAT THE CONDITION

20  THEMSELVES ARE BEING CAUSED BY OVERCROWDING OR WHETHER YOU

21  BELIEVE OVERCROWDING IS PREVENTING PEOPLE FROM RECEIVING CARE

22  FOR THINGS THAT COULD --

23      **JUDGE KARLTON:**  MAYBE BOTH.

24      **MR. KAUFHOLD:**  IT COULD BE BOTH.

25      **JUDGE REINHARDT:**  I DON'T SEE HOW YOU HAVE THIS

 1  NARROW TAILORED LIMITED TO THE SPECIFIC PEOPLE.

 2        I MEAN, I WOULD BE HAPPY TO CONSIDER THAT KIND OF

 3  PROPOSAL IF I ONLY UNDERSTOOD HOW YOU CAN SEGREGATE THAT CLASS,

 4  BECAUSE THE THEORY IS IT'S THE OVERCROWDING THAT'S CAUSING THE

 5  FAILURE TO TREAT HEALTH PROBLEMS PROPERLY.

 6        SO WHAT DO YOU DO BY SEGREGATING THE CLASS?  HOW DOES

 7  THAT AFFECT YOUR RESOLUTION OF THE PROBLEM IF IT'S CAUSED BY

 8  OVERCROWDING?

 9        **MR. KAUFHOLD:**  I GUESS IT DEPENDS, YOUR HONOR, ON THE

10  EXTENT TO WHICH IT REALLY IS CAUSED BY OVERCROWDING, BUT ONE

11  THING WOULD BE TO DO SOME SORT OF SEGREGATION ALONG THE LINES

12  THAT COUNSEL MITCHELL SUGGESTED, TO HAVE SPECIALIZED FACILITIES

13  OF THE SORT THAT I BELIEVE JUDGE KARLTON WAS SPEAKING OF

14  EARLIER.

15        **JUDGE KARLTON:**  YOU KNOW WHAT'S HAPPENED.  THE

16  RECEIVER ON BEHALF OF BOTH THE PLATA CLASS AND THE COLEMAN

17  CLASS WANTS TO BUILD 10,000 BEDS.  THE STATE SAID, FINE, WE

18  WILL GO RIGHT ALONG WITH THAT.  AND IN THE MIDDLE OF THE TRIAL

19  THEY SAID, WE ARE NOT GOING TO DO THAT.  AND NOW THEY SAY,

20  LET'S GET RID OF THE RECEIVER.

21        IT'S NOT LIKE -- IT'S NOT LIKE THESE SUGGESTIONS HAVE

22  NOT BEEN RAISED AND, INDEED, AT SOME POINT IDENTIFIED -- I

23  MEAN, ADOPTED.  WE ARE FACED WITH THE FACT THAT THE STATE HAS

24  NOW INDICATED THEY ARE UNWILLING TO DO THAT.

25        **MR. KAUFHOLD:**  AND I THINK THE ANSWER, YOUR HONOR, WE

1  ARE GOING TO HAVE SHORTLY FROM THE NINTH CIRCUIT.  THE ONLY

2  THING THAT I WOULD ADD IS THAT WE ARE NOT A MONOLITHIC GROUP

3  NECESSARILY AND PEOPLE CAN HAVE DIFFERING OPINIONS ON THAT.

4          WE BELIEVE THAT BOTH THE RECEIVER AND SPECIAL MASTER

5  HAVE MADE A LOT OF PROGRESS.  WE HAD CITY LEGISLATORS COME IN

6  AND TESTIFY THAT THAT WAS THEIR BELIEF.

