PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

                Plaintiffs,

        v.

ARNOLD SCHWARZENEGGER, et al.,

                Defendants.

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' BED PLAN STATEMENT AND REQUEST FOR AN ORDER REQUIRING DEFENDANTS TO PREPARE AND IMPLEMENT AN INTERIM EMERGENCY PLAN TO ADDRESS THE ICF, APP, MHCB AND EOP BED SHORTAGES**

Hearing:        March 24, 2009
Time:            1:30 P.M.
Courtroom:     4
The Honorable Lawrence K. Karlton

[282703-3]

# INTRODUCTION

Governor Schwarzenegger and other state officials responsible for compliance with the remedial orders of this Court have again demonstrated their inability or unwillingness to seriously address the unconstitutional and dangerous current conditions that exist within the CDCR for prisoners with serious mental illnesses.  Despite numerous court orders and the development of at least six mental health bed plans, the present need for mental health beds remains unmet, and the state has no plan that comes close to meeting its own projections for future needs.  The significant mental health bed shortages will continue to result in preventable deaths, injuries, pain and suffering among the plaintiff class.

Defendants have made clear in their response to the Tentative Order of the Three Judge Court, that they have no interest in working with the parties and intervenors to reduce the overcrowding that is the primary cause of the failure to provide adequate care to *Coleman* class members.  (*See* Defendants' Response to Tentative Ruling, Docket No. 3531.)  They prefer to engage in a Supreme Court appeal that they hope will deny or delay any population reduction measures far into the future.  Consistent with their position in the Three Judge Court proceedings, Defendants' bed planning process treats population reduction through parole and credit reform as one of many far-off contingencies on which the *Coleman* class and this Court cannot rely for any short-term relief to the current suffering, or for any long-term commitment for change.  Plaintiffs therefore must continue to press for bed plans that meet the existing and projected needs—not on the state's business-as-usual time schedule, but on an emergency basis.  Overcrowding is the primary cause of the ongoing constitutional violations in the delivery of mental health care and no relief other than a population reduction order can remedy the violations.   In addition to a population reduction order, the construction of appropriate numbers of specialized mental health beds to address the needs of the *Coleman* class is necessary to remedy the violations.  In the interim, the current emergency conditions require prompt action to save lives.

On February 17, 2009, this Court issued an order permitting continued operation of an unlicensed unit at the CIM General Acute Care Hospital due to the chronic shortage of Mental

[282703-3]

1  Health Crisis Beds.  (Docket No. 3516.)  At the same time, the Court granted Plaintiffs' request

2  for an evidentiary hearing on the current status of Defendants' mental health bed plans, setting

3  the hearing for March 24, 2009, and directing Defendants to "file and serve a statement setting

4  forth the present bed plan not later than fifteen days from the date of this order," or by March 4,

5  2009.  (Docket No. 3515.)  On the day their filing was due, Defendants filed a request for a 90-

6  day extension of time, which Plaintiffs opposed.  (Docket No. 3538.; *see also* Plaintiffs'

7  Opposition (Docket No. 3539).)  On March 5, 2009, the Court denied Defendants' request for an

8  extension of time and directed Defendants "to work immediately and with full dispatch on the

9  development of a plan, so the financial aspects thereof can be included in the upcoming budget

10  process if necessary." (Docket No. 3450 at 2:7-9.)  The Court also ordered Defendants to file a

11  written progress report within 10 days, and ordered that the "hearing set for March 24, 2009 will

12  now be for the purpose of considering what further steps are required to insure timely

13  compliance." (*Id.* at 2:11-12, 2:20-22.)

14       Defendants filed their written progress report on March 19, 2009.  (Docket No. 3544[1].)

15  Defendants assert that they expended "a total of 1,356 hours" over the three days from March 9

16  to March 11, 2009 (Docket No. 3544 at 2), but still have no mental health bed plan, and will not

17  have one for another 30 days.  (*Id.* at 10.)  Defendants ask this Court to endorse their decision to

18  abandon years of prior bed-planning efforts and go back to square one, starting with hundreds of

19  hours of "collaborative, consensus-based facilitated process." (Docket No. 3544 at 2.)

20  Defendants have already had years and years of high-level, abstract collaborative processes, out

21  of which have come no fewer than six bed plans.[2]  If the present needs for mental health beds

22

23  _____

24  [1] When citing attachments to Defendants March 19, 2009 filing that are not consecutively
   paginated, Plaintiffs here use the numbering system provided by the ECF header.  Page numbers

25  that end with "of 88" refer to the ECF headers.  When page numbers are used without "of 88,"
   they refer to the internal pagination of Exhibit 1 to the March 19, 2009 filing, entitled "Report on

26  Progress Regarding the Development of a Bed Plan in Response to the March 5, 2009 Court
   Order."

27
   [2] March 2005 Bed Plan, August 2005 Bed Plan, April 2006 Bed Plan, December 2006 Bed Plan,

28  August 2007 Bed Plan, July 2008 Bed Plan.

[282703-3]

were being met, Plaintiffs would have no objection to such a leisurely collaborative process.

Present needs, however, are not being met.[3]  *Coleman* class members who need life-saving

mental health placements are instead lingering on wait lists for weeks and months.[4]  The wait

lists have existed for years and will continue to grow if this Court endorses Defendants' return to

bed planning square one.

The only concrete plans referenced in Defendants' written progress reports are projects

that were ordered by this Court years in the past and which, with few exceptions, are still not

completed.  Some of the excuses for non-completion are mind boggling.  The 64-bed

Intermediate Care Inpatient facility at Salinas Valley State Prison is not open to patients because,

according to Defendants' report, they cannot finish the contractor's "punch list" because they

have an "invoice backlog" that kept them from paying the contractor for work already

performed.  (Docket No. 3544 at 52 of 88 ("Project Information Sheet").)  These 64 beds are for

a program with a wait list that has not been below 159 for the past year.  These are among the

most acutely ill and hardest to place (high custody Level IV) *Coleman* class members.

---

[3] The Enhanced Outpatient Program gap for fiscal year 2009/10 is 1,107 beds.  (Docket No. 3544, Attachment C, "Mental Health Bed Plan Study – Based on Fall 2008 Population Projections, November 2008," at page 33 (811-bed deficit for EOP Male General Population + 174-bed deficit for EOP Male Administrative Segregation Unit Population + 122-bed deficit for EOP Male Psychiatric Services Unit Population = 1,107-bed EOP deficit).)  The Acute Inpatient Program gap for fiscal year 2009/10 is 50 beds.  (*Id.*)  The Mental Health Crisis Bed gap for fiscal year 2009/10 is 66 beds.  (*Id.*)  The gap for Intermediate Inpatient Care in celled housing for fiscal year 2009/10 is 113 beds.  (*Id.*)

[4] The Mental Health Crisis Bed average weekly wait list for January 2009 was 42 patients, up from a monthly average of 23.5 patients according to Defendants' chart of wait list trends from the Three Judge Court trial.  (*Compare* Declaration of Jane Kahn In Support of Plaintiffs' Objections To Defendants' Bed Plan Statement And Request For An Order Requiring Defendants To Prepare And Implement An Interim Emergency Plan To Address The ICF, APP, MHCB And EOP Bed Shortages (hereinafter "Kahn Decl.") ¶ 21, Exh. P-1020 (January 2009 MHCB Wait List Table), *with* Defs.' Exh. D-1290 at 4.)  The Acute Inpatient or APP program wait list for February 2009 includes 19 men.  (Kahn Decl. ¶ 13, Exh. P-1011.)  The Salinas Valley Psychiatric Program waitlist for Intermediate Inpatient Care had 163 persons in February 2009, 154 of whom had an average length of stay exceeding 30 days.  (Kahn Decl. ¶ 9-12, Exhs. P-1010, P-1012.)

3

[282703-3]

1    Defendants allowed the project to stall because of unpaid bills, despite having just spent 1,356

2    hours in meetings about how to get projects moving.  This level of deliberate indifference speaks

3    for itself.

4        Defendants' written progress report also includes a "new" Navigant Mental Health Bed

5    Needs Study, dated November 2008.  (Docket No. 3544 at 55 of 88.)  Defendants offer no

6    explanation as to why this November 2008 report was not produced to plaintiffs and the Special

7    Master until March 2009 or during the course of the recent Three Judge Court trial despite its

8    obvious materiality to the question of whether Defendants can provide mental health care to the

9    numbers of prisoners they are currently housing, and plan to house in the future.  The November

10   2008 Navigant study projects higher needs in 10 out of the 13 population groups, compared to

11   the Spring 2008 Navigant projections that Defendants made available for the Three Judge Court

12   trial.  (Defs.' Exh. D-1175-2.)

13       Pursuant to the Court's March 5, 2009 Order stating that the purpose of the March 24,

14   2009 hearing is "for the purpose of considering what further steps are required to insure timely

15   compliance," (Docket No. 3450 at 2:20-22), Plaintiffs respectfully request that the Court issue an

16   Order requiring the following:

17       1.   <u>Short Term Relief</u>.

18       The following steps are required regarding specific short-term projects.

19           a.   California Men's Colony 50-Bed Free Standing Mental Health Crisis Beds.

20   Defendants must complete submission of all necessary documents to the Legislature within 5

21   days, certify to this Court within two weeks that all contingencies have been removed, and

22   provide this Court with a firm date for completion of the construction no later than September

23   30, 2009.

24           b.   CIW 45-Bed Acute and Intermediate Care Facility.  Defendants must submit

25   a final plan for funding and construction, with all contingencies removed and all events

26   calendared for dates certain, within 30 days.

