PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

Plaintiffs,

v.

ARNOLD SCHWARZENEGGER, et al.,

Defendants.

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' BED PLAN STATEMENT AND REQUEST FOR AN ORDER REQUIRING DEFENDANTS TO PREPARE AND IMPLEMENT AN INTERIM EMERGENCY PLAN TO ADDRESS THE ICF, APP, MHCB AND EOP BED SHORTAGES**

Hearing: March 24, 2009
Time: 1:30 P.M.
Courtroom: 4
Judge: Honorable Lawrence K. Karlton

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

[282540-1]

I, Jane E. Kahn, do hereby declare as follows:

1. I am an attorney admitted to practice law in California and am of counsel in the law firm Rosen, Bien & Galvan, LLP, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Objections to Defendants' Bed Plan Statement and Request for an Order Requiring Defendants to Prepare and Implement an Interim Emergency Plan to Address the ICF, APP, MHCB and EOP Bed Shortages.

2. Attached hereto as **Exhibit P-1001** is a true and correct copy of a document titled Office of the Governor of the State of California, Governor's Remarks, Governor Participates in Q&A at Sacramento Press Club Luncheon (January 28, 2009), printed from the Governor's website at http://gov.ca.gov/index.php?/print-version/speech/11442/.

3. Attached hereto as **Exhibit P-1002** is a true and correct copy of a document titled Office of the Governor of the State of California, Governor's Remarks, Schwarzenegger Administration Officials and Attorney General Announce Filing of Motion to End Federal Receivership (January 28, 2009), printed from the Governor's website at http://gov.ca.gov/index.php?/print-version/speech/11433/.

4. Attached hereto as **Exhibit P-1003** is a true and correct copy of an August 17, 2008 article from the San Luis Obispo Tribune entitled "CMC to Get New Center to Treat Mentally Ill Inmates."

5. As part of the *Coleman* remedial process, Defendant CDCR provides to the Special Master and to Plaintiffs' counsel the *Coleman* Monthly Report, which includes a wide range of data concerning the mental health program, including but not limited to, the prison mental health caseload population, mental health staffing allocations and vacancies, mental health crisis bed admissions and waiting lists, referrals and admissions to Department of Mental Health programs, and suicide data. Attached hereto as **Exhibit P-1004** is a true and correct copy of the cover to the January 2009 Monthly data provided to Special Master Lopes and Plaintiffs' counsel on February 27, 2009.

1

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

[282540-1]

6. Attached hereto as Exhibit **P-1005** is a true and correct copy of Enclosure 20 from the *Coleman* Monthly data for the months of August 2008 through January 2009. Enclosure 20 is a report entitled, Summary of Inter-Institutional Mental Health Crisis Bed Referrals and Transfers, prepared by Rick Johnson, Chief of the Health Care Placement Oversight Program (HC-POP), of the Correctional Health Care Services Division. This report summarizes the number of MHCB referrals from institutions to HC-POP, the number of MHCB placements by HC-POP, timeframes for transfers, and the number of MHCB referrals that are rescinded. Enclosure 20 data is the source of Plaintiffs' Trial Exhibit P-263 in the recent Three-Judge panel trial. Plaintiffs' Trial Exhibit P-263 charts the increase in prisoners referred by institutions to HC-POP for placement in a MHCB and the increasing gap in the number of prisoners that HC-POP could place. Pls.' Exh. P-263 (MHCB Unmet Need).

7. Using the data from Enclosure 20 for August 2008 to January 2009, I instructed a paralegal to input into a Microsoft Excel spreadsheet the total number of inmates for each monthly report that were 1) referred by institutions to HC-POP for a MHCB 2) placed by HC-POP in a MHCB and 3) placed by HC-POP in a MHCB within 24 hours. Using Microsoft Excel, a chart was created showing the historical pattern of these categories between August 2008 and January 2009 ("MHCB Unmet Need Chart"). This chart shows that between August 2008 and January 2009 the majority of referrals for a MHCB are not placed by HC-POP, and of those that HC-POP can successfully place, the vast majority are not placed within 24 hours. Attached hereto as Exhibit **P-1006** is a true and correct copy of the MHCB Unmet Need Chart. Using the same date I instructed a paralegal to calculate the average number of days that a person waited for transfer to an MHCB for each month from August 2008 to January 2009. Attached hereto as Exhibit **P-1007** is a true and correct copy of the resulting chart ("Average Days Waiting for Transfer to MHCB Chart"), showing that the average wait time increased to 5.33 days in January 2009.

