# Exhibit
# P-1001



ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

## GOVERNOR'S REMARKS

Case No. CIV S-90-0520 LKK JFM P (E.D. Cal)
HEARING ON DEFS' BED PLANS – 3/24/09
PLTF Exhibit No. P-1001
Date Entered:_____
Signature:_____
Alternate Reference:_____

Wednesday, 01/28/2009 6:22 pm

### Governor Participates in Q & A at Sacramento Press Club Luncheon

GOVERNOR SCHWARZENEGGER: Thank you very much, John, for your nice introduction and the great work that you're doing. Since I have just stopped the Big Five meeting to come over here and to talk to you, I thought it would be appropriate to talk about nothing else but the budget. I actually had a speech but then I said to myself, why am I giving a speech? I'm in the middle of the budget negotiations and I know that everyone will be interested about what's going on in that area.

So let me just quickly say that it is very important that we solve our $42 billion problem. This is a problem that is bigger than any problem we have ever had in this state and this is why we should not just approach it by coming up with certain solutions for this fiscal year and then solve, after the May Revise, the next fiscal year but to go and solve the whole $42 billion problem in one shot.

Now, what that means, basically, is we will be doing something historic because, as you know, in my State of the State Address I said that the legislators are always late with the budget and that I actually recommend that we should stop paying them for each day they are late and they go past the constitutional deadline and also stop paying and giving them per diem money. So now we have a situation where we actually have a chance to have a budget five months before the constitutional deadline and that's what I'm shooting for. Now, even though everyone says you're crazy and this will never happen but I never go and listen to those kinds of naysayers because I believe anything is possible.

So I can only tell you that our legislators -- I see with all four of the leaders, Democrats and Republicans, I see the will during the negotiations even though these are very, very tough things that we talk about, where we go into areas that we have never, ever dreamt of going into and trying to solve. So you will be very surprised when the whole thing is done. We're still not there yet. There is still a lot of work that needs to be done but we are moving slowly forward with this process.

As you know, my budget proposal is a four-legged stool and that means that I believe very strongly that, since we have to make cuts, severe cuts and also have revenue increases. It is about $14.3 billion that I have in my budget in revenue increases and around $17.6 billion in cuts and then the rest of it is the lottery and the RAW, that makes up the $42 billion. But since we are talking about those two things, cuts and revenue increases, both of them affect the people of California, I feel very strongly that at the same time, in order to really show to the people that we are doing other things than just asking them for their help, to go and also make government more efficient. So there are two legs, which is the cuts and which is the revenue increase.

But the third leg is to make government run more efficiently, to consolidate some of the departments, to improve on our IT, where we can save $2 to $4 billion dollars over the next five years and to also look at some of the boards and commission that cost us a lot of money and to make some of them self sufficient and others to get absorbed into various different agencies. So we are looking at all of that.

And then the fourth leg is to create an economic stimulus package, because again, when you do revenue increases that inevitably hurts the economy somewhat and businesses. So you've got to give businesses and the economy something to boost that and to create an equalizer and so this is why we are trying to push and put in billions of dollars of bond money into our infrastructure, for instance. And in order to do that successfully we had to go and also negotiate and talk about how to speed up the permitting process, how to speed up and reduce the amount of time that we do environmental studies -- not to eliminate environmental studies but to speed it up and to reduce it, so we can literally put shovel in the ground within the next few months. And also get the people to work, because we know that

for every billion dollars that we spend of infrastructure it creates 18,000 to 25,000 jobs. And I think that is what is needed right now, to put people back to work, because our unemployment rate, as you know, has gone up to 9.3 percent and it will go even further if we don't do something about it and I think that we can do something about it.

So also we talk about some easing of labor laws, we talk about all kinds of things there that will help businesses, that make businesses in California more competitive compared to other states and to really stimulate the economy and try to get the economy back again.

So this is what our budget proposal is all about. And of course these are very challenging things, like I said, to get accomplished, because a lot of things that we talk about have never really been talked about, or have been talked about and we never agreed on it and so on. But it gives us a good opportunity. I always say when there's a crisis it gives us also a good opportunity to fix things and to deal with things that were long overdue. And I think that we now, because of this economic crisis, have a good opportunity to fix those things.

So with that, I just want to leave it up to you, if you have any questions about any of those things. I also just want to add quickly and just tell you, even though we are going through some very challenging moments, I love my job. (Laughter) I love my job. People always ask me and come up to me on the street and say, I'm so sorry that you have to go through this mess and with those legislators. And people feel literally sorry for me, what I have to go through.

But don't feel sorry for me. I have a terrific time. I think it is -- I never thought that I would have such a satisfying feeling about serving the people. My father-in-law has talked to me about that 30 years ago when I met his daughter and he talked about serving the people. And at that time I was into acting and I'd rather talk about how to swing the Conan sword (Laughter) than to talk to him about public service, even though I was involved in some form of public service by going around and talking about fitness and how to get kids off drugs and alcohol and those things.

But it was not the public service that he was talking about. And he always talked about, I remember in his speech at Yale University, he told the students -- it was like 30 years ago -- "Tear down that mirror. Tear down that mirror in front of you that makes you always look at yourself and you will see the millions of people behind that mirror that need your help. Serve those people. Serve, serve, serve."

So this is always what he always said to me and now I understand it. I've done movies and I've been on the stage, the most muscular man in the world and all of those kinds of things and made millions of dollars in my various different jobs and movies and so on. But this is, without any doubt, the greatest thing that I have ever done and the most satisfying thing that I have ever done. And it's also a great journey, to learn all of those things, because there's a tremendous learning curve there, to sit there and you make mistakes, you learn from your mistakes, you pick up the pieces when you fail and then you get going again and you try it again in a smarter way and a more inclusive way in bringing people together and all of those things.

So anyway, I just wanted to let you know that I think it is terrific to serve the state of California and now I want to open it up to questions.

JOHN MYERS: We promise not to feel sorry for you. Don't worry, Governor. (Laughter) Sorry.

GOVERNOR:  I was not talking about you. I know you wouldn't feel sorry for me. (Laughter) But I feel sorry for you guys, because I know that journalism and I think the press coverage -- you know, you see it kind of slowly trickling down here in Sacramento and that your business is going through some difficult moments. And I like the press. The more press participation there is and the more coverage we get the better it is. So I hope that you make your business strong, if it's television, if it's radio, magazines, newspapers and all of those things. It saddens me when I hear that the newspapers have to lay off writers, because I think we need the writers. They are important. The more coverage all those different subjects get, the better it is for the people of California. So we like a vibrant press participation and business, so I hope that your business will come again as the economy will come back also.

QUESTION/ANSWER:

QUESTION:         Speaking of press participation, I know we have reporters who have questions. I know there's one up here and then we'll go to the back and the front.

