PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No. Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** <br><br> **DECLARATION OF ALISON HARDY REGARDING ERRATA TO SECOND SUPPLEMENTAL EXPERT REPORT OF RONALD M. SHANSKY, M.D.** |
| MARCIANO PLATA ,et al., <br><br> Plaintiffs, <br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** |

I, Alison Hardy, hereby declare:

1. I am a member of the Bar of this Court and a staff attorney at the Prison Law Office, one of the counsel of record for the plaintiffs in this action. I have personal knowledge of the matters set forth herein and if called as a witness I could and would competently so testify.

2. On September 10, 2008, I served a copy of Dr. Shansky's Second Supplemental Expert Report on all parties via email. The copy that I served was complete and contained paragraph 118 in its complete form. Attached hereto as Exhibit A is a true and correct copy of the email sending the report sent to the parties.

3. Attached hereto as Exhibit B is a true and correct copy of the report sent to the parties on September 10, 2008, signed by Dr. Shansky on September 9, 2008.

4. Before filing Dr. Shansky's Second Supplemental Expert with the Court on October 30, 2008, I corrected the format of a citation used several times. I failed to notice that, in doing so, I had changed the pagination of the report. Thus, the report I filed on October 30, 2008 as Exhibit K to Donald Specter's Declaration Regarding Submission of Plaintiffs' Expert Reports (*Plata* Docket No. 1714) with Dr. Shansky's signature page was missing a portion of paragraph 118, which consists of one sentence.

5. Attached hereto as Exhibit C is a list of three corrections that were made to the report after it was distributed to the parties on September 10, 2008. With these three changes, the report is identical to the one plaintiffs intended to file on October 30, 2008. Plaintiffs hereby submit Exhibit B and C together to replace plaintiffs' Exhibit K to the Declaration of Donald Specter Regarding Submission of Expert Reports (*Plata* Docket No. 1714).

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed April 7, 2008, in Berkeley, California.

/s/
_____
Alison Hardy

-1-

# EXHIBIT A

## Alison Hardy

| | |
|---|---|
| **From:** | Alison Hardy [ahardy@prisonlaw.com] |
| **Sent:** | Wednesday, September 10, 2008 12:43 PM |
| **To:** | 'AKECK@sonoma-county.org'; 'Don'; 'imt@jones-mayer.com'; 'Kaufhold, Steven'; 'Kimberly Hall Barlow'; 'Kyle Lewis'; 'Leonard, Natalie'; 'Lisa Tillman'; 'Maria Morris'; 'mjm@jones-mayer.com'; 'Paul B. Mello'; 'Renju P. Jacob'; 'Rochelle East'; 'Samantha D. Tama'; 'Stegeman, Chad'; 'Theresa.Fuentes@cco.sccgov.org'; 'Wang, Teresa'; 'WEmitchell@RivCoDA.org'; 'S. Anne Johnson' |
| **Cc:** | 'Sara Norman'; 'Michael Bien'; 'Amy E. Whelan'; 'Don Specter'; 'Steve Fama' |
| **Subject:** | Second Supplemental Report of Ronald Shansky, M.D. |
| **Attachments:** | Scan080910111839.pdf |

Attached is Dr. Shansky's Second Supplemental Expert Report.

Alison Hardy
Prison Law Office
510.280.2621

EXHIBIT B

SECOND SUPPLEMENTAL EXPERT REPORT OF
RONALD M. SHANSKY, M.D.

SEPTEMBER 10, 2008

## TABLE OF CONTENTS

I    EXPERT QUALIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BASES FOR EXPERT OPINIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  EACH OF THE PRISONS I INSPECTED IN AUGUST, 2008 IS
      DRAMATICALLY OVERCROWDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   THE PRISON HEALTH CARE FACILITIES STILL ARE
      INADEQUATE FOR THE NUMBER OF PRISONERS WHO REQUIRE
      MEDICAL CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Reception Center Clinical Areas Continue to be Inadequate for
            the High Volume of Medical Contacts . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    The Severe Shortage of Clinical and Office Space Described in
            My First Report Has Not Changed in the Last Six Months . . . . . . . . . . . 9

            1.    NKSP's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 10

            2.    SATF's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 12

            3.    PVSP's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 13

            4.    CSP-Solano's Clinical Space is Inadequate . . . . . . . . . . . . . . . . 13

            5.    Receiver's Assessment of Other Prisons' Medical Space . . . . . . 14
                  a.    California Rehabilitation Center (CRC) . . . . . . . . . . . . . . . 14

                  b.    California Training Facility – Soledad (CTF) . . . . . . . . . . . 14

                  c.    Mule Creek State Prison (MCSP) . . . . . . . . . . . . . . . . . . . . 15

V.    THE NUMBER OF CLINICIANS CONTINUES TO BE INSUFFICIENT
      FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL
      CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.    CDCR Still Cannot Fill Some Vacancies . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.    NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

|   |   | 2. | SATF | 18 |
|   |   | 3. | PVSP | 18 |
|   |   | 4. | HDSP | 19 |
|   | B. | Some Prisons Are Still Allocated Too Few Providers | | 19 |
|   | C. | Use of Registry Still Cannot Resolve Staffing Shortfalls | | 19 |
|   | D. | Clinical Staff Shortages Continue to Result in Delayed and Inadequate Care | | 20 |
|   |   | 1. | NKSP | 20 |
|   |   | 2. | SATF | 20 |
|   |   | 3. | PVSP | 21 |
|   |   | 4. | Solano | 21 |
|   |   | 5. | HDSP | 22 |
|   | E. | Inspected Prisons Still too Shortstaffed to Implement Required Programs | | 22 |
|   |   | 1. | NKSP | 23 |
|   |   | 2. | SATF | 23 |
|   |   | 3. | PVSP | 25 |
|   |   | 4. | SOL | 25 |
|   |   | 5. | HDSP | 25 |
| VI. | PLAINTIFFS ARE STILL NOT RECEIVING TIMELY SPECIALTY CARE | | | 26 |
|   | A. | PVSP | | 26 |
|   | B. | SOL | | 26 |
|   | C. | HDSP | | 27 |
|   | D. | NKSP | | 27 |

VII.    MEDICATION MANAGEMENT PROBLEMS . . . . . . . . . . . . . . . . . . . . . . . . . 28

VIII.   OVERCROWDING FUELS DYSFUNCTION IN MEDICAL RECORDS . . . . 29

      A.    Quality of Medical Records Continues to be Poor at Inspected
           Prisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      B.    CDCR Continues to Rely on Inadequate Tracking Systems . . . . . . . . 31

IX.     THERE ARE STILL NOT ENOUGH CUSTODY OFFICERS TO ENSURE
      ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL
      CONTACTS AT SOME PRISONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      A.    PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      B.    HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

X.      THERE ARE MORE PRISONERS REQUIRING SPECIALIZED
      PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN
      ACCOMMODATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XI.     IT WILL TAKE YEARS FOR THE RECEIVER'S TURNAROUND PLAN TO
      REMEDY THE UNCONSTITUTIONAL MEDICAL CONDITIONS . . . . . . . . 35

XII.    OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF
      INFECTIOUS DISEASE TRANSMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . 35

XIII.   CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# SECOND SUPPLEMENTAL EXPERT REPORT OF
# RONALD M. SHANSKY, M.D.

## I.    EXPERT QUALIFICATIONS

1.    I am a Physician Consultant specializing in correctional medicine and continuous quality improvement, and a voluntary attending physician for the Cook County Hospital, Department of Medicine, in Chicago, Illinois. My C.V. is attached.

2.    I have provided two prior reports in this matter, on November 9, 2007 and on December 6, 2007. My November report sets forth my complete academic and professional career.

3.    I have listed all of my publications on my attached C.V. I have not published additional publications since my November 2007 report.

4.    I am billing the plaintiffs $250 an hour, my usual billing rate. For testimony, my rate is $350 an hour. I have not testified in any cases since November 9, 2007.

## II.    BASES FOR EXPERT OPINIONS

5.    I have been retained by plaintiffs' counsel in the *Plata* and *Coleman* cases as an expert in prison medical care and health care administration, and the impact of overcrowding on prisoners' medical care, including how prison overcrowding detrimentally affects prisoners' access to health care and interferes with the ability of prison officials to meet the existing and increased medical needs of the prisoners in an overcrowded system. I have also been asked to render my opinion with respect to whether overcrowding in the California Department of

Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes. My opinions are based upon the evidence that I have reviewed to date documenting current conditions within the CDCR, on my earlier inspections of California Institution for Men (CIM), Avenal State Prison (ASP), Valley State Prison for Women (VSPW), San Quentin State Prison (SQ) and High Desert State Prison (HDSP), on my more recent inspections of North Kern State Prison (NSKP), the Substance Abuse and Treatment Facility at Corcoran (SATF), Pleasant Valley State Prison (PVSP), California State Prison at Solano (SOL), and a second inspection of HDSP, and on my professional experiences working in similarly overcrowded correctional settings. A list of the documents I have reviewed is attached.

