1  EDMUND G. BROWN JR.
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  DEBBIE J. VOROUS, State Bar No. 166884
   JEFFREY STEELE, State Bar No. 124668
4  Deputy Attorneys General
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone:  (916) 324-5345
    Fax:  (916) 324-5205
7   E-mail:  Debbie.Vorous@doj.ca.gov

8  Attorneys for Defendants

9                   IN THE UNITED STATES DISTRICT COURT

10                FOR THE EASTERN DISTRICT OF CALIFORNIA

11                          SACRAMENTO DIVISION

12

13  **RALPH COLEMAN, et al.,**                      2:90-cv-00520 LKK JFM P

14                               Plaintiffs,   **DEFENDANTS' RESPONSE TO
                                               COURT'S MARCH 31, 2009 ORDER**
15          **v.**                             **THAT DEFENDANTS FILE A FINAL
                                               PROPOSAL TO MEET THE**
16                                             **REMAINING SHORT-TERM,
                                               INTERMEDIATE, AND LONG-RANGE**
17  **ARNOLD SCHWARZENEGGER, et al.,**         **BED NEEDS OF THE PLAINTIFF
                                               CLASS**
                                 Defendants.
18

19

20          On March 31, 2009, this Court ordered that Defendants develop and file concrete

21  proposals to meet the remaining short-term, intermediate, and long-range bed needs of the

22  Plaintiff class.  (Docket No. 3556 ¶ 4.)  Enclosed as Attachment A, with Exhibits 1 through 9, is

23  Defendants' final proposal.[1]

24

25

26

27  ───────────────────
        [1] Filed concurrently with this response are Defendants' activation schedules for
28  completion of "all other court-ordered construction projects."  (Docket No. 3556 ¶ 3.)

1

Defs.' Final Prop. To Meet Short-Term, Interm. And Long Range Bed Needs of Pl. Class
(2:90-cv-00520 LKK JFM P)

1       Dated:  May 26, 2009                  Respectfully submitted,

2                                      EDMUND G. BROWN JR.
Attorney General of California

3                                      JONATHAN L. WOLFF
Senior Assistant Attorney General

4

5                                      */s/ Debbie J. Vorous*

6                                      DEBBIE J. VOROUS
Deputy Attorney General
Attorneys for Defendants

7

8   CF1997CS0003
   30758111.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Final Prop. To Meet Short-Term, Interm. And Long Range Bed Needs of Pl. Class
(2:90-cv-00520 LKK JFM P)

# ATTACHMENT A

**(Part 1 of 4)**

TABLE 1. GLOSSARY OF TERMS

| Acronym | Term |
|---------|------|
| AB | Assembly Bill |
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | Correctional Health Care Facility |
| CIC | Condemned Inmate Complex |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison, Corcoran |
| CPR | California Prison Health Care Receivership Corporation |
| CSH | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| DARS | Division of Addiction and Recovery Services |
| DCHCS | Division of Correctional Health Care Services |
| DHS | Department of Health Services |
| DJJ | Division of Juvenile Justice |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPA | Department of Personnel Administration |
| DPH | Department of Public Health |
| DTP | Day Treatment Program |
| DVI | Duel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| FPCM | Facilities, Planning, Construction, and Management |
| GACH | General Acute Care Hospital |
| GP | General Population |
| HDSP | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ICF-H | Intermediate Care Facility – High Custody |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| LOC | Level of Care |
| LOU | Locked Observation Unit |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health-Outpatient Housing Unit |
| MSH | Metro State Hospital |

| Acronym | Term |
|---------|------|
| NKSP | North Kern State Prison |
| NSH | Napa State Hospital |
| OISB | Offender Information Services Branch |
| PBSP | Pelican Bay State Prison |
| PC | Penal Code |
| PSH | Patton State Hospital – DMH (Female) |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| RC | Reception Center |
| Receiver | *Plata* Federal Receiver |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison, Sacramento |
| SAP | Substance Abuse Program |
| SATF | Substance Abuse Treatment Facility |
| SFM | State Fire Marshal |
| SMY | Small Management Yard |
| SNY | Sensitive Needs Yard |
| SOL | California State Prison, Solano |
| SQ | California State Prison, San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| TC-1 | Treatment Center 1 |
| TC-2 | Treatment Center 2 |
| TSI | DMH Therapeutic Strategies and Interventions Training |
| VPP | Vacaville Psychiatric Program |
| WSP | Wasco State Prison |

**FOR SUBMITTAL TO THE *COLEMAN* COURT**

*Report on Short-Term, Intermediate, and Long Range Bed Plan*
*in Response to the March 31, 2009 Court Order*

## PURPOSE AND BACKGROUND

On March 31, 2009, this Court ordered defendants to "develop concrete proposals to meet the remaining short-term, intermediate, and long-range bed needs of the plaintiff class." This report, and the detailed activation schedules filed concurrently with this report, detail defendants' plan to provide outpatient and inpatient mental health treatment beds to the *Coleman* population in the California Department of Corrections and Rehabilitation (CDCR) and the Department of Mental Health (DMH). Defendants are committed to complying with all previous and current Court orders and will take all steps necessary to comply with these orders.

Specifically, defendants discuss their short-term and intermediate-term proposals to meet the *Coleman* population's immediate needs, and their long-term plan for an integrated health care delivery system that provides for the mental health, medical, and dental needs of inmates, as well as specialty services for inmates with disabilities. These proposals were developed, and will continue to be refined, using a collaborative process that engages leadership and staff from all areas of CDCR, DMH, and the Department of Finance.

## MENTAL HEALTH BED NEED

Navigant Consulting issued its Fall 2008 population projections on December 8, 2008 and its Spring 2009 Mental Health Bed Need Study on April 29, 2009. When defendants began researching and developing the short-term and intermediate-term proposals described below, the Spring 2009 population projections were not available. Thus, defendants relied upon the current needs (Fiscal Year 2008/09) identified in the Fall 2008 projections.[1] Defendants subsequently discovered, however, that the number of beds identified in the Fall 2008 projections as "Capacity & Planned" beds does not accurately reflect the number of actual beds presently available for each level of care. Accordingly, defendants developed Table 2 below to reflect the difference in need based upon the projected bed numbers identified in the Fall 2008 projections, and the actual bed numbers identified by the DCHCS. (*See* Exhibit 1, Staffed Capacity by Institution and Mental Health Program.) Table 2 reflects: 1) the "Capacity & Planned" beds identified in the Fall 2008 projections ("Navigant Identified Fall 2008/09 Capacity & Planned Beds"), along with the corresponding need based on the projected "Capacity & Planned" bed numbers ("Navigant Unmet Need"); and, 2) the actual number of beds presently available ("Actual Bed 2009"), and the corresponding bed needs based on the actual bed numbers ("Actual Unmet Need").

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

---

[1]  Mental Health Bed Need Study, Fall 2008, page 33.

TABLE 2. BED NEED THROUGH 2009

| LOC | Bed Need 2009[2] | Navigant Identified Fall 2008/09 Capacity & Planned Beds | Navigant Unmet Need | Actual Bed 2009[3] | Actual Unmet Need[4] |
|---|---|---|---|---|---|
| *Males* | | | | | |
| Acute | 218 | 175 | 43 | 155 | 63 |
| ICF | 252[5] | 375[6] | (123) | 365[7] | (113) |
| ICF-H | 370 | 241 | 129 | 306 | 64 |
| MHCB | 340 | 294 | 46 | 314 | 26 |
| EOP-GP | 3,858 | 3,141 | 717 | 3,141 | 717 |
| EOP-ASU | 622 | 474 | 148 | 474 | 148 |
| PSU | 479 | 384 | 95 | 384 | 95 |

The long-term plan is based on the Spring 2009 projections, which provide the most recent information regarding future bed needs. The long-term plan uses the Spring 2009 projections for Fiscal Year 2013. These projections, however, do not account for population changes that may result from any CDCR parole, sentencing, and credit reforms. Nor does the Spring 2009 bed need reflect the results of the CDCR/DMH modified assessment of unmet needs, which is currently underway, and also subject to the March 31, 2009 Court Order. The results of this modified assessment may impact future bed needs.

## SHORT-TERM AND INTERMEDIATE-TERM PROPOSALS

The defendants, in consultation with the *Coleman* Special Master and the *Plata* Receiver, developed various short-term (9 months or less until activation) and intermediate (over 9 months until activation) proposals to meet the immediate *Coleman* bed needs. In developing these proposals, defendants considered, among other things, program needs, resource availability, ease of recruiting, hiring and retaining staff, and timeframes for implementation. Defendants also considered the number and type of beds that would be displaced by these proposals, the impact the proposals may have on the Receiver's efforts, and the impact the proposals may have on existing *Coleman* court–ordered projects. In addition to the proposals identified below, defendants considered many alternative proposals, and discussed some of the alternatives during weekly meetings with the *Coleman* Special Master. These alternatives, however, were not viable

---

[2] Mental Health Bed Need Study, Fall 2008, page 33.

[3] These figures are based upon the number of actual beds.

[4] The bed need identified in this column is derived by subtracting the numbers in the "Actual Bed 2009" column from the numbers in the "Bed Need 2009" column.

[5] This number is derived by subtracting the FY 2008/09 "Intermediate Male Celled Housing" bed need number (370) from the FY 2008/09 total "Intermediate Male Bed Need" (622).

[6] This number is derived by subtracting the FY 2008/09 "Intermediate celled housing Capacity & Planned" bed number (241) from the FY 2008/09 total "Intermediate Capacity & Planned" bed number (616).

[7] This number includes 321 regular ICF-low custody beds as well as the CMF 44 DTP beds in housing unit A-2.

for a variety of reasons, including the timeframe needed for implementation, funding uncertainties, barriers to recruiting and hiring, custody limitations, and movement restrictions due to the sensitivity of the inmate population.

Defendants are committed to implementing the proposals outlined below upon the Court's approval of defendants' plan, in order to comply with previous and current court orders. There are some impediments to immediate implementation of some of these proposals. For instance, certain proposals may require the Legislature to appropriate funding for additional staffing. The Budget Act of 2009 (Chapter 1, Statutes of 2009) appropriates resources to support all of CDCR's mental health outpatient populations, and CDCR is committed to successfully implementing an accurate staffing allocation model based on the workload study ordered by the *Coleman* Court in 2006. CDCR and the Special Master identified specific concerns with the model that will be completed by August 2009. With respect to the additional ICF and Acute care programs proposed below, DMH requires additional clinical resources, and in certain instances, modification of the physical plant. DMH has already taken the appropriate steps to request the Legislature appropriate the resources it needs.

In addition to funding and staffing, some of the proposals described below require facility modifications to enable licensure and to ensure the health and safety of the inmates. Defendants also anticipate seeking a waiver from the Court of the State's licensing requirements in certain instances, and the Department of Public Health must grant program flexes, as detailed below. Furthermore, defendants intend to seek modification of existing *Coleman* orders, as necessary, upon this Court's approval of these proposals.

The following are defendants' short-term and intermediate-term proposals to increase capacity to support mental health programs. Table 3 below is a summary chart of each of the short-term and intermediate-term proposals. Table 4, set forth at the end of defendants' short-term and intermediate-term proposals, demonstrates the resulting number of beds at each level of care, upon the Court's approval of all of the short-term and intermediate-term proposals.

**TABLE 3. SUMMARY OF SHORT-TERM AND INTERMEDIATE-TERM PROPOSALS**

| Proposal | LOC Served | # of Beds |
|---|---|---|
| SATF: Dual Diagnosis Treatment Program | EOP – GP, Levels I & II | 88 |
| SATF: New EOP SNY Beds | EOP SNY, Levels III/IV | 150 |
| SOL: New EOP Level III/IV Beds | EOP – GP, Levels III/IV | 150 |
| COR: Additional EOP ASU Beds | EOP – ASU | 45 |
| SVSP: Additional EOP ASU Beds | EOP – ASU | 27 |
| LAC: Increase Staffing for Additional EOP-ASU Beds | EOP – ASU | 20 |
| SQ: New MHCBs in CTC | MHCB | 17 |
| SAC: Temporary MHCBs | MHCB | 20 |
| SVPP: Add two beds in D-5 and two beds in D-6 for ICF-H | ICF-H | 4 |

| | | |
|---|---|---|
| SVPP: Convert two buildings of C yard to ICF-H. | ICF-H | 116 |
| SVPP: Convert one 10-bed wing in TC1 to double cells for ICF-H. | ICF-H | 10 |
| CMF: Convert A-2 Beds from DTP to low custody ICF. | ICF | 0[8] |
| ASH: Convert the 25 ASH APP beds to low custody ICF beds | ICF | 25 |
| VPP: Transfer P1 wing from CMF to VPP and convert to acute | APP | 32 |
| VPP: Convert the P2 wing from high custody ICF to acute | APP | 36 |

**EOP-GP**

The Fall 2008 Navigant population projections reflect a current need of 717 additional EOP beds. The short-term and intermediate-term proposals for EOP, described below, create an additional 388 EOP beds. Although the Fall 2008 projections would suggest there is a remaining need for 329 EOP beds, the Fall 2008 projections do not account for the sizable EOP population that already receives Court-ordered mental health services at Reception Centers (RC). On average, from July 2007 through June 2008, there were 550 RC-EOP inmate-patients. The Court ordered that defendants develop a RC-EOP program to meet the needs of these inmates. This program has been in operation since October 2007. Of the 550 RC-EOP inmates, on average, there were approximately 296 inmates in RCs with a release date of five months or less.[9] As a result, CDCR developed an RC-EOP program to provide for the needs of these inmates that parole directly back to the community. Consequently, the Fall 2008 projections significantly overstate the actual need for EOP beds.

- **Dual Diagnosis Treatment Program at SATF.** This proposal will result in an increase of 88 EOP-GP beds. CDCR proposes to develop a dual disorders treatment program, in collaboration with the DARS program at SATF for Levels I and II EOP inmate-patients with substance use disorders and serious mental illness. An evidence-based model will be implemented on Facility F, where the pods were designed with the concepts of therapeutic community in mind and are presently underutilized. Each pod is comprised of 11 four-person dorms. Upon the Court's approval of this proposal, CDCR will convert two pods and implement this dual diagnosis program, which will take 180-365 days.

  CDCR intends to conduct training of custody and mental health staff to ensure that cultural issues related to the treatment of mentally ill inmates are addressed. If approved by the Special Master, CDCR plans to utilize the training module in its "Plan to Address the Overall Dysfunction in Custody/Mental Health Relations at SVSP," which was presented to the Special Master on January 5, 2009. The module, entitled "Advanced Training for Correctional Staff Working in Mental Health Programs in the Prison Setting:

---

[8] This proposal does not reflect any ICF beds because the CMF 44 DTP beds in housing unit A-2 are already included in the ICF numbers as ICF beds. (*See* Convert DTP to ICF proposal, page 11.)
[9] OISB.

