# Achieving a
# Constitutional Level of Medical Care
# in
# California's Prisons

## Eleventh Tri-Annual Report of the
## Federal Receiver's Turnaround Plan of Action

**June 1, 2009**

# California Prison Health Care Receivership

## Vision:

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

## Mission:

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1.  Introduction………………………………………………..……..  1

2.  Executive Summary…………………………………………………..  5

3.  The Receiver's Reporting Requirements…………........................…….  15

4.  Status and Progress Toward the Turnaround Plan Initiatives……………  17

    GOAL 1     Ensure Timely Access to Health Care Services……………………  17

    *Objective 1.1*     Screening and Assessment Processes………………..……….  17

    *Objective 1.2*     Access Staffing and Processes...……………………………  18

    *Objective 1.3*     Schedule and Patient-Inmate Tracking…………………….....  20

    *Objective 1.4*     Standardized Utilization Management System…………………  21

    GOAL 2     Establish a Prison Medical Program Addressing the Full

               Continuum of Health Care Services………………………………  23

    *Objective 2.1*     Primary Care………………………………………………  23

    *Objective 2.2*     Chronic Care………………………………………………  23

    *Objective 2.3*     Emergency Response………………………………………..  25

    *Objective 2.4*     Specialty Care and Hospitalization………………………….  28

    GOAL 3     Recruit, Train and Retain a Professional Quality Medical Care

               Workforce…………………………………………………  35

    *Objective 3.1*     Physicians and Nurses……………………………………….  35

    *Objective 3.2*     Clinical Leadership and Management Structure…………………  43

    *Objective 3.3*     Professional Training Program………………………………  44

    GOAL 4     Implement a Quality Improvement Program...…………………….....  46

    *Objective 4.1*     Clinical Quality Measurement and Evaluation Program…..……..  46

    *Objective 4.2*     Quality Improvement Programs……………………………….  47

    *Objective 4.3*     Medical Peer Review and Discipline Process……………………  50

| | | |
|---|---|---|
| *Objective 4.4* | Medical Oversight Unit…………………………………………... | 53 |
| *Objective 4.5* | Health Care Appeals Process…………………………………….. | 56 |
| *Objective 4.6* | Out-of-State, Community Correctional Facilities and Re-entry Oversight………………………………………………………… | 60 |
| **GOAL 5** | **Establish Medical Support Infrastructure…………………………** | **65** |
| *Objective 5.1* | Pharmacy…………………………………………………………… | 65 |
| *Objective 5.2* | Medical Records…………………………………………………... | 72 |
| *Objective 5.3* | Radiology and Laboratory………………………………………... | 73 |
| *Objective 5.4* | Clinical Information Systems……………………………………... | 74 |
| *Objective 5.5* | Telemedicine……………………………………………………... | 75 |
| **GOAL 6** | **Provide for Necessary Clinical, Administrative and Housing Facilities…………………………………………………………..** | **77** |
| *Objective 6.1* | Upgrade Administrative and Clinical Facilities………………….. | 77 |
| *Objective 6.2* | Expand Administrative, Clinical, and House Facilities………….. | 79 |
| *Objective 6.3* | Finish Construction at San Quentin State Prison………………… | 83 |
| **5.** | **Additional Successes Achieved by the Receiver………………..…..……** | **85** |
| A. | CPHCS Town-Hall Meetings……………………………………….. | 85 |
| B. | Status of the Project Management Office………………………………... | 85 |
| C. | Efforts of the Communications Department…………………….……... | 86 |
| **6.** | **Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented By Institutions Or Individuals……………………………..……..** | **88** |
| **7.** | **An Accounting of Expenditures for the Reporting Period………………** | **89** |
| **8.** | **Other Matters Deemed Appropriate for Judicial Review...……………...** | **90** |
| A. | Coordination with Other Lawsuits………………………………….. | 90 |
| B. | Master Contract Waiver Reporting………………………………….. | 90 |

**9.**     **Conclusion…………...…………………………………………………………...**    **92**

# Section 1
# Introduction

The last four months have seen substantial changes in the Receivership's organization, in the approach to implementation of certain aspects of the Turnaround Plan of Action (mostly in response to the fiscal crisis confronting the State), and in the cooperative relationship between the Receiver and the California Department of Corrections and Rehabilitation's (CDCR). The State's bleak fiscal condition – certainly the worst since the Great Depression – presents significant challenges to the rapid implementation of various components of the Turnaround Plan of Action. The changes in the Receivership's organization and the dramatically improved cooperative relationship with the State are extremely positive developments that will help us move forward more quickly.

This Eleventh Tri-Annual Report to the court outlines and describes these modifications and the positive impact and momentum gained since the January 15, 2009, Tri-Annual Report.

<u>Organizational Changes</u>

In keeping with the Receiver's assurance to establish a correctional health care system capable of being sustainable by the State of California, the Receiver has continued to reduce the number of California Prison Health Care Receivership Corporation employees by either transitioning these staff to State positions or hiring new, civil service employees to take on roles previously fulfilled by Corporation staff. This shift has moved the Receivership in the direction of reestablishing closer connections to the usual State processes and sets the stage for the reintegration of medical, mental health and dental services to promote patient safety and cost-effective management.

The organizational structure for the Receivership, which had been criticized in the past by some as a large and complicated mix of civil service and non-civil service executives, has now been pared down and reorganized to resemble typical State department structures. As a result, the executive team is a leaner and more focused group. Refer to the organizational chart on page 2.

# California Prison Health Care Services



(A)=Acting

Plan for One, Single Health Care Organization

Steps toward the reintegration of medical, mental health, and dental services into one healthcare organization have commenced. The Receiver has established a Joint Healthcare Policy group consisting of executives from CDCR, Division of Correctional Health Care Services (DCHCS) and the Receiver's California Prison Health Care Services (CPHCS). The Joint Healthcare Policy group meets monthly to address cross-organizational policies and to plan for the reintegration of the two separate organizations. In addition to establishment of this group, a Joint Clinical Coordination Group, consisting of the respective Directors of mental health, dental, nursing and medical services, meets monthly to address patient care issues, to provide timely updates regarding respective clinical services' issues, and to address and resolve issues of mutual concern.

Plans are also underway to join the governing bodies of each organization into one healthcare governing body in order to establish and implement consistent policies statewide. These integration activities are key steps necessary to eventually join the various, fragmented health care entities into one, unified correctional healthcare organization.

Coordinated Construction Planning

The conflict between the State and the Receivership over construction planning and funding reached its highest point in February after the State filed a motion in the District Court to terminate the Receivership and end the Receiver's expansion construction program. The District Court ultimately denied this motion, and a motion filed by the State to stay construction pending appeal is still pending before the court. During the same time period, the United States Court of Appeals for the Ninth Circuit dismissed the State's appeal from a court order last year setting a hearing on the Receiver's motion for contempt, and that motion is also before the District Court.

As a result of nearly continuous meetings between Secretary Matt Cate and the Receiver over the last 6 months, relations between CDCR and the Receivership began to improve dramatically beginning in March of 2009. Among other improvements, CDCR's and the Receiver's construction teams began meeting to engage in coordinated planning regarding bed and treatment needs. This joint planning has led to the possibility of a settlement of the pending motions described above and an agreement about long-term construction and funding, a possible settlement which was the underlying basis for the State's recent bed plan filing in the *Coleman* case and which has received widespread reports in the press. Although a memorandum of understanding and final settlement between the State and the Receiver has not yet been secured, Secretary Cate and the Receiver believe such an agreement is within reach. In any event, it has become clear that coordinated planning between CDCR and the Receivership is the key to continued, cost-effective progress.

Monitoring and Medical Inspections

The Office of the Inspector General (OIG), in conjunction with the Receiver and attorneys for the parties, have developed a medical inspection program that measures progress made by the Receivership towards compliance with the requirements set forth in the *Plata* policies and procedures. The OIG medical inspections encompass 20 separate components of medical

delivery and consists of up to 162 various questions. The questions are weighted by importance to the access and delivery of medical care to patient-inmates. The percentages reported represent the percentage of total weighted points possible for each of the 20 components.

Over the past three months the OIG has completed and posted to their website (www.oig.ca.gov) the medical inspection reports for California State Prison-Sacramento, California Medical Facility, Richard J. Donovan Correctional Facility, Centinella State Prison, Deuel Vocational Institution, and Central California Women's Facility. These reports are also displayed on the Receiver's website (www.cphcs.ca.gov) with a summary report, or "report card," indicating the percent of adherence to the *Plata* stipulated policies and procedures. (Refer to Appendix 1).

Also, in accordance with the *Plata* and *Perez* Stipulated Agreements, the Prison Law Office (PLO) reinitiated their tours of CDCR institutions in February 2009. The PLO visits are conducted by plaintiffs counsel to assess current compliance with the *Plata* and *Perez* requirements. As of the close of this reporting period, the PLO has toured the following seven institutions: Kern Valley State Prison, Salinas Valley State Prison, Substance Abuse Treatment Facility, Pleasant Valley State Prison, High Dessert State Prison, San Quentin, and Avenal State Prison. The PLO plans on visiting at least three institutions per month. Since reinitiated, the PLO tours have gone smoothly with each institution cooperating fully and openly with plaintiffs counsel.

<u>Remediating Correctional Health Care during a Fiscal Crisis</u>
During this time of fiscal crisis, the Receivership has joined the State in implementing plans to address the budget crisis. These measures have included restricting travel and work furloughs. The Receivership has complied with these measures in order to do our part in reducing avoidable spending. However, these measures, particularly the reduction of travel, have had an impact on the Turnaround Plan of Action, causing delays in accomplishing certain objectives. The Receivership has responded by finding innovative ways to advance our goals, with minor adjustments to the timeframes specified in the Turnaround Plan of Action.

In some areas of the report, particularly with regard to the Access to Care Initiatives, onsite visits and training has been replaced by videoconferences, teleconferences, and WebEx presentations. Separate Access to Care Initiatives have also been consolidated into one, coordinated program to reduce costs. A new CPHCS Headquarters Access to Care leadership group has been formed to consolidate and coordinate the former plans and to adjust the timeframes and outcomes.

In addition, the Receiver has been actively reviewing operations, programs, projects, and initiatives to determine if inefficiencies exist and where streamlining reductions and consolidation efforts should be focused. In some cases, process reengineering will better meet the goals of the Turnaround Plan of Action in a more efficient and cost-effective manner. Some of these decisions may affect the schedule for implementation of certain components of the Turnaround Plan of Action.

# Section 2
# Executive Summary

During the January 15, 2009 through May 15, 2009 reporting period, progress has continued toward attaining constitutionally adequate medical care for patient-inmates of the CDCR. Highlights of progress include the following:

- Custody Access to Care Preliminary Operational Assessments have been completed at each of the 33 CDCR institutions.
- Monthly reports are now available which measure custody performance in providing patient-inmates with access to health care services, including the percentage of scheduled healthcare appointments which are complete and not complete with specific reasons why appointments are missed.
- The Office of Inspector General completed the first six of its institution-specific medical care inspections.
- A standardized set of medical equipment to support emergency medical response has been deployed to the field, including 486 emergency equipment bags, 31 defibrillators, and 69 automated external defibrillators.
- CPHCS obtained accreditation as a Continuing Medical Education provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education.
- Recruitment and hiring of staff is complete and training is in process for the CPHCS Policy Unit. A policy tracking system was also procured and user training on the new system is underway.
- Several Utilization Management (UM) reports are now published regularly which assist physician mentoring and monitoring and promote the development of best practices and decisions regarding network management.
- Utilization of telemedicine services has increased during 2008.
- The percentage of institutions passing pharmacy inspection has increased during the reporting period.

While we continue to make progress in many important areas that bring us closer to our goal of providing a constitutional level of healthcare within California's correctional system, our momentum has clearly been affected by (1) the State's budget and fiscal crisis, and (2) the continuing disagreement with the State regarding the scope and funding for upgraded and new healthcare facilities. The budget and fiscal crisis is likely to continue for the foreseeable future, and the Receivership is doing everything it can to reduce expenditures without cutting into core healthcare areas, with the result that certain projects and initiatives will be delayed in their implementation. With respect to healthcare facilities, the Receivership continues to have very productive discussions with CDCR and the Administration at both a staff and leadership level. We remain hopeful of a positive outcome for these discussions.

Format of the Report

To assist the reader, this Report provides three forms of supporting data:

1. *Metrics*:  Metrics that measure specific Turnaround Plan of Action initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions.

   Metrics were initially included in the Ninth Quarterly Report to the court and were also published as part of the Receiver's Turnaround Plan of Action Monthly Reports beginning in October 2008.  Monthly Reports for February through April 2009 are included as Appendices 2-4 and can also be viewed at the CPHCS website (http://www.cphcs.ca.gov).

   It should be noted that some Objectives are in a planning and development stage, and therefore it is premature to implement metrics.  However, other programs (e.g., the hiring of clinical personnel) can be measured by very specific metrics.  Over time, the metrics provided in the Receiver's reports will improve in terms of both quantity and quality as new measurement systems are implemented and necessary information technology (IT) systems are established in California's prisons.

2. *Appendices*:  In addition to providing metrics, the report also references a number of documents which are provided to the reader in the included Appendices filed concurrently with this report.

3. *Website References*: Whenever possible, appendices are provided.  In some cases, however, website references are provided to the reader.

Dashboard Documents

A chart summarizing the status of each of the six Goals of the Turnaround Plan of Action is provided below.  Objectives and Actions' status indicated with a "check mark" (✓) are currently on schedule to be completed by the specified completion date.  Objectives and Actions' status with an "x" (✗) are delayed from the specified completion date.  Objectives and Actions' status with a "boxed x" (☒) are not progressing.  Objectives and Actions which have been accomplished are noted as being "complete."  Progress on the 46 action items is as follows:

| | | |
|---|---|---|
| **Completed** | 11 | 24% |
| **On Schedule** | 18 | 39% |
| **Delayed** | 11 | 24% |
| **Not Progressing** | 6 | 13% |

A second chart is also provided below indicating the percent of completion for the Objectives

and Actions of the Turnaround Plan of Action. The average of the percents of completion is 54%.  Discussion and explanations regarding progress as well as delays are included in Section 4 with the narratives for the respective Objective or Action.

# Status of Turnaround Plan of Action
## As of May 15, 2009

| 5/15/09 Status ⇩ | | | 2008 2nd Q 3rd Q 4th Q | 2009 1st Q 2nd Q 3rd Q 4th Q | 2010 1st Q 2nd Q 3rd Q 4th Q | 2011 1st Q 2nd Q 3rd Q 4th Q | 2012 1st Q 2nd Q 3rd Q 4th Q | 2013 1st Q 2nd Q |
|---|---|---|---|---|---|---|---|---|
| | **GOAL 1** | **Ensure Timely Access to Care** | | | | | | |
| | **Obj. 1.1** | **Reception Center Screening and Assessment Processes** | | | | | | |
| ✔ | Act 1.1.1 | Develop Standardize Screening and Assessment | | Extended to 9/2009 | | | | |
| ✔ | Act 1.1.2 | Implement Screening and Assessment Process | | Shortened to 12/2009 | | | | |
| | **Obj. 1.2** | **Staffing and Processes for Health Access** | | | | | | |
| complete | Act 1.2.1 | Preliminary Assessment for Access Teams | | | | | | |
| ✘ | Act 1.2.2 | Fully Implement Health Care Access Teams | | | | | | |
| | **Obj. 1.3** | **Scheduling and Tracking System** | | | | | | |
| ✔ | Act 1.3.1 | Strategic Offender Management System | | | | | | |
| | **Obj. 1.4** | **Standardized UM System** | | | | | | |
| ☒ | Act 1.4.1 | Long-Term Care Pilot | | | | | | |
| ✔ | Act 1.4.2 | Implement Centralized UM System | | | | | | |
| | **GOAL 2** | **Establish a Medical Services Program** | | | | | | |
| | **Obj. 2.1** | **Access and Processes for Primary Care** | | | | | | |
| ✔ | Act 2.1.1 | Redesign sick call | | | | | | |
| ✔ | Act 2.1.2 | Implement new sick call system statewide | | | Shortened to 12/2009 | | | |
| | **Obj. 2.2** | **Chronic Care** | | | | | | |
| ✘ | Act 2.2.1 | Chronic Care Initiative | | | | | | |
| | **Obj. 2.3** | **Emergency Medical Response System** | | | | | | |
| complete | Act 2.3.1 | Emergency Medical Response Policy | | | | | | |
| ✔ | Act 2.3.2 | Certification and Training | | | | | | |
| complete | Act 2.3.3 | Standardize Emergency Equipment | | | | | | |
| | **Obj. 2.4** | **Specialty Care and Hospitalization** | | | | | | |
| ✔ | Act 2.4.1 | Utilization and Care Management Policies | | | | | | |
| ✔ | Act 2.4.2 | Statewide Specialty Care Contracts | | | | | | |
| ✘ | Act 2.4.3 | Specialty Care Invoice Payments | | | | | | |

**Status of Turnaround Plan of Action**
**As of May 15, 2009**
Case 2:90-cv-00520-KJM-SCR    Document 3595-1    Filed 06/01/09    Page 14 of 97

| 5/15/09 Status ⇩ | | | 2008 2nd Q | 3rd Q | 4th Q | 2009 1st Q | 2nd Q | 3rd Q | 4th Q | 2010 1st Q | 2nd Q | 3rd Q | 4th Q | 2011 1st Q | 2nd Q | 3rd Q | 4th Q | 2012 1st Q | 2nd Q | 3rd Q | 4th Q | 2013 1st Q | 2nd Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **GOAL 3** | **Recruit, Train & Retain Medical Workforce** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 3.1** | **Physician and Nurse Recruitment** | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 3.1.1 | Nursing and Nursing Executive Positions | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 3.1.2 | Physician and Physician Executive Positions | | | | Extended to 6/2009 | | | | | | | | | | | | | | | | | |
| | **Obj. 3.2** | **Management Structure** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 3.2.1 | Establish and Staff Executive Leadership | | | | Extended to 9/2009 | | | | | | | | | | | | | | | | | |
| ✘ | Act 3.2.2 | Establish and Staff Regional Leadership | | | | Extended to 9/2009 | | | | | | | | | | | | | | | | | |
| | **Obj. 3.3** | **Professional Training for Clinicians** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 3.3.1 | Orientation and Preceptor / Proctoring | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 3.3.2 | CME Accreditation | | | | | | | | | | | | | | | | | | | | | |
| | **GOAL 4** | **Quality Improvement Programs** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.1** | **Quality Measurement and Evaluation Program** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.1.1 | Measurement, Eval. and Patient Safety Programs | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 4.1.2 | OIG Audit Program | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.2** | **Quality Improvement Program** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.2.1 | Train and Deploy QI Advisors to Develop Model | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.2.2 | Establish a Policy Unit | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.2.3 | Implement Improvement Programs | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.3** | **Medical Peer Review Process** | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 4.3.1 | Establish Peer Review Process | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.4** | **Medical Oversight Unit** | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 4.4.1 | Staff and Establish Medical Oversight Unit | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.5** | **Health Care Appeals** | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 4.5.1 | Centralize Appeals, Correspondence & Habeas | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 4.5.2 | Health Care Appeals Task Force & Report | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.6** | **Out-of-State & Other Facilities** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 4.6.1 | Administrative Unit for Oversight | | | | Extended to 9/2009 | | | | | | | | | | | | | | | | | |

