PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

          Plaintiffs,

    v.

ARNOLD SCHWARZENEGGER, et al.,

          Defendants.

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF ERNEST GALVAN IN SUPPORT OF PLAINTIFFS' COMMENTS PURSUANT TO THE COURT'S MARCH 31, 2009 ORDER REGARDING (1) DEFENDANTS' FINAL PROPOSAL TO MEET THE REMAINING SHORT-TERM, INTERMEDIATE, AND LONG-RANGE BED NEEDS OF THE PLAINTIFF CLASS; AND, (2) DEFENDANTS' DETAILED ACTIVATION SCHEDULES FOR COMPLETION OF ALL OTHER COURT-ORDERED CONSTRUCTION PROJECTS.**

Submitted to Special Master Matthew Lopes With a Copy Filed With the Court Pursuant to the Order of March 31, 2009 (Docket No. 3556)

Hearing: June 16, 2009, 1:30 p.m.
Court: Hon. Lawrence K. Karlton

[299779-1]

I, Ernest Galvan, do hereby declare under penalty of perjury as follows:

1.      I am an attorney admitted to practice law in California and a partner in the law firm Rosen, Bien & Galvan, LLP, one of the counsel of record for Plaintiff class in this case.  I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Comments Pursuant To The Court's March 31, 2009 Order Regarding (1) Defendants' Final Proposal To Meet The Remaining Short-Term, Intermediate, And Long-Range Bed Needs Of The Plaintiff Class; And, (2) Defendants' Detailed Activation Schedules For Completion Of All Other Court-Ordered Construction Projects.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of a document I downloaded from the website of the State Treasurer on June 6, 2009, at the following link: http://www.treasurer.ca.gov/pmia-laif/pmib-staff/20090520_6.pdf.  The document is titled "POOLED MONEY INVESTMENT BOARD, MAY 20, 2009, Staff Report – Agenda Item 6." The Staff Report recommends denial of CDCR's requests for funding of the California Medical Facility 64-Bed Intermediate Inpatient Facility and the Enhanced Outpatient Program Treatment Space project at the same prison, giving the following text at pages 2-3 as reasons for the denial:

> On May 4, 2009, the Taxpayers for Improving Public Safety (TIPS) filed an appeal with the California Supreme Court relating to the AB 900 litigation. The Attorney General's Office has stated that until there is a final, non-appealable judgment in favor of the State, it will not be able to provide its customary bond opinion. The Board's past practice has been to not approve any loans for which the Attorney General's Office can not issue its customary bond opinion.

> Although the Board approved one AB 900 loan request for CA Men's Colony, San Luis Obispo: 50 Mental Health Crisis Beds at the April 15, 2009 meeting, DOF stated that it would stipulate to the deferral of all other loan requests for AB 900 projects until the TIPS litigation was fully resolved.

> Staff of the STO's Public Finance Division believes that there are excess proceeds of other PWB bond issues that may be able to be used to fund the loan request.

GALVAN DEC. ISO PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[299779-1]

3.    Attached hereto as **Exhibit 2** is a true and correct copy of a document I

downloaded from the State Treasurer's website on June 6, 2009, at the following link:

http://www.treasurer.ca.gov/pmia-laif/pmib-minutes/20090415.pdf.    The document has the

following title:  "POOLED MONEY INVESTMENT BOARD, State Treasurer's Office, 915

Capitol Mall, Room 587, Sacramento, California 95814, MINUTES, Wednesday, April 15,

2009."  The minutes contain the following text regarding the need for approval of the 50-bed

MHCB at CMC, beginning at page 4:

> Mr. Dean Borg, Director of Finance & Administration and Ms.
> Deborah Hysen, Chief Deputy Secretary of Facility Planning &
> Construction for the California Department of Corrections and
> Rehabilitation (CDCR) addressed the Board. They confirmed that
> Item f [California Medical Facility, Vacaville: Enhanced Outpatient
> treatment space project] had not been approved by the SPWB and
> was awaiting legislative approval, so it had been withdrawn from
> consideration by the PMIB at this meeting. However, Ms. Hysen
> urged approval of the other two requests, particularly Item g [CMC
> 50-bed MHCB], due to a pending court order requiring the State to
> act by April 23, 2009. Ms. Hysen elaborated on the judge's decision
> that the San Luis Obispo Men's Colony facilities were inadequate to
> support the inmate population. She explained that many of the
> inmates are high risk suicide candidates and the court order
> determined it is imperative the 50 mental health crisis beds be
> constructed as soon as possible.
>
> Mr. Sheehy [identified earlier as Tom Sheehy, appearing for Mr.
> Finance Director Michael Genest] indicated the DOF's support for
> both CDCR's loan requests. In particular, he said contracts necessary
> to proceed with the project listed as Item g needed to be executed by
> April 23, 2009, per the court order and that failure to act will have
> serious repercussions. He noted: 1) without an appropriation, there is
> no other viable funding source, and 2) CDCR has a multi-billion
> dollar support budget from which the loans could be repaid, and
> therefore the PMIB could be assured of loan repayment. Mr. Sheehy
> suggested the Board make an exception and approve this particular
> AB 900 bond-funded project presented in Item g, despite the pending
> TIPS litigation. Mr. Sheehy noted that DOF would stipulate to the
> deferral of loan requests for all other AB 900 projects until the TIPS
> litigation was resolved, but that the state had no choice but to comply
> with this 30-day court order.

GALVAN DEC. ISO PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV
S 90-0520 LKK-JFM

[299779-1]

The Chair invited Ms. Catherine Brown of AG's Office to comment on the pending litigation. Ms. Brown said there are two pending cases relating to Item e and g. The first case, *Taxpayers for Improving Public Safety v. Schwarzenegger*, challenges the Public Safety and Offender Rehabilitation Services Act (AB 900) which authorizes the SPWB to issue lease-revenue bonds for the construction and renovation of correctional facilities. While the State had prevailed in the trial court and the decision had been affirmed by the appellate court, there had been mention in the media the plaintiffs was prepared to seek review by the California Supreme Court, and the deadline to file for such review was May 4, 2009. Therefore, the AG's Office was unable to provide its customary "unqualified bond opinion" regarding the validity of AB 900 bonds until after the May 4th deadline, or based on how the Supreme Court handles the appeal.

Ms. Brown went on to mention a second case, *Coleman v. Schwarzenegger*, a class action in which the federal court has ordered the state to take steps to improve mental health services to state prison inmates. The judge had expressed particular frustration with the lack of progress on the 50 Mental Health Crisis Beds at the Men's Colony in San Luis Obispo and ordered the state to execute certain contracts with respect to this project within 30 days. This is the project addressed by the loan request in Item g. She noted the SPWB approved the project on Friday, April 10, 2009. Ms. Brown stated the judge had made it clear he would not tolerate noncompliance and would impose fines, plus other means, to assure the order was implemented by April 23, 2009. She noted that the second project before the Board, the California Medical Facility, Vacaville, 64-bed Intermediate Care Facility (Item e), was not subject to the 30-day order, but the judge had ordered the state to submit detailed schedules for this and other projects by May 26, 2009, or be subject to sanctions.

4.    Attached hereto as **Exhibit 3** is a true and correct copy of a document that I downloaded on June 6, 2009, from the State Treasurer's website at the following link: http://www.treasurer.ca.gov/pmia-laif/pmib-agenda/20090617.pdf.  The pertinent part of the title is "POOLED MONEY INVESTMENT BOARD, BOARD MEMBERS, State Treasurer Bill Lockyer, State Controller John Chiang, Director of Finance Michael C. Genest, Regular Meeting – Open Session, Wednesday, June 17, 2009 – 10:00 a.m."

GALVAN. DEC. ISO PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[299779-1]

5.    Attached hereto as **Exhibit 4** is a true and correct copy of a document, dated March 20, 2009, that I downloaded from the Department of Finance website on June 5, 2009 at the following link: http://www.dof.ca.gov/budget/historical/2009-10/april_1_finance_letters/documents/Early%20Finance%20Letter.pdf.

6.    Attached hereto as **Exhibit 5** is a true and correct copy of a document, identified in his deposition by Robert Storms, a CDCR official testifying regarding pre-release planning and parole policies, as the contract between Kern County and CDCR for pre-parole benefits applications.  Mr. Storms identified this document as Exhibit 10 at his August 19, 2008 deposition.

7.    Attached hereto as **Exhibit 6** is a true and correct copy of pages 66-67 of the August 19, 2008 deposition of Robert Storms, wherein he identifies the Kern County contract that is attached hereto as Exhibit 5.

8.    Attached hereto as **Exhibit 7** is a true and correct copy of the revised agenda for the June 4, 2009 San Francisco Bay Conservation and Development Commission received in my office by email on May 29, 2009.  The revised agenda states at page 2 that CDCR withdrew consideration of permits for the San Quentin Condemned Inmate Complex from the agenda, after already requesting at least one postponement of a vote on the project.

9.    Attached hereto as **Exhibit 8** is a true and correct copy of a report and appendix that our office received from Defendants via email on June 9, 2009 at 5:04 p.m., which is titled "June 9, 2009 Activity Report and on the CDCR/DMH Mental Health Assessment and Referral Project in Response to the Deputy Special Master's Request following the March 31, 2009 Court Order" for Submittal to the *Coleman* Special Master.

I declare under penalty of perjury under the laws of California and the United States, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on June 9, 2009.

*/s/ Ernest Galvan*
Ernest Galvan

GALVAN DEC. ISO PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[299779-1]

# EXHIBIT 1

**POOLED MONEY INVESTMENT BOARD**
**MAY 20, 2009**
**Staff Report – Agenda Item 6**

| BOND SALE SUMMARY – YEAR TO DATE |
|---|

While the Pooled Money Investment Board (Board) does not have a role in the issuance of State bonds, the following summary of recent General Obligation (GO) and Public Works Board (PWB) bond sales is being provided to show the amount of "upfront" project funding from bond sales that has helped alleviate the impact of the AB 55 loan freeze.

| Bond Issue | Closing Date | Par Amount* | Amount Used to Pay Down Disbursed AB 55 Loans* | Amount Used to Provide Upfront Funding* |
|---|---|---|---|---|
| GO Bonds (Private Placement - BATA) | February 27, 2009 | $194,000 | - | $194,000 |
| GO Bonds (Private Placement - LACMTA) | April 1, 2009 | $132,890 | - | $132,890 |
| GO Bonds (Tax-Exempt) | April 2, 2009 | $6,543,020 | $3,871,192 | $2,671,828 |
| PWB Series ABCD | April 15, 2009 | $435,145 | $250,012 | $185,133 |
| GO Bonds (Taxable and Build America Bonds) | April 28, 2009 | $6,855,000 | $1,061,683 | $5,793,317 |
| PWB Series EF | April 30, 2009 | $206,830 | $149,795 | $57,035 |
| GO Bonds (Private Placement - SANBAG) | May 15, 2009 | $193,475 | - | $193,475 |
| | | | | |
| **TOTAL** | | **$14,560,360** | **$5,332,682** | **$9,227,678** |

*amounts in thousands*

Following the issuance of $6.855 billion of GO bonds on April 28, 2009, the Department of Finance (DOF) released Budget Letter 09-15 on May 6, 2009 outlining the proceeds available by bond act and department.  The Budget Letter stated "based on estimated cash flow needs that departments provided to the State Treasurer's Office (STO), these bond proceeds are sufficient to pay the balance of outstanding obligations (i.e. "unpaid bills"), and pay for estimated project/grant cash needs going forward until a subsequent bond sale.  In addition, bond funded projects/grants that had been committed or awarded that were suspended prior to completion of necessary agency approvals may restart.  This affects nearly all general obligation bond funded projects/grants that had been suspended pursuant to BL 08-33 and by actions of the Pooled Money Investment Board (PMIB) on December 17, 2008."

## AB 55 LOAN STATUS

As a result of the publicly offered bond sales that have closed this year, the amount of unreimbursed AB 55 loans has been reduced from a high of $6.115 billion on April 2, 2009 to $930.01 million as of May 4, 2009. This amount consists of $59.06 million in disbursements for GO bond programs, $702.52 million in disbursements for the PWB lease revenue bond program, and $168.43 million in disbursements for two other revenue bond programs.

## RECOMMENDATIONS

**1.    Loan Renewal Requests.** Staff recommends the Board approve the 17 AB 55 loan renewals (Items 6.a-q) on the May 20, 2009 agenda in the amounts shown on column g of Exhibit A.  The recommended amounts are for either the amount of the existing adjusted loan amount, a decrease requested by the department, or an increase necessary for the requesting department to pay costs authorized by DOF's Budget Letter 09-09. All renewed loans will be subject to the freeze described in Recommendation 3.

**2.    New Loan Requests.**  Staff recommends the following for the two new loan requests on the agenda:

| | |
|---|---|
| **Item 6.r** | **California Department of Corrections and Rehabilitation,** |
| | SPWB Lease Revenue Bonds, AB 900, CA Medical Facility, |
| | Vacaville: 64-Bed Intermediate Care Facility, $3,293,000. |
| Recommendation: | Staff does not recommend approval at this time. |
| Comments: | This loan was denied at the April 15, 2009 meeting.  Although this loan was included in DOF's Budget letter 09-09, Staff continues to recommend that this loan not be approved based on the following: |

- On May 4, 2009, the Taxpayers for Improving Public Safety (TIPS) filed an appeal with the California Supreme Court relating to the AB 900 litigation. The Attorney General's Office has stated that until there is a final, non-appealable judgment in favor of the State, it will not be able to provide its customary bond opinion. The Board's past practice has been to not approve any loans for which the Attorney General's Office can not issue its customary bond opinion.
- Although the Board approved one AB 900 loan request for CA Men's Colony, San Luis Obispo: 50 Mental Health Crisis Beds at the April 15, 2009 meeting, DOF stated that it would stipulate to the deferral of all other loan requests for AB 900 projects until the TIPS litigation was fully resolved.
- Staff of the STO's Public Finance Division believes that there are excess proceeds of other PWB bond issues that may be able to be used to fund the loan request.

| Item 6.s | **California Department of Corrections and Rehabilitation,** |
|---|---|
| | SPWB Lease Revenue Bonds, AB 900, CA Medical Facility, |
| | Vacaville: Enhanced Outpatient Treatment, Program and Office Space, $3,346,000. |
| Recommendation: | Staff does not recommend approval at this time. |
| Comments: | While this loan was included in DOF's Budget Letter 09-09, Staff recommends that this loan not be approved based on the following: |

- On May 4, 2009, the Taxpayers for Improving Public Safety (TIPS) filed an appeal with the California Supreme Court relating to the AB 900 litigation. The Attorney General's Office has stated that until there is a final, non-appealable judgment in favor of the State, it will not be able to provide its customary bond opinion. The Board's past practice has been to not approve any loans for which the Attorney General's Office can not issue its customary bond opinion.
- Although the Board approved one AB 900 loan request for CA Men's Colony, San Luis Obispo: 50 Mental Health Crisis Beds at the April 15, 2009 meeting, DOF stated that it would stipulate to the deferral of all other loan requests for AB 900 projects until the TIPS litigation was fully resolved.
- Staff of the STO's Public Finance Division believes that there are excess proceeds of other PWB bond issues that may be able to be used to fund the loan request.

**3.     AB 55 Loan Disbursement Freeze.**  Staff recommends that the Board continue the freeze on AB 55 loan disbursements except for disbursements authorized by DOF's Budget Letter 09-09.  However, as shown above, more than $9.2 billion of bond proceeds have been made available for direct project funding from bond sales completed since February 27, 2009.

**EXHIBIT A**

POOLED MONEY INVESTMENT BOARD
LOAN REQUESTS (AB 55 LOANS)
For the May 20, 2009 PMIB Meeting

| Agenda Item | New or Renewal | Old Loan No. | New Loan No. | Fund No. | Type | Department/Program | [a] New Loan Amount per Loan Application | [b] Original Amount of Existing Loan | [c] Impact on the Pool (a-b) | [d] Amount of CP or Bonds Issued (since previous loan) | [e] Current Loan Amount Outstanding (b - d) | [f] Adjusted Loan Requested Amount (a - d) | [g] Recommended Loan Amount | [h] Impact of Recommendations (g-b) | [i] Interest Paid by | [j] CP | [k] Finance Committee or Board Approval Needed? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| **RENEWAL REQUESTS** | | | | | | | | | | | | | | | | | |
| **GO** | | | | | | | | | | | | | | | | | |
| a | Renewal | 0780160 | 0890071 | 6001705 | GO | **Resources Agency** Safe Drinking Water, Clean Water, Watershed Protection and Flood Protection Act | $ 7,162,630.44 | $ 7,162,630.44 | $ - | $ 7,143,007.64 | $ 19,622.80 | $ 19,622.80 | $ 7,162,630.44 | $ - | BF | YES | No |
| b | Renewal | 0780154 | 0890144 | 6041700 | GO | **University of California** Kindergarten-University Public Education Facilities Bond Act of 2004 (Hi-Ed) | $ 156,514,466.12 | $ 212,533,425.51 | $ (56,018,959.39) | $ 113,320,640.12 | $ 99,212,785.39 | $ 43,193,826.00 | $ 156,514,466.12 | $ (56,018,959.39) | BF | YES | No |
| c | Renewal | 0780155 | 0890145 | 6044700 | GO | **State Allocation Board Office of Public School Construction** Kindergarten-University Public Education Facilities Bond Act of 2004 (K-12) | $ 2,707,691,308.00 | $ 1,998,574,725.00 | $ 709,116,583.00 | $ 673,133,284.39 | $ 1,325,441,440.61 | $ 2,034,558,023.61 | $ 1,998,574,725.00 | $ - | BF | YES | No |
| d | Renewal | 0780157 | 0890146 | 0005700 | GO | **Resources Agency** Safe Neighborhood Parks, Clean Water, Clean Air, and Coastal Protection Bond Act of 2000 | $ 216,410,000.00 | $ 216,410,000.00 | $ - | $ 129,811,774.94 | $ 86,598,225.06 | $ 86,598,225.06 | $ 216,410,000.00 | $ - | BF | YES | No |
| e | Renewal | 0780158 | 0890147 | 6001700 | GO | **Department of Water Resources** Safe Drinking Water, Clean Water, Watershed Protection and Flood Protection Act | $ 76,432,538.76 | $ 76,432,538.76 | $ - | $ 19,256,051.57 | $ 57,176,487.19 | $ 57,176,487.19 | $ 76,432,538.76 | $ - | BF | YES | No |
| f | Renewal | 0780159 | 0890148 | 6001704 | GO | **Department of Public Health** Safe Drinking Water, Clean Water, Watershed Protection and Flood Protection Act | $ 1,334,049.41 | $ 1,334,049.41 | $ - | $ 559,181.54 | $ 774,867.87 | $ 774,867.87 | $ 1,334,049.41 | $ - | BF | YES | No |
| g | Renewal | 0780161 | 0890149 | 0402701 | GO | **State Water Resources Control Board** Safe, Clean, Reliable Water Supply Act | $ 10,467,835.74 | $ 12,767,454.00 | $ (2,299,618.26) | $ 10,043,647.07 | $ 2,723,806.93 | $ 424,188.67 | $ 10,467,835.74 | $ (2,299,618.26) | BF | YES | No |
| h | Renewal | 0780162 | 0890150 | 6053702 | GO | **Office of Emergency Services** Highway Safety, Traffic Reduction, Air Quality and Port Security Bond Act of 2006 | $ 100,132,588.00 | $ 100,132,588.00 | $ - | $ 59,526,276.90 | $ 40,606,311.10 | $ 40,606,311.10 | $ 100,132,588.00 | $ - | BF | YES | No |
| **REV** | | | | | | | | | | | | | | | | | |
| i | Renewal | 0780165 | 0890151 | 0660546 | REV | **Department of Forestry and Fire Protection SPWB Lease Revenue Bonds** Red Bluff Forest Fire Station / Unit HQ: Replace Station | $ 2,079,555.00 $ 1,480,486.00 | $ 2,079,555.00 | $ (599,069.00) | N/A | N/A | N/A | $ 2,079,555.00 $ 1,480,486.00 | $ (599,069.00) | BF | NO | No |
| j | Renewal | 0780167 | 0890152 | 0660651 | REV | **Department of Forestry and Fire Protection SPWB Lease Revenue Bonds** Twain Hart Forest Fire Station: Relocate Facility | $ 4,167,293.00 | $ 4,126,532.00 | $ 40,761.00 | N/A | N/A | N/A | $ 4,167,293.00 | $ 40,761.00 | BF | NO | No |
| k | Renewal | 0780168 | 0890153 | 0660640 | REV | **Department of Forestry and Fire Protection SPWB Lease Revenue Bonds** Elk Camp Forest Fire Station: Relocate Facility | $ 3,284,598.00 $ 1,350,000.00 | $ 3,284,598.00 | $ (1,934,598.00) | N/A | N/A | N/A | $ 3,284,598.00 $ 1,350,000.00 | $ (1,934,598.00) | BF | NO | No |
| l | Renewal | 0780169 | 0890154 | 0660673 | REV | **Department of Forestry and Fire Protection SPWB Lease Revenue Bonds** Bautista Conservation Camp: Replace Modular Buildings | $ 7,571,378.00 $ 570,609.00 | $ 7,571,378.00 | $ (7,000,769.00) | N/A | N/A | N/A | $ 7,571,378.00 $ 570,609.00 | $ (7,000,769.00) | BF | NO | No |

