PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

            Plaintiffs,

    v.

ARNOLD SCHWARZENEGGER, et al.,

            Defendants.

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' COMMENTS PURSUANT TO THE COURT'S MARCH 31, 2009 ORDER REGARDING (1) DEFENDANTS' FINAL PROPOSAL TO MEET THE REMAINING SHORT-TERM, INTERMEDIATE, AND LONG-RANGE BED NEEDS OF THE PLAINTIFF CLASS; AND, (2) DEFENDANTS' DETAILED ACTIVATION SCHEDULES FOR COMPLETION OF ALL OTHER COURT-ORDERED CONSTRUCTION PROJECTS**

Submitted to Special Master Matthew Lopes With a Copy Filed With the Court Pursuant to the Order of March 31, 2009 (Docket No. 3556)

Hearing:  June 16, 2009, 1:30 p.m.
Court:  Hon. Lawrence K. Karlton

[299307-1]

I, Jane E. Kahn, do hereby declare under penalty of perjury as follows:

1.      I am an attorney admitted to practice law in California and of counsel in the law firm Rosen, Bien & Galvan, LLP, one of the counsel of record for Plaintiff class in this case.  I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Comments Pursuant To The Court's March 31, 2009 Order Regarding (1) Defendants' Final Proposal To Meet The Remaining Short-Term, Intermediate, And Long-Range Bed Needs Of The Plaintiff Class; And, (2) Defendants' Detailed Activation Schedules For Completion Of All Other Court-Ordered Construction Projects.

2.      Attached hereto as **Exhibit A** is a true and correct copy of Plaintiffs' Trial Exhibit P-390, a Budget Change Proposal dated April 1, 2008, for CSP-SAC Treatment and Office Space to Accommodate 192 Enhanced Outpatient Program ("EOP") Inmate-Patients.  This project was proposed to provide the necessary program, treatment and office space to serve the existing 192 Level IV EOP inmate-patients housed in Facility B at CSP-SAC.  According to the Problem Statement, "[d]ue to CDCR's mental health inmate population pressures, CDCR activated 192 EOP beds at CSP-SAC in July 2006 (96 beds) and October 2006 (96 beds)… CSP-SAC completed temporary retrofits and space conversions for treatment and office space … [h]owever, these temporary retrofits do not provide an adequate therapeutic environment for the seriously mentally disordered inmate-patients." *Id.* at p. 3.  This project is now projected for completion on May 23, 2011, almost five years after the patients were admitted to the program. (Docket No. 3591 at p. 31)

3.      Attached hereto as **Exhibit B** is a true and correct copy of Enclosure 3, pages R1-1 to R1-3, from the *Coleman* Monthly data for April 10, 2009.  Pages R1-1 to R1-3 is a report entitled, Mental Health Population – Placement Per Institution.  This report provides the mental health population for each prison, including the CCCMS and EOP capacity, current population and percentage of capacity, as well as the capacity, current population and percent of capacity in each of the DMH programs.  According to the April 10, 2009 Report, the Reception Centers with

[299307-1]

Decl. Kahn ISO Pls.' Comments Pursuant To 3/31/09 Order Re (1) Defs'/ Final Proposal To Meet The Remaining Bed Needs Of Pl. Class; & (2) Defs.' Activation Scheds. For Completion Of Court-Ordered Constr. - Case No. Civ S 90-0520 LKK-JFM

1  the largest EOP populations are CIM RC with 200 EOP prisoners, Lancaster RC with 129 EOP

2  prisoners, RJD RC with 83 EOP prisoners, and Wasco RC with 90. (*Id.*)

3  　　　4.　　Attached hereto as **Exhibit C** is a true and correct copy of Enclosure 3, pages R2-1

4  to R2-2, from the *Coleman* Monthly data for April 10, 2009. Pages R2-1 to R2-2 is a Report

5  entitled, Mental Health Adseg/SHU/PSU, which provides the numbers and percentages of EOP

6  and CCCMS prisoners in each prison's administrative segregation unit, in each SHU and PSU. I

7  added together the administrative segregation capacity of 5,504, the PSU capacity of 394 and the

8  SHU capacity of 1,718 to get the total CDCR segregated housing capacity of 7,617.

9  　　　5.　　Attached hereto as **Exhibit D** is a true and correct copy of CDCR Weekly

10  Population Report for April 8, 2009, downloaded from the CDCR website. The total institutional

11  population on April 8, 2009 was 156,798. Using this institutional population figure and the total

12  segregated housing capacity of 7,617, I computed the percentage of CDCR prisoners housed in

13  segregated housing units as 4.8%. Using the *Coleman* Monthly Data in Enclosure 3, R1-3, I

14  added the EOP (4603) and PSU (369) to get a total of 4,972 EOP prisoners. Using the data

15  found on R2-1 to R2-2 in **Exhibit C**, I added the EOPs in segregation (569), PSU (360) and SHU

16  (11), to get a total number of 940 EOP prisoners housed in segregated housing. Using the total

17  EOP population figure (4,972) and the total EOP population in segregated housing (940), I

18  computed the percentage of EOPs in segregation as 19%. Thus, 19% of EOPs are housed in

19  segregation, while less than 5% of the total prison population resides in segregated housing.

20  　　　6.　　Attached hereto as **Exhibit E** is a true and correct copy of the November 9, 2007

21  Review of the Classification Process for Unit 32, Mississippi State Penitentiary, James Austin,

22  Ph.D. Attached hereto as **Exhibit F** is a true and correct copy of the Supplemental Consent

23  Decree on Mental Health Care Use of Force and Classification in *Presley v. Epps*, which is the

24  underlying lawsuit in which the Review of the Classification Process for Unit 32 was conducted.

25  　　　7.　　Attached hereto as **Exhibit G** is a true and correct copy of the report, entitled,

26  "Special Review, Management of the California Department of Corrections and Rehabilitation's

27  Administrative Segregation Unit Population," Office of the Inspector General, State of

28  California, January 15, 2009.

[299307-1]

1   (http://www.oig.ca.gov/media/reports/BAI/reviews/Management%20of%20the%20California%2

2   0Department%20of%20Corrections%20and%20Rehabilitation's%20Administrative%20Segregat

3   ion%20Unit%20Population.pdf.)

4          8.      Attached hereto as **Exhibit H** is a true and correct copy of Plaintiffs' Trial Exhibit

5   P-485, the Special Master's July 12, 2008 Letter to Defendants, where the Special Master

6   reviewed the workload staffing model for which the CDCR was seeking legislative approval.

7          9.      Attached hereto as **Exhibit I** is a true and correct copy of Plaintiffs' Trial Exhibit

8   P-183, A Finance Letter requesting 407.7 positions in Fiscal Year 2008-09 for Mental Health

9   Staffing based on the workload staffing model.  The Finance Letter provided that "salary savings

10  from currently authorized vacant positions will be used to offset these costs, resulting in no

11  funding for these positions being required for Budget Year.  By July, 2009, it is projected that all

12  existing salary savings will be exhausted and a subsequent BCP will be submitted for FY

13  2009/10 costs of up to $30.5 m."  p. 5 of 5.

14         10.     On June 5, 2009, I went to the Department of Finance website to review the

15  Department of Corrections and Rehabilitation Finance Letters that are posted as proposals to

16  amend the 2009 Budget Act.  (http://www.dof.ca.gov/budget/historical/2009-

17  10/april_1_finance_letters/)  The April 1, 2009 Finance Letter submitted on behalf of CDCR

18  addresses staffing needs for the CMF 50-Bed MHCB and the San Quentin MHCB, which will be

19  opened by January 2010.  The Finance Letter does not request the workload study staffing

20  augmentation of 407.7 positions.  Attached hereto as **Exhibit J** is a true and correct copy of the

21  April 1, 2009 Finance Letter which has been submitted on behalf of CDCR to amend the 2009

22  Budget Act.  I have also reviewed the currently enacted California State Budget, SBX3-1,

23  http://www.leginfo.ca.gov/pub/09-10/bill/sen/sb_0001-

24  0050/sbx3_1_bill_20090220_chaptered.pdf, and the Governor's veto message, which must be

25  read together with the enacted Budget.  (http://www.dof.ca.gov/budget/historical/2009-10-

26  governors/documents/2009_Budget_Act-Summary_Tables_and_Veto_Messages.pdf).  The

27  California State Budget does not include the 407.7 mental health positions assessed as part of the

28  Court-ordered workload study.

[299307-1]

11.     Attached hereto as **Exhibit K** is a true and correct copy of the Enclosure 2, "Six Month Vacancy Summary (*Coleman*) November-08 through April-09," page 1, from the *Coleman* Monthly data for April 10, 2009.

12.     Attached hereto as **Exhibit L** is a true and correct copy of Enclosure 20 from the *Coleman* Monthly data for the month of April 2009.  Enclosure 20 is a report entitled, Summary of Inter-Institutional Mental Health Crisis Bed Referrals and Transfers, prepared by Rick Johnson, Chief of the Health Care Placement Oversight Program (HC-POP), Division of Correctional Health Care Services.  This report summarizes the number of Mental Health Crisis Bed ("MHCB") referrals from institutional clinicians to HC-POP for assistance in finding an MHCB bed, the number of MHCB placements by HC-POP, the timeframes for those MHCB placements, and the number of MHCB referrals that were rescinded before HC-POP placed them.

13.     On October 7, 2008 the Court ordered Defendants to "implement and maintain electronic and manual tracking logs for inmates who have been placed into alternative housing pending MHCB transfers, and the dates, times and places of return to regular housing for inmates not transferred to an MHCB."  (Docket 3072 at p. 2:16-19)  I have personally requested information from Defendants regarding the status of their compliance with the October 7, 2008 Order.  I have been informed that Defendants have not yet implemented the tracking logs for inmates who have been placed into alternative housing pending transfer to an MHCB.

14.     Attached hereto as **Exhibit M** is a true and correct copy of the June 5, 2009 Monthly Report on the Licensure of Intermediate Care and Day Treatment Programs at the California Medical Facility, Vacaville, and the Salinas Valley Psychiatric Program, Salinas Valley State Prison.  This report is provided to Plaintiffs and the Special Master monthly by Defendants via email.  The June 5, 2009 report includes data on the Salinas Valley Psychiatric Program (SVPP) waitlist for June 1, 2009.  SVPP is the high custody Intermediate Care Facility located in Salinas Valley State Prison.  According to the report, there were 230 patients on the SVPP waitlist, including 80 EOP patients housed in segregated housing (PSU and ASU units).  (*Id.* at p. 2)  The report also includes the census for the SVPP, which opened a unit in April 2009.

4

[299307-1]

1    The new unit, TC2, has a 64 bed capacity and currently has 29 beds filled, and 28 beds available.

2    (*Id*. at p. 1)

3        15.    Attached hereto as **Exhibit N** is a true and correct copy of the June 4, 2009

4    Monthly Staffing and Staffing Vacancies Report for All DMH State Hospitals, Vacaville

5    Psychiatric Program and Salinas Valley Psychiatric Program.  Defendants provide this report on

6    a monthly basis to Plaintiffs and the Special Master via email.  This Report includes the staffing

7    and staffing vacancy data for all DMH hospitals and programs where *Coleman* class members

8    are treated.  According to the report, the overall functional vacancy rate in the DMH facilities

9    (with contractor positions offsetting the vacancies) was 11% on May 25, 2009.  (*Id.* at 1)

10   However, the individual DMH hospitals had varying vacancy rates, with Atascadero State

11   Hospital reporting a functional vacancy rate of 18%, while Coalinga State Hospital reported a

12   functional vacancy rate of 0%.  (*Id* at 5, 6)  Despite Defendants' statement in their May 26, 2009

13   Bed Plan filing that "it is difficult to recruit staff at CSH", (Docket 3592 at footnote 13,) on May

14   25, 2009, Coalinga ("CSH") was the only DMH program to report *a surplus* of 1.45 staffing

15   positions.  (*Id*.)  Of all the DMH hospitals and DMH programs reporting on May 25, 2009,

16   Coalinga State Hospital had the *lowest* staffing vacancy rates.  *See, e.g.*, Atascadero State

17   Hospital at 18%; Metropolitan State Hospital at 22%; Napa State Hospital at 8%; Patton State

18   Hospital at 5%; SVPP at 27%; and VPP at 16%.

19       16.    Attached hereto as **Exhibit O** is a true and correct copy of the Mental Health

20   Delivery System Program Guide, 2009 Revision, Chapter 4, pages 12-4-1, 12-4-8, and Chapter 2,

21   page 12-2-8.  These sections address the Chapter 4 EOP program requirements, including the ten

22   hours per week of scheduled, structured therapeutic activities, and sheltered housing as well as

23   the Chapter 2 RC EOP requirements.

24       17.    Attached hereto as **Exhibit P** is a true and correct copy of a redacted version of

25   excerpts from the April 13, 2009 Monthly Bed Utilization Report for the Department of Mental

26   Health Hospitals and Psychiatric Programs providing data for the month of March 2009.  This

27   document provides the names and CDCR numbers of each prisoner referred, accepted, placed on

28   a DMH waitlist, and/or transferred.  In order to comply with the *Coleman* Protective Order, we

5

1  have redacted the prisoners' names and CDCR numbers.  1/12/07 Order (Docket 2109).

2  According to the March 2009 report, there were 38 patients on the waiting list for the Acute

3  Psychiatric Program (APP), with an additional 4 patients "Deferred to ASH," for a total of 42

4  patients in need of an acute care bed.  *See*, *e.g.*, Patients Nos. 219 to 261.

5        18.    Attached hereto as **Exhibit Q** is a true and correct copy of a redacted version of

6  excerpts from the May 14, 2009 Monthly Bed Utilization Report for the Department of Mental

7  Health Hospitals and Psychiatric Programs providing data for the month of April 2009.  This

8  document provides the names and CDCR numbers of each prisoner referred, accepted, placed on

9  a DMH waitlist, and/or transferred.  In order to comply with the *Coleman* Protective Order, we

10  have redacted the prisoners' names and CDCR numbers.  1/12/07 Order (Docket No. 2109)

11  According to the April 2009 report, there were 44 patients on the Acute Psychiatric Program

12  (APP) waiting list, with an additional 8 "Deferred to ASH," for a total of 52 patients who were

13  waiting for transfer to an acute care bed.  See, e.g. Patients Nos. 229 to 280.  This report also

14  shows that Defendants were severely underutilizing ICF and acute beds at ASH, with only 5

15  patients currently housed in acute beds (out of 25 allegedly available beds) and only 91 patients

16  in the ICF beds (out of 231 allegedly available beds).  *See, e.g.*, Patient Nos. 825-831 (for acute)

17  and Patient Nos. 832-949 (for ICF).

18        19.    Attached hereto as **Exhibit R** are true and correct copies of pages 54-56 and 180

19  from the certified deposition transcript of Victor F. Brewer, dated September 4, 2008.  When

20  asked how long it would take to convert regular prison housing units for use as emergency high-

21  level ICF beds, Mr. Brewer testified that: "Salinas took four to six months to convert Delta-5 and

22  another four to six months for Delta-6.  Vacaville did it in 90 days." *Id.* at 180:14-19.  Mr.

23  Brewer's reference to "Vacaville" means the P-2 and P-3 units at CMF.

24        20.    Defendants operate two, temporary high custody ICF units at SVSP in the D-5 and

25  D-6 wings on Facility D.  Defendants opened the D-6 unit in May of 2006, followed by the D-5

26  unit in April of 2007.  (Docket No. 3544, Attachment C at p. 12 (Navigant Report)).  Both

27  programs were opened without adequate office and treatment space, leading Defendants' own

28  expert in the overcrowding matter to describe D-5 and D-6 as follows:  "[T]he unit in the D-

6

[299307-1]

building (which has been designated as temporary space) is [a] standard prison unit, without

adequate space for treatment, and difficulties in providing confidential 1:1 treatment

environments.  The problem is not with the census in the unit, but rather that *the space is not*

*appropriate for the purposes of providing intermediate care treatment to mentally ill inmates."*

Defs.' Exh. D-1019 at p. 10 (12/10/07 Expert Report of Dr. Ira Packer)**.**  As early as March of

2007, Victor Brewer, the director of the DMH programs at both CMF and SVSP, urged

defendants to construct adequate office and treatment space in the D-5 and D-6 units.  He wrote:

> On June 2006, I submitted a request to the Salinas Valley State Prison to
> construct three (3) group rooms and (1) interview room on each side of the
> divider within the current dining room between Delta-5 and Delta-6.  On or
> around June 12, 2006, a conversation was held between George Sifuentes,
> [Doug McKeever] and myself regarding the construction of the requested
> temporary group and interview rooms.  At this time Mr. Sifuentes opposed
> the addition of the group rooms, however, was willing to re-discuss the
> issue at a future date.  On October 24, 2006, I submitted a second memo to
> Dean Barchacky, SVSP Plant  Manager, requesting that pursuant to
> discussions with the representatives of the *Coleman* Federal Court, SVPP
> again formally requests that the six (6) group rooms and two (2) interview
> rooms be constructed to meet the expanding patient needs.
> Of major concern to SVPP staff is the lack of confidentiality
> because interviews are currently conducted in the dining room
> between Delta-5 and Delta-6, which is open to SVSP non-clinical
> staff (cooks, plant operations and custody officers).
> Having patient interviews and Treatment Team Conferences
> conducted in such an open area is a direct violation of acceptable
> patient care and is clearly a violation of the HIPPA and State
> statutes.

Pls.' Exh. P-158 at 1 (March 1, 2007 Memorandum from Victor Brewer to Doug McKeever).

During his deposition on September 4, 2008, Mr. Brewer explained that there were still no

treatment rooms for group or individual therapy in any of the six PODS that make up D-5 and D-

6, and that individual therapy is conducted in a vacated dining room.  *See* **Exhibit R** to this

declaration (Brewer deposition at p. 56).  Mr. Brewer also testified that defendants obtained

"somewhere around 12 or 14 program flexes" in order to open and run the D-units at SVSP as

well as the temporary P-2 and P-3 units at CMF.  (*Id.* at pp. 54-55)

[299307-1]

1    21.    Attached hereto as **Exhibit S** is a true and correct copy of Enclosure 3, pages R1-1

2 to R1-4, from the *Coleman* Monthly data for December 7, 2007, January 11, 2008, February 15,

3 2008, March 7, 2008, April 11, 2008, May 16, 2008, June 20, 2008, August 8, 2008, September

4 26, 2008, October 24, 2008, December 10, 2008, January 12, 2009, February 13, 2009,

5 February 27, 2009, and April 10, 2009.  Defendants provide their ASH census in this monthly

6 report, which averaged since December 2007, only 123 patients in the 256 ASH beds.  I

7 calculated this average number by adding the ASH patient population of each of these reports

8 (1851) and dividing that number by the total number of reports (15) to get 123.4.

9    I declare under penalty of perjury under the laws of California and the United States, that

10 the foregoing is true and correct, and that this declaration is executed in San Francisco,

11 California on June 9, 2009.

12

13                                             */s/ Jane E. Kahn*_____
                                              Jane E. Kahn

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

[299307-1]

# EXHIBIT A

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE     (REV 02/07) | IMS Mail Code: A15 |

**BUDGET YEAR 2008-09**

ORG CODE:___5225___ COBCP NO. _____ PRIORITY: _____ PROJECT ID:___61.47.007__

DEPARTMENT:     California Department of Corrections and Rehabilitation (CDCR)

PROJECT TITLE:    CSP-SAC Treatment and Office Space to Accommodate 192 Enhanced
Outpatient Program Inmate-Patients

TOTAL REQUEST (DOLLARS IN THOUSANDS): $___1,168_____ MAJOR/MINOR: MA

PHASE(S) TO BE FUNDED: __P____ PROJ CAT: __ECP-E__ CCCI/EPI: 4877

**SUMMARY OF PROPOSAL:** The purpose of this proposal is to design and construct office and treatment space for the Enhanced Outpatient Program (EOP) at the California State Prison, Sacramento (CSP-SAC). This project will provide the necessary program, treatment and office space to serve the existing 192 Level IV EOP inmate-patients housed in Facility B at CSP-SAC, by converting existing, unused warehouse space. The project is consistent with the August 2007 Supplemental Mental Health Bed Plan, approved by the *Coleman* court in October 2007. The total estimated cost of this project is $15,051,000.

HAS A BUDGET PACKAGE BEEN COMPLETED FOR THIS PROJECT? (E/U/N/?):_U_

REQUIRES LEGISLATION (Y/N): _N_ IF YES, LIST CODE SECTIONS: _____

REQUIRES PROVISIONAL LANGUAGE (Y/N) _N_

IMPACT ON SUPPORT BUDGET: ONE-TIME COSTS (Y/N):_N__ FUTURE COSTS (Y/N): N _____ FUTURE SAVINGS (Y/N):_N_ REVENUE (Y/N): _N_

DOES THE PROPOSAL AFFECT ANOTHER DEPARTMENT (Y/N): _N_ IF YES, ATTACH

COMMENTS OF AFFECTED DEPARTMENT SIGNED BY ITS DIRECTOR OR DESIGNEE.

**SIGNATURE APPROVALS:**

| Kim Garcia/SSMIII, DCHCS   1/24/08 | Dean L. Borg, Director, FASS, FPCM   3/12/08 |
|---|---|
| PREPARED BY                    DATE | REVIEWED BY                         DATE |
| Karen Wong, Deputy Director, DCHCS   3/26/08 | Deborah Hysen, Chief Deputy Secretary, FPCM   3/24/08 |
| DEPARTMENT DIRECTOR           DATE | AGENCY SECRETARY                   DATE |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DOF ANALYST USE**

DOF ISSUE #_____ PROGRAM CAT:___ PROJECT CAT:___ BUDG PACK STATUS:____
ADDED REVIEW:___ SUPPORT:____OTROS:____ FSCU:___ OSAE:___ CALSTARS: ____
PPBA: Original Signed By:           Date: APR 0 1 2008
          Chris Lief

(DF)-151 Rev 02/07

Case No. CIV S-90-0520 LKK JFM P (E.D. Cal)
C01-1351 THE (N.D. Cal)
PLTF Exhibit No. P - 390
Date Entered:_____
Signature:_____
Alternate Reference:_____

DSUPP001393

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 02/07) | IMS Mail Code:  A15 |
| **BUDGET YEAR 2008-09** | |

ORG CODE: __5225__  COBCP NO. _____  PRIORITY: _____  PROJECT ID: __61.47.007__

## A. PURPOSE OF THE PROJECT:

Introduction:

This proposal is to renovate existing warehouse space (once used by Prison Industries Authority) in Facility B at the California State Prison, Sacramento (CSP-SAC) in order to meet the treatment needs of seriously mentally disordered inmate-patients housed at the Enhanced Outpatient Program (EOP) level of care at CSP-SAC.  This project will provide the necessary program, treatment and office space to serve the existing 192 Level IV EOP inmate-patients housed in Facility B.   The project is consistent with the August 2007 Supplemental Mental Health Bed Plan, approved by the *Coleman* court in October 2007.

Submission of a 2008/09 Finance Letter on this project is due to an immediate risk to public safety and health.  This project is mandated by the California Department of Corrections and Rehabilitation (CDCR) Mental Health Bed Plan that was approved by the Coleman court in October 2005.  Failure to proceed with these projects in the 2008/09 fiscal year will lead to delays of at least 12 months, and CDCR will be faced with potential contempt citations from the court.

Background

The male inmate population, which presents the greater demand for mental health care, currently is housed at more than 200% of the designed capacity of the prisons in which these inmates are housed, leading to challenges in identifying and dedicating the necessary space to provide required mental health treatment programs.

The population of inmates with serious mental disorders has increased faster than the overall population. The prevalence of serious mental disorders among the male prison population has grown from 7.9% in 1996, when the Mental Health Service Delivery System (MHSDS) was established, to nearly 20% today. This is partially due to the improved identification of inmate-patients requiring mental health services, and the continuing degenerative nature of serious mental disorders.  The CDCR treats and manages approximately 30,500 inmates with serious mental disorders.  The most serious cases may be treated and sometimes controlled but not cured, and thus the demand for care continues to increase.  Inmates are screened for mental health problems when they enter CDCR at reception centers, and are assigned to different levels of mental health care, as appropriate.

As the mental health population is identified, the need for celled mental health beds has increased.  The CDCR must continue to convert General Population (GP) cells throughout the prison system to provide appropriate housing for these inmate-patients.  To date, CDCR has converted over 3,100 Level III and Level IV male GP beds for EOP housing.  However, these converted facilities currently do not provide sufficient treatment and program space to fully meet the requirements of the mental health programs, and these conversions exacerbate the system-wide shortage of cells by reducing the available housing for GP inmates. The shortage of mental health beds is especially severe for inmate-patients who require maximum-security housing.

(DF)-151 Rev 02/07

DSUPP001394

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 02/07) | IMS Mail Code: A15 |
| **BUDGET YEAR 2008-09** | |

ORG CODE:___5225___  COBCP NO. _____  PRIORITY: _____  PROJECT ID:___61.47.007___

*Existing Operation*
Mental Health Service Delivery System (MHSDS):
The CDCR is mandated under the federal constitution to provide adequate medical and mental health care to all inmates who require such services. "Deliberate indifference to medical needs", has long been held to be a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Several precedent setting cases have demonstrated that "deliberate indifference" is determined when inmates do not have timely access to staff, facilities, equipment, and procedures to diagnose and treat their medical and mental health problems.

The CDCR, over the past decade, has implemented the MHSDS, which provides clinical services and therapeutic programs to seriously mentally disordered inmates through inpatient and outpatient services. The MHSDS includes the following general components:

1) Reception center screening and evaluation;
2) Outpatient care programs: the Correctional Clinical Case Management System (CCCMS) for MHSDS inmates capable of living in the GP, the lowest level of care, and EOP for inmate-patients that require a structured living environment, the next level of care;
3) An inpatient care program: short term (10-day) crisis care in a Mental Health Crisis Bed (MHCB); and
4) Agreements with the Department of Mental Health (DMH) under section 2684 of the Penal Code for Intermediate Care Facility (ICF) and acute hospitalization for patients needing extended inpatient care, and day treatment for patients needing transitional outpatient care, the highest levels of care. Access to long-term inpatient and day treatment mental health care provided by DMH is a critical component of the MHSDS continuum of mental health care.

Since 1995, the federal court in *Coleman v. Schwarzenegger*, upon issuing its finding that the CDCR violated the U.S. Constitution in its treatment of seriously mentally disordered inmates, has continued to oversee the development and operation of the CDCR MHSDS.

Problem Statement
Due to CDCR's mental health inmate population pressures, CDCR activated 192 EOP beds at CSP-SAC in July 2006 (96 beds) and October 2006 (96 beds). CSP-SAC accommodated this population in Facility B by relocating existing GP Level IV inmates throughout the system. To provide for the treatment needs of this EOP population, CSP-SAC completed temporary retrofits and space conversions for treatment and office space, pending approval of major capital outlay funding for permanent space conversion. However, these temporary retrofits do not provide an adequate therapeutic environment for the seriously mentally disordered inmate-patients.

The 2006 Budget Act authorized preliminary plan funding to design program and treatment space, as defined by the MHSDS, to support 384 EOP level of care inmate-patients at CSP-SAC; preliminary plans were completed in March 2007. Subsequent to legislative

NARRATIVE, PAGE __3__ OF _6__

(DF)-151 Rev 02/07

| STATE OF CALIFORNIA<br>CAPITAL OUTLAY<br>BUDGET CHANGE PROPOSAL (COBCP)<br>COVER PAGE    (REV 02/07)<br>BUDGET YEAR 2008-09 | DEPARTMENT OF FINANCE<br>915 L Street<br>Sacramento, CA 95814<br>IMS Mail Code:  A15 |
|---|---|

ORG CODE:___5225___ COBCP NO._____ PRIORITY:_____ PROJECT ID:___61.47.007_

concerns regarding scope and cost, CDCR determined the project was erroneously "over scoped/programmed", by authorizing preliminary plan funds for a permanent space conversion for 384-EOP inmates.  The scope should have been for the existing 192 EOP inmates at Facility B, as there is sufficient space in Facility A to accommodate the EOP population in that facility.  Based on the August 2007 Supplemental Mental Health Bed Plan, CSP-SAC EOP population will remain at the current level of 384, with Facilities A & B each having 192 inmate-patients.

Department stakeholders, in coordination with the Department of Finance, agreed to cancel this over-scoped project and prepare a new budget package that: a) re-scopes the project to just the 192 EOP inmate-patients in Facility B;  b) provides control agencies with a revised future cost of design and construction; c) standardizes treatment and office space for the general population EOP level of care; and, d) maintains compliance with the *Coleman v. Schwarzenegger* court approved August 2007 Supplemental Mental Health Bed Plan.  Notice of the cancellation of the original project is pending notification to the Legislature and Public Work Board approval.  This proposal is the result of the new budget package.

## B. RELATIONSHIP TO THE STRATEGIC PLAN

This project is consistent with the CDCR Strategic Plan, Goal Number 7, Health Care Delivery, "to ensure an organization design and accompanying system to provide efficient delivery of quality health care."

The CDCR is mandated to provide mental health care to all inmates requiring care.  One critical test of the constitutionality of a health care program is timely access to appropriate care.  Therefore, CDCR must assure sufficient availability of outpatient and inpatient care for all inmate-patients who are clinically determined to require that level of care.  This project will assist in assuring the courts that CDCR is striving to provide sufficient mental health housing and treatment capacity for its mentally ill inmate-patients.

## C. ALTERNATIVES CONSIDERED:

Alternative #1: Renovate and expand existing space within Facility B at CSP-SAC to create treatment, therapy, and office space to support 192 EOP inmate-patients.

Project Advantages:
o  Will satisfy Coleman court requirement to provide mental health treatment and counseling space for EOP inmate-patients.
o  Is consistent with the August 2007 Supplemental Mental Health Bed Plan.

Project Disadvantages:
o  Requires Major Capital Outlay Funding

Estimated Project Cost:  $15,051,000

Alternative #2:  Continue to operate the Mental Health Program on Facility B for the 192 EOP inmate-patients within existing space.

NARRATIVE, PAGE __4__ OF _6_

(DF)-151 Rev 02/07

DSUPP001396

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 02/07) | IMS Mail Code: A15 |
| BUDGET YEAR 2008-09 | |

ORG CODE:___5225___    COBCP NO. _____    PRIORITY: _____    PROJECT ID:___61.47.007___

Project Advantages:
o    No capital outlay costs.

Project Disadvantages:
o    The temporary retrofits completed in 2006 do not provide an adequate therapeutic environment for the seriously mentally disordered inmate-patients.
o    Does not support the CDCR Supplemental Mental Health Bed Plan as approved by the *Coleman* court in October 2007; the Department would be subject to contempt of court.

## D.  RECOMMENDED SOLUTION:

1.  Which alternative and why.
    Alternative #1 is the recommended alternative, to renovate existing, unused PIA warehouse space at CSP-SAC in order to provide the necessary program, treatment and office space to serve the existing 192 Level IV EOP inmate-patients housed in Facility B at CSP-SAC. This alternative is consistent with the August 2007 Supplemental Mental Health Bed Plan approved by the *Coleman* court in October 2007.

2.  Detail scope description
    The PIA warehouse is located between Facility A and Facility B. The portion of the warehouse being converted is currently unused, and is located at the west end of the warehouse, adjacent to Facility B.  The proposed warehouse conversion will be single story with an area of approximately 17,000 square feet.  The scope includes the following:
    •    Site preparation work for extension of existing utilities including water, sewer, electrical and communications to the proposed building site. The project requires providing concrete pad and 12-ft high perimeter fencing and gates at the Chiller yard.
    •    Warehouse conversion: the building is a Type II-Fire Rated (FR) construction, B Occupancy. Maintenance will be performed to existing exterior walls, foundation, and roof system as required.  The non-bearing interior walls will be metal studs with a painted gypsum wallboard finish. Ceilings for the offices, working areas, record/file storage area, copy/supply room, and entrance lobby will be suspended acoustical tile. Ceilings in the restrooms and electrical equipment room will be suspended painted gypsum board. Vinyl composition tile flooring will be provided for the same areas receiving a suspended acoustical tile ceiling. The staff toilet rooms will have ceramic tile floors and wainscots. The electrical equipment room will have a sealed concrete floor and ceiling will be exposed to structure.
    •    Fire-Life Safety: New fire sprinkler system and fire alarm system will be installed; personal alarm system will also be provided.
    •    Roofing: New roofing over existing roof deck will be extended to 20' beyond the area of improvement in all directions. Roofing material will be single-ply mechanically attached geo-membrane, non-ballasted.
    •    Structural support will be provided for any new mechanical/other units and ductwork in the ceiling. Any new wall openings will be reinforced with new steel and anchorage details.

NARRATIVE, PAGE ___5___ OF _6__

(DF)-151 Rev 02/07

DSUPP001397

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 02/07) | IMS Mail Code:  A15 |
| **BUDGET YEAR 2008-09** | |

ORG CODE:___5225___ COBCP NO. _____    PRIORITY: _____ PROJECT ID:___61.47.007__

- New wall partitions consist of 6"x 20 gauge metal studs at 16" on center for office and treatment spaces while 8" masonry walls shall be used at holding area including the inmate toilet.
- Cooling:  The cooling methodology for the new mechanical system shall consist of a 60-ton air-cooled chiller located at the new outdoor chiller yard.
- Heating: The existing HVAC system consists of individual evaporative coolers which are beyond their useful economic life, and are not well suited for the new proposed use. Existing steam lines are available, and can be reused to provide heating for the new spaces. The steam shall be converted to hot water using a shell and tube heat exchanger. A five-horsepower pump with air separator and expansion tank will deliver water to rooftop air handling equipment and reheat coils within the building.
- Power Distribution: The improvements in the building will require (2) new pad mounted transformers.  No emergency power will be provided for this building.

3.  Basis for cost information.
    Based on Budget Package prepared by Kitchen CEM.

4.  Factors/benefits for recommending other than the least expensive alternative.
    Alternative #1 is in accordance with the Coleman court mandates and consistent with the court approved August 2007 Supplemental Mental Health Bed Plan.

5.  Complete description of impact on support budget.
    None.  This project provides treatment and counseling space for staff already assigned to the existing EOP inmate-patient population at this facility.

6.  Identify and explain any project risks.
    There are no identified risks associated with completion of this project.

7.  List requested interdepartmental coordination and/or special project approval (including mandatory reviews and approvals, e.g. technology proposals).
    Review and approval will be required by the Office of the State Fire Marshal.

8.  Proposed project schedule:
    | | | | |
    |---|---|---|---|
    | Preliminary Plans | Start 08/2008 | Complete | 10/2009 |
    | Working Drawings | Start 10/2009 | Complete | 05/2010 |
    | Construction | Start 07/2010 | Complete | 01/2012 |

ATTACHMENTS:
    Attachment A:  3-Page Estimate dated 2/20/08.

NARRATIVE, PAGE __6__ OF _6_

(DF)-151 Rev 02/07

DSUPP001398

# PROJECT COST SUMMARY

| | | | |
|---|---|---|---|
| PROJECT: | 192 EOP Treatment and Office Space at SAC | CONCEPT ESTIMATE: | 08CDCC7P |
| LOCATION: | California State Prison, Sacramento | EST./ PROJ. CCCI: | 4983/4983 |
| CLIENT | California Department of Corrections & Rehabilitation | DATE ESTIMATED: | 2/20/2008 |
| DESIGN BY: | TBD | DATE UPDATED: | N/A |
| PROJECT MGR: | Keith Beland | ABMS NO: | N/A |
| PLAN DATE: | TBD | PREPARED BY: | Patrick McCollam |
| | | DOF PROJ. I.D. NO.: | TBD |

## DESCRIPTION

The purpose of this project is to convert the existing Facility B warehouse space that was once used by Prison Industries Authority (PIA) to office and treatment space for the 192 Enhanced Outpatient Program inmate/patients housed in Facility B. The conversion of the PIA warehouse will include the construction of approximately 16,700 sf of space to accommodate administration, treatment, and custody services space. New roofing over existing roof deck will be installed on the entire Facility B warehouse. Single-ply mechanically attached geomembrane roofing materials, non-ballasted will be used. The structure is assumed sound and structural support will be provided for any new mechanical/other units and ductwork in the heating, ventilation and air conditioning system will be installed. The proposed location of the chiller yard is in the open area west of the building. The existing steam piping will be used for heating. The existing utilities including electrical, water and sewer are assumed to have sufficient capacity to handle the needs of this project. A new fire safety system and personal alarm system for this space will be installed. The goal of this project is to meet LEED Silver certification. The medical supply storage will be relocated into an approximately 12,000 sf space within the same warehouse.

## ESTIMATE SUMMARY

| | Item | | Cost |
|---|---|---|---|
| Item 1 | Demolition | | $96,000 |
| Item 2 | Sitework | | $194,000 |
| Item 3 | Building (aprox. 16,700 sf Treatment/Office space) | | $4,890,000 |
| Item 4 | Rebuild Medical Storage (aprox 12,000 sf) | | $1,125,000 |
| Item 5 | Roofing | | $1,632,000 |
| | Subtotal | | $7,937,000 |
| | **ESTIMATED TOTAL CURRENT COSTS:** | | $7,937,000 |
| | Adjust CCCI from 4983 to 4983 | $0 | |
| | **ESTIMATED TOTAL CURRENT COSTS ON JANUARY 2008:** | | $7,937,000 |
| | Escalation to Start of Construction 31 Months @ 0.42%/Mo.: | $1,033,000 | |
| | Escalation to Mid Point of Construction 8 Months @ 0.42%/Mo.: | $301,000 | |
| | **ESTIMATED TOTAL CONTRACTS:** | | $9,271,000 |
| | Contingency At: 7% | $649,000 | |
| | **ESTIMATED TOTAL CONSTRUCTION COST** | | $9,920,000 |

080318_C7_SAC_192_EOP_3_Pager.xls

DSUPP001399

# SUMMARY OF COSTS BY PHASE

PROJECT:   192 EOP Treatment and Office Space at SAC
LOCATION:  California State Prison, Sacramento
CLIENT:    California Department of Corrections & Rehabilitation

CONCEPT ESTIMATE:              08CDCC7P
DATE ESTIMATED:                2/20/2008
DATE UPDATED:                       N/A
PREPARED BY:          Patrick McCollam

| | | |
|---|---|---|
| CONSTRUCTION DURATION: | | 16 Months |
| ESTIMATED CONTRACT COST: | $9,271,000 | $9,271,000 |
| CONSTRUCTION CONTINGENCY: | $649,000 | $649,000 |
| TOTAL | $9,920,000 | $9,920,000 |

| CATEGORY | STUDY 00 | PRELIMINARY PLANS 01 | WORKING DRAWINGS 02 | CONSTRUCTION 03 | TOTAL |
|---|---|---|---|---|---|
| **ARCHITECTURAL AND ENGINEERING SERVICES** | | | | | |
| A&E Design | | $675,000 | $675,000 | $337,000 | $1,687,000 |
| Construction Inspection | | | | $216,000 | $216,000 |
| Construction Inspection Travel | | | | $45,000 | $45,000 |
| Coordination & Contract Management | | | | | $0 |
| Advertising, Printing and Mailing | | | $24,000 | | $24,000 |
| Construction Guarantee Inspection | | | | $15,000 | $15,000 |
| **SUBTOTAL A&E SERVICES** | $0 | $675,000 | $699,000 | $613,000 | $1,987,000 |
| | | | | | |
| **OTHER PROJECT COSTS** | | | | | |
| Special Consultants | | $119,000 | $46,000 | $168,000 | $333,000 |
| Materials Testing | | | | $150,000 | $150,000 |
| Project/Construction Management | | $99,000 | $99,000 | $298,000 | $496,000 |
| Contract Construction Management | | | $65,000 | $390,000 | $455,000 |
| Site Acquisition Cost & Fees | | | | | $0 |
| Agency Retained Items | | | | $1,035,000 | $1,035,000 |
| DVBE Assessment - Const. | | | | $3,000 | $3,000 |
| Structural Peer Review | | $0 | $0 | $0 | $0 |
| Essential Services | | $0 | | | $0 |
| Hospital Checking - Health Care Review | | $0 | $0 | $0 | $0 |
| State Fire Marshal | | $1,000 | $2,000 | $8,000 | $11,000 |
| Access Compliance Checking | | | $1,000 | $1,000 | $2,000 |
| Other - Local Mitigation | | | | $0 | $0 |
| Other - Due Diligence | | $25,000 | | | $25,000 |
| Other - Equipment | | | | | $0 |
| Other - Program Management | | $198,000 | $198,000 | $99,000 | $495,000 |
| Other - Health Services Checking | | $1,000 | $1,000 | $1,000 | $3,000 |
| Other - OCIP | | | $38,000 | $48,000 | $86,000 |
| Environmental Document | | $50,000 | | $0 | $50,000 |
| **SUBTOTAL OTHER PROJECT COSTS** | $0 | $493,000 | $450,000 | $2,201,000 | $3,144,000 |
| | | | | | |
| **SUBTOTAL OF A&E AND OTHER COSTS** | $0 | $1,168,000 | $1,149,000 | $12,734,000 | $15,051,000 |
| LESS FUNDS TRANSFERRED | | | | | $0 |
| LESS FUNDS AVAILABLE NOT TRANSFERRED | | | | | $0 |
| CARRY OVER | | $0 | $1,168,000 | $2,317,000 | |
| **BALANCE OF FUNDS REQUIRED** | $0 | $1,168,000 | $2,317,000 | $15,051,000 | $15,051,000 |

080311_C7_SAC_192_EOP_3_Pager.xls

DSUPP001400

# FUNDING DATA & ESTIMATE NOTES

PROJECT:  192 EOP Treatment and Office Space at SAC
LOCATION: California State Prison, Sacramento
CLIENT:   California Department of Corrections & Rehabilitation

BUDGET ESTIMATE:                     08CDCC7P
DATE ESTIMATED:                     2/20/2008
DATE UPDATED:                            N/A
PREPARED BY:                  Patrick McCollam

## FUNDING DATE

| Charter / Item | Phase | Amount | Totals |
|---|---|---|---|
| **Fund Transfers** | | | |
| | | | $0 |
| **Total Funds Transferred** | | | $0 |
| **Funds Available Not Transferred** | | | |
| | | | |
| **Total Funds Available not Transferred** | | | $0 |
| **Total Funds Transferred and Available** | | | $0 |

## ESTIMATE NOTES

1.  The construction costs in this estimate are indexed from the CCCI Index as of the date of estimate preparation. The project estimate is then escalated to the scheduled start of construction and then to an assumed construction midpoint in accordance with Budget Letter BL 05-21.

2. Estimated costs for the following Agency Retained Items that will be incurred during the construction phase of the project. Agency Retained items have not been verified by CDCR.

| | |
|---|---|
| Guarding Costs | $205,000 |
| Telecommunications | $350,000 |
| Group II Equipment | $464,000 |
| Landscaping | $0 |
| PIA Equipment | $0 |
| Permits & signs | $0 |
| Utility Costs | $16,000 |
| **Total:** | **$1,035,000** |

3. This project will require a Proposed Mitigated Negative Declaration.

4. The schedule assumes funding for Preliminary Plans in FY 08/09, Working Drawings in FY 09/10 & Construction in FY 10/11.

080311_C7_SAC_192_EOP_3_Pager.xls

DSUPP001401

| STATE OF CALIFORNIA | | | | | | Budget Year 2008-09 | |
|---|---|---|---|---|---|---|---|
| CAPITAL OUTLAY BUDGET CHANGE PROPOSAL (COBCP) | | | | | | Org Code: | 5225 |
| FISCAL IMPACT WORKSHEET | | | | | | COBCP #: | |
| Department Title: | California Department of Corrections and Rehabilitation | | | | | Priority: | |
| Project Title: | California State Prison, Sacramento: EOP Treatment Space for 192 Inmates | | | | | Proj ID: | 61.47.007 |
| Program Category: | Enrollment/Caseload/Population - Existing | | | | | MA/MI: | MA |
| Program Subcategory: | Programs | | | | | | |

| FUNDING | | | Existing Authority | January 10 Action | April 1 Action | May 1 Action | Special Action | Net Legis Changes | Project Total |
|---|---|---|---|---|---|---|---|---|---|
| org-ref-fund-yoa-yob | ph | action | | | | | | | |
| 5225-301-0001-08-08 | P | BA | | | 1,168 | | | | 1,168 |
| 5225-301-0001-09-09 | W | FF | | | 1,149 | | | | 1,149 |
| 5225-301-0001-09-09 | C | FF | | | 12,734 | | | | 12,734 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| TOTAL FUNDING | | | 0 | 0 | 15,051 | 0 | 0 | 0 | 15,051 |
| PROJECT COSTS | | | | | | | | | 0 |
| Study | | | | | | | | | 0 |
| Acquisition | | | | | | | | | 0 |
| Preliminary Plans | | | | | 1,168 | | | | 1,168 |
| Working Drawings | | | | | 1,149 | | | | 1,149 |
| Total Construction | | | | 0 | 12,270 | 0 | 0 | 0 | 12,270 |
| Equipment (Group 2) | | | | | 464 | | | | 464 |
| TOTAL COSTS | | | 0 | 0 | 15,051 | 0 | 0 | 0 | 15,051 |
| CONSTRUCTION DETAIL | | | | | | | | | 0 |
| Contract | | | | | 9,271 | | | | 9,271 |
| Contingency | | | | | 649 | | | | 649 |
| A&E | | | | | 613 | | | | 613 |
| Agency Retained | | | | | 571 | | | | 571 |
| Other | | | | | 1,166 | | | | 1,166 |
| TOTAL CONSTRUCTION | | | | 0 | 12,270 | 0 | 0 | 0 | 12,270 |
| FUTURE FUNDING | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| SCHEDULE | mm/dd/yyyy | PROJECT SPECIFIC CODES | | | |
|---|---|---|---|---|---|
| Study Completion | | Proj Mgmt | CDCR | Location | CSP Sacramento |
| Acquisition Approval | | Budg Pack | N | County | Sacramento |
| Start Preliminary Plans | 8/1/2008 | Proj Cat | ECP-E | City | Represa |
| Preliminary Plan Approval | 10/1/2009 | Req Legis | N | Cong Dist | 4 |
| Approval to Proceed to Bid | 5/1/2010 | Req Prov | N | Sen Dist | 6 |
| Contract Award Approval | 7/1/2010 | SO/LA Imp | SO | Assm Dist | 4 |
| Project Completion | 1/1/2012 | | | | |

DSUPP001402

| STATE OF CALIFORNIA, | | Budget Year 2008-09 | |
|---|---|---|---|
| CAPITAL OUTLAY BUDGET CHANGE PROPOSAL (COBCP) | | Org Code: | 5225 |
| FISCAL DETAIL WORKSHEET | | COBCP #: | 0 |
| Department Title: | California Department of Corrections and Rehabilitation | Priority: | 0 |
| Project Title: | California State Prison, Sacramento: EOP Treatment Space for 192 Inmates | Proj ID: | 61.47.007 |
| Program Category: | Enrollment/Caseload/Population - Existing | MA/MI: | MA |
| Program Subcategory: | Programs | | |

*Identify all items which fit into the categories listed below. Attach a detailed list if funding is included in this request. Provide descriptions and summary estimates for items for which you plan to request funding in the future. When possible, ident*

| PROJECT RELATED COSTS | COST | TOTAL |
|---|---|---|
| AGENCY RETAINED: | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL AGENCY RETAINED | | 0 |
| GROUP 2 EQUIPMENT | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL GROUP 2 EQUIPMENT | | 0 |

| IMPACT ON SUPPORT BUDGET | COST | TOTAL |
|---|---|---|
| ONE-TIME COSTS: | | |
| | | |
| | | |
| TOTAL SUPPORT ONE-TIME COSTS | | 0 |
| ANNUAL ONGOING FUTURE COSTS: | | |
| | | |
| | | |
| TOTAL SUPPORT ANNUAL COSTS | | 0 |
| ANNUAL ONGOING FUTURE SAVINGS: | | |
| | | |
| | | |
| TOTAL SUPPORT ANNUAL SAVINGS | | 0 |
| ANNUAL ONGOING FUTURE REVENUE: | | |
| | | |
| | | |
| TOTAL SUPPORT ANNUAL REVENUE | | 0 |

DSUPP001403

| STATE OF CALIFORNIA | | Budget Year 2008-09 | |
|---|---|---|---|
| CAPITAL OUTLAY BUDGET CHANGE PROPOSAL (COBCP) | | Org Code: | 5225 |
| SCOPE/ASSUMPTIONS WORKSHEET | | COBCP #: | 0 |
| | | Priority: | 0 |
| Department Title: | California Department of Corrections and Rehabilitation | Proj ID: | 61.47.007 |
| Project Title: | California State Prison, Sacramento: EOP Treatment Space for 192 Inmates | MA/MI: | MA |
| Program Category: | Enrollment/Caseload/Population - Existing | | |
| Program Subcategory: | Programs | | |

*Project Specific Proposals: For new projects provide proposed Scope language. For continuing projects provide the latest approved Scope language. Enter Scope language in cell A111. If you get a message that A111 is full, continue the description in A*

*Conceptual Proposals: Provide a brief discussion of proposal defining assumptions supporting the level of funding proposed by fiscal year in relation to outstanding need identified for that fiscal year. (BY in cell A 111-A115, BY +1 in cell A117-A120, B*

This project will design and construct office and treatment space for the existing 192 Level IV EOP inmates in Facility B at CSP Sac by converting existing unused warehouse space.

*Enter BY+1 in cell A117:*

*Enter BY+2 in cell A122:*

*Enter BY+3 in cell A127:*

*Enter BY+4 in cell A132:*

DSUPP001404

# EXHIBIT B

# CONFIDENTIAL

## Mental Health Population  -  Placement Per Institution

### Download Date April 10, 2009

| | | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP | II | 1,099 | 1,310 | 119% | | 15 | | | 1,325 |
| ASP Ad-Seg | | | 47 | | | 5 | | | 52 |
| CAL | I,IV + | | 4 | | | | | | 4 |
| CAL Ad-Seg | | | 2 | | | | | | 2 |
| CCC | I,II,III | | 0 | | | | | | 0 |
| CCI | I,II,III,IV * | 1,053 | 631 | 60% | | 23 | | | 654 |
| CCI Ad-Seg | | | 97 | | | 19 | | | 116 |
| CCI-RC | | 166 | 224 | 135% | | 20 | | | 244 |
| CCI-SHU | | 130 | 153 | 118% | | 11 | | | 164 |
| CCWF | | 739 | 912 | 123% | 54 | 44 | 81% | 12 | 956 |
| CCWF Ad-Seg | | | 26 | | | 1 | | | 27 |
| CCWF-RC | | 110 | 174 | 158% | | 1 | | | 175 |
| CEN | III | | 7 | | | | | | 7 |
| CEN Ad-Seg | | | 1 | | | | | | 1 |
| CIM | I | 366 | 501 | 137% | | 22 | | 34 | 523 |
| CIM-RC | | 633 | 760 | 120% | | 185 | | | 945 |
| CIM-RC--Ad-Seg | | | 96 | | | 15 | | | 111 |
| CIW | | 349 | 539 | 154% | 75 | 69 | 92% | 10 | 608 |
| CIW-RC | | 100 | 134 | 134% | | 1 | | | 135 |
| CIW-RC--Ad-Seg | | | 9 | | 10 | 12 | 120% | | 21 |
| CMC | I,II,III | 1,049 | 1,133 | 108% | 580 | 524 | 90% | 36 | 1,657 |
| CMC Ad-Seg | | | 46 | | 54 | 41 | 76% | | 87 |
| CMF | I,II,III | 599 | 588 | 98% | 533 | 615 | 115% | | 1,203 |
| CMF Ad-Seg | | | 13 | | 58 | 42 | 72% | | 55 |
| CMF** | | | 72 | | | 0 | | | 72 |
| COR | I,III,IV + * | 499 | 609 | 122% | 150 | 143 | 95% | 23 | 752 |
| COR Ad-Seg | | | 175 | | 54 | 49 | 91% | | 224 |
| COR-SHU | | 450 | 467 | 104% | | | | | 467 |
| CRC-M | II | 848 | 800 | 94% | | | | | 800 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health numbers are as accurate as the information provided by the DDPS identifier system.

* + " is a 270 Design Facility.  * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

***Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.   SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Beginning 8/2/06, CMC reflects a temporary MHCB capacity of 36 due to a court order.

CRC-M does not include the SNY population.

Health Care Placement Oversight Program

R1-1

4/10/2009

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| CTF <sup>I,II</sup> | 699 | 848 | 121% | | 4 | | | **852** |
| CTF Ad-Seg | | 50 | | | 1 | | | **51** |
| CVSP <sup>I,II</sup> | | 21 | | | 3 | | | **24** |
| DVI <sup>I,II</sup> | 85 | 72 | 85% | | 4 | | | **76** |
| DVI Ad-Seg | | 44 | | | 8 | | | **52** |
| DVI-RC | 564 | 460 | 82% | | 34 | | | **494** |
| DVI-RC--Ad-Seg | | 63 | | | 11 | | | **74** |
| FOL <sup>III</sup> | 599 | 721 | 120% | | 6 | | | **727** |
| FOL Ad-Seg | | 45 | | | 1 | | | **46** |
| HDSP <sup>I,II,IV *</sup> | 608 | 673 | 111% | | 10 | | 10 | **683** |
| HDSP Ad-Seg | | 70 | | | 2 | | | **72** |
| HDSP-RC | 91 | 101 | 111% | | 8 | | | **109** |
| ISP <sup>I,III</sup> | | 6 | | | | | | **6** |
| ISP Ad-Seg | | 4 | | | 1 | | | **5** |
| KVSP <sup>I,IV</sup> | 1,000 | 1,021 | 102% | 96 | 108 | 113% | 12 | **1,129** |
| KVSP Ad-Seg | | 84 | | | 11 | | | **95** |
| LAC <sup>I,II,IV +</sup> | 1,000 | 292 | 29% | 300 | 277 | 92% | 12 | **569** |
| LAC Ad-Seg | | 138 | | 54 | 70 | 130% | | **208** |
| LAC-RC | 149 | 463 | 311% | | 129 | | | **592** |
| MCSP <sup>I,II,III,IV +</sup> | 999 | 1,316 | 132% | 510 | 441 | 86% | 8 | **1,757** |
| MCSP Ad-Seg | | 53 | | 36 | 32 | 89% | | **85** |
| NKSP <sup>I,III</sup> | 80 | 108 | 135% | | 2 | | 10 | **110** |
| NKSP-RC | 719 | 782 | 109% | | 70 | | | **852** |
| NKSP-RC--Ad-Seg | | 47 | | | 4 | | | **51** |
| PBSP <sup>I,IV *</sup> | 349 | 306 | 88% | 66 | 70 | 106% | 10 | **376** |
| PBSP Ad-Seg | | 65 | | | | | | **65** |
| PBSP SHU | | 9 | | | | | | **9** |
| PVSP <sup>I,III</sup> | 1,299 | 1,510 | 116% | | 8 | | 6 | **1,518** |
| PVSP Ad-Seg | | 132 | | | 6 | | | **138** |
| RJD <sup>I,III</sup> | 800 | 824 | 103% | 330 | 307 | 93% | 14 | **1,131** |
| RJD Ad-Seg | | 87 | | 63 | 60 | 95% | | **147** |
| RJD-RC | 399 | 430 | 108% | | 83 | | | **513** |
| SAC <sup>I,IV *</sup> | 849 | 757 | 89% | 384 | 387 | 101% | 24 | **1,144** |
| SAC Ad-Seg | | 85 | | 74 | 59 | 80% | | **144** |

\*\*This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health numbers are as accurate as the information provided by the DDPS identifier system.

" + " is a 270 Design Facility.  " * " is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

\*\*\*Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.   SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Beginning 8/2/06, CMC reflects a temporary MHCB capacity of 36 due to a court order.

CRC-M does not include the SNY population.

Health Care Placement Oversight Program

R1-2

4/10/2009

| | CCCMS | | | | EOP | | | MHCB | Total Mental Health Pop |
| | Capacity | Current Pop | % of Capacity | | Capacity | Current Pop | % of Capacity | Capacity | |
|---|---|---|---|---|---|---|---|---|---|
| **SAC SHU** | | 34 | | | | | | | **34** |
| **SATF** *II,III,IV* * | 1,199 | 1,465 | 122% | | | 14 | | 20 | **1,479** |
| **SATF Ad-Seg** | | 101 | | | | 6 | | | **107** |
| **SCC** *I,II,III* | 499 | 607 | 122% | | | 4 | | | **611** |
| **SCC Ad-Seg** | | 28 | | | | 7 | | | **35** |
| **SOL** *II,III* | 1,199 | 1,286 | 107% | | | 8 | | 9 | **1,294** |
| **SOL Ad-Seg** | | 79 | | | | 2 | | | **81** |
| **SQ** *I,II* *** | 350 | 535 | 153% | | | 53 | | | **588** |
| **SQ-RC** | 549 | 526 | 96% | | | 37 | | | **563** |
| **SQ-RC--Ad-Seg** | | 47 | | | 36 | 24 | 67% | | **71** |
| **SVSP** *I,IV* * | 999 | 978 | 98% | | 192 | 190 | 99% | 10 | **1,168** |
| **SVSP Ad-Seg** | | 215 | | | 45 | 53 | 118% | | **268** |
| **VSPW** | 606 | 850 | 140% | | | 6 | | | **856** |
| **VSPW Ad-Seg** | | 25 | | | 9 | 7 | 78% | | **32** |
| **VSPW SHU** | | 29 | | | | | | | **29** |
| **VSPW-RC** | 143 | 205 | 143% | | | 8 | | | **213** |
| **WSP** *I,III* | 105 | 70 | 67% | | | | | 6 | **70** |
| **WSP Ad-Seg** | | 43 | | | | 20 | | | **63** |
| **WSP-RC** | 944 | 989 | 105% | | | 90 | | | **1,079** |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health numbers are as accurate as the information provided by the DDPS identifier system.

" + " is a 270 Design Facility.  " * " is a 180 Design Facility.

Grand Totals do not include MHCB data
COR Ad-Seg EOP housing is located in the SHU.
***Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.   SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Beginning 8/2/06, CMC reflects a temporary MHCB capacity of 36 due to a court order.

CRC-M does not include the SNY population.

Health Care Placement Oversight Program

*R1-3*

4/10/2009

# EXHIBIT C

# Mental Health Adseg/SHU/PSU

**April 10, 2009**

| | | MH POPULATION IN AD SEG | | | AD SEG CAPACITY | MH PERCENT OF AD SEG* | | |
|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| ASP | II | 5 | 47 | 52 | 175 | 2.86% | 26.86% | 29.71% |
| CAL | I,IV | | 2 | 2 | 300 | 0.00% | 0.67% | 0.67% |
| CCI | I,II,III,IV | 19 | 97 | 116 | 327 | 5.81% | 29.66% | 35.47% |
| CCWF | | 1 | 26 | 27 | 61 | 1.64% | 42.62% | 44.26% |
| CEN | III | | 1 | 1 | 350 | 0.00% | 0.29% | 0.29% |
| CIM-RC | I | 15 | 96 | 111 | 356 | 4.21% | 26.97% | 31.18% |
| CIW | | | | | 56 | | 0.00% | |
| CIW-RC | | 12 | 9 | 21 | 56 | 21.43% | 16.07% | 37.50% |
| CMC | I,II,III | 41 | 46 | 87 | 226 | 18.14% | 20.35% | 38.50% |
| CMF | I,II,III | 42 | 32 | 74 | 164 | 25.61% | 19.51% | 45.12% |
| COR | I,III,IV | 49 | 175 | 224 | 460 | 10.65% | 38.04% | 48.70% |
| CTF | I,II | 1 | 50 | 51 | 228 | 0.44% | 21.93% | 22.37% |
| DVI | I,II | 8 | 44 | 52 | 303 | 2.64% | 14.52% | 17.16% |
| DVI-RC | I,II | 11 | 63 | 74 | 303 | 3.63% | 20.79% | 24.42% |
| FOL | III | 1 | 45 | 46 | 138 | 0.72% | 32.61% | 33.33% |
| HDSP | I,III,IV | 2 | 70 | 72 | 343 | 0.58% | 20.41% | 20.99% |
| ISP | I,III | 1 | 4 | 5 | 175 | 0.57% | 2.29% | 2.86% |
| KVSP | I,IV | 11 | 84 | 95 | 396 | 2.78% | 21.21% | 23.99% |
| LAC | I,III,IV | 70 | 138 | 208 | 450 | 15.56% | 30.67% | 46.22% |
| MCSP | I,II,III,IV | 32 | 53 | 85 | 175 | 18.29% | 30.29% | 48.57% |
| NKSP-RC | I,III | 4 | 47 | 51 | 175 | 2.29% | 26.86% | 29.14% |
| PBSP | I,IV | | 65 | 65 | 246 | 0.00% | 26.42% | 26.42% |
| PVSP | I,III | 6 | 132 | 138 | 350 | 1.71% | 37.71% | 39.43% |
| RJD | I,III | 60 | 87 | 147 | 350 | 17.14% | 24.86% | 42.00% |
| SAC | I,IV | 59 | 85 | 144 | 406 | 14.53% | 20.94% | 35.47% |
| SATF | II,III,IV | 6 | 101 | 107 | 325 | 1.85% | 31.08% | 32.92% |
| SCC | I,II,III | 7 | 28 | 35 | 175 | 4.00% | 16.00% | 20.00% |
| SOL | II,III | 2 | 79 | 81 | 350 | 0.57% | 22.57% | 23.14% |
| SQ-RC | I,II | 24 | 47 | 71 | 379 | 6.33% | 12.40% | 18.73% |
| SVSP | I,IV | 53 | 215 | 268 | 439 | 12.07% | 48.97% | 61.05% |
| VSPW | | 7 | 25 | 32 | 76 | 9.21% | 32.89% | 42.11% |

Mental Health and HIV numbers are as accurate as the information
provided by the respective DDPS identifier systems.

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

Health Care Placement Oversight Program
4/10/2009

| WSP *I,III* | 20 | 43 | **63** | 175 | 11.43% | 24.57% | **36.00%** |
|---|---|---|---|---|---|---|---|

| **Totals** | **569** | **2036** | **2605** | **5504** | **10.34%** | **36.99%** | **47.33%** |
|---|---|---|---|---|---|---|---|

| | **MH POPULATION IN PSU** | | | **PSU CAPACITY** | **MH PERCENT OF PSU** | | |
|---|---|---|---|---|---|---|---|
| | **EOP** | **CCCMS** | **TOTAL** | | **EOP** | **CCCMS** | **TOTAL** |
| **CIW** | 6 | 0 | **6** | 10 | 60.00% | 0.00% | **60.00%** |
| **PBSP** *I,IV* | 113 | 4 | **117** | 128 | 88.28% | 3.13% | **91.41%** |
| **SAC** | 241 | 5 | **246** | 256 | 125.52% | 2.60% | **128.13%** |

| | **MH POPULATION IN SHU** | | | **SHU CAPACITY** | **MH PERCENT OF SHU** | | |
|---|---|---|---|---|---|---|---|
| | **EOP** | **CCCMS** | **TOTAL** | | **EOP** | **CCCMS** | **TOTAL** |
| **COR** *I,III,IV* | | 467 | **467** | 1400 | 0.00% | 33.36% | **33.36%** |
| **VSPW** | 0 | 29 | **29** | 44 | 0.00% | 65.91% | **65.91%** |
| **CCI** | 11 | 153 | **164** | 274 | 4.01% | 55.84% | **59.85%** |

| **Total** | **11** | **649** | **660** | **1718** | **0.64%** | **37.78%** | **38.42%** |
|---|---|---|---|---|---|---|---|

Mental Health and HIV numbers are as accurate as the information

    provided by the respective DDPS identifier systems.

*R2-2*

Health Care Placement Oversight Program

4/10/2009

*Ad Seg Capacities do not include "overflow."  Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

# EXHIBIT D

```
Data Analysis Unit                        Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                          State of California
Offender Information Services Branch                                   April 13, 2009
                        WEEKLY REPORT OF POPULATION
                        AS OF MIDNIGHT April 8, 2009
```

| | FELON/ OTHER | CIVIL ADDICT | TOTAL | CHANGE SINCE 04/09/08 NO. | PCT. | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|---|---|
| A. TOTAL INSTITUTIONS | 167,992 | 860 | 168,852 | -1,617 | -0.9 | | | |
| I.  IN-STATE | 161,356 | 860 | 162,216 | -8,253 | -4.8 | | | |
| (MEN, Subtotal) | 150,447 | 623 | 151,070 | -4,774 | -3.0 | | | |
| (WOMEN, Subtotal) | 10,909 | 237 | 11,146 | -204 | -1.7 | | | |
| 1. INSTITUTIONS/CAMPS | 155,943 | 855 | 156,798 | -3,754 | -2.3 | 83,282 | 188.3 | 159,877 |
| INSTITUTIONS | 151,637 | 855 | 152,492 | -3,663 | -2.3 | 79,044 | 192.9 | 155,518 |
| CAMPS(CCC & SCC) | 4,306 | | 4,306 | -91 | -2.0 | 4,238 | 101.6 | 4,359 |
| 2. COMMUNITY CORR. CTRS. | 5,240 | 5 | 5,245 | -1,198 | -18.5 | 5,844 | 89.8 | |
| CCF PRIVATE | 2,642 | | 2,642 | -354 | -11.8 | 2,752 | 96.0 | |
| CCF PUBLIC | 2,063 | | 2,063 | -705 | -25.4 | 2,461 | 83.8 | |
| DRUG TREATMT FURLOUGH | 342 | 5 | 347 | -64 | -15.5 | 440 | 78.9 | |
| PRISONER MOTHER PGM | 69 | | 69 | +3 | +4.5 | 70 | 98.6 | |
| FAMILY FOUNDATION PGM | 73 | | 73 | +12 | +19.6 | 70 | 104.3 | |
| WORK FUR. IN CUSTODY | 51 | | 51 | -18 | -26.0 | 51 | 100.0 | |
| 3. DMH STATE HOSPITALS | 173 | | 173 | -26 | -13.0 | | | |
| II. OUT OF STATE(COCF) | 6,636 | 0 | 6,636 | | | | | |
| ARIZONA | 3,467 | | 3,467 | | | | | |
| MISSISSIPPI | 2,231 | | 2,231 | | | | | |
| OKLAHOMA | 938 | | 938 | | | | | |
| B. PAROLE | 114,462 | 1,359 | 115,821 | -10,580 | -8.3 | | | |
| COMMUNITY SUPERVISION | 113,044 | 1,359 | 114,403 | -10,487 | -8.3 | | | |
| COOPERATIVE CASES | 1,418 | | 1,418 | -93 | -6.1 | | | |
| C. NON-CDC JURISDICTION | 1,731 | 0 | 1,731 | -158 | -8.3 | | | |
| OTHER STATE/FED. INST. | 494 | | 494 | -23 | -4.4 | | | |
| OUT OF STATE PAROLE | 1,033 | | 1,033 | -171 | -14.2 | | | |
| OUT OF STATE PAL | 65 | | 65 | -2 | -2.9 | | | |
| CYA-W&IC 1731.5(c) | | | | | | | | |
| INSTITUTIONS | 139 | | 139 | +38 | +37.6 | | | |
| D. OTHER POPULATIONS | 18,847 | 102 | 18,949 | -1,627 | -7.9 | | | |
| INMATES | | | | | | | | |
| OUT-TO-COURT, etc. | 2,184 | 22 | 2,206 | -130 | -5.5 | | | |
| ESCAPED | 213 | | 213 | -8 | -3.6 | | | |
| PAROLEES (PAL/RAL) | 16,450 | 80 | 16,530 | -1,489 | -8.2 | | | |
| TOTAL CDCR POPULATION | 303,032 | 2,321 | 305,353 | -10,707 | -3.3 | | | |

```
CHANGE FROM LAST WEEK
   A. TOTAL INSTITUTIONS      +8       +6      +14
        (MEN, Subtotal)     +126       +3     +129
      (WOMEN, Subtotal)      -54       +3      -51
   B. PAROLE              -1,644        0   -1,644
   D. PAROLEES (PAL/RAL)    -229        0     -229
This report contains the latest available reliable population figures from OBIS.  They have been
carefully audited, but are preliminary, and therefore subject to revision.

 Figure excludes institution based camps.  Total persons in camps, including base camps, are
 4,319 .  Base camp at CMC is included in institution counts.
Report # TPOP-1W.  Questions:     (916) 327-3262  (CALNET) 467-3262.
```

WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT April 8, 2009

| INSTITUTIONS/CAMPS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| **MALE** | | | | | | |
| ASP  (AVENAL SP) | 6,424 | | 6,424 | 2,820 | 227.8 | 6,878 |
| CCC  (CAL CORRECTL CTR) | 5,496 | | 5,496 | 3,883 | 141.5 | 5,724 |
| CCI  (CAL CORRECTL INSTITN) | 5,160 | | 5,160 | 2,608 | 197.9 | 5,835 |
| CIM  (CAL INSTITN FOR MEN) | 5,899 | 12 | 5,911 | 2,976 | 198.6 | 6,011 |
| CMF  (CAL MEDICAL FACIL) | 2,782 | | 2,782 | 2,297 | 121.1 | 3,000 |
| CMC  (CAL MEN'S COLONY) | 6,384 | | 6,384 | 3,838 | 166.3 | 6,488 |
| CRC  (CAL REHAB CTR, MEN) | 3,691 | 559 | 4,250 | 2,491 | 170.6 | 4,332 |
| CAL  (CAL SP, CALIPATRIA) | 4,225 | | 4,225 | 2,308 | 183.1 | 4,218 |
| CEN  (CAL SP, CENTINELA) | 4,768 | | 4,768 | 2,308 | 206.6 | 4,916 |
| COR  (CAL SP, CORCORAN) | 5,506 | | 5,506 | 2,995 | 183.8 | 5,511 |
| LAC  (CAL SP, LOS ANGELES CO) | 4,794 | | 4,794 | 2,400 | 199.8 | 5,027 |
| SAC  (CAL SP, SACRAMENTO) | 2,925 | | 2,925 | 1,828 | 160.0 | 2,979 |
| SQ   (CAL SP, SAN QUENTIN) | 5,303 | 6 | 5,309 | 3,082 | 172.3 | 5,259 |
| SOL  (CAL SP, SOLANO) | 4,814 | | 4,814 | 2,480 | 194.1 | 5,235 |
| SATF (CAL SATF AND SP - COR) | 7,039 | 3 | 7,042 | 3,424 | 205.7 | 7,064 |
| CVSP (CHUCKAWALLA VALLEY SP) | 3,570 | | 3,570 | 1,738 | 205.4 | 3,278 |
| CTF  (CORRL TRAING FAC) | 6,200 | 4 | 6,204 | 3,412 | 181.8 | 6,327 |
| DVI  (DEUEL VOCATL INSTITN) | 3,862 | 7 | 3,869 | 1,681 | 230.2 | 3,811 |
| FOL  (FOLSOM SP) | 4,143 | | 4,143 | 2,469 | 167.8 | 4,078 |
| HDP  (HIGH DESERT SP) | 4,404 | 13 | 4,417 | 2,324 | 190.1 | 4,486 |
| IRON (IRONWOOD SP) | 4,081 | | 4,081 | 1,960 | 208.2 | 4,325 |
| KVSP (KERN VALLEY SP) | 4,804 | | 4,804 | 2,448 | 196.2 | 4,728 |
| MCSP (MULE CREEK SP) | 3,802 | | 3,802 | 1,700 | 223.6 | 3,748 |
| NKSP (NORTH KERN SP) | 5,375 | 13 | 5,388 | 2,694 | 200.0 | 5,354 |
| PBSP (PELICAN BAY SP) | 3,357 | | 3,357 | 2,380 | 141.1 | 3,502 |
| PVSP (PLEASANT VALLEY SP) | 5,019 | | 5,019 | 2,308 | 217.5 | 5,162 |
| RIO  (RIO COSUMNES COR CTR-RC) | 348 | | 348 | 0 | - | 250 |
| RJD  (RJ DONOVAN CORR FACIL) | 4,800 | | 4,800 | 2,300 | 208.7 | 4,714 |
| SVSP (SALINAS VAL SP) | 4,034 | | 4,034 | 2,472 | 163.2 | 4,099 |
| SRTA (SANTA RITA CO. JAIL-RC) | 815 | | 815 | 0 | - | 750 |
| SCC  (SIERRA CONSERV CTR) | 5,860 | | 5,860 | 3,454 | 169.7 | 6,067 |
| WSP  (WASCO SP) | 5,999 | 6 | 6,005 | 2,984 | 201.2 | 5,848 |
| **MALE TOTAL:** | 145,683 | 623 | 146,306 | 78,062 | 187.4 | 149,004 |
| **FEMALE** | | | | | | |
| CIW  (CAL INST FOR WOMEN) | 2,458 | 217 | 2,675 | 1,356 | 197.3 | 2,669 |
| CCWF (CENT CAL WOMEN'S FACIL) | 3,900 | 5 | 3,905 | 2,004 | 194.9 | 4,046 |
| RIO  (RIO COSUMNES COR CTR-RC) | 20 | | 20 | 0 | - | 0 |
| VSP  (VALLEY SP) | 3,882 | 10 | 3,892 | 1,860 | 209.2 | 4,158 |
| **FEMALE TOTAL:** | 10,260 | 232 | 10,492 | 5,220 | 201.0 | 10,873 |
| **INSTITUTIONS/CAMPS TOTAL:** | 155,943 | 855 | 156,798 | 83,282 | 188.3 | 159,877 |

```
WEEKLY INSTITUTION/CAMPS POPULATION DETAIL              MIDNIGHT April 8, 2009
```

| MALE INSTITUTIONS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| ASP (AVENAL SP) | 6,424 | | 6,424 | 2,820 | 227.8 | 6,878 |
| CCC (CAL CORRECTL CTR) | | | | | | |
|     Camps | 1,932 | | 1,932 | 1,908 | 101.3 | 2,029 |
|     Level I | 1,487 | | 1,487 | 867 | 171.5 | 1,557 |
|     Level II | 1,130 | | 1,130 | 608 | 185.9 | 1,203 |
|     Level III | 947 | | 947 | 500 | 189.4 | 935 |
| CCI (CAL CORRECTL INSTITN) | | | | | | |
|     Level I | 539 | | 539 | 444 | 121.4 | 1,237 |
|     Level II | 1,537 | | 1,537 | 664 | 231.5 | 1,478 |
|     Level IV | 818 | | 818 | 684 | 119.6 | 843 |
|     SHU | 770 | | 770 | 316 | 243.7 | 798 |
|     Reception Ctr | 1,496 | | 1,496 | 500 | 299.2 | 1,479 |
| CIM (CAL INSTITN FOR MEN) | | | | | | |
|     Level I | 1,989 | | 1,989 | 1,374 | 144.8 | 2,065 |
|     East - Reception Center | 1,156 | 3 | 1,159 | 369 | 314.1 | 1,192 |
|     Reception Center - Central | 1,443 | 9 | 1,452 | 618 | 235.0 | 1,470 |
|     Reception Center - West | 1,311 | | 1,311 | 615 | 213.2 | 1,284 |
| CMF (CAL MEDICAL FACIL) | | | | | | |
|     Level I | 97 | | 97 | 135 | 71.9 | 117 |
|     Level II | 351 | | 351 | 230 | 152.6 | 400 |
|     Level III | 2,334 | | 2,334 | 1,932 | 120.8 | 2,483 |
| CMC (CAL MEN'S COLONY) | | | | | | |
|     East | 3,683 | | 3,683 | 2,425 | 151.9 | 3,674 |
|     West | 2,701 | | 2,701 | 1,413 | 191.2 | 2,814 |
| CRC (CAL REHAB CTR, MEN) | 3,691 | 559 | 4,250 | 2,491 | 170.6 | 4,332 |
| CAL (CAL SP, CALIPATRIA) | | | | | | |
|     Level I | 199 | | 199 | 208 | 95.7 | 308 |
|     Level IV | 4,026 | | 4,026 | 2,100 | 191.7 | 3,910 |
| CEN (CAL SP, CENTINELA) | | | | | | |
|     Level I | 313 | | 313 | 208 | 150.5 | 308 |
|     Level III | 4,455 | | 4,455 | 2,100 | 212.1 | 4,608 |
| COR (CAL SP, CORCORAN) | | | | | | |
|     Level I | 707 | | 707 | 492 | 143.7 | 734 |
|     Level III | 2,988 | | 2,988 | 1,379 | 216.7 | 2,651 |
|     Level IV | 427 | | 427 | 100 | 427.0 | 881 |
|     SHU | 1,370 | | 1,370 | 1,000 | 137.0 | 1,221 |
|     PHU | 14 | | 14 | 24 | 58.3 | 24 |
| LAC (CAL SP, LOS ANGELES CO) | | | | | | |
|     Level I | 274 | | 274 | 200 | 137.0 | 300 |
|     Level III/IV | 1,501 | | 1,501 | 1,200 | 125.1 | 1,440 |
|     Reception Center | 2,853 | | 2,853 | 900 | 317.0 | 3,187 |
|     Adseg | 166 | | 166 | 100 | 166.0 | 100 |
| SAC (CAL SP, SACRAMENTO) | | | | | | |
|     Level I | 266 | | 266 | 192 | 138.5 | 288 |
|     PSU | 214 | | 214 | 256 | 83.6 | 256 |
|     Level IV | 2,445 | | 2,445 | 1,380 | 177.2 | 2,435 |
| SQ (CAL SP, SAN QUENTIN) | | | | | | |
|     Level I | 1 | | 1 | 115 | 0.9 | 215 |
|     Level II | 1,827 | | 1,827 | 916 | 199.5 | 1,627 |
|     Condemned | 635 | | 635 | 637 | 99.7 | 636 |
|     Reception Center | 2,840 | 6 | 2,846 | 1,414 | 201.3 | 2,781 |
| SOL (CAL SP, SOLANO) | | | | | | |
|     Level II | 2,591 | | 2,591 | 1,280 | 202.4 | 2,950 |
|     Level III | 2,223 | | 2,223 | 1,200 | 185.3 | 2,285 |
| SATF (CAL SATF AND SP - COR) | 7,039 | 3 | 7,042 | 3,424 | 205.7 | 7,064 |
| CVSP (CHUCKAWALLA VALLEY SP) | | | | | | |
|     Level I | 297 | | 297 | 208 | 142.8 | 308 |
|     Level II | 3,273 | | 3,273 | 1,530 | 213.9 | 2,970 |
| CTF (CORRL TRAING FAC) | | | | | | |
|     Central-II | 2,838 | | 2,838 | 1,312 | 216.3 | 2,877 |
|     North-II/III | 2,375 | 4 | 2,379 | 1,594 | 149.2 | 2,480 |
|     South-I | 987 | | 987 | 506 | 195.1 | 970 |
| DVI (DEUEL VOCATL INSTITN) | | | | | | |
|     Level I/II | 667 | | 667 | 494 | 135.0 | 677 |
|     Reception Center | 3,195 | 7 | 3,202 | 1,187 | 269.8 | 3,134 |
| FOL (FOLSOM SP) | | | | | | |
|     PSAP | 197 | | 197 | 129 | 152.7 | 200 |
|     TTP | 137 | | 137 | 131 | 104.6 | 203 |
|     Level I | 322 | | 322 | 408 | 78.9 | 424 |
|     Level II | 1,995 | | 1,995 | 1,663 | 120.0 | 649 |
|     Level III | 1,492 | | 1,492 | 138 | 1081 | 2,602 |

```
#TPOP-1A
```

WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT April 8, 2009

| MALE INSTITUTIONS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| HDP (HIGH DESERT SP) | | | | | | |
| Level I | 325 | | 325 | 200 | 162.5 | 300 |
| Level II | 111 | | 111 | 0 | - | 120 |
| Level III | 503 | | 503 | 800 | 62.9 | 500 |
| Level IV | 2,859 | | 2,859 | 1,124 | 254.4 | 2,996 |
| Reception Center | 606 | 13 | 619 | 200 | 309.5 | 570 |
| IRON (IRONWOOD SP) | | | | | | |
| Level I | 239 | | 239 | 200 | 119.5 | 300 |
| Level III | 3,842 | | 3,842 | 1,760 | 218.3 | 4,025 |
| KVSP (KERN VALLEY SP) | | | | | | |
| Level I/II | 270 | | 270 | 200 | 135.0 | 300 |
| Level IV | 4,534 | | 4,534 | 2,248 | 201.7 | 4,428 |
| MCSP (MULE CREEK SP) | | | | | | |
| Level I/II | 266 | | 266 | 200 | 133.0 | 392 |
| Level III | 2,557 | | 2,557 | 1,000 | 255.7 | 2,412 |
| Level IV | 979 | | 979 | 500 | 195.8 | 944 |
| NKSP (NORTH KERN SP) | | | | | | |
| Level I | 254 | | 254 | 210 | 121.0 | 308 |
| Level III | 498 | | 498 | 300 | 166.0 | 452 |
| Reception Center | 4,623 | 13 | 4,636 | 2,184 | 212.3 | 4,594 |
| PBSP (PELICAN BAY SP) | | | | | | |
| Level I | 244 | | 244 | 200 | 122.0 | 296 |
| Level III/IV | 1,998 | | 1,998 | 996 | 200.6 | 2,097 |
| SHU | 1,115 | | 1,115 | 1,184 | 94.2 | 1,109 |
| PVSP (PLEASANT VALLEY SP) | | | | | | |
| Level I/II | 278 | | 278 | 208 | 133.7 | 308 |
| Level III/IV | 4,741 | | 4,741 | 2,100 | 225.8 | 4,854 |
| RIO (RIO COSUMNES COR CTR-RC) | 348 | | 348 | 0 | - | 250 |
| RJD (RJ DONOVAN CORR FACIL) | | | | | | |
| Level I | 351 | | 351 | 300 | 117.0 | 300 |
| Level III | 1,788 | | 1,788 | 600 | 298.0 | 1,460 |
| Reception Center | 1,996 | | 1,996 | 900 | 221.8 | 2,004 |
| IV | 665 | | 665 | 500 | 133.0 | 950 |
| SVSP (SALINAS VAL SP) | | | | | | |
| Level I/II | 288 | | 288 | 200 | 144.0 | 300 |
| Level III/IV | 3,746 | | 3,746 | 2,272 | 164.9 | 3,799 |
| SRTA (SANTA RITA CO. JAIL-RC) | 815 | | 815 | 0 | - | 750 |
| SCC (SIERRA CONSERV CTR) | | | | | | |
| Camps-Men | 2,065 | | 2,065 | 2,010 | 102.7 | 2,010 |
| Level I | 1,110 | | 1,110 | 472 | 235.2 | 1,378 |
| Level II | 1,461 | | 1,461 | 472 | 309.5 | 1,486 |
| Level III | 1,224 | | 1,224 | 500 | 244.8 | 1,193 |
| WSP (WASCO SP) | | | | | | |
| Level I | 203 | | 203 | 200 | 101.5 | 296 |
| Level III | 453 | | 453 | 200 | 226.5 | 555 |
| Reception Center | 5,343 | 6 | 5,349 | 2,584 | 207.0 | 4,997 |
| MALE TOTAL: | 145,683 | 623 | 146,306 | 78,062 | 187.4 | 149,004 |
| | | | | | | |
| FEMALE INSTITUTIONS | | | | | | |
| CIW (CAL INST FOR WOMEN) | | | | | | |
| Institution | 1,911 | 187 | 2,098 | 822 | 255.2 | 1,909 |
| Reception Center | 236 | 30 | 266 | 184 | 144.6 | 394 |
| Corr Trt Ctr | 2 | | 2 | 30 | 6.7 | 46 |
| Camps-Women | 309 | | 309 | 320 | 96.6 | 320 |
| CCWF (CENT CAL WOMEN'S FACIL) | | | | | | |
| Institution | 3,126 | 3 | 3,129 | 1,631 | 191.8 | 3,239 |
| Reception Center | 759 | 2 | 761 | 356 | 213.8 | 790 |
| Condemned | 15 | | 15 | 17 | 88.2 | 17 |
| RIO (RIO COSUMNES COR CTR-RC) | 20 | | 20 | 0 | - | 0 |
| VSP (VALLEY SP) | | | | | | |
| Institution | 3,052 | | 3,052 | 1,460 | 209.0 | 3,332 |
| Reception Center | 770 | 10 | 780 | 356 | 219.1 | 764 |
| SHU | 60 | | 60 | 44 | 136.4 | 62 |
| FEMALE TOTAL: | 10,260 | 232 | 10,492 | 5,220 | 201.0 | 10,873 |
| | | | | | | |
| INSTITUTIONS/CAMPS TOTAL: | 155,943 | 855 | 156,798 | 83,282 | 188.3 | 159,877 |

#TPOP-1A, PAGE 2

# EXHIBIT E

**Review of the Classification Process for Unit 32, Mississippi State Penitentiary**
**November 9, 2007**
**By James Austin, Ph.D.**

**Introduction**

This is a status report on MDOC's reform of its system for classifying prisoners to administrative segregation in Unit 32. This status report is based on my most recent visit to Unit 32, on October 10-11, 2007, during which I toured the unit, reviewed classification records and specific cases, and met with Deputy Commissioner of Institutions DCI Emmitt Sparkman and other MDOC officials.

**BACKGROUND**

The ACLU retained me in the fall of 2006 to review the policies and practices according to which it assigns prisoners to administrative segregation in Unit 32 at Parchman (the State's primary administrative segregation facility), and how it manages those prisoners and reviews their status in lock-down. One thousand men were housed in Unit 32, virtually all of them permanently locked down 32 or 24 hours a day.

MDOC cooperated fully in this review process, allowing me unlimited access to its classification policies and records and interviews with classification staff. I spent a number of weeks reviewing the data and conducting interviews.

**December 2006 Meeting**

On December 8, 2006, I met with Commissioner Christopher Epps, Deputy Commissioner of Institutions Emmitt Sparkman, and other MDOC classification officials and made a presentation on the results of my analysis. The two major points I made in that meeting were that (1) a very significant percentage of the 1,000 prisoners housed in Unit 32 – perhaps eighty per cent of them -- did not actually require such confinement, and (2) a major reason for this over-assignment to administrative segregation was that the MDOC was inappropriately using its custody classification system in assigning prisoners to Unit 32. The custody classification system, which I had helped to design in 2001, was intended for use in assigning inmates to general population in an appropriate facility; it was never designed or intended for assigning prisoner to isolated confinement in a maximum-security facility like Unit 32.

An additional reason for the inappropriate assignments to Unit 32 was that the MDOC was using the Unit for prisoners who, according to the MDOC's own records, were not aggressive or violent. For example, inmates classified by MDOC as "protective custody" were housed in Unit 32 even though they had no record at all of violent or aggressive behavior in prison. Furthermore, even prisoners whose initial classification to Unit 32 might have been appropriate tended to remain in Unit 32 far longer than necessary because credit for good behavior was not being awarded in a timely and adequate manner under the classification instrument's point system.

I discussed with MDOC my view that under widely accepted correctional standards the assignment of prisoners to Unit 32 should be based on a very narrow set of criteria. Essentially, prisoners should be housed in administrative segregation only when there is evidence of the prisoner's potential for violence resulting in serious injury to others, and largely based on recent acts of assault while in custody.

I incorporated these findings and recommendations in a report dated January 23, 2007, "Action Plan for Mississippi Department of Corrections: Mississippi State Penitentiary Unit 32" (attached here as Appendix A).

**January- August 2007: Formation and Work of MDOC Classification Task Force**

Following this December 8, 2006 meeting, the MDOC Commissioner established a Classification Task Force under the direction of MDOC Deputy Director of Institutions Emmitt Sparkman, to work closely with me, and to include MDOC's Deputy Director of Operations, Director of Classification, and the Director of Management Information Services.

The Classification Task Force spent the next several months considering options for reform of the system. Among other inquiries, MDOC made a site visit to the Ohio Department of Corrections to learn how that DOC has designed and implemented its program for housing high risk and violent prisoners in a controlled environment.

In order to re-evaluate the current classification system it was necessary to modify MDOC's information system so that it stores each prisoner's initial and reclassification record. MDOC accomplished this task, making it relatively easy to conduct a wide variety of statistical tests to determine what factors are driving the scoring process, the use of overrides, and the relationship between the scoring system and prisoner misconduct.

Statistical analysis could then be conducted to determine how prisoners are being scored on both the initial and reclassification forms. A snapshot of the daily population was being taken, making it possible for MDOC to download to all case files the classification forms that have been completed on each prisoner, and transferred to me for analysis. This in turn would make it possible for the Task Force to meet to review these results and make decisions on how the current system should be modified.

Finally, based on completion of these tasks, a modified classification system could be readied for implementation. The implementation process would need to include training of staff in the new system as well as adjustments to the MIS database. My recommendation to MDOC was that the new system be applied to all new prison admissions and to the existing prisoner population as they are re-classed as part of the normal re-class process.

I made a second site visit to Unit 32 on May 9-10, 2007 to review electronic data files and meet with MDOC Task Force members. The Classification Task Force conducted an audit of the case files for the entire prisoner population assigned to Unit 32. This work resulted in the identification of significant numbers of prisoners who should be released to the general population, or to specialized mental health and medical units.

Based on all of this analysis, the MDOC Classification Task Force reached consensus on the following points:

1. An estimated 200 out of the 1,000 prisoners in the facility – only about twenty per cent of the current population --would actually need such placement on any given day.
2. The MDOC was inappropriately using its custody classification system in assigning prisoners to Unit 32. It was intended only as an instrument for assigning inmates to general population. It was never designed or intended for assigning prisoner to isolated confinement in a maximum-security facility like Unit 32.
3. A large numbers of prisoners had been assigned to Unit 32 simply for refusing to work. While such behavior may subject the prisoners to discipline, it does not justify placement in a locked-down unit for extended periods of time of prisoners who have not engaged in violent and aggressive conduct in prison.
4. A significant number of prisoners in Unit 32 had had no misconduct reports for many months and no longer required confinement in administrative segregation. 32.
5. Prisoners labeled as protective custody were being housed in Unit 32 even though they have no record of violent or aggressive behavior within the MDOC.
6. Prisoners whose initial classification to Unit 32 might have been appropriate tended to remain in Unit 32 far longer than necessary because credit for good behavior was not awarded in a timely and adequate manner under the current classification instrument's point system.
7. The assignment of prisoners to Unit 32 should be based on a very narrow set of criteria that clearly reflects the prisoner's potential for violence, largely based on recent acts of assault while in custody resulting in serious injury to staff or other inmates.
8. Case manager caseloads were excessive (180 – 200) and their contacts with prisoners were not intensive or effective. Prisoners were not being seen for treatment or even for their basic reclassification review which was supposed to be conducted every six months. Sizeable numbers (over 200) of the current Unit 32 population had not had their reclassification completed. Case loads needed to be reduced to 50.
9. There was not a formal housing plan at Unit 32 that would clearly designate what types of prisoners should be housed there, based on their potential for violence and progress within the unit. This is an essential component of any high security unit.

10. Several of the items on the classification forms are not weighted properly. For example, under the classification instrument inmates cannot get their points lowered through good behavior in a reasonably timely manner.
11. There was also some indications that the items on the classification forms are not being interpreted properly by the staff resulting in scoring errors and hence custody designation errors.
12. The current classification system needed to be re-validated to ensure the current weights and scales are appropriate.
13. There needed to be a review and modification of the way that classification points for prior escapes and history of violence were being applied, to eliminate the potential for double-counting of these items.

The MDOC then proceeded to develop new criteria for the types of prisoners to be admitted to Unit 32 as well as any other special management unit. The new criteria for assignment to Unit 32 and other special management units I recommended were that the inmate, during his incarceration, has engaged in any of the following acts:

1. *Causing or attempting to cause serious physical injury or death to another person;*

2. *Compelling or attempting to compel another person, by force or threat of force, to engage in sexual conduct;*

3. *Extorting another, by force or threat of force, for property or money;*

4. *Coercing another, by force or threat of force, to violate any rule;*

5. *Leading, organizing, or inciting a serious disturbance that results in the taking of a hostage, major property damage, or physical harm to another person;*

6. *Procuring deadly weapons or other major contraband that poses a serious threat to the security of the institution;*

7. *Escaping, attempting to escape or facilitating an escape from a close or maximum security facility, or while under supervision outside of such a facility, resulting in physical harm or threatened serious physical harm to others, or in major destruction to the physical plant.*

The Task Force also tackled the issue of where to house the large number of prisoners who would be released to general population. It became clear that it would be necessary to create general population housing units within Unit 32 for maximum custody prisoners who do not require placement in a lock down unit. For this to happen, construction of program and recreation space, and the creation of meaningful work assignments, would need to be completed.

Furthermore, a core component of the new Unit 32 would have to be the establishment of a clearly defined incentive program that would allow prisoners to earn their return to the general population as they meet certain behavioral based criteria. In such a program there would be a short period of orientation (1-2 weeks) for staff to evaluate the prisoner, develop a case plan for the inmate outlining specific program and behavioral achievements, and then an assignment to one of three program/security levels each with progressively higher levels of security and access to programs.

Finally, as the Unit 32 high security population was being reduced, there would have to be a plan for how to house the residual administrative segregation population in accordance with the incentive-based program. Such a plan would identify areas in Unit 32 where prisoners are to be housed relative to their progress within the program.

I summarized these Classification Task Force plans and the progress on their implementation in a report to the ACLU dated August 15, 2007 (Appendix B).

**STATUS AS OF OCTOBER 2007**

MDOC has made swift progress, reaching or coming within reach of most of the goals that were identified in my December 2006 audit. During my October 2007 audit, I found that there has been a striking transformation of the facility's operations and procedures even in the five months that had elapsed since my May 2007 audit.

The two most dramatic changes have been the reduction of prisoners assigned to administrative segregation and the related creation of a general population operation for inmates no longer assigned to administrative segregation.

As of October 10, 2007 there were a total of only 272 prisoners assigned to "lockup" or administrative segregation. The major reason for the change has been the application of new criteria for placement in administrative segregation, which were jointly developed by the MDOC and the author of this report. General population housing areas have been created in housing areas that until now were used to lock down prisoners. The inmates in these housing areas now spend several hours a day out of their cells.

Outdoor basketball courts have been constructed and prisoners are already being allowed, for the first time, to engage in outdoor sports activity and to recreate together. They have access to work assignments and even to some educational and rehabilitative programs. It is my understanding, based on my discussions with DCI Sparkman, that structured education and general mental health services will be expanded as the space for such services becomes more available. A small stand-alone facility has been set up as a classroom, intended as a computer lab and an area for study; two college courses are to be made available for eligible inmates early in 2008. A remedial studies instructor will be retained. Contact visits will be permitted, for the first time. A warehouse is in the process of being converted into a dining hall, so that prisoners for the first time will be able to eat meals together rather than in their cells.

As of the date of my site visit, the current total population of Unit 32 was 842, well below Unit 32's designated capacity of 1,000. MDOC indicated that an additional 55 prisoners were in the process of being transferred from Unit 32 to other MDOC units and/or facilities. Since many of the 55 men who are scheduled to be transferred are currently in lockdown, I am increasingly confident that few if any people will remain in lockdown merely for having scored a particular number of points on the classification instrument at admissions, or for conduct that does not meet the level set by the new screening form

**Table 1**
**Current Capacity, Populations and Statuses of the Unit 32**

| Bldg | Zone | Cells | Double Cell? | Population | Mission |
|------|------|-------|--------------|------------|---------|
| A | A | 100 | No | 51 | Lock-Up STG, Recent Assaults |
|  | B | 100 | No | 86 | General Population |
| B | A | 100 | No | 97 | Lock-Up |
|  | B | 100 | No | 96 | General Population |
| C | A1,2,3 | 75 | No | 59 | Death Row |
|  | A4 | 25 | No | 23 | Lock Up |
|  | B | 100 | No | 86 | General Population |
| D | A | 100 | No | 95 | Lock Up |
|  | B 2,3 | 33 | No | 19 | Mental Health |
|  | B 1 | 17 | No | 6 | Lock Up |
|  | B 4, 5, 6 | 50 | No | 49 | General Population |
| E | A | 100 | No | 84 | General Population |
|  | B | 100 | No | 91 | General Population |
|  |  |  |  |  |  |
| Totals |  | 1000 |  | 842 |  |

**Next Steps**
While considerable progress has been made, there are a number of additional tasks that need to be completed over the next few months.

1. *Clarify inmate population designations and custody levels:*
   The MDOC should formally adopt standardized terms for key population types and custody levels in its classification system. I would recommend that the MDOC to formally adopt and make part of their official departmental policy standardized terms for Custody Levels (Maximum, Medium, Minimum) and Population Status (General Population, Administrative Segregation, Disciplinary Segregation, Protective Custody, Restricted Medical, Restricted Mental Health.).

2. *Formally adopt and apply screening form to all Unit 32 Administrative Segregation Inmates*

The Classification Task Force developed a classification screening form some months ago, to reflect the classification criteria we had agreed upon. While the screening form is being used, it has not been formally adopted by the MDOC and it has not been applied to all inmates at Unit 32. MDOC should adopt the screening form we agreed to, as well as other required forms and standard operating procedures that will govern Unit 32's operations in the future. A screening form should be completed for each inmate who enters the system and it should be made part of the inmate's official file.

3.  *Develop a Standard Re-assessment and Review Process for Unit 32*
    Once inmates are admitted to the administrative segregation unit, there needs to be a review process that meets due process and sound correctional practices. This would require the MDOC basically to *promise release from administrative segregation within reasonable time frame* (12-24 months) assuming that the inmate's conduct is satisfactory. There will be a small number of inmates for which release will not be possible because of the nature and seriousness of the violent acts they committed while in prison. But this number ought to be quite small. MDOC needs to draft forms for this review process and to adopt these forms as official operating procedures and policy. These must be completed within the next three months at the latest.

4.  *Delete use of violent crime detainer for placement in Close custody and transfer to Unit 32*
    This factor or rationale for admission to the close custody and/or transfer to Unit 32 needs to removed.

5.  *Restrict Transfers to Unit 32 General Population at Admission*
    Although prisoners can no longer be transferred to lock down simply by scoring close custody at the reception center, inmates so classified are still being routinely sent to Unit 32, although to general population. While this movement may be proper for some inmates it will be excessive for others. The rule should be that MDOC will not send prisoners to Unit 32 merely because they score close custody at the reception center. Exceptions can be made in exceptional cases.

Finally, I am strongly of the opinion that the very impressive strides that MDOC has made in a short period of time should be carefully monitored in routine semi-annual audits over the next two years to ensure that the progress that has been made is lasting.

The attached referral form, "Warden's Recommendation: High Security Unit Transfer" (Attachment A) is to be used by the Warden or his designee to make a recommendation to central classification to transfer a prisoner to the High Security Unit. *Such recommendations should not be made unless the prisoner represents a severe threat to the safety and security of the institution.* The Warden must document the precise reasons with adequate documentation for the referral.

# ATTACHMENT A

**Referral Form**
## Warden's Recommendation
## High Security Unit Transfer

| Inmate Name: | Number: |
|---|---|
|  |  |

*Indicate (with a check) which of the following behavioral categories apply to the inmate's proven behavior—check all that apply, and attach the supporting documents:*

☐ I.    The inmate has demonstrated behavior resulting in either serious physical injury or death to any person.  List below the precise dates and location these incidents occurred. Attach documents that support a referral for this category.

    1.  Date:____/_____/_____Location:_____

    2.  Date:____/_____/_____  Location:_____

    3.  Date:____/_____/_____  Location:_____

☐ II.   The nature of the criminal offense committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others such as serious assaults against law enforcement or participation in organized criminal activity. Attach a description of each crime that fits this category.

☐ III.  The inmate has lead or organized a disturbance or riot that resulted in the taking of a hostage, significant property damage, physical harm, or loss of life. Attach a copy of the documents that support a referral for this category.

☐ IV.   The inmate has conspired or attempted to convey, introduce or possess major contraband.  Only the following forms of contraband qualify. Check which of the following categories apply and attach documents that support this referral category.

    ☐   Deadly weapons that are capable of inflicting death.

    ☐   Ammunition that includes bullets, gunpowder, shots, or shells

    ☐   Escape instruments that include any substance, device, instrument, or article designed or specially adapted for criminal use in escape attempt.

☐  V.  The inmate is a leader, enforcer, or recruiter of a security threat group. Attach document(s) supporting this referral category.

☐  VI.  The inmate escaped, attempted to escape or committed acts to facilitate an escape from a medium or maximum security facility.  Attach document(s) supporting this referral category.

**Recommendation.**

_____

**Reasons for the Warden's Recommendation.**

_____

_____

_____

_____

**Evidence relied on to support the reason(s) for the recommendation**
_**Instruction:** Set forth the specific facts (evidence) relied on to support the reason(s) for the recommendation._

_____

_____

_____

_____

_____

☐ YES ☐ NO    Was the inmate notified of the appeal procedures?
☐ YES ☐ NO    Was the inmate given a copy of the Notice of Appeal form?
☐ YES ☐ NO    Was the inmate given a copy of this document?

| Warden/Designee's Signature: | Date: |
|---|---|
|  |  |

# EXHIBIT F

DOC 90

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

JEFFERY PRESLEY, ET AL.,                                    PLAINTIFFS

V.                                    CIVIL ACTION NO. 4:05CV148-JAD

CHRISTOPHER EPPS, ET AL.                                    DEFENDANTS


### SUPPLEMENTAL CONSENT DECREE
### ON MENTAL HEALTH CARE,
### USE OF FORCE AND CLASSIFICATION


The parties enter into this Supplemental Consent Decree on Mental Health Care, Use of Force, and Classification in order to supplement the Consent Decree previously entered April 28, 2006 and the Supplemental Consent Decree on Medical Care entered April 16, 2007.


### MENTAL HEALTH

1.      After December 1, 2007, Unit 32 will not be used for long-term housing of prisoners with Severe Mental Illness, other than those on Death Row. For purposes of this Order "long term" means more than 14 days. "Prisoners with Severe Mental Illness" means those with an Axis I diagnosis of a major mental illness (for example Schizophrenia or other psychotic disorder), Bipolar Disorder, Depressive Disorder or other serious Mood Disorder; prisoners who are significantly disabled by mental retardation or an organic brain disorder; and prisoners who are significantly disabled by any other mental disorder (for

1

example, Generalized Anxiety Disorder, Posttraumatic Stress Disorder or any disorder characterized by repetitive self-harm.

2.    Prisoners in Unit 32 with Severe Mental Illness requiring inpatient level of care will be housed at East Mississippi Correctional Facility or in another facility where they can receive the full range of appropriate treatment programs and the level of care consist with their individualized treatment plans.    The parties have not reached an accord on whether Defendants will facilitate access by Plaintiffs' lawyers and experts to these facilities for purposes of monitoring; Plaintiffs' motion to compel Defendants to facilitate such access is pending before the Court.

3.    Defendants will designate a space at Unit 32 exclusively for use as a Mental Health Step-Down Unit.    The Mental Health Step-Down Unit will be used to house mentally ill prisoners who require an intermediate level of psychiatric care (intermediate between inpatient and outpatient treatment, roughly equivalent to residential treatment and partial hospitalization in the community). These prisoners will be involved in mental health treatment and will not be in administrative segregation status. The care provided will include an individualized multidisciplinary treatment plan, based on an assessment of the patient's needs, and a statement of short- and long-term goals and the methods by which these goals will be pursued. When clinically indicated, and in light of consultation between mental health and security staff, the treatment plan will give patients access to the range of treatment, supportive and rehabilitative services

2

(such as individual and group counseling, a range of psychiatric rehabilitation programs and self-help groups) that mental health specialists deem appropriate. The step-down unit will be staffed by at least one full-time psychologist and such other mental health treatment and nursing personnel as are needed. After one year of operation the mental health step-down program at Unit 32 will be re-evaluated for staff and/or location changes.

4.      Prisoners in suicidal or other psychiatric crisis will be housed and provided appropriate observation and treatment at Unit 32 in a crisis stabilization area inside the Step-Down Unit. Twenty-four-hour nursing coverage (which may include coverage by the nursing staff at Unit 42) will be available to prisoners in the crisis stabilization area. The prisoners in this area will have out-of-cell time and will participate in individual and group treatment consistent with orders from the supervising psychiatrist. Prisoners will spend no more than fourteen days in the crisis stabilization area, after which they will either be released back to their cells, or to the Mental Health Step-Down Unit, or sent to East Mississippi Correctional Facility, or other housing appropriate for their condition.

5.      Defendants will ensure that security staff persons successfully complete a 40-hour training course for working with mentally ill prisoners prior to working in the Mental Health Step-Down Unit. Only those officers successfully trained will be assigned work in the Mental Health Step-Down Unit.

3

6.    Defendants will retain or cause to be retained at least five full-time mental health professionals, with at least masters' degrees in mental health, to provide services to the prisoners housed in Unit 32. Defendants will ensure that at least three such mental health professionals are in place by the time the Court enters this Order; that at least four are in place by January 1, 2008; and that at least five are in place by March 1, 2008. At least one of these full-time mental health professionals shall be a licensed therapeutic mental health clinician, trained in crisis intervention work, with at least a Masters degree.

7.    No later than December 1, 2007, Defendants will ensure that there are least two full-time psychiatrists on site at MSP dedicated exclusively to providing mental health services to prisoners at MSP.

## USE OF FORCE

8.    Physical force (including chemical sprays) will not be used against any prisoner unless his actions are creating an immediate threat of serious self-injury, or of physical injury to another person, or of property damage causing a threat to security, and not unless reasonable efforts to use verbal persuasion and other non-physical methods of gaining control have been attempted and have failed. Force likely to cause serious bodily injury may never be used except to prevent escape or an immediate threat of serious physical injury to another person and when a lesser use of force would not eliminate that threat.

9.    Defendants agree that audio-visual recording of all use of force incidents in Unit 32, of adequate quality to allow review of the incident, must be the norm, and that only in the most exceptional circumstances should it be impracticable to make such recordings. To accomplish this goal, Defendants will add at least 41 security cameras to Unit 32 for a total of 341, and will develop protocols and procedures to ensure that adequate audio-videotaping of use of force in Unit 32 is the norm through the identification of improvements in equipment, equipment placement, record keeping, staff training, and regulations. They will also implement procedures for generating monthly reports on use of force in Unit 32.

10.    Except in emergency circumstances where no delay is possible because of the risk of serious bodily injury or damage to property creating a threat to security, the Shift Commander or Warden will be notified and his or her consent obtained before force is used. Whenever possible, the Shift Commander or Warden will visit the prisoner before consenting to the use of force, to determine if force is necessary. Likewise, except in emergency circumstances, a mental health professional will be consulted or summoned before force is used, to try to make the use of force unnecessary. A log will be maintained recording the efforts made to obtain the presence of the Shift Commander or Warden and a mental health professional prior to the use of force.

11.    Defendants will develop protocols and procedures in consultation with Plaintiffs' mental health monitor to ensure the involvement of a mental health

professional prior to use of force on prisoners with Severe Mental Illness at Unit 32.

12.     All Unit 32 prisoners who have been exposed to OC spray or other chemical agents will be immediately removed from the contaminated area, will promptly be permitted to shower, and will be examined by medical staff cell-side to see if transport to the clinic is needed.     Any contaminated cell will be decontaminated before a prisoner is returned to it.  If emergency circumstances creating an imminent threat to security prevent staff from immediately removing prisoners from contaminated areas, Defendants will at the very least promptly provide the prisoners who have been exposed to the chemical agents with an adequate supply of appropriate decontaminating agents.

## CLASSIFICATION

13.     Prisoners may be held in long-term administrative segregation only when (A) they have behaved violently and aggressively while incarcerated, (B) they are actively involved in disruptive gang activity, (C) they have escaped or attempted to escape from within a security perimeter and/or custody or direct supervision, (D) they have committed a felony while on escape from a community correctional facility, or  (E) the Commissioner or his designee determines, based on specific objective criteria set forth in writing, that there is a significant risk that the prisoner will cause physical injury to prison staff, other prisoners, or members of

the public if he is housed in general population, even at the highest security

level.. "Long term" administrative segregation means longer than sixty days.

14.    Prisoners will not be housed in administrative segregation based solely on

their classification scores or for refusing to work or program.

15.    Prisoners will not be housed in administrative segregation solely because

they escaped from a youth facility or community correctional facility.

16.    Prisoners will not be housed in administrative segregation solely because

they are subject to a felony detainer, even if for a serious crime, from another

jurisdiction.

17.    Prisoners will not be housed in administrative segregation solely because

they were convicted of a serious crime and have tested positive for marijuana.

18.    Prisoners will not be housed in administrative segregation solely because

they need protective custody.  Prisoners needing protection will be housed and

accorded access to visits, canteen, and other privileges consistent with their

custody levels.

19.    Prisoners with Severe Mental Illness will not be housed in administrative

segregation at Unit 32 for longer than fourteen days.

7

Case 4:05-cv-00148-JAD    Document 850    Filed 11/15/2007    Page 8 of 21

20.    Prisoners who are not high-level gang members will not be placed in long-term administrative segregation solely because they are affiliated with a gang. Prisoners will be placed in long-term administrative segregation based on gang affiliation only if they are confirmed leaders, enforcers or disruptive core members of gangs designated by MDOC as security threat groups. Defendants will provide prisoners with a means for renouncing affiliation with a security threat group that does not require prisoners to provide identities of gang members as a condition for renunciation.

21.    The process for admission to and release from administrative segregation will be centralized. A Warden who wishes to recommend that an inmate be housed in administrative segregation must submit to the Central Classification Office for review a referral form documenting the reason for the referral. If the Central Classification Office agrees with the recommendation, it will forward the referral form to the Commissioner or his designee for final review and approval. Emergency admissions will be permitted but the referral form must be submitted at the time of admission and the review process must be completed within seven calendar days of the emergency admission.

22.    Prisoners in administrative segregation who remain free of serious rules violations and who have satisfactorily participated in any recommended rehabilitative programs that were made available to them will, within two years at

the latest, be released from administrative segregation and will be housed in general population housing at the appropriate security level, unless: (A) the prisoner murdered another person while incarcerated; (B) the prisoner planned or participated in a major riot; (C) the prisoner escaped from a secured perimeter or from custody or direct supervision and while on escape caused serious physical injury to another; or (D) the Commissioner or his designee determines, based on specific objective criteria set forth in writing, that there is a significant risk that the prisoner will cause physical injury to prison staff, other prisoners, or members of the public if he is housed in general population, even at the highest security level.    Defendants will maintain a current list of all prisoners in administrative segregation with the date of and reason for placement, date of last review, and, in case where the prisoner is being held in administrative segregation pursuant to subparagraph D, above, the written statement of the objective criteria relied upon.

23.    By January 31, 2008, Defendants will develop a formal policy establishing a program whereby all prisoners in administrative segregation can through good conduct earn increased privileges and access to programs.

24.    Defendants represent that as of the date of this agreement there are a total of 152 cells in Unit 32 with solid-front doors. Fifty of these solid-front cells are occupied as of the date of this agreement. Defendants agree that the current total of 152 solid-front doors in Unit 32 is adequate for existing security needs, and that they will not increase the total of solid-front doors except on notice to

Plaintiffs and when shown to be necessary to prevent serious bodily injury or maintain security. Medical staff will make daily visits to any prisoner housed behind solid steel doors and mental health staff will visit at least weekly or more often as needed to ensure that the prisoner's mental and medical health needs are being met. Defendants will review prisoners' confinement in solid-front cells every sixty days and will house prisoners in these cells no longer than necessary to prevent serious bodily injury or maintain security.

25.    Defendants will afford each Unit 32 prisoner notice of and documentation for all MDOC decisions that result in his initial placement and continued confinement in administrative segregation. Each Unit 32 prisoner in administrative segregation will be formally reviewed every ninety days to determine the need, if any, for further confinement in administrative segregation and the level of privileges to be afforded the prisoner, including but not limited to canteen, visits, telephone, recreational and congregate recreational activity, and access to educational and rehabilitative programs. At each such review Defendants will issue a written assessment of the prisoner's progress, and if continued confinement in administrative segregation is ordered the written assessment will detail the basis for the prisoner's further retention in administrative segregation and the specific actions the prisoner can take to be considered for release at subsequent reviews.

10

26.     By June 1, 2008, Defendants will provide program space and staffing at Unit 32 for day room use, dining hall, education and other rehabilitative services, and recreational and congregate recreational activities (both indoors and outdoors) for eligible Unit 32 inmates.

## MISCELLANEOUS

27.     The relief set forth in this Supplemental Consent Decree is narrowly drawn, extends no further than necessary to prevent irreparable harm to Plaintiffs, and is the least intrusive means necessary to prevent an unreasonable risk of harm to the health and safety of the Plaintiffs. The Court further finds, based on the evidence regarding current conditions at Unit 32, that the relief set forth above is otherwise appropriate pursuant to the standard set forth in 18 USC § 3626(a).

28.     The Parties agree that the terms of this Supplemental Consent Decree shall be submitted to the Court for approval and that the Court shall retain jurisdiction to enforce the terms thereof.

SO ORDERED, this 15th day of nov 2007.

_____
UNITED STATES MAGISTRATE JUDGE

11

# EXHIBIT G



# SPECIAL REVIEW

MANAGEMENT OF THE CALIFORNIA DEPARTMENT
OF CORRECTIONS AND REHABILITATION'S
ADMINISTRATIVE SEGREGATION UNIT POPULATION

## OFFICE OF THE
## INSPECTOR GENERAL

DAVID R. SHAW
INSPECTOR GENERAL

STATE OF CALIFORNIA

JANUARY 2009



January 15, 2009


Matthew L. Cate, Secretary
California Department of Corrections and Rehabilitation
1515 S Street, Room 502 South
Sacramento, California 95814

Dear Mr. Cate:

Enclosed is the Office of the Inspector General's special review concerning the management of
administrative segregation units (ASUs) in adult prisons. The purpose of this special review was
to determine if prisons were complying with California Department of Corrections and
Rehabilitation policies and due process requirements for inmates housed in ASUs.

The report identified repeated instances where inmates at California State Prison, Los Angeles
County, California State Prison, Solano and San Quentin State Prison were held in ASUs for an
inappropriate length of time. These extended ASU confinements violated CDCR policies and
procedures, resulted in the denial of inmates' due process rights and potentially exposed the
department to costly litigation. In addition, the consequence of these extended confinements was
the expenditure of millions of dollars in unnecessary operating costs.

The report contains the results of our review of the management of ASUs and presents two
findings and 12 recommendations. The two findings detail the violation of inmates' due process
rights and the additional costs incurred as a result of the unnecessary retention of inmates in
administrative segregation.

Thank you for the courtesy and cooperation extended to my staff during the special review.
Please call Jerry Twomey, Assistant Inspector General, at (916) 830-3600 if you have any
questions.

Sincerely,

David R. Shaw
Inspector General

Mr. Matthew L. Cate, Secretary
Page 2


cc:     Scott Kernan, Undersecretary, Operations
        Terri McDonald, Chief Deputy Secretary, Adult Operations (A)
        Suzan Hubbard, Director, Division of Adult Institutions
        Kim Holt, External Audits Manager

Enclosure

# Contents

Executive Summary ........................................................................................1

Introduction ................................................................................................4
    Background ......................................................................................4
    Objectives, Scope, and Methodology.............................................7

Finding 1 ....................................................................................................9

**CSP Los Angeles County, CSP Solano, and San Quentin State Prison routinely violate the rights of inmates to due process and timely release from administrative segregation.**

Finding 2 ..................................................................................................21

**The California Department of Corrections and Rehabilitation incurs additional costs as a result of the unnecessary retention of inmates in administrative segregation.**

Recommendations .....................................................................................23

California Department of Corrections and Rehabilitation's Response.............25

# Executive Summary

During a special review into the management of administrative segregation units in California's adult male prisons, the Office of the Inspector General identified repeated failures by some prisons to comply with California Department of Corrections and Rehabilitation policies and due process requirements for inmates. The inability of certain prisons to effectively manage administrative segregation units (ASUs) caused some inmates to be held in segregation units for an inappropriate length of time. We found that these extended ASU confinements violate California Department of Corrections and Rehabilitation (department) policies and procedures, resulting in the denial of inmates' due process rights while potentially exposing the department to costly litigation. Further, we estimated that these confinements result in millions of dollars in unnecessary operating costs.

California prisons temporarily segregate inmates who threaten institution safety and security. These inmates are placed in ASUs while prison staff members evaluate the threat they pose to prison security. Because inmates placed in ASUs lose more of their freedoms than inmates in the general population, they are entitled to mandated due process rights. For example, an inmate placed in the ASU is entitled to a written lock-up notice that tells him why he is being segregated in order to provide him the information necessary to dispute his ASU placement. The inmate also has the right to a hearing before a classification committee regarding his ASU placement, where he can call witnesses and/or obtain staff assistance, such as an English translator.



**ASU cell**

Staff members at the department's 33 adult prisons are required to comply with the complex rules that govern the ASU classification process to ensure inmates' due process rights. However, based on our evaluation of the ASU tracking logs from eight sample prisons, we identified four prisons—California State Prison, Los Angeles County; California State Prison, Sacramento; California State Prison, Solano; and San Quentin State Prison—with a pattern of questionable entries. As a result, we performed a detailed review of the ASU management practices at these four prisons.

We developed two findings based on our analysis of information related to ASU management:

- Certain prisons routinely violate policies and procedures intended to provide inmates with due process and timely release.

- The policy violations potentially cost the department $10.9 million.

The first finding discusses how California State Prison, Los Angeles County; California State Prison, Solano; and San Quentin State Prison routinely violate policies and procedures intended to provide inmates with due process and timely release from the ASU. Specifically, the information we reviewed revealed the following:

- Prison staff members often fail to conduct inmate classification hearings in a timely manner. California law requires that ASU inmates have a hearing within 14 calendar days of the completion of any investigation or disciplinary report, but we found that the three prisons frequently failed to comply with the 14-day requirement.

- These prisons routinely violate department policies and procedures during the lock-up notice process, which causes unnecessary delays in releasing inmates from the ASU. For example, prison staff members do not always issue new lock-up notices that are required for notifying inmates about the reason for their ASU retention. In addition, inmates may be held in the ASU beyond their authorized release dates.

- The department has no formal policies or criteria establishing timelines for the prisons to complete gang validations and investigations regarding safety concerns. As a result, prison staff members often take a long time to complete gang validations and investigations. These delays may cause unnecessarily longer ASU stays for inmates.

- These prisons do not effectively use tracking logs to identify delayed ASU cases, and the staff does not closely monitor the logs to manage the ASU workload. At the three prisons, we found potential problems easily identifiable in the tracking log, including expired segregation terms and overdue classification hearings.

- These prisons do not consistently obtain approval from the classification staff representative (CSR) to keep inmates in the ASU. To comply with ASU regulations, prisons must seek approval from a CSR to retain an inmate in segregation for longer than 30 days; we also found that the prisons regularly failed to resolve problems cited by the CSR.

- Postponed hearings by the Board of Parole Hearings (BPH) can result in unnecessarily longer ASU confinements.

- Some of the prisons we surveyed failed to accurately maintain data on their prison transfer lists, thus preventing inmates from being transferred on time and causing some inmates to remain housed in the ASU for much longer than necessary.

The second finding of our report addresses the significant extra costs that the department incurs as a result of needlessly retaining inmates in the ASU. The average cost of housing a male inmate in the ASU is far greater than in a general population unit because of the extra officers and single-inmate cells needed to safely house ASU inmates. However, in

our discussions with department headquarters staff, they could not determine the statewide costs associated with operating ASUs. Therefore, we contacted various department program units and prisons, and we received information from which we estimated the annual ASU costs. Department headquarters provided costs for correctional staff while California State Prison, Sacramento; California State Prison, Solano; and Pelican Bay State Prison provided staffing information and the budgeted number of inmates for both general population and ASUs. Using this information, we estimated the average cost for housing an inmate in a general population housing unit and an ASU.

Although ASU costs can vary significantly from prison to prison because of their different programs and physical layouts, we estimated that the annual correctional staff cost of a standard ASU bed to be at least $14,600 more than the equivalent general population bed. For the 8,878 ASU beds statewide, this additional cost equates to nearly $130 million a year. While ASUs are an important part of prison population management, unnecessary ASU housing is a waste of taxpayer dollars.

While poor management and violations of policies and procedures result in unnecessary delays in releasing inmates from the ASUs, those delays also force the department to incur unnecessary operating costs, thus wasting taxpayer dollars. Further, the ASU management problems we found at the three of the four sample prisons are likely to be indicative of problems in prisons throughout California. By reducing these delays at prisons statewide, California could significantly curtail the more than $10.9 million expended each year for ASU overflow beds and staff overtime. When the ASU population exceeds the available permanent space for ASU beds, the prison uses general population housing as overflow.

We made 12 recommendations to the department secretary and department staff and management as a result of this special review. These recommendations are listed on pages 23 and 24 of this report.

# Introduction

This report presents the results of a special review into the management practices of administrative segregation units (ASUs) at select male adult prisons within the California Department of Corrections and Rehabilitation (the department). The issues addressed in this report were originally discovered during routine facility inspections conducted by deputy inspectors general from the Office of the Inspector General. Our inspectors found that certain prisons repeatedly failed to comply with department policies and due process requirements for inmates housed in ASUs. Some of the due process rights that were violated included the requirement to be adequately notified of the reasons for placement in the ASU; access to a timely, fair, and impartial hearing; and the right to a timely release. The failure to effectively manage ASUs potentially exposes the department to costly litigation. These improper, extended ASU stays also result in unnecessary additional operating costs totaling millions of dollars.

We conducted this review under California Penal Code section 6126, which assigns the Office of the Inspector General responsibility for oversight of the California Department of Corrections and Rehabilitation.

## Background

### *Prison staff segregate inmates who threaten prison safety and security*



**ASU housing unit**

The department houses inmates in various prison settings with different levels of security, dictated by the need to maintain order and safety. Most inmates live in general population facilities. Depending on the security level of each prison, general population inmates have some freedom to move within a facility in order to attend work assignments, participate in rehabilitation and education programs, and exercise with other inmates on the recreation yards.

When inmates engage in violent or dangerous behavior, staff members are obligated to remove them from the general population to protect the safety of the prison. Behavior such as rioting, assaults, and gang participation can cause an inmate to be sent to the ASU while staff members evaluate the nature and level of threat the inmate presents to the prison. Also, some inmates who become victimized by other inmates and need protection are placed in the ASU until the staff can find appropriate housing for them.

ASU inmates are subject to greater control than inmates housed in a general population setting. For safety reasons, ASU inmates are searched and handcuffed before they leave

their cells. When moving from one location to another, ASU inmates must be escorted by correctional officers. In addition, inmates in the ASU lose many privileges, and they have limited access to rehabilitative programs and activities. For example, an ASU inmate is only entitled to ten hours of recreation time outside his cell each week, compared to a general population inmate who can spend many hours outside his cell each day.

### Inmates placed in ASUs are entitled to due process rights

Because ASU inmates lose more of their freedoms than inmates in the general population, prison officials must provide them with due process protections to ensure



**Notice posted at ASU entrance**

they receive a fair hearing to dispute their ASU placement. Therefore, the department has established comprehensive policies and procedures to protect inmates' due process rights and ensure the consistent and appropriate use of ASUs statewide.

The first step in ensuring an inmate's due process rights is to advise him of the reasons he is being segregated. To accomplish this, the department uses a form called the Administrative Segregation Unit Placement Notice, also referred to as a lock-up notice. Further, inmates are entitled to the following procedural protections:

- Only a correctional lieutenant or higher-ranked officer may issue a lock-up notice.

- The lock-up notice must contain enough information to allow the inmate to dispute his placement in the ASU.

- A copy of the lock-up notice must be issued to the inmate within 48 hours of ASU placement.

- A captain must review the lock-up notice and interview the inmate the following working day to determine if the placement is reasonable pending further review.

- A captain has the authority to release the inmate back to the general population if ASU placement is no longer necessary.

- If the inmate must remain in the ASU, a captain must evaluate whether the inmate needs staff assistance, such as a translator for non-English speaking inmates.

- The inmate is afforded a hearing before the institution classification committee (ICC) within ten days of his placement in the ASU.

- The inmate may call witnesses and present evidence at the ICC hearing.

- Subsequent hearings must be held for changes in the reason the inmate is being held in the ASU.

- A hearing must be held within 14 days of the completion of the casework, such as the inmate disciplinary process or investigation, related to the inmate's ASU placement.

- The inmate must be provided the documented results of the hearings.

### Prison staff must comply with comprehensive processes and rules

The proper placement of ASU inmates is a complex process for a prison's staff. The ASU institution classification committee (ICC) determines the appropriate housing of the inmate and ensures that his due process rights are met. Besides determining when to release an inmate from the ASU, the ICC has many issues to consider related to the inmate's procedural rights and living conditions while in the ASU. Some of the issues include evaluating medical and mental health concerns, enemy situations, and cell and yard compatibility. The ICC is composed of staff members representing the following areas:

**ASU Institution Classification Committee (ICC)**



Correctional counselors are tasked with completing the casework for inmates in the ASU. This casework includes determining changes in the inmate's placement score,[1] custody level, and credit-earning status.[2] Correctional counselors must maintain constant communication with facility staff members responsible for the disciplinary process,

---

[1] Correctional counselors review each inmate's history and case factors, including both positive and negative behavior, and calculate a score that determines the custody level in which to house an inmate. Higher placement scores result in placement into prisons that are more secure.
[2] Credit-earning refers to the additional time credited to inmates for participating in work or education programs, thus reducing the amount of time they serve in prison.

investigators from various prison units, prison district attorney liaisons, medical and mental health professionals, headquarters personnel, and other staff members.

Correctional counselors rely heavily on inmates' central files to keep a chronological history of each case. The central file also acts as a communication tool among the various staff members who serve a role in monitoring and processing an inmate's stay in the ASU. Central files hold a multitude of reports and forms that staff members use to classify and make housing placement decisions for inmates. Before the ICC hearings, the assigned counselor prepares the file for review by the committee chairperson during the hearing. After the hearing, correctional counselors document each committee action in a form called the classification chrono, which is maintained in the central file.

The department's Classification Services Unit provides another layer of review for administrative segregation cases. The Classification Services Unit employs classification staff representatives (CSRs), who travel from prison to prison reviewing classification actions. Specialized CSRs act as the department's gatekeepers to ensure due process rights are provided to inmates placed in segregated housing, including ASUs and security housing units (SHUs).[3]

## Objectives, Scope, and Methodology

The purpose of this special review is to determine whether California's state prisons are violating the due process rights of inmates in ASUs. This review also seeks to determine whether prisons are wasting state funds by housing inmates in administrative segregation for longer periods than necessary.

We reviewed management and tracking information for eight prisons to determine if there were indicators of potential problems in the administration of ASUs. Some factors considered to be indicative of potential problems in ASU management included overdue classification hearing dates, expired minimum eligible release dates, classification hearing recommendations not being forwarded to the CSR for review, and other gaps in the tracking records. The eight sample prisons were:

- California State Prison, Los Angeles County

- California State Prison, Sacramento

- California State Prison, Solano

- Deuel Vocational Institution

- Folsom State Prison

---

[3] SHUs are designed as long-term housing for inmates whose behavior demonstrates they are a threat to the safety and security of general population facilities. Movement and privileges of SHU inmates mirror that of ASU inmates. There are two types of SHU placements: indeterminate terms, which have no expiration date and require staff review every 180 days, and determinate terms, which are directly associated with a specific disciplinary offense and are for a specific length of time.

- Kern Valley State Prison

- Mule Creek State Prison

- San Quentin State Prison

Based on our initial evaluation, we identified no significant issues in the management of ASUs for four of the prisons. However, for the other four prisons—California State Prison, Los Angeles County; California State Prison, Sacramento; California State Prison, Solano; and San Quentin State Prison—we identified a pattern of questionable entries in the management and tracking data. As a result, we performed an expanded review of ASU management for these prisons. During our review, we determined that questions regarding the management of the ASU at California State Prison, Sacramento, related to inmates who were temporarily removed from the prison, and those instances were being managed appropriately.

Our expanded review focused on the cases of inmates who had been in the ASU more than 200 days because such long stays in the ASU may be indicative of violations of due process rights. In the process of performing this review, we:

- Identified 1,508 inmates housed in the ASUs at California State Prison, Los Angeles County (CSP Los Angeles County); California State Prison, Sacramento (CSP Sacramento); California State Prison, Solano (CSP Solano); and San Quentin State Prison (San Quentin).

- Determined that 331, or 22 percent, of the 1,508 inmates were housed in ASUs for more than 200 days.

- Reviewed 85, or 26 percent, of the 331 inmate central files and other relevant documents to determine whether inmates had been placed appropriately in the ASU and to determine whether the inmates' cases had been processed within established time frames.

- Interviewed a CSR to document the classification process and the Classification Services Unit's oversight responsibilities for the administration of ASUs and inmate due process rights.

- Interviewed the department's Program Support Unit and budget staff regarding staffing ratios for ASUs and statewide ASU costs.

Based on our analysis of the information we obtained through this process, we developed two findings and 12 recommendations regarding the management of ASUs.

# Finding 1

**CSP Los Angeles County, CSP Solano, and San Quentin State Prison routinely violate the rights of inmates to due process and timely release from administrative segregation.**

The process for assigning and retaining inmates in the administrative segregation unit (ASU) is complex and cumbersome. As a result, the opportunities for mistakes to occur are numerous. While our review found many errors, the following chart shows the most common problems related to the ASU process.



These violations are caused by lapses in scheduling, tracking, and completing casework on time, as well as lapses in holding prompt classification hearings. In addition, we found certain prisons fail to obtain mandatory headquarters approval for retaining inmates in the ASU for longer than 30 days. Breakdowns in the ASU classification process often prevent inmates from returning to the general population in a timely manner.

***Some prisons routinely violate department policies and procedures and make errors that cause unnecessary delays in releasing inmates from the ASU, particularly at the end of an inmate's SHU term***

Staff members must provide due process for inmates placed in segregated housing. The initial procedural requirement is for the inmate to be provided with a lock-up notice explaining the reasons for the ASU placement. In addition, when the reason or circumstances for an inmate's placement in the ASU change, staff members are required to issue the inmate a new lock-up notice to afford the inmate additional procedural protections. One example of a changing circumstance is when a security housing unit (SHU) term expires[4] and the inmate cannot be released to the general population because he remains a threat to the victims of his offense. In this circumstance, the inmate would receive a new lock-up notice explaining his retention in the ASU, and he would be provided with an opportunity to appeal the action.

In 30 of the 85 inmate cases reviewed (35 percent), we found violations of inmates' procedural rights in relation to the lock-up notice process. Violations included:

- Failure to provide an adequate lock-up notice;

- Failure to meet time frames for hearings;

- Failure to provide staff assistance when needed;

- Failure to issue a new lock-up notice when an inmate's reason for being held in the ASU changed.

The following is an example of a San Quentin inmate who was not provided his procedural rights, including not receiving the required lock-up notice when his reason for ASU placement changed:

*On March 29, 2007, an inmate with an extensive history of mental health problems arrived at San Quentin and claimed he feared for his safety in the prison. Based on the safety concern, the inmate was issued a lock-up notice and placed in the ASU. Within a few days, the ICC decided to keep him in the ASU pending receipt of the inmate's archived central file. The ICC also referred the case to the CSR for approval to keep the inmate in the ASU for 90 days to evaluate his safety concerns. On May 8, 2007, the CSR instructed the prison to return the case in 15 days, noting that the file was already available so there was no reason to delay evaluating the safety issue. However, the investigation into the inmate's safety concerns was not completed until early July 2007, and the prison failed to return the case to the CSR for review and approval as required. As a result, the inmate continued to be held in the ASU without required CSR approval.*

---

[4] Many SHU terms expire before a transfer to a SHU facility can occur, resulting in the entire SHU term being served in the ASU.

*While in the ASU, the inmate assaulted two correctional officers. Because of his assaults on the officers, the reason for his ASU placement changed. At this point, staff members should have provided the inmate with a new lock-up notice, consistent with department policy, and reclassified him. However, a new lock-up notice was not issued.*

*Ultimately, the ICC did not see the inmate until December 6, 2007, seven months after his first hearing and over six months after staff members were instructed to return the case to the CSR for review. At this hearing, the ICC imposed two SHU terms, with an expiration date of September 8, 2008. Even at this hearing, the ICC failed to recognize that a new lock-up notice was required because the reason for the inmate's ASU placement had changed.*



**ASU exercise unit**

*While in the ASU, the inmate's mental state deteriorated, and the inmate was temporarily transferred to another prison to address his mental health needs. However, on May 27, 2008, the inmate was returned to San Quentin. Upon his return, the inmate was placed back into the ASU and issued a new lock-up notice stating that because he was in the ASU before the transfer, he was being placed there again. Despite multiple changes in the inmate's status during the intervening period, this was the first lock-up notice the inmate received since March 29, 2007. Further, while the staff finally issued a lock-up notice, the prison violated policies and procedures by not providing enough information for the inmate to appeal his ASU placement.*

While there were numerous errors and procedural violations in the handling of this inmate's ASU placement, at a minimum, the ICC should have reviewed the inmate's case immediately after instructed by the CSR on May 8, 2007, and returned the case within 15 days as required. Further, the ICC should have reviewed the case at 30-day to 90-day intervals.

More than one year after arriving in the ASU, San Quentin staff continued to violate this inmate's rights by not complying with policies and procedures, as follows:

- The staff had yet to issue the inmate a new lock-up notice with sufficient detail to inform him that his pattern of misbehavior resulted in SHU terms and was causing him to be held in the ASU.

- The staff had not provided him with the required lock-up notice protections, such as assigning a staff assistant and holding a lock-up notice hearing based on the changed reason for being held in the ASU, which also precluded the inmate from appealing these issues.

- The staff had not provided the inmate's central file to a CSR for review and approval of the ICC's actions, including issuing him two SHU terms for assaulting staff members.

On August 31, 2008, the inmate was transferred to the California Medical Facility to address his mental health needs. His unapproved SHU term expired in September 2008.

In addition, prison staff need to determine the appropriate housing before an inmate's SHU term ends. Prison staff are required to conduct a classification hearing at least 30 days prior to the expiration of the SHU term. A new lock-up notice is required if the inmate is to be retained in the ASU pending a transfer to another prison. However, our review found that prison staff members did not always issue new lock-up notices and reclassify inmates before the end of their SHU terms. These inmates could not be released to the general population for other reasons, and they were held in the ASU an average of three months beyond their SHU term without an appropriate notice and hearing. At CSP Los Angeles County, in more than one-half of the cases we reviewed, inmates were held an average of nearly four additional months beyond the expiration of their SHU terms without the required notice and hearing.

In another example, staff errors resulted in an inmate being retained in the ASU after his SHU term expired:

> On January 24, 2007, an inmate was placed in San Quentin's ASU. While in the ASU, the inmate received multiple disciplinary reports; however, while assessing SHU terms and classifying the inmate, staff members made multiple errors in their calculations. On May 7, 2008, while attempting to correct the errors, the ICC determined that the inmate's SHU term had expired on January 20, 2008, almost four months earlier. Despite this fact, the inmate continues to occupy an ASU bed while the staff attempts to sort out the multitude of problems in his central file. As of June 18, 2008, San Quentin still housed the inmate in the ASU, even though his SHU term expired on January 20, 2008. No new lock-up notice was issued to explain why the inmate was still housed in the ASU even though his SHU term expired. Because no notice was issued, the inmate has not been given an opportunity to appeal his retention in the ASU.

### The department does not have specific policy requirements regarding time frames to complete investigations and gang validations, and as a result, staff frequently take an inappropriate length of time to complete casework

An inmate's stay in an ASU is temporary while staff members gather information to determine the inmate's next classification placement. The most common areas to resolve before an inmate's appropriate classification and placement are investigations and inmate disciplinary processes.

In 17 of 85 inmate files we reviewed, or 20 percent, staff members took an average of almost eight months to complete the investigations, as noted in the graph below. Of those investigations, 65 percent were to determine an inmate's prison gang involvement, 17.5 percent concerned the circumstances of the inmate's safety concerns, and 17.5 percent involved serious misconduct allegations.

The graph below shows the average number of months to complete each type of investigation in the cases we reviewed.



Inmates are commonly removed from the general population to prevent them from interfering with investigations. Staff members conduct investigations regarding serious misconduct, such as assaults, drug trafficking, and attempted escapes. Staff members also investigate when an inmate claims his safety is in jeopardy, or when an inmate is suspected to belong to a prison gang, such as the Mexican Mafia or Aryan Brotherhood. The prison's investigative officers and gang coordinators usually investigate serious misconduct or gang activity. However, classification or facility staff members also investigate some issues, such as misconduct and inmate safety concerns. When an inmate is held in the ASU pending an investigation, prison managers are responsible for tracking the investigation's timely completion.

For gang validations, the gang investigator prepares the documents and submits the evidence of prison gang involvement to the department's Office of Correctional Safety for approval. In eleven central files that we reviewed, the average time to complete gang validations was over eight and a half months. However, we also found that six of the eleven gang validation cases took over ten months to complete after the inmate was placed in the ASU, with no explanation in the central files regarding why those investigations took so long.

The California Department of Corrections and Rehabilitation has no formal procedures governing time frames for completing gang validations. The Office of Correctional Safety's internal goal is to conduct its review within 60 to 90 days. However, documents returned by the Office of Correctional Safety to the prisons for revisions can cause significant delays in completing the validation process.

Since the department has no criteria for the timely completion of investigations regarding safety concerns and gang validations, such investigations can take many months to

complete. In turn, these lengthy investigations increase the time inmates are held in the ASU. The following example illustrates an extended ASU confinement stemming from a delayed investigation:

> *A San Quentin inmate was placed in the ASU on July 20, 2007, for safety concerns. The investigation into his safety concerns did not begin until February 11, 2008, nearly seven months after he was first placed in the ASU. Once initiated, the investigation was completed in only two days. There was no explanation for the delay in initiating this investigation.*

> *On February 27, 2008, the ICC said that the inmate's transfer was delayed until completion of reception center processing, a process normally completed within 60 days after an inmate arrives at a reception center. This inmate had arrived at the reception center on July 20, 2007; therefore, the reception center processing should have been completed by the end of September 2007.*



**ASU unit at CSP Sacramento**

> *On May 22, 2008, a new lock-up notice was finally issued advising the inmate he was in the ASU for safety concerns, yet there was no information in the inmate's central file indicating that he had new safety concerns. It appears that staff members were unaware that the investigation into the inmate's safety concerns was already completed. On May 28, 2008, the ICC elected to retain this inmate in the ASU pending an investigation into his safety concerns. We contacted a counselor and a gang investigator who both said they were unaware of any new investigation for this inmate. Yet, as of June 18, 2008, the inmate was still housed in the ASU. Had staff members diligently processed this case, the ICC could have reasonably referred the inmate for transfer around October 2007.*

### Prison staff fail to conduct inmate classification hearings in a timely manner

Since ASU housing is intended to be temporary, the responsibility of the ICC is to ensure staff work is completed on time in order to determine an inmate's next placement. California Code of Regulations, Title 15, section 3335 requires that each ASU inmate have an ICC hearing within 14 calendar days after the completion of the casework, such as an investigation or disciplinary report, related to an inmate's placement in the ASU.

Significant delays in completing casework can occur when managers fail to monitor the status of staff work. We found that in 32 of the 85 inmate files we reviewed, or 32 percent, the staff failed to comply with the 14-calendar-day requirement. The average delay in processing these cases was 56 days beyond the 14-day requirement. CSP Solano had 18 cases where the 14-day rule was violated, which averaged 49 days beyond the 14-day requirement. In contrast, CSP Sacramento had no 14-day violations. In the following example, the ICC did not review the inmate's disciplinary report within 14 days of completion:

> *An inmate was initially placed in the ASU on February 22, 2007, at Calipatria State Prison for battery on an inmate. He was transferred to the ASU at CSP Los Angeles County on September 20, 2007. As a result of the mishandling of his initial rules violation report hearing, his disciplinary report was not completed until October 17, 2007. He did not appear before the ICC until March 27, 2008, which was 148 days more than the 14 days allowed.*

### Three of eight prisons sampled do not effectively use tracking logs to identify delinquent ASU cases

Tracking logs are usually designed as a tool to assist staff and managers in scheduling cases, ensuring due dates are met, and serving as a reminder for work needing to be done. During our review, we obtained the ASU tracking logs for the eight sample prisons. Three of these prisons used a common tracking program, while the other five prisons used variations of spreadsheets created by the prison staff. As a whole, we found that most of the logs would be adequate to manage the respective ASU caseloads; however, CSP Los Angeles County, CSP Solano, and San Quentin State Prison did not seem to closely monitor the logs to manage the work. Had staff members closely monitored the ASU tracking log, the problems cited in the following case may not have occurred:

> *A CSP Los Angeles County inmate's file indicated that he was initially placed in the ASU on July 3, 2006, for battery on a peace officer. While in the ASU, this inmate committed additional rules violations. On November 28, 2007, the inmate's SHU term for the battery and other violations expired, but he was retained in the ASU for safety concerns. On December 26, 2007, the CSR approved a recommendation that the inmate be transferred to another prison with an expiration date of April 24, 2008. As of June 18, 2008, the inmate was still retained in the CSP Los Angeles County ASU and had not been brought back to the ICC to review his case status.*

> *The inmate's information in the June 9, 2008, ASU tracking log was consistent with the inmate's file. The log clearly shows that the inmate's SHU term had expired on November 28, 2007, and in addition, his transfer endorsement expired on April 24, 2008. A review of the ASU tracking log would have alerted staff that the inmate should have been referred to the ICC before April 24, 2008. As a result, the inmate was confined to the ASU for two additional months because he could not be transferred with an expired transfer endorsement.*

The warden at one prison has been holding weekly status meetings regarding ASU cases for the previous six months to reduce the errors that had been occurring. However, we still found numerous potential errors during our review of the ASU tracking log for this prison. Our review of the tracking log showed 51 potential problems with ASU cases, including expired SHU terms, expired CSR approvals, and overdue classification hearings. These red flags indicate that, despite participating in the warden's weekly ASU meeting, managers are not using the tracking log to effectively identify and address potential problems.

### Certain prisons do not consistently obtain CSR approval for retaining inmates in the ASU

To maintain consistent compliance with regulations regarding the use of the ASU, the Classification Services Unit has oversight of the inmates housed in segregation. When the ICC determines that an inmate must stay in the ASU for more than 30 days, staff members are required to submit the inmate's central file with an explanation of the need to exceed 30 days to a CSR for approval. The chart below outlines the CSR approval guidelines.



A common procedural error occurs when staff members fail to adequately inform the inmate of the specific reasons for his stay in segregation. In such cases, either the CSR may deny the ASU placement, or the CSR may require that staff members provide the inmate with additional due process protections, such as issuing a new lock-up notice, which requires a new ICC hearing.

Moreover, we found that the prisons regularly failed to take action to resolve the discrepancies cited by a CSR until the inmate's next normally scheduled ICC hearing, usually months later. Seventy-two percent of the cases we reviewed had significant lapses in responding to CSR concerns by the date requested, averaging nearly a three-month delay per case. On one extreme, CSP Los Angeles County failed to meet the time frames for resolving issues in 18 of the 20 cases we reviewed (90 percent). CSP Solano and San

Quentin were not significantly better—they failed to meet time frames in 32 out of 46 cases (70 percent) and 11 out of 13 cases (85 percent), respectively. In contrast, we found 100 percent compliance with cases from CSP Sacramento.

The department's general time frame for staff members to submit a case to the CSR after an ICC hearing is 30 days (which is extended up to 60 days for certain exceptions). In almost one-third of the cases we reviewed, the classification staff failed to forward their recommendation to the CSR within 60 days of the ICC hearing. In those cases, it took almost 120 days to obtain CSR approval. At San Quentin, over three-quarters of the cases were not submitted to the CSR for approval within 60 days of the classification hearing. The following is an example of a prison not obtaining the CSR's approval to retain an inmate in the ASU:

> *On October 25, 2007, a CSP Los Angeles County inmate was placed in the ASU for battery on a peace officer. On November 26, 2007, the CSR stated that the file was missing information and requested that the prison review the case and return it to the CSR by December 11, 2007. The prison took no further action until March 6, 2008, when the ICC assessed a SHU term for the disciplinary action. However, the file was not presented to a CSR after it went to the committee. As of June 19, 2008, seven months since the last CSR review, the inmate's case had still not been forwarded to the CSR for review and approval to retain the inmate in the ASU.*

In an apparent acknowledgment that staff members are struggling to comply with the 60-day requirement, on May 5, 2008, the department issued a memorandum revising the time frames for submitting transfer referrals to a CSR. The memorandum emphasizes the expectation of submitting cases to a CSR within 30 days. However, the memorandum also serves to extend the time frames for updating a case by an additional month, from 60 days to 90 days.

In cases requiring a CSR approval to transfer an inmate, delays in processing reports and getting a case presented to the CSR ultimately result in delays in transferring the inmate to his next prison. Delays in facilitating transfers may result in the unnecessary use of ASU bed space and additional restrictions of the inmate's liberty.

CSRs only review the central files that are presented to them by the prisons' classification staff members. Once a CSR requests action on a problematic case, there is no external method to track whether the prison is addressing that CSR request in a timely manner. Under the current system, the responsibility for ensuring compliance with CSR requests relies totally on the prison. The CSRs are not required to follow up on past referrals to ensure staff compliance. When classification staff members do not effectively track the status of their cases, there is no safety net to ensure an inmate's stay is not delayed for months because of the errors. The following is an example of one prison's failure to track an inmate's case status:

*An inmate was initially placed in CSP Los Angeles County's ASU on November 14, 2007, for safety concerns. On December 11, 2007, the CSR approved his retention in the ASU pending an investigation into the inmate's safety concerns. Included was a directive to return the case with an update to the CSR by January 20, 2008. The investigation was completed on March 7, 2008, which concluded the inmate could not be released to the general population housing unit. As of June 19, 2008, the case has still not been returned to the CSR, and there is no explanation of why the CSR's directive was ignored and why the inmate has not been endorsed for transfer.*

### Postponed parole hearings result in extended ASU confinement

In our review, we also discovered a lack of coordination between correctional counselors and the department's Board of Parole Hearings (BPH). Prison staff members are precluded from transferring inmates who are within 90 days of their BPH lifer hearing dates. When staff members are alerted to an upcoming BPH hearing for an ASU inmate, they retain the inmate in the ASU pending completion of the hearing. But in some cases we found that the BPH postponed the hearings and rescheduled them several months later. When this occurred, only a brief window became available to transfer the inmates. However, there is no process in place to alert classification staff of postponed BPH



**Correctional officers escorting an ASU inmate**

hearings. As a result, frequently when the committee conducts the next review, the inmate is once again within 90 days of his BPH hearing and the window to transfer the inmate has closed.

The frequency of the BPH hearings affecting an inmate's stay in the ASU was small, just eight percent, or seven of the cases we reviewed. However, the impact for those eight percent was significant. The average additional stay in the ASU related to BPH hearing issues was about six months. Of the seven inmates we reviewed whose ASU stay had been affected by BPH actions, five had their BPH hearings postponed one or more times. The following is an example of how a postponed BPH hearing affected an inmate's ASU stay:

*An inmate was initially placed in CSP Solano's ASU on April 21, 2007, for attempted over-familiarity with a staff member. The inmate was later found guilty of over-familiarity, a charge that does not warrant a SHU term. The staff member who the inmate targeted voiced concerns regarding her safety if the inmate were released, so the ICC retained him in the ASU pending transfer to another prison. However, the inmate could not be transferred because he was within 90 days of his BPH hearing, which was scheduled for October 2007, six months after his initial ASU placement. Because the BPH could not provide a panel for that*

*week's hearings, the inmate's BPH hearing was rescheduled for March 2008. When classification staff discovered his BPH hearing was postponed, the rescheduled hearing was already within the 90 days and the inmate again could not be transferred to another prison. The BPH held a hearing in March 2008, and the inmate was denied parole. On July 23, 2008, 15 months after being placed in the ASU for a rules violation that does not require segregation in a SHU or ASU, the inmate finally received a transfer to another prison.*

### Certain prisons failed to accurately maintain data on their transfer lists

We noted that in 23 of the 85 inmate files reviewed (27 percent), inmates were retained in the ASU for a period averaging nearly six and a half months while pending transfer to another prison. When the ICC determines an inmate needs to transfer to another prison, it makes a recommendation to a CSR for approval. If the case complies with department requirements, the CSR "endorses" the inmate for transfer. The prison's case records staff are tasked with maintaining a list of inmates to be transferred.

Each week the case records staff uses the transfer list to request bus seats from the department's Transportation Unit. Because of overcrowding and limited program availability, there are only a few bus seats given each week to each prison. The case records staff schedules inmates for transfer based on the number of bus seats they receive. The case records staff then prioritizes bus seats based on factors such as medical transfers and ASU placement. In addition, inmates are also scheduled based on the length of time they have been endorsed for transfer, with oldest endorsements transferring first. However, most transfer endorsements expire after 120 days, and before an endorsement expires, the classification staff is required to resubmit the case to the CSR for a new endorsement.

Nevertheless, we found ten cases at three prisons where inmates were endorsed for transfer two to four times over the course of several months (in one case, 17 months) without receiving a transfer.

For example, we obtained a copy of CSP Solano's transfer list and compared the list data with endorsement information in the central files. We found that staff members were incorrectly tracking information on the transfer list. Specifically, in the section identifying the inmate's length of time that he was endorsed, instead of showing his original endorsement date, staff members entered the date of the most recent endorsement. The result is that the inmate's name was moved to the bottom of the transfer list each time the inmate received a new endorsement. While we were unable to track each inmate's endorsement history on the transfer list, staff members responsible for the list said they were unaware they were making these incorrect entries. According to these staff members, this situation was more than likely compounded when the classification staff allowed an endorsement date to expire before resubmitting the case to a CSR. In those instances, the inmates' names were completely removed from the transfer list until they were re-endorsed. The following is an example of a transfer list problem affecting an inmate's ASU stay:

*A CSP Solano inmate was listed on the May 29, 2008, automated transfer report with an original endorsement date of April 22, 2008. However, we reviewed the inmate's file and noted that he had three endorsements without being transferred. The inmate's first endorsement was July 3, 2007, more than nine months earlier than the endorsement date currently noted on the transfer report.*

Therefore, staff failure to accurately maintain the information on the transfer list causes some inmates to remain housed in the ASU for much longer than would normally occur. Some of these inmates had not committed any misconduct, but rather they had been victims of assaults and were awaiting transfer to sensitive needs yards (SNYs).[5]

---

[5] Inmates who cannot be housed safely in general population facilities because of safety concerns are placed in SNY facilities. SNYs are similar to general population yards in terms of cost to operate, freedom of movement, and access to programming.

# Finding 2

**The California Department of Corrections and Rehabilitation incurs additional costs as a result of the unnecessary retention of inmates in administrative segregation.**

The average cost of housing a male inmate in the ASU is much greater than in a general population unit for two reasons. First, the ratio of staff to inmates is greater in the ASU than in a comparable general population housing unit. The additional staff members are necessary because most inmates who are housed in ASUs are there for violent or dangerous behavior. Anytime an ASU inmate is moved from his cell (such as to the showers, ICC hearings, visiting, or the law library), per department policies and procedures, he needs to be handcuffed and escorted by correctional officers. The second reason is that since ASU inmates are often dangerous to others, many are housed in single cells as opposed to dormitories and double-bunked cells in general population housing; therefore, there are generally fewer inmates housed in an ASU than in a comparable general population housing unit. As a result, an ASU has more staff members overseeing the needs of fewer inmates.



**ASU exercise units**

Documentation provided by the department revealed that the male ASU population has increased from an average of 8,791 in the 2006–07 fiscal year to an average of 8,878 in the 2007–08 fiscal year. This increase contrasts with the male inmate population as a whole, which has trended slightly downward in recent years.

Included in the ASU population increase was an additional 48 ASU overflow beds statewide, from 704 beds in 2006–07 to 752 beds in 2007–08. When more ASU beds are required at a particular prison, an ASU overflow housing unit is created by converting portions of a general population housing unit. The costs of these overflow beds are comparable to those of regular ASU beds; however, instead of budgeted positions, this additional overflow cost is paid through staff overtime. For example, CSP Solano reported that the additional cost attributed to the ASU overflow in 2007–08 was $431,000 for correctional staff overtime.

In our discussions with department headquarters staff, they could not determine the statewide costs associated with operating ASUs or ASU overflow units. Therefore, we contacted various program units and prisons within the department, and we received information from which we estimated the annual ASU costs.

- Custody costs for correctional officers, sergeants, and lieutenants were provided by department headquarters.

- Staffing information and the budgeted inmate capacity for general population and ASU housing units was provided by three prisons: CSP Sacramento, CSP Solano, and Pelican Bay State Prison.

- We calculated the correctional cost per inmate by multiplying the number of staff members assigned to a general population housing unit and ASU and dividing that number by the budgeted inmate capacity.

For example, at CSP Sacramento, the annual correctional cost for housing a general population inmate is $11,512 while the equivalent ASU cost is $28,137, or a difference of $16,625. At CSP Solano, the difference is $15,692 and at Pelican Bay State Prison the difference is $11,501. The costs vary significantly from prison to prison because of the different physical designs and the various missions and programs provided to inmates. If we were to average the three prisons, we estimate that the annual correctional staff cost of a standard ASU bed to be approximately $14,600 more than the equivalent general population bed. For the 8,878 ASU beds statewide, this additional cost equates to nearly $130 million a year.

While previously noted, unnecessary delays in releasing inmates from ASUs resulted in violations of inmates' due process rights; those delays also resulted in the department incurring unnecessary additional costs. We estimate the ASU overflow costs are more than $10.9 million of the nearly $130 million expended on ASU beds statewide. We recognize there are situations beyond the department's control, such as riots, that require short-term use of ASU overflow beds. However, by reducing delays, the department could achieve a considerable savings by reducing ASU overflow beds and the associated overtime costs. Were the department and its prisons able to reduce the need for ASU overflow beds, the department could significantly reduce the $10.9 million expended each year. In addition, the reduction of overflow beds would reduce overcrowding because ASUs typically have more single cells then general population housing units.

# Recommendations

The Office of the Inspector General makes the following recommendations:

- The secretary of the California Department of Corrections and Rehabilitation should ensure that the department develops defined expectations for completing investigations, including specific timelines for each type of investigation. The department should prioritize investigations, identify required resources, and establish due dates in order to complete investigations on time.

- Department managers and supervisors should closely monitor tracking logs for inmate disciplinary reports and account for the status of every incomplete inmate disciplinary report. The results of completed inmate disciplinary reports should be forwarded to the classification staff in a timely manner.

- The secretary should ensure that the department standardizes its tracking log program for managing ASU cases. The program should include a "responsible party" section with due dates to help managers identify the progress of work associated with ASU cases. The program should also contain detailed dates regarding transfer endorsements, BPH hearings, and CSR approval.

- Department classification staff and managers should conduct analytical reviews of tracking logs to ensure that investigations and other actions are completed and that hearings are held in a timely manner, and that cases are monitored on an ongoing basis. ICCs should carefully review inmates' case factors and determine whether continued segregation is necessary.

- The secretary should rescind the May 5, 2008, memorandum that increased the time frames for submitting transfer referrals to a CSR to 90 days.

- The secretary should ensure that the department provides ongoing training on assigning and retaining inmates in the ASU to the correctional counselors and managers who are responsible for processing ASU placements.

- Correctional counselors should ensure that all inmates serving determinate SHU terms are scheduled for a classification hearing within at least 30 days prior to the expiration of the SHU term. In cases when the inmate remains a threat to safety and security, staff members should comply with regulations by issuing a new lock-up notice to the inmate and provide due process protections for his changed reasons for segregation.

- The Classification Services Unit should implement a system for CSRs to follow up on problematic ASU cases. Each CSR visiting the prison could review past issues and inquire when staff members have not rectified the problems.

- The secretary should ensure that the department develops a system and criteria for coordinating BPH hearings for inmates housed in the ASU to prevent delays caused by postponed BPH hearings.

- The secretary should ensure that the department creates standard desk procedures for staff members responsible for maintaining the prison transfer lists and ensure compliance with the procedures. The ICC chairpersons should become proactive in seeking resolution for inmates spending unusually long periods in the ASU waiting to transfer to another prison.

- The secretary should ensure that the department develops effective comparative statistics (COMPSTAT) methods for tracking the prisons' use of ASU bed space. Currently, these COMPSTAT reports require that prisons report the average length of stay for inmates in the ASU and analysis of the budgeted beds, including overflow. A more effective method is to capture the number of stays over 200 days, 400 days, or 800 days, including data justifying the specific reasons for extended ASU retention. In addition, COMPSTAT data could include information identifying time frames affecting the availability of ASU bed space, such as the length of gang validations, time spent on transfer lists, and expired transfer endorsements.

- The secretary should ensure that the department develops a process to accurately account for ASU costs statewide. The level of detail should include added special program costs, such as mental health, in addition to custody costs. The effective management of ASUs must consider both due process and cost factors.

# California Department of Corrections and Rehabilitation's Response

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**OFFICE OF THE SECRETARY**
P.O. Box 942883
Sacramento, CA 94283-0001

January 8, 2009

Mr. David R. Shaw
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780

Dear Mr. Shaw:

This letter is being submitted in response to the Office of the Inspector General's (OIG) report titled *Special Review: Management of the California Department of Corrections and Rehabilitation's Administrative Segregation Unit Population,* dated January 2009. During this review, the OIG identified several violations of compliance with policies and procedures by California Department of Corrections and Rehabilitation (CDCR) institutions related to inmates housed in Administrative Segregation Units (ASU).

As with all OIG audits and special reviews, CDCR appreciates the OIG's continued commitment to improving our programs and operations. Within this special review, the OIG identified 2 findings and 12 recommendations for CDCR to consider addressing. As identified by the OIG, the Department acknowledges our need to improve the management of the ASU populations at California State Prison, Los Angeles County; California State Prison, Solano; and San Quentin State Prison.

The OIG reports that due process violations have occurred which have resulted in unnecessary operating costs. As you know, CDCR's operations are intricate and complex and we continually strive to resolve all identified deficiencies. In an effort to address these issues, CDCR will evaluate the standardization of procedures for all institutions related to the management of ASU populations. This will include developing standardized tracking systems, implementing appropriate management review tools, and providing training to staff involved in these processes.

I would like to thank the OIG for allowing CDCR the opportunity to comment on the special review and appreciate your continued professionalism and guidance in our efforts to improve our operations. CDCR's Office of Audits and Compliance will monitor and document the Department's progress in addressing the report's findings. If you should have any questions or concerns, please call my office at (916) 323-6001.

Sincerely,

*Matthew L. Cate*

MATTHEW L. CATE
Secretary

# EXHIBIT H


PANNONE
LOPES &
DEVEREAUXᴜᴄ

July 12, 2008

Robin Dezember
Chief Deputy Secretary
Division of Correctional Health
Care Services
501 J Street, Suite 530
Sacramento, CA 95814-0001

Lisa A. Tillman, Esquire
Deputy Attorney General
Office of the Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 95814

RE:    Workload Study

Dear Robin and Lisa:

    I have reviewed the workload-based staffing model for which the California
Department of Corrections and Rehabilitation (CDCR) is currently seeking legislative
approval. This letter is a summary of how the staffing model would be implemented. At
the outset, I would like to state that Business Advantage Consulting and Phase 2
Consulting (consultants) produced a thorough and detailed analysis of the mental health
staffing needs. However, given the dynamic nature of mental health care within CDCR
institutions and the resulting ongoing evolution of staffing needs, it is important to keep
in mind that, of necessity, a meaningful Workload Study must be a work in progress.
With that in mind, certain issues should be addressed in order to avoid any
underestimation of actual staffing needs. This letter details my concerns and
recommendations in that regard.

Background:

    Beginning in 2002 and continuing for approximately the next four years, the
parties to the Coleman case were engaged in negotiating the content of an updated set of
standards for mental health care in CDCR institutions that were later collectively given
the more formal title of the Coleman Revised Program Guide.[1] It was within that context
in 2004 that the CDCR undertook a field study to determine the levels of staffing
necessary to implement the Program Guide revisions. In response to that study, the
CDCR submitted a Budget Change Proposal (BCP) that provided input on staffing needs
to the Department of Finance (DOF) in the May 2005 revise process for the fiscal year
(FY) 2005-06 budget. In it, CDCR sought $4.1 million for 51.25 mental health positions
to implement the revised Program Guide in the administrative segregation and secure

---

[1] The Coleman court entered an order dated March 2, 2006 approving the undisputed provisions of the
January 2006 Revised Program Guide and ordering defendants to implement them immediately.

Case No. CIV S-90-0520 LKK JFM P (E.D. Cal)
C01-1351 THE (N.D. Cal)
PLTF Exhibit No. P - 485
Date Entered:_____
Signature:_____
Alternate Reference: Coleman Pls' Trial Ex. 64

DEFS027299

housing units at California State Prison, Corcoran (CSP/Corcoran). In addition, the BCP provided for the allocation of 822.1 permanent mental health staff field positions and 21.2 limited term field positions to implement the revised Program Guide system-wide.

This 2005 BCP offered four strategies for the allocation of the recommended staffing. The first proposal called for the allocation of all the required positions in FY 2005-06 and the second proposal would spread the allocations over a two-year period. The third proposal would allocate just the staffing required to implement the revised Program Guide in the administrative segregation and segregated housing units at CSP/Corcoran. The fourth proposal would allocate no resources to implement the revised Program Guide.

The DOF approved only the staffing required to implement the revised Program Guide in the administrative segregation and segregated housing units at CSP/Corcoran which was specifically mandated by the Court. No explanation was offered as to why pending Program Guide revisions were not taken into consideration.

In the following year (FY 2006-07), the CDCR reduced by 40 percent its proposal for mental health staffing to implement the revised Program Guide. The CDCR justified this new request for staffing by highlighting areas already troubled by inadequate services and subject to the Court's scrutiny and remedial orders. The DOF allocated two percent of the staffing requested by the CDCR for administrative segregation and reduced by one-third CDCR's already reduced request for staffing to implement the revised Program Guide. The DOF promised to fund a workload study to corroborate and ensure appropriate staffing levels.

During a status conference held on May 19, 2006 to address the short list of unresolved issues with the revised Program Guide, the Court was informed that the DOF had rejected some portion of CDCR's request for mental health staffing necessary to implement the revised Program Guide. On May 25, 2006 the Court directed then Coleman Special Master J. Michael Keating to submit a report on the status and sufficiency of the defendants' budget requests for the staffing. On July 28, 2006, Special Master Keating filed his report, and on that same day the Court issued an amended order, paragraph two of which states:

> "Defendants shall prepare and present to the special session of the Legislature, scheduled to occur in August 2006, a budget proposal for the allocation of no less that 530.65 permanent and 21.2 limited term positions recommended by the Department of Finance's Unit Review in 2005, together with an allocation of sufficient funding to execute and complete a workload study in time to include its findings and recommendations in the FY 2007/08 budget. The 530.65 permanent positions should be in addition to the 208 permanent positions already allocated to implement the revised Program Guide."

In response to that order, Senate Bill 1134 was introduced to make appropriations for the 551.8 positions necessary to implement the revised Program Guide, and for $750,000 to conduct an extensive workload study to be incorporated into the budget process for the 2007-08 fiscal year. The legislation also mandated that the CDCR complete the workload study and submit it to the California State Legislature (Legislature) no later than April 1, 2007. Senate Bill 1134 was approved by the Governor on September 27, 2006 and Chaptered by the Secretary of State on September 27, 2006.

Workload Study Project:

CDCR engaged the consultants to conduct a statewide mental health staffing workload study. The project was completed in approximately six months. The project team held its first meeting in January 2007 and transmitted a request for information to headquarters. The information obtained by the project team was used to form "key assumptions" to develop the model. Some of this information included Program Guide requirements, the percentage of Mental Health Delivery Services System (MHSDS) inmates taking medication, staff assigned to particular tasks, the frequency of tasks, and the number of inmates per group.

The project team then sent data requests to identified mental health contacts at each institution requesting specific information or reports in the areas of:

- licensed clinician staffing patterns
- support personnel staffing patterns
- organizational/reporting structure
- duty statements
- local operating procedures
- budget financial statements
- management reports (e.g. dashboard or performance measurements)
- mental health activity volumes

After analyzing the data, the project team visited specific institutions designated as "calibration sites" to assess the structure and program deployment at those facilities. Four institutions were visited (Salinas Valley State Prison, California Medical Facility, California State Prison at Sacramento, and California Institution for Men) and the following programs were examined:

- reception center
- security levels I – IV
- DMH licensed inpatient psychiatric care
- 3CMS and EOP level of care in general population and administrative segregation
- mental health crisis beds (MHCB)
- psychiatric services unit (PSU)
- sensitive needs yard (SNY) designation

DEFS027301

The project teams that visited these calibration sites were typically comprised of two licensed clinicians and up to five core project team members. The site visits lasted approximately four to five hours per institution and were all concluded during the week of January 22, 2007. The project team collected additional data from the institutions and Division of Correctional Health Care Services (DCHCS) headquarters throughout the month of February.

With this data, the project team began to develop the "activity grids" which provided the method for representing the actual clinical time required, by position, to perform the required services or "tasks" mandated by the revised Program Guide. The estimates of the time required for each task were not derived from actual observations or measurements, but were developed by the consultants and CDCR health care administrative staff prior to the site visits. These estimates were then refined through the site visits by interviewing field staff. By multiplying the number of minutes necessary to perform each task by the number of times the task is supposed to be performed over the course of a year using the Program Guide minimum requirements, the project team arrived at the total amount of time that each task required by position or classification.

The project team then visited twenty five institutions designated as validation sites during the time period of March 5, 2007 through March 27, 2007. These validation site visits lasted approximately three to four hours and involved the institution's participating staff. These visits were used to attempt to validate or correct assumptions about workload estimates, review the space and equipment issues, and refine the activity grids.

On April 2, 2007 the project team sent the reports generated from the collected data to the Chief of Mental Health or designee at each institution. Throughout the month of April and into May 2007, the project team continued to assess the collected data and catalogue the information. From April 3rd though April 12th, key DCHCS headquarters staff were interviewed. From those interviews twenty five persons were asked to participate in confidential discussions. By April 13, 2007 the mental health staffing model was completed in draft form. A "milestone meeting" with mental health leadership, Division of Adult Institutions (DAI) representatives, nursing, and health care licensing staff was held on April 13th and generated additional feedback. A working session was held in early May with mental health clinicians.

The Mental Health Staffing Workload Study (Workload Study or Study) was completed and presented to the CDCR in June of 2007. The DCHCS did not approve these findings until December 2007.

2008-09 Budget:

On April 1, 2008, Vincent Brown, Chief Deputy Director of the DOF, submitted a Finance Letter to the Senate Budget and Fiscal Review Committee. It contained a request for 407.7 new positions in FY 2008-09 that were recommended by the Workload Study and intended for compliance with the court order dated March 2, 2006. It is my understanding, based on representations made by representatives of the DCHCS, that this funding request has stalled in the Legislature. According to these DCHCS

representatives, the two concerns raised by both chambers of the Legislature are the validity of the Study and that 500 positions already authorized within the CDCR are still vacant and therefore more positions should not be approved. DCHCS staff has informed me that CDCR has stated to the Legislature that the Workload Study model should be approved this year for three reasons. First, CDCR may fill all of the vacant positions before the next budget cycle. Second, the Workload Study model provides better distinction for the classifications actually needed. Third, the CDCR wants to replace the current Prevalence Mix method of staffing because the Prevalence Mix method generates the number of necessary staff based only on the population numbers and this could cause the CDCR to lose positions.

DCHCS representatives have informed my staff that if the Workload Study model is approved, the CDCR would be required by the DOF to run the model twice every year, in the Spring and Fall, to account for any changes in programming or population changes. The new data would be entered into the model and an up to date staffing number would be generated and presented to the Legislature for the appropriate action. Although the consultants' report also addressed the staffing at DCHCS headquarters and custody staffing at all institutions, the experts' analysis of the Workload Study focused on clinical staffing positions.

Special Master's Review:

Copies of the Workload Study were provided to me in early February 2008. However, disk number 2 that was provided by CDCR was unable to be accessed and a new disk was provided. Although the Workload Study provided recommendations for headquarters and support staffing, my experts and monitors (experts) focused their evaluation solely on the mental health clinical staffing. The consultants reported that DAI was conducting a custody staffing study, and they recommended using the same methodology for custody as they had used for the mental health Workload Study to arrive at the custody staffing recommendations. While data concerning the functions of Correctional Counselor I positions appeared in the Workload Study matrix, the Study itself did not examine custody staffing, nor was custody staffing evaluated by my experts.

The voluminous information contained on the three compact disks was reviewed by the experts. The experts immediately began to question certain information within the Study. Although the Study was very comprehensive, it became clear to the experts that the answers they sought could not be found within the pages of the Study.

Meetings with Consultants:

Given the breadth of the information contained in the Study, the complexity of the methodology used by the consultants, and the unanswered questions, the experts determined that a face to face meeting with the consultants would be beneficial to a better understanding of the Workload Study.

DEFS027303

The first meeting with my experts was held on April 24, 2008[2]. The consultants were represented by Todd Wilcox, M.D., Betsy Figueiro-Steinbrueck, and Tiffany Rolston. The consultants provided a general overview of how the staffing model was designed. The experts attended subsequent meetings on May 13th and May 23rd [3]. A final meeting was held on June 5th with Jennifer Johnson, CDCR Associate Health Program Advisor, Suzanne Streeter, CDCR Staff Services Manager and Sharon Riegel, CDCR Health Program Specialist I, who demonstrated to the experts how the new staffing spreadsheet worked.

Productive Minutes:

The productive minutes are intended to represent the actual amount of time necessary to perform a task required by the Program Guide (i.e. direct patient care or clinical process). During the course of the meetings it became clear to the experts that some of the data which was used to drive the staffing numbers was unreliable and not based on objective measures. It was determined that the minute values that were assigned to each task were estimates originally provided by DCHCS administrative staff or developed by the consultants and then refined during the site visits. The "validation" of these values was accomplished through interviews with institutional staff to determine whether the values made sense. There was no direct observation of any task or any actual measurement of a task used to arrive at a reasonable representation of the time required to perform each task. Comments by CDCR staff, located in the frequently asked questions section of the Workload Study, indicated that they also had doubts about the accuracy of the estimates for some of the tasks. The consultants openly acknowledged that the time frame imposed by CDCR for the completion of the Workload Study restricted their ability to conduct a more in depth approach.

The tables and comments below provide a sample of the issues and questions regarding the assigned values of productive minutes which have been raised by the experts:

Task:  3CMS Clinical Intake Assessment (case manager duties)

| Sub Task | Minutes Value Assigned |
|---|---|
| UHR Review | 15 minutes |
| Face-to-Face Evaluation | 25 minutes |
| Institutional Staff Interview | 6 minutes |
| Review Previous Mental Health Records | 2 minutes |

[2] In attendance at this meeting were Dr. Jeffrey Metzner, Dr. Ted Ruggles, Ms. Haunani Henry, and Mr. Kerry F. Walsh (via telephone). My attendance at that meeting was very brief as I also had to attend another meeting.
[3] In attendance at this meeting were Dr. Jeffrey Metzner, Dr. Ted Ruggles, Ms. Haunani Henry, Mr. Mohamedu F. Jones, and Mr. Kerry F. Walsh (via telephone).

DEFS027304

| Multiaxial Diagnosis | 5 minutes |
| Progress Note | 5 minutes |

Commentary:

- It is not clear whether time is allotted for filling out the CDCR form which summarizes the evaluation.

- The time allotted for "Institutional Staff Interview" does not appear sufficient to determine adaptive functioning and no time is allocated for additional observation, cell side visits, etc.

- There is no time allocated for Central File Review (required by the Program Guide).

Task: 3CMS  Individual Therapy (90-day case management contact)

| Sub Task | Minutes Value Assigned |
| --- | --- |
| 90-Day Contact, Orientation and Supportive Counseling | 30.6 minutes/90-day cycle |
| Progress Note | 7.2 minutes/90-day cycle |

Commentary:

- There is no provision for case management contact at intervals of less than 90 days.

Task: 3CMS Medication Evaluation and Management

| Sub Task | Minutes Value Assigned |
| --- | --- |
| Psychiatrist Face-to-Face for Re-evaluation | 25.2 minutes/90-day cycle |
| Psychiatrist Responding to Medication Requests (probably self referrals regarding medication issues) | 6.3 minutes/patient per 90-day cycle |
| Psychiatrist's Progress Note | 6.3 minutes/90-day cycle |
| LPT Medication Preparation | 2.5 minutes/patient per day |

| LPT Medication Administration | 2.0 minutes/patient per day |
| --- | --- |

Commentary:

- There does not appear to be time allocated for the psychiatrist to review the UHR.

Task: EOP Intake Assessment

| Sub Task | Minutes Value Assigned |
| --- | --- |
| UHR Review (by case manager) | 15 minutes |
| Face-to-Face Interview | 25 minutes |
| Interview with Institutional Staff | 6 minutes |
| Multiaxial diagnosis | 5 minutes |
| Progress Note | 10 minutes |

Commentary:

- The time allocated for an EOP intake assessment is the same as that allowed for 3CMS intake assessment. This appears unrealistic in view of the fact that prospective EOP inmates have much more complex presentations.

- There is no provision for Central File Review (required by the Program Guide).

- There is a severe restriction on the time allocated for collection of collateral information. This limitation, in combination with the absence of any provision for observation or cell side visits, limits the extent to which important adaptive information could be incorporated into the evaluation.

- It is not clear whether there is an allocation of time required to complete the Mental Health Intake evaluation form (which incorporates information regarding history, etc.).

The activity grids do not factor in visits by a case manager for any emergencies that might arise. Again, some required tasks were simply omitted (e.g. Central File Reviews). The frequency of a particular task was based on minimal Program Guide requirements. One illustration of this problem is found in the frequency of case manager visits for 3CMS inmates. The Program Guide requires that a 3CMS inmate have contact with a case manager at a *minimum* of every ninety days. The Program Guide itself assumes that visits will take place more frequently than once every ninety days if more frequent visits are clinically indicated. The Program Guide at p. 12-3-14 states "[f]ace to

DEFS027306

face individual contacts between the CCM[4] and the 3CMS inmate-patients in a general population setting shall occur as often as clinical needs dictate but at least once every 90 days."

Indirect Time:

The "indirect time" factor was included to reflect time that could not be attributed to direct clinical time with inmates or requirements not specifically documented in the Program Guide, but that were necessarily part of the workday. This indirect time factor is reflected as a percentage and is added to the base total FTE hours (2,080) per year. The consultants arrived at this percentage based on interviews and observations at the prisons as well as discussions with DCHCS representatives. The Workload Study allocated an indirect time factor of 23 percent for licensed clinical positions. Other than the following lists of indirect time classifications, there does not appear to be any empirical evidence of how the allocation of 23 percent was calculated:

- vacation hours
- sick hours
- holidays
- bereavement
- in-service training time
- required meetings
- continuing education

In addition to those factors listed above, indirect time factors may also include the following:

- administrative activities
- training
- quality and professional activities
- other court mandates (e.g. Vitek hearings, Clark evaluations, Keyhea activities)
- other reports (e.g. Board of Prison Term)
- forensic reports (e.g. Mentally Disordered Offenders, Board of Parole Hearing)

Program Guide and Court Ordered Plans:

The Workload Study is a point-in-time study which was based on Program Guide requirements as of January 2007. The Study did not take into account any additional workload requirements for mental health clinicians resulting from contemplated revisions to the Program Guide subsequent to January 2007. These unaccounted for tasks include, but are not limited to, the following:

---

[4] Clinical case manager

- mental health assessment for indecent exposure

- production of MHTS inmate profile which tracks suicide history

The Study also did not include any additional workload requirements for mental health clinicians resulting from portions of court-ordered plans that have been approved. These unaccounted for tasks include the following:

| Program Impacted | Requirement |
|---|---|
| Development of Administrative Segregation Unit (ASU) EOP | Institutions with an EOP HUB should charter a weekly QIT to ensure that out of cell and treatment within the ASU EOP programs is maintained. |
| Reception Center EOP | EOP inmates within Reception Centers are to be seen weekly by case managers. |
| Reception Center EOP | RC EOP inmates with release dates within 60 – 120 days will be identified and a treatment plan will be written to incorporate individualized re-entry needs. |
| Redevelopment of 3CMS RVR | Note that this project is currently a "pilot." If the pilot procedures are adopted for wider use, the workload impact should be evaluated. |

Key Assumptions:

Key assumptions represent data extracted from the Program Guide and on site interviews, or that are based on factors such as percentages of time allocated to clinical positions to perform tasks, percentage of inmates requiring activities of daily living (ADLs), weekly group hours and other assumptions for each level of care. The genesis of the key assumption values were reportedly provided through the mental health tracking system, interviews with administrative staff, and discussions with site clinicians.

One assumption that was immediately questioned by the experts regarded the percentage of 3CMS inmates who were taking medication. The value that was assigned for that assumption was 30 percent. This value was clearly incorrect. A survey of four institutions by the experts more accurately reflected the percentage of 3CMS inmates on medication was roughly 80 percent. At the demonstration of the staffing model provided by the CDCR on June 5th, the 30 percent value of 3CMS inmates on medication was replaced with a hypothetical value of 85 percent for one institution and this resulted in an increase by eleven staffing positions *for that institution alone*.

There are also instances of tasks being re-assigned to different positions based on assumptions that need to be more closely examined to ensure that the proper care is being provided despite the financial benefits of these re-assignments. While some of the re-

DEFS027308

assignments may lead to an overestimate of necessary positions, this may also have the unintended effect of underestimating other positions.

There were other assumptions questioned by the experts for which answers were not provided. The following questions regarding these assumptions were submitted to the consultants by the experts. The questions were derived from information contained on the standard assumption chart provided by the consultants.

- Is it correct to assume that "discharge % to other CDCR programs" refers to the percentage of various populations that discharge to "other" CDCR programs? If this is correct, what are the other programs?

- Is it truly accurate that there is no difference between the percentage of EOP inmates and the percentage of 3CMS inmates who discharge to other CDCR programs?

- The chart indicates that one percent of 3CMS and one percent of EOP inmates discharge to DMH. Intuitively, the percentage for EOP inmates would seem to be higher. What is the basis for these percentages?

- The chart indicates that five percent of the total MHCB inmate stay is spent in restraints and that the average time spent in restraints is ten hours. What is the basis for these numbers, since both appear to be excessive?

- The chart indicates that 34 percent of MHCB inmates require psychometric testing. Based upon the experience of the experts, this appears to be a very high percentage, since psychometric testing seldom occurs in the MHCB programs or elsewhere. What is the basis for this percentage?

The answers to these questions have not been provided. It was indicated that further research needed to be completed in order to provide the answers.

In response to the experts' questions regarding the origin of certain key assumptions, the consultants reported that many of the values for these assumptions were established by a subcontractor in Salt Lake City, Utah who has gone out of business. And the individuals responsible for the establishment of these values are very difficult or impossible to contact.

Recommendations:

The Excel-based spreadsheet that comprises the staffing matrix produced by the Workload Study appears to be completely functional and adaptable to any changes within the MHSDS. This spreadsheet is a working model that can be expanded and adjusted for any changes in staffing, population, and programming within the MHSDS. The staffing matrix is data driven and any new data that is input into the spreadsheet produces immediate staffing changes. This Excel-based spreadsheet appears to function in a manner that allows the CDCR to arrive at accurate projections for staffing needs. However, the Workload Study simply did not go far enough and is incomplete for the reasons that I have stated above.

DEFS027309

The following recommendations are offered to address the concerns regarding the ultimate implementation of the workload based staffing model:

- Given the errors which have been discovered and the uncertainty regarding the origin of many assigned values, the key assumptions should be thoroughly reviewed. If it is not possible to determine whether these values are objectively based, an effort should be made to verify their accuracy.

- CDCR should review the clinical activities that are performed by mental health staff and develop activity grids that include all tasks typically assigned to mental health staff and not just those tasks required by the Program Guide. Tasks required in meeting recent Program Guide revisions and court orders should also be included.

- CDCR should review all of the modules to insure that all identified subtasks (e.g. Central File Review) are consistent with Program Guide requirements.

- CDCR should validate the "minutes" values.

- The development of the Program Guide is an ongoing process which will demand that staffing needs be addressed and adjusted on a regular basis. CDCR should conduct reviews of the staffing needs twice a year utilizing the Excel-based spreadsheet, and Coleman experts should be involved in this process.

The completion of these measures will go a long way to ensure that the staffing recommendations generated by the Workload Study are based on data that has been both objectively determined and validated.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Matthew A. Lopes, Jr.

cc:    Michael Stone, Esq.
       Michael Bien, Esq.
       Donald Specter, Esq.
       Jane Kahn, Esq.
       Amy Whelan, Esq.
       Ivan Trujillo, Esq.
       Brenda Epperly-Ellis
       Sharon Riegel

DEFS027310

# EXHIBIT I

STATE OF CALIFORNIA
FINANCE LETTER - COVER SHEET
FOR FISCAL YEAR 2008/09
DF-46 (WORD Version)(REV 3/00)
Use report dollars in thousands.

**Department of Finance**
915 L Street
Sacramento, CA  95814
IMS Mail Code:  A-15

| FINANCE LETTER # | PRIORITY NO. | ORG. CODE **5225** | DEPARTMENT California Department of Corrections and Rehabilitation |
|---|---|---|---|
| PROGRAM 50 | ELEMENT 30 | COMPONENT | |

TITLE OF PROPOSED CHANGE
Mental Health Staffing – Workload Study

SUMMARY OF PROPOSED CHANGES

This Finance Letter requests 407.7 positions in Fiscal Year 2008-09 and ongoing which will be funded by available salary savings. This is requested in order to comply with the *Coleman* court order dated March 2, 2006, and the 2006 MHSDS Revised Program Guide requirements, as recommended by the Mental Health Staffing Workload Study.

|  | FY 2007/08 | FY 2008/09 |
|---|---|---|
| POS | 0.0 | 407.7 |
| PYs | 0.0 | 387.3 |
| Funding (000's) | $0 | $0 |

| REQUIRES LEGISLATION<br><br>☐ YES<br>☒ NO | CODE SECTION(S) TO BE AMENDED/ADDED | BUDGET IMPACT—PROVIDE LIST AND MARK IF APPLICABLE<br>☒ ONE-TIME COST        ☐ FUTURE SAVINGS<br>☐ FULL-YEAR COSTS    ☐ REVENUE<br>☐ FACILITIES/CAPITAL COSTS |
|---|---|---|

| PREPARED BY Jennifer Johnson | DATE 3/24/08 | REVIEWED BY Scott Carney, Deputy Director | DATE 4/1/08 |
|---|---|---|---|
| DEPARTMENT DIRECTOR Robin Dezember Division Director | DATE 3/24/08 | AGENCY SECRETARY Heidi Lackner, Director Division of Support Services | DATE 4/1/08 |

IF PROPOSAL AFFECTS ANOTHER DEPARTMENT, DOES OTHER DEPARTMENT CONCUR WITH PROPOSAL?

☐ YES    ☐ NO        ATTACH COMMENTS OF AFFECTED DEPARTMENT, SIGNED AND DATED BY THE DEPARTMENT DIRECTOR OR DESIGNEE.

FOR INFORMATION TECHNOLOGY REQUESTS, SPECIFY THE DATE SPECIAL PROJECT REPORT (SPR) OR FEASIBILITY STUDY REPORT (FSR) WAS APPROVED BY DOIT.

| DATE | PROJECT # | FSR ☐ | OR | SPR ☐ |
|---|---|---|---|---|

| DOF ANALYST USE (ADDITIONAL REVIEW) | Orignal Signed BY: Amy Jarvis |
|---|---|

PAGE II-1

Case No. CIV S-90-0520 LKK JFM P (E.D. Cal)
C01-1351 THE (N.D. Cal)
PLTF Exhibit No. P - 183
Date Entered:_____
Signature:_____
Alternate Reference:_____

DEFS014440

STATE OF CALIFORNIA
BUDGET CHANGE PROPOSAL- FISCAL DETAIL
STATE OPERATIONS
DF 46 (REV 07/06) Alternative
Please report dollars in thousands

Printed: 03/25/08 time: 08:11:27
Data source    : W:\TEMP\FLO325A.DBF
Report Location: W:\TEMP\FSCLDT~1.RP1
Report Form    : DF46-Plcy/FnLtr_Whl_v1.09

| BCP # B4460MH | DATE 03/25/08 | TITLE MH WORKLOAD STUDY FL |

| PROGRAM *( Consolidated )* | ELEMENT | COMPONENT |

| PERSONNEL YEARS | PYs CY | PYs BY | PYs BY + 1 | CY | BY | BY + 1 |
|---|---|---|---|---|---|---|
| TOTAL S & W | | 407.7 | 407.7 | | | |
| SALARY SAVINGS | | -20.4 | -20.4 | | | |
| NET TOTAL S & W | 0.0 | 387.3 | 387.3 | | $0 | |
| STAFF BENEFITS | -- | -- | -- | | | |
| OASDI | | { | } | ( | ) ( | ) ( | ) |
| HEALTH INSURANCE | | { whole | } | ( | ) ( | ) ( | ) |
| RETIREMENT - Industrial | | { dollars | } | ( | ) ( | ) ( | ) |
| RETIREMENT - Safety | | { | } | ( | ) ( | ) ( | ) |
| RETIREMENT - Peace Officer | | { | } | ( | ) ( | ) ( | ) |
| RETIREMENT - Other | | { | } | ( | ) ( | ) ( | ) |
| WORKERS' COMPENSATION | | { | } | ( | ) ( | ) ( | ) |
| IDL, NDI, UI (incl in W.C.) | | | | | | |
| TOTAL of STAFF BENEFIT DETAIL (whole $$) | | | | ( | ) ( | ) ( | ) |

| TOTAL PERSONAL SVCS | | | | | | |

**OPERATING EXPENSES AND EQUIPMENT**

| | | | | | | |
|---|---|---|---|---|---|---|
| GENERAL EXPENSE | | | | | 4 | 4 |
| PRINTING | | | | | | |
| COMMUNICATIONS | | | | | | |
| POSTAGE | | | | | | 0 |
| INSURANCE | | | | | | |
| TRAVEL - IN STATE | | | | | | |
| TRAVEL - OUT OF STATE | | | | | | |
| TRAINING | | | | | | |
| FACILITIES OPERATIONS | | | | | | |
| UTILITIES | | | | | | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | | | | | |
| CONSULTING & PROFESSIONAL:External | | | | | | |
| CONSOLIDATED DATA CENTERS | | | | | | |
| Health and Welfare Data Center | | | ( | ) ( | ) ( | ) |
| Stephen P. Teale Data Center | | | ( | ) ( | ) ( | ) |
| DATA PROCESSING | | | | | | |
| EQUIPMENT | | | | | | |
| SERVICE | | | | | | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | | | | | | |

| TOTAL OPERATING EXPENSES and EQUIPMENT | | | | | 4 | 4 |

| SPECIAL ITEMS of EXPENSE | | | | | | |

| TOTAL STATE OPERATIONS EXPENDITURES | | | | | $4 | $4 |

PAGE III-2a

DEFS014441

CONTINUATION Sheet   *ADULT CORR'L HEALTH CARE, PSYCHIATRIC*   Printed:03/25/08  time:08:11:27

BCP# B4460MH   Page:2   DEPARTMENT:*CORRECTIONS & REHABILITATION*   FISCAL YEAR2008 - 2009

| SOURCE OF FUNDS | APPROPRIATION NO. | | | | CY | BY | BY + 1 |
|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | |
| GENERAL FUND | 5225 | 001 | 0001 | $ | $ | $ | |
| SPECIAL FUNDS | 5225 | | | $ | $ | $ | |
| HEALTH CARE FUND | 5225 | 002 | 0001 | $ | $ | $ 4 | $ 4 |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | $ | $ | |
| OTHER FUNDS - Bond | 5225 | 001 | 0001 | $ | $ | $ | |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | $ | $ | |
| OTHER - Spcl Deposit | 5225 | 001 | 0942 | $ | $ | $ | |
| OTHER - | 5225 | 000 | 0000 | $ | $ | $ | |
| OTHER - Lottery Educ | 5225 | 001 | 0831 | $ | $ | $ | |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | $ | $ | |
| General Fund,Prop 98 | 5225 | 011 | 0001 | $ | $ | $ | |
| Corr Trng Fund | 5225 | 001 | 0170 | $ | $ | $ | |

| LOCAL ASSISTANCE SOURCE OF FUNDS | APPROPRIATION NO. | | | | | | |
|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | |
| GENERAL FUND | 5225 | 101 | 0001 | $ | $ | $ | |
| SPECIAL FUNDS | 5225 | | | $ | $ | $ | |
| FEDERAL FUNDS | 5225 | | 0890 | $ | $ | $ | |
| OTHER FUNDS | 5225 | | | $ | $ | | $ |
| REIMBURSEMENTS | 5225 | 601 | 0995 | $ | $ | $ | |

PAGE III-2b

/////////// *E N D  of  CONSOLIDATED DISPLAY* ///////////////

DEFS014442

CONTINUATION Sheet       ADULT CORR'L HEALTH CARE, PSYCHIATRIC            Printed:03/25/08   time:08:11:27

BCP# B4460MH    Page:3       DEPARTMENT:CORRECTIONS & REHABILITATION            FISCAL YEAR2008 - 2009

---

**PROGRAM    *ADULT CORR'L HEALTH CARE, PSYCHIATR* | ELEMENT       | COMPONENT**

| PERSONNEL YEARS | CY | BY | BY + 1 | CY $$ | BY $$ | BY + 1 $$ |
|---|---|---|---|---|---|---|
| TOTAL S & W | | 407.7 | 407.7 | | | |
| SALARY SAVINGS | | -20.4 | -20.4 | | | |
| NET TOTAL S & W | 0.0 | 387.3 | 387.3 | $0 | $0 | |
| STAFF BENEFITS | -- | -- | -- | | | |
| OASDI | | | | ( ) | ( ) | ( ) |
| HEALTH INSURANCE | | { whole | | ( ) | ( ) | ( ) |
| RETIREMENT - Industrial | | { dollars | | ( ) | ( ) | ( ) |
| RETIREMENT - Safety | | | | ( ) | ( ) | ( ) |
| RETIREMENT - Peace Officer | | | | ( ) | ( ) | ( ) |
| RETIREMENT - Other | | } } | | ( ) | ( ) | ( ) |
| WORKERS' COMPENSATION | | { } | | ( ) | ( ) | ( ) |
| IDL, NDI, UI (incl in W.C.) | | | | | | |

**TOTAL PERSONAL SVCS**

**OPERATING EXPENSES AND EQUIPMENT**

| | | | | | | |
|---|---|---|---|---|---|---|
| GENERAL EXPENSE | | | | | 4 | 4 |
| PRINTING | | | | | | |
| COMMUNICATIONS | | | | | | |
| POSTAGE | | | | | | |
| INSURANCE | | | | | | |
| TRAVEL - IN STATE | | | | | | |
| TRAVEL - OUT OF STATE | | | | | | |
| TRAINING | | | | | | |
| FACILITIES OPERATIONS | | | | | | |
| UTILITIES | | | | | | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | | | | | |
| CONSULTING & PROFESSIONAL:External | | | | | | |
| CONSOLIDATED DATA CENTERS | | | | | | |
|   Health and Welfare Data Center | | | ( ) | ( ) | ( ) | |
|   Stephen P. Teale Data Center | | | ( ) | ( ) | ( ) | |
| DATA PROCESSING | | | | | | |
| EQUIPMENT | | | | | | |
| DEBT SERVICE | | | | | | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | | | | | | |

**TOTAL OPERATING EXPENSES and EQUIPMENT**          4          4

**SPECIAL ITEMS of EXPENSE**

**TOTAL STATE OPERATIONS EXPENDITURES**    | $    | $    4    | $    4

PAGE III-2a

DEFS014443



### 50  ADULT CORR'L HEALTH CARE, PSYCHIATRIC

| SOURCE OF FUNDS | APPROPRIATION NO. | | | CY | BY | BY + 1 |
|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | |
| GENERAL FUND | 5225 | 001 | 0001 | $ | $ | $ |
| SPECIAL FUNDS | 5225 | | | $ | $ | $ |
| HEALTH CARE FUND | 5225 | 002 | 0001 | $ | $      4 | $      4 |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | $ | $ |
| OTHER FUNDS - Bond | 5225 | 001 | 0001 | $ | $ | $ |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | $ | $ |
| OTHER - Spcl Deposit | 5225 | 001 | 0942 | $ | $ | $ |
| OTHER - | 5225 | 000 | 0000 | $ | $ | $ |
| OTHER Lottery-Educ | 5225 | 001 | 0831 | $ | $ | $ |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | $ | $ |
| General Fund,Prop 98 | 5225 | 011 | 0001 | $ | $ | $ |
| Corr Trng Fund | 5225 | 001 | 0170 | $ | $ | $ |

| LOCAL ASSISTANCE SOURCE OF FUNDS | APPROPRIATION NO. | | | $(          ) | $(          ) | |
|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | |
| GENERAL FUND | 5225 | 101 | 0001 | $ | $ | $ |
| SPECIAL FUNDS | 5225 | | | $ | $ | $ |
| FEDERAL FUNDS | 5225 | | 0890 | $ | $ | $ |
| OTHER FUNDS | 5225 | | | $ | $ | $ |
| REIMBURSEMENTS | 5225 | 601 | 0995 | $ | $ | $ |

DEFS014444

*CONTINUATION Sheet*    *ADULT CORR'L HEALTH CARE, PSYCHIATRIC*    Printed:03/25/08  time:08:11:27

BCP# B4460MH  Page:**5**    **DEPARTMENT:***CORRECTIONS & REHABILITATION*    **FISCAL YEAR**2008 - 2009



Fiscal Detail Continued
**DETAIL OF PERSONAL SERVICES***50*    *ADULT CORR'L HEALTH CARE, PSYCHIATRIC*

| *Workload Adjustments* | | POSITIONS | | | | AMOUNT | |
|---|---|---|---|---|---|---|---|
| **CLASSIFICATION** | CY | BY | BY + 1 | SALARY/RANGE | CY | BY | BY + 1 |
| Registered Nurse,CF | | -55.6 | -55.6 | 7285- 9296 | | | |
| Psychologist-Clinical, CF | | -614.1 | -614.1 | 7116- 8930 | | | |
| Supvng Registered Nurse | | -15.0 | -15.0 | 5060- 6551 | | | |
| Occ Therapist | | -1.0 | -1.0 | 3241- 4450 | | | |
| Psychiatric Social Worker | | -211.5 | -211.5 | 3554- 4430 | | | |
| Psychometrist | | -0.8 | -0.8 | 3241- 4037 | | | |
| Med Transcriber | | -49.5 | -49.5 | 2751- 3354 | | | |
| Ofc Asst-Typing | | -71.7 | -71.7 | 2324- 2826 | | | |
| **TOTAL SALARIES AND WAGES** | | **-1,019.2** | **-1,019.2** | | | | |

PAGE III-3

\*
\*
\*

**SUPPLEMENTAL INFORMATION**
*Please report dollars in thousands.*Whole dollars
**IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW.**  SEE INSTRUCTIONS

| | CURRENT YEAR | BUDGET YEAR | BY + 1 |
|---|---|---|---|
| P - | | | 0 |
| PS-In | | | 0 |
| &PS-Ex | | | 0 |
| ONE-TIMES(One-Times inclds EQUIP & CONTRACTS) | | | 0 |
| FULL-YR | | | |
| FACILITIES/CAPITAL COSTS | | | |

PAGE III-4

CONTINUATION Sheet      *ADULT CORR'L HEALTH CARE, PSYCHIATRIC*      Printed:03/25/08  time:08:11:27

BCP# B4460MH   Page:6      DEPARTMENT:*CORRECTIONS & REHABILITATION*      **FISCAL YEAR2008 - 2009**

Fiscal Detail Continued
**DETAIL OF PERSONAL SERVICES***50*    *ADULT CORR'L HEALTH CARE, PSYCHIATRIC*

| Proposed New | POSITIONS | | | | AMOUNT | | |
|---|---|---|---|---|---|---|---|
| CLASSIFICATION | CY | BY | BY + 1 | SALARY/RANGE | CY | BY | BY + 1 |
| Sr Psychiatrist, CF-Spec | | 14.1 | 14.1 | 9845- 13170 | | | |
| Staff Psychiatrist,CF | | 36.5 | 36.5 | 11534-12863 | | | |
| Chief Psychologist | | 12.0 | 12.0 | 11391-11798 | | | |
| Sr Psychologist, CF-Spec | | 57.0 | 57.0 | 8416- 9376 | | | |
| Psychologist - Clinical (Safet | | 363.0 | 363.0 | 7116- 8930 | | | |
| Corr Counselor I | | 63.4 | 63.4 | 5033- 7772 | | | |
| Recr Therapist | | 122.4 | 122.4 | 5679- 6367 | | | |
| Assoc Govtl Prog Analyst | | 16.5 | 16.5 | 4400- 5348 | | | |
| Psych Techn (Safety) | | 279.7 | 279.7 | 4814- 5161 | | | |
| Psychiatric Social Worker | | 363.0 | 363.0 | 3554- 4430 | | | |
| Ofc Svcs Supvr II-Gen | | 37.2 | 37.2 | 2953- 3590 | | | |
| Ofc Techn-Typing | | 62.1 | 62.1 | 2686- 3264 | | | |
| TOTAL SALARIES AND WAGES | | 1,426.9 | 1,426.9 | | | | |

\*
\*
\*

PAGE II+90V

**SUPPLEMENTAL INFORMATION**
*Please report dollars in thousands.*Whole dollars
**IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW.  SEE INSTRUCTIONS**

| | CURRENT YEAR | BUDGET YEAR | BY + 1 |
|---|---|---|---|
| EQUIP - | | | 0 |
| C&PS-In | | | 0 |
| C&PS-Ex | | | 0 |
| ONE-TIMES(One-Times inclds EQUIP & CONTRACTS) | | | 0 |
| FULL-YR | | | |
| FACILITIES/CAPITAL COSTS | | | |

PAGE III-4

\\\\\\\\\\\\\\\\\\\   E N D  of  PROGRAM:

DEFS014446

**California Department of Corrections and Rehabilitation**
**Finance Letter**
**Fiscal Year 2008/09**
**Mental Health Staffing–Workload Study**

**Division/Institution:** Division of Correctional Health Care Services – Mental Health Programs

**Title:** Mental Health Staffing - Workload Study

## A.    NATURE OF REQUEST

Pursuant to SB 1134, Chapter 511, the California Department of Corrections and Rehabilitation (CDCR) was required to complete a workload study to assess the total level of resources needed for the implementation of the Revised Program Guide for the Mental Health Services Delivery System (MHSDS). The Mental Health Staffing Workload Study was completed in June, 2007 and this funding request has been developed as a result of the recommendations identified in the study. The Department is requesting 407.7 permanent positions effective Fiscal Year (FY) 2008/09.

## B.    BACKGROUND/HISTORY

### 1991

On June 25, 1991, a class action complaint *Coleman vs Schwarzenegger, et al* (*Coleman*) was filed alleging that the Department "...under color of state law...acted with deliberate indifference depriving the plaintiff class of their rights to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth amendments to the United States Constitution."

The United States District Court for the Eastern District of California ultimately found that the state and prison officials had acted with deliberate indifference to the medical needs of inmates with serious mental disorders by ignoring the advice of their own experts regarding the deficiencies that had existed in the Correctional Health Care System for years. The Court found that the Department and the Health Care Services Division's MHSDS was a constitutionally inadequate system that lacked the necessary elements for delivery of adequate mental health care, such as screening and identification of mentally ill inmates; prompt access to mental health professionals for diagnosis and treatment; patient access to necessary and appropriate levels of care as determined by clinicians, including outpatient care; residential care, crisis care, and inpatient care; medical records and an information management system; and a quality assurance system. The Court concluded that California's system could not, and did not; meet the serious medical needs of mentally ill inmates. On June 6, 1994, it was recommended that the District Court order the appointment of a Special Master and that state and prison officials develop and implement forms, protocols, and plans necessary to remedy constitutional violations.

### 1995

In 1995, the *Coleman* decision found that the Department violated the Eighth and Fourteenth Amendments by being deliberately indifferent to the mental health needs of inmates. The CDCR, the Division of Correctional Health Care Services (DCHCS), the Mental Health Program (MHP), and the institutional MHSDS intends, through approval of this request, to provide full compliance with the *Coleman* orders.

DEFS014447

**Finance Letter**
**Fiscal Year 2008/09**
**Mental Health Staffing–Workload Study**

The DCHCS mission is to protect the health and safety of the public and CDCR staff by providing proper health care service in a timely and cost-effective manner to mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patient potential for violence and its associated costs.

### 1997

In 1997, the Department established initial policies and procedures for providing mental health services at all institutions through the MHSDS Program Guide, which was approved by the *Coleman* Court. Revisions to the Program Guide have been an ongoing requirement of the *Coleman* case. As a result, each revision has resulted in amending memoranda to the field requiring additional workload, changing timelines, and/or new programs.

### 2006

The MHSDS Revised Program Guide includes all amendments and represents up-to-date policies and procedures for compliance with the *Coleman* Court orders, and to provide the necessary levels of mental health care statewide. Implementing the MHSDS Revised Program Guide is an integral part of the strategy to exit the *Coleman* case and to reduce costs related to this litigation.

During the summer of 2006, SB 518 was Chaptered, mandating that the CDCR execute and complete a workload study of the staffing requirements necessary to deliver the level of care outlined in the MHSDS Revised Program Guide, of which the findings and recommendations of this study were to be included in the FY 2007/08 budget.

### 2007

The Mental Health Staffing Workload Study was completed in June, 2007. Due to the complexities and significance of the Study, the DCHCS was unable to provide appropriate Executive level resources to analyze and approve the findings until December, 2007.

## C.   STATE LEVEL CONSIDERATIONS

The CDCR acknowledges, in its legislatively approved Strategic Plan, that it is morally and constitutionally obligated to provide health care services to incarcerated offenders. The plan notes that a fundamental level of health care is necessary for incarcerated individuals' successful return and integration into the community and concedes that radical changes are necessary in the Department's health care systems to ensure efficient delivery of quality, cost-effective health care services.

As noted in the *Coleman* Special Master's January 2006 report:

> *"Coleman will not be ended until the defendants can demonstrate an ability to provide meaningful mental health care…. The defendants' recent history of*

DEFS014448

Case 2:90-cv-00520-KJM-SCR   Document 3667   Filed 08/03/09   Page 111 of 153
California Department of Corrections and Rehabilitation
Finance Letter
Fiscal Year 2008/09
Mental Health Staffing–Workload Study

*developing erratic plans or plans they are unable subsequently to implement suggests the present need for something more than just another requirement for the generation of yet more plans."*

Standardizing the delivery of mental health care is an essential, critical step to managing the inmate and parolee population and providing necessary mental health care in a safe, efficient, and cost effective manner. By providing the resources required to comply with the pending federal Court order and the mandated policies and procedures essential to providing constitutionally adequate mental health care, CDCR will take an important step toward self-directed management of the Mental Health Service Delivery System.

### D.  FACILITY/CAPITAL OUTLAY CONSIDERATIONS

A space study is currently underway to determine the space needs of the Mental Health, Dental, and Medical programs as well as other programs in the institutions. CDCR intends to continue to work closely with the Health Care Receiver's Office to ensure facility space planning for all facility health care needs are coordinated and therefore not duplicated. Therefore, a future space request is anticipated.

### E.  JUSTIFICATION

This Finance Letter addresses the necessary MHP field staffing for compliance with the *Coleman* Court orders, and the staffing in the institutions required to fully implement the MHSDS Revised Program Guide in conjunction with the staffing levels as described in the Mental Health Staffing Workload Study.

The CDCR is, therefore, requesting field positions to manage the increased workload relating to implementing and monitoring the MHSDS Revised Program Guide. The staffing levels requested in this Finance Letter will provide compliance with Court mandates and assist in extricating the state from federal judicial oversight.

After thirteen years of implementing the Court's orders and mandated services; the implementation of the MHSDS Revised Program Guide; and the development of and concurrence with, the Mental Health Staffing Workload Study; the DCHCS has determined that current resources are insufficient to comply with the required levels of care for mentally ill inmates. Partial implementation of the MHSDS Revised Program Guide suggests a tolerance for insufficient treatment of mentally ill inmates—undiscovered, undiagnosed, and untreated; while being subjected to conditions that aggravate conditions/illnesses. Due to limited resources, mentally-ill inmate patients, who are receiving treatment suffer needless extended and medically harmful delays accessing necessary psychiatric care.

To continue a MHSDS, which is understaffed, significantly overworked, and lacks a quality assurance program, places inmates and inmate-patients at a high risk, and the State, CDCR, and key decision-makers in danger of being found in contempt of court.

DEFS014449

California Department of Corrections and Rehabilitation
**Finance Letter**
**Fiscal Year 2008/09**
**Mental Health Staffing–Workload Study**

Standardizing the mental health care in accordance with generally accepted medical practice, the National Commission on Correctional Health Care, community standards, and the law is consistent with the CDCR's Strategic Plan and DCHCS's Goals and initiatives to manage the inmate and parolee population in a safe, efficient, and cost effective manner.

To date, the State of California has spent in excess of $30 million on monitoring and attorney fees in the *Coleman* case. To continue current operations without making adequate provisions for compliance with the Court's mandates and Mental Health professional standards, will leave the State in jeopardy of further litigation and expenses associated with Court imposed remedies that may be avoided by implementing the proposed improvements.

## F.    OUTCOMES AND ACCOUNTABILITY

The *Coleman* Court continues to monitor compliance with their requirements, and it is the Department's goal to demonstrate the ability to plan for and to provide meaningful mental health care, and to effect an exit from this case by implementation of the MHSDS Revised Program Guide, and activating the staffing levels detailed in the Mental Health Staffing Workload Study.

## G.    ANALYSIS OF ALL FEASIBLE ALTERNATIVES

**Alternative A:**   Fully implement the MHSDS Revised Program Guide with the addition of Field Operations staff designated in the Mental Health Staffing Workload Study.
- Establish 407.7 permanent field positions.
- The initial implementation of these positions will be funded using available salary savings .
- The DCHCS will monitor the activation of these positions, and will develop and present a request to the department's Budget Office for an augmentation to fund the ongoing costs associated with this request.

**Pros:**   This alternative would provide compliance with policies and procedures contained in the 2006 MHSDS Revised Program Guide, which were negotiated with all parties in the *Coleman* court case. This is the most likely alternative to lead to final exit of the *Coleman* case and reduction of legal costs associated with this case. This alternative is consistent with the mission of CDCR "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services.

**Cons:**   Alternative A will require a future augmentation to the department's budget when the temporary salary savings are exhausted.

**Alternative B:**   Do not implement the requirements of the revised MHSDS Program Guide.

DEFS014450

California Department of Corrections and Rehabilitation
Finance Letter
Fiscal Year 2008/09
Mental Health Staffing–Workload Study

**Pros:**    Requires no funding.

**Cons:**    Failure to provide constitutionally adequate mental health treatment may harm inmates and is a violation of inmate's rights under the Eighth and Fourteenth Amendments of the United States Constitution prohibiting cruel and unusual punishment.   Failure to implement the MHSDS Revised Program Guide with necessary staffing and equipment allocations will lead to increased litigation costs.   This alternative is not consistent with the CDCR's mission.

## H. RECOMMENDATION

The CDCR mission "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services is consistent with the revisions in the MHSDS Program Guide.   The best strategy to exit the *Coleman* Court case is to fully implement the revised MHSDS Program Guide.   It is therefore recommended that **Alternative A** be implemented beginning July 1, 2008.

The cost for the 407.7 positions is $30.5 million annually.   In FY 2008/09, salary savings from currently authorized vacant positions will be used to offset these costs, resulting in no funding for these positions being required for Budget Year.   By July, 2009, it is projected that all existing salary savings will be exhausted and a subsequent BCP will be submitted for FY 2009/10 costs of up to $30.5m.

The statewide Mental Health Programs vacancies are at 625.   Recruitment activities are being conducted for these positions, and an expedited hiring process is in place for most classifications.   Estimating that the Mental Health Programs will fill 10 percent (62 positions) of the vacancies each month will generate quantifiable cost savings through June, 2009.

The Mental Health Program will develop a comprehensive hiring plan based on the Mental Health Staffing Workload Study, vacancies and staffing complements by institutions, and submit to the Department and the Department of Finance.

## Attachments
1 - 3/2/06 *Coleman* Court order
2 - SB 1134
3 - Workload Staffing Analysis
4 – MHP Classification Vacancy Summary
Revised MHSDS Program Guide (on CD)
Mental Health Workload Study (on CD)

DEFS014451

# EXHIBIT J

**DEPARTMENT OF FINANCE**
OFFICE OF THE DIRECTOR

ARNOLD SCHWARZENEGGER, GOVERNOR

STATE CAPITOL ■ ROOM 1145 ■ SACRAMENTO CA ■ 95814-4998 ■ WWW.DOF.CA.GOV

APR 0 1 2009

Honorable Denise Moreno Ducheny, Chair
Senate Budget and Fiscal Review Committee

Attention: Mr. Danny Alvarez, Staff Director (2)

Honorable Noreen Evans, Chair
Assembly Budget Committee

Attention: Mr. Christian Griffith, Chief Consultant (2)

**Amendment to Budget Bill Items 5225-001-0001 and 5225-002-0001, Support, California Department of Corrections and Rehabilitation**

It is requested that Item 5225-001-0001 be decreased by $5,134,000 and Item 5225-002-0001 be increased by $13,311,000 to reflect the following adjustments:

***Coleman v. Schwarzenegger* Mental Health Crisis Beds at California Medical Facility**—An increase of $4,595,000 General Fund to fully staff the Mental Health Crisis Bed Facility at the California Medical Facility as required by the *Coleman* Court. This request amends and augments the proposal included in the February 2009 Budget Act.

***Coleman v. Schwarzenegger* Mental Health Crisis Beds at San Quentin**—An increase of $3,582,000 to provide clinical staffing consistent with the Mental Health Workload Study for the newly constructed Mental Health Crisis Bed Unit at San Quentin, which will be operational in January 2010.

**Technical Scheduling Adjustments**—To ensure that the Medical Care Services budget reflects all expenditures under the jurisdiction of the Receiver appointed by the court in the *Plata v. Schwarzenegger* lawsuit, we request the following adjustments, which have a net zero impact on the General Fund:

- Transfer $2,835,000 from Item 5225-001-0001 to Item 5225-002-0001 for the administration of tuberculosis testing and Hepatitis B vaccinations for California Department of Corrections and Rehabilitation (CDCR) employees.

- Transfer $2,299,000 from Item 5225-001-0001 to Item 5225-002-0001, and reschedule $260,000 within Item 5225-002-0001, to conduct health care screenings to determine an inmates' eligibility for transfer to out-of-state correctional facilities, and to monitor and oversee the delivery of medical care to inmates housed at out-of-state correctional facilities.

- Reschedule $4,818,000 within Item 5225-002-0001 for the leasing of all health care program facilities consistent with the Space Coordination Agreement adopted by the *Plata, Coleman, Perez,* and *Armstrong* courts on September 5, 2008.

- 2 -

It is also requested that Budget Bill language (Attachment I) be deleted from
Item 5225-001-0001 that restricts the expenditure of funds for tuberculosis testing and
Hepatitis B vaccinations for CDCR employees since the Receiver's nursing staff will now
administer these tests and vaccinations, thus eliminating the need for CDCR to contract for
these services.

The effect of my requested action is reflected on the attachment.

If you have any questions or need additional information regarding this matter, please call
Amy Jarvis, Principal Program Budget Analyst, at (916) 445-8913.

MICHAEL C. GENEST
Director
By:

/s/ Ana J. Matosantos

ANA J. MATOSANTOS
Chief Deputy Director

Attachment

cc:  Honorable Christine Kehoe, Chair, Senate Appropriations Committee
       Attention:  Mr. Bob Franzoia, Staff Director
     Honorable Bob Dutton, Vice Chair, Senate Budget and Fiscal Review Committee
       Attention:  Mr. Seren Taylor, Staff Director
     Honorable Kevin de Leon, Chair, Assembly Appropriations Committee
       Attention:  Mr. Geoff Long, Chief Consultant
     Honorable Roger Niello, Vice Chair, Assembly Budget Committee
       Attention:  Mr. Peter Schaafsma, Staff Director
     Honorable Mark DeSaulnier, Chair, Senate Budget and Fiscal Review Subcommittee No. 4
     Honorable Juan Arambula, Chair, Assembly Budget Subcommittee No. 4
     Mr. Mac Taylor, Legislative Analyst (4)
     Mr. Craig Cornett, Senate President pro Tempore's Office
     Mr. Christopher W. Woods, Assembly Speaker's Office (2)
     Mr. Ivan Altamura, Chief of Staff, Assembly Republican Leader's Office
     Mr. Matthew L. Cate, Secretary, California Department of Corrections and Rehabilitation
     Mr. Brett Morgan, Chief of Staff, California Department of Corrections and Rehabilitation
     Ms. Lori Gillihan, Acting Director, Division of Support Services, California Department of
       Corrections and Rehabilitation
     Mr. David Lewis, Acting Deputy Director, Fiscal Services, California Department of Corrections and
       Rehabilitation
     Ms. Keely Martin-Bosler, Assistant Director, Budget Management Branch, California Department of
       Corrections and Rehabilitation

APR 0 1 2009

Attachment I

## Proposed Deletion of Budget Bill Language

**Item 5225-001-0001:**

~~Provision 7.  Of the amount appropriated in Schedule (1), $3,270,000 is for contract costs to provide employees of the Department of Corrections and Rehabilitation with tuberculosis testing and Hepatitis B vaccinations.  Any funds not expended for this purpose by June 30, 2010, shall revert to the General Fund.  The Department of Corrections and Rehabilitation shall report actual contract expenditures to the Department of Finance.~~

# EXHIBIT K

**EXECUTIVE SUMMARY**
**Mental Health Program Hire Progress and Vacancy Reports**
**April 2009 Reporting Period**

- Summarized below are the Mental Health Program (MHP) vacancies for April 2009.

| FY 09/10 7A Authorized Positions [1] | SCO Filled Positions [2] | Unadjusted Vacancies | Vacancy Adjustment for Registry Usage [3] | Vacancies after Registry Adjustment | Vacancy Adjustment for New Hires & Long Term Sick [4] | Adjusted Vacancies |
|---|---|---|---|---|---|---|
| 2924 | 2539 | **385** | 164 | **221** | 32 | **189** |

- The following compares vacancies and the vacancy rates of November 2008 and April 2009.

| Vacant positions and corresponding vacancy rates | Nov. 2008 pos. / rate | Apr. 2009 pos. / rate |
|---|---|---|
| Unadjusted vacancies and vacancy rate | 576 / 18.7% | 385 / 12.5% |
| Vacancies adjusted for *registry use* only | 411 / 13.3% | 221 / 7.6% |
| Vacancies adjusted for *registry use, temporary appointments* and *new hires* | 361 / 11.7 % | 189 / 6.4% |

- The April 2009 vacancy report reflects a reduction of 190 adjusted vacancies when compared to the 379 vacancies shown in the March 2009 report. This is due to the combined effect of 32 positions filled between March and April, and the change in position authority reflected in the FY 09/10 Schedule 7A (for 08/09 authorized positions).

| March to April Adjusted Vacancies Differences [5] | March 2009 Adjusted Vacancies | April 2009 Adjusted Vacancies | Difference |
|---|---|---|---|
| Adjusted Vacancies | 379 | 189 | 190 or (158 + 32) |

---

[1] Source: FY 09/10 Schedule 7A of the Governor's Budget beginning April 2009. *(Excludes temp help and unfunded positions)*

[2] Source: State Controller's Office (SCO) payroll data base

[3] Source: Institution contract analyst via the Institution Personnel Office (IPO). Registry hours converted to full time equivalents (FTEs) based on 1 FTE = 173.3 hours/month.

[4] Source: The SCO Management Information Retrieval System (MIRS) and the IPO at each institution.

[5] The difference between March and April 2009 adjusted vacancies can be attributed to 158 fewer authorized MH positions in FY 09/10 Schedule 7A as compared to FY 08/09 Schedule 7A, and an increase of 32 filled positions. (08/09 7A inadvertently included 158 Non-Mental Health positions) .

Executive Summary, Mental Health Program Hire Progress and Vacancy Reports April 2009
Author: Anne Jackson, PDCU
File: \\Hcs501jfile001\workgroups\Dental & Mental Health Recruitment\Reports\Vacancy
Reports\2009_04\Word Source Files\DRAFT MH EXECUTIVE SUMMARY 04-2009_rev.6.doc

# EXHIBIT L

State of California                                                                    California Department of Corrections and Rehabilitation

# Memorandum

Date:     May 14, 2009

To:       Sharon Aungst
          Chief Deputy Secretary
          Division of Correctional Health Care Services

Subject:  **SUMMARY OF INTER-INSTITUTIONAL MENTAL HEALTH CRISIS BED REFERRALS AND TRANSFERS FOR APRIL 2009**

Attached are summaries regarding the number of Mental Health Crisis Bed (MHCB) referrals and placements coordinated by Health Care Placement Oversight Program (HC-POP) staff. During the month of **April 2009**, there were **171 MHCB** referrals. Of the **171** referrals, **97** were placed. The **74** not placed (**43%** of those referred) were rescinded by the referring clinician. Of the **74** rescinded, **45** no longer required MHCB treatment, **26** were placed in a MHCB internally, **1** transferred to the Department of Mental Health and **2** paroled.

**Attachment 1** summarizes the referrals/transfers/rescinded cases by sending institution and previous levels of care. Additionally, every referral is tallied by classification score.

**Attachment 2A (3 pages)** provides additional details of the completed referrals/transfers, including transfer timeframes, average number of days waiting to transfer, and prior level of care. For the **97** transferred, the average number of days waiting was **2.79** Of the **97** transferred, **16** cases were transferred within the required 24 hours.

**Attachment 2B (3 pages)** provides details regarding those MHCB referrals that were rescinded by the referring institution. **Attachment 2C** summarizes the cases rescinded.

**Attachment 3** summarizes, by institution, the average number of days referrals waited before being transferred or rescinded.

**Attachment 4** is a summary of those inmates referred from the California Medical Facility (CMF) and transferred into the CMF/Acute Psychiatric Program as crisis bed emergency admissions.

Please let me know if you have any questions about the information provided.


*Original Signed By*
RICK JOHNSON, CHIEF
Health Care Placement Oversight Program
Division of Correctional Health Care Services

Attachments

cc:    Wayne Strumpfer
       Karen Wong                          Dwight Winslow, M.D.
       Marion Chiurazzi, Ph.D.             Tia Araminta, Ph.D.
       Andrew Swanson, Ph.D.               Steve Clavere, Ph.D.
       Shama Chaiken, Ph.D.                Health Care Regional Administrators
       Robert Canning, Ph.D.               Cathy Jefferson
       Jack Martin, Ph.D.                  HC-POP Staff

° CDC 1617 (3/89)

**SUMMARY**
**TRANSFERRED AND RESCINDED MHCB REFERRALS**
**BY INSTITUTION AND PRIOR LEVEL OF CARE**
**APRIL 2009**

| | TOTAL REFERRALS | | | | | | REFERRED AND TRANSFERRED | | | | | | REFERRED AND RESCINDED | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CCCMS | EOP | GP | DMH | TOTAL | % TTL | CCCMS | EOP | GP | DMH | TOTAL | % TTL | CCCMS | EOP | GP | DMH | TOTAL | % TTL |
| ASP | 5 | 1 | 0 | 0 | 6 | 3.51% | 3 | 1 | 0 | 0 | 4 | 4.12% | 2 | 0 | 0 | 0 | 2 | 2.70% |
| CAL | 0 | 0 | 3 | 0 | 3 | 1.75% | 0 | 0 | 1 | 0 | 1 | 1.03% | 0 | 0 | 2 | 0 | 2 | 2.70% |
| CCI | 5 | 4 | 0 | 0 | 9 | 5.26% | 3 | 4 | 0 | 0 | 7 | 7.22% | 2 | 0 | 0 | 0 | 2 | 2.70% |
| CCI-RC | 3 | 2 | 0 | 0 | 5 | 2.92% | 0 | 2 | 0 | 0 | 2 | 2.06% | 3 | 0 | 0 | 0 | 3 | 4.05% |
| CEN | 2 | 1 | 6 | 0 | 9 | 5.26% | 2 | 0 | 3 | 0 | 5 | 5.15% | 0 | 1 | 3 | 0 | 4 | 5.41% |
| CIM | 1 | 0 | 0 | 0 | 1 | 0.58% | 0 | 0 | 0 | 0 | 0 | 0.00% | 1 | 0 | 0 | 0 | 1 | 1.35% |
| CIM-RC | 3 | 8 | 2 | 0 | 13 | 7.60% | 0 | 0 | 0 | 0 | 0 | 0.00% | 3 | 8 | 2 | 0 | 13 | 17.57% |
| CMF/DMH | 0 | 0 | 0 | 1 | 1 | 0.58% | 0 | 0 | 0 | 1 | 1 | 1.03% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| COCF | 0 | 0 | 1 | 0 | 1 | 0.58% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 1 | 0 | 1 | 1.35% |
| CRC | 0 | 0 | 1 | 0 | 1 | 0.58% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 1 | 0 | 1 | 1.35% |
| CTF | 2 | 0 | 0 | 0 | 2 | 1.17% | 1 | 0 | 0 | 0 | 1 | 1.03% | 1 | 0 | 0 | 0 | 1 | 1.35% |
| CVSP | 0 | 1 | 0 | 0 | 1 | 0.58% | 0 | 1 | 0 | 0 | 1 | 1.03% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| DVI | 2 | 2 | 2 | 0 | 6 | 3.51% | 2 | 2 | 2 | 0 | 6 | 6.19% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| DVI-RC | 12 | 16 | 3 | 0 | 31 | 18.13% | 8 | 10 | 3 | 0 | 21 | 21.65% | 4 | 6 | 0 | 0 | 10 | 13.51% |
| ISP | 0 | 0 | 1 | 0 | 1 | 0.58% | 0 | 0 | 1 | 0 | 1 | 1.03% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| KVSP | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| LAC | 1 | 0 | 0 | 0 | 1 | 0.58% | 0 | 0 | 0 | 0 | 0 | 0.00% | 1 | 0 | 0 | 0 | 1 | 1.35% |
| LAC-RC | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| MCSP | 0 | 1 | 0 | 0 | 1 | 0.58% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 1 | 0 | 0 | 1 | 1.35% |
| NKSP | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| NKSP-RC | 1 | 0 | 0 | 0 | 1 | 0.58% | 0 | 0 | 0 | 0 | 0 | 0.00% | 1 | 0 | 0 | 0 | 1 | 1.35% |
| PVSP | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| RJD | 6 | 1 | 0 | 0 | 7 | 4.09% | 4 | 0 | 0 | 0 | 4 | 4.12% | 2 | 1 | 0 | 0 | 3 | 4.05% |
| RJD-RC | 3 | 2 | 0 | 0 | 5 | 2.92% | 1 | 2 | 0 | 0 | 3 | 3.09% | 2 | 0 | 0 | 0 | 2 | 2.70% |
| SAC | 6 | 22 | 0 | 0 | 28 | 16.37% | 2 | 4 | 0 | 0 | 6 | 6.19% | 4 | 18 | 0 | 0 | 22 | 29.73% |
| SCC | 1 | 4 | 1 | 0 | 6 | 3.51% | 1 | 4 | 0 | 0 | 5 | 5.15% | 0 | 0 | 1 | 0 | 1 | 1.35% |
| SQ | 1 | 0 | 1 | 0 | 2 | 1.17% | 1 | 0 | 1 | 0 | 2 | 2.06% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| SQ-RC | 6 | 18 | 1 | 0 | 25 | 14.62% | 6 | 18 | 1 | 0 | 25 | 25.77% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| SVSP | 1 | 2 | 0 | 0 | 3 | 1.75% | 0 | 0 | 0 | 0 | 0 | 0.00% | 1 | 2 | 0 | 0 | 3 | 4.05% |
| WSP | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| WSP-RC | 1 | 1 | 0 | 0 | 2 | 1.17% | 1 | 1 | 0 | 0 | 2 | 2.06% | 0 | 0 | 0 | 0 | 0 | 0.00% |
| TOTAL | 62 | 86 | 22 | 1 | 171 | 100.00% | 35 | 49 | 12 | 1 | 97 | 100.00% | 27 | 37 | 10 | 0 | 74 | 100.00% |
| % TTL | 36.26% | 50.29% | 12.87% | 0.58% | 100.00% | | 36.08% | 50.52% | 12.37% | 1.03% | 100.00% | | 36.49% | 50.00% | 13.51% | 0.00% | 100.00% | |

| Referrals by Classification Score | |
|---|---|
| Score | Total |
| 0-18 | 35 |
| 19-27 | 28 |
| 28-51 | 30 |
| 52+ | 63 |
| TOTAL | 156 |
| Not Calc | 15 |
| Grand TTL | 171 |

HC-POP 5/14/09

| Transferred From | Transferred To | Date of Request | Transfer Dates | Previous LOS | Days Waiting* |
|---|---|---|---|---|---|
| ASP | CMF | 4/22/2009 | 4/24/2009 | CCCMS | 2 |
| ASP | CMF | 4/22/2009 | 4/24/2009 | CCCMS | 2 |
| ASP | LAC | 4/27/2009 | 4/30/2009 | CCCMS | 3 |
| ASP | CMF | 4/1/2009 | 4/3/2009 | EOP | 2 |
| **ASP Average** | | | | | **2.25** |
| CAL | SVSP | 4/9/2009 | 4/10/2009 | GP | 1 |
| **CAL Average** | | | | | **1.00** |
| CCI | CMF | 4/20/2009 | 4/22/2009 | CCCMS | 2 |
| CCI | CMF | 4/17/2009 | 4/20/2009 | CCCMS | 3 |
| CCI | SOL | 4/15/2009 | 4/22/2009 | CCCMS | 7 |
| CCI | SATF | 4/23/2009 | 4/25/2009 | EOP | 2 |
| CCI | SATF | 4/22/2009 | 4/24/2009 | EOP | 2 |
| CCI | SOL | 4/15/2009 | 4/22/2009 | EOP | 7 |
| CCI | SOL | 3/29/2009 | 4/2/2009 | EOP | 4 |
| **CCI Average** | | | | | **3.86** |
| CCI-RC | CMF | 3/29/2009 | 4/4/2009 | EOP | 6 |
| CCI-RC | SATF | 4/21/2009 | 4/24/2009 | EOP | 3 |
| **CCI-RC Average** | | | | | **4.50** |
| CEN | SATF | 4/9/2009 | 4/16/2009 | CCCMS | 7 |
| CEN | SATF | 4/23/2009 | 4/25/2009 | CCCMS | 2 |
| CEN | LAC | 4/3/2009 | 4/8/2009 | GP | 5 |
| CEN | SATF | 4/23/2009 | 4/23/2009 | GP | 0 |
| CEN | SVSP | 4/7/2009 | 4/9/2009 | GP | 2 |
| **CEN Average** | | | | | **3.20** |
| CMF/DMH | CMF | 4/27/2009 | 4/30/2009 | CMF/DMH | 3 |
| **CMF/DMH Average** | | | | | **3.00** |
| CTF | HDSP | 4/7/2009 | 4/9/2009 | CCCMS | 2 |
| **CTF Average** | | | | | **2.00** |
| CVSP | LAC | 3/26/2009 | 4/3/2009 | EOP | 8 |
| **CVSP Average** | | | | | **8.00** |
| DVI | CMF | 4/9/2009 | 4/11/2009 | CCCMS | 2 |
| DVI | CMF | 4/10/2009 | 4/11/2009 | CCCMS | 1 |
| DVI | HDSP | 4/17/2009 | 4/18/2009 | EOP | 1 |
| DVI | PBSP | 3/31/2009 | 4/2/2009 | EOP | 2 |
| DVI | HDSP | 4/16/2009 | 4/18/2009 | GP | 2 |
| DVI | HDSP | 4/17/2009 | 4/18/2009 | GP | 1 |
| **DVI Average** | | | | | **1.50** |
| DVI-RC | HDSP | 4/17/2009 | 4/19/2009 | CCCMS | 2 |
| DVI-RC | HDSP | 4/15/2009 | 4/17/2009 | CCCMS | 2 |
| DVI-RC | PBSP | 4/20/2009 | 4/24/2009 | CCCMS | 4 |
| DVI-RC | PBSP | 4/20/2009 | 4/24/2009 | CCCMS | 4 |
| DVI-RC | PBSP | 4/6/2009 | 4/8/2009 | CCCMS | 2 |
| DVI-RC | PBSP | 4/6/2009 | 4/8/2009 | CCCMS | 2 |
| DVI-RC | PBSP | 4/20/2009 | 4/24/2009 | CCCMS | 4 |
| DVI-RC | SATF | 4/18/2009 | 4/21/2009 | CCCMS | 3 |
| DVI-RC | CMF | 4/9/2009 | 4/14/2009 | EOP | 5 |
| DVI-RC | CMF | 4/24/2009 | 4/29/2009 | EOP | 5 |
| DVI-RC | CMF | 4/3/2009 | 4/4/2009 | EOP | 1 |

*Days Waiting based on days between referral
and transfer, not days between referral and an
MHCB becoming available.  Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.

| Transferred From | Transferred To | Date of Request | Transfer Dates | Previous LOS | Days Waiting* |
|---|---|---|---|---|---|
| DVI-RC | CMF | 4/3/2009 | 4/4/2009 | EOP | 1 |
| DVI-RC | CMF | 4/24/2009 | 4/25/2009 | EOP | 1 |
| DVI-RC | CMF | 4/10/2009 | 4/14/2009 | EOP | 4 |
| DVI-RC | HDSP | 4/6/2009 | 4/9/2009 | EOP | 3 |
| DVI-RC | PBSP | 3/31/2009 | 4/2/2009 | EOP | 2 |
| DVI-RC | PBSP | 4/5/2009 | 4/7/2009 | EOP | 2 |
| DVI-RC | PBSP | 4/6/2009 | 4/8/2009 | EOP | 2 |
| DVI-RC | CMF | 4/1/2009 | 4/3/2009 | GP | 2 |
| DVI-RC | SATF | 4/18/2009 | 4/19/2009 | GP | 1 |
| DVI-RC | SVSP | 3/24/2009 | 4/1/2009 | GP | 8 |
| **DVI-RC Average** | | | | | **2.86** |
| ISP | SATF | 4/15/2009 | 4/22/2009 | GP | 7 |
| **ISP Average** | | | | | **7.00** |
| RJD | CMF | 4/6/2009 | 4/8/2009 | CCCMS | 2 |
| RJD | CMF | 4/14/2009 | 4/17/2009 | CCCMS | 3 |
| RJD | LAC | 4/9/2009 | 4/11/2009 | CCCMS | 2 |
| RJD | LAC | 4/9/2009 | 4/11/2009 | CCCMS | 2 |
| **RJD Average** | | | | | **2.25** |
| RJD-RC | CMF | 4/7/2009 | 4/8/2009 | CCCMS | 1 |
| RJD-RC | CMF | 4/11/2009 | 4/16/2009 | EOP | 5 |
| RJD-RC | CMF | 4/6/2009 | 4/8/2009 | EOP | 2 |
| **RJD-RC Average** | | | | | **2.67** |
| SAC | CMF | 4/19/2009 | 4/21/2009 | CCCMS | 2 |
| SAC | CMF | 4/23/2009 | 4/28/2009 | CCCMS | 5 |
| SAC | CMF | 4/25/2009 | 4/29/2009 | EOP | 4 |
| SAC | HDSP | 4/21/2009 | 4/24/2009 | EOP | 3 |
| SAC | PBSP | 4/7/2009 | 4/9/2009 | EOP | 2 |
| SAC | PBSP | 4/20/2009 | 4/23/2009 | EOP | 3 |
| **SAC Average** | | | | | **3.17** |
| SCC | CMF | 4/8/2009 | 4/9/2009 | CCCMS | 1 |
| SCC | CMF | 4/23/2009 | 4/25/2009 | EOP | 2 |
| SCC | CMF | 3/30/2009 | 4/2/2009 | EOP | 3 |
| SCC | CMF | 4/23/2009 | 4/25/2009 | EOP | 2 |
| SCC | CMF | 4/8/2009 | 4/14/2009 | EOP | 6 |
| **SCC Average** | | | | | **2.80** |
| SQ | HDSP | 4/2/2009 | 4/5/2009 | CCCMS | 3 |
| SQ | CMF | 4/17/2009 | 4/20/2009 | GP | 3 |
| **SQ Average** | | | | | **3.00** |
| SQ-RC | CMF | 4/20/2009 | 4/21/2009 | CCCMS | 1 |
| SQ-RC | CMF | 4/17/2009 | 4/17/2009 | CCCMS | 0 |
| SQ-RC | CMF | 4/19/2009 | 4/21/2009 | CCCMS | 2 |
| SQ-RC | CMF | 4/8/2009 | 4/11/2009 | CCCMS | 3 |
| SQ-RC | HDSP | 4/8/2009 | 4/10/2009 | CCCMS | 2 |
| SQ-RC | PBSP | 4/21/2009 | 4/24/2009 | CCCMS | 3 |
| SQ-RC | CMF | 4/10/2009 | 4/11/2009 | EOP | 1 |
| SQ-RC | CMF | 4/17/2009 | 4/17/2009 | EOP | 0 |
| SQ-RC | CMF | 4/24/2009 | 4/29/2009 | EOP | 5 |
| SQ-RC | CMF | 4/24/2009 | 4/30/2009 | EOP | 6 |

*Days Waiting based on days between referral
and transfer, not days between referral and an
MHCB becoming available.  Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.    Page 2                                5/14/09

| Transferred From | Transferred To | Date of Request | Transfer Dates | Previous LOS | Days Waiting* |
|---|---|---|---|---|---|
| SQ-RC | CMF | 3/30/2009 | 4/1/2009 | EOP | 2 |
| SQ-RC | CMF | 4/12/2009 | 4/14/2009 | EOP | 2 |
| SQ-RC | CMF | 4/3/2009 | 4/5/2009 | EOP | 2 |
| SQ-RC | CMF | 3/30/2009 | 4/1/2009 | EOP | 2 |
| SQ-RC | CMF | 3/30/2009 | 4/1/2009 | EOP | 2 |
| SQ-RC | HDSP | 4/7/2009 | 4/9/2009 | EOP | 2 |
| SQ-RC | HDSP | 4/12/2009 | 4/16/2009 | EOP | 4 |
| SQ-RC | HDSP | 4/24/2009 | 4/25/2009 | EOP | 1 |
| SQ-RC | HDSP | 4/2/2009 | 4/5/2009 | EOP | 3 |
| SQ-RC | HDSP | 4/1/2009 | 4/5/2009 | EOP | 4 |
| SQ-RC | PBSP | 4/21/2009 | 4/24/2009 | EOP | 3 |
| SQ-RC | PBSP | 4/21/2009 | 4/24/2009 | EOP | 3 |
| SQ-RC | SOL | 4/1/2009 | 4/3/2009 | EOP | 2 |
| SQ-RC | SOL | 4/1/2009 | 4/3/2009 | EOP | 2 |
| SQ-RC | CMF | 4/20/2009 | 4/22/2009 | GP | 2 |
| **SQ-RC Average** | | | | | **2.36** |
| WSP-RC | CMF | 4/14/2009 | 4/17/2009 | CCCMS | 3 |
| WSP-RC | CMF | 4/8/2009 | 4/10/2009 | EOP | 2 |
| **WSP-RC Average** | | | | | **2.50** |
| **Grand Average** | | | | | **2.79** |

| SUMMARY OF TRANSFERS | | | |
|---|---|---|---|
| Time Frames | Total Transfers | Average Days Waiting | Range for Days Waiting |
| Combined | 97 | 2.79 | 8 |
| < or = 1 day | 16 | 0.81 | 1 |
| 2 days | 40 | NA | NA |
| 3 days | 18 | NA | NA |
| 4 or more days | 23 | 5.39 | 4 |

*Days Waiting based on days between referral
and transfer, not days between referral and an
MHCB becoming available.  Field clinicians
identify the most urgent cases and HQ MHP
senior clinical staff authorize priority placements.

RESCINDED MHCB REFERRALS
BY INSTITUTION AND PRIOR LEVEL OF CARE
**APRIL 2009**

| Referred By | Referral Date | Rescind Date | Previous LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| ASP | 4/24/2009 | 4/25/2009 | CCCMS | RETURN TO HOUSING | 1 |
| ASP | 4/26/2009 | 4/27/2009 | CCCMS | RETURN TO HOUSING | 1 |
| **ASP Average** | | | | | **1.00** |
| CAL | 3/25/2009 | 4/1/2009 | GP | RETURN TO HOUSING | 7 |
| CAL | 4/1/2009 | 4/2/2009 | GP | RETURN TO HOUSING | 1 |
| **CAL Average** | | | | | **4.00** |
| CCI | 4/3/2009 | 4/6/2009 | CCCMS | RETURN TO HOUSING | 3 |
| CCI | 4/18/2009 | 4/20/2009 | CCCMS | RETURN TO HOUSING | 2 |
| **CCI Average** | | | | | **2.50** |
| CCI-RC | 4/3/2009 | 4/7/2009 | CCCMS | RETURN TO HOUSING | 4 |
| CCI-RC | 4/20/2009 | 4/21/2009 | CCCMS | RETURN TO HOUSING | 1 |
| CCI-RC | 4/20/2009 | 4/21/2009 | CCCMS | RETURN TO HOUSING | 1 |
| **CCI-RC Average** | | | | | **2.00** |
| CEN | 4/20/2009 | 4/22/2009 | EOP | RETURN TO HOUSING | 2 |
| CEN | 3/28/2009 | 4/2/2009 | GP | RETURN TO HOUSING | 5 |
| CEN | 4/13/2009 | 4/19/2009 | GP | RETURN TO HOUSING | 6 |
| CEN | 4/26/2009 | 4/29/2009 | GP | RETURN TO HOUSING | 3 |
| **CEN Average** | | | | | **4.00** |
| CIM | 4/2/2009 | 4/6/2009 | CCCMS | ADMITTED | 4 |
| **CIM Average** | | | | | **4.00** |
| CIM-RC | 4/2/2009 | 4/6/2009 | CCCMS | ADMITTED | 4 |
| CIM-RC | 4/2/2009 | 4/3/2009 | CCCMS | ADMITTED | 1 |
| CIM-RC | 4/24/2009 | 4/27/2009 | CCCMS | ADMITTED | 3 |
| CIM-RC | 4/2/2009 | 4/3/2009 | EOP | ADMITTED | 1 |
| CIM-RC | 4/2/2009 | 4/6/2009 | EOP | ADMITTED | 4 |
| CIM-RC | 4/2/2009 | 4/6/2009 | EOP | ADMITTED | 4 |
| CIM-RC | 4/2/2009 | 4/3/2009 | EOP | ADMITTED | 1 |
| CIM-RC | 4/24/2009 | 4/28/2009 | EOP | ADMITTED | 4 |
| CIM-RC | 4/24/2009 | 4/28/2009 | EOP | RETURN TO HOUSING | 4 |
| CIM-RC | 4/24/2009 | 4/28/2009 | EOP | RETURN TO HOUSING | 4 |
| CIM-RC | 4/24/2009 | 4/28/2009 | EOP | RETURN TO HOUSING | 4 |
| CIM-RC | 4/2/2009 | 4/3/2009 | GP | ADMITTED | 1 |
| CIM-RC | 4/24/2009 | 4/27/2009 | GP | ADMITTED | 3 |
| **CIM-RC Average** | | | | | **2.92** |
| COCF | 4/25/2009 | 4/28/2009 | GP | RETURN TO HOUSING | 3 |
| **COCF Average** | | | | | **3.00** |
| CRC | 4/14/2009 | 4/17/2009 | GP | RETURN TO HOUSING | 3 |
| **CRC Average** | | | | | **3.00** |
| CTF | 4/20/2009 | 4/21/2009 | CCCMS | PAROLED | 1 |
| **CTF Average** | | | | | **1.00** |
| DVI-RC | 4/3/2009 | 4/4/2009 | CCCMS | RETURN TO HOUSING | 1 |
| DVI-RC | 4/6/2009 | 4/8/2009 | CCCMS | ADMITTED | 2 |
| DVI-RC | 4/20/2009 | 4/22/2009 | CCCMS | PAROLED | 2 |
| DVI-RC | 4/27/2009 | 4/29/2009 | CCCMS | ADMITTED | 2 |
| DVI-RC | 4/4/2009 | 4/6/2009 | EOP | RETURN TO HOUSING | 2 |

*Days Waiting based on days between referral
and rescission.  Field clinicians identify the most
urgent cases and Headquarter's Mental Health
Program senior clinical staff authroize priority
placements.

HC-POP
5/14/09

RESCINDED MHCB REFERRALS

BY INSTITUTION AND PRIOR LEVEL OF CARE

**APRIL 2009**

| Referred By | Referral Date | Rescind Date | Previous LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| DVI-RC | 4/5/2009 | 4/6/2009 | EOP | RETURN TO HOUSING | 1 |
| DVI-RC | 4/19/2009 | 4/23/2009 | EOP | ADMITTED | 4 |
| DVI-RC | 4/20/2009 | 4/21/2009 | EOP | RETURN TO HOUSING | 1 |
| DVI-RC | 4/24/2009 | 4/26/2009 | EOP | RETURN TO HOUSING | 2 |
| DVI-RC | 4/27/2009 | 4/29/2009 | EOP | RETURN TO HOUSING | 2 |
| **DVI-RC Average** | | | | | **1.90** |
| LAC | 4/21/2009 | 4/23/2009 | CCCMS | RETURN TO HOUSING | 2 |
| **LAC Average** | | | | | **2.00** |
| MCSP | 4/14/2009 | 4/16/2009 | EOP | ADMITTED | 2 |
| **MCSP Average** | | | | | **2.00** |
| NKSP-RC | 4/16/2009 | 4/19/2009 | CCCMS | RETURN TO HOUSING | 3 |
| **NKSP-RC Average** | | | | | **3.00** |
| RJD | 4/10/2009 | 4/13/2009 | CCCMS | DMH (Pending or Transferred) | 3 |
| RJD | 4/16/2009 | 4/21/2009 | CCCMS | RETURN TO HOUSING | 5 |
| RJD | 4/9/2009 | 4/13/2009 | EOP | RETURN TO HOUSING | 4 |
| **RJD Average** | | | | | **4.00** |
| RJD-RC | 4/6/2009 | 4/6/2009 | CCCMS | RETURN TO HOUSING | 0 |
| RJD-RC | 4/14/2009 | 4/15/2009 | CCCMS | ADMITTED | 1 |
| **RJD-RC Average** | | | | | **0.50** |
| SAC | 4/5/2009 | 4/6/2009 | CCCMS | ADMITTED | 1 |
| SAC | 4/11/2009 | 4/13/2009 | CCCMS | ADMITTED | 2 |
| SAC | 4/25/2009 | 4/29/2009 | CCCMS | RETURN TO HOUSING | 4 |
| SAC | 4/27/2009 | 4/27/2009 | CCCMS | RETURN TO HOUSING | 0 |
| SAC | 3/30/2009 | 4/2/2009 | EOP | RETURN TO HOUSING | 3 |
| SAC | 3/31/2009 | 4/2/2009 | EOP | RETURN TO HOUSING | 2 |
| SAC | 3/31/2009 | 4/2/2009 | EOP | RETURN TO HOUSING | 2 |
| SAC | 4/5/2009 | 4/6/2009 | EOP | ADMITTED | 1 |
| SAC | 4/6/2009 | 4/6/2009 | EOP | ADMITTED | 0 |
| SAC | 4/8/2009 | 4/9/2009 | EOP | ADMITTED | 1 |
| SAC | 4/11/2009 | 4/13/2009 | EOP | RETURN TO HOUSING | 2 |
| SAC | 4/11/2009 | 4/12/2009 | EOP | RETURN TO HOUSING | 1 |
| SAC | 4/19/2009 | 4/20/2009 | EOP | RETURN TO HOUSING | 1 |
| SAC | 4/19/2009 | 4/20/2009 | EOP | RETURN TO HOUSING | 1 |
| SAC | 4/19/2009 | 4/21/2009 | EOP | ADMITTED | 2 |
| SAC | 4/20/2009 | 4/21/2009 | EOP | RETURN TO HOUSING | 1 |
| SAC | 4/20/2009 | 4/21/2009 | EOP | RETURN TO HOUSING | 1 |
| SAC | 4/21/2009 | 4/22/2009 | EOP | RETURN TO HOUSING | 1 |
| SAC | 4/24/2009 | 4/27/2009 | EOP | ADMITTED | 3 |
| SAC | 4/25/2009 | 4/29/2009 | EOP | RETURN TO HOUSING | 4 |
| SAC | 4/27/2009 | 4/27/2009 | EOP | RETURN TO HOUSING | 0 |
| SAC | 4/27/2009 | 4/27/2009 | EOP | RETURN TO HOUSING | 0 |
| **SAC Average** | | | | | **1.50** |
| SCC | 4/6/2009 | 4/7/2009 | GP | RETURN TO HOUSING | 1 |
| **SCC Average** | | | | | **1.00** |
| SVSP | 3/29/2009 | 4/1/2009 | CCCMS | ADMITTED | 3 |

*Days Waiting based on days between referral and rescission.  Field clinicians identify the most urgent cases and Headquarter's Mental Health Program senior clinical staff authorize priority placements.

HC-POP
5/14/09

RESCINDED MHCB REFERRALS
BY INSTITUTION AND PRIOR LEVEL OF CARE
**APRIL 2009**

ATTACHMENT 2B

| Referred By | Referral Date | Rescind Date | Previous LOC | Rescind Reason | Days Waiting* |
|---|---|---|---|---|---|
| SVSP | 4/27/2009 | 4/29/2009 | EOP | ADMITTED | 2 |
| SVSP | 4/27/2009 | 4/29/2009 | EOP | ADMITTED | 2 |
| **SVSP Average** | | | | | **2.33** |
| **Grand Average** | | | | | **2.24** |

| SUMMARY OF RESCINDED REFERRALS | | | |
|---|---|---|---|
| Time Frames | Total Rescinds | Average Days Waiting | Range for Days Waiting |
| Combined | 74 | 2.24 | 7 |
| < or = 1 day | 29 | 0.83 | 1 |
| 2 days | 17 | NA | NA |
| 3 days | 11 | NA | NA |
| 4 or more days | 17 | 4.41 | 3 |

*Days Waiting based on days between referral
and rescission.  Field clinicians identify the most
urgent cases and Headquarter's Mental Health
Program senior clinical staff authroize priority
placements.

HC-POP
5/14/09

REASON FOR RESCINDED MHCB REFERRALS    ATTACHMENT 2C
**April 2009**

| Institution | RESCIND REASON | | | | Total Rescinded |
|---|---|---|---|---|---|
| | Admitted | Return to Housing | DMH Pending or Transferred | Paroled | |
| ASP | 0 | 2 | 0 | 0 | **2** |
| CAL | 0 | 2 | 0 | 0 | **2** |
| CCI | 0 | 2 | 0 | 0 | **2** |
| CCI-RC | 0 | 3 | 0 | 0 | **3** |
| CEN | 0 | 4 | 0 | 0 | **4** |
| CIM | 1 | 0 | 0 | 0 | **1** |
| CIM-RC | 10 | 3 | 0 | 0 | **13** |
| CMC | 0 | 0 | 0 | 0 | **0** |
| CMF | 0 | 0 | 0 | 0 | **0** |
| COCF | 0 | 1 | 0 | 0 | **1** |
| CRC | 0 | 1 | 0 | 0 | **1** |
| CTF | 0 | 0 | 0 | 1 | **1** |
| CVSP | 0 | 0 | 0 | 0 | **0** |
| DVI | 0 | 0 | 0 | 0 | **0** |
| DVI-RC | 3 | 6 | 0 | 1 | **10** |
| FOL | 0 | 0 | 0 | 0 | **0** |
| ISP | 0 | 0 | 0 | 0 | **0** |
| KVSP | 0 | 0 | 0 | 0 | **0** |
| LAC | 0 | 1 | 0 | 0 | **1** |
| LAC-RC | 0 | 0 | 0 | 0 | **0** |
| MCSP | 1 | 0 | 0 | 0 | **1** |
| NKSP | 0 | 0 | 0 | 0 | **0** |
| NKSP-RC | 0 | 1 | 0 | 0 | **1** |
| PVSP | 0 | 0 | 0 | 0 | **0** |
| RJD | 0 | 2 | 1 | 0 | **3** |
| RJD-RC | 1 | 1 | 0 | 0 | **2** |
| SAC | 7 | 15 | 0 | 0 | **22** |
| SATF | 0 | 0 | 0 | 0 | **0** |
| SCC | 0 | 1 | 0 | 0 | **1** |
| SOL | 0 | 0 | 0 | 0 | **0** |
| SQ | 0 | 0 | 0 | 0 | **0** |
| SQ-RC | 0 | 0 | 0 | 0 | **0** |
| SVSP | 3 | 0 | 0 | 0 | **3** |
| WSP | 0 | 0 | 0 | 0 | **0** |
| WSP-RC | 0 | 0 | 0 | 0 | **0** |
| **TOTAL** | **26** | **45** | **1** | **2** | **74** |

AVERAGE DAYS WAITING*
MHCB Referrals and Transfers
**APRIL 2009**

| | TRANSFERS | | RESCINDED REFERRALS | | TOTAL REFERRALS | |
|---|---|---|---|---|---|---|
| | Number | Avg Days Wait | Number | Avg Days Wait | Number | Avg Days Wait |
| **ASP** | 4 | 2.25 | 2 | 1.00 | 6 | 1.83 |
| **CAL** | 1 | 1.00 | 2 | 4.00 | 3 | 3.00 |
| **CCI** | 7 | 3.86 | 2 | 2.50 | 9 | 3.56 |
| **CCI-RC** | 2 | 4.50 | 3 | 2.00 | 5 | 3.00 |
| **CEN** | 5 | 3.20 | 4 | 4.00 | 9 | 3.56 |
| **CIM** | 0 | 0.00 | 1 | 4.00 | 1 | 4.00 |
| **CIM-RC** | 0 | 0.00 | 13 | 2.92 | 13 | 2.92 |
| **CIW** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **CIW-RC** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **CMF/DMH** | 1 | 3.00 | 0 | 0.00 | 1 | 3.00 |
| **COCF** | 0 | 0.00 | 1 | 3.00 | 1 | 3.00 |
| **COR** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **Community** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **CRC** | 0 | 0.00 | 1 | 3.00 | 1 | 3.00 |
| **CTF** | 1 | 2.00 | 1 | 1.00 | 2 | 1.50 |
| **CVSP** | 1 | 8.00 | 0 | 0.00 | 1 | 8.00 |
| **DVI** | 6 | 1.50 | 0 | 0.00 | 6 | 1.50 |
| **DVI-RC** | 21 | 2.86 | 10 | 1.90 | 31 | 2.55 |
| **Extradition** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **FOL** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **HDSP** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **ISP** | 1 | 7.00 | 0 | 0.00 | 1 | 7.00 |
| **KVSP** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **LAC** | 0 | 0.00 | 1 | 2.00 | 1 | 2.00 |
| **LAC-RC** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **MCSP** | 0 | 0.00 | 1 | 2.00 | 1 | 2.00 |
| **NKSP** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **NKSP-RC** | 0 | 0.00 | 1 | 3.00 | 1 | 3.00 |
| **PAROLE** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **PVSP** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **RJD** | 4 | 2.25 | 3 | 4.00 | 7 | 3.00 |
| **RJD-RC** | 3 | 2.67 | 2 | 0.50 | 5 | 1.80 |
| **SAC** | 6 | 3.17 | 22 | 1.50 | 28 | 1.86 |
| **SATF** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **SCC** | 5 | 2.80 | 1 | 1.00 | 6 | 2.50 |
| **SOL** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **SQ** | 2 | 3.00 | 0 | 0.00 | 2 | 3.00 |
| **SQ-RC** | 25 | 2.36 | 0 | 0.00 | 25 | 2.36 |
| **SVSP** | 0 | 0.00 | 3 | 2.33 | 3 | 2.33 |
| **WSP** | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **WSP-RC** | 2 | 2.50 | 0 | 0.00 | 2 | 2.50 |
| **TOTAL** | **97** | **2.79** | **74** | **2.24** | **171** | **2.56** |

*Average Days Waiting is based on number of days between referral and transfer or rescission. It does not indicate days between referral and an MHCB becoming available. Field clinicians identify the most urgent cases and Headquarters Mental Health Program senior clinical staff authorize priority placement of these cases into available MHCBs.

CMF/DMH EMERGENCY ADMISSIONS
BY PRIOR LEVEL OF CARE
**APRIL 2009**

ATTACHMENT 4

| | Referring Institution |
|---|---|
| **Prior Level of Care*** | **CMF** |
| **CCCMS** | 1 |
| **EOP** | 29 |
| **GP** | 1 |
| **DTP** | 0 |
| **Total Emergency Admissions** | **31** |

**\*Prior Level of Care:**
  **CCCMS=Correctional Clinical Case Management System**
  **EOP=Enhanced Outpatient Program**
  **GP=General Population**
  **DTP-Day Treatment Program**

# EXHIBIT M



# Mental Health

1600 9th Street, Sacramento, CA 95814
(916) 654-2413

June 5, 2009

Matthew A. Lopes, Jr., Esq.                    via:    Debbie J. Vorous
Office of Special Master                                Jeffery Steele
Pannone, Lopes & Devereaux, LLC                        Deputy Attorneys General
317 Iron Horse Way, Suite 301                          1300 I Street, Suite 125
Providence, RI  02908                                  P.O. Box 944255
                                                       Sacramento, CA  94244-2550

**RE:    MONTHLY REPORT ON THE LICENSURE OF INTERMEDIATE CARE AND DAY
        TREATMENT PROGRAMS AT THE CALIFORNIA MEDICAL FACILITY, VACAVILLE
        AND THE SALINAS VALLEY PSYCHIATRIC PROGRAM, SALINAS VALLEY STATE
        PRISON**

In accordance with the July 24, 2007 Court order issued by Judge Karlton, the California
Department of Mental Health (DMH) is to provide a monthly report on the implementation of the
expanded Intermediate Care Programs (ICPs) and Day Treatment Programs (DTPs) at the
California Medical Facility, Vacaville.  In addition to the terms of the Court order, the DMH also is
providing information on the implementation of the expanded ICPs and DTPs at the Salinas Valley
Psychiatric Program to optimize transparency and provide the full scope of our expansion of
services.

Enclosed is the monthly report providing data on each program's census and wait list information.
The data reflects the time period of May 1, 2009 through May 31, 2009.

If you need clarification on any aspect of this report, please contact Nathan Stanley, Long Term
Care Services Division at (916) 654-2413.

Sincerely,

CYNTHIA A. RADAVSKY
Deputy Director

Enclosures

## STATUS OF IMPLEMENTATION OF PLAN FOR
## INCREASING CAPACITY OF INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS
## AT THE CALIFORNIA MEDICAL FACILITY
### REPORT DATE: 06/01/09

| VPP UNITS | CAPACITY | FILLED | HOLD | AVAILABLE |
|---|---|---|---|---|
| A-2 DTP | 44 | 29 | 4 | 11 |
| A-3 ICF | 40 | 33 | 7 | 0 |
| P-2 ICF Level IV | 36 | 36 | 0 | 0 |
| P-3 ICF Level IV | 30 | 30 | 0 | 0 |

| SVPP Units | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available | Dormitory Capacity | Dormitory Filled | Dormitory Hold | Dormitory Available |
|---|---|---|---|---|---|---|---|---|
| TC1 | 32 | 31 | 1 | 0 | 32 | 26 | 2 | 4 |
| TC2 | 64 | 29 | 7 | 28 | N/A | N/A | N/A | N/A |

| SVPP Delta Units | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available |
|---|---|---|---|---|
| D-5 | 58 | 56 | 2 | 0 |
| D-6 | 58 | 56 | 2 | 0 |

### WAIT LIST DATA

| UNIT | WAIT LIST |
|---|---|
| P2 ICF LEVEL IV | 0 |
| P3 ICF LEVEL IV | 0 |
| A3 ICF | 0 |
| A2 DTP | 0 |
| SVPP | 230 |

1

6/5/2009

STATUS OF IMPLEMENTATION OF PLAN FOR
INCREASING CAPACITY OF INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS
AT THE CALIFORNIA MEDICAL FACILITY
REPORT DATE: 06/01/09

WAIT LIST DATA BY HOUSING UNIT/LEVEL OF CARE

| FACILITY | PSU | MHCB | ACUTE | AD. SEG - EOP | SHU | EOP | CCCMS | PC 1370 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| P-2 ICF LEVEL IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| P-3 ICF LEVEL IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-3 ICF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-2 DTP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SVPP | 44 | 18 | 2 | 36 | 0 | 100 | 5 | 25 | 205 |
| SVPP PC 1370* | 10 | 0 | 0 | 4 | 0 | 9 | 2 | --- | 25 |

2

6/5/2009

# EXHIBIT N

CALIFORNIA DEPARTMENT OF
# Mental Health

1600 9th Street, Sacramento, CA  95814
(916) 654-2413

June 4, 2009

Matthew A. Lopes, Jr., Esq.                    via:    Debbie J. Vorous
Office of Special Master                                Jeffery Steele
Pannone, Lopes & Devereaux, LLC                        Deputy Attorneys General
317 Iron Horse Way, Suite 301                          1300 I Street, Suite 125
Providence, RI  02908                                  P.O. Box 944255
                                                       Sacramento, CA  94244-2550

RE:    **MONTHLY STAFFING AND STAFFING VACANCIES REPORT FOR ALL DMH STATE
       HOSPITALS, VACAVILLE PSYCHIATRIC PROGRAM AND SALINAS VALLEY
       PSYCHIATRIC PROGRAM**

In accordance with the February 6, 2007 Court Order on the issue of pay parity for the California
Department of Mental Health (DMH) Clinicians, DMH is providing the following information on
Staffing and Staffing Vacancies in all DMH Hospitals, the Vacaville Psychiatric Program at the
California Medical Facility and the Salinas Valley Psychiatric Program at the Salinas Valley State
Prison.

The enclosed report contains the following data for 26 Coleman Related Clinical Positions: Total
amount of budgeted positions, positions filled, positions currently vacant and the overall percentage
of vacancies for each facility as of May 25, 2009. In addition, this report contains the DMH Coleman
totals that incorporate all of the data collected from the above-mentioned facilities. Please note that
DMH has included additional information that identifies the number of contracted staff employed at
DMH hospitals.

If you need clarification on any aspect of this report, please contact Nathan Stanley, Long Term
Care Services Division at (916) 654-2413.

Respectfully,

CYNTHIA A. RADAVSKY
Deputy Director

Enclosures

## DMH Staffing Classifications/Vacancy Rate Report as of  May 25, 2009

| | | | | Facility Totals as of  May 25, 2009 | | | | |
|---|---|---|---|---|---|---|---|---|
| Class Code | COLEMAN RELATED CLASSES | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacany Rate (Authorized Positions Vacant) | Functional Vacany Rate (Contractor Offset to Vacancies) |
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594 | Medical Director, State Hospital/Developmental Center, C.E.A. | 6.00 | 5.00 | 1.00 | 0.00 | 1.00 | 17% | 17% |
| 8236** | Psychiatric Technician Assistant (Safety) | 366.00 | 352.00 | 14.00 | 0.00 | 14.00 | 4% | 4% |
| 8238** | Psychiatric Technician Trainee (Safety) | 88.00 | 72.50 | 15.50 | 0.00 | 15.50 | 18% | 18% |
| 8253 | Psychiatric Technician (Safety) | 2049.10 | 1885.90 | 163.20 | 14.00 | 149.20 | 8% | 7% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety)** | 127.00 | 125.00 | 2.00 | 0.00 | 2.00 | 2% | 2% |
| 8252 | Senior Psychiatric Technician (Safety) | 370.00 | 332.50 | 37.50 | 0.00 | 37.50 | 10% | 10% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 322.20 | 251.55 | 70.65 | 8.00 | 62.65 | 22% | 19% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 38.70 | 34.20 | 4.50 | 0.00 | 4.50 | 12% | 12% |
| 9288 | Senior Psychologist, Correctional Facility (Supervisor) | 46.50 | 27.45 | 19.05 | 0.00 | 19.05 | 41% | 41% |
| 7619** | Staff Psychiatrist (Safety) | 280.80 | 197.00 | 83.80 | 44.00 | 39.80 | 30% | 14% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 35.00 | 29.00 | 6.00 | 1.00 | 5.00 | 17% | 14% |
| 7616** | Senior Psychiatrist (Specialist) | 19.90 | 2.00 | 17.90 | 0.00 | 17.90 | 90% | 90% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 56.70 | 32.00 | 24.70 | 0.00 | 24.70 | 44% | 44% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 84.40 | 76.20 | 8.20 | 0.00 | 8.20 | 10% | 10% |
| 8323**** | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 14.00 | 13.00 | 1.00 | 0.00 | 1.00 | 7% | 7% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 182.40 | 136.85 | 45.55 | 4.00 | 41.55 | 25% | 23% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 60.20 | 56.40 | 3.80 | 0.00 | 3.80 | 6% | 6% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 13.00 | 8.00 | 5.00 | 0.00 | 5.00 | 38% | 38% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 361.10 | 313.55 | 47.55 | 4.00 | 43.55 | 13% | 12% |
| 8104 | Unit Supervisor (Safety) | 116.00 | 104.00 | 12.00 | 0.00 | 12.00 | 10% | 10% |
| 9859 | Chief Psychologist | 24.00 | 20.00 | 4.00 | 0.00 | 4.00 | 17% | 17% |
| 9867 | Supervising Psychiatric Social Worker | 6.00 | 1.00 | 5.00 | 0.00 | 5.00 | 83% | 83% |
| | COLEMAN GRAND TOTALS | 4669.00 | 4077.10 | 591.90 | 75.00 | 516.90 | 13% | 11% |

*Salary Increases Effective 04/01/07

*DMH Class Codes added in May 07

*Class Codes are not on DPA Data Run for Plata (Pending info from actual Pay Letter)

****Staffing exceeds budgeted due to clinical needs funded by savings in other classifications

| Class Code | VACANCY WORKSHEET | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| **DMH Psychiatric Technician Classifications as of  May 25, 2009** | | | | | | | | |
| | **COLEMAN RELATED POSITIONS** | | | | **ASH Facility Totals** | | | |
| 8236** | Psychiatric Technician Assistant (Safety) | 14.00 | 8.00 | 6.00 | 0.00 | 6.00 | 43% | 43% |
| 8238** | Psychiatric Technician Trainee (Safety) | 75.00 | 57.50 | 17.50 | 0.00 | 17.50 | 23% | 23% |
| 8253 | Psychiatric Technician (Safety) | 495.90 | 449.70 | 46.20 | 0.00 | 46.20 | 9% | 9% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 60.00 | 60.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 96.00 | 82.00 | 14.00 | 0.00 | 14.00 | 15% | 15% |
| | **SUB-TOTAL** | **740.90** | **657.20** | **83.70** | **0.00** | **83.70** | **11%** | **11%** |
| | **COLEMAN RELATED POSITIONS** | | | | **CSH Facility Totals** | | | |
| 8236** | Psychiatric Technician Assistant (Safety) | 40.00 | 40.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 13.00 | 15.00 | -2.00 | 0.00 | -2.00 | -15% | -15% |
| 8253 | Psychiatric Technician (Safety) | 233.60 | 224.00 | 9.60 | 14.00 | -4.40 | 4% | -2% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 26.00 | 24.00 | 2.00 | 0.00 | 2.00 | 8% | 8% |
| 8252 | Senior Psychiatric Technician (Safety) | 68.00 | 62.50 | 5.50 | 0.00 | 5.50 | 8% | 8% |
| | **SUB-TOTAL** | **380.60** | **365.50** | **15.10** | **14.00** | **1.10** | **4%** | **0%** |
| | **COLEMAN RELATED POSITIONS** | | | | **MSH Facility Totals** | | | |
| 8236** | Psychiatric Technician Assistant (Safety) | 52.00 | 46.00 | 6.00 | 0.00 | 6.00 | 12% | 12% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 322.10 | 250.00 | 72.10 | 0.00 | 72.10 | 22% | 22% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 50.00 | 36.00 | 14.00 | 0.00 | 14.00 | 28% | 28% |
| | **SUB-TOTAL** | **424.10** | **332.00** | **92.10** | **0.0** | **92.10** | **22%** | **22%** |

*Salary Increases Effective 04/01/07
**DMH Class Codes added in May 07

2

| | DMH Psychiatric Technician Classifications as of May 25, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Class Code | VACANCY WORKSHEET | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
| | COLEMAN RELATED POSITIONS | | | NSH Facility Totals | | | | |
| 8236** | Psychiatric Technician Assistant (Safety) | 224.00 | 224.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 283.50 | 265.20 | 18.30 | 0.00 | 18.30 | 6% | 6% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 27.00 | 27.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 70.00 | 66.00 | 4.00 | 0.00 | 4.00 | 6% | 6% |
| | SUB-TOTAL | 604.50 | 582.20 | 22.30 | 0.00 | 22.30 | 4% | 4% |
| | COLEMAN RELATED POSITIONS | | | PSH Facility Totals | | | | |
| 8236** | Psychiatric Technician Assistant (Safety) | 36.00 | 34.00 | 2.00 | 0.00 | 2.00 | 6% | 6% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 714.00 | 697.00 | 17.00 | 0.00 | 17.00 | 2% | 2% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 14.00 | 14.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 86.00 | 86.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | SUB-TOTAL | 850.00 | 831.00 | 19.00 | 0.00 | 19.00 | 2% | 2% |
| | COLEMAN RELATED POSITIONS | | | VPP Facility Totals | | | | |
| 8236** | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | SUB-TOTAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |

*Salary Increases Effective 04/01/07
**DMH Class Codes added in May 07

3

| Class Code | VACANCY WORKSHEET | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| colspan=9 | **DMH Psychiatric Technician Classifications as of  May 25, 2009** |||||||||
| | **COLEMAN RELATED POSITIONS** |  | **SVPP Facility Totals** |||||||
| 8236** | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **SUB-TOTAL** | **0.0** | **0.0** | **0.0** | **0.0** | **0.00** | **0%** | **0%** |
| | **TOTAL VACANCY RATE** | **3000.10** | **2767.90** | **232.20** | **14.00** | **218.20** | **8%** | **7%** |

*Salary Increases Effective 04/01/07
**DMH Class Codes added in May 07

4

Case 2:90-cv-00520-KJM-SCR    Document 3607    Filed 05/05/10    Page 142 of 153

| Class Code | Coleman Related Classifications | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594/ | Medical Director, State Hospital/Developmental Center, C.E.A. | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236** | Psychiatric Technician Assistant (Safety) | 14.00 | 8.00 | 6.00 | 0.00 | 6.00 | 43% | 43% |
| 8238** | Psychiatric Technician Trainee (Safety) | 75.00 | 57.50 | 17.50 | 0.00 | 17.50 | 23% | 23% |
| 8253 | Psychiatric Technician (Safety) | 495.90 | 449.70 | 46.20 | 0.00 | 46.20 | 9% | 9% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 60.00 | 60.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 96.00 | 82.00 | 14.00 | 0.00 | 14.00 | 15% | 15% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 81.40 | 45.00 | 36.40 | 0.00 | 36.40 | 45% | 45% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 8.00 | 6.00 | 2.00 | 0.00 | 2.00 | 25% | 25% |
| 9288/9831 | Senior Psychologist, Correctional Facility (Supervisor) | 13.00 | 8.00 | 5.00 | 0.00 | 5.00 | 38% | 38% |
| 7619** | Staff Psychiatrist (Safety) | 78.10 | 22.50 | 55.60 | 35.00 | 20.60 | 71% | 26% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616** | Senior Psychiatrist (Specialist) | 6.00 | 2.00 | 4.00 | 0.00 | 4.00 | 67% | 67% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 9.00 | 4.00 | 5.00 | 0.00 | 5.00 | 56% | 56% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 16.00 | 13.00 | 3.00 | 0.00 | 3.00 | 19% | 19% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 49.70 | 30.80 | 18.90 | 0.00 | 18.90 | 38% | 38% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 4.00 | 3.50 | 0.50 | 0.00 | 0.50 | 13% | 13% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 2.00 | 0.00 | 2.00 | 0.00 | 2.00 | 100% | 100% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 70.90 | 52.00 | 18.90 | 0.00 | 18.90 | 27% | 27% |
| 8104 | Unit Supervisor (Safety) | 33.00 | 27.00 | 6.00 | 0.00 | 6.00 | 18% | 18% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **COLEMAN TOTAL** | **1116.00** | **875.00** | **241.00** | **35.00** | **206.00** | **22%** | **18%** |

| Class Code | Coleman Related Classifications | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594/9693 | Medical Director, State Hospital/Developmental Center, C.E.A. | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236** | Psychiatric Technician Assistant (Safety) | 40.00 | 40.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 13.00 | 15.00 | -2.00 | 0.00 | -2.00 | -15% | -15% |
| 8253 | Psychiatric Technician (Safety) | 233.60 | 224.00 | 9.60 | 14.00 | -4.40 | 4% | -2% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 26.00 | 24.00 | 2.00 | 0.00 | 2.00 | 8% | 8% |
| 8252 | Senior Psychiatric Technician (Safety) | 68.00 | 62.50 | 5.50 | 0.00 | 5.50 | 8% | 8% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 36.10 | 33.10 | 3.00 | 8.00 | -5.00 | 8% | -14% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 7.00 | 4.00 | 3.00 | 0.00 | 3.00 | 43% | 43% |
| 9288/9831 | Senior Psychologist, Correctional Facility (Supervisor) | 7.50 | 6.45 | 1.05 | 0.00 | 1.05 | 14% | 14% |
| 7619** | Staff Psychiatrist (Safety) | 9.20 | 4.60 | 4.60 | 9.00 | -4.40 | 50% | -48% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616** | Senior Psychiatrist (Specialist) | 5.60 | 0.00 | 5.60 | 0.00 | 5.60 | 100% | 100% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 4.00 | 3.00 | 1.00 | 0.00 | 1.00 | 25% | 25% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 9.00 | 6.80 | 2.20 | 0.00 | 2.20 | 24% | 24% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 8.00 | 5.00 | 3.00 | 0.00 | 3.00 | 38% | 38% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 17.00 | 16.50 | 0.50 | 0.00 | 0.50 | 3% | 3% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 33.30 | 39.80 | -6.50 | 3.00 | -9.50 | -20% | -29% |
| 8104 | Unit Supervisor (Safety) | 19.00 | 19.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **COLEMAN  TOTAL** | **538.30** | **505.75** | **32.55** | **34.00** | **-1.45** | **6%** | **0%** |

6

| Class Code | Coleman Related Classifications | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594/9690 | Medical Director, State Hospital/Developmental Center, C.E.A. | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236** | Psychiatric Technician Assistant (Safety) | 52.00 | 46.00 | 6.00 | 0.00 | 6.00 | 12% | 12% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 322.10 | 250.00 | 72.10 | 0.00 | 72.10 | 22% | 22% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 50.00 | 36.00 | 14.00 | 0.00 | 14.00 | 28% | 28% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 43.00 | 38.00 | 5.00 | 0.00 | 5.00 | 12% | 12% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 4.00 | 3.00 | 1.00 | 0.00 | 1.00 | 25% | 25% |
| 9288 | Senior Psychologist, Correctional Facility (Supervisor) | 6.00 | 1.00 | 5.00 | 0.00 | 5.00 | 83% | 83% |
| 7619** | Staff Psychiatrist (Safety) | 48.40 | 38.50 | 9.90 | 0.00 | 9.90 | 20% | 20% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616** | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 12.50 | 8.00 | 4.50 | 0.00 | 4.50 | 36% | 36% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 8.60 | 8.10 | 0.50 | 0.00 | 0.50 | 6% | 6% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 27.00 | 22.50 | 4.50 | 0.00 | 4.50 | 17% | 17% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 5.00 | 4.00 | 1.00 | 0.00 | 1.00 | 20% | 20% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 49.00 | 37.00 | 12.00 | 0.00 | 12.00 | 24% | 24% |
| 8104 | Unit Supervisor (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 20.00 | 16.00 | 4.00 | 0.00 | 4.00 | 20% | 20% |
| 9867 | Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
|  | COLEMAN TOTAL | 652.60 | 511.10 | 141.50 | 0.00 | 141.50 | 22% | 22% |

| Class Code | Coleman Related Classifications | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594 | Medical Director, State Hospital/Developmental Center, C.E.A. | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236** | Psychiatric Technician Assistant (Safety) | 224.00 | 224.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 283.50 | 265.20 | 18.30 | 0.00 | 18.30 | 6% | 6% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 27.00 | 27.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 70.00 | 66.00 | 4.00 | 0.00 | 4.00 | 6% | 6% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 60.80 | 46.50 | 14.30 | 0.00 | 14.30 | 24% | 24% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 9.70 | 12.00 | -2.30 | 0.00 | -2.30 | -24% | -24% |
| 9288 | Senior Psychologist, Correctional Facility (Supervisor) | 9.00 | 6.00 | 3.00 | 0.00 | 3.00 | 33% | 33% |
| 7619** | Staff Psychiatrist (Safety) | 64.90 | 56.40 | 8.50 | 0.00 | 8.50 | 13% | 13% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616** | Senior Psychiatrist (Specialist) | 8.30 | 0.00 | 8.30 | 0.00 | 8.30 | 100% | 100% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 7.00 | 7.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 16.30 | 15.80 | 0.50 | 0.00 | 0.50 | 3% | 3% |
| 8323**** | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 3.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 31.20 | 22.30 | 8.90 | 4.00 | 4.90 | 29% | 16% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 18.20 | 17.40 | 0.80 | 0.00 | 0.80 | 4% | 4% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 3.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 63.40 | 60.00 | 3.40 | 0.00 | 3.40 | 5% | 5% |
| 8104 | Unit Supervisor (Safety) | 31.00 | 26.00 | 5.00 | 0.00 | 5.00 | 16% | 16% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 5.00 | 0.00 | 5.00 | 0.00 | 5.00 | 100% | 100% |
| | **COLEMAN TOTAL** | **937.30** | **859.60** | **77.70** | **4.00** | **73.70** | **8%** | **8%** |

| Class Code | Coleman Related Classifications | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594 | Medical Director, State Hospital/Developmental Center, C.E.A. | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 8236** | Psychiatric Technician Assistant (Safety) | 36.00 | 34.00 | 2.00 | 0.00 | 2.00 | 6% | 6% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 714.00 | 697.00 | 17.00 | 0.00 | 17.00 | 2% | 2% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 14.00 | 14.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 86.00 | 86.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 80.90 | 74.95 | 5.95 | 0.00 | 5.95 | 7% | 7% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 6.00 | 5.20 | 0.80 | 0.00 | 0.80 | 13% | 13% |
| 9288/(9831) | Senior Psychologist, Correctional Facility (Supervisor) | 9.00 | 5.00 | 4.00 | 0.00 | 4.00 | 44% | 44% |
| 7619** | Staff Psychiatrist (Safety) | 80.20 | 75.00 | 5.20 | 0.00 | 5.20 | 6% | 6% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616** | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 23.20 | 10.00 | 13.20 | 0.00 | 13.20 | 57% | 57% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 25.50 | 25.50 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 6.00 | 6.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 47.50 | 41.25 | 6.25 | 0.00 | 6.25 | 13% | 13% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 13.00 | 12.00 | 1.00 | 0.00 | 1.00 | 8% | 8% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 103.50 | 93.75 | 9.75 | 0.00 | 9.75 | 9% | 9% |
| 8104 | Unit Supervisor (Safety) | 33.00 | 32.00 | 1.00 | 0.00 | 1.00 | 3% | 3% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **COLEMAN TOTAL** | **1282.80** | **1214.65** | **68.15** | **0.00** | **68.15** | **5%** | **5%** |

9

| Class Code | Coleman Related Classifications | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594 | Medical Director, State Hospital/Developmental Center, C.E.A. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236** | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 8.00 | 4.00 | 4.00 | 0.00 | 4.00 | 50% | 50% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9288 | Senior Psychologist, Correctional Facility (Supervisor) | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 7619** | Staff Psychiatrist (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 10.00 | 8.00 | 2.00 | 1.00 | 1.00 | 20% | 10% |
| 7616** | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 10.00 | 7.00 | 3.00 | 0.00 | 3.00 | 30% | 30% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 2.00 | 1.00 | 1.00 | 0.00 | 1.00 | 50% | 50% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 16.00 | 12.00 | 4.00 | 1.00 | 3.00 | 25% | 19% |
| 8104 | Unit Supervisor (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **COLEMAN TOTAL** | **51.0** | **35.0** | **16.00** | **2.0** | **14.0** | **31%** | **27%** |

| Class Code | Coleman Related Classifications | Budgeted | Filled | Vacant | Contracted FTE | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| 7577 | Medical Director, State Hospital/Developmental Center | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7594 | Medical Director, State Hospital/Developmental Center, C.E.A. | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236** | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238** | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8254** | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9873 | Psychologist (Health Facility-Clinical-Safety) | 12.00 | 10.00 | 2.00 | 0.00 | 2.00 | 17% | 17% |
| 9839 | Senior Psychologist (Health Facility) (Specialist) | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9288 | Senior Psychologist, Correctional Facility (Supervisor) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7619** | Staff Psychiatrist (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 25.00 | 21.00 | 4.00 | 0.00 | 4.00 | 16% | 16% |
| 7616** | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609** | Senior Psychiatrist (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 8.00 | 6.00 | 2.00 | 0.00 | 2.00 | 25% | 25% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 9.00 | 8.00 | 1.00 | 0.00 | 1.00 | 11% | 11% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 25.00 | 19.00 | 6.00 | 0.00 | 6.00 | 24% | 24% |
| 8104 | Unit Supervisor (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | | | | | | | | |
| | COLEMAN TOTAL | 91.00 | 76.00 | 15.00 | 0.00 | 15.00 | 16% | 16% |

# EXHIBIT O

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



Division of Correctional Health Care Services

Department of Corrections & Rehabilitation

# CHAPTER 4
## Enhanced Outpatient Program

### A. INTRODUCTION

The Enhanced Outpatient Program (EOP) provides the most intensive level of outpatient mental health care within the Mental Health Services Delivery System (MHSDS). The program is characterized by a separate housing unit and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care. Inmate-patients who, because of a mental disorder, do not function well in EOP may be referred for higher levels of care including: Mental Health Crisis Bed (MHCB); or Department of Mental Health (DMH) Day Treatment Program, Intermediate Care Program, or Acute Psychiatric Program.

Critical components include:

1. A comprehensive array of mental health services delivered within the framework of an Interdisciplinary Treatment Team (IDTT), which is composed of representatives from a cross-section of clinical disciplines as well as prison custodial and counseling staff. Treatment is focused on resolution of institutional adjustment problems which impede functioning within the GP. Services include management of activities of daily living, group and individual psychotherapy, medication management, recreational therapy, and clinical pre-release planning.

2. A designated housing unit with restricted access and alternative educational, work, and recreational opportunities specifically provided for inmate-patients whose mental illness precludes their placement and participation in the GP programs.

3. Active interface with custodial staff, including Correctional Counselors (CC), which enhances the assessment and treatment process and optimizes the inmate-patient functioning within the prison environment.

### B. PROGRAM OBJECTIVES

The goal of the EOP is to provide focused evaluation and treatment of mental health conditions which are limiting an inmate's ability to adjust to a GP placement. The overall objective is to provide clinical intervention to return the individual to the least restrictive clinical and custodial environment.
More specific objectives include:

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

prescription of treatment activities should consider the commitment offenses and current institutional maladjustment.

Inmate-patients who are released from Administrative Segregation Unit (ASU) or the PSU to a GP EOP for continuing mental health treatment may require mental health services related to adjustment to the GP environment. The ASU or PSU PC shall document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to GP. The receiving EOP IDTT will consider documentation by the ASU or PSU clinician in developing the inmate-patient's treatment plan. The treatment plan for inmate-patients transferred from ASU or PSU to GP-EOP shall include services provided to aid in the transition to the GP environment. Inmate-patients referred from the ASU or PSU to a GP-EOP Unit shall be retained at EOP level of care for a minimum of 90 days.

**Release after Initial Evaluation**

If, at the conclusion of the initial evaluation process, the IDTT determines that EOP placement is inappropriate, documentation to this effect is placed in the UHR using CDCR 7388, *Mental Health Treatment Plan*. A CDCR 128-MH3, *Mental Health Placement Chrono*, noting the decision and recommending more appropriate placement shall be prepared for classification processing and transfer (if appropriate). If inpatient care is indicated, the assigned PC is responsible for initiating and completing the placement process.

## E. EOP INMATE-PATIENT TREATMENT SERVICES

Each EOP inmate-patient will have an individualized treatment plan that provides for treatment consistent with the inmate-patient's clinical needs. The treatment plan shall be documented on a CDCR 7388, *Mental Health Treatment Plan*. Each inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT. It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services. For some inmate-patients, ten hours per week may be clinically contraindicated. For those inmate-patients scheduled for less than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan,* must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities or refer to a higher level of care as clinically indicated.

| Reception Center | Mental Health Services Delivery System |
|---|---|
| **Mental Health Assessment** | |

6. <u>Initial Treatment Planning and Treatment</u>

Initial treatment planning must be developed and regular treatment must be provided for all inmate-patients who are identified as requiring mental health services. Mental Health needs of inmate-patients housed in a RC are often greater than those of inmate-patients in a general population setting, due to a variety of problems related to incarceration which often precipitate dysfunctional behavior or exacerbate pre-existing mental conditions. Treatment plans must address basic issues of adjustment, access to care, monitoring of medication continuity, and clinical pre-release or parole planning.

Without exception, mental health services are extended to all MHSDS designated inmate-patients while awaiting transfer to a mainline institution. Services include case management contacts, medication management, and monitoring pertinent to the level of functionality based on clinical judgment. In addition, crisis intervention, clinical pre-release or parole planning, and other case management services shall be provided consistent with the inmate's clinical needs. Services are provided through staff assigned to the RC.

Inmate-patients who require Correctional Clinical Case Management System (CCCMS) level of care shall be seen by the PC within 30 days of placement in CCCMS and at least every 90 days thereafter while at the RC, or more often if clinically indicated. These inmate-patients shall also be evaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues.

Inmate-patients who require Enhanced Outpatient Program (EOP) level of care shall be seen by the PC weekly and shall be evaluated by a psychiatrist at least monthly regarding psychiatric medication issues. Institutions that have both a RC and an established EOP may temporarily house and treat these inmate-patients in their regular EOP housing units until transfer.

Reception Centers housing inmate-patients requiring EOP level of care shall provide structured therapeutic activities. At the five reception centers with the preponderance of inmates (California Institution for Men, Richard J. Donovan Correctional Facility, North Kern State Prison, Wasco State Prison, and San Quentin State Prison), regularly scheduled therapy groups will be held on a daily basis. The remaining seven RCs with smaller populations will provide a less structured treatment array, but **all sites will provide opportunities for a minimum of one hour per day, five days per week, of out-of-cell therapeutic activities.** Inmate-patients will be enrolled into various group activities based upon PC assessment of individual needs, related to both individual symptoms as well as commitment status. The treatment activities delineated in the Program Guide will be augmented with the following options: