PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

            Plaintiffs,

    v.

ARNOLD SCHWARZENEGGER, et al.,

            Defendants.

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' COMMENTS PURSUANT TO THE COURT'S MARCH 31, 2009 ORDER REGARDING (1) DEFENDANTS' FINAL PROPOSAL TO MEET THE REMAINING SHORT-TERM, INTERMEDIATE, AND LONG-RANGE BED NEEDS OF THE PLAINTIFF CLASS; AND, (2) DEFENDANTS' DETAILED ACTIVATION SCHEDULES FOR COMPLETION OF ALL OTHER COURT-ORDERED CONSTRUCTION PROJECTS.**

Submitted to Special Master Matthew Lopes With a Copy Filed With the Court Pursuant to the Order of March 31, 2009 (Docket No. 3556)

Hearing:  June 16, 2009, 1:30 p.m.
Court:  Hon. Lawrence K. Karlton

[298396-5]

# TABLE OF ABBREVIATIONS/ACRONYMS

APP:             Acute Psychiatric Program

ASH:             Atascadero State Hospital

ASU:             Administrative Segregation Unit

CCCMS:           Correctional Clinical Case Manager System

CCM:             Clinical Case Manager

CDCR:            California Department of Corrections and Rehabilitation

CIM:             California Institution for Men

CIW:             California Institution for Women

CMC:             California Men's Colony

CMF:             California Medical Facility

COR:             California State Prison/Corcoran

CSH:             Coalinga State Hospital

DAPO:            Division of Adult Parole Operations

DHS:             California Department of Health Services

DJJ:             Division of Juvenile Justice

DMH:             California Department of Mental Health

DOF:             California Department of Finance

DTP:             Day Treatment Program (at California Medical Facility)

DVI:             Deuel Vocational Institute

EOP:             Enhanced Outpatient Program

GP:              General Population

HC-POP:          Health Care Placement Oversight Program

ICF:             Intermediate Care Facility

IDTT:            Interdisciplinary Treatment Team

LAC:             California State Prison/Lancaster

LOC:             Level of Care

LOU:             Locked Observation Unit

[298396-5]

| | | |
|---|---|---|
| 1 | MCSP: | Mule Creek State Prison |
| 2 | MDOC: | Mississippi Department of Corrections |
| 3 | MHCB: | Mental Health Crisis Bed |
| 4 | MHOHU: | Mental Health Outpatient Housing Unit |
| 5 | MHSDS: | Mental Health Services Delivery System |
| 6 | NKSP: | North Kern State Prison |
| 7 | OHU: | Outpatient Housing Units |
| 8 | PMIB: | Pooled Money Investment Board |
| 9 | PSU: | Psychiatric Services Unit |
| 10 | RC: | Reception Center |
| 11 | RJD: | Richard J. Donovan Correctional Facility |
| 12 | RN: | Registered Nurse |
| 13 | SAC: | California State Prison/Sacramento |
| 14 | SATF: | California Substance Abuse Treatment Facility |
| 15 | SHU: | Segregated Housing Unit |
| 16 | SOL: | California State Prison/Solano |
| 17 | S/PWB: | State Public Works Board |
| 18 | SQ: | San Quentin State Prison |
| 19 | STO: | State Treasurer's Office |
| 20 | SVPP: | Salinas Valley Psychiatric Program |
| 21 | SVSP: | Salinas Valley State Prison |
| 22 | TIPS: | Taxpayers for Improving Public Safety |
| 23 | TSI: | Therapeutic Strategies and Interventions training |
| 24 | VA: | Veterans' Administration |
| 25 | VPP: | Vacaville Psychiatric Program (at California Medical Facility) |
| 26 | WSP: | Wasco State Prison |
| 27 | | |
| 28 | | |

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS/ACRONYMS ................................................................I

TABLE OF CONTENTS .................................................................................... III

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 6

PLAINTIFFS' SPECIFIC COMMENTS ................................................................ 10

I.      ACTIVATION PLAN ............................................................................... 10

        A.      AB 900 Funding Is Stalled By The Attorney General, State Treasurer,
                Controller and Finance Director (a current *Coleman* Defendant) ...................... 10

        B.      Additional Steps Required to Expedite Elements of the Activation Plan .............. 11

                1.      California Men's Colony, 50 Mental Health Crisis Beds ........................... 11

                2.      Salinas Valley State Prison, 64-Bed Intermediate Care Facility for
                        High Custody Inmates .................................................................... 12

                3.      Salinas Valley State Prison, Treatment Space for Inpatient Care in
                        D-5, D-6 Areas ............................................................................. 12

                4.      California Medical Facility, Vacaville, Treatment and Office
                        Space for General Population Enhanced Outpatient Program and
                        EOP Administrative Segregation Unit .............................................. 12

                5.      California Medical Facility, 64-Bed Intermediate Care Facility for
                        High Custody Inmates .................................................................... 13

                6.      California Medical Facility, Vacaville, Suicide Proofing of 124
                        Inpatient Cells (Q1, Q2, S1, and S2 Areas) ..................................... 14

                7.      California State Prison, Sacramento, EOP Treatment and Office
                        Space ........................................................................................ 14

                8.      California State Prison, Sacramento, Los Angeles County (LAC),
                        EOP Treatment and Office Space .................................................. 15

                9.      Salinas Valley State Prison, 72-bed Enhanced Outpatient Program
                        Administrative Segregation Unit ..................................................... 16

                10.     Salinas Valley State Prison, EOP Treatment and Office Space ................ 16

[298396-5]

11. California Institution for Women, 45-bed Intermediate Care Facility ..................................................................... 18

12. California Institution for Women, 20-bed Psychiatric Services Unit ........................................................................ 19

II. SHORT AND INTERMEDIATE TERM PLANS PROJECTED 18 MONTHS OUT TO DECEMBER 2010 ........................................................... 19

A. General Comments ................................................................. 19

1. Defendants Did Not Comply With The Court's Order To Identify "Concrete Proposals To Meet The Remaining Short-Term, Intermediate, And Long Range Bed Needs Of The Plaintiff Class" (Docket No. 3556 at 5:20-21.) ......................................... 19

2. Defendants Did Not Comply with the Court Order to Address the Gaps In the Short and Intermediate Terms Because They Only Tried to Address the *Current* 2009 Need, Not the Need That Is Projected to Exist At the End of 2010 When Their Short and Intermediate Term Projects Are Set For Completion ................................. 20

3. The Court Should Reject Defendants' Assertion That The Short And Intermediate Term Enhanced Outpatient Program Gap Need Not Be Fully Addressed Because Of The Reception Center Program ................................................................... 22

4. Defendants Have Not Addressed the Use of Coalinga State Hospital to Relieve the EOP Bed Shortage ...................... 23

5. Defendants Have Now Admitted That Many Patients At The EOP Level Of Care Need A Program Geared Toward Their Imminent Release To The Community, And Defendants Should Be Ordered To Plan For This Reality ............................................... 25

6. Defendants Must Meet the PSU/EOP ASU Gap and Reassess the Population .............................................................. 26

7. Other MHOHUs That Are and Will Be Substituting for Crisis Beds Should Also Be Staffed Up to Address the Continuing Gaps ........... 28

B. Comments On Specific Short And Intermediate Term Projects ............................................................ 30

1. Dual Diagnosis Treatment Program at Substance Abuse Treatment Facility ................................................... 30

2. 150 Bed EOP Sensitive Needs Yard at SATF ............................ 30

|  | 3. | 150 EOP GP Beds at SOL | 30 |
|  | 4. | 45 EOP-ASU Beds at COR | 31 |
|  | 5. | 27 EOP ASU Beds at SVSP | 31 |
|  | 6. | 20 EOP ASU Beds at LAC | 31 |
|  | 7. | 17 MHCB Beds at San Quentin Central Health Services Building (Building 22) | 31 |
|  | 8. | 20 Temporary MHCB Beds at SAC | 31 |
|  | 9. | 4 ICF Cells at SVSP D5/D6 | 32 |
|  | 10. | 116 Bed ICF Conversion at SVSP C5/C6 | 32 |
|  | 11. | 10 ICF Beds Via Double Bunking at SVSP TC-1 | 33 |
|  | 12. | 44 Bed Conversion from DTP to ICF at CMF | 33 |
|  | 13. | Conversion of 25 ASH Acute Beds to ICF | 35 |
|  | 14. | 32 Bed CMF P-1 Conversion to Acute | 37 |
|  | 15. | 36 Bed CMF P-2 Conversion to Acute | 37 |
| III. | | LONG RANGE PLANS | 37 |
|  | A. | General Comments | 37 |
|  | 1. | Defendants Should Be Required to Certify Before the June 16, 2009 Hearing That the *Plata* Receiver's Projects Are Approved By All Pertinent Branches of State Government | 37 |
|  | B. | Comments on the Specific Long-Term Proposals | 38 |
|  | 1. | Receiver's Consolidated Health Care Facilities | 38 |
|  | 2. | 152 SAC PSU Beds | 38 |
|  | 3. | 733 EOP Beds at "Alternative Sites" | 39 |
|  | 4. | 70 Female EOP-GP Beds At Receiver's Correctional Health Care Center Site No. 1 | 40 |
|  | 5. | 12- Bed MHCB at SQ in the Condemned Inmates Center | 40 |

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

IV.   COMMENTS ON BED PLANNING ISSUES NOT ADDRESSED IN DEFENDANTS' SUBMISSIONS ...................................................................... 41

A.   DMH Should Be Ordered to Operate Every ICF and Acute Bed Unit for Female and Male Class Members Whether Located in Prisons, in DMH Hospitals, or in the Receiver's Consolidated Care Centers ................................... 41

B.   The Court Should Order Special Master Supervision Over the Activation Plan, As Well as the Short, Intermediate, and Long Term Projects...................... 42

C.   The Court Should Direct Changes in On-Going Bed Planning ............................ 42

D.   At All Levels Of Care, Temporary Stop Gap Beds Must Eventually Be Replaced With Appropriate Beds That Meet The Standards For Licensing ............................................................................................................... 43

E.   At All Levels Of Care, Defendants Must Quickly Begin To Acquire Appropriate Staffing—Not Based On The Existing Defective Workload Study—And Must Prepare Adequate Training Programs...................................... 44

   1.   Immediate Action is Needed By Defendants to Fund Proper Staffing Levels In The Current Budget Process............................................. 44

   2.   Siting The Plans In Troubled Prisons And Trying To Compensate With Training Is Risky, And If Allowable At All, Needs Better Training Than What Is Shown Here ........................................................... 45

CONCLUSION ...................................................................................................................... 47

[298396-5]

1    TO:  MATTHEW A LOPES, JR., *COLEMAN* SPECIAL MASTER, COUNSEL, AND

2    THE COURT.  As required by the Court's March 31, 2009 Order (Docket No. 3556), the

3    *Coleman* Plaintiff class, through their counsel, provide these comments regarding

4    (1) Defendants' Response To Court's March 31, 2009 Order That Defendants File A Final

5    Proposal To Meet The Remaining Short-Term, Intermediate, And Long-Range Bed Needs Of

6    The Plaintiff Class (Docket No. 3592), hereinafter referred to as "Bed Plan;" and,

7    (2) Defendants' Response To Court's March 31, 2009 Order That Defendants File A Detailed

8    Activation Schedules For Completion Of All Other Court-Ordered Construction Projects (Docket

9    No. 3591), hereinafter referred to as the "Activation Schedule."

10                                  **INTRODUCTION**

11          It is well past time for Defendants to start meeting the undisputed mental health

12    specialized bed, treatment, office space and staffing needs of the *Coleman* class.  This Court's

13    imposition of a structure and timeline for bed planning after the March 24, 2009 hearing has

14    pushed Defendants close to having a workable plan.  Far too many gaps and flaws remain.  It is

15    most important now, however, that the Court remove all possible excuses for delay.  Therefore,

16    Plaintiffs request first and foremost that the Court issue orders for prompt implementation of the

17    deadlines in the Activation Schedules and the Bed Plan, with the changes and additions requested

18    below.

19          Defendants' plans do not comply with the Court's order that Defendants identify

20    "concrete proposals to meet the remaining short-term, intermediate, and long range bed needs of

21    the plaintiff class."  (Order (Docket No. 3556) at 5:19-21.)  The plans are not concrete, and they

22    do not meet the needs.  The plans are heavily reliant on *Plata* Receiver projects, which cannot be

23    considered "concrete" while the State maintains its position that the Receivership should be

24    dissolved and its projects terminated.  Even if the cloud were lifted from the Receivership and

25    the projects went forward, the projects as set forth here would not close the gaps in bed need.

26    For the largest share of beds, those in the Enhanced Outpatient Program, even the long-range

27    plan relies on 733 beds for which there are no sites, no funding and no real plan.  For most of the

28    time between now and mid-2013, Defendants' plans do not close the gaps, but rather maintain

                                            1

[298396-5]

1  them.  Even under the most optimistic scenarios, bed supply chases bed demand upward, but

2  lessens the gap by little or nothing until right at the very end in 2013 when the hoped-for

3  Receiver beds are supposed to materialize.  (*See* Declaration of Mark Feeser In Support of

4  Plaintiffs' Comments on Bed Plans and Activation Schedules (hereinafter "Feeser Decl.") ¶¶ 7-

5  12, Exhs. F-J (charts showing EOP, EOP-ASU, MHCB, PSU, and ICF bed supply and demand to

6  2013).)

7      The inability of Defendants, even with the Special Master's help, to close the bed gap on

8  the supply side is further proof that relief is desperately needed on the demand side, that

9  crowding is the primary cause of the constitutional violations in *Coleman*, and that no other relief

10  will remedy those violations.  (*See* Tentative Ruling (Docket No. 3514) at 4-6.)  Nevertheless

11  *Coleman* Plaintiffs must ask for approval of the deadlines in the Activation Schedule and Bed

12  Plan—with the changes and additions sought here—to mitigate the harm caused by the

13  violations, even if they will not remedy the violations.

14      Plaintiffs ask the Court to issue an order approving the deadlines in the Activation

15  Schedule and Bed Plan with certain changes and additions, which are briefly summarized here.

16      Plaintiffs request that the order setting deadlines for the Activation Schedule make

17  adjustments to the timelines.  For the California Men's Colony 50-Bed Mental Health Crisis Bed

18  Unit, and the California Medical Facility suicide proofing of 124 inpatient cells, Plaintiffs

19  request approval with an acceleration of the deadlines proposed by Defendants.  For certain

20  projects, including the California Institute for Women, 45-bed intermediate care inpatient

21  facility, Plaintiffs ask that Defendants work with the Special Master to explore alternative

22  procurement process such as those used by the *Plata* Receiver.

23      For Activation Schedule projects that would provide additional Enhanced Outpatient

24  Program beds, the situation is complicated by the Defendants' failure to come close to meeting

25  the EOP bed needs in their short, intermediate and long-range plans.  Defendants admit that their

26  short and intermediate term EOP plans come up at least 329 beds short.  (Docket No. 3592 at 9.)

27  The long-range plan depends on 733 EOP beds that are so uncertain that they should simply be

28  considered part of the gap.  In light of the intractable nature of the EOP bed shortage, Plaintiffs

[298396-5]

1  make three alternative requests for Activation Schedule projects that would add EOP beds.

2  These are the Lancaster, Salinas Valley, and California Medical Facility Treatment and Office

3  Space Projects, which together would add 313 EOP beds. Defendants propose to activate these

4  in 2012 and 2013. Plaintiffs ask that the Court either order them activated at the end of the

5  period that Defendants have designated for the intermediate term projects, that is 18 months from

6  now, by December 2010, or, in the alternative, if they are not to be activated until 2012 and

7  2013, that Defendants be ordered to establish an EOP program using the hundreds of empty beds

8  at Coalinga State Hospital.

9        For the short and intermediate term proposals in the Bed Plan, Plaintiffs request that the

10  Court reject the suggestion that EOP beds in the temporary Reception Center program be counted

11  toward meeting the bed needs. Plaintiffs also request that in light of Defendants' admission that

12  many prisoners in the EOP level of care have special needs arising from short stays of five

13  months or less, that the Court order the Reception Center EOP program to be enhanced to

14  provide for these needs.

15        The short and intermediate term plan makes no effort to address the shortage of

16  Psychiatric Services Unit (PSU) beds. Based partly on the experience of other jurisdictions, it is

17  very likely that Defendants are over-classifying *Coleman* class members for these and other

18  isolation units. In lieu of any attempt to address the short and intermediate term need, Plaintiffs

19  request that Defendants be ordered to conduct a review of the EOP population currently housed

20  in segregation units to determine how many of these EOP patients require continued segregated

21  housing based on a specific set of criteria developed for the review.

22        Defendants' short and intermediate term bed plan includes one emergency crisis bed

23  conversion. Plaintiffs request that Defendants be ordered to augment two other prisons'

24  Outpatient Housing Units (OHUs) so that they too can serve as emergency MHCBs. These

25  prisons are Mule Creek State Prison and Deuel Vocational Institute.

26        For the 15 specific projects identified in the short and intermediate term sections of the

27  Bed Plan, Plaintiffs request that the Court order the deadlines proposed by Defendants, with the

28  following exceptions and additions. The conversion of the C5/C6 units at Salinas Valley State

1   Prison for use as intermediate inpatient care beds should be accompanied by necessary

2   augmentations to ensure adequate treatment space, without any delay in the timeframe proposed

3   by Defendants.  The double-bunking pilot at the Salinas Valley TC-1 unit should be

4   accompanied by a waiver of state laws and regulations that would otherwise impose disciplinary

5   sanctions for failure to accept a cell mate.  The closure of the Day Treatment Program at

6   California Medical Facility should be temporary only, with reactivation by 2013.  The proposal

7   to convert 25 Acute inpatient beds at Atascadero State Hospital to ICF beds should be denied.

8   The conversion of the P-1 unit at California Medical Facility should be accelerated so that it is

9   completed in four months, and the P-2 unit should be completed in 2 months.

10          The long range plans remain highly doubtful without any representation by the

11  responsible parties—the Governor and the Attorney General—that the State now fully supports

12  the Receiver's projects set forth by Defendants in the *Coleman* bed plan.  The tossing of

13  *Coleman* bed plans back and forth between the Receiver and CDCR like a political football has

14  to stop.  Plaintiffs ask that the Court simply order Defendants' proposed completion dates for

15  these projects as hard deadlines—with the specific changes and adjustments requested here.

16          For these long-range deadlines, and for all deadlines requested here, Plaintiffs ask that the

17  Court issue an order stating that compliance is defined as meeting the final deadline, and that

18  compliance is not established by following any or all of the detailed preliminary steps in

19  Defendants' plans.  (Plaintiffs herewith file a Proposed Order making this clear.)  For too long,

20  bed planning in this case has been plagued by excuses that officials could not get permission or

21  buy-in from one agency or another.  The Court's next bed planning order should be clear that

22  what is being ordered is not the pursuit of certain bureaucratic steps, but the activation of certain

23  mental health placements by a certain time.

24          The Court should not accept the claim of 733 EOP beds in "alternate sites."  These

25  "alternate sites" do not have even the certainty of the Receiver's plans, but will remain rank

26  speculation even if the Receiver and the State end their war.  In part because these 733 beds are

27  nothing but talk, Plaintiffs urge the Court to order immediate action to meet the EOP gap, either

28  through the opening of an EOP unit in the empty beds at Coalinga State Hospital or by rapid

[298396-5]

1  acceleration of the Activation Schedules for all projects that involve new EOP beds, as

2  referenced above.

3  Plaintiffs also request that the Court issue an order mandating continued Special Master

4  involvement in the planning and construction phases of the Activation Schedule and Bed Plan.

5  Plaintiffs request that the Court also order Defendants to meet their proposed August 2009

6  schedule to correct the flawed workload study so that the projects can be staffed based on an

7  accurate workload model.

8  Finally, Plaintiffs request that the Court take certain steps regarding the results of the

9  modified needs assessment, the first phase of which was due for completion 60 days after the

10  March 31, 2009 order, or by May 30, 2009, and was provided to Plaintiffs' counsel just as these

11  comments were being completed.  The last such process in 2004 identified hundreds of patients

12  who should have been referred to inpatient care.  The current process has produced similar

13  results.  Plaintiffs request that Defendants, including and especially the DMH officials, take

14  prompt steps to transfer the individuals identified for inpatient care during the needs assessment.

15  These steps should include but not be limited to increasing the rate of admissions to Atascadero

16  State Hospital (ASH) from 5 to 10 patients per week and using the empty beds at Coalinga State

17  Hospital, either to accommodate the non-*Coleman* patients current using *Coleman* beds at ASH,

18  thereby freeing up those beds for *Coleman* class members, or directly to accommodate the

19  *Coleman* class members at Coalinga.  In addition, Plaintiffs request that the needs assessment be

20  ordered to continue on a periodic basis, that the bed planning contract with Navigant be

21  extended, and that the results of the continuing needs assessment be incorporated into the bed

22  planning process going forward.

23  None of the steps requested here can or may be used as an excuse for Defendants to delay

24  implementation.

25  The Court's March 31, 2009 Order provided that Plaintiffs' comments be directed to the

26  Special Master.  Where Plaintiffs are requesting that the Special Master recommend certain

27  orders by the Court, Plaintiffs have set apart a brief statement of the requested orders in ***bold***

28  ***italics*** after discussion of the issue.

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1

**BACKGROUND**

2    Plaintiffs here incorporate by reference the background section of Plaintiffs' Objections to

3 Defendants' Bed Plan Statement and Request for an Order Requiring Defendants to Prepare and

4 Implement an Interim Emergency Plan to Address the ICF, APP, MHCB and EOP Bed

5 Shortages, March 23, 2009.  (Docket No. 3545 at 6-15).  In those few pages, Plaintiffs reviewed

6 the 10 years of stop-and-start bed planning efforts from 1998 through 2008, culminating in the

7 Defendants' on-and-off again embrace and recoil from the Receiver's consolidated healthcare

8 facilities.  The previous bed plans also toggled back and forth on whether the inpatient programs

9 would be operated by the Department of Mental Health (DMH), or by the California Department

10 of Corrections and Rehabilitation (CDCR) after an undefined period of transition and

11 mentorship.  (*Id.* at 11-12.)

12    Pertinent developments after the March 24, 2009 hearing are summarized briefly here:

13    On April 2, 2009, the Court granted the Special Master's request to appoint Dr. William

14 Alvarez to his team.  (Docket No. 3558.)  Dr. Alvarez prepared the 2004 "Unidentified Needs

15 Assessment Report," on the number of CDCR inmates identified as requiring inpatient DMH

16 care.  (Docket No. 3557 at 3.)  Dr. Alvarez was appointed to assist the Special Master "to quickly

17 assess the defendants' compliance with the variety of ongoing mental health care programming

18 and construction projects, pinpoint any remaining unmet needs of the mental health population

19 with the prisons," and to conduct meetings with Defendants regarding those needs.  (*Id.*)

20    On April 23, 2009, Defendants filed "Defendants' Response to Courts' March 31, 2009

21 Order that Defendants file a Detailed Time Schedule for Completion of the California Men's

22 Colony 50-Bed Mental Health Crisis Bed Unit."  (Docket No. 3568.)  Under Defendants' April

23 23 schedule, the CMC 50-bed MHCB would not receive patient admissions until January 31,

24 2013. (*Id.* at 6.)  (The Activation Schedule filed on May 26, 2009 moves the first patient

25 admission date forward to August 9, 2012. (*See* Docket No. 3591 at 10.))

26    On April 28, 2009, the Court granted Defendants' request for an order waiving certain

27 state laws and regulations so that CDCR could complete steps needed to open the Salinas Valley

28 State Prison 64-bed Intermediate Care Facility prior to obtaining compliance with certain state

[298396-5]

1  building code provisions.  (Docket No. 3573.)  The Court set a deadline of August 31, 2009 to

2  certify that the remaining code work is complete or to explain any delays in completion.  (*Id.* at

3  2.)

4          On April 29, 2009, Defendants filed their "Response to Court's March 31, 2009 Order

5  that Defendants File a Detailed Schedule for Completion of the Salinas Valley State Prison 64-

6  Bed Intermediate Care Facility." (Docket No. 3574.)  The April 29 filing set first patient

7  admissions for that same day, with completion of patient admissions by July 10, 2009.  (*Id.* at 3.)

8  The April 29, 2009 filing including an activation sequence for each wing of the facility with

9  Wing D to be fully activated by May 15, 2009, Wing C by June 5, 2009, Wing B by June 22,

10  2009, and Wing A by July 10, 2009, and all construction to be completed by July 31, 2009.

11          On May 5, 2009, the Court issued an order requiring Defendants to report to the Court

12  immediately if any of the dates set for activation of wings in the Salinas Valley State Prison

13  intermediate care facility are delayed for any reason.  (Docket No. 3575 at 2.)

14          On May 14, 2009, Defendants provided Plaintiffs' counsel and the Special Master with

15  their "Monthly Bed Utilization Report for the Department of Mental Health Hospitals and

16  Psychiatric Programs providing data for the month of April 2009."  According to this report,

17  there were 44 patients on the Acute Psychiatric Program (APP) waiting list, with an additional 8

18  "deferred to ASH," for a total of 52 patients who were waiting for transfer to an acute care bed.

19  (Declaration of Jane Kahn In Support of Plaintiffs' Comments on Bed Plans and Activation

20  Schedules (hereinafter "Kahn Decl.") ¶ 18, Exh. Q.)  This report also shows that Defendants

21  were severely underutilizing ICF and acute beds at ASH, with only 5 patients currently housed in

22  acute beds (out of 25 allegedly available beds) and only 91 patients in the ICF beds (out of 231

23  allegedly available beds).  (*Id.*)

24          On May 26, 2009, Defendants filed the Activation Schedule (Docket No. 3591) and Bed

25  Plan (Docket No. 3592) to which Plaintiffs respond here.

26          On May 28, 2009, Defendants provided Plaintiffs' counsel and the Special Master with

27  their monthly reports of data on *Coleman* compliance for the month of April 2009.  This new

28  data shows that the waitlists and treatment delays caused by the bed shortages are continuing.

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1    For April 2009, CDCR reported 171 referrals to Mental Health Crisis Beds, of which only 97

2    patients were placed, only 16 of whom were placed within 24 hours as required.  (Kahn Decl.

3    ¶ 12, Exh. L (Summary of Inter-Institutional Mental Health Crisis Bed Referrals and Transfers

4    for April 2009).)  The Enhanced Outpatient Program (EOP) general population remains

5    overcrowded, with an April 10, 2009 current population of 4,603 occupying a reported capacity

6    of 3,763.  (Kahn Decl. ¶¶ 4, 5, Exhs. C and D (Mental Health Population—Placement Per

7    Institution, April 10, 2009).)  Hundreds of these EOP patients are housed in institutions with no

8    EOP program or with only a stop-gap Reception Center EOP program.  (*Id.*)

9            On June 1, 2009, the Receiver in *Plata v. Schwarzenegger*, CIV C-01-1351 TEH (N.D.

10   Cal.), presented his Eleventh Tri-Annual Report to the *Plata* court as well as to the Courts in this

11   case (*Coleman* Docket Nos. 3595-3600), and in *Armstrong v. Schwarzenegger*, CV 94-2307 CW

12   (N.D. Cal.) (prisoners and parolees with disabilities), and in *Perez v. Cate*, No. 05-5241 JSW

13   (N.D. Cal.) (dental care).  The Receiver's Report noted a "possibility of a settlement" of CDCR's

14   motions to terminate the Receivership and end the Receiver's construction plans, and that such a

15   settlement "was the underlying basis for the State's recent bed plan filing in the *Coleman* case . .

16   . ."  (*Coleman* Docket No. 3595 at 9.)  The Receiver further noted, however, that "a

17   memorandum of understanding and final settlement between the State and the Receiver has not

18   yet been secured . . . ."  (*Id.*)

19           The Receiver reported that progress on the Receiver's construction projects, including

20   upgrades within CDCR's 33 prisons and new construction, have been impacted and, with some

21   specific exceptions, delayed due to the lack of funding.  (*Id.* at 82-89.)  The Receiver reported

22   that the commencement of construction of the planned consolidated health care facilities,

23   originally scheduled for February 2009, has been delayed.  (*Id.* at 87.)  The Receiver reported

24   that this delay in starting the projects "may impact" the previously projected July 2013

25   completion date."  (*Id.*)

26           The Receiver also reported that "[p]resently, San Quentin State Prison and Avenal State

27   Prison are the only institutions proceeding with construction," while the other previously

28

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1    authorized projects at Mule Creek State Prison, Correctional Training Facility, and California

2    Rehabilitation Center, "were stopped after completion of the criteria documents due to lack of

3    funding." (*Id.* at 83-84.) The two projects that are progressing—the San Quentin State Prison

4    Central Health Services Building (also known as "Building 22") and the Avenal State Prison

5    modular space—are the construction projects for which the Receiver sought and received

6    waivers of unduly time-consuming state contracting laws in 2007.[1] The Receiver's 11th Report

7    notes that the Avenal State Prison modular project includes the use of a "design-build" process.

8    (*Id.* at 84.)

9         On June 5, 2009, Defendants provided Plaintiffs' counsel and the Special Master with

10   their "Monthly Report on the Licensure of Intermediate Care and Day Treatment Programs at the

11   California Medical Facility, Vacaville, and the Salinas Valley Psychiatric Program, Salinas

12   Valley State Prison." The June 5, 2009 report includes May 2009 data on the Salinas Valley

13   Psychiatric Program (SVPP) waitlist. SVPP is the high custody Intermediate Care Facility

14   located in Salinas Valley State Prison. Whereas the March and April 2009 reports showed

15   waiting lists of 149 and 141 patients respectively, the May 2009 report showed a dramatic spike

16   to *230 patients* waiting for placement in an SVPP bed, the highest the waiting list has been in

17   years. (Kahn Decl. at ¶ 14 and Exh. M.)

18

19

20

---

21   [1] *See* Receiver's Master Application For Order Waiving State Contracting Statutes, Regulations

     And Procedures, And Approving Receiver's Substitute Procedure for Bidding And Award Of

22   Contracts, *Plata v. Schwarzenegger,* CIV 01-1351 TEH (N.D. Cal. April 17, 2007, *Plata* Docket

     No. 639, at 18-21; Declaration Of John Hagar In Support Of Receiver's Master Application For

23   Order Waiving State Contracting Statutes, Regulations And Procedures, And Approving

     Receiver's Substitute Procedure For Bidding And Award Of Contracts, In Connection With

24   Certain Major Projects, *Plata v. Schwarzenegger,* CIV 01-1351 TEH (N.D. Cal. April 17, 2007,

     *Plata* Docket No. 640, at 10-13; Order Re Receiver's Master Application For Order Waiving

25   State Contracting Statutes, Regulations, And Procedures, And Request For Approval Of

26   Substitute Procedures For Bidding And Award Of Contracts, *Plata v. Schwarzenegger,* CIV 01-

     1351 TEH (N.D. Cal. June 4, 2007, *Plata* Docket No. 700) (waiving state laws, including Cal.

27   Gov't Code §§ 13332.19, 15815, governing plans, specifications and procedures for major

     capital projects, for the 13 specific projects identified in the Master Application).

28

[298396-5]

**PLAINTIFFS' SPECIFIC COMMENTS**

I.    **ACTIVATION PLAN**

A.    **AB 900 Funding Is Stalled By The Attorney General, State Treasurer, Controller and Finance Director (a current *Coleman* Defendant)**

With the exception of a few specific projects, Defendants have not asked the State Legislature to fund the *Coleman* bed plans. Instead, Defendants are largely relying on bond funding authorized under AB 900. AB 900 bond funding, however, remains uncertain because the Attorney General has not issued its customary bond opinion approving the sales. The state board from which CDCR needs permission to borrow funds against AB 900 bond sales, the Pooled Money Investment Board (PMIB), has stated that it will not approve funding until the Attorney General issues its customary bond opinion. *See* Declaration of Ernest Galvan In Support of Plaintiffs' Comments on Bed Plans and Activation Schedules (hereinafter "Galvan Decl.") ¶ 2, Exh. 1 (PMIB, Staff Report, Agenda Item 6, May 20, 2009, *available at* http://www.treasurer.ca.gov/pmia-laif/pmib-staff/20090520_6.pdf.) Citing this uncertainty, the PMIB has already denied funding for two specific *Coleman* projects, denying funding for the CMF EOP-ASU Treatment Space at its May 20, 2009 meeting and for the CMF 64-bed ICF at both the April 15 and May 20, 2009 meetings. (Docket No. 3591 at 22, 28.) Defendants have not identified any alternative source of funding for these projects.

Two other projects are scheduled for hearing at the PMIB meeting set for June 17, 2009, the CIW 45-bed ICF and the SVSP 72 bed EOP ASU. (*Id.* at 37, 43.) The PMIB has approved some funding for the CMC 50-bed MHCB. That approval was only secured when the Chief Deputy Secretary of CDCR Facility, Planning, Construction & Management, Deborah Hysen, and the Director of Finance, Administration and Support Services for this same CDCR division, Dean Borg, pleaded with the Board's three members, State Treasurer Bill Lockyer, Secretary of Finance Michael Genest, and Controller John Chiang to override their staff recommendation and approve the project because of this Court's statements at the last bed plan hearing. (Galvan Decl. ¶ 3, Exh. 2 (Minutes of PMIB April 15, 2009 Meeting, *available at*

[298396-5]

http://www.treasurer.ca.gov/pmia-laif/pmib-minutes/20090415.pdf).)

One of the three PMIB members, Director of Finance Michael Genest, is already a Defendant in the *Coleman* case, the Court having added him in his official capacity on August 1, 2006.  (Docket No. 1929.)

**B.    Additional Steps Required to Expedite Elements of the Activation Plan**

**1.    California Men's Colony, 50 Mental Health Crisis Beds**

The Court has issued numerous orders directing Defendants to implement, revise, and/or accelerate their bed planning measures for mental health crisis beds at CMC.  *See, e.g.*, 10/20/06 Order (Docket No. 1998) (ordering Defendants to file a final long-range plan that will include the construction of the 50-bed mental health crisis unit at CMC-E); 3/27/07 Order (Docket No. 2173) (ordering Defendants to complete and occupy the 50-bed MHCB units at CMC as soon as possible); and 2/26/08 Order (Docket No. 2697) (regarding construction agreement and defendants obligation under March 27, 2007 order to construct the 50-bed MHCB unit at CMC-E even with approval of the construction agreement).  The only actual funding that Defendants have secured from the PMIB is for "preliminary plans."  (Galvan Decl. ¶ 3, Exh. 2 (Minutes of PMIB April 15, 2009 Meeting, *available at* http://www.treasurer.ca.gov/pmia-laif/pmib-minutes/20090415.pdf).)  The timeline attached to the Activation Plan as Exhibit 2 projects Defendants having to make two more pleas for funding, one in late 2009 for "Working Drawings" and another in late 2010 for construction funding.  (Docket No. 3591 at 9.) Defendants give themselves 20 months from the time they "Mobilize Construction Contractor" to completion in July 2012.  (*Id.*)  Defendants have not demonstrated that they have exhausted alternative procurement processes of the type being used by the Receiver at San Quentin and Avenal (*see* footnote 1, above), or that they have explored a faster construction timeline after procurement is complete.

***Requested Action: Plaintiffs request that the Court set the activation deadline for this long-delayed project of July 2011, one year earlier than the projection on Defendants'***

[298396-5]

1  *activation schedule.*

2

3  **2.     Salinas Valley State Prison, 64-Bed Intermediate Care Facility for High Custody Inmates**

4

5     The latest DMH population figures show that the new facility opened in April 2009 and

6  had 29 of 64 beds filled as of June 1, 2009, with 28 beds still available.  (Kahn Decl. ¶ 14,

7  Exh. M.)   Defendants project that patient admissions will be complete as of July 10, 2009.

8  (Docket No. 3591 at 13.)  The acceleration of this project since the March 24, 2009 bed plan

9  hearing demonstrates what can be accomplished when Defendants receive specific orders.

10     *Requested Action:  Order the July 10, 2009 Deadline to Complete Patient Admissions.*

11

12  **3.     Salinas Valley State Prison, Treatment Space for Inpatient Care in D-5, D-6 Areas**

13

14  Defendants project that construction will be complete by July 20, 2009.

15     *Requested Action:  Order the July 20, 2009 Deadline to activate the treatment space.*

16

17  **4.     California Medical Facility, Vacaville, Treatment and Office Space for General Population Enhanced Outpatient Program and EOP Administrative Segregation Unit**

18

19     This project is stalled at the funding stage due to obstruction by the Attorney General and

20  the members of the PMIB.  According to Defendants' Activation Plan, the PMIB denied the

21  initial funding for Preliminary Plans at its May 20, 2009 meeting.  (Docket No. 3591 at 22.)

22  CDCR appears to have failed to get this item back on the PMIB agenda for the June 17, 2009

23  meeting.  (Galvan Decl. ¶ 4, Exh. 3 (PMIB June 17, 2009 agenda, *available at*

24  http://www.treasurer.ca.gov/pmia-laif/pmib-agenda/20090617.pdf).)  Defendants' Activation

25  Plan contains a cryptic notation:  "Pursuing alternative interim financing."  (Docket No. 3591 at

26  22.)  No specific alternative is provided.  This lack of concrete funding plans is unacceptable for

27  a project that has been Court approved since October 2007.  (Docket No. 2461.)

28

[298396-5]

1    Defendants propose to delay this project's activation to April 19, 2013.  (Docket No. 3591

2    at 22.)  As discussed in more detail below in Section II.A, below, Defendants' Short and

3    Intermediate Term plans leave a 329-bed EOP gap based on 2009 need, and a 492-bed EOP gap

4    based on 2010/11 Need.  (*See* Docket No. 3592 at 9 ("remaining need for 329 beds"); Table 2,

5    below (492-bed gap after completion of short/intermediate term projects in 2010/11, based on

6    Fall 2008 Navigant Projections).)  Defendants' assertion that the Reception Center program

7    should be deemed to meet this gap must be rejected, for the reasons state below in Section II.A.3.

8        Defendants claim that this CMF Treatment Space project will add 67 EOP-GP Beds.

9    (Docket No. 3592 at 19.)  Those beds are needed now and should not be delayed until 2013.

10   Defendants should be ordered to advance activation of this project and to bring the 67 EOP-GP

11   beds on-line within 18 months, along with the rest of the short and intermediate term projects.  In

12   the alternative, they should be ordered to close the immediate EOP-bed gap by opening an EOP

13   unit at Coalinga State Hospital, which has hundreds of empty beds.  (*See* Section II.A.4, below.)

14       ***Requested Actions:***

15       ***IN THE ALTERNATIVE, EITHER***

16       ***(1) Defendants shall activate an EOP unit at Coalinga State Hospital within 60 days of***

17   ***the Court's order to meet the short and intermediate-term EOP gaps; and,***

18       ***(2) The deadline for completion of this project and the activation of 67 additional EOP***

19   ***beds is set as Defendants propose to February 19, 2013***

20   ***—OR—***

21       ***(1) Defendants shall activate the CMF EOP Treatment space project and its 67***

22   ***additional EOP beds no later than December 31, 2010.***

23

24       **5.    California Medical Facility, 64-Bed Intermediate Care Facility for High**
             **Custody Inmates**
25

26       This project is stalled at the funding stage due to obstruction by the Attorney General and

27   the members of the PMIB.  According to Defendants' Activation Plan, the PMIB denied the

28

---

13

[298396-5]

1    initial funding for Preliminary Plans at both the April 15, 2009 and May 20, 2009 meeting.

2    (Docket No. 3591 at 28.)  CDCR appears to have failed to get this item back on the PMIB

3    agenda for the June 17, 2009 meeting.  (Galvan Decl. ¶ 4, Exh. 3 (PMIB June 17, 2009 agenda,

4    *available at* http://www.treasurer.ca.gov/pmia-laif/pmib-agenda/20090617.pdf).)  Defendants'

5    Activation Plan contains a cryptic notation:  "Pursuing alternative interim financing." (Docket

6    No. 3591 at 28.)  No specific alternative is provided.  This lack of concrete funding plans is

7    unacceptable for a project that has been Court approved since May 2006.  (Docket No. 1786-2 at

8    17; Docket No. 1800 ¶ 1.)

9        ***Requested Action: Order setting activation deadline of August 27, 2012.***

10

11        **6.    California Medical Facility, Vacaville, Suicide Proofing of 124 Inpatient**

12        **Cells (Q1, Q2, S1, and S2 Areas)**

13        Defendants state that they have received funding for these projects in the 2007/2008

14    budget act and in the current state budget.  (*See* Docket No. 3591 at 25.)  While Defendants have

15    identified no funding obstacles, they admit that they are four months late on construction, and are

16    giving themselves two years to complete the project.  (*Id.*)  This construction schedule is too long

17    to address a need identified in connection with several prisoner suicides.  Defendants state that

18    they will use inmate/ward labor for this project.  (*Id.*)  If the use of inmate/ward labor is slowing

19    the project down, it should be expedited with the use of private sector contractors.

20        ***Requested Action: The Court should set a deadline of December 31, 2009 for***

21    ***completion of this suicide proofing project.***

22

23        **7.    California State Prison, Sacramento, EOP Treatment and Office Space**

24    This project does not add any new EOP bed capacity.

25        ***Requested Action: Order the May 23, 2011 date to activate the office and treatment***

26    ***space.***

27

28

[298396-5]

8.    **California State Prison, Sacramento, Los Angeles County (LAC), EOP Treatment and Office Space**

In their March 19, 2009 bed plan filing, Defendants stated that they would request preliminary funding for the LAC project from the PMIB at a future date.  (Docket No. 3544 at 39, 47.)  They have now stated that they would seek preliminary funding at the July 15, 2009 PMIB meeting.  (Docket No. 3591 at 34.)  Defendants have not identified a funding alternative in the event the PMIB rejects this proposal as it has rejected two other *Coleman* projects.

Defendants give themselves 440 days for construction, as compared with only 390 days for the SAC EOP Treatment Project.  (Docket No. 3591 at 34, 31.)  If the short and intermediate term EOP bed needs were projected to be met, Plaintiffs would request only that the Court shorten the LAC construction term to match the SAC construction term, so that the treatment and office space is activated on July 25, 2012 instead of September 12, 2012.

However, the short and intermediate term EOP bed needs are not being met under Defendants' Bed Plan, as discussed in the section on the CMF EOP Treatment Space.  (*See*, *supra*, Section 4.)  Defendants state that this LAC project would add 150 EOP-GP Beds.  (Docket No. 3592 at 19.)  If Defendants are not going to meet the short and intermediate term EOP bed need by using Coalinga or any other means, then the Court should not accept a 2012 activation date for these 150 EOP-GP beds at LAC.  Defendants should be ordered to advance activation of this project and bring the 150 EOP-GP beds on-line within 18 months, along with the rest of the short and intermediate term projects.  In the alternative, they should be ordered to close the immediate EOP-bed gap by opening an EOP unit at Coalinga State Hospital, which has hundreds of empty beds.  (*See* Section II.A.4, below.)

*Requested Actions:*

*IN THE ALTERNATIVE, EITHER*

*(1) Defendants shall activate an EOP unit at Coalinga State Hospital within 60 days of the Court's order to meet the short and intermediate-term EOP gaps; and,*

*(2) The deadline for completion of the LAC EOP Treatment space project and the*

[298396-5]

1  *activation of 150 additional EOP beds is set to July 25, 2012.*

2  *—OR—*

3    *(1) Defendants shall activate the LAC EOP Treatment space project and its 150*

4  *additional EOP beds no later than December 31, 2010.*

### 9.    Salinas Valley State Prison, 72-bed Enhanced Outpatient Program Administrative Segregation Unit

Defendants' funding request for $2.48 million for preliminary plans for this project is on the agenda for the June 17, 2009 PMIB meeting.  (Docket No. 3591 at 37; Galvan Decl. ¶ 4, Exh. 3 (PMIB June 17, 2009 agenda, *available at* http://www.treasurer.ca.gov/pmia-laif/pmib-agenda/20090617.pdf).)  The total needed for the project is $47.4 million.  (Docket No. 3544 at 37.)

Defendants give themselves 600 days for construction after working drawings are approved.  (Docket No. 3591 at 37.)  The project activation would not be complete until May 10, 2013.  (*Id.*)

**Requested Action: Order the May 10, 2013 deadline to activate the SVSP EOP ASU.**

### 10.    Salinas Valley State Prison, EOP Treatment and Office Space

For this project, Defendants have not even taken advantage of the AB 900 procurement process, but instead are using the business-as-usual major capital outlay process, under which it takes three fiscal years (one each for preliminary plans, working drawings, and construction funding) to get anything built.[2]  (Docket No. 3591 at 40.)  Defendants project activation on

---

[2] Defendants presented a summary of two processes for securing construction funding as Exhibit 15 to the Activation Plan. (Docket No. 3591 at 50-59.)  The first process is the "Capital Outlay Annual Budget Process – General Fund."  The second process is the "AB 900 Process."

[298396-5]

1   April 15, 2013.  (*Id.*)  Defendants have not exhausted efforts to accelerate this schedule through

2   the use of alternative procurement processes such as those being employed by the *Plata* Receiver

3   for the San Quentin and Avenal projects.  (*See supra* note 1.)

4          The short and intermediate term EOP bed needs are not being met under Defendants'

5   plans, as discussed above in the section on the CMF EOP Treatment Space.  (*See supra*, Section

6   8.)  Defendants state that this SVSP project would add 96 EOP-GP beds.  (Docket No. 3592 at

7   19.)  If Defendants are not going to meet the short and intermediate term EOP bed need by using

8

9   _____

10  The Capital Outlay Annual Budget Process requires three budget cycles—each budget cycle
    comprising one full year—before construction can even begin.  One budget cycle is consumed
11  for each of three phases, "preliminary plans," "working drawings," and then "construction"
    funding.  (Docket No. 3591 at 51.)  As noted above in the Background Section of this Response,
12  the *Plata* Receiver secured waivers of the time-consuming state contracting process in 2007 for
    13 specific programs, including two construction projects, one at San Quentin State Prison and
13  one at Avenal State Prison.  (*See supra* note 1.)  According to the Receiver's most recent report,
    the 11th Triannual Report, these two construction projects are progressing toward completion
14  while most other projects remain stalled.  (Docket No. 3595 at 83-84.)

15  The "AB 900 Process" does not appear to require a state budget cycle for each phase because it
16  draws either on AB 900 general fund money, or on loans from AB 900 bonds that will be offered
    in the future.  Instead of three budget cycle phases each depending on a budget cycle, the AB 900
17  process appears to consist of two phases: (1) Scoping Plans, which requires a 30-day review by
    the Joint Legislative Budget Committee and then approval by the Public Works Board and the
18  Pooled Money Investment Board; and (2) Preliminary Plans, which requires a 45-day review by
    the Joint Legislative Budget Committee followed by Public Works Board approval.  After
19  preliminary plans are approved, CDCR and the Department of Finance can complete working
20  drawings and award the project for construction.  (Docket No. 3591 at 64.)

21  Defendants have not informed the Court as to whether even the faster AB 900 process can be
22  accelerated by eliminating the separate Working Drawings phase and simply awarding a Design-
    Build contract, as the Receiver appears to have done for the Avenal State Prison contract.  The
23  CDCR California Department of Corrections and Rehabilitation has sought, and in February
24  2009 received, legislative authority to speed up some projects by combining the contracts for
    design and building into one contract, thus cutting out an entire budget cycle from the
25  construction process.  In addition, the *Plata* filings cited above at footnote 1 show that the faster
26  design-build procurement process can be authorized if this Court issues a waiver of state laws
    requiring the more time-consuming state contracting process.  Defendants have not made any
27  showing to this Court that they have exhausted attempts to use design-build or any other
    expedited contracting process as part of either the Activation Plan or the Short/Intermediate/Long
28  Term bed plans now under submission.

[298396-5]

1  Coalinga or any other means, then the Court should not accept an April 2013 activation date for

2  these 96 EOP-GP beds at SVSP.  Defendants should be ordered to advance activation of this

3  project and bring the 96 EOP-GP beds on-line within 18 months, along with the rest of the short

4  and intermediate term projects.  In the alternative, they should be ordered to close the immediate

5  EOP-GP bed gap by opening an EOP unit at Coalinga State Hospital, which has hundreds of

6  empty beds.  (*See infra* Section II.A.4.)

7      *Requested Actions:*

8      *IN THE ALTERNATIVE, EITHER*

9      *(1) Defendants shall activate an EOP unit at Coalinga State Hospital within 60 days of*

10  *the Court's order to meet the short and intermediate-term EOP gaps; and,*

11      *(2) The deadline for completion of the  SVSP EOP treatment space project and its 96*

12  *additional EOP beds is set as Defendants propose to  April 15, 2013,*

13  *—OR—*

14      *(1) Defendants shall activate the SVSP EOP treatment space project and its 96*

15  *additional EOP beds no later than December 31, 2010.*

16

17      **11.    California Institution for Women, 45-bed Intermediate Care Facility**

18      Defendants submitted funding requests to the PMIB on May 20, 2009 for the June 17,

19  2009 meeting.  (Docket No. 3591 at 43.)  This is a new loan request, Item "o." on the PMIB June

20  17, 2009 agenda.  (Galvan Decl. ¶ 4, Exh. 3 (PMIB June 17, 2009 agenda, *available at*

21  http://www.treasurer.ca.gov/pmia-laif/pmib-agenda/20090617.pdf).)  Although $62.39 million is

22  needed for the entire project, CDCR has requested only $4.17 million.  (*Compare id. with* Docket

23  No. 3544 at 32.)

24      Defendants give themselves 661 days for construction and related activities, and set an

25  activation deadline of March 9, 2012.  (Docket No. 3591 at 43-44.)  Defendants have not

26  exhausted efforts to accelerate this schedule through the use of alternative procurement processes

27  such as those being employed by the *Plata* Receiver for the San Quentin and Avenal projects.

28

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1  (*See supra* note 1.)

2        **Requested Action: (1) Order the March 9, 2012 deadline to activate the CIW 45-Bed**

3  **ICF; (2) Defendants must work with the Special Master and report to the Court within 30 days**

4  **on the use of alternative procurement processes to accelerate this project by 3 to 6 months.**

5

6        **12.**      **California Institution for Women, 20-bed Psychiatric Services Unit**

7        **Requested Action: (1) Order the February 24, 2011 deadline.**

8

9  **II.**      **SHORT AND INTERMEDIATE TERM PLANS PROJECTED 18 MONTHS OUT**

10        **TO DECEMBER 2010**

11      **A.**      **General Comments**

12        **1.**      **Defendants Did Not Comply With The Court's Order To Identify**

13                **"Concrete Proposals To Meet The Remaining Short-Term,**
              **Intermediate, And Long Range Bed Needs Of The Plaintiff Class"**

14                **(Docket No. 3556 at 5:20-21.)**

15        The short and intermediate term plans rely on extremely vague proposals with no

16  indication of how they will be funded.  The short and intermediate term plan includes 15 specific

17  proposals, only one of which has a funding source identified.  *See infra* Table 1; *see generally*

18  Docket No. 3592.

19  •  **Table 1, Identified Funding Sources for Short and Intermediate Term Projects**

| | Short/Intermediate Term Project | Funding Source |
|---|---|---|
| 1. | 88 Bed EOP GP SATF Dual Diagnosis Treatment Program | None identified. |
| 2. | 150 Bed EOP SNY at SATF | None identified. |
| 3. | 150 EOP GP Beds at SOL | None identified. |
| 4. | 45 EOP ASU Beds at COR | None identified. |
| 5. | 27 EOP ASU Beds at SVSP | None identified. |
| 6. | 20 EOP ASU Beds at LAC | None identified. |
| 7. | 17 MHCB Beds at San Quentin Central Health Services Building (Building 22) | Budget change proposal submitted to legislature on April 1, 2009, according to Docket No. 3592 at 11. |

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

| | Short/Intermediate Term Project | Funding Source |
|---|---|---|
| 8. | 20 Temporary MHCB Beds at SAC | None identified. |
| 9. | 4 ICF Cells at SVPP D5/D6 | None identified. |
| 10. | 116 Bed ICF Conversion at SVPP C5/C6 | None identified. |
| 11. | 10 ICF Beds Via Double Bunking at SVPP TC-1 | None identified. |
| 12. | 44 Bed Conversion from DTP to ICF at CMF | None identified. |
| 13. | Conversion of 25 ASH Acute Beds to ICF | None identified. |
| 14. | 32 Bed VPP P-1 Conversion to Acute | None identified. |
| 15. | 36 Bed VPP P-2 Conversion to Acute | None identified. |

**2.    Defendants Did Not Comply with the Court Order to Address the Gaps In the Short and Intermediate Terms Because They Only Tried to Address the *Current* 2009 Need, Not the Need That Is Projected to Exist At the End of 2010 When Their Short and Intermediate Term Projects Are Set For Completion**

In the Bed Plan, Defendants present Table 4, entitled "Impact of Short-Term and Intermediate-Term Proposals on Need." (Docket No. 3592 at 15.) The problem with this table is that it holds "Need" fixed in time at fiscal year 2008/09, or the present moment. It then uses this need to evaluate plans that will not be complete until 2010/11. The need for mental health care beds is not static, and increases substantially for most levels of care, even in the short term. (Feeser Decl. ¶ 6, Exh. E.) Plaintiffs' Table 2, *infra*, supplements Defendants' Table 4 by including the remaining unmet need after all of the short-term and intermediate-term proposals are implemented—using the needs projected at the time of completion in fiscal year 2010/11,

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1  when all of the short- and intermediate-term proposals will have been implemented.[3]  Substantial

2  unmet need remains under either set of projections for EOP-GP, EOP-ASU, PSU, ICF-H, and

3  MHCB levels of care.

4  • **Table 2, Adding Contemporaneous 2010/11 Need to Defendants' Table 4, Impact of Short-Term**
   **and Intermediate-Term Proposals on Need (*See* Feeser Decl. ¶ 6, Exh. E)**

| Defendants' Table 4. Impact of Short-Term and Intermediate-Term Proposals on Need | | | | | Gap in 2010/11 Based on Need Projected for 2010/11 | |
|---|---|---|---|---|---|---|
| LOC | Bed Need 2009 | Actual Beds 2009 | Short & Intermediate-Term Proposals Increase | Bed Total after Implementation of Short & Intermediate-Term Proposals | Fall 2008 Navigant Projection of Need in 2010/11 and Gap Left After Short & Intermediate Term Projects Completed, NEED / GAP | Spring 2009 Navigant Projection of Need in 2010/11 and Gap Left After Short & Intermediate Term Projects Completed, NEED / GAP |
| Acute | 218 | 155 | 43 | 198 | 229 / 31 | 187 / (11) |
| ICF | 252 | 365 | 25 | 390 | 252 / (138) | 297 / (93) |
| ICF-H | 370 | 306 | 94 | 400 | 455 / 55 | 528 / 128 |
| MHCB | 340 | 314 | 37 | 351 | 375 / 24 | 425 / 74 |
| EOP-GP | 3,858 | 3,141 | 388 | 3,529 | 4,021 / 492 | 4,516 / 987 |
| EOP-ASU | 622 | 474 | 92 | 566 | 667 / 101 | 644 / 78 |
| PSU | 479 | 384 | - | 384 | 526 / 142 | 507 / 123 |
| Total | 6,139 | 5,139 | 679 | 5,818 | 6,525 / 707 | 7,104 / 1,286 |

* Unmet need for Fall '08 Navigant uses the projected need for each LOC based on FY 2010/11, the period in which all the Short & Intermediate Term Proposals are implemented, December 2010.

** Unmet need for Spring '09 Navigant uses the projected need for each LOC based on FY 2010/11, the period in which all the Short & Intermediate Term Proposals are implemented, December 2010.

---

[3] In an effort to be conservative, the implementation dates for each of the short term and intermediate term proposals were calculated using the earliest completion dates described in the Bed Plan (Docket No. 3952 at 9-15), and assuming the earliest possible date for court approval, June 16, 2009.  Using this methodology, the short term and intermediate term proposals will be fully implemented in December 2010, as the last proposal to come online is the EOP Level III/IV Beds at SOL, which will create 150 additional EOP-GP beds, but will not be fully operational for 18 months after Court approval.  (Docket No. 3952 at 10.)  Accordingly, the proper point of comparison for actual need is FY 2010/11.

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1

### 3. The Court Should Reject Defendants' Assertion That The Short And Intermediate Term Enhanced Outpatient Program Gap Need Not Be Fully Addressed Because Of The Reception Center Program

2

3

4          Defendants propose meeting the short-term, intermediate, and the long-term EOP bed gap

5   through the use of the Reception Center EOP program.  (Docket No. 3592 at 9.)  This is

6   unacceptable and the Court should reject this proposal.  Even after Defendants activate the 388

7   new EOP beds and 92 EOP ASU beds included in their Short-Term/Intermediate-Term Bed Plan

8   within 18 months, Defendants will have a shortage of 492 EOP GP beds (using the Fall 2008

9   Navigant projections) or 987 EOP GP beds (using the most recent Spring 2009 Navigant

10  projections).  Using either calculation, Defendants' proposals fail to address this serious gap.

11  Moreover, Defendants' suggestion that many hundreds of EOP patients can receive appropriate

12  treatment in the RC EOP program is not appropriate bed planning.

13         First, and most importantly, the RC EOP program is a stop-gap measure which

14  Defendants were ordered to develop for EOP patients who were delayed in transfer to EOP

15  treatment programs while Defendants developed adequate EOP bed resources.  5/1/06 Order

16  (Docket No. 1803) at 2:1-10.)  The RC EOP program was never intended to relieve Defendants

17  of their responsibility to appropriately plan and meet the EOP bed need of the *Coleman* class.

18  The RC EOP program provides at best "half" of the mandated EOP treatment for EOP patients

19  requiring the full EOP treatment program who are delayed in their transfer to a program for

20  months and months on end.[4]

21         Second, in addition to only providing half the treatment hours, the RC EOP programs do

22  not require sheltered housing (an essential element of the EOP program) and many programs co-

23

24

---

25  [4] Mental Health Delivery System Program Guide, 2009 Revision, Ch. 4, 12-4-8 ("Each EOP
26  inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic
    activities as approved by the IDTT."); Ch. 2, 12-2-8 (" Reception Centers housing inmate-
27  patients requiring EOP level of care shall provide structured therapeutic activities…all sites will
    provide opportunities for a minimum of one hour per day, five days per week, of out of cell
28  therapeutic activities.").  (Kahn Decl. ¶ 16 and Exh. O.)

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1    mingle the EOPs in dorm settings with non-mentally ill prisoners.[5]

2        Finally, the reception center conditions themselves often resemble lockdown units, with

3    little or no programming, which can exacerbate the mental illness of EOP patients waiting

4    months for transfer to a real EOP treatment program.[6]

5    ### 4.    Defendants Have Not Addressed the Use of Coalinga State Hospital to Relieve the EOP Bed Shortage

6

7        Plaintiffs proposed in the March 23, 2009 filing that Defendants establish an interim,

8    emergency plan to house EOP prisoners at Coalinga State Hospital (CSH).  (*See* Docket

9    No. 3545 7:5-8.)  There is no statutory barrier to housing EOP prisoners at Coalinga and

10   Defendants themselves have admitted that "the physical security of CSH [Coalinga State

11   Hospital] does not need to be upgraded to house and treat Level III CDCR inmate-patients,

12   provided that those inmate-patients are low custody."  (Docket No. 3545 at 31-32 (citing Docket

13   No. 1786-2 at 7-8).)  The availability of hundreds of mental health beds in a state-of-the art

14   hospital, at the same time that *Coleman* class members are utterly unable to reach the levels of

15   care they desperately require, offers an extraordinary opportunity to ease the bed crisis.  Yet

16   Defendants, and the DMH Defendants in particular, have inexplicably refused to consider

17   Coalinga's empty beds as a solution, even during meetings with the Special Master to address the

18   bed shortages.  (*See, e.g.*, Docket No. 3556 at 2:20-22 (noting Special Master's report that

19   "DMH officials took an intractable position with respect to the use of Atascadero State Hospital

20   (ASH) and Coalinga State Hospital (CSH) for any part of necessary [bed plan] solutions").)  As a

21

22   ───────────────

23   [5] Chapter 4 of the Program Guide describes the EOP program as "characterized by a separate housing unit and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so

24   impaired as to require 24-hour inpatient care."  (Kahn Decl. ¶ 16 and Exh. O.)

25   [6] Expert Report of Professor Craig Haney (Docket No. 3201) at ¶¶ 11, 117, 126  (CIM caged

26   dorm, where no jobs, no vocational training, only left the dorm for yard, showers and chow; EOP and no-EOP co-mingled in dorms throughout the crowded housing units in CIM, EOP population up with a corresponding increase in the use of the overall MHCB beds.); ¶ 296 (NKSP failed to

27   meet EOP transfer timelines and their own data showed that EOPs represented 21 percent of the

28   MHCB admissions, although they were only 7 percent of the overall MHSDS.)

[298396-5]

1  result of this intractable and still unexplained position, this Court directed that Stephen Mayberg,

2  the Director of DMH, attend any and all meetings regarding bed planning. *Id.* at 3:3-7. Yet the

3  resulting bed plan lacks any sign that Defendants considered Coalinga as an emergency, interim

4  placement for *Coleman* class members. The sole mention of Coalinga in Defendants' plan

5  occurs in a footnote, the entire text of which reads:

> Defendants also considered various proposals involving CSH. However,
> defendants do not consider expansion at CSH a viable option. In part, defendants
> note that the greatest need for inpatient care exists among high custody inmate-
> patients. CSH is not equipped to accommodate these ICF inmate-patients. In
> addition, it is difficult to recruit staff at CSH. Presently, CSH does not have its full
> complement of staff. (*See* Exhibit 3, 10-6-06 Feasibility Study; Exhibit 4,
> Amended Coalinga Study.)

11  (Docket No. 3592 at 12 n.13).

12  Defendants' focus on a three-year old study regarding the use of Coalinga for high-

13  custody ICF patients is irrelevant. Plaintiffs do not seek to house high-custody ICF patients at

14  Coalinga; Plaintiffs seek to use some portion of the more than 600 empty beds at Coalinga for

15  lower-level EOP patients (*see* Docket 3549 at ¶ 7), or, as discussed in Section II.B.13, *infra*, to

16  address the unmet need for low security male ICF beds. As Plaintiffs pointed out in their initial

17  filing, DMH anticipates having only 825 patients housed at Coalinga by June 24, 2009 and only

18  894 housed there by June 30, 2010, leaving more than 600 beds empty for the next year. (Docket

19  No. 3549-2 at 57 (Exhibit P-1029).) Defendants' protestations about staffing difficulties at

20  Coalinga are similarly unpersuasive since they are belied by DMH's own data. Coalinga has the

21  absolute lowest functional staffing vacancy rate (0%) of *every* DMH program treating *Coleman*

22  class members, including Atascadero State Hospital (18%), Metropolitan State Hospital (22%),

23  Napa State Hospital (8%), Patton State Hospital (5%), the SVPP at Salinas Valley (27%), and the

24  VPP at CMF (16%). (Kahn Decl. at ¶ 15, Exh. N.)

25  **Requested Action: DMH Defendants shall make at least 100 of the Coalinga beds**

26  **available to Level I, II and III EOP male class members either for mainline or reception**

27  **center programs.**

28

[298396-5]

**5.    Defendants Have Now Admitted That Many Patients At The EOP Level Of Care Need A Program Geared Toward Their Imminent Release To The Community, And Defendants Should Be Ordered To Plan For This Reality**

Defendants have identified 296 prisoners who require an EOP level of care who are housed in Reception Centers and have release dates of five months or less. (Docket No. 3592 at 9.) As Defendants note, these EOPs will parole directly back to the community from the Reception Center, *id.*, and thus should be provided with a full EOP program, including significant pre-release planning services, during their RC stays. Two RC EOP programs currently house 329 EOPs (CIM has 200, LAC has 129). (Kahn Decl ¶ 3, Exh. B (Monthly data, April 10, 2009 at R1-1 to 3).). Two other RC EOP programs house an additional 163 EOPs (Wasco has 90 and RJD has 83). (*Id.*)

First, Defendants should be ordered to cluster EOP prisoners in the reception centers. Although the Program Guide requires such clustering on the mainline, Defendants have resisted clustering EOPs in reception centers from the start, despite noting the benefits of doing so. In their July 31, 2006 Plan, Defendants indicated that, "[w]hile mainline EOP inmate/patients are provided separate housing units, no separate housing space will be given to this population because of the reception center processing function and the constant turnover of inmates rotating thru [sic] reception. To the extent feasible at individual institutions however, and to facilitate medication distribution, heat plan monitoring, and access to CCM contacts, inmates with the EOP designation will be housed or clustered in close proximity to one another." (Docket No. 1928-2 at 7.) This empty promise has proven ineffective and Defendants should now be ordered to cluster EOP patients in the reception center programs.

Second, Defendants should be required to provide greater pre-release planning services, with a focus on short-term parole violators. Defendants have for years promised to improve the spotty pre-release planning for EOP prisoners paroling from reception centers. To date, the only tangible improvement has been the execution of an October 29, 2007 contract with Kern County to provide certain pre-parole services from July 1, 2005 – June 30, 2010. (Galvan Decl. ¶ 6,

[298396-5]

1   Exh. 5.)  For Transitional Case Management Program services for prisoners with mental illness,

2   the Kern County contract covers only three of the seven RCs with EOP programs:  DVI, NKSP

3   and WSP.  It does not cover LAC, CIM, RJD or SQ.  (Galvan Decl., Exh. 5 at 7.)  For assistance

4   securing federal and state benefits entitlements, the Kern County contract includes only two of

5   the seven RCs with EOP programs:  NKSP and WSP.  It does not cover DVI, LAC, CIM, RJD,

6   or SQ.  (*Id.* at 16.)  The contract does not prioritize EOP prisoners among the targeted groups

7   eligible for the services, there is no contract for providing similar services for the other RC EOP

8   programs, and there are no contracts between CDCR/DAPO and either the Department of Health

9   Services (DHS) or the Veterans' Administration (VA).

10         ***Requested Action:  Defendants should be required to cluster patients in the RC-EOP***

11   ***program, and to take steps to enhance the program to meet the needs of persons about to***

12   ***parole to the community, including but not limited to finalizing a contract with the VA and***

13   ***DHS, and to executing a contract for the RC EOP programs not covered by the Kern County***

14   ***contract.  Finally, Defendants should be ordered to prioritize the EOP prisoners covered by the***

15   ***Kern County contract, with an emphasis on the RC EOP prisoners with short terms of stay.***

16

17         **6.      Defendants Must Meet the PSU/EOP ASU Gap and Reassess the**
            **Population**
18

19         Defendants' May 26, 2009 Bed Plan fails to address the PSU bed shortfall.  (Docket No.

20   3592 at 11.)  EOP patients waiting for transfer to a PSU are housed in the administrative

21   segregation units system-wide.  Defendants must be ordered to remedy the EOP ASU/PSU gaps

22   in their short- and intermediate-term bed proposals.  In the interim, the Court should order

23   Defendants to address their acknowledged shortfall of PSU and EOP ASU beds through a careful

24   custody/clinical assessment of the current PSU/EOP ASU population housed in these units or

25   endorsed for transfer to these units.  The purpose of this assessment should be to evaluate

26   whether the EOP prisoners can be safely returned to EOP GP housing, based upon a current risk

27   assessment and their need for continued segregated housing.  The Mississippi Department of

28

[298396-5]

1   Corrections (MDOC) undertook such an assessment of their segregation population in Unit 32 at

2   Parchman, which housed one thousand men on segregation status.  (Kahn Decl. ¶ 6, Exh. E at 1

3   (Review of the Classification Process for Unit 32, Mississippi State Penitentiary, November 9,

4   2007, by James Austin, Ph.D).)  The MDOC created a Classification Task Force to work closely

5   with an outside consultant, Dr. James Austin.  (*Id.* at 2.)  The MDOC Classification Task Force

6   and Dr. Austin reached consensus on many issues, including that 80% of the 1,000 prisoners did

7   not actually need the administrative segregation placement; that a significant number of prisoners

8   in the administrative segregation unit had had no misconduct reports for many months and no

9   longer required confinement in segregation; that prisoners labeled as protective custody were

10  being housed in the unit even though they had no record of violent or aggressive behavior; and

11  that assignment to the administrative segregation unit should be based on a very narrow set of

12  criteria that clearly reflects the prisoner's potential for violence.  (*Id.* at 3.)

13       Within California's prisons, almost 20 percent of the EOP population is housed in

14  segregated housing, compared to only five percent of the total population.[7]  In the 1995 decision

15  after trial, this Court expressed concern that seriously mentally ill prisoners were being treated

16  with punitive measures by custody staff "without regard to the cause of the behavior, the efficacy

17  of such measures, or the impact of those measures on the inmates' mental illnesses."  *Coleman v.*

18  *Wilson,* 912 F. Supp. 1282, 1320 (E.D. Cal. 1995).  The Special Master has extensively

19  monitored the placement of mentally ill prisoners in segregation, their lengths of stay, and the

20  factors which have contributed to the delays in moving mentally ill prisoners to EOP ASUs or to

21  their endorsed housing placements.  (20th Round Report (Docket No. 3029) at 73, 149, 219, 229,

22  238, 256, 265, 311, 317, 353.)  He has also noted the adverse impact of such housing on

23  prisoners requiring EOP levels of care:

24

25

26  [7] According to the most recent *Coleman* monthly data for April 10, 2009, the total number of
    prisoners housed in segregated housing (including segregation, SHU and PSU) was 7,616

27  prisoners or 5% of the total prison population (including EOPs).  There were a total of 4,972
    EOPs housed throughout the prison system, with 940 EOPs or 19% housed in segregated

28  housing.  (Kahn Decl. ¶¶ 4-5.).

[298396-5]

1
2
3
4
5

> Much has been written over the past two decades to validate the deleterious impact of confinement in administrative segregation on sound minds. Simply to immerse fragile EOP inmates in such an environment for extended periods, even while providing adequate mental health care, arguably tiptoes on the boundaries of cruel and unusual punishment. To immerse them in administrative segregation without providing ready access to a significantly heightened level of mental health services pretty clearly crosses that boundary.

6

(8th Interim Report (Docket No. 1303) at 52-53.)

7
8
9
10
11
12
13
14
15
16
17

Likewise, the Office of the Inspector General issued a report in January 2009 on the CDCR's management of its administrative segregation population, in which it found that prisoners often languished in segregation units because: (1) CDCR has no formal policies or criteria establishing timelines for the prisons to complete investigations, which may cause unnecessarily long ASU stays; (2) some prisons do not effectively use tracking logs to identify delayed ASU cases, resulting in some prisoners remaining in segregation despite expired segregation terms; (3) that postponed parole hearings can result in long ASU stays; and (4) some prisons failed to accurately maintain data on prison transfer lists, preventing some prisoners from being transferred on time and consequently unnecessarily extending their segregation stay. (Kahn Decl. ¶ 7, Exh. G at 1-2 (OIG's January 2009 Report, Management of the CDCR's Administrative Segregation Unit Population).)

18
19
20
21
22
23

*Requested Action: The Court should require CDCR to review the EOP population currently housed in segregated housing to determine how many of these EOP patients require continued segregated housing based on a specific set of criteria developed for the review. If, as a result of this assessment, Defendants determine that they no longer have an unmet need for PSU and EOP ASU beds, Defendants should be ordered to expand EOP GP bed capacity as needed.*

24
25
26

**7.    Other MHOHUs That Are and Will Be Substituting for Crisis Beds Should Also Be Staffed Up to Address the Continuing Gaps**

27
28

Defendants' short- and intermediate-term proposals will not meet the Navigant 2008

[298396-5]

1   Projections for MHCB need even after their proposed projects are complete in 2010.  The

2   continued use of understaffed infirmaries, holding cells, administrative segregation units, and the

3   like for prisoners requiring crisis-bed level of care until the Defendants' final bed projects come

4   on-line is simply unacceptable.

5           In the short term, Defendants should be required to augment the staffing at several prisons

6   that have been forced to use their OHUs to house patients on suicide watch well beyond Program

7   Guide transfer timelines.  Several MH OHUs and OHUs stand out in the Special Master's

8   Reports and the Plaintiff's Experts' reviews for the Three-Judge Court trial.

9           Mule Creek State Prison has a large mental health population, with 1,668 mental health

10  caseload prisoners, including 556 EOP prisoners.  (20th Round Report (Docket No. 3029) at 54.)

11  Despite this fact, the prison has only an eight-bed MHCB, and a six-bed MH OHU.  (*Id.* at 61-

12  62.)  The Special Master has long noted the insufficiency of these beds: "The inadequacy of

13  MCSP's eight-bed MHCB unit, a long-standing and serious deficiency, grew more dire during

14  the monitoring period as the institution's EOP programs expanded to full capacity…. Faced with

15  a chronic shortage of crisis beds, MCSP operated a six-bed MHOHU and used five cells in

16  administrative segregation to monitor inmates waiting for MHCBs." (*Id.*)

17          Deuel Vocational Institute (DVI) is a reception center, with a mental health population in

18  October 2007 of almost 1,000 patients, including 45 EOP patients.  (*Id.* at 109.)  DVI has an

19  unlicensed OHU, with a large proportion of the OHU beds filled with chronic care medical

20  patients, leaving very few beds for psychiatric admissions.  (*Id.* at 114.)  As a result, DVI

21  activated an "overflow OHU" in one administrative segregation unit and eventually renovated

22  eleven cells in another administrative segregation unit to replace the older OHU overflow cells.

23  (*Id.* at pp. 114-15.)  There was an average of nearly 100 OHU admissions per month, with

24  average stays ranging from 1.8 to 3.2 days.  (*Id.* at 115.)

25          These two prisons suffer from inadequate access to MHCBs, combined with fully

26  occupied MHOHU and OHU overflow units that operate without adequate staffing for the

27  populations they serve.

28          ***Requested Action:  Plaintiffs request an order mandating augmented staffing in these***

29

[298396-5]

*units, including 24-hour RN staffing and a dedicated mental health clinician.  Defendants*
*would not be required to staff these units fully as MHCBs or seek licensing waivers.*

### B.    Comments On Specific Short And Intermediate Term Projects

#### 1.    Dual Diagnosis Treatment Program at Substance Abuse Treatment Facility

Plaintiffs support efforts to address the needs of persons with co-occurring mental illness and addiction, although the need would be better served by community-based rather than prison-based programs.  This project and several others are located in a prison with a troubled history, which Defendants recognize and suggest can be remedied through training.  The CDCR training program that they suggest using is inadequate.  *See infra* Section IV.E.2.

*Requested Actions: (1) Order a deadline of 9 months (270 days) from the Court's approval order, based on Defendants' representation that activation will take 180-365 days; and (2) Defendants' CDCR training program should be rejected, and training should be based on the DMH training program submitted by Defendants.*

#### 2.    150 Bed EOP Sensitive Needs Yard at SATF

*Requested Actions: (1) Order a deadline of 5 months from the Court's approval order, based on Defendants' representation that activation will take 150-180 days; (2) Defendants' CDCR training program should be rejected, and training should be based on the DMH training program submitted by Defendants.*

#### 3.    150 EOP GP Beds at SOL

*Requested Action: Order a deadline for full operation of 12 months from the Court's approval order, based on Defendants' representation that activation will between 12 and 18 months.*

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

**4.      45 EOP-ASU Beds at COR**

*Requested Action: Order a deadline for activation within 90 days of the Court's order based on Defendants' representations.*

**5.      27 EOP ASU Beds at SVSP**

*Requested Actions: (1) Order a deadline of 120 days from the Court's order, based on Defendants' representation that activation will take 120-150 days; (2) Defendants' CDCR training program should be rejected, and training should be based on the DMH training program submitted by Defendants.*

**6.      20 EOP ASU Beds at LAC**

*Requested Actions: (1) Order a deadline of 6 months (180 days) from the Court's order, based on Defendants' representation that activation will take 180-270 days; (2) Defendants' CDCR training program should be rejected, and training should be based on the DMH training program submitted by Defendants.*

**7.      17 MHCB Beds at San Quentin Central Health Services Building (Building 22)**

*Requested Action: Order a deadline for activation in January 2010 based on Defendants' representations.*

**8.      20 Temporary MHCB Beds at SAC**

Defendants anticipate that this proposal will be implemented within five to six months after Court approval.  (Docket No. 3592 at 12.)  Plaintiffs request that the Court approve this request and order Defendants to expedite this proposal.

*Requested Action: Order a deadline for activation within 150 days based on the earliest part of the range in Defendants' 150-180 day representation.*

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1

2  ### 9.    4 ICF Cells at SVSP D5/D6

3  Defendants represent that this conversion is already completed.  (Docket No. 3592 at 12.)

4

5  ### 10.    116 Bed ICF Conversion at SVSP C5/C6

6  Although Plaintiffs suggested additional temporary emergency conversions in the

7  March 23, 2009 filing (*see* Docket No. 3545 at 5:24-26, 35:15-17), Defendants should apply

8  lessons learned from earlier emergency conversions.  The D-5 and D-6 units at SVSP, for

9  instance, were hastily converted and have been operating for the past 2-3 years as ICF units with

10  wholly inadequate treatment and office space.  (Kahn Decl. ¶ 20).  Defendants' own expert in the

11  overcrowding trial, after touring these units, described them as follows:  "[T]he unit in the D-

12  building (which has been designated as temporary space) is [a] standard prison unit, without

13  adequate space for treatment, and difficulties in providing confidential 1:1 treatment

14  environments.  The problem is not with the census in the unit, but rather that *the space is not*

15  *appropriate for the purposes of providing intermediate care treatment to mentally ill inmates.*"

16  (12/10/07 Packer Report (Docket No. 3139-8) at 10.)  Victor Brewer, the Director of DMH

17  programs at both CMF and SVSP, urged Defendants as early as March of 2007 to construct

18  adequate office and treatment space, referring to the current situation in D-5 and D-6 as "a direct

19  violation of acceptable patient care and [a] clear[] violation of the HIPPA and State Statutes."

20  (Kahn Decl. ¶ 20, and Pls.' Exh. P-158 at 1.)  While Defendants are slated to finish construction

21  in the D-5 and D-6 units by July of 2009, the Court should not tolerate additional unit

22  conversions that severely compromise patient safety and care for years after activation.  (Docket

23  No. 3544, Attachment B at p. 4 (three months after anticipated Fire Marshal approval on April

24  15, 2009)

25  ***Requested Actions:  (1) Order a deadline for activation within 1 year of the Court's***

26  ***order based on Defendants' representation; and, (2) Defendants must work with the Special***

27  ***Master to identify within 60 days of the Court's order necessary augmentations to the proposal***

28

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

*to ensure adequate treatment space in a manner that does not delay the implementation.*

### 11.    10 ICF Beds Via Double Bunking at SVSP TC-1

To create 10 more ICF-H beds at SVSP, Defendants propose to pilot double-bunk *Coleman* patients in one 10-cell wing of the SVPP.  (Docket No. 3592 at 10.)  The regulation that they propose to use for this, Cal. Code Regs., tit. 15, Section 3269, threatens disciplinary sanctions for inmates who refuse to accept a cellmate.  Getting 10 extra beds at the expense of embroiling more *Coleman* class members in the disciplinary process is no gain for the class, and risks further crowding the EOP-ASU and PSU programs.  Plaintiffs therefore ask that any order approving this pilot also waive application of Section 3269 or any other disciplinary statute or regulation.

*Requested Actions: (1) Approve double-bunking pilot for the T-1 unit in the SVPP; (2) The disciplinary provisions of Cal. Code Regs, tit. 15, Section 3269 should be waived in a manner such that disciplinary proceedings may not be initiated against Coleman class members for refusal to accept a cellmate or for conduct arising from refusal to accept a cell-mate in this pilot program, and that no losses of privileges, worktime credits, or good time credits, revocation extension terms, referrals to segregation, SHU terms, nor any other sanctions may be assessed against a Coleman class member for refusal to accept a cellmate or for conduct arising from refusal to accept a cellmate in this pilot program; (3) The Special Master should be required to closely monitor this project; and, (4) Defendants should be prohibited from expanding double-bunking proposals to any ICF or acute units without leave of Court.*

### 12.    44 Bed Conversion from DTP to ICF at CMF

Due to the emergency shortage of ICF beds, Plaintiffs agree to the use of the Day Treatment Program (DTP) beds at CMF as low level ICF beds, particularly given the current underutilization of those beds.  Plaintiffs do not agree, however, that the DTP should be

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1   permanently eliminated from the Mental Health Delivery System and as a program required to be

2   maintained by this Court's orders.[8]  The DTP was created by Defendants to address the needs of

3   a unique and vulnerable subset of the *Coleman* class who may be clinically excluded from ICF

4   and acute beds, but who are unable to function in traditional EOP units.  Defendants have

5   provided no clinical justification for its closure other than a brief statement that "the low custody

6   ICF and the DTP are similar in admission criteria."  (Docket No. 3592 at 11.)  In fact, there are

7   stark differences between the two programs.  Whereas patients referred for ICF care must require

8   "highly structured inpatient psychiatric care with 24-hour nursing supervision," patients referred

9   to the DTP have only "mild to moderate impairment of functioning" and "do[] not require 24-

10  hour nursing supervision."  *(Id.* at Exhibit 6 (Docket No. 3592-4.))  Whereas referrals to ICF

11  often result when inmates engage in "ritualistic or repetitive self-injurious/suicidal behavior," are

12  "chronically suicidal" or have "had repeated admissions to a Mental Health Crisis Bed," no such

13  criteria exists for the DTP and, in fact, clinicians are prohibited from referring patients to the

14  DTP unless they have had "no serious suicide attempts in the past 30 days."  *(Id.)*

15      *Requested Actions:  (1) Defendants should be required to reactivate, by 2013, the DTP*

16  *at CMF (or in another appropriate location) unless or until they obtain leave of Court to*

17  *eliminate the program by demonstrating that it is no longer clinically justified and the needs of*

18  *the patients that it was serving are being addressed appropriately in other MHSDS programs;*

19  *and, (2) the Special Master should be ordered to monitor and report on the use of the former*

20  *DTP beds, as well as Defendants' success accommodating previously DTP-qualifying patients*

21  *in alternative programs.*

22

23

24

25

---

26  [8]  Defendants attempted to abolish the DTP in late 2002, prompting vigorous objections by the
     Plaintiff class, the first Order that Defendants conduct an unmet needs assessment and an

27  eventual agreement between the parties that the DTP would continue.  In fact, by January 2005,
     Defendants agreed to "expand the capacities of both the ICF and the DTP at CMF, thereby

28  rendering moot their earlier motion to reduce both programs."  (Docket 1638 at p. 2.)

### 13.     Conversion of 25 ASH Acute Beds to ICF

Plaintiffs oppose the immediate closure of the 25 acute beds at ASH.  DMH has a long history of underutilizing both the acute and the ICF beds at ASH.  In January 2007, the DMH Defendants stopped admitting *Coleman* class members into ASH without notifying either the Special Master or the Court.  In March of 2007, Plaintiffs sought emergency relief from this Court to force Defendants to reopen the ASH beds.  (Docket Nos. 2165-2168.)  At that time (March 2007), ASH had only 110 CDCR patients housed in its hospital.  (Docket No. 2167 at ¶ 17.)  After two hearings and additional briefing, this Court issued an order on June 28, 2007 requiring DMH to accept 125 *Coleman* class members into ICF beds within 60 days and to come up with a plan to have all 231 ICF beds full.  (Docket No. 2301 at 3-4.)  Defendants' plan, filed on November 30, 2007, promised to have 147 ICF beds full by December of 2007 and all 231 ICF beds open by July of 2008.  (Docket No. 2580-2 at 3.)  Defendants identified Cynthia Radavsky as the staff member responsible for filling the ASH beds.

Far from ensuring access for *Coleman* class members to the ASH acute and ICF beds, Defendants have chronically underutilized those beds for the entire time period since this Court's June 28, 2007 Order.  Indeed, for the past 1 ½ years, Defendants have had an average of only 123 patients in the 256 "available" beds, meaning that Defendants have consistently utilized fewer than 50 percent of the ASH beds.  (Kahn Decl. ¶ 21, Exh. S ("Mental Health Population-Placement per Institution" data at pp. R1-4).)  Taking the 25 acute beds alone, Defendants had only 5 class members in those beds as of April 10, 2009.  (*Id.* at ¶ 18, Exh. Q.)  At the same time, 42 *Coleman* class members were on the waiting list for acute beds in March of 2009, rising to 52 patients by April.  (*Id.* at ¶¶ 17, 18 and Exhs. P, Q.)

It is clear from the results of the 2004 needs assessment that the lack of ASH utilization is not caused by lack of actual need—as DMH officials frequently and erroneously claim—but rather by barriers to referral that have no relation to actual need.  The 2004 needs assessment uncovered hundreds of patients who were appropriate for ASH and who were not referred.  The 2009 modified needs assessment has again identified hundreds of patients for ASH and Coalinga,

[298396-5]

1    as well as the low and high custody programs at SVSP and CMF.  (Galvan Decl. Exh. 8.)

2        Defendants must not be permitted to close the acute beds at ASH unless and until they

3    successfully open and license the new CMF P-1 and P-2 units (with all suicide barriers

4    removed), or until there is no acute waiting list.  In the meantime, Defendants must act swiftly to

5    reconcile the waiting list and the empty beds.  It is unfathomable that 52 patients were left on the

6    acute bed waiting list in April of 2009 at the same time that 20 acute beds remained empty at

7    ASH.

8        In the Court's March 31, 2009 Order, it warned Defendants, and Dr. Mayberg in

9    particular, that further orders would ensue if they failed to utilize the ASH beds.  (Docket No.

10   3556.)  As the Special Master reported to the Court, Defendants artificially limit all patient

11   admissions at ASH to 5 patients per week.  (*Id.* n.3.)  The Court made clear that if the barriers to

12   admission continued, "defendant Mayberg will be directed to work, at the request of the special

13   master, to develop new polices and procedures to expedite admissions to ASH."  (*Id.* at 3:20-22.)

14   Plaintiffs respectfully suggest that it is now time for such an order.

15       *Requested Actions:  Plaintiffs request that the Court issue an order including the*

16   *following elements:  (1) Defendants' request to immediately close 25 Acute beds at Atascadero*

17   *State Hospital (ASH) is denied; (2) Defendants shall immediately increase the rate of*

18   *admissions to ASH from 5 patients to 10 patients per week, and shall redirect resources to the*

19   *admission units until the need for inpatient beds is met; (3) Defendants shall continue to*

20   *accept CDCR patients at ASH and Coalinga at the rate of 10 patients per week until all such*

21   *eligible patients have been accommodated and without regard for the previous cap of 256;*

22   *(4) Defendants shall transfer as many of the non-Coleman class members to Coalinga or other*

23   *state hospitals as is necessary to accommodate the increase in ASH admissions ordered above;*

24   *and (5) Alternatively, Defendants may accommodate the Coleman class members at ASH to*

25   *meet the needs identified in the modified needs assessment.*

26

27

28

[298396-5]

### 14.    32 Bed CMF P-1 Conversion to Acute

While Plaintiffs support Defendants' plan to convert the P-1 and P-2 wings into acute inpatient units, Defendants have not adequately explained why it will take upwards of 10 months to convert the P-1 unit and admit patients, particularly when it took defendants only 90 days to convert the P-2 and P-3 units from general population to ICF.  (Kahn Decl. 19, Exh. R at 180 (Brewer deposition testimony).)  Plaintiffs therefore request that the Court approve the project but reject the deadline, and set a more realistic deadline of 4 months for full activation of the beds, one month more than was needed for the ICF conversions.

*Requested Action:  Order the CMF P-1 Conversion and set deadline for full activation and full occupancy by patients no later than 4 months from the Court's order.*

### 15.    36 Bed CMF P-2 Conversion to Acute

Defendants provided no timeline, but stated that "the wing could be converted in a short period of time" and identified changing ventilation screens as the only work needed.  (Docket No. 3592 at 15.)  Plaintiffs request that this change be expedited with a 2-month deadline.

*Requested Action:  Order the CMF P-2 Conversion and set deadline for full activation and full occupancy by patients no later than 2 months from the Court's order.*

## III.    LONG RANGE PLANS

### A.    General Comments

#### 1.    Defendants Should Be Required to Certify Before the June 16, 2009 Hearing That the *Plata* Receiver's Projects Are Approved By All Pertinent Branches of State Government

Defendants were ordered to identify "concrete proposals."  (Order, Docket No. 3556 at 5:19-20.)  Closure of the bed gap, however, depends entirely on the *Plata* Receiver projects that the Governor and the Attorney General still oppose in *Plata*.  (*See* Docket No. 3592 at 18.)  In total, the Receiver's north and south facilities would add an additional 1,368 MHSDS Beds, including 576 EOP-GP, 175 EOP-ASU, 167 MHCB, 18 Acute, and 432 ICF-H beds.  (*Id.* at 18,

[298396-5]

1   Tbl. 6.)  This represents 54 percent of the net MHSDS beds added by Defendants' May 2009 Bed

2   Plan (1,368 out of 2,533 beds).  (*See* Docket Nos. 3592 at 18 and 3592-4 at 31.)  However, in

3   January 2009, the State filed a motion in *Plata v. Schwarzenegger* to terminate the Receivership

4   and terminate the Receiver's expansion construction plans.  *See* (Achieving a Constitutional

5   Level of Medical Care in California's Prisons, Eleventh Tri-Annual Report of the Federal

6   Receiver's Turnaround Plan of Action, June 1, 2009 (*Coleman* Docket No. 3595-2) at 8.)

7   Though the relationship between the CDCR and the Receiver began to improve dramatically in

8   March 2009 and "joint planning has led to the possibility of a settlement," final settlement has

9   "not yet been secured."  (*Id.*)  Notably, the Stipulation and Order entered into between the State

10  and Receiver on May 29, 2009 indicates the State is continuing to press for termination of the

11  Receiver, submitting Defendants' motion to stay denial of their motion to terminate the Receiver

12  "on the papers."  (Stipulation and Order (*Plata* Docket No. 2166).)

13      If the State in *Plata* is successful in terminating the Receivership and the associated

14  construction plans, Defendants' May 2009 Bed Plan will be a failure.  Yet Defendants continue

15  to prosecute their attacks on the Receiver and his construction plans in the *Plata* litigation.  They

16  cannot have it both ways.

17

18      **B.    Comments on the Specific Long-Term Proposals**

19      **1.    Receiver's Consolidated Health Care Facilities**

20      ***Requested Action:  Order Defendants to activate two Correctional Health Care***

21  ***Facilities with a total of at least 1,365 male mental health placements and 70 female mental***

22  ***health placements, no later than June 30, 2013, with placements at levels of care distributed as***

23  ***set forth in the Bed Plan.***

24          .

25      **2.    152 SAC PSU Beds**

26      Defendants' May 26, 2009 Bed Plan at Table 8 describes this project as new treatment and

27  office space, with a housing conversion for an additional 152 PSU beds.  (Docket No. 3592 at

28

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]

1  Tbl. 8.)  Footnote 22 says: "Both the Senate and Assembly Sub-Committee left open the decision

2  on whether to include funding for the construction phase of the project in the 2009-10 budget.

3  However, based on the revised budget process for this year, this issue is proceeding to the

4  Conference Committee."  (*Id.* at 20, n.22.)  This is incorrect.  Plaintiffs counsel has not been able

5  to locate any evidence that Defendants have requested funding from the Legislature for the 152

6  bed PSU expansion at SAC.

7           The funding proposal before the Legislature concerns the SAC EOP treatment and office

8  space for the 192 EOP patients who were added to the program in 2006, and not the proposed

9  SAC PSU 152 bed expansion listed in Table 8.  Kahn Decl. ¶ 2, Exh. A (Pls' Trial Exhibit P-390,

10  a Budget Change Proposal dated April 1, 2008, for CSP-SAC Treatment and Office Space to

11  Accommodate existing 192 EOP Patients added in 2006).)  Furthermore, on March 20, 2009, the

12  Department of Finance, requested that the Legislature provide $12.9 million in the next state

13  budget for construction, thereby further delaying any completion of the SAC EOP treatment

14  space by another year.  (Galvan Decl. ¶ 5, Exh. 4, March 20, 2009 Finance Letter, *available at*

15  http://www.dof.ca.gov/budget/historical/200910/april_1_finance_letters/docments/

16  Early%20Finance%20Letter.pdf).)

17           ***Requested Action:  Order Defendants to activate 152 EOP PSU beds at California State***

18  ***Prison, Sacramento no later than June 30, 2013.***

19

20                    **3.        733 EOP Beds at "Alternative Sites"**

21           Defendants' Bed Plan asserts that Defendants will meet an EOP 733 Bed Gap through

22  renovations for EOP beds, treatment and office space at alternative sites "to be determined."

23  (Docket No. 3592 at 20.)  In their footnote to "alternative sites," Defendants describe these to

24  include "DJJ, short-term or intermediate-term programs that have proven effective, appropriate

25  reception center EOP programs, and other CDCR sites yet to be determined."  (*Id.* at 20, n.23.)

26  This is an inadequate bed plan to provide for the undisputed needs of 733 seriously ill and

27  vulnerable EOP class members.  There is no funding, no location, no timeline and no responsible

28

---

39

[298396-5]

1  party. This part of the long-term plan must be rejected.

2        The proposed "alternative sites" are unacceptable as they include short-term,

3  intermediate-term programs that are "jerry-rigged" housing units and the Reception Center EOP

4  program as Defendants' proposal to bridge their significant long-term EOP bed shortfalls.

5  Defendants' suggestion that the Reception Center EOP program meets the Long-term EOP

6  Unmet Need is quite disturbing, for the reasons stated above regarding the short- and

7  intermediate-term plans at Section II.A.3, at page 22.

8        ***Requested Action: Defendants should be required to return within 60 days with a***

9  ***specific plan to address this Long-term EOP Need through specific projects at identified***

10  ***locations with funding, timeframes and responsible parties fully identified.***

12      **4.    70 Female EOP-GP Beds At Receiver's Correctional Health Care**

13               **Center Site No. 1**

14        As with all of the Receiver-based proposals, this is not "concrete" if the State is still at

15  war with the Receiver.

17        ***Requested Action: The Order setting the deadline for activation of the Correctional***

18  ***Health Care Facilities should include a requirement for these 70 female beds.***

20      **5.    12- Bed MHCB at SQ in the Condemned Inmates Center**

21        In the Bed Plan, Defendants assert they "will utilize 12 MHCBs in the proposed

22  Condemned Inmate Complex." (Docket No. 3592 at 20.) This project has been stalled for many

23  years and is mired in Marin County and statewide politics, including coastal development

24  restrictions. Defendants recently removed the entire project from the agenda of the Bay Coastal

25  Development Commission. (Galvan Decl. ¶ 8, Exh. 7.) Defendants have not demonstrated that

26  the project has the necessary approvals from various state boards and agencies to permit

27  construction to commence. Plaintiffs are not aware of any clear time line for the project to be

28  completed. Defendants must be required to demonstrate that this project will be completed by

[298396-5]

1    2013 or build the MHCB beds in a separate, stand alone project.

2        *Requested Action:  Order Defendants to activate an additional 12 Mental Health Crisis*

3    *Beds at San Quentin State Prison, in the projected Condemned Inmate Complex or elsewhere,*

4    *no later than June 30, 2013.*

5

6    **IV.    COMMENTS ON BED PLANNING ISSUES NOT ADDRESSED IN DEFENDANTS' SUBMISSIONS**

7

8        **A.    DMH Should Be Ordered to Operate Every ICF and Acute Bed Unit for Female and Male Class Members Whether Located in Prisons, in DMH Hospitals, or in the Receiver's Consolidated Care Centers**

9

10        Defendants' plan omits any mention as to whether DMH or the CDCR will run the mental

11    health units at the Receiver's facilities.  While CDCR in this and the *Plata* lawsuit launched a

12    war against the Receiver's facilities, it was CDCR that initially proposed the concept of building

13    "Consolidated Care Centers" to meet the mental health bed shortage.  (Docket No. 2091 at 4-5

14    (Defendants' December 2006 Bed Plan).)  Defendants' proposal also included a plan to shift

15    responsibility for all ICF and acute bed units away from DMH to CDCR.  Plaintiffs objected to

16    CDCR operating the inpatient mental health programs and Defendants abandoned the plan by the

17    time they filed their July 2008 bed plan.  (Pls.' Exh. P-477 at 2 (stating that DMH and the CDCR

18    agreed that DMH would continue to provide "all inpatient acute and intermediate mental health

19    services instead of transferring responsibilities to provide those services to the CDCR.").)

20        Defendants' May 26, 2009 Bed Plan does not affirm that DMH will operate the

21    short/intermediate-term or the long-range ICF and acute units in either the existing prisons or in

22    the Receiver's two "Consolidated Care Centers."**[9]**

23        *Requested Action:  Plaintiffs respectfully request an order requiring that the DMH*

24    *Defendants operate all female and male acute and ICF units located in the prisons, in outside*

25    *DMH hospitals, and in the Receiver's two "Consolidated Care Centers," and specifying that*

26

27    _____

28    **[9]** DMH also operates mental health crisis beds in the S-2 unit at CMF.  Plaintiffs would oppose any attempt by Defendants to transfer responsibility for this unit to the CDCR.

[298396-5]

1    *the CDCR shall not operate any ICF or acute units in the absence of a Court order.*

2

3    **B.      The Court Should Order Special Master Supervision Over the Activation
              Plan, As Well as the Short, Intermediate, and Long Term Projects**

4

5    The past 60 days has demonstrated the necessity and value of Special Master involvement

6    in the bed planning process.  The long history of ineffective bed planning, characterized by

7    endless internecine squabbling among state agencies, demonstrates the necessity of continued

8    Special Master supervision over the process.

9    *Requested Action:  The Court should direct the Special Master or his designees to*

10   *continue meeting with the responsible parties identified in the bed plan filings, and to*

11   *designate an expert to supervise planning and implementation of the projects identified on the*

12   *activation schedule and the short, intermediate and long-term plans.  The Governor's Office,*

13   *the Department of Finance, DMH, as well as CDCR shall all participate in the process, as well*

14   *as representatives of the Controller and Treasurer.*

15

16   **C.      The Court Should Direct Changes in On-Going Bed Planning**

17   It is undisputed in this case that accurate planning to meet projected mental health need, is

18   a critical part of the remedial effort to establish a constitutional mental health care system.

19   Accordingly, the Court has ordered two needs assessments to revise Defendants' projections in

20   the past five years.  The first clearly showed hundreds of patients with unidentified treatment

21   needs in 2004.  Although the 2009 assessment is not final, the assessment team preliminarily

22   identified hundreds of EOP inmates that team members agree require inpatient care, and should

23   therefore be referred immediately.  Many of those patients are lower custody inmates who

24   qualify for placement at Atascadero State Hospital and Coalinga State Hospital (Galvan Decl.

25   ¶ 9, Exh. 8).  Plaintiffs have no reason to doubt that many more patients will be identified as the

26   team continues the second phase of the assessment at additional prisons, and that the full results,

27   once compiled, may even exceed the unmet need identified during the 2004 "Unidentified Needs

28

[298396-5]

1  Assessment."

2  *Requested Actions:  (1)  The Navigant contract should be extended for an additional*

3  *five years; (2) When Navigant issues its fall mental health bed plan projection report, which*

4  *should be required by November 1, 2009, it should incorporate all Unidentified Needs*

5  *Assessment data from Phases I, II, and whatever portion of Phase III is completed at that*

6  *time; (3) The Needs assessments of the type currently in process, pursuant to the March 31,*

7  *2009 Order, should be conducted regularly and incorporated in the Navigant bed planning*

8  *process; (4) the Navigant process should be open to review by the Special Master, with bed*

9  *planning forecasts promptly served on the Special Master and Plaintiffs' counsel when*

10  *completed.*

11

12  **D.    At All Levels Of Care, Temporary Stop Gap Beds Must Eventually Be
        Replaced With Appropriate Beds That Meet The Standards For Licensing**

13

14  It is presently unavoidable that Defendants' Bed Plan relies on temporary, emergency

15  projects that do not meet licensing standards for MHCBs or for ICF and APP beds.  These

16  projects include the temporary MHCBs at SAC, the SVSP C5/C6 ICF beds, and the P-1 and P-2

17  acute wing conversions, which will result in an additional 20 MHCBs, 116 ICFs, and 68 acute

18  beds.  (Docket No. 3592 at 12-15.)  The creation of temporary MHCBs at SAC requires no

19  additional construction or conversion in the existing MH-OHU, which is located inside a housing

20  unit; the proposal addresses staffing augmentation only.  The creation of the 116 high custody

21  ICF beds at SVSP requires staffing, program flexes and modification of the physical plant.  The

22  creation of acute beds in P-1 and P-2 will require staffing, program flexes and physical plant

23  retrofits, including the replacement of the suicide-risk screens in P-2.  (*Id.*)

24  As in the past, Plaintiffs have little choice but to support the licensing waivers and

25  program flexes.  The long-term plan, however, should require the closure of all of these

26  emergency programs, as well as previously authorized emergency programs (CMC LOU, CIM

27  MHCB, SVSP D-5 and D-6, etc.), and their replacement with appropriately licensed facilities

28

---
43

[298396-5]

1    that meet health and safety standards and include appropriate treatment and office space.

2          *Requested Action:  The Court should order Defendants to begin work immediately with*

3    *the Special Master on the steps necessary to bring all long-term beds into compliance with*

4    *licensing and program standards without waivers.*

5

6    **E.     At All Levels Of Care, Defendants Must Quickly Begin To Acquire**
           **Appropriate Staffing—Not Based On The Existing Defective Workload**

7          **Study—And Must Prepare Adequate Training Programs**

8          Defendants acknowledge the need to implement an accurate workload staffing allocation

9    model in their May 26, 2009 Bed Plan Proposal and promise a completion date for their revised

10   workload study model of August 2009.  (Docket No. 3592 at 8.)  Furthermore, Defendants state

11   that DMH has already undertaken the necessary steps to obtain clinical resources and other funds

12   from the Legislature for their projects.  (*Id.*)  Defendants make no such claims about CDCR's

13   efforts to obtain necessary clinical resources and funding for the bed projects for which CDCR

14   has responsibility, including the short-term, intermediate EOP and MHCB projects.  In fact, the

15   August 2009 date proposed for the revision of their workload study is after the current budget

16   process, and may delay a request for another year.

17

18   1.     **Immediate Action is Needed By Defendants to Fund Proper Staffing**
             **Levels In The Current Budget Process**

19

20

21         On July 28, 2006, Defendants were ordered to complete a workload study in time to

22   include its findings and recommendations in the FY 2007/08 budget.  (Docket No. 1992 at 3:23-

23   24.)  Defendants failed to comply with the order by performing the study, but not requesting any

24   new positions in the 2007/2008 budget.  On July 12, 2008, the Defendants were provided with

25   the Special Master's review of their workload study.  (Kahn Decl. ¶ 8, Exh. H (Pls' Exh. P-

26   485).)  The Special Master identified a series of concerns and recommendations that Defendants

27   should address "in order to avoid any underestimation of actual staffing needs."  (*Id.* at 1.)

28   Among the concerns raised by the Special Master were the omission of key tasks when

44

[298396-5]

1    determining staffing workloads (including, but not limited to, reviewing central files, emergency

2    clinical contacts, more frequent clinical contacts than the minimum), the omission of new

3    programs (including, the RC EOP and the Exhibitionism treatment program) and faulty key

4    assumptions (including, the assumption that only 30 percent of the CCCMS population were

5    taking medication.  (*Id.* at 8-10.)   The Special Master recommended that Defendants engage in

6    a review of the workload model and correct the faulty assumptions.  (*Id.* at 12.)

7    While Defendants did not submit a staffing Budget Change Proposal (BCP) in the FY

8    2007/2008 Budget, they did submit a BCP requesting 407.7 positions the following year, using

9    the workload study model that was later found to underestimate demand.  (Kahn Decl. ¶ 9, Exh. I

10   at 1, 5 (Pls' Exh. P-183).).  Although the Legislature approved these positions, no funds were

11   allocated because the savings from the existing clinical vacancies could fund these positions.  In

12   the current budget process, Defendants do not appear to have requested funding for these

13   previously approved positions.  (Kahn Decl. ¶ 10, Exh. J.)   This is quite shocking in light of the

14   Court's Order requiring Defendants to develop short-term and intermediate beds to meet the

15   current bed need of the *Coleman* class, which will result in the creation of hundreds of additional

16   mental health beds that will require significant staffing immediately.  In addition, there remains

17   the Court's previous order that Defendants seek funding for the workload study positions.

18   Although the revised workload study is likely to assess a greater staffing allocation, Defendants

19   must move forward immediately to seek funding for the previously approved 407.7 positions.

20   ***Requested Action:  Plaintiffs request that the Court order Defendants to complete their***

21   ***workload study correction by August 2009, and prepare and submit an emergency BCP or***

22   ***Augmentation request for the current budget year for the positions identified in the workload***

23   ***study and for any additional staff positions required by Defendants' May 26, 2009 Bed Plan.***

24

25        **2.    Siting The Plans In Troubled Prisons And Trying To Compensate With**
           **Training Is Risky, And If Allowable At All, Needs Better Training Than**
26          **What Is Shown Here**

27   Defendants' May 26, 2009 Bed Plan sites some of the short-term, intermediate beds in

28

[298396-5]

1   prisons in which staff misconduct has existed historically,[10] and Defendants propose to provide a

2   specialized training to staff to address these concerns, utilizing the training module "Plan to

3   Address the Overall Dysfunction in Custody/Mental Health Relations at SVSP" ("SVSP Training

4   Plan"), which is attached to their plan as Exhibit 2.  (Docket No. 3592 at 6-7 & Exh. 2.)   The

5   SVSP Training Plan was developed in response to the Court's October 7, 2008 Order that

6   Defendants address the "overall dysfunction in custody/mental health relations at Salinas Valley

7   State Prison."  (Docket No. 3072.)  The SVSP Training Plan has not been approved by the

8   Special Master.

9          Defendants' Bed Plan also includes a second training module developed by DMH staff,

10  the DMH Therapeutic Strategies and Interventions training (TSI), which was developed as part

11  of the Recovery Model implemented in the state hospitals and psychiatric programs, and which

12  Defendants propose to provide to all of the DMH staff at Salinas Valley State Prison working in

13  D5/D6 and the new C5/C6.  (Docket No. 3592 at 13 & Exh. 5.)  This training program is

14  described as focusing on "understanding the clinical issues of the patient and de-escalation

15  techniques to utilize during a behavioral episode."  (*Id.*)  These two training modules are not

16  comparable.  The CDCR training program is clearly inadequate.  Among other things, it is

17  riddled with counterproductive statements to the effect that training is not really needed but that

18  the Department is just going through the motions to satisfy the Court.  (*See, e.g.*, Docket No.

19  3592 at 32 (citing "Coleman court expert perception" as the reason for the training).)  The DMH

20  training modules are better matched to the need.

21  _____

22  [10] Defendants' Plan proposes adding beds at Corcoran State Prison, a prison where the Special
    Master reported that the rate of use of force incidents involving mentally ill prisoners is higher

23  than those involving non-caseload inmates.  (18th Round Report (Docket No. 2334) at 177.)  By
    the next round of monitoring, the Special Master reported that, "the overall increase in the rate of

24  use of force once again illustrates the need for continued vigilance in this area at CSP/Corcoran."
    (19th Round Report (Docket No. 2895-2) at 47.)  At SVSP, the Special Master described a

25  "pervasive and disturbing pattern of custodial dysfunction was apparent at SVSP" (20th Round

26  Report (Docket No. 3029-5) at 188), and at Lancaster State Prison, the Special Master reported
    that even after joint training to correctional and mental health staff, "EOP inmates continued to

27  complain about treatment by third watch officers." (19th Round Report (Docket No. 2895-3) at

28  89.)

[298396-5]

1  ***Requested Action:  Plaintiffs request that Defendants be ordered to provide the DMH***

2  ***TSI training to CDCR and DMH staff in all of the EOP (EOP-GP, EOP-ASU and PSU) , ICF***

3  ***and APP programs to come on line as part of their May 26, 2009 Bed Plan.***

4

5  **CONCLUSION**

6  In light of the foregoing, Plaintiffs respectfully request that the Court approve the

7  Activation Schedules and May 26, 2009 Bed Plan, with the exceptions and additional steps set

8  forth in the accompanying Proposed Order.

9

10  Dated:  June 9, 2009                                    Respectfully submitted,

11                                                          ROSEN, BIEN & GALVAN, LLP

12                                                          By: */s/ Ernest Galvan*

13                                                              Ernest Galvan
                                                                Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' COMMENTS ON BED PLANS AND ACTIVATION SCHEDULES - CASE NO. CIV S 90-0520 LKK-JFM

[298396-5]