1  EDMUND G. BROWN JR.
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  DEBBIE J. VOROUS, State Bar No. 166884
   JEFFREY STEELE, State Bar No. 124668
4  Deputy Attorneys General
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone:  (916) 324-5345
    Fax:  (916) 324-5205
7   E-mail:  Debbie.Vorous@doj.ca.gov

8  Attorneys for Defendants

9                       IN THE UNITED STATES DISTRICT COURT

10                    FOR THE EASTERN DISTRICT OF CALIFORNIA

11                                SACRAMENTO DIVISION

13  **RALPH COLEMAN, et al.,**          2:90-cv-00520 LKK JFM P

14                         Plaintiffs,  **DEFENDANTS' RESPONSES TO PLAINTIFF'S COMMENTS CONCERNING DEFENDANTS' MAY 26, 2009 ACTIVATION SCHEDULES AND PROPOSALS TO MEET THE REMAINING BED NEEDS OF THE PLAINTIFF CLASS**
15        v.

17  **ARNOLD SCHWARZENEGGER, et al.,**

                           Defendants.

| Acronym List | |
|---|---|
| **Term** | **Definition** |
| AB | Assembly Bill |
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CDCR | California Department of Corrections and Rehabilitation |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CTC | Correctional Treatment Center |
| COR | California State Prison, Corcoran |
| DMH | Department of Mental Health |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| ICF | Intermediate Care Facility |
| LAC | California State Prison, Los Angeles County |
| MHCB | Mental Health Crisis Bed |
| PSU | Psychiatric Services Unit |
| SAC | California State Prison, Sacramento |
| SATF | Substance Abuse Treatment Facility |
| SOL | California State Prison, Solano |
| SQ | California State Prison, San Quentin |
| SVPs | Sexually Violent Predators |
| SVSP | Salinas Valley State Prison |
| TIPS | Taxpayers for Improving Public Safety v. Schwarzenegger |

**INTRODUCTION**

On May 26, 2009, Defendants submitted detailed activation schedules for completion of all of the court-ordered construction projects (Docket No. 3591) and a proposal to meet the remaining short-term, intermediate, and long-range bed needs of the Plaintiff class. (Docket No. 3592.) On June 9, 2009, Plaintiffs filed extensive comments to Defendants' schedules and proposal. (Docket No. 3609.) In their comments, Plaintiffs improperly accuse Defendants of stalling the court-ordered projects and erroneously assert that Defendants did not comply with this Court's March 31, 2009 Order concerning their short-term and intermediate-term proposals. Hence, Defendants submit this response in order to respond to Plaintiffs' inaccurate statements, to go on record as not waiving the right to address additional inaccuracies in the future, and to provide additional information about Defendants' proposals.[1]

**DEFENDANTS' RESPONSES**

**I.  THE COURT SHOULD APPROVE DEFENDANTS' ACTIVATION SCHEDULES BECAUSE THEY COMPLY WITH THIS COURT'S MARCH 31, 2009 ORDER**

On March 31, 2009, this Court ordered that Defendants submit detailed activation schedules for all of the court-ordered construction projects. (Docket No. 3556, p. 5:8-15.) The Court further ordered that the *Coleman* Special Master approve the schedules prior to filing. (*Id.*) Accordingly, after the Special Master approved Defendants' detailed schedules (Ex. 3), they submitted them to this Court for approval. (Docket No. 3591.)

Plaintiffs do not contend that Defendants failed to file detailed activation schedules. Instead, Plaintiffs discredit Defendants' progress and allege that Defendants and the Attorney General's Office have stalled funding for the AB 900 projects. Plaintiffs further ask the Court to

---

[1] In addition, Defendants discovered two incorrect statutory references in the Capital Outlay Process (Narrative) attached to Defendants' activation schedules as Exhibit 15 (Docket No. 3591, pp. 50-59) and an incorrect total for net capacity in the Spreadsheet, Long-Term Bed Plan, attached to Defendants' final proposal as Exhibit 9. (Docket No. 3592-4, p. 31.) Attached as Exhibits 1 and 2, are replacements for Exhibit 15 and 9, respectively.

1

expedite the scheduled completion date for four projects. But Defendants have made significant progress and neither they nor the Attorney General's Office have stalled AB 900 funding. Moreover, Plaintiffs' expedited dates are unattainable.

### A. Defendants Have Made Significant Progress in Moving the Court-Ordered Projects Forward.

A review of Defendants' activation schedules show that they have made significant progress in moving the court-ordered projects forward. For instance, the California Department of Corrections and Rehabilitation (CDCR) is scheduled to complete the Small Management Yards this month. (Docket No. 3591, pp. 19-20.) Defendants are currently phasing in occupancy of the Salinas Valley State Prison (SVSP) 64-bed Intermediate Care Facility (ICF) and on schedule to complete activation by July 10, 2009. (*Id.*, p. 13.) Construction of the treatment space in the SVSP D5/D6 buildings is underway and scheduled to be complete on July 20, 2009. (*Id.*, p. 16.) Construction commenced on the renovation of 124 cells at California Medical Facility (CMF) for suicide prevention on April 16, 2009, and that project is continuing. (*Id.*, p. 15.)

Working drawings for the California Institute for Women (CIW) 20-bed Psychiatric Service Unit (PSU) are scheduled to be complete in October 2009, and construction funding is included in the 2009/2010 Budget Act. (Docket No. 3591, p. 47.) Working drawings for the California State Prison, Sacramento (SAC), Enhanced Outpatient Program (EOP) Treatment and Office Space project, are funded in the 2009/2010 Budget Act and scheduled to be complete in December 2009. (*Id.*, p. 31.)

On April 15, 2009, the Pooled Money Investment Board approved a loan for the initial design phase of the California Men's Colony (CMC) 50-bed Mental Health Crisis Bed (MHCB) project, which is currently in the preliminary plan phase. (Docket No. 3591, pp. 9-10.) The CIW 45-bed ICF and California State Prison, Los Angeles (LAC), Treatment Space for EOP projects are on the Pooled Money Investment Board Agenda for June 17, 2009, and July 15, 2009,

2

Defs.' Responses to Pls.' Comments  (2:90-cv-00520 LKK JFM P)

respectively.  (*Id.*, pp. 34, 43.)

On May 20, 2009, the Pooled Money Investment Board denied Defendants' loan request for two CMF projects: 1)  Treatment Space for Enhanced Outpatient Administrative Segregation Unit (EOP ASU); and 2) 64-bed ICF for High Custody Inmates.  (Docket No. 3591, pp. 22, 28.)  Nonetheless, Defendants successfully secured alternative interim funding for the preliminary plan phase of the Treatment Space project and working drawings phase of the 64-bed ICF project.  (Ex. 4.)

Defendants also took steps to move the SVSP 72-bed EOP ASU and Treatment Space for General Population EOP projects forward.  CDCR is in the preliminary plan phase of the Treatment Space project.  (Docket No. 3591, p. 40.)  And in May 2009, the Department of Finance, on behalf of CDCR, submitted a request to the Joint Legislative Budget Committee for establishment of the 72-bed EOP ASU project.  (*Id.*, p. 37.)  Joint Legislative Budget Committee approval of this AB 900 project is a prerequisite to submitting this project to the Pooled Money Investment Board.  On June 11, 2009, however, the Joint Legislative Budget Committee denied this project.  (Ex. 5.)  And because completion of the 72-bed EOP ASU project is a prerequisite to activating the Treatment Space project, that project will be impacted as well.  (*Id.*, p. 40.)  Defendants are evaluating their options for these projects in light of the Committee's recent decision.

**B.  Neither the Attorney General's Office nor the Department of Finance "Stalled" AB 900 Funding.**

Plaintiffs contend that the Attorney General's Office and the Department of Finance stalled the AB 900 funding for two CMF projects; that is, the CMF Treatment Space for EOP ASU and the 64-bed ICF for High Custody Inmates, and imply that they will stall funding for the SVSP 72-bed EOP ASU and CIW 45-bed ICF projects set for hearing on June 17, 2009.  (Docket No. 3609, p. 10: 5-27.)  But Plaintiffs mischaracterize the reason that the Pooled Money

3

Investment Board declined to approve the loans for the CMF projects, which is because of the pending *Taxpayers for Improving Public Safety v. Schwarzenegger* (TIPS) lawsuit. TIPS challenges the Public Safety and Offender Rehabilitation Services Act (AB 900), which authorizes the State Public Works Board to issue lease-revenue bonds for the construction and renovation of correctional facilities. (Docket No. 3606, pp. 2-4, 6-18.) The California Court of Appeal ruled in the State's favor, but on May 4, 2009, TIPS filed a petition for review in the California Supreme Court. There has not been resolution on that petition.

In response to Plaintiffs' inaccurate allegations, first, any request for a bond opinion from the Attorney General's Office is premature as the opinion is only delivered when the bonds are issued, which is once the facility is at or near completion. Moreover, the pending TIPS lawsuit prevents the Attorney General's Office from giving an unqualified bond opinion on the validity of any AB 900 bonds until that decision is final and in the state's favor that AB 900 is not facially invalid.[2] In addition, the Director of Finance has moved for, argued for, and voted for providing loans for all the *Coleman* projects that have come before the Pooled Money Investment Board. The decisions of the two other members of the Board cannot be reasonably seen as the Department of Finance "stalling" these projects.

### C. The Court Should not Order Defendants to Expedite the Court-Ordered Projects.

Plaintiffs ask the Court to order that Defendants accelerate the activation date for four court-ordered projects: CMC 50-bed MHCB (July 2011 versus an August 9, 2012, planned start

---

[2] Generally speaking, a bond opinion is unqualified if counsel is "firmly convinced (also characterized as having a 'high degree of confidence') that, under the law in effect on the date of the opinion, the highest court of the relevant jurisdiction, acting reasonably and properly briefed on the issues, would reach the legal conclusions stated in the opinion." Nat. Assoc. of Bonds Lawyers Comm. On Opinions and Documents, Model Bond Opinion Report (February 2003); *see also Weiss v. Securities and Exhange Comm.,* 468 F.3d 849 (D.C. Cir. 2006) (standards published by the National Association of Bond Lawyers could be presumed by bond purchasers to apply to bond opinions).

4

Defs.' Responses to Pls.' Comments  (2:90-cv-00520 LKK JFM P)

1  date); CMF Treatment and Office Space for EOP ASU (December 31, 2010, versus a February
2  19, 2013, planned start date); LAC Treatment Space for EOP (December 31, 2010, versus a July
3  9, 2012, planned start date); and SVSP EOP Treatment and Office Space (December 31, 2010,
4  versus a February 11, 2013, planned start date). (Docket No. 3609, pp. 18:26-19:1, 20:21-22,
5  23:3-4, 23:14-15; *c.f.* Docket No. 3591, pp. 9, 22, 34, 40.) Plaintiffs also request that the Court
6  set a deadline of December 31, 2009, for completing the CMF cell renovation project, which
7  deadline is currently set for March 25, 2011. (*Id.*, p. 21:20-21; *c.f. id.*, p. 25.)
8  
9  Plaintiffs suggest that the Court should accelerate the CMC 50-bed MHCB project by a
10 year because "Defendants have not demonstrated that they have exhausted alternative
11 procurement processes of the type being used by the Receiver at San Quentin and Avenal … or
12 that they have explored a faster construction timeline after procurement is complete." (Docket
13 No. 3609, p. 18:22-25.) But Plaintiffs do not offer any authority for the broad proposition that
14 Defendants could utilize the procurement process used by the Receiver at San Quentin and
15 Avenal. And Plaintiffs incorrectly argue that Defendants have not explored options to accelerate
16 the project. As reflected by the updated schedule filed on May 26, 2009, Defendants have
17 accelerated the project by an aggressive six months. (Docket No. 3591, p. 9, *c.f.*, Docket No.
18 3568, p. 5.) Additionally, the schedule that Plaintiffs propose is not reasonably attainable under
19 the traditional process governed by the State Contract Act (Cal. Pub. Contract Code § 10100 et
20 al.) or alternative project delivery methods such as design build (Cal. Gov. Code § 14661.1).
21 Similarly, Plaintiffs' requests to accelerate the CMF Treatment and Office Space for EOP
22 ASU, LAC Treatment Space for EOP, and the SVSP Treatment Space for EOP projects to
23 December 31, 2010, are not reasonably attainable under traditional or alternative project delivery
24 methods. Plaintiffs also contend that the schedule for the CMF Cell renovation project is too
25 long. The March 25, 2011, schedule is based on 4 cells under modification at a time limited by

5

available swing space determined in a discussion with the *Coleman* Special Master. The Special Master approved the plan to modify the S1 and S2 facilities on December 17, 2008.

## II. DEFENDANTS, IN CONSULTATION WITH THE *COLEMAN* SPECIAL MASTER AND THE *PLATA* RECEIVER, SUBMITTED CONCRETE SHORT-TERM AND INTERMEDIATE-TERM PROPOSALS, WHICH THIS COURT SHOULD APPROVE

On March 31, 2009, this Court ordered that Defendants meet with the *Coleman* Special Master and the *Plata* Receiver to develop concrete proposals to meet the remaining short-term, intermediate, and long-range bed needs of the Plaintiff class. (Docket No. 3556, p. 5.) Accordingly, Defendants met with the *Coleman* Special Master and the *Plata* Receiver and developed fifteen short-term and intermediate-term proposals to meet the bed needs of the Plaintiff class members. (Docket No. 3592.)

Plaintiffs allege that Defendants did not comply with the Court's Order for the following reasons: 1) they did not identify specific funding sources for each project, including funding proper staffing levels (Docket No. 3609, pp. 26:12-27:10, 51:6-52:23 ); 2) they utilized Navigant Consulting's Fall 2008 Population Projections for Fiscal Year 2008/09 (*Id.*, pp. 27:12-28:28); 3) they relied on the Reception Center EOP (*Id.*, pp. 29:1-30:4, 32:1-33:15); 4) they did not address the use of Coalinga State Hospital to house EOP inmates (*id.*, pp. 30:5-31:27); and 5) they did not address the PSU gap (*id.*, pp. 33:17-35:23). But as shown below, Plaintiffs are incorrect—Defendants did comply with this Court's Order and developed concrete proposals.

### A. Defendants have Considered Funding for the Short-Term and Intermediate-Term Proposal, including Staffing.

Defendants are committed to implementing the short-term and intermediate-term proposals as outlined in their May 26, 2009 Bed Plan. Defendants submitted a Budget Change Proposal to the Legislature requesting additional funding for clinical staff for the Department of Mental Health to support the proposed inpatient beds. (*See* Docket No. 3592, p. 8.) The Joint

6

Legislative Conference Committee on the Budget approved this request for resources on June 15, 2009, and now the request will move to the floor of both houses to be voted on. As for resources to support the CDCR outpatient programs, implementation of the proposals that Defendants submitted do not drive a need for additional position authority or funding, as the Budget Act of 2009 (Chapter 1, Statutes of 2009) appropriates resources to support all of CDCR's mental health outpatient populations. (*Id.*)

Plaintiffs are incorrect that additional funding is immediately required to support the 407.7 positions identified in the workload study. The current level of vacancies in the mental health program generates sufficient salary savings to enable CDCR to begin filling the 407.7 new positions. CDCR is currently working with the Special Master to finalize a revised model for the mental health staffing workload study that will be completed in August 2009.

### B. Defendants Reasonably Relied on the Navigant Consulting Fall 2008 Population Projections for Fiscal Year 2008/09 as the Appropriate Benchmark for Developing Emergency Measures to meet the Immediate Bed Needs of the Plaintiff Class Members.

As Plaintiffs correctly note, the need for mental health beds is not static. For that reason, Defendants identified a point in time in which to aim. Defendants, in meetings with the *Coleman* Special Master, identified the Navigant Consulting Fall 2008 Population Projections for Fiscal Year 2008/09 as the appropriate point in time to use in developing their short-term and intermediate-term measures to meet the bed needs of the plaintiff class members.

Consistent with those projections, Defendants expect to complete nine of the fifteen projects prior to end of 2009 and anticipate completing another two projects between December 2009 and June 2010. (*See* 150 EOP Special Need Yard Beds at the Substance Abuse Treatment Facility (SATF) [November 2009–December 2009]; 45 EOP ASU Beds at Corcoran (COR) [September 2009]; 27 EOP ASU Beds at SVSP [October 2009–November 2009]; 20 Temporary MHCBs at SAC [November 2009–December 2009]; 4 ICF high custody beds in D-5/D-6 at

7

SVSP [Completed May 2009]; Convert one 10-bed wing in SVSP TC1 to double cells for ICF high custody [October 2009–December 2009]; Convert DTP at CMF to low custody ICF [June 2009 for new admissions and September 2009 for remaining population]; Convert the 25 Atascadero State Hospital (ASH) Acute Psychiatric Program beds to low custody ICF beds [June 2009]; 32 CMF P2 wing conversion [June 2009]; Dual Diagnosis Treatment Program at SATF [December 2009–June 2010]; and Increase Staffing for Additional 20 EOP-ASU Beds at LAC [December 2009–March 2010].) (Docket No. 3592, pp. 7-15.)

Although Defendants do not expect to be able to complete the remaining four projects in 2009, it is an unfair bench post to now argue that Defendants should have used the 2010 numbers in order to increase the unmet bed need with respect to all the projects. To adopt Plaintiffs' argument would be to sanction a constant moving target, one that Defendants will never be able to reach. (*See* MHCBs in SQ CTC [January 2010]; Transfer CMF P1 wing from CMF to SVSP and convert to acute [January 2010]; New EOP Level III/IV Beds at Solano State Prison (SOL) [CDCR will begin transition within 12 months and fully activation with 18 months]; Convert two buildings of SVSP C yard to ICF-H [Within 12 months].). (Docket No. 3592, pp. 7–15.)

**C. Defendants Do Not Propose to Meet the Unmet EOP Need Through Reception Centers.**

Defendants do not propose to meet the unmet EOP need through the Reception Center EOP program, as Plaintiffs allege. (Docket No. 3609, p. 29:4-6.) Defendants note in their May 26, 2009 Bed Plan that the figure for the unmet need includes a sizeable number of Reception Center EOP inmates who will be incarcerated for only a short term (less than five months), and not endorsed to a mainline EOP but will be paroled directly from the Reception Center. (Docket No. 3592, p. 9.) Although these inmates receive Court-ordered mental health services, Defendants recognize in their May 26, 2009 Bed Plan the need for an additional 733 EOP beds as "New Planned Capacity." (Docket No. 3592, pp. 18-20.)

8

Plaintiffs nonetheless use this filing as a vehicle in which to ask the Court to order that Defendants revise the court-ordered Reception Center EOP, change the means by which Defendants house EOP inmates in Reception Centers, and implement a program that provides significant pre-release planning services with a focus on short-term parole violators. (Docket No. 3609, pp. 29:1-30:4, 32:1-33:15.) Defendants respectfully ask that, to the extent the Court desires that Defendants address Plaintiffs' requests, that they first have an opportunity to consult with the Special Master and, if necessary, present additional briefing to this Court, supplemented by affidavits, that fully addresses the clinical aspect of the Reception Center EOP, how Defendants currently house EOP inmates in the Reception Centers, and the agreements and programs that Defendants currently have in place concerning pre-release planning services.

**D. Coalinga State Hospital is Not a Feasible Option to Meet the Immediate Bed Needs of the Plaintiff Class Members.**

Plaintiffs state that Defendants have "inexplicably refused to consider Coalinga's empty beds as a solution" to house EOP inmates and that the "bed plan lacks any sign that Defendants considered Coalinga as an emergency, interim placement for *Coleman* class members." (Docket No. 3609, pp. 30:15-17, 31:2-4.) That is not accurate. Defendants clearly state that they considered Coalinga, but did not consider expansion at the hospital a viable option. (*See* Docket no. 3592, p. 12 n.13.)

Placing CDCR inmates at the same institution as civilly-committed Sexually Violent Predators (SVPs) is not conducive for staff and patient safety. SVPs are often victimized by CDCR inmates while in the same facility. These conflicts place staff at risk as well. Coalinga currently has over 800 patients committed as SVPs, and 50 *Coleman* class patients. With the 50 *Coleman* patients currently housed at Coalinga, the hospital has to function as two hospitals within one setting. Because these two populations cannot co-mingle, the 800+ SVPs must be returned to their units in order for the 50 *Coleman* patients to have access to the dining room,

9

canteen, mail, vocational, rehabilitation and other off-unit treatment facilities and services. Adding the EOP program to Coalinga would require that a section of the hospital be walled off to segregate the 50 *Coleman* ICF patients and SVP patients from the EOP patients. This would be necessary because EOP patients are higher functioning than ICF patients. For these reasons, the EOP beds would have to be self-contained, and deactivated within two years because of the projected increased of SVP admissions. Based on the retrofits necessary to wall off the EOP program, the cost of renovation of the facility for this short time frame would make this option infeasible.

Plaintiffs point out that Coalinga has a 0% staff vacancy rate. This rate is based on only 825 beds currently activated. This does not mean that the Defendants could increase staffing to accommodate a larger number of *Coleman* class inmate-patients. Because of Coalinga's remote location, it is difficult to recruit staff. Plaintiffs also state that in "January 2007, the DMH Defendants stopped admitting Coleman class members into ASH without notifying either the Special Master or the Court. . . " (Docket No. 3609, p. 42.) This is incorrect. Defendants notified the Special Master of the restrictions on admissions at that time and notified the Court of the restrictions on January 30, 2007. (Docket No. 2121.)

### E. Defendants were Unable to Develop any Short-term or Intermediate-term Solution for the PSU Population Gap.

The identified shortage of PSU and EOP-ASU beds is documented in Defendants' May 26, 2009 Bed Plan. Defendants, however, were unsuccessful in indentifying a short-term or intermediate-term proposal to fill the projected need for PSU beds. (Docket No. 3592, p. 11.) CDCR will review the EOP inmates in the PSUs or ASUs to ensure they continue to require segregated housing based on current departmental policy.

///

///

10

Defs.' Responses to Pls.' Comments (2:90-cv-00520 LKK JFM P)

### III. THIS COURT SHOULD APPROVE DEFENDANTS' SHORT-TERM AND INTERMEDIATE-TERM PROPOSALS

Plaintiffs raise six concerns with Defendants' proposed short-term and intermediate-term projects, none of which weigh against approving them.

First, Plaintiffs urge the Court to order that Defendants complete seven of the projects within the following time frames: Dual Diagnosis Treatment Program at SATF [270 days: Defendants' estimate is 180-365 days]; 150 EOP Special Need Yard Beds at SATF [5 months; Defendants estimate is 150-180 days]; 150 EOP Level III/IV Beds at SOL [12 months; Defendants estimate is 12 to 18 months]; 27 EOP ASU Beds at SVSP [120 days; Defendants estimate is 120-150 days]; Increase Staffing for Additional 20 EOP-ASU Beds at LAC [180 days; Defendants estimate is 180-270 days]; and 20 Temporary MHCBs at SAC [150 days; Defendants estimate is 150-180 days]; and 32-bed CMF P-1 Conversion to Acute [4 months; Defendants estimate is 9 months]. (Docket No. 3609, pp. 37:7-28, 38:5-15, 38:22-28, 39:5-40:1, 44:1-10.) Specific time lines are required for each project, and Plaintiffs' efforts to substitute their lay opinion for the professional opinions of CDCR facilities and program employees should be rejected.

Second, Plaintiffs make a request for a blanket exception to departmental regulations for *Coleman* class members concerning Defendants' proposal to create 10 more new ICF high custody beds at SVSP through a pilot double bunk plan. (Docket No. 3609, p. 40:4-22.) Plaintiffs' request is inappropriate. There are court-approved processes in place for clinical review of the impact that mental health has on an inmate's actions resulting in disciplinary action. *Coleman* class members already receive additional scrutiny in the form of review of disciplinary action by clinical staff via form 115-MH Rules Violation Report: MH Assessment Request. It is unreasonable to attempt to remove the department's authority to manage the inmate population via departmentally approved means; that is, Rules Violation Reports.

11

Third, Plaintiffs indicate that they have no objection to converting the 44-Day Treatment Program (DTP) beds to ICF beds at CMF as long as Defendants reactivate the DTP by 2013. (Docket No. 3609, pp. 40:24-41:21.) This proposal would not eliminate beds but, rather, make the 44 DTP beds available to a wider range of *Coleman* class members. The rationale for converting the 44 DTP beds to ICF beds is to optimize their utilization when DTP referrals fall short of 44 beds. The clinical criteria for admission to DTP can be subsumed into the ICF level-of-care and treated appropriately. DTP has changed over the years as more programming has been developed and implemented. DTP has been used predominately by CMF even after significant training to all prisons on the DTP. While the criteria have been identified, DMH has staffed and operated the DTP as an ICF since the patients referred are the more chronic ICF type patients. This conversion will provide a high level of care and address the ICF needs.

Fourth, Plaintiffs oppose Defendants' proposal to convert the 25 ASH Acute beds to ICF beds. (Docket No. 3609, pp. 42-43.) Plaintiffs inaccurately characterize this proposal as a closure of beds for *Coleman* class inmate-patients. The total number of *Coleman* class beds at ASH would remain at 256. The addition of acute beds at CMF in P-1 and P-2 increases the number of *Coleman* acute beds from 25 to 68 for a net increase of 43 (not including the 130 acute beds that are currently operated at CMF). Further, the acute beds will be more fully utilized at CMF because they can accommodate inmate-patients who, for reasons of safety and security, might otherwise not be appropriate for admission to ASH.

Plaintiffs request that the Court order Defendants to continue to accept CDCR patients at ASH at the rate of 10 patients per week until all such eligible patients have been accommodated and without regard to the previous cap of 256. (Docket No. 3609, p. 43:19-22.) The Department of Mental Health is prepared to double the rate of admissions of *Coleman* class inmate-patients (currently 5 per week) at ASH until the full complement of 256 beds are occupied by patients of

12

the *Coleman* class. The Department of Mental Health, however, must maintain the cap of 256 beds for *Coleman* class inmate-patients because the abolition of this cap would require that ASH increase its total facility census. Due to the competing demand from other patients that the Department of Mental Health is statutorily required to admit (such as mentally disordered offenders and incompetents to stand trial) this would overburden an already stressed system. And for the reasons discussed above, transfer of non-*Coleman* class members to Coalinga to accommodate the increase in *Coleman* class members is not conducive as Coalinga has limited staffing resources.

Fifth, Plaintiffs request that Defendants explain why it will take an estimated nine months to complete the 32-bed CMF P-1 conversion (seven months to retrofit and two months to activate the beds once the retrofit is complete), and suggest that the Court order the project complete in four months. (Docket No. 3609, p. 44:9-10.) Seven months is responsible for physical plant modifications, including installation of a Fire Alarm System. A four month schedule may be attainable provided that the State Fire Marshall and the Court waive the need for a Fire Alarm System.

Last, Plaintiffs object to the training module that Defendants propose to use in connection with several short-term proposals, and request that the Court order Defendants to provide the DMH TS1 training module in all of the EOP, ICF and APP programs. (Docket No. 3609, pp. 37:14-16, 37:20-22, 38:7-9, 38:13-15.) CDCR is working with the *Coleman* Special Master to develop a training module to replace the module that Defendants presented as part of their proposed short-term and intermediate term proposals, which will come online as part of Defendants' May 26, 2009 Bed Plan. (See Docket No. 3592, pp. 26-55.) In addition, CDCR and DMH are in the process of reviewing the "Therapeutic Strategies and Interventions" training and considering using it for all custody and mental health staff who are assigned to EOP-GP, EOP-

13

1  ASU, PSU, ICF, MHCB, and acute programs.

2  **IV.    LONG-RANGE PLAN**

3      **A.    Time Line of Long-Range Plan**

Defendants addressed their long-term mental health bed plan in their May 26, 2009 filing. Defendants and the Receiver are still working out the details of a possible coordinated approach to providing an integrated health care delivery system, including financing and construction for two facilities, as described in the State's May 26, 2009 plan. Because Defendants' long-term plan is predicated on coordinating construction and financing with the Receiver, Plaintiffs' suggestion that Defendants should be ordered to activate two Correctional Health Care Facilities is premature and inappropriate.

    **B.    733 EOP Beds at Alternate Sites**

Plaintiffs allege that the Court should reject Defendants' proposal to add 733 EOP Beds at Alternative Sites because it is inadequate. (Docket No. 3609, p. 46:26-47:1.) According to CDCR, the location of these beds remains in development because the locations must be coordinated with the Receiver. Additionally, Defendants must liaison with the communities where the beds may be located given the sensitive nature of the population. Such liaison efforts will take time for Defendants to complete, but community outreach is important to ensure a smooth transition. In working with both the Receiver's office and communities, Defendants intend to identify and then design and construct the appropriate number of EOP beds to meet the remaining gap. Defendants are considering multiple sites, including but not limited to renovated Division of Juvenile Justice facilities, existing institutions that can be renovated, or new facilities.

**V.    COMMENTS NOT ADDRESSED BY DEFENDANTS' PLAN**

Plaintiffs make several requests to the Court that are not at issue in this preceding. Defendants have already addressed some the requests above as part of their responses to

14

Defs.' Responses to Pls.' Comments  (2:90-cv-00520 LKK JFM P)

Plaintiffs' comments on their May 26, 2009 Bed Plan, and now offer the following additional two comments.

### A. DMH and CDCR Intend to Work Together to Transfer all Mental Health Care to CDCR.

The Defendants' long-term plan is that CDCR take over all care needed by inmates, including inpatient care. CDCR intends to meet the requirements, as ordered by the Court, that the Joint Commission must accredit any ICF or Acute program. CDCR and DMH will work to together to develop a long-term plan for transitioning all services back to CDCR and will work collaboratively with the *Coleman* Special Master and Plaintiffs in this process.

### B. Defendants Already are Working with the *Coleman* Deputy Special Master Concerning the Unmet Needs Assessment Project.

Defendants are working with the *Coleman* Deputy Special Master to finalize the third phase of the unmet needs assessment project. (Docket No. 3606, p. 70.) In addition, Defendants are working with the *Coleman* Special Master to extend the project to the remaining CDCR institutions. (*Id.*, p. 71.) This Court should, therefore, resist Plaintiffs' suggestion that the Court order changes to the on-going bed planning, pending an opportunity for the Defendants and the Special Master to put this process in place. Moreover, Defendants have agreed to provide the data to Navigant Consulting at the end of the project. (*Id.*, p. 72.) Defendants recognize that the Navigant contract is ending at the end of the calendar year and are exploring contracting options to ensure that the data calculation needed to identify bed needs for the *Coleman* class is maintained.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court approve their activation schedules and final proposal to meet the remaining short-term, intermediate-term, and long-range bed needs of the Plaintiff class, with the exception that Defendants will continue

15

1 | working with the *Coleman* Special Master to submit a new training module.

3 | Dated: June 15, 2009                    Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General

/s/ Debbie J. Vorous

DEBBIE J. VOROUS
Deputy Attorney General
Attorneys for Defendants

CF1997CS0003
30775536.doc