EXHIBIT 1

Case 2:90-cv-00520-KJM-SCR    Document 3610-1    Filed 06/15/09    Page 2 of 8

**Capital Outlay Process—**

**California Department of Corrections and Rehabilitation Mental Health Projects**

**General**

- Capital Outlay is the acquisition or development of state owned real property.
    - Acquisition means obtaining, by purchase, gift, or other means, a fee or lesser interest in real property.
    - Development means any project that changes the function or capacity of a state asset:
        - Function: How something is used.
        - Capacity: How much the building holds.
    - Real property includes land and anything permanently attached, such as a building (anything moveable or not permanently attached is personal property).
- As a general matter, Capital Outlay Projects need both 1) Legislative authority and 2) Cash to proceed.
- Capital Outlay Projects require project-specific legislative authorization (usually as an appropriation in the Budget Act). Article IV, Section 12 of the California Constitution and Government Code Section 13308 specify the Legislative deadlines for the submission of the Governor's Budget and revisions to the Governor's Budget.
    - Exceptions:
        - Minor Capital Projects -- each project's total cost is less than $400,000. CDCR generally receives a few million dollars in each budget for minor capital projects ($3.8 million in the 2009 Budget Act).
        - "Section 6.00" capital outlay projects -- A department may redirect state operations budget for projects up to $100,000 without legislative notification, and up to $750,000 (as of 7/1/2009) with 30-day legislative notification. (Section 6.00 is a reference to the section of the annual Budget Act that includes these procedures.)
- All capital outlay projects that are not considered Minor Capital Projects and are not "Section 6.00" projects are considered "Major" Capital Outlay Projects, and they are subject to administrative oversight by the State Public Works Board.

**Capital Outlay Budget Process (General Fund)**

- CDCR prepares a Capital Outlay Budget Change Proposal (COBCP) and submits to Department of Finance for review.
    - Projects often will need to have a "budget package" prepared to refine scope and have a conceptual cost estimate prepared. This helps determine an adequate design budget.

1

- - Funding requests for projects are for project phases that can be initiated within the budget year.  Many projects will be funded over the course of three budget cycles, with funding for preliminary plans, working drawings, and then construction each being appropriated in separate Budget Acts.  Construction appropriations are typically made after substantial design work is completed to ensure the funds requested are reasonable and adequate.
- Department of Finance makes recommendations to the Governor's Office on which projects should be included in the Governor's Budget (or proposed as a revision to the Budget Bill through an April 1 Finance Letter or a May 1 Technical Finance Letter)
  - Governor's Budget is primary mechanism to propose new projects or continuing phases of previously funded projects.
  - April 1 Finance Letters may be used for emergency proposals for new projects or for adjustments to projects included in Governor's Budget.
  - May 1 Technical Finance Letters are used to make adjustments to costs for projects included in the Governor's Budget or for other technical actions, such as reappropriations or reversions of appropriations from previous years.
- The Governor's proposals are reviewed by budget subcommittees in the Assembly and Senate.
  - CDCR proposals are heard in Assembly Budget Subcommittee #4 and Senate Budget Subcommittee #4.
- Issues where the two houses take different action go to the Conference Committee for resolution.
- After the Conference Committee resolves the differences between the actions taken by the budget subcommittees, the resulting Budget Bill is submitted to both houses for a floor vote.
  - The Budget Bill requires a 2/3 vote in both houses for passage.
- Funding is available after the Governor signs the Budget Bill into law.
  - Fiscal year begins July 1.  Budget should be, but often is not, enacted on or before this date.

**Public Works Board (PWB)**

- The PWB is comprised of three board members, the Department of Finance (Chair), the Department of General Services, and the Department of Transportation.  The Department of Finance's capital outlay staff serve as staff to the PWB.
- The PWB assures that projects are within legislatively approved scope and cost at certain project points.
- Steps in the major capital outlay process (all funding sources):
  - PWB and Finance approves preliminary plans.

2

- For CDCR managed projects, Penal Code 7003 requires CDCR to submit a description of the preliminary plans to the Joint Legislative Budget Committee (JLBC) 45 days prior to PWB approval. Lack of legislative action constitutes approval. The CDCR will request PWB approval of preliminary plans to coincide with the expiration of this 45-day period.
- Prior to approval of preliminary plans, PWB requires departments to complete the following:
    - California Environmental Quality Act (CEQA) compliance, including completion of the relevant environmental documents and expiration of the statute of limitations.
    - Real estate due diligence, which includes an examination of the title of the property and an analysis of whether any title exceptions or unrecorded rights would adversely affect the project and, in the case of lease-revenue financed projects, would affect the state's ability to issue lease revenue bonds for the project. This review is typically performed by the Department of General Services.

o PWB recognizes and thus authorizes scope changes.
- General:
    - The scope of a project is *what* will be constructed (or acquired) and *why*. Thus, scope encompasses both the physical characteristics of the project and the intended program use. Scope is typically established initially in the Capital Outlay Budget Change Proposal (COBCP), with key elements reiterated (or restricted) in supplemental language to the Budget Act. The preliminary plans—and later the working drawings—refine scope in terms of the physical characteristics of the project.
    - A scope change means a significant or substantial change in the previously approved project scope. Such changes can include, but are not limited to, changes in building size or configuration, changes in building purpose, change in building location. Whether or not there is a scope change depends on the specificity of the approved scope and the changes being sought.
- Scope changes may be requested at any time after a project is authorized by the Legislature. The project's initial scope is generally determined by the COBCP approved by the Legislature for inclusion in the Budget Act, or other initial authorization of the project.
    - Scope changes are formally recognized by action of the PWB. Prior to PWB action, Finance sends a letter to the Legislature notifying them of the proposed scope change at least 20 days prior to the PWB action.

3

- o PWB approves cost augmentations.
    - Augmentations of up to 10 percent of total appropriations may be approved by PWB staff without a specific action of the PWB. Such augmentation need not be reported to the Legislature.
    - Augmentations of more than 10 percent but less than 20 percent may be approved by a specific action of the PWB. Prior to PWB action, Finance sends a letter to the Legislature notifying them of the proposed augmentation at least 20 days prior to the PWB action.
    - Augmentations of more than 20 percent are outside of the authority of the PWB and thus are not permitted.
- o PWB approves reversions. (A reversion is when the projects funding needs are less than what was appropriated by the Legislature.)
    - Bid savings (PWB staff are delegated this authority).
    - Project termination (coincides with scope change to terminate project).
- o Finance staff approve working drawings (construction documents) and proceed to bid.
- Lease-Revenue-Specific PWB Steps.
    - o Lease-Revenue funded projects follow all the steps outlined above. In addition, the PWB has additional duties related to the interim financing and sale of bonds for the projects. For example,
        - PWB officially states its intent to issue bonds to fund the project;
        - PWB and the project department request interim financing to provide the necessary funds to develop the project; and,
        - PWB issues bonds to "take-out" interim financing and enters into a long-tem lease with the project department. These lease proceeds are used to repay the bondholders.
    - o For these bond-related actions, the PWB has two voting members in addition to the three identified in the previous section: the State Treasurer and the State Controller (both elected officials of constitutional offices separate from the Governor's administration).

4

**Public Safety and Offender Rehabilitation Services Act of 2007 (AB 900)**

- Appropriated lease revenue authority to CDCR for building programs -
    - Phase I
        - $1.8 billion for infill
        - $975 million for reentry
        - $710.94 million for medical, mental health, and/or dental facilities
    - Phase II appropriation available after certain benchmarks achieved by CDCR
        - $600 million for infill
        - $1.625 billion for reentry
        - $285.7 million for medical, mental health, and/or dental facilities
- Follows the general PWB lease revenue financing processes outlined above but with some nuances.
- Because appropriations in AB 900 are not project specific, AB 900 has procedures for "establishing" each project.
    - Legislature must approve each project.
        - CDCR develops a "30-day package" for each project that describes the project scope, cost, schedule, as well as the program and staffing requirements.
        - Department of Finance reviews draft "30-day package" from CDCR to ensure the package is complete, consistent with other packages, etc.  Finance staff will work with CDCR staff to resolve any issues or to make any required changes and then prepares a cover letter and submits the cover letter and the "30-day package" to the JLBC.
            - From receipt of draft "30-day package" from CDCR, Finance's review and release of the letter requesting Legislative approval takes, on average, about 30 days.
        - Government Code Section 15819.40(d) provides 30 days for the JLBC to review the "30-day package".  Lack of action by the JLBC constitutes approval.  Expedited reviews can be requested but the requests are not always granted, and when an expedited review is granted a positive response from the JLBC is required for project approval.
    - After legislative approval, the project is "established" by formal action of the PWB.
        - The PWB regularly meets the second Friday of each month. Other "special" meetings may be scheduled if needed.

5

- o  Establishing a project through the regular budget process can be a much lengthier process than the AB 900 process.
    - COBCPs need to be developed and submitted to Finance by July 1, 2009 for consideration for the 2010-11 Governor's Budget. Finance has several months to review the project and make a determination of whether to include the project in the budget. By the time funding is available, it could be August or September of 2010.
- Scope changes for AB 900 projects would be accomplished in the same way as described in the general capital outlay process.
- Augmentations for AB 900 projects are handled differently than the normal capital outlay process.
    - o  Cost increases for individual projects may be made to any level so long as the total allocations from a given pot of money are at or below the total appropriation.
        - Hypothetical example: A total of $680 million of projects have been established from the medical/mental health phase 1 appropriation of $711 million. One of these projects was originally allocated $50 million; however, when established the project actually bids for $65 million. This project may proceed without an augmentation because the total allocated funds ($695 million) remains below the total appropriation. (Note, in the normal budget process this project would need to stop and wait to receive an additional appropriation because the augmentation would be more than 20 percent).
    - o  The entire program may be augmented. For purposes of augmentation the entire phase 1 appropriation of $711 million serves as the "base" for augmentation.
        - Hypothetical example: The entire $711 million from the medical/mental health has been allocated for various projects. Again, the project was originally allocated $50 million;however, when established the project actually bids for $65 million. An augmentation of $15 million is required (2.1 percent of $711 million). Because the augmentation is less than 10 percent of the entire appropriation, this augmentation may be done without legislative notification.
        - Note if the total cumulative augmentation exceeds 10 percent, legislative notice is required, as in the regular capital outlay process for individual project appropriations.
- Interim financing resolutions were already adopted by the PWB in March 2008 for phase I of the infill, reentry, and medical/mental health/dental construction programs. Thus, PWB has already taken an initial step in the process by declaring its intent to issue bonds to fund the first phase of AB 900 projects.

- After each project is established, CDCR requests interim financing loan from the Pooled Money Investment Board (PMIB). (Such loans are frequently called AB 55 loans.)
    - The PMIB regularly meets the third Wednesday of each month. Other "special" meetings may be scheduled if needed.
    - The PMIB's standard practice is to consider a loan for projects the month following their establishment at the PWB, but to expedite loan approval, they have placed items on their agenda pending PWB action.
    - The PMIB has three members: the State Treasurer (Chair), the State Controller, and the Director of Finance. Treasurer's staff serve as staff to the PMIB.
    - The PMIB has a fiduciary responsibility in its management of the Pooled Money Investment Account. For any AB 55 loans it makes, it must be reasonably assured that the loan will be eventually repaid by the sale of bonds.
    - PMIB approval could be impacted by the *TIPS v. Schwarzenegger* litigation. The state has prevailed on the case at the Superior court and at the Third District court of Appeal. On May 4, 2009, TIPS asked the California Supreme Court to review the appeals court decision. The California Supreme Court is currently reviewing the case to determine whether it will hear the case or allow the appeals court decision to stand without further review.
    - PMIB loans have a one-year term. They are renewed annually, or more often if necessary, at a level sufficient to meet the project's cash flow needs.
- Lease revenue bond sale typically occurs after construction is underway, when final construction costs are known with a relative high degree of certainty. Bond proceeds are used to repay any outstanding AB 55 loans and to provide remaining cash flow needs of the project.

Attachments

- PWB Calendar and Due Dates. Note "30-day package" are due to Finance 10 days prior to the due date listed for "20-day letters."
- PMIB Calendar and Due Dates

7