1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99641
   1917 Fifth Street
3  Berkeley, CA 94710
   Telephone: (510) 280-2621
4
5
6
7
8  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
9  CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
10 San Francisco, CA 94107
   Telephone: (415) 864-8848
11
12 Attorneys for Plaintiffs

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARK R. FEESER, Bar No. 252968
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

13           UNITED STATES DISTRICT COURT

14          EASTERN DISTRICT OF CALIFORNIA

15

16 RALPH COLEMAN,                    Case No. Civ S 90-0520 LKK-JFM

17            Plaintiffs,            **PLAINTIFFS' REPLY TO DEFENDANTS'
                                     RESPONSE TO COURT'S JUNE 18, 2009
18     v.                           ORDER RE: MEMORANDUM OF
                                     UNDERSTANDING AND REQUEST FOR
19                                   COURT-ORDERED SCHEDULE RE: LONG
   ARNOLD SCHWARZENEGGER, et         TERM BED PLAN**
20 al.,

21            Defendants.

22

23

24

25

26

27

28

[304214-7]

**INTRODUCTION**

On May 26, 2009, pursuant to this Court's March 31, 2009 Order, Defendants submitted their final proposal to meet the remaining short-term, intermediate, and long-range bed needs of the *Coleman* plaintiff class.  Defendants' Response to Court's March 31, 2009 Order That Defendants File a Final Proposal to Meet the Remaining Short-Term, Intermediate, and Long-Range Bed Needs of the Plaintiff Class (Docket No. 3592) ("Defendants' Bed Plan").  Defendants' Bed Plan included both a short-term/intermediate and long-range bed plan.  The long-range plan sought to close a projected gap in FY 2012/13 of 2,433 male beds and 62 female mental health care beds, spread across all levels of care.  *Id.* at 18.[1]  Defendants' long-range bed plan relied in substantial part on the construction of two Correctional Health Care Facilities ("CHCFs") to be constructed in coordination with the *Plata* Receiver.  *See id.* at 15; Exhibit 2 to Defendants' Response to Plaintiffs' Comments Concerning Defendants' May 26, 2009 Activation Schedules and Proposals to Meet the Remaining Bed Needs of the Plaintiff Class (Docket No. 3610-3) (corrected version of Exhibit 9 to Defendants' Bed Plan, summarizing Defendants' long-range bed plan), at true and correct copy of which is attached hereto as **Exhibit A**.  The two CHCFs were to be funded through the I-Bank, which provides financing for capital improvement projects of certain nonprofit corporations, which the Receiver would be eligible to receive as a 501(c)(3) corporation.  Defendants' Bed Plan at 23.

On June 16, 2009, the Court held a hearing to consider, *inter alia*, the approval of Defendants' short-term and intermediate plans to meet the current need for mental health beds, and Defendants' long-range bed plan.  *See* Order, June 18, 2009 at 1 (Docket No. 3613).  Following the June 16, 2009 hearing, the Court entered an Order approving Defendants' short-term and intermediate bed plan subject to certain conditions but did not approve Defendants' long-range bed plan.  *Id.* at 2:9-3:20.  Further, the Court ordered Defendants to report within fifteen days regarding the status of the Memorandum of Understanding ("MOU") between

---

[1] All references to page numbers in Defendants' Bed Plan correspond to the docketed page number (i.e. page 18 refers to page 18 of 87 pages in Docket No. 3592).

1

PLS.' REPLY TO DEFS.' RESPONSE TO COURT'S JUNE 18, 2009 ORDER RE: MEM. OF UNDERSTANDING AND REQ. FOR COURT-ORDERED SCHEDULE RE: LONG TERM BED PLAN - CASE NO. CIV S 90-0520 LKK-JFM

[304214-7]

1  Defendants and the *Plata* Receiver regarding construction of the CHCFs relied upon in

2  Defendants' Bed Plan. *Id.* at 3:15-19.

3      On July 1, 2009, Defendants filed their response to the Court's June 18, 2009 order

4  regarding the MOU with the *Plata* Receiver. Defendants' Response to Court's June 18, 2009

5  Order RE: Memorandum of Understanding (Docket No. 3624) ("Defendants' MOU Response").

6  Citing to the June 24, 2009 letter from Matthew L. Cate, Secretary of the California Department

7  of Corrections and Rehabilitation, to the *Plata* Receiver, Defendants' MOU Response indicated

8  that "State defendants would not agree to the proposed MOU in light of California's current

9  budget and cash crisis, and because it was unclear whether the construction outlined in the MOU

10 was necessary to provide constitutional care." *Id.* at 3:12-14. Defendants assert that the

11 construction outlined in the MOU may be unnecessary based on current administration budget

12 proposals, which, they assert, could reduce the prison population by 19,000 prisoners. *Id.* at

13 3:24-4:2. Additionally, Defendants' MOU Response stated that Defendants were "readjusting"

14 the funding for the long-range bed plan, in order to construct the beds via AB 900 appropriations,

15 and that Defendants "will notify the Court in thirty days if, after review of AB 900

16 appropriations, Defendants propose to change the number of beds in their May 26, 2009 long-

17 term bed plan." *Id.* at 4:21-5:2.

18     For the reasons set forth below, Plaintiffs respectfully request the Court enter an Order

19 requiring Defendants to file a status report with the Court by July 31, 2009 (30 days from their

20 July 1, 2009 submission), describing Defendants' plan to obtain funding for their long-range bed

21 plan and identifying any proposed changes to the number of beds identified in Defendants' Bed

22 Plan. Additionally, in order to avoid any further delay in developing and implementing a long-

23 range bed plan, Plaintiffs request that the Court order Defendants to submit a final revised long-

24 range bed plan to meet the long-term mental health care needs of plaintiff class. The revised

25 long-range bed plan, which should include specific projects, time-frames for completion, and

26 funding sources, should be submitted to the Court by September 1, 2009, three weeks prior to the

27 September 22, 2009 hearing in order to provide Plaintiffs' counsel and the Special Master an

28 opportunity to review and comment on the revised plan prior to the hearing.

1
2
3

**I.    Defendants Should Be Ordered to Report Within 30 Days Regarding Defendants'
Plan to Obtain Funding for the Long-Range Bed Plan and to Develop and Submit a
Revised Final Long-Range Bed Plan to the Court Prior to the Court's September 22,
2009 Hearing**

4       Plaintiffs' June 9, 2009 response to Defendants' Bed Plan raised significant concerns

5   regarding the reliance by Defendants on the construction of the two CHCFs, in coordination with

6   the *Plata* Receiver, to meet the long-range mental health care needs of the *Coleman* plaintiff

7   class.  Plaintiffs' Comments Pursuant to the Court's March 31, 2009 Order Regarding

8   (1) Defendants' Final Proposal to Meet the Remaining Short-Term, Intermediate, and Long-

9   Range Bed Needs of the Plaintiff Class; and (2) Defendants' Detailed Activation Schedules for

10  Completion of All Other Court Ordered Construction Projects, June 9, 2009 at 6, 37-38 (Docket

11  No. 3609) ("Plaintiffs' Comments to Defendants' Bed Plan").  Specifically, Plaintiffs pointed to

12  "the 10 years of stop-and-start bed planning efforts from 1998 through 2008, culminating in the

13  Defendants' on-and-off again embrace and recoil from the Receiver's consolidated healthcare

14  facilities," *id.* at 6, and Defendants' continued efforts to press for termination of the *Plata*

15  Receiver, *id.* at 37-38.

16      At the June 16, 2009 hearing, Defendants' counsel conceded that there was no agreement

17  with the *Plata* Receiver, despite the centrality of such an agreement to the bed plan Defendants

18  had filed only three weeks earlier.  Transcript of June 16, 2009 Status Hearing on Defendants'

19  Progress on Court-Ordered Projects ("Transcript") at 13:14-20, a true and correct copy of which

20  is attached hereto as **Exhibit B**.  As a result, the Court stated that it "can't approve a plan were

21  there's no money, there's no possibility of money until somebody does something, and all that

22  needs to be done is to sign the MOU and get on with it."  *Id.* at 14:9-12.  The Court further

23  cautioned Defendants that they "remain under an obligation to this Court to plan to meet the

24  long-range needs" of the plaintiff class.  Transcript at 14:16-17.  Regrettably, and consistent with

25  the history of both stop-and-start bed planning and on-and-off embrace and recoil from the

26  Receiver's construction projects in this case, Defendants now report that the MOU has not and

27  will not be signed.  Defendants' MOU Response at 3.

28      Without the *Plata* Receiver's construction projects, Defendants essentially have no long-

range bed plan.  As this Court observed during the June 16, 2009 hearing, "[t]he long-term plan is, to some significant degree, dependent upon the MOU being worked out by the [*Plata*] Receiver and the [D]efendants."  Transcript at 13:8-10.  The two CHCFs to be constructed in coordination with the *Plata* Receiver were expected to account for 1,368 mental health beds, including 576 EOP beds, 175 EOP-ASU beds, 167 MHCB, 18 Acute, and 432 ICF-H beds.  Defendants' Bed Plan at 18.  This represents more than half of the net additional beds created pursuant to Defendants' long-term bed plan.  Plaintiffs' Comments to Defendants' Bed Plan at 37-38; Exhibit A hereto.

The elusiveness and incompleteness of Defendants' current long-range bed planning is exacerbated further by Defendants' reliance on 733 EOP beds to be developed at "Alternate Sites" that are "yet to be determined" and do not identify any specific funding source.  Defendants' Bed Plan at 20; Plaintiffs' Comments to Defendants' Bed Plan at 39-40; Exhibit A.  Moreover, without the additional beds described above, Defendants will be unable to decommission the use of 313 inadequate "temporary program" beds that Defendants' long-range plan anticipated would be closed as alternative capacity was added.  Defendants' Bed Plan at 20-21; Exhibit A hereto.

In total, Defendants' long-range bed plan now has a hole representing at least 2,414 beds (1,368 CHCF beds, 733 "alternate site" beds, and 313 "temporary program" beds), with no concrete plans to close the gap.  This represents over thirty percent of the total projected need for FY 2012/13 per the Spring 2009 Navigant Study (2,414 beds out of 7,572 needed).  Now that it is clear that Defendants will not be able to move forward with construction of the two CHCFs pursuant to the MOU with the *Plata* Receiver, it is crucial that Defendants immediately identify alternative funding sources to construct the beds identified in their long-range bed plan.  Defendants' MOU Response indicates that they are "readjusting" the funding mechanism for the CHCFs to obtain funding through AB 900 appropriations and that they will notify the Court within thirty days as to whether they "propose to change the number of beds in their May 26, 2009 long-term bed plan."  Defendants MOU Response at 4-5.  The failure of Defendants to sign the MOU with the *Plata* Receiver represents a significant setback towards implementing a long-

4

1   range plan to meet the substantial future need for mental health care beds.  This is particularly

2   disconcerting given the inability of the short-term and intermediate bed plan to meet the gap in

3   mental health care beds during the period between now and when the long-range plan was

4   originally scheduled to come online.  *See* Plaintiffs' Comments to Defendants' Bed Plan at 20-

5   21.  Accordingly, Defendants cannot be permitted to once again delay the development and

6   implementation of the significant construction projects that will be required to meet the projected

7   need in FY 2012/13.

8           The time has long passed for Defendants to flip-flop between funding sources and further

9   delay development and implementation of a long-range bed plan.  Defendants' vague new

10  promises are based on AB 900 funding.  Choosing their words very carefully, Defendants state

11  that certain events have "cleared the way for an unqualified bond opinion on the validity of the

12  AB 900 bonds for capital projects."  Defendants' MOU Response at 4:7-8.  The event that

13  "cleared the way" was the dismissal of a law suit two weeks before Defendants' filing.  *Id.* at 4:3.

14  Yet, Defendants, represented here by the Attorney General, are unable to tell the Court whether

15  the Attorney General has issued the bond opinion that would make AB 900 funding at all

16  realistic for the *Coleman* bed plan.  Even if a clean bond opinion is issued, it is unclear whether

17  there will be sufficient funds available for these projects.  June 30, 2009 Letter Signed by

18  Matthew L. Cate and J. Clark Kelso, Exhibit 4 to Defendants' MOU Response (stating that

19  "creative joint planning" is required "so that as many of our mutual construction goals as

20  possible may be met within the confines of AB 900").  Further delay in identifying a funding

21  source, particularly in the current fiscal environment, places any long-range planning in doubt.

22          Similarly, Defendants' speculative and unenacted budget proposals to reduce the total

23  prison population by 19,000 prisoners must not serve as a barrier to immediate development of a

24  long-range bed plan.  The most obvious reason being that these proposals may never be enacted

25  and would have an unknown impact on the total prison and mental health populations.  The

26  current administration has previously submitted numerous proposals to reduce the prison

27  population, which were never enacted.  *See* Plaintiffs' Corrected Proposed Findings of Fact and

28  Conclusions of Law, at 115-118 (Docket No. 3489) (recounting administration proposals to

1    reduce the prison population, none of which were ever enacted).

2           Additionally, it is undisputed that the Spring 2009 Navigant Projections for FY 2012/13,

3    which Defendants identified as the target for Defendants' long-range bed planning, significantly

4    underestimate the total mental health population.  The Court's March 31, 2009 Order required

5    Defendants to "conduct a modified assessment to determine whether there are unmet needs for

6    inpatient care among members of the plaintiff class and to refer on an expedited basis any

7    inmates identified during this modified assessment for appropriate inpatient care."  Order at 6:8-

8    12 (Docket No. 3556).  The modified needs assessment, which is still in process, has already

9    identified hundreds of additional EOP inmates requiring inpatient care.  *See* Transcript at 16:16-

10   19 (the Court noted that "the modified need assessment demonstrates clearly that there are a

11   substantial number of Coleman class members over and above those identified in the Navigant

12   projections . . .");  Plaintiffs' Comments to Defendants' Bed Plan at 5, 42-43 (describing initial

13   results of 2009 modified needs assessment);  Galvan Declaration in Support of Plaintiffs'

14   Comments to Defendants' Bed Plan Exh. 8 (Docket No. 3606) (Defendants' June 9, 2009

15   Activity Report on CDCR/DMH Mental Health Assessment and Referral Project in Response to

16   the Deputy Special Master's Request following the March 31, 2009 Court Order).

17          As discussed above, the failure to sign the MOU results in a massive unaddressed long-

18   range gap compared to the current Navigant projections, which will certainly be adjusted upward

19   as a result of the modified needs assessment.  It would be irresponsible to delay development and

20   implementation of a concrete long-range plan to meet the identified future needs based on

21   uncertain budget proposals.

22          Finally, as Plaintiffs have previously noted, Defendants' prior bed plans have toggled

23   between the Department of Mental Health ("DMH") and the California Department of

24   Corrections and Rehabilitation ("CDCR") having responsibility for operation of inpatient

25   programs.  Plaintiffs' Comments to Defendants' Bed Plan at 6, 41.  On October 18, 2007,

26   Defendants were ordered, in response to the revised August 2007 bed plan, to file supplemental

27   information demonstrating that CDCR would be able to replicate and replace the functions

28   performed by DMH.  Order, October 18, 2007 (Docket No. 2461).  However, Defendants'

6

[304214-7]

1   July 16, 2008 bed plan abandoned plans to transition towards CDCR operation of inpatient

2   mental health programs.  Plaintiffs' Exhibit P-477 at 2.  Defendants' current long-range bed plan

3   fails to indicate whether DMH would operate the long-range ICF and acute units.  As the Court

4   correctly noted during the June 16, 2009 hearing, Defendants should not be permitted to

5   "divorce" DMH from CDCR "unless this Court is absolutely satisfied that the people in the class

6   will not be disserved by that divorce."  Transcript at 15:8-11.

7           Accordingly, Defendants should be ordered to report to the Court by July 31, 2009,

8   whether the 1,368 beds included in Defendants' long-range bed plan as part of the *Plata*

9   Receiver's CHCFs can and will be constructed using AB 900 funds and if not, whether they

10  intend to change the number of beds included in their May 26, 2009 bed plan.  To keep this

11  process from once again stopping and starting, Defendants should be ordered, prior to the Court's

12  September 22, 2009 hearing, to develop and submit to the Court a revised long-range bed plan,

13  developed in coordination with the Special Master and, as appropriate, the *Plata* Receiver, that:

14  (1) fully meets the projected long-term mental health bed need as identified in the Spring 2009

15  Navigant Study for FY 2012/13; (2) identifies specific and concrete projects including the

16  number and location of beds to be created under the revised long-range bed plan including

17  activation schedules similar to those provided with regard to Defendants' short-term and

18  intermediate bed plan, and which does not rely upon undeveloped proposals such as the 733 "yet

19  to be determined" "alternate sites" included in Defendants' prior long-range bed plan;

20  (3) identifies all necessary funding sources for each specific project required to implement the

21  revised long-range bed plan; (4) reflects a final decision as to whether and to what degree

22  Defendants will continue to coordinate with the *Plata* Receiver regarding the construction of

23  additional mental health care beds; (5) considers, to the extent necessary, the use of Department

24  of Mental Health facilities, county hospitals, and other State, community, or private resources

25  that are currently available and do not require the construction of additional facilities; and (6)

26  requires that DMH operate all female and male acute and ICF units located in prisons, in outside

27  DMH hospitals, and in any new facilities constructed as part of Defendants' revised long-range

28  bed plan, and that CDCR shall not operate any ICF or acute units absent a finding by the Court

7

1 | that CDCR is capable of replicating and replacing the functions performed by DMH.

2 | Defendants should be ordered to submit their concrete revised long-range bed plan to the

3 | Court and the Special Master by September 1, 2009, with Plaintiffs' comments to the revised

4 | long-range plan to be submitted to the Special Master by September 14, 2009.

5 |

6 | Dated: July 10, 2009                    Respectfully submitted,

7 |                                         ROSEN, BIEN & GALVAN, LLP

8 |                                         By:  */s/ Mark R. Feeser*

9 |                                              Mark R. Feeser
                                                 Attorney for Plaintiffs

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

[304214-7]

**EXHIBIT A**

Case 2:90-cv-00520-LKK-JFM     California Department of Corrections and Rehabilitation     Filed 06/15/2009
Division of Correctional Health Care Services
Mental Health Program

# Men's Mental Health Program Capacity Requirements
## Long Term Bed Plan
### Spring 2009 Projections through 2013

| Level of Care | Current Program Capacity | New Capacity | Returned Capacity | Net Capacity | Mental Health Bed Need Study, Spring 2009 Population Projections, April 2009 (Navigant Consulting) Need to 2013 | over/(under) need |
|---|---|---|---|---|---|---|
| EOP | 3,141 | 1,622 | 0 | 4,763 | 4,763 | 0 |
| ASU | 476 | 292 | -45 | 721 | 675 | 46 |
| PSU | 384 | 152 | 0 | 536 | 546 | (10) |
| MHCB | 314 | 246 | 0 | 560 | 470 | 90 |
| Acute - Total | 156 | 38 | 0 | 193 | 193 | 0 |
| ICF (Low Custody) - Total | 365 | 0 | 0 | 365 | 301 | 64 |
| ICF - High Custody | 200 | 406 | 0 | 624 | 624 | 0 |
| **Total** | 5,139 | 2,846 | -313 | 7,672 | 7,672 | 100 |

### Legend
- Current program capacity
- New capacity
- Returned capacity
- Net capacity
- Long term plan
- Long term plan/Court ordered

---

**Table #A: Capacity as of May, 2009.**
Data sources for number of beds: Health Care Population Oversight Program.

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF+H | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 384 | 74 | 236 | 24 | | | | 738 |
| RJD | 330 | 63 | | 14 | | | | 407 |
| CMC | 580 | 54 | | 36 | | | | 670 |
| CIM | | | | 34 | | | | 34 |
| LAC | 300 | 54 | | 12 | | | | 366 |
| SVSP | 192 | 45 | | 10 | | 240 | | 487 |
| CMF | 533 | 58 | | 70 | 130 | 84 | 66 | 941 |
| PBSP | 66 | 128 | | 10 | | | | 204 |
| COR | 150 | 54 | | 23 | | | | 227 |
| MCSP | 510 | 36 | | 8 | | | | 554 |
| SQ | 36 | | | | | | | 36 |
| HDSP | | | | 10 | | | | 10 |
| ISP | | | | | | | | 0 |
| KVSP | 96 | | | 12 | | | | 108 |
| NKSP | | | | 10 | | | | 10 |
| PVSP | | | | 6 | | | | 6 |
| SATF | | | | 20 | | | | 20 |
| SOL | | | | 9 | | | | 9 |
| WSP | | | | 6 | | | | 6 |
| Site 1 | | | | | | | | 0 |
| Site 2 | | | | | | | | 0 |
| Alt. sites | | | | | | | | 0 |
| **Sub Total** | 3,141 | 474 | 384 | 314 | 130 | 155 | 306 | 5,139 |
| Department of Mental Health Hospital Capacity: | | | | | | | | |
| ASH | | | | | 25 | | 231 | 256 |
| CSH | | | | | | | 281 | 50 |
| **Total:** | 0 | 0 | 0 | 0 | 25 | 281 | 0 | 306 |
| **Grand Total (DMH Hospital + CDCR)** | 3,141 | 474 | 384 | 314 | 155 | 305 | 306 | 5,139 |

---

**Table #B: New capacity under development, proposed or converted.**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF+H | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | | | 152 | | | | | 152 |
| RJD | | | | | | | | 0 |
| CMC | | | | 50 | | | | 50 |
| CIM | | | | | | | | 0 |
| LAC | 150 | | | | | | | 150 |
| SVSP | 96 | 72 | | | | | | 168 |
| CMF | 67 | | | 20 | | | 64 | 151 |
| PBSP | | | | | | | | 0 |
| COR | | 45 | | | | | | 45 |
| MCSP | | | | | | | | 0 |
| SQ | 36 | | | 29 | | | | 29 |
| HDSP | | | | | | | | 0 |
| ISP | | | | | | | | 0 |
| KVSP | | | | | | | | 0 |
| NKSP | | | | | | | | 0 |
| PVSP | | | | | | | | 0 |
| SATF | | | | | | | | 0 |
| SOL | | | | | | | | 0 |
| WSP | | | | | | | | 0 |
| Site 1 | 320 | 87 | | 63 | | | | 470 |
| Site 2 | 256 | 88 | | 104 | | | 432 | 898 |
| Alt. sites | 733 | | | | | | | 733 |
| **Sub Total** | 1,622 | 292 | 152 | 246 | 38 | | 496 | 2,846 |
| Department of Mental Health Hospital Capacity: | | | | | | | | |
| ASH | | | | | | | | 0 |
| CSH | | | | | | | | 0 |
| **Total:** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Grand Total (DMH Hospital + CDCR)** | 1,622 | 292 | 152 | 246 | 38 | | 496 | 2,846 |

---

**Table #C: Capacity to be returned to alternate use when need is eliminated by adding capacity.**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF+H | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | | | | | | | | 0 |
| RJD | | | | | | | | 0 |
| CMC | | | | -36 | | | | -36 |
| CIM | | | | -34 | | | | -34 |
| LAC | | | | | | | | 0 |
| SVSP | -45 | | | | | | -112 | -157 |
| CMF | | -20 | | | | | -66 | -86 |
| PBSP | | | | | | | | 0 |
| COR | | | | | | | | 0 |
| MCSP | | | | | | | | 0 |
| SQ | | | | | | | | 0 |
| HDSP | | | | | | | | 0 |
| ISP | | | | | | | | 0 |
| KVSP | | | | | | | | 0 |
| NKSP | | | | | | | | 0 |
| PVSP | | | | | | | | 0 |
| SATF | | | | | | | | 0 |
| SOL | | | | | | | | 0 |
| WSP | | | | | | | | 0 |
| Site 1 | | | | | | | | 0 |
| Site 2 | | | | | | | | 0 |
| **Sub Total** | -45 | 0 | 0 | -90 | 0 | 0 | -178 | -313 |
| Department of Mental Health Hospital Capacity: | | | | | | | | |
| ASH | | | | | | | | 0 |
| CSH | | | | | | | | 0 |
| **Total:** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Grand Total (DMH Hospital + CDCR)** | -45 | 0 | 0 | -90 | 0 | 0 | -178 | -313 |

---

**Table #D: Net capacity.**

| Institution | EOP | ASU | PSU | MHCB | Acute | ICF | ICF+H | Total |
|---|---|---|---|---|---|---|---|---|
| SAC | 384 | 74 | 408 | 24 | | | | 890 |
| RJD | 330 | 63 | | 14 | | | | 407 |
| CMC | 580 | 54 | | 50 | | | | 684 |
| CIM | | | | 0 | | | | 0 |
| LAC | 450 | 54 | | 12 | | | | 516 |
| SVSP | 288 | 72 | | 10 | | | 128 | 498 |
| CMF | 600 | 58 | | 50 | 150 | 84 | 64 | 1,006 |
| PBSP | 66 | 128 | | 10 | | | | 204 |
| COR | 150 | 99 | | 23 | | | | 272 |
| MCSP | 510 | 36 | | 8 | | | | 554 |
| SQ | 0 | 36 | | 29 | | | | 65 |
| HDSP | | | | 10 | | | | 10 |
| ISP | | | | | | | | 0 |
| KVSP | 96 | | | 12 | | | | 108 |
| NKSP | | | | 10 | | | | 10 |
| PVSP | | | | 6 | | | | 6 |
| SATF | | | | 20 | | | | 20 |
| SOL | | | | 9 | | | | 9 |
| WSP | | | | 6 | | | | 6 |
| Site 1 | 320 | 87 | | 63 | | | | 470 |
| Site 2 | 256 | 88 | | 104 | | | 432 | 898 |
| Alt. sites | 733 | | | | | | | 733 |
| **Sub Total** | 4,763 | 721 | 536 | 470 | 169 | 64 | 624 | 7,346 |
| Department of Mental Health Hospital Capacity: | | | | | | | | |
| ASH | | | | | 25 | | 231 | 256 |
| CSH | | | | | | | 50 | 50 |
| **Total:** | 0 | 0 | 0 | 0 | 25 | 281 | | 306 |
| **Grand Total (DMH Hospital + CDCR)** | 4,763 | 721 | 536 | 470 | 193 | 365 | 624 | 7,672 |

LT Bed plan build all common projects 6-11-09 1001 hrs.xls
May 23, 2009

**EXHIBIT B**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                          ---O0O---

 4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

 5

 6   RALPH COLEMAN, et al.,

 7         Plaintiffs,

 8   Vs.                             CASE NO. CIV. S-90-0520 LKK

 9   ARNOLD SCHWARZENEGGER,
     et al.,
10

11         Defendants.

12   _____/

13

14

15

16                          ---o0o---

17

18                    REPORTER'S TRANSCRIPT

19                 TUESDAY, JUNE 16TH, 2009

20       RE:  STATUS HEARING ON DEFENDANTS' PROGRESS ON

21                  COURT-ORDERED PROJECTS

22

23                          ---o0o---

24

25   Reported by:              CATHERINE E.F. BODENE,
                               CSR. No. 6926
```

```
 1                          APPEARANCES

 2                          ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5            ROSEN, BIEN & GALVAN, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN,
                   ATTORNEY AT LAW
 8

 9

10

11

12    FOR THE DEFENDANTS:

13             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
14             1300 I STREET
               SACRAMENTO, CALIFORNIA  95814
15
               BY:  DEBBIE J. VOROUS,
16                  DEPUTY ATTORNEY GENERAL

17                   AND

18                 JEFF STEELE,
                   DEPUTY ATTORNEY GENERAL
19

20

21

22

23                          ---o0o---

24

25
```

1

1          SACRAMENTO, CALIFORNIA

2        TUESDAY, JUNE 16TH, 2009 – 1:30 P.M.

3                 ---o0o---

4          THE CLERK:  Please, remain seated.

5          Court is now in session.

6          THE COURT:  Please, be seated, folks.

7          Good afternoon.

8          THE CLERK:  Calling Civil Case S-90-520, Coleman, et

9    al., v. Schwarzenegger, et al.

10         THE COURT:  Counsel, please approach the podium,

11   state your appearance for the record.

12         MR. BIEN:  Good afternoon, Your Honor.  Michael Bien

13   on behalf of the Coleman plaintiff class.

14         MS. VOROUS:  Good afternoon, Your Honor.  Debbie

15   Vorous on behalf of the defendants.

16         MR. STEELE:  Good afternoon, Your Honor.  Jeff Steele

17   also on behalf of the defendants.

18         THE COURT:  Miss Vorous, you're essentially going to

19   be speaking for defendants?

20         MS. VOROUS:  Yes, that's correct.

21         THE COURT:  All right.

22         You may retire, sir.

23         I suppose the first thing I ought to do is welcome

24   you to the ongoing hearings in this matter.  I leave it at

25   that.

2

1          Actually, counsel -- all counsel can retire for a

2     moment.  I want to talk about some things that we're doing

3     and that we're not doing this afternoon.  I have some

4     questions that I want to ask and go from there.

5          This matter is on for -- So that you all understand

6     how serious this is, I've got written remarks to make sure

7     that important points are covered.

8          This matter is on for consideration of approval of

9     three separate matters related to bed planning:  defendants'

10    activation schedule for projects that have long been

11    scheduled -- that have already been ordered by this Court,

12    some of them long ago; defendants' short-term and

13    intermediate plans for meeting the current needs for mental

14    health beds; and defendants' long-range plan.

15         The Court has received and read all of the papers,

16    including the defendants' responses to the plaintiffs'

17    comments filed last evening.

18         To say that I've read them, and I have, is different

19    than saying that I have fully digested all of them.  These

20    are very complicated matters, which all I can do is do the

21    best that I can.

22         Plaintiffs, have you had a chance to review the

23    defendants' responses?

24         MR. BIEN:  Yes, Your Honor.

25         THE COURT:  All right.  Good.

3

1          Before we turn to the specific plans and schedules, I

2   want to discuss the role of the modified needs assessment and

3   what effect it will have on this hearing.

4          The Court is aware that the assessment ordered by

5   this Court in March is complete and has resulted in, not

6   surprisingly, identification of additional unmet need for

7   hospital beds.

8          The Court is also aware that the Special Master is

9   working with defendants to extend this assessment to other

10  prison institutions.

11         The Court is encouraged by the fact that the

12  Department of Mental Health has participated as well as the

13  plaintiffs.

14         The Court intends to assess each of the proposals

15  before the Court with reference to the current needs as

16  identified in the Navigant numbers, not with reference to the

17  additional unmet needs now being reported.

18         After the Court goes through Defendants' three

19  proposals, we will have to discuss where we go from here with

20  respect to the modified needs assessment.

21         I do want to say that the Court wants to acknowledge

22  the very solid effort made by defendants with the guidance of

23  the Special Master at the meetings immediately following this

24  Court's last hearing and weekly thereafter for several weeks.

25         Significant progress has been made.  The parties

4

1    have, as best I can tell, and the Special Master assures me,

2    have worked in good faith.  While there remains a difference

3    between what is planned and what is actually needed today,

4    defendants' short-term and intermediate plans will, when

5    fully activated, significantly reduce the difference in most

6    categories of beds.

7         I want to say to plaintiffs:  Progress is important.

8    Having abstract plans is not nearly as important.  Hopes are

9    not nearly as important.  Getting things done is what

10   matters.

11        There are people out there who are not being treated.

12   And what we can do to get them treated, get them beds, get

13   them service, sometimes is more important than perfectly

14   executed plans -- perfectly articulated plans which are not

15   going to be executed because they can't be.

16        For purposes of this hearing, therefore, the Court

17   accepts the decision made by defendants in their meetings

18   with the Special Master to focus their short-term and

19   intermediate plans on meeting current needs.

20        I just think that was the right thing to do not to

21   pick a later target date for those plans.

22        But having said that, defendants remain under a

23   continuing obligation to meet all of the needs of the

24   plaintiff class and any approval of plans today is not a

25   finding by this Court that defendants have met those

5

1   obligations, nor is it approval of ongoing bed shortages.

2          I don't know how to say this so that people hear me,

3   but it is an approval of the steps that defendants represent

4   that they are able to take at this time.  No more.  No less.

5   There is a continuing obligation that the defendants must

6   meet.

7          As I've already said, I've read all of the papers

8   filed by the parties in connection with this hearing.  I do

9   not need further argument on many of the issues raised.

10  There are a few serious matters I do need to discuss with the

11  parties, and this hearing will be focused on those issues as

12  I've identified them.

13         I want to start with Activation Schedules For

14  Court-Ordered Projects.

15         I'm going to take a deep breath because while the

16  schedules proposed by the parties -- by the defendants are

17  encouraging, I must remind the defendants that those are

18  orders of the Court which must be obeyed.  Not hoped for.

19  Not prayed for.  Obeyed.

20         I'm sorry.  I was about to -- All right.

21         Defendants, relative to the 13 projects already

22  ordered, have presented detailed activation schedules for

23  each of those projects.

24         There are two main comments from plaintiffs.  First,

25  the time frame for some of the projects, and second, funding.

6

1          The Court recognizes the urgent need that continues

2     to exist.  The emergency.

3          Defendants have presented time frames, that if

4     approved, will have the force of a court order.  And I'm not

5     kidding.  The Court understands that the Special Master gave

6     defendants a clear directive to develop schedules that were

7     reasonable and could be met.  On that basis the Court will

8     approve the activation schedules proposed by defendants.

9          I want to say that to the extent possible, and it may

10    not be possible, but to the extent possible that the

11    defendants can accelerate any of those projects I instruct

12    you to do so.

13         The critical issue in this part of the hearing is the

14    funding source for several of these court-ordered projects.

15    I want to start by saying the Court will not tolerate further

16    delays.  The time to move forward is past.  I have written

17    "it is now."  It is not, it is past.

18         Defendants have identified two separate funding

19    sources for the court-ordered projects, General Funds and the

20    AB900 process.

21         The orders for these projects have been in existence,

22    some of them, for years.  Defendants shall report to the

23    Special Master on a monthly basis all action or actions taken

24    on each project and whether each project remains on schedule

25    or has been or can be accelerated.  Defendants' report shall

7

1   be in the form of updates to the existing activation

2   schedules.

3           I'm assuming that there will be no slippage, but for

4   any project that has fallen off the promised time frame,

5   defendants shall equally describe with specificity the reason

6   or reasons for the departure and shall identify individuals

7   or agencies whose acts or failure to act contributed to not

8   meeting the deadline.

9           If necessary, the Court will consider -- No, I won't.

10  Well, I'll consider joining additional parties in this action

11  as necessary.  We're going to get this done, and I'm going to

12  want to know who is holding it up, if anybody.

13          The Court will set this matter for status conference

14  in three months at which time the Court anticipates all the

15  necessary funding will have been secured and the projects

16  will be moving forward.

17          Second issue is Short-term and Intermediate Plan.

18          The plan presented to the Court, if implemented,

19  meets the current need identified in the Navigant Fall 2008

20  projections for intermediate care hospital beds, including

21  intermediate care hospital beds for high security inmates and

22  mental health crisis beds.

23          The plan comes close to meeting the current need

24  identified in those projections for actual hospital beds.

25  Given the defendants' representation, the Court assumes that

8

1   the identified projects are achievable on the timelines

2   presented.

3           The plaintiffs are going to say:  Judge, you've got

4   no right to assume that.  They've never made it yet.

5           This is a new day.  This is a new day.

6           I will accept the representation of the defense

7   counsel in that regard, but I'm going to ask counsel now to

8   make that specific representation or to describe any

9   potential impediments, other than what are already described

10  in the plan, to completion of the projects identified.

11          Come forward, Miss Vorous, and tell me.  Is it

12  realistic, do you really think you can do it, are there any

13  impediments I don't know about?

14          MS. VOROUS:  Your Honor, the only potential

15  impediments that may impact the schedule would relate to the

16  four CDCR projects that involve the creation of confidential

17  individual and group treatment space.  To the extent that

18  there are issues that may come up with that, such as delays

19  by licensing, fire marshal approval, those sorts of things,

20  then there could be a potential delay in the schedule.

21          At this point all of the funding -- CDCR believes all

22  the funding is available for those projects and are committed

23  to meet the timeline.  But with respect to any other

24  potential impediments, this could be one that could create

25  some delay with respect to those four facilities.

9

1          THE COURT:  You will timely notify the Special Master
2    of any impediment such as the ones that you have just
3    described.
4          The Special Master is directed to immediately contact
5    the Court, and we will do whatever is necessary.  If you have
6    a suggestion, please file it.
7          By the way, when I say "inform the Special Master,"
8    you're obligated, of course you understand, to inform the
9    plaintiffs as well.
10         If there are such impediments and you have a proposal
11   relative to solving them, let me know at the time that you
12   discover the impediment.  Plaintiffs are invited to join in
13   prompt responses as well.
14         I'm not going to wait for you folks.  I think we
15   have -- You know, I don't know how often I've said we have an
16   emergency.  And I don't know how often I feel like the only
17   person who hears me saying that is the Special Master.
18         All right.  I'm sorry.  I didn't mean that.  Forget
19   it.
20         You may retire, ma'am.  Thank you.
21         MS. VOROUS:  Thank you.
22         THE COURT:  Regarding the C5 and C6 units at Salinas
23   Valley, it appears that these units are to be identical to D5
24   and D6 units at the same prison.
25         That is correct, is that not, Miss Vorous?

10

1          MS. VOROUS:  Yes, it is correct.

2          THE COURT:  The D5 and D6 units have required

3    additional construction since they opened which will be

4    completed hopefully -- not hopefully -- will be completed in

5    July 2009 or I want to know why.

6          Plaintiffs request that the C5 and C6 units be

7    completed on the scheduled proposed by defendants so that

8    upon completion they are just like the D5 and D6 will be in

9    July of this year without the need for additional

10   construction.

11         I understand that to be the defendants' plan.  Am I

12   correct?

13         MS. VOROUS:  Yes.  The timeline includes

14   construction.

15         THE COURT:  All right.  Good.

16         In their responses to plaintiffs' comments,

17   defendants report that just yesterday the Joint Legislative

18   Conference committee on the budget approved their request for

19   funding for DMH clinical staff for the inpatient beds they

20   propose to add and that the request is now before both houses

21   of the California Legislature.

22         Frankly, the Court is reluctant to approve a plan

23   that has the potential funding and staffing impediments

24   identified by defendants, but at least one of those

25   impediments was removed yesterday.

11

1          Given the emergency that exists, defendants must move

2     forward with the proposed project and the Court will

3     therefore approve the project described in this plan.

4          The Court expects defendants to continue to take all

5     steps necessary to secure the necessary funding and to

6     resolve the staffing allocation issues.  To that end,

7     defendants shall complete a staffing plan by the end of

8     August.  The plan shall be developed under guidance of the

9     Special Master following the model used to develop the plans

10    now before the Court.

11         Defendants include a proposal to train custody staff

12    at certain institutions.  Plaintiffs object to the specific

13    plan identified by the defendants.  Plaintiffs propose

14    instead that defendants train custody staff using the new DMH

15    Therapeutic Strategies and Intervention training.

16         Defendants represent that they are working with a

17    Special Master to replace the training module plaintiffs

18    object to, and they are reviewing the DMH model and

19    considering using it for all custody and mental health staff

20    assigned to all levels of care above CCCMS.  That's with the

21    exception of the EOP programs in Reception Centers.

22         The Court approves the concept of training custody

23    staff and will leave the final determination of the

24    appropriate plan to do so to the Special Master.

25         Once again, the defendants shall develop the training

12

1    plan under the guidance of the Special Master following the

2    module used to develop the plan before this Court, and it

3    shall be completed in 90 days.  The Court approves

4    defendants' plan for training clinical staff at the units at

5    Salinas Valley.

6          Finally, the defendants have acknowledged this plan

7    does not meet their current need for EOP beds or for

8    psychiatric services unit beds.  Defendants and plaintiffs

9    disagree over the correct way to incorporate the EOP program

10   in Reception Centers into the calculation of need.

11         The Court will not resolve that question at this

12   time, nor will the Court consider plaintiffs' requests for

13   modifications of the EOP program in Reception Centers.

14         For purposes of this hearing, it is sufficient to say

15   that the Court approves the projects defendants have

16   identified to increase their EOP capacity and that the

17   Court's approval of these projects in no way signifies

18   defendants' full compliance.

19         In that regard, there is this question about

20   Coalinga.  And I accept the DMH -- I accept?  That's much too

21   strong.  I understand that DMH has its reasons concerning the

22   beds in Coalinga, but the answer to that is not to stand

23   there frustrated.  It is to say that DMH has those reasons,

24   let it move people into those beds from their other

25   institutions freeing up beds for the Coleman class.  And if

13

1    that can't be done, I want to know why.

2         I'm sorry. I didn't mean to speak like that. If I

3    sound terribly frustrated, it is because I am.

4         I want to talk about the long-term plan. I don't

5    understand what is going on. The long-term plan -- I'm

6    sorry. I'm about to deviate from the writing, and that is

7    probably not a good thing to do.

8         The long-term plan is, to some significant degree,

9    dependent upon the MOU being worked out by the Receiver and

10   the defendants. The Receiver tells me, best he knows, there

11   is a completed MOU which has not been signed.

12        Miss Vorous, come forward.

13        I want to know whether you know why.

14        MS. VOROUS: Your Honor, I do not know why the MOU

15   has not been signed at this point in time. I do know that

16   there is not an agreement. And with respect to conversations

17   that have occurred between myself and my clients, I'm not at

18   liberty to discuss those based on attorney-client privilege,

19   but I can honestly say to you I do not understand why it has

20   not been signed at this point in time.

21        THE COURT: This is intolerable.

22        The defendants shall report in 15 days whether the

23   MOU has been signed; if it has not, the reasons that it has

24   not been signed.

25        And Miss Vorous, I'm not threatening anybody, I

14

1   promise you, but I want to know why it has not been signed,

2   who is responsible for not signing it.

3          I mean, if it is because there is no agreement as to

4   the content, that's one thing.  My understanding is that's

5   not the -- I'm sorry.  My understanding is that is not the

6   problem, and I don't know what the problem is.  The Special

7   Master, wherever he is, the Special Master doesn't know what

8   the reason is.  The Receiver doesn't know what the reason is.

9          I can't approve a plan where there's no money,

10  there's no possibility of money until somebody does

11  something, and all that needs to be done is to sign the MOU

12  and get on with it.

13         All right.  You may retire, ma'am.

14         I obviously cannot approve the long-term plan so long

15  as those contingencies remain.

16         Defendants remain under an obligation to this Court

17  to plan to meet the long-range needs of the plaintiffs.  The

18  matter will be set for further hearing in three months on the

19  status of defendants' long-term plan.

20         And ma'am, you tell your clients that if they're not

21  going to sign that MOU, they better come in three months from

22  now with real money on the table.  Because otherwise I'm

23  going to start eating into their budget in a dramatic kind of

24  way.

25         Take that back.  I'm not threatening anything.  I'm

15

1    not threatening anything.

2              MS. VOROUS:  I understand.

3              THE COURT:  I just want to see progress, real honest

4    to God progress.

5              There's also this -- Once again, out of the blue, has

6    come DMH's divorce from CDCR.  I don't know why.  I don't

7    know what's going on.  I don't care.

8              It isn't going to happen without this Court's

9    approval.  And it won't happen unless this Court is

10   absolutely satisfied that the people in the class will not be

11   disserved by that divorce.

12             I mean, if that isn't typical of what's gone on in

13   this case.  "Yes, we are."  "No, we're not."  "Yes, we are."

14             Plaintiffs request that defendants be required to

15   extend the contract with Navigant Consulting.  In their

16   response, defendants indicate they are exploring contracting

17   options to pursue after the Navigant contract expires at the

18   end of this year.

19             I must say, in this Court's view, the Navigant

20   contract has been a significant component of the development

21   of useful planning tools.

22             Defendants do not yet have a long-range Bed Plan, and

23   even when the projects approved today are completed, they are

24   not -- it will not have enough beds to meet present demand,

25   particularly for the EOP level of care.

16

1          It's the Court's view it is simply too soon for

2     defendants to stop working with Navigant.  The Court will

3     give defendants ten days to show cause why they should not be

4     ordered to renew the contract with Navigant for another three

5     years.

6          I said at the start of this hearing that the Special

7     Master has informed me that the modified needs assessment

8     ordered in March is partially completed.  As a result of that

9     assessment, as I understand it, 561 inmates have been

10    referred to the DMH inpatient care.  The assessment, which so

11    far has involved 12 prisons, is continuing as to those

12    prisons.

13         In addition, defendants and the Special Master agree

14    that the assessment should be conducted at all of the

15    remaining non-desert CDCR institutions.

16         The modified need assessment demonstrates clearly

17    that there are a substantial number of Coleman class members

18    over and above those identified in the Navigant projections

19    who are in need of hospital care now -- right now.

20         The projects this Court has just approved include

21    conversion of hospital beds to provide a full compliment of

22    256 intermediate care beds at Atascadero State Hospital to

23    Coleman class members.

24         This Court approves that plan with the understanding

25    that the DMH defendants have committed to admitting Coleman

17

1    class members to those beds at a rate of not less than ten

2    per week until all those beds are full, and that by the end

3    of October of 2009 all 256 beds will be filled with members

4    of the Coleman class.

5           To that end, defendants have submitted a proposed

6    plan for expediting admissions to DMH inpatient facilities.

7    Defendants shall finalize this plan under the guidance of the

8    Special Master following the model used to develop the plan

9    before this Court, and it shall be completed in 30 days.  The

10   Court expects the agreed upon schedule to be followed, and

11   where possible, if possible, accelerate it.

12          Defendants have agreed to provide the Special Master

13   with bimonthly reports on the placement of the individuals

14   whose need for inpatient care is identified, and that is part

15   of this Court's order.

16          Defendant shall work with the Special Master

17   forthwith to ensure that the reports contain all of the

18   information that the Special Master needs to ensure

19   compliance with the timetables set in this order.

20          I have not given the parties an opportunity to

21   comment because I don't know that any comments are useful,

22   but I may be wrong.

23          We will take a ten minute recess or so to give the

24   parties a chance to think – that would be different – and if

25   they feel some need to comment on the orders of the Court, I

18

1    doubt very much you're going to get me to change anything,

2    but at least you might help me think about what needs to be

3    done.

4            We'll take a ten minute -- Ten minutes all right?

5            We will take a ten minute recess.

6            (Off the record at 02:04 PM.)

7            (On the record at 02:15 PM.)

8            THE CLERK:  Please, remain seated.

9            Court is now in session.

10           THE COURT:  Please, be seated everyone.

11           Plaintiffs, do you have any comments?

12           I want to make clear before you start, we're not

13   going to deal with all the other things besides the Bed Plan

14   that you introduced into your comments.

15           If you think that those need Court attention, bring a

16   separate motion or at least talk to the Special Master and

17   then decide.

18           Yes.

19           MR. BIEN:  Thank you, Your Honor.

20           First, we want to say we appreciate and acknowledge

21   the tremendous work the Special Master and his team have done

22   since the last hearing with the defendants in moving forward

23   on this.  A tremendous amount of time and effort has gone

24   into this, and we're very well aware of that.

25           We also appreciate the difficult decisions the Court

19

1    faces in the hearing —— this hearing and all the prior

2    hearings on these issues and the difficult things that you

3    are balancing at this time.

4          We're not taking issue with any of that.  I'm not

5    going to argue about any of them.  I would like clarification

6    concerning one or two of the points you made today.

7          One concerns the long-term Bed Plan, and here we are

8    without a decision from the State.  The Court suggested a

9    report in 15 days about ——

10         THE COURT:  Whether it is signed; if it isn't signed,

11   why it isn't signed.  And ma'am, I want to make clear to you

12   that the attorney-client privilege won't lie because I'll

13   order your clients in and order them to tell me why.

14         Go ahead.

15         MR. BIEN:  That was —— What you just said, Your

16   Honor, clarifies it.  I think there —— if there is not an MOU

17   in 15 days, there should be a hearing so that we can

18   understand is this going to happen or not.

19         THE COURT:  The point is if it isn't signed in 15

20   days, you're going to have to find some other way of

21   financing the long-term plan.

22         I cannot —— Sorry.  I will not tolerate further delay

23   based upon goodness knows what.

24         Go ahead.

25         MR. BIEN:  The other issue has to do with the Court's

20

1    orders relative to the Department of Mental Health and access

2    to beds at Atascadero and Coalinga.

3         The Court, I think, made reference to the fact

4    Coalinga has a lot of space.  And it's the one place in the

5    system that has a lot of room.  And I think there was a

6    suggestion in what you said that if there's a need for

7    additional -- if there aren't enough beds at Atascadero for

8    the Coleman class members that are referred, that DMH should

9    be ordered to open additional beds at Coalinga.

10        I think that needs to be, if the Court would consider

11   that, it should be part of the Court's order.

12        THE COURT:  I think that that's the right thing to

13   do.  There may be reasons that can't be done.  If so, I want

14   to know about it.  Otherwise, I expect it to be done.

15        Whether I put that into an order now or await a

16   response, I'm going to have to think about it.  But I want to

17   tell you what the problem is, ma'am.  When I await a

18   response, that's just more delay.  And we've long passed the

19   time where the Court will tolerate delay because people are

20   trying to learn how to tie their shoes.

21        MR. BIEN:  Your Honor, those are the only comments we

22   would like to add.

23        THE COURT:  Thank you, sir.

24        Ma'am, anything you would like to say on behalf of

25   your clients?

21

1           MS. VOROUS:  Other than to thank Your Honor and the

2     Special Master --

3           THE COURT:  I'm sorry.  I know nobody believes it.  I

4     can't hear.

5           MS. VOROUS:  I apologize.

6           THE COURT:  That's all right.

7           MS. VOROUS:  Other than to thank Your Honor and the

8     Special Master and the Special Master's team for all the

9     effort and time that has been put in over the last six

10    months, we don't have any further comments on the Court's

11    orders.

12          THE COURT:  Thank you very much.

13          I join both the parties in commending the Special

14    Master and his staff on the inordinately hard work that

15    they've done for significant progress towards making a Bed

16    Plan that actually may happen.

17          Court will stand in recess.

18          Thank you, gentlemen and ladies.

19          (Off the record at 02:23 PM.)

20                        ---o0o---

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2                              ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5


6
           I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 22ND day of
11   JUNE, 2009.

12

13

14   /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
15           Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25