# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs

      v.               No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants


## TWENTY-FIRST MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS


Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE, LOPES, DEVEREAUX, & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
July 31, 2009

## TABLE OF ABBREVIATIONS/ACRONYMS

3CMS:              Correctional Clinical Case Manager System

ACH:               Acute Care Hospital

ADA:               Americans with Disabilities Act

ADD:               Attention Deficit Disorder

ADHD:              Attention Deficit Hyperactivity Disorder

ADLs:              Activities of Daily Living

AED:               Automatic External Defibrillator

ambu bag:          Ambulatory Bag Used for CPR

APP:               Acute Psychiatric Program

ASH:               Atascadero State Hospital

ASMHS:             Administrative Segregation Mental Health Services

ASP:               Avenal State Prison

ASU:               Administrative Segregation Unit

BLS:               Basic Life Support

BMU:               Behavior Modification Unit

BPT:               Board of Prison Terms

C-file:            Central File

C&PP:              Clinical Policy and Programs

C&PR:              Classification and Parole Representative

Calipatria:        Calipatria State Prison

CAP:               Corrective Action Plan

| | |
|---|---|
| CAT II: | Category II |
| CC: | Correctional Counselor |
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCM: | Clinical Case Manager |
| CCPOA: | California Correctional Peace Officers Association |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| Centinela: | Centinela State Prison |
| CHCFs: | California Health Care Facilities |
| CHSC: | Central Health Services Center |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMO: | Chief Medical Officer |
| CNA: | Certified Nursing Assistant |
| CO: | Correctional Officer |
| CPER: | Clinical Performance Enhancement and Review Subcommittee |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSH: | Coalinga State Hospital |

| | |
|---|---|
| CSP/Corcoran: | California State Prison, Corcoran |
| CSP/LAC: | California State Prison, Los Angeles County |
| CSP/Sac: | California State Prison, Sacramento |
| CSP/Solano: | California State Prison, Solano |
| CSR: | Classification Staff Representative |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility/Soledad |
| CTQ: | Confined To Quarters |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DA: | District Attorney |
| DAI: | Division of Adult Institutions |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disabilities Program |
| DDPS: | Distributed Data Processing System |
| DHS: | Department of Human Services |
| DMH: | Department of Mental Health |
| DNC: | Death Notification Coordinator |
| DNR: | Do Not Resuscitate |
| DOF: | Director of Finance |
| DOM: | Department Operations Manual |
| DON: | Director of Nursing |
| DOT: | Direct Observation Therapy |
| DRC: | Death Review Coordinator |

| | |
|---|---|
| DRMC: | Delano Regional Medical Center |
| DSM: | Diagnostic and Statistical Manual |
| DTP: | Day Treatment Program |
| DVI: | Deuel Vocational Institution |
| EOP: | Enhanced Outpatient Program |
| EPPD: | Earliest Possible Parole Date |
| EPRD: | Earliest Possible Release Date |
| ERDR: | Emergency Response and Death Review Committee |
| ERRC: | Emergency Response Review Committee |
| ERV: | Emergency Response Vehicle |
| ETV: | Emergency Transport Vehicle |
| FIT: | Focus Improvement Team |
| Folsom: | Folsom State Prison |
| FPTTP: | Foreign Prisoner Transfer Treaty Program |
| FTE: | Full-Time Equivalent |
| GACH: | General Acute Care Hospital |
| GAF: | Global Assessment of Functioning |
| GP: | General Population |
| HCCUP: | Health Care Cost and Utilization Program |
| HCM: | Health Care Manager |
| HCPOP: | Health Care Placement Oversight Program |
| HCPU: | Health Care Placement Unit |
| HCQMC: | Health Care Quality Management Committee |
| HDSP: | High Desert State Prison |
| HQ: | Headquarters |

| | |
|---|---|
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| ICP: | Intermediate Care Program |
| ICU: | Intensive Care Unit |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IMHIS: | Inmate Mental Health Information System |
| IMSP: | Inmate Medical System Policy |
| INS: | Immigration and Naturalization Service |
| IP: | Inmate Profile |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training *or* Incompetent to Stand Trial |
| ISU: | Investigative Services Unit |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LCSW: | Licensed Clinical Social Worker |
| LLE: | Language Learning Enterprises |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| LOU: | Locked Observation Unit |
| LPN: | Licensed Practical Nurse |
| LPT: | Licensed Psychiatric Technician |

| | |
|---|---|
| LSW: | Limited Suicide Watch |
| LVN: | Licensed Vocational Nurse |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDD: | Major Depressive Disorder |
| MDO: | Mentally Disordered Offender |
| MERD: | Minimum Eligible Release Date |
| MH-4: | Mental Health Assessment |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHP: | Mental Health Program |
| MHQMS: | Mental Health Quality Management System |
| MHS: | Mental Health Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| MHSPC: | Mental Health Suicide Prevention Coordinator |
| MHSR: | Mental Health Suicide Reviewer |
| MHTS: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MPIMS: | Madrid Patient Information Management System |
| MSF: | Minimal Support Facility |
| MTA: | Medical Technical Assistant |
| NAM: | Nurse Administered Medication |
| NCF: | Normal Cognitive Functioning |
| NKSP: | North Kern State Prison |

| | |
|---|---|
| NOS: | Not Otherwise Specified |
| NPPEC: | Nursing Professional Practice Executive Committee |
| NVDRS: | National Violent Death Reporting System |
| OCD: | Obsessive Compulsive Disorder |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Investigative Affairs |
| OJT: | On the Job Training |
| OP: | Operating Procedure |
| OSS: | Office Services Supervisor |
| OT: | Office Tech |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PHU: | Protective Housing Unit |
| PIA: | Prison Industry Authority |
| POC: | Parole Outpatient Clinic *or* Psychiatrist on Call |
| POD: | Psychiatrist on Duty *or* Psychiatrist of the Day |
| PPE: | Personal Protective Equipment |
| PPEC: | Professional Practice Executive Committee |
| PPRC: | Psychological Peer Review Committee |
| PSH: | Patton State Hospital |
| PSU: | Psychiatric Services Unit |
| PSW: | Psychiatric Social Worker |
| psych tech: | Licensed Psychiatric Technician |
| PT: | Licensed Psychiatric Technician |

PTSD:                          Post Traumatic Stress Disorder

PVSP:                          Pleasant Valley State Prison

QIP:                           Quality Improvement Plan

QIT:                           Quality Improvement Team

QMAT:                          Quality Management Assessment Team

QMC:                           Quality Management Committee

QMT:                           Quality Management Team

QNC:                           Quality Nurse Consultant

R&R:                           Receiving & Release / Reception and Receiving

RC:                            Reception Center

RJD:                           Richard J. Donovan Correctional Facility

RN:                            Registered Nurse

RT:                            Recreation Therapist

RVR:                           Rule Violation Report

SCC:                           Sierra Conservation Center

SHU:                           Security Housing Unit

SI:                            Suicidal Ideation

SMTA:                          Senior Medical Technical Assistant

SMY:                           Small Management Yard

SNF:                           Skilled Nursing Facility

SNY:                           Sensitive Needs Yard

SOA&P:                         Subjective Objective Assessment and Plan

SPC:                           Suicide Prevention Committee

SPRFIT:                        Suicide Prevention and Response Focused Improvement Team

SPU:                           Special Processing Unit

| | |
|---|---|
| SQ: | San Quentin State Prison |
| SRA: | Suicide Risk Assessment |
| SRAC: | Suicide Risk Assessment Checklist |
| SRC: | Suicide Review Committee |
| SRN: | Senior Registered Nurse |
| SSA: | Staff Services Analyst |
| SSI: | Supplemental Security Income |
| SVP: | Sexually Violent Predator |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| THU: | Transitional Housing Unit |
| TLU: | Transitional Living Unit |
| TPU: | Transitional Program Unit *or* Temporary Protective Unit |
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| UCSF: | University of California at San Francisco |
| UHR: | Unit Health Records |
| UNA: | Unidentified Needs Assessment |
| VSPW: | Valley State Prison for Women |
| VPP: | Vacaville Psychiatric Program |
| WHO: | World Health Organization |
| WSP: | Wasco State Prison |

# TABLE OF CONTENTS

**TABLE OF ABBREVIATIONS**

**INSTITUTIONAL SUMMARIES**     5

**Service Area A**     5

    California State Prison, Sacramento (CSP/Sac)     5

    Folsom State Prison (Folsom)     29

**Service Area B**

    Pelican Bay State Prison (PBSP)     38

    High Dessert State Prison (HDSP)     53

    California Correctional Center (CCC)     65

**Service Area C**

    Mule Creek State Prison (MCSP)     68

    Sierra Conservation Center (SCC)     75

**Service Area D**

    California Medical Facility (CMF)     88

    California State Prison, Solano (CSP/Solano)     100

    San Quentin State Prison (SQ)     117

    Duel Vocational Institution (DVI)     134

**Service Area E**

    California State Prison, Corcoran  (CSP/Corcoran)     150

    California Substance Abuse Treatment Facility (CSATF)     169

    Pleasant Valley State Prison (PVSP)     185

Avenal State Prison (ASP)                                              192

**Service Area F**

    Salinas Valley State Prison (SVSP)                          199

    Correctional Training Facility (CTF)                        211

**Service Area G**

    California Men's Colony (CMC)                               220

    Wasco State Prison (WSP)                                    228

    Kern Valley State Prison (KVSP)                             241

    North Kern State Prison (NKSP)                              253

**Service Area H**

    California State Prison, Los Angeles County (CSP/LAC)       263

    California Correctional Institution (CCI)                   276

**Service Area I**

    California Institution for Men (CIM)                        283

    California Rehabilitation Center (CRC)                      293

**Service Area J**

    Richard J Donovan Correctional Facility ( RJD)              302

    Ironwood State Prison (ISP)                                 317

    Calipatria State Prison (Calipatria)                       321

    Centinela State Prison (Centinela)                         326

    Chuckawalla Valley State Prison (CVSP)                      332

**Service Area K**

California Institute for Women (CIW)                                335

**Service Area L**

Central California Women's Facility (CCWF)                          344

Valley State Prison for Women (VSPW)                               359

**SUMMARY**                                                       375

**CONCLUSION**                                                    408

**EXHIBITS**                                                      426

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.,

    Plaintiffs

       vs.                        No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants


TWENTY-FIRST MONITORING REPORT OF THE SPECIAL MASTER
ON THE DEFENDANTS' COMPLIANCE WITH
PROVISIONALLY APPROVED  PLANS,
POLICIES, AND PROTOCOLS

The Special Master's Twenty-First Monitoring Report on the Defendants'

Compliance with Provisionally Approved Plans, Policies, and Protocols is his latest review of

compliance by the California Department of Corrections and Rehabilitation ("CDCR" or "the

Department") with the plans, policies, and protocols provisionally approved by this Court in

mid-1997, and now known as the Revised Coleman Program Guide ("Program Guide").

      The monitoring period covered in this Report extended from April 2008 through

November 2008.  As in previous monitoring periods, CDCR mental health care services staff and

institutional administrators and mental health staff cooperated fully with the monitoring process,

and counsel for plaintiffs and defendants accompanied the Special Master's monitoring staff on

several of their site visits.  The Special Master's experts and monitors examined and assessed

institutional mental health staffing levels, quality management, suicide prevention, medication management, inmate sexual misconduct, and access to higher levels of care. They also focused on each institution's provision of mental health services in its enhanced outpatient program (EOP), administrative segregation units, reception center, and the correctional clinical case management system (3CMS) program, and examined available treatment and program space areas, relationships between custody and mental health, and other matters that affect inmate access to mental health care.

The Special Master's staff continued to work with defendants in the areas of treatment of EOP inmates in reception centers and administrative segregation units, recruitment of mental health staff, enhancement of inmate access to intermediate care beds at Atascadero State Hospital (ASH), improvement of mental health assessments in the disciplinary process for inmates at the 3CMS level of care, and meeting women's EOP bed needs in mainline and administrative segregation units. They also continued to offer their consultation to CDCR's mental health care services staff on a wide spectrum of issues that affected mental health care. In addition, members of the Special Master's staff participated in the process for consideration of proposed revisions to the Program Guide, and continued their ongoing assessment and analysis of the court-ordered CDCR Workload Study.

The broad-ranging involvement by the Special Master and his staff on the court-ordered coordination of the Coleman case with the Armstrong,[1] Perez,[2] and Plata[3] cases remained very active during the twenty-first monitoring period.  Among the many results of this effort was the shift of responsibility for conducting medication management audits from mental health to nursing at numerous CDCR institutions.  To ease this transition and to address several

---

[1] Armstrong v. Schwarzenegger, No. C 94-2307 CW (N.D. Cal.).
[2] Perez v. Tilton, No. C 05-05421 JSW (N.D. Cal.).
[3] Plata v. Schwarzenegger, No. C 01-1351 TEH (N.D. Cal.).

2

substantial issues that arose as a result of it, a coordination work group including members of the

Special Master's staff was established to develop comprehensive consistent medication

management tools and procedures.  These will be designed to collect and analyze data on the use

and effects of psychotropic medications via methods that should yield more reliable and useful

findings.  As of this writing, the work group remains actively engaged in this task.

All 33 CDCR institutions were reviewed.  There were on-site visits at 28 of the

institutions: Avenal State Prison (ASP), California Correctional Institution (CCI), California

Institution for Men (CIM), California Institution for Women (CIW), California Men's Colony

(CMC), California Medical Facility (CMF), California Rehabilitation Center (CRC), California

State Prison, Los Angeles County (CSP/LAC), California State Prison, Sacramento (CSP/Sac),

California State Prison, Solano (CSP/Solano), California Substance Abuse Treatment Facility

(CSATF), Central California Women's Facility (CCWF), California State Prison, Corcoran

(CSP/Corcoran), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI),

Folsom State Prison (Folsom), High Desert State Prison (HDSP), Kern Valley State Prison

(KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State

Prison (PBSP), Pleasant Valley State Prison (PVSP), Richard J. Donovan Correctional Facility

(RJD), Salinas Valley State Prison (SVSP), San Quentin State Prison (SQ), Sierra Conservation

Center (SCC), Valley State Prison for Women (VSPW), and Wasco State Prison (WSP).  The

remaining five institutions were monitored by means of a paper review, which required each of

them to provide the Special Master with documentation of their compliance during the

monitoring period with their local corrective action plans (CAPs) as well as any pertinent court-

ordered mental health programs.  These institutions were California Correctional Center (CCC),

Calipatria State Prison (Calipatria), Centinela State Prison (Centinela), Chuckawalla Valley State Prison (CVSP), and Ironwood State Prison (ISP).

    Recently, the Coleman court entered its most comprehensive order to date concerning defendants' unfinished mental health bed projects.  The order, dated March 30, 2009, concerns mental health beds in the contexts of existing bed construction project orders as well as the defendants' long-range mental health bed strategy.  The court set short-term deadlines with respect to the outstanding bed construction orders, such as the 50-bed mental health crisis bed (MHCB) unit at CMC and the 64-bed intermediate care facility (ICF) at SVSP, and ordered the filing of detailed activation schedules for completion of all other specific court-ordered construction projects.  The court also ordered the defendants to develop and file concrete proposals to meet all remaining short-term, intermediate, and long-range bed needs of the Coleman plaintiff class.  In support of this comprehensive mental health bed effort, the Court ordered CDCR and the Department of Mental Health (DMH) clinicians to jointly conduct a modified assessment to determine whether there are unmet needs for inpatient mental health care among the Coleman plaintiff class, and to refer on an expedited basis any inmates identified in this modified assessment process for inpatient care.  This assessment will not only lead to the accelerated delivery of inpatient treatment to inmates who require it, but will also help update and refine the landscape of mental health needs that will shape the future of mental health bed construction within Coleman.  The Court's order is vast in its scope and promises to be dramatic in its effect on the future of mental health care for CDCR inmates.

    This Report adheres to the general format of previous monitoring reports by presenting a summary of the Special Master's findings on each institution's inmate census and mental health staffing levels, and its compliance in the focal areas of quality management,

suicide prevention, medication management, inmate sexual misconduct, access to higher levels

of care, and any other issues that may be specific to the institution.  These summaries are

organized into groups by CDCR regional service areas, each of which typically includes from

one to four facilities, with a 3CMS program in the general population of each facility.  Each

group generally includes a hub institution with an MHCB for providing inpatient care to inmates

who are in crisis and need short-term intervention and stabilization, and an intensive residential

EOP.  As in the past, this Report also offers comparative analyses of compliance by all 33

institutions, organized by the afore-described focus areas and mental health program areas, as

well as the Special Master's cross-institutional general findings and conclusions, and his specific

recommendations for consideration by this Court.

<u>**California State Prison, Sacramento (CSP/Sac)**</u>
October 6, 2008 – October 9, 2008

<u>Census</u>:

As of June 20, 2008, CSP/Sac's inmate population stood at 2,990, eight percent

fewer inmates than were reported in October 2007.  There were 1,563 mental health services

delivery system (MHSDS) inmates, nine percent more than were reported in October 2007.

Accordingly, MHSDS inmates comprised a larger percentage of CSP/Sac's population, growing

from 44 percent in October 2007 to 52 percent in June 2008.

The EOP population stood at 685, which was 17, or 2.5 percent, more than were

reported in October 2007.  Populations in the mainline EOP programs were stable during the

reporting period, with 189 inmates in EOP 1 and 186 inmates in EOP 2.  Psychiatric services unit

(PSU) 1 and PSU 2 collectively held 244 inmates, an increase of 36 percent since October 2007.

There were 840 3CMS inmates, including 84 in administrative segregation, 68 in A Facility, 228

in B Facility, 441 in C Facility, eight in C-Dorm, and 11 in the security housing unit (SHU).

There were 26 inmates in MHCBs and 12 inmates in the mental health outpatient housing unit (MHOHU).

Staffing:

Staffing at CSP/Sac continued to improve. The overall vacancy rate among mental health positions, reported to be 38 percent in March 2007 and 15.8 percent in October 2007, had fallen to nine percent as of May 2008. Contractors, who collectively provided the equivalent of 15.4 full-time equivalent services during May 2008, reduced the overall functional vacancy rate to 3.4 percent. With few exceptions, nearly all staffing categories were full or nearly full.

Three of 20 allocated psychiatrist positions were not filled, yielding a vacancy rate of 15 percent. Contract psychiatrists reduced the functional vacancy rate to 4.5 percent.

There remained a 17-percent vacancy rate among psych techs, as 12.34 of 71.04 allocated positions were not filled. Contract licensed vocational nurses (LVNs) provided the equivalent of nine full-time equivalent staff during May, thereby reducing the psych tech vacancy rate to 4.7 percent.

Quality Management:

CSP/Sac's quality assurance processes continued to function as intended, enabling the institution to monitor the implementation of an extensive array of programs. The local governing board met quarterly. The institutional quality management committee met at least monthly, and its standing agenda included a wide variety of issues. CSP/Sac monitored implementation of Program Guide requirements in the MHCB, MHOHU, EOP, PSU, and 3CMS programs.

The mental health subcommittee continued to meet weekly, maintain records of its activities, review the results of audits, and forward reports to the quality management committee. The subcommittee made regular use of action items and chartered new quality improvement teams (QITs) to address institutional issues as well as in response to departmental directives. Staff were informed of the results of quality management audits, though there were indications that the use of QITs to identify and raise problems encountered by treatment providers was not fully exploited. Peer review was reportedly resumed by all three mental health disciplines.

Suicide Prevention:

The suicide prevention and response focused improvement team (SPRFIT) met monthly during the reporting period and kept minutes. Agenda topics were consistent with Coleman Program Guide requirements and included review of suicide attempts, multiple inmate admissions to the MHCB, five-day follow-ups, and the inmate profile process.

Audits relevant to five-day follow-up demonstrated inconsistent compliance due to the large numbers of inmates released from MHCBs, MHOHU beds, and alternative cells with orders for suicide prevention monitoring. For example, tracking information indicated that 616 MHOHU discharges required five-day follow-up during the first six months of 2008, for an average of over 100 cases a month. Follow-up was not fully completed for 71, or 11 percent, of these discharges. The institution had recently chartered a QIT to study this issue.

CSP/Sac was compliant with most, but not all, of the components of the Department's plan to reduce suicides in administrative segregation units. Clinical supervisors and custody staff met daily to discuss new arrivals, problem cases, and special situations. Internal audits covering the period from December 2007 to May 2008 showed widely variable

compliance rates relative to the completion of pre-placement screens. During this period, compliance averaged 79 percent and ranged from a low of 53 percent in December 2007 to a high of 95 percent in February 2008. Staff reported ongoing training to improve compliance in this area.

From December 2007 through April 2008, only non-MHSDS inmates placed in the stand-alone administrative segregation unit were screened with the 31-item questionnaire. During that period, internal audits found that all inmates were offered a confidential screen within 72 hours of their placement in the stand-alone administrative segregation units. Just over 90 percent of the confidential screens were refused by the inmates and were performed cell-front.

Starting in May 2008, CSP/Sac started utilizing the 31-item questionnaire to screen all MHSDS and non-MHSDS inmates placed in administrative segregation. During May 2008, staff offered timely confidential screens to 97 of 125 inmates placed in administrative segregation, yielding a compliance rate of 78 percent. Internal data indicated that 66 percent of the inmates refused a confidential screen and were screened cell-front. Staff training and adjusted psych tech assignments had reportedly restored compliance in this area during recent months.

There were four designated intake cells in the EOP administrative segregation hub and three in the 3CMS administrative segregation unit, all of which were equipped with suicide-resistant vents and doors with two-window panels that made it easier for staff to see into the cells. In addition, electrical outlets had been removed from the intake cells. The intake cells in the EOP hub had a single cement bed, while the intake cells in the 3CMS administrative

segregation unit had metal bunk beds.  At the time of the monitor's[4] visit, inmates housed in the intake cells on both units had been there longer than 72 hours, though staff reported that they tried to move inmates into cells with electrical outlets as soon as possible.

There were six designated intake cells in the stand-alone administrative segregation unit.  These cells were not used to house high-risk inmates during the first 72 hours in administrative segregation, as envisioned by the Department's suicide reduction plan.

Thirty-minute welfare checks were documented in all administrative segregation units, though there were noted problems and irregularities.  Documentation in all units indicated that rounds were conducted at regular intervals, and none of the correctional officers interviewed by the monitor knew that rounds were to be completed at staggered intervals.  In the EOP administrative segregation hub, 30-minute checks were not documented after 7:00 a.m., though it was after 8:00 a.m. when the monitor toured the building.  In the stand-alone administrative segregation, 11:30 a.m. rounds were already recorded when the monitor toured the building at 11:00 a.m.  Lastly, the cell numbers listed on the logs used to record the completion of welfare checks were often different from the cells identified with intake placards, which raised concerns about whether officers were monitoring the correct cells.

Isolation log audits covering the period from December 2007 to May 2008 and logs reviewed by the monitor confirmed compliance with daily psych tech rounds. Staff reported that inmate profiles, which included the results of completed suicide risk assessment checklists (SRACs), were reviewed as part of the screening process for administrative segregation.  Staff and inmates reported, and reviewed yard schedules confirmed, that inmates in all administrative segregation units were consistently offered at least ten hours per week of outdoor yard.

_____

[4] Although the data collected and the findings discussed in this Report are the product of many members of different monitoring teams, references to various monitors throughout the Report are singular rather than plural. Clinical judgments of the Special Master's psychiatric experts are explicitly attributed to an expert.

Correctional officers and supervisors in all administrative segregation units reported that monthly emergency drills were completed.

All cells in the EOP hub and 3CMS administrative segregation unit, with the exception of retrofitted intake cells, were equipped with electrical outlets, and inmates were permitted to have a television or radio.  Inmates in the stand-alone administrative segregation unit plugged entertainment appliances into electrical outlets that were located in the pipe chases between cells.  However, there were no surfaces in the cells on which to place appliances so that the electrical cords could reach the outlets.  Consequently, inmates fashioned slings from torn bed sheets to suspend televisions and radios from the ceilings in their cells.  Staff indicated that there were plans to install shelves in each cell, but did not know when the project would start.

Medication Management:

Nursing audits indicated that half of all inmates transferred to CSP/Sac did not arrive with a supply of currently prescribed medications, as required by CDCR transfer policy. Nonetheless, 94 percent of newly arriving inmates with current prescriptions received medication within 24 hours of arrival.  By contrast, audits found that only 78 percent of new and changed medication orders were filled by the pharmacy within 24 hours.  Slippage in this area was attributed to the institution's transition to Maxor National Pharmacy Services Corporation's new pharmacy management information system.  More recent data reportedly indicated that compliance was restored immediately prior to the site visit.

Various internal audits yielded compliance rates of 80 to 100 percent for timely renewal of medications.  The same audits showed the overall compliance rate for proper documentation in progress notes related to new, changed, or discontinued medication orders increased from 63 to approximately 85 percent during the reporting period.

Internal audits yielded an 86-percent compliance rate for proper documentation of medication noncompliance on the medication administration record (MAR), defined as missing three consecutive days or half of all doses during a seven-day period. The audits showed that medication noncompliance was routinely referred, but that psychiatric follow-up was documented in the unit health record (UHR) only 45 percent of the time. This issue was to be included in future psychiatric peer review audits.

Monthly UHR reviews related to completion of informed consent forms for new medication orders yielded mixed results, with compliance rates ranging from 60 to 100 percent. Noncompliance was largely attributed to missing and misfiled MARs, and audit results showed improved performance during the reporting period. Audits focused on the completion of annual updates were inconclusive because consent forms were often inappropriately removed from thinned UHRs.

Internal audits of MAR documentation and the presence of the previous month's MAR in the UHR yielded compliance rates of 87 and 97 percent, respectively.

Monthly audits related to the completion and documentation of Abnormal Involuntary Movement Scale examinations yielded compliance rates that ranged from 80 to 100 percent.

There were 663 inmates on hour of sleep (HS) medications at the time of the site visit, 316, or 91 percent, more than were reported during the preceding site visit. The institution did not complete an audit to determine when HS medications were administered. However, the monitor noted while reviewing isolation logs in administrative segregation units that the last medication pass of the day often occurred prior to 8:00 p.m.

CSP/Sac issued direct observation therapy (DOT) chronos for inmates with current Keyhea orders and with histories of hoarding and attempted suicide by overdose. Audit findings, based on the observation of two medication passes a month in either EOP, EOP administrative segregation, or PSU, showed 100-percent compliance throughout the monitoring period. However, the audit reports did not describe local DOT protocols, specify what was observed, or define compliance. Consequently, it was impossible to determine whether or not local DOT protocols and practices conformed to CDCR policy.

The mental health program continued to actively and assertively use the Keyhea process for clinically relevant and appropriate cases. There were 270 active Keyhea orders at the time of the site visit. CSP/Sac's willingness to make use of the Keyhea process when clinically warranted imposed a heavy administrative burden on available resources. During the monitoring period, the institution initiated 72 Keyhea petitions, of which seven were denied; one was certification, two were withdrawn by legal counsel due to insufficient documentation of grave disability, and four were denied by the administrative law judge for lacking clear and convincing evidence. Another 38 Keyhea orders were permitted to expire during the monitoring period, most of which involved inmates with impending parole dates.

Sexual Misconduct:

CSP/Sac was largely compliant with the Department's protocols for indecent exposure. CSP/Sac reported 132 incidents of sexual misconduct from October 1, 2007, to June 6, 2008. Sixty-two percent of the incidents involved EOP/PSU inmates, 20 percent involved MHCB inmates, 14 percent involved 3CMS inmates, and three percent involved non-MHSDS inmates. Ten inmates were involved in two incidents, five inmates were involved in three

incidents, two inmates were involved in four incidents, two inmates were involved in five incidents, and one inmate was involved in six incidents.

Tracking data provided by the institution indicated that clinicians completed 102 sexual misconduct screens during the reporting period.  The screens were consistently completed within one to three days of the incident and generally were immediately followed by an interdisciplinary treatment team (IDTT) review.  In most cases involving inmates who were issued consecutive rule violation reports (RVRs) for indecent exposure within a short period of time, one screen and/or IDTT encompassed two or more incidents.  Seven incidents involving four inmates were referred for a comprehensive evaluation, and two inmates were diagnosed with Exhibitionism during the reporting period.

CSP/Sac's Exhibitionism treatment program was activated in May 2008, when there were eight inmates who met the program's diagnostic criteria.  Three inmates refused treatment, and five inmates were participating.  Two social workers were assigned to co-facilitate the program and followed a cognitive behavioral treatment model.  An Exhibitionism treatment manual, recently promulgated by the Division of Correctional Health Care Services (DCHCS), was described by staff as helpful.

Transfers:

Access at CSP/Sac to higher levels of care continued to be problematic.  Slow access to DMH led to long correctional treatment center (CTC) admissions, which, in turn, resulted in long stays in MHOHU beds and a continued reliance on alternative holding areas to monitor inmates for whom CTC/MHOHU beds were unavailable.  Only 14 percent of inmates admitted to DMH acute care were transferred within ten days of referral.  Less than a third of the inmates referred to Salinas Valley Psychiatric Program (SVPP) were transferred, and none of

13

those admitted to SVPP were transferred within 30 days of referral.  Just shy of 60 percent of

MHCB admissions lasted longer than ten days, 28 percent lasted longer than 20 days, and 12

percent of MHCB admissions lasted longer than 30 days.  There was an average of 157 MHOHU

placements a month, 57 percent of which lasted longer than 72 hours.  There was an average of

29 placements a month in alternative holding cells, 28 percent of which lasted longer than a day.

   Access to DMH acute care was slow.  CSP/Sac generated 45 referrals to DMH

Acute Psychiatric Program at Vacaville (APP) from October 2007 through May 2008.  Eight

referrals were rescinded by the institution, and 33 referrals resulted in transfer.  Of the 28 cases

in which referral and transfer dates were recorded, 24, or 86 percent, did not meet the ten-day

transfer guideline.  More than half of the inmates transferred to the APP waited longer than 20

days, and more than a third waited longer than 30 days.

   Eighteen inmates were returned from the APP to CSP/Sac during the reporting

period, and their average DMH length of stay was 81 days.  Staff reported that discharge

summaries from the APP were often missing or provided long after the inmate's return, which

compromised continuity of care.  On the flip side, the monitor's expert found inadequate follow-

up and treatment of two inmates after their return to CSP/Sac from the APP.

   Access to intermediate care was also poor.  Although CSP/Sac generated a higher

number of referrals than did any other prison, staff did not make all referrals that were clinically

warranted.  Staff attributed the under-utilization of intermediate care to perceived futility of

making a referral, as only a small percentage of accepted referrals resulted in transfer.

   During the reporting period, CSP/Sac generated 51 referrals to SVPP, less than a

third of which, or 15, resulted in transfer.  None of the transfers occurred within 30 days of

referral.  The number of days between referral and transfer ranged from 34 to 192 days, and

14

averaged 96 days.  As of May 30, 2008, another 32 inmates who had been accepted by SVPP

were pending transfer, 27, or 84 percent, of whom had been waiting longer than 30 days.  Half of

the inmates pending transfer to SVPP had been waiting longer than 90 days; a quarter had been

waiting more than 150 days.

      Two inmates were referred to ASH during the reporting period, both of whom

were rejected for security reasons.  These referrals were redirected to SVPP.

      CSP/Sac's growing MHSDS population produced a demand for short-term acute

care that far exceeded the institution's current capacity, which consisted of 26 MHCBs in two

licensed CTCs.  Consequently, CSP/Sac utilized an MHOHU and alternative holding areas to

temporarily house inmates in need of acute care when all MHCBs were occupied.  Due largely to

slow access to DMH beds, lengths of stay in MHCBs routinely exceeded ten days.  In some

cases, MHCB staff decided to extend lengths of stay by a week or two rather than initiate the

lengthy DMH referral process.  In other cases, inmates languished for weeks in MHCBs while

waiting for DMH beds.  Consequently, more than half of MHCB admissions lasted longer than

ten days, more than a quarter exceeded 20 days, and 12 percent lasted longer than 30 days.

      The MHOHU continued to be very busy.  During the period from October 1,

2007, to June 6, 2008, there were 1,101 discharges from the MHOHU, or about 157 a month.

Slightly less than half, or 47 percent, of the MHOHU admissions lasted longer than 72 hours.

Twelve percent of admissions lasted longer than seven days, six percent lasted longer than ten

days, and about one percent lasted longer than 20 days.  Staff reported that long stays in the

MHOHU often involved inmates who repeatedly threatened suicide and/or self-harm for reasons

that were deemed unrelated to mental health.  In such cases, referral to an MHCB was considered

clinically unwarranted, while release to a housing unit was deemed unacceptably risky.

CSP/Sac continued to use alternative holding cells to temporarily monitor inmates when MHOHU and CTC beds were not available. CSP/Sac utilized 15 cells in Yards A, B, and C, which included "ZZ Cells" and contraband cells, all of which were plumbed. From October 1, 2007, to June 6, 2008, there were 206 such placements, or about 29 a month. Nearly three quarters of these placements lasted a day or less, about a quarter lasted two days, and three percent, lasted three days. Two outliers both lasted 12 days. Of the 206 placements, 164, or 80 percent were released to the MHOHU, four, or two percent, were released to the CTC, two, or one percent, were released to the outpatient housing unit (OHU), and 36, or 17 percent, were released to housing units.

There was one PSU-endorsed inmate at CSP/Sac waiting for a PSU bed. He arrived at CSP/Sac on October 7, 2008, and had been waiting one day. Staff reported that access to PSU beds had improved, and that most PSU-endorsed inmates received a PSU bed, either at CSP/Sac or elsewhere, within four to six weeks.

Other Issues:

Administrative Segregation

The institution reported that five MHSDS inmates were mistakenly placed in the stand-alone administrative segregation unit during the reporting period. Four of five inmates were removed from the unit within 24 hours; one was removed within 72 hours. This latter inmate was placed in the stand-alone unit on Friday and discovered the following Monday.

MHCB

Eight monthly audits completed by the institution during the reporting period yielded compliance rates ranging from 90 to 100 percent for nearly all Program Guide requirements related to MHCB treatment. These included, among other things, completion of an

admission note within 24 hours of admission, development of an initial treatment plan within three days of admission, completion of updated treatment plans at least twice a week, documented consideration of referral to DMH for inmates with three or more MHCB admissions in six months, completion of SRACs upon admission and discharge, documentation of daily psychiatric rounds, and documentation on the discharge summary of direct communication between an MHCB clinician and the case manager or supervisor assigned to the MHSDS program to which the inmate was to be returned.  CSP/Sac remained noncompliant with Program Guide requirements related to MHCB length of stay, in large part attributable to slow access to DMH programs.

Internal audits found that initial assessments were consistently completed by the recreation therapist within 72 hours of an inmate's admission to the MHCB.  Weekly contact with the recreation therapist varied considerably related to an inmate's clinical presentation and willingness to participate.

Both CTCs documented the utilization of restraint in thorough logs, which indicated that the application of restraint was clinically appropriate.

The monitor's expert observed IDTT meetings in both MHCB units.  The meetings were attended by all required disciplines, consisted of clinically appropriate and pertinent discussion among all participants, and included input from the patient when appropriate.

OHU/MHOHU

CSP/Sac's 20-bed MHOHU was staffed with 4.75 full-time equivalent clinical case managers and a part-time psychiatrist.  Psych tech coverage was provided 24

hours a day and registered nurse (RN) coverage was provided from 7:00 a.m. to 11:00 p.m., seven days a week.

PSU and EOP inmates accounted for 79 percent of MHOHU placements, followed by 3CMS inmates at 17 percent, inmates from Folsom at two percent, and non-MHSDS inmates from CSP/Sac at two percent. The majority of MHOHU placements were related to suicidal ideation, and it was not uncommon for there to be ten inmates on suicide precaution at any given time. Staff reportedly conducted suicide prevention rounds in the MHOHU on a near-continuous basis.

Staff estimated that approximately 20 to 30 percent of all MHOHU placements were referred to an MHCB level of care, the vast majority of whom were admitted to one of two CTCs at CSP/Sac. During the reporting period, only 13 inmates were transferred from the MHOHU to an MHCB in another CDCR prison.

There was inadequate treatment and office space in the MHOHU. Clinician work space was cramped and part of a larger IDTT room. Inmates requiring medical care were escorted to the B Facility-Clinic due to lack of a medical treatment area within the MHOHU.

In practice, the MHOHU operated as an unlicensed CTC. However, the unit, which consisted of 20 retrofitted cells in a typical housing unit, did not meet the staffing or physical plant requirements associated with licensed CTCs. For example, 24-hour nursing was not provided, and a psychiatrist with other duties devoted only part of his time to the MHOHU. Cells in the MHOHU were inadequate, particularly in relation to suicide prevention.

18

Staffing and physical plant limitations contributed to poor compliance with some treatment requirements.  Internal audits indicated that inmates in the MHOHU were not seen by a psychiatrist on a regular basis.  Only 60 percent of MHOHU records reviewed by the institution during May 2008 documented psychiatric contact.  Staff indicated that, in some cases, psychiatric contact was not indicated.  In other instances, however, lack of documentation was attributed to inadequate psychiatric coverage in the MHOHU.  In addition, psychiatric staff responsible for evaluating inmates for placement in the MHOHU during non-business hours often failed to complete required paperwork, including SRACs.

Case manager contacts in the MHOHU were frequent, but often non-confidential.  All inmates in the MHOHU were reportedly seen at least weekly, and as often as daily, by a case manager.  Clinicians, however, were routinely forced to conduct brief cell-side interviews because there were an insufficient number of confidential booths for one-to-one contacts.

Compliance was sustained in other treatment areas.  For example, an internal audit in May 2008 yielded a 90-percent compliance rate for timely completion of IDTT meetings.  With few exceptions, daily progress notes were present in UHRs.

SHU

The 90-bed SHU program at CSP/Sac, activated on May 5, 2008, was initially conceived as a transitional unit for HIV-positive inmates from CSP/Corcoran waiting for beds at PBSP.  The impetus for the transitional program was to move HIV-positive inmates to SHU beds in areas of the state in which coccidiomycosis (also known as Valley Fever) was not considered a health risk.  However, due to the lack of SHU beds at PBSP and Madrid restrictions related to the

placement of MHSDS inmates in SHU beds, CSP/Sac's new SHU program quickly evolved into a long-term SHU program for non-MHSDS and 3CMS inmates. By October 2008, the SHU program had nearly reached full capacity, holding 86 inmates, 43 of whom were 3CMS.

The "transitional" SHU program at CSP/Sac was activated without additional custody or mental health staffing allocations. Staff borrowed from other programs, which included a full-time clinician and part-time psychiatrist, reportedly conducted monthly case manager contacts and medication reviews every 45 days. Psych techs completed daily rounds in the SHU, and rounds observed by the monitor's expert were noted to be competent. Custody staff reported that all inmates in the SHU were offered ten yard hours a week. The institution planned to assess the need for additional mental health staffing allocations and clinical space for the new SHU.

PSU

The PSU at CSP/Sac consisted of two separate programs, known locally as PSU 1 and PSU 2. PSU 1 maintained an inmate capacity of 128 beds throughout the reporting period. PSU 2 doubled in size from 64 to 128 beds during the reporting period, thereby extending CSP/Sac's total PSU capacity to 256 inmates by April 2008.

Each program, while located on the same yard, operated independently, with separate staffing packages that included nine full-time case managers, two full-time psychiatrists, and two full-time recreation therapists. Case manager caseloads averaged 13 inmates in both programs. However, a relatively high rate of staff absences in PSU 2 effectively increased caseloads in that program during the reporting period. Each program utilized psych techs to administer psychotropic medications and facilitate groups. RNs were assigned to each program to triage and manage physician lines. In

20

PSU 1, RNs attended IDTT meetings in order to provide medical input; this function was carried out by psych techs in PSU 2.

Both PSU programs used a behavioral incentive program to encourage inmate participation in therapeutic activities. The behavioral incentive program consisted of four steps, each permitting greater access to privileges as the inmate demonstrated sustained participation in the mental health services prescribed by his treatment plan. Step 1 afforded limited privileges to new-arrival inmates during a period of evaluation and orientation, and Step 1A offered restricted privileges to inmates who were removed from higher steps after receiving RVRs or failing to meet the participation requirements. Advancement to Step 2 was contingent on a 75-percent participation rate. Steps 3 and 4 required a sustained participation rate of 85 percent.

CSP/Sac had recently revised the behavioral incentive program in an effort to improve inmate compliance with all aspects of treatment. Participation rates, previously based solely on group attendance and compliance with weekly case manager contacts, were expanded to include attendance at ducated psychiatric appointments and IDTT reviews. Failure to attend a single IDTT meeting resulted in an automatic one-step reduction. In addition, cell-front case manager contacts that resulted from the inmate's failure to attend a scheduled appointment were no longer calculated into participation percentages. The minimum amount of time at each privilege step was increased from 30 days to 60 days, and inmates returned to Step 1 after receiving an RVR were required to remain discipline-free and maintain a 75-percent participation rate for 30 days, as opposed to 14 days, before qualifying for Step 2. Finally, the threshold for gaining access to several privileges was increased in the revised behavioral incentive program.

For example, access to canteen was moved from Step 2 to Step 3, and access to in-cell televisions/radios and annual packages was moved from Step 3 to Step 4.

As of May 2008, almost a quarter of the PSU population was in Step 2, about 15 percent of the population was in Step 3, and 47 percent were in Step 4. Approximately 13 percent of the PSU population was in Steps 1 and 1A.

The institution reported that the revisions to the behavioral incentive program had increased the rate of inmate participation in IDTTs to above 90 percent. However, many clinicians and inmates expressed concern regarding the increased "potency" of the behavioral incentive program, and cases reviewed by the monitor's expert highlighted a handful of inmates whose increasing level of acuity and maladaptive behaviors had thwarted their ability to progress through the steps of the behavioral incentive program. Some of these individuals no longer responded to privilege incentives, while others had multiple MHOHU admissions or numerous RVRs. Hearing officers' failure to consider well-documented mental health factors when reviewing RVRs sometimes contributed to an inmate's inability to advance within the confines of the behavioral incentive program. This subgroup of inmates, typically stalled for lengthy periods of time in highly restrictive conditions, suggested the need for a more proactive approach to treatment.

Most inmates in PSU 1 and PSU 2 were scheduled to attend a minimum of five two-hour groups a week, all of which took place in the mental health treatment center on A Facility. Clinical and skill enhancement groups comprised 70 percent of offerings; the remaining 30 percent consisted of rehabilitation and leisure groups.

High cancellation rates sometimes reduced the average number of offered groups per week to fewer than ten.  According to data provided by the institution, during the period from October 2007 through April 2008, PSU 1 offered an average of 9.3 group hours a week, ranging from a low of seven in April 2008 to a high of 11 in February 2008.  Staff cancelled less than five percent of scheduled groups during most months.  However, group offerings declined notably in April 2008, when 29 percent of scheduled activities were cancelled.  Group performance data were not provided for PSU 2.

Group refusal rates were not provided.  However, firsthand observations of PSU group sessions, anecdotal reports, and interviews of staff and inmates suggested that refusal rates were high.  In PSU 2, staffing instability resulted in group cancellations, lack of subject continuity across group sessions, and revolving leadership, all of which reportedly discouraged inmate participation.

Audit data, based on ten UHR reviews a month in each PSU program during the reporting period, showed consistent compliance with weekly case manager contacts, initial IDTT meetings within 14 days of arrival, and quarterly IDTT reviews. Data regarding cell-front contacts in PSU were not provided.  However, the institution reported that coordinating officer and clinician schedules to facilitate out-of-cell case manager interviews was "a work in progress," indicating that there continued to be a high number of cell-front contacts.  Some clinicians assigned to the PSU reported seeing all inmates in a confidential setting, while others claimed that half of all contacts were conducted cell-front due to various logistical obstacles.

The institution reported increased compliance with confidential, monthly psychiatric contacts after introducing in each PSU program two psychiatric ducat lines

per week.  However, audit data provided by the institution yielded mixed results.  On the one hand, compliance rates for monthly psychiatric contacts in PSU 1 ranged from 90 to 100 percent.  On the other hand, nine of ten reviewed UHRs belonging to inmates in PSU 2 did not document monthly psychiatric contact.

The monitor's experts found that IDTT meetings observed in PSU 2 were attended by a full team, fulfilled their purpose, and were therapeutic for those inmates who elected to attend.  Records were available at the meetings.  Multidisciplinary discussion reflected a thoughtful approach to all cases reviewed by the IDTT.  Custody staff routinely weighed the option of vacating or suspending a SHU term that had brought an inmate to the PSU.

Administrative Segregation EOP

The capacity of the EOP administrative segregation hub was reduced from 138 to 74 inmates during the reporting period in order to accommodate the PSU expansion.  The institution reported that 8.5 clinicians were assigned to the hub, producing caseloads of eight to nine inmates.  According to data presented by the institution, during the period from October 2007 through May 2008, EOP inmates received a total of 1,393 one-to-one clinical contacts, 753, or 54 percent, of which were cell-front.  According to the institution, the high percentage of cell-front contacts was misleading in that most of them were related to inmate refusals, five-day follow-up contacts, and daily contacts associated with chronic program refusers and inmates on reduced/modified programs.

Monthly audits completed from October 2007 to May 2008 found 90-percent or greater compliance with timely completion of initial and quarterly IDTT meetings, as well as with completion of weekly case manager contacts.  The average number of offered weekly group

hours ranged from 8.2 in February 2008 to 10.7 in October 2007, with a mean of 9.7. The average number of weekly group hours fell below ten during November 2007, January 2008, February 2008, and April 2008. Noncompliance during November, January, and February was attributed to holidays, and noncompliance in April was attributed to mandatory custody training and TB testing/reading.

Group refusal rates were not provided. However, staff reported that inmate participation decreased notably after the location of group sessions was changed from the housing unit to the new mental health building.

A retrospective review of inmate contact histories covering the period from October 2007 through April 2008 yielded a mean compliance rate of 82 percent for completion of monthly psychiatric contacts. The compliance percentage ranged from a low of 70 percent in December 2007 to a high of 100 percent in February 2008.

The monitor's expert observed two EOP hub groups and interviewed the inmates participating in each group. The inmates reported benefiting from the groups offered and confirmed receiving at least ten hours per week of structured therapeutic activities. The inmates also reported being offered out-of-cell clinical contacts with their case managers.

3CMS

Eight monthly audits completed by the institution during the period from October 2007 to May 2008 yielded compliance rates of greater than 90 percent related to quarterly case manager contacts, annual IDTT reviews, and annual treatment plan updates. Compliance rates for completion of mental health evaluations within ten days of arrival/referral and IDTT reviews and initial treatment plans within 14 days of arrival/referral were 85 percent and 88 percent, respectively.

The institution started auditing compliance with quarterly psychiatric contacts in May 2008 and, as of the end of the reporting period, had completed only one review of 18 cases—a sample size that represented just two percent of the 3CMS population.  Therefore, the audit, which yielded a compliance rate of 61 percent, was not statistically significant and could not be used to gauge performance in this area.

During the preceding monitoring period, CSP/Sac offered only one group to 3CMS inmates. It was a "transition" group designed to help inmates recently released from EOP adjust to 3CMS services and the general population environment.  Lack of group space on the yards reportedly prevented the institution from offering more groups to 3CMS inmates. However, throughout this reporting period, CSP/Sac located additional programming space on all three yards and, by early March 2008, had adopted a robust group schedule for 3CMS inmates.  From April 11 to June 5, 2008, approximately seven percent of the 3CMS population participated in groups, of which there were an average of five a week.  Group topics included transition from EOP, anger management, pre-parole planning, and mindfulness.  This was an area of marked improvement, and may result in resolution of this institution's last CAP item if performance is sustained.

Administrative Segregation 3CMS

There were approximately 90 3CMS inmates in administrative segregation.  Three case managers were assigned full-time to administrative segregation and carried caseloads of 30 inmates, 26 inmates, and 34 inmates, respectively.  Monthly audits conducted throughout the reporting period indicated that weekly contacts occurred consistently, with three quarters of them made available to inmates in confidential treatment booths.  Inmates refused about half of all out-

of-cell contacts.  Consequently, approximately 70 percent of weekly case manager contacts were conducted cell-front.

A psychiatrist was assigned part-time to administrative segregation and followed 80 3CMS inmates taking psychotropic medications.  A retrospective review of inmate contact histories covering the period from July 2007 through May 2008 found that 17 of 18 reviewed cases recorded at least quarterly psychiatric contacts, yielding a compliance rate of 94 percent.

Eight separate audits completed by the institution during the period from October 2007 through May 2008 found greater than 90-percent compliance with several Program Guide requirements, including completion of initial mental health evaluations within ten days of placement, completion of an initial IDTT meeting and treatment plan within 14 days of placement, and completion of an IDTT review and treatment plan update every 90 days.  Audits yielded compliance rates of 76 percent for documented case manager acknowledgment of weekly psych tech notes and 48 percent for documentation of daily psych tech rounds via weekly summaries.

The institution reported that IDTTs were consistently attended by a case manager, psychiatrist, and correctional counselor.  UHRs were usually available for IDTT meetings and one-to-one case manager interviews, but were not provided for institutional classification committee (ICC) hearings.  The inmate profile was described as a "useful tool" for ICC hearings.

Group therapy was not available to 3CMS inmates in administrative segregation "due to the lack of a group room" in or around the housing unit.

Referrals

CSP/Sac did not have a reliable system for tracking referral response times.  The institution chartered a QIT, which reportedly devised a system for triaging and documenting

27

referrals, entering referral data into the mental health tracking system (MHTS), and confirming clinician follow-up.  Nurse training was ongoing, and the institution planned to start monthly audits in August 2008.

Medical Records/MHTS

UHRs were problematic in relation to misfiled paperwork, filing backlogs, inappropriate thinning, and poor availability.  Staff reported that poor UHR organization compromised the peer review process.

RVRs

A case reviewed by the monitor's expert raised serious concerns regarding the degree to which mental health factors were considered within the RVR process.  It was not clear whether this disturbing case represented an isolated incident or an example of prevailing practice.

Shortly after being tapered off Seroquel, a severely psychotic PSU inmate with a current Keyhea order was issued two 115s within two days, one for throwing soggy mattress stuffing at his cell door that hit the face of an officer standing on the tier, and another for refusing to take involuntary medications that resulted in his extraction from a CTC cell.  In both cases, the assessing clinician described the inmate as severely psychotic at the time of the incident, and in both cases, the hearing officer chose to hold the inmate "accountable for his action" and recommended the forfeiture of behavior credit.

This inmate's extraction from a CTC cell, for which he received a 60-day credit loss for obstructing an officer's duties, may have been a prudent course of action given his severely psychotic state and refusal to take involuntary antipsychotic medication.  However, holding this inmate accountable for his actions and adding time to his sentence patently

contradicted the purpose and spirit of RVR protocols that were specifically designed to protect seriously mentally ill inmates from losing time credits and gaining security points for behavior resulting from severe psychosis.  Failure to dismiss these RVRs also resulted in this inmate's loss of Level 4 privileges in the PSU, which, according to the newly revised behavioral incentive program, would take him at least five months to regain.

**Folsom State Prison (Folsom)**
August 5, 2008 − August 7, 2008

Census:

As of August 7, 2008, Folsom housed a total of 4,073 inmates, of whom 731, or 18 percent, were members of the mental health caseload.  There were three EOP inmates and 675 3CMS inmates in general population.  Two EOP inmates and 51 3CMS inmates were housed in administrative segregation.

Staffing:

With the exception of .75 recreation therapist positions, Folsom maintained full mental health clinical staffing.  Folsom clinical staffing consisted of two senior psychologists, three psychiatrists, six staff psychologists, and three psychiatric social workers.  The health program specialist position had been filled on a staff development basis just prior to the site visit.  Folsom did not utilize any contract services during the reporting period.

The senior psych tech position was filled, and all six allocated psych tech positions were filled.  The mental health allocated senior registered nurse (SRN) II position was vacant; however, the position was covered on an acting basis.

Quality Management:

The quality management program that was utilized to identify issues, develop CAPs, and monitor outcomes was very active.  There was documentation of good

interdisciplinary representation in the various meetings and committees.  Meeting minutes detailed the comprehensive functioning of quality assurance.

It was reported that the quality management committee (QMC), health care supervisors' meetings, and warden's executive staff meetings were occurring regularly and weekly.

Peer review remained operational for pertinent disciplines.

Suicide Prevention:

Folsom continued to have a functioning suicide prevention committee (SPC).  The suicide reduction plan was implemented during the preceding monitoring period and continued to be a required Program Guide function.  There were four suicides from February 2, 2008, to October 23, 2008.

Staff continued to report adequate notification of returning inmates as the classification and parole representative (C&PR) staff would not accept a returning transfer until the senior psychologists were notified and approved the transfer.  Compliance with five-day follow-up after MHCB stays improved.  Mental health clinicians conducted the follow-up during the usual workweek, and psych techs conducted the follow-up on weekends and holidays.

Eight intake cells were in the process of being retrofitted for direct observation cells.  Intake cells were clearly marked with the required information.

Pre-placement screening, including the suicide risk screening questionnaire, had been implemented in the preceding monitoring period.  The May 2008 QIT audit found that only 14, or 42.2 percent, of 33 inmates received mental health screenings within 72 hours.  In the June 2008 QIT audit, 29, or 78.4 percent, of 37 inmates received mental health screenings within 72

hours.  No refusals were documented for either audit.  It was noted that in June 2008, a brief in-service training class was provided by the senior psychologist with all clinicians attending.

The 30-minute welfare checks for new-intake inmates continued to be well documented in the required staggered fashion.

Each caseload inmate was offered a minimum of ten hours of yard per week.

The emergency response procedure was fully in place.  Regular drills and training were assimilated and documented.  Notably, no psych techs participated in the May 2008 exercise per requirement; on-duty custody and RN staff did participate as required.  The administrative segregation unit medical staff CPR training was current.

The emergency response review committee (ERRC) met four times during the monitoring period.  It was noted that the required senior psychologist or psychiatrist member of the committee was lacking.

The administrative segregation unit had not been equipped to provide for appliances in the individual cells, and there were no plans to retrofit for this capability.

Medication Management:

Folsom had made substantial improvements in auditing the medication administration process and had started to implement corrective actions based on audit findings since the last visit.  Mental health staff and the director of nursing (DON) credited the acting SRN II for this improvement.

An audit completed by the acting SRN II regarding medication continuity upon intra-institutional transfers showed that 61 percent of inmates did not have a missed dose, 22 percent missed one dose but received their medication within 24 hours, 11 percent missed two pill passes but received medication within 48 hours, and six percent refused their medication

upon arrival in the new unit. Inmates interviewed corroborated the audit findings. The institution developed a new procedure in which medications were transferred directly from the transferring unit nurse to the receiving unit nurse to address this issue.

The one psychotropic medication refusal referral audit conducted since the last visit showed that 11 inmates were entered into the refusal log from May 3, 2008, to June 3, 2008, and that 83 percent of them were referred to the psychiatrist after refusal. There were no audits of whether all refusing inmates were logged into the refusal log or whether mental health follow-up in response to the referrals was timely, although a plan to audit the timeliness of referral response was documented. Mental health staff reported that notice of medication noncompliance was inconsistent.

The institution reported that the length of pill lines was no longer an issue since the addition of a second window in Building 1, which houses over 1,200 inmates. The associate warden of health care reported that the additional line, as well as smoother operations in general during pill call, was made possible by the addition of correctional officers in each of the buildings to assist in the process.

Folsom had formed a QIT regarding psychotropic medication laboratory testing and had created a procedure that was in draft form at the time of the monitor's last visit. In March 2008, UHR reviews of the new procedural requirements were conducted by the psychiatrists, who found baseline lab compliance rates ranging from 30 to 100 percent, but lower compliance rates for recommended labs at three and six months. A second audit was conducted in June 2008, and six-month lab compliance rates had improved to 66- to 95-percent compliance. The involvement of psychiatrists in conducting these audits served as both a type of peer review and a way to involve psychiatrists in the QIT process.

At the time of the monitor's visit, 95.2 percent of all psychotropic medication prescriptions were ordered as DOT. The monitor expressed concern regarding whether any clinical discretion was being exercised around the use of this process and questioned whether DOT could realistically be undertaken accurately and thoroughly for the more than 650 inmates on psychotropic medications.

There were no inmates on Keyhea orders at the time of the visit.

An audit of HS medications was conducted in June 2008 by the acting SRN II, and HS medication distribution was observed on five different dates. The audit found that HS distribution started at 8:00 p.m. on each of the dates. Approximately 50 percent of all psychotropic medication prescriptions were ordered for HS administration (438 prescriptions out of 876).

An audit of mental health inmates on psychotropic medications was conducted by the supervising pharmacist. It was reported that 97 percent of the inmates on psychotropic medications received their parole medications during the monitoring period, up from 90 percent as reported for the preceding monitoring period.

Sexual Misconduct:

Inmates housed in administrative segregation unit intake were operationally identified by placement above the cell of a blank yellow card indicating sexual misconduct in compliance with the Program Guide. Seven RVRs were issued relating to sexual misconduct, with four resulting in SHU terms. Five sexual misconduct RVRs resulted in a screening and IDTT review; however, none of these inmates were referred for a comprehensive evaluation.

One inmate diagnosed with Exhibitionism was not transferred to an Exhibitionism treatment program due to a noted close release date in August 2008. The inmate received

weekly case management contacts in the administrative segregation unit.  However, it was

subsequently determined that this inmate had two SHU terms and that his actual release date was

March 2009.  The case was to be submitted to the administrative segregation unit ICC for

approval of transfer to an Exhibitionism treatment program.

Transfers:

Because Folsom does not refer directly to DMH, but rather to MHCBs or EOPs

for more intensive mental health services and assessment to determine whether DMH referral is

necessary, there were no DMH referrals during the time period between monitoring rounds.

All Folsom inmates determined to need the MHCB level of care continued to be

referred to CSP/Sac during the monitoring period.  If beds were not available at CSP/Sac,

Folsom contacted the health care placement unit headquarters for referral to another MHCB unit.

If no MHCBs were immediately available, Folsom checked on availability of a MHOHU bed at

CSP/Sac, as per existing practice.

Since the monitor's last site visit, there were 41 MHCB referrals, but 28 of them,

or 68 percent, were actually admitted to the CSP/Sac MHOHU due to the lack of available

MHCBs.  Inmates identified as requiring MHCB transfer were maintained on one-to-one watch

in Building 4 while awaiting transfer.  Logs were maintained.  The duration of time between

referral to MHCB and actual movement was within Program Guide requirements in the vast

majority of cases, although three inmates were held overnight at Folsom prior to transfer.

There were 13 transfers from general population to the EOP level of care since the

last visit, and all occurred within the Program Guide timeframes.  Eight of nine administrative

segregation EOP transfers were completed within 30 days; one transfer took 32 days.  Two EOP

inmates were awaiting transfer at the time of the visit but had been waiting for only a few days.

34

Staff reported that the C&PR staff worked diligently and called other institutions to process and move the inmates out quickly.

Other Issues:

Administrative Segregation

The administrative segregation mental health program continued to be well organized.  Clinical staff assigned to the unit each had been assigned confidential office space. There was adequate confidential treatment space.  Each office was equipped with a therapeutic module for individual inmate treatment.  The IDTT space on the third floor included a large conference space utilized for IDTT meetings, with two offices located off the large space, one for the RN and one for the clinician's office.  There were additional custody escort staff assigned to the administrative segregation unit.  They shared working space on the first floor corridor area adjacent to the clinicians' offices.

The primary administrative segregation unit was in Building 4.  The local operating procedure (LOP) to double-cell was not implemented at Folsom unless two inmates chose to double-cell, in which case both were required to sign that they had requested and voluntarily accepted sharing a cell.  The overflow administrative segregation in Building 1 was utilized during the monitoring period due to the retrofitting of eight cells in Building 4.

In administrative segregation, IDTT meetings were scheduled on Fridays and were not observed during the site visit.  Information provided by the institution for the most current audit reflected that 60 of 61, or 98.3 percent, had timely compliance of IDTT review.

EOP

Timeliness of EOP transfers remained compliant.  Review of Folsom's EOP tracking log revealed 100 percent of all EOP general population inmates were transferred within

Program Guide timeframes.  There were 13 transfers completed since the last site visit; three transfers were pending, but had been waiting for less than 30 days.  UHR reviews and MHTS inmate histories revealed weekly contacts by case managers and monthly psychiatrist appointments for inmates waiting to be transferred to an EOP institution while housed at Folsom.

3CMS

Inmate interviews, UHR reviews, and MHTS histories demonstrated that the 3CMS program was functioning as required by the Program Guide.  Ten weekly groups were being conducted at the time of the visit, with another three to begin in August 2008.  Data reflected that 101 inmates had participated in group treatment during the monitoring period, and 14 inmates were on waiting lists.  The number of groups being offered was limited by the current lack of group treatment space.  There was only one group room available in the mental health area.  Inmates reported they were quite pleased overall with the quality and frequency of their mental health interventions and knew how to access their case managers between scheduled sessions, if necessary.

Referrals

Folsom had a QIT in place to regularly monitor the timeliness of mental health response to referral requests.  Audits continued to reveal that responses to emergency and urgent referrals were timely.  In addition, the average response time to routine referrals improved to 4.8 days, as compared to 9.1 days reported in the preceding monitoring period.  The late responses were critically analyzed by the QIT.  Actions taken to correct identified problems included improving cross-coverage processes during unanticipated absence of a clinician, using alternative space for confidential interviews during lockdowns (rather than having inmates come to mental health building offices), and clarifying scheduling expectations with office technicians.

IDTT/Treatment Plans

Although training and peer review to improve the quality, specificity, and individual nature of IDTT plan documentation had occurred since the preceding monitoring period, anticipated improvements were not yet apparent in the UHRs reviewed. In addition, the quality and utility of the actual IDTT meetings themselves were questioned, given the fairly routine absence of nursing staff and the cursory and limited participation permitted of the inmate in his own team meeting.

Medical Records/MHTS

Some issues regarding report queries with MHTS had been uncovered since the monitor's last visit. Individual data per inmate were entered and retained accurately, but requests for reports or compilations of individual records were filled with errors. For example, a report of the number of inmates at the 3CMS level of care, which was approximately 730, yielded a count of over 900 because it included duplicate entries. Similarly, a query regarding dates of the last IDTT meetings yielded a report indicating many were untimely, but when the actual date of the last meeting was viewed, virtually all were timely. The institution was told by the MHTS help desk that they would need to devise some alternative procedures and databases to get the information sought, as the help desk was unable to support them at the time due to budget cuts and other priorities. The unavailability of accurate MHTS reports had slowed considerably the rates at which various QIT projects could be completed.

Space

Folsom continued to report there was adequate confidential treatment space and that nearly all clinical contact was out of cell.