Heat Plan

Folsom had a fully functioning heat plan that was routinely activated during the monitoring period.

RVRs

Folsom issued 723 RVRs, including two to EOP inmates and 194 to 3CMS inmates. Eight assessments were completed for 3CMS inmates, and one for a non-MHSDS inmate. Mental health assessments were not completed for two EOP inmates. There were nine RVRs related to hoarding and cheeking medication during the monitoring period.

**Pelican Bay State Prison (PBSP)**
August 26, 2008 − August 27, 2008

Census:

As of May 1, 2008, PBSP housed 3,352 inmates, including 1,100 inmates in the SHU and 161 inmates in administrative segregation. There were 494 MHSDS inmates, including 120 inmates in the PSU, eight inmates in MHCBs, 64 inmates at the EOP level of care, and 219 3CMS inmates. Due to several riots, there was an increase of 125 3CMS inmates in administrative segregation since the preceding monitoring period.

All administrative segregation status EOP inmates were housed in the PSU. Two 3CMS inmates were in the temporary housing unit, four were in the behavior modification unit (BMU), 77 were in administrative segregation, and six were in the SHU. The remaining 130 3CMS inmates were housed in traditional general population units.

The BMU count on August 12, 2008, was 47 inmates, which included four 3CMS inmates.

Staffing:

Significant progress was made with filling vacancies. Of the 71.15 mental

health positions, six positions were vacant. The vacancy rate was 8.4 percent.  Use of contractors reduced the functional vacancy rate to 5.4 percent.  The six vacancies were for a senior supervising psychologist, a senior psychiatrist, and four psych techs.

Quality Management:

The infrastructure of the quality improvement systems remained intact and very functional.  The governing body met twice during the first six months of 2008, in February and May.  Minutes indicated that mental health was represented at both meetings and that issues related to mental health services were addressed.

The health care quality management committee continued to meet weekly and kept minutes.  The mental health department was almost always well represented in these meetings although there were some absences by mental health staff and other required attendees. Issues and activities related to mental health services were periodically presented or discussed. The monitor's expert attended the weekly mental health QMC meeting on August 26, 2008, which focused on issues related to the quality of treatment plans.  The interaction and discussion among the attendees were very good.  The subcommittee continued to meet weekly and kept minutes.  Attendance for required participants significantly improved since the last monitoring period.  Meetings addressed a range of topics relevant to the delivery of mental health services. Mental health QMC recommendations implemented during this monitoring period included issuance of cell phones to supervising staff, appointment of a senior psychologist to oversee the 3CMS program, and incorporation of the new pre-admission log into a new LOP.

The pilot project relevant to the administrative structure of the mental health system was very successful.  The Health Care Compliance Unit (HCCU) staff were an integral part of the self-monitoring and quality improvement process.  The HCCU maintained the

integrity of the process and ensured compliance information was reported to the highest level in the chain of command.

QITs chartered during the reporting period included lengths of time over 30 days for clinical appointments with psychiatrists, a CTC recreation therapist duty statement, and suicide precautions.

PBSP staff reported difficulties with collecting and interpreting audit results from nursing staff. No standardized auditing, analyzing, or reporting methodologies were used, and no effective system was in place to ensure audit results were reported back for quality improvement and corrective action when necessary.

Significant improvement was noted in the peer review process, which involved reviewing different issues each month. Peer review activities occurred monthly for psychiatrists, psychologists, psychiatric social workers, and psych techs during the reporting period.

Suicide Prevention:

The SPRFIT met monthly during the reporting period, with attendance at 80 percent for both custody and clinical staff. The SPRFIT was chaired by the senior psychologist for the MHCB and was comprised of administrative and supervisory staff. Discussion revolved around incidents of suicidal gestures, suicide attempts, self-mutilation, and suicide deaths. The information gathered was used to facilitate education and training, and to assess the effectiveness of local plans and interventions.

The SPRFIT coordinator monitored and audited the mandated five-day post-MHCB discharge follow-ups. Audits were conducted monthly and reported as performance key indicators. The audits were submitted to the mental health QMC as key indicators, and to headquarters. For the monitoring period, five-day follow-ups were ordered for 52 inmates, and

100 percent of those follow-ups were successfully completed.

Recommendations from the SPRFIT during this reported period included more non-custody translators and training of staff on procedures for treating suicidal inmates after hours.

Approximately 75 percent of new mental health staff and 100 percent of the ongoing staff had been trained on use of the new CDCR mental health services SRAC. The remaining 25 percent were scheduled for this training.

Suicide prevention cut-down kits with ambu bags were maintained in the control rooms within administrative segregation and PSU. All custody staff interviewed had CPR micro-shields in their possession. All custody staff reported attendance at annual CPR training and participation in monthly emergency response drills, which included mental health scenarios. The ERRC met monthly.

All caseload inmates in administrative segregation were housed in cells with electrical outlets and allowed the use of televisions and radios. Due to frequent turnover of cells, there were no designated intake cells in any unit, but new admissions were noted by placards on cell-fronts.

Medication Management:

Major changes affecting medication management occurred. PBSP implemented the Maxor formulary, the non-formulary request procedure, and the CDCR Policy and Procedure for Seroquel and Wellbutrin. On a local level, revisions to Volume 5A of the policies and procedures that resulted from the PBSP Madrid litigation were submitted to the medication management QIT.

Continuity of medication for new arrivals continued to be problematic. Problems

included inmates arriving from the sending institution without medications, untimely filling of medication orders, and untimely deliveries to the housing units.  Nursing and psychiatry conducted audits regarding new arrivals and medication continuity.  Compliance rates, measured by timely receipt of medications by the inmate, ranged from 48 percent to 77 percent.  For both staff training and implementation of a paper MAR for use during weekends and evening hours, a 95-percent compliance rate was achieved during April 2008.

Medication noncompliance policies and procedures and informed consent procedures had also been implemented.  Review of medication consent documentation indicated that improvement was needed.  The missing consent forms fell into two areas: patients transferred out of the CTC to another facility, and specific psychiatry staff not obtaining consents.  Both of these areas were addressed with the staff involved.

Medication orders were processed and administered in a timely fashion during regular work hours.  However, after hours, on weekends, and on holidays, there were problems related to pharmacy verification of Madrid Patient Information Management System (MPIMS) medication orders and the distribution of medication from the pharmacy.

Laboratory monitoring guidelines were established and audited.  These guidelines were to be slightly modified based on national guidelines.  There were compliance issues related predominantly to two psychiatrists.

All psychotropic medications were ordered as DOT.  If clinically indicated, psychiatrists were allowed to change this to out-of-cell DOT, or out-of-cell DOT with a 30-minute hold in case of risks of selling, hoarding, or abuse of medication.

The Keyhea process had steadily improved following the reorganization within the Office of Legal Affairs.  At the time of the visit, there were 62 inmates under Keyhea orders.

The Keyhea coordinator reported good communication with other Keyhea coordinators regarding transfers of inmates under such orders.

Psychiatry staff uniformly prescribed HS medication when clinically indicated. As of April 20, 2008, 82 MHSDS inmates received HS psychotropic medication. Nursing conducted an HS medication audit that demonstrated that HS medications were delivered after 8:00 p.m.

Parole medications were routinely dispensed to inmates upon parole when the pharmacy was notified in a timely manner about the inmate's parole date, as confirmed by relevant audits. However, the list received by the pharmacy reportedly did not include about 20 to 30 percent of the inmates who were actually paroling.

Sexual Misconduct:

Although PBSP was one of three CDCR prisons with a treatment program for Exhibitionism, few, if any, inmates could actually meet treatment criteria due to problems in the screening and diagnosis process. From November 1, 2007, to April 30, 2008, there were 37 RVRs related to sexual misconduct. Eleven of these RVRs were committed by one inmate, who was transferred to SVPP during December 2007. Thirty-four had sexual misconduct screens, and 32 were discussed in IDTT meetings. Only one sexual misconduct screen was referred for a comprehensive evaluation. The inmate did not meet the diagnostic criteria for a diagnosis of Exhibitionism or Paraphilia not otherwise specified (NOS).

The lack of more than one comprehensive evaluation appeared directly related to the lack of an adequate screen for a paraphilia. The mental health screen previously referenced was designed to screen for the presence of a serious mental disorder, not a paraphilia. It did not require relevant sexual history questions to be asked.

43

There were 51 referrals of inmates, with some inmates referred more than once, to the district attorney (DA) due to indecent exposure since November 2007. Regardless of the outcome of sexual misconduct screens or diagnoses, inmates were offered group and individual therapy services. Custody-driven behavioral modification procedures had been implemented to include indecent exposure jumpsuits, yellow placards on cell doors, concrete yard, loss of canteen, and some property restrictions.

The group therapy Exhibitionism treatment program curriculum was developed by the CDCR in June 2007. This volunteer program continued to be offered on a weekly basis at the PBSP PSU treatment program and was scheduled in three phases over a 12-week period. The new group semester started on April 1, 2008, with eight inmates enrolled.

There were significant differences in the clinical indecent exposure protocols between the PBSP Freitag-driven model and the CDCR systemwide model, which has significantly impacted both programs.

Transfers:

From December 2007 through July 2008, PBSP transferred 70 inmates to CMF APP. The average time from referral to transfer was 5.9 days. No CMF APP referrals were refused placement during this period. At the time of the monitor's review, one inmate, who was initially placed into the MHCB on August 12, 2008, was pending a Vitek hearing for DMH placement, after initially accepting transfer and subsequently refusing.

A total of 16 inmates were referred for SVPP placement from December 2007 through July 2008, with one case rejected due to no Axis I symptoms, with which the referring clinician agreed. Only four inmates had actually been transferred, within an average period of 33 days between referral and bed assignment, and 3.5 days between bed assignment and transfer.

One transfer was cancelled due to medical problems.

No referrals for ASH APP were noted for the period.

PBSP's CTC was currently licensed for ten MHCBs.  There was an unlicensed CTC bed, number 184, which was referred to as the observation room because it was located directly in front of the nurse's station window.  Staff reported, and the monitor's visit confirmed, that this bed's physical plant was similar to the licensed beds.  Staff reported that it was their practice to utilize this room if all MHCBs were full.

From December 2007 through July 2008, the institution recorded a total of 219 MHCB placements, with 60 of those coming from outside institutions.  Eighty-six were received from the institution's PSU.  The average length of stay ranged from 6.8 days in April 2008 to nine days in January 2008, with an overall average of eight days.

At the time of the visit, only seven MHCB beds were occupied.  The institution reported that, with one minor exception, at no time during this period were any MHCBs utilized for medical admissions.  The one exception was for a period of less than 24 hours in July 2008 when three of the beds were occupied during an outbreak of MRSA.

The institution reported that, during a five-day period at the end of March 2008, four MHCB cells were undergoing repair and two patients were required to be housed in holding cells, one for a period of ten hours and the other for five hours.  Each was on one-to-one suicide watch during these periods.  This was the only recorded use of holding cells during the period.

Other Issues:

PSU

For the reporting period of November 2007 through April 2008, very significant progress was made in providing a minimum of an average of ten hours of structured out-of-cell

treatment/therapeutic activities for PSU inmates. The overall average weekly number of hours provided for this reporting period improved from the previous reporting period average of 8.7 to 11.8 per week per inmate. The monthly average of offered structured therapeutic activities exceeded the ten-hour target, and for half of the reporting period, PBSP's PSU provided in excess of 13 therapeutic hours (13.4, 14.4, and 13.2), which does not reflect individual therapy appointments with case managers or psychiatrists.

Improvements in the level of average out-of-cell therapeutic time were the result of full staffing of case managers and improved availability of recreation therapists and psych techs.

PBSP's efforts to increase the number of groups available also resulted in an increase in the overall refusal rate from approximately 40 percent in the previous reporting period to 47 percent. It was the staff's opinion that the increase was a by-product of offering more opportunities for group to the same inmates who refuse as usual or inmates who had enough offered to them by the end of the week.

A group questionnaire was developed and administered to PSU inmates to see if changes could be solicited in the context of the high refusal rate. The questionnaire was administered during the week of May 19, 2008. Of the 30 questionnaires that were turned back in, the vast majority of inmates wanted no change in the length of groups.

Space problems were reported to exist in the PSU, especially in the context of space for individual clinician contact in a manner that offered adequate sound privacy.

The monitor's expert attended part of an IDTT during the site visit. Inmates being reviewed were interviewed during the IDTT process, and the meeting was conducted in a competent manner.

EOP

Review of the performance indicators report confirmed the staff's report that, except for January 2008, EOP inmates were being offered at least ten hours per week of structured therapeutic activities.

Administrative Segregation EOP

Administrative segregation-status EOP inmates were housed in the PSU.  Thirteen to 15 such inmates were in the PSU from May 2008 through July 2008.  All suicide prevention measures were in place in the PSU, except that the 30-minute staggered review of new admissions was supplanted by hourly custody reviews, documented on unit logs.  All inmates were offered 1.5 hours of yard time per day, meeting the ten-hour per week requirement. All cells had available electrical outlets.  From December 2007 through July 2008, the average weekly number of group hours offered to PSU inmates ranged from 8.5 to 13.6.  Seventy-two different groups were offered, provided in four group therapy rooms with up to nine inmates per group in individual holding cells and average attendance of six to seven per group.  These figures did not include other out-of-cell therapeutic activities, such as case manager contacts and psychiatric appointments.  The inmate refusal rate for group activities hovered around 40 percent during the monitoring period.

3CMS

Issues continued to exist related to providing 3CMS groups, a historically problematic issue due to prolonged lockdowns at PBSP.  Each group on both A and B general population yards at PBSP was scheduled to run for 12 weeks, not counting cancellations for any reason.  Groups started with a census of ten inmates, with dropouts generally due to job assignments as they became available.  During the monitoring period, the group topic on both

yards was anger management.

Modified programs had their most significant impact on the mental health program's ability to provide group therapy on the main yards.  In particular, Facility B yard was unavailable for group therapy for half of the reporting period.

From December 2007 to May 1, 2008, compliance had ranged from 84 percent to 98 percent for frequency of clinicians' clinical contacts being consistent with the inmates' treatment plans.  There were very few clinical contacts with the psychiatrists that occurred later than 90 days after the previous contact with the psychiatrist.

Treatment plans had improved and were no longer were extremely generic.  Audit results of treatment plans for 3CMS inmates were reviewed.  Compliance with specific indicators ranged from 66 percent to 96 percent.  Plans to improve the treatment plans that involved both supervision and training processes were developed by staff.

Administrative Segregation 3CMS

3CMS administrative segregation inmates were housed in building A-1, with 64 inmates at the time of the monitor's visit, and A-2, with 61 inmates at that time.  A stand-alone unit for non-MHSDS inmates was also available for general population inmates.  The pre-placement health screen was conducted by nursing staff at the time of initial placement.  An institutional audit showed these screenings were completed on over 90 percent of new admissions for all administration segregation units for the period from November 2007 through April 2008.  Audits conducted during the period demonstrated that, for the stand-alone administrative segregation unit, completion was within 72 hours for 92.9 percent.  For A-1 and A-2, completion rates within 72 hours existed for 96.4 percent.

Full mental health screenings on new unit placements were being conducted

according to program requirements, as were psych tech rounds.

The 31-question screening was provided on all new admissions by psych techs. If a general population inmate in the stand-alone unit tested positive on this screen, he was transferred to administrative segregation Unit 1 or 2 immediately. It was reported that Hispanic inmates had in the past been coerced into refusing these screenings or any other involvement in mental health treatment activities by institutional Hispanic gangs, under threat of death. A process was established to conduct these screenings in a private interview room outside the view of other inmates. As a result, most refusals were eliminated.

Both custody and clinical staff reported very good communication/cooperation between them. A daily conference to share information concerning new admissions and individuals with mental health issues was occurring between the psych techs and unit sergeants. Custody staff indicated during interviews that they conduct 30-minute welfare checks throughout an inmate's stay in the units; a review of the logs confirmed this.

Hourly five-day follow-ups of inmates released to administrative segregation from MHCBs were conducted and logged. In a recent audit of 26 discharges, 22 yielded completed logs indicating an 84.6-percent level of compliance with this requirement, compared to 85.7-percent compliance in the previous period. Two units in PSU had not returned reports on this audit at the time of the site visit.

Clinical staff reported strong support and cooperation from custody staff in inmate transports for interviews and coordination between scheduled group therapy sessions and exercise periods. All 3CMS inmates were offered at least one two-hour group per week. Six differently focused groups were provided, and inmates were referred by their case managers to

the IDTT for enrollment.  Inmates could also submit their own requests for enrollment to the scheduling psych tech.

Group therapy continued to be offered to all administrative segregation MHDS inmates.  Per institution report, all 3CMS inmates in administrative segregation were offered between six and seven hours of yard time per week, due to the overflow of inmates in these units and limited yard space.  This compares to a total of 14 hours per week for non-MHSDS inmates in the stand-alone administrative segregation and three hours per week in the overflow unit (Unit 3).

No formal "bad news" screening process was in place in the administrative segregation units, although an informal referral system to communicate such information received from correctional counselors or the RN at bus screening was functional.  Additionally, psych techs attempted to address this issue in their daily rounds.

The institution reported that custodial efforts were initiated during June 2008 to reduce the lengths of stay of MHSDS inmates in administrative segregation, which had reduced the average stay from 204 days in May 2008 to 98.5 days in July 2008.

On June 20, 2008, the monitor's expert visited PBSP to review the administrative segregation mental health pilot project.  Compliance was present with weekly clinical case manager contacts.  Review of July 2008 data indicated that 77 percent of these contacts were out of cell.

On the morning of August 27, 2008, the monitor's expert observed the mental health rounds process, which was done very competently by the psych tech and correctional officers during the medication administration process.  The monitor's expert also attended part of an IDTT meeting, which involved useful interdisciplinary discussion.  Presence of central files

(C-files) at IDTT meetings remained an area of concern.

Referrals

Response to mental health referrals by both psychiatrists and case managers occurred much faster.  The average number of monthly referrals from November 2007 to April 2008 was 165, with 13 percent not being seen within Coleman timeframes, or nine percent for case manager noncompliance and four percent for psychiatrist noncompliance.  Review of the noncompliance rate for psychiatry showed there had been a significant improvement from the previous reporting period rate of 10.8 percent not in compliance to only 4.1 percent on average during this monitoring period.  Review of the noncompliance rate for case managers showed there had been a very significant improvement from the previous reporting period of 17-percent noncompliance to only an average of 8.7 percent this reporting period.

Medical Records/MHTS

As reported during the preceding monitoring period, the use of MPIMS was facilitated by implementation of uniform training protocols and increased accountability among mental health clinicians.  Since February 2007, PBSP had implemented a meaningful MAR using a Java program to extract information from the MPIMS Oracle database.  This MAR had limitations related to the lack of staffing for a 24-hour pharmacy at PBSP, which had been mitigated by the use of a paper MAR during weekends and evening hours for inmates requiring medication initiation or changes of medications.  PBSP was seeking permanent technical support positions though the Plata receivership.

The medical records department was reported to have a filing backlog of just a few days, and records were organized and reasonably accessible to staff.

<u>Lockdowns</u>

During the monitoring period there were no full lockdowns.  However, the frequency of modified program days on the main yards remained an area of concern.  There were several significant modified programs, mostly related to riots on Facility A and Facility B yards that impaired the delivery of mental health services primarily in the areas of group therapy and screening prior to placement in administrative segregation.  For example, B yard groups ran from November 6, 2007, to January 15, 2008, with only five groups successfully completed due to B yard being in and out of lockdown.

A New Year's Eve riot occurred in A Yard, followed by a modified program in January 2008 with housing unit A being the primary unit involved.  A-8 was on modified program for 29 days, as were units A-2 to A-7 inclusive for 14 days.  An additional four days of modified program were experienced for all units of Facility A yard in April 2008 due to a statewide all-housing units alert.  All group therapies were cancelled on the yard until May 27, 2008.

PBSP staff further reported that on January 18, 2008, a riot on Facility B yard led to a substantially modified program including units B-4 through B-8 inclusive for 81 days on units B-4, B-6, B-7, and B-8, and for 96 days for unit B-5.  On or about April 18, 2008, approximately 90 days after the modified program began, normal program resumed.  Groups resumed on May 24, 2008.

PBSP staff further reported that on or about April 1, 2008, B-8 was declared an administrative segregation overflow unit and inmates were housed there with limited screenings.

There was a lapse of six days of 30-minute welfare checks being

conducted because custody staff on Facility B were unfamiliar with administrative segregation policies that required these checks.  Training was since provided.

### Pre-Release Planning

Pre-release planning at PBSP consisted primarily of interviews by a contract representative for the transitional case management program (TCMP), who provided notice to inmates in MHSDS of their requirement for participation in the Parole Outpatient Clinic (POC) at the time of their parole.  The monitor met with the TCMP staff person, who reportedly came to the institution every two or three months and interviewed approximately ten to 15 inmates who would be paroling within 90 days.  Reporting requirements were provided with the name and address of the POC clinician.  A brief description of the inmate, his level of care, medications, diagnosis, and general appearance were then documented and forwarded to the parole region.  Occasionally, when the TCMP representative happened to be familiar with mental health resources in the area in which the inmate was to parole, a referral for benefit programs might ensue.  File reviews by the monitor confirmed documentation of TCMP contacts on paroling inmates during this period.

In addition to TCMP, PBSP provided the mandated educational pre-release class, in which MHSDS inmates were eligible to enroll.  Some individual and group therapy related to issues of community adjustment, particularly substance abuse and peer relations, was sometimes provided on an individual basis.

### High Desert State Prison (HDSP)
October 14, 2008 – October 16, 2008

Census:

On October 15, 2008, HDSP's total inmate population was 4,520, which included 668 reception center inmates, an increase of nine percent since the preceding monitoring period.

The total MHSDS population was 917, or 131 percent of the institution's rated MHSDS capacity of 699. There were 401 inmates in administrative segregation, a decrease of 22 percent from the preceding monitoring period. There were 899 3CMS inmates, with 14 inmates at the EOP level of care and four inmates in the MHCB.

HDSP had a 32-bed CTC, including a ten-bed MHCB that housed four MHCB and three EOP inmates. There were 14 EOP inmates awaiting transfer, three EOP inmates housed in administrative segregation, four in the reception center, and four in mainline.

During the reporting period, HDSP became a designated Level IV sensitive needs yard (SNY) site, with approximately 1,000 beds in Yard B dedicated to that population. The SNY reached its capacity in February 2008.

Staffing:

The institution had a mental health functional vacancy rate of 24 percent at the time of the visit. The chief psychologist position was filled, and two of the 2.5 senior psychologist positions were also filled. All six of the allocated staff psychiatrist positions were vacant. The institution relied on 3.7 contract psychiatry positions and 114 hours of psychiatry telemedicine per month for coverage. Despite the use of contract psychiatrists and psychiatric telemedicine, continuity of care and the IDTT process were both affected by the absence of permanent positions.

Twelve of 17 allocated staff psychologist positions were filled, and a contractor covered the equivalent of one position. All seven of the social worker positions were filled.

Since June 2008, five of ten psych tech positions were vacated, and a recruitment effort was underway to fill those positions.

54

All institutional yards had full-time clinical case managers assigned, with mainline caseloads averaging 80 inmates, and administrative segregation caseloads averaging 36. Three psychologists and one social worker were assigned to the reception center full-time, in addition to one part-time rover and one contract psychologist. The 1.65 recreation therapist positions remained vacant.

Quality Management:

The mental health quality management subcommittee met at least monthly during most of the reporting period, with attendance ranging from six to eight mental health staff members. Nursing, pharmacy, medical records, and custody were generally unrepresented. Meeting minutes were maintained and covered a broad array of issues.

The subcommittee chartered QITs and reviewed routine audits. Although treatment space and construction was outside of the quality management process, there was no indication that lack of confidentiality had been examined through a QIT or another systemic process.

Suicide Prevention:

During a ten-month period prior to July 2008, the SPC reportedly met every month but one. The committee reviewed key indicators of MHCB operations, remained updated on statewide videoconferences on suicide prevention, and maintained minutes of its meetings. The committee devoted little time to formulating a proactive approach to important issues including self-inflicted injuries and repetitive admissions to MHCBs, and needed to expand its scope to address a handful of salient issues and to refine its approach on selected issues.

A six-month audit of tracking the completion of five-day follow-up and custody observations of suicidal inmates released from MHCBs indicated a 95-percent compliance rate. The institution needed to address this issue to ensure 100-percent compliance.

The CDCR administrative segregation suicide prevention program was generally in place in all four administrative segregation buildings.  An audit of the 31-question mental health screening for the period of May 2008 through July 2008 demonstrated a 92.5-percent compliance rate for screenings occurring within 72 hours of admission.

New retrofitted cells were provided, and new admissions were identified by placards outside of the cells.  Electrical outlets for televisions and radios were available in all cells.

Custody staff performed 30-minute welfare checks for the first 21 days of placement throughout the units on a staggered basis.  Logs of these checks indicated 90-percent compliance.  A review of records for two inmates released to administrative segregation following suicide watch confirmed that hourly welfare checks occurred pursuant to the five-day follow-up requirement.

Daily rounds were being conducted by psych techs, and discussions between staff, case managers, and custody sergeants regarding new admissions and other mental health issues occurred daily.

All inmates were offered ten hours of yard time per week in the enclosed yards.

Suicide cut-down kits were observed in all the control rooms, and all custody staff surveyed produced micro-shields.  In addition, all custody staff completed yearly CPR training and participated in monthly emergency medical response drills.

Medication Management:

        HDSP's transition to the Maxor pharmacy management information system began on June 30, 2008, and reportedly remained inconsistent at the time of the monitor's visit. Physicians reported that non-formulary medication was readily available. Poor medication continuity was a complaint of both inmates and staff, with reported interruptions in the administration of medication between refills and housing changes. The magnitude of HDSP's medication management problems was not quantified, as most audit results were based on small samples collected early in the year.

        Responses to noncompliance with medication were inconsistent. Missing MARs, partly due to a backlog of loose filing, posed problems for auditors as well as providers who requested information regarding inmates' compliance. Pill lines of one to three hours in length were regular occurrences in two yards. When medications were administered at cell-front during lockdowns, lapses in administration were commonplace due to lack of correspondence between the location shown on an MAR and an inmate's actual location, as well as to scheduling difficulties that disrupted the timing of intervals between doses.

        The use of DOT and HS orders remained problematic. The last medication pass of the day was typically between 5:00 and 6:00 p.m. Inmates reported awakening regularly at 3:00 a.m., which they attributed to taking medication too early in the evening. A total of three inmates had HS orders.

        HDSP initiated five Keyhea petitions, tracked the legal status of eight inmates who arrived with current Keyhea orders, and sought renewals when clinically appropriate. Three orders were renewed. Two orders lapsed in February 2008 because HDSP was unable to make arrangements for a judge and counsel for the inmate to come to the prison.

<u>Sexual Misconduct</u>:

Forty-seven RVRs were issued for sexual misconduct during the period from September 2007 through June 2008. All of these received the sexual misconduct screen, except one who left the institution prior to completion of screening. The screenings plus an IDTT review led to eight full evaluations, with four 3CMS individuals receiving the clinical diagnosis of Exhibitionism. Only one of these inmates was subsequently transferred to an Exhibitionism treatment program; the institution itself offered no formal treatment for this behavior. Custody measures, including covering the bottom two thirds of the cell window, identification of the individual on unit picture boards, and use of designated jumpsuits, were utilized. Two cases were accepted for prosecution by the local DA.

<u>Transfers</u>:

Access to DMH care was poor. The institution completed one DMH intermediate care transfer to SVPP during the reporting period, which took 26 days.

There were 11 referrals from October 2007 through September 2008, resulting in three transfers. Most inmates remained acutely psychotic for weeks despite receiving attentive MHCB treatment and never reached an acute care bed. HDSP staff tracked referrals, DMH decisions, and the outcomes of referrals, watching cases rise toward the top, and fall back again, on the Department's waiting list for acute care beds.

HDSP rescinded four referrals to acute care. The long delays allowed them to stabilize and improve enough to return to their sending institution, transfer to a prison with an EOP unit, or return to the reception center that had sent them to HDSP in time to be released on parole. Inmates accepted by DMH were typically transported the same day; all were dispatched

to DMH within 72 hours of a bed assignment.  None were discharged from DMH for return to HDSP.

Staff reported that two referrals were rejected because the inmates had not had a parole revocation hearing and hence no parole date had yet been set, while a third was rejected because the inmate was very close to his parole date.  The institution was made aware of the new policy change on these issues.  The institution noted that it was nearly impossible to achieve acute care transfers unless the individual was suicidal.

HDSP had 14 EOP inmates in residence during the monitor's visit.  This was an unusually high number in contrast to numbers reported in the past.  Approximately half of the EOP inmates were transferred or paroled from the reception center within the required timeframes during the reporting period.  In July 2008, there were 17 EOP inmates pending transfer at the time of the visit.  Six had been awaiting transfer longer than 60 days, with the longest wait being four months in a case that was complicated by medical needs.

Staff attributed excessive lengths of stay and the accumulated number of EOP inmates to the statewide lack of beds.  Staff reported that no beds were made available to them at their designated EOP administrative segregation hub facility.

The CTC had 35 beds including ten designated MHCBs and three safety cells. Medical patients rarely occupied MHCBs.  The MHCB did not reach maximum capacity during the monitoring period.  The MHCB typically recorded 24 to 36 admissions per month.  Holding cells were not used.  Quarterly audits indicated that routine clinical practices in the MHCB were largely consistent with Program Guide requirements, with the exception of early in the monitoring period, when missed daily psychiatry contacts were associated with shortages in psychiatry staffing.

A log of seclusion and restraint use appeared to be complete. The log indicated that safety cells were frequently used but that restraints were rarely used. Inmates were placed in safety cells upon a physician's order. Inmates in safety cells were provided with a safety mattress, blanket, and smock unless explicitly prohibited by order. Personal property and eating utensils were prohibited in all cases.

The new 50-bed MHCB at CMF did not result in any decrease in demand for MHCBs. Additionally, the mission change that resulted in a new SNY at HDSP contributed to an increase in MHCB admissions, including multiple admissions.

During the period from September 1, 2007, through June 30, 2008, there were 317 admissions to the MHCB, with one third of admissions originating outside HDSP. One hundred forty-three additional inmates were evaluated but not admitted. Staff reported that inmates were moved from the MHCB on the day of discharge or the following day. Administrative delays in moving inmates discharged from the MHCB were reportedly rare.

During this reporting period, a total of 46 stays lasted longer than ten days. The average length of stay was 5.6 days, excluding these 46 cases. During the first six months of 2008, nine inmates were admitted to the MHCB three times or more.

All inmates attending MHCB IDTT meetings were handled as if on administrative segregation status, regardless of lengths of stay or security status. Out-of-cell contacts and other out-of-cell activities, such as outdoor recreation hours mandated by Title 15, were rarely permitted.

Although permitted in theory, out-of-cell activities and access to outdoor recreation were effectively blocked at the time of the monitor's visit in October 2008. The vacant recreation therapist position had effectively ended access to out-of-cell time. According

to HDSP's LOP, a special ICC meeting could be held to approve outdoor recreation for MHCB inmates with long lengths of stay.  However, access to the outdoor yard, as well as out-of-cell activities indoors, had been a topic of discussion among staff since 2001 with no discernible effect.

Other Issues:

### Reception Center

Due to its small size, the reception center did not receive additional clinical staff to provide full EOP services outlined in the CDCR reception center EOP plan.  It had, however, dedicated one full-time clinical case manager to provide EOP treatment for this small population. Daily clinical contacts were provided, with more than 75 percent of these out of cell and lasting up to one hour in duration.  Ten hours of yard time were provided per week.  Limited pre-release planning was provided through the TCMP program.

### Administrative Segregation

A senior psych tech was available to participate in IDTT reviews.  However, it was noted that three psych tech positions were vacated, which may impact future compliance. The institution appeared to be compliant in the delivery of medications, which could also be jeopardized by the current vacancies and should be subject to future review.

For the period of August 2007 through April 2008, the institution was 100-percent compliant with weekly case manager clinical contacts due to the availability of three full-time case managers.  However, institutional data indicated that fewer than 50 percent of these contacts occurred out of cell.

An audit conducted for the period of February 2008 through April 2008 indicated

that 45 percent of inmates appearing before the administrative segregation ICC for the initial review had updated treatment plans.  The monitor observed an IDTT session in administrative segregation indicating that treatment plans were not being updated as a part of that review in any meaningful way.

Referrals

An institutional audit of non-emergency inmate requests to be seen by clinical staff for the period of August 2007 through April 2008 revealed that the average days to appointment, exclusive of weekends or holidays, ranged from 4.8 to 6.6 days.

IDTT/Treatment Plans

Institutional audits, completed from August 2007 through April 2008, found that the compliance rate for timely completion of initial assessments was 59 percent, and 57 percent for completion of initial IDTT meetings within 14 working days.  An institutional audit of IDTT attendance for the reporting period indicated compliance for attendance by case managers, senior psychologists, and correctional counselors, but not for psychiatrists because all six psychiatry allocations were vacant.

In five IDTT meetings observed by the monitor, C-files were unavailable, and the UHR was unavailable for one of the cases.  In another session of IDTT meetings however, UHRs were available.

There was little or no treatment planning in the sessions, which appeared to be perfunctory reviews.  The possible need for higher levels of care for specific cases was never addressed.  A follow-up meeting with a case manager was scheduled for one inmate, and the remaining inmates were told that they would be seen weekly while in administrative segregation.

Both clinical and custody staff were questioned regarding the handcuffing of

inmates within holding cells during the IDTT reviews.  Both indicated it was simply a past practice, and an added measure of security.  Both indicated that the cuffs could be removed if requested by clinical staff, assuming the inmate was deemed by custody not to be of high risk.

Group therapy was not being provided at HDSP at the time of this monitoring visit.  Previously, groups had been provided on each yard plus administrative segregation, but the recent vacancies among psych techs, who facilitated the groups, resulted in a discontinuation of these.  Over 150 inmates were on waiting lists for groups.

Medical Records/MHTS

The institution continued to work at utilizing MHTS but still experienced some problems.  It acknowledged that mental health records remained an area of concern.  It reported that the backlog of filing was in the range of four to five days, and increasing.  Some of the backlog was attributed to an influx of filing with the implementation of the new SNY.  Additionally, access to UHRs for IDTT reviews was sometimes a problem, as noted in administrative segregation IDTT meetings, discussed above.

Behavior Modification Unit

The BMU was phased out during the monitoring period and was no longer in use.

Space

The lack of available treatment space for mental health clinicians was an institutionwide problem that compromised the confidentiality of all clinical contacts.  Psychiatrist interviewed inmates at dining tables in the dayrooms.  Mental health staff did not have access to any treatment or office space located in the clinics and program offices in each of the four yards, as this space was used by medical staff, custody, and the clergy.  Mental health staff rarely had access to offices in the housing units.  The best scenario was access to office

space shared by correctional officers and used as a repository for their personal belongings. However, information concerning the health status of other inmates and the identification cards of each inmate were openly displayed in these offices for any occupant to see. At the time of the visit, 19 case managers shared ten offices, four contract psychiatrists shared one office, and four social workers assigned to administrative segregation shared one office.

RVRs

During the monitoring period, 105 3CMS inmates received RVRs, with reportedly 100 referrals. It was estimated that fewer than ten percent of the assessments were used in the determination of the final outcomes in the RVR process. The monitor reviewed four cases in which the mental health assessment was considered by the hearing officer but did not influence the finding of guilt and resulted in no mitigation in the penalty. In one case, the associate warden overrode the hearing officer's decision and reduced the charges due to the inmate's mental illness.

Pre-Release Planning

The only pre-parole planning program at HDSP was the TCMP. Approximately 40 inmates who had release dates within 90 days were interviewed each month. The inmates were provided with instructions to contact the POC upon release. Brief file summaries, including medications and a treatment summary, were prepared for the receiving parole agent and psychologist. A new benefits worker had been assigned to the institution to help establish or re-establish community benefits, primarily supplemental security income. However, the benefits worker indicated that the target population was primarily inmates in need of medical care and not mental health care. There was no other pre-release planning, and the TCMP procedures had limited focus.

## California Correctional Center (CCC)
Paper Review

Census:

As of April 9, 2008, CCC managed a total of 6,067 inmates, 1,995 of whom resided at nearby fire camps.  The prison held 3,924 inmates, including 133 in administrative segregation and 15 in the OHU for medical reasons.  During the reporting period, which started September 1, 2007, and ended February 29, 2008, CCC housed a total of 11 3CMS inmates.  On April 9, 2008, there were no MHSDS inmates at CCC.

Staffing:

Mental health staffing at CCC consisted of three psychologists and four psych techs.  One of three vacant psychologist positions was covered by a full-time contractor.  Three of four psych tech positions were filled.  Psychiatric services were provided via telemedicine.  On-site medical doctors were reportedly permitted to assess inmates with psychiatric problems and to prescribe psychotropic medications in consultation with telemedicine psychiatrists.  Such cases were scheduled for follow-up with a telemedicine psychiatrist as soon as possible.

Quality Management:

The institution's quality management committee met weekly and discussed all areas of health care, including medical, dental, and mental health.  Due to the small number of MHSDS inmates at CCC at any given time, the institution did not have a mental health subcommittee and did not conduct audits of most Program Guide requirements.

Suicide Prevention:

CCC's SPC met monthly and kept minutes.  Inmates released from CCC's OHU and discharged from the MHCB at HDSP with orders for five-day follow-up were appropriately monitored by mental health staff and checked by custody officers upon their return to housing.

CCC appeared to be largely compliant with the Department's suicide reduction plan for administrative segregation, although information regarding all components of the plan was not provided. All inmates were screened within 72 hours of their placement in administrative segregation. Psych techs reportedly obtained an inmate profile from mental health staff, which was used as part of the screening process. Psych techs, with occasional help from mental health clinicians, completed and documented daily rounds in administrative segregation. Discussions among staff, clinical case managers, and custody sergeants regarding new admissions and other mental health issues occurred daily. Information regarding the completion of pre-screens was not provided.

There were nine intake cells in administrative segregation, all of which had been retrofitted in accordance with the Department's suicide reduction plan. Custody staff completed 30-minute welfare checks.

The institution reported that inmates in administrative segregation were offered eight to ten outdoor yard hours per week. Information regarding access to in-cell entertainment appliances was not provided.

Three MHSDS inmates were placed in administrative segregation during the reporting period. Mental health staff conducted initial IDTT reviews prior to the initial ICC hearing and upon any change in an MHSDS inmate's level of care. Mental health staff regularly attended ICC hearings and routinely provided input. Emergent, urgent, and routine referrals reportedly prompted contact within established timeframes.

Medication Management:

Blood levels were ordered for six of 11 MHSDS inmates housed at CCC during the reporting period. Internal audits showed that lab work was completed and reviewed by a psychiatrist, on average, within 12 days of the order.

DOT was ordered for all psychotropic prescriptions, and all psychotropic medications were administered by LVNs. CCC used drug-interaction software and complied with the statewide drug formulary.

Transfers:

CCC used an unlicensed OHU to monitor and assess inmates about whom mental health staff had inconclusive concerns. Inmates deemed to require acute care were transferred to the licensed MHCB unit at HDSP, either after a short stint in the OHU or directly from the housing unit. Access to the MHCB at HDSP, located next door to CCC, was reported to be good.

During the reporting period, CCC transferred seven inmates to the MHCB at HDSP, four of whom returned to CCC. Four inmates were placed in the OHU and returned to housing. The average length of stay in the OHU for these inmates was 1.5 days.

CCC placed seven inmates in 3CMS and inappropriately received four 3CMS inmates from other CDCR prisons during the reporting period. All 11 inmates were transferred from CCC in accordance with established transfer guidelines.

Other Issues:

Referrals

Mental health staff completed 427 contacts, most of which were in response to referrals submitted by non-MHSDS inmates. An institutional audit covering the period from September 2007 to January 2008 found that routine mental health referrals prompted contact

within 4.6 days on average. Emergent referrals, all of which were communicated verbally or telephonically, prompted placement in the OHU and the completion of a mental health evaluation that same day.

RVRs

The institution reported that nine RVRs were referred to mental health for evaluations. None of the referred cases involved MHSDS inmates. In each case, the assessing clinician concluded that mental illness had not influenced the behavior that resulted in the RVR.

**Mule Creek State Prison (MCSP)**
August 6, 2008 – August 8, 2008

Census:

On July 21, 2008, MCSP's inmate population stood at 3,693, more than the 3,660 inmates reported in November 2007. There were 1,702 MHSDS inmates, representing a minimal increase over the 1,668 MHSDS inmates in November 2007. MHSDS inmates included 1,179 3CMS inmates, 520 EOP inmates, and three MHCB inmates. On July 10, 2008, there was a total of 51 EOP inmates, or nine percent, held in administrative segregation.

MCSP's 3CMS population increased by about seven percent compared to November 2007. Of the 1,179 3CMS inmates, 225, or 19 percent, were housed in dormitory settings.

Staffing:

The mental health staff vacancy rate of ten percent during the preceding monitoring period remained unchanged. Significant vacancies in psychology continued with 11 of the 24.5 positions being vacant. At the time of the monitoring visit, the institution was in the process of hiring two psychologists, and had identified potential candidates for the other vacant psychology positions.

All 10.5 psychiatry positions were filled; registry staff covered the two full-time equivalent psychiatry positions on medical leave.  All allocated unlicensed social worker positions and all but .15 recreation therapist positions were also filled.

The positions of unit supervisor of psych techs, two senior psych techs, and all 26 psych tech positions were filled.  Allocated positions for medical transcribers, office assistants, and office technicians were also filled.

Staff assigned to administrative segregation areas at MCSP included a total of six full-time and one part-time case managers.  The EOP program was assigned a total of 14.2 full-time case managers, 4.2 full-time psychiatrists, and 6.5 recreation therapists.  Caseloads averaged 35 inmates per case manager and ranged from 31 to 39 inmates.

A total of 11 case managers (which included eight psychologists and three licensed clinical social workers), four psychiatrists, and a senior psychiatrist provided services to 3CMS inmates.  Caseloads for case managers ranged between 56 and 139 inmates, while psychiatrists were responsible for between 104 and 404 inmates each.

Quality Management:

MCSP's institutional approach to quality management continued to be mixed. The local governing body met monthly.  The quality management committee, however, met sporadically during the monitoring period.

The mental health quality management committee showed significant improvement over the prior monitoring period.  The committee met at least twice each month, with good attendance, and recorded reasonable minutes.  The committee regularly reviewed substantive matters of mental health care that have been referred to QITs and focus improvement teams (FITs).  In the course of its meetings, the committee considered audits, key indicator

reports, and action items.  It also attended to matters of access to mental health care, status of the various mental health programs, impending mission changes, staffing changes, and population adjustments.

At the time of the monitoring visit, MCSP had recently established its psychiatry peer review process.  The psychology peer review processes appeared to be in an early stage of development.  There was no indication that other mental health disciplines were engaged in peer review.

MCSP completed audits for supervision and monitoring purposes regarding clinical contacts in 3CMS, clinician completion of documentation on 3CMS cases, case manager contacts within EOP, compliance with EOP key indicators, compliance with EOP program in administrative segregation, MHCB compliance, and DMH referrals.

Suicide Prevention:

The institution's SPRFIT met monthly.  However, attendance remained problematic.  The monitor's review of minutes and attendance at a meeting revealed that the SPRFIT did not fully discuss actual implementation of plans, recommendations, or outcomes related to suicide prevention.  Where records were reviewed, there was no identification or quantification of them.

It did not appear that the method used by the institution to track five-day follow-ups after crisis placements actually and completely documented each occurrence.  MCSP reportedly tracked suicide attempts, but did not define what constituted an "attempt."  Notably, there were no designated outcomes of actions indicated as responses to these reviews.

Monthly emergency response drills were held, but did not comprise scenario enactments.  Custody staff were provided annual CPR training.

Medication Management:

MCSP remained noncompliant with providing prescribed psychotropic medications to inmates within 24 hours of their arrival.  Audits showed compliance ratings of 56 percent to 88 percent in this area.  The institution was also noncompliant with appropriately delivering prescribed psychotropic medications to inmates without interruption following movements within the institution, reporting compliance ranges of 72 percent to 76 percent.  At the time of the site visit, MCSP was considering the establishment of a QIT to address these issues.

Also, MCSP continued to have problems with the consistent and accurate documentation of inmates who did not show up for medication or refused medication, reporting a compliance range of 69 percent to 89 percent.  The institution also continued to have problems with consistently referring inmates who were no-shows or refused medication three consecutive times.  Audits showed that referrals were made in a range of 69 percent to 89 percent. MCSP also reported that it was noncompliant with regard to provider response within seven calendar days of the last missed dose, reporting compliance levels ranging from 70 percent to 86 percent. A QIT was under consideration regarding these issues at the time of the monitor's site visit.

Administration of medications via DOT continued to pose some difficulty for MCSP but was found mainly compliant, and the pertinent CAP item was resolved.  Delivery of HS medications at 8:00 p.m. or later was reported in a range of 95 percent to 100 percent of cases, and the pertinent CAP item was considered resolved.

Sexual Misconduct:

MCSP implemented the Department's screening, evaluation, and diagnosis protocols, as well as the custody intervention procedures for sexual misconduct.  Mental health

71

evaluations of inmates accused of sexual misconduct addressed the required components. No inmates at MCSP were diagnosed with Exhibitionism during the period under review.

Transfers:

MCSP was noncompliant with timely transfers to PSUs. Close to half of EOP transfers occurred beyond the 60-day timeframe.

Availability of designated crisis beds at MCSP was affected by their use for medical care. Placements of inmates on suicide watch or precaution in the MHCB, the MHOHU, or the MHCB overflow was more dependent more on bed availability in the various locations than on acuity of patient need.

Inmates requiring inpatient care were retained in holding cells or other inappropriate settings when beds were not available in the MHCB, MHOHU, or crisis overflow units. Transfers from the MHOHU or crisis overflow to other more appropriate crisis treatment areas seldom occurred. The MHOHU did not have adequate treatment or office space to provide care to MHSDS inmates. Therapeutic modules in the MHOHU provided semi-confidential treatment spaces that were affected by the ambience of their locations. MCSP did not routinely contact CDCR's Health Care Population Management regarding transferring patients held in its MHOHU or overflow units to MHCBs, based on scarce placements resulting from such contacts. Over 25 percent of MHOHU placements exceeded 72 hours.

MCSP did not have a formal process through which inmates who had histories of multiple crisis care admissions or who otherwise met criteria for consideration for a higher level of care could be systematically identified for it. The institution also did not have in place an organized process for tracking inmates with multiple crisis placements for referral to intermediate or acute care.

The MHCB at MCSP was an effective program with appropriate staffing, treatment planning process, and adequate psychiatric assessments.  Treatment planning in the MHCB was adequate, with appropriately attendance by clinical staff and available confidential space.

From November 15, 2007, through July 15, 2008, 18 inmates were transferred from MCSP to EOP programs in other prisons.  Thirteen of these individuals were referred to the CSP/Sac IV PSU program.  These transfers took from six to 73 days from endorsement to departure.  Three inmates transferred to the CSP/Sac IV EOP and took 13 to 21 days from endorsement to departure.

Other Issues:

<u>Administrative Segregation</u>

Inmates arriving in administrative segregation at MCSP were routinely screened for mental health issues by psych techs.  Cells of new arrivals were marked by placards. Custody welfare checks appeared to be occurring but were not at staggered intervals and were not always appropriately documented.

MCSP was compliant with Program Guide requirements regarding initial and quarterly IDTTs and weekly case manager contact in administrative segregation, with audit results reporting 100-percent compliance in these areas. The institution was noncompliant with offering ten hours of weekly structured activities.  Appropriate custody follow-up of inmates admitted to administrative segregation from crisis care was not documented.

MCSP activated additional treatment space in administrative segregation, resulting in significant progress in alleviating existing space shortage.

Administrative segregation inmates were routinely offered adequate yard access.

EOP

The institution continued to achieve major improvement in the number of structured activities offered to EOP inmates, but had not yet attained consistent compliance across the various EOP yards.  Review of key indicators at MCSP showed that it was not offering ten hours of structured activity, reaching an average of 9.4 hours during the review period.

Facility audits of the consistency of case manager contacts reported monthly compliance figures that ranged from 80 percent to 100 percent across three EOP housing areas. Average compliance rates for Buildings A-5 and B-6 were 98 percent and 90.5 percent, respectively, while compliance for Building B-7 was 89.2 percent.

The monitor's expert reviewed a number of EOP cases at the time of the monitoring visit and found mainly that treatment plans for EOP inmates at MCSP were adequate. Observations of treatment teams indicated that their composition satisfied Program Guide specifications. Audit data regarding the consistency of treatment team compositions were, however, not available at the time of the visit.

It was concerning that EOP inmates reported ongoing verbal harassment by some custody staff and psych techs.

3CMS

MCSP was compliant with requirements for completing initial evaluations, initial IDTTs, and treatment planning within 14 days of arrival of 3CMS inmates.  The institution also met Program Guide requirements regarding minimal quarterly contacts, as well as annual IDTT and treatment plan updates for this level of care.  Observed IDTT meetings were well facilitated, with appropriate input from multidisciplinary staff and reasonable discussion with the inmates

under review.  Review of mental health records showed that documentation varied with regard to the quality and comprehensiveness of treatment plans and progress notes of 3CMS inmates.

At the time of the monitoring visit, more than one third of 3CMS inmates were participants in psychotherapeutic and recreational groups.  At the time of the monitor's visit, 613 3CMS inmates were on waiting lists for groups, generally for lengthy periods.

Referrals

Timely response to mental health referrals remained problematic, with compliance data in the range of 16.7 percent to 70 percent.  To remedy this problem, MCSP initiated an appointment review and streamlining process and expanded its psychiatric schedule, which included the addition of "emergency slots" in psychiatrists' schedules.  The institution was similarly noncompliant regarding responses to mental health referrals from administrative segregation.

RVRs

Mental health staff consistently completed mental health assessments as part of the disciplinary process for EOP inmates.  It appeared that these assessments were referenced within the disposition of the disciplinary infraction.  Data regarding mitigation were not available for review at the time of the site visit.

**Sierra Conservation Center (SCC)**
November 12, 2008 – November 14, 2008

Census:

SCC's inmate population was stable during the first ten months of 2008.  As of mid-November 2008, the prison held 5,968 inmates, which was 57, or less than one percent, fewer than were reported in January 2008.  The number of inmates in administrative segregation grew from 156 in January 2008 to 173 in mid-November 2008, for a ten-percent increase.  An

overflow administrative segregation unit, activated as needed throughout the reporting period, held nine inmates in mid-November. Despite a slight decrease in its population, SCC operated well beyond its designed capacity. Emergency dayroom beds were set up in three buildings on one yard, and double-bunked gyms were in operation on all three yards.

There were 638 3CMS inmates, 25 more than were reported in January 2008 and 139, or 28 percent, above the institution's rated capacity of 499. There were 12 EOP inmates awaiting transfer and one inmate in the OHU for psychiatric reasons. There were 41 MHSDS inmates in administrative segregation, which included 34 3CMS inmates and seven EOP inmates.

Staffing:

Despite the prison's remote location, 89 percent of SCC's 35 allocated mental health positions were filled. Use of contractors reduced the overall functional vacancy rate to about four percent. Clinical supervision consisted of one senior psychologist position, which was filled. All 2.75 allocated psychiatrist positions were filled, and a contract psychiatrist provided an additional .75 full-time equivalent coverage. Telemedicine was also available, but information regarding the amount provided during the reporting period was not provided.

Positions for 8.75 of 12 psychologists were filled. A contract social worker and contract marriage and family therapist together filled the equivalent of 1.5 psychologist positions, thereby reducing the functional vacancy rate to 15 percent. Case manager caseloads in the mainline 3CMS program and administrative segregation were described as manageable. Two full-time case managers covered 41 MHSDS inmates in administrative segregation, each with caseloads of about 20 inmates.

SCC employed a half-time recreation therapist, leaving a .5 full-time equivalent vacancy.  All nine psych tech positions were filled, as were positions for a social worker, senior psych tech, and health programs specialist.  All six office tech positions were filled, as was a position for a limited-term office assistant.

Quality Management:

SCC's robust and proactive quality assurance program provided the engine for continued program improvements, which resulted in the resolution of four CAP items during the preceding reporting period and another five items during this monitoring period.

Nearly all mental health staff and custody officers with duties related to mental health regularly attended mental health quality management subcommittee meetings, which were held monthly during the first five months of 2008.  Minutes were maintained and indicated that meeting attendance improved, reaching about 70 percent of required attendees toward the end of the reporting period.  The subcommittee meetings appeared to function as staff meetings, and a substantial portion of the meetings was dedicated to routine exchanges of information.  Minutes documented reports from task groups and individuals representing parts of the mental health department, but did not include updates on the status of active QITs.

QITs were chartered and active during the reporting period, focusing on, among other things, completion of medication consent forms, timely rescheduling of appointments, consistency in the provision of groups, and decreasing referral response times.  Minutes were maintained and indicated that QIT meetings were well attended and that the focal issues were followed to completion.  QITs produced written recommendations that were reviewed by the institution's quality management committee.

With the exception of some medication management issues, mental health audits were developed and carried out by the health program specialist.  A substantial system of routine audits was established, the results of which formed the basis of program evaluations and informed efforts to resolve open CAP items.  Most of the audits were methodologically sound and utilized adequate sample sizes.

SCC had a quasi-peer review process for case managers.  A designated peer review coordinator completed routine UHR reviews, the results of which were summarized in an objective and meaningful fashion and provided as feedback to individual clinicians.  Available options for improving the process included rotating responsibility for conducting UHR reviews among case managers or appointing a committee with revolving members to complete this task. Peer review for psychiatrists was not yet established.

Suicide Prevention:

The SPC met monthly and maintained minutes.  Meeting attendance varied from about a third to over half of recommended participants.  Areas of discussion included various policies and procedures relevant to suicide prevention, staff training, information sharing, and case presentations.

Inmates for whom suicide watch and precaution were clinically warranted were monitored in the institution's OHU pending referral to an MHCB or return to housing.  When possible, inmates on suicide precaution were placed in a cell that could be seen from the OHU's nursing station and received 15-minute checks.  One-to-one continuous observation was provided to inmates on suicide watch.  If two inmates were on suicide watch at the same time, the inmates were placed in adjacent cells, and one person was assigned to monitor both cells. The monitor's expert noted that a single observer could not be positioned so that all areas within

both cells were visible, and recommended that the institution review this practice.

Internal audits covering the last quarter of 2007 and first quarter of 2008 showed 100-percent compliance with the clinical monitoring requirements for inmates released from the OHU with orders for five-day follow-up. Completion of custody checks occurred 90 percent of the time. Audits covering the same period yielded 100-percent compliance rates for the completion of SRACs upon placement and release from the OHU.

SCC was compliant with many but not all components of the Department's suicide reduction plan for administrative segregation. The institution questioned all newly arriving inmates with the new bus screening form, which included a question about recent receipt of "bad news." Prior to an inmate's placement in administrative segregation, nursing staff completed a pre-screen that included questions regarding current suicidal feelings and past suicidal behaviors. Completion of the screens was documented on a chrono and filed in the UHR.

The institution did not provide any performance data regarding the completion of 31-question screens. The monitor's review of a small number of UHRs of 3CMS inmates in administrative segregation indicated that MHSDS inmates were not screened with the 31-question form when placed in administrative segregation. Isolation logs documented compliance with daily psych tech rounds in administrative segregation and administrative segregation overflow.

Correctional officers conducted and documented the completion of 30-minute welfare checks on new-arrival inmates during their first 21 days in administrative segregation and administrative segregation overflow. Contrary to CDCR policy, the documentation indicated that the checks were not completed at staggered intervals.

There were 12 intake cells in administrative segregation, all of which had been fitted with new doors, cement bunks, and suicide-resistant air vents.  Wall-mounted shelves were also removed from intake cells.  Despite these extensive renovations, the intake cells were not used to house new-arrival inmates during their first 72 hours in administrative segregation, as envisioned by the Department's plan.

Weekly case manager contacts occurred on a regular basis; a small percentage took place cell-front.  According to data collected by the institution, during the first five months of 2008, there were 1,204 case manager contacts in administrative segregation, 13 percent of which occurred cell-front.  Clinicians assigned to administrative segregation reported that nearly all cell-front contacts were the result of an inmate's refusal to attend an out-of-cell interview.

There were 168 inmates in administrative segregation, including 127 non-MHSDS inmates, 34 3CMS inmates, and seven EOP inmates.  Lengths of stay in administrative segregation exceeded 90 days for 32 inmates, or 19 percent, including 23 non-MHSDS inmates, seven 3CMS inmates, and two EOP inmates.

Cells in administrative segregation were not equipped with working electrical outlets, and no inmates in administrative segregation were permitted to have in-cell entertainment appliances.  There were no plans to place electrical outlets in administrative segregation cells.  Inmates in administrative segregation were offered between nine and 11 hours a week of outdoor yard.

Medication Management:

Responsibility for conducting audits related to DOT, MAR documentation, administration of new-arrival and HS medications, and medication noncompliance was shifted to nursing staff.  Mental health staff were actively involved in the development of the audit

procedures that were to be used.  However, the transition to nursing was ongoing, and audit data from the reporting period related to these areas were either missing or inconclusive.

Performance data regarding medication continuity upon arrival were not provided. Staff reported that newly arriving inmates, often confined to their cells until reviewed by a classification committee, sometimes missed one to two medication doses because nursing staff were not made aware of their presence in a timely manner.  Internal audits, covering the period from December 1, 2007, through May 2008, showed that 94 to 95 percent of new-arrival inmates with current medication orders were seen by a psychiatrist within 14 days of arrival.

Monthly audits, covering the period from November 1, 2007, through May 2008, showed that 92 to 100 percent of all inmates with current prescriptions transferred within the institution received medication within 24 hours of the move.  Quarterly audits of ten percent of the MHSDS population with current prescriptions yielded compliance rates of 100 percent for timely renewal of medications during the reporting period.  These same audits showed that 97 to 98 percent of medication orders were accompanied by current informed consent forms.

Nursing audits indicated that MAR documentation was poor, though incomplete information rendered it impossible to gauge the extent of noncompliance.  According to a summary of findings, portions of the reviewed MARs were inexplicably blank, rendering it impossible to determine why medication was not administered.  Contrary to departmental policy, noncompliance recorded on the front of the MAR was not always explained on the back of the form.  In such cases, it could be not discerned whether noncompliance was the result of the inmate's stated refusal or failure to come to the pill line.  Nor was it clear whether the noncompliance was referred to mental health.

Staff reported that a senior psych tech was to review MARs every two weeks and refer noncompliance with psychotropic medications to mental health.  Noncompliance was defined locally as missing two consecutive doses or three doses within a week.  The institution had not audited compliance with this local policy.  However, mental health staff reported receiving numerous referrals for medication noncompliance.

Staff reported that HS medications were administered at or after 8:00 p.m. in all mainline areas of the prison, but believed that HS medications were sometimes delivered to inmates in administrative segregation prior to 8:00 p.m.  Administration of HS medications was not audited.

All psychotropic medications were ordered DOT.  Behaviors that called for additional scrutiny, such as cheeking and hoarding, were reportedly flagged by handwritten notes on MARs.  Nursing audits relative to compliance with DOT protocols were inconclusive.

Pill lines on the SNY yard were reportedly long, often requiring inmates to wait in line longer than 30 minutes to receive prescribed psychotropic medications.

Performance data regarding the ordering of labs for inmates prescribed mood-stabilizing medications were not available.  Compliance with procedures for supplying parole medications was not audited during the reporting period.

There were no inmates at SCC with active Keyhea orders.

Sexual Misconduct:

Staff reported compliance with sexual misconduct protocols.  Incomplete paperwork indicated that inmates issued RVRs for sexual misconduct were referred to mental health for completion of an Exhibitionism screen, the results of which were reviewed by an

IDTT.  No inmates were referred for a thorough evaluation or diagnosed with Exhibitionism during the reporting period.

The institution did not track sexual misconduct incidents.  Provided documents did not permit analysis of the timeliness of screens and IDTT reviews, nor was information provided regarding the outcome of sexual misconduct RVRs.

Transfers:

SCC did not refer or transfer any inmates to DMH during the reporting period.  In practice, inmates deemed to require a higher level of care were referred to an EOP program or transferred to an MHCB in another prison.  Staff indicated that past efforts to refer inmates to DMH had been frustrated by obstacles and delays.

SCC referred inmates to MHCB units in several other prisons, including CIM, CMF, CSP/Corcoran, CSP/Sac, CSATF, HDSP, KVSP, and PVSP.  During the period from January 1 to September 30, 2008, SCC generated 23 MHCB referrals, an average of two to three referrals a month.

Access to MHCBs during the first four months of 2008 was poor, but notably improved during the second half of the reporting period.  From January through April, there were 14 MHCB referrals, seven of which were rescinded by SCC after excessive transfer delays.  None of the seven inmates admitted to an MHCB during this period were transferred within 24 hours of referral.  Transfer delays ranged from three to 21 days.  In contrast, from May through September, one of nine MHCB referrals was rescinded by the institution, and seven transfers occurred within 24 hours of referral.  It appeared that activation of the new 50-bed CTC at CMF, to which SCC had already sent four inmates, had improved overall access to MHCBs during recent months.

SCC's OHU had 12 beds, each of which was used interchangeably for medical and mental health patients.  Staff reported that access to OHU beds was adequate.  They knew of one case in April 2008 in which an inmate was held in an administrative segregation cell overnight on suicide watch pending admission to the OHU.

According to a health care cost and utilization program report, during the period from January 1 to June 30, 2008, there were 130 psychiatric admissions to the OHU, or an average of approximately 22 a month.  During this period, 90 inmates were admitted to the OHU once, 15 inmates were admitted twice, two were admitted three times, and one inmate was admitted four times, generating a multiple admission rate of less than three percent.

Nearly half of the OHU admissions lasted longer than three days.  Most of the placements that lasted longer than 72 hours were related to the institution's prohibition against releasing inmates from the OHU during weekends and holidays, which typically extended stays by a day or two.  Approximately 80 percent of OHU placements lasted five days or less.  There were, however, several excessive stays, the longest of which were 23 days, 33 days, 40 days, 48 days, and 50 days, respectively.  Staff reported that excessive stays in the OHU most often involved fragile inmates pending transfer to an EOP and patients with medical complications.

Inmates referred to EOP hubs often waited longer than 30 days to be transferred, while nearly all inmates referred to mainline EOP programs were transferred within 60 days. Access to both hub and mainline programs appeared to have slowed during the weeks preceding the monitor's site visit.

During the period from January 1 to November 5, 2008, SCC generated 95 EOP referrals.  There were 12 EOP inmates pending transfer as of mid-November 2008, three of whom had not yet been endorsed.  Five inmates were endorsed to EOP hubs, all of whom had

been waiting longer than 30 days.  Four endorsed EOP inmates were pending transfer to mainline programs, two of whom had been waiting longer than 60 days.  Another nine inmates were not transferred due to changed case factors: one inmate's level of care was reduced to 3CMS prior to transfer, five inmates were referred to MHCB prior to transfer, and three inmates paroled prior to transfer.

Of the 76 EOP inmates who transferred during the reporting period, 17 were sent to EOP hubs, and 59 were sent to mainline programs.  Access to hubs was poor, with seven of 17 transfers, or 41 percent, taking longer than 30 days.  In contrast, 95 percent of transfers to mainline EOP programs met the 60-day deadline.

Other Issues:

### Administrative Segregation

Review of mental health services in administrative segregation provided a mixed picture.  Institutional audits showed continued compliance with the completion of weekly case manager contacts during the reporting period.  However, the majority of case manager contacts in administrative segregation occurred on an impromptu basis, usually in response to self- and staff referrals.  Consequently, an estimated 90 percent of case manager interviews were completed without the UHR.  In addition, local security protocols required that an officer remain in the interview room for the duration of the clinical appointment, which substantially compromised clinician/patient confidentiality and inhibited discussion of sensitive issues.

A small number of UHRs reviewed by the monitor contained documentation of initial and follow-up IDTT reviews in administrative segregation, all of which were attended by a psychiatrist.  Frequent psychiatric contact was also documented in reviewed UHRs.

Daily psych tech rounds were completed and properly documented in isolation logs.  UHRs reviewed by the monitor contained weekly summaries of psych tech rounds. Interviewed psych techs complained that increased medical responsibilities, which included passing medications, taking glucose levels, and changing dressings, had notably limited the duration and content of mental health rounds.

Nine groups were offered to inmates in administrative segregation, all of which convened weekly.  The offerings diverged from the usual topics and included a Post-Traumatic Stress Disorder (PTSD) group and a group for inmates with Hepatitis C.  The groups were facilitated by psych techs and a psychologist.  In-cell recreational activities, including various word puzzles and reading material, were also available.

An ICC hearing observed by the monitor was attended by both clinicians assigned to administrative segregation.  UHRs were not requested for the meeting.

OHU/MHOHU

Clinical contact in the OHU was rarely private.  Confidential areas within the OHU were not equipped with holding cells, and custody escort was limited.  When possible, clinicians conducted interviews inside inmate cells, which permitted some degree of privacy. Most contacts in the OHU, however, occurred at cell-front and afforded no privacy.

Audits covering the last quarter of 2007 and first quarter of 2008 yielded compliance rates of 99 to 100 percent for completion of daily (i.e. Monday through Friday) psychiatric rounds, weekly and "as needed" IDTT reviews, and psych tech rounds during weekends and holidays.

3CMS

The treatment provided to 3CMS inmates in mainline and SNY programs largely complied with Program Guide requirements.  Institutional audits and UHRs reviewed by the monitor during the site visit confirmed compliance with quarterly case manager and psychiatric contacts.

Institutional audits covering the last quarter of 2007 and first quarter of 2008 yielded compliance rates of 90 to 100 percent for the completion of initial treatment plans within ten days of arrival and annual updates thereafter.  Audits also found adequate correspondence between the diagnoses and recommended treatment interventions recorded on treatment plans, though the basis for this judgment was not clear.  Treatment plans in UHRs reviewed by the monitor's expert were sometimes overly generic and, in some cases, failed to identify clinical interventions.

IDTT meetings observed by the monitor's expert were attended by all required disciplines, with the inmate's UHR and C-file present.  The meetings included relevant discussion of history and treatment, and inmates were invited to participate.  In some cases, the inmate's case manager was absent, and a treatment summary was presented by another clinician. In most of these cases, the summary was thorough, and the presenting clinician appeared to have knowledge of the inmate.  Nonetheless, the absence of the inmate's case manager contravened Program Guide requirements.

Institutional lockdowns did not disrupt the provision of mental health services. Audits covering the last quarter of 2007 and first quarter of 2008 found less than one percent of clinical contacts failed to comply with Program Guide timeframes as a result of lockdowns.