SCC offered a robust group therapy program to mainline and SNY 3CMS inmates. At the time of the monitor's visit, the institution offered 28 to 35 group hours a week on the yards that housed MHSDS inmates. Nearly all of the groups were led by psych techs.

An anger management group observed by the monitor's expert was attended by eight 3CMS inmates. The group was ably facilitated by a clinician who was covering for a psych tech who had been redirected. The inmate participants were enthusiastic and engaged, and assisted the facilitator in determining the material that was to be discussed. The inmates uniformly provided favorable assessments of the anger management group, as well as the amount and type of group treatment available at SCC.

Referrals

The average response time for referrals declined during the reporting period, dropping from 8.7 days in December 2007 to 5.6 days in April 2008. The referral tracking report for April, which posted the best average response time, listed 191 referrals. The time lapse between the date on the referral and the date of contact exceeded seven calendar days for 52 referrals, or 27 percent of all referrals that month. The time lapse between the referral receipt date and contact date exceeded seven calendar days for 21, or 11 percent, of the referrals. These data indicated that routing delays often prevented staff from responding to referrals within five working days.

**California Medical Facility (CMF)**
August 12, 2008 – August 14, 2008

Census:

As of August 11, 2008, CMF housed 3,055 inmates. There were 1,277 MHSDS participants, or 42 percent of the prison's inmate population. There were 551 EOP inmates, including 488 in mainline, which was 87 percent of the rated capacity of 562, 47 in

88

administrative segregation, and 16 in medical beds. EOP inmates were not permitted to be housed in Unit IV, which was a portion of CMF designed to attend to the unique psychosocial and medical issues associated with HIV-positive inmates. There were 706 3CMS inmates, including 170 in Unit IV, 441 in Units I–III, 47 in administrative segregation, and 48 in medical beds. There were approximately 20 inmates in S-2, which was CMF's temporary MHCB unit.

Staffing:

Units I to III at CMF were allocated 142 allocated mental health positions. A notable increase in hiring reduced the vacancy rate from 26 percent in April 2007 to 13 percent in August 2008. Use of contractors caused the overall mental health functional vacancy rate to drop to ten percent. Two of 20 supervisory positions remained vacant, with positions for a senior psychiatrist and senior occupational therapist empty. Positions for 1.75 of 11.5 allocated psychiatrists were vacant, with the equivalent of 1.3 full-time equivalent contractors reducing the functional vacancy rate to four percent during the first half of 2008.

Among case managers, seven of 43 allocated staff psychologist and social worker positions were vacant, with the equivalent of 2.4 full-time equivalent contractors reducing the functional vacancy rate to 11 percent during the first half of 2008. There were 8.8 recreation and occupational therapist positions, 1.8 of which remained vacant. Contractors covered these vacant positions during the reporting period. There was a ten-percent vacancy rate among nursing staff assigned to mental health, with 3.62 of 34.59 positions unfilled.

Existing staffing levels permitted manageable caseloads within the various MHSDS programs and areas. Mainline EOP caseloads hovered from 25 to 30 inmates, and caseloads in the EOP administrative segregation hub adhered to the required one-to-nine clinician-to-patient ratio. 3CMS caseloads in Units I to III ranged from 70 to 105 inmates, while

3CMS caseloads in Unit IV were reported to be between 40 and 95 inmates. Clinicians assigned to 3CMS in administrative segregation carried caseloads of 30 to 35 inmates, and clinicians assigned to follow MHSDS inmates in the hospital wings typically carried caseloads of 40 to 60 inmates.

Unit IV was staffed separately. As of this monitoring visit, a full-time psychiatrist position was vacant, as were one of three staff psychologist positions, one of five psych social worker positions, and a full-time psych tech position. A half-time senior psychologist, full-time psych tech, and full-time office tech were redirected from Units I to III to work in Unit IV.

Quality Management:

The mental health quality management subcommittee met monthly, reported to the quality management committee, and reviewed reports from the SPRFIT and QITs. Documentation of quality management meetings and QIT activities was detailed enough to convey meaningful information.

The quality assurance process was a useful management tool. Staff continued to audit a variety of performance indicators to manage the MHSDS and gauge compliance with Program Guide requirements. Information flowed from top to bottom generally, with treatment providers informed of quality management activities and audit results. Treatment providers reported that information about the issues they faced was rarely addressed via the quality management process. There were indications, however, that a newly formed clinical support team would address systemic issues that impacted the work of treatment providers.

Managers reported that that they had recently broadened the focus of quality management to encompass quality of care.

Suicide Prevention:

CMF's SPRFIT met monthly, but not always with a quorum.  Informative minutes were kept, and agendas included both mandated items and local issues.

According to staff audits, throughout the first six months of 2008, SRACs were completed when inmates were discharged from DMH to CMF.  Audits during this period also found consistent compliance with five-day clinical follow-up upon discharge from DMH.  The compliance rate for hourly custody checks, which had improved during the previous monitoring period, steadily declined from 94 percent in March to 77 percent in June 2008.

CMF implemented many, but not all, of the components of the Department's suicide reduction plan for administrative segregation.  Pre-screens, which included questions about past and present suicidal behaviors and feelings, were administered with the 31-question screen prior to placement in administrative segregation.  Daily psych tech rounds were routinely completed and documented, and weekly case manager contacts consistently took place in a private setting.  Inmates in administrative segregation were regularly offered at least ten hours of outdoor yard a week.  Monthly medical emergency drills consisting of on-the-job reviews of various scenarios occurred regularly.

Documentation indicated that inmates placed in administrative segregation units I-3, M-3, and S-3 were identified and received 30-minute welfare checks during their first 21 days in administrative segregation.  Documentation in unit W-1, an administrative segregation unit for non-MHSDS inmates, indicated that 30-minute rounds were not routinely completed.

Intake cells were identified in Wings I-3 and M-3, but not in S-3 and the Willis Unit.  The intake cells received new doors with larger windows and suicide-resistant wall vents.  However, the retrofitted cells were not used to house inmates during their first 72 hours in

administrative segregation, as envisioned by the Department's suicide reduction plan.

Cells in administrative segregation units were not equipped with electrical outlets. Consequently, inmates in administrative segregation were not permitted to have appliances such as radios and televisions in their cells. The holding cells used for individual and group activities in administrative segregation did not meet the Department's required design specifications.

Medication Management:

Staff and 3CMS inmates widely reported that medication renewal gaps were commonplace. The lapses were attributed to vacancies among psychiatrists during most of the monitoring period. However, such problems reportedly nearly disappeared when nearly all allocated psychiatrist positions were covered in June 2008. Contrary to anecdotal reports, institutional audits conducted throughout the reporting period showed that psychiatrists timely renewed medication orders for 3CMS inmates; none had lapsed inadvertently since January 2008. Notwithstanding these discrepant reports, it appeared that performance in this area had recently improved.

Most 3CMS inmates, with the exception of inmates housed in administrative segregation and medical units, received medications at a central pill line located within the prison. Medications were administered to EOP inmates in their housing units. Therefore, housing moves did not impact medication distribution for the vast majority of MHSDS inmates at CMF. Staff reported that medication continuity for inmates placed in administrative segregation had notable improved during the reporting period, though inmates sometimes had to choose between going to yard and staying in the housing unit to receive prescribed psychotropic medications. MHSDS inmates were at times discharged from medical units without the proper medication orders in place and consequently experienced lapses in medication continuity.

Medication noncompliance was consistently documented in MARs and triggered referrals to mental health.  However, approximately half of all referral paperwork related to medication noncompliance took four days or longer to reach the mental health office.  Such delays often prevented mental health staff from timely responding to medication noncompliance.

Sexual Misconduct:

CMF's handling of disciplinary infractions associated with inmate sexual misconduct appeared to be consistent with departmental directives.  Staff maintained a log of RVRs issued for incidents of sexual misconduct that occurred in CMF and DMH units.  The log captured pertinent information, including the dates and locations of the incidents and the dates and outcomes of the screens and IDTT reviews.

During the first six months of 2008, 57 RVRs for sexual misconduct were issued to inmates in treatment at DMH; none were written for inmates housed at CMF at the time of incident.  Most of the inmates listed in the log received multiple RVRs for sexual misconduct.  In most cases, inmates with repeated infractions received one screen and IDTT review.  Consequently, only ten sexual misconduct screens and eight IDTT reviews were completed during the first half of 2008.  Three inmates were recommended for and received comprehensive evaluations, two of whom were found to meet CDCR's diagnostic criteria for Exhibitionism.  Both inmates were referred to the C&PR, and one was transferred to a prison with a specialized Exhibitionism treatment program.  The second inmate was inexplicably transferred to a CDCR prison that did not have an Exhibitionism treatment program.

Plastic yellow beacons were placed on cell doors to identify inmates in administrative segregation with charges related to indecent exposure.  In addition to the beacon, the bottom half of the cell door was covered with yellow paper.  Staff reported that inmates

charged with sexual misconduct were not required to wear indecent exposure jumpsuits when attending out-of-cell interviews and group sessions.

Transfers:

CMF was unique among CDCR prisons in that it utilized 20 beds within the APP as an MHCB unit. The 50-bed CTC was activated in June 2008, and its census reached 48 inmates by mid-August 2008. As admissions were drawn primarily from the state's MHCB waiting list, CMF continued to utilize APP beds for MHCBs during the monitoring period. S-2 admissions were to be treated for ten days and either returned to CMF or formally referred to the APP, and CMF inmates in S-2 for longer than ten days were typically designated in local tracking records as having been admitted to the APP.

Access to DMH intermediate care was relatively good, in large part due to the presence of three ICF programs within CMF's walls. The day treatment program, with a capacity of 44 inmates, was located on A-2, and a Level III ICF program, with a capacity of 40 inmates, was located on A-3. There was no waiting list for these programs, both of which had available beds. CMF inmates, primarily Levels II–III, were admitted to both ICF programs through direct referrals and via the APP.

A Level IV ICF program, with a capacity of 66 inmates, was located on P-2 and P-3. CMF inmates were rarely referred to this program, though it did occasionally accept Level III overrides. As of mid-August 2008, this program was full, and staff reported that the State's waiting list for Level IV ICF beds stood at approximately 100 inmates.

The Level IV ICF program was located in a typical housing tower and consequently was constrained by the same treatment space limitations that have long hampered the provision of individualized group therapy in the EOP wings at CMF. Inmates admitted to

CMF's Level IV ICF program did not have access to the quantity, quality, or variety of treatment services that were available to most inmates at SVPP. Inmates in the Level IV ICF interviewed by the monitor's expert generally expressed satisfaction with the program, but reported a need for more groups and yard time.

CMF did not comply with the 60-day transfer timeline for endorsed PSU inmates. Noncompliance was reportedly related to a systemwide lack of PSU beds. As of July 25, 2008, there were five inmates at CMF who were endorsed to the PSU program at CSP/Sac, three of whom had been waiting longer than 60 days. These overdue inmates had been waiting 114 days, 86 days, and 62 days, respectively.

Other Issues:

EOP

CMF's EOP program, while notably limited in some respects, continued to be largely compliant with basic Program Guide requirements. Institutional audit data covering the period from February 1 through June 2008 yielded compliance rates of 90 percent for timely completion of intake evaluations, 94 percent for timely completion of initial IDTT meetings, and 98 percent for completion of quarterly IDTT reviews. Available data continued to indicate that EOP inmates were offered an average of ten to 12 therapeutic activity hours per week and refused a little more than a third of them.

The institution's ability to consistently offer all EOP inmates at least ten group hours a week was contingent on maximizing utilization of the dayroom on each self-contained EOP wing, which was the only group space other than outdoor recreation yards and a large occupational therapy room. In most cases, group participation was the result of a random process whereby officers walked from cell door to cell door until the number of accepted

invitations reached the capacity of the dayroom, somewhere between 20 and 30 inmates. Consequently, most group assignments were not treatment plan-driven or tailored to the specific clinical needs of the individual.  While clinicians did their best to make the most of this arrangement, the sessions were frequently little more than a series of unrelated support group meetings.

Despite the dearth of individualized group therapy, the monitor's expert noted that treatment plans were typically individualized and that many progress notes carried relevant clinical information.  However, staff reported that limited treatment space and packed program schedules restricted their flexibility to increase the frequency and duration of individual interviews when clinically indicated.  Audit data related to compliance with weekly contacts were not provided.

<u>Administrative Segregation EOP</u>

The EOP administrative segregation census ranged from 26 to 44 inmates during March, April, and May 2008.  As of August 8, 2008, administrative segregation held 47 EOP inmates, ten, or 21 percent, of whom had been there longer than 90 days.  As required, custody staff monitored the length of stay of EOP inmates in administrative segregation and recorded the reasons for prolonged stays.  According to the provided documentation, most EOP inmates in administrative segregation longer than 90 days were retained for pending disciplinary proceedings, unexpired SHU terms, and transfer delays.

CMF appeared to be compliant with basic Program Guide requirements for the treatment of EOP inmates in administrative segregation.  Staff and inmates both reported completion of daily psych tech rounds, initial IDTT meetings prior to the first ICC hearing, and quarterly IDTT reviews.  Data provided for the months of May and June 2008 showed well over

90-percent compliance with the timely completion of intake assessments, initial IDTT meetings, and quarterly IDTT reviews.

The institution reportedly maintained the required one-to-nine clinician-to-patient ratio in the EOP hub throughout the reporting period. Clinicians reported meeting with inmates on their caseload every week. However, interviewed inmates indicated that individual contacts with their case manager occurred biweekly. Clinicians reported having adequate access to confidential office space for one-to-one interviews and uniformly indicated that a low refusal rate reduced the need for cell-front interviews. The institution did not provide audit findings related to compliance with weekly case manager contacts or information regarding the percentage of cell-front contacts.

Available data indicated that EOP inmates in administrative segregation were offered an average of nine to 11 activity hours a week and refused a little more than a quarter of them. Staff and inmates confirmed that most EOP inmates in administrative segregation were routinely offered five two-hour groups a week. Clinicians reported having creative control of group content, but acknowledged that logistics made it impossible to assign individual patients to specific groups. Staff were familiar with the budget for group supplies and indicated that the new materials had had a small but notable positive impact on services.

Most groups were held in the dayrooms on Wings I-3 and M-3, each of which was equipped with seven holding cells. Recreation therapists occasionally held groups in the corridor adjacent to S-3. The straight-line configuration of the holding cells and their remote location in the corridor limited the suitability and desirability of this space.

Staff expressed concern regarding security protocols that required an officer to stand in the office during clinical interviews when wheelchair-bound and other physically

compromised inmates could not or would not be placed in a holding cell.  This was a common

scenario at CMF.  Staff also reported that medical devices were sometimes confiscated along

with personal property when an inmate was placed in administrative segregation and that

replacements were often difficult to obtain or not available for lengthy periods of time.

> 3CMS

All case manager positions allocated to the general population 3CMS program in

Units I to III were filled as of July 1, 2008.  Methodologically sound audits showed that the

3CMS program in Units I to III maintained compliance with nearly all Program Guide

requirements, including timely completion of initial mental health evaluations, initial IDTT

meetings, annual treatment plan reviews, and quarterly case manager contacts.  However, staff

reported that ongoing space constraints compromised their ability to see some caseload inmates

as frequently as clinically warranted, and often left them little choice but to hold clinical

interviews in non-confidential settings.

Two case manager positions assigned to Unit IV remained vacant.  Despite these

vacancies, institutional audits that focused on the Unit IV 3CMS program found greater than 90-

percent compliance with timely completion of initial evaluations and annual IDTT meetings

during the first six months of 2008.

Roughly 25 to 30 treatment groups were available to 3CMS and non-MHSDS

inmates at CMF.  Limited group space and inadequate time and materials for group development

reportedly prevented the introduction of more groups.

All referrals to mental health involving 3CMS inmates in Units I to III, excluding

those triggered by medication noncompliance, were triaged by a nurse beginning in June 2008.

Monthly audits indicated that mental health staff consistently responded to referrals within five working days.

### Heat Plan

Despite the relief of a relatively moderate summer, indoor temperatures in excess of 90 degrees were common at CMF. A few housing units recorded temperatures in excess of 95 degrees during prolonged heat waves in May and July 2008. The monitor's tour of several housing units indicated that Stage II and Stage III heat alerts were likely under-reported. Compared to the monitor's handheld calibrated thermometer, housing unit thermometers under-reported temperature by .5 degrees to 4.8 degrees when appropriately placed in individual cells and dorms, and by up to ten degrees when placed in or by the officer's station. These discrepancies were concerning given that housing unit temperatures of 88 degrees and 89 degrees were recorded 401 times during the months of May, June, and July 2008.

### New 50-Bed CTC

The MHCB consisted of two 25-bed units, two negative pressure cells, four safety cells, and four restraint cells, as well as ten outdoor walk-alone yards that were not yet activated. Cells within the 25-bed units were equipped with cameras and call buttons connected to nursing stations on each unit.

From June 16 to August 16, 2008, 55 inmates were admitted to the MHCB, and average length of stay was approximately eight days. Based on the monitor's expert's observation of several IDTT meetings, case reviews, and inmate interviews, inmates currently in the MHCB appeared to be placed at the appropriate level of care.

While the MHCB provided a spacious, clean, state-of-the-art clinical milieu, it had adopted a number of security protocols that were reminiscent of administrative segregation.

All clinical offices and meeting rooms in the MHCB were equipped with therapeutic modules, none of which conformed to the design approved by the Coleman experts.

Staff reported that the therapeutic modules were initially intended to be used when interviewing new admissions, high-security and unclassified inmates, and patients who, upon further observation and review, were considered dangerous and/or psychologically unstable. However, the default practice that quickly emerged was that all inmates were handcuffed during escort to and from clinical activities and placed in holding cells for all clinical interviews throughout their stay in the MHCB.

Staff reported their intention to adopt a system to relax security protocols for patients who were stable and considered safe from a clinical and security perspective.

### California State Prison, Solano (CSP/Solano)
May 20, 2008 – May 22, 2008

Census:

The institution housed a total of 5,731 inmates, a decline of 294 from the November 2007 monitoring visit. The EOP population increased from 11 to 19 since the preceding monitoring period. The number of inmates in the MHCB was nine, a slight increase over eight inmates since the monitor's preceding visit. There were 1,518 3CMS inmates, 21 fewer than were reported during the 20th monitoring period visit, and 319, or 21 percent, above the institution's rated capacity of 1,199.

There were 347 inmates in administrative segregation, including four EOP inmates and 113 3CMS inmates.

Staffing:

The institution had made significant strides in filling mental health vacancies. The overall vacancy rate had dropped from 26 percent to 15 percent, and all six mental health

management positions had been filled.  There was a functional vacancy rate of only four percent.  During the current reporting period, total staffing allocations increased from 58.5 to 61.

The chief psychiatrist and two senior supervisory psychologist positions were filled, as were the senior psych tech, senior RN, and health program supervisor positions.

The issue of filling psychiatrist positions appeared to be the only current unresolved issue in the area of staffing.  Only one full-time psychiatrist position was filled, resulting in a vacancy rate of 80 percent.  The three full-time and two part-time unfilled psychiatry positions were fully covered by contractors.  Each yard had a full-time psychiatrist, although three of them were contractors.

With respect to clinical case managers, 15 of 16.5 psychologist positions and five of six social worker positions were filled.  A half-time contract psychologist was employed, bringing the functional vacancy rate for psychologists to six percent.  Overall, case managers had a functional vacancy rate of nine percent.

The 6.5 psych tech positions were filled.  The five mental health RN positions and three recreation therapist positions were all filled.  A new health care manager was hired.

Of 13 allocated clerical positions, there were only 2.5 vacancies.  Of 9.5 office technicians, 8.5 were filled, and one of two medical transcriber positions was filled.  The half-time office assistant position remained vacant.

The institution reported that four correctional officer positions for mental health services in administrative segregation had been allocated and were filled.  No general population mental health custody positions had been allocated.

Quality Management:

Quality assurance activities were ongoing.  The governing body reportedly met in April 2008; however, minutes were not available for review.  The institution's record showed that the mental health quality management subcommittee, local quality management committee, SPC, and medication management committee were meeting regularly.

The mental health quality management committee chartered several new QITs to address deficiencies with clinical progress notes, psychiatric staff vacancies, MHTS, and staff development.  A QIT on suicide prevention was ongoing.

Peer review was not occurring, pending guidance from central office.

Suicide Prevention:

The SPC continued to meet regularly, reviewing compliance with the provision of five-day follow-up of inmates released from the MHCB and the issuance of appropriate utensils for inmates brought to the triage and treatment area (TTA) for pre-screening evaluations during mealtimes.  The suicide prevention LOP was recently updated in April 2008 and was under review for final approval.  There were no completed suicides at this institution during the monitoring period.

Five-day follow-up was occurring according to the institution's suicide prevention operating procedures.  Weekend and holiday coverage had not been consistent in some cases by clinical and custody staff alike.

New-intake inmates were identified by paper placards, which were affixed to their cell door during their first 21 days in administrative segregation.  Although new-intake cells were identified and were retrofitted with suicide-resistant vents, these were not regularly utilized due to frequent admissions and transfers of inmates.

Thirty-minute welfare checks were completed on all inmates throughout their stays in administrative segregation. A review of logs of these checks confirmed their completion, staggered intervals, and review by supervisory custody staff.

The 117 MHSDS inmates in administrative segregation had little or no access to exercise yards. Only two exercise yards, with one small space in between that was utilized for walk-alone inmates, existed for the entire administrative segregation. Plans for an additional 40 small management yards were noted.

Inmates in administrative segregation did not have appliance privileges for things such as televisions or radios in their cells.

Emergency medical response drills, including mental health emergency scenarios, were conducted once per month during each shift in each housing unit during the reporting period. Logs of monthly emergency medical response drills for second and third watches in the units were noted. Logs for first watch sessions were reportedly maintained in the mental health office, but were not reviewed due to time constraints. Suicide prevention cut-down kits were maintained in the control room and custody office in the units. All custody staff who were asked had CPR mouth shields on their person. Staff reported that they attend yearly CPR refresher training.

Medication Management:

For the second consecutive visit, no current medication management audit data was made available for the monitor to review. The monitor was unable to confirm whether audits were actually conducted for the twenty-first monitoring period. An outdated and never-before-seen audit that was provided showed noncompliance in several areas.

The institution reported that continuity of medication with intra-institutional housing transfers continued to be problematic. Generally, inmates who were moved within the institution were identified after a missed medication administration.

Reportedly, long pill lines continued to be problematic, especially when the flow of inmates was not controlled.

A recent institution UHR audit on compliance with obtaining informed consent found 100-percent compliance. Of 148 charts reviewed, 135, or 91 percent, had informed consent forms, and the remaining 13 charts did not require informed consent.

Pharmacy staffing improved. Laboratory results continued to be filled within 72 hours, which was attributed to the increase in clerical and medical records staffing. Results were forwarded to staff psychiatrists within 24 hours of receipt. Consequently, follow-ups of laboratory tests had improved. Laboratory results were continuously filed in charts in a timely manner.

There did not appear to be any uniform method for addressing or ordering laboratory tests to monitor possible metabolic changes related to atypical antipsychotic medications. The chief psychiatrist reported that a statewide protocol for laboratory tests was being developed.

Because of the limitations of the pharmacy computer program at CSP/Solano, all psychotropic medications were labeled as DOT medications. In the general population setting, there was a uniform method of administering medications without distinction between the nurse-administered and DOT medications. The pharmacy labeling system did not allow medication administration staff to identify physician-ordered DOT medications. A nursing supervisor reported that during lockdowns in administrative segregation and MHCB, medications were

104

administered in the housing units through the food port, except for inmates with a history of hoarding, cheeking, or noncompliance, who were brought out of their cells.

The pharmacy was unable to provide the number of inmates who were prescribed HS medication.  Psychiatrists continued to prescribe medications to be administered at HS, as clinically indicated.  It was reported by mental health and nursing leadership that HS medications were not administered at 8:00 p.m. or later, except in the MHCB setting.  A nursing supervisor indicated that pill lines were open till 8:00 p.m. and that some inmates went to the pill line close to 8:00 p.m. to receive their HS medications.  There were no established policies and procedures to honor a physician's order for HS medication.  The chief psychiatrist reported that the medication management FIT was in the process of developing policies and procedures for administration of medications at HS in all yards.

Parole medications were not always delivered to R&R by nursing staff and given to paroling inmates.  The institution reported some breakdown in this process, resulting in some inmates paroling without medications.

Sexual Misconduct:

The RVR log and institutional audit completed on April 15, 2008, reflected that three sexual misconduct disciplinary actions were initiated during the reporting period.  Two of these involved non-MHSDS inmates, and the third involved a 3CMS inmate who was serving a term for Exhibitionism with prior violations.  The audit tool indicated all departmental requirements were met in these three cases.  There was no institutional sexual misconduct treatment program or custody-driven behavioral modification procedure at the institution.

Although a log was maintained in the mental health unit for referrals for mental health assessments for the disciplinary process, the outcomes of the hearings related to those

referrals were not included.  The assignment of staff to complete these referrals appeared to be on a basically random basis, leading to much inconsistency and incompleteness in the final product.

Transfers:

There were significant delays in the transfer process, attributed to a change to MHCB level of care for some inmates.  Of 20 inmates in the MHCB who had more than two admissions there, six, or 30 percent, were at the EOP level of care, awaiting transfer to EOP institutions.  One of those six EOP inmates was referred and transferred to DMH; one inmate had been recently identified as needing a referral to DMH and the referral packet was being prepared while the monitor was on site.  However, correctional counselor staff informed the monitor that EOP inmates could not be endorsed for transfer to an EOP program institution while they were on MHCB status.  Delays were also caused by the unavailability of appropriate documentation or files that were necessary to initiate the committee action and classification staff representative (CSR) endorsement.

Under the current consideration/referral process at the institution, all referrals to DMH were discussed and generated by the MHCB IDTT.  During the monitoring period, the institution made four referrals to DMH.  During the monitoring visit, four additional referrals to DMH were initiated: one EOP inmate from administrative segregation, two general population EOP inmates, and one MHCB inmate.  Of the four prior referrals, only one inmate was transferred to DMH.  The transfer satisfied timeframes.  The three remaining inmates were placed on a lengthy waiting list and subsequently were returned to the sending institutions.

The internal process for referring and transferring inmates to the MHCB continued to be adequate.  Transfers were occurring in a timely manner.  There were 89

admissions to the MHCB during the monitoring period, with an additional 39 inmates who were referred for possible MHCB admissions but were not admitted due to the lack of clinical indication. These inmates were pre-screened and received appropriate intervention and follow-up recommendations.

From January 1, 2008, to May 5, 2008, 22 inmates were referred for EOP transfer. Of these 22, 15 inmates, or 66 percent, were transferred within the established timeframe. This was compared to 80 percent transferred within the prescribed timeframe during the preceding monitoring period. The institution's audit indicated that the average number of days to complete the transfer was 43, compared to 41 in the last monitoring period, with the longest overdue length of stay at 112 days. Delays were partially caused by the unavailability of appropriate documentation or files that were necessary to initiate the committee action and CSR endorsement. Fourteen cases were pending transfer, compared to six in the preceding monitoring period, and five were overdue, compared to one in the preceding monitoring period. The option of possible referral for intermediate care in DMH for some of these inmates who met criteria was discussed with the chief psychiatrist.

Follow-up on inmate referrals deteriorated during the reporting period, with inmates being seen within 23.1 calendar days, rather than the 12.5 days in the previous period. The institution attributed this slippage to an influx of referrals generated by medication no-shows identified in the improved Plata documentation system.

Other Issues:

Bus Screens

Bus screenings were not observed during the visit. The supervising psychologist stated that clinical follow-up on positive referrals occurred within 72 hours of arrival, although no auditing of this was provided to the monitor.

Administrative Segregation

In an audit conducted on May 5, 2008, 63 percent of 3CMS inmates in administrative segregation were seen by case managers out of cell on a weekly basis, while 37 percent were seen at cell-front. This was a complete reversal of figures from the preceding monitoring period. Average case manager caseloads were 33 per case manager, down from 58 in the preceding monitoring period.

The institution reported, and a review of available logs confirmed, that psych techs made up to three rounds per day, seeing all inmates in the units.

The critical need for confidential treatment space continued in administrative segregation. Although a weekly group therapy session had been initiated by a clinical case manager, only three individuals at a time were seen in this group. They participated in the three available holding cells on the Building 10 floor, with very poor levels of confidentiality. The unit IDTT sessions were conducted in a room on the unit floor, surrounded by filing cabinets and short partitions, affording very limited confidentiality. The institution acknowledged, and interviews with inmates in the unit confirmed, that the lack of confidentiality led to many refusals to participate in therapy sessions.

A nursing pre-screen, including a question regarding past and present suicidal feelings and behaviors, was provided to all inmates admitted to administrative segregation.

Psych techs also administered the 31-question mental health screening on all non-MHSDS new admissions within 72 hours. These screens were administered in the shared psych tech office in the unit. MHTS suicide risk summaries were not provided for intake screening.

Medication refusals were noted on inmate MARs, and referred for review by the unit psychiatrist on a daily basis.

A review of logs revealed that a total of 23 inmates, including two EOP, nine 3CMS, and 12 general population inmates, in administrative segregation were endorsed and awaiting transfer to SNY yards. No EOP inmate had been in the unit pending disciplinary action beyond 90 days.

MHCB

The chief psychiatrist reported that the census for MHCB beds had been consistently full. On the last day of the monitor's visit, the census was eight, with one empty bed vacated by a psych and return discharge that morning. If no bed was available, an inmate was held either in the holding cell up to two hours, in the R&R, or in the administrative segregation unit in one of the observation cells with one-to-one suicide watch. The chief psychiatrist reported that because of the time-limited use of holding cells in the TTA for the specific purpose of conducting pre-screening evaluations, they had not been keeping a tracking log. Data on the use of alternative sites, including R&R and administrative segregation observation cells, were not available since the institution was not tracking this area either.

Between January 1, 2008, and May 1, 2008, there were 89 admissions to the MHCB. Twenty inmates had more than two admissions to the MHCB. The average length of stay was 9.49 days. The longest wait was 37 days in the case of DMH referral and transfer. An institution audit indicated that 30 of 89 MHCB inmates, or 33 percent, exceeded ten days. The

monitor noted that medical complications extended some periods of stay.  The review of the TTA log showed that 39 inmates received MHCB admission pre-screening evaluations and were returned to housing units with appropriate follow-up appointments.

All MHCB inmates were afforded safety blankets, smocks, and mattresses.  A copy of the restraint log was provided to monitors and was found to be current with the necessary information.  There were five inmates who were on five-point restraints to prevent self-injurious behavior during the monitoring period.

There were no inmates on Keyhea orders.  One Keyhea petition was initiated, but the petition was declined as the inmate did not meet the danger-to-others criteria.

EOP

The institution reported that all EOP inmates awaiting transfer continued to receive weekly individual contacts with the clinical case manager and recreation therapy.  The institution assigned one clinical case manager to perform this task to ensure continuity and quality of care provided for EOP inmates.  However, this information was not verified through the chart review during the monitor's visit.

There had been some confusion among institution staff in previous monitoring periods regarding the discharge of unprocessed reception center inmates who were newly placed into the EOP level of care while in an MHCB.  At the time of the visit, staff were discharging these inmates back to the sending reception center for processing, consistent with the CDCR psych and return policy.

3CMS

Audits demonstrated that over 90 percent of 3CMS inmates had the required 90-day clinical contacts with their clinical case manager and timely updating of their treatment plans

in the IDTT review process.  A review documented by the institution demonstrated that 98 percent of the 148 charts reviewed had the required clinical case manager contact within the 90-day time period, and 82 percent had updated treatment plans.

Internal audits of 148 UHRs found varying degrees of compliance with meeting the Program Guide requirements, with the following compliance rates:  94 percent for conducting clinical intake assessment, 93 percent for meeting diagnostic criteria, 96 percent for 90-day psychiatrist contacts, 98 percent for progress notes in subjective objective assessment and plan (SOAP) format, 100 percent for global assessment of functioning (GAF) score over 50 for 3CMS and below 50 for EOP, 99 percent for legible progress notes and signatures, and 91 percent for medication informed consents and signatures.  The methodology of the audits was judged to be sound, and the findings of the audits were considered accurate in reflecting the status of the program at the time of the visit.

Psychiatrists continued to participate in IDTT meetings.  The rate of participation in IDTT meetings by clinical case managers improved from 63 percent during the preceding monitoring period to 93 percent.  C-files were reportedly always available for these reviews. Internal audits showed 91-percent compliance for holding initial IDTT meetings, 84-percent compliance for documentation of IDTT meetings, 63-percent compliance for custody presence in IDTT meetings, 78-percent compliance for completion of treatment plans, and 89-percent compliance for annual IDTT meetings.

The institution reported that four therapy groups, with a total of 40 inmates, were in progress, with one group for nine inmates completed since the previous visit.  Three recreation therapy groups were also in progress.  The institutional target for group participation was 152 inmates, or ten-percent enrollment; thus, only partial compliance had been achieved.  The recent

institutional audit revealed only six of 148 inmates, or four percent, were offered group therapy when clinically indicated. Sixty-eight percent were not offered group therapy, and 28 percent were not applicable. Space availability was a key limiting issue with this problem. Institution staff reported that ongoing scheduling and space issues had not been conducive to providing more groups to inmates when clinically indicated.

Required clinical pre-release planning was virtually nonexistent. The parole TCMP continued to conduct pre-release planning on a bimonthly basis, with 150 to 200 inmates being interviewed at 90 and 30 days prior to release. Pre-parole assessment essentially consisted of setting up an initial appointment at the POC. Inmates were given an appointment letter and the list of community resources. The education department also offered general population type pre-release programs that were available to 3CMS inmates. However, neither service was deemed to be fully adequate to meet the overall need.

Per institution report, the procedure for clinicians obtaining outside records of inmates with prior mental health histories had not changed. Although they previously understood that this was a reception center responsibility, they have recently accepted the need for greater diligence in seeking these records.

Referrals

There had been no significant changes or improvements made in the overall procedures for handling routine referrals to mental health since the last monitoring period. A review of 156 routine referrals from January to May of 2008 documented in MHTS indicated that inmates were seen within 23.1 calendar days, meaning substantially longer waits than the 12.5 days in the preceding monitoring period.

Emergency referrals continued to be processed in a timely manner, with clinical appointments scheduled on the same day of referrals and inmates seen immediately. However, the ineffective system of processing routine self-referrals remained problematic, resulting in significant delays in clinical contacts. Once received, all referrals were tracked by a designated office tech for entry to the MHTS and triaged by mental health supervisors. However, the institution had not yet developed an efficient system to collect the routine self-referrals in a timely manner. As reported in the preceding monitoring period, there were significant time lapses between the date of routine self-referrals and the date received by the mental health personnel. These self-referrals were routinely sent to the mental health department for processing via institutional mail, which could contribute to delays. However, once the referrals were received by the mental health department, the institutional tracking system indicated some improvement in the process for data entry, triaging, and scheduling for clinical contacts.

Medical Records/MHTS

With the increase in staffing, there was compliance with the requests for UHR at IDTT meetings. An institutional audit showed that of 148 UHRs, 145 charts, or 98 percent, were available for IDTT meetings. The other three charts were pulled for specialty clinics. IDTT meetings had been given priority over all other requests except the specialty clinics.

Administrative staff had received briefings on the Plata automated tracking system, but it had not yet been implemented. In the interim, MHTS systems were in place, and a full-time office tech was employed to enter and download information. The institution reported that in a recent audit of 148 UHRs in the MHTS, a 99-percent rate of compliance for conformance between MHTS and the UHR had been achieved, compared to an accuracy

113

correlation of 82 percent during the preceding monitoring period.  No case file reviews were able to be undertaken to confirm the results of this audit during the visit.

Questions persisted as to what was a "referral date" for the tracking system, i.e., the date the inmate signed or the date the referral was received by the individual making assignments for the tracking system.  Questions also lingered over the means by which levels of referral, for example, urgent or routine, could be tracked in the MHTS.

Space

Although the institution reported an active QIT working on space issues, few actual gains had been made since the preceding visit by the monitor.  Success in increasing staffing had in fact exacerbated space problems.  One additional office for psychiatric assessments had been added in the annex-medical clinic in the education area of yard 4, with a second space in that yard also provided in the Level II Program Complex.  Another space for psychiatric assessments had also been identified in the satellite-medical clinic in yard 3.  Clinicians were also able to share office space with counselors in all yards.  The administrative segregation IDTT was utilizing the unit conference room, with limited confidentiality.  Confidential space for clinical contacts in administrative segregation was essentially non-existent.

Overcrowding necessitated the continued operation of "E" beds or temporary emergency bunk beds in dayrooms and two triple-bunked gymnasiums. H Dorm at CSP/Solano was a gymnasium converted to overflow housing, utilizing triple bunks for a capacity of 226.  At the time of the monitor's visit, there were 206 inmates housed there. Forty 3CMS inmates, 27 of whom were on heat-sensitive medications, were housed there during the review.  A randomly selected pool of ten of these 3CMS inmates was interviewed.  They had been housed in the unit

114

from two weeks to 11 months.  They had up to six hours per day of access to the facility

yard/exercise area.  None of these individuals had received a mental health screening prior to

placement, and most stated they had complained about the conditions in the unit to their clinical

case managers, but were informed there was nothing the case managers could do.  Some had

filed inmate appeals, known as form 602s, but none had received relief in this process, and most

indicated that they experienced "harassment" from custody staff for complaining.  Staff in the

unit were interviewed and denied any claims of inmate harassment.  Unit clinical case managers

and the supervising psychologist were interviewed and confirmed that mental health status was

not a factor in housing inmates in this setting.  The case managers apparently visited the unit

infrequently, with most clinical contacts coming via escorts to their offices.  At the request of

monitors, staff checked MHCB records to see if any referrals to those beds had come from the H

Dorm during this reporting period, but no such referrals were noted.

Heat Plan

During the preceding monitoring period, the four previous CAP items dealing

with implementation of the institutional heat plan were consolidated into a new CAP item.

The institution indicated that procedures allowed for release of only small groups

of heat-medication inmates to participate in pill lines and canteen during heat alerts, thereby

reducing time in the heat to less than 30 minutes.  Further monitoring of this procedure was

required.

New heat-risk cards were in the process of being delivered to all appropriate

inmates at the time of the monitor's visit.  The cards indicated that the inmate was required to

return to his housing unit in stage 1 alerts unless he was working in an air-conditioned space, and

115

also listed things to do in heat alerts. The cards were observed. However, not all had been delivered prior to the monitor's visit, and thus, this issue needed subsequent review.

The institutional extreme weather plan was obtained, reviewed, and appeared to be current. Although the institution had designated heat-risk buildings with air-conditioning, the realities of overcrowding meant that inmates on designated medications could be and were housed in all buildings, including "E" beds in triple-bunked gymnasiums. Lists of those on heat medications were maintained in each unit, as were hourly temperature logs. Thermometers were checked on a random basis in five different buildings. In all cases, the instruments were mounted appropriately and provided consistent readings. All buildings surveyed had at least three different thermometers, including at least two on the upper floors. Staff were aware of heat precaution measures during stage 1 and 2 alerts. Provisions for access to showers and delivery of ice in extreme conditions were available.

Inmates interviewed generally concurred that they were afforded these precautions during the most recent heat episode of May 19 and 20, 2008, although inmates in the H dorm voiced great concerns over the heat and lack of adequate air circulation in that overcrowded dormitory setting. The unit had fans and swamp coolers, but poor air circulation. They also indicated that they had never been provided ice and only had access to showers with warm water with little cooling effect. Staff in the unit provided a current inmate heat-medication list and reported that heat plan rules were satisfied during the recent heat alert. Unit thermometers were noted on each wall and appeared to be functioning properly.

Lockdowns

There were two extended periods of institutionwide lockdown. Medications were delivered to inmates in their cells. Per inmate and staff reports, these lockdowns resulted in

116

delays in appointments of inmates for clinical case manager contacts and IDTT reviews. Requests for interviews with psychiatrists and other clinical staff were not honored on a timely basis. Full clinical services, however, were provided to inmates in administrative segregation housing units.

### San Quentin State Prison (SQ)
July 29, 2008 − July 31, 2008

Census:

SQ's census was 5,210 inmates, with the total number of inmates in administrative segregation at 389, and 598 inmates on condemned row.

There were 1,149 inmates on the mental health caseload. In the mainline housing units, there were nine EOP inmates and 447 3CMS inmates. The condemned men's unit had two EOP inmates and 88 3CMS inmates. In the administrative segregation units, there were 31 EOP inmates and 114 3CMS inmates. Six inmates were in the OHU during the visit due to mental health issues.

Staffing:

Actual and functional staffing vacancies had significantly decreased since the preceding site visit. The chief psychiatrist position and the senior psychiatrist positions had been vacant for about nine months. The chief psychologist position remained filled. All six senior psychologist positions were filled. Of the 8.5 allocated staff psychiatrist positions, three were vacant but covered by registry staff. Only one of 37.6 staff psychologist positions was vacant and was covered by a contractor. All five social worker positions were filled.

The senior psych tech position had been filled since the preceding site visit. Of the 14.6 psych tech positions, there was one vacancy, and it was covered by registry staff. Of the 2.46 RN positions, there was a vacancy of .46, which was used to cover overtime. The health

117

program specialist position was filled.  There were 2.75 recreation therapist positions with a .75 vacancy.

Quality Management:

The quality management committee continued to meet weekly, with good attendance by both custody and mental health staff.  Reviewed minutes provided very good summaries of the meetings.

The mental health subcommittee reported monthly to the health care quality management committee, chaired by the chief medical officer (CMO), which also met on a weekly basis.  The mental health subcommittee provided regular status reports to the health care QMC on QIT activities and status.  Substantive areas that were addressed by the mental health quality management subcommittee included progress of current QITs, review of relevant quality management audit results, issues related to the OHU, office space, training, and five-day follow-up.  A list was provided showing 14 active QITs, 11 monthly audits, two FITs, and nine reoccurring status reports.  All QIT and audit leaders were required to present a verbal progress summary to the subcommittee on a scheduled basis.  A very structured written report process had also been implemented.  QITs produced written results, with their recommendations forwarded up the chain of command as appropriate.  Line staff both were informed about the QITs and often part of the QIT process.  Audits relevant to the issues examined by the QIT process were frequently continued after the QIT process had been completed.

Suicide Prevention:

The SPC met on a monthly basis.  Review of the minutes since January 2008 indicated that both custody staff and the DON were not attending these meetings. Review of the sign-in sheets and information obtained from staff indicated that custody staff were in

attendance, although it varied.  It was not unusual for attendance by some mental health staff members of the committee to be poor due to a variety of other competing demands, such as guardian training.  The SPC reported to the mental health subcommittee on a frequency ranging from monthly to quarterly.

Substantive areas that were addressed by the SPC included five-day follow-up audit results, review of monthly videoconference, suicide CAPs, high-risk patient list, case examples, DMH referrals, and monitoring and tracking of all suicide gestures, suicide attempts, self-mutilations, and deaths.

Audits demonstrated consistent compliance rates, over 96 percent, for clinical and custody staffs' follow-up of inmates discharged from the OHU.  Required elements of the follow-up process were fulfilled.

Intake cells were modified in Carson unit, but they were not utilized due to difficulties with the doors.  As a result, inmates on intake status were housed in regular cells with identification on the cell door.  Staff attempted to cluster them as much as possible for ease during welfare checks.

A review of log sheets for each of the housing units indicated that welfare checks were occurring for new arrivals in accordance with policy.  These were being signed off by the supervisor for each shift.  During some shifts, each check began at exactly the same interval, causing some concern as to the accuracy of the logs.  This concern, as well as the need for staggered intervals, was discussed with all custody supervisory staff on units where this was discovered.

Yard schedules indicated that inmates in administrative segregation were scheduled for a minimum of 12 hours of recreation time.

It was documented that mental health and custody staff were meeting in the mornings to discuss new arrivals and pertinent information about caseload inmates or others who might be of concern.

Inmates were generally not able to have electronic appliances in the adjustment center and the Carson unit. Staff reported that the cells were not wired for appliances in either unit.

The psych tech audits provided by institutional staff indicated 100-percent compliance with psych tech rounding. A review of the isolation logs located in the unit supported this. The psych techs also conduct the 31-item screens. Audit results demonstrated compliance above 90 percent with the timeliness of these screenings. Nursing staff had implemented the screening form that included the bad news screen.

There were 19 EOP inmates who had been housed in administrative segregation for more than 90 days. The reasons for delayed transfer broke down as follows: one due to pending investigation, one due to pending transfer to the CSP/Sac PSU, six due to pending disciplinary completion, one due to pending ICC review, four due to pending CSR review, two due to pending DA referral, two due to pending return from MHCBs, and two due to pending parole within 60 days. This information was monitored by staff and reported to the warden. Actions were taken to attempt to reduce stays, in accordance with the administrative segregation plan to improve EOP treatment.

Medication Management:

Audits relevant to medication management issues were generally very helpful, but problems persisted in selected audits concerning methodology and the need to document the

audit process in a manner that clearly explained the purpose of the audit, methodology used, results of the audit, assessment of the results, and corrective action, if any, to be implemented.

Nursing staff reported audit results for the period from February through June 2008. The nursing staff's audit of medication continuity showed compliance of 86.8 percent. Medication continuity issues decreased since the last site visit until July 2008, when they were reported again to be problematic due to the initiation of the Maxor pharmacy system. The result was that SQ no longer was able to use a variety of locally developed management information systems designed to work around previous system obstacles. Problems in implementing the Maxor system included unexpected difficulties with the system related to the frequent housing moves of inmates within SQ as well as medication management issues related to nursing practices.

The nursing staff's audit results on medication noncompliance for February through June 2008 showed compliance of 75.8 percent. The medication noncompliance audit had an inadequate sample size related to methodological issues, and the initial sample was not selected for the indicator being reviewed. Audits either had not been performed or were problematic concerned newly arriving inmates, timely renewals upon discharge from MHCB, timeliness of responses to referrals for noncompliance, centralized list for DOT use outside of the MHCB, criteria for ordering medication by DOT, and institutional systems for verifying that the people administering medication consult a DOT list and employ DOT as indicated.

A memo covering the period from February 2008 through June 2008 stated that pill lines were working, and that medication orders began to be consistently processed and filled in a timely manner since January 2008, when a new pharmacist in charge began work at SQ. It

121

also stated that it was discovered in late January 2008 that HS medications were not being administered at the appropriate time.

Informed consent audits indicated compliance, although the accuracy of these audits was not confirmed due to lack of methodological issues within the audits.

Audits relating to obtaining blood levels of certain psychotropic medications demonstrated compliance, but studies relevant to obtaining other pertinent laboratory tests were lacking.

SQ staff reported compliance with statewide policy regarding the delivery of DOT medications.  However, staff reported that the Maxor pharmacy software system did not include the inmate's mental health status, and therefore the institution could not produce a list of mental health patients on DOT medication.

The Keyhea coordinator reported that delivery of services from the Keyhea program coordinator has shown marked improvement during the monitoring period due to increased support from the office of legal affairs.

Audit results from February through June 2008 showed compliance with parole medications at the rate of 78.6 percent.  While the audit data were very useful, the audit had inadequate written analysis of the causes of the noncompliance.

Sexual Misconduct:

There were 41 incidents of sexual misconduct involving 32 inmates that resulted in RVRs.  Of those 41 incidents, 31 resulted in screenings for Exhibitionism.  From available information, reasons for not screening were comprehensive evaluations in five cases, the inmate was at an outside hospital when the incident occurred in one case, and the inmate transferred/paroled soon after the incident in two cases.  There were six comprehensive

evaluations during the monitoring period, of which four resulted in a positive finding of Exhibitionism.  Of the screenings that occurred, 20 were reviewed in an IDTT.  The *Department Operations Manual* (chapter 5) indicates that mental health inmates must be taken to an IDTT, and the Program Guide at least implies that anyone who has a positive screening for Exhibitionism must be taken to an IDTT.  Timeliness was an issue in most cases, with mental health screenings taking more than 24 hours, and timeliness of IDTT meetings also problematic.  IDTT meetings occurred in only 20 out of 41 cases.  The data provided by mental health staff did not indicate the outcome of the screenings, and therefore, the final number of required IDTT meetings could not be determined.  It appeared in at least five cases that IDTT meetings should have been held but were not.

Mental health staff reported that some inmates who met criteria for Exhibitionism were not sent to a treatment program due to their custody classifications, and were treated on a case-by-case basis at SQ.  Staff also reported that no inmates were receiving treatment at SQ at the time of the monitor's visit.

The screenings completed by SQ mental health staff had varying formats, from the mental health evaluation used for all RVR mental health assessments to a brief mental health evaluation also referred to as CDCR form 7389.  The lack of standardization presented obvious problems, particularly inadequacy of screening or assessing for the presence of paraphilias.  In addition, documentation of screenings and evaluations was missing for some of the inmates, further complicating the monitor's ability to draw conclusions.

Transfers:

During January through June 2008, SQ referred inmates to DMH acute, intermediate, and day programs.  Presented data showed that 18 inmates were referred during the

123

period.  Ten, or 55 percent, of these inmates were accepted, of whom nine, or 90 percent, were

transferred to a DMH facility.  Five, or 28 percent, of the 18 referred inmates were on waiting

lists, two, or 11 percent, were rescinded, and one, or six percent, was canceled.  The two inmates

who were rescinded were subsequently transferred to CMF for medical reasons.  The canceled

referral, which was due to medical hold, was transferred to an SNY.

      Times between referral and acceptance ranged from one day to nearly three

months.  Accepted inmates generally transferred no later than the next day, although two inmates

were transferred five days following acceptance.  Of the five inmates on waiting lists, SQ

appealed two.  Alternative treatment plans were subsequently developed in both instances, and

the inmates were re-housed at the EOP level of care.  The institution reported that four of the

nine inmates who were transferred to DMH in the review period were returned, with appropriate

psych and return protocols followed.

      From September 2007 through June 2008, SQ made 159 referrals to MHCBs, of

which 101, or 64 percent, were accepted and transferred.  Fifty-three, or 33 percent, of the 159

referred inmates improved, three, or two percent, paroled, and two, or one percent, of the inmates

were pending MHCB transfer at the end of June 2008.  Institutional data showed that ten percent

of MHCB-accepted inmates were transferred within one day of acceptance, three percent were

transferred within two days of acceptance, and the remaining 87 percent were transferred three or

more days after acceptance.  The average number of days between MHCB acceptance and actual

transfer was ten days, with a range from 3.5 to 17.7 days.  Staff reported that access to the new

beds at CMF had positively affected lengths of stay in the OHU and transfer times to crisis beds.

      SQ utilized 14 mental health beds on the second floor of its infirmary building as

its OHU.  An additional five beds designated as overflow were located on the third floor of the

same building.  The institution reported that it did not use any other facility as OHU beds or alternative OHU cells.

Nursing coverage in the OHU generally spanned seven days a week and included one to two RNs, one LVN, and one certified nursing assistant per shift.  Staff reported that nursing coverage was increased when appropriate due to high acuity of need, including medical instability and suicide watches.  Psychiatric coverage included one psychiatrist on site during second watch and on call during first and third watches Mondays through Fridays.  On Saturdays and Sundays, a psychiatrist was reported to be on-site five hours per day, with the remaining time covered by on-call psychiatry.  Psychology coverage in the OHU was reported to be 2.25 on site during second and third watches on Mondays through Fridays.  Presented data indicated that inmates in the OHU received a combined psychiatry/psychology contact more than once per day.

Institutional data showed that during January through June 2008, there were 378 OHU regular placements at SQ.  In the same period, there were seven long-term OHU placements.  These long-term placements included non-acute condemned inmates requiring a high level of care, or inmates with conditional risks related to custody issues and no viable housing options, including other available higher level of care beds.  From January through June 2008, the institution reported that 295 placements had dispositions completed within 48 hours, representing 78 percent of all placements.  The percentage of placements disposed of within 48 hours during the covered period ranged from 60 percent to 85 percent.  In the same time period, there were 95 placements representing inmates with three or more placements in the OHU within 90 days.

The average daily census in the OHU in January through June 2008 was reported to range from nine to 19.  In the same period, the average length of stay ranged from 8.8 days in

January to 3.6 days in June.  Staff reported that the reduced lengths of stay, which began with an average of 4.8 days in April, likely correlated with increased access to MHCB in recent months.

For the period of February through June 2008, institutional data indicated that there were 430 inmates at the EOP level of care.  Of these inmates, 263, or 61 percent, were held in the general population reception center.  The remaining 167, or 39 percent, were in administrative segregation.  Reported data showed that 139, or 53 percent, of the 263 in the general population reception center remained at SQ for less than 60 days, while 124, or 47 percent, exceeded 60 days.

Regarding the 167 inmates held in administrative segregation during the February through June 2008 period, 51, or 31 percent, were transferred out of SQ in less than 60 days, while the remaining 116, or 69 percent, exceeded the 60-day timeframe.

During February through June 2008, SQ held 2,278 inmates in the 3CMS general population reception center and 449 inmates in reception center administrative segregation status.  The institution transferred 181 3CMS inmates in the period, and another 646 inmates were paroled.  Transferred inmates included 94 3CMS inmates who were transferred in less than 90 days for general population.  No administrative segregation inmates were transferred in less than 90 days.  There were 85 3CMS inmates who were transferred from the general population reception center more than 90 days following placements; two 3CMS inmates were transferred from administrative segregation over 90 days after placement.  The institution reported a continued statewide shortage of sensitive needs beds for 3CMS inmates.

In the reception center in June 2008, there were 87 EOP inmates, nine of whom were transferred out.  Five, or 55 percent, of those were transferred in less than 60 days.  In addition, 20 EOP inmates in the reception center paroled, ten of whom paroled in less than 60

days.  Of the 588 3CMS inmates in reception center in June 2008, 34 were transferred.  Out of those, 22, or 65 percent, were transferred in less than 90 days.  A total of 97 3CMS inmates in the reception center paroled, 81 of them in less than 90 days.

Other Issues:

Reception Center

As part of its functional team approach to mental health care delivery, SQ had an assessment and evaluation team in its reception center.  As of June 2008, initial mental health screening was integrated into the reception center medical screening, which was done in confidential settings and conducted by either a certified nurse assistant or an LVN.  Arriving inmates received a screening on the day of their arrival, and with a small number of exceptions, all were screened within 24 hours.

Any inmates who tested positive on the screen, who had a previous mental health history, or who were taking psychotropic medication were sent for psychological evaluations (MH-7 or 7386) on the first floor of the infirmary.  Evaluations were being done by clinicians within seven days of arrival, in private settings, with access to inmates' treatment and parole histories.

Access to information in the POC database was available at initial screenings and mental health evaluations, and for all clinicians in the reception center, available information included IDTT notes and parole medications.

From February through June 2008, there was a total of 430 EOP inmates and 2,727 3CMS inmates in the SQ reception center.  A monthly average of 86 EOP inmates and 545 3CMS inmates were received there during that period.  Forty-nine of those EOP inmates were transferred out, and 74 EOP inmates paroled.  Approximately 32 percent of EOP inmates were

transferred in less than 60 days.  One hundred and eighty-one 3CMS inmates were transferred, and 465 paroled.  Approximately 51 percent of 3CMS inmates were transferred in less than 90 days.

The institution had made progress with implementing many of the features of the plan for providing treatment to EOP inmates in reception center.  Most EOP inmates in reception center were housed in 35 beds in the Bay View Housing Unit, or in Donner, Alpine, or the West Block.  Level IV EOP inmates were housed on the first tier in Badger.

IDTT meetings were being scheduled three days per week in a consistent location within the infirmary, as opposed to on the cell blocks.  Initial IDTT meetings were taking place within 14 days of inmates' arrivals, as required.  Timeliness of follow-up IDTT meetings, i.e. every 30 days, had been at 70-percent compliance, slipped during the monitoring period to 56 percent, but recovered to 70 percent by the time of the monitor's visit.  Difficulty was attributed to institutional information technology changes, although those changes were expected to help in the long run.  Having the psychiatrist in one location was helping facilitate institutional ability to track inmates.  However, if there was change in an inmate's status that resulted in changes of IDTT due dates, ability to track those changes was variable.

Audits found that the institution was compliant with giving inmates initial and weekly case manager contacts, although about half of these were cell-front.  An audit found that the rate of compliance had been 89 percent in May 2008, and rose to 95 percent in June 2008.  Audits also found that the institution was providing at least the minimum of five hours of structured therapeutic activity per week.  On average, inmates were offered 7.8 hours of group per week, and received an average of six hours per week.  EOP inmates were offered the same access to yard time as other inmates, commensurate with their case factors.

128

There had been progress since the preceding monitoring period with pre-release planning. An LOP was in place. Each EOP inmate in reception center had an assigned pre-release clinician, and a pre-release group was offered. All EOP inmates being released from the reception center were offered a face-to-face meeting with a pre-release clinician. Since the time of the preceding site visit, SQ had increased its number of pre-release clinicians from .5 to 1.75, after much turnover during the preceding months. Shortly before the monitor's visit, the institution implemented the use of File Maker Pro for entry of pre-release planning progress notes. One aspect of EOP reception center parole planning that was not in place was providing assistance prior to inmates' releases with the process for filing applications for entitlement programs. This aspect of the program was in the process of being addressed systemwide.

Staff reported that the greatest obstacle to compliance was the lack of a continuous, up-to-date list of EOP reception center inmates who would be paroling, with dates of their upcoming discharges. Staff said that additional information technology resources would assist them with meeting IDTT timelines and with identifying and tracking reception center EOP inmates who will be paroling.

The monitor attended three initial EOP reception center IDTT meetings and one follow-up IDTT meeting. All of the requisite members were present and familiar with the inmates' histories and current status, C-files were present, meaningful discussion among the team members took place, and appropriate and pertinent exchange with the inmates occurred. Pertinent therapeutic objectives and goals were identified, and plans to attain them were discussed.

Construction of the new reception center complex was underway at the time of the monitor's visit.

Administrative Segregation

During the monitoring period, SQ maintained five units that it categorized as lockup units: the adjustment center with condemned row and administrative segregation inmates, East Block with condemned row inmates, North Segregation with condemned row inmates, Carson section with administrative segregation inmates, and Donner section with administrative segregation units. Donner section functioned as an administrative segregation overflow unit and housed anywhere from one to four tiers of administrative segregation inmates. Custody, mental health, and psych tech supervisory staff reported that this unit was always appropriately staffed for the number of administrative segregation inmates by the next shift following increased placements into the unit.

The mental health management staff had created a new position, administrative segregation coordinator, which was a staff psychologist who was assigned to enhance and coordinate treatment activities provided to inmates housed in administrative segregation units or on administrative segregation status.

OHU/MHOHU

There were six inmates in the OHU at the time of the monitor's visit. Lengths of stay were reported to have decreased significantly since the opening of the new MHCBs at CMF. The monitor's expert attended an OHU IDTT and a well-attended difficult patient management conference. Discussions at both were useful for treatment planning.

Information obtained from the primary DMH coordinator showed that, except for condemned men, the process for referrals to the acute care DMH beds was working well. Inmates with multiple OHU and/or MHCB admissions were routinely considered for such transfers. Referrals to day treatment and intermediate care DMH programs had been more

problematic due to long waiting lists and the perception that such referrals could not be generated from inmates in the OHU because they would be considered too acute for such programs.  This perception was later clarified as inaccurate, and staff were again reminded to initiate referrals when clinically indicated despite the long waiting lists.

Inmates in the OHU did not have beds, but had mattresses on the floor.  This practice is unacceptable; inmates in the OHU should be provided with beds.

Administrative Segregation EOP

SQ implemented the intensive treatment program (ITP) LOP on April 24, 2008; this designated that inmates who had refused more than 50 percent of their structured therapeutic activities would receive enhanced services.  The mental health management staff also had an LOP that specified that inmates refusing 30 percent or more of their assigned groups would be considered for an alternative treatment plan.  Unfortunately, several of the medical records reviewed involved cases that would be indicated for the ITP, but no mention of the necessity for placement into the program was found in the chart.  Despite this, staff had modified group content to provide incentives to inmates to attend these current groups.  In addition, custody staff maintained a log tracking inmates' refusals of showers and yard.

The institution was compliant with offering ten hours of structured therapeutic activity for EOP inmates housed in the adjustment center from September 2007 through June 2008.  For EOP inmates in administrative segregation, SQ was not compliant with offering ten hours of structured therapeutic activity per week from September 2007 through February 2008, but in March 2008, the facility began to meet this ten-hour requirement.

The facility was not meeting requirements for weekly contacts for EOP inmates in administrative segregation.  Of the sample of medical records reviewed by the monitor's expert

131

for compliance with weekly contacts, progress notes filed in the UHR showed compliance. During the site visit, a supervisor's UHR/MHTS concordance study similarly showed noncompliance. Institutional data, however, indicated that the institution was merely approaching compliance in this area.

Similarly, initial and ongoing IDTTs were not always occurring in accordance with timeframes, with initial IDTTs being most problematic. In many of the records reviewed, current treatment plans could not be located, and the quality of the plans was variable, depending on the provider.

3CMS

The institution presented data on case manager contacts for 3CMS inmates in the reception center, reporting compliance rates ranging from 94 percent in January to 97 percent in June 2008.

IDTT meeting compliance for condemned 3CMS inmates was reported above 90 percent. Compliance rates for IDTT meetings for mainline 3CMS inmates was shown to be consistently about 90 percent.

SQ offered two substance abuse groups and one stress management group to 3CMS inmates. The institution continued to explore adding more 3CMS groups as time and meeting space became available. The three offered groups included from ten to 16 inmates per group per week, totaling approximately 35 to 45 inmates. There was a waiting list of approximately 20 to 25 inmates who had been referred for at least one of these 3CMS groups. The waiting list was comprised of referrals that had been screened by one of the group clinicians and assigned to a future group. The two substance abuse groups were staggered so that a new

group began each month.  The result was that referred inmates were waiting from one and four

weeks, depending on when the referral was received.

### Administrative Segregation 3CMS

The mental health management staff reported that they had recently been

informed that administrative segregation inmates would be allowed to receive therapeutic

services in the new health care building, and that this should result in the ability to provide

therapeutic groups to 3CMS administrative segregation unit inmates.

Medical record reviews showed that the institution was not meeting, but was

approaching, case manager contact requirements for 3CMS inmates in administrative

segregation.

Initial and ongoing IDTT meetings for 3CMS inmates in administrative

segregation were also not compliant, with initial IDTTs being most problematic.  Treatment

plans, when filed in the UHR, were variable in quality.

### Referrals

SQ issued an updated LOP governing its referral process effective May 21, 2008.

Responses to emergent and urgent referrals had remained compliant.  The institution conducted

an audit of all self- and staff referrals between February and May 2008 and found a range of 87-

percent to 97-percent compliance for resolution of these referrals in less than five working days.

### Medical Records/MHTS

Medical records continued to be problematic.  Documents were not appropriately

filed, and necessary documents were not consistently brought forward and placed into the current

volume when multiple volumes of charts were created.

Heat Plan

SQ updated its annual heat-related pathologies plan as required on April 15, 2008. The plan conformed to the systemwide standard. The institution indicated that with the implementation of Maxor's pharmacy system on June 23, 2008, work was ongoing on the generation of heat lists under the new system. In the interim, mental health clinicians, including psychiatrists, psychologists, social workers, psych techs, and LVNs, had been issued heat cards, which were distributed to all inmates needing them. SQ had also translated the heat cards into Spanish for monolingual Spanish-speaking inmates.

## Deuel Vocational Institution (DVI)
### June 3, 2008 − June 5, 2008

Census:

DVI housed 3,838 inmates, with a total MHSDS population of 869 inmates. There were 343 inmates housed in the administrative segregation unit. The mental health population in administrative segregation included 25 EOP and 109 3CMS inmates. There were 59 general population 3CMS inmates housed at the facility.

In the reception center, there were 28 EOP and 301 3CMS inmates. The special processing unit, a sensitive needs housing block, housed 23 EOP and 305 3CMS inmates.

There were 18 inmates housed in the OHU. In the main OHU located on B wing, there were four EOP and nine 3CMS inmates. The OHU overflow unit located on L wing housed three EOP inmates and two 3CMS.

Staffing:

Of the 96.25 mental health positions, 88.5 were filled. Contractors filled 7.75 of the 12 vacancies.

134

At the time of the monitor's visit, the positions of chief psychiatrist and chief psychologist were both filled. The 3.5 senior psychologist positions were filled.

Four of 5.75 psychiatrist positions were filled, for a vacancy rate of 30 percent. Notably, one of the four full-time psychiatrists was on extended absence from DVI until late 2008.

DVI had 29.5 allocated state psychologist positions, of which 26.5 were filled and the remaining three were covered by contractors. All six social work positions were fully staffed. The total vacancy rate for primary clinician positions, comprised of psychologists and social workers, was 8.5 percent. All 13 psych tech positions were filled, as was the health program specialist position.

The staff services analyst, medical secretary, and office assistant positions were also filled. In addition, five of the 5.5 allocated office tech positions were filled. The pharmacist II position was filled. Of five allocated pharmacist I positions, one was filled by a state employee, with the remaining allocations covered by registry staff. DVI had seven allocated pharmacist technicians, of which three were filled by full-time equivalent state employees, two were classified as limited term, and two were covered by registry staff. All 50 allocated RN positions were covered. Of the 32 allocated LVN positions, 28 were filled, with registry staff covering an additional six positions.

Quality Management:

DVI's mental health program continued to be well managed and supervised, with a functioning quality management system in place and documented and appropriately attended meetings that dealt with substantive mental health issues.

Review of minutes of the mental health quality management committee for October 2007 to May 2008 revealed well-attended meetings that addressed substantive issues of mental health care, as well as issues regarding information technology and staffing, such as use of registry, nursing, training, and education.

There were a number of ongoing QITs functioning at the time of the site visit. These included one dedicated to developing a system to track mental health referrals and to ensure appropriate follow-ups of these referrals, one to develop a staff training manual, and another to produce a handbook of available resources for paroling inmates.

The institution conducted multiple audits for supervision and monitoring purposes. Except for medication, audits relating to the core mental health issues were sufficiently adequate, were methodologically appropriate, were supported by the underlying statistics, and offered appropriate status-in-time information to management.

Peer review processes were occurring for psychiatry, psychology, and social work. Psychologists' and social workers' peer review had been developed in the case manager context and were occurring according to mental health program areas.

Suicide Prevention:

Mental health was not represented on the institution's ERRC. The infrequency of committee meetings posed a barrier to the timely implementation of corrective action. Staff reported that DVI's ERRC met on one occasion during the monitoring period and reviewed seven incidents dating from January 9, 2008, through March 1, 2008. The review committee consisted of the SRN II, associate warden for custody, associate warden for Americans with Disabilities Act (ADA) compliance, DON, and a staff services analyst.

None of the reviews resulted in the identification of any issues of training, staff compliance, or suggestions for improvement.  CPR appeared to have been appropriately initiated in the single incident in which it was indicated.

Five-day follow-up after discharge from the OHU was reviewed and monitored by the SPRFIT.  A review of these minutes indicated that the team examined follow-up and noted some errors in its timeliness.  Team meetings also documented attempts to remedy noted errors in follow-up.  The institution's audit confirmed compliance with the provision of suicide prevention monitoring, including daily clinical contacts and 24 hours of hourly custodial monitoring, for inmates returning to housing after suicidal incidents.

Medication Management:

Medication audits, a nursing function, remained seriously flawed and continued to adversely affect the delivery of adequate care.  DVI continued to present inadequate information regarding medication management issues, which resulted in inadequate assessment of various aspects of medication management, including medication compliance, continuity of medications, DOT, and HS medication administration.  To assist in nursing management, the DON from MCSP was on loan as acting DON at DVI.  Many of the duties of compliance monitoring were assumed by the compliance division at DVI, which had begun to audit some areas of medication management.

Inmates who were interviewed consistently and emphatically reported medication lapses that occurred after medication changes, renewals, and housing moves.  Interviewed inmates and mental health staff reported that medications were not delivered timely after the psychiatrist changed medications and after new medication orders.  Discontinuation of medications took several days beyond discontinuation orders.