Pharmacy hours had been expanded during the week and on Saturdays to address limitations with timely dispensing of medications.

Supervisory staff reported that since a "strike team" had been tasked with ensuring medication continuity upon arrival, documentation of informed consent had improved.

The institution provided adequate audits of laboratory studies, which showed varying levels of compliance. Mental health staff had implemented a functional system for ordering and tracking laboratory studies. The facility provided audit results of various aspects of laboratory studies for mood-stabilizing medications as well as for atypical psychotropic medications. There were, however, only 11 of 15 instances in which laboratory orders were received, for a 73-percent compliance rate. It was observed that in five of the instances, medications used had no required laboratory studies.

Interviewed inmates consistently reported that DOT occurred. Nursing supervisory staff reported that all medications were administered by DOT. They reported that an officer was present at all of the pill lines, and that nursing staff observed DOT procedures regarding medication administration in pill lines as well as within locked units. The facility conducted two separate audits of pill lines during second and third watches. An audit conducted October and November 2007 indicated 70-percent compliance with officer DOT, and an audit for January and February 2008 showed that compliance improved to the rate of 95 percent.

The mental health department reviewed all incident reports, logs, and RVRs concerning hoarding of psychotropic medications. These inmates were referred to the psychiatrist for evaluation and follow-up.

Problems continued with timely identification of Keyhea inmates arriving at DVI due to lack of timely electronic transmission of information. The institution initially reported

that there were no inmates on Keyhea orders. However, it was learned during the monitor's visit that two inmates were on active Keyhea orders, and that four inmates on Keyhea orders had been housed at the institution during the monitoring period. All had had Keyhea orders initiated prior to arrival at DVI. One of the four inmates' orders were not reviewed and expired in October 2007. Two inmates were granted Keyhea injunctions at hearings, and one inmate paroled on May 20, 2008. The nursing supervisors reported that the Keyhea memo was placed in the MAR to inform the nurse administering medications that the inmate was on Keyhea orders.

Problems also continued with use of HS medications. Review of a pharmacy printout indicated at least 300 inmates who had been prescribed psychotropic medications at HS. It was not clear if the psychiatric staff prescribed medications at HS as clinically warranted, or whether concerns regarding workload demands affected HS prescriptions. Interviewed inmates denied that HS medications were administered consistently.

Auditing for parole medications was performed by the compliance division and indicated that 74 percent to 83 percent of paroling inmates received their medications at the time of release. Reportedly, medications were mailed to those inmates who did not receive their medications at the time of discharge.

In 25 percent of cases, inmates who arrived at DVI with prescriptions from other CDCR institutions were not seen by a psychiatrist within 24 hours of intake, as will normally occur according to the Program Guide. The institution reported that an audit conducted in March 2008 found that 15 of 20 cases examined in the audit were seen within 24 hours. The audit also looked at appropriateness and quality of documentation by the case manager and psychiatrist, receipt and filling by the laboratory of physicians' orders, and obtaining of informed consents, and found 100-percent compliance for all of these parameters.

<u>Sexual Misconduct</u>:

DVI's process for assessing inmates following incidents of indecent exposure was limited to mental health screens that were completed as part of the RVR process.  Although DVI's database captured information regarding the date of the incident, inmate identification information, the clinician assigned to complete the screen, and the date that the screen was completed, the form did not capture the occurrence of IDTT review, referral and completion of comprehensive evaluation, referral for treatment, and imposition of any sanctions.

DVI's database log indicated that from November 9, 2007, through April 13, 2008, there were seven documented incidents of indecent exposure.  At least two of the inmates charged in these incidents had been cited for the behavior previously.  Data available for six of these incidents indicated that, once requested, mental health screenings were completed in a timely manner, within three to 12 calendar days from the time that the request for evaluation was received.

DVI's process for assessment following incidents of indecent exposure was limited to the mental health screens that were completed as part of the RVR process.  These did not routinely include a review of the relevant history available within the C-file or comprehensive assessments for Exhibitionism.  Diagnostics were included in these evaluations.  None of the evaluations that were reviewed by the monitor resulted in a diagnosis of Paraphilia or Exhibitionism.

Review of DVI's existing LOP suggested the statewide guidelines regarding the imposition of security measures in response to incidents of indecent exposure had not yet been fully implemented.

Transfers:

        Problems continued with use of the OHU to deliver MHCB level of care, lengths of stay in the OHU, and delays in transfer to the MHCB. Staff reported that the facility had increased staffing in the OHU as well as added weekend coverage. They also reported increased communication with the MHCB to facilitate better treatment. Physical plant limitations as well as poor access to higher levels of care resulted in prolonged stays in the OHU. Review of the OHU database for January 2008 through May 2008 revealed that 46 individuals were referred for crisis care on three to ten occasions.

        Statewide MHCB bed shortages resulted in continued heavy use of OHU beds for mental health crisis care, long lengths of stay, extreme delays in transfers to MHCB, and apparent suppression of the frequency with which DVI referred inmates to MHCB. Many inmates were returned to their housing units without ever transferring outside of DVI. From December 2008 through the end of April 2008, there were 457 mental health crisis care placements on the OHU. Approximately 87 percent of these inmates were initially placed into beds on the OHU overflow units. The average length of stay within the overflow areas ranged from 1.67 days to 2.58 days, indicating that the inmates were generally moved from overflow to regular OHU beds within the initial 2.5 days of their placement. The monthly average length of crisis placement, including "overflow" and "OHU" placement, ranged from 3.07 to 4.19 days. One hundred fifty-four, or approximately 34 percent, of the individuals who were placed into the OHU were referred for MHCB placement. Of considerable concern was that, due to the systemwide restriction in the availability of MHCB beds, only 42 percent of the patients who were referred for MHCB placement were ever actually transferred to an MHCB.

It appeared that the decision to refer an individual to MHCB generally occurred early within the OHU stay, but that transfer was quite delayed by the time it occurred. An audit performed early in the monitoring period found that the average number of days from admission to the order to transfer was 1.94 days. The average time from the transfer order until actual transfer, however, increased to 10.94 days, with a range of one to 20 days. This was a substantial increase from the average of 4.64 days that was reported during the preceding monitoring period. Staff reported that they continued to call Population Management on a daily basis to attempt to move patients to MHCBs but were frequently told that there were simply no beds available.

Clinicians reported ongoing concern with the tendency for inmates who had been sent to MHCBs to return to DVI in less than stable condition. An audit of those inmates who returned from crisis care from January through March 2008 found that of 34 inmates who were sent to MHCB care, four, or 11.8 percent, required EOP care upon their return and 14, or 41.2 percent, were re-admitted to the OHU. Only 20, or 59 percent, of the 34 inmates were considered stable enough to be discharged to a housing unit upon their return.

The DVI OHU was housed on the B unit at DVI. Staff reported that due to increasing numbers of chronic medical patients, the OHU had expanded to the L1 administrative segregation unit. At the time of the monitor's visit, there were seven inmates housed in the main OHU and two inmates housed in the OHU overflow. The OHU staff reported that the overflow unit routinely housed seven to nine inmates who were awaiting transfer to the main OHU. They also reported that attempts were made to move inmates from the overflow unit to the main OHU when a bed was available.

Concern with physical plant issues persisted for both the OHU and the overflow unit in the L1 administrative segregation unit. The three management cells that were utilized for suicide watch in the main OHU had been modified to reduce the possibility of self-harm by inmates. The facility had also reportedly implemented a regular cleaning schedule for maintenance of the cells. Despite these changes, problems persisted. The window of one of the cells was smeared or scratched to such an extent that visibility into the cell was impaired. Furthermore, a wall in front of the cells limited accessibility and visibility of the area. The cells in the L1 administrative segregation unit had also been modified to decrease the possibility of self-injury. Despite these changes, these rooms were clinically inappropriate for the monitoring of potentially suicidal inmates. The size of the windows in the doors necessitated that the observer sit in an elevated chair directly in front of the cell for clear visualization. Additionally, the lack of proximity of these patients to the OHU resulted in monitoring only by the one-to-one observer rather than by the OHU nursing staff. All inmates housed on this unit were monitored with a one-to-one observer, usually an LVN. Lastly, there were reports, which were of great concern, that the inmates housed on the L1 unit for OHU overflow were not afforded showers consistently.

The OHU treatment team met daily from Monday through Friday. This team consisted of the psychiatrist, two psychologists, a psych tech, and a housing officer who was escorting the inmate. The expert attended one of these meetings and found it well run, with good discussion regarding treatment options and referral to an MHCB when indicated. Interdisciplinary discussion was evident.

Interviews with the mental health staff indicated a general consensus that inmates could not be referred to DMH if they had less than three months before parole. It was not

uncommon for inmates to arrive at this reception center in need of psychiatric stabilization while

having less than three months to serve.  This resulted in few referrals for DMH level of care, and

inmates remained housed in the OHU with multiple admissions and poor mental health stability.

Referral to DMH acute care was also not pursued due to a belief that inmates must first be

admitted to an MHCB prior to DMH referral.  The level of severity of mental health symptoms

observed by the monitor indicated that referral to DMH for acute care was indicated for some

individuals who remained unstable in the OHU and awaiting an MHCB bed.

   The facility reported a process, referred to as a "multiple admission IDTT," which

was charged with tracking multiple admissions to OHU and making recommendations regarding

elevations in the level of care.  At the time of the monitor's visit, this team consisted of only an

OHU clinician and the regular case manager. Plans were in place to enhance the composition of

this group to include the psychiatrist and a correctional counselor 1 (CC-1).  The directive given

to this team was to refer for consideration for a higher level of care following the third OHU

admission.  Comparison of the database that tracked OHU admissions to the OHU multiple

admissions log revealed several instances in which inmates with multiple admissions were not

considered for DMH referral.  The monitor's expert suggested that the database records be used

as a basis for making recommendations regarding cases that were in need of discussion.

   From December 18, 2007, through May 21, 2008, the log from the multiple

admissions team showed that of 50 case discussions, four cases were identified as requiring

referral to DMH intermediate acute care.  Referrals were actually completed for two of these

individuals, who were in fact transferred to DMH programs.  Examination of the summaries of

the group's discussions regarding DMH referrals suggested that referral to MHCB was often not

considered as an option after a third OHU admission. There also appeared to be hesitancy to recommend inmates with repeated OHU admissions for elevation to the EOP level of care.

From November 1, 2007, through May 21, 2008, 15 mental health patients were identified as requiring referral to DMH programs, of whom six were transferred to DMH programs. Four of the six transfers actually occurred from MHCB programs at HDSP and PBSP. Four of the 15 identified inmates transferred to other prisons or paroled before the referral was completed. There were four referrals, all for patients identified on May 21, 2008, that were pending as of the time of the monitor's visit. It appeared that the completion of the case factor sheets and the completion of the referral packet typically occurred in a timely fashion.

With regard to use of OHU overflow areas at DVI, after a history of using an isolated, poorly suited area of K Wing to house crisis patients when OHU beds were full, DVI converted 11 cells on L Wing, another administrative segregation housing unit, for this purpose. In the process of this conversion, there were significant safety-related changes, including replacement of windows with Lexan, covering of vents with smaller-holed grates, and installation of enclosed light fixtures. The potential for attaching ligatures to braces supporting the upper bunk was reduced by welding metal covers over these braces. At the time of the monitor's monitoring visit, these cells remained unpainted due to ongoing difficulties with getting paint to adhere to the walls.

While the above modifications have improved the safety within these cells, entry of natural light into cells continued to hamper observation into the cells. Earlier plans to install cell doors with better visibility had not yet materialized. Meanwhile, inmates in these cells complained of the lack of ventilation and of elevated temperature, even on a day when the outdoor temperature was under 80 degrees.

145

The institution was noncompliant with the CAP regarding unsafe conditions in OHU cells used for suicide watch and observation.  Despite improvements that were made to the cells in the OHU and OHU overflow in L Wing, problems remained.  Visibility was also poor for provision of one-to-one observation due to a wall in front of the management rooms in the OHU.

Other Issues:

### Reception Center

The institution was compliant with timely screening of new arrivals who had mental health histories.  An audit of 30 cases, including eight prior EOPs and 22 prior 3CMSs, found compliance for 28 of the 30, or 93-percent compliance.

With regard to the plan for treatment of EOP inmates in reception center, the institution reported there were 100 EOP inmates in reception center from January 1 to March 30, 2008.  As of March 30, 2008, 58 of these inmates had transferred to appropriate institutions, reportedly within required timelines.  Of the remaining 42, the institution reported that 16 had endorsement dates ranging from January 2008 to April 2008.  At the time of the monitor's visit, eight of these 16 inmates were no longer at the institution.  With regard to the remaining 26 inmates, the institution reported that they had either left the institution, which made it impossible to get transfer information, or that they remained at DVI and were not endorsed. It was concerning that the institution did not provide the required information for these 26 inmates and appeared to be implying that it did not have the capacity to do so.

DVI separated its reception center EOP into a general population EOP and a special processing unit EOP program for inmates who otherwise would be on SNY status.  Staff reported that there was no difference in mental health services available to the two groups.

Initial IDTT meetings for reception center EOP inmates were done within 14 days in 75 percent of cases. Thirty-day follow-up IDTT meetings for reception center EOP special processing unit inmates were done in 96 percent of cases. Weekly case manager contacts occurred in 91 percent of cases, and five hours of structured out-of-cell activity was offered in 98 percent of cases. For the reception center EOP special processing unit program, audit data, staff interviews, and data review showed 100-percent compliance for screening new arrivals within 24 hours, doing intake evaluations within seven days of arrival, initial IDTT meetings, weekly case manager contacts, and five-hour weekly structured therapeutic activities, but noncompliance with intake evaluations and 30-day follow-up IDTTS meetings.

In the reception center EOP generally, audits were conducted for the quarter January through March 2008 to explore the EOP program in reception center. Audits found 100-percent compliance for screening of new arrivals within 24 hours, 76-percent compliance for intake evaluations within seven days of arrival for inmates with EOP histories, 94-percent compliance for initial IDTT meetings within 14 days, 72-percent compliance for 30-day follow-up IDTT meetings, 99-percent compliance for weekly case manager contacts, and 88-percent compliance for provision of five hours of structured out-of-cell activity. These audit findings were confirmed through data and document reviews, as well and staff and inmate interviews.

The institution offered subject matter specialty groups to EOP reception center inmates.

<u>Administrative Segregation</u>

DVI's EOP administrative segregation population consistently remained there far beyond timeframes. An audit completed in May of 2008 found that of 70 EOP inmates in administrative segregation, 40, or 57 percent, were there beyond the 30-day timeframe for

transfer to an EOP administrative segregation hub. Staff noted that these delays in transfers caused the number of EOP patients in administrative segregation areas to swell over time.

A third of 3CMS inmates in administrative segregation remained there longer than timeframes allowed.

Eight case managers (one of whom was a contractor), a senior psychologist-supervisor, and a contract psychiatrist were assigned to administrative segregation. Psych techs were assigned to perform rounds in all administrative segregation housing areas.

Mental health 31-item screens were conducted by case managers. Pre-placement screening was assigned to nursing staff in the L1 clinic area. A single daily meeting covered all three administrative segregation housing areas and involved the custody sergeant or lieutenant, case managers, and psych techs.

No group therapy was offered to inmates in administrative segregation due to lack of space that could accommodate treatment modules. To provide an enhanced level of clinical monitoring, clinical staff were directed by mental health supervisors to schedule EOP inmates for two clinical visits per week. These contacts did not occur consistently or in confidential settings. Facility audits of ten caseload inmates who had been in administrative segregation for three to nine weeks found that the average number of case manager contacts for these inmates was just under two per week.

An audit of the composition of treatment teams in administrative segregation showed slippage, with custody staff present for only 70 percent of meetings. The audit also found full compliance with presence of a psychiatrist, a *Diagnostic and Statistical Manual* (*DSM*) *IV* diagnosis, and identification of target symptoms.

All of the administrative segregation units shared a single yard area, resulting in most inmates being offered far less than the required ten hours per week of yard time. Some inmates were offered as little as thee hours per week, and none received more than six hours. Twenty new walk-alone yards were expected to be completed several weeks later

The condition of DVI's physical plant, the limitations on out-of-cell activities, restricted access to yard, difficulties in gaining inmates' compliance with requests for out-of-cell clinical contacts, and existing transfer delays combined to create a situation in which many EOP inmates in administrative segregation were languishing. Institutional staff efforts to overcome these problems were laudatory, but the situation of EOP inmates remaining in non-EOP settings was problematic and concerning.

3CMS

During a four-month period, of 810 3CMS inmates, 563 inmates were transferred from reception center to 3CMS programs within timeframes, but 247, or 30 percent, remained at DVI longer. Institutional audit data for mainline 3CMS inmates found an average of 34 treatment plan interventions for each such inmate.

IDTT composition remained resolved but with minor slippage. For mainline 3CMS IDTT meetings, presented data showed full compliance for presence of a psychiatrist, a *DSM-IV* diagnosis, activities of daily living (ADLs), with target symptoms identified 100 percent of the time. Custody was present in 84 percent of cases.

Audit data showed that DVI was compliant with initial screening. An institutional sample found that the institution was fully compliant with timely initial IDTT meetings. This finding was corroborated by examination of data and documents. Examinations of mainline treatment plans revealed full compliance with mental health diagnoses and

149

identification of target symptoms.  There were an average of 4.8 treatment interventions per inmate. Mainline inmates were seen an average of 2.13 times per month, exceeding the quarterly Program Guide requirement.  There was a limited number of groups available for 3CMS inmates.

Referrals

Audit data for January 2008 through March 2008 regarding referrals showed that referrals were seen timely in only 51.3 percent of cases, taking on average 6.4 days to complete appointments.  A QIT was formed to shorten times between referrals and contacts.  A "strike team" was tasked with picking up triaging and completing face-to-face appointments with inmates within a 24-hour period.

Medical Records/MHTS

There were significant improvements with medical records.  Staff reported improvement with staffing and service.

Pre-Release Planning

Pre-release planning services at DVI were dependent on innovational efforts of individual clinicians.  The institution reported that it ran a parole planning group during January to June 2008.  Clinicians were expected to contact parole officers as needed, and to provide community resource packets to EOP inmates.  Although pre-release planning had advanced, the institution was found to be partially compliant.

**California State Prison, Corcoran (CSP/Corcoran)**
September 9, 2008 – September 12, 2008

Census:

CSP/Corcoran's census on September 9, 2008, was 5,767, an increase of less than two percent since the preceding monitoring period.  The MHSDS population at CSP/Corcoran increased by less than one percent, growing from 1,400 in January 2008 to 1,409 in September

2008.  The general population 3CMS census increased by less than three percent, growing from 582 in January 2008 to 599 in September 2008.  However, the number of 3CMS inmates in administrative segregation increased by 31 percent, growing from 119 in August 2006 to 165 in January 2008.  The overall EOP census declined during the reporting period by slightly more than two percent.  The number of EOP inmates in the administrative segregation hub was 45, 17 percent below its capacity of 54.  The general population EOP program increased by about nine percent and stood at 139 in September 2008.

Staffing:

        CSP/Corcoran continued to make progress in the hiring and retention of mental health staff.  The chief psychiatrist and senior psychiatrist positions were filled, as were the chief psychologist and all five senior psychologist positions.

        Only 4.5 of CSP/Corcoran's 16.3 allocated psychiatry positions were filled by state employees.  Contract psychiatrists covered the equivalent of seven positions, reducing the functional vacancy rate to 30 percent.

        Among case managers, only 8.21 of 35.21 clinical psychologist positions and .4 of 18.8 psychiatric social worker positions were vacant, for a functional vacancy rate of 16 percent for case managers.  This was a decrease by 25 percent since the previous monitoring period.  Seven of the 10.71 recreation therapist positions were filled, as were 40.6 of 42.6 psych tech positions.

        Only two of the 43.92 allocated RN positions were vacant, and all pharmacy, laboratory, and medical records positions were filled.

Quality Management:

        The local governing body met monthly during the reporting period and

maintained minutes that were sparse in content but reflected better-detailed agendas.  Meetings were routinely attended by custody, medical, and mental health supervisors.  The local governing body reviewed and approved minutes generated by the quality management committee.

The quality management committee generally met monthly during the reporting period.  Required staff usually attended the meetings, and minutes were kept.  At the committee meetings, mental health staff provided oral summaries of the mental health programs, including reports on the mental health quality management subcommittee and the SPRFIT.  The committee also reviewed and approved minutes and operational procedures generated by the mental health subcommittee.

The mental health subcommittee continued to meet twice a month and kept minutes.  The chief of mental health served as the chairperson.  Meetings were usually attended by the associate warden and two facility captains, who were present to address access-to-care issues.  In the first meeting each month, the subcommittee discussed the status of the mental health programs, including SPRFIT, based on information collected from the previous month and also reviewed the progress of all QITs.  In the second monthly meeting, the subcommittee discussed any audits that occurred during the previous month and what corrective actions were taken to address any deficiencies.  QITs were established when indicated.

There were three active QITs during the reporting period.  One QIT was chartered prior to the preceding monitoring period and continued to focus on improving documentation of custody checks on inmates released from the MHCB with orders for five-day follow-up.  A second QIT was chartered to improve procedures and monitoring for clinical five-day follow-up.  The third QIT was formed to monitor treatment participation and various obstacles in the EOP hub, including monitoring inmates with stays exceeding 90 days and inmates who refuse at least

50 percent of structured activities.

It was reported that psychologists, psychiatrists, and social workers reviewed representative samples of UHRs on a monthly basis. The peer review committees were designated and met regularly. The psychologist peer review committee provided summaries of each meeting, but the social work peer review committee failed to keep minutes or summaries of its meetings. The peer review activities for psychiatrists were coordinated by a volunteer staff psychiatrist, and the areas of focus included initial psychiatric evaluation, working diagnosis, treatment plan, polypharmacy, lab monitoring, medication consent, and Abnormal Involuntary Movement Scale (AIMS) exams.

Mental health line staff reported that they received no feedback regarding the quality management process and had only limited participation in the quality management process through peer review.

Suicide Prevention:

CSP/Corcoran's SPC, which included an active SPRFIT, met monthly, was well attended, and kept useful minutes. The committee routinely reviewed reports and data on completed and attempted suicides, DMH and MHCB admissions, and Keyhea petitions.

An operational procedure was developed to track suicidal inmates who transferred to other institutions. The procedure was implemented and expanded to ensure that an inmate's history of suicidal or self-injurious behavior was accessible whenever an inmate was transferred to other institutions, placed in administrative segregation, or for any reason the suicide tracking history was needed. Since November 2007, 23 to 54 percent of all inmates arriving at CSP/Corcoran had inmate profiles.

153

Suicide prevention cut-down kits and ambu bags were present in all administrative segregation units, and micro-shields were carried by custody staff.

The institution's ERRC generally met monthly. Minutes were maintained and indicated that all required staff, including the suicide prevention coordinator, attended the meetings. The committee reviewed all incidents involving emergency response including suicide attempts, and issued findings as to whether staff responded timely to the emergency and in a manner that was appropriate and consistent with institutional policies and procedures.

The institution reported that it was generating an inmate profile for all transferring inmates. Staff indicated that the list of transferring inmates was provided weekly by the records department and updated daily during the week. This list was used to generate inmate profiles that were provided to receiving and releasing for inclusion in the packets of transferring inmates. CSP/Corcoran reported that between December 2007 and April 2008, it received new-arrival inmate profiles in 38 percent of cases.

Medication Management:

CSP/Corcoran performed audits of most areas of medication management, but issues of methodology and the written reports of these audits re-emerged. The audits were conducted predominantly by nursing staff, but an increasing number were also conducted through the psychiatric peer review process. It was reported that psychiatry had dramatically improved in the area of medication management. Psychiatrists were documenting the presence of current informed medication consent forms, necessary lab tests, AIMS exams, and weight monitoring, and conducting chart reviews that found that 90 percent also had the above-referenced documentation in their UHRs. This information was consistent with audit results and with the monitor's review of sample UHRs.

154

Medication continuity upon arrival continued to be very good.  An audit of 13 to 23 percent of all inmates arriving at CSP/Corcoran with current orders for psychotropic medications during a seven-month period yielded compliance rates of 100 percent for re-ordering medications within eight hours of arrival, and 93 to 100 percent for distributing medications within 24 hours of arrival.

Medication continuity upon intra-institutional transfers had compliance rates of 80 to 94 percent, which were unchanged since the preceding monitoring period.

There was no change in prescription practices.  Psychiatrists routinely wrote 90-day orders for psychotropic medications.  Thirty-day bridge orders were used to avoid administration gaps when prescribed medications were due to expire prior to the next scheduled psychiatric appointment.  These were routinely written by mental health RNs under the supervision of a psychiatrist.  The new Maxor pharmacy management information system was reported to be running smoothly at the time of the monitor's visit.

Medication noncompliance protocols were not consistently followed, although improvement was noted since the preceding monitoring period.  The compliance rate for established noncompliance procedures was approximately 42 percent.  Staff training and increased utilization of telemedicine and registry staff were strategies employed by the institution to improve performance in this area.

Obtaining informed consent forms significantly improved, with an increase in the compliance rate from 51 percent to 85 percent as a result of increased supervision and training.

Audits of monitoring of blood levels for certain psychotropic medications were improved from a methodological perspective, but the audits were not in an acceptable written format.  However, it appeared that progress had been made, based on audits and discussions with

155

supervisors from both nursing and psychiatry.  Psychiatrists reported untimely access to laboratory results related to the failure to draw blood, delayed results, and movement of inmates.

Audits of DOT protocols showed consistent compliance by the institution.

The August 2008 audit indicated that 88 inmates were receiving psychotropic medications pursuant to Keyhea orders, with 15 new orders initiated during the previous month. No Keyhea cases were rejected for technical reasons nor were they declined by the office of legal affairs.  Staff reported that the Keyhea statewide list generated by the office of legal affairs continued to include inaccurate locations of inmates.

Nursing audits indicated that HS medication orders were routinely administered at or after 8:00 p.m.; however, methodological issues concerning these audits were discussed with the relevant staff.

There were no audits of pill line waits or parole medication during this monitoring period, although staff reported that inmates did not have long waits in pill lines.

Sexual Misconduct:

CSP/Corcoran completed 152 mental health assessments for RVRs for the reported period.  Of the 152 mental health assessments, 48 were related to indecent exposure. The institution reported that sexual misconduct referrals, screenings, and treatment increased during the reporting period.

One group of seven to eight inmates met twice per week in the therapeutic module treatment room in the SHU where the inmates were housed.  In addition to the 12-week group treatment program, clinicians met weekly with inmates individually, irrespective of their participation or non-participation in group treatment.  Participation in group treatment was voluntary, and there was no waiting list for the treatment group.  Individual contacts with non-

participants focused primarily on overcoming denial.  It was reported that 30 inmates had diagnoses of Exhibitionism.  Staff reported that a second treatment group could be accommodated if more inmates were willing to participate in the program.  The group treatment curriculum was being revised by the central office in collaboration with institutional treatment providers.

Transfers:

From December 2007 through August 2008, CSP/Corcoran generated 20 referrals to DMH acute care.  Three referrals were rescinded by the institution, and the remaining 17 inmates were transferred to DMH acute care.  All acute care referrals originated from MHCBs.

The average time between referral and clinical acceptance ranged from the same day to 51 days.  There were no DMH denials for acute care.  The average time from acceptance to transfer to acute care was 2.35 days.

CSP/Corcoran generated six referrals to intermediate care during the reporting period, all of which involved EOP and MHCB inmates.  One of these referrals was rescinded by the institution, one inmate left CSP/Corcoran prior to transfer to DMH, and one admission was denied.  The remaining three inmates were transferred to SVPP.  For one inmate, the time between referral and clinical acceptance was approximately three days, and the delay between the receipt of a bed assignment and transfer was four days.  The longest delay was the bed assignment, which took 82 days.  For a second inmate, the time between referral and acceptance was 28 days, the time for bed assignment was eight days, and it took five days from bed assignment to actual transfer.  The times for the third inmate who transferred were unavailable.

Inmates who returned from DMH were routinely placed at an EOP level of care at the time of discharge form DMH.  Their level of care was reviewed at the first IDTT meeting subsequent to their return.

The MHCB, located in one of the four wings of the general acute care hospital, was comprised of 23 beds.  The daily census averaged between 27 and 30 inmates during the reporting period, with a peak census of 37, and often exceeded the unit's capacity.  When the census exceeded 23, medical/surgical inmates were transferred to local community hospitals and the medical/surgical beds were then used for the overflow.

The number of MHCB admissions of inmates from CSP/Corcoran decreased by eight percent during the reporting period, while the average monthly percentage of admissions from other CDCR prisons increased from 2.5 to 7.5 percent.  It was reported that 79 percent of admissions were related to suicidal behavior, which included suicidal ideations, suicide gestures, and suicide attempts.  In an effort to provide better continuity of care, a psychiatrist and psychologist were assigned to the MHCB Thursdays through Mondays.

MHCB staffing increased to two fully functional clinical teams during the week, and a third team, which included a psychiatrist, covered the weekends.  Face-to-face examinations during the off-hours were expected to reduce unnecessary admissions.  Although the MHCB continued its practice of not discharging inmates from Friday afternoon through Sunday due to the lack of clinical staff, it was anticipated that the weekend coverage would result in increased discharges on Mondays.

Two office spaces were secured in the 3C wing of the building and were shared by six staff members on alternate days.  The lack of sufficient treatment space impeded the optimal utilization of the recreation therapist, and the absence of consistent escort officers

158

limited the use of the outside yard.  There were only two places for treatment, but a plan to install a therapeutic module in a room for use by the recreation therapist had been approved, as well as a plan to convert a tub room into a treatment space for individual contacts and IDTT meetings.  IDTT meetings were held in a converted cell, and inmates could be seen there individually when it was available. The other treatment space was a laundry room that contained a therapeutic module.  All other interventions had to be conducted at cell-front.

There were 691 MHCB admissions, an average of 86 admissions a month and a decrease of eight percent from the previous monitoring period.  For December 2007 through April 2008, 52, or seven percent, of these admissions lasted longer than ten days, representing a one-percent increase from the preceding monitoring period.  According to the data provided by the institution, 61 percent of MHCB admissions from December 2007 through April 2008 involved inmates with three or more admissions within the preceding six months.

An IDTT meeting observed by the monitor's expert in the MHCB was attended by all required disciplines, who participated in the discussions.  Participation by the inmate was solicited and taken into consideration.  In the case of one developmentally disabled inmate, the outpatient clinician and developmental disability counselor also attended.  Previously reported problems regarding clean mattresses and blankets had been addressed.  However, issues related to worn-out patient gowns still persisted.

From November 2007 through April 2008, CSP/Corcoran produced 56 PSU endorsements, 17 of which resulted in transfer.  The number of days between endorsement and transfer ranged from seven to 97.  Transfer was prevented in the remaining cases as a result of parole, transfer to another institution, or a change in the inmate's level of care.

The MHCB was the only area in the institution where mental health restraints were applied.  The restraint log was reviewed and correctly identified the date, start time, discontinuation time, and duration of time in five-point restraints.  The average duration of restraint ranged from 12 hours in March 2008 to 31 hours in May 2008.  The chief and senior psychiatrists reported that no trends or patterns were seen in this data, but they did state that a few outliers negatively effected the average duration.  The institution also had no alternative to five-point restraints such as a rubberized seclusion room.

Other Issues:

### Administrative Segregation

CSP/Corcoran's EOP administrative segregation hub is located in building 3B01and has a capacity of 54 inmates.  At the time of the site visit, there were 29 inmates in the administrative segregation unit and 12 inmates in the SHU.  There were seven case managers assigned to the unit, and the institution was in compliance with the one-to-nine clinician-to-inmate ratio.

The institution was 85-percent compliant in offering at least ten hours of weekly group therapy for EOP administrative segregation inmates.  It was reported that each inmate received an average of 10.4 hours per week.  Offered programs included substance abuse, cognitive restructuring, anger management, stress management, ADLs, medication management, recreation therapy, and education.

The rate of non-completed group treatment appointments was 52 percent.  To improve attendance and interest in groups, audiovisual equipment had been provided.  Of the non-completed appointments, 86 percent were attributed to inmate refusal, and ten percent were attributed to conflicting appointments.  Inmates who refused to participate in at least 50 percent

of the offered treatment activities were seen daily by case managers. These contacts were used to identify the reasons for treatment refusal and to encourage participation in group therapy. This was the subject of a QIT.

Inmates reported that they were offered sufficient yard time. The monthly report indicated that inmates were being offered at least ten hours per week of yard time, but in the first week of August 2008, only 18 percent received ten or more hours. The last week of the month indicated that 52 percent of the inmates received ten or more hours of yard time. It was reported that inmates refused yard time at the beginning of the month due to the heat but that the cooler temperatures at the end of the month led to more inmates going outdoors.

The weekly compliance rate for case manager contacts averaged 97 percent. Cell-front contacts due to inmate refusal averaged 3.8 percent, and clinician-initiated cell-front contacts averaged 2.6 percent.

At the time of the monitor's visit, there were eight EOP inmates housed in administrative segregation for more than 90 days, with stays ranging from 101 days to 200 days. Of the eight inmates, two were endorsed and were pending transfer, i.e., one to SVSP on June 3, 2008, and one to CMC on July 28, 2008. Waits lasted approximately 98 days and 45 days, respectively. Four inmates were referred to CSR for transfer, and one inmate was referred to CSR for retention pending a parole date of September 13, 2008. The inmate with the longest wait was retained by the ICC on June 19, 2008, pending adjudication of RVRs.

There were two EOP inmates in the SHU in excess of 90 days. They were both endorsed to CSP/Sac PSU with waits of 75 days and 41 days.

There was no formal institutional audit of IDTT meetings, but it was reported that

the compliance rate was 99 percent based on weekly logs.  A random sample of UHRs indicated that a full complement of team members generally attended the IDTT meetings.  However, the UHRs also indicated that initial and follow-up IDTT meetings were not always conducted within the required timeframes. The IDTT meetings attended by the monitor were well attended.

The institution reported a 100-percent compliance rate for 30-minute welfare checks.  A review of the daily logs in the unit corroborated that assertion.

The institution reported a compliance rate of 98.4 percent for psych tech rounds. Review of the logs in the unit showed that daily rounds were being made, with a compliance rate of 100 percent.

The treatment space provided the necessary privacy for individual contacts. However, staff reported that more space was needed for both individual contacts and group therapy as the 4B1L building shared treatment space with the 4B1R building that housed 3CMS administrative segregation inmates.  EOP clinicians had priority in all of the treatment rooms except one, which was used primarily by 3CMS administrative segregation clinicians.

Staff reported that pre-screening was taking place.  However, a sample review of UHRs indicated that the pre-screening forms were not contained within the file.

SHU

The 3CMS SHU census was 418 at the end of April 2008, and decreased to 383 at the time of the monitor's September 2008 site visit.  At that time, the staff allocated to the program included 11 full-time and two part-time case managers, four dedicated psychiatrists, and one full-time recreation therapist.  At the time of the site visit, the average caseload had declined to approximately 40.

162

As a result of the increased number of case managers, case manager contacts reached a compliance rate of 95 percent, with the exception of one month when a case manager was absent due to medical reasons. A significant number of inmates received contacts in excess of the minimum Program Guide requirements.

An internal audit indicated that the institution had a compliance rate between 94 and 98 percent for timely completion of IDTT meetings. Quarterly audit data related to attendance at IDTT meetings for all 3CMS programs, including in the SHU, reported compliance for the presence of case manages and psychiatrists. However, the data indicated that inmates were present at only 57 percent of IDTT meetings, and correctional counselors were present for only 52 percent of them.

The availability of escorts continued to be a significant problem with access to care in the institution. There were 11 escort teams assigned to health care services, but there were times when 18 to 20 clinicians, including dentists, yard physicians, and mental health clinicians, were scheduled to see inmates during the same time period. Periodically, this caused delays of up to several hours, but inmates were rarely denied access to mental health clinicians.

The percentage of out-of-cell contacts changed little from the previous monitoring period and accounted for 55 to 65 percent of case manager contacts. The lack of improvement in this area was again attributed to inmate refusals having to do with frequency of case manager contacts and inmates' complaints concerning IDTT reviews. Strip search protocols that were implemented in August 2007 also thwarted inmate participation. The monitor discussed this matter with institutional authorities and was advised that the institution was drafting an LOP that would eliminate strip searches of inmates leaving their cells to attend mental health activities in the same building, but would require such searches on return due to safety and security concerns.

At the end of the reporting period, there were 14 active weekly group therapy sessions and 12 weekly recreation therapy groups.  The group topics included coping skills, current affairs, health information, TV trivia, anger management, and art.

The increase in staffing led to the need for increased treatment space.  The classification rooms served as the primary treatment rooms in the SHU buildings.  At times, clinicians had to stagger their times in the buildings, especially in building 4A3, where four clinicians were assigned.  The institution reported that plans existed to convert one storage area into a treatment room.  Staff reported that the 3CMS SHU program had six dedicated group rooms with new modules and one group room shared with the EOP hub program, for a total of 58 modules for group treatment.

One SHU unit was designated for the indecent exposure program.  Inmates who were sent to CSP/Corcoran for the indecent exposure program were put on the regular SHU caseload if they did not meet the criteria for the indecent exposure program.

EOP

Seven full-time case managers covered an average of 150 inmates in the mainline EOP program, each carrying a caseload of 22 inmates.  Individual treatment space continued to be utilized in designated areas in the EOP housing unit.

In addition to case managers, the mainline EOP program was staffed with 1.25 psychiatrists, two full-time recreation therapists, psych techs, and a full-time recreation therapist intern.  Escort officers were available five days per week to escort inmates to group treatment, psychiatry appointments, medication administration, and IDTT meetings.  The institution reported an 86-percent completion rate for all scheduled mental health appointments despite an increase of 209 percent in the number of appointments since the previous reporting period.

At the time of the site visit, the conversion to a Level III EOP program was complete although there remained a small number of Level I, II, and IV inmates. The institution reported that all initial intakes were seen within the required timeframe.

Institutional data indicated that inmates in the mainline EOP program were offered, on average, nine hours of therapeutic activities per week and received an average of 8.65 hours per week. The number of hours represented an increase of 50 percent since the preceding monitoring period.

The institution remained compliant with weekly case manager contacts and IDTT meetings. All disciplines were represented at the IDTT meetings.

Institutional data indicated that group attendance improved to 87 percent, which represented a 15-percent increase since the preceding monitoring period. Inmate refusal rates were nine percent, or no change since the preceding monitoring period.

3CMS

The mainline 3CMS program at CSP/Corcoran was housed in three facilities, 3A, 3B, and 3C, in addition to the protective housing unit on facility 4A. Compliance rates for quarterly case manager contacts and timely completion of IDTT reviews remained above 98 percent.

Facility 3A reported a census of 217 inmates with two case managers who had caseloads of 100 and 117. Telemedicine continued to be used to provide psychiatry coverage. Treatment space was reported to be adequate, with dedicated space for telemedicine and a case manager's office large enough to accommodate groups. There was a dedicated escort officer on the yard with assigned search and escort officers providing backup.

Facility 3B reported a census of 176 inmates at the end of April 2008.  There were two case managers assigned to the facility, but one of these also managed the inmates in the protective housing unit.  Caseloads for this facility were 58 and 118.  Psychiatry was provided two to three days per week, or as needed, and was consistently represented at IDTT meetings. Treatment space on this yard was not a problem nor was access to care due to dedicated escorts. There was sufficient treatment space for group treatment, and the treatment group for Level I and II inmates occurred in the gymnasium.

Facility 3C housed the SNY and reported a census of 196 at the end of April 2008.  There were two case managers assigned to this facility.  Psychiatric coverage was available three to four days per week and appeared to adequately address medication issues and continuity of care.  The addition of a case manager and the increased availability of psychiatry had a negative effect on the availability of treatment space.  The institution was reportedly modifying office space in the hobby shop to accommodate two mental health clinicians and psychiatry two to three days per week.  There were several ongoing groups during the reporting period, and although there were no dedicated escort officers, access to care was not an issue due to custody assistance and collaboration.

Administrative Segregation 3CMS

At the time of the monitor's visit, there were 192 3CMS inmates in administrative segregation.  Four case managers were assigned to building 3A03, and three case managers were assigned to building 4B1R.  Both buildings were equipped to accommodate in-cell appliances. Internal audits yielded a compliance rate of 97 percent for weekly case manager contacts. However, 61 percent of case manager contacts were cell-front, of which 47 percent resulted in cell-front refusals.  The average caseload for each case manager was approximately 28 inmates.

166

There were no institutional audits of IDTT meetings, but weekly logs indicated that compliance had consistently exceeded 90 percent.  It was reported that the IDTT meetings were regularly attended by clinical case managers, psychiatrists, psych techs, custody staff, and correctional counselors.  However, as was the case with the EOP inmates housed in administrative segregation, a random sample of the UHRs indicated that initial IDTT meetings were not always conducted within 14 days and that quarterly IDTT meetings were not occurring in a timely manner.  The inmate history printouts also did not lend much assistance in corroborating weekly IDTT logs.

There was still no space in building 3A03 to provide group treatment.  In the 4B1R building, there was one office in the hallway that served as a treatment room and allowed for one group.  Custody reported that the inmates were offered between 10.5 and 14 hours of yard time per week.

Internal audits yielded a compliance rate of 97 percent for weekly case manager contacts.  However, 61 percent of case manager contacts occurred at cell-front, and 47 percent of those resulted in cell-front refusals.

Psych techs conducted daily rounds and had a reported compliance rate of 100 percent.  Inspections of the logs in these units also indicated 100-percent compliance for the dates recorded.

The institution reported a 100-percent compliance rate for 30-minute welfare checks.  However, a review of the logs indicated one day when welfare checks were not conducted for a period of 6.5 hours in building 3A03.  A memo was drafted, and training was recommended to address the problem.  A small percentage of logs showed that welfare checks had been completed but did not list the building or unit where the checks took place, and the

167

monitor was left to assume that the records applied to the unit that was recorded immediately before and after the untitled log.  There was one shift that did not record welfare checks in building 3A03 for a period of 2.5 hours during first shift.  Upon questioning, custody in the unit explained that the floor officer was called to escort kitchen help across the yard, leaving only the gunner.

Individual treatment space was comprised of four treatment modules placed on the dayroom floor at a point furthest from the cells.  They were positioned so that the backs of the modules were facing each other and were approximately six to ten feet apart and separated by freestanding dividers, but they were still inadequate in terms of offering appropriate privacy of care.  IDTT meetings occurred in the ICC meeting room.

Referrals

The institution reported that new procedures were developed to respond to and track mental health referrals through the MHTS.  The average number of days to receive an appointment generally exceeded the Program Guide timeframes.  All referrals were directed to the clinics in the yard, where nursing staff determined whether the issues was medical, mental health, or dental.  Staff reported that mental health clerical staff collected written referrals from the clinics and distributed them to the program supervisor of the mental health program where the inmate was placed.  The referral was then triaged as routine, urgent, or emergent and assigned a clinician to respond.

Medical Records/MHTS

Audits of medical records between December 2007 and March 2008 reported a compliance rate of 80 to 85 percent for filings in the correct locations in UHRs.  This finding

was corroborated by the monitor's expert's review of UHRs.  Documents in UHRs at the time of that review were generally current through mid-August 2008.

Licensed Marriage and Family Therapists

The chief of psychology reported that the DCHCS had authorized a licensed marriage and family therapist (LMFT) pilot project at CSP/Corcoran.  Two LMFTs were selected for the program, but after two weeks, one of the individuals left.  A staff social work supervisor was assigned to meet weekly with the LMFT to provide training and assess the individual's skills in adapting to the environment as a case manager.  The pilot program rotated the LMFT through different programs every two months.  The institution expressed an interest in this program to offset the difficulty of recruiting individuals into long-standing staff psychology vacancies.

**California Substance Abuse Treatment Facility (CSATF)**
April 13, 2008 – April 15, 2008

Census:

CSATF's inmate population fell from 7,522 in November 2007 to 7,138 in April 2008, a five-percent decline.  There were 272 inmates, or 3.8 percent of the institution's population, in administrative segregation.  Despite the falling census, the institution continued to operate 640 beds in triple-bunked gyms located on four yards, each of which had a capacity of 120 inmates.  There were 160 temporary bunk beds set up on dayroom floors.  In addition to these beds, CSATF operated 242 non-traditional dormitory beds.

The MHSDS population increased by nine percent, growing from 1,247 in November 2007 to 1,359 in April 2008.  Staff reported that most of this growth occurred as a result of the institution's efforts to increase enrollment in the contracted substance abuse program on Facilities F and G.  The 3CMS population on these yards had grown by 20 percent

since October 2007.  The number of 3CMS inmates in administrative segregation remained fairly stable, increasing from 94 in November 2007 to 99 in April 2008.

The number of EOP inmates pending transfer had doubled during the preceding year, growing from 16 in April 2007 to 23 in November 2007, and then reaching 32 in April 2008.  There were 18 EOP inmates in administrative segregation.

Staffing:

Of the institution's 58.65 allocated mental health positions, 53, or 90 percent, were filled.  The chief psychiatrist and chief psychologist positions remained filled with long-term employees, while turnover had occurred in other supervisory positions.  A senior psychologist left during the reporting period, leaving 1.5 of 3.5 positions vacant.  A newly hired full-time senior psychologist was expected to start in May 2008.  Staff planned to combine the remaining vacant half-time senior psychologist position with a half-time staff psychologist position to create a supervisory social work position.  This request, previously denied by CDCR, was reasserted and pending as of the monitor's visit.

CSATF continued to rely on contract and telemedicine doctors to fill long-vacant psychiatric positions.  As of mid-April 2008, 1.5 of 5.5 allocated positions were vacant.  Three contract psychiatrists worked throughout the reporting period, together providing a monthly average of two full-time equivalent psychiatrists. Telemedicine services, assigned to Facilities F and G, were provided from 31 hours to 69 hours a month during the reporting period.

Among case managers (psychologists and social workers), 20.5 of 22 allocated positions were filled, and one social worker was on medical leave. A contract psychologist provided the equivalent of .8 full-time equivalent psychologists during the period from December 1, 2007, to March 31, 2008, which reduced the functional vacancy rate to eight percent.

The turnover rate among case managers was still high, but had decreased since November 2007. As of mid-April 2008, just shy of 60 percent of the case manager positions were filled with clinicians who had been working at CSATF for more than six months, up from about half in November 2007. Only a third, or seven, of the allocated psychologists and social workers had been at CSATF longer than a year as of mid-April 2008. The slight, but notable, decrease in attrition was attributed in part to the efforts of a task force that was assembled in October 2007 to develop strategies for improving staff retention.

The senior psych tech had been redirected to fill the institution's community resources position. Pending finalization of this move, a psych tech had stepped into the senior position on an acting basis, and another psych tech was out on medical leave. This left two of 10.5 psych tech positions functionally vacant. Contract staff reportedly covered these vacancies.

One of 1.65 recreation therapist positions was filled, a full-time health programs specialist position was filled, and 11 of 11.5 clerical positions were filled. The institution reported that an office services supervisor 1 (OSS-1) position was needed to provide supervision and direction to clerical staff. It was unclear if the institution had formally requested this position.

Pharmacy allocations increased from 11 in October 2007 to 16 in March 2008, all of which were filled in April 2008.  All five laboratory positions were filled, as were all 60.71 RN positions and all 40.83 LVN positions.  However, 8.5 RN positions and two LVN positions were functionally vacant as a result of employee leave.  Contract LVNs covered 5.92, or 56 percent, of these functional vacancies during March 2008.

Medical records allocations decreased from 16.83 in October 2007 to 15.83 in March 2008.  A half-time position remained vacant, and one full-time employee was on leave. The institution reported that medical records allocations were inadequate and had requested three additional full-time office assistant positions.  In the meantime, the institution used an average of 200 hours a month of overtime and unfunded contract workers to fill functional vacancies and to compensate for inadequate staffing allocations.

Quality Management:

The quality management committee continued to meet regularly and receive reports from QITs and subcommittees, including the mental health subcommittee.  Minutes were kept, attendance was good, and there was a high level of multidisciplinary collaboration.  The mental health subcommittee met twice monthly.  Minutes were thorough, and the meetings were well attended.  The mental health program's audits were sound and monitored a wide variety of indicators.  In addition, all mental health staff were involved in auditing a small sample of UHRs each month, with results reported to DCHCS.

CSATF chartered QITs when needed, but none were active at the time of the monitor's visit.  Managers reported that recently identified problems were resolved by directives and supervision.  CSATF mental health staff were informed about the results of quality management audits but were not engaged in peer review.  Managers reported that they planned to

172

introduce a method of peer review that was presented at a recent DCHCS meeting of mental health supervisors and managers.

Suicide Prevention:

The SPRFIT met monthly and maintained informative minutes.  According to SPRFIT meeting minutes, SRACs were routinely completed upon admission and discharge from the MHCB.  The committee tracked a wide variety of pertinent indicators, including suicide attempts, and typically acted expeditiously to remedy breakdowns in established procedures. Audits reviewed by the SPRFIT appeared to be sound.  The committee discussed nationwide trends, statewide suicide prevention training, and local critical cases.

Roughly half of all planned five-day follow-up cases were audited monthly, and results indicated that they were completed consistently.

Changes were made in documentation of 30-minute welfare checks in administrative segregation, and an audit of these changes was devised and carried out.  CSATF administrators planned to train all nurses in the use of the SRAC to ensure compliance with MHCB admission protocols during non-business hours and weekends.

CSATF was compliant with the Department's suicide reduction plan for administrative segregation.  Nursing staff completed an administrative segregation pre-screen, the results of which were documented on a chrono that was filed in the UHR.  The pre-screen included questions related to the inmate's past and current suicidal behaviors and feelings.

The revised bus screen, which included a question about whether or not the inmate had recently received "bad news," was used to screen all inmates processed through R&R.

Psych techs continued to make routine daily rounds. Internal audits showed that weekly summaries of daily rounds on MHSDS inmates were completed and filed in the UHR, and isolation log audits indicated that daily rounds were completed and properly documented in all administrative segregation units.

Psych techs utilized the 31-question screen for new-intake non-MHSDS inmates within 72 hours of their placement in administrative segregation.  Inmates were encouraged to leave their cells to complete the screens.  Refused screens reportedly prompted referral to mental health.  In Unit E-1, screens were completed in holding cells located on the dayroom floor, which afforded limited sound privacy and no visual privacy.  In the stand-alone administrative segregation unit, screens were completed in a private office.

Mental health staff reportedly talked with the facility captain assigned to administrative segregation every morning.  Mental health staff also reported more formal bimonthly meetings with custody staff assigned to administrative segregation.

The stand-alone administrative segregation and Building E-1 each had five intake cells, all of which were retrofitted with suicide-resistant vents.  Cement beds and new doors had not yet been installed.  None of the designated intake cells were used to house new-arrival inmates during their first 72 hours in administrative segregation, as envisioned by the Department's suicide reduction plan.  Staff explained that the high volume of traffic in and out of administrative segregation rendered it impractical to use the intake cells as intended.

Intake status inmates, identified by paper placards on the cell door, received 30-minute welfare checks during their first 21 days in administrative segregation.  Logs confirmed that 30-minute welfare checks were completed and documented on a consistent basis during the

174

reporting period, though only about half of the rounds appeared to have been conducted at staggered intervals.

CSATF had an adequate number of walk-alone yards to service its administrative segregation population. Inmates in all administrative segregation units reported being consistently offered ten hours of yard per week, with some interruptions related to fog and other security-related issues.

All inmates in administrative segregation were permitted to have one in-cell entertainment appliance. Staff reported, and documentation confirmed, that monthly medical emergency drills were completed on all watches in both administrative segregation units.

Medication Management:

Medication continuity problems were commonplace and largely attributed to disruptions caused by the institution's transition to Maxor's pharmacy management information system. Institutional reports indicated, and inmates and staff reported, that medication administration lapses occurred upon arrival at CSATF due to untimely prescription renewals. Delays were traced to order processing and movement of inmates within the institution.

Pill lines were problematic. Both inmates and staff reported that waits of an hour or longer in pill line were common. Contrary to the tenets of the heat plan, inmates taking heat-sensitive medications were often exposed to outdoor temperatures in excess of 90 degrees for over 30 minutes while waiting in pill lines. Instead of issuing heat cards, black markers were used to write identifying letters on the prison IDs of inmates taking heat-sensitive medications. However, such IDs could not be used by the inmate to reduce waiting times in outdoor lines during Stage I heat alerts.

CSATF provided a list of 44 inmates for whom DOT orders were written related to clinical concerns.  However, there was confusion among psychiatrists about whether DOT was mandatory or optional for psychotropic medication orders.  Many psychiatrists were under the impression that staff did not administer DOT medications differently from other medications.

CSATF was not compliant with medication noncompliance protocols.  Internal audits found that no-shows and refusals were consistently recorded on the front of MARs, but that patterns of noncompliance were not consistently documented on the back of MARs with written notification of referral to mental health.

Over 200 inmates had HS medication orders.  Time of administration of HS medications was not audited by the institution.

There were 16 inmates at CSATF with current Keyhea orders or pending petitions as of March 28, 2008.  The log of Keyhea cases was clear and complete.  Staff occasionally administered medication on an involuntary basis in the MHCB, initiated Keyhea petitions, and sought renewals of orders.

A pharmacy audit showed that medications were appropriately dispensed to paroling inmates.

Sexual Misconduct:

CSATF continued to be compliant with the clinical and custodial components of the Department's sexual misconduct protocol.  During the period from October 1, 2007, to March 31, 2008, CSATF issued 25 RVRs for indecent exposure; 21 inmates were issued one RVR, and two inmates were issued two RVRs.  All cases were reportedly referred to the local DA's office.

176

Information regarding the outcome of SHU assessments was not provided for 16 of 25 cases. Four inmates were assessed a SHU term, two of whom transferred to the SHU program at CSP/Corcoran, not to be confused with the Exhibitionism treatment program. SHU assessments were pending in two cases, and a SHU term was suspended in one case.

Yellow 170-inch-tall coverings were placed on the cell windows of all inmates issued RVRs for sexually inappropriate behavior. At the time of the monitor's visit, nine inmates in administrative segregation were required to have window coverings related to sexual misconduct. Staff were not aware of the jumpsuits designed to prevent indecent exposure during out-of-cell activities.

The monitor reviewed 13 RVRs issued for indecent exposure/masturbation during the reporting period, all of which were accompanied by mental health assessments and four-page, pre-formatted screens for alleged sexual misconduct. The screens, usually completed about a week after the incident, appeared to be properly completed and uniformly indicated that an IDTT meeting was scheduled to review the clinician's recommendations. Documentation of the subsequent IDTT meeting was not attached to the paperwork provided. None of the screens recommended a more-thorough evaluation or concluded that an Exhibitionism diagnosis was indicated. One RVR was dismissed in the interest of justice.

CSATF had begun to develop individualized treatment plans for MHSDS inmates issued RVRs for indecent exposure who did not meet the diagnostic criteria for Exhibitionism. The specialized treatment plans, developed by the inmate's treatment team, considered specific behavioral security precautions, adjustments to medications, and other therapeutic interventions designed to reduce and ultimately eliminate sexually inappropriate behavior.

Transfers:

Access to DMH acute and intermediate care was poor. Access to acute care was often slowed by delayed referrals and long waits for beds. CSATF under-referred to intermediate care.

CSATF generated 11 referrals to DMH acute care from October 1, 2007, to March 31, 2008, or an average of slightly less than two referrals a month. As of mid-April 2008, ten of 11 referrals had resulted in transfer. The number of days between referral and transfer ranged from seven to nine days in six cases, was two weeks in one case, was a month in two instances, and was two months in one case. One inmate, referred to DMH in mid-February 2008, was still awaiting transfer to the APP in mid-April. Eight of ten transfers occurred within 72 hours of receiving a bed assignment; two occurred within 96 hours.

Four of 11 referrals were submitted more than three weeks after the inmate was admitted to the MHCB, perhaps reflecting hesitancy on the part of CSATF staff in some cases to consider a higher level of care.

CSATF did not refer to intermediate care as clinically warranted. MHCB staff appeared to rely on overly restrictive criteria for referring inmates to intermediate care, continued to harbor misconceptions about referral restrictions for ASH, and appeared to have succumbed to the futility of getting inmates into SVPP in a timely manner.

CSATF generated seven referrals to intermediate care during November and December 2007. One inmate waited 64 days to be transferred to SVPP, and one inmate was transferred to DMH acute care after waiting 148 days for a bed at SVPP. As of mid-April 2008, CSATF housed three inmates who had been waiting five months or longer to be transferred to SVPP. Two referrals were rescinded after long waits.

CSATF made no referrals to intermediate care during the first three-and-a-half months of 2008, despite having over 30 MHCB admissions that lasted longer than 20 days, excessive transfer delays for increasing numbers of EOP inmates, and a reported increase in acuity among 3CMS inmates.

CSATF reported significant inconsistencies with psych and return protocols. Clinician-to-clinician contact was usually not initiated prior to discharge, and discharge summaries were not always provided in a timely manner.

CSATF had a licensed CTC with 24 medical/surgical beds, 14 MHCBs, three safety cells, and two observation rooms. Access to MHCBs was adequate, and CSATF did not use alternative holding areas to monitor inmates pending admission to the CTC for mental health crisis care. When necessary, medical patients were sent to a community hospital to free up beds for psychiatric admissions.

From October 1, 2007, to March 31, 2008, there were 221 MHCB admissions, for an average of 37 admissions per month. CSATF generated 92 percent of the admissions; eight percent were from other CDCR prisons. By comparison, during the period from October 1, 2006, to April 30, 2007, CSATF generated an average of 31 admissions per month, and roughly a quarter of all MHCB admissions involved inmates from other prisons. These data suggested that increased local demand for crisis care had caused access to MHCBs to be limited for prisons that had routinely referred inmates to CSATF.

A third of all admissions lasted longer than ten calendar days; 14 percent lasted 20 days or longer. Many, but not all, outliers involved inmates who were waiting to be transferred to DMH and EOP inmates deemed too fragile to return to housing. In a handful of cases, 3CMS inmates spent several weeks in the MHCB before being returned to housing. During the

monitoring period, 140 inmates were admitted once, 25 inmates were admitted twice, three inmates were admitted three times, four inmates were admitted four times, and one inmate was admitted six times, generating a multiple admission rate of 4.6 percent.

More than three quarters of the 29 EOP inmates transferred from CSATF during the monitoring period waited longer than 60 days.  Nine inmates missed the deadline by only a few days.  Eight transfers took longer than 75 days, and a handful had excessive delays, at 107, 155, 162, 175, and 246 days.  As of April 23, 2008, a third of the 32 EOP inmates housed at CSATF had been awaiting transfer longer than 60 days.  Six EOP inmates had been waiting longer than 100 days, two had been waiting close to five months, and one EOP inmate had been at CSATF for 223 days.  Staff reported that transfer delays were largely attributable to a statewide shortage of EOP beds, particularly Level IV SNY beds.  However, transfer logs indicated that some of the longer delays were related to internal disciplinary and classification processes.

Internal audits showed consistent weekly case manager contacts with EOP inmates, an improvement over preceding monitoring periods. However, the growth of the EOP population at CSATF increasingly strained MHCB resources and presented heavier workloads for case managers, particularly those assigned to administrative segregation.  Eighteen of the 32 EOP inmates at CSATF were housed in administrative segregation and did not have access to group therapy.

Other Issues:

Administrative Segregation

As of mid-April 2008, there were 272 inmates in administrative segregation, including 99 3CMS inmates and 18 EOP inmates.  About a third of the 3CMS inmates and 39

percent of the EOP inmates had been in administrative segregation longer than 90 days. Three full-time case managers carried inmate caseloads of 28, 26, and 38, respectively, and a half-time clinician followed 13 inmates.

Case managers in administrative segregation had access to a private office equipped with a holding cell for one-to-one interviews. Reportedly due to a high inmate refusal rate, about half of all contacts occurred at cell-front. Compliance with weekly case manager contacts in administrative segregation fell from 92 percent during the fourth quarter of 2007 to 68 percent during January and February 2008. Following the assignment of a different supervisor in mid-February, performance dramatically improved. All MHSDS inmates in administrative segregation were reportedly seen weekly by their case managers during March 2008, and 82 percent of contacts occurred out of cell. Custody escort in administrative segregation was described as adequate.

Group therapy was not available to MHSDS inmates in administrative segregation. Clinicians refused to use five therapeutic modules clustered on the dayroom floor because they failed to afford adequate visual privacy. The lack of group therapy was concerning, given the increasing number of EOP inmates in administrative segregation, some of whom waited months to be transferred to an EOP hub or released to general population. Staff expressed concern about the growing EOP population in administrative segregation and the increasing average lengths of stay. In particular, they reported not having sufficient time to spend with these inmates, which was evidenced by greater reliance on crisis management and repeated MHCB admissions.

The monitor observed an IDTT meeting held in Building E-1. All required disciplines were present. Most but not all UHRs and C-files were present. Sign language

services were provided for a hearing-impaired inmate.  The team discussed relevant case factors and invited inmates to participate in the meeting.

MHCB

CSATF complied with basic Program Guide requirements related to MHCB treatment.  An IDTT meeting observed by the monitor's expert was well attended and had multidisciplinary discussion.  A correctional counselor brought C-files and participated actively in the disposition of cases.

Outdoor recreation therapy and yard were not available to inmates in the MHCB unit, regardless of their security classification and length of stay.  A directive recently issued by the warden will permit access to indoor and outdoor recreational activities for all general population inmates in MHCBs following IDTT approval.

All inmates in the MHCB unit, regardless of their security status, presentation, and behavior, were subjected to movement and property restrictions reminiscent of administrative segregation units.  Clothing was restricted, eyeglasses and reading materials were prohibited, all movement required escort in handcuffs, and inmates were locked in mesh holding cells during IDTT meetings.

3CMS

After experiencing slippage related to staff turnover during recent monitoring periods, CSATF regained compliance with basic Program Guide requirements within its general population 3CMS program.  Treatment continuity remained problematic in that no case manager had been assigned to his/her general population yard for more than a year.  Initial signs of increased staff retention were expected to improve treatment continuity.

Intake assessments were timely completed, and quarterly case manager contacts occurred on a consistent basis. The assignment of escort sergeants had notably reduced the number of cancelled and missed appointments, particularly during institutional lockdowns. The daily difficulties associated with sharing an inadequate amount of office space on the yards, thought to be a contributor of poor staff retention, often required case managers to curtail the duration of clinical interviews.

Psychiatric contact occurred regularly, though medication administration had recently become less reliable as the institution experienced transition glitches related to the activation of Maxor's pharmacy management information system.

IDTT meetings were timely, attended by required disciplines, and consistently had UHRs and C-files present. Treatment plans were generally individualized and clinically appropriate.

As of mid-April, 76 3CMS inmates, or 5.6 percent of 3CMS general population inmates, were enrolled in groups, and 134 3CMS inmates were on waiting lists. Increased staffing retention and ongoing efforts to locate appropriate program space were expected to yield greater access to groups during the coming monitoring period.

As a result of the institution's efforts to increase 3CMS enrollment in the substance abuse program, the number of 3CMS inmates on F and G yards increased by 20 percent during the reporting period. While increased enrollment in the substance abuse program was positive, more coordination was needed between the mental health program and substance abuse program.

Referrals

CSATF failed to respond to most mental health referrals within five working days. MHTS data yielded an average response time of 10.4 days and indicated that only a third of referrals generated a response within five days. Nearly a quarter of referrals failed to be completed within 14 days. The institution planned to reconvene a dormant QIT to develop a CAP.

Medical Records/MHTS

With the use of overtime and contractors to compensate for inadequate staffing allocations, the medical records department was able to file most mental health paperwork in a timely manner. However, UHR organization remained problematic in that paperwork was frequently misfiled and difficult to find. An institutional audit found that paperwork was not filed in the correct UHR section 39 percent of the time. UHR availability for scheduled mental health appointments was generally reported to be good. UHR availability in administrative segregation was less consistent due to number and frequency of scheduled appointments and meetings.

The institution reported that hardware upgrades, fewer clerical vacancies, and the completion of additional staff training had resulted in significant improvements in the accuracy and timeliness of the data available in the MHTS.

Behavior Modification Unit

The BMU appeared to fulfill its intended purpose. As of April 24, 2008, 29 inmates were enrolled in the BMU program, including two 3CMS inmates. Two inmates were in privilege stage 3 and about to advance, seven inmates were in stage 2, and 17 inmates were in stage 1. According to staff, no inmates were stuck in stage 1 as a result of refusal to cooperate

with the BMU program.  Logs indicated that 56 inmates had graduated from the BMU since

August 2007 and that only two inmates had returned to the BMU since its activation.  Inmates

were not cuffed when escorted to and from program activities and had access to dayroom in

accordance with the LOP.

The monitor interviewed both 3CMS inmates in the BMU, neither of whom

appeared to be distressed by the program requirements or loss of privileges.  One inmate was in

stage 1 and expected to advance to stage 2 after a unit classification committee review scheduled

to take place later that day.  The second inmate was in stage 2 and was reportedly attending all

required BMU activities.

Unit classification committee hearings were held in the BMU on a weekly basis to

ensure that all program participants were reviewed at least monthly.  A mental health clinician

did not attend the unit classification committee hearings.

### Pleasant Valley State Prison (PVSP)
May 13, 2008 – May 15, 2008

Census:

At the time of the monitor's visit, PVSP had a total population of 5,168 inmates, a

decrease of 172 inmates since the preceding monitoring period.  The number of inmates on the

MHSDS caseload was 1,669, which included six EOP inmates, two MHCB inmates, and 1,661

3CMS inmates of whom 129 were housed in administrative segregation.  PVSP's mental health

census was 462, or 38.5 percent above the rated MHSDS capacity for this institution.  The

institution had removed the third bunks from the triple-bunked gyms.

Staffing:

The overall vacancy rate for mental health clinicians and ancillary mental health

staff except nursing was approximately 11 percent, down from 31 percent reported in the

185

preceding monitoring period.  The chief psychiatrist, health program specialist, and one social worker positions were filled during the monitoring period, and shortly before that, two senior psychologist positions had been filled.

Of 6.5 staff psychiatry positions, three were filled, and 2.6 were covered by contact psychiatrists, for a functional vacancy rate of 14 percent.

Of the 20.12 full-time psychologist allocations, 14 were filled, and 5.2 were covered by contract psychologists, for a functional vacancy rate of five percent.

The 1.5 psychiatric clinical social worker positions were filled, and only one of the 8.5 office tech positions was vacant.  For psych techs, six positions were filled, with one senior psych tech and one line psych tech position vacant.

The .65 recreation therapist position remained vacant.

Quality Management:

The institution's quality management process remained active.  The local governing body and health care quality management committee met regularly and maintained minutes.  Many aspects of institutional operations, as well as the provision of health care, were audited regularly.  The four QITs chartered to address medication management were attended by multiple disciplines and custody members.  QIT records were of high quality and indicated the use of empirical methods to investigate and remedy multiple sources of problems.  No QITs were chartered to address mental health issues other than medication management, although they were needed.  The mental health subcommittee did not bring problems encountered by providers to a level at which they could be examined and remedied.  Lack of confidential mental health contacts, increased group treatment, and transporting medical records could have benefitted from QITs.

Staff reported that psychiatry and psychology engaged in peer review and maintained records of their activities.

Suicide Prevention:

The SPRFIT met monthly, kept minutes, reviewed required agenda items, and identified pertinent local issues. Minutes were thorough; at each meeting, the team discussed statewide training and supplemental discussion topics pertinent to suicide prevention. Attendance was notable given the breadth and depth of representation of health care and custody staff at the meetings.

Five-day follow-up and custody observations were done. Inmate profiles were sent with transferring inmates, but PVSP did not always receive them with new arrivals. When inmate profiles were received, they were distributed to psych techs and case managers.

The ERRC reviewed not only deaths and Code 3 cases but also suicide attempts. Their reviews encompassed responses by both uniformed and civilian staff. All questions and issues raised by a review were followed up at subsequent meetings until a resolution was reached. Methods and resolution included obtaining or correcting records, taking remedial action, and staff training. The ERRC appeared to be functioning as intended.

In administrative segregation, inmates were not offered ten hours of yard time weekly, but staff reported that 20 small management yards were planned for construction.

The cells of inmates admitted to administrative segregation within the last 72 hours were marked by placards and wellness checks made at 30-minute staggered intervals.