Medication Management:

Medication management was a major problem at PVSP. With the introduction of the Maxor pharmacy management information system, it was a work in progress and the focus of sustained attention by a substantial number of personnel across disciplines.

Continuity of medication was poor in two of three main areas, arrival and intra-institutional moves. Continuity across the intra-institutional transfers appeared to be better than that for new arrivals. In over half of the audited cases, 19 of 29, medication continuity was sustained, and doses were administered the same day or the day after relocation. During the period of October 1, 2007, through February 25, 2008, 24 of 480 new arrivals, or five percent, received medications on the day of arrival or the next day.

The policy regarding noncompliance with medication was implemented, but the data were unclear, resulting in uncertainty about the degree to which procedures followed policy. UHRs and inmate histories documented instances of psychiatric follow-up in response to noncompliance. A QIT chartered in 2007 to address the handling of noncompliance remained active.

The issue of administering medication DOT as opposed to nurse-administered needed to be reviewed, and HS medication needed to be ordered when clinically indicated. Pharmacy labels did not differentiate between DOT and nurse-administered orders. Orders written by psychiatrists were labeled DOT. Pill lines observed in the yards followed nurse administration. There were reportedly few HS orders administered in each yard, some with caseloads of over 500. Blood levels of mood stabilizers were monitored appropriately.

Audits found that informed consent forms were obtained and placed in UHRs over 90 percent of the time.

Transfers:

PVSP made fewer than 12 referrals to DMH, with two or three to intermediate care.  Staff believed that inmates with certain classification factors could not be referred to ASH.  PVSP made some referrals to DMH in a timely manner, but should have referred earlier in a few cases.

The institution's CTC had 15 beds, with five designated and staffed as MHCBs.  Audits indicated that clinical requirements were met, but a few exceptions reduced compliance from 100 percent to 90 percent.  Records of holding cell use in the MHCB were maintained and audited by staff.  It was reported that if no beds were available in the MHCB, medical patients were moved to other locations to place the MHCB inmate in that bed.  Neither lengths of stay nor multiple admissions were excessive; all such cases were scrutinized by staff.

During the monitoring period, there were 141 admissions to the MHCB, with an average daily census of 4.6 and an average length of stay of 6.8 days.  The length of stay exceeded ten days in 17 cases.

The use of cells located in the yards did not seem to be logged as holding cell use.  In one instance that was reviewed by the ERRC, an inmate was brought to the CTC more than one hour after an order was given.

PVSP was noncompliant in transfer timelines for EOP inmates.  Several EOP inmates remained in administrative segregation for three or four months.  Staff reported that they were not transferred to a hub within 30 days because their hub was over capacity by 17.  Staff reported that the C&PR was aware of those cases but that headquarters staff, who exercised authority over transfers to the beds, deferred transfers.

Not all EOP inmates awaiting transfer to a prison that could provide the EOP level of care were moved within 60 days. PVSP transferred 22 EOP inmates during the monitoring period. Of these 22 cases, seven, or 32 percent, had lengths of stay over 60 days, with the longest reaching 230 days.

At the time of the monitor's visit, there were six EOP inmates housed at PVSP. Two were transferred during the visit, on May 14, 2008, to higher level of care.

Other Issues:

Administrative Segregation

The stand-alone administrative segregation unit at PVSP, known as administrative segregation I, housed non-MHSDS caseload inmates. In building D-4, known as administrative segregation II, there were 129 MHSDS caseload inmates housed at the time of the monitor's visit.

Data indicated that 100 percent of inmates placed into administrative segregation I were offered a mental health screen in a private interview space within 72 hours of admission. However, the rate of inmates who refused to be screened remained at 90 percent. Psych tech rounds were conducted daily. All MHSDS caseload inmates in administrative segregation II were seen weekly by case managers. Psych tech rounds were made daily, and IDTT meetings were attended by all disciplines. The percentage of case manager contacts that occurred out of cell was unknown. The size of groups was limited to eight by the number of therapeutic modules available, and the placement of the modules allowed for adequate interaction between the inmates.

MHCB

The monitor observed a series of IDTT meetings at the time of the visit. Not only were they therapeutic but participation by custody staff was pivotal in a number of cases through their efforts to address environmental factors that exacerbated inmates' mental disorders.

Restraints were used rarely, and Keyhea orders and involuntary mediation were initiated as clinically warranted.

Psychiatric inmates were afforded in-cell recreational materials and could have the use of the TV/reading room, unless they were placed on administrative segregation status.

3CMS

Lack of confidential treatment space was the biggest impediment to the mental health treatment of inmates at the 3CMS level of care. A majority of case manger contacts were not occurring in confidential settings. The serious nature of this deficiency was heightened by the culture of gang activity, bullying, and intimidation that took place in the yards.

The institution was compliant with quarterly case manager contacts, individualized treatment planning, and annual IDTT meetings. Attendance at IDTT meetings was problematic. An audit found that correctional counselors were absent 29 percent of the time and that C-files were usually not available. Most treatment plans reviewed by the monitor's expert were individualized and of high quality.

For those inmates whose treatment plans recommended group treatment, only 61 percent were offered the opportunity to attend groups. The institution offered ten groups, with a total enrollment of 171 inmates during the monitoring period.

Staff reported that for 194 3CMS inmates who arrived at the institution over a six-month period, intake assessments did not occur until approximately nine days following arrival.

However, a log provided by the institution indicated that many new arrivals were seen 13 days after arrival.

Referrals

Staff reported that routine referrals took an average of 5.7 days from the time the referral was initiated to the time of clinical contact. Reports indicated that urgent referrals were seen within 24 hours and that emergency referrals were seen immediately. However, a significant proportion of inmates interviewed indicated that either they received no response to several self-referrals or a response came weeks later.

Medical Records/MHTS

An audit with a sample size of 32 percent of the MHSDS caseload indicated a 97-percent accuracy rate when the MHTS indicated that an inmate had been seen.

**Avenal State Prison (ASP)**
April 15, 2008 – April 17, 2008

Census:

On April 8, 2008, the inmate census was 7,194. This included 1,273 MHSDS inmates of whom three were in the MHCB, 27 were EOP, and 1,243 were 3CMS. There were 140 inmates in administrative segregation, including four EOP and 28 3CMS inmates.

Staffing:

The institution saw a decrease in the vacancy rate among allocated mental health positions from the preceding monitoring period, down from 38 percent to 19 percent. The functional vacancy rate was reduced to four percent, taking into account registry staff. During the reporting period, a new associate warden for health care services and a new health care manager were appointed to the institution.

The chief psychologist position was filled as was one of two senior psychologist positions. The other senior psychologist position was filled by a contractor.

None of the five allocated staff psychiatrist positions was filled with permanent employees, but all five vacancies were covered by registry staff.

Fourteen of 15 allocated psychologist positions were filled; contract staff provided services at the equivalent of .75 full-time equivalent positions.

Two of the 2.5 allocated psychiatric social worker positions were filled. Ten of 11 allocated psych tech positions were filled, and a contractor filled the remaining position. One of the 1.15 allocated recreation therapist positions was filled, and the two mental health RN positions were filled.

All eight of the allocated office tech positions were filled as was the one allocated health program specialist position. The one allocated OSS II position was vacant.

<u>Quality Management</u>:

The mental health quality management process continued to improve but remained in partial compliance. The QMC met regularly and was well attended. The mental health subcommittee met monthly and incorporated qualitative aspects of treatment into routine audits of compliance with Program Guide requirements.

Three QITs specific to mental health were active at the time of visit to address IDTT meetings, mental health referrals, and the OHU. There was a separate QIT to examine laboratory results. Audit results were routinely forwarded to the mental health subcommittee and other relevant bodies.

<u>Suicide Prevention</u>:

The SPRFIT met five times during the monitoring period.  A supplemental tracking system was used to monitor multiple admissions, suicide watches, and the use of SRACs.  The institution was compliant with five-day follow-ups, but it was uncertain if hourly observations were made by custody in those cases.  Pre-placement screening was not performed reliably, and an audit found a 34-percent compliance rate.

Institutional data indicated a 96-percent compliance rate for mental health screenings.  Staff reported that an LOP required the use of inmate profiles.

Staff audits indicated that custody and clinical staff assigned to administrative segregation met daily.  Custody staff performed 30-minute welfare checks at staggered intervals, and supervisors periodically reviewed or audited documentation of welfare checks and inventories of emergency equipment within the units.

At the time of the visit, the suicide prevention plan was being followed, and the ERRC operated in accordance with existing procedures.

<u>Medication Management</u>:

Medication management continued to progress at ASP.  QITs were used as a central function to remedy medication management issues.

Audits indicated that continuity of medications for new arrivals continued to improve as medications were administered within 24 hours in 96 percent of the cases.

A staff audit found that medication distribution within 24 hours following yard changes also occurred at an improved rate of 94 percent.

A staff audit also found that orders for psychotropic medications were renewed and medication made available in a timely manner in 85 percent of the cases. ASP remained partially compliant with prescription renewals and refills.

Pill lines at ASP continued to be problematic. The institution had a plan to increase the number of pill lines, but this was contingent upon an unresolved space issue.

The institution was transitioning away from unnecessary DOT orders. Audits identified inconsistencies in the use and labeling of DOT and nurse administered medication (NAM) orders.

All medication orders were submitted to the pharmacy within 24 hours of being written. Staff errors resulted in noncompliance in tracking orders and scheduling follow-up appointments despite a proven tracking system.

A tracking and auditing system reported compliance with timely order and review of laboratory tests.

An audit of renewal medication orders for administrative segregation inmates found no lapses in medication continuity due to inadvertent expiration of orders. The institution was partially compliant regarding administrative segregation inmates receiving medications after prescription changes, timely medication reviews, and renewals.

During the monitoring period, one Keyhea petition was initiated, two inmates were on Keyhea orders, and a fourth order was allowed to lapse by the treating physician.

<u>Sexual Misconduct</u>:

Staff reported that six RVRs were issued for indecent exposure during the monitoring period. All six inmates were screened, and five were referred for comprehensive

evaluations.  One inmate was diagnosed with Exhibitionism but refused treatment and did not meet the criteria for placement in the MHSDS.

Transfers:

From November 2007 through April 2008, ASP did not initiate any referrals to DMH, although inmates with multiple admissions to MHCB were reviewed for possible increased levels of care, including admission to DMH.

Psychiatric inmates typically occupied six to ten beds in the OHU, and records indicated 11 occasions when there were an insufficient number of beds to accommodate mental health inmates.  Inmates awaiting admission to the OHU were placed in administrative segregation on one-to-one suicide watch for the duration of their stays in administrative segregation.

Each inmate was seen daily by a psychiatrist and psychologist in the OHU, but confidential treatment space remained problematic.  Inmates in the OHU had access to daily activities.  Although construction of the OHU yard was complete, custody concerns prevented its activation.

Across the period from November 16, 2007, through April 3, 2008, audits showed a total of 172 admissions to the OHU.  Thirty-three of these inmates were referred to MHCBs, 21 were rescinded prior to transfer, and 12 transferred.  There were 92 IDTT meetings recorded for the 172 admissions to the OHU.  The institution remained only partially compliant regarding OHU IDTT meetings.

The average time from OHU placement to MHCB referral was 3.8 days.  The average time from acceptance to transfer was seven days.  The average number of days spent in the MHCB was 8.44, with the longest stay at 18 days.

At the time of the visit, there were 26 EOP inmates at ASP, with five in administrative segregation.  Of these 26 inmates, 20 were within transfer timelines, four had exceeded transfer timelines, and two inmates in administrative segregation were waiting for legal proceedings.

Other Issues:

Administrative Segregation

A staff audit reported that clinical contacts occurred at cell-front in only four percent of the cases.  It was reported that eight therapeutic modules were at the institution and that video equipment had been ordered. However, group treatment was still not offered at the time of the monitor's visit.  Staff reported that daily rounds were made by psych techs and that 30-minute welfare checks occurred for new arrivals for 21 days after initial placement in administrative segregation.  New arrivals were housed in intake cells with white placards posted on the door for the first three weeks.

Inmates could not use electrical appliances due to the unavailability of utility services in the unit.

It was reported that ASP has a compliance rate of 99 percent for the completion of the 31-question mental health screening.  An audit of inmate charts indicated a compliance rate of 34 percent for completed pre-placement screenings.

Staff reported that inmates were offered at least ten hours of yard time per week, but the institution did not provide data to confirm this representation.  Plans to construct 20 small management yards were in the initial stages.

Treatment space was problematic in administrative segregation, with only two private offices available for interviews and one conference room utilized for IDTT meetings and clinical contacts.

IDTT meetings observed by the monitor were attended by an appropriate compliment of disciplines. C-files were available, but UHRs were unavailable in three cases. The meetings were well run, and treatment plans were adequately addressed.

Emergency removal drills were performed by all three watches on a monthly basis. Drills were simulated for cases of drug overdose, unresponsive inmates, and hanging incidents.

EOP

Case manager contacts were occurring weekly, IDTT meetings were timely 90 percent of the time, monthly psychiatric contacts were made 93 percent of the time, and EOP inmates had access to groups.

MHTS scheduled pre-release appointments with a discharge planner. During the reporting period, it was reported that a TCMP counselor made a total of 94 contacts, 91 with caseload inmates.

3CMS

The institution was compliant with case manager contacts. ASP was partially compliant in referring arriving inmates to psychiatry. The institution conducted initial intake assessments 100 percent of the time. Initial and annual IDTT meetings were held in a timely manner, and a staff audit indicated a full complement of disciplines in attendance. C-files were unavailable approximately 80 percent of the time in IDTT meetings. Eight treatment groups were available to 3CMS inmates.

Referrals

From November 15, 2007, through April 1, 2008, there were 1,686 routine referrals, 45 urgent referrals, and six emergency referrals, with compliance rates of 82 percent, 89 percent, and 100 percent, respectively. This represented a substantial improvement from the preceding monitoring period.

Medical Records/MHTS

Medical records continued to be problematic at ASP. At the time of the visit, the work space was seriously deficient and overcrowded with staff, who reported a backlog of 6.5 feet. Supervising mental health staff described the state of medical records as poor.

The institution supplemented the MHTS with a locally developed system that provided closer supervision and a larger array of reports.

ASP was partially compliant with seeking outside health records of inmates with histories of prior mental health issues.

**Salinas Valley State Prison (SVSP)**
June 2, 2008 – June 5, 2008

Census:

On June 2, 2008, the population at SVSP was 3,627, representing a population decrease of 14 percent since October 2007. Caseload inmates numbered 1,392, as compared to 1,397 in October 2007. Consequently, MHSDS inmates comprised a larger percentage of SVSP's inmate population, representing 38 percent of the inmate census in June 2008, as compared to 33 percent in October 2007. There were 336 inmates in administrative segregation.

There were 1,161 3CMS inmates, which included 1,005 in general population and 153 in administrative segregation. There were 224 EOP inmates, 187 in general population, and 37 in administrative segregation. Eight inmates were in MHCBs.

There were also approximately 170 intermediate care patients in SVPP and Units D5 and D6, all under the care of DMH staff.

Staffing:

SVSP continued to rely on contractors to fill large numbers of vacancies. There were 111.8 allocated mental health positions, 34.25, or 31 percent, of which were vacant. Staff psychologist positions continued to have the highest vacancy rate. Staff reported that the cost of living in the vicinity of the prison impacted recruitment and retention of mental health staff. A consequence of the high psychologist vacancies was the challenge it posed to clinical managers at the institution.

Contractors covered approximately 71 percent of the vacancies, reducing the functional vacancy rate to about nine percent.

Among supervisory positions, the chief psychiatrist and psychologist positions were filled, as was a senior psychiatrist position, and three of four senior psychologist positions. Additionally, two of nine psychiatrist positions remained vacant, as did 11.12 of 27.87 psychologist positions.

One of the two senior psych tech positions, two supervising RN positions, and an office services supervisor position were also vacant. Other vacancies included 4.9 of 7.9 psych social worker positions and three of 5.3 recreation therapist positions.

Ten of 10.73 RN positions were filled, as were 20 of 24 psych tech positions. Among clerical staff, 6.5 of 14 positions were vacant, with contractors covering all but one vacant position. A health programs specialist position was filled.

Quality Management:

SVSP's mental health quality management subcommittee appeared to be functioning very well.  The monitor's expert observed a meeting that was well attended by appropriate mental health and custody staff.  The agenda was wide ranging, including comprehensive reports written and discussed by the senior psychiatrist, who chaired an ongoing QIT.  Substantive issues of mental health, including referrals, structured treatment tracking, and CAP updates, were considered by the subcommittee.

Psychologists met monthly in peer review and examined charts for purposes of checking that all required mental health requirements had been met and for quality of treatment. SVSP reported the results to individual clinicians and supervisors throughout the process.  At the time of the visit, the institution reported that the focus of its psychology peer review process was on quality of documentation by clinicians, reviewing critical incidents, and developing focused peer review of sentinel quality improvement indicator events.  In addition, SVSP was developing a psychology peer review mission statement and working on a feedback mechanism that would enable the results of psychology peer reviews to be disseminated to the staff in a systematic fashion.

SVSP also reported that results from earlier psychology peer review findings had led to the development of a protocol to monitor quality of IDTT and progress note documentation, which had been implemented in a mainline 3CMS quality improvement outcome indicator pilot project at the institution.

Psychiatrists also engaged in peer review at SVSP.  The review process was comprised of examination of at least five charts per staff psychiatrist each quarter.  Analysis was conducted utilizing an 11-item instrument that looked at interview content, laboratory

201

monitoring, medication prescription, and follow-up.  The objective was to determine the clinical appropriateness of a psychiatrist's evaluation and treatment process.  Under the protocols of the psychiatric peer review process, the identity of the reviewing psychiatrist was kept confidential.

At the time of the site visit, there were two active QITs at SVSP, one on referrals and the other on access to care in administrative segregation.

Suicide Prevention:

SVSP's standard operating procedure was to use OC spray to disable inmates inside cells or holding cells who disobeyed orders to stop doing something that could result in self-injury, even if it were likely to be superficial, for example, scratching oneself with a laminated ID card or its metal clip, or standing passively with a piece of cloth intended to suggest a possible future hanging attempt.

The institution's ERRC met monthly and reviewed incidents, including selected suicide attempts or self-injuries and all inmates' deaths.  A review of ERRC's minutes indicated that SVSP did not have a standard operating procedure or standardized review of responses to suicide attempts or threats of self-injury.

SVSP continued the implementation of the suicide reduction program in its several administrative segregation units. All non-MHSDS inmates placed in administrative segregation were given a 31-question screening within one to three days of placement.  Daily psych tech rounds were completed in all administrative segregation units at SVSP.

Reviewed documentation in administrative segregation units that held MHSDS inmates indicated that 30-minute welfare checks were conducted on all identified new-intake inmates.  Staff interviews reported that checks were completed for the duration of an inmate's first 21 days in administrative segregation.  It was, however, concerning that 30-minute check

rounds in these buildings were not conducted at staggered intervals.  Documentation indicated

that they always started on the hour and half hour and took a set amount of time, which was five

or ten minutes, depending on the unit and rounding officer.

Inmates in the stand-alone unit, Unit D9, from which MHSDS inmates were

barred, were checked every 30 minutes throughout the duration of their stays in administrative

segregation.  Documentation indicated that the welfare checks were slightly staggered.  New-

intake inmates were not identified by door placards, or in any other readily accessible way in

Unit D9.

Inmates in administrative segregation buildings D1, D2, and D8 were permitted

in-cell televisions or radios.  Inmates' cells in Unit D9 were equipped with electrical outlets but

did not have cable hookups.  Inmates in this building were permitted to have an in-cell radio, but

television services were not accessible.

Documentation indicated that monthly medical emergency drills were conducted

on all watches in the various administrative segregation buildings.

Medication Management:

SVSP's local medication management policy was revised and signed in February

2008.  It was consistent with statewide directives regarding medication management.

The institution conducted a number of audits related to medication management

that were reasonable in size and scope and applied acceptable methodologies.  The audits

indicated that medication continuity was sustained when inmates arrived at SVSP, were

discharged from the CTC to a yard, and were moved between yards.  The audits showed

compliance rates of better than 90 percent in each of these categories, and rates of 100-percent

compliance at various audit points during the monthly audit undertaken from September 2007 to March 2008.

Timely renewal of expiring orders was also reported to be in compliance. Monthly staff audits that yielded a cumulative sample size of 108 cases found that orders were renewed timely in all but five cases.  A staff audit of 138 UHRs of caseload inmates whose orders for psychotropic medication were changed found a documented rationale for the change in 132 cases, resolving that CAP item.

The matter of timely response to inmate medication noncompliance continued to present some difficulty for SVSP.  Audit data showed that 40 of 147 inmates, or 27 percent, who should have been referred for noncompliance were not.  Of those who were referred, audits during November 2007 to April 2008 showed that a range of 85 percent to 97 percent were seen within seven calendar days, as required by the Program Guide.

Staff reported that DOT and medication noncompliance protocols were not consistently followed on Yards C and D.

The institution's process for monitoring blood levels of mood stabilizers needed improvement.  Audit data for the period October 2007 to March 2007, showed that although 93 percent of inmates on mood stabilizers had labs ordered, only 83 percent of the results of the labs were appropriately filed in UHRs.  Moreover, where abnormal results were discovered, action on abnormal findings occurred in 78 percent of such cases.

During the period from September 2007 to March 2008, SVSP reported that the results of supervisors' observation and interviews with inmates on HS medications found that HS orders were consistently administered between 8:00 p.m. and 9:00 p.m.

The institution reported that 19 Keyhea orders were initiated or renewed during the monitoring period.  Notably, 12 other petitions were lost or dropped as a result of missed timelines or decisions made by CDCR's Office of Legal Affairs.

Institutional audit data showed that during the period from October 2007 to March 2008, informed consent was obtained and filed in UHRs, with a range of 92-percent to 98-percent compliance.

Pharmacy audits of inmates' signed receipts for medications documented 100-percent compliance with parole medications.

Sexual Misconduct:

At SVSP, inmates who were charged with sexual misconduct violations were not screened within 24 hours of an incident.  Most screenings were done one to two weeks afterward.  The procedure included a full mental health evaluation for all inmates charged with sexual misconduct.  No inmates were diagnosed with Exhibitionism.  Two inmates were referred to a centralized treatment program for Exhibitionism after receiving two RVRs for indecent exposure within a six-month period, although neither inmate was deemed to meet CDCR's diagnostic criteria for Exhibitionism.  One of these inmates was transferred to the program.

Transfers:

Access to higher levels of care from SVSP continued to pose major difficulties.  Access to DMH care from SVSP continued to be problematic. Staff did not consider ASH an option due to the high custody levels of many of their patients.  Lengths of stay in the institution's MHCB and its use of holding cells pending MHCB placements continued to be excessive and in violation of departmental directives.  Staff reported that MHCBs were frequently unavailable when needed.

205

SVSP made nine referrals to acute care, but not all inmates reached the appropriate level of care. The institution reported that it continued to experience difficulty with the waiting list for referral to DMH acute care, including following self-injurious behaviors and suicidal ideation. During the review period, inmates referred to acute care typically waited two to three weeks for a bed.

Access to MHCBs was generally poor and inadequate due to insufficient system capacity. Factors that affected MHCB availability included slow access to DMH programs and long average length of stay, which was in part a by-product of local utilization management practices. SVSP had only eight MHCBs for 1,161 3CMS inmates and 224 EOP inmates. Lengths of stay often exceeded ten days. As a result of poor access to MHCBs, inmates continued to be placed in holding cells pending placement in crisis beds.

In practice, many inmates at SVSP were often shuffled back and forth between the holding cells and the waiting rooms as they waited long periods of time for MHCBs to become available. While staff continued to maintain logs to track utilization of the holding cells and waiting rooms, the logs were incomplete. Moreover, the information contained in the logs was organized in a manner that made it often impossible to follow an individual's movement from the time he arrived in the CTC to the time he was placed in an MHCB.

Less than half of MHCB referrals at the institution resulted in admission during the reporting period. It was noteworthy that many of the inmates rejected for admission received five-day clinical follow-up and hourly custody checks upon their return to housing.

Once admitted, inmates being treated in the MHCB were restrained and placed in modules during IDTT meetings, regardless of their administrative segregation status. Notably, no outside yard time was allowed MHCB inmates, regardless of their status or length of stay.

All MHCB inmates were issued a mattress, even when in a safety cell, unless explicitly prohibited by a doctor's order.  Smocks were issued only on a doctors' order.

IDTT meetings were held twice weekly in the MHCB and were appropriately attended by a full team, including correctional counselors who brought C-files.

Other Issues:

Administrative Segregation

SVSP's administrative segregation hub continued to be noncompliant with the 60-day requirement for transfer to a PSU.  Access to PSU beds was also poor during most of the reporting period, but improved during April, May, and June 2008.

As required, custody staff closely monitored EOP inmates who remained in administrative segregation longer than 90 days.  The increased scrutiny did not appear to have significantly reduced lengths of stay.  The reasons for long lengths of stay included pending disciplinary and court proceedings, pending transfer to other prisons/programs, pending transfer within SVSP, and pending CSR/C&PR reviews.

Data analysis showed that MHSDS inmates tended to remain longer in administrative segregation than their non-MHSDS counterparts.  Length of stay exceeded 90 days for 75 percent of EOP inmates, 54 percent of 3CMS inmates, and 34 percent of non-MHSDS inmates.  A full explanation for this disparity was not readily discernible, although slow access to MHSDS programs, for example Level IV SNY, PSU, appeared to be a correlative factor.

The monitor's expert observed an EOP IDTT meeting in administrative segregation.  All required participants were present, and the team met in a confidential group room.  While the correctional counselor had C-files available, UHRs were not requested by

clinicians attending the observed IDTT meeting. Staff reported that only about 20 percent of requested UHRs for IDTT meetings were normally made available.

Two psych techs and a recreation therapist helped run groups in administrative segregation. The modules used for group meetings in the MHSDS administrative segregation unit remained in a straight line, causing compromised sight lines and auditory information that had a negative effect on the efficacy of the treatment.

Inmates in all four administrative segregation units were consistently offered ten hours of outdoor yard per week.

EOP

Access to EOP care at the institution continued to be problematic. Inmates who developed a need for EOP level of care while at SVSP often waited 60 days or longer for an EOP bed.

The institution continued to meet the minimum weekly case manager contact requirement for EOP inmates. It also continued to provide the locally instituted enhanced case manager treatment program aimed at lowest functioning or chronic treatment-resistant inmates. At the time of the visit, there were seven EOP inmates in the program. There was a 30-day IDTT review of each inmate scheduled as part of the program requirement.

SVSP reported that it was partially compliant with the requirement to offer ten hours of structured therapeutic activities to EOP inmates. Psychotherapeutic groups that were offered indoor in the EOP program included coping skills, music, poetry, reading and writing, health/nutrition, and journaling. Staff reported that the EOP treatment building located on the D Yard had insufficient capacity for the treatment needs of the population. Several groups were therefore held outdoors, subject to environmental conditions.

Clinicians worked two to four per office, which affected capacity to provide one-to-one clinical services.  Seventy-five percent of clinical case manager contacts with EOP inmates were out of cell.

Through examination of a sample of treatment plans, the monitor's expert observed, and supervisory staff confirmed, that few EOP treatment plans were individualized.

Education programming in the EOP mainline was expanded to include inmates working towards their general equivalency diploma and/or accumulating junior college level credits.

3CMS

SVSP met basic Program Guide requirements for general population 3CMS inmates by consistently meeting minimal quarterly case manager contacts.  Annual IDTT reviews were routinely held, and a significant proportion of the 3CMS caseload had access to group therapy.

In the 3CMS programs on Yards A and B, which were Level III and Level IV SNYs with 78 percent of the institution's 3CMS population, case manager caseloads were manageable.  This permitted frequent contact when requested and/or clinically indicated.  In addition, office and program space was adequate and accessible.  Clinicians offered several groups involving MHSDS and non-MHSDS inmates.  Dedicated correctional counselors attended IDTT meetings, routinely brought C-files, and provided meaningful input.  Medication management was reportedly good in these two yards.

The monitor's expert observed an anger management group on A Yard, which was characterized as excellent.  Eleven MHSDS and non-MHSDS inmates participated in the group, which was held in a clinician's spacious office.  Nearly all of the inmates in the group

participated in a well-directed discussion about making good choices and the repercussions of poor decisions.

In the programs on Yard C, which was for Level IV with 16 percent of the 3CMS population, and Yard D, which was a multipurpose yard holding six percent of the 3CMS population, correctional counselors were assigned to IDTT meetings on a rotating basis and did not bring C-files.  Input from correctional counselors during IDTT meetings was minimal to non-existent.  Mental health clinicians on these yards shared program space with nursing and custody staffs.  As a result, office space was not consistently available for one-to-one interviews, and clinicians were often forced to conduct inmate interviews in non-confidential and/or uncomfortable makeshift areas.  Psych tech-run groups on C Yard were scheduled, but rarely convened due to regular lockdowns and modified programming.

On review of treatment plans, the monitor's expert observed, and interviews with supervisory staff confirmed, that most 3CMS treatment plans were individualized.

The monitor's expert also observed an IDTT in the 3CMS program during the site visit.  There was essentially no input by the psychiatrist during this process.  The IDTT meeting appeared to focus little on the actual treatment plan and more on summarizing the inmate's history.  The correctional counselor I provided useful input during the IDTT meeting.

Referrals

SVSP's audit showed that it was noncompliant in responding to referrals.  The institution's referral tracking system produced compliance rates of 76 percent for emergent and urgent referrals, and 30 percent for routine referrals for non-MHSDS inmates.  Contrary to Program Guide requirements, SVSP did not apply a five-day response time to routine referrals for MHSDS inmates and had not included this category of referrals in its study.

RVRs

EOP inmates who incurred RVRs received a mental health evaluation for disciplinary purposes, although the exercise did not necessarily conform to departmental requirements or have the intended results. There was wide variability in the proportion of 3CMS inmates referred for evaluations in connection with RVRs.

SVSP's warden reported that the vast majority of RVRs and incidents at SVSP occurred in the D Yard, the location of the EOP units and treatment building, two buildings with intermediate care beds operated by DMH, and administrative segregation. Data provided by the institution confirmed that MHSDS inmates in general, and EOP in particular, received a disproportionate number of RVRs during the reporting period. MHSDS inmates received 1,174 of 2,396 RVRs, or 49 percent, issued during the reporting period. EOP inmates, just six percent of the prison population, were involved in a growing percentage of the RVRs issued by SVSP, rising from 106 out of 836, or 13 percent, during the second quarter of 2007, to 148 out of 837, or 18 percent, during the last quarter of 2007, and reaching a high of 154 out of 723, or 21 percent, during the first quarter of 2008.

There was wide variability in the proportion of 3CMS inmates referred for evaluations in connection with RVRs. Staff referred 23 of 248 3CMS inmates for evaluation in connection with RVRs during the last quarter of 2007, but made only two referrals during the first quarter of 2008, when 234 3CMS inmates were issued RVRs.

**Correctional Training Facility (CTF)**
September 9, 2008 – September 11, 2008

Census:

CTF had a total inmate population of 6,421 inmates as of September 4, 2008, with 896 inmates in the MHSDS program. The caseload census remained basically constant over the

past year, at 891 in September 2007.  At the time of the site visit, two inmates were in the OHU, and eight inmates who had been elevated to the EOP level of care were awaiting transfer.  A total of 270 inmates were housed in administrative segregation, with 47 of those at the 3CMS level of care.  There were no EOP inmates in administrative segregation.  Eleven of the inmates in administrative segregation were pending transfer to SNYs, with waiting periods of up to five months.

Staffing:

At the time of the site visit, the 2.5 allocated senior psychologist positions and the chief of mental health post were filled.  Of the 3.5 allocated staff psychiatrist positions, 1.75 full-time equivalent positions were filled.  Contractors provided services equivalent to 1.25 full-time equivalent positions, leaving a functional vacancy in psychiatry of .5.  All 12.5 psychologists positions, including the designated Clark clinician, were filled.  One psychologist was on extended medical leave, and a contractor provided .25 full-time equivalent services.

The 1.5 allocated psychiatric social worker positions were filled.  A contractor provided an additional .25 full-time equivalent services.  The one senior psych tech position and all ten psych tech positions were filled.

CTF had an allocation of 8.5 office tech positions, eight of which were filled.  In addition, three contractors were hired to cover anticipated medical leaves for two full-time equivalent office techs.  The .5 allocated office assistant position was vacant at the time of the site visit.  The institution was in the process of recruiting to fill the .65 recreation therapist position at the time of the monitor's visit.

Supervisory staff reported major turnovers among office techs because of limited opportunity for upward mobility in this classification.  Staff indicated that the impact of this

instability was reflected in the difficulty the institution had maintaining adequate databases and logs.

Quality Management:

The quality management process at CTF continued to improve during the review period, but did not achieve full compliance.  The mental health quality management subcommittee showed improved participation and reviewed important issues, but needed to move in the direction of more focused problem solving and documentation of decisions made.  The peer review processes required further development.

CTF continued to have a functioning quality management committee that was chaired by the CMO and met on a weekly basis.  Minutes of committee meetings were adequate and were maintained.  They documented issues under review and decisions reached.  Mental health was regularly represented at the QMC by a senior psychologist.  These meetings were well attended by all required disciplines.  QITs were chartered and provided periodic reports to the QMC for its consideration.

CTF had an active mental health quality management subcommittee that met bimonthly.  The monitor examined minutes of meetings conducted from October 2007 through May 2008; they substantiated increasing levels of participation and regular review of important issues.  The monitor observed a committee meeting during the visit and noted good attendance and extensive discussion regarding pertinent matters.  Notwithstanding, the wide-ranging discussions, the minutes did not document resolution of issues or clear plans to move them toward resolution.

The monitor reviewed documentation of monthly psychiatric and psychologist peer reviews for the period from August 2007 through April 2008.  CTF had not yet

implemented a comprehensive peer review process in either discipline at the time of the review, a problem acknowledged by mental health staff. As previously noted in the Special Master's Twentieth Monitoring Report Part A, these reviews essentially involved file audits for the presence or absence of specific documents and did not address substantive issues of quality of care.

Suicide Prevention:

The SPRFIT met monthly during the period from October 2007 through August 2008. CTF's suicide prevention coordinator chaired the SPRFIT meetings. Although staff reported that these meetings were well attended, attendance records were provided for two recent meetings at which at least half of the 17 members were absent.

Each prior month's suicide attempts were reviewed during the meetings, with OHU placements and MHCB transfers noted. However, CTF did not document actions regarding specific issues in suicide attempts or devise a plan to reduce attempts.

Five-day follow-up logs were reviewed by the SPRFIT, and reasons for noncompliance were discussed. Logs for the period from January 2008 through April 2008 documented a compliance level of 100 percent for follow-up by clinical staff for the first three months of the year, and 80 percent for April 2008. A total of 109 releases from OHU occurred during this period of time.

Contrary to Program Guide requirements, minutes from the SPRFIT showed that fewer than 50 percent of the inmates released from OHU following suicide watch or precautions were placed on clinical five-day follow-up by the discharging clinician.

Medication Management:

CTF conducted an audit regarding medications for newly arriving inmates. It found that the institution was noncompliant with providing arriving inmates on medications with their first dose within required timeframes.

Although the institution had a process in place to ensure that inmates who were transferred internally did not have their medication administration interrupted, CTF did not provide audit data regarding this area.

CTF expanded its medication distribution points and reported that pill line waiting times had significantly decreased, but no audits were conducted.

Institutional data reported that MHSDS medication orders were processed timely and inmates received their medications by the next ordered dose.

CTF reported that it ordered medications DOT as clinically indicated, but had not completed any process audits that examined whether DOT had been appropriately administered.

Nursing staff reported that HS medications were ordered and dispensed as indicated.

The institution reported that its audits showed a 76-percent compliance rate with obtaining medication informed consent forms for psychotropic medications and placing them in medical records.

Institutional data reported a 72-percent compliance rate regarding laboratory orders for inmates who required blood level testing every six months, but did not cover whether the labs were actually drawn, results were provided to the prescribers, or prescribers reviewed the results of tests.

215

CTF continued to struggle with meeting its institutional program requirement for a follow-up visit within 30 days for inmates who had been given newly prescribed psychotropic medications, as well as with addressing medication side effects. Staff informed the monitor that they were considering methods for standardizing the review of these issues.

The institution also reported that it was noncompliant with offering explanations to inmates regarding medication changes, as documented in psychiatric progress notes.

Audit data documented compliance with medication renewals prior to prescription expiration at a rate of 93 percent. Similarly, audits reported 100-percent compliance for psychiatric contact with inmates for whom it was indicated before medication discontinuance.

Sexual Misconduct:

During September 2007 through April 2008, four different inmates, one of whom was a 3CMS inmate, were cited for sexual misconduct violations. Screens were not completed in accordance with policy regarding sexual misconduct. The custody intervention procedure had not been implemented at CTF at the time of the site visit.

Transfers:

Access to DMH from CTF was very limited. The sole inmate referred to DMH intermediate care during the period September 2007 to September 2008 was rejected by ASH due to his high custody level, according to CTF staff. Remarkably, a coordinated clinical assessment team process to review the rejection was not done. As an alternative, CTF staff were advised that a referral to SVPP had a wait time of least 45 days before this inmate could be admitted. No inmate with multiple admissions was referred to DMH, nor was there documentation in reviewed medical records that showed higher levels of care were considered in view of his multiple admissions.

During the site visit, the monitor's discussion with mental health staff regarding utilization of DMH beds indicated that confusion remained regarding referrals to the DMH level of care at that institution, and that it needed to be addressed at the CDCR central office.

CTF reported that there were 12 transfers to MHCBs during the review period. Reliable data regarding MHCB transfers were significantly problematic and offered no information regarding referral rate or compliance with transfer timeframes. The monitor's expert examination of a sample of UHRs indicated that CTF continued to under-refer and under-utilize access to crisis beds for appropriately indicated inmates.

The institution reported 142 admissions to the OHU during the period from September 2007 to April 2008. OHU data was maintained across multiple databases, which did not include the MHTS. This had a deleterious impact on available utilization management information. Some information did correlate across databases, which did not include such pertinent information such as whether a referral to MHCB had been made.

Average length of stay in the OHU was 5.23 days, making CTF noncompliant with Program Guide requirements. Audits of multiple admissions were flawed. The monitor's expert examined a sample of inmates with histories of OHU placements and found little documentation that inmates discharged from the OHU were seen by an IDTT prior to discharge. Required forms for such discharges were not uniformly completed.

Even though CTF maintained an EOP transfer log, there were gaps in and information missing from the log, including transfer data. At the time of the site visit, there was no information available for review regarding the cause of delays for EOP inmates that remained at CTF beyond 60 days.

217

Other Issues:

Administrative Segregation

The institution reported that administrative segregation pre-placement screening was appropriately completed by the medical staff. Audit for the period October 2007 to April 2008 showed that CTF was not compliant with the 31-item post-placement mental health screening. The MHTS suicide profile report was not generated for new administrative segregation placements.

New intakes were routinely housed within six designated intake cells that were retrofitted for suicide prevention. At the time of the visit, six additional cells were in the retrofit process, with completion expected within two weeks following the visit. As the number of new admissions frequently exceeded the capacity of intake cells, new intakes not in the retrofitted cells were designated with a poster outside the cell door.

Logs and inmate interviews confirmed that administrative segregation inmates received staggered, 30-minute welfare checks throughout their stays.

A significant improvement that occurred at CTF since the preceding monitoring period was the institution's commencement of weekly individual therapy sessions with clinical case managers for all 3CMS inmates in administrative segregation. In addition, administrative segregation was monitored daily by psych techs, medication rounds were completed daily, and there were regular medication reviews by psychiatrists. Administrative segregation inmates had access to the required ten hours of yard time per week, and electric outlets were available in all cells except intake cells. The lack of available space precluded the provision of group therapy for inmates in administrative segregation.

218

Psych techs were no longer required to distribute medications to non-caseload inmates, thereby resolving a standing CAP regarding this issue.  This change permitted psych techs to perform required duties in administrative segregation regarding MHSDS inmates with their current staffing level.

A cadre of health care escort officers had been assigned in administrative segregation, which staff reported had improved attendance and participation in scheduled mental health appointments in the unit. Staff further reported that very positive work relations existed between custody and mental health.

### 3CMS

CTF did not meet the Program Guide requirement for quarterly case manager contact with 3CMS inmates.  Data for September 2007 to January 2008 showed that initial IDTT meetings were typically not held within 14 days of arrival of a 3CMS inmate into the mainline.  Psychiatry was generally represented at these initial IDTT meetings when they did occur.  The institution was also noncompliant with timely completion of annual IDTT meetings for 3CMS inmates, and with the presence of a psychiatrist at a team meeting.

In the period September 2007 to January 2008, CTF audits showed that treatment plans for its 3CMS inmates were individualized, which the institution defined as including diagnosis, symptoms, and treatment interventions consistent with diagnosis, as well as indications for group therapy and the presence of a GAF score.

The institution offered a myriad of group therapy to its 3CMS inmates, including one that was facilitated in Spanish.

Referrals

Analysis of presented data showed that CTF was noncompliant with staff response to routine and emergent referrals, and did not cover urgent referrals.

Space

Expanded clinical services space, including mental health, had been developed as part of the Plata receiver's interim institutional retrofit program, but work on the space had not started at the time of the monitor's visit.

Pre-Release Planning

The TCMP was active at CTF. A representative visited the institution bimonthly for three days each visit. The TCMP representative was interviewed and reported that she saw an average of 40 inmates combined in the course of the two visits each month. She reported that following reviews of the C-file and UHR, she interviewed eligible inmates individually, and provided outside contact and other information related to parole outpatient services. CTF also provided a weekly therapeutic session that addressed pre-release issues.

Ducating

Audits reported compliance with ducat management, finding that for September 2007 to November 2007 and January 2008 to April 2008, 90 percent of inmates appeared for scheduled appointments.

**California Men's Colony (CMC)**
May 27, 2008 – May 29, 2008

Census:

On May 27, 2008, CMC housed 6,500 inmates. The MHSDS population stood at 1,788, which represented a four-percent increase from the preceding monitoring period. There were 1,165 3CMS inmates, with 59 in administrative segregation, and 586 EOP inmates, with 45

in administrative segregation. There were 36 inmates in the temporary MHCB also known as the locked observation unit.

Staffing:

At the time of the site visit, CMC reported 211.68 allocated positions in the mental health program with 178.46, or 84 percent, of them filled.

Both the chief psychiatrist and chief psychologist positions were filled. Two of the three senior psychiatrist supervisor positions were filled, as were all five senior psychologist positions and all four senior psychologist specialist positions. All of the 20.48 allocated psychiatrist positions were filled. Of the 37.48 allocated staff psychologist positions, there were 8.98 vacancies. At the time of the site visit, 5.98 of the 8.98 vacant psychologist positions were filled by psychology intern positions and positions with the pilot program for marriage and family therapists. There were 13.5 allocated social worker positions, 3.5 of which remained vacant. Two of the seven supervising psychiatric social worker positions were vacant. Six of the 11.8 allocated recreation therapist positions were filled, and 30 of the 33.90 psych tech positions were filled.

Quality Management:

The QMC included administrators from medical, mental health, and nursing as well as the chairs of the various health care subcommittees. The QMC met on a monthly basis, and attendance was consistent.

The mental health subcommittee met biweekly and included medical and mental health staff and supervisors, custody, pharmacy, and nursing supervisors and staff. Minutes were maintained and included tracking of active QITs and a review of audit results. They showed consistent attendance by required members.

221

Peer review committees continued to operate reasonably and consistently for psychology, psychiatry, and social work.

The ERRC met monthly with meetings including required staff. The committee reviewed incidents requiring emergency response, considered the adequacy and correctness of documentation, and recommended corrective action.

Suicide Prevention:

The SPC met monthly during the reporting period. Attendance generally included adequate representation of all disciplines. Minutes of the meetings clearly documented the activities of the committee.

The institution did not maintain a database to track completion of five-day follow-up and completion of custody follow-up for inmates released from crisis care. A random audit found that the rate of compliance of five-day follow-up for general population inmates was 98.5 percent and was 75 percent for administrative segregation inmates.

An institutional audit of custody checks following discharge from crisis beds for general population inmates yielded a compliance rate of 99.6 percent. However, staff reported uncertainty with regard to the maintenance of the custody follow-up process, since inmates returning from MHCB were not placed in one location but were dispersed across the facility.

CMC also continued to be deficient in pre-placement screening of administrative segregation inmates, with a compliance rate of 77 percent. However, there was compliance with the completion of the 31-question screening.

Newly arriving inmates were identified and received 30-minute welfare checks during their first 21 days in administrative segregation. Psych techs performed daily rounds and met daily with housing officers.

Physical plant limitations prevented inmates from having access to electrical appliances in administrative segregation.

Medication Management:

An audit of medication continuity for newly arriving inmates was not performed, as the institution reported 100-percent compliance during the preceding monitoring period. For inmates transferring out of MHCBs, an audit indicated 82-percent compliance with medication continuity for the first quarter of 2008. A medication renewal audit covering the months of January and February 2008 yielded a compliance rate of 100 percent, although the sample was again small. Psychiatric appointments were scheduled to occur in advance of 90 days for 3CMS inmates and shorter intervals for EOP inmates to prevent expirations of orders.

At CMC, medication noncompliance was defined as three doses of psychotropic medication missed within one week. Noncompliant inmates were identified through weekly reviews of MARs by nursing staff, and were interviewed by nursing staff to determine the reasons for noncompliance, evaluate for decompensation, and assess the risk of harm to self or others. The interview was documented in the UHR. Inmates were referred to psychiatry based on need.

The institution increased the number of pill lines on C-Quad from two to four, and shortened the wait for medication. There was a similar plan for D-Quad.

There was a significant decrease in RVRs written for medication diversion since nursing had assumed more of the DOT function.

Reviews of 75 UHRs yielded a compliance rate of 64 percent for informed consent forms, a decrease from the 75-percent compliance rate reported in the preceding monitoring period. In 20 percent of the UHRs reviewed, no consent forms were found. Lab

results yielded a 90-percent compliance rate for monitoring mood-stabilizing medications, but there were no reports of any adjustments that were made based on the results.

Psychiatrists were no longer prohibited from writing HS medication orders for more than seven inmates on their caseload. Data indicated that 206 inmates were prescribed HS medication, compared to 96 from the preceding monitoring period.

CMC initiated 18 new Keyhea petitions, four of which were denied. Thirty Keyhea petitions were renewed, one was rescinded due to a transfer, and two were dismissed due to filing errors.

Audits showed that 90 percent of paroled inmates were provided medications prior to release.

Sexual Misconduct:

During the reporting period, 15 RVRs were issued for sexual misconduct. Seven were referred for mental health screens and three received comprehensive evaluations. Of those three inmates, two were diagnosed with Exhibitionism or Paraphilia, but neither was referred for treatment. Staff attributed this to a lack of bed space in these programs. All RVRs issued for sexual misconduct resulted in DA referrals.

Records indicated that all screens were reviewed by an IDTT. Hearing officers noted the findings of mental health screenings, and in one instance, charges were dismissed against one mentally ill inmate.

Transfers:

The institution generated approximately 224 acute care referrals during the reporting period, an increase of 141 percent from the preceding period. Two referrals were denied, four were on the waiting list, and four were pending at the time of the site visit.

Approximately 57 percent were rescinded by the institution, and 38 percent resulted in transfers. There were 63 transfers to ASH acute care, with the average time from acceptance to transfer at 3.1 days, with only one case exceeding ten days. There were 21 referrals to CMF APP acute care, with the average time from referral to acceptance at 21 days and the average time from acceptance to transfer at 1.8 days.

CMC generated 56 intermediate care referrals, for a 27-percent increase from the preceding period. One referral was denied, eight were on the waiting list, and 11 were pending at the time of the monitor's visit. Approximately 16 percent were rescinded by the institution, and 48 percent resulted in transfers. There were 21 transfers to ASH intermediate care, with the average time from acceptance to transfer at 6.9 days and no cases exceeding 30 days. There were five referrals to SVPP intermediate care, with the average time from referral to acceptance at 25 days and the average time from acceptance to transfer at 3.8 days.

Due to ongoing renovations, the MHCB unit remained located in the locked observation unit. During the reporting period, there were 679 admissions to the MHCB, with an average length of stay of 7.55 days and the longest stay of 107 days. Thirteen percent of admissions had stays of more than ten days, with 51, or 7.5 percent, ranging from 11 to 20 days and 39, or 5.7 percent, with stays of more than 21 days. Inmates with two or more MHCB admissions were automatically considered as potential DMH referrals during the IDTT meetings. A newly formed MHCB admissions approval team consisting of two psychologists and one psychiatrist had reduced MHCB admission by 25 percent.

Staff reported infrequent use of two holding cells, although there was no documentation to confirm this assertion. One inmate was placed in restraints during the monitoring period. An outside yard for the MHCB unit had been completed.

Other Issues:

### Administrative Segregation

Two offices and four interview spaces were shared by 11.5 clinical staff members, which resulted in one third of clinical contacts occurring at cell-front. Limited space continued to be a problem in the EOP hub.

Data indicated that EOP inmates were offered on average 13 hours of group per week, and received approximately 7.5 hours, with an average attendance rate of 52 percent for inmates offered groups. The institution offered a total of 58 groups at the time of the monitor's visit, with 77-percent specialty groups and 23-percent recreation therapy groups for EOP inmates.

CMC was compliant with timely IDTT meetings and met composition requirements, but reported slippage with timely completion of initial assessments and treatment plans.

Approximately 17 percent of the EOP inmates in administrative segregation had been there longer than 90 days, but 68 percent of those inmates were endorsed and awaiting transfer.

For 3CMS inmates, 5.25 hours of group were offered per week, and 4.44 hours were received. Audits indicated that 75 percent of 3CMS inmates attended group appointments.

Despite the activation of 45 new walk-alone yards, CMC was not compliant with offering ten hours of yard time per week to 3CMS inmates. However, while 100 percent of EOP inmates were offered ten hours of yard time per week, 50 percent chose not to go to yard. A QIT was being developed to address the conflict that existed with medication passes occurring simultaneously with yard time and group appointments.

226

EOP

Staffing for the EOP program included one senior supervising psychologist, 1.5 senior psychologist, 15.5 psychologists, 6.5 psychiatrists, three social workers, three recreation therapist, 6.75 psych techs, and three clerical positions.

The institution reported compliance with weekly case manager contacts, with minimal cell-front contacts. Data indicated compliance with timely completion of initial assessments and treatment plans.

Between December 1, 2007, and April 30, 2008, EOP inmates were offered an average of 13.5 hours of group per week and attended an average of 7.5 hours per week.

3CMS

Data indicated compliance with case manager contacts, psychiatry contacts, psychiatry intake assessments, and SRACs in the 3CMS program. CMC was noncompliant with treatment planning for 3CMS inmates.

Referrals

In administrative segregation and EOP mainline, the institution reported compliance in response to emergent and urgent referrals, and improved response to routine referrals. CMC was noncompliant in response to emergent, urgent, and routine referrals in the 3CMS program.

Heat Plan

The institution's heat plan covered all necessary components and was consistent with CDCR heat plan policies, including the recently developed formulary.

<u>Pre-Release Planning</u>

TCMP services were reduced from two full-time workers to one part-time worker, and in the interim, case managers were assigned to pre-release planning.

<u>Licensed Marriage and Family Therapist Pilot Program</u>

At the time of the monitor's visit, the institution had hired five LMFTs in a pilot program that included orientation, proctoring/mentoring, training focused on diagnosis and differential diagnosis, and proposed audits of LMFTs in IDTTs.

**<u>Wasco State Prison (WSP)</u>**
September 16, 2008−September 18, 2008

<u>Census</u>:

On September 8, 2008, WSP's total population was 5,883 inmates, including a total of 1,272 MHSDS inmates. There were 113 EOP inmates, including 96 in the reception center and 17 in administrative segregation. The 3CMS census stood at 1,151 inmates, which was 102, or 9.7 percent, above the institution's rated capacity of 1,049. There were 1,055 3CMS inmates in the reception center, 51 in mainline, and 45 in administrative segregation. There were eight inmates in MHCBs.

<u>Staffing</u>:

WSP continued to make progress filling mental health positions except in psychiatry. Nearly 90 percent of 90.22 allocated mental health positions were filled, with contractors reducing the functional vacancy rate to approximately four percent.

The sole psychiatrist employed by WSP filled the chief psychiatrist position. Positions for a senior psychiatrist and seven staff psychiatrists were vacant; the latter were covered by a cadre of contractors, many of whom worked part-time during weekends.

Two of 40 psychologist positions were vacant, and three psychologists were on long-term leave.  Contract psychologists brought the functional vacancy rate to about 11 percent.  Two of three allocated psychometrist positions were filled.

WSP's ten social work positions were filled, as were all seven psych tech positions, and the sole senior psych tech position.  Of a total of 15 support positions, including a health program specialist, medical transcribers, office technicians, and office assistants, one position was vacant, and one employee was on medical leave.

Staff reported that the number of allocated nursing positions had nearly tripled over the past several years to around 140, nearly all of which were filled.  Contractual staff, mainly certified nursing assistants, were used daily to monitor inmates placed in alternative holding areas pending admission to the MHCB unit.

Quality Management:

WSP's quality management committee met regularly, kept minutes, and reviewed a variety of indicators.  The mental health subcommittee did not include non-supervisory members, an arrangement that appeared to interfere with communication between line staff and supervisors and stifle the institution's ability to identify and resolve problems that affected the delivery of mental health services.  In addition, the mental health subcommittee did not meet independently, but rather convened concurrently with WSP's licensed inpatient care committee at meetings in which crisis care, outpatient care, and other MHSDS issues were discussed.

There were three QITs focused on reception center treatment, the provision of recreation therapy, access to MHCBs, and medication management.  Only the QIT on medication management was fully active.  On the whole, WSP's audits of MHSDS indicators were "snapshots" characterized by small sample sizes and long intervals between audits.  An

exception was a monthly audit based on a 20-percent sample of the EOP reception center population, the results of which were submitted to DCHCS.  WSP's peer review process was still not fully functional.

Suicide Prevention:

The SPRFIT met monthly, maintained informative minutes, covered required agenda items, and in general, reflected a dedication among its core members to reducing suicide risk at WSP.  Custody staff participated fully in meetings, raised pertinent questions, and moved swiftly to address problems that were amenable to custodial remedy.  Nonetheless, many meetings were notably brief and routinely poorly attended.  None of the monthly meetings convened to date during 2008 met quorum.

During the first seven months of 2008, internal tracking revealed inconsistent compliance with five-day clinical follow-up following an inmate's discharge from the MHCB or release from an alternative holding cell.  Submission of paperwork related to 24-hour custody checks improved during the reporting period, but continued to indicate that checks were not always completed as required.

WSP complied with most elements of the Department's suicide reduction plan for administrative segregation.  Mental health and custody staff assigned to administrative segregation met daily and worked collaboratively.  Newly arriving inmates, identified with intake placards on the cell door, received 30-minute welfare checks during their first 21 days in administrative segregation.  The checks were conducted at staggered intervals, appropriately logged, and monitored by custodial supervisors.

All inmates were screened for past and present suicidal behaviors and feelings prior to their placement in administrative segregation.  A log maintained by psych techs appeared

to indicated that the 31-item questionnaire was used to screen all inmates within 72 hours of their placement in administrative segregation.  Inmates who refused to be screened in a confidential setting were interviewed cell-front.  Daily psych tech rounds were documented.

Entertainment appliances were not available to inmates in administrative segregation because cells were not equipped with electrical outlets.  Staff reported that inmates in administrative segregation were routinely offered at least ten hours of outdoor yard a week.

Weekly meetings, attended by the warden, mental health supervisors, and custodial managers, were held to discuss the status of EOP inmates with long lengths of stay at WSP.  Despite these meetings, the number of EOP inmates with excessive stays in administrative segregation and the reception center increased during the reporting period.

Medication Management:

Implementation of Maxor's pharmacy management information system commenced shortly before the monitor's visit.  Nearly all LOPs related to medication management were in the process of being revised.  Staff reported that this transition had negatively affected medication continuity upon arrival.  The institution audited 27 inmates who had arrived at WSP with current medication orders from December 1, 2007, through April 2008.  Orders were rewritten and medications were administered within 24 hours of arrival for 22 of 27 inmates, generating a compliance rate of 81 percent.

Medication continuity related to yard moves within the institution had reportedly improved, but remained noncompliant.  More than a quarter of 34 inmates audited by the institution during the reporting period experienced medication disruptions after being moved within the institution.  The institution planned to charter a QIT to address this ongoing problem.

Staff acknowledged that frequent inmate movement within the reception center, reportedly averaging 100 cell changes per day, made it difficult to avoid disruptions in medication administration, all of which was conducted cell-front.  Low-functioning inmates and individuals in crisis were more likely to experience difficulties that resulted in cell changes. Audit data related to this issue were not provided.

Medications were consistently renewed in a timely manner.  During the reporting period, the institution reviewed 92 medication orders, 93 percent of which were timely renewed. Expiration gaps were avoided with 30-day bridge orders followed by psychiatric contact within ten days, as well as with 14-day telephone orders that required the prescriber's verification and signature the following day.

WSP did not consistently identify or respond to medication noncompliance. MARs often did not distinguish between no-shows and refusals, and frequently failed to provide an explanation for missing entries.  Moreover, internal audits found that incidents of medication noncompliance, when appropriately documented, failed to adhere to local referral protocols in more than half of the reviewed cases.

There were only a few locations in the prison that used pill lines to administer medication, none of which were reported to be problematic.  In these few locations, the institution planned to remove mesh window coverings in order to improve staff's ability to observe inmates taking medication.

An audit performed in the context of psychiatric peer review found that informed consent was obtained for 76 of 85 orders included in the sample, generating a compliance rate of 89 percent.  Signed informed consent was also found in a small number of UHRs reviewed by

the monitor's expert.  However, in some cases, consent was not obtained for all prescribed medications, and in other cases, the forms were not timely signed by the inmate.

WSP's compliance with protocols for monitoring blood levels associated with the prescription of mood stabilizers and other psychotropic medications needed improvement.  Three small audits performed in the context of psychiatric peer review yielded compliance rates that ranged from 49 to 89 percent for adherence to established lab protocols.

DOT orders, of which there were over 700 at the time of monitor's visit, were not, in practice, administered differently from NAM orders.  Consequently, it was unlikely that the administration of DOT medications ordered for hoarding, cheeking, overdose, and Keyhea petitions received the level of scrutiny that was clinically warranted.  This was an issue that had been implicated in CAPs related to drug overdose.

Staff reported an increase in the number of initiated Keyhea petitions and Vitek hearings related to poor access to MHCBs and concomitant reliance on treating crisis inmates in alternative holding areas.  Eight Keyhea petitions were initiated during recent months.  Several Keyhea petitions were reportedly rejected by the administrative law judge.  In one notable case, involving an inmate for whom Keyhea orders had been in place for six consecutive years, a renewal petition was rejected by the administrative law judge due to lack of preparation related to personnel turnover.

Staff reported that the last medication pass of the day in some areas of the prison sometimes occurred prior to 6:00 p.m., indicating that HS medications were not consistently administered at or after eight 8:00 p.m.

Staff reported that a supply of medication was provided to nearly all paroling inmates prior to their release from WSP.  However, performance in this area was not audited during the reporting period.

MARs were not consistently filed in the UHR in a timely manner, and MAR documentation was sometimes unintelligible.  Both of these deficiencies compromised the institution's ability to audit medication management.

Sexual Misconduct:

WSP issued 27 RVRs to 24 inmates for indecent exposure, all of whom were screened by mental health staff.  The screens were thorough but sometimes completed days after the incident due to custody staff's failure to forward the RVR to mental health in a timely manner.  Completed screens were reviewed by an IDTT.

Not all captains knew that they had discretion regarding the issuance of RVRs for incidents resulting from misbehavior attributed to acute mental illness and from custodial interventions requested by mental health clinicians, such as cell extraction performed to compel compliance with Keyhea medications.  Failure to dismiss RVRs when clinically appropriate sometimes further delayed transfers and prolonged stays in restrictive settings for inmates who were among the most fragile and low functioning at WSP.

Transfers:

Access to higher levels of care was problematic at every point along the treatment continuum.  Slow access to DMH, often the result of unresolved parole revocation processes, produced excessively long MHCB admissions.  Long stays in the MHCB, in turn, reduced access to the CTC and necessitated the utilization of overflow cells or alternative holding areas located throughout the prison and set aside to monitor inmates for whom MHCBs were unavailable.

EOP inmates languished for months in administrative segregation and the reception center, often cycled in and out of acute crisis, which further increased the institution's reliance on clinically inappropriate alternative holding cells.  The institution's most fragile and low-functioning inmates were the most likely subjects of repeated rotations between the reception center, administrative segregation, and alternative holding cells, often receiving RVRs along the way that only served to delay transfers to appropriate levels of care.  This harmful cycle jeopardized the safety of inmates and staff and injected unnecessary risk into routine operations.

During the first eight months of 2008, WSP generated 20 referrals to DMH acute care, all but one of which resulted in transfer.  Five referred inmates were transferred to DMH within seven days.  Transfer of the remaining 14 inmates was delayed; four having waited longer than 40 days.  Three inmates in the MHCB during the monitor's visit had been awaiting transfer to acute care from 48 to 58 days, their transfers reportedly suspended pending the completion of parole revocation hearings.

Referrals to DMH intermediate care appeared to be under-utilized, the apparent result of the perceived futility of making referrals.  During the reporting period, WSP generated 40 referrals to DMH intermediate care, 14 of which resulted in transfer to either SVPP or ASH. Transfer delays varied, ranging from five days to more than six months, and averaged approximately 61 days.  Three accepted referrals were pending transfer and six referrals were under consideration by DMH at the time of monitor's visit.  The remaining referrals involved inmates who paroled, transferred from WSP, or stabilized prior to transfer.

Staff reported that psych and return protocols failed to prevent DMH from returning to WSP low-functioning inmates with impending prison release dates.  Contrary to

psych and return protocols, WSP reportedly received inmates discharged from DMH at an EOP level of care.

WSP had a licensed CTC with six MHCBs. The institution's need for crisis care far exceeded its capacity to provide it. The number of psychiatric patients in the CTC typically exceeded six, with the use of medical swing beds. There were 16 overflow cells located throughout the prison that were used to monitor inmates for whom CTC beds were unavailable. From January 1 to September 16, 2008, there were 403 MHCB admissions, for an average of 42 admissions a month. Lengths of stay averaged 8.5 days and ranged from one to 109 days. Nearly 18 percent of admissions lasted longer than ten days, and 30 inmates had three or more admissions during this period. These data excluded stays in overflow cells, which sharply decreased the multiple admission rate.

Overflow cells used for monitoring inmates waiting for MHCBs were located in one SNY building, two mainline buildings, and administrative segregation. The cells were located on the first tier close to the front of the building in order to facilitate maximum supervision. A handwritten log showed 51 overflow cell placements during August 2008. Length of stay in the overflow cells ranged from hours to ten days and averaged 2.4 days.

The number and status of inmates waiting for crisis care beds during the monitor's visit were typical. On September 18, 2008, there were eight psychiatric patients in the CTC, four of whom were occupying medical/surgical beds and were on the State's waiting list for placement in an MHCB. Two MHCBs were being held for incoming crisis patients. Another 12 inmates were in overflow cells, all on the waiting list for MHCBs.

WSP was unable to meet transfer guidelines for MHSDS inmates in the reception center. According to tracking data provided by the institution, as of September 17, 2008, there

236

were 107 EOP inmates in the reception center, over half of whom had been awaiting transfer longer than 60 days, and 28 percent who had been waiting 90 days or longer.  Internal processing delays slowed transfers and lengthened stays in the reception center over and above what was attributable to the statewide shortage of certain types of beds and too few bus seats.

Access to EOP hub and PSU beds was also poor.  Average length of stay for EOP in administrative segregation far exceeded 30 days.  Lack of access to the hub at CSP/Corcoran during the first six months of 2008 prompted the authorization of transfers to alternative hubs, which had resulted in a small number of transfers to CMC-E.  Despite some relief, EOP inmates continued to languish in administrative segregation.  At the time of the monitor's visit, five EOP inmates had been in administrative segregation longer than 90 days, three waiting for hub beds and two waiting for PSU beds.  WSP needed to more closely scrutinize internal processes that contributed to long transfer delays, particularly those associated with RVR protocols.

Other Issues:

Reception Center

WSP's efforts to provide five hours per week of treatment to EOP inmates in the reception center continued to fall short of expectations.  Staff reported that most eligible EOP inmates received fewer than 3.5 hours of treatment a week, an ongoing deficiency that was attributed to the large number of EOP inmates in the reception center, group cancellations related to clinician absences and security issues, and inadequate funding to fill custody escort positions.

Audits indicated that 80 percent of initial IDTT meetings were completed timely and that weekly case manager contacts consistently occurred.  Audit findings relative to the timely completion of initial mental health evaluations were inconclusive.