3CMS inmates with extended reception center stays were seen by clinicians as clinically indicated, often more frequently than every 90 days.

MHCB

WSP's CTC was licensed and fully staffed, which included full-time clinical supervision, psychiatric coverage seven days a week, and social worker coverage six days a week.  Access issues aside, MHCB treatment largely complied with Program Guide requirements.  Internal audits found that histories and physical examinations were timely completed and that initial treatment plans were routinely developed and reviewed by an IDTT within 72 hours of admission.  All inmates for whom five-day follow-up after discharge was ordered received it.

In contrast to the preceding monitoring period, during which physical restraint was not used, MHCB staff utilized restraint 11 times from January 1 to May 9, 2008.  Length of time in restraint ranged from about four hours to four-and-a-half days in one concerning case. Staff attributed the jump in restraint use to heavier overflow traffic, more suicide watches, an increase in self-injurious behavior, poor access to DMH, and agitation related to postponed revocation hearings and transfer delays.

An MHCB IDTT observed by the monitor's expert was attended by all appropriate disciplines, as well as the inmates.  The team completed a thorough review of each case.

Overflow Cells

The care provided to inmates in overflow areas differed in several important ways from MHCB treatment.  All inmates placed in overflow cells remained on suicide watch, including one-to-one continuous observation, clothing restricted to a suicide smock, and no

238

access to eating utensils, showers, or books, until admitted to the MHCB or released to housing. Suicidal inmates were not distinguished from inmates who were placed in the overflow areas for psychosis or grave disability. Nor were there provisions for clinicians to reduce clothing and property restrictions and provide access to showers for inmates deemed to be at low to negligible risk of self-injury.

A group of two psychologists, a psychiatrist, a nurse, and a sergeant reviewed each weekday morning all inmates housed in the overflow cells located in administrative segregation. Inmates in overflow cells outside of administrative segregation were reviewed daily, Monday through Friday, by a team of psychologists and referred to psychiatry as needed. The daily meetings, while necessary and useful, were often hamstrung by insufficient information regarding the inmate's history of recent treatment and behavior. In some cases, the treating clinicians lacked accurate information regarding the event that precipitated the inmate's placement in an overflow cell. Space available for confidential interviews in the overflow areas was severely limited.

3CMS

Internal audits showed improved compliance with Program Guide requirements within WSP's small mainline 3CMS program. The quality of treatment plans improved, as did attendance of required disciplines at IDTT meetings and the provision of group treatment, all associated with newly resolved CAP items. An audit of 62 UHRs yielded a compliance rate of 79 percent for the completion of progress notes related to medication orders.

Medical Records/MHTS

Clinical contacts that were recorded in MHTS tracking reports often could not be found in progress notes filed in the UHR. Staff, while unable to fully explain the discrepancy,

reported that the institution's heavy reliance on contract psychiatrists, many of whom worked unsupervised during weekends, may have contributed to missing documentation in UHRs.

A small filing backlog, estimated to be about 12 inches, was noted during the monitor's visit, and access to UHRs for scheduled appointments was reportedly good. Improvement in these areas was attributed to substantial use of contract workers to bolster staffing in medical records.

The treatment provided to inmates in overflow cells was reportedly compromised by missing UHR documentation, including records of MHCB stays, DMH referrals, recent suicide attempts, and RVR evaluations.

Pre-Release Planning

Staff at WSP had an advanced awareness of pre-release issues and concerns and, in some notable cases, made laudatory efforts to contact parole agents and to connect inmates with outside programs and services. Nonetheless, many aspects of the institution's pre-release program needed improvement. Staff continued to report that accurate parole dates were not always timely provided, though access to different sources of parole information had led to recent improvement in this area. Pre-release groups were available for 3CMS and EOP inmates, but turnover among group leaders had significantly disrupted and limited the utility of some of the groups.

Consideration of pre-release issues was part of most IDTT meetings. However, documentation reviewed during the site visit was not sufficiently individualized, consisting of generic, pre-printed categories of concern rather than specifics regarding the inmate in question. Staff reported reduced contact with TCMP social workers during this monitoring period, with some key personnel unaware of their existence. Staff reported having difficulty arranging

conservatorships for inmates because CDCR staff in Kern County did not have standing to initiate these proceedings.

**Kern Valley State Prison (KVSP)**
September 23, 2008 – September 25, 2008

The monitor visited KVSP twice during the reporting period.  During the first visit, nearly all of the time was spent assisting the institution in developing a CAP.  The 31-item CAP, based on the findings set forth in the Special Master's Twentieth Monitoring Report Part A, will serve as the focus for monitoring going forward.  The focus was on discrete program areas.  Other information presented is based on the monitor's review of provided documentation, most of which reflected the status of KVSP's mental health program during the period from October 1, 2007, to May 31, 2008.

Census:

After reopening its doors to MHSDS transfers during this reporting period, KVSP's 3CMS population grew from 472 in October 2007 to 805 on July 7, 2008, an increase of 71 percent in about seven months.  KVSP's rated capacity for 3CMS reportedly increased from 419 to 999 during this period.  As of the beginning of July 2008, there were 14 EOP inmates pending transfer and four inmates in MHCBs.  There were 497 inmates in administrative segregation, which included 173 3CMS inmates and eight EOP inmates.

Staffing:

Mental health staffing at KVSP had not changed appreciably since the last monitoring visit.  As of May 2008, approved allocations remained the same, with a total of 51.54 full-time equivalent positions.  The overall vacancy rate among mental health positions was 18 percent, two percent below the vacancy rate reported in October 2007.

All supervisory positions, including a chief psychiatrist, chief psychologist, senior psychologist, and senior psych tech were filled.  All four staff psychiatrist positions were filled, as were allocated positions for five psych social workers, 10.8 RNs, 5.5 office techs, and an associate health programs advisor.  Seven of 7.6 psych tech positions were filled, as was one of 1.5 SRN II positions.

Unfilled psychologist and recreation therapist positions accounted for nearly all vacancies.  Among psychologists, 5.49 of 9.59 positions were vacant, with contractors reducing the functional vacancy rate to about 44 percent during the reporting period.  All 2.65 recreation therapist positions were vacant.

Case manager caseloads in the mainline 3CMS program ranged from 65 to 136 inmates and averaged 97 inmates among seven assigned clinicians.  Three case managers were assigned to the 3CMS administrative segregation program and carried caseloads of 52, 54, and 62 inmates, respectively.

Quality Management:

KVSP reported that quality management committee and mental health subcommittee meetings regularly occurred.  Meeting minutes were not provided to the monitor. Therefore, meeting attendance and content were not reviewed.

Documentation provided by the institution indicated that KVSP had not chartered, sustained, or completed any QITs during the reporting period.

A provided memorandum indicated that UHR reviews were to be conducted in January, May, and September 2008, and that the results of these reviews would be discussed during peer review sessions in March, July, and November 2008.  Summaries of the results of

the UHR reviews conducted in January and May were provided, but related meeting minutes were not.

Suicide Prevention:

From October 1, 2007, to May 31, 2008, five-day clinical follow-up was ordered for and completed on 218 MHCB discharges, or nearly three quarters of all discharges during that period. Staff reported, and tracking logs confirmed, that compliance with custody checks for inmates released from the MHCB with orders for five-day follow-up monitoring had substantially improved in recent months. Tracking information indicated that documentation of custody checks was submitted for 91 percent of MHCB discharges during the reporting period. Nearly all of the misses occurred during November and December 2007; all paperwork was submitted in April and May 2008.

With regard to requirements associated with the CDCR's suicide reduction plan for administrative segregation, nearly all inmates placed in administrative segregation units during the period from October 1, 2007, to May 31, 2008, were screened with the 31-item questionnaire within 24 hours of placement. All were screened within 72 hours of placement. Information was not provided regarding completion of pre-screens.

The institution was 100-percent compliant with the completion of daily psych tech rounds in units B-1 and B-2 during the period from October 1, 2007, to May 31, 2008. Information regarding compliance with daily rounds in the stand-alone units was not provided. According to provided logs, psych techs distributed games to inmates in all administrative segregation units on a weekly basis.

Logs used to document the completion of 30-minute welfare checks in administrative segregation units indicated that the checks were not conducted at staggered

intervals, as required.  Staff also expressed concern that the current system failed to adequately address situations in which inmates on new-intake status were moved from one cell to another within administrative segregation.  In such cases, it was possible, if not likely, for officers to monitor the cell from which the new-intake inmate was moved.  There had been discussion about following individual inmates instead of cell assignments.

<u>Medication Management</u>:

The institution's audit of 60 UHRs yielded a compliance rate of 90 percent for renewal or discontinuation of medication orders prior to expiration.  An internal audit of 64 UHRs yielded a compliance rate of 97 percent for completion of a progress note when medications were started, changed, and discontinued.  A review of 60 UHRs indicated that 92 percent of newly initiated and changed medications orders were administered to the inmate by the end of the day.  The paperwork associated with these audits did not indicate what percentage of the reviewed cases involved psychotropic medications or psychiatric documentation.

The institution reported that compliance with medication continuity upon discharge from the CTC and upon transfers within the institution was currently not being tracked.

The institution's review of 36 cases indicated that no-shows and refusals were correctly documented on the MAR 92 percent of the time.  Another review of 15 cases yielded a 73-percent compliance rate for timely follow-up of medication noncompliance, defined as missing three consecutive days or half of all doses within a seven-day period.  The paperwork did not indicate what percentage of these cases involved inmates taking psychotropic medications.

The institution reported that 471 inmates were prescribed HS medications. The paperwork did not indicate whether this tally included all medication prescriptions, or just orders for psychotropic medications. KVSP did not appear to have audited administration of HS medications.

The institution reported that 867 inmates were prescribed DOT medications. The paperwork did not indicate whether this tally included all medication prescriptions, or just orders for psychotropic medications. KVSP did not provide information about its compliance with DOT protocols.

KVSP initiated four Keyhea petitions during the period from October 1, 2007, to May 31, 2008. Two of the petitions resulted in Keyhea orders, one was pending an administrative law judge hearing as of the end of May 2008, and one involved an inmate who was transferred to CMC prior to the completion of the Keyhea process. In this latter case, the Keyhea petition was reportedly successfully completed by CMC. Lastly, there was an inmate at KVSP with a current Keyhea order that had been initiated elsewhere.

Transfers:

Access to DMH acute care continued to be slow in many cases. Nearly half of the inmates accepted by DMH were not transferred within ten days of referral, and almost a third were not transferred within 20 days.

KVSP produced 24 acute care DMH referrals from October 1, 2007, to May 31, 2008, an average of three referrals a month. Four referrals were withdrawn by the institution, one was rejected by DMH due to the inmate's proximity to parole, and one referred inmate had been awaiting transfer for 16 days as of the end of May 2008. During this period, 17 inmates were transferred to DMH. The transfer date was not recorded in one case. The delay between

the day the referral was mailed to DMH and the date of transfer exceeded ten days in seven of 16

cases, or 44 percent, and was 20 days or longer in five cases, or 31 percent. The delay between

bed assignment and transfer exceeded 72 hours in three of 16 cases, or 19 percent.

        KVSP did not refer any inmates to DMH intermediate care during the reporting

period.

        KVSP's 22-bed CTC included 12 MHCBs. Access to MHCBs was inadequate, as

demonstrated by KVSP's continued use of alternative holding cells to monitor inmates pending

admission to the CTC. Staff reported during the site visit that KVSP used four housing unit cells

as alternative sites to hold inmates pending admission to the CTC, and acknowledged that

utilization of such areas had recently increased with the influx of EOP/SNY inmates.

        A provided log indicated that alternative cells were used to monitor inmates on 16

occasions during the period from October 1, 2007, to May 31, 2008. The log was incomplete in

that it did not record the date the inmate was released from the alternative cell and/or the location

to which the inmate was released in six cases. Nine of the remaining ten inmates were admitted

to the CTC within a day of their placement in an alternative cell, and one inmate waited two days

to be transferred to the CTC. Staff confirmed that, in most cases, inmates were transferred to the

CTC within a day or two of their placement in an alternative cell. The institution reported that

registry nursing staff provided one-to-one continuous monitoring throughout an inmate's stay in

these areas.

        KVSP generated 299 MHCB admissions during the period from October 1, 2007,

to May 31, 2008, an average of about 37 admissions a month. Clinical length of stay exceeded

ten days in 55 cases, or 18 percent, and 20 days in 23 cases, or 7.6 percent. The delay between

clinical and physical discharge exceeded three days in 26 cases, or 8.7 percent, and pushed the inmate's total length of stay beyond ten days in 18 cases.

A list of EOP inmates who were transferred from KVSP during the reporting period was provided. However, the list did not provide the dates of EOP designation, endorsement, or transfer. Nor was information regarding the number and length of stay of EOP inmates currently housed at KVSP provided. However, staff reported that EOP inmates often waited longer than 60 days to be transferred. This item was included in the draft CAP.

Other Issues:

Administrative Segregation

UHR audits completed by the institution during the reporting period showed improved compliance with weekly case manager contacts, but found poor and declining compliance with other basic Program Guide requirements. In two separate peer review audits, one completed in January 2008 and the second in May 2008, clinicians audited a total of 23 UHR belonging to MHSDS inmates in administrative segregation. Compliance rates for weekly case manager contacts increased from 75 percent in January to 100 percent in May. The average compliance rate for completion of a treatment plan or treatment plan update upon placement in administrative segregation was 71 percent. The compliance rate for quarterly treatment plan updates fell from 75 percent in January to 18 percent in May. Psychiatric attendance at IDTT meetings fell from 90 percent in January to 64 percent in May. Similarly, correctional counselor participation in IDTTs fell from 85 percent in January to 64 percent in May.

KVSP had two stand-alone administrative segregation units, each of which was prohibited by court order from housing MHSDS inmates. Information provided by the institution indicated that, during the period from October 1, 2007, through May 2008, 13

MHSDS inmates were mistakenly placed in the stand-alone units, and that two of these inmates were not identified and removed from the units within 24 hours. In these two cases, the inmates were removed within two and three days, respectively.

MHCB

The data provided by the institution to the monitor did not include information on the completion of initial and follow-up IDTT meetings, daily clinical contacts, or admission and discharge SRACs. It was reported in previous monitoring visits that inmates were placed in five-point restraint and seclusion for prolonged periods of time, which was a deficiency included in the draft CAP. A provided log indicated that five-point restraint was used 13 times during the period from October 1, 2007, to June 11, 2008. The average amount of time in restraint was 4.8 hours, and ranged from .7 to 13.7 hours. A second log indicated that seclusion was used 42 times during the reporting period. The average amount of time in seclusion was 11.3 hours, and ranged from .4 to 65.3 hours. The amount of time in seclusion exceeded 24 hours in four of 42 cases, or 9.5 percent. These data reflected notable improvement in this area.

Staff reported that all inmates admitted to the MHCB, regardless of their presentation and security status, were subjected to administrative segregation-type security protocols. This ongoing deficiency was included in the draft CAP.

3CMS

UHR audits completed by the institution indicated that compliance with basic Program Guide requirements plummeted during the monitoring period, while provided MHTS data showed high aggregate compliance rates. The reason for this discrepancy was unknown. Declining performance indicators, if accurate, were likely related to the recent and substantial expansion of the institution's 3CMS population.

In two separate peer review audits, one completed in January 2008 and the second in May 2008, clinicians audited 95 UHRs of inmates participating in the mainline 3CMS program. Compliance rates for many of the Program Guide requirements associated with new arrivals were well below 90 percent. The audits yielded average compliance rates of 42 percent for completion of initial mental health evaluations within seven days of arrival, 46 percent for completion of SRACs upon arrival, 34 percent for completion of initial treatment plans within 14 working days of arrival, and 36 percent for completion of initial IDTT meetings within 14 working days of arrival.

Compliance with many of the Program Guide requirements related to ongoing care fell dramatically from January to May 2008. For example, compliance rates fell from 57 percent to 44 percent for completion of annual treatment plan updates, from 83 percent to 40 percent for completion of annual IDTT reviews, and from 91 percent to 65 percent for documentation of quarterly case manager contacts. IDTT attendance rates for psychiatrists fell from 87 percent in January to 50 percent in May, and attendance rates for correctional counselors fell from 96 to 65 percent during this period.

In contrast to these audit data, MHTS reports dated May 31, 2008, showed compliance rates of 88 percent for timely completion of quarterly case manager contacts and 91 percent for timely completion of annual IDTT reviews.

Provided data indicated that 80 3CMS inmates were enrolled in ten groups, including anger management, anxiety management, depression, trauma, and grief and loss. UHR audits indicated that documented consideration of group treatment during IDTT reviews fell from 40 percent in January 2008 to 21 percent in May 2008.

<u>Referrals</u>

KVSP responded to fewer than a quarter of routine mental health referrals within five working days, and did not respond to most urgent referrals within 24 hours. A mental health referral compliance report was provided, which indicated that the mental health department received 2,682 referrals from October 1, 2007, to May 31, 2008, of which 31, or one percent, were urgent and 2,651, or 99 percent, were routine. Of these referrals, 631, or 24 percent, were compliant in that they prompted a response within five working days. Response times in excess of 20 days were common. Of the 31 urgent referrals, five, or 16 percent, resulted in contact within 24 hours, and nine prompted contact within 72 hours. The time between referral and contact for the remaining 22 urgent referrals ranged from four to 25 days and averaged eight days.

<u>Heat Plan</u>

Compliance with heat plan protocols was inconsistent at KVSP. Documentation maintained by the institution's litigation coordinator/heat plan coordinator showed that neither exterior nor interior temperatures were consistently logged in May 2008, a month during which exterior temperature exceeded 90 degrees on ten days. Widespread noncompliance prompted immediate intervention, and performance substantially improved during June, July, and August 2008.

However, deficiencies were noted by the monitor in five of eight housing units visited in September 2008, most of which were related to staff's unfamiliarity with heat plan protocols or their failure to follow them. Interior temperature was not logged as required in three of eight housing units, including a converted gym that reported temperatures in excess of 90 degrees during two days in July 2008.

Updated lists of inmates taking heat-sensitive medications were attached to the daily movement sheet, which was circulated throughout the prison on a daily basis. However, housing officers in five of eight visited housing units did not know this and, when asked to provide current lists of inmates taking heat-sensitive medications, produced reports that were several weeks old.

Wall-mounted thermometers in converted gyms under-reported temperature by five to ten degrees Fahrenheit as compared to the monitor's calibrated, handheld thermometer. Temperatures recorded in housing unit dayrooms were one to three degrees lower than the temperature in second-tier cells, as indicated by the monitor's thermometer.

Pharmacy staff reported that a list of inmates taking heat-sensitive medications was circulated to custody supervisors on a weekly basis. However, the weekly report listed inmates alphabetically, making it difficult and time-consuming to identify all inmates taking heat-sensitive medications in a single housing unit. The monitor recommended that pharmacy staff utilize the new Maxor pharmacy management information system, expected to be launched at the end of September 2008, to produce weekly heat lists organized by housing unit.

KVSP's inconsistent compliance with heat plan protocols will be addressed in a new CAP item.

New Level IV EOP/SNY Program

KVSP's 96-bed Level IV EOP/SNY program was activated on August 20, 2008. It had a census of 67 inmates as of September 25, 2008. Staff expected to continue to receive EOP inmates at a rate of 15 a week, and anticipated reaching full capacity by mid-October 2008.

The staffing package for the new program included full-time positions for a senior psychologist, a supervising psych social worker, two psychologists, two social workers, one

recreation therapist, and two psych techs.  Notably, the staffing package did not include an

allocation for a psychiatrist, a concerning deficiency that needed to be corrected.

As of September 25, 2008, none of the positions in the staffing package had been

filled.  KVSP was using a combination of contractors and clinicians borrowed from other CDCR

prisons to temporarily fill positions.  The program was supervised by a senior social worker on

loan from CSP/Corcoran.  Borrowed clinicians were due to return to their respective prisons at

the end of October 2008, raising concerns about KVSP's ability to introduce comprehensive

EOP services in a program that was only weeks away from reaching full capacity.

The new program, only a month old and largely focused on processing and

orienting large numbers of new arrivals, did not yet offer a full array of EOP services.  EOP

inmates were seen weekly by their case managers.  Individual contacts occurred on the dayroom

floor of the housing unit for orientation-status inmates and in the mental health program offices

for all other inmates.  Psych techs and a recreation therapist provided a total of four groups, and

expected to add two more groups during the last week of September 2008.  Groups occurred in

the mental health program building, which afforded adequate clinical space.  Future plans

included limiting group sessions to ten inmates and increasing the number of clinician-run

groups.

IDTT meetings occurred on the EOP dayroom floor, an area that was not

clinically appropriate for this purpose.  Work opportunities for EOP inmates were limited to

porter jobs in the EOP building.  Involvement of EOP inmates in education had not been

clarified at the time of the visit.  At the time of the visit, SNY EOP inmates commingled with

non-EOP SNY inmates on the yard, a deficiency that staff hoped to remedy with the

development of a new yard schedule.  The facility had developed an LOP for the Level IV SNY

EOP, and planned to circulate in late September 2008 an addendum that addressed additional issues that had emerged following activation of the program. Supervisory staff reported that specialized training was provided to officers assigned to the new EOP unit.

**North Kern State Prison (NKSP**)
September 23, 2008 – September 25, 2008

Census:

The institutional census for September 23, 2008, was 5,459 inmates. There were 4,417 reception center inmates, including 48 EOP and 790 3CMS inmates housed in the reception center. There were 171 inmates in administrative segregation, including nine EOP and 42 3CMS inmates. Nine inmates were in MHCBs.

Staffing:

Staffing issues at NKSP remained virtually unchanged over the monitoring period, except in the area of staff psychologists. The actual clinical vacancy rate was 26 percent, but the functional vacancy rate, including contractor usage, was 16 percent.

The chief psychologist, the senior psychiatrist, and the three senior psychologist positions were filled. Of the 7.5 allocated psychiatrist positions, 6.5 were filled, with the remaining position filled by a contractor. The vacancy rate among psychologist positions continued to be problematic, with 17 of 39 positions vacant and ten positions filled by contractors. All six psychiatric social worker positions were filled, and 5.75 of the allocated 7.25 allocated psych tech positions were filled. Two of the 2.2 recreation therapist positions were filled, as was a health program specialist position. The supervising RN II position was filled, as was the OSS II position. Two of the three allocated psychometrist positions were filled, and the one health program specialist position was filled.

<u>Quality Management</u>:

Staff routinely audited many aspects of compliance with the Program Guide and did an excellent job of monitoring operations. The mental health subcommittee met regularly, reviewed results of audits, chartered QITs, and reported its findings. Goals and methods appropriately addressed institutional priorities and departmental directives. Psychologists and social workers engaged in combined case manager peer review and psychiatry also conducted peer review; however, the comprehensiveness of the reviews was not assessed during the visit.

<u>Suicide Prevention</u>:

The SPC met regularly and reviewed audit results of numerous suicide prevention practices, including MHCB utilization and operations, access to DMH, reliance on overflow areas for inmates awaiting access to higher levels of care, and completion of five-day follow-up of inmates who exhibited elevated levels of risk. Records were well organized and appeared to be complete.

Ten retrofitted cells were available for new admissions to administrative segregation, although these did not meet the demand. Cells of new-intake inmates who were not placed in a retrofitted cell were identified by paper affixed to the doors. The institution was compliant with 30-minute welfare checks for 21 days post-admission, daily rounding by psych techs, and hourly checks for five-days after release from suicide watch in crisis bed. All inmates newly admitted to administrative segregation received the 31-question screenings in confidential settings. Staff reported very few refusals. Institutional procedures required that inmate profiles be obtained by psych techs within 24 hours of admission to administrative segregation and be reviewed by the senior psychologist within 72 hours. NKSP was compliant with pre-admission screenings. Monthly emergency response drills were conducted in administrative segregation.

There were no electrical outlets in the administrative segregation unit, but a television was provided in the common area and was visible to most inmates through their cell windows. Although inmates were offered ten hours of yard time per week, group therapy sessions sometimes conflicted with yard time. Twenty small management yards were approved and planned for construction. Although no standardized assessment of receipt of bad news by inmates was provided, psych techs reportedly knew when inmates went to court or received mail from home and proactively discussed these events with inmates.

Medication Management:

The new Maxor pharmacy management information system was scheduled to be rolled out at NKSP in October 2008. An active QIT was dedicated to medication management, and many aspects were routinely audited. Multidisciplinary collaboration was apparent, with medication management issues included on weekly meetings chaired by the warden. Psychiatrists audited informed consents, labs, and the use of polypharmacy in mental health treatment, and evaluated newly arriving inmates who self-reported medication needs or were urgent referrals.

Staff audits indicated a compliance rate of 86 percent for administering medication to newly arriving inmates with current medication orders. Staff reported medication continuity for intra-institutional transfers, but psychiatric response to medication noncompliance was only partially compliant.

Staff audits indicated that improvement was needed in obtaining informed consents and in the monitoring of mood stabilizers through laboratory tests. Informed consent for psychotropic medication was present in 74 percent of the cases sampled, and the institution was only partially compliant with notifying psychiatrists of laboratory results.

255

NKSP maintained a list of inmates with DOT orders and followed up instances of medication noncompliance with current Keyhea orders. For the period of January through August 2008, there were 19 inmates who had Keyhea orders or for whom petitions were initiated.

The institution reported that documentation was filed in the correct place only 24 percent of the time. This issue was addressed with the medical records supervisor and audited on a monthly basis, with the results presented to the mental health quality management committee.

The institution remained only partially compliant regarding medical records. Audits showed that UHRs were available to clinicians 70 percent of the time. Despite the introduction of carts to increase accessibility to records, mental health continued to produce approximately 2.8 inches of loose filing daily.

NKSP maintained a list of inmates with DOT orders and swiftly followed up instances of medication noncompliance by inmates with current Keyhea orders. NKSP initiated Keyhea petitions and sought renewals. Records of Keyhea orders were well organized and recorded the status, tickler dates, and hearing outcomes of cases of pending or current orders. Records spanning January through August 2008 reflected a total of 19 inmates who had current Keyhea orders or for whom petitions were initiated.

Sexual Misconduct:

NKSP remained partially compliant for sexual misconduct protocols. There were 18 sexual misconduct screens during the reporting period. Six received comprehensive evaluations, and two received a clinical diagnosis of Exhibitionism. One inmate was transferred to CSP/Corcoran, and one was transferred CCI Level II. There was a third inmate diagnosed with Exhibitionism during the previous monitoring report who remained in administrative

segregation with a SHU term awaiting transfer to CSP/Corcoran. The institution did not fully implement protocols until March 2008.

One case reviewed by the monitor's expert failed to provide an adequate account of the inmate's mental status at the time of the offense. The hearing officer considered the perfunctory mental health input and imposed sanctions with no mitigation.

Transfers:

Access to higher levels of care from MHCBs was problematic. On the day of the monitor's visit, there were four inmates in the MHCB awaiting transfer to DMH. The lengths of time between admission to the MHCB and DMH referral for the four inmates were one, 12, 14, and 21 days, respectively. Three inmates were accepted by DMH. The average time between referral and acceptance was seven days. All three inmates were waiting for transfer, with waits of three, ten, and 21 days, respectively. Between December 2007 and May 2008, 18 inmates were transferred to DMH. The average length of stay in the MHCB for these inmates was 32.8 days. The institution remained partially compliant due to stays in the MHCB exceeding ten days.

The continued use of holding cells pending transfers was problematic from both custody and clinical perspectives. Pursuant to the LOP, short-term placement was limited to 72 hours with the exception of inmates pending transfer to crisis beds or DMH. The physical set-up was inadequate and unsafe for potentially high-risk inmates. Observation by custody and nursing was minimal, with compromised privacy and confidentiality of clinical contacts.

From December 2007 through August 2008, 727 inmates were placed in temporary holding cells, with an average length of stay of 2.1 days. The extent and outcome of referrals from temporary holding cells to an MHCB or DMH could not be determined due to the

lack of audits and logs.  Clinical services in the holding cells included nursing rounds on each watch, history and physical examination on psychiatric order, suicide risk assessments within 24 hours of placement, daily IDTT and clinician contact, medication administration, and implementation of suicide watch and suicide precaution measures.  Restraints were not implemented in the holding cells.  Inmates were discharged from the holding cells with five-day follow-up unless clinically indicated otherwise.

During the monitoring period, there were 220 MHCB admissions, with an average length of stay of 14.11 days.  There were 11 inmates held for an additional 24 hours after discharge due to transfer or housing issues.

Transfers out of the reception center remained noncompliant.  On the date of the visit, 24, or 44 percent, of the 54 EOP inmates had been awaiting transfer longer than 60 days. The average length of stay for inmates transferred during the monitoring period was 99 days, with a range of 15 to 148 days.  Transfer delays were attributed to a lack of EOP beds, particularly for Level IV and SNY inmates, and other barriers such as RVRs, medical holds, and out-to-court status.

NKSP was noncompliant for 3CMS inmate transfers out of the reception center. Current data showed that 157 of 798, or 20 percent, had stays exceeding 90 days.  There was no expedited transfer. NKSP did not institute a tracking system or consider a priority status over non-MHSDS inmates to ensure that all 3CMS inmates were transferred out of reception center within the established timeframe.

Other Issues:

Reception Center

Per institutional report, approximately 500 inmates were received at the NKSP

reception center per week.  Initial screening was conducted by nursing staff, who utilized the approved CDCR form that included eight questions concerning mental health status, including a question regarding "bad news."  Simultaneous interviews were conducted in one office by two nurses whose desks were separated by a short office module that did not provide full confidentiality.  Unique to NKSP, inmates whose records from county jails or comments in interviews indicated a history of use or need of psychotropic medications received same-day interviews with a staff psychiatrist, who might issue new prescriptions.  Individuals who expressed other mental health concerns not related to medications, or whose suicide risk profiles indicated a history of suicide attempts, were interviewed by a staff psychologist for possible need of crisis care.  These clinical interviews were conducted in a separate office from nursing staff, but could involve two different inmates at the same time, thus full confidentiality was not provided.

On the day of the monitor's visit, there were 48 EOP inmates housed in the reception center.  The program was staffed by one psychiatrist, four psychologists, 2.5 psych techs, one social worker, one recreation therapist, three designated custody officers, and one senior psychologist who provided oversight.

Case manager contacts and IDTT meetings were held in a private office.  Group therapies were held in dayrooms or the chapel when available, but lack of privacy on the dayroom floor led to inmate refusals.  EOP inmates co-existed with 3CMS and non-MHSDS inmates, which limited inmate privacy and confidentiality.

The EOP reception center program included weekly case manager contacts, biweekly recreation and pre-release groups, monthly IDTT reviews, art therapy, psychiatry contacts, daily psych tech rounds, and five hours per week of out-of-cell therapeutic activities.

Groups included anger management, substance abuse, orientation to prison, thoughts and feelings, affect management, symptom management, and other recreation and art therapy groups. However, the lack of treatment and individual office space, as well as safety and security issues, adversely affected the institution's ability to deliver adequate individual and group therapies as described above.

The institution was compliant with weekly case manager contacts. However, overall treatment for EOP inmates awaiting transfer was inadequate. NKSP provided a number of training sessions for EOP clinical staff related to re-entry planning.

There were approximately 798 3CMS inmates in reception center at the time of the monitor's visit. Clinicians were assigned to each building, performing a variety of tasks including diagnostic workup, on-call coverage, initial evaluation, regular follow-up contacts, group therapy, and other court-mandated evaluations. The staffing ratio was adequate to provide mental health services to 3CMS inmates during their stay in reception center.

Group therapies were available twice a week and focused on such topics as coping with mental illness, adjustment to prison and reception center setting, medication management, and pre-release issues. However, the delivery of individual and group therapies was often negatively impacted by the lack of treatment space and lockdowns. It was reported that custody captains and clinicians were instructed by the warden to continue to complete all mental health appointments as scheduled during lockdowns. Mental health ducats were treated as priority ducats. No institution audit data were available to measure program compliance.

<u>Administrative Segregation</u>

At the time of the monitor's visit, there were 171 inmates in administrative segregation, including 36 3CMS inmates and five EOP inmates, virtually unchanged from the

preceding monitoring period.  The overflow unit, implemented in February 2008, housed six 3CMS and three EOP inmates.  One EOP inmate had been waiting for transfer for 266 days, but excluding that outlier, the average time for transfer was 62 days.

There were two case managers assigned to the administrative segregation unit who provided weekly individual out-of-cell clinical contacts to all MHSDS inmates.  Group therapy was available for all EOP inmates and was provided in an office where three therapeutic modules were placed.  There was additional space on the dayroom floor with portable walls and holding cells available for groups, but this was rarely used.

IDTT meetings attended by the monitor demonstrated good interaction by all participants, were conducted in a private office, afforded adequate confidentiality, and had both C-files and UHRs available for review.  Issues regarding ongoing retention in the unit were discussed.

MHCB

NKSP maintained a ten-bed MHCB program within the CTC.  On the day of the monitor's visit, there were nine inmates in the MHCB, with four waiting for transfer to DMH. Staffing consisted of one psychiatrist, 1.5 psychologists, one recreation therapist who also functioned as the Keyhea coordinator, and nursing staff.

Generally, IDTT meetings were held twice per week at a minimum.  Daily rounds by a psychiatrist or psychologist were occurring, including weekends and holidays, with good documentation in the chart.  The monitor's expert attended an IDTT meeting and found that it was well structured and organized with input from all disciplines in attendance.  C-file information was not shared by either clinical or custody staff during the meeting, and this resulted in a lack of custody participation and partial compliance.

3CMS

There were 89 inmates at the 3CMS level of care at NKSP.  There was one case manager who provided individual contacts, group therapy, and crisis intervention.  There were no inmates on the waiting list for group therapy.  Institutional audits indicated 100-percent compliance with case manager contacts.  Timely intake assessments and IDTT meetings showed 100-percent compliance in all areas.  However, the adequacy of the IDTT treatment plans was not assessed during the visit, and the institution remained partially compliant regarding this issue.

Medical Records/MHTS

Staff audits found that the concordance rate between MHTS records of contacts and UHR entries was 90 percent or better, with the exception of group treatment.  Although staff that provided group treatment to EOP inmates in the reception center went to great lengths to compile precise records of inmate participation in group treatment, concordance between those two sources of information was found to range from 74 to 80 percent during the monitoring period.

Space

Availability of adequate office and treatment space was a severe problem at NKSP.  Inmates awaiting SNY placement were housed in building D-4.  Some MHSDS inmates were placed within dormitories on C yard, although no MHSDS inmates were retained in the converted gymnasiums.  Two offices in the reception center were designated for EOP treatment on B and D yards and used for single therapy and IDTT sessions.  One office in mainline was designated for mental health treatment and was also used for individual therapy.  Inmates were usually seen within their housing units by clinical staff, utilizing custody and counseling offices

to afford confidentiality.  One office in administrative segregation was used for group therapy, with three individual treatment modules utilized for the three-person groups.  The chapels in B and D facilities were utilized for EOP group therapy, a change from the preceding monitoring period, in which groups were conducted on the floor of the common area within the housing unit. Inmate interviews were primarily conducted in housing units, utilizing custody office space set aside for this purpose and providing adequate confidentiality.

An area previously used for visiting at NKSP was converted to office space for 18 mental health staff, with nine desks situated adjacent to each other on two long corridors.  The chief psychologist had an office in the mental health administration building, where two large rooms were provided for the 6.5 psychiatrist desks.

The institution reported that representatives from the <u>Plata</u> receiver's office had conducted a preliminary site review at NKSP for planning for additional clinical space. However, initial plans had yet to be completed.  Additionally, modular office space was requested for two office buildings, but had yet to be approved.

**California State Prison, Los Angeles County (CSP/LAC)**
April 7, 2008 – April 10, 2008

<u>Census</u>:

On April 1, 2008, CSP/LAC housed 5,033 inmates in a prison with a capacity of 4,440 inmates.  There were 1,392 inmates on the mental health caseload, or 27 percent of the total population.  The caseload population included 233 mainline EOP and 226 mainline 3CMS inmates, 176 reception center EOP inmates, 508 reception center 3CMS inmates, and two inmates in MHCBs.  Two hundred forty-seven out of 336, or 73 percent of the administrative segregation population, consisted of mental health caseload inmates.  There were 70 EOP

inmates and 177 3CMS inmates housed in administrative segregation at the time of the monitor's visit.

Staffing:

According to data for the month of October 2008 posted on the CDCR Secured FTP Website for Monthly Reports, the institution's chief psychiatrist and senior psychiatrist positions were vacant. Its chief psychologist position was filled. Of its 6.5 senior psychologist positions, only .5 was vacant, for a vacancy rate of seven percent.

Two and a half of the institution's ten positions for line psychiatrists were vacant, but use of .93 contractors reduced the functional vacancy rate to 16 percent. Coverage was not as good for line psychologists, with 13.3 of its 40.3 allocations unfilled. With use of 3.27 full-time equivalent contractors, the functional vacancy rate was 26 percent.

Use of two full-time equivalent social workers caused all nine social work positions to be fully covered. Seven of the 27 psych tech positions were vacant, with no coverage by contractors. The vacancy rate was 26 percent.

Five of the institution's 7.15 recreation therapist positions were filled, for a vacancy rate of 30 percent.

Quality Management:

The quality management program at CSP/LAC remained relatively unchanged. The mental health quality management committee meetings were held weekly. Quality improvement was a key focal point, as well as implementation and staff training on the new Program Guide. The meetings were well attended by the necessary clinical staff, although custody staff did not regularly attend.

264

The committee maintained a reasonable agenda, with an appropriate focus on clinical operations in various programs, support services, and CAP activities. Suicide prevention activities were considered on a monthly basis via a report from the SPC.

There were only two active QITs at the time of the monitor's visit, both of which were mandated by CDCR headquarters. The MHTS QIT was functionally impotent due to the lack of technical support and significant limitations inherent with the MHTS. The administrative segregation EOP QIT was also problematic in that the co-chairs seemed uncertain of its purpose and did not appear to have clarity regarding the goals for the QIT or how to measure achievement of those goals and conclude the QIT. Consequently, the QIT functioned more as a supervisory tool than a true QIT.

CSP/LAC completed three QITs and issued their final recommendations during February 2008, for DMH issues, suicide prevention, and management of medication delivery following housing transfers.

Peer review at CSP/LAC improved in form but remained unchanged in quality. While psychiatrists, psychologists, and social workers met regularly, the review continued to consist of presence or absence of criteria rather than qualitative review.

Suicide Prevention:

SPC meeting attendance of custody staff and psych techs remained problematic. The committee met regularly, and agenda items included review of prevention efforts, MHCB statistical reviews, training issues, and five-day suicide step-down updates.

Post-MHCB discharge five-day follow-up was compliant during the monitoring period.

The institutional ERRC met at least monthly during the review period.  CPR training was provided to all CSP/LAC correctional staff and all CTC credentialed clinical staff.  Further, the mental health department implemented CPR training of all clinical staff as an annual requirement.  Emergency response drills were performed monthly in administrative segregation.

The administrative segregation suicide reduction plan implementation was noncompliant.  The renovation of intake cells was completed during this monitoring period.  Electricity was not available in the cells.

Welfare checks were not completed as required, and documentation was poor.  Suicide profiles could not be generated due to information technology limitations.

CPR training was completed, and there were cut-down tools on each housing unit.  Emergency response drills occurred monthly.

Medication Management:

Medication management remained troubled at CSP/LAC.  Methodological issues plagued audits of laboratory testing for mood-stabilizing medications, medication expiration, medication noncompliance, parole medications, and informed consent.  Additionally, CSP/LAC did not provide audits regarding DOT, pill lines, or HS medications.  Tracking of Keyhea inmates was problematic.

Medication continuity for newly arriving inmates improved, with data revealing that 100 percent of newly admitted inmates received their medication within 24 hours of arrival.  Problems continued, however, with intra-institutional transfers that resulted in a revision of the relevant LOP and staff training.

CSP/LAC remained noncompliant regarding laboratory monitoring for mood-stabilizing medications.  Limited data revealed blood levels not being ordered, and for those

ordered, failure to document discussion of the results with inmates.  Further, it was not uncommon for ordered laboratory tests not to be drawn.

A limited UHR sample revealed continued problems with MAR documentation, with a random sample revealing that about three to five MAR entries per two to three months were blank.

DOT remained noncompliant, and clinical staff reported problems related to inmate medication hoarding.  CSP/LAC continued to not utilize a centralized list of inmates on DOT, and the total number of inmates on DOT was unknown.  All Keyhea inmates were prescribed medications via DOT.

During the monitor's visit, there were 22 inmates with current Keyhea orders; two inmates had pending Keyhea orders.  The number of inmates with Keyhea orders over the course of the monitoring period was unknown due to the lack of tracking.

Lockdowns did not affect medication administration during the monitoring period.

Sexual Misconduct:

CSP/LAC improved, but continued to struggle with implementation of screening and evaluation for Exhibitionism.  During the monitoring period, there were 22 RVRs written for indecent exposure, involving nine EOP inmates, 11 3CMS inmates, and two non-caseload inmates.  All were screened for Exhibitionism and need for treatment.  None were referred for comprehensive evaluations.  All inmates were reviewed by IDTT, regardless of the outcome of the screen.

Screens were not completed timely due to a delay in receiving the mental health assessment request from custody staff.  Further, screens were problematic due to cell-front

completion, and focused on the presence of major mental illness rather than Exhibitionism. Documentation of the screens revealed no review of prior offenses or any evaluation of the inmate's thoughts, fantasies, etc. related to the offense. Decisions to refer were based predominantly on the frequency of behavior.

IDTT documentation was poor, and treatment plans for the eight referred inmates did not indicate Exhibitionism as a diagnosis. Security measures were utilized, including special jumpsuits and window coverings. However, there was no clinical intervention while inmates awaited transfer to the treatment program. There was no treatment for sexual misconduct at CSP/LAC.

Referral, endorsement, and transfer to treatment programs were extremely problematic. Only one inmate transferred to a treatment program during the monitoring period. Twelve inmates were awaiting transfer to a treatment program. However, due to confusion by CSP/LAC classification staff, they were never referred for endorsement to an appropriate program.

Seventeen sexual misconduct RVRs were referred to the DA.

Transfers:

The long-standing problems with DMH acute care tracking remained unchanged. Further, CSP/LAC's referrals to DMH remained sluggish, with only five referrals to the DMH acute care program. There were no rejections and two rescissions. Time from MHCB admission to clinician referral took an average of five days, and completion and submission of the referral packet averaged two days. It took one day to receive an acceptance, and inmates were transferred within 72 hours. The average transfer time from referral to transport increased from approximately 20 days to 64 days during this period.

Intermediate care referral tracking improved.  However, chronic-symptom patients continued to linger in MHCBs for long periods prior to transfer.  Delays were often the result of case managers not appropriately arranging Vitek hearings, the lack of a mechanism to identify referrals with missing information, and the evident lack of urgency noted in the handling of movement of DMH-referred inmates.

CSP/LAC referred nine inmates for intermediate care at SVPP.  Packet completion significantly improved to an average of 16 days.  Five inmates were accepted, and four inmates were awaiting a decision.  From referral to assignment of a bed number took 77 days, and inmates were transferred within 72 hours of bed assignment.  The inmates awaiting a decision had been waiting an average of 30 days.  There were no rejections.

The small number of available MHCBs and the small number of admissions to MHCBs from the TTA located outside of the CTC were concerning in the context of the multiple missions at CSP/LAC.  Further, there was a clear reporting problem of bed availability from CSP/LAC to population management, with no admissions from outside facilities and two empty beds throughout the monitor's visit.

From November 2007 through March 2008, medical patients occupied an average of four of the nine designated MHCBs per month, leaving CSP/LAC with only five beds for inmates requiring mental health treatment.  The average daily census in the MHCBs during this review period was only five inmates.

From January 2008 through March 2008, 89 inmates visited the TTA but were subsequently not admitted to the MHCB after evaluation.  Forty-six percent of these inmates were placed in holding tanks while awaiting evaluation.  Eleven percent had three or more visits to the TTA that did not result in admission to the MHCB.

The holding tank log was poorly maintained, although it demonstrated extensive lengths of stay. Approximately seven to 14 inmates per week were admitted to the TTA holding tank after hours and remained overnight.

Inmates retained in the TTA holding tank were monitored on a one-to-one basis by staff for suicide watch or precaution. It was unclear whether inmates were provided with a mattress, blanket, or smock when retained in the tanks for extended time periods. CSP/LAC was not compliant with its local policy for inmates to be seen by a clinician within 24 hours of discharge from the holding tank if not admitted to the MHCB.

There were only 46 MHCB admissions, or an average of nine per month, during this monitoring period, and eight inmates in the MHCB at the time of the monitor's visit. The average length of stay was 7.46 clinical days and one to two administrative days. Fifteen percent had lengths of stay over ten days. Documentation was maintained for cases of extended stays. There were two inmates with three admissions each during this monitoring period.

Treatment plans for two inmates in MHCBs awaiting transfer to DMH were problematic with respect to clinical relevance, as they merely consisted of "transfer to DMH." Discharge planning was not evident for the inmate paroling in three weeks.

Restraints were utilized only once during the review period. However, the restraint log indicted that the inmate was restrained for nine hours without a renewal order by a psychiatrist.

CSP/LAC referred 31 inmates to PSU. Endorsements were swift, with an average of four days from referral to endorsement. However, it took an average of 97 days to transfer once endorsed. Delays were largely attributed the short amount of time to the minimum eligible release date or parole dates. Seven inmates transferred to PSUs during this period.

Reception center EOP inmates continued to linger unendorsed for transfer far beyond Program Guide timeframe requirements.  Thirty-six percent of the reception center EOP inmates had been awaiting transfer for more than 60 days, 11 percent had been waiting more than 150 days, eight inmates were waiting over 200 days, and three inmates were waiting over 300 days.  Only five percent of the reception center EOP population was currently endorsed for transfer, and 47 percent of the population paroled or discharged out of CSP/LAC prior to transfer during this review period.  The average length of stay prior to release to the community was 91 days.  Endorsements of reception center EOP inmates virtually ceased during the monitoring period, predominantly due to institutional delays.  The monitor requested a report for the next review period of all unendorsed reception center EOP inmates with lengths of stay over 60 days, detailing the reasons for the delays.

Similarly, only 68 percent of reception center 3CMS inmates transferred within Program Guide timeframe requirements.  Fifty-seven percent of the 3CMS population paroled or discharged to the community prior to transfer during this review period.  The average length of stay prior to release to the community was 86 days.

<u>Other Issues</u>:

<u>Reception Center</u>

Reception center processing at CSP/LAC continued to operate fairly well during the monitoring period.  Bus screens were completed timely and adequately.  Initial mental health screens and CDCR 7836s were completed timely as well.  However, there problems with confidentiality due to a lack of visual and auditory privacy.

While working relations between nursing and mental health were reportedly excellent, during the screening process, mental health staff were not routinely provided with

relevant clinical information, such as inmates' current psychotropic medications, which accompanies inmates from the county jail.

Inmates identified during the screening process as EOP were not always entered into the MHSDS and were consequently left off of the caseload for periods of time.

Adequate programming for reception center EOP inmates proved challenging during this monitoring period due to significant space deficiencies. Clinical case managers met with inmates weekly. However, due to the loss of office space, confidentiality was problematic. Initial and subsequent IDTT meetings were compliant.

Reception center EOP inmates were offered a minimum of five hours of group therapy weekly. Limited data revealed that they actually received an average of seven hours.

Pre-release planning was attempted at CSP/LAC, but was not adequate. Staff had not yet received re-entry training, and inmates were not provided with assistance in applying for benefits in any consistent manner. A social worker provided pre-release planning support for those who were able to attend her group. Due to the population demands at CSP/LAC, there was a clear need for more resources for pre-release planning, including additional staff dedicated to that function.

The housing of transitional program unit inmates with reception center EOP inmates was problematic, as EOP inmates needed to be locked in when transitional program unit inmates were programming.

Administrative Segregation

Space continued to present major challenges in administrative segregation also. Pre-placement screenings and 31-question screens were completed, but they were routinely done

at cell-front.  Daily meetings occurred between clinical and custody staff Monday through Friday.

CSP/LAC was noncompliant with reviews for inmates whose lengths of stay exceeded 90 days.  At the time of the monitor's visit, 63 percent of the EOP population and 70 percent of the 3CMS population had lengths of stay in excess of 90 days.

Daily psych tech rounds remained problematic, and weekly summaries were rarely completed.  Overall, psych tech documentation was limited and of poor quality.

CSP/LAC was noncompliant with timely completion of initial and subsequent IDTT meetings.  Further, treatment plans were often generic and not individualized to the inmate.  Necessary disciplines attended IDTT meetings as required, and observed meetings were clinically meaningful.

Documentation of weekly clinical contacts was problematic, and at least 75 percent of clinical contacts with 3CMS inmates occurred cell-front due to the lack of confidential treatment space.

CSP/LAC offered an average of 12.5 hours of group therapy per week to EOP inmates in administrative segregation, with an average of seven hours utilized.  However, the nature and duration of groups were troublesome.  Inmates were scheduled for one four-hour block group per week, and many inmates left the modules prior to their completion.  Moreover, staff described group setting as often chaotic, with staff entering and exiting throughout the group and engaging in conversation.  Television was a primary focus of many groups, with reportedly informal and unsupervised discussion among inmates.

CSP/LAC implemented a behavior modification program in administrative segregation during the monitoring period.  It required automatic removal from all group therapy

for two weeks due to disrespect of staff. The inmate must remain discipline free and incident free during the two weeks to return to group. None of this was documented in a treatment plan. There was no functional analysis of the inmate's behavior to be modified, nor was there an intervention plan that included reinforcing desired behavior as typical behavior modification programs provide. It instead appeared quite punitive. This institution's behavior modification program was troubling in several aspects, causing the monitor's expert to express concerns to the mental health staff, and calling for a closer examination of this program in the upcoming twenty-second monitoring period.

CSP/LAC remained unable to satisfy the ten-hour yard time requirement for inmates housed in administrative segregation.

EOP

In the EOP, CSP/LAC satisfied weekly clinical contact requirements, although they were consistently in non-confidential settings. All psychiatric contacts reportedly occurred in the dayroom.

IDTT timelines were met, although treatment plan goals and clinical interventions were vague and inconsistent with previous treatment plans. Many of the diagnoses given by various clinicians contradicted one another, and some inmates had had "rule out" or "not otherwise specified diagnoses" for months to years.

While observed IDTT meetings reflected a considerably higher level of individualization than was captured in the treatment plans, the use of an outdated *DSM* seemed to reflect the lack of emphasis on specific diagnoses.

CSP/LAC remained partially compliant with offering ten hours of out-of-cell structured therapeutic activity weekly, but had not yet developed a system that could withstand the disruptions inherent in the prison setting.

Referrals

While tracking and logging improved, mental health referral follow-up remained noncompliant.  Urgent and emergency referrals were not documented, and routine referrals took seven working days instead of five working days as required.

Medical Records/MHTS

UHR filing was up to date; however, organization remained very problematic. Access to UHRs improved, but remained intermittently problematic related to competing appointments.

Significant problems remain with the MHTS with regard to accessing reports, suicide history screens, and inmate profile screens.

RVRs

During the monitoring period, CSP/LAC issued 226 RVRs to 111 EOP inmates, 114 3CMS inmates, and one MHCB inmate.  Mental health assessments were completed for all of the EOP and MHCB inmates, and for 34 of the 3CMS inmates.  Clinicians continued to provide appropriate input, but there was very little indication that the recommendations were taken into account, apart from boilerplate language that the clinician's input was considered.

## California Correctional Institute (CCI)
August 12, 2008 – August 14, 2008

Census:

On July 2, 2008, the inmate census was 5,424.  At the time of the monitor's visit, the EOP population stood at 107 and the 3CMS population was 1,375.  From January 2, 2008, through August 6, 2008, the mental health population ranged from 1,220 to 1,524.

There had been a mission change since the preceding reporting period, with the Level II inmate population replaced by Level II SNY inmates.

Staffing:

The vacancy rate among mental health clinicians remained high at 42 percent. There was no change from the preceding monitoring period in the vacancy rate among psychiatrists, with 5.5 of 8.5 allocated positions, or 65 percent, vacant.  Of the 35 allocated psychologist positions, there were 14 vacancies, which were covered by contractors and staff who worked more than full-time.  With 21 filled psychologist positions, additional positions assigned to state employees, and coverage provided by contractors, CCI operated with slightly more clinical staff than allocated.  All three social worker positions were filled.

Five of 17 allocated psych tech positions were vacant as were all three recreation therapist positions.

Quality Management:

The mental health subcommittee met biweekly during the monitoring period and regularly reviewed and discussed all CAP items.  There were four active QITs, which focused on EOP transfers, laboratory testing, psychiatric follow-up, and medication monitoring.  Action items were identified and followed though towards resolution.

276

Psychiatry peer review met quarterly.  Psychology peer review met monthly and reportedly varied its agenda to conduct chart reviews, review difficult cases, and conduct training as needed.  Both committees appeared to limit their review to records only.

Suicide Prevention:

CCI's SPRFIT met monthly during the reporting period.  Minutes documented that attendance by custody staff, nursing, psychiatrist, and the chief psychiatrist was inconsistent, and that the absence of these members frequently thwarted the efforts of the SPRFIT.

Topics of review included suicide attempts, suicidal gestures, self-injurious behavior, five-day follow-up, psychiatric follow-up, 15-minute welfare checks, and timely discharge from the OHU.

In administrative segregation, documentation of 30-minute welfare checks was questionable, and tracking sheets were often not signed by a supervisor.  Intake cells were designated, and retrofitting was complete in some areas and ongoing in other areas.  It was unclear if psych techs referenced suicide profiles when screening non-caseload inmates, as no data were available.  Mental health staff and custody met each morning to review concerns and new arrivals.  Staff had implemented the "bad news" screening form.

Medication Management:

CCI's history of problems in the various areas of medication management continued into the twenty-first monitoring period.  A number of QITs were active at the time of the monitor's visit.  Audits regarding continuity of medication were sporadic and often of insufficient or unknown sample size.  Problems with audits conducted by nursing staff were especially apparent within the various areas of medication management and completion of

relevant laboratory studies.  Intervention by mental health staff to provide support in many of these audits had been initiated.

During the reporting period, less than 50 percent of inmates who transferred into or within the prison received medication within 24 hours, with the average delay being 2.5 days. However, based on recommendations from the quality management committee, medication continuity for intra-institutional transfers improved to the range of 72 percent to 100 percent across the various yards.  Continuity of medications for inmates released from the OHU also showed improvement.  Uncertainty regarding the methodology utilized in the audits made interpretation of the results difficult.

Available data suggested that psychiatric medications were renewed prior to expiration.  HS medications were generally administered after 8:00 p.m.  Inmates typically waited less than 20 minutes in pill lines.

Problems appeared to exist with the consistency in referrals for medication noncompliance and in the delivery of parole medication.  Limited audit data resulted in questionable accuracy in regard to adherence to DOT procedures.

A QIT was chartered to address problems with the ordering and completion of laboratory studies.

From January 1, 2008, through June 30, 2008, no Keyhea petitions were initiated, no orders were renewed, and no inmates left CCI with pending Keyhea hearings.  Keyhea orders for two inmates expired, and efforts to renew them were unsuccessful. Two inmates were on Keyhea orders at the time of the monitor's visit.

Sexual Misconduct:

There were 11 reported sexual misconduct incidents, eight of which were committed by MHSDS inmates. All inmates were screened timely after receipt of the referral for evaluation, although it was often delayed.

Two inmates received comprehensive evaluations. Both were found to meet the criteria for Exhibitionism. One was transferred to a treatment program, and the other was endorsed and awaiting transfer to CSP/Corcoran.

Treatment plans for MHSDS inmates did not always incorporate the sexual misconduct behavior that was purportedly the precipitating factor for the IDTT meeting. The quality of the screenings, treatment plans, and evaluations varied by provider.

Transfers:

From January 1, 2008, to August 8, 2008, CCI generated 21 referrals to DMH, 20 to acute care and one to intermediate care. Thirteen inmates were transferred to acute care, and one inmate was transferred to intermediate care. Three inmates were accepted to acute care, placed on a waiting list, and later rescinded after remaining on the waiting list for three to five months. A review by the monitor's expert indicated that two of the rescissions should have been transferred, and also noted a lack of documentation of IDTT consideration for some inmates in need of higher levels of care.

The time from initial referral to the forwarding of the information to DMH was less than seven days for ten of the 13 referrals to acute care. For ten of the 13 inmates not placed on a waiting list, the time from acceptance to transfer ranged from the same day to 13 days, with nine inmates transferred within two days.

Transfers of inmates in the reception center were delayed due to pending parole revocation hearings.

CCI's OHU was located in the 16-bed infirmary and had a capacity of 11 beds for mental health inmates. Inmates were generally offered confidential interviews, but they often refused. Much of the clinical contact occurred at cell-front. Five holding cells were utilized to hold OHU overflow inmates for periods of up to 24 hours pending the availability of OHU beds. During the monitoring period, 23 inmates were placed in holding cells; five were admitted to the OHU the same day, and the remaining inmates were generally discharged to the housing units. There were no inmates in the holding cells at the time of the visit.

From January 1, 2008, through August 13, 2008, there were 261 admissions to the OHU. Approximately 80 percent were discharged within 48 hours, with 31 percent referred to the MHCB and eight percent referred to DMH. All other inmates were discharged within 72 hours except for those inmates waiting for beds in administrative segregation.

Since February 2008, the average time to transfer inmates to an MHCB ranged from seven to 15 days, with 44 percent of inmates transferring from an OHU to an MHCB. For inmates returning from an OHU or MHCB, the compliance rate for follow-up by clinicians was 99.6 percent, and for hourly checks, it was 68 percent.

From January through August 2008, 54 inmates were admitted to the OHU on more than one occasion. Thirteen were admitted three times, six were admitted four times, and four were admitted more than four times.

Compliance with EOP transfer deadlines continued to decline from the preceding monitoring period. From January 1, 2008, to August 7, 2008, the number of EOP inmates at CCI awaiting transfer ranged from 45 to 102. During this period, the percentage of EOP inmates with

overdue transfers ranged from 37 to 75 percent.  Delays were attributable to reclassification issues, lack of available SNY beds, prolonged safety and security investigations, and the endorsement process.

Other Issues:

> Reception Center

> During the preceding monitoring period, the number of EOP inmates in the reception center increased from 31 to 41 inmates per week.  During the twenty-first monitoring period, it increased to 62 to 78 inmates per week.  The reception center EOP program was operating with adequate staffing allocation.  Lockdowns and lack of adequate treatment space and escort staff adversely affected the provision of mental health services to reception center EOP inmates.  The institution was compliant with initial and follow-up IDTT meetings.

> Administrative Segregation

> At the time of the monitor's visit, there were 105 3CMS and 11 EOP inmates in administrative segregation, and 141 3CMS and 59 EOP inmates in the SHU.  Although staff reported that mental health screens were generally completed within 24 hours of placement in administrative segregation, the institution's logs, medical records, and other data sources did not confirm this assertion.  Institutional audits indicated that screenings were conducted in confidential settings approximately 80 percent of the time.

> The range of compliance with daily psych tech rounds was 89 to 100 percent. This was more of an issue in the SHU than in administrative segregation units.  Records of psych tech rounds were poorly documented.

> Case manager contacts were not compliant with Program Guide requirements. The monitor's review of inmate medical records and inmate histories via the MHTS indicated

that some inmates went without case manager contacts for periods ranging from one week to three months.  Contacts frequently occurred at cell-front, but inmates were typically brought to therapeutic modules on the dayroom floor.  Although yard 4A had been on lockdown since April 2008, the data indicated that private clinical contacts occurred 97 percent of the time, but this was not supported by the MHTS or medical records.

Composition of IDTTs did not appear to be compliant with Program Guide requirements, with records indicating a 50-percent compliance rate.

Staff reported no groups for yard 4A or Level II unit.  It was reported that the institution had received the wrong therapeutic modules and that there was no appropriate space to place the modules.

Inmates in the 4A yard were not offered yard time, and inmates in Level II unit were not offered sufficient yard time.

Compliance with case manager contacts for SHU inmates was uncertain due to the condition and quality of health care records.  IDTT meetings in the SHU generally included required participants.  There were significant problems with psych tech rounds in the SHU.  Reviewed records did not indicate that rounds occurred weekly for caseload inmates.  Therapeutic groups were provided to SHU inmates.

3CMS

CCI reported that 3CMS caseloads varied form 40 to 50 in administrative segregation and SHU, and from 150 to 200 in yards 1 and 2.  IDTTs consistently included psychiatrists and correctional counselors.  Psych techs had an attendance rate of 79 percent when their attendance was "required."  Ten therapeutic groups were offered to Level I and II inmates.

<u>Referrals</u>

Audits revealed continued problems with the timeliness of clinician responses to referrals.  A sample of referrals indicated that routine referrals were seen within the required time in the range of 58 percent to 88 percent of cases.  An audit from July 2008 indicated that the institution had a compliance rate for emergent and urgent referrals of only 20 percent.

<u>Medical Records/MHTS</u>

UHR availability and filing backlogs continued to be problematic.  In July 2008, the volume of loose filing was reportedly less than five feet.  Staff reported that there was no effective process to transfer records from clinician to clinician.

<u>RVRs</u>

During the monitoring period, CCI wrote 479 RVRs.  Of the 70 cases referred for mental health evaluations, 18 were for 3CMS inmates.  Referrals were completed in a timely manner.  It did not appear that the evaluations were consistently referenced by the hearing officers, and there was little evidence that the evaluations resulted in mitigation of any penalties.

<u>Pre-Release Planning</u>

Mental health inmates within 60 to 120 days of parole were identified and included in the institution's pre-release planning process.  A newly appointed pre-parole coordinator provided information to parole agents and outpatient clinics, but coordination with TCMP was lacking as was any process to assist inmates with entitlement programs.

**<u>California Institution for Men (CIM)</u>**
May 14, 2008 – May 16, 2008

<u>Census</u>:

On May 14, 2008, CIM housed 6,090 inmates.  Although this represented a two-percent decrease in the overall population, the percentage of mental health inmates remained

unchanged from the preceding monitoring period at 23 percent, with 1,411 inmates. Among

them, 181 inmates, or 13 percent, required an EOP level of care. There were 349 inmates in

administrative segregation, including 112 mental health caseload inmates, or 32 percent. Thirty-

five inmates housed in administrative segregation were receiving EOP services. Thirty inmates

were in the MHCB unit, and the remaining 1,234 inmates were at the 3CMS level of care.

Staffing:

   Mental health vacancies continued to improve, dropping from 12 percent to only

eight percent during this monitoring period. All five administrative positions were filled.

Remaining vacancies included 2.5 staff psychiatrist positions of 12.5, and one staff psychologist

position of 12.5, all of which were covered by contractors. One of the 13 social work positions

was vacant, as was 1.5 of 14 psych tech positions. There were 3.09 of ten nursing positions

vacant. All clerical positions were filled.

Quality Management:

   The mental health subcommittee met at least monthly and updated the quality

management committee.

   During the monitoring period, QITs to address five-day follow-up and an MHCB

LOP were completed. It was reported that a QIT to address delays in transfers to DMH was

initiated in May 2008.

   The peer review process was ongoing for psychologists, psychiatrists, and social

workers. There continued to be significant problems with peer review, including the quality of

the process, the frequency of the peer reviews, and the limited number of clinicians involved in

the actual review process.

<u>Suicide Prevention</u>:

Minutes indicated that the institution's SPRFIT met monthly and reviewed substantive issues of mental health care.  The SPRFIT completed its review of suicide issues, which included suicide attempts and incidents of serious self-injurious behavior.

The institution had not reviewed its LOPs and post orders to maintain consistency with the Program Guide.

In contrast to the preceding monitoring period, the ERRC met monthly for several months prior to the monitor's visit.  The minutes indicated that the ERRC spent several hours reviewing emergency responses and formulated corrective actions where indicated.  All meetings were attended by an appropriate range of participants.

<u>Medication Management</u>:

Medication management remained problematic during the monitoring period.  A review of CIM's medication management quality indicators for the first quarter of 2008 addressed relevant medication management issues, but continued methodological flaws left questions regarding some audit results unanswered.

The compliance rate for ordering medications within eight hours of inmates' arrivals from CDCR institutions or county facilities reached 100 percent for the first quarter of 2008.  The institution reported that 80 percent of arriving inmates received their first doses of medication by the end of the day after the order was written.  This represented an improvement by 20 percent since the preceding monitoring period.

An institutional audit found that 23 percent of UHRs did not contain MARs.  It was also reported that MARs were not being consistently transferred with the inmate upon custody moves.  The institution reported a 90-percent compliance rate in filing the prior month's

MARs in the UHRs. Legibility and completeness of MARs continued to be problematic.

CIM remained compliant with timely renewals and discontinuations of psychotropic medication orders.  In addition, the institution was compliant in providing adequate documentation in UHRs supporting orders for new, changed, or discontinued medications.

CIM reported 100-percent compliance in administering HS medications after 8:00 p.m.  Audits found that 100 percent of inmates on mood-stabilizing medications had blood drawn for drug level monitoring.  Results were placed in the charts 76 percent of the time, and action taken as a result of abnormal results occurred in only 63 percent of cases.

Audits indicated a 79-percent compliance rate for referral documentation for inmates who were no-shows, refused one dose of Keyhea medication, refused psychotropic medication for three consecutive days, or missed 50 percent of psychotropic medications over a seven-day period.  Audit results found that once a referral was made, follow-up counseling occurred within seven days in 68 percent of the cases.

CIM reported 37 Keyhea orders initiated during the period from September 2007 to April 2008.  Four Keyhea orders had lapsed or expired, two were renewed, and seven orders were stopped after a hearing.  Four Keyhea orders were not pursued on the advice of counsel.

Completion of CDCR forms related to discharge medications signed by the inmate at the time of parole was reportedly 100-percent compliant.

Sexual Misconduct:

The log provided by CIM at the time of the monitor's visit documented the number of RVRs issued for inappropriate sexual behavior and the dates when the RVR mental health assessments were assigned and completed.  However, the log did not include notations

regarding the implementation of security measures mandated by the indecent exposure policy, and did not include documentation of referrals for comprehensive evaluations for Exhibitionism.

From October 15, 2007, to April 23, 2008, RVRs were issued for nine different inmates. Of these nine inmates, four were at the EOP level of care, two were 3CMS, and two were non-MHSDS inmates. The evaluations often occurred well beyond 72 hours after the incident, did not follow existing guidelines, were poorly documented, generally did not include a record review, and did not adequately address whether additional mental health intervention was indicated. Comprehensive evaluations for the possible existence of Exhibitionism were neither recommended nor completed. In instances where mental illness was cited as likely contributing to the behavior and acknowledged by the hearing officer, there was no mitigation of the penalty.

Transfers:

During the monitoring period, 51 referrals to DMH were initiated by the IDTT. Of the 51 referrals, 21 were transferred, and 11 were rescinded or cancelled due to parole or transfer to other institutions. Of the 41 referrals for which MHCB documentation was available, 23, or 56 percent, were initiated beyond ten days, and 12, or 30 percent, were initiated beyond 20 days. For the 31 cases completed and forwarded to DMH, the number of days from initial referral to transmission of the package to DMH ranged from five to 75 days.

Delays in referrals were attributed to custody classification issues, locating the C-file or UHR, and scheduling of Board of Prison Term hearings. It was reported that a QIT was initiated but had not yet met at the time of the monitor's visit.

A database that contained information on individuals with multiple MHCB admissions was maintained in the MHCB unit. However, outside of the MHCB unit, staff reportedly relied on their own recollection and familiarity with the inmates when considering