referrals to higher levels of care.  The institution had no formal process involving regularly scheduled IDTT meetings to review inmates in possible need of referral to higher levels of care.

Over the monitoring period, there were 1,094 MHCB admissions, a 20-percent increase from the preceding monitoring period.  The average number of daily admissions was 4.85, a slight decrease from the preceding reporting period, and the average length of stay remained at approximately six days.  The average daily census for the six-month period decreased slightly from 31.35 to 30.1 inmates.

Of the 1,094 infirmary MHCB admissions this monitoring period, 131 inmates, or 12 percent, had three or more admissions during the preceding six-month period.  Institution data indicated that there were several inmates with more than ten crisis bed admissions during the monitoring period.  Across the monitoring period, of 116 inmates who had stays longer than ten days, 55, or 47 percent, were referred for DMH transfer.  MHCB lengths of stay over ten days decreased from 14 percent of all admissions to ten percent.

Only one inmate was restrained for mental health purposes in the four months prior to the monitor's visit.

The institution continued to use overflow areas to provide crisis care.  They were activated on an episodic basis when bed space in the hospital was exhausted.  These areas included ten cells in Del Norte and a variable number of cells in Birch Hall, collectively referred to as transitional bed housing areas or TBH.  These areas were not used in January and February 2008, but had 28 placements in March 2008 and 48 placements in April 2008.

Although staff reported that inmates were typically held in these cells for less than 24 hours, approximately ten percent of April admissions exceeded 72 hours.  There was no yard access.  It was reported that generally, inmates who required suicide watch were not placed in

these beds.  The Del Norte logbook documented admissions and checks by nursing and custody, which showed considerable variation in the time intervals between checks, ranging from 15 minutes to 30 minutes, and some hourly. Modification of these cells was put on hold pending a determination of continued use of the cells for crisis care.

The practice of "red tagging" mental health inmates, with its resultant constriction of access to care, continued to be problematic during the monitoring period.  A problematic working relationship with third watch custody caused significant access issues for clinicians and MHCB inmates.  The periodic lack of mattresses available for MHCB inmates was a recurring problem.

CIM continued to utilize holding cells for inmates awaiting transfer to a crisis bed.  Placement logs were inconsistent among facilities in the institution, often lacked information concerning placement times, removal times, transfer locations, restroom breaks, and meals, and in some instances were not completed for more than two hours after inmates were placed in the cells.  Holding cell usage times exceeded policy mandates of four hours, and records revealed that inmates remained in the cells for two to four hours before being seen by health care staff.  Fifteen-minute checks were inconsistent, and data indicated that at times, inmates were not adequately monitored subsequent to a determination to transfer to crisis care.

Ongoing problems with the MHTS restricted the use of data available for tracking transfers.  During the period of December 1, 2007, through January 15, 2008, 266 mental health inmates paroled or transferred out of the reception center.  The average length of stay for 3CMS and EOP inmates was 98 days and 106 days, respectively.  As a result of the delays, 24 of 52 EOP inmates, or 46 percent, paroled directly from CIM.  Board of Parole hearings, lack of clerical staff, and delays in the receipt of inmate records contributed to the delays.

CIM remained noncompliant for timely completion of administrative segregation EOP hub transfers.  Review of institutional data for EOP inmates transferred during the period of December 19, 2007, through May 12, 2008, indicated that 49 percent transferred within 20 days, 36 percent transferred within 20 to 60 days, and 15 percent transferred after more than 100 days.  However, only four percent actually transferred to EOP hub facilities, and 96 percent transferred to other yards within the institution to await parole or transfer to an EOP program.  Staff reported that across a three-month period, of 259 admissions to crisis care, 143, or 55 percent, were EOP inmates awaiting transfer.

Other Issues:

Reception Center

Initial screens and 31-question screens were compliant and performed in confidential settings.  The institution reported compliance with mental health evaluations but showed a slight downward trend, with ranges of 96 percent in January 2008 to 87 percent in February 2008.

Timeliness of initial IDTT meetings remained severely problematic, with compliance levels ranging from 26 percent to 56 percent during the monitoring period.  Problems also remained regarding assignment of case managers to EOP inmates, with the resultant delay in initiation of treatment and initial IDTT meetings.  The institution was noncompliant with follow-up IDTT meetings, with ranges of compliance rates from 55 percent to 80 percent.  Observed IDTT meetings were attended by a full complement of disciplines, and case presentations were complete.  Areas of concern were the complete lack of UHRs and the general lack of inmate presence at the meetings.

Weekly case manager contacts were generally occurring, but the different

methodologies used by the institution to compile the reports made it impossible to track trends.

Reception center EOP inmates were provided with five hours of structured therapeutic activity per week.

There were 4.5 social work staff positions dedicated to the provision of pre-release planning. CIM remained partially compliant with meeting the pre-release planning requirements in its EOP reception center due to deficiencies in equipment, information technology, and work space. Data indicated evidence of pre-release planning in 45 percent to 82 percent of charts during the monitoring period. Although staff reported accurate knowledge regarding release dates, pre-release efforts were not routinely commenced in a timely manner and were not adequately integrated into the IDTT process.

Administrative Segregation

Staff reported that an increase of mental health inmates in administrative segregation had complicated the provision of services. There was essentially no access to out-of-cell activities, and very limited access to in-cell activities. Six psychologists were assigned to the area to better monitor the EOP population.

Space was limited, with seven clinicians sharing three small offices for treatment purposes. Space issues were exacerbated by the closing of Cyprus Hall for renovations. Once those renovations have been completed and the inmates moved back, Birch Hall will then be closed for renovations.

The inmates had no access to electrical appliances.

CIM was compliant with 30-minute welfare checks in administrative segregation. An audit indicated 100-percent compliance with weekly case manager contacts, but only 42 percent of all clinical contacts occurred in a confidential setting during the monitoring period.

Refusal rates for mental health appointments remained high due to gang edicts to not cooperate with mental health appointments.

Log sheets for daily psych tech rounds for the period of January 1, 2008, through April 30, 2008, revealed three occasions when rounds did not occur.

A review of the logs for the 31-question mental health screenings for the period of March 1, 2008, through April 30, 2008, indicated that they were completed. The screenings took place within 72 hours in two thirds of the cases reviewed, but one third did not contain an arrival date necessary to determine the timeliness of the screening.

At the time of the monitor's visit, CIM was not compliant with Title 15-required outdoor yard time for administrative segregation inmates. The planned construction of 21 walk-alone yards had not yet been initiated. Inmates designated as on walk-alone status received only two to four hours of yard per week. Inmates who went to group yard received ten to 12 hours per week.

Staff estimated that over 90 percent of intake assessments occurred without the availability of health care records.

At the time of the visit, inmates did not attend IDTT meetings. This was attributed to lack of escort officers.

Medical Records/MHTS

There was little change to the MHTS at CIM. Staff in reception center reported that the data derived form the MHTS were not reliable and that information technology shortcomings continued to be major barriers to compliance. However, the monitor believed that the impressions garnered from the flawed and incomplete data, staff interviews, and chart reviews were reasonably congruent and led the monitor to believe that the findings were

substantially accurate.

Audits performed for the period of January, March, and April 2008 indicated that 82 percent of ordered charts were pulled and delivered. During this same time, medical records management estimated a records backlog of two to four days, a marked improvement from the three- to four-week backlog reported for the preceding monitoring period.

RVRs

During the monitoring period, 3CMS inmates were referred to mental health when they exhibited bizarre or unusual behavior. A sample review of RVR packages indicated that there was reasonable mitigation of the penalties imposed, based on the findings of the mental health assessment.

**California Rehabilitation Center (CRC)**
November 5, 2008 – November 7, 2008

Census:

On November 4, 2008, the inmate census at CRC was 4,343 inmates. This represented a seven-percent decrease from the preceding monitoring period. There were 1,007 3CMS inmates in the facility at the time of the monitoring visit, with 22 inmates in the reception center and no inmates in the OHU. There was a four-percent increase in the 3CMS population since the preceding monitoring period.

Staffing:

The senior psychiatrist position was filled, as were the two allocated senior psychologist positions. Of the 2.25 allocated staff psychiatrist positions, 1.25 were vacant. There was an 11-percent vacancy rate among case managers, which represented a 14-percent decrease since the preceding monitoring period. Sixteen of the 17 allocated psychologist positions were filled, and one of the two social work positions was filled. Two of the three

allocated psych tech positions were filled, but another psych tech had been hired and was scheduled to start on December 2, 2008.

The one health program specialist I position was filled, and the allocated 1.15 recreation therapist positions remained vacant.  All nursing positions were filled. These included 28.75 RNs, 22.61 LVNs, six SRN II positions, and one SRN III position.

Quality Management:

The QMC met biweekly during the covered period from January 2008 to June 2008.  Minutes reviewed indicated that membership and attendance were appropriate.  The QMC also addressed health care matters, which included substantive issues of mental health.  The QMC established a procedure for approving LOPs that required them to be developed and brought to the appropriate quality management subcommittee for consideration.  Following that action, the LOP would be brought to the institutional QMC and, if approved, forwarded to the local governing board for approval and implementation.  Membership in the local governing board consisted of the warden and CMO.  CRC reported that the first two LOPs to be approved under this procedure were treatment of Exhibitionism and suicide history tracking.  No minutes for the local governing board were available for review.

A review of minutes indicated that the mental health subcommittee met monthly. Due to overlapping membership and subject matter responsibilities, the quality management meetings were held in conjunction with the SPC.  Minutes for the period from January 2008 to June 2008 showed that the meetings were appropriately attended by mental health, medical, and custody staff.  Adequate minutes were kept, and the subject matters under consideration were relevant to substantive mental health issues.  The committee routinely examined circumstances

of inmate placements in the OHU during the prior month, as well as all transfers to crisis beds, to determine if appropriate procedures were followed or if procedural changes were appropriate.

Staff reported that QITs were not routinely used at CRC. Significant problems identified with respect to mental health during the preceding few months had been resolved without QITs.

CRC had a monthly peer review process for its psychologist case managers. The peer review meeting was routinely scheduled on the fourth Tuesday of each month in lieu of a mental health staff meeting. There were four peer review meetings during January through May 2008, and meetings were reportedly ongoing at the time of the monitor's visit. Supervisors did not attend the meetings and were not provided detailed information about the content of the reviews, which was submitted to mental health clerical staff and stored.

The minutes preserved anonymity with respect to individual clinicians and the specific issues related to them, and were subsequently provided to supervisors. Staff psychologists controlled the content and process of each meeting.

Limitations in the peer review form utilized by the institution prompted the creation of a project to examine this issue. The project called for integration of the established CRC form with one that was being used at CSP/Corcoran.

Suicide Prevention:

CRC's SPRFIT met monthly in conjunction with the mental health subcommittee. Attendance of members and attention to substantive suicide-related issues were documented. CRC reported that custody attendance was consistent, but medical attendance was not. Supervisors reported that this was brought to the attention of the QMC. Documents showed that there were two months during the monitoring period when a quorum was not present.

295

At each meeting, staff reviewed inmates who were either placed in the OHU for mental health reasons or transferred to MHCB due to concerns of suicidality. The SPRFIT focused on ensuring that all protocols were followed, particularly when there was a concern about the possible risk of suicide, and noted the need to make and respond to referrals appropriately. The SPRFIT considered whether thorough assessments were performed and if transfers were made when appropriate. It also examined custody's ongoing concern about inmates who claim to be suicidal when they have safety or other concerns that need to be handled by custody.

The LOP for suicide prevention was reviewed. It included the procedure for determining whether or not custody observation was required along with medical observation of inmates in the OHU.

CRC reported that all mental health clinical staff hired prior to March 2008 had been trained in the completion of the SRAC and routinely completed them upon initial evaluation of inmates, when an inmate was placed in or removed from the OHU due to risk of suicide, or when there appeared to be a change in an inmate's risk factors for suicide.

The LOP for suicide history tracking was implemented during the review period. Information obtained from profiles of inmates transferred to CRC was entered into MHTS, and profiles were prepared for inmates who were transferred from CRC, including profiles for inmates transferred to administrative segregation at the CIM. Suicide risk screening was also completed by nursing staff at CRC prior to administrative segregation transfer.

Clinicians completed an SRAC for all 3CMS inmates on their caseloads and for every inmate evaluated in the reception center. SRACs were also completed whenever there was

a change in the apparent risk of suicide for an inmate. Comments and the level of risk were also included by clinicians on their tracking sheets and then entered into MHTS.

Medication Management:

Audit reports for the period from December 2007 through March 2008 found that CRC was compliant with timely psychiatric evaluation of inmates arriving with medication orders. There were no audit data available after that date. Audit data for the period of January 2008 through May 2008 showed that psychiatric follow-up appointments occurred in a timely manner in 92 percent of cases. Again, no audit data were available after that date.

There was no audit material available to determine compliance with respect to intra-institutional transfers.

The facility reported that medication orders were written for a maximum duration of 90 days. If orders were written in the absence of the inmate, CRC scheduled a return appointment within two weeks following the date the order was written. A psych tech or RN arranged for a seven-day to ten-day order from the psychiatrist when medications expired. Psychiatric notes were brief, and the rationale for medication changes was not always documented. The institution did not provide sufficient audit information regarding this area.

CRC revised the procedure followed when an inmate was reported to be noncompliant with psychotropic medications. Chronos indicating that inmates had been noncompliant with prescribed medications, that is, missing three consecutive doses or 50 percent in a seven-day period, were date-stamped and given to a psych tech who logged them into a database. A process was then followed whereby the inmate was scheduled for appropriate follow-up in an attempt to identify and remedy the cause of the noncompliance. The facility stated that inmate medication noncompliance had decreased significantly since the

297

implementation of a new procedure in May 2008 in which inmates who do not report to pill line on their own are escorted by the medical access officers.  Concerns related to this refusal procedure were brought to the attention of facility leadership by the monitor.  The process for transmitting information between nursing and mental health concerning instances of noncompliance was circuitous.  Combined with the shortage of psychiatrists, it resulted in numerous instances of inmates who were noncompliant with psychotropic medications being referred but not evaluated by the psychiatrist.  Audit information given to the monitor on this issue was insufficient.

The LOP regulating pill lines was being revised.  The revised LOP would be examined through a QIT process that would include representatives for mental health, medical, and custody.

The pharmacy successfully made the transition to individually packaged prescription medications.

The institution reportedly reviewed informed consent information with the inmate and updated the consent annually.  CRC was updating informed consent forms to replace the generic forms.  The monitor was not given sufficient audit information regarding this issue.

The institution reported that DOT was only ordered for inmates on psychotropic medications who were noncompliant or were suspected of being so.  There were 76 inmates with DOT orders at the time of the visit.

CRC continued to transfer inmates requiring Keyhea orders to institutions capable of providing services to those needing higher levels of care.

Audits indicated inconsistency among prescribers in ensuring that inmates with HS medications were given a pill line pass and notation of the basis for the HS order. Staff raised questions as to whether HS medications were routinely offered.

Incoming inmates were screened in the reception center by an RN who reviewed relevant documentation and obtained telephone orders for medications. Inmates generally received these medications within 24 hours and were seen by a psychiatrist within two weeks. The monitor was not given sufficient audit information regarding this issue.

CRC reportedly maintained a medication expiration list that was checked daily for renewals and to determine if inmates needed an appointment with the psychiatrist for medication renewal. The institution provided insufficient data on this issue.

CRC updated the MARs form so that specific medications and medication administrations could be documented. However, the monitor did not receive sufficient audit material concerning this issue. The availability and organization of UHRs remained problematic.

Sexual Misconduct:

CRC's LOP for treatment of Exhibitionism was approved by the QMC and implemented. Two incidents were reported during the monitoring period, but neither inmate met the criteria for Exhibitionism.

Transfers:

No inmates were referred to acute or intermediate care during the monitoring period.

CRC continued to refer inmates indicated for crisis care to CIM. For the period of July though October 2008, 13 3CMS inmates were elevated to EOP and transferred to CIM. All transfers were completed within 24 to 56 days.

CRC had a ten-bed OHU with no beds specifically dedicated for mental health care. The OHU lacked space designated to minimize suicide risk. One-to-one watches were assigned as needed, but there was no appropriate location to conduct the suicide watch. From January to May of 2008, there were 36 placements into the OHU. The length of stay in the OHU was beyond three days in only two cases. CRC instituted additional monitoring of OHU inmates, and notes of OHU inmates were placed in the UHR.

Other Issues:

        3CMS

Institutional audits of inmates who arrived between June and September 2008 found that in 98 percent of cases, initial assessments were completed within five working days. A review of inmate histories indicated that 90-day case manager visits occurred within required timeframes.

CRCR reported that 32 groups were ongoing at the time of the monitor's visit, with diverse subject matter topics. Staff reported that 163 inmates were participating in group therapy and that the number of inmates on the waiting list for group therapy was between 40 and 50. Reported data indicated that inmates who were classified as 3CMS in the reception center were generally placed within 30 days.

        IDTT/Treatment Plans

Institutional audits found that initial IDTT meetings were held within 14 days of an inmate's arrival in 94 percent of the cases. Inmate histories indicated that the institution was compliant with annual IDTT meetings. Institutional data from January 2008 through June 2008 indicated that psychiatrists attended IDTT meetings in 96 percent of cases, but the rate of

attendance for correctional counselors was only 84 percent.  The institution reported that a CAP was put in place to address the correctional counselor attendance rate.

Reviewed treatment plans varied considerably in their individualization for particular inmates. Many of the treatment goals were generic and difficult to measure. Subsequent progress notes varied considerably in the degree to which they related back to the stated goals.  Some records contained several distinct diagnoses without discernible attempts to reconcile differing clinical views of the inmate.  There was a wide range of appropriate groups offered for 3CMS.

Consistent with the mission of the institution, many 3CMS inmates had co-occurring substance abuse and psychiatric diagnoses.  Mental health administrators made efforts to improve coordination between mental health staff and substance abuse staff, such as training, but the services appeared to generally operate separately, and substance abuse treatment notes were not found in the charts.

Space

Staff reported that sufficient treatment space was available for group therapy but that individual treatment space remained limited.  Out of the 21 offices used by clinicians, six were shared by two clinicians, and the remaining offices were occupied by individual clinicians. All of the offices were used to treat inmates.  In addition to two designated group rooms, four of the clinician offices were also large enough to be used for group therapy.

Pre-Release Planning

There was insufficient coordination and communication between TCMP and mental health staff.  Two small audits indicated that four of five inmates on psychotropic

medications who paroled from CRC over a two-day period received their medication.  The other inmate's name was not on the list presented to the pharmacy.

### Richard J. Donovan Correctional Facility (RJD)
August 11, 2008 – August 14, 2008

Census:

      During the monitoring period, RJD's population remained fairly constant between 4,500 and 4,700 inmates.  In July 2008, RJD's census was 4,659 inmates, which included 381 inmates in administrative segregation.  The caseload population was 2,324 inmates, a significant increase to 50 percent of the prison's total population.  There were 1,510 caseload inmates in general population, including 287 EOP inmates and 1,223 3CMS inmates, of whom 43 were sensitive needs inmates. There were 583 caseload inmates in the reception center, including 113 EOP inmates and 470 3CMS inmates.  There were 219 caseload inmates in administrative segregation, including 63 EOP inmates and 156 3CMS inmates.  There were 12 inmates in MHCBs.

Staffing:

      Overall mental health staffing again improved at RJD, with a functional vacancy rate of five percent.  Of the 161.76 mental health positions, there were 23.76 vacancies as of July 2008.  Of those vacancies, 11 were psych techs.

      Psychiatry staffing remained stable over the monitoring period, with 12 of 12.5 full-time equivalent psychiatrist positions filled.  The .5 full-time equivalent vacancy was covered by one long-term contractor throughout the period.  The chief psychiatrist has been in place over three years, and the senior supervising psychiatrist has been at RJD for over two years.

      The additional half-time psychiatrist position requested during the last monitoring

period due to increased MHSDS inmate census was not approved.

Quality Management:

   The health care quality management committee at RJD continued to meet regularly, with consistent attendance by required staff.  Brief summaries of the meetings were maintained in the meeting minutes, but audit results were rarely attached.

   Only two mental health QITs were active during this monitoring period, although RJD implemented an audit schedule for all key program areas to monitor identified problems concurrent with QITs.  Progress was noted in identifying areas to be audited, designating staff to complete the audits, and setting timelines.  Audit items were tracked at the mental health QMC meetings, but presentation of the results to the mental health QMC for analysis, discussion, and necessary follow-up was not consistent.

   Peer review for psychiatrists continued over the monitoring period.  Although the audit tool was expanded since the last site assessment, it remained primarily a quality assurance instrument that focused on presence or absence of various UHR elements rather than an assessment of various quality issues and/or ways to improve current processes.

   Peer review for psychologists and social workers was initiated in May 2008.  An audit tool was developed and implemented by the peer review coordinator.  However, as with the psychiatrists' peer review process, the audit tool was primarily a quality assurance instrument that focused on presence or absence of various UHRs.

   RJD implemented a monthly education seminar program that was mandatory for all staff.  Topics included GAFs, C-files, substance abuse, referral criteria, peer review, and suicide profiles.

Suicide Prevention:

The SPRFIT met monthly during the monitoring period. Attendance remained inconsistent and problematic. Pertinent issues, including completed suicides, admissions to the MHCB for suicidality, suicidal ideation, and suicidal gestures were reviewed by the team. The SPRFIT also reviewed suicide watch and precaution procedures, including use of video cameras as a supplement to direct observation, to ensure that they were carried out consistently with operating procedures.

The SPRFIT videoconference was attended consistently by the entire mental health management team and recently by the DON as well. All staff watched the eight-hour suicide training video for the year 2007.

The LOP for suicide prevention was updated in February 2008 to include descriptions of procedures for suicide watch, suicide precautions in the MHCB, staff training, special suicide reduction procedures in administrative segregation, responding to an acute attempt, and information transfer between units. Further, in May 2008, the LOP for suicide profile tracking was revised to mirror the departmental template from headquarters, and training was provided to all staff.

The institution was compliant with five-day post-MHCB follow-up during the monitoring period.

RJD continued to hold weekly meetings on high risks for suicide in the mainline EOP, in administrative segregation, and within IDTT meetings in the reception center. Discussions during the meetings included all mental health caseload inmates considered to be decompensating, or who were engaging in dangerous behaviors. Potential changes in level of care were discussed, as well as expedited medication evaluations, potential referrals to DMH

facilities, or possible Keyhea referrals.  RJD maintained a high-risk monitoring list to track these inmates, which averaged 24 on the list per week during the monitoring period.

Electrical appliances continued to be unavailable for inmates housed in the administrative segregation units due to the conversion cost to include electricity.

Medication Management:

The medication management system continued to work well at RJD, with the use of either a mechanical technical occupational trainee or a medical transcriber trained as the "MAR czar" for facilitating medication management issues.  Mental health supervisors continued to perform audits relevant to medication continuity issues throughout the monitoring period.

Medication continuity upon arrival from another CDCR institution improved from only 77 percent to 86 percent, and medication continuity upon transfer from county jails remained compliant at 97 percent.

Compliance was maintained for continuity of medications upon movement within RJD, at 93 percent both for inter-facility transfers and on discharges from the MHCB.

Medication noncompliance remained problematic throughout the monitoring period.  Compliance audits found a rate with a range of only 60 to 80 percent.  Similarly, compliance decreased for the presence of medication informed consent forms from inmates, with a rate ranging from 85 to 89 percent.  Medication renewals remained compliant.

RJD demonstrated significant improvement in obtaining blood levels of mood stabilizers and other relevant laboratory results, with compliance rates ranging from 86 to 100 percent.  Compliance for laboratory studies pertinent to the use of atypical antipsychotic medications averaged 93 percent.

DOT procedure compliance remained problematic, directly related to training issues.

Keyhea orders continued to be appropriately monitored and timely renewed. During July 2008, RJD had 26 inmates on Keyhea orders. From April 2008 through May 2008, 13 Keyhea orders were initiated at RJD. Three were allowed to expire based on the decision of the treating psychiatrist. No Keyhea orders lapsed due to staff error. Two Keyhea orders were renewed, and two were rejected at hearing. There were no cases that were not pursued based on state counsel's decision. Four Keyhea patients transferred to other institutions but not prior to the initial renewal hearing.

HS medication administration was compliant, occurring consistently after 8:00 p.m. throughout the monitoring period. Provision of heat cards remained partially compliant, improving from 67 to 81 percent. Presence of the heat-medication list in all housing units also improved to 91 percent.

Pill line length improved from 19 minutes to an average of 13 minutes, with a median of two to five minutes.

While 98 percent of identified paroling inmates received their medication upon release, an audit was necessary to determine if all mental health caseload inmates were being identified by the health care staff to ensure that appropriate medications were ordered.

Sexual Misconduct:

During this monitoring period, all inmates at RJD diagnosed with Exhibitionism were referred to Exhibitionism treatment programs. However, delays of several months occurred prior to their endorsement and transfer. In the interim, these inmates were placed in the mental

health treatment program in administrative segregation and provided with weekly case manager contacts.

EOP inmates were provided with weekly group therapy, although Exhibitionism was not addressed during these sessions. Further, inmates with a Paraphilia NOS also had the opportunity to discuss this in individual therapy, but not in a group setting.

RJD custody staff utilized indecent exposure jumpsuits and posted signs on cell doors when prescribed by the ICC. Between January 2008 and May 2008, 19 inmates were referred and screened by mental health clinicians subsequent to their exhibiting sexual misconduct. Only two were found positive for Exhibitionism. Screening reports were problematic, as several did not contain information pertinent either to the precipitating event leading to the indecent exposure report or to the inmate's sexual history.

RJD drafted an LOP for indecent exposure that was pending institutional review and approval at the time of the monitoring visit. The LOP clarified procedures for referrals, screenings, and evaluations. Additionally, specific training was completed with the clinical staff with respect to the indecent exposure program.

Transfers:

RJD made ten referrals to APP at CMF, with six accepted and transferred, and four rescinded. Three of the referrals were rescinded after acceptance, and one was rescinded prior to a decision. Referral packet completion improved from eight to six days, and acceptance times remained constant at four days. The average number of days from referral initiation to transfer was improved from 35 days to 24 days. There was only one referral to ASH acute care, and the number of days from referral initiation to transfer was 11 days.

RJD made 52 referrals to ICFs, with five to CMF, 11 to SVPP, and 36 to ASH. Forty-five, or 71 percent, of the referrals resulted in transfers. Three inmates transferred to SVPP, while two referrals were rescinded and two were rejected. One of the rejections was a 3CMS inmate who clinicians determined had no major Axis I diagnosis. Four inmates were on the SVPP waiting list at the time of the monitor's visit, with waits ranging from 11 to 133 days. Transfers to SVPP slowed, with the average number of days from referral to transfer at 71 days, and the average time between acceptance and transfer increased from 38 to 45 days.

RJD referred five inmates to intermediate care at CMF, all of whom transferred. However, transfer times to CMF slowed, with the average time from referral initiation to transfer increasing from 28 to 38 days.

RJD referred 36 inmates to intermediate care at ASH. Thirty inmates transferred, one paroled, and five were on the waiting list for seven days to 20 days. Again, transfers slowed, taking 43 days on average from initial referral to transfer. Decision time periods increased from two to 12 days, and post-decision transfers increased from only five days to 15 days on average.

The MHCB unit at RJD continued to consist of 15 beds, including one seclusion room and one mobile restraint bed. From January 2008 through June 2008, there were 295 MHCB admissions. The average length of stay increased slightly from six to seven clinical days plus one administrative day. Out of 67 admissions during the monitoring period, lengths of stay exceeding ten days increased to 23 percent from a previous level of 16 percent. Repeat admissions remained low at eight percent. Two inmates were admitted six times, five inmates were admitted four times, and ten inmates were admitted three times. DMH consideration was not routinely noted for multiple admissions.

The average daily MHCB census increased to 13 inmates, and for substantial periods, the MHCB daily census exceeded 15 inmates. When capacity was reached, RJD transferred medical patients to a community hospital and placed MHCB inmates in medical cells with one-to-one watch. The increased admission rate was largely attributed to a change in local practice that required admission of all inmates who presented to the treatment and triage area with an initial complaint of suicidal ideation.

Restraint and seclusion logs revealed infrequent use of restraints, with only three instances over an eight-month period. Seclusion was ordered only twice during the same time period. A log was maintained documenting the ordering clinician, type of restraint, date and time of application, date and time of removal, and reason for restraint.

Holding cell utilization for inmates transferred to the CTC while awaiting beds was problematic throughout the monitoring period. Inmates were often held in cells for longer than four hours without appropriate documentation of supervisor approval for extended lengths of stay. Logs were again incomplete, and actual lengths of stay were not verifiable. Similar problems were noted in housing units when inmates were awaiting transfer to the CTC. Staff reported that the practice changed in May 2008, but no documentation was provided for holding cells after April 2008.

RJD maintained a tracking log of inmates referred to PSU during the monitoring period that revealed six referrals. Limited data demonstrated an average of 24 days from committee action to endorsement. One endorsement expired while awaiting transfer, and one inmate's SHU term was suspended and he was re-endorsed to RJD. The average number of days from endorsement to transfer was 90 days.

Timeliness of reception center transfers remained noncompliant during the monitoring period.  There was marginal improvement to 65 percent for EOP inmate transfers during the monitoring period, while 3CMS transfers remained constant at 62 percent.  Whereas 38 percent of the 3CMS inmates were beyond transfer timeframe guidelines, the majority were endorsed and awaiting beds or bus transportation.  RJD referred 11 EOP inmates for expedited transfer, but none transferred.  Staff reported that there was no way to formally refer these inmates to the C&PR other than by verbal communication, as there was no departmental form for this purpose.

Other Issues:

Reception Center

RJD satisfied timeframes for screening and processing newly arriving inmates.  Bus screens were completed in confidential settings on the day of arrival, and all positive screens were forwarded to the psychiatrist for evaluation within 24 hours.  Initial mental health screens and evaluations were also completed timely and in confidential settings.  At the time of the monitoring visit, RJD had six 3CMS groups in the reception center.

The reception center EOP remained fully staffed except for two psych tech positions.  Bus screens were completed timely and in a confidential setting.  The screener did not routinely ask inmates if they were previously in the EOP, but for inmates who self-identified as EOP, 89 percent were screened by mental health within 24 hours.  Inmates were referred and seen by psychiatry following the bus screen on the day of arrival, or if it was a late bus arrival, they were seen on the following day.  Mental health evaluations for these inmates occurred within seven days.

Screenings and evaluations were conducted in private confidential office settings. Access to mental health offices for screenings closed at 3:30 p.m. daily due to lack of custody coverage.

Case manager contacts with accompanying progress notes occurred weekly during the monitoring period. Cell-front contacts were significantly decreased to less than four percent.

RJD was compliant with initial 14-day and 30-day follow-up IDTT meetings. Treatment plans bearing appropriate team members' signatures were present in the UHRs. Access to inmate C-files remained problematic for IDTT meetings.

RJD continued to exceed the minimum requirements for provision of structured therapeutic activity in the reception center EOP. Approximately 96 percent of reception center EOP inmates were provided with at least five hours of structured therapeutic activity weekly, with an average of eight hours actually offered and six hours received. Frequent cancellations often disrupted group timing, resulting in numerous instances of two to three hours of groups offered in one day to individual inmates.

Access to outdoor recreation in reception center EOP remained problematic, with audits showing an average of only five days per month, for two hours per day, on Facility 4 from January 2008 through June 2008.

Re-entry planning for reception center EOP inmates developed well over the monitoring period. A full-time case manager continued to facilitate re-entry planning, and it remained fully integrated into the IDTT process to form part of the treatment plan. All reception center EOP inmates to be released in nine months or less were assigned to a re-entry group. The number of groups was directly dependant on the number of inmates in need.

311

At the time of the monitoring visit, there were six re-entry groups with approximately 12 to 15 inmates participating in each. Approximately 80 percent of all re-entry planning was performed in the group setting. There were occasions when inmates met on an individual basis with the case manager for specific circumstances.

Re-entry planning services at RJD included, but were not limited to, communication and cooperation with parole agents for inmate pickup, assistance with completion of supplemental security income applications, interface with the POC, referral to therapeutic programs, and community housing. The re-entry case manager also attended a monthly community resource meeting to access potential referral sources. While the pre-release case manager procured a computer during the monitoring period, additional resources were needed.

Administrative Segregation

During August 2008, 156 3CMS and 63 EOP inmates, for a total of 219, or 57 percent, of the 381 inmates in administrative segregation, were caseload inmates. Twenty-two EOP inmates and 87 3CMS inmates, for a total of 109, or approximately 50 percent, had been in administrative segregation for over 90 days. Forty-two 3CMS inmates were pending endorsement and/or transfer; 11 EOP inmates were pending endorsement and/or transfer; four were pending RVR adjudication; and two were pending investigations. There was one SNY Level 4 EOP inmate who was pending transfer to a Level 4 SNY EOP.

Treatment space remained problematic and varied among the multiple administrative segregation units. While RJD had approximately 30 therapeutic modules throughout the units, they were not of the approved prototype. There was a myriad of other

312

obstacles to using the modules, including lack of food ports, lack of backing on the modules, and lack of soundproofing.

There were seven clinical case managers assigned to EOP administrative segregation, with an additional clinician as a floater to cover absences and vacations. The one-to-nine clinician-to-inmate ratio was maintained until the week prior to the monitor's visit, when the administrative segregation EOP census grew beyond the court-mandated cap of 63 to 68 inmates. Attempts were made to move endorsed EOP inmates to other facilities, but there were no available beds. The census was below the cap of 63 inmates by week's end.

Two clinical case managers were assigned to 3CMS inmates in each of the administrative segregation buildings. Weekly case manager contacts for both EOP and 3CMS inmates in administrative segregation were compliant throughout the monitoring period, but approximately one third of EOP inmates did not come out of cell for contacts. Daily rounds were provided by the case managers for EOP inmates who refused out-of-cell contacts.

RJD continued to offer EOP inmates in administrative segregation over ten hours per week of group therapy. Groups were also offered to 3CMS inmates in administrative segregation, if housed in unit six. There was no group therapy offered in the other administrative segregation units at RJD.

The intake and screening process for administrative segregation units significantly improved over the course of the last year. Intake orientation and screenings occurred within 24 hours in therapeutic modules. Approximately 50 percent occurred cell-front due to refusals. Inmate profiles were not available for the initial screenings. Morning meetings continued for all administrative segregation units, including pertinent mental health staff and the custody sergeant.

Yard time remained problematic due to the continued lack of yard availability coupled with the volume of walk-alone status inmates in administrative segregation. Twenty walk-alone units were under construction at the time of the monitor's visit, with a reported completion date of October 2008. Twenty more yards were planned long-term.

RJD implemented the administrative segregation suicide reduction plan during the monitoring period. Custody checks were documented every 30 minutes for the first three weeks of administrative segregation status, but some of the checks were not staggered as required. The 12 intake cells in each administrative segregation unit were modified. They were centrally located in areas of increased visibility and were clearly marked. Other cells were utilized once the designated intake cells filled.

Documentation on CPR training of administrative segregation staff was requested but was not provided.

EOP

During the monitoring period, RJD formalized the pilot project in which EOP inmates were seen every other week by their case managers even if the inmate was also in one of the case manager's weekly groups. Utilizing these guidelines, RJD reached 100-percent compliance for clinical case manager contacts.

RJD continued to offer over ten hours of structured therapeutic activities weekly to mainline EOP inmate. On average, seven hours were actually utilized. The rate of non-attendance at groups remained constant at 36 percent. Timely IDTT completion was compliant at 93 percent.

314

Availability of yard and dayroom time for EOP inmates remained unchanged. EOP inmates continued to receive 18 hours as opposed to 41 hours, or 44-percent less yard and dayroom time than general population inmates throughout the monitoring period.

At the time of the monitor's visit, RJD housed five Level 4 SNY EOP inmates who had been endorsed and were awaiting transfer to a Level 4 SNY EOP. Housing among general population inmates and lack of programming were problematic for these inmates.

3CMS

The 3CMS program continued to run well at RJD, with both case manager contacts and completion of timely IDTT meetings at a rate of 93 percent. The 3CMS program offered 23 groups, with an overall attendance rate of 90 percent. As of June 2008, there were waiting lists ranging from one to 51 inmates for these groups. While there was adequate space and clinical staffing, the lack of custody support in the mental health building on Facility 3 considerably limited the number of groups offered on this facility.

Referrals

RJD did not satisfy timeframes for response to mental health referrals. Institutional data did not differentiate between emergency, urgent, and routine referrals. RJD had mechanisms in place to identify inmates who were in need of consideration for a higher level of care. Consideration was given during IDTT meetings, as well as during the weekly high-risk meetings for mainline EOP and administrative segregation inmates. There was no mechanism in place for EOP SNY inmates housed in Facility 3 with general population inmates.

Medical Records/MHTS

Access to medical records and filing remained adequate throughout the monitoring period. A filing backlog of approximately two days remained. Additionally, loose

filing increased over the monitoring period due to an increase in the new required mental health forms. Near the end of the monitoring period, the medical records department lost nine medical assistant positions as they were unbudgeted.

Space

RJD improved its process for offering confidential sessions to inmates in the 3CMS programs on Facilities 2 and 3. On Facility 2, staff began utilizing the chapel. Case managers that share an office coordinate their appointments to avoid conflicts. Facility 3 staff began using another building, which now gives staff several private offices and a very large group room that can also be divided into smaller group rooms.

The reception center EOP program on Facility 4 also recently began to utilize the chapel on that facility. Office cubicle dividers were obtained in order to improve the confidentiality of groups that are provided in the chapel. The reception center EOP case managers who work with the special needs inmates on Facility 2 utilize an office within the housing unit for their sessions.

RJD also began work in administrative segregation to improve the ability of case managers to offer a higher quality of session due to improving the cubicle areas that they utilize.

Computer lines were run for almost all of the case managers and senior psychologist supervisors during the later part of the monitoring period to provide access to the Disability Effective Communication System of information regarding ADA issues.

RVRs

From January 2008 through May 2008, RJD issued 1,460 RVRs. During that same period, 211 mental health assessments were requested for 29 3CMS, 173 EOP, and five MHCB inmates.

316

Timely completion of the mental health assessments was problematic due to delays in receipt by the mental health department. The number of 3CMS inmates who received mental health assessments due to bizarre, unusual, or uncharacteristic behavior at the time of the RVR increased to seven percent during the monitoring period.

RJD attempted a six-month RVR pilot project from February 2008 to August 2008. The pilot focus areas included review of RVRs issued to 3CMS inmates to determine if a mental health assessment should have been requested, implementation of a tracking system to track 3CMS inmate RVRs, improvement of the quality and specificity of the completed mental health assessments, and modification of the RVRs to include a checklist that identifies the degree to which the results of the mental health evaluation were considered in the findings and in any mitigation. The pilot also focused on the quality and amount of training needed for clinicians and hearing and correctional officers. The pilot ended August 30, 2008, after the monitor's visit.

**Ironwood State Prison (ISP)**
Paper Review

Census:

As of February 29, 2008, ISP's inmate census was 4,573, which included 29 3CMS inmates.

Staffing:

ISP lost three psychiatrists and three psych techs during the monitoring period. Poor staff retention was attributed to inadequate training and orientation for new employees. As of the end of February 2008, the chief psychiatrist position was vacant, as were both staff psychiatrist positions. Contractors covered two of three vacant psychiatric positions. Telemedicine was not used at ISP. A senior psychologist position was filled, as were two of 2.5

317

psychologist positions.  Two contract psychologists covered the equivalent of a half-time position.

Quality Management:

Monthly quality management meetings were held to address general health care issues.  Much of the committee's work during the reporting period was focused on obtaining CTC licensure for the ISP's infirmary, an initiative that was ultimately set aside by the Plata receiver's office.  Committees for pharmacy and therapeutics and patient care policy, as well as a medical executive committee, met during the reporting period and kept minutes.

Due to the small number of caseload inmates at ISP, a mental health subcommittee had not been established.  Mental health issues were reportedly addressed within the context of staff and departmental meetings.

MHTS data were incomplete and unreliable due to program glitches and data entry errors, and could not be used to measure performance in most areas.  This problem was largely the result of inadequate MHTS training, which in turn resulted in high turnover among office techs.

Suicide Prevention:

Information regarding the institution's SPC was not provided.

No inmates were returned to ISP from the OHU at CVSP with orders for five-day follow-up during the reporting period.  ISP had procedures in place to provide clinical five-day follow-up and custody checks if needed.

ISP produced documentation regarding compliance with about half of the issues included in the Department's suicide reduction plan.  The institution reported that all inmates were pre-screened for past and present suicidal behavior and ideation prior to their placement in

administrative segregation, and that any reported mental health issues were appropriately referred.  No performance data were provided.

Data and audits provided by the institution indicated that staff administered 434 31-question screens during the reporting period, all of which were completed within 72 hours of the inmate's placement in administrative segregation.  Daily rounds, conducted interchangeably by psych techs and mental health staff, were completed and appropriately documented in administrative segregation.  Weekly round summaries were not consistently filed in the UHR.

No information was proved regarding intake cells, 30-minute welfare rounds, yard time, morning meetings, or entertainment appliances.

Medication Management:

DOT was ordered for all prescribed psychotropic medications.  Regular monitoring by nursing supervisors showed 100-percent compliance with DOT protocols on all yards and in administrative segregation.

During the monitoring period, there were no inmates at ISP who required involuntary medications or blood work for prescribed mood stabilizers  All mental health staff reportedly received training on Keyhea protocols.

Minutes from various committee meetings indicated that parole medication was not consistently issued to inmates in a timely manner.  In one case, an inmate was unable to leave the prison at the scheduled time because he had not received parole medications.

Transfers:

ISP had an unlicensed CTC with 15 beds that served as an OHU for medical patients.  Five designated mental health beds in the CTC were closed to admissions due to unresolved licensure issues.  Accordingly, inmates deemed to require enhanced monitoring and

assessment were transferred to the OHU at CVSP.  All inmates transferred to the OHU at CVSP were monitored, assessed, and treated by mental health clinicians from ISP, which was an arrangement that was described by staff as inefficient and unnecessary.  Nonetheless, access to OHU beds was quick, and ISP did not use holding areas to monitor inmates in crisis.

Access to MHCBs was slow.  During the reporting period, ISP referred 26 inmates to an MHCB, half of whom waited approximately ten days to be transferred.  One inmate waited 23 days to be transferred to an MHCB.

ISP transferred 59 3CMS inmates during the reporting period, nearly all of whom waited less than 90 days.  The sole EOP transfer occurred within 25 days of referral.

Other Issues:

3CMS

Unreliable MHTS data indicated that less than half of all case manager contacts in mainline and administrative segregation complied within timeframes.  More reliable UHR reviews indicated that weekly case manager contacts consistently occurred in administrative segregation.

UHR audits completed by the institution yielded a compliance rate of 87 percent for the timely completion of IDTT reviews in administrative segregation.  In contrast, MHTS data showed compliance rates ranging from a low of eight percent to a high of 100 percent.

General groups, focused on lifer issues, wellness, and rehabilitation, were available to MHSDS and non-MHSDS inmates on mainline yards and in administrative segregation.  There were no groups designed for and offered exclusively to MHSDS inmates.

Heat Plan

Heat alert reports were distributed to staff Monday through Friday throughout the institution.  Most of the reports were hand delivered or faxed to ensure that employees involved in the institution's heat plan had current information.  Housing officers reportedly received the daily heat alert report via institutional mail, which was a potentially unreliable system for disseminating time-sensitive reports.

RVRs

ISP issued RVRs for indecent exposure to two non-MHSDS inmates during the reporting period, both of whom screened negative for Exhibitionism.  Three other inmates, including one 3CMS inmate, were referred to mental health after receiving RVRs.  All five inmates were properly and timely evaluated by mental health staff and received follow-up contact.

## Calipatria State Prison
Paper Review

Census:

Calipatria's total inmate population was 4,278, with 42 inmates in the MHSDS.  The caseload census doubled since the last monitoring period.  In administrative segregation, there were 305 inmates, including five 3CMS inmates and one EOP inmate.  There were 21 3CMS inmates in general population and 15 3CMS inmates in the OHU.

Staffing:

During the monitoring period, Calipatria hired one psychiatrist and one psychologist.  Overall, however, the filling of vacancies remained slow.  There was no chief of mental health or mental health supervisor position allocated to Calipatria, which negatively affected the administrative and clinical supervision of the mental health program.

The overall vacancy rate was 18 percent, and no contractors were utilized. The two full-time equivalent psychiatrist positions were filled, as were four of the six psychologist positions, the senior psych tech position, and five of the 9.5 psych tech positions. The half-time office assistant position was filled, as were 2.5 of the 3.5 office tech positions.

Quality Management:

Due to the lack of clear leadership in mental health, quality management was not fully functioning at Calipatria. Over the monitoring period, only 38 percent of the mental health program subcommittee meetings achieved a quorum. Often, the meetings were combined with the SPRFIT. UHR reviews were the primary vehicle of quality management at Calipatria.

Other than suicide prevention, the LOPs were not updated or revised to reflect Program Guide revisions. The LOP for administrative segregation, OHU, and referrals had not been updated since 2006/2007.

Suicide Prevention:

Due to the persistent lack of a quorum, the SPC met jointly with the mental health program subcommittee. Agenda items included issues related to administrative segregation unit pre-placement, SRAC training needs, revision and update of the LOP on suicide prevention, and restraints. The chairperson handwrote minutes. Minutes of the local quality management committee meetings were not available for review.

Custody and clinical staff attended monthly suicide prevention videoconferences. All clinicians and nursing staff were trained on suicide risk assessment completion.

Clinical five-day follow-up of inmates discharged from OHU was compliant, but compliance with custody observation could not be determined.

Calipatria implemented the administrative segregation suicide reduction plan, but compliance was not achieved. Pre-placement screens were noncompliant, as screens that resulted in an immediate referral were not always referred for evaluation.

Eight cells were retrofitted as intake cells. It was unclear if welfare checks were occurring as required.

MHSDS inmates received ten hours of yard time per week, except during heat alerts. No electrical appliances were available to administrative segregation unit inmates. Caseload inmates were kept out of the stand-alone administrative segregation unit.

Medication Management:

No information was available regarding medication management audits for this monitoring period. No blood level laboratory workups were ordered, due to the short-term stays of MHSDS inmates. Calipatria's psychiatrists found it impractical to order blood level laboratory workups prior to transfer.

Transfers:

Transfers of MHSDS inmates were problematic, particularly for inmates who required an MHCB level of care. There were 23 inmates who were waiting for MHCB transfers, nine of whom were rescinded after 6.5 days. Of 14 inmates, only three, or 21 percent, were transferred within timeframes. The average number of days for transfer was six days. The health care placement unit at central office was routinely contacted for necessary assistance with these transfers.

Between October 2007 and March 2008, 18 3CMS inmates were inappropriately transferred to Calipatria from various reception centers. No EOP inmates were inappropriately transferred. Fourteen inmates were transferred to appropriate institutions, but 71 percent of these

transfers exceeded the 30-day transfer timeframe. At the time of the monitor's visit, four inmates were pending transfer, two of whom were overdue.

During the same period, Calipatria identified 135 3CMS, 37 EOP, and 23 MHCB inmates who required transfer to program institutions. Of the 135 3CMS inmates, 111 inmates were transferred, and 24 were pending. Of the 111 completed transfers, 96 percent met transfer timeframes. Three of 24 inmates awaiting transfer exceeded the transfer timeframe by an average of two days. The average number of days for transfer of 3CMS inmates was 32 days. Of 37 EOP inmates, 34 were transferred within timeframes, and three were pending.

Other Issues:

Administrative Segregation

As of April 9, 2008, five 3CMS inmates and one EOP inmate were housed in administrative segregation. Clinical input into the ICC and RVR process was documented in UHRs. Referrals generated from the administrative segregation units were seen in a timely manner, with documentation in the charts. Treatment plans were usually updated prior to the initial ICC. Psych tech daily rounds and weekly summaries were well documented.

The conference room in the building was available for private and confidential interviews. Inmates who refused to come out for a confidential interview were seen at cell-front. Due to the small number of MHSDS inmates and differing security needs of these inmates, group therapy was not considered practical or appropriate.

OHU/MHOHU

During this monitoring period, there were 59 admissions to the OHU, 23 of whom were identified as needing MHCB placement. Thirteen of the MHCB inmates were transferred

to MHCB beds, and nine referrals were rescinded.  One remained in the OHU for treatment of unrelated medical conditions.

Upon designation of MHCB level of care, inmates were referred to the health care placement unit at central office.  Of 22 completed transfers, only 13 percent occurred within the transfer timeframe.  The average number of days to complete the transfer was six days.

The OHU had four designated cells for mental health purposes.  However, these beds were regularly used by medical patients, resulting in putting mental health inmates into non-mental health beds.  During this monitoring period, 27 percent of mental health inmates were placed in non-mental health beds.

Eighty percent of admissions to the OHU were necessitated by concerns of suicide. Only 55 percent of these inmates were placed appropriately in cells easily visible from the nursing station.  Sixty-nine percent of inmates in OHU experienced lengths of stay over 72 hours.  The average length of stay in the OHU was nine days, with an outlier of 43 days.  The excessive lengths of stay in the OHU resulted in a bed shortage, prompting the discharge of two high-risk inmates to administrative segregation without IDTT consultation.

Calipatria did not track the use of holding cells during the monitoring period. Direct observation and 15-minute nursing checks were performed when an inmate was placed in a holding cell.  There were no multiple placements to OHU.

The institution was 100-percent compliant with admission notes, suicide risk assessments, and treatment plans on the day of placement into OHU, weekly IDTT meetings, and daily clinician contacts.  Treatment plans were not updated biweekly.

Referrals

Ninety percent of routine referrals were seen within five days of referral. A total of 226 referrals were received, with follow-up completed in an average of 3.6 days.

Space

Adequate office and treatment space remained problematic. Mental health staff members shared one office in the family visiting apartment. Individual case manager contacts, ranging from ten to 25 hours per week per clinician, were conducted in utility/multipurpose rooms located in each yard clinic area that stores medical and housekeeping supplies and equipment. These utility/multipurpose rooms were also shared with other institution ancillary staff. The institution had no treatment space to provide group therapy or confidential individual contacts. All contacts in OHU were made at cell-front.

RVRs

Six mental health assessments were requested during the monitoring period. Incidents included possession of dangerous contraband, two mutual combats, possession of inmate-manufactured weapons, and two indecent exposures.

Pre-Release Planning

Calipatria had not developed a pre-release program for paroling inmates. TCMP documentation was not present in audited UHRs.

**Centinela State Prison**
Paper Review

Census:

As of April 16, 2008, the inmate census stood at 5,061, or 189 fewer than were reported in September 2007. There were 407 inmates in administrative segregation, including 175 in the stand-alone unit and 232 in overflow buildings.

326

Centinela's MHSDS census remained low throughout the reporting period. As of mid-April 2008, there were 27 MHSDS inmates pending transfer, including 21 3CMS inmates, five EOP inmates, and one inmate in the CTC for psychiatric reasons. The overflow administrative segregation buildings held seven 3CMS inmates and one EOP inmate. No MHSDS inmates were housed in the stand-alone administrative segregation unit.

Staffing:

Centinela was allocated a total of 17.72 mental health positions, 27 percent of which were vacant. A stable cadre of contractors reduced the functional vacancy rate to less than one percent. All 1.5 psychiatric positions were vacant, as were 2.87 of 4.87 psychologist positions. Contractors fully covered these vacancies. Positions for a senior psychologist, a social worker, a senior psych tech, six of 6.35 psych tech positions, and two recreation therapist positions were filled.

Quality Management:

Centinela's quality management program routinely tracked several performance indicators and monitored various areas related to mental health services. The mental health subcommittee, chaired by the senior psychologist and comprised of appropriate representatives from mental health, nursing, and custody, regularly reviewed audit reports and addressed issues related to staffing, space, suicide prevention, and Keyhea training during the monitoring period. The subcommittee provided oversight to peer review activities and provided regular reports to the institution's quality management committee.

Staff and contract psychologists and psychiatrists participated in peer review, which consisted of approximately 50 UHR reviews during the reporting period. Reviewers provided written feedback and recommendations to individual clinicians.

Suicide Prevention:

The SPC met monthly and maintained minutes. Meeting agenda items included implementation of the suicide reduction plan in administrative segregation, completion of mental health screens and SRACs, review of incidents involving suicide attempts and gestures, and compliance with five-day follow-up upon discharge from the CTC. Mental health staff regularly attended suicide prevention meetings. Custody participation was erratic.

Clinicians appropriately monitored inmates discharged from the CTC with orders for five-day follow-up. Documentation of custody checks was missing or incomplete in four of 18 cases reviewed during the monitoring period. Local policies and procedures were recently revised in order to restore compliance in this area.

Centinela had fully implemented most, but not all, components of the Department's suicide reduction plan for administrative segregation. Nursing staff did not consistently screen inmates for past and current suicidal behavior and ideation prior to their placement in administrative segregation. Screening forms were not always available to nursing staff, and chronos documenting the completion of screens were not always submitted to mental health for review and filing.

Audit findings indicated that MHSDS inmates were identified and evaluated within 24 hours of their placement in administrative segregation. Newly arriving inmates received 30-minute welfare checks during their first 21 days in administrative segregation. Intake cells had been identified and retrofitted. Daily psych tech rounds were completed and appropriately documented in isolation logs and on weekly summaries that were filed in UHRs. Morning meetings between mental health and custody staff occurred seven days a week.

Internal audits found perfect compliance with the completion of weekly case manager contacts in administrative segregation, all of which reportedly occurred in confidential settings.  A recreation therapist contacted inmates individually as requested, distributed in-cell activities, and planned to introduce groups following the installation of recently received therapeutic modules.  A small audit completed by the institution indicated that initial IDTT reviews and treatment plans were not always completed prior to the initial ICC hearing.  Internal audits showed that staff timely responded to urgent and emergent referrals, and found that five of six routine referrals prompted clinical contact within five working days.

Inmates in administrative segregation were offered only three hours a week of outdoor yard.

Medication Management:

Medication management audits were limited by the rapid turnover within Centinela's small mental health population.  Nonetheless, the institution continued to conduct monthly audits and had instituted a number of changes to improve methodology and reporting. The audits, previously conducted by one person, were now the responsibility of several individuals assigned to specific areas within medication management.

Internal audits showed that medication continuity was inconsistent for inmates arriving at Centinela during weekends.  The institution's decision to maintain supplies of stock medication in the CTC appeared to have resolved this deficiency toward the end of the monitoring period.  Audits also found that medication orders were not filled and administered to inmates within 24 hours.  Delays of two to three days were noted in a small number of cases.

Documentation of medication noncompliance on MARs, while not always consistent with local protocol, prompted referrals to mental health.  Eight of nine inmates

referred for medication noncompliance were seen within one week. Institutional audits found perfect compliance with the completion of informed consent forms. Blood work was appropriately ordered in the one case for which it was clinically indicated.

Transfers:

Access to CTC beds was adequate, and Centinela did not use alternative holding areas to monitor inmates pending admission to an MHCB. There were 39 psychiatric admissions to the CTC during the reporting period, one of which lasted longer than ten days. The average length of stay was 4.2 days. One inmate was admitted to the CTC twice and was promptly transferred to an MHCB unit during the second admission. Centinela referred 13 inmates to MHCBs, 12 of whom were timely transferred. In one case, the lapse between referral and transfer was six days.

Institutional audits showed consistent compliance with the timely completion of SRACs and IDTT reviews upon admission to the CTC, as well as with documentation of daily clinical rounds. The institution reported inconsistent compliance with the completion of SRACs upon discharge from the CTC. Out-of-cell recreational activities were reportedly offered to inmates when clinically appropriate.

Centinela complied with transfer guidelines applicable to desert institutions. During the seven-month reporting period, Centinela placed 138 inmates in 3CMS and 13 inmates in EOP, all of whom were transferred from the institution within established timeframes. During this period, Centinela inappropriately received 14 3CMS inmates and one EOP inmate from reception centers throughout the state, all of whom were returned to the sending institution within a week of arrival.

330

MHTS contact printouts recorded weekly contacts and timely IDTT reviews for EOP inmates pending transfer.  Most contacts reportedly occurred in confidential settings.

One MHSDS inmate was mistakenly placed in the stand-alone administrative segregation unit during the reporting period.  This inmate was promptly identified and removed from the unit.

Other Issues:

Referrals

MHSDS inmates mistakenly sent to Centinela were immediately evaluated by a psychiatrist or an on-call physician and referred to mental health on an urgent basis.  MHSDS inmates who arrived during business hours were typically seen by a clinician within one to two hours of arrival; inmates arriving during non-business hours were seen within 24 hours.  Inmates deemed to be in crisis upon their arrival in R&R were referred to the CTC.  Inmates referred on an emergency basis during non-business hours were admitted to CTC and evaluated by a mental health clinician within 24 hours.  An on-call physician consulted with a psychiatrist-on-duty at CIM to resolve medication-related emergency referrals during non-business hours.

Non-MHSDS inmates with documented histories of mental health treatment were not routinely referred to mental health upon their arrival at Centinela.  The institution had provided staff training and developed a monitoring log to improve performance in this area.

Space

Mental health and medical staff continued to share office space in the yard clinics.  On occasion, this arrangement created conflicts that required mental health staff to reschedule appointments.  Overall, however, staff access to adequate office and treatment space reportedly improved during the reporting period.

331

## <u>Chuckawalla Valley State Prison (CVSP)</u>
Paper Review

<u>Census</u>:

At the time of this review, the total number of inmates at CVSP was 3,164. There were eight MHSDS inmates, all at the 3CMS level of care. One 3CMS inmate was housed in the OHU. There were 147 inmates in administrative segregation, none of whom were caseload inmates. There were only nine caseload inmates housed in administrative segregation during the monitoring period.

<u>Staffing</u>:

CVSP had a 20-percent vacancy rate during the monitoring period. The 1.5 full-time equivalent psychiatrist positions remained filled, as did the one full-time equivalent senior psychologist and senior psych tech positions. Three of the 4.5 full-time equivalent psychology positions and four of the 5.5 full-time equivalent psych tech positions were filled.

<u>Quality Management</u>:

Quality management activities at CVSP consisted primarily of UHR audits. The mental health program subcommittee met monthly, but custody staff attendance was consistently poor. Due to sporadic attendance, the committee meetings never had a quorum throughout the monitoring period.

There were no QITs chartered. An action-item list attached to the meeting minutes had not been updated or revised for six months. The volume of completed mental health assessments following an RVR was regularly reported, but the final outcome of the hearings and any indication of consideration of the assessment were not.

332

Suicide Prevention:

The SPC met monthly.  Custody staff attendance at the meetings was consistently poor.  Meeting minutes were adequately maintained.  The regular agenda items included Coleman-related items, requests for RVR mental health evaluations, five-day follow-up, OHU, transfer issues, suicide risk assessment training, and staffing.

Staff attended the monthly suicide prevention videoconferences provided by headquarters.

Five-day follow-up was infrequently required at CVSP, as inmates rarely return to CVSP once transferred to an MHCB.  Five-day follow-up was ordered on only two occasions during the monitoring period.  Clinical and custody follow-up were appropriately completed.

CVSP demonstrated 100-percent compliance for completion of SRAC assessments upon admission to the OHU.  However, SRAC assessments were completed for only 40 percent of the inmates upon discharge.  SRAC assessments were completed on MHSDS inmates placed in administrative segregation.

The institution achieved compliance with pre-placement screening for inmates placed in administrative segregation.  The 31-question mental health screens were offered within 72 hours for 100 percent of inmates placed in administrative segregation.  Thirty-five percent of the inmates refused screening and were subsequently seen by a case manager.  Inmate profiles including prior suicide history were available for only 22 percent of the inmates at the time of placement into administrative segregation.

CPR training was provided to all staff. Monthly emergency drills were routinely conducted in administrative segregation, but it was unclear whether the reports on the emergency drills were made to the ERRC.

333

Medication Management:

Medication management was going well at CVSP. Continuity of medications on arrival was compliant, and all arriving inmates on psychotropic medications were seen by the psychiatrist within 24 hours or bridge orders were written. There were only two instances throughout the monitoring period when an order was continued but not filled timely by the pharmacy.

Laboratory tests with regard to the use of mood-stabilizing medications were ordered only once during the monitoring period. Blood was drawn, and results were reviewed within appropriate timeframes by the psychiatrist. Progress notes were thorough and included follow-up recommendations.

Sexual Misconduct:

Seven inmates receiving RVRs were referred to mental health for assessments. Three of the assessments indicated that the behavior was affected by mental illness. There was no indication of consideration of the clinical assessment affecting the disposition for any of these three. Further, the custody-maintained disciplinary log did not list the inmates as caseload inmates, but rather as general population inmates.

Transfers:

There were 32 admissions to the OHU at CVSP. There were no referrals to DMH during the monitoring period. Twenty-four inmates were referred to MHCBs; however, only ten transferred. Inmates were referred within 24 hours of admission to the OHU, although actual transfer was noncompliant and took an average of seven days. Inmates were seen daily while awaiting transfer, and the majority of inmates were placed on suicide watch. The average length of stay in the OHU during the monitoring period was nearly nine days. Fourteen inmates

needing crisis level care who had been transferred from ISP to CVSP for this care were returned to ISP after they no longer needed OHU placement or transfer to an MHCB institution.

During the monitoring period, 100 inmates were identified as needing mental health services. Of these, 83 percent were designated as 3CMS, ten percent as MHCB, and seven percent as EOP. CVSP transferred all 3CMS and EOP inmates to appropriate institutions within the established transfer timeframes. Weekly clinical contacts with case managers were provided to all 3CMS and EOP inmates until they were transferred to appropriate institutions or paroled.

Inappropriate transfers of 39 inmates to CVSP continued to account for approximately 40 percent of the institution's mental health population. These inmates arriving at CVSP inappropriately, with or without psychotropic medications, were transferred to appropriate institutions, primarily within transfer timeframes. Thirty-eight percent of these inappropriate transfers were from CIM. Thirty of the inmates were on psychotropic medications, and mental health placement chronos were not found in UHRs in 25 cases.

Other Issues:

      3CMS

      CVSP was compliant with the provision of care for its 3CMS population. Weekly clinical case management was provided, and IDTT meetings were timely. No MHSDS inmates were removed from the mental health program prematurely during this monitoring period.

**California Institution for Women (CIW)**
July 22, 2008 – July 24, 2008

Census:

In July 2008, CIW's census was 2,670 inmates, including 310 fire camp inmates. The mental health caseload population was 815 inmates, or 30 percent of the prison's population.

It increased by 12 percent since the preceding monitoring period. There were 61 inmates in the mainline EOP and 545 inmates in the mainline 3CMS program, and there were an additional 46 EOP inmates and 135 3CMS inmates in the reception center. Ten inmates were in the CTC, five inmates were in the PSU, and one EOP and 12 3CMS inmates were housed in administrative segregation.

Staffing:

CIW achieved nearly full staffing during the monitoring period, with a mental health clinical position vacancy rate of only 3.5 percent with no registry staff utilized. Allocated positions at CIW included one chief psychiatrist, one senior supervising psychiatrist, one chief psychologist, five senior psychologists, and 8.5 staff psychiatrists. Additionally, CIW had 25 staff psychologists, 7.5 social workers, two senior psych techs, 17 psych techs, and four recreation therapists. One unfilled social worker position and 1.5 unfilled psychologist positions were the only vacancies at the time of the monitor's visit.

Quality Management:

The quality management process remained active and integrated with provision of services. The quality management committee met twice a month, and the mental health subcommittee generally met twice a month. There was an active peer review process in place for psychiatrists, psychologists, and social workers. A committee on access to care, comprised of mental health, medical, and custody personnel, was established to address issues related to mental health care and custody interface.

Suicide Prevention:

The SPC met monthly during the monitoring period, and minutes were maintained. A suicide history tracking policy and procedure was in draft form at the time of the

monitor's visit.

The institution had a well-implemented process for five-day post-MHCB follow-ups and DMH returns.  Institutional logs indicated compliance with five-day follow-ups during the monitoring period, but custody checks were noncompliant.

Medication Management:

Due to the institution's focus on the recently implemented Maxor pilot project for automation of pharmacy procurement and distribution, audits of some areas of medication management were postponed.  A limited sample indicated that medication continuity upon arrival was compliant, but continuity of medications upon movement within CIW was noncompliant.  Compliance with medication continuity after changes in orders decreased significantly to 44 percent during the monitoring period.

CIW did not audit medication noncompliance data or pill line issues during the monitoring period.  Plans were in place for the installation of three new pill line windows, with two on the general population yards and one in the EOP building.  Long pill lines continued to negatively affect many aspects of programming at CIW, especially the provision of group therapy.

There was improvement in the tracking of medication errors since the implementation of the Maxor pharmacy system, but the information provided listed only the number of medication errors and did not include data regarding follow-up after errors were noted.

Completion of MARs improved from 77 percent to 84 percent during the monitoring period.

CIW did not provide information regarding audits for laboratory testing for mood-stabilizing medications.