There were ten inmates housed at CIW who were on active Keyhea orders as of June 12, 2008. From January 1, 2008, to June 13, 2008, there were 19 inmates who had been on Keyhea orders. Three of those inmates' Keyhea orders were renewed during this period, and 16 inmates were placed on new orders. Two of the inmates had paroled, and two were discharged and transferred to Patton State Hospital as mentally disordered offenders.

Approximately 20 percent of MHSDS inmates received HS medications at CIW. Staff psychiatrists were educated regarding the use of HS medications. The psychiatric peer review process monitored the practice of prescribing HS medications.

The facility had a process in place for the provision of parole medications within 15 to 30 days of inmates' releases. The process involved the provision of a 30-day supply of medications upon release. No audits of this process were provided.

Sexual Misconduct:

From November 1, 2007, to July 2, 2008, six mental health evaluations were requested as a result of RVRs issued for sexual misconduct. A review of the available reports from the senior hearing officer indicated that clinician input was considered and that penalty mitigation occurred for two of the cases. Two inmates were referred for more extensive mental health evaluations, which were comprehensive, were well organized, and addressed diagnostic issues including the possible diagnosis of Exhibitionism. One inmate was referred to the DA for possible prosecution.

Transfers:

CIW referred only three inmates to DMH at Patton State Hospital during the monitoring period, and all were rejected. Rejections took eight, 15, and 28 days. Staff indicated that Patton State Hospital declined inmates with histories of staff assault or strong Axis II

338

tendencies and behavioral issues.  It was reported that staff did not make more referrals to Patton State Hospital due to the likelihood of rejection or swift return, but anticipated making substantial use of the 45-bed ICF/acute care facility planned for construction at the institution. Logs maintained by the institution did not include the reasons why referrals were not made to Patton State Hospital.

There were no problems with psych and return protocols during the monitoring period.

There were 194 admissions, or 54 percent of all referrals, to the MHCB from January 1, 2008, through June 13, 2008.  The average length of stay was 4.8 days, with five percent of all admissions staying longer than ten days.  There were 34 inmates, or 18 percent, who had three or more admissions within a six-month period.  More than 84 percent of referrals not admitted to the MHCB occurred after hours.  CIW did not use alternate sites for placement of crisis bed inmates pending admission or transfer to an MHCB.  Fifteen percent of admissions resulted in five-day follow-ups upon discharge, and 97 percent of those were completed appropriately.

Daily psychiatric contacts were compliant for the reporting period.  The institution reported a compliance rate of 99 percent for initial MHCB IDTT meetings and 97 percent for follow-up IDTT meetings, when necessary.  CIW completed 100 percent of SRACs at the time of admission and discharge.

The PSU at CIW accommodates the statewide need for female inmates in the CDCR.  The ten-bed PSU program continued to operate out of the temporary location in the refurbished OHU.  The PSU clinical staff included a part-time psychiatrist, two full-time psychologists, a part-time-time social worker, and a part-time recreation therapist.  Psych tech

services were provided on second and third watches only. The PSU had one group room with five therapeutic modules, a single interview room with one therapeutic module, and a conference room that was used for IDTT meetings.

From January 2008 through June 2008, there were only two transfers to the PSU. The time from referral to endorsement took two days for one inmate and 22 days for the other, with transfer occurring within five days for both inmates. It was reported that two inmates from VSPW were on the waiting list for approximately three weeks at the time of the visit. Case manager contacts and IDTT meetings were compliant during the monitoring period. CIW offered an average of 20.44 hours of structured therapeutic activities per week, with the average number of hours received at 12.83 per week.

During the monitoring period, 319 3CMS inmates transferred from the CIW reception center. Only seven inmates, or three percent, were not transferred within 90 days due to pending RVRs, records audit backlog, unavailable bus seats, enemy concerns, and clerical error. At the time of the monitoring visit, none of the 135 3CMS inmates in the reception center had exceeded transfer timeframes.

There were 76 EOP inmates transferred from the reception center during the monitoring period. Nineteen inmates, or 25 percent, did not transfer within 60 days due to missing chronos, pending RVRs, records backlog audits, and unknown reasons. At the time of the monitoring visit, none of the 46 EOP reception center inmates had exceeded transfer timeframes.

The EOP reception center inmates were housed in the mainline EOP unit and received the same services as the mainline EOP inmates. CIW had no allocated staff for reception center EOP inmates, but provided services through one full-time psychologist and a

social worker from other areas.

The institution was compliant with screening new arrivals with EOP histories within 72 hours and evaluating them within seven days. IDTT meetings were held within 14 days of arrival, and weekly case manager contacts occurred throughout the monitoring period.

Reception center EOP inmates were offered more than five hours per week of structured, out-of-cell activities. Internal reports indicated that 96 EOP inmates were released to the community during the monitoring period. Training was provided to the social worker responsible for re-entry planning.

Other Issues:

Administrative Segregation

During the monitor's visit, there were one EOP and 12 3CMS inmates housed in administrative segregation. Staffing for the unit included three case managers, one full-time psychiatrist, and three psych techs. CIW had implemented the administrative segregation suicide reduction plan, and records indicated that 30-minute checks were performed as required. Inmates were allowed the use of one electrical appliance in their cells. 3CMS inmates were seen weekly by case managers and were offered out-of-cell contacts.

The unit had four therapeutic modules for group therapy and one additional module for individual contacts. It was reported that two escort officers were assigned to mental health during the week, but weekends were problematic as regular custody staff were hesitant to provide assistance for out-of-cell contacts. EOP inmates were offered group therapy, but the offering of ten hours had not yet been accomplished. Newly arrived inmates were screened timely out of cell, and suicide profiles were reviewed prior to screening.

Pre-placement screening was problematic. There was no documentation in UHRs

of completed screenings during the monitoring period.  Daily psych tech rounds were compliant during the monitoring period. Use of the inmate suicide profile was implemented during the monitoring period.

EOP

Endorsed EOP inmates were housed in the Support Care Unit together with unendorsed reception center inmates.  The institution continued to have adequate treatment space for the provision of clinical services, which also allowed CIW to offer the required number of group treatment hours.  For the reporting period, 29 percent of scheduled groups were cancelled. The EOP building had only one pill window for medication delivery, which caused delays and accounted for more than 30 percent of group cancellations.  It was reported that a second pill window would be operational in the near future.

Mainline EOP inmates were offered an average of 13.42 hours of clinical activities per week and received an average of 6.39 hours.  Reception center EOP inmates were offered an average of 11.84 hours per week and received an average of 6.43 hours.  Refusal rates were problematic at over 45 percent.

3CMS

CIW continued to meet Program Guide requirements for the provision of services to inmates requiring a 3CMS level of care.  Audits indicated 91-percent compliance with timely case manager contacts.  At the time of the visit, there were 14 different group formats, with a total of 28 groups offered weekly, providing 335 patient contacts per week.  The topics of group therapy offered were varied and clinically relevant.

CIW had an adequate system in place for the triage and tracking of referrals. Overall compliance rates improved over the monitoring period.  From January 1, 2008, to June

342

13, 2008, 2,730 referrals were processed, with a compliance rate of 75 percent. Routine referrals were timely evaluated in 72 percent of cases. Urgent and emergent referrals had compliance rates of 89 percent and 98 percent, respectively.

Heat Plan

Implementation of the heat plan was problematic during the monitoring period. While housing unit hall temperatures were monitored and recorded, cell temperatures were not. Additionally, unit temperatures were not consistently checked at the end of the unit where sunlight comes in throughout the day. Concerns were also raised regarding the time of year at which the facility's heating system was turned off for the summer season. Reports were made that the heat in some units was not turned off until June, while another unit reported that the heat was still running at the time of the monitor's visit. Further investigation revealed a steam leak flowing into the inmate cells.

EOP programming space had no ventilation, and no thermometers were provided to monitor room temperatures. Four 3CMS clinicians had offices in converted cells in housing unit Walker B. The cells had no ventilation, and though routinely requested, thermometers were not provided.

Mental health staff addressed these issues through the QMC with no relief. While immediate modifications were made, and thermometers and fans were distributed during the site visit, continued monitoring was warranted.

Administrative segregation staff provided early morning yard time to accommodate inmates taking heat-sensitive medications. Also, education staff were very familiar with the heat plan, and all classrooms were monitored with digital thermometers. Fans

and/or portable air conditioners were provided in the classrooms, but many of the air conditioners were not operable due to technical problems that appeared to be easily remedied.

Prison Industry Authority correctional staff appropriately monitored ambient temperature in three areas of the facility.

**Central California Women's Facility (CCWF)**
September 9, 2008 – September 11, 2008

Census:

The total institutional population on September 11, 2008, was 4,092. There were 1,146 MHSDS inmates, 30, or 2.6 percent, more than were reported during the monitor's preceding site visit. The EOP population stood at 60, which included seven administrative segregation status inmates, 49 mainline inmates, and four reception center status inmates. All mainline EOP inmates, as well as the four reception center status EOP inmates, were housed in the EOP program. Six of seven EOP inmates on administrative segregation status were housed in the administrative segregation overflow unit, located within the same housing unit as the EOP program. One EOP inmate on administrative segregation status was housed in the primary administrative segregation unit.

The 3CMS population stood at 1,080, which included 917 mainline inmates, 122 reception center inmates, 31 administrative segregation status inmates, and ten condemned inmates.

Staffing:

Most of the clinical supervisory positions were filled during this reporting period. The presence of consistent and competent leadership had notably improved mental health services at CCWF. In particular, group therapy for EOP and 3CMS inmates had substantially improved.

Among clinical supervisors, 7.5 of 8.5 positions were filled, with one senior psychiatrist position unfilled and covered by an acting staff psychiatrist. All 8.5 allocated psychiatrist positions were filled. However, a full-time psychiatrist was redirected to temporarily fill the vacant senior psychiatrist position, a half-time psychiatrist was on extended leave, and a full-time psychiatrist was required to cut his hours to part-time in order to reduce accrued vacation time. Consequently, two of 8.5 allocated psychiatrist positions were not covered.

CCWF successfully filled all other mental health staffing classifications except staff psychologist positions. Of the institution's 93.39 allocated mental health positions, 20.29, or 22 percent, remained vacant. Staff psychologist vacancies comprised nearly 90 percent of the total vacancies. Despite numerous psychologist vacancies, case manager caseloads remained within accepted sizes in all MHSDS programs. Case manager caseloads ranged from 20 to 25 for EOP and from 18 to 20 for 3CMS administrative segregation, and averaged 85 for 3CMS mainline.

Like many other prisons, CCWF increasingly hired unlicensed clinicians. At the time of this site visit, four psychologists and two social workers were unlicensed.

All nursing positions, including two SRN IIs, a senior psych tech, eight psych techs, and nine RNs, were filled. Five recreation therapist positions were filled, as was a health programs specialist position. All clerical positions, including 11.5 office techs and assistants, a medical secretary, and a medical transcriber, were filled.

Quality Management:

CCWF's quality assurance program was revitalized under the guidance of new mental health leadership. Audit methodology and accuracy improved. A newly established quality assurance analytical unit with three full-time workers had begun to systematically collect

and analyze performance data from each program area in order to timely identify problems and devise strategies for improvement.  QITs were chartered to resolve issues related to UHR availability and timely completion of initial clinical intake assessments and IDTT meetings.  The overall focus of the quality assurance program had shifted from retrospective reviews of discrete CAP items to data-based analyses of processes and systems that broadly affected the provision of mental health services.

The quality management committee and mental health subcommittee each met twice a month.  Both meetings were multidisciplinary and well attended.  Minutes were taken and regularly reviewed by committee members.  Peer review was not fully functional.

<u>Suicide Prevention</u>:

The SPC met monthly and routinely reviewed pertinent issues, including incident reports related to self-mutilation, suicide attempts, RVR mental health evaluations, admissions and re-admissions to MHCBs, and compliance with five-day follow-up for inmates discharged from MHCBs.  The local suicide prevention policy had been updated and was pending final approval at the time of the monitor's visit.

Tracking paperwork indicated that the institution was 96-percent compliant with the monitoring protocols for inmates discharged from the MHCB with orders for five-day clinical follow-up.  In two of three noncompliant cases, the fifth and final contact was missed due to lack of coverage for an absent clinician.  In the remaining case, contact was missed when the inmate refused to go to the CTC to see the psychiatrist-on-call during the weekend.  This case prompted the institution to revise its practice, and on-call clinicians were currently required to go to the inmate's housing unit if the inmate refused to come to the CTC.

Compliance with custody checks associated with five-day follow-up was poor. During the reporting period, custody checks were fully completed for 22 of 61 cases, generating a compliance rate of just 36 percent.  Staff had reportedly taken steps to improve performance in this area.

In accordance with CDCR policy, inmates in the MHCB placed on suicide watch were provided with one-to-one direct observation and suicide precaution 15-minute behavioral checks.  Video cameras were no longer used to monitor inmates in the MHCB.  Inmates on suicide watch and precaution were given tear-proof smocks, mattresses, and blankets, all of which were readily available.

CCWF continued to implement the administrative segregation suicide prevention plan.  All inmates were screened for past and current suicidal behavior and feelings prior to their placement in administrative segregation.  Clinicians screened all inmates placed in administrative segregation using the Department's 31-item questionnaire.  Internal audits showed that all screens were completed within 72 hours of the placement during the monitoring period, and staff reported that most screening interviews were conducted in a private setting due to a low inmate refusal rate.

Inmate profiles, which listed the results of completed SRACs among other things, routinely accompanied inmates transferred from the institution and were provided to staff involved in the screening process for administrative segregation.

Four intake cells had been identified and modified in order to reduce suicide risk, although new-intake inmates were scattered in cells throughout the administrative segregation unit.  New arrivals in administrative segregation remained on intake status for 21 days and were identified with placards on their cell doors.  Custody wellness checks for inmates on intake status

347

did not consistently occur every 30 minutes as required, but often occurred at regular and predictable intervals.

Nine psych techs were assigned to administrative segregation and were responsible for passing all medications and completing daily rounds. The institution reported that daily psych tech rounds consistently occurred, but acknowledged that documentation of rounds was inadequate. Staff training was provided in July 2008, and an audit in August 2008 showed improvement in this area. Custody escort in administrative segregation was reported to be adequate.

Administrative segregation cells were equipped with working electrical outlets, and inmates in administrative segregation were permitted to have one in-cell entertainment appliance after ICC approval.

Mental health staff assigned to administrative segregation met daily with the custody sergeant and a mental health officer. Custody staff reported that all inmates in administrative segregation were offered outdoor yard ten hours per week.

Documentation of monthly medical emergency drills and CPR training was provided.

Medication Management:

Medication management at CCWF was in a state of transition related to implementation of the Maxor pharmacy management information system, which commenced one month before the monitor's visit. The institution provided audits of some areas within medication management, none of which yielded interpretable results due to inadequate sample sizes and failure to differentiate between medical and psychotropic medications.

Impressions based on anecdotal reports, UHR reviews, and consideration of institutional audits indicated that medications were timely renewed and administered, and that new-arrival prescriptions were consistently accompanied by a physician's order and valid MAR or pharmacy printout.  Medication continuity upon arrival was most often accomplished with 30-day bridge orders followed by psychiatric contact within two weeks of arrival.  This practice was problematic for inmates who arrived at CCWF with medication orders that were changed in order to comply with CDCR formulary restrictions.

Medication continuity for inmates who were moved within the institution remained problematic.  Internal audits suggested that custody officers failed to consistently ensure that medications followed inmates who were moved from one yard to another.  In some instances, noncompliance was attributed to local security protocols that permitted inmates to move unescorted from one yard to another.

Most psychotropic medications were ordered DOT.  Supervisory staff reported improvement in this area, based on a decrease in documented incidents of cheeking and hoarding.  Nursing supervisors reportedly observed pill lines on a regular basis, but had not conducted any formal audits.

Internal audits yielded a 90-percent compliance rate for timely response to medication noncompliance referrals, locally defined as psychiatric contact within ten to 14 days of referral.  The audits did not examine whether medication noncompliance was appropriately recorded on MARs and consistently referred to mental health.

Staff and inmates reported that pill lines continued to be long and that waits in excess of an hour were increasingly common.  Pill lines were not formally audited during the reporting period.

Methodologically sound internal audits showed that psychiatrists timely ordered blood work for inmates taking mood-stabilizing medications, results were reported, and appropriate follow-up occurred.

Staff reported no problems with the Keyhea process. Throughout the reporting period, there had been 25 inmates at CCWF on current Keyhea orders, eight of whom remained at the institution at the time of the monitor's visit. No Keyhea petitions were denied during the reporting period. One petition was pending at the time of the monitor's visit.

CCWF appeared to have a procedure in place to ensure the provision of medications upon an inmate's release from prison. Staff provided a list of 30 inmates who were released from CCWF during the first quarter of 2008, all of whom acknowledged by signature their receipt of medications upon discharge.

There were 147 inmates prescribed HS medications at CCWF during the site visit. Inmates reported that HS medications were consistently administered at or after 8:00 p.m. The institution had not audited compliance with HS administration requirements.

The institution had not audited the completion of informed consent forms for prescribed medications. However, CCWF's practice of using bridge orders to change non-formulary prescriptions for newly arriving inmates, most of which were written without contact with the inmate, indicated that informed consent was sometimes obtained one to two weeks after new medications were initiated.

Sexual Misconduct:

RVRs issued for sexual misconduct were rare at CCWF. There were no inmates at CCWF diagnosed with Exhibitionism at the time of the monitor's visit. During the reporting period, CCWF generated 81 RVRs for which mental health evaluations were requested. The

monitor's review of provided RVRs and mental health evaluations indicated that hearing officers routinely documented their consideration of mental health input and that RVRs were dismissed in some cases based on information provided by mental health staff.

Transfers:

All CCWF inmates deemed to require DMH services were referred to Patton State Hospital at an intermediate level of care. CCWF did not consistently meet transfer guidelines for referrals to intermediate care, which require transfer within 30 days of referral and 72 hours of clinical acceptance. In addition, the DMH referral log was incomplete.

During the period from March 1 through August 2008, CCWF generated 14 referrals to Patton State Hospital, all of which reportedly resulted in the inmate's transfer. In five cases, the referral log failed to record the referral and/or transfer date. Two of the remaining nine inmates were not transferred to Patton State Hospital within 30 days of referral, each missing the mark by a few days. Eight inmates were not transferred within 72 hours of acceptance.

Access to MHCBs was adequate. Alternative holding areas were not used to monitor inmates pending admission to the MHCB unit.

During the six-month reporting period, there were 118 MHCB admissions, or an average of about 20 per month. Ninety-five admissions, or about 81 percent, were from CCWF, and the remaining 19 percent were from VSPW. Lengths of stay exceeded ten calendar days for 31 admissions, or 26 percent of all admissions. Average length of stay in the MHCB was nine days. Seventeen inmates were admitted to the MHCB two or more times during the reporting period. All inmates with three or more MHCB admissions during a six-month period were reportedly considered for EOP or DMH levels of care via the IDTT process.

Approximately 97 percent of the inmates released from the MHCB during the reporting period returned to a housing unit at CCWF or VSPW within 24 hours of clinical discharge, a considerable improvement compared to preceding monitoring periods.

Despite its close proximity to the EOP administrative segregation hub at VSPW, which is literally across the street, CCWF did not consistently meet the 30-day transfer guideline. At the time of the site visit, there were seven EOP inmates awaiting transfer to the administrative segregation hub at VSPW.  Two of seven inmates exceeded the 30-day limit and had been waiting 45 days and 76 days, respectively.  Another two inmates had been waiting 29 days and were likely to exceed the transfer deadline.  Staff reported that administrative segregation hub beds were available at VSPW and that transfer delays were largely the result of internal processing delays.

CCWF consistently complied with the 60-day transfer timeframe for EOP inmates and the 90-day transfer guideline for 3CMS inmates in the reception center.

Other Issues:

Reception Center

Newly arriving EOP inmates who had yet to be endorsed to an EOP program were not housed in CCWF's reception center.  Reception center-status EOP inmates were housed and programmed with mainline EOP inmates.  A social worker was assigned to provide pre-release services to all EOP inmates with impending parole dates.  Services reportedly included providing assistance to inmates in need of placement in board and care facilities.  The monitor's review of a small sample of UHRs indicated that intake screens and initial assessments were timely completed.

MHCB

CCWF operated a 39-bed skilled nursing facility (SNF), which included 12 MHCBs. The status of SNF licensure was unclear because the license displayed within the facility was not current. Staff reported that the MHCBs within the SNF were operated in accordance with CTC policies and procedures, except that SNF licensure prohibited the utilization of restraint and seclusion.

The MHCB program was staffed with a psychiatrist, two psychologists, an office tech, and a recreation therapist, as well as nursing and custodial support staff. A dual-appointment psychologist was assigned to triage inmates referred to the MHCB during non-business hours four days a week. Psychologists were granted MHCB admitting privileges.

MHCB services at CCWF continued to meet basic Program Guide requirements. Histories and physical examinations were routinely completed by the admitting or attending psychiatrist within 24 hours of admission, and transcribed reports were found in inpatient records. Inmates were assessed and monitored daily by treating clinicians, IDTTs convened twice a week to ensure timely initial reviews and weekly updates as needed, and SRACs were routinely completed upon admission and discharge. Progress notes related to IDTTs, medication monitoring, and clinical intervention were timely placed in inpatient records and later transferred to UHRs.

EOP

There were three full-time case managers assigned to the EOP, each with caseloads of about 20 inmates. There was also the equivalent of three full-time recreation therapists and a part-time psychiatrist who split his time between EOP and administrative segregation.

The EOP program had undergone changes that were initiated in response to issues raised during the preceding monitoring visit. Inmates were no longer regularly seen by their case managers on the dayroom floor. Rather, individual sessions routinely occurred in private clinician offices. Safety issues associated with this change were addressed, and escort of inmates to the offices reportedly occurred without difficulty. The facility's audits showed greater than 90-percent compliance with weekly case manager contacts.

The provision of group therapy had also undergone change during the reporting period. The number of groups run by clinicians was increased in order to improve quality, and the number of recreation therapy activities was increased. The institution had also taken concrete steps to reduce the number and duration of program disruptions attributed to lockdowns.

Staff provided up to seven hours of group therapy per day, five days per week. During August 2008, EOP inmates were offered an average of 21.9 therapeutic activity hours a week and received an average of 11.6 hours a week. Over 90 percent of EOP inmates were offered at least ten activity hours a week during August. Education was included in the August 2008 results, but not case manager and psychiatric interviews. Jobs were not available to EOP inmates.

Finally, admissions to and discharges from the EOP program were more formally folded into the IDTT process and were closely monitored by clinical supervisors.

Despite these notable improvements and demonstrable commitment on the part of custodial and clinical supervisors, the EOP program continued to be adversely affected by its location within a housing unit that served as the institution's overflow administrative segregation unit. The presence of administrative segregation inmates, whose numbers sometimes approached 20, often disrupted clinical activities, posed concerns regarding confidentiality and

safety, and compromised the program's therapeutic milieu.  In addition, EOP inmates were relegated to quasi-walk-alone yards attached to the overflow unit and continued to experience delays in obtaining personal property.  At times, the environment in the housing unit was more closely aligned to that of an administrative segregation unit than an EOP program.  The institution planned to charter a QIT that would be tasked with finding a solution to this long-standing problem.

### 3CMS

The mainline 3CMS program notably improved in many areas.  Despite a functional vacancy rate of 27 percent among case managers, the average caseload within the mainline 3CMS program was 85 inmates.  3CMS inmates continued to be seen by their case managers at least quarterly, and in some cases as often as biweekly or monthly.  Each yard had an assigned psychiatrist, and psychiatric contact occurred regularly.

As a result of several interventions recommended by a QIT, the compliance rate for timely completion of initial case manager contacts and IDTT reviews surpassed 90 percent and appeared ready for resolution.  Increased custody cooperation regarding inmate compliance with priority ducats had resulted in fewer cancelled mental health appointments.

Following the addition of 1.25 full-time equivalent recreation therapists in August 2008, CCWF added 30 new groups that primarily focused on inmates transitioning from EOP to 3CMS and activities geared toward non-MHSDS and developmentally disabled inmates. Consequently, the number of 3CMS inmates on waiting lists for groups had substantially decreased, reportedly falling from 340 to 40 during the weeks immediately preceding the monitor's visit.  The average time an inmate waited for a group assignment was expected to drop from 18 months to about eight weeks.

CCWF had also reduced from 265 to 40 the number of non-MHSDS inmates taking psychotropic medications. The institution was working on a system to quickly identify non-MHSDS inmates discharged from medical beds in the SNF with orders for psychotropic medications.

IDTT composition was an area of noncompliance. In order to address this ongoing problem, CCWF adopted a set Tuesday/Thursday IDTT meeting schedule during the reporting period. The new schedule produced mixed results. The rate of psychiatric attendance increased dramatically, rising from 14 percent in April 2008 to 87 percent in June 2008. During this period, inmate attendance improved only slightly, moving from 59 percent to 66 percent. Correctional counselor attendance, on the other hand, decreased from 75 percent in April to 62 percent in June.

IDTT attendance rates for case managers were reported to be at or near 100 percent during the monitoring period. However, due to CCWF's increased utilization of part-time contractors and dual appointments, three case managers assigned to the mainline 3CMS program did not work either Tuesdays or Thursdays, and two others worked only Mondays and Tuesdays. As a result, IDTT reviews routinely occurred without the assigned case manager present. When this occurred, the case manager prepared paperwork that was presented to the IDTT by another clinician, which was condoned and presented as compliant in local audits.

Administrative Segregation 3CMS

CCWF's administrative segregation unit occupied half of the building that housed the EOP program. Overflow administrative segregation inmates were housed in a cluster of cells within the EOP section of the building. Administrative segregation-status EOP inmates were transferred to the administrative segregation hub at VSPW.

The monitor's review of inmate contact histories and UHRs, as well as inmate interviews, indicated that 3CMS inmates in administrative segregation were seen weekly by their case managers.  Internal audits found that inmates were removed from their cells to attend case manager interviews in 95 percent of cases.  Interviews were conducted in a private room that was equipped with therapeutic module, as well as in three other areas that afforded more limited but adequate confidentiality.  Group therapy and recreation therapy were not offered to 3CMS inmates in administrative segregation due to lack of space.

Referrals

CCWF did not consistently respond to mental health referrals within five working days.  An MHTS referral report indicated that staff responded to 1,369 referrals from mainline yards during the period from June 1, 2008, to July 31, 2008.  The first 20 pages of this report listed 235 referrals, 70, or 30 percent, of which did not generate contact within seven calendar days.

Because of ongoing concerns about the accuracy of MHTS referral data, staff developed a parallel referral tracking system with different software.  Using this alternative tracking system, during August 2008, staff recorded response times for 255 referrals, including those generated by medical and mental health staff, resulting from medication noncompliance and submitted by inmates.  Over half of the listed referrals failed to generate a response within five working days.

In an effort to improve referral response times, shortly before the monitor's visit CCWF instituted a system whereby staff were assigned to collect and triage referrals from all yards on a daily basis.  The institution had not yet measured response times associated with the new system.

Medical Records/MHTS

The MHTS at CCWF was upgraded to the latest version about a month prior to the site visit. Clerical staff reported that the upgrade was a significant improvement and that it was easier to produce several useful reports. However, the MHTS did not permit staff to purge or archive old data. As a result, the system was sluggish and often took an inordinate amount of time to process routine requests and retrieve information.

Heat Plan

CCWF was compliant with several components of the local heat plan, but failed to effectively use heat cards to protect inmates taking heat-sensitive medications from prolonged exposure to excessive external temperatures.

According to records maintained by the institution, there were 15 Stage II heat alerts and two Stage III heat alerts during the summer of 2008, all of which were the result of a combination of hot weather and malfunctioning ventilation systems in housing units. Housing unit logs recorded activation and deactivation of Stage I, II, and III heat alerts, but did not document cooling interventions. However, interviewed inmates confirmed that ice was provided to all inmates, including individuals not prescribed heat-sensitive medications, during Stage II heat alerts, and reported that all inmates had continuous access to cool showers.

Inmates and staff reported that heat cards did not consistently give inmates access to housing units during Stage I heat alerts. Nor were inmates with heat cards permitted to bypass long lines during hot weather. Consequently, inmates taking heat-sensitive medications were often exposed to excessive outdoor temperatures for longer than 30 minutes when waiting in lines associated with pill windows and work release, and when locked outside of their housing unit.

**Valley State Prison for Women (VSPW)**
April 21, 2008 – April 23, 2008

Census:

As of April 18, 2008, there were 3,847 inmates housed at VSPW. On April 22, 2008, there were 13 inmates at the EOP level of care and 1,093 inmates at the 3CMS level of care. There were five EOP inmates and 181 3CMS inmates in the reception center. Four EOP inmates were in administrative segregation, and one EOP inmate was in the SHU. The administrative segregation unit and the SHU each held 29 inmates at the 3CMS level of care. There were three EOP inmates and 854 3CMS level of care inmates in the general population units.

Staffing:

Staffing of mental health supervisory positions became more stable. Significant hiring of mental health staff had occurred. The allocated staff vacancy rate was down from 35 percent to 22.77 percent. The hiring of a permanent chief of mental health was imminent.

Since April 2007, a mental health clinical staff of approximately 30 was hired. The addition of supervisory staff was beneficial, as 13 new social work and psychology hires were unlicensed. Clerical support staff reportedly remained insufficient for the workload demands.

A request for a senior psychiatrist position had been placed on hold, and the institution planned to utilize a staff psychiatrist to act as the lead psychiatrist. The chief psychologist position was vacant. However, a longtime acting chief had been offered the position and was expected to formally fill it shortly after the conclusion of the monitor's visit. All four senior psychologist supervisor positions were filled.

359

Of the 6.5 allocated psychiatric positions, four were filled.  For September 2007 through March 2008, contract psychiatrists covered 98 percent of the vacancies.  As psychiatric staffing improved, so did psychiatrists' participation in IDTTs, which showed greater than 90 percent compliance as reported by institutional audits.

Clinical psychologists were allocated 28.2 positions, of which 20.5 were filled.  One psychologist was on long-term sick leave.  Contract psychologists covered 18 percent of the vacancies during September 2007 through March 2008.

The 1.2 supervising social worker positions remained vacant.  Of the 6.3 social worker positions, .55 were vacant.  The senior psych tech position was filled.  Thirteen of the 14.66 allocated licensed psych tech positions were filled.  Of the 4.44 RN positions, four were filled.  The health program specialist I position was filled.  One of the 3.75 allocated recreation therapist positions was pending completion of the hiring process at the time of the site visit.  Of the eight allocated office technician positions, 7.5 were filled.  A limited-term .5 office assistant position was vacant.  The associate governmental program analyst position was filled.

Quality Management:

For both the quality management committee and the mental health subcommittee, attendance, documentation, and addressing of substantive mental health issues were in accordance with requirements, as reflected in meeting minutes.  QITs were chartered to address substantial mental health issues.

At the time of the monitor's visit, ongoing QITs were addressing peer review, laboratory tracking/mood-stabilizing medications, and the OHU.

VSPW reported that peer review meetings were held once a month.  Recommendations were discussed with the chief of mental health, and training for staff was then

developed.  Individual clinicians had informal collegial meetings with their supervisors.  Special

training sessions by discipline were also utilized as needed.

    The institution's peer review processes found that clinical work appeared to have

improved.  There were problems with completeness of forms, such as omissions of the time of

the contact or birth date of birth of the inmate.  There were also problems with the SOAP format,

legibility of progress notes for a few clinicians, and misunderstandings of the proper way to

document a mental status examination.  Some clinicians failed to refer to the treatment plan and

had inadequate entries relating to follow-up.  Amended or boilerplate mental health forms

continued to be used.

    Peer review on psychiatric prescribing practices was not effective.  Notably, the

peer review process included those prescribers who were involved in the problematic practices.

The peer review process was evolving and needed to be strengthened in each discipline,

particularly in psychiatry.  In addition, documentation that peer review was intra-disciplinary and

not interdisciplinary needed to be clearly spelled, out as did the requirements of appropriate peer

review reports.

Suicide Prevention:

    Although both the SPRFIT and the ERRC met regularly with appropriate

attendance, the meetings appeared to be *pro forma* and perfunctory.

    The SPC discussed suicidal events but did not document assessments as to

whether the events represented a gesture, self-mutilation, or attempt.  This determination was

required for proper tracking and monitoring, and especially for evaluation of treatment planning,

and clinical and custodial follow-up.  Similarly, the ERRC meetings did not document

deliberations, nor did it determine whether institutional and outside emergency response actions satisfied required standards.

VSPW continued to satisfy administrative segregation requirements, including pre-placement screening, post-placement screening, intake cell identification, psych tech rounds, documented and reviewed 30-minute welfare checks, and access to yard.  Entertainment devices were allowed in cells.

<u>Medication Management</u>:

There were significant improvements regarding medication management.  The hiring of four mental health nurses approximately one year ago, as well as additional psychiatric staffing, assisted significantly.  The facility provided good documentation of auditing of the various components of medication management.

VSPW was 94-percent compliant with continuity of medications to inmates arriving in the reception center with verified medications.  Audits of continuity of medications for inmates arriving in the reception center with unverified medications showed that the average number of days to medication evaluation by the psychiatrist was 11.5.

The facility's audits for November 2007 and January 2008 indicated that 87 percent of non-reception center inmates who went directly to general population upon arrival at the institution received their medications without disruption.  The November 2007 audit indicated at compliance rate of 71 percent.  The institution reported that the low compliance rate occurred during the period of training of new LVNs.

The facility's audits of November 2007 and February 2008 indicated 100-percent compliance with medication continuity for inmates transferred intra-institutionally. The facility had utilized pharmacy techs who reviewed the daily movement sheets and ensured that

psychotropic medications followed inmates after housing moves.  Supervisory staff expressed some concern regarding expected loss of these employees with the assumption of services by the Maxor pharmacy management information system during August 2008.

The facility performed audits that indicated 100-percent compliance with timely meeting medication refills.  However, staff and inmates continued to complain of medication lapses with refills, which the monitor will re-examine in the twenty-second monitoring period. The facility's audits indicated an 83-percent compliance rate for timely renewal of medications. This compliance rate was similar to that of the preceding monitoring period.

A protocol for the ordering of laboratory studies for mood-stabilizing medications and for atypical antipsychotic medications had been instituted. The facility provided audit results regarding the number of laboratory tests that were obtained, abnormal results, and the timeliness of testing.  The compliance rate for the first quarter of laboratory testing for 2008 indicated greater than 90-percent compliance.

The facility's audits indicated some problems with timely follow-up after medication noncompliance referral, with a compliance rate of 65 percent for the review period. However, despite this low compliance rate, the average number of days to follow-up was approximately seven, which was the goal for follow-up.  In addition to referral from the nursing staff regarding inmates who were noncompliant, the pharmacy techs also reviewed all of the MARs and referred those inmates who may have been missed by the nursing staff on a biweekly basis.

The institution did not provide audits of the pill lines.  This issue had historically been problematic, especially during the summer months.

363

The institution reported that it did not have any inmates on active Keyhea orders. It indicated that inmates in need of Keyhea were usually transferred to an MHCB or to DMH for stabilization.

Past monitoring visits led to concerns regarding psychiatric prescribing practices. Instances had been noted regarding the use of antipsychotic medications for punitive reasons as well as discontinuation of psychotropic medications without clinical rationale. The facility conducted an audit that revealed problems with psychiatric prescriptions for Haldol, which was one of the medications of concern in the past. A review of the UHRs for these cases led to significant concern regarding prescriptions for intramuscular dosages of Haldol without evidence of a true emergency, given without consent. (See Exhibit AA, Case Reviews A, B, C, D, and F.) If patients presented with a true emergency requiring involuntary medications, they were not considered for and transferred to a higher level of care and/or Keyhea. A review of the pharmacy printout of psychotropic medications revealed three current prescriptions for Haldol. These practices are inappropriate and should cease. The monitor will be closely examining and reporting on this area of concern in the upcoming twenty-second monitoring period.

Also of concern were the standing "as needed" orders to treat agitation lasting for 72 hours. It also appeared that there continued to be instances in which inmates with long histories of mental illness were admitted to the OHU, their diagnoses changed, and their medications discontinued based on alleged malingering. In one instance, the inmate eventually had to be referred to EOP due to decompensation. (See Exhibit AA, Case Review E.) These practices are also inappropriate and should be stopped. They will be closely monitored and reported on in the next monitoring period.

There were 201 prescriptions for HS medication administration at the facility. This number included all medications administered at HS and not specific to psychotropic medications. Inmates reported that HS medication passes consistently occurred, and it appeared that medications were ordered at HS when clinically appropriate.

The institution conducted an audit for November and December 2007 and February 2008 regarding receipt of parole medications upon discharge. The audit indicated that 98 percent of inmates received their medications when released.

Sexual Misconduct:

The monitor reviewed nine mental health evaluations that followed incidents in which inmates had been charged with indecent exposure or sexual disorderly conduct. In contrast to the existing guidelines with respect to the completion of these evaluations, seven of eight evaluations for which data were available occurred more than 72 hours following the occurrence of the behavior that had resulted in the issuance of the RVR. Five evaluations occurred from one week to more than one month after the RVR. Because of these delays, the probability that the evaluations reflected the inmate's mental status at or near the time of the infraction was substantially diminished.

The reports that were reviewed appeared to reflect an adequate mental health examination. Diagnostic impressions were generally adequately supported by the documented observations. In one situation in which the inmate's mental status was obviously quite unstable, the evaluating clinician's conclusion appropriately noted the possible exacerbation by mental illness and recommended an evaluation of the inmate's current medication regimen, but in all instances, the assessments included an opinion that the behavior was not attributable to Exhibitionism. Given the absence of any review of the inmate histories, the scope of these

evaluations was inadequate to support such a determination.  Because health care records were

not available for the monitor's review, it was not possible to determine whether the evaluations

had been reviewed by the IDTT, as required by existing policy.

Transfers:

From September 2007 through March 2008, VSPW made three referrals to

intermediate or acute care.  All of these referrals occurred within a three-day period in February

2008.  Once initiated, acceptance and transfer occurred quickly, with times from referral to

transfer ranging from 11 to 14 days.

Existing data suggested that VSPW seldom considered referral of inmates to

intermediate or acute care, even for those inmates who had repeatedly been within crisis care,

often for extended periods.  Though VSPW maintained a database that included records of safety

cell and OHU placement, there was no systematic process by which the IDTT considered these

inmates for possible referral to intermediate or acute care.

An internal audit found that from September 2007 through March 2008, 15

inmates were transferred for MHCB placement.  Of the 13 inmates who returned to VSPW

following MHCB placement, only three were identified as requiring five-day follow-up, and

none of these inmates were seen for five days.  During the same period, 121 inmates were placed

into safety cells, but nearly half of these inmates were transferred back to housing units with no

orders for five-day follow-up.  Of those for whom follow-up was ordered, 81 percent were

actually seen for five consecutive days.

From September 2007 through March 2008, 60 inmates were transferred to EOP

care.  A range of 75 percent to 100 percent, or an average of 91 percent, of these transfers

occurred within the required timeframes.  All such transfers in 2008 were within timeframes.

Other Issues:

Reception Center

The EOP reception center program had appropriate multidisciplinary staffing. The institution was compliant with EOP transfer deadlines and requirements for screening, evaluation, initial and subsequent IDTT meetings, case manager contacts, and access to psychotherapeutic services for EOP inmates in the reception center. Presented data showed that 38 EOP inmates transferred to the institution or were designated for the EOP level of care from September 1, 2007, to March 5, 2008. At the time of the monitor's visit, none of these inmates were at the institution. Of the 38 inmates, ten paroled from VSPW, 19 transferred within 30 days, six transferred within 31 to 60 days, and four transfers exceeded 60 days due to inpatient admissions or RVRs.

The institution reached a compliance rate of 84 percent for meeting reception center initial health screening requirements within 24 hours of the inmate's arrival at the institution. Of 38 EOP inmates transferred to the institution or designated at the EOP level of care between September 1, 2007, and March 5, 2008, 32 were screened on the day of arrival or the next day, and six were screened within two to four days of arrival.

EOP inmates were seen within a week after arrival for an evaluation to determine level of care. Of 38 EOP inmates transferred to the institution or designated at the EOP level of care between September 1, 2007, and March 5, 2008, VSPW completed 36 mental health evaluations in five calendar days or less.

EOP inmates were given an IDTT meeting within the first two weeks of their arrival, and then once a month on the reception center yard until they were transferred to another institution. Of 38 EOP inmates transferred to the institution or designated EOP between

367

September 1, 2007, and March 5, 2008, 35 IDTT meetings occurred within two weeks of arrival or EOP placement.

EOP inmates were seen by their case managers once a week. They were offered group therapy once a day for an hour. Staff reported that referrals to groups were made at the time of assessment and were automatic for EOP inmates.

The institution reported significant ongoing problems with office space for treatment and evaluation, taking into account the recent increase in staff. Reception center EOP inmates not in administrative segregation were housed in A-3 in two-person cells, and were reported to be monitored closely by custody. Staff reported that inmates who arrived and were placed in another housing unit were moved by the yard sergeant per the correctional counselor 2 (CC-2) as soon as possible. The housing unit was given an EOP list weekly to ensure awareness of these inmates.

EOP inmates who were identified as paroling within 30 to 60 days were referred to the psychologist who managed pre-release planning. Staff reported that they obtained lists of inmates within 180 days of release and commenced pre-release planning.

Administrative Segregation

The institution was meeting requirements for psychotherapeutic group hours, case manager contacts, and IDTT meetings in administrative segregation.

A tour of the administrative segregation units/SHUs showed that they were generally clean, neat, and orderly. The MHSDS clinical staff reported that relationships with, and support by, custody staff had improved greatly. With the hiring of more clinicians for administrative segregation, there had been improvement in available mental health services. The

hiring of two correctional officers dedicated to mental health improved escort services during the week, but there were still problems on the weekends.

The monitor observed that processing of inmates in and out of their cells was methodical and appropriate. Psych techs and the RN shared a confidential office space in the administrative segregation unit. Documented reports indicated that psych techs completed daily rounds appropriately.

VSPW adopted a procedure whereby clinical staff rather than correctional officers informed inmates of their scheduled mental health contacts. Staff reported that inmates appeared to be more receptive to this, resulting in more contacts being out of cell.

An institutional summary of completed case manager contacts at all levels of care during a one-month period showed that 93 percent of required contacts were completed. Cell-front contacts for EOP inmates decreased, and for 3CMS inmates, cell-front contacts increased significantly. For EOP inmates, 15 percent of the case manager contacts were cell-front. In the administrative segregation unit/SHU, the rate of cell-front contacts with MHSDS patients was ten percent. In the 3CMS program, 85 percent of the case manager contacts were cell-front.

Staff reported that IDTT meetings were held every Tuesday and inmates were seen by the IDTT the first Tuesday after their arrival in administrative segregation. As described by clinical staff, the process appeared to run smoothly and met Program Guide requirements.

There was a confidential room with five therapeutic new-model modules for providing psychotherapeutic group therapy. Each mental health clinician offered groups during the week. Generally there were three groups a day for two hours. Psych techs offered groups on weekends, but were concerned that there was not sufficient escort staff to maximize weekend groups. During the monitoring period, there were on average three EOP inmates in the

administrative segregation unit/SHU who were offered an average of eight hours of group per week.  Provided information reflected that during the last three months of the monitoring period, ten hours were offered, in compliance with Program Guide requirements.  With a consistently low EOP census, staff reported that 3CMS inmates were also offered the opportunity to participate in the scheduled groups.

MHSDS inmates were offered at least ten hours of yard per week.  In reviewing the schedule, it was observed that the refusal rate was very high.  Clinical staff reported that inmates refused to avoid cell searches while they were out.  Staff reported that clinicians and psych techs continuously encouraged inmates to go to yard.

### OHU/MHOHU

Inmates who required crisis care were typically admitted to safety cells or to OHU observation rooms.  Inmates were routinely maintained under very restrictive conditions within safety cells with no bed, toilet, or access to running water, often for prolonged periods of time.  Referral for MHCB transfer often occurred only after prolonged placement within safety cells or OHU observation rooms.  Following release from crisis care, many inmates were not provided with required follow-up.  From September 2007 through March 2008, there were 256 admissions to crisis care in safety cells or OHU observation rooms.  In the vast majority of cases, admissions into either of these two areas were from the inmates' housing units.  In approximately 17 cases, inmates were transferred directly from safety cells to OHU observation rooms, suggesting that OHU placement was not typically used as a step-down from the more restricted safety cell placement.  Three transfers occurred from observation to safety cells, and one transfer occurred from MHCB to an observation cell.  There was a total of 21 inmates who were placed into the

OHU on three or more occasions, including four who were admitted on four occasions, one admitted five times, and one admitted on six occasions.

Inmates were often held within OHU or safety cells beyond the 72-hour limit. Thirty-nine of 121 admissions to safety cells, or 32 percent, were for longer than 72 hours, including 23 instances in which inmates remained within the safety cell placement for more than 96 hours. Seventy of 141 observation cell placements, or half, went beyond 72 hours. Of considerable concern were five cases in which inmates remained within the restrictive safety cell placement for periods of seven, ten, 12, 17, and 25 days, respectively. In four of these cases, inmates were then released to the housing unit, while the inmate with the 25-day stay was transferred to an MHCB.

Consideration for MHCB transfer of crisis patients did not routinely occur. Of 256 admissions to OHU safety or to observation cells, only 11 resulted in placement in MHCBs. Of the six transfers that occurred from safety cells to MHCBs, three occurred in less than 72 hours, and two required from 73 to 79 hours. With only one exception, the five transfers from OHU observation cells to MHCBs occurred well beyond the 72-hour timeframe, with times in the OHU cell ranging from six days to 13 days prior to MHCB transfer.

The monitor's expert reviewed a number of cases of individuals who had experienced recurrent placements into crisis care in observation cells or safety cells. Although notes documenting crisis bed placement often indicated significant restrictions based on concern over possible suicidality, five-day follow-up for these inmates was seldom ordered or provided upon their release. Staff within the facility reported an internal practice of holding inmates in observation cells for periods of time beyond the crisis placement as an alternative to providing the required five-day follow-up at the time that the inmate returns to the regular housing unit.

The practices in safety cells and in the OHU described above are unacceptable, and must be modified forthwith to be brought into compliance with Program Guide standards. The monitor will be examining this area closely in the upcoming twenty-second monitoring period.

EOP

On April 21, 2008, there were 12 EOP inmates at the institution, including four in administrative segregation/SHU, two in the OHU, and six in the reception center. None had exceeded transfer deadlines at the time of the visit, and one was slated for transfer to Patton State Hospital.

3CMS

VSPW reported that it had two psychologists, a social worker, and one psychiatric nurse working in the 3CMS program. The institution provided pre-release planning services to these inmates.

Reportedly, each 3CMS yard had two full-time clinicians and one part-time clinician. Caseloads averaged 110 inmates per case manager. Supervisory staff reported that initially, 3CMS caseloads were checked monthly and adjusted accordingly, but due to problems with continuity of care, caseload adjustments were made only when new inmates were assigned to a yard. The institution determined that the size of 3CMS caseloads generally allowed clinicians sufficient time to provide individual treatment and to run additional groups. VSPW had one psychologist who oversaw the groups and waiting lists. The institution reported, and data sampling confirmed, compliance rates of over 95 percent for case manager contacts and IDTT meetings for 3CMS inmates.

Groups

The institution reported that although space issues continued to be a challenge, the warden had authorized the use of a visiting area for group treatment, which provided significant relief. VSPW reported that it offered 48 groups, including 11 new ones. There were 479 inmates who were members of the active groups, compared to 357 inmates during the preceding monitoring period.

VSPW reported that group demand was high and that inmates had to wait from two weeks to four months to gain entry to groups. Each prospective participant was given a 30-minute to 45-minute one-to-one interview to assess appropriateness of group treatment and the best choice of group for that inmate.

Referrals

There continued to be some problems with getting referrals to mental health, and it appeared that collaboration with nursing and custody was required to address this issue. Once referrals reached mental health, responses were made within required timeframes.

IDTT/Treatment Plans

An institutional sampling of health care records found the presence of current treatment plans. They generally included goals and interventions that were consistent with and relevant to the mental health conditions of the particular inmates. However, subsequent case notes often did not reflect that the interventions specified within the treatment plans were being carried out. In most instances, case manager contacts did not occur often enough to allow for carrying out intervention methods or the therapeutic goals that were designated within the treatment plans.

Space

The institution's severe lack of space remained a challenge. The increase in mental health staff had resulted in added pressures on available office and programming space. Dental, mental health, and medical had to compete for space in areas that were never designed to house and treat the current inmate population.

In administrative segregation, access to confidential space for clinical contacts with inmates was problematic. Available space included the group room, the IDTT conference room, and any office that might be vacant. In addition, there were three therapeutic modules just outside the IDTT room that were arranged to provide some level of privacy with partitions, but they were not confidential and were subject to ambient noise in the unit. Holding cells on the administrative segregation unit side of building were used, but these offered no privacy or confidentiality.

Tentative approval had been given for three triple-wide trailers for mental health. Mental health was working with plant operations on appropriate specifications. According to plant operations, the documents were ready to submit for legislative approval, and they would not provide any immediate relief for the lack of space. No progress had been made regarding this issue. Recent approval for six clinicians to utilize space in the visiting area for group psychotherapy, case management, and crisis intervention had some positive impact. Alternative scheduling of inmates and staff was being explored.

# SUMMARY

Staffing:

As of October 31, 2008, the vacancy rate in mental health staffing[5] at CDCR institutions continued the decline that had been found during the preceding monitoring period. The only exceptions to this trend were for senior psychologists, for whom the earlier vacancy rate of 12 percent increased slightly to 13 percent, and for psych techs, whose vacancy rate remained the same at 19 percent.

The total number of established mental health positions for chief, senior, and line psychiatrists; chief, senior, and line psychologists; clinical social workers; psych techs; and recreation therapists was 2,126.2. Of these positions, 1,711.85 were filled by full-time employees. The collective vacancy rate for all of these positions was 19 percent, as compared to the vacancy rate of 28 percent during the preceding monitoring period. With use of contractors, the functional vacancy rate for all of these mental health disciplines was reduced to 11 percent, which was an improvement over the twentieth monitoring period's mental health functional vacancy rate of 17 percent.

For the 188.2 chief and supervising psychiatrist and psychologist positions, the vacancy rate was 14 percent. No contractors were used to cover any of these vacancies. Among the 1,938 line mental health staff positions, there were 387.4 unfilled positions, for a vacancy rate of 20 percent. Use of contractors reduced the functional vacancy rate among all line mental health positions to 11 percent.

---

[5] Source of staffing data reported in this section: *CDCR Secured FTP Website for Monthly Reports*, posted on November 26, 2008, covering the month of October 2008. Defendants stated on page three of their January 6, 2009, response to this Court's Order of October 8, 2008, that their posting of three Coleman Monthly Reports has drawn a total of 20 "hits," of which six were by plaintiffs' counsel, and that "only the plaintiff's attorneys have consistently retrieved every report." Contrary to defendants' implication that their web-posted monthly report is rarely used by the Special Master, it was used extensively to measure defendants' compliance with staffing requirements discussed in this Report.

There was significant improvement with staffing chief and supervising psychiatrist positions. The vacancy rate for chief psychiatrists dropped from 42 percent to 16 percent since the preceding monitoring period. The only institutions that did not fill their chief psychiatrist allocations were CRC, CSP/LAC, ISP, and SQ.

Although staffing of senior psychiatry allocations improved over the vacancy rate of 47 percent in the preceding monitoring period, it stood out as the least successful with staffing among all disciplines, with a vacancy rate of 38 percent. Institutions that had one or more unfilled senior psychiatry positions were CCI, CMF, CMC, CRC, CSP/Corcoran, CSP/LAC, CCWF, and SQ, none of which used contractors to cover these vacancies.

For chief psychologist positions, the earlier but already-low overall vacancy rate of eight percent during the preceding monitoring period was surpassed, with full employment in these positions and no contractual assistance required.

For senior psychologist positions, the vacancy rate at 13 percent was marginally higher than it was during the preceding monitoring period, when it was 12 percent. Seventeen institutions filled all of their posts for senior psychologists. CMC, CSP/LAC, CSP/Sac, DVI, and RJD had vacancy rates ranging from seven percent to 14 percent, while CMF, HDSP, PBSP, PVSP, SVSP, and VSPW had vacancy rates ranging from 17 percent to 25 percent. ASP, CCWF, SQ, and CSP/Solano had the highest vacancy rates, at 50 percent for both ASP and CSP/Solano, 44 percent for CCWF, and 36 percent for SQ. No contractors were used to cover senior psychologist vacancies at any of the institutions.

Filling line psychiatry positions has posed the biggest challenge to CDCR mental health staffing in recent years. Since the preceding monitoring period, the vacancy rate was reduced from 51 percent to 33 percent. With use of contractors, the functional vacancy for line

376

psychiatry rate dropped to only six percent.  Twelve institutions filled all or nearly all of their line psychiatry allocations with full-time psychiatrists, while 19 institutions were able to fill some of their psychiatry allocations with full-time employees. ASP, CCI, CIM, CSP/Solano, CTF, PVSP, SQ, and WSP were able to achieve full or near-full coverage with contractual assistance.  CMF, CRC, CSP/LAC, CSP/Corcoran, CSP/Sac, CSATF, Centinela, CVSP, HDSP, PBSP, and SVSP lowered their functional vacancy rates to a range of 14 percent to 45 percent. CCC and ISP and had functional vacancy rates of 100 percent and 61 percent, respectively.

In line psychology, the earlier systemwide vacancy rate of 27 percent was reduced during this monitoring period to 18 percent.  Use of contract psychologists lowered the functional vacancy rate to six percent.  Those institutions that filled or nearly filled their line psychology positions with full-time employees were ASP, CIM, CIW, CMF, CRC, CSP/Sac, CSATF, CTF, DVI, Folsom, RJD, SQ, and WSP.  With use of contractors, another group of institutions, CCI, CMC, CSP/Solano, Centinela, ISP, KVSP, MCSP, PBSP, PVSP, and SVSP, achieved full or near-full coverage by using contractors.  However, CSP/LAC, Calipatria, and HDSP had functional vacancy rates in the range of 26 to 33 percent, while functional vacancy rates at CCWF and CCC were 41 percent and 69 percent, respectively.

The institutions fared well overall with filling and covering social work positions, with an overall vacancy rate of 11 percent, and a functional vacancy rate of five percent with use of contractors.  In the preceding monitoring period, the vacancy rate was 18 percent, and with use of contractors, the functional vacancy rate was reduced to eight percent. A total of 15 institutions filled all of their social work positions with full-time employees, and another three institutions were able to keep their vacancy rates under ten percent.  With use of contract social workers, two more institutions fully covered their allocations in this discipline.  The remaining

ten institutions that employ social workers had functional vacancy rates of 26 percent or less. These institutions were ASP, CIW, CMF, CMC, KVSP, CSP/Corcoran, CSP/Sac, SVSP, SQ, and VSPW.  The institution that fared the poorest was CRC, with a functional vacancy rate of 50 percent.

Insofar as coverage of psych tech positions, the institutions continued to use contractors very sparsely.  Only 2.4 full-time equivalent psych tech contractors were used, which was not enough to nudge the pre-existing psych tech vacancy rate of 19 percent any lower.  CIW was the only institution that filled all of its psych tech positions with full-time employees, and CTF almost achieved that status with a vacancy rate of only one percent.  Another seven institutions, CSP/Corcoran, CSATF, MCSP, NKSP, SVSP, SQ, and SCC, managed to keep their vacancy rates under ten percent.  Among the remaining 24 institutions, 14 kept their vacancy rates under 30 percent.  These institutions were ASP, CCC, CIM, CMF, CMC, CSP/LAC, CSP/Sac, CSP/Solano, Centinela, CCWF, CVSP, DVI, KVSP, and WSP.  Vacancy rates ranged from 30 percent to 42 percent at CCI, CRC, Calipatria, HDSP, PBSP, PVSP, RJD, and VSPW.  Folsom had no coverage for its sole .75 psych tech position.  ISP covered only 61 percent of its psych tech allocations.

The vacancy rate for recreation therapist positions was 25 percent, and scant use of contractors lowered the functional vacancy rate by only two percent.  Among the 29 institutions that employ recreation therapists, ten had vacancy rates under ten percent.  Apart from a group of 12 institutions that filled up to half of their recreation therapist positions, there were seven institutions that had no coverage at all for any of their recreation therapist positions, yielding vacancy rates of 100 percent.  These seven institutions were CRC, CTF, DVI, Folsom, HDSP, PVSP, and SCC.

378

Quality Management:

During the monitoring period, the quality management processes at CIW, CSP/Sac, CSP/Solano, DVI, Folsom, and PVSP continued to function. At ASP and CTF, the process continued to improve, but did not achieve full compliance. SCC's proactive quality assurance program provided the engine for continued program improvements, resulting in the resolution of four CAP items during the preceding reporting period, and another five items during the current monitoring period. The institutional approach to quality management at MCSP continued to be mixed. The quality assurance program was revitalized under the guidance of new mental health leadership at CCWF. At CIW, an access-to-care committee comprised of mental health, medical, and custody personnel was established to address issues related to mental health care and custody interface. CMF broadened the focus of quality management to encompass quality of care.

During the monitor's site visits, a number of concerns were noted. At CVSP and Calipatria, quality management activities consisted primarily of UHR audits. Due to lack of clear leadership in mental health at Calipatria, quality management was generally not fully functioning. Other than suicide prevention, LOPs at Calipatria were not updated or revised to reflect Program Guide revisions, and the LOPs for administrative segregation, OHU, and referrals had not been updated since 2006/2007. At CMF, treatment providers reported that information about the issues they faced was rarely addressed via the quality management process. Mental health line staff at CSP/Corcoran reported that they received no feedback regarding the quality management process and had only limited participation in the quality management process through peer review.

During the monitoring period, the local governing bodies of CSP/Corcoran and MCSP met monthly.  CSP/Solano's local governing body reportedly met in April 2008, and PBSP's local governing body met twice during the first six months of 2008.  The local governing body at CSP/Sac met quarterly, and the one at PVSP met regularly.  The local governing bodies at PVSP and PBSP maintained minutes.  Although the local governing body at CSP/Corcoran maintained minutes that were sparse in content, agendas were detailed.  Minutes were not available for local governing body meetings at CSP/Solano and CRC.  Local governing body meetings at CSP/Corcoran were routinely attended by custody, medical, and mental health supervisors.  The membership of CRC's local governing body consisted of the warden and CMO.  PBSP's local governing body meeting minutes indicated that mental health was represented and mental health issues were addressed.

The quality management committees of ASP, CSP/Solano, CSATF, KVSP, and WSP met regularly, and CRC's quality management committee met biweekly.  Quality management committees at CCC, CSP/LAC, CTF, Folsom, and SQ met weekly, while at CMC and CSP/Sac, they met monthly.  The quality management committee at CSP/Corcoran generally met monthly, and the ones at CCWF and CIW met twice a month.  MCSP's quality management committee met sporadically, but at least twice each month, and showed significant improvement since the preceding monitoring period.  The quality management committee meetings at ASP, CMC, CCWF, CRC, CSATF, CTF, DVI, Folsom, MCSP, SQ, and VSPW were well attended.  CSP/LAC's quality management committee meetings were well attended by necessary clinical staff, but custody staff did not regularly attend.  The quality management committees at CCWF, CRC, CSATF, CTF, DVI, MCSP, SQ, VSPW, and WSP kept minutes, but the one at KVSP did not.

The mental health subcommittees at CCI and CMC met biweekly, while at CSP/Sac, PBSP, and SQ, mental health subcommittees met weekly. At CSP/Corcoran, CCWF, CIW, and CSATF, mental health subcommittees met twice per month. The mental health subcommittees of ASP, CIM, CMF, CRC, CVSP, HDSP, and SCC met at least monthly, and CTF's mental health subcommittee met bimonthly. Meetings of the mental health subcommittees at CMC, CCWF, CRC, CSATF, CTF, SCC, and SVSP were well attended, but WSP's mental health subcommittee did not include non-supervisory members. At PBSP, attendance for required participants at mental health subcommittee meetings improved significantly. CTF also had increasing levels of participation. At Calipatria, only 38 percent of the mental health subcommittee meetings achieved a quorum. CVSP's mental health subcommittee meetings never attained a quorum, and custody staff attendance was consistently poor. At HDSP's mental health subcommittee meetings, attendance ranged from six to eight mental health staff members, and custody was generally unrepresented. Toward the end of the monitoring period, SCC's mental health subcommittee minutes showed that attendance had improved to about 70 percent of required attendees present at meetings.

CMC, CSP/Corcoran, CCWF, CRC, CSATF, CTF, HDSP, PBSP, SCC, and VSPW kept minutes for the mental health subcommittee meetings. KVSP did not provide meeting minutes. CTF minutes showed a need for greater focus on problem solving and documentation of decisions made. SCC's mental health subcommittee meetings appeared to double as staff meetings, with a substantial portion of the meetings dedicated to routine exchange of information.

Throughout the monitoring period, several institutions chartered and used QITs appropriately and effectively. Institutions that chartered QITs to address substantive mental

health issues included ASP, CCI, CIM, CSP/Solano, CTF, DVI, HDS, PBSP, SCC, and VSPW. At PVSP, four QITs were chartered to address medication management issues, but none were chartered to address other mental health issues, although issues with confidentiality of mental health contacts, increased group treatment, and transporting of medical records could have benefitted from QITs. At WSP, there were three QITs, but only the medication management QIT was fully active. CSP/Corcoran had three active QITs, SQ had 14, and SVSP had two. At RJD, two mental health QITs were active, although an audit schedule was implemented for all key program areas to monitor identified problems concurrent with QITs. At CCWF, QITs were chartered to resolve issues related to UHR availability and timely completion of initial clinical intake assessments and IDTT meetings.

At CSP/LAC, there were only two active QITs at the time of the monitor's visit, both mandated by headquarters. The MHTS QIT was functionally impotent due to lack of technical support and significant limitations inherent in the MHTS. The administrative segregation EOP QIT was also problematic because of the lack of clarity regarding the goals for the QIT.

At CVSP, no QITs were chartered, nor had the action-item list attached to the meeting minutes been updated or revised for six months. KVSP provided documentation indicating that it had not chartered, sustained, or completed any QITs during the reporting period. CSATF chartered QITs when needed, but none were active at time of the monitor's visit. Managers reported that recently identified problems were resolved by directives and supervision. At CSP/Sac, there were indications QITs were not fully utilized to identify and deal with problems encountered by treatment providers. At CRC, staff reported that QITs were not

routinely used and that significant problems with mental health during the preceding few months

had been resolved without QITs.

At ASP, CMF, CSATF, HDSP, MCSP, NKSP, PVSP, SCC, and SQ, routine

audits occurred regularly and were integral to the quality management system.  With the

exception of medication audits, DVI similarly conducted useful quality management audits.

Audit methodology and accuracy improved at CCWF.  A newly established

quality assurance analytical unit had begun to systematically collect and analyze performance

data from each program area to timely identify problems and devise strategies for improvement.

At WSP, with only one exception, audits of MHSDS indicators were characterized by small

sample sizes and long intervals between audits.  At PBSP, staff reported difficulties with

collecting and interpreting audit results from nursing staff.  No standardized auditing, analyzing,

or reporting methodologies were used, and no effective system was in place to ensure audit

results were reported back for quality improvement and corrective action as necessary.  RJD's

audit items were tracked at the QMC meetings, but presentation of the results to the QMC for

analysis, discussion, and necessary follow-up was not consistent.

At CIM, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, DVI, Folsom, PBSP,

and RJD, an active peer review process was in place for psychiatrists, psychologists, and social

workers.  PBSP had significant improvement in its peer review process for clinical staff and an

active process in place for psych techs.  At CIM, however, there continued to be significant

problems with quality of the process, frequency, and the limited number of clinicians involved in

the peer review process.  Although showing improvement in form, CSP/LAC focused more on

the presence or absence of criteria rather than qualitative review.  At CCI, Centinela, MCSP,

PVSP, and SVSP, psychiatry and psychology engaged in peer review.  At CRC, peer review for

psychologists and case managers occurred.  At NKSP, psychiatry conducted peer review, as did psychologists and social workers in a combined case manager review format.  At CSP/Corcoran, the psychologist peer review committee provided summaries of each meeting, but the social work peer review committee failed to keep minutes or summaries.  Peer review at CCI, CRC, and PVSP maintained records of activities.

At RJD, the audit tool developed and implemented by the peer review coordinator was primarily a quality assurance instrument that focused on the presence or absence of various items in the UHR.  CCI limited its peer review process to records only.  At VSPW, the peer review process was evolving and needed to be strengthened in each discipline, particularly in psychiatry.  Documentation that peer review was intra-disciplinary and not interdisciplinary needed to be clearly spelled out, as did the requirements of appropriate peer review reports.

Mental health staff were not engaged in peer review at CSATF.  Peer review at CCWF and WSP was not fully functional, and was not occurring at all at CSP/Solano.  At CTF, peer review processes for both psychiatrists and psychologists needed to be expanded beyond examination of UHRs for presence of required documentation.  Peer review for psychiatrists was not yet established at SCC.

Suicide Prevention:

Over one third of institutional SPCs satisfied Program Guide requirements, with regular meetings, pertinent agenda items, and appropriate attendance.  These institutions included ASP, CIM, CIW, CMC, CSP/Corcoran, CSP/Sac, CSATF, CCWF, CSP/Solano, Folsom, NKSP, and PVSP.  While CCI, CMF, CRC, CSP/LAC, CTF, Calipatria, Centinela, CVSP, PBSP, RJD, SCC, SQ, and WSP satisfied requirements for regular meetings, substantive agenda items, and maintaining of minutes, they continued to struggle to achieve adequate

attendance by all disciplines. The SPCs at HDSP and VSPW met regularly with appropriate

disciplines, but meetings were *pro forma* and lacked substantive content. MCSP's SPC met

regularly, although committee attendance was poor and failed to discuss implementation of

plans, recommendations, or outcomes related to suicide prevention.

Institutional ERRCs were fully implemented and functioned well at ASP, CIM,

CSP/LAC, PBSP, and PVSP. CSP/Corcoran had a fully functioning committee, but

documentation needed improvement. Similarly, SVSP's committee, while fully implemented,

did not have a standardized review process for suicide attempts. VSPW's ERRC meetings were

*pro forma* and perfunctory. At DVI and Folsom, the ERRCs failed to meet regularly and were

poorly attended by all required disciplines.

One quarter of the institutions completed CPR training for nearly all custody staff.

These institutions included CSP/LAC, CSP/Solano, CCWF, CVSP, Folsom, HDSP, MCSP,

PBSP, and RJD. Monthly medical emergency response drills in administrative segregation units

were performed at ASP, CMF, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, CCWF, CVSP,

HDSP, and SVSP. At Folsom, psych techs did not participate, and at MCSP, the drills did not

include scenario enactment.

One third of the institutions were compliant with five-day follow-up of inmates

discharged from an MHCB or, in some instances, returned from DMH. These institutions

included ASP, CSATF, CVSP, DVI, Folsom, KVSP, NKSP, PVSP, RJD, SQ, and SCC.

CSP/LAC was substantially compliant, even though tasked with following up on approximately

100 cases per month. CMC did not track completion of five-day follow-up and custody

observation, but an audit yielded a compliance rate of 75 percent for clinical follow-up of

inmates in administrative segregation. At CSP/Solano, weekend and holiday follow-up was not

consistent by clinical and custody staff alike. WSP was noncompliant for completion of both mental health follow-up and custody observation.

Custody observation was completed as required at HDSP, although mental health follow-up was not. Likewise, custody observation was substantially compliant at CMF and PBSP, but was noncompliant at CIW, CTF, and Centinela.

All institutions demonstrated at least some degree of implementation of the Department's plan to reduce suicides in administrative segregation. ASP, CIW, CMF, CRC, CSP/Sac, CCWF, Folsom, NKSP, PVSP, and SCC included in their initial screening process the inmate history section of the MHTS inmate profile, which contains information about past suicidal behavior. CVSP implemented the inmate profile toward the end of the monitoring period. CSP/LAC was unable to generate inmate profiles due to limitations with information technology.

Half of the institutions administered the pre-placement screens for suicidal behavior to inmates newly arriving in administrative segregation. CMF, CSP/Solano, CSATF, CVSP, CTF, DVI, Folsom, NKSP, PBSP, SQ, SCC, and VSPW were compliant with timely, confidential screens. CSP/LAC, CSP/Sac, and RJD completed the screens at cell-front. CMC screened only 77 percent of new arrivals into administrative segregation, while Centinela experienced difficulties with documentation. ASP, CIW, and Calipatria were noncompliant with completion of screens.

Nearly 70 percent of the institutions completed post-placement 31-question screens. ASP, CIW, CMF, CMC, CSP/Solano, CSATF, CCWF, DVI, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, SVSP, SQ, and VSPW were compliant for timely completion in a confidential setting and filing in UHRs. CSP/LAC, CSP/Sac, and RJD were timely with this task

386

but completed the screens at cell-front.  CIM's documentation was incomplete, with the inmate's date of arrival at administrative segregation routinely missing.  Folsom fell short on timeliness. CCI, CTF, and SCC were not compliant with completion of post-placement screens.

Retrofitting of administrative segregation intake safety cells was completed at one third of the institutions.  These institutions included ASP, CSP/LAC, CSP/Sac, Calipatria, Centinela, CCWF, HDSP, KVSP, NKSP, RJD, and VSPW.  CMF, CSP/Solano, and SCC completed the renovations, but the cells were not used regularly for newly arriving inmates. CSATF, CTF, and Folsom were in the process of retrofitting cells.  Although SQ renovated cells, problems with the doors rendered the cells unusable for new arrivals.  PBSP and PVSP did not retrofit any cells for intake of new arrivals in administrative segregation, but utilized placards to identify these cells.

Custody 30-minute welfare checks were completed at over 70 percent of the institutions.  Forty-two percent of the institutions achieved full compliance with documented staggered checks during the first 21 days of an inmate's stay in administrative segregation.  ASP, CIM, CIW, CMC, CSP/Corcoran, CSP/Solano, Centinela, Folsom, HDSP, NKSP, PBSP, PVSP, and VSPW were all in compliance.  CSATF, KVSP, MCSP, RJD, SVSP, SQ, and SCC completed the welfare checks, but they were not staggered appropriately.  CMF adequately completed welfare checks in three of its four administrative segregation units.  CCI, CSP/LAC, CSP/Sac, and CCWF were noncompliant with completion of 30-minute welfare checks for new arrivals in administrative segregation.

The proportion of institutions that complied with documented daily psych tech rounding decreased from 70 percent to 60 percent during the monitoring period.  ASP, CIM, CIW, CMF, CMC, CSP/Sac, CSP/Solano, CSATF, Centinela, CTF, Folsom, HDSP, MCSP,