but completed the screens at cell-front.  CIM's documentation was incomplete, with the inmate's date of arrival at administrative segregation routinely missing.  Folsom fell short on timeliness. CCI, CTF, and SCC were not compliant with completion of post-placement screens.

Retrofitting of administrative segregation intake safety cells was completed at one third of the institutions.  These institutions included ASP, CSP/LAC, CSP/Sac, Calipatria, Centinela, CCWF, HDSP, KVSP, NKSP, RJD, and VSPW.  CMF, CSP/Solano, and SCC completed the renovations, but the cells were not used regularly for newly arriving inmates. CSATF, CTF, and Folsom were in the process of retrofitting cells.  Although SQ renovated cells, problems with the doors rendered the cells unusable for new arrivals.  PBSP and PVSP did not retrofit any cells for intake of new arrivals in administrative segregation, but utilized placards to identify these cells.

Custody 30-minute welfare checks were completed at over 70 percent of the institutions.  Forty-two percent of the institutions achieved full compliance with documented staggered checks during the first 21 days of an inmate's stay in administrative segregation.  ASP, CIM, CIW, CMC, CSP/Corcoran, CSP/Solano, Centinela, Folsom, HDSP, NKSP, PBSP, PVSP, and VSPW were all in compliance.  CSATF, KVSP, MCSP, RJD, SVSP, SQ, and SCC completed the welfare checks, but they were not staggered appropriately.  CMF adequately completed welfare checks in three of its four administrative segregation units.  CCI, CSP/LAC, CSP/Sac, and CCWF were noncompliant with completion of 30-minute welfare checks for new arrivals in administrative segregation.

The proportion of institutions that complied with documented daily psych tech rounding decreased from 70 percent to 60 percent during the monitoring period.  ASP, CIM, CIW, CMF, CMC, CSP/Sac, CSP/Solano, CSATF, Centinela, CTF, Folsom, HDSP, MCSP,

NKSP, PBSP, PVSP, SVSP, SQ, SCC, and VSPW all demonstrated compliance.  Psych tech rounds were completed at CCI and CCWF, but documentation was poor.

Provision of out-of-cell exercise for inmates housed in segregated housing remained difficult at nearly 60 percent of the institutions.  CMF, CSP/Corcoran, CSATF, Calipatria, CCWF, CTF, Folsom, HDSP, MCSP, SVSP, SQ, SCC, and VSPW offered ten hours per week of out-of-cell exercise.  NKSP offered ten hours, but these often occurred simultaneously with offers of group therapy.  PBSP was partially compliant, offering seven hours per week.  CCI, CIM, CSP/LAC, CSP/Solano, Centinela, DVI, PVSP, and RJD were noncompliant, largely due to the lack of yard space, particularly walk-alone yards.

Forty percent of the institutions fulfilled their minimum requirement of implementing a morning "check-in" meeting among an administrative segregation unit sergeant and designated mental health personnel.  ASP, CCI, CSP/LAC, CSP/Sac, CSATF, CCWF, CVSP, DVI, Folsom, HDSP, PBSP, RJD, SQ, and VSPW all demonstrated compliance.

Nearly 70 percent of the institutions explored the feasibility of providing access to electricity within cells for electrical appliances within cells for non-disciplinary inmates in administrative segregation.  Inmates at CIW, CSP/Sac, CSATF, CCWF, CTF, HDSP, PBSP, SVSP, and VSPW had access to electrical appliances.  There were no electrical outlets in the administrative segregation cells at ASP, CIM, CMF, CMC, CSP/LAC, CSP/Solano, Calipatria, Folsom, NKSP, RJD, SQ, SCC, and WSP.

Medication Management:

Medication Management Data and Auditing Transition Issues

During the course of the twenty-first monitoring period, institutions were faced with a number of transition issues that affected medication administration and audits of

medication-related functions. Principally, transition issues involved the initiation of the Maxor

pharmacy management information system in pharmacies throughout CDCR and the shifting of

responsibility for medication management audits to nursing. These developments affected

medication data and audits at several institutions. Medication management auditing was

temporarily impeded by the introduction of the Maxor  system at CIW, CSP/Sac, CSATF,

HDSP, PBSP, PVSP, SQ, and WSP.  It was anticipated that these issues would be resolved as the

institutions became acclimated to these new systems.

All institutions planned to eventually shift responsibility for medication

management from mental health to nursing.  Responsibility for conducting medication

management audits was shifted from mental health staff to nursing at CCI, CRC, DVI, SCC, and

SQ, which similarly had growing pains. A number of institutions, including ASP, Centinela,

Folsom, PBSP, SVSP, and VSPW, made significant changes to their medication management

auditing systems and methodologies, while several others continued to struggle.  There were

some institutions that did not provide medication management audits, or produced partial audits

that did not cover required substantive medication areas, or produced audit results that were

methodologically flawed. These institutions included Calipatria, CCI, CIM, CMC, CRC,

CSP/LAC, CSP/Solano, CCWF, DVI, KVSP, and SQ.  The Special Master is working closely

with nursing staff to develop and refine medication management audit tools to improve

performance in this area.

Issues surrounding medication management data and audits, as well as the

overlapping responsibilities for psychotropic medication management in both mental health

programs and medical services, led to the establishment of a work group on nursing audits of

medication management within the ongoing coordination process among the Armstrong, Coleman, Perez, and Plata cases.

<u>Medication Continuity for Newly Arriving Inmates</u>

An increased number of institutions were compliant with continuing medication for newly arriving inmates by providing the first doses within 24 hours of arrival. CIW, CSP/Corcoran, CRC, and CVSP maintained compliance, while ASP, CSP/LAC, CCWF, and SVSP achieved compliance. There was significant improvement with medication continuity for arriving inmates at CSP/LAC, NKSP, PBSP, and WSP. NKSP and MCSP were both close to compliance.

CIM, CSP/Sac, and RJD were compliant with continuing medications without interruption for inmates who arrived with verified medication orders from other CDCR institutions or county jails.  CIM and RJD achieved noted improvement in medication continuity for inmates newly arriving with unverified medication orders. VSPW similarly maintained compliance with medication continuity for newly arriving inmates at its reception center, but had a measure of difficulty meeting the same standard for arriving non-reception center inmates. Centinela was compliant with meeting medication continuity for inmates arriving during the workweek, but had problems with new arrivals during weekend days. CMC did not audit arrival medication continuity.

A number of institutions did not meeting the standard for continuing medications of arriving inmates.  These institutions included Centinela, CCI, CSATF, CTF, DVI, HDSP, PBSP, PVSP, and CSP/Solano. SQ continued to have problems with medication management audits, including those for medication for newly arriving inmates.  SCC, which was previously

compliant, did not provide data concerning this item. CMC did not perform audits regarding medication continuity for arriving inmates.

<u>Medication Continuity on Intra-Institutional Transfers</u>

Compliance with continuity of medications following housing changes within the same institution was maintained or achieved by ASP, CCWF, CSP/Corcoran, NKSP, RJD, SCC, SVSP, and VSPW. RJD and SVSP also achieved medication continuity upon discharge from an MHCB or OHU. Marked improvements in medication continuity upon housing transfer were noted at CCI and WSP, although they did not reach compliance. CSP/Corcoran remained noncompliant but showed notable improvement.

Medication continuity following intra-institutional transfers was problematic at CIW, CSP/LAC, CSP/Solano, CSATF, CCWF, DVI, Folsom, HDSP, MCSP, PVSP, and SQ. KVSP did not track medication continuity related to housing moves, and CRC did not conduct audits of medication continuity upon intra-institutional housing changes. CTF did not provide audit data related to intra-institutional transfers.

CMF did not comply with medication continuity following discharges from inpatient care. For CMF inmates, medication continuity was not affected by intra-institutional housing changes. Medication continuity in administrative segregation at CMF conflicted with scheduled yard time.

<u>Medication Order Renewals</u>

Medication renewal orders were issued timely at CCI, CIM, CMC, CSP/Corcoran, CSP/Sac, CTF, Centinela, DVI, KVSP, RJD, SCC, SVSP, and WSP. ASP was nearing compliance with timely renewal of medication orders for general population inmates, and

attained compliance in administrative segregation. VSPW was near compliance with timely renewing medication orders.

A number of institutions were noncompliant with timely renewal of psychotropic medications. At CMF and DVI, medication renewal gaps and lapses were commonplace. There were also problems at CIW, CSATF, HDSP, PBSP, and SQ with timely renewals.

KVSP and SVSP were compliant with documenting the rationale for medication orders, including reasons for changes and discontinuations. CRC did not consistently document the rationale for medication changes.

Medication Refills

CSP/Sac, CTF, DVI, KVSP, and VSPW were compliant with timely refilling and administering medication orders. ASP was close to compliance in refilling medications in its MHSDS general population areas, but was noncompliant with timely refilling medications in administrative segregation following medication changes, reviews, and renewals. PBSP processed refill orders and administered medications appropriately during regular work hours, but was noncompliant after regular hours and on weekends and holidays. CIW, CSATF, Centinela, CVSP, DVI, HDSP, and SQ were noncompliant with appropriate delivery of medications following changes and new orders.

Medication Noncompliance

Appropriate identification, documentation, referral, and response to inmate medication noncompliance continued to be a major hurdle for a large number of institutions. CIM, CMF, CSATF, CCI, CSP/Corcoran, CSP/Sac, Centinela, Folsom, HDSP, KVSP, MCSP, NKSP, PVSP, RJD, SCC, SVSP, VSPW, and WSP did not meet standards for addressing issues of medication noncompliance.

392

CMC, CCWF, and DVI were compliant with referrals and responsiveness to medication noncompliance. CRC revised its procedures and reported a significant decrease in incidents of medication noncompliance. PBSP instituted new medication noncompliance policies and procedures. Audits of medication noncompliance at CSP/LAC, CSP/Solano, and SQ were flawed, and CIW failed to provide audit data concerning medication noncompliance.

Pill Lines

Several institutions continued to use pill lines for medication delivery. Lengths of pill lines and waiting times were appropriate at Folsom, PBSP, and RJD.  Expansion of available pill lines at CMC and Folsom accounted for improvements.

Pill line waiting times were problematic at ASP, CSP/Solano, CSATF, HDSP, and SCC.  CIW developed plans for additional pill lines when waiting times frustrated access to scheduled group therapy. CCWF reported excessively long pill lines, but neither CCWF nor CSP/Corcoran conducted formal audits in this area.  Despite its history of problems with pill lines, VSPW did not conduct audits on them.  CRC was in the process of developing an LOP to improve pill line efficacy.

Informed Consent

CSP/Solano, DVI, PVSP, SVSP, and SCC complied with requirements regarding obtaining and maintenance of current informed medication consent forms concerning psychotropic medications. PBSP instituted new policies and procedures on informed consent and was compliant with informed consent standards.

Audits of informed consent at CSP/Sac yielded mixed results as a result of misfiled documents. WSP improved with informed consent, but continued to have problems.

CSP/Corcoran showed improvement as a result of increased supervision. RJD, which was previously complaint, slipped but remained very close to compliance standards.

A number of institutions were noncompliant with informed consent requirements and reported problems. These institutions included CMC, Centinela, CCWF, and NKSP. Audits of informed consent at SQ were inadequate, and at CRC, they were not done.

Laboratory Testing

Requirements for laboratory testing of blood levels for atypical antipsychotic medications were satisfied at RJD, and for mood stabilizers, they were satisfied at ASP, CMC, CTF, CCWF, RJD, SQ, and VSPW. CSP/Solano and Folsom improved but did not attain compliance. Folsom did not have in place a process to meet laboratory requirements for atypical antipsychotic medications.

Laboratory testing was problematic or noncompliant at CCC, CIM, CSP/LAC, DVI, NKSP, PBSP, SVSP, SQ, and WSP. CSP/Corcoran improved significantly, but still did not reach compliance. Laboratory tests were not ordered at Calipatria due to the short-term stay of MHSDS inmates at Calipatria. In the single instance where laboratory tests for mood-stabilizing medications were ordered at CVSP, the institution complied with requirements. CIW and SCC did not provide information regarding laboratory testing.

DOT Medication Administration

Large numbers of DOT orders at institutions raised questions whether they were supported by exercise of clinical judgment and whether adequate DOT could actually be utilized. Several institutions, including CCC, CSP/Solano, ISP, PBSP, and SCC, required that all psychotropic medications were to be administered DOT. Psychotropic medications were administered DOT at CSP/Corcoran, CSP/Sac, CCWF, and NKSP, and almost exclusively via

DOT at Folsom.  Compliance with appropriate DOT protocols improved markedly at DVI. MCSP had some difficulties with DOT, but satisfied compliance requirements. CTF and KVSP ordered medications DOT, but did not present audit data related to the area. ASP was in the process of transitioning away from inappropriate DOT orders.

CSP/LAC, CSATF, Folsom, PVSP, RJD, and SVSP ordered medications DOT, but did not comply with required protocols. SQ was unable to generate a DOT list. At WSP, DOT medication administration was indistinguishable from nurse-administered medication. CRC ordered DOT medications for inmates who were medication noncompliant or suspected of noncompliance.

Keyhea Process

A number of institutions appropriately used the Keyhea process, including ASP, CIW, CMC, CSP/Corcoran, CSP/Sac, CSATF, CCWF, KVSP, NKSP, PBSP, RJD, and SVSP. CRC and VSPW immediately transferred their Keyhea inmates to other institutions. The Keyhea process improved at SQ, but remained problematic at CIM, DVI, Folsom, and WSP. CSP/LAC did not track Keyhea orders.

Support from CDCR's Division of Legal Affairs in the Keyhea process was generally reported to be beneficial across institutions.

HS Medications

Institutions that appropriately utilized HS medication orders included CIM, CIW, CSP/Corcoran, CTF, CCWF, Folsom, PBSP, RJD, and VSPW.  Medications were prescribed HS at CSATF and KVSP, and psychiatrists at CMC were no longer limited in writing HS medication orders. SCC reported compliance with HS medication standards, but did not present any audits.

CRC, Folsom, SQ, and WSP delivered HS medications without adherence to the 8:00 p.m. time requirement. Delivery of HS medications was problematic at CSP/Sac, CSP/Solano, DVI, and PVSP.

Parole Medications

Compliance with standards for providing medications to inmates paroling from institutions was achieved at CIM, CIW, CMC, CSATF, CCWF, DVI, Folsom, RJD, SCC, and VSPW. Institutions that did not meet these standards included CSP/Solano, ISP, PBSP, and SQ. CSP/Corcoran, SVSP, and WSP did not provide audits of parole medications.

Sexual Misconduct:

Generally, compliance with protocols regulating mental health assessments for use in the discipline of sexual misconduct violations remained mixed during the monitoring period.

In its six reported cases, ASP completed all required screenings, with five comprehensive evaluations completed and one diagnosis of Exhibitionism. CIW, HDSP, and MCSP were compliant with required protocols, and NKSP remained partially compliant.

At VSPW, required screenings were conducted, but seven of eight were untimely. None of these evaluations resulted in findings that the behavior was attributable to Exhibitionism, but the scope of these examinations was inadequate to support such findings. WSP completed all required screenings, which were all reviewed by IDTTs. However, screenings were sometimes days late due to custody delays in forwarding documentation. CCI also completed required screenings, although they were often delayed. Quality of the screenings, treatment plans, and evaluations varied by provider. At SVSP, screenings included a full mental health evaluation but occurred one to two weeks after the violation. Two inmates were referred

396

to a treatment program for Exhibitionism after receiving two RVRs within six months, despite the lack of diagnoses of Exhibitionism. CRC implemented its LOP for treatment of Exhibitionism. CSP/Solano was reportedly compliant with all protocols, although the outcomes of sexual misconduct hearings were not documented. Folsom completed all required screenings and IDTT reviews, but referred no inmates for comprehensive evaluations. CMF appeared to be compliant with required protocols, but generally, inmates with repeated infractions received one screening and IDTT review.

At CIM, screenings occurred late, did not follow existing guidelines, and were poorly documented. Comprehensive evaluations were neither recommended nor completed. Although SCC reported compliance, documentation was incomplete for recording the timeliness of screenings and IDTT reviews. At CTF, screenings were not completed in accordance with protocols. DVI's process for mental health assessments in connection with incidents of indecent exposure was limited to a mental health screening completed as part of the RVR process, and did not include a comprehensive evaluation for Exhibitionism.

RJD referred all inmates diagnosed with Exhibitionism to treatment programs, but endorsements and transfers took several months. Screening results were inadequate in that they lacked information of any precipitating event or sexual history. A pending LOP clarified procedures for referrals, screenings, and evaluations, and clinical staff completed training on treatment programs. At SQ, IDTT reviews occurred in fewer than 50 percent of cases, and those that did occur were late. Screenings were untimely and lacked standardization, which resulted in inadequate screening for Paraphilias. Some inmates who satisfied the criteria for a diagnosis of Exhibitionism were excluded from transferring to a treatment program due to their custody classifications, and were treated at SQ on a case-by-case basis.

CSP/LAC performed all required screenings and IDTT reviews, but the screenings were untimely and the IDTT reviews were of poor quality. There were no referrals for comprehensive evaluations, and referrals, endorsements, and transfers to treatment programs were problematic. CSATF remained compliant with the clinical and custodial components of the Department's protocols, although screenings were usually completed one week after the incident. The institution was in the process of developing individualized treatment plans for caseload inmates who had been issued RVRs for indecent exposure but not diagnosed with Exhibitionism.

CSP/Sac was generally compliant the Department's protocols for indecent exposure. Screenings were completed in a timely manner and in most cases were followed immediately by an IDTT review. Along with CSP/Corcoran and PBSP, CSP/Sac was designated as a treatment facility for inmates diagnosed with Exhibitionism. The institution's Exhibitionism treatment program was activated in May 2008 and had two psychiatric social workers assigned to the program.

CSP/Corcoran implemented an operational procedure for management of the treatment of inmate sexual misconduct and Exhibitionism. The institution had four psychotherapeutic groups on Exhibitionism, which accommodated 15 inmates. Responses to referrals for sexual misconduct were usually compliant except when received on Fridays or weekends.

Although PBSP was one of the designated treatment institutions, few, if any, inmates met the treatment criteria due to problems in the screening and diagnosis process. The screen utilized by the institution did not require relevant sexual history questions and was designed to detect the presence of serious mental disorders, but not Paraphilia. Inmates were offered group and individual therapy regardless of the outcomes of screenings or diagnoses.

Significant differences in the clinical indecent exposure protocols between the PBSP <u>Freitag</u> model and the CDCR systemwide model negatively affected both programs. The PBSP <u>Freitag</u> program clinically treated only inmates who consented to treatment. The designation of these inmates at the EOP level of care, regardless of their history or psychiatric diagnoses, resulted in disruptive behavior and adversely affected the therapeutic milieu in the PSU. The placement of these inmates in the same pod tended to reinforce and "normalize" their deviant behavior.

<u>Transfers</u>:

### Non-Desert Men's Institutions

At every point along the continuum of care for caseload inmates, lack of timely access to appropriate levels of care remained a significant challenge for the MHSDS. Inmates waiting for acute and intermediate inpatient care beds at DMH and for EOP beds occupied MHCBs. At the same time, inmates awaiting care in those MHCBs filled growing numbers of MHOHU beds and makeshift holding areas, while inmates in need of care languished in reception centers and administrative segregation. The result of this logjam was a population of seriously mentally ill inmates held for too long in the wrong treatment settings, or cycling in and out of acute crisis, or spending increasing amounts of time in administrative segregation units.

DMH acute care resources for male inmates were insufficient. They consisted of 130 beds at CMF and 25 beds at ASH. Increasing numbers of rescinded referrals translated to delayed access and a waiting list that sometimes exceeded 60 inmates during the monitoring period. Of the 18 prisons that referred inmates to the acute care programs at CMF and ASH, 16 reported delayed access. Most of these cases and the longest delays were associated with referrals of non-suicidal acutely psychotic inmates. Such referrals, considered low priority, were routinely placed on a waiting list and were commonly rescinded by the institution. Referred

inmates within 30 days of parole and inmates without parole dates continued to be rejected for care by DMH.  Consequently, a large number of referrals—more than 25 percent of referrals at nine prisons—failed to result in transfers.  The portion of acute care referrals resulting in transfers was less than 40 percent at CIM, CMC, HDSP, and CSP/Solano; 50 percent at SQ; and barely 60 percent at RJD.  Despite such slow access and declining success rates, many institutions continued to generate a reasonable number of acute care referrals.  CIM, CMC, and PBSP produced more than 50 referrals to acute care during the monitoring period, followed by CSP/Sac with 45 referrals, MCSP with 31 referrals, and KVSP with 24 referrals.  CCI, CSP/Corcoran, CSATF, HDSP, NKSP, and SQ generated between 11 and 20 referrals, while CSP/Solano, CSP/LAC, RJD, and SVSP produced fewer than ten referrals.  With their large and complex mental health programs, CSP/LAC, RJD, and SVSP all underutilized DMH acute care resources.

CMF continued to use 20 beds within DMH's APP at the CMF facility as MHCBs.  While this arrangement provided access to these MHCB-like beds, it blocked access to DMH acute care for most CMF inmates in need of such care.  CMF inmates who required acute services after spending time in the MHCB wing rarely moved from it to the three acute care wings of the hospital where they would have had access to needed higher level acute care programs and services.

Sixteen institutions referred inmates to DMH intermediate care programs during the monitoring period.  There were excessively long transfer delays that resulted from SVPP's intermediate care waiting list, which swelled to over 170 inmates in July 2008.  As a result, increasing numbers of Level IV inmates were denied access to intermediate care.  Institutional records, albeit incomplete and unclear in some instances, indicated that only slightly more than a

400

third of SVPP referrals resulted in transfers.  A growing number of institutions, including CSP/Sac, CSATF, MCSP, SVSP, and WSP, underutilized intermediate care resources.  This troubling trend appeared to be related to frustration and perceived futility of referrals on the part of mental health clinicians.

Transfers to ASH generally occurred within 30 days of referral, although only a few prisons transferred inmates to ASH during the reporting period.  CMC and RJD generated over 90 percent of all ASH referrals, with 21 and 36, respectively.

CMF and DMH generated nearly all referrals to the intermediate care programs at CMF.  Access to intermediate care and the day treatment programs was reportedly good for CMF inmates who had relatively lower security scores and uncomplicated case factors.  RJD, the only other prison reported to have made referrals to intermediate care at CMF, transferred five inmates.  The average delay between referral and transfer for these inmates was 38 days.

The scarcity of MHCBs for CDCR's male inmate population continued.  The problem was exacerbated by the filling of MHCBs with decompensated and fragile inmates who were waiting for weeks to months for transfers to appropriate higher levels of care.  At CSP/LAC, use of MHCBs for inmates with chronic, long-term medical conditions regularly reduced by nearly half the institution's MHCB capacity, although this particular problem was no longer pervasive throughout the state.  When necessary, medical patients were moved to community hospital beds in order to open beds in CTCs for mental health admissions at CSP/Corcoran, CSATF, PVSP, and RJD.

Only six prisons, CMF, CSP/Corcoran, CSATF, HDSP, PBSP, and PVSP, reported adequate and timely access to licensed MHCBs.  The remaining prisons used OHUs, MHOHUs, and a variety of temporary holding areas to monitor inmates for whom MHCBs were

unavailable. Data provided by the health care placement oversight program (HCPOP), a department within the DCHCS tasked with finding available MHCBs for inmates throughout the state, highlighted the growing crisis. During the final quarter of 2007, HCPOP received a monthly average of 181 referrals, 27 percent of which resulted in MHCB placement. In contrast, during the second quarter of 2008, HCPOP received a monthly average of 314 referrals, of which 15 percent resulted in placement in an MHCB.

Fourteen prisons had licensed crisis care units, nine of which were too small to accommodate the local inmate population. Despite having 26 CTC beds, CSP/Sac relied on 20 MHOHU beds and 15 holding areas to monitor inmates for whom MHCBs were unavailable. The MHOHU absorbed an average of 157 placements a month, nearly half of which lasted longer than 72 hours. Holding areas were used an average of 29 times per month, with stays exceeding 24 hours for a quarter of all placements. MCSP used six MHOHU beds and five observation cells to monitor inmates when its eight-bed MHCB unit was full. On a monthly basis, the MHOHU received an average of 45 placements, a quarter to a third of which lasted longer than 72 hours.

Utilization of the observation cells at MCSP was not accurately tracked. CSP/LAC, CSP/Solano, KVSP, NKSP, RJD, SVSP, and WSP, all with licensed CTCs, routinely used holding cells and tanks to monitor inmates for whom MHCBs were unavailable. Utilization of these cells was not adequately tracked at CSP/Solano, KVSP, RJD, and SVSP.

Eight prisons did not have licensed MHCBs and relied on other prisons for crisis care. Folsom transferred inmates in need of crisis care to CSP/Sac, but although such transfers were immediate, 68 percent of these referrals were placed in MHOHUs because MHCBs were unavailable at CSP/Sac. ASP, CCI, CRC, CTF, DVI, SCC, and SQ used unlicensed OHUs to

402

monitor inmates in crisis and to assess the need for transfer to an MHCB unit.  The average

number of OHU placements per month was less than 22 at CRC, SCC, and CTF.  The number of

placements ranged from 31 to 38 at CCI and ASP, was 63 at SQ, and reached 91 at DVI.  ASP,

CCI, and DVI used alternative sites to monitor inmates for whom OHU beds were unavailable.

Slow access to crisis beds resulted in long OHU admissions and a large number of

rescinded MHCB referrals.  OHU length of stay at CCI, CTF, DVI, SCC, and SQ routinely

exceeded 72 hours, and less than half of the MHCB referrals at ASP, CCI, and DVI resulted in

transfer.  SCC and SQ rescinded 35 and 36 percent, respectively, of MHCB referrals.  Transfers

to MHCB units almost never occurred within 24 hours of referral, and delays of two weeks were

common.  Notably, CTF did not track MHCB transfers.

In light of the statewide shortage of licensed crisis care beds, CIM and CMC were

permitted by the court to temporarily utilize unlicensed infirmary beds as MHCBs.  At CIM, a

30-bed infirmary received an average of 146 admissions per month.  Holding areas in housing

units were used to monitor inmates for whom infirmary beds were unavailable.  About ten

percent of such placements, of which there were 28 in March 2008 and 48 in April 2008,

exceeded 72 hours.

Nearly all inmates at the EOP level of care were transferred timely from the

mainline programs at CRC, Folsom, and SCC, followed closely by ASP with 85 percent of EOP

transfers meeting the 60-day timeframe.  However, about a third of the EOP inmates transferred

from the mainline programs at CSP/Solano, CSATF, and PVSP waited longer than 60 days.

CTF and KVSP did not adequately track EOP transfers.

None of the Department's reception centers consistently transferred EOP inmates

within 60 days.  The compliance rate for meeting the 60-day timeframe ranged from a low of

about 44 percent at CCI to a high of 68 percent at DVI, with an average of 56 percent among nine reception centers. Excessive waits of many months were common, and protocols for expedited, 30-day transfers were underutilized. Transfer delays were often the result of the lack of EOP beds, particularly in Level IV SNY programs. However, endorsement delays associated with untimely completion of medical clearance chronos, RVR protocols, and sluggish classification processes were increasingly common.

Only Folsom routinely transferred inmates to EOP administrative segregation hubs in a timely manner. CIM, MCSP, PVSP, SCC, and WSP often failed to meet the 30-day transfer timeframe, and waits in excess of 90 days were increasingly common.

PBSP and CSP/Sac reported timely access to PSU beds, in large part due to their advantage of having PSU programs. SVSP reported slow access during the first quarter of 2008, but managed to transfer all inmates within one month of PSU endorsement during the second quarter of 2008. CMF, CSP/Corcoran, CSP/LAC, MCSP, SVSP, and WSP failed to consistently meet the 60-day timeframe for PSU transfers, often missing the mark by several weeks.

Only CIM, CSP/LAC, NKSP, RJD, and SQ reliably provided data on lengths of stay for 3CMS inmates in their reception centers. The compliance rate for meeting the 90-day timeframe ranged from a low of 52 percent at SQ to a high of 80 percent at NKSP. For 3CMS inmates transferred from CIM during the monitoring period, the average length of stay was 98 days.

Desert Institutions

Calipatria, CCC, Centinela, CVSP, and ISP did not have MHSDS programs due to their desert locations. The average daily MHSDS census at these prisons ranged from near zero at CCC to approximately 40 inmates at Calipatria. Most of these inmates were placed in the

MHSDS by mental health clinicians working at these prisons, though a significant number of 3CMS inmates continued to be mistakenly transferred to the desert institutions.

During the reporting period, the five desert institutions identified approximately 383 3CMS inmates and 58 EOP inmates, nearly all of whom were transferred within 90 days and 60 days, respectively. Another 75 3CMS inmates were inappropriately transferred to desert institutions. Four of five institutions reported returning inappropriately received 3CMS inmates within 30 days. Only 29 percent of the 3CMS inmates mistakenly sent to Calipatria were transferred within 30 days. One EOP inmate mistakenly transferred to Centinela was returned to the sending institution within one week.

CCC and Centinela reported having timely access to crisis beds in other CDCR prisons, while Calipatria, CVSP, and ISP continued to struggle in this area. All MHCB transfers from CCC and 12 of 13 transfers from Centinela occurred within 24 hours of referral. Calipatria rescinded nine of 23 MHCB referrals and met the 24-hour timeframe for only three of 14 MHCB referrals that resulted in transfer. The average lapse between referral and transfer to an MHCB unit was seven days for CVSP. Half of the 26 inmates ISP referred to crisis beds waited an average of approximately ten days to be transferred.

Women's Prisons

Access to higher levels of care presented a mixed picture among CDCR's three prisons for women. Unlike at the men's prisons, transfers of women to Patton State Hospital were not affected by long waiting lists, inadequate capacity, or a short supply of bus seats. Rather, poor access to DMH, MHCBs, and EOP programs was largely the product of restrictive referral practices and self-imposed delays at the women's institutions.

405

Twenty women, or four more than during the preceding monitoring period, were referred to Patton State Hospital.  With 14 referrals and transfers, CCWF utilized DMH resources with the greatest frequency and efficacy.  However, transfers to Patton State Hospital did not consistently occur within 30 days of referral or 72 hours of acceptance.  In addition, CCWF's DMH referral log was incomplete.

VSPW referred three inmates to Patton State Hospital in the last week of February 2008, after five-and-a-half months of generating no DMH referrals.  All three referrals resulted in timely transfers.  VSPW seldom considered DMH referrals for inmates with multiple and lengthy OHU placements.

CIW generated three DMH referrals, all of which were rejected by Patton State Hospital within 30 days.  Patton State Hospital's reported refusal to admit inmates with histories of violent behavior and/or prevalent Axis II disorders had a dampening effect on clinicians' willingness to refer.

CCWF and CIW had licensed MHCB units, with adequate access.  Neither prison used alternative holding areas to monitor inmates waiting for MHCBs.  CIW averaged 35 admissions per month, five percent of which lasted longer than ten days.  In contrast, CCWF averaged 20 admissions a month, with more than a quarter lasting longer than ten days.

VSPW used safety cells and observation cells in its OHU to monitor inmates in crisis.  It did not adhere to CDCR policy and procedures governing the use of OHU beds and did not transfer inmates to MHCBs when clinically indicated.  Over 40 percent of OHU placements lasted longer than 72 hours and, in some cases, approached one month in duration.  Despite the large number of prolonged stays in restrictive settings, VSPW referred only 11 inmates to the

MHCB unit at CCWF.  Nearly all of these inmates were held in safety and/or observation cells for more than a week before being referred to an MHCB.

All EOP inmates transferred from CCWF, and 91 percent of EOP inmates transferred from VSPW waited less than 60 days.  The reception center at CIW processed 76 EOP transfers, a quarter of which exceeded the 60-day timeframe.  The delayed transfers were attributed to internal problems, including missing chronos, pending RVRs, and backlogged record audits.  Nearly all 3CMS transfers occurred within 90 days.

Access to the ten-bed PSU at CIW appeared adequate.  During the first six months of 2008, CIW transferred two inmates to the PSU, both of whom were placed within five days of endorsement.

Referrals:

Timely institutional response to routine referrals within five work days continued to elude most institutions.  A number of institutions failed to consistently respond to routine referrals of inmates for mental health services within the five-day timeframe.  At CCI, CMC, CSP/Corcoran, CSP/Solano, CSATF, DVI, KVSP, MCSP, RJD, and SCC, there were a substantial number of routine referrals that were not processed timely, with compliance rates ranging from 17 percent to 70 percent, and average response times ranging from 6.4 to 23 days.  HDSP, PBSP, PVSP, and SQ improved, with average response times that approached five days and compliance rates above 80 percent.  CMF consistently responded to routine mental health referrals within five working days.  Only a handful of prisons tracked response times for urgent and emergent mental health referrals.  CCI, CMC, CTF, KVSP, and SVSP were unable to consistently respond to urgent and/or emergent referrals within prescribed timeframes.  ASP,

CSP/Solano, Folsom, and PVSP, on the other hand, responded timely to urgent and/or emergent referrals.

## CONCLUSION

The twenty-first monitoring period found the CDCR in the midst of changing conditions that, in all probability, will affect it for years to come. Trial in the prison overcrowding litigation took place. The State of California reported major budget deficits. State officials announced possible fiscal actions that, if implemented, may deter CDCR's current operations as well as its long-term planning and development, particularly in the area of facility construction. As of this writing, the prospect of some limited relief from these budgetary strains is beginning to manifest itself, but their long-term effects are far from clear.

Overall, the staffing of mental health clinical positions continued to improve during the monitoring period, with a decline in the vacancy rate from 28 percent to 19 percent since the preceding monitoring period. Use of registry staff lowered the functional vacancy rate for these positions from 17 percent to 11 percent.

There were improvements across the board with filling supervisory psychiatry positions. For chief psychiatrist positions, the vacancy rate fell from 42 percent to 16 percent, and for senior psychologist positions, it dropped, albeit not as dramatically, from 47 percent to 38 percent. Adequate full-time staffing of line psychiatry positions continued to elude the Department, with its vacancy rate of 33 percent, which, while still too high, was an improvement over the rate of 51 percent in the preceding monitoring period. Use of contractors helped greatly with covering these core mental health positions and lowered the functional vacancy rate to six percent. Commendably, the Department managed to fill all of its allocated chief psychologist positions, and maintained its vacancy rate of 13 percent for senior psychologist positions. For

line psychologists, the vacancy rate declined from 27 percent to 18 percent, and was reduced functionally to six percent with use of contractors. The vacancy rate and functional vacancy rate for social work positions stood at 11 percent and five percent, respectively. Unfortunately for both psych tech and recreation therapist positions, their respective vacancy rates of 19 percent and 23 percent were unimproved, with very sparse use of contractors.

These developments in mental health staffing indicate a continuation of the generally positive trend that was seen in the twentieth monitoring period. More work is needed to bring vacancy rates among staff psychiatrists, psych techs, and recreation therapists into line with the other better staffed mental health positions.

While the Department's improvements in mental health staffing advanced its position on the continuum of its access-to-care service model, already-scarce mental health treatment space in a number of institutions was even further strained. Only major construction can remediate this problem, given its scale.

An increasing number of institutions met or maintained quality management activity standards, but others lagged behind in this area. Several institutions' programs consisted primarily of UHR audits or reviews and/or not using quality management procedures to address issues with delivery of care. The most serious problems in this area were found at desert institutions. Local governing bodies, which are required at all institutions that have licensed mental health inpatient units, did not consistently meet, keep appropriate minutes, or secure attendance by required participants. Quality management committees generally did much better, with regular meetings, adequate minutes, and good attendance. Mental health subcommittee function improved during the monitoring period, with regular meetings at 23 of the 33 institutions, and adequate attendance and minutes. Substantive mental health issues were

409

addressed at many institutions. Multiple institutions chartered and utilized QITs effectively. However, lingering shortcomings with audit tools, methodologies, and reporting of results persisted at some institutions. This problem is currently under review and revision by a work group organized within the Coleman/Plata coordination effort, and will be examined in the field during the twenty-second monitoring period.  A number of institutions still had not instituted meaningful peer review processes for psychiatrists, psychologists, and social workers.  The monitor will be looking for a shift toward using qualitative rather than quantitative criteria for all three disciplines by the next monitoring period.

In the area of suicide prevention, only one third of institutional SPCs satisfied Program Guide standards for regular meetings, appropriate attendance, and relevant agendas. Similar problems appeared with institutional ERRCs, which were fully implemented and functional at only a small number of institutions.  CPR training of custody staff and conduct of monthly medical emergency response drills in administrative segregation showed improvement generally.  However, neither five-day follow-up of inmates discharged from MHCBs or from DMH nor required custody observations were occurring consistently across institutions.  This problem is all too similar to a problem that was the subject of a recommendation in Part A of the Special Master's Twentieth Monitoring Report—the lack of follow-through for suicidal inmates who have been released back to general housing from alternative housing areas while pending transfer to an MHCB. Failure to provide five-day follow-up and required custody observation is a "zero tolerance" shortcoming.  This is the sort of lapse that can lead to the most serious of consequences in the mental health population.  The monitor will be closely examining compliance in the area in the twenty-second monitoring period.

Defendants' plan to reduce suicides in administrative segregation was at least partially implemented at all institutions. Only half of institutions administered pre-placement screens for suicidal behavior prior to admission to administrative segregation, and no institutions included inmate suicide profiles in the process. However, more institutions were complying with the post-placement, 31-question screening process, although a few were conducted in non-confidential settings. One third of designated intake cells had been retrofitted, and accordingly, use of "intake" status placards continued. Two thirds of institutions did custodial 30-minute welfare checks, but most were noncompliant with documentation. Overall, compliance with daily documented psych tech rounds declined, perhaps due to the lingering vacancies in psych tech positions. Daily "check-in" meetings between an administrative segregation sergeant and designated mental health staff were not occurring at nearly 60 percent of institutions. Insufficient out-of-cell exercise time was generally attributable to lack of yard capacity, including walk-alone yards, a number of which were under construction or completed during the monitoring period. Due to infrastructure limitations, most institutions could not offer access to in-cell electrical appliances to non-disciplinary inmates in administrative segregation.

In the area of medication management, there were both significant changes and lingering problems. The Maxor pharmacy management information system was initiated or continued at a number of institutions. Despite some start-up problems, long-term improvements were anticipated. Responsibility for conduct of medication management audits was shifted from mental health to nursing staff. Audit results showed overall improvement with timely provision of medications to inmates following arrival or intra-institutional housing changes. Medication orders were renewed timely at most institutions. Medication administration and length of pill lines remained problematic at many institutions, but expansion of proper use of HS medications.

411

With respect to inmates who were noncompliant with their medication regimes, identification, documentation, referral, and timely response remained generally elusive.  With some exceptions, there was generally improvement across institutions with use of appropriate medication informed consent forms, compliance with standards for laboratory testing of psychotropic medications, appropriate use of Keyhea orders, and delivery of parole medications.

Management of inmate sexual misconduct violations continued to challenge the institutions.  Institutions experienced problems with not conducting screenings timely or not conducting them at all.  Some incidents of sexual misconduct escaped referred to mental health. In some cases, comprehensive evaluations did not occur when indicated, or varied by treatment provider. Documentation in all parts of the process remained problematic. There were very few diagnoses of Exhibitionism, and endorsements and transfers to treatment programs for sexual misconduct at CSP/Corcoran, CSP/Sac, and PBSP were often delayed. CSP/Sac's Exhibitionism program was activated in May 2008.  CSP/Corcoran implemented its operational procedure on treatment for Exhibitionism and conducted psychotherapeutic groups for inmates in the program. Due to problems in the screening and diagnosis process, PBSP reported that few inmates referred to its program met treatment criteria.  Differences in the clinical indecent exposure protocols between the institution's Freitag model and the CDCR protocols affected both programs negatively.

The greatest challenge for mental health services in CDCR continued to be the absence of timely access to appropriate levels of care at every point in the system. The overwhelming majority of referrals to acute care at CMF and ASH were met with delayed access.  Admission of referred acutely psychotic non-suicidal inmates was commonly delayed, with longer waiting lists and routine rescissions. Delayed access or lack of it altogether were

412

experienced in transfers to acute and intermediate levels of care at DMH, to EOP beds, and to MHCBs and PSU beds for men. The primary cause of this problem was a systemwide lack of such beds, and the effect, not surprisingly, was the holding of many inmates in unsuitable settings, sometimes for significant periods of time, with repeated placements in administrative segregation and referrals to acute care.  As a result, a significant number of the more severely mentally ill inmates experienced extended prison stays, only further exacerbating the already short supply of available mental health resources.  However, the long-standing problem of DMH automatic rejection of inmates who would be paroling within 30 days or who did not have parole dates was finally resolved.  The monitor will continue to examine DMH rejections for this practice.

Access to inpatient intermediate care at SVPP was effectively denied for increasing numbers of Level IV inmates. There was trend toward perceived futility of referral for intermediate care, and consequent under-referral, at CSP/Sac, CSATF, MCSP, SVSP, and WSP. Although inmates who were accepted at ASH were routinely transferred within 30 days, only CMC and RJD accounted for 90 percent of ASH referrals during the monitoring period.

MHCBs for men remained inadequate, with nine of the 14 institutions that have licensed crisis care units unable to meet local bed needs. Data showed that in 2007, DCHCS placed 27 percent of referred inmates into MHCBs, while during the second quarter of 2008, 15 percent of referred inmates were actually placed in MHCBs.  Only CMF, CSP/Corcoran, CSATF, HDSP, PBSP, and PVSP reported appropriate access.  Problems with access for men were significantly exacerbated by delayed access to acute and intermediate care and to EOP programs.  There was a backup in MHCBs where many severely mentally ill inmates waited for even months for higher levels of care while referrals to MHCBs were rescinded.  Another

413

untoward effect was over-reliance on OHUs, MHOHUs, and an assortment of temporary areas to hold inmates when MHCBs were not available. Stays in OHUs were excessively long, and were often not adequately tracked.

Compliance with transfers to EOP programs was mixed. A small number of non-reception center institutions transferred inmates to EOP programs in a timely manner, but none of the reception centers consistently transferred EOP inmates within Coleman Program Guide timeframes. Expedited transfers for EOP inmates were significantly under-utilized. Only Folsom routinely transferred inmates to an EOP administrative segregation hub in a timely manner. EOP transfer delays were tied to issues with bed capacity, particularly for Level IV SNY inmates.

Transfers to PSUs were reported timely at PBSP and CSP/Sac, which both have PSUs, but other institutions reported consistent delays, often exceeding timelines by several weeks.

For women inmates, access to higher levels of care presented a mixed picture. Problems at the DMH level tended to result from restrictive institutional referral practices and delays rather than limitations on capacity. CCWF referred the most women to Patton State Hospital, while VSPW seldom utilized DMH. Clinicians at CIW reported discouragement with DMH referrals after receiving rejections. At CCWF and CIW, access to these institutions' licensed MHCB beds was adequate. VSPW, however, did not transfer inmates to MHCBs when clinically indicated, nor did it adhere to CDCR policies and procedures regarding OHU use. EOP transfers from CCWF and VSPW were timely for the most part, but CIW reported problems with timely EOP transfers, correlated with missing chronos, pending RVRs, and backlogged records.

Undeniably, the twenty-first monitoring period saw the defendants make progress with their implementation of several court-ordered plans and their continuation of others. Still,

414

their progress was at best mixed and in many respects was disappointing with regard to meeting

mental health bed needs on a particularized, project-specific basis, for both the short and the long

term.  In its recent order dated March 30, 2009, the <u>Coleman</u> Court has focused intensely on the

defendants' performance in response to all existing court orders for provision of mental health

beds for CDCR inmates, and on their strategy for comprehensively meeting inmate mental health

bed needs on a long-range basis.  This order established a number of near-term deadlines for

compliance with outstanding orders concerning construction of mental health beds.  For the 50-

bed MHCB at CMC, among other things, defendants were ordered to take all steps necessary by

April 23, 2009, to have procured necessary executed contracts for construction, and provide a

detailed schedule including a date certain for completion of this project.  For the 64-bed ICF at

SVSP, among other things, the defendants were ordered to submit by April 29, 2009, a detailed

schedule for completion, opening, and filling of those beds, and a date certain by which the unit

shall be open for occupancy.  The court also ordered that by May 26, 2009, defendants must file

detailed activation schedules for completion of all other court-ordered construction projects, and

develop and file concrete proposals to meet the remaining short-term, intermediate, and long-

range bed needs of the <u>Coleman</u> plaintiff class.  In addition, the Court ordered CDCR and DMH

clinicians to work together to conduct a modified assessment to identify any members of the

plaintiff class who have unmet needs for DMH inpatient care, and to assess and refer these

inmates for such care on an expedited basis.

        In short, the Court's order calls for an accelerated response from the defendants to

meet existing bed needs and identify any heretofore undetected needs for DMH-level inpatient

care.  With its intensified timetable and comprehensive scope, this order holds great promise for

the most rapid and far-reaching advancement in the provision of mental health services to CDCR

inmates since the Coleman case entered its compliance phase 14 years ago. The importance of defendants' compliance with their obligations under this order cannot be overstated. If their charge is executed properly, it may well set the course for a meaningful and lasting solution to the unmet mental health needs in the CDCR inmate population. Unquestionably, for the near future, the defendants' resources will be absorbed with meeting these specific demands, and they will likely continue to be tapped thereafter as the resulting new mental health beds come on line and are integrated into an effective management strategy. In this context of intense focused effort, the Special Master will refrain from offering recommendations for additional court orders at this time.

Suffice it to say, however, that in addition to fulfilling their duties under the Court's recent mental health bed plan and modified assessment order, the defendants must also allocate their resources during the next several months to maintain the progress they have already made in other areas of mental health programming, and must redouble their efforts in those areas which have yet to satisfy Program Guide benchmarks. As cited in several specific instances within the foregoing Report, during the twenty-second monitoring period, the Special Master will be closely examining those institutions that have fallen short of meeting Program Guide criteria. Particular attention will be given to examining existing psychiatric medication prescribing practices, and to conditions and clinical practices in the OHU and safety cells at VSPW.

This report was sent in draft form to the parties on May 15, 2009. In response, plaintiffs requested that the Special Master make six recommendations, each of which is addressed individually below. At this time, the Special Master is not going to make these recommendations, nor any others. The overriding consideration for now is to enable defendants

to focus their resources on compliance with recent orders of the <u>Coleman</u> court concerning

assessments and transfers of inmates to higher levels of care, and on meeting short-term,

intermediate, and long-range mental health bed needs.  Accomplishment of these goals will

address most of the concerns raised by the plaintiffs in their proposed recommendations.  It is

therefore imperative that defendants' efforts not be distracted from this mission.

      On March 24, 2009, the court held a hearing on what further steps must be taken

to insure timely compliance with existing orders regarding provision of necessary mental health

beds to members of the plaintiff class.  With specific regard to existing court-ordered projects, it

ordered defendants to proceed with contracting to construct the 50-bed MHCB at CMC, to

submit a detailed schedule for completion and opening no later than June 15, 2009 of the 64-bed

intermediate care facility at SVSP, and to submit detailed activation schedules for all other court-

ordered construction projects.  The court also ordered defendants to continue to develop by May

26, 2009 concrete proposals for meeting the remaining short-term, intermediate, and long-range

bed needs of the plaintiff class.  In addition, the court ordered both CDCR's and DMH's

clinicians to conduct a modified needs assessment to detect and refer for appropriate inpatient

mental health care any inmates who have unmet needs such care.

      The court held another hearing on June 16, 2009.  Among the matters taken up by

the court at that time was the defendants' schedule for activation of previously court-ordered

construction projects, defendants' short-term and intermediate plans for meeting mental health

bed needs, and defendants' long-range bed plan.  For the 13 previously court-ordered projects,

the court approved the schedules proposed by the defendants and ordered them to report monthly

to the Special Master on actions taken and whether each of the projects remains on schedule.

At the same hearing, the court approved the defendants' plan to meet short-term and intermediate bed needs, stating that the plan presented by defendants met the current need identified in the Navigant Fall 2008 projections for intermediate care hospital beds (including those for high security inmates) and MHCBs. It specifically ordered the C5 and C6 units at SVSP to be completed on defendants' proposed schedule so that they are substantially similar to the D5 and D6 units as completed at the same institution. The court ordered that all necessary steps be taken to secure funding for full implementation of these projects.

The court also addressed needs for mental health staffing and custody staff training. It ordered defendants to complete a staffing plan by the end of August 2009. The court rejected the specific plan proposed by defendants to address problems in relations between custody staff and mental health at SVSP (defendants' "Plan to Address the Overall Dysfunction in Custody/Mental Health at Salinas Valley State Prison") and ordered defendants to develop another plan under the guidance of the Special Master within 90 days of the court's order.

The court noted the parties' disagreement as to how to incorporate the EOP program in the institutions' reception centers into the overall calculation of need for treatment of EOP inmates generally. That notwithstanding, the court declined to consider the plaintiffs' requests for modification of the EOP program in RCs and confined its decision in this regard to an approval of the projects that defendants have identified to increase their overall EOP capacity. The court made it clear that its approval of these identified EOP projects does not signal any finding of full compliance on the part of defendants.

The court rejected the defendants' long-range bed plan and its contemplated eventual turning over of DMH beds to CDCR absent the court's approval, and ordered defendants to return in 90 days for further hearing on defendants' long-range bed plan.

418

With regard to the ongoing modified needs assessment and the resulting referral of 561 inmates for DMH inpatient care as of the time of the June 16 hearing, the court noted that there appeared to be a substantial number of plaintiff class members above and beyond those identified in Navigant projections who are presently in need of hospital care.  In the interest of expediting these transfers, defendant DMH was ordered to immediately begin exploring movement of non-plaintiff class member patients in beds at ASH to Coalinga State Hospital in order to free up available beds.

The court approved the continuation and expansion of the modified needs assessment to all non-desert CDCR institutions.  It also approved the defendants' plan to convert 256 DMH hospital beds to provide intermediate level care at ASH to members of the plaintiff class, on the understanding that defendant DMH is committed to admitting plaintiff class members at the rate of no less than ten per week until all of those beds are filled by plaintiff class members no later than October 31, 2009.  Defendants were ordered to submit a plan to expedite admissions to DMH facilities and finalize it under the guidance of the Special Master within 30 days.  A status conference on the activation schedules and the short-term and intermediate projects, and further hearing on the defendants' long-range bed plan, was set for September 22, 2009.

The first of plaintiffs' six requested recommendations is for an order requiring defendants to develop and implement a policy and procedure that requires written justification by a clinician for placing a mentally ill prisoner in restraints (including handcuffs and/or a holding cell) while in a licensed MHCB unit.  Such clinical justification cannot be based solely on the inmate's housing status.  Although this request will not be the subject of any recommendation to

the court for an order, it has merit and will be discussed at the upcoming policy meeting with the parties and the Special Master.

Plaintiffs' second request is for defendants to be required to complete their workload study correction (including staffing for enhanced pre-release planning) by the end of August 2009, and to prepare and submit an emergency budget change proposal or augmentation request for the current budget year for the positions identified in the workload study. As described above, defendants were already recently ordered to complete a staffing plan by the end of August 2009. This plan must be drawn within the context of a current rapidly changing mental health bed milieu, and of necessity this must be able to accommodate the resulting shifting landscape of mental health beds. It would be premature to proceed with a budget change proposal or augmentation before staffing needs are more clearly identified and defined. Consequently, no such order will be requested at this time.

Plaintiffs' third request is to require defendant to provide emergency clinical staffing for the OHU/MHOHU units and OHU overflow units at DVI and MCSP until the backlog in MHCBs has been resolved. As stated above, the basis for this request – the number of needed MHCBs --was considered by the court at the June 16 hearing. The court found that the defendants' short-term and intermediate bed plan, if implemented, meets the current need identified in the Navigant Fall 2008 projections for mental health crisis beds. Thus, further orders in this regard would be somewhat redundant, if not potentially moot. In any event, the requirement requested by plaintiffs is, at the very least, premature at this time.

The fourth request from plaintiffs is for a requirement that the EOP population in segregated housing be reviewed for housing changes, based on a designated set of criteria. This request is redundant with the ongoing modified needs assessment which draws largely from the

420

pool of the EOP population.  These assessments have been, and presumably will continue to be,

resulting in movement of significant numbers of inmates at the EOP level of care to indicated

higher levels of care.  To superimpose another layer of review of EOP inmates would duplicate,

and perhaps unnecessarily complicate, the modified assessment process which appears to be

functioning well and meeting its stated objectives as of this writing.

        The fifth request from plaintiffs for a recommendation concerns the EOP

reception center program.  Plaintiffs request that defendants should be required to identify EOP

reception center inmates with upcoming parole dates, should provide EOP reception center

inmates with separate housing, and should provide pre-release planning for all EOP inmates in

reception centers and enhanced pre-release planning for those EOP inmates who will be paroling

directly out of reception centers.  Undoubtedly, institutional success with the defendants'

reception center EOP program has been mixed at best, as evidenced throughout this report.  But

the fact remains that defendants have already been ordered to develop a plan for, among other

things, identification of EOP inmates in RCs who have imminent release dates, and for training

of reception center IDTT staff on re-entry planning for these inmates.  *See* 10-2-07 Order.  On

December 3, 2007, defendants reported that as part of their reception center EOP plan, reception

center EOP inmates who have release dates within 60 to 120 days shall be identified prior to

their initial interdisciplinary treatment team meetings so that their individualized re-entry needs

can be incorporated into their treatment plans.  They also reported that on October 29, 2007, a

public entity contract (known as the Kern County contract) had been entered into for the purpose

of placing contracted workers in 18 prisons to assist inmates with imminent release dates with

applications for federal and state benefit entitlements such as those provided by the Social

Security Administration, the Veterans Administration, and the California Department of Health

Care Services.  Defendants also reported that a second such contract to cover the remaining 15 institutions was pending approval, and that agreements between CDCR and the Division of Health Care Services with the Social Security Administration and the Veterans Administration concerning applications for benefits for released inmates were pending final reviews and signatures.

Defendants reported in May 2008 that they chartered a focused improvement team to develop a local operating procedure for early identification of reception center EOP inmates with parole dates within 60 to 120 days, as well as an audit tool to measure compliance. The focused improvement team was also reported to be working on an outline for training reception center interdisciplinary treatment team members, with training to be completed by July 1, 2008.  As of early 2009, defendants reported that the Veterans Administration still had not signed the agreement.  Kern County social workers were in 13 prisons working on to help obtain Social Security Supplemental Security Income benefits, but not Medi-Cal benefits for inmates nearing release.  The second contract still remained with the California Department of General Services for final approval.  Insofar as staff training, the Division of Adult Parole Operations was reportedly working with the CDCR DCHCS mental health management team on statewide training for institutional mental health staff.

As laudable as defendants' goals are for its reception center EOP may be, their progress toward these goals has been slow.  Plaintiffs' frustration with their progress is understandable.  Nevertheless, defendants have already been ordered to develop a plan to deal with early identification and pre-release planning for reception center inmates with imminent release date.  They have in fact developed such a plan, which is responsive to the same general concerns that plaintiffs raise.  Consequently, any recommendations to address these same issues

would be redundant at this point. Defendants are advised, however, that the Special Master's forbearance from making additional recommendations in this regard should not be read as acquiescence in, or resignation to, their slow progress. They must carry out their plan, and the sooner they do so, the better.

       In the reach for a solution to the plight of EOP inmates in RCs, it should be kept in mind that the EOP reception center program was conceived as a stop-gap measure because EOP inmates were experiencing stays in RCs exceeding the maximum of 60 days. While the EOP reception center program is certainly necessary to manage the mental health care of EOP inmates who have been languishing in RCs, it was never intended to create a subset EOP program in perpetuity for RCs. Its purpose has been to afford care for these inmates until defendants have added needed mental health beds and begin moving EOP inmates through RCs and into EOP hubs as swiftly as possible. The current atmosphere of mental health bed planning offers realistic hope for lasting achievement with easing of bed shortages and facilitating of rapid movement of plaintiff class members into beds and levels of care that are sorely needed. This includes movement of EOP inmates out of RCs, which will not only bring these inmates to where they should be, but will also free up resources that would otherwise have been devoted to maintaining the necessary but somewhat duplicative EOP reception center program. For these reasons, the focus should remain on supporting defendants' ability to succeed with their plans to meet mental health bed needs, and not on imposing more orders that may dilute defendants' capacity to achieve compliance with the court's orders. The plaintiffs' request concerning the EOP reception center program will not be made at this time.

       The sixth and last of plaintiffs' requests is to require training on the existing requirement that inmates in need of DMH inpatient psychiatric treatment not be denied such

treatment based on their parole status.  Plaintiffs point to the two institutions – HDSP and WSP –

at which inmates' parole status was cited as an impediment to inpatient care at the time of the

monitor's visits during the twenty first round.  This issue has already been addressed in

substance, as an order was entered on August 8, 2008, barring consideration of inmates' parole

status as grounds for denial inpatient care.  The monitor's twenty first review of these two

institutions occurred on October 14-16, 2008 and September 16-18, 2008, respectively.  It is

reasonable to infer that although these visits followed the entry of the order, staff were not yet

aware of the ban and had not yet incorporated it into their practices.  This report shall serve as

notice to these two institutions that, if they have not already modified their practices to comply

with the August 8, 2008 order, they must do so forthwith.  With that said, the plaintiffs' request

for training in this area does not at this time rise to the level of meriting a court order for staff

training on the substance of the August 8, 2008 order.

This Report will close on a positive note, citing three institutions that

demonstrated sufficient improvement with their levels of compliance with Coleman Program

Guide standards and court orders while managing to maintain their performance.  The Special

Master recommends that, based on SCC's record of performance, it be added to the list of those

institutions monitored by paper review.  He further recommends that on-site monitoring  at CIW

and CMC be reduced to one-day visits at each of these institutions for examination of their levels

of compliance in their PSUs, CTCs, adherence to heat plan measures, and possibly with regard to

broader issues as well.  Paper review of CMC will include tracking of the construction of the 50-

bed MHCB unit there, and paper review of CIW will include patient access to Patton State

Hospital and construction of the ICF PSU there.

424

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

July 31, 2009