EXHIBIT A
California State Prison, Sacramento (CSP/Sac)
October 6, 2008 – October 9, 2008

**Inmate A**

This EOP inmate arrived at CSP/Sac during August 2007. He had a diagnosis of Schizophrenia chronic undifferentiated type. He had been in the EOP program since February 2008. The inmate was involved in a number of groups, including anger management and cultural awareness. In addition, he had a job assignment picking up trash in the yard; the inmate was enthusiastic about his job assignment. The inmate was on a Keyhea order for his psychotropic medications. He was seen weekly by his clinical case manager. His last IDTT meeting occurred on July 15, 2008, and the last psychiatrist appointment occurred on July 28, 2008. The documentation in the medical record regarding mental health services was individualized and relevant in clinical content. A monthly EOP nursing/psych tech assessment that provided a summary of medical and mental health information, including appointments, medications, treatment compliance, and crisis episodes, was located in the medical record.

Findings

This inmate appeared to be placed at the appropriate level of care. He was seen by his clinical case manager and the psychiatrist at the appropriate intervals. There was a monthly nursing summary note detailing the inmate's medical and mental health condition, care, and follow-up.

**Inmate B**

This inmate was housed in the MHCB at the time of the site visit. He was hospitalized in the MHCB from April 17, 2008, to July 8, 2008. He was provided with a diagnosis of Schizoaffective Disorder. The inmate was ultimately transferred to DMH APP at CMF; however, the transfer process was prolonged, lasting over one month. The inmate was placed on a Keyhea order; subsequently, his condition improved with the initiation of Clozaril, which was maintained at DMH.

The inmate returned to CSP/Sac on September 10, 2008. At the time of intake, it was noted that the inmate had been treated with Clozaril and that he required psychiatric assessment within 24 hours. The inmate was not seen for mental health follow-up until six days later, and he did not receive medications during this interval. His condition deteriorated quickly, and he required re-admission to the MHCB, where he remained at the time of the monitoring visit. The inmate was described as "floridly psychotic, disorganized, hostile, belligerent, uncommunicative and uncooperative." Although Clozaril had been re-initiated, the inmate's condition had not improved at the time of the monitoring visit. The inmate was seen daily by one or more MHCB mental health staff (case manager, psychiatrist, recreation therapist) and was reviewed in the IDTT; this meeting was attended by the chief psychiatrist.

Findings

In spite of assertive psychopharmacologic intervention and acute care at DMH, the inmate rapidly decompensated upon return to CSP/Sac due to a failure in timely response to mental health referrals. The mental health staff recognized this issue and had been working on mechanisms to address this omission. The care that was provided to the inmate, subsequently,

appeared to be appropriate; however, the inmate had not attained the degree of stability that he had previously experienced.

## Inmate C

This inmate was housed in the MHCB pending transfer to DMH for acute care.  He was hospitalized in the MHCB from July 8, 2008, to August 5, 2008, for treatment of psychosis and suicidal ideation.  He had been on a Keyhea order since June 1, 2007, which was renewed at intervals due to dangerousness to self.  The inmate was transferred to DMH acute care from the MHCB.  The DMH discharge summary indicated that the inmate expressed bizarre somatic delusions while at DMH acute care, but he "achieved full issue within a number of days," and was not preoccupied with auditory hallucinations.  He was discharged "back to CDCR as no longer in need of inpatient care."

The inmate was seen by a mental health clinician on the day after returning to CSP/Sac, and he was placed in the mental health OHU.  He returned to the MHCB by August 26, 2008, within four days of DMH return; he remained there at the time of the monitoring visit.  Another referral for DMH acute care was submitted based upon the inmate's persecutory and somatic delusions and failure to improve.  He remained on Keyhea order, but he was placed into a holding cell for monitoring after taking his medications due to cheeking of medications.  He was evaluated consistently by the clinical staff in the MHCB, including his clinical case manager, psychiatrist, and recreation therapist.  Weekly IDTT meetings were conducted.

Findings

This inmate appeared to be placed at the appropriate level of care in the MHCB.  The clinical interventions provided were consistent with timeframes outlined by the Program Guide and clinical need.  This case illustrated the problem with access to a higher level of care in terms of delays between acceptance and bed availability.  The rationale for return to CDCR versus transfer to the ICF level of care was not located in the medical record, nor was there documentation to suggest communication between DMH and CDCR clinicians regarding discharge planning.

## Inmate D

This transgender (male to female) inmate was receiving the EOP level of care.  Prior to placement at CSP/Sac, the inmate was housed at PBSP, where she was also receiving the EOP level of care.  She was admitted to the MHCB at PBSP three times within two months and subsequently was referred to DMH acute care at CMF.  The inmate was prescribed Remeron, Risperdal, and estradiol hormone.  The inmate was discharged on July 30, 2008, to CSP/Sac.  Initially, the inmate was housed in the mental health OHU overnight, and then was placed in the administrative segregation EOP unit.  The inmate was released to general population EOP within a week.  She remained in general population EOP since August 8, 2008, and had no reported crisis episodes at CSP/Sac.

The inmate had an extensive history of mental health treatment in the community, including more than 100 psychiatric hospitalizations and commitments to mental health treatment facilities for suicide attempts, overdose, and self-injury by cutting.  She also had a history of substance abuse, including heroin, cannabis, alcohol, and methamphetamine.  At CSP/Sac, the inmate attended education, pre-release group, communication skills, and stress and anger management groups, among others.  The most recent case management appointment occurred on September 25, 2008, and the psychiatric appointment occurred on September 11, 2008.  The last IDTT occurred on August 20, 2008.  Documentation in the medical record indicated that the inmate's condition had improved, and she was reportedly stable.  She participated in the EOP and was evaluated at the appropriate intervals by her clinical case manager and psychiatrist.

Findings

Based upon the documentation of the inmate's psychiatric condition and functioning, EOP appeared to be the appropriate level of care.  This inmate appeared to be coping adequately in a general population EOP setting, despite concerns regarding the housing of transgender inmates in this setting.  The DMH discharge summary was not located in the medical record; this lack of critical information could compromise treatment continuity and effectiveness.

**Inmate E**

This inmate was transferred to CSP/Sac for Exhibitionism treatment.  His medical record was reviewed at the request of the plaintiffs' attorney due to a request for an update on the type of treatment being provided to the inmate in the Exhibitionism program.

This inmate arrived at CSP/Sac on May 28, 2008, from CSP/LAC.  He was endorsed to the PSU due to indecent exposure, with a maximum expected release date of October 24, 2008, with the expectation that he would be "considered for exhibitionism treatment."  He was evaluated in the C-facility by the mental health staff during early June 2008, when he reported suicidal ideation.  The inmate was transferred to the mental health OHU and was placed on suicide watch precautions.  He was subsequently transferred to the MHCB and was referred to DMH acute care.  He was hospitalized at DMH acute care from August 1, 2008, to September 2, 2008.  He was discharged to return to CSP/Sac.

The inmate had a lengthy history of psychiatric illness.  His symptoms included a delusional belief that he was controlled by the military or other governmental entity.  He exhibited suspiciousness, paranoia, social isolation, racing thoughts, excessive anxiety, agitation, mood swings, auditory hallucinations, and poor impulse control.  There was a current Keyhea order in effect.  The DMH discharge summary indicated that the inmate remained delusional about the CIA and the government, and that the medications (Depakote, Zyprexa, and Abilify) did little to decrease the inmate's paranoid symptoms.  The inmate reportedly refused treatment with Anafranil or other selective serotonin reuptake inhibitors (SSRI) for treatment of his compulsion to exhibit his genitals.  The documentation indicated that the inmate continued his behavior despite counseling by the psychologist; as a result, the DMH staff believed that there was little that they could offer him.  The DMH summary indicated diagnoses of Schizophrenia paranoid type versus Delusional Disorder; Exhibitionism or other paraphilia diagnoses were not provided.

After his return to the PSU, the inmate was again placed into the mental health OHU from October 2, 2008, to October 6, 2008, after reporting thoughts of suicide by hanging. The inmate subsequently recanted this threat of self-harm. The medical records contained no documentation indicating that the inmate was actually assigned to the Exhibitionism treatment program, nor any comprehensive Exhibitionism assessment performed at CSP/LAC.

Findings

This inmate had recently arrived at CSP/Sac, and he required transfer from the PSU on at least two occasions for higher levels of mental health care for periods of several months. The inmate was not a participant in the Exhibitionism treatment program at the time of the monitoring visit.

**Inmate F**

This PSU inmate was housed in the MHCB. He was admitted on October 2, 2008, from the PSU following significant blood loss secondary to self-inflicted lacerations. At the MHCB IDTT meeting on October 3, 2008, the treatment team decided to refer the inmate to DMH acute care.

When he was housed in the PSU, the inmate was involved in several groups including men's issues, problem solving, relationships, travel adventures, current events, art therapy, and interpersonal skills. He was evaluated weekly by his clinical case manager, and he was evaluated monthly or twice monthly by his psychiatrist. The inmate began refusing groups during early September 2008, but he denied difficulties with his clinical case manager and the psychiatrist.

Findings

The documentation in the medical record indicated that the inmate was receiving mental health services consistent with Program Guide requirements for care in the PSU. The inmate stopped attending groups, but there were no identifiable issues related to the clinical case manager or the psychiatrist. He subsequently made a serious suicide attempt and was hospitalized in MHCB while awaiting transfer to DMH acute care. His mental health care appeared to have been managed appropriately, and his self-injury did not appear to have been foreseeable based upon the information in the medical record.

**Inmate G**

This EOP inmate reported that he had received an RVR for failing to accept another inmate as his cellmate. He denied that he had refused a cellmate. The medical record and the RVRs for this inmate were reviewed.

The inmate had received two RVRs during the past year; neither of these RVRs involved refusing a cellmate. In each case, the inmate was referred to mental health to provide input into the process, and the mental health staff reported that the inmate's behavior was not attributable to mental illness.

With respect to his mental health treatment, the inmate was provided with a diagnosis of Schizoaffective Disorder and Generalized Anxiety Disorder. The inmate had been placed on a Keyhea order in the past; he was compliant with prescribed medications at the time of the monitoring visit. He was evaluated weekly by his clinical case manager and monthly by his psychiatrist. The inmate attended group therapy and had a job assignment. His mental status was described as suspicious and anxious at times, but he functioned adequately. The inmate presented during interview with organized thought processes, and he expressed himself clearly. The medical record indicated that his parole hearing date was approaching, and the inmate had become increasingly anxious regarding his upcoming parole hearing date.

Findings

This inmate appeared to be placed at the appropriate level of care. The EOP interventions that were provided were consistent with Program Guide requirements. The inmate's clinical case manager was aware of the inmate's increasing anxiety regarding his approaching parole hearing date. There was no documentation indicating that the inmate had received an RVR for having refused a cellmate.

**Inmate H**

This EOP inmate transferred to CSP/Sac on March 20, 2008, for placement in the PSU. His first mental health contact occurred on the following day. The inmate was enrolled in group therapy, and weekly clinical case management contacts were conducted. He received six RVRs from April 18, 2008, to August 1, 2008; these RVRs were issued for incidents including the flooding of the tier, striking other inmates (twice), and at least two written by the mental health staff for disrespect. The inmate reported suicidal ideation on two occasions after receiving disciplinary infractions. He was admitted to the mental health OHU on both occasions; these admissions were followed by brief admissions in the MHCB.

The inmate had generally refused medications since his arrival at CSP/Sac, and although the MHCB staff documented that he was "assaultive, threatening, paranoid and suicidal" without medications, a Keyhea request was denied by the administrative law judge reportedly because the evidence presented was "not clear and convincing." The PSU staff consulted for input into the disciplinary process did not view the inmate's behavior as related to his untreated mental illness.

Findings

The MHCB treatment staff viewed the inmate's behavior and multiple RVRs as a consequence of medication refusal, but the PSU staff expressed a different opinion. The PSU staff issued two of the RVRs, and when consulted, reported that the inmate's mental illness was not related to the behaviors resulting in the disciplinaries. This may be an area in which additional training may be necessary to provide information to the staff regarding the behavioral manifestations of untreated mental illness.

431

**Inmate I**

This 3CMS inmate had a long criminal and psychiatric history.  He had multiple psychiatric hospitalizations dating back to his adolescence.  In one instance, he had a two-year stay at Napa State Hospital as he was found incompetent to stand trial.  His psychiatric symptoms included paranoid delusions and command auditory hallucinations.  The inmate also had a significant substance abuse history in the community.

Earlier in the course of his prison term, the inmate was placed at the EOP level of care.  He reportedly functioned well in that program.  After four months, his level of care was changed to 3CMS during March 2007, and he had remained at that level of care with no crisis incidents.  The inmate was provided with a diagnosis of Schizophrenia paranoid type.  He was evaluated quarterly by his clinical case manager and the psychiatrist.  The most recent IDTT occurred on April 23, 2008.  During July 2008, the inmate began to refuse Zyprexa, and he was referred to psychiatry.  The inmate explained that he wanted to discontinue this medication during the summer months as it was on the heat list and he wanted to maintain his job assignment as a "yard man."  The medication was discontinued temporarily at the inmate's request, with instruction about contacting mental health if his symptoms worsened.  At the end of September 2008, the inmate submitted a request to be seen by the psychiatrist to resume his medication because the summer months (and subsequently heat alert days) were over.  He was seen on October 1, 2008, and an antipsychotic medication was prescribed.  The inmate did not deteriorate during his medication "holiday" and was able to maintain his job.

Findings

This 3CMS inmate was evaluated clinically at the required intervals.  His medication was temporarily suspended at the inmate's request so that he could continue his yard job assignment during the hot weather.  Fortunately, his psychiatric condition did not deteriorate.  Unfortunately, the inmate was essentially forced to choose between a job assignment and treatment with a recommended psychotropic medication.

**Inmate J**

This 3CMS inmate was housed in the administrative segregation unit.  He was provided with a diagnosis of Intermittent Explosive Disorder.  He was prescribed an anticonvulsant medication, and he was reportedly medication compliant.  The MHTS inmate history demonstrated weekly clinical case manager contacts, and psychiatric appointments occurred every one to two months.  The last IDTT meeting occurred on August 19, 2008.  The inmate was not involved in any group therapy at the time of the monitoring visit.  The documentation in the medical record indicated that the inmate's clinical condition was stable.

Findings

This inmate appeared to be placed at the appropriate level of care based upon his clinical condition and functioning.  He was followed by his clinical case manager and the psychiatrist at intervals that met or exceeded 3CMS Program Guide requirements.

**Inmate K**

This inmate's case was reviewed with the MHCB staff at CSP/Sac at their request because the inmate had been denied DMH care based upon medical complications caused by self-injurious behavior (swallowing metal objects) that exceeded their capacity to medically manage. The inmate had been housed in the MHCB for more than one year, except for some outside medical acute care transfers. The inmate's self-injurious behavior was viewed as manipulative and volitional; however, this behavior had led to more than 20 abdominal surgeries with subsequent adhesions, abscesses, a colostomy, and, at present, several metal objects lodged in his gastrointestinal tract that could not be removed surgically because of the potential complications.

<u>Findings</u>

The case was well known to the <u>Coleman</u> experts because of the long-standing nature of the inmate's problems, the resulting medical complications, and difficulty in accessing an appropriate level of care. Continued long-term MHCB placement was clinically inappropriate. The monitoring team recommended that an independent assessment of this inmate occur in order to make a determination of the best placement to meet his complicated medical and mental health needs. This recommendation was shared with the institutional staff, as well as with CDCR headquarters and plaintiffs' attorneys during the exit interview.

EXHIBIT B
Folsom State Prison (Folsom)
August 5, 2008 – August 7, 2008

**Inmate A**

This inmate was transferred from SQ to Folsom on April 2, 2008, after he was re-incarcerated due to a parole violation.  He had no history of mental health treatment prior to incarceration.  He was placed in the administrative segregation unit on July 4, 2008, due to a charge of indecent exposure and threatening a peace officer.  Mental health screening that was conducted on the following day was essentially unremarkable.  An indecent exposure evaluation that was completed on July 9, 2008, documented that the inmate had "some mild delusions and other psychotic features."  His case was presented at the IDTT meeting, and the determination was made to not include him in the MHSDS.  On the following week, a staff referral was submitted, and a mental health progress note documented that the inmate was "obviously psychotic" at that time.  Despite this, the intake assessment was not conducted until July 30, 2008.  During the IDTT meeting on August 1, 2008, the treatment team recommended the inmate for the EOP level of care.  At the time of the monitoring tour, there was no documentation indicating that the inmate had been referred to the psychiatrist for medication evaluation.

Findings

It was of concern that this inmate was evaluated several times by the mental health staff and, despite documentation that he presented with psychotic symptoms, was not initially placed on the mental health caseload.  Further, the patient was not seen by psychiatry and remained psychotic without treatment for another several weeks.  An intake assessment was finally completed, and the inmate was determined to require the EOP level of care.  This case was referred to the mental health supervisory staff for review and discussion with the clinical case manager involved.

**Inmate B**

This EOP inmate arrived at Folsom on June 10, 2008, from WSP, where he had been provided with a diagnosis of Schizoaffective Disorder.  He arrived at the reception center on October 24, 2006, and was started on medications and placed in the 3CMS program.  When evaluated at WSP, the initial psychiatric evaluation indicated that the inmate had a long history of psychiatric illness with an onset of depression and auditory hallucinations at age 19.  He also had a history of psychiatric hospitalizations and outpatient treatment prior to prison.

The inmate was placed into the EOP after his case was presented in an IDTT meeting at Folsom on June 20, 2008.  He was subsequently followed consistently by the psychiatrist as well as weekly by the clinical case manager.  The inmate was prescribed Prozac and Zyprexa.  The medical record did not provide documentation regarding the rationale for the change in level of care from 3CMS to EOP.  The treatment plan also failed to acknowledge the necessity to adequately address the inmate's psychotic symptoms.

Findings

The documentation in the medical record did not adequately provide the clinical rationale for the change in this inmate's level of care. He was seen weekly by his clinical case manager and monthly by the psychiatrist while awaiting EOP transfer.

**Inmate C**

This EOP inmate was transferred from the DVI reception center to Folsom on April 11, 2008. He was presented at an IDTT meeting on May 23, 2008, after he was referred to mental health several times by custody and other prison staff due to poor hygiene and functioning. He was provided with a diagnosis of Schizoaffective Disorder. Despite this diagnosis, progress notes described the inmate as stable, and noted that the inmate denied mental health difficulties or the desire for mental health services. He was subsequently determined to not require mental health services; nonetheless, he was followed clinically. At an IDTT meeting on June 27, 2008, the inmate was placed in the 3CMS program. On July 17, 2008, he was referred for EOP level of care based upon continuing concerns of the security and other staff regarding the inmate's poor functioning and depression. No psychotropic medications were prescribed, as the inmate refused.

Findings

It was of concern that multiple referrals from other institutional staff (custody, education) were necessary before this inmate was included on the mental health caseload. There was no documentation in the medical record indicating that the staff had attempted to obtain additional information to assist in the treatment of this inmate or to solicit medication compliance. He was seen weekly by the clinical case manager. EOP appeared to be the appropriate level of care, but this referral could have been avoided had the patient received needed services sooner. This case was referred to the mental health supervisory staff for additional follow-up.

**Inmate D**

This inmate was transferred from CTF to Folsom on October 31, 2007. He was placed into the 3CMS program on November 13, 2007, and he was referred for EOP level of care on August 5, 2008. From the time of his arrival at Folsom, the inmate was noted to have an extensive prior mental health history by his self-report (no collateral information was sought). He was prescribed Geodon, and he was reportedly medication compliant. There was documentation that the inmate had exhibited psychotic symptoms since at least June 11, 2008, when he was referred to mental health by the custody staff due to bizarre behavior, including talking to himself and staring blankly for long periods of time. The inmate denied any problems, and no additional mental health interventions or medication reassessments were planned. During August 2008, the custody staff telephoned the clinical case manager again and requested assistance for this inmate because of continued bizarre behavior and problems managing his personal self-care. Although the inmate continued to deny problems, the documentation indicated that he was "obviously hallucinating and psychotic." He was referred to the EOP and was awaiting transfer at the time of the monitoring visit.

Findings

It was of concern that there were multiple staff referrals regarding this inmate due to obvious psychotic decompensation, but the mental health staff failed to increase the frequency or intensity of interventions and minimized the staff concerns while accepting the inmate's denial of problems for several months. Finally, the inmate was appropriately referred for EOP level of care, but this increase in level of care possibly could have been avoided had the mental health staff responded sooner. This case was referred to the mental health supervisory staff for follow-up.

## Inmate E

This 3CMS inmate arrived at Folsom on July 22, 2008, from DVI's reception center. He was seen as a new arrival by a senior psychologist on July 29, 2008, was presented at the IDTT meeting on August 5, 2008, and was referred to the psychiatrist. At this meeting, he was placed into the 3CMS program. He was prescribed Topamax, Seroquel, Abilify, and Prozac. He reported a history of multiple psychiatric hospitalizations, community treatment with Seroquel and Wellbutrin, and a significant family history of serious mental illness in both parents. There was no documentation in the medical record that his consent had been sought for outside records to verify his treatment history and medication trials; such consent would have been beneficial in the determination whether an off-formulary medication request was appropriate.

Findings

This inmate was placed in the appropriate level of care in the 3CMS program. The lack of consent for prior treatment records was an omission that was of concern due to the inmate's reported mental health and family mental health history. The inmate reported that he was treated and stabilized in the community with Seroquel and Wellbutrin at doses consistent with his diagnosis. There was no documentation in the medical record or discussion at the IDTT meeting regarding whether or not it would be appropriate to submit an off-formulary request for either or both medications.

## Inmate F

This 3CMS inmate arrived at Folsom on February 8, 2008. At the most recent treatment team meeting at Folsom, he was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depression; earlier evaluations listed Major Depression as his diagnosis. The inmate had been treated with antidepressant medications in the past, but the medications had been discontinued for more than a year at the inmate's request; he had no subsequent problems off medications. He was followed consistently by his clinical case manager and the psychiatrist on a quarterly basis.

Findings

The necessity of maintaining this inmate on the mental health caseload with quarterly psychiatric contacts given his current diagnosis and no psychotropic medications prescribed for more than a year was not clear from the documentation in the medical record.

**Inmate G**

This 3CMS inmate arrived at Folsom on March 20, 2008, from DVI's reception center. He had no prior history of mental health treatment at the time of his incarceration. He submitted a request to mental health on June 5, 2008, that stated "experiencing frustrated thoughts that are extremely complicated; having real personal issues and feel trapped; tired." He was seen by a clinical case manager on June 9, 2008, and he was placed in the 3CMS program. He was referred to psychiatry for a medication evaluation, and he was seen four days later. Remeron was prescribed, and he was provided with a diagnosis of Depressive Disorder NOS.

Findings

This inmate appeared to be placed at the appropriate level of care based upon his clinical presentation and level of functioning. The mental health responses to the inmate's self-referral and concerns were timely.

**Inmate H**

This 3CMS inmate arrived at Folsom on December 1, 2006 from RJD. He had a history of episodic depression, methamphetamine dependence, and poor coping skills. He was reportedly stable until a change in the CDCR formulary necessitated a change from Lexapro to Celexa, which precipitated an increase in depressive symptoms. He was seen several times for noncompliance with prescribed meds according to the MHTS inmate history. Eventually, the inmate discontinued medications altogether, citing problematic side effects. His last IDTT meeting occurred on December 14, 2007. He was seen by his clinical case manager at 90-day intervals, and his condition was stable.

Findings

This inmate appeared to be placed at the appropriate level of care based upon his clinical presentation and level of functioning.

**Inmate I**

This 3CMS inmate arrived at Folsom on July 23, 2008, from CTF. He was seen as a new arrival on the same date, and an initial IDTT meeting occurred on August 1, 2008. The initial psychiatric evaluation was conducted August 5, 2008. He was prescribed Paxil. The most recent diagnosis provided was Mood Disorder NOS, but the inmate was provided with several other diagnoses in the past, including Antisocial Personality Disorder and Dysthymic Disorder. He was serving a life sentence after having received his third strike.

Findings

This inmate appeared to be placed at the appropriate level of care based upon his clinical presentation and level of functioning.

**Inmate J**

This 3CMS inmate arrived at Folsom on June 3, 2008. He had a diagnosis of Psychotic Disorder NOS. He was consistently evaluated by his clinical case manager and the psychiatrist as clinically indicated and consistent with Program Guide timeframes. The inmate had a job assignment in janitorial services. He was stable and functioning well.

Findings

This inmate appeared to be placed at the appropriate level of care based upon his clinical presentation and level of functioning.

EXHIBIT C
Pelican Bay State Prison (PBSP)
August 26, 2008 – August 27, 2008

**Inmate A**

The medical record of this inmate was reviewed at the request of plaintiffs' attorney, who reported the following:

> As of late May, Inmate A was at the 3CMS level of care and residing in A-1. At that time, he reported that he had been off medication for approximately eight months. Inmate A also reported experiencing significant stress and thoughts of self-harm earlier this year. Plaintiffs are concerned about Inmate A's well-being, and ask that monitors review the adequacy of his current treatment plan.

This inmate, who described himself as a sexual predator, had been housed in the administrative segregation unit while awaiting transfer to an SNY. His original endorsement date was March 28, 2008; he was re-endorsed on August 22, 2008, to an SNY. The medical record documented that the inmate was seen weekly by the clinical case manager.

The most recent treatment plan was written during August 18, 2008. The IDTT note documented the presence of a psychiatrist at the meeting. This treatment plan included the following:

> He reports still having auditory hallucinations of command type. He states that he is learning to cope with them and when he was on medication there was not a difference. When describing the voices he just said I'm a sexually violent predator.

The treatment plan recommended weekly individual cognitive therapy and weekly group therapy focusing on the enhancement of social skills.

Findings

This inmate was receiving mental health services at the appropriate level of care. His treatment plan was clinically relevant. The difficulties expressed by the inmate appeared to be related to his placement in the administrative segregation unit and the security limitations present within this setting.

**Inmate B**

The medical record of this inmate was reviewed at the request of plaintiffs' attorney, who reported the following:

> As of late May, Inmate B was at the 3CMS level of care and reported having an "individualized treatment plan" for reported instances of suicidal ideation. While at the EOP/PSU level of care in January 2008, he stated that according to an individualized treatment plan, he was handcuffed for about 4.5 hours during a reported instance of suicidal ideation. He reported that he was not released from handcuffs until he denied suicidal ideation. Plaintiffs understand that other patients experienced similar practices around the same time of this report. Plaintiffs ask that monitors review the adequacy of

Inmate B's current treatment plan and determine whether a previous version of his treatment plan included the above or some other form of specialized and potentially improper form of crisis care management.

Progress notes during the month of January 2008 were reviewed.  A January 10, 2008, note indicated that Inmate B had been placed in a holding cell after threatening to harm himself.

During January 15, 2008, the inmate was placed in a holding cell for one hour, related in part, to a threat that he was going to harm himself.

Progress notes documented at least weekly contact with Inmate B by his clinical case manager.

Prescribed medications at that time included Geodon and Remeron; the inmate was receiving medications via a Keyhea order.  Diagnoses that were present in the medical record included Major Depressive Disorder recurrent, Dysthymic Disorder, Exhibitionism, and Personality Disorder NOS.

The treatment plans dating from September 2007 were reviewed.  The treatment plans included the following problem issues: dysphoric mood, isolation, and self-sabotage of parole date. Interventions included medication management, case manager contacts, and completion of requirements for the GED.  Group therapy was also offered.  The treatment plan listed no reference to handcuffing of the inmate as a treatment intervention.

Findings

This inmate's treatment plan did not include any reference to handcuffs as apparently alleged by this inmate.  The treatment plan was generic in nature and required individualization for this inmate's specific treatment requirements.

**Inmate C**

The medical record of this inmate was reviewed at the request of plaintiffs' attorney.  This inmate had been housed in the PSU, where he had been receiving treatment for his indecent exposure incidents.  This treatment was terminated during December 2007 by the staff due to his lack of reasonable participation and lack of progress.  His level of care was subsequently decreased to 3CMS, and he was transferred to the administrative segregation unit, where he was housed at the time of the monitoring tour.

Inmate C was treated with medications that included Risperdal, Abilify, and Wellbutrin until his Keyhea order was not upheld by the administrative law judge during March 2008.  Since that time, he had been only been willing to take Wellbutrin and recently Depakote.

Inmate C received three RVRs during August 2008 related to indecent exposure incidents.  The most recent treatment plan included plans to transfer him to CSP/Corcoran for participation in the indecent exposure program after his current rule violations were adjudicated at PBSP.  He

had not been offered such treatment at PBSP based upon his recent history and his reported desire to participate in the program at CSP/Corcoran.

It should be noted that the inmate's special treatment program had been effective in that he had not been admitted to the MHCB since February 2007, when the special treatment plan was implemented.  The special treatment plan had only been reviewed on two occasions since its implementation, which was not consistent with the quarterly review requirement.

<u>Findings</u>

This inmate's treatment plan was clinically appropriate; however, the plan had not been updated as required.

EXHIBIT D
High Desert State Prison (HDSP)
October 14, 2008 – October 16, 2008

**Inmate A**

This 3CMS inmate from the C yard was interviewed, and his medical record was reviewed. At the time of interview on October 15, 2008, he reported that he felt sedated after taking his medication around 5:00 to 6:00 p.m., and he thought that it should be taken later in the day. He expressed concerns about an RVR that he had incurred.

According to the medical record, the inmate had orders for Remeron to be administered in the evening, and not at hour of sleep.

According to the progress notes, the inmate transferred to HDSP from a SHU and since incurred an RVR.

Findings

The mental health treatment that was provided to this inmate was largely consistent with Program Guide requirements; however, it fell short in important respects. The IDTT meeting was not attended by psychiatry. Although this inmate reported feeling sedated too early in the day, orders for Remeron were prescribed at evening rather than at hour of sleep.

**Inmate B**

This 3CMS inmate reported that in the past, he had been refused treatment for what was later diagnosed as an anxiety disorder. He reported that he followed the 602 grievance process and was currently receiving mental health treatment. He was neatly dressed, was well groomed, and exhibited linear thought processes. According to the medical record, he recently requested discontinuation of Vistaril because it made him less alert in his culinary job.

According to the inmate history, the inmate was provided with a diagnosis of Panic Disorder with Agoraphobia, and he was treated at the 3CMS level of care for medical necessity. His treatment plans were written in the context of an IDTT meeting and were updated every six months. The IDTT meetings were not attended by the necessary participants; no psychiatrist was present. The most recent plan indicated that the inmate was actively engaged in treatment. The plan was individualized with the exception of the interventions that were outlined, which were generic in content. The treatment provided was, however, more individualized than the plan indicated. The inmate was seen frequently by his clinical case manager, who employed an array of interventions designed to address his presenting problem. A self-help book was part of his treatment; individual sessions were cognitive-behavioral in nature and focused on the management of anxiety.

The medical record contained no MARs after June 2008. This inmate was seen by several different psychiatrists, among them two contractors and a psychiatrist who evaluated the inmate via telemedicine.

445

Findings

The most recent MARs were missing from the medical record. When this inmate reported experiencing excessive sedation during work hours, medication was discontinued at his request. The mental health treatment provided was largely consistent with Program Guide requirements but fell short in important respects. The IDTT meeting was not attended by psychiatry, the inmate was seen by many different psychiatrists, and the interventions listed on his treatment plan were generic. Despite the lack of individualized content in the treatment plans, the treatment that the inmate received from his clinical case manager was individualized. The inmate was evaluated at the clinically indicated frequency, and he was treated using empirically validated interventions.

**Inmate C**

This inmate's case was reviewed because the inmate had a series of admissions to the MHCB, and his name appeared a number of times in the minutes of the SPC. This inmate was referred to the mental health staff on an urgent basis during April 2008, because he wrote a letter to his attorney stating that he felt suicidal and believed that the mental health treatment he had been receiving was inadequate. During October 2008, he remained housed at HDSP, where he was housed on an SNY.

The inmate was serving a term of 15 years to life. During 2006 and 2007, he was treated at both the EOP and 3CMS levels of care. Before his arrival at HDSP, the inmate was at MCSP and CSP/Sac. He had a history of suicide attempts.

He was discharged from the EOP at MCSP during June 2007 with diagnoses of Adjustment Disorder, PTSD by history, Polysubstance Dependence, and Antisocial Personality Disorder. He also had chronic back pain associated with spinal bifida. During the past two years, this inmate was treated with a variety of psychotropic medications with little apparent benefit. He continued to seek mental health treatment and to report and exhibit emotional discomfort and occasional suicidal ideation.

The inmate was admitted to the MHCB on several occasions after he arrived at HDSP in November 2007. Admissions to the MHCB occurred on the following dates: March 26, 2008, to March 27, 2008; April 25, 2008, to May 1, 2008; May 2, 2008, to May 8, 2008; and September 17, 2008, to September 26, 2008. His case was discussed during meetings of the SPC. Minutes indicated that he was probably admitted to the MHCB at HDSP on at least six occasions. A progress note indicated that there was a hiatus in his series of admissions lasting roughly five months between May and September 2008.

According to documentation of an IDTT meeting held during July 2008 and a psychiatric evaluation that occurred several days later, this inmate was retained at the 3CMS level of care due to medical necessity for treatment of Mood Disorder NOS, possible Bipolar II Disorder, Pedophilia, Polysubstance Dependence, and Borderline Personality Disorder. Chronic back pain was also noted. His GAF score was assessed at 58. The meeting, which was a six-month review, was attended by the necessary participants. Although the treatment plan was

individualized in terms of problems and goals, the interventions were insufficiently individualized given this inmate's recent history and low level of adaptive functioning.

<u>Findings</u>

This case should have elicited, but did not, closer scrutiny by the SPC of the need for a revised treatment plan in light of the inmate's frequent expressions of suicidal ideation, history of suicide attempts, recent treatment at the EOP level of care, and multiple admissions to the MHCB. There was a lack of focused attention by the SPC and MHCB staff, and no apparent effort to collaborate with treatment providers in general population to develop continuity of care and treatment during the periods between his admissions to crisis care. Although the outpatient treatment plan was not specific, treatment provided by the clinical case manager was individualized. The inmate was seen as frequently as was clinically warranted, and he was treated using empirically supported interventions.

**Inmate D**

This inmate's self-injury elicited review by the SPC early in 2008. This inmate also had a history of RVRs for disruptive behavior, including at least two for sexual misconduct. According to a mental health screening report performed at MCSP on February 9, 2007, in connection with an RVR for indecent exposure/masturbation, this inmate was committed to the CDCR for a term of 31 years to life for a sex offense.

Despite a screening that indicated normal cognitive functioning, a number of more recent clinical documents indicated that the inmate's level of cognitive functioning was low. One indicated that his Tests of Adult Basic Education (TABE) score was below four. His TABE score was recorded as above four on recent RVR paperwork. He told a <u>Clark</u> screener, however, that he could not read or write.

The inmate remained at HDSP as of October 14, 2008. He arrived at HDSP from MCSP on December 17, 2007. A hanging attempt during January 2008 resulted in an MHCB hospitalization that occurred from January 11, 2008, to January 14, 2008. He was discharged back to the SNY with plans for five-day follow-up, but he was not placed on the mental health caseload. He reported to the staff that he was unhappy due to stressors that he experienced in his yard, including an incompatible cellmate and gang activity. He was also concerned about his mother's health and a pending transfer to another prison.

The inmate was taken to a hospital during May 2008 after reporting blurry vision; he was also found to have contusions and other injuries to his hands and head following an altercation. Regarding his mental health history, during 2006, soon after he arrived in the CDCR, this inmate passed a <u>Clark</u> screening and was not referred for further evaluation. During May 2006, he was seen by mental health staff, and he was diagnosed with Depressive Disorder NOS and was placed on the caseload at the 3CMS level of care. He was prescribed an antidepressant, but he was noncompliant by September 2008, when an IDTT removed him from the mental health caseload.

447

Regarding RVRs for sexual misconduct, the inmate received an adequate screening at MCSP during 2006, and he was not referred for a full mental health evaluation.  He incurred an RVR for the same behavior at HDSP on July 9, 2008.  The screening at HDSP was cursory and did not adequately consider all relevant information before concluding that the inmate had a diagnosis of Antisocial Personality Disorder and required no further evaluation.

Findings

The screening that was performed in connection with disciplinary charges stemming from sexual misconduct was cursory.  This case should have elicited a better diagnostic formulation that encompassed the inmate's mental health needs, level of intellectual functioning, academic achievement/literacy, risk of self-injury or victimization, dangerousness to others, and security issues.

EXHIBIT E
Mule Creek State Prison (MCSP)
August 6, 2008 – August 8, 2008

**Inmate A**

This EOP inmate was housed in the MHCB. He was provided with a diagnosis of Psychotic Disorder NOS, and he had a history of head banging. The inmate had been placed in five-point restraints on July 19, 2008, due to auditory hallucinations directing self-harm and suicidal intent. He remained in restraints until July 20, 2008, when he was removed from five-point restraints and placed into seclusion, where he remained until July 21, 2008. An IDTT that occurred on August 7, 2008, documented a diagnosis of Psychotic Disorder NOS, and a suicide risk assessment that was completed on that same date indicated the inmate had no current suicide risk; despite this, he was referred to the clinical case manager and psychiatrist. The treatment team subsequently determined that the inmate should be referred to DMH for further care and treatment.

This inmate was interviewed during the site visit while he was housed in the MHCB, where he had resided for the past 18 days. He reported he had been hospitalized at DMH for 39 days during May 2007 but, upon his return to MCSP, Seroquel that had been prescribed at DMH was changed to Thorazine. This inmate reported a long history of mental illness since childhood.

Findings

The care and treatment provided to this inmate were clinically appropriate; however, he had been hospitalized in the MHCB for longer than ten days without referral to DMH. The MHCB treatment staff did not follow the Unidentified Needs Assessment (UNA) criteria for referral to DMH of patients not stabilized within the ten-day period. This inmate reported that his Seroquel had been changed to Thorazine upon his return from DMH. This was an area that needed further review at the administrative level to ensure that DMH staff are made aware of formulary restrictions within CDCR, and that CDCR reviews carefully changes from non-formulary medications prescribed at DMH for their very difficult to manage patients.

**Inmate B**

This 3CMS inmate was interviewed and his medical record was reviewed in response to a request by plaintiffs' attorneys due to concerns regarding the need for a higher level of care and the assessment and treatment of the inmate's chronic suicidal ideation. On interview, the inmate reported that he was evaluated weekly by his clinical case manager and was enrolled in three groups (depression, stress management, and skills training). He reported that he only desired to attend the depression group. He reported that he benefitted more from "process" versus "psycho education" groups. The inmate reported that he had been in the EOP at MCSP, SVSP, CMC, CSP/LAC, and RJD.

A review of the medical record revealed that the inmate had requested removal from the EOP during August 2007. He was provided with a diagnosis of Mood Disorder NOS. He was treated with Risperdal, Cymbalta, Benadryl, and Vistaril. On August 5, 2008, he reported to his clinical case manager that he wanted a job or placement in the EOP for "something to structure his time." The medical record indicated that the inmate was enrolled in several groups, including stress

management, depression, and dialectical behavioral therapy (DBT); however, he did not attend groups consistently, and he had not been compliant with group therapy.

<u>Findings</u>

The care and treatment that were provided to this inmate were consistent with Program Guide requirements, and the 3CMS level of care appeared to be the appropriate level of care. The inmate appeared to be unwilling to participate in the enhanced interventions that the 3CMS program offered him. There was no clinical indication for transfer to a higher level of care at the time of the visit.

**Inmate C**

This inmate's medical record was reviewed in response to the plaintiffs' attorneys request due to reports that the inmate had not received his prescribed medications. The medical record indicated the inmate was prescribed Effexor, and the MAR revealed that there was a lapse in medication administration from July 16, 2008, to July 18, 2008, when the inmate was housed in the administrative segregation unit. The MAR also documented that the inmate had multiple medication refusals and no-shows for medications. The inmate refused medications from July 2, 2008, to July 17, 2008, as well as from June 2, 2008, to June 26, 2008, with the exception of June 7, 2008, when he did take his medication. The inmate did not show for medication administration on June 17, 2008, and June 18, 2008.

<u>Findings</u>

The inmate's report that he did not receive medications appeared to be largely based on his refusals or no-shows in taking prescribed medications. There was a three-day period in which the MAR indicated that medications were not administered.

**Inmate D**

This EOP inmate's medical record was reviewed in response to the plaintiffs' attorneys report that he had thoughts of self-harm and concerns regarding the adequacy of the treatment plan. The inmate was diagnosed with Mood Disorder NOS as well as a history of traumatic brain injury and drug dependence with the use of inhalants. He was prescribed Effexor and Remeron. On August 5, 2008, he requested a change in the administration of Remeron from nighttime to morning dosages. A progress note on July 13, 2008, indicated that the inmate was generally stable, but with occasional depressed mood. The inmate had a history of a suicide attempt by overdose of medications during 2006; however, a suicide risk assessment performed on February 19, 2008, indicated low suicide risk, and another performed on March 19, 2008, indicated no risk of self-harm. On the following day, he was admitted to the OHU due to concerns regarding self-harm; he had multiple previous admissions to the OHU due to recurrent suicidal ideation. The medical record indicated that the inmate retracted his report of suicidal ideation and threats of self-harm within two to three days of admission, appearing stable.

An IDTT meeting on July 2, 2008, indicated that the inmate had been placed in the administrative segregation unit for refusing orders; he had been prescribed Effexor, Lamictal, and Zyprexa on an as-needed basis. The treatment team also contemplated whether the inmate met the criteria for a diagnosis of Borderline Personality Disorder.

Findings

This inmate's care and treatment appeared to be clinically appropriate. He reported suicidal ideation or threats sporadically, and the treatment team responded by transferring the inmate to an appropriate treatment setting for monitoring and stabilization.

**Inmate E**

This 3CMS inmate's medical record was reviewed at the request of plaintiffs' attorneys, who reported that he had a history of PTSD and suicide attempts and who questioned whether his "E-bed" (overflow bed) housing was appropriate. The medical record indicated that the inmate was diagnosed with Adjustment Disorder, Polysubstance Abuse, and Personality Disorder NOS. Psychiatric progress notes on March 14, 2008, and June 13, 2008, noted that the inmate's mental status was stable, with a low risk of dangerousness, although he did report irritable mood and mild depression. The IDTT meeting on December 13, 2007, noted diagnoses of Major Depression recurrent, PTSD, and Personality Disorder. The PTSD diagnosis was due to a history of childhood molestation by a priest. The progress note indicated that the inmate was functioning reasonably well; however, his personality disorder was a primary focus of treatment. His level of care was maintained at the 3CMS level of care.

Findings

The care and treatment that were provided to this inmate appeared to be appropriate for his mental health needs.

**Inmate F**

This EOP inmate's case was reviewed at the request of the plaintiffs' attorneys due to concerns regarding delay in transfer to DMH. The inmate received an RVR on July 15, 2008, for manipulation and had been housed in the administrative segregation unit since July 16, 2008. He was initially transferred to the administrative segregation overflow unit on suicide watch from July 16, 2008, to July 18, 2008. He was seen for five-day follow-up until July 22, 2008, after he was released from suicide watch. He was prescribed Risperdal, and the medical records indicated that the inmate was receiving his medication. The inmate had been accepted to DMH on June 19, 2008; however, he was number 120 on the waiting list of 123 inmates awaiting transfer.

Findings

The care and treatment provided to this inmate were of concern due to the one-and-one-half months that he had been awaiting transfer to DMH; he remained very low on the waiting list for transfer.

**Inmate G**

This inmate's record was reviewed at the request of the plaintiffs' attorneys due to concerns regarding whether he had been receiving his medications. He was prescribed Depakote ER, Risperdal, Olanzapine (as needed), Haldol (as needed), and Vistaril (as needed). He was provided with a diagnosis of Mood Disorder NOS. A psychiatric progress note on July 24, 2008, noted the above medications and stated that the inmate's mental status was stable. An administrative segregation unit treatment team meeting on July 23, 2008, recommended a change to the EOP level of care; however, a chrono for the change in level of care was not located in the medical record. There were blank spaces on the inmate's July MAR on several days.

Findings

The medical record indicated that there was disruption in medication administration for this inmate. It was unclear whether medications were not administered or if the inmate did not respond to efforts to administer the medications. The case was referred to the treatment team for further review and resolution.

**Inmate H**

This 3CMS inmate was diagnosed with Bipolar Disorder. On September 25, 2007, he was transferred from NKSP to MCSP at the EOP level of care. Strattera was prescribed at NKSP, and this medication was delayed at least one week after the order was written at MCSP. A Lithium order was filled by the pharmacy on October 18, 2007, and his Thorazine order was filled on November 13, 2007, by the pharmacy. The first clinical case manager progress note in the medical record after the inmate's arrival at MCSP was dated October 11, 2007. The inmate received an RVR on October 27, 2007, for obstructing a peace officer, and OC spray was used.

A treatment plan of July 16, 2008, indicated diagnoses of Bipolar Disorder, Polysubstance Abuse, and possible Antisocial Personality Disorder. The plan documented that the inmate was transferred to the 3CMS level of care, but noted that the inmate might require the EOP level of care. The medical record indicated that the inmate's clinical course was characterized by periods of exacerbations of his mental illness.

He was treated with Tegretol, Thorazine, Neurontin, Lithium, and Ativan. The medical record indicated that the inmate had been moved between the administrative segregation unit, EOP, 3CMS, and MHCB levels of management and care for the past several months. A Lithium level and a Tegretol level performed on July 7, 2008, were both in the therapeutic range. The June MAR indicated that the inmate had several incidents of refusals and no-shows for medications, but he was generally compliant with medications.

Findings

The mental health care provided to this inmate should be reviewed by the treatment team as he had previously demonstrated rapid decompensation with medication noncompliance and may be in need of the EOP level of care.

**Inmate I**

This 3CMS inmate's care was reviewed at the request of the plaintiffs' attorneys due to concerns that the inmate was not receiving his prescribed medications and was possibly decompensating. This inmate was prescribed Risperdal, Effexor, and Trileptal, which appeared to have been ordered on June 30, 2008, and then reordered on July 18, 2008.  He was also prescribed Lithium, which he had refused or did not show for medication administration 18 times during May 2008; Lithium was discontinued on May 19, 2008.  Trileptal was also discontinued on that same date for the same reasons.  On July 23, 2008, the inmate's level of care was changed from EOP to 3CMS.  A psychiatrist reported in a progress note on July 31, 2008, that there were no psychiatric symptoms reported or endorsed by the inmate.  A clinical case manager progress note on August 7, 2008, reported that the inmate was stable, was not in crisis, and did not report any difficulties with sleep or appetite.  His cell appeared to be clean, and the plan outlined in the progress note was to continue to monitor the inmate for any signs of decompensation.  Psych tech rounds continued for this inmate as per Program Guide requirements.

Findings

This inmate's medications were discontinued due to his medication refusal.  He did not appear to meet the criteria for a Keyhea order at the time of the site visit; however, it was appropriate that the mental health staff continued to monitor him for signs of decompensation.

**Inmate J**

The medical record for this 3CMS inmate was reviewed due to his history of multiple MHCB admissions.  The inmate had a history of hospitalization at ASH when he was 18 years of age. He had the following MHCB admissions: December 5, 2007, to December 11, 2007; December 27, 2007, to December 31, 2007; January 5, 2008, to January 9, 2008; and January 10, 2008, to March 6, 2008 (a total of 57 days).  MHCB logs indicated that the inmate was placed on suicide precautions during all of these hospitalizations.

The inmate was initially admitted to the MHCB during December 2007 after he reported a number of somatic issues, including being unable to walk.  He was initially uncooperative with attempts at mental health assessment.  When, after a few days, he cooperated with interviews, he reported having thoughts of suicide that he attributed to his perception of his deteriorating physical condition.  He was provided with a diagnosis of Depressive Disorder NOS at the time of discharge.

454

He was re-admitted to the MHCB in late December 2007 after ingesting a small amount of Comet cleanser. He again reported an inability to walk and underwent neurological evaluation (which resulted in the impression that there was "no true neuromuscular or neurological disorder"). He was again admitted to MHCB on December 5, 2007, when he reported feeling suicidal. He was discharged four days later with a diagnosis of Adjustment Disorder NOS. He attempted to hang himself upon being informed that he was being released from the MHCB, and he was re-admitted. Progress notes indicated that the inmate required "immediate DMH referral" due of the severity of his depressive symptoms. A referral to DMH acute care was apparently initiated on January 11, 2008, and the admission information was faxed to DMH on January 22, 2008. Progress notes indicated that the referral was pending approximately one month later. The referral was eventually rescinded, apparently as a result of the inmate having reported that he had malingered psychiatric symptoms in an attempt to gain access to psychotropic medications and to social security disability income.

This inmate was maintained at the 3CMS level of care. The most recent medical records entries indicated that this individual likely exaggerated or malingered physical symptoms, and he maintained his claims of various physical illnesses despite having undergone medical tests that indicated there was no physical basis for his symptoms.

This most recent treatment plan was written on December 28, 2007. Although the plan included an adequate problem list and related interventions, there was no indication that the interventions that were cited in the plan were ever implemented.

Findings

Although the IDTT considered referral to DMH acute care, the referral was not completed after the staff apparently received information that the inmate had exaggerated symptoms. It would appear that this inmate functioned at an adaptive level that was chronically less than optimal. The existing treatment plan was not implemented. The team should have considered referral to an EOP program with referral to DMH intermediate care after evaluation of his functioning at the EOP level of care.

EXHIBIT F
Sierra Conservation Center (SCC)
November 12, 2008 – November 14, 2008

**Inmate A**

This EOP inmate had a history of multiple placements in the OHU for suicide monitoring. He was housed in the OHU for either suicide watch or suicide precautions at least monthly from August 2008 to October 2008. The inmate had a documented history of depression, sleep difficulties, and isolative behavior. A psychological evaluation that was conducted on August 7, 2007, resulted in diagnoses of Depressive Disorder NOS, Polysubstance Dependence, and Antisocial Personality Disorder. The most recent medications included Zoloft 200 mg/day, Risperdal 3 mg/day, Benadryl 75 mg/day, and Thorazine 300 mg/day.

The inmate was transferred to the administrative segregation unit on June 19, 2008, after he was involved in an altercation in his cell. The inmate was placed into the OHU on August 13, 2008, when he reported hearing voices directing him to harm himself. He was placed on suicide watch; this monitoring was reduced to suicide precautions on the following day. A progress note on August 15, 2008, indicated that the inmate was stable and did not require EOP or MHCB transfer. Five-day follow-up after release from the OHU was documented.

The inmate was again transferred to the administrative segregation unit on August 23, 2008, after he was involved in a fight upon his return to housing after OHU placement. An administrative segregation screening form was present in the medical record regarding this admission. The inmate was seen by the treatment team on August 27, 2008. There was no psychiatrist present at this IDTT meeting. Psych tech rounds were documented in the medical record, and weekly clinical case manager contacts were also documented in the administrative segregation unit. The documentation of the weekly case manager contacts indicated that the inmate was stable without risk of self-harm.

The inmate was re-admitted to the OHU on September 19, 2008, after he reported intent to harm himself; a suicide risk assessment was completed at that time. The inmate reported that voices were telling him to harm himself, and he was placed on one-to-one suicide watch. The inmate's medications were adjusted, and at the time of discharge, there was documentation to indicate that the clinician believed that the inmate did not require transfer to an MHCB or the EOP. He returned to the administrative segregation unit on September 22, 2008; the IDTT also met on that date and made no further specific treatment recommendations. Five-day follow-up after release from the OHU was documented.

The inmate was again placed in the OHU from October 9, 2008, to October 14, 2008, due to suicidal ideation. Progress notes indicated that the clinician was concerned regarding the inmate's recurrent suicidal ideation as well as the inconsistency of his clinical presentation. A recommendation was made for transfer to the EOP level of care. A chrono documenting this recommendation was completed on October 14, 2008.

<u>Findings</u>

This inmate had a pattern of recurrent suicidal ideation that precipitated transfer to the OHU for monitoring. He was appropriately placed into the OHU, and there was documentation of the

appropriate clinical follow-up after release from the OHU. Of some concern was the lack of psychiatric presence at many of the IDTT meetings.

Referral to the EOP appeared to be an appropriate recommendation for this inmate in light of his multiple OHU placements and recurrent suicidal ideation. The treatment plan required more specificity and individualization. Current medication consent forms were present in the medical record.

## Inmate B

This 3CMS inmate was provided with a diagnosis of Mood Disorder NOS secondary to interferon treatment. He had a history of Hepatitis C. There was no apparent history of mental health treatment preceding the initiation of interferon treatment.

The inmate was placed in the OHU on July 8, 2008, for suicide watch. A suicide risk assessment was completed at that time. The inmate was treated with an antidepressant medication while housed in the OHU. A determination was made that the inmate did not require transfer to the EOP or an MHCB. An IDTT meeting occurred on July 10, 2008, and included the necessary participants. The inmate was apparently released from the OHU on the following day. Both custody and clinical follow-up were documented after the inmate was returned to housing after release from the OHU. A progress note on October 23, 2008, indicated that the interferon treatment was completed, and the inmate's viral load was undetectable. The progress note indicated that the inmate would be followed by mental health for one additional month and then he would be discontinued from the 3CMS program.

Findings

The mental health care that was provided to this inmate appeared to be clinically appropriate. He was appropriately transferred to the OHU due to suicidal ideation. He was seen for follow-up as was clinically indicated. He appeared to be receiving care at the appropriate level in the 3CMS program.

## Inmate C

This inmate was recommended for EOP level of care on October 29, 2008; he had previously been receiving the 3CMS level of care at SCC. He was provided with a diagnosis of Schizophrenia, paranoid type and methamphetamine dependence; an alternative diagnosis of Depressive Disorder NOS was also present in the medical record. He had a history of hospitalization at ASH, and he had a history of an evaluation that found him incompetent to stand trial.

Progress notes indicated that the inmate was referred for psychiatric evaluation during August 2008 due to suspected hoarding of medications. The inmate was placed in the OHU on September 24, 2008, for suicide precautions after reporting that he wanted to harm his cellmates. He was released two days later, with follow-up provided.

458

The inmate was transferred to the administrative segregation unit; a progress note on October 22, 2008, described the inmate as unstable.  There was documentation of psych tech rounds in the medical record.  The inmate was followed consistently by the psychologist and the psychiatrist while he was housed in the administrative segregation unit.  An IDTT meeting on October 29, 2008, recommended the EOP level of care.

Findings

This inmate was appropriately transferred to the OHU for monitoring of possible suicidal and/or homicidal ideation.  Referral to the EOP level of care appeared to be clinically appropriate.  Clinical contacts occurred as required.  The IDTT meetings included the necessary participants.  Medication informed consent forms were located in the medical record.

**Inmate D**

This inmate was placed in the OHU on November 11, 2008.  He was admitted due to suicidal ideation, and he was placed on suicide watch.  A suicide risk assessment was completed at the time of admission to the unit.  Progress notes indicated that the inmate reported that he had not been suicidal, but made threats of self-harm to facilitate his removal from the yard.

The most recent treatment plan was completed on August 26, 2008.  The plan did not include identified problems or interventions listed.

Findings

It appeared that this inmate was receiving adequate mental health care.  The clinical documentation that was present in the medical record was adequate, with the exception of the treatment plan that required more individualized modification.

EXHIBIT G
California Medical Facility (CMF)
August 12, 2008 – August 14, 2008

**Inmate A**

This inmate was housed in the MHCB, where he was admitted three days prior from the administrative segregation EOP unit at Folsom.  The inmate was prescribed Lithium and Geodon, and he reported that he also received an injection every two weeks.  He was on a Keyhea order.  Upon interview, the inmate reported that he was admitted to the MHCB due to self-inflicted lacerations.  He further stated that he had been incarcerated since 2001 and had been admitted to DMH in the past.

A review of the medical record indicated that the inmate was admitted to the MHCB on August 9, 2008, and he was discharged on August 12, 2008.  He was provided with a diagnosis of Schizoaffective Disorder, and Risperdal was added to his medication regimen.  A suicide risk assessment completed on August 9, 2008, indicated that the inmate posed medium risk of self-harm.  An IDTT meeting that occurred on August 12, 2008, was clinically relevant, and the documentation outlined the inmate's progress.

Findings

This inmate's care and treatment appeared to have been appropriate for his mental health needs.

**Inmate B**

This 3CMS inmate was housed in the MHCB.  He was admitted to the MHCB after transfer from SQ.  This inmate reported that he had been incarcerated for the past four months.  A review of his medical record confirmed the MHCB admission on August 11, 2008, with a diagnosis of Adjustment Disorder with depressed mood.  He was placed on suicide watch because of a serious attempt by multiple self-inflicted lacerations.  The inmate's behavior was described as unpredictable.  He had been prescribed Paxil after admission to the MHCB, and he was not a participant in the MHSDS prior to his admission to the MHCB.  There was no SRAC located in this medical record.

Findings

This inmate's care and treatment appeared to be appropriate; however, there was no documented suicide risk assessment located in the medical record.  The inmate was appropriately monitored on one-to-one suicide watch because of a serious suicide attempt prior to his admission to the MHCB.

**Inmate C**

This 3CMS inmate was housed in the MHCB, where he had been admitted on July 25, 2008, from Folsom.  He was provided with diagnoses of Bipolar Disorder, Cannabis Abuse, and Paranoid Personality Disorder.  A review of the medical record confirmed that the inmate had been clinically discharged on August 12, 2008, the date of this interview.  The psychiatric and nursing notes included content that was clinically relevant.  A mental health evaluation performed on July 25, 2008, and the suicide risk assessment completed on the following day

were also completed accurately and provided relevant clinical information. The suicide risk assessment indicated that the inmate posed no apparent risk of self-harm. The documentation of an IDTT meeting that was conducted on August 12, 2008, documented the inmate's improvement with medication treatment and a plan to return the inmate under protective custody status to Folsom.

Findings

This inmate's care and treatment appeared to have been appropriate for his mental health needs. He was admitted to the MHCB on July 25, 2008, and remained there on August 12, 2008; the inmate had a length of stay of 17 days without documentation that there was consideration of referral to a higher level of care prior to the tenth day of his MHCB stay.

**Inmate D**

This inmate's medical record was reviewed as he had been admitted to the MHCB on August 2, 2008, and had a ten-day length of stay. The inmate had been receiving care at the EOP level of care prior to admission. A suicide risk assessment indicated that the inmate posed medium risk of self-harm on the day of arrival at the MHCB, but the assessment noted that the medical record had not been reviewed as part of the suicide risk assessment process. IDTT meetings were conducted consistently, and a treatment plan dated August 12, 2008, was individualized and clinically relevant. The inmate was provided with diagnoses of Bipolar Disorder, Alcohol Dependence, and Borderline Personality Disorder. The medical record did not document that the inmate had been referred to a higher level of care.

Findings

This inmate's care and treatment appeared to be appropriate in the MHCB, although the suicide risk assessment evaluator did not review the medical record as part of the evaluation. Further, the inmate did not appear to have been considered for referral to a higher level of care, as required by the Program Guide.

**Inmate E**

This inmate's medical record was reviewed as he had been admitted to the MHCB on August 9, 2008, three days prior to the monitoring tour. The inmate had been receiving care at the EOP level of care prior to admission, and he was admitted due to suicidal ideation and threat. The inmate was diagnosed with Major Depressive Disorder recurrent, which was changed after admission to the MHCB to Bipolar Disorder, Borderline Personality Disorder, Narcissistic Personality Disorder, and Antisocial Personality Disorder. He was prescribed Haldol and Lamictal. An IDTT progress note of August 11, 2008, was clinically relevant and documented the inmate's progress and the rationale for changes in diagnosis.

Findings

This inmate's care and treatment appeared to be appropriate for his mental health needs.

**Inmate F**

This inmate's medical record was reviewed as he was housed in the DMH S-1 program. The inmate had been receiving care at the EOP level of care, and he had been placed on a Keyhea order. He was admitted to the S-2 MHCB on June 21, 2007, and on June 24, 2007, he was provided with diagnoses of Schizoaffective Disorder, Schizotypal Personality Disorder, and Polysubstance Dependence. He was transferred to DMH acute care, but he remained housed on S-2. A 60-day treatment plan on August 21, 2007, documented the above-mentioned diagnoses. The inmate was subsequently transferred to the P-3 DMH ICF program. The course of treatment was difficult to follow, but it appeared that the inmate was transferred back to the P-3 unit from Q-3 DMH acute care on approximately August 19, 2008. At the time of the monitoring tour, the inmate had returned to the S-1 DMH acute care unit because his condition had not stabilized.

Findings

The care and treatment provided to this inmate required careful review as he had been placed on Keyhea, had multiple suicide risk assessments completed due to concerns of self-harm, and had multiple level of care changes from DMH acute care to ICF and then back. Treatment planning should be re-evaluated to determine the most appropriate long-term level of care for this inmate.

**Inmate G**

This inmate's medical record was reviewed as he had been interviewed in an administrative segregation EOP group. The medical record indicated that the inmate was transferred to CMF on May 16, 2006; a treatment plan completed on July 8, 2008, documented that the inmate was provided with diagnoses of Major Depressive Disorder, provisional, and Antisocial Personality Disorder. The inmate was prescribed Zoloft; the MAR documented medication compliance. Review of the structured therapeutic activities for June 2008 documented that 50 hours of activities were scheduled, 48 of those hours were offered, and 34 of those hours were received in either group or individual treatment. This indicated that less than ten hours per week of structured therapeutic activities for the month of June 2008 were received, but approximately 12 hours per week were offered to the inmate.

Findings

This inmate's care and treatment appeared to be appropriate, but the treatment plan should address issues of his refusal to attend the full number of structured therapeutic activities offered.

**Inmate H**

This inmate's medical record was reviewed as he had been interviewed in an administrative segregation EOP group. The medical record indicated that the inmate was transferred to CMF on November 7, 2007, and his level of care was changed to EOP on February 19, 2008. The inmate was provided with diagnoses of Schizoaffective Disorder, Polysubstance Abuse, Seizure Disorder, and Hypertension, as well as having hearing impairment. IDTT meetings that were

conducted on February 19, 2008, and on August 12, 2008, were clinically appropriate and documented the inmate's history of two suicide attempts; the last attempt occurred during 2001. An increase in the inmate's level of care was considered; however, it was determined that he would remain at the EOP level of care.  A psych tech weekly progress note indicated that the psych techs conducted administrative segregation rounds daily.  There was documentation that the inmate was seen by the clinical case manager and the psychiatrist at the required frequencies. Regarding structured therapeutic activities for May 2008, the inmate was scheduled for and offered 26 hours, but he only attended 18 hours.  For June 2008, the inmate was originally scheduled for 57 hours; he was offered 55 hours, and he attended 53 hours.

Findings

The current care and treatment that were provided to this inmate appeared to be appropriate for his mental health needs.  The treatment team markedly increased the offering of group therapy for this inmate during the month of June 2008.

**Inmate I**

This inmate's record was reviewed as he was interviewed in an administrative segregation EOP group.  The medical record indicated that the inmate was transferred to CMF on June 30, 2005. He was receiving care at the 3CMS level of care until early 2008, when his level of care was changed to EOP.  At that time, he was provided with diagnoses of Major Depressive Disorder, Polysubstance Dependence, and Antisocial Personality Disorder.  His medications included Celexa, Trazodone, Risperdal, and Vistaril.  A suicide risk assessment that was completed on July 1, 2008, determined that the inmate posed low risk of self-harm; however, this assessment was based on the inmate interview only, without review of the medical record.

Findings

The care and treatment that were provided to this inmate appeared to be clinically appropriate; however, the evaluator who completed the suicide risk assessment appeared to have relied only on the inmate's statements without review of the medical record, custody classification file, or information from the custody staff.  These were other data sources that should have been included in the completion of the suicide risk assessment.

EXHIBIT H
California State Prison, Solano (CSP/Solano)
May 20, 2008 – May 22, 2008

**Inmate A**

This inmate was included in the MHSDS on January 11, 2008, when he was brought to the MHCB by the custody staff with paranoid delusional thinking regarding his wife attempting to kill him and suicidal ideation.  He was provided with a diagnosis of Psychotic Disorder NOS.  He was placed into the administrative segregation unit on January 17, 2008, due to safety concerns that were under investigation.  He was released to the administrative segregation unit at the 3CMS level of care and provided five-day clinical follow-up after release.  A prescription for Risperdal was continued at his psychiatric assessment that occurred on February 28, 2008.  Subsequent progress notes indicated that the inmate was stable on his prescribed medications.

Findings

The inmate appeared to have benefitted significantly from treatment in the MHCB  and subsequent clinical follow-up.  The inmate remained in the administrative segregation unit at his request due to safety concerns, and he was provided with appropriate assessment, five-day follow-up, and daily monitoring.

**Inmate B**

This 3CMS inmate was placed in the administrative segregation unit on October 14, 2007, after his involvement in a fight with his cellmate using a weapon.  He was subsequently issued a 15-month SHU term for this offense after he was found guilty of this charge.  No mental health evaluation (115X) was requested as there was reportedly no bizarre or uncharacteristic behavior associated with the incident.  A suicide risk assessment was conducted in the administrative segregation unit, and the inmate was assessed as posing low risk of self-harm.  A clinical case manager assessment occurred on October 17, 2007, and the assessment indicated that the inmate exhibited paranoid ideation.  A diagnosis of Schizophrenia paranoid type was provided.  Due to concerns regarding possible dangerousness to others, the inmate was admitted to the MHCB on that date for further assessment and stabilization.  The inmate was discharged from the MHCB on October 24, 2007, and was returned to the administrative segregation unit at the 3CMS level of care.  Discharge medications included continuation of Risperdal and Remeron.  Subsequent progress notes indicated that the inmate was monitored daily by the psych techs while housed in the administrative segregation unit, where he remained pending endorsement for SHU placement.

Findings

This 3CMS inmate had an extensive and recent history of assaultive behavior that was possibly exacerbated by his paranoid ideation.  He received appropriate mental health screening and MHCB hospitalization when clinically indicated.  He was medication compliant and appeared stable while awaiting SHU transfer.

**Inmate C**

This inmate was placed into the administrative segregation unit on February 6, 2007, following a fight with another inmate in his H-Dorm housing unit.  He was retained in the administrative segregation unit due to ongoing disciplinary violations, including refusing orders and possession of a weapon.  Although some of these violations resulted in convictions, no referrals for mental health assessments (115Xs) were requested, as no evidence of bizarre or unusual behavior was noted.

This inmate was initially placed into the MHSDS at the 3CMS level of care at the time of reception screening on October 17, 2006, when he was provided with a diagnosis of Bipolar Disorder.  He was prescribed Depakote and Seroquel.

Daily psych tech rounds and weekly clinical case manager contacts were documented.  The inmate was admitted to the MHCB unit during December 2007, apparently after threatening the staff.  A suicide risk assessment on December 9, 2007, assessed the inmate as posing low risk for self-harm.  He was discharged back to the administrative segregation unit on December 15, 2007, and was seen for follow-up by the clinical case manager on a daily basis for seven days.  He was again admitted to the MHCB on March 6, 2008, after reporting suicidal ideation.  He was discharged on March 10, 2008, and was monitored on a daily basis by the clinical case manager for seven days.  At the time of the site visit, the inmate again reported possible suicidal ideation, and admission to the MHCB was pending.

<u>Findings</u>

This inmate had a well-documented and lengthy history of mood instability, punctuated by threats to harm himself and others.  The clinical responses to the inmate's threats of self-harm were prompt, and there was good documentation of appropriate admission to the MHCB and timely follow-up after discharge to the administrative segregation unit.  There was documentation of psych tech rounds and clinical case manager contacts as required by the Program Guide.

EXHIBIT I
San Quentin State Prison (SQ)
July 29, 2008 – July 31, 2008

**Inmate A**

This EOP inmate was housed in the adjustment center.  He was seen by this reviewer during psych tech rounds and appeared disheveled and agitated.  The custody staff reported that he had been disruptive during the morning, yelling for an extended period of time.  He was quiet during the time of rounds and was initially unwilling to communicate with the psych tech.  She was eventually able to engage him.

According to his medical record, he had been in the EOP level of care since September 2007.  During that time, he had been placed in MHCBs and also in DMH.  He appeared to have been transferred to DMH during January 2008.  He was returned to SQ on May 23, 2008, from DMH.  The staff noted that while he had an extensive history of medication noncompliance that led to grave disability resulting in the DMH placement, the inmate did not meet criteria for a Keyhea order.

This inmate continued to refuse to participate in groups.  According to the medical record, he remained paranoid and resistant to therapeutic intervention.  The inmate had a current treatment plan that recognized his resistance to mental health services and refusal of medications, but there was no plan described to engage the inmate, other than to "encourage treatment."  In addition, this treatment plan stated that the inmate was discharged from DMH with a GAF score of 30, indicating MHCB placement, but that the inmate had "exhausted both DMH and Mental Health Crisis Beds."  This seemed to suggest that discharge and non-admission decisions may not have been based on this inmate's clinical need.  This fact was clearly outside the control of the SQ staff; however, they had not utilized the appeal process or contacted headquarters staff for assistance.  In addition, progress notes made multiple references to the need for placement of this inmate in an MHCB or DMH, but there was no indication that such a referral had been pursued.  There was also reference to the need for a Keyhea order for this inmate, but again no indication as to whether it had been pursued.  It did appear that the inmate was finally placed on the ITP list, although there was no current treatment plan to reflect that referral as the supervisory staff indicated was required.

Findings

According to the medical record, psych tech daily rounds were compliant for May and June 2008, but there was no documentation for a two-week period at the beginning of July 2008.  Conversely, clinical case manager contacts were not compliant for June 2008, but they were compliant for July 2008.  There was a current treatment plan as required by the Program Guide requirements.

**Inmate B**

This EOP inmate was housed in the adjustment center and was a condemned inmate.  The medical record indicated that he had been receiving the EOP level of care since early 2007.  He was prescribed Lithium Carbonate 1,200 mg/day, Zyprexa 40 mg/day, Abilify 10 mg/day, Thiothixene 60 mg/day, and Artane 4 mg/day.  The inmate was not seen within 90 days by the psychiatrist, but bridge orders were provided.  He was seen 108 days after his previous

psychiatric visit.  The most recent treatment plan that was located in the medical record was dated February 6, 2008.  The treatment plan was basic and generic.  This inmate had been seen weekly by his clinical case manager with the exception of one week.  He was somewhat erratic in his group attendance, but the medical record clearly indicated that group facilitators made contact with him at cell-front when he refused to attend groups.

Findings

This inmate was seen by his clinical case manager in compliance with Program Guide requirements.  However, he was not seen timely by his psychiatrist or the IDTT.

**Inmate C**

This 3CMS inmate was housed in the administrative segregation unit.  He had been receiving the 3CMS level of care since August 30, 2007.  There was no current treatment plan in the medical record, although there were progress notes dating to 2007.  The available medical volume that was reviewed was the second volume of his record, so it was possible that the current treatment plan was not brought forward to the current medical record; however, given the documents in the record and the way that they were filed, this seemed unlikely.

This inmate had been seen in compliance with Program Guide requirements by psychiatry and was prescribed Zoloft 50 mg/day.  He had several medication changes during the past three months.  According to the psychiatric progress notes, these changes were due to continued depressive symptoms.

Although a roster indicated that this inmate was on administrative segregation status, nothing in the medical record supported that.  Verification with the staff proved that the inmate was not on administrative segregation status.

Findings

This inmate was seen by his clinical case manager and the psychiatrist in accordance with Program Guide requirements.

**Inmate D**

This condemned male had been receiving the EOP level of care since at least January 2008.  The medical record that was available for review was the most current volume of a multivolume record that did not contain any documents preceding January 2008.  The most recent treatment plan was dated January 2008.  While this inmate was not seen every week that he was on administrative segregation status, he was seen at a 90-percent compliance rate by his clinical case manager.  The psych techs saw him daily for psych tech rounds; he was offered group therapy regularly.  The medical record indicated that he generally refused group therapy.  According to the progress notes, he "chose yard over group."  The possibility that an inmate would have to choose between yard and group therapy was discussed with the Group Treatment Coordinator.  He indicated that the expectation was that inmate would not have to choose

470

between group and yard and assured that he would remedy the situation. This inmate had been attending group regularly in the past, and his poor attendance had occurred during the past several months; however, the treatment notes did not reflect any recognition of this change in his behavioral pattern.

This inmate was prescribed Remeron 30 mg/day and Benadryl 50 mg/day. He was seen frequently, at times weekly, by psychiatry.

Findings

This inmate was seen by psychiatry and his clinical case manager in compliance with Program Guide requirements. He had not been seen by the IDTT in accordance with Program Guide requirements and did not have a current treatment plan.

**Inmate E**

This 3CMS inmate was housed in the administrative segregation unit. It could not be determined when this inmate was placed into the administrative segregation unit. He was not on the administrative segregation unit log provided to the monitors; however, he clearly had been housed in the administrative segregation unit since at least the third week in June 2008 as demonstrated by the medical record (i.e., ICC, psych tech rounds). There was no documentation that he was seen by his clinical case manager until July 14, 2008. He was seen consistently by the psychiatrist, and he was prescribed Neurontin 600 mg/day. While progress notes indicated clear adjustment difficulties and significant distress regarding a possible pending transfer to PBSP that would take him far from his pregnant spouse and young child, a progress note by the psychiatrist indicated that the inmate would be removed from 3CMS level of care. This seemed inconsistent with the medication prescribed by the same psychiatrist. It also suggested that the psych techs, clinical case manager, and psychiatrist were not communicating with each other.

Findings

This inmate was not seen by his clinical case manager in accordance with the Program Guide requirements. He was seen by psychiatry consistent with Program Guide requirements. It did not appear that the mental health staff communicated with each other about this inmate's mental health status, which compromised the care that was provided.

**Inmate F**

This EOP inmate was sent to the APP during May 2008. The inmate had also been placed in the OHU during June 2008 and July 2008. A progress note dated July 22, 2008, reported that an IDTT meeting had been held and the inmate refused to attend. Despite this progress note, no treatment plan for that date was located in the medical record. There was no current treatment plan in the medical record. The medical record was in extreme disarray. It could not be confirmed through the medical record that this inmate had been seen weekly by his clinical case manager. It appeared that there were missing weeks, but that may have been due to medical records misfiling. The same was true of the psych tech rounds.

471

According to the medical record, this inmate had been refusing to attend group regularly. Despite that, there was no mention of the need to implement the intensive treatment plan. He was seen at times by more than one clinical case manager during the week, and group facilitators did document cell-front contacts with him. However, it was not clear that anyone attempted to clarify why he was refusing groups or to implement any significant intervention to his treatment noncompliance.

Findings

It could not be determined if this inmate had been seen by his clinical case manager, the psychiatrist or during psych tech rounds in compliance with Program Guide requirements. While he had been offered groups regularly, he consistently refused to attend. The staff did not appear to have made significant efforts to address this issue.

**Inmate G**

This condemned (B) inmate was treated at the EOP level of care. The reviewer interviewed him during this monitoring tour. He was a bright and articulate individual with a history of paranoia. He had not been prescribed psychotropic medications since March 2008, but he was seen by psychiatry within Program Guide timeframes prior to that time. He was seen by his clinical case manager less than 50 percent of the time. It also appeared from the progress notes that the inmate's paranoia interfered with his ability to engage in mental health treatment as he frequently refused out-of-cell contact for group or individual meetings. His group therapy attendance was somewhat erratic; at times he reached approximately 50-percent compliance with group attendance, and at other times he consistently refused to attend groups. The progress notes did not document that the staff had adequately addressed his group non-attendance and his refusal of confidential clinical contacts. There was documentation of weekly psych tech rounds in the medical record. There was no current treatment plan in the medical record.

Findings

This inmate was not seen in accordance with Program Guide requirements by the clinical case manager or the IDTT. He did not have a current treatment plan as required by the Program Guide. He was seen by psychiatry and during psych tech rounds in accordance with Program Guide requirements.

**Inmate H**

This 3CMS inmate was housed in the administrative segregation unit. He arrived in the administrative segregation unit on July 8, 2008. Since that time, he was seen weekly by the clinical case manager. There was not a current treatment plan in the medical record. The medical records documentation indicated that weekly psych tech rounds occurred during his time in the administrative segregation unit.

472

This inmate was prescribed Paroxetine 40 mg/day and Geodon 80 mg/day. He was seen by the psychiatrist in October 2007, but not again until February 2008; this was not in compliance with the Program Guide requirement of every 90 days. He was then seen approximately every three weeks by psychiatry until July 2008, when bridge orders were written. The psychiatric contact was eight days overdue.

Findings

This inmate was seen in accordance with Program Guide requirements by the clinical case manager and during psych tech rounds. He was seen erratically by the psychiatrist, with two periods of noncompliance. Finally, he did not have a current treatment plan, as required by the Program Guide.

**Inmate I**

This reception center inmate was treated at the EOP level of care. The placement chronos in his medical record indicated that he had not had a significant mental health history until he was referred for an evaluation on June 12, 2008. On June 24, 2008, he was placed into the EOP. A current bus screen was not located in the medical record to determine when this inmate arrived at SQ, making it difficult to determine if his evaluation had occurred within time requirements. There was no current treatment plan in the medical record. There was also no documentation that he had been offered the required five hours of weekly therapeutic activity. Finally, there was no documentation of psychiatric contact. There were no orders for current psychotropic medications. Clinical case manager contacts were not in compliance (50 percent) with the Program Guide.

Findings

It could not be determined if this inmate was screened or evaluated in a timely fashion since his arrival date was unavailable. He was not seen by psychiatry or the clinical case manager, or offered group therapy in accordance with Program Guide requirements.

**Inmate J**

This inmate was placed into the 3CMS program on May 28, 2008, and he was housed in the administrative segregation unit due to an assault in which he was a victim. He was not listed in the administrative segregation unit log, so his placement date in the administrative segregation unit could not be determined. Based on the psych tech rounds documentation, it appeared that he was placed into administrative segregation during the third week of June 2008. He was not seen by the clinical case manager during that week, but was seen weekly thereafter. He was seen by the psychiatrist, and he reported that he did not want to take medications. He reported that he was symptom free and requested removal from the MHSDS. The treatment team did convene during June 2008, and they acknowledged this request, but did not indicate a plan. There was a treatment plan in the chart, but it was incomplete.

<u>Findings</u>

This inmate was seen by psychiatry and the clinical case manager and during psych tech rounds in accordance with Program Guide requirements.  The treatment plan was, however, inadequate.

**Inmate K**

The medical record of this inmate was randomly selected for review from a list of reception center EOP inmates.

This inmate was admitted to SQ during March 20, 2008.  The initial case manager contact progress note was dated March 25, 2008.  He was assessed to require a 3CMS level of care.

His treatment plan was completed during June 25, 2008.  Diagnoses include Major Depressive Disorder severe with psychotic features, Amphetamine Abuse by history, and Bereavement. Weekly clinical case manager progress notes as well as group therapy notes were present, and the content was clinically relevant.  Psychiatric progress notes were timely. The inmate's level of care was changed to EOP.

<u>Findings</u>

This inmate was receiving mental health treatment that was consistent with Program Guide requirements.

**Inmate L**

The medical record of this inmate was randomly selected for review from a list of reception center EOP inmates.  This inmate was admitted to SQ during February 25, 2008.

An Offender Parole Clinical Summary form was completed and present in the medical record as well as a list of medications prescribed during his course of treatment with the POC.

This inmate was in MHCB from March 26, 2008, to April 11, 2008.  His level of care was assessed to be 3CMS.

A mental health evaluation (form 7386) update was completed during May 23, 2008.  It was typed and contained clinically relevant information.  This inmate's presentation was consistent with the following diagnoses: Adjustment Disorder, Polysubstance Dependence, Mild Mental Retardation, Mood Disorder NOS, and Antisocial Personality Disorder.

A May 29, 2008, health chrono indicated that the inmate's level of care was changed to EOP. He was admitted to the OHU during May 30, 2008.  By June 9, 2008, he was housed in the administrative segregation unit.

Subsequent progress notes, which were not chronologically filed, included both individual clinical case management contacts and group therapy notes. It appeared that there were missing progress notes that most likely were related to the medical records filing issues.

<u>Findings</u>

This inmate was receiving appropriate care consistent with Program Guide requirements. There appeared to be documentation issues that were most likely related to medical records filing issues.

**Inmate M**

The medical record of this inmate was randomly selected for review from a list of reception center EOP inmates. His arrival date at SQ was April 25, 2008. A mental health evaluation (form 7386) was completed that same date. He was provided with the following diagnoses: Schizophrenia paranoid type by history and Polysubstance Dependence. He was determined to require the 3CMS level of care.

Psychiatric progress notes indicated that the inmate was seen for evaluation on May 7, 2008, May 30, 2008, June 11, 2008, and June 25, 2008.

His level of care was changed to EOP on June 2, 2008. He was monitored in the OHU at that time. Subsequent clinical case manager progress notes and group therapy notes were consistent with Program Guide requirements.

<u>Findings</u>

This inmate was receiving appropriate care that was consistent with Program Guide requirements.