EXHIBIT J
Deuel Vocational Institution (DVI)
June 3, 2008 – June 5, 2008

**Inmate A**

This EOP inmate's medical record was reviewed due to multiple referrals to crisis care. The inmate had been receiving the EOP level of care since at least April 30, 2008. He had been placed into crisis care on at least a monthly basis from January 2008 to May 2008. Of concern was the fact that this inmate's name did not appear on the OHU multiple admissions IDTT log.

Several chronos (at least five) in the inmate's medical record documented referrals to MHCB, and he was apparently placed on a waiting list. Despite this, the inmate's name did not appear on the DMH referral log.

The most recent volume of the inmate's medical record did not include a treatment plan. Progress notes in the inpatient record indicated that, on May 6, 2008, the inmate was in an MHCB bed due to suicidal ideation. The medical record indicated that the inmate had a history of Depressive Disorder as well as a consideration of malingering. His clinical presentation was reportedly inconsistent. On May 10, 2008, he was provided with a diagnosis of Major Depression with psychotic features; he was on the MHCB waiting list at that time. Later descriptions of this inmate were not consistent with the need for MHCB placement, but the clinician wrote, "[h]owever, MHCB has benefited inmate providing new coping skills and helping him manage symptoms." He was referred to MHCB on this basis. He was apparently returned to his housing unit (without ever having been transferred to the MHCB) on May 16, 2008. There was no documentation that any clinical contact occurred after that date.

Findings

This inmate had a history of several crisis placements and had been referred to the MHCB on several occasions and placed on a waiting list, but apparently was never transferred to an MHCB. His medical record did not contain documentation that the inmate was seen in his regular housing unit. He was not tracked in the IDTT log of multiple referrals. There were no clinical progress notes in his medical record since the date when he was apparently released from the MHCB, although it was possible that this documentation was contained in other volumes of the medical record.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit. His medical record was reviewed due to several crisis care placements.

A mental health evaluation on February 8, 2008, noted that the inmate had "an extensive history of suicidal thoughts." He had a history of inpatient hospitalization that dated from childhood. There was a history of at least five DVI OHU placements that occurred between January 2008 and May 2008 due to suicidal ideation and psychosis.

The inmate was provided with diagnoses of Schizophrenia chronic type and Psychotic Disorder NOS. No treatment plans were located in the medical record.

An IDTT meeting that occurred on January 22, 2008, in the administrative segregation unit did not include a psychiatrist. The inmate was described as posing moderate to high risk of self-harm at that time. Subsequent progress notes provided little specific information regarding the inmate's symptoms, but did document the presence of psychotic symptoms. He was placed in the EOP at an IDTT meeting that occurred on February 13, 2008.

The inmate returned to crisis care on February 21, 2008. Follow-up was ordered and implemented for only two days after discharge. There was documentation of psych tech rounds in the medical record.

A progress note on May 13, 2008, reported that the inmate indicated that he was willing to participate in the process of a referral to DMH. This referral was also documented in the OHU multiple referral log but not in the DMH referral log.

Findings

This inmate had a recent history of repeated OHU placements. There was no indication that clinicians considered a referral to DMH prior to May 21, 2008. Although clinicians did change his level of care to EOP during February 2008, he had not been transferred to this program at the time of the monitoring tour. Treatment plans were not located in the medical record.

**Inmate C**

This EOP inmate was housed in the administrative segregation unit; he had been in the EOP since May 5, 2008. The inmate's medical record was reviewed due to his history of multiple crisis care placements.

An evaluation on February 7, 2008, indicated that the inmate had a history of diagnoses of Bipolar Disorder and Antisocial Personality Disorder. He had been transferred from DVI to CSP/Corcoran; at that time, he was refusing medications and was described as delusional with auditory hallucinations and manic symptoms. He was determined to pose a risk of danger to others, and an order for involuntary Keyhea medications was granted. The inmate was placed into the OHU on February 23, 2008, after returning from the MHCB at CSP/Corcoran, where he had been hospitalized for 45 days. He was placed on suicide watch and ordered five-day follow-up upon discharge. He was provided with a diagnosis of Psychotic Disorder NOS. There was documentation that five-day follow-up occurred.

This inmate was again admitted to the OHU during February 2008; he was provided with a diagnosis of Psychotic Disorder NOS at that time. He was admitted due to auditory hallucinations and suicidal ideation. The primary issue at this admission appeared to have been the inmate's demand to be double-celled. He was reportedly stable at the time of admission and was released to his housing unit.

The inmate was seen on March 12, 2008, by the clinical case manager at cell-front after refusing an out-of-cell visit. He was reportedly stable and reported that he was anticipating transfer to an EOP hub. He was admitted to the OHU again two days later after reporting suicidal ideation;

this followed a dispute with custody staff on his housing unit. He was discharged on March 17, 2008. Progress notes indicated that the inmate's functioning had improved after the placement on Keyhea-ordered medications.

Findings

This inmate had a history of multiple placements in the OHU. It appeared that many of these placements occurred when the inmate threatened to harm himself in response to disputes with custody staff. He did, at times, present with symptoms of decompensation requiring a Keyhea order for medications.

The inmate was seen consistently on at least a weekly basis. It appeared that the need for placement at a higher level of care was considered by the IDTT. Progress notes indicated that the inmate was stable at the time of the monitoring visit.

**Inmate D**

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Psychotic Disorder NOS. He was treated with Abilify 20 mg/day and Atomoxetine (Strattera) 40 mg/day.

This inmate arrived at DVI from a county jail on October 9, 2007. His bus screen was remarkable for a reported history of Schizophrenia and Depression. Information from the county jail did not indicate treatment with psychotropic medications; a mental health referral chrono from the psych tech, however, indicated the need for psychotropic medication review as the inmate was "on Trazodone." The inmate was screened and referred for further evaluation. He was placed into the EOP on November 13, 2007. It also appeared that the inmate was placed into the administrative segregation unit soon after his incarceration.

Progress notes indicated that the inmate presented with chronic auditory hallucinations and paranoia. He was initially treated with Risperdal; he was changed to Abilify to address his persistent symptoms. Subsequent progress notes also indicated that he was experiencing occasional difficulties in dealing with situational stressors in the administrative segregation unit. An ICC note dated March 13, 2008, indicated that he had been endorsed to the EOP hub. The inmate continued to express frustration regarding the delays in his transfer to an EOP.

Findings

There appeared to be a lapse in medications after medication renewal. A review of the April 2008 MAR indicated a lapse of two days for Abilify. An additional area of concern was the delay in transfer for this inmate to an EOP. There was documentation of weekly summaries of daily psych tech rounds. There was also documentation of at least weekly clinical case manager contacts.

EXHIBIT K
California State Prison, Corcoran (CSP/Corcoran)
September 9, 2008 – September 12, 2008

**Inmate A**

This 3CMS inmate was housed in the SHU. The care that was provided to this inmate was reviewed at the request of plaintiffs' attorneys due to the inmate's report of a history of suicide attempts with recurrent suicidal ideation and difficulty sleeping. The inmate also reported that he had received no clean clothing for several months since his arrival at CSP/Corcoran.

The inmate was transferred from SVSP to CSP/Corcoran during March 2008. He utilized a wheelchair and cane due to long-standing back problems and pain. He was prescribed several pain medications. He was housed in a single cell and reportedly stated that he would kill any cellmate with whom he would have to share a cell. He had been included in the mental health caseload since his arrival at CSP/Corcoran.

The inmate generally refused to leave his cell for appointments with his clinical case manager, and he was only responsive to some attempts at contacts that occurred at cell-front. He did reportedly request to be seen by mental health staff for specific requests for intervention such as cell moves. He reportedly did attend his scheduled psychiatric appointments.

The medical record indicated that the inmate was provided with diagnoses of Borderline Personality Disorder with a history of antisocial behavior, as well as Depressive Disorder NOS. He was described also as "highly manipulative" as well as having a history of self-injurious behavior. The inmate was prescribed Effexor XR 150 mg/day and Remeron 15 mg/day. The progress notes indicated that the inmate's medication was increased after he reported an increase in depressive symptoms; however, he experienced medication side effects. The inmate was seen by the psychiatrist at approximately six-week intervals, when his medications were adjusted. During August 2008, laboratory studies were ordered, medication consent forms signed, and the inmate was referred for participation in anger management group.

<u>Findings</u>

The inmate appeared to be receiving mental health services at the appropriate level of care. He was seen by the clinical case manager and psychiatrist at the required intervals and as was clinically indicated. Although there were occasions in which the inmate did not attend his scheduled clinical appointments, the mental health staff appeared to be responsive to his concerns.

**Inmate B**

This 3CMS inmate was housed in the SHU. The care that was provided to this inmate was reviewed at the request of plaintiffs' attorneys due to an incident in which he reportedly was placed into restraints during an MHCB admission for 15 hours "as punishment for loud shouting about back pain that he was experiencing."

The inmate was admitted to the MHCB on January 25, 2008, due to suicidal ideation with reported auditory and visual hallucinations. He was evaluated by the psychiatrist three days later at 5:00 p.m.; at that time, the inmate was described as "extremely agitated, screaming,

481

uncooperative and unpredictable.  All attempts at redirection failed."  The medical record indicated that the inmate was placed into restraints because he was assessed as posing a danger to himself and others.  At 9:00 p.m., he was re-examined by the psychiatrist and "remained uncooperative and agitated."  An order for restraints was renewed for an additional eight hours. Another renewal order was obtained following re-assessment.  The inmate was released from restraints at 8:45 a.m. on January 29, 2008.  There were no further recorded instances of restraint use during the remainder of this MHCB hospitalization.  The progress notes indicated that the inmate subsequently acknowledged to the MHCB staff that he had not been suicidal at the time of his admission and that he "just wanted to get away from the yard."  He also apologized for his behavior that led to the placement into restraints.

Following discharge from the MHCB, the appropriate five-day follow-up was completed.  The inmate continued to be seen clinically by the psychiatrist and the clinical case manager at required intervals.

Findings

The documentation in the medical record supported the utilization of restraints in the MHCB; however, the duration of time that the inmate remained in restraints was excessive.  Despite this, the inmate was clinically assessed at the required intervals.

**Inmate C**

This 3CMS inmate was housed in administrative segregation unit due to indecent exposure.  The care that was provided to this inmate was reviewed at request of the plaintiffs' attorneys due to concerns that he had been diagnosed with Exhibitionism; however, he had reportedly not received specific treatment, including group and individual treatment.

The inmate had been included in the mental health caseload since approximately 1996 due to treatment for intermittent depression and anxiety symptoms.  During February 2008, he was diagnosed with Exhibitionism.  He was seen daily during mental health rounds, but he refused to leave his cell for weekly clinical case management contacts.  When offered treatment, the inmate reportedly threatened legal action.  Progress notes indicated that the inmate was also uncooperative with medical examinations; despite this treatment refusal, he wrote several grievances indicating that he had been denied services.  The treatment plan identified two issues that were problematic: resistance to treatment and a history of depressive symptoms.

Findings

Attempts were made to involve this inmate in weekly mental health treatment; however, he consistently refused participation.  Nevertheless, he was seen daily during mental health rounds, and the staff attempted to provide cell-front contacts due to out-of-cell treatment refusal.  The inmate appeared to be receiving mental health services at the required level of care.

**Inmate D**

This inmate's case was reviewed at the request of the plaintiffs' attorneys due to concerns regarding whether the inmate was receiving mental health services at the appropriate level of care.

The inmate had a long history of mental health treatment. During his incarceration within the CDCR, he had multiple psychiatric hospitalizations at DMH and in MHCBs. He was provided with a diagnosis of Psychotic Disorder NOS. The inmate arrived at CSP/Corcoran from NKSP on April 24, 2007; he was in the EOP at that time. Subsequently, his level of care was reduced to 3CMS; the rationale for this level of care change was not documented in the medical record. After an MHCB hospitalization during April 2007, the inmate was placed on a Keyhea order. Subsequently at the IDTT meeting, the level of care was changed from 3CMS to EOP. The last IDTT meeting occurred on July 16, 2008, and the last documentation of psychiatric contact occurred on August 27, 2008.

Findings

This inmate appeared to be receiving the appropriate level of care in the EOP based upon his level of functioning, history of psychotic decompensation, and hospitalizations as well as the need for Keyhea to maintain medication compliance. The progress notes in the medical record did not, however, clearly document the rationale for changes in the level of care.

**Inmate E**

This EOP inmate was provided with a diagnosis of Schizophrenia paranoid type. He was housed in the general population EOP at CSP/Corcoran.

The inmate had a long history of mental health treatment, including psychiatric hospitalizations prior to his incarceration. He was last hospitalized at DMH-APP at Vacaville on December 31, 2007, after he was transferred there from CSP/Corcoran due to paranoid delusions regarding sexual assault from other inmates and staff at the prison. The inmate had a history of medication noncompliance, and he had been noncompliant with his prescribed antipsychotic medication at CSP/Corcoran. It appeared that the inmate was discharged from DMH during early July 2008; however, the medical record was somewhat unclear regarding the specific date of return to CSP/Corcoran. The inmate was discharged with a recommendation for the EOP level of care, and he was prescribed Haldol Decanoate injections to improve medication compliance.

The inmate had two MHCB admissions after his return from DMH. The medical record did not provide documentation regarding the reasons for admission, and the discharge summaries and MHCB treatment information were not present in the medical record. The most recent progress notes indicated that the psychiatrist was tapering the inmate's Haldol Decanoate and increasing Geodon pursuant to the inmate's request for a change in medications. The inmate was seen weekly by his clinical case manager. He was seen for psychiatric contact every two weeks. The medical record also documented that the inmate attended group therapy sessions.

Findings

The inmate appeared to be placed at the appropriate level of care in the EOP. This inmate had a long history of psychiatric instability, with hospitalizations and medication noncompliance, and the change from Haldol Decanoate to Geodon was of concern as this medication change provided less assurance of medication compliance. The treating psychiatrist should reconsider this change in medications or provide more explicit documentation of the rationale for this medication change in light of the inmate's extensive history.

**Inmate F**

This EOP inmate was housed in the general population EOP at CSP/Corcoran. This inmate was transferred to CSP/Corcoran from DMH ICF at CMF during late 2007. His initial IDTT meeting at CSP/Corcoran occurred on December 26, 2007. He was seen weekly by his clinical case manager, and he was seen monthly by the psychiatrist. The IDTT progress note indicated that the inmate participated in group therapy; however, it was unclear which groups he was assigned to attend.

The inmate was provided with a diagnosis of Schizophrenia by the psychiatrist, but the clinical case manager documented a diagnosis of Mood Disorder NOS. He was prescribed both antipsychotic and antidepressant medications. Progress notes documented that the inmate had poor social skills, lack of spontaneity and social isolation. The most recent IDTT update indicated that the treatment team was contemplating a possible move to the 3CMS program.

Findings

Informed consent for treatment with psychotropic medications was present in the medical record. There was also documentation that the inmate was seen clinically at the required intervals by the case manager and the psychiatrist. The treatment team should reconcile the discrepancy regarding the inmate's diagnosis. The inmate appeared to be placed at the appropriate level of care in the EOP. Based upon the inmate's symptoms, transfer to the 3CMS program did not appear to be clinically appropriate at the time of the site visit.

**Inmate G**

This EOP inmate was housed in the general population EOP at CSP/Corcoran. The inmate was transferred from CMC to CSP/Corcoran; the initial clinical case manager contact was documented on May 29, 2008. An IDTT meeting that occurred on June 4, 2008, indicated that the inmate had been receiving the EOP level of care since at least 2003. The medical record documented that the inmate had been tested at DMH and had been provided with the following diagnoses: Schizoaffective Disorder, Cocaine Dependence in remission, and Mild Mental Retardation.

The medical record indicated that the inmate was treated with the following medications: Risperdal, Geodon, Remeron, Celexa, Depakote, Benadryl, and Buspar. The inmate was followed weekly by his clinical case manager and monthly by the psychiatrist. A progress note

484

by the clinical case manager indicated that there was consideration of change to the 3CMS level of care.

<u>Findings</u>

The inmate appeared to be placed at the appropriate level of care in the EOP based upon his history and level of functioning. He was seen at required intervals by the psychiatrist and clinical case manager. The documentation in the medical record did not provide adequate rationale regarding relevant clinical issues such as the use of polypharmacy, rationale for consideration of changes in levels of care, and other treatment decisions.

**Inmate H**

This EOP inmate was housed in the general population EOP at CSP/Corcoran. The inmate was transferred from CIM to CSP/Corcoran. His initial clinical case manager contact at CSP/Corcoran occurred on May 27, 2008; at that time, he was reportedly stable and was provided with a GAF score of 65. At the time of his placement into the EOP at CIM on May 13, 2008 (two weeks earlier), he had been assessed as having a GAF score of 45.

The inmate was provided with a diagnosis of Depressive Disorder NOS. The inmate was placed into the EOP at CSP/Corcoran; a chrono on June 2, 2008, provided a GAF score of 55.

Progress notes described the inmate as functioning well, with normal mental status examinations and no history of mental health treatment prior to entering prison. He was prescribed two antidepressants, Remeron and Zoloft. The inmate was involved in social skills and communication skills groups. He was followed weekly by his clinical case manager and monthly by the psychiatrist. The IDTT notes indicated that there was consideration of lowering the inmate's level of care to 3CMS.

<u>Findings</u>

The inmate was followed consistently by the clinical case manager and the psychiatrist at the required frequency. The rationale for placement at the EOP level of care was not clearly provided in the medical record; the description of the inmate's level of functioning was inconsistent with this level of care. There was documentation of informed consent for treatment with Remeron, but consent for Zoloft was not located in the medical record. The treatment planning for this inmate required greater specificity and individualization; target symptoms were not clearly defined, and group therapy appeared to be generic and not individualized.

**Inmate I**

This EOP inmate was housed in the general population EOP at CSP/Corcoran, where he was serving a life sentence. He was diagnosed with Schizophrenia paranoid type. He had been housed at CSP/Corcoran in the EOP since April 8, 2002.

485

The medical record indicated that the inmate participated in mental health programming and worked as a porter in his housing unit. He had reportedly been without disciplinary infractions for a period of time. He was involved in group therapy, including substance abuse, medication management, social skills/communication skills, and wellness groups. The inmate was prescribed Clozapine, Risperdal, Haldol Decanoate, and oral Haldol.

Findings

This inmate appeared to be placed at the appropriate level of care in the EOP. He was followed at the required frequency by the clinical case manager and the psychiatrist. The inmate appeared to be benefiting from this level of care. Informed consent for treatment with the above-mentioned medications was present in the medical record. The rationale for treatment with three different antipsychotic medications simultaneously was not apparent in the volume of the medical record that was available for review. The appropriate laboratory studies for treatment with Clozapine were conducted and documented in the medical record.

**Inmate J**

This EOP inmate was housed in the EOP administrative segregation hub. He was transferred from CSATF to CSP/Corcoran during July 2008. After his transfer to CSP/Corcoran, the 31-question screening was conducted on July 19, 2008. The SRAC was completed three days later. The documentation of the first IDTT meeting, which occurred on that same date, indicated that the inmate had a long history of depression, multiple prior suicide attempts, medication hoarding, treatment noncompliance, gang affiliation, and pressuring cellmates for sexual favors. He was provided with a diagnosis of Depressive Disorder NOS. He also had medical concerns, which included cardiac problems, history of a stroke, and seizures. He required assistance with a cane for ambulation.

The inmate was initially seen by the psychiatrist on July 30, 2008. He was not prescribed psychotropic medication. His mental status examination was described as normal except for "limited self-awareness and judgment" and the inmate's report of auditory hallucinations. Despite this, he was assessed as having a GAF score of 45. There was documentation of weekly clinical case manager contacts that occurred on July 30, 2008, and August 6, 2008. There was also documentation of group therapy attendance.

Findings

The initial IDTT meeting and initial screening, including suicide screening, were completed timely. It was difficult to determine the frequency of clinical contacts due to the recent arrival of the inmate to the facility. There was documentation of involvement in group therapy; however, determination regarding the provision of ten hours per week of groups could not be assessed based upon the available documentation. The GAF score that was assessed was somewhat inconsistent with the clinical description that was provided of this inmate.

486

**Inmate K**

This EOP inmate was housed in the EOP administrative segregation hub.  The inmate was originally transferred to CSP/Corcoran on February 23, 2007, from SCC.  He reportedly had a history of Bipolar Disorder; however, he was not prescribed medications.  He had the following MHCB hospitalizations:  March 13, 2008, to March 25, 2008; April 8, 2008, to April 10, 2008; and April 16, 2008, to April 17, 2008.  The documentation in the medical record indicated that it was believed that the inmate reported suicidal ideation to gain admission to MHCB, but he was not actually suicidal.  During May 2008, a clinical case management progress note indicated that the inmate's level of care had recently changed from EOP to 3CMS.

Although the documentation in the medical record was somewhat unclear, it appeared that the inmate was transferred to DMH APP from CSP/Corcoran.  The precipitants that led to the DMH admission were not identified in the medical record.  The discharge summary from DMH APP that was dated July 23, 2008, indicated that the inmate was depressed and psychotic.  Upon his return to CSP/Corcoran, the inmate was placed into the EOP.  He had been placed on Keyhea order while hospitalized at DMH.

Findings

It appeared that the EOP was the appropriate level of care for this inmate.  The documentation in the medical record was such that it was difficult to follow the course of treatment for this inmate and the rationale for treatment decisions.  Prior to hospitalization at DMH APP, the documentation strongly suggested a diagnosis of malingering.

**Inmate L**

This inmate was not included in the MHSDS.  His medical record was reviewed to evaluate the decision to remove him from the MHSDS.

This inmate had a well-documented and long-standing history of psychotic symptoms.  A review of his medical record revealed that he was found not guilty by reason of insanity for a felony-level offense.  As a result of this finding, he was hospitalized for a significant period of time in the state psychiatric hospital system.

After he was released from the state hospital, the inmate re-offended and was sentenced to prison.  He underwent an initial health screening at CSP/Corcoran on March 6, 2007.  He was placed into the 3CMS program; the medical record indicated that his mental health history, symptoms of delusional thinking, and potential for violent behavior were factors in the decision for inclusion in the program.  The medical record also documented that the inmate had episodes of medication refusal.  The most recent IDTT meeting occurred on October 4, 2006, at another institution.  The most recent mental health progress note in the medical record was dated April 2, 2007; this note indicated that the inmate would be discharged from the 3CMS program at his request.

Findings

The rationale for the decision to discharge the inmate from the MHSDS was not provided in the medical record, nor was there evidence that this decision was made in consultation with the IDTT.  Although the inmate was reportedly noncompliant with medications, there was no documentation of appropriate referral regarding this issue.

**Inmate M**

This EOP inmate was housed in the EOP administrative segregation hub.  He was transferred from NKSP to CSP/Corcoran on July 28, 2008.  He was evaluated by the psychiatrist within three days of arrival (July 31, 2008) when his medications were continued.  The inmate was on Keyhea order, and he was prescribed Effexor and Geodon with Haldol intramuscular injections if Geodon was refused, in accordance with the Keyhea order.  The psychiatrist indicated that the inmate's Axis I diagnosis was deferred; an IDTT meeting conducted on August 6, 2008, provided a diagnosis of Psychotic Disorder NOS.  There appeared to have been at least two MHCB admissions with a five-day follow-up progress note.

Findings

The medical record was incomplete and did not include all of the documentation regarding recent treatment and MHCB hospitalizations.  The institution subsequently instituted a number of procedures within the MHCB to ensure that discharge summaries were timely received by outpatient treatment staff.  It appeared that the EOP level of care was clinically appropriate; however, a higher level of care may be indicated in light of his two recent MHCB admissions.  Determination regarding the need for a higher level of care could not be made due to the incomplete documentation.

**Inmate N**

This EOP inmate was housed in the EOP administrative segregation hub.  He was diagnosed with Bipolar Affective Disorder.  He was treated with Zyprexa and Depakote ER; the inmate was on a Keyhea order.

The inmate had a history of assaultive behavior at ASH and WSP.  According to the progress notes, he attempted to kill a correctional officer; he was subsequently transferred to CSP/Corcoran.  Psychiatric progress notes indicated that the inmate was seen for psychiatric evaluation on a monthly basis.  There was documentation of clinical case manager contacts that occurred on July 30, 2008, and August 26, 2008, and an IDTT meeting occurred on August 6, 2008.

Findings

There was no documentation of weekly clinical case management contacts or the provision of ten hours of group therapy per week.  The appropriate baseline metabolic laboratory studies were conducted for treatment with the prescribed psychotropic medications.  The lack of detail

488

regarding the documentation of treatment rationale made assessment of the appropriate level of care difficult; however, intermediate level of care at DMH should have been a treatment consideration. Consideration of a higher level of care was not documented for this inmate in the medical record.

**Inmate O**

This EOP inmate was housed in the EOP administrative segregation hub. The inmate transferred to CSP/Corcoran from CCI, where he had been admitted to the MHCB after cutting himself. There was documentation of weekly contact with the clinical case manager and monthly psychiatrist evaluations. There was documentation of group attendance in the medical record. The inmate was hospitalized in the MHCB from July 15, 2008, to July 27, 2008, due to suicidal thoughts and auditory hallucinations. The inmate was on a Keyhea order for Risperdal Consta. He had consistently refused laboratory testing.

Findings

This inmate was seen at the required frequency by the clinical case manager and the psychiatrist. Treatment planning was also timely. The inmate appeared to be placed at the appropriate level of care in the EOP, and a Keyhea order was clinically indicated. The quality of clinical documentation should be improved by providing details and specificity regarding assessment and clinical interventions. It was difficult to determine whether the inmate was offered ten hours of group therapy per week based upon the documentation in the medical record.

EXHIBIT L
California Substance Abuse Treatment Facility (CSATF)
April 13, 2008 – April 15, 2008

**Inmate A**

This EOP inmate's case was reviewed at the request of the plaintiffs' attorneys regarding whether the inmate was receiving the appropriate level of care. This inmate arrived at CSATF from CSP/Solano during October 2007. Prior to that, he arrived at DVI during September 2006. He was not receiving mental health treatment at that time. At CSP/Solano, he was seen by mental health staff after referral by custody staff due to unusual behavior. He was housed in the administrative segregation unit at both CSP/Solano and CSATF; the inmate was housed in this unit at the time of the monitoring visit.

A bus screening was completed when the inmate arrived at CSATF. He was referred to mental health with a notation that his medication order had already expired. He was seen in a timely manner by the mental health staff. The treatment plan was updated, and a timely IDTT meeting that consisted of the necessary participants was conducted. A diagnosis of Adjustment Disorder with mixed anxiety and depressed mood was provided; a GAF score of 65 was assessed. He was placed at the 3CMS level of care.

This inmate was concerned regarding discharge from administrative segregation. He was evaluated by mental health staff, who recommended short-term single-cell housing. A Keyhea petition was initiated on the grounds of grave disability. The evaluation provided diagnoses of Delusional Disorder persecutory type, possible Schizophrenia paranoid type, hypertension and dehydration due to fears of poisoned foods and water. He was assessed with a GAF score of 25.

The medical record contained many written self-referrals to medical staff that were written at both CSP/Solano and CSATF including the ailments flat feet, heartburn, and dry and bleeding lips; requests for HIV, diabetes and "all diseases" testing; and requests for orthotics, medicine, and other remedies.

Progress notes and referrals revealed that the inmate had sustained fears for his personal safety, beliefs about being persecuted by inmates and staff, insomnia, beliefs about being stared at, and high levels of anxiety. Some clinicians perceived him as paranoid. He sometimes stated that his food was poisoned. When medical staff attempted to draw blood to perform laboratory tests that he had requested in writing, he refused on grounds that the needle was contaminated. He also refused X-rays in connection with his request for orthotics. He wrote numerous letters to his mother, some of which were found in the medical record. His mother reportedly contacted prison staff on more than one occasion. She reportedly expressed grave concerns about her son's well-being. This inmate often reported enemies throughout the CDCR, including on the yard on which he was housed. The CDCR staff at CSATF were unable to substantiate his claims of enemies.

The inmate was initially seen by a psychiatrist on November 16, 2007, when he was treated with Risperdal 1 mg/day. Laboratory studies were ordered on that date. A follow-up appointment was scheduled for three to four weeks later. A psychiatric contact was attempted, but deferred for three weeks later due to problems in the housing unit. The psychiatrist saw him at cell-front at that time and in person on the following week. The inmate concluded that he no longer

needed medication, complained that it made him sick, and stopped taking his prescribed medications.  Benadryl, Ativan, and Effexor were attempted without success.

A Keyhea petition was initiated on March 12, 2008.  This inmate was recommended for the EOP level of care on March 27, 2008.  A Keyhea hearing was scheduled for April 16, 2008.  Staff reported orally that the petition was withdrawn.

Although this inmate's <u>Clark</u> screening did not indicate a need for further evaluation to examine his level of adaptive functioning, after discussion with the monitor's expert, the mental health staff decided to refer this inmate for a full <u>Clark</u> evaluation.

<u>Findings</u>

Intake processing at CSATF was complete and timely.  In administrative segregation, the inmate was seen weekly by a clinical case manager and daily on rounds.  IDTT meetings were held quarterly and attended by the necessary participants, in accordance with Program Guide requirements.  Documentation of rounds and weekly clinical case manager contacts was complete, containing the location of contact as well as pertinent clinical information.  A self-referral made through a psych tech in administrative segregation was documented in the medical record with prompt response.  There was documentation that the response to mental health crises and ongoing difficulties was timely.  The mental health staff appropriately referred the inmate to the medical staff for possible medical problems.

The appropriate laboratory testing was obtained.  The psychiatrist appropriately referred the inmate to the medical staff for evaluation of abnormal results.

**Inmate B**

This 3CMS inmate was provided with a diagnosis of Schizophrenia paranoid type.  A GAF score was assessed at 70 when the treatment plan was updated during August 2008.  The treatment plan was individualized.  The inmate was medication compliant and symptom free at that time.  The treatment plan outlined plans for continued medication management and quarterly clinical case manager contacts.  During September and October 2007, the inmate reported increased irritability, suspiciousness, and feeling "kind of paranoid."  His dosage of Risperdal was increased, and he continued taking Remeron and Wellbutrin.  He also had an order for Neurontin prescribed by the medical staff.

<u>Findings</u>

The mental health treatment that was provided to this inmate conformed to Program Guide requirements.  Medication continuity was sustained.  The psychiatrist was responsive to the inmate's concerns, and medication dosages were adjusted as indicated.  Wellbutrin was prescribed as part of the medication regimen.  Clinical case manager contacts were conducted at quarterly intervals.  The treatment plan was current and was individualized.

**Inmate C**

This EOP inmate was awaiting transfer to the EOP at MCSP at the time of the monitoring visit. A clinical progress note indicated that the inmate was endorsed for transfer to MCSP during October 2007.  It appeared that the inmate had been awaiting transfer for over six months, and had been designated as requiring the EOP level of care for nearly nine months.

The inmate was recommended for EOP level of care on August 22, 2007, when he was discharged from the MHCB.  At that time he was provided with a diagnosis of Schizoaffective Disorder depressed type.  According to the medical record, he was treated at the 3CMS level of care during 2006 and 2007.  His medical concerns included Hepatitis C, a back injury due to an accident, and a history of head injury.

During April 2008, this inmate was treated with Seroquel and Wellbutrin.  He was seen weekly by a clinical case manager.  He continued to exhibit depressed mood, high levels of anxiety, and impaired cognitive processing.  An IDTT met and updated his treatment plan quarterly.  IDTT meetings were attended by the necessary participants.  Treatment plans were individualized.  The inmate declined to participate in group treatment.

Findings

The mental health treatment that was provided to this inmate conformed to Program Guide requirements.  The inmate was seen monthly by a psychiatrist, weekly by a clinical case manager and had quarterly IDTT meetings and an individualized treatment plan.  He was not, however, receiving the required EOP level of care.  Transfer to a prison that could provide the appropriate level of care was significantly delayed.

**Inmate D**

This MHSDS inmate had been housed at CSATF since June 27, 2007.  He had recently been placed in the substance abuse program.  Although the mental health records indicated that the inmate was a new arrival at CSATF, he had been housed there for nine months.  There was no documentation that he had been seen for an intake evaluation by a mental health clinician.

The medical record documented that the inmate was treated via telepsychiatry, and he had been noncompliant with medications frequently during the monitoring period.  Informed consent for treatment with Risperdal and Remeron was located in the medical record.  An annotated MAR indicated that the inmate was referred to mental health during January 2008 due to medication noncompliance.  There was an indication that his medication orders might have been discontinued on January 14, 2008.

During an interview, this inmate expressed the opinion that his mental health issues were not considered in the substance abuse program, and he believed that the omission was to his detriment.  He cited discussions in substance abuse program groups that explored issues that elicited in him severe anxiety symptoms consistent with PTSD.  Further, he reported that

fluctuations in both his mood and his level of daily functioning made it difficult to consistently participate in the demanding aspects of the substance abuse program adequately.

Findings

The lack of integration between the substance abuse program and mental health treatment was problematic for this inmate's progress. Although the inmate was enrolled in the MHSDS, he had not been seen by a mental health clinician at CSATF during the nine months that he had been housed there. Additionally, there was no indication that the inmate had been seen in response to a referral for medication noncompliance. Inadequate documentation, or possibly missing records, of psychiatric treatment and medication orders obscured the course of his recent treatment. The mental health staff acknowledged the need for improved coordination and communication between the substance abuse program and the mental health staff.

**Inmate E**

This 3CMS inmate was in the substance abuse program. He arrived at CSATF from NKSP on March 7, 2008. Seroquel had been prescribed at NKSP, and a 90-day order from NKSP expired one week after the inmate arrived at CSATF. From the bus screening, the inmate was referred to mental health.

He was seen in a timely manner for an initial visit and a new treatment plan. The plan was individualized. A timely IDTT meeting was held and was attended by the necessary participants. He had been provided with diagnoses that included Psychotic Disorder NOS and Polysubstance Dependence. He was initially seen by a psychiatrist approximately three weeks after arrival, ten days after the order from NKSP had expired. He consistently reported auditory hallucinations.

When he was seen by a psychiatrist on March 27, 2008, his medication regimen was changed. Seroquel was discontinued, and Risperdal and Vistaril were initiated and ordered for 90 days. No psychiatric follow-up was scheduled prior to the 90-day medication renewal. Based upon the medical record, there was no current medication order between March 18, 2008, and March 27, 2008. The staff reported that at times, medication may be administered from stock in similar circumstances.

Psychiatric treatment was provided by telemedicine. There was no MAR located in the medical record that was associated with medication administration at CSATF.

Findings

The mental health treatment that was provided to this inmate conformed to Program Guide requirements except regarding medication management. There was a lapse of ten days between medication orders after the inmate arrived at CSATF. Further after Seroquel was discontinued and Risperdal was initiated, the inmate was not scheduled for psychiatric follow-up timely.

494

**Inmate F**

This case was reviewed because the inmate was issued an RVR for sexual misconduct during the monitoring period.  This inmate arrived at CSATF from CTF on October 19, 2007.  No history of mental health treatment was documented on the bus screening form, and the inmate was not referred to mental health.  A progress note in the medical record indicated that the mental health staff attended his ICC meeting on November 15, 2007, and no mental health concerns were noted.  On the following day, the inmate asked the mental health staff for a single-cell chrono, offering the rationale that he was a recent convert who needed to be alone in order to read his bible.  Single-cell status was not recommended.  Annotations found elsewhere in the medical record indicated that the inmate refused to accept a cellmate.

At least one of the inmate's admissions to the MHCB was precipitated by suicidal ideation.  This inmate was discharged from the MHCB on December 24, 2007, with diagnoses of Adjustment Disorder with anxiety and Antisocial Personality Disorder.  He was discharged with orders for five-day follow-up, which was performed.

He was again admitted to the MHCB on January 10, 2008, and discharged on February 8, 2008.  During that time, either a Keyhea order was obtained or medications were administered on an involuntary, emergency basis.  When he was discharged on February 8, 2008, a nursing note indicated that the inmate was malingering and approved his placement in administrative segregation.

The RVR dated February 3, 2008, which reported an incident of masturbation in a CTC cell that was observed via camera, was signed by a nurse.  According to the RVR, at the time of the offense, the inmate had been hospitalized in the MHCB for over three weeks and had a "previous admission just before that."  The narrative further explained that the inmate had been told many times to "keep himself covered, and he has demonstrated understanding of this by usually keeping himself covered."  The RVR contained statements that indicated the inmate was in the MHSDS and that he did not exhibit bizarre behavior.

The medical record documented that a lieutenant in administrative segregation referred the case to mental health on February 6, 2008; a second referral was made two days later.  A supervisor reviewed and signed the RVR on February 10, 2008, and a captain reviewed and signed the RVR on the following day.

Two mental health contacts were made in connection with the RVR.  On February 14, 2008, a standard mental health evaluation was conducted for disciplinary purposes.  The results indicated that mental illness was not a factor in the inmate's misbehavior.  A screening triggered by the nature of the RVR was also performed on the same date.  Pertinent information was provided, i.e., that the inmate had a Keyhea order because he was noncompliant with medications, that he experienced mood swings and irritability, and that his judgment, insight, and impulse control were poor or extremely poor.  The behavior was attributed to a personality disorder that was the primary diagnosis, although diagnoses of Mood Disorder NOS and Polysubstance Abuse were also noted.  No further evaluation was recommended.

Documentation indicated that the inmate was seen in a safety cell for the screening; his classification file and medical record had been reviewed. He was advised of the limitations of confidentiality during the interview, and he provided informed consent. His stance toward the examination was uncooperative and resistant.

The administrative staff reported that the RVR was dismissed "in the interest of justice."

Findings

It appeared that this inmate's mental health treatment was generally responsive to his clinical presentation. The ICC meeting was attended by mental health staff. He was evaluated shortly after being referred for consideration of single-cell status. He was admitted to the MHCB when he expressed suicidal ideation. Five-day follow-up was conducted as planned. Two mental health contacts precipitated by disciplinary charges were performed in accordance with departmental policies and directives. The 24-hour screening requirement that applied in cases of indecent exposure was violated due to a delay in mental health referral. The mental health staff completed a standard evaluation for disciplinary purposes within five days of receiving the referral.

The administrative staff reported that it was atypical for health care staff to write RVRs under the circumstances that prevailed in this incident, and they stated that the RVR was dismissed "in the interest of justice."

496

EXHIBIT M
Pleasant Valley State Prison (PVSP)
May 13, 2008 – May 15, 2008

**Inmate A**

This EOP inmate was housed in the administrative segregation unit at the time of the monitoring visit.  He was treated with Strattera and Lithium; he had previously also been treated with Abilify, but this medication had recently been discontinued.  The psychiatric progress note indicated that the treating psychiatrist was aware of the inmate's recent surgery, planned upcoming surgery, and the possible implications for medication management.  This inmate reportedly had an extensive history of self-mutilation.  The progress notes indicated that the inmate had been deemed at risk of self-harm when discussion of change to the 3CMS level of care was broached.  According to a log of the RVRs, the inmate was issued an RVR on December 8, 2007, for attempted suicide.

Findings

The appropriate laboratory testing for treatment with Lithium was obtained, and the results were present in the medical record.  The mental health treatment that was provided in the administrative segregation unit met Program Guide requirements regarding clinical contacts.  A treatment plan written in conjunction with an IDTT meeting conducted on May 8, 2008, provided specific treatment interventions for this inmate.

**Inmate B**

This 3CMS inmate was seen at the request of the plaintiffs' attorneys.  He had a diagnosis of Depressive Disorder NOS, and he was being treated for situational stress and complicated bereavement.  He was treated with Cymbalta, Buspar, Benadryl, and Trazodone.

An IDTT meeting was held on April 29, 2008.  The individualized treatment plan was updated; a GAF score was assessed as 58.  During January 2008, the inmate reported insomnia, irritability, fatigue, and restlessness.  Although he had an order for an antidepressant, he reported to his clinical case manager that he had not received medication for seven days.  The staff reportedly addressed this omission.

Findings

The IDTT meeting included the necessary participants.  Prescribed medications were not administered as ordered, but the mental health staff were responsive to this omission.  The inmate was seen for evaluation by the clinical case manager and the psychiatrist at a frequency that was consistent with the Program Guide requirements.

**Inmate C**

This Level IV EOP inmate was housed in the administrative segregation unit.  He was treated with Gabapentin (ordered by non-mental health staff), Celexa, Geodon, Zyprexa, and Benadryl. Tramadol was added to the medication regimen by a psychiatrist in consultation with medical staff.  This inmate arrived at PVSP during October 2007, and he was recommended for the EOP level of care during December 2007.

This inmate was treated at the 3CMS level of care throughout 2006 and 2007. He was mistakenly transferred to CMC during February 2008 and expressed anger and suicidal ideation in connection with his swift return to PVSP. He was housed in the MHCB at CMC on suicide precautions following his ICC meeting because he reported command hallucinations telling him to kill himself.

The inmate incurred two RVRs since he arrived at PVSP; one RVR was due to attacking and seriously injuring another inmate in concert with a third inmate. The staff reported that an RVR for mutual combat was dismissed.

Laboratory testing was performed upon the inmate's arrival at PVSP during October 2007, and it was repeated in April 2008.

Findings

This EOP inmate required transfer to a prison with an EOP level of care; this transfer was delayed in violation of required transfer timelines. An RVR for mutual combat was dismissed for mental health reasons. Mental health contacts at PVSP were conducted at the required frequency while the inmate was housed in the administrative segregation unit. Some clinical case manager contacts occurred at cell-front due to the inmate's request. When not housed in the administrative segregation unit, he was evaluated weekly by the clinical case manager and monthly by a psychiatrist. IDTT meetings were timely and were attended by the necessary participants; treatment plans were individualized. Informed consent was appropriately obtained for prescribed psychotropic medications. Laboratory testing was obtained, and results were filed, reviewed and considered by treating psychiatrists, including the appropriate response to abnormal laboratory values. Documentation of psych tech rounds and clinical case manager and psychiatry contacts contained pertinent clinical information.

**Inmate D**

This 3CMS inmate arrived at PVSP on January 30, 2008. Before arriving at PVSP the inmate was housed at RJD, where he was reportedly noncompliant with psychotropic medications. After they had been discontinued, Vistaril and Remeron were ordered for this inmate.

The bus screener at PVSP noted the inmate's 3CMS level of care and referred to the pharmacy's patient profile showing his current medication regimen, which was printed on the back of the screening form. There was no documentation of initial mental health contact upon the inmate's arrival at PVSP. A timely IDTT meeting was conducted on February 21, 2008. It was not attended by a correctional counselor. The resulting treatment plan was not individualized. The inmate was seen twice by the psychiatrist since his arrival. During the second psychiatric contact, he again reported that his medications were ineffective; this resulted in medication changes.

Findings

The bus screening appropriately noted the inmate's 3CMS status. A patient profile showing his medication regimen was printed on the back of the screening form. The initial mental health contact did not occur upon the inmate's arrival at PVSP. Although the initial IDTT meeting was timely, there was no documentation of custody presence at the meeting. The treatment plan was not individualized. Informed consent for treatment with psychotropic medications was obtained.

## Inmate E

This 3CMS inmate arrived at PVSP from WSP on January 9, 2008. The bus screener noted the inmate's MHSDS status and referred him to mental health for further evaluation. He was not evaluated until January 28, 2008; a progress note indicated that a psychologist attempted to see him on January 22, 2008, but he was not seen, reportedly because the inmate had already been moved to another location within PVSP. The IDTT was attended by the necessary participants; however, the associated treatment plan was incomplete. During the IDTT meeting, the inmate was evaluated by a psychiatrist for the first time.

According to the MAR for January 2008, the inmate did not receive medication until one week after his arrival at PVSP. He was noncompliant with medication during February 2008; the MAR indicated the inmate usually did not show for medications. He was evaluated again by a psychiatrist when medications were discontinued at the inmate's request. He reported that he was doing well without medications.

Findings

The mental health treatment that was provided to this inmate did not meet Program Guide requirements. The initial mental health assessment and the IDTT meeting were late. The treatment plan was incomplete. MARs were not filed in chronological order in the medical record. There was a delay in initiation of medications upon arrival at PVSP for approximately one week. Although the MAR reflected medication noncompliance, there was no documentation that the inmate was referred to mental health for evaluation.

## Inmate F

This 3CMS inmate was diagnosed with Depressive Disorder NOS. His case was reviewed at the request of the plaintiffs' attorneys due to concerns regarding needed treatment for anxiety and difficulties with the administration of his medication, including a nine-day lapse during April 2008.

According to the MHTS, an IDTT meeting occurred during October 2007. It appeared that this meeting was an annual update, but the MHTS did not reflect that an IDTT meeting had occurred one year earlier. Although the MHTS inmate history showed an arrival date of April 29, 2008, this inmate had been housed at PVSP since 2004.

500

The inmate was evaluated by a psychiatrist on March 23, 2008, and orders for Strattera, Remeron, and Buspar were written. On April 4, 2008, the inmate reported to a clinical case manager that he was not receiving his prescribed medications. The clinical case manager wrote a progress note to document that he faxed a request to the CTC in an attempt to resolve the problem. The inmate was seen again by the psychiatrist ten days later, when he reported that he had begun receiving psychotropic medication the week prior. Despite the medication orders that were noted in the medical record, the record did not contain a corresponding MAR or medication label at the time of the site visit.

Findings

It appeared that it took two weeks to process an off-formulary medication. The documentation indicating that the medication order was processed was lacking, but the inmate had begun to receive his prescribed medication. Aside from medication management irregularities and a gap in the administration of medication as ordered, mental health treatment appeared to meet Program Guide requirements. This inmate was seen more frequently than quarterly by his clinical case manager and by the psychiatrist. There were some discrepancies between the information in the medical record and information in the MHTS.

**Inmate G**

This 3CMS inmate's case was reviewed at the request of plaintiffs' attorneys due to concerns regarding the use of Wellbutrin. This inmate had taken Buspar during 2007, but he was observed cheeking the medication. Subsequently the medication was ordered crushed, but the inmate then stopped taking the medication. Buspar was discontinued several months before the inmate was transferred to PVSP. Progress notes written late in his MCSP stay indicated that the inmate was euthymic at the time that he was not taking psychotropic medications.

This inmate began taking Wellbutrin during March 2007, shortly after he arrived at PVSP from MCSP. He reported that Wellbutrin was not working well two months later, and a medication change was discussed, but was deferred with his agreement. By June 2007, his mood had improved, and he was reading, exercising, communicating with family, and getting along with his cellmate. Wellbutrin was continued until November 2007, when it was discontinued due to a policy change. Zoloft was prescribed, but the inmate reportedly found it unhelpful. Since that time, he was seen regularly by his clinical case manager and by the psychiatrist, but he consistently declined a trial of another antidepressant.

A review of the available medical record indicated that during the course of his incarceration, this inmate was described as having depressed mood. He had intermittently been prescribed antidepressant medications.

Findings

The mental health treatment that was provided to this inmate appeared to be clinically appropriate. He was followed consistently by the clinical case manager and the psychiatrist with appropriate medication management.

501

EXHIBIT N
Avenal State Prison (ASP)
April 15, 2008 – April 17, 2008

**Inmate A**

The medical record of this 3CMS inmate was reviewed at the request of the plaintiffs' attorneys due to concerns regarding medication discontinuity with a subsequent RVR for staff assault. This inmate was treated with Risperdal. He was housed in the administrative segregation unit at the time of the monitoring visit.

The inmate arrived at ASP on October 1, 2007; at the time of arrival, he had a current order for Risperdal and was in the 3CMS program. The MAR reflected that the inmate only received one dose of Risperdal during his first two weeks at ASP. The inmate was also prescribed Risperdal Consta intramuscular every 14 days, which was administered on October 4, 2007, and again on October 11, 2007. There was no documentation of subsequent Risperdal Consta injections. The inmate was compliant with oral Risperdal until early December.

The inmate was admitted to the OHU after expressing fears for his personal safety and vague suicidal ideation without lethal intent. He was released to a yard that was compatible for him, and he remained there for nearly two months. Approximately two months after leaving the OHU and arriving on his new yard on or around December 27, 2007, this inmate was charged with assault on a peace officer resulting in the use of force, and he was placed in administrative segregation. At that time, his GAF score was assessed as 60. While housed in the administrative segregation unit, the inmate was seen weekly by a clinical case manager and daily by a psych tech. Progress notes and documentation of rounds contained relevant clinical information and behavioral observations.

On January 14, 2008, the inmate was seen for a mental health evaluation due to an RVR. The case was referred to the DA. The evaluation contained pertinent information; for example, it included information that the inmate's diagnosis should be considered by the hearing officer, that persons with that particular diagnosis could behave in an unpredictable manner, and that the inmate's mental disorder could have potentially contributed to the behavior that led to the RVR.

<u>Findings</u>

Medication continuity upon arrival was poor for this inmate; he received only one dose of Risperdal during his first two weeks at ASP. His length of stay in the OHU was excessive, extending to nine days. After his discharge, five-day follow-up was completed. The mental health treatment that the inmate received in administrative segregation appeared to meet Program Guide requirements.

Although the reporting officer indicated that no mental health evaluation was needed, the inmate was referred to and evaluated by mental health after incurring an RVR. A mental health evaluation that was completed in connection with the RVR for staff assault contained pertinent information and concluded that the inmate's mental disorder could have been a factor in the behavior that lead to the RVR.

**Inmate B**

This 3CMS inmate arrived at ASP during October 2007; at that time, he was assessed with a GAF score of 65. During February 2008, he reported that he no longer wanted to take prescribed medications and wanted to be removed from the mental health roster. He discontinued taking an antidepressant medication for a short time, but he soon asked to resume the medication. At the time of the monitoring visit, he was taking antidepressant and antipsychotic medications, a regimen that he had been following for several weeks.

The inmate presented with signs and symptoms of depression, including self-reported weight loss of 30 pounds, and vague suicidal ideation. He was not referred to DMH intermediate care or to an MHCB despite two OHU admissions and a lengthy period of impaired functioning. The second OHU stay was nearly three weeks in duration.

Findings

The inmate was not referred to an MHCB or to a higher level of care as was clinically warranted. Progress notes indicated that five-day follow-up visits and observations by officers were completed as required after the inmate left the OHU. The medical record was incomplete; information regarding recent treatment was missing from the medical record. Clinical contacts that occurred during April 2008 were documented on the inmate history, but were not reflected in the medical record. This inmate should have been transferred to an MHCB during his three-week OHU stay and/or referred to DMH intermediate care.

**Inmate C**

This 3CMS inmate was unable to function in general population and was housed in the OHU, where he remained for months. He was provided with a diagnosis of Schizophrenia paranoid type. An alternative diagnosis of Major Depressive Disorder was also located in the medical record. The inmate was treated with Paxil. The inmate reportedly was withdrawn, refusing to leave his cell. A recreation therapist's recent attempts to engage the inmate in indoor recreational activities were unsuccessful.

The most recent treatment plan was 15 months old, and had not been updated since January 2007. The most recent mental health progress notes filed in the medical record were dated December 27, 2007.

Findings

Although housed in the OHU for months, this inmate did not have access to the unit's dayroom or to yard. The mental health treatment that was provided did not appear to meet Program Guide requirements. There was a dearth of documentation regarding the recent course of mental health treatment for this inmate. There were indications that documentation in the medical record had not been filed or was misfiled.

**Inmate D**

This EOP inmate had multiple OHU placements since November 2007 and had been awaiting transfer to an SNY for several months.  He had been endorsed to the EOP SNY at MCSP four months prior.  The inmate's parole date was scheduled for July 2008.  It appeared likely that he would be paroled from ASP prior to transfer.

This inmate arrived at ASP from CIM on or about November 28, 2007.  At the time of arrival the inmate had been receiving the 3CMS level of care, and he was provided with a diagnosis of Bipolar Disorder.

The inmate was treated with a variety of psychotropic medications.  During February and March 2008, his medication regimen included Abilify, Zyprexa, and Benadryl.  Progress notes indicated that the inmate reported PTSD-like symptoms that he stated made it difficult to live in a dormitory setting.  The inmate remained in the OHU while awaiting EOP transfer due to his inability to function in a general population setting.

<u>Findings</u>

The medical record documented that this inmate posed an elevated risk of self-injury, suicide, and decompensation.  This inmate's high level of distress and precipitous decline in functioning over the previous nine months warranted careful diagnostic formulation and a collaborative approach to housing, treatment, and risk management.  His EOP designation and inability to live in a dormitory led to placement in the OHU for a prolonged length of time.  The inmate did not receive appropriate treatment for PTSD.

In the absence of a collaborative treatment option, it was determined that the inmate required the EOP level of care and an SNY because his level of functioning deteriorated markedly in the dormitory setting.  While housed in the OHU, the inmate did not have access to the unit's dayroom, which was used routinely by medical patients.  The inmate also did not have access to the OHU yard.

505

EXHIBIT O
Salinas Valley State Prison (SVSP)
June 2, 2008 – June 5, 2008

**Inmate A**

This 3CMS inmate's case was reviewed at the request of the plaintiffs' attorneys due to concerns about his ability to care for himself in light of his medical problems and his recent mental health difficulties that were believed to be associated with his brother's transfer to another prison. He was housed in a Level IV SNY. A recent progress note indicated that the inmate had requested to be double-celled due to "worsening medical concerns." He had a current treatment plan that included diagnoses of Adjustment Disorder with depressed mood, Cannabis Abuse, and Antisocial Personality Disorder. Axis III diagnoses included Hepatitis B, Hepatitis C, and liver cancer. His GAF score was assessed as 60 during January 2008.

A January 2008 IDTT meeting was attended by the necessary participants. A suicide risk assessment was completed at that time. The assessment indicated that the inmate did not pose significant risk of self-harm, despite the inmate having a terminal illness and limited protective factors. Two protective factors that he had at that time were "helping others" and "family support." A progress note during March 2008 indicated that the inmate did not report suicidal ideation; he explicitly denied suicidal ideation, stating, "I'm not going to kill myself." He was seen monthly by a clinical case manager. He was prescribed psychotropic medications. He signed a do-not-resuscitate order during January 2008.

According to the progress notes, this inmate had mobility impairment. He was single-celled due to a history of violent behavior.

<u>Findings</u>

The mental health treatment that was provided to this inmate appeared to meet Program Guide requirements. Due to the significant stressors related to his medical condition, it will be important for the mental health staff to reevaluate the inmate's risk of self-harm and any changes in protective factors by the completion of consistent suicide risk assessments. The mental health staff should also refer the inmate to the medical staff for nursing or other supports and assistance.

**Inmate B**

This inmate was provided with the following diagnoses: Mood Disorder NOS, Cocaine Dependence, Methamphetamine Dependence, and Antisocial Personality Disorder. His GAF score was assessed as 72 during November 2007. He was seen for a timely initial IDTT meeting held in the A Yard during November 2007. The meeting was attended by the necessary participants, and an individualized treatment plan was formulated. He was placed on a waiting list for group therapy. The preprinted treatment plan listed problems and interventions that addressed his current diagnoses.

During February 2008, the inmate was enrolled in a stress management group. Summary notes written by the group leader indicated that he attended three sessions during February 2008; a fourth session was cancelled. He attended all three group sessions held in March 2008. He attended one session held in April 2008; one meeting was cancelled.

507

The staff reported that this inmate was housed for eight months in the administrative segregation unit before he was moved to the A Yard during October or early November 2007. He was reportedly in administrative segregation because he incurred an RVR while in the EOP. Eventually he was discharged to the 3CMS level of care, after which he waited to regain his SNY status.

The inmate was noncompliant with psychotropic medication during November 2007. During January 2008, he was seen by his clinical case manager, and he was described as irritable due to a lockdown or modified programming that deleteriously affected him. He requested that his medication be reinstated during April 2008. He reported to a clinical case manager that his self-referrals did not elicit a response. He was referred to psychiatry by a clinical case manager on May 1, 2008. The referral was assigned to a psychiatrist on May 7, 2008. As of June 4, 2008, there was no progress note that indicated that he had been seen by a psychiatrist, but there was a physician order written on May 7, 2008, by a psychiatrist and a signed consent with the same date. A clinical case manager note dated May 7, 2008, indicated that the inmate began taking Zoloft on May 6, 2008.

Findings

The mental health treatment that was provided to this inmate appeared to meet Program Guide requirements. The May 2008 progress notes were not filed in the correct sequence. A psychiatric order written during May 2008 did not have a corresponding progress note; it was unclear if the inmate was seen for actual clinical contact at the time that the physician orders were written.

**Inmate C**

This 3CMS inmate was provided with diagnoses of Mood Disorder NOS and Cannabis and Alcohol Dependence in remission. He had asthma and was scheduled for a sleep study. He was housed in general population.

During February 2008, a physician providing medical treatment referred this inmate to psychiatry to consider a change from Depakote due to leukopenia. The chrono indicated that the inmate was ducated for psychiatry on February 27, 2008, but the medical record did not contain a psychiatric progress note or a physician order that suggested that he was seen or that his medication was changed. There was an order written by the chief psychiatrist on March 4, 2008, to discontinue Depakote and to administer Risperdal 1 mg every morning for 90 days. There was no corresponding progress note, nor any progress notes written by a psychiatrist during March or April 2008.

At the time of the June 2008 review, the inmate was treated with Risperdal 1.5 mg/day. Laboratory studies were performed on April 17, 2008, and the results were noted by the treating psychiatrist on May 12, 2008. On that date, the psychiatric progress note indicated that because the inmate's knee was swollen and hot, he called a physician to discern whether emergency medical treatment was warranted. The inmate was seen by the nursing staff on May 13, 2008, and the following day for his knee problem.

The treatment plan was updated in a timely manner during April 2008. A suicide risk assessment was also completed on that date. The IDTT meeting was attended by the necessary participants, and the treatment plan was individualized.

Findings

The mental health treatment that was provided to this inmate appeared to meet Program Guide requirements. There was, however, a problem noted regarding psychiatric orders that were written without documentation of patient contact or, alternatively, progress notes that were written but not filed in the medical record. There was good collaboration between the medical and mental health staff regarding treatment of the inmate's medical condition.

EXHIBIT P
Correctional Treatment Facility (CTF)
September 9, 2008 – September 11, 2008

**Inmate A**

This EOP inmate was housed in the CTF OHU while awaiting transfer.  He was diagnosed with Major Depressive Disorder.  He was treated with Zoloft 100 mg/day and Abilify 15 mg/day.  The inmate had a recent, serious suicide attempt that occurred on June 29, 2008, by hanging that required placement in an outside hospital for medical stabilization.  He was transferred to an MHCB for stabilization, and he returned to CTF on July 30, 2008.

The inmate had an undated mental health evaluation in his medical record from a prior facility.  No update from CTF was located in the medical record, despite the recent, serious suicide attempt.  There was an updated treatment plan that was dated August 8, 2008; this treatment plan was inadequate in light of the almost lethal (per medical record) suicide attempt and continued clinical fragility of this inmate.  This treatment plan did indicate that consideration of DMH should occur; despite this statement, there was no documentation that such consideration ever occurred.

The most recent progress notes completed by the psychologist and psychiatrist indicated that the inmate's mental status had been steadily improving since the end of August 2008, suggesting that the EOP level of care might be appropriate.  During the last week of August 2008, progress notes completed by the psychologist and psychiatrist indicated that they clearly disagreed about the appropriate placement for this inmate.  The psychologist believed that the inmate should and would remain in the OHU pending transfer to an EOP.  The psychiatrist, in a note dated August 26, 2008, discharged the inmate to administrative segregation pending transfer, on single-cell status.  This resulted in concern from the staff, who believed that the inmate posed an ongoing and significant risk of suicide.  An IDTT pre-printed progress note August 26, 2008, indicated that an IDTT had occurred with the psychiatrist, psychologist, and CCI.  Unfortunately, the progress note contained little content, except that the inmate was recommended for the EOP level of care and that he should be single-celled.  The note did not mention whether the inmate was to be discharged, nor was there an associated treatment plan located in the medical record or OHU chart.  During the five-day follow-up process on August 28, 2008, the primary clinician noted that both the inmate and the clinician believed that the inmate had worsened clinically.  The inmate was re-admitted to the OHU.  The staff reported that the inmate would remain in the OHU until transfer.

Findings

This inmate was not evaluated while on suicide watch and precautions as required by the Program Guide.  He was not referred to DMH when clinically indicated.  He was seen by mental health staff in accordance with Program Guide requirements while in the OHU, but was inappropriately discharged to the administrative segregation unit.  The current treatment plan was minimally adequate and was not updated as clinically indicated.

Of significant concern was documentation from July 1, 2008, and surrounding dates that clearly indicated that the treating psychiatrist believed that suicide watch involved 15-minute checks.  This occurred following training of psychiatry staff regarding the appropriate standards for suicide watch and suicide precautions that included reference documents for their future use.

This was particularly alarming in light of a recent suicide that occurred on March 2008 of another inmate in the OHU that also included inappropriate standards for suicide watch and precautions.

**Inmate B**

This inmate's case was reviewed at the request of the plaintiffs' attorneys. He was provided with a diagnosis of Schizoaffective Disorder, depressed, in remission. He was prescribed Risperdal M-Tab 3 mg/day and Celexa 20 mg/day. The inmate had been noncompliant with Risperdal and was seen on September 2, 2008, for a medication noncompliance assessment. At that time, he had been prescribed Risperdal 2 mg twice daily, but he did not want to continue with that dosage. The progress note of that date indicated that the inmate reported no medication side effects, but it would appear from the content of the note that the inmate had experienced some negative impact that he attributed to Risperdal. The psychiatrist decreased the dosage by 1 mg, with a follow-up appointment scheduled within four weeks.

A mental health interdisciplinary treatment team housing/program recommendation (CDCR 128-MH8) form in the medical record that was dated August 5, 2008, indicated that the inmate required double-cell housing due to serious mental health symptoms. This form was also signed by the CCI, thereby communicating the housing needs of the inmate to custody staff. During a July 9, 2008, clinical contact, the inmate reported that he had a "no dorm" chrono renewed at that time. No such chrono was located in the medical record.

The inmate was seen frequently by the mental health staff, including psychiatry. There was a current treatment plan in the medical record; the plan was dated June 11, 2008, with an addendum dated June 24, 2008. The treatment plan of June 11, 2008, indicated an EOP level of care; no IDTT progress note from that date was located in the medical record, although a placement chrono indicating EOP level of care of the same date was found. The addendum to the treatment plan and a placement chrono dated June 24, 2008, indicated that the inmate should be returned to the 3CMS level of care, but documentation that an IDTT occurred was not located in the medical record. The treatment plan present in the medical record was inadequate.

Findings

This inmate's housing issues were addressed by the mental health staff. The placement chrono that provided for limited housing options, while satisfactory to the inmate, was not supported by the medical record nor were the underlying "mental health factors" referenced as the rationale for the housing restriction. The inmate was evaluated consistently by the mental health staff in accordance with the Program Guide requirements. The treatment plan was inadequate, and IDTT meetings were not held in accordance with Program Guide requirements. The treatment plan should have addressed the reasons for limited housing (i.e., no dormitory) and interventions to address those issues.

**Inmate C**

This 3CMS inmate was housed in the administrative segregation unit. He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood. He was treated with Zoloft 100 mg/day, Trazodone 150 mg/day and Vistaril 100 mg/day. The inmate had been admitted to the OHU for suicidal ideation; he was discharged from the OHU on April 10, 2008. Placement chronos in the medical record indicated that he had been in the 3CMS program due to medical necessity since April 3, 2008. The medical record also included a current treatment plan that was dated July 28, 2008, and a suicide risk assessment that was completed on the same date.

The inmate was consistently evaluated at cell-front for weekly clinical contacts because he refused out-of-cell clinical contacts. According to the progress notes, the inmate also refused to leave his cell to shower. On July 7, 2008, the progress note indicated that the inmate's personal hygiene was poor. The primary clinician consistently rated his hygiene as poor, while during the same time period, the psych techs conducting rounds rated his hygiene as good. In the most recent treatment plan, the primary clinician described the inmate as "smelly"; however, the psych techs described his hygiene as "good." The treatment plan on that date did not address the inmate's continued refusal to leave his cell for clinical contact and showers. While the treatment plan noted paranoia and auditory hallucinations, there was no change in the above-mentioned diagnosis.

<u>Findings</u>

This inmate was seen in accordance with Program Guide requirements by psychiatry and his clinical case manager. Treatment plans were completed timely. However, the level of care that was assigned was inconsistent with Program Guide requirements, as the inmate was continued with an inclusion in the 3CMS for medical necessity beyond 90 days without clinical justification. The diagnosis that was provided was not supported by the documentation in the medical record, and the treatment plan was inadequate given the psychiatric symptoms described.

**Inmate D**

This 3CMS inmate arrived at CTF on June 12, 2008. At the time of the site visit, he was housed in the administrative segregation unit. He was provided with a diagnosis of Major Depression recurrent, severe, with psychotic features and Antisocial Personality Disorder. He was treated with Vistaril, 50 to 100 mg at night as needed. The inmate had previously been prescribed Seroquel, but this medication was discontinued on May 21, 2008. A treatment plan was completed on July 2, 2008, prior to ICC that was held on the following day, but the IDTT was not actually held until July 8, 2008. There was no documentation that the CCI was present at the IDTT meeting. The treatment plan did not contain specific interventions to address the problem areas that were noted. It did appear that the inmate was seen daily by the psych techs during rounds, although the documentation was minimal in content. This inmate was typically seen at cell-front in the administrative segregation unit; there was no documentation to explain the reason for the cell-front interviews. On at least one occasion, it was noted that the inmate

513

refused an out-of-cell clinical contact.  The clinical contacts documented in the medical record were superficial in content, and they did not occur weekly as required.

Findings

The inmate was not seen by the IDTT in accordance with Program Guide requirements for his initial IDTT meeting.  There was no documentation that the necessary participants were present at the IDTT meeting.  The treatment plan was minimally adequate, and clinical contacts were not focused on treatment issues contained within the treatment plan.  The inmate was seen by psychiatry, but his clinical case manager contacts were not conducted in accordance with Program Guide requirements.

**Inmate E**

This inmate was housed in the administrative segregation unit.  His most recent diagnosis was Adjustment Disorder and Antisocial Personality Disorder.  He was prescribed Celexa 30 mg/day and Buspar 60 mg/day.  The inmate was also prescribed several medications for medical conditions.  A pre-printed psychiatric progress note on June 13, 2008, contained minimal information related to the inmate's mental status and reported symptoms and side effects; it contained only one comment about the inmate report of significantly irritable mood that resulted in the addition of Lithium.  Informed consents for medications were current.  There was documentation that psych tech rounds were conducted daily, but documentation was minimal in content.  The medical record was not in chronological order, making it difficult to determine if weekly clinical contacts had occurred; it did appear that several weeks had been missed.  The documentation of these contacts indicated that they primarily occurred at cell-front and were superficial in content.  There was no evidence that actual therapeutic intervention occurred.  There was a current treatment plan in the medical record, and the treatment plan had been updated at least quarterly during the administrative segregation placement.  The treatment plan, however, was not adequate and was generic in content.

Findings

The inmate was seen by psychiatry, the psych techs, and the IDTT consistent with Program Guide requirements.  It did not appear that the inmate was seen by the clinical case manager at the frequency that was consistent with the Program Guide.  In addition, the documentation provided by the psych techs, psychiatrist, and clinical case manager was minimally adequate in content.  The treatment plans, while updated according to the timelines dictated by the Program Guide requirements, were inadequate in content and clinical relevance.

**Inmate F**

This 3CMS inmate was provided with a diagnosis of Major Depressive Disorder.  He was prescribed Zoloft 75 mg/day and Benadryl 100 mg/day; informed consent for treatment with these medications was present in the medical record.  A placement chrono dated May 1, 2008, indicated that the inmate was in the MHSDS due to medical necessity; however, he had previous

placement chronos dating back to 2002 that indicated that he had been in the 3CMS program since that time.

This inmate was housed in the OHU from July 7, 2008, to July 10, 2008. He was admitted after he expressed thoughts of harming his cellmate; the inmate also had a history of aggressive behavior. The mental health staff believed that a change in cellmates was appropriate and communicated this information to the custody staff. The inmate was returned to housing with a different cellmate upon discharge from the OHU.

This inmate had also been admitted to the OHU on April 13, 2008, on suicide watch; he was downgraded to suicide precautions on April 14, 2008, and was further downgraded to psychiatric observation the following day. The inmate was discharged from the OHU on April 16, 2008. A discharge summary noted that the plan for follow-up treatment included follow-up with psychiatry within five days but no five-day follow-up due to "secondary gain issue of desire for single cell chrono." The inmate had reported significant frustration with his cellmate's snoring and a consequent inability to sleep. He was not actually seen by psychiatry again for 32 days. A suicide risk assessment was completed at the time of admission and discharge; the discharge assessment noted that the inmate was to be seen by psychiatry and his clinical case manager within seven days (this was the same provider as the discharge writer, but there were contradictory recommendations for psychiatric follow-up). He was seen by the clinical case manager on the seventh day following his release.

This inmate was never referred to an MHCB during his OHU admissions, nor was he ever seen by the OHU IDTT. An IDTT was held on May 1, 2008, with no psychiatrist present. There was a treatment plan completed on April 23, 2008, that did not address the inmate's recent OHU placement for suicidal ideation or poor problem-solving skills. There were no subsequent treatment plans in the medical record, despite an additional OHU admission. There were no treatment plans completed during the inmate's OHU admissions.

Findings

This inmate did not receive mental health services while in the OHU in accordance with the Program Guide. He did not receive timely referral to an MHCB. He did not receive five-day follow-up after his April 2008 OHU discharge. He was not seen by the IDTT, nor did he have a treatment plan developed while housed in OHU. This inmate was not seen by psychiatry in the time period indicated on his discharge paperwork from the OHU. He was seen by his clinical case manager and the IDTT while in the general population in accordance with Program Guide requirements; however, the treatment plan developed did not address the inmate's recent OHU admission and was not updated following the subsequent admission.

**Inmate G**

This non-MHSDS inmate was admitted to the OHU on May 12, 2008, following treatment at an outside hospital emergency room for a suspected drug overdose. At that time he was provided with possible diagnoses of Adjustment Disorder versus Major Depressive Disorder and Antisocial Personality Disorder. The progress note of that date indicated that the suicide attempt

515

was considered by the staff as a "lethal attempt." Despite that assessment, five-day follow-up did not occur as indicated. That same progress note indicated that the psychiatrist wanted the inmate referred to an MHCB. It was unclear if the inmate was ever referred.

On April 29, 2008, a mental health evaluation was completed that indicated that the inmate wanted to be transferred out of state, had concerns for his safety, and felt that gang life was putting him at risk. The inmate reported that he had been assaulted at the reception center, which was when his safety concerns began. He stated that he wanted to be transferred from CTF. A suicide risk assessment was completed on that date and indicated that the inmate posed no apparent risk of self-harm. He was provided with diagnoses of Anxiety Disorder NOS, Alcohol Dependence, and Cannabis Dependence; however, he refused mental health services for fear that it would jeopardize his chance of transferring out of state. Despite this, the inmate was seen by the mental health staff on at least eight more occasions, and he was seen by psychiatry on two more occasions. One progress note indicated that the inmate was being prepared for an IDTT meeting, but no documentation was located in the medical record documenting that such meeting had occurred. Most of the progress notes documented that the inmate had a significant fear for his personal safety and limited problem-solving skills.

Findings

The inmate did not receive an IDTT or treatment plan while housed in the OHU following a suicide attempt that was described by one psychiatrist as a lethal attempt. The inmate did not receive five-day follow-up as required; he was never referred or transferred to an MHCB, despite that recommendation. No discharge suicide risk assessment was completed, in violation of the Program Guide standards.

**Inmate H**

This inmate arrived at CTF on May 17, 2008. There was a placement chrono in his medical record dated July 23, 2008, that indicated that the inmate was placed in the 3CMS program due to medical necessity; he had previously received mental health services, and a treatment plan dated April 9, 2008, reflected that the inmate was in the 3CMS program, but not for medical necessity. The subsequent medical necessity chrono appeared to be inaccurate.

The inmate was admitted to the OHU twice, on April 11, 2008, and April 18, 2008. He was provided with a diagnosis of Depressive Disorder NOS with a provisional diagnosis of PTSD. He was prescribed the following medications: Risperdal 1 mg/day, Cogentin 1 mg/day, Benadryl 150 mg/day, and Zoloft 50 mg/day. Informed consent for treatment with these medications was present in the medical record.

The inmate was initially admitted to the OHU on April 11, 2008, due to complaints of inability to sleep and auditory hallucinations. He was placed on psychiatric observation status with checks every 30 minutes. The inmate was subsequently discharged on April 16, 2008; he was never considered for MHCB placement.

516

The second admission to the OHU occurred on April 18, 2008.  A psychiatry note on the following day indicated that the inmate was admitted on the prior evening; the reason for admission was unclear, but a nursing note indicated that the inmate had reported auditory hallucinations.  The psychiatrist recommended MHCB referral.  A subsequent progress note by another psychiatrist the following day suggested that the inmate had not been referred to the MHCB.  The inmate was discharged from the OHU on April 22, 2008, and it appeared that he was never referred to the MHCB.  There was documentation of five-day follow-up after discharge from the OHU.  There was a current treatment plan in the medical record that pre-dated the two OHU admissions.  The treatment plan was not updated, despite these significant events.  The treatment plan was minimally adequate in content, and there was no corresponding IDTT documentation.  There was an IDTT meeting conducted on July 23, 2008, that included the necessary participants.  The corresponding treatment plan was, however, pre-printed, generic, vague, and inadequate.  The inmate was seen by his clinical case manager and psychiatry consistent with Program Guide requirements; the documentation of actual clinical intervention was, however, clinically inadequate.

Findings

The inmate should have been referred to the MHCB; however, he was not referred.  This inmate should have been considered for a higher level of care (e.g., EOP, ICF); there was no documentation that this referral occurred.  This inmate did not receive services while housed in the OHU that were consistent with Program Guide requirements.

EXHIBIT Q
California Men's Colony (CMC)
May 27, 2008 – May 29, 2008

**Inmate A**

This transgendered, EOP inmate was evaluated at the request of the plaintiffs' attorneys to review the current treatment plan and the inmate's level of care. The inmate was provided with diagnoses of Dysthymic Disorder and Borderline Personality Disorder. He was prescribed Risperdal, Remeron, and Lamictal. Previously the inmate was prescribed Depakote, but it was recently discontinued due to medication side effects. Subsequently, Lamictal was substituted.

The inmate was seen consistently by his primary clinician in confidential settings. The progress notes indicated that the clinician was proactive in anticipating the inmate's needs; for example, the clinician arranged for an elective, brief MHCB admission when he noted that the inmate was experiencing increased stress levels associated with separation from his partner, a temporary reduction in family contact, poor medication compliance, and increased depression. The inmate improved with this intervention.

The inmate attended approximately 60 percent of his group offerings and was intermittently noncompliant with medication. He had a history of occasional medication noncompliance.

Findings

This inmate appeared to be placed at the appropriate level of care. His primary clinician was active in monitoring this inmate and intervening when clinically appropriate. In addition, there was evidence that the treatment team modified the treatment plan in response to the inmate's concerns and complaints in addition to careful monitoring of his clinical condition.

**Inmate B**

This 3CMS inmate's medical record was reviewed in response to the plaintiffs' attorneys request for a review of his medication regimen. The inmate was diagnosed with Depressive Disorder NOS. The onset of his symptoms occurred later in life than that typically associated with the onset of Schizophrenia or Schizoaffective Disorder. He was prescribed Prozac, Risperdal, and Vistaril at the evening (but not HS) pill call. He stated that he desired "Seroquel for sleep." The inmate was also prescribed a number of medications for physical illnesses/conditions.

Findings

The inmate's reported symptoms were addressed by both the primary clinician and psychiatrist and prescribed medications, doses, and dosing schedule were appropriate for his condition. The inmate was placed at the appropriate level of care.

**Inmate C**

This EOP inmate was diagnosed with Major Depression recurrent mild and Antisocial Personality Disorder. He also had a history of Cannabis Abuse. He intermittently reported auditory hallucinations and suicidal ideation and was admitted to the MHCB several times in response. He was also hospitalized at ASH following an instance of cutting his wrist with a

519

razor blade. The progress notes indicated that it appeared that worsening mental health symptoms were temporally related to the inmate's concern that his level of care would be lowered to 3CMS, making him eligible for transfer to another institution. The inmate had family close to the facility and had encouraged his family to advocate for his continued placement at CMC.

The inmate also requested consideration for inclusion in the classification of developmental disability (DD2) despite having no history or current presentation to suggest the presence of such a disability. There was no documentation in the medical record to suggest that a lower level of care had been considered for this inmate, although the inmate expressed concern that it would be discussed at every IDTT meeting. The last treatment plan summary was dated April 10, 2008, and no change in the level of care was contemplated. The next update was due July 10, 2008.

Findings

Although there appeared to be some question about the severity of this inmate's level of mental health need given his obvious and stated secondary gain motivation, the staff remained responsive to his concerns and reports of symptoms. A change in his level of care had not been contemplated at the time of the monitoring visit. The inmate was placed at the appropriate level of care.

**Inmate D**

This 3CMS inmate had a reported history of Bipolar Disorder; he was prescribed Risperdal, Artane, Buspar, and Seroquel. His case was reviewed at the request of the plaintiffs' attorneys, who reported that he had been experiencing "side effects and severe depression" since Wellbutrin was discontinued during September 2008.

The inmate arrived at CMC on November 27, 2007. He consistently chose not to participate in any group treatment interventions offered to him; however, he met individually with his primary clinician and the psychiatrist. Although he was followed consistently and there was documentation that medications were regularly discussed, there was no documentation in the medical record that the inmate brought his concerns regarding the discontinuation of Wellbutrin to his treating psychiatrist. In addition, Wellbutrin was discontinued at another institution prior to the inmate's arrival at CMC due to hoarding. Documentation of the inmate's clinical presentation did not suggest the presence of signs and symptoms of depression. The inmate was followed consistently by clinicians.

Findings

This inmate was placed at the appropriate level of care. There was no documentation suggesting the presence of depression, and he was followed consistently by clinicians. The treatment of an individual with Bipolar Disorder would generally not require ongoing treatment with an antidepressant medication, and in some cases, this treatment would be contraindicated due to the possibility of precipitating a manic episode.

**Inmate E**

This EOP inmate was provided with a diagnosis of Schizophrenia chronic undifferentiated type. He was also classified as developmentally disabled (DD2). His case was reviewed at the request of the plaintiffs' attorneys to evaluate the inmate's medication regimen.

He was prescribed Risperdal and Zoloft. The dosage of Zoloft was increased slightly at the end of March 2008 based upon the inmate's report of recurrence of his depressive symptoms. The psychiatrist documented in a progress note on May 20, 2008, that the inmate's depressive symptoms were improved.

This inmate was prescribed Seroquel for his psychotic symptoms; when this medication was removed from the formulary, he was prescribed Geodon and then Risperdal to determine an appropriate substitution. His psychotic symptoms appeared to be well managed with his current medication regimen. The inmate had inquired about a trial of Invega (an antipsychotic medication that is the active-ingredient breakdown product of Risperdal), but his response to Risperdal was favorable without side effects; the treating psychiatrist indicated that he would consider this change at a later time.

The inmate was seen weekly by his primary clinician; he was seen consistently by the psychiatrist, and he attended groups in addition to having a paying job at the prison industry shoe factory. There was no documentation suggesting he reported any problems or concerns about his medication to institutional mental health staff.

Findings

This man appeared to be functioning well as evidenced by his clinical stability and ability to maintain a job. He was placed at the appropriate level of care, and his medication regimen was clinically appropriate.

**Inmate F**

This EOP inmate was housed on the D-Quad. His case was reviewed at the request of the plaintiffs' attorneys regarding the adequacy of his current treatment plan and the need for a higher level of care.

The medical record indicated that the inmate was transferred from CSP/LAC to CMC on January 30, 2008. He was prescribed Cogentin, Buspar, Haldol, Paxil, and Zoloft. The medical record was unclear regarding the inmate's psychiatric diagnosis. Symptoms described in the medical record included symptoms of mania, depression, anxiety, auditory hallucinations, and amnesia. He acknowledged poor medication compliance because he did not wish to wait in line, but added that he had thoughts of harming others when medication noncompliant. He also had medical problems that include hypertension, seizures, dyslipidemia, reflux disease, and anemia.

The inmate had an extensive criminal record with convictions for murder, robbery, and assault among numerous other offense convictions. He was serving 15 years for robbery and was on

parole at the time of this offense.  He had 25 alias names, 11 reported dates of birth, ten Social Security numbers, four driver's license numbers, and four CDCR numbers.  He also asked for consideration of developmental disability classification.  Although his criminal history clearly demonstrated a degree of sophistication that was inconsistent with an individual with developmental disability, he was nonetheless tested and found not to have developmentally disability.

Findings

This inmate was placed at the appropriate level of care given his clinical presentation; this presentation was inconsistent with that of an individual with a serious and persistent mental illness.  As he was relatively new to the institution; he was maintained at an EOP level of care for close contact and monitoring.  There was no evidence to suggest the necessity for a higher level of care and, in fact, some reason for concern that he might represent a risk to other less able inmates in the EOP program.

**Inmate G**

This 3CMS inmate was provided with a diagnosis of PTSD.  His case was reviewed at the request of the plaintiffs' attorneys to evaluate his treatment plan and the need for a higher level of care.  He was prescribed Abilify and Zoloft.  The inmate was enrolled in several groups, including anger management, depression management, and stress management groups.  He attended his psychiatric appointments and primary clinician contacts as scheduled.  He missed one third to one half of his groups, but his participation was characterized as attentive and involved when present.

The inmate had two recent MHCB admissions.  At the time of the first admission, which lasted from March 28, 2008, to April 4, 2008, he reported feeling suicidal and depressed in reaction to family problems.  In the IDTT meeting, he told the treatment team that he "really just needed a break and was not suicidal or depressed."  When he was discharged from the MHCB to the Transitional Living Unit, he fashioned a noose and put it around his neck in a suicide gesture; he was then re-admitted to the MHCB.  He acknowledged to his treatment team that he wanted to remain housed in D-Quad rather than being moved to C-Quad.  He was assigned a regular bed on the third floor of seven building D-Quad and had no further incidents warranting MHCB admission.  At a treatment team meeting on April 24, 2008, he was referred to problems solving/coping and DBT groups.  Sometime following the second MHCB admission, a referral to DMH was submitted; however, it was later rescinded based on the inmate's improvement.

Findings

This 3CMS inmate was seen at regular intervals and as needed in response to psychosocial stressors.  Although he had two relatively recent MHCB admissions, it did not appear that he required an increased level of care.  His treatment plans were comprehensive, detailed, and clinically appropriate.

**Inmate H**

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Depressive Disorder NOS. He was prescribed Zoloft and Benadryl. His case was reviewed at the request of the plaintiffs' attorneys to evaluate his treatment plan and the need for a higher level of care. He was hospitalized in MHCB from January 2, 2008, to March 6, 2008, much of the time while awaiting a bed at DMH. He was referred to DMH APP at Vacaville on January 7, 2008, and was accepted on January 8, 2008. While housed in the MHCB, the inmate's medications were adjusted, and he participated in one-to-one therapy sessions. His condition improved, and the request for DMH was rescinded on March 6, 2008. The most recent IDTT progress note on May 21, 2008, indicated that the inmate appeared stable with no indication of the need for a higher level of care. The rationale for not considering EOP level of care following the two-month MHCB hospitalization was not located in the medical record.

Findings

Based upon documentation of the inmate's current condition and functioning, he appeared to be placed at the appropriate level of care.

**Inmate I**

This EOP inmate was housed in the administrative segregation unit due to a staff assault. He was serving a life sentence after having received his third strike. He had been receiving the EOP level of care since July 26, 2006, following a suicide attempt.

The medical record contained documentation of daily mental health rounds in the administrative segregation unit. The inmate was seen weekly by the clinical case manager. He was also seen consistently by the psychiatrist for medication management, and he participated in depression and crisis management groups. He attended 81 percent of the treatment offered to him. He was last seen by the psychiatrist on May 8, 2008, when he was provided with diagnoses of PTSD, Polysubstance Dependence, and Antisocial and Borderline Personality Disorders. He was prescribed Trazodone, Mirtazapine, and Effexor. No informed consent forms for psychotropic medications were located in the medical record.

Findings

This inmate appeared to be functioning well at the EOP level of care. He participated in offered treatments and appeared to show improvement.

**Inmate J**

This EOP inmate was housed in the administrative segregation unit due to a charge of indecent exposure. He was serving a life term for kidnapping and armed robbery. He had been in the EOP since September 4, 2007. He was prescribed Zyprexa, which he was compliant with approximately 50 percent of the time. The inmate participated in groups occasionally, but he attended his one-to-one clinical case manager contacts consistently. The inmate was rather odd

and idiosyncratic in his presentation, referring to himself in the plural and sometimes claiming to have multiple personalities. His psychological testing was most consistent with Schizotypal Personality Disorder, but he also tended to exaggerate symptoms and difficulties, raising issues about the validity of the test results.

<u>Findings</u>

This inmate was seen at the recommended Program Guide intervals and as clinically indicated for the EOP level of care. Because of his limited participation in treatment and the lack of diagnostic clarity, it was difficult to ascertain the continued need for EOP rather than 3CMS level of care. A reduction in level of care did not appear to be a treatment team consideration at the time of the monitoring visit.

**Inmate K**

This EOP inmate was housed in the administrative segregation unit. An evaluation completed on April 19, 2007, indicated that the inmate was provided with diagnoses of Psychotic Disorder NOS and Polysubstance Dependence. A suicide risk assessment completed on the following week indicated that the inmate posed little risk for self-harm; there was however documentation of a history of suicidal ideation during 2006. This inmate had been receiving the EOP level of care since at least January 2008. A treatment plan completed on January 16, 2008, listed problems that included delusional thinking, paranoia, auditory hallucinations, and poor coping skills. The stated interventions for these issues were group therapy and one-to-one case management contacts. The IDTT meeting consisted of the necessary participants with the exception of a correctional counselor.

There was documentation of the inmate's involvement in group therapy as well as his participation in one-to-one weekly sessions with his clinical case manager. A progress note on April 3, 2008, indicated that the inmate had two instances when he missed his medications.

The medical record included weekly summaries of psych tech rounds that described the inmate as having good group attendance and medication compliance. These progress notes also documented that the inmate seldom went to yard, but he maintained his personal hygiene.

<u>Findings</u>

The medical record documented that the inmate was stable on medications, with occasional refusals. He was seen clinically as required by the Program Guide. He participated in group and individual therapies. The clinical progress notes clearly documented the inmate's condition. The treatment plan should be updated to provide more individualized treatment problems, goals, and interventions.

**Inmate L**

This EOP inmate was housed in the general population.  A treatment plan dated July 7, 2007, indicated that the inmate had auditory hallucinations, poor interpersonal problem-solving skills, and suicidal ideation.  Relevant interventions were noted for each of these problems.

Monthly clinical treatment summaries indicated that this inmate was enrolled in nine different groups; he reportedly did not always attend groups on a consistent basis, but his participation was good when he was present.  Progress notes in the medical record documented consistent clinical contacts as required.  The weekly progress notes indicated that the inmate remained stable and was generally compliant with prescribed medications.

<u>Findings</u>

This inmate appeared to be stable and was placed at the appropriate level of care.  The documentation indicated that this inmate was seen at the required intervals that were consistent with Program Guide requirements.