EXHIBIT R
Wasco State Prison (WSP)
September 16, 2008 – September 18, 2008

**Inmate A**

This MHCB inmate with an extensive CDCR history was apparently returned to prison on July 24, 2008, pursuant to a parole violation.  The exact date of admission to the MHCB was difficult to ascertain, as the inmate apparently was housed in an overflow setting prior to his actual admission to the MHCB. Upon admission, the inmate was described as angry, paranoid, and agitated, complaining of "pain all over."  The staff subsequently assessed him with grave disability.

This inmate was transferred from the Fresno County Jail, where he was treated with Risperdal and Benadryl.  He was provided with a diagnosis of Schizophrenia paranoid type.  He was assessed with a GAF score of 20.  He was treated with Haldol 5 mg/day and Zydis 10 mg/day. His medication compliance was reportedly poor.

The relevant mental health history included inpatient psychiatric treatment in the community and multiple MHCB admissions since at least 1995.  Prior to this admission, he had reportedly paroled on November 25, 2006.  He was administered psychotropic medication pursuant to a Keyhea order from 1999 to 2006.  At a recent initial internal review regarding the need for Keyhea medication over objection, the inmate refused to participate, was hostile, and was noted to refuse meals and showers and to be wearing toilet paper on his feet to "protect from radiation."  Despite this presentation at his Keyhea hearing on September 11, 2008, the CDCR withdrew its petition.  Discussions with the staff and review of the medical record indicated that this case was transferred between state attorneys during the week prior to the scheduled hearing and that the second attorney did not have what he or she considered sufficient time to review and proceed with the case.  As a result, the petition was withdrawn.

The MHCB staff maintained regular clinical contact with this inmate.  According to the MHTS, he had generally been seen weekly for IDTT meetings since his admission during July 2008. The exception to this was a lapse between September 2, 2008, and September 15, 2008.  He was seen daily for MHCB rounds. Despite the inclusion of various medication orders in the MHTS, there was no documentation of psychiatric contact after the emergency psychiatric contact documented on July 27, 2008, when the inmate was housed in the MHCB overflow setting. A progress note on August 20, 2008, indicated that a <u>Vitek</u> hearing was held on that date to determine the necessity of referring the inmate to DMH without his informed consent.

On August 18, 2008, the inmate was assessed by a psychologist as having a mental illness rendering him incapable of participating in goal-directed conversation during a Board of Parole hearing.  The team concluded that the inmate required referral to DMH acute care due to poor treatment adherence, grave disability, and aggressive/hostile behavior.  However, the progress notes indicated that the DMH referral, while in process, was pending parole resolution.  A review of the referral package revealed that it had not been submitted as a parole date was not included. As a result, the inmate's hearing had been held in abeyance.  According to staff responsible for effectuating DMH transfers, this delayed the inmate's transfer to DMH.  In addition, the staff indicated that the inmate was losing weight, was refusing medication, and had exhibited worsening behavior control, likely related to a recent RVR.

Findings

This inmate with a chronic, serious mental illness was doing poorly in the MHCB, where he remained while awaiting transfer to DMH. It was unlikely that his incompetence to proceed with the parole revocation hearing would resolve in light of his lack of compliance with treatment, the withdrawal of his Keyhea hearing, and his psychotic, violent presentation. Generally, while on EOP status, the inmate was seen within minimum requirements, but his difficult presentation should have warranted more intensive attention particularly in light of his need for DMH placement.

**Inmate B**

This inmate was receiving the EOP level of care at the time of the site visit, but during this incarceration, he had repeated admissions to the MHCB. He was provided with a diagnosis of Schizophrenia undifferentiated type. He was treated with Risperdal 3 mg/day and Remeron 15 mg/day.

This inmate had a number of parole violations resulting in re-incarceration in the CDCR. Regarding his most recent incarceration, he left CDCR custody on December 16, 2007, but he returned due to a parole violation on January 22, 2008. While housed at WSP during this monitoring period, the inmate was placed alternatively in the MHCB and the EOP reception center program. From approximately July 19, 2008, to July 30, 2008, this inmate was housed in CSP/LAC's MHCB for treatment. While awaiting MHCB placement in overflow status, he was placed on one-to-one suicide watch; the most recent placement occurred on August 31, 2008. At WSP, his most recent MHCB placement occurred on September 12, 2008; discussions with the staff indicated that they believed this inmate's clinical condition warranted placement in a level of care higher than EOP. He was recently discharged from the MHCB, reportedly as a result of the lack of beds and overcrowding. While in the EOP, he was moved frequently to the administrative segregation unit.

During this incarceration, the inmate's clinical course was significant for periods of poor treatment adherence, suicidal ideation, and agitated behavior such as head banging. He made repetitive grunting noises, which caused consternation to his fellow inmates and staff. His personal hygiene was poor. There had been no significant improvement in his mental status. Discussions with the staff provided some additional information. Reportedly, this inmate functioned poorly in the community. The staff indicated that the inmate required a conservatorship to assist with his adjustment to community living as he was unable to care for his basic needs outside of the structured environment of the prison. The staff reported that they were not authorized to commence conservatorship proceedings in Kern County and further believed that the inmate's discharge from the MHCB additionally weakened the ability to have a conservator appointed.

Findings

This inmate cycled repeatedly between the MHCB and the EOP. It appeared that he was prematurely discharged from the MHCB to make room for another inmate requiring MHCB

placement. This inmate likely required DMH placement. His pre-release planning was compromised by the staff's inability to effectuate a conservatorship, which they determined as critical for the inmate's adequate functioning following release.

**Inmate C**

This inmate was provided with diagnoses of Mood Disorder NOS, Psychotic Disorder NOS, and possible Schizoaffective Disorder bipolar type. An additional diagnosis that was present in the medical record was Bipolar I Disorder, severe with psychotic symptoms. He was treated with Risperdal 6 mg/day, Lithium 600 mg/day, Vistaril as needed for anxiety, and Cogentin 2 mg/day. The inmate recently returned from the MHCB at SVSP, where he was treated and released on September 8, 2008. At the time of the monitoring visit, the inmate was housed in the MHCB overflow area while awaiting an open MHCB bed.

This inmate was recently re-admitted to the CDCR on a parole violation. The medical record indicated that he attempted to hang himself two weeks prior to this re-admission; at that time, he requested admission to ASH.

This inmate was scheduled for release on September 18, 2008. The staff were seeking civil commitment, having unsuccessfully attempted to coordinate adequate discharge plans with his parole officer.

The medical record indicated that the inmate had recent psychiatric symptoms that included suicidal ideation, depression, psychotic symptoms, and anxiety. His history was remarkable for at least six prior suicide attempts, ETOH use, and inhalation of paint. The stated obstacles to his pre-release planning included chronic homelessness, difficulty in keeping appointments with parole officer, and his desire for permanent placement in a psychiatric hospital upon discharge. A progress note dated September 16, 2008, recommended transport directly to a hospital in the community, as the inmate stated that he would "kill himself if given the opportunity." The staff reported significant efforts with a CDCR headquarters social worker to facilitate this transfer following release.

Although discussions with the treating psychologist revealed his concern about this inmate's safe discharge to the community, with the exception of the progress note of September 16, 2008, the progress notes and treatment plans do not document attention to pre-release planning.

Findings

This case illustrated the significant efforts made by the staff in individual cases of particular concern to arrange for commitment to a psychiatric hospital following release. It also demonstrated the detrimental effects of MHCB overflow placement and transfer between the MHCB and the EOP. This inmate should have been considered for DMH placement. Despite active efforts by the staff for appropriate placement in a psychiatric facility upon his imminent release, on the day prior to his release, it remained unclear whether adequate arrangements would be facilitated.

**Inmate D**

This EOP inmate was provided with a diagnosis of Schizoaffective Disorder. He was treated with Effexor 75 mg/day, Geodon 80 mg/day, and Buspar 10 mg/day. This inmate had multiple admissions to the MHCB between January 2008 and May 2008; there were a total of eight MHCB admissions due to suicidal ideation to date. The lengths of stay varied from three to six days.

The inmate was seen consistently by the clinical case manager; however, there were occasional lapses in weekly clinical contacts. There was no documentation that the inmate was seen at increased frequency during periods of transition or exacerbation.

Findings

Due to the frequent MHCB admissions, a treatment plan review was warranted. This inmate required either more intensive and revised mental health treatment while in EOP status or consideration for DMH placement. There was no documentation that either of these treatment options was pursued.

**Inmate E**

This EOP inmate was diagnosed with Schizoaffective Disorder. He was treated with Geodon 80 mg/day; the inmate reported sporadic medication compliance. The inmate had a history of multiple CDCR admissions and discharges. The inmate had a history of poor compliance with follow-up upon release from prison.

This admission was characterized by six admissions to the MHCB; the most recent hospitalization occurred from July 12, 2008, to July 15, 2008.

The medical record revealed one previous meeting with the EOP pre-release group on September 10, 2008. The record revealed that this inmate was first scheduled for parole during August 2008, but the date was moved to September 27, 2008. The first mention of pre-release planning in the medical record was during August 2008, but there was no follow-up documented until September 9, 2008, when the inmate was assigned to the pre-release group. The medical record indicated that the inmate was pending transfer to DMH; however, a progress note on September 5, 2008, stated that the transfer to DMH ICF had been rescinded due to the inmate's parole later during the month.

Findings

The treatment planning that was provided did not address the inmate's chronic poor adherence to follow-up upon release and subsequent parole violation, or his chronic homelessness. Knowledge of these issues by the staff was documented; however, they were not integrated into the treatment or pre-release planning. It was possible that confusion regarding the inmate's parole date, as well as the apparent cancelation of his transfer to DMH resulting from his imminent parole date, delaying pre-release planning.

**Inmate F**

This EOP inmate was diagnosed alternatively with Bipolar I Disorder, most recent episode manic, severe with psychotic features and Schizoaffective Disorder.  He was treated with Thorazine 100 mg/day and Cogentin 1 mg/day.

The inmate was admitted to the MHCB from February 28, 2008, to March 3, 2008, due to an assessment that determined that the inmate was gravely disabled.  The medical record documented pre-release group attendance during April 2008 and May 2008, but no attendance since that time.  The inmate reported that he was scheduled for release from prison within the next several days of the monitoring visit, and that he required assistance with applying for re-instatement of his social security income, which he received for psychiatric reasons.

At that time of the monitoring visit, there was no documentation of pre-release planning and placement in light of the impending release from prison.

Findings

This case illustrated the difficulty that the staff encountered in obtaining accurate information regarding parole dates to guide pre-release efforts, as well as sporadic meetings of pre-release groups during this monitoring period.  This inmate, with significant psychosocial difficulties and the need for specific assistance with benefits, apparently had not received this necessary assistance at the time of review.

**Inmate G**

This EOP inmate arrived at WSP on April 3, 2008.  The bus screening occurred on the following day and was negative for mental health concerns.  Soon after his arrival, he experienced a medical emergency and was referred to an outside hospital.  A copy of the discharge record from Mercy Hospital dated April 12, 2008, indicated the diagnosis of a psychiatric disorder, and suggested a psychiatric evaluation and suicide watch if deemed necessary.

The inmate returned to WSP from Mercy Hospital on the following day.  Shortly after his return to WSP, orders for Zyprexa and Remeron were provided.  He was to be admitted to the MHCB; however, he was housed in the MHCB overflow area located in a general population reception center building due to the lack of an MHCB bed.  The inmate was housed on this unit for approximately five days after his return from the hospital.  Following discharge from the MHCB overflow area, the inmate was placed in standard reception center housing at the EOP level of care.  The inmate was discharged with planned five-day follow-up and psychiatric follow-up in ten days.  A provisional diagnosis of Schizoaffective Disorder was provided.  The inmate was assessed with a GAF score of 25.  He was described as calm and oriented, but with depressed mood, slowed speech, thought blocking, and command auditory hallucinations that told him to hurt himself; he believed that people controlled his mind and could sometimes read his thoughts.  His cognitive processing was impaired by poor concentration, distractibility, poor memory, and

limited intellectual functioning and fund of information. He reported significant weight loss during 2008.

An IDTT meeting, which was attended by the necessary participants, occurred on May 27, 2008; there were subsequent monthly treatment plan updates. Monthly updates were typically generic in content. An IDTT treatment plan dated July 31, 2008, was pre-printed, documenting little individualized content save for a list of medications and a plan to continue EOP treatment of five hours of group therapy per week. A plan dated August 20, 2008, was an exception. It was annotated to indicate problems of assaultive behavior and manic episodes, with auditory hallucinations and suicidal ideation. The planned response to those problems, however, was generic. The plan was to address all of the issues on the list by means of weekly case manager contacts, daily psych tech rounds, and follow-up by a psychiatrist as needed.

Available documentation regarding disciplinary infractions suggested that the inmate was involved in at least two incidents, one occurred during a manic episode; it involved injury to custody officers. This serious offense occurred during August 2008. Seven officers were injured while attempting to restrain this inmate during a manic episode. An officer's nose was broken by the inmate, who was swinging his arms wildly. The inmate was charged with assault on an officer. The case was referred to the DA; the inmate waived his right to a timely hearing pending outcome of the DA referral, and therefore, the RVR was pending.

Informed consent was obtained for the use of psychotropic medications; some of the forms were signed belatedly.

<u>Findings</u>

This EOP inmate's length of stay in the reception center and in administrative segregation exceeded court-ordered timeframes. He was not referred for expedited EOP transfer to a destination institution, nor was he sent from administrative segregation to an institution with an EOP administrative segregation hub within the required 30 days. Access to the MHCB was impaired. Despite urgent medical and mental health issues, this low-functioning, high-needs inmate did not gain admission to an MHCB bed. Instead, he was housed in an MHCB overflow area, where conditions were inadequate.

Early in his stay, it appeared that the urgent nature of this inmate's condition interfered with routine processing that might conceivably have resulted in timely transfer from the reception center. As his stay lengthened, factors that mitigated against transfer increased. The inmate became a management concern, due in part to his mental illness, and began to accrue RVRs. He had a pending DA referral. Despite attempts to provide adequate treatment, mental health treatment was inadequate overall. Mental health treatment provided during the inmate's six months at WSP was crisis driven and reactive, and was characterized by lack of access to the appropriate levels of care. The inmate was never moved to an MHCB after presenting during April 2008 with psychotic symptoms. The staff decided on April 13, 2008, that DMH referral was not warranted.

IDTT meetings were conducted as required and were attended by the necessary participants.

**Inmate H**

This inmate was treated alternately at the 3CMS and EOP levels of care. He was hospitalized in the MHCB from July 22, 2008, to July 23, 2008, due to suicidal ideation, violent outbursts, and issues related to poor medication adherence. He was treated with Remeron and Geodon. At the time of the monitoring tour, the inmate was receiving the EOP level of care. He was diagnosed alternately with Mood Disorder unspecified, Bipolar Disorder NOS, and Schizoaffective Disorder. His history was significant for at least three suicide attempts. The medical record revealed that the inmate's psychotropic medications were discontinued, but were resumed during August 2008. At that time, he reported feeling confused and depressed.

During a group interview that included the inmate, he presented with significantly disheveled appearance. He requested assistance with prerelease planning.

His medical record revealed a TCMP chrono dated June 12, 2008, with an interview date of June 26, 2008. The treatment plans contained little attention to pre-release planning.

Findings

This EOP inmate had a low level of functioning. Although his medical record contained a TCMP chrono, the extent of services received was unclear. The mental health treatment plan did not address the inmate's pre-release needs in an individualized or specific manner. His medical record contained no documentation of prior attendance in the pre-release group.

EXHIBIT S
North Kern State Prison (NKSP)
September 23, 2008 – September 25, 2008

**Inmate A**

This EOP inmate arrived at NKSP on July 25, 2008.  He was endorsed to CMF on August 19, 2008, but the inmate had not been transferred as of September 25, 2008, exceeding the 60-day transfer timeframe for EOP inmates.  He was provided with a diagnosis of Schizoaffective Disorder.  He was treated with Haldol 5 mg/day.  The inmate also had a history of coccidioidomycosis meningitis and arthritis of the back for which he was treated with Diflucan.  He was followed consistently by the mental health and medical staff.  The inmate was also involved in several groups, including symptom management, socialization, art, affect regulation, pre-parole, and substance abuse groups.  This inmate had a long history of multiple CDCR incarcerations.  He also had multiple placements in the administrative segregation unit as well as in the MHCB.

Findings

The inmate had demonstrated a history of regression and deterioration resulting in multiple administrative segregation placements and MHCB admissions.  Although this inmate appeared to be receiving basic mental health services, it was of concern that he had not been transferred from the reception center to the endorsed mainline institution in a timely manner, due to the lack of either an available bed or a bus seat.  Prolonged stay in the NKSP reception center with limited mental health services and custody limitations might result in an exacerbation of the inmate's psychiatric symptoms.

There also appeared to be problems regarding the availability of the medical record, and progress notes documented that the medical record was not always available for clinical encounters.  The organization of the medical record was also problematic.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit due to the imposition of a SHU term for battery on a custody officer.  The inmate had paroled from CSP/Corcoran SHU six days prior to his arrival at NKSP.  He reportedly discontinued his medications after parole.  He arrived at the NKSP reception center on June 4, 2008, and he was recommended for the EOP level of care soon after his arrival.  The inmate was placed in the administrative segregation unit on August 8, 2008.  The inmate was classified as DD2 (developmental disability category).  He was diagnosed with Schizophrenia paranoid type.  He was treated with Risperdal 4 mg/day.

This inmate had a long history of mental illness and special education as a child.  He was previously admitted to ASH and other private psychiatric hospitals in the community.

Findings

This inmate was observed during group therapy and interviewed individually.  He stated he was fearful of his cellmate and was running from him when he hit the officer.  He further stated that he did not know why he hit the officer.  A RVR was completed on August 8, 2008.  A mental health evaluation that was completed by a psychologist on August 21, 2008, documented the

inmate's mental illness and DD2 status, and indicated that the inmate's mental illness played a role in his rule violation. Despite this recommendation, the mental health evaluation did not appear to have any effect on the penalty assessed. Transfer to a higher level of care should have been considered for this inmate prior to the placement in the administrative segregation unit. This case was discussed with the supervisory staff for consideration of DMH referral or transfer to a PSU.

**Inmate C**

This 3CMS inmate arrived at NKSP on July 10, 2007. The inmate was placed into the 3CMS program within three weeks of arrival at NKSP. He was diagnosed with Schizophrenia paranoid type. He was initially treated with Effexor and Geodon. The inmate was assessed with a GAF score of 68.

The inmate was seen for follow-up with the clinical case manager during October 2007. At that time, he reported experiencing auditory hallucinations and weight loss, and he denied past or current suicidal ideation or self-injury.

On January 14, 2008, he was seen by the clinical case manager. He was described as delusional, paranoid, and exhibiting restricted affect, but all other aspects of his mental status, sleep, and appetite were reportedly within normal limits. His GAF score was assessed as 56. He was referred for a psychiatry appointment, and he was evaluated by a psychiatrist ten days later. He reported feeling better, but his mood was sad with restricted affect. He also reported a decrease in command hallucinations. Laboratory studies were ordered, and follow-up was planned for 30 days.

The inmate was next seen on March 3, 2008, when he presented in crisis. The inmate had an altercation with his cellmate; subsequently, the inmate reported auditory hallucinations that caused him to fear that he would harm himself or others. A progress note stated that the inmate made self-inflicted lacerations over an unspecified period of time prior to the mental health staff learning of this behavior. The inmate was placed in an MHCB overflow cell, as no MHCB was available. He was observed for two to three days in the overflow cell furnished with a safety mattress. Behavioral observations were recorded in the progress notes, and an IDTT meeting was conducted.

The inmate's medications were changed to Celexa, Risperdal, and Benadryl based upon the inmate's presenting symptoms and medication side effects.

Findings

This inmate remained in the reception center for an extended period with subsequent deterioration in his mental status. The inmate required MHCB placement; however, access to an MHCB was poor, and the inmate was treated and monitored in an MHCB overflow cell. The mental health follow-up that was provided for this inmate was insufficient given his clinical presentation. Consideration of transfer to DMH for stabilization was not documented.

EXHIBIT T
California State Prison, Los Angeles County (CSP/LAC)
April 7, 2008 – April 10, 2008

**Inmate A**

This reception center EOP inmate's medical record was reviewed as he was a participant in a group on pre-release planning observed by this observer. This inmate had a long history of EOP placement while in the custody of the CDCR dating back at least to 1983. He reported a history of five hospitalizations at ASH, and he had a history of suicide attempts; the most recent occurred during 2003. He was provided with a diagnosis of Schizoaffective Disorder and possible Antisocial Personality Disorder. He was alternately treated with Depakote, Effexor ER, and Risperdal. This inmate also had a significant history of substance abuse, although the inmate was not consistently provided with this type of diagnosis.

The inmate arrived from the Los Angeles County Jail on February 26, 2008, but there was also a transfer summary from the jail dated February 9, 2008. This uncertainty regarding the date of transfer was difficult to reconcile with the rest of the documentation in the medical record, and may have been erroneous. The inmate was treated with Depakote and Effexor ER at the jail. The initial screening and evaluation occurred on February 29, 2008, apparently three days after arrival. The initial screening documented that the inmate presented with symptoms of depression and paranoia as well as several suicide risk factors.

The initial IDTT occurred on March 12, 2008; this meeting was timely based upon the February 29, 2008, arrival date. The IDTT note documented the relevant history of psychiatric hospitalizations, suicide attempt, treatment with medication, and diagnosis, but failed to address the inmate's significant substance abuse history. This omission was significant because the inmate identified during the pre-release group that his drug use was the major reason that he failed to report to parole following his most recent release. He subsequently violated parole; as such, the inmate's substance abuse was a major obstacle to his successful re-integration to the community and should have been a major focus of the staff's re-entry planning efforts for this inmate.

The treatment plan noted issues with impulsive behavior and mood swings. The goals were responsive to the problems identified, but the goals identified were not specific or measurable. The treatment team meeting was attended by the necessary participants.

A review of progress notes revealed that the inmate was evaluated by both the clinical case manager and psychiatry as described in the treatment plans and in accordance with, or even more frequently than, Program Guide requirements through March 2008. Inexplicably, at the time of the monitoring visit, there were no case management progress notes after March 24, 2008. The case management progress notes prior to that date reflected that there were problems with the availability of private treatment space; a progress note on March 12, 2008, indicated that the inmate was seen at cell-front. The inmate was evaluated again on March 17, 2008, in the dayroom.

The progress notes in the medical record reflected the mental health staff's awareness that pre-release planning was a significant issue for this inmate. The entry of March 7, 2008, stated that the inmate would parole within seven months, and the progress note of March 24, 2008, stated that a staff member was attempting to help this undomiciled inmate secure a place to live upon

release.  While the case manager's progress note of March 17, 2008, indicated that this inmate was attending groups, there was a lack of documentation of the inmate's participation in the pre-release planning group.

<u>Findings</u>

This medical record indicated that the care provided to this inmate met Program Guide requirements; however, the medical record was incomplete and contained ambiguities, making it difficult to assess the quality of mental health care provided.  Clinical case manager contacts occurred at the required intervals, but documentation of contacts ended on March 24, 2008.  The documentation of cell-front and dayroom clinical contacts reflected the inadequacy of private interview space available to the mental health staff.  The understanding of this inmate's re-entry needs was comprehensive, but the lack of adequate planning reflected the limited staff available to address these needs and the current inability to provide assistance with benefits applications.

**Inmate B**

This reception center EOP inmate's record was reviewed to ascertain compliance with Program Guide requirements and to evaluate the pre-release re-entry services for EOP inmates.  This inmate apparently arrived at the facility on February 14, 2008.  He was screened and assessed on that same day and was provided with a diagnosis of Psychotic Disorder NOS.  He had a history of paranoid ideations, and he was treated in the past with medications including Trazodone and Seroquel.  According to the medical records, this inmate's paranoia led to behaviors that resulted in being stabbed.

Upon arrival, the inmate reported auditory hallucinations, paranoid ideation, and racing thoughts. The initial screening evaluation, which was completed in a timely manner, was notable for symptoms of depression and paranoia.

The initial IDTT meeting occurred on March 15, 2008.  Problems noted included auditory and visual hallucinations and paranoid ideation, which were to be addressed by clinical case management contacts and group therapy as well as medication management.  "Sleep" was listed as problem, and "EOP" services were listed as an intervention.  A subsequent IDTT meeting occurred on April 2, 2008.  This plan noted the same basic interventions and goals, but it also indicated that the inmate had demonstrated improvement.  The appropriate disciplines were in attendance at the meeting, and the inmate's diagnoses were updated to include his drug use.

This inmate was placed in and apparently attended groups; however, the documentation did not identify which groups the inmate was involved in.

The medical record contained no documentation of pre-release planning at the time of the monitoring visit.  Although the inmate's release was not imminent, this inmate's circumstances indicated that re-entry planning was critical due to his history of mental illness.

<u>Findings</u>

This inmate was generally seen within Program Guide requirements, although his initial IDTT occurred one month, rather than 14 days, following admission.  The treatment plan was generic in content.

**Inmate C**

This reception center EOP inmate's medical record was reviewed specifically to evaluate the extent of the re-entry planning and to determine if inmates who were released on EOP status were re-enrolled on that status upon return to CSP/LAC.

This inmate was provided with a diagnosis of Schizophrenia paranoid type and Amnesic Disorder.  He was released from prison while on EOP status, and he was re-admitted on or about March 14, 2008.  An initial mental health evaluation occurred on the day of arrival.  Relevant mental health history included recent EOP treatment as well two psychiatric hospitalizations.  A progress note on March 20, 2008, documented that the inmate would parole on April 22, 2008.

A subsequent and timely IDTT meeting occurred on March 26, 2008.  Given the seriousness of the inmate's mental illness and possible cognitive impairment (history of head trauma), both of which would make re-entry particularly challenging, parole planning was listed as the primary problem, with successful transition as the accompanying goal.  Progress notes indicated that the inmate was concerned that he would not recall parole appointments; this was a concern that was consistent with the inmate's diagnosis, history, and presentation.

<u>Findings</u>

This inmate's mental health contacts and assessments generally occurred consistent with Program Guide requirements.  Although the mental health staff documented awareness regarding the challenge of re-entry planning, the medical record did not document a concomitant intensity of services in this regard.  The inmate was re-admitted to the EOP level of care upon his re-admission to the prison in accordance with the institution's practice.

**Inmate D**

This reception center EOP inmate was provided with a provisional diagnosis of Psychotic Disorder NOS and possible Schizoaffective Disorder.  He returned to CSP/LAC as a parole violator on January 3, 2008.  The mental health screening occurred on the day of arrival.  The screening indicated the need for a mental health evaluation, which also occurred on the same day.  The screening also noted the inmate's history of audiovisual hallucinations, as well as his EOP status at the time of parole.  The inmate's history was also remarkable for treatment with Zyprexa and Thorazine.

The initial IDTT occurred on January 28, 2008, 25 days following admission.

540

It appeared that the inmate was housed in the administrative segregation unit, although it was difficult to ascertain the precise dates. There was a lack of documentation of clinical contacts during that time.

A clinical case manager's progress note on March 3, 2008, documented the inmate's recent return from administrative segregation. At that time, the inmate was described as actively psychotic. An IDTT meeting with an accompanying treatment plan on the same date emphasized this regressed inmate's need for support in completing ADLs, as well as his need for parole planning and reality testing. The plan that was developed was consistent with the inmate's clinical need, but the plan did not contain clear or measurable goals.

Regarding pre-release planning, a progress note from the pre-release group leader on April 1, 2008, indicated that this inmate did not want substance abuse treatment upon release. Rather, he desired to go to a "board and care" facility upon release. The progress note documented that psychiatric treatment was a condition of parole, and indicated that the inmate did not seem to understand the correlation among chronic homelessness, increased recidivism, and drug use.

Findings

During the stay in the reception center EOP program, this inmate received care consistent with Program Guide requirements except that his initial IDTT was not completed within 14 days. The inmate's re-entry needs represented a significant challenge to staff that were knowledgeable regarding the inmate's needs and attempted to provide services within their staffing and programmatic limitations.

**Inmate E**

This 3CMS inmate was seen for his 90-day clinical contact during February 1, 2008. He reportedly attended 40 hours per week in vocational training for plumbing. He was not treated with psychotropic medications. His diagnosis was "possibly bipolar."

Review of previous contacts since an April 2007 IDTT meeting was consistent with the inmate's current presentation.

During the group meeting, the inmate did not report that he was working. He reported questions regarding his diagnosis.

Findings

This inmate's 3CMS level of care was appropriate for his clinical presentation.

**Inmate F**

This inmate reported that he had continuity of medication problems relevant to his Risperdal. The medical record of this inmate was reviewed. The most recent clinical case manager progress note was dated February 7, 2008. The inmate was evaluated by the psychiatrist on the following

week.  Both clinicians noted that this inmate was stable.  His last IDTT meeting occurred on January 7, 2008.

The most recent MAR present in the medical record was for February 2008.  From December 2007 to February 2008, there were a total of six days for which the MARs were blank.

Findings

This inmate's report relevant to medication continuity problems was confirmed by review of his medical record.

**Inmate G**

The medical record of this inmate was reviewed, as the inmate reported medication continuity problems.  The most recent psychiatrist's progress note was dated April 8, 2008.  The inmate was seen at cell-front due to an A yard lockdown.  He was described as stable and doing well with his prescribed medications.  The most recent clinical case manager progress note was written on March 25, 2008.  The inmate had previously been evaluated by another clinical case manager during December 27, 2007.

The three most-recent MARs present in the medical record were from December 2007 to March 2008.  There were five missed days of medications during that time period.

Findings

This inmate's level of care was appropriate.  His report regarding some continuity of medication problems was confirmed by review of his medical record.

**Inmate H**

This inmate was silent throughout the group interview process.  His medical record was reviewed.  He had been provided with a DD2 (developmental disability) classification.  The most recent psychiatry note was dated April 2, 2008.  The last two 3CMS clinical encounters occurred on November 15, 2007, and March 6, 2008.

The March 2008 MAR revealed five days when the inmate did not receive his medications.

Findings

This inmate was not being seen by his clinical case manager at the frequency consistent with Program Guide requirements.

**Inmate I**

This inmate reported that he was infrequently seen by his clinical case manager.  He also complained that inmates were treated as commodities by CDCR.

542

The medical record of this inmate was reviewed.  He was being seen by his clinical case manager at 90-day intervals.  The last appointment with the psychiatrist occurred on February 13, 2008.  The inmate's clinical presentation was consistent with diagnoses of Depressive Disorder NOS and PTSD.

The MARs did not demonstrate medication continuity disruptions.

<u>Findings</u>

This inmate's level of care was appropriate to his clinical presentation.

**Inmate J**

This EOP inmate was housed in the administrative segregation unit.  He arrived at CSP/LAC on March 27, 2008.  He was provided with a diagnosis of Depressive Disorder NOS.  A note in the classification file by a psychologist on March 14, 2008, indicated that the inmate appeared to meet the criteria for Sexual Sadism, but treatment was not recommended due to the presence of a thought disorder.  The most recent treatment plan on the same date described the inmate as having disorganized and delusional thinking.  The treatment plan was incomplete, but the following diagnoses were noted:  Psychotic Disorder NOS, possible Schizophrenia, and Sexual Sadism; he was provided with a GAF score of 45.  There was no treatment plan from CSP/LAC since the inmate's arrival.

The inmate was involved in depression groups according to the medical record, and he also self-reported participating in a four-hour group.  The inmate was seen weekly by his clinical case manager while housed at CSP/LAC.  It could not be confirmed by the medical record that he was seen daily by the psych techs.  The inmate was prescribed Zyprexa 10 mg/day and Vistaril 100 mg/day.  Informed consent for treatment with Zyprexa was present in the medical record.

<u>Findings</u>

It appeared that this inmate was seen in accordance with Program Guide requirements by his clinical case manager and the psychiatrist.  There was a lack of documentation regarding daily rounds by the psych techs in the administrative segregation unit.  The treatment plan required update.

EXHIBIT U
California Correctional Institution (CCI)
August 12, 2008 – August 14, 2008

**Inmate A**

This 3CMS inmate was housed in the SHU at CCI.  He had previously been prescribed Zoloft, which was discontinued on April 18, 2008, due to reported noncompliance.  This occurred prior to his arrival at CCI on June 17, 2008.  According to the medical record, this inmate had not been seen by a psychiatrist since his arrival at CCI.  He was seen by the psych tech during rounds on June 18, 2008, but there was no further documentation regarding psych tech rounds following that date.  The inmate was seen on June 20, 2008, by the clinical case manager, although the progress note did not indicate whether this contact occurred out of cell or at cell-front.  The inmate was evaluated again on July 24, 2008, by the clinical case manager at cell-front due to unavailable escort staff.  The inmate requested a private setting.  The clinical case manager agreed to return the following day to see the inmate privately, but there was no documentation that such contact occurred.

There was a current treatment plan in the medical record dated June 26, 2008. The interventions in the treatment plan were generic. The treatment plan form was incomplete, but did document that the necessary participants were in attendance at the IDTT.  There was no documentation that the inmate's medications were reviewed by the psychiatrist in light of the above-stated symptoms or documentation of a psychiatric referral.

Findings

There was a lack of documentation of consistent psych tech rounds for this inmate.  He was seen by the clinical case manager and by the IDTT at frequencies that were consistent with Program Guide requirements, although the treatment plan was inadequate and incomplete.  A psychiatric referral was indicated, but there was no documentation that this referral occurred.

**Inmate B**

This 3CMS inmate arrived at CCI on March 7, 2008.  He was serving a SHU/administrative segregation term.  The mental health staff had conducted a full evaluation for Exhibitionism for this inmate following a delayed referral from the custody staff.  This inmate had a lengthy sexual misconduct history.  An incident during December 2007 was apparently not reported.  When this was discovered in his central file, the custody staff made a referral to mental health staff.  His evaluation was conducted on March 28, 2008, and he was found to meet criteria for Exhibitionism and was referred for transfer to a treatment program.  He remained at CCI at the time of the monitoring visit pending that transfer.

The inmate was prescribed Remeron 30 mg/day and Risperdal 4 mg/day.  He was seen consistently by the psychiatrist, and there were no lapses in medication continuity according to the physician's orders.  The May 2008 MAR indicated that there was a period of almost two weeks when no medications were administered to the inmate.  The MAR stated on the front that the medication was discontinued on May 23, 2008, but there were no orders located in the medical record that supported the medication discontinuation.  There was no documentation on the MAR explaining the failure to administer medications as ordered during that two-week period.  A suicide risk assessment completed on June 30, 2008, indicated that the inmate had

decided not to take his medications anymore.  The suicide risk assessment indicated that no referral was needed; however, the inmate was seen on July 7, 2008, by a psychiatrist.  That psychiatric progress note contained little information and made no reference to medication noncompliance.  The note did document that the psychiatrist had ordered laboratory studies on May 21, 2008, which had not yet been drawn; laboratory studies were reordered at that time.

This inmate's medical record was in complete disarray.  There was a current treatment plan in the medical record, and the treatment plans were updated regularly in accordance with Program Guide requirements.  No treatment was provided for Exhibitionism pending the inmate's transfer.  There were no clinical case manager contacts documented in the medical record for the months of April and May 2008.  Psych tech rounds were only documented for the month of March 2008.  The documentation for the psych tech rounds was minimal in content, with no narrative provided; consequently, the documentation was of little clinical benefit for the psychiatrist and clinical case manager.

<u>Findings</u>

This inmate was not seen in accordance with Program Guide requirements by the clinical case manager or the psych techs.  He was seen by the psychiatrist and IDTT consistent with Program Guide requirements.  There appeared to be little communication between the various mental health disciplines providing care to this inmate, and this had a negative impact on the care that was provided, particularly regarding medication management.

**Inmate C**

This 3CMS inmate was housed in the SHU.  He arrived at CCI on June 25, 2008, and he was seen by the psychiatrist on June 27, 2008; there was no corresponding progress note documenting this contact.  The inmate was prescribed Effexor XR 225 mg/day.  Although there was a progress note dated July 7, 2008, documenting that the inmate was seen by the psychiatrist, much of the progress note was illegible.  The placement chronos from February 2008 indicated that the inmate was placed at the 3CMS level of care due to medical necessity.

The inmate was seen by a clinical case manager on July 1, 2008, and again on July 3, 2008; portions of the progress notes were illegible.  There was no acknowledgment that the inmate's status in the MHSDS was due to medical necessity that required reassessment.  The inmate was seen again by the clinical case manager on August 5, 2008.  Again, the progress note was mostly illegible.  There was a current treatment plan in the medical record (dated July 3, 2008) that was also illegible.  The legible portion of the progress note was generic in content, and the diagnoses (Amphetamine-Induced Psychotic Disorder and Alcohol-Induced Mood Disorder) listed were not supported by any of the documentation.  In addition, the treatment plan did not address the issue of the placement in the 3CMS for medical necessity.  It appeared that the medical record was never reviewed by the IDTT or the clinical case manager.  There was no documentation of psych tech rounds.

Findings

This inmate was seen in accordance with Program Guide requirements by the psychiatrist, but the documentation was problematic. He was not seen by the clinical case manager or psych tech consistent with Program Guide requirements. Although there was a current treatment plan, it was illegible, rendering it virtually useless. It also contained unsupported diagnoses. Informed consent for treatment with psychotropic medications was not located in the medical record.

**Inmate D**

This inmate was a recent arrival at CCI. He was housed in the administrative segregation unit. Although his exact arrival date at CCI could not be determined from the chart, it appeared that he arrived on or about August 7, 2008. He was last housed at CSP/Sac on August 6, 2008. There was no bus screen in the medical record. He was seen by a CCI clinician on August 7, 2008, when a suicide risk assessment was completed. On August 9, 2008, he was admitted to a 4B clinic holding cell on suicide watch pending OHU placement. At that time, the inmate was prescribed Prozac 20 mg/day, Lamictal 100 mg/day, Abilify 10 mg/day, Trileptal 1,200 mg/day, and Remeron 15 mg/day for ten days by DOT. It was unclear if the inmate was ever placed into an OHU bed.

The inmate was released back to the administrative segregation unit at the EOP level of care on August 12, 2008. The discharge order by a psychologist on that date indicated "contact physician on call to write discontinuation order—meds" and "psychiatry appointment within 7 days." The inmate had previously been prescribed Prozac on July 30, 2008. It was unclear from the discharge summary why these medications were all to be discontinued with a follow-up psychiatric appointment not recommended for seven days. The OHU IDTT did not include all of the required participants. The treatment plan that was developed was generic in content and was inadequate regarding the clinical issues presented.

This inmate had a prior admission during June 2008 to an OHU and had a history of self-injurious behavior. He had previously been housed at CSP/Sac at the EOP level of care. It was unclear why he was transferred; although it was possible that his level of care was decreased to the 3CMS level of care, the most recent chrono dated July 23, 2008, maintained him in the EOP.

Findings

This inmate did not receive a new-arrival screening (bus screen) as required by Program Guide requirements. He was seen soon after arrival as a result of suicidal ideation. The services provided regarding medication continuity were problematic based on the documentation available. His treatment plan was clinically inadequate.

**Inmate E**

This EOP inmate was housed in SHU. His case was reviewed at the request of the plaintiffs' attorneys for review of his mental health care. This inmate was prescribed Depakote ER 2,000 mg/day, Celexa 60 mg/day, and Trilafon 8 mg/day. This inmate was seen by at least six different

psychiatrists during this monitoring period.  Each time he was seen by a different psychiatrist, his medications were changed, as was the inmate's diagnosis.  For example, during a five-week period, this inmate was seen by one psychiatrist who changed his medications; within two weeks, he was seen by another psychiatrist who changed his medications; and then, within nine days, he was seen by the first psychiatrist, who changed all of the medications back to what had been originally prescribed.  The progress notes did not provide clear clinical rationale for these medication and diagnostic changes.

A current treatment plan in the medical record was developed by a treatment team that consisted of all of the required members.  The treatment plan outlined individualized treatment goals and interventions that specified the type of therapeutic action required.  According to the progress notes, the inmate was generally seen at least monthly by the clinical case manager, except for the month of March 2008, when it appeared that he was not seen at all.  This inmate was not seen weekly by the psych techs for most of this monitoring period.

<u>Findings</u>

This inmate's mental health care was negatively impacted by the frequent changes in psychiatrists assigned to him and consequent medication changes.  He was not seen in accordance with Program Guide requirements by his clinical case manager or psych techs.  He did have a current treatment plan that was adequate, and his level of care was appropriate.  The staff reported that the inmate had been endorsed and was awaiting an available bed at a PSU.

**Inmate F**

This EOP inmate was housed in the administrative segregation unit at CCI.  His case was reviewed at the request of the plaintiffs' attorneys to review the inmate's level of care.  He was received at CCI on February 14, 2008, following an admission to the KVSP MHCB due to an acute psychotic state.  He was treated with Risperdal 4 mg/day, Prozac 30 mg/day, Remeron 15 mg/day, and Cogentin 2 mg/day.  Lapses were noted regarding medication continuity; according to the MAR, the inmate did not receive medications for 11 days due to lapses in clinical contact.  There was a current treatment plan in the medical record, and the inmate was seen by the IDTT in accordance with Program Guide requirements.  The IDTT meeting lacked documentation of custody presence.  The treatment plans were rather generic in content.

On February 28, 2008, this inmate was referred to DMH APP and was placed on the waiting list.  According to the CCI DMH coordinator, this inmate remained on the waiting list for an extended period.  Eventually, DMH contacted the coordinator and asked that those cases on the DMH APP waiting list be reviewed to ensure that all referrals remained valid.  The DMH coordinator determined that this inmate no longer required the DMH level of care and removed him from the waiting list.  This inmate was interviewed by the monitor's expert, and he appeared to meet criteria for the DMH ICF level of care.  It was recommended to the DMH coordinator that he reevaluate this inmate's level of care.  Custody staff reported that this inmate was endorsed for transfer to a PSU (August 6, 2008, endorsement), but he was awaiting an open bed.

Findings

Based on the review of the medical record, it did appear that this inmate was seen by the clinical case manager and psych tech in accordance with Program Guide requirements. The referral to DMH should not have been rescinded, and the inmate should be re-referred for the ICF level of care. Also of concern was the medication discontinuity due to a lapse in psychiatric contact. This inmate had a long history of mental illness (including conservatorship), so the abrupt discontinuation of his medication regimen was problematic.

**Inmate G**

This inmate was housed in the administrative segregation unit. He arrived at CCI on March 25, 2008, from MCSP, where he had also been housed in the administrative segregation unit. The inmate reported that he had not been seen regularly by his clinical case manager. A review of the medical record revealed that the inmate did not have a current placement chrono. His last placement chrono (dated December 13, 2007) indicated the 3CMS level of care. A mental health evaluation (CDCR 7386) completed on June 3, 2008, indicated the 3CMS level of care. It did not appear that this inmate had ever received the EOP level of care during this monitoring round. There was a current treatment plan in the chart, although it was inadequate and incomplete. There was no documentation of clinical case manager contacts in the medical record for April 2008, part of May 2008, and since July 15, 2008. Documentation for psych tech rounds was also lacking. According to the medical record, no psych tech rounds were conducted from May 18, 2008, to June 20, 2008.

This inmate was prescribed Zyprexa 25 mg/day. He had been evaluated by five different psychiatrists since his arrival. Beginning in June 2008, this inmate was seen approximately every two weeks by different psychiatrists who made significant medication changes (i.e., discontinuing medications, beginning new medications) each time. The progress notes did not clearly delineate a clinical rationale for these frequent medication changes.

Findings

This inmate was not seen by his clinical case manager and psych techs in accordance with Program Guide requirements. His treatment plan, while current, was inadequate. He was seen consistently and frequently by psychiatry; however, continuity of care was negatively impacted by the large number of provider changes.

**Inmate H**

This 3CMS inmate was housed in the administrative segregation unit. He was provided with a diagnosis of Depressive Disorder NOS. He was prescribed Remeron 30 mg/day and Prozac 40 mg/day. Although this inmate was seen almost monthly since April 2008, his medications lapsed during one renewal period, and he did not receive his psychotropic medication for five days. This inmate was seen consistently by his IDTT; however, he was not seen weekly by his clinical case manager. In fact, there was a lapse of four weeks when the inmate was not seen by the clinical case manager.

549

Findings

This inmate was not seen by his clinical case manager in accordance with Program Guide requirements. While he was seen frequently by a psychiatrist, his medications were still allowed to expire. The inmate was seen consistently by the IDTT.

**Inmate I**

This 3CMS inmate was housed in the administrative segregation unit. He was provided with a diagnosis of Bipolar I Disorder, most recent episode mixed. He was treated with Lithium Carbonate 1,200 mg/day. He was seen by psychiatry as indicated for follow-up appointments, and medication renewals were timely. He was evaluated by five different clinical case managers during the five months that he was housed in the administrative segregation unit. Of the nine clinical contacts that occurred during that period, 30 percent occurred at the cell-front. The clinical case manager clinical contacts did not occur weekly as required, and there had not been an IDTT meeting held since December 2007.

Findings

This inmate was not seen by his clinical case manager or the IDTT in accordance with Program Guide requirements. He was seen by the psychiatrist at intervals that were consistent with Program Guide requirements.

**Inmate J**

This 3CMS inmate was housed in the administrative segregation unit. He was provided with a diagnosis of Mood Disorder NOS. He was prescribed Zyprexa 5 mg/day and Remeron 15 mg/day. The inmate was seen at varying intervals by psychiatry, with three different psychiatrists providing care. This inmate was seen by the IDTT on February 28, 2008, and June 5, 2008. Of 28 clinical case manager contacts, 19 (68 percent) were completed at the cell-front due to the inmate refusing to come out of his cell for private contacts. Weekly clinical case manager contacts were not documented consistently.

Findings

This inmate was not seen by his clinical case manager or the IDTT in accordance with Program Guide requirements. He was seen by the psychiatrist at intervals that were consistent with Program Guide requirements; however, he was rarely evaluated by the same provider.

EXHIBIT V
California Institution for Men (CIM)
May 14, 2008 – May 16, 2008

**Inmate A**

This inmate's case was reviewed due to his multiple (at least 13) MHCB admissions.  An intake assessment on September 22, 2006, noted that the inmate had a history of previous psychiatric hospitalization and prior involvement with the MHSDS.  At that time, he was provided with diagnoses of Cognitive Disorder NOS and Psychotic Disorder NOS, and he was included in the MHSDS at the 3CMS level of care.  An updated evaluation during November 2007 resulted in a diagnosis of Major Depressive Disorder with psychotic features.

On February 29, 2008, the inmate was admitted to the MHCB due to depressive symptoms with auditory hallucinations and suicidal ideation.  He was continued on his previously prescribed medication.  The medical record indicated that the inmate stabilized quickly, and he was discharged on March 4, 2008.  He was provided with a diagnosis of Schizoaffective Disorder at that time.

There was documentation that the inmate participated in group therapy during February 2008.  The weekly psychiatric technician summary from March 16, 2008, to March 22, 2008, indicated that the inmate reported "no symptoms," was compliant with medications, and was maintaining his self-care.  Progress notes from the psychologist assigned to the administrative segregation unit during March 2008 were sparse in content, but indicated that the inmate was seen at cell-front and was considered "stable" at that time.  The psychologist's progress note on April 1, 2008, indicated that the inmate was not in his cell; the inmate had reported suicidal ideation on that day, and he was transferred to the MHCB.  There was no documentation located in the medical record regarding this inpatient stay.  The inmate was seen for five-day follow-up following this discharge.

The inmate was again admitted to the MHCB from April 11, 2008, to April 21, 2008.  During this admission, the progress notes described the inmate as "vague and uncooperative."  The progress notes further indicated that the clinical case manager considered referral to DMH; however, there was no documentation that this option was considered by the IDTT.  Progress notes indicated that the inmate improved markedly by the time that he was discharged from the MHCB; however, two days later, the inmate was again described as guarded and responding to internal stimuli.  He was again admitted to the MHCB.  At the time of discharge, the inmate was described as "significantly more communicative."

<u>Findings</u>

This inmate exhibited a pattern of repeated MHCB hospitalizations that were preceded by decompensation.  Progress notes indicated that the inmate stabilized quickly during these hospitalizations; however, this stability was not sustained upon return to regular housing.  Some progress notes documented concerns regarding the inmate's medication compliance.  Although there was at least one occasion when the clinical case manager documented the possible need for transfer to a higher level of care, there was no indication that this option was formally considered by the IDTT, and no such referral had been initiated.

The medical record documented the occurrence of psych tech rounds. Clinical case manager progress notes were often sparse in content, and there was no documentation of IDTT consideration of this case. Progress notes did not indicate that the historical pattern of the inmate's multiple MHCB admissions had been tracked or evaluated. This inmate's medication compliance was also in question. This inmate should have been considered for referral to DMH for intermediate care.

**Inmate B**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. The MAR from April 2008 was present in the medical record. Medication informed consent forms were present relevant to the use of prescribed psychotropic medications. Progress notes were present from psychiatrists in the context of medication changes that occurred on April 2, 2008, April 15, 2008, and May 12, 2008.

Findings

Documentation relevant to medication management issues in this medical record was consistent with previously reported medication audits.

**Inmate C**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. The most recent MAR in the medical record was dated July 2007. The latest medication order was dated October 9, 2007. The most recent mental health progress note was dated April 7, 2008. This inmate was housed in the administrative segregation unit. Prior progress notes indicated a diagnosis of "bipolar depressive disorder." Seroquel had been prescribed as recently as October 2007.

Findings

This medical record appeared to be very problematic from the perspective of the lack of expected MARs and weekly clinical case manager progress notes.

**Inmate D**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. This inmate was listed on the mental health caseload although there were no mental health progress notes or indications in this medical record that he had any mental health issues.

Findings

It was unclear why this inmate was listed on the mental health caseload.

**Inmate E**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. The last physician's order was dated June 26, 2007. Chronos indicated that this inmate had a negative mental health screening. There were no mental health progress notes in this inmate's medical record.

Findings

It was unclear why this inmate was listed on the mental health caseload.

**Inmate F**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. There were no mental health progress notes in this medical record or indications that this inmate was a mental health caseload inmate.

Findings

It was unclear why this inmate was listed on the mental health caseload.

**Inmate G**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. Prescribed medications included Zyprexa and Risperdal. An urgent referral was initiated April 1, 2008, to the psychiatrist. A psychiatrist's progress note was dated April 6, 2008, in response to this consult. The assessment was Psychotic Disorder NOS (provisional). Another psychiatrist evaluated this inmate the following day. He was subsequently transferred to the MHCB and placed on suicide precautions. Five-day suicide discharge follow-up was initiated during April 12, 2008.

A May 7, 2008, psychologist's note indicated that this inmate wanted to stop his medications. The outlined plan was for weekly one-to-one sessions. The inmate was provided with a diagnosis of Schizophrenia. It appeared that he was also to be reviewed for medication management.

The most recent MAR in the chart was dated April 2008.

Findings

554

This inmate did not receive timely psychiatric consultations, and the subsequent psychiatric follow-up following his MHCB discharge did not appear to be timely. Medication management problems were present from the perspective of timely follow-up by the psychiatrist.

**Inmate H**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. Medications prescribed during the past several months included Zoloft, Depakote, Risperdal, and Seroquel. Appropriate laboratory studies were ordered during March 13, 2008; however, laboratory results were not present in the medical record. No reference to the lack of laboratory results in the chart or to the laboratory results was located after a review of progress notes.

Progress notes by the psychiatrist were not present relevant to significant changes made in medications.

The most recent MAR was dated April 2008.

Findings

Review of this medical record was not consistent with medication management audits previously reported due to lack of documentation relevant to psychiatrist's progress notes and laboratory results.

**Inmate I**

This inmate's medical record was specifically reviewed regarding issues relevant to medication management of mental health caseload inmates for the timeframe ranging from November 2007 to April 2008. The most recent MAR present in the chart was dated March 2008. Appropriate medication informed consent forms were documented. A progress note relevant to the April 22, 2008, psychiatrist's orders was not present in the medical record.

Findings

Review of this medical record was not consistent with medication management audits previously reported due to lack of documentation relevant to psychiatrist's progress notes and absence of the April MAR.

EXHIBIT W
California Rehabilitation Center (CRC)
November 5, 2008 – November 7, 2008

**Inmate A**

This 3CMS inmate, who had more than one stay in the OHU for mental health reasons, was diagnosed with Schizoaffective Disorder bipolar type. He also was diagnosed with Alcohol Dependence and hypothyroidism. He was treated alternately with Risperdal, Lexapro, Trazodone, Remeron, Haldol, and Zyprexa. His medical record was reviewed to evaluate the clinical response to his mental health-related OHU placement. This inmate's history was significant for a suicide attempt during 1996. During the course of this incarceration, he regularly reported psychotic symptoms and suicidal ideation. Some clinicians viewed these reported symptoms with concern, while others assessed these complaints as attempts at "manipulation." These differing assessments notwithstanding, the focus of treatment was the abatement of auditory hallucinations and labile mood.

He was placed in the OHU during September 2008. From there, he was transferred to CIM for a brief MHCB admission. On October 16, 2008, his clinical presentation again required placement in the OHU. According to the staff, his adherence to prescribed medications was erratic during the intervening time between OHU placements. While admitted to CIM's MHCB, mental health treatment was reported to focus on anxiety, possibly related to past alcohol abuse, rather than psychosis. Upon his return to CRC, the staff did not revise his treatment plan as a result of this possibility, although one case manager noted agreement with this assessment.

Findings

This inmate required a comprehensive assessment concerning his diagnosis and the development of an overall approach to his treatment planning. Some clinicians viewed him as psychotic, some as having anxiety secondary to substance abuse, while others saw primarily an exaggeration of symptoms for secondary gain. These disparate clinical views of the inmate should have been reconciled through the IDTT process. None of the mental health evaluations adequately assessed the possible effect of his hypothyroidism, which could have mental status implications. Treatment plans did not sufficiently consider approaches to improving adherence to prescribed medications.

**Inmate B**

This 3CMS inmate was diagnosed with Mood Disorder NOS and Alcohol Dependence. He was treated primarily with Geodon, Effexor, and Remeron. His mental health history was significant for two psychiatric hospitalizations in the community during 2007 and 2008 with follow-up outpatient care, suicidal ideation within the past year, multiple head injuries, and collecting social security disability for psychiatric reasons. A review of the community mental health records that were incorporated into the CDCR medical record indicated a diagnosis of Major Depressive Disorder with psychotic features and treatment with various antipsychotic, antianxiety, and mood-stabilizing medications. A suicidal "gesture" during 2006 was also noted. His medical record was reviewed primarily because of his OHU placement for mental health reasons, and to review the treatment planning that he received.

557

While housed at CRC, progress notes documented that the inmate experienced symptoms of depression, anxiety, and restlessness, although paranoid ideation was also noted. At times, he experienced uncontrollable crying, and periods of depression rendered the inmate unable to get out of bed.

On October 9, 2008, this inmate was moved to the OHU, where he was placed on one-to-one monitoring due to an "anxiety attack." He was discharged the following day after reporting that he was not feeling suicidal. At that time, he stated that he was willing to participate in the substance abuse program, but was too anxious to do so at that time. On October 10, 2008, he was evaluated by the senior psychologist and returned to his housing dormitory. He was also evaluated by the psychiatrist, whose plan was to reassess the inmate in one week. However, he was next seen by a different psychiatrist on October 31, 2008. Progress notes in the medical record did not make clear whether the inmate had recently attended the substance abuse program.

Findings

This inmate was placed in the OHU and was clinically assessed timely when this was indicated. His treatment plan called for substance abuse programming without addressing the inmate's stated concern regarding overwhelming anxiety associated with that programming. If in fact this inmate was attending the substance abuse program, there was no indication of coordination between the mental health and substance abuse staff. This would have been particularly warranted given his stated concern.

The treatment plans were generic. Although the plans contained problems and goals aimed at addressing appropriate concerns, the goals were not sufficiently measurable, and the progress notes were insufficiently connected to the stated goals. Although he was seen in accordance with the frequency of contact (every 90 days) designated in his treatment plan, he should have been assessed for increased intensity of monitoring by mental health staff if he was to be maintained at the 3CMS level of care and to attend the substance abuse program. He should have been seen within one week following his release from OHU placement by the psychiatrist.

**Inmate C**

This 3CMS inmate was transferred to CRC from NKSP on August 7, 2008. He was diagnosed with Psychotic Disorder NOS and Depressive Disorder NOS. He was treated with Risperidone and Zoloft. His mental health history was significant for a suicide attempt by overdose during 1985, and incidents of self-injurious behavior (cutting), as well as past diagnoses of Schizoaffective Disorder and Substance Abuse. Progress notes from a previous CDCR incarceration during August 2007 indicated that the inmate was applying for social security disability income and was paroling to Los Angeles County. On August 28, 2008, he was placed in the OHU. The move to substance abuse programming was significantly upsetting to this inmate. He reported suicidal ideation in connection with this. This appeared related to the need for the OHU placement. His medical record was reviewed primarily because of his placement in the OHU and to assess the treatment planning provided by the mental health staff.

Findings

The treatment plan was unclear in its goals and problems listed. Although the inmate was placed in a PTSD group, the medical record contained no indication why this was clinically indicated. The treatment plan was not sufficiently detailed or individualized. The inmate's substance abuse problem, as well as his emotional reaction to placement in the substance abuse program, appeared disconnected from the mental health treatment. There was no indication of coordination between mental health and substance abuse staff.

**Inmate D**

This 3CMS inmate was diagnosed with Psychotic Disorder NOS. He was prescribed Abilify, Remeron, and Effexor. The inmate's medical record was reviewed primarily because of his OHU placement and to review the treatment that he received. His mental health history was significant for his involvement in a car accident during 1991, which was described as a suicide attempt, as well as for substance dependence. He chronically reported depression with worsening over time, as well as anxiety and sleeping difficulties. His mental status was described as deteriorating during his last IDTT meeting during April 2008. On August 13, 2008, the inmate reported a plan to commit suicide by cutting his wrist because his wife was leaving him. At that point, he was transferred to the OHU while awaiting MHCB transfer. However, following a case conference on August 13, 2008, he was returned to his housing dormitory. The planned five-day follow-up did occur. He was seen twice since that time by a clinical case manager, but there was no reference documented in the progress note regarding this incident. He did discuss the divorce from his wife and feeling "strange."

Findings

This inmate was seen for his five-day follow-up after his release from the OHU. His treatment plan was not revised following this incident (suicidal ideation with OHU placement), which was clinically indicated. Subsequent treatment, although timely, did not document continued assessment of suicidal ideation or risk, although the concern about suicidality prompted his OHU placement. The medical records reviewed during November 2008 did not provide documentation of a formal IDTT meeting since April 3, 2008.

**Inmate E**

This 3CMS inmate was diagnosed with Depressive Disorder NOS and Psychotic Disorder NOS. He was treated with Zoloft. His recent mental health history within the CDCR was significant for having been on suicide watch and suicide precautions. He was placed in the OHU on July 23, 2008, and his medical record was reviewed for that reason.

Findings

This inmate received timely IDTT meetings as well as timely psychiatric and clinical case management contacts. His treatment plan should have been reviewed and possibly revised following his placement in the OHU due to concerns about suicidality.

**Inmate F**

This 3CMS inmate was diagnosed with Psychotic Disorder NOS as well as with severe asthma. He was treated with Remeron and Risperdal. His medical record was reviewed because of his MHCB transfer and subsequent return to CRC. On October 24, 2008, he was transferred to the MHCB at CIM due to command hallucinations telling him to commit suicide; he remained in the MHCB until October 27, 2008. A psychiatric progress note on November 6, 2008, indicated that the inmate reported severe depression, with feelings of hopelessness and despair; it also noted that he had a pending release in 12 days. At that time, the psychiatrist lowered the inmate's dosage of Geodon and started Effexor. This inmate was apparently discharged from the MHCB at CIM on October 28, 2008; however, according to the medical records, he did not arrive back at CIM until November 3, 2008. It was not clear where this inmate was located in the interim, although the mental health staff did inquire.

Findings

Five-day follow-up occurred after the discharge from the MHCB, but this follow-up was not completed as required. Although he was transferred to the MHCB with significant psychiatric symptoms, the overall approach to his treatment was not reassessed adequately following his return. An IDTT should determine the appropriate level of care and the adequacy of the treatment plan, including the possibility of increased frequency of mental health contacts to monitor his symptoms. Discharge planning was also indicated in light of his imminent release from prison.

**Inmate G**

This 3CMS inmate was diagnosed with Mood Disorder NOS and Polysubstance Dependence. He was treated with Effexor XR. His clinical presentation was significant for anxiety symptoms. His medications were discontinued on October 2, 2008, following his refusal. His medical record was reviewed primarily as a result of his medication refusal.

Findings

The medical records provided indicated that this inmate signed a refusal for Effexor on October 3, 2008. He was apparently not evaluated by the psych tech until November 7, 2008. The medical records provided no indication that he was evaluated by a psychiatrist during the interim.

**Inmate H**

This 3CMS inmate was last diagnosed with Major Depressive Disorder recurrent, severe with psychotic features. He was treated with Geodon and Cymbalta. These medications were discontinued on July 25, 2008, but they were subsequently restarted. He was seen by the psychiatrist for medication renewal on October 16, 2008. On October 22, 2008, he was reported to have refused his medications. The medical record indicated that the inmate signed a refusal

for Geodon on October 17, 2008, but he was not seen by the psych tech in this regard until October 29, 2008. The next psychiatric evaluation noted in the inmate history occurred on November 3, 2008. There was no documentation of any individual clinical case management contact following his refusal of medication or the subsequent medication discontinuation.

Findings

The treatment plan should be reviewed and amended to address the need for more timely and intensive response to the inmate's medication refusal.

**Inmate I**

This 3CMS inmate was diagnosed with Major Depressive Disorder, single episode, severe with psychotic features, and Polysubstance Dependence, as well as with Psychotic Disorder NOS and Mood Disorder. He was treated with Remeron and Abilify. His primary symptoms were auditory hallucinations and depression. His medical record was reviewed to determine the clinical response to the inmate's refusal of psychotropic medications.

According to medical record, this inmate signed a refusal for Abilify on October 17, 2008. It was logged as being received by the psych tech on October 28, 2008. He was seen by the psych tech the following day, 12 days following the initial refusal. There were notations indicating a prior refusal on October 10, 2008. Abilify was subsequently discontinued as this was the medication that was identified as the source of the inmate's concern.

The inmate history revealed no mental health contacts during the period of refusal except for a self-referral to the clinical case manager on November 3, 2008.

Findings

There was no documentation of treatment planning to address the need for more frequent clinical monitoring during this period of medication noncompliance with antipsychotic medications. Additionally, there was a need for diagnostic clarification regarding the numerous and somewhat conflicting diagnoses provided.

**Inmate J**

This 3CMS inmate was housed in the SNY. The medical record was reviewed to evaluate the response to the inmate's refusal of psychiatric medications and his treatment planning. He was provided with diagnoses of Mood Disorder NOS, Amphetamine Abuse, and Psychotic Disorder NOS. His predominant symptoms were anxiety with sleep disturbance, auditory and visual hallucinations, and labile mood. He was treated with Zoloft and Geodon. His mental health history was significant for MHCB admissions, suicidal gestures, a suicide attempt as a child, and two psychiatric hospitalizations, as well head injuries.

Other diagnoses present in the medical record included Adjustment Disorder with depressed mood and possible diagnoses of Major Depressive Disorder, Depressive Disorder NOS, and depression secondary to head injuries.

On October 21, 2008, the inmate signed a refusal of Zoloft. At the time of review (November 6, 2008), he had not been reevaluated by the psychiatrist concerning his medication, although it was reported that he had been referred. A clinical case manager's progress note on October 27, 2008, noted depression, irritability, isolation, and other depressive symptoms without addressing the medication refusal or pending psychiatric evaluation.

<u>Findings</u>

This inmate required a comprehensive reassessment of his treatment planning and clarification of his diagnosis. This should have occurred during the IDTT meeting. His poor compliance with medications should have been addressed in a more timely and comprehensive manner. Although he had been referred, he was not evaluated by the psychiatrist.

EXHIBIT X
Richard J. Donovan Correctional Facility (RJD)
August 11, 2008 – August 14, 2008

**Inmate A**

This EOP inmate was housed in the administrative segregation unit.  He was diagnosed with Mood Disorder NOS.  He was treated with Celexa 60 mg/day.

Findings

There was documentation of weekly clinical case manager contacts in the administrative segregation unit; however, it was unclear what proportion of these contacts occurred out of cell. It appeared that a significant percentage of the contacts may have occurred at cell-front.  There was also documentation of involvement in group therapy, with documentation of a number of refusals.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit.  He was diagnosed with Schizoaffective Disorder.  He was treated with Zydis 20 mg/day and Depakote 1,200 mg/day.

Findings:

There was documentation of weekly clinical case manager contacts in the administrative segregation unit; however, it appeared that a significant percentage of the contacts may have occurred at cell-front.  There was also documentation of involvement in group therapy.

**Inmate C**

This 3CMS inmate was housed in the administrative segregation unit.  He was diagnosed with Adjustment Disorder with anxiety.  He was not treated with psychotropic medications at the time of the monitoring visit.  His medical record was reviewed in response to a request by the plaintiffs' attorneys regarding his treatment plan and medication regimen.

This inmate was transferred from KVSP to RJD on November 1, 2007.  Progress notes indicated a history of treatment with and abuse of Wellbutrin.  He was most recently treated with Effexor; however, progress notes indicated that he was hoarding this medication.  Effexor was discontinued; however, the medical record was unclear regarding the specific date of this discontinuation.

Findings

There was documentation of weekly clinical case manager contacts in the administrative segregation unit.  This 3CMS inmate was involved in group therapy on that unit.  The treatment plan was not individualized to address the issues regarding medication compliance and specific goals for treatment.  The question of the need for medication treatment was not resolved by the medical record review, and continued monitoring and evaluation by the treatment team were necessary.

**Inmate D**

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Schizoaffective Disorder. He was treated with Trazodone 500 mg/day, Risperdal 3 mg/day, Duloxetine 20 mg/day, and Lithium 600 mg/day.

Findings

There was documentation of weekly clinical case manager contacts in the administrative segregation unit. There was also documentation of involvement in group therapy.

**Inmate E**

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Mood Disorder NOS. He was treated with Effexor XR 150 mg/day and Vistaril 300 mg/day. His medical record was reviewed in response to a request by the plaintiffs' attorneys regarding his treatment plan and medication regimen.

This inmate had been housed at RJD since November 30, 2006. The inmate had been treated for depressive symptoms. He was admitted to the MHCB after reporting suicidal ideation. He was hospitalized for one day, from June 17, 2008, to June 18, 2008. After his discharge, he was returned to the administrative segregation unit where he continued to exhibit some mild depressive symptoms; he was described as "doing well."

Findings

There was documentation of weekly clinical case manager contacts in the administrative segregation unit, although the majority of the contacts occurred at cell-front. This 3CMS inmate was involved in group therapy on that unit. The medication regimen appeared to be appropriate for the inmate's symptoms. The treatment plan was not individualized to address the issues regarding medication compliance and specific goals for treatment.

**Inmate F**

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Adjustment Disorder with mixed anxiety and depressed mood. He was treated with Effexor XR 75 mg/day.

Findings

There was documentation of weekly clinical case manager contacts in the administrative segregation unit. There was also documentation of involvement in group therapy.

**Inmate G**

This reception center SNY EOP inmate was housed in Facility 2; he was not housed in the mainline EOP housing unit. He was treated with Vistaril 100 mg/day and Lithium 1,200 mg/day. He was diagnosed with Depressive Disorder NOS.

The inmate was hospitalized for suicidal ideation in the MHCB at RJD during May 2008; the information regarding this admission was not located in the medical record. Subsequent progress notes indicated that the inmate presented with labile mood, but was reportedly stable on medications.

<u>Findings</u>

There was documentation that the appropriate laboratory testing for treatment with Lithium occurred. The inmate was generally seen by the clinical case manager; however, there were some lapses in weekly contacts. There was documentation of involvement in group therapy.

**Inmate H**

This Level IV SNY EOP inmate was housed in Facility 3. He was diagnosed with Schizophrenia, paranoid type. He was treated with Remeron 15 mg/day, Benadryl 25 mg/day, Haldol 10 mg/day, and Cogentin 2 mg/day.

This inmate had been housed at RJD since December 2006. The medical record was unclear regarding specific dates; however, it appeared that he had been in the EOP, was changed to 3CMS during 2007 and then was returned to the EOP level of care. Progress notes indicated that the inmate presented with withdrawn behavior, refusing to attend group therapy sessions. He also presented with auditory hallucinations and delusional thinking.

<u>Findings</u>

There was documentation of monthly psychiatric contacts as well as weekly clinical case manager contact, but with some missed sessions. The inmate refused to attend group therapy. As there had been significant delays in transfer to a Level IV SNY EOP, a higher level of care should have been considered.

EXHIBIT Y
California Institution for Women (CIW)
July 22, 2008 – July 24, 2008

**Inmate A**

This EOP inmate was housed in the EOP housing unit, Support Care Unit (SCU).  She was diagnosed with Schizoaffective Disorder bipolar type.  She was treated with Prolixin 5 mg/day, Effexor XR 37.5 mg/day, Buspar 20 mg/day, and Benadryl 75 mg/day.

This inmate arrived at CIW on April 29, 2008.  Her bus screen indicated a history of treatment for depression as well as a history of suicide attempts.  She was referred to mental health at the time of screening; the referral form indicated a history of treatment in the EOP.  The mental health evaluation was completed on the day after arrival, and the inmate was placed into the EOP; she had paroled one month prior from the EOP.  She was seen by the psychiatrist on June 6, 2008, when she was treated with Geodon and Benadryl.

Progress notes indicated that the inmate was admitted to the MHCB on one and possibly two occasions.  A progress note dated May 29, 2008, indicated that she was discharged from the MHCB on May 19, 2008, where she was hospitalized for suicidal ideation.  Subsequent progress notes indicated that the inmate reported chronic auditory hallucinations and suicidal ideation.  The second MHCB admission occurred from June 20, 2008, to June 23, 2008.  She was discharged with five-day follow-up.

<u>Findings</u>

This inmate was appropriately placed into the EOP upon return to CIW.  A suicide risk assessment was completed appropriately when the inmate presented with suicidal ideation. She had reportedly been treated with psychotropic medications during her past incarceration, but the medical record was unclear regarding when she had been treated, making it difficult to assess whether the delay of approximately one week in ordering medications was clinically appropriate.

There was documentation that the inmate was involved in group therapy, and there was adequate documentation of group therapy involvement; however, it was difficult to quantify the amount of groups offered or received.  Informed consent for treatment with Prolixin was not located in the medical record.

Information regarding the MHCB admission during May 2008 was not present in the medical record.  There was also a lack of documentation of the completion of suicide risk assessments when clinically appropriate.  Five-day follow-up was documented after the June 2008 MHCB admission.

**Inmate B**

This EOP inmate was housed in the SCU.  She was diagnosed with Schizoaffective Disorder bipolar type.  She was treated with Zydis 30 mg/day and Benadryl 50 mg/day.

This inmate arrived at CIW on June 3, 2008.  The bus screen indicated that she had been previously treated with psychotropic medications.  Seroquel was prescribed on the day of arrival.

The mental health evaluation was completed on the day after admission, indicating that the inmate paroled two months prior.

Findings

Informed consent for treatment with Zyprexa was not located in the medical record. Several progress notes indicated that the group therapy was cancelled due to the pill line; most of the June 2008 progress notes indicated either that the inmate refused group therapy or that group was cancelled. There was documentation of weekly EOP clinical case manager contacts.

**Inmate C**

This EOP reception center inmate was housed in the SCU. She was diagnosed with Bipolar Disorder NOS. She was treated with Zydis 25mg/day, Cogentin 2 mg/day, and Prozac 10 mg/day. This inmate arrived at CIW from the county jail on June 10, 2008. The provided information from the county jail indicated treatment with Seroquel. A mental health evaluation was completed on June 12, 2008, and she was placed into the EOP. The medication profile and psychiatric progress note indicated that the inmate was treated with Zyprexa and Prozac on June 13, 2008.

Findings

Only a temporary medical record was available for review, and it was possible that some materials were not included in this file. There was documentation that the inmate was seen weekly by the clinical case manager. Although the inmate had been treated with antipsychotic medications prior to transfer to CIW, she was not seen by the psychiatrist and treated with medications until three days after arrival at CIW.

**Inmate D**

This 3CMS inmate was housed in general population. She was diagnosed with Bipolar Disorder NOS. She was treated with Abilify 15 mg/day and Cogentin 2 mg/day.

This inmate transferred from CCWF to CIW on January 22, 2008. Trilafon, Celexa, and Trazodone were ordered on the day of arrival. The mental health evaluation was completed on February 5, 2008, and the inmate was placed in the 3CMS program. The inmate's medications were adjusted due to reports of medication side effects and lack of effectiveness. The most recent progress notes indicated that the inmate was stable.

Findings

There was documentation of medication continuity upon arrival at the facility. There was also documentation of involvement in group therapy and quarterly clinical case manager contacts.

**Inmate E**

This 3CMS inmate was housed in general population.  She was diagnosed with Bipolar Disorder mixed, and PTSD.  She was treated with Abilify 15 mg/day, Cogentin 3 mg/day, and Trazodone 25 mg/day.

The inmate arrived at CIW on May 23, 2008.  Seroquel, Zoloft, and Topamax were ordered upon arrival at the facility.  She was placed into the 3CMS program after the completion of the mental health evaluation.  Progress notes indicated that the inmate had persistent mood instability; her medications were adjusted accordingly.

Findings

There was documentation of informed consent for prescribed psychotropic medications.  There was documentation of quarterly clinical case manager contacts.  The IDTT meeting that occurred on July 17, 2008, did not document the presence of custody staff.

**Inmate F**

This EOP inmate's medical record was reviewed at the request of the plaintiffs' attorneys regarding reported increasing levels of anxiety and problems receiving her medications as well as the need for a higher level of care.  She was diagnosed with Schizoaffective Disorder bipolar type.

The inmate was housed in the SCU.  She was treated with Geodon 160 mg/day, Celexa 40 mg/day and Cogentin 1 mg/day.  Progress notes indicated that the inmate had a history of hospitalizations at Patton State Hospital.  She was transferred to CIW on August 30, 2007.  Recent progress notes indicated that the inmate had frequent complaints regarding auditory hallucinations, and the inmate received Geodon as needed.  Clinicians included a possible diagnosis of Malingering due to some of the inmate's reports of auditory hallucinations.

She was seen frequently by the psychiatrist and clinical case manager.  Although she was enrolled in groups, she reportedly frequently did not attend.

Findings

The treatment plan for this inmate was somewhat generic in content.  Group therapy notes indicated that groups were frequently cancelled due to the pill line and other reasons.  She was seen weekly by her clinical case manager and frequently by the psychiatrist.

It appeared that medication management was clinically appropriate, despite the inmate's requests for Lamictal and benzodiazepines.  A review of the medical record did not suggest the need for a higher level of care at the time of the review.

**Inmate G**

This inmate's medical record was reviewed due to multiple MHCB admissions. She was admitted to the MHCB at CIW on eight occasions from January 6, 2008, to May 31, 2008. Previous medical records indicated that this inmate had a long history of mental health services including multiple psychiatric hospitalizations and suicide attempts. Her history included sexual assault as a child, a head injury attributable to jumping from a moving car, and extensive abuse of alcohol and drugs, including inhalants. An evaluation that occurred on January 2, 2008, included a primary diagnosis of Borderline Personality Disorder.

The medical record indicated that this inmate frequently engaged in self-injurious behavior and reported depressed mood and auditory hallucination. The staff indicated that the threats of self-harm were directed at gaining admission to the MHCB. Her presentation was described as inconsistent and varied based upon the observers present. For example, a progress note on May 29, 2008, indicated that the inmate was talking to herself during a conversation with custody, but later presented in a more coherent manner when she believed that she was not observed.

The inmate generally did not attend groups, but was compliant with individual therapy sessions. Psych tech progress notes indicated that she was seen routinely for rounds and that she was under a Keyhea order and was generally compliant with medications.

Progress notes indicated that the inmate was seen on a weekly basis by the clinical case manager from late April 2008 to May 2008.

A treatment plan on June 5, 2008, listed problems including "parasuicidal behavior" and "social withdrawal." There were goals listed for each problem, but these goals were not necessarily addressed in later progress notes. The inmate remained at Level 1 of the behavioral incentive program for an extended period.

<u>Findings</u>

This inmate appeared to be appropriately diagnosed with severe Borderline Personality Disorder. The multiple MHCB admissions should have prompted the staff to initiate a formal IDTT consideration of the inmate's possible need for transfer to a higher level of care. Notes within a binder in the MHCB offered the possibility that this consideration may have occurred. These notes did not provide specific details regarding this consideration or the rationale supporting the decision not to refer to a higher level of care. The absence of progress notes in the medical record made it difficult to follow the course of treatment.

EXHIBIT Z
California Correctional Women's Facility (CCWF)
September 9, 2008 – September 11, 2008

**Inmate A**

This EOP inmate was housed in the EOP housing unit.  She was diagnosed with Psychotic Disorder NOS.  She was treated with Risperdal 6 mg/day.  She was also classified as DD2 (developmental disability category).

This inmate transferred from a county jail to CCWF on February 26, 2008.  Her bus screen was negative for mental health concerns.  Although her initial mental health screening recommended further evaluation, the evaluation indicated that she did not meet the criteria for inclusion in the MHSDS.  The inmate was referred to mental health, and she was seen on March 20, 2008, after she reportedly exhibited bizarre behavior; this mental health evaluation recommended placement in the 3CMS program due to delusional thinking.  She was seen by the psychiatrist on that date and was treated with Risperdal.  The inmate remained on reception center status and was referred to the psychiatrist.  She was evaluated by the psychiatrist on May l2, 2008, when she presented with continued evidence of psychosis, and Risperdal was increased.

The inmate was placed into administrative segregation on May 7, 2008, due to allegations of sexual assault perpetrated by another inmate.  A psychiatric assessment on the following day indicated concern regarding the validity of the inmate's report of assault.  It appeared that she remained only briefly in administrative segregation, and was discharged to general population.  Subsequent progress notes indicated that the inmate reported recurrent sexual assault and presented to the TTA on other occasions with this complaint.  Concern was noted regarding delusional thinking and questionable medication compliance.  She was placed in the EOP on June 25, 2008.

Findings

The inmate's Risperdal was appropriately changed to Risperdal M-tabs to address her questionable medication compliance.  She was also appropriately placed into the EOP after presenting with psychosis and inability to function in general population.  Although there was nearly weekly documentation of psychiatric contacts, there were lapses in the documentation of weekly EOP clinical case manager contacts.  There was also documentation of involvement in group therapy in the EOP.  There was documentation of pre-release planning for this inmate, with an upcoming prison release date.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit.  She was diagnosed with Bipolar Disorder NOS; alternative diagnoses of Schizoaffective Disorder and Major Depressive Disorder with psychosis were also present in the medical record.  She was treated with the following medications: Risperdal 6 mg/day, Cogentin 4 mg/day, Effexor XR 150 mg/day, Depakote ER 1,000 mg/day, and Benadryl 100 mg/day.  The inmate was on a Keyhea order that will expire on June 19, 2009.

This inmate was transferred from the county jail to CCWF on February 7, 2008; her bus screen was remarkable for a history of treatment for mental illness.  It appeared that she was initially

placed into the administrative segregation unit, where she repeatedly refused out-of-cell interviews with the clinical case manager. There was a lapse in documentation for several months, and it appeared that the inmate left the institution. She returned to the administrative segregation unit on June 18, 2008. She was hospitalized in the MHCB from August 20, 2008, to August 25, 2008, due to suicidal ideation with plan. After discharge, progress notes indicated that the inmate was stable on medications.

<u>Findings</u>

There was generally documentation of weekly clinical case manager contacts for this inmate in administrative segregation. It appeared that there may have been information missing from the medical record. There was documentation of five-day follow-up dated June 24, 2008, through June 28, 2008; however, there was no documentation of the preceding MHCB admission.

The appropriate laboratory testing for treatment with Depakote was conducted. A current treatment plan was not located in the inmate's medical record.

**Inmate C**

This EOP inmate was housed in the EOP housing unit. She was diagnosed with Psychotic Disorder NOS. She was treated with Haldol 30 mg/day, Lamotrigine 200 mg/day, and Cogentin 4 mg/day.

It appeared that this inmate arrived at CCWF on March 21, 2008. She was seen in the reception and receiving area on that date after transfer to CCWF from the county jail, where she reported the need for continuation of psychotropic medications. She was treated with Zyprexa, Paxil, Ativan, and Thorazine; Ativan was eventually tapered and discontinued. She received a mental health screen and evaluation that led to placement into the EOP one week later. The inmate programmed in the EOP with involvement in group and individual therapy.

<u>Findings</u>

There were lapses in the documentation of weekly clinical case manager contacts in the EOP. There was documentation of participation in group therapy. The appropriate laboratory testing for treatment with Depakote was conducted when the inmate was briefly treated with this medication. The most recent treatment plan was incomplete and generic in content, without individualized goals and interventions for treatment.

**Inmate D**

This 3CMS inmate was housed in the administrative segregation unit. She was diagnosed with Bipolar I Disorder. She was prescribed Effexor XR 75 mg/day and Abilify 15 mg/day. Her inmate history was reviewed to evaluate the frequency of clinical case manager contacts in the administrative segregation unit.

574

Findings

There was documentation of weekly clinical case manager contacts as well as timely psychiatric evaluation and follow-up.

**Inmate E**

This 3CMS inmate was housed in the administrative segregation unit. She was diagnosed with Bipolar I Disorder. She was prescribed Abilify 15 mg/day and Zoloft 50 mg/day. Her inmate history was reviewed to evaluate the frequency of clinical case manager contacts in the administrative segregation unit.

Findings

There was documentation of weekly case manager contacts as well as timely psychiatric evaluation and follow-up.

**Inmate F**

This 3CMS inmate was housed in the administrative segregation unit. She was diagnosed with Depressive Disorder. She was prescribed Prozac 10 mg/day and Trileptal 900 mg/day. Her inmate history was reviewed to evaluate the frequency of clinical case manager contacts in the administrative segregation unit.

Findings

There was generally documentation of weekly clinical case manager contacts as well as timely psychiatric evaluation and follow-up.

**Inmate G**

This 3CMS inmate was housed in the administrative segregation unit. She was diagnosed with Bipolar I Disorder. She was prescribed Risperdal 2 mg/day and Benadryl 150 mg/day. Her inmate history was reviewed to evaluate the frequency of clinical case manager contacts in the administrative segregation unit.

Findings

There was generally documentation of weekly clinical case manager contacts as well as timely psychiatric evaluation and follow-up.

**Inmate H**

This EOP inmate was housed in the EOP housing unit. She was diagnosed with Psychotic Disorder NOS. She was treated with Depakote ER 750 mg/day and Zyprexa 15 mg/day.