This inmate transferred from a county jail to CCWF on June 3, 2008. She had been prescribed Zyprexa according to her bus screen; a one-week supply of Depakote and Zyprexa was ordered at the time of arrival. The inmate received a mental health screen and evaluation and was placed into the EOP at the time of arrival due to her history of EOP treatment. The initial psychiatric progress note indicated a history of treatment at Patton State Hospital during early 2008 after which she was transferred to the county jail and subsequently to CCWF. The inmate was involved in individual and group therapy in the EOP. On July 7, 2008, the inmate was screened for placement in the administrative segregation unit as she had reportedly assaulted another inmate. After a brief stay on that unit, she was returned to the EOP, where she had repeat assaultive behaviors; she was treated with Lithium to address her mood instability.

Findings

There was documentation of weekly clinical case manager contacts and monthly psychiatric contacts. The appropriate laboratory testing for treatment with Depakote was conducted, and there was appropriate clinical intervention after the inmate had an elevated valproic acid level. A treatment plan dated July 7, 2008, was incomplete. There was documentation of administrative pre-placement screening for an admission during September 2008, but not for a transfer to that unit during July 2008. There was evidence of mental health screening prior to administrative segregation placement.

**Inmate I**

This 3CMS inmate was admitted to MHCB for her second admission on September 7, 2008, with multiple self-inflicted lacerations on the face. She had a history of an MHCB admission approximately one year prior. The admitting diagnosis for this hospitalization was Psychotic Disorder NOS. Informed consent for prescribed psychotropic medications was obtained on September 8, 2008. The SRAC was completed on the same date; this checklist indicated that the inmate was at moderate risk of self-harm. A nutritional assessment was also completed. Daily clinician contacts were documented in the medical record.

Findings

A medical records review was performed to assess the adequacy of mental health services provided in the MHCB program. The history and physical performed by the attending psychiatrist were thorough. Medication consent was obtained in a timely manner. The nutritional assessment was appropriately ordered and completed in a timely manner. The quality of mental health assessment and treatment provided in the MHCB was adequate, with good documentation.

**Inmate J**

This EOP inmate was admitted to MHCB on August 20, 2008; this was the second MHCB admission. The inmate was admitted to the MHCB due to refusal to eat or drink and to take medications while housed in EOP program for a few weeks. The admitting diagnosis was Depressive Disorder NOS.

576

The inmate was first admitted to MHCB after transfer from VSPW; she was subsequently discharged to the EOP at CCWF. Keyhea was initiated on August 21, 2008. She was referred to Patton State Hospital for intermediate care on September 4, 2008. This inmate was accepted for admission to Patton State Hospital, but the transfer was delayed pending the completion of the Keyhea hearing scheduled for September 30, 2008. Interdisciplinary progress notes indicated improvement on medications. The notes also indicated a plan to discharge the inmate to EOP while awaiting transfer to Patton State Hospital.

Findings

This inmate was appropriately placed on Keyhea and referred to DMH for intermediate care. She had a history of decompensation prior to EOP placement, which provided a structured therapeutic milieu. In view of the past history of medication noncompliance and recurrent depression while housed in EOP, discharge of the inmate back to EOP was not recommended while awaiting transfer to Patton State Hospital. The monitor's concerns with regard to this interim discharge planning were discussed with the appropriate clinical staff.

**Inmate K**

This 33-year-old 3CMS inmate was scheduled for parole on October 6, 2008. She had several previous CDCR incarcerations, and she most recently returned to CCWF due to a parole violation on March 20, 2008. A review of the medical record indicated a mental health treatment history during incarceration that included prior EOP treatment and one MHCB admission for psychotic and assaultive behavior while at CIW during May 2007. Since that time, she had been transferred in and out of EOP, most recently from June 19, 2008, to August 6, 2008, at CCWF.

On August 6, 2008, this inmate was discharged from the EOP to the 3CMS program. At that time, she was reportedly stable and was recommended for group therapy to address depression and anxiety, regular case manager contact, medication management group, and referral to the substance abuse program. She was diagnosed with Schizoaffective Disorder and Polysubstance Dependence. There was a chrono documenting the review of C-file by the TCMP social worker on August 18, 2008. There was no documentation of follow-up contacts by TCMP located in the medical record.

Findings

This inmate, who had a history of poor adjustment to the community, was scheduled for parole within one month of the site visit. There was no documented discharge planning located in the medical record, nor was there documentation of follow-up contacts by TCMP. Documentation regarding involvement in recommended group therapies was not located in the medical record.

**Inmate L**

This inmate arrived at CCWF on March 18, 2008. She was initially placed into the EOP, but she was discharged to 3CMS on March 26, 2008, after determination that she did not meet the

577

criteria for EOP placement. Discharge progress notes indicated improvement on prescribed medications and her interest in school and work.

This inmate had a previous mental health treatment that included placement in the EOP at CIW for eight months with a diagnosis of Bipolar Disorder in 2007 and at VSPW during February 2008. She also had a history of an MHCB admission during 2007. The most recent diagnoses included Depressive Disorder NOS, Polysubstance Dependence, PTSD, and a history of having had a stroke.

The inmate was evaluated by a psychiatrist on July 11, 2008, for medication evaluation following a suicide risk assessment that determined that she was at moderate risk of self-harm. A psychiatric progress note six days later indicated that the inmate reported depressed mood without suicidal ideation. She was prescribed Celexa, Zyprexa, Geodon, and Cogentin at that time. Informed consent was obtained, and an AIMS test was performed with negative findings. During July 2008, she stopped taking Geodon and also reportedly lost consciousness while attending the substance abuse program. She denied having suicidal ideation at that time. There was no documentation of recent mental health or medical follow-up located in the medical record. The progress notes were not filed in chronological order.

Findings

This inmate's medical record was reviewed after she was interviewed in a group interview session. During the group, she reported that she was not receiving Seroquel and was experiencing suicidal thoughts on a daily basis. She reported that she wanted to be placed into the EOP. She presented with irritability and angry, depressed mood. In light of the inmate's presentation, the monitor referred the case to the clinical supervisor for consideration of the need for a higher level of care and closer monitoring of medication compliance.

**Inmate M**

This 66-year-old non-English-speaking Asian inmate was serving 15 years to life for second-degree murder. She had been in the 3CMS program since her arrival at CCWF during 2005. She was provided with a diagnosis of Major Depressive Disorder with psychotic features. A psychiatrist progress note dated August 28, 2008, documented the inmate's report of hearing voices, feeling dizzy, and having an inability to sleep. The treatment plan was last completed on October 31, 2007; however, there was no documentation of problem identification, treatment goals, and intervention found in the treatment plan. The inmate was seen regularly by the clinical case manager and psychiatrist using the telephone language line for interpreter service. Progress notes consistently indicated that the inmate was stable on medications including Zoloft 50 mg/day and Risperdal 0.5 mg/day. The medication side effects and benefits of taking medications were discussed with the inmate by psychiatrist.

578

Findings

Interpreter service was appropriately provided for this non-English-speaking inmate. Medication concerns were appropriately addressed. The treatment plan, however, lacked identified problems, treatment goals, and interventions.

**Inmate N**

This 3CMS inmate was housed in general population. On May 20, 2008, the clinical case manager consulted with the EOP supervisor for consideration of EOP placement. The inmate was not accepted to EOP, because the EOP supervisor determined that the inmate's level of functioning was lower than the average EOP inmate and, therefore, the placement would be inappropriate. The supervisor recommended that the inmate be taken out of the school program and placed into a meaningful work program. On June 25, 2008, the clinical case manager progress note documented continuing behavioral problems posing security concerns as well as medication noncompliance with delusional and disorganized thinking. The clinical case manager documented the plan to consult with the psychiatrist for initiation of Keyhea proceedings and with the EOP supervisor for EOP placement.

This inmate exhibited disruptive behavior in the housing unit and school with poor judgment and insight into her behavior as documented in a clinical case manager progress note on September 3, 2008. She had been noncompliant with prescribed Haldol and Cogentin, and she signed a refusal on June 11, 2008. The medications were subsequently discontinued.

The updated treatment plan dated July 9, 2008, noted that the treatment goals were to maintain education and support to take psychotropic medications. The stated discharge plan was to maintain the inmate in general population until she paroled. Her diagnosis was Psychotic Disorder NOS, Hepatitis B, Hepatitis C, history of head injury, and diabetes. The updated treatment plan by the clinical case manager clearly documented the inmate's difficulty functioning in a general population setting with severe behavioral and psychological problems. Despite this, the IDTT attended by the clinical case manager, one psychologist, a correctional counselor II, and the patient did not document consideration of transfer to a higher level of care. No psychiatrist was present at the meeting.

Findings

The medical record was reviewed after the inmate was interviewed in a group interview. This inmate was disruptive during the interview, exhibiting flight of ideas, disorganized thinking, and overly productive speech during the group interview. Due to concerns for this inmate with a history of MHCB and DMH hospitalizations, the 3CMS supervisor was consulted for consideration of a higher level of care and improved monitoring of medication noncompliance.

579

EXHIBIT AA
Valley State Prison for Women (VSPW)
April 21, 2008 – April 23, 2008

**Inmate A**

This inmate's case was reviewed due to concerns regarding the use of antipsychotic medications at VSPW.  She was diagnosed with Bipolar Disorder NOS and Antisocial Personality Disorder.  She was treated with Risperdal 2 mg/day.

The inmate was housed in the OHU on January 29, 2008.  While housed there, on the following day, an order was written by a psychiatrist for Haldol 10 mg every two hours as needed for agitation; if refused oral Haldol, then Haldol 10 mg intramuscular for 72 hours.  An order dated January 31, 2008, written by the psychiatrist was for the following: "Haldol 15 mg PO TID, Haldol 15 mg Po q 1 hour prn (as needed) for agitation not exceed overall dose of Haldol 100 mg/24 hours.  Haldol 15 mg IM for each refused dose of any mediation above x 72 hours."  The nurse documented on several occasions that the inmate had attended an IDTT meeting and was argumentative and yelling.  Subsequent progress notes indicated that she was agitated, yelling and threatening staff.  She refused oral Haldol and was given Haldol 10 mg intramuscular.  The psychiatrist's rationale for treatment was that the patient did not respond to verbal de-escalation by the staff and was agitated, yelling and "non-complying with orders."  She was given two intramuscular injections of Haldol 10 mg.

Findings

The care provided to this inmate while housed in the OHU was of significant concern.  This inmate was given intramuscular dosages of Haldol without evidence of a true emergency and against her will.  If this inmate presented in such a way, she should have been considered for and transferred to a higher level of care and/or a Keyhea order should have been pursued.  Also of concern were the prn (as needed) orders for agitation lasting for 72 hours, specifically the very large amount of Haldol (100 mg/day) that was provided as the daily limit.

**Inmate B**

This inmate's case was reviewed due to concerns regarding the use of antipsychotic medications at VSPW.  She was diagnosed with Psychotic Disorder NOS and PTSD.  She was not prescribed psychotropic medications at the time of the visit.

This inmate was housed in the OHU on November 2, 2007.  The psychiatrist noted on that date that the inmate had flooded her room and had thrown her food around the room.  He indicated that she would be transferred to the safety cell.  On the following day, the psychiatrist noted that the inmate was agitated in the morning, yelling and smearing feces all over the room.  An order was written on November 3, 2007, for "Haldol 5 mg po BID, Haldol 5 mg po q 4 hours prn for agitation, Haldol 5 mg IM for each refusal done of PRN Haldol.  First dose of oral prn Haldol now."  She was discharged from the OHU to general population with referral to the EOP.  On November 29, 2007, the 3CMS treatment team recommended the 3CMS level of care as the inmate was functioning well in general population.

Findings

This inmate was ordered Haldol intramuscular if she refused oral medication. Involuntary treatment with Haldol intramuscular was clinically inappropriate for this patient for whom Keyhea was not pursued. In addition, the informed consent form dated November 4, 2007, obtained by the psychiatrist included consent for "Haldol; up to 100 mg/day, Haldol Decanoate up to 400 mg/month." These dosage limits appeared to be excessive.

**Inmate C**

This inmate was diagnosed with Bipolar I Disorder, depressed. She was treated with Haldol Decanoate 100 mg intramuscular on the first of each month and Haldol Decanoate 50 mg intramuscular on the 15th of each month, and Depakote 1,500 mg/day.

This inmate was transferred to VSPW during December 2005. She had been receiving 3CMS level of care since her arrival at the facility. On December 12, 2007, the case manager progress note indicated that the inmate presented in a group with manic symptoms, threats of harm to others, and medication refusal. She was transferred to the OHU on the following day for psychiatric observation. On December 14, 2007, the psychiatrist wrote for "Haldol 10 mg PO liquid x 1 now, if refuses Haldol 10 mg IM, Haldol 5 mg PO TID, if refused 5 mg IM x 72 hours." The inmate was seen in IDTT and ordered an immediate dose of Haldol three times per day. She refused and was ordered on suicide watch with one-to-one monitoring in the safety cell. She was later described as yelling and screaming very loudly; one hour later, the nurse noted that an extraction team was forming to extract the inmate due to her "destructive and impulsive behavior," as she reportedly flooded her cell and hallway, ripped open her mattress, and filled windows with stuffing and smeared feces. The inmate received a Haldol injection upon extraction by custody. On December 21, 2007, the psychiatrist indicated that the patient decompensated during the interview. She was described as having "exhibited delusional thinking and inability to control her impulses. Alarm was activated after pt. disobeyed the orders to leave the room and started to yell and disrobe. Required IM inj of Haldol and placement in safety cell." She was eventually discharged from the OHU with follow-up within seven days on December 24, 2007.

Findings

The care provided to this inmate was of significant concern. This inmate presented with manic symptoms and subsequently received a criminal charge for battery on a police officer and indecent exposure. The RVR mental health assessment request indicated that there were no current mental health factors that the hearing officer should consider in assessing the penalty. Her case was referred to the DA for prosecution. This inmate's mental condition clearly was a factor in her behavior resulting in the RVR. After transfer to the OHU, this inmate was given intramuscular dosages of Haldol without evidence of a true emergency and against her will. If this inmate presented in such a way, she should have been considered for and transferred to a higher level of care and/or a Keyhea order should have been pursued. Also of concern were the standing prn orders for agitation lasting for 72 hours.

**Inmate D**

This patient had a long history of multiple OHU admissions. She was admitted to the OHU on September 14, 2007, after presenting with suicidal ideation and probable psychosis. On that date, the psychiatrist wrote an order for "Haldol 5 mg PO q 6 hours prn agitation if refused 5 mg IM x 72 hours." The patient was admitted to the safety cell with one-to-one monitoring on suicide watch. She continued to exhibit psychosis and was transferred to the MHCB on or about September 24, 2007.

Findings

Although it did not appear that this inmate received the Haldol intramuscular dosage ordered by the psychiatrist, it was of concern that the psychiatrist gave a standing order for this medication if oral medications were refused for three days' duration as this inmate was not on a Keyhea order.

**Inmate E**

This EOP inmate was housed in the administrative segregation unit. She was diagnosed with Psychotic Disorder NOS. She was treated with Risperdal Consta 37.5 mg intramuscular bimonthly.

This inmate was transferred from a county jail to VSPW during June 2007. She had been receiving the 3CMS level of care throughout her stay until March 11, 2008, when she was referred for the EOP level of care. A review of her medical record indicated multiple stays in the OHU and a long history of mental health treatment. During one of her OHU stays that lasted for one day, the psychiatrist on October 10, 2007, indicated that she had been malingering after reportedly taking an overdose of medications. He then ordered Risperdal and Cogentin discontinued, and she was discharged back to the yard without five-day follow-up. She was re-admitted to the OHU the following month, when she presented with psychosis, confusion, and bizarre behavior. Her antipsychotic medications were reordered by the same psychiatrist, and she was ultimately treated upon discharge with the above-mentioned medication. She ultimately was placed into administrative segregation, where the IDTT recommended the EOP level of care on March 18, 2008.

Findings

The care provided to this inmate while housed in the OHU was poor. The treating psychiatrist indicated that the inmate was malingering and discontinued her medications, despite her long history of treatment with antipsychotic medications. Furthermore, she was not ordered follow-up after she was admitted to the OHU for suicidal reasons. This inmate eventually decompensated and was placed in administrative segregation, where she was appropriately referred for the EOP level of care.

In addition, this facility had implemented a level of monitoring in the OHU that appeared to be unique within the CDCR. The psychiatrist ordered "transfer to OHU safety cell 1:3 SP." The

583

staff reported that this meant that inmates were placed into the safety cell with a staff person observing three inmates at one time. This was of significant concern as the criteria determining whether an inmate was placed on suicide watch with one-to-one observation versus one-to-three suicide precautions was not clearly delineated. There was apparently concern regarding this inmate as she was provided with a safety gown and a blanket and mattress ordered by the psychiatrist; it was unclear why this inmate was not placed on one-to-one suicide watch.

**Inmate F**

This EOP inmate was housed in the administrative segregation unit on SHU status. She was diagnosed with Psychotic Disorder NOS. She was treated with Haldol Decanoate 100 mg intramuscular every four weeks, Zoloft 150 mg/day, Trazodone 150 mg/day, and Haldol 5 mg/day.

This inmate was transferred to the facility from CCWF on March 18, 2008. The RN note on the day of arrival indicated that she had tried to starve herself for two weeks without food or water (per the inmate) after her daughter's recent death and her return from the community hospital. A suicide risk assessment was completed. She was cleared for housing in the administrative segregation unit upon her arrival due to SHU endorsement. She was admitted to the OHU on March 25, 2008; however, documentation was not located in the medical record regarding this observation in the OHU. An IDTT note dated April 1, 2008, indicated that the inmate was referred for the EOP level of care. She was re-admitted to the OHU from April 5, 2008, to April 9, 2008, for suicidal ideation and questionable seizure activity versus self-injurious behavior. On April 5, 2008, the psychiatrist noted that she was hitting her head against the door and did not respond to questions. After responding with profanity to the psychiatrist, she was transferred to the safety cell on one-to-one suicide watch and was given a dose of Haldol intramuscular. She remained in the safety cell until April 7, 2008, when she was removed. At the IDTT meeting on April 8, 2008, her diagnosis was noted as Cocaine Dependence and Antisocial Personality Disorder; she was prescribed no psychotropic medications at that time. She was seen for follow-up four of the five days indicated. She remained in administrative segregation at the time of the visit.

Findings

There were significant concerns regarding the care provided to this inmate. She was given an intramuscular Haldol injection after she responded to the psychiatrist with profanity. This action appeared to be punitive in nature. Furthermore, she was diagnosed with Cocaine Dependence and Antisocial Personality Disorder despite having been referred to EOP by the treatment team in administrative segregation and having a history of diagnosis of a mood disorder. Lastly, the five-day follow-up was not completed in entirety.

**Inmate G**

This 3CMS inmate's medical record was reviewed as a result of her history of multiple crisis care placements within the past year. She apparently arrived at VSPW during February 2007. She had a history of several significant head injuries due to trauma. Her substance abuse history

584

included the use of alcohol and cocaine. She had a significant history of mental health inpatient treatment outside of the prison system, as well as a history of suicidal ideation.

An evaluation at the time of reception center screening on February 8, 2007, indicated that the inmate had a history of at least one incident of self-injury, which involved cutting her wrist. She was placed into the OHU safety cell for crisis care on at least six occasions. With the exception of one placement into a safety cell that occurred on February 10, 2007, OHU placements lasted for less than 72 hours. This inmate was referred from a safety cell to a crisis bed on October 5, 2007.

On June 22, 2007, the inmate was admitted to an MHCB, placed into a strip cell, and placed on suicide watch. This referral occurred after the VSPW staff reported that the inmate exhibited depressive symptoms with hopelessness, helplessness, and anorexia. She also exhibited mood swings between elation and depression, and two suicide attempts.

The inmate was admitted to the MHCB after taking an overdose of aspirin. She was discharged from the MHCB at CCWF on October 15, 2007, with a provisional diagnosis of Depressive Disorder NOS. She was discharged with an order for five-day follow-up, and she was prescribed Geodon and Effexor. When she was seen on October 16, 2007, she continued to report depressed mood. On October 18, 2007, she was seen by the psychiatrist for medication noncompliance. Progress notes indicated that her psychotropic medications were discontinued at that time; however, there was no rationale provided for the discontinuation of the medications.

A progress note by the clinical case manager on December 26, 2007, stated that the psychiatrist indicated that the inmate should be removed from the MHSDS and provided with a diagnosis of Antisocial Personality Disorder. A clinical case manager's progress note on January 8, 2008, indicated that the inmate would be removed from the 3CMS program on January 4, 2008. The evaluation that resulted in this recommendation consisted of a mental status evaluation with no acknowledgment of the inmate's prior history or the rationale for removal from the MHSDS.

An IDTT progress note on January 15, 2008, poorly documented the rationale for the change in the level of care.

On February 10, 2008, the inmate was placed into the OHU in a safety cell with an order for suicide watch. She was held there for 83 hours and was discharged on February 13, 2008. Progress notes described the inmate as despondent, hopeless, and suicidal. There was no documentation that there was consideration for transfer to an MHCB. It did not appear that suicide follow-up was ordered, nor did it occur following this inmate's return to the housing unit.

Findings

This inmate presented with significant symptoms of depression and suicidal ideation and behavior. She had a history of several placements into crisis care. Despite these observations in the OHU and MHCB, the appropriate clinical follow-up did not occur after discharge. The rationale for many of the decisions regarding initiation and continuation of crisis care placement, discontinuation of medication, and reduction in level of care were poorly documented and did

585

not appear to be based upon adequate clinical evaluation. The decision by the psychiatrist to discontinue medications and the IDTT's decision to reduce the inmate's level of care were poorly supported and were in conflict with existing medical records regarding the inmate's presentation. There was no evidence that the IDTT appropriately considered the inmate's need for referral to a higher level of care.

**Inmate H**

This general population inmate's case was reviewed as a result of multiple admissions for crisis care. It appeared that the inmate arrived at the CDCR on November 18, 2003. The inmate's mental health history included at least one suicide gesture as a teenager, as well as the use of methamphetamine. The inmate was included in the 3CMS program during 2005; she was removed from the caseload in early 2006, and she was re-admitted to the 3CMS program during March 2007. On June 5, 2007, the inmate was again removed from the MHSDS. Despite several subsequent placements into the OHU when she was at times provided with the diagnosis of a mood disorder, she was not been formally included in the MHSDS since 2007.

There were at least four placements into the OHU; these admissions were generally due to suicidal ideation. The appropriate follow-up did not always occur after discharge back to the housing unit.

A treatment plan written on June 5, 2007, contained reasonable target behaviors, goals, and interventions. This plan specified that clinical contacts occur quarterly and prescribed discussion of anger management issues and group therapy when available.

Findings

This inmate had a history of suicide threats that resulted in OHU placement. Despite being maintained in the OHU with considerable restrictions (theoretically based on the staff's perception that there was a potential for self-injury), the appropriate follow-up care was not prescribed or implemented, and the inmate was not included in the MHSDS. The inmate had an adequate treatment plan that was not implemented. There was no evidence that the IDTT considered the potential need for a higher level of care for this inmate.

**Inmate I**

This 3CMS inmate's case was reviewed as a result of her history of multiple placements into crisis care. She had been in the 3CMS program since at least January 14, 2008; since early 2007, the inmate had been alternatively placed at both EOP and 3CMS levels of care.

This inmate had multiple placements into the OHU. She was placed into the OHU safety cell on January 13, 2008, through January 14, 2008, when she was placed on one-to-one suicide watch. At the time of this placement, she had been exhibiting manic behavior, anger, and loud speech, and was observed striking her hand on solid surfaces and crying. She was provided with a diagnosis of Schizoaffective Disorder at that time. She was prescribed Abilify 15 mg/day and Zoloft 100 mg/day. There was no evidence that the inmate was ordered five-day follow-up, and

there was no evidence that such follow-up occurred after the inmate was returned to her housing unit. She was placed into an observation cell (on one-to-one suicide watch in a stripped cell) on January 25, 2008, after she threatened to hang herself; at that time, she was described as despondent and crying.

The only treatment plan located in the medical record was sparse in content, identifying the inmate's problems as auditory hallucinations, depression, anger, and aggression. The stated plan involved one-to-one clinical case management visits weekly until the inmate was transferred to the EOP at CIW.

On February 26, 2008, the inmate was seen by a clinical case manager who noted that the inmate had returned to the administrative segregation unit after accruing a drug debt on the yard. She was seen weekly by a clinical case manager during this period. There was documentation within the medical record that indicated that the inmate was involved in clinically relevant group therapy.

Findings

This inmate had several OHU placements, and she was provided with diagnoses indicating a significant mood disorder as well as disorganized thinking and behavior consistent with the presence of psychosis. Although she had been considered as posing a substantial enough risk to warrant placement on suicide watch, it did not appear that five-day follow-up was ordered or implemented at the time that she was discharged from the OHU. Despite numerous OHU placements, the medical record did not include documentation of specific discussion of the possible need for this inmate to be referred to EOP or to DMH for intermediate care.