IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                   Plaintiffs,<br><br>      v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>                Defendants. | NO. CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>                   Plaintiffs,<br><br>      v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>                Defendants. | NO. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>OPINION AND ORDER |

**TABLE OF CONTENTS**

I.      INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **6**

II.     **FACTUAL AND PROCEDURAL BACKGROUND**  . . . . . . . . . . . . . . . . . . . . .  **10**

    A.      *Plata* (Medical Care) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        1.      Complaint, Stipulation, and Order for Injunctive Relief  . . . . . . . . . .  11

        2.      Appointment of Court Experts and Their Findings  . . . . . . . . . . . . . .  13

        3.      Periodic Status Conferences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        4.      Proceedings To Determine Whether a Receiver Should Be

              Appointed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

        5.      Findings of Fact and Conclusions of Law Concerning Continuing

              Failure To Meet Constitutional Standards and Necessity of a

              Receivership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

        6.      Interim Remedies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

        7.      Appointment of the *Plata* Receiver  . . . . . . . . . . . . . . . . . . . . . . . . . .  21

    B.      *Coleman* (Mental Health Care) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        1.      Findings of Eighth Amendment Violations . . . . . . . . . . . . . . . . . . . .  23

        2.      Remedial Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

            a.      Mental Health Care Beds and Treatment Space  . . . . . . . . . . .  28

            b.      Transfers to Appropriate Level of Care . . . . . . . . . . . . . . . . . .  32

            c.      Staffing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

        3.      Special Master's 2006 Monitoring Reports  . . . . . . . . . . . . . . . . . . . .  34

    C.      Crowding in California's Prison System . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

        1.      The Increasing California Prison Population  . . . . . . . . . . . . . . . . . . .  37

        2.      Studies Commissioned by the State of California To Examine

              Prison Crowding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

        3.      Defining the Capacity of California Prisons . . . . . . . . . . . . . . . . . . . .  39

        4.      Crowding in Relation to Capacity  . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

D.  Governor Schwarzenegger's Emergency Proclamation . . . . . . . . . . . . . . . 43

E.  Motions To Convene Three-Judge Court and Subsequent Prison Studies
    by the State of California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    1.  Motions To Convene and Initial Proceedings . . . . . . . . . . . . . . . . . 44

    2.  Intervening Reports on Prison Crowding . . . . . . . . . . . . . . . . . . . . . 44

    3.  Final Hearing and Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

F.  Proceedings Before this Three-Judge Court . . . . . . . . . . . . . . . . . . . . . . . . 48

III.  **LEGAL FRAMEWORK** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**

A.  The PLRA Standard for Prisoner Release Orders: Primary Cause and
    No Other Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

B.  The PLRA Standard for All Prospective Relief: Need-Narrowness-
    Intrusiveness and Consideration of Public Safety . . . . . . . . . . . . . . . . . . . . 52

C.  The Remedial Nature of the Three-Judge Court Proceeding . . . . . . . . . . . . 54

IV.  **CROWDING AS PRIMARY CAUSE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **55**

A.  General Problems in the Delivery of Medical and Mental Health Care
    Caused by Crowding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

B.  Space Issues Affecting the Delivery of Care . . . . . . . . . . . . . . . . . . . . . . . . 60

    1.  Reception Centers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    2.  Treatment Space . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    3.  Inability To House Inmates by Classification . . . . . . . . . . . . . . . . . . 67

    4.  Beds for Mentally Ill Inmates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

C.  Conditions of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

D.  Other Access to Care Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    1.  Staffing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        a.  Medical Staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

        b.  Mental Health Staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

        c.  Custodial Staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

    2.  Medication Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

|  |  |  |  |  |
|---|---|---|---|---|
| | | 3. | Specialty Medical Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 |
| | | 4. | Lockdowns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81 |
| | E. | Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 83 |
| | F. | Increasing Acuity of Mental Illness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85 |
| | G. | Extreme Departures from the Standard of Care and Preventable or Possibly | |
| | | Preventable Deaths, Including Suicides . . . . . . . . . . . . . . . . . . . . . . . . . . . | 86 |
| | H. | Expert Opinions Regarding Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 88 |
| | I. | Findings and Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99 |
| **V.** | **NO OTHER RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **101** |
| | A. | Alternatives to a Prisoner Release Order . . . . . . . . . . . . . . . . . . . . . . . . . | 102 |
| | | 1. | Inadequacy of Construction as a Remedy . . . . . . . . . . . . . . . . . . . | 102 |
| | | | a. | Prison Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 102 |
| | | | b. | Construction of Re-entry Facilities . . . . . . . . . . . . . . . . . . . | 103 |
| | | | c. | Medical Facilities and Prison Expansion . . . . . . . . . . . . . . | 105 |
| | | | d. | Construction as a Means of Compliance . . . . . . . . . . . . . . . | 108 |
| | | 2. | Inadequacy of Additional Hiring . . . . . . . . . . . . . . . . . . . . . . . . . . | 109 |
| | | 3. | Insufficiency of the *Plata* Receivership and *Coleman* Special | |
| | | | Mastership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 109 |
| | | 4. | Other Proposals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 112 |
| | B. | Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 114 |
| | C. | Findings and Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 119 |
| **VI.** | **NARROWLY DRAWN, LEAST INTRUSIVE REMEDY THAT EXTENDS** | |
| | **NO FURTHER THAN NECESSARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **119** |
| | A. | Scope of Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 120 |
| | B. | Form of Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 122 |
| | C. | The Required Population Reduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 124 |

1  VII.   **POTENTIAL POPULATION REDUCTION MEASURES AND THEIR**
2          **IMPACT ON PUBLIC SAFETY AND THE OPERATION OF THE**
3          **CRIMINAL JUSTICE SYSTEM** ................................... **131**
4      A.    Criminogenic Nature of Overcrowded Prisons ...................... 133
5      B.    Potential Population Reduction Measures .......................... 137
6              1.    Early Release Through Expansion of Good Time Credits ........ 139
7              2.    Diversion of Technical Parole Violators ..................... 145
8              3.    Diversion of Low-Risk Offenders with Short Sentences ......... 149
9              4.    Expansion of Evidence-Based Rehabilitative Programming in
10                   Prisons or Communities .................................. 152
11             5.    Sentencing Reform and Other Potential Population Reduction
12                   Measures .............................................. 154
13     C.    Impact of Proposed Measures on Communities ..................... 157
14             1.    Investigation and Prosecution of Crime ...................... 157
15             2.    Effect on Jail Population ................................... 160
16             3.    Effect on Parole Supervision Resources ...................... 162
17             4.    Impact on Community Corrections, Rehabilitative Services, and
18                   Re-entry Programs ....................................... 164
19             5.    Impact on Integrity of Criminal Justice System ................ 166
20             6.    Weight To Be Given Public Safety .......................... 167
21     D.    Feasibility Notwithstanding the Present Fiscal Crisis ................. 167
22     E.    Inclusion of Mentally Ill Inmates in Any Population Reduction Order ... 168
23     F.    Empirical Evidence on Incarceration and Crime Rates ................ 172
24     G.    Findings and Conclusions ....................................... 177
25  VIII.  **CONCLUSION** ................................................. **181**
26  **ORDER** ........................................................ **183**

27

28

5

1    **I.      INTRODUCTION**

2          "California's correctional system is in a tailspin," the state's independent oversight

3    agency has reported.  Ex. P3 at i (Jan. 2007 Little Hoover Commission Report, "Solving

4    California's Corrections Crisis: Time Is Running Out").[1]  Tough-on-crime politics have

5    increased the population of California's prisons dramatically while making necessary reforms

6    impossible.  *Id.* at ii, 2-5, 9, 20.  As a result, the state's prisons have become places "of

7    extreme peril to the safety of persons" they house, Ex. P1 at 7-8 (Governor

8    Schwarzenegger's Oct. 4, 2006 Prison Overcrowding State of Emergency Declaration), while

9    contributing little to the safety of California's residents, Ex. P3 at ii.  California "spends

10   more on corrections than most countries in the world," but the state "reaps fewer public

11   safety benefits."  *Id.* at 14.  Although California's existing prison system serves neither the

12   public nor the inmates well, the state has for years been unable or unwilling to implement the

13   reforms necessary to reverse its continuing deterioration.

14         In this proceeding, we address two particular problems that every day threaten the

15   lives and health of California prisoners.  First, the medical and mental health care available to

16   inmates in the California prison system is woefully and constitutionally inadequate, and has

17   been for more than a decade.  The United States Constitution does not require that the state

18   provide its inmates with state-of-the-art medical and mental health care, nor does it require

19   that prison conditions be comfortable.  California must simply provide care consistent with

20   "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347

21   (1981) – care sufficient to prevent the unnecessary and wanton infliction of pain or death,

22   *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  Tragically, California's inmates have long

23   been denied even that minimal level of medical and mental health care, with consequences

24   that have been serious, and often fatal.  Inmates are forced to wait months or years for

25   medically necessary appointments and examinations, and many receive inadequate medical

26   care in substandard facilities that lack the medical equipment required to conduct routine

27          [1]The Little Hoover Commission is a state agency charged with preparing reports and
recommendations regarding the structure and operation of state government in order to
28   improve its economy, efficiency, and service.  Cal. Gov't. Code §§ 8501, 8521-8522.

1   examinations or afford essential medical treatment.  Seriously mentally ill inmates languish

2   in horrific conditions without access to necessary mental health care, raising the acuity of

3   mental illness throughout the system and increasing the risk of inmate suicide.  A significant

4   number of inmates have died as a result of the state's failure to provide constitutionally

5   adequate medical care.  As of mid-2005, a California inmate was dying needlessly *every six*

6   *or seven days*.

7        California's inmates face a second everyday threat to their health and safety: the

8   unprecedented overcrowding of California's prisons.  Since reaching an all-time population

9   record of more than 160,000 in October 2006, the state's adult prison institutions have

10  operated at almost double their intended capacity.  As Governor Schwarzenegger observed in

11  declaring a prison state of emergency that continues to this day, this creates "conditions of

12  extreme peril" that threaten "the health and safety of the men and women who work inside

13  [severely overcrowded] prisons and the inmates housed in them . . . ."  Ex. P1 at 1, 8.

14  Thousands of prisoners are assigned to "bad beds," such as triple-bunked beds placed in

15  gymnasiums or day rooms, and some institutions have populations approaching 300% of

16  their intended capacity.  In these overcrowded conditions, inmate-on-inmate violence is

17  almost impossible to prevent, infectious diseases spread more easily, and lockdowns are

18  sometimes the only means by which to maintain control.  In short, California's prisons are

19  bursting at the seams and are impossible to manage.

20        It is the relationship between these two critical problems that lies at the heart of the

21  cases before us.  We must answer the question whether overcrowding is the primary cause of

22  the unconstitutional medical and mental health care to which California prison inmates are

23  currently subjected.  Two federal lawsuits have brought the crisis in California's prisons to

24  this three-judge court.  Plaintiffs in the two lawsuits contend that a reduction in the prison

25  population is necessary to bring the California prison system's medical and mental health

26  care into constitutional compliance.  In both *Plata v. Schwarzenegger* and *Coleman*

27

28

7

1  *v. Schwarzenegger*,[2] the federal courts initially issued narrow orders requiring California to

2  develop and implement remedial plans to meet this objective.  However, as the state time and

3  again failed to meet its own remedial targets – let alone to achieve constitutional compliance

4  – both courts were forced to adopt increasingly drastic remedies, culminating in the *Plata*

5  court's 2005 appointment of a receiver to manage the prison medical system.  Ultimately, by

6  late 2006 it became apparent that the overcrowding in California's prisons rendered the

7  efforts of the courts, the *Coleman* Special Master, and the *Plata* Receiver utterly insufficient.

8  At the request of the *Plata* and *Coleman* courts, the Chief Judge of the United States Court of

9  Appeals for the Ninth Circuit convened this three-judge court to consider the plaintiffs'

10  request for a court-ordered reduction in the California prison population.

11       During the pendency of this proceeding, the outlook for California's prisons has only

12  grown dimmer.  The state is now in the throes of a fiscal crisis that renders it unable or

13  unwilling to commit the necessary resources to fix the problems in its prisons.  As Matthew

14  Cate, Secretary of the California Department of Corrections and Rehabilitation[3] and a

15  defendant here, recently put it, California "cannot at this time become further indebted for

16  correctional healthcare."[4]  Ex. 1 to Defs.' July 1, 2009 Response to Court's June 18, 2009

17  Order, filed in *Coleman*, at 1.

18       Federal law makes any prisoner release order, including the population reduction

19  order requested by plaintiffs, a "remedy of last resort," H.R. Rep. No. 104-21, at 25 (1995)

20  _____

21  [2]*Plata* involves the prison system's constitutionally inadequate medical care, while
*Coleman* involves the constitutional deficiencies in mental health care provided to California
22  inmates.

23  [3]Until 2005, California's adult prisons were run by the California Department of
Corrections, which was a department within the state's Youth and Corrections Agency.  On
24  July 1, 2005, the agency was reorganized and renamed the California Department of
Corrections and Rehabilitation ("the CDCR").  Ex. P5 at ix.  In this opinion and order, we
25  refer to the agency as the CDCR except when quoting orders issued prior to the
reorganization.

26  [4]California has reduced spending on education, health care, the social safety net, and
services for the needy, the blind, and children to the breaking point.  Under these
27  circumstances, we would be reluctant to direct the state to allocate additional funds to its
prisons or to rehabilitative services at the expense of others to whom it has a legal and moral
28  obligation.

8

1    (report of the House Committee on the Judiciary on the Violent Criminal Incarceration Act of

2    1995), and imposes various conditions upon the issuance of such an order.  *See* 18 U.S.C.

3    § 3626(a)(3).  As we explain below, those conditions have been met here: (1) crowding is the

4    primary cause of the state's failure to provide its inmates with constitutionally sufficient

5    medical and mental health care; (2) no relief besides a prisoner release order can bring the

6    California prison system into constitutional compliance; (3) an order requiring the state to

7    reduce the population of its adult institutions to a lower percentage of their combined design

8    capacity than presently exists – a population cap – is narrowly tailored to the constitutional

9    violations identified by the *Plata* and *Coleman* courts, extends no further than necessary to

10   remedy those violations, and is the least intrusive possible remedy; and (4) the state can

11   comply with such an order with little or no impact on public safety and the operation of the

12   criminal justice system.  There are numerous means by which the state can reduce the prison

13   population, from parole reform and the diversion of technical parole violators and low-risk

14   offenders to sentencing reform and the expansion of good time credits and rehabilitative

15   programming.  There is no need for the state to release presently incarcerated inmates

16   indiscriminately in order to comply with our order.  Much of the relief can be achieved

17   instead by reducing prison intake in a manner recommended by the state's own experts.

18          We recognize the gravity of the population reduction order we issue herein, and we do

19   not intervene in matters of prison population lightly.  Nonetheless, when federal court

20   intervention becomes the only means by which to enforce rights guaranteed by the

21   Constitution, federal courts are obligated to act.  "Without this, all the reservations of

22   particular rights or privileges would amount to nothing."  *The Federalist* No. 78 (Alexander

23   Hamilton).  California's prisoners have long been denied constitutionally adequate medical

24   and mental health care, often with tragic consequences, and the overcrowding in California's

25   prisons, which have become criminogenic, must be reduced if the prison system is to achieve

26   constitutional compliance.  California's prisoners, present and future, (and the state's

27   population as a whole) can wait no longer.

28

9

## II.      FACTUAL AND PROCEDURAL BACKGROUND

Because the courts' prior remedial efforts are of profound relevance in understanding the effect of prison overcrowding and the inadequacy of forms of relief that do not address that problem, we begin with a detailed history of the individual *Plata* and *Coleman* cases. We then describe the crowded conditions in California's prison system and the history of the three-judge court proceeding before turning to the legal questions before us.

### A.      *Plata* **(Medical Care)**

The history of *Plata* involves extensive remedial efforts over the last seven years that have faltered because of the severe overcrowding in California's prisons.

The *Plata* class action was filed on April 5, 2001, and plaintiffs filed an amended complaint on August 20, 2001, alleging constitutional violations in the delivery of medical care to inmates confined in California state prisons, as well as violations of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. Ex. D1059. Plaintiffs asserted that the "unconstitutional conditions" caused by defendants' failure to "properly care for and treat the prisoners in [their] custody . . . caused widespread harm, including severe and unnecessary pain, injury and death." *Id.* ¶ 1. The *Plata* plaintiffs and defendants negotiated a stipulation for injunctive relief, which the *Plata* court approved by court order.[5]

However, defendants proved incapable of or unwilling to provide the stipulated relief. Three years after approving the stipulation as an order of the court, the *Plata* court conducted an evidentiary hearing that revealed the continued existence of appalling conditions arising from defendants' failure to provide adequate medical care to California inmates. The Court found that defendants had been given "every reasonable opportunity to bring [the] prison medical system up to constitutional standards, and it [was] beyond reasonable dispute that the State ha[d] failed." Oct. 3, 2005 Findings of Fact & Conclusions of Law Re: Appointment of Receiver ("FF&CL"), 2005 WL 2932253, at *1 (Ex. D1063).[6] Following that hearing, the

---

[5]The stipulation resolved all of plaintiffs' claims, including their Rehabilitation Act and ADA claims.

[6]All references to court orders in this section of our opinion and order are to orders filed in the district court in *Plata*.

1     *Plata* court concluded that it had no choice but to place the CDCR's medical health care

2     delivery system in receivership.  The *Plata* Receivership continues to this date, but, as we

3     explain below, severe crowding throughout California's prison system renders the Receiver

4     unable to resolve the constitutional violations at issue in *Plata*.

5             1.     Complaint, Stipulation, and Order for Injunctive Relief

6       In their amended complaint, the *Plata* plaintiffs alleged that a number of specific

7     deficiencies in the CDCR's prison medical care system rendered the system as a whole

8     unconstitutional.  The alleged deficiencies included inadequate medical screening of

9     incoming prisoners; delays in or failure to provide access to medical care, including

10    specialist care; untimely responses to medical emergencies; the interference of custodial staff

11    with the provision of medical care; the failure to recruit and retain sufficient numbers of

12    competent medical staff; disorganized and incomplete medical records; a "lack of quality

13    control procedures, including lack of physician peer review, quality assurance and death

14    reviews"; a lack of protocols to deal with chronic illnesses, including diabetes, heart disease,

15    hepatitis, and HIV; and the failure of the administrative grievance system to provide timely

16    or adequate responses to complaints concerning medical care.  Ex. D1059 ¶ 192.[7]

17       Prior to filing suit, the *Plata* plaintiffs had been in informal negotiations with

18    defendants since July 1999.  Ex. D1060 ¶ 3 (June 13, 2002 Stip. & Order).  After *Plata* was

19    filed, the parties ultimately agreed to a stipulation for injunctive relief, which the *Plata* court

20    entered as an order on June 13, 2002.  Defendants agreed to and were ordered to implement

21    certain policies and procedures on a staggered basis, with seven prisons to complete

22    implementation in 2003.  *Id.* ¶¶ 4-5.  In each subsequent year, defendants were to complete

23

24

25

26 ─────────────────

27       [7]As we explain below, *infra* Section II.A.2, it became apparent early in the *Plata* litigation that, given the size of their populations, California's prisons lacked the space and

28    facilities required to deliver constitutionally adequate medical care or to remedy the above deficiencies.

1    implementation at five additional prisons, such that statewide implementation would be

2    achieved by the end of 2008. *Id.* ¶ 5.[8]

3          The stipulated policies and procedures, which defendants filed with the *Plata* court on

4    February 15, 2002, and supplemented on May 30, 2002, "are approximately 800 pages long

5    and contained in 11 volumes." Mar. 10, 2003 Order at 2. Although the stipulated policies

6    and procedures were "designed to meet or exceed the minimum level of care necessary to

7    fulfill the defendants' obligation to plaintiffs under the Eighth Amendment of the United

8    States Constitution," the stipulation "require[s] defendants to provide only the minimum

9    level of medical care required under the Eighth Amendment." Ex. D1060 ¶ 4.

10         The stipulation for injunctive relief provided *inter alia* for regular audits of

11   defendants' compliance. *Id.* ¶¶ 19-23. These audits were to include a review of no less than

12   180 inmate health records at each prison. *Id.* ¶ 21(a). Medical assessments or treatment

13   plans contained in those records would be deemed substantially in compliance with the

14   settlement agreement if they were consistent with the policies and procedures or with the

15   community standard of care "imposed under the laws of the State of California upon health

16   care providers licensed to practice in California." *Id.* ¶ 22(b) & at 11 n.3. Compliance with

17   the agreement would also require "conducting minimally adequate death reviews and quality

18   management proceedings," having "tracking, scheduling and medication administration

19   systems adequately in place," and the absence of any "pattern or practice that is likely to

20   result in serious problems [where] those problems are not being adequately addressed." *Id.*

21   ¶¶ 22(c)-(e).

22         Had the stipulated policies and procedures been implemented, they would have

23   resulted in comprehensive improvements to nearly all aspects of the medical delivery system

24   in California's prisons, including quality management; health records management;

25   ─────────────

26   [8]This roll-out plan did not include Pelican Bay State Prison, which was under the
     *Plata* court's jurisdiction in a separate action, *Madrid v. Cate*, Case No. C90-3094 TEH

27   (N.D. Cal.), and was not included in the *Plata* case. However, on June 6, 2008, the parties
     stipulated, and the court ordered, that prisoners housed at Pelican Bay State Prison be

28   included in the *Plata* class. Thus, the *Plata* case now includes all thirty-three adult
     institutions within the CDCR.

1   infectious disease control; staffing; inter-institution transfers; and the timing and manner in

2   which inmates are provided with physician and nurse care, as well as with necessary

3   medications.  Unfortunately, defendants utterly failed to comply with the implementation

4   schedule to which they had stipulated.  As of May 10, 2005, when implementation should

5   have been completed at twelve prisons, "not a single prison ha[d] successfully completed

6   implementation."  May 10, 2005 Order to Show Cause ("OSC"), 2005 WL 2932243, at *2

7   (Ex. D1062).  The same remains true now, more than seven years after the court approved

8   the parties' settlement agreement.  As we explain below, this is due in large part to the severe

9   overcrowding in California's prisons.

10                    2.      Appointment of Court Experts and Their Findings

11          In addition to stipulating to an implementation schedule, the parties agreed to the

12   appointment of medical and nursing experts "to advise the Court on the adequacy and

13   implementation of defendants' Policies and Procedures and any other matter that

14   appropriately may be the subject of the experts' testimony."  Ex. D1060 ¶¶ 16-17.  The

15   experts routinely reviewed defendants' progress towards implementing the stipulated

16   injunctive relief and periodically communicated their findings and recommendations to the

17   *Plata* court.

18          In their July 16, 2004 report to the court, the experts identified a pattern of serious

19   deficiencies relating to physician quality at California prisons, and defendants agreed to

20   address those deficiencies in a stipulation entered as an order of the court on September 17,

21   2004 ("Patient Care Order"), Ex. D1061.

22                  The Patient Care Order required defendants to engage an
                    independent entity to (a) evaluate the competency of physicians
23                  employed by the CDCR and (b) provide training to those
                    physicians found to be deficient.  It also required defendants to
24                  undertake certain measures with respect to the treatment of high-
                    risk patients, to develop proposals regarding physician and
25                  nursing classifications and supervision, and to fund and fill
                    Quality Management Assistance Teams ("QMAT") and other
26                  support positions.

27   Oct. 3, 2005 FF&CL, 2005 WL 2932253, at *2.  However, "[d]efendants failed to come

28   close to meeting the terms of the Patient Care Order, even with generous extensions of time

13

1    from the Court." *Id.*  The experts noted one example of defendants' failure to comply after

2    visits to the Substance Abuse and Treatment Facility in February and March 2005:

3
4
5
6

> [N]ot only has little progress been made in the implementation of
> *Plata*, but the initial morale and enthusiasm in utilizing QMAT
> has evaporated in large part because of the inability of the
> California Department of Corrections to provide the necessary
> staff and support to this process.  This has delivered an unspoken
> message that no change will occur.

7    May 16, 2005 Experts' Report on Substance Abuse Treatment Center, at 3 (filed in *Plata* on

8    May 19, 2005).

9        The experts' reports following visits to San Quentin State Prison were no better.

10   Following a February 2005 visit to that facility, the court's nursing experts observed that

11   clinics in housing areas were sometimes "nothing more than an office used by correctional

12   officers" and "lacked basic medical equipment and supplies."  Apr. 9, 2005 Nursing Experts'

13   Report on San Quentin, at 2 (filed in *Plata* on May 10, 2005).  The "[m]ost disturbing"

14   conditions were in one unit where

15
16
17
18
19
20

> [t]he area used for nursing triage [was] a small room at the end of
> the tier that the nurse accesses by walking through a gate and into
> the men's showers. . . .  Because of a clogged shower drain,
> standing water was present outside the clinic door.  Inside, the
> room was filthy.  The furniture was old and in disrepair.  There
> was no examination table, medical equipment or supplies, or
> handwashing facilities.  According to staff, equipment (otoscope
> [an instrument used to examine the ear]) requested for this area
> had been denied.  As well, there was no telephone or computer
> access.  Prior to this room being used, a broom closet on the
> fourth tier was used for nurse triage.

21
22

> These conditions are deplorable and have no resemblance to a
> medical setting whatsoever.

23   *Id.* at 2-3.  Following their visits to San Quentin in January and February 2005, the medical

24   experts noted that "[m]edical record reviews demonstrate[d] multiple instances of

25   incompetence, indifference, cruelty, and neglect.  Ten deaths were reviewed.  All showed

26   serious problems; most deaths were preventable. . . .  Routine medical care [was] replete with

27   numerous errors resulting from both system failures as well as physician mistakes."  Apr. 8,

28   2005 Medical Experts' Report on San Quentin, at 13 (filed in *Plata* on May 10, 2005).

14

1    Perhaps most damning was the medical experts' conclusion that "overall compliance

2 with the Stipulated Order and subsequent Court Orders was non-existent [at San Quentin].  In

3 fact, it was clear that for most areas we reviewed there has been indifference to beginning the

4 process required in the Stipulated Order," *id.* at 2 – despite the fact that the prison was to

5 have *completed* that process by the time of the experts' site visit.  The experts ultimately

6 concluded that San Quentin was "so old, antiquated, dirty, poorly staffed, poorly maintained,

7 with inadequate medical space and equipment and over-crowded that it is our opinion that it

8 is dangerous to house people there with certain medical conditions and is also dangerous to

9 use this facility as an intake facility."  *Id.*  According to the experts, "the overcrowding and

10 facility life-safety and hygiene conditions create a public health and life-safety risk to

11 inmates who are housed there."  *Id.*

12               3.   Periodic Status Conferences

13    Beyond receiving periodic reports from the experts, the *Plata* court also conducted

14 regular status conferences with the parties to help monitor and facilitate implementation of

15 the stipulated injunctive relief, as well as to assess defendants' ability and willingness to

16 comply with the court order approving such relief.  Based on the experts' dismal reports of

17 defendants' progress, the court increased the frequency of these conferences and, in February

18 2005, started meeting with the parties on a monthly basis.  To facilitate these meetings,

19 which typically involved large numbers of CDCR staff housed in Sacramento, the court

20 rotated the location of these meetings between San Francisco and Sacramento.

21              The Court invited the parties during [the] monthly status
22              conferences to contribute ideas as to possible remedies, and the
               Court especially encouraged defendants to consider ways in
23              which they could take the actions necessary to solve the medical
               care problems through measures within their own control,
24              including use of the extraordinary powers of the Governor.  The
               Court went to the length of requesting that defendants present it
25              with a series of proposed orders so that the Court could help
               empower them to overcome some of their bureaucratic hurdles on
26              their own.  Defendants did not submit a single proposed order.

27 Oct. 3, 2005 FF&CL, 2005 WL 2932253, at *26 (citation omitted).

28

15

4.    Proceedings To Determine Whether a Receiver Should Be Appointed

Ultimately, the *Plata* court found itself with no alternative but to issue an order to show cause ("OSC") why defendants should not be found in civil contempt and why a receiver should not be appointed to manage medical care delivery for the CDCR.  As the court noted when it issued the OSC on May 10, 2005:

> In the four years since this case was filed, which includes the year and a half that this Court has been meeting with the parties on a regular basis, two things have become ever increasingly clear: (1) the Governor has appointed, and the State has hired, a number of dedicated individuals to tackle the difficult task of addressing the crisis in the delivery of health care in the California Department of Corrections ("CDC"), and, (2) despite the best efforts of these individuals, little real progress is being made. The problem of a highly dysfunctional, largely decrepit, overly bureaucratic, and politically driven prison system, which these defendants have inherited from past administrations, is too far gone to be corrected by conventional methods.
>
> The prison medical delivery system is in such a blatant state of crisis that in recent days defendants have publicly conceded their inability to find and implement on their own solutions that will meet constitutional standards.  The State's failure has created a vacuum of leadership, and utter disarray in the management, supervision, and delivery of care in the Department of Corrections' medical system.
>
> Defendants have devised a long-term strategy to contract out health care management and much of the delivery of care. However, full implementation of that plan is, by defendants' own estimates, years away.  In the meantime, roughly 162,000 prisoners are being subjected to an unconstitutional system fraught with medical neglect and malfeasance.  Defendants themselves have conceded that a significant number of prisoners have died as a direct result of this lack of care, and it is clear to the Court that more are sure to suffer and die if the system is not immediately overhauled.
>
> . . . .
>
> Since the entry of the Stipulated Injunction in June 2002, the most notable characteristic of this case has been defendants' failure to achieve any substantial progress in bringing the medical care system even close to minimal constitutional standards.

May 10, 2005 OSC, 2005 WL 2932243, at *1-2.  "Even following issuance of the OSC – on the brink of possible contempt and the imposition of a Receivership – defendants were able

1  to enact only very limited and piece-meal measures, with no prospect for system-wide reform

2  or restructuring."  Oct. 3, 2005 FF&CL, 2005 WL 2932253, at *26.

3        Beginning on May 31, 2005, and concluding on June 9, 2005, the *Plata* court

4  conducted a six-day evidentiary hearing concerning the OSC.  *Id.* at *2.  The court

5  considered eighty-two exhibits, *id.*, and heard testimony from the court experts; relevant state

6  officials, including Undersecretary of Corrections Kevin Carruth and Dr. Renee Kanan, the

7  Acting Director of Health Care Services for the CDCR; and defendants' medical expert

8  Dr. Ronald Shansky.[9]  Following the hearing, the parties submitted legal briefs addressing

9  both contempt and the appointment of a receiver, and several unions representing state prison

10  medical personnel filed an amicus brief.  *Id.*  Defendants did not dispute that the *Plata* court

11  had the power to appoint a receiver; instead, they argued only that a receivership was an

12  extraordinary remedy to be used only if less intrusive remedies had failed or were likely to

13  fail.  Defs.' June 20, 2005 Response to OSC at 2, 25.

14        On June 30, 2005, the *Plata* court heard argument on the OSC.  Oct. 3, 2005 FF&CL,

15  2005 WL 2932253, at *2.  "Based on the arguments of counsel, the evidence presented, the

16  full record in this case, and the Court's own observations on prison tours [of two facilities,

17  accompanied by counsel for the parties], the Court delivered an oral ruling at the conclusion

18  of the hearing that it would take control of the medical delivery system of the CDCR and

19  place it under the auspices of a Receivership."  *Id.*

20              5.    Findings of Fact and Conclusions of Law Concerning Continuing

21                    Failure To Meet Constitutional Standards and Necessity of a

22                    Receivership

23        On October 3, 2005, the court issued findings of fact and conclusions of law setting

24  forth the detailed reasoning behind its oral ruling.  As the court noted in its written decision:

25              By all accounts, the California prison medical care system is
              broken beyond repair.  The harm already done in this case to
26              California's prison inmate population could not be more grave,

27        [9]As noted in our discussion below, although Dr. Shansky testified as defendants'
28  expert witness in the proceedings before the *Plata* court, he testified as plaintiffs' expert
   witness in the proceedings before this three-judge court.

1   and the threat of future injury and death is virtually guaranteed in
    the absence of drastic action.  The Court has given defendants
2   every reasonable opportunity to bring its prison medical system
    up to constitutional standards, and it is beyond reasonable dispute
3   that the State has failed.  Indeed, it is an uncontested fact that, on
    average, an inmate in one of California's prisons needlessly dies
4   every six to seven days due to constitutional deficiencies in the
    CDCR's medical delivery system.  This statistic, awful as it is,
5   barely provides a window into the waste of human life occurring
    behind California's prison walls due to the gross failures of the
6   medical delivery system.

7   It is clear to the Court that this unconscionable degree of
    suffering and death is sure to continue if the system is not
8   dramatically overhauled.  Decades of neglecting medical care
    while vastly expanding the size of the prison system has led to a
9   state of institutional paralysis.  The prison system is unable to
    function effectively and suffers a lack of will with respect to
10  prisoner medical care.

11  *Id.* at *1.

12          In its order, the court identified a number of serious problems in the care provided to

13  inmates.  The court found that the CDCR failed to follow its own policies regarding access to

14  medical care, and inmates routinely lacked timely access to care, both in terms of screening

15  requests and in receiving care once it was determined that an appointment with a physician

16  was warranted.  *Id.* at *13.  Inmates needing specialty services to treat serious medical

17  problems were forced to wait inordinate and inexcusable amounts of time for appointments;

18  at one prison, inmates with consultation referrals from early 2004 had yet to be seen in May

19  2005.  *Id.* at *16.  In addition, the CDCR had failed to develop or implement a system to

20  track and treat inmates with chronic care needs, *id.* at *14, and the court's nursing expert

21  found that CDCR nurses often "fail[ed] to perform basic functions," such as taking vital

22  signs, conducting examinations, and identifying urgent medical issues requiring immediate

23  referral to a physician.  *Id.* at *9.

24          Not unexpectedly, death reviews revealed "repeated gross departures from even

25  minimal standards of care."  *Id.* at *7.  The lack of adequate care also resulted in "an

26  inordinately high level of morbidity," defined as "any significant injury, harm or medical

27  complication that falls short of death," among CDCR inmates.  *Id.* at *8-9.  For example:

28

18

1
2
3
4
5
6

> [I]n 2004 a San Quentin prisoner with hypertension, diabetes and renal failure was prescribed two different medications that actually served to exacerbate his renal failure. An optometrist noted the patient's retinal bleeding due to very high blood pressure and referred him for immediate evaluation, but this evaluation never took place. It was not until a year later that the patient's renal failure was recognized, at which point he was referred to a nephrologist on an urgent basis; he should have been seen by the specialist within 14 days but the consultation never happened and the patient died three months later.

7   *Id.* (citations omitted). This incident was simply a "representative example[]" of the grossly

8   inadequate care that could be found throughout the prison system. *Id.* at *6. Many prisoners

9   were the victims of similar treatment, or worse.

10          Beyond these quality of care problems, the court noted a number of additional

11  deficiencies in the prison medical system. Prison medical facilities "lack[ed] the necessary

12  medical equipment to conduct routine examinations and to respond to emergencies," *id.* at

13  *15, and were also "completely inadequate for the provision of medical care":

14
15
16
17
18

> Many clinics [did] not meet basic sanitation standards. Exam tables and counter tops, where prisoners with infections such as Methicillin-Resistant Staph Aureus (MRSA) and other communicable diseases are treated, [were] not routinely disinfected or sanitized. Many medical facilities require[d] fundamental repairs, installation of adequate lighting and such basic sanitary facilities as sinks for hand-washing. In fact, lack of adequate hygiene ha[d] forced the closure of some operating rooms.

19  *Id.* at *14 (citations omitted). Likewise, the management of prison pharmacy operations was

20  "unbelievably poor." *Id.* at *16. No statewide coordination between pharmacies existed, and

21  there were "serious, long-standing problems with dispensing medication, renewing

22  prescriptions, and tracking expired prescriptions." *Id.* Medical records in most CDCR

23  prisons were "either in a shambles or non-existent. . . . mak[ing] even mediocre medical care

24  impossible," *id.* at *14 (citation omitted), and the resulting lack of access to inmates' medical

25  histories "result[ed] in dangerous mistakes, delay in patient care, and severe harm." *Id.*

26  Furthermore, the reception center intake process, which was designed to allow medical staff

27  to identify inmates' medical issues, including communicable diseases posing a risk of

28  transmission to other inmates and staff, was woefully inadequate. *Id.* at *12-13.

19

The court also noted a number of serious personnel problems. Qualified medical staff were sorely lacking at every level. According to one court expert, "20-50% of physicians at the prisons provide[d] poor quality of care." *Id.* at *5. However, the CDCR was incapable of recruiting qualified personnel to fill the significant vacancies that existed throughout the system, *id.* at *11, and the CDCR's lack of a medical credentialing policy resulted in many CDCR clinicians' practicing outside of their areas of medical expertise. *Id.* at *21. The CDCR also lacked medical leadership, both at the central office and at individual prisons, and the resulting lack of supervision "foster[ed] a culture of non-accountability and non-professionalism whereby the acceptance of degrading and humiliating conditions bec[ame] routine and permissible." *Id.* at *10 (internal quotations, citation, and alteration omitted).

Bases on these findings, the *Plata* court concluded that "the establishment of a Receivership, along with those actions necessary to effectuate its establishment, are narrowly drawn to remedy the constitutional violations at issue, extend no further than necessary to correct a current and ongoing violation of a federal right, and are the least intrusive means to correct these violations." *Id.* at *33. The court recognized that:

> the imposition of a Receivership is a drastic measure. But it is not a measure that the Court has sought, nor is it one the Court relishes. Rather, the Court is simply at the end of the road with nowhere else to turn. Indeed, it would be fair to say that the Receivership is being imposed on the Court, rather than on the State, for it is the State's abdication of responsibility that has led to the current crisis. Since the Court has jurisdiction over this matter, it has no choice but to step in and fill the void.

*Id.* at *31 (citation omitted). The court held the contempt remedy in abeyance after concluding that a finding of contempt was not a prerequisite to the appointment of a receiver. *Id.* at *33. Nevertheless, it sought to employ all feasible means other than a prisoner release to remedy the constitutional violations.

### 6.   Interim Remedies

On plaintiffs' motion, the court considered appointing a temporary receiver but ultimately opted instead to appoint a correctional expert pending the search for and appointment of a receiver. *Id.* at *34-35. On November 14, 2005, the Correctional Expert

1    filed a report and recommendations on interim remedies concerning clinical staffing and

2    death reviews.  "[T]he Correctional Expert's report powerfully underscore[d] the depth of the

3    crisis in the delivery of health care services in the CDCR . . . ."  Ex. D1065 at 1 (Dec. 1, 2005

4    Order).  Over defendants' objections, the court ordered a series of "discrete, urgently needed,

5    remedial measures that could be undertaken immediately" to improve recruitment and

6    retention of clinical staff.  *Id.* at 1, 6-15.

7                     7.      Appointment of the *Plata* Receiver

8           With the parties' participation, the *Plata* court engaged in a national search for a

9    receiver.  On February 14, 2006, the court appointed Robert Sillen as Receiver, with an

10   effective date of April 17, 2006.  In its order of appointment, the court conferred broad

11   authority on the Receiver to "provide leadership and executive management of the California

12   prison medical health care delivery system with the goals of restructuring day-to-day

13   operations and developing, implementing, and validating a new, sustainable system that

14   provides constitutionally adequate medical care to all class members as soon as practicable."

15   Ex. P313 at 2 (Feb. 14, 2006 Order).  The Receiver was assigned "the duty to control,

16   oversee, supervise, and direct all administrative, personnel, financial, accounting,

17   contractual, legal, and other operational functions of the medical delivery component of the

18   CDCR," *id.*, and was granted "all powers vested by law in the Secretary of the CDCR as they

19   relate to the administration, control, management, operation, and financing of the California

20   prison medical health care system."  *Id.* at 4.  On January 23, 2008, the Court appointed

21   J. Clark Kelso to replace Sillen as Receiver, and he has served in that capacity to date.

22          The Receivers have implemented substantial changes in the CDCR's prison medical

23   care system and have issued regular reports documenting their progress.  For example, the

24   Receiver has increased recruitment and retention of clinical staff, implemented a new

25   pharmacy system, and instituted pilot programs to improve medical screening at reception

26   centers and management of chronic care.  Nonetheless, as we describe below, fundamental

27   unconstitutional deficiencies, caused primarily by overcrowding, continue to exist and

28   prevent the delivery of constitutionally adequate medical care to California's inmates.

1

**B.**    *Coleman* **(Mental Health Care)**

2      While the *Plata* court has struggled to bring the CDCR's medical system into

3 constitutional compliance for more than seven years, the *Coleman* action has lasted even

4 longer – almost two decades.  The first five years of litigation culminated in a finding that the

5 CDCR was violating the Eighth Amendment by failing to provide constitutionally adequate

6 mental health care to inmates with serious mental disorders.  The past fourteen years have

7 involved continual efforts to remedy the constitutional violations.

8      At the time of the *Coleman* trial, the Eighth Amendment violations stemmed in large

9 part from the state's complete failure to identify with any accuracy the number of mentally ill

10 inmates in the prison population, despite several expert reports addressing the issue.  Early in

11 *Coleman*'s remedial phase, the state developed a screening mechanism to identify mentally

12 ill inmates and plans for a system that could deliver mental health care to the thousands of

13 inmates suffering from serious mental disorders.  There are currently over 34,000 inmates

14 identified as seriously mentally ill in the state's prisons.  Ex. P243 at 900124 (collection of

15 monthly CDCR mental health population placement reports, dated between December 2006

16 and August 2008).  However, California remains unable to deliver constitutionally adequate

17 mental health care for these inmates.

18      After fourteen years of remedial efforts under the supervision of a special master and

19 well over seventy orders by the *Coleman* court, the California prison system still cannot

20 provide thousands of mentally ill inmates with constitutionally adequate mental health care,

21 and "critically mentally ill inmates [are] languishing in horrific conditions without access to

22 immediate necessary mental health care." May 2, 2006 Order at 2.[10]  The relentless growth

23 of the inmate population has prevented the state from meeting its obligations under the

24 Eighth Amendment and has led, inexorably, to the proceeding before this court.

25

26

27      [10]All references to court orders in this section of our opinion and order are to orders
filed in the district court in *Coleman*.  *Coleman* docket numbers are listed when multiple,
28 untitled orders were issued on the same day.

1        1.      Findings of Eighth Amendment Violations

2        The *Coleman* action was filed on April 23, 1990.  On July 25, 1991, plaintiffs filed an

3   amended complaint, Ex. D1036, raising claims under the Eighth and Fourteenth

4   Amendments to the United States Constitution and the Rehabilitation Act, 29 U.S.C. § 794.

5   These claims were based on serious inadequacies in the delivery of mental health care to

6   inmates in the California adult prison system.  *Id.*  The *Coleman* court subsequently certified

7   a class consisting of inmates with serious mental disorders.[11]  Nov. 14, 1991 Order at 4-5.

8   The matter proceeded to trial before a United States Magistrate Judge, and in June 1994 the

9   magistrate judge found that defendants' delivery of mental health care to class members

10   violated the Eighth Amendment.  On September 13, 1995, the district court adopted the

11   magistrate judge's decision, with modifications.  *Coleman v. Wilson*, 912 F. Supp. 1282

12   (E.D. Cal. 1995).[12]

13        In adopting the magistrate's findings, the *Coleman* court identified several significant

14   deficiencies in the delivery of mental health care to California's inmates.  First, the court

15   found delays in access to necessary mental health care "at each level of the mental health

16   care delivery system as it exist[ed] in the CDC," which "result[ed] in exacerbation of illness

17   and patient suffering."  *Id.* at 1308, 1309.  Evidence specifically noted by the *Coleman* court

18        [11]The class certified in 1991 consisted of "all inmates with serious mental disorders

19   who are now or who will in the future be confined within the California Department of
     Corrections (except the San Quentin State Prison, the Northern Reception Center at Vacaville

20   and the California Medical Facility-Main at Vacaville)."  Nov. 14, 1991 Order at 4-5.  On
     July 12, 1995, the *Coleman* class was decertified as to the Rehabilitation Act claim, which

21   was dismissed with prejudice.  July 12, 1995 Order at 2.  The class definition was
     subsequently amended to include "all inmates with serious mental disorders who are now, or

22   who will in the future, be confined within the California Department of Corrections."
     July 23, 1999 Order & Stip. & Order Amending Plaintiff Class & Application of Remedy

23   appended thereto at 2.
          Inmates suffering from "serious mental disorders" include those with "Organic Brain-

24   Syndrome-Severe, Schizophrenia, Major Depression [or] the Bipolar Disorders," those who
     "currently or within the last three years . . . [have] had a significant disorder of thought or

25   mood which substantially impairs or substantially impaired reality testing, judgment or
     behavior," and those who "currently do[] not have the ability to meet the functional

26   requirements of prison life without psychiatric intervention, including psychotropic
     medication."  *Coleman*, 912 F. Supp. at 1300 nn.15-16 (internal quotations and citations

27   omitted).

28        [12]The district court's order was issued following *de novo* review by that court of the
     magistrate judge's findings and recommendations.  *Coleman*, 912 F. Supp. at 1293, 1297.

1   included "backlogs of 300-400 inmates awaiting transfer to enhanced outpatient programs at

2   California Men's Colony [('CMC')] or California Medical Facility [('CMF')]" and a defense

3   exhibit describing "the problem of the backlog of male inmates awaiting transfer to CMF and

4   CMC for mental health services" as "approaching the crisis level." *Id.* at 1309 (internal

5   quotations omitted).

6          In addition, defendants did not have "a systematic program for screening and

7   evaluating inmates for mental illness." *Id.* at 1305.  Instead, they relied on mechanisms that

8   were "either used haphazardly, or depend[ed] for efficacy on incomplete or non-existent

9   medical records, self-reporting, or the observations of custodial staff inadequately trained in

10  the signs and symptoms of mental illness." *Id*. at 1305-06.  As a result, "thousands of

11  inmates suffering from mental illness [were] either undetected, untreated, or both." *Id*. at

12  1306.

13         Furthermore, the *Coleman* court found that "defendants' supervision of the use of

14  medication [was] completely inadequate; prescriptions [were] not timely refilled, there [was]

15  no adequate system to prevent hoarding of medication, . . .  inmates on psychotropic

16  medication [were] not adequately monitored, and it appear[ed] that some very useful

17  medications [were] not available because there [was] not enough staff to do necessary post-

18  medication monitoring." *Id.* (internal quotations and citation omitted); *see also id.* at 1310.

19  The court also found violations of a constitutional magnitude in the involuntary medication

20  of inmates.  *Id.* at 1313.  In addition, the court found significant deficiencies in medical

21  record keeping, "including disorganized, untimely and incomplete filing of medical records,

22  insufficient charting, and incomplete or nonexistent treatment plans" at most prisons.  *Id.* at

23  1314 (internal quotations and citation omitted); *see also id.* at 1315.  The court found that

24  "inmates [were] typically transferred between prisons without even such medical records as

25  might exist." *Id.* at 1314 (internal quotations and citation omitted); *see also id.* at 1315.

26         The *Coleman* court also found that "the California Department of Corrections [was]

27  significantly and chronically understaffed in the area of mental health care services." *Id.* at

28  1307.  Relying on the testimony of a defense expert, the *Coleman* court further found that

1    "defendants [could not] provide adequate mental health care without some form of quality

2    assurance" program to ensure the competence of their mental health care staff, but that the

3    CDCR lacked any such program. *Id.* at 1308.

4         These findings led the *Coleman* court to conclude that defendants lacked all of the

5    "basic, essentially common sense, components of a minimally adequate prison mental health

6    care delivery system," *id.* at 1298 (citing *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp.

7    1558, 1577 (D. Idaho 1984) (citing *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex.

8    1980)), including proper screening; timely access to appropriate levels of care; an adequate

9    medical record system; proper administration of psychotropic medication; competent staff in

10   sufficient numbers; and a basic suicide prevention program. *Id.* at 1298 n.10.  The *Coleman*

11   court found that the CDCR was seriously deficient in each of the first five components and

12   that the CDCR's suicide prevention program was adequate in design but inadequately

13   implemented due to severe and chronic understaffing throughout the CDCR.  *Id.* at

14   1305-15.[13]

15        On the basis of its findings, the *Coleman* court entered an order for injunctive relief

16   requiring defendants to develop plans to remedy the constitutional violations under the

17   supervision of a special master.  *Id.* at 1323-24; *see also* Fact #5, Nov. 17, 2008 Joint

18   Statement of Undisputed Facts.

19

20

21
_____

22        [13]In addition, the *Coleman* court found "inappropriate use of disciplinary and
     behavioral control measures directed towards the members of plaintiff class."  *Id.* at 1319-20.
23   Seriously mentally ill inmates were "being treated with punitive measures by the custody
     staff to control the inmates' behavior without regard to the cause of the behavior" because
24   custody staff was "inadequately trained in the signs and symptoms of serious mental illness."
     *Id.* at 1320.  Defendants' placement of *Coleman* class members in administrative segregation
25   and segregated housing units ("SHUs") was found to violate the Eighth Amendment because
     mentally ill inmates were placed in such units "without any evaluation of their mental status,
26   because such placement [caused] further decompensation, and because inmates [were] denied
     access to necessary mental health care while they [were] housed in administrative
27   segregation and/or segregated housing."  *Id.* at 1320 (internal quotations and citation
     omitted).  The court also found unconstitutional defendants' policy permitting the use of
28   tasers and 37mm guns on *Coleman* class members without consideration of the impact of
     such measures on mental illness.  *Id.* at 1321-23.

2.      Remedial Orders

On December 11, 1995, the *Coleman* court appointed a special master to oversee the remedial phase of the action.  Dec. 11, 1995 Order Appointing a Special Master at 2.  The specific duties of the Special Master included working with defendants to develop a remedial plan to address the constitutional violations identified by the court, monitoring defendants' implementation of and compliance with the remedial plan, and submitting interim reports on the progress of the remedial plan and defendants' compliance.  Dec. 11, 1995 Order of Reference at 3-4.

Eighteen months later, the Special Master submitted a report to the court accompanied by remedial plans, policies, procedures, and forms collectively identified as the Mental Health Services Delivery System Program Guides (hereafter "Program Guides").  June 6, 1997 Special Master's Report on Plans, at 1-2.[14]  The court accepted the Special Master's report, ordered two specific modifications recommended by the Special Master, gave provisional approval to the Program Guides, and directed the Special Master to "forthwith commence monitoring defendants' implementation of and compliance with" the delivery of mental health care services as set forth in the Program Guides.  June 27, 1997 Order at 2-3.

Following the court's provisional approval of the Program Guides, defendants continued to work with the Special Master to implement and revise the guides.[15]  In early 2006, the Special Master submitted a report and recommendations regarding a Revised Program Guide that defendants concurrently submitted for final approval.  *See* Jan. 2006 Revised Program Guide (*Coleman* docket # 1753).  On March 3, 2006, the *Coleman* court

[14]A reformatted copy of the Program Guides was filed in January 1998.  *Coleman* docket # 913.

[15]As the *Coleman* Special Master explained when defendants' Revised Program Guide was submitted for final approval, at the start of the remedial phase "the basic program guides were a work in progress, hence their provisional adoption.  Many of the programmatic components of the defendant's mental health system were still embryonic and needed much nurturing. . . .  All agreed that their implementation needed close scrutiny and analysis over the next several years.  During the subsequent implementation process, many aspects of the provisionally approved plans, policies, and protocols were revisited and amended by the court, while some other provisions were modified and upgraded by the defendants on their own initiative."  Feb. 3, 2006 Special Master's Report & Recommendations on Defs.' Revised Program Guide at 2.

26

1   gave final approval to all undisputed provisions of the Revised Program Guide and ordered

2   their immediate implementation.  Mar. 3, 2006 Order at 1-2.[16]

3     Operating under the framework established by the Program Guides, the *Coleman*

4   court has engaged in extensive efforts to address the identified constitutional violations

5   through means other than a prisoner release order.  Since June 1997, the *Coleman* Special

6   Master has filed twenty monitoring reports and fifty-six other reports.  During the same

7   period, the *Coleman* court has issued well over seventy orders concerning the matters at the

8   core of the remedial process.  As discussed in detail below, the vast majority of the orders by

9   the *Coleman* court have been directed at accurately projecting short-, medium-, and long-

10   range bed needs; creating a sufficient number of beds at the higher levels of the mental health

11   care delivery system; reducing delays in transfers to necessary levels of care; and ensuring

12   adequate staffing.[17]  In addition, the court has issued several orders addressing deficiencies at

---

13     [16]The Revised Program Guide approved by the *Coleman* court in March 2006 contains
14   specific provisions for an annual revision process.  *See* Jan. 2006 Revised Program Guide
(*Coleman* docket # 1753-2) at 12-1-14; *see also* Dezember Trial Aff. ¶ 24 ("The Program
15   Guide is now subject only to an annual revision process.").  The *Coleman* court has
specifically approved at least one additional modification to the Revised Program Guide.  *See*
16   Sept. 11, 2006 Stip. & Order at 3.
  The parties have offered three separate versions of the Revised Program Guide into
17   evidence.  Defendants have offered as Exhibit D1147 a document they represent to be the
Revised Program Guide approved by the *Coleman* court in March 2006.  *See* Dezember Trial
18   Aff. ¶ 16.  Plaintiffs have offered as Exhibit P9 a document identified as the September 2006
Revised Program Guide.  Defendants have also offered as Exhibit D1148 a version of the
19   2008 Revised Program Guide to which is appended a redline document showing edits from a
Draft August 2008 revision.  Defendants represent that at the time of filing the 2008 Revised
20   Program Guide had been through "the annual revision process to enable [its] publication"
and that "distribution of the final 2008 Revised Program Guide to the field [was] in the
21   offing."  Dezember Trial Aff. ¶ 24.  Unless otherwise noted, all citations in this opinion and
order are to the 2008 Revised Program Guide, Ex. D1148.

22     [17]At the earliest stages of the remedial phase, the Special Master reported that
23   defendants' plan for screening inmates at reception centers represented a "vast improvement"
over the screening procedures that existed at the time of trial, and that defendants had chosen
24   an effective screening instrument.  Mar. 12, 1996 First Report of the Special Master on the
Remedial Plan at 6-7.  Implementation of screening practices was slow at the start of the
25   remedial phase, but by mid-1997 defendants' screening process had improved.  Evidence
offered at the *Coleman* trial showed that, in July 1987, approximately 2,966 inmates had
26   been identified with a psychiatric classification and/or placement in psychiatric facilities used
by the CDCR, while, conservatively, over 4,000 inmates with serious mental disorders were
27   undetected.  *See Coleman*, 912 F. Supp. at 1306 n.29.  By July 1997, 14,293 inmates with
serious mental disorders had been identified.  *See* Feb. 3, 2006 Special Master's Report &
28   Recommendations on Defs.' Revised Program Guide at 2.  The Special Master's second
monitoring report, filed in October 1998, reflected increasing institutionalization of, and

specific institutions.[18]  Finally, the court has issued several orders concerning suicide

prevention efforts, including, in the last five years, orders addressing a rising number of

inmate suicides, particularly in administrative segregation units.[19]

*a.*     *Mental Health Care Beds and Treatment Space*

As the remedial phase of *Coleman* began and thousands of inmates with serious

mental disorders were identified, the need for additional treatment space at every level of the

mental health care delivery system became manifest.  *See* Ex. D1292 (Special Master's

Response to Court's May 17, 2007 Request for Information) at 5 (noting emergence in mid-

and late-1990s of a "need for much expanded mental health care and the space needed to

provide it").[20]

---

compliance with, the mental health screening system, *see* Ex. D1108 (compilation of summaries and recommendations from the *Coleman* Special Master's twenty monitoring reports) at DEFS059840-DEFS059849.  By August 2008, there were 34,319 inmates with serious mental disorders identified in California's prison system.  Ex. P243 at 900124.

[18]*E.g.*, Nov. 19, 1998 Order at 1-2 (regarding California Rehabilitation Center ("CRC"), Mule Creek State Prison ("Mule Creek"), Salinas Valley State Prison ("SVSP"), Wasco State Prison ("Wasco"), Deuel Vocational Institution ("DVI"), California Institution for Men ("CIM"), California Institution for Women ("CIW"), and California State Prison-Solano ("CSP-Solano")); Oct. 26, 2001 Order at 1-2 (regarding California Substance Abuse Training Facility ("SATF") and California State Prison-Los Angeles County ("CSP-LAC")); Apr. 25, 2002 Order at 2-3 (regarding CSP-LAC); June 13, 2002 Order (*Coleman* docket # 1384) at 1-2 (regarding CIM, SATF, California State Prison-Corcoran ("CSP-Corcoran"), CSP-LAC, CSP-Solano, San Quentin State Prison ("San Quentin"), and SVSP); Mar. 8, 2005 Order at 3-4 (regarding CSP-Corcoran, San Quentin, and Richard J. Donovan Correctional Facility ("R.J. Donovan")).

[19]*E.g.*, Dec. 22, 2000 Order at 4 (requiring Special Master to report on whether defendants have adequate mechanisms for disciplining staff whose conduct contributes to inmate suicide); Oct. 1, 2001 Order at 2 (directing implementation of Suicide Reporting and Review Policy); Jan. 12, 2004 Order at 2-3 (requiring several training and planning measures for suicide prevention); June 10, 2005 Order at 1-2 (*Coleman* docket # 1668) (requiring implementation of several suicide prevention measures); June 8, 2006 Order at 2-3 (requiring defendants to develop a plan to deal within rising percentage of suicides in administrative segregation and a budget and implementation schedule); Aug. 8, 2006 Stip. & Order at 1-2 (regarding use of video-monitoring for suicide watch observation); Sept. 11, 2006 Stip. & Order at 3 (extending time to submit final plan regarding suicides in administrative segregation).

[20]Plaintiffs also offered this document into evidence as Exhibit P35.  Because we discuss the reports of the *Coleman* Special Master and the *Plata* Receiver throughout this opinion and order, we note that, at trial, both plaintiffs and defendants introduced various reports from the Receiver and the Special Master without objection.

28

1    At the time of the *Coleman* trial, mental health care delivery to inmates in California's

2    prison system was "limited to a few institutions and involved some 3,200 designated mental

3    health care beds," Defs.' Proposed Finding of Fact # 45 (citing Ex. D1273 at 43-44;

4    Dezember Trial Aff. ¶ 70), including beds for inpatient hospital care provided by the

5    Department of Mental Health ("DMH") at CMF and Atascadero State Hospital.  Dezember

6    Trial Aff. ¶ 70.  After the *Coleman* trial, defendants undertook to implement plans

7          for the delivery of a continuum of mental health services,
          including long-term inpatient care (provided through the

8          department's contract with the California Department of Mental
          Health), short-term inpatient care (the department's Mental

9          Health Crisis Bed program), intensive outpatient care (the
          Enhanced Outpatient Program) and routine outpatient care (the

10         Correctional Clinical Case Management program).

11   Mar. 12, 1996 First Report of the Special Master on the Remedial Plan at 2-3.  Defendants

12   planned regional mental health care service areas, with "[i]nitial entry to the service

13   continuum . . . provided primarily through a uniform screening process" at each of the

14   CDCR's reception centers.[21]  *Id.* at 3.

15   Defendants' remedial plans were built around the Mental Health Services Delivery

16   System ("MHSDS") set forth in the original Program Guides and the Revised Program

17   Guide.  The MHSDS is designed to provide mental health care to all inmates with current

18   symptoms of any of the Axis I serious mental disorders identified in the current Diagnostic

19   and Statistical Manual,[22] inmates who need mental health treatment "to protect life and/or

20   treat significant disability/dysfunction" resulting from a diagnosed or suspected mental

21   disorder, and inmates with a diagnosis or recent episode of exhibitionism.  Ex. D1148 at

22

23

24        [21]We describe reception centers in more detail below when we discuss whether

25   crowding is the primary cause of the constitutional violations at issue.  *See infra*
     Section IV.B.1.

26        [22]As listed in the Revised Program Guide, these are:  Schizophrenia (all subtypes);

27   Delusional Disorder; Schizophreniform Disorder; Schizoaffective Disorder; Brief Psychotic
     Disorder; Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal);

28   Psychotic Disorder Due to a General Medical Condition; Psychotic Disorder Not Otherwise
     Specified; Major Depressive Disorders; and Bipolar Disorders I and II.  Ex. D1148 at 12-1-6.

1  12-1-6.  The MHSDS has the same basic structure as the "embryonic"[23] system first reported

2  by the *Coleman* Special Master in March 1996.  The system is designed around four levels of

3  care: the Correctional Clinical Case Management Services program ("CCCMS" or "3CMS"),

4  the Enhanced Outpatient Program ("EOP"), Mental Health Crisis Bed ("MHCB") Placement,

5  and DMH Inpatient Hospital Care.  Ex. D1148 at 12-1-7 to 12-1-9.[24]

6       A significant amount of remedial effort in *Coleman* has been spent on the as yet

7  unsuccessful endeavor to develop a sufficient number of mental health care beds at the EOP,

8  MHCB, and inpatient levels of care,[25] as well as to provide adequate treatment space for all

9  inmates with serious mental health disorders.[26]  The *Coleman* court has issued numerous

10  orders addressing the need for mental health care beds and treatment space, including orders

11

12      [23]Feb. 3, 2006 Special Master's Report & Recommendations on Defs.' Revised Program Guide at 2.

13      [24]The CCCMS level of care is for inmates whose symptoms are under control or in
14  partial remission and can function in the general prison population, administrative
segregation, or segregated housing units.  Ex. D1148 at 12-1-7.  The EOP level of care is for
15  inmates who suffer "Acute Onset or Significant Decompensation of a serious mental disorder
characterized by increased delusional thinking, hallucinatory experiences, marked changes in
16  affect, and vegetative signs with definitive impairment of reality testing and/or judgment,"
and who are unable to function in the general prison population but do not require twenty-
17  four hour nursing care or inpatient hospitalization.  *Id.* at 12-1-7 to 12-1-8.  MHCBs are for
inmates who are markedly impaired and/or dangerous to others as a result of mental illness,
18  or who are suicidal, and who require 24-hour nursing care.  *Id.* at 12-1-8 to 12-1-9.  The
MHCB level of care is also for inmates "awaiting transfer to a hospital program" and for
19  inmates "being stabilized on medication prior to transfer" to a lower level of care.  *Id.*
Finally, DMH inpatient care is for inmates who "cannot be successfully treated" at a lower
20  level of care; both intermediate and acute levels of inpatient care are to be provided.  *Id.* at
12-1-9.

21      [25]CCCMS inmates are housed in the general prison population.

22      [26]At a relatively early stage in the remedial process, defendants recognized the need to
23  develop an adequate method of forecasting the need for such beds.  However, according to
Robin Dezember, Chief Deputy Secretary of CDCR's Correctional Healthcare Services
24  Division at the time of trial, there was a period of several years prior to 2006 "where there
seemed to be a lack of continuous attention to this program."  Rep. Tr. at 862:12-14.  In
25  2002, a health care consulting firm "designed a mental health bed demand forecast
methodology for the CDCR. . . .  This method projects future bed needs based on several
26  variables that drive bed usage, including total overall prison population, length of stay and
discharge rates of patients in inpatient status, and growth in outpatient demand proportional
27  to the historical prevalence of outpatients in the total prison population."  Defs.' Statewide
Mental Health Bed Plan, April 2006, filed April 17, 2006, at 3.  In 2006, defendants
28  acknowledged that the forecasting methodology developed in 2002 needed to be updated.
May 2, 2006 Order at 2 n.1.

1   directing defendants to assess the need for beds and treatment space throughout the mental

2   health care delivery system and to plan for and develop the necessary number of beds as well

3   as sufficient space at each level of care.[27]

4          When the state's growing prison population reached a record of more than 160,000 in

5   2006, the shortage of beds and space reached a crisis level.  In March 2006, defendants were

6   ordered to submit a plan to meet both the immediate and long-term need for mental health

7   care beds.  Mar. 3, 2006 Order at 3-4.  During a subsequent hearing on the adequacy of

8   defendants' proposed plan, the CDCR's then-Director of Health Care Services reported a

9   shortage of 75 MHCBs and 125 intermediate inpatient beds and "repeatedly referred to the

10  shortage as a 'crisis.'"  May 2, 2006 Order at 2.  The *Coleman* court found that defendants'

11  plan entirely failed to address the CDCR's immediate bed needs:

12             The special master reports, the record reflects, and defendants
               admit, that the plan presented to the court in no way adequately
13             responds to the severe shortage of intermediate care facility beds
               and mental health crisis beds that currently exists in the CDCR.
14             It is undisputed that the shortage is leaving critically mentally ill
               inmates languishing in horrific conditions without access to
15             immediately necessary mental health care.

16  *Id.*  The court further found that defendants' long-range plan for the provision of acute and

17  intermediate care beds and mental health crisis beds appeared "sound in principle," but

18  required revision because it was based on population figures that were "already out of date."

19  *Id.*  Defendants' plan for EOP beds was not approved because it "describe[d] a shortfall of

20  over 1000 such beds in the year 2011."  *Id.* at 4.  Following the hearing, the court ordered

21  defendants to file an amended long-term plan and to include with that plan a list of any

22  projects that could be accelerated; to file a plan for the interim provision of intermediate

23  inpatient beds and mental health crisis beds; and to maintain, open, or create intermediate

24  inpatient and mental health crisis beds at specific prison locations.  *Id.* at 4-6.  The *Coleman*

25  court has subsequently issued several orders concerning the provision of EOP, MHCB, and

26          [27]*E.g.*, May 21, 1998 Stip. & Order at 4; Sept. 14, 2000 Order at 2; Apr. 4, 2001 Order
    at 4; June 27, 2001 Order at 2; Dec. 20, 2001 Order at 1-2; Mar. 4, 2002 Order at 1; May 7,
27  2002 Order at 1-2; Oct. 8, 2002 Order at 2; Jan. 12, 2004 Order at 2; Apr. 5, 2004 Order at 3;
    July 9, 2004 Order at 3-4; Oct. 5, 2004 Order at 2; Jan. 27, 2005 Order at 2; Mar. 3, 2006
28  Order (*Coleman* docket # 1772) at 3-4.

1    inpatient beds, all of which are in critically short supply, including an extensive order

2    concerning defendants' long-range and interim plans for the provision of these beds.[28]

3    However, providing the beds is obviously infeasible without the necessary space in which to

4    locate them, especially in light of the constantly increasing need for such beds as a result of

5    the substantial, if unanticipated, growth in the prison population.

6                    b.    *Transfers to Appropriate Level of Care*

7            Throughout *Coleman*'s remedial phase, the state's delivery of mental health care to its

8    inmates has been plagued by delays in the transfer of inmates to higher levels of care.  Both

9    the original Program Guides and the Revised Program Guide include timelines for post-

10   referral transfers to EOP programs, mental health care crisis beds, and DMH inpatient beds.

11   *See Coleman* docket # 913 at 1-4, 4-13, 5-13, 6-4; Ex. D1148 at 12-1-16.[29]  Unfortunately,

12   the state remains unable to transfer inmates to required care in a timely fashion, and the

13           [28]Oct. 20, 2006 Order; *see also* July 20, 2006 Order (*Coleman* docket # 1904) at 1;
14   Aug. 23 2006 Order.

15           [29]The timelines in the Revised Program Guide are as follows:

16           Reception Centers:  EOP transfers should occur within 60 days,
             or 30 days if clinically indicated.  CCCMS transfers should occur
17           within 90 days, or 60 days if clinically indicated.

18           MHCB:  MHCB transfers should occur within 24 hours of
             referral.

19           DMH:  Transfers to DMH acute placements should occur within
20           10 days of referral, if accepted to DMH.  Referral must be
             completed within 2 working days of identification.  Transfers to
21           DMH intermediate care placements should occur within 30 days
             of referral, if accepted to DMH.  Referral must be completed
22           within 5-10 working days.

23           EOP:  Transfers to general population ("GP") EOP programs
             should occur within 60 days, or 30 days if clinically indicated.

24           EOP Administrative Segregation Unit ("ASU") Hub:  EOP
25           inmates housed in the regular ASU should transfer to an EOP
             ASU Hub within 30 days of placement in the regular ASU or
26           within 30 days of referral to EOP level of care.

27           PSU:  EOP inmates housed in the ASU who are endorsed for the
             PSU must be transferred within 60 days of endorsement.

28   Stewart Expert Report ¶ 153; *see* Ex. D1148 at 12-1-16.

1   *Coleman* court has issued numerous orders directed at expediting transfers and reducing

2   delays.[30]

3                              *c.      Staffing*

4        A final focus of the remedial effort in *Coleman* over the last decade has been the

5   development and retention of sufficient numbers of competent mental health care clinicians.

6   In June 1998, the *Coleman* court issued the first of numerous orders aimed at remedying the

7   substantial understaffing of the CDCR's mental health care system, directing defendants to

8   show improvement in the "quality and quantity of contracted psychiatric services and/or" the

9   implementation of a "recruitment program sufficient[] to fill vacancies in presently

10  authorized positions." June 16, 1998 Order at 1. In the same order, the court directed the

11  *Coleman* Special Master to recommend the staffing ratios necessary to a constitutionally

12  adequate mental health care delivery system. *Id*. at 2.[31] Since then, the court has repeatedly

13  ordered defendants to create the necessary positions and to hire staff to fill those positions.[32]

14  In addition, the court has issued orders designed to assure the competence of staff, primarily

15  by requiring the state to develop and implement a quality assurance and peer review

16  process.[33]

17       After two years of compliance monitoring, it became apparent that orders setting

18  staffing ratios and requiring defendants to fill clinical positions would not be sufficient to

19  ───────────────

20      [30]*E.g.*, July 26, 1999 Order at 5-6; Jan. 13, 2000 Order (*Coleman* docket # 1111) at 4;
Apr. 27, 2000 Order at 5; July 3, 2000 Order at 6; Sept. 14, 2000 Order at 2; Apr. 4, 2001

21  Order at 3-4; Jan. 12, 2004 Order at 2; Mar. 25, 2004 Order at 2-3; Mar. 8, 2005 Order at 2;
Oct. 20, 2006 Order at 3.

22      [31]In July 1999, the court approved several mental health staffing ratios and required

23  defendants to adopt and implement specific mental health care staffing ratios for
administrative segregation units. July 26, 1999 Order at 4-5.

24      [32]*E.g.*, Aug. 25, 1998 Order at 1; Jan. 19, 1999 Order at 2; July 26, 1999 Order at 4;

25  Jan. 13, 2000 Order (*Coleman* docket # 1111) at 4; Apr. 27, 2000 Order at 5; July 3, 2000
Order; Aug. 28, 2000 Order (*Coleman* docket # 1198) at 3; Apr. 4, 2001 Order at 4; Oct. 26,

26  2001 Order at 1; June 13, 2002 Order (*Coleman* docket # 1383) at 4; June 13, 2002 Order
(*Coleman* docket # 1384) at 2; Mar. 3, 2006 Order (*Coleman* docket # 1772) at 3; Mar. 9,

27  2006 Order (*Coleman* docket # 1774) at 1-2.

28      [33]*E.g.*, June 16, 1998 Order at 2; Aug. 12, 1998 Order at 1-2; June 13, 2002 Order
(*Coleman* docket # 1384) at 2.

1    remedy the constitutional violations.  Accordingly, the *Coleman* court ordered defendants to

2    develop a plan to retain CDCR psychiatrists.  July 26, 1999 Order at 4.  Over the next eight

3    years, as part of its ongoing effort to ensure that California hires and retains sufficient

4    clinical staff, the court issued several orders concerning recruitment and retention bonuses, as

5    well as salary increases for mental health clinicians.[34]

6                        3.   Special Master's 2006 Monitoring Reports

7            By the end of the first decade of remedial work in *Coleman*, the state had made some

8    progress but still had not met its constitutional obligation to provide *Coleman* class members

9    with adequate mental health care.  July 23, 2007 Order, 2007 WL 2122636, at *3.  Worse,

10   two monitoring reports filed by the *Coleman* Special Master in 2006 reflected a troubling

11   reversal in the progress of the remedial efforts of the preceding decade and demonstrated the

12   profound impact of population growth on the state's ability to meet its constitutional

13   obligations to seriously mentally ill inmates.

14           On January 23, 2006, the *Coleman* Special Master filed his Fifteenth Monitoring

15   Report, which included findings made at monitoring visits to all CDCR institutions between

16   early August 2004 and late May 2005.  Jan. 23, 2006 Fifteenth Monitoring Report at 2-3.

17   The report was grim.  The Special Master reported rising vacancy rates in staffing, as well as

18   a "growing crisis in accessibility to a MHCB level of care and the continuing inadequacy of

19   access to DMH programs highlighted by the unmet needs assessment that was conducted and

20   concluded during the period."  Ex. D1108 (compilation of summaries and recommendations

21   from the *Coleman* Special Master's twenty monitoring reports) at DEFS060221-

22   DEFS060222.  The Special Master also reported that "suicides in CDCR escalated

23   significantly during the monitoring period for reasons that are just beginning to be subjected

24   to analysis."  *Id.* at DEFS060222.

25

26          [34]*E.g.*, Jan. 13, 2000 Order (*Coleman* docket # 1111) at 4-5; July 25, 2003 Order at 6;
     Mar. 8, 2005 Order at 1-2; June 10, 2005 Order (*Coleman* docket # 1667) at 1-2; Mar. 9,
27   2006 Order (*Coleman* docket # 1774) at 1-2; Dec. 15, 2006 Order at 1-2; Feb. 7, 2007 Order
     at 2; May 23, 2007 Order (*Coleman* docket # 2236) at 5; June 28, 2007 Order (*Coleman*
28   docket # 2301) at 3.

1       The Special Master further reported that "transfers to more intensive levels of mental

2  health programming and treatment" had "deteriorated sharply and widely." *Id.* at

3  DEFS060252.  The availability of MHCBs, "the department's sole internal resource for

4  providing short-term crisis care for unstable and suicidal inmates," had declined to the point

5  that it "became by mid-2005 a critical issue with severe impact on CDCR's most seriously

6  mentally disordered inmates." *Id.*  In addition, "the waiting list for the admission to

7  Psychiatric Service Units (PSUs) for EOPs with a SHU [Segregated Housing Unit] term,

8  imposed on inmates who are viewed as a danger to themselves or others, expanded steadily,

9  and mental health caseload inmates continued to spend long periods in reception awaiting

10  transfer to EOP and 3CMS general population programs." *Id.* at DEFS060252-

11  DEFS060253.

12       Taken together, the expanding wait lists, critical shortage of beds, and identification of

13  hundreds of inmates in need of clinical referrals "meant that a growing number of the most

14  seriously mentally ill inmates in the CDCR were not receiving in a timely fashion the levels

15  of care they needed." *Id.* at DEFS060253.  To explain this backward slide in the progress

16  made under the *Coleman* court's supervision, the Special Master pointed to the prison

17  system's expanding population.  For example, "none of the [CDCR's] planning documents . .

18  . addressed the department's need to expand its capacity to provide acute inpatient DMH care

19  to meet the expanding need being pushed, among other causes, by an inexorably rising

20  MHSDS population commensurate with CDCR's growing overall population." *Id.* at

21  DEFS060258.  Likewise, progress in the timely transfer of mentally ill inmates from

22  reception centers into general population programs had "been largely cancelled by the

23  recently escalating growth in the overall CDCR population and the concomitantly increasing

24  number of MHSDS inmates in reception." *Id.* at DEFS060272-DEFS060273.

25       Defendants did not object to the Special Master's Fifteenth Monitoring Report or the

26  recommendations contained therein, including the Special Master's finding as to the role

27  played by the rapidly growing prison population and the resulting lack of space necessary to

28

1  provide the requisite care to mentally ill inmates.  Mar. 3, 2006 Order (*Coleman* docket

2  # 1772) at 1.

3       As compliance work continued in 2006, the population pressures identified by the

4  Special Master in his Fifteenth Monitoring Report were evident:  Compliance became more

5  difficult and the gains made by defendants in the first decade receded.  On December 14,

6  2006, the *Coleman* Special Master filed his Sixteenth Monitoring Report.  That report, which

7  covered a monitoring period from the summer of 2005 until March 2006, Ex. D1108 at

8  DEFS060302, revealed that serious shortages in staffing and bed space, as well as substantial

9  delays in transfers to necessary levels of care, continued unabated.

10       Among other findings, the Special Master reported that "the inexorably expanding

11  demand for services resulting from the bulging population" had caused a "continuing

12  deterioration of mental health staffing."  *Id.* at DEFS060303.  According to the Special

13  Master, "[t]welve years after the determination that mental health treatment in CDCR was

14  unconstitutional, the defendants still lacked clinical resources to meet the needs of some 25

15  to 30 percent of inmates identified as seriously mentally disordered."  *Id.* at DEFS060304.

16       Furthermore, the Special Master reported that

17            [t]he general breakdown in transfers was another transcendent
             issue in the 16th round of review.  As the overall caseload
18            population continued to increase, so too did the percentage of the
             caseload in need of program beds with intensive care and high
19            security, including specifically DMH inpatient beds, MHCBs,
             PSU beds and EOP administrative segregation placements.
20

21  *id.* at DEFS060306.  "[A]ccess to appropriate levels of care for seriously mentally ill inmates

22  remained a problem in almost every CDCR institution."  *Id.* at DEFS060307.

23       Although Defendants filed a response to two recommendations contained in the

24  Sixteenth Monitoring Report, they did not object to any of the above findings, once more

25  including the Special Master's determination that the "escalating growth in the overall

26  CDCR population" was a major cause of the CDCR's reversal of progress.  *Id.* at

27  DEFS060273; *see* Defs.' Dec. 7, 2006 Response to Special Master's Sixteenth Report.

28

1        **C.      Crowding in California's Prison System**

2                1.      The Increasing California Prison Population

3        Since the mid-1970s, California's prison population has increased by over 750

4  percent, rising from approximately 20,000 inmates to an "all-time high" in October 2006 of

5  over 170,000 inmates, with more than 160,000 housed in the state's adult prison institutions.

6  Ex. P1 at 1 (Governor Schwarzenegger's Oct. 4, 2006 Prison Overcrowding State of

7  Emergency Declaration); Ex. P5 at 62 (May 2006 California Policy Research Center Report,

8  "Understanding California Corrections"); Fact # 9, Nov. 17, 2008 Joint Statement of

9  Undisputed Facts; Ex. D1259-1.  Much of this population expansion occurred during the time

10 in which the *Plata* and *Coleman* courts have monitored the medical and mental health care in

11 California's prisons.  In 1991, when the *Coleman* plaintiffs filed their amended complaint,

12 the state's prison system housed approximately 100,000 inmates.  Ex. P410 at 2 (CDCR

13 Offender Information Services Branch Data Analysis Unit, Institution and Camp Design Bed

14 Capacity and Population, June 30, 1987 - June 30, 2007).  As of August 27, 2008, 156,352

15 inmates were housed in in-state prison institutions.  Fact # 10, Nov. 17, 2008 Joint Statement

16 of Undisputed Facts.[35]

17       The expansive growth of the prison population in California is due, in part, to the

18 state's adoption of determinate sentencing in the 1970s, Ex. P5 at 61-62, and the "countless

19 increases in criminal sentences" enacted by the legislature or in initiative measures in

20 succeeding years, Ex. P3 at 68 (Jan. 2007 Little Hoover Commission Report, "Solving

21 California's Corrections Crisis: Time Is Running Out") (detailing increases in California

22 sentencing since the Determinate Sentencing Act became effective in 1977).  In addition,

23 California's prison population has increased because of its post-sentencing practices.  "The

24 state has [] been widely criticized for not doing a better job of preparing inmates to return to

25      [35]In this opinion and order, we will hereafter consider only figures and percentages
26 relating to the CDCR's thirty-three in-state adult prison institutions.  We do not consider
   camps, community correction centers, or Department of Mental Health state hospitals, all of
27 which also house CDCR inmates.  It is the thirty-three in-state adult prison institutions that
   are the subject of the Governor's Prison Overcrowding State of Emergency Proclamation and
28 were the focus of the evidence at trial before this court.  All references to "system" and
   "systemwide" encompass only those thirty-three adult institutions.

1   society."  Ex. P4 at 121 (June 2004 Corrections Independent Review Panel Report,

2   "Reforming Corrections").

> Approximately 90 percent of state prison inmates are eventually
> released on parole, and at present, more than half return to prison.
> A 2003 study by the Little Hoover Commission concluded that
> inmates are not prepared for their release from prison.
> Department of Corrections reports show that 43 percent of
> inmates released from prison in 1999 were sent back to prison
> within a year and that 56 percent returned within two years.
> Many of those returned to prison are parolees who are sent back
> for violating the conditions of parole, rather than for committing
> new crimes, and many of those go back for relatively short
> periods of time – an average of 5½ months.

9   *Id.*  The consequences of the state's failure to prepare inmates for re-entry are significant:

10  "The vast numbers of parolees returning to prison help drive both the size of the prison

11  population and the cost of the system.  In 2001 more than 74,000 (47 percent) of the average

12  daily prison inmate population of 157,000 was made up of parole violators."  *Id.*  Finally,

13  also significant are the actions of the parole board and the Governor in declining to release

14  prisoners serving terms of 15 or 25 years to life who have served their minimum sentence or

15  more with unblemished records and are determined by prison officials not to constitute a risk

16  to society.

17          2.      Studies Commissioned by the State of California To Examine

18                  Prison Crowding

19          The California legislature has recognized prison crowding as a serious problem since

20  at least 1987, when it convened a Blue Ribbon Commission on Inmate Population

21  Management.  *See* Ex. P2 at 78.  The commission issued its final report in 1990, with thirty-

22  eight recommendations, including "alternative sanctions, and more programming [and]

23  reentry programs."  *Id.*  Between 1990 and 2006, more than a dozen commissions and other

24  groups issued reports with proposals to solve the overcrowding problem in California's

25  prison system.  *Id.* at 3, 10, 78-79.  As Joan Petersilia, co-chair of the expert panel convened

26  by the CDCR in 2007, noted, "all of the reports recommended essentially the same ten

27  things," including diverting non-violent, non-serious offenders and technical parole violators

28  from prison; using a risk and needs assessment tool to match inmates with resources and

1     programming; expanding rehabilitative programs; reforming California's determinate

2     sentencing system; transferring low-risk prisoners in the later part of their sentences to

3     community-based reintegration facilities; establishing a sentencing commission; reforming

4     parole; creating partnerships between state and local corrections agencies; requiring that all

5     programs be based on solid research evidence; and promoting public awareness regarding

6     California's prison system. *Id.* at 77.

7         One of the most exhaustive reports completed during this period was the June 2004

8     report of the Corrections Independent Review Panel, which was appointed by Governor

9     Schwarzenegger; chaired by former California Governor and Attorney General George

10     Deukmejian, who had a reputation as tough on crime; and composed of forty independent

11     correctional consultants and representatives from state agencies. Ex. P4 at i. The Panel

12     noted that California's "correctional system has grown to become the largest in the nation,

13     rivaling in size and numbers even those of most other countries," and that "[n]ot surprisingly,

14     this massive system shows the strains of both its age and its decades-long growth." *Id.* at

15     199. The Panel found that "[a]dult prisons are severely overcrowded, imperiling the safety

16     of both correctional employees and inmates." *Id.* Consequently, a number of the Panel's 237

17     recommendations, including the enhancement of earned credits, the expansion of

18     rehabilitative programming, the identification of older inmates for early release, and the

19     diversion of certain parole violators, were aimed at inmate population reduction. *See id.* at

20     122-61.

21                 3.     <u>Defining the Capacity of California Prisons</u>

22         In its report, the Corrections Independent Review Panel discussed three distinct

23     measures of prison capacity: "design capacity," "operable capacity," and "maximum safe and

24     reasonable capacity." Ex. P4 at 123-124. First:

25                "Design capacity" is the term used for the past 50 years to
                 designate the number of inmates a prison is designed to

26                accommodate according to standards developed by the
                 Commission on Accreditation and the American Correctional

27                Association. [Footnote omitted.] The number can be based on
                 any combination of single-occupancy cells, double-occupancy

28

1    cells, single- or double-bunked multiple occupancy rooms, or
2    dormitories. The standards take into account the need for
     humane conditions, as well as the need to prevent violence and
     move inmates to and from programs, such as mental health care,
3    education classes, and drug abuse treatment.

4    *Id.* at 123. "In California, design capacity is based on one inmate per cell, single bunks in

5    dormitories, and no beds in space not designed for housing." *Id.*

6         California has never limited its prison population to 100% design capacity, *id.* at 123

7    n.1, and has in some respects planned for inmate population levels that exceed 100% design

8    capacity. The "staffing packages" for California's prison facilities have two parts: the

9    "initial staffing package," which is based on population at 100% design capacity, or one

10   inmate per cell, and the "overcrowding package which, depending on the level of the facility

11   being built, could be 150 percent, 175 percent, 190 percent or 200 percent." Rep. Tr. at

12   540:24-541:4 (Raymond). The "overcrowding package" is "a staff enhancement of the

13   design bed package." *Id.* at 548:4-7. The combined staffing package shows the size of the

14   staff necessary for a facility at 100% design capacity and the additional staff required as the

15   facility becomes more crowded. *Id.* at 545:10-13.

16        Similarly, prisons built between 1985 and 1998, when the design capacity of the

17   CDCR's adult institutions and camps increased from 29,042 to near its present level of

18   approximately 80,000 inmates, Ex. P212 at Table 10, "were designed and built to

19   accommodate population growth" with respect to some infrastructure components –

20   specifically the "'water, wastewater, electrical and mechanical components, needed to meet

21   anticipated overcrowding of as much as 190 percent in cells and 140 percent in

22   dormitories.'" Dezember Trial Aff. ¶ 72 (quoting Ex. D1292, *Coleman* Special Master's

23   May 31, 2007 Response to Court's May 17, 2007 Request for Information, at 5). However,

24   "these same prisons were not designed and made 'no provision' for any expansion of medical

25   care space beyond the initial 100% of [design] capacity." *Id.* (quoting Ex. D1292 at 4-5).

26   "Even worse, 'none of the 19 CDCR institutions planned and built in the boom of the 80s

27   and 90s gave any thought to the space that might be needed for mental health purposes.'" *Id.*

28

1  (quoting Ex. D1292 at 5).[36]  "A similar failure in design vision occurred with the Department

2  of Mental Health," the sole provider of inpatient mental health care for CDCR inmates,

3  "which discovered in 1998 that it had 'no facilities of its own in which to provide the level of

4  inpatient care needed by CDCR for high custody inmates with a history of violence or

5  escape.'" *Id.* (quoting Ex. D1292 at 8).  Thus, even though the infrastructure of California's

6  newer prisons was built to accommodate inmate populations greater than 100% design

7  capacity, no similar accommodation was made for the provision of medical and mental health

8  care in California's prisons.

9       The second measure of prison capacity, "operable capacity," refers to "the maximum

10  capacity of the prisons to house inmates safely and securely while providing effective

11  education, training, and treatment."  Ex. P4 at 122.  "Operable capacity . . . takes into account

12  space needed for effective programming in addition to safety and security."  *Id.* at 124.

13  Based on input from a "group of experienced California prison wardens," the Corrections

14  Independent Review Panel determined that the operable capacity of California's prison

15  system is 145% design capacity.  *Id.*  Notably, however, operable capacity does not take into

16  account the space required to provide medical and mental health care.  *See id.* at 161 n.3;

17  Nov. 9, 2007 Scott Report ¶ 46.

18       The third measure, "maximum 'safe and reasonable' capacity," refers to "the

19  maximum number of inmates who can safely and reasonably be housed in the prison

20  system."  Ex. P4 at 124.  This definition takes into account only "the 'safe and reasonable'

21  capacity of individual housing units according to inmate custody levels, staffing levels, and

22  the physical structure of the units."  *Id.*  Units for inmates at higher custody levels have a

---

23  [36]*But see* Sept. 3, 2008 Tilton Dep. at 60:10-61:17 (testifying that in the 1980s and

24  1990s, the CDCR would "make sure [it] provided programs based on the population," and
    that this testimony referred to prisons at somewhere between 100% and 140% design

25  capacity).  We do not credit Tilton's testimony on this point because he also testified that the
    CDCR operated "fully-programmed facilities at that time."  *Id.* at 61:16-17.  As is clear from

26  our discussion of the history of the *Plata* and *Coleman* cases, the CDCR was not operating
    fully-programmed facilities with regard to medical and mental health care.  Moreover, even

27  if Tilton's testimony were to be credited, he acknowledged that "certain facilities lost the
    ability, in terms of space, to deliver adequate programs to the inmates" when populations

28  exceeded 140% design capacity.  *Id.* at 62:14-19.  As we note below, the California prison
    population well exceeds 140% design capacity, and indeed is approaching 200%.

1    lower maximum safe and reasonable capacity than units for inmates who present a lower

2    security risk.  *Id.* at 124.

> 3    The Department of Corrections has determined the maximum
>      safe and reasonable capacity of the general population and
> 4    reception center housing to be 190 percent of design capacity,
>      while other housing can be filled only to between 100 and 160
> 5    percent of design capacity.  Overall, the Department has
>      determined that the maximum safe and reasonable capacity of the
> 6    state's male prisons is . . . 179 percent of design capacity.

7    *Id.*  "Maximum 'safe and reasonable' capacity" does not take into account "the need for

8    humane conditions" incorporated into design capacity, or the need for programming space

9    incorporated into both design and operable capacity.  *See id.* at 123-124.  More important for

10   present purposes, that classification does not take into account the space or facilities required

11   to provide medical or mental health care.

12                    4.    Crowding in Relation to Capacity

13        California's inmate population has far exceeded the design capacity of the state's

14   prison system for over twenty-five years.  *See, e.g.,* Ex. P268 at 2 (Institution and Camp

15   Design Bed Capacity and Population, June 30, 1983 - June 30, 2003); Ex. P410 at 2;

16   Ex. D1259-1.  By October 2006, the state's adult prisons, excluding camps, were operating at

17   200.2% design capacity with 162,792 inmates.[37]  Ex. D1149 at 1 (CDCR weekly population

18   report as of October 25, 2006).  As of August 27, 2008, the population of these institutions

19   was reduced to 195.9% design capacity with 156,352 inmates, largely as a result of shipping

20   several thousand prisoners to Mississippi and other contract states.  Ex. P135 at 1 (CDCR

21   weekly population report as of August 27, 2008).  The current level of crowding far exceeds

22   even the maximum safe and reasonable capacity of the California prison system, which, by

23   CDCR's own determination, is 179% design capacity for prisons holding male prisoners.

24   Ex. P4 at 124.

25

26

27        [37]The state also operates several prison camps, housing just over 4000 inmates.  These
     camps are less crowded than the adult institutions and operate at between 100% and 110%
28   design capacity.  Ex. P20 at 1; Ex. P21 at 1.

1          **D.      Governor Schwarzenegger's Emergency Proclamation**

2          In response to the severity of the prison crowding problem, Governor Arnold

3   Schwarzenegger, a primary defendant in both *Plata* and *Coleman*, declared a state of

4   emergency on October 4, 2006.  Ex. P1.  In his Prison Overcrowding State of Emergency

5   Proclamation, the Governor declared that "all 33 of CDCR's prisons are now at or above

6   maximum operational capacity, and 29 of the prisons are so overcrowded that the CDCR is

7   required to house more than 15,000 inmates in conditions that pose substantial safety risks";

8   that "the severe overcrowding in 29 CDCR prisons has caused substantial risk to the health

9   and safety of the men and women who work inside these prisons and the inmates housed in

10  them"; that "the overcrowding crisis gets worse with each passing day, creating an

11  emergency in the California prison system"; and that "immediate action is necessary to

12  prevent death and harm caused by California's severe prison overcrowding."  *Id.* at 1, 6, 8.

13         The risks enumerated by the Governor in his Proclamation include "increased,

14  substantial risk for transmission of infectious illness"; security risks caused by line-of-sight

15  problems for correctional officers, particularly in areas where inmates are triple-bunked and

16  in "tight quarters"; and "thousands of gallons of sewage spills and environmental

17  contamination" from overloading the prisons' sewage and wastewater systems.  *Id.* at 2.

18  Governor Schwarzenegger also declared that the suicide rate in the 29 severely overcrowded

19  prisons "[was] approaching an average of one per week."  *Id.* at 6.

20         In addition, the Proclamation described three separate proposals by the Governor to

21  address the overcrowding crisis, including a proposal for "two new prisons and space for

22  83,000 prisoners to address California's current and future incarceration needs."  *Id.* at 7.

23  The California Legislature rejected all of these proposals.  *Id.*  As a result, the Governor

24  invoked his powers under the California Emergency Services Act to call for immediate

25  efforts to transfer inmates to out-of-state correctional facilities, as well as the suspension of

26  state contracting laws so that the CDCR could contract for all goods and services "needed to

27  immediately mitigate the severe overcrowding and the resulting impacts within California."

28  *Id.* at 8-9.

1   The California Correctional Peace Officers' Association ("CCPOA"), a plaintiff-

2   intervenor in this case, challenged the validity of the Proclamation in state court.  On June 4,

3   2008, the California Court of Appeal upheld the Proclamation, finding that the Governor

4   acted within his authority, in part because the declaration of emergency was based on

5   conditions that presented extreme peril to the safety of persons and property.  *CCPOA v.*

6   *Schwarzenegger*, 163 Cal. App. 4th 802 (2008).  The Proclamation declaring a state of

7   emergency remains in effect.  Fact # 12, Nov. 17, 2008 Joint Statement of Undisputed Facts.

8         **E.      Motions To Convene Three-Judge Court and Subsequent Prison Studies**

9                 **by the State of California**

10                 1.      Motions To Convene and Initial Proceedings

11   Following the Governor's issuance of the State of Emergency Proclamation, the

12   plaintiffs in *Plata* and *Coleman* filed motions to convene a three-judge court to limit the

13   prison population.[38]  The *Plata* court continued the hearing on its motion to provide

14   defendants with an opportunity to outline specific measures they were taking or planned to

15   take to alleviate crowding, as well as to allow the *Plata* Receiver to analyze the effects of

16   crowding on his remedial efforts.  Feb. 15, 2007 Order in *Plata* at 4-5.  Similarly, the

17   *Coleman* court, after oral argument, continued the hearing for six months to permit

18   defendants to demonstrate sufficient progress in their remedial efforts and in relieving prison

19   overcrowding such that convening a three-judge court would not be necessary.  Dec. 11,

20   2006 Rep. Tr. in *Coleman*, *passim*; Dec. 12, 2006 Order in *Coleman* at 1.

21                 2.      Intervening Reports on Prison Crowding

22   During the period in which the motions to convene a three-judge court were pending,

23   two more reports concerning prison overcrowding were presented to the California

24   Legislature.  First, in January 2007, the Little Hoover Commission, a bipartisan and

25   independent state body charged with conducting research and preparing recommendations to

26   _____

27   [38]The Prison Litigation Reform Act of 1996 ("PLRA") provides that a prisoner release order may be issued only by a three-judge court.  18 U.S.C. § 3626(a)(3)(B).  We discuss in more detail below, *infra* Section III, the meaning of the term "prisoner release order" and

28   other relevant provisions of the PLRA.

1  improve the economy, efficiency, and service of California state government, Cal. Gov't.

2  Code §§ 8501, 8521-8522, echoed the concerns in the Governor's State of Emergency

3  Proclamation, stating that "California's prisons are out of space and running out of time."

4  Ex. P3 at 1.  In its report, entitled "Solving California's Corrections Crisis: Time Is Running

5  Out," the Commission, which had previously issued a series of reports on California's

6  prisons, *id.* at 13, again offered "comprehensive recommendations" to reduce the prison

7  population, improve public safety, and manage public dollars, *id.* at 1.  Second, in June 2007,

8  the Expert Panel on Adult Offender Recidivism Reduction Programming – a panel convened

9  by the CDCR and consisting of the CDCR's Chief Deputy Secretary for Adult Programs and

10  a number of academic experts, consultants, and former and current secretaries of corrections

11  in Pennsylvania, Arizona, Washington, Ohio, and Maine,[39] Ex. P2 at ii – issued a report

12  recommending a course of action to reduce the prison population while at the same time

13  reducing recidivism and generating savings.  Ex. P2.

14      The first recommendation of both the Little Hoover Commission and the CDCR

15  Expert Panel was to reduce prison overcrowding.  Ex. P3 at iv; Ex. P2 at 10.  Both panels

16  noted that the state had received numerous reports over the past two decades containing

17  recommendations for reducing the state's prison population.  Ex. P3 at iv; Ex. P2 at 10 &

18  App. A.  Although the Expert Panel was convened to make recommendations for reducing

19  California's high recidivism rate and "improving the programming in California's prison and

20  parole system," Ex. P2 at vii, and not for "solving the overcrowding problem," *id.* at 10, the

21  panel nonetheless found that California's prisons were "dangerously overcrowded" and that

22  reducing overcrowding was a "'pre-condition' to [the] success" of its mission, *id.* at viii.

23          3.    Final Hearing and Rulings

24      On June 27, 2007, the *Plata* and *Coleman* courts jointly heard oral argument on

25  plaintiffs' motions to convene a three-judge court.  Persuaded that the state had not

26  ───────────────
[39]Several members of the Expert Panel appointed by defendants, including James
27  Austin, Ph.D., Jeffrey Beard, Ph.D., Joseph Lehman, and Barry Krisberg, Ph.D., testified for
plaintiffs at the trial of this matter.  Another member of the Expert Panel, James Gomez, was
28  the Director of the California Department of Corrections from 1991 to 1996, during the
merits phase of the *Coleman* action.

45

adequately addressed its prison overcrowding crisis so as to make possible the remedying of

the constitutional violations, and that consideration of a population reduction order was

necessary in order to achieve that objective in both cases, both courts granted plaintiffs'

motions.  July 23, 2007 Order in *Plata*, 2007 WL 2122657; July 23, 2007 Order in *Coleman*,

2007 WL 2122636.

The *Plata* court found that although "the Receiver has made much progress since his

appointment," the establishment of the *Plata* Receivership did not require the court "to wait

more time, potentially years, to see whether the Receiver's plans will succeed or fail."

July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *3.  It found that the unconstitutional

conditions that led to the Receiver's appointment continued to exist.  The *Plata* court

explained:

> Had the Receiver reported to the Court that he did not view
> overcrowding to be a substantial impediment to implementing the
> reforms required in this case, the Court may well have reached a
> different conclusion regarding the appropriateness of convening a
> three-judge court to consider a prisoner release order.  However,
> quite to the contrary, the Receiver's reports indicate that
> overcrowding is a serious problem that impacts, for example, his
> ability to develop adequate reception centers and health facilities
> because of the high numbers of inmate transfers and the
> inadequate amount of available health care beds and other
> physical space. Receiver's Report Re: Overcrowding [Ex.
> D1092] at 26-28.  Overcrowding also negatively impacts the
> Receiver's ability to hire and retain competent medical and
> managerial staff.  *Id.* at 24-26.  Beyond that, the Receiver reports
> that:
>
>> Every element of the Plan of Action faces crowding
>> related obstacles.  Furthermore, overcrowding does
>> not only adversely impact the Receiver's
>> substantive plans, it also adversely impacts on the
>> very process of implementing remedies because
>> overcrowding, and the resulting day to day
>> operational chaos of the CDCR, creates regular
>> "crisis" situations which call for action on the part
>> of the Receivership and take time, energy, and
>> person power away from important remedial
>> programs.
>
> *Id.* at 28-29. . . .
>
> Tellingly, the Receiver's concerns about the impacts of
> overcrowding on his ability to reform the medical health care

delivery system became even stronger in the weeks following his initial report. In his supplemental report, filed just four weeks after his initial report, the Receiver concluded that: "Mission changes, yard flips, and prison-to-prison transfers, aggravated by the limited alternatives imposed by overcrowding, are now assuming a size, scope and frequency that will *clearly* extend the timeframes and costs of the receivership and *may render adequate medical care impossible,* especially for patients who require longer term chronic care." Receiver's Suppl. Report Re: Overcrowding [Ex. D1094] at 10 (emphases added). While the Court appreciates Defendants' statements that greater coordination between the State and the Receiver will alleviate some of the Receiver's concerns, such sentiments only underscore the Receiver's expressed concerns that overcrowding presents serious problems not only because of the substantive ways in which it interferes with delivery of medical care, but also because of the amount of time and attention the Receiver must devote to dealing with crowding-related issues. *It is clear to the Court that the crowded conditions of California's prisons, which are now packed well beyond their intended capacity, are having – and in the absence of any intervening remedial action, will continue to have – a serious impact on the Receiver's ability to complete the job for which he was appointed: namely, to eliminate the unconstitutional conditions surrounding delivery of inmate medical health care.*

*Id.* at *4 (last emphasis added).

The *Coleman* court found that between 1997 and 2005, defendants had made "slow but evident progress toward constitutional compliance," but that, "[i]n spite of the commendable progress . . ., defendants' mental health care delivery system has not come into compliance with the Eighth Amendment at any point since this action began." July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *3. The *Coleman* court further found that:

Several prisons remain notable exceptions to the progress made at others, and delays in access to care at the highest level of need – mental health crisis beds, acute inpatient care, and intermediate inpatient care – have plagued the CDCR throughout the course of this litigation. Moreover, defendants' efforts at long-range planning for the delivery of mental health care continues to be hampered by inadequacies in the capture and collection of data and the use of outdated methodologies to interpret that data.

. . . [O]n May 31, 2007, the Special Master reported that programming space, beds for mentally ill inmates, and staffing levels have all been "impacted seriously by overcrowding." Special Master's Response to Court's May 17, 2007 Request for Information, filed May 31, 2007, at 4-14 ("Special Master's May 31, 2007 Response"). The staffing shortages alone mean that the CDCR only has enough staff "to provide full mental

47

health services to roughly two-thirds of its mental health caseload, or two-thirds of required services to its full caseload, or, probably more realistically, some combination of reduced services to some segments of the caseload that can be covered with a third less clinicians than required." *Id.* at 11-12. While acknowledging the difficulties in quantifying precisely the scope of the unmet mental health needs, the Special Master reports that,

> defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources. Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services. All three deficiencies are unquestionably exacerbated by overcrowding.

> *Id.* at 14. With a mental health caseload of almost 33,000 inmates, *id.* at 2, this level of unmet needs is unconscionable.

*Id.* at *3-*4 (footnote omitted).

In their orders granting plaintiffs' motions, the *Plata* and *Coleman* courts recommended that the cases be assigned to the same three-judge court "[f]or purposes of judicial economy and avoiding the risk of inconsistent judgments." July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *6; *see also* July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *8. The Chief Judge of the United States Court of Appeals for the Ninth Circuit agreed and, on July 26, 2007, convened the instant three-judge district court pursuant to 28 U.S.C. § 2284.

## F.   Proceedings Before this Three-Judge Court

In August and September 2007, this court granted motions to intervene on behalf of defendants filed by groups of district attorneys; sheriffs, police chiefs, and probation officers (collectively "law enforcement intervenors"); counties; and Republican state Senators and Republican Assembly Members. We note that the Republican state Senators and Republican Assembly Members constitute just over a third of the membership of each respective body. We also granted the CCPOA's motion to intervene on behalf of plaintiffs.

On November 1, 2007, we appointed a settlement referee, former state Court of Appeal Justice Elwood Lui, and a settlement consultant, current state Court of Appeal Justice

1   and former Legal Affairs Secretary to Governor Schwarzenegger, Peter Siggins, to aid the

2   parties and intervenors in settlement discussions.  Nov. 1, 2007 Order at 1-2.  However, the

3   settlement efforts ultimately proved unsuccessful, as Justices Lui and Siggins reported to the

4   three-judge court on June 25, 2008.

5        On September 15, 2008, defendants filed a motion for summary judgment, which we

6   denied by written order on November 3, 2008.  Trial commenced on November 18, 2008,

7   and concluded on December 19, 2008, after fourteen court days in which we heard testimony

8   from nearly fifty witnesses, received written testimony from several additional witnesses, and

9   received hundreds of exhibits into evidence.  Following the close of evidence, we received

10  proposed findings of fact and conclusions of law from the parties and intervenors and heard

11  final argument on February 3 and 4, 2009.

12       To assist the parties in planning their further actions, we issued a tentative ruling on

13  February 9, 2009, explaining that plaintiffs had met their burden of proof and that a

14  population reduction order was necessary to remedy the constitutional violations concerning

15  the provision of medical and mental health care in California's prisons.  We even gave the

16  state an indication of the range within which the population cap would fall.  In our tentative

17  ruling, we once again asked whether a court-appointed settlement referee would be of

18  assistance.  Plaintiffs and intervenors expressed a willingness to engage in further settlement

19  discussions, but the state defendants responded that they did not believe such efforts would

20  be fruitful.

21       After carefully reviewing all of the evidence and oral and written arguments presented

22  in this proceeding, we make the following findings of fact and conclusions of law and issue

23  the following order.  This opinion and order supersedes the tentative ruling in its entirety.

24

25  **III.   LEGAL FRAMEWORK**

26       Federal courts have long recognized that population reduction orders may sometimes

27  be necessary to ensure constitutional prison conditions.  For example, in *Duran v. Elrod*, 713

28  F.2d 292 (7th Cir. 1983), the Seventh Circuit upheld a district court's order requiring a

1   reduction in the population of the Cook County Department of Corrections, finding that the

2   order was "sensitive to[] . . . the principles of federalism," *id.* at 297, and that the district

3   court "acted fairly and reasonably to ease a critical problem" of overcrowding in the face of

4   "substantial noncompliance" by Cook County, *id.* at 298.  Likewise, in *Newman v. Alabama*,

5   683 F.2d 1312 (11th Cir. 1982), the Eleventh Circuit found that, where Alabama's county

6   jails were unconstitutionally overcrowded, a cap on the state inmate population in the county

7   jails "represent[ed] the proper balance between the duty of the district court to remedy

8   constitutional violations and the right of the State to administer its prison and parole

9   systems," *id.* at 1321.  There are other examples as well, including a continuing cap on Los

10  Angeles County's jail population stipulated to by the parties in *Rutherford v. Pitchess,*

11  No. CV 75-4111 (C.D. Cal.).

12          Until 1996, federal courts relied upon general principles of equitable relief and

13  federalism in deciding whether to enter a population reduction order to remedy constitutional

14  violations.  However, in 1996 Congress enacted the Prison Litigation Reform Act ("PLRA"),

15  Pub. L. No. 104-134, 110 Stat. 1321 (codified in relevant part at 18 U.S.C. § 3626).  The

16  PLRA established "a comprehensive set of [statutory] standards to govern prospective relief

17  in prison conditions cases."  *Gilmore v. California*, 220 F.3d 987, 998 (9th Cir. 2000).

18  Because there is no dispute that both the *Plata* and *Coleman* lawsuits are "civil action[s] with

19  respect to prison conditions," the matter before us is governed by the statutory requirements

20  of the PLRA.  18 U.S.C. § 3626(a)(1).

21          The PLRA contains two sets of requirements that are relevant here: one applicable to

22  all forms of "prospective relief" in federal prison conditions lawsuits, *see id.*, and another

23  applicable only to "prisoner release orders," *see id.* § 3626(a)(3).  The PLRA defines a

24  "prisoner release order" as "any order . . . that has the purpose or effect of reducing or

25  limiting the prison population, or that directs the release from or nonadmission of prisoners

26  to a prison."  *Id.* § 3626(g)(4).  Under this definition, a "prisoner release order" includes not

27  only an order requiring the release of presently incarcerated inmates, but also an order

28  requiring the diversion of convicted persons from prison, changing the treatment of parole

50

1  violators in order to prevent their return to overcrowded prisons, or imposing a cap on the

2  prison population or any part of it.  *See, e.g.*, *Tyler v. Murphy*, 135 F.3d 594, 595-96 (8th Cir.

3  1998) (finding a cap on the number of technical probation violators who could be admitted to

4  a particular facility to be a "prisoner release order").  There is no dispute that the population

5  reduction order requested by the plaintiffs falls within the PLRA's definition of "prisoner

6  release order" because the order would have the "purpose" of "limiting the prison

7  population."  18 U.S.C. § 3626(g)(4).  Accordingly, this court can grant the plaintiffs'

8  request for a population reduction order only if the proposed order meets both the PLRA's

9  specific standard for prisoner release orders and its general standard for prospective relief in

10 prison conditions cases.

11      A.      **The PLRA Standard for Prisoner Release Orders: Primary Cause and No**

12              **Other Relief**

13      The PLRA does not prohibit courts from entering an order requiring a reduction in the

14 population of a prison or prison system.  To the contrary, in enacting the PLRA, Congress

15 was clear to state that "a court still retains the power to order [a population reduction order]"

16 when such an order "is truly necessary to prevent an actual violation of a prisoner's federal

17 rights."  H.R. Rep. No. 104-21, at 25 (1995); *cf.* 141 Cong. Rec. S14419 (daily ed. Sept. 27,

18 1995) (statement of Sen. Abraham) (noting that the PLRA permits "narrowly tailored

19 order[s] to correct" constitutional violations and that the PLRA "allows the courts to step in

20 where they are needed").[40]  Rather than barring "prisoner release orders" altogether, the

21 PLRA simply makes such orders, including population caps and other population reduction

22 orders, "the remedy of last resort."  H.R. Rep. No. 104-21, at 25.

23      It does so by imposing a number of restrictions on the entry of prisoner release orders.

24 First, a court considering such an order must find that "a court has previously entered an

---

[40]In fact, a number of courts have entered consent decrees for prisoner release since the enactment of the PLRA – decrees that must meet the same set of requirements as any order entered by a court.  *See* 18 U.S.C. §3626(c)(1); *Roberts v. Mahoning County*, 495 F. Supp. 2d 719 (N.D. Ohio 2007); John Boston, *The Prison Litigation Reform Act*, 67 Brook. L. Rev. 429, 446 n.67 (2001) (collecting orders for overcrowding relief entered by consent decree after the enactment of the PLRA).

51

order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order," and that "the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A). If both of these requirements are met, the court must request that a three-judge district court be convened to consider the propriety of the proposed order. *Id.* § 3626(a)(3)(B). Finally, the three-judge court must find by clear and convincing evidence (1) that "crowding is the primary cause of the violation of the Federal right," and (2) that "no other relief will remedy the violation of the Federal right." *Id.* § 3626(a)(3)(E).

Before convening the present three-judge court, the *Plata* and *Coleman* courts found that their prior orders for less intrusive relief had failed to remedy the unconstitutional denial of adequate medical and mental health care to prisoners in California's prisons, and that the defendants have had a more than reasonable amount of time to comply with those prior orders. *See* July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *3; July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *2. Accordingly, the findings required by § 3626(a)(3)(A) have been made. The procedural history described above clearly establishes that the *Plata* and *Coleman* courts have previously entered orders for less intrusive relief that have failed to remedy the constitutional deprivations at issue in each case despite the reasonable time given to defendants to comply with those orders. In this opinion and order, we primarily consider the requirements of § 3626(a)(3)(E) – whether crowding is the "primary cause" of the unconstitutional denial of adequate medical and mental health care to California's prisoners, *see infra* Section IV, and whether any other form of relief could remedy those constitutional violations, *see infra* Section V.

### B. The PLRA Standard for All Prospective Relief: Need-Narrowness-Intrusiveness and Consideration of Public Safety

In addition to these specific limitations on the entrance of prisoner release orders, the PLRA establishes a standard applicable to all forms of prospective relief in prison conditions lawsuits. First, the PLRA requires that such relief "[be] narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means

1   necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Rather

2   than imposing any new limitations on federal authority, this provision codifies the common-

3   law standard for injunctive relief, generally referred to as the "need-narrowness-

4   intrusiveness" standard. *See* H.R. Rep. 104-21, at 24 n.2 (1995) (explaining that the "dictates

5   of [18 U.S.C. §3626(a)(1)] are not a departure from current jurisprudence concerning

6   injunctive relief"); *see also Armstrong v. Davis*, 275 F.3d 849, 872 (9th Cir. 2001); *Smith v.*

7   *Ark. Dep't of Corr.*, 103 F.3d 637, 647 (8th Cir. 1996); *Williams v. Edwards*, 87 F.3d 126,

8   133 n.21 (5th Cir. 1996).[41] Likewise, the PLRA requires that any prospective relief "extend

9   no further than necessary to correct the violation of the Federal right of a particular plaintiff

10  or plaintiffs." 18 U.S.C. § 3626(a)(1)(A); *cf. Lewis v. Casey*, 518 U.S. 343, 357-360 (1996)

11  (holding that the remedy in a prison conditions case must remedy actual injuries that have

12  been identified by the court and suffered by the plaintiffs). In class action lawsuits such as

13  *Plata* and *Coleman*, the PLRA requires that the remedy be tailored to the actual injuries

14  suffered by class members. *See Armstrong*, 275 F.3d at 870-73.

15        Second, the PLRA requires that any court considering the entry of prospective relief

16  give "substantial weight" to any adverse impact the order might have on public safety or the

17  operation of the criminal justice system. 18 U.S.C. § 3626(a)(1)(A); *see also* H.R. Rep. No.

18  104-21, at 24 (1995) (stating that courts must give "appropriate consideration" to "any

19  potential impact on public safety or the criminal justice system"). This requirement codifies

20  the longstanding common law requirement that federal courts "pay particular regard for []

21  public consequences in employing the extraordinary remedy of injunction." *Weinberger v.*

22  *Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Yakus v. United States*, 321 U.S. 414,

23  440 (1944).

24

25  _____

26        [41]In lieu of changing the general standard for prospective relief in prison conditions
     cases, the PLRA limits federal court authority in matters relating to prison conditions
27   primarily by applying the "need-narrowness-intrusiveness" standard to consent decrees as
     well as court orders, 18 U.S.C. § 3626(c)(1); by making it easier to terminate existing court
28   orders or consent decrees, 18 U.S.C. § 3626(b); and by imposing distinct limitations on
     prisoner release orders, 18 U.S.C. § 3626(a)(3).

We address the "need-narrowness-intrusiveness" standard in Section VI and consider the impact of the order we adopt on public safety and the operation of the criminal justice system in Section VII.

### C.    The Remedial Nature of the Three-Judge Court Proceeding

The question before this three-judge court is whether the remedy requested by the plaintiffs is proper as a matter of federal law.  The *Plata* and *Coleman* courts years ago identified the constitutional deficiencies underlying this proceeding.  Since that time, both cases have been in their remedial phase.  After prior remedial efforts failed, the *Plata* and *Coleman* courts both faced the question whether an order requiring a reduction in the population of California's prisons was necessary to remedy the previously identified constitutional violations, and both concluded that such an order should be considered by a three-judge court.

We need not yet again evaluate the state's continuing constitutional violations.  In requesting that this three-judge court be convened, the *Plata* and *Coleman* courts both found, without objection from defendants, that the constitutional violations were ongoing.  *See* July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *3; July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *4.  That is sufficient under the PLRA.  In addition, defendants have never filed a motion to terminate under § 3626(b), the proper means for any challenge to the existence of "current and ongoing" constitutional violations relating to the provision of medical and mental health care in the California prisons.  Moreover, even if we were required to find independently that the requirements of § 3626(a)(3)(A) – including its requirement that prior orders have "failed to remedy the deprivation of the Federal right" – have been met, we did so in denying defendants' motion for summary judgment, Nov. 3, 2008 Order at 6-7.  Accordingly, the question we must answer in this opinion and order is entirely remedial, i.e., whether the plaintiffs' proposed remedy meets the imposing standards established by the PLRA.[42]

---

[42]Because this proceeding deals only with the plaintiffs' requested remedy, we did not permit the introduction of evidence relevant only to determining whether the constitutional violations found by the *Plata* and *Coleman* courts were "current and ongoing."

## IV.   CROWDING AS PRIMARY CAUSE

The extent of overcrowding in the California prison system, approximately 190% of systemwide design capacity, is "extraordinary" and "almost unheard of." Rep. Tr. at 297:1-17, 298:19-20 (Haney). The problem is "widespread" and "not restricted to just a few institutions. It's occurred throughout the system." *Id.* at 297:23-25. There would seem to be no dispute about the egregious nature of the overcrowding in this case. Under the PLRA, however, the question is whether clear and convincing evidence establishes that the overcrowding is the primary cause of the unconstitutional denial of adequate medical and mental health care to California's prisoners. 18 U.S.C. § 3626(a)(3)(E)(i). Only if it is may the court – a three-judge court – enter a population reduction order. Defendants do not contest that prison crowding impedes the delivery of constitutionally adequate medical and mental health care in the California prison system. They claim only that crowding is not the *primary* cause of the violations of plaintiffs' constitutional rights. *E.g.,* Rep. Tr. at 2953:6-11 (closing argument by defendants' counsel).

We accept defendants' proposed definition of "primary cause" as the cause that is "first or highest in rank or importance; chief; principal." *Random House Webster's Unabridged Dictionary* 1537 (2d ed. 1998) (defining "primary").[43] We note, however, that the PLRA does not require that crowding be the *only* cause of the constitutional violations at issue. "Probably it cannot be said of any event that it has a single causal antecedent; usually there are many." 4 Harper, James and Gray on Torts § 20.2 (3d ed. 2007). The PLRA's "primary cause" standard incorporates this basic aspect of causation. By requiring only that crowding be the *primary* cause of the constitutional violations at issue, the PLRA's language explicitly contemplates that *secondary* causes may exist. Had Congress intended to require that crowding be the only cause, it would have used language to that effect – for example, "exclusive" or "only" instead of "primary."

---

[43]Unfortunately, the legislative history of the PLRA is sparse and provides no meaningful insight into the meaning of "primary cause" or "crowding."

55

1       As all of the parties to this proceeding have recognized, in the context of prison

2   conditions litigation "crowding" refers to the presence in a facility or prison system of a

3   prisoner population exceeding that facility or system's capacity.  *See, e.g.*, *Doty v. County of*

4   *Lassen*, 37 F.3d 540, 543 (9th Cir. 1994) (finding overcrowding where a jail's actual

5   population exceeded its design capacity by an average of approximately fifty percent);

6   *Hoptowit v. Ray*, 682 F.2d 1237, 1248-49 (9th Cir. 1982) (finding a penitentiary

7   overcrowded where its population exceeded its design capacity); *see also Lareau v. Manson*,

8   651 F.2d 96, 99-100 (2d Cir. 1981); *cf. Random House Webster's Unabridged Dictionary*

9   482 (2d ed. 1998) (defining "crowded" as "filled to excess").  In other contexts, the term

10  "overcrowding" would ordinarily be used.  Here, the words crowding and overcrowding have

11  the same meaning, and we use them interchangeably.

12      A prison system's capacity is not defined by square footage alone; it is also

13  determined by the system's resources and its ability to provide inmates with essential

14  services such as food, air, and temperature and noise control.  Following the parties' lead, we

15  will discuss the capacity of the California prison system primarily in terms of design

16  capacity.  As the Corrections Independent Review Panel explained, design capacity

17  "designate[s] the number of inmates a prison is designed to accommodate according to

18  standards developed by the Commission on Accreditation and the American Correctional

19  Association."  Ex. P4 at 123.  These standards "take into account the need for humane

20  conditions, as well as the need to prevent violence and move inmates to and from programs,

21  such as mental health care, education classes, and drug abuse treatment."  *Id.*

22      Taking into account the meaning of "primary cause" and the criteria governing

23  "crowding," we must determine whether the presence in California's prison system of a

24  prison population almost double the system's design capacity is the principal cause of the

25  failure to provide constitutionally adequate medical and mental health care to the members of

26  the *Plata* and *Coleman* classes.

27      As we discuss below, the evidence presented at trial, including testimony from

28  defendants' experts, admissions by defendants and their agents, and data maintained by

56

1  defendants, overwhelmingly establishes not only that crowding adversely affects every

2  aspect of prison administration, forcing a constant state of crisis management, but also that

3  crowding creates numerous barriers to the provision of medical and mental health care that

4  result in the constitutional violations we consider here.  These barriers include severe space

5  and other shortages that prevent inmates from receiving the care they require.  Crowding also

6  renders the state incapable of maintaining an adequate staff and an adequate medical records

7  system.  In addition, crowding causes prisons to rely on lockdowns, which further restrict

8  inmates' access to care, and it forces prisons to house inmates in non-traditional settings,

9  such as triple-bunks in gyms and dayrooms not designed for housing, that contribute to the

10  lack of care and the spread of infectious disease and that increase the incidence and severity

11  of mental illness among prisoners.

12       Multiple experts testified that crowding is the primary cause of the constitutional

13  violations at issue in *Plata* and *Coleman*.  Most impressive, four current or former prison

14  administrators so testified.  These four correctional experts had, collectively, administered

15  the correctional systems of five different states, including California.[44]  Three had never

16  before testified on behalf of a prisoner, and two were not paid for their time as experts.  A

17  number of medical and mental health experts also testified that crowding is the primary cause

18  of the constitutional violations, and even defendants' own mental health expert testified that

19  crowding is the primary cause of defendants' inability to provide adequate care to the

20  *Coleman* class at reception centers.  Dec. 10, 2007 Packer Report at 20.  As the Secretary of

21  the Pennsylvania Department of Corrections testified, "the biggest inhibiting factor right now

22  in California being able to deliver appropriate mental health and medical care is the severe

23  overcrowding of [the] system."  Rep. Tr. at 219:7-10 (Beard).  We agree.  For the reasons we

24  discuss below, we conclude that clear and convincing evidence establishes that crowding is

25

26       [44]The experts included Jeanne Woodford, former warden at San Quentin and former
    acting Secretary of the CDCR; Doyle Wayne Scott, former Executive Director of the Texas
27  Department of Criminal Justice; Joseph Lehman, former head of corrections in Pennsylvania,
    Washington, and Maine; and Jeffrey Beard, current Secretary of the Pennsylvania
28  Department of Corrections.

57

1   the primary cause of the unconstitutional denial of medical and mental health care to

2   California's prisoners.

3       A.    **General Problems in the Delivery of Medical and Mental Health Care**

4             **Caused by Crowding**

5       Correctional experts agree that crowding "affects virtually every aspect of a prison's

6   operation."  Aug. 15, 2008 Lehman Report ¶ 10 (expert report from former head of

7   corrections in Pennsylvania, Washington, and Maine).  Jeanne Woodford, the former head of

8   corrections in California, testified that, under crowded conditions, there "are simply too

9   many issues that arise from such a large number of prisoners and staff.  One result of this is

10  that management spends virtually all of its time fighting fires instead of engaging in

11  thoughtful decision-making and planning.  This results in short-sighted decisions that create

12  even more crises."  Nov. 9, 2007 Woodford Report ¶ 12.  Doyle Wayne Scott, a thirty-year

13  employee of the Texas Department of Criminal Justice who served as its Executive Director

14  for five years, explained:

15              Overcrowding has burdened CDCR's inadequate management
                systems that underlie health care delivery.  The excessive
16              population leads to management failures in two ways.  First,
                overcrowding engenders a state of perpetual crisis that causes
17              management failures.  Administrators spend their time doing
                damage control, rather than making sure the prison is operating
18              properly and prisoners are getting the services that they need. . . .
                A population of 7,000 or more, as is found in some California
19              prisons, is not manageable at all.  The sheer size and complexities
                of managing a prison that size would be overwhelming for one
20              manager especially with the limited resources in the areas of
                staffing and inadequate space for services to the offenders that I
21              observed at all of the prisons I toured in California.  One warden
                simply cannot know what he/she needs to know on a daily basis
22              to make good informed management decisions.

23              Second, overcrowding overwhelms management infrastructure.
                As I have read in numerous reports of the Receiver, the CDCR
24              lacks the management information systems needed to adequately
                organize and track prisoner transfers for specialized medical and
25              mental health care and public health related needs (for example,
                people with compromised immune systems not going to Valley
26              Fever risk areas) in the severely overcrowded conditions.

27  Nov. 9, 2007 Scott Report ¶¶ 1, 76-77.  Secretary Woodford concluded that crowding makes

28  it "virtually impossible for the organization to develop, much less implement, a plan to

1  provide prisoners with adequate care"; "[i]n [her] opinion, it is all but impossible to safely

2  and humanely incarcerate this many prisoners within the existing facilities."  Nov. 9, 2007

3  Woodford Report ¶¶ 10, 12.

4  　　　As put in the most simple terms by Secretary Woodford, who recently administered

5  the California prison system and who shortly before that was the warden at San Quentin,

6  "[o]vercrowding in the CDCR is extreme, its effects are pervasive and it is preventing the

7  Department from providing adequate mental and medical health care to prisoners."  Aug. 15,

8  2008 Woodford Supp. Report ¶ 31.  While defendants dispute that crowding is the primary

9  cause of the ongoing constitutional violations in *Plata* and *Coleman*, they do not dispute that

10  crowding makes the delivery of adequate medical and mental health care in the California

11  prison system extremely difficult.  Matthew Cate, the current head of the CDCR and a

12  defendant in this proceeding, stated that "overpopulation makes everything we do more

13  difficult," Rep. Tr. at 1683:19-20, and further agreed that crowding continues to "severely

14  hamper[]" the Department's ability "to provide inmates with adequate medical care in a

15  fiscally sound manner," *id.* at 1683:3-19 (testimony that statements in the Office of the

16  Inspector General's 2006 audit of the CDCR, issued when Cate was the Inspector General,

17  continue to be true today); Ex. P46 at ES-1 (April 2006 Office of the Inspector General

18  Accountability Audit, Review of Audits of the California Department of Corrections and

19  Rehabilitation Adult Operations and Adult Programs, 2000-2004).  James Tilton, Cate's

20  predecessor as Secretary of the CDCR, likewise explained that it "was clear" to him that

21  crowding, and the resulting lack of space, adversely affected the delivery of medical and

22  mental health care.  Sept. 3, 2008 Tilton Dep. at 80:5-25.  Similarly, John Dovey, a former

23  CDCR official, testified before a state Senate committee in August 2006 that "the risk of

24  catastrophic failure in a system strained from severe overcrowding is a constant threat.  As

25  the Director of the Division of Adult Institutions [for the CDCR], it is my professional

26  opinion this level of overcrowding is unsafe and we are operating on borrowed time."

27  Ex. P72 at 15 (Aug. 15, 2006 CDCR Presentation to Senate Select Committee on Prison

28  Population Management and Capacity).  Before this court, Robin Dezember, then the Chief

1  Deputy Secretary of the Correctional Healthcare Services Division of the CDCR, stated his

2  "belief that we are terribly overcrowded in our prison system," and that crowding adversely

3  affects the delivery of mental health care services.  Rep. Tr. at 853:13-15, 21-24.  Even

4  defendants' expert Dr. Ira Packer opined that "the overcrowding in CDCR significantly

5  contributes to the difficulties in providing adequate mental health services."  Dec. 10, 2007

6  Packer Report at 8.

7         **B.    Space Issues Affecting the Delivery of Care**

8         The evidence before us demonstrates that crowding causes a number of specific

9  problems central to the ongoing violation of California inmates' constitutional right to

10  adequate medical and mental health care.  One of the clearest effects of crowding is that the

11  current prison system lacks the physical space necessary to deliver minimally adequate care

12  to inmates.  This manifests itself in a variety of areas, each of which we discuss below.

13              1.    Reception Centers

14         The medical and mental-health related problems caused by crowding are immediately

15  apparent at the state's reception centers.  Each year, California admits approximately 140,000

16  inmates into the state prison system.  Rep. Tr. at 224:17-18 (Beard); *see also* Aug. 15, 2008

17  Austin Report ¶¶ 45-46 & Table 3; Ex. P18 at 3; Ex. P19 at 2; Ex. P75 at 3.[45]  The CDCR's

18  reception centers are the locus of the intake and classification functions for all of these

19  inmates.  *See* Nov. 9, 2007 Austin Report ¶¶ 27-28; Aug. 15, 2008 Austin Report ¶ 97.  The

20  CDCR has reception centers at twelve prisons, nine at male institutions and one at each of the

21  state's three female prison institutions.  Ex. P135 at 3-4.  As of August 2008, all but one of

22  these reception centers were near or over 200% design capacity, and two were over 300%

23  design capacity.  *Id.*  This severe crowding at the reception centers makes it impossible to

24  provide adequate medical and mental health services to inmates entering the California

25  ─────────────

26  [45]As Dr. Austin explained, "[t]here are two major types of prison admissions for the
    CDCR – new court commitments and parole violators."  Aug. 15, 2008 Austin Report ¶ 45.

27  At the cited pages, Exhibits P18, P19, and P75 set forth data on new admissions, felon parole
    violators returned with a new term, and felon parole violators returned to custody during

28  periods specified in each exhibit.  The aggregation of these three numbers in each of the
    exhibits ranges from 141,288 (Ex. P18) to 139,399 (Ex. P19) to 140,560 (Ex. P75).

1   prison system.  In addition, severe crowding throughout the system forces prisons to house

2   inmates in these reception centers without adequate care for extended periods of time.

3          As the *Plata* Receiver explained, reception centers "must be staffed and have the

4   appropriate clinical space to provide a level of medical care and clinical evaluations above

5   that of the general population institutions."  Ex. D1092 at 19 (*Plata* Receiver's May 15, 2007

6   Report Re: Overcrowding).[46]  Each time an individual is admitted to the CDCR, whether for

7   the first time, by re-offending, or on a parole violation:

8                      he or she returns to the CDCR through a reception center where a
                       medical/mental health/dental health care appraisal must be
9                      performed.  Once that appraisal is completed the newly received
                       prisoner is transferred to an open bed at a prison which has been
10                     designated for his or her classification.  However, none of the
                       CDCR's designated reception centers were designed or
11                     constructed with adequate clinical space [to perform these
                       functions].
12

13  *Id.*; *see also, e.g.*, Aug. 15, 2008 Haney Report ¶¶ 246-247 (describing space shortages at the

14  California Correctional Institution reception center, including a holding room containing

15  three holding cells that "were originally intended to hold disciplinary cases but now have

16  been converted to mental health use").  "To make matters worse, as the original prisons

17  designated for reception became overwhelmed by the influx of parole violators, the CDCR

18  was forced to 'convert' general population prisons into reception centers.  These

19  'conversions,' however, were not accompanied by adequate additions to clinical staff or

20  clinical space."  Ex. D1092 at 19; *see also, e.g.*, Nov. 9, 2007 Stewart Report ¶ 48 (because

21  reception center at DVI "was not designed as a reception center, it has been difficult to find

22  space for various reception center functions").

23         Without sufficient space, reception centers are unable to screen or treat inmates

24  adequately.  For instance, as plaintiffs' medical expert Dr. Ronald Shansky explained, the

25  number of prisoners who must be processed at the reception center at CIM "exceeds the

26  number of patients that can be adequately treated," thereby forcing the prison to "squeeze[]

27  too many prisoners and too many providers into the available treatment area."  Nov. 9, 2007

28         [46]Plaintiffs also offered this document into evidence as Exhibit P26.

1   Shansky Report ¶ 12.  Exams are conducted in areas separated only by "a thin white fabric

2   folding screen that is approximately five to six feet tall" and conversations between

3   physicians and inmates can be overheard on the other side of the screen.  *Id.*  Similarly, at

4   North Kern State Prison, inmate health interviews are conducted in a small office, "with

5   prisoners sitting back to back, separated only by a shoulder-high divider."  Sept. 10, 2008

6   Shansky 2d Supp. Report ¶ 23.  Such conditions do not allow for appropriate confidentiality,

7   causing prisoners to be "less likely to provide accurate information about sensitive medical

8   and psychiatric conditions."  *Id.* ¶ 24; *see also* Aug. 15, 2008 Haney Report ¶ 280

9   (psychiatrist and psychologist who work in the North Kern reception center "must share a

10   converted cell that serves as their office"); Nov. 9, 2007 Stewart Report ¶ 48 (describing

11   observations of small classroom at DVI reception center "where at any time six psychologists

12   simultaneously conduct reception center mental health assessments for new arrivals"); *id.*

13   ¶ 82 (noting that the "[l]ack of adequate and appropriate space for reception center

14   psychological screening was also apparent at DVI").

15          Moreover, at North Kern, follow-up physical examinations are conducted in rooms

16   that "are so small that it would be very difficult if not impossible to perform an actual

17   physical examination in them," so that the "'exams' that take place are in fact simply medical

18   interviews, primarily for the purpose of determining what type of housing is appropriate for

19   the prisoner."  Sept. 10, 2008 Shansky 2d Supp. Report ¶ 25.  This violates the "basic

20   principle that incoming prisoners must undergo a comprehensive exam upon arrival so that

21   an adequate treatment plan may be developed and implemented.  A physical exam, as

22   opposed to a medical interview, is necessary because some conditions can be identified and

23   confirmed only through physical examination of the patient."  *Id.* ¶ 26; *see also* Rep. Tr. at

24   224:10-225:15 (Beard) (testifying that the number of people coming in through reception

25   centers may cause prisons to "miss people who have certain needs and certain care needs that

26   aren't being dealt with").  The medical facilities at North Kern are also so "inadequate" that

27   defendants cannot comply with the *Plata* policies and procedures they agreed to implement,

28

1    which provide for a complete history and physical examination of inmates within fourteen

2    days of arrival at a reception center.  Sept. 10, 2008 Shansky 2d Supp. Report ¶ 22.

3         The consequences of the state's inability to screen inmates properly at the reception

4    centers are obvious:  If an inmate's health needs are not identified, they cannot be treated.  In

5    addition, inmates whose needs are not identified may be placed in a setting that will

6    exacerbate existing but unidentified health problems.  Likewise, if the lack of confidentiality

7    in the screening centers prevents inmates from reporting infectious diseases, the failure to

8    diagnose them at the reception center may result in their being spread throughout the prison

9    population.

10        In addition to preventing the reception centers from properly screening newly

11   admitted inmates, crowding at the reception centers prevents the provision of adequate care

12   to the inmates housed there.  As numerous experts, including defendants' own mental health

13   expert, testified, the number and types of inmates in the centers overwhelms their capacity to

14   provide adequate medical or mental health care services.  Rep. Tr. at 1121:16-19 (Packer);

15   Rep. Tr. at 368:12-369:4 (Woodford) (mentally ill inmates did not receive "really any

16   treatment" at San Quentin reception center beyond identification as CCCMS or EOP and

17   certainly not anything "to prevent further deterioration of people's mental illness"); Aug. 15,

18   2008 Stewart Supp. Report ¶ 136 ("CDCR's Reception Centers are dangerously overcrowded

19   and do not and cannot provide appropriate mental health care for anyone"); Sept. 10, 2008

20   Shansky 2d Supp. Report ¶ 79 ("acute staffing shortage, coupled with the lack of clinical

21   exam space" prevents North Kern State Prison from providing incoming inmates with

22   comprehensive physical examination or follow-up appointments with primary care

23   providers); Rep Tr. at 368:12-22 (Woodford) (at San Quentin reception center, due to

24   vacancies and "just the sheer numbers and lack of space," medical staff "were unable to keep

25   up with physicals or providing any kind of chronic care follow-up").

26        If California's inmates spent only a brief time at the reception centers before being

27   placed in other facilities, the centers' inability to provide adequate medical and mental health

28   care to the inmates housed there would constitute a less substantial aspect of the

1    constitutional violations at issue in this proceeding.  However, inmates in California are

2    "tend[ing] to spend significantly longer periods of time in reception centers."  Nov. 9, 2007

3    Stewart Report ¶ 24; *see also* Nov. 9, 2007 Austin Report ¶ 27 (reporting that the CDCR

4    routinely fails to meet its mandate to transfer inmates from reception centers to mainline

5    institutions within sixty days).  As one of plaintiffs' experts Dr. James Gilligan explained,

6    "The dramatic levels of prison overcrowding through the state mean that individuals coming

7    into prison are housed in 'Reception Centers' for extended periods of time, far longer than

8    intended."  Aug. 15, 2008 Gilligan Report ¶ 26 (footnotes omitted).

9            The consequences of the increased lengths of stay at the reception centers along with

10   the lack of space in those centers are particularly grave for *Coleman* class members.

11   Dr. Packer, defendants' mental health expert, reported that mentally ill individuals "often

12   enter[] the prison system with a more acute mental health presentation, not having received

13   adequate treatment in the community and/or having abused substances there."  Dec. 10, 2007

14   Packer Report at 20.  These inmates are "disproportionately represented" among the parole

15   violators returning to custody for short sentences, *id.*, and are thus likely to spend their entire

16   sentence at the reception center.  *Id.*  Because their sentences are so short, they are frequently

17   discharged before receiving treatment and fall into "a vicious cycle, as they decompensate in

18   the community and quickly return . . . ."  *Id.*; *see also* Aug. 15, 2008 Haney Report

19   ¶¶ 358-59.  ("[M]entally ill parolees often do not receive meaningful mental health treatment

20   when they are on parole. . . .  Frequently as a result of their decompensation, many are

21   returned to prison, often for technical or minor violations.  Thus, many of the parole

22   violations that return them to prison are directly related to their unmet mental health needs.

23   When they return to prison, these vulnerable prisoners are then packed into overcrowded

24   reception centers.").

25           The absence of adequate mental health care at reception centers also has significant

26   adverse consequences for mentally ill inmates admitted to serve longer sentences in state

27   prison.  The shortage of mental health care beds throughout the prison system – which we

28   discuss in more detail below – means that these inmates often spend months in a reception

64

center with little or no access to necessary mental health care while waiting for a bed to open up.  *See, e.g.*, Nov. 9, 2007 Stewart Report ¶ 166 (discussing impact of delays in transfer of mentally ill inmates from reception centers to necessary level of care); Aug. 15, 2008 Haney Report ¶ 105 (discussing delays in transfer of EOP inmates out of CIM reception center); *id.* ¶ 129 (discussing prolonged reception center stays and minimal treatment provided for EOP and CCCMS inmates at CIM reported by *Coleman* Special Master).  For example, the number of inmates in reception centers needing an EOP level of care[47] continues to grow, *see* Ex. P243 at 900004-06, 900121-23, but the EOP program provided to these inmates falls far below the care mandated by the Program Guide for EOP patients.  Aug. 15, 2008 Haney Report ¶ 29 (citing September 2006 Program Guide, Ex. P9 at 12-4-1); *see also* Nov. 9, 2007 Stewart Report ¶ 167.  This is not surprising, given that the conditions in these reception centers have been described as "toxic, noxious, psychologically and medically unhealthy," Rep. Tr. at 953:13-14 (Haney), and that a lack of treatment space severely impedes efforts to provide even the most rudimentary forms of mental health care in reception centers.  *E.g.*, Nov. 9, 2007 Stewart Report ¶ 80; Aug. 15, 2008 Haney Report ¶¶ 246, 247.

2.    Treatment Space

The severe shortage of treatment space evident at CDCR reception centers affects the provision of medical and mental health care throughout the state prison system.  Dr. Stewart reported that the "problem of adequate office and treatment space is endemic in the CDCR," Nov. 9, 2007 Stewart Report ¶ 190, and the *Plata* Receiver noted in his Turnaround Plan of Action that "investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily operations."  Ex. D1133 at 25.  In part, this is due to the CDCR's policy and practice of anticipating that prisons will be filled beyond their design capacity, but not including sufficient health care space to serve the anticipated population.  Ex. D1092 at 20 (*Plata* Receiver's May 15, 2007 Report Re: Overcrowding).  Compounding problems caused by the lack of space, the space that does exist to provide health care services is often

---

[47]The various levels of mental health care are defined *supra* note 24.

1  "woefully inadequate.  Through years of neglect, the facilities have long since passed the

2  time when modest investments could remedy the problem.  We are dealing not with deferred

3  maintenance, but with some facilities that are literally falling apart."  Ex. D1133 at 25.

4       The court received evidence of inadequate treatment space at a variety of prisons

5  statewide.  At Avenal State Prison, staff must attempt to provide care for 7,525 inmates in

6  space designed for less than one-third of that number.  Ex. D1233 at 25 (*Plata* Receiver's

7  Nov. 3, 2008 Analysis of Year 2007 Death Reviews).[48]  At Mule Creek State Prison, a *Plata*

8  Receivership team found that "[a]ll of the Facility Clinics are undersized for the quantity of

9  inmate/patients seen on a daily basis and lack[] appropriate holding/waiting space for

10  inmate/patients ducated [scheduled] to be seen by health care providers."  Ex. P101 at 7

11  (*Plata* Receiver's Custody/Security Assessment for Health Care Access at Mule Creek State

12  Prison).

13       One expert who testified at trial explained that crowding has so "over-taxed" the

14  clinical facilities at California Institution for Men that, as with the reception center at the

15  same prison, "fundamental medical confidentiality rights are routinely ignored" in the space

16  used to provide care to inmates housed at the prison:

17  
18  
19  
20  
21  
22  
23  
24  
> In the West facility clinic at CIM, two PCPs [primary care
> physicians] share one room and simultaneously see patients for
> sick call and other encounters.  A thin fabric folding screen
> separates the area in which the doctors see patients from a single
> exam table which the PCPs must share, as the room is not large
> enough to accommodate a second table.  In the same clinic, the
> registered nurse conducts face-to-face triage appointments with
> patients in a large room that is shared by another nurse (who may
> be seeing patients) and an office technician.  These arrangements
> cannot provide for minimally adequate patient-provider privacy.
> Moreover, the medical treatment area is so small that there is no
> medically appropriate waiting area, so sick patients must wait for
> appointments on a small bleacher outside the clinic, exposed to
> the elements.

25  Nov. 9, 2007 Shansky Report ¶ 24.  Dr. Shansky also testified about the shortage of clinical

26  space he observed at several other prisons.  *Id.* ¶¶ 16-23 (Valley State Prison for Women,

27  Avenal State Prison, and San Quentin); Sept. 10, 2008 Shansky 2d Supp. Report ¶¶ 31-46

28       [48]Plaintiffs also offered this document into evidence as Exhibit G to Exhibit P413.

(North Kern State Prison, Substance Abuse and Treatment Facility, Pleasant Valley State Prison, and California State Prison-Solano); *see also* Rep. Tr. at 663:22-665:10 (Rowlett) (testifying about clinical space shortage at California State Prison-Solano). Similarly, Secretary Woodford testified that "space represents a serious obstacle to the delivery of health care." Aug. 15, 2008 Woodford Supp. Report ¶ 27; *see also id.* ¶¶ 27-29 (discussing space issues encountered on tours of the Correctional Training Facility ("CTF") and California State Prison-Los Angeles County (Lancaster)).

As the *Plata* Receiver concluded in his supplemental report on overcrowding, "[t]here is a dire need for additional clinical space . . . in the prisons because the existing capacity has been swamped by the number of inmates in the system." Ex. D1094 at 2 (*Plata* Receiver's June 11, 2007 Supp. Report Re: Overcrowding). On the basis of all of the evidence received at trial, there is no doubt that crowding renders the existing clinical space in California's prisons grossly inadequate.

### 3. Inability To House Inmates by Classification

Crowding also negatively impacts the state's ability to house inmates according to their proper classification, which in turn creates inadequacies in the medical and mental health care that the system is capable of providing to inmates.

A prison classification system is "an objective tool" that allows correctional staff to consider individual factors, including "age, criminal history, educational levels or deficiencies, mental health issues, [and] medical issues" so that inmates can be placed "in the appropriate custody housing level." Rep. Tr. at 149:18-24 (Scott). Prisoners in California are assigned to one of four levels of classification "based on the length of their sentence, their disciplinary history and other objective factors." Nov. 9, 2007 Woodford Report ¶ 13.

In an overcrowded system, this classification system breaks down. A "well-functioning" system of classification should have no more than 10% of prisoners housed outside their classification level. Nov. 9, 2007 Scott Report ¶ 69. In California, population pressures have forced the CDCR to house an estimated 25% of inmates outside their classification levels. *Id.* This failure to house inmates within such levels "mak[es] it harder

to provide for their medical and mental health care needs," *id.* ¶ 68, and deprives the

overcrowded system of "the flexibility needed to respond to inevitable crises." *Id.* As

Director Scott explained, this "widespread rejection of CDCR's classification system has a

significant impact on medical and mental health care":

> [I]t is harder to get health care appointments within the prison as
> well as out-of-prison specialty appointments, and more limited
> staff contact means that staff are less responsive to emergencies
> due to distrust, lack of understanding and compassion, and simple
> logistics: it is harder to get staff attention in a high-pressure,
> high-security unit.  In addition, prisoners are subject to increased
> degrees of danger and potential for violence because they are
> placed with more dangerous and violent prisoners than their
> classification scores would warrant.

*Id.* ¶ 71.  Similarly, Secretary Woodford testified that crowding makes it "impossible to

move inmates where they need[] to be" to address inmates' medical and mental health needs.

Rep. Tr. at 375:4-6; *see also id.* at 227:4-13 (Beard) ("[H]uge overcrowding creates a

problem, because you have an individual who needs to go to Institution A, and Institution A

is full.  So where do you put him. . . .  [Y]ou end up having to put them somewhere that

maybe is not the most appropriate for that individual.").  Dr. Shansky likewise agreed "that

the CDCR is currently unable to accommodate the housing needs of medical patients

requiring specialized placement."  Nov. 9, 2007 Shansky Report ¶ 126.

### 4.   Beds for Mentally Ill Inmates[49]

Crowding has also created severe bed shortages at every level of the CDCR's mental

health care system, causing inmates in need of higher levels of care to languish in clinically

inappropriate settings.  It is not simply the beds themselves that the state does not possess,

but the space in which to place them.  The need for such space is rapidly growing.  From

December 2006 to August 2008, for example, the shortage of EOP beds more than tripled to

almost 1,000.  Ex. P243 at 900007, 900124.  Likewise, between June and September 2008,

---

[49]Throughout this section, we cite evidence offered at trial on the number of mental
health beds at each level of the mental health care delivery system above CCCMS.  The
*Coleman* court recently approved several projects planned by defendants to increase, in the
near term, the number of such beds.  June 17, 2009 Order in *Coleman*.  Nonetheless, it
remains to be seen whether and when defendants will comply with the *Coleman* court's
June 17, 2009 order, and, in any event, compliance with that order alone will not suffice to
meet defendants' constitutional obligations to the *Coleman* class.  *Id.* at 5.

1   the CDCR's severe shortage of mental health crisis beds prevented more than two-thirds of

2   the inmates referred to such beds from actually being transferred.[50]  *See* Exs. P555, P586,

3   P587, P585 (mental health crisis bed referral data from June 2008 through September 2008

4   showing 391 transfers out of a total of 1,424 referrals).  At the level of care reserved for the

5   most mentally ill, inmates sometimes wait as much as a year before being transferred to

6   inpatient beds.  Aug. 15, 2008 Stewart Supp. Report ¶ 20.

7           The shortage of mental health beds throughout the system means that large numbers

8   of inmates in need of care cannot be transferred and do not receive the treatment their mental

9   illness requires.  *See, e.g.*, Aug. 15, 2008 Haney Report ¶ 216.  Inmates requiring an EOP

10  placement often remain in general population yards receiving only "limited mental health

11  treatment."  *Id.*  Many of them decompensate and require one or more admissions to a mental

12  health crisis bed for stabilization.  *Id.*  Because of the severe shortage of available mental

13  health crisis beds, however, inmates in need of such care are frequently placed "in a variety

14  of temporary housing alternatives" ranging from infirmaries to "telephone-booth-sized

15  interview stalls typically placed in corridors."  Ex. D1292 at 3.  "Most of these alternative

16  placements lack suitable staffing and/or the physical configuration needed for the continuous

17  monitoring or intensive treatment provided in a MHCB unit."  *Id.* at 3-4.  Suicidal inmates

18  referred to mental health crisis beds have spent "from Thursday evening to . . . Monday

19  morning" being transferred between so-called "dry cells," which are "tiny, freestanding

20  upright cages with mesh wiring surrounding them (and no toilet)," during the day and

21  so-called "wet cells," which are holding cells that have toilets, at night.  Aug. 15, 2008

22  Haney Report ¶ 156.  In several instances, inmates referred to mental health crisis beds have

23  committed suicide while awaiting transfer.  *E.g.*, Nov. 9, 2007 Stewart Report ¶¶ 173-75

24  (inmate referred to crisis bed hanged himself after several days on a "suicide precaution

25  protocol" in a mental health outpatient housing unit); Aug. 15, 2008 Stewart Supp. Report

26  ¶ 100 (after determination that neither restraint room nor crisis beds were available, an

27  _____

28      [50]All inmates referred to mental health crisis beds "are suffering from severe
    decompensation or are a danger to themselves or others.  A substantial proportion of these
    inmate/patients are at a high risk for suicide."  Ex. D1292 at 3; *see also* Ex. D1148 at 12-1-8.

1   inmate referred to mental health crisis bed and for possible involuntary medication returned

2   to administrative segregation cell where he hanged himself); *id.* ¶ 109 (inmate identified as

3   "high suicide risk" and referred to crisis bed hanged himself two days later in unlicensed

4   infirmary at CTF).

5          These shortages at every level, which are caused by the lack of space resulting from

6   overcrowding, have created a destructive feedback loop that is now endemic to the CDCR's

7   mental health care delivery system.  Inmates denied necessary mental health placements "are

8   decompensating and are ending up in mental health conditions far more acute than necessary

9   . . . . creat[ing] a cycle of sicker people being admitted, with greater resources necessary to

10  treat them, which then creates even further backlog in an already overwhelmed system."

11  Aug. 15, 2008 Stewart Supp. Report ¶ 92; *see also* Nov. 9, 2007 Stewart Report ¶¶ 31, 32;

12  Ex. D1292 at 9-10; Dec. 10, 2007 Packer Report at 11.  Because overcrowding has led to a

13  significant, unaddressed demand for mental health services that only becomes more acute

14  over time, new mental health beds cannot be added quickly enough to address the system's

15  problems.  "[D]ue to the effects of overcrowding on the delivery of mental health care, any

16  reduction in the waitlists for higher levels of care will be temporary due to the pentup

17  demands in the system."  Aug. 15, 2008 Haney Report ¶ 33.

18          **C.    Conditions of Confinement**

19          The severe overcrowding in California's prisons has also affected the conditions under

20  which members of the *Plata* and *Coleman* classes are confined.  One consequence of the

21  growing gap between the size of the CDCR population and the capacity of its prisons has

22  been a significant increase in the use of "non-traditional" or so-called "ugly" or "bad" beds.

23  Ex. P4 at 200; Rep. Tr. at 1912:8-14 (Kernan) (CDCR Undersecretary of Operations).  These

24  include triple bunks, housing two inmates in cells designed for one inmate, and "beds for

25  both low- and medium-risk inmates . . . crammed into gyms and dayrooms that were never

26  meant to be used for housing."  Ex. P4 at 200; *see also* Rep. Tr. at 1912:15-17 (Kernan).  The

27  court heard testimony and saw photographic and videographic evidence of these beds.  *See*,

28  *e.g.*, Rep. Tr. at 148:9-149:1 (Scott); *id.* at 269:11-25 (Lehman); Exs. P336, P339, P348,

P363.  Director Scott, the former head of corrections in Texas, described some of the ugly

beds he saw on his tours of California prisons as "truly appalling" and reported that, "[i]n

more than 35 years of prison work experience, I have never seen anything like it."  Nov. 9,

2007 Scott Report ¶ 11.  In the October 2006 Prison Overcrowding State of Emergency

Proclamation, Governor Schwarzenegger found that the CDCR was housing "more than

15,000 inmates" in these beds.  Ex. P1 at 1.  By August 2007, the number of inmates housed

in non-traditional beds had increased to approximately 19,600.  Rep. Tr. at 1893:11-19

(Kernan); *see also* Ex. D1252-2 at 2.  At the time of trial, the department was using

approximately 14,000 such beds.  Rep. Tr. at 1911:9-14 (Kernan).

    The use of non-traditional housing raises serious safety concerns, contributes to the

spread of infectious disease, and exacerbates mental illness.  First, as Secretary Woodford,

former head of the CDCR, testified, the number of custodial staff is often "grossly

inadequate" to meet "basic needs" with "often only two officers to supervise 200 prisoners in

a gym or a dorm.  This is extremely dangerous for both the prisoners and the staff because

line of sight supervision is impossible under these circumstances and it does not permit the

staff the time to recognize that prisoners are in trouble from any number of causes, including

medical or mental illnesses."[51]  Nov. 9, 2007 Woodford Report ¶ 17.  One of her successors,

Secretary Tilton, similarly reported that because of overcrowded conditions, including the

high use of non-traditional beds, "the risk of catastrophic failure in a system strained from

severe overcrowding is a constant threat."  Ex. P104 at 15.

    Second, crowding generates unsanitary conditions, overwhelms the infrastructure of

existing prisons, and increases the risk that infectious diseases will spread.  *See, e.g.,* Nov. 9,

2007 Scott Report ¶¶ 17-24.  The Governor recognized such dangers when he issued his

emergency proclamation on crowding, declaring that "current severe overcrowding in 29

CDCR prisons" has caused "substantial risk to the health and safety of CDCR staff, inmates,

and the public."  Ex. P1 at 1-2.  Similarly, Scott Kernan, then the Chief Deputy Secretary of

---

[51]We discuss additional problems related to inadequate staffing below, *infra*
Section IV.D.1.

71

the Division of Adult Institutions for the CDCR, declared that overcrowding "has led to increased numbers of infectious disease outbreaks and riots and disturbances system-wide." Ex. P11 ¶ 3 (May 16, 2007 Decl. of Scott Kernan filed in *Plata*) (noting eleven different outbreaks, possible outbreaks, or exposure to tuberculosis at seven prisons).  As plaintiffs' medical expert testified, "the overcrowded housing conditions, and in particular, the conditions in the non-traditional beds, including the converted gyms, create potential breeding grounds for disease."  Sept. 10, 2008 Shansky 2d Supp. Report ¶ 118; *see also* Rep. Tr. at 270:7-12 (Lehman) (crowding "contributes to the difficulties of healthcare delivery by virtue of the fact that it increases the incidence of illnesses, [and] infectious disease"); *id.* at 257:15-22 (Beard) (while prisons may not always be incubators for disease, "they could be if your population densities get so intense," like "if you have a gymnasium that you triple bunk and put hundreds and hundreds of people in a closed dense area"); *id.* at 88:25-89:3 (Stewart) (interviewed two *Coleman* class members who "were suffering from staph infections that they got while living in these unhealthy conditions"); Ex. P4 at 200 (non-traditional beds "create difficult, unsanitary living conditions where ventilation is poor, toilet access is limited, and as many as 200 people might share six showers").  "Until CDCR reduces its population, it will remain highly vulnerable to outbreaks of communicable diseases, including staph infections, tuberculosis and influenza."  Nov. 9, 2007 Shansky Report ¶ 135.

Third, plaintiffs' mental health experts also reported on the toxicity of non-traditional housing for members of the *Coleman* class and other inmates.  As Dr. Stewart explained, "[p]lacing inmates in overcrowded gym and dorm settings is often inappropriate for people with mental health issues and can either exacerbate existing symptoms or, in some cases, trigger symptoms in people who would not otherwise display them."  Aug. 15, 2008 Stewart Supp. Report ¶ 66; *see also id.* ¶ 52 (crowded dorm "settings also may exacerbate mental health conditions such as paranoia and create stressful environments for people who are otherwise vulnerable due to mental health issues, including cognitive impairment"); Aug. 15, 2008 Haney Report ¶ 291 (reporting on "extensive use of 'non-traditional' or 'bad' beds" at North Kern State Prison, which was operating at 200% design capacity, and describing

72

1    housing conditions as "especially inappropriate for the confinement of mentally ill

2    prisoners").

3           Finally, non-traditional beds are frequently created by "converting activity space into

4    inmate housing areas," which adversely impacts all inmates by reducing the amount of space

5    available for programs.  Ex. P4 at 124.  As the *Coleman* Special Master has explained:

6               The inevitable result of severe overcrowding is that everyone also
                spends more and more time in their cells.  General yards are more
7               crowded, less well supervised and increasingly dangerous.  There
                are not nearly enough walk-alone yards to provide statutorily
8               required amounts of exercise for those who by choice or need
                require them.  Gyms are no longer an option for time out of one's
9               cell.  Dayrooms share many of the same problems.  Work or
                vocational opportunities shrink in the expanding population.
10              Disturbances occur more frequently, with resulting increases in
                the number and duration of lockdowns.  All inmates must spend
11              increasingly larger chunks of their days in their cells, or much
                more dangerously, in one of those triple-bunked "non-traditional"
12              spaces.  None of this is conducive to the health and well-being of
                any inmate, much less a seriously mentally disordered
13              inmate/patient . . . .

14   Ex. D1292 at 7-8.  Instead, these conditions "inevitably escalate[] the incidence of mental

15   illness and exacerbate[] the condition of those already mentally fragile and vulnerable."  *Id.*

16   at 8.

17        **D.     Other Access to Care Issues**

18          Beyond the issues arising from critical space shortages, crowding has other severe

19   impacts on access to medical and mental health care.

20               1.     Staffing

21          The level of crowding has rendered current staffing levels insufficient to handle the

22   health care needs of the overpopulated system:

23               Many CDCR prisons are unable to sustain the basic delivery of
                 medical, mental health, and dental services because of limited
24               staffing (clinical and custody) and an overwhelming number of
                 prisoner/patients who require care.  Every day, many California
25               prison wardens and health care managers make the difficult
                 decision as to which of the class actions, *Coleman*, *Perez*,
26               *Armstrong* or *Plata* they will fail to comply with because of staff
                 shortages and patient loads.
27

28

                                        73

1    Ex. D1092 at 30 (*Plata* Receiver's May 15, 2007 Report Re: Overcrowding).[52]   Crowding

2    also makes it impossible for the CDCR to hire the additional staff necessary to provide

3    constitutionally adequate medical and mental health care to the current population.

                            a.      *Medical Staff*

5            Defendants' own data demonstrates significant vacancy rates for medical staff.  As of

6    August 2008, 20 percent of chief physician and surgeon positions, 25 percent of physician

7    positions, 19 percent of physician assistant positions, 39 percent of nurse practitioner

8    positions, 10 percent of registered nurse positions, and 18 percent of licensed vocational

9    nurse positions remained vacant.  Ex. D1235-2 (charts summarizing staffing trends and

10   indicating number of positions and number of positions filled by full-time employees).  The

11   statewide vacancy rate for primary care provider positions, which include physicians and

12   surgeons, nurse practitioners, and physician assistants, was 27 percent.  *Id.*; Nov. 9, 2007

13   Shansky Report ¶ 37 (explaining positions that are considered primary care providers).

14   Some prisons have attempted to fill these vacancies with registry (contract) physicians, but

15   this practice is insufficient as a long-term solution.  "Because registry physicians tend to turn

16   over quickly, the prisons end up spending time doing extensive on-the-job training

17   repeatedly, which is time-consuming and detracts from patient care delivery."  Sept. 10, 2008

18   Shansky 2d Supp. Report ¶ 66; *see also* Nov. 9, 2007 Shansky Report ¶ 45.

19           "In any system, inadequate medical staffing, whether due to unfillable vacancies or

20   insufficient allocation of positions, will result in delayed care.  In a dramatically

21   overcrowded system like the CDCR's the treatment delays become more acute."  Nov. 9,

22   2007 Shansky Report ¶ 46.  In overcrowded systems, prisoners experience "significant

23   appointment delays," *id.*, both in terms of seeing a primary care physician and even in being

24   triaged by a nurse to determine whether an appointment with a physician is necessary.  *E.g.,*

25   *id.* ¶¶ 46-49; Sept. 10, 2008 Shansky 2d Supp. Report ¶¶ 67-77.  In addition, "[w]ith too few

26

27           [52]*Perez v. Cate*, Case No. C05-5241 JSW (N.D. Cal.), is a statewide class action
     concerning dental care in California prisons.  *Armstrong v. Schwarzenegger*, Case No.
28   C94-2307 CW (N.D. Cal.), is a statewide class action concerning California prisoners and
     parolees with hearing, vision, mobility, kidney, and learning impairments.

                                              74

1    primary care providers to meet the most immediate needs of the current population, some

2    prisons are unable to develop required medical programs," including the chronic and

3    preventive care programs required by the *Plata* policies and procedures to which defendants

4    have committed themselves.  Nov. 9, 2007 Shansky Report ¶¶ 51-53.  "Even the remedies the

5    state uses to alleviate crowding cause problems for an already overburdened staff.  For

6    example, at CTF the medical department was swamped with work because they had been

7    ordered to review 1,500 medical files to determine which prisoners were eligible for transfer

8    to out-of-state prisons." Aug. 15, 2008 Woodford Supp. Report ¶ 6.

9            In addition to rendering current medical staffing levels seriously inadequate, crowding

10   makes it impossible for the CDCR to increase the number of clinical positions to the level

11   needed to provide adequate care to inmates.  Staffing and space issues are inextricably

12   intertwined such that, given the overcrowding, hiring staff alone could not solve the problem.

13   As Secretary Lehman asked, "[W]here are the providers going to work and how"?  Rep. Tr.

14   at 272:1-13.  A number of chief medical officers expressed the opinion that they would not

15   have sufficient space for clinical staff if all of the clinical positions currently budgeted were

16   filled, *id.* at 501:3-7 (Shansky), let alone if new positions were created and filled.

17          Moreover, crowding negatively impacts the recruitment and retention of clinical staff.

18   *See, e.g.,* Nov. 9, 2007 Shansky Report ¶¶ 16, 20.  Dr. Shansky explained that "[t]he clinical

19   space allocated at San Quentin is so substandard and creates such a stressful environment

20   that . . . the prison's capacity to retain physicians is seriously jeopardized by both the

21   physicians' perception of personal safety issues and the unprofessional conditions."  Nov. 9,

22   2007 Shansky Report ¶ 23.  More broadly, Dr. Shansky testified:

23                  I believe that the hiring gains for clinicians made in the past year
                    will be lost if these systemic issues [concerning overcrowding]
24                  are not addressed, because many newly-hired clinicians will be
                    unwilling to risk their professional credentials and reputations by
25                  practicing in an environment where their patients are at risk of
                    harm because among other things adequate clinical space is
26                  scarce, appointments are not scheduled, complete medical records
                    are unavailable, and medications are not delivered.
27

28

75

*Id.* ¶ 136.  The *Plata* Receiver likewise reported that crowding interferes with the "ability to recruit, hire and retain competent medical personnel.  The overwhelming number of prisoners needing care at the prisons, existing staffing shortages and inadequate clinical space are just a few of the consequences that make developing a competent medical staff a daunting challenge."  Ex. D1094 at 2 (*Plata* Receiver's June 11, 2007 Supp. Report Re: Overcrowding).

b.   *Mental Health Staff*

There are also staffing shortages "at all clinical levels" of the CDCR's mental health care delivery system, and overcrowding in California's prisons has "a profound impact" on mental health staffing levels.  Rep. Tr. at 309:3-22 (Haney).  Between March 2008 and August 2008, for example, the total vacancy rate among existing mental health care positions ranged from 22 percent to 36.1 percent, while the vacancy rate in psychiatrist positions was particularly high, ranging from 30.6 percent to 54.1 percent.  Ex. P245 at 1.  Moreover, CDCR "significantly underestimated the staffing needed to implement critical portions of the *Coleman* Program Guide requirements" in its 2008-09 staffing requests.  Aug. 15, 2008 Haney Report ¶ 336 (citing Ex. P485, July 12, 2008 letter from *Coleman* Special Master to Robin Dezember and *Coleman* defense counsel reporting review of CDCR workload study).  Accordingly, these high vacancy rates understate the actual level of mental health understaffing.  Dr. Haney reported on the "significant staff shortages" at the eight facilities he visited, all of which he described as "[s]everely [o]vercrowded."  Aug. 15, 2008 Haney Report at 56 & ¶ 335.

As Dr. Haney explained, these shortages have a serious adverse effect upon the mental health care provided to inmates.

> [S]erious staffing shortages all translate into inadequacies in the mental health delivery system and, in some instances, an outright denial of needed and mandated mental health services.  In many of the units this means that professional staff are doubling up on duties, performing more tasks than they should be called upon to handle, and managing far larger caseloads than is appropriate or effective.  One psychologist at CIM told me "I can't keep up with

76

1
2

> everything.  I've been doing too much.  We hired new staff, but that hasn't helped."  He also told me "in my opinion, we are doing about 50% of what we should be doing."

3   *Id.* ¶ 335.

4       Although defendants need additional clinical staffing to implement necessary mental

5   health programs, the CDCR "ha[s] been unable to recruit and retain staff even to meet the

6   budgeted levels."  *Id.* ¶ 336.  This inability is directly related to the overcrowding in

7   California's prisons.  "[T]he serious deficiencies in office and treatment spaces I observed

8   throughout the system are themselves an obstacle to ever achieving appropriate clinical

9   staffing.  The working conditions are terrible and there is no space, in any event, for more

10  clinicians."  *Id.*  Dr. Stewart explained that "it is extremely difficult to recruit and retain

11  good clinical staff in a correctional environment in the best of times," but that, "[i]n

12  overcrowded systems, with the attended violence, high acuity, [and] shortage of office space,

13  these ordinary recruitment problems are compounded and become significantly more difficult

14  to overcome."  Nov. 9, 2007 Stewart Report ¶ 41.

15                    c.      *Custodial Staff*

16      Crowding has also caused significant custodial staffing shortages in the CDCR that

17  have a direct impact on defendants' ability to deliver constitutionally adequate medical and

18  mental health care to prison inmates.  "Custodial staff are essential to providing health care

19  to prisoners because they supervise prisoner movement to and from medical appointments,

20  they escort prisoners to services within an institution and they provide supervision when

21  prisoners are taken out of the prison to medical appointments, hospitals or they are

22  transferred to another institution."  Nov. 9, 2007 Woodford Report ¶ 15.  In addition,

23  custodial staff are "responsible for alerting health care staff when prisoners complain of an

24  immediate serious problem and also are supposed to observe prisoners periodically to

25  identify actual or potential problems."  Aug. 15, 2008 Woodford Supp. Report ¶ 25.

26      The California prison system lacks sufficient custodial staff "to keep prisoners safe

27  from harm," *id.*, or "to provide prisoners with timely access to care and still perform other

28  essential functions," Nov. 9, 2007 Woodford Report ¶ 15.  The "paucity of correctional

1   officers in California, due to the low staffing rate and high number of vacancies, is

2   dangerous."  Nov. 9, 2007 Scott Report ¶ 26 (footnote omitted).  In fact, Director Scott

3   testified that "every institution I toured had inadequate custodial staff on the ground to

4   address the needs of the prisoner population, including ensuring that health care services are

5   provided."  *Id.* at 14 n.3.  This "is particularly dangerous for prisoners in need of medical

6   care . . . not just because staff are not available to escort prisoners or clinicians to

7   appointments, but because short-staffing can lead to forced overtime and burnout, such that

8   staff make poor decisions, particularly in health care emergencies."  *Id.* ¶ 26; *see also* Nov. 9,

9   2007 Woodford Report ¶¶ 16-23 (discussing dangers of understaffing correctional officer

10  positions).  As Director Scott testified:

> [O]verworked staff without adequate back-up are less able to
> respond to emergencies and more likely to downplay prisoners'
> concerns.  In a housing unit such as San Quentin's H Unit Dorm
> 2 (one officer for 200 prisoners) or CIM's West Facility
> Cleveland Hall (two officers for 198 prisoners) or East Facility
> gym (two officers for 202 prisoners), staff in an emergency can
> only sound the alarm, make frantic telephone or radio calls, and
> hope for backup.  An officer alone with several hundred inmates
> is unlikely, for example, to perform emergency first aid or CPR –
> it is simply unsafe to do so with no backup, when prisoners could
> easily simulate an emergency as a diversion.  The inability to
> perform basic lifesaving functions could have potentially
> devastating consequences on the life and health of a prisoner
> undergoing a medical or mental health emergency.  This situation
> presents an unacceptable risk of harm to prisoners.

19  Nov. 9, 2007 Scott Report ¶ 59.

20      In addition, the *Plata* Receiver has explained that, "[s]ystem-wide, CDCR lacks the

21  custody staff and organizational structure and processes to ensure that patient-inmates are

22  reliably escorted and/or transported to medical appointments."  Ex. D1133 at 5 (*Plata*

23  Receiver's June 6, 2008 Turnaround Plan of Action).  This results in denial of "timely access

24  to health care services" and "substantially increas[es] the risk that patient-inmates' health

25  will further deteriorate."  *Id.*  Dr. Shansky also concluded that lack of adequate custodial staff

26  causes "significant delays in treatment . . . because there are not enough custody officers to

27  move the prisoners in and out of the clinics on a timely basis."  Sept. 10, 2008 Shansky 2d

28  Supp. Report ¶ 107.  Similarly, defendants' own mental health expert testified that the

1   shortage of correctional officers statewide impedes the delivery of mental health care to

2   members of the *Coleman* class, particularly CCCMS inmates.  Dec. 10, 2007 Packer Report

3   at 15-16.  A reduction in the crowding of California's prisons would help ease the burden on

4   the custodial staff and permit staff members to better monitor inmates for medical or mental

5   health problems and to deliver inmates for necessary care.

6                      2.      Medication Management

7           Next, crowding prevents defendants from achieving an adequate medication delivery

8   system that is marked by "the timely delivery of the correct medication to the correct patient,

9   with accurate documentation of what has been administered."  Nov. 9, 2007 Shansky Report

10  ¶ 79.  "Defendants' medication delivery systems are inadequate for the size of the population

11  they serve, and are plagued by short-staffing at a number of prisons. . . .  [Consequently,]

12  prisoners receive their medications late or not at all, and suffer as a result."  *Id.* ¶ 80.  "The

13  shortcomings in the medication delivery system are rooted in overcrowding – quite simply,

14  there are more patients requiring medications than the prison has the resources or staffing to

15  address."  *Id.* ¶ 81.

16          Overcrowding affects the administration of both traditional medications to *Plata* class

17  members and psychotropic medications to *Coleman* class members.  *See, e.g.*, Rep. Tr. at

18  77:21-79:24 (Stewart); Aug. 15, 2008 Stewart Supp. Report ¶ 96.  As Dr. Stewart testified,

19  "[t]here are just too many people that are prescribed too many medications" for the system to

20  handle.  Rep. Tr. at 77:19-20.  Following tours of Salinas Valley State Prison, California

21  Medical Facility, and Mule Creek State Prison, Dr. Stewart reported that:

22                  First, due to the lack of adequate staff to distribute medications
                    and the overwhelming number of inmates prescribed medications,
23                  staff members do not have sufficient time to adequately monitor
                    whether inmates are taking medications properly. . . .  Second,
24                  the clinical staff members who distribute medications are too
                    understaffed to evaluate the efficacy and potential side effects of
25                  the prescribed medications.  Every patient I talked to about the
                    medication distribution system described the same drive-by
26                  process – they received their medications in pill lines or at their
                    cell doors from staff members who spent only a few seconds with
27                  them.  The staff members never ask the patients about the
                    efficacy of the medications or whether they are causing side
28                  effects.  Third, psychiatrists are also overburdened and may

                                              79

1                      consist largely of contract employees that are unable to maintain
consistent relationships with their patients due to constant
2                      movements between units or even prisons.

Aug. 15, 2008 Stewart Supp. Report ¶ 96; s*ee also id.* ¶ 95; Rep. Tr. at 670:9-673:10

(Rowlett) (correctional officer discussing similar problems based on her experience at

California State Prison-Solano).

      The failure of the CDCR's medication delivery systems results in not only traditional

medical problems, but also high medication non-compliance rates among patients with

serious mental illness.  Blood samples taken of seriously mentally ill CDCR inmates

admitted to DMH inpatient care units over more than two years show that the vast majority

of such inmates have little or no psychotropic medication in their systems.  *See* Brewer Dep.

at 135:5-137:25; *see also* Aug. 15, 2008 Stewart Supp. Report ¶¶ 98-99 (reporting

information provided by Drs. Neill and Gandhi, DMH Program Directors for Salinas Valley

and CMF, respectively).  The Executive Director of the DMH inpatient psychiatric programs

at Salinas Valley and CMF testified that this is a "serious problem," Sept. 4, 2008 Brewer

Dep. at 127:17-18, the consequence of which is that acuity levels in mentally ill inmates

admitted to DMH units are rising, inmates admitted to inpatient care "are taking longer to

stabilize on medications" and often require orders for involuntary medication, and, upon

discharge, the inmates "are then returned to the same system that fails to adequately monitor

medication compliance, thereby starting the cycle all over again."  Aug. 15, 2008 Stewart

Supp. Report ¶ 100.

                        3.    Specialty Medical Care

      The CDCR is also unable to provide access to "specialty [medical] services, including

in urgent (high priority) cases, in accord with [its own] policy requirements."  Nov. 9, 2007

Shansky Report ¶ 56.  As a "result of overcrowding, the number of prisoners who need such

services exceeds the capacity of the providers available to CDCR, and/or is so great that

CDCR cannot adequately track and schedule such cases."  *Id.*  For example, at Avenal State

Prison, Dr. Shansky reviewed two reports printed the day of his visit in the fall of 2007.  *Id.*

¶ 61.  Those reports showed 1,293 pending specialty referrals, 316 urgent and 977 routine.

*Id.* Of the 316 pending urgent referrals, only approximately 105 had an appointment date, with only 2 of the 316 urgent referrals – a dismal 0.6 percent – scheduled to take place within the fourteen-day period required by CDCR policy for such appointments. *Id.* Of the 977 pending routine referrals, only approximately 285 had a scheduled appointment date, and only approximately 135 of the 977 routine referrals – approximately fourteen percent – were scheduled to occur within the three-month period required by CDCR policy for such appointments. *Id.* ¶ 62. While Avenal provides the starkest numbers, the problem exists at other prisons as well. *E.g., id.* ¶ 65 (more than 50 percent of urgent referrals on pending list at High Desert State Prison were pending for longer than fourteen-day period required by CDCR policy); Sept. 10, 2008 Shansky 2d Supp. Report ¶¶ 88-94 (discussing specialty care problems at four prisons and concluding that "[t]he demand for care, particularly for the high priority cases, continues to overwhelm the resources available to the defendants").

Prison staff at Avenal indicated that "they were not confident that the reports [of pending specialty care referrals] were entirely accurate," and that some referrals that appeared as pending may have actually taken place but were not yet closed out in the system as having been completed. Nov. 9, 2007 Shansky Report ¶ 63. However,

> to the extent that the aging report data is incorrect, then it reflects that the prison has more patient data than it is capable of processing, leaving [Avenal State Prison] unable to determine who actually needs the services, with the distinct possibility of prisoners being double-scheduled (and thus delaying specialty services for other prisoners still actually in need of an appointment).

*Id.* ¶ 64. Put simply, even if the specialty care numbers are not as dire as the reports indicate – and it would be difficult to do worse than having only 0.6 percent of pending urgent referrals scheduled within the fourteen-day period mandated by CDCR policy – "[Avenal's] population exceeds its capacity for scheduling and tracking." *Id.*

### 4. Lockdowns

Delays in access to care are even more acute during periods when prisons are in lockdowns. *See, e.g.*, Sept. 10, 2008 Shansky 2d Supp. Report ¶¶ 108-11 (discussing impact of lockdowns at Pleasant Valley State Prison and High Desert State Prison). Because of

81

1  crowding, the California prison officials who administer the state's thirty-three adult prison

2  institutions

> rely largely on lockdowns to control their system. . . .  [I]n 2006,
> they had 449 lockdowns, which averaged 12 days a lockdown.
> And they had 20 or so of those lockdowns that were over 60
> days.  Those things impact upon your ability to properly deliver
> any service within an institution, including mental health and
> medical services.

7  Rep. Tr. at 218:18-25 (Beard); *see also* Nov. 9, 2007 Scott Report ¶ 63 ("Overcrowding

8  engenders a state of perpetual crisis that shuts down non-emergency prison functions.").  As

9  Dr. Haney explained:

> Lockdowns are used in the California Department of Corrections,
> I believe, in large part because of the profound level of
> overcrowding at a level that is unheard of in corrections
> departments across the United States with which I'm familiar.
>
> Lockdowns mean that prisoners, including EOP prisoners, if they
> are in a unit that is locked down, are essentially without programs
> during the periods of time that the lockdown is in place.
>
> There are housing units in the California Department of
> Corrections that are locked down more often than they are
> unlocked.

17  Rep. Tr. at 316:23-317:9; *see also id.* at 70:4-6 (Stewart) ("The fact that there's too many

18  inmates at the Salinas Valley State Prison in the general population yard . . . resulted in an

19  almost continuous lockdown.").

20          Lockdowns require a "radically different form of medical delivery than the services

21  provided under normal general population conditions."  Ex. D1092 at 29 (*Plata* Receiver's

22  May 15, 2007 Report Re: Overcrowding).  When a prison is in lockdown, inmates housed in

23  the general population are unable to "leave their housing units to go to yard clinics" to access

24  medical care; instead, "clinical staff must go from cell to cell to see the prisoner/patient, or

25  small groups or individual prisoners must be escorted by correctional officers to and from

26  clinic areas."  *Id.* at 29-30.  California prisons "are not staffed" for this type of situation,

27  where staff "must escort prisoners to every service or bring the service to them."  Nov. 9,

28  2007 Woodford Report ¶ 25.

1    Likewise, lockdowns affect the delivery of mental health care in several ways.

2    Inmates frequently cannot leave their cells to attend necessary treatment programs.  Rep. Tr.

3    at 881:4-10 (Dezember); Nov. 9, 2007 Stewart Report ¶ 138; Aug. 15, 2008 Stewart Supp.

4    Report ¶¶ 34, 38.  Additionally, lockdowns prevent staff from supervising the intake of

5    psychotropic medications.  Aug. 15, 2008 Stewart Supp. Report ¶ 96 (noting that lockdowns

6    "result[] in distributions of medications through food ports or otherwise at cell doors, where

7    it is difficult to monitor compliance with medication regimens").  Finally, some mentally ill

8    prisoners "cannot handle the severe stress of locked-down confinement" and "may

9    decompensate or become suicidal as a result."  Aug. 15, 2008 Haney Report ¶ 166.

10   **E.    Medical Records**

11   Another deficiency in the delivery of medical and mental health care to California

12   inmates concerns medical records.  For example, Director Scott testified that the CDCR

13   "cannot track and transfer essential health care records, because the record system lacks the

14   capacity to deliver records regarding this many prisoners."  Nov. 9, 2007 Scott Report ¶ 78.

15   As he explained,

16   
17   given the extraordinary number of prisoners in these facilities, it is simply impossible to manually file so many records on a timely basis.  In my experience, such extraordinary pressure on staff also leads to serious filing errors, which means that even records that

18   have been filed might not be available to clinicians, and might be impossible ever to locate.

19   

20   *Id.*

21   Dr. Shansky's observations similarly revealed medical records that were "dangerously

22   incomplete."  Nov. 9, 2007 Shansky Report ¶ 101; *see also id.* ¶ 106 (at Avenal State Prison,

23   "the amount of documents generated had simply overwhelmed the staff's capacity to timely

24   and properly place documents in prisoners' [unit health records]"); *id.* ¶ 107 (at High Desert

25   State Prison, 107 inches of loose filing remained, and even those documents that are filed are

26   only placed rather than fastened into inmates' health files, which "greatly increases the

27   chance of documents being lost or misplaced"); *cf.* Nov. 9, 2007 Scott Report ¶ 78 (noting

28   observation of "four feet of loose filing waiting to be placed in prisoners' health records" at

1    Avenal, a prison at over 200% of design capacity).  Dr. Shansky summarized his

2    observations as follows:

> At each of the prisons I inspected, I found that the medical
> records were unwieldy, rarely organized chronologically and, in
> general, poorly maintained.  Retrieving useful information from
> the files invariably requires considerable time sifting through
> extraneous reports, misfiled documents and outdated materials.
> At the same time, certain documents that would be extremely
> useful, such as an updated "Problem List" for each file, which is
> required by the court-ordered *Plata* Policies and Procedures [to
> which defendants stipulated], are typically missing.

8    Sept. 10, 2008 Shansky 2d Supp. Report ¶ 99.  Dr. Shansky further testified that "CDCR's

9    tracking and information systems cannot keep up with the overwhelming data requirements

10   in the system's overcrowded prisons."  *Id.* ¶ 102; *see also* Nov. 9, 2007 Shansky Report

11   ¶ 110 (noting that adequate care requires timely appointments, which in turn requires an

12   effective scheduling and tracking system, something that "CDCR has proven itself incapable

13   of developing . . . due in large part to the sheer numbers of patients and their vast and

14   growing need for coordinated appointments").

15        The deficiencies in the management of medical records extend to mental health care

16   as well.  Defendants' mental health expert Dr. Packer described several such deficiencies:

> In several institutions there were difficulties in clinical staff
> obtaining charts in a timely manner (that is, the charts were not
> available when needed for a clinical assessment) as well as
> difficulties in updating the charts (that is, delays in notes being
> placed in the records).  Staff referred to a category of "Flimsy"
> charts, meaning that they sometimes had limited information
> available when doing an assessment.  The documentation I
> reviewed also described institutions in which there were
> significant numbers of charts unfiled.

22   Dec. 10, 2007 Packer Report at 19.  Dr. Packer opined that the medical records problem "is a

23   direct effect of overcrowding," and that "[t]his problem does impact directly on the ability to

24   provide timely and appropriate care."  *Id.* at 19-20; *see also* Rep. Tr. at 1119:2-5 (expressing

25   his "opinion that the sheer number of inmates in the system is the most direct cause resulting

26   in the difficulty of CDCR to manage their medical records appropriately").

27        Plaintiffs' expert Dr. Stewart reviewed approximately sixty medical records during his

28   tours and reported that he "consistently found the records to be unwieldy, disorganized and

1   bulky, with loose papers floating around in the files," and that "[i]t was exceedingly difficult

2   to follow the clinical course of treatment of the patients because of the size and

3   disorganization of the files."  Aug. 15, 2008 Stewart Supp. Report ¶ 102.  He also reported "a

4   few instances where [he] found other patients' records in the files [he] reviewed."  *Id.*  He

5   described these problems as "typical in an overwhelmed and overcrowded system."  *Id.*

6          As Dr. Stewart explained,

7                   [a]ccurate well organized medical records are a critical element
                    of medical and mental health care.  They are even more essential
8                   in a complex and overcrowded system such as the CDCR which
                    is characterized by frequent transfers of patients, high turnover of
9                   clinical staff and overuse of contract clinicians who lack
                    familiarity with the patients and the system itself.
10

11  *Id.*  According to Dr. Shansky, "[u]nless medical records and scheduling information are

12  managed, organized, and maintained effectively, appropriate health care services cannot be

13  provided.  *Overcrowding makes it impossible* for CDCR to perform these essential

14  functions."  Nov. 9, 2007 Shansky Report ¶ 97 (emphasis added).

15          **F.**      **Increasing Acuity of Mental Illness**

16          Finally, and alarmingly, the evidence shows that crowded conditions, and the bed and

17  staffing shortages and delays in access to necessary care that result from crowding, intensify

18  the acuity of mental illness among inmates throughout the California prison system.  As

19  Dr. Stewart explained:

20                  [I]nsufficient access to higher levels of care has created a system
                    which is overwhelmed by the acuity of its patients at every level
21                  of care.  EOP units house many patients in need of inpatient care,
                    MHCB's house patients in need of inpatient hospitalization,
22                  intermediate care facility units house many patients in need of
                    acute hospital care and so on.  When and if these patients finally
23                  reach the level of care they require, their mental health conditions
                    may be far more serious, resulting in longer stays and more
24                  resources in order to stabilize and get well.

25  Aug. 15, 2008 Stewart Supp. Report ¶ 43 (footnote omitted); *see also id.* ¶ 88 ("It was clear

26  that the severe shortage of mental health beds has created a system that houses a significant

27  portion of *Coleman* class members at lower levels of care than the patients clinically

28  require.").  Dr. Stewart reported that he was "struck by the very high acuity of the patients

85

[he] encountered during [his] tours because they were much sicker, as a whole, than the *Coleman* class members [he] encountered between 1990 and 2000," when he served as a court-appointed monitor at CMF. *Id.* ¶ 88. Dr. Stewart attributed this directly to overcrowding:

> The reality of the current MHSDS system, as demonstrated by my interviews with these class members and the admitted shortage of EOP, MHCB and inpatient beds, is that too many people are housed in places that simply cannot provide them with the level of mental health care they require. This is a direct result of overcrowding – there are too many people in the system and too few resources to treat them. This in turn means that the acuity level at every level of care is higher than it would be in a system that has sufficient inpatient beds.

*Id.* ¶ 91.

Dr. Haney similarly reported that "there is evidence that the *worsening* prison overcrowding crisis has had a *corresponding* effect on the quality of mental health care." Aug. 15, 2008 Haney Report ¶ 373 (emphasis in original). At trial, he testified that mentally ill inmates in need of higher levels of mental health care are "getting sicker as a result of their inability to get the appropriate level of care," Rep. Tr. at 304:16-19, and he agreed that overcrowding in California's prisons is resulting in more significant mental illness than one would find at a "properly run prison with proper population" and "an adequately functioning mental health care delivery system." *Id.* at 305:24-306:5.

## G.    Extreme Departures from the Standard of Care and Preventable or Possibly Preventable Deaths, Including Suicides

All of the above problems, caused by crowded conditions, ultimately contribute to unacceptably high numbers of both preventable or possibly preventable deaths, including suicides, and extreme departures from the standard of care.

In 2006, California had a prisoner suicide rate of 25.1 suicides per 100,000 inmates, compared to the national average of 14 per 100,000. Ex. P58 at 9 (*Coleman* Special Master's Report on Suicides Completed in the CDCR in Calendar Year 2006).[53] In reviewing these

---

[53]Because the record does not contain evidence of the number of suicides in 2007 or 2008, it is unclear from the record whether California's inmate suicide rate has risen or declined since 2006. It appears, however, that the suicide rate is not appreciably lower, as

suicides, the Special Master found that "72.1 percent of completed suicides in 2006 involved some measure of inadequate treatment or intervention and were, therefore, most probably foreseeable and/or preventable." *Id.* at 8. Since 2003, the percentage of suicides found to be foreseeable or preventable each year has remained relatively constant at around 75 percent, representing "marked increases over the 45 percent rate of inadequate treatment that was found for suicides that occurred in 2002." *Id.* at 8. While we do not suggest that crowded conditions are the sole cause of the increase in the suicide rate among California inmates, the evidence demonstrates that crowding throughout the prison system has a significant effect on many of the risk factors that contribute to inmate suicides. "Major contributing factors" to foreseeable and preventable suicides include "inadequate clinical assessments, inappropriate interventions, incomplete referrals, missed appointments and appointments that were not rescheduled, unsupported diagnoses, failure to review records, assignments to inappropriate levels of mental health care, failure to provide protective housing, and the provision of inadequate or untimely resuscitation efforts." Ex. D1281 at 680. As our discussion above makes clear, crowding is a major cause of nearly all of these factors.

The *Plata* Receiver also reviews inmate deaths to determine whether any deaths were preventable or possibly preventable. In 2007, of the 110 deaths considered to be unexpected and not the result of homicide or self-inflicted injuries, 44 deaths (40 percent) were found to be preventable or possibly preventable, Ex. D1233 at 8 (*Plata* Receiver's Nov. 3, 2008 Analysis of Year 2007 Death Reviews), meaning that "better medical management or a better system of care would likely have" or "may have prevented the patient's death," *id.* at 5. Dr. Shansky testified that this rate was "extremely high." Rep. Tr. at 428:23-429:7. The Receiver also examined "extreme departures from the standard of care," defined as "lapse[s] in care that a reasonable and competent clinician would not render under the same or similar circumstances." Ex. D1233 at 5, 15. He found extreme lapses in nearly 60 percent of the

_____

the CDCR reported 31 apparent suicides to the *Coleman* Special Master during the first ten months of 2008. *See* Ex. P171-R; Ex. P506. If annualized, this equates to approximately twenty-four suicides per 100,000 inmates for calendar year 2008, based on an in-state inmate population of 156,352.

1  inmate deaths he reviewed.  *See id.* at 9-13.  Dr. Shansky testified that this is an

2  extraordinarily high rate, and that in the Illinois prison system he would see extreme

3  departures from the standard of care in only five to ten percent of inmate deaths.  Rep. Tr. at

4  428:9-17.  According to Dr. Shansky, there was no question that a number of the lapses were

5  "related to crowding."  *Id.* at 427:17-428:4, 430:21-431:3.

6      Defendants presented evidence that California had the fourteenth lowest "average

7  annual illness mortality [rate] per 100,000 state prisoners from 2001 to 2004" in the United

8  States.  Rep. Tr. at 1272:12-21 (Mumola).  However, these statistics failed to control for

9  demographics of each state's inmate population; the statistics are therefore of limited value in

10  comparing states.  Aug. 27, 2008 Reingold Report ¶¶ 10-11, 15, 24.  Furthermore, California

11  has the fourth lowest death rate among all fifty states, and the fifth lowest after controlling

12  for age.  *Id.* ¶ 12.  "Thus, while California has a very low death rate for its general

13  population, its death rate for state prisoners is relatively higher."  *Id.* ¶ 14.  In any event,

14  serious deficiencies continue to exist in the California prison system such that California

15  inmates are not receiving adequate care.  This is true regardless of where California might

16  rank in a valid comparison of inmate death rates among the states.

17      **H.    Expert Opinions Regarding Causation**

18      Based on their observations of crowded conditions in California's prisons, including

19  those discussed above, as well as on their extensive experience in working in or managing

20  crowded prisons,[54] seven experts testified that crowding is the primary cause of California's

21  inability to provide constitutionally adequate medical and mental health care to its inmates.[55]

22  Four of the experts are current or former state prison system administrators who have led

23  correctional agencies in five states, including California.  Jeanne Woodford – who worked

24  for the CDCR for twenty-seven years in various capacities, including as warden at San

25  ――――――――――――

26  [54]*E.g.*, Nov. 9, 2007 Woodford Report ¶ 7; Nov. 9, 2007 Scott Report ¶¶ 4-5; Aug. 15, 2008 Lehman Report ¶ 7; Rep. Tr. at 263:24-267:12 (Lehman); *id.* at 209:9-14 (Beard).

27  [55]As we have previously explained, while "the primary cause issue is ultimately a question of law for the three-judge court to decide, the Federal Rules of Evidence allow experts to express opinions that embrace the ultimate issue in a case," including the issue of

28  causation.  Nov. 3, 2008 Order at 10-11 (citing Fed. R. Evid. 704(a) and other authority).

1    Quentin and as acting Secretary of the CDCR, Nov. 9, 2007 Woodford Report ¶ 1 – testified

2    that she "absolutely believe[s] the primary cause is overcrowding." Rep. Tr. at 376:3-9; *see*

3    *also id.* at 383:4-10; Nov. 9, 2007 Woodford Report ¶ 6. Doyle Wayne Scott – who worked

4    for thirty years for the Texas Department of Criminal Justice, the second largest prison

5    system in the United States after California, including five years as its Executive Director,

6    and has served as an expert consultant to the National Institute of Corrections and seven

7    prison systems throughout the United States and Puerto Rico, Nov. 9, 2007 Scott Report

8    ¶¶ 1, 4 – similarly testified that:

9
10            Everything revolves around overcrowding. The deficiencies in
          the classification plan, the deficiencies in the unavailability of
          staff because they are doing other tasks associated with
11        overcrowding problems to do onsite medical appointments or
          offsite medical appointments, the wear and tear on the
12        infrastructure. I know there have been electrical outages because
          of the overload that the large number of offenders is causing at
13        institutions. There's also been water problems at a number of the
          institutions, and I think the Governor's proclamation clearly
14        described a lot of those issues.

15    Rep. Tr. at 152:6-15. Director Scott therefore opined that "overcrowding is the primary

16    cause of the medical and mental health care violations in California prisons." *Id.* at 152:1-6;

17    *see also* Nov. 9, 2007 Scott Report ¶ 80. Joseph Lehman – who has over thirty-five years of

18    experience in corrections, including fifteen combined years as head of corrections in

19    Pennsylvania, Washington, and Maine, Aug. 15, 2008 Lehman Report ¶ 1 – also rendered his

20    expert opinion that crowding "is the primary cause of the inability to provide [medical and

21    mental health] services. It's overwhelming the system both in terms of sheer numbers, in

22    terms of the space available, in terms of providing healthcare." Rep. Tr. at 270:25-271:6.

23    Likewise, Jeffrey Beard – a licensed psychologist who has worked for the Pennsylvania

24    Department of Corrections for over thirty-six years, including serving as its Secretary since

25    2001, *id.* at 200:15-201:7 – testified that, in his opinion, "the biggest inhibiting factor right

26    now in California being able to deliver appropriate mental health and medical care is the

27    severe overcrowding of [the] system." *Id.* at 219:7-10.

28

At least three of these four experts who had headed state prison systems had never before testified on behalf of a prisoner, and at least two of them were not paid for their time as experts in this case.  Rep. Tr. at 153:12-14 (Scott) (never testified on behalf of a prisoner or class of prisoners); *id.* at 230:2-10 (Beard) (never testified for plaintiffs in thirty-six years as a corrections professional, and not paid for testimony in this case); *id.* at 273:6-10 (Lehman) (never testified on behalf of prisoners in thirty-five years of experience); *id.* at 385:12-14 (Woodford) (not paid for testimony in this case).  They decided to testify on plaintiffs' behalf in this case because "the situation in California is so egregious," *id.* at 273:11-12 (Lehman); and because "the prisons aren't safe," "nobody seems to be willing to step up to the plate and fix the problem," and "if there's anything I can do to help see that California moves in [the right] direction . . . that's why I'm here today," *id.* at 231:13-20 (Beard).  Secretary Woodford, the former warden at San Quentin and acting Secretary of the CDCR, explained that she testified:

> because I truly believe that we can do better than we are in California.  I think it's unbelievable that in this state that we have the kind of overcrowded conditions that we have; that we do little or nothing to prepare people for the return to society in spite of the fact that we parole 10,000 people a month from our prison system.
>
> And I absolutely believe that we make people worse, and that we are not meeting public safety by the way we treat people.
>
> And that I believe overcrowding is prohibiting us from providing quality medical care and mental healthcare to inmates in our system.
>
> And for California to be in the shape that it's in is just unbelievable.

*Id.* at 385:17-386:5 (Woodford).

In addition to these present or former heads of state prison systems, three other experts testified on plaintiffs' behalf that crowding is the primary cause of the constitutional violations at issue in *Plata* and *Coleman*.  Dr. Ronald Shansky – a physician who has worked primarily in correctional health care for over thirty-six years, including twelve years as Medical Director of the Illinois Department of Corrections and five years as a medical

consultant to the CDCR, and who has been involved "with over two dozen other correctional

systems as either a court-appointed expert/monitor/special master or as a consultant retained

by the correctional system," including five years as a court-appointed receiver of the District

of Columbia Jail Medical and Mental Health Program, Nov. 9, 2007 Shansky Report ¶¶ 2-3 –

explained that:

> the CDCR's medical care delivery system cannot provide a
> constitutional level of care because the prison system incarcerates
> far more prisoners than can be adequately treated with the
> resources, staffing and facilities available in the CDCR.  In short,
> it is my opinion that overcrowding is the primary cause of the
> constitutional violations in the CDCR for *Plata* class members.

Sept. 10, 2008 Shansky 2d Supp. Report ¶ 7; *see also* Nov. 9, 2007 Shansky Report

¶¶ 136-38.  Dr. Shansky is "confident" in his conclusion.  Rep. Tr. at 423:8-14.

Dr. Craig Haney – a professor of psychology at the University of California, Santa

Cruz, who has studied "the psychological effects of living and working in institutional

environments" for thirty-five years and has toured, inspected, and analyzed conditions of

confinement in prisons in twenty states, three maximum security federal prisons, and prisons

in five other countries, Aug. 15, 2008 Haney Report ¶¶ 1-3 – similarly testified that:

> Because of the tremendous importance of overcrowding and its
> impact on virtually every aspect of prison life, it is my opinion
> that it is the primary cause of the continuing constitutional
> violations that plague the California prison system, including the
> CDCR's inability to provide medical and mental health care for
> state prisoners that meets the relevant constitutional minimum
> standards.

*Id.* ¶ 17; *see also id.* ¶ 364 (overcrowding is a crisis "that now consumes the CDCR and

prevents it from discharging its constitutional responsibilities").  Dr. Haney further explained

that:

> I don't believe in a system this overcrowded at this magnitude of
> overcrowding with overcrowding as widespread as it has been in
> California for as long a period that it has been that there's any
> other plausible or credible explanation for the failure of the
> system to provide constitutionally-adequate mental healthcare.
>
> The court's been monitoring this issue for many, many years.
> There have been many, many court orders, and there have been

91

1
2

> many activities that have been engaged in in trying to bring this
> system's mental health care delivery into constitutional
> compliance.

3
4
5

> In the face of all of those efforts there has been this
> overwhelming overcrowding problem of such a degree,
> magnitude and duration that it has incapacitated the system's
> ability to deliver constitutionally-adequate care.

6    Rep. Tr. at 317:18-318:7.

7        Dr. Pablo Stewart – a licensed psychiatrist and clinical professor of psychiatry at the

8    University of California, San Francisco, with over twenty years of experience in correctional

9    psychiatry, including service as a court-appointed expert in several federal class action

10   lawsuits concerning the delivery of mental health care in prisons and jails, Nov. 9, 2007

11   Stewart Report ¶¶ 1-15 – testified that the "conclusion that overcrowding is the primary

12   cause" of the constitutional violations in *Coleman* is "inescapable." *See id.* ¶ 196; Aug. 15,

13   2008 Stewart Supp. Report ¶ 111.  Dr. Stewart's opinion is predicated on the persistent

14   nature of the constitutional violations in *Coleman*:

15
16
17
18
19
20
21
22
23

> [T]aken together, the range of Constitutional violations . . .
> including inadequate suicide monitoring and prevention, inability
> to timely access appropriate levels of care, inability to timely
> access mental health clinicians due to staffing shortage, and
> inadequate medication management practices are unusual in a
> system that has been under Court supervision for more than ten
> years.  These serious, dangerous violations this late in the
> remedial process are typical indicators of a system plagued by
> severe overcrowding.  In a non-crowded system, the
> Constitutional violations are more readily addressed by such
> interventions as increased staff and increased programming.
> However, in a system overwhelmed by crowding, these
> traditional remedies are woefully inadequate.  This appears to be
> the case in the CDCR where remedial efforts have resulted in
> significant expansions of staffing and programming activities, yet
> the constitutional violations persist or even worsen.

24   *Id.* ¶ 112.  Dr. Stewart's opinion is also based on "the fact that the percentage of persons with

25   serious mental illness in the CDCR is increasing faster than the overall CDCR population," a

26   phenomenon that "is typical of overcrowded systems because . . . overcrowding creates new

27   mental health needs and exacerbates existing mental health needs." *Id.* ¶¶ 114, 116.  Finally,

28   Dr. Stewart found that:

1
2
3
4
5
6
7

> The causal link between overcrowding and unconstitutional mental health care is clear and direct in the many CDCR housing units where space shortages from overcrowding directly result in long-term living arrangements that are harmful to the mental health of *Coleman* class members. . . .  These same harsh conditions, as discussed earlier, also increase the demand for mental health services in the general population who, in a properly operating, not overcrowded system, would not need mental health services.  Isolation, seclusion, idleness, violence, fear and stress plague the prisoners in the CDCR as a direct result of overcrowding.  These conditions exacerbate mental illness and are serious barriers to the provision of minimally adequate mental health and medical care.

8   *Id.* ¶ 117.

9          Defendants' expert Dr. David Thomas – an ophthalmologist for almost forty years

10  who served in various capacities at the Florida Department of Corrections for nine years,

11  most recently as Assistant Secretary for Health Services and Director of Health Services, and

12  who now serves as a professor of surgery and correctional medicine at Nova Southeastern

13  University in Fort Lauderdale, Florida, Nov. 9, 2007 Thomas Report ¶¶ 1-2 – was the only

14  expert who testified that crowding was not the primary cause of constitutional deficiencies in

15  the delivery of medical care in California's prisons.  *See, e.g.*, Rep. Tr. at 1217:11-13.

16  Instead, Dr. Thomas testified that "the single most important item in achieving a sound

17  Constitutional level of care is a culture that fosters providing care at that level."  Nov. 9,

18  2007 Thomas Report ¶ 11 (emphasis omitted).  In his opinion, the "empowerment of [health

19  care] staff" – unlike in the past, when "security services dominated the prison system and

20  program services existed only at the whim of security services" – is "the crux of having a

21  constitutional level of health care."  Addendum to Thomas Report ¶ 1.  He further explained

22  that:

23
24
25
26

> The culture was such prior to appointing of the Receiver that this was a security-driven system without regard for any other programs or any other constitutional requirements.  Since the Receiver has been appointed, . . . there is clear indication that the culture is shifting in the department to understand the need for a correctional healthcare system that works on a constitutional level of healthcare.

27  Rep. Tr. at 1215:21-1216:3.  According to Dr. Thomas, a constitutional system of delivering

28  medical care cannot be developed without the change away from a custody-oriented culture

93

that is now underway, and a reduction in crowding might make it easier to develop such a system, but it is not necessary and will not, without more, lead to a constitutionally adequate system of care. *See, e.g.*, Addendum to Thomas Report ¶ 4.

We find the testimony of Dr. Thomas to be unpersuasive for several reasons. First, Dr. Thomas's testimony that reducing crowding will not, without more, remedy the constitutional violations at issue in *Plata* does not mean that crowding is not the primary cause of those violations. Indeed, we find that reducing crowding is a necessary but not sufficient condition for eliminating the constitutional deficiencies in the provision of medical care to California's inmate population. Other steps will be necessary to fully remedy the deficiencies in the CDCR's medical and mental health care services. Nonetheless, a problem that has multiple causes will ordinarily still have a primary cause. As Dr. Shansky explained, "Reducing overcrowding is not a panacea, but crowding is the primary cause of the ongoing inadequate medical care in the CDCR system. Overcrowding is the one factor that negatively impacts almost every other matter that must be addressed to create a minimally adequate medical care delivery system for California's prisons." Sept. 10, 2008 Shansky 2d Supp. Report ¶ 9; *see also supra* Section IV.A.

Second, as Dr. Beard testified, a culture that allows "custodial interference with the delivery of care" is problematic, but "you have to realize that the culture grew out of the overcrowding." Rep. Tr. at 221:17-222:9. Crowded conditions force prison administrators "to take a strong custodial approach. . . . They have to rely on the lockdowns. They have to rely on guns, gas, those kinds of things, to control the prisons so they're safe for the staff and for their inmates." *Id.* at 222:14-21. Thus, although we agree with Dr. Thomas that a custody-dominated culture is a barrier to delivering constitutionally adequate care, we also agree with Dr. Beard that "[i]f you try to change the culture, you can't. You can't change the culture until you reduce the population and can make the institution safe." *Id.* at 222:22-24. Consequently, it is crowding and not culture that is the primary cause of the unconstitutional system of health care delivery in California's prisons.

1    Third, we give less weight to the testimony of Dr. Thomas because he formed his

2  opinions and drafted his initial report before visiting even a single prison in California. *Id.* at

3  1220:20-22 (Thomas).  Although he subsequently visited eight prisons and opined that those

4  visits supported his initial views, he took no notes during or after those tours; did not make

5  any audio or video recordings during the tours; reviewed fewer than ten medical records at

6  each prison and could not recall any details of any of the medical files he reviewed; and did

7  not recall how many staff members he talked to at each prison or whether he asked the staff

8  members at each prison any of the same questions. *Id.* at 1228:17-1229:3, 1229:21-1231:9,

9  1236:1-4, 1240:2-14 (Thomas).

10    Fourth, some of the testimony by Dr. Thomas was both internally inconsistent and

11  patently incredible.  For instance, Dr. Thomas testified that he believed all eight prisons he

12  visited were "richly staffed," yet he earlier testified that "outcome measurements of work

13  study programs" should be used to determine staffing ratios and he had not conducted or seen

14  any such studies of the California prison system. *Id.* at 1197:18-1198:6, 1251:2-17.  He also

15  suggested that providing treatment in a men's restroom would be appropriate because "one

16  has to be creative . . . in corrections," and that treatment could also be provided in closets, *id.*

17  at 1223:7-12, 1226:8-15, although he provided other, more plausible suggestions, such as

18  using space more frequently on weekends or adding modular buildings.

19    Finally, even if we were to credit Dr. Thomas's opinions in their entirety, we find

20  such opinions to be overwhelmingly outweighed by the testimony of the numerous other,

21  more qualified experts cited above.  Defendants argue that the opinions of some of plaintiffs'

22  experts must be discounted because of the role played by plaintiffs' counsel in drafting the

23  expert reports.  However, upon review of all of the relevant testimony, we are convinced that

24  the opinions contained in the expert reports are those of the experts themselves, and that

25  plaintiffs' counsel did not impermissibly influence any of the experts' opinions. *See, e.g.*, *id.*

26  at 181:16-182:5 (Scott) (testifying that the opinions in his expert report were "mine and only

27  mine" and that, before signing his reports, he reviewed every word, "[a]ll the way down to

28  the grammatical remarks," to ensure that they accurately reflected his opinions); Pls.' Opp'n

1    to Defs.' Mot. in Limine No. 9 to Exclude Expert Reports at 2-5 (citing deposition testimony

2    by Director Scott, Dr. Shansky, Dr. Stewart, Secretary Lehman, and Secretary Woodford

3    concerning the preparation of their expert reports, including that counsel never asked the

4    experts to change any of their opinions); *Marek v. Moore*, 171 F.R.D. 298, 300-302 (D. Kan.

5    1997) (counsel's assistance in the preparation of expert reports is proper as long as the

6    reports reflect the testimony of the expert and are signed by the experts).

7              Defendants also suggest that the court should discredit the testimony of experts who

8    lack medical training and have never practiced correctional medicine.  However, a medical

9    background is not required to opine on the cause of constitutional violations in the delivery

10   of medical care in a correctional environment, and plaintiffs' experts' wealth of experience in

11   managing prisons and prison systems, including experience in doing so under crowded

12   conditions, establishes their ability to form an expert opinion on that subject.  In fact, the

13   CDCR has previously recognized the expertise of several of plaintiffs' experts.  In addition to

14   employing Secretary Woodford for twenty-seven years, culminating in her appointment as

15   acting Secretary, Nov. 9, 2007 Woodford Report ¶ 1, the CDCR named Dr. Beard and

16   Secretary Lehman to its Expert Panel on Adult Offender and Recidivism Reduction

17   Programming and employed Dr. Shansky as a medical consultant for five years.  Ex. P2 at ii;

18   Rep. Tr. at 210:15-25 (Beard); Aug. 15, 2008 Lehman Report ¶ 4; Nov. 9, 2007 Shansky

19   Report ¶ 2.  As noted earlier in this opinion and order, the CDCR employed Dr. Shansky as

20   its own medical expert during the *Plata* evidentiary hearings regarding whether a

21   receivership was necessary.  Thus, we reject defendants' suggestion that plaintiffs' experts

22   are not qualified.  To the contrary, we find their expertise far outweighs that of Dr. Thomas.

23             Defendants also offered mental health expert Dr. Ira Packer in support of their

24   position in *Coleman*.  Dr. Packer – who is board-certified in forensic psychology and has

25   worked for over twenty-eight years in correctional and forensic psychology, including as

26   Deputy Mental Health Program Director for the Massachusetts Department of Corrections

27   and as Assistant Commissioner for Forensic Mental Health in the Massachusetts Department

28   of Mental Health, Dec. 10, 2007 Packer Report at 4-6 – testified that, with one exception,

96

crowding was not the primary cause of the constitutional violations with respect to mental

health care.  *Id.* at 23-24.  The exception was that, like all of plaintiffs' experts, Dr. Packer

concluded that "crowding is the primary cause of the particular difficulties in providing

services to the *Coleman* class at the reception centers," *id.* at 20; that issue is therefore

undisputed.  As to mental health care delivery in other settings, Dr. Packer opined that

"overcrowding in CDCR significantly contributes to the difficulties in providing adequate

mental health services, but is not the *primary* cause of the deficiencies."  *Id.* at 8 (emphasis in

original).  In Dr. Packer's opinion, the primary cause of the constitutionally inadequate

mental health care in California's prisons is that California "now has many more acutely

mentally ill individuals and at a level of more severity than had been anticipated when the

prisons were built," and that the existing prison space was "not designed to meet the needs"

of a mentally ill population.  Rep. Tr. at 1079:11-1080:4; *see also* Dec. 10, 2007 Packer

Report at 8-9.[56]

What Dr. Packer is actually saying is that lack of planning is the cause of the

overcrowding in California's prisons – but that is not the question before us.  Regardless of

the cause of the overcrowding, that condition is defined in terms of the capacity of the

prisons, and that capacity simply is not there.  Dr. Packer's testimony principally supports

our conclusion that crowding is the primary cause of the constitutional violations in the

delivery of mental health care.  For example, Dr. Packer testified that if crowding were

defined as not having enough mental health beds to serve the current population, then

crowding would be the primary cause of the ongoing mental health care violations in

California's prisons.  Rep. Tr. at 1093:25-1094:6.  Clear evidence establishes that, due to

crowding, there is insufficient room in California's prisons for necessary additional mental

health care beds and treatment space.  Accordingly, Dr. Packer's opinion is congruent with

---

[56]Dr. Packer also opined that difficulties with maintaining adequate medical records
are a "direct effect of overcrowding, as the number of charts in the institutions is proportional
to the population," Dec. 10, 2007 Packer Report at 19, and he testified that "the medical
record system is a paper system, and the prison is simply not able to keep up with the amount
of work and volume that's required in order to maintain an appropriate medical record
system without going to an electronic process, which is not yet in place," Rep. Tr. at
1080:7-11.

1   our finding that crowding is the primary cause of the ongoing constitutional violations in

2   *Coleman*.

3      Additionally, while Dr. Packer's opinion on the unanticipated nature of the influx of

4   mentally ill prisoners into the correctional system might have had some merit at the time of

5   the *Coleman* trial in 1993, or even at the beginning of the *Coleman* remedial phase in 1996, it

6   is less persuasive at this late stage in the *Coleman* remedial process.  The *Coleman* court has,

7   for almost a decade, directed defendants to make adequate projections of the size of the

8   mentally ill inmate population so that they can appropriately plan for that population's needs.

9   The fact that it has taken defendants years to comply with those orders does not render the

10  increasing size of the *Coleman* class unanticipated.  As we explained when we denied

11  defendants' motion for summary judgment:

12
13      Defendants' inability or unwillingness to tackle the problem of
    the increasing prison population does not support the contention
    that overcrowding is not the primary cause of the unconstitutional
14      delivery of medical or mental health care.  It simply helps explain
    why overcrowding exists and has now become a problem that
15      may be the primary cause of the constitutional violation.

16  Nov. 3, 2008 Order at 9-10.  In fact, the efforts defendants have made since the *Coleman*

17  remedial process began, combined with the serious ongoing problems we have discussed in

18  this opinion, only bolster the inescapable conclusion that crowding is the primary cause of

19  defendants' failure to deliver constitutionally adequate mental health care in their prison

20  system.

21     All of the steps defendants have taken under the *Plata* court's supervision, as well as

22  the steps taken under the *Coleman* court's supervision, have failed to remedy the

23  constitutional deficiencies.  The crushing inmate population has strained already severely

24  limited space resources to the breaking point, and crowding is causing an increasing demand

25  for medical and mental health care services, a demand with which defendants are simply

26  unable to keep pace.  It also, as the expert witnesses repeatedly told us, has created numerous

27  barriers to the delivery of constitutionally adequate medical and mental health care.

28

1

## I.      Findings and Conclusions

2      On the basis of the clear and convincing, indeed overwhelming and overwhelmingly

3  persuasive, evidence described above, we conclude that crowding is the primary cause of the

4  state's unconstitutional failure to provide adequate medical and mental health care to

5  California prisoners.  Such is the opinion as well of some of the nation's foremost prison

6  administrators, who testified that they have never previously witnessed such appalling prison

7  conditions and that overcrowding is not only the primary cause of the constitutionally

8  inadequate medical and mental health care in California's prisons, but also that until the

9  problem of overcrowding is overcome it will be impossible to provide constitutionally

10  compliant care to California's prison population.  No credible evidence to the contrary was

11  presented by defendants.

12      The evidence conclusively demonstrates the many ways in which crowding prevents

13  the state from providing constitutionally adequate medical and mental health care in its

14  prison system.  Prison overcrowding has created a state of emergency in California's prisons,

15  as the Governor has proclaimed.  It forces prison administrators to devote most of their

16  energy to addressing crises and has overwhelmed the prison system's management

17  infrastructure.  Crowding of reception centers at levels approaching 300% design capacity

18  prevents the state from identifying the medical problems of entering inmates, and makes it

19  impossible to provide necessary medical and mental health care to incoming inmates, who

20  routinely remain in reception centers for more than sixty days and may serve their entire

21  sentence there.  Crowding has also left the California prison system without the space, beds,

22  and medical, mental health, and custodial staff required to provide constitutionally adequate

23  medical and mental health care in all parts of the prison system, and has prevented proper

24  classification of inmates and appropriate housing according to their needs.  Furthermore,

25  crowding has created conditions of confinement that contribute to the spread of disease, and

26  it requires the increased use of lockdowns as a method of prison control, further impeding the

27  prison authorities' ability to provide needed medical and mental health care.  In addition,

28  crowding has prevented the development of an adequate medical records system.  The

1  consequences of crowding are often dangerous, and on many occasions fatal.  Crowding

2  contributes to an alarming number of extreme departures from the standard of care and an

3  unacceptably high number of inmate deaths that are preventable or possibly preventable.

4  Likewise, crowding worsens many of the risk factors for suicide among California inmates

5  and increases the prevalence and acuity of mental illness throughout the prison system.

6         The history of the individual *Plata* and *Coleman* cases further demonstrates the role of

7  crowding in causing the constitutional violations at issue here.  The extensive remedial

8  efforts in *Plata* over the last seven years, beginning with the stipulated relief and culminating

9  in the Receivership, have failed to bring the California prison system's medical care into

10  constitutional compliance.  Likewise, fourteen years of remedial efforts in *Coleman*, directed

11  at every aspect of the mental health care problem, except crowding, have failed to ensure that

12  California prisoners have access to constitutionally adequate mental health care.  In fact, by

13  2006, the progress that had been achieved during more than a decade of remedial work in

14  *Coleman* was being lost because of "the inexorably expanding demand for services resulting

15  from the bulging population."  Ex. D1108 at DEFS060303.

16         The only conclusion that can be drawn from the wealth of clear and convincing

17  evidence before this court is that the unconstitutional denial of adequate medical and mental

18  health care to California's inmates is caused, first and foremost, by the unprecedented

19  crowding in California's prisons.  In reaching this conclusion, we need not, and do not,

20  conclude that crowding is the exclusive cause of those violations.  We recognize that other

21  factors contribute to California's failure to provide its inmates with constitutionally adequate

22  medical and mental health care, and that reducing crowding in the prisons will not, without

23  more, completely cure the constitutional violations the *Plata* and *Coleman* courts have

24  sought to remedy.  We need not find that crowding is the *only* cause, but simply that it is the

25  *primary* one.  *See supra* Sections IV, IV.H.  In the end, we agree with the former Executive

26  Director of the Texas Department of Corrections Doyle Wayne Scott, who testified that

27  "[e]verything revolves around overcrowding," Rep. Tr. at 152:6.

28

1    In short, while other factors contribute to the unconstitutional state of the California

2    prisons' medical and mental health care system, and while there are other steps the state must

3    take to meet its constitutional obligations, clear and convincing evidence establishes that

4    crowding is the primary cause of the constitutional violations, and that, therefore, this court

5    must consider, as we do below, what actions we may order be taken to remedy that condition.

6

7    **V.    NO OTHER RELIEF**

8    The Governor has proclaimed that crowding in prisons constitutes an emergency that

9    poses a substantial risk to CDCR staff, inmates, and the general public, and that "immediate

10   action is necessary to prevent death and harm caused by California's severe prison

11   overcrowding." Ex. P1 at 1-2, 6.  Because crowding is the primary cause of the state's

12   inability to provide its inmates with constitutionally adequate medical and mental health care,

13   an order requiring a reduction in prison population is the most obvious and direct method by

14   which to bring the California prison system into constitutional compliance.

15   However, the PLRA makes such an order "the remedy of last resort." H.R. Rep. No.

16   104-21, at 25 (1995).  Before entering any prisoner release order, we must find that no other

17   relief could remedy the constitutional violations at issue here.  18 U.S.C. § 3626(a)(3)(E)(ii).

18   In context, it is clear that "other relief" refers to any form of relief other than a prisoner

19   release order. *See id.* § 3626(a)(3)(E) ("The three-judge court shall enter a prisoner release

20   order only if . . . no other relief will remedy the violation of the Federal right.").  In other

21   words, we must first determine whether the unconstitutional denial of adequate medical and

22   mental health care to California's prisoners can be remedied through an order that does not

23   have "the purpose or effect of reducing or limiting the prison population" and that does not

24   "direct[] the release from or nonadmission of prisoners to a prison." *Id.* § 3626(g)(4).  The

25   PLRA does not require that a prisoner release order, on its own, will necessarily resolve the

26   constitutional deficiencies found to exist in *Plata* and *Coleman*.  All that the PLRA requires

27   is that a prisoner release order be a necessary part of any successful remedy.  If all other

28

1   potential remedies will be futile in the absence of a prisoner release order, "no other relief

2   will remedy the violation." *Id.* § 3626(a)(3)(E)(ii).

3          We conclude that the constitutional deficiencies in the California prison system's

4   medical and mental health system cannot be resolved in the absence of a prisoner release

5   order. Clear and convincing evidence establishes that none of the available alternatives to

6   such an order, including the continued efforts of the *Plata* Receiver and the *Coleman* Special

7   Master, can bring the California prison system into constitutional compliance within a

8   reasonable period of time. We agree with the numerous experts who testified that a prisoner

9   release order is a prerequisite to providing constitutionally adequate medical and mental

10  health care to California prisoners. Although the CDCR and the Receiver have implemented

11  a number of remedial programs as a result of the *Plata* and *Coleman* litigation, and

12  defendants have sought in various ways to improve the medical and mental health care

13  provided in California's prisons, these efforts cannot succeed in the absence of a prisoner

14  release order.

15          **A.**      **Alternatives to a Prisoner Release Order**

16                  1.      Inadequacy of Construction as a Remedy

17                          *a.      Prison Construction*

18          In considering other alternatives to a prisoner release order, we first look to whether

19  the state has a feasible prison construction plan that would render a prisoner release order

20  unnecessary; if so, equity, if not law, would require that we refrain from entering that order.

21  In a case involving overcrowding, the construction of additional prisons always provides a

22  theoretical remedy because more prisons would necessarily reduce or eliminate

23  overcrowding. To construe the PLRA to preclude the entry of a prisoner release order based

24  on no more than such a theoretical remedy, however, would transform the conditions under

25  which the PLRA permits prisoner release orders into an absolute bar on such orders. In

26  short, it would eliminate overcrowding as a basis for a prisoner release order, and thus

27  prisoner release orders themselves, because the state could, in theory, always build more

28  prisons. Thus, what we must determine is not whether building prisons *could* solve the

1   problem, but whether prison construction offers an actual, feasible, sufficiently timely

2   remedy for the unconstitutional state of medical and mental health care in California's

3   prisons.  Here, California has no plans to construct additional prisons in the near future and

4   has not suggested that it does.  As a result, we need not consider further the construction of

5   additional prisons as an alternative remedy.

6                         *b.    Construction of Re-entry Facilities*

7           The next question is whether building re-entry facilities could serve to reduce prison

8   overcrowding.  The answer is that it could, if enough were constructed and if enough

9   prisoners were transferred to them.  Thus, whether the state determined to build such

10  facilities voluntarily, or whether a court ordered or approved such construction, we would not

11  issue the type of order plaintiffs seek if the planned construction, like any prison-related

12  construction, offered an actual, feasible, and timely remedy that would render the relief

13  sought here unnecessary.  Defendants point to only one existing proposal that might offer

14  such a partial remedy: construction of the additional re-entry facilities authorized by

15  Assembly Bill 900 ("AB 900").  However, as we explain below, this construction plan does

16  not provide a feasible alternative to the order sought here.  More than two years after AB 900

17  was signed into law, any reduction in the crowding of California's prisons resulting from the

18  construction of the AB 900 re-entry facilities remains years away and would in any event

19  likely not provide adequate relief.

20          In the first place, AB 900 construction has already been delayed for more than two

21  years due to the absence of funding.  At the start of trial not a single facility had been

22  constructed under AB 900.  *E.g.*, Rep. Tr. at 1679:18-23 (Cate); *id.* at 2460:25-2465:7

23  (Spitzer); Ex. P750 (Sept. 17, 2008 CDCR press release following legislature's failure to

24  pass clean-up language to AB 900); Sept. 3, 2008 Hysen Dep. at 31:15-20 (state has not even

25  reached the "preliminary-plan" stage for any in-fill or re-entry construction under AB 900).

26  As far as we are aware, it remains the case today, eight months later, that there is no funding

27  for AB 900 and no ground has been broken on the AB 900-authorized re-entry facilities.

28

                                              103

1    Second, even if funding were secured in the near future, other practical concerns

2  would lead to significant additional delays.  Deborah Hysen, the CDCR's chief deputy

3  secretary for facility planning and construction management, Sept. 3, 2008 Hysen Dep. at

4  14:11-14, explained that environmental impact reviews, which have not yet been completed

5  for any of the proposed building sites, "could potentially hang up projects for years," *id.* at

6  38:8-16, 56:1-2.  Delays would also result from the need to obtain necessary construction

7  materials, *id.* at 38:17-25; permit public comment at each phase of construction, *id.* at

8  111:9-15; and provide for seismic retrofitting, *id.* at 112:16-21.  Challenges in locating space

9  for re-entry facilities are also likely to significantly delay or prevent full implementation of

10  AB 900.  Only one location, for 500 re-entering prisoners, has been secured, *id.* at 118:19-21,

11  but many obstacles to construction remain, and securing sites for other re-entry facilities is

12  likely to prove more difficult because of community opposition.  *E.g.*, Rep. Tr. at 221:11-16

13  (Beard); *id.* at 2750:16-2751:10 (Runner); *id.* at 2793:8-2794:3 (Meyer); Nov. 9, 2007

14  Woodford Report ¶ 36.  Moreover, although some sites may "offer up a renovation

15  alternative," most of the sites under consideration by the CDCR are "raw land."  Sept. 3,

16  2008 Hysen Dep. at 120:13-15.  As to the latter sites, the CDCR itself estimates that "we

17  could be looking at several years between the time that we make this recommendation to

18  acquire the land, and occupancy."  *Id.* at 120:15-18.

19    Accordingly, it will be years before any re-entry facility construction pursuant to

20  AB 900 will be completed.  It is thus clear that the proposed construction of re-entry facilities

21  cannot bring the sort of "immediate action" that the Governor has conceded is necessary to

22  resolve the present crisis caused by prison crowding.  Ex. P1 at 6.  As Dr. Haney explained,

23  prisoners in California's prisons with medical and mental health needs face "emergency-like

24  conditions."  Rep. Tr. at 945:25.

25        There are people, prisoners, suffering throughout the entire
          prison system, mentally ill and medically ill prisoners who are
26        not able to get the level of care they need. . . .  Those things are
          urgent problems, and only a solution which can be brought to
27        fruition quickly can address the kind of immediate suffering
          which is taking place throughout the system which I saw and
28        other experts saw as well.

1   *Id.* at 946:1-9.  Any beneficial effects of defendants' planned re-entry facility construction

2   are simply too distant to make such construction a meaningful remedy for the emergency-like

3   conditions in California's prisons.  Moreover, it is unlikely that the number of re-entry

4   facilities that would be constructed would be sufficient to remedy the overcrowding

5   problems in any event.  A prisoner release order would thus be necessary as well.

6          Given the serious inadequacy of the state's only existing facilities construction plan, it

7   is also clear that no other, yet-to-be-developed plan could remedy the constitutional

8   violations here within a reasonable period of time.  The evidence before the court is thus

9   clear and convincing that the state has no feasible plan to remedy the constitutional violations

10  at issue in *Plata* and *Coleman* through either prison construction or re-entry facility

11  construction, and that such construction does not provide a meaningful alternative to the type

12  of order sought by plaintiffs in this case.

13                        *c.     Medical Facilities and Prison Expansion*

14         Besides re-entry facility construction, defendants identify two additional proposals to

15  increase the capacity of the prison system: the *Plata* Receiver's medical facility construction

16  plan and prison expansion through the construction of space for in-fill beds, as authorized by

17  AB 900.  Rep. Tr. at 1689:10-18 (Cate).  For reasons similar to those discussed above, we

18  conclude that neither the Receiver's medical facility construction plans nor the proposed

19  AB 900 in-fill beds – prison expansion – can remedy the constitutional violations at issue in

20  *Plata* and *Coleman*.  Like the AB 900 re-entry facilities, these proposed facilities will not be

21  realized at any point in the near future.  Furthermore, their funding is threatened by the

22  present fiscal crisis, and the proposed construction would in any event likely fall far short of

23  remedying the problems created by the crowding of California's prisons.

24         As with the proposed re-entry facilities, any overcrowding relief resulting from the

25  construction of medical facilities or the addition of in-fill bed space as a result of prison

26  expansion is years away, at best.  The *Plata* Receiver initially planned to start construction of

27  the first site in February 2009 and to complete construction of necessary additional facilities

28  by July 2013.  Ex. D1100 at 64-65 (*Plata* Receiver's Sept. 15, 2008 Ninth Quarterly Report).

1    To date, however, no construction has started and no funding has been secured.  Likewise, as

2    noted already, there is no available funding for AB 900, no ground has been broken on

3    AB 900 construction, and no new beds – in-fill *or* re-entry – have been made available.

4           The delays are compounded by the fiscal crisis now facing the state, which makes the

5    completion of any new construction even more distant and unlikely.  The Receiver and the

6    CDCR were until a month or so ago "negotiating a potential agreement concerning the

7    construction of health-care-focused prison facilities" that would have provided funding for

8    necessary healthcare construction through the California Infrastructure and Economic

9    Development Bank (I-Bank).  However, the state ultimately declined to sign the agreement.

10   Ex. 1 to Defs.' July 1, 2009 Response to Court's June 18, 2009 Order, filed in *Coleman*, at 1.

11   Because the fiscal crisis has required "severe and significant cuts to vital State programs,"

12   the state refused to enter into any agreement that would "require[] the State to seek I-Bank

13   funding, or any other additional funding not previously appropriated by the California

14   Legislature." *Id.*  Although defendants did state that they would use a "significant" but

15   unspecified portion of the funds allocated by the legislature in AB 900 "to build appropriate

16   beds for inmates with disabilities and/or other health needs," *id.* at 2, there is no indication as

17   to when such funds will be made available; when construction might begin; or what part, if

18   any, of the constitutional inadequacies in delivering medical and mental health care to

19   California inmates might be remedied by such construction.  Because we have received no

20   evidence on any of these questions, we cannot conclude that the state has any actual, feasible,

21   timely plans for such construction, which in any event would be unlikely to render a prisoner

22   release order unnecessary.

23          As the state's failure to sign the agreement demonstrates, the present fiscal crisis

24   makes any remedy that requires significant additional spending by the state chimerical – the

25   state has said that it will not procure *any* new funds for prison hospital construction.  Even if

26   AB 900 funding were secured in the near future, however, the practical concerns described

27   above in relation to re-entry facilities – environmental impact reviews, materials

28   procurement, public comment, and seismic retrofitting – would lead to delays in the

1   construction of medical facilities and prison expansion.  Accordingly, like the proposed re-

2   entry facilities, neither the Receiver's constructions plan nor AB 900 prison expansion will

3   provide inmates with relief from the emergency conditions in California's prisons in a timely

4   fashion.

5        Beyond any funding and timeliness issues, we have no reason to believe that

6   defendants' proposed expansion of prison facilities would reduce crowding significantly or

7   lead to any improvements in the delivery of medical and mental health care to California

8   inmates.  The *Plata* Receiver has found that the in-fill bed plan proposed by the CDCR

9   includes allocations of clinical space that "are wildly disparate and, in many cases obviously

10  inadequate," and that the CDCR's plan "ignor[es] the real life differences in clinical

11  requirement[s] based on the characteristics of the patient population, security level and escort

12  officers requirements, the need for clinical privacy, equipment requirements, and other

13  critical factors."  Ex. D1092 at 37 (*Plata* Receiver's May 15, 2007 Report Re:

14  Overcrowding).  On a more fundamental level, the AB 900 in-fill construction plan

15  "essentially is a prison expansion measure which increases the number of prison cells

16  without addressing the fundamental structural issues that have caused the crisis and that have

17  created unconstitutional conditions within the prisons."  Nov. 9, 2007 Woodford Report ¶ 31.

18  According to Secretary Woodford:

19         [t]he so-called "in-fill" beds will cause more problems than they
20         will solve.  Many of California's prisons are so big that they are
           effectively unmanageable.  Wardens and other administrators
21         spend much of their time responding to crises, rather than
           fulfilling their responsibilities to provide adequate medical and
22         mental health care.  Unless these in-fill beds stand alone with
           their own administrative and support facilities, adding thousands
23         of additional prisoners to already overburdened facilities will
           only compound the burdens imposed on prison administrators
24         and line staff.

25  *Id.* ¶ 39.  Similarly, Director Scott explained that, because the in-fill bed numbers in

26  defendants' construction plan are based on "housing overcrowding capacity" rather than

27  "design build capacity,"

28

                                           107

1
2
3
4

> [p]risoners in the new facilities . . . might not initially be living in gymnasiums or hallways, as they are now, but they will still be overcrowded. California will be in the same position with the new beds as with the old, replicating the same conditions that led to inadequate staffing and treatment space, inadequate out-of-cell time, and overworked and overstressed staff and violent, frustrated prisoners.

5   Aug. 13, 2008 Scott Supp. Report ¶ 17. Thus, while the construction of in-fill beds would

6   reduce the use of "bad beds," the principal effects of the overcrowding in California's prisons

7   would remain unaddressed.

8                    d.      *Construction as a Means of Compliance*

9          Given all of the above problems, we are convinced that neither prison expansion, nor

10  re-entry or medical facilities construction, nor any other construction effort offers a

11  meaningful and timely remedy for the constitutional deficiencies in the delivery of prison

12  medical and mental health care caused by crowding. Although it might be theoretically

13  possible for California to build its way out of its prison overcrowding problem, it is not

14  practical to anticipate that the state will do so in a timely manner, if ever, given "the time that

15  it takes and . . . the huge costs that it takes to do things like this." Rep. Tr. at 254:25-255:12

16  (Beard). Dr. Beard concluded that although construction "should be part of a plan, if you try

17  to rely on that alone, you are probably never going to get there, because they haven't been

18  able to get there over the last 20 years." *Id.* at 256:4-8; *see also, e.g., id.* at 219:11-25

19  (Beard).

20         Nonetheless, because our order requires defendants to reduce the prison population to

21  a specified percentage of the prison system's design capacity, any additional capacity

22  provided by completed construction could help the state meets its obligations and might

23  allow it to increase the number of prisoners who could constitutionally be housed in the

24  prison system. In such case an adjustment as to the specific terms of the population

25  reduction order, although not to the percentage cap itself, might conceivably be appropriate.[57]

26  We see little prospect for such an occurrence, however, in the reasonably near future, and

27  _____

28  [57]Likewise, should for some reason the design capacity of California's adult prison institutions *decrease*, the CDCR would be required to reduce the absolute population of its adult prison institutions by a greater number.

1   thus no prospect of remedying the constitutional violations in a timely manner, other than in

2   accordance with the order we issue below.

3                           2.    Inadequacy of Additional Hiring

4          Defendants do not suggest that the constitutional deficiencies in the CDCR's system

5   of medical and mental health care could be remedied by hiring additional medical, mental

6   health, and custodial staff.  This is not surprising, given the serious and ongoing difficulty in

7   filling vacant positions encountered in both the *Plata* and *Coleman* remedial proceedings.

8   *See supra* Sections II.A.5, II.B.2.c.  Furthermore, as noted already, crowding itself seriously

9   impedes the recruitment and retention of medical and mental health care staff.  The working

10  conditions for such personnel in California's overcrowded prisons are uninviting, and many

11  potential staff members are unwilling to work under them.  *See, e.g.*, Nov. 9, 2007 Stewart

12  Report ¶ 41; Nov. 9, 2007 Shansky Report ¶ 23.  Even if staff could be hired, they would

13  have almost nowhere to work because CDCR's facilities lack the physical space required to

14  provide medical and mental health care.  *See, e.g.*, Rep. Tr. at 272:1-13 (Lehman); *id.* at

15  501:3-7 (Shansky).  Thus, the evidence is clear and convincing that hiring additional staff

16  could not bring the CDCR's medical and mental health care into constitutional compliance in

17  the absence of a reduction in prison crowding.

18                          3.    Insufficiency of the *Plata* Receivership and *Coleman* Special

19                                Mastership

20         We next consider whether the existing remedial efforts of the *Plata* and *Coleman*

21  courts provide an alternative form of relief that could remedy the constitutional violations at

22  issue in *Plata* and *Coleman*.  Defendants argue that the delivery of medical and mental health

23  care has improved and continues to improve under the direction of the *Plata* Receiver and the

24  oversight of the *Coleman* Special Master.  However, the *Plata* and *Coleman* courts are barred

25  by the PLRA from ordering any remedy that involves a reduction in the prison population,

26  18 U.S.C. § 3626(a)(3)(B), and the *Plata* Receiver and *Coleman* Special Master therefore

27  lack the most direct and effective means of eliminating the fundamental problems that result

28  from overcrowding, *see supra* Section IV.  While improvements have been and continue to

1    be made, and the *Plata* and *Coleman* courts have continued their efforts during this three-

2    judge court proceeding, it is clear that the Receiver and the Special Master cannot remedy the

3    constitutional violations in the absence of a prisoner release order.

4         The *Plata* Receiver has determined that adequate care cannot be provided for the

5    current number of inmates at existing prisons and that additional capacity is required to

6    remedy the medical care deficiencies that exist in California's prison system.  *See, e.g.*,

7    Ex. D1133 at 27-28 (*Plata* Receiver's June 6, 2008 Turnaround Plan of Action).  Defendants

8    correctly note that the *Plata* Receiver has stated that "[f]ailure is not an option" and that

9    "[o]ver time the CDCR's medical delivery system will be raised to constitutional levels."

10   Ex. D1092 at 41 (*Plata* Receiver's May 15, 2007 Report Re: Overcrowding).  However, the

11   Receiver also noted that "the time this process will take, and the cost and the scope of

12   intrusion by the Federal Court cannot help but increase, and increase in a very significant

13   manner, if the scope and characteristics of CDCR overcrowding continue."  *Id.*  According to

14   the Receiver, the creation of a system that could adequately deliver medical care to all of the

15   inmates moving through the reception center at the California Institution for Men under the

16   present level of overcrowding could "all but bankrupt the State of California and create a

17   medical delivery problem in [surrounding] counties because there may not be enough

18   competent clinicians to provide medical care for an unlimited number of State prisoners and

19   for the public also."  *Id.*  Even assuming that the Receiver's comments are somewhat

20   overstated, relying on the authority that he possesses to resolve the medical care crisis in the

21   absence of a population reduction order does not offer a feasible alternative.  There is no

22   question that in the absence of a population reduction order a fair number of new prisons and

23   medical facilities would be required.  We have already explained that such construction

24   could not be completed in a timely manner, even if the legislature were willing to fund it.

25        The history of the *Coleman* case demonstrates even more starkly the impossibility of

26   establishing a constitutionally adequate mental health care delivery system at current levels

27   of crowding.  For almost a decade the *Coleman* court has issued specific orders directing

28   defendants to develop sufficient beds for the delivery of mental health care at each level of

110

1   the mental health care delivery system.  Despite all of those orders, defendants have far too
2   few mental health care beds to meet present demand.  The CDCR's recent refusal to sign the
3   agreement it negotiated with the Receiver makes compliance even more unlikely, as the state
4   had previously offered the agreement as its primary method of developing the needed mental
5   health beds.  Likewise, the *Coleman* court has issued numerous orders directing defendants
6   to decrease the time required to transfer seriously mentally ill inmates, including those who
7   are suicidal or otherwise in crisis, to appropriate levels of supervised care, but wait lists
8   remain at every level.  These are but two examples of the *Coleman* court's ongoing inability,
9   despite tremendous effort, to bring the prison mental health care system into constitutional
10   compliance.  In light of this history, the evidence is clear and convincing that defendants are
11   simply unable to meet the escalating demand for resources caused by the overcrowding in
12   California's prisons.

13         Defendants argue that a prisoner release order will not fix the constitutional violations
14   in the delivery of mental health care because they will need to develop appropriate treatment
15   space and hire sufficient staff even if the total inmate population is reduced.  Defendants
16   point to the *Coleman* Special Master's findings that "[e]ven the release of 100,000 inmates
17   would likely leave the defendants with a largely unmitigated need to provide intensive
18   mental health services to program populations that would remain undiminished by a
19   reduction of some 19,000 [CCCMS] inmates," and that the release of 50,000 inmates "would
20   probably not raise staffing resources into equilibrium with the mental health caseload."
21   Ex. D1292 at 15.

22         We agree with the Special Master that the population reduction order sought by
23   plaintiffs is not by itself a panacea, and that defendants' efforts to provide constitutionally
24   adequate mental health care must go beyond reducing prison overcrowding.  Obviously,
25   simply creating additional space would not solve the problem; prison authorities would be
26   required to ensure that the space is used to provide prisoners with professionally sound
27   medical and mental health treatment, to administer necessary medications to prisoners, and to
28   remove the other barriers to constitutionally adequate medical and mental health care created

111

1  by overcrowding.  However, the defendants cannot remedy the ongoing constitutional

2  violations without significant relief from the overcrowded conditions.  We find the Special

3  Master's statement about 100,000 inmates somewhat hyperbolic.  The comment about 50,000

4  inmates more nearly approximates the remedy we deem appropriate given our obligation to

5  adopt the least intrusive remedy.  Nevertheless, as he and we have both noted, additional

6  steps will be required after the prison population is reduced.  We believe that the Special

7  Master will be able to provide significant assistance to the state in that respect.

8      It is apparent from the extraordinary efforts undertaken by the Special Master and the

9  Receiver, as well as the fundamental constitutional inadequacies in medical and mental

10  health care, that a reduction in the present crowding of the California prisons is necessary if

11  the efforts of the *Plata* Receiver and the *Coleman* Special Master to bring the medical and

12  mental health care in California's prisons into constitutional compliance are ever to succeed.

13  In the absence of a prisoner release order, all other remedial efforts will inevitably fail.

14          4.   Other Proposals

15      As noted in our discussion of prison construction, equitable concerns would prevent

16  us from entering a prisoner release order if the state had plans in place that would reduce the

17  crowding of California's prisons sufficiently to allow the remedying of the constitutional

18  violations in the near future.  However, the evidence at trial was clear and convincing that

19  none of the state's existing plans can reduce the prisoner population to the extent necessary

20  to permit the CDCR to bring its prison medical and mental health systems into constitutional

21  compliance.

22      The state and one of the defendant-intervenors have suggested two different means of

23  reducing the prison population.  The first is already being implemented by the state through

24  its program to transfer California inmates to facilities in other states.  *E.g.,* Kernan Trial Aff.

25  ¶¶ 16-17.[58]  We do not comment on the merits of this program, although we have doubts

_____

26      [58]Defendants' out-of-state transfer program, if ordered by the court, would fall within
27  the PLRA's definition of a prisoner release order, because it "directs the release [of inmates]
   from . . . *a* prison," 18 U.S.C. § 3626(g)(4) (emphasis added).  An order requiring the transfer
   of prisoners from California's adult prison institutions to out-of-state prisons would be
28  functionally identical to an order requiring the transfer of prisoners from a single prison or

1   about its efficacy as applied to the mentally ill and question its possible adverse effect on

2   prisoners moved to a location far removed from their families and friends.  Still, as of

3   August 29, 2008, approximately 4852 California inmates had been housed in out-of-state

4   institutions, and the CDCR had plans to transfer up to a total of 3000 additional inmates to

5   such sites.  Cate Trial Aff. ¶ 47.

6        Given the severely overcrowded conditions we have already described, this planned

7   additional reduction of 3,000 prisoners in the in-state inmate population is too small to

8   significantly affect the provision of medical and mental health care to California's inmates.[59]

9   Not surprisingly, defendants do not suggest that the transfer of even more additional inmates

10  to out-of-state facilities would provide a meaningful alternative to the population reduction

11  order proposed by plaintiffs.  Furthermore, despite the small size of the existing transfer

12  program, the need to monitor out-of-state facilities to ensure that all California inmates are

13  receiving constitutionally adequate medical care has already hampered the in-state remedial

14  process.  Ex. D1100 at 48-49 (*Plata* Receiver's Sept. 15, 2008 Ninth Quarterly Report)

15  (discussing on-site investigation and corresponding corrective action plan following the

16  death of a California inmate being housed at a private prison in Mississippi).  As the

17  Receiver noted, out-of-state monitoring

18          has had a serious negative impact on the Office of the Receiver,
            drawing critical clinical personnel away from other important
19          projects and delaying "in-state" remedial efforts.  In essence,
            thousands of dollars of valuable clinical hours have been devoted
20          to helping a private prison organization rework its medical
            delivery system (at the request of CDCR and State officials) in
21          order to keep the out of state transfer process from collapsing.

22  _____

23  jail to other institutions, and an order of that type has been held to be a prisoner release order,
    notwithstanding that the state, county, or city could move the affected prisoners into other
24  institutions rather than releasing them from incarceration.  *See Tyler*, 135 F.3d at 595-98
    (finding that injunction limiting the number of technical probation violators that could be
25  housed in the city jail, thereby forcing the city to pay for their confinement elsewhere, was a
    prisoner release order under the PLRA).

26      [59]Defendants stated that "CDCR will also seek authorization to transfer [additional]
27  inmates out-of-state, if necessary," Cate Trial Aff. ¶ 47, but there is no evidence regarding
    how difficult this authorization is to obtain; how long the authorization process or transfer
28  process takes; what the cost of such a transfer would be; or how many additional inmates
    could realistically be dispatched to out-of-state facilities.

1    *Id.* at 49.

2        Based on this clear and convincing evidence regarding the operation of the existing

3    out-of-state transfer program, we conclude that the transfer of inmates to out-of-state

4    facilities would not on its own begin to provide an adequate remedy for the constitutional

5    deficiencies in the medical and mental health care provided to California's inmates.

6    Moreover, given the need to ensure constitutionally adequate medical and mental health care

7    in states as distant as Mississippi, the program may be of questionable efficacy, given the

8    comparatively small number of prisoners who might be included.

9        A defendant-intervenor has suggested that the prison population might be reduced by

10   transferring inmates who do not have legal status in the United States to federal custody.

11   Runner Trial Decl. ¶ 19.  However, the intervenor introduced no evidence suggesting that

12   this transfer program could soon be implemented, that the federal government would agree to

13   such an arrangement, or that any implementation of this program would result in a population

14   reduction sizable enough to allow the CDCR to remedy the constitutional violations in *Plata*

15   and *Coleman*.[60]  The program is thus too speculative to suggest that we should abstain from

16   entering the type of prisoner release order set forth below.

17       **B.    Expert Testimony**

18       The testimony we received from the experts overwhelmingly rejected the claim that

19   alternatives such as construction of prisons or other facilities or the transfer of small numbers

20   of prisoners could render a prisoner release order unnecessary.  Director Scott succinctly and

21   persuasively summarized the testimony of the experts in stating that "unless the population is

22   [substantially] reduced, the state will remain in crisis verging on catastrophe and will remain

23   utterly unable to provide adequate medical and mental health care to the prisoners in its

24   custody."  Nov. 9, 2007 Scott Report ¶ 6; *see also id.* ¶ 3 ("[W]ithout substantially reducing

25   its prisoner population, California will never be able to generate the custodial support

26   services necessary to provide prisoners with basic medical and mental health care.").

27   Secretary Woodford, the former head of the CDCR who also served as warden at San

28       [60]*See infra* note 82.

1    Quentin State Prison, Nov. 9, 2007 Woodford Report ¶ 1, similarly testified that, "[u]ntil the

2    population is reduced substantially there is no realistic hope that the unconstitutional

3    conditions will be eliminated," *id.* ¶ 46; *see also id.* ¶ 6 ("[N]othing short of a reduction in

4    the prison population will effectively address these issues.").  Woodford explained that, in

5    her experience as a manager of both an individual institution and the entire department:

6
> [W]e would come up with wonderful ideas and have great
> planning, but overcrowding interfered with our ability to
7 > implement any of those ideas, to bring resolution to any of the
> problems that we're facing in both [*Plata* and *Coleman*].  And
8 > the overcrowding was every day, more and more inmates coming
> into the system.
9

10   Rep. Tr. at 376:3-15.  Thus, according to Woodford, "without addressing the issue of

11   overcrowding, the Department of Corrections will never be able to provide appropriate

12   medical or mental healthcare and . . . sustain any kind of quality constitutionally-adequate

13   medical or mental healthcare."  *Id.* at 385:6-10.

14          Other experts also agreed with Secretary Woodford's and Director Scott's opinions.

15   For example, Dr. Beard opined that, while he believes CDCR staff and leadership generally

16   "want to do the right thing," he does not believe they are capable of providing

17   constitutionally adequate care under the current crowded conditions.  *Id.* at 251:12-23,

18   259:5-12.  Similarly, Secretary Lehman testified that "you cannot provide adequate

19   healthcare and mental healthcare under the current situation of crowding within the State of

20   California," *id.* at 271:22-25, and that "a reduction in the population is a necessary condition"

21   for providing such care.  Aug. 15, 2008 Lehman Report ¶ 11.  And Dr. Shansky testified that:

22
> The CDCR, in concert with the Receiver, cannot simultaneously
> develop a competent medical care delivery system in facilities
23 > that lack necessary space and staffing, and address the growing
> needs of an ever-increasing number of patients.  Until the
24 > existing overcrowding situation is addressed, CDCR is locked
> into a "crisis-response" approach where it can focus only on
25 > putting out "fires" rather than system-building.

26   Nov. 9, 2007 Shansky Report ¶ 138.  "The limitations on the CDCR, including staffing,

27   administrative resources and especially treatment space, are so severe that the only avenue

28   for building a constitutional health care delivery system is to reduce the demand on the

1   system by lowering the number of patients it serves."  Sept. 10, 2008 Shansky 2d Supp.

2   Report ¶ 8.  One of defendant-intervenors' experts agreed that "the necessary constitutional

3   medical and mental health services can't be provided with today's overcrowding."  Rep. Tr.

4   at 2202:4-6 (Bennett).

5          The mental health experts who testified also agreed that a reduction in crowding is a

6   prerequisite to providing constitutionally adequate care.  Dr. Stewart testified that, "due to

7   the extreme nature of the overcrowding, which negatively impacts all aspects of the mental

8   health and medical care system that is currently causing *Coleman* class members needless

9   suffering, as well as death, . . . the only remedy that would help the system move into

10   constitutional compliance" is reducing the population.  *Id.* at 2207:22-2208:2.  Dr. Stewart

11   based his conclusion on "the persistence of the [Eighth Amendment] violations [in *Coleman*]

12   after years of very close court monitoring," and on statements by the *Coleman* Special

13   Master "in several places that the progress that was made early on in the *Coleman* matter has

14   been undermined by current population pressures that exist."  *Id.* at 2208:12-19.  Dr. Stewart

15   testified that defendants' plans to remedy the persistent problems that pose barriers to

16   constitutional compliance are inadequate mainly because the plans "will take years to

17   implement, if they are even able to be implemented at all, given the current degree of the

18   population pressures."  *Id.* at 2208:21-2209:4.

19          Dr. Haney also concluded that the only remedy for the ongoing Eighth Amendment

20   violations in the delivery of mental health and medical care is a substantial reduction of the

21   CDCR inmate population, Aug. 15, 2008 Haney Report ¶¶ 364-378; Rep. Tr. at 945:14-19,

22   and provided several reasons for his conclusion.  The first was "the urgency of the problem

23   itself, and the unacceptably time-consuming nature of alternative solutions."  Aug. 15, 2008

24   Haney Report ¶ 367.  As Dr. Haney testified, mentally ill inmates suffering in the

25   "emergency-like conditions" of California's prisons cannot await relief for an additional four

26   or five years, the time projected by defendants' best-case scenario for the construction of

27   additional mental health facilities.  Rep. Tr. at 945:22-946:16; *see also* Aug. 15, 2008 Haney

28   Report ¶ 367.  Dr. Haney also identified other problems with the proposed construction

1    plans:  They are insufficient, by themselves, to address the range of mental health care

2    delivery problems caused by crowding; do not take into account the conditions in which

3    CCCMS inmates are housed; do not provide sufficient EOP space; and do not "realistically

4    address" the "massive" staffing increases that will be required.  Rep. Tr. at 947:16-948:14.

5    Finally, Dr. Haney opined that, for the past twenty-eight years, the CDCR has taken the

6    same basic approach to overcrowding and its impacts on mental health and medical care and,

7    while conditions have occasionally improved over that period, "the system has gotten worse

8    not better."  *Id.* at 948:18-949:8.  Delivery of services is now so stressed by the

9    "overwhelming press of the numbers in the system" that the CDCR's method of addressing it

10   "has finally run its course, and it is time . . . to address the issue at its cause, and the cause of

11   it is overcrowding."  *Id.* at 949:13-17 (Haney).

12          Defendants emphasize testimony that it is possible to provide constitutionally

13   adequate care in a crowded prison system.  *E.g.*, Rep. Tr. at 286:15-18 (Lehman) (testifying

14   that it is possible to provide adequate care "at some level" of overcrowding); *id.* at 1216:21-

15   1217:3 (Thomas) (testifying that such care can be provided in "extremely overcrowded

16   conditions"); Nov. 9, 2007 Thomas Report ¶ 6 (same); Rep. Tr. at 1080:12-24 (Packer)

17   (testifying that, "although overcrowding exacerbates the problems" in providing appropriate

18   mental health care, such care can be provided "if appropriate facilities and programs are

19   developed").  Although for the reasons previously stated we are skeptical of Dr. Thomas's

20   testimony, we credit the remaining testimony to the extent that it states that the inmate

21   population need not be reduced to 100% design capacity before constitutional levels of care

22   can be provided.  We find, however, that California's prison system is now so overcrowded

23   that it is impossible to provide adequate care without a substantial reduction in crowding.  As

24   Secretary Lehman persuasively explained, no state "has experienced anything close" to the

25   level of crowding in California – a level that makes it impossible to provide constitutionally

26   adequate medical and mental health care.  *Id.* at 286:19-287:1; *see also id.* at 297:1-17

27   (Haney) (testifying that California has been operating at 190% design capacity, which is "an

28   unheard of amount of overcrowding"); Nov. 9, 2007 Scott Report ¶ 3 (overcrowding crisis in

117

California is "unprecedented in scope").  Moreover, Dr. Packer's opinion that constitutionally adequate mental health care can be provided in an overcrowded prison setting is significantly qualified by his testimony that the provision of constitutionally adequate care in such settings is contingent upon the development of "appropriate facilities," and that simply retrofitting prison space that was not originally designed for delivery of mental health care is unlikely to lead to "a program that is sufficient."  *See* Rep. Tr. at 1080:18-1082:12.

Additionally, although defendants' two experts testified that adequate care can be provided in overcrowded settings and that they themselves have been able to do so, the systems in which they worked had prison population controls in place.  Dr. Packer testified that he was able to provide appropriate mental health care in the overcrowded Massachusetts jail facilities he supervised.  *Id.* at 1086:6-12.  However, he admitted that "there was some effort on the part of the courts to not send in some of the mentally ill inmates into the system. And, frankly, in my opinion the most effective procedure we had was that we provided mental health services at the courts, and we diverted mentally ill people away from the jail." *Id.* at 1086:17-23.  Thus, he explicitly opined that the diversion of mentally ill prisoners – a remedy falling within the PLRA's definition of a prisoner release order – would be the most effective interim remedy.  *Id.* at 1086:25-1087:14; *cf. id.* at 1084:17-18 (testifying that new construction is required to get the level of mental health care "to the level that really needs to be").  Similarly, during the time in which Dr. Thomas served as a physician with the Florida Department of Corrections, the department operated under statutory population controls that capped the population at prison hospitals and infirmaries at 100% design capacity and the general prison population at 150% design capacity.  *Id.* at 1250:1-1251:1.  Consequently, in light of the overwhelming expert testimony to the contrary, we do not find persuasive the testimony by either Dr. Packer or Dr. Thomas that constitutional levels of medical and mental health care can be established in California's prisons without first reducing the California prisoner population to well below 190% design capacity.

1        **C.**       <u>**Findings and Conclusions**</u>

2         The evidence establishes that "[r]educing the population in the system to a

3 manageable level is the only way to create an environment in which other reform efforts,

4 including strengthening medical management, hiring additional medical and custody staffing,

5 and improving medical records and tracking systems, can take root in the foreseeable future."

6 Sept. 10, 2008 Shansky 2d Supp. Report ¶ 10. Other forms of relief are either unrealistic or

7 depend upon a reduction in prison overcrowding for their success. Accordingly, we find, by

8 clear and convincing evidence, that no relief other than a prisoner release order is capable of

9 remedying the constitutional deficiencies at the heart of these two cases.

10

11 **VI.**     **NARROWLY DRAWN, LEAST INTRUSIVE REMEDY THAT EXTENDS NO**

12          **FURTHER THAN NECESSARY**

13         Plaintiffs have demonstrated that crowding is the primary cause of the

14 unconstitutional denial of medical and mental health care to California prisoners, and that no

15 relief other than a prisoner release order can remedy those constitutional violations.

16 Accordingly, plaintiffs have met the PLRA's requirements for the entry of a prisoner release

17 order. *See* 18 U.S.C. §§ 3626(a)(3)(E)(i), (ii). However, any relief this court orders must

18 also meet the PLRA's general standard for prospective relief. Specifically, the relief must be

19 "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal

20 right, and [be] the least intrusive means necessary to correct the violation of the Federal

21 right." *Id.* § 3626(a)(1)(A). Plaintiffs seek an order requiring the state to reduce the

22 population of its adult institutions to 130% of their combined design capacity. We find that

23 the scope and form of the relief proposed by plaintiffs comports with the PLRA. Although

24 we believe that plaintiffs' request for a cap of 130% is reasonable and finds considerable

25 support in the record, there is some evidence that a reduction in the population to a level

26 somewhat higher than 130% of the system's design capacity but lower than 145% might

27 provide the relief from overcrowding necessary for the state to correct the constitutional

28 violations at issue. Notwithstanding the weight of the evidence, we cannot say with certainty

1    that a cap as low as 130% is necessary, although we are persuaded that the cap must not be

2    much higher.  Because any relief we order must extend no further than necessary, and

3    because we are convinced that a cap of no higher than 137.5% is necessary, we order

4    defendants to reduce the prisoner population to 137.5% of the adult institutions' total design

5    capacity.[61]

6         **A.    <u>Scope of Relief</u>**

7         Our remedy "must of course be limited to the inadequac[ies] that produced the

8    injur[ies] in fact that the plaintiff[s] ha[ve] established."  *Lewis*, 518 U.S. at 357.  In this

9    proceeding, those injuries involve the state's longstanding and knowing failure to provide its

10   prisoners with the minimal level of medical and mental health care required by the

11   Constitution.  The *Plata* court found that "the California prison medical system is broken

12   beyond repair"; that the "future injury and death" of California prisoners is "virtually

13   guaranteed in the absence of drastic action"; and that the state had failed to address those

14   problems despite having "every reasonable opportunity" to do so.  Oct. 3, 2005 FF&CL in

15   *Plata*, 2005 WL 2932253, at *1.  Likewise, the *Coleman* court found that the state was

16   deliberately indifferent to the fact that

17              seriously mentally ill inmates in the California Department of
             Corrections daily face an objectively intolerable risk of harm as a
18           result of the gross systemic deficiencies that obtain throughout
             the Department. . . .  [I]nmates have in fact suffered significant
19           harm as a result of those deficiencies; seriously mentally ill
             inmates have languished for months, or even years, without
20           access to necessary care.  They suffer from severe hallucinations,
             they decompensate into catatonic states, and they suffer the other
21           sequela to untreated mental disease.

22   *Coleman*, 912 F. Supp. at 1316, 1319.

23        With the identified constitutional violations in mind, we first consider the propriety of

24   plaintiffs' request for a systemwide cap.  "'The scope of injunctive relief is dictated by the

25   extent of the violation established.'  The key question . . . is whether the inadequacy

26   complained of is in fact 'widespread enough to justify system wide relief.'"  *Armstrong*, 275

27   _____

     [61]As noted already, our opinion and order is limited to the CDCR's thirty-three adult
28   prison institutions and does not include camps, community correction centers, or Department
     of Mental Health state hospitals.

F.3d at 870 (quoting *Lewis*, 518 U.S. at 359).  In other words, a systemwide remedy like that requested by plaintiffs is appropriate only if plaintiffs have established systemwide injury and impact.  *See, e.g.*, *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 463-65 (1979); *Armstrong*, 275 F.3d at 871; *Smith v. Ark. Dep't. of Corr.*, 103 F.3d 637, 645-46 (8th Cir. 1996).  "[I]solated violations affecting a narrow range of plaintiffs" cannot support systemwide relief.  *Armstrong*, 275 F.3d at 870; *see also Lewis*, 518 U.S. at 359 (finding systemwide relief inappropriate where plaintiffs had shown only two violations).

There can be no serious dispute that a systemwide remedy is appropriate in this case. As we have already noted, the constitutional violations identified by the *Plata* and *Coleman* courts exist throughout the California prison system and are the result of systemic failures in the California prison system.  *See* Nov. 3, 2008 Order at 7.  Numerous reports issued by the *Plata* Receiver and the *Coleman* Special Master document the systemic nature of those problems.  Not surprisingly, defendants have never contended that the problems at issue in *Plata* and *Coleman* are institution-specific.  Accordingly, a systemwide remedy is appropriate.

Similarly, we conclude that a single systemwide cap rather than a series of institution-specific caps or a combination of systemwide and institution-specific caps is appropriate. Although institution-specific caps would be tailored to each institution's needs and limitations, an institution-by-institution approach to population reduction would interfere with the state's management of its prisons more than a single systemwide cap, which permits the state to continue determining the proper population of individual institutions.  Unless and until it is demonstrated that a single systemwide cap provides inadequate relief, we will limit the relief we order to that form of order.

To be certain, the relief sought by plaintiffs extends further than the identified constitutional violations in one regard:  Any population reduction plan developed by the state is likely to affect inmates without medical conditions or serious mental illness.  However, there is no feasible prisoner release order that would reduce overcrowding without affecting

1 | some inmates outside the *Plata* and *Coleman* classes.  Thus, we have no doubt that the relief

2 | we order contravenes no principle of law or equity in that regard.

3 |      Accordingly, the systemwide scope of plaintiffs' requested relief is properly tailored

4 | to the identified constitutional violations, at least at this first stage of the court's attempt to

5 | bring the system into compliance with the Constitution's mandate.

6 | **B.  <u>Form of Relief</u>**

7 |      We next consider the form of relief proposed by plaintiffs.  Plaintiffs seek an order

8 | requiring the state to reduce its prison population to a specified percentage of the system's

9 | design capacity within two years.  Initially, the state would be required to develop a plan to

10 | reduce the population to the designated percentage.  After considering the proposed plan and

11 | any objections from plaintiffs or intervenors, we would enter a final order incorporating the

12 | state's proposal if it is feasible, with any appropriate modifications or amendments we may

13 | deem necessary.  We would then retain jurisdiction to ensure compliance with the order or

14 | make further changes as necessary in order to allow the state to attain the actual reduction in

15 | the prison population set forth in our order within the specified time.

16 |      The Supreme Court described the nearly identical procedure used in *Bounds v. Smith*,

17 | 430 U.S. 817 (1977), as an "exemplar of what should be done" in crafting systemwide

18 | prospective relief.  *Lewis*, 518 U.S. at 363.  In *Bounds*, the district court found that the state's

19 | failure to provide legal research facilities unconstitutionally denied its inmates access to the

20 | courts.  *Bounds*, 430 U.S. at 818.  However,

> [r]ather than attempting to dictate precisely what course the State
> should follow [to remedy the constitutional violation], the court
> charged the Department of Correction with the task of devising a
> Constitutionally sound program to assure inmates access to the
> courts.  It left to the State the choice of what alternative would
> most easily and economically fulfill this duty.

25 | *Id.* at 818-19 (internal quotations omitted).  "The State responded with a proposal, which the

26 | District Court ultimately approved with minor changes, after considering objections raised by

27 | the inmates."  *Lewis*, 518 U.S. at 362-63 (citing *Bounds*, 430 U.S. at 819-20).

28 |

1    In both *Bounds* and *Lewis*, the Supreme Court praised the *Bounds* lower court's

2   remedial approach, finding that it "scrupulously respected the limits on [the court's] role"

3   and preserved the prison administrators' "wide discretion within the bounds of constitutional

4   requirements." *Bounds*, 430 U.S. at 832-33; *Lewis*, 518 U.S. at 363.  The relief requested by

5   plaintiffs here demonstrates the same respect for this court's limited role and for the need to

6   preserve the state's "wide discretion" in managing its prisons.  As in *Bounds*, plaintiffs'

7   proposal would permit the state to develop the necessary population reduction plan in the

8   first instance.  As we describe *infra*, the state would not be required to throw open the doors

9   of its prisons, but could instead choose among many different options or combinations of

10  options for reducing the prison population.  The state's options include, *inter alia*, the

11  following: enhancing good time and program participation credits; diverting technical parole

12  violators and certain offenders with short sentences; reducing the length of parole

13  supervision; implementing evidence-based rehabilitative programming; or implementing

14  sentencing reforms, perhaps by means of a sentencing commission or by otherwise changing

15  outmoded or counterproductive sentencing practices.  Many of these options have already

16  been proposed at various times by defendants themselves.  *See, e.g.*, Rep. Tr. at 1694:19-

17  1699:15 (Cate) (discussing Governor Schwarzenegger's proposed reforms, including the

18  elimination of parole supervision and enhanced good time and program participation credits);

19  *see also* Ex. P3 at 77 (noting that fifteen reports presented to the state between 1990 and

20  2007, some of which were prepared by state-established commissions or committees,

21  recommended sentencing reform and the establishment of a sentencing commission).

22    Plaintiffs' proposed order would permit the state to choose among many available

23  means of achieving the prescribed population reduction, thereby maximizing the state's

24  flexibility and permitting the state to comply with the cap in a manner that best accords with

25  the state's penal priorities.  For this reason, an order requiring a systemwide population

26  reduction to a specified percentage is preferable to an order or series of orders requiring

27  particular methods of population reduction, such as the reform of the parole system or the

28  overhaul of the state's sentencing policies.  By asking the state to develop a remedial plan in

1   the first instance, the relief sought by plaintiffs exhibits the deference to state expertise

2   required by the PLRA and *Lewis* and limits this court's intrusion into "'the minutiae of

3   prison operations.'"  *Lewis*, 518 U.S. at 362 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562

4   (1979)).  The population reduction order sought by plaintiffs is thus "the least intrusive

5   means necessary to correct the [constitutional] violation[s]" at issue in this proceeding.

6   18 U.S.C. § 3626(a)(1)(A).[62]

7           **C.      The Required Population Reduction**

8           Finally, we consider plaintiffs' specific request that we order defendants to reduce

9   California's prisoner population to 130% of the system's design capacity.  At the outset, we

10  note that choosing the percentage of design capacity to which the prison population should

11  be reduced is "not an exact science."  Rep. Tr. at 976:3-4 (Haney).  As plaintiffs' expert

12  Dr. Craig Haney explained, "there's nothing magical" about any specific percentage,

13  including 100%, *id.* at 976:7-8, but the likelihood of bringing the system into constitutional

14  compliance increases as the prison population nears 100% design capacity, *id.* at 976:8-15.

15  Our task is further complicated by the fact that defendants have not presented any evidence

16  or arguments suggesting that we should adopt a percentage other than 130% design capacity.

17  Nonetheless, both the PLRA and general equitable principles require this court to ensure that

18  the population reduction sought by plaintiffs extends no further than necessary to rectify the

19  unconstitutional denial of medical and mental health care to California's prisoners.

20          Although plaintiffs seek a cap at 130% design capacity, the evidence at trial

21  demonstrated that even a prison system operating at or near only 100% design capacity faces

22  serious difficulties in providing inmates with constitutionally sufficient medical and mental

23  health care.  First, California's prisons were not designed to provide medical and mental

24  health care for the numbers now housed therein.  Instead, the physical space for health care

---

25  [62]Of course, *Bounds* involved the initial remedial response to a recently identified
26  constitutional violation, whereas *Plata* and *Coleman* have been in their remedial phases for a
    number of years.  We do not believe this distinction would justify a departure from the
27  remedial model praised in *Bounds* and *Lewis*, in which the state is given the first opportunity
    to develop a remedial plan.  It may, however, along with the nature of the constitutional
28  violations and of plaintiffs' injuries, affect the length of time in which the state is required to
    develop and implement the plan.

in California's prisons was devised on the assumption that the prisons' populations would not exceed 100% of their design capacity. Rep. Tr. at 271:8-10 (Lehman) ("The physical space provided [in each institution] is based on the hundred percent population as opposed to 200 percent."). As defendants' witness Robin Dezember noted, the state's prisons "were not designed and made no provision for any expansion of medical care space beyond the initial 100% of capacity," and "none of the 19 CDCR institutions planned and built in the boom of the 80s and 90s gave any thought to the space that might be needed for mental health purposes." Dezember Trial Aff. ¶ 72 (internal quotations omitted). Shockingly, this failure to account for the effect of overcrowding on the ability of prisons to deliver medical and mental health continued even after the state knew that they would be filled to 200% of their design capacity. Ex. D1092 at 21-22 (*Plata* Receiver's May 15, 2007 Report Re: Overcrowding) (noting that a new prison built in 2005 was designed to provide medical care for a population equal to 100% design capacity notwithstanding the CDCR's existing plan to house a population equal to 200% design capacity in the new prison).

The mismatch between the physical design of the prisons and their present overcrowding accounts for many of the space-related obstacles to the provision of constitutionally sufficient medical and mental health care. According to Secretary Lehman, the former head of corrections in Washington, Maine, and Pennsylvania, this mismatch leaves California's prisons without the physical space to provide medical and mental health care to the number of prisoners now housed in those overcrowded institutions. In the absence of sufficient space the prisons are "simply not able to provide the [healthcare] services that [are] required." Rep. Tr. at 271:10-11.

More generally, any prison operating at 100% design capacity stretches the limits of its physical design. According to Dr. Haney, "prisons were virtually always designed sparsely . . . so that a prison that was reaching 100% of its capacity really was pushing against the limits of the number of prisoners that it could safely and humanely hold." Aug. 15, 2008 Haney Report ¶ 380. This is especially true in the context of space allocated for purposes other than housing, including medical and mental health care. "[P]rison design

1   traditionally maximized housing capacities and minimized space allocated to programming

2   needs, opportunities, and demands." *Id.*  As a result, "[w]hen a prison beg[ins] to operate at

3   or near its [design] capacity, there [is] typically little or no space available to pursue all but

4   the most basic programming options." *Id.*

5          Finally, numerous witnesses testified that a prison system must operate *below* 100%

6   design capacity to function properly.  Secretary Woodford, former head of CDCR and

7   warden at San Quentin, stated that a five percent vacancy rate is necessary "[t]o manage the

8   movement of prisoners appropriately."  Nov. 9, 2007 Woodford Report ¶ 14.  "Without the

9   flexibility that this vacancy rate provides, it is very difficult to ensure that prisoners are

10  housed appropriately for their medical and mental health needs." *Id.*  In addition, three

11  witnesses for the defendant-intervenors testified that jails require a vacancy rate of at least

12  five or ten percent to operate properly.  According to San Mateo County Sheriff Gregory

13  Munks, jails operate properly only when at or below their "functional capacity," which is

14  five to ten percent lower than their design capacity.  *See* Rep. Tr. at 1776:15-20 (Munks); *see*

15  *also id.* at 1776:20-23 (functional capacity "takes account [of] having the room for

16  classification, being able to move inmates around, [and] keep[ing] them separated based on

17  classification, based on needs, based on gang affiliation").  Lieutenant Stephen Smith of the

18  Los Angeles County Sheriff's Department testified that jails cannot operate safely or

19  properly if every bed is filled, and that he would expect the same result in prisons.  *Id.* at

20  1837:5-1838:6 (Smith).  According to Lieutenant Smith, "A hundred percent of your

21  capacity is really a misnomer. . . . [Y]ou're at a hundred percent capacity when you are at 90

22  percent.  You need a ten percent vacancy factor to just facilitate movement, and those type of

23  issues because of the margins." *Id.* at 1845:16-21.  Likewise, Gary Graves, the acting

24  County Executive for Santa Clara County, testified that a fifteen percent vacancy rate is

25  generally necessary in Santa Clara County's jail system. *Id.* at 2275:3-6.

26         This testimony establishes that, when a prison or jail's population reaches 100%

27  design capacity, its administrators lose the flexibility required to classify inmates and to

28  move prisoners in accordance with their needs.  We have already noted that overcrowding

1   prevents the state from providing constitutionally adequate medical and mental health care in

2   part by preventing the proper classification of inmate medical and mental health needs,

3   limiting the state's ability to bring inmates to required appointments and services, and

4   preventing the state from transferring inmates into necessary clinical placements.

5   Accordingly, the testimony suggests that the state's ability to provide constitutionally

6   adequate medical and mental health care is hampered at 100% design capacity.

7           Despite this evidence, plaintiffs do not seek an order capping the prison system's

8   population at 100% design capacity.  Instead, they seek a cap at 130% design capacity,

9   acknowledging that constitutionally adequate medical and mental health care can be provided

10  in such circumstances.  Plaintiffs' proposed population limit is drawn from a

11  recommendation by the Governor's own prison reform personnel.  To implement the prison

12  building and prison reform projects authorized by AB 900, the Governor established a series

13  of strike teams, and Deborah Hysen became head of the Facilities Strike Team in May 2007.

14  Sept. 3, 2008 Hysen Dep. at 12:8-10, 15-17.  In that role, Ms. Hysen suggested that the

15  CDCR impose two limits on the state prison population.  First, she suggested that new prison

16  beds built pursuant to AB 900 be allocated in a manner that would limit overcrowding to no

17  more than 145% design capacity.  Ex. P128 at 1, 6 (Aug. 13, 2007 AB 900 Strike Team

18  memo).  Hysen acknowledged that housing prisoners at 145% design capacity "does not meet

19  federal guidelines nor national standards," but she nonetheless believed that a reduction in

20  overcrowding to 145% design capacity would "begin to moderate and control the

21  department's overcrowding practices."  *Id.* at 6.  As a long-term goal, however, Hysen

22  suggested that the prison system's population should not exceed 130% design capacity, the

23  federal standard for prison overcrowding.  *Id.*; Hysen Dep. at 94:13-24.  Ms. Hysen also

24  suggested that the CDCR consider "establishing planning capacity and oversight mechanisms

25  to prevent the occurrence of exceeding this [130%] threshold."  Ex. P128 at 6.

26          Plaintiffs' experts testified that the 130% cap recommended by Ms. Hysen would be

27  sufficient to remedy the constitutional violations here.  Secretary Lehman testified that

28  "housing California prisoners at 130% design capacity will give prison officials and staff the

127

1   ability to provide the necessary programs and services for California's prisoners."  Aug. 15,

2   2008 Lehman Report ¶ 20.  Doyle Wayne Scott, the former executive director of the Texas

3   Department of Criminal Justice, testified that Ms. Hysen's 130% recommendation was "a

4   realistic and appropriate place for CDCR to be, to ensure that its prisons are safe and provide

5   legally required services," Aug. 13, 2008 Scott Supp. Report ¶ 18.  Secretary Woodford also

6   agreed with Ms. Hysen's recommended 130% cap.  Aug. 15, 2008 Woodford Supp. Report

7   ¶ 3.

8          Notably, however, both Director Scott and Secretary Woodford qualified their

9   endorsement of the 130% cap by stating that certain facilities could not provide

10   constitutionally sufficient medical and mental health care when filled to 130% design

11   capacity.  Woodford noted that "different (and particularly older) facilities might require

12   slightly lower population limitations, based on the quality of infrastructure and availability of

13   treatment space, for example."  *Id.*  According to Scott, "[W]hile [130%] might be

14   appropriate for new construction, it should be used carefully in CDCR's old, decaying

15   facilities, with their failing infrastructure.  Crowding prisoners at 130% is an appropriate goal

16   for CDCR, speaking broadly, but some facilities might only be able to support and provide

17   appropriate health care for smaller numbers."  Aug. 13, 2008 Scott Supp. Report ¶ 18.

18          Although Director Scott and Secretary Woodford suggested that a 130% limit might

19   be too high in certain instances, other evidence suggested that a cap above 130% might be

20   sufficient.  For example, Dr. Ronald Shansky testified that the Illinois prison medical system

21   was brought into constitutional compliance at 140% design capacity.  Rep. Tr. at 479:2-16.

22   Similarly, the Corrections Independent Review Panel determined in 2004 that the California

23   prison system's "operable capacity" was 145% of its design capacity.  Ex. P4 at 124.  The

24   Panel's estimate was prepared by a group of experienced California prison wardens, who

25   suggested that a system operating at 145% design capacity could "support full inmate

26   programming in a safe and secure environment."  *Id.*

27          Numerous witnesses testified, however, that the Panel's operable capacity estimate

28   suffers from a potentially fatal flaw for purposes of measuring the constitutional

1   requirements relating to medical and mental health care.  Operable capacity does not take

2   into account the ability to provide that care.  Thus, the wardens did not consider prisoner

3   medical or mental health needs in reaching their estimate.  *See* Ex. P4 at 161 n.3; Nov. 9,

4   2007 Scott Report ¶ 46 ("[The expert panel's] definitions [of design capacity, operational

5   capacity, and maximum safe and reasonable capacity], however, still fail to look at the

6   capability of a system or individual facility to adequately and legally care for the medical and

7   mental health needs of its population . . . .").  According to Dr. Stewart, "The [maximum

8   operable capacity] incorporated educational, vocational, substance abuse, and other

9   rehabilitation programming, but did not account for programming associated with mental

10  health or medical treatment. . . .  When mental health treatment needs are taken into account,

11  the maximum operable capacity will be lower."  Aug. 15, 2008 Stewart Supp. Report

12  ¶¶ 126-27.  Likewise, Dr. Haney reported that

13
14
15          the Panel's estimate of [maximum operable capacity] did *not*
            specifically contemplate, take into account, or attempt to
            calculate the *additional* space and staffing levels that would be
            required to provide constitutionally adequate mental health and
16          medical care. . . .  When these crucial mental health and medical
            treatment needs are taken into account – as they must be in any
            calculation aimed at addressing the primary cause of these
17          continuing constitutional violations – then the appropriate
            percentage for maximum operable capacity would certainly be
18          lower than the Panel's and wardens' estimates of 145%.

19  Aug. 15, 2008 Haney Report ¶¶ 383, 385.

20          Plaintiffs' experts convincingly demonstrated that, in light of the wardens' failure to

21  consider the provision of medical and mental health care to California's inmates and in light

22  of their reliance on maximum operable capacity, which does not consider the ability to

23  provide such care, the Panel's 145% estimate clearly exceeds the maximum level at which

24  the state could provide constitutionally adequate medical and mental health care in its

25  prisons.  Unfortunately, plaintiffs' experts did not calculate the extent to which the operable

26  capacity of California's prisons exceeds the percentage necessary for the provision of

27  constitutionally adequate medical and mental health care.  *See* Aug. 15, 2008 Stewart Supp.

28  Report ¶ 127 (stating only that the maximum operable capacity of California's prisons is

1   lower than 145%); Aug. 15, 2008 Haney Report ¶ 385 (same); *see also* Aug. 15, 2008 Haney

2   Report ¶ 385 (describing 145% as "a very conservative estimate of [maximum operable

3   capacity]" that is "the <u>outer</u> limit or <u>maximum</u> capacity *in a range* that is intended to

4   eliminate the constitutional violations that are at issue here" (last emphasis added)).  Even

5   more unfortunately, as noted earlier, defendants introduced no evidence suggesting that the

6   population of California's prisons should be reduced to some level above 130%.

7          Although there is strong evidence that a prison system operating at even 100% design

8   capacity will have difficulty providing adequate medical and mental health care to its

9   inmates, the evidence before the court establishes that California's prisoner population *must*

10  be reduced to some level between 130% and 145% design capacity if the CDCR's medical

11  and mental health services are ever to attain constitutional compliance.  The evidence in

12  support of a 130% limit is strong:  Both national standards and the Governor's own strike

13  team, which adopted those standards, suggest 130% design capacity as a reasonable upper

14  limit on the prison system's population.  However, we cannot determine from the evidence

15  whether the national standard selected by the Governor's strike team represents a judgment

16  regarding the mandates of the Constitution or whether it merely reflects a policy that ensures

17  desirable prison conditions.  Other, far less persuasive evidence at trial suggested that

18  California might be able to remedy the constitutional violations at issue in *Plata* and

19  *Coleman* if the population of the CDCR's adult institutions were reduced to 140% or

20  somewhere else lower than 145% design capacity.  Exercising the caution and restraint

21  required by the PLRA, we credit this evidence to the extent it suggests that the limit on

22  California's prison population should be somewhat higher than 130% but lower than 145%.

23  Rather than adopting the 130% limit requested by plaintiffs, we will out of caution require a

24  reduction in the population of California's adult prison institutions to only 137.5% of their

25  combined design capacity – a population reduction halfway between the cap requested by

26  plaintiffs and the wardens' estimate of the California prison system's maximum operable

27  capacity absent consideration of the need for medical and mental health care.  At the adult

28  institutions' present design capacity of 79,828, Ex. P135 (CDCR weekly population report as

of August 27, 2008), this equates to a population of just below 110,000.[63]  Should the state prove unable to provide constitutionally adequate medical and mental health care after the prison population is reduced to 137.5% design capacity, plaintiffs may ask this court to impose a lower cap.[64]  Similarly, should it appear that the provisions set forth in the plan adopted by the court will not achieve the expected population reduction, plaintiffs may seek to have the plan amended.

## VII.   POTENTIAL POPULATION REDUCTION MEASURES AND THEIR IMPACT ON PUBLIC SAFETY AND THE OPERATION OF THE CRIMINAL JUSTICE SYSTEM

Before we enter a population reduction order, we must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1)(A).  To aid us in meeting this requirement, the parties devoted nearly ten days of trial to this issue and submitted hundreds of exhibits.  The impressive collection of evidence before the court included testimony from former and current heads of corrections of five states; top academic researchers in the field of incarceration and crime; CDCR officials; and county officials, district attorneys, probation officers, and sheriffs from across California.  We also had the benefit of many state-commissioned reports that proposed various measures for safely reducing the overcrowding in California's prison system.  Indeed, four of plaintiffs' experts – Dr. Austin, Dr. Beard, Dr. Krisberg, and Secretary Lehman – had previously been appointed by the CDCR to serve as members of the Expert Panel on Adult Offender Recidivism Reduction Programming.  We give substantial consideration to the report from this panel, which recommended a number of

---

[63]Of course, our order is based on a percentage of design capacity.  If the CDCR closes existing prisons or constructs new prisons or prison beds, the system's design capacity will change, and our order will therefore require a prison population than just below 110,000. *See supra* Section V.A.1.d.

[64]We recognize that certain institutions and programs in the system require a population far below 137.5% design capacity.  We trust that any population reduction plan developed by the state in response to our opinion and order will properly account for the particular limitations and needs of individual institutions and programs.

measures that it believed would help to safely reduce overcrowding in California's prisons, as a necessary first step to reducing recidivism; it included a list of ten related reforms that have been repeatedly recommended to the state, Ex. P2 at 77, some of which we discuss below.

We begin by emphasizing the nature of the order this court issues herein.  The order requires the state to reduce California's prison population to 137.5% design capacity within two years and to submit a plan within 45 days to implement our order.  As we discuss below, there are a number of population reduction measures that will not have an adverse impact on public safety and that in fact may improve public safety, all of which have been previously recommended to the state, in various reports, by experts it retained to examine ways to reduce California's high recidivism rate.[65]  Any or all of these measures may be included in the state's plan.  Whichever solutions it ultimately chooses, the evidence is clear that the state can comply with our order in a manner that will not adversely affect public safety.  Indeed, the evidence is clear that the state's continued failure to address the severe crowding in California's prisons would perpetuate a criminogenic prison system that itself threatens public safety.

In addressing the potential impact on public safety of our population reduction order, we do not ignore the serious fiscal crisis presently facing the state of California.  We are aware that California will not through its ordinary budget process increase its expenditures in order to ameliorate or resolve the constitutional issues it confronts.  However, as we explain below, a reduction in California's prison population would produce significant savings, some of which, even with a budget reduction, could be used to fund effective rehabilitative and re-entry programming in the prisons and to help county and local governments meet any additional costs resulting from their expansion of existing programs in order to meet the

---

[65]The state recidivism rate is the ratio of the number of felons returned to prison during a specific period to the number of felons paroled during the same period, times one hundred.  Ex. DI-600 at 4.  The CDCR's statistics on recidivism show return-to-prison rates within three years, and they include returns for technical parole violations.  Rep. Tr. at 1373:3-20 (Woodford).  California's recidivism rate is one of the highest in the country. *See* Aug. 15, 2008 Bennett Report ¶ 58; Aug. 15, 2008 Austin Report ¶¶ 9-11; Ex. P2 at 88.

needs of persons affected by a population reduction order who may require county or local services.  Even if the state were not to use any savings for such purposes, population reduction could be accomplished without any significant adverse impact on public safety or the operation of the criminal justice system.  A number of the population reduction measures that have been recommended by the various expert committees do not require any substantial additional expenditures, and, in many instances, any additional burdens on county and local governments resulting from the prison population reduction would fall within current fluctuations in the demand for existing services.

In any event, we cannot now determine with finality whether the population reduction plan the state will propose in response to our order would have an adverse impact upon public safety or the operation of the criminal justice system.  We do know, however, that the state *could* comply with our population reduction order without a significant adverse impact upon public safety or the criminal justice system's operation; the evidence before us clearly establishes its ability to do so.  We will consider the impact of the state's actual population reduction plan before approving it or any modified or substitute plan.  Whatever plan we do adopt will be consistent with our obligation to accord substantial weight to any adverse impact involved.

### A.  Criminogenic Nature of Overcrowded Prisons

As an initial matter, we conclude that the current combination of overcrowding and inadequate rehabilitation or re-entry programming in California's prison system itself has a substantial adverse impact on public safety and the operation of the criminal justice system.  A reduction in the crowding of California's prisons will have a significant positive effect on public safety by reducing the criminogenic aspects of California's prisons.

Defendants do not credibly dispute the above conclusion, although they argue that California's criminal justice system is no different from that of other jurisdictions.  In a certain sense they are correct.  For example, California's incarceration rate for prisoners sentenced to more than one year in state or federal prisons is about 475 per 100,000 residents, close to the national average.  Cate Trial Aff. ¶ 22.  California does not incarcerate

1    felons at an unusually high rate, *id.* ¶¶ 23-24, and the average prison sentence imposed and

2    served in California is lower than the national average, *id.* ¶ 25.  However, as convincingly

3    explained by Professor Joan Petersilia, an expert on the California prison system and a

4    member of the CDCR's Rehabilitation Strike Team,[66] "the similarities end once an individual

5    has been sentenced to prison.  California truly is different when it comes to the way inmates

6    are housed, the way they are treated while incarcerated, the way they are released, and the

7    way their parole is handled and revoked."  Ex. P5 at 9 (May 2006 California Policy Research

8    Center Report, "Understanding California Corrections").  As a consequence, although

9    California spends billions of dollars on its prison system, it has "one of the highest return-to-

10   prison rates in the nation."  *Id.* at ix.  In 2005, 66% of offenders released from the California

11   prison system returned to prison within three years.  *Id.*  At least two experts reported that

12   California's recidivism rate is at 70 percent.  Aug. 15, 2008 Bennett Report ¶ 58; Nov. 9,

13   2007 Austin Report ¶ 42.

14        The evidence clearly establishes that, because of overcrowding, the state is limited in

15   its capacity to classify inmates properly according to their security risk or programming

16   needs.  *See, e.g.*, Rep. Tr. at 2013:21-23 (Lehman); *id.* at 145:15-18 (Scott); *id.* at 225:21-

17   227:13 (Beard); Aug. 15, 2008 Lehman Report ¶ 8; Nov. 9, 2007 Woodford Report ¶ 13.  In

18   addition, a December 2007 report from the CDCR's Rehabilitation Strike Team found that

19   "fully 50% of all exiting California prisoners did not participate in *any* rehabilitation or work

20   program nor did they have a work assignment, during their entire prison term . . . ."

21   Ex. P113 at 13 (December 2007 report, "Meeting the Challenges of Rehabilitation in

22   California's Prison and Parole System: A Report from Governor Schwarzenegger's

23   Rehabilitation Strike Team") (hereinafter "Rehabilitation Strike Team Report") (emphasis in

24   original); *see also* Sept. 22, 2008 Marquart Supp. Report ¶ 5 ("[O]f the 134,000 prisoners

25   who exited California's prisons in 2006, only 7% participated in substance abuse programs

26   and only 10% participated in vocational education while incarcerated.").  The CDCR's

27   _____

28        [66]The Rehabilitation Strike Team was established by Governor Schwarzenegger to
     develop and implement prison and parole programs for the CDCR.  Ex. P113 at 10.

1    Undersecretary of Programs Kathryn Jett believed that the same remained true as of August

2    2008.  Rep. Tr. at 1731:4-8.

3         Witnesses for plaintiffs and defendant-intervenors with substantial experience

4    administering or studying correctional and law enforcement systems testified that, in such

5    conditions, high-risk inmates do not rehabilitate and low-risk inmates learn new criminal

6    behavior.[67] *E.g.*, Rep. Tr. at 1580:5-9 (Beard) ("They are probably getting worse with the

7    environment that they're in, associating with the higher risk people and with the

8    overcrowding, with the violence, those lower risk people are probably going to be more

9    likely to reoffend."); *id.* at 1052:19-1053:9 (Powers) (Stanislaus County Chief Probation

10   Officer) (testifying that, as a probation officer, he would prefer to treat offenders in the

11   community because offenders come out of prison worse than when they went in); *id.* at

12   2777:2-19 (Meyer) (Yolo County Chief Probation Officer) ("When I toured the prisons with

13   the intervenors some time ago, I was actually shocked about how almost nothing positive is

14   going on, how crowded it was.  It's an issue that – that it seems like they produce additional

15   criminal behavior."); *see also id.* at 385:23-25 (Woodford) ("I absolutely believe that we

16   make people worse, and that we are not meeting public safety by the way we treat people.").

17   California's prisons, in other words, are serving as "crime school[s]."  *Id.* at 2014:1

18   (Lehman).

19        According to Secretary Lehman, the former head of corrections in Washington,

20   Maine, and Pennsylvania, "there's only one term you can use" to describe California's

21   overcrowded prisons: "criminogenic."[68]  *Id.* at 2013:18-2014:1.  The criminogenic

22   environment in the prison system means that "[e]ach year, California communities are

23   burdened with absorbing 123,000 offenders returning from prison, often more dangerous

24   than when they left."  Ex. P3 at 17 (Jan. 2007 Little Hoover Commission Report, "Solving

25   California's Corrections Crisis: Time is Running Out").  This situation presents a clear threat

26   ──────────────

     [67]Low-risk inmates are those with low risks of reoffending, whereas high-risk inmates
27   are those with high risks of reoffending.  *See* Rep. Tr. at 1170:25-1171:22 (Powers).

28        [68]Something that is "criminogenic" contributes to the occurrence of crime.  *See* Rep.
     Tr. at 2013:19-20 (Lehman).

                                        135

1   to public safety and the operation of the criminal justice system.  *See* Rep. Tr. at 1580:17-19

2   (Beard); *id.* at 974:11-22 (Haney).

3       The state has recently attempted to reduce these criminogenic effects by implementing

4   a new case management system.  However, the CDCR is still in the preliminary stages of

5   implementing this new programming.  As of August 2008, there was no system in the prisons

6   "'to deliver the right inmate to the right program,'" Rep. Tr. at 1727:23-24 (quoting Jett

7   Dep.), and, at the time of trial, the case management system was in "its infancy," *id.* at

8   1713:3-5 (Jett).

9       Defendants do not dispute the overwhelming evidence that overcrowding in prisons

10  itself threatens public safety, nor could they.  In fact, in his 2006 Prison Overcrowding State

11  of Emergency Proclamation, Governor Schwarzenegger found that "overcrowding causes

12  harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates

13  programs, and increases recidivism as shown within this state and in others."  Ex. P1 at 2.

14  The contention by defendants' expert Dr. James Marquart that "there is no clear evidence

15  that overcrowding by itself automatically leads to violence," Aug. 14, 2008 Marquart Prelim.

16  Report at 7-8, is unpersuasive, but in any event, it does not directly contradict the evidence

17  that crowding increases recidivism.  Moreover, even if Dr. Marquart is correct that there is

18  no "systematic empirical investigation" confirming the "pernicious effects" of overcrowding,

19  Aug. 27, 2008 Marquart Rebuttal Report ¶ 3, we credit the testimony of correctional and law

20  enforcement experts who have seen and studied the conditions in California prisons and

21  convincingly opined that they do adversely affect public safety.

22      Accordingly, we find that California's overcrowded prisons are criminogenic and, as

23  the Governor declared in his State of Emergency Proclamation, Ex. P1 at 2, have an adverse

24  effect on public safety.  Mitigating prison overcrowding could improve public safety by

25  rendering possible the proper classification of inmates and the expansion and targeting of

26  rehabilitation programming.  *See* Ex. P2 at 9-10 (June 2007 CDCR Expert Panel on Adult

27  Offender Recidivism Reduction Programming Report to the California State Legislature, "A

28

136

1    Roadmap for Effective Offender Programming in California") (recommending population

2    reduction measures in order to reduce recidivism rates).

3        **B.    Potential Population Reduction Measures**

4        There was overwhelming agreement among experts for plaintiffs, defendants, and

5    defendant-intervenors that it is "absolutely" possible to reduce the prison population in

6    California safely and effectively.  Rep. Tr. at 2189:9-23 (Bennett) (Sonoma County

7    corrections expert); *see, e.g.*, *id.* at  2101:24-2102:1 (Krisberg) (plaintiffs' expert); *id.* at

8    1995:8-20 (Marquart) (defendants' expert); *id.* at 2012:20-25 (Lehman) (plaintiffs' expert);

9    *id.* at 1327:3-6 (Woodford) (plaintiffs' expert).

10       Plaintiffs proposed several measures to reduce the prison population.  The first, the

11   expansion of the good time credits system, would allow eligible low- to moderate-risk

12   inmates to be released a few months early in exchange for complying with prison rules and

13   participating in rehabilitative, education, or work programs.  The second and third, the

14   diversion of technical parole violators and of low-risk offenders with short sentences, would

15   keep low-risk offenders in community correctional systems rather than incarcerating them in

16   prison for a few months.  The fourth, the expansion of evidence-based rehabilitative

17   programming, would reduce the prison population by addressing offenders' rehabilitative

18   needs, thus lowering their likelihood of reoffending.[69]

19       Many of the witnesses presented by defendant-intervenors objected to simply

20   throwing open the prison doors and releasing inmates early in a generic manner, erroneously

21   assuming that such a remedy might be contemplated or ordered by the court.  *See, e.g.*, Rep.

22   Tr. at 1087:16-22 (Packer) ("When they said 'prison release,' I thought they were literally

23   releasing people from the prison."); *id.* at 1052:8-12 (Powers) (stating that he prefers his

24   population reduction proposal to "let's throw the door open, and in six months from now we

25   will be there"); Aug. 15, 2008 Bennett Report ¶ 13 ("The wholesale release of inmates would

26   _____

27       [69]Plaintiffs also propose shortening the length of parole supervision, which would
     have a more immediate and direct impact on the distribution of parole resources than on the
     prison population.  For that reason, we discuss this proposal separately.  *See infra*

28   Section VII.C.3.

                                        137

1   only shift the crowding problem to the counties and provide nothing more than temporary

2   relief to the state."); Bay Stip. ¶ 7 (Director of San Mateo County Department of Housing)

3   ("I am assuming that the prisoner release order is a one-time event and not part of a pattern of

4   shorter sentences for a class of prisoners.").  However, many of the same witnesses, as well

5   as others presented by defendants and defendant-intervenors, testified that they supported

6   other measures for reducing the prison population, including measures substantially similar

7   to those proposed by plaintiffs.  *E.g.*, Rep. Tr. at 1086:20-1087:22 (Packer) (recommending

8   diversion of mentally ill inmates from the prisons); *id.* at 1041:12-1045:11 (Powers) (stating

9   that a prison population reduction could be achieved safely by investing in probation); Aug.

10  15, 2008 Bennett Report ¶¶ 68-71, 75-76 (recommending systemic changes, including

11  reducing return to incarceration as a sanction for technical parole violations and enhancing

12  community-based sanctions programs); *see also* Buddress Trial Decl. ¶ 3 (San Mateo County

13  Chief Probation Officer) (supporting population reduction measures proposed by plaintiffs'

14  expert Dr. Krisberg); Dalton Am. Trial Decl. ¶¶ 17-26 (Los Angeles County Sheriffs'

15  Department, Director of Bureau of Operations for Bureau of Offender Programs and

16  Services) (recommending diversion to community corrections, sentencing reform, diversion

17  of technical parole violators, and re-entry programming); Rep. Tr. at 2770:23-2771:10

18  (Meyer) (testifying that, if appropriate programs were funded, the population could be

19  reduced by about 30% while crime was also reduced); Dumanis Trial Decl. ¶¶ 16-20 (San

20  Diego District Attorney) (supporting re-entry programming and rehabilitative and diversion

21  programs); Boesch Trial Decl. at 13 (San Mateo County Assistant County Manager)

22  (supporting rehabilitation programs and graduated sanctions).

23          We do not suggest that plaintiffs' proposed methods are the only ways to reduce the

24  prison population without adversely affecting public safety and the criminal justice system.

25  We have discussed some other methods earlier, *supra* Section V.A.4 (discussing the state's

26  proposals to transfer inmates out of state or into federal custody), and will discuss others

27  later, *supra* Section VII.B.5 (discussing, *inter alia*, sentencing reform and modifications of

28  criminal statutes).  There are other proposals as well that have been recommended by various

1    state commissions or bodies that may be worthy of consideration.  Our discussion here is not

2    necessarily exhaustive.

3           First, we consider plaintiffs' four proposed population reduction measures.  They are

4    substantially similar to those proposed by the Governor and many correctional experts.  We

5    find credible the evidence that these measures, properly implemented, would not adversely

6    impact public safety or the operation of the criminal justice system.  We also find that these

7    measures are feasible, and that they could achieve the population reduction required to

8    achieve constitutional levels of medical and mental health care delivery.

9                          1.    Early Release Through Expansion of Good Time Credits

10           California, like the federal government and nearly every other state, has a system

11   through which inmates can earn credits to reduce their prison sentences by complying with

12   prison rules or by participating in rehabilitative, education, or work programs.  *See, e.g.*, Rep.

13   Tr. at 1398:6-15 (Austin); *id.* at 1549:23-1550:14 (Beard).  California's inmates can earn

14   credits off their prison sentences through "participation in work, educational, vocational,

15   therapeutic or other prison activities" and for good behavior.  Cal. Penal Code §§ 2931,

16   2933.[70]  CDCR Undersecretary Jett testified that the purpose of California's good time

17   credits system is to provide an incentive for inmates to participate in education and work

18   programs because those programs can reduce recidivism.  Rep. Tr. at 1724:6-16.

19           Experts presented by plaintiffs, defendants, and defendant-intervenors all supported

20   the expansion of this good time credits system.  Secretary Lehman and Secretary Woodford

21   both recommended the expansion of the credit system as a way to reduce the prison

22   population without adversely affecting public safety.  *See* Aug. 15, 2008 Lehman Report

23   ¶ 13; Rep. Tr. 1326:21-1327:2, 1361:2-13 (Woodford).  The public safety experts for

24   defendants and defendant-intervenors criticized generic early release programs but testified

25   that they were not opposed to the good time credits system.  *See* Rep. Tr. at 1991:22-25

26

27   _____

28        [70]These credits are referred to, variously, as earned good time credits, good time
     credits, earned credits, time credits, or earned time credits.

(Marquart) (stating that he is not opposed to granting earned credits for compliance with prison rules);[71] Aug. 15, 2008 Bennett Report ¶ 79; Rep. Tr. at 1015:21-1016:2 (Rodriguez).

Defendants themselves have proposed the expansion of earned good time credits, and they would "[o]f course not" propose plans that would endanger public safety. *Id.* at 1685:3-15 (Cate); *id.* at 1921:14-1922:1 (Kernan). The Governor's 2008 and 2009 budget proposals included an enhancement in the award of good time credits for up to four months for each program successfully completed by an eligible inmate, reasoning that "[i]ncentivizing program participation and completion will reduce inmate violence within the CDCR and will facilitate the inmate's reintegration into society." Ex. P780 at 18 (Governor's Budget, Special Session 2008-09); Jan. 16, 2009 Sturges Decl., Ex. A at 28 (2009-10 Governor's Budget).[72] The Corrections Independent Review Panel chaired by former Governor Deukmejian also recommended the expansion of the earned time credits system as one component of comprehensive reform of the prison system. Ex. P4 at 122, 130. The CDCR Expert Panel made the same recommendation. *See* Ex. P2 at ix, 92.

Expansion of the good time credits system would reduce the prison population by allowing inmates to shorten their lengths of stay in prison by a few months. The evidence indicates that such moderate reductions in prison sentences do not adversely affect either recidivism rates or the deterrence value of imprisonment. According to Dr. Austin, a correctional sociologist and plaintiffs' expert, criminologists have known "for many, many, many years" that generally "there is no difference in recidivism rates by length of stay" in prison, so reducing the length of stay by a "very moderate period of time" – four to six months – would have no effect on recidivism rates. Rep. Tr. at 1387:1-11. Other experts, including an expert for defendants and an expert for defendant-intervenors, agreed with the

---

[71]Dr. Marquart criticized the earned credit system implemented in Texas in his expert report, *see* Aug. 14, 2008 Marquart Report at 19, but testified that he was not opposed to earned credits more generally. As we discuss below, Dr. Marquart's testimony on this issue is contradictory and unreliable.

[72]We do not consider here other proposed measures in budget messages submitted by the Governor post-trial. We are aware, however, that they contain additional proposals for reducing the prison population safely.

1   proposition that there is no statistically significant relationship between an individual's

2   length of stay in prison and his recidivism rate.  *E.g.*, *id.* at 1325:11-16 (Woodford); *id.* at

3   1995:21-24 (Marquart); *id.* at 1154:18-24 (Powers); *see also* Ex. DI-204 at 1 (April 2007

4   National Council on Crime and Delinquency report, "Effect of Early Release from Prison on

5   Public Safety: A Review of the Literature").  Dr. Austin's study of the CDCR data confirmed

6   that this is true of inmates in California's prisons.  Aug. 27, 2008 Austin Supp. Report

7   ¶¶ 4-8.[73]  Similarly, a moderate reduction in an inmate's length of stay in prison would not

8   affect the deterrence value of imprisonment.  According to two correctional experts,

9   including one presented by a defendant-intervenor, "certainty of punishment" and "the

10  quickness with which penalties are brought to bear" have a much bigger effect on deterrence

11  than a marginal difference in the level of sanctions.  Rep. Tr. at 2106:2-7 (Krisberg)

12  ("There's a pretty large consensus that minor reductions [in sanctions] are not going to make

13  a big difference."); *id.* at 2194:19-2195:18 (Bennett) (testifying that "[i]t's not the severity of

14  the sanction that's important" but "the certainty and the immediacy of it").

15       Defendants' expert Dr. Marquart opined as a general proposition that shortening the

16  length of stay in prison by "advancing good time credits" could negatively impact recidivism

17  because it might reduce the opportunity for inmates to complete rehabilitation programming.

18  *E.g.*, Aug. 14, 2008 Marquart Prelim. Report at 20-21.[74]  Dr. Marquart's opinion amounts, at

19  most, to a note about the factors that should be considered in designing an effective expanded

20  good time credits system.  It is entitled to little, if any, weight as an observation about the

21  possible negative effect on public safety of such a system.  First, as noted above,

22  approximately 50% of the 134,000 inmates released from California's prisons annually are

23  currently released without the benefit of any rehabilitation programming and, in fact,

24  _____

25       [73]In fact, some evidence suggests that properly targeted early release programs can
     actually reduce recidivism rates.  *E.g.*, Sept. 8, 2008 Krisberg Report at 5.

26       [74]Dr. Marquart stated that shortening the inmates' lengths of stay might present a
27  particular problem with respect to inmates in conservation camps who are trained to fight
     fires.  Aug. 14, 2008 Marquart Prelim. Report at 21.  It appears, however, that his concern
28  with respect to these inmates is not that their recidivism rates would increase but that "their
     release could severely impact the services these inmates render to the state."  *Id.*

1    evidence shows that inmates with shorter sentences are especially unlikely to benefit from

2    such programming at this time.[75]  *See* Ex. P113 at 13 (Rehabilitation Strike Team Report);

3    Ex. P5 at 76.  Thus, for at least 50% of the inmates released from California's prisons each

4    year, an expanded good time credits program would not, at present, reduce their

5    opportunities to complete rehabilitation programs.

6         More important, defendants are at the beginning stages of expanding rehabilitation

7    programming in the state's prison system.  The CDCR has recently begun to implement an

8    evidence-based system of rehabilitation programming to reduce recidivism, and it has also

9    taken steps to increase utilization of existing educational, vocational, and substance abuse

10   programs.  Rep. Tr. at 1710:20-1711:19, 1714:19-1715:1 (Jett).  The evidence is clear that

11   expanded rehabilitation programming, and expanded inmate participation in such

12   programming, is a necessary component of California's goal of reducing its high recidivism

13   rate.  One of the proposals advanced by Defendant Governor Schwarzenegger in his 2008-09

14   budget would authorize the CDCR to provide "up to four months of earned credit for each

15   program successfully completed by an eligible inmate."  Ex. P780 at 18.  Thus, the Governor

16   contemplates *completion* of rehabilitation programs as one of the foundations of an expanded

17   earned good time credits system.

18        We also reject the testimony that inmates released early from prison would commit

19   additional new crimes.  Even aside from the fact that many of these individuals would be less

20   likely to reoffend because they benefitted from completing rehabilitative programs, the

21   weight of the evidence showed that, because length of stay is unrelated to recidivism, all else

22   being equal the likelihood that a person who is released a few months before his original

23   release date will reoffend is the same as if he were released on his original release date.  *See,*

24   *e.g.*, Rep. Tr. at 1966:20 -1967:5 (Marquart); *id.* at 2653:2-15 (Yim) (Chief of Correctional

25

26        [75]Inmates with short sentences who participate in San Diego County's community re-
     entry program are receiving some rehabilitation programming in prison.  San Diego,
27   however, is the only county that has implemented such a program since the 2005 passage of
     Senate Bill 618, which authorized them.  At the time of the trial, San Diego's program had
28   only 389 inmate-participants.  Rep. Tr. at 987:9-16 (Rodriguez) (San Diego County Deputy
     District Attorney).

1    Services Division of the Los Angeles County Sheriff's Department).  Shortening the length

2    of stay in prison thus affects only the timing and circumstances of the crime, if any,

3    committed by a released inmate – i.e., whether it happens a few months earlier or a few

4    months later.  *Id.* at 1329:16-19 (Woodford); *id.* at 2319:1-23 (Dyer) (City of Fresno Police

5    Chief); *id.* 1569:11-20 (Beard); *id.* 2163:12-19 (Krisberg); *see also id.* at 1769:5-13

6    (Hoffman) (CDCR's Director of Adult Parole Operations) (testifying that returning technical

7    parole violators to prison only postpones victimization and crime).  Although there might be

8    an increase in arrests in the initial months of an early release, *see, e.g.*, Austin Aug. 15, 2008

9    Report ¶¶ 93-95; Austin Aug. 27, 2008 Report ¶ 9, this increase represents only a

10   concentration in the number of arrests that would have happened in any event and does not

11   affect the total number of arrests.  While the victims of crimes may be different, and we do

12   not underestimate the significance of early release to those victims, our concern under the

13   PLRA is to consider the overall impact on public safety, which we find would be no

14   different.

15         Thus, the testimony by defendant-intervenors regarding the increased arrests that

16   followed early releases in two counties and one city does not undermine our conclusion that

17   early release through an expanded good time credits program could be implemented without

18   adversely affecting public safety.  Defendant-intervenors' witnesses offered the following

19   testimony.  In Orange County in the 1990s inmates were released early due to court-ordered

20   population caps, and a number were rearrested for crimes committed during the time they

21   would otherwise have been in custody.  Ex. DI-628 (July 1, 1997 Sheriff's Presentation on

22   Theo Lacy [Jail] Expansion to Orange County Board of Supervisors); *see also* Dostal Decl.

23   ¶ 11 (Executive Director of Administrative Services for Orange County Sheriff's

24   Department); Dostal Supp. Decl. ¶ 2.  In Los Angeles County, 10% of those released from

25   jail pursuant to an early release program were rearrested during the period of early release,

26   including 16 for murder, over a five-year period.  Rep. Tr. 1811:18-1812:4, 1824:14-15

27   (Smith) (Lieutenant in Los Angeles County Sheriff's Department Custody Support Services

28   Division).  While this evidence may suggest an accelerated arrest pattern, it does not show an

increase in the overall crime rate.  Chief Dyer of the Fresno Police Department testified that

when an increased number of parolees were released in 2005 as part of an earned credits

program, the city experienced an increase in crime, *id.* at 2329:20-2330:11, but his testimony

again did not reveal whether the crime represented only a temporary bulge, whether other

factors affecting crime remained unchanged, or whether a risk assessment tool – which

measures the probability that an offender will recidivate, *see id.* at 2128:24-2129:1, 2132:6-

2134:13 (Krisberg) – was used to target low- to moderate-risk inmates for release.

        In fact, empirical evidence from California's communities demonstrates that early

release programs – as well as diversion, a population reduction measure we discuss in more

detail below – do not increase crime.  Dr. Krisberg reviewed data provided by California and

the FBI and concluded that such programs, which were instituted in twenty-one California

counties between 1996 to 2006, resulted in approximately 1.7 million inmates released by

court order but did not result in a higher crime rate.  Sept. 8, 2008 Krisberg Report at 10.

This is persuasive evidence that the early release program proposed by plaintiffs poses no

threat to public safety or the operation of the criminal justice system.

        Furthermore, if the good time credits system is expanded and programming enhanced,

it is likely that recidivism will decrease.  Expansion of the good time credits system could

include an "increase in the number of credits that prisoners can earn for participation in

programs, or being in compliance with a case management plan."  Rep. Tr. at 1387:16-18

(Austin).  Such an incentive contributes to a decline in recidivism because "it gives [inmates]

what they need [in order] to keep them out of prison in the future," *id.* at 1549:21-22 (Beard),

as determined by an evidence-based assessment of the underlying factors, such as addiction

or lack of vocational skills, that may have driven the inmate's criminal behavior.  *Id.* at

1550:18-1551:19 (Beard); *see also id.* at 1398:21-1399:1 (Austin) (reducing sentence length

due to inmate's completion of an education program is a "win-win" because it lowers the

length, and therefore the cost, of incarceration and lowers the likelihood of the inmate's

recidivism upon release).  The evidence tendered thus confirms the conclusion of the CDCR

Expert Panel that "the public safety benefits of [expanding good time credits] will be a vast

1    improvement over California's current practice of releasing offenders who have not

2    completed rehabilitation programming."  Ex. P2 at 12.

3           Based on all of the above, we conclude that shortening an inmate's length of stay in

4    prison would not increase recidivism rates, and that shortening the length of stay through

5    earned credits would give inmates incentives to participate in programming designed to

6    lower recidivism.  We credit the opinions of the numerous correctional experts that the

7    expansion of good time credits would not adversely affect but rather would benefit the public

8    safety and the operation of the criminal justice system.  We also note that this is the view of

9    the Governor, who has recommended the adoption of an earned credit program as a means to

10   better "facilitate the inmate[s'] reintegration into society."  Ex. P780 at 18 (Governor's

11   Budget, Special Session 2008-09).

12                    2.    Diversion of Technical Parole Violators

13          California has a "very abnormal practice" of sending a high number of technical

14   parole violators to prison for a short of amount of time.[76]  Rep. Tr. 1434:12-14 (Austin);

15   Aug. 15, 2008 Austin Report ¶ 13 (explaining that California's re-arrest rate for parolees is

16   similar to other states, but the high use of imprisonment for parole violations produces a high

17   return to prison rate).  In California, more than 70,000 parolees are returned to prison each

18   year for technical parole violations, approximately 17,000 of whom are "pure technical

19   violators" who have not been arrested for a new crime but have only violated a term or

20   condition of their parole.  Ex. P5 at 72-74; Rep. Tr. at 1739:18-19 (Hoffman).

21          Evidence – including testimony from Thomas Hoffman, Director of the CDCR's

22   Division of Adult Parole Operations – overwhelmingly showed that California's practice of

23   sending parole violators back into the state prison system for an average of four months and

24   incarcerating them during that time in crowded reception centers endangers public safety and

25   burdens the criminal justice system.  *See, e.g.*, Rep. Tr. at 1769:5-13 (Hoffman) (agreeing

26   

27          [76]Technical parole violators are those parolees who have violated their conditions of
     supervised release but have not been convicted of new crimes.  Aug. 15, 2008 Austin Report
28   ¶ 12.  The category includes those who have been arrested for new crimes but were not
     prosecuted or convicted.  *Id.*

that "this churning pattern just postpones victimization and crime" and testifying that "we know it's not working"); Ex. P113 at 78 (Rehabilitation Strike Team Report) ("This system of 'catch and release' makes little sense from either a deterrence, incapacitation, treatment, or economic standpoint.").  According to research by Professor Petersilia, this high return-to-prison rate for parole violators "is creating a destructive situation by constantly cycling offenders in and out of prison and their home communities in a way that blurs the distinction between the two and combines the worst elements of each."  Ex. P5 at 75.  Professor Petersilia found that, among other negative effects, this "churning" or "catch-and-release" disrupts the inmate's ability to participate in community-based rehabilitative programs, encourages the spread of prison-gang culture in communities, wastes parole processing resources, and reduces the deterrent value of prison by "transform[ing] a trip to prison into . . . a trivial and short-lived intrusion on day-to-day criminality."  *Id.* at 76.  Secretary Woodford, the former acting Secretary of the CDCR, agreed with this assessment, based on her experience administering California prisons in various capacities, including as warden at San Quentin.  Rep. Tr. at 1316:23-1317:11; *see also* Ex. D1196 at DEFS021721 (Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions) ("[C]hurning is costly, does little or nothing to promote public safety and frustrates real efforts at rehabilitation.").  Dr. Gilligan, plaintiffs' mental health expert, testified that this practice has a particularly adverse impact on the mentally ill, who are not given adequate treatment or transition plans because of the short length of their return to prison.  Aug. 15, 2008 Gilligan Report ¶ 33.

This churning, and its adverse effects, could be stopped in several ways.  One is to use a parole revocation instrument to determine whether parole violators should be sent back to prison.  Rep. Tr. at 1385:11-21 (Austin); Aug. 15, 2008 Austin Report ¶ 52.  Such an instrument has been implemented in a number of states, including Pennsylvania, South Carolina, New Jersey, Oregon, Georgia, Iowa, Kansas, South Dakota, and Texas.[77]  *Id.*; Rep. Tr. at 1564:4-1565:8 (Beard).  The CDCR has already started implementing reform of the

---

[77]Washington State has a law that prevents technical parole violators from being returned to prison.  Aug. 15, 2008 Lehman Report ¶ 16.

1   parole system and has developed a "Parole Violation Decision Making Instrument." *Id.* at

2   1678:15-25 (Cate); Hoffman Trial Aff. ¶¶ 8-13; Ex. D1198 (Sept. 30, 2008 Letter from

3   Jessica R. Devencenzi, Deputy Attorney General, to Michael Bien, Rosen Bien & Galvan,

4   LLP).  Secretary Cate called the use of the parole revocation instrument one of the "best

5   practices" in the area of parole reform.  Rep. Tr. at 1706:9-14 (Cate).  Dr. Austin noted a

6   number of other ways to reduce the return of technical parole violators to prison, including

7   prohibiting parole violators from being readmitted to prison for technical violations, reducing

8   the period of parole supervision, and instituting an incentive program for parole agents.

9   Aug. 15, 2008 Austin Report ¶¶ 51-54.  The Governor has proposed placing all "non-serious,

10  non-violent, non-sex offenders" on summary parole.  *See* Ex. P780 at 18 (Governor's

11  Budget, Special Session 2008-09); Jan. 16, 2009 Sturges Decl. ¶ 2 & Ex. A at 28 (2009-10

12  Governor's Budget); Ex. P328 at 178 (Governor's Budget Summary 2008-09).  All of these

13  options may be considered by the state and implemented in a manner that would be

14  consistent with its ultimate objectives.

15      The use of a "best practices" instrument, as well as other methods referred to above, to

16  reduce the number of parole violators returned to the state prison system, if properly

17  implemented, would not have an adverse impact on public safety or on the criminal justice

18  system.  At the very least, slowing the flow of technical parole violators to prison would

19  mitigate the dangerous crowding at reception centers and ease the burden on the parole

20  processing system.  It would free up space in the reception centers so that those centers could

21  be used for their original purpose: sorting inmates into the right correctional settings.  It

22  would give parolees a better opportunity to participate in continued rehabilitative

23  programming in the community, and it would likely improve a system that currently

24  "undercut[s] the deterrent effect of serving prison time." Ex. P5 at 76.  We agree, for

25  example, with the assertion of the CDCR's Director of Adult Parole Operations that the use

26  of a parole revocation instrument in California would "reduce future victimization, increase

27  public safety, and enhance the ability of offenders to become more productive members of

28  the community."  Hoffman Trial Aff. ¶ 10.

147

1    Additionally, public safety would improve if technical parole violators who are not

2    returned to prison were diverted to alternative sanctions in the community, including drug

3    treatment, day reporting centers, electronic monitoring, and, if necessary, county jail.[78]  *See*

4    Rep. Tr. at 1318:21-1319:2 (Woodford).  The CDCR already has alternative sanctions

5    programs and is working on expanding the scope and availability of such programs.

6    Hoffman Trial Aff. ¶¶ 19-25.  Many of these programs address the offender's criminogenic

7    factors and can thus reduce recidivism.  *Id.*  The use of graduated sanctions would serve the

8    same deterrent purpose as imprisonment while effectively reducing recidivism.  *See*

9    Woodford Aug. 15, 2008 Supp. Report ¶ 32 ("Sanctions other than incarceration are effective

10   in punishing many prisoners and at the same time reducing the risk of recidivism."); Rep. Tr.

11   at 2194:19-2195:18 (Bennett) ("We need to have meaningful, immediate, certain sanctions.

12   And it doesn't have to be a return to prison.  We can develop sanctions at the local level. . . .

13   We can have a more effective sanction without interrupting individuals' lives and returning

14   them to prison.").  Former CDCR Secretary James Tilton stated that he believed that these

15   alternative community sanctions programs would improve public safety over time.  Sept. 3,

16   2008 Tilton Dep. at 153:4-154:3.

17   CDCR officials and experts overwhelmingly supported the use of the parole

18   revocation instrument and the diversion of technical parole violators to alternative sanctions

19   in the community.  Scott Kernan, the CDCR's Undersecretary of Operations, stated that

20   "[t]hese efforts have proven to reduce prison population while maintaining public safety."

21   Kernan Trial Aff. ¶ 23.  Experts for plaintiffs, defendants, and defendant-intervenors testified

22   in favor of the diversion of technical parole violators.  *E.g.*, Aug. 15, 2008 Lehman Report

23   ¶ 16; Rep. Tr. at 1993:6-8 (Marquart); *id.* at 2194:19-2195:18 (Bennett); Buddress Trial

24   Decl. ¶ 3.  The Governor's Rehabilitation Strike Team urged the use of the parole violation

25   instrument and diversion, concluding that "[s]imilar 'best practices' proposals have worked

26   in other states to better prepare inmates for re-entry, reduce prison returns, protect public

27   safety, and reduce the costs of corrections."  Ex. P113 at 17, 89-90.  The three reports of

28   [78]We discuss the likely impact of these measures on the counties *infra* Section VII.C.

1   independent commissions presented to the state – the CDCR Expert Panel Report, the

2   Corrections Independent Review Panel Report, and the Little Hoover Commission Report –

3   also recommended the diversion of technical parole violators.  *See* Ex. P2 at 47-49; Ex. P3 at

4   31; Ex. P4 at 154, 158-59.  In fact, according to the CDCR Expert Panel, fifteen reports

5   published since 1990 on California's prison crisis have recommended the diversion of

6   technical parole violators.  Ex. P2 at 77.

7          We conclude that simply slowing the flow of technical parole violators to prison,

8   thereby substantially reducing the churning of parolees, would by itself improve both the

9   prison and parole systems, and public safety.  Diversion of parole violators to community

10  alternative sanctions programs would serve to significantly reduce recidivism.  We therefore

11  find that diverting parole violators to alternative community sanctions programs would

12  reduce the prison population while having a positive rather than a negative effect on public

13  safety and the operation of the criminal justice system.

14                 3.      Diversion of Low-Risk Offenders with Short Sentences

15         Plaintiffs also propose reducing the prison population by diverting low-risk offenders

16  with short sentences for community sanctions.  Rep. Tr. 1385:22-1386:21 (Austin); Aug. 15,

17  2008 Austin Supp. Report ¶¶ 58-61.

18         According to Dr. Austin, a substantial number of inmates enter the California prison

19  system with sentences of less than twenty-four months, the largest group of which are those

20  with a sixteen-month sentence, many of whom have already served up to seven months of

21  their sentence in a county jail.  Rep. Tr. 1386:2-1386:12; Aug. 15, 2008 Austin Supp. Report

22  ¶ 60 & tbl. 5.  Under current policies, these inmates can halve the remaining periods of their

23  sentences by earning work credits, with the result that these inmates serve only a few months

24  in state institutions – an amount comparable to that served by technical parole violators.

25  Rep. Tr. 1386:2-1386:12.  Like the technical parole violators, these inmates are unlikely to

26  participate in any meaningful programming during their short term of imprisonment.  *See*

27  Aug. 15, 2008 Austin Report ¶ 60 ("A diversion program would eliminate a short period of

28

149

1  imprisonment within the CDCR (during which the prisoner is unlikely to become involved in

2  any meaningful programming). . . .").

3        Instead of incarcerating all of these offenders, the CDCR could use risk assessment

4  instruments to identify low-risk offenders and divert these offenders to community

5  correctional programs to serve their sentences.  *See* Rep. Tr. 1386:13-21 (Austin).  The state

6  might also consider implementing incentive-based funding for community corrections,

7  similar to that adopted by California in the 1960s, when the state provided fiscal rewards to

8  counties that reduced the number of people being sent to prison.  *See* Rep. Tr. at 1042:4-14

9  (Powers).  This would require the diversion of only a portion of the funds that adoption of the

10  reforms discussed herein would save the state.

11        A number of correctional and law enforcement experts opined that the diversion of

12  low-risk offenders would not have an adverse impact on public safety or the operation of the

13  criminal justice system.  Secretary Woodford stated, based on her prior experiences as the

14  chief probation officer of San Francisco, warden of San Quentin, and acting Secretary of the

15  CDCR, that California "incarcerates many more prisoners than is necessary for the safety of

16  the public."  Aug. 15, 2008 Woodford Supp. Report ¶ 32.  She stated that there are

17  intermediate sanctions available, and that California would have safer communities if it used

18  those sanctions rather than incarceration in appropriate circumstances.  *Id.*  The use of such

19  intermediate sanctions would not significantly affect deterrence, as sanctions short of

20  imprisonment have deterrent value so long as they are "meaningful, immediate, and certain."

21  *See, e.g.*, Rep. Tr. at 2194:19-2195:18 (Bennett).

22         Law enforcement officials from the counties also testified that diversion could

23  improve public safety if implemented correctly.  *See, e.g.*, James Trial Decl. ¶¶ 6-7 (Orange

24  County Assistant Sheriff); Rep. Tr. at 2369:5-12 (Dyer); Buddress Trial Decl. ¶¶ 10-11.

25  According to these local law enforcement officials, offenders who have not been to prison

26  "are easier to program [and] treat . . . before they have been exposed to (and potentially

27  trained by) more hardened and experienced criminals in the state prison system."  James

28  Trial Decl. ¶ 20; *see also* Rep. Tr. at 1052:16-1053:10 (Powers) ("[S]o you put someone who

1  is a low risk, low level person into an environment[] with high risk individuals, they don't

2  naturally get better.  They gravitate up.  So when they come out, they are worse off.").

3  According to the testimony of law enforcement and county officials, many counties now

4  successfully divert offenders from jail to substance abuse programs, correctional day

5  reporting centers, and electronic monitoring.  *See, e.g.*, *id.* at 2276:19-2277:1 (Graves); *id.* at

6  2798:3-24 (Hennessey) (City and County of San Francisco Sheriff); Dalton Am. Trial Decl.

7  ¶¶ 33-35.  Thus, successful models for community corrections are already in place, and,

8  although the characteristics of the populations that they currently serve may be different from

9  the prison population, they can be expanded to serve an increase in diverted offenders with

10  proper funding and coordination between the state and the counties.  *See, e.g.*, Aug. 15, 2008

11  Garner Report at 6 (Director of Santa Clara County Department of Alcohol and Drug

12  Services) ("Local treatment systems exist in every county and with adequate state funding

13  they can be expanded to accommodate the proposed increase in clients resulting from early

14  release of prisoners."); Meyer Am. Trial Decl. ¶ 69.  An expert for the law enforcement

15  intervenors testified that if the state were to establish such programs on a statewide or

16  county-by-county level, the prison population could be reduced, by that reform alone, by

17  about 30%, as a conservative estimate, in two to five years.  Rep. Tr. at 2771:4-10 (Meyer).[79]

18       The opinion of these California correctional and law enforcement experts was

19  confirmed by Dr. Beard, the Secretary of the Pennsylvania Department of Corrections, who

20  testified regarding Pennsylvania's success in implementing an intermediate punishment

21  program that diverts offenders from jails and prisons to substance abuse programs.  *Id.* at

22  1554:20-1556:20.  A study of that program found that inmates in the program had lower

23  recidivism rates than those sent to county jails or state prisons.  *Id.* at 1555:2-5.  Dr. Beard

24  testified that "the research is really clear out there that community-based programming is

25  actually more effective than prison-based programming."  *Id.* at 1555:21-23.  Such

26  programming can contribute to rehabilitation without taking the offender away from the

_____

27       [79]The witnesses for defendant-intervenors expressed concern that neither the state nor

28  the counties have the funds to expand the community correctional system.  We address this
     concern below.  *Infra* Section VII.C.

1    community and creating the problems of re-entry upon release from prison. *Id.* at 1556:1-14.

2    According to Dr. Austin, other states, including Ohio and Michigan, have also successfully

3    adopted diversion programs without an adverse effect on crime. *E.g.*, *id.* at 1399:2-15.

4         There was testimony that some individuals on electronic monitoring or in other

5    alternative programs have committed crimes, *e.g.*, *id.* at 1179:23-1180:3 (Powers), and we

6    acknowledge that diversion programs cannot stop all crime.  But, again, the individuals to be

7    diverted are those who would have been released from prison a few months later in any

8    event, after being exposed to "more hardened and experienced criminals."  James Trial Decl.

9    ¶ 20.  Thus, the incidents that have occurred during participation in alternative programs do

10   not undermine the weight of the testimony that diversion programs have an overall positive

11   effect on public safety and the operation of the criminal justice system.

12        We therefore conclude that the diversion of offenders to community correctional

13   programs has significant beneficial effects on public safety and the operation of the criminal

14   justice system as compared to the current system, including preventing the exposure of

15   offenders to criminogenic conditions, providing effective rehabilitation, and avoiding a

16   disruption in the offender's life that creates re-entry problems upon release.

17            4.    Expansion of Evidence-Based Rehabilitative Programming in Prisons or

18                  Communities

19        Every witness, from the CDCR's Undersecretary of Programming to law enforcement

20   officers and former heads of correctional systems, testified that an increase in the availability

21   of evidence-based rehabilitative programming – i.e., programs that research has proven to be

22   effective in reducing recidivism, Rep. Tr. at 1042:19-1043:14 (Powers) – in the prisons or in

23   the communities would reduce the prison population and have a positive impact on public

24   safety. *See, e.g.*, *id.* at 1721:16-22 (Jett); *id.* at 1159:14-19 (Powers); *id.* at 1962:15-23

25   (Marquart); *id.* at 2009:15-2010:1 (Lehman); *id.* at 2728:6-18 (Runner); *id.* at 2385:2-14

26   (Pacheco) (Riverside County District Attorney); Meyer Am. Trial Decl. ¶¶ 46-52.  Research

27   from Washington State concluded that an expansion of evidence-based programming would

28   reduce the prison population, while leading to a net decrease in the crime rate. *See*

1   Ex. D1331 at 15 (Oct. 2006 Washington State Institute for Public Policy report, "Evidence-

2   Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs,

3   and Crime Rates").

4           Experience demonstrates the benefits of evidence-based programming.  Missouri and

5   Washington have successfully and safely reduced prison populations through such

6   programming.  *See* Rep. Tr. at 2767: 21-2768:11 (Meyer).  Moreover, the evidence from the

7   law enforcement intervenors and county intervenors overwhelmingly showed that there are

8   already models for successful evidence-based programs all over California, from Yolo

9   County to San Diego County, that have reduced recidivism and thus improved public safety

10  in those communities.  *See, e.g.*, *id.* at 2784:25-2785:4 (Meyer); *id.* at 2803:19-2804:1

11  (Hennessey); Rodriguez Trial Decl. ¶¶ 20-21; Aug. 15, 2008 Bennett Report app. C ch.3

12  ("Chapter Three: Alternatives to Incarceration" from July 2007 "Sonoma County, California:

13  Corrections Master Plan").  As Chief Probation Officer Meyer stated, successful models "are

14  on the shelf" and ready to be implemented.  Rep. Tr. 2784:25-2785:4.

15           As discussed above, the CDCR has also already begun to design and implement an

16  expansion of rehabilitation services for inmates and parolees.  *See* Jett Trial Aff. ¶¶ 6-13;

17  Ex. P79 (July 15, 2008 California Rehabilitation Oversight Board Biannual Report).  We

18  agree with Undersecretary Jett, who oversees this process, that its successful implementation

19  would lead to a reduction in recidivism and a reduction in the prison population.  *See* Jett

20  Trial Aff. ¶ 13.[80]  Improvements in the implementation of the process will become

21  increasingly likely as the reduction in the prison population occurs.  The two functions are, in

22  practicality, related.

23          Based on the overwhelming and uncontroverted evidence, we find that additional

24  rehabilitative programming would result in a significant population reduction while

25  improving public safety and reducing the burden on the criminal justice system.  If

26  implemented in conjunction with any or all of the population reduction measures described

27

28          [80]Successful implementation of such programming will, of course, require space that
     is currently not available in California's prisons.

1   above, such programming would enhance the likelihood that recidivism will decline as the

2   prison population is decreased.  Moreover, if implemented within the state prison institutions,

3   such programming would have a synergistic effect on the ability of inmates to reduce their

4   sentences by earning good time credits.

5              5.      <u>Sentencing Reform and Other Potential Population Reduction Measures</u>

6          The evidence at trial focused primarily on the potential effects of the population

7   reduction measures proposed by plaintiffs.  However, there are other means as well by which

8   the state could reduce its prisoner population, and the state is in no way bound by plaintiffs'

9   proposals.  For example, Expert Panel co-chair Professor Joan Petersilia reported that fifteen

10  studies have been issued regarding California prisons since 1990, all containing essentially

11  the same ten recommendations.  Ex. P2 at 77-79.  Those recommendations include not only

12  the four population reduction measures proposed by plaintiffs, but also reformation of the

13  state's determinate sentencing regime "to reward prisoners for participating in rehabilitation

14  programs and allow the system to retain prisoners who represent a continued public safety

15  risk," the creation of a sentencing reform commission "authorized to design new sentencing

16  statues into a workable system that balances uniformity of sentencing with flexibility of

17  individualization," and the release or diversion of certain "[s]ub-populations, such as women,

18  the elderly and the sick" from prison to community-based facilities.  *Id*. at 77.  Also, as noted

19  above, the state has suggested that its prison population might be reduced through the

20  transfer of inmates out of state or into federal custody.  The state is certainly free to include

21  any of these alternatives in its proposed population reduction plan should it be able to

22  establish the feasibility and the positive effects of such programs, especially their

23  compatibility with public safety.

24          Like plaintiffs' proposed population reduction measures, the other measures discussed

25  by Professor Petersilia generally would have a positive effect on public safety.  In particular,

26  the repeated recommendation that the state establish a sentencing commission and reform its

27  determinate sentencing regime reflects an urgent need for the state to reconsider its

28  counterproductive sentencing practices.  As the Little Hoover Commission reported,

154

California's present sentencing regime is a "chaotic labyrinth of [sentencing] laws with no cohesive philosophy or strategy." Ex. P3 at 35. The state's sentencing laws promote certainty in the length of sentences at the expense of public safety: Because release at a particular date is certain, offenders have little incentive to improve themselves in prison or while on parole,[81] and offenders must be released even if they pose a serious threat to the community. *Id.* at 34. In addition, sentencing judges and prison authorities have little ability to ensure that sentences and conditions of incarceration reflect the circumstances of a particular crime and offender. Similarly, characteristics suggesting that the offender presents a low-risk of recidivism or would more effectively serve his sentence in a correctional setting besides prison, including the fact that the offender is elderly or infirm, cannot be considered. "[California sentencing] law treats many crimes alike, even when the circumstances of an individual case or the characteristics of the offender might warrant a different resolution that would better benefit victims and the community." *Id.* at 36. Furthermore, the present system leads to "overreliance on the most expensive sanction – state prison – instead of local correctional alternatives that could provide more effective and efficient punishment." *Id.* Finally, the "countless increases in the length of criminal sentences" over the last few decades do not reflect a coherent sentencing policy and also may not serve the state's sentencing goals. *Id.* at 33, 35, 48. Public safety is not benefitted by blindly approving of the continued incarceration of prisoners who pose little threat of committing further crimes. Like a number of other official bodies, the Little Hoover Commission recommended that a sentencing commission be established to "develop sentencing guidelines, as well as post release supervision and revocation guidelines that [would] become law unless rejected by a majority vote of the Legislature," *id.* at 48.

The establishment of a sentencing commission is but one approach to addressing the problems in the state's sentencing laws; there are undoubtedly others. Regardless of the approach adopted by the state, however, it is clear that California's sentencing regime ill-

---

[81]However, according to the Commission, "incentives can be built into the existing sentencing structure to improve public safety and offender outcomes." *Id.* at 37.

1   serves the state's interests, and that the overcrowding crisis in California's prisons provides

2   an opportunity for the state to reconsider its sentencing practices.  Numerous reports have

3   recommended sentencing reform and established that such reform would, if implemented,

4   have a positive impact upon public safety.  *See id.* at 38-42 (describing the positive public

5   safety effects in various states of their use of a sentencing commission).  Given the fact that

6   legislative bodies tend to vote only to increase sentences and not to reduce them, however,

7   and given the questionable nature of California's initiative process, there appears to be little

8   or no hope of a serious review of sentencing laws or policies in the absence of some

9   extraordinary state action.

10          The state might also consider changing the criminal law itself.  For example, the

11   Governor has proposed adjusting the threshold value at which certain property crimes

12   become felonies to reflect inflation since 1982.  Ex. P780 at 18 (Governor's Budget: Special

13   Session 2008-09); Jan. 16, 2009 Sturges Decl. Ex. A at 28 (2009-10 Governor's Budget).

14   Such a change would reclassify crimes falling below the adjusted threshold as misdemeanors.

15   Likewise, the state might consider permitting low-risk offenders, such as the elderly or the

16   infirm, to serve the latter portions of their sentences in community corrections facilities or on

17   house arrest.  Both of these proposals would reduce the prison population by diverting certain

18   offenders to alternative placements rather than prison.  Both have also been endorsed by state

19   officials, a strong indication that the proposals would not have an adverse effect on public

20   safety.

21          The parties introduced no evidence as to the effect on public safety of the transfer of

22   inmates out-of-state or into federal custody, so we cannot consider those measures in detail at

23   this time.  As we have already explained, however, the out-of-state transfer program

24   proposed by defendants is far too small, by itself, to make more than a dent in the problem of

25   overcrowding, and the additional resources required to monitor the medical and mental

26   health care provided to transferred inmates could eliminate any benefits that otherwise result

27   from such transfers.  Furthermore, by moving inmates far away from their places of residence

28   and making contact with families and friends unavailable, such transfers may reduce the

1    inmates' prospects for rehabilitation.  The transfer of undocumented aliens to federal custody

2    might involve a larger number of inmates, but this suggestion was not sufficiently developed

3    to permit any extended analysis of its effect upon public safety and the operation of the

4    criminal justice system.[82]

5                    **C.    Impact of Proposed Measures on Communities**

6          Law enforcement and other witnesses from the communities testified that plaintiffs'

7    proposed prisoner release order would result in an overwhelming increase in the number of

8    crimes, arrests, and jail inmates, thus adversely affecting their ability to investigate,

9    prosecute, and punish crime.  We cannot accept their opinions, however, to the extent that

10   they are based on the assumption that a "prisoner release order" would involve such drastic

11   measures as a mass early release and/or a ban on the admission of new offenders to prison.

12   We credit the concern of some witnesses, however, that resources at the community level are

13   strained, particularly because of the current fiscal crisis.  *See, e.g.*, Cogbill Trial Decl.

14   ¶¶ 29-38 (Sonoma County Sheriff-Coroner); Boesch Trial Decl. at 8-9 (San Mateo County

15   Assistant County Manager); Aug. 15, 2008 Graves Report at 3-4.  Nonetheless, as we discuss

16   below, the evidence demonstrates that the fears regarding increased crime, arrests, and jail

17   populations are largely unjustified, and that there are ways to achieve a reduction in

18   California's prison population without unduly burdening the already limited resources of

19   local communities.

20              1.       Investigation and Prosecution of Crime

21         Defendant-intervenors presented credible evidence that California's local law

22   enforcement resources are currently overtaxed.  There are not enough judges, prosecutors,

23   public defenders, police officers, or resources to support their necessary work, and the

---

24   [82]The only evidence in the record on this proposal is testimony from one witness,
     California State Senator George Runner, that California prisons house roughly 30,000 illegal
25   aliens, which is disproportionately high when compared to other states, and that federal
     reimbursement is insufficient to cover the costs of housing these inmates.  Runner Trial Decl.
26   ¶¶ 6, 19; Rep. Tr. at 2728:19-2729:12.  We received no testimony on the feasibility of
     transferring all or even a portion of these inmates to federal custody, and no testimony
27   regarding any potential impact on public safety or the operation of the criminal justice system
     of such a transfer, including whether the prisoners might be swiftly deported and just as
28   swiftly re-cross the border into California shortly thereafter.

1  situation has worsened with the economic downturn.  *See, e.g.*, Rep. Tr. at 2197:5-2199:9

2  (Bennett); *id.* at 1856:13-21 (Word) (City of Vacaville Police Chief); Word Trial Decl. ¶ 25.

3  The courts are severely clogged with cases and are several years behind on trials.  *See* Meyer

4  Am. Trial Decl. ¶ 43; Ryan Trial Decl. ¶ 28 (Amador County Sheriff-Coroner).  Any

5  significant increase or concentration in crime would likely further hamper investigations and

6  prosecutions.  *See, e.g.*, Ryan Trial Decl. ¶¶ 27-28; Dumanis Trial Decl. ¶ 33; Dyer Am.

7  Report ¶ 28; Rep. Tr. at 1179:5-17 (Powers).

8          The population reduction measures described above, however, would not result in the

9  significant increase in crime that many witnesses opposed to the measures believe would

10  occur.  As explained above, many witnesses wrongly assumed that this court would require a

11  sudden mass release of one-third of California's prisoners or a ban on accepting new or

12  returned prisoners.  *See, e.g.*, Rep. Tr. at 1052:8-12 (Powers); Aug. 15, 2008 Bennett Report

13  ¶¶ 13,18.  That approach was not proposed by any party, nor would it be approved by the

14  court.

15          Many witnesses also testified that, at present, a large number of crimes are committed

16  by parolees, *see, e.g.*, Rep. Tr. at 2331:1-8 (Dyer); parolees have a high rate of recidivism,

17  *e.g.*, Meyer Am. Trial Decl. ¶¶ 39-40;[83] and more crimes occur than are reported to the

18  police, *e.g.*, Rep. Tr. at 1506:21-1507:20, 1508:11-19 (Austin).  The parolees who would be

19  released early to communities under the proposed measures, however, are the ones who are

20  least likely to commit further offenses and who along with their fellow parolees would be

21  released in any event a few months later.  Indeed, the evidence describing the criminogenic

22  nature of the California prisons suggests that the longer an inmate remains incarcerated, the

23  more likely he is to reoffend upon release.  *See*, *e.g.*, Rep. Tr. at 1580:5-9 (Beard); *id.* at

24  2013:14-2014:1 (Lehman); Ex. P3 at 17.  The relevant question for us to examine is not the

25  absolute impact of the current population of parolees on local criminal justice systems, but

26

27          [83]This testimony does not take into account that the recidivism rate for parolees is high
    in California in part because the state returns most technical parole violators to prison.  *See*
28  Aug. 15, 2008 Austin Report ¶13.

1    the relative impact on the criminal justice system of the additional parolees in the community

2    because of the proposed population reduction order.

3            The evidence shows that any such impact would be small.  The expanded award of

4    good time credits proposed by Dr. Austin, for example, would result in only a temporary

5    increase in the return of parolees to communities during the initial period of implementation.

6    Rep. Tr. at 1408:13-21 (Austin); Aug. 15, 2008 Austin Report ¶¶ 93-94.  Although the

7    increase in parolees could result in a temporary increase in arrests during the initial period of

8    accelerated release, these arrests would represent an increase of only approximately 0.3%

9    during that period.  Rep. Tr. at 1490:17-1491:25; *see also* Aug. 27, 2008 Austin Supp. Report

10   at 10; Rep. Tr. at 1479:13-1480:5.  Similarly, the impact of the proposed diversion of

11   technical parole violators and low-risk offenders on the total number of arrests in each

12   county, and statewide, would be an increase of less than 1%.  *See* Aug. 27, 2008 Austin

13   Supp. Report at 10.  All of these individuals would in any event be released to the

14   community after a fairly short period of incarceration, following their going through the

15   churning process, in which they are subjected to criminogenic influences.  Further, all of the

16   figures noted above are consistent with the testimony described earlier that plaintiffs'

17   proposed population reduction measures do not threaten public safety or the operation of the

18   criminal justice system.

19           Any increase in the arrests of parolees resulting from the population reduction

20   measures would actually be smaller than that calculated by Dr. Austin and by many

21   defendant-intervenors.  These witnesses assumed that prisoners released due to good time

22   credits or diverted to alternative sanctions would recidivate at a rate of 70% over a three-year

23   period, the average recidivism rate for all prisoners in California.  *See, e.g.*, Rep. Tr. at

24   2628:8-25 (Austin); Dyer Am. Report ¶ 18; Dostal Trial Decl. ¶ 14.  However, if a risk

25   assessment instrument were used to implement such measures, the CDCR would be able to

26   identify low-risk inmates whose likelihood of recidivism would be considerably lower than

27   that of the average inmate.  Rep. Tr. at 2628:8-25 (Austin); *id.* at 2133:8-11 (Krisberg) ("If

28   one is selecting low risk inmates, you would expect the recidivism rate would be lower

1   because that 70 percent rate consists of people with much higher risk and people with lower

2   risk."). According to Director Hoffman, low-risk inmates have an average recidivism rate of

3   just 17%. Rep. Tr. at 1750:1-6. Furthermore, as we found above, it is likely that recidivism

4   rates would begin to drop as plaintiffs' proposed measures were implemented. The proposed

5   population reduction measures would therefore not result in a significant additional burden

6   on the ability of law enforcement officers to investigate or prosecute crime.

7                              2.        Effect on Jail Population

8              Defendant-intervenors also presented credible evidence that California's jails are, for

9   the most part, already overcrowded, resulting in adverse public safety and criminal justice

10  effects. Thirty-two of California's county jails are under some type of court-ordered

11  population cap, Rep. Tr. at 2198:3-9 (Bennett); Ex. DI-774,[84] and many that are not have

12  inmate populations close to or above their design capacity. *E.g.*, Rep. Tr. at 2684:22-23,

13  2686:15-22 (Ryan); Boesch Trial Decl. at 12. As expected, this overcrowding – even at

14  levels much lower than in the state prison system – has limited the counties' capacity to

15  provide services in the jails or to maintain a safe correctional environment for the detainees,

16  the staff, and the community. *See, e.g.*, Boesch Trial Decl. at 12; Munks Trial Decl. ¶¶ 7-9;

17  Rep. Tr. at 2702:5-17 (Ryan); Dostal Trial Decl. ¶¶ 15, 17.

18             As a result of this crowding problem, counties already routinely engage in the early

19  release of jail inmates. *See, e.g.*, Rep. Tr. 1803:23-1804:9 (Smith) (stating that in 2007, Los

20  Angeles County released about 50,000 inmates early from its jails); Rep. Tr. at 2364:17-19

21  (Dyer); Rep. Tr. at 2378:13-18 (Pacheco); James Trial Decl. ¶ 19; Ingrassia Trial Decl.

22  ¶¶ 12-13 (Sheriff's Commander assigned to San Diego County Sheriff's Detention Services

23  Bureau). County law enforcement officials testified that any significant limit on the prison

24  population would force them to initiate the early release of jail inmates or to expand extant

25  early release programs to include higher-risk inmates. *See, e.g.*, Rep. Tr. at 2388:8-2391:16

26  (Pacheco); *id.* at 2668:7-14 (Christianson) (Stanislaus County Sheriff-Coroner); Munks Trial

27  _____

28       [84]Many of the caps for the county jails are set at or near 100% design capacity. *See*
    Ex. DI-774.

1    Decl. ¶¶ 11-12; Ingrassia Trial Decl. ¶ 12.  According to these witnesses, such early releases

2    lower the deterrence value of incarceration, increase crime, reduce incentives for offenders to

3    participate in programming, and result in a high failure-to-appear rate for pre-trial defendants

4    who are not incarcerated.  *See, e.g.*, Aug. 15, 2008 Bennett Report ¶ 27; Rep. Tr. at 1179:18-

5    1180:3 (Powers); *id.* at 1819:9-1821:19 (Smith).

6           We need not determine whether an acceleration of early release from jails would have

7    the pernicious effects anticipated by the law enforcement witnesses because evidence shows

8    that any increase in parolees and probationers resulting from plaintiffs' proposed population

9    reduction measures would not have a significant effect on the population of the county jails.

10   These measures would adversely affect the jail population only if the additional parolees or

11   probationers in the community were incarcerated in jail for arrests for new crimes or as a

12   sanction for failing to complete community-based diversion programs.  As Sheriff Munks of

13   San Mateo County noted, however, only "a very, very small percentage of th[e]

14   overcrowding [in jails] is attributable to parolees who have been arrested and returned to

15   [the] jail."  *Id.* at 1790:16-17 (Munks).  Given the small adverse effect that the increase in

16   parolees and probationers would have on the total arrests in each county, this increase is not

17   likely to have a significant effect on the county jail population.[85]  *See id.* at 1409:2-23

18   (Austin); *see also id.* at 1830:21-1831:23 (Smith) (population reduction order of 52,000

19   inmates, even when calculated using the high 67.5% recidivism rate, would result in an

20   increase of only 20 admissions a day in the Los Angeles County jail system, which books

21   from 300 to 1,100 inmates every day).  The diversion of technical parole violators could even

22   serve to reduce the jail population because those offenders would no longer have to be kept

23   in county jail pending their transfer to CDCR facilities.  Aug. 15, 2008 Austin Report ¶ 88.

24

25   _____

26       [85]We reject some of the witnesses' calculations of the impact of a population reduction
     order on the county jails.  Sheriff Munks, for example, agreed during trial that the method he
27   used to calculate the impact of a population reduction order on the jail population was
     inconsistent with the county's current experience with parolees.  Rep. Tr. at 1794:19-22.
28   Sheriff-Coroner Christianson admitted that he did not know how his staff calculated the
     estimated impact on his jail population.  *Id.* at 2680:4-7.

1    In any event, the implementation of plaintiffs' proposed population reduction measures

2    would not significantly exacerbate overcrowding in the various county jails.

3                    3.    Effect on Parole Supervision Resources

4           Plaintiffs' proposed population reduction measures would result in an increase in the

5    population of parolees in the community at any given moment.  Defendant-intervenors argue

6    that the parole departments would not be able to supervise the increased number of parolees,

7    and that inadequate supervision would lead to an increase in recidivism.  They presented

8    evidence that, even at present, parole departments are overburdened and cannot adequately

9    supervise the parolees, leading to parolees' failure to integrate into society.  *See, e.g.*, Dyer

10   Am. Report ¶¶ 6, 32; Rep. Tr. at 1856:13-21 (Word).

11          The evidence shows, however, that many of the current problems with parole

12   supervision are created by the poor allocation of resources.  California's parole system is

13   significantly out of step with that of the other states.  California is the only state that puts

14   every inmate leaving the prison system on parole, usually for one to three years.  Rep. Tr. at

15   1756:16-22 (Hoffman); Ex. P113 at 75 (Rehabilitation Strike Team Report).  "The upshot is

16   that California's parole system is so overburdened that parolees who represent a serious

17   public safety risk are not watched closely enough, and those who wish to go straight cannot

18   get the help they need."  Ex. P113 at 15.

19          The evidence conclusively showed that public safety would not be adversely affected

20   by releasing low-risk, nonserious, nonviolent offenders from the prison system without

21   placing them on parole supervision.  Such individuals can be identified using a risk

22   assessment tool.  *See* Rep. Tr. at 1406:6-1407:10 (Austin).  Hoffman, the CDCR's Director

23   of Adult Parole Operations, testified that "the science and evidence . . . do[] support a

24   conclusion that there is a percentage of the parole population that shouldn't be supervised or

25   supervised very little; that at the low end of the spectrum supervision is counter productive."

26   *Id.* at 1758:6-10.  Secretary Woodford also opined that reducing the supervision of low-risk

27   offenders would reduce recidivism and crime, *see id.* at 1323:9-24 (Woodford), and the

28   Rehabilitation Strike Team's report reached the same conclusion, Ex. P113 at 15-17.  Most

                                              162

1    of the states in the country do not supervise low-risk offenders at all.  Rep. Tr. at

2    1759:23-1760:7 (Hoffman).

3            Parole could also be shortened to one year for those who comply with their terms of

4    release and meet certain other criteria.  This "earned discharge" strategy for parolees would

5    provide incentives for parolees to conform to their parole supervision requirements or to

6    participate in programming.  Ex. P2 at 13 (CDCR Expert Panel Report); Ex. P113 at 82-84

7    (Rehabilitation Strike Team Report); Ex. P600 at CDCR015633 (CDCR Division of Adult

8    Parole Operations, "White Paper: Earned Discharge"); *see also* Aug. 15, 2008 Austin Report

9    ¶ 53.  At the same time, it would not adversely affect recidivism because there is no proven

10   relationship between time on parole and recidivism.  Aug. 15, 2008 Austin Report ¶ 77.  It

11   would also allow the CDCR to reallocate resources to moderate- and high-risk offenders

12   "who require, and benefit from, improved supervision and evidence based programming."

13   Ex. P600 at CDCR015633.  Such strategies have been successful across the nation in

14   lowering recidivism rates.  *Id.*  Both the Governor's Rehabilitation Strike Team and the

15   CDCR Expert Panel recommended implementing the earned discharge strategy for parolees

16   as a way to improve the parole system and reduce recidivism.  Ex. P2 at 13; Ex. P113 at

17   16-17.

18           Based on this evidence, we find that shortening the length of parole or limiting the use

19   of parole for certain offenders would ease the present burden on the parole system.  These

20   reform efforts would also improve the public safety impact of the parole system by

21   concentrating resources on high-risk offenders who need supervision and by offering

22   incentives to all offenders to participate in rehabilitative programming.

23           Both Dr. Austin and the CDCR Expert Panel included parole reform along the lines

24   described above in their packages of measures to reduce the prison population without

25   adversely affecting public safety or the operation of the criminal justice system.  We find

26   their recommendations persuasive, and conclude that the implementation of parole reform –

27   which is already in progress – would allow local parole systems to safely absorb any increase

28   in the number of parolees resulting from the proposed population reduction measures.

1          4.     Impact on Community Corrections, Rehabilitative Services, and

2                 Re-entry Programs

3          Defendant-intervenors also argued that the influx of parolees and probationers in

4   communities as a result of plaintiffs' proposed population reduction measures would strain

5   the community corrections system, rehabilitative services, and re-entry programs.  They

6   presented evidence that there are not enough community correctional resources to supervise

7   or provide services to offenders who are diverted from the prison system to the

8   communities.[86]  *E.g.*, Rep. Tr. at 2384:3-14 (Pacheco); *id.* at 1030:3-21 (Powers); Cogbill

9   Trial Aff. ¶¶ 35-36.  The caseload for probation officers in Los Angeles County, for example,

10  is upwards of 1000:1, while the recommended caseload is between 30:1 and 50:1.  Dalton

11  Am. Trial Decl. ¶ 32; *see also* Meyer Am. Trial Decl. ¶¶ 18, 20.  Many cases are largely

12  unsupervised, so that the officers can focus on cases that require more intense supervision or

13  on emergency situations.  *E.g.*, Meyer Am. Trial Decl. ¶¶ 20, 24; Rep. Tr. at 1030:7-21

14  (Powers).

15         Defendant-intervenors also presented evidence that both diverted offenders and

16  offenders coming out of California's prisons and reentering the communities have significant

17  needs in the areas of mental health, substance abuse treatment, other medical services, family

18  services, employment, and housing.  *See, e.g.*, Cogbill Trial Decl. ¶ 29; Dalton Am. Trial

19  Decl. ¶¶ 30-31; Johnson Trial Decl. ¶ 2 (Director of San Mateo County Human Services

20  Agency); Oct. 16, 2008 Bennett Supp. Report at 2-4; Ex. DI-218 at 1 (Report of the Re-Entry

21  Policy Council).  Evidence shows that counties lack the resources to meet those needs even

22  now.  *See* Rep. Tr. at 2073:15-2074:14 (Conklin) (San Diego County Sheriff's Department

23  Detentions Chief Mental Health Clinician); *id.* at 2456:7-14 (Pena) (Santa Clara County

24  Director of Mental Health); *id.* at 2492:13-22 (Garner); *id.* at 2511:25-2512:5 (Bataille)

25  (defendants' expert); Aug. 15, 2008 Graves Report at 5-6; Cogbill Trial Decl. ¶ 7; Pena Trial

26

27         [86]The increase in the population of probationers would not occur as a result of the
    expansion of earned credits or the diversion of technical parole violators.  It would occur
28  only if the state decides to reduce the prison population by diverting low-risk offenders to
    probation.

1   Decl. ¶¶ 11, 15; Aug. 15, 2008 Pena Report at 3-5; Word Trial Decl. ¶ 26; James Trial Decl.

2   ¶ 34.[87]  The gap between the needs and availability of services contributes to the high level of

3   recidivism among parolees.  Cogbill Trial Decl. ¶ 7.

4          Because the community re-entry and rehabilitation services in most counties, if not all,

5   are inadequate to serve the current population, those released into the communities as a result

6   of the proposed population reduction measures would either not receive services in the

7   community promptly or would displace other people who are currently receiving services.

8   *See* Rep. Tr. at 2495:5-13 (Garner); *id.* at 2699:23-2700:3 (Ryan).  Such a result could be

9   mitigated, however, through a population reduction plan that created only a gradual increase

10  in the number of parolees or probationers in each county.  Moreover, the increased needs in

11  each county resulting from the population reduction measures proposed by plaintiffs are

12  likely to fall within normal fluctuations in the number of people served by the counties.  *See,*

13  *e.g.*, Rep. Tr. at 2442:2-8 (Pena) (stating that the Santa Clara mental health system serves a

14  dynamic population of between 17,000 and 19,000 clients each year); Pena Trial Decl. ¶ 18

15  (estimating that the proposed population reduction order would result in an additional 100 to

16  700 individuals in Santa Clara County needing mental health services).

17         Furthermore, overwhelming evidence establishes that diversion would be successful

18  and that the proposed population reduction measures would have no adverse effect – and

19  would in fact improve public safety – if the state were to divert some portion of the savings

20  generated by the population reduction to community corrections, rehabilitation, and re-entry

21  resources.  *See, e.g.*, Rep. Tr. at 1828:2-19 (Smith) (opining that his concerns would be

22  ameliorated if the state redirected funding to the counties); *id.* at 1573:1-1574:3 (Beard)

23  (testifying that funding community services could compensate for the 0.3% increase in

24  arrests of parolees).  The programs are already in place, and better coordination between the

25  _____

26         [87]Although community public mental health programs are not intended to serve
    parolees, Rep. Tr. at 2550:9-19 (Bataille), parolees still rely on county services at times.  *See,*
27  *e.g.*, *id.* at 2432:16-22 (Pena) (testifying that in Santa Clara, approximately 60% of parolees
    receiving state outpatient services also accessed county services); *id.* at 2550:24-25 (Bataille)
28  (testifying that county systems still triage parolees in need of psychiatric emergency
    services).

state and the counties, alongside additional funding, could make these services available to a larger portion of the population. *See, e.g.*, Aug. 15, 2008 Garner Report at 6; Meyer Am. Trial Decl. ¶ 69. In any event, as noted already, the additional demand for community resources created by a population reduction is likely to fall within existing fluctuations in demand, and thus would not result in any significant changes at the county or local level.

We have no question that the entire criminal justice system and the state itself, as well as the local communities, would be well-served if the state would help fund some of the county programs that are designed to help parolees, probationers, and other persons convicted of criminal offenses with problems such as drug and alcohol addiction, mental illness, job training, and rehabilitation generally. Such programs would certainly help to reduce the crime rate and make the local communities safer places in which to live. Whether to do so, however, is a question as to how the state wishes to expend its resources that must be answered by the state's elected officials and not by this court. We can only note that should the officeholders of California and their constituents wish to raise the level of safety of the state's communities by increasing the availability of programs that facilitate the orderly re-entry into society by former prisoners, they are free to appropriate the necessary funds to do so in a manner that will not divert such funds from other important societal needs. There is no bar to the people's financing of projects they deem desirable through new tax revenues or the issuance of additional state bonds.

5.     Impact on Integrity of Criminal Justice System

David Bennett, a criminal justice consultant and expert witness for Defendant-Intervenor Sonoma County, opined that "[t]he closing of the front door to the prisons and resulting jail overcrowding, combined with a reduced capacity to locally sentence lower level offenders (such as misdemeanants) will *compromise the criminal justice system's ability to hold offenders accountable*." Aug. 15, 2008 Bennett Report ¶ 30 (emphasis in original). He anticipated that this would result in a loss of system integrity because, among other negative effects, offenders would not be held accountable for criminal behavior, district attorneys

1    might stop prosecuting certain crimes, and judges might modify sentences to accommodate

2    the overcrowding in jails.  *Id.* ¶¶ 35-37.

3        Bennett's opinion was based on the assumption that a population reduction order

4    would involve closing the front door of the prisons.  *Id.* ¶ 30.  None of the measures proposed

5    by plaintiffs or considered here would require such an extreme result.  Moreover, as

6    illustrated above, the measures would not result in a loss of deterrence or cause an increase in

7    jail overcrowding; they would simply affect where offenders serve their sentences and

8    whether they might be released a few months earlier, with no effect on the state's ability or

9    incentive to arrest, prosecute, or imprison new offenders.  We thus find that a prison

10   population reduction could be achieved without the negative impact on the integrity of the

11   criminal justice system predicted by Bennett.

12                    6.    Weight To Be Given Public Safety

13       As demonstrated above, we have given substantial weight to the question of the effect

14   of our order upon public safety and the operation of the criminal justice system.  While we

15   conclude that there is no adverse effect, were we in error and were there in fact some adverse

16   effect, it would be small, given the number and types of individuals to be released early or

17   diverted to non-prison settings, and given the number of counties, and the size of the state

18   and its population.  Even considering the possibility of a minor adverse effect, we would, in

19   view of the extremely serious injuries that continue to result from the long-standing

20   constitutional violations at issue, be required to grant (with the modification set forth in our

21   order) the relief that plaintiffs seek.

22       **D.    Feasibility Notwithstanding the Present Fiscal Crisis**

23       In concluding that the plaintiffs' proposed population reduction measures could safely

24   reduce the population of California's prisons, and that such a reduction would not have a

25   significant adverse effect in California's communities, we do not ignore the state's current

26   economic difficulties.  The fiscal crisis does not, however, alter our conclusions.

27       There will be a substantial fiscal savings to the state as a result of the reduction in the

28   size of the prison population.  According to Deputy Cabinet Secretary Robert Gore, the

167

1   approximate cost of housing a prisoner is $43,000 per year.  Ex. P163 at DEFS036906

2   (Jan. 10, 2008 Mem. from Robert Gore re: Governor's CDCR Rehabilitation Strike Team

3   Final Report).  Under the order establishing a population cap, the size of the prison

4   population will be reduced by approximately 46,000.  The changes leading to that reduction

5   recommended by plaintiffs, such as an increase in good time credits followed by early

6   release, diverting technical parole violators and modifying parole requirements, and diverting

7   low-risk offenders with short sentences, involve no fiscal cost.  Other changes recommended

8   by various state commissions and committees can also be adopted without any state funding.

9   There are other state actions that all agree would help reduce crime significantly on both a

10  short- and a long-term basis if taken along with the prisoner reduction measures.  They

11  involve helping fund community re-entry programs, such as drug and alcohol treatment, job

12  training, mental health therapy, and half-way houses.  Although California's prison

13  population could be reduced without adopting or strengthening such local programs, the

14  benefit to the state of investing in them would be considerable.  Whether or not to make such

15  an investment, however, is, as we observed previously, a matter for state officials, not the

16  court, to decide.  In any event, the present fiscal crisis would be alleviated rather than

17  worsened by a prisoner release order.

18            **E.        Inclusion of Mentally Ill Inmates in Any Population Reduction Order**

19            The state has suggested that, should we issue a population reduction order, we should

20  nonetheless exempt seriously mentally ill inmates from release pursuant to our order.

21  However, there is no public safety reason to treat mentally ill inmates differently from other

22  inmates as a categorical matter.

23            Under the current system, mentally ill inmates are regularly released when their prison

24  sentences end.  Although these inmates reportedly have higher recidivism rates than non-

25  mentally ill inmates, evidence shows that mentally ill inmates who are released do not, by

26  virtue of their mental illness, present any higher risk than other released inmates.  Much of

27  the high recidivism is attributable to noncompliance with parole conditions related to the

28  disorganization produced by mental illness.  Ex. P715 at 5 (July 2007 CDCR Division of

                                            168

1   Adult Parole Operations report entitled "Mentally Ill Parolee Population").  Dr. Gilligan, a

2   psychiatrist and an expert on mentally ill offenders, testified that, based on research

3   throughout the United States and also in California specifically, mentally ill parolees are not

4   more likely to commit violent crimes after discharge than are non-mentally ill parolees.

5   Aug. 15, 2008 Gilligan Report ¶¶ 34, 36-39; Rep. Tr. at 1608:12-25 (Gilligan).  Rather, the

6   risk factors for violence, such as substance abuse, family dysfunction, and character

7   disorders, are comparable for the mentally ill and non-mentally ill.  Aug. 15, 2008 Gilligan

8   Report ¶ 40.  Defendants' expert Dr. Packer agreed that "the research literature does not

9   suggest that mentally ill offenders pose a higher risk of violence than their non-mentally ill

10  counterparts."  Oct. 1, 2008 Packer Addendum at 1.  Another expert for defendants Gale

11  Bataille, the former director of the of Behavioral Health and Recovery Services for San

12  Mateo County, testified that mental illness has a high rate of co-occurrence with substance

13  abuse, which is a predictor of violence, but agreed that mental illness by itself is not a

14  significant indicator of violence.  Bataille Rebuttal Report at 2; Rep. Tr. at 2514:6-20; *see*

15  *also* Oct. 1, 2008 Packer Addendum at 2 (stating that "mental illness is a risk factor for

16  violence, particularly if the individual also abuses substances and has acute psychotic

17  symptoms," but opining that "[t]his does *not* mean that mentally ill inmates should, by virtue

18  of their mental illness, be considered higher risk than other inmates" (emphasis in original)).

19       The testimony from the mental health care experts was unanimous that mentally ill

20  people who are receiving proper mental health treatment pose no greater risk to the

21  community than those who are not mentally ill.  Rep. Tr. at 2209:25-2210:23 (Stewart);

22  Oct. 1, 2008 Packer Addendum at 1-2; Rep. Tr. at 1640:4-10 (Gilligan); Bataille Rebuttal

23  Report at 2; *see also* Ex. DI-219 at 6 (June 2006 UCLA Integrated Substance Abuse Program

24  Neuropsychiatric Institute report entitled "Final Report on the Mental Health Services

25  Continuum Program of the California Department of Corrections and Rehabilitation – Parole

26  Division").  Therefore, population reduction measures involving the successful diversion of

27  offenders and technical parole violators to community mental health programs instead of

28  prison would not have a negative impact on public safety.  The diversion of mentally ill

1    technical parole violators might even improve public safety because the current churning of

2    mentally ill parole violators in and out of crowded prison reception centers is especially

3    disruptive to their treatment needs and re-entry success.  Aug. 15, 2008 Gilligan Report

4    ¶¶ 32-33; Aug. 15, 2008 Stewart Supp. Report ¶ 136.

5         Numerous witnesses for defendants supported the diversion of mentally ill offenders.

6    Dr. Packer, defendants' mental health expert, did not support the mass early release of the

7    mentally ill but recommended diversion of mentally ill offenders to community-based

8    programs as an effective population reduction measure.  Rep. Tr. at 1086:15-1087:22.

9    Director Bataille also supported community diversion.  *See* Aug. 15, 2008 Bataille Prelim.

10   Report at 19.  Director Hoffman testified that the CDCR has, consistent with public safety,

11   already stopped returning parolees to custody for technical violations resulting from their

12   mental illness when programs are available.  Rep. Tr. at 1766:15- 1767:19; Hoffman Trial

13   Aff. ¶ 29; Ex. D1195 (Jan. 12, 2007 Mem. from CDCR Secretary James E. Tilton to the

14   Division of Adult Parole Operations).  He also stated that, like all other parolees, mentally ill

15   parole violators can be given intermediate sanctions using the "Parole Violation Decision

16   Making Instrument."  Hoffman Trial Aff. ¶ 30.

17        The disagreement among the experts centered not on whether diversion would be

18   harmful to public safety, but on whether California's communities had sufficient community

19   mental health programs to support the early release or diversion of mentally ill parolees.

20   Plaintiffs' experts testified that the impact of the inclusion of some *Coleman* class members

21   in the population reduction measures would not be significant.  Dr. Stewart calculated that,

22   assuming a reduction in the prison population by 50,000 inmates, there would be about

23   10,000 more *Coleman* class members in the community over a period of time.  Out of that

24   group, about 8,500 people would be at the CCCMS level and would need minimal care in the

25   community.  Rep. Tr. at 2211:3-15.  About 650 additional people per year would need

26   enhanced outpatient care, but that would not pose a significant burden on the current system,

27   which serves 69,000 people.  *Id.* at 2211:18-2212:7.  Finally, only 100 additional people each

28   year would need DMH-level care, which would not be a significant additional burden on a

1    system that currently treats 43,000 people annually.  *Id.* at 2212:8-21.  Dr. Stewart also

2    testified that the number of people needing care may be lower because the class members'

3    mental health conditions would improve once they left prison.  *id.* at 2211:18-2212:21; *see*

4    *also* Aug. 27, 2008 Gilligan Rebuttal Report ¶¶ 10-11.

5          Defendants' experts contested these numbers and their significance.  Dr. Packer stated

6    that it is not necessarily true that mentally ill inmates will do better outside of prisons and

7    opined that it is more common for some mentally ill individuals to function at a higher level

8    while in prison.  Oct. 1, 2008 Packer Addendum at 3.  Dr. Packer also testified that elements

9    for successful release – pre-release planning, coordination with community providers, access

10   to systems of care in the community, and availability of community programs – are not

11   currently fully functioning within the CDCR, and that an accelerated release of mentally ill

12   prisoners would exacerbate those problems.  *Id.* at 2.  Director Bataille opined that most

13   California communities are not prepared for, or capable of, providing the community mental

14   health and treatment services necessary to support an accelerated release of mentally ill

15   inmates, and that the problem is not only funding but also a lack of trained professional staff.

16   *See* Aug. 15, 2008 Bataille Prelim. Report at 5-18.  Other witnesses testified that counties are

17   unable to serve their mentally ill populations now.  *See, e.g.*, Rep. Tr. at 2456:7-17 (Pena);

18   Dalton Trial Decl. ¶ 31; Conklin Trial Decl. ¶ 41; Meyer Am. Trial Decl. ¶¶ 64-65.

19         We credit the testimony that community mental health programs are overburdened in

20   many, if not most, California communities.  Still, the *Coleman* class may safely be included

21   in the state's population reduction measures in any number of ways.  For example, as

22   Director Bataille suggested, a diversion or earned credits program could be structured so that

23   only those mentally ill individuals with the greatest level of psychiatric stability and the

24   greatest potential to "voluntarily" follow up on outpatient care would be eligible, at least

25   until appropriate community programming is in place.  Aug. 15, 2008 Bataille Prelim. Report

26   at 4.

27         Moreover, credible evidence demonstrates that treating mentally ill offenders outside

28   prison is more effective and less costly than treating them in prison.  *See* Gilligan Rebuttal

1   Report ¶ 11 (stating that "mental health treatment in the community is more likely to be

2   successful and effective than similar treatment would be in the social environment of the

3   prison"); Rep. Tr. at 1747:9-16, 1753:24-1755:5 (Hoffman) (affirming that providing mental

4   health care for parolees is cheaper than providing it for inmates); *id.* at 2450:14-2451:7

5   (Pena) (acknowledging that it costs about $24,000 less per year to provide a therapeutic bed

6   in the community than to incarcerate a mentally ill person).  There was also unrebutted

7   testimony that it is easier to recruit and hire qualified mental health professionals in civil

8   hospital and clinic settings than in prisons.  Aug. 27, 2008 Gilligan Rebuttal Report ¶ 17.  In

9   light of the abysmal qualify of the mental health care presently available to California's

10  inmates, it is unlikely that any mentally ill inmates released by the state will find their mental

11  health treatment seriously compromised by their release from prison.

12          We recognize that expanding community programming would require an increase in

13  professional staff at the community level; however, as with other types of programming, this

14  would require a shift in, rather than an infusion of, resources.  The state has already begun to

15  expand parolee services, *see* Hoffman Trial Aff. ¶ 32, and also has a roadmap for further

16  expansion of programming in the CDCR Expert Panel Report.  Defendants' expert Director

17  Bataille agreed that a population reduction could be achieved and sustained by following the

18  recommendations contained in the CDCR Expert Panel Report, including its

19  recommendation for expanding the communities' capacity to provide programming.

20  Aug. 15, 2008 Bataille Prelim. Report at 19.  Collaboration between the mental health and

21  criminal justice systems could also begin to address the resource gap.  *See* Rep. Tr. at

22  2534:7-2535:11 (Bataille).

23          On the basis of this evidence, we conclude that mentally ill inmates could, under

24  appropriate conditions, be included in the proposed population reduction measures without

25  any adverse effect on public safety or the operation of the criminal justice system.

26      **F.      Empirical Evidence on Incarceration and Crime Rates**

27          We acknowledge the concern of some law enforcement officials that incarceration

28  serves the interest of incapacitation over the life of a repeat offender.  *See, e.g.*, *id.* at

172

1181:5-13 (Powers).  To that extent, there is likely some correlation between incarceration rates and crime rates.  Indeed, according to plaintiffs' experts, some studies have concluded that every ten percent increase in the incarceration rate results in a two to four percent decrease in the crime rate, *id.* at 1582:1-3 (Beard); *id.* at 2032:4-12 (Lehman), and that massive incarceration rates have contributed to a 25% reduction in violent crime across the United States, *id.* at 1447:18-1450:23 (Austin).

This testimony does not, however, persuade us that California's prison population could not be reduced without adversely affecting public safety.[88]  First, even if we credit these studies, population reduction measures could still have a net positive impact on the crime rate.  For example, defendants introduced Exhibit D1331, a report by the Washington State Institute for Public Policy, for the proposition that incarceration rates and crime rates correlate.  *See* Rep. Tr. 2030:14- 2032:12 (questioning of Dr. Lehman by defendants' counsel and related colloquy with the court).  That same report, however, concluded that the decrease in recidivism resulting from an expansion of evidence-based programming would outweigh any potential adverse impact on crime rates resulting from decreased incarceration rates.  *See* Ex. D1331 at 15.

Second, the evidence supported Dr. Austin's testimony that there is still disagreement as to the validity of the research connecting incarceration rates to crime rates, Rep. Tr. at 1450:20-23, and that "[r]esearch on crime and incarceration does not consistently indicate that the massive use of incarceration has reduced crime rates," Aug. 15, 2008 Austin Report ¶ 20.  In fact, with regard to the relationship between incarceration and crime in California, both defendants' expert Dr. Marquart and Professor Petersilia concluded that the decline in violent crime in California in the past decade "is not likely to be a function of the state's approach to corrections."  Rep. Tr. 2001:9-2002:18 (Marquart) (agreeing that "it would be a

---

[88]We also note that the same studies referred to by plaintiffs' experts found that increasing the incarceration rate becomes counterproductive once the incarceration rate reaches a certain inflection point. *E.g.*, Rep. Tr. at 1582:1-13 (Beard); *see also id.* at 1447:18-1450:23 (Austin).  At its present incarceration rate of 470 per 100,000, California is close to the inflection point at which further incarceration would not be productive.  *Id.* at 1582:1-13 (Beard).

1   mistake to conclude that the decline in the California crime rate is a result of its incarceration
2   policies"); Ex. P5 at 2.  As we have already noted, it is likely that "[t]he overwhelming and
3   undisputed negative side effects of incarceration and crowding far outweigh the potential,
4   unproven benefits of incarceration" in California.  Aug. 15, 2008 Austin Report ¶ 23.

5          Moreover, Dr. Austin and Dr. Krisberg testified that the historical data and empirical
6   research regarding early release programs across the country show no significant relationship
7   between crime rates and early releases.  Aug. 15, 2008 Austin Report ¶¶ 19, 27-42; Rep. Tr.
8   at 2159:20-2162:7 (Krisberg); *see also* Ex. DI-204 at 1.  Their testimony, like that of
9   Dr. Beard and Secretary Lehman, who both implemented prison population reduction
10  measures in other prison systems, confirms that it is possible to lower the prison population
11  without an adverse impact on crime or public safety.  For example, in Washington, the state
12  legislature prohibited sending technical parole violators to prison, instituted graduated
13  sanctions, and expanded good time credits.  Rep. Tr. at 2004:24-2005:14, 2006:23-2007:18
14  (Lehman).  Secretary Lehman, the former secretary of corrections in Washington, testified
15  that these measures did not have any "deleterious effect on crime" or public safety.  *Id.* at
16  2008:18-2009:14.

17         Secretary Lehman further testified that, during his tenure as secretary of corrections in
18  Pennsylvania, sentencing reforms that made it more likely for an offender to be diverted into
19  the community did not have any adverse impact on public safety.  *Id.* at 2007:19-2008:24.
20  Dr. Beard, the current secretary of corrections in Pennsylvania, testified that he had "spent a
21  lot of time in the last seven years studying what other states have done and looking for ways
22  that we can better manage our population from a public safety perspective, from a population
23  control perspective, and from a cost perspective."  *Id.* at 1552:19-24.  He played a role in
24  passing legislation in Pennsylvania that allowed for, among other things, intermediate
25  punishment instead of incarceration, incentive credits for evidence-based programming, and
26  parole reform.  *Id.* at 1549:10-1550:14, 1552:1-18.  Rather than having an adverse impact,
27  these reform measures have served to improve public safety.  *Id.* at 1552:19-1553:3.

28

1    Dr. Austin – who has thirty years of experience in correctional planning and research

2    and has personally worked with correctional systems in eight states to reduce their prisoner

3    populations, Nov. 9, 2007 Austin Report ¶¶ 2, 5 – similarly testified that a number of

4    population reduction measures have been adopted in various states without an adverse impact

5    on public safety: diversion of technical violators in Kansas and Washington, Rep. Tr. at

6    1392:21-1393:5, 1399:11-15; good time credits in Illinois,[89] Nevada, Maryland, and Indiana,

7    *id.* at 1398:11-1399:1, 1399:11-15;[90] and implementation of "large community corrections

8    diversion programs" in Ohio and Michigan, where "the state basically is paying the counties

9    to hold people at the county level who otherwise would go to prison," *id.* at 1399:5-15.  In

10   Nevada, the legislature expanded the award of good time credits to prisoners, probationers,

11   and parolees in 2007, which reduced the prison population without any known increase in

12   crime, arrests, or court filings as of July 2008.  Aug. 15, 2008 Austin Report ¶ 36.  In New

13   York, the prison population decreased due in part to the expansion of programs awarding

14   good time credits, and not only did the crime rate not increase, it "declined substantially."

15   *Id.* ¶¶ 27-28.

16   Dr. Krisberg also reviewed empirical research analyzing early release programs over

17   the past twenty years in Canada, California, Washington, Wisconsin, Illinois, Texas,

18   Colorado, Montana, Michigan, and Florida, and found that such programs do not endanger

19   public safety.  Sept. 8, 2008 Krisberg Report at 4-5.  Dr. Krisberg reported that early release

20   produced lower recidivism rates for released inmates when the release targeted low-risk

21   offenders and made provisions for community-based supportive services.  *Id.*

22   [89]Dr. Austin's report regarding Illinois stated his opinion that early release should only

23   be used as a short-term measure for prison overcrowding.  Ex. DI-785 at 3614 (James Austin, *Using Early Release to Relieve Prison Crowding: A Dilemma for Public Policy*, 32 Crime

24   Delinquency 404 (1986)).  Nonetheless, the article concluded that there was an overall cost savings to the state as a result of early release, with "relatively lower costs to local public

25   criminal justice agencies stemming from arrests of the early releases."  *Id.* at 3700.  This is not inconsistent with Dr. Austin's testimony in this case.

26   [90]Although Dr. Austin stated that he did not endorse early release as a long-term

27   remedy, Rep. Tr. 2610: 8-2611:1, it was not clear whether his testimony on that point related to the expansion of good time credits or generic release.  In any event, he testified that the

28   prison population could be lowered safely through the expansion of good time credits and other measures.  Aug. 15, 2008 Austin Report ¶ 43.

1    District Attorney Pacheco of Riverside County opined that a generic early release

2    program from California prisons would increase crime, as it had in other jurisdictions like

3    Florida, Illinois, Philadelphia, and Los Angeles.  Rep. Tr. at 2380:20-2381:9.  His opinion,

4    however, appeared to be based largely on newspaper articles reporting specific crimes that

5    occurred during the early release period, and not on a broader analysis of crime rates.  *See*

6    Pacheco Decl. ¶ 23 & Ex. C.  Moreover, Mr. Pacheco discussed only a generic early release

7    and failed to consider whether some of the adverse impacts he fears would be mitigated by

8    basing early release decisions on an improved system of earned credits or by instituting a

9    diversion program or other measures proposed by plaintiffs.  *See* Rep. Tr. at 2379:17-23

10   (discussing only generic early release).

11   Dr. Marquart, defendants' sole witness on population reduction measures and public

12   safety, stated that he opposed any prisoner release order in part because the early release

13   measures implemented in Texas in the 1980s to meet a 95% population cap caused an

14   increase in crime.[91]  *Id.* at 1956:14-20, 23-24, 1957:12-18.  However, he also testified that he

15   did not know how much of the increase in crime was attributable to the early release

16   program, as opposed to other factors.  *Id.* at 1984:16-1985:9.  Indeed, the basis for

17   Dr. Marquart's opposition to any reduction in the prison population appeared to be not the

18   Texas experience but, instead, his opinion that he "didn't know what the consequences would

19   be, not that it would be a disaster," *id.* at 1990:22-24.  According to Dr. Marquart, reducing

20   the prison population could have a negative impact on public safety, it could have no impact,

21   or it could have a positive impact.  *Compare id.* at 1990:17-24; *with id.* at 1995:8-20.  Such

22   equivocal testimony is not helpful to the court.  In any event, Dr. Marquart stated that he was

23   not opposed to the expansion of good time credits, parole reform, or evidence-based

24   programming, and further stated that the prison population could be reduced in a safe manner

25   through proper programming.  *Id.* at 1991:22-1993:18, 1994:17-25.  The Texas prison

26   [91]Neither the number of inmates who were released early nor the length of time by
27   which their incarceration was shortened is apparent from Dr. Marquart's testimony.
     Dr. Austin, however, stated that his recommended amount of good time credits is less than
28   the amount awarded to Texas prisoners between 1980 and 1989, and the amount presently
     awarded in that state.  Aug. 27, 2008 Austin Supp. Report ¶ 20(e).

1  population, in fact, has recently been reduced safely by diverting technical parole violators

2  and increasing the state's parole grant rate using risk-based guidelines.  Aug. 27, 2008 Austin

3  Supp. Report ¶ 20.

4        To the extent that District Attorney Pacheco, Dr. Marquart, or any other witness

5  opined that *any* population reduction measure applied to California prisons would result in an

6  adverse public safety impact, we reject that opinion.  If anything, such testimony shows only

7  that the CDCR should implement population reduction measures mirroring those of the

8  jurisdictions that have successfully and safely reduced their inmate populations.  We credit

9  the testimony from experts who, through careful study and experience in a number of

10 jurisdictions, arrived at the opinion that a population reduction, through a combination of

11 earned credits, parole reform, and diversion, could be accomplished in a manner that

12 preserves public safety and the operation of the criminal justice system.  Moreover,

13 California's present system of churning inmates into and out of overcrowded and

14 criminogenic prisons itself poses a threat to public safety.  Thus, any increase in the crime

15 rate associated with lowered incarceration rates could be substantially offset, and perhaps

16 entirely eliminated, by the public safety benefits of ridding the system of churning and

17 reducing the criminogenic effect of spending time in California prisons.

18        **G.**    **Findings and Conclusions**

19        We take seriously our duty to consider public safety, and we have done so.  We do not

20 construe this PLRA requirement, however, to preclude a population reduction order based on

21 a possibility that the order *might* have an adverse impact on public safety or the operation of

22 the criminal justice system, no matter how small.  If that were enough to prevent the court

23 from ordering a population cap, no court would ever be able to impose such a remedy, thus

24 contravening the congressional intent that a population cap be ordered if "it is truly necessary

25 to prevent an actual violation of a prisoner's federal rights."  H.R. Rep. No. 104-21, at 25.

26        Based on our detailed findings examining the evidence from correctional and public

27 safety experts around the state and across the country, we are confident that a prison

28 population reduction to 137.5% design capacity can be achieved in California without a

177

1    meaningful adverse impact on public safety or the operation of the criminal justice system.[92]

2    The evidence and testimony from plaintiffs, defendants, and defendant-intervenors

3    overwhelmingly showed that there are ways for California to reduce its prison population

4    without such an adverse impact, and that a less crowded prison system would in fact benefit

5    public safety and the proper operation of the criminal justice system.

6           The population reduction measures that we specifically considered include the

7    expansion of earned credits, the diversion of technical parole violators, the diversion of low-

8    risk offenders to community corrections, and the expansion of evidence-based programming.

9    These measures were recommended not only by plaintiffs' experts but also by experts for

10   defendants and defendant-intervenors, the Governor, CDCR officials, and the CDCR Expert

11   Panel.  Because these measures either have no impact on or reduce the recidivism rate, they

12   would not adversely affect public safety.  Furthermore, unlike measures such as

13   indiscriminately and suddenly releasing inmates or closing prison doors to further admission,

14   the measures we considered would not have a significant adverse impact on the operation of

15   the criminal justice system.  Any adverse impact on community resources resulting from

16   these measures could readily be mitigated by parole reform and the reallocation of funding

17   and resources.  It follows from the many reports we have discussed that other methods of

18   reducing the prison population such as sentencing reform and the release of members of

19   groups that are least likely to recidivate, such as the aged and the infirm as well as low-risk

20   prisoners nearing the end of their sentences, do not pose any threat to public safety.

21          Other jurisdictions have successfully reduced their prison populations through

22   measures similar to those proposed by plaintiffs and the other reforms discussed herein, and

23   we find that California could also do so.  In fact, California could do so perhaps more easily

24   _____

     [92]*Duran*, 760 F.2d 756, a pre-PLRA case, does not suggest a different outcome.  In
25   *Duran*, the court of appeals vacated the district court's order directing the release of pretrial
     detainees after finding that the order would adversely affect the public interest.  *Duran*
26   involved the release of detainees without the use of any risk-based instrument, and the
     uncontested evidence before that court showed that many of the released inmates would
27   become fugitives or commit felonies while awaiting trial.  *See id.* at 757-58.  By contrast, the
     evidence before this court establishes that California could reduce its prison population
28   without any adverse effect on public safety or the operation of the criminal justice system.
     Accordingly, the balance of interests in this case differs substantially from that in *Duran*.

1    than other jurisdictions because of its current, unproductive incarceration policies, such as

2    returning most technical parole violators to prison and denying judges the ability to tailor

3    sentences to the risks and needs of particular offenders.

4          One of the most persuasive pieces of evidence before us is the report of the Expert

5    Panel on Adult Offender Recidivism Reduction Programming, which was convened by the

6    CDCR in 2007 to suggest strategies for reducing California's high recidivism rate.  Ex. P2 at

7    vii.  The panel consisted of CDCR's Chief Deputy Secretary for Adult Programs, academic

8    researchers, consultants, and former and current secretaries of corrections in Pennsylvania,

9    Arizona, Washington, Ohio, and Maine.  *Id.* at ii.  The report recommended a comprehensive

10    set of measures that would reduce California's prison population while also reducing

11    recidivism.

12          The CDCR Expert Panel concluded that, if the CDCR were to follow its

13    recommendations to divert technical parole violators, implement parole reform, and expand

14    good time credits, these changes alone would serve to reduce the prison population by

15    between 38,500 and 43,500 inmates, and the parole population would be reduced by 6,500 to

16    11,500.  *Id.* at 95.  The panel expected an additional reduction in the prison population of

17    about 2,194 to 4,388 from evidence-based programming initiatives.  *Id.* at 97.[93] After

18    accounting for the costs of the additional programming recommended by the panel, full

19    implementation of its recommendations would still save the state between $561 and $684

20    million a year.[94]  *Id.* at 99.  The proposed reduction resulting from the above measures alone

21    would fall within the range necessary to comply with a 137.5% population cap.  Other means

22    suggested by the state and others, including the expert committees and the numerous other

23    official committees, could reduce the prison population even further.

---

24        [93]As of August 27, 2008, the CDCR was housing 156,352 inmates in prison
institutions designed to hold 79,828 inmates. Ex. P135 (CDCR weekly population report as

25    of August 27, 2008).

26        [94]James Tilton, then the CDCR Secretary, endorsed the CDCR Expert Panel's
recommendations, but with a reservation as to the estimated impact on the prison population.

27    Rep. Tr. at 2614:20-2615:2 (Austin); Ex. P49 (Sept. 25, 2007 Letter from Secretary James E.
Tilton, California Department of Corrections and Rehabilitation, to the Hon. Denise

28    Ducheny).

1        Secretary Lehman, who was a member of the CDCR Expert Panel, testified that use of

2   the measures proposed in the Panel report could reduce California's prison population

3   without causing any adverse impact.  Rep. Tr. at 2012:20-25.  Secretary Woodford and

4   Dr. Austin testified that it is possible to reach 130% design capacity without adversely

5   impacting public safety.  *Id.* at 1321:19-1322:5 (Woodford); *id.* at 1384:3-12 (Austin).

6   Dr. Austin called this a "moderate" reduction in the state's prison population, because

7   California "has got this big bulge" of unnecessary and unproductive incarceration, which is

8   "an easier target" for reduction.  *Id.* at 1434:9-1435:4.  Although Dr. Austin recommended

9   that, to achieve a reduction of 50,000 prisoners, California should change its sentencing laws

10  so that second strikers serve 65% to 70% of their sentences rather than 80% as required

11  currently, *id.* at 1436:18-20, 2568:2-3, he also stated that there are other ways to achieve that

12  reduction, *id.* at 2570:14-25, a reduction somewhat larger than that which we order.

13       Next, some law enforcement officials testified that the prison population could be

14  reduced safely by about 30% – approximately the same size reduction we order here – simply

15  by offering incentives for the communities to expand their local correctional systems.  *Id.* at

16  2771:4-10 (Meyer); *see also id.* at 1042:4-14 (Powers).  Their opinion was based on the

17  state's experience in the 1960s, when the state paid counties to reduce the number of people

18  being sent to prison, and the counties were able to achieve a 30% general reduction in the

19  state prison population through the expansion of community-level programming and

20  probation resources.  *See id.* at 1042:4-14 (Powers).

21       We should note finally that, regardless of the conclusion of the overwhelming

22  majority of the experts that adoption of the population control measures described above

23  would not adversely affect public safety, they all strongly recommend that the state, in

24  addition to strengthening its own rehabilitative programs, should help establish or improve

25  local community programs designed to assist probationers, parolees, and released prisoners

26  (whether released as the result of the expiration of their terms or otherwise) to re-enter

27  society.  Such programs, as noted earlier, should include drug and alcohol rehabilitation,

28  mental health treatment, and job training.

There is no doubt that the adoption of these programs would help increase public safety above its current level, including after issuance of our population reduction order. Clearly, a failure by the state to comply with the experts' recommendations to take these steps would be regrettable and would be contrary to the interests of public safety.  Still, unlike the population cap we order here, which our analysis shows is required by the United States Constitution, the decision whether to adopt these rehabilitative measures is left to the Governor and the Legislature.  Whether a failure to adopt them would be acceptable, in view of the effect on public safety, is a question that ultimately the people of California will be required to answer.

In sum, the four recommendations in the CDCR Expert Panel report adopted as proposals by plaintiffs provide a means for the state to safely reduce the prison population to 137.5% design capacity.  The population could be reduced even further with the reform of California's antiquated sentencing policies and other related changes to the laws.  We are therefore satisfied that the state has available methods by which it could readily reduce the prison population to 137.5% design capacity or less without an adverse impact on public safety or the operation of the criminal justice system.  Accordingly, even after giving "substantial weight to any [potential] adverse impact on public safety or the operation of a criminal justice system caused by" our population reduction order, 18 U.S.C. § 3626(a)(1)(A), we conclude that our order meets the requirements of the PLRA.

## VIII.  CONCLUSION

The massive 750% increase in the California prison population since the mid-1970s is the result of political decisions made over three decades, including the shift to inflexible determinate sentencing and the passage of harsh mandatory minimum and three-strikes laws, as well as the state's counterproductive parole system.  Unfortunately, as California's prison population has grown, California's political decision-makers have failed to provide the resources and facilities required to meet the additional need for space and for other necessities of prison existence.  Likewise, although state-appointed experts have repeatedly

181

provided numerous methods by which the state could safely reduce its prison population, their recommendations have been ignored, underfunded, or postponed indefinitely. The convergence of tough-on-crime policies and an unwillingness to expend the necessary funds to support the population growth has brought California's prisons to the breaking point. The state of emergency declared by Governor Schwarzenegger almost three years ago continues to this day, California's prisons remain severely overcrowded, and inmates in the California prison system continue to languish without constitutionally adequate medical and mental health care.

Federal courts do not intervene in state affairs lightly. Principles of federalism, comity, and separation of powers require federal courts to refrain from addressing matters of state government in all but the most pressing of circumstances. Even then, federal courts must proceed cautiously, giving the states every opportunity to meet their federal constitutional and statutory obligations voluntarily. Unfortunately, during the 8 years of the *Plata* litigation and the 19 years of the *Coleman* litigation, the political branches of California government charged with addressing the crisis in the state's prisons have failed to do so. Instead, the rights of California's prisoners have repeatedly been ignored. Where the political process has utterly failed to protect the constitutional rights of a minority, the courts can, and must, vindicate those rights. *See* John Hart Ely, *Democracy and Distrust* 103, 173 (1980). We do so here, recognizing the seriousness of our action and with the hope that California's leadership will act constructively and cooperatively, and follow the mandate of this court and the PLRA, so as to ultimately eliminate the need for further federal intervention.

**ORDER**

Within 45 days, defendants shall provide the court with a population reduction plan that will in no more than two years reduce the population of the CDCR's adult institutions to 137.5% of their combined design capacity. Should any of defendants' proposed population reduction measures require the waiver of any provisions of state law, the state shall so advise the court, and shall explain why the requested waiver is permissible under 18 U.S.C. § 3626(a)(1)(B). In preparing their plan, defendants shall consult with plaintiffs, intervenors, and other relevant stakeholders, including the *Coleman* Special Master and the *Plata* Receiver. Should such consultation fail to resolve any objections to the proposed population reduction plan, plaintiffs and intervenors shall file their objections no more than 20 days after defendants file their proposed plan, and defendants shall file responses to such objections no more than 10 days thereafter. Defendants shall set forth in their proposal the effective dates of the various actions they propose to undertake and their estimate of the reduction in population they expect to achieve after six, twelve, eighteen, and twenty-four months. The court will consider all of the written submissions and make any necessary modifications or changes to defendants' proposed plan before issuing a population reduction plan as an order of the court. The court may before doing so request clarification on any matters and conduct any further hearings it deems necessary. However, given that this court issued a preliminary ruling on this matter almost six months ago so as to "give the parties notice of the likely nature of [this] opinion, and [] allow them to plan accordingly," Feb. 9, 2009 Tentative Ruling at 1, the court will look with disfavor upon any effort to postpone or delay an expeditious resolution of the terms of the population reduction plan, including the submission of a proposed plan by the state and the issuance of the order adopting the final plan. The court will not grant any stay of the proceedings prior to the issuance of the final population reduction plan, but will entertain motions to stay implementation of that plan pending the resolution of any appeal to the Supreme Court. We will retain jurisdiction over this matter to ensure compliance with the population reduction plan and to consider any subsequent modifications made necessary by changed circumstances.

1   **IT IS SO ORDERED.**

2

3   Dated:  08/04/09

4                          STEPHEN REINHARDT
                         UNITED STATES CIRCUIT JUDGE
                         NINTH CIRCUIT COURT OF APPEALS

5

6

7   Dated:  08/04/09

8                          LAWRENCE K. KARLTON
                         SENIOR UNITED STATES DISTRICT JUDGE
                         EASTERN DISTRICT OF CALIFORNIA

9

10

11   Dated:  08/04/09

12                          THELTON E. HENDERSON
                         SENIOR UNITED STATES DISTRICT JUDGE
                         NORTHERN DISTRICT OF CALIFORNIA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28