PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | ) No.  Civ S 90-0520 LKK-JFM P<br>) **THREE-JUDGE COURT**<br>)<br>) **PLAINTIFFS' MOTION TO COMPEL**<br>) **DEFENDANTS TO CONSULT WITH**<br>) **PLAINTIFFS AND PRODUCE DATA**<br>) **RELEVANT TO POPULATION**<br>) **REDUCTION PLAN; DECLARATION OF**<br>) **REBEKAH EVENSON**<br>) |
| MARCIANO PLATA ,et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | ) No. C01-1351 TEH<br>) **THREE-JUDGE COURT**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

[219945-1]

## INTRODUCTION

This Court's Opinion and Order requires defendants to develop a population reduction plan by September 18, 2009, and requires that "[i]n preparing their plan, defendants shall consult with plaintiffs . . . ." *Plata* Docket No. 2197 at 183. One of the reasons for this consultation is to attempt to "resolve any objections to the proposed population reduction plan." *Id.* It is unlikely that any meaningful consultation will occur, however, because of defendants' position. Instead of a productive exchange of ideas based on data, defendants have proposed a 90 minute meeting to be held a few days before the plan is due to be submitted to the Court. That meeting will not be useful because plaintiffs will not know until the meeting what specific measures defendants will propose and, more importantly, plaintiffs will not have the data necessary to evaluate whether defendants' proposals will have their intended effect or to make counter-proposals.

The same data that plaintiffs seek here is also necessary to determine whether to object to any parts of the plan that defendants submit to the Court. Under the August 4, 2009 Opinion and Order, plaintiffs only have 20 days to file objections. Therefore, it is critical that the data be produced at the earliest possible time in order for plaintiffs to provide the court with accurate information about defendants' proposals and, if necessary, to request modifications of the plan.

## BACKGROUND

The Court's August 4, 2009 Opinion and Order requires the state to develop a plan to reduce the prison population to 137.5% of the population of the adult institutions. *Plata* Docket No. 2197 at 183. Currently, the design capacity of the State's in-state adult institutions (excluding camps and community correction centers) is approximately 80,000 and the population is just over 149,000. *See* CDCR August 31, 2009 population reports, available at http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/WeeklyWe d/TPOP1A/TPOP1Ad090826.pdf (site last visited September 1, 2009). Accordingly, the State's plan must provide methods to reduce the population of adult institutions to 110,000 prisoners, a reduction of 39,000 prisoners.

Defendants' population reduction plan is due on September 18. This Court ordered defendants to consult with plaintiffs in preparing their plan. *Plata* Docket No. 2197 at 183. The order contemplated that such consultation would resolve potential objections in advance, and only "[s]hould such consultation fail to resolve any objections to the proposed plan," would the parties file formal objections. *Id.* However, defendants have not yet consulted with plaintiffs, and have blocked plaintiffs' efforts to engage in a meaningful consultation.

On August 21, 2009, plaintiffs' counsel contacted defense counsel to formally request that the parties engage in the required consultation. Evenson Decl., Exh. A. One week later, defense counsel responded by stating only in general terms that defendants would consult with the parties "as appropriate." Evenson Decl., Exh. A. On September 1, 2009, defense counsel offered to hold a 90 minute meeting to discuss the defendants' plan on September 14, 2009 – four days before defendants plan is due to be filed with the Court. Evenson Decl., Exh. B. Plaintiffs responded by requesting an earlier meeting, and requesting data and information necessary to make the meeting productive. Evenson Decl., Exh. B. Defendants failed to respond.

Defendants had developed legislative proposals to reduce the prison population by 37,000 inmates over a two-year period. Evenson Decl., Exhs. C and D. That plan contemplates:

- Alternative custody options for lower-risk offenders, including allowing certain offenders to serve their sentence under house arrest. This proposal is estimated to reduce the average daily prison population by 6,300 inmates.
- Placing non-serious, non-sex, low-risk parolees on a "banked" caseload, and placing parolees who commit certain parole violations on GPS supervision instead of returning them to prison. This proposal is estimated to reduce the prison population by 5,300 inmates.
- Commuting the sentences of certain deportable non-citizens. This proposal is estimated to reduce the prison population by 8,500 inmates.

- Converting certain felonies to misdemeanors. This proposal is estimated to reduce the prison population by 5,600 inmates.

- Granting enhanced good time credits to prisoners who participate in rehabilitative programs. This proposal is estimated to reduce the prison population by 1,600 inmates.

It is likely that any plan that is submitted to the Court will incorporate some or all of these elements. Accordingly, when plaintiffs sought to confer with defendants about their population reduction plan, plaintiffs counsel asked defendants for data that would be necessary for plaintiff expert James Austin to "validate the five population reduction estimates" in the Governor's plan. Evenson Decl., Exh. A, attachment at 1. The data includes information about the offense, sentence, classification, risk assessment, and demographics of prisoners who were admitted and released from prison over the last 12 months, those currently in prison, those currently on parole, and those released from parole in the last 12 months. *Id.* Defendants flatly refused to provide this or any other data. Evenson Decl., Exh. A.

## ARGUMENT

### A. Defendants Must Be Ordered to Timely Provide Plaintiffs Information Necessary to Analyze Their Plan.

If the Court's order requiring defendants to consult with plaintiffs is to fulfill its objective of resolving or narrowing objections to defendants' plan, defendants must provide plaintiffs with information necessary to evaluate that plan, and provide a forum for plaintiffs to give input and suggestions about the plan prior to its submission to the Court.

Defendants' intention to "consult" with plaintiffs for 1 ½ hours four days before their population reduction plan is due to be filed with the Court simply does not meet that requirement. First, it is too close to the deadline to allow for meaningful revisions given defendants' cumbersome decision-making process. Second, plaintiffs will not be able to provide more than cursory comments if they learn about the plan at the meeting.

Moreover, plaintiffs will be utterly unable to engage in a meaningful consultation if defendants do not provide the data necessary to evaluate defendants' plan. For example,

defendant CDCR Secretary Matt Cate has indicated that defendants' plan will likely follow the Governor's legislative proposals to reduce the prison population by 37,000 inmates over two years. But those proposals are fairly vague, and have, to date, been presented publically in bullet-point format. Evenson Decl., Exhs. C and D. There is not enough detail to fully analyze the impacts of those population reduction methods. Defendants estimate that the population will be reduced by 5,300 prisoners if they put non-serious, non-sex, low-risk parolees on a "banked" caseload, and make those parolees ineligible for return to prison based on a parole violation. Evenson Decl., Exh. C. The only way for plaintiffs to evaluate this proposal is to know how many non-serious, non-sex, low-risk parolees there are, the rate at which they are currently returned to prison for parole violations and the likelihood that they will be returned to prison through a court commitment on other charges.

Accordingly, plaintiffs have requested that defendants provide them with basic demographic information about the current prisoner and parolee population. Evenson Decl., Exh. A. That information will allow plaintiffs to evaluate the defendants' proposals, and to make suggestions. For example, plaintiffs' expert may have suggestions about how to identify appropriate parolees for banked caseloads or other population reduction methods. Or plaintiffs' experts may be able to suggest additional measures they might take to realize a safer population reduction. Furthermore, this same information will be necessary for plaintiffs to determine whether to make any objections to the plan once it is submitted to the Court.

## B. Neither Defendants' Appeal Nor the Legislature's Actions or Inactions Provide an Excuse for Defendants' Failure to Consult.

Defense counsel's first reason for failing to engage in a more meaningful consultation with plaintiffs is that "Defendants intend to appeal the three-judge court's order." Evenson Decl., Exh. A at 1. But a party's intent to appeal an order does not absolve the party of the obligation to comply with the order. Defendants must comply with the August 4, 2009 order to consult unless and until they obtain a stay of that order. This Court has already indicated its intent not to consider a request for a stay of the Order to submit a plan. *Plata* Docket No. 2197 at 183.

Defendants may also hope that the legislature will pass measures that would comprise at least part of the population reduction plan ordered by this Court. However, as of this date, the legislature has not yet enacted the Governor's population reduction proposals. In any event, defendants' obligation to submit a plan is independent of actions that may or may not be taken by the Legislature. Indeed, the Governor can include in his population reduction plan measures that would require this Court to waive State law. *Id.*

## C.    Further Delay Will Prejudice Plaintiffs.

Under the August 4, 2009 Opinion and Order, if the consultation between defendants and plaintiffs about the population reduction plan "fail[s] to resolve any objections to the proposed population reduction plan" plaintiffs have just 20 days to file objections. Such response will require expert analysis. Plaintiffs need to have the relevant information about the contents of the plan, and the data necessary to evaluate the plan, in order to meet this 20-day deadline.

## CONCLUSION

For the foregoing reasons, plaintiffs request that the Court issue an Order compelling defendants to (1) immediately provide plaintiffs with the data necessary to analyze the defendants' potential population reduction measures, (2) immediately provide plaintiffs notice of the specific measures defendants are actively considering, (3) provide defendants' proposed population reduction plan as soon as possible but no later than twenty-four hours in advance of the meeting and (4) to schedule the initial meeting with plaintiffs as early as possible but no later than September 10.

Dated:  September 2, 2009

Respectfully submitted,

/s/ *Rebekah Evenson*

Rebekah Evenson
PRISON LAW OFFICE
Attorneys for Plaintiffs

# DECLARATION OF REBEKAH EVENSON

I, Rebekah B. Evenson declare as follows:

1. I am an attorney admitted to practice before this Court and am one of the counsel for plaintiffs in the above-entitled action.

2. Attached hereto as Exhibit A is a true and correct copy of emails sent to and from Donald Specter and Paul Mello, dated August 21, 2009 and August 27, 2009, respectively.

3. Attached hereto as Exhibit B is a true and correct copy of emails sent to and from Kyle Lewis and Donald Specter, dated September 1, 2009.

4. Attached hereto as Exhibit C is a true and correct copy of the "CDCR Prison Population reduction Package." On July 29, 2009, I spoke by telephone with CDCR Press Secretary Seth Unger, who confirmed that this is a document issued by CDCR to the public in connection with a CDCR press briefing to discuss the Governor's budget proposals. The document was also provided by CDCR to members of the Legislature.

5. Attached hereto as Exhibit D is a true and correct copy of an editorial authored by Secretary Matt Cate, published on August 13, 2009.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 2, 2009 at Berkeley, California.

/s/ Rebekah Evenson
Rebekah Evenson

[219945-1]

# EXHIBIT A

## Don Specter

| | |
|---|---|
| **From:** | Paul B. Mello [Pmello@hansonbridgett.com] |
| **Sent:** | Thursday, August 27, 2009 12:06 PM |
| **To:** | Don Specter |
| **Cc:** | Michael W. Bien; Wolff, Jonathan L.; Rochelle East |

**Subject:** RE: Consultation on Population Reduction

Don,

Thank you for your e-mail. Defendants intend to appeal the three-judge court's order. Defendants will consult with the parties, as appropriate, but will not be providing Plaintiffs' counsel and Plaintiffs' expert with access to the voluminous information requested in your email and in James Austin's memorandum. Please understand that the proposals discussed in Mr. Austin's memorandum are those currently before the Legislature in light of the State's budget situation.

Thanks.

Paul

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Friday, August 21, 2009 9:58 AM
**To:** Paul B. Mello
**Cc:** 'Michael W. Bien'; 'Amy Whelan'; REvenson@prisonlaw.com; 'Ernest Galvan'
**Subject:** Consultation on Population Reduction

Paul,

As you know, the August 4 Opinion and Order requires the State to consult with the parties about its proposed plan to reduce the population to 137.5%. The State's plan is due on September 18. I am writing to determine when and how Defendants intend to fulfill the consultation requirement and to request that Defendants provide information that will enable us to properly evaluate the State's plan.

Attached is a memo from Dr. Austin outlining the data that he currently believes is necessary to properly evaluate Defendants' current legislative proposals. To make this go as smoothly as possible, I suggest that Dr. Austin communicate directly with the appropriate researchers at CDCR.

Please let me know what dates your clients are available to meet with us about this issue and when we can expect to receive access to the necessary data.

Thanks.

Don

Date: 8/9/09
To: CDCR
From: James Austin
Re: Plan to Reduce the CDCR Prisoner Population

This memo outlines the kind of data and analysis required to assess the five major reforms suggested by the State of California that would serve to reduce the CDRC institutional population by 27,300. One is assuming that the reductions would begin rather quickly since each reform provides at prison population reduction estimate in the Average Daily Population (ADP) that is to occur by the end of FY 2009 -2010.

In order to validate the five population reduction estimates, further analysis is required as the reforms stated publicly are not very specific nor is there documentation on how the estimates were made.

My strong preference is to do these estimates in direct coordination with the CDCR Population Estimates Unit. They know the data files better than I and the more we work together the less disagreement there would be on the final numbers.

Once the more precise estimates are made there should be a list of the assumptions and a range of the effects (5,000 – 7,000 rather than 6,300). I would also recommend that we provide estimates on the effects of each reform to the counties as was done for the trial.

What I have done is list the data one would need to make such estimates. In some cases (especially reforms #1, #4 and #5), there will be a need to sample cases since the data do not exist in the CDCR databases.

To conduct estimates for these and other reforms, the basic data files needed would be:

1. Prison admissions (last 12 months),
2. Prison releases (last 12 months),
3. The current prisoner population,
4. The current parole population and
5. Parole releases (last 12 months).

Each file would have to contain the same core data elements that I have previously received from the CDCR (offense, sentence, classification and risk assessment, and demographics). My understanding is that these data can be readily assembled and made available to me.


**1. Alternative Custody for Low Risk Offenders. Estimated at 6,300.**

This reform would allow low risk prisoners to serve the last portion of their sentences in the community. There is no mention of whether certain offense categories of offenders other than low risk would qualify. Such a reform could be used to quickly release newly sentenced prisoners with short sentences or place prisoners in the community much quicker after serving longer terms. It would also seem that the use of a GPS might not be required based on the risk level of the prisoner.

In order to estimate, I would need the prison release file, which would include a measure of risk associated with each releasee in order to identify the "low risk" person. In making the estimate one will need to factor in a GPS program failure rate (and thus re-incarceration rate) to the estimates as well as how much time will take to get the GPS units up and operating.

2. **Risk based parole supervision and lower parole agent caseloads. Estimated at 5,300.**

   This reform would create bank caseloads for parolees who are low and moderate risk and do not require supervision. Higher risk parolees would receive intensive supervision. The low and moderate risk parolees would not be returned to prison for technical violations. As noted later on in the memo there may be other methods for achieving these same goals that are more direct and effective.

   In order to evaluate this reform, I would need a data file of parolees being violated for technical violations and returned to prison (the prison admission file). The file would need to show the parolees risk level and the date and nature of the violation. The data would also have to show the disposition of the violation to see how much prison time these parole violators are now receiving.

3. **Commutation of Select Deportable Criminal Aliens. Estimated at 8,500.**

   This appears to be a straightforward reform. The data file needed here is a snapshot of the current CDCR population that would list the immigration status of each prisoner. One assumes that the commutation of the sentences for these prisoners would be an on-going reform in order to continually realize the gains made after the initial commutation effort is completed.

   The data file would also list offense, sentence, and projected release dates as well as other basic data elements.

4. **Adjusting Property Crime Thresholds and Felony /Misdemeanor Categories. Estimated at 5,600- prospective.**

There are two components to this reform. One is changing the definition of a "wobbler" from a felony/misdemeanor to only a misdemeanor. The most substantial offense would be the petty theft with a prior as there are over 5,000 prisoners now serving time for this offense. However, it appears the reform will not be made retroactively so it will take some time for the effect to build up.

The other component is changing the dollar amount threshold for certain property crimes from $400 to $2,500. To make this estimate the CDCR will need to audit a sample of cases, as the dollar amount is not listed in the CDCR data system.  I would suggest that a sample of 250 cases from the snapshot file to be used to expedite the work.

The prison admission, prison release and daily snapshot files would be used to make these estimates.

### 5. Program Credits. Estimated at 1,600.

This reform would grant additional good time credits to prisoners participating in and completing a set of rehabilitative services.  It is not yet clear how much good time would be allowed and for which programs. The number seems low but it's hard to say unless we know how much good time an inmate could get and which inmates are eligible.

The two data files needed here would be a prison release file and the current snapshot data file.  Program participation/completion rates would be the key data to have on these files.

## Other Reforms

There is another reform that the CDCR might want to consider.

### 1. Good time for parolees and probationers

The one that I feel would have a very positive effect would be allowing parolees to receive good time on parole so they could have their terms reduced and have a clear incentive for adhering to the rules of supervision. This would be a more effective way for reducing parole violations and the parole population.

Nevada passed this law several years ago and has seen its revocation rates and the parole population decline – which in turn has lowered the prison population. It is so effective that they now allow it for probationers, which

could also be done in California thus reducing probation revocations and the size of the probation population.

# EXHIBIT B

**Don Specter**

**From:**   Don Specter [dspecter@prisonlaw.com]

**Sent:**   Tuesday, September 01, 2009 4:06 PM

**To:**   'Kyle Lewis'; 'mbien@RBG-Law.com'

**Cc:**   'Rebekah Evenson'

**Subject:** RE: Plata/Coleman -- Consultation with parties regarding State'splan

Kyle,

While we appreciate your clients' willingness to consult with us, we do not think the proposed September 14 meeting will be meaningful, or meet the requirements set forth in the Court's August 4 order that defendants consult with the parties in developing the plan. The consultation needs to be more than a pro-forma presentation of what defendants will tell to the court four days later. The Court contemplated that the consultative process should "resolve any objections to the proposed population reduction plan."

To meet the Court's consultation requirement:

1. The parties need to meet sooner than September 14, even if that means meeting before the end of the legislative session. The State's compliance with the Order is not contingent on legislative action. The defendants can include in the population reduction plan measures that would require this Court to waive State law, and under the PLRA the Court may issue an order waiving State law so long as the PLRA's preconditions are met. Also, we read the court's order as requiring the State to involve plaintiffs in the discussion as the plan develops, not just providing plaintiffs with a draft of a finalized plan; thus, meeting before the legislative session ends will not be a futile exercise.
2. Plaintiffs need basic information about the current prison population. Plaintiffs will be utterly unable to engage in a meaningful consultation if you do not provide us with the data necessary to evaluate any plan you propose. For example, Matt Cate has indicated in public comments that defendants' plan will likely follow the Governor's legislative proposals to reduce the prison population by 37,000 inmates over two years. But those proposals are fairly vague, and have, to date, been presented publicly only in bullet-point format. There is not enough detail for us to fully analyze the impacts of those population reduction methods (e.g., the claim that the population will be reduced by 5,300 prisoners if we put non-serious, non-sex, low-risk parolees on a "banked" caseload, and make those parolees ineligible for return to prison based on a parole violation). The only way for us to evaluate this proposal is to know how many non-serious, non-sex, low-risk parolees there are, and how many are currently being returned to prison for parole violations. My email to Paul Mello of August 21 explains the type of information we need. I've attached the description to this email as well.
3. Plaintiffs need information about the State's proposals in advance of our in-person meeting – otherwise, we won't be able to do any of the necessary analysis, and there will not be a meaningful opportunity to resolve any objections.

Please let me know by tomorrow at noon whether your clients will agree to an earlier consultation, and to give us the necessary data and information in advance of our meeting. If we can't resolve this issue, we will seek assistance from the court tomorrow afternoon.

Thank you for your attention to this issue.

Don

---

**From:** Kyle Lewis [mailto:Kyle.Lewis@doj.ca.gov]
**Sent:** Tuesday, September 01, 2009 2:11 PM
**To:** dspecter@prisonlaw.com; mbien@RBG-Law.com
**Subject:** Plata/Coleman -- Consultation with parties regarding State'splan

Dear Don and Mike,

In accordance with the three-judge court's August 4, 2009 order, State
defendants write to schedule meetings concerning its prison plans.  The
State's prison plans are currently under development.  Because the
legislative session ends on September 11, 2009, State defendants do not
believe it would be appropriate to meet before Monday September 14,
2009.  In addition, State defendants' decision to consult with the
parties concerning its plan and the submission of any plan to the
three-judge court should not and does not constitute the waiver of any
and all appellate rights it has with respect to the August 4, 2009
order.  In fact, State defendants will be appealing the August 4th order
because they believe it to be both legally and factually flawed.

Due to the short time frame between the end of the legislative session,
and the three-judge court's September 18, 2009 deadline, State
defendants would like to meet with you on September 14, 2009 from
2:00 PM to 3:30 PM.  The meeting will take place at the following location:

CDCR Headquarters
1515 S Street, Suite 502
Sacramento, CA 95811

Please confirm, at your earliest convenience, your availability to meet
on the date and at the time listed above.

Thank you.

--Kyle

Kyle A. Lewis
Office of the Attorney General
Department of Justice, State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA   94102
Telephone:  (415) 703-5677
Facsimile:  (415) 703-5843
E-mail:  Kyle.Lewis@doj.ca.gov

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally

privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT C



**CDCR Prison Population Reduction Package**
*By the Numbers*

The Administration has proposed a budget reduction package designed to reduce Average Daily Population (ADP) by approximately **27,300**, which is estimated to save up to **$1.2 billion** if fully implemented in the 2009-10 fiscal year. This document lays out the estimated prison population reduction numbers for FY 2009-10 involved with each proposal:

### POPULATION REDUCTIONS

- **Alternative Custody Options for Lower-Risk Offenders:** Proposal would provide alternative custody options for lower-risk offenders to reduce costs and strain on the state prison system. Certain offenders would be eligible to serve the last 12 months of their sentence under house arrest with GPS monitoring. House arrest may include placement in a residence, local program, hospital or treatment center. Statutorily eligible inmates would include inmates with 12 months or less remaining to serve, and elderly or medically infirm inmates. *Estimated to reduce the prison population by 6,300 ADP.*

- **Risk-Based Parole Supervision and Lower Agent Caseloads:** Proposal would target active parole supervision to offenders with a serious or violent commitment history, sex offenders, and those assessed as high risk. The remaining offenders, largely low and moderate risk, nonviolent felons, would be placed on administrative or "banked" parole, but would continue to be subject to warrantless search and seizure by local police. CDCR will reduce parole caseload ratios from 70-1 to 45-1, improving supervision and services for those with the highest risk of reoffending. Parolees who commit certain parole violations will be eligible for placement on GPS supervision as an alternative to returning them to prison. *Estimated to reduce the number of parole violators in prison population by 5,300 ADP.*

- **Commutation of Select Deportable Criminal Aliens:** The California Constitution provides the Governor the authority to commute prison sentences. The Governor will review the cases of criminal alien felons who are subject to deportation upon release on a case-by-case basis starting with the lowest level offenders. The first group to be considered for commutation will by those inmates who have never committed a violent or sex offense and who have only one felony in their entire adult criminal history. *Could reduce the number of criminal alien felons in California prisons by up to 8,500 ADP.*

- **Adjusting Property Crime Thresholds and/or Changing Crimes to Misdemeanors:** Proposal would reduce from wobblers to misdemeanors property crimes associated with writing bad checks, petty theft with a prior, receiving stolen property, vehicle theft and grand theft crimes, and change the monetary threshold that determines whether the property crime is a misdemeanor or felony from $400 to $2,500. For wobblers where there is no monetary threshold specified (e.g., vehicle theft), a $2,500 threshold would be added. *Estimated to prospectively reduce the prison population by 5,600 ADP.*

- **Positive Behavior and Rehabilitation Program Credit Enhancements:** Proposal would allow inmates who participate in and complete rehabilitation programs such as GED, college degrees, and vocational training, to earn additional sentence credits. Credits would also be increased for discipline-free time served in county jail, during parole violations, or while waiting for programs to become available. *Estimated to reduce the prison population by 1,600 ADP.*

####

# EXHIBIT D

# CAPITOL WEEKLY

THE NEWSPAPER OF CALIFORNIA GOVERNMENT AND POLITICS

## Prisons: it's time to reform and reduce population

By **Mathew Cate** | 08/13/09 12:00 AM PST

Federal courts are telling California that we are out of time when it comes to reducing inmate overcrowding. The Legislature and the Governor agree that we are out of money, and have cut $1.2 billion from the Corrections budget. Now is the time for elected officials and law enforcement to come together and pass criminal justice reforms that will safely reduce our inmate population.

Inmate "early release" is a radioactive term, and something that everyone wants to avoid. Yet, a three judge court ruling issued last week seeks to impose a cap that could force the release of upwards of 40,000 inmates over the next two years. While the state will likely appeal the ruling, lawmakers should not sit idly by and leave it up to the courts. The recent riot in Chino demonstrates the perils of severe overcrowding. California needs a package of sensible prison, parole and sentencing reforms that will allow our prisons to reduce population over time without swinging open the gates for serious and violent criminals and jeopardizing the safety of our communities.

The best minds in California and the nation have already provided us with recommendations. Five years ago, the Deukmejian Commission outlined ways that we can target resources on higher risk offenders and reduce costs, without increasing crime rates. An expert panel convened by the Schwarzenegger Administration has given us a roadmap to reducing recidivism. The Administration has adopted the recommendations of both these groups in drafting its current reform proposals.

The one remaining piece of the puzzle is the passage of these population and budget reduction proposals. When the Legislature returns next week, public safety reforms must be a focal point of discussion.

Over the past several months, the Administration has worked with law enforcement stakeholders to refine a plan that we believe can reduce the prison population by up to 27,000 inmates this year, and 37,000 through 2009-10, and avert the early release that has been widely feared with the following five key components:

• Risked based parole supervision to reduce agent to parolee caseloads while maintaining law enforcement's search and seizure rights on non-serious, low-risk parolees;

• House arrest or alternative custody with GPS for elderly or infirmed inmates, or low-level offenders with 12 months or less remaining;

• Commutation to Immigration and Customs Enforcement custody of criminal alien felons who can be immediately deported to their country of origin if they're not prosecuted by the feds;

• Changing sentencing for low level offenders convicted of writing bad checks, petty theft with a prior, receiving stolen property, and vehicle theft so that they don't occupy $48,000 per year state prison beds for low-level property crimes, and raising the grand theft threshold for the first time since 1982 from $400 to $2,500; and,

• Motivating low-level offenders to complete in-prison GED, vocational, or substance abuse programs by offering up to six weeks off of the end of their sentences.

In addition to these population reduction strategies, CDCR is slashing operational costs. We are cutting over 400 positions from headquarters, reducing our programs budget by $250 million, curtailing overtime and sick leave abuse, and increasing efficiencies across the agency.

It is the duty of California's elected officials and appointed representatives of the people to make these tough decisions on budgeting for public safety resources. We cannot let the courts exert further control over our system, or allow this critical situation to worsen. With a $1.2 billion hole in our departments

budget that needs to be plugged immediately, and the price of inaction mounting at over $100 million a month or more, lawmakers cannot afford to wait any longer.

If California is to avoid court-ordered early release, and have the resources to keep serious, violent, and sex offenders locked up, our elected officials need to pass a sensible package of smart-on-crime bills in the coming weeks that allow us to reduce our prison population on our own terms.

Copyright ©2009 :: Contact Us



Bookmark & Share

| | |
|---|---|
| Favorites | Print |
| Delicious | Digg |
| Google | MySpace |
| Live | Facebook |
| StumbleUpon | Twitter |
| More... (54) | |

What's this?                                 AddThis