Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, D.C.  20009
Telephone:  301-292-3737
Facsimile:  301-292-6272

REPORT ON SUICIDES COMPLETED
IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION IN
CALENDAR YEAR 2007

## I.    Introduction

This is the ninth annual Report on Completed Suicides in the California Department of
Corrections and Rehabilitations ("CDCR" or "Department"), covering all 34 such deaths which
occurred in calendar year 2007.  It is submitted as part of the Special Master's continuing review
of the Defendants' compliance with court-ordered remediation in the matter of Coleman v.
Schwarzenegger, No. CIV S-90-0520 LKK JFM P (E.D. Cal.).

As discussed in greater detail in Parts V and VI below, a number of significant findings emerged
from this reviewer's examination of all 34 suicides in 2007. These findings include the
following:

- **In 2007, the rate of suicides in CDCR prisons was 19.7 per 100,000 inmates.  This
  rate was a continuation of the CDCR's pattern of exceeding the national prison
  suicide rate which was 17 per 100,000 for the period from 2005 through 2006 (the
  latest years reported).**

- **The CDCR suicide rate per 100,000 inmates for 2007 was higher by 1.5 percent than
  the CDCR average annual suicide rate per 100,000 inmates for the preceding nine
  years.**

- **In 82 percent of the suicide cases in 2007, there was at least some degree of
  inadequacy in assessment, treatment, or intervention, for the highest rate of
  inadequacy in these areas in the past several years.**

- **A number of inmate suicide risk assessments finding levels of risk ranging from
  "moderate" to "severe" were not followed by interventions that were appropriate to
  these risk levels.**

- **Some inmates whose assessments indicated that they should have been placed on the
  mental health caseload were not.**

- **In 22 percent of suicide cases, cardiopulmonary resuscitation was not performed in
  a timely and/or appropriate manner.**

1

- **Deadlines in completion and submission of required Departmental documentation of suicides were missed in 79 percent of cases.**

- **Some required Departmental reporting on suicides was not completed at all as of the time of this writing.**

- **Although three suicides of CDCR inmates occurred within the Department of Mental Health (DMH), it refused to provide complete documentation of the implementation of quality improvement plans (QIPs) and other action plans to CDCR on the pretext of patient confidentiality.**

Clearly, these findings give rise to concern and should be addressed by the Department, as discussed more fully later on in this report.

Like suicide reports for previous years, this one is a comprehensive report discussing all suicides which occurred during 2007.  It summarizes the demographic and mental health characteristics of all of these inmates, and includes this reviewer's overall critique of the Department's levels of compliance with the various applicable standards for suicide prevention within CDCR institutions, as well as his recommendations based on his findings and conclusions.

Some of the information contained in this report is presented in chart format within the body of the report. Chart 1 shows the frequency of suicides by institution.  Chart 2 shows inmate demographic information and other factors, categorized according to these factors.  Tables 1 and 2 both show, by inmate, individual demographic and mental health characteristics.  Table 2 also includes limited information on the times of the Department's responses to certain suicide review protocols.

Appendix A summarizes the timeframes for clinical and executive review and documentation of completed suicides.  Appendix B to this report contains in-depth case reviews of each of the 34 suicides. These individual case reviews also include an assessment and critique of the Department's own suicide review and its compliance with applicable procedures. Lastly, Appendix C is a glossary of the acronyms which appear in this report.

## II.   <u>Terminology and Definitions</u>

In this report, the terms "foreseeable" and "preventable" are used as they were in previous reports.  They describe the adequacy and implications of the CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgments, and utilization of clinical and custodial alternatives that are used to reduce the likelihood of completed suicides.  The CDCR Division of Correctional Health Care Services (DCHCS) has frequently required that facilities conduct suicide prevention training, and has taken the lead with it in its Suicide Prevention and Response Focused Improvement Team (SPRFIT) process.  While the importance of such training cannot be understated, neither can the importance of staff supervision following the training.  Currently, there appears to be a lack of adequate supervision at various levels.  It should be conducted by both clinical and custodial supervisors at not only the institutional level but also at the level of the DCHCS and the Division of Adult Institutions (DAI).

The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of a substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s).  Assessment of the degree of risk, whether high, moderate, or low to none, is an important component in determining foreseeability.  In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk and the most appropriate and relevant interventions to prevent suicide.  These interventions may include, but are not limited to, changes in clinical level of care (LOC), placement on suicide precautions or suicide watch, and changes in housing, including utilization of safe cells and transfers to higher LOCs.  Individuals evaluated as "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation, with appropriate notification of clinical staff of a potential for self injury and/or suicidal ideation or activity.

The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy.  Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.  First responders in CDCR include custody officers.  As discussed in detail in Appendix B, in 2007 there were suicide cases in which custody officers did not perform CPR or other life saving measures, including first aid, on inmates when they arrived on the scene.  Again, this issue transcends mere training and calls for appropriate supervisory responsibility.

As utilized in the CDCR 2005 Annual Report on Suicides, "suicide" is defined in the sources indicated below, as follows:[1]

> World Health Organization:  Suicide is the result of an act deliberately initiated and performed by a person in the full knowledge or expectation of its fatal outcome.

> National Violent Death Reporting System, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention:  Suicide is a death resulting from the intentional use of force against oneself.  A preponderance of evidence should indicate that the use of force was intentional.

The CDCR Annual Suicide Report for 2005 classified as suicides any deaths under the circumstances described below:

- A person committed a suicidal act, then changed his mind, but still died as a result of the act.

---

[1] *See CDCR Annual suicide Report for 2005*, Appendix I, Suicide Determination Guidelines.

- A person intended only to injure rather than kill himself, for example by playing "Russian roulette" voluntarily with a firearm.

- Assisted suicide, including passive assistance to the decedent, for example by supplying only information or the means needed to complete the act.

- Intentional, self-inflicted death committed while under the influence of a voluntarily-taken mind-altering drug.

- Intentional, self-inflicted death committed while under the influence of a mental illness.

According to the CDCR Annual Suicide Report for 2005, deaths under the circumstances described below should *not* be classified as suicides:

- The physical consequences of chronic substance abuse, including alcohol or drugs (natural death).

- Acute substance abuse, including alcohol or drugs, with less than a preponderance of evidence showing intent to use the substance(s) against oneself (undetermined or unintentional injury or death).

- Death as a result of autoerotic behavior, e.g., self-strangulation during sexual activity (death by unintentional injury).

## III.    Developments in Suicide Prevention

In 2006 and 2007, there were a number of significant developments with regard to suicide prevention in the CDCR prisons. Study of the problem led to a more focused effort to identify and eliminate a number of factors that correlated with the disturbingly high rate of suicides in administrative segregation units. A summary of these developments is helpful for a greater understanding of the conditions that surrounded the suicides that are covered in this report.

On October 2, 2006, CDCR submitted its Plan to Address Suicide Trends in Administrative Segregation Units, and on December 1, 2006, it submitted its amended version.[2] This plan was ordered by the Coleman court on June 7, 2006, following a set of recommendations from the Coleman Special Master to curb a disturbing trend of rising suicides in CDCR administrative segregation units.[3] While development and implementation of the Plan remained ongoing at the end of 2006, CDCR had begun taking steps in its implementation.

---

[2] Following circulation of this report in draft form to the parties on June 23, 2009, defendants requested that the status of their compliance with this plan as of March 2009 be included in this report. However, this report covers the period of calendar year 2007, and consequently any developments and events which occurred in 2009 are beyond the scope of this report.

[3] Defendants objected to this writer's use of the term "disturbing trend" on the assumption that it was based on the period of two to three years before 2006, and on the further assumption that trends can be measured over only five-

In October 2006, CDCR began requiring 30-minute welfare checks of inmates during the initial three weeks of their stays in administrative segregation. It had also devised a plan to modify the large-mesh ventilation screens in 406 administrative segregation intake cells, on a schedule to modify 66 by April 2007, 85 by July 2007, and the remaining 255 by September 2007. Other cell modifications consisted of installation of concrete slabs, elimination of cell protrusions, replacement of vents or installation of cell vent coverings, replacement of light fixtures or installation of light coverings, and replacement or modifications to cell doors in order to increase visibility into cells.

Also as part of their Plan to Address Suicide Trends in Administrative Segregation Units, defendants submitted a procedure and timetable for pre-placement screening of inmates endorsed for transfer to administrative segregation units. These screenings were to be implemented by June 2007. However, they were not conducted in all facilities as anticipated. For example, in one of the suicide cases covered in Appendix B, the pre-placement screening was done in the presence of a captain as part of that facility's usual and customary procedure. Another item in the plan was proposed allowance of certain items of personal property for those inmates in administrative segregation for non-disciplinary reasons. By December 29, 2006, CDCR provided such proposed revisions to CDCR executive staff for their review.

The Coleman court order entered on June 9, 2005 also directed defendants to develop and implement a policy that requires properly trained custody staff to provide immediate life support until medical staff arrives, or to continue life support measures, irrespective of whether the obligation to do so is part of the custody staff member's duty statement. After extensive negotiation between the parties, CDCR reported to the Coleman court on January 31, 2006 that training on the amended CPR policy and use of the mouth-shield, preparation of procedures for taking inventories of cut-down kits, and the conduct of such inventories were occurring system-wide. In addition, CDCR directed wardens to ensure that any incident report form for incidents requiring the initiation of CPR must include whether CPR was performed, and if not performed, a detailed explanation as to why not; the classification of person(s) who administered the CPR; and the outcome of CPR efforts. Unfortunately, in the sole reported suicide death by a woman in 2007, CPR efforts were inadequate.

Another change in suicide prevention procedures during 2006 was CDCR's voluntary placement of a moratorium as of April 10, 2006 on the use of video monitoring as the sole means of conducting suicide watches. This suicide prevention measure was embodied in a stipulation signed by the Coleman parties and entered as an order by the Coleman court on August 8, 2006.

By mid-2007, efforts to implement suicide prevention measures in administrative segregation had continued, but more work was needed. On May 14, 2007, the Coleman Special Master reported in his Supplemental Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation that the defendants' proposed completion date for construction of more small management yards in 2012 was too late, and that defendants should not rely on inmate day labor to do the work, as that may lead to obstacles to completion of the

---

year time increments. These assumptions are mistaken, as this writer is relying on the longer-term general trend of increasing suicides in administrative segregation in CDCR, which goes back to at least 1999. *See* page 7-8, *infra*.

yards.  Thirty-minute welfare checks during the first three weeks of inmate stays in administrative segregation were occurring, but with inconsistencies in proper conduct and documentation.  Defendants reported that modification of the large-mesh ventilation screens in 66 intake cells in stand-alone administrative segregation was completed by April 1, 2007, as required by their Plan.  They reported to the Special Master that they were on schedule for completion of the balance of 340 such screens by September 1, 2007,[4] for a total of 406.  The plan also required defendants to complete by July 2008 a number of changes to physical features of non-stand-alone intake cells, including replacing doors, in order to increase visibility into the cells.  Defendants reported at the end of May 2007 that they were in the process of assessing their budget to accomplish these renovations.

With regard to reducing lengths of stay in administrative segregation, in the spring of 2007, defendants cited delays in referrals of charges to the local district attorneys and said that they would address these issues directly with the district attorneys.  They also instructed all institutions to assess their logistical abilities to provide in-cell radios and televisions to inmates in administrative segregation for non-disciplinary reasons.  Insofar as use of the mental health tracking system for tracking inmates' histories of suicidality, the Coleman Special Master stated in his May 14, 2007 report that staff needed further training and improved access to such inmate histories.  Defendants had circulated proposals for screening inmates for suicidality prior to their placements in administrative segregation, and for awareness of potential suicidal tendencies following an inmate's receipt of "bad news" at court or otherwise.  Defendants also reported that mental health staff would be conducting the 31-item post-placement mental health screening interviews in private settings, but Coleman monitoring found that some were still not occurring in confidential areas, and that defendants still had not conducted their assessments of resources to provide privacy for these sessions.[5]

An important part of the defendants' plan was its initiative to aggressively increase emergency response to attempted suicides, including administration of CPR.  It called for CPR refresher training, which refers to reinforcement of custody staff's awareness of its responsibility to provide CPR.  The Coleman Special Master reported in mid-2007 that no documentation had been provided to establish that the required CPR refresher training had actually been completed.

Following the Special Master's report of May 14, 2007, the Coleman Court ordered on May 31, 2007 that the defendants must accomplish the following suicide-reduction measures within 60 days:

> o  develop a plan to require each institution to train staff on accurate logging of 30-minute welfare checks and to track and self-monitor compliance with the performance of these checks;

---

[4] As defendants had previously stated in their December 1, 2006 response to plaintiffs' objections to defendants Plan to Address Suicide Trends in Administrative Segregation, Declaration of George Sifuentes, ¶ 8.

[5] In their response to the draft of this report, defendants requested that it cite their efforts during the 21st monitoring period.  This report covers calendar year 2007; the 21st monitoring period covered the period from April through November 2008, and as stated above, any developments in such later periods are beyond the timeframe covered in this report.

- o provide budgetary figures for the construction of the physical features of the non-stand alone intake cells;

- o submit a report on each institution's capability to provide televisions and/or radios to inmates in administrative segregation;

- o submit a status report on the implementation of the suicide history tracking system and a plan to train staff in its use and improve access to suicidal history data at all relevant times;

- o provide a specific assessment of their space needs for providing confidential mental health interviews; and

- o produce evidence that required CPR refresher training was accomplished by submitting documentation of the required proof of practice.

The Coleman court also overruled defendants' proposed use of inmate day labor to construct small management yards as a basis for objection to the Special Master's recommendation that these yards be completed by the end of fiscal year 2008/2009.

On July 30, 2007, defendants reported that 367 of the 406 total large-mesh ventilation screens in administrative segregation intake cells had been modified, and that modification of the remaining 39 was on schedule for completion by September 1, 2007. With regard to CPR training, defendants reported on August 3, 2007 that custody officers in administrative segregation units attended CPR refresher training in the fall of 2006. Every shift at every institution was required to conduct an emergency response drill once per month, with varied scenarios to reflect a wide range of emergency situations. Defendants also reported that in December 2006, ten correctional officers at each institution had received CPR/first aid trainer certification and were responsible for conducting CPR skills training they would continue to annual training in CPR skills. On August 6, 2007, defendants further reported that they had devised and distributed their plan to require each institution to train staff on accurate logging of 30-minute welfare checks. Defendants reported on August 21, 2007 that they had also surveyed availability of in-cell access to radio and television for non-disciplinary inmates in administrative segregation, and had found that in-cell electrical power access was unavailable at nine institutions

## IV.    Statistical Summary of Suicides in 2007

The chart below offers an overview of the annual rates of suicides among CDCR inmates which occurred during the decade ending with calendar year 2007. As indicated below, although the suicide rate for 2007 was lower than it had been for the two immediately preceding years, it was still higher than the rate for six of the nine preceding years.[6] Annual suicide rates since 1998 per 100,000 inmates in CDCR have been as follows:

---

[6] Defendants requested that this sentence be deleted and replaced with the sentence, "Defendants' programmatic improvements and physical plant improvements resulted in fewer suicides in 2007 than in the preceding two years." Given defendants' track record with the rate of suicides within CDCR since 1999, the decrease in suicides in 2007 from the preceding two years is not so marked as to be remarkable. It is also curious that defendants seek this

1998 – 22 suicides in a population of approximately 158,159
          Completed suicide rate of 13.9/100,000

1999 – 25 suicides in a population of approximately 160,970
          Completed suicide rate of 15.5/100,000

2000 – 15 suicides in a population of approximately 160,855
          Completed suicide rate of 9.3/100,000

2001 – 30 suicides in a population of approximately 155,365
          Completed suicide rate of 19.3/100,000

2002 – 22 suicides in a population of approximately 158,099
          Completed suicide rate of 13.9/100,000

2003 – 36 suicides in a population of approximately 155,722
          Completed suicide rate of 23.1/100,000

2004 – 26 suicides in a population of approximately 163,346
          Completed suicide rate of 15.9/100,000

2005 – 43 suicides in a population of approximately 164,179
          Completed suicide rate of 26.2/100,000

2006 – 43 suicides in a population of approximately 171,340
          Completed suicide rate of 25.1/100,000

2007 – 34 suicides in a population of approximately 172,535
          Completed suicide rate of 19.7/100,000

Charts 1 and 2 below summarize the 34 suicides which occurred in 2007 by various
characteristics, as indicated:

## CHART 1

Frequency of 34 total suicides, by facility:

| | |
|---|---|
| High Desert State Prison (HDSP) | 4 |
| California Correctional Institution (CCI) | 2 |
| California Medical Facility (CMF) | 2 |
| California State Prison, Sacramento (CSP/Sac) | 2 |
| California State Prison, Corcoran (CSP/Corcoran) | 2 |
| Correctional Training Facility (CTF) | 2 |

---

modification, as it is apparently their hypothesis that trends cannot be measured over any time period which is less
than five years in duration,. *See infra* p. 4-5, n. 3.

| | |
|---|---|
| DMH/APP at California Medical Facility (CMF) | 2 |
| Deuel Vocational Institution (DVI) | 2 |
| Atascadero State Hospital (ASH) | 1 |
| Avenal State Prison (ASP) | 1 |
| California Correctional Women's Facility (CCWF) | 1 |
| California Institution for Men (CIM) | 1 |
| California Rehabilitation Center (CRC) | 1 |
| California State Prison, Los Angeles County (CSP/LAC) | 1 |
| California Substance Abuse Treatment Facility (CSATF) | 1 |
| Corcoran District Hospital (from CSATF) | 1 |
| Kern Valley State Prison (KVSP) | 1 |
| Mule Creek State Prison (MCSP) | 1 |
| Pelican Bay State Prison (PBSP) | 1 |
| Pleasant Valley State Prison (PVSP) | 1 |
| Richard J. Donovan Correctional Facility (RJD) | 1 |
| San Quentin State Prison (SQ) | 1 |
| Sierra Conservation Center (SCC) | 1 |
| Wasco State Prison (WSP) | 1 |

TOTAL:            34

## **CHART  2**

o   Single-Cell Housing

       23 of 34          (68%)

o   Inmates Incarcerated for Sex Offenses ("R" Suffix)

       7 of 34          (21%)

o   Method

       • Hanging

       25 of 34          (74%)

       • Overdose

       5 of 34          (15%)

       • Suffocation

       2 of 34          (6%)

- Water Intoxication

  1 of 34          (3%)

- Trauma

  1 of 34          (3%)

o History of Suicidal Behavior

  27 of 34          (79%)

o History of Mental Health Treatment

  29 of 34          (85%)

o Housed in Infirmary, mental health crisis beds (MHCBs), outpatient housing unit (OHU), psychiatric services unit (PSU), or DMH

  4 of 34          (12%)

o Housed in Administrative Segregation Unit (ASU) or Secured Housing Unit (SHU)

- ASU:  11 of 34  (32%)

- SHU:   2 of 34   (6%)

- Total:  13 of 34  (38%)[7]

o Inmates on Keyhea Order for Involuntary Medication

  2 of 34          (6%)

o Concomitant Severe or Life-Threatening Medical Illness

  10 of 34          (29%)

o On Mental Health Service Delivery System (MHSDS) Caseload at Time of Death

  24 of 34          (71%)

---

[7] Compare with rates of suicides in administrative segregation units or secured housing units, at 44 percent in 2006, 33 percent in 2005, 73 percent in 2004 (single-celled) and 57 percent in 2003.

- 4 in Enhanced Outpatient Program (EOP) (15% of all suicides, 21 % of suicides by inmates on the MHSDS caseload)

- 17 in Correctional Clinical Case Management System (3CMS) (50 % of all suicides, 63% of suicides by inmates on MHSDS caseload)

- 3 in DMH (2 in CMF APP, 1 in ASH) (9% of all suicides, 13% of suicides by inmates on MHSDS caseload)

  o Age Range

  - Under 18        0           (0%)
  - 18-30            7 of 34     (21%)
  - 31-34            16 of 34    (47%)
  - 41-50            5 of 34     (15%)
  - 50+              6 of 34     (18%)

  o Race

  - Caucasian            15 of 34  (44%)
  - Hispanic             14 of 34  (41%)
  - African American      3 of 34  (9%)
  - Native American       1 of 34  (3%)
  - Filipino              1 of 34  (3%)

  o Gender

  - Male                 33 of 34  (97%)
  - Female                1 of 34  (3%)

  o Significant Indications of Inadequate Treatment

      28 of 34          (82%)

## V.    Discussion and Observations:

As stated above, there were 34 deaths during calendar year 2007 that, more likely than not, were the result of suicide.[8] Three of the 34 suicide deaths occurred within facilities of DMH. Thirteen

---

[8] For one additional inmate death within CDCR, the coroner concluded that its manner and cause were both "undetermined."  Based on the insufficiency of presently available information, this reviewer agrees with CDCR's position that the cause and manner of this death are appropriately "undetermined" at this time.  In the event that additional information becomes available in the future and suggests a different conclusion, this death will be re-examined.

of the suicides occurred in administrative segregation or a secure housing unit (SHU), and another three occurred within CDCR reception centers.  One was committed by an inmate in an OHU, and none were committed by inmates in MHCBs.  One of the suicides was committed by a woman housed in CCWF.  Twenty five, or 73 percent, of the suicides among CDCR inmates were accomplished by hanging.

The suicide rate for calendar year 2007 was 19.7 per 100,000, based on an average daily CDCR inmate population of 172,535.[9]  From 1998 to 2007, the suicide rate for inmates in CDCR ranged from a low of 9.3/100,000 in 2000 to a high of 26.2/100,000 in 2005. Overall, for the same ten-year period, the average annual suicide rate per 100,000 inmates was 18.2.  More recently, since 2004, the rate has ranged from 15.9 per 100,000 in 2004 to 26.2 per 100,000 in 2005, and most recently from  2006 to 2007, the suicide rate dropped from 25.1/100,000 to 19.7/100,000.

CDCR suicide rates have been consistently higher than national prison suicide rates.  Across prisons in the United States, the rate was calculated at 17 per 100,000 for the period from 2005 through 2006 (the latest years reported by the U.S. Department of Justice, Bureau of Justice statistics).

Examination of the individual suicide cases in 2007 revealed that for 24, or 82 percent, of the 34 inmates who completed suicides, there had been at least some degree of inadequate assessment, treatment, or intervention.  This finding was based on the presence of information that was or should have been available to clinical staff.  These suicides were, therefore, most probably foreseeable and/or preventable.  Even more concerning is the fact that this high rate of inadequacy in assessment, treatment, or intervention is worse than the rates of 72.1 percent for 2006, 74.4 percent for 2005, and 76.9 percent for 2004.  These numbers clearly indicate no improvement in this area during the past several years, and possibly signal a trend of ongoing deterioration, given that the rate of inadequate assessment, treatment, or intervention five years earlier in 2002 was 45 percent.

The case reviews in Appendix B demonstrate the specifics with regard to individual inmates and suicide risk assessment checklists (SRACs).  While this reviewer found that SRACs were completed appropriately in the majority of the cases, there were a number in which SRACs had resulted in determination of "no risk."  Staff did not properly prepare SRACs according to CDCR policy by failing to:

- obtain information that was available in records or via staff referrals, and instead relying only on inmates' self-reports;

- assess risk and/or protective factors;

- define an estimate of the risk based on the evaluation as "high," "moderate," "low," or "none";

---

[9] Source: *Average Daily Prison Population, Calendar Year 2007*, CDCR official website.

- develop and implement appropriate plans for follow-up evaluation and care; and/or

- recommend transfers of inmates to more appropriate clinical and/or custodial settings.

(*See* Tables 1 and 2, and Appendix B, for descriptions of specific instances of these deficiencies, in summarized and detailed fashion, respectively.)   In addition, there were a number of SRACs in which the risk was determined to be "moderate" or "high," and in one case "severe."  In these cases, the interventions should have been appropriate to these levels of risk, but were not.

In addition to the deficiencies in SRACs found among the aforementioned 82 percent of cases, there was also some measure of inadequate intervention and treatment, meaning that these suicides were therefore most probably foreseeable and/or preventable.  This finding was based on information that was or should have been available to clinical staff.  Instances of inadequate treatment included:

- canceled appointments that were not rescheduled
- referrals that drew no response
- past medical records that were not reviewed
- diagnoses that were unsupported
- inmate noncompliance with treatment that was not reassessed
- assignment of inmates to inappropriate levels of care
- failure to refer inmates to higher levels of care/supervision
- failure to provide immediate and/or appropriate CPR
- insufficient communication among clinical, medical, and custodial staffs
- failure to review documented histories in medical records, central files, and/or referral forms
- failure to provide adequate and timely screenings or custody monitoring and assessments of inmates on intake and/or placement in administrative segregation, upon transfers to other facilities, and/or on referrals to clinicians for assessment of suicide potential in correctional treatment centers (CTCs) or other clinical settings.

There continued to be inmates who were not placed on the mental health caseload, despite indications of their need for mental health interventions and/or psychotropic medications.  There were also cases with documented concerns about the need for assessment of inmates who demonstrated significant mental illness, past suicidal behavior, or suicidal ideation or statements, and for their placement into higher levels of care.

No doubt, the finding that 82 percent of cases were marked by inadequacy in treatment is troubling in itself.  However, even more concerning is its indication that the pre-existing pattern of poor performance in this area continues.  This is evidenced by a comparison of the 2007 rate with the rates found for preceding years. In 2006, the rate of findings of inadequate treatment or intervention was 72.1 percent, while in 2005, the rate was 74.4 percent, in 2004 it was 76.9 percent, and in 2003 it was 74.3 percent.  Prior to that, in 2002, the rate of suicides involving

inadequate treatment or intervention was 45.4 percent. These disheartening figures and the trend they indicate all point to the inexorable conclusion that practices in the treatment of suicidal CDCR inmates must be improved greatly and immediately.

The Department continued its effort to reduce suicide deaths by providing training on CPR requirements and on the suicide review process. However, it was apparent that CPR was not performed in a timely and/or appropriate manner in seven, or 22 percent, of the 34 suicides. This rate of non-compliance is lower than it was in calendar year 2006, when there were 17 such instances among 43 suicides, for a non-compliance rate of 40 percent.

Although there were some positive developments in suicide prevention policies and procedures, as described in Part III above, the Department not always keep pace with their implementation. Departmental response to suicides was marked by widespread lateness in completion and submission of required documentation. (*See* Appendix A for pertinent timelines). As of April 30, 2009, deadlines were missed in the reviews of 27, or 79 percent of, the 34 suicide cases**.** Data was incomplete for all three of the suicides in DMH facilities; for two of them, institutional responses to QIPs have not been produced as of this writing. For four of the suicide cases within CDCR prisons, institutional responses to QIPs were not provided to this reviewer or to the Special Master until May 1, 2009, and even then, they were incomplete. For a completed suicide which occurred on December 5, 2007, the Department's suicide report was not produced to this reviewer or the Special Master until April 17, 2009, and needless to say, there is still no QIP for that suicide as of this time, even though approximately 18 months have passed since its occurrence.

2007 was not the first year for which the Department failed to comply with deadlines for completion and submission of required documentation. Following distribution of the Special Master's expert's 2006 report on suicides in the CDCR in draft form, defendants stated in their response that they had failed to provide any of the mental health records within the Unit Health Record for one of the inmates whose suicide in 2006 was reviewed and included in the draft report. In the final version of this reviewer's Report on Suicides in the CDCR in 2006, Defendants were admonished that they "must ensure that no such lapses in their production of information occur again. Review of incomplete records can lead to erroneous conclusion and recommendations, and ultimately to allowing deficiencies in the defendants' suicide prevention efforts to remain undetected and uncorrected." *Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2006*, filed 9/12/08, at 1, n.1. Unfortunately, that admonition must be repeated, and failure to heed it in the future may result in a recommendation for an order from the court.[10]

While timely provision of complete information on suicides to the Office of the Special Master and his experts is important, its provision to CDCR facilities and staff is essential. The

---

[10] Defendants cite one 2006 suicide case in support of their plea that they should not be faulted for failing to produce the inmate's mental health records to this reviewer in a timely manner. The suicide they cite has already been covered in this writer's earlier Report on Suicides in 2006, and is therefore beyond the scope of this report. Defendants also argue that they should be excused from their tardiness because the inmate's UHR was in the possession of the <u>Plata</u> Receiver's office. That is no excuse, given their awareness of their duty to produce these records.

information which is gleaned from Departmental suicide review and response is critical to identification of problems and development and implementation of meaningful suicide reduction measures.  Furthermore, the timelines for CDCR's follow-up and reporting on each suicide are not merely arbitrary guideposts or a suggested schedule.  They were established within the <u>Coleman</u> Revised Program Guide.[11]  By order dated March 2, 2006, the <u>Coleman</u> court approved and ordered the defendants to immediately implement all but two provisions[12] of the January 2006 Revised Program Guide, which includes Chapter 10, "Suicide Prevention and Response." The aforesaid review and reporting timelines are set forth therein.   Thus, defendants' failure to abide by these suicide review timelines is not mere tardiness but is also a violation of court order.

In addition to lack of timeliness, some required reports were not completed and therefore not produced and distributed in accordance with the Department's own suicide review process. Particularly egregious examples of this included the suicides which occurred within DMH.  On a pretext of patient confidentiality, DMH refused to provide documentation on implementation of the QIP and other action plans to CDCR.  That practice should be stopped because it makes no sense.  CDCR and DMH are both responsible for the care and treatment of their mutual patients, and must be able to communicate about these patients with each other.

As this reviewer's past annual suicide reports have noted, there is great need for full implementation of the Departmental suicide review processes that are already in place.  Suicide prevention training by DCHCS, in its SPRFIT process, has emphasized that suicide prevention measures must be taken on a case-by-case basis.  That, however, is only half of the story, for it remains clear that such training of staff must be reinforced by supervision.   This supervision must occur not only at the facility level by both clinical and custodial supervisors, but also at the central office level by the DCHCS and the DAI.  Those who are responsible for supervision and evaluation of staff must carry out this aspect of the suicide reduction process, or be held accountable for not doing so.

## VI.   <u>Findings</u>:

Analysis of the individual suicide cases reviewed in Appendix B yielded a number of findings. These were particularly disturbing for the three suicides by CDCR inmates which occurred in DMH facilities. Many of the findings drawn from the case discussions in Appendix B are consistent with conclusions reached in earlier annual suicide reports, and are as follows:

- The majority of the 34 inmates who committed suicide had histories of mental health treatment and/or suicidal behavior.  Twenty nine, or 85 percent, of the 34 suicides were committed by inmates who had received mental health treatment in the past, and 27, or 79 percent, had histories of suicidal ideation or behavior.

---

[11] *See Mental Health Service Delivery System Program Guide*, September 2006, Chapter 10, "Suicide Prevention and Response" at 12-10-24 – 12-10-29.

[12] At that time, two disputed provisions of the January 2006 Revised Program Guide would have, if implemented, reduced the amount of care which was mandated by the 1997 Program Guides.  Those two provisions concerned the number of daily psych tech rounds for non-MHSDS inmates in administrative segregation, and the number of clinical contacts for 3CMS inmates in administrative segregation.  The <u>Coleman</u> court ordered that the more stringent requirements of the 1997 Programs Guides continue to apply, rather than the lesser requirements proposed by the defendants.

- Three suicides in administrative segregation were completed by suffocation, medication overdosing, or water intoxication, respectively. These deaths raise serious concerns regarding the monitoring of inmates by custody and clinical staff. Clinical assessment, custody monitoring, and access to controlled medications have been a continuing concern in administrative segregation units. Among the cases reviewed, one involved an inmate in administrative segregation who managed to maintain possession of a plastic bag which he used to suffocate himself. In another, the inmate overdosed on medications which should have been administered under some form of observation. And in a third case, the inmate was able to overdose himself by drinking large quantities of water, in a cell where access to water is controllable. This inmate had a recent history of attempting to overdose on water in the recent past, clearly necessitating collaboration between clinical and custody staff.

- Inadequate and untimely completion of the SRACs remained an ongoing problem that was detected in review of a number of the suicides. There were variations among the institutions with respect to screening inmates who were placed in administrative segregation units, as well as with conducting 72-hour screenings in confidential settings. This continued to have an adverse effect on the adequacy of information that clinicians were able to obtain and incorporate into their overall assessments. Although such screenings are to be conducted in confidential settings, and staff continues to receive instruction via video that was instituted by CDCR administrative, staff supervision at the institutional level to ensure that these policies were being followed appeared to be inadequate.

- As in previous years, during 2007 clinicians failed to utilize available information that was located in inmates' unit health records or central files, compromising the adequacy of treatment and interventions in 82 percent of cases. Custody referral information was not incorporated into all of the reviews in which they applied, and was frequently absent from SRACs.

- In 2007, there were continuing concerns about daily rounds by psych techs and placement of inmates in cells presenting the lowest possible risk for suicide completion. The defendants had not yet achieved full compliance with the Coleman Court order of June 9, 2005 requiring them to develop, among other things, a plan to alleviate the suicide risk posed by large-mesh ventilation screens in administrative segregation cells. Of the 34 completed suicides in 2007, 23 (11 in administrative segregation, four in general population, three in DMH, two in a SHU, one in a general acute care hospital (GACH), one in condemned housing, and one in an OHU) involved hangings by single-celled inmates, although not all of these involved ventilation screens.

- Although 30-minute welfare checks and confidential screens for inmates newly admitted to administrative segregation were features of the defendants' 2006 Plan to Address Suicide Trends in Administrative Segregation, circumstances of at least one suicide in 2007 raised questions about implementation of this policy.

- As stated above, three of the suicides occurred within DMH facilities. Issues surrounding availability of DMH in-patient beds figured prominently in whether there was prompt referral and transfer of inmates in need of hospital level care at these facilities. One suicide occurred in an OHU and another in a GACH. Continued use of ZZ cells and other holding cells for inmates awaiting transfers to *bona fide* CTCs with MHCBs, and OHU stays that exceeded the 72-hour time limit, were ongoing obstacles to the appropriate care of inmates in need of constant or close monitoring or timely transfer to higher levels of care.

- Three suicides occurred in institutional reception centers. This re-focuses attention on an ongoing concern over whether the level of mental health services at the Reception Centers is commensurate with inmates' levels of care.

- In 2007, one of the 34 suicides was completed by a woman, for a rate of three percent of suicides by female inmates. This is comparable to the years 2000 through 2003, and 2005, when none of the suicides were committed by women. In 2006, four of the 43 suicides were committed by women, for a rate of nine percent, which is comparable to the three out of 26 suicides in 2004, for a rate of 11.5 percent for that year.

- In seven, or 21 percent, of the 34 suicide cases reviewed, CPR was not performed or was not initiated in a timely manner when required. Of these seven cases, CPR efforts were untimely in six. In four other cases, CPR was determined to be not applicable or was not initiated, based on the inmate's condition at the time of his discovery. These determinations were made by various clinical staff members including registered nurses and medical technical assistants, but none were made initially by a physician. In the case involving a woman, a correctional officer and one inmate began CPR but their efforts were inadequate. [13]

- Timeliness of the Department's conduct of the internal CDCR suicide review process deteriorated. Timeframes set forth in Appendix A were exceeded in 27 of the 34 cases. Missed deadlines occurred with suicide notifications, preparation of suicide reports and/or dates of implementation of QIPs, and recommendations at both the institutional and departmental levels. As these timelines are established within the Coleman 2006 Revised Program Guide, which defendants were ordered on March 2,

---

[13] Defendants requested clarification of this finding and asked whether the monitor recommends a revision to suicide response plans or recommends that CPR be administered in every case. Applicable provisions of the Program Guide provide the answer to defendants' request. All correctional officers who respond to a medical emergency are mandated, pursuant to court order, to provide immediate life support until medical staff arrives. *See* PROGRAM GUIDE, Ch. 10, "Suicide Prevention and Response," § III. B. 3, "Response to Self-Injurious Behaviors and Suicide Attempts;" *see also Coleman v. Schwarzenegger*, No. 90-0520, Order (E.D. Cal. June 9, 2005). Medical staff must then continue life support measures unless and until the patient is revived, the situation is determined to be not a medical emergency, or the patient is pronounced dead. Only a physician may pronounce a patient dead. Accordingly, the Program Guide already requires that immediate life support be administered by responding custody officers in every case. No revision to suicide response plans is necessary or recommended at this time.

2006 to implement, defendants' failure to comply with these timelines is a clear violation of court order.

- Required reports were not completed and therefore not produced and distributed in accordance with the Department's own suicide review process. Extreme examples of this included the suicides which occurred within DMH, for which it did not provide to CDCR documentation on implementation of QIPs and other action plans, on the pretext of confidentiality. This excuse is insupportable because CDCR and DMH are both responsible for care and treatment of the same patients. Consequently, there is no reasonable basis for a barrier to communication between these care providers.

- The process for Departmental suicide review was lacking in some respects. There were cases with inadequate documentation of achievement of the goals and outcomes for specified corrective actions. Some institutional responses merely repeated previous responses to deaths that had occurred during preceding years at the same institutions. Others had recommendations including referrals to the Professional Practice Executive Committee (PPEC) or custody administration, but the results of these reviews were not provided to the Coleman Special Master.

- As in the past, the quality of CDCR suicide reports was varied. Many reflected appropriate quality-of-care standards, and were very thoughtful and well crafted despite the challenges encountered by facility clinicians and custody staff. However, other Departmental suicide reports appeared to ignore failures at the facility level, as well as several inadequate facility responses to the Department's corrective action recommendations. As of April 30, 2009, deadlines were missed in the reviews of 27 of the 34, or 79 percent of, suicide cases. Data was incomplete for all three of the suicides in DMH facilities; for two of them, institutional responses to QIPs have not been produced as of the time of this writing. For four suicides in CDCR prisons, institutional responses to QIPs were not provided to this reviewer or to the Coleman Special Master until May 1, 2009, and even then, they were incomplete or inadequate. For another completed suicide, which occurred on December 5, 2007, the Department's suicide report was not produced to this reviewer nor to the Special Master until April 17, 2009. There is no QIP for that suicide even though it occurred approximately one and a half years ago.


**VII.    Recommendations**:

Based on all of the foregoing, this Reviewer recommends that the following actions be taken to address and resolve fundamental impediments to reducing suicides by CDCR inmates on a lasting basis:

- Identification of inmates' known and/or suspected medical problems and medications within these inmates' mental health treatment plans. Ten of the 34, or 29 percent of, inmates who committed suicide in 2007 had significant to substantial medical illnesses. Given this frequency of co-occurrence of medical problems and suicides, as well as the fact

that medical problems are a known risk factor for suicide, mental health staff who are preparing inmates' treatment plans should specifically identify these inmates' medical illnesses and medications within the treatment plans rather than merely allude to them by reference to other records.

• Communication and collaboration between CDCR and DMH to ensure that the highest level of care provided by DMH to CDCR inmates is given to any inmate who has been determined to need it.

• Access to inpatient care for CDCR inmates at DMH facilities must be given priority, particularly for Level III and Level IV inmates. This involves requiring clinical staff to properly assess suicide risk factors for inmates experiencing changes in mental health functioning, particularly on placement in administrative segregation or other single-cell housing. It underscores the need for appropriate screening, assessment, and referrals to higher levels of care, especially at the DMH level, when indicated. A vital component of this process is appropriate crisis-level service in treatment settings such as MHCBs, or limited treatment within OHUs, until transfers to DMH facilities can be achieved. DMH must be held accountable for its decisions on admissions or rejections and its timely communication of important patient information, as well as for treatment it has provided to CDCR inmates, and cannot be permitted to avoid transparency on these things behind a pretext of patient "confidentiality."

• Full and timely implementation of the suicide prevention and review processes that are already in place, at both the institutional and department levels, should be given priority. This includes incorporation of revised policy and procedural guidelines and court orders into those processes. It also entails the identification of deficiencies at the facility and systemic levels, appropriate follow-up of corrective action plans, and submission of documentation to the <u>Coleman</u> Special Master on the outcomes of investigations of staff misconduct, negligence, and error. This process must include not only training but supervision and appropriate supervisory action regarding staff performance.[14]

---

[14] Plaintiffs also submitted written comments in response to this report in its draft form. These comments consisted of requests for greater particularization of this writer's recommendations, as well as for four additional recommendations, namely to require (1) an update by defendants on their plan for, and implementation of, a system for tracking the suicidal histories of inmates in the CDCR mental health caseload (as per order dated June 9. 2005); (2) formation of a quality improvement team at each institution to probe the reasons why completion of suicide risk assessment checklists has remained inadequate and untimely; (3) documentation of updated training in emergency response of all custody officers at Deuel Vocational Institution, Pelican Bay State Prison, High Desert State Prison, California Correctional Women's Facility, California Training Facility, the Richard J. Donovan Correctional Facility, Mule Creek State Prison, and California Substance Abuse Treatment Facility, where CPR was either delayed or not provided to inmates who committed suicide in 2007; and (4) exchange of all necessary information between CDCR and DMH so that the highest level of clinically appropriate care is provided to all CDCR inmates who are treated at DMH facilities. With the sole exception of defendants' plan for implementation of the suicide history tracking system, the other recommendations proposed in plaintiffs' comments are already recommended and/or discussed in this report, and therefore will not be given additional treatment in this report. Nevertheless, the concerns expressed in plaintiffs' comments are valid and important but would more appropriately be addressed within the context of a <u>Coleman</u> policy meeting.

## TABLE 1

| No. | Inmate | Facility | Date of Death | Sex | Method | Ethnicity | Age | Housing | LOC | R-Suffix | Medical |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | A | HDSP | 1/5/07 | M | Overdose | Caucasian | 42 | D-GP | 3CMS | N | Y |
| 2 | B | WSP | 1/22/07 | M | Hanging | Hispanic | 32 | S-GP | EOP | N | N |
| 3 | C | DMH-Vacaville | 1/27/07 | M | Hanging | Hispanic | 19 | S-GP (DMH) | APP | N | N |
| 4 | D | DMH-Vacaville | 1/29/07 | M | Hanging | Hispanic | 31 | S-GP (DMH) | APP | N | N |
| 5 | E | CIM | 2/15/07 | M | Hanging | Caucasian | 51 | Dorm | None | N | Y |
| 6 | F | CSP-Corcoran | 2/21/07 | M | Suffocation | Hispanic | 56 | S-ASU | 3CMS | N | N |
| 7 | G | ASH | 3/2/07 | M | Hanging | African American | 43 | S-ASH (DMH) | ASH/ICF | N | N |
| 8 | H | DVI | 3/9/07 | M | Hanging | Caucasian | 29 | S-GP | None | Y | N |
| 9 | I | KVSP | 3/13/07 | M | Hanging | Filipino | 35 | D-GP | None | N | N |
| 10 | J | PBSP | 3/14/07 | M | Hanging | Hispanic | 36 | S-GP | None | N | N |
| 11 | K | PVSP | 3/21/07 | M | Overdose | Caucasian | 54 | D-GP | 3CMS | N | Y |
| 12 | L | CMF | 3/31/07 | M | Hanging | African American | 40 | S-ASU | 3CMS | N | Y |
| 13 | M | LAC | 4/19/07 | M | Hanging | Caucasian | 32 | D-GP | 3CMS | N | N |
| 14 | N | CSP-SAC | 4/25/07 | M | Hanging | Hispanic | 30 | S-ASU | None | N | N |
| 15 | O | HDSP | 4/26/07 | M | Hanging | Native American | 30 | S-GP | 3CMS | N | Y |
| 16 | P | ASP | 5/23/07 | M | Hanging | Hispanic | 50 | S-ASU | None | N | N |
| 17 | Q | CSP-SAC | 5/28/07 | M | Hanging | Hispanic | 31 | S-OHU | 3CMS (OHU) | N | N |
| 18 | R | HDSP | 6/5/07 | M | Hanging | Hispanic | 35 | S-ASU | 3CMS | N | N |
| 19 | S | CSP-SQ | 6/10/07 | M | Hanging | Caucasian | 28 | S-Cond | 3CMS | Y | N |
| 20 | T | CSATF | 7/1/07 | M | Hanging | Hispanic | 34 | S-ASU | 3CMS | N | N |
| 21 | U | CCI | 7/3/07 | M | Hanging | Hispanic | 36 | S-SHU | None | Y | N |
| 22 | V | CSP-Corcoran | 7/7/07 | M | Water Intoxication | Caucasian | 39 | S-ASU | EOP | Y | N |
| 23 | W | CTF | 7/30/07 | M | Hanging | Hispanic | 44 | D-GP | EOP | N | N |
| 24 | X | CCWF | 8/4/07 | F | Hanging | African American | 25 | Dorm | None | N | N |
| 25 | Y | CRC | 9/5/07 | M | Trauma | Caucasian | 52 | Dorm | 3CMS | Y | N |
| 26 | Z | CMF | 9/14/07 | M | Hanging | Caucasian | 39 | S-GACH | EOP | N | Y |
| 27 | AA | DVI | 9/24/07 | M | Overdose | Caucasian | 67 | D-GP | 3CMS | Y | Y |
| 28 | BB | CTF | 9/25/07 | M | Hanging | Caucasian | 51 | S-ASU | None | N | N |
| 29 | CC | HDSP | 11/3/07 | M | Hanging | Hispanic | 39 | S-ASU | 3CMS | N | Y |
| 30 | DD | RJDCF | 11/21/07 | M | Suffocation | Caucasian | 36 | D-GP | None | N | N |
| 31 | EE | SCC | 12/5/07 | M | Overdose | Caucasian | 47 | D-GP | 3CMS | N | Y |
| 32 | FF | Corcoran Dist. Hospital (CSATF) | 12/6/07 | M | Hanging | Hispanic | 37 | S-ASU | 3CMS | N | N |
| 33 | GG | MCSP | 12/20/07 | M | Overdose | Caucasian | 36 | S-ASU | EOP | Y | N |
| 34 | HH | CCI | 12/21/07 | M | Hanging | Caucasian | 25 | S-SHU | 3CMS | N | Y |

TABLE 2

| No. | Letter | MENTAL HEALTH HISTORY | SUICIDE HISTORY | KEYHEA | MHCB/ DMH | 5 DAY FOLLOW UP | CPR | SUICIDE REPORT | 90 DAY REPORT | FOR/ PREV |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | A | Y | Y | N | N | N/A | Y | 3/9/07 | 7/27/07 | Y |
| 2 | B | Y | Y | N | N | N/A | Y | 5/8/07 | 6/28/07 | Y |
| 3 | C | Y | Y | Y | Y | N/A | Y | 3/20/07 | 3/26/09 | Y |
| 4 | D | Y | Y | N | Y | N/A | Y | 4/20/07 | 3/26/09 | Y |
| 5 | E | Y | Y | N | N | N/A | Y | 5/8/07 | 9/17/07 | N |
| 6 | F | Y | Y | N | N | N/A | Y | 4/24/07 | 10/10/07 | Y |
| 7 | G | Y | Y | N | Y | N/A | Y | 7/3/07 | 9/17/07 | Y |
| 8 | H | Y | Y | N | N | N/A | Y (late) | 6/18/07 | 10/10/07 | Y |
| 9 | I | N | N | N | N | N/A | Y | 6/8/07 | N/A | N |
| 10 | J | N | N | N | N | N/A | Y (late) | 4/24/07 | N/A | N |
| 11 | K | Y | Y | N | N | N/A | N/A | 5/29/07 | 10/10/07 | Y |
| 12 | L | Y | Y | N | N | N/A | Y | 5/29/07 | 11/28/07 | Y |
| 13 | M | Y | Y | N | N | N/A | Y | 5/29/07 | 4/29/08 | Y |
| 14 | N | N | N | N | N | N/A | Y | 5/29/07 | N/A | N |
| 15 | O | Y | Y | N | N | N/A | Y | 5/29/07 | 10/18/07 | Y |
| 16 | P | Y | N | N | N | N/A | Y | 7/27/07 | N/A | Y |
| 17 | Q | Y | Y | N | Y | N/A | Y | 8/20/07 | 5/27/08 | Y |
| 18 | R | Y | Y | N | N | N/A | Y (late) | 10/1/07 | 4/21/08 | Y |
| 19 | S | Y | Y | N | N | N/A | Y | 9/17/07 | 1/15/08 | Y |
| 20 | T | Y | Y | N | N | N/A | Y | 10/10/07 | 3/5/08 | Y |
| 21 | U | N | N | N | N | N/A | Y | 10/10/07 | 4/21/08 | Y |
| 22 | V | Y | Y | N | N | N/A | N/A | 11/26/07 | 9/15/08 | Y |
| 23 | W | Y | Y | N | N | N/A | Y | 11/1/07 | 9/15/08 | Y |
| 24 | X | Y | Y | N | N | N/A | N * | 10/22/07 | 2/11/08 | Y |
| 25 | Y | Y | N | N | N | N/A | N/A | 11/1/07 | 6/5/08 | Y |
| 26 | Z | Y | Y | Y | N | N/A | Y | 1/24/08 | 6/5/08 | Y |
| 27 | AA | Y | Y | N | N | N/A | Y | 10/30/07 | 9/30/08 | Y |
| 28 | BB | N | N | N | N | N/A | Y (late) | 11/26/07 | N/A | Y |
| 29 | CC | Y | Y | N | N | N/A | Y | 4/8/08 | 11/10/08 | Y |
| 30 | DD | Y | Y | N | N | N/A | Y (late) | 4/16/08 | 5/1/09 | Y |
| 31 | EE | Y | Y | N | N | N/A | N/A | 4/17/09** | | N |
| 32 | FF | Y | Y | N | N | N/A | Y | 7/15/08 | 5/1/09 | N |
| 33 | GG | Y | Y | N | N | N/A | Y (late) | 7/15/08 | 5/1/09 | Y |
| 34 | HH | Y | Y | N | N | N/A | Y | 8/13/08 | 5/1/09 | Y |

*CPR performed by correctional officer and inmate.

**Official Suicide Report signed by Directors of the Division of Health Care Services and the Division of Adult Institutions is dated 4/17/09.

# Appendix A

Tracking Timelines for Departmental Review of Inmate Suicides

| **Event/Documents** | **Timeline** |
|---|---|
| 1. Date of Death | 0 hour |
| 2. Chief Medical Officer notice to Death Notification Coordinator | 8 hours from time of death |
| 3. Initial Death Report by local SPR FIT Coordinator to Death Notification Coordinator | 2 business days from date of death |
| 4. Death Notification Coordinator Notice to DCHCS SPR FIT Coordinator | 1 business day from #3 |
| 5. DCHCS SPR FIT Coordinator appoints Mental Health Suicide Reviewer | 2 business days from #4 |
| 6. Mental Health Suicide Reviewer completes Preliminary Suicide Report | 30 days from date of death |
| 7. DCHCS Suicide Case Review Subcommittee forwards completed Report to Mental Health Suicide Reviewer. | 45 days from date of death |
| 8. Report signed and issued by Directors of DCHCS and the Division of Adult Institutions | 60 days from date of death |
| 9. Facility Warden and Chief Medical Officer Implement Quality Improvement Plan | 120 days from date of death |
| 10. Facility warden and CMO submit report of implementation of quality improvement plan | 150 days from date of death |

22