7          SO I WOULD NOT WRITE OFF THAT POSSIBILITY, AND I

8  CERTAINLY WOULDN'T TRY TO FORETELL WHAT THE COURT WILL DECIDE

9  WITH RESPECT TO THE CONTINUANCE OF THE RECEIVER'S WORK.

10         **JUDGE KARLTON:**  I UNDERSTAND WHAT YOU ARE SAYING.  WE

11  HAVE GOT TO DECIDE -- WELL, ALL RIGHT.

12         **MR. KAUFHOLD:**  MY ONLY POINT IS, YOUR HONOR, THERE IS

13  ADDITIONAL TIME TO SEE HOW THAT TURNS OUT, AND IT'S NOT LIKE

14  EIGHT JOINDERS DROPPED IN THE MAIL TO THAT MOTION.  THAT'S WHAT

15  I'M SAYING.

16         **JUDGE REINHARDT:**  AT SOME POINT I GUESS IF THE CASE

17  GOES ON LONG ENOUGH, YOU JUST HAVE TO DECIDE WHAT TO DO AND YOU

18  HAVE TO LOOK AT THE CURRENT CIRCUMSTANCES AT SOME POINT.

19         WE CAN'T SAY, WELL, WITHIN THE NEXT FIVE TO TEN YEARS

20  THE STATE WILL BUILD PRISONS BECAUSE WE ARE GOING TO ELECT A

21  LEADER FOR THEM.

22         AN ASIDE, BARAK OBAMA ISN'T AVAILABLE.  SO WHERE IS

23  THIS NEXT MESSIAH GOING TO COME FROM?  I KNOW SOME PEOPLE MAY

24  HAVE AN IDEA THAT THEY KNOW WHO HE IS, BUT WE'VE SEEN HIM

25  BEFORE.

1        SO DON'T KNOW WHO IT'S GOING TO BE.  THERE ARE A LOT

2   OF PEOPLE WHO ARE INTERESTED, WHETHER THAT PRISON IS GOING TO

3   BE A LEADER OR NOT.  AND I DON'T THINK WE CAN WAIT FOR THAT.

4        AND IF HE IS A LEADER, HOW IS HE GOING TO GET TO

5   LEGISLATURE ON BEHALF OF YOUR CLIENTS?  THIS IS A DIFFICULT

6   SYSTEM, AND YOU WAIT AWHILE.

7        I THINK JUDGE KARLTON AND JUDGE HENDERSON WERE --

8   HAVE BEEN QUITE PATIENT AND REASONABLE AND THEN AT SOME POINT

9   YOU SAY, WELL, WE CAN'T SPECULATE AS TO WHETHER THE STATE IS

10  GOING TO BECOME REASONABLE.  WHEN ARE THEY GOING TO ALLOW THE

11  LEGISLATURE TO KISS AND MAKE UP AND THROW THEIR ARMS AROUND

12  EACH OTHER AND MARCH OFF AND SAY MORE MONEY FOR PRISON?

13      **JUDGE KARLTON:**  AND THE TRUTH IS, YOU KNOW --  I

14  MEAN, PART OF THE PROBLEM IS WE NOW ARE FACED WITH THIS

15  ECONOMIC CRISIS.  AND I DON'T SEE ANYTHING SUGGESTING THAT

16  WE'RE GOING TO HAVE TONS OF MONEY TO SPEND ON THESE PROGRAMS

17  THAT THE COUNTIES URGE UPON US.

18      **MR. KAUFHOLD:**  IT'S A VERY DIFFICULT PROBLEM.

19      THE ONE THING I JUST WOULD ADD, YOUR HONOR, IS WE

20  ACTUALLY DID TRY TO COME TOGETHER TWO YEARS AGO AND IT WORKED

21  AS FAR AS IT WENT UNTIL IT DIDN'T.

22      AND I CAN'T PROMISE YOU WHEN THAT EFFORT WILL BE

23  REINVIGORATED, OTHER THAN TO SAY THAT AS RECENTLY AS DECEMBER,

24  MY CLIENTS AND MANY OTHERS WERE IN THE TRENCHES TRYING AND

25  ACTUALLY PASSED WHAT IS -- THE TESTIMONY, THE SWORN TESTIMONY

1  BEFORE THIS COURT WAS THAT WAS THE LAST STEP TO REAL PROGRESS.

2  AND IT'S BEEN THWARTED, BUT IT DOESN'T MEAN THAT IT'S NOT BEING

3  ACTIVELY PURSUED IN GOOD FAITH.

4       **JUDGE KARLTON:**  MAY I ASK YOU A QUESTION?  AND IF YOU

5  HAVEN'T RESEARCHED IT, THAT'S PERFECTLY UNDERSTANDABLE.

6       DO YOU AGREE WITH THE PLAINTIFFS OR DEFENDANTS THAT

7  THIS COURT HAS THE POWER TO ORDER THE STATE TO SHARE ANY

8  SAVINGS THAT WOULD COME FROM A PRISONER RELEASE?

9       **MR. KAUFHOLD:**  I HAVEN'T BRIEFED THAT, YOUR, HONOR

10  BUT MY PRELIMINARY THOUGHT WOULD BE IT DOESN'T SEEM LIKE THERE

11  ARE LIMITATIONS WITHIN THE PLRA OTHER THAN THOSE SPECIFICALLY

12  STATED, WHICH WERE THE TAXATION AND THE BUILDING OF PRISONS.

13       **JUDGE KARLTON:**  IT'S NOT A STATUTORY QUESTION.  IT'S

14  A CONSTITUTIONAL QUESTION.

15       **JUDGE REINHARDT:**  I WOULD BE INTERESTED IN YOUR VIEW

16  WHEN YOU DO RESEARCH IT.  YOU COME FROM A PRETTY GOOD FIRM.

17  YOU COULD PUT SOME GOOD PEOPLE TO WORK ON.  I'M NOT AS SURE AS

18  JUDGE KARLTON THAT THERE IS A PROBLEM.

19       **MR. KAUFHOLD:**  WE WOULD BE GLAD TO DO THAT, YOUR

20  HONOR.

21       **JUDGE REINHARDT:**  WELL, I THINK WE MAY SEND YOU ALL

22  AN ORDER BECAUSE IT'S AN IMPORTANT PART FOR US TO KNOW WHAT WE

23  CAN DO.

24       AND WE HAVE HAD -- THE FEDERAL COURTS HAVE HAD

25  PROBLEMS WITH STATES BEFORE THAT RESISTED ALL KINDS OF FEDERAL

1  ORDERS.  THEY ISSUED ORDERS THAT MADE THE STATES INTEGRATE THE

2  SCHOOLS EVEN THOUGH IT COST THEM MONEY.  THERE ARE LOTS OF

3  THINGS THAT FEDERAL COURTS HAVE ORDERED STATES TO DO WHICH

4  REQUIRED THE EXPENDITURE OF FUNDS.

5          SO I'M NOT SO SURE WE HAVE A CONSTITUTIONAL

6  LIMITATION.  AND OUR AUTHORITY TO SEE THE PROGRAMS WORK,

7  EVERYTHING COSTS MONEY.  AND IF WE COULDN'T ORDER THE

8  EXPENDITURES OF FUNDS, FEDERAL COURTS COULDN'T TELL THE STATES

9  ANYTHING.

10         SO I WOULD REALLY BE INTERESTED IN YOUR VIEW.  WE'LL

11  TALK ABOUT GETTING AN ORDER TO THE PARTIES TO GIVE US THEIR

12  VIEWS.  I KNOW YOU'VE ALL GIVEN US PRELIMINARY VIEWS.

13         AND I APPRECIATE MR. MELLO CALLING OUR ATTENTION TO A

14  PARTICULAR CASE, BUT THAT DOESN'T NECESSARILY ANSWER THE

15  QUESTION.

16         SO WE WILL LET YOU LET YOU KNOW, BUT I THINK -- IT'S

17  CERTAINLY A GOOD QUESTION IN THIS CASE AS TO WHAT WE COULD DO

18  AND IT CERTAINLY WOULD BE A LOT NICER TO BE ABLE TO HAVE THE

19  COUNTIES HAVE SOME PROGRAMS TO TAKE OVER PART OF THE STATE'S

20  PROBLEM.  SO YOU'LL PROBABLY HEAR FROM US ABOUT THAT, AND DO A

21  GOOD JOB.

22         **MR. KAUFHOLD:**  THANK YOU FOR LETTING US PARTICIPATE,

23  YOUR HONORS.

24         **JUDGE REINHARDT:**  THANK YOU.  WE HAVE ENJOYED HAVING

25  YOU HERE.  AND THAT TAKES CARE OF IT FOR THIS AFTERNOON.

1    TOMORROW MORNING WE WILL HAVE THE PLAINTIFFS' REBUTTAL.

2              (WHEREUPON AT 5:08 P.M. FURTHER PROCEEDINGS

3               IN THE ABOVE-ENTITLED CAUSE WAS ADJOURNED

4               UNTIL WEDNESDAY, FEBRUARY 3, 2009 AT 10:00 A.M.)

5

6                         -   -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **I   N   D   E   X**

3

4                                                           <u>PAGE</u>      <u>VOL.</u>

5   Closing Argument by Mr. Specter              2873      15
    Closing Argument by Mr. Bien                 2917      15
6   Closing Argument by Ms. Leonard              2943      15
    Closing Argument by Mr. Mello                2946      15
7   Closing Argument by Ms. Tillman              2993      15
    Closing Argument by Mr. Mitchell             3013      15
8   Closing Argument by Ms. Barlow               3037      15
    Closing Argument by Ms. Woodward             3060      15
9   Closing Argument by Ms. Fuentes              3066      15
    Closing Argument by Ms. Keck                 3071      15
10  Closing Argument by Mr. Kaufhold             3082      15

11

12                          –   –   –   –

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, DEBRA L. PAS, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C 01-1351 MARCIANO PLATA VS ARNOLD SCHWARZENEGGER AND S-90-0520 RALPH COLEMAN VS ARNOLD SCHWARZENEGGER, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.


_____
/S/ DEBRA L. PAS

DEBRA L. PAS, CSR 11916, CRR, RMR, RPR

TUESDAY, FEBRUARY 3, 2009