27

28

[282703-3]

c.    CMF 64-bed Intermediate Care Facility. Defendants must submit a final plan for funding and construction, with all contingencies removed and all events calendared for dates certain, within 30 days.

d.    CMF EOP Treatment Space. Defendants must submit a final plan for funding and construction, with all contingencies removed and all events calendared for dates certain, within 30 days.

e.    LAC & SAC EOP Treatment Space.  Defendants must submit a final plan for funding and construction, with all contingencies removed and all events calendared for dates certain, within 30 days.

f.    San Quentin 20 MHCB Beds. Defendants must submit a final plan for funding and construction of the 20 Mental Health Crisis Beds at San Quentin that are part of the Building 22 project, with all contingencies removed and all events calendared for dates certain, within 30 days.

g.    SVSP 64-Bed Intermediate Care Facility. Defendants are ordered to show cause at an evidentiary hearing in 10 days why the SVSP 64-bed intermediate care facility is not open for patients, with the Governor to produce for examination the persons responsible for payment of the contractor's invoices.

h.    SVSP 72-Bed EOP Administrative Segregation Unit. Defendants must submit a final plan for funding and construction of this project with all contingencies removed and all events calendared for dates certain, within 30 days.

i.    SVSP EOP Treatment, Office and Housing Conversions. Defendants are ordered to include the necessary funding in the 2009/10 budget submissions.

2.    <u>Interim Emergency Relief</u>.

a.    Defendants must identify within 30 days other locations for emergency retrofits similar to the D5/D6 conversions at SVSP and the P2/P3 conversions at CMF, in a number sufficient to address the current need for licensed ICF Level IV male inpatient beds.

b.    Defendants must identify Outpatient Housing Unit (OHU) programs which can be converted to emergency MHCBs through augmented mental health staffing and limited

[282703-3]

1   retrofitting, if necessary.  The Court has issued emergency waivers in the past to enable

2   defendants to operate the CMC LOU and the CIM GACH as "licensed" MHCBs in the face of

3   emergency MHCB shortages.  Defendants must be ordered to come forward with a similar plan

4   within 30 days.

5           c.      Defendants must establish an EOP program at Coalinga State Hospital to

6   accept  Level I-III EOP patients within 60 days.  This program is an interim step to address the

7   current emergency need for EOP beds that will continue to exist until Defendants' long-term bed

8   plans are finalized and implemented.

9           d.      Defendants must address the immediate shortage of acute inpatient beds and

10  provide 25 acute beds in licensed DMH hospitals by July 2009.  The bed plan that Defendants

11  must file in 30 days must include a plan to address the acute bed need identified in their Navigant

12  bed need study for FY 2009/10 and forward until the completion of any long-range bed plan

13  projects.

14          3.      <u>Long Term Relief</u>.

15          a.      Defendants are to serve and file a long-term bed plan to meet all needs

16  identified in the most recent Navigant study within 30 days.  The long-term bed plan must meet

17  100% of the need identified in the most recent Navigant study by June 30, 2013.  The plan must

18  provide a means to eliminate funding obstacles and contingencies.  The plan must not include as

19  "contingencies" elements that are in Defendants' control, such as any "uncertainty" regarding the

20  status of the Receiver beds, as such uncertainty is entirely the creation of Defendants.

21          b.      Defendants' contract for outside mental health bed projections must be

22  extended to at least 2012, and reports from the contractor must be provided to Plaintiffs and the

23  Special Master immediately upon receipt.

24                          **BACKGROUND**

25          For reference, the mental health beds discussed here fall into the following categories:

26          1.      <u>Enhanced Outpatient Program (EOP)</u>.  The EOP program within CDCR provides

27  the most intensive level of outpatient mental health services to prisoners.  It is characterized by

28  separate housing and structured therapeutic activities for prisoners with serious mental illness

[282703-3]

1  who, because of their illness, cannot function in the general population, but do not require 24-

2  hour inpatient care.  (Pls.' Exh. P-9 at 12-4-1.)

3    2.    Mental Health Crisis Bed (MHCB).  The MHCB programs are licensed in-patient

4  beds located inside of prisons which operate 24 hours a day, seven days a week for inmate-

5  patients admitted with acute symptoms of a serious mental disorder or a significant or life-

6  threatening disability.  (Pls.' Exh. P-9 at 12-5-1.)  An inmate-patient referred to an MHCB shall

7  be transferred within 24 hours of referral, and the length of stay in the MHCB is up to 10 days.

8  (*Id.* at 12-5-4.)

9    3.    Acute Inpatient.  The Acute Inpatient Program (APP) is the highest level of acute

10  inpatient psychiatric hospitalization provided by DMH for CDCR patient in an intensive

11  treatment program, with stays generally ranging from 30 to 45 days.  (Pls.' Exh. P-9 at 12-6-2.)

12  Inmate-patients who have repeated admissions to an MHCB or who cannot be stabilized in an

13  MHCB after 10 days shall be considered for referral to APP.  (*Id.* at 12-6-1.)  The program for

14  males is provided in the Vacaville Psychiatric Program at California Medical Facility and at

15  Atascadero State Hospital and the program for women is provided in Patton State Hospital. (*Id.*)

16    4.    Intermediate Inpatient.   The Intermediate Care Inpatient Programs (ICF) for

17  CDCR patients are located at Atascadero State Hospital, Coalinga State Hospital, Patton State

18  Hospital, Salinas Valley Psychiatric Program at Salinas Valley State Prison, and Vacaville

19  Psychiatric Program at California Medical Facility. (Pls.' Exh. P-9 at 12-6-7.)  The ICF programs

20  provide longer-term mental health non-acute inpatient treatment for patients who have a serious

21  mental disorder requiring treatment that is not available within CDCR.  (*Id.*)  By definition, these

22  patients are unable to adequately "function within the structure of the CDCR EOP Level of

23  Care."  (*Id.*)

24    The history of Defendants' bed planning efforts began in 1998.  By 2002, they had

25  undertaken long-range bed planning with a bed need study prepared by Tucker-Alan.  (*See*

26  Special Master's Supplemental Report on the Status and Sufficiency of Defendants' Interim and

27  Long Term Plans for the Provision of Acute and Intermediate Inpatient Beds and Mental Health

28  Crisis Beds [hereinafter "SM Supp Report"] at 6 (Docket No. 1969).)   In late 2004, the CDCR

[282703-3]

1  Mental Health Master Plan (HOK Plan), was developed, proposing three regional 1,500 bed

2  mental health facilities.  (Fifteenth Monitoring Report of the Special Master on the Defendants'

3  Compliance with Provisionally Approved Plans, Policies and Protocols [hereinafter "Special

4  Master's 15th Report"] at 386 (Docket No.1746).)  The California Legislature refused to fund the

5  next phase of the development of the HOK plan, and CDCR had to "return to the drawing

6  board."  (*Id.* at 378.)

7        Defendants next developed their interim August 2005 Intermediate Care Facility Bed

8  Plan, which provided for the conversion of prison housing units to increase the number of Level

9  IV Intermediate Care Beds.  (*Id.*)  In discussing Defendants' efforts to address the needs of Level

10  IV prisoners requiring this level of care, the Special Master noted with frustration:

11        The defendants' paucity of resources for the provision of
          intermediate inpatient care to level IV inmates is not a recent
12        development.  In 1998, CDCR committed to conduct an assessment
          to determine the extent of the suspected need, but took seven years to
13        complete the assessment.  DMH has long operated under the
          protective assumption that it had no obligation to provide mental
14        health services for CDCR inmates who might represent a danger to
          DMH programs and staff, although it knew well it was the only
15        source of inpatient care available to CDCR.  For its part, CDCR has
          long assumed that it met its obligation to provide mental health
16        services to these most difficult to place inmates  by executing its
          inter-agency agreement with DMH, even though it knew, or should
17        have know, that DMH did not, and would not, accept these violence-
          prone Level IV inmates.  CDCR has a direct obligation under the
18        terms of the *Coleman* remedy to provide clinically identified
          treatment services to this group of CDCR inmates. That obligation
19        has not simply disappeared in the crack between the false
          assumptions of CDCR and DMH.

20

21  (*Id.* at 385.)

22        Finally, in response to the recommendations contained within the Fifteenth Monitoring

23  Report, which the Court adopted, Defendants were ordered to submit a plan by April 17, 2006

24  for the provision of MHCBs for all CDCR prisoners and a plan to address the interim and long-

25  range needs based on updated population projections.  (March 3, 2006 Order (Docket No. 1772).)

26  Defendants filed their Mental Health Bed Plan on April 17, 2006.  (Docket No. 1786.)

27

28

[282703-3]

## April 2006 Bed Plan And Bed Plan Hearings

The Special Master recommended, and the Court ordered, that hearings be held on the adequacy of Defendants' April 2006 bed plan. (March 3, 2006 Order at ¶ 8 (Docket No. 1772).) During the two days of hearings, held on April 26 and April 27, 2006, state officials, including representatives from CDCR, the Department of Mental Health (DMH), and the Department of Finance (DOF) testified. This Court noted in its order issued following the hearings:

> The special master reports, the record reflects, and defendants admit, that the plan presented to the court in no way adequately responds to the severe shortages of intermediate care facility beds and mental health crisis beds that currently exists in the CDCR. It is undisputed that the shortage is leaving critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care.

(May 2, 2006 Order at 2:14-18 (Docket No. 1800).)

The Court approved Defendants' long-range bed plan, but required Defendants to address the serious shortfall in EOP beds. (*Id.* at 4 ¶ 2.) The Court directed Defendants to file an interim bed plan within forty-five days to address the significant and immediate shortages of Intermediate Inpatient and Mental Health Crisis Beds. (*Id.* at 4 ¶ 4.) Defendants filed their interim bed plan on June 14, 2006. (*See* Docket No. 1860.) In his review of the interim bed plan, the Special Master noted that Defendants had added to "their interim plan a new commitment to build a 50-bed permanent mental health crisis unit at California Men's Colony" but cautioned that, "[i]n the short term, the success of defendants' planning for the provision of an adequate supply of mental health crisis beds can best be gauged by the length of the wait beyond 24 hours for inmates referred to a mental health crisis bed throughout the system."[5] (SM

---

[5] Using the standard suggested by the Special Master, Defendants' ability to provide an adequate supply of Mental Health Crisis Beds has deteriorated even further since the overcrowding trial. In the most recent data provided by Defendants on the MHCB Referrals/Transfers, only 9 of the 397 patients referred for MHCB transfer were transferred within 24 hours, while in August 2008, 58 of the 322 referred for MHCB transfer were transferred within 24 hours. (Kahn Decl. ¶¶ 6-7, Exhs. P-1005 (Enclosure 20, August 2008; January 2009 Coleman Monthly Data), P-1006 & P-1007.)

[282703-3]

1  Supp Report at 19-20 (Docket No. 1969).)   The Special Master found that although Defendants'

2  "interim and long range plans together meet the needs projected in the Navigant study for this

3  category of CDCR's seriously mentally ill population through FY2011; they do not meet the

4  need identified in defendants' mid-April projections until permanent construction comes on line

5  sometime in FY2011." (*Id.* at 21.)

6      The Special Master recommended that Defendants be required to file a final long range

7  plan to meet the needs for Acute Inpatient, Intermediate Inpatient, and EOP beds. (*Id.* at 26.)

8  Special Master Keating noted that a legislative initiative referenced by Defendants[6] to build "up

9  to 5,000 beds for seriously  mentally disordered inmates," while welcome, should "not be

10  allowed to further delay the delivery of sorely needed resources now scheduled for completion in

11  2011, a year that will mark the twentieth anniversary of the filing of the *Coleman* suit." (*Id.* at

12  27.) In an order dated October 20, 2006, the Court ordered Defendants to file within sixty days,

13  a final long-range plan for the provision of Acute and Intermediate Inpatient beds, and EOP beds.

14  (Docket No. 1998 at ¶ 4.) Defendants' interim plan for the establishment of Intermediate

15  Inpatient beds in D-5 and D6 at Salinas Valley State Prison and in the P-3 wing at California

16  Medical Facility was approved by the Court. (*Id.* at ¶ 6.)

17                                    **December 2006 Bed Plan**

18      On December 19, 2006, Defendants filed what they characterized as a new Mental Health

19  Bed Plan. (Docket No. 2091.) The Special Master described the December 2006 bed plan as

20  "even less than a plan for a future plan; it is, more accurately, a concept paper." (Docket No.

21

22  [6] In the summer of 2006, Governor Schwarzenegger called a Special Session of the Legislature
    to address prison overcrowding. *See* Press Release, June 26, 2006, "Gov. Schwarzenegger Calls

23  Special Session of the Legislature to Address Prison Crowding, Recidivism," available at

24  http://gov.ca.gov/index.php/?press-release/1076/ (last accessed March 22, 2009). Although at
    least two bills were introduced to float bonds for new facility construction, neither was passed.

25  *See* ABX2_2, available at http://www.leginfo.ca.gov/cgi-
    bin/postquery?bill_number=abx2_2&sess=0506&house=B&author=spitzer (last accessed March

26  22, 2009); SBX2_2, available at http://www.leginfo.ca.gov/cgi-
    bin/postquery?bill_number=sbx2_1&sess=0506&house=B&author=runner (last accessed March

27  22, 2009).

28

[282703-3]

1  2133 at 14.)  In their newest bed plan, Defendants proposed consolidating the majority of the

2  mental health beds into five prisons—which they referred to as future Consolidated Care Centers

3  and removing the Department of Mental Health as the provider of inpatient care to CDCR

4  patients.  (*Id.* at 4-5.)  The Special Master recommended that the Court order a hearing where

5  Defendants should be required to demonstrate the reasonableness and feasibility of their

6  proposals.  (*Id.* at 20.)

7        In their response, Defendants requested an additional 90 days to submit a supplemental

8  bed plan that would address the details of their plan.  (Docket No. 2151 at 11.)  They also

9  referred to funding in the Governor's Budget for fiscal year 2007-08, which "proposes the

10  issuance of $1 billion in lease revenue bonds for the development and construction of mental,

11  dental and medical health facilities, including the consolidated care centers," and reported that

12  they "are working with the Receiver" to coordinate the bed planning process.  (*Id.* at 4, 5.)  In the

13  various declarations filed with their response, Defendants set forth the lengthy, burdensome

14  process that the State defendants must satisfy before a single bed is built.  (*Id.* at 7-8.)  The Court

15  granted Defendants' request for an extension of time and ordered them to file their supplemental

16  bed plan by June 15, 2007.  (Docket No. 2200.)

17                  **Defendants' August 2007 Supplemental Bed Plan**

18        On June 13, 2007, Defendants filed an *ex parte* request for a sixty-day extension of time

19  to file their supplemental bed plan.  (Docket No. 2276.)  Deborah Hysen, Lead of the Facilities

20  Construction Strike Team, filed a declaration in support of the *ex parte* motion.  (Docket No.

21  2276-3.)  In her declaration, Ms. Hysen testified that the Strike Team "will work to expedite the

22  construction of the in-fill, re-entry, medical/mental health, and county jail beds authorized by AB

23  900."  (*Id.* at ¶ 5.)  Furthermore, Ms. Hysen testified that the Strike Team will meet weekly with

24  CDCR executives to manage the design, construction and opening of the beds on schedule, and

25  "expediting construction will include waiving state laws, as needed, pursuant to the Governor's

26  Emergency Proclamation."  (*Id.* at ¶ 7.)  Finally, Ms. Hysen testified that the Strike Team had

27  reviewed the *Coleman* bed plan and required additional time to establish the organizational

28  capacity, systems, personnel and resources within the CDCR's facility operations.  (*Id.* at ¶¶ 8,

11

[282703-3]

10.)  Defendants were granted an extension and filed their Supplemental August 2007 Bed Plan

on August 17, 2007.  (Docket No. 2375-2.)

On September 24, 2007, the Special Master filed his Report and Recommendations on

Defendants' August 2007 Supplemental Bed Plan.  (Docket No. 2432.)  While the Special

Master noted that the August 2007 bed plan was an improvement over the December 2006

version, he reported that the supplemental bed plan "does not yet have the clear endorsement of

the special master's experts."  (Docket No. 2432 at 9.)  According to the Special Master, with the

plan's projected construction schedule, the completion of the bed project will  "stretch out the

full implementation period to January 2014, assuming the accuracy of the projected 59-month

schedule for the design and construction of the new facilities."  (*Id.* at 11.)   In fact, the Special

Master noted that "[o]ne could hardly be faulted for assuming actual implementation of all

aspects of this ambitious plan is unlikely to occur within a decade."  (*Id.* at 13.)  Even at the time

of the filing of the August 2007 bed plan, there was not even "[l]egislative authority to construct

any of the five consolidated care centers" that were projected in the December 2006 plan and

carried over in the August 2007 Supplemental Plan.  (*Id.* at 12.)  Despite the limitations of the

supplemental bed plan, the Special Master recommended that the Court should approved

defendants' revised August 2007 bed plan, while requiring the submission of additional planning

documents, including:  timelines for meeting and procuring for all CDCR-operated inpatient

programs applicable State licensure and accreditation by the Joint Commission on Accreditation

of Healthcare Organization  (JCAHO); a plan for the recruitment and compensation of hospital

administrators to develop and run CDCR's overall inpatient treatment program and specific

institutional inpatient programs; preparation of a MOU on DMH's mentoring in preparation for

CDCR to take over DMH's role as inpatient care provider; a plan identifying anticipated clinical

and custody staffing needs and a program for providing the personnel required to recruit, hire,

and retain; a development proposal for adequate mental health and treatment space for CMF and

SVSP; and an analysis justifying the reduction and/or elimination of mental health crisis beds in

the revised August 2007 plan.  (*Id.* at 16.)  The Court's October 18, 2007 Order approved

Defendants' August 2007 supplemental bed plan and required that Defendants file the

[282703-3]

1   supplemental information as recommended by the Special Master, demonstrating that CDCR had

2   a realistic plan for replicating and replacing the functions performed by the DMH in providing

3   licensed inpatient psychiatric hospital care to CDCR prisoners. (Docket No. 2461.)

**Consolidation With Receiver's Projects/Defendants' July 2008 Bed Plan**

5       On November 13, 2007, the parties were ordered to show cause why the *Plata*, *Coleman*,

6   *Perez* and *Armstrong* Courts should not approve a "Construction Agreement" presented to them

7   for review and approval by the *Plata* Receiver, *Coleman* Special Master and the *Perez* and

8   *Armstrong* Court Representatives. (*Coleman* Docket No. 2522.) *Coleman* Plaintiffs filed a

9   response on November 26, 2007. (*Coleman* Docket No. 2565.) In their response, Plaintiffs

10  expressed concerns over the status of pending court-ordered bed projects and requested specific

11  reporting requirements of the Receiver regarding upgrade projects at the prisons and the

12  construction of the 5,000 mental health beds, which were the subject of the *Coleman* bed plan

13  filed with the Court in August 2007. Plaintiffs also requested that class counsel be included in

14  the planning process for the 5,000 mental health beds. (*Coleman* Docket No. 2565 at 9-10.) The

15  Receiver filed a response and clarified his intention to file quarterly reports and to comply with

16  the ADA in construction, but he also set forth his limited responsibilities to the *Coleman* class:

17  "[T]he Receiver has not assumed responsibility for mental health construction, but may, as

18  appropriate, be able to include mental health related construction in projects that he undertakes."

19  (*Plata* Docket No. 1022 at 5.) On February 26, 2008, Judges Karlton, Henderson, White and

20  Wilken issued an order approving the construction agreement subject to certain conditions: that

21  the *Plata* Receiver meet with the parties, the *Coleman* Special Master and the *Perez* and

22  *Armstrong* court representatives concerning the 5,000 mental health beds and 5,000 medical

23  beds; and that the *Plata* Receiver file quarterly reports concerning developments related to the

24  construction agreements, with the first quarterly report filed on or before March 15, 2008.

25  (*Coleman* Docket No. 2696.)

26      By April 2008, *Coleman* Defendants were actively working with the Receiver in the

27  placement and planning for thousands of mental health beds within the Receiver's projects, and

28  requested an additional extension in the deadline to file their bed plan in order to complete the

[282703-3]

1   process.  Defendants represented that "[t]he *Plata* Receiver has now vested with a leadership role

2   over the construction of the mental health beds…[and] will meet with the *Coleman* parties on

3   April 24, 2008 to discuss the construction of 5,000 mental health beds under his aegis."  4/16/08

4   Stipulation and Order re Extension of Time re: Bed Plan at 2:20-23 (*Coleman* Docket No. 2759.)

5   Defendants provided the Special Master and Plaintiffs with a revised July 16, 2008 Mental

6   Health Bed Plan, which includes mental health beds to be built by the Receiver inside of seven

7   projected Consolidated Health Care Facilities (CHFCs) and mental health treatment space

8   renovations within the prisons, including, for example, the D5/D6 DMH units at SVSP.  (Pls.'

9   Exh. P- 477 at 2.)  In their July 2008 bed plan, Defendants asserted that CDCR and DMH had

10  agreed that DMH would continue to provide "all inpatient acute and intermediate mental health

11  services instead of transferring responsibilities to provide those services to the CDCR," *id.* at 2,

12  as had been proposed by the State in the 2007 Bed Plan.  In addition, the 2008 bed plan revised

13  the projected number and types of beds based on Spring 2008 Population Projections, resulting in

14  a reduction of beds in most categories.  (*Id.* at 2; Pls.' Exh. P-150 at 3-4 (Navigant Mental Health

15  Bed Need Study, June 2008).)  According to the timelines for construction set forth in the July

16  2008 bed plan document, the construction of the first 1500-bed Consolidated Health Care

17  Facility was targeted to begin in January 2009, with completion of all mental health beds by

18  January 2011.  (*Id.* at 4.)  Attachment C to the July 2008 Bed Plan sets forth the mental health

19  bed projects that are court-ordered, the location of the project, the program, the status and

20  comments regarding the funding or builder of the project.  P-447 at PDF page 29.

21      Robin Dezember, former Chief Deputy Secretary of Correctional Health Care Services,

22  testified in the recent Three Judge Court trial that it was his understanding that "a modification of

23  the CDCR Long-term Mental Health Bed Plan may require a re-submittal for *Coleman* court

24  approval by the end of 2008 depending on the results of the coordination."  (Trial Affidavit of

25  Dezember at 30:1-5 (*Coleman* Docket No. 3228).)  At this point, no modification has been

26  sought, no construction is in progress, and Defendants are actively opposing the Receiver's bed

27  plan projects in legal proceedings.  (*See*, *e.g.*, Defendants' Motion: To Replace the Receiver with

28  a Special Master and To Terminate the Receiver's Construction Process, filed 1/28/09 (*Plata*

14

[282703-3]

1   Docket No. 2039).)  The Governor and the Attorney General have taken to making high-profile

2   statements condemning the Receiver's projects as unjustified and wasteful.  (Kahn Decl. ¶¶ 2-3

3   Exhs. P-1001 & P-1002.)  The Governor has publicly vowed that "I think that the Receiver will

4   never get that money.  So that's important to know, because I will not give it to him.  I think the

5   controller will not give it to him and I don't the legislators will give it to him."  (Kahn Decl. ¶ 2,

6   Exh. P-1001, available at: http://gov.ca.gov/index.php?/print-version/speech/11442/.)

7   **I.     IN THE SHORT TERM, DEFENDANTS MUST IMPLEMENT AN EXPEDITED
         CONSTRUCTION AND ACTIVATION SCHEDULE FOR MENTAL HEALTH
8        BEDS PROJECTS OUTSIDE RECEIVER'S PROJECTS:  CMC-E 50 BED MHCB
         PROJECT, CMF 64 BED ICF, SVPP 64 BED ICF , CIW PSU, CMF AND SVSP
9        EOP OFFICE AND TREATMENT SPACE.**

10       **A.     California Men's Colony 50-Bed Free Standing Mental Health Crisis Beds.**

11       Defendants' April 17, 2006 bed plan provided for a February 29, 2008 deadline for

12   completion of these desperately needed MHCB beds at CMC.  (April 2006 Bed Plan, page 13.)

13   This deadline was approved by the Court on May 2, 2006.  (*Coleman* Docket No. 1800 at ¶ 1.)

14   Defendants' progress reports show no progress.  They are in exactly the same place they were in

15   October 2008, and in fact seem to be moving backward, according to the prior testimony of

16   Deborah Hysen.  On October 30, 2008, Ms. Hysen testified: "CDCR completed the necessary

17   30-day project scope authorization package in August 2008.  Once the package is released to the

18   Joint Legislative Budget Committee, it can be scheduled for a Public Works Board hearing for

19   authorization."  (Trial Affidavit of Deborah Hysen, *Coleman* Docket No. 3157, Oct. 30, 2008,

20   ¶ 8c, page 3.)  Almost 5 months later, on March 19, 2009, the status of the project is:

21              CDCR is working with the Department of Finance to submit the
             scope and cost package to the Legislature for approval.  Assuming
22           Legislative approval, it is anticipated that the PWB will formally
             establish the scope and cost of the project at its May 8, 2009 meeting.
23           Funding for design and construction is contingent upon the State's
             ability to obtain interim financing from the PMIB.
24

25   (Docket No. 3544 at 50 of 88.)  If this is the same scope and cost package that Ms. Hysen swore

26   was completed in August 2008, Defendants have let seven months pass before doing what Ms.

27   Hysen swore they were about to do in October 2008 (after an unexplained two-month delay).

28   Defendants have not secured funding, have projected no date for construction, and have

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' BED PLAN STATEMENT AND REQUEST FOR AN ORDER
REQURING DEFENDANTS TO PREPARE AND IMPLEMENT AN INTERIM EMERGENCY PLAN TO ADDRESS
THE ICF, MHCB AND EOP BED SHORTAGES -

[282703-3]

1  projected a long construction period of "23 months from funding." This is completely beyond

2  the realm of reason for a project that was supposed to be completed in February 2008.

3      Plaintiffs request that the Court order Defendants to complete submission of all necessary

4  documents to the Legislature within 5 days, certify to this Court within two weeks that all

5  contingencies have been removed, and provide this Court with a firm date no later than January

6  1, 2011 for completion of the construction.

7      **B.    CIW 45-Bed Acute and Intermediate Care Facility**

8      Defendants' March 19, 2009 submission does not show progress, but rather that they are

9  running on a treadmill. This project was part of the April 2006 bed plan, and thus was ordered

10  by the Court on May 2, 2006, with a June 2011 deadline. (*Coleman* Docket No. 1786-2 at page

11  11; Docket No. 1800 ¶ 1.) In the July 2008 plan, these beds were to be part of the Receiver's

12  Consolidated Health Care Facilities. (P-477, July 2008 Plan, Attachment C.) In the March 19,

13  2009 progress report, Defendants assert that they will attempt to secure funding from the Pooled

14  Money Investment Board and the State Public Works Board. Although it is not clear, they

15  appear to assert that they are abandoning the Receiver's plans, and are instead seeking to fund

16  this project through AB 900 funds. Defendants provide no basis for the Court to conclude that

17  the Legislature will be any more likely to fund these beds through AB 900 than they are to fund

18  them through the Receiver. Defendants provide no explanation as to why they must seek funding

19  through new AB 900 lease revenue bonds rather than the far more certain route of using already

20  appropriated money for this project.

21      On October 30, 2008, Deborah Hysen executed a sworn declaration stating that

22  preliminary plans for this project had already been submitted to the Joint Legislative Budget

23  Committee. (Trial Affidavit of Deborah Hysen, Oct. 30, 2008, ¶ 8d, pages 3-4.) The March 19,

24  2009 progress report states that a preliminary plan was provided to the Joint Legislative Budget

25  Committee in September 2008, but that "CDCR is working with the Department of Finance to

26  submit the scope and cost package to the Legislature for approval." (Docket No. 3544 at page 32

27  of 88). The project thus appears to be in a loop of repeated requests to the Legislature. No date

28  certain is given for approval of funding by the Public Works Board—it is simply stated as "a

[282703-3]

1  future date (to be determined)." (*Id.*)

2      Plaintiffs request that the Court reject this free-floating projection of possible future

3  approval and require Defendants to submit a final plan for funding and construction, with all

4  contingencies removed and all events calendared for dates certain, within 30 days.

5      **C.    CMF 64-bed Intermediate Care Facility.**

6      This project was part of the April 2006 bed plan, and thus was ordered by the Court on

7  May 2, 2006, with a June 2011 construction completion deadline. (*Coleman* Docket No. 1786-2

8  at page 11; Docket No. 1800 ¶ 1.)  In the July 2008 plan, these beds were to be part of the

9  Receiver's Consolidated Health Care Facilities.  (P-477, July 2008 Plan, Attachment C.)  As with

10 the CIW acute and intermediate beds, Defendants have now switched to AB 900 funding through

11 the State Public Works Board and Pooled Money Investment Fund, giving this Court no basis to

12 conclude that the Legislature will be any more likely to fund these beds through AB 900 than

13 they are to fund them through the Receiver.

14     Again, as with the projects described above, Defendants are simply running in place.

15 Ms. Hysen swore on October 30, 2008 that "CDCR is currently 99% complete with preliminary

16 plans" and "these plans are expected to be submitted to the Public Works Board at its January

17 2009 meeting."  (Trial Affidavit of Deborah Hysen, Oct. 30, 2008, ¶ 8b, page 3.)  Five months

18 later, its status is reported as:  "Preliminary plans for this project are 99 percent complete and are

19 pending SPWB approval.  The CDCR is working with DOC to submit a 30-day scope and cost

20 package to JLBC (Joint Legislative Budget Committee) for approval."  (Docket No. 3544 at 6.)

21 Actual funding, however, is stated as contingent on both legislative approval, and financing from

22 the Pooled Money Investment Board.  (*Id.*)

23     Plaintiffs request that the Court reject this free-floating projection of possible future

24 approval, and require Defendants to submit a final plan for funding and construction, with all

25 contingencies removed and all events calendared for dates certain, within 30 days.

26     **D.    CMF, EOP Treatment Space**

27     On October 18, 2007, the Court approved the August 2007 bed plan that included much-

28 needed additional treatment space for the Enhanced Outpatient Program at CMF.  (Docket No.

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' BED PLAN STATEMENT AND REQUEST FOR AN ORDER
REQUIRING DEFENDANTS TO PREPARE AND IMPLEMENT AN INTERIM EMERGENCY PLAN TO ADDRESS
THE ICF, MHCB AND EOP BED SHORTAGES -

[282703-3]

1  2461; Docket No. 2735-2 at Enc. II)  The July 2008 bed plan did not push this program to the

2  Receiver, but rather maintained responsibility with CDCR.

3      Inexplicably, Defendants used part of the 10 days this Court gave them for the

4  development of a plan after they missed the March 4, 2009 deadline not to accelerate this much

5  delayed project, but to gut it.  Offering no clinical explanation for why the space is no longer

6  needed, Defendants state in their March 19, 2009 progress report that "[t]hrough collaborative

7  conceptual planning sessions" they decided to cut the therapy rooms by half and the educational

8  classrooms by two-thirds.  (Docket No. 2544 at 40 of 88.)

9      Apart from the effort spent to cut the program, Defendants made no progress to advance

10  its completion, but merely throw it into the uncertain pot of AB 900 contingencies along with

11  many of the other long-delayed projects.  The proposed "rescoping" (gutting) of the project will

12  certainly delay it for another year, at least.

13      Plaintiffs request that the Court reject this free-floating projection of possible future

14  approval, and require Defendants to submit a final plan for funding and construction, with all

15  contingencies removed and all events calendared for dates certain, within 30 days.

16      Plaintiffs further request that the Court reject the proposed "rescope" (reduction) of the

17  treatment space and classrooms in the program.

18      **E.    LAC & SAC EOP Treatment Space**

19      These projects were included in the August 2007 bed plan approved by the Court on

20  October 18, 2007, but were eliminated in the July 2008 bed plan because the Receiver's

21  Consolidated Health Care Facilities were to meet this need for EOP beds.  (P-477, July 2008 Bed

22  Plan Attachment C.)  The March 19, 2009 progress report revives this project with reliance on

23  AB 900 funding, with a "30 day scope and cost package" to be completed in the first week of

24  April 2009 for LAC and in May 2009 for SAC, and submission to the Public Works Board at

25  some undesignated "future date" for LAC and for a July 2009 meeting for SAC.  (Docket No.

26  3544 at 39 & 47 of 88.)

27      Plaintiffs request that the Court reject this free-floating projection of possible future

28  approval, and require Defendants to submit a final plan for funding and construction, with all

18

1   contingencies removed and all events calendared for dates certain, within 30 days.

2         **F.**    **San Quentin 32 MHCB Beds**

3         On October 30, 2008, Deborah Hysen testified that CDCR planned to establish 20 Mental

4   Health Crisis Beds at San Quentin as part of the Receiver's renovation of Building 22, and 12

5   Mental Health Crisis Beds as part of the new death row, the Condemned Inmate Complex.  (Trial

6   Affidavit of Deborah Hysen, Oct. 30, 2008, ¶ 8e, page 4.)  Defendants point to no evidence that

7   the Condemned Inmate Complex was ever part of any previous *Coleman* mental health bed plan.

8   Plaintiffs object to the use of the Court-ordered bed planning process to advance Defendants'

9   separate agendas that have nothing to do with the needs of the *Coleman* class.

10        In the March 19, 2009 plan, the 20 Mental Health Crisis Beds that were to be part of the

11  Receiver's construction of the Central Health Services Facility at San Quentin are not mentioned

12  at all.  According to the Receiver's most recent report, funding for the ongoing construction of

13  this previously approved project was cut off by the State a few months ago.  (Receiver's 10th

14  Report, *Plata* Docket No. 2011-2, filed 1/20/09 at 101.)

15        Plaintiffs request that the Court reject this free-floating projection of possible future

16  approval for the completion of Building 22 and its 20 Mental Health Crisis Beds at San Quentin.

17  Plaintiffs that the Court require Defendants to provide a plan for completion of these 20 beds

18  with all contingencies removed and all events calendared for dates certain, within 30 days.

19        **G.**    **SVSP 64-Bed Intermediate Care Facility**

20        This project was part of the Intermediate Care Facility Bed Plan of August 2005, and was

21  reported as authorized and funded.  (Docket No. 1788-3, Enclosure 3 at 1, 10.)  The July 2008

22  Bed Plan listed the projected completion date as November 2008.  (Pls.' Exh. P-477 at

23  Attachment C.)  During the Three Judge Court trial, Cynthia Radavsky of DMH testified that she

24  had been handed possession of the administration building, would be receiving patients in

25  February 2009, and would be at full occupancy in March 2009.  (Three Judge Panel Trial,

26  Radvasky at RT 794:1-19.)  As of February 2009, there are 163 men on the waiting list for the

27  high-custody intermediate care beds that this 64-bed unit is intended to supplement.  The March

28  19, 2009 progress report contains the following explanation for the fact that there are no patients

[282703-3]

1  there yet:

2  Project was halted at 99% completion on December 19, 2008 due to
   the PMIB's action to freeze disbursements from existing interim
3  financing accounts.  Project was subsequently exempted but funding
   has only been made availale [*sic*] to pay for work through December
4  2008 stoppage.  The CDCR is concerned that a waiver of State Fire
   Marshal and OSHPD reviews to conduct critical fire, life, safety and
5  operation licensure issue may not be in the best interest of the State
   given the potential life safety risks that occupants would be exposed
6  to without those critical systems in place.  Additionally, performing
   punch list item repairs by entities other than the contracted firm who
7  is unable to proceed given the significant invoice backlog caused by
   actions of the Pooled Money Investment Board will void the
8  construction warranties and is not advisable at this time.

9  (Docket No. 3544 at 52 of 88.)  Translated into plain English, this seems to mean:  "The

10 contractor will not finish the work until we pay them for work they did last year.  But we cannot

11 pay them because we have a 'significant invoice backlog.'"  This project has been in CDCR's

12 bed plans since August 2005.  Yet the 57 people who worked 1,356 hours on the progress report

13 could not be bothered to get the contractor's invoice out of the "backlog" and get it paid.

14 Therefore, 163 men who need inpatient psychiatric care must remain in general population units,

15 with some of them paroling to the streets without ever having received the prescribed level of

16 care.

17      Plaintiffs respectfully request that the Court issue an order to show cause at an evidentiary

18 hearing in 10 days why the SVSP 64-bed intermediate care facility is not open for patients, with

19 the Governor to produce for examination the persons responsible for payment of the contractor's

20 invoices.

21      **H.      SVSP 72-Bed EOP Administrative Segregation Unit**

22      The August 2007 bed plan included a 70-bed EOP Administrative Segregation Unit.  This

23 was eliminated in the July 2008 plan, with the bed need to be addressed in the Receiver's

24 construction plans.  (P-477, July 2008 Bed Plan, Attachment C.)  The March 19, 2009 progress

25 report appears to revive the project as a separate CDCR project, to be funded through AB 900

26 funds, subject to numerous contingencies.  (Docket No. 3544 at 37 of 88.)

27      Plaintiffs request that the Court reject this free-floating projection of possible future

28 approval, and require Defendants to submit a final plan for funding and construction of this

[282703-3]

1  project with all contingencies removed and all events calendared for dates certain, within 30

2  days.

3  **I.     SVSP EOP Treatment, Office and Housing Conversions**

4  The October 18, 2007 Order required Defendants to plan for and construct additional

5  treatment space for the EOP, at SVSP.  (Docket No. 2461 at page 6.)  The March 19, 2009

6  progress report states that "preliminary plans" are 17% complete, and that funding will be sought

7  in the 2010/2011 Governor's budget.  (Docket No. 3544 at 45 of 88.)  The earliest possible date

8  for funding in the 2010/2011 Governor's budget is July 1, 2010.  Construction cannot be

9  completed until 14 months after that, according to Defendants.  (*Id*.)  Defendants present no

10  reason why funding cannot be included in the 2009/2010 budget so that the 14-month clock can

11  start running from July 1, 2009.

12  Plaintiffs request that the Court order Defendants to include necessary funding in the

13  2009/2010 budget.

14  **II.     AS INTERIM RELIEF, DEFENDANTS SHOULD BE REQUIRED TO SUBMIT A
     PLAN TO ADDRESS INTERIM  INPATIENT, MHCB AND EOP BED DEFICITS
15  BASED ON UPDATED POPULATION PROJECTS; DETAIL ANY FINANCIAL
     AND CONTSTRUCTION PLANS; TIMETABLES AND STAFFING
16  REQUIREMENTS TO MEET THE NEEDS; AND ENSURE THAT
     CONTRUCTION AND FINANCIAL ELEMENTS OF THE PLAN ARE
17  SUFFICIENTLY TIMELY FOR INCLUSION IN THE MAY REVISE.**

18  Delayed or inadequate mental health care can exacerbate existing mental illness and result

19  in unnecessary and avoidable harms such as decompensation into hallucinations, catatonic states

20  and other sequela to untreated mental disease.  *Coleman v. Wilson*, 912 F. Supp. 1282, 1316

21  (E.D. Cal. 1995).  Undisputed evidence of current, life-threatening and severe shortages of

22  mental health beds at all levels of care was introduced at the recent overcrowding trial.

23  Defendants have no long-term bed plan and few if any short-term projects sufficient to meet the

24  current, existing shortages.  Thus, as was true in 2006, Plaintiffs request the Court again order

25  emergency measures and waivers of state licensing requirements to address the current

26  emergency.

27

28

[282703-3]

**A.    Defendants Must Establish Interim Level IV ICF Beds To Meet Current Need**

In the overcrowding trial, it was undisputed that a significant disparity remains between the demand for Intermediate Inpatient Level IV beds and the present availability of those beds. Pls.' Exh. P-244 at 900129 (166 patient waiting list for the Salinas Valley Psychiatric Program ICF beds as of August 31, 2008). DMH has maintained a waiting list for these beds for more than three years and since at least November of 2007, the waiting list has steadily expanded from a low of about 100 patients to a high of 173 patients. In the most recent DMH data provided to Plaintiffs since the overcrowding trial, the SVPP waitlist has remained high, ranging between

**Figure 1, Exhibit P-1010**



159 and 176 patients from September 2008 through February 28, 2009. (Kahn Decl. ¶ 10, Exh. P-1010 (Updated SVPP Waitlist).)

In January 2009, the majority of the patients waiting for transfer to an inpatient ICF bed at SVPP waited beyond Program Guide standards, and in fact, more than 103 men waited for periods greater than 4 months while they were housed in locked down units (including Administrative Segregation and Psychiatric Housing Units), mental health crisis beds, acute beds, and mainline EOP units. (Kahn Decl. ¶ 11, Exh. P-1011 (2/28/09 DMH Report on SVPP.)

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' BED PLAN STATEMENT AND REQUEST FOR AN ORDER
REQURING DEFENDANTS TO PREPARE AND IMPLEMENT AN INTERIM EMERGENCY PLAN TO ADDRESS
THE ICF, MHCB AND EOP BED SHORTAGES -

[282703-3]

Figure 2, P-1012



**Number of Patients on SVPP Waitlist by Length of Time on Waitlist (February 2009)**

| | < 31 Days* | 1-4 Months | > 4 Months to 1170 days |
|---|---|---|---|
| ■ Number of Patients | 9 | 51 | 103 |
| Average Length of Wait (Days) | 22 | 72 | 307 |

\* Program Guide timeline for transfer is 30 days from date of referral.

Source: Department of Mental Health's Report on Monthly Bed Utilization for February 2009.

The only Level IV ICF project scheduled for completion in the near future is the 64-bed unit located at Salinas Valley State Prison, which was scheduled for completion on November 2008, but has still not been completed. (Defs.' Progress Report at 5 (Docket No. 3544).) Even with these new beds, at least 100 patients will remain on the SVPP waitlist, and it is likely that the waitlist will climb back up to its current level once clinicians learn that a new DMH resource is available for their patients. (*See* Kahn Decl. ¶ 14, Ex. P-1013 (Deposition of Victor Brewer at 120:23-123:5).) Defendants CDCR and DMH have an obligation to provide care to this population of CDCR patients, who are scattered throughout the prison system. The Special Master noted that the "paucity of resources" for this *Coleman* group dated back to 1998, yet CDCR and DMH continue to ignore the needs of this population. (Special Master's 15th Report at 385 (Docket No. 1746).) During his September 4, 2008 deposition, Victor Brewer, Executive Director of Salinas Valley and Vacaville Psychiatric Program, testified that the immediate ICF bed shortage could be met by retrofitting more housing units within prison settings, similar to the

23

[282703-3]

1  retrofits done at SVSP and CMF, where D5/D6, P2/3 were retrofitted for ICF patients.

2  According to Mr. Brewer, the conversion of beds at Salinas Valley took four to six months to

3  convert D-5 and another four to six months for D-6, while Vacaville did the P wing conversions

4  within 90 days.  (Kahn Dec ¶ 14, Exh. P-1013 (Deposition of Victor Brewer at 180:3-181:4).)

5  Defendants must address the immediate ICF Level IV bed shortages with similar conversions

6  until the long-range bed projects are completed.

7       Plaintiffs request that the Court order Defendants to identify within 30 days other

8  locations for emergency retrofits similar to those at D5/D6 and P2/P3, in a number sufficient to

9  address the current unmet need for male inpatient psychiatric beds for Level IV inmates.

10      **B.    Defendants' Interim Plan Must Address the Severe MHCB Shortages**

11      During the overcrowding trial, the evidence was uncontroverted that the CDCR has a

12  severe shortfall of mental health crisis beds.  Defendants' own mental health expert, Dr. Ira

13  Packer, reported that "the shortage of crisis beds is problematic as inmates requiring more

14  intensive observation and/or treatment must remain in other settings, which are not clinically

15  appropriate."  (Defs.' Exh. D-1019 at 11.)  Between June and September 2008, CDCR was

16  unable to transfer the vast majority of patients referred from institutions to the Health Care

17  Placement Oversight Program (HC-POP) for crisis bed placement, transferring only 52 of 355

18  referrals in June 2008, only 104 of the 388 referrals in July 2008, only 135 of the 322 referrals in

19  August 2008, and only 100 of the 359 referrals in September 2008.  (Pls.' Exhs. P-263, P-585).

20      By January 2009, only 106 of the 397 patients referred to HC-POP were transferred, and

21  only 9 of these were transferred within 24 hours in compliance with the Program Guide transfer

22  timeline.  (Pls.' Exh. P-9 at 12-5-3 to 12-5-4.)  The figure below shows the trend in unmet

23  MHCB needs since August 2008.  (Kahn Decl. ¶¶ 6-7, Exh. P-1006.)

24

25

26

27

28

[282703-3]

Figure 3, Exhibit P-1006



| | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 | Jan-09 |
|---|---|---|---|---|---|---|
| Referred by Institutions to HC-POP | 322 | 359 | 315 | 212 | 308 | 397 |
| Placed by HC-POP | 135 | 100 | 124 | 109 | 107 | 106 |
| Transferred by HC-POP within 24 hours | 58 | 27 | 41 | 58 | 28 | 9 |

Source: CDCR's Monthly Summary of Inter-Institutional Mental Health Crisis Bed Referrals and Transfers

The 106 patients waited an average of 5.53 days to transfer to a mental health crisis bed in January 2009. (Kahn Decl. ¶ 7, Exh. P-1007 (Chart of Enclosure 20 from the January 2009 *Coleman* monthly data).)

[282703-3]

**Figure 4, Exhibit P-1007**





### Average Days Waiting for Transfer to MHCB

| | August-08 | September-08 | October-08 | November-08 | December-08 | January-09 |
|---|---|---|---|---|---|---|
| Average Days Waiting for Transfer | 2.04 | 3 | 2.16 | 2.04 | 3.43 | 5.33 |
| Patients Placed by HC-POP | 135 | 100 | 124 | 109 | 107 | 106 |

At the time of the overcrowding trial in August 2008, the 135 patients transferred by HC-POP waited an average of 2.04 days to do so, with only 58 transferring within 24 hours. (Pls.' Exh. P-587 at 4.) It is clear that despite the opening of the 50-bed MHCB unit at CMF in July 2008, the impact of the mental health crisis bed shortages has worsened since the opening, not improved, and there are no new MHCB beds slated to come on line for years.

At the overcrowding trial, there was also testimony and evidence presented concerning the "alternative placements" where mental health clinicians are forced to place their suicidal patients because of the insufficient number of licensed mental health crisis beds. (Defs.' Exh. D-1019 at 11, (Packer expert report); Stewart at RT 75:20-24, 76:24-77:7,125:23-126:16; Haney at RT 303:21-25; Pls.' Exh. P-338 (SVSP-13); Pls.' Exh. P-337 (CCI-11); Pls.' Exh. P-339 (MCSP-11); Pls.' Exh. P-341 (WSP-17).)

Most recently, in a memo dated December 31, 2008, Defendants distributed a policy requiring that all patients admitted to alternative mental health crisis bed locations for suicide

[282703-3]

1    risk be provided with the five-day daily clinical follow-up contacts provided to patients who are

2    actually transferred to a mental health crisis bed.  (Kahn Decl. ¶ 15, Exh. P-1014 (Dec. 31, 2008

3    memo by Brenda Epperly-Ellis).)  Unfortunately, this appears to be the limit of defendants'

4    proactive efforts to address the serious MHCB shortfall.

5        Defendants must identify Outpatient Housing Unit (OHU) programs that can be converted

6    to emergency MHCBs through augmented mental health staffing and limited retrofitting, if

7    necessary.  The Court has issued emergency waivers in the past to enable defendants to operate

8    the CMC LOU and the CIM GACH as "licensed" MHCBs in the face of the emergency MHCB

9    shortages.  Defendants must be ordered to come forward with a similar plan within 30 days.

10        **C.    Defendants' Plan Must Address the EOP Unmet Need**

11            **1.    The Current EOP Waitlist Includes Lower Custody Patients**

12        The Enhanced Outpatient Program (EOP) within CDCR provides the most intensive level

13    of outpatient mental health services to prisoners.  It is characterized by separate housing and

14    structured activities for prisoners with serious mental illness, who, because of their illness,

15    cannot function in the general population, but do not require 24-hour inpatient care.  (Pls.' Exh.

16    P-9 at 12-4-1 (*Coleman* Program Guide).)  EOP prisoners are placed in specialized housing

17    where they are provided with increased "clinical and custody support."  (*Id*. at 12-4-4.)  They are

18    also provided with a minimum of ten hours per week of enhanced outpatient mental health

19    services.  (*Id*. at 12-4-8.)  The November 2008 Navigant study provided by Defendants as

20    Attachment C to their March 19, 2009 progress report gives a ratio of Level IV EOP census to

21    total EOP census of approximately 35%.  (Defs.' Progress Report, Attachment C, "Mental Health

22    Bed Plan Study – Based on Fall 2008 Population Projections, November 2008," at 21 (Docket

23    No. 3544).)  The remaining approximately 65% of EOP inmates are in Levels I-III and in

24    Reception Center status.  (*Id.*)

25        At the overcrowding trial, Plaintiffs presented evidence that CDCR had a backlog of

26    approximately 1,000 EOP prisoners clinically designated as EOP who were housed in

27    "alternative locations," including administrative segregation units, mainline housing in prisons

28    without EOP programs and in Reception Centers.  (Pls.' Exh. P-264; Plaintiffs' Corrected

27

[282703-3]

1   Proposed Findings of Fact and Conclusions of Law at 63 (Docket No. 3489).)  The EOP Unmet

2   Need, which is documented in Plaintiffs' Exhibit P-264, illustrates the growth in the EOP bed

3   shortage since late 2006, when the gap was little more than 300 beds, to almost 1,000 beds by

4   August 2008.  In the most recent data provided by Defendants in January 2009, the EOP bed gap

5   remains high with 845 EOP prisoners housed in locations without EOP programs.  (Kahn Decl. ¶

6   16, Exh. P-1015 (Enclosure 3, MH Population Placement per Institution January 12, 2009).)  Due

7   to overcrowding, some EOP patients are even housed in overcrowded gyms and in dayrooms,

8   while they wait for transfer to an EOP program.  (Chaiken Dep. at 196:11-15 (Docket No. 3443,

9   Exh. 6); Defendant Cate's Response to Plaintiff *Coleman*'s Interrogatories, Set One, Documents

10  Identified in Response to Interrogatories 17and 18 (Docket No. 3433-3) at Table Two, pp. 27-51;

11  Haney Report at ¶ 220-221, 224-226, 232-233.)

12      The Navigant November 2008 study provided by Defendants as Attachment C to their

13  March 19, 2009 progress report shows an EOP bed gap on the same scale as the above-cited

14  figures from the Three Judge Court trial and recent *Coleman* document productions.  The

15  Navigant study shows an 811-bed deficit for EOP Male General Population plus a 174-bed

16  deficit for EOP Male Administrative Segregation Unit Population, plus a 122-bed deficit for

17  EOP Male Psychiatric Services Unit Population, for total deficit of 1,101 EOP beds.  (Defs.'

18  Progress Report, Attachment C, "Mental Health Bed Plan Study – Based on Fall 2008 Population

19  Projections, November 2008," at 87 (Docket No. 3544).)

20      Using Navigant's ratio of Level IV to lower level EOP inmates (35% to 65%), and

21  conservatively assigning the entire Administrative Segregation group to higher custody levels,[7]

22  65% of the current 811-bed general population EOP gap can be expected to include

23  approximately 527 prisoners in custody Levels I-III or in Reception Center status.  Plaintiffs'

24  counsel has checked this statistical assumption against the lists of EOP prisoners housed in non-

25  EOP institutions as of January 2009.  The lists confirm that the number of EOP prisoners in the

26

27  [7] This is a very conservative assumption because Administrative Segregation units house inmates
    of all custody levels, including inmates who are not in segregation for disciplinary reasons, but
28  rather for their own protection.  (*See* Defs.' Exh. D-1019 at 23 (Report of Dr. Ira Packer).)

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' BED PLAN STATEMENT AND REQUEST FOR AN ORDER
REQURING DEFENDANTS TO PREPARE AND IMPLEMENT AN INTERIM EMERGENCY PLAN TO ADDRESS
THE ICF, MHCB AND EOP BED SHORTAGES -

[282703-3]

1  lower custody levels are in the hundreds.  (Kahn Decl. ¶¶ 16 - 18.)

2         **2.    Coalinga State Hospital Can Appropriately House EOP Patients**

3         Since 2006, Coalinga State Hospital has successfully treated CDCR patients within the

4  hospital program.  (Docket No. 1800 (Order requiring that DMH make 50 ICF beds available to

5  appropriate CDCR inmates).)   In fact, Coalinga State Hospital has been described by DMH

6  administrators as their most secure hospital.  During her August 8, 2008 deposition, Cynthia

7  Radavsky, Deputy Director of Long-term Care Services for DMH, testified that "In CDCR's

8  language [ASH] would barely qualify as a Level II in their world.  But Coalinga was designed

9  with different security, but you still – they're hospitals, you know."  (Kahn Decl. ¶ 19, Exh. P-

10 1018 (Radavsky deposition excerpt at 101:25-102:3).)  On April 26, 2006, at the evidentiary

11 hearing on Defendants' bed plan, John Rodriguez, former Deputy Director of Long-term Care

12 Services, testified as follows:

13         Q.  Coalinga is the highest security state mental hospital that exists?
           A.  From an external security standpoint, that's correct.
14         Q.  It's surrounded by fences?
           A.  Yes.
15         Q.  Okay.  And it's guarded by CDCR men on the fences?
16         A.  That's exactly what makes it the higher security than Atascadero.
           The internal security is similar.  It's the external security that you just
17         mentioned that makes them a higher level.

18

19 (Kahn Decl. ¶ 20, Exh. P-1019 (excerpts from April 26, 2006 hearing transcript at page 83).)

20         CDCR itself evaluated housing *Coleman* class members at Coalinga State Hospital in

21 2006 in order to utilize all available resources to alleviate overcrowding.  (Pls.' Exh. P-191 at 6

22 (noting that CDCR was evaluating the use of Coalinga State Hospital to house lower level

23 inmates assigned to the MHSDS currently housed in cells within CDCR institutions); Tilton Dep.

24 at 193:21-25 (Docket No. 3443, Exh. 19) (Administration considered using available space at

25 Coalinga State Hospital to address need for additional beds).)  CDCR observed that the full

26 capacity of Coalinga State Hospital was "not being fully utilized" and that up to 1,000 empty

27 beds at Coalinga could be used for temporary inmate housing.  (CDCR, Increased Housing

28 Capacity in Existing Prisons and Other State Facilities, available at

[282703-3]

1    http://www.cdcr.ca.gov/News/Reform_Archives /docs/ExistingCDCRFacilityConstruction.pdf

2    (last accessed March 23, 2009).)  As a result, CDCR proposed legislation to provide that

3    "[n]otwithstanding any other provision of law, with the consent of the Department of Mental

4    Health, [CDCR] may house state prison inmates at Coalinga State Hospital."  (*Id.*)

5        Though CDCR's proposed statutory language was never formally introduced, there is no

6    statutory barrier to placing lower custody mentally ill CDCR prisoners at Coalinga State

7    Hospital.  (Stats. 2001, c. 171 (A.B. 430) (removing the requirement from WELF. & INST. CODE §

8    6600.05 that "In no event shall any persons other than those placed pursuant to [the SVPA] be

9    housed or treated at a facility established pursuant to this subdivision unless expressly authorized

10   by the legislature"); *see also* Kahn Decl. ¶ 19, Exh. P-1018 (Radavsky depo at 104:10-15,

11   testifying that no statutory requirement that only SVP detainees be housed at Coalinga State

12   Hospital).)

13        Ms. Radavsky testified at trial that approximately 700 of the 1,500 beds at Coalinga State

14   Hospital were vacant.  (Radvasky at RT 815:23-8:16:2.)  In the 2009-10 budget cycle, DMH

15   projected a total Sexually Violent Predator (SVP) population of 750 as of January 14, 2009.

16   (The Legislative Analyst's Office, 2009-10 Budget Analysis Series: Health, at HE-34, February

17   6, 2009, available at http://www.lao.ca.gov/analysis_2009/health/ health_anl09.pdf, table under

18   heading "State Mental Hospital 2008-09 Census Lower Than Expected.")  In previous

19   representations to the Court, Defendants have asserted that they needed to reserve empty beds for

20   a forecasted surge of SVPs after the passage of Jessica's Law (Proposition 83) on November 7,

21   2006, which loosened the standards for SVP eligibility and made SVP terms indeterminate.  The

22   Department of Mental Health's statistics, however, confirm that while Jessica's Law caused

23   many more state prisoners to be referred for SVP evaluations, it has not caused any surge in

24   persons actually adjudicated as SVPs and sent to the state hospital system.  (Declaration of Mark

25   Feeser In Support of Plaintiffs' Objections To Defendants' Bed Plan Statement And Request For

26   An Order Requiring Defendants To Prepare And Implement An Interim Emergency Plan To

27   Address The ICF, APP, MHCB And EOP Bed Shortages ¶¶ 2-8, Exhs. P-1025-1030.)

28        Although the Coalinga Feasibility Studies conducted by CDCR and DMH concluded that

[282703-3]

1   Level IV High Custody prisoners could not be housed at Coalinga without expensive retrofits, no

2   such conclusion was reached about lower custody prisoners, and in fact, Defendants stated in

3   their April 2006 Mental Health Bed Plan that "the physical security of CSH [Coalinga State

4   Hospital] does not need to be upgraded to house and treat Level III CDCR inmate-patients,

5   provided that those inmate-patients are low custody." (Docket No. 1786-2 at 7-8.) Clearly, the

6   hundreds of empty beds at Coalinga State Hospital should be made available to Defendants as

7   they develop an interim bed plan to address the immediate shortfall of EOP beds. At such time

8   in the future that Defendants' long-range mental health beds are completed and/or DMH requires

9   Coalinga beds to house a future (but not yet occurring) increase in the SVP population, the Court

10  can review its order establishing this emergency EOP program.

### D. Defendants Must Address the Current Acute Inpatient Bed Shortage By July 1, 2009

13          Defendants' March 19, 2009 progress report does not provide for a single additional acute

14  inpatient bed despite mental health bed projections that show an increasing shortage of these

15  beds–in this year, the shortage will have grown to 50 male acute beds–and a monthly DMH

16  waitlist of real patients who linger in prison beds waiting for weeks or longer for an empty acute

17  psychiatric bed.

18          Defendants' July 2008 bed plan provided that the Receiver would build 90 acute beds

19  within his consolidated bed projects. Defendants fail to even acknowledge this critical shortage

20  in their March 19, 2009 filing. The most recent waitlist data provided by DMH for February

21  2009 shows 19 patients[8] on the APP waitlist, while the Navigant updated bed planning

22  documents forecast a shortfall of 43 male acute beds in FY 2008/09 and 50 male acute beds this

---

[8] Among these 19 patients are a man who has been waiting 103 days for transfer to an acute bed, (Kahn Decl. ¶ 13 (Inmate B, CDC No. F__)) and a man who has been waiting for more than two months (*id.* (Inmate G, CDC No. G__).) The 19 patients include a man who has been identified in the Special Master's 17th and 18th Monitoring Reports in previous incidents of failures to take appropriate steps to increase his level of care. (*Id.* (Inmate M, CDC No. K__).) The 19 patients include two persons on the parole revocation lists of persons recently arrested on parole violation charges and deemed unable to participate in a hearing due to the severity of their mental health symptoms. (*Id.* Inmate S, CDC No. T__ and Inmate C, CDC No. F__).)

[282703-3]

1    year.  (Defs.' Progress Report at 87 (Docket No. 3544).)

2       Defendants must address the immediate shortage of acute inpatient beds and provide 25

3    acute beds in licensed DMH hospitals by July 2009.  The bed plan that Defendants must file in

4    30 days must include a plan to address the acute bed need identified in their Navigant bed need

5    study for FY 2009/10 and forward until the completion of any long-range bed plan projects.

6    **III.    DEFENDANTS SHOULD NOT BE PERMITTED TO START A NEW LONG-**
7    **TERM BED PLAN FROM SCRATCH, BUT SHOULD IMMEDIATELY REMOVE**
     **UNCERTAINTIES AND CONTINGENCIES THEY HAVE CREATED IN THE**
8    **EXISTING PLANS, CHOOSE THE OPTIONS THEY WILL FOLLOW AND**
     **FOLLOW THEM.**

9       The *Coleman* class did not decide to abandon the Court-approved August 2007 bed plan

10    and put nearly all of the planned mental health beds into the Receiver's Consolidated Health

11    Care Facilities.  The *Coleman* class did not later decide to declare war on the Receiver and throw

12    years of mental health bed planning into uncertainty.  But the *Coleman* class will be the people

13    suffering and dying as a result of these decisions.  That Defendants would now file with this

14    Court a statement making future bed plans contingent on "uncertainties" about the Receiver's

15    plans—uncertainties that are entirely of their own creation—is nothing short of outrageous.

16    Defendants may be entitled to take whatever litigation strategy they like regarding the Receiver.

17    They are not entitled to impose the costs of their litigation strategy on the *Coleman* class in the

18    form of more years of needless suffering and death.  Defendants' declaration of war on the

19    Receiver does not relieve them of their Eighth Amendment obligations, and does not constitute a

20    change of circumstances requiring modification of this Court's prior orders.

21       Plaintiffs respectfully request that the Court order Defendants to make a final decision

22    regarding their long-term bed plan for the *Coleman* class.  Plaintiffs request that the Court order

23    Defendants to show cause within 30 days why the needed mental health beds should not be built

24    in the Consolidated Health Care Facilities that the Receiver has already planned, on which the

25    state has already spent millions of dollars, and two of which - one in Northern and one in

26

27

28

[282703-3]

1    Southern California - are already scoped in detailed Environmental Impact Studies.[9]  Plaintiffs

2    request that Defendants be required to answer the Court's questions not based on whether

3    Defendants will win their war against the Receiver, but on the objective facts regarding whether

4    the Receiver's plans or Defendants' independent plans are closer in time to actual operation for

5    the *Coleman* class.

6            Plaintiffs respectfully request that Defendants be ordered to serve and file a long-term bed

7    plan to meet all needs identified in the most recent Navigant study within 30 days.  The long-

8    term plan must meet 100% of the need identified in the most recent Navigant study by June 30,

9    2013.  The plan must provide a means to eliminate funding obstacles and contingencies.  The

10   plan must not include as "contingencies" elements that are in the control of Defendants, such as

11   any "uncertainty" regarding the status of the Receiver beds, as such uncertainty is entirely

12   Defendants' own creation.

13
     **IV.    THE COURT SHOULD MODIFY ITS ORDER REGARDING THE CONTRACT
14           WITH NAVIGANT.**

15           On October 20, 2006, this Court ordered Defendants to contract with Navigant

16   Consultants to conduct annual population reviews and updates of their projections for mental

17   health program populations through 2009, with a transition to CDCR thereafter.  (Docket No.

18   1998.)  CDCR's contract with Navigant, provides that Navigant will update the mental health

19   bed forecast twice a year, in the Fall and Spring.  (Kahn Decl. ¶ 8, Exh. P-1008 (Navigant

20   Contract (11-20-06) at 4, § E.1).)  This order was implicitly premised on the assumption that by

21   now Defendants would be well on their way to implementation of a final bed plan.  Defendants

22   are much farther from this goal than expected.  Their obligation to use professional outside

23   consultants for bed planning needs should therefore be extended for at least another three years.

24   _____

25   [9] The northern facility is on CDCR property near the former Northern California Women's
     Facility in Stockton, *see* http://www.cprinc.org/docs/projects/DEIR_20081024
26   _v1_1_Executive_Summary.pdf.  The southern facility is on CDCR property adjacent to R.J.
     Donovan State Prison near San Diego, *see* http://www.cprinc.org/docs/projects/DEIR_
27   20081104_v1_1_Executive_Summary.pdf.

28

[282703-3]

In addition, given Defendants' delay in producing the November 2008 Navigant report until March 2009 (after the Three Judge Court trial), Defendants should be ordered to provide all Navigant reports to the Special Master and to Plaintiffs' counsel immediately upon receipt.

**CONCLUSION**

Defendants cannot go back to square one after more than 10 years of bed planning and related studies. Identified projects must be accelerated. New projects must be identified to meet the need that will not be met by the identified projects. Interim steps must be taken to prevent suffering and death while long term projects are completed. Plaintiffs therefore respectfully request that the Court order the following steps:

1. <u>Short Term Relief</u>.

The following steps are required regarding specific short-term projects.

a. California Men's Colony 50-Bed Free Standing Mental Health Crisis Beds. Defendants must complete submission of all necessary documents to the Legislature within 5 days, certify to this Court within two weeks that all contingencies have been removed, and provide this Court with a firm date no later than September 30, 2009 for completion of the construction.

b. CIW 45-Bed Acute and Intermediate Care Facility. Defendants must submit a final plan for funding and construction, with all contingencies removed and all events calendared for dates certain, within 30 days.

c. CMF 64-bed Intermediate Care Facility. Defendants must submit a final plan for funding and construction, with all contingencies removed and all events calendared for dates certain, within 30 days.

d. CMF EOP Treatment Space. Defendants must submit a final plan for funding and construction, with all contingencies removed and all events calendared for dates certain, within 30 days.

e. LAC & SAC EOP Treatment Space. Defendants must submit a final plan for funding and construction, with all contingencies removed and all events calendared for dates certain, within 30 days.

f.     San Quentin 20 MHCB Beds.  Defendants must submit a final plan for funding and construction of the 20 Mental Health Crisis Beds at San Quentin that are part of the Building 22 project, with all contingencies removed and all events calendared for dates certain, within 30 days.

g.     SVSP 64-Bed Intermediate Care Facility.  Defendants are ordered to show cause at an evidentiary hearing in 10 days why the SVSP 64-bed intermediate care facility is not open for patients, with the Governor to produce for examination the persons responsible for payment of the contractor's invoices.

h.     SVSP 72-Bed EOP Administrative Segregation Unit.  Defendants must submit a final plan for funding and construction of this project with all contingencies removed and all events calendared for dates certain, within 30 days.

i.     SVSP EOP Treatment, Office and Housing Conversions.  Defendants are ordered to include the necessary funding in the 2009/10 budget submissions.

2.     <u>Interim Emergency Relief.</u>

a.     Defendants must identify within 30 days other locations for emergency retrofits similar to the D5/D6 conversions at SVSP and the P2/P3 conversions at CMF, in a number sufficient to address the current need for licensed ICF Level 4 male inpatient beds.

b.     Defendants must identify Outpatient Housing Unit (OHU) programs which can be converted to emergency MHCBs through augmented mental health staffing and limited retrofitting, if necessary.  The Court has issued emergency waivers in the past to enable defendants to operate the CMC LOU and the CIM GACH as "licensed" MHCBs in the face of emergency MHCB shortages.  Defendants must be ordered to come forward with a similar plan within 30 days.

c.     Defendants must establish an EOP program at Coalinga State Hospital to accept Level I-III EOP patients within 60 days.  This program is an interim step to address the current emergency need for EOP beds that will continue exist until Defendants' long-term bed plans are finalized and implemented.

[282703-3]

1         d.     Defendants must address the immediate shortage of acute inpatient beds and

2    provide 25 acute beds in licensed DMH hospitals by July 2009.  The bed plan Defendants should

3    be ordered to file within 30 days must include a plan to address the acute bed need identified in

4    their Navigant bed need study for FY 2009/10 and forward until the completion of any long-

5    range bed plan projects.

6         3.    <u>Long Term Relief</u>.

7         a.     Defendants are to serve and file a long-term bed plan to meet all needs

8    identified in the most recent Navigant study within 30 days.  The long-term plan must by June

9    30, 2013 meet 100% of the need identified in the most recent Navigant study.  The plan must

10   provide a means to eliminate funding obstacles and contingencies.  The plan must not include as

11   "contingencies" elements that are in the control of Defendants, such as any "uncertainty"

12   regarding the status of the Receiver beds as such uncertainty is entirely of Defendants' own

13   creation.

14        b.     Defendants' contract for outside mental health bed projections must be

15   extended to at least 2012, and reports from the contractor must be provided to Plaintiffs and the

16   Special Master immediately upon receipt.

17   Dated:  March 23, 2009          Respectfully submitted,

18                         ROSEN, BIEN & GALVAN, LLP

19

20                         By: <u>*/s/ Jane E. Kahn*</u>

21                           Jane E. Kahn

                          Attorney for Plaintiffs

22

23

24

25

26

27

28

[282703-3]