8. Attached hereto as **Exhibit P-1008** is a true and correct copy of the November 20, 2006 contract between Navigant Consulting Incorporated and CDCR, No. C06.284. This agreement provides that the Contractor will provide consulting services to the CDCR, Division

2

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

[282540-1]

of Health Care Services, to update the mental health bed forecast, review and update the methodology; and provide expert testimony to the associated parties in the *Coleman v. Schwarzenegger* lawsuit. CDCR's Responsibilities under the contract are set forth in Section C on page 3 and the Contractor's Responsibilities are set forth in Section D on page 3. The contract period runs through December 31, 2009, and includes the Fall 2009 bed projection.

9. Attached hereto as **Exhibit P-1009** are true and correct copies of the Monthly Reports on the Licensure of the Intermediate Care and Day Treatment Programs at California Medical Facility, Vacaville and the Salinas Valley Psychiatric Program, Salinas Valley State Prison for October 1, 2008, November 1, 2008, December 31, 2008, January 30, 2009, and February 28, 2009. According to the February 28, 2009 data, the patients waiting for transfer to the DMH program were housed in a variety of locations, including 78 housed in the general population EOP units, 58 housed in EOP administrative segregation or psychiatric housing units, 20 housed in mental health crisis beds and 5 housed in the acute psychiatric program beds.

10. Attached hereto as **Exhibit P-1010** is an updated SVPP Waitlist Chart that includes data from the Monthly Reports on the Licensure of the Intermediate Care and Day Treatment Programs at California Medical Facility, Vacaville, and the Salinas Valley Psychiatric Program, Salinas Valley State Prison for October 2008 through February 2009. I instructed a paralegal to add the SVPP waitlist numbers for the months October 2008 through February 2009 on the SVPP Waitlist Chart in the same manner in which we created Plaintiffs' Trial Exhibit P-265.

11. Attached hereto as **Exhibit P-1011** is a true and correct copy of a redacted version of excerpts of the Department of Mental Health's Monthly Bed Utilization Report for DMH Hospitals and Psychiatric Programs (February 2009). This document provides the names and CDCR numbers of each prisoner referred, accepted, placed on a DMH waitlist and/or transferred. We have reviewed this data and have created a chart that reflects the lengths of stay for prisoners who were referred and accepted to the SVPP program and placed on their waitlist. The *Coleman* Program Guide transfer timeline mandates that a prisoner should be transferred within 30 days of referral to any intermediate care DMH placement if accepted. (Mental Health Services Delivery System Program Guide, Sept. 2006, Three-Judge Court Trial, Plaintiffs' Exhibit P-9 at 12-1-13.)

3

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

[282540-1]

12. Using the data from the Department of Mental Health's Report on Monthly Bed Utilization for February 2009 (Exhibit P-1011), I instructed a paralegal to input the date of referral for each inmate included on the SVPP and 1370 Waitlists. The length of stay for each inmate was calculated as the difference between referral date and the end of the date range covered in the report (February 28, 2009). A chart was created using Microsoft Excel, which summarizes this data ("SVPP Waitlist Chart"). Nearly ninety-five percent (154 out of 163) of the inmates had an average length of stay exceeding 30 days, the *Coleman* Program Guide Standard. The SVPP Waitlist Chart shows that for those inmates on the waitlist more than 4 months, the average length of stay was 307 days.[1] Attached hereto as Exhibit **P-1012** is a true and correct copy of the SVPP Waitlist Chart.

13. The Department of Mental Health's Report on Monthly Bed Utilization for February 2009 (Exhibit P-1011), includes the list of prisoners who have been accepted to the Acute Psychiatric Program (APP) but remain on the waitlist because of bed shortages. In February 2009, there were 19 patients on the APP waitlist with lengths of stay ranging from several days to more than 100 days. Inmate B, CDCR No. F___, who appears on line 218 of the APP waitlist, was referred to APP for acute inpatient care on November 17, 2008, and although his referral was received on that date, he remained on the waitlist as of February 28, 2008, three months later. Inmate G, CDCR No. G___, who appears on line 219 of the APP waitlist, was referred to APP on December 30, 2008, the same date that his referral was received by DMH, however he remains on the waitlist as of February 28, 2008. The 19 patients include a man who was identified in the Special Master's 17th and 18th Monitoring Reports due to previous failures to take refer him to higher levels of care. Inmate M, CDCR No. K___, who appears on line 221 of the APP waitlist. This patient has been waiting for transfer to an acute inpatient bed since his

---

[1] As provided to Plaintiffs' counsel, a small number of inmates included in the SVPP waitlist for February 2009 had the date of referral partially obscured due to a stamp placed on each page of the report indicating the information was confidential and subject to a protective order. For each of those inmates, the month and year were visible, so it was assumed that each inmate had been referred on the last possible day given the information visible. As a result, the actual average lengths of stay may be longer than those shown on the chart.

4

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

1  referral on January 31, 2009. He was previously referred and accepted for transfer to SVPP on
2  August 6, 2008, and remains on that waitlist today. Finally, among the 19 patients are two
3  persons on the parole revocation lists who were recently arrested on parole violation charges and
4  were deemed unable to participate in their hearings due to the severity of their mental health
5  symptoms. Inmate S, CDCR No. T___, who appears on line 235 of the APP waitlist, and Inmate
6  C, CDCR No. F___, who appears on line 231 of the APP waitlist.

7    14.  Attached hereto as **Exhibit P-1013** is a true and correct copy of pages 120-124 and
8  180-181 from the September 4, 2008 Deposition of Victor F. Brewer, Executive Director of
9  Salinas Valley and Vacaville Psychiatric Program.

10   15.  Attached hereto as **Exhibit P-1014** is a true and correct copy of the December 31,
11  2008 Memorandum from Brenda Epperly-Ellis, Director of the Statewide Mental Health
12  Program to Chiefs of Mental Health, regarding the provision of suicide prevention follow-up care
13  to prisoners referred to mental health crisis beds for suicide risk, even when the patient is
14  discharged from their alternative suicide watch placement before they are admitted to an MHCB.

15   16.  Attached hereto as **Exhibit P-1015** is a true and correct copy of Enclosure 3,
16  Mental Health Population Placement per Institution, dated January 12, 2009, from the *Coleman*
17  Monthly Report provided by defendants. Based on a mathematical calculation in which I added
18  the EOP/PSU Current Pop, which equals 5,002 EOP patients (found on page R1-4) and
19  subtracted the total of the EOP/PSU bed capacity, which equals 4,157 (found on page R1-4), the
20  EOP Unmet Need in January 2009 was approximately 845 EOP patients. I reviewed the
21  institutional listings in Enclosure 3, which lists individual prisons and their housing units
22  (general population, administrative segregation, security and psychiatric housing units, and
23  reception centers). I was able to count the number of EOP prisoners housed in general
24  population units and by reviewing the CDCR website description of each of the prisons, I was
25  able to determine which prisons had only Level I to III general population housing units. There
26  were a total of 99 EOP patients housed in non-EOP prisons that were described by the CDCR
27  website as having only Level I to III housing. The number of EOPs housed at each prison were
28  reported as follows: Avenal (10), Centinela State Prison (1), California Institute for Men (16),

1 Correctional Training Facility (6), Chuckawalla Valley State Prison (2), Deuel Vocational

2 Institution (6) , Folsom (6), Ironwood State Prison (1) , North Kern State Prison (2) , Sierra

3 Conservation Center (5) , Solano (7), and San Quentin (37[2]).

4     17.    Attached hereto as **Exhibit P-1016** is a true and correct copy of the CDCR

5 download descriptions of the twelve (12) prisons where the 99 EOP prisoners were housed on

6 January 12, 2009. In addition to the 99 EOP prisoners, there were another 59 EOP prisoners

7 housed at non-EOP prisons which also had a Level IV yard, such as California Substance Abuse

8 Treatment Facility (CSATF), where eight (8) EOP prisoners were reportedly housed on a general

9 population yard on January 12, 2009, and California Correctional Institution, where twenty-eight

10 (28) prisoners were reportedly housed on a general population yard on January 12, 2009. *See*

11 Exhibit P-1015 at R1-1, R1-3. Some of the EOPs housed at these prisons with Level IV housing

12 may, in fact, be lower custody prisoners, as was the case at CSATF in July 2008. In July 2008,

13 Dr. Haney, plaintiffs' mental health expert, interviewed EOP prisoners housed in a lower custody

14 A Facility dorm housing unit and in a Facility E housing unit with dayroom bunks. Haney

15 Report at ¶¶ 220-221, 224-225 (interviews with Prisoners NN and PP, each EOP prisoners

16 housed in a SATF dorm waiting for transfer to an EOP program) and ¶ 232-233 (Prisoner UU,

17 previously housed in triple-bunk gym and now in E-4, with 20 dayroom bunks); Pls.' Exh. P-336

18 at SATF-10, July 28, 2008, Facility A, Building 2 Dorm, Section A. In fact, SATF staff reported

19 that they made no effort to house EOP prisoners in a single building on a yard to enhance

20 monitoring, safety, or clinical care to these inmates. Haney Report at ¶ 216. Thus, the count of

21 99 is likely to be an undercount of the Level I-III EOPs currently housed at prisons without EOP

22 programs waiting for transfer to an EOP program, because the SATF EOPs and possibly other

---

[2] Although there are 52 EOPs listed at San Quentin on the general population, Enclosure 3 does not account for how many of these may be Condemned prisoners. The Special Master's September 12, 2008 Monitoring Report (Docket No.3029 at 107) found that there were 15 Condemned EOP prisoners at San Quentin, although it does not indicate how many of the 15 are in the condemned segregation unit. I have therefore subtracted 15 from the 52 San Quentin general population EOPs in an abundance of caution to make the estimate of unserved Level I-III EOPs as conservative as possible.

6

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

EOPs housed in prisons with Level IV yards are not included. There were also 741 EOP patients listed in the reception center housing units on the January 12, 2009 monthly population report. See Exhibit P-1015. Although CDCR does not provide a custody breakdown for this overall EOP reception center population, CDCR has done its own analysis of its daily prison population for the calendar year 2008, and concluded that approximately 70 percent of the men's prison population were Level I – III prisoners.

18. Attached hereto as **Exhibit P-1017** is a true and correct copy of the downloaded CDCR Average Daily Prison Population Report for Calendar Year 2008. Applying the same percentages of Level I to IV prisoners (20% of population are Level IV prisoners) to the 741 EOP RC prisoners identified in the January 12, 2009 Coleman Monthly data would result in 592 Level I-III EOP RC prisoners. Applying the Navigant distribution of EOPs, with 35% at Level IV, would result in 482 Level I-III EOP RC prisoners.

19. Attached hereto as **Exhibit P-1018** is a true and correct copy of pages 101, 102 and 104:10-15 from the August 28, 2008, Deposition of Cynthia Radavksy, Deputy Director of Long-term Care Services for DMH.

20. Attached hereto as **Exhibit P-1019** is a true and correct copy of page 83 from the transcript of the April 26, 2006 Evidentiary Hearing Re Motion for Court Order, *Coleman v. Schwarzenegger,* The Honorable Lawrence K. Karlton.

21. Attached hereto as **Exhibit P-1020** is a true and correct copy of the Mental Health Crisis Bed Waitlist, January 2009, from Enclosure 18 of the January 2009 Monthly data provided by defendant CDCR.

22. Attached hereto as **Exhibit P-1021** is a true and correct copy of a redacted version of page of the December 2008 Inpatient Psychiatric Aging Report, Enclosure 6, which covers California State Prison, Sacramento, from the *Coleman* Monthly Report provided by defendants.

7

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct and that this Declaration was executed on March 23, 2009 at San
3  Francisco, California.

                                                */s/ Jane E. Kahn*
                                                Jane E. Kahn

DECL. J. KAHN ISO PLS.' OBJ. TO DEFS.' BED PLAN STMT. & REQ. FOR ORDER REQUIRING DEFS. TO PREPARE & IMPLEMENT INTERIM EMERG. PLAN RE BED SHORTAGES - CASE NO. CIV S 90-0520 LKK-JFM

[282540-1]