GOVERNOR:         Sure.

QUESTION:         Hi, Governor. Juliet Williams at the Associated Press. A new poll out today shows 30 percent of Californians approve of your handling of the budget. There is broad disagreement over a lot of your proposals in

there. How much of the gridlock is at your feet, as the chief executive of the state?

GOVERNOR:        Well, I think that the important thing for us is to stay focused, not to look at that but to look at the end result. And I think that what we are shooting for, like I said, is to eliminate the $42 billion budget deficit that we have. I think that the lawmakers will, if we succeed -- and I think that we will -- I think will have done something historic. And I think that the people of California will appreciate that. And I think it's important to offer to the people that A) We need their help, we need everyone's help to participate in this crisis. But B) That we will do everything that we can to make government run more efficiently and also to create an economic stimulus package. And so this is what we are working on. For me, the important thing is the end goal. We're shooting for a really big goal but I'm absolutely confident that we will accomplish that.

HOST:        Governor, back here.

QUESTION:        Governor, Kevin Riggs from KCRA. That same poll indicates 54 percent support for reducing the voting threshold in California from two-thirds to a 55 percent super majority. It's the largest amount ever expressing support for that. Should that go before voters, that question, in a special election later this year, A? And B, when would you like to see the legislature set that special election?

GOVERNOR:        Well, as you know, that I have always said that the big problem that we have at the Capitol is that people get stuck in ideology and I think not only with the budget but with so many other issues. And this is why we worked very hard, since the time I came into office, to have redistricting reform.

To me, what is important is that we create an environment where people can come to the center and don't get punished by being in the center and don't get punished for compromise. People now get rewarded for getting stuck in their ideological corners and getting punished if they compromise. So I think that that has to change and so I think that redistricting reform was a great vehicle. It will not help during my administration but that's not always what I am interested in, is to do things that will help during my time but what is important is that it will help California in the long run, over the next few decades.

And also, on top of that, open primaries is an additional thing that I will be looking at down the line, because that's another thing that we need in this state in order to bring people to the center where there's more action. So I think it's not the two-thirds vote that is the problem, I think that the political system that we have in place is really the problem.

QUESTION:        What about the special election? When would you expect to ask the legislature to call that? Would it be May, June? What's your expectation?

GOVERNOR:        I think that the first and most important thing is that we solve our budget problem and we get rid of our $42 billion problem. And then we can go and say okay, here are various different measures that need to be voted on by the people, which is the lottery, for instance, or we have the budget reform, which is the rainy day fund and the mid-year cutting authority, all of those things that were negotiated by the legislators in the last budget negotiations and additional things that will be on the ballot and maybe even when we negotiate the water infrastructure bonds, those kind of things we can then put on the special election. So there will be a bunch of measures. We don't know exactly what the time will be when we have that special election.

HOST:        We'll go right here.

GOVERNOR:        Yes.

QUESTION:        George Skelton, Los Angeles Times. You know, a lot of people out there don't think we need a tax increase, they think that we can balance the budget just with spending cuts. What do you tell those people when you're trying to defend your proposal for a tax increase when you used to be against it?

GOVERNOR:        Why was I not looking surprised when you said tax increase? (Laughter) First of all, I despise tax increases. You know that, I have told you that many times. But mathematics is much more powerful than ideology. So you see the numbers, $42 billion and you know that you can't do $42 billion in cuts. It doesn't exist. Anyone that thinks that you can do all of this with just cuts doesn't know math and they should go back to Math 101 where they learn a little bit about numbers, because there is only so much you can do.

And I think that our budget -- I have said this last August -- that the way the number are going, that they went way beyond the $10 billion, which we could have done in cuts. It went to 20 billion, then to 25 billion. I said okay, from here on this is not anymore a spending problem. We have an economic crisis on top of self-inflicted wounds that we

have also. So that's why I said on August 15th last year that we need also revenue increases and so since then I have been talking about that.

And I think that the Republicans agree that there is a way of doing that with revenue increases but certain things have to happen in order for them to go along with that revenue increase, because to Republicans to go and to -- most of the Republicans, I'm not speaking for everyone -- but to most Republicans a revenue increase or a tax increase is an equivalent of going to say to a Democrat, change your mind now from being pro-choice to being pro-life. It's such a huge change, philosophic change. I hope that the Democrats always appreciate that, of how big that is for Republicans to go there. And so I think that's important in those negotiations and I think that the Democrats also see that, that it is a huge thing to overcome.

So with that in mind, I think they're going to move forward and try to work together, where Democrats will make cuts that are very painful for them -- and for us too but more so sometimes to them -- and that the Republicans will have to do a tax increase also. So I think that all of this is in the negotiations.

And I think what is important to the Republicans is that we have at the same time a strong economic stimulus package that really means something, where we can put tens of thousands of people as quickly as possible to work and to go and to moderate some of those -- modify, I should say -- some of those labor laws that hold businesses back.

QUESTION:          Governor, J. G. Preston, Capital Television News Service. If the judge rules against you and says you don't have the authority to issue the executive order for the furloughs, what's Plan B for saving that money?

GOVERNOR:          Well, first of all, I think that the receiver will never get that money. So that's important to know, because I will not give it to him. I think the controller will not give it to him and I don't the legislators will give it to him.

I think that this was the right thing for the attorney general to do today. It is outrageous, when we are seeing that programs for kids are being cut and where we have to make severe cuts in education and in health care -- vulnerable citizens that really need the money and they have to go and get a haircut there and reduce those programs and the funding for those programs -- to have someone out there by himself running around with an $8 billion project and trying to get this $8 billion project going, as if this is the most important thing right now.

So I think it is totally inappropriate. I think that he has missed the boat completely. He has not been a team player. I asked him over and over to become part of a team and to work together with the legislative leaders, to work together with the attorney general, to work together with our office and with everyone and he refused to do that. And so, therefore, I think that he is really an obstacle in order to get things done and to really provide good health care for the inmates.

QUESTION:          Governor, I'm extraordinarily glad to have that answered but I actually had a different question. The question was about the furlough order.

GOVERNOR:          Oh, the furlough? Sorry.

QUESTION:          But no, we wanted that answered too, so that's good.

GOVERNOR:          Because I heard something about $8 billion. The furlough --

QUESTION:          That was a twofer. But if the judge rules against you on the furlough, what's Plan B?

GOVERNOR:          To me, labor has the choice -- and I made this very clear -- that they can help us in making the decision on how we save the $1.4 billion. So our recommendation was furloughs, where everyone takes a little haircut rather than laying people off. That's the last thing I want to do, is lay people off. So it's their decision now.

But there are constitutional officers that decided to make this a political issue and there are some of them that are running for governor and they feel that it's a little bit uncomfortable for them to go in that direction, because maybe they don't get the support from labor. I can't help them. The fact of the matter is, in the end, I have the authority as the governor to, if they don't go along with the furlough, to lay off the amount of people necessary so we have a savings of $1.4 billion. So that's what I will do.

But I leave it up to labor. You have to understand that I want to work with them but everyone has to go and help here in order to solve our budget crisis. This is not an anti-labor thing by any means. I love our state employees. They are

very dedicated individuals, they are doing incredible work and we owe them a lot because they make the state run. But at the same time, I need to balance the books.

HOST:          Back here, Governor?

GOVERNOR:      Yes?

QUESTION:      Nanette Miranda with KABC TV Los Angeles. As you know, the House Stimulus Package has a huge amount for California, $32.6 billion, of which 7.8 billion could probably be used towards our deficit. How helpful is this?

GOVERNOR:      Well, you know, I always count on things when I have it. So there are a lot of people at the Capitol running around saying oh, the federal government and the Obama administration is bailing us out and is helping us. And I always make it clear that we will not use that money to bail us out, because we have to bail ourselves out. Half of the problem that California has is because of the economic crisis that we have worldwide and nationwide but the other half is self-inflicted.

So we don't want anyone to go and try to patch it up and to help us and put a Band-Aid over those problems, because we have to fix those problems. And now is a good time to fix those problems, like for instance having a rainy day fund, having mid-year cut authority and those kinds of issues. I think this is important and not for us to spend more money than we take in and to keep some money always aside when there are the good years so we have money when there are bad years or down years, so we have money for those things. So those are the things we have to do.

Now, when we get certain federal money we can then take that, for instance instead of the RAW use that money. We can do that but not to really fix our thing, because any money that comes in just one time only should be considered as one-time revenue or two-times, maybe for two years it comes in. But it does not fix the structural deficit, only money that we get. And where the federal government says okay, we're going to continue increasing this forever -- here's $2 billion -- then you can use it in a budget and then it is ongoing and it will help us with the structural deficit. So I think we have to be very careful to not look at them as the savior but to just look at them as the icing on the cake. We have to do the rest of it.

And so I'm looking forward to getting money for education, which we will give to the schools and share with the schools. I think it's important to get money in health care, which the Obama administration wants to work with us and we are looking forward to working with them, including health care reform, because President Obama is interested in health care reform, to do that nationwide. And we have, of course, done a lot of work on a state level to have health care reform. We almost got it passed last year, so I think with help from the federal government we will get it done this year.

There is help that we get on infrastructure, there are billions of dollars that come our way. We will use that money. And we told them that we have $28 billion worth of projects ready to go, where we have the permits and everything, where we can put shovel in the dirt immediately. So I think those are the kind of things we're looking forward to getting from the federal government but not to help us with our budget problem.

QUESTION:      Governor, to your right, here in the back.

QUESTION:      Governor, Phil Matier, San Francisco Chronicle and CBS 5 San Francisco. What do you say to the 2 million-plus people who won't be getting income tax refunds and the vendors who won't be getting paid while you hash out the budget?

GOVERNOR:      Well, I think that we made it very clear that everyone here will have to help the situation that we are in, because we don't have the money. It's as much as what we say to the schools that are getting less money and much as we say to everyone that doesn't get the money or get IOUs and so on, that we don't have the money. And I made that clear last fall already, when the Controller still said, "No, no, we have money to March or April."

I said, "No, we are running out of money by the beginning of February and this is exactly what is happening here now. So within the next 10 days we will be out of money. I hope that we can get our budget done within the next 10 days, meaning also to have the legislators vote on the budget, not just to come to an agreement but to vote on a budget so that we can go then and start really collecting extra revenues and also show to the financial community that we have our act together and that we have passed the budget the first time in history five months early.

And that we can sell our bonds again -- that we can sell our bonds again, because that has held up now, the lack of bond money has held up 2,000-some projects, so we want to make sure that those projects get funded again, because

that will put people back to work. So I think that we will get everything going again as soon as we have a budget and then we can again get this money back to the people.

QUESTION:          Governor, Carlos Sanchez, Univision 19 Sacramento. With this financial crisis the issue of immigration reform has been put on the back burner. What do you plant to do as the governor of California to work with the Obama administration on this issue?

GOVERNOR:          Well, as soon as it comes up -- we want to work with the Obama administration on every issue, because I think that the important thing is there is a great partnership between local government, the state and the federal government. When we all work together, whenever everyone works together, you accomplish much more. So I'm looking forward to seeing his ideas on this so we can work together and solve this problem. And we still have the same concerns as we have always had but we want to solve the problem. And as you know, I've talked about that many, many times.

So I don't think that this is on his front burner right now but I don't want to speak for him. He has his own spokespeople. But we are happy that to him on the front burner is the economic stimulus package and also the environmental issues, that he is going to grant us the waiver so that we can regulate our own tailpipe emissions and all of those things. So we are looking forward to working with the administration.

QUESTION:          Thank you, Governor.

QUESTION:          Up here at the front, to your left.

QUESTION:          Hi, Governor. Hilton Collins with Government Technology Magazine. Your reorganization plan, if enacted, calls for consolidating state IT under Takai's office, the Office of the Chief Information Officer. If that consolidation becomes a reality do you foresee what the consolidation of the IT functions, that any IT employee downsizing will occur?

GOVERNOR:          Well, what we will do is, we will make government run more efficiently, which I think that we owe to the taxpayers. And I think that we have tried very hard this last five years. We have made great progress since I have come into office and we pulled everyone together.

And then especially since we hired Teri Takai, who made Michigan the number one state in IT. We hired her from there to bring her out here and do the same thing for California. I told her, I said, "Look, I don't want to be 16th like we are now." And since she has come in we are now number five in IT in the nation and I think within the next two, three years, she will make the state of California number one. And I think that's where we ought to be, is number one, because we are a high technology state. We have the Silicon Valley and all those industries here. We're number one. So to not make government run and be the number one in IT is a shame and this is why I push and push.

So that will mean that 130-some agencies and entities in government that have their own ITs basically will come under one roof and therefore all those different bureaucracies that are created in all those different agencies and entities will be eliminated. But still there will be a lot of people working on it when it's under one roof but it definitely will streamline. And like I said, it will save $2 billion to $4 billion in the next five years just by doing that.

So those are the kind of things that we as a state must do to make government run more efficiently, because we can take that money and use it for important programs, if it is in health care or if it is in education and so on.

HOST:          Governor, back here.

QUESTION:          Governor, Michael Rothfeld --

GOVERNOR:          Where is back here?

QUESTION:          I'm sorry, over here.

GOVERNOR:          Okay, back here.

QUESTION:          Michael Rothfeld from the LA Times. I was wondering, since the negotiations in the Big Five for some time have not been able to produce an agreement, whether you've ever considered and think it might be helpful to bring in a professional mediator who might be able to get you and the Republicans and the Democrats on the same page?

GOVERNOR:        Well, first of all, as you know, that historically those budget negotiations take a long time. And I think, because you're dealing with so much money and you're dealing with programs and people feel very passionate about various different programs and there's ideology involved. So it's not like where you sit down and just work out a little agreement; it's huge. And we have like $100 billion budget and so on and there are the special funds, that is like $40 billion or so. So it's very complicated.

But I tell you, I always know when I sit down, when there is what I call the Kabuki, where there is no interest to get anything done at that particular meeting. But you also know right away when there is the will developing. And I tell you, that over the last few weeks that we have been negotiating, I really detected the will there that we are going to get this done by the end of January. And I think it's really fantastic to see that, because you can see something so gigantic, to solve a budget problem that is a little bit more than half of our budget deficit. It's really extraordinary when you see $42 billion and then to solve that.

But to see people coming together, Democrats and Republicans and understanding each other's point of view and listening to each other -- because that's the important thing, rather than just to go there and to make the statements at the meeting and to argue but to actually listen, to listen to the other side and to think and to take that back home at night when you go home, why is it difficult for this group over here to eliminate these programs? Why is it difficult for them here to go and raise taxes? To make them understand each other and I think that's what is going on right now in those negotiations. They understand each other much more and they are willing to work together and to reach across the aisle to make this work and to actually make compromises also.

So I don't think we need a professional mediator. I think that maybe the Screen Actors Guild needs one more than we do. (Laughter)

Yes?

HOST:                We've got time for a couple more, so we'll go back there first.

QUESTION:          Okay. Right here?

GOVERNOR:        Yes.

QUESTION:          Hi, Governor. Samantha Young with the Associated Press. You said that ideology is partly to blame for this gridlock in the budget negotiations but there are several partisan proposals that are still on the table, that we understand, to change AB 32, delay the diesel regulations and also delay some pesticide regulations, all things that have been worked out through the public process and adopted by the state. Is this an appropriate place for these to be included in the budget negotiations and do you support them?

GOVERNOR:        First of all, yes, anything is appropriate to be part of those budget negotiations. So there should be no limit; anything that has to do with the economy and with helping businesses and with providing jobs for people, because all of this is very important, to get more revenues for the state of California. So that's why it is budget related.

First of all, no one is trying to undo AB 32. As you know, I'm very passionate about AB 32. I'm very proud of California, that California has been a leader in that area of making a commitment of the steps that we have created to get us there. But at the same time, one has to look at that and say is there anything that we can do to achieve the same goal but to ease some of this for the next two years while we go through this economic crunch? And that's the discussion that we have and we have had.

When it comes to speeding up the process, for instance, the environmental process, again in the infrastructure projects, we are not trying -- and no one ever in a Big Five meeting mentioned that we should eliminate any regulations or eliminate protecting the environment. Everyone is in sync that CEQA is great but let's go and find a way of, first of all, eliminating the abuse, meaning that people sue just to delay a project. And as soon as you delay a project because of that abuse, like we have seen with the Caldecott Tunnel, or with Highway 50, as soon as we started talking about easing some of those regulations and moving forward with the projects, they negotiated and they came to a settlement, something that could have dragged on another two years. So as you can see, we can shrink that time and we can, instead of waiting four years for a project, wait only a year for a project. So we can cut down the permitting process, cut down how long we study those things, the environmental studies and so on. So those are the kind of things that we are talking about.

No one is trying to get rid of CEQA, no one is trying. And it will never happen on my clock, by the way, to get rid of any of those regulations, because to me to protect the environment and to clean the air and to provide clean water, all

Office of the Governor of the State of California
Page 8 of 8
Case 2:90-cv-00520-KJM-SCR    Document 3547-1    Filed 03/23/09    Page 9 of 23

of those things are extremely important. And I always said, when I ran for governor, that I will do everything I can to protect the environment but also at the same time protect the economy. It is a very fine line and we are navigating through that to find the sweet spot, at what point does it help the economy and also at the same time protect the environment? That's what we have, those are the challenges in front of us that we are trying to come to a conclusion with.

QUESTION:        Governor, one final question to you left hand.

GOVERNOR:        Yes?

QUESTION:        Mike Zapler from the Mercury News. In recent weeks you've appointed former, termed-out legislators to high-paying jobs on some of the same boards and commissions that you've called for eliminating. Why?

GOVERNOR:        Well, first of all, we have the boards in place and they need to be filled, because otherwise they can't make a decision, because they have a certain function. So I have a policy that I will appoint Democrats and Republicans to that, anyone that I feel has been a great public servant and has still this passion in them and want to continue on being a public servant. They come to us and they say look, I can do something with this board, I have a good idea for this, I know how to streamline. And based on what they present as their idea, their philosophy, we go and put them on those boards. That's why.

But because they are high-paying jobs and because some of those can be absorbed within agencies and we don't need them, I want to get rid of them. So this is why part of my proposal, my budget proposal, is let's look at those boards very carefully together, Democrats and Republicans and maybe we can eliminate some of them. Now, if I call for 20 to be eliminated, maybe we are lucky to get five eliminated. You know the way it works.

These are all the things that I tried to do when I first came into office. But at that time, when we talked about blowing up the boxes and eliminating some of those commissions and boards, our revenues were going up, the economy was coming back and it was very strongly recommended to not go and make this a main issue. Let's go and tackle these other big problems that we have. There are bigger fish to fry. So we kind of put it on deep freeze for a while but now is a good opportunity to bring those things back.

Last year we were very successful in bringing the Office of Emergency Services and Homeland Security under one roof, to bring it together. This year we have a good chance to go and do that with Energy, which is a place where we really have to do a lot of work because there are all those entities out there that make decisions based on energy, there are 11 or 13 different agencies and entities. We can bring them all under one roof. And IT for instance and so on. Get rid of some of the boards and commissions. So there are a lot of things that we want to accomplish. And maybe we'll accomplish all that by the time the budget is being signed.

QUESTION:        Governor, thank you. Thanks for the time.

GOVERNOR:        Absolutely. Thank you very much. Thank you. (Applause)

QUESTION:        Thank you to the Governor. Let me just remind all of you, thank you for being here. Events coming up: On Monday night, the Legislative Reception, second floor of the Rotunda and February 11th Senator Steinberg. Thanks again, everyone.

# Exhibit P-1002



**Office of the Governor**    ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

## GOVERNOR'S REMARKS

Case No. CIV S-90-0520 LKK JFM P (E.D. Cal)
HEARING ON DEFS' BED PLANS – 3/24/09
PLTF Exhibit No. P-1002
Date Entered:_____
Signature:_____
 Alternate Reference:_____

Wednesday, 01/28/2009 10:25 am

### Schwarzenegger Administration Officials and Attorney General Announce Filing of Motion to End Federal Receivership

ATTORNEY GENERAL BROWN:  Good morning, thanks for attending. I'm here to -- wait, turn off your cell phone. Is that you, Mr. Walsh? I thought you were a good undercover guy, you didn't blow your cover that quickly.

MR. WALSH:  I'm out of practice.

ATTORNEY GENERAL BROWN: You're out of practice? Okay. I'm here to announce, on behalf of the Governor and the state of California, the filing of a motion to terminate the receivership that has taken over the health care of the prisons of California. We're also asking that the $8 billion spending plan also be terminated.

The state is facing a terrible fiscal crisis. Children are losing their education, the elderly are being deprived of medical care, and yet this receiver who has taken over the California prisons wants to spend wildly, spend at a level far in excess of what the federal prisons spend and far in excess of what the average Californian enjoys by way of medical care. The cost per prisoner, as you see over here as proposed by the receiver, is $13,800. For the average Californian it's under $5,000. The receiver has enough money. He's had several years and actually has made some very good progress, and we maintain now it's time to return the management of our prisons to the people who are authorized by law to do that.

What's happened in the interim, like any good idea, it's gone to excess, and what the receiver has become is a parallel government, operating virtually in secret, not accountable, not subject to public scrutiny. And the result of that is this wild spending that far exceeds what the Constitution requires and far exceeds what California is capable of, and that is the reason why we're filing this motion to terminate.

I'd like you now to hear from Matt Cate, the director of Corrections.

DIRECTOR CATE:  Good morning. I just wanted to say a few things in addition to what the Attorney General has just laid out. It's true that federal court takeover of a state function is an extraordinary remedy. It's also true that the receiver has made a great deal of progress, particularly on those areas that the federal court identified three or four years ago as the primary problem with medical care in California's correctional system.

One of those issues was the recruitment and retention of doctors and nurses. By raising salaries significantly the receiver has been able to fill those positions to the point where 91 percent of the nursing positions are filled and 88 percent of the doctor/physician positions are filled.

The court raised the concern regarding the quality of care provided by those clinicians. Through a peer review process and discipline process put into place the quality of care, by everyone's agreement, by those physicians has increased dramatically. The physicians providing incompetent care have been removed and so that issue has largely been addressed.

In addition, there was concern about access to care, making sure that inmates were able to get to a doctor to be seen, or get to an outside specialist to have particularly serious concerns addressed. The receiver has hired 1,100 custody staff personnel who provide that access to care now. In fact, he's recently stated he recognizes that he is overutilizing specialty care in the community and will be hiring an expert to try to address his utilization issues there.

We are also expanding clinical space at many prisons throughout California. And finally, the Inspector General's

Office has put together a medical oversight team to provide independent oversight of the department's medical care, another concern raised by the court.

So the receiver has made significant progress. Our point today is just that receivership isn't supposed to last forever and, in our view, it's time to transition that back to those who were elected to perform state functions, both on the executive and legislative branch of government.

So with that, we believe a special master at this time is more important and more appropriate, I should say, for oversight. The federal court would still have the ability to look over our shoulder and make sure that we don't fall back, have the ability to issue court orders that we would be compelled to follow should there be any identified problems, but the running of state government would go back to the people of California.

With that, I introduce Mike Genest, the director of Finance.

DIRECTOR GENEST: Thank you. I'll show the numbers, these numbers now. I'll put this over here. I just wanted to say that at times like this the state is unfortunately forced to cut back on even the highest-priority programs. As you all know, we're negotiating a budget that will solve a $41.6 billion budget gap. In doing that, unfortunately we're having to cut back everywhere. At the same time, the receiver's demands for spending, which we have no control over, continue to escalate.

This chart shows the receiver budget. This isn't for the capital outlay, for the $8 billion; that's a separate matter altogether. This is just his spending on his operational budget. And as you can see, he's gone from $948 million in 05-06 and would, if unchecked, go to $2.3 billion next year. That's just an unsupportable rate of growth and we don't think it's necessary. We think we could keep those numbers down much lower, closer to where we're proposing in our budget and still maintain adequate health care in the prisons.

QUESTION/ANSWER:

BROWN: Any questions?

QUESTION: Mr. Attorney General, can you articulate some of the "wild spending," some of the excesses that specifically cause you concern?

BROWN: Well, you've got Yoga rooms, quiet rooms, basketball courts, all manner of amenity that is not required by the Constitution, and yet that's what the receiver wants, despite the fiscal crisis. So what we have here is a plan concocted in secret, without any scrutiny, no legislative review, no public scrutiny, no Department of Finance critique, and that has resulted in this incredible wish list that's completely inappropriate.

We assert that this plan is illegal because it's not the least intrusive, which federal law requires, and also it violates the federal prohibition on ordering prison construction by a federal judge. So what we have here is a plan that was conceived by a group of planners following some gold-plated wish list to give things that may be very nice, and if the state had plenty of money we might consider some of it. But to have it imposed by a federal judge against the will of the Governor and the Legislature, it's not only inappropriate, it's illegal, and that's the basis of our motion and we intend to prosecute it vigorously.

QUESTION: Mr. Brown, what makes you think that a federal judge is going to terminate the very receiver he appointed just because you asked him to? And what recourse do you have if he doesn't?

BROWN: Well, we're going to make our case -- which, by the way, has never been before in this court, there never has been a factual trial on the merits. What is the deprivation? Who are these patients that are dying and who is causing their deaths? For example, the receiver is in charge. He said last year there were three preventable deaths. We tried to get information. What are the names of these people, what were the causes? Is there somebody responsible? We've been denied that information.

And that is the central vice here, that we're facing an autonomous government that does not operate according to the American and California system of checks and balances. We're going to make that case. If we're unsuccessful we have a right of appeal to the court of appeals and ultimately to the US Supreme Court.

QUESTION: Is there a constitutional conflict brewing here?

BROWN: There's a constitutional discussion brewing, a debate. Obviously, the receiver feels he has unchecked

authority to ride roughshod over the state of California and its officials. We believe he's violating federal law and that this order exceeds the authority of the federal court. As to what happens when there's a dispute like this, you have a decision first at the district level and then you go up to higher authority to finally get it resolved by the ultimate authority, which is the U.S. Supreme Court.

QUESTION: Mr. Brown, back when Judge Henderson did appoint the receiver, the list of -- if you read the Findings of Fact that led up to his decision, it lays out medical expert testimony that spells out horrendous cases of inmates exhibiting symptomology that was clearly life threatening and they were ignored. Are you saying that since that time --

BROWN: Yes.

QUESTION: -- the state has made sufficient improvements to meet constitutional standards and the inmates now incarcerated by the state of California have a constitutional level of medical care? You seem to suggest this has never been tried or heard before, but clearly it has.

BROWN: What has been tried before?

QUESTION: The deficiency of the health care system.

BROWN: These were declarations filed by plaintiff's attorneys. And that was then; now is now. That was then. We're now all the way up to here. So we've had billions of dollars of spending and if the receiver can't bring it up to what he considers the right standard, either he's incompetent or his standard is too high.

As a matter of fact, the receiver has been quoted by one health director from one of the California prisons, when asked what is the standard of care required by the Constitution, Kelso reportedly said, "We'll know it when we get there." So they don't know what it is. And that's the vice of this entire operation. You have a secret, autonomous government with no clear standards. So what are they?

We believe this state has done yeoman's service. We're way beyond, almost three times what the federal government is spending, more than two times what the average Californian gets. When is enough enough? And we believe, to answer your question precisely, there must be an agreed-upon standard with sufficient particularity that one can actually measure where we are in each prison on each day.

And I believe the receiver has made substantial progress and you might say, why? Because he's thrown a lot of money at the problem. That money didn't go down a rat hole. It's gone to pay doctors and nurses, more guards so you can transport prisoners out to hospitals. Things are happening. The prisoners are getting colonoscopies, they're getting all sorts of attention and care. Is it enough? I believe if it isn't enough then somebody is extremely culpable to spend all this money and not be able to get there. How does the federal government do it on $4,000 per inmate? How do the other states do it? How does the average citizen get along without this?

So to answer you, number one, the standard is not clearly articulated. Number two, tremendous progress has been made. I think there is very good health care. I've talked to two health directors myself from two different prisons, myself personally. They've both said -- in the case of one, he said he's giving better care at this facility than the average citizen in his community. And the second person I talked to -- and this was at the new Folsom in Sacramento -- he felt he is giving constitutional care.

Now, all the other prisons, I haven't had a chance to talk to them, but I am confident that the state of California is doing better than most. And certainly we can always find ways to improve, but we've got to do it with a dose of fiscal commonsense, and that has been lacking.

QUESTION: My I ask what has changed? And maybe this is better directed toward Director Genest or something. The administration has seemed fine with the $8 billion number before. There was even a discussion that you looked for the funding through the iBank instead of the Legislature. What has changed with the price tag, in the administration's opinion, that is now not acceptable?

GENEST: Well, the issue with the iBank was an issue of avoiding a cash draw out of the state's general fund in a sort of sudden and unpredictable fashion. If we're going to build any new prison facilities -- and I think we agree that some need to be built -- perhaps in the depths of a fiscal crisis this is not the right time. We do think there are probably some that need to be built, but if we're going to build them we can't do it with cash. They have to be financed, like any other capital program, and the infrastructure would have accomplished that.

As far as the $8 billion, the administration never signed off on the $8 billion. There was a bill that had that amount in it, but that was merely sort of a ceiling. And that bill, if you look at, as well as the iBank alternative that was discussed in the summer, both of those had some review processes that have yet to occur before you could have spend a dime of that amount. And both of them assume that we wouldn't just go out and do $8 billion overnight; there would be some sort of phasing in.

The review process that we would want is one, we think the Department of Finance and the Department of Corrections would both need to look at the guidelines that the court, or the receiver has created for what kind of facilities are needed and come to some agreement about whether those were excessive or acceptable. We're in the process of reviewing those guidelines; so is the Department of Corrections. It will take us a while. There are what, 900 pages, and it's a lot of detail.

But once, even if we approve and review that, then that doesn't say a particular prison needs to be built. Then we need to see a specific proposal for a prison, at which point that would go to the Public Works Board, it would be reviewed in Finance. The timing of the expenditure would have to be taken into consideration, the departments' other needs would have to be taken into consideration. So it's not at all clear that we would be building a prison, even under that approach, say next year. But at some point we probably do need to add some capacity on the medical side.

QUESTION: But the (Inaudible) is the $8 billion number? That's the --

GENEST: There was never an agreement to go spend $8 billion. There was an $8 billion number in a bill but it was not okay, go ahead and spend that, you're set to go. It was more that's an upper limit, now how do we plan to get to that over a long period of time?

QUESTION: But sir, the administration did, a year ago, propose in your budget to authorize the receiver to borrow -- at the time it was $7 billion -- and you backed the bill to authorize him to do Lease Revenue Bonds for this amount of money. So that is a definite change from what you're saying today.

GENEST: Yeah. Well, the state's fiscal condition has changed, the condition in the prisons has changed, our ability to stand up to the receiver and look at what he's specifically asking for has evolved. Secretary Cate may want to comment on some of that, I don't know.

SECRETARY CATE: I think you said it well. We have had an opportunity now to review the facility program statement; it's still being reviewed. But obviously, from our view of the custodial safety of our staff and the safety of inmates, we've just now been able to review that. So we have concerns in that respect and we haven't had much coordination on those kinds of issues between the receiver and the state. And so I think that, once that has started to happen, then the state's position on that has really been formulated on that basis.

BROWN: Let me just say something about that. If you read the lower court opinion by the district judge, when we fought the $250 million down payment, the response in the 17-page opinion was just as you just said; the $8 billion was in the budget, there was an agreement, the consent decree, the plan last June. All this went to the issue of that somehow the state has waived its rights.

But under the Prison Litigation Reform Act the state never waives its rights, the taxpayers never lose the right to be represented fairly and honestly. And I can say, whatever the thinking was a year ago or six months ago, now that the full reality of this $8 billion boondoggle, this gold-plated Utopian hospital plan that would turn inmates into patients, that has sunk home in a way that we believe we need a fundamental change, a return to the Department of Corrections, and the provision of health care on a more reasonable and humane basis.

I'm sure at the end California will still spend more and do more than any other state but, on the path we are now, it's institutionally dysfunctional. We cannot have one government operating in secret, called the receiver, and the other, the Department of Corrections, and a $40 billion deficit in between. It just can't work and we must have relief. And that's why the seriousness of this meeting this morning and the filing of this motion, and we intend to fight this vigorously. It is not a matter of some political view; it's a matter of absolute economic and human necessity for California to get back in charge of its own government.

QUESTION: Jerry, as I look at this list of amenities -- music, art, community college -- these are things not available to the average California public school kid.

BROWN: Well, there's no doubt that if you look at the quiet rooms, the Yoga room, the music room, the full basketball court, these amenities are not available to many citizens. They're certainly not on the health care plan that

the vast majority of citizens have. So, as I say, this is a Utopian plan to envision dormitories of patients instead of cellblocks of inmates. Now, somewhere between one and the other we can find a middle path. But the Yoga rooms, the quiet rooms -- nice, but not constitutionally required and completely inappropriate at this moment of fiscal crisis.

STAFF: Thank you all very much.

BROWN: Wait, we've got a couple more. Yeah?

QUESTION: The receiver is already inferring that this is just part of a campaign on your part, running for governor in 2010. You're trying to score points with the electorate. Your terms, like "Utopian systems," and "secret governments," would tend to lend credence to that.

BROWN: Sir, we have asked in official court documents, tell us who are these inmates who have died? We have not gotten an answer yet. They won't tell us. What's the evidence? Who is responsible? This is a secret, autonomous government operating outside the normal checks and balances that state and federal law require.

And I would turn to -- here's a nice, good, solid civil servant -- maybe a Republican (Laughter) Are you running for any office? I mean, what is this? He's got a big job here.

GENEST: No, I can assure you I'm running for no office. I don't think I could get the votes of even my own family at this stage.

But I would say that, in answer to this question about what's excessive, the receivership has, within these numbers, embedded in these numbers, he has his own Personnel Department, he has his own Budget Office, he has his own Facilities Operations Department, he has his own Information Technology Division, and it goes on. These are duplicative bureaucratic functions. They're all necessary to run an organization. Typically, they are funded once, and that is at the central part of the organization and they serve the branches -- health care, custody, what have you. That's the way it used to be, that's the way it needs to return. Eliminating that duplication will eliminate a lot of this excess spending. Maybe not all, but some.

BROWN: Another point I'd make in terms of the receiver is it's very odd and unbecoming for an officer of the court to engage in political mud throwing. This is a serious matter. Their budget has clearly grown by leaps and bounds at a time when the money is not there. So what is required is for people of good will to try to figure out what's the answer. And unfortunately, because we're dealing with orders that are mandatory by the federal government, we have to go into court and we have to make our case. Instead of making the case, he brings up collateral issues like my future career or lack thereof.

QUESTION: Are you hopeful that this will stop, the filing of this motion today will stop the clock on the contempt proceedings that are now being heard by the circuit court?

BROWN: No, the clock is still running and we're going to be in court in February, arguing in the court of appeals that the $8 billion is illegal. We're talking about a demand for money that violates the Federal Prison Litigation Reform Act.

QUESTION: And is there any intersection between this, then, and the three-judge panel considering the overcrowding?

BROWN: That's another story. We'll be getting an order on that very soon. That's another issue.

QUESTION: These are all on separate tracks at this point?

BROWN: Look, there are probably 20 different consent decrees. And I want to say something about the Department of Corrections. They have their challenges, but when you have 20 different federal courts sending experts and monitors saying how to run things, everything from dental to handicapped access -- to mental health access   rather - - it becomes dysfunctional in its totality.

And what my goal here, as someone who is sworn to see that our laws are fairly and adequately enforced, is to enable the state to do its job. And to do its job you need some unity of command, you need clarity of authority. Today, with the Department of Corrections, there's not unity of command because dozens of people can run around and give orders, some of them quite contradictory.

QUESTION: Jerry?

BROWN:  I think she's been asking. Did you --

QUESTION:  I just wanted to get a clarification on, why ask for a special master? How would that improve your legal standing?

BROWN:  Well, that's only -- that's during the transition back. I believe that the federal government has really gone very far. And the goal of the federal government is to vindicate an individual right, to provide a specific remedy for specific violations, not engage in the wholesale re-engineering of an entire state function. I believe that does exceed the federal law, the Prison Litigation Reform Act. We also assert it violates the 11th Amendment. I would also say that it really confuses the separation of powers between the legislative branch, the executive branch and the judicial branch.

QUESTION:  The Coleman case has always had a special master. And would you say, comparing the two, that the special master in Coleman, that system has worked a lot better than --

BROWN:  It's worked better, yes, and it's worked better because the department is still in charge. The master is giving all sorts of orders, but he hasn't taken it over and created a secret government like Kelso has. But we're not asking for any long-term master. We would like to have -- I believe that the state of California is a sovereign state and is capable of exercising its duty, and that the federal courts should, as quickly as possible, let us get about the business of doing what we're supposed to do instead of escalating standards that are virtually impossible to meet.

In the Coleman case we have now received our 22nd report. The 22nd report is 600 pages long. I first got a copy of it a week ago and I've been trying to find the time to finish it. In the first three pages they were giving congratulations to the master upon retirement after 14 years.

So if you stand back, what we're looking at is a never-ending, escalating set of demands and spending directed at the state of California. And that ensures that the management cannot succeed, because it's always being second guessed and the standards are always being changed. The goalposts are moving, the demands are increasing.

And the state is in a crisis. We've got to bring a dose of reality to the process, and that's the goal. It isn't intended against Kelso or against anybody else. We've got to get it back to a manageable way of doing things. Otherwise, it's just going to be lawyers. I would assert, I would estimate their spending on the lawyers, public and private, runs into the hundreds of millions of dollars. This is not free. This is a very expensive frolic and detour that has to be brought back to constitutional levels. And we're all for that. We want to get an authoritative ruling on what are the constitutional levels and what is the level of intrusion that is least intrusive. It looks to me like, instead, the courts have chosen the most intrusive.

QUESTION:  Mr. Brown?

BROWN:  Yes?

QUESTION:  A question for you. Yesterday the Oakland police chief resigned, as you know. There seems to be --

BROWN:  Did you have anything on this? Before we get to -- I may want to get out of here before I answer that question. (Laughter)

QUESTION:  Has the state done anything, do you think, apart from what the receiver had done, to demonstrate that it's capable of meeting the obligations different from three years ago?

BROWN:  Look. Look at the little box down there and look at the big, huge, rectangular box there. You give Cate a couple billion bucks and he'll run a good system. They were struggling. They couldn't hire people, they couldn't fill vacancies, they couldn't get the guards to get people out to hospitals. So the flood of money has been unleashed by the federal courts, and we say hallelujah. But when is enough enough? And we're saying we're at that point.

QUESTION:  Conceivably you could go right back, you could reduce the spending again if you wanted to. Not you, but they could if they wanted to.

BROWN:  Yeah, but we understand that there were problems. We'd like to get the problems out in the public. We'd like to know, who are these three preventable deaths? One time they say it's somebody dying every week; now they say it's somebody dying -- I guess three, what is it, every four months or something? What are they? What are the conditions? Is somebody guilty? Should we find -- they won't tell us.

So we've got to open this thing up. Didn't somebody say we've got to blow up the boxes? Well, there are a lot of boxes here that need to be blown up. And they are getting blown up, in accordance with the law, reasonable, with hopefully good will on the part of everybody.

QUESTION:  Just one quick question on Oakland.

BROWN:  I'll tell you if I like it or not. (Laughter)

QUESTION:  Okay. The police chief, as you know, resigned yesterday.

BROWN:  Yes.

QUESTION:  There seems to be some ongoing tension between the police department and the city council there. As a former mayor of Oakland, what's your take on things? Is that city dysfunctional, is it ungovernable? What's your perspective?

BROWN:  Again, there are four monitors there governing every aspect of the police department. And interestingly enough, the longer the monitors are there the more complaints they get and the more problems that occur. And that's exactly what I'm seeing here. The more we have intrusion -- and not the least intrusive -- the more problems we get. And it's a formula for never solving things. That's not the only problem we have down there, but that's one of the issues.

And I wouldn't comment more than that. I do think the city council is very supportive of the police. I think now with MR. Kozicki there, he's an excellent man as the interim, and I think they'll do quite well.

QUESTION:  MR. Brown, recently there was a $2 million ecstasy bust in the Oakland-El Cerrito. Are you pretty certain you got it all off the street?

BROWN:  We got as much as we could on that day. We'll still be finding more.

# Exhibit
# P-1003



Sunday, Aug 17, 2008

Posted on Sun, Aug 17, 2008

# CMC to get new center to treat mentally ill inmates

## Leah Etling

The state has plans for a new 44,000-square-foot, 50-bed mental health crisis facility at the California Men's Colony, but construction isn't likely to start for two years.

CMC has the largest number of inmates with mental health needs in the state prison system, facility spokesman Lt. Mike Siebert said. About 1,800 of CMC's approximately 6,000 prisoners have been prescribed psychotropic medication, he said.

Designated beds for inmates undergoing short-term mental health crises have been in place at CMC, located off Highway 1 between San Luis Obispo and Morro Bay, for about a decade.

Those beds are in a building that was designed for general population prisoners. The new building would be better suited to the needs of patients who are struggling with acute men-tal health issues, according to a state assessment.

If patients are not able to be treated successfully for their condition at the special center, they would likely be transferred to Atascadero State Hospital, Siebert said. Data was not available regarding how many such transfers take place each month now.

The new facility is estimated to cost $60 million, assuming it is approved by the state Legislature, and would be built in what is now a parking lot at CMC East.

Preliminary plans were distributed to members of the prison warden's Citizens Advisory Council last week.

Staffing would require 187 personnel year round, which includes everyone from doctors to maintenance workers. But the prison would not need to hire additional employees, according to a state assessment.

It's possible that the prison could add 50 general population prisoners once space is freed up by the new facility, Siebert said. If construction begins in 2010, it is expected to be complete by 2012. An environmental assessment will be part of the planning process, and community notification will take place.

The effort to improve mental health care facilities in California's prisons is the result of a federal judge's decision on an inmate lawsuit, Coleman v. Schwarzenegger, which decreed adequate health care must be provided to the incarcerated.

Creating the new medical and mental health facilities is one proposal to bring prison health care up to constitutional standards, according to the state.

CMC was considered for a larger prisoner health care center that is part of the federal receivership of prisons, but it appears to be out of the running for such an expansion at this point, according to the receiver's Web site.

© 2008 San Luis Obispo Tribune and wire service sources. All Rights Reserved.
http://www.sanluisobispo.com

Case No. CIV S-90-0520 LKK JFM P (E.D. Cal)
HEARING ON DEFS' BED PLANS – 3/24/09
PLTF Exhibit No. P-1003
Date Entered:_____
Signature:_____
Alternate Reference:_____

# Exhibit
# P-1004

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
MENTAL HEALTH PROGRAM
P.O. Box 942883
Sacramento, CA 94283-0001



February 27, 2009

Matthew A. Lopes, Jr., Esq.              Via:    Lisa Tillman
Office of the Special Master                     Deputy Attorney General
Pannone Lopes & Devereaux LLC                    Department of Justice
317 Iron Horse Way, Suite 301                    1300 "I" Street, Suite 125
Providence, RI  02908                            P. O. Box 944255
                                                 Sacramento, CA  94244-2550

**RE:  COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of January 2009 data (or as otherwise noted).
The following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy
    History.
2.  MHSDS Hiring Activity Report.
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary and
    Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly Report for
    all disciplines.
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC)
    Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient
    Psychiatric Aging Report.
7.  Referrals for Transfer to the Department of Mental Health (including admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals--Summary and Penal
    Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated
    Hub institutions.
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).

Case No. CIV S-90-0520 LKK JFM P (E.D. Cal)
HEARING ON DEFS' BED PLANS – 3/24/09
PLTF Exhibit No. P-1004
Date Entered:_____
Signature:_____
Alternate Reference:

Matthew A. Lopes, Jr., Esq.
Page 2

17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at
California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and
Salinas Valley State Prison (SVSP

18. Mental Health Crisis Beds Wait List.

19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement
Issues. **(No longer available)**

20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of
Care.

If you have any questions, please contact me at (916) 928-4705.

Sincerely,

DENNIS BEATY
Deputy Director, Program Services
Mental Health Program
Division of Correctional Health Care Services

Enclosures

cc:  Sharon Aungst, Chief Deputy Secretary, Correctional Health Care Services
Wayne Strumpfer, Deputy Director (A), Division of Correctional Health Care Services
(DCHCS)
Brenda Epperly-Ellis, Director, Statewide Mental Health Program, DCHCS
Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
Linda Buffardi, Esq., *Coleman* Deputy Special Master
Jeffrey L. Metzner, M.D., *Coleman* Expert
Dennis F. Koson, M.D., *Coleman* Expert
Kerry C. Hughes, M.D., *Coleman* Expert
Melissa G. Warren, Ph.D., *Coleman* Expert
Raymond F. Patterson, M.D, *Coleman* Expert
Pal Nicoll, MPA, *Coleman* Monitor
Ted Ruggles, Ph.D., *Coleman* Expert
Mary Perrien, Ph.D., *Coleman* Expert
Mary-Joy Spencer, Esq., *Coleman* Monitor
Yong Joo Erwin, LCSW, *Coleman* Expert
Kathryn A. Burns, M.D., MPH, *Coleman* Expert
Henry A. Dlugacz, Esq., *Coleman* Expert
Kerry F. Walsh, Esq., *Coleman* Monitor

Angela Shannon, M.D., *Coleman* Expert
Lisa Tillman, Esq., Office of the Attorney General
Matthew A. Lopes, Jr., Esq.
Page 3

Michael Stone, Esq., Office of Legal Affairs
Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Patricia Williams, Esq., *Coleman* Monitor
Haunani Henry, *Coleman* Monitor
J. Ronald Metz, *Coleman* Monitor
Karen Higgins, M.D., Deputy Director (A), Psychiatry Services, DCHCS
Marion Chiurazzi, Psy.D., Deputy Director, Mental Health Clinical Services, DCHCS
Judy Burleson, Coleman Compliance Manager, DCHCS
Mary Neade, Correctional Counselor II, Division of Adult Institutions
Sharon Riegel, HPS II, DCHCS