6.    During my inspections, I spoke to medical staff throughout the facilities, including the Health Care Managers, Chief Medical Officers, physicians, nurses and schedulers. The staff members at each prison were consistently cooperative, provided me with the files, logbooks, documents, records and data I requested, and ensured my full access to the facilities I wished to inspect.

7.    In my first report, I concluded that the CDCR's medical delivery system was operating in a state of crisis that harmed prisoners with serious medical concerns and placed them at substantial risk of harm because the number of prisoners in the system far outstripped the capacity of the system to provide care. Having completed the five recent prison inspections and reviewed recent documents, including the Receiver's Seventh and Eighth Reports and his Turnaround Plan of Action, my opinion is unchanged: the CDCR's medical care

2

delivery system cannot provide a constitutional level of care because the prison system incarcerates far more prisoners than can be adequately treated with the resources, staffing and facilities available in the CDCR. In short, it is my opinion that overcrowding is the primary cause of the constitutional violations in the CDCR for *Plata* class members.

8.    I also concluded in my first report that it will not be possible to achieve a constitutional level of health care in the CDCR in the foreseeable future, unless the prison population is significantly reduced. My opinion has not changed. The limitations on the CDCR, including staffing, administrative resources and especially treatment space, are so severe that the only avenue for building a constitutional health care delivery system is to reduce the demand on the system by lowering the number of patients it serves.

9.    While I believe that reducing the population is necessary to achieve a constitutional level of medical care, population reduction alone will not, in a vacuum, produce a constitutionally adequate medical delivery system. For example, if the population were reduced at a prison facility, but that prison lacked sufficient numbers of physicians, the care would still be unconstitutional. Reducing overcrowding is not a panacea, but crowding is the primary cause of the ongoing inadequate medical care in the CDCR system. Overcrowding is the one factor that negatively impacts almost every other matter that must be addressed to create a minimally adequate medical care delivery system for California's prisons.

10.    Reducing the population in the system to a manageable level is the only way to create an environment in which other reform efforts, including strengthening medical management, hiring additional medical and custody

staffing, and improving medical records and tracking systems, can take root in the foreseeable future. Continuing efforts to build a constitutional system under the current overcrowded conditions will guarantee that the unconstitutional conditions, and preventable suffering, will exist for a substantially longer period of time than would be the case if the population were reduced.

11.    The Receiver has tools to fix the health care system, but has no tool within his purview, to deal with external pressures such as overcrowding. The Receiver's mandate is to remove the Court's direct control of the CDCR health care delivery system as quickly as possible. It is my opinion that, if the current overcrowding is not remedied, the Court's involvement in overseeing the health care system will certainly extend many years.

## III.    EACH OF THE PRISONS I INSPECTED IN AUGUST, 2008 IS DRAMATICALLY OVERCROWDED.

12.    According to the CDCR's August 20, 2008 population statistics, there were 159,823 prisoners housed in CDCR prisons and camps, which is 191% over the prison system's design capacity. Jt. Pls' Trial Ex. 98. The five prisons that I inspected are all, like the system itself, significantly overcrowded, and at some prisons, the higher security classification prisoners are the most significantly overcrowded. All five of the prisons currently house prisoners in "non-traditional" beds, including bunks in gyms and day rooms that were not designed for housing.

13.    North Kern State Prison was built for 2,694 prisoners. *Id.* As of August 20, 2008, the prison was at 204% capacity, housing 5,496 prisoners. *Id.* Most NKSP prisoners, over 4,600, are housed in the Reception Center. *Id.* The remainder of the population is made up of 297 Level I prisoners and 581 Level III prisoners. *Id.* NKSP also serves as a health care "hub" for an additional 2,000

4

prisoners housed in community corrections facilities who receive health care at the prison.

14.    The Substance Abuse Treatment Facility and Prison at Corcoran was designed to hold 3,424 prisoners, but the total population as of August 20 was 7,121, *i.e.*, 208% of design capacity. *Id.*

15.    Pleasant Valley State Prison, built for 2,308 prisoners, now houses 5,199, making it among the state's most overcrowded prisons at 225% of design capacity. *Id.* That prison houses primarily Level III and IV prisoners (over 4,900), and has a small minimum security facility (MSF) housing fewer than 300 Level I and II prisoners. *Id.* While the MSF is less crowded than most other facilities, at 131% of design capacity, the Level III/IV facilities are currently at 234% of design capacity. *Id.* The prison staff also provides care to prisoners at a community care facility with approximately 400-500 patients.

16.    California State Prison, Solano, with 5,607 Level II and Level III prisoners in space designed for 2,610, is at 214% capacity. *Id.* The Level III prisoners are slightly more crowded than the Level II prisoners, with rates of 225% and 206% respectively. *Id.*

17.    High Desert State Prison has 4,472 prisoners in a prison built for 2,324. *Id.* With fewer than 1,000 Level I, II and III prisoners, the majority of the prisoners are either Level IV (approximately 2,850) or in the Reception Center (approximately 640). *Id.* Both of these populations are very overcrowded: the Level IV prisoners are housed at 253% of design capacity, and the Reception Center prisoners are housed at 319% of design capacity. *Id.*

IV.    THE PRISON HEALTH CARE FACILITIES STILL ARE INADEQUATE FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE.

18.    The Receiver recognized the critical shortage of health care facilities in his Turnaround Plan of Action,

> The facilities available for providing health care services within CDCR are woefully inadequate. . . . We are dealing not with deferred maintenance, but with some facilities that are literally falling apart. In addition, investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily operations.

Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 25.  Based on my site inspections and review of documents, I believe the Receiver accurately describes the critical shortage of adequate clinical space for the existing prison population.   These conditions, which are also described in my first report, create insurmountable barriers to providing timely medical care with appropriate confidentiality safeguards. Additionally, I believe that the lack of clinical and medical office space creates an unprofessional working atmosphere that likely impedes CDCR's recruitment and retention efforts.

19.    The Receiver's Turnaround Plan includes plans to build and upgrade clinical spaces around the state.  I understand, however, that the Receiver has yet to obtain funding for this construction plan, and has recently had to move to hold the Governor in contempt for failing to provide financial support for the plan. Except at two prisons, *actual construction of clinical space has yet to begin.*  Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report) at 39-44.

20.    Even if the Receiver were able to obtain immediate funding for his construction project, his target date for completion of the clinical upgrade program

is not until 2012, more than three years from now. Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 25-26.

**A.    Reception Center Clinical Areas Continue to be Inadequate for the High Volume of Medical Contacts.**

21.    In my initial report, I documented the significant space limitations at the Reception Center located at the California Institution for Men in Chino. The space limitations that I observed at the North Kern State Prison for reception center processing were as bad as the conditions I found at CIM. NKSP, a prison with a population of approximately 5,500 prisoners, including approximately 4,800 RC prisoners, receives approximately 500 new RC prisoners each week.

22.    Under the *Plata* Inmate Medical Policies and Procedures, prisoners arriving at a Reception Center undergo a health screening on their day of arrival. Policies and Procedures, 4-2-1. "Licensed health care staff shall conduct interviews with inmate-patients in a manner that ensures the privacy of their health care information subject to the safety and security concerns of the institution." *Id.* Reception Center prisoners must be provided a "complete history and physical examination performed by a Nurse Practitioner, Physician Assistant, or a Physician and Surgeon" within 14 days of arrival. P&P's, 4-2-2. The medical facilities that I observed at NKSP were inadequate for this purpose.

23.    Arriving RC prisoners are delivered to the Receiving and Release area at NKSP. In this large open area, prisoners are interviewed, have their vital signs taken and receive a TB test, among other things, before proceeding to a housing unit. The initial health screening, which consists of an interview by an RN and administration of the TB test, takes place for most prisoners in a small

office just off the R&R area. Two nurses conduct interviews simultaneously, with prisoners sitting back to back, separated only by a shoulder-high divider. I was told that a third nurse sometimes conducts these medical interviews at a desk in the open receiving area, where prisoners and staff circulate. Neither of these situations affords the necessary confidentiality for these critical initial health care encounters.

24.     I questioned Dr. Emam, the facilities Chief Physician and Surgeon, about these conditions. He indicated that space is so limited, that there is no other space available in which these interviews may be performed. I believe that, given the lack of confidentiality for these encounters, prisoners are less likely to provide accurate information about sensitive medical and psychiatric conditions.

25.     According to Dr. Emam, prisoners at NKSP are seen by a physician or mid-level provider for their medical history and physical examination within two to three days. I inspected the area where these encounters take place. The area contains a series of very small rooms, each equipped with two chairs and a medical exam table. The exam table, however, functions as a desk for the medical provider, and the rooms are so small that it would be very difficult if not impossible to perform an actual physical examination in them. Dr. Emam acknowledged that the "exams" that take place are in fact simply medical interviews, primarily for the purpose of determining what type of housing is appropriate for the prisoner.

26.     Adequate physical examinations are not performed on NKSP prisoners, despite the P&P requirements, which are based on the basic principle that incoming prisoners must undergo a comprehensive exam upon arrival so that

an adequate treatment plan may be developed and implemented. A physical exam, as opposed to a medical interview, is necessary because some conditions can be identified and confirmed only through physical examination of the patient.

27.    Dr. Emam told me that the prison lacks the space to provide actual physical examinations for the high number of incoming Reception Center prisoners arriving daily at NKSP, and that, in any case, he lacks the physician staff to provide that service. The failure to provide a true physical examination creates the risk that certain medical conditions will not be timely identified and/or treated.

28.    The Receiver has piloted a Reception Center screening process at San Quentin State Prison that, according to the Receiver, "provides integrated medical, dental, and mental health screening on the day of arrival as well as laboratory testing, medication review and administration, and referrals to providers based on national guidelines." Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report) at 7. The Receiver states that he intends to implement standardized reception center screening processes at the major reception center prisons by January 2009. *Id.* However, the Receiver frankly acknowledges that "[t]he most formidable challenge to progress at all the sites will be inadequacies in physical space and environment." *Id.*

29.    Based on my review of the facilities available at NKSP, I do not believe that the Receiver's pilot Reception Center screening program can be implemented at that prison, without creating additional clinical examination facilities.

**B.    The Severe Shortage of Clinical and Office Space Described in My First Report Has Not Changed in the Last Six Months.**

30.    As noted above, the Receiver has concluded that the facilities

available for medical care delivery are "woefully inadequate." That is consistent with my findings during my November 2007 inspections, and is further supported by my observations during my most recent inspections.

### 1.    NKSP's Clinical Space is Inadequate

31.    At NKSP, the clinical spaces available for medical encounters following Reception Center processing and for the mainline prisoners are inadequate for the number of prisoners requiring medical attention.

32.    NKSP is divided into five prison yards, denominated A-E. Yards B, C and D house only Reception Center prisoners awaiting transfer to a permanent institution. Yard A houses both general population prisoners (*i.e.*, prisoners who have been classified and endorsed to stay at NKSP) as well as Reception Center prisoners, and Yard E, a minimum security facility, houses only mainline prisoners.

33.    Each of the yards A-D has medical clinic space consisting of one exam room, a very small office in which the LVN prepares medications for distribution, a very small medical supply room, a dental clinic and a dentists' office.

34.    Each yard is supposed to run at least two medical lines each day, one for the RN doing face-to-face triage, and one for the primary care provider (PCP) doing sick call. The yard medical clinics on A-D cannot accommodate simultaneous RN and PCP lines in the one available exam room. Accordingly, NKSP has created three exam spaces on B yard in an area that formerly housed custody offices, in which the RNs are now conducting face-to-face triage for yards B, C and D on Second and Third Watch (*i.e.*, 8 a.m. to 2 p.m., and approximately

3 p.m. to 9 p.m.). The NKSP staff members refer to this area as the Reception Center Medical Clinic (RCMC).

35. While the clinical space allocated to the RNs in the RCMC is objectively adequate for performing screenings, data provided to me by the scheduler shows that prisoners are regularly not seen for their scheduled appointments. The fact that some prisoners going to the RCMC must be escorted from other yards for their appointments may contribute to this problem.

36. For example, I reviewed the nurse triage tracking data for the week of August 18, 2008 for prisoners from D-yard. Joint Pls' Trial Ex. 36. During that week, of the 119 appointments schedule, more thant 50% (61) did not take place. While the tracking form states that five prisoners were not seen because of a yard change, one paroled and one was at a different medical appointment, the primary reason stated for the missed appointment was "lockdown," "out of time," or "short nurses." I strongly suspect that the location of the clinic on a different yard means that the triage line runs slower, resulting in fewer patients being seen timely.

37. I was told that patients who are not seen for their appointment are given an appointment on the next available triage line, usually two days later. However, I reviewed D-yard's August 18-22 nursing tracking data, and found that of the 14 patients who were scheduled but not seen on August 18, just three patients were rescheduled and seen that week, while ten were either rescheduled but not seen, or not rescheduled within the week. *Id.* (One prisoner transferred or paroled.)

38. The A-yard prisoners do not go to the RCMC for nurse triage. Because the PCP runs a sick call line in the only medical exam room, the RN does

11

face-to-face triage in the hallway, with the prisoner sitting in a chair, within several feet of the prisoners awaiting their appointments. The RN states that, if she decides she needs an exam table for these encounters, she must wait until the PCP is between patients, and then use that office. The triage encounters cannot be maintained confidential under these circumstances; thus, the RN's ability to obtain reliable information from their patients is critically impaired.

39.    Prisoners who are housed in the Administrative Segregation Units on A-yard and D-yard are seen for RN triage and for sick call encounters in a meeting room in the housing unit. It is not set up with any medical equipment. Without necessary medical equipment, including an exam table, the medical staff cannot provide adequate medical care.

### 2.    SATF's Clinical Space is Inadequate

40.    The Substance Abuse and Treatment Facility at Corcoran is one of the largest prisons in the system, with approximately 7,000 prisoners housed on seven yards, A-G. Each of the prison yards has its own clinic, with an exam room for the RN performing triage, and a second room for the PCP seeing patients for sick call.

41.    At SATF, the medical staff reported that there were 1,200 overdue primary care appointments. I was told that, in an effort to address the backlog, SATF had on the day of my visit three CDCR physicians from the Central Office, whose mission was to visit, at their cell front, prisoners who had submitted sick call slips to determine what medical care they required, if any. I was told that primary care providers will be performing cell front triages two days a week, every two weeks, for the foreseeable future.

42.    The SATF staff said that the physicians were seeing patients in the housing units at their cell fronts because SATF lacked exam space for them to use for these medical encounters. Such encounters, which take place with custody officers and fellow prisoners within earshot, are not an adequate substitute for clinical encounters in a private, medically equipped setting.

### 3.    PVSP's Clinical Space is Inadequate

43.    Dr. Igbinosa, the Chief Medical Officer at PVSP, reported that he is currently authorized to hire 14 primary care providers to care for the 5,200 prisoners at PVSP. If he were able to fill all primary care positions, he advised me that he would not have the space for them.

44.    Dr. Igbinosa further related that he would like to have more specialty providers from the outside community provide care to prisoners on-site at the prison. Although some specialists do currently see patients at the prison periodically, Dr. Igbinosa said that he cannot expand this program because he lacks the necessary clinical space to accommodate the providers.

### 4.    CSP-Solano's Clinical Space is Inadequate

45.    At SOL, the Annex Clinic, which serves the needs of the approximately 1,750 prisoners housed at the prison's Facility 4, is located in what had been an area used for education programs, and the space is still used for education programs as well as prison classification committee activities. The main patient encounter area is a small room in which patients are seen by one of three primary care providers who work in the room. The room is divided into three medical encounter areas by five foot tall wood and cloth partitions or screens. The

three patient encounter areas are immediately adjacent to one another, such that a conversation in one can be heard in the others. This space does not provide for adequate patient confidentiality. A PCP also sees patients in the Annex Clinic's main work room. There, a thin hospital bed style curtain separates the patient and PCP from the clinic's other business.

46.    All available space in SOL's medical clinics was being used. SOL does not have adequate space for its current complement of PCPs to work in, let alone additional PCPs should the prison hire such additional staff.

### 5.    Receiver's Assessment of Other Prisons' Medical Space

47.    I reviewed operational assessments prepared for the Receiver regarding several of the CDCR prison facilities.

#### a.  California Rehabilitation Center (CRC)

48.    The January 2008 operational assessment regarding the CRC conducted by the Receiver's office concluded that all medical spaces are in urgent need of repair, and that, "[f]or the most part, none of the existing areas occupied by health care clinicians are clinically appropriate." Jt. Pls' Trial Ex. 100. (California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at the California Rehabilitation Center) at 15.

#### b.  California Training Facility – Soledad (CTF)

49.    A review of CTF conducted by CDCR and Receiver staff in March 2007 determined that the prison's Central Facility clinic is so crowded and has such limited space that "[i]nmates that are ducatted for health care usually wait for hours to see the provider," the North Facility clinic is "very small based on the number of inmate-patients being served," and that the South Facility clinic area,

although the newest physical plant of the three facility clinics at the prison, was "built to support an inmate population of 510 inmates and not the current housing of more than 1000 inmates." Jt. Pls' Trial Exh. 99 (Operational Assessment, review conducted in March 2007) at 2-3.

### c. Mule Creek State Prison (MCSP)

50.    The December 2007 operational assessment report regarding MCSP conducted by the Receiver's office concluded, "[a]ll of the Facility Clinics are undersized for the quantity of inmate/patients seen on a daily basis and lack[] appropriate holding/waiting space for inmate/patients ducated to be seen by health care providers." Jt. Pls' Trial Ex. 101 (Operational Assessment for Access to Care at Mule Creek State Prison) at 7. The assessment also pointed out that although Mule Creek's "size and overall design . . . is likely one of the most manageable . . . anywhere within the State . . . ", it is "no exception" to the "system wide barrier" of "serious space deficiencies for clinical staff," which have existed at "[a]ll of the CDCR facilities the Review Team has visited . . . ." *Id.* at 28.

51.    The Receiver plans to address medical facility deficiencies at existing prisons by assessing those prisons' needs, developing plans and then upgrading or constructing necessary facilities. The Receiver's Plan provides that assessments, plans and will be done on a phased and serial basis. The assessments are scheduled to be completed by January 2010. The target date for completing all upgrades and construction is January 2012. Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 25-26.

52.    As of June 2008, Avenal and San Quentin were the only two existing

prisons at which medical facility construction upgrades had begun. Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report) at 39-44. Avenal was scheduled to have construction completed in July 2009. *Id.* at 40. San Quentin had some projects completed; most projects there were scheduled to be completed in February 2009 with the final project (the central health services building) scheduled to be done in April 2010. *Id.* at 42-44.

53.     NKSP, SATF and SOL, where, as discussed above, clinic space is inadequate, are in the final group of 13 prisons scheduled to be assessed and to have upgrades completed (by 2012) . Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 -- Receiver's Turnaround Plan of Action) at 26. Thus, in the best case -- if the Receiver's timetable has no slippage at all -- tens of thousands of prisoners will continue to be incarcerated in prisons with inadequate medical facilities for the next three plus years.

## V.    THE NUMBER OF CLINICIANS CONTINUES TO BE INSUFFICIENT FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE.

54.     In my previous report, I stated that overcrowding creates pressures on the system that make hiring and retaining sufficient numbers of clinicians and other medical workers exceedingly difficult, and that California's overcrowding crisis has created a situation where the prisons, and particularly the more remote prisons, are unable to hire and retain enough health care staff to address the medical needs of the prisoner-patient population. Based on my most recent inspections and my review of the vacancy data from May 2008, my opinion remains unchanged.

A.    **CDCR Still Cannot Fill Some Vacancies**

55.    Even after the Receiver substantially raised salaries for medical staff, the vacancy rates at some prisons remain high. The May 2008 vacancy and registry report provided by the *Plata* health care support division shows on-going serious problems in hiring primary care providers (PCPs), and even with having adequate numbers of such providers on site. Jt. Pls' Trial Ex. 35 (*Plata Vacancy/Registry Report, May 2008*) at 1. The report shows that statewide there was a 25 percent vacancy rate in primary care provider positions; the vacancy rate adjusted to account for PCP employees on leave in May was 35 percent. *Id.* Further, the report shows that in May the prisons statewide had a shortfall of 56 PCPs even after temporary, overtime, and contract/registry PCPs used to reduce vacancies were taken into account. *Id.* Consistent with this statewide vacancy report, four of the five prisons I inspected in August have had critical, on-going problems filling their primary care positions with state employees.[1]

1.    **NKSP**

56.    According to the *Plata* Vacancy/Registry Report for May 2008, NKSP had a total of 16 primary care provider positions, of which 6.6 were unfilled, for a vacancy rate of 41%. *Id.* at 12.

57.    Dr. Emam, the acting Chief Physician and Surgeon at NKSP advised me that the prison had very recently succeeded in hiring some primary care providers, but that it has been extremely difficult to fill the vacant positions. He reported that the prison continued to have two line physician vacancies and that

---

[1]/ CSP-SOL, the fifth prison I visited, did not have an adequate allocation of PCP positions. See Part V.B, below. Further, as discussed above (see Part IV.B), the prisons, including CSP-SOL, do not have adequate clinic space for PCPs to see prisoner-patients.

that they had also been unable to fill the Chief Physician and Surgeon position that he has been filling on a temporary basis.

### 2.    SATF

58.    The May 2008 Vacancy Report shows that SATF had 13 primary care positions allocated, of which one was filled with a state physician, but that person was on leave. *Id.* at 15.

59.    The Report shows that SATF hired 7.7 registry providers at that time to deliver primary care. *Id.*

60.    When I inspected the prison, Dr. Enenmoh, the acting Chief Medical Officer, advised me the prison still had just one state employee physician, and that recruiting for the physician positions, and for the unfilled Chief Physician and Surgeon position, had been very difficult.  He had eight contract physicians and two contract mid-level providers.

### 3.    PVSP

61.    The May 2008 Vacancy Report shows that PVSP had 14.8 allocated primary care positions.  At that time, PVSP had just one state employee primary care provider.  The prison contracted with 5.1 registry primary care providers. *Id.* at 13.

62.    According to Dr. Igbinosa, as of the date of my inspection, the prison had the equivalent of eight full-time primary care practitioners.  He explained that it is extremely difficult to recruit medical professionals to work at the prison because it is so remote.  Most contract providers currently providing care at the prison live in Los Angeles or San Francisco and commute to the prison on an intermittent basis.  One physician commutes from Chicago twice a month,

for a week each time. Dr. Igbinosa said that none are willing to relocate to the Central Valley. He noted that, even when candidates at hiring fairs express interest in working at PVSP, they often retract their application when they realize that they can earn the same CDCR salary and live in or near an urban environment. As a consequence, PVSP has too few primary care providers to care for the number of patients at the prison.

### 4.    HDSP

63.    The May 2008 Vacancy Report shows that HDSP had 8.0 allocated primary care positions, and that two were vacant in May. *Id.* at 10. However, on the date that I inspected High Desert in August 2008, Chief Medical Officer Dr. Swingle advised me that, although HDSP appeared to have four state physicians, all four were either on leave or stripped of their clinical privileges.

### B.    Some Prisons Are Still Allocated Too Few Providers

64.    At SOL, the prison is authorized 9.0 staff primary care provider (PCP) positions. The health care manager stated that the prison was making a request to add two more staff PCP positions, so that there would be a total of eleven. The chief medical officer, however, said that the prison needs a total of 13 PCP staff positions, given the number of medical encounters.

### C.    Use of Registry Still Cannot Resolve Staffing Shortfalls

65.    The heavy use of registry providers is, as I explained in my initial report, a stop-gap measure that mitigates harm to individual patients in the short-term, but is not an adequate long-term solution. Solano's Chief Medical Officer, Dr. Traquina, indicated that there is a rapid turnover in registry personnel, and it is difficult to build a medical care delivery program with staff who do not intend to

make a substantial time investment at the prison.

66.    Because registry physicians tend to turn over quickly, the prisons end up spending time doing extensive on-the-job training repeatedly, which is time-consuming and detracts from patient care delivery.

### D.    Clinical Staff Shortages Continue to Result in Delayed and Inadequate Care

67.    At each prison I inspected in August, there were delays in triaging patients' sick call slips, and in primary care visits, because the clinicians were unable to keep up with the heavy demand for medical care.

68.    At most of the prisons I inspected, the staff reported that, although there are backlogs of patients waiting to see their primary care providers, the staff does triage to ensure that the sicker patients are seen first on the primary care provider lines. The defendants have not, however, demonstrated a method for this triage or that they evaluate or track whether this triage is effective.

#### 1.    NKSP

69.    At NKSP, I reviewed the tracking data for the D-yard primary care provider sick call line for the week before my inspection, August 18-22. Jt. Pls' Trial Ex. 37. I found that the clinic had scheduled 94 appointments, but that the primary care provider had not seen 27 (29%) of those patients. The most common reasons cited on the tracking instrument were that the clinician ran out of time, or did not have the patient's Unit Health Record.

#### 2.    SATF

70.    At SATF, the prison's Health Care Manager, Gayle Martinez, reported that SATF had a backlog of 1,200 overdue primary care appointments. The prison has a far greater demand for services than the staff at SATF can

deliver.

71.    I interviewed the Office Technicians and reviewed sick call slips on four of the seven prison yards (A, C, E and G). I found that, on each of the yards, it usually takes two to six days for prisoners to see a nurse for a triage appointment. (These appointments are supposed to occur within one business day of receipt of the patient's sick call slip.) For example, on E-yard, I reviewed the stack of sick call slips for the patients scheduled to see the RN on August 27. The sick call slips were marked received on August 21-25.

72.    On each of the four prison yards I inspected, the Office Technicians reported, and the sick call slips demonstrated, that it takes roughly four weeks for primary care appointments, once the patient has been referred to the primary care line on a routine basis.

### 3.    PVSP

73.    I was told by PVSP staff that the wait for routine primary care provider appointments is two to four weeks.

### 4.    Solano

74.    At SOL, there are major delays for routine appointments with a primary care provider at each of the prison's three clinics (Primary, Sattelite, and Annex). In the Primary clinic, it takes 16 weeks for such an appointment. In the Satellite clinic, it takes six to eight weeks. In the Annex clinic, the backlog is eight to ten weeks, even with primary care provider appointments taking place on Saturdays. The Primary clinic also has a backlog of face-to-face appointments with registered nurses; such appointments take about ten days to occur, even though the clinic had run triple lines of such appointments on weekends.

21

### 5.    HDSP

75.    At each of the four main medical clinics at HDSP there are significant delays for routine appointments with a primary care provider (PCP). In "A" facility clinic, routine appointments are scheduled six weeks after a nurse determined that patient should be seen by such a provider. In "B" facility clinic, such appointments are scheduled approximately 16 weeks after such determinations. In "C" facility clinic, such appointments are scheduled approximately eight weeks after such determinations. In "D" facility clinic, such appointments are scheduled approximately 4 weeks after such determinations.

76.    The "C" and "D" facility clinics also had backlogs for routine registered nurse face-to-face triage appointments; those appointments are scheduled two and four to five days, respectively, after the prisoner's written request for medical attention was received.

77.    The HDSP CMO was not surprised, during the file reviews, to find that documents are placed in UHRs without having the practitioners review them, and the follow-up with PCPs are not timely scheduled. These documents include CT scan, ultrasound, and consultation reports. She was also not surprised that the files demonstrated substantial treatment delays. She advised me that HDSP lacked the staff and resources to treat the number of prisoners at the facility.

### E.    Inspected Prisons Still too Shortstaffed to Implement Required Programs.

78.    Because there are too few clinical staff members to provide adequate treatment to the number of prisoners incarcerated, some prisons have failed to fully implement certain essential medical programs.

### 1.    NKSP

79.    For example, as explained above, NKSP has a large reception center, and thus is tasked with processing arriving prisoners and classifying them for transfer to permanent prisons. Given the acute staffing shortage, coupled with the lack of clinical exam space, NKSP has been unable to provide incoming prisoners with the required comprehensive physical examination. Instead, these prisoners are simply undergoing a second medical interview, several days after their initial interview with an RN.

80.    Additionally, based on my review of a sample of unit health records (UHR), I believe required follow-up appointments with primary care providers are not being done for a substantial number of patients. I reviewed 13 UHRs for prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. I found that nine of the 13 UHRs lacked documentation of a timely follow-up with a physician, and eight lacked required documentation of the service or hospital visit.

### 2.    SATF

81.    At SATF, I visited four prison yard clinics. In none of these clinics was the staff maintaining an "Urgent/Emergent Log Book." Each yard is supposed to have an Urgent/Emergent Log book, in which the staff records each encounter in which a prisoner reports an urgent or emergent condition. P&P, 4-12-1. These logs play an important role in continuity of care, because the primary care provider assigned to each yard clinic is required to review the log each work

day to determine whether any patients require further follow-up. P&P 4-12-3. Without this link, I believe some patients who do require urgent follow-up attention will fail to receive it.

82.    I reviewed 11 UHRs for prisoners who had transferred to SATF two weeks earlier and had significant medical conditions. Based on these records and the available documentation, I concluded that for ten of the eleven patients, medically necessary follow-up had not occurred. The problems I identified included missed medications and lapsed chronic care follow-up visits with a primary care provider.

83.    Additionally, the UHRs lacked documentation of required primary care follow-up appointments.  I reviewed nine UHRs for prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. I was unable to find documentation of a PCP follow-up in four records. For three of those four medical records, there was also no documentation from either the hospital or specialist regarding the encounter.  Some patients who receive medical attention off-site but are not adequately followed up by their primary care providers upon return to prison will be at serious risk of harm because necessary treatment will either lapse, or not be ordered.

84.    The SATF medical staff advised me that they are unable to schedule timely follow-ups in many cases because they have too few medical providers for the number of prisoners requiring treatment.

### 3.    PVSP

85.    I reviewed the UHRs for 23 prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care.  According to the UHRs, 12 of 23 prisoners did not receive timely follow-up appointments. Eleven of the 23 UHRs were missing required documentation, including ER reports, consult reports, etc.

### 4.    SOL

86.    At Solano, I reviewed 14 records of patients sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should be in the file for minimally adequate care.  I found that just seven of the files contained documentation of timely follow-up, and in four UHRs, required documentation of the offsite medical encounter was missing.

### 5.    HDSP

87.    At HDSP, I reviewed 15 records of patients sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. In eleven cases, there was no documentation of a timely PCP follow-up visit, and in nine cases, there was missing documentation. My review uncovered other serious problems. For example, one patient was ordered an urgent MRI of the brain on July 8, 2008. There was no documentation that the MRI had occurred as

of August 29, 2008.

## VI. PLAINTIFFS ARE STILL NOT RECEIVING TIMELY SPECIALTY CARE

88.    Although defendants have added contract specialty providers, the prisons I inspected still cannot schedule timely "high priority" visits in a large number of cases. PCPs request offsite specialty appointments on a "high priority" basis when the patient has an urgent medical need, and these appointments are supposed to be scheduled within 14 days of the request for services. P&P 4-8-1. The demand for care, particularly for the high priority cases, continues to overwhelm the resources available to the defendants. Additionally, some facilities have proven unable to obtain timely reports from the specialty providers, resulting in unnecessary treatment delays. (See paras. 80, 83, 85-87 above.)

### A.    PVSP

89.    At PVSP, the offsite aging specialty report included 55 high priority referrals as of August 27, 2008. *Plata* Pls' Trial Ex. 38. Of those, 11 had been pending for over 14 days, yet had no appointment scheduled, and of those scheduled, 19 were scheduled to take place more than 14 days after the referral. Thus, well over half of the PVSP patients are unable to receive timely high priority appointments.

### B.    SOL

90.    The situation at SOL was worse. There, 63 high priority off-site specialty appointments were listed on the aging report for such appointments. *Plata* Pls' Trial Ex. 39. None were scheduled for a date within 14 days of the primary care provider request. Most of these urgent referrals – approximately 40 – did not yet even have an appointment date; four of these cases had been already

pending at least 20 weeks, four others at least 15 weeks, three others at least 10 weeks, and another approximately one dozen between four and eight weeks. Of the approximately two dozen high priority off-site specialty referrals that had appointment dates scheduled, about 12 were scheduled to take place more than approximately five weeks after approval, with a few of these being scheduled four to five months (or longer) after approval. Another approximately one dozen were scheduled to take place three or four weeks after the approval date.

C.    HDSP

91.    At HDSP, 48 high priority off-site specialty referrals were listed on the aging report. *Plata* Pls' Trial Ex. 40. Only one was scheduled for a date within 14 days of the primary care provider request, as required for these urgent referrals by the court-approved policies. Three other referrals were scheduled to take place between 14 and 21 days after the approval date. Seven other high priority referrals had appointments scheduled, with dates ranging from four to eight weeks after the approval date. The vast majority of the urgent off-site specialty referrals – 37 of the cases – did not yet even have an appointment date with the requested specialty provider. Approximately 20 cases without an appointment date scheduled had been pending for at least six weeks; half of these had been pending for more than two months.

D.    NKSP

92.    At NKSP, of the 70 listed high priority offsite specialty referrals, 22 (31%) had been pending for more than 14 days and had no appointment scheduled. *Plata* Pls' Trial Ex. 41. Twelve more were scheduled, but more than 14 days had elapsed between the referral and the appointment. Nearly half the appointments

currently listed as "high priority" NKSP will not take place within the required timeframe.

93.    When specialists see CDCR prisoners or when prisoners are seen for certain procedures, the service provider must provide the sending prison with a report of the encounter. The CDCR primary care provider then uses that report to determine the prisoner's treatment plan.

94.    Based on my reviews of unit health records at NKSP and PVSP, I concluded both prisons have a serious problem obtaining these records.

## VII.    MEDICATION MANAGEMENT PROBLEMS

95.    In my initial report, I found that defendants' medication delivery systems were inadequate for the size of the population they serve, and were plagued by short-staffing at a number of prisons. Based on my most recent inspections and my review of the report by Pablo Stewart, M.D., it is still my opinion that the defendants' medication delivery system is inadequate for the population it serves. Because there are too many prisoners, coupled with too few staff and insufficient resources, the system suffers from medication delays and inadequate treatment documentation. Some prisoners continue to receive their medication late, or not at all, and suffer as a result.

96.    The Receiver is rolling out a new medication delivery system under the auspices of Maxor. At SATF, the Maxor system was initiated in April 2008. The staff reported that they continued to find "bugs" in the system, and that the biggest issue was that refills were not being provided timely. The staff also reported that the system was considerably more labor-intensive than the previous system, requiring additional clerical work, and yet the prisons were not provided

additional clerical support positions.

97.    In its annual report to the Receiver for 2007, Maxor recognizes that overcrowding significantly impacts its ability to deliver medications:

> **Overcrowding:** The impact of overcrowding on the system's abilities to provide timely and effective delivery of necessary medications is significant. A clear example of this impact was noted at San Quentin. San Quentin receives 75-80 new prisoners each day and presumably transfers out or releases about the same number. Overcrowding however, forces a series of "compaction" moves resulting in as many as 300-400 separate prisoner moves each day in order to free up appropriate housing for the offenders. This constant "churn" of prisoners within the institution keeps the healthcare staff chasing prisoner movement to ensure medications can be delivered in a timely fashion. . . . This takes time, and in some cases, the medications are simply returned to the medical area to try to determine where the prisoner is housed. During this time, the prisoner patient is not getting his medications and may complain to staff – who in turn – reorders the medications, resulting in duplicate work.

Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report, Exh. 6) at 29.

## VIII. OVERCROWDING FUELS DYSFUNCTION IN MEDICAL RECORDS

98.    As I explained in my first report, health care records are a critical component of any adequate medical delivery system. Unless medical records and scheduling information are managed, organized, and maintained effectively, appropriate health care services cannot be provided. Overcrowding continues to make it impossible for CDCR to perform these essential functions.

### A.    Quality of Medical Records Continues to be Poor at Inspected Prisons.

99.    Although the Receiver has long-term plans to develop an electronic medical record, those plans are unlikely to come to fruition for years. In the meantime, California relies on paper medical records (except at Pelican Bay State Prison). At each of the prisons I inspected, I found that the medical records were unwieldy, rarely organized chronologically and, in general, poorly maintained.

Retrieving useful information from the files invariably requires considerable time sifting through extraneous reports, misfiled documents and outdated materials. At the same time, certain documents that would be extremely useful, such as an updated "Problem List" for each file, which is required by the court-ordered *Plata* Policies and Procedures, are typically missing.

100.    There are dangerous widespread delays in filing medical documents at HDSP. After I had provided HDSP medical staff with a list of the names and CDCR numbers of the prisoners whose unit health records (UHRs) I wanted to review, someone from the prison went through medical records' loose filing (documentation not yet placed in individual patient UHRs) to find any documents for the patients whose charts I was going to review. These documents were then brought to the room where I reviewed the UHRs. The documentation retrieved from loose filing included documents more than a month old, including, for example, the result of a CT Scan received by the prison in July. More alarming, most of the documents in loose filing, some of which had been received a month before my site visit, had not yet been initialed as reviewed by a primary care provider.

101.    In addition, Dr. Swingle, the HDSP Chief Medical Officer, reported that the transcribing of dictated primary care provider notes was "several months" behind at the prison. This means that documentation of a PCP-patient encounter is missing in the UHR. This, combined with the backlog in loose filing described above, creates dangerous risks because medical staff members who provide care to the patient have no idea what assessments were made previously or, in some cases, what diagnostic test results were obtained.

**B.    CDCR Continues to Rely on Inadequate Tracking Systems**

102.    CDCR's tracking and information systems cannot keep up with the overwhelming data requirements in the system's overcrowded prisons. In support of his Seventh Quarterly Report, the Receiver submitted a February 6, 2008 report entitled "Patient Identification Assessment." Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report, Exh. I.] There, the consultant concluded that "the information technology environment within the medical care side of the CDCR is not a 'system' . . . it is *an act of desperation.*" *Id.* at 5, emphasis in the original. The report further explains that, because the defendants cannot identify and link previous diagnostic and treatment information across prison sites, they face risks including "the possibility of significant errors during patient treatment . . . [and the] inability to identify individuals with chronic and/or communicable conditions upon reincarceration. . . ." *Id.*

103.    The Report explains that these problems are magnified in the CDCR due to several factors, including "overcrowding in the prisons (increasing the risk of communicable disease transmission) . . . ." *Id.* "Due to debilitating technology and record management practices, pulling together a cohesive picture of the inmate's health status is a significant challenge, and currently is near impossible. This puts continuity of care at risk." *Id.* at 6.

104.    I agree with this report that the information systems currently in place in the CDCR are inadequate, and place prisoners at risk of harm.

**IX.    THERE ARE STILL NOT ENOUGH CUSTODY OFFICERS TO ENSURE ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL CONTACTS AT SOME PRISONS.**

105.    As the Receiver explained in his Turnaround Plan in June 2008,

> Health care services are meaningful only if patient-inmates have timely access to those services. In a correctional setting, issues of access are inextricably intertwined with control and supervision of inmate movement by custody staff. System-wide, CDCR lacks the custody staff and organizational structure and processes to ensure that patient-inmates are reliably escorted and/or transported to medical appointments. As a result, patient-inmates are often denied timely access to health care services, substantially increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services.

Jt. Pls' Trial Ex. 56, (Receiver's Eighth Quarterly Report, Exh. 1 -- Turnaround Plan of Action) at 5.

106.    The Receiver has added additional custody teams to facilitate timely medical appointments, but his overall plan does not call for the full implementation of these additional custody allocations until July 2011, "contingent upon recruiting and training sufficient numbers of correctional officers to fill the new health care access posts." *Id.* at 6.

107.    At some of the prisons I inspected, prisoners are unable to access medical care appointments based on custody shortages. When a prison yard is placed on "modified program" status, *i.e.,* either all prisoners or some racial subgroups must be escorted to the clinics, often in shackles, there are often significant delays in treatment. These delays arise because there are not enough custody officers to move the prisoners in and out of the clinics on a timely basis, so far fewer prisoners are seen in the clinics.

### A.    PVSP

108.    I was told by custody staff that the B-yard at PVSP has been locked down during the last two months. The appointment tracking data for PVSP for the month of August (through August 14) shows the dramatic drop off in completed patient appointments on B-yard. *Plata* Pls' Trial Ex. 42 (PVSP Physician

Appointment Statistics, August 2008). During the first two weeks of August, primary care providers on yards A, C and D saw 258, 193 and 215 prisoners, respectively. On B-yard, the primary providers saw 118 prisoners during the same period. Indeed, on August 7, two providers were scheduled to see 42 patients, but just ten patients were seen. *Id.* The reasons stated on the tracking list were "alarms, LD [presumably lockdown]; no escorts." *Id.*

109.    The tracking statistics for the RN triage appointments likewise reflect a drop for completed patient triage appointments for B-yard patients. *Plata* Pls' Trial Ex. 43 (PVSP RN Appointment Statistics, August 2008). While A, C and D completed 215, 121 and 129 triage appointments, B-yard nurses completed just 98, or fewer than ten appointments per clinic day. *Id.* The reasons provided for the cancelled appointments included, "lockdown," "no escorts," and "alarms." *Id.*

110.    Additionally, on B-yard, the staff advised me that it took one business day from the date of collection of sick call slips to the date of the face-to-face triage appointment. However, when I questioned the office technician further about the scheduling, he stated that because the yard was on lockdown, he had to schedule prisoners for their triage appointments by race/gang affiliation, with each subgroup having one day a week for appointments. Thus, he was able to schedule timely RN triage appointments in only a handful of cases.

### B.    HDSP

111.    At HDSP, the prison routinely has what the Warden describes as rolling lockdowns, in which half of the prison's four main housing facilities are locked down at any one time because the prison does not have enough correctional

officers to operate all facilities without using overtime. When there is such a
lockdown on the two HDSP facilities used to house maximum custody prisoners,
access to medical care is affected because such prisoners must be escorted to the
medical clinics. When there is a lockdown in "D" facility, the primary care
provider will be able to see between 12 and 20 patients a day, instead of the 20
that can be seen if there is no lockdown.

## X.    THERE ARE MORE PRISONERS REQUIRING SPECIALIZED PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN ACCOMMODATE

112.    In my first report, I agreed with the Receiver's opinion that the
CDCR is currently unable to accommodate the housing needs of medical patients
requiring specialized placement. My opinion has not changed.

113.    In his Turnaround Plan of Action, the Receiver discusses his plan to
expand facilities to accommodate the 10,000 state prisoners "whose medical
and/or mental condition requires separate housing to facilitate appropriate, cost-
effective access to necessary health care services." Jt. Pls' Trial Ex. 56
(Receiver's Eighth Quarterly Report, Ex. 1 – Turnaround Plan of Action) at 27.
The Receiver explains these facilities must be built because "CDCR does not have
adequate clinical, administrative and housing facilities to support constitutionally
adequate health care." *Id.*

114.    As the Receiver explained in his Eighth Quarterly report, the current
lack of medically appropriate housing for medically fragile prisoners can have dire
consequences. "Simply stated, before constitutionally adequate health care can be
delivered in California's prisons, there needs to be *constitutionally adequate
treatment facilities to provide such care.* Unless and until these facilities are

34

constructed, the major health care class action cases will continue indefinitely. Likewise, prisoners will continue to die unnecessarily." Jt. Pls' Exh. 56 at 46. (Emphasis in the original.)

115.    I understand that defendants have failed to provide the Receiver with the necessary funding for the construction, and the Receiver recently moved for contempt against the Governor and the State Controller for their failure to provide the funding. To my knowledge, no construction has yet begun on this essential project.

## XI.    IT WILL TAKE YEARS FOR THE RECEIVER'S TURNAROUND PLAN TO REMEDY THE UNCONSTITUTIONAL MEDICAL CONDITIONS

116.    On June 6, 2008, the Receiver submitted to the Court a "Turnaround Plan of Action" designed to correct constitutional deficiencies in the California prison health care system. I have reviewed the Receiver's Turnaround Plan.

117.    In his August 5, 2008 newsletter, the Receiver wrote that the Turnaround Plan "consists of over two dozen complex projects, initiatives and programs. Any one of these major projects would be enough to challenge an ordinary department." Jt. Pls' Trial Ex. 102 (August 5, 2008 Newsletter from the Receiver.) I agree that the plan is enormously complex, and I believe that it will take years to remedy the current unconstitutional conditions. The timeframe to reach a constitutionally adequate medical delivery system will be delayed if crowding is not reduced.

## XII.    OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF INFECTIOUS DISEASE TRANSMISSION

118.    I have not changed my opinion that the overcrowded housing conditions, and in particular, the conditions in the non-traditional beds, including

the converted gyms, create potential breeding grounds for disease.

## XIII.  CONCLUSIONS

119.   Based on all that I have set forth above and in my previous reports, I continue to believe that overcrowding is the primary cause of the current state of medical crisis in the CDCR.  I do not believe the Receiver and the CDCR will be able to address and resolve the critical medical care deficiencies until the need for services within the system is significantly reduced, and I still believe that some of the hiring gains for clinicians will be lost if these systemic issues are not addressed, because many newly-hired clinicians will be unwilling to risk their professional credentials and reputations by practicing in an environment where their patients are at risk of harm because, among other things, adequate clinical space is scarce, appointments are not scheduled, complete medical records are unavailable, and medications are not timely delivered.

Dated: _____9 . 9 . 0 8_____          _____

Ronald Shansky, M.D.

36

ATTACHMENT A

# RONALD MARK SHANSKY, M.D.

## CURRICULUM VITAE

1441-G North Cleveland
Chicago, IL 60610

312-787-3365 Residence
312-919-9757 Cell
rshansky@rshanskymd.com

### *ACADEMIC TRAINING*

Bachelor of Science, University of Wisconsin, 1967
Doctor of Medicine, Medical College of Wisconsin, 1971
Master of Public Health, University of Illinois School of Public Health, 1975

### *PROFESSIONAL LICENSE*

Licensed Physician (Illinois) No. 36-46042

### *INTERNSHIP AND RESIDENCY TRAINING*

Internship – Cook County Hospital, July 1971-1972
Residency – Internal Medicine, Cook County Hospital, July 1972-1974

### *BOARD CERTIFICATION AND FELLOWSHIPS*

Diplomate of the American Board of Internal Medicine – September 1978
Diplomate of the American Board of Quality Assurance and Utilization Review Physicians – 1992
Elected Fellow of the Society of Correctional Physicians – 1999

### *EMPLOYMENT*

Medical Director, Center for Correctional Health & Policy Studies, Washington, D.C. Jail –
  2004 to 2006
Consultant, Corrections Medicine and Continuous Quality Improvement – 1993 to present on a full-time
  basis; and throughout career while holding other positions
Medical Director, Illinois Department of Corrections – 1982-1993, 1998-1999
Attending Physician, Department of Medicine, Cook County Hospital – 1978 to Present
Surveyor (part-time), Joint Commission on Accreditation of Healthcare Organizations – 1993-1997
Staff Physician, Metropolitan Correctional Center of Chicago – 1975-1982

## *CONSULTATIONS*

Condition of Confinement Reviews for PricewaterhouseCoopers,
   reviewing detention facilities housing federal detainees; 2000–Present
Essex County Jail, Newark, N.J.
Michigan Department of Corrections
Montana Department of Corrections
New Mexico Department of Corrections
Polk Correctional Center, Raleigh, N.C.
South Dakota Department of Corrections

## *APPOINTMENTS*

Member of Medical Oversight Team reviewing the Ohio prison system – 2005 to present
Court Monitor, De Kalb County Jail, Decatur, Georgia – 2002-2005
Consultant, California Department of Corrections – 2000
Court Monitor, Milwaukee County Jail – 1998 to present
Court Monitor, Essex County Jail, Newark, NJ – 1995 to present
Medical Expert, State of Michigan – 1995
Consultant to Special Master, *Madrid v. Gomez*, Pelican Bay Prison, California Department of
   Corrections – 1995
Medical Expert, State of New Mexico – 1994
Consultant, Connecticut Department of Corrections – 1994
National Advisory Board of the National Center for Health Care Studies – 1991
Illinois AIDS Interdisciplinary Advisory Council – November 1985
Illinois AIDS Caretaker Group – November 1985
Task Force to Rewrite American Public Health Association Standards for Medical Services in
   Correctional Facilities – 1983
Corrections Subcommittee, Medical Care Section, APHA – 1983
Preceptor, then Clinical Associate Professor, Department of Preventive Medicine and Community Health,
   Abraham Lincoln School of Medicine, University of Illinois, Chicago, Illinois – 1972-1979
Clinical Associate Professor, Department of Medicine, Ravenswood Medical Center, Chicago,
   Illinois – 1979-1981
Director, Phase 1 and 2 Program at Cook County Hospital for the Abraham Lincoln School of
   Medicine – 1976-1978
Medical Director, Uptown People's Health Center – September 1978
Director, General Medicine Clinic, Department of Medicine, Cook County Hospital – 1975
Director, Clinical Services, Department of Internal Medicine, Cook County Hospital – 1975
Associate Attending Physician, Department of Internal Medicine, Cook County Hospital – 1974-1975
Instructor, Illinois College of Optometry, Chicago, Illinois – 1972-1974

## *COMMITTEE MEMBERSHIPS*

Chairman, State of Illinois AIDS Caretakers Committee – 1985
Chairman, Corrections Subcommittee, Medical Care Section – 1983
Chairman, Medical Records Committee, Cook County Hospital – 1981
Member, Executive Medical Staff, Cook County Hospital – 1979
Member, Task Force to Rewrite the *Standards for Health Services in Correctional Institutions* –
   published 1986

## PROFESSIONAL ORGANIZATIONS

Society of Correctional Physicians – President, 1993-1995
American Public Health Association – 1974 to present
American Correctional Health Services Association – 1988
American Correctional Association – 1982
Federation of American Scientists – 1974-1981

## CIVIC

Mutually agreed upon expert, Milwaukee County Jail – 2001
Mutually agreed upon expert, *Inmates v. Essex County Jail*, 1995 to present
Appointed Receiver by Judge William Bryant, Medical and Mental Health Programs, District of Columbia Jail, *Campbell v. McGruder* – 1995
Mutually agreed upon neutral expert, State of Montana, *Langford v. Racicot* – 1995
Mutually agreed upon neutral expert, State of Vermont, *Goldsmith v. Dean* – 1996
Executive Committee Overseeing Health Care, Puerto Rico Administration of Corrections – 1993
Appointed by Judge Gerald Jenks, District Court for the Central District of Utah, as Impartial Expert in the matter of *Henry v. Deland* – 1993
Appointed by Magistrate Claude Hicks Jr., U.S. District Court in Macon, Georgia as Medical Expert in the matter of *Cason v. Seckinger* – 1993
Appointed by Judge Owen M. Panner, District of Oregon, as Special Master in *Van Patten v. Pearce* involving medical services at Eastern Oregon Correctional Institution – December 1991
Appointed by Allan Breed, Special Master, *Gates* case, as Medical Consultant regarding California Medical Facility in Vacaville
Appointed by Judge M. H. Patel, Special Master, case involving San Quentin Prison – 1989 to 1995
Selected as part of delegation to inspect the medical services provided to Palestinian detainees in the Occupied Territories and Israel by Physicians for Human Rights – 1989
Appointed by U.S. District Judge Williams as member of medical panel monitoring medical services in Hawaii Prison System – 1985
Appointed by U.S. District Judge Black to evaluate medical services in the Florida Prison System –1983
Appointed by U.S. District Judge Kanne as monitor to the Lake County, Indiana Jail in the litigation of the *Jensen* case (H74-230) – 1982
Appointed by U.S. District Judge J. Moran as Special Master of the Lake County, Illinois Jail in the litigation of *Kissane v. Brown* – 1981
Board Member, Health and Medicine Policy Research Group, Chicago, Illinois – 1980
Appointed to Advisory Committee, State of Alabama, Department of Mental Health – 1980
Appointed as consultant to the State of Alabama, Department of Mental Health – 1979
Consultant, U.S. Department of Justice Civil Rights Division, Special Litigation Section – 1977
Appointed by U.S. District Judge J. Foreman to a three-member panel of medical experts to advise on health conditions at Menard Correctional Center, Menard, Illinois – 1976

## *AWARDS*

Armond Start Award for Excellence in Correctional Medicine, Society of Correctional Physicians – 1999

American Correctional Health Services Association Distinguished Service Award – 1992

## *PUBLICATIONS*

Michael Puisis, editor, Ronald Shansky, associate editor, *The Clinical Practice in Correctional Medicine, second edition,* 2006.

Schiff, G., Shansky, R., chapter: "The Challenges of Improving Quality in the Correctional Health Care Setting," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Schiff, G.; Shansky, R.; Kim, S., chapter: "Using Performance Improvement Measurement to Improve Chronic Disease Management in Prisons," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Anno, B.J., Graham, C., Lawrence, J., and Shansky, R. *Correctional Health Care – Addressing the Needs of the Elderly, Chronically Ill, and Terminally Ill Inmates*. National Institute of Corrections, 2004.

Schiff, G., Shansky, R., chapter: "Quality Improvement in the Correctional Setting," in *The Clinical Practice in Correctional Medicine*, 1998.

How-To Manual, *Quality Improvement in a Correctional System*, State of Georgia, Department of Corrections, 1995.

*Journal of Prison and Jail Health*, Editorial Board; 1988 – present.

Shansky, R., "Advances in HIV Treatment: Administrative, Professional and Fiscal Challenges in a Correctional Setting," *Journal of Prison and Jail Health*, Volume 9, Number 1.

B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991; Member of Editorial Advisory Board.
Coe, J., Kwasnik, P., Shansky, R., chapter: "Health Promotion and Disease Prevention" in B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991.

Hoffman, A.; Yough, W.; Bright-Asare, P.; Abcariam, H.; Shansky, R.; Fitzpatrick, J.; Lidlow, E.; Farber, M.; Summerville, J.; Petani, C.; Orsay, C.; Zal, D., "Early Detection of Bowel Cancer at an Urban Public Hospital: Demonstration Project," *Ca – A Cancer Journal for Clinicians*, American Cancer Society, Nov/Dec 1983, Vol. 33, No. 6.

Mehta, P.; Mamdani, B.; Shansky, R.; and Dunea, G., "Double Blind Study of Minoxidil and Hydralazine." Sixth International Conference of Nephrology, Florence, Italy – June 1975.

## PRISONS INSPECTED

State of Alabama Prisons at Kilby, Holman, Fountain, Tutweiller, Staton, and Draper
Parchman State Prison, Mississippi Jefferson County and Birmingham City Jails, Alabama
Arizona State Prison, Florence, Arizona
Washington County Jail, Fayetteville, Arkansas
California Medical Facility, Vacaville
California State Penitentiary, San Quentin
Colorado State Penitentiaries, Centennial, Fremont, Territorial
District of Columbia Jail at Occoquan
Florida Prison System
Florida County Jails, including Monroe County, Pasco County and Polk County
Krome Detention Facility (INS), Miami, Florida
Department of Juvenile Justice, State of Georgia
Georgia Diagnostic Center, Jackson, Georgia
Hawaii Prison System
Menard Correctional Center, Illinois
Rock Island County Jail, Rock Island, Illinois
Indiana State Penitentiary, Michigan City, Indiana
Indiana Reformatory, Pendleton, Indiana
Lake County Indiana Jail, Crown Point, Indiana
Maine State Prison, Thomaston, Maine
State Prison of Southern Michigan
New Hampshire State Penitentiary, Concord
New York City Jails
Sing Sing Penitentiary, New York
Ohio Women's Prison
State of Vermont Prison System
Walla Walla State Penitentiary, Washington
Wisconsin State Penitentiaries at Waupan, Fox Lake, Taycheedah and Dodge

## SURVEYED MEDICAL PROGRAMS

Federal Bureau of Prisons, approximately 20 facilities

## INTERNATIONAL INSPECTION

Israeli Prisons and Jails Housing Palestinian Detainees

ATTACHMENT B

# DOCUMENTS REVIEWED BY DR. SHANSKY

CDCR Weekly Population Report, as of Midnight, August 20, 2008

Plata Vacancy/Registry Report, May 2008

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at California Rehabilitation Center

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at the California Training Facility

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at Mule Creek State Prison

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at Avenal State Prison

NKSP Tracking Forms for D-Yard RN Line, dated August 18-22, 2008

NKSP MD/PCP Line, 2nd Watch, dated August 18-22, 2008

PVSP Offsite Aging Report, dated August 27, 2008

SOL Offsite Aging Report, dated August 28, 2008

HDSP Offsite Aging Report, dated August 29, 2008

NKSP Offsite Aging Report, dated August 25, 2008

PVSP Physician Appointment Statistics, August 2008

PVSP RN Appointment Statistics, August 2008

August 5, 2008 Newsletter from the Receiver

Receiver's Seventh Quarterly Report and Exhibits

Receiver's Eighth Quarterly Report and Exhibits

Report of Pablo Stewart, M.D., August 15, 2008

Various Logbooks maintained at inspected facilities and reviewed on-site

# EXHIBIT C

1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99641
   ALISON HARDY, Bar No. 135966
3  SARA NORMAN, Bar No. 189536
   REBEKAH EVENSON, Bar No. 207825
4  1917 Fifth Street
   Berkeley, CA 94710
5  Telephone: (510) 280-2621

6  KIRKPATRICK & LOCKHART PRESTON
   GATES ELLIS LLP
7  JEFFREY L. BORNSTEIN, Bar No. 99358
   EDWARD P. SANGSTER, Bar No. 121041
8  RAYMOND E. LOUGHREY, Bar No. 194363
   55 Second Street, Suite 1700
9  San Francisco, CA 94105-3493
   Telephone: (415) 882-8200
10
   THE LEGAL AID SOCIETY –
11 EMPLOYMENT LAW CENTER
   CLAUDIA CENTER, Bar No. 158255
12 600 Harrison Street, Suite 120
   San Francisco, CA 94107
13 Telephone: (415) 864-8848

14 Attorneys for Plaintiffs

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

15        IN THE UNITED STATES DISTRICT COURTS
16     FOR THE EASTERN DISTRICT OF CALIFORNIA
        AND THE NORTHERN DISTRICT OF CALIFORNIA
17  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
18    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| 19 RALPH COLEMAN, et al., | ) No. Civ S 90-0520 LKK-JFM P |
| | ) |
| 20       Plaintiffs, | ) **THREE-JUDGE COURT** |
| | ) |
| 21    vs. | ) **ERRATA TO SECOND SUPPLEMENTAL** |
| | ) **EXPERT REPORT OF RONALD** |
| 22 ARNOLD SCHWARZENEGGER, et al., | ) **M.SHANSKY, M.D.** |
| | ) |
| 23     Defendants | ) |
| 24 MARCIANO PLATA ,et al., | ) No. C01-1351 TEH |
| | ) |
| 25       Plaintiffs, | ) **THREE-JUDGE COURT** |
|    vs. | ) |
| 26 | ) |
| 27 ARNOLD SCHWARZENEGGER, et al., | ) |
| | ) |
|     Defendants | ) |
| 28 | |

1    Paragraph 36: First sentence cites "Joint Pls' Trial Ex. 36." This should read "*Plata*
2  Pls' Trial Ex. 36."

3    Paragraph 55: Second sentence cites "Jt. Pls' Trial Ex. 35." This should read "*Plata*
4  Pls' Trial Ex. 35."

5    Paragraph 69: First sentence cites "Jt. Pls' Trial Ex. 37." This should read "Plata Pls'
6  Trial Ex. 37."

7    Dated: April 7, 2009                    Respectfully submitted,

8

9

10                                   _____/S/_____
11                                   Alison Hardy
                                     Attorney for Plaintiffs
12                                   PRISON LAW OFFICE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERRATA TO SECOND SUPPLEMENTAL EXPERT REPORT OF RONALD SHANSKY, M.D. , NOS.  CIV S 90-0520 LKK-JFM, C01-1351 TEH