Building a High Caliber Interdisciplinary Treatment Team," was developed to focus on elevating awareness and understanding, and to demonstrate the importance of ongoing communication between custody and the mental health staff. (*See* Exhibit 2.) CDCR will provide this training, designed to foster an environment that facilitates the provision of mental health treatment and improved safety and security within the institution, to SATF staff prior to the transfer of inmates into the program.

- **EOP SNY Beds at SATF.** This proposal will result in an increase of 150 level III/IV EOP SNY beds. Much of the EOP wait list consists of SNY inmates. For the period of May 2008 through April 2009, the weekly average wait list for EOP SNY beds was 101.[10] To address this need and the anticipated need, CDCR proposes to convert a 270-design housing unit at SATF, Facility E, to a 150-bed Level III/IV EOP SNY housing unit. As previously noted, SATF staff will receive training to address cultural issues related to the treatment of mentally ill inmates. Upon the Court's approval, defendants will implement this proposal within 150-180 days. However, the creation of confidential, individual and group treatment space in the housing unit is required to fully implement this proposal. Defendants anticipate converting non-traditional areas, using available resources to create office and treatment space.

- **EOP Level III/IV Beds at SOL.** To further address the EOP-GP bed need, CDCR proposes to reallocate 150 beds from GP to EOP at SOL in an existing 270-design housing unit. This proposal requires hiring additional staff, adding additional office and treatment space, an expansion of treatment hours to perform treatment during non-traditional work hours, and staff training to address cultural issues related to the treatment of mentally ill inmates. CDCR will provide the same training to SOL staff that it provides to SATF staff. Upon the Court's approval of this proposal, CDCR will begin the transition from GP to EOP within 12 months, and will be fully operational within 18 months.

## EOP-ASU

- **Additional EOP-ASU Beds at COR.** This proposal will result in an additional 45 EOP-ASU beds. In recognition of current population need, CDCR is currently planning on converting one 270-design building at COR from Level IV GP to a Level IV ASU / Level IV EOP-ASU. Defendants notified the Special Master on March 3, 2009, that the conversion will result in an additional 27 EOP-ASU beds, and planning for this project is already underway. In addition to these 27 beds, CDCR proposes to increase by 18 the number of EOP-ASU beds at COR. CDCR will provide the same training to COR staff that it provides to SATF staff.

  This proposal will require additional office space, confidential, individual and group treatment space, and an expansion of treatment hours to provide treatment during non-traditional work hours, until permanent space is allocated. Defendants anticipate converting non-traditional areas, using available resources to create office and treatment

---

[10] Data source: DCHCS.

space. Defendants intend to activate the EOP-ASU beds within 90 days of the Court's approval.

- **Additional EOP-ASU Beds at SVSP.** CDCR proposes to add 27 EOP-ASU beds at SVSP, which will bring the total EOP-ASU beds at SVSP to 72. CDCR will continue to train SVSP staff with the training module presented to the Special Master on January 5, 2009, in the "Plan to Address the Overall Dysfunction in Custody/Mental Health Relations at SVSP." Defendants will implement this proposal within 120-150 days following Court approval. However, this proposal will require an expansion of treatment hours to perform treatment during non-traditional work hours. Additionally, defendants ultimately intend to transfer this EOP-ASU population to the court-ordered 72-bed EOP-ASU building, which is scheduled for activation in 2013.

- **Increase Staffing at LAC for Additional EOP-ASU Beds.** This proposal will result in an additional 20 EOP-ASU beds. Currently, LAC is staffed for 54 EOP-ASU beds. However, LAC's EOP-ASU monthly average census for 2008 was 77. During this time, defendants have provided mental health services to all EOP-ASU inmates. In response, CDCR will increase staffing at LAC to provide for 20 additional EOP-ASU beds to support current need. This proposal will require the creation of confidential, individual and group treatment space, hiring additional staff, and an expansion of treatment hours to provide treatment during non-traditional work hours, until permanent space is allocated. Staff training to address cultural issues related to the treatment of mentally ill inmates will be completed as described above prior to the transfer of inmates into the program. This proposal will be implemented in 180-270 days following Court approval.

## PSU

Defendants were unsuccessful in identifying a short-term or intermediate-term proposal to fill the projected need for 95 PSU beds. Notably, however, as of May 22, 2009, the actual wait list for PSU beds was substantially lower (54)[11] than the projected need.

## MHCB

- **MHCBs at SQ CTC.** This proposal will result in 17 additional MHCBs. As part of the *Plata* Receiver's efforts, Building 22 at SQ has undergone major renovation. Construction was originally designed to meet licensing requirements as a free-standing 50-bed CTC, of which 20 beds were designated as licensed MHCBs. Although defendants originally hoped to activate all 20 MHCBs, defendants can only activate 17 MHCBs because of a fire barrier separation design issue, and because one bed must be used as an observation room. On April 1, 2009, a budget change proposal was submitted to the Legislature requesting funding and additional clinical staffing to support the activation of these beds. Activation is scheduled to begin in January 2010.

/ / /
/ / /

---

[11] Data source: DCHCS, PSU Wait List, 5-22-09.

- **Temporary MHCBs at SAC.** To alleviate the current MHCB waitlist (average of 25 between January and April 2009[12]), CDCR will convert 20 MH-OHU beds at SAC, Facility B, to temporary unlicensed MHCBs pending the construction of additional, permanent MHCBs as part of the long-term plan. This proposal will require hiring additional mental health, nursing, custody, and support staffing for MHCB level of care. CDCR will, upon approval of this bed plan, ask the Court to waive the State's licensing requirements regarding the licensing of Correctional Treatment Centers; that is California Health and Safety Code section 1250(j) and California Code of Regulations, Title 22, sections 79501–79861. This proposal will be implemented in 150-180 days following Court approval.

## ICF

In order to implement a solution for the ICF population as quickly as possible, defendants recognize that the most effective method is to expand already existing programs. Thus, defendants developed proposals to increase capacity at SVPP and VPP.[13] These proposals provide continuity of care to *Coleman* inmate-patients. Additionally, the management, mission, policies, and experience with this patient type and these types of licensed programs are already well established within SVPP and VPP, as it is their only mission.

- **Addition of four cells to SVPP D-5/D-6**. DMH identified and completed all steps to add two additional beds for patient care in both DMH SVPP D-5 and D-6 housing units, for a total of four additional beds. During the original renovation of D-5 and D-6, these four cells were completely renovated to the standard of the other 112 cells at D-5 and D-6. At the time of the renovation, however, the SFM only approved occupancy for 56 beds per building. As part of defendants' efforts to activate as many beds as possible, defendants requested that the SFM approve defendants' use of the remaining four beds. On May 12, 2009, the SFM approved use of the beds. On May 13, 2009, DPH approved defendants' request to add four beds to the SVPP license, and the beds were occupied the following week.

- **Convert SVSP C-5/C-6 to ICF-high.** DMH proposes to convert housing units C-5 and C-6 at SVSP to operate as high custody ICF beds. Standing alone, this proposal would result in an increase of 116 ICF high custody beds.[14] DMH would implement the same treatment programs provided in TC-1, TC-2, D-5, and D-6, which includes two hours of daily yard time as part of the therapeutic milieu.

  Health & Safety Code §1276 authorizes the use of alternate methods of compliance known as program flexes to be used to obtain and maintain compliance in all licensed and

---

[12] Data source: DCHCS.

[13] Defendants also considered various proposals involving CSH. However, defendants do not consider expansion at CSH a viable option. In part, defendants note that the greatest need for inpatient care exists among high custody ICF inmate-patients. CSH is not equipped to accommodate these inmate-patients. In addition, it is difficult to recruit staff at CSH. Presently, CSH does not have its full complement of staff. (*See* Exhibit 3, 10-6-06 Feasibility Study; Exhibit 4, Amended Coalinga Study.)

[14] See the Acute proposal to convert 36 ICF-H beds at CMF Wing P-2 to Acute beds, which will result in a net gain of 80 beds.

certified facilities. This proposal will require DPH approval of program flexes. DPH has previously approved similar program flexes during activation of D-5 and D-6 in SVPP, and P-2 and P-3 in VPP. Therefore, defendants anticipate that DPH will approve this approach.

Defendants also propose to conduct joint staff training to ensure that staff are trained on the requirements for licensure, and to ensure that cultural issues related to the treatment of mentally ill inmates are addressed. In addition, staff in both Facility C and D will receive the new DMH Therapeutic Strategies and Interventions training (TSI). (*See* Exhibit 5, Training Manual, with bibliography.) TSI was developed by DMH staff as part of the Recovery Model being implemented in the state hospitals and psychiatric programs. TSI focuses on understanding the clinical issues of the patient and de-escalation techniques to utilize during a behavioral episode. Training on Facility C and D will assist in maintaining a positive treatment environment for treatment of mentally ill inmates. This proposal requires modification of the physical plant. Defendants anticipate converting non-traditional areas (i.e., dining halls) to develop treatment space similar to the scope used to build the D5/D-6 group treatment rooms. The D5/D6 scope includes removing tables in the dining room, constructing new group rooms, and installing new fence in the group yard to separate the EOP from the general population. Additionally, the Warden at SVSP agreed to allocate existing office space sufficient to meet the office space needs of SVPP clinical staff. This proposal will be implemented within 12 months of the Court's approval of this plan.

- **Pilot Double Bunk at SVSP TC-1.** This proposal will result in 10 additional ICF-H beds. DMH proposes to double-bunk ICF inmates in one 10-cell wing in SVPP (TC-1) as another option in the treatment continuum within DMH's current array of housing options for SVPP high custody ICF beds. The current continuum of care starts with single cell housing, which is considered to be the most restrictive, and then moves to the four-man dormitory setting, which is considered to be the least restrictive housing environment, prior to a transfer back to CDCR. The option to double-bunk those inmates in SVPP who are not ready for a four-man dorm setting provides an intermediary option in the continuum of care for transition and recovery.

A determination to double bunk is based upon the review and assessment completed by clinicians pursuant to California Code of Regulations, Title 15, section 3269. Upon intake to CDCR, inmates are reviewed to assess their specific case factors and determine appropriate housing. One portion of that review is specific to identifying whether the inmate is appropriate for celled or dormitory housing. Single-cell status may be assigned to an inmate by custodial classification committee reviews. Mental health and medical clinicians may recommend temporary single-cell status based upon clinical diagnoses. These recommendations are reviewed by a classification committee to make the final determination of an inmate's cell assignment designation as single- or double-cell. When the inmate has clearance to double cell, the DMH treatment team can utilize this criterion to place the individual within the SVPP housing options.

This pilot project is proposed to last 9 to 12 months. Defendants will evaluate the success of the pilot project with measurable and achievable criterion, including the total number of patients, the number of patients considered for double bunking, the total number of patients assigned to double bunking, the total number of patients removed from double bunking and the rationale for this removal, and the length of stay in double bunking before moving into a four-man cell. If successful, defendants may expand this proposal to other areas of the SVPP high custody housing, such as TC-2 or units C-5 and C-6. This proposal will be implemented in 120-180 days, following Court approval.

- **Convert DTP to ICF.** DMH proposes to convert the 44 DTP beds at CMF housing unit A-2 to low custody ICF beds. DTP is a program dating back prior to the *Gates v. Deukmejian* transition into *Coleman*. DTP was considered an essential program at that time because the number and type of treatment programs were limited, and the Mental Health Service Delivery System was in its infancy. Since that time, however, levels of care and treatment services have been developed and refined via program guides, and small management and special needs yards were developed. The low custody ICF and the DTP are similar in admission criteria, and both programs are licensed and staffed at the ICF level of care. (*See* Exhibit 6, Admission Criteria.) The referral data and length of stay data collected by DMH suggests that the DTP is an underutilized program. (*See* Exhibit 7, Data.) This proposal, if approved by the Court, will enable defendants to provide ICF level of care to meet present and anticipated ICF needs. In order to implement this proposal, defendants will seek to modify this Court's Order dated July 9, 2004, which states that "Defendants are prohibited from closing the DTP/ICF unit at CMF until the court has approved a plan to meet the needs of class members for DMH inpatient care."

  The plan to implement this proposal will occur in the following manner. Effective July 1, 2009, ICF low custody inmates will be admitted into the empty beds in the current DTP. All remaining inmate-patients in the program will be reassessed within a 90-day period, including a suicide risk assessment, for level of care and safety concerns. Defendants will review the current treatment groups provided in the DTP and determine which level of care (EOP or ICF) should provide the treatment groups before the inmate-patient reviews begin. This proposal will be implemented immediately for new admissions, and in 90 days for the remaining population, following Court approval.

- **25 ASH Acute to ICF.** DMH proposes to convert the 25 ASH Acute beds to low custody ICF beds. This conversion allows DMH to maximize the use of these beds which have a low average daily census. In order to implement this proposal, defendants will seek to modify this Court's Order dated May 23, 2007, which requires that the Department of Mental Health maintain 25 acute care beds at Atascadero State Hospital. This proposal will be implemented immediately, following Court approval.

**Acute**

- **Convert CMF Wing P-1 to Acute**. DMH proposes to convert 32 beds in the P-1 housing unit wing at CMF to acute care beds, to be operated by DMH as part of its VPP.

This proposal would require the Department of Public Health to grant program flexes. Defendants anticipate that it will take approximately seven months to retrofit the physical plant. Once the retrofit is complete and the cells are vacated, it will take approximately 60 days to activate these beds.

- **Convert CMF Wing P-2 to Acute.** DMH proposes to convert 36 ICF-H beds in the P-2 housing unit wing to acute care beds, to better accommodate the demand for acute beds. DMH currently operates the P-2 housing unit. DMH anticipates that a screen retrofit would be needed as a suicide precaution, but this wing could be converted in a short period of time, and the screens could be retrofitted on a phased schedule similar to the current retrofit schedule, which is to take 4 cells at a time off line and replace the screens. This proposal will be implemented, based on a transitional plan to ensure that patients' clinical needs are met, immediately following Court approval.

In summary, defendants' short-term and intermediate-term proposals result in a net bed increase of 679 beds. The net gain of beds at each level of care is shown in the following table:

TABLE 4.  IMPACT OF SHORT-TERM AND INTERMEDIATE-TERM PROPOSALS ON NEED

| LOC | Bed Need 2009 | Actual Bed 2009 | Short & Intermediate-Term Proposals Increase | Bed Total after Implementation of Short & Intermediate-Term Proposals |
|---|---|---|---|---|
| Acute | 218 | 155 | 43[15] | 198 |
| ICF | 252 | 365 | 25[16] | 390 |
| ICF-H | 370 | 306 | 94[17] | 400 |
| MHCB | 340 | 314 | 37 | 351 |
| EOP-GP | 3,858 | 3,141 | 388 | 3,529 |
| EOP-ASU | 622 | 474 | 92 | 566 |
| PSU | 479 | 384 | 0 | 384 |

(*See also* Exhibit 8, Spreadsheet on Impact of Short-Term and Intermediate-Term Proposals.)

/ / /

/ / /

/ / /

/ / /

---

[15]  The 43 beds are calculated as follows:  32 (VPP P1 wing) + 36 (VPP P2 wing) – 25 (ASH APP beds) = 43.

[16]  The 25 beds represent the 25 ASH APP beds converted to low custody ICF beds.  Because the numbers include the CMF 44 DTP beds, converting them from DTP beds to ICF beds does not expand or increase the actual number of ICF beds.

[17]  The 94 beds are calculated as follows:  116 (SVPP C-yard ) + 4 (SVPP D-5/D-6) + 10 (SVPP TC1) – 36 (VPP P2 ICF to acute) = 94.

## LONG-TERM MENTAL HEALTH BED PLANNING

Since the issuance of the March 31, 2009 Order by this Court, CDCR has met with the Special Master and, where appropriate, consulted with the *Plata* receiver to develop concrete proposals to meet the long-range bed needs of the plaintiff class and to fully comply with this Court's previous and current orders. This plan is intended to outline the concrete proposals developed over the last sixty days.

As a matter of reference, and prior to this Order, on February 26, 2008, the *Coleman*, *Plata*, *Perez* and *Armstrong* courts approved a construction agreement for collaborative construction of medical beds and mental health beds. The agreement states, "[g]iven the significant need to coordinate the long-term treatment and care of mentally ill patients who also have serious medical problems, there exist both strong patient care and fiscal incentives to plan, design, and construct health care facilities that will effectuate coordinated medical and mental health treatment." The Receiver assumed "leadership responsibility" for the construction projects described in the agreement. In light of the collaboration required with the Receiver, defendants reconfigured the long-term mental health bed plan approved by the *Coleman* court on October 17, 2007.

In order to effectively meet its overall mission and accomplish its multiple complex priorities, CDCR must implement an integrated strategy that takes into consideration:

- Expanded capacity through implementation of AB 900;
- Construction of the health-related facilities in collaboration with the Receiver;
- Administration's proposed budget and policy reforms;
- Analysis of short and long-term population trends; and
- Three judge panel proceedings.

Long term bed planning begins with currently existing and operational programs, including temporary court-ordered beds.[18] Throughout the long-term plan, the term "current capacity" refers to actual beds as of May 2009.[19] "New planned capacity" and "previously planned capacity" are those projects that are in various stages of planning and are intended to remain permanent. "Returned capacity" refers to currently operational beds that are being returned to alternate uses. "Net capacity" refers to the current capacity, the new planned capacity and the previously planned capacity, less the returned capacity.

The long-term mental health bed plan consists of a combination of currently operating programs, *Coleman* court-ordered projects in varying stages of planning and design, the two projects planned as short term proposals that will be permanent, currently planned projects that are not

---

[18] For purposes of the long-term plan, the term "temporary" refers to projects that are identified in court orders as not permanent.

[19] Apart from the COR 45-bed EOP ASU project and the SQ 17-bed MHCB project, the short -term and intermediate-term proposals described above are not a part of the State's long-term bed plan. Moreover, these projects are not considered current capacity for the purposes of the long-term plan.

court ordered, and new projects, as outlined in this report.  Unlike the short-term and intermediate-term proposals described above, projects identified as long-term proposals are those that involve extensive new construction or renovations, which will require two to five years to complete.

The long-term mental health bed plan assumes all of the following:

- Meet the mental health bed need projections to 2013 using the Spring 2009 population projections.
- Two new Correctional Health Care Facilities (CHCF), one in northern California and one in southern California, are proposed to be built in collaboration with the *Plata* Receiver. The CHCFs will be located near population centers to assist in staff recruitment and retention.
- All *Coleman* court-ordered construction projects will be completed pursuant to the activation plans filed concurrently with this report, and the beds that are created by the court-ordered projects will not be included in the new CHCFs.
- All proposed projects to meet mental health population projections will have adequate treatment and office space and will be located in facilities conducive to recruitment and retention of staff.
- All temporary program beds are ultimately decommissioned (returned).
- All of the short-term and intermediate-term proposals described above, except for the EOP ASU proposal at COR and the SQ MHCB proposal, will be decommissioned.
- No currently operating programs will be decommissioned unless:
  - The space is being converted to another level of mental health care as required by projections, and
  - There is adequate alternative capacity to accommodate future need at that level of care.
- Continued use of currently designated DMH hospital bed capacity.

Table five represents the difference between the existing mental health beds in 2009 (not including CCCMS) and the projected bed need through 2013, as identified in the Navigant Mental Health Bed Need Study, Spring 2009.  Defendants intend to build to the projected need such that enough capacity is created and wait lists for treatment beds are eliminated.
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

TABLE 5.  BED NEED THROUGH 2013

| LOC | Bed Need 2013[20] | Actual Beds 2009[21] | Gap |
|---|---|---|---|
| *Males* | | | |
| Acute | 193 | 155 | 38 |
| ICF | 301 | 365 | (64) |
| ICF-H | 624 | 306 | 318 |
| MHCB | 470 | 314 | 156 |
| EOP-GP | 4,763 | 3,141 | 1,622 |
| EOP-ASU | 675 | 474 | 201 |
| PSU | 546 | 384 | 162 |
| Totals | 7,572 | 5,139 | **2,433** |
| *Females* | | | |
| Acute/ICF | 27 | 30 | (3) |
| MHCB | 18 | 22 | (4) |
| EOP-GP | 199 | 129 | 70 |
| EOP-ASU | 16 | 19 | (3) |
| PSU | 12 | 10 | 2 |
| Totals | 272 | 210 | **62** |

## Men's Population Mental Health Bed Plan

The Spring 2009 population projections to 2013 show an increased need for 2,433 beds across the various levels of care for the male population.  The following discussion describes the various elements that will be combined to meet the projected need.

Two CHCFs are planned to be constructed with the *Plata* Receiver specifically for integrated correctional health care.  One will be located in northern California, the other in southern California.  Both will be constructed near high population centers to facilitate the recruitment and retention of clinical, support and custodial staff.  The two sites will be configured as follows for the mentally ill inmate population:

TABLE 6.  NEW CORRECTIONAL HEALTH CARE FACILITIES

| SITE | EOP | EOP-ASU | MHCB | Acute | ICF-H | Total Beds |
|---|---|---|---|---|---|---|
| Site 1 (south) | 320 | 87 | 63 | 0 | 0 | 470 |
| Site 2 (north) | 256 | 88 | 104 | 18 | 432 | 898 |

---

[20] Mental Health Bed Need Study, Spring 2009.
[21] Based upon number of actual beds.

Additional needed capacity will be met through the previously *Coleman* Court-ordered new construction projects listed in Table 7.  Defendants have, concurrent with this filing, submitted activation schedules for each of these projects.

**TABLE 7. *COLEMAN* COURT ORDERED PROJECTS**

| SITE | PROJECT DESCRIPTION | NEW PLANNED CAPACITY |
|------|---------------------|----------------------|
| CMC | MHCB | 50 MHCB |
| SVSP | New treatment and office space for EOP housing unit conversion | 96 EOP-GP beds |
| SAC | New treatment and office space for existing EOP program | No new capacity |
| CMF | New treatment and office space for existing EOP program (591) plus housing unit conversion | 67 EOP-GP beds |
| LAC | New treatment and office space for existing EOP program (300) plus housing unit conversion | 150 EOP-GP beds |
| SVSP | New bed, treatment and office space for EOP-ASU | 72 EOP-ASU beds |
| CMF | ICF-H beds | 64 ICF-H beds |

Defendants will continually review the construction timelines set forth in the activation schedules to identify opportunities to shorten the timelines for design and construction.

Defendants further propose to utilize existing beds, reallocating them to the mental health population and providing the necessary treatment and office space for each.  New projects proposed to meet the population projection need are as follows:

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

TABLE 8. NEW PROJECTS TO MEET LONG TERM PROJECTIONS

| SITE | PROJECT DESCRIPTION | NEW PLANNED CAPACITY |
|---|---|---|
| SAC[22] | New treatment and office space for expanded PSU program with housing unit conversion | 152 PSU beds |
| COR | New treatment and office space for expanded EOP-ASU program with housing unit conversion | Identified in the short term and intermediate-term proposals as adding 45 EOP-ASU beds |
| Alternate Sites[23] | Renovations for EOP beds, treatment and office space | 733 EOP beds |

The mental health beds that are a part of the Receiver's construction activities in Building 22 at SQ will further serve to meet projected need. The Building 22 project, a combination medical/mental health facility, was previously proposed in the December 2006 and August 2007 Bed Plans. As previously noted, this project was originally designed as a 50-bed CTC, and defendants anticipate activating 17 licensed MHCBs in January 2010. Defendants also anticipate using the remaining beds once staffing is available. In addition, defendants will utilize 12 MHCBs in the proposed Condemned Inmate Complex. This project was identified in the December 2006 Bed Plan and the August 2007 Supplemental Bed Plan. These projects increase mental health capacity as follows:

TABLE 9. PREVIOUSLY PLANNED NON-COURT ORDERED PROJECTS

| SITE | PROJECT DESCRIPTION | PREVIOUSLY PLANNED CAPACITY |
|---|---|---|
| SQ | CTC within the Condemned Inmate Complex | 12 MHCB |
| SQ | Building 22 – Medical Building | 17 MHCB; noted also in short term proposals as currently under construction |

The *Coleman* Court has ordered defendants to establish certain programs as temporary measures. Defendants will request the Court's approval to decommission operating programs, current or otherwise, only if: a) the space is converted to another level of mental health care as required by projections; and b) there is adequate alternative capacity to accommodate future need at that level of care. In light of these considerations, the temporary programs that defendants may request approval from the Court to decommission (return) are as follows:

---

[22] Both the Senate and Assembly Sub-Committee left open the decision on whether to include funding for the construction phase of the project in the 2009-10 budget. However, based on the revised budget process for this year, this issue is proceeding to Conference Committee.

[23] May include DJJ, short-term or intermediate-term programs that have proven effective, appropriate reception center EOP programs, and other CDCR sites yet to be determined.

TABLE 10. TEMPORARY PROGRAMS TO BE DECOMMISSIONED

| SITE | PROGRAM | RETURNED CAPACITY |
|------|---------|-------------------|
| CMC | MHCB (LOU)[24] | 36 MHCB |
| CIM | MHCB (GACH)[25] | 34 MHCB |
| SVSP | ICF-H Beds (D-5 and D-6)[26] | 112 ICF-H beds |
| CMF | MHCB (APP) | 20 MHCB; to return to acute use |
| CMF | ICF-H Beds[27] | 66 ICF-H beds[28] |

The following is a cumulative table of current capacity, new planned capacity, returned capacity and net capacity as compared to bed need projections.

TABLE 11. MEN'S NET CAPACITY

| LOC | Current Capacity | New Capacity | Returned Capacity | Net Capacity | Population Projections to 2013 | Over/ (Under) |
|-----|------------------|--------------|-------------------|--------------|-------------------------------|---------------|
| EOP | 3,141 | 1,622 | 0 | 4,763 | 4,763 | 0 |
| ASU | 474 | 292 | -45[29] | 721 | 675 | 46 |
| PSU[30] | 384 | 152 | 0 | 536 | 546 | (10) |
| MHCB | 314 | 246 | -90 | 470 | 470 | 0 |
| Acute | 155 | 38 | 0 | 193 | 193 | 0 |
| ICF | 365 | | 0 | 365 | 301 | 64 |
| ICF-H | 306 | 496 | -178 | 624 | 624 | 0 |
| Total: | 5,139 | 2,846 | -313 | 7,672 | 7,572 | 100 |

(*See also* Exhibit 9, Spreadsheet on Long-Term Bed Planning.)

## Women's Population Mental Health Bed Plan

The Spring 2009 population projections to 2013 show an increased need for 70 EOP-GP beds for the female population. CDCR proposes meeting that need in the following ways:

One housing unit with treatment and office space will be constructed for the women's EOP-GP need. It will be located at the CHCF at Site 1.

---

[24] Court Order filed 5/2/06, Docket No. #1800.

[25] Court Order filed 2/17/09, Docket No. #3516.

[26] Court Order(s) filed 5/2/06, Docket No. #1800; filed 10/20/06, Docket No. #1998.

[27] Court Order(s) 5/2/06, Docket No. #1800; filed 10/20/06, Docket No. #1998.

[28] Upon the Court's approval of defendants' short-term and intermediate-term proposals, the 66 ICF-H beds will be converted to acute beds.

[29] Once the SVSP 72-bed EOP ASU is built, defendants will transfer the existing 45 EOP ASU beds to the new facility.

[30] In the new facilities, the EOP-ASU and PSU capacity is combined. In the chart, the noted "(under)" in PSU is offset by the "over" in ASU.

TABLE 12. NEW WOMEN'S EOP HOUSING AND TREATMENT

| SITE | PROJECT DESCRIPTION | NEW PLANNED CAPACITY |
|------|---------------------|----------------------|
| CHCF (Site 1) | Housing, treatment and office space for new EOP capacity | 70 EOP-GP beds |

The following *Coleman* court-ordered projects will continue as scheduled and as submitted action plans indicate:

TABLE 13. CONTINUING *COLEMAN* COURT ORDERED PROJECTS

| SITE | PROJECT DESCRIPTION | NEW PLANNED CAPACITY |
|------|---------------------|----------------------|
| CIW | ICF and Acute | 45 ICF/Acute beds |
| CIW | PSU | 20 PSU beds[31] |

The temporary programs that defendants may request approval from the Court to decommission (return) are as follows:

TABLE 14. PROGRAMS TO BE DECOMMISSIONED

| SITE | PROGRAM | RETURNED CAPACITY |
|------|---------|-------------------|
| CIW | PSU | 10 PSU beds |
| Patton State Hospital | ICF/Acute beds | 30 ICF/Acute beds |

The following is a cumulative table of current capacity, new planned capacity, returned capacity and net capacity as compared to bed need projections.

TABLE 15. WOMEN'S NET CAPACITY

| LOC | Current Capacity | New Capacity | Returned Capacity | Net Capacity | Population Projections to 2013 | Over/ (Under) |
|-----|------------------|--------------|-------------------|--------------|-------------------------------|---------------|
| EOP | 129 | 70 | 0 | 199 | **199** | **0** |
| ASU | 19 | 0 | 0 | 19 | **16** | **3** |
| PSU | 10 | 20 | -10 | 20 | **12** | **8** |
| MHCB | 22 | 0 | 0 | 22 | **18** | **4** |
| Acute/ICF | 30 | 45 | -30 | 45 | **27** | **18** |
| Total: | 210 | 135 | -40 | 305 | **272** | **33** |

(*See also* Exhibit 9, Spreadsheet on Long-Term Bed Planning.)

---

[31]  The Senate Sub-Committee approved increased construction funding for this project and the Assembly Sub-Committee left the matter open.  Therefore, this issue is proceeding to Conference Committee for a final determination of whether to increase the amount appropriated for construction of this project from $5,729,000 to $6,433,000.

**Long Term Funding**

The long-term construction projects will be funded through a combination of General Fund Budget Act appropriations, AB 900 appropriations, and the California Infrastructure and Economic Development Bank (I-Bank). Each action plan filed with the court details the specific funding source for that project. Defendants believe that the combination of these funding mechanisms will provide the necessary resources for defendants to build the needed beds to serve CDCR's mentally ill inmate population.

The proposed CHCFs, which will be designed and built collaboratively with the Receiver's Office, are proposed to be funded through the I-Bank. I-Bank operates pursuant to the Bergeson-Peace Infrastructure and Economic Development Bank Act contained in the California Government Code sections 63000 et seq. I-Bank offers financing for capital improvement projects for qualified nonprofit corporations. Defendants intend to work in conjunction with the Receiver's Office to obtain funding via bonds authorized from I-Bank for the Receiver's 501(c)(3) corporation, the CPR, to build two CHCFs. The I-Bank's "501(c)(3) revenue bonds" are obligations of the I-Bank, but are repayable from revenues the I-Bank receives from the borrowing nonprofit corporation.

Financing of the CHCFs through bonds issued by the I-Bank to private investors will require that CDCR and the Receiver seek and obtain appropriate court orders from the Court in *Plata v. Schwarzenegger* (No. C01-1351 TEH) to establish a sufficiently secure stream of revenues to repay the investors. Notably, as a result of State Constitutional prohibitions and any applicable federal tax law, these bonds cannot be secured by a direct pledge of State revenues. Instead, the financing would be repaid by payments from CDCR to CPR for the use and occupancy of the CHCFs.

The first step in the bond issuance process will be for CPR to apply to the I-Bank for funding for the proposed CHCFs. Next, the I-Bank's Board will publicly consider whether to approve the proposed project. Following an approval of the proposed project, the I-Bank and the financing participants, including CPR, will work with investment banks to bring the bonds to potential purchasers. The federal securities laws pertaining to this marketing and sale process requires the financing participants to disclose the proposed uses of those funds, and the source of the repayment of the borrowing. The investment banks, in compliance with their regulatory obligations, will require the provision of opinions of counsel regarding the validity of the I-Bank's and the CPR's repayment obligations and the validity of the ultimate source of the repayment, the CDCR obligation to the CPR.

# Exhibit #1

# Staffed Capacity by Institution and Selected Mental Health Program

## Staffed Capacity* by Institution and Selected Mental Health Program

| MALES | | EOP | EOP ASU | PSU | MH OHU | MHCB | ICF | APP | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | LEVEL OF CARE | | | | |
| State Hospitals | ASH | | | | | | 231 | 25 | 256 |
| | CSH | | | | | | 50 | | 50 |
| CDCR Institutions | ASP | | | | | | | | |
| | CAL | | | | | | | | |
| | CCC | | | | | | | | |
| | CCI | | | | | | | | |
| | CEN | | | | | | | | |
| | CIM | | | | | 34 | | | 34 |
| | CMC | 580 | 54 | | | 36 | | | 670 |
| | CMF* | 533 | 58 | | | 70 | 150 | 130 | 941 |
| | COR | 150 | 54 | | | 23 | | | 227 |
| | CRC | | | | | | | | |
| | CTF | | | | | | | | |
| | CVSP | | | | | | | | |
| | DVI | | | | | | | | |
| | FOL | | | | | | | | |
| | HDSP | | | | | 10 | | | 10 |
| | ISP | | | | | | | | |
| | KVSP | 96 | | | | 12 | | | 108 |
| | LAC | 300 | 54 | | | 12 | | | 366 |
| | MCSP | 510 | 36 | | 6 | 8 | | | 560 |
| | NKSP | | | | | 10 | | | 10 |
| | PBSP | 66 | | 128 | | 10 | | | 204 |
| | PVSP | | | | | 6 | | | 6 |
| | RJD | 330 | 63 | | | 14 | | | 407 |
| | SAC | 384 | 74 | 256 | 20 | 24 | | | 758 |
| | SATF | | | | | 20 | | | 20 |
| | SCC | | | | | | | | |
| | SOL | | | | | 9 | | | 9 |
| | SQ | | 36 | | | | | | 36 |
| | SVSP | 192 | 45 | | | 10 | 240 | | 487 |
| | WSP | | | | | 6 | | | 6 |
| | Sub-TOTAL | 3,141 | 474 | 384 | 26 | 314 | 671 | 155 | 5,165 |
| FEMALES | | | | | | | | | |
| State Hospitals | PSH | | | | | | 30 | | 30 |
| CDCR Institutions | CCWF | 54 | | | | 12 | | | 66 |
| | CIW | 75 | 10 | 10 | | 10 | | | 105 |
| | VSPW | | 9 | | | | | | 9 |
| | Sub-TOTAL | 129 | 19 | 10 | 0 | 22 | 30 | 0 | 210 |
| | TOTAL | 3,270 | 493 | 394 | 26 | 336 | 701 | 155 | 5,375 |

*CMF-ICF includes 66 high custody and 84 low custody beds.

Source:R1 for EOP, EOP ASU, and PSU; MHCB Census for MHCB; MHSDS MIS Summary Report for ICF and APP.

**State Hospitals**

ASH - Atascadero State Hospital

CSH - Coalinga State Hospital

PSH - Patton State Hospital

**Levels of Care**

EOP - Enhanced Outpatient Unit

ASU - Administrative Segregation Unit

PSU - Psychiatric Services Unit

MH OHU - Mental Health Outpatient Housing Unit

MHCB - Mental Health Crisis Bed

ICF - Intermediate Care Facility

APP - Acute Psychiatric Program

# Exhibit #2

# Advanced Training
# for Correctional Staff Working in Mental
# Health Programs in the Prison Setting:
# Building a High Caliber
# Interdisciplinary Treatment Team

MENTAL HEALTH INTERDISCIPLINARY TEAM QUESTIONNAIRE

In a 2008 court order, the judge in the *Coleman* case asserted that specialized training is needed to "foster an environment that will facilitate the provision of mental health treatment, and promote a therapeutic milieu in SVSP." The following questionnaire will be given to a sample of custody and mental health staff, in order to guide advanced training for custody and mental health staff working in programs that provide Enhanced Outpatient or higher levels of mental health care. This survey is anonymous. Each staff member should fill out one survey.

Date Completed: _____

Circle One:        Medical Staff              Mental Health Staff              Custody Staff

Classification_____

Indicate your regular work hours: _____

Please fill out the following questionnaire using the scale provided. Use zero (0) when you completely disagree with the statement and ten (10) when you completely agree with the statement. Circle your answer clearly.


## DO NOT PUT YOUR NAME ON THIS QUESTIONNAIRE


1) Mental Health and Custody Staff at SVSP generally work well together

   Completely Disagree              Neutral              Completely Agree
                        0   1   2   3   4   5   6   7   8   9   10

2) All staff members should be aware of the specific crimes that each inmate has committed.

   Completely Disagree              Neutral              Completely Agree
                        0   1   2   3   4   5   6   7   8   9   10

3) The prison environment interferes with providing Mental Health treatment.

   Completely Disagree              Neutral              Completely Agree
                        0   1   2   3   4   5   6   7   8   9   10

4)  Inmates have too many privileges.



5)  Too many inmates in the EOP/ICF level of care exaggerate or fake symptoms to gain access to, or stay in, the program.



6)  Mental Health treatment reduces violence in prison.



7)  Inmates should be called "patients" by Medical and Mental Health Staff.



8)  Mental Health treatment teams can help inmates change problematic behavior.

9)  Mental Health staff are over-familiar with inmates.



1/5/2009

10) More combined meetings and training that include both Custody and Mental   Health staff would reduce conflict in the work environment.



Completely Disagree          Neutral          Completely Agree

0   1   2   3   4   5   6   7   8   9   10

11) There is conflict between custody and mental health staff in some units that creates a difficult work environment

Completely Disagree          Neutral          Completely Agree

0   1   2   3   4   5   6   7   8   9   10

12) The presence of mental health clinicians in a prison setting, compromises safety and security.

Completely Disagree          Neutral          Completely Agree

0   1   2   3   4   5   6   7   8   9   10

13) Most inmates in the mental health program really need treatment.

Completely Disagree          Neutral          Completely Agree

0   1   2   3   4   5   6   7   8   9   10

14) Mental Health staff treat Custody staff with respect.



Completely Disagree          Neutral          Completely Agree

0   1   2   3   4   5   6   7   8   9   10

15) Custody staff treat mental health staff with respect.

Completely Disagree          Neutral          Completely Agree

0   1   2   3   4   5   6   7   8   9   10

1/5/2009

16)  Mental Health staff believe inmates are mistreated by Custody.

Completely Disagree              Neutral              Completely Agree

0    1    2    3    4    5    6    7    8    9    10

17)  The state should focus on the mental health of staff as much as the mental health
of inmates.

Completely Disagree              Neutral              Completely Agree

0    1    2    3    4    5    6    7    8    9    10

18)  Mental Health, Medical, and Custody should all wear similar uniforms to create
unity.

Completely Disagree              Neutral              Completely Agree

0    1    2    3    4    5    6    7    8    9    10

19)  Custody staff have a bond with each other that they do not share with
non-custody staff.

Completely Disagree              Neutral              Completely Agree

0    1    2    3    4    5    6    7    8    9    10

20)  Working in prison is a thankless job.



Completely Disagree              Neutral              Completely Agree

0    1    2    3    4    5    6    7    8    9    10

21)  Working in prison is a rewarding job.

Completely Disagree              Neutral              Completely Agree

0    1    2    3    4    5    6    7    8    9    10

1/5/2009

Please write below any other specific survey questions you think would be helpful to collect information about the relationship between custody and mental health staff in the prison setting.

ASSOCIATE DBT TRAINING FOR CORRECTIONAL STAFF

WORKING IN MENTAL HEALTH PROGRAMS IN THE PRISON SETTING
BUILDING A HIGH CALIBER INTERDISCIPLINARY TREATMENT TEAM

I. **Reasons for this Training (5 minutes)**
  A. Coleman court expert perception that there is discord between custody and mental health staff at SVSP.
  B. Ongoing communication and joint training will foster an environment that will facilitate the provision of mental health treatment and improve safety and security.
  C. Correctional officers working in mental health settings can benefit from advanced training that addresses how to recognize and react to behaviors related to mental illness.
  D. The relationships and interactions that typically occur between mental health clinicians and their patients are different than those that occur between custody staff and the inmate-patient population.  This training will provide a chance to discuss any questions or concerns about different roles as part of the correctional and treatment team.

II. **Brief History of Mental Health in Corrections (20 minutes)**
  A. *Gates* court case and consolidated mental health care – Why mental health services are required at all institutions.
  B. Changes over time to the organizational structure at the institutions and at headquarters
  C. Role of class action cases in creating the Mental Health Services Delivery System and standards for care in corrections.
  D. Custody interest in mental health treatment to lower violence rates
  E. Provision of licensed Mental Health Services for CDCR
      1. Acute Psychiatric Program – Vacaville (APP)
      2. Intermediate Care Facility – Salinas and Vacaville (ICF)

III. **Major Class Action Law Suits - Mental Health Care in the Prison Setting**
  A. *Madrid/Coleman* court cases **(15 minutes)**
      1. Mental health treatment and reducing injuries to staff and inmates
      2. Role of Mental Health Clinicians prior to Use of Force
      3. Rules Violation Reports and Mental Health Assessments – Why the clinical assessment of mental illness has an impact on the hearing officer's decision about penalties for rules violations.  Does mental illness explain or excuse dangerous, destructive, or disruptive behavior?

  B. Psychological Impact of working in Corrections **(30 minutes)**
      1. Emotional Survival (Video Clips) – The need to maintain control for safety and security reasons, and reactions to things that are not within the scope of control of staff at work, such as new mental health treatment requirements and court orders (like for this training).
      2. Insert data from survey and discuss.  Are there issues that staff have indicated in the survey, that need to be resolved.
      3. Impact of working in a prison on staff and family.
      4. Zimbardo Study – Impact on treatment of incarcerated individuals

  C. The Interdisciplinary Treatment Team **(10 minutes)**

2. Assessment when an inmate is suspected of exaggerating mental illness.
3. Is everyone contributing to the IDTT process? How are differences of opinion resolved?
4. Present data from the survey and concepts of risk management
5. Enhanced Outpatient Program - Segregated housing and secondary gain

**IV. Governing Authorities – Law and Regulation about Mental Health Care (10 minutes)**
   A. Title 15/ Departmental Operations Manual
   B. Business and Professions Code
   C. Welfare and Institutions Code
   D. Ethics Code
   E. Medical Board, Board of Psychology, Board of Behavioral Sciences
   F. Community Standards of Care
   G. Medical Staff Bylaws

**V. Mental Health and the Therapeutic Alliance (15 minutes)**
   A. What is it?
   B. How does it work?
   C. What are boundaries?
      1. Appropriate interactions between clinicians and inmate-patients.
      2. What is over-familiarity and what to do when you suspect that a clinician is engaging in over-familiarity with an inmate-patient.
      3. Training of mental health new employees.

**VI. Confidentiality (15 minutes)**
   A. Legal and Ethical mandates.
   B. Why is it necessary?
   C. What information is confidential, and what must be disclosed?

**VII. Teamwork to meet CDCR Mission (30 minutes)**
   A. Creating a therapeutic environment – How correctional staff can help.
   B. De-escalating techniques. Recognizing and reacting to behaviors related to mental illness.
   C. Fact: A small number of inmate-patients take up a lot of the time.
   D. Clinicians, Custody, and staff splitting – Coordinating our response
   E. Communication across shifts – How are we doing?

# ADVANCED TRAINING FOR CORRECTIONAL STAFF

## WORKING IN MENTAL HEALTH IN THE PRISON SETTING—BUILDING A HIGH CALIBER INTERDISCIPLINARY TREATMENT TEAM



# REASONS FOR THIS TRAINING

- Coleman court expert perception – discord between custody and mental health staff at Salinas Valley State Prison.



# Reasons for this Training

- Ongoing communication and joint training will foster an environment that will facilitate the provision of mental health treatment and improve safety and security.



# Reasons for this Training

- Correctional Officers working in mental health settings can benefit from advanced training that addresses how to recognize and react to behaviors related to mental illness.

4

# Reasons for this Training



- The relationships and interactions that typically occur between mental health clinicians and their patients are different than those that occur between custody staff and the inmate-patient population. This training will provide a chance to discuss any questions or concerns about different roles as part of the correctional and treatment team.

# Brief History of Mental Health in Corrections



- *Gates* court case and consolidated mental health care – Why mental health services are required at all institutions.

- Changes over time to the organizational structure at the institutions and at headquarters.

6

# Brief History of Mental Health in Corrections



- Role of class action cases in creating the Mental Health Services Delivery System and standards for care in corrections.

- Custody interest in mental health treatment to lower violence rates.

# Brief History of Mental Health in Corrections



- **Provision of licensed Mental Health Services for CDCR**
  - Acute Psychiatric Program – Vacavile (APP)
  - Intermediate Care facility – Salinas and Vacaville (ICF)



# Major Class Action Law Suits – Mental Health Care in the Prison Setting

- MADRID/COLEMAN court cases
  - Mental health treatment and reducing injuries to staff and inmates
  - Role of Mental Health Clinicians prior to Use of Force
  - RVRs and Mental Health Assessments – Why the clinical assessment of mental illness has an impact on the hearing officer's decision about penalties for rules violations. Does mental illness explain or excuse dangerous, destructive, or disruptive behavior?

9

# Major Class Action Law Suits –
## Mental Health Care in the Prison Setting



- **PSYCHOLOGICAL IMPACT OF WORKING IN CORRECTIONS**
  - Emotional Survival – The need to maintain control for safety and security reasons, and reactions to things that are not within the scope of control of staff at work, such as new mental health treatment requirements and court orders (like for this training).

# Major Class Action Law Suits –
## Mental Health Care in the Prison Setting



- PSYCHOLOGICAL IMPACT OF WORKING IN CORRECTIONS
  - Survey data here



# Major Class Action Law Suits –
## Mental Health Care in the Prison Setting

- **PSYCHOLOGICAL IMPACT OF WORKING IN CORRECTIONS**
  - Impact of working in a prison on staff and family
  - Zimbardo Study – Impact on treatment of incarcerated individuals

12

# Major Class Action Law Suits –
## Mental Health Care in the Prison Setting



- THE INTERDISCIPLINARY TREATMENT TEAM
  - Decisions about which inmates stay in mental health programs.
  - Assessment when an inmate is suspected of exaggerating mental illness.

13



# Major Class Action Law Suits –
## Mental Health Care in the Prison Setting

- THE INTERDISCIPLINARY TREATMENT TEAM
  - Is everyone contributing to the Interdisciplinary Treatment Team process?
  - Survey data—risk management

14



# Major Class Action Law Suits – Mental Health Care in the Prison Setting

- ## THE INTERDISCIPLINARY TREATMENT TEAM

  - Enhanced Outpatient Program – Segregated housing and secondary gain

15

# Governing Authorities –
## Law and Regulation about Mental Health Care



- Title 15/DOM
- Business and Professions Code
- Welfare and Institutions Code
- Ethics Code



# Governing Authorities –
## Law and Regulation about Mental Health Care

- **Medical Board, Board of Psychology, Board of Behavioral Sciences**
- **Community Standards of Care**
- **Medical Staff Bylaws**

# Mental Health and the Therapeutic Alliance



- What is it?
- How does it work?

# Mental Health and the Therapeutic Alliance



- What are the boundaries?
  - Appropriate interactions between clinicians and inmate-patients.
  - What is over-familiarity and what to do when you suspect that a clinician is engaging in over-familiarity with an inmate-patient.
  - Training of mental health new employees.

# Confidentiality



- Legal and Ethical mandates.
- Why is it necessary?
- What information is confidential, and what must be disclosed?

# Teamwork to meet CDCR Mission



- Creating a therapeutic environment – How correctional staff can help.
- De-escalating techniques.  Recognizing and reacting to behaviors related to mental illness.

# Teamwork to meet CDCR Mission



- FACT:  A small number of inmate-patients take up a lot of the time.
- Clinicians, Custody, and staff splitting—Coordinating our response.
- Communication across shifts—How are we doing?

**Exhibit #3**

**10-6-06 Feasibility Study**

1 | BILL LOCKYER
Attorney General of the State of California
2 | JAMES M. HUMES
Chief Assistant Attorney General
3 | FRANCES T. GRUNDER
Senior Assistant Attorney General
4 | ROCHELLE C. EAST
Supervising Deputy Attorney General
5 | LISA A. TILLMAN, State Bar No. 126424
Deputy Attorney General
6 |   1300 I Street, Suite 125
P.O. Box 944255
7 |   Sacramento, CA 94244-2550
Telephone: (916) 327-7872
8 |   Fax: (916) 324-5205

9 | Attorneys for Defendants
CF1997CS0003

10

11

12                    IN THE UNITED STATES DISTRICT COURT

13                 FOR THE EASTERN DISTRICT OF CALIFORNIA

14

15 | **RALPH COLEMAN, et al.,**                    CASE NO. CIV S-90-0520 LKK
                                                  JFM P
16 |                                Plaintiffs,
                                                  **DEFENDANTS' SUBMISSION**
17 |         **v.**                                 **OF REPORT ON**
                                                  **FEASIBILITY OF CREATING**
18 | **ARNOLD SCHWARZENEGGER, et al.,**             **INTERMEDIATE CARE**
                                                  **BEDS AT COALINGA STATE**
19 |                                Defendants.    **HOSPITAL FOR LEVEL IV,**
                                                  **HIGH CUSTODY CDCR**
20                                                **INMATES**

21

22          In compliance with this Court's order of May 2, 2006, Defendants hereby file a report

23  on the feasibility and cost of creating thirty intermediate inpatient beds at Coalinga State

24  Hospital beds for Level IV, high-custody inmates of the California Department of Corrections

25  and Rehabilitation (CDCR). Attached as Exhibit A is a copy of the report.

26          Defendants state their final long range plan for the provision of acute and intermediate

27  inpatient beds and the provision of enhanced outpatient program (EOP) beds for all seriously

28  mentally ill male and female CDCR inmates clinically determined to be in need of those levels

DEF. SUBMISSION COALINGA REPORT

1

1 | of care, due on December 19, 2006, will discuss the feasibility of using Coalinga State Hospital

2 | beds.

3 |          Defendants respectfully request that any decision concerning this feasibility study be

4 | made after review of the submitted revised long-term plan.

5 |          Dated: November 1, 2006

6 |                              Respectfully submitted,

7 |                              BILL LOCKYER
                                Attorney General of the State of California

8 |                              JAMES M. HUMES
                                Chief Assistant Attorney General

9 |
                                FRANCES T. GRUNDER
10 |                             Senior Assistant Attorney General

                                ROCHELLE C. EAST
11 |                            Supervising Deputy Attorney General

12 |

13 |                             /s/ *Lisa A. Tillman*

14 |                             LISA A. TILLMAN
                                Deputy Attorney General

15 |                             Attorneys for Defendants

16 |                                          .

17 |
30182765.wpd
18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

DEF. SUBMISSION COALINGA REPORT

RALPH COLEMAN, et al., v. ARNOLD SCHWARZENEGGER, et al.,

CASE NO. CIV S-90-0520 LKK JFM P

EXHIBIT A

DEFENDANTS' FEASIBILITY STUDY

# COMPARATIVE FEASIBILITY STUDY

## Coalinga State Hospital Intermediate Care Facility

*Prepared by Kitchell*
*For The*

### California Department of Corrections and Rehabilitation
Sacramento, CA



**October 6, 2006 - Final**
**Job No. 3270M8**




**1. EXECUTIVE SUMMARY** .................................................................................................. 3

**2. ANALYSIS** .......................................................................................................................... 4

**3. COMPARATIVE COST SUMMARY** .............................................................................. 8
   a) Conversion of Existing
   b) New Construction

**4. COMPARATIVE SCHEDULE** ...................................................................................... 14
   a) Narrative
   b) Conversion of Existing
   c) New Construction

**6. PRELIMINARY FLOOR PLANS** .................................................................................. 22

**7. AERIAL PHOTOGRAPH** ............................................................................................. 24

**8. APPENDICES** ................................................................................................................ 25



**View of Typical Dining Room and Unit Entrance**



**View of Housing Wings**


## 1. EXECUTIVE SUMMARY

### Introduction

This study was undertaken to assist the California Department of Corrections and Rehabilitation in determining a direction for compliance with a court order to provide additional non-acute intermediate mental health treatment beds to Level IV inmates.

The project target was thirty beds. The area of the hospital designated for this study is approximately 16,000 square feet, with housing wings which can accommodate twenty-seven beds. This study uses 27 beds as its basis. Using the program for the Salinas Valley State Prison CTC 64 Bed addition, the proposed facility requires 22,500 gross square feet. The difference of 6,500 square feet must be found outside the original designated area.

We have studied two options for providing this treatment facility:

Option A: Convert the designated area of the lower floor of one wing of the existing hospital, approximately 16,000 square feet, to the new requirements, with an additional 6,500 square feet to be accommodated separately.

Option B: Construct a stand-alone facility of 22,500 square feet on the grounds of the hospital.

Relative advantages and disadvantages of the two approaches are detailed in Appendix A.

### Findings

The earliest that Coalinga State Hospital - Level IV Intermediate Care Facility could be operational is December, 2010, in the case of new construction, or June, 2011 in the case of the conversion.

Option A, conversion, will cost approximately $29.2 million. Option B, new construction, will cost $27.7 million. Guard towers with attendant perimeter work would cost an additional $2.1 million. There is a savings of approximately $1.5 million in the case of new construction.





## 2. ANALYSIS

### Introduction

This study was undertaken to assist the California Department of Corrections and Rehabilitation in determining a direction to comply with a court order to provide additional non-acute intermediate level mental health treatment beds to Level IV inmates. The Court Master directed the Department to evaluate Coalinga State Hospital for this study.

The housing wings identified for the project accommodate twenty-seven beds; thus, this study uses 27 beds as its basis. The program requires approximately 22,500 square feet. The designated area has 16,000 square feet. An additional 6,500 square feet will have to be allocated for the facility.

Two approaches were considered in this study:

| | |
|---|---|
| Option A: | Convert a portion of the existing hospital to the new requirements. |
| Option B: | Construct a new stand-alone facility on the grounds of the hospital. |

A previous study, performed by the California Department of General Services, dated April 5, 2006, titled Coalinga State Hospital Coleman Bed Conversion Study, examined conversion issues at length. The target area of the previous study was double, with double the beds. This study expands on the list of issues identified in the previous report. The differences in the findings are outlined in a matrix found in Appendix B.

### Approach

This study will:

- Discuss construction challenges for the alteration of the existing wing to provide the required Level IV security.
- Discuss functional challenges of the conversion option.
- Provide cost estimates and timelines for both options.
- Propose layouts to accommodate the program.
- Compare program effectiveness, costs and timelines for the two approaches.
- Compare the assumptions and findings of this study with the previous study and with the Salinas Valley State Prison Inpatient Mental Health Treatment Facility 64 Bed Addition.
- Compare relative advantages and disadvantages of the two approaches.




## Discussion

The CDCR inmates to be treated in the new facility have a documented history of violence and volatility in a prison setting. For their safety, and for the safety of the staff, serving them requires CDCR Level IV, maximum security construction.

The following requirements, developed by the Department of Corrections and Rehabilitation in conjunction with the Department of Mental Health, apply to the proposed facility:

- There will be no contact between CDCR inmates and the DMH hospital population.
- CDCR inmates will be admitted directly to the Level IV housing unit from the transferring facility.
- The facility will be self-contained. All services and treatment will be provided within the unit.
- Movement within the facility will be strictly controlled by the custody staff with the inmates in restraints. Movement will be limited to the housing unit/treatment core and designated exercise yards.
- Housing will be in maximum-security single cells, with water closets and lavatories.
- Perimeter security will continue to be handled operationally with roving patrols.
- A price for six guard towers is included in the cost analysis, for further consideration.

## Construction Challenges of the Conversion Option

Coalinga State Hospital is a licensed Acute Psychiatric Hospital which treats a non-violent population. The patients are allowed a range of free movement throughout the facility; they are not incarcerated. The building most closely resembles CDCR Level I construction

Extensive physical reconstruction will be necessary to bring the building up to Level IV:

- Virtually complete demolition within the shell, without disturbing the existing structure.
- Construction of a new structure inside the shell, without disturbing it. Secure perimeter walls will be built within the existing walls. A secure "lid" will be placed over housing and core treatment and support areas. Footings to support the new loads will be required.
- Trenching and replacement of a large portion of the concrete slab with extensive new plumbing lines in the slab to provide for lavatories and toilets in the cells.
- Seismic analysis and upgrade to comply with current seismic codes.
- Substantial demolition and reconfiguration of plumbing, HVAC, electrical and security systems.



**Coalinga State Hospital – Level IV Intermediate Care Facility**
Comparative Feasibility Study

## Functional Challenges of the Conversion Option

In a situation where the arrangement of spaces is dictated by an existing building configuration, the program of spaces will be compromised. The designated area to be converted has approximately 6,550 square feet in the housing wings (not including stairwells). The following compromises will be necessary:

- Only twenty-seven beds can be accommodated in the existing housing wings, and the shapes of the resulting cells are irregular and inefficient. Two different cell configurations will be created. CDCR staff have identified this as an issue for security.
- Sightlines and oversight functions may be compromised.
- Sizes and arrangements of spaces will be forced, resulting in awkward and possibly dangerous situations in moving inmates to daily functions, such as therapy.
- Additional space will have to be provided to accommodate the entire program.
- Space efficiency will be compromised, with a high proportion of support square footage per inmate.
- Exterior functions, especially the entrances, will be awkward.
- Fifty recently constructed state-of-the-art beds will be eliminated from the intended use.
- The entire hospital campus will require upgraded perimeter security, possibly including six new guardtowers.

## The Program

Using the program for the recently approved Salinas Valley State Prison Inpatient Mental Health Treatment Facility 64 Bed Addition as a guide, a total of 22,500 square feet is required to house the facility. The area designated for the conversion is 16,000 square feet. The additional square footage could come from adjacent space in Unit #8, or offices could possibly be placed on the second floors of the housing wings. The preliminary floor plan shows the approximate area needed if provided on a single floor.

## Findings

Although this study considers one-half the number of beds as the previous report, the same support spaces have to be provided. A conversion of existing hospital space will require that a significantly larger area be given over to the new use. Essential functions for the remaining DMH beds in the unit will be displaced.

The logistical challenges of constructing a building-within-a-building could be avoided by undertaking new construction, saving approximately 4.8% of the construction cost. The new building could be built in five months less than the conversion. Housing, treatment, support and administrative functions could be accommodated in one structure without displacing other functions. Construction noise and dust could be kept away from



occupied parts of the hospital. Unconstrained by the existing configuration, a more efficient and effective building could be put in place.

## Conclusion

We conclude that a new, stand-alone, facility would meet the program requirements better, have less impact on the existing hospital, and could be built more quickly and at less cost than a conversion of the existing space.



## PROJECT COST SUMMARY-CONVERSION
### FY 06/07

| | | | |
|---|---|---|---|
| PROJECT: | Level IV Intermediate Care Facility -CONVERSION | BUDGET ESTIMATE: | 3270M8 |
| LOCATION: | Coalinga State Hospital | EST./ PROJ. CCCI: | 4618/4618 |
| CLIENT | California Department of Corrections & Rehabilitation | DATE ESTIMATED: | 10/2/2006 |
| DESIGN BY: | Kitchell CEM | DATE UPDATED: | 10/5/2006 |
| PROJECT MGR: | Jon Witherspoon | ABMS NO: | N/A |
| PLAN DATE: | N/A | PREPARED BY: | Kitchell CEM |
| | | DOF PROJ. I.D. NO.: | N/A |

### DESCRIPTION

Conversion of 22,474 square feet of an existing lower floor portion of a two-story, minimum security hopsital
to accommodate intermediate non-acute mental health treatment for Level IV inmates, including housing, treatment,
support and administrative services, with attendant exercise yards and six guardtowers.

### ESTIMATE SUMMARY

**DIRECT COST**

| | | |
|---|---|---|
| 1.) | Conversion of existing building to Level IV Intermediate Care Facility ( 22,474 GSF) including exterior functional use area of 1,370 sf. | $13,149,000 |
| 2.) | Sitework | $1,933,000 |
| 3.) | Site Security, including 6 each Guard Towers and fence modifications | $2,090,000 |

| | | |
|---|---|---|
| **ESTIMATED TOTAL CURRENT COSTS:** | | $17,172,000 |
| Adjust CCCI from 4618 to 4618 | $0 | |
| **ESTIMATED TOTAL CURRENT COSTS ON OCTOBER 2006:** | | $17,172,000 |
| Escalation to Start of Construction 29 Months @ 0.42%/Mo.: | $2,091,550 | |
| Escalation to Mid Point 13 Months @ 0.42%/Mo.: | $937,591 | |
| **ESTIMATED TOTAL CONTRACTS:** | | $20,201,141 |
| Contingency At: 7% | $1,414,080 | |
| **ESTIMATED TOTAL CONSTRUCTION COST** | | $21,615,221 |

**Conversion**

## SUMMARY OF COSTS BY PHASE - CONVERSION
### FY 06/07

PROJECT: Level IV Intermediate Care Facility -CONVERSION  
LOCATION: Coalinga State Hospital  
CLIENT: California Department of Corrections & Rehabilitation  

BUDGET ESTIMATE: 3270M8  
DATE ESTIMATED: 10/2/2006  
DATE UPDATED: 10/5/2006  
PREPARED BY: Kitchell CEM  

| | | |
|---|---|---|
| CONSTRUCTION DURATION: | | 20 Months |
| ESTIMATED CONTRACT COST: | $20,201,141 | $20,201,141 |
| CONSTRUCTION CONTINGENCY: | $1,414,080 | $1,414,080 |
| TOTAL | $21,615,221 | $21,615,221 |

| CATEGORY | STUDY 00 | PRELIMINARY PLANS 01 | WORKING DRAWINGS 02 | CONSTRUCTION 03 | TOTAL |
|---|---|---|---|---|---|
| **ARCHITECTURAL AND ENGINEERING SERVICES** | | | | | |
| A&E Design | | $1,373,678 | $1,373,678 | $686,839 | $3,434,194 |
| Construction Inspection | | | | $1,434,096 | $1,434,096 |
| Construction Inspection Travel | | | | $358,524 | $358,524 |
| Coordination & Contract Management | | | | | $0 |
| Advertising, Printing and Mailing | | | $50,000 | | $50,000 |
| Construction Guarantee Inspection | | | | | $0 |
| SUBTOTAL A&E SERVICES | | $1,373,678 | $1,423,678 | $2,479,459 | $5,276,814 |

| | | | | | |
|---|---|---|---|---|---|
| **OTHER PROJECT COSTS** | | | | | |
| Special Consultants | | | | | $0 |
| Materials Testing | | | | | $0 |
| Project/Construction Management | | $323,218 | $323,218 | $161,609 | $808,046 |
| Contract Construction Management | | | $101,006 | $909,051 | $1,010,057 |
| Site Acquisition Cost & Fees | | | | | $0 |
| Agency Retained Items | | | | $1,985,000 | $1,985,000 |
| DVBE Assessment - A&E | | | | | $0 |
| DVBE Assessment - Const. | | | | | $0 |
| School Checking | | | | | $0 |
| Hospital Checking - Health Care Review | | $50,000 | $100,000 | $50,000 | $200,000 |
| Essential Services - Fire Marshal | | $25,000 | $25,000 | $50,000 | $100,000 |
| Handicapped Checking | | $0 | $0 | $0 | $0 |
| Other Costs - Due Diligence | | $40,000 | | | $40,000 |
| Environmental Document | | $250,000 | | | $250,000 |
| SUBTOTAL OTHER PROJECT COSTS | | $688,218 | $549,224 | $3,155,660 | $4,393,103 |

| | | | | | |
|---|---|---|---|---|---|
| TOTAL ESTIMATED PROJECT COST | | $2,061,896 | $1,972,902 | $27,250,340 | $31,285,137 |
| LESS FUNDS TRANSFERRED | | | | | |
| LESS FUNDS AVAILABLE NOT TRANSFERRED | | | | | |
| BALANCE OF FUNDS REQUIRED | | $2,061,896 | $1,972,902 | $27,250,340 | $31,285,137 |

**Conversion**

## FUNDING DATA & ESTIMATE NOTES - CONVERSION
### FY 06/07

PROJECT:  Level IV Intermediate Care Facility -CONVERSION
LOCATION: Coalinga State Hospital
CLIENT:    California Department of Corrections & Rehabilitation

BUDGET ESTIMATE:             3270M8
DATE ESTIMATED:             10/2/2006
DATE UPDATED:               10/5/2006
PREPARED BY:              Kitchell CEM

## FUNDING DATE

| Charter / Item | Phase | Amount | Totals |
|---|---|---|---|
| **Fund Transfers** | | | |
| None | | $0 | |
| **Total Funds Transferred** | | | $0 |
| **Funds Available Not Transferred** | | | |
| None | | $0 | |
| **Total Funds Available not Transferred** | | | $0 |
| **Total Funds Transferred and Available** | | | $0 |

## ESTIMATE NOTES

1.  The construction costs in this estimate are indexed from the CCCI Index as of the date of estimate preparation. The project estimate is then escalated to the scheduled start of construction and then to an assumed construction midpoint in accordance with Budget Letter BL 05-21.

2. Estimated costs for the following Agency Retained Items that will be incurred during the construction phase of the project.  Agency Retained items have not been verified by CDC.

| | |
|---|---|
| Guarding Costs | $594,000 |
| Telecommunications | $360,000 |
| Group II Equipment | $1,031,000 |
| Total | $1,985,000 |

3. It is assumed an extensive Mitigated Negative Declaration will be required for this project.

4. The schedule assumes funding for PP in FY 06/07, W/D inFY07/08 and Construction in FY 08/09.

**Conversion**


## PROJECT COST SUMMARY-NEW
### FY 06/07

| | | | |
|---|---|---|---|
| **PROJECT:** | Level IV Intermediate Care Facility - NEW | **BUDGET ESTIMATE:** | 3270M8 |
| **LOCATION:** | Coalinga State Hospital | **EST./ PROJ. CCCI:** | 4618/4618 |
| **CLIENT** | California Department of Corrections & Rehabilitation | **DATE ESTIMATED:** | 10/2/2006 |
| **DESIGN BY:** | Kitchell CEM | **DATE UPDATED:** | 10/5/2006 |
| **PROJECT MGR:** | Jon Witherspoon | **ABMS NO:** | N/A |
| **PLAN DATE:** | N/A | **PREPARED BY:** | Kitchell CEM |
| | | **DOF PROJ. I.D. NO.:** | N/A |

### DESCRIPTION

A new single-story facility of 22,474 square feet for intermediate non-acute mental health treatment
for Level IV inmates, including housing, treatment, support and administrative services, with attendant exercise yards
and six guardtowers.

### ESTIMATE SUMMARY

**DIRECT COST**

| | | |
|---|---|---|
| 1.) | New stand alone Level IV Intermediate Care Facility (22,474 GSF) including exterior functional use area of 1,370 sf. | $12,169,000 |
| 2.) | Sitework | $2,335,000 |
| 3.) | Site Security, including 6 each Guard Towers and fence modifications | $2,090,000 |

| | | |
|---|---|---|
| **ESTIMATED TOTAL CURRENT COSTS:** | | **$16,594,000** |
| Adjust CCCI from 4618 to 4618 | $0 | |
| **ESTIMATED TOTAL CURRENT COSTS ON OCTOBER 2006:** | | **$16,594,000** |
| Escalation to Start of Construction 29 Months @ 0.42%/Mo.: | $2,021,149 | |
| Escalation to Mid Point 11 Months @ 0.42%/Mo.: | $766,643 | |
| **ESTIMATED TOTAL CONTRACTS:** | | **$19,381,792** |
| Contingency At: 5% | $969,090 | |
| **ESTIMATED TOTAL CONSTRUCTION COST** | | **$20,350,882** |

**New**

## SUMMARY OF COSTS BY PHASE-NEW
### FY 06/07

PROJECT:  Level IV Intermediate Care Facility - NEW  
LOCATION: Coalinga State Hospital  
CLIENT:   California Department of Corrections & Rehabilitation  

BUDGET ESTIMATE: 3270M8  
DATE ESTIMATED: 10/2/2006  
DATE UPDATED: 10/5/2006  
PREPARED BY: Kitchell CEM  

| | | |
|---|---|---|
| CONSTRUCTION DURATION: | | 20 Months |
| ESTIMATED CONTRACT COST: | $19,381,792 | $19,381,792 |
| CONSTRUCTION CONTINGENCY: | $969,090 | $969,090 |
| TOTAL | $20,350,882 | $20,350,882 |

| CATEGORY | STUDY 00 | PRELIMINARY PLANS 01 | WORKING DRAWINGS 02 | CONSTRUCTION 03 | TOTAL |
|---|---|---|---|---|---|
| **ARCHITECTURAL AND ENGINEERING SERVICES** | | | | | |
| A&E Design | | $1,317,962 | $1,317,962 | $658,981 | $3,294,905 |
| Construction Inspection | | | | $1,434,096 | $1,434,096 |
| Construction Inspection Travel | | | | $358,524 | $358,524 |
| Coordination & Contract Management | | | | | $0 |
| Advertising, Printing and Mailing | | | $50,000 | | $50,000 |
| Construction Guarantee Inspection | | | | | $0 |
| SUBTOTAL A&E SERVICES | | $1,317,962 | $1,367,962 | $2,451,601 | $5,137,525 |
| | | | | | |
| **OTHER PROJECT COSTS** | | | | | |
| Special Consultants | | | | | $0 |
| Materials Testing | | | | | $0 |
| Project/Construction Management | | $310,109 | $310,109 | $155,054 | $775,272 |
| Contract Construction Management | | | $96,909 | $872,181 | $969,090 |
| Site Acquisition Cost & Fees | | | | | $0 |
| Agency Retained Items | | | | $1,985,000 | |
| DVBE Assessment - A&E | | | | | $0 |
| DVBE Assessment - Const. | | | | | $0 |
| School Checking | | | | | $0 |
| Hospital Checking - Health Care Review | | $50,000 | $100,000 | $50,000 | $200,000 |
| Essential Services - Fire Marshal | | $25,000 | $25,000 | $50,000 | $100,000 |
| Handicapped Checking | | $0 | $0 | $0 | $0 |
| Other Costs - Due Diligence | | $40,000 | | | $40,000 |
| Environmental Document | | $250,000 | | | $250,000 |
| SUBTOTAL OTHER PROJECT COSTS | | $675,109 | $532,018 | $3,112,235 | |
| | | | | | |
| TOTAL ESTIMATED PROJECT COST | | $1,993,071 | $1,899,979 | $25,914,718 | |
| LESS FUNDS TRANSFERRED | | | | | |
| LESS FUNDS AVAILABLE NOT TRANSFERRED | | | | | |
| BALANCE OF FUNDS REQUIRED | | $1,993,071 | $1,899,979 | $25,914,718 | |

**New**

## FUNDING DATA & ESTIMATE NOTES  - NEW
### FY 06/07

| | |
|---|---|
| PROJECT:  Level IV Intermediate Care Facility - NEW | BUDGET ESTIMATE:        3270M8 |
| LOCATION: Coalinga State Hospital | DATE ESTIMATED:         10/2/2006 |
| CLIENT:     California Department of Corrections & Rehabilitation | DATE UPDATED:           10/5/2006 |
| | PREPARED BY:         Kitchell CEM |

### FUNDING DATE

| Charter / Item | Phase | Amount | Totals |
|---|---|---|---|
| **Fund Transfers** | | | |
| None | | $0 | |
| **Total Funds Transferred** | | | $0 |
| **Funds Available Not Transferred** | | | |
| None | | $0 | |
| **Total Funds Available not Transferred** | | | $0 |
| **Total Funds Transferred and Available** | | | $0 |

### ESTIMATE NOTES

1.  The construction costs in this estimate are indexed from the CCCI Index as of the date of estimate preparation. The project estimate is then escalated to the scheduled start of construction and then to an assumed construction midpoint in accordance with Budget Letter BL 05-21.

2. Estimated costs for the following Agency Retained Items that will be incurred during the construction phase of the project.  Agency Retained items have not been verified by CDC.

| | |
|---|---:|
| Guarding Costs | $594,000 |
| Telecommunications | $360,000 |
| Group II Equipment | $1,031,000 |
| Total | |

3. It is assumed an extensive Mitigated Negative Declaration will be required for this project.

4. The schedule assumes funding for  PP in FY 06/07, W/D in FY07/08 and Construction in FY 08/09.

**New**



**Coalinga State Hospital – Level IV Intermediate Care Facility**

Comparative Feasibility Study

## 4. COMPARATIVE SCHEDULE

The attached schedules illustrate project delivery durations for both the stand alone and the conversion approaches using the typical project delivery approach for California Department of Corrections and Rehabilitation projects.

The major difference in the two approaches is the length of construction. Under the conversion approach, it is estimated that the project will require an additional 60 days for demolition and another additional 90 days for construction, due to the need to reroute and tie in utilities and building services. This results in a net five months additional construction duration.



| Duration | Start | Finish | Pred |
|---|---|---|---|
| 14 d | Tue 2/13/07 | Mon 2/26/07 | 3 |
| 56 d | Tue 2/27/07 | Mon 4/23/07 | 4 |
| 21 d | Tue 4/24/07 | Mon 5/14/07 | 5 |
| 1 d | Tue 5/15/07 | Tue 5/15/07 | 6 |
| 21 d | Wed 5/16/07 | Tue 6/5/07 | 7 |
| 21 d | Wed 5/16/07 | Tue 6/5/07 | 7 |
| 7 d | Wed 6/6/07 | Tue 6/12/07 | 8, 9 |
| 7 d | Wed 6/13/07 | Tue 6/19/07 | 10 |
| 14 d | Wed 6/20/07 | Tue 7/3/07 | 11 |
| 1 d | Sun 7/1/07 | Sun 7/1/07 | |
| 45 d | Wed 7/4/07 | Fri 8/17/07 | 12 |
| 1 d | Mon 7/2/07 | Mon 7/2/07 | 13 |
| | | | |
| 231 d | Thu 7/5/07 | Wed 2/20/08 | |
| 5 d | Thu 7/5/07 | Mon 7/9/07 | 15 |
| 14 d | Tue 7/10/07 | Mon 7/23/07 | 18 |
| 1 d | Tue 7/24/07 | Tue 7/24/07 | 19 |
| 1 d | Tue 7/10/07 | Tue 7/10/07 | 18 |
| 28 d | Wed 7/25/07 | Tue 8/21/07 | 20 |
| 2 d | Wed 8/22/07 | Thu 8/23/07 | 22 |
| 1 d | Fri 8/24/07 | Fri 8/24/07 | 23 |
| 1 d | Mon 8/27/07 | Mon 8/27/07 | 24 |
| 42 d | Tue 7/10/07 | Mon 8/20/07 | 18 |
| 56 d | Tue 8/21/07 | Mon 10/15/07 | 26 |
| 1 d | Tue 8/28/07 | Tue 8/28/07 | 25 |
| 21 d | Wed 8/29/07 | Tue 9/18/07 | 28 |
| 14 d | Wed 9/19/07 | Tue 10/2/07 | 29 |
| 1 d | Wed 10/3/07 | Wed 10/3/07 | 30 |
| 28 d | Thu 10/4/07 | Wed 10/31/07 | 31 |
| 7 d | Thu 11/1/07 | Wed 11/7/07 | 32 |
| 77 d | Thu 11/8/07 | Wed 1/23/08 | 33,27 |
| 28 d | Thu 1/24/08 | Wed 2/20/08 | 34 |
| 77 d | Tue 7/10/07 | Mon 9/24/07 | 18 |
| 63 d | Tue 7/10/07 | Mon 9/10/07 | 18 |
| 56 d | Tue 7/10/07 | Mon 9/3/07 | 18 |
| | | | |
| 150 d | Tue 7/3/07 | Thu 11/29/07 | |
| 1 d | Tue 7/3/07 | Tue 7/3/07 | 15 |
| 54 d | Wed 7/4/07 | Sun 8/26/07 | 41 |
| 22 d | Mon 8/27/07 | Mon 9/17/07 | 42 |
| 1 d | Tue 9/18/07 | Tue 9/18/07 | 43 |
| 30 d | Wed 9/19/07 | Thu 10/18/07 | 44 |
| 11 d | Fri 10/19/07 | Mon 10/29/07 | 45 |
| 11 d | Fri 10/19/07 | Mon 10/29/07 | 45 |
| 1 d | Tue 10/30/07 | Tue 10/30/07 | 47 |
| 30 d | Wed 10/31/07 | Thu 11/29/07 | 48 |
| 1 d | Wed 10/31/07 | Wed 10/31/07 | 48 |
| | | | |
| 255 d | Wed 10/3/07 | Fri 6/13/08 | |
| 35 d | Wed 10/3/07 | Tue 11/6/07 | 30 |
| 1 d | Wed 11/7/07 | Wed 11/7/07 | 53 |
| 14 d | Thu 11/8/07 | Wed 11/21/07 | 54 |
| 1 d | Thu 11/22/07 | Thu 11/22/07 | 55 |
| 35 d | Fri 11/23/07 | Thu 12/27/07 | 56 |
| 28 d | Fri 11/30/07 | Thu 12/27/07 | 57FF |
| 13 d | Fri 12/28/07 | Wed 1/9/08 | 57 |
| 7 d | Thu 1/10/08 | Wed 1/16/08 | 59 |
| 7 d | Thu 1/17/08 | Wed 1/23/08 | 60 |
| 7 d | Thu 1/24/08 | Wed 1/30/08 | 61 |
| 1 d | Thu 1/10/08 | Thu 1/10/08 | 59 |
| 18 d | Fri 1/11/08 | Mon 1/28/08 | 63 |
| 28 d | Tue 1/29/08 | Mon 2/25/08 | 64 |
| 51 d | Tue 1/29/08 | Wed 3/19/08 | 64 |



Project Funding - P
Notice to Proceed
Notice to Proceed
Target Date for CEQA Compliance...

| Duration | Start | Finish | Predecessors |
|---|---|---|---|
| 14 d | Fri 11/30/07 | Thu 12/13/07 | 49 |
| 20 d | Fri 12/14/07 | Wed 1/2/08 | 74 |
| 14 d | Thu 1/3/08 | Wed 1/16/08 | |
| 21 d | Thu 2/28/08 | Wed 3/19/08 | 66FF |
| 27 d | Thu 4/3/08 | Tue 4/29/08 | 76FF,67 |
| 45 d | Wed 4/30/08 | Fri 6/13/08 | 78,58,66,38,35 |
| | | | |
| 184 d | Tue 7/1/08 | Wed 12/31/08 | |
| 1 d | Tue 7/1/08 | Tue 7/1/08 | 79 |
| 50 d | Wed 7/2/08 | Wed 8/20/08 | 82 |
| 14 d | Thu 8/21/08 | Wed 9/3/08 | 83 |
| 7 d | Thu 9/4/08 | Wed 9/10/08 | 84 |
| 56 d | Thu 8/21/08 | Wed 10/15/08 | 84SS,85FF |
| 14 d | Thu 10/16/08 | Wed 10/29/08 | 86 |
| 7 d | Thu 10/30/08 | Wed 11/5/08 | 87 |
| 14 d | Thu 11/6/08 | Wed 11/19/08 | 88 |
| 7 d | Thu 11/20/08 | Wed 11/26/08 | 89 |
| 1 d | Thu 11/27/08 | Thu 11/27/08 | 90 |
| 7 d | Fri 11/28/08 | Thu 12/4/08 | 91 |
| 7 d | Thu 11/6/08 | Wed 11/12/08 | 88 |
| 7 d | Thu 11/13/08 | Wed 11/19/08 | 93 |
| 7 d | Thu 11/20/08 | Wed 11/26/08 | 94 |
| 21 d | Thu 11/27/08 | Wed 12/17/08 | 95 |
| 7 d | Thu 12/18/08 | Wed 12/24/08 | 96 |
| 7 d | Thu 12/25/08 | Wed 12/31/08 | 97,92 |
| | | | |
| 64 d | Thu 1/1/09 | Thu 3/5/09 | |
| 42 d | Thu 1/1/09 | Wed 2/11/09 | 98 |
| 1 d | Thu 1/1/09 | Thu 1/1/09 | 101SS |
| 1 d | Thu 2/12/09 | Thu 2/12/09 | 101,102 |
| 20 d | Fri 2/13/09 | Wed 3/4/09 | 103 |
| 1 d | Thu 3/5/09 | Thu 3/5/09 | 104 |
| | | | |
| 813 d | Fri 3/6/09 | Fri 5/27/11 | |
| 60 d | Fri 3/6/09 | Mon 5/4/09 | 105 |
| 690 d | Tue 5/5/09 | Fri 3/25/11 | 108 |
| 30 d | Sat 3/26/11 | Sun 4/24/11 | 109 |
| 32 d | Mon 4/25/11 | Thu 5/26/11 | 110 |
| 1 d | Fri 5/27/11 | Fri 5/27/11 | 111 |



PWB Review/Approval

Funding FY 08/09 Working Drawings

Bid Opening

Award

Notice To Proceed

| | Duration | Start | Finish | Pred |
|---|---|---|---|---|
| | 14 d | Tue 2/13/07 | Mon 2/26/07 | 3 |
| | 56 d | Tue 2/27/07 | Mon 4/23/07 | 4 |
| | 21 d | Tue 4/24/07 | Mon 5/14/07 | 5 |
| | 1 d | Tue 5/15/07 | Tue 5/15/07 | 6 |
| | 21 d | Wed 5/16/07 | Tue 6/5/07 | 7 |
| | 21 d | Wed 5/16/07 | Tue 6/5/07 | 7 |
| | 7 d | Wed 6/6/07 | Tue 6/12/07 | 8,9 |
| | 7 d | Wed 6/13/07 | Tue 6/19/07 | 10 |
| | 14 d | Wed 6/20/07 | Tue 7/3/07 | 11 |
| | 1 d | Sun 7/1/07 | Sun 7/1/07 | |
| | 45 d | Wed 7/4/07 | Fri 8/17/07 | 12 |
| | 1 d | Mon 7/2/07 | Mon 7/2/07 | 13 |
| | | | | |
| | 231 d | Thu 7/5/07 | Wed 2/20/08 | |
| | 5 d | Thu 7/5/07 | Mon 7/9/07 | 15 |
| | 14 d | Tue 7/10/07 | Mon 7/23/07 | 18 |
| | 1 d | Tue 7/24/07 | Tue 7/24/07 | 19 |
| | 1 d | Tue 7/10/07 | Tue 7/10/07 | 18 |
| | 28 d | Wed 7/25/07 | Tue 8/21/07 | 20 |
| | 2 d | Wed 8/22/07 | Thu 8/23/07 | 22 |
| | 1 d | Fri 8/24/07 | Fri 8/24/07 | 23 |
| | 1 d | Mon 8/27/07 | Mon 8/27/07 | 24 |
| | 42 d | Tue 7/10/07 | Mon 8/20/07 | 18 |
| | 56 d | Tue 8/21/07 | Mon 10/15/07 | 26 |
| | 1 d | Tue 8/28/07 | Tue 8/28/07 | 25 |
| | 21 d | Wed 8/29/07 | Tue 9/18/07 | 28 |
| | 14 d | Wed 9/19/07 | Tue 10/2/07 | 29 |
| | 1 d | Wed 10/3/07 | Wed 10/3/07 | 30 |
| | 28 d | Thu 10/4/07 | Wed 10/31/07 | 31 |
| | 7 d | Thu 11/1/07 | Wed 11/7/07 | 32 |
| | 77 d | Thu 11/8/07 | Wed 1/23/08 | 33,27 |
| | 28 d | Thu 1/24/08 | Wed 2/20/08 | 34 |
| | 77 d | Tue 7/10/07 | Mon 9/24/07 | 18 |
| | 63 d | Tue 7/10/07 | Mon 9/10/07 | 18 |
| | 56 d | Tue 7/10/07 | Mon 9/3/07 | 18 |
| | | | | |
| | 150 d | Tue 7/3/07 | Thu 11/29/07 | |
| | 1 d | Tue 7/3/07 | Tue 7/3/07 | 15 |
| | 54 d | Wed 7/4/07 | Sun 8/26/07 | 41 |
| | 22 d | Mon 8/27/07 | Mon 9/17/07 | 42 |
| | 1 d | Tue 9/18/07 | Tue 9/18/07 | 43 |
| | 30 d | Wed 9/19/07 | Thu 10/18/07 | 44 |
| | 11 d | Fri 10/19/07 | Mon 10/29/07 | 45 |
| rogram | 11 d | Fri 10/19/07 | Mon 10/29/07 | 45 |
| | 1 d | Tue 10/30/07 | Tue 10/30/07 | 47 |
| iod | 30 d | Wed 10/31/07 | Thu 11/29/07 | 48 |
| | 1 d | Wed 10/31/07 | Wed 10/31/07 | 48 |
| | | | | |
| | 255 d | Wed 10/3/07 | Fri 6/13/08 | |
| | 35 d | Wed 10/3/07 | Tue 11/6/07 | 30 |
| | 1 d | Wed 11/7/07 | Wed 11/7/07 | 53 |
| | 14 d | Thu 11/8/07 | Wed 11/21/07 | 54 |
| | 1 d | Thu 11/22/07 | Thu 11/22/07 | 55 |
| | 35 d | Fri 11/23/07 | Thu 12/27/07 | 56 |
| | 28 d | Fri 11/30/07 | Thu 12/27/07 | 57FF |
| | 13 d | Fri 12/28/07 | Wed 1/9/08 | 57 |
| | 7 d | Thu 1/10/08 | Wed 1/16/08 | 59 |
| | 7 d | Thu 1/17/08 | Wed 1/23/08 | 60 |
| | 7 d | Thu 1/24/08 | Wed 1/30/08 | 61 |
| | 1 d | Thu 1/10/08 | Thu 1/10/08 | 59 |
| | 18 d | Fri 1/11/08 | Mon 1/28/08 | 63 |
| | 28 d | Tue 1/29/08 | Mon 2/25/08 | 64 |
| | 51 d | Tue 1/29/08 | Wed 3/10/08 | 64 |

Project Funding - P

Notice to Proceed

Notice to Proceed

Target Date for CEQA Compliance...

| Duration | Start | Finish | Predecessors |
|---|---|---|---|
| 14 d | Fri 11/30/07 | Thu 12/13/07 | 49 |
| 20 d | Fri 12/14/07 | Wed 1/2/08 | 74 |
| 14 d | Thu 1/3/08 | Wed 1/16/08 | |
| 21 d | Thu 2/28/08 | Wed 3/19/08 | 66FF |
| 27 d | Thu 4/3/08 | Tue 4/29/08 | 76FF,67 |
| 45 d | Wed 4/30/08 | Fri 6/13/08 | 78,58,66,38,35 |
| | | | |
| 184 d | Tue 7/1/08 | Wed 12/31/08 | |
| 1 d | Tue 7/1/08 | Tue 7/1/08 | 79 |
| 50 d | Wed 7/2/08 | Wed 8/20/08 | 82 |
| 14 d | Thu 8/21/08 | Wed 9/3/08 | 83 |
| 7 d | Thu 9/4/08 | Wed 9/10/08 | 84 |
| 56 d | Thu 8/21/08 | Wed 10/15/08 | 84SS,85FF |
| 14 d | Thu 10/16/08 | Wed 10/29/08 | 86 |
| 7 d | Thu 10/30/08 | Wed 11/5/08 | 87 |
| 14 d | Thu 11/6/08 | Wed 11/19/08 | 88 |
| 7 d | Thu 11/20/08 | Wed 11/26/08 | 89 |
| 1 d | Thu 11/27/08 | Thu 11/27/08 | 90 |
| 7 d | Fri 11/28/08 | Thu 12/4/08 | 91 |
| 7 d | Thu 11/6/08 | Wed 11/12/08 | 88 |
| 7 d | Thu 11/13/08 | Wed 11/19/08 | 93 |
| 7 d | Thu 11/20/08 | Wed 11/26/08 | 94 |
| 21 d | Thu 11/27/08 | Wed 12/17/08 | 95 |
| 7 d | Thu 12/18/08 | Wed 12/24/08 | 96 |
| 7 d | Thu 12/25/08 | Wed 12/31/08 | 97,92 |
| | | | |
| 64 d | Thu 1/1/09 | Thu 3/5/09 | |
| 42 d | Thu 1/1/09 | Wed 2/11/09 | 98 |
| 1 d | Thu 1/1/09 | Thu 1/1/09 | 101SS |
| 1 d | Thu 2/12/09 | Thu 2/12/09 | 101,102 |
| 20 d | Fri 2/13/09 | Wed 3/4/09 | 103 |
| 1 d | Thu 3/5/09 | Thu 3/5/09 | 104 |
| | | | |
| 663 d | Fri 3/6/09 | Tue 12/28/10 | |
| 600 d | Fri 3/6/09 | Tue 10/26/10 | 105 |
| 30 d | Wed 10/27/10 | Thu 11/25/10 | 108 |
| 32 d | Fri 11/26/10 | Mon 12/27/10 | 109 |
| 1 d | Tue 12/28/10 | Tue 12/28/10 | 110 |

PWB Review/Approval

Funding FY 08/09 Working Drawings

Bid Opening

Award

Notice To Proceed




**Coalinga State Hospital - Intermediate Care Facility**

**Comparative Feasibility Study**

## Level IV Intermediate Care Facility, COALINGA, CA
### Program and Analysis                    DRAFT 9/29/2006

| ROOM NAME/FUNCTION | SF | Qty. | Subt | Tot.Net | Gross | Gross Subt | Grand Tot |
|---|---|---|---|---|---|---|---|
| **HOUSING** | | | | | | | |
| Single Wet Cell | 135 | 25 | 3,375 | | | | |
| HC Cell | 155 | 2 | 310 | | | | |
| Pat.Shower | 45 | 4 | 180 | | | | |
| Handwash | 10 | 2 | 20 | | | | |
| Interview Room | 100 | 2 | 200 | | | | |
| Housing Total | | | | 4,085 | | | |
| Housing Total w/65% Load Factor | | | | | 6,740 | | |
| | | | | | | | |
| **TREATMENT UNIT - CORE** | | | | | | | |
| Control Station | 100 | 1 | 100 | | | | |
| Nurse | 600 | 1 | 600 | | | | |
| Medication Room | 150 | 1 | 150 | | | | |
| Mental Health Obs. Room | 135 | 1 | 135 | | | | |
| Mental Health Obs. Room HC | 155 | 1 | 155 | | | | |
| Safety (Padded) Room | 50 | 2 | 100 | | | | |
| Supervising Nurse | 100 | 1 | 100 | | | | |
| Supervising MTA | 100 | 1 | 100 | | | | |
| Group Room | 300 | 3 | 900 | | | | |
| Medical Exam/Treatment | 150 | 1 | 150 | | | | |
| Tub Room | 100 | 1 | 100 | | | | |
| Patient Phone Alcove | 15 | 1 | 15 | | | | |
| Storage Alcove (stretcher/chair) | 15 | 1 | 15 | | | | |
| Clean Linen/Utility | 100 | 1 | 100 | | | | |
| Soiled Linen/Utility | 100 | 1 | 100 | | | | |
| Staff Toilet | 50 | 1 | 50 | | | | |
| Patient Toilet | 50 | 1 | 50 | | | | |
| Janitor's Closet | 35 | 1 | 35 | | | | |
| Staff Breakroom | 100 | 1 | 100 | | | | |
| Staff Lockers | 80 | 1 | 80 | | | | |
| Drinking Fountain | 10 | 1 | 10 | | | | |
| Treatment Core Total | | | | 3,145 | | | |
| Treatment Core w/65% Load Factor | | | | | 5,189 | | |
| | | | | | | | |
| **CORE SUPPORT SPACES** | | | | | | | |
| Food Storage/Warming | 250 | 1 | 250 | | | | |
| Security Gear Storage | 80 | 1 | 80 | | | | |
| General Storage | 600 | 1 | 600 | | | | |
| Supply Storage | 65 | 1 | 65 | | | | |
| Harzardous Waste Storage | 60 | 1 | 60 | | | | |
| Trash Storage | 125 | 1 | 125 | | | | |
| Janitor/Housekeeping Supply | 90 | 1 | 90 | | | | |
| Clean Linen Rec/Holding | 135 | 1 | 135 | | | | |
| Soiled Linen Holding | 100 | 1 | 100 | | | | |
| Telecommunications | 20 | 1 | 20 | | | | |
| Core Support Total | | | | 1,525 | | | |
| Core Support w/Load Factor 40% | | | | | 2,135 | | |



**Coalinga State Hospital – Intermediate Care Facility**
**Comparative Feasibility Study**

## Level IV Intermediate Care Facility, COALINGA, CA
### Program and Analysis                    DRAFT 9/29/2006

| ROOM NAME/FUNCTION | SF | Qty. | Subt | Tot.Net | Gross | Gross Subt | Grand Tot |
|---|---|---|---|---|---|---|---|
| **CDCR STAFF** | | | | | | | |
| Correctional Officer | 100 | 1 | 100 | | | | |
| | | | | | | | |
| **TREATMENT STAFF** | | | | | | | |
| Senior Psychologist | 125 | 1 | 125 | | | | |
| Staff Psychiatrist | 110 | 1 | 110 | | | | |
| Clinical Psychologist | 110 | 1 | 110 | | | | |
| Psych. Social Worker | 80 | 1 | 80 | | | | |
| Rehab. Therapist | 80 | 1 | 80 | | | | |
| | | | | | | | |
| **PROGRAM ADMINISTRATION** | | | | | | | |
| Executive Director | 150 | 1 | 150 | | | | |
| Program Director | 125 | 1 | 125 | | | | |
| Hospital Admin. Resident II | 125 | 1 | 125 | | | | |
| Nursing Coordinator | 125 | 1 | 125 | | | | |
| Executive Secretary | 100 | 1 | 100 | | | | |
| Office Technician | 70 | 1 | 70 | | | | |
| Waiting | 15 | 1 | 15 | | | | |
| | | | | | | | |
| **DMH OFFICES** | | | | | | | |
| Records Technician | 100 | 1 | 100 | | | | |
| Medical Transcriber | 64 | 1 | 64 | | | | |
| Office Technician | 70 | 1 | 70 | | | | |
| Medical Records Storage | 160 | 1 | 160 | | | | |
| Associate Personnel Analyst | 120 | 1 | 120 | | | | |
| Personnel Services Specialist | 80 | 1 | 80 | | | | |
| Office Technician | 70 | 1 | 70 | | | | |
| Personnel Storage | 120 | 1 | 120 | | | | |
| Accounting Technician | 80 | 1 | 80 | | | | |
| Information Systems AISA | 130 | 1 | 130 | | | | |
| Computer Network | 80 | 1 | 80 | | | | |
| Dietitian | 80 | 1 | 80 | | | | |
| Housekeeping Supervisor | 80 | 1 | 80 | | | | |
| | | | | | | | |
| **STAFF SUPPORT** | | | | | | | |
| Conference/Training Room | 235 | 1 | 235 | | | | |
| Copier/Storage | 85 | 1 | 85 | | | | |
| Training Officer | 100 | 1 | 100 | | | | |
| Training Room | 900 | 1 | 900 | | | | |
| Men's Staff Toilet | 155 | 1 | 155 | | | | |
| Women's Staff Toilet | 155 | 1 | 155 | | | | |
| Janitor Closet | 25 | 1 | 25 | | | | |
| Drinking Fountain | 10 | 1 | 10 | | | | |
| Office & Staff Support Total | | | | 4,214 | | | |
| Office & Staff Support w/Load Factor 30% | | | | | 5,478 | | |
| | | | | | | | |
| **Structure Total** | | | | 12,969 | | 19,543 | |
| **Structure Gross w/15% Load Factor** | | | | | | | 22,474 |



**Coalinga State Hospital - Intermediate Care Facility**

**Comparative Feasibility Study**

## Level IV Intermediate Care Facility, COALINGA, CA
### Program and Analysis          DRAFT 9/29/2006

| ROOM NAME/FUNCTION | SF | Qty. | Subt | Tot.Net | Gross | Gross Subt | Grand Tot |
|---|---|---|---|---|---|---|---|
| **EXTERIOR DEVELOPMENT** | | | | | | | |
| Yard Access/Sallyport | 380 | 1 | 380 | | | | |
| Group Exercise Yards, Small | 150 | 3 | 450 | | | | |
| **Exterior Development Total** | | | | 830 | | | |
| **Exterior Development Total** | | | | | 1,370 | | 1,370 |

## 6. PRELIMINARY FLOOR PLANS





## PRELIMINARY FLOOR PLANS CONTD.

Additional 6500 SF

Treatment & Core Support

| T | 8 |
| 6 | 9 |
| 5 | 10 |
| 4 | 11 |
| 3 | 12 |
| 2 HC | 13 HC |
| 1 | Sh. Sh. |
| Obs. | Exam |

Group Rm 1

Group Rm 2

Group Rm 3

Nurse Control

| Obs. | Tub |
| 26 | Sh. Sh. |
| 25 | 14 |
| 24 | 15 |
| 23 | 16 |
| 22 | 17 |
| 21 | 18 |
| 20 | 19 |
| 27 | Int. |

B **New Construction CTC**
1/32" = 1'-0"

Refer to program for spaces
included in study assumptions


## 7. AERIAL PHOTOGRAPH



NOTE: OPTION B IS A REPRESENTATION ONLY AND THE LOCATION IS TO BE DETERMINED.

AERIAL VIEW OF COALINGA STATE HOSPITAL
WITH LOCATION OF PROPOSED WORK





## Advantages and Disadvantages of Options A and B

|  | Option A - Conversion | Option B - New | Remarks |
|---|---|---|---|
| **Construction noise and disturbance** | Direct impact | Controllable indirect impact | New construction will all better control during construction. |
| **Provide total 22,500 SF** | Eliminate state-of-the-art hospital beds and their support functions | No reduction in hospital function | With the conversion, services will be eliminated. |
| **Cost** | $          31,285,137 | $          29,914,718 | Approx. $1.5 M less |
| **Completion Date** | 5/27/2011 | 12/28/2010 | Conversion will require about 5 months longer construction time |
| **Program** | Compromised | Use best knowledge | New construction will provide a safer and more satisfactory facilitly |



**Coalinga State Hospital - Intermediate Care Facility**

**Comparative Feasibility Study**

**APPENDIX B.1**                    **Program Comparison and Analysis**

| Item | Conversion | New | Note | DGS | Note | DGS/ Conv. | SVSP | Note |
|---|---|---|---|---|---|---|---|---|
| No. of Beds | 27 Beds | 27 Beds | | 54 Beds | | 2 | 64 Beds | |
| Nominal Area of Project | 16,000 | 16,000 | | 32,000 | | 2 | Not Applicable | |
| Guard towers (six) | Yes | Yes | | Unknown | | | No | |
| | | | | | | | | |
| Net Program | 12,969 | 12,969 | | 22,947 | 2 | 1.8 | 22,462 | |
| Gross Program | 22,474 | 22,474 | | 37,577 | 3 | 1.7 | 36,783 | |
| Gross/Net S.F. | 1.73 | 1.73 | | 1.64 | | | 1.64 | |
| | | | | | | | | |
| Housing SF (Gross) | 6,550 | 6,740 | 1 | 13,100 | 1 | 2 | 15,708 | |
| Support Space (Gross) | 15,924 | 15,734 | | 24,477 | | 1.5 | 21,075 | |
| Housing as a % of Gross | 29% | 30% | | 35% | | 1.1 | 43% | |
| | | | | | | | | |
| Construction Cost Total | $21,461,015 | $20,350,796 | | | 4 | | $28,615,773 | 5,6 |
| Construction Cost/SF | $955 | $906 | | | 4 | | $778 | 6 |
| | | | | | | | | |
| Project Cost Total | $31,285,137 | $29,807,768 | | $34,624,000 | 2 | | $30,937,337 | 6 |
| | | | | | | | | |
| **Project Cost/GSF** | **$1,392** | **$1,326** | | **$1,591** | | | **$1,127** | 6,7 |
| Cost savings of new/conversion | | $1,477,369 | | | | | | |

1. Housing wings are existing
2. This number is from the DGS study
3. Unknown how DGS study derived net/gross proportion - this number was obtained by multiplying the net square footage by the same proportion of net-to-gross as SVSP.
4. No information
5. This number is from current cost estimates
6. No guard towers
7. Escalated 29 months with 10% contingency (to be comparable to current study costs)


**APPENDIX B.2**     **Program Comparison and Analysis**

| Model Differences | Conversion | New | DGS | SVSP - 64 Bed | Remarks |
|---|---|---|---|---|---|
| Perimeter Security | Perimeter Patrol and New Guard Towers | Perimeter Patrol and New Guard Towers | Perimeter Patrol and New Guard Towers | Existing | Cost of guard towers does not appear to be completely addressed in DGS study; cost of guard towers included in this study as a line item. |
| Food Service | Retherm facility | Retherm facility | Dining Room | Dining Room | Program assumption that inmates will receive their meals in their cells |
| Administrative Space | Cost model includes all administrative functions | Cost model includes all administrative functions | Cost model does not include 2,482 net/3,711 gross SF of offices due to space shortage | Administrative space is already provided elsewhere in the facility. This is just an addition. | Potential $4.3 million additional cost to bring DGS program up to actual requirements. |
| Exterior Facilities | 1,370 SF incl in cost | 1,370 SF incl in cost | 8,185 SF | 8,185 SF | Not known if cost is included in DGS price |
| Completion Date | 5/27/2011 | 12/28/2010 | 6/25/2012 | | 5 months more to complete Conversion than New |
| Adjusted Project Costs | $31,285,137.0 | $29,807,768.0 | Lack of information regarding the DGS cost model | $38,182,861.3 | See Note below explaining derivation of this number for SVSP |

Note: Escalated current construction cost 29 months with 10% contingency (to be comparable to current study costs)

SVSP has no guard towers; also, recent trends in the industry suggest non-Project costs are increasing substantially