# Status of Turnaround Plan of Action
## As of May 15, 2009
Case 2:90-cv-00520-KJM-SCR    Document 3595-1    Filed 06/01/09    Page 15 of 97

| 5/15/09 Status ⇩ | | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q |
| **GOAL 5** | | **Medical Support Infrastructure** | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.1** | | **Pharmacy Program** | | | | | | | | | | | | | | | | | | | | |
| complete | Act 5.1.1 | Drug Formulary | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 5.1.2 | Pharmacy Policies and Practices | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 5.1.3 | Central-Fill Pharmacy — Extended to 3/2010 | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.2** | | **Health Records** | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 5.2.1 | Roadmap for Standardized Health Records — Extended to 9/2009 | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.3** | | **Radiology and Lab Services** | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 5.3.1 | Determine strategy for HR, Lab and Radiology — Extended to 9/2009 | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.4** | | **Clinical Information Systems** | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 5.4.1 | Establish Clinical Data Repository | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.5** | | **Telemedicine Program** | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 5.5.1 | Secure Leadership for Upgrade — Extended to 9/2009 | | | | | | | | | | | | | | | | | | | | |
| **GOAL 6** | | **Clinical, Administrative & Housing** | | | | | | | | | | | | | | | | | | | | |
| **Obj. 6.1** | | **Upgrade Program** | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.1.1 | Assessment & Planning at 33 Institutions | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.1.2 | Upgraded Administrative & Clinical Facilities | | | | | | | | | | | | | | | | | | | | |
| **Obj. 6.2** | | **10,000 Bed Expansion Program** | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.2.1 | Pre-Planning on All Sites | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.2.2 | Construction at First Site | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.2.3 | Phased Construction Program | | | | | | | | | | | | | | | | | | | | |
| **Obj. 6.3** | | **San Quentin Construction** | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 6.3.1 | All Construction excluding Central Health Services — Extended to 6/2009 | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 6.3.2 | Central Health Services | | | | | | | | | | | | | | | | | | | | |

**Turnaround Plan of Action Goals**
**Percent Complete**
**As of May 15, 2009**

| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 1** | **Ensure Timely Access to Care** | | | | | | | | | | |
| **Obj. 1.1** | **Reception Center Screening and Assessment Processes** | | | | | | | | | | |
| Act 1.1.1 | Develop Standardize Screening and Assessment | | | | | | | 70% | | | |
| Act 1.1.2 | Implement Screening and Assessment Process | 0% | | | | | | | | | |
| **Obj. 1.2** | **Staffing and Processes for Health Access** | | | | | | | | | | |
| Act 1.2.1 | Preliminary Assessment for Access Teams | | | | | | | | | | 100% |
| Act 1.2.2 | Fully Implement Health Care Access Teams | | 20% | | | | | | | | |
| **Obj. 1.3** | **Scheduling and Tracking System** | | | | | | | | | | |
| Act 1.3.1 | Strategic Offender Management System | | | | 40% | | | | | | |
| **Obj. 1.4** | **Standardized UM System** | | | | | | | | | | |
| Act 1.4.1 | Long-Term Care Pilot | 10% | | | | | | | | | |
| Act 1.4.2 | Implement Centralized UM System | | | 30% | | | | | | | |

11

# Turnaround Plan of Action Goals
## Percent Complete
**As of May 15, 2009**

| | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 2** — Establish a Medical Services Program | | | | | | | | | | |
| **Obj. 2.1** — Access and Processes for Primary Care | | | | | | | | | | |
| Act 2.1.1 — Redesign sick call | | 20% | | | | | | | | |
| Act 2.1.2 — Implement new sick call system statewide | | 20% | | | | | | | | |
| **Obj. 2.2** — Chronic Care | | | | | | | | | | |
| Act 2.2.1 — Chronic Care Initiative | 10% | | | | | | | | | |
| **Obj. 2.3** — Emergency Medical Response System | | | | | | | | | | |
| Act 2.3.1 — Emergency Medical Response Policy | | | | | | | | | | 100% |
| Act 2.3.2 — Certification and Training | | | | | 50% | | | | | |
| Act 2.3.3 — Standardize Emergency Equipment | | | | | | | | | | 100% |
| **Obj. 2.4** — Specialty Care and Hospitalization | | | | | | | | | | |
| Act 2.4.1 — Utilization and Care Management Policies | | 20% | | | | | | | | |
| Act 2.4.2 — Statewide Specialty Care Contracts | | | | | | | 70% | | | |
| Act 2.4.3 — Specialty Care Invoice Payments | | 20% | | | | | | | | |
| **GOAL 3** — Recruit, Train & Retain Medical Workforce | | | | | | | | | | |
| **Obj. 3.1** — Physician and Nurse Recruitment | | | | | | | | | | |
| Act 3.1.1 — Nursing and Nursing Executive Positions | | | | | | | | | | 100% |
| Act 3.1.2 — Physician and Physician Executive Positions | | | | | | | | | 90% | |
| **Obj. 3.2** — Management Structure | | | | | | | | | | |
| Act 3.2.1 — Establish and Staff Executive Leadership | | 20% | | | | | | | | |
| Act 3.2.2 — Establish and Staff Regional Leadership | | 20% | | | | | | | | |
| **Obj. 3.3** — Professional Training for Clinicians | | | | | | | | | | |
| Act 3.3.1 — Orientation and Preceptor / Proctoring | | | | 40% | | | | | | |
| Act 3.3.2 — CME Accreditation | | | | | | | | | | 100% |

| | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 4** **Quality Improvement Programs** | | | | | | | | | | |
| **Obj. 4.1** **Quality Measurement and Evaluation Program** | | | | | | | | | | |
| Act 4.1.1 Measurement, Eval. and Patient Safety Programs | | 20% | | | | | | | | |
| Act 4.1.2 OIG Audit Program | | | | | | | | | | 100% |
| **Obj. 4.2** **Quality Improvement Program** | | | | | | | | | | |
| Act 4.2.1 Train and Deploy QI Advisors to Develop Model | | | | | 50% | | | | | |
| Act 4.2.2 Establish a Policy Unit | | | | | 50% | | | | | |
| Act 4.2.3 Implement Improvement Programs | | | | 40% | | | | | | |
| **Obj. 4.3** **Medical Peer Review Process** | | | | | | | | | | |
| Act 4.3.1 Establish Peer Review Process | | | | | | | | | | 100% |
| **Obj. 4.4** **Medical Oversight Unit** | | | | | | | | | | |
| Act 4.4.1 Staff and Establish Medical Oversight Unit | | | | | | | | | | 100% |
| **Obj. 4.5** **Health Care Appeals** | | | | | | | | | | |
| Act 4.5.1 Centralize Appeals, Correspondence & Habeas | | | | | | | | | | 100% |
| Act 4.5.2 Health Care Appeals Task Force & Report | | | | | | | | | | 100% |
| **Obj. 4.6** **Out-of-State & Other Facilities** | | | | | | | | | | |
| Act 4.6.1 Administrative Unit for Oversight | | | | | 50% | | | | | |

| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 5** | **Medical Support Infrastructure** | | | | | | | | | | |
| **Obj. 5.1** | **Pharmacy Program** | | | | | | | | | | |
| Act 5.1.1 | Drug Formulary | | | | | | | | | | 100% |
| Act 5.1.2 | Pharmacy Policies and Practices | | | | | | | 70% | | | |
| Act 5.1.3 | Central-Fill Pharmacy | | | 30% | | | | | | | |
| **Obj 5.2** | **Health Records** | | | | | | | | | | |
| Act 5.2.1 | Roadmap for Standardized Health Records | | | | | | | 70% | | | |
| **Obj. 5.3** | **Radiology and Lab Services** | | | | | | | | | | |
| Act 5.3.1 | Determine strategy for HR, Lab and Radiology | | | | | | | | | 90% | |
| **Obj. 5.4** | **Clinical Information Systems** | | | | | | | | | | |
| Act 5.4.1 | Establish Clinical Data Repository | | | | | 50% | | | | | |
| **Obj. 5.5** | **Telemedicine Program** | | | | | | | | | | |
| Act 5.5.1 | Secure Leadership for Upgrade | | | | | 50% | | | | | |
| **GOAL 6** | **Clinical, Administrative & Housing** | | | | | | | | | | |
| **Obj. 6.1** | **Upgrade Program** | | | | | | | | | | |
| Act 6.1.1 | Assessment & Planning at 33 Institutions | 10% | | | | | | | | | |
| Act 6.1.2 | Upgraded Administrative & Clinical Facilities | 5% | | | | | | | | | |
| **Obj. 6.2** | **10,000 Bed Expansion Program** | | | | | | | | | | |
| Act 6.2.1 | Pre-Planning on All Sites | | | | | | | | | 90% | |
| Act 6.2.2 | Construction at First Site | 0% | | | | | | | | | |
| Act 6.2.3 | Phased Construction Program | 0% | | | | | | | | | |
| **Obj. 6.3** | **San Quentin Construction** | | | | | | | | | | |
| Act 6.3.1 | All Construction excluding Central Health Services | | | | | | | | | 90% | |
| Act 6.3.2 | Central Health Services | | | | | | | 70% | | | |

# The Receiver's Reporting Requirements

This is the eleventh report filed by the Receivership, and the fifth submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* court concerning the following issues:

> 1.  All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
> 2.  Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
> 3.  Particular success achieved by the Receiver.
> 4.  An accounting of expenditures for the reporting period.
> 5.  Other matters deemed appropriate for judicial review.

(Appointing Order at p. 2-3.)

In support of the coordination efforts by the four federal courts responsible for the major health care class actions pending against the CDCR, the Receiver now files Tri-Annual Reports in four different federal court class action cases.  An overview of the Receiver's enhanced reporting responsibilities is included below.

*Plata, Coleman, Perez* and *Armstrong* Coordination Reporting Requirements
The Joint Order filed on June 28, 2007 in *Coleman v. Schwarzenegger* (mental health care), *Perez v. Tilton* (dental care) and *Plata v. Schwarzenegger* (medical care) approved various coordination agreements made between the representatives of the three health care class actions.  (Order Approving Coordination Agreements Attached to Joint May 29, 2007 Order, hereinafter "Joint Coordination Order.")  These coordination agreements provide for the *Plata* Receiver to assume responsibility for the following: (1) direct oversight of contracting functions for medical, dental, and mental health care; (2) implementation of long-term IT systems to include the medical, dental and mental health programs; and (3) oversight of pharmacy operations serving the medical, dental, and mental health programs.  (Joint Coordination Order at 2.)

The Receiver's assumption of these responsibilities is coupled with reporting requirements which mandate that the Receiver file progress reports addressing the following: (a) all tasks and metrics necessary to the contracting functions, implementation of long-term IT, and pharmacy services for mental health care and dental care, with degree of completion and date of anticipated completion for each task and metric; (b) particular problems being faced by the Receiver in accomplishing remedial goals; and (c) particular successes achieved by the Receiver in accomplishing remedial goals.  (Joint Coordination Order at 2-3.)

Additional reporting requirements were subsequently placed on the Receiver following his assumption of the management of certain coordinated functions involving the delivery of

Americans With Disability Act (ADA) related services in California prisons.  (August 24, 2007 *Armstrong v. Schwarzenegger* Order Approving Coordination Statements.")

On February 26, 2008, the *Plata*, *Coleman*, *Perez* and *Armstrong* courts issued an additional joint order which provides for the *Plata* Receiver to manage two major prison health care construction projects: (1) upgrades to improve health care delivery at the existing 33 CDCR institutions, and (2) the construction, on existing prison sites, of health care facilities for up to 10,000 patient-inmates (hereinafter "Order Approving Construction Agreement").  In addition, on March 10, 2008 the courts issued an additional joint order which provides for further development of the health care system's information technology program (hereinafter "Order Approving Information Technology Agreement").  As with the prior coordination Orders, the Receiver was ordered to file reports in each case concerning developments pertaining to matters that are the subject of the coordination agreements. (Order Approving Construction Agreement at 3:1-3; Order Approving Information Technology Agreement at 3:1-3.)

Modification to Receiver's Reporting Frequency
On November 19, 2008, the court issued the "Order Modifying Reporting Requirements" which modified the Receiver's requirement to file reports with the four federal courts every three months (quarterly) to every four months (tri-annually).  Therefore, the Receiver will now file Tri-Annual Reports on or before January 15, May 15, and September 15 each year.

Integration of Coordination Related Reporting in This Tri-Annual Report
Pursuant to the mandates of the various coordination Orders referenced above, the Receiver's remedial umbrella now encompasses the following: the overhaul of the health care contract function; the implementation of long-term IT systems; the oversight of pharmacy operations for medical, mental health, dental and ADA patient-inmates; and the oversight of health care prison construction projects.  As such, when this Tri-Annual Report describes progress and challenges facing reform of contracting functions, IT systems, pharmacy operations, and construction, all such references are referring to mental health, dental, ADA and medical care for patient-inmates.  Specifically, the Receiver's Coordination-related reporting is set forth in the following sections of this Report: Credentialing and Privileging of Health Care Providers (Goal 4, Objective 4.2); Contracts (Goal 2, Objective 2.4); IT Update (Goal 1, Objective 1.3; Goal 5, Objective 5.4); Telemedicine Reform (Goal 5, Objective 5.5); Coordination with Other Lawsuits (Section 8.A.); and Construction (Goal 6).

Reporting Related to the Order Waiving State Contracting Statutes
On June 4, 2007, the court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts.  The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date.   As ordered by the court, the Receiver provides a summary of each contract the Receiver has awarded under the substitute contracting process during the reporting period.  The Receiver's contract waiver-related report is provided in Section 8.B.

# Section 4
# Status of Turnaround Plan Initiatives

## Goal 1. Ensure Timely Access to Health Care Services

**Objective 1.1.**   Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

*Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*

*Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons*

Under the Access to Care Initiative, a multi-disciplinary Reception Center Core Team has been working to redesign the current Reception Center process, test the new process at a subset of institutions, and refine the program for statewide implementation.

As reported in the Tenth Tri-Annual Report, the Reception Center Core Team had completed the second of three pilot projects.  During this reporting period, the last pilot project was scheduled to begin at a dedicated Reception Center, North Kern State Prison, on February 10, 2009.  In February 2009, as a cost-savings measure, the Reception Center Core Team modified the initial pilot implementation plans by using group training sessions and tele-conferencing tools to reduce travel and related costs and to accelerate the roll-out schedule.  The Reception Center Core Team also began initial planning to integrate a disability evaluation with the Reception Center process in cooperation and coordination with the *Armstrong* class action court-appointed expert.

In an effort to better coordinate planning, the new Access to Care Integration Leadership Team began re-evaluating the Reception Center initiative activities in coordination with all four Access to Care initiatives. The new goal is to implement the Reception Center process redesign by December, 31 2009.   The specifics of this plan and progress reports related to all Access to Care initiatives will be provided in the next Tri-Annual Report.

**Objective 1.2.**   **Establish Staffing and Processes for Ensuring Health Care Access at Each Institution**

> *Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution*

This action was completed on schedule as set forth in the Turnaround Plan of Action.  As of January 2009, Preliminary Operational Assessments have been completed at each of the 33 CDCR institutions.  The last Preliminary Operational Assessment was conducted during the week of January 26 – 30, 2009 at Pelican Bay State Prison.  The review resulted in the recommendation of 62.34 positions for use as custody manager/supervisors, clinic officers, escort officers and transportation officers.

To summarize, the 33 Preliminary Operational Assessments combined with the eight Operational Re-Assessments have identified all health care custody program resources (excluding Community Hospital Guarding) needed at each location to improve and facilitate patient-inmate access to health care services such as routine primary care, on and off-site specialty care, on and off-site emergency care, and on-site inpatient care. Copies of all 33 prison Operational Assessments were provided to CDCR for an independent review of allocated staffing resources. The number of additional positions needed to complete this action will be dependent upon a joint review with CDCR of current staffing resources and field operations, and will be updated in the next Tri-Annual Report.  The Receiver will continue to cooperate with CDCR in a joint effort to ensure the most efficient use of custody resources is maintained for the delivery of health care services.

> *Action 1.2.2 By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions*

To date, full Health Care Access Units (implementation of staffing and procedures for operations *both* inside the prisons and in the community hospitals outside the prisons) have been established at three prisons:  San Quentin State Prison, California Medical Facility, and Avenal State Prison.

Moving forward, hospital guarding positions will no longer be assessed and implemented at each individual institution as originally planned.  Instead, plans are underway to assess and create strategically placed, locked guarding units at community hospitals throughout the State to improve resource efficiency.  Given this new direction for Community Hospital Guarding, it is no longer necessary to establish the "full implementation" (which was to include the Community Hospital Guarding component) at the remaining prisons.  Plans will now be made to consolidate the community hospital guarding function in locked guarding units strategically placed in community hospitals around the State to reduce the required custody resources and gain operational efficiencies.   The specific plans will be reported in the next Tri-Annual Report.

During the reporting period, a full implementation analysis was completed at California Institution for Men, the Correctional Training Facility, Soledad, and the California Rehabilitation Center. Custody Support staff will continue to work with the managers of Health Care Access Units at each prison to develop operational procedures, and assist with creating Post Assignment Schedules and a relief matrix to better utilize assigned resources and avoid overtime expenses. A revised assessment instrument will be completed in the next several weeks and will focus on operational improvements to ensure operational efficiencies are achieved at each prison. The revised assessment instrument will be reviewed by CDCR and healthcare representatives and provided to the court in the next Tri-Annual Report.

<u>Monthly Health Care Access Quality Report - Data Collection Instrument</u>
As previously reported to the court, a data collection instrument was developed and implemented in November 2008 to formally measure custody performance in providing patient-inmates with access to health care services. (Refer to Appendix 5, Executive Summary and Quality Report for March 2009, and Appendices 2-4, Receiver's Monthly Reports for March and April 2009.) As reported in the Tenth Tri-annual Report, over half of the institutions provided viable data for the Monthly Health Care Access Quality Report (Quality Report), but 16 institutions were unable to achieve this goal. A follow-up review was conducted with the Associate Wardens and analysts responsible for completing the Quality Report, and several obstacles were reported (e.g. some clinical schedulers do not utilize the ducat process and simply provide officers with a list of patient-inmates to be seen; clinical providers do not always coordinate with clinic officers when a patient-inmate does not show for an appointment; and several institutions do not have their Health Care Access positions activated and therefore relied on clinical data which does not reflect why patient-inmates are/are not seen by providers).

To improve the data collection process and ability to report viable data, regional one-day training sessions were held on January 20 through January 23, 2009 and February 3, 2009 for each institution's Health Care Operations Analyst and Office Technician. The training was designed to expand the understanding of Health Care Access Unit functions, roles, and responsibilities, by listing and discussing the ten most frequent barriers, distributing data collection methodology, defining counting rules, citing references, and providing feedback in question and answer periods.

During this reporting period, the ability of the institutions to provide viable data has steadily improved. As of the last Quality Report, March 2009, 30 institutions are providing viable data. Overall, the data collected thus far shows an improvement in institutional coordination between clinical and custody staff. The Quality Report for March indicates that 85 percent of all patient-inmates who received a ducat for a health care appointment were seen by a clinical provider. Specific to custody performance, the data element "Number of Inmates Not Seen Due to Custody" is declining. For the month of March, only 10 percent of those patient-inmates not seen were the result of custody operations.

Custody Support staff continue to work with the institutions to resolve obstacles encountered in collecting data and is working to integrate the Quality Report into CDCR's COMPSTAT report.

This integration will permit ease of information access, decreased reproduction of data to staff in various parts of CPHCS and CDCR, and allow for proper maintenance of historical data. A pilot is scheduled in the next several weeks after which time the collection process will be transitioned to CDCR. Related progress will be reported in the next Tri-Annual Report.

<u>**Objective 1.3.**</u>   **Establish Health Care Scheduling and Patient-Inmate Tracking System**

> *Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System with a scheduling and inmate tracking system as one of its first deliverables*

A centralized system for the scheduling and tracking of health care appointments, coordinated with all other appointments for patient-inmates, is an essential element of providing timely access to care. General offender scheduling and movement control within the 33 existing CDCR prisons and the planned new long-term health care facilities will be handled by the Strategic Offender Management System (SOMS). SOMS will include four informational components for each offender that are critical to the success of the prison health care system: a unique lifetime identification number; demographic information; continuous real-time location; and a comprehensive master schedule and scheduling prioritization protocol. Specific health care scheduling needs will be handled by a Health Care Scheduling System (HCSS), described below, which will interface with offenders' schedules in SOMS.

In March 2009, Electronic Data Systems was selected as the prime system integration consultant for the SOMS project following a rigorous nine-month long competitive Request for Proposals (RFP) process. Electronic Data Systems will lead a team that includes the development of a commercially available software product that is used, with necessary customizations, by several other State and local correctional agencies. A CDCR project team has been assembled, which includes a representative from CPHCS' Custody Support Services. Individual system functions will be implemented in the adult institutions in phases running through spring 2010, at which time all institutions are anticipated to have full functionality. The roll-out schedule is being developed and will be provided to the court when available.

The HCSS will have the capability to schedule medical, dental and mental health care appointments for offenders based on mandated health care requirements, offender requests, provider referrals, and chronic care plans. The HCSS will integrate with SOMS and the CDCR Business Information System (BIS)[1] as well as CPHCS' forthcoming Clinical Data Repository.

The HCSS RFP was completed in late 2008 and was released to the vendor community on January 9, 2009. The complete RFP is available for review at the CPHCS website (http://www.cphcs.ca.gov). CPHCS has retained Gartner, Inc. to assist with the vendor selection process.

---

[1] BIS will standardize, automate and integrate CPHCS's financial, procurement and human resources business processes for the headquarters and all 33 institutions.

CPHCS received several proposals by the February 23, 2009 due date for proposal submission. The Evaluation Team then began the three-tiered proposal evaluation process, eliminating those proposals that did not meet the minimum mandatory requirements set forth by CPHCS. The remaining bidders were invited to participate in bidder confidential discussions, and their proposals were scored according to the pre-established scoring and evaluation guidelines. The RFP responses that CPHCS reviewed and scored included both "off-the-shelf" and "best-of-breed" solutions, some of which would require significant levels of customization and development.

In March 2009, the Evaluation Team selected the finalist bidders to demonstrate their solutions and submit a Best and Final Offer proposal. Best and Final Offer proposals from bidders are due by June 8, 2009. The Evaluation Team will then incorporate the reviews from the demonstrations and score the finalist proposals to recommend a winning bid to the HCSS Steering Committee. It is currently expected that CPHCS will award the contract for the HCSS by the end of July 2009. An implementation of the HCSS to selected pilot sites is planned for summer 2010 with a subsequent phased roll-out to the remaining CDCR institutions. The HCSS will be completed by June 2010.

**Objective 1.4.** **Establish A Standardized Utilization Management System**

*Action 1.4.1. By January 2009, open long-term care units at one facility as a pilot project to assist in developing plans for other long-term chronic care facilities*

This initiative was established in the Turnaround Plan of Action as a bridge to increase the available medical beds until the Receiver's proposed new construction is completed. The California Medical Facility was identified as the pilot site for this project and planning was initiated on May 20, 2008.

A project was developed to convert the "H" wing in California Medical Facility to a 109 bed Outpatient Housing Unit with related clinical spaces and other renovations at a total project cost of $6.65 million. As reported in the Tenth Tri-Annual Report, this project was put on hold due to a lack of funding. This project remains on hold but will be considered as part of the overall health facility Master Plan as set forth in Objective 6.1 to upgrade all 33 institutions.

*Action 1.4.2. By October 2010, establish a centralized Utilization Management System*

The accelerated timeline to support UM departmental staffing, originally planned to be completed by June 2009, will not be achieved as reported in the Tenth Tri-Annual Report. Subsequent to the filing of the Tenth Tri-Annual Report and in light of the rapidly deteriorating condition of the State's fiscal and budget condition, the Receiver directed his executive staff to complete a comprehensive review of all Turnaround Plan of Action initiatives and projects, to prioritize those initiatives and projects, to review each initiative and project for its cost-effectiveness, and to recommend to the Receiver any changes. During this review, the Receiver

decided to hold off on hiring permanent clinical and administrative UM positions. As a result, completion of this action will revert back to the original October 2010 timeframe set forth in the Turnaround Plan of Action.

Rapidly escalating health care costs underscore the critical importance of effective UM processes to control cost outliers. Important drivers of escalating medical costs include medically unnecessary specialty referrals, infirmary bed shortages that prevent timely community hospital discharge, hospital admissions without concurrent medical oversight and an antiquated claims payment system that hinders prompt and accurate invoice payment with resultant lack of leverage for best rates within the community hospital and specialty networks.

A centralized UM departmental organization that focuses on field-oriented clinical support teams of UM Regional Physician Advisors and UM Nursing is currently being developed. Central departmental activities will concentrate on the monitoring of key operating data and its communication to medical management at local, regional and State levels, so that actions can be coordinated to reduce unnecessary health care costs and improve clinical outcomes. Regionally based UM teams will focus on the oversight of institutional outcomes, compliance with policies and procedures, and daily utilization management issues and challenges. The regional teams' goals will include efficient processing and medically appropriate approval outcomes for specialty referrals, institutional bed occupancy and community hospital admissions and discharge planning. Existing Institutional Medical Authorization Review Subcommittees will be transitioned to a standardized UM committee format that not only reviews provider referral appeals, but is accountable for referral outcomes and infirmary and community hospital bed utilization and guideline compliance, so that institutional familiarity and ownership of UM processes becomes ingrained in the local clinical culture.

A phased approach to departmental implementation – beginning with clinical physician and nursing regionally-based teams – is planned, so that critical cost avoidance and utilization management techniques can be immediately operational. Four of the six requested Regional Physician Advisory staff have been hired and have begun institutional mentoring and monitoring. Although the UM/Case Management Nursing Director position has not yet been filled, it is anticipated that existing qualified nursing staff can be assigned for many of the necessary regional team positions in order to accelerate implementation.

Once an electronic claims payment process is established, a Claims Appeal unit will be trained to provide clinical oversight of community hospital and provider billing practices and appeals. Elimination of duplicate payments, overlapping hospital interval payments and unbundled claims should contribute to significant cost avoidance.

For additional details related to UM, refer to Appendix 6.

## Goal 2. Establish A Prison Medical Program Addressing The Full Continuum of Health Care Services

**Objective 2.1.**   **Redesign and Standardize Access and Medical Processes for Primary Care**

> *Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models*

To accomplish the Receiver's objective, the Access to Care Sick Call Team had planned to implement a three-phased strategy: Phase I - Pilot new sick call processes and staffing models at select pilot institutions. Phase II - Refine pilot processes and staffing based upon the pilot findings. Phase III - Implement the redesigned sick call process at all CDCR institutions.  During this reporting period, the Sick Call Team continued activities as defined in Phase I including data collection.  Pilot planning for implementing redesigned Sick Call processes at Mule Creek State Prison, Central California Women's Facility and Richard J. Donovan Correctional Facility was completed. The team completed pilot site visits to document current sick call triage processes and to collect data on the demand for services, backlogs in scheduling, numbers of provider encounters, and send outs to local emergency rooms. Chart audits were conducted to create a baseline for Quality Improvement (QI) performance measures. Additionally, the team developed an open access scheduling model for pilot development.

In March 2009, remaining Phase I activities and all Phase II & III activities were suspended and Access to Care processes were reevaluated.  A reorganization of the Team occurred and a new Access to Care Integration Leadership Team is re-evaluating Sick Call Initiative activities, in the context of all Access to Care initiatives.  The goal is to implement the sick call process redesign more quickly and cost-effectively than originally planned.  The redesigned sick call process, forms, and staffing model are planned for accelerated statewide implementation by December 31, 2009, which is six months earlier than originally planned (Refer to Action 2.1.2 below). Specific plans and progress reports related to all Access to Care initiatives will be provided in the next Tri-Annual Report.

> *Action 2.1.2. By July 2010, implement the new system in all institutions*

The redesigned sick call process, forms, and staffing model are now planned for accelerated statewide implementation by December 31, 2009, which is six months earlier than originally planned.

**Objective 2.2.**   **Improve Chronic Care System to Support Proactive, Planned Care**

> *Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered*

The Chronic Care Initiative is scheduled for completion by December 2009.

The focus of the chronic care initiative is to build the infrastructure for both an effective chronic care system and an ongoing quality improvement process at each CDCR institution using a learning collaborative model. Institutions will effectively employ critical elements of the chronic care model, including the identification of high risk patient subpopulations, case management, use of evidence-based treatment protocols, and patient education and self management strategies. As a result of the lessons learned in the six pilot institutions during Phase I of this initiative, a chronic care policy has been drafted and is going through the approval process and will supersede the existing Inmate Medical Services Program Chronic Care and High Risk Policy (Volume 7).

Phase II of the initiative began in January 2009. The six pilot institutions continued to meet as a collaborative, participated in two learning sessions on diabetes and developed strategies to spread the Chronic Disease Management Program from the pilot yards throughout the institution. Simultaneously, the remaining 27 institutions began a statewide learning collaborative starting with asthma as the paradigm for learning the Chronic Care Model.  The statewide collaborative completed two-day learning sessions in January and March 2009, during which institution leaders shared strategies and outcomes, solved problems together and received technical assistance and training on rapid-cycle improvement, the elements of the Chronic Care Model, and evidence-based treatment guidelines.

In February 2009,  each of the three  regions participated in web-based virtual workshops which allowed the Regional Operations Leaders and Quality Improvement Advisors (identified in Goal 4, Objective 4.2) to conduct mini-learning sessions with smaller groups. These sessions facilitated more interactive collaboration than the larger and more didactic statewide sessions. In February 2009, workshops were held via website conferencing.

In April 2009, the Leadership Team with regional leadership began planning to implement the Chronic Care Model in all prisons by December 31, 2009.

<u>Mentoring and monitoring at the institutions</u>
During this reporting period, the Access to Care team worked with the QI Section to finish the training and deployment of ten quality improvement advisors who have started to work with the imbedded nurse consultants and staff at each of the 33 prisons to assist with implementation of the Chronic Care Model and the use of standardized QI processes and tools.

<u>The Primary Care Model</u>
During the last month of the reporting period, Access to Care leadership and the six pilot institutions identified the absence of a clearly formulated Primary Care Model of care as a barrier to effective care of chronic disease. The establishment of a team based Primary Care Model, with clear delineation of responsibility for managing populations (panels) of patients, must form the infrastructure of care throughout the CDCR. Establishment of such a Primary Care Model, then, is the first priority and the foundation for improvement in all other components of care, including timely accessed sick call, planned care of chronic disease, guideline based specialty care and cost-effective hospital care.

Electronic Care Management Registry

Patient registries help to manage panels of patients by providing the following three basic types of information: (1) individual patient reports with relevant clinical information (identification of high risk indicators, patient education and case management needs, medication compliance issues, and  evidence based guidelines) supplied to clinicians at the point of care; (2) exception reports, which can identify groups of patients in need of testing, procedures, or other intervention (education or out-of-sequence visits to improve control or reassess the clinical situation); and (3) aggregate reports to assist in system-wide patient panel management.

The Chronic Care Initiative has designed a registry customized to the needs of the yard clinics. The registry was deployed to the six pilot sites by January 18, 2009.  Based on their feedback, significant modifications were made to the original templates.

**Objective 2.3.**  **Improve Emergency Response to Reduce Avoidable Morbidity and Mortality**

*Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions*

This Action has been completed and is in the sustainability phase.

As reported previously, Action 2.3.1 is comprised of five elements: Element I – Establish emergency response policies and procedures; Element II – Pilot the initiative in two institutions; Element III – Modify policies and procedures based on feedback and lessons learned at the pilot institutions and from stakeholders; Element IV – Train each institution on the new policies and procedures; and Element V – Sustain the initiative through regular reviews of adherence to policy.

Elements I, II, III and IV were completed during prior reporting periods.  During this reporting period activities of Element V – Sustain the initiative through quarterly reviews of adherence to policy, has commenced.  All implementation follow-up visits to institutions were completed per the plan.  A self-audit tool and process was developed and disseminated to the institutions.  Self-audits have begun and are being reviewed and analyzed by the EMR project team.

Also, during the reporting period, the EMR team developed an Emergency Medical Response Review Committee (EMRRC) meeting documentation review/analysis process and an evaluation template.   The review focuses on EMRRC performance indicators which directly relate to emergency medical response.

Self-audit summary scorecards and analysis and EMRRC meeting analysis will be provided to the institutions' healthcare and custody executives, regional medical directors, regional directors of nursing and HQ clinical leadership.   These reports will include recognition of exemplary behavior as well as identification of negative trends with corrective action recommendations.

The EMR Team has initiated collection of potential revisions to the policy and procedures. During the next reporting period, the EMR team will solicit input for additional revisions to the policy and procedures with a revision target date of August, 2009.

> ### Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff

This Action is on schedule to be completed by July 2009.

The second component of the EMR Initiative is to develop and implement appropriate certification standards for all clinical staff and training programs for all clinical and custody staff.  This action is comprised of the following elements to achieve compliance:  Element I – Establish certification standards; Element II – Survey all institutions to determine the Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS) training needs; Element III – Identify and/or develop training contracts for BLS, ACLS and other training that will support the overall goal of the Initiative; and Element IV – Develop a training program to sustain on-going BLS/ACLS training and certification.

Progress during this reporting period is as follows:

Element I – Certification Standards for all clinical staff have been developed and implemented. These include BLS certification for all clinical staff and ACLS certification for selected staff based on their assignment.

Element II - The initial survey of training needs was completed in the prior reporting period. During this reporting period an additional survey was designed to identify ACLS and BLS certification needs for current Triage and Treatment Area (TTA) employees statewide.  The survey was conducted by Nursing Services with input from the Workforce Development Training Unit.  An additional survey was created for the purposes of determining how each institution provides ACLS and BLS training to employees and the current ACLS and BLS status of each employee statewide who does not work in the TTA.  Tabulation and analysis of the survey results will be completed within the next several weeks. The next step will be for the Workforce Development Training Manager to identify and compile a list of the available resources (vendors, community colleges, etc.) for medical personnel to obtain their ACLS/BLS certification.

Element III – A master services contract for first responder, BLS and ACLS training has been initiated for 16 institutions.  The remaining 17 institutions not included in the master services contract continue to obtain BLS/ACLS training from local providers in the community.  Providers (physicians, nurse practitioners, and physician assistants) and nursing continue to focus on BLS/ACLS certification.  As of the end of this reporting period, 75 percent of the providers have BLS certification and 83 percent have ACLS certification.  Ninety-nine (99) percent of the nursing staff in the TTAs is BLS certified with 99 percent of the classes certified

by the American Heart Association and 86 percent of the nursing staff in the TTAs is ACLS certified with 100 percent of the classes certified by the American Heart Association.

Element IV - The ongoing BLS/ACLS training program is being developed and will be managed by a Workforce Development Training Officer who began work in January 2009.

**Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response**

The third component of the EMR Initiative is to ensure standardization of equipment to support emergency medical response. The successful completion of this component includes the following: Element I – Identify critical emergency medical equipment; Element II – Inventory and deploy emergency medical treatment bags; Element III – Survey other EMR equipment needs; Element IV – Develop procurement methods; Element V – Procure and deploy EMR equipment; Element VI – Develop program sustainability.

This Action was completed in January 2009, as set forth in the Turnaround Plan of Action.

Progress during this reporting period is as follows:

Elements I and IV – These elements were completed in prior reporting periods.

Element II - Deployment of EMR Bags was completed during this reporting period. Institutions received a total of 486 bags and emergency supplies.

Element III - The initial EMR equipment inventory was completed during the last reporting period. Equipment requirements were verified through the Regional Health Care Managers and a final requirements matrix was developed and provided to executive management.

Element V – Thirty-one (31) defibrillators and 69 automated external defibrillators were deployed during this reporting period.

Element VI – The equipment sustainability program was developed during this reporting period. The EMR Standard Equipment Catalogue was developed and provided to CPHCS Procurement Services, institution Directors of Nursing, Regional Directors of Nursing, institution Health Care Managers, and Regional Administrators. In alignment with the approved equipment standardization and expansion strategy to achieve brand/model standardization over several fiscal years, a four-year standardization and expansion budget plan was developed.

**Objective 2.4.    Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality**

*Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals*

This action item is on schedule to be standardized statewide by June 2009 as set forth in the Turnaround Plan of Action.

Standardized Utilization Management processes include oversight of the following:

- Referral management;
- Infirmary bed  management;
- Community hospital bed management;
- Case management for high risk, high cost patients and patient groups;
- Care Coordination to mitigate morbidity and mortality caused by miscommunication and poor information sharing;
- Utilization and cost reports.

The pilots described below create a system to standardize referrals and infirmary and hospital bed management so that access to care and patient outcomes can be monitored and "logjams" decreased.  Cost avoidance will be optimized through UM and medical leadership cooperative oversight and interventions, based on utilization and cost reports.

Specialty Referral Management and InterQual Outcomes

Both the Southern and Central Regions are now operational, and implementation in the Northern Region was completed April 30, 2009.  With the hiring of a UM Regional Physician Advisory staff, an aggressive schedule of direct observation and monitoring will begin in all Regions, and it is anticipated that provider and leadership acceptance of referral management concepts will improve.

For additional details related to UM, various reports are attached as Appendix 6.  These reports assist physician mentoring and monitoring and promote the development of best practices and decisions regarding network management.  Initial review of performance data demonstrates the following:

- Personal, direct and continuous UM physician advisor support is essential at this time for institutional sustainability.

- The primary care provider community will need extensive education and prompt feedback regarding their specialty referral practices through the regular review of outcomes data and expectations of continuous improvement compared to prior results.

- Many network specialists' recommendations are not based on medical necessity. Discussions with key specialists regarding CPHCS expectations for evidence-based practice recommendations will be necessary.

- On-site specialty access does not control utilization by itself.  Without careful referral review, on-site services quickly become overwhelmed.

- UM Nursing is experiencing significant challenges from non-clinical UM data entry requirements that detract from necessary clinical review duties.  To enable institutional UM nursing to focus on important infirmary and acute community hospital patient case management and concurrent review, nursing leadership is actively reviewing strategies to share referral review duties among other functional nursing areas.

Infirmary/Community Hospital Bed Access

Both the infirmary bed management and community hospital management pilots were merged into one project.  The pilot was focused on Central Region institutions and community hospitals. Goals include: (1) generating standardized criteria for infirmary bed admission and continued stay and discharge; (2) development of processes to accommodate both medical and mental health needs; (3) development of reliable patient census information; (4) and promoting regular clinical rounds as medically necessary for all infirmary patients.

The Infirmary Bed Access Pilot began December 4, 2008.  Meeting regularly, a multidisciplinary team of physicians, nurses, bed placement personnel, mental health clinicians and correctional officers has developed oversight processes that include clinical rounds, discharge coordination with parole case management, discharge planning instruction and processes to identify alternative housing for patient populations that can be transitioned from OHU beds to the general population without  risk to their clinical status (patients with supplemental oxygen, special diets, pre procedures needing bowel preps).

While small improvements in patient transfers and bed vacancies have resulted, major transfer and discharge challenges continue.  Hospital aberrant bed days (patients who have no clinical reason to stay in the hospital, but have no suitable destination) remain in the hundreds per month, despite valiant attempts by management to reduce this number.  Weekly surveillance of all infirmary beds in the Central Region reveals that a large percentage of patient beds are occupied by patients who are long-term and who will need alternative placement options before they can be discharged.  They will not become available for hospital discharges until such solutions are found.  Predictable mental health overflow into medical beds continues to decrease bed availability on a regular basis and prevent hospital discharges.  Even with maximum efficiency, given the lack of treatment beds within the organization, health care staff will have no option but to continue to use outside hospital and providers at a significant cost.

Confirmation of the figures using a modification of the original Abt Tool used in 2007 to conduct  a  bed  sweep  of  all  Institutional  infirmary  beds  has  begun  in  the mini-Region.  The survey is expected to be completed mid-June 2009.  Once completed, the

assessment will be used to guide short-term patient placement as resources are identified or developed.

Accurate daily patient census information that is distributed to all stakeholders is a key tool to patient management in all health care systems. Currently, statewide, daily, accurate census information is not available. Improvements to existing IT systems are underway to provide this information, and it is anticipated that both upgrades should be available in summer of 2009.

Acute Community Hospital Pilot
This pilot was originally scheduled to begin mid-April 2009. Using available nursing resources and daily census information, regional and institutional UM nursing partnerships planned to teach and imbed standard processes for concurrent review of acute community hospital patients and discharge planning procedures and techniques. This training is on hold pending an agreement with union representatives regarding institutional case management positions and case management nursing organization.

As a workaround, plans to reallocate UM daily data entry requirements and basic referral processing duties to Specialty clinic and support personnel is contemplated. Once operational training on hospital case management skills can begin, processes to support regular clinical review and oversight of institutional patients in community hospitals and out of area hospitals will then be taught, so that the community hospital bed occupancy can be optimal.

Clinical Care Coordinator
The projected redesign of the current UM and specialty care nursing functions at the institutions to the new integrated functional role of Clinical Care Coordinator is delayed. Union agreement and Human Resources' processes will need to be in place before this role can be piloted.

Hospital Case Manager
As resources permit, current institutional nurses will be trained to support discharge planning, appropriate concurrent review and care coordination of community hospitalized patients, under the supervision of existing UM supervisory nursing personnel. This activity is currently operational under the Infirmary bed/Community Hospital bed pilot.

*__Action 2.4.2. By July 2009, establish on a statewide basis approved contracts with specialty care providers and hospitals__*

ProdAgio Contract Processing System
In February 2009, the Medical Contracts Branch successfully deployed the ProdAgio contract processing system in the remaining twelve institutions, providing each of the thirty-three institutions with improved tools to create and store contracts for direct medical care services. Training on the system is ongoing and full implementation is expected this year. During this reporting period, contract documents created before implementation of the ProdAgio system were uploaded into the system to complete the electronic library of direct medical care service contracts available for view and download on demand.

<u>Streamlining Medical Contracting and Aligning Resources to Achieve Performance Goals</u>
During this reporting period 58 exempt contracts and 42 contract amendments were executed.  In addition, bid efforts initiated in the previous reporting period resulted in 100 executed contracts during this reporting period for Temporary Relief Optometry, Speech Therapy, Dental Assistant, Dentist, Lithotripsy, Blood Bank and Prosthesis/Orthotics services. An average of 50 contracts and contract amendments were negotiated and fully-executed each month during this reporting period. In addition, 122 contracts for Occupational Therapy, Emergency Physical Therapy, X-Ray Technician, Statewide Physical Therapy, Mobile Ultrasound, Dietician, Clinical Laboratory Scientist, Psychiatrist and Podiatrist services are in the final stages of award resulting from competitive bid activity performed during this reporting period.

<u>Emergency Medical Services Committee</u>
As previously reported to the court, CPHCS formed an Emergency Medical Services committee in September 2008 comprised of a multi-discipline body designed to interface with community Emergency Medical Services, Hospital Emergency Departments, Fire Departments and Ambulance service providers.  The intent of the committee is to facilitate the successful negotiation of reasonable rates for ambulance contracts. During the past four months, the Medical Contracts Branch has initiated new contract activity with 25 providers and has 7 contracts pending rate approval.

<u>CDCR/CPHCS Business Information System Integration</u>
CPHCS is participating alongside CDCR in work groups organized by the CDCR's BIS[2] Team to define the business processes related to contract administration in order to facilitate a smooth integration of the BIS system into current CDCR/CPHCS contract processing cycle. The CPHCS BIS Implementation Manager will coordinate with the BIS development team to identify necessary modifications to the BIS system which are anticipated to offer business solutions and fiscal efficiencies better suited to supporting direct medical care contracting efforts.

<u>Status of Chancellor Consulting Group Hospital and Associated Physicians Contract Negotiations</u>
As of April 2009, the Chancellor Consulting Group (retained by the Receiver to re-negotiate hospital and associated physician group contracts) has successfully negotiated and executed 40 hospital letters of agreement and 17 additional letters of agreement pending approvals. This brings the total number of hospital agreements to 57.  An associated physician network has been negotiated and includes 1,805 physicians that have been included in hospital agreements and 928 individual physician letters of agreement, for a total of 2,733 physician providers.

The Chancellor Consulting Group has also formed a network of hospital and physician providers who have agreed to manage the transplant population after the University of California System and Stanford Medical Center refused to continue all or part of this service with the Department.

---

[2] BIS will standardize, automate and integrate CPHCS's financial, procurement and human resources business processes for the headquarters and all 33 institutions.

Additionally, they have negotiated individual letters of agreements for patients who require specialized services including transplants and other tertiary services not available in community acute care hospitals. At present, Chancellor Consulting Group is on schedule to complete their planned negotiations by July 2009.

> ***Action 2.4.3. By July 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner***

Efforts continue to manage CPHCS's processing of outside provider billing. The status and the related activities are detailed below.

Strike Team Solution to the Invoice Processing Backlog
A "Strike Team" was formed and began work on December 24, 2008 to adjudicate medical invoices in an effort to eliminate the invoice backlog. Members of the "Strike Team" include existing Healthcare Invoice, Data and Provider Services Branch staff and staff from other branches of the organization. In addition, experienced CPHCS invoice processers from other parts of the State worked on weekends in Sacramento to help the effort. Between December 24, 2008 and March 13, 2009 the "Strike Team" processed 29,620 invoices. The CDCR Headquarters and Regional Accounting staff and managers worked cooperatively with CPHCS to streamline payments through CDCR and the State Controllers Office. The focus of the "Strike Team" will now transition to the implementation of the Third Party Administrator electronic claims processing system as detailed below.

Contract with the Third Party Administrator
In April 2009, the CPHCS entered into an agreement with Correct Care, a Third Party Administrator, to implement an electronic claims processing system for medical claims. The Third Party Administrator will be responsible for transitioning the current manual medical invoice processing operation to a claims processing system based on industry best practices and standards applicable to the correctional environment. This system will be the lynchpin to future compliance with Court mandated payment timeframes. Initial meetings have begun and an implementation timeline is being developed and will be provided to the court in the next Tri-Annual Report.

The TPA has a subcontractor who will conduct post audit reviews of their payments. The CPHCS is in the process of entering into a separate agreement with their subcontractor to perform a post audit for all claims processed during the previous two years to identify duplicate payments as well as billing and payment errors.

Medical Invoice Processing Days
Overall, during the first quarter 2009, medical invoice processing days have begun to stabilize and level off as displayed on Table 1 below.

**Table 1.**



Statewide Invoice Processing Days - July 1, 2007 through April 29, 2009

Status of Contract Medical Database System Upgrades

The redesigned web-based Contract Medical Database (CMD) has been developed and deployed. The web-based CMD combines the 33 institutions' databases into a single centralized database providing real-time access to information and streamlining the maintenance of contracts and vendor data. Staff continues to meet with the IT programmers to provide input for modifications which enhance overall CMD system operation and performance. The web-based CMD allows medical contract and fiscal staff access to contract medical utilization and expenditure data to aid them in preparing reports for contract negotiations and budget documents.

# Goal 3. Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1.** **Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions**

### Action 3.1.1. By January 2009, fill 90% of nursing positions

This action item was accomplished as of November 2008. As of February 28, 2009, which is the most recent reporting period available, over 93 percent of the statewide nursing positions have been filled. (This percentage is an average of six State nursing classifications).

More specifically, the goal of filling 90 percent of the Registered Nurse (RN) positions has been achieved at 27 institutions (81.2 percent of all prisons). The six remaining institutions (18 percent) have filled 80 to 89 percent of their RN positions. The goal of filling 90 percent of the Licensed Vocational Nurse (LVN) positions has been achieved at 27 institutions (81.2 percent) and three institutions (10 percent) have filled 80 to 89 percent of their LVN positions. Fifteen institutions (45 percent) have achieved the goal of filling 90 percent of their Psychiatric Technicians (Psych Tech) positions. Seven institutions have filled 80 to 89 percent of their Psych Tech positions.

The following hiring related initiatives continued during the reporting period: (1) focused recruitment continues statewide for LVNs and Psych Techs; (2) presentations at nursing schools statewide; (3) advertisements in local papers, professional trade magazines, and online; and (4) mass mailers targeting LVN classifications. Additionally, there continues to be a push at all institutions with nursing vacancies to schedule interviews on a weekly basis and interview all interested applicants expeditiously. A direct mailer continues to be sent to LVNs residing near institutions with vacancies.

For additional details related to vacancies and retention, the December 2008 and January and February 2009 *Plata* Human Resources Recruitment and Retention Reports are included in the Receiver's February, March and April 2009 Monthly Reports. These reports are included as Appendices 2-4. The Human Resources Monthly Reports for December 2008 through March 2009 are included as Appendix 7, and the Workforce Development Branch Monthly Reports for December 2008 through March 2009 are included as Appendix 8. Nursing turnover is being monitored closely, and related data is included as Appendix 9.

The following metrics, which are a summary of the data in the February 2009 *Plata* Human Resources Recruitment and Retention Report, are included: Table 2 summarizes nursing filled percentages by prison; Table 3 summarizes nursing turnover rates by prison (also refer to Objective 3.3 and Appendix 9); and Table 4 summarizes nursing filled percentages and turnover rates by prison.

**Table 2.**



**Table 3.**



**Table 4.**



*Action 3.1.2. By January 2009, fill 90% of physician positions*

This action item was not achieved by the timeframe set forth in the Turnaround Plan of Action. However, a 90 percent fill rate for statewide physician positions is within reach, and progress was made during this reporting period toward achieving that goal.

Physician recruitment efforts continue to focus on "hard-to-fill" institutions, and most urban institutions have now hired into all primary care provider positions, proving the focused efforts at the "hard-to-fill" institutions successful. As of February 28, 2009, which is the most recent reporting period available, approximately 86 percent of statewide physician positions are filled. More specifically, 93 percent of the Chief Medical Officer positions are filled; 76 percent of the Chief Physician & Surgeon positions are filled; and 86 percent of the Physician & Surgeon (P&S) positions are filled. Sixteen institutions (48 percent) have achieved the goal of filling 90 percent of their P&S positions, all of which have filled at least 95 percent of their P&S positions. Seven institutions (15 percent) have filled 80 – 89 percent of their P&S positions. With the exception of San Quentin State Prison, all institutions still proving to be "hard-to-fill" are located in the Central Valley region. Significant improvements have been made in the Central "mini-region" during this reporting period with the filled rate at three of the four "mini-region" institutions nearly doubling from November 2008. The "mini-region" consists of the Substance Abuse Treatment Facility, Pleasant Valley State Prison, Avenal State Prison, and California State Prison, Corcoran. This improvement was accomplished by the creation of a "mini-region" and the hiring of dedicated nursing and physician executive leadership. In addition, specialized recruitment efforts for physicians continue with advertisements placed in professional periodicals, newspapers, online, direct mailers, conferences, and visits to residency programs.

For additional details related to vacancies and retention, the December 2008 and January and February 2009 *Plata* Human Resources Recruitment and Retention Reports are included in the Receiver's February, March and April 2009 Monthly Reports. These reports are included as Appendices 2-4. The Human Resources Monthly Reports for December 2008 through March 2009 are included as Appendix 7, and the Workforce Development Branch Monthly Reports for December 2008 through March 2009 are included as Appendix 8. Physician turnover is being monitored closely, and related data is included as Appendix 9.

The following metrics, which are a summary of the data in the February 2009 *Plata* Human Resources Recruitment and Retention Report, are included: Table 5 summarizes physician filled percentages by prison; Table 6 summarizes physician turnover rates by prison (also refer to Objective 3.3 and Appendix 9); and Table 7 summarizes physician filled percentages and turnover rates by prison.

**Table 5.**



**Table 6.**



**Table 7.**



**Objective 3.2**   **Establish Clinical Leadership and Management Structure**

> ***Action 3.2.1. By January 2009, establish and staff new executive leadership positions***
>
> ***Action 3.2.2. By January 2009, establish and staff regional leadership structure***

Activities related to Objective 3.2 are progressing, although this objective was not completed by the timeframe set forth in the Turnaround Plan of Action.

The Chief Executive Officer (CEO) examination was launched on December 24, 2008.  Since the exam commenced, 247 CEO eligibles have been added to the certification list.  Each Curriculum Vitae is being screened for interview consideration with the focus on our pilot locations (Folsom/Sacramento, Mule Creek State Prison and San Quentin).  During this reporting period, one CEO hire is in process.

The Nurse Executive examination was launched in September 2008.  Since the examination commenced, 190 Nurse Executive eligibles have been added to the certification list and seven Nurse Executives have been hired in statewide, northern, southern, central, "mini-region," and the construction program regional positions.  During this reporting period, of the seven total hires in this classification, three Nurse Executives began work in February 2009.  However, three other Nurse Executives declined job offers during this reporting period due to higher salary expectations.

The Medical Executive examination was launched in December 2008.  Since the examination commenced, 73 Medical Executive eligibles have been added to the certification list and six Medical Executives have been hired in statewide, central, southern, "mini-region," long-term care regional positions and for the Mule Creek State Prison and the San Quentin State Prison pilot locations.  These employees commenced work in March and April 2009.  An additional Medical Executive hire is in process for the remaining pilot locations at Folsom/Sacramento.

A fourth Receiver's Career Executive Assignment (RCEA) classification, entitled Clinical Executive was approved by the State Personnel Board on September 3, 2008.  This classification is intended for the chief and assistant chief responsible for all ancillary disciplines (rehabilitation, pharmacy, laboratory, radiology, optometry, podiatry, and dietary services).  The recommended salary for this class is being finalized, and the next step in establishing this classification will be to seek Department of Personnel Administration (DPA) approval for the proposed salary and for DPA to issue a pay letter.  The pay plan will be similar to the other RCEAs.  The civil service examination for this classification is nearing completion and should be finalized by the time DPA issues the pay letter.

A fifth and final RCEA, Health Care Administrator, was submitted to DPA and the SPB for consideration on January 4, 2009.  This classification completes the executive management structure for health care.  This RCEA classification will be responsible for all medical administration subject areas that are not clinical in nature.  DPA has declined to participate in the

formal review and creation of this class, as it is DPA's understanding that the RCEAs are created as a result of a stipulated agreement between CPHCS and SPB.  However, DPA will provide feedback on the Board item, as requested.  SPB staff has calendared the item; however, the five-member board has not yet approved this agenda item to be heard.  Staff of both organizations are working together to address the board's issues.

CPHCS staff continues to meet regularly with both DPA and SPB staff in an effort to foster better working relationships and to resolve issues to our mutual satisfaction.  CPHCS workload remains high and staff resources at the control agencies are limited.  In an effort to meet the operational needs of all three organizations, recent discussions have focused on delegation of some functions, streamlining procedures, and providing dedicated resources at DPA and SPB.

## Objective 3.3.  Establish Professional Training Programs for Clinicians

*Action 3.3.1. By January 2009, establish statewide organizational orientation for all new health care hires and institution-specific clinical orientation through a nursing preceptor or proctoring program*

Status of New Employee Orientation and Training
As reported in the Tenth Tri-Annual Report, the program was expected to be fully operational by the end of this reporting period and was to include dental and mental health staff.  However, due to State-imposed restrictions on travel, the Health Care New Employee Orientation (HCNEO) program was placed on hold effective February 9, 2009.   All regional sessions were cancelled and field staff was directed to attend local CDCR New Employee Orientation (NEO) until an alternate delivery method such as satellite or e-learning could be identified and implemented. CPHCS's Clinical Support Unit now delivers the physician preceptor program (previously delivered on day five of the HCNEO) using WebEx meetings offered through the internet.  A revised plan for delivering statewide organizational orientation will be provided in the next Tri-Annual Report.

Status of the Proctoring/Mentoring Program
CPHCS is committed to providing qualified proctors and mentors for the purpose of orienting new staff to correctional nursing, improving job satisfaction, and reducing employee turnover. The proctor and mentor program is designed for all new clinical CPHCS employees, including RNs and LVNs assigned to perform patient care functions.  The proctor and mentor program consists of a four-week program for RNs and a three-week program for LVNs in addition to the four-day HCNEO.

The proctoring and mentoring program has been developed and partially implemented at some institutions based upon their staffing capacity.  Over the past six months, a planning session was held at each institution to discuss the local process to implement the nursing services proctor and mentor program.   The planning sessions at each institution included the Nurse Consultant Program Review (NCPR)-Educator, Director of Nursing (DON), Supervising RN (as designated by the DON), and the Nursing Instructor.  Additionally, a Headquarters' NCPR was recently

approved and appointed to support the statewide implementation. As the proctor and mentor program is specific to each new employee hired by CPHCS, the implementation plan must remain flexible. The statewide implementation of the proctor and mentor program has commenced based on each institution's recent nursing hires and individual staff needs. Exit interview data supports the importance of an "onboarding" program that supports nurses as they adapt their practice to this challenging setting.

Full implementation of a proctoring/mentoring program was not complete by the timeframe set forth in the Turnaround Plan of Action. However, it is expected that this program will be fully operational by the end of the next reporting period.

> ***Action 3.3.2. By January 2009, win accreditation for CDCR as a CME provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education***

Objective 3.3 has been accomplished as of March 31, 2009, when CPHCS obtained accreditation as a Continuing Medical Education provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education. The Interdisciplinary Professional Development Unit within CPHCS is now responsible for the operation and administration of the Continuing Medical Education program which includes oversight of the planning, development, presentation, and certification verification of all Continuing Medical Education activities. The CPHCS will operate under the regulations of the Institute of Medical Quality in order to maintain compliance. This accreditation is valid until 2011.

During this reporting period, as part of the accreditation process, CPHCS's Continuing Medical Education Committee was involved in a survey by the Institute of Medical Quality. The survey consisted of a presentation, staff interviews and review of proof of practice documents. In addition to the accreditation results, a *Primary Care Introduction to Chronic Pain Management* activity was conducted at seven locations with a total of 78 clinicians attending and receiving Continuing Medical Education, *AMA PRA Category I Credits™*. In April 2009, the Continuing Medical Education Committee reviewed and approved two additional activities: *Principals of Just Culture – Application to Clinical Care* and *2009 Program Guide: Legal & Ethical Requirements for Correctional Mental Health in California*.

## Goal 4. Implement Quality Improvement Programs

**Objective 4.1.**  **Establish Clinical Quality Measurement and Evaluation Program**

*Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs*

This action is on schedule for completion as set forth in the Turnaround Plan of Action.

In November 2008, the CPHCS entered into a contract with the RAND Corporation to assess current measurement activities, collect information about other correctional and health system approaches to quality improvement, and ultimately recommend strategies for the CPHCS to routinely measure and evaluate program performance.  During this reporting period, RAND interviewed more than 50 subject matter experts between January 2009 and April 2009 to assess current quality measurement activities at the CPHCS, including on-site interviews with staff at four CDCR institutions.  RAND conducted literature reviews and key informant site interviews to research quality measurement at other correctional health care systems, including the Federal Bureau of Prisons, and systems in Texas, Missouri, Washington, and Canada.  RAND also researched access and quality measurement activities and non-correctional health care organizations and advisory groups, including the Department of Veterans' Affairs, Department of Defense, Integrated Healthcare Association, National Committee for Quality Assurance, Center for Medicare and Medicaid Services, and National Quality Forum.  RAND presented findings from this research activity to CPHCS executives in March 2009. An expert panel of nine members will rank proposed quality measurements for a final set of recommendations to be issued in the fall of 2009.

Beyond collaboration with RAND, the Research and Evaluation Unit continued to work with Access to Care staff in compiling a list of performance measures that might be included in a dashboard report for CPHCS executives.  In addition, the Research and Evaluation Unit assisted in the development of an evaluation strategy for the sick call pilot project, which involved data collection at three institutions.

The Quality Improvement Section has been exploring methods for collecting performance measurement and patient safety data per community standards, including on-site reviews, provider and patient surveys, and linking with statewide health care data sets, such as the Office of Statewide Health Planning and Development dataset.  In addition, the Quality Improvement Section is working with the Medical Oversight Program and mental health and dental executives to develop a standardized system for categorizing sentinel event data to allow Quality Improvement Section staff to more accurately track and trend quality of care problems.

***Action 4.1.2. By July 2009, work with the Office of Inspector General to establish an audit program focused on compliance with Plata requirements***

This Action is divided into two phases. Phase I includes program development and pilot implementation, and Phase II included statewide roll-out and implementation. Phase I is complete. During Phase I, the OIG developed the inspection instruments in a collaborative process with the CDCR, Prison Law Office, CPHCS staff and other stakeholders. The inspection tool is based on the Inmate Medical Services Policies and Procedure approved under the *Plata* Stipulation for Injunctive Relief. The OIG conducted pilot medical inspections at five institutions. The final pilot medical inspection was completed on June 12, 2008 and a stakeholder meeting was held on August 19, 2008 to discuss proposed revisions to the medical inspection instrument based on lessons learned during the pilot phase.

In September 2008, the OIG initiated Phase II of the Medical Inspection Program with a medical inspection at California State Prison - Sacramento. As of the close of this reporting period, the OIG has completed nine additional inspections at California Medical Facility, Richard J. Donovan Correctional Facility, Centinela State Prison, Deuel Vocational Institution, Central California Women's Facility, California Men's Colony, Sierra Conservation Center, California State Prison - Los Angeles County, and Pleasant Valley State Prison respectively. The first year inspection results will establish a baseline that will provide an objective, clinically appropriate method to evaluate and monitor the progress of medical care delivery to inmate-patients within each institution. Once final inspection reports are issued, the inspection results for each institution will be available to be viewed on the OIG website (http://www.oig.ca.gov).

Phase II began on schedule; however, due to the current budgetary constraints, the funding for a second OIG medical inspection team has been delayed until July 2009. The CPHCS has loaned three positions (one Physician & Surgeon and two Nurse Consultants, Program Review) to the OIG to ensure that the OIG is able to continue its medical inspections at the rate of one institution every three weeks.

## Objective 4.2.   Establish a Quality Improvement Program

Quality improvement is a hallmark of an adequate, fiscally responsible health care system. Using information from measurement and evaluation systems, as well as self-assessment and other sources of ideas for improvement, the health care system works on a continuous basis to improve both its efficiency and its outcomes. Improvements in clinical processes will also require updating of clinical policies and procedures.

Policy Implementation
The Credentials Committee's Policies and Procedures have been completed and approved by both the Credentials Committee and the Professional Practices Executive Committee. The Governing Body reviewed the policies in December 2008 which resulted in necessary changes. These changes have been incorporated and will be resubmitted through the formal review process for approval.

Credentials Committee

During this reporting period, the Committee reviewed 67 individual practitioner cases. Of those cases, 11 were approved, 31 denied and 25 are pending a final determination. In addition to the specific case reviews, the Credentials Committee has also reviewed and approved monthly activity reports that represent further detailed activities of the Credentialing and Privileging Unit. Specifically, the Unit processed 452 practitioner credential files, of which, 381 were approved, 47 denied and 24 were closed due to incomplete and/or untimely requests.

Approved Credentials File

During the previous reporting period, 81 civil service practitioners were identified as not having a credential file. To date, all but 31 have complied by completing a credential application. It is expected that by mid-May 2009, all existing civil service practitioners will have an electronic credential profile. Processes have been implemented to ensure that all new practitioners have a credential file established within the CredentialSmart database. Practitioners hired outside of the credentialing and privileging process are addressed with the local management through the Credentials Committee to ensure compliance with the credential requirements.

Two-Year Reappointment Compliance

During this reporting period, 206 two-year reappointments have been completed. The two-year reappointment process is an on-going process with new requests for practitioner compliance being sent out and completed every month.

Tracking of License and Board Certification Expirations

During this reporting period, 152 Notice of Licensure Expirations were processed and renewed. To date all practitioner licenses are current. In addition, five board certification expiration notices were provided to the human resources department for processing. The tracking of expiring license and certifications is an on-going process with notifications being sent out regularly to ensure that the practitioners have active current credentials and license at all times.

New Process and Requirements

During this reporting period, the credential verification reviews have been expanded to include Marriage and Family Therapists, Public Health Physician and Surgeons, Quality Management Physician and Surgeons, and Medical Executive classifications. The credential requirements now include verification of Basic Life Support Certification, Advanced Cardiac Life Support Certification, Drug Enforcement Administration Certification, and a minimum of three peer references. Finally, the credentialing requirements were added to the boiler plate language in the medical practitioner contracts and the credentialing requirements and application have been added to the Contracts Branch internet site within the CDCR website.

***Action 4.2.1. By September 2009, train and deploy a cadre of quality improvement advisors to develop model quality improvement programs at selected institutions.***

During this reporting period, the QI Section trained and deployed ten QI Advisors. The physician and nurse consultant QI Advisors completed two one-day QI Advisor trainings, as well as ongoing training and mentoring. A field guide was also completed and released to act as a quality improvement reference to the advisors. The QI Advisors have been coaching, mentoring, and reviewing the implementation of the Primary Care Model, the Chronic Disease Management Program, rapid-cycle improvement processes, and other concepts that are consistent with quality improvement at all CPHCS institutions. The goal is the establishment and promulgation of a quality improvement skill set that all medical staff can use to set improvement goals, test methods for achieving goals, and evaluate success.

***Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.***

To accomplish this action item, an action plan was established and divided into two elements that are being implemented concurrently. Element I includes development of the organization structure and program concept, recruitment and hiring of staff, and staff training. Element II includes the development of policies and procedures and the procurement and implementation of a policy tracking system.

During this reporting period, the recruitment and hiring of staff was completed and staff training is in process. The challenge of finding candidates with relevant qualifications, excellent writing skills, and experience in policy and procedure development delayed the filling of all of the positions within the Policy Unit.

Simultaneously, Element II is underway. A policy tracking system was procured and user training on the new system is in progress. This policy tracking system was chosen because it is designed to address policy management and compliance in a health care setting; it automates the process of documenting, communicating and maintaining an organization's policies and procedures; and offers a centralized library for all policies, procedures and forms. The Policy Unit staff have identified the most current versions of medical policies and uploaded them into the new policy tracking system. Staff has begun the process of updating existing policies and procedures, centralizing the policy development process, and standardizing the development of new policies and procedures.

This action item is currently on schedule to be completed by September 2009.

***Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors***

During this reporting period, the Quality Improvement Section developed a draft program description that describes the new Quality Monitoring and Improvement (QMI) Program at CPHCS. The QMI Program, which is inter-disciplinary and designed to encompass medical, mental health, and dental issues, consists of three major areas: a quality improvement committee structure at headquarters and in the field that provides direction to statewide and institution-level QI work, a group of QI Advisors at headquarters that provides technical assistance and training support, and QI Section staff, including research scientists and analysts that develop and implement QI programs, analyze data, compile reports, implement QI committee decisions, develop training, and perform other functions to support the overall QMI Program.

Also, the QI Section prepared for implementation of a new QI committee structure at headquarters and adaptations to the existing QI committee structure in the field. The QI committees at both levels will manage the QI system, routinely reviewing performance measurement data; prioritizing program areas for quality interventions; designing, implementing and monitoring interventions; and providing oversight for all QI operations, including dissemination of best practices, adoption of community standard QI processes, and training of all medical staff. Working with CPHCS, mental health, and dental executives, staff has developed a proposed headquarters committee structure, including committee membership, actions and responsibilities, and referral sources. Between January and April 2009, QI Section staff issued one QI committee policy, describing the new Clinical Guidelines Committee, and completed drafts of two additional policies. The Clinical Guidelines Committee is already a functioning committee, meeting at least monthly to adopt guidelines for patient care that become the standard of practice at the CPHCS. During this reporting period, the Clinical Guidelines Committee completed asthma guidelines, and began the evaluation process for diabetes guidelines.

## <u>Objective 4.3.</u>  Establish Medical Peer Review and Discipline Process to Ensure Quality of Care

***Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care***

This Action has been accomplished as set forth in the Turnaround Plan of Action.

The Professional Practice Executive Committee and Peer Review Subcommittee met 17 times during the reporting period and have reviewed a total of 134 referrals. The Peer Review Subcommittee closed 40 referrals following review or the successful results of training and/or monitoring plans, of which 31 new plans were implemented. The Governing Body approved 11 case closures of providers whose clinical practice was deemed to meet an appropriate standard of care following a peer review investigation.

The Professional Practice Executive Committee summarily suspended the privileges of three providers, while one provider separated from State service during the course of a peer review investigation.  The Governing Body also issued Notices of Final Proposed Action under the new policy to revoke privileges and employment of 3 physicians.  Graphical displays of Professional Practice Executive Committee outcomes for the period January through April 20, 2009 are presented in the Tables 8 and 9 below.

In an effort to ensure physicians are afforded their due process rights in a timely manner, CPHCS has taken affirmative steps to implement the entire disciplinary process to include the formal hearing.  During this reporting period, CPHCS was successful in convening three Judicial Review Committees for the formal hearings and has completed the first week of a three week hearing being held in Los Angeles.

While the PPEC's primary charge is providing for patient safety, PPEC is also charged with supporting physician practice improvement.  With an improving physician and mid-level workforce, the PPEC can increasingly focus efforts on remediation and practice improvement while still providing for increased patient safety.  During this reporting period training and remedial activities have increased.

**Table 8.**



**Table 9.**



**Peer Review Activity by Percentage**
**January - April 2009**

Summary Suspension 2%
Separated 1%
Case Closed 38%
Training/Monitoring 23%
Pending Cases 36%

Total:    134

*Tables 8 and 9 Results Explanation:*
*The data represented pertains to physicians and surgeons and mid-level providers.*
*"Separated" status refers to employees that separate from State service after a peer review investigation is initiated by PPEC.*
*"Case closed" is defined as physicians or mid-level providers that are deemed to be practicing at an appropriate standard of care after conclusion of training/monitoring or a peer review investigation.*
*"Pending cases" are referrals that are not yet closed due to training /monitoring or further information needed.*
*"Training/Monitoring" is the manner in which provider's are supported in the development of clinical competency through training/monitoring.*
*"Summary Suspension" is defined as a suspension of some or all of a practitioner's clinical privileges by a peer review body based on the determination that allowing the practitioner to continue without such limitation would put patients at risk.*

**Objective 4.4.  Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations**

*Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations*

This Action has been accomplished as set forth in the Turnaround Plan of Action.

The Medical Oversight Program (MOP) team consists of staff from the CPHCS, CDCR's Office of Internal Affairs, CDCR's Employee Advocacy and Prosecution Team and is monitored by the OIG.  The MOP has been conducting multi-disciplinary clinical investigations since January 1, 2008.

During this reporting period, the Medical Oversight Program was activated and rolled-out on twelve cases.  Teams rolled-out on nine "Unexpected death" and three "Non-death" cases for possible employee misconduct or practice issues; while on these roll-outs the teams were also responsible for identifying systemic issues.  Six (6) cases were "Opened for Investigation," 8 cases were "Rejected for Investigation," and 6 cases are "Pending" further review and presentation to the Medical Intake Panel.  Of the 12 cases, 4 were submitted by institutional health care managers on a CDCR Form 989, Request for Investigation, to be reviewed by MOP.

There have been 9 subject referrals to Nursing Practice Review and 16 subject referrals to the Professional Practice Executive Committee.  MOP is tracking all requests for investigation and referrals to Nursing Practice Review and Professional Practice Executive Committee for monitoring purposes and also to ensure a comprehensive assessment of "system vulnerabilities" can be accomplished within the CPCHS.  Efforts are underway to establish tracking tools to assess and report the "system vulnerabilities" by way of the MOP, clinical leadership, Utilization Management and Quality Improvement.   A subcommittee has begun collaborating to develop a classification and taxonomy for systemic issues.

During this reporting period, the MOP directed its focus on training institutional staff (custody and clinicians) on the Just Culture Principles, beginning with the Chief Medical Officers and Directors of Nursing in April 2009.   These principles will distinguish provider issues from "systemic vulnerabilities" to ensure the most effective and appropriate remedies are considered when responding to concerns identified in each investigation.

Also during this reporting period, the MOP has formed a subcommittee of program stakeholders to develop formal policies and procedures based on current practices as outlined in the Medical Oversight Program Guide.   The policies and procedures will provide greater detail to the processes the program agreed upon with key stakeholder executives and subsequently implemented.

A graphical display of MOP outcomes for January thru April 2009 is presented in Tables 10 and 11.

**Table 10.**



*Table 10 Results Explanation:*
*"Opened for Investigation" is a formal investigation conducted by MOP.*
*"Rejected for Investigation" is when a MOP inquiry does not result in a formal investigation being opened (e.g. due to insufficient facts to support an investigation).*
*"Direct Actions" are when a request for investigation is referred back to the hiring authority (health care manager) for employee remedial training, counseling, a letter of instruction, or adverse action for general administrative corrective purposes (e.g. attendance).*
*"Pending" is when a case is awaiting an investigatory assignment prior to Medical Inquiry Panel review.*

**Table 11.**



| Active Cases | NPR Referrals | PPEC Referrals | Non-Death Roll-Outs | Unexpected Death Roll-Outs | Opened For Investigation |
|---|---|---|---|---|---|
| 16 | 9 | 16 | 3 | 9 | 6 |

***Table 11 Results Explanation:***

*"Active Case" is any case currently under inquiry by the MOP (i.e. under preparation for Medical Intake or in the investigative process).*

*"NPR Referral" is made when the Medical Intake Unit suspects substandard clinical practices by a nurse and refers the case to the Nursing Practice Review Program.*

*"PPEC Referral" is made when the Medical Intake Unit suspects substandard clinical practices or clinical misconduct by a physician or mid-level provider and refers the case to the PPEC.*

*"Non-death Roll-Outs" are defined as any act that may cause imminent danger to the patient-inmate (e.g. disruptive conduct, unethical conduct, substandard competencies, fail to perform standards of care).*

*"Unexpected Death Roll-Outs" are cases when a patient-inmate is one of the following: 40-years old or less and has had no history of a chronic medical condition; was seen two or more times in the TTA within the last week of life, submitted two or more request for services in the last week of life. "Unexpected death cases" also include cases where possible inappropriate, absent or untimely care is suspected; death is directly attributed to asthma or a seizure condition; the patient-inmate returned from an off-site emergency room visit or acute care inpatient stay within 14 days prior to death; or a medication error is suspected.*

*"Opened for Investigation" are formal investigations conducted by MOP.*

**Objective 4.5.  Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative**

*Action 4.5.1. By July 2008, centralize management over all health care patient-inmate appeals, correspondence and habeas corpus petitions*

This Action was divided into two phases and is complete.  Phase I was completed in October 2007 and included the consolidation of all correspondence and habeas corpus petition responses under the Controlled Correspondence and Litigation Support Unit (CCLSU).  Phase II was completed on August 1, 2008, and included the separation of health care appeals from CDCR institution appeals and the establishment of the Office of Third Level Appeals – Health Care. Previously, institution appeals were routed through CDCR institution appeals which the Receiver deemed inefficient and unnecessary.  The third level appeals were also responded to by CDCR custody staff who lacked the medical knowledge to appropriately respond to patient-inmates' health care issues. Currently, all patient-inmate health care appeals are completely centralized and consolidated under the Medical Policy and Program Compliance Branch.

Controlled Correspondence Unit

The impact of Phase I, particularly the consolidation of correspondence, has caused a sharp and marked increase in workload for the Controlled Correspondence Unit (CCU).  CCU now conducts the research and provides responses to all patient-inmate, family, and advocate correspondences to the Honorable Judge Thelton Henderson, as well as the Receiver; telephone calls placed to the Inmate Health Care Inquiry Hotline; correspondence addressing health care issues for patient-inmates that are part of the California Out-of-State Correctional Facility (COCF) program; correspondence for the Sacramento Central Office; correspondence for the Western Interstate Compact programs; and the review and routing of all Receiver website e-mail inquiries.  Since June 2008, CCU has received an average of 515 inquiries each month.

The increase in workload since June 2008, impacted staff's ability to respond in a timely manner and resulted in a significant increase in overdue responses. Additional staffing for a new Controlled Correspondence team to address the increased workload was requested and the positions have been filled with one exception. Overdue responses spiked in January 2009 to a high of 430, but with the increased staff and a limited amount of overtime, overdue responses decreased in February and March 2009, to 355 and 285 respectively.  In addition, policies and procedures are currently being reviewed to streamline CCU processes, and it is anticipated the number of overdue responses will continue to decrease.

Refer to Table 12 below regarding the tracking of CCLSU incoming inquiries and overdue responses for January through April 2009.  The CCLSU Executive Summary Report for January through March 2009 are included as Appendix 10.

**Table 12.**



Habeas Corpus Petitions

The development of a habeas corpus response policy was initiated as a result of multiple requests for information or action submitted by the courts to the California Prison Health Care Receivership related to petitions for writ of habeas corpus submitted by patient-inmates confined within CDCR. When a habeas petition is received, the patient-inmate's medical records are reviewed by the Chief Medical Officer of the Clinical Support Unit.  This evaluation includes a review of all legitimate health care issues that may be identified in the petition and the development of a Corrective Action Plan (CAP), if necessary, to address the health care issues identified in the petition.

The volume of Habeas Corpus petitions received remains inconsistent month to month, as it did during 2008.  However, an average of seven petitions were received during each of the last four months of 2008 and for each of the first four months of 2009.  The number of CAPs initiated varied slightly from the previous reporting period, showing a small decline.  Completed CAPs have increased slightly; however, overdue CAPs remain approximately the same.

Refer to Table 13 below regarding the tracking of habeas corpus petitions for January through April 2009.

**Table 13.**



Institutional Health Care Appeals

In August 2008, the processing of health care appeals was separated from all other inmate appeals. The Receiver determined that health care appeals routed through CDCR institution appeals was both unnecessary and inefficient.

The first four months of 2009 saw the total number of health care appeals processed and received at institution health care appeals offices increase slightly over the prior period. However, the total average overdue appeals volume declined.

Refer to Table 14 below regarding the tracking of health care appeals by the CCLSU for January through April 2009.

**Table 14.**



Health Care Appeals – Office of Third Level Appeals

On August 1, 2008, the Office of Third Level Appeals began receiving all third level appeals regarding health care issues. Due to the higher than anticipated volume, there are a significant number of overdue third level appeals presently, and additional staffing is currently in the process of being hired. However, based on a recent workload analysis, additional positions will be required and are being requested. Additionally, Office of Third Level Appeals is conducting a re-engineering analysis in an effort to streamline the Office of Third Level Appeals processes.

Table 15 below displays data related to the Office of Third Level Appeals for January through April 2009.

**Table 15.**



*Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver*

This Action is complete as set forth in the Turnaround Plan of Action.

**Objective 4.6.  Establish Out-of-State, Community Correctional Facilities and Re-entry Facility Oversight Program**

*Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities*

This action is complete as set forth in the Turnaround Plan of Action.

During this reporting period, CPHCS's Field Support Division (staff assigned to the Receiver's COCF Program); Program Oversight Unit; and the Corrections Corporation of America (CCA) have continued to work collaboratively on improvements at the Tallahatchie County Correctional Facility (TCCF) in Mississippi. An update is being provided regarding the following remedial measures agreed to be implemented by CCA:

1. <u>Implement a CAP in a timely manner at TCCF.</u>

   Meetings were held in California during the weeks of January 12-16, 2009, March 9-13, 2009, and April 20-24, 2009, in an attempt to finalize all outstanding policies related to implementation of the CAP.  As a result of these collaborative efforts, the following items have been approved by CPHCS and are pending implementation by CCA:

   - Nursing Referral Guidelines and 28 Nursing Protocols;
   - Nurse Practitioner Protocols; and
   - Monitoring Reports, which included instructions and examples of completed reports, designed to monitor CCA's compliance with the following processes:
     - Intake Screening;
     - Sick Call;
     - Specialty Care Referrals;
     - Medical Transports;
     - Hospital Stays and Emergency Department Visits; and
     - Watch List.

   Additionally the following policies have been finalized and submitted for final approval by CPHCS Clinical Services' executive staff.  It is anticipated that the following policies will be approved by CPHCS during the next reporting period:

   - Health Evaluations for Pre-Segregation/Segregation Access to Health Care;
   - Informed Consent/Refusal of Care;
   - Medical Records;
   - Observation Beds;
   - Off-site Care-Consultation;
   - Pharmaceuticals;
   - Physician's Orders and Nursing Protocols;
   - Sick Call;
   - Health Appraisals;
   - Initial Intake Screening;
   - Infection Control;
   - Credentialing, Privileging and Licensure;
   - Transportation;
   - Transfer/Release Screening and Follow-up; and
   - Inventory Management.

   Meetings will be scheduled to finalize CCA policies related to implementation of chronic care, quality improvement, peer review, investigations, sentinel events and medical emergency response programs.  The status of each of these programs will be updated during the next reporting period.

2.  Increase clinical staffing at TCCF.
    Although CCA has made interim adjustments to their original staffing patterns, as part of the CAP they are required to complete a staffing analysis to determine whether their current staffing levels and classifications are sufficient to provide health care services to the California patient-inmate population housed in their facilities.

    During the previous reporting period, CCA submitted a proposal requesting additional staffing for their facilities housing California patient-inmates.  However, based on CPHCS's Field Support Division's review of the proposal numerous questions and concerns were raised and a decision was made to modify the methodology used to conduct the staffing analysis.  Consequently, no decisions have been made regarding this issue to date.  It is anticipated that the staffing analysis will be completed during the next reporting period and discussed with the Receiver and CPHCS.  Once the staffing levels and classifications have been agreed upon, CCA will be required to follow State processes to obtain any modifications to their existing budgeted/contracted levels.

3.  Seek approval by the Receiver's clinical team concerning all future physician hires that will treat California patient-inmates.
    During this reporting period, Field Support Division staff met with CCA staff to develop a final draft policy related to credentialing, privileging and licensure.  The policy is pending final review by CCA's Chief Medial Officer and will then be submitted to CPHCS's clinical leadership for review and final approval.  An agreement was also reached regarding CCA's peer review policy and it is being finalized for the same level of review and approval. Pending final approval of these policies, CCA continues to obtain review and approval of all potential licensed independent practitioner hires through the Receiver's clinical staff prior to a job offer being made.  The Receiver's clinical staff continues to perform Clinical Performance Appraisals on all licensed independent practitioners providing care to California patient-inmates.

    It is anticipated that all CCA policies related to this process will be finalized and approved during the next reporting period.

4.  Establish a special CCA oversight organization to monitor and manage the health care provided at all CCA facilities which house California patient-inmates.
    CPHCS staff and CCA's California Oversight Team continues to work collaboratively to finalize policies and move into the implementation phase of the CAP.  Numerous meetings continue to occur and discussions are ongoing regarding any deficiencies found during this process.  As CCA finalizes their health services management structure at TCCF, Regional CCA, and National CCA levels, updates will be provided regarding the permanent structure that is established.

5.  Over time, CCA will implement the TCCF remedial plan at all CCA facilities which house California patient-inmates, creating an internal CCA structure which will provide consistent medical care to California patient-inmates.

As we finalize the numerous issues associated with the CAP, the Office of the Receiver and CCA will meet to discuss the plan to roll-out the CCA CAP to the remaining facilities housing California patient-inmates.

COCF Medical Screening Criteria

During this reporting period the new screening criteria was implemented statewide. As a result of a stricter criteria, the number of patient-inmates identified as ineligible for out-of-state placement has increased.

"At Risk" Patient-Inmate Returns to California

CPHCS clinical staff continues to have weekly meetings with CCA's clinical leadership at all CCA facilities housing California patient-inmates, the Regional Medical Director for California patient-inmates and the COCF Chief Medical Officer to discuss patient-inmates with chronic diseases or other immediate medical problems and track their status through resolution of any medical issue. Daily discussions also occur when a medical problem arises with a patient-inmate.

COCF Staffing

The Office of the Receiver requested funding to obtain staffing to support the Field Support Division in their efforts to provide monitoring and oversight of the medical care being provided to patient-inmates housed in COCF, CCF and Re-entry Facilities within CDCR. The request took into consideration the decision to move from a general population COCF screening and transfer process to a Reception Center process, which will screen patient-inmates upon being received into CDCR for COCF eligibility.

As an interim solution, CDCR redirected 13 positions and associated funding to the Field Support Division to continue the COCF screening and transfer process through June 30, 2009, in support of the program. All but three of the positions have been filled or committed. Field Support Division continues to advertise vacant physician and surgeon, and nursing positions in anticipation of filling these positions prior to the end of the fiscal year.

The Office of the Receiver continues to work collaboratively with CDCR to obtain the resources required to provide monitoring and oversight of the COCF, CCF and Re-entry Programs.

COCF Reception Center Transfer and Screening Process

In December 2008, staff from the Office of the Receiver participated in a workgroup with CDCR staff to discuss processing patient-inmates for transfer to out-of-state facilities at Reception Centers, rather than from all 33 institutions. The Reception Center test will begin at two Reception Centers (Deuel Vocational Institute and North Kern State Prison) in June 2009.

Community Correctional Facilities

Field Support Division staff continues to provide direction, oversight, and monitoring of the CCFs. With seven CCF contracts expiring during the next fiscal year, Field Support Division staff, as well as clinical and nursing staff from the Office of the Receiver, are working

collaboratively with CDCR to develop standardized contract language required to ensure a constitutional level of health care services are being provided to the patient-inmate population housed in CCFs.

Re-entry Facilities Update
The CDCR continues performing pre-activation activity for the Northern California Re-Entry Facility; however, the anticipated activation has been moved from approximately July 2009 to October 2009.  The CPHCS continues to work collaboratively with CDCR concerning each step of the pre-activation efforts.

# Goal 5. Establish Medical Support Infrastructure

**Objective 5.1.   Establish a Comprehensive, Safe and Efficient Pharmacy Program**

Implementation of the pharmacy services *Road Map to Excellence* continues to move forward and to realize progress.  The *Road Map* gives priority to achieving improved patient safety and health outcomes, developing an evidence-based pharmacy practice and increasing cost-efficiency.  Progress continues and is detailed below.

### Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications

Development and improvement of the Formulary is an ongoing process.  The Pharmacy and Therapeutics (P&T) Committee meets monthly to address formulary issues, discuss and approve Disease Medication Management Guidelines, and review and approve pharmacy policies and procedures.  The CDCR Formulary is a key health care management tool oriented to the specific needs of the CDCR patient-inmate population, and reflects the goals of standardization of a contemporary, evidence-based, efficient, safe and cost effective correctional healthcare system.

During this reporting period, a need for migraine prophylaxis and Disease Medication Management Guidelines (DMMG) was identified as a result of a therapeutic category review.  Subsequently, a draft migraine DMMG and Drug Use Evaluations of Imitrix® (sumatriptan) and Straterra® (atomoxetine) were presented to P&T.  The DMMG for Migraine and therapeutic interchange programs for Strattera® (atomoxetine) and Renagel® (sevelamer HCl) were approved.  Additionally, a draft DMMG for Neuropathic Pain was developed with final approval anticipated in May 2009.  The HIV DDMG was also updated to reflect changes in national guidelines and current practice standards.

A number of requests for formulary additions were reviewed and approved as a part of the monthly formulary updates.  All updates to the formulary are distributed to provider and pharmacist staff, posted to the CPHCS website and are made available through the online *Epocrates* web service.  A cycle of ongoing therapeutic class review has been continued to ensure a regular review of all drug classes.  The P&T Committee also continues to review Formulary related requests at each of its meetings.

During this reporting period, Clinical Pharmacy Specialists continued their active support of pharmacy initiatives by providing in-service training to providers, pharmacy and nursing staff on approved DMMGs, conducting in-service training for facility staff on pharmacy policy and procedures, and discussing targeted non-formulary purchases with facility leadership.  New clinical and managed care reports are now routinely produced for facilities that are using the GuardianRx® operating system.  Monthly report sets are auto-emailed to Pharmacists-In-Charge (PIC) starting the first week of the month for the preceding reporting period.  The expectation is for the PIC to distribute and review the reports with Chief Medical Officer/Health Care Manager

and clinical staff. These reports include system-wide, facility level and provider level report cards.

As noted in earlier reports, the establishment of a viable P&T Committee process, the implementation of a CDCR-specific formulary and the development of evidence-based treatment medication guidelines are critical components of achieving improved cost-effectiveness in the system. This integrated approach and responsive contract strategies continues to demonstrate success in cost avoidance. As displayed in Table 16, through March 2009, Maxor has documented cost avoidance of $4,656,361 thus far in Calendar Year 2009 from the use of targeted contracting strategies linked to P&T Committee decisions.

**Table 16.**



*Table 16 Results Explanation*: *These categories represent specific P&T Committee initiatives targeting particular drugs or drug classes. Savings calculated by comparing purchases using the actual targeted contract rate to the pre-targeted contract rate.*

Contract, purchase, and inventory monitoring efforts also continue to yield results by avoiding unnecessary costs due to out-of-stock orders and ensuring that the correct contracted items are purchased. Targeted contracts, order management activities, and the implementation of a wholesaler agreement tailored specifically to address the pharmaceutical needs of the CDCR health care system continue to contribute to savings as displayed in Tables 17 and 18. In this

reporting period, through the month of March 2009, more than $11.9 million in expenditures were avoided when compared to prior historical trends.

**Table 17.**



***Table 17 Results Explanation****: Cost savings/cost avoidance calculated based on comparing actual wholesaler purchases to prior historical trend line (also based on wholesaler purchases). Data pulled monthly from Wholesaler Purchase data. Maxor began managing pharmacy purchasing in April-May 2007.*

**Table 18.**



*Table 18 Results Explanation*: *Savings/Cost Avoidance is calculated by comparing actual wholesaler purchases to prior wholesaler purchase trend line. Maxor began managing pharmacy purchasing in April-May 2007.*

**Action 5.1.2. By June 2009, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system**

Pharmacy Policies and Practices
During this reporting period, the CDCR P&T Committee has continued to review and revise Pharmacy Policies and Procedures as needs are identified. This process involved reviewing and updating the policies to reflect improved practice standards, implement quality control measures and standardize pharmacy processes. The P&T Committee approved revisions to Chapter 5 - Emergency Drug Supply and Chapter 24 - Handling of Antineoplastic Medications (first revisions) and initiated a second cycle review of revisions to Chapter 1 - Pharmacy Policy and Procedures Manual, Chapter 2 - Pharmacy Licensing Requirements, Chapter 4 - CDCR Pharmacy and Therapeutics Committee, Chapter 27 - Reporting Medications Errors & Adverse Drug Reactions, Chapter 34 - Heat Risk Medications and Chapter 8 - CDCR Drug Formulary. During this reporting period, pharmacy leadership has identified an increased need to focus on implementation of policy and procedures at the facility level to ensure compliance. Visits to facilities found that not all new or revised pharmacy policies and procedures have been fully implemented as required. A follow-up plan has been developed to visit all facilities where

polices are not fully implemented and to set specific timelines and corrective action plans to ensure that the facilities implement required policies.

A renewed emphasis has been placed on the use of the *MC Strategies* online training and assessment tool to provide in-service training.  Facility PICs were given instruction and introduced to *MC Strategies* management reports in order to monitor staff progress. Expectations were established with a target of a 95 percent completion rate by the end of the month.  Facilities deficient in compliance are required to submit a written plan of action to bring training compliance up to the targeted levels.  During this reporting period, 13 facilities achieved or exceeded this goal and overall completion rate improved by 31 percent. Also during this reporting period, a new PIC orientation was held in late January 2009 as part of a new program to enhance the training of new PICs.

Recruitment efforts continue in an effort to fill pharmacy positions across the State.  Work continues through the centralized hiring process to identify, interview and select qualified applicants.  So far, through the first three months of 2009, twenty-eight interviews have been conducted; eighteen offers were made; fifteen accepted and three declined after a visit to a facility.

Following the most recent quarterly assessment of workload and staffing, recommendations are being implemented on the redeployment of positions from sites with fewer prescriptions per person to sites where the prescription per person is above average. Additionally, it has been recommended that training Pharmacy Technician positions be moved from training sites into facilities requiring extra assistance to accomplish their daily work load.

Pharmacy inspections are conducted and documented monthly, with slow but steady progress forward across the State.  The number of pharmacies with an inspection rating score of pass/problem (not failed) has increased from 21 percent in March 2007 to 76 percent in February 2009.  The Maxor team is also continuing to objectively validate the improvements for any facility moving from non-passing to passing status in their monthly inspection reports by conducting independent onsite validations (an important verification process which began last year).  Pharmacy inspection status data is displayed in Table 19.

**Table 19.**



***Table 19 Results Explanation*** *Pharmacy areas are denoted in blue, and non-pharmacy locations (medication administration locations) are denoted in red: Independent Maxor Validation of Monthly Inspection Data began in Feb 2008.*

Roll-out of the GuardianRx® System

The GuardianRx® pharmacy operating system has now been successfully implemented in 20 of the 33 CDCR institutions (California Correctional Center, High Desert State Prison, Folsom State Prison, Mule Creek State Prison, California State Prison - San Quentin, California State Prison - Sacramento, California Men's Colony, Chuckawalla Valley State Prison, Ironwood State Prison, California State Prison - Corcoran, Substance Abuse Treatment Facility, Central California Women's Facility, Valley State Prison for Women, and California Institution for Women, Deuel Vocational Institution, North Kern State Prison, Kern Valley State Prison, Pleasant Valley State Prison, California State Prison – Los Angeles County, and Salinas Valley State Prison). Group training for PICs on the GuardianRx® system and the implementation process has continued as scheduled.

A review of the GuardianRx® implementation schedule conducted by the GuardianRx® Steering Committee resulted in a decision to revise the GuardianRx® roll-out schedule in order to allow time for more training, to allow a reasonable period of time to orient newly recruited nursing implementation leadership staff, to improve efficient use of limited roll-out team resources and

to allow facilities with significant infrastructure issues additional time to address those challenges. A revised schedule for the next six conversion sites has been approved, detailing conversion activities through September of 2009. A schedule for the remaining facilities will be developed by the Steering Committee. An additional schedule has been developed to return to facilities that have already implemented GuardianRx® in order to assess their status, provide supplemental operational oversight and training and to upgrade the facilities with new system functionality. This effort is viewed as an essential component of monitoring and sustainability efforts.

Maxor is on schedule to improve pharmacy policies and practices at each institution by June 2009, having completed an initial review and revision of all pharmacy policies and procedures. However, the roll-out of the GuardianRx® system has been extended, as described above, and will not be fully implemented statewide until early in 2010. As currently planned and resourced, the system will be implemented in 26 of the 33 facilities by the end of September 2009, with the remaining seven facilities to follow. The conversion schedule is under continual review by the GuardianRx® Steering Committee and updates to the schedule will be included in the next Tri-Annual Report.

### *Action 5.1.3. By February 2009, establish a central-fill pharmacy*

Work continues towards the establishment of a Central Fill Pharmacy Facility for the CDCR. The pre-centralization ambulatory model is being defined and implemented as processes are standardized and validated as part of the GuardianRx® implementation work plan.

During this reporting period, a contract for the automation design and equipment was executed and formal design work and coordination begun. Significant progress was made on completion of the specifications needed to incorporate the planned facility automation. Work has been completed on initial block diagram floor plans for the new pharmacy facility and development of build-out specifications, including the identification of specific site adaptation requirements needed to accommodate the automation system. Department of General Services' architect and space planners have been meeting with the pharmacy team and automation vendor to refine the scope of the build-out and to address security, production area and pre-packaging needs. Additionally, Maxor has retained the services of an expert qualified to assist in identifying and meeting applicable Food and Drug Administration manufacturing specifications. Meetings were also held with Drug Enforcement Administration staff to review construction requirements applicable to the new building. The Department of General Services, CDCR and Maxor are working cooperatively to negotiate final build-out and lease terms with the property owner, with construction work estimated to begin by June 2009.

Maxor's 2008 Annual Report is included as Appendix 11, and a Monthly Report for February 2009 is included as Appendix 12. Maxor's 2009 Annual Report, Monthly Reports, and the CPHCS Formulary are also available for review at the CPHCS website (http://www.cphcs.ca.gov).

**Objective 5.2.  Establish Standardized Health Records Practice**

*Action 5.2.1. By February 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions*

To create a standardized health records practice that supports constitutionally-adequate healthcare system, CDCR's current operations need to be assessed, a roadmap for transformation of the system to support health records best practices must be created, a plan based on the road map must be established, and the plan must be implemented.

As reported in prior reports, Sourcecorp, Inc. (Sourcecorp) is the organization the Office of the Receiver contracted with to provide health information management (HIM) professional services.  During this reporting period Sourcecorp submitted deliverable three – the Remediation Road Map. An abstract of the HIM Remediation Road Map was presented to the HIM Executive Sponsors and Steering Committee and the final draft was submitted on January 23, 2009. This draft included electronic document management solution recommendations as well. In January and February 2009, Sourcecorp conducted remediation plan meetings aimed at obtaining the Receivership's review and approval of the HIM remediation road map, including cost projections for implementation.

After a thorough review of the Sourcecorp's recommendations and related cost estimates, the Receiver decided to close this contract with the exception that Sourcecorp, Inc. would continue to provide the services of contract personnel for transition planning activities for a period of sixty (60) days.

A HIM work team has convened to address short, mid, and long-term plans for HIM remediation and to develop a comprehensive work plan that combines the efforts of external HIM expertise and existing HIM knowledge workers. The foundational work completed by Sourcecorp will serve as an important basis and touchstone for this plan. The goal is still to transition the current paper-based HIM operation to one based on industry best practices and standards applicable to the correctional environment, and the major objectives of this initiative remain unchanged: to remediate health information management within CPHCS to enable cost-effective, constitutionally adequate healthcare for all patient-inmates and to standardize records processes as a preparatory step for the possible implementation of an electronic health record.  The initial work plan will be completed by the HIM work team by May 15, 2009, and then reviewed and approved by the HIM Executive Sponsors and Steering Committee.  Timeframes for work plan completion and detailed progress updates will be reported in the next Tri-Annual Report.

Also during this reporting period, support work continues for other Receiver projects with HIM dependencies. Examples include developing the Health Information Privacy Policy; providing consultation for the Receiver's construction program; evaluating electronic document management and scanning solutions; and continuing to conduct HIM assessments at the remaining CDCR facilities. The HIM work team also continues to collaborate with dental

program leadership to address issues with the organization of dental forms within the Unit Health Record.

**Objective 5.3.** **Establish Effective Radiology and Laboratory Services**

*Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants*

Medical Records
The strategy and plan related to Health Records is addressed under Objective 5.2.

Imaging/Radiology Services
On January 20, 2009, the Receiver signed an Agreement engaging McKenzie Stephenson, Inc. (MSI) to implement the Clinical Imaging Roadmap presented to the Office of the Receiver in July 2008. This project is presently on schedule and within budget.

During this reporting period, MSI organized dedicated staff into three teams for the execution of this project: an Operations Team, a Professional Services Team, and a Technology Team. The Operations team immediately began making site visits to the fifteen institutions not included in the assessment work completed in early 2008. These site visits, completed in early April 2009, provided the MSI Operations team with important detail on the levels and types of imaging services available to the patient-inmate population at each site, as well as the current staffing in each facility. Using data gathered during these visits and the previous assessment, the Operations Team is developing a plan for normalizing and stabilizing imaging practices system-wide. The Operations Team has begun working with imaging and radiology staff in all locations to bring image libraries into compliance with regulatory standards. Communication with staff and leadership at each institution has been established, is ongoing, and will increase significantly over the coming year as consistent practice standards are introduced to the institutions. In addition, MSI is working to address dental imaging needs in coordination with CDCR staff and the *Perez* court representatives.

The Professional Services Team has completed an in-depth review of professional services agreements and a review of equipment maintenance agreements is now underway. This team is collaborating with CPHCS Contracts Administration to develop appropriate language and service level agreements and to consolidate the many individual institution agreements into fewer and more cost-effective regional or statewide contracts. This work has been prioritized based on the expiry of existing agreements. In addition, an analysis of available locations for the placement of MRI mobile equipment to meet standard site requirements was completed. The Professional Services Team is also working closely with CDCR and the Receiver's construction teams to review specifications for institution specific construction projects.

Also during this reporting period, the Technology Team, working collaboratively with CPHCS staff, is developing detailed specifications for the technology needed to automate and centralize imaging data and records. This team has been engaging with related CPHCS IT teams to ensure

the infrastructure and data handling capacity will be in place to support the technology when it is placed in service.

<u>Laboratory Services</u>
In February 2009, CPHCS appointed a project manager to manage the implementation of system-wide lab management services. As reported in the Tenth Quarterly Report, these services support the achievement of the recommendations provided in the Navigant Report for laboratory services system-wide.

**<u>Objective 5.4.</u>   Establish Clinical Information Systems**

*Action 5.4.1. By July 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems*

The goal of the Clinical Data Repository ("CDR") project is to store key patient health information, such as current medications, allergies, lab results, encounters, problems, etc., in a standardized manner and ensure availability of this information to providers at the point-of-care to support clinical decision-making.

As of April 2009, the "Solution Outline" phase of the CDR project was completed, and the project team moved into the next phase – "Solution Design." The key deliverable for this phase of the project is a "Clinical Data Repository and Portal Solution Design" document. The "Solution Design" document expands upon the prior "Solution Outline" deliverable by detailing all aspects of the system, including the various architectures (logical, physical, data, security, and integration), system configuration, data exchange specifications, high availability designs, and test plans. Initially slated for delivery in January 2009, completion of the "Solution Design" document has been delayed due to changes made to the overall design of the system to enhance its ability to support forthcoming health IT systems and future needs.

During "Solution Design," the CDR project team has continued its in-depth discussions and interviews with the clinical user community, stakeholders, and business partners to build-out the design details of the solution. For example, the project team conducted an application design session in March 2009. During this session, the project's clinical user advisory group was given a preview of the initial build of the system and detailed discussions were held to refine the user interface and ensure that it met users' needs in terms of functionality and usability. Similarly, the team meets bi-weekly with key trading partners -  Foundation Laboratory, Maxor, Quest Diagnostics - to establish the specific mechanisms by which patient health information (allergies, lab results, medication data) will be securely and reliably sent to the system.

During this reporting period, the CDR project team initiated other key activities. First, members of the CDR project team conducted site visits in January 2009 to Central California Women's Facility, Valley State Prison for Women, and California State Prison - Los Angeles County to educate clinical leadership and staff at each of the institutions on the solution; identify key contacts and establish lines of communication; determine potential, institution-specific issues

that may affect roll-out of the system; and generally build support for the solution. Second, the team has begun developing the overall system roll-out plan, which includes end-user device deployment schedule, training curriculum and associated materials, and on-going support model. Third, the project team in coordination with Verizon Business has begun installing and configuring system hardware and software in the production environment at the Verizon data center in Torrance, CA, in anticipation of completion of system development efforts.

Upon completion of the "Solution Design" phase, the project will then move into "Solution Build." The "Solution Build" phase is approximately four months in length, during which time the CDR project team will conclude all development efforts, run the system through an entire series of tests to validate its correct operation, and initiate training and roll-out activities.

**Objective 5.5.**   **Expand and Improve Telemedicine Capabilities**

> ***Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure***

This action item is partially completed. During this reporting period, a telemedicine steering committee was convened to provide ongoing leadership, direction and oversight for the expansion of telemedicine services. Despite delays in recruitment for an RCEA executive leader for this program, progress is being made under the direction of the Nurse Manager that was hired in December 2008. Since its inception, the Office of Telemedicine Services has reached a milestone of over 100,000 specialty services provided via telemedicine. Additionally, between January 2008 and January 2009 the number of medical specialty patient-inmate visits has increased by 37 percent.

The Office of Telemedicine Services continues to be involved with several of the Receiver's healthcare IT projects. A Telemedicine IT Training session was conducted in March 2009 that introduced the telemedicine program and technology to CPHCS IT technical staff.  Effective April 2009, the responsibility for IT field support for telemedicine services was transferred from within the Telemedicine program in Sacramento to the CPHCS IT unit. This provides for more timely and cost-effective support system-wide.  As previously noted, projects such as the Central Data Repository (CDR), network infrastructure, Local Area Network and Wide Area Network roll-out, ISDN to IP conversion, and electronic health records provide essential support for the expansion of telemedicine services.

During this reporting period, Phase I of the "Provider On-Boarding" process has been completed. This is the method by which a provider network or group are brought on-board to provide telemedicine services to the patient-inmate population of the CDCR.  Alvarado Hospital and their telemedicine physician group (in San Diego) was the pilot for this new process. They started providing services via telemedicine in March 2009 for five Southern Region institutions: Richard J. Donovan Correctional Facility, Ironwood State Prison, Chuckawalla Valley State Prison, Calipatria State Prison and California State Prison - Centinela.  The initial specialty

services being provided are cardiology, neurology, hepatology and gastroenterology. Additional institutions and specialty services will be added as we move into Phase II.

In an effort to increase telemedicine encounters and offered specialty services the Office of Telemedicine Services has been engaged in discussions with prospective medical groups located in the central region.  These meetings are part of a continued effort to expand the telemedicine provider network.

# Goal 6. Provide for Necessary Clinical, Administrative and Housing Facilities

**Objective 6.1.**   Upgrade administrative and clinical facilities at each of CDCR's 33 prison locations to provide patient-inmates with appropriate access to care

Progress on this objective continues to be impacted due to lack of funding.  Assessments, planning, design and construction progress was limited due to the funding impacts. The timeframes originally established in the action items are no longer feasible and will continue to be negatively impacted until such time that funding is available.

> *Action 6.1.1. By January 2010, complete assessment and planning for upgraded administrative and clinical facilities at each of CDCR's 33 institutions.*

The assessments and planning to renovate or build new clinical space at each of the 33 prisons has been temporarily suspended due to funding limitations and related uncertainties.  The Facility Master Plans for the Correctional Training Facility, California Rehabilitation Center and Mule Creek State Prison (the second, third, and fourth prisons respectively to undergo the planning process) have proceeded into development of criteria documents, but have stalled prior to procurement, design and construction.

As reported in the Tenth Quarterly Report, final approval of the Master Plans for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, and Folsom State Prison and completion of the subsequent four Master Plans for California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center was suspended to allow the development of a conceptual budget model defining an integrated program that includes facility upgrades for medical, mental health and dental needs. The conceptual budget model was completed and presented to the Receiver on October 20, 2008. Following completion of this conceptual budget model, the planning teams revisited and amended the previously prepared Master Planning documents to reflect the integrated plans. The integrated Master Plans and addenda for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, Folsom State Prison, California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center were approved by each respective institution and submitted in January 2009 for executive and CDCR signatures.

Master planning resumed on December 3, 2008, with initiation of planning at California State Prison - Solano, and continued with initiation of planning at California Men's Colony on December 9, 2008, Calipatria State Prison on December 16, 2008, California Medical Facility on January 27, 2009 and Deuel Vocational Institution on February 17, 2009.   The Master Plan for Calipatria was signed off by the institution on February 20, 2009, followed by California State Prison – Solano and Deuel Vocational Institution on April 28, 2009, and California Men's Colony and California Medical Facility on April 30, 2009.

During this reporting period, institution-specific Master Planning efforts were temporarily suspended due to funding limitations and recalibration/validation of Master Planning assumptions and metrics.  As part of the recalibration and validation efforts, five work groups consisting of clinical, custody, consultants and Vanir Construction Management staff, were established to validate the planning models and standards in coordination with the clinical operations and pilots being implemented. The five work groups were defined as follows:

- Clinical Care Opportunities – Primary Care need and flow.
- Clinical Care Opportunities – Specialty Care services.
- Opportunities for Servicing Special Populations.
- Administrative and Health Care Access Unit space need and organization.
- Opportunities for development of Integrated Care Centers and Basic Care Institutions.

The objective of the combined work groups is to define a balanced program solution to meet the Receiver's goals for delivering health care services in an efficient and economical way to patient-inmates in the 33 institutions. The conclusions, outcomes and recommendations of the program are to be completed in May 2009 for submission to the Receiver.  It is anticipated that upon completion of this work, the program scope will be sufficiently validated and defined to resume institution-specific Master Planning activities.

*Salinas Valley Psychiatric Program (Intermediate Care Facility):* It was reported in the Tenth Tri-Annual Report that the special planning project to address inadequate treatment space at the Salinas Valley Psychiatric Program (Intermediate Care Facility) had been completed and approved, but was without funding.  The project was identified in a recent report to the *Coleman* court by CDCR and appears to be anticipated for completion under the original plans and process in which it was initially proposed.

If the State and the Receiver are able to conclude a memorandum of understanding and settlement of the outstanding construction-related motions, we anticipate that CDCR's and the Receiver's construction teams will need to engage in a significantly revamped master planning process since the settlement under discussion would allocate substantially less funds that had originally been contemplated for the upgrade program. The Receiver believes the medical, mental health and dental construction needs are still achievable even with lower funding because of the CDCR's willingness to identify certain facilities as "healthcare hubs" where inmates with health problems can be moved for appropriate treatment. This consolidation will mean that construction dollars can be most efficiently targeted. In addition, the experience we have gained at San Quentin in the use of modular construction gives us a much more cost-effective solution to upgrades at other prisons.

**Action 6.1.2.  By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's 33 institutions**

Presently, San Quentin State Prison and Avenal State Prison are the only institutions proceeding with construction. Mule Creek State Prison, Correctional Training Facility, Soledad, and

California Rehabilitation Center were authorized to proceed with implementation but were stopped after completion of the criteria documents due to lack of funding. The 90-day suspension and revisions to the Master Plans, as described in the Tenth Tri-Annual Report, coupled with the recent suspension of the planning efforts has affected the Master Schedule as it relates to completion of construction across the 33 institutions. With uncertainty surrounding when funding may become available and the sequence of implementation, the Upgrade Master Schedule has yet to be updated to reflect the ongoing delays. The Upgrade Master Schedule included in the Tenth Quarterly Report revised the construction completion date from January 2012 to December 2012, assuming approval of Master Plans in January 2009, and subsequent authorization to develop criteria documents. Since neither of these assumptions was met, the Master Schedule has been delayed further, extending the completion of construction past December 2012. The Master Schedule will be updated once there is funding clarity and Master Planning and implementation are authorized to proceed fully.

*Upgrade Construction at Avenal State Prison:* During this reporting period, the construction at Avenal State Prison has made significant progress.  The design-builder for construction package ASP-04, consisting of the three modular health services clinic buildings, administration, Health Care Access Unit and administrative segregation units, completed design drawings and obtained necessary approvals. The buildings are now under construction.  Building pad construction on the Administration and Administrative Segregation Unit Clinic buildings is complete.  Domestic and fire water line tie-ins are complete to all building sites. The design-builder has started the manufacture of the modular units in its factory in Santa Rosa. This construction package is expected to be complete by December 2009. The warehouse project continues to be on hold. The Infirmary and Pharmacy renovation (ASP-03) is nearing completion. The existing Pharmacy in building 390 has moved to its new location within building 395.  New Pharmacy furniture has been installed and the space is being used for its intended purpose.  Renovations in Building 390 are in progress and on schedule. Design-Build criteria documents are ready for construction package ASP-08 that consists of medical records expansion and canopies for medication distribution areas.

For additional information, Vanir Construction Management's December 2008 and January and February 2009 monthly reports for Avenal State Prison are included as Appendices 13-15.

**Objective 6.2.   Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs**

   *Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible*

At the inception of the Receivership, experienced consultants were hired to provide direction and guidance for the Receiver's new health care facility projects.  As detailed in the Tenth Tri-Annual Report, the Receiver also hired experienced, well-qualified, State civil servants to assume planning, design, activation, and operational responsibilities for the new health care facilities.  In March 2009, with new facility planning milestones nearly complete, the Receiver began transitioning the CPHCS management structure into a model that will be prepared to

function as an entity within the State of California once the Receiver's goal of improving prison health care is achieved.  The Receiver's new organizational model reduces costs, improves efficiencies, and streamlines the management structure of CPHCS.

During this reporting period, the Receiver's new facilities Integrated Care and Administrative Services and Facilities Teams achieved the following primary objectives: (1) Developing an integrated health care program model for the new facilities that will deliver medical, mental health, dental and rehabilitation services to patient-inmates; and (2) Finalizing a streamlined and efficient prototypical facility design that supports security, administration, and facility operations; and (3) Developing a staffing plan to support the integrated health care program model and facility operations, while providing a safe and secure environment for patient-inmates and staff.  The objectives are detailed below:

1. *Develop an Integrated Health Care Program Model:*  The Receiver's new facilities Integrated Care Team provided the draft "*Service Delivery Model*" report outlining the types, levels, and expectations of care to the Receiver's Clinical Leadership.  The model provides standardized goals, objectives, and outcomes for each area, ensures a uniform program structure and staffing, and describes implementation of best practices for patient-inmate care and staff performance.

2. *Finalize the Prototypical Facility Design:*  The Receiver's new facilities Integrated Care and Administrative Services and Facilities Teams worked side-by-side with the Joint Venture Integrated Project Delivery (JV-IPD) Teams to complete the prototype design. The Owners Group collaborated with the JV-IPD to reduce the size and scope of the prototype facility, without sacrificing patient care or efficiency in operations.  The new design significantly reduces costs by creating multi-purpose space rather than dedicated space; utilizing day rooms for multiple program purposes; reducing square footage, including in the exercise and patient waiting areas by co-locating services; and consolidating space where feasible.  The design is streamlined and efficient, supports security, administration, and facility operational needs, and will require the least possible resources to activate, open, and operate on a long-term basis.

3. *Develop a Staffing Plan to Support the Facility:*  The Receiver's new facilities Integrated Care and Administrative Services and Facilities Teams developed, revised, and finalized a staffing plan to support the integrated health care program model and facility operations.  The number of beds in the prototypical design was increased from 1,320 to 1,536, allowing for approximately 16 percent more patient-inmates than initially planned. However, the increase in the number of beds was not accompanied by a like increase in staffing but rather achieved through analysis and realizing operational efficiencies.  The Teams analyzed patient flows and mapped staffing needs to patient movement and security considerations.  Additionally, the security staffing model sought to standardize custody staffing for each section of the facility to provide the maximum opportunities for adaptability to changing patient-inmate populations while adhering to the principles of

Direct Supervision.  The security staffing model was then compared to current practices within CDCR as well as to other facilities throughout the United States.

Evidence-Based Rehabilitation Programs

The Integrated Care Team also completed preliminary design of appropriate space and models for evidenced-based rehabilitation program opportunities for patient-inmates in the new health care facilities.  Demographic data on the patient-inmates projected to be housed in these facilities was gathered, including an in-depth research and analysis of CDCR patient-inmates participating in the Mental Health Services Delivery System at the Enhanced Outpatient Program (EOP) level of care.   Specifically, the Receiver contracted with Dr. Val Jenness, Associate Professor, University of California, Irvine, and Dr. Ryken Grattett, Associate Professor, University of California, Davis, to investigate the current processing and treatment of offenders with serious mental health conditions in the CDCR, focusing specifically on those requiring an EOP level of care.  The purpose of the research was to aid the planning and the development of programming for new health care facilities.  The April 2009 report entitled "CDCR Inmates and Parolees with Serious Mental Health Problems:  Behavior, Treatment, and Management," reveals the EOP population, both inmates and parolees, presents considerable challenges to the CDCR.   The report provides valuable, detailed demographic information on these patients not currently readily available in CDCR.

The Integrated Care Team also continues to consult with CDCR program staff on the necessary space dimensions required to address rehabilitative needs of the planned populations.  CDCR standards have been incorporated into the Facility Program Statement Version 4, scheduled to be released in July 2009.  Rehabilitative programs offered at the facilities (and which are currently provided in CDCR facilities) will include academic and vocational education, substance abuse treatment, recreational activities, and faith-based programs.

Rehabilitation Services Advisory Council

The Rehabilitation Services Advisory Council members were appointed and the first Rehabilitation Services Advisory Council meeting was planned for February 2009.  However, due to the State's fiscal situation, the Receiver notified each member that the first meeting must be postponed to a future date. Further action on this item is suspended for now.

Supply Chain and Inventory Management

During this reporting period, the Administrative Services and Facilities Team explored utilizing a new procurement model to reduce the costs associated with purchasing, inventory, and storage, including a reduction of constructing warehouse space.  Although the purchasing aspect of the proposed model is not feasible at this time, warehouse, design and operational efficiencies were identified during the analysis, and elements were incorporated into the prototypical facility design.

Custody Services

Efforts continue on developing a Medical Classification System, and integrating the system not only with CDCR's current custody classification system, but also working with CDCR to design

a statewide integrated bed plan.  With the prototypical design completed, security staff will now increase efforts on these critical endeavors.

Prototypical Design Approach

By organizing the work into teams representing all interests for each design, construction, and facility operational function, URS/Bovis Lend Lease Joint Venture was able to explore efficiencies and cost savings in ways not possible in a traditional design/construction approach. It was then possible to coordinate across all the functions to identify further savings.  The Receiver's Operations Group with CDCR participants, were responsible for planning the operations of each prototype facility.  The identified operational efficiencies reduce operating costs by more than $50 million per year, for each prototype facility.  Unique tools, not practical in traditional approaches to facility and operational planning, were employed and were critical to the success.  These tools include the following:

1.  Value Stream Mapping – Allows for mapping every step in a procedure, evaluating for waste and developing means of performing the work more efficiently, with fewer staff. Value Stream Mapping is being applied successfully to both health care facility operations and to construction programs around the U.S. with breakthrough savings in cost and service quality.

2.  Target Value Design – Allowing for setting ambitious construction budgets and designing the buildings in system "sets" which can be independently evaluated and selected in combinations that fit the target value budget.  The Target Value Design process focused on four objectives: (1) Scope; (2) Schedule; (3) Cost (capital and operation); and (4) Staffing.

3.  Choosing by Advantages – A rigorous process for evaluating sets and making clear, well informed choices with the ability to assure the completed assemblies function as intended.

4.  Integrated Project Delivery design and construction – a method of contracting for design and construction that removes adversarial barriers between the prime contractors and the chain of sub agreements in traditional capital projects.  Integrated Project Delivery creates incentives for cost savings, schedule compliance and building quality goals and has been proven to reverse the process of cost overruns almost always present in traditional public funded projects.

**Action 6.2.2. By February 2009, begin construction at first site**

Commencement of this Action has been delayed.

**Action 6.2.3. By July 2013, complete execution of phased construction program**

Actions 6.2.1 and 6.2.2 have been delayed which may impact completion of this item by the timeframe set forth.  Updates regarding progress will be provided in the next Tri-Annual Report.

**Objective 6.3.   Complete Construction at San Quentin State Prison**

Construction at San Quentin consists of Three Construction Packages.  Construction Packages One and Two are detailed under Action 6.3.1 and Construction Package Three is detailed under Action 6.3.2.

> *Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility*

Six of eight projects in Construction Package One at San Quentin State Prison are complete.  The completed projects are:  Project One- Personnel Offices, Project Two- Replacement Parking Spaces; Project Three- Relocate Exercise Yard; Project Five- the Triage and Treatment Area Renovation; Project Seven- Clinic Heat Project, and Project Eight- Addition of Re-locatable Office Space Trailer.  Project four- the medical warehouse, and Project Six- East/West Rotunda clinics, remain in construction

The following are updates on the two remaining projects in Construction Package One:

Project Four:
Construction of the Medical Supply Warehouse is approximately 80 percent complete as of the end of March 2009. The State Pooled Money Investment Board's decision to freeze funding for State construction projects caused delays in processing contractor progress payments. Consequently, the general contractor demobilized and stopped work for nonpayment on February 1, 2009.  Following Pooled Money Investment Board release of funds, contractor payments were brought up to date and construction resumed on March 30, 2009.  The work stoppage caused a 58 day delay in the project schedule which revises the contract completion date to June 15, 2009.

At this time, the prefab metal building is mostly complete.  Framing of the interior walls is ongoing and the walk-in cold storage box is installed.  Progress has been good following the work stoppage.

Project Six:
The schedule has slipped on the East/West Rotunda clinics project. Despite the schedule slippage, the project is approximately 95 percent complete.   Incomplete work consists of checkout and test of the fire alarm and personnel alarm systems and punch list inspections.  All furniture and equipment has been delivered and is scheduled for installation.  Occupancy is forecast for early May 2009.

Regarding Construction Package Two, all projects are now complete and occupied.  The projects include the R & R remodel, medical records remodel and the upper yard medical modulars.

***Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility***

Construction Package Three, the Central Health Services Facility at San Quentin State Prison, is progressing well and remains ahead of schedule.  The building is weatherized and the building's exterior is complete except where the construction hoist is located. Most of the above ceiling rough-ins, such as mechanical ductwork, plumbing piping, medical gas and electrical distribution is complete on levels 2 through 5 and ongoing on level 1.  The majority of the interior partition walls are framed and sheet rocked.  Plastering has started on the second level.  All Maxwall high security walls are complete.  Overall, the project is nearly 70% complete, with a forecast completion date of January 2010.

The Pooled Money Investment Board action to freeze funds caused anxiety with the contractor and staff.  The general contractor notified CPR Corporation of their intention to stop work due to non-payment.  However, continued close contact with the contractor, and keeping him apprised of the progress in Sacramento, the work continued.  Ultimately, all delinquent payments were received and no construction time was lost.   Currently, the Pooled Money Investment Board has authorized payments for work through June 2009.

For additional information, Vanir Construction Management's December 2008 and January and February 2009 monthly reports for San Quentin State Prison are included as Appendices 16-18.

# Section 5
# Additional Successes Achieved by the Receiver

## A.    CPHCS Town-Hall Meetings

The Receiver hosted the first series of town hall meetings from April 1, 2009 through April 3, 2009 in thirteen half-hour sessions at CPHCS Headquarters. These meetings were attended by Headquarters employees, including CDCR mental health and dental staff, in order to inform staff of the current status and future of correctional health care services.  The Receiver was accompanied by the Chief Deputy Receiver, and together they provided an update regarding the Receivership and reminded staff of the vision and mission. The Chief Deputy Secretary for DCHCS joined the Receiver at meetings which included mental health and dental staff.  Topics covered during the meetings included the following: goals and objectives of the Turnaround Plan of Action: new, streamlined CPHCS organizational structure; process to re-prioritize CPHCS projects to ensure we are focusing our resources appropriately; and heightened focus on controlling expenditures in response to the State's budget crisis.  Following the presentation portion of each meeting, there was a question and answer session to allow staff the opportunity to ask the Receiver specific questions that are important to them or their work unit. The town hall meetings are viewed as an overall success, and according to comments received, the meetings were appreciated by staff.  The second series of town hall meetings is scheduled for summer of 2009.

## B.    Status of the Project Management Office

Projects to develop business processes, clinical procedures and services, and IT solutions are necessary to improve the access and quality of health care for California's patient-inmates. Project Management Offices (PMO) exist across the globe in most industries to manage organizational projects, and, as reported in prior reports, implementation of a PMO is necessary to improve the project, program and portfolio management of all CPHCS projects related to the Turnaround Plan of Action.  In April 2008, the Receiver assembled a team to develop the infrastructure to build, deploy and support the PMO efforts.  Since April 2008, project management and contract management processes were developed; a best-practice project management methodology was adopted; a comprehensive library of templates was published; and Clarity (an electronic project and portfolio management system) was implemented to ensure standardized management of projects throughout CPHCS.

Specifically, during this reporting period, the focus of the PMO has been toward fiscal accountability of projects and successful completion.  The PMO continues to align projects to business needs and is streamlining executive oversight of projects through improved governance processes while developing the capabilities needed to successfully transition from project to maintenance and operations.  In March 2009, the PMO tasked the various project managers to rapidly and accurately document and track cost information for their respective projects.  This information was distributed to CPHCS executive management staff and delivered meaningful

projected budgets appropriate to both the needs of the organization and the requirements of State budget policies and regulations.

Additionally, during this reporting period, the PMO professionalized contract management in two areas. The first is through implementation of accurate financial management processes including contract management to independently verify the appropriateness of invoice payments, to monitor expenditures against contract authority, and to proactively recognize potential contract deviations before problems arise. The second contract management improvement is the implementation by the PMO of industry and State of California standard procurement processes. The PMO utilizes standardized templates, tools and processes and the project managers are responsible to coordinate with CPHCS contract and accounting staff to ensure invoice payments are made in accordance with contract terms and conditions and that the quality, appropriateness, and actual delivery of approved goods, services and solutions occurs as specified in the contract.

Project summary information, generated by project managers on a monthly basis, is used throughout the organization and in the field to communicate how solutions to business needs are being planned and delivered. Monthly Project Summary sheets for January through April 2009 are attached as Appendices 19-22.

## C.    Efforts of the Communications Department

The Receiver and Communications Department recognize the need for increased communication within CPHCS. As a result, efforts are underway on two new projects to ensure the efficient flow of information within CPHCS. Those two projects are an expansion of the *Turnaround Lifeline* newsletter and the establishment of a CPHCS intranet network. Both of these efforts are detailed below.

1. *Turnaround Lifeline* Newsletter to Staff - The CPHCS Communications Department concluded this reporting period with the distribution of the May 2009 issue of the *Turnaround Lifeline* newsletter. The tenth issue of the *Turnaround Lifeline* includes a special insert that provides basic information to existing and new staff regarding the Receivership and includes an updated organizational chart with office contact information for key executive staff. The insert will be the first in a series of inserts which will provide general Receivership information to all health care staff in a convenient format. The insert is hole-punched so it can be inserted in a binder for reference. The new contact information will facilitate increased interaction between field staff and headquarters and maintain lines of communications.

   For the upcoming June 2009 edition of the *Turnaround Lifeline* newsletter, the Receiver's Communications Department is expanding the newsletter format to include new, distinct sections for departments within CPHCS. Starting in June, these new departmental sections will be incorporated within the *Turnaround Lifeline* in much the same way as *HR Connections*. The expanded newsletter will include the normal four pages of general news, two pages dedicated for Human Resources, two pages dedicated

for Nursing Services, two pages dedicated for Ancillary Services, and one page each for the Project Management Office and Pharmacy Services. These new sections will enable each department to use the Turnaround Lifeline as a vehicle to deliver specialized information to employees system wide.

2. CPHCS Intranet - The CPHCS Communications Department is in the process of establishing an intranet system dedicated for CPHCS. This new system is being developed to support the increased flow of communication required as CPHCS projects and programs develop. CDCR network administrators have assisted by providing server space dedicated to the project and an IT team is working to establish the content framework for the site. The front page intranet design was created to simulate an employee's desktop environment, complete with a section for a CPHCS calendar and urgent memos. Examples of other information that will be made available on the intranet include the following: staff directory, best practices, "Today's News" (focusing on the Receivership or State issues involving the prisons), commonly used forms and templates, travel information, Human Resources information, IT help, and links to external CPHCS and CDCR websites. The intranet home page will also include links to specialized sections (e.g. for physicians or nurses). These links will be tailored to a particular specialty; however any CPHCS employee can access this specialized information.

Communications Regarding the H1N1 Influenza

In late April 2009, the outbreak of the H1N1 Influenza (initially referred to as the "swine flu") and the resulting reaction around the world prompted the CDCR and CPHCS Communications Departments to collaboratively produce an informative response tailored for staff and inmates. Part of that response took the form of a video which was jointly produced by CDCR and CPHCS Communications. This informative video was conceived, scripted, filmed, edited, and distributed within three days. In it, CPHCS health officials explained the H1N1 flu outbreak and provided staff and inmates with guidelines on how to avoid contracting the virus and what to do if they think they might be infected. By coordinating closely on this project, staff from CDCR and CPHCS expanded their practical understanding of Communication's joint resources and infrastructure in a way that will facilitate cooperation in the future.

# Section 6
# Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

There were no reportable problems or obstacles faced by the Receiver during this reporting period. The State's dire fiscal condition presents both CDCR and the Receiver with extraordinary management challenges as we endeavor to reduce expenditures. At this time, however, core healthcare functions and programs have not been seriously impacted.

# Section 7
# An Accounting of Expenditures for the Reporting Period

**A.      Expenses**

The total net operating and capital expenses of the Office of the Receiver for the four months ending April 30, 2009 were $5,615,322 and $17,980,813 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 23.

**B.      Revenues**

The Receiver did not request any additional funding for the period of January 1, 2009, through April 30, 2009.  Total year-to-date funding to the California Prison Health Care Receivership Corporation from the State of California is $96,147,258.

# Section 8
# Other Matters Deemed Appropriate for Judicial Review

**A.     Coordination with Other Lawsuits**

During the reporting period, regular meetings between the Receiver and the monitors of the *Coleman, Perez,* and *Armstrong* ("Coordination Group") class actions have continued. Coordination Group meetings were held on March 24, 2009, and April 17, 2009, and the next meeting will take place on June 9, 2009. Progress has continued, as follows, during this reporting period:

1. As reported in the Receiver's Tenth Tri-Annual Report, Coordination agreements have been prepared and submitted to the courts for approval in the areas of health care appeals, transcription and dictation, and the transition, activation and management of the Receiver's construction program. At this time, the agreements on transcription and dictation and the transition, activation and management of the Receiver's construction program have been put on hold pending further developments with the Receiver's construction program. The State has raised objections to the agreement on health care appeals, and, as a result, the agreement has not yet been approved by the courts. The Receiver is working currently to resolve the objections by the State.

2. Both the Receiver and the *Coleman* Special Master have begun to meet with CDCR separately regarding construction planning. As a result, the Receiver has scheduled a weekly meeting to keep the Coordination Group updated on ongoing construction planning developments. These meetings also ensure the Coordination Group has the opportunity to provide input concerning construction planning. Meetings were held on April 27, 2009, and May 4, 2009, and the most recent meeting was held on May 11, 2009.

**B.     Master Contract Waiver Reporting**

On June 4, 2007, the court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007, Order and, in addition, to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the court's orders, and therefore, the Receiver will not reiterate those details here.

As ordered by the court, included as Appendix 24 is a summary of each contract the Receiver has awarded during this reporting period, including (1) a brief description of each contract, (2) which

project the contract pertains to, and (3) the method the Receiver utilized to award the contract (*i.e.*, expedited formal bid, urgent informal bid, sole source.)

# Section 9
# Conclusion

This Eleventh Tri-Annual Report demonstrates significant progress in achieving the goals of the Turnaround Plan of Action notwithstanding challenges posed by the greatest budget and fiscal crisis facing the State of California since the Great Depression and disagreements between the State and the Receiver regarding the need and funding for healthcare related capital investments. That we have been able to continue our momentum, and that we now find ourselves very close to a resolution of the capital investments dispute, is a testament to the power of the Receiver to maintain resource levels in support of the Turnaround Plan of Action and to the genuine commitment of State officials, most importantly the Governor and the Secretary of CDCR, to meaningfully address California's prison crisis. The Receivership has learned an important lesson in the process: true collaborative planning and effort, combined with leadership that is committed to success, can always find a way forward to achieving our goals.