POOLED MONEY INVESTMENT BOARD
LOAN REQUESTS (AB 55 LOANS)
For the May 20, 2009 PMIB Meeting

| Agenda Item | New or Renewal | Old Loan No. | New Loan No. | Fund No. | Type | Department/Program | [a] New Loan Amount per Loan Application | [b] Original Amount of Existing Loan | [c] Impact on the Pool (a-b) | [d] Amount of CP or Bonds Issued (since previous loan) | [e] Current Loan Amount Outstanding (b - d) | [f] Adjusted Loan Requested Amount (a - d) | [g] Recommended Loan Amount | [h] Impact of Recommendations (g-b) | [i] Interest Paid by | [j] CP | [k] Finance Committee or Board Approval Needed? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Impact on the Pool | | Commercial Paper Adjustment | | | | | |
| m | Renewal | 0780172 | 0890155 | 0660580 | REV | **Department of Mental Health** **SPWB Lease Revenue Bonds** Patton State Hospital - Upgrade Electrical Generator Plant | $ ~~3,078,655.00~~ $ 3,058,137.00 | $ 2,992,086.00 | $ 66,051.00 | N/A | N/A | N/A | $ ~~3,058,136.82~~ $ 3,058,137.00 | $ 66,051.00 | BF | NO | No |
| n | Renewal | 0890108 | 0890156 | 0660628 | REV | **Department of Mental Health** **SPWB Lease Revenue Bonds** Metropolitan State Hospital - Construct New Kitchen | $ 24,480,158.00 | $ 19,951,245.00 | $ 4,528,913.00 | N/A | N/A | N/A | $ 24,480,158.00 | $ 4,528,913.00 | BF | NO | No |
| o | Renewal | 0780170 | 0890157 | 0660669 | REV | **Department of General Services** **SPWB Lease Revenue Bonds** Marysville Office Building: Replacement | $ ~~76,769,154.00~~ $ 75,176,680.00 | $ 75,176,680.00 | $ - | N/A | N/A | N/A | $ 75,176,680.00 | $ - | BF | NO | No |
| p | Renewal | 0780163 | 0890158 | 0660564 | REV | **Department of Corrections and Rehabilitation** **SPWB Lease Revenue Bonds** Susanville: Wastewater Treatment Plant Modifications | $ ~~29,900,854.00~~ $ 25,870,710.00 | $ 31,712,132.00 | $ (5,841,422.00) | N/A | N/A | N/A | $ ~~29,900,854.00~~ $ 25,870,710.00 | $ (5,841,422.00) | BF | NO | No |
| q | Renewal | 0780164 | 0890159 | 0660583 | REV | **Department of Corrections and Rehabilitation** **SPWB Lease Revenue Bonds** San Quentin Prison: Condemned Inmate Complex | $ 19,126,942.00 | $ 18,358,511.00 | $ 768,431.00 | N/A | N/A | N/A | $ 19,126,942.00 | $ 768,431.00 | BF | NO | No |

**NEW LOAN REQUESTS**

REV

| Agenda Item | New or Renewal | Old Loan No. | New Loan No. | Fund No. | Type | Department/Program | [a] New Loan Amount per Loan Application | [b] Original Amount of Existing Loan | [c] Impact on the Pool (a-b) | [d] | [e] | [f] | [g] Recommended Loan Amount | [h] Impact of Recommendations (g-b) | [i] | [j] | [k] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | New | | 0890140 | | REV | **Department of Corrections and Rehabilitation** **SPWB Lease Revenue Bonds, AB 900** CA Medical Facility, Vacaville: 64-Bed Intermediate Care Facility | $ 3,293,000.00 | $ - | $ 3,293,000.00 | N/A | N/A | N/A | $ - | $ - | BF | NO | No |
| s | New | | 0890141 | | REV | **Department of Corrections and Rehabilitation** **SPWB Lease Revenue Bonds, AB 900** CA Medical Facility, Vacaville: Enhanced Outpatient Treatment, Program and Office Space | $ 3,346,000.00 | $ - | $ 3,346,000.00 | N/A | N/A | N/A | $ - | $ - | BF | NO | No |
| | | | | | | **TOTAL** | $ 3,438,065,431.47 | $ 2,790,600,128.12 | $ 647,465,303.35 | $ 1,012,793,864.17 | $ 1,612,553,546.95 | $ 2,263,351,552.30 | $ 2,722,309,848.47 | $ (68,290,279.65) | | | |

| | Requested | Recommended |
|---|---|---|
| Total amount of outstanding PMIA loans as of May 14, 2009* | $ 6,738,328,068.56 | $ 6,738,328,068.56 |
| Impact on the Pool from this months actions | $ 647,465,303.35 | $ (68,290,279.65) |
| Outstanding PMIA loans after this months actions | $ 7,385,793,371.91 | $ 6,670,037,788.91 |

*To the extent a project would have received funding from the active PMIA loan, the loan authorization will be reduced by the amount from the upfront sale once the final project funding determinations are made for the April 2 and April 28 GO bond issues.

# EXHIBIT 2

**POOLED MONEY INVESTMENT BOARD**
**State Treasurer's Office**
**915 Capitol Mall, Room 587**
**Sacramento, California  95814**

<u>**MINUTES**</u>

Wednesday, April 15, 2009

The meeting was called to order at 10:15 AM.

Roll:            Francisco Lujano, for State Treasurer Bill Lockyer
                 Tom Sheehy, for Director of Finance Michael C. Genest
                 Richard Chivaro, for State Controller John Chiang

Staff Present:   Bill Dowell, State Treasurer's Office
                 Mark Paxson, State Treasurer's Office
                 Catherine Brown, Attorney General's Office

**MINUTES**

The Minutes for the April 6, 2009, meeting were approved as submitted, 2-0. (Mr. Chivaro arrived after the minutes were approved.)

**PMIB DESIGNATION**

Mr. Bill Dowell of the State Treasurer's Office presented the portfolio Summary Report as of March 31, 2009.  On that day, the portfolio stood at $58.670 billion.  The effective yield was 1.812%, the quarter-to-date yield was 1.916% and the year-to-date yield was 2.431%.  The average life of the portfolio was 196 days and AB 55 Loans approved stood at $11.769 billion, with $6.114 billion having been disbursed.  The Local Agency Investment Fund had deposits totaling $23.741 billion, with 2,723 participants.

Mr. Andre Rivera of the Cash Management Division of the State Treasurer's Office presented a Summary of the Forecast of Changes in Portfolio for the Pooled Money Investment Account for the period April 13, 2009, through June 19, 2009.  Mr. Rivera highlighted several of the key receipts, as presented in Attachment A.  For this ten week period, a total of $60.133 billion were anticipated in receipts.

Mr. Michael Havey of the State Controller's Office presented the Estimated Pooled Money Disbursements for the forecast period and highlighted several of the major disbursements, also shown in Attachment A.  He noted that disbursements for the period were estimated to total $43.717 billion

Designation No. 1718 was approved, 3-0.

PMIB Minutes
April 15, 2009
Page 2

**AUTHORIZATION FOR GENERAL FUND INTERNAL BORROWING:**

Mr. Dowell presented this document which authorizes the General Fund to borrow from internal sources to meet its cash needs during periods of shortfall.  The authorization presented at this meeting was for the period from May 1, 2009, through July 31, 2009.  He noted that the amount available from various internal funds is estimated to be up to $19.372 billion.

The Authorization for General Fund Internal was approved, 3-0.

**DECLARATION OF SURPLUS MONEY/REDUCTION OF SURPLUS MONEY**

Mr. Dowell presented the changes in the Surplus Money Investment Fund for the period March 1, 2008, through March 31, 2009.  During that month, $8.589 billion was declared Surplus in various special funds, while $7.862 billion was declared to be a Reduction in Surplus.

The Surplus Money Declaration/Reduction for the month, was approved, 3-0.

**SURPLUS MONEY INVESTMENT FUND REQUESTS**

Mr. Dowell presented one request to participate in the Surplus Money Investment Fund from the California Horse Racing Board:

> Special Deposit Fund
> Trainer Audits and Gambling Prevention
> Fund Number 0942217

The Board accepted the staff recommendations of the State Controller's Office and the State Treasurer's Office and approved the requests, 3-0.

**DISCUSSION AND CONSIDERATION REGARDING THE IMPACT OF CASH MANAGEMENT REQUIREMENTS ON APPROVAL OF AB 55 LOANS, INCLUDING POSSIBLE INCREASES OR REDUCTIONS IN LOAN AMOUNTS, OR FREEZING DISBURSEMENTS, FOR OUTSTANDING, RENEWED, OR NEW LOANS**

Mr. Blake Fowler of the State Treasurer's Office Public Finance Division explained that staff was recommending approval of the three renewal loan requests, Items a, b and c on the agenda in the amounts recommended on the summary sheet.  He said all renewal loan requests complied with DOF Budget Letter 09-09.  Mr. Fowler went on to say staff was recommending the Board not approve any of the new loan requests on the agenda for the following reasons:

**d.  California Air Resources Board**, Highway Safety, Traffic Reduction, Air Quality, and Port Security Bond Act of 2006.  Staff does not recommend approval at this time. This loan is <u>not</u> included in DOF's Budget Letter 09-09.

PMIB Minutes
April 15, 2009
Page 3

**e.  California Department of Corrections and Rehabilitation,** SPWB Lease Revenue Bonds, AB 900, CA Medical Facility, Vacaville:  64-Bed Intermediate Care Facility.  The Federal court overseeing the *Coleman* litigation has ordered the State to submit detailed schedules no later than May 26, 2009, or face possible sanctions.  While this loan was included in DOF's Budget Letter 09-09, the staff recommendation to not approve this loan is based on the following:

- As a result of litigation regarding AB 900 filed by the Taxpayers for Improving Public Safety (TIPS), the AG's Office has informed the State Treasurer's Office (STO) that it will not be able to provide its customary bond opinion until there is a final, non-appealable judgment in favor of the State.  The PMIB's practice has been to not approve any loans for which the AG's Office can not issue its customary bond opinion.
- Staff of the STO's Public Finance Division had identified excess proceeds associated with another State Public Works Board (SPWB) bond issue for the Department that may be able to be used to fund the amount of this loan request, but there may not be sufficient appropriation authority for the proceeds to be used.

**f.  California Department of Corrections and Rehabilitation**, SPWB Lease Revenue Bonds, AB 900, CA Medical Facility, Vacaville: Enhanced Outpatient Treatment.  This request has been withdrawn by the Department pending compliance with the 30-day Legislative notice requirement and project approval by SPWB. No Board action is necessary at this time.

**g.  California Department of Corrections and Rehabilitation,** SPWB Lease Revenue Bonds, AB 900, CA Men's Colony, San Luis Obispo: 50 Mental Health Crisis Beds.
The Federal court overseeing the *Coleman* litigation has ordered the State to take all steps necessary to have contracts with the architect, engineering firm and EIR consultant in place by April 23, 2009, or face possible sanctions. While this loan was included in DOF's Budget Letter 09-09, the staff recommendation to not approve this loan is based on the following:

- As a result of litigation regarding AB 900 filed by the TIPS, the AG's Office has informed the STO that it will not be able to provide its customary bond opinion until there is a final, non-appealable judgment in favor of the State.  The PMIB practice has been to not approve any loans for which the AG's Office can not issue its customary bond opinion.
- Staff of the STO's Public Finance Division has identified excess proceeds associated with another SPWB bond issue for the Department that may be able to be used to fund the amount of this loan request, but there may not be sufficient appropriation authority for the proceeds to be used.

Mr. Fowler concluded by saying that staff recommends the Board continue the freeze on AB 55 loan disbursements, except for disbursements authorized by DOF's Budget Letter 09-09. However, as described in the staff report for the April 6, 2009 PMIB meeting, based on completed and planned bond sales for April, more than $5 billion of direct project funding from bond proceeds is expected to be provided to projects impacted by the freeze.

PMIB Minutes
April 15, 2009
Page 4

Mr. Dean Borg, Director of Finance & Administration and Ms. Deborah Hysen, Chief Deputy Secretary of Facility Planning & Construction for the California Department of Corrections and Rehabilitation (CDCR) addressed the Board. They confirmed that Item f had not been approved by the SPWB and was awaiting legislative approval, so it had been withdrawn from consideration by the PMIB at this meeting. However, Ms. Hysen urged approval of the other two requests, particularly Item g, due to a pending court order requiring the State to act by April 23, 2009. Ms. Hysen elaborated on the judge's decision that the San Luis Obispo Men's Colony facilities were inadequate to support the inmate population. She explained that many of the inmates are high risk suicide candidates and the court order determined it is imperative the 50 mental health crisis beds be constructed as soon as possible.

Mr. Sheehy indicated the DOF's support for both CDCR's loan requests. In particular, he said contracts necessary to proceed with the project listed as Item g needed to be executed by April 23, 2009, per the court order and that failure to act will have serious repercussions. He noted: 1) without an appropriation, there is no other viable funding source, and 2) CDCR has a multi-billion dollar support budget from which the loans could be repaid, and therefore the PMIB could be assured of loan repayment. Mr. Sheehy suggested the Board make an exception and approve this particular AB 900 bond-funded project presented in Item g, despite the pending TIPS litigation. Mr. Sheehy noted that DOF would stipulate to the deferral of loan requests for all other AB 900 projects until the TIPS litigation was resolved, but that the state had no choice but to comply with this 30-day court order.

The Chair invited Ms. Catherine Brown of AG's Office to comment on the pending litigation. Ms. Brown said there are two pending cases relating to Item e and g. The first case, *Taxpayers for Improving Public Safety v. Schwarzenegger*, challenges the Public Safety and Offender Rehabilitation Services Act (AB 900) which authorizes the SPWB to issue lease-revenue bonds for the construction and renovation of correctional facilities. While the State had prevailed in the trial court and the decision had been affirmed by the appellate court, there had been mention in the media the plaintiffs was prepared to seek review by the California Supreme Court, and the deadline to file for such review was May 4, 2009. Therefore, the AG's Office was unable to provide its customary "unqualified bond opinion" regarding the validity of AB 900 bonds until after the May 4th deadline, or based on how the Supreme Court handles the appeal.

Ms. Brown went on to mention a second case, *Coleman v. Schwarzenegger*, a class action in which the federal court has ordered the state to take steps to improve mental health services to state prison inmates. The judge had expressed particular frustration with the lack of progress on the 50 Mental Health Crisis Beds at the Men's Colony in San Luis Obispo and ordered the state to execute certain contracts with respect to this project within 30 days. This is the project addressed by the loan request in Item g. She noted the SPWB approved the project on Friday, April 10, 2009. Ms. Brown stated the judge had made it clear he would not tolerate noncompliance and would impose fines, plus other means, to assure the order was implemented by April 23, 2009. She noted that the second project before the Board, the California Medical Facility, Vacaville, 64-bed Intermediate Care Facility (Item e), was not subject to the 30-day order, but the judge had ordered the state to submit detailed schedules for this and other projects by May 26, 2009, or be subject to sanctions.

PMIB Minutes
April 15, 2009
Page 5

In response to a question from Mr. Lujano, Ms. Brown concluded by indicating she was not aware of any other funding sources available to initiate these projects.

**AB 55 LOAN APPLICATIONS (Government Code §16312)**

| Agenda Item | Loan Number | Department/Program | Adjusted Loan Amount |
|---|---|---|---|
| a. | 0890137 | Housing and Community Development Housing and Emergency Shelter Trust Fund Act of 2002 | $677,413,052.38 |
| b. | 0890138 | Housing and Community Development Housing and Emergency Shelter Trust Fund Act of 2006 | $173,923,127.77 |
| c. | 0890139 | California Institute for Regenerative Medicine California Stem Cell Research and Cures Bond Act of 2004 | $295,000,000.00 |
| g. | 0890142 | Department of Corrections and Rehabilitation SPWB Lease Revenue Bonds, AB 900 CA Men's Colony, San Luis Obispo: 50 Mental Health Crisis Beds | $3,872,000.00 |

Mr. Sheehy made a motion, which was seconded by Mr. Chivaro, to accept the staff recommendations, with the exception of Item g.  The Board approved the three renewal loan requests, declined the new loans requested in Items d and e, and accepted the staff recommendation to continue the Disbursement Freeze, 3-0.

Mr. Sheehy made a motion to approve the new loan request for $3,872,000, presented in Item g, as requested by CDCR.  Mr. Chivaro seconded the motion.  The Board approved the loan request, 2-1, with the Treasurer voting no.

**PUBLIC COMMENT**

None.

**ADJOURNMENT**

In the absence of further business, the meeting was adjourned at 10:45 AM.

Respectfully submitted,

_____
Bettina Redway
Executive Secretary

# EXHIBIT 3

**POOLED MONEY INVESTMENT BOARD**
**State Treasurer's Office**
**915 Capitol Mall, Room 587**
**Sacramento, California  95814**

**BOARD MEMBERS**
**State Treasurer Bill Lockyer**
**State Controller John Chiang**
**Director of Finance Michael C. Genest**

**EXECUTIVE SECRETARY**
**Bettina Redway**

**Regular Meeting – Open Session**
Wednesday, June 17, 2009 – 10:00 a.m.

**<u>AGENDA</u>**

1.  Roll Call

2.  Minutes

3.  PMIB Designation

4.  Surplus Money Declarations

5.  Surplus Money Investment Fund Requests

6.  New Commercial Paper Issuer

7.  Discussion and Consideration Regarding the Impact of Cash Management Requirements on Approval of AB 55 Loans, Including Possible Increases or Reductions in Loan Amounts, or Freezing Disbursements, for Outstanding, Renewed, or New Loans.

    AB 55 Loans (Government Code §16312 and §16313), as referenced below:

RENEWAL REQUESTS

| PMIB<br>Loan No. | Department<br>& Bond Act | Amount |
|---|---|---|
| a.  0890160 | Department of Water Resources<br>Water Conservation and Water Quality Bond Law of 1986 | $ 1,795,000.00 |
| b.  0890161 | Voting Modernization Board<br>Voting Modernization Bond Act of 2002 | 12,747,000.00 |
| c.  0890162 | State Allocation Board<br>Office of Public School Construction<br>Kindergarten-University Public Education Facilities Bond Act of 2006 (K-12) | 1,797,982,072.94 |

PMIB Agenda
June 17, 2009
Page 2

| | PMIB Loan No. | Department & Bond Act | Amount |
|---|---|---|---|
| d. | 0890163 | Resources Agency<br>CA Clean Water, Clean Air, Safe Neighborhood Parks and Coastal Protection Bond Act of 2002 | $ 425,925,000.00 |
| e. | 0890164 | Department of Forestry and Fire Protection<br>SPWB Lease Revenue Bonds<br>Ishi Conservation Camp: Replace Facility | 1,985,963.00 |
| f. | 0890165 | Department of Forestry and Fire Protection<br>SPWB Lease Revenue Bonds<br>Bieber Forest Fire Station & Helitack Base: Relocate Facility | 2,229,017.00 |
| g. | 0890166 | Department of Forestry and Fire Protection<br>SPWB Lease Revenue Bonds<br>South Operations Area Headquarters: Relocate Facility | 7,034,833.00 |
| h. | 0890167 | Department of Forestry and Fire Protection<br>SPWB Lease Revenue Bonds<br>Ventura Youth Conservation Camp: Construct Apparatus Building & Shop/Warehouse | 2,285,468.00 |
| i. | 0890168 | Department of Forestry and Fire Protection<br>SPWB Lease Revenue Bonds<br>Mendocino Ranger Unit Headquarters: Replace Automotive Shop | 1,860,568.00 |
| j. | 0890169 | Department of Mental Health<br>SPWB Lease Revenue Bonds<br>Patton State Hospital: Construct New Main Kitchen | 1,440,814.00 |
| k. | 0890170 | Department of Mental Health<br>SPWB Lease Revenue Bonds<br>Napa State Hospital: Construct New Main Kitchen | 1,418,956.00 |
| l. | 0890171 | Department of Corrections and Rehabilitation<br>SPWB Lease Revenue Bonds<br>Salinas Valley State Prison: 64-Bed Mental Health Facility | 30,922,063.00 |

PMIB Agenda
June 17, 2009
Page 3

| PMIB Loan No. | | Department & Bond Act | Amount |
|---|---|---|---|
| m. | 0890172 | Department of Corrections and Rehabilitation SPWB Lease Revenue Bonds | $ 41,083,563.00 |
| | | Chuckawalla Valley State Prison: Heating, Ventilation, and Air Conditioning System | |

NEW LOAN REQUESTS

| | | | |
|---|---|---|---|
| n. | 0890173 | Department of Corrections and Rehabilitation SPWB Lease Revenue Bonds, AB 900 | 2,475,321.00 |
| | | Salinas Valley State Prison: 72-Bed Administrative Segregation Unit/Enhanced Outpatient Program Mental Health Facility | |
| o. | 0890174 | Department of Corrections and Rehabilitation SPWB Lease Revenue Bonds, AB 900 | 4,172,000.00 |
| | | CA Institution for Women: 45-Bed Acute/Intermediate Care Facility | |

8.  Public Comment

9.  Adjournment

**FOR ADDITIONAL INFORMATION:**
Bill Dowell
State Treasurer's Office/Cash Management Division
915 Capitol Mall, Room 315
Sacramento, California  95814
(916) 651-3098/bdowell@treasurer.ca.gov

This agenda is also available at the State Treasurer's web site:
http://www.treasurer.ca.gov

The Pooled Money Investment Board complies with the Americans with Disabilities Act (ADA) by ensuring that the facilities are accessible to persons with disabilities, and providing this notice and information given to the members of the Pooled Money Investment Board in appropriate alternative formats when requested.  If you need further assistance, including disability-related modifications or accommodations, you may contact the Pooled Money Investment Board no later than five calendar days before the meeting at 916-653-3147 and Telecommunication Device for the Deaf (TDD) at 916-654-9922.

# EXHIBIT 4

DEPARTMENT OF
**FINANCE**
OFFICE OF THE DIRECTOR

ARNOLD SCHWARZENEGGER, GOVERNOR
STATE CAPITOL ■ ROOM 1145 ■ SACRAMENTO CA ■ 95814-4998 ■ WWW.DOF.CA.GOV

MAR 2 0 2009

Honorable Denise Moreno Ducheny, Chair
Senate Budget and Fiscal Review Committee

  Attention:  Mr. Danny Alvarez, Staff Director (2)

Honorable Noreen Evans, Chair
Assembly Budget Committee

  Attention:  Mr. Christian Griffith, Chief Consultant (2)

**Amendment to Budget Bill Items 5225-301-0001 and 5225-301-0747, Capital Outlay, Department of Corrections and Rehabilitation**

It is requested that Item 5225-301-0001 be increased by a net of $245,000 to reflect the following changes:

It is requested that funding be increased for the following projects in the specified amounts:

- Increase by $12,980,000 to fund construction of the California State Prison, Sacramento:  Enhanced Outpatient Program Treatment and Program Space project.  A revised project schedule indicates funding construction in addition to completing design will accelerate the completion of this project, which is part of the Department of Corrections and Rehabilitation's (CDCR's) bed plan to provide constitutionally adequate mental health care required by the *Coleman* court.

- Increase by $6,030,000 for construction of the Correctional Training Facility:  Solid Cell Fronts (SCF) project.  This project will provide critical improvements to the Administrative Segregation Unit (ASU) to enhance staff and inmate safety, including solid cell fronts and related ventilation improvements.  Because this project also includes suicide prevention measure in the Administrative Segregation cells, it is being monitored by the *Coleman court*.

- Increase by $374,000 to complete design of the Deuel Vocational Institution (DVI): SCF project.  This project will provide critical improvements to the ASU to enhance staff and inmate safety, including solid cell fronts and related ventilation improvements. Because this project also includes suicide prevention measure in the Administrative Segregation cells, it is being monitored by the *Coleman court*.

- Increase by $231,000 to begin design for the Folsom State Prison:  SCF project.  This project will provide critical improvements to the ASU to enhance staff and inmate safety, including solid cell fronts and related ventilation improvements.  Because this project also includes suicide prevention measure in the Administrative Segregation cells, it is being monitored by the *Coleman court*.

- 2 -

- Increase by $704,000 to construct the California Institution for Women: 20-Bed Psychiatric Services Unit project. An updated cost estimate for construction of this project indicates this adjustment is necessary to ensure adequate funding is available for construction of this project, which is part of CDCR's bed plan to provide constitutionally adequate mental health care required by the *Coleman* court.

It is further requested the increases be offset by decreased funding for the following projects in the specified amounts:

- Decrease by $9,192,000 for the Ironwood State Prison: Heating Ventilation and Air Conditioning project. It has been determined that funding to complete the design of this project can be deferred to a future year.

- Decrease by $5,072,000 for the Mule Creek State Prison: Wastewater Treatment Plan Improvements project. It has been determined that this project may be funded from the General Fund appropriation for capital outlay in Chapter 7, Statutes of 2007 (AB 900).

- Decrease by $4,851,000 for the Sierra Conservation Center: Effluent Disposal Pipeline project. It has been determined that this project may be funded from the General Fund appropriation for capital outlay in AB 900.

- Decrease by $959,000 for the California Rehabilitation Center: Install Bar Screen project. It has been determined that funding for this project can be deferred while the CDCR determines whether to proceed with an alternative to have the City of Norco provide the necessary waste screening.

It is requested that Item 5225-301-0747 be decreased by $896,000 to reflect a revised cost estimate for completion of the DVI: New Minimum Support Dining Facility project. It is further requested the following provisional language be added to the item in order to extend the availability of funding for the project:

> Provision X. Notwithstanding any other provision of law, the funds appropriated in this item shall be available during the 2009-10 fiscal year, except appropriations for working drawings which shall be available for expenditure until June 30, 2011, and appropriations for construction which shall be available until June 30, 2014. In addition, the balance of the funds appropriated for construction that have not been allocated, through fund transfer or approval to bid, by the Department of Finance on or before June 30, 2012, shall revert as of that date to the fund from which the appropriation was made.

The effect of my requested action is reflected on the attachment.

MAR 2 0 2009

If you have any questions or need additional information regarding this matter, please call Chris Lief, Principal Program Budget Analyst, at (916) 445-9694.

MICHAEL C. GENEST
Director
By:


/s/ Ana J. Matosantos

ANA J. MATOSANTOS
Chief Deputy Director

Attachment

cc:  Honorable Christine Kehoe, Chair, Senate Appropriations Committee
        Attention:  Mr. Bob Franzoia, Staff Director
      Honorable Bob Dutton, Vice Chair, Senate Budget and Fiscal Review Committee
        Attention:  Mr. Seren Taylor, Staff Director
      Honorable Kevin de Leon, Chair, Assembly Appropriations Committee
        Attention:  Mr. Geoff Long, Chief Consultant
      Honorable Roger Niello, Vice Chair, Assembly Budget Committee
        Attention:  Mr. Peter Schaafsma, Staff Director
      Honorable Mark DeSaulnier, Chair, Senate Budget and Fiscal Review Subcommittee No. 4
      Honorable Juan Arambula, Chair, Assembly Budget Subcommittee No. 4
      Mr. Mac Taylor, Legislative Analyst (4)
      Mr. Craig Cornett, Senate President pro Tempore's Office
      Mr. Christopher W. Woods, Assembly Speaker's Office (2)
      Mr. Ivan Altamura, Chief of Staff, Assembly Republican Leader's Office
      Mr. Matthew Cate, Secretary, Department of Corrections and Rehabilitation
      Ms. Deborah Hysen, Chief Deputy Secretary, Facility Planning, Construction, and Management, Department of Corrections and Rehabilitation
      Mr. Dean Borg, Director, Finance Administration and Support, Facility Planning, Construction, and Management, Department of Corrections and Rehabilitation
      Ms. Sarah VanDyke, Branch Chief, Finance and Budgeting Branch, Facility Planning, Construction, and Management, Department of Corrections and Rehabilitation

# EXHIBIT 5

**STANDARD AGREEMENT AMENDMENT**
STD. 213 A (Rev 6/03)

Agt. # _899-2007_

| ☒ CHECK HERE IF ADDITIONAL PAGES ARE ATTACHED    24    Pages | AGREEMENT NUMBER **P05.0008** | AMENDMENT NUMBER **1** |
|---|---|---|
| | REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and Contractor named below:

   STATE AGENCY'S NAME
   **THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**

   CONTRACTOR'S NAME
   **COUNTY OF KERN**

2. The term of this
   Agreement is    July 1, 2005    through    June 30, 2010

3. The maximum amount of this    $ 20,124,243
   Agreement after this amendment is:    Twenty Million One Hundred Twenty Four Thousand Two Hundred forty three Dollars and no cents.

4. The parties mutually agree to this amendment as follows.  All actions noted below are by this reference made a part of the Agreement and incorporated herein:

   Contract Number P05.0008, dated July 1, 2005, for Transitional Case Management Programs, is hereby amended to revise the Scope of Work to better define the TCMP program and adding the Pre-Parole Benefits Entitlement Services and the Budget for the Pre-Parole Benefits Entitlement Services.  Amendment will increase in the dollar amount of $7,705,604.  See attached the Scope of Work (Exhibit A) and Budget (Exhibit B-2.1 through B-2.4).

   All other terms and conditions shall remain the same.

**IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.**

| CONTRACTOR | CALIFORNIA Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (If other than an individual, state whether a corporation, partnership, etc.) **County of Kern** | |
| BY (Authorized Signature)    DATE SIGNED (Do not type) OCT 0 2 2007 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING **CHAIRMAN – BOARD OF SUPERVISORS** | **APPROVED** OCT 2 9 2007 |
| ADDRESS **1115 Truxtun Avenue, Room 502 Bakersfield, CA  93301** | DEPT OF GENERAL SERVICES |

| STATE OF CALIFORNIA | |
|---|---|
| AGENCY NAME The California Department of Corrections and Rehabilitation | |
| BY (Authorized Signature)    DATE SIGNED (Do not type)  10/17/07 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING  .REN V. SMITH, Chief, Service Contracts Section, Office of Business Services | Exempt per: |
| ADDRESS **1515 S Street, Room 410 South Sacramento, CA 95814** | |

APPROVED AS TO FORM
Office of County Counsel
Kern County
By:

The County of Kern, Department of Public Health      Amendment Agreement No. P05.0008-1
California Department of Corrections and Rehabilitation (CDCR)      Exhibit A

## DIVISION OF ADULT PAROLE OPERATIONS
## CRISIS PLACEMENT UNIT

### SCOPE OF WORK

**TRANSITIONAL CASE MANAGEMENT PROGRAM FOR MENTALLY ILL PAROLEES
AND
PRE-PAROLE PROCESS FOR SECURING FEDERAL AND STATE BENEFIT ENTITLEMENTS
AND COMMUNITY BASED CONTINUITY OF CARE**

**A.**   **ROLE OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION:**

The overall coordination and management of this program will be the responsibility of the California Department of Corrections and Rehabilitation's (CDCR) Division of Adult Parole Operations (DAPO). The Associate Governmental Program Analyst (AGPA) located at the DAPO Headquarters Office in Sacramento, California, will be the program manager for this contract.

The AGPA will act as a liaison between the institutions, DAPO, Division of Correctional Health Care Services, and the Contractor. In addition, the AGPA will be responsible for invoice review, approval, monitoring of the contract, outcome report development and presentations to DAPO executive staff, and coordinating orientation to contract staff as to the CDCR process.

Regional DAPO Headquarters staff will assist in identifying the Agent of Record (AOR) for those parolees participating in the program. The AOR will assist the Contractor in communications with the parolee as necessary.

CDCR shall design and supply forms as appropriate to the process that must address, at the minimum the following: consent to release information, medical, mental health and psychosocial assessment, activities of daily living, level of care, mode of transportation, community contact log, drug and arrest history, and a service plan (a written document that identifies a client's problems and needs, intended interventions and expected results in measurable terms with short-range goals).

CDCR will provide an accurate list of inmates qualified for services within a timely matter. This will be automated in the Parole Automated Tracking System (PATS) to the extent possible and require the Contractor to review reports built into the PATS.

CDCR shall ensure that the Contractor has access to c-files, medical records, CDCR staff, and clients/inmates.

Random program quality reviews will be conducted by CDCR staff. Evaluations to measure deliverables and outcomes for reporting on program effectiveness will be conducted during this agreement.

**Bilingual and Communication Services:**
As needed, access to bilingual and interpreter service providers; and effective communication devices and/or services for persons who are hearing and/or vision impaired will be made available and provided by the respective institution.

The State of California and
County of Kern, Department of Public Health
Page 2

Amendment Agreement No. P05.0008-1
Exhibit A

## B.    ROLE OF THE CONTRACTOR:

The Contractor shall designate a Project Director to be responsible for ensuring that the terms, conditions, and provisions of this contract are met. The Contractor shall notify CDCR within five (5) working days of a change in the Project Director. The continuation and subsequent replacement of this position is subject to the provisions contained in this agreement.

All contracted staff must meet security requirements for admission to California State prisons, and successfully pass a background investigation, which includes fingerprinting. Ex felons or persons with criminal convictions will be reviewed by the CDCR on a case by case basis for hiring determination.

**California Department of Corrections & Rehabilitation Security-Gate Clearance Process:**
A memorandum is sent by the Contractor to the DAPO Program Manager with the prospective employee's full name, date of birth, social security number, and California drivers' license number if applicable. The DAPO Program Manager will then request a verification check on the potential employee through the California Law Enforcement Telecommunications System (CLETS). The CLETS provides all law enforcement user agencies with the capability of obtaining information directly from federal, state, and local computerized information files.

A CDCR Peace Officer will review the CLETS report for any hits/discrepancies and once cleared via the peace officer review of CLETS, the potential Contractor employee then goes to an authorized Live Scan Center to have their fingerprints ran through the Department of Justice/Federal Bureau of Investigations database. Fingerprints and Subsequent Arrest Notifications are processed through the Selection Support Section (SSS), which acts as the liaison between CDCR and the California Department of Justice.

The Contractor then contacts the DAPO Program Manager to get the results of the fingerprinting after approximately one week.

**Résumés, Job Descriptions and Duty Statements:**
The Contractor must provide and maintain résumés, duty statements and/or job descriptions for all staff paid through this Agreement. In addition, all contracted staff personnel files must indicate the date of employment, rate of pay and benefits, funding source, pay increases, promotions and status changes, and, if applicable, the date and reason(s) for employment termination.

Staff List/Personnel Résumés/Qualifications
When applicable, this subsection is used to request the following:
1.    Copies of personnel licenses (NOTE: Do Not request for registry type agreements), certifications, permits, if required,
2.    Minimum qualifications, and
3.    Experience

The Contractor agrees to allow CDCR the right to:
1.    Approve in advance, any personnel to be assigned to this project, and
2.    Disapprove the continuing assignment of any personnel.

If any employee of the Contractor is unable to perform due to illness, resignation or other factors beyond Contractor's control, the Contractor shall provide acceptable substitute personnel as quickly as practical.

The State of California and                          Amendment Agreement No. P05.0008-1
County of Kern, Department of Public Health                          Exhibit A
Page 3

The Contractor shall report, in writing, the resignation or dismissal of personnel who are an essential part of the successful operation of the contracted program. The CDCR may immediately terminate the Agreement if the replacement of personnel is detrimental to the program as determined by the CDCR.

**Collection of Program and Participation Data:**
The Contractor shall collect program and participation data, as approved by the CDCR Program Manager, which tracks potentially eligible inmates participants, services offered, services provided, services denied, and application submittals and outcomes. This reporting will be automated in PATS to the extent possible. The Project Coordinator will monitor and analyze the program and participation data and work with staff to make adjustments, and/or provide training as needed to ensure quality management. In addition, the Contractor is required to cooperate in program evaluations and assist CDCR in the data collection efforts and program analysis.

**Monthly Reports:**
The Contractor shall submit required reports regarding program activities, client load, and other ad hoc reports as needed. Monthly reports are to be submitted on or before the 10th of the month to:
    California Department of Corrections and Rehabilitation
    Division of Adult Parole Operations
    Crisis Placement Unit, Program Manager
    P.O. Box 942883
    1515 S Street, Room 212 North
    Sacramento, CA 94283-0001

**Documentation Practices:**
The client/inmate service record must be maintained and shall follow the accepted guidelines for record handling and documentation practices for health care records:
- Each client/inmate must have a separate record and unique identifying CDCR number.
- Observations and conclusions documented should be objective, professional and non-judgmental.
- Records should follow a standard format with standardized documents.
- Documentation must be legible, typewritten, computer generated or handwritten in black ink, dated and signed (with title).
- Contractor policy should assign responsibility for recording documentation with time frames.
- Corrections should be made by drawing a single line through the entry, writing "error" and dating and initialing the entry. The use of "white out" or other correction methods is not acceptable.

**Record Handling, Storage and Confidentiality:**
All documents should be secured in the record and protected from potential damage. No forms shall be destroyed or removed from the records once entered into them. Records should be available only to the agency staff directly responsible for filing, charting, and reviewing, and to State and Federal representatives as required by law. They should be protected from unauthorized access; computerized records must have appropriate safeguards.

Medical/mental health information cannot be released, either verbally, in writing, or copied from records outside of CDCR, or to anyone within CDCR that does not have a need to know, without a written consent for the release of information signed by the client/inmate (or legal representative). The consent must specify the type of information to be released and to whom, and may be revoked at any time by the client (or legal representative). Current State law will be followed regarding client/inmate access to records.

The State of California and                                    Amendment Agreement No. P05.0008-1
County of Kern, Department of Public Health                              Exhibit A
Page 4

The Contractor shall:

- Foster inter and intra agency working relationships to help accomplish tasks.
- Establish and maintain active working relationships with resources in the community, with benefit administrators, federal, state, and local governmental agencies and CDCR staff.
- Maintain a current resource file/directory of information regarding location and phone numbers of benefit offices in the community so that inmates can be advised of the local office in their county of residence. This information will be automated in PATS to the extent possible.
- Maintain a supply of applications and claim forms for the benefit application process.
- Maintain accurate and confidential client records regarding all clients/inmates that services are provided to. This information will be automated in PATS to the extent possible.
- Maintain records on clients who refuse services. This information will be automated in PATS to the extent possible.

**Effective Communication:**
As needed, the Contactor shall ensure that clients have access to bilingual and interpreter service providers; and effective communication devices and/or services for persons who are hearing and/or vision impaired. These services will be made available and provided by the respective institution.

**C.    CDCR and Contractor Responsibilities:**
The DAPO Program Manager and the Contractor will meet as often as necessary, but not less than quarterly, to review progress and performance. The review criteria will include, but not be limited to, problems encountered, future performance, and any other subjects relating to the completion of specified tasks.

**Program Definitions:**

1. Assessment - A comprehensive evaluation of the client will be conducted to determine health, psychosocial, financial, functional status, and support systems. This assessment will provide a determination of probable eligibility for benefits, as well as which benefits to apply for.

2. CalWorks - California Work Opportunity and Responsibility to Kids.

3. C-File – Central File: The C-file is maintained in the prison's Central Records office and holds information pertaining to the inmate's social factors, sentencing, criminal history, county of residence, custody level, in-custody disciplinary history, and assigned parole unit.

4. Contractor - The entity, which has entered into a contract with CDCR to provide agreed upon services for inmates with medical/mental disabilities and/or illness.

5. CCCMS – Correctional Clinical Case Management System: A classification designated to an inmate that is participating in the prison's Mental Health Services Delivery System and requires minimal mental health care.

6. CDCR – California Department of Corrections and Rehabilitation.

7. CDCR Number: A unique identifier assigned to each inmate which continues until discharge from CDCR jurisdiction. The CDCR number currently consists of a letter followed by 5 numbers, (i.e., A12345)

8. CDSS – California Department of Social Services.

The State of California and
County of Kern, Department of Public Health
Page 5

Amendment Agreement No. P05.0008-1
Exhibit **A**

9.   CDHCS – California Department of Health Care Services.

10.  EOP – Enhanced Outpatient Program:  A classification designated to an inmate with a GAF score of 50 or less that is participating in the prison's Mental Health Services Delivery System and requires increased mental health care.

11.  GAF Score – Global Assessment of Functioning Score.

12.  Medi-Cal/Medicare - A program jointly funded by the states and the federal government, which provides medical aid for people who are unable to finance their own medical expenses.

13.  MHSDS – Mental Health Services Delivery System.

14.  PATS – Parole Automated Tracking System:  PATS is the primary database that will be used by the contractor for data input, and tracking.

15.  POC – Parole Outpatient Clinic:  A DAPO program to provide outpatient mental health services and medication management for mentally ill parolees.

16.  SSA – Social Security Administration:  A federal government agency promoting the Nation's economic security by administering America's major income support programs for the elderly, disabled, and their dependants through Old-Age and Survivors Insurance, Disability Insurance, and Supplemental Security Income.

17.  SSI – Supplemental Security Income:  A government program providing economic assistance to persons faced with disability.

18.  TCMP – Transitional Case Management Program:  A DAPO program to provide transitional case management from prison to parole.

19.  VA – A federal agency with the goal to provide excellence in patient care, veterans' benefits with the commitment to help veterans get the services they have earned.

**D.**   **Contractor/CDCR Contact Information:**

All legal notices to be given by either party to the other shall be made in writing by hand delivery or by registered or certified mail, return receipt requested or by other method reasonably capable of proof of receipt thereof and addressed to the attention of:

Contractor:
Kern County Department of Public Health
Dave Martin, Project Director
1800 Mt Vernon
Bakersfield, CA 93306
Phone Number:  (661) 868-0366
FAX Number:  (661) 868-0171

The State of California and
County of Kern, Department of Public Health
Page 6

Amendment Agreement No. P05.0008-1
Exhibit A

CDCR:
Should questions or problems arise during the term of this Agreement, the Contractor should contact the
following offices:

Billing/Payment Issues:
Headquarters Accounting Office
Phone No. (916) 327-0280
Fax No. (916) 445-2248

Program Support/Scope of Work/Performance Issues:
Division of Adult Parole Operations
Crisis Placement Unit
Robert Storms, Staff Service Manager I
Phone Number: (916) 324-4218
Fax Number: (916) 445-1920

General Contract Issues:
Office of Business Services
Phone Number: (916) 323-8718
FAX Number: (916) 322-1098

The State of California and
County of Kern, Department of Public Health
Page 7

Amendment Agreement No. P05.0008-1
Exhibit A

E.  **TRANSITIONAL CASE MANAGEMENT PROGRAM FOR MENTALLY ILL PAROLEES:**

The Contractor agrees to provide the CDCR with Transitional Case Management Program (TCMP) services for inmates/parolees who are receiving treatment for mental illness. The Contractor agrees that TCMP services shall be provided in accordance with the Scope of Work.

The Contractor is expected to establish a TCMP that will service 30 to 40 new inmates per month, per Social Worker. The list of clients served will consist of inmates identified as admitted to the Correctional Clinical Case Management System (CCCMS) and/or Enhanced Outpatient Program (EOP) within the institution. Furthermore, it is the Contractor's responsibility to link the identified inmates to the appropriate Parole Outpatient Clinic (POC) in the inmate/parolee's respective Parole Region. The Contractor will be expected to work cooperatively with representatives of the CDCR, DAPO and the following CDCR participating institutions:

1.  California Correctional Institution (CCI)
2.  Avenal State Prison (ASP)
3.  California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF)
4.  California Men's Colony (CMC)
5.  Wasco State Prison (WSP)
6.  North Kern State Prison (NKSP)
7.  High Desert State Prison (HDSP)
8.  Pelican Bay State Prison (PBSP)
9.  Pleasant Valley State Prison (PVSP)
10. Valley State Prison for Women (VSPW)
11. Sierra Conservation Center (SCC)
12. Deuel Vocational Institution (DVI)
13. California State Prison, Corcoran (COR)
14. Central Valley Women's Facility (CCWF)
15. California State Prison, Sacramento (SAC)
16. Mule Creek State Prison (MCSP)
17. California Correctional Center (CCC)
18. Kern Valley State Prison (KVSP)
19. Folsom State Prison (FSP)

The Contractor shall:
- Perform comprehensive client assessments and ongoing periodic assessments.
- Develop, review and, if necessary, revise each client's service plan prior to the inmate's parole date.
- Act as a liaison with the POC and institution's mental health treatment staff as needed.
- Participate in case conferences.
- Maximize use of all existing resources in regard to mental health.
- Assist clients in decision making for service planning.
- Establish and maintain active working relationships with resources in both public and private benefits, entitlements, and assistance programs and systems.
- Establish and maintain current resource file/directory of information regarding available programs, services, contact persons, and avenues of access in the community, and current trends and knowledge regarding mental health.
- Develop and maintain a supply of applications and claim forms for the most commonly used programs.

The State of California and
County of Kern, Department of Public Health
Page 8

Amendment Agreement No. P05.0008-1
Exhibit A

- Provide one-on-one consultation to clients regarding benefits, entitlements, and potential available assistance.
- Maintain accurate and confidential client records regarding all client benefits, entitlements and assistance, actions taken on behalf, correspondence and phone logs.
- Develop and submit required reports regarding program activities, client load, and other ad hoc reports as needed.
- Obtain and package appropriate documents in the preparation for transition to the POC for scheduled visits and for the transitional staff in other counties.
- Work with the POC liaison to identify the AOR on paroling inmates in service areas.
- Assist the CDCR's Research Unit in the collection of data for evaluation purposes.
- Collect and enter all relevant information of each client into the CDCR issued laptop.
- Meet with CDCR administration as required.
- Provide orientation and education as necessary for the successful implementation and use of this project as defined by the DAPO Program Manager.
- Ensure that pre-release assessment plans for each participant in the program is provided to the designated Regional POC and Parole Unit Supervisor.
- All other duties relating to the collection and transfer of treatment information to the POCs.

**Program Requirements:**
After an inmate has been identified to participate in the MHSDS and is within 90 days to parole the initial intake and the comprehensive client assessment shall be performed. Identification of an inmate's MHSDS status will be automated in PATS to the extent possible.

**Comprehensive Client Assessment:**
The comprehensive assessment shall be age, gender, culturally and linguistically appropriate. Identification of barriers to service utilization and service delivery, and proposed resolutions to these barriers should be addressed. The comprehensive client assessment shall include, but not be limited to, the following elements:
- **Medical/Mental Health Status** means information about the client's physical condition establishing the diagnosis and any other medical problems the client may have, and prognosis. Medical/mental health information defines the need for treatment. This information must be, at a minimum, a written statement from the client's attending physician verifying the diagnosis. Additional information may include a copy of the most recent medical/mental history and physical examination or a copy of the discharge summary from an acute care hospital, if applicable.
- **Psychosocial and Financial Assessments** provide information about a client's social, emotional, behavioral, psychological, mental, spiritual, environmental, financial and benefit eligibility status. These assessments include information about family and support systems and legal issues to include parole conditions. They also include information on the client's coping strategies, strengths and weaknesses, and reaction to illness.

**Client Contacts, Reassessments and Case Conferences:**
- **Initial Release:** Transitional case management services shall be offered to eligible inmates, face-to-face, 90 days prior to parole, but may be initiated at any juncture prior to release to parole. A minimum of two (2) face-to-face inmate contacts are required prior to the inmate's release to parole. The initial contact shall include intake information and comprehensive assessment. The subsequent contact within the institution shall include delivery of the service plan, reassessments, and adjustment of service plan, as necessary. Exceptions to this policy, due to change in the Earliest Possible Release Date (EPRD), transfers or other situations, shall be documented in the client's progress notes. A minimum of one (1) face-to-face contact is required after release to parole for follow-up and service

The State of California and
County of Kern, Department of Public Health
Page 9

Amendment Agreement No. P05.0008-1
Exhibit A

delivery. Exceptions to this policy due to the parolee's parolee-at-large status and failure to comply with appointments, etc., must be documented in the progress notes in the client's file.

- Reassessments shall be performed at a minimum of 30 days prior to parole, but may be initiated at any juncture prior to release to parole. The reasons for non-compliance with this policy shall be documented in the client's progress notes.

**Comprehensive Service Plan:**

TCMP, in conjunction with the client and the AOR, utilizes the baseline information from the comprehensive client assessment to help formulate the Comprehensive Service Plan. This comprehensive plan shall be written based on the service needs identified in the comprehensive client assessment and the services provided shall not exceed the needs as identified. The plan shall demonstrate input from the client and/or family, if applicable. The Comprehensive Service Plan shall include, but not be limited to, the following elements:

1. Service needs and interventions.
2. Clearly defined priority for needed services.
3. Within each area, measurable goals and specific action steps to be taken, methods and timelines for evaluating progress, and the responsible case management team member.
4. Review and revisions shall be documented after case conferences and/or as necessary.
5. Minimum of assistance in accessing appropriate services.
6. Provide clients with appropriate referral to a POC. Maintain linkage and follow-up with the POC to ensure access to services as described in the care plan.
7. Assist clients in utilizing transportation to appointments and programs, if necessary.
8. Assist clients with the application form and paperwork, if required.
9. Provide advocacy for clients.
10. Offer emotional support to clients during the process.

**Record Maintenance:**

The Contractor shall enter pertinent information in PATS to:

- Communicate client/inmate assessment to POC Clinician staff.
- Meet HIPPA requirements.
- Substantiate decisions made with or on behalf of the client/inmate.
- Collect data necessary for POC client/inmate care and program decisions.

**Contents of a Client Record:**

1. Face sheet: demographic data, including emergency contacts, legal representatives, intake information, and necessary updates.
2. Physician certification of HIV/AIDS, if applicable.
3. Client (or legal representative) signed consent for program participation, if applicable, Release of Information, Clients Rights in Case Management, and Contractor Grievance Procedure.
4. Initial Comprehensive Client Assessment: physical, functional, Level of Care, psychosocial, home, financial, and medication.
5. Nursing and psychosocial reassessments.
6. Comprehensive Service Plan, initial plan and review, as needed.
7. Progress notes.
8. Required contact notes.
9. Current physical, psychosocial, and functional status and changes.
10. New problems identified with planned interventions. (May refer to service care plan.)
11. Education, counseling, referrals, or other direct service provided to the client.
12. Phone contact with client, caregivers, service providers, physicians, AOR, etc.
13. Summary of interdisciplinary case conference.

The State of California and
County of Kern, Department of Public Health
Page 10

Amendment Agreement No. P05.0008-1
Exhibit A

14. Copies of correspondence, medical, and provider service records.
15. Data collection forms including the initial enrollment and monthly service provided summary, if applicable.
16. Documentation of the clients (or representatives) input into the Comprehensive Service Plan and the identified services through the case management programs.
17. Documentation of the need for the specific services given.
18. Scheduled appointment time with the POC upon release from the institution.

**Program Administration:**
The Contractor shall maintain records and comply with all regulations for use of a State vehicle in accordance with the State Administrative Manual (SAM), Sections 4100 through 4118 (which by reference are a part of this Agreement). The State reserves the right to replace any SAM sections without amending the agreement as revisions are issued by the California Department of General Services.

The Contractor shall provide administrative support, equipment, office space and supplies, transportation and insurance (in excess of that provided by the State, who is self-insured), and staffing at the level necessary to meet the contractual obligations. The Contactor is to maintain detailed financial records for both audit and research purposes.

**Orientation and Education:**
The Contractor shall provide orientation regarding purpose and function of TCMP and benefits of continued medical and mental health care to all eligible inmates 90 days prior to their release to parole.

The Contractor together with the CDCR Program Manager shall provide a TCMP orientation to the AOR's regarding the TCMP goals and procedures at least annually.

The CDCR and the Contractor will meet, as necessary, to assess the program's goals and objectives and make modifications as required.

**Transfer of Case Management to POC:**
The Contractor is to use the following as a guideline to determine when a case is ready for transfer to POC:
1. The TCMP Social Worker has collected the necessary data and has had the face to face with the inmate.
2. The appointments have been scheduled and shared with the inmate and POC via PATS.

**Travel Requirements:**
A State vehicle will be provided to the Contractor for transportation related to the service needs of the TCMP. The Contractor's staff will be required to travel to and from the participating institutions for the purpose of providing the inmate with pre-release assessments and other related data collection tasks. The State reserves the right to recall the State vehicle from the Contractor in the event of Contractor misuse, abuse, or damage to the vehicle or should the State determine a more cost-effective way for the Contractor to handle travel to and from the participating institutions.

It is the Contractor's responsibility to ensure that all staff driving a State vehicle has a valid California driver's license. The Contractor is required to maintain automobile insurance in accordance with the provisions contained in Exhibit E.

Only costs for travel which are directly related to the TCMP are allowable. The TCMP transportation cost reimbursement shall not exceed the State approved rates for non-represented State employees at the time the TCMP transportation costs were incurred.

The State of California and                                   Amendment Agreement No. P05.0008-1
County of Kern, Department of Public Health                                          Exhibit A
Page 11

All transportation costs shall be supported by travel expense vouchers showing purpose, location, dates, time of travel, rates claimed, completed mileage logs, and any applicable receipts.

**Staffing Requirements:**
The Contractor will be responsible to recruit, train, supervise, and maintain the required staff positions of the TCMP, which must consist of:

- One (1) Project Director/Public Health Nurse.
- Three (3) Social Service Worker Supervisors I/II.
- Twenty-Two (22) Social Workers I/II/III/IV.
- One (1) Case Aide Supervisor/Office Services Specialist.
- One (1) Case Aide/Office Services Technician.

**TCMP Staff Responsibilities:**
Specifically, each TCMP member's duties include but are not limited to:

**One (1) Project Director/Public Health Nurse** – responsibilities include:
1. Provides complete oversight to any/all TCMP agreement activities.
2. Assures compliance with the terms of the Agreement.
3. Serves as the primary representative of the Contractor.
4. Directs, leads and controls workflow of the TCMP staff.
5. Makes presentations and promotes the program to parole staff and the community.
6. Provides orientation and education as necessary for the successful implementation and use of this project as defined by the Program Manager.
7. Supervises all team members and provides performance evaluations in no less than one-year Increments.
8. All other duties as required by the Program Manager.

**Note: Education and experience requirements are at least a Masters Degree in a related field plus one year management experience OR a Bachelor of Arts or Science Degree and at least three (3) years of experience in a management position in the health care field.**

**Three (3) Social Service Worker Supervisors I/II/Social Worker Supervisors I/II/III** – responsibilities include:
1. Assists the Project Director and assists in the control of workflow of the TCMP staff.
2. Makes presentations and promotes the program to the parole staff and the community as when directed by the Project Director.
3. Provides orientation and education as necessary for the successful implementation and use of this project as defined by the Program Manager.
4. Produces effective ad efficient quality control reports on the TCMP program and submits it to the DAPO Program Manager as requested.
5. Ensures that the service plans for each participant in the program are provided to the designated Regional POCs and the PA/US as required.
6. Conducts quality assurance meetings with all team members (Social Workers and support staff).
7. Supervises all Social Worker and support staff and provide performance evaluations in no less than one-year increments.
8. All other duties as required by the Project Director/Nurse.

The State of California and                         Amendment Agreement No. P05.0008-1
County of Kern, Department of Public Health                              Exhibit A
Page 12

Note:  Educational and/or experience requirements are a Masters Degree in a related field, plus one (1)
year experience in a social services setting OR a Bachelor of Arts or Science Degree and at least two (2)
years of experience in a social services setting.

Twenty-Two (22) Social Service Workers I/II/III/Social Workers I/II/III/IV responsibilities include:
1.   Performs psychosocial assessments on identified clients.
2.   Participates in the development of clients' service plans.
3.   Participates in weekly case conferences with pertinent mental health staff (POC or institutional).
4.   Promotes the understanding among the TCMP of the psychosocial factors that impact the mentally ill.
5.   Recommends appropriate information and referral services for social and emotional support.
6.   Schedules appointments and communicates appointments to clients for aftercare link to the appropriate Regional POC.
7.   Acts as liaison with the institutions' mental health staff; Chief Medical Officer, PA and POC staff.
8.   Maximizes the use of all existing resources.
9.   Collects, maintains and enters data on identified clients into the State's automated database.
10.  Performs other duties as assigned by the Supervisor.

Note:  Educational and/or experience requirements are a Masters Degree in a related field plus one (1)
year experience in a social services setting OR a Bachelor of Arts or Science Degree and at least two (2)
years of experience in a social services setting.

One (1) Case Aide Supervisor/Office Services Specialist responsibilities include:
1.   Works directly with the TCMP Project Director on a day-to-day basis on budgetary needs of the program including but not limited to processing invoices, budget transfer requests and general fiscal issues.
2.   Creates and processes various required forms needed to alter/amend TCMP agreements.
3.   Directly oversees all support staff positions work duties and responsibilities.
4.   Assists the TCMP Management team in training new support staff.
5.   Works with all TCMP programs in acquiring the necessary computer equipment, tracking equipment and reviews lease agreements for accuracy and validity.
6.   Maintains and updates confidential, statewide parole list on all identified inmates within the service institutions.
7.   Facilitates and processes training and travel for all staff.
8.   Gathers data and prepares daily and weekly reports as requested by the Project Director.
9.   Performs all other duties as assigned.

Note:  Educational and/or experience requirements are a Bachelor of Arts or Science Degree in a related
field OR a minimum of two (2) years of experience in a social services setting.

One (1) Case Aide/Office Services Technician responsibilities include;
1.   Collecting any/all pertinent data from specified TCMP reports as required.
2.   Provides administrative support to the Project Director/Public Health Nurse and field operational staff.
3.   Coordinates the Project Director and the DAPO's instructions to various field units.
4.   Conducts other duties as required to ensure the accuracy of any/all data collection process.
5.   Sends regularly scheduled, current parole lists to all TCMP providers.
6.   Works with the DAPO Regional Re-Entry Coordinator or designee to identify the AOR on paroling inmates in the service area.
7.   Assists the CDCR's Research Unit with the collection of data for evaluation purposes.

The State of California and                              Amendment Agreement No. P05.0008-1
County of Kern, Department of Public Health                              Exhibit A
Page 13

8.  Prepares statistical reports for monthly program review by the DAPO Program Manager.
9.  Performs other duties as assigned.

**Note:  Educational and/or experience requirements are a Bachelor of Arts or Science Degree in a related field, OR a minimum of two (2) years of experience in a social services setting.**

CDCR Shall:
Provide the Contractor with a CDCR-issued laptop computer, fully equipped (both with hardware and software).  CDCR retains all rights and privileges associated with each laptop issued to the Contractor and will expect the laptops to be returned, in fair and adequate condition, upon the completion of the Agreement.  In addition, it is the Contractor's responsibility to monitor/maintain the lease agreement and ensure that any/all monthly lease payments for the laptops are paid in a timely manner for the entire term of the Agreement.

F.  **PRE-PAROLE PROCESS FOR SECURING FEDERAL AND STATE BENEFIT ENTITLEMENTS AND COMMUNITY BASED CONTINUITY OF CARE**

The Contractor shall provide to the CDCR, DAPO:

Social Worker[1] (Benefits Worker) services to secure benefit entitlements for eligible inmates upon parole.  Benefits addressed are Social Security benefits, such as Social Security Supplemental Security Income (SSI), or Social Security Disability Income, California State sponsored Medi-Cal benefits, Veterans Affairs (VA) benefits and County operated General Assistance where possible.  Inmate participation in this program is voluntary, and requires a signed authorization to represent from the participating inmates.

The Benefits Worker will also serve as a point of contact and liaison between prison staff and DAPO's Nursing Consultant, Program Review (Medical Placement Coordinator) for identifying and referring inmates that will require community-based continuity of care upon release from incarceration, (i.e., hospice, hospital/acute care, skilled nursing/long-term care, in-patient mental health care, board & care/assisted living, in-home health care, dialysis, oxygen {intermittent and continuous}, chemotherapy, medications, etc.).

**Program Goals:**
The overall goal of the program is to:

Goal 1:   Provide eligible inmates with secured benefit entitlements upon release to their respective counties.

Goal 2:   Serve as a point of contact and liaison between the prison and DAPO Medical; Placement Coordinator for identifying and referring inmates that require community-based continuity of care upon release from incarceration.  The DAPO Medical Placement Coordinator will be the primary source of consultation and guidance to the contractor on inmates in need of community based care upon release.

Both program goals require timely identification of inmates potentially eligible for benefit entitlements, and/or inmates requiring continuity of care upon parole.  The target group for this program are inmates

---

[1] The working title "social worker" in the pre-parole process for securing federal and state benefit entitlements and community based continuity of care program will be referred to as "benefits worker" to distinguish from other programs and staffing within CDCR.

The State of California and
County of Kern, Department of Public Health
Page 14

Amendment Agreement No. P05.0008-1
Exhibit A

within 210 days to parole that are medically, mentally or developmentally disabled, enduring a long-term illness, or have reached the age of 65 years or older.

Inmates will be screened and referred by various programs that currently exist within the prisons, including the Transitional Case Management Programs, Parole Planning and Placement Program, Division of Correctional Health Care Services, spiritual leaders, custody staff, and classification committees.

Inmates designated as members of the *Coleman[2], Plata[3], Armstrong[4], and Clark[5]* class action lawsuits will also be included in this population and screened for potential eligibility.

DAPO will provide laptop computers with an installed database called the Parole Automated Tracking System (PATS) for tracking and data entry. The data in PATS will include information on clients/inmates such as, name, date of birth, social security number, health information, social and financial information, criminal history, and behavioral factors. The PATS is a confidential database. No information in PATS can be disclosed to clients/inmates, parolees, or anyone outside the CDCR without written approval from the DAPO program manager. Written approval can be in the form of signed memorandum or electronic-mail.

CDCR shall provide office space within the institutions for each benefits worker. Benefits workers shall be supplied with access to a telephone with voicemail, office furnishings; copiers and fax machines, internet access, and a laptop computer with the appropriate software to accomplish their duties.

CDCR shall provide a point of contact within the prisons for day-to-day operational needs, and on-site orientation of the prisons that individual benefits workers are assigned to.

**Staffing:**
The Contractor agrees to provide the CDCR with services for inmates/parolees who are potentially eligible for benefit entitlements or in need of community based care. The Contractor agrees that the services shall be provided in accordance with the Scope of Work. Benefits workers shall be hired local to the prison that they are primarily assigned to. In the event that recruitment efforts fail due lack of candidates, the Contractor shall recruit from neighboring communities in an effort to fill the position(s). The benefits workers will work fulltime in the prisons they are assigned to. Fulltime in the prisons represents a 40 hour weekly work schedule of Monday through Friday (excluding state holidays), with a daily eight hour work shift and arrival at the prison beginning no earlier than 7:00 am, and ending and departing the prison no later than 5:30 pm.

---

[2] Coleman v California Department of Corrections and Rehabilitation: A court order that the CDCR to change its mental health care policies and procedures to ensure timely access to adequate care.

[3] Plata v California Department of Corrections and Rehabilitation: A court order that the CDCR to change its medical care policies and procedures to ensure timely access to adequate care.

[4] Armstrong v California Department of Corrections and Rehabilitation: A court order for the CDCR to improve access to prison programs for prisoners with physical disabilities at all of California's prisons and parole facilities in accordance with the Americans with Disabilities Act and the Rehabilitation Act.

[5] Clark v California Department of Corrections and Rehabilitation: A court order for the CDCR to develop and implement a plan to screen inmates for developmental disabilities and to provide developmentally disabled prisoners with safe housing and supportive services.

The State of California and
County of Kern, Department of Public Health
Page 15

Amendment Agreement No. P05.0008-1
Exhibit A

Benefits workers shall only travel as needed and approved by the DAPO Program Manager.  Travel for the program director and supervising benefits workers is permitted for program management.

The Contractor will be responsible to recruit, train, supervise, and maintain adequate staffing to accomplish the requirements of this agreement.

**Staff Responsibilities:**

**One (1) Project Director/Public Health Nurse** – responsibilities include:
- Provides complete oversight to any/all Benefit agreement activities of this Contract.
- Oversee, and assist with the secondary contractor on implementation, and monitoring for 6-12 months upon activation of the secondary contractor's contract.
- Assures compliance with the terms of the Agreement.
- Serves as the primary representative of the Contractor.
- Directs, leads and controls workflow of the Benefits staff.
- Makes presentations and promotes the program to parole staff and the community.
- Provides orientation and education as necessary for the successful implementation and use of this project as defined by the Program Manager.
- Supervisory oversight of supervising social workers and provides performance evaluations in no less than one-year increments.
- All other duties as required by the Program Manager.

**Note:  Education and experience requirements are at least a Masters Degree in a related field plus one year management experience OR a Bachelor of Arts or Science Degree and at least three (3) years of experience in a management position in the health care field.**

**Benefits Worker Supervisor Duties:**
Supervisors of Benefits workers are:
- Ensure that each of the goals as listed in the Benefits Workers duties are accomplished.

**Benefits Worker Duties:**
Benefits workers are to work within each prison with duties of:
- Determining potential benefit eligibility based on medical/mental disability and/or age.
- Gather necessary information for the benefit applications.
- Complete and submit benefit applications (web based initiation for Social Security).
- Facilitate telephone interviews between the inmate and Social Security staff.
- Point of contact (authorized representative) during the application process.
- Track application process and outcome.
- Identify and refer inmates that require community-based continuity of care upon release from incarceration to the DAPO Medical Placement Coordinator.

Administrative Support Duties:
The Administrative Support person shall:
- Provide, travel, training and infrastructure coordination and support for the program.

It is anticipated that the benefits application process, which includes preparation, web based and hard copy applications, providing supporting documentation via fax, telephone interviews, additional from disability evaluators, and interviewing inmates, will take approximately 4 to 6 hours per inmate to process.

The State of California and                        Amendment Agreement No. P05.0008-1
County of Kern, Department of Public Health                        Exhibit A
Page 16

The Contractor will be expected to work cooperatively with representatives of the CDCR, DAPO and the following CDCR participating institutions:

1. California Correctional Institution (CCI)
2. Avenal State Prison (ASP)
3. California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF)
4. California Men's Colony (CMC)
5. Wasco State Prison (WSP)
6. North Kern State Prison (NKSP)
7. High Desert State Prison (HDSP)
8. Pelican Bay State Prison (PBSP)
9. Pleasant Valley State Prison (PVSP)
10. Valley State Prison for Women (VSPW)
11. Sierra Conservation Center (SCC)
12. California State Prison, Corcoran (COR)
13. Central Valley Women's Facility (CCWF)
14. California State Prison, Sacramento (SAC)
15. Mule Creek State Prison (MCSP)
16. California Correctional Center (CCC)
17. Kern Valley State Prison (KVSP)
18. Folsom State Prison (FSP)

**The Contractor shall:**
Identify potentially eligible inmates by referral and PATS reports.

Provide one-on-one consultation to clients/inmates 210 days prior to parole regarding benefits, entitlements and potential assistance available for coordination of community-based continuity of care. During the initial one-on-one counseling the contracted benefits worker shall have inmate/parolee sign Release of Information/Right to Represent form.

Determine which benefit entitlements the inmate/parolee is eligible for by performing comprehensive client assessments, which includes determining financial status which may preclude them from SSI, in which case, the Medi-Cal application must be done if medical care is needed.

Process benefit forms according to appropriate time frames for each entitlement program. The following are the timelines for which each benefit application shall be submitted to the benefits administrators:
- 180-Days – Medi-Cal/Medicare application submitted to designated county Medi-Cal office.
- 180-Days – Veteran's Affairs application submitted to designated VA office.
- 90-Days – Social Security application submitted via third party web based application process.

Unless approved or otherwise directed by the DAPO Program Manager, prioritization of the inmate population to be provided benefit entitlement application services shall be as follows:
1. Inmates requiring long-term medical care inmates and inpatient mental health care.
2. Inmates in need of board & care/assisted living, in-home health care, and hospice.
3. Inmates diagnosed with HIV/AIDS.
4. Inmates with a chronic illness (i.e., dialysis, continuous oxygen).
5. Mentally ill inmates designated Enhanced Outpatient Program (EOP).
6. Inmates that are 65 years of age or older.
7. Inmates that are developmentally disabled and/or have other qualifying disabilities.
8. Mentally ill inmates designated Correctional Clinical Case Management System (CCCMS).

The State of California and
County of Kern, Department of Public Health
Page 17

Amendment Agreement No. P05.0008-1
Exhibit A

**Comprehensive Client Assessment:**
The comprehensive assessment shall be age, gender, culturally and linguistically appropriate. Identification of barriers to service utilization and service delivery and proposed resolutions to these barriers should be addressed. The comprehensive client/inmate assessment shall include, but not be limited to the following elements:

a. **Medical/Mental Health Status** means information about the client's physical condition establishing the diagnosis, and any other medical problems the client may have, and prognosis. Medical/mental health information defines the need for treatment. This information must be at a minimum, a written statement from the client's attending physician verifying the diagnosis. Additional information may include a copy of the most recent medical/mental history and physical examination or a copy of the discharge summary from an acute care hospital if applicable.

b. **Psychosocial and financial assessments** provide information about a client's social, emotional, behavioral, psychological, mental, spiritual, environmental, financial and benefit eligibility status. These assessments include information about family and support systems and legal issues to include parole conditions. They also include information on the client's coping strategies, strengths and weaknesses, and reaction to illness.

**Initiation of Benefits and/or Referral for Care Coordination:**
Services shall be offered to eligible clients/inmates, face-to-face, 210 days prior to parole, but may be initiated at any juncture prior to release to parole. Face-to-face client/inmate contacts are required prior to applying for benefits and/or referring for coordination of community-based care on behalf of the inmate. Initial contact shall include obtaining a signed release, intake information, and initiating the comprehensive assessment.

**Travel Requirements:**
Only costs for travel which are directly related to the Pre-Parole Benefits Program are allowable. The transportation cost reimbursement shall not exceed the State approved rates for non-represented State employees at the time the transportation costs were incurred.

All transportation costs shall be supported by travel expense vouchers showing purpose, location, dates, time of travel, rates claimed, completed mileage logs, and any applicable receipts.

**Program Reports:**
The Contractor shall provide monthly reports on all program activity for the previous month.

Information provided in the monthly report shall include the number of participant referrals, number of participants that decline services, number of assessments, number of applications submitted (by type) and number of referrals made to DAPO's Medical Placement Coordinator.

COUNTY OF KERN, Department of Public Health          Amendment Agreement Number P05.0008-1
California Department of Corrections And Rehabilitation (CDCR)          Exhibit B
BUDGET DETAIL AND PAYMENT PROVISIONS

## 1.    Invoicing and Payment

    **a.**    For services satisfactorily rendered, and upon receipt and approval of contractor's invoices, the State agrees to compensate the Contractor for actual expenditures incurred in accordance with Exhibit B-1, Contractor Rate Sheets and the rates specified herein on Exhibit B-2, Rate Sheet, which are attached hereto and made a part of this Agreement.

    **b.**    Invoices shall include the Agreement Number and shall be submitted in triplicate not more frequently than monthly in arrears to:

        California Department of Corrections and Rehabilitation (C DCR)
        Headquarter Accounting
        Attention: Accounts Payable
        P.O. Box 187018
        Sacramento, CA 95818-7018

## 2.    Budget Contingency Clause

    **a.**    It is mutually agreed that if the California State Budget Act for the current fiscal year and/or any subsequent fiscal years covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect.  In this event, the State shall have no liability to pay any funds whatsoever to Contractor, or to furnish any other considerations under this Agreement, and Contractor shall not be obligated to perform any provisions of this Agreement.

    **b.**    If funding for the purposes of this program is reduced or deleted for any fiscal year by the California State Budget Act, the State shall have the option to either cancel this Agreement with no liability occurring to the State, or offer an Agreement amendment to Contractor to reflect the reduced amount.

## 3.    Prompt Payment Clause

Payment will be made in accordance with, and within the time specified in, Government Code Chapter 4.5, commencing with Section 927.  Payment to small/micro businesses shall be made in accordance with and within the time specified in Chapter 4.5, Government Code 927 et seq.

COUNTY OF KERN, Department of Public Health
CDCR BUDGET DETAIL AND PAYMENT PROVISIONS

Amendment Agreement Number P05.0008-1
Exhibit B

**4.    City/County Rate Increase**

It is understood that the city/county may regulate some or all of the contractor's rates for services.  In the event the city/county increases the rates that directly affect the services provided in this Agreement, the contractor may, once during the term of the Agreement, request from the State an increase in the rates stated in this Agreement.  The contractor must submit a written request to the State with a copy of the resolution fro m the city/county listing the prior rates and new rates and effective date of the n ew rates.

**5.    Subcontractors**

For all Agreements, with the exception of Interagency Agreements and other governmental entities/auxiliaries that are exempt from bidding, nothing contained in this Agreement, or otherwise, shall create any contractual relation between the State and any subcontractors, and no subcontract shall relieve the Contractor of Contractor's responsibilities and obligations hereunder.   The Contractor agrees to be as fully responsible to the State for the acts and omissions of its subcontractors and of persons either directly or indirectly employed by any of them as it is for the acts and omissions of persons directly employed by the Contractor.   The Contractor's obligation to pay its subcontractors is an independent obligation from the State's obligation to make payments to the Contractor.  As a result, the State shall have no obligation to pay or to enforce the payment of any moneys to any subcontractor.

**CONTRACTOR: Kern County Department of Public Health**
**California Department of Corrections and Rehabilitation (CDCR)**

P05.0008-1
Exhibit B-2.1

BUDGET
**PRE-PAROLE BENEFITS PROGRAM**

FISCAL YEAR 2007/08
August 1, 2007 through June 30, 2008

| A. PERSONNEL | No. of Positions | Monthly Salary Range | Monthly Salary or Hourly Rate | % of Project Time | No. of Months or Hours | | Total |
|---|---|---|---|---|---|---|---|
| PHN III/Project Director | 1 | $ - $ | $7,228.00 | 19% | 11 | months | $ 15,107 |
| Social Worker Supervisor II | 1 | $ - $ | $4,738.00 | 100% | 11 | months | $ 52,118 |
| Social Worker Supervisor I | 1 | $ - $ | $4,353.00 | 100% | 11 | months | $ 47,883 |
| Social Worker II/III/IV | 24 | $ - $ | $3,495.00 | 100% | 11 | months | $ 922,680 |
| Office Services Specialist | 1 | $ - $ | $3,764.00 | 100% | 11 | months | $ 41,404 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| TEMPORARY HELP | N/A | Various | Various | Various | N/A | | $ |
| OVERTIME | N/A | Various | Various | Various | N/A | | $ |
| Total Staff Salaries | | | | | | | $ 1,079,192 |
| Average Total Staff Benefits as a percentage | | | 78.48% | Range 58.36%-81.23% | | | $ 846,987 |
| | | | TOTAL PERSONNEL COSTS (A) | | | | $ 1,926,179 |

**B. SUB-CONTRACTORS/CONSULTANTS COSTS (list firms and costs)**

| | | | |
|---|---|---|---|
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| | | TOTAL SUB-CONTRACTORS/CONSULTANT COSTS (B) | $ 0 |

**C. OPERATING COSTS**

| | |
|---|---|
| Facility Lease/Rent | $ |
| Food Costs | $ |
| Communications | $ |
| Utilities | $ |
| Travel | $ 70,000 |
| Training | $ |
| Insurance | $ |
| Office, Program & Household Supplies | $ 6,000 |
| Non-Expendable Equipment (per Exhibit B3) | $ |
| Client Needs | $ |
| *Line Item Additions:* | |
| Recruitment and Retention | $ 26,400 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| TOTAL OPERATING COSTS (C) | $ 102,400 |
| SUBTOTAL ANNUAL DIRECT EXPENSES (A+B+C) | $ 2,028,579 |

| D. TOTAL INDIRECT COSTS | 15% | of Subtotal Annual Direct Expenses | $ 304,287 |
|---|---|---|---|
| PROFIT/SERVICE FEE | | of Subtotal Annual Direct Expenses | $ 0 |
| TOTAL BUDGET FOR FISCAL YEAR 2007/08 (A+B+C+D+E) | | | $ 2,332,866 |

**CONTRACTOR: Kern County Department of Public Health**
**California Department of Corrections and Rehabilitation (CDCR)**

P05.0008-1
Exhibit B-2.2

BUDGET
### PRE-PAROLE BENEFITS PROGRAM

FISCAL YEAR 2008/09
**July 1, 2008 through June 30, 2009**

| A. PERSONNEL | No. of Positions | Monthly Salary Range | Monthly Salary or Hourly Rate | % of Project Time | No. of Months or Hours | | Total |
|---|---|---|---|---|---|---|---|
| PHN III/Project Director | 1 | $ - $ | $7,517 | 19% | 12 | months | $ 17,139 |
| Social Worker Supervisor II | 1 | $ - $ | $4,928 | 100% | 12 | months | $ 59,136 |
| Social Worker Supervisor I | 1 | $ - $ | $4,527 | 100% | 12 | months | $ 54,324 |
| Social Worker II/III/IV | 24 | $ - $ | $3,635 | 100% | 12 | months | $ 1,046,880 |
| Office Services Specialist | 1 | $ - $ | $3,915 | 100% | 12 | months | $ 46,980 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| | | $ - $ | | | | months | $ 0 |
| TEMPORARY HELP | N/A | Various | Various | Various | N/A | | $ |
| OVERTIME | N/A | Various | Various | Various | N/A | | $ |
| | | Total Staff Salaries | | | | | $ 1,224,459 |
| Average Total Staff Benefits as a percentage | | | 78.46% | Range 58.36%-81.23% | | | $ 960,761 |
| | | | | | TOTAL PERSONNEL COSTS (A) | | $ 2,185,219 |

**B. SUB-CONTRACTORS/CONSULTANTS COSTS (list firms and costs)**

| | | | |
|---|---|---|---|
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| | (enter amt) | | $ 0 |
| TOTAL SUB-CONTRACTORS/CONSULTANT COSTS (B) | | | $ 0 |

**C. OPERATING COSTS**

| | |
|---|---|
| Facility Lease/Rent | $ |
| Food Costs | $ |
| Communications | $ |
| Utilities | $ |
| Travel | $ 70,000 |
| Training | $ |
| Insurance | $ |
| Office, Program & Household Supplies | $ 6,000 |
| Non-Expendable Equipment (per Exhibit B3) | $ |
| Client Needs | $ |
| *Line Item Additions:* | |
| Recruitment and Retention | $ 28,800 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| TOTAL OPERATING COSTS (C) | $ 104,800 |
| SUBTOTAL ANNUAL DIRECT EXPENSES (A+B+C) | $ 2,290,019 |

| | | | |
|---|---|---|---|
| D. TOTAL INDIRECT COSTS | 15% | of Subtotal Annual Direct Expenses | $ 343,503 |
| PROFIT/SERVICE FEE | | of Subtotal Annual Direct Expenses | $ 0 |
| TOTAL BUDGET FOR FISCAL YEAR 2008/09 (A+B+C+D+E) | | | $ 2,633,522 |

**CONTRACTOR: Kern County Department of Public Health**
**California Department of Corrections and Rehabilitation (CDCR)**

P05.0008-1
Exhibit B-2.3

BUDGET
**PRE-PAROLE BENEFITS PROGRAM**

FISCAL YEAR 2009/10
July 1, 2009 through June 30, 2010

| A. PERSONNEL | No. of Positions | Monthly Salary Range | Monthly Salary or Hourly Rate | % of Project Time | No. of Months or Hours | | Total | |
|---|---|---|---|---|---|---|---|---|
| PHN III/Project Director | 1 | $ - $ | $7,818 | 19% | 12 | months | $ | 17,825 |
| Social Worker Supervisor II | 1 | $ - $ | $5,125 | 100% | 12 | months | $ | 61,500 |
| Social Worker Supervisor I | 1 | $ - $ | $4,708 | 100% | 12 | months | $ | 56,496 |
| Social Worker II/III/IV | 24 | $ - $ | $3,780 | 100% | 12 | months | $ | 1,088,640 |
| Office Services Specialist | 1 | $ - $ | $4,071 | 100% | 12 | months | $ | 48,852 |
| | | $ - $ | | | | months | $ | 0 |
| | | $ - $ | | | | months | $ | 0 |
| | | $ - $ | | | | months | $ | 0 |
| | | $ - $ | | | | months | $ | 0 |
| | | $ - $ | | | | months | $ | 0 |
| | | $ - $ | | | | months | $ | 0 |
| | | $ - $ | | | | months | $ | 0 |
| | | $ - $ | | | | months | $ | 0 |
| TEMPORARY HELP | N/A | Various | Various | Various | N/A | | $ | |
| OVERTIME | N/A | Various | Various | Various | N/A | | $ | |
| | Total Staff Salaries | | | | | | $ | 1,273,313 |
| Average Total Staff Benefits as a percentage | | | 78.48% | | Range 58.36%-81.23% | | $ | 999,314 |
| | | | TOTAL PERSONNEL COSTS (A) | | | | $ | 2,272,627 |

| B. SUB-CONTRACTORS/CONSULTANTS COSTS (list firms and costs) | | | |
|---|---|---|---|
| | (enter amt) | $ | 0 |
| | (enter amt) | $ | 0 |
| | (enter amt) | $ | 0 |
| | (enter amt) | $ | 0 |
| | (enter amt) | $ | 0 |
| TOTAL SUB-CONTRACTORS/CONSULTANT COSTS (B) | | $ | 0 |

| C. OPERATING COSTS | | |
|---|---|---|
| Facility Lease/Rent | $ | |
| Food Costs | $ | |
| Communications | $ | |
| Utilities | $ | |
| Travel | $ | 73,000 |
| Training | $ | |
| Insurance | $ | |
| Office, Program & Household Supplies | $ | 7,500 |
| Non-Expendable Equipment (per Exhibit B3) | $ | |
| Client Needs | $ | |
| *Line Item Additions:* | | |
| Recruitment and Retention | $ | 28,800 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| TOTAL OPERATING COSTS (C) | $ | 109,300 |
| SUBTOTAL ANNUAL DIRECT EXPENSES (A+B+C) | $ | 2,381,927 |

| D. TOTAL INDIRECT COSTS | 15% | of Subtotal Annual Direct Expenses | $ | 357,289 |
|---|---|---|---|---|
| PROFIT/SERVICE FEE | | of Subtotal Annual Direct Expenses | $ | 0 |
| TOTAL BUDGET FOR FISCAL YEAR 2007/08 (A+B+C+D+E) | | | $ | 2,739,216 |

**CONTRACTOR: Kern County Department of Public Health**
**California Department of Corrections and Rehabilitation (CDCR)**

P05.0008-1
Exhibit B-2.4

## PRE-PAROLE BENEFITS PROGRAM

### BUDGET SUMMARY

| FISCAL YEAR | BUDGET |
|---|---|
| 2007/08 | $ 2,332,866.00 |
| 2008/09 | $ 2,633,522.20 |
| 2009/10 | $ 2,739,215.98 |
| | |
| | |
| AMENDED AMOUNT | $ 7,705,604.18 |

## CERTIFICATE OF ADOPTION OF RESOLUTION
## AUTHORIZING CHAIRMAN TO SIGN INSTRUMENT

The undersigned, Clerk of the Board of Supervisors of the County of Kern, hereby certifies that the following resolution was adopted by said Board of Supervisors at a regular meeting duly convened on the 2nd day of October, 2007:

"WHEREAS, this Board has determined that the County of Kern should enter into Amendment No. 1 to Agreement 607-2005 with California Department of Corrections and Rehabilitation (State Agreement No. P05.0008) for Transitional Case Management Programs for the Mentally Ill (TCMP-MI) (Kern County Agreement 899-2007).

NOW, THEREFORE, BE IT RESOLVED by the Board of Supervisors of the County of Kern, State of California, that said instrument be, and it is hereby executed on behalf of and in the name of said County of Kern, and the Chairman of this Board is hereby authorized and directed to sign his name thereto on behalf of said County."

The undersigned further certifies that on the date last mentioned the person who so signed said instrument was the duly elected Chairman of said Board and that his signature on said instrument is genuine.

The undersigned further certifies that said resolution was adopted by the following vote:

Ayes:      McQuiston, Maben, Maggard, Watson, Rubio

Noes:      None

Absent:    None

Dated:     October 2, 2007

KATHLEEN KRAUSE
Clerk of the Board of Supervisors
County of Kern

By:  *Karen L Winn*

Karen L. Winn, Deputy Clerk

Ref:    Agenda Item 33 AM

# EXHIBIT 6

## Golden Gate Reporting

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

       Plaintiffs,

              Case No. Civ S 90-0520 LKK-JFM P

vs.

ARNOLD SCHWARZENEGGER, et al.,

       Defendants.

_____/

MARCIANO PLATA, et al.,

       Plaintiffs,       Case No. C01-1351 TEH

                    CONFIDENTIAL PORTION

vs.

                    Pages 195 through 199

ARNOLD SCHWARZENEGGER, et al.,

       Defendants.

_____/


DEPOSITION OF ROBERT STORMS


DATE:        August 19, 2008

TIME:        9:35 a.m.

LOCATION:    ROSEN, BIEN & GALVAN, LLP
             315 Montgomery Street, Tenth Floor
             San Francisco, California  94104

REPORTED BY: Katy Leonard
             Certified Shorthand Reporter
             License Number 11599

## Golden Gate Reporting

Page 66

1   on task.  And the nine to ten prisons with the Kern

2   County contract, I'm hopeful that those would be up

3   before the end of 2008.

4        Q.  Have you identified the second contractor?

5        A.  We believe we have.  There's a couple that are

6   still working with us, but we believe we've narrowed it

7   down to one, if it works out.

8        Q.  Okay.

9            MR. GALVAN:  I believe I'm up to Exhibit?

10           THE REPORTER:  10.

11           MR. GALVAN:  I'd like to mark Exhibit 10.

12           (Whereupon Plaintiffs' Exhibit 10

13            was marked for identification.)

14           MR. GALVAN:  For the record, what I've marked

15   as Exhibit 10 is entitled, "Standard Agreement

16   Amendment."  And it has -- it says, "Kern County

17   Agreement No. 899-2007" at the top.

18   BY MR. GALVAN:

19        Q.  Mr. Storms, are you familiar with Exhibit

20   No. 10?

21        A.  Yes, I am.

22        Q.  Could you tell us what Exhibit 10 is?

23        A.  Exhibit 10 is a contract between the

24   California Department of Corrections and Rehabilitation

25   and Kern County Public Health.

Golden Gate Reporting

Page 67

1    Q.  Does this appear to be a correct copy of the

2  contract?

3    A.  Appears to be, yes.

4    Q.  Okay.

5        And would you summarize for us, what are the

6  services that Kern will provide under this contract?

7    A.  Yes.

8        This contract addresses two services, two

9  programs:  One being the TCMP for the mentally ill; the

10  second being the preparole benefits service.

11    Q.  And do you have an estimate of how many

12  prisoners this contractor will serve -- will serve per

13  any period of time -- per year, per month?

14    A.  I really don't, because the workload and the

15  time involved on the cases -- that information is still

16  being gathered as it implements.

17    Q.  Okay.

18        And is it correct to say that this is -- this

19  contract is the one that you were referring to in your

20  earlier testimony regarding the actual assistance with

21  the Social Security veterans and State benefits planning

22  for the prisoners --

23    A.  Yes.

24    Q.  -- about to be released?

25    A.  Yes.

```
 1          CERTIFICATION OF DEPOSITION OFFICER

 2

 3          I, KATY LEONARD, duly authorized to

 4  administer oaths pursuant to Section 2093(b) of the

 5  California Code of Civil Procedure, hereby certify that

 6  the witness in the foregoing deposition was by me sworn

 7  to testify to the truth, the whole truth and nothing but

 8  the truth in the within-entitled cause; that said

 9  deposition was taken at the time and place therein

10  stated; that the testimony of the said witness was

11  thereafter transcribed by means of computer-aided

12  transcription; that the foregoing is a full, complete

13  and true record of said testimony; and that the witness

14  was given an opportunity to read and correct said

15  deposition and to subscribe the same.

16          I further certify that I am not of counsel

17  or attorney for either or any of the parties in the

18  foregoing deposition and caption named, or in any way

19  interested in the outcome of this cause named in said

20  caption.

21

22

23

24  _____

25          KATY LEONARD, CSR 11599
```

# EXHIBIT 7

# SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION

50 California Street • Suite 2600 • San Francisco, California 94111 • (415) 352-3600 • Fax: (415) 352-3606 • www.bcdc.ca.gov

**COMMISSION MEMBERS**

R. Sean Randolph, *Chair*

Anne Halsted, *Vice Chair*

   James T. Chappell, *Alternate*

Brian Baird

   Amy Vierra, *Alternate*

Tom Bates

   Ed Balico, *Alternate*

Jim Bourgart

   Bijan Sartipi, *Alternate*

Valerie Brown

David Chiu

Karen Finn

Geoffrey Gibbs

John Gioia

   Gayle Uilkema, *Alternate*

Larry Goldzband

Richard Gordon

   Carole Groom, *Alternate*

Jane Hicks

   Mike Dillabough, *Alternate*

Colleen Jordan Hallinan

Alice Lai-Bitker

   Beverly Johnson, *Alternate*

Joan Lundstrom

   Pete Sanchez, *Alternate*

Sophie Maxwell

   Mark Addiego, *Alternate*

Charles McGlashan

   Susan Adams, *Alternate*

Jim McGrath

Stan Moy

Barry Nelson

Mike Reagan

   Barbara Kondylis, *Alternate*

George Shirakawa

   Eric Carruthers, *Alternate*

David Smith

   Karen Schwinn, *Alternate*

Paul Thayer

   Grace Kato, *Alternate*

Brad Wagenknecht

   Keith Caldwell, *Alternate*

Bob Wieckowski

   Peter Drekmeier, Alternate

**LEGISLATIVE MEMBERS**

Senator Elaine Alquist

   Charles Taylor, *Alternate*

**EXECUTIVE DIRECTOR**

Will Travis

**DEPUTY ATTORNEY GENERAL**

Alice Busching Reynolds

## *Revised Meeting Notice*

### Item #8 Postponed

1:00 P.M.
Thursday, June 4, 2009
Port of San Francisco Board Room
Ferry Building
Second Floor
San Francisco, CA 94111
(415) 693-0996

### *Tentative Agenda*

1. **Call to Order**

2. **Roll Call**

3. **Public Comment Period** *(Each speaker is limited to three minutes)*

   A maximum of 15 minutes is available for the public to address the Commission on any matter on which the Commission either has not held a public hearing or is not scheduled for a public hearing later in the meeting. Speakers will be heard in the order of sign-up, and each speaker is generally limited to a maximum of three minutes. It is strongly recommended that public comments be submitted in writing so they can be distributed to all Commission members for review. The Commission may provide more time to each speaker and can extend the public comment period beyond the normal 15-minute maximum if the Commission believes that it is necessary to allow a reasonable opportunity to hear from all members of the public who want to testify. No Commission action can be taken on any matter raised during the public comment period other than to schedule the matter for a future agenda or refer the matter to the staff for investigation unless the matter is scheduled for action by the Commission later in the meeting.

   (Will Travis) [415/352-3653  travis@bcdc.ca.gov]

4. **Approval of Minutes of May 7, 2009 Meeting**

   (Mamie Lai) [415/352-3639  mamiel@bcdc.ca.gov]

5. **Report of the Chair**

6. **Report of the Executive Director**

7. **Commission Consideration of Administrative Matters**

   (Bob Batha) [415/352-3612  bobb@bcdc.ca.gov]



*Making San Francisco Bay Better*

8. **Public Hearing and Vote on Permit Application No. 2-06 from the California Department of Corrections and Rehabilitation for the San Quentin Prison Condemned Inmate Housing Project in Marin County [POSTPONED]**

*AT THE REQUEST OF THE APPLICANT, THIS ITEM HAS BEEN POSTPONED UNTIL THE NEXT COMMISSION MEETING.*

The Commission will hold a public hearing and may vote on a permit application from the California Department of Corrections and Rehabilitation to construct a condemned inmate housing project at the San Quentin State Prison, in an unincorporated portion of Marin County. The proposed project, which is on a 40-acre site within the prison, includes the construction of four new buildings, the largest of which would be a 768-cell complex for the housing of 1,152 condemned male inmates. The portions of the proposed project that are located within the Commission's jurisdiction include a guard tower, a gun locker building, a resurfaced road, paving, security perimeter fencing, a construction staging area for approximately two years, and a storm water outfall structure. To avoid security conflicts, in-lieu of providing public access within the prison complex, the applicant proposes to provide approximately $2,900,000 to the Marin Transportation Authority (TAM) to partially fund Phase One of the Central Marin Ferry Connection near Larkspur Landing and Corte Madera Creek on Sir Francis Drake Boulevard and construct a two- to three-car parking lot view area and trail to the Bay along Main Street in San Quentin Village. The first public hearing on the application was held on December 18, 2008, and another public hearing was held on February 5, 2009 at which the Commission asked the applicant to provide $3,000,000 in in-lieu fees for public access improvements. Because the applicant could not make that commitment at the time, the applicant asked that the vote be postponed. To provide the public with an opportunity to comment on the new public access proposal, a third public hearing will be held on June 4, 2009.
(Karen Wolowicz) [415/352-3669  karenw@bcdc.ca.gov]

9. **Consideration of Response to Governor's Budget Proposal**

The Commission will consider options for responding to a proposal in the May revision of the Governor's proposed fiscal year 09-10 budget, which calls for the elimination of BCDC as a state department and the realignment of BCDC's functions to a regional entity.
(Will Travis) [415/352-3653  travis@bcdc.ca.gov]

10. **Second Public Hearing on San Francisco Bay Plan Amendment No. 1-08 Concerning Climate Change**

On May 7, 2009, the Commission held a public hearing for Bay Plan Amendment No. 1-08, which proposes to address climate change by adding a new findings and policies section on climate change and updating the findings and policies in several existing sections of the Bay Plan, including Safety of Fills, Tidal Marshes and Tidal Flats, Shoreline Protection, Mitigation, and Public Access. The public hearing was continued to this June 4, 2009 meeting, where the Commission will again accept public comments on the proposed amendment.
(Leslie Lacko) [415/352-3646 lesliel@bcdc.ca.gov]

11. **Consideration of Strategic Plan Status Report**

The Commission will consider a status report on the progress being made in meeting the objectives contained in the strategic plan adopted on October 2, 2008. The Commission will also determine whether any revisions in the plan are necessary and whether to take further action to achieve the plan's goals and objectives.
(Will Travis) [415/352-3653  travis@bcdc.ca.gov]

12. **New Business**

13. **Old Business**

14. **Adjournment**

**Speaker Sign-Up and Time Limits.** If you would like to comment on an item scheduled for a public hearing or speak during the public comment period, please fill out a "Request to Speak" form and give it to a staff member. Each speaker is limited to a maximum of three minutes during the public comment period, and the Chair may set time limits for each speaker at the beginning of a public hearing. You are encouraged to submit written comments of any length and detailed information to the staff. This material will be distributed to the Commission members. Applicants are responsible for presenting their projects at the public hearing.

**Questions and Staff Reports.** If you have any questions concerning an item on the agenda or would like to receive a staff report related to the item, please contact the staff member whose name and direct phone number are indicated in parenthesis at the end of the agenda item.

**Campaign Contributions.** State law requires Commissioners to disqualify themselves from voting on any matter if they have received a campaign contribution from an interested party. If you intend to speak on any hearing item, please indicate on the "Request to Speak" form or in your testimony if you have made campaign contributions in excess of $250 to any Commissioner within the last year, and if so, to which Commissioner(s) you have contributed. Other legal requirements govern contributions by applicants and other interested parties and establish criteria for Commissioner conflicts of interest. Please consult with the staff counsel if you have any questions about the rules that pertain to campaign contributions or conflicts of interest.

**Internet Access to Commission Meeting Material.** Public notices of Commission meetings and staff reports dealing with most matters on the meeting agendas can be found on BCDC's website by selecting the date of the meeting after logging onto www.bcdc.ca.gov.

**Access to Meetings.** Meeting facilities are accessible to persons with disabilities. If you require special assistance, please contact any staff member prior to the meeting. An interpreter for the deaf will also be made available upon request to the staff at least five days prior to the meeting.

**Bagley-Keene Open Meeting Act.** As a state agency, the Commission is governed by the Bagley-Keene Open Meeting Act which requires the Commission to: (1) publish an agenda at least ten days in advance of any meeting; (2) describe specifically in that agenda the items to be transacted or discussed; and (3) refuse to add an item subsequent to the published agenda. In addition to these general requirements, the Bagley-Keene Act includes other specific provisions about how meetings are to be announced and conducted.

## *Upcoming Meetings of Interest*

The following meetings, which may be of interest, will be held over the next several weeks. All of the meetings are open to the public. If you have any questions concerning one of the meetings or would like to receive a meeting notice, please contact the staff member whose name and direct phone number are indicated in parenthesis.

- **Dredged Material Management Office (DMMO) Annual Meeting**
  The DMMO, a multi-agency collaboration to promote environmentally sound management of dredged material in the San Francisco Bay Area, will hold its annual meeting at the Port of San Francisco, Pier 1, from 8:30 a.m. to 2:00 p.m. on May 27, 2009. Topics will include the 2008 dredging season, trends in dredging and disposal, environmental updates, permitting issues and the DMMO database.
  (Brenda Goeden) [415/352-3623  brendag@bcdc.ca.gov]

- **Design Review Board Meeting**
  BCDC's Design Review Board will hold a public meeting on Monday, June 8, 2009, at 6:30 p.m. at the San Francisco Bay Conservation and Development Commission's office, 50 California Street, Suite 2600, McAteer-Petris Conference Room, San Francisco.
  (Brad McCrea) [415/352-3615  bradm@bcdc.ca.gov]

- **Harbor Safety Committee Meeting**
  The San Francisco Bay Harbor Safety Committee will hold a public meeting on Thursday, June 11, 2009, from 10:00 a.m. to noon at Port of Oakland, 530 Water Street, 7th Floor, Conference Room, Oakland.
  (Linda Scourtis) [415/352-3644  lindas@bcdc.ca.gov]

# EXHIBIT 8

**FOR SUBMITTAL TO THE *COLEMAN* SPECIAL MASTER**

*June 9, 2009 Activity Report on CDCR/DMH Mental Health*

*Assessment and Referral Project in Response to the Deputy Special Master's Request*

*following the March 31, 2009 Court Order*

**GLOSSARY OF TERMS**

| Acronym | Term |
|---|---|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CCIII | Correctional Counselor III |
| CCAT | Coordinated Clinical Assessment Team |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison, Corcoran |
| CSH | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| DAI | Division of Adult Institutions |
| DARS | Division of Addiction and Recovery Services |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPH | Department of Public Health |
| DTP | Day Treatment Program |
| EOP | Enhanced Outpatient Program |
| FPCM | Facilities, Planning, Construction, and Management |
| GACH | General Acute Care Hospital |
| GP | General Population |
| H&P | History and Physical |
| HQ | Headquarters |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| LAC | California State Prison, Los Angeles County |
| LOC | Level of Care |
| MAR | Medication Administration Record |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health-Outpatient Housing Unit |
| MOU | Memorandum of Understanding |
| PSU | Psychiatric Services Unit |
| RC | Reception Center |
| RJD | R. J. Donovan Correctional Facility |
| RPMB | Regulation and Policy Management Branch |
| SAC | California State Prison, Sacramento |
| SAP | Substance Abuse Program |

| SATF | Substance Abuse Treatment Facility |
| SFM | State Fire Marshall |
| SNY | Sensitive Needs Yard |
| SOL | California State Prison, Solano |
| SQ | California State Prison, San Quentin |
| SVSP | Salinas Valley State Prison |
| SVPP | Salinas Valley Psychiatric Program |
| UHR | Unit Health Record |
| UM | Utilization Management |
| VPP | Vacaville Psychiatric Program |
| WSP | Wasco State Prison |

**FOR SUBMITTAL TO THE *COLEMAN* SPECIAL MASTER**

*June 9, 2009 Activity Report on CDCR/DMH Mental Health*
*Assessment and Referral Project in Response to the Deputy Special Master's Request*
*following the March 31, 2009 Court Order*

---

### PURPOSE AND BACKGROUND

The *Coleman Court's* March 31, 2009 order required that California Department of Corrections and Rehabilitation (CDCR) and Department of Mental Health (DMH) clinicians work together to conduct a modified assessment to determine whether there are unmet needs for inpatient care among members of the plaintiff class and to refer on an expedited basis any inmates identified during this modified assessment for appropriate inpatient care.

This report responds to Deputy Special Master Mohamedu Jones's request that CDCR and DMH provide him with an update on the status of the CDCR/DMH Mental Health Assessment and Referral Project (the Project) as of June 9, 2009, and that they copy plaintiffs' counsel with the update.

The Project, which involves the assessment of 12 institutions, consists of three Phases; Phase(s) I and II, which are complete and Phase III, which has not yet commenced. This report, therefore, can only describe and summarize the outcome of the Project to date and is being jointly submitted by CDCR and DMH. Thus, it includes information and data available through June 8, 2009, on the number of inmate-patients identified and referred by the institutions in Phase I, the number of inmate-patients identified for referral to DMH in Phase II, and the number of inmate-patients that will be reviewed in Phase III. In addition, it provides data on the total number of Penal Code § 2684 referrals to DMH between April 1 and May 31, 2009. Last, it provides information regarding any obstacles encountered in the Project.

*Methodology*

Phase I was completed on April 30, 2009. During this Phase, CDCR staff at designated institutions identified and listed inmate-patients to be assessed for higher level of care referral. Phase II was completed on May 21, 2009. During this Phase, assessment teams comprised of clinical HQ staff from CDCR and DMH conducted reviews at all 12 designated institutions (CMF, MCSP, SAC, SQ, RJD, SVSP, COR, WSP, CIM, CCI, CMC, and LAC). The teams reviewed as many identified cases as possible from lists provided in Phase I in the short time frame allowed for the Project.

The DMH referral process started with the institutions identifying patients for potential DMH referral by using established clinical indicators. Each institution compiled a Master List of those identified patients that met the criteria delineated in Appendix i attached to this report.

---

Phase II consisted of the CDCR/DMH team reviewing patients from the initial Phase I list who had not already been referred by the institution. CDCR prioritized patients for review based on their Phase I clinical indicators.

Phase III will consist of reviewing patients from the Master List who were not reviewed during the Phase II CDCR/DMH assessment. Phase III will not include patients who have paroled, who were referred prior to Phase I, or who were referred in the interim between Phase I and Phase II.

During Phase I and prior to Phase II, 1659 total cases were identified for potential referral to a DMH higher level of care. (See Table 1 below.) Of these, 655 were reviewed in Phase II, with 278 determined appropriate for referral to DMH and 377 determined inappropriate. A total of 493 remain to be reviewed during Phase III. In the period between Phase I and Phase II, prior to review by the DMH and CDCR HQ review, clinicians at the institutions initiated a total of 281 referrals. This data is illustrated in Appendix ii attached to this report. This data, however, does not include the numbers for those inmate-patients referred prior to Phase I or those that paroled.

A table of referrals to DMH for a higher level of care broken down by institution and type of review/referral is attached to this report as Appendix ii. In addition, a number of indicators are being tracked to allow for more complete analysis and improvements in CDCR's process, including items related to timely referrals and admissions, custody factors, medication management and communication around clinical patient care issues.

## PHASE I

Initially, Phase I consisted of informing the Chiefs of Mental Health and custody leadership at the 12 selected institutions of the purpose and scope of the CDCR/DMH Mental Health Assessment and Referral Project. The representative from the DAI sent a memo to the Wardens and institutional custody leadership at the 12 institutions describing the purpose of the project. The 12 selected institutions joined teleconferences with CDCR Mental Health HQ either on April 8, 2009 or April 13, 2009. Participation by DAI enforced the need for the completion of the case factor sheets on all inmate-patients identified for inclusion on the institutional referral lists.

Concurrent with the teleconferences and instructions to the institutions, ongoing dialogue occurred with DMH, DAI, and the *Coleman* Deputy Special Master and experts on how to conduct the Project. This additional information was relayed to the institutions providing more details about Phase I and Phase II procedures. In retrospect, delaying the communication with the institutions until final information was available would have been beneficial in order to provide complete direction and create a smoother process. This may have given the institutions more opportunity to organize and prepare for the site visit.

The institutions were directed to cast a "very wide net" in identifying EOP inmate-patients in all housing and settings (ASU-EOP, PSU, MHCB, RC) in their programs for possible placement on the referral list. One item on the criteria for the possible placement on the referral list may have resulted in an over-inclusive number of inmate-patients in Phase I at some institutions. For instance, one institution placed all of their EOP population on the list stating that all their EOP patients met criteria 3 ("The inmate-patient would benefit from a comprehensive treatment program…and all of our patients meet this criterion and could benefit.") Additional direction and

clarification was given to the institutions when prioritizing their lists for the Phase II review. The lists sent from the institutions to DCHCS used various data formats which made it cumbersome to reconcile the data and merge with the lists derived from the Phase II review teams. Given more time before the start of Phase III, a standardized format to report the data will be provided to the institutions to facilitate data reconciliation.

The table below reflects a summary by institution of the number of inmate-patients on the lists constructed during Phase I.

Table 1. Summary of Results for Phase I

| Institution | Numbers on List |
|---|---|
| CMF | 282 |
| MCSP | 86 |
| SAC | 182 |
| SQ | 80 |
| COR | 72 |
| RJD | 212 |
| LAC | 94 |
| WSP | 79 |
| CCI | 35 |
| CIM | 156 |
| CMC | 279 |
| SVSP | 102 |
| Total | 1659 |

*Table 1 reflects the number of inmate-patients identified by each institution using the Phase I referral criteria.*

Many of the institutions decided to begin referring selected inmate-patients to DMH, based on clinical need, prior to Phase II referral teams arriving at their institutions. The institutions were directed to note on their referral lists those inmate-patients who were in active referral up to the time of the Phase II team arrival at their institutions. DCHCS HQ staff are tracking these initial referrals.

## PHASE II

The Phase II teams consisted of CDCR HQ Psychologists, HQ Nurse Consultants, a HQ CCIII, HQ Health Program Specialists and DMH clinicians. The review team did not include institutional staff in the review process with the exception of correctional counselors. *Coleman* experts/monitors were on site to observe and to provide suggestions when indicated.

Frequent collaboration occurred with DMH staff, Deputy Special Master Jones, and the *Coleman* monitors on development of the Project. CDCR and DMH held face to face meetings to resolve issues regarding H&P format, diagnosis clarifications and to discuss Phase III development and procedures. In addition to reaching agreements on these issues, closer relationships were formed between CDCR and DMH, and the partnership became apparent in achieving completion of the Project. Other positive aspects in the Project included relationship development with the institutional staff due to time spent in the institutions. This also brought a better appreciation and clearer understanding of what types of inmate-patients can be treated and to which DMH institutions, based upon custody criteria, inmate-patients may be sent.

*Methodology*

The CDCR/DMH teams reviewed the UHRs using the inclusion criteria tool (see Appendix i) to determine potential inmate-patients for higher level of care referral. Based on the available documentation and a summary discussion of the clinical case factors known, a synopsis was presented to either the CDCR or DMH representative. The team members discussed their clinical findings to determine if the inmate-patient demonstrated the need for a referral to a higher level of care. If team members were unable to come to an agreement or additional clinical information was needed, the inmate-patient's primary clinician was interviewed and/or interview with the inmate-patient was conducted.

There was no instance of consensus not being achieved on the disposition of a recommendation for any inmate-patient's referral to DMH. A planned review similar to the CCAT process therefore did not have to be utilized. Final decisions for each case, including ultimate failure to arrive at a consensus, were to be documented, described, and summarized in a Project Report at the conclusion of this assessment. DMH referral packets were to be completed by assigned institutional staff within ten working days in order to expedite the process. The Assessment and Referral Teams established a case review and referral list for each site visit. A copy of the list remained at the institution for follow-through on completion of referral packets. A second copy was forwarded to DCHCS HQ. A third copy of the list was forwarded to DMH HQ.

Institutions were directed to submit all referrals to DCHCS HQ instead of directly to DMH in order to track, copy, and check for required documentation. Because most institutions are not submitting complete referral packages, requests for the additional documentation must be made. This delays forwarding some of the referral packages to DMH within the HQ internal timeline of 24 hours until the missing documents are received from the referring institutions.

A tracking log continues to be kept to document the date when referral packages are received at HQ from the institutions. The log denotes the date that DCHCS HQ forwarded the reviewed referral package to DMH and the length of time the referral packages were held at HQ.

A change in the process was made early in Phase II to include an inmate-patient interview when an acute level of care referral was being considered. This change was precipitated from feedback by the institutional staff to ensure that the inmate-patient's current clinical status was consistent with the records reviewed and indeed warranted acute LOC.

The assessment team members were liberal in the referral criteria in order to capture inmate-patients' cases that may benefit from establishing baseline behaviors, diagnostic clarification,

treatment goals and further plan of care.  The intent of the referral was to include inmate-patients that presented a clinical need for a comprehensive treatment program with an emphasis on skill development and a structured treatment environment.

Some of the challenges encountered by the clinical teams during the Phase II assessment process were related to incomplete clinical documentation, backlog of filing, poorly organized UHRs, lack of current MARs and/or correlating physician orders, and documentation not being in chronological order, making it more time consuming for the teams to make a determination of clinical status of the inmate-patients under review.

Some of the challenges encountered by the institutional staff in completing the referral packages in an expedited fashion were related to additional work load demands and labor resources in completing the required paperwork within the specified ten-day timeframe while continuing their usual patient care assignments, for example, having available physicians to complete the H&P forms.

The table below reflects a breakdown of cases reviewed by the Phase II assessment team.

Table 2. DMH Referral Phase II Roll-up (12 Institutions)

| Cases Reviewed | 655 |
|---|---|
| Cases Identified to be Referred by Review Team | 278 |
| Cases Identified *not* to be Referred by Review Team | 377 |

*The Phase II review team identified if inmate-patients should be referred or not to DMH.  If referral was indicated by the review team, the institutional staff is to complete and submit DMH referral packages.*

## PHASE III

CDCR and DMH are currently working with Deputy Special Master Jones and his staff to finalize the Phase III plan. At this juncture, Phase III will consist of a) completing reviews for the inmate-patients remaining on the institutional master lists; b) training of institutional staff on access to higher levels of care; and c) analysis of compiled data to better estimate bed planning needs.

The DCHCS Mental Health Utilization Management Unit, with DMH, shall implement a systematic joint review and training process with institutional staff to ensure ongoing referrals to a higher LOC in a standardized fashion.  The most important part of MH UM is to improve access to care by creating standardized, measurable, and reliable processes.  MH UM will strive to match the patient's needs with the appropriate level and type of mental health care, whether it be an outpatient CCCMS, EOP level, CDCR inpatient MHCB level, or DMH acute or intermediate level of care.  In collaboration with DMH, the Mental Health UM unit will inspect, monitor and perform utilization reviews prospectively, concurrently, or retrospectively regarding the courses of treatment or inpatient care provided to *Coleman* class inmate-patients.  These reviews shall be undertaken to determine whether the course of treatment or services respected

the inmate-patients' due process rights and is clinically necessary and performed in accordance with the agreed upon rules and guidelines between DMH and CDCR. This will establish the sustainable collaborative process of reviewing intake, treatment and discharge practices to optimize outcomes for inmate-patients.

The table below reflects the number of cases to be reviewed during Phase III that were not reviewed during Phase II.

Table 3. Phase III Cases

| Cases Remaining for Phase III Review | 493 |
|---|---|

*Methodology*

To begin Phase III, the master referral list will be verified for accuracy. The institutions will be requested to have all available primary and senior clinicians be part of Phase III. In addition to a review of the current records by the assessment team members, participation will begin by the primary clinicians after study of the *IDTT Screening Checklist - Referral to DMH ICF* (see Appendix iii) and DMH ICF MOU admission criteria. Participation by the primary clinicians will also include providing current clinical data on the inmate-patient being reviewed.

If no decision is achieved in this step, the team shall conduct an interview with the inmate-patient. In all cases of decisions to refer for acute level of care, the team will conduct an inmate-patient interview. If a decision regarding a higher level of care cannot be reached, the case will be referred for review by CDCR and DMH clinicians, similar to the CCAT process, for final disposition.

The Assessment and Referral Teams will establish a Case Review and Referral List for each site visit. A copy of the list will remain at the institution for follow-through on referrals to be completed, and a second copy will be forwarded to DCHCS HQ. A third copy will be forwarded to DMH. Inmate-patients determined to be in need of a higher level of care will have a DMH referral packet completed within ten working days by assigned institutional staff.

DMH staff in Phase III will take on a modified role and will be part of the teaching teams and not part of the assessment/referral teams as in Phase II. The scope will be expanded to include all institutions, in varying degrees dependent upon mission.

*Timeline*

The schedule of visits showing the proposed start and completion dates for Phase III that has been submitted to Deputy Special Master Jones for the 12 institutions is attached as Appendix iv to this report. This schedule may be subject to change in order to accommodate all 33 CDCR institutions that CDCR expects to add to this Project. The timetable and details will be developed by the stakeholders and by the Deputy Special Master and his staff with the goal of completing this Project by the end of this calendar year. While waiting for the start of Phase III, Mental Health program staff at the institutions will continue to review their caseloads for DMH referral as usual and make referrals as clinically indicated.

*Plan*

This plan includes that the IDTT will incorporate the checklist, use it routinely, and apply it to each inmate-patient reviewed in IDTTs to better determine ICF placements in the future. Furthermore, CDCR HQ Nurse Consultants and other staff will perform institutional audits, clinical training, referral processing and tracking. The tracking process will begin from time of referral to DMH acceptance or denial, through discharge and review of the treatment outcomes. This plan will allow for sustained, improved, quality outcomes by combining the ongoing assessment with a teaching component for institutional IDTT members.

### Referrals Received by DMH

The total number of referrals generated by the Assessment and Referral Project are indeterminate at this time and will be known upon the completion of Phase III. However, for the time frame of April 1, 2009, through May 31, 2009, the referral of inmate-patients in the *Coleman* class (Penal Code § 2684) for inpatient care provided by DMH is as follows:

<u>Table 4. Referrals Received by DMH</u>

| Total Referrals | 808 |
|---|---|
| *Admissions (From Ongoing Referrals)* | *166\** |
| *Admissions (Pts. Identified in Project)* | *69* |
| *Wait List (DMH facilities total)* | *531* |
| *Rejected Referrals* | *3* |
| *Rescinded Referrals* | *43* |

*\*includes four inmate-patients that were referred in March 2009 and admitted in April 2009.*

The information in Table 4 reflects the total number of referrals to DMH between April 1 and May 31, 2009. A total of 235 *Coleman* class inmate-patients were admitted to DMH within this time frame of which 69 (46 ICF and 23 Acute) were inmate-patients referred for inpatient care as a result of this Project. DMH is currently developing a tracking system that will be capable of specifically identifying referrals made through this project. As soon as this tracking system is in place, DMH will provide updates on patient movement to Deputy Special Master Jones twice per month. At this time, DMH is working with Deputy Special Master Jones to develop a plan to admit inmate-patients referred through the project on an expedited basis.

### NEXT STEPS

A follow-up report will provide information regarding the outcome of Phase III including the number of referrals made to and accepted by DMH and inmate-patients placed in ICF beds as a result of the Project. A final report at the end of this Project detailing bed planning data will be provided to all the stakeholders and to Navigant Consulting.

## CDCR/DMH Mental Health Assessment and Referral Project

### Criteria for Identifying Inmate-patients to Consider for *Potential*
### Referral to DMH for a higher Level-of-Care

- EOP Inmate-patients (I-P) at the project institutions shall be reviewed for overall criteria that warrant consideration of potential referral to a higher level-of-care at a facility operated by the Department of Mental Health (DMH).

- All clinicians shall have available to them a copy of the criteria information below <u>during</u> the review.

- Clinical staff participation/completion of the review shall be documented on page two (2) of this review form.

### Criteria for Identifying Inmate-Patients for *Consideration* of Referral to a DMH facility:

**Primary Clinicians will identify inmate-patients for criteria 1-4 Other criteria will be placed on separate sublists**

1. As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care
2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms
3. The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and a structured treatment environment.
4. The inmate-patient demonstrates chronic psychiatric symptoms (disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning
5. Inmate-patient has less than 50% overall cooperation/participation with programming and/or the treatment plan during the last 3 months. (i.e., mental health issues substantially affect ability to actively participate in treatment, the inmate-patient is noncompliant with medication, etc...) *MHP supervisors will review Mental Health Tracking System (MHTS) data for EOP caseloads to determine inmate-patients whose participation or cooperation with programming and treatment plan has been less than 50 percent during the last three months. Where this MHTS data is not available primary clinicians will identify these inmate-patients.*
6. The inmate-patient has incurred three (3) or more Rules Violation Reports during the last 3 months. *Mental Health staff will review Rules Violation Report (RVR) logs for the names of EOP inmates who received CDCR-115s during the months of January through March 2009 to identify those who received RVRs for three or more incidents during that three-month time period.*
7. The inmate-patient needs a comprehensive assessment for diagnostic clarification (only available at ASH, PSH, and VPP). *EOP staff will indicate caseload inmates*
8. The inmate-patient needs initiation of a trial of Clozapine *EOP psychiatrists will forward the names of inmate-patients who require initiation of a trial of Clozapine, to program supervisors.*
9. The inmate-patient had three (3) or more admissions to a MHCB during the last six (6) months. (Include MHCB admissions if the inmate-patient paroled and returned during the last six (6) months.) *MHP supervisors will review MHTS reports or Mental Health Crisis Bed (MHCB) Admission/Discharge Logs to identify inmate-patients.*
10. The inmate-patient has been in a MHCB for ten (10) or more days for clinical issues, i.e. the inmate-patient is not yet stabilized. *MHP supervisors will review MHTS reports or MHCB Admission/Discharge logs.*

For the below criteria MHP supervisors, DMH Coordinators, and EOP supervisors will jointly create a list of inmate-patients. To accomplish this, the institution's DMH log and the EOP caseload will be reviewed.

11. Has had two (2) or more admissions and/or referrals during the last twelve (12) months to a **DMH** facility

12. Has ever been referred to **DMH** but rejected

13. Has been accepted to **DMH** within the past year but ultimately not transferred

Appendix i

**Appendix ii**
**Referral to DMH for a Higher Level of Care Review Broken Down by Institution**

| Institution | Number of IPs Referred by the Institution Between Phase I and Phase II | Number of IPs Cases Reviewed by CDCR/DMH Team During Phase II Review | Number of IPs Recommended for Referral by CDCR/DMH Team During Phase II Review | Number of IPs *NOT* Recommended for Referral During Phase II Review | Number of IP Cases to be Reviewed in Phase III |
|---|---|---|---|---|---|
| CCI | 2 | 27 | 15 | 12 | 2 |
| CIM | 21 | 66 | 25 | 41 | 31 |
| CMC | 66 | 73 | 9 | 64 | 92 |
| CMF | 71 | 62 | 31 | 31 | 109 |
| COR | 3 | 51 | 26 | 25 | 7 |
| SAC | 16 | 65 | 24 | 41 | 100 |
| LAC | 21 | 55 | 31 | 24 | 1 |
| MCSP | 23 | 54 | 29 | 25 | 9 |
| RJD | 15 | 38 | 22 | 16 | 127 |
| SQ | 18 | 53 | 21 | 32 | 2 |
| SVSP | 2 | 72 | 30 | 42 | 6 |
| WSP | 23 | 39 | 15 | 24 | 7 |
| *Total* | *281* | *655* | *278* | *377* | *493* |

**California Department of Corrections and Rehabilitation -Mental Health Program**

## INTERDISCIPLINARY TREATMENT TEAM (IDTT) - SCREENING CHECKLIST
## REFERRAL TO DEPARTMENT OF MENTAL HEALTH - INTERMEDIATE CARE FACILITY

The purpose of the Interdisciplinary Treatment Team (IDTT) Screening Checklist is to assess patient behaviors, symptoms and potential benefit from a referral to DMH-ICF. The Screening Checklist and Current Treatment Plan, CDCR form 7388-MH shall be completed at **every** IDTT, and filed together in the inmate-patient's Unit Health Record – Mental Health section.

**Check applicable IDTT meeting**:
☐ Initial IDTT  ☐ Weekly IDTT  ☐ 30-day IDTT  ☐ 60-day IDTT  ☐ 90-day IDTT  ☐ 1-year IDTT  ☐ other IDTT-_____
**Date of last IDTT :** _____

Current LOC:_____    Total length of time at EOP(excluding MHCB admit) :_____    Parole Date(If Known) : _____

### Check the ☆ box if the document is unavailable for review in the UHR.

| Check Applicable Box | Meets **one** of the established screenings for potential referral from: **MHCB, CCCMS, EOP (PSU, ASU-EOP) or RC to DMH-ICF:** |
|---|---|
| ☐ Y ☐ N  ☐ ☆ | As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care. |
| ☐ Y ☐ N  ☐ ☆ | The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms. |
| ☐ Y ☐ N  ☐ ☆ | The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and a structured treatment environment. |
| ☐ Y ☐ N  ☐ ☆ | The inmate-patient demonstrates chronic psychiatric symptoms (disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning. |
| ☐ Y ☐ N  ☐ ☆ | Inmate-patient has less than 50% overall cooperation/participation with programming and/or the treatment plan during the last 3 months. (i.e., mental health issues substantially affect ability to actively participate in treatment, the inmate-patient is noncompliant with medication, etc...) |
| ☐ Y ☐ N  ☐ ☆ | For Custody: the inmate-patient has incurred three (3) or more Rules Violation Reports during the last 3 months. |
| ☐ Y ☐ N  ☐ ☆ | The inmate-patient needs a comprehensive assessment for diagnostic clarification (only available at ASH, PSH, and VPP). |
| ☐ Y ☐ N  ☐ ☆ | The inmate-patient needs initiation of a trial of Clozapine. |
| ☐ Y ☐ N  ☐ ☆ | The inmate-patient had three (3) or more admissions to a MHCB during the last six (6) months. **(Include MHCB admissions if the inmate-patient paroled and returned during the last six (6) months.)** |
| ☐ Y ☐ N  ☐ ☆ | The inmate-patient has been in a MHCB for ten (10) or more days for clinical issues, i.e. the inmate-patient is not yet stabilized. |
| ☐ Y ☐ N | Are any of the above screenings checked yes? |
| ☐ Y ☐ N | Does the inmate-patient meet criteria for DMH-ICF referral and MOU criteria for admission?  If so, refer to DHM-ICF MOU criteria for admission. |

If inmate-patient met screening element(s) above for DMH-ICF referral, but was not referred, document clinical rationale for non-referral:

| INSTITUTION: | IDTT DATE: | |
|---|---|---|
| NAME: | CDC#: | DOB: |

7388 XXXX

Appendix iii

**California Department of Corrections and Rehabilitation -Mental Health Program**
**MOU CRITERIA FOR INTERMEDIATE CARE/NON-ACUTE ADMISSION (2008)**

A.  Criteria for inpatient care in a DMH hospital or psychiatric program requires an Axis I major (severe) mental disorder with active symptoms and any one of the following:

    1.  As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

    2.  The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms.

    3.  Neurological/neuropsychological consultation services are available at ASH, PSH, and VPP. This level of assessment is not available at SVPP.

    4.  The inmate-patient requires an inpatient diagnostic evaluation.

    5.  The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and structured treatment environment.

    6.  The patient's psychiatric medication history indicates that a clozapine trial may be useful.

    7.  Inmate-patients (male only) who are deemed a significant assault risk have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner) or present a high escape risk, shall be referred to the SVPP ICF. CDCR refers to these inmate-patients as high custody I/Ps.

    8.  The inmate-patient's GAF indicates behavior that is considerably influenced by psychotic symptoms; OR serious impairment in communication or judgment; OR inability to function in almost all areas.

    9.  For SVPP only, the inmate-patient is medically appropriate as determined by the receiving Prison medical staff. The SVPP Clinical Assessment Team (CAT) will determine mental health suitability.

B.  In addition to a primarily Axis I disorder, admission to a DMH hospital or psychiatric program shall be considered when:

    1.  The inmate-patient engages in ritualistic or repetitive self-injurious/suicidal behavior that has not responded to treatment in a CDCR facility. Without inpatient mental health treatment the inmate-patient is likely to develop serious medical complications or present a threat to his life.

    2.  The inmate-patient is chronically suicidal and has had repeated admissions to a MHCB.

C.  Inmate-patient committed to DMH by the courts as being incompetent to stand trial per PC § 1370.

    Inmate-patients who commit an offense while in CDCR, are referred to the District Attorney for prosecution, and are found by the court to be incompetent to stand trial per Penal Code § 1370 will first be considered for the SVPP. If there are no custodial or clinical reasons for admission to SVPP, they will then be considered for other DMH programs.

    1.  Whenever the CDCR institution referring clinician is in doubt concerning the appropriateness of referring a particular inmate-patient, the referring clinician will call the Chief, Classification and Parole Representative (C&PR), or designee then if necessary will call the State Hospital's PC§ 2684 screening clinician or the psychiatric programs' admission and discharge coordinator (ADC) to clarify the adequacy of the referral before formally submitting the referral.

    2.  When an inmate-patient is admitted to either a state hospital or psychiatric program as a PC 1370, the sending CDCR institution shall provide all the documentation that would be required if the inmate-patient were being admitted to DMH for ICF mental health care.

7388 XXXX

**California Department of Corrections and Rehabilitation – Mental Health Program**

### INTERDISCIPLINARY TREATMENT TEAM –SCREENING CHECKLIST INSTRUCTION SHEET

***One tool shall be completed for each patient at every Interdisciplinary Treatment Team (IDTT) at all levels of care, including MHCB, CCCMS, EOP (PSU, ASU-EOP), or RC (when IDTT is being held in RC).***

➢ <u>Check applicable</u>: place a check in the box to indicate if it is the patient's initial, weekly, 60 day, 90 day, 1-year or other time line IDTT, according to the level of care the patient is at and the IDTT requirement for that level of care. Be sure to specify if the IDTT is not a routine IDTT.

➢ <u>Prior LOC:</u> Write what level of care the patient was at prior to the current level of care the patient resides.

➢ <u>Current LOC:</u> Write on the line the current level of care the patient is assigned (CCCMS, EOP, MHCB).

➢ <u>Total length of time at LOC:</u> Write in how much time the patient has been at that level of care in total, include if the patient has transferred from one institution to another and maintained that level of care: Example: patient was at EOP level of care for 6 months at SQ and transferred to SOL EOP. He has now been at SOL for 3 months. His total length of time at EOP LOC is 9 months.

➢ <u>Length of time at LOC at institution:</u> Write the amount of time at current institution at that level of care: Using above example: the patient has been at SOL at EOP LOC for 3 months.

**CHECK –** This tool is intended to assist in screening patients for potential referral to an intermediate level of care facility. It is not intended to supersede clinical judgment. One or more yes answers may warrant consideration for a referral to ICF. If a decision is made by the IDTT to not refer the patient, the team shall document a clinical rationale for the non–referral at the bottom of the form.

➢ <u>Questions:</u> Yes or no questions regarding the patient's behavior. The questions may require review of the patient's unit health record and/or C-file and are not limited to only the time the patient has been at the current location.

➢ <u>If any of the questions are checked **yes** it indicates that the patient may be a good candidate for referral to ICF.</u>

➢ <u>MOU Criteria:</u> The next step is to determine if the patient meets DMH-ICF MOU referral criteria. The MOU referral criterion has been provided for reference on page 2 of the screening checklist. Review the MOU criteria and check yes if the patient meets the criteria and check no if the patient does not meet the MOU criteria.

➢ <u>Referral to DMH-ICF:</u> This question is asking if the patient meets both clinical and MOU criteria for referral to DMH-ICF, and if so, is a referral going to be made, yes or no.

➢ <u>APP Referral:</u> This question is asking if the patient met above criteria, but was not referred to ICF, was the patient referred to an Acute Psychiatric Program instead.

➢ <u>DOCUMENTATION FOR NON-REFERRAL:</u> This area is to be used to document why a patient was not referred to DMH-ICF if they met clinical and MOU criteria for referral. *Be specific in the justification for the non-referral.*

➢ <u>Institution:</u> Document full name of institution patient is housed.

➢ <u>IDTT Date:</u> Document date IDTT held.

➢ <u>Name:</u> Document last and first name of patient.

➢ <u>CDC#:</u> Document CDC# of patient.

➢ <u>DOB:</u> Document date of birth of patient.

| July 2009 | | | | | | |
|---|---|---|---|---|---|---|
| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|  |  |  | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 RJD<br><br>126 charts | 8 RJD | 9 RJD | 10 | 11 |
| 12 | 13 | 14 RJD | 15 RJD | 16 RJD | 17 | 18 |
| 19 | 20 | 21 RJD | 22 RJD | 23 RJD | 24 | 25 |
| 26 | 27 | 28 BREAK | 29 BREAK | 30 BREAK | 31 |  |

## August 2009

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 CIM **(31 CHARTS)** | 5 CIM | 6 CIM | 7 | 8 |
| 9 | 10 | 11 SVSP (6 charts) | 12 SVSP | 13 SVSP | 14 | 15 |
| 16 | 17 | 18 CMC **(92 charts)** | 19 CMC | 20 CMC | 21 | 22 |
| 23 | 24 | 25 CMC | 26 CMC | 27 CMC | 28 | 29 |
| 30 | 31 |  |  |  |  |  |

| September 2009 | | | | | | |
|---|---|---|---|---|---|---|
| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| | | 1 BREAK | 2 BREAK | 3 BREAK | 4 | 5 |
| 6 | 7 | 8 CMF<br><br>(109 charts) | 9 CMF | 10 CMF | 11 | 12 |
| 13 | 14 | 15 CMF | 16 CMF | 17 CMF | 18 | 19 |
| 20 | 21 | 22 COR<br>(7 Charts)<br>WSP<br>(7 Charts) | 23 COR<br><br>WSP | 24 COR<br><br>WSP | 25 | 26 |
| 27 | 28 | 29 SQ<br>(2 charts)<br>MCSP<br>(9 charts) | 30 SQ<br><br>MCSP | | | |

## October 2009

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | | [1]SQ  MCSP | 2 | 3 |
| 4 | 5 | [6]LAC **(1 chart)** CCI **(2 charts)** | [7]LAC  CCI | [8]LAC  CCI | 9 | 10 |
| 11 | 12 | [13]SAC  100 charts | [14]SAC | [15]SAC | 16 | 17 |
| 18 | 19 | [20]SAC | [21]SAC | [22]SAC | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |