REPORT ON SUICIDES COMPLETED
IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION
IN CALENDAR YEAR 2007

Case Reviews

## 1. Inmate A

### Brief History:

This inmate was a 42-year-old Caucasian male who committed suicide by overdose of Quetiapine (Seroquel) in his general population cell at High Desert State Prison (HDSP). The inmate was doubled-celled at the time of his death and was a participant in the Mental Health Services Delivery System (MHSDS) at the Correctional Clinical Case Management System (3CMS) level of care. This was the inmate's first prison term which began on 9/9/04 when he entered the California Department of Corrections and Rehabilitation (CDCR) via the Richard J. Donovan Correctional Facility (RJD) Reception Center (RC). He had been convicted of two counts of murder, two counts of attempted murder, one count of carjacking, and one count of attempted carjacking resulting in multiple sentences, including two life-without-parole sentences.

The inmate was discovered on 1/4/07 at 11:55 p.m. by staff responding to another inmate yelling "man down." The inmate's yelling resulted in staff responding as well as a medical emergency when announced on Facility "B" specifying the building and cell this inmate was housed in. Upon arrival, staff was told by the inmate's cellmate that something was wrong with the inmate. The cellmate who yelled "man down" was restrained and escorted to a shower area and secured. The sergeant who responded to the "man down" call reported that he saw this inmate lying on the upper bunk on his back and could see the inmate's chest rising and falling, indicating, he believed, the inmate was breathing. A medical technical assistant (MTA) arrived and reported that the inmate had stopped breathing. CPR was started by the MTA and a security and escort officer. Additional staff arrived and the inmate was lifted onto a backboard, carried out of the cell, and placed on a gurney. The inmate was transported to the Correctional Treatment Center (CTC) with CPR in progress. After arrival to the CTC, a physician pronounced the inmate dead at 12:45 a.m. on 1/5/07. While in the CTC, the inmate was administered oxygen, IV fluids, Epinephrine, and Atropine; however, these efforts did not result in restoration of pulse or respiration. An autopsy was performed on 1/5/07 by the Washoe County Medical Examiner/Coroner and determined the cause of death to be Acute Quetiapine Toxicity, and the manner of death to be suicide. The toxicology report indicated trace amounts of Triprolidine and the presence of Atropine. Quetiapine was measured at 17,000 mg/ml (the expected blood level was approximately 850-900 mg/ml for the dosage prescribed for the inmate). There were no illicit drugs or alcohol detected in the toxicology specimens.

Several suicide notes were discovered after the inmate's death, including one in the outgoing mail addressed to his parents, and others apparently to his attorney, the District Attorney (DA), and prison staff. The contents of the notes vary, but included references to his having loved his mother and father, plans to not take anyone's life but only to hurt his wife, his fatigue and declining health, his love for his son, and his request for forgiveness. There were also references in which he thanked "all COs" for treating him with respect, again with references to his being "so tired of being sick," and to both his attorney and the DA, and his beliefs that he was "wrongfully convicted" because he did not intend to kill anyone but only to hurt his wife and that because he was under the influence of several drugs including Valium, Vicodin, and Percocet, he was not in his right mind. Other notations included his request to have a pastor give him his last rites and "God save my soul."

The suicide report recounted the inmate's criminal justice history which was limited to the commitment offense. The suicide report referenced the inmate's use of marijuana, Valium, alcohol, cocaine, and methamphetamine, as well as prescription pain killers, barbiturates, and benzodiazepines. His use of illegal drugs began at age 12 with marijuana and continued with the drugs referenced above, including addictions to pain killers and prescription drugs after a skiing accident when he was 21 years of age. It appeared from the records reviewed that the inmate married his second wife in 1999, but the marriage did not go well and he continued to abuse various substances. He reportedly attempted suicide by overdose on prescription medications in September 2000 which, according to the records, was his third suicide attempt. His abuse of drugs continued, and in May 2002 his wife ordered him to leave the house and announced her intention to obtain a divorce. He remained in the house and ultimately, on 6/6/02, his wife and her brother, mother, and attorney went to the couple's residence where they were confronted by the inmate. The inmate began shooting, killing the attorney and inmate's wife's brother, and seriously injuring the inmate's wife and her mother. He subsequently fled the scene and ultimately entered Mexico. After checking into a hotel, he attempted to overdose on prescription medication for his seizure disorder. He was arrested and hospitalized. After serving a six-month sentence, he was extradited to the United States. The suicide report referenced a "condition of the extradition" that he was not to be given the death penalty.

After extradition and while in jail, the inmate received a comprehensive psychological evaluation dated 1/30/04. The suicide report referred to this evaluation as having determined the inmate had received diagnostic impressions of (1) Dementia secondary to overdose and substance abuse, (2) Major Depressive Episode, recurrent, severe without psychotic features, (3) Polysubstance Dependence, (4) Personality Disorder Not Otherwise Specified (NOS) with borderline and dependent features, and a global assessment of functioning (GAF) of 42. In addition, there were recommendations that the inmate be closely monitored for depression and suicidal ideation. There were also references to the inmate having first received treatment for mental health problems in 1992 when he had self-mutilated by cutting off his thumb. He was subsequently diagnosed with Bipolar Disorder and Borderline Personality Disorder. The record also indicated that he had periods of treatment beginning in 1992 for approximately five years,

and following a second attempted suicide by overdose in 2000. The treatment included the prescription of psychotropic medications, but the inmate reportedly stated that he had variability in taking those medications.

The inmate received a mental health screening after he entered the CDCR at RJD. The screener reported that the inmate had no indication of a mental disorder, but he was referred for a mental health evaluation based on his history. The mental health evaluation was completed on 10/14/04. The inmate complained of depression, racing thoughts, hearing voices, and anxiety, and was placed in the MHSDS at the 3CMS level of care. This information was obtained from the suicide report, which noted the RC assessment (MH-7) was not found in the record. The inmate's course of treatment in MHSDS was reported as stable and uneventful, including his being maintained on medications and appropriate case management contacts while at RJD. He was transferred on 3/7/05 to California Correctional Institution (CCI) while en route to California State Prison, Corcoran (CSP/Corcoran), where he arrived on 3/8/05. He was subsequently transferred to HDSP on 11/8/05. While at CSP/Corcoran, the inmate received a CDC-115 rule violation report (RVR) on 5/15/05 for getting a tattoo. He received a second RVR on 10/14/06 while at HDSP for attempted battery of an inmate for which the inmate received 90 days' loss of credit. The suicide report referred to this inmate possibly being pressured by a "skinhead" gang, as per reports by officers at HDSP, and that this pressure may have had something to do with the attempted battery charge.

Review of the inmate's medical records indicated he remained in the MHSDS until his death.

Between 9/9/04 and 11/8/05, the inmate had received Seroquel, Depakote, Buspar, Geodon, Lexapro, Thorazine, and Paxil at various times. When the inmate arrived at CSP/Corcoran on 3/8/05 his medications of Geodon, Buspar, Lexapro, Depakote, and Seroquel were continued for 30 days.

The bus screening dated 11/8/05 when the inmate arrived at HDSP included the inmate's statement that he was being treated for depression, headaches, "Bipolar," and hypertension, and that his medications were Sertraline, Quetiapine, Divalproex, Busprione, and Ziprasidone, none of which were restarted until 11/8/05. He began receiving Seroquel on 11/14/05 and Zoloft on 11/22/05, with delays of six and 14 days, respectively.

The interdisciplinary treatment team (IDTT) meeting progress note dated 11/16/05 indicated that the treatment team meeting was attended by three psychologists, a social worker, and a Correctional Counselor 1 (CC-1); however, no psychiatrist was noted in attendance. It was noted that the inmate was taking Seroquel. No group therapies were indicated at that time, and the recommendations were to retain the inmate at the 3CMS level of care.

It appeared the inmate's Seroquel 800 mg p.m., Zoloft 100 mg a.m., and 50 mg p.m. were being ordered for 180 days, apparently by a non-psychiatrist, beginning 1/25/06 through

5/19/06. Zoloft was discontinued on 6/12/06 and Paxil was begun on the same day. His Seroquel 100 q a.m. and 700 q p.m. were ordered crushed. His Paxil 20 mg q a.m. was not ordered crushed. The medication administration records (MARs), including that of December 2006, indicated that the inmate received his medications each day, including the crushed Seroquel.

The inmate was seen by his clinical case manager (CCM) on a quarterly basis and seen by a psychiatrist via telemedicine during the remainder of his stay at HDSP. His last treatment plan date 10/18/06 was consistent with previous treatment plans. It was noted that he was fearful of going to yard and may have been "sleeping" too much. The treatment plan on 10/18/06 at HDSP indicated that the treatment team meeting was attended by a psychologist, two social workers, and the CC-1. There was no documentation that a psychiatrist attended this meeting. The medications recorded on the treatment plan were erroneous, indicating the inmate was taking Seroquel 100 mg a.m. and 100 mg p.m., and Paxil 20 mg.

He last saw his CCM on 12/27/06 when the yard was on lockdown. The CCM noted that the inmate focused on his medical health concerns and his son having moved out of state, but reported that his psychotropic medications were "working fine." At that time, his medications were Seroquel 300 mg two tabs at p.m. crushed, Seroquel 100 mg a.m. and p.m. crushed, and Paxil 20 mg every a.m.

The inmate's final diagnoses were Major Depression with Psychosis, Polysubstance Dependence by history, and "Bipolar Not Otherwise Specified (provisional)." He had no Axis II diagnosis. His medical problems were described as Hypertension and Hepatitis "C." No Axis IV stressors were identified even though there were repeated references in the records to his being fearful of other inmates, avoiding the yard, and increasing concerns over his medical conditions. The medical conditions identified included cardiac ischemia and Hepatitis "C," and the inmate was scheduled for a liver biopsy. In his suicide notes the inmate also referred to his hypertension and to his beliefs that his health was declining and that he had heart problems.

The suicide report identified one problem and recommendation as follows:

> Problem:  HDSP has had past problems with properly continuing medications upon arrival from another institution.
> Recommendation:  Provide documentation of current compliance, e.g. ongoing audits.

On 7/27/07, the director of mental health of the Division of Correctional Health Care Services (DCHCS) and the director of the Division of Adult Institutions (DAI) issued their report on implementation of the quality improvement plan (QIP) for the suicide of Inmate A, in response to the recommendation in the suicide report dated 3/9/07. It was noted that the HDSP QIP response was received by DCHCS on 6/6/07, and reviewed and approved by the Suicide Prevention and Response Focused Improvement Team (SPRFIT) on 6/26/07. The submission by the health care manager and warden in response to the

identified problem provided medication audits dated February 2007 covering the previous quarter as proof of practice. The medication management audit tool provided answers to ten questions, including five regarding continuity of medication and three regarding medication renewals. There was also one question for no shows/refusals and follow-ups, and one question on continuity upon movement within the institution. While the compliance rates were reported as 90 percent or 100 percent for all questions (except zero percent for medications accompanying an inmate who arrives from another CDCR institution on medication, and 80 percent for documentation of progress notes by the provider supporting orders for new, changed, or discontinued medications), the audit did not specify the number of records that were reviewed for any of the ten questions that were considered in the medication audit. The medication audit provided by HDSP concluded by stating that the medication management report identified some deficiencies with noncompliance, with the sending institution not providing the inmate's medications, and some deficiencies with medication refusals. This particular comment did specify that out of "two out of the three charts reviewed, one had a `not documented' on the back of the MAR for refusal." This was the only example in the medication audit with the actual number of records reviewed for any specific item. There was no other documentation provided regarding the implementation of the QIP by HDSP.

The inmate sent a health care services request form on 1/12/05 stating that he was hearing voices and his mood was up and down a lot. The inmate sent health care services request forms more than 20 times requesting Ibuprofen for daily headaches, beginning in June 2005 through September 2006. He also made requests for mental health services, including a health care services request form on 10/11/05 stating that he was having a "real hard time, thoughts and voices racing through my mind, can't concentrate, need rest." The inmate submitted a health care services request form on 9/11/06 stating that the MTA had told him that his Seroquel had expired, but that it only had been one month since he had last seen the doctor who ordinarily re-ordered it for three month periods. He also sent a request on 9/12/06. The inmate submitted a heath care services request form on 9/13/06 stating that he needed to have his Seroquel and Paxil re-ordered. Seroquel crushed and Paroxetine were started on 9/14/06. The MAR indicated compliance.

A cardiac consultation was requested on 11/13/06 because of progressive ischemia noted on the EKG. It did not appear from the records that the cardiology consultation had been completed, nor does it appear in the progress notes or the Axis IV stressors that the inmate's declining cardiac status was considered in his overall treatment planning.

The 12/27/06 CCM progress note referred to the inmate's son having been taken out of state and described his mental status as essentially within normal limits, with the exception of his "flat" facial expression and his apparently decreased appetite. The note also referred to the inmate's statement that his medication works, "but now I have bad blood flow to heart. Now I have to wait for the biopsy."

**<u>Findings</u>:**

This inmate's completed suicide does not appear to have been foreseeable in that the inmate did not make statements or engage in behaviors that suggested he was at increased risk of suicide or self-harm. However, the inmate did make statements to his CCM and psychiatrist that he was concerned about his deteriorating physical health as well as the loss of visits by his son who had moved to another state. The inmate had also sent more than 20 requests to medical with complaints of pain, headache, urinary retention, and concerns about his cardiac and liver status. The mental health staff did not appear to have any knowledge of this and certainly did not indicate in the treatment planning document that his stressors had changed or were increasing; indeed the Axis IV on both his treatment plans at HDSP were left blank. In addition, there was no participation by a psychiatrist at either of his treatment plan meetings at HDSP. The psychiatrists did, however, change the inmate's Seroquel to "crushed" to improve compliance and to reduce the likelihood of cheeking. Therefore this inmate's suicide may have been preventable, as it is unclear how he had obtained enough Seroquel for a toxicology analysis after his death to indicate that he had 17,000 mg/ml in the specimen.[1] The coroner's report indicated that a dosage of 750 mg per day of Seroquel should give steady state peak plasma levels of 828 mg/ml.

Quite remarkably, the suicide report was silent on the issue of the inmate having completed suicide by overdosing on a medication prescribed for him but ordered to have been given in a crushed form. The record clearly indicated that this inmate avoided other inmates and was fearful of gang-related politics, which decreases the likelihood that he could have collected Seroquel from other inmates. While the suicide report identified one problem -- that the inmate's medications were not continued when he arrived at HDSP -- the audit submitted by HDSP in response to the recommendation was flawed and did not specify the methodology or even the sample sizes used to conduct the audit. Based on the documentation, it appears that this audit was accepted without any further requirement or follow-up from DCHCS. There were a number of additional documentation problems in the medical record, including the absence of a RC mental health evaluation and deficiencies in both the participation and documentation in the treatment plans. The absence of any requirement for HDSP to review their medication management practices, particularly for an inmate who was to receive crushed medications as per the order of the psychiatrist but was able to hoard enough medication to have blood levels of this magnitude and sufficiency to kill him, should have been recognized as a

---

[1] Defendants requested that this reviewer withdraw his conclusion that this inmate's suicide was preventable. They state that it was unclear exactly how this inmate obtained and ingested a large enough quantity of Seroquel to cause a fatal overdose. Defendants objection is premised on an assumption that CDCR should not bear any responsibility for this death if there is a possibility that the inmate obtained the excess amount of Seroquel from other inmates. This assumption is fundamentally flawed. Whether this inmate obtained the drug from other inmates, or as a result of it being administered to him without proper supervision, makes no difference to the predictability of this suicide death. Both scenarios indicate serious deficiency in medication management practices, which unfortunately means that this suicide was preventable.

problem, with requirements to assess the medication management process in order to reduce the likelihood of similar deaths in the future.

## 2. Inmate B

### Brief History:

This inmate was a 32-year-old Hispanic male who committed suicide by hanging on 1/22/07 in a Wasco State Prison (WSP) RC double-cell of which he was the sole occupant. The inmate was a participant in the MHSDS at the Enhanced Outpatient Program (EOP) level of care. The inmate re-entered the CDCR via the WSP RC for his third term on 11/20/06, having had two parole violations after his first incarceration in the CDCR on 8/29/01. Because of a positive drug screen, the inmate received a six-month term for his second parole violation. His earliest possible release date was 2/13/07 as per the coroner's report, but was May 2007 as per the CDCR suicide report.

The inmate was discovered on 1/22/07 at approximately 1:58 p.m. by an officer who was making security checks. The officer came to the inmate's cell and noted that the inmate was hanging from the light fixture by what appeared to be a State-issued laundry bag tied around his neck. He activated the building's personal alarm system and verbally notified the control officer. Two correctional officers (COs) responded from directly in front of the building. A control officer placed the cut-down tool in a bucket which was immediately lowered to these officers. Upon their arrival at the cell, the control officer opened the cell and the two officers entered. One officer held the inmate around the waist and pushed upwards while the other officer attempted to cut the laundry bag from the inmate's neck, but was unsuccessful. A third officer who responded inserted his fingers into the knot and was able to pull the knot free. The officer who was holding the inmate up carried him out of the cell and laid him on the floor. A second officer then utilized the micro-shield and began ventilations. MTAs arrived and one initiated chest compressions to the inmate and a second continued CPR while a facility gurney was brought to the scene. The inmate was then transported to the gurney at the base of the stairs, and was subsequently transported by gurney to the CTC Triage and Treatment Area (TTA). TTA medical staff assumed resuscitation efforts including advanced cardiac life support protocols. The TTA nurse practitioner took charge of the code response. A Code 3 ambulance was requested and arrived at approximately 2:15 p.m. The ambulance left the institution at 2:31 p.m. with the inmate. Upon arrival at Delano Regional Medical Center, the inmate was pronounced dead by a physician at 3:00 p.m. An event timeline was provided as part of the incident report and stated that the inmate was discovered at 1:58 p.m., CPR was initiated at 2:00 p.m., the gurney arrived at 2:01 p.m. to transport the inmate to the CTC where he arrived, and a Code Blue was activated at 2:03 p.m. The ambulance was not notified until 2:08 p.m. and arrived at 2:15 p.m. at the institution, ultimately leaving the institution at 2:31 p.m. with arrival at Delano Regional Medical Center at 2:55 p.m. The inmate was pronounced dead at 3:00 p.m., as noted above. An autopsy was conducted by the Kern County Sheriff/Coroner's Office on 1/23/07 and determined the cause of death to be hanging. The Coroner's investigation summary stated that the inmate was discovered at 1:59 p.m. on 1/22/07, hanging in his cell from a

laundry bag suspended from the ceiling light fixture, and was cut down with evidence of a weak pulse. The toxicology screen for drugs of abuse and alcohol was negative. As noted, the cause of death was hanging and the manner of death was suicide.

The suicide report recounted the inmate's criminal justice history, which began at the age of 18. The records reviewed did not reveal a history of juvenile arrest or incarceration. The inmate's first conviction was for misdemeanor assault at age 18, with a 60-day jail sentence and three years' probation. He received an additional brief jail term and probation until his original commitment offense in June 2001, when he was age 26. This conviction was for assault with a deadly weapon, for which he received a two-year prison term, based on his throwing a beer can and rocks at neighbors. He was admitted to the CDCR on 8/29/01 via the WSP RC. In 2000, he was convicted of aggravated battery on staff by gassing. He subsequently paroled in May 2003, returned to CDCR in August 2003 on a violation, paroled again in January 2006, and returned to CDCR on 11/20/06 for a second parole violation, this time for a positive drug screen. On 12/14/06, the inmate received an RVR for an escape attempt in which he tried to climb a yard fence in the WSP RC. He was placed in administrative segregation, and was evaluated on 12/14/06 by a psychologist who reported a diagnosis of Paranoid Schizophrenia. His mental status was reported as stable; however, he was referred to a psychiatrist. The psychiatrist saw him the following day. As the inmate denied any symptoms of mental illness, medications were not renewed. Two days later, the inmate received a RC mental health evaluation and this time, his mental status was described as fair. He also was noted to have a flat affect and poor insight and judgment, but he denied current suicidal or homicidal ideation. In 2004, a Suicide Risk Assessment Checklist (SRAC) noted suicidal ideation as well as a history of poor impulse control and poor compliance with medications. The inmate was assessed as having a negative to low risk for suicide, but was referred to his primary clinician/case manager. An IDTT meeting was held on 12/20/06. The inmate refused to participate. He was diagnosed with Schizophrenia Disorganized Type, and Polysubstance Dependence, and was placed at the EOP level of care, as his GAF was scored at 40. No medications were prescribed. He was to have weekly CCM contacts as well as daily psych tech rounds. The following day, a psychologist supervisor prepared a clinical summary for the initial Institutional Classification Committee (ICC). He described the inmate as "deteriorating, refusing meds" and noted that the inmate presented both a suicide risk and an assault risk. The prognosis was described as "fair," and the inmate was returned to the RC EOP program on that same day, 12/21/06. Despite the reference to suicide risk, no SRAC was provided on that date in the records reviewed.

The inmate reported a history of substance and alcohol abuse, including marijuana and cocaine, when he was a teenager. There was no history of treatment for substance abuse. Based on the records reviewed, his mental health history appeared to have begun while he was incarcerated at the California Correctional Center (CCC) on 7/16/02, when he was placed in the MHSDS at the 3CMS level of care. He was described at that time as psychotic, hearing auditory hallucinations of voices telling him to fight with other races. He was subsequently hospitalized in August 2002 for four days, and transferred to HDSP on 8/8/02. On 8/22/02, the inmate was admitted to a Mental Health Crises Bed (MHCB)

at HDSP because of suicidal ideation. He was admitted two additional times as a danger to self or others, and was eventually housed in administrative segregation on 10/10/02 after he had been convicted of aggravated battery on staff, as noted above. During his course of treatment at HDSP, the inmate was diagnosed with Obsessive Compulsive Disorder (OCD), Alcohol Dependence, and Personality Disorder NOS, and was described as psychotic, reporting a history of head injury, and suicidal ideation.

After his first parole violation in August 2003, the inmate returned to HDSP at the 3CMS level of care; however, he was transferred to the CSP/Corcoran Security Housing Unit (SHU) on 11/13/03. His transfer to the SHU appeared to have been related to his having received RVRs for mutual combat and battery on an inmate. He remained in the CSP/Corcoran SHU until 10/1/04 except for a temporary transfer to a MHCB from 9/20/04 to 9/22/04. He was discharged to the EOP level of care at that time, but he remained in the CSP/Corcoran SHU until 11/18/04 when he was transferred to Salinas Valley State Prison (SVSP). He paroled from the California Men's Colony (CMC) on 1/5/06 and was subsequently returned for this incarceration on 11/20/06. While at SVSP, he was diagnosed with Major Depressive Disorder severe with psychotic features, and Antisocial Personality Disorder, and continued at the EOP level of care.

While on parole after his release on 1/5/06, he received treatment in a psychiatric hospital on a 72-hour hold in August 2006. The suicide report referenced a report by his family that he had stopped taking his medications and punched a police officer in the nose, which resulted in a referral for a psychiatric evaluation in October 2006. The psychiatrist reported that the inmate was coherent, responsive, and willing to take Zyprexa, and was not a candidate for return to prison based on his psychiatric status. The inmate subsequently tested positive for methamphetamine and was returned on 11/20/06.

Following his return to WSP RC on 11/20/06, the bus screening indicated the inmate had a diagnosis of Paranoid Schizophrenia and was at the EOP level of care. The inmate reported taking Valproic Acid and Sinequan and denied current symptoms. The medications Remeron and Depakote were ordered for him. On 11/22/06, a mental health screening determined he had no active symptoms, but he was referred for further evaluation. On 11/26/06, a psychiatrist evaluated the inmate and discontinued his medications on 11/27/06 because, the psychiatrist noted, the inmate denied hallucinations, depression, or suicidal ideation and did not want to take medication. His mental status was described as clear and he was diagnosed with Schizoaffective Disorder in remission. The suicide report made reference to the Mental Health Tracking System (MHTS) indicating that the inmate was seen on a weekly basis (11/28, 12/5, and 12/12/06) for CCM contacts. However, documentation in the record was only present for an 11/28/06 cell-front contact with a psychologist who noted that the inmate was compliant with medication and denied suicidal and homicidal ideation. At that time, the inmate was not receiving medication.

On 12/14/06, the inmate received the RVR for the escape attempt referenced earlier in this report. On 12/15/06, the inmate once again denied any symptoms of mental illness to the psychiatrist and no medications were renewed. A mental health progress note by the

CCM was completed on 12/14/06 and stated that the inmate was seen at cell front for weekly contact "due to time constraints." In this note, the inmate reported that he tried to escape because he was "stressing," but denied that he had any mental illness, although he said "they say" that he is Paranoid Schizophrenic.

An RC Mental Health Evaluation dated 12/14/06 was in the record and noted that the inmate was seen because of the staff referral and a history of mental illness. On mental status, his behavior was described as "unsure" with flat affect, fair fund of information, and intellectual functioning, and limited organization of thought and associations of thought. Insight and judgment were both poor. He denied current suicidal ideation, current homicidal ideation, hallucinations, and delusions. His diagnosis was Schizophrenia Disorganized Type, Polysubstance dependence, and rule-out OCD.

An SRAC completed by a psychologist on 12/18/06 was based on the inmate interview only, without other sources of information including the unit health record (UHR), central file (C-file), or CO or staff interview. It was noted that the inmate had been at the CSP/Corcoran CTC with "S/I," but that he denied previous suicide attempts as well as suicidal ideations/threats in the past. An SRAC also noted "a history of poor impulse control, current adm seg status, poor compliance with treatment and medication, and single cell placement," but noted that the protective factors are "family support, realistic life plan, exercise and group activities." The evaluation of risk based on factors above was noted as an "X" between negligible risk and low risk, with the referral to primary CCM as the recommended plan.

On 12/20/06, an IDTT progress note completed by a psychologist contained minimal information as well, and reported that the inmate was not present because of his refusal. It noted that the inmate was a suicide risk and a homicide risk/assaultive behavior risk, with "yes" circled for each of those and the notation "not current" for each as well, without further explanation. The inmate was described as having fair activities of daily living with treatment target symptoms of impulsivity and auditory hallucinations, but his current mental status was stable. There would be no treatment changes and no recommendations for placement in an alternative level of care. It was also noted that the inmate was not taking any medications and that the treatment plan and objective were reviewed with the inmate. The actual "objective" and "assessment" sections of the plan referred the reader to the MH-2. The plan was for weekly CCM contact, daily psych tech rounds, and psychiatrist contact as needed per self-referral. In terms of inmate education, the comment was "none." There was no reference to attempting to address the inmate's diagnoses, need for medication, or structured therapeutic activities and compliance with EOP requirements. The actual MH-2 provided a notation "inmate refused to attend IDTT. completed in absentia. inmate seen on 12/12/06 and MSE was fair." The diagnosis was Schizophrenia Disorganized Type by history, and Polysubstance dependence with a GAF of 40, with his current stressors being incarceration and administrative segregation housing. Part Two of the treatment plan indicated a plan to refer the inmate to problem-solving, anger management, or stress reduction groups – psych tech. There was nothing in the record to suggest that these referrals were actually made.

There was no SRAC completed on 12/21/06 when the senior psychologist completed the clinical summary outline for the ICC.

Although there was no documentation in the medical record of an IDTT meeting, weekly CCM contacts were structured group activities as required for the month of January 2007. The MHTS identified that the inmate was seen by the IDTT on 1/10/07 and had a CCM contact on 1/17/07. The CCM progress note dated 1/17/07 indicated that the psychologist had a 15-minute EOP contact out-of-cell, with the inmate reporting that his symptoms were the same, suicidal ideation denied, mood stable, with the inmate described as quiet/anxious with the plan to continue EOP and a notation stating "group participation" and "topic: sleeping better in prison." The actual form had a line drawn through much of the subjective and objective sections, and the assessment and plan sections of the progress note did not include any assessment of whether the inmate was stable or deteriorating, except for the inmate's mood being "stable." The note did not include any diagnoses or GAF score. The suicide report referenced this note as having "minimal" information and it appeared to be largely incomplete and not in compliance with properly completing a progress note.

Custody staff referred the inmate to mental health for an evaluation because of bizarre behavior, which included smearing feces and head banging. The inmate was seen by a psychiatrist on 1/21/07, after being placed in a holding cell for approximately 90 minutes. A psychiatric progress note of 1/21/07 described the inmate as having diagnoses of Chronic Paranoid Schizophrenia and OCD, "hasn't been taking meds since four months, poorly insightful and history of schizophrenia since age 19 years." The psychiatrist also recorded "no psychiatric hospitalizations" and that the "inmate denies history of past suicide attempts." He also noted that the inmate had a history of fighting, banging his head on the cell, and feces in the cell. The inmate was noted as cooperative with his thought processes, having mild disorganization, and denial of delusions, hallucinations, psychosis, and suicidal and homicidal ideation. He was noted as having limited insight and judgment. His diagnosis was Psychotic Disorder NOS and Polysubstance abuse. A GAF of 45 was noted, and the plan was to prescribe Risperdal. The psychiatrist reportedly had given verbal orders for Risperdal 2 mg po (*per os*) and Haldol 10 mg po, as well as Cogentin 1 mg po, to be given while the inmate was in the holding cell. The doctor's orders for 1/21/07 noted at 11:30 a.m. Risperdal 2 mg at p.m. times 90 days. However, there was no written notation by a nurse of verbal orders for Risperdal 2 mg, Haldol 10 mg, and Cogentin 1 mg as referenced in the suicide report. All psychotropic medications had been discontinued on 11/25/06 until the re-order on 1/21/07, the day prior to the inmate's death. The MAR indicated an order for Risperdal 2 mg q p.m. that was given on 1/21/07. There was a separate MAR that recorded Haldol 5 mg, Risperdal 2 mg and Cogentin 1 mg, all by mouth stat on the morning of 1/21/07. The suicide report made reference to an order for Haldol 10 mg which was inaccurate compared to the MAR.

After the inmate was interviewed by the psychiatrist in the holding cell, and agreed to take Risperdal 2 mg at bedtime for 90 days, the psychiatrist authorized the return of the

inmate to his cell, with instructions that he should be advised immediately if the inmate refused medication or behaved in a bizarre fashion. The psychiatrist's assessment and plan were based on the inmate's self-report, the examination of the inmate in the holding cell, and verbal reports by custody and the MTA. However, the record was not available as the medical records office was closed on weekends, according to the suicide report.

The suicide report suggested that the inmate suffered from chronic mental illness, and that his behavior had become increasingly disorganized over time, including his escape attempt at the RC and "digging out feces by hand because of constipation," by the inmate's self-report. He was characterized by denial and simple manipulation in his interactions with mental health staff. The suicide report also made reference to the inmate's psychotic symptoms, paranoid and bizarre behavior, impairments in judgment and daily self-care. Problem resolution and that treatment compliance had deteriorated over the past three months, with the inmate becoming increasingly disorganized. He was observed by other inmates banging his head. Custody officers made a referral to mental health because of his head-banging and feces smearing, resulting in his being seen by a psychiatrist the day before he committed suicide and returned to population in a single cell.

The inmate was noted to have had variable periods of compliance with at least 11 refusals of medications in September 2005, and sporadic compliance during other months when he was prescribed medications.

The suicide report identified four problems and recommendations as follows:

Problem 1: The Code Blue sequence was difficult to read and notations were not in the correct column, making it difficult to determine the intervention sequence. Also, there was an eight to ten minute delay in calling community ambulance.
Recommendation: Refer to DCHCS Nursing Quality Management Assessment Team (QMAT) to investigate the Code sequence.

Problem 2: Psychiatrist conducting emergency evaluation on a Sunday did not have access to the UHR. Chief psychologist told reviewer that evaluations are not usually conducted at the TTA and the UHRs are not available to mental health staff on weekends.
Recommendation: WSP to develop a process to ensure that UHRs can be accessed at all times during an emergency. Emergency evaluation should be conducted at the TTA, and the nursing supervisor should have keys to medical records. Additionally, provide in-service training (IST) to mental health clinical staff regarding this process.

Problem 3: Psychiatrist conducting emergency evaluation on 1/21/07 did not admit inmate to MHCB despite signs of severe decompensation.
Recommendation: DCHCS will refer this psychiatrist to the PPEC. The SPRFIT will consider implementing system-wide training in the recognition of grave disability in a correctional setting.

Problem 4: CCM contacts were indicated in the mental health tracking system but were not always documented in the UHR.
Recommendation: UHR is the official record, and if treatment is not documented, it did not happen. WSP to conduct a concordance study for a two-month period.

On 6/28/07, a memorandum regarding the corrective action plan (CAP) of suicide of Inmate B was sent from the health care manager and warden of HDSP to the senior psychologist supervisor, mental health programs, DCHCS. This memorandum was forwarded as part of the records for review and there was not the usual QIP issued by the directors of the DCHCS and DAI. Therefore, the memorandum was included in this report as the facility response to the recommendations and QIP identified in the suicide report dated 5/8/07. There was no documented QIP with regard to Problem One which required the DCHCS Nursing QMAT to investigate the Code sequence i.e. report from Nursing Professional Practice Executive Committee (NPPEC).

With regard to Problem Two, WSP did submit documentation stating that the TTA holding cells were impractical to conduct mental health emergency evaluations in consideration of the numerous medical patients seen there. They identified that WSP RC has dedicated offices for mental health treatment and assessments in almost every RC unit as well as the housing units of Facility B, C, and D as well as offices on A and H yards for evaluations as necessary. WSP also provided the CDCR Policy and Procedure Manual Section Five Pre-Admission Screening, with specific references to the availability of the UHR, meaning that the nursing staff in the CTC, ER, or senior registered nurse 2 (SRN-2) was able to get the UHR after hours, and if for any reason they were not available, the on-call psychiatrist could obtain a key to the medical records department from complex control. WSP also provided documentation of a quality improvement team (QIT) formed on 6/5/07 to address "mental health access to Unit Health Records on weekends" and IST, with sign-in sheets for psychologists and psychiatrists, regarding the modification of procedures.

With regard to Problem Three, there was no additional documentation provided by DCHCS regarding the recommendation to refer the psychiatrist to the Professional Practice Executive Committee (PPEC) or the SPRFIT plans to implement system-wide training in recognition of grave disability in a correctional setting.

With regard to Problem Four, WSP provided documentation that there was a follow-up review of the inmate's UHR, and eight of 15 clinical contacts that were indicated in the MHTS were located. Seven of the 15 contacts identified in the MHTS were not located in the UHR. The staff reported that upon further review, three additional clinical contacts were misfiled in the UHR and another two clinical contacts were located in medical records loose filing. In addition, a CCM located a copy of one of the missing clinical contacts that was not in the UHR. After these efforts, one of the 15 clinical contacts listed in the MHTS remained unaccounted for in the UHR, and the conclusion was that the missing note had been lost. Corrective actions were based on this review and, in consideration of five vacant positions in the medical records department, they suggested

(1) staff overtime to decrease the back log of loose filing and compensate for unassigned CDCR numbers, (2) training to minimize misplaced documentation and address placing loose filing in the UHR as a priority; and (3) having a health records technician specialist II audit death charts for accuracy and completion.  Staff reported that, in addition, a concordance study of clinical contact notes in the UHR was conducted for contacts between 5/1/07 and 6/22/07, which included 16 inmate patient charts, totaling 32 contacts for 3CMS 90-day follow-up evaluations and weekly EOP contacts.  This concordance study indicated that 31 of 32 clinical notes, or 97 percent, were demonstrated, and that based on the results of the QIT, the loose filing backlog had been reduced from 16.5 feet to four feet.

**Findings:**

This inmate's suicide does not appear to have been foreseeable as he was not reporting suicidal ideation or intent to harm himself in any way. Indeed, he was denying that he had any symptoms of mental illness and said that he was not in need of medications since his return to the CDCR at WSP RC on 11/20/06.  Although he was placed at the EOP level of care and medications were prescribed, the medications were discontinued as of 11/27/06 and were not re-started until the day prior to his suicide.  The record is replete with past information regarding this inmate's decompensation, past suicidal gestures, and multiple admissions to MHCBs.  In addition, his diagnoses have included Schizophrenia, Psychotic Disorder NOS, Major Depression with psychotic features, Intermittent Explosive Disorder, and a number of Personality Disorders.  Despite his decompensation when he has been noncompliant with treatment in the past, and his relative stability when he has been properly medicated, these issues were not properly addressed by the treatment staff at WSP.  The documentation was missing from the UHR for a number of clinical contacts and the assessments by Psychiatry and Psychology, including an SRAC, and did not include available information already in the past records, but rather relied on the inmate's self-report.

The custody staff initiated referral to mental health because of the inmate's bizarre behavior.  The psychiatrist who saw the inmate documented that the inmate's mental status had decompensated, but did not review the record and did not make any changes in his treatment other than to order for him a stat dose of medication and to order the prescription of a low dose anti-psychotic to begin that same night.  This was a woefully inadequate response to the inmate's decompensation and the referral initiated by custody staff.  Therefore, this inmate's suicide may very well have been preventable had he been properly placed in a crisis bed or higher level of care based on his presenting behaviors, and had the record been available and reviewed by a treating psychiatrist.

In addition, there were flaws in the emergency response. The inmate was initially described as having a weak pulse and there appeared to have been at least brief periods when CPR was interrupted during transport.  Further, the emergency ambulance was not called for ten minutes, and did not arrive at the facility until 17 minutes after the inmate's discovery. This was clearly out of compliance with required protocols.  There were also medical record filing issues and lack of available information in the medical record.  In

those instances when contacts were documented, several of them were woefully inadequate, with minimal information including CCM notes and IDTT team progress notes. Although the suicide report reviewer identified a number of these items, the two that were the responsibility of DCHCS were not provided in the documents received. Therefore, at the time of this report, it is unclear whether the recommendations in the QIP were approved by the directors of DCHCS and DAI or implemented regarding the review of the emergency response and the psychiatrist practice regarding this inmate's care and treatment.

**3. Inmate C**

<u>**Brief History**</u>**:**

This inmate was a 19-year-old Hispanic male who committed suicide on 1/27/07 in the Department of Mental Health (DMH) Vacaville Psychiatric Program (VPP) at the California Medical Facility (CMF) at Vacaville. This inmate was part of the MHSDS and was at the EOP level of care prior to his placement in the VPP. He was the sole occupant of his VPP cell. The inmate had been admitted to the CDCR on 11/17/05 via the Deuel Vocational Institution (DVI) RC, having been transferred from the California Youth Authority (CYA). His commitment offense involved his spitting on a lieutenant at the CYA and being found guilty of aggravated battery/gassing a peace officer with a two-year sentence.

The inmate was discovered at approximately 2:30 p.m. on 1/27/07 by a CO who was walking by the inmate's cell and saw feces on the cell window. The CO went to inform an RN who discharged an MTA to walk down the tier. The MTA saw the inmate spreading feces on his cell door window, and yelling obscenities at staff. The inmate had continued to cover his window with feces until he could no longer be seen. At approximately 2:45 p.m., the senior MTA went to the cell and attempted to talk to the inmate. The inmate did not respond and the senior MTA sent another MTA to get an extraction shield. The MTA returned with the extraction shield and the senior MTA opened the food port, while the other MTA blocked the area with the shield and looked inside the cell. The MTA saw the inmate kneeling in front of his desk with a noose around his neck. The MTA stated that the inmate was "hanging," activated his personal alarm, and a third MTA unlocked and opened the cell door. The senior MTA and three other MTAs entered the cell and discovered the inmate in a kneeling position at his desk, with his knees on the floor, his arms hanging by his sides with his head back and eyes staring blankly upwards. One of the MTAs yelled for a cut-down tool and a second MTA attempted to remove the noose from the inmate's neck. The material around the inmate's neck appeared to be a two-inch strip of the green non-tear safety blanket that was in the inmate's cell as he was on suicide watch. The cut down tool was ultimately retrieved; however, by that time two MTA's had lifted the inmate by his shoulders and a third MTA had untied the knot and removed the noose from the inmate's neck. The inmate was then carried into the hallway and placed on a backboard, and once out of cell, the inmate's airway was cleared and an MTA noticed a weak pulse. Another MTA brought a gurney, and as per the incident report, the fourth MTA began CPR. The inmate was then pushed

onto the gurney and it was noted that his color was blue, he had no respirations, and was unresponsive. The ambu bag was used during transport to the B1 clinic. An oxygen tank was turned on and placed on the outbound gurney. The Automatic External Defibrillator (AED) was activated and the pads were attached to the inmate as chest compressions began. The incident report indicated that the chest compressions began after the inmate was placed on the gurney, although it also indicated that CPR began prior to the inmate being placed on the gurney. Respirations and chest compressions were continued en route to the B1 clinic; however, the staff stopped transport three times while reading the AED. An MTA stated that the staff and inmate arrived at the B1 clinic at approximately 3:00 p.m. After arrival there, a respiratory therapist administered 100 percent oxygen through the ambu bag, and a physician attempted to intubate the inmate without success. An I.V. line was placed in the inmate's right forearm, medications including Atropine and Epinephren were given, and CPR continued. However by this time, the inmate was reported as having no pulse and no spontaneous respirations. The inmate was successfully intubated during a second attempt, but there was no pulse and no recordable blood pressure, with the inmate's pupils noted as being dilated and fixed. After 25 minutes of resuscitation efforts, the inmate was pronounced dead at 3:20 p.m. by the physician. The cause of death was noted as suicide. The body temperature was also recorded as 100.2 degrees with the room temperature of the B1 clinic recorded as 76 degrees. An autopsy report provided by the Solano County Sheriff/Coroner stated that an autopsy was performed on 1/29/07 and determined the cause of death to be asphyxia due to hanging (minutes). The report noted that peripheral blood was saved for a toxicology specimen and the urine drug screen was negative.

In addition to the suicide report completed by the CDCR, DMH completed a Root Cause Analysis of this inmate's suicide, both expedited at the direction of the Coleman Special Master. This reviewer will comment on the Root Cause Analysis later in this report.

The suicide report contained information regarding the inmate's criminal justice history. It described the commitment offense as occurring while the inmate was confined to the CYA, as noted above, with his ultimate admission to the CDCR on 11/17/05. According to the suicide report, the CYA records indicated the inmate had been diagnosed with Attention Deficit Disorder (ADD) at a young age and did not receive medications because his mother, who had previously been admitted to Patton State Hospital (PSH), was crushing his medication and inhaling it. In August 1998, the inmate at age 11 was arrested for smashing the rear window of a car. This case was settled out of court. He was again arrested that same month for possession of a stolen bicycle and several days later for shoplifting at a local store.

In September 1998, he was declared a ward of the juvenile court and placed on home probation. He ran away in October 1998, and he tried to escape during attempts to arrest him. He was charged with resisting arrest, placed in a group home, and received psychological testing that noted a history of abuse as well as head injuries. The inmate was subsequently placed in juvenile hall because of refusal to follow rules and assaults against staff and peers. While in juvenile hall he continued to demonstrate disruptive behavior. He was then treated for Attention Deficit Hyperactivity Disorder (ADHD) with

medication. He was subsequently placed at another group home, and the records indicate that he was involved in several assaultive incidents.

Approximately two years later, in September 2000, he was arrested for two counts of sexual battery and confined to the CYA. He was noted as having assaultive behaviors as well as self-harming behavior, including suicidal ideation and carving marks in to his forearm. He was on suicide watch for most of his time at the Southern Youth Correctional RC and Clinic, according to the suicide report. The probation officer's report noted that he had incurred more than 40 serious rule violations through June 2005, including multiple batteries by gassing the staff as well as his leaving the grounds of the CYA. In June 2005, he attempted to leave the grounds of the CYA facility, was stopped by staff, and spit in the face of the Lieutenant. This incident ultimately resulted in his being charged with aggravated battery/gassing a peace officer and he was sentenced to the CDCR for a two-year term.

The inmate was reported to have an extensive mental health history, beginning at approximately the third grade when he was diagnosed with ADD. There was a history of his parents having reportedly met while they were both patients at PSH. The inmate was raised primarily by his maternal grandmother and mother. It was also noted in the records that the maternal grandmother was physically abusive to the inmate, and that the inmate reported that he had been sexually abused by a male family friend at the age of five. His involvement with law enforcement is noted above. However, concurrent with these incidents were references to the inmate's reporting history of abuse, head trauma, and diagnoses of Depression and Adjustment Disorder in addition to ADHD. He was noted to have had his first suicide attempt at age seven, but the report also makes reference to the inmate's stating he had had "hundreds" or "thousands" of suicide attempts. Workers note that he was hospitalized multiple times at age 12 at a treatment facility as a danger to himself and others, with reference to his first serious suicide attempt at age 12 when he tied a sheet around his neck. By the end of 2000, after being charged with two counts of sexual battery, he remained on suicide watch in the CYA for an extended period of time. He was subsequently diagnosed with Borderline Intellectual Functioning, Dysthymia, Conduct Disorder, and Learning Disorder NOS. He had been prescribed Buproprion, Paroxetine, Quetiapine, and Valprolic Acid, but was noted to have been noncompliant with treatment. The inmate was noted to have had no significant alcohol or drug abuse history prior to incarceration. Earlier references to a seizure disorder appeared to have been reported after his incarceration in the CDCR.

After his arrival at the CDCR in November 2005, he was placed in the MHSDS at the 3CMS level of care. He was receiving Depakote, Haldol, Zyprexa, Remeron, and Cogentin, as well as Levothyroxine prior to his arrival via the DVI RC. The records indicate that the inmate attempted to suffocate himself with a sheet and cut both of his wrists on 12/14/2005, and was placed in a MHCB at North Kern State Prison (NKSP) the following day. He returned to DVI on 12/29/2005 and remained at the 3CMS level of care. He was also placed in the DD1 Developmental Disability Program classification based on an evaluation done on 11/29/2005. He had several evaluations in the Outpatient Housing Unit (OHU) for suicidal ideation with returns to his housing unit.

The inmate had numerous MHCB admissions including an admission from 1/4/2006 through 1/9/2006 at California State Prison, Solano (CSP/Solano) because of numerous abrasions on his arms related to his breaking the toilet in his cell. He was again referred to the MHCB on 1/10/06 but that referral was rescinded. Three days later, he was placed in the OHU because of suicidal ideation and received five-day follow-up from 1/13/06 to 1/17/2006 because of these statements.

Despite an evaluation as Developmentally Disabled, on 1/22/2006 he had further testing and was reported to have Normal Cognitive Functioning (NCF), in stark contrast to all other evaluations.

On 1/22/2006, the inmate attempted to hang himself and was sent to an outside hospital with return to the OHU and subsequently to general population on 1/23/2006, again at the 3CMS level of care. On 2/3/2006, the inmate was transferred to an MHCB at Pelican Bay State Prison (PBSP) because of suicidal ideation. He was on suicide watch until his transfer on 2/10/2006 to VPP. The CDCR suicide report indicates that the inmate was sent to an outside hospital on 2/26/2006 and returned to the VPP on 3/15/2006 when he was transferred to an administrative segregation unit in CMF. The CDCR suicide report indicates that no information was found on why this hospitalization occurred.

Remarkably, while the inmate was in administrative segregation, two SRACs were completed on 3/15/06 and 3/16/2006, respectively. The first indicated a "low risk" and the second indicated "no apparent significant risk" of suicide, although each recorded his past history of suicide attempts and minimal protective factors. Less than two weeks later, on 3/27/2006, the inmate was admitted to the VPP due to having a bloody sheet tied around his neck and head-banging. Although the inmate's diagnosis was Schizophrenia with a GAF as 45, he was returned to the general population EOP program on 3/28/2006. He was prescribed Remeron, Seroquel, Geodon, and Depakote. However, it is unclear from the records as to whether or not his level of care had been changed to EOP. Approximately five days later, on 4/2/2006, the inmate was placed in administrative segregation after reportedly being noncompliant with his medications despite an evaluation stating that he was reporting auditory hallucinations and paranoid ideation. On that same day, the inmate stabbed himself in the head, and the following day he was sent to an outside hospital where he remained overnight for observation. He then returned to the VPP where he was once again retained for less than one day, with his ultimate return to the administrative segregation unit at CMF. An SRAC was completed on 4/5/2006, noting his serious suicide attempts (seven), and documenting no level of risk. He was referred for evaluation by a psychiatrist but was not transferred to an MHCB or higher level of care. He was prescribed Geodon, Depakene, Seroquel, and Thorazine prn and returned to administrative segregation.

The suicide report made reference to the inmate reportedly flooding his cell in administrative segregation on 4/9/2006. However, on 4/12/2006 he was placed in a general population EOP program. An SRAC was completed the following day, noting his past suicide attempts and a number of protective factors, but giving no estimate of

risk. Three days later, the inmate was moved to another EOP unit and celled with his father who was serving a 25-years-to-life term and was at the EOP level of care. An IDTT on 4/26/2006 provided a diagnosis of Mood Disorder NOS, Intermittent Explosive Disorder, PTSD, and Borderline Personality Disorder, with the determination to continue him at the EOP level of care. The inmate continued to have self-injurious behaviors including cutting the back of his head, being seen with a noose tied around his neck, cutting himself superficially, and complaining that he was having problems getting along with his father. These incidents did not result in transfer to an MHCB or acute psychiatric program (APP). However, on 9/28/2006, the inmate was moved to another EOP unit at CMF, away from his father. He also had complaints of seizures in September and October 2006. This inmate had 23-hour admissions to crisis beds in the DMH/psychiatric evaluation service on 3/27/06, with return on 3/27/06, and on 4/4/06 with return on 4/5/06. He also was admitted from 10/7/06 to 10/26/06.

His next admission to the DMH APP was on 10/7/06 after he set a fire in his cell and reported suicidal ideation. During the admission he also was involuntarily medicated via a Keyhea order that began on 10/8/2006. An SRAC was completed on 10/26/2006 after the inmate's return to the CMF EOP unit. It documented no protective factors nor his past suicide attempts, and concluded that the inmate was a "low risk" for suicide. The inmate was next transferred to the VPP on 11/1/06. The case conference on 11/7/06 on S2 resulted in an agreement that S2 would keep him until the Keyhea hearing on 11/16/06. The second case conference was held on 12/12/06 with an agreement to refer the inmate to the Intermediate Care Program. He remained until 12/12/06 when he was sent to an outside hospital after a serious suicide attempt in which he tried to hang himself and was found unresponsive. A CAT scan from the outside hospital indicated that he may have had a small brain infarct but was without other central nervous system dysfunction. He remained in the outside hospital for three days, returned to DMH on 12/15/06, and was hospitalized on the APP Q2 Unit where he remained until his death. During his stay in DMH from 11/1/06 until the time of his death, the inmate was diagnosed with Bipolar Disorder, Antisocial Personality Disorder, rule out ADD, and rule out Borderline Personality Disorder. He also had diagnoses of Intermittent Explosive Disorder as well as Hypothyroidism. After his return to DMH on 12/15/06, the inmate attempted to hang himself on 12/19/06. On 12/21/06, he was also noted to have had torn a strip of material from his mattress which he then put around his neck. He continued to be treated with medication, but there appeared to be some confusion with regard to his being on a Keyhea order, as noted in the CDCR suicide report which stated that the DMH psychiatrist was unaware that the inmate was on a Keyhea order.

Psychological testing was conducted between 1/4/07 and 1/12/07, with a report that was completed on 1/25/07, two days prior to the inmate's death. The neuropsychological and personality testing report for this inmate, dated 1/25/07, was based on testing done on 1/4/07, 1/5/07, 1/10/07, and 1/12/07, and concluded with diagnoses of Cognitive Disorder NOS, etc. The recommendations strongly stated that the inmate should continue to be monitored, that suicide risk should be a focus of his treatment, that a behavioral plan should be implemented, that he be closely monitored in order to reduce his risk of self-harm, that he receive a more structured form of treatment than EOP such as the

41

Intermediate Treatment Program (ITP), that repetition and other strategies as well as visual cues should be used to ensure the inmate's comprehensive encoding, and that neuropsychological testing should be repeated. He had also been sent to an outside hospital because of lacerations to his scalp and injuries due to head banging on 1/7/07, with return to DMH and placement in restraints for head-banging on 1/9/07. The inmate had been placed on suicide observation initially during his DMH stay, but this was reduced to suicide precautions until 1/24/07 when the inmate again engaged in head-banging and threats to staff. After a cell extraction, he was placed in restraints on 1/24/07. With his release from restraints he was again placed on a one-to-one suicide watch on that date. On 1/26/07, the day prior to his suicide, the inmate had a treatment team meeting with staff from the Intermediate Care Program (ICP). According to the suicide report, there was some concern expressed by the APP treatment team because they wanted the ICP staff to wait for transfer to ICP until the following Monday, and also for their (APP) staff to be included in the case conference. The inmate was on one-to-one suicide watch on 1/27/07. He was noted to have been yelling, flooding his cell, and covering himself with his suicide blanket, resulting in his being taken to the day room. He was returned to his cell at approximately 2:30 pm, began flooding the cell again, began spreading feces on the window, and yelling until he did not respond to the MTA at 2:45 pm and was discovered hanging in his cell. These events occurred while the inmate was to have been on a one-to-one suicide watch.

The final diagnoses within the CDCR EOP were: (1) Cognitive Disorder NOS, (2) Rule out Mixed Expressive/Receptive Language Disorder, (3) Borderline Intellectual Functioning, (4) Borderline Personality Disorder, and (5) Antisocial Personality Disorder. There are references to the inmate having a history of hanging attempts with possible brain injury, head-banging, asthma, seizure disorder, and hypothyroidism. Stressors were incarceration, conflicts with family relationships, and a GAF of 20.

On 2/15/2007, DMH submitted a Root Cause Analysis regarding this inmate's suicide. Much of the information contained in the CDCR suicide report as well as the references to other documents included in this report are also included in the DMH Root Cause Analysis. The DMH report states that the inmate "while on 1:1, covered his cell window with feces" on 1/27/07 at approximately 2:45 pm. In this Root Cause Analysis, there is a listing of the event, information used, policies and procedures relative to administrative segregation prescreening, and medical report of injury or unusual occurrence, as well as Chapter 16 of the Program Guide and references to a number of attachments, including among others, the diagnostic analysis.

A death/suicide review on this inmate/patient was provided as an attachment to the suicide report and stated in the discussion that the physician did not think the hypothyroidism contributed to the inmate's attempted suicide.

The suicide report dated 3/20/2007 included 21 identified problems and recommendations as follows:

Problem 1:  The DMH administration requested to have 124 cells retrofitted to remove the desks and stools, replace the beds, doors, and vent and window screens.
Recommendation:  The CDCR facilities management will seek funding for the expeditious physical plant modifications, and will provide a schedule for completion of these physical plant modifications to the Coleman court as soon as possible.  See DMH Root Cause Analysis issues numbers 1 though 4 and 8.

Problem 2:  One-to-one watch was not conducted appropriately on 1/27/2006.  As soon as the inmate/patient could no longer be seen, the food port should have been shielded and opened for constant observation.
Recommendation:   The DMH will revise policies that specify that if an inmate/patient begins to cover his or her window, the response shall be to activate an alarm immediately.  See DMH Root Cause Analysis issue number 5.

Problem 3:  Response time to open the door may have been too slow.  There is no time frame indicated between the inmate/patient's failure to respond and the opening of the food port.  Mitigating this problem is the fact the senior MTA bypassed standard Universal Precautions in order to intervene more quickly.
Recommendation:  DMH will revise policies regarding opening the food ports and doors for the purpose of observation and emergency response.  See DMH Root Cause Analysis issue number 5.

Problem 4:  Suicide precaution documentation indicated that the inmate-patient was observed every 15 minutes.  The intervals of observation were not staggered and the documentation indicated very little interaction.
Recommendation:  DMH will revise policies regarding quality and time intervals for suicide precaution rounds.  These policies will require increased interaction and staggered time intervals.  See DMH Root Cause Analysis issue number 13.

Problem 5:  The inmate/patient was able to use a safety "no-tear" blanket to create a noose.
Recommendation:  DMH will research the availability of "no-tear" blankets that are more tear-proof, and will purchase alternative blankets if they are available.  See DMH Root Cause Analysis issue number 9.

Problem 6:  CDCR and DMH executive staff were required to intervene at several points to prevent the inmate/patient from being prematurely discharged from the APP to the CDCR.  Although the past corrective action to convene joint executive teams was successful, the goal is to have fewer referrals for premature discharge.
Recommendation:  DMH will establish expectations that all inmate/patients in the Acute Psychiatric Program, including MHCBs, be considered for discharge to ICP and/or the day treatment program.  When the EOP program is determined to be the appropriate level of care, justification shall be fully articulated.  See DMH Root Cause Analysis issue number 16.

<u>Problem 7</u>:  Admissions to the DMH on 3/27/06 and 4/4/06 resulted in cursory evaluations with release within 23 hours. Documentation indicated inadequate review of past history.

<u>Recommendation</u>:  DMH will take measures to supervise clinical practice, and to approve documentation.  See DMH Root Cause Analysis issues numbers 17, 20, and 23.

<u>Problem 8</u>:   Despite recent injurious behavior, the plan on 1/27/06 was to discharge the inmate/patient to the ICP, a lower level of care than the APP.  After discussion with DMH executive staff, it became apparent that the intention was to provide <u>increased</u> individual and group therapy programming available in an ICP. Treatment of the inmate/patient focused on evaluation stabilization with medication, behavioral reinforcement, and recreational therapy. Evidence-based practice for treatment of Borderline Personality Disorder includes maintaining a consistent environment and engaging the patient in ongoing consistent individual therapy and skill building with a trained cohesive interdisciplinary team.  Staff from Unit P-2 met with the inmate-patient on Friday, 1/26/07 despite verbal recommendations from the Q-2 treatment team that the meeting should not occur.

<u>Recommendations</u>:  DMH will provide additional training for APP staff in the treatment of Axis II disorders.  A Positive Behavioral Support Team (PBST) will be implemented to make specific recommendations regarding the delivery of therapeutic services in the APP.   This shall include the expectation that all disciplines involved in the treatment team will be included in the development of the treatment plan for each inmate/patient.  Policy shall include requirements for coordination between DMH units when a treatment plan includes transfer to a new unit.  See DMH Root Cause Analysis issues numbers 10, 11, and 21.  The DMH and the CDCR will work together to assess options related to space for recommended treatment.

<u>Problem 9</u>:   The DMH treating psychiatrist did not adequately document the rationale for pharmacy ordered changes.  Continuity of care was not maintained.

<u>Recommendation</u>:   DMH will identify subject matter expert, and provide additional training for psychiatrists regarding documentation of the rationale for the application of psychopharmacological agents.  See DMH Root Cause Analysis issues numbers 14, 14a, 15, and 22.

<u>Problem 10</u>:   DMH does not have a mandatory suicide prevention training requirement.

<u>Recommendation</u>:   DMH will implement annual mandatory suicide prevention training for clinical and nursing staff.

<u>Problem 11</u>:  DMH did not enforce the requirement in the Mental Health Services Delivery System program guide requiring that a full SRA, using an SRAC, be completed upon admission and discharge of patients referred for suicidal ideation and/or behavior.

Recommendation:  DMH will draft and obtain an order requiring psychiatrists to conduct and complete a suicide risk assessment (SRA) upon admission and before discharge of inmate-patients referred for suicidal ideation and/or behavior.  See DMH Root Cause Analysis issue number 18.

Problem 12:  The DMH behavioral plan for this inmate-patient included punitive measures.
Recommendation:  DMH will ensure that behavioral plans do not include punitive measures.  See DMH Root Cause Analysis issue number 19.

Problem 13:  This inmate patient remained at 3CMS level of care despite several MHCB admissions from DVI and a history of suicide attempts.  Several SRAs at DVI did not clearly define the rationale for the risk level indicated.
Recommendation:  DVI shall develop a QIT to ensure that all staff are trained in SRA and Documentation, using the training by Dr. [___], before 3/31/07.  The QIT shall audit at least one SRA per clinician, or create a Peer Review for this purpose, and shall provide follow-up training for any inadequacies determined by the audit.

Problem 14:  The OHU at DVI was used frequently, without referral to a MHCB, including for a serious suicide attempt on 1/22/06.  This problem is mitigated by the fact that the inmate-patient was sent to a MHCB three times while at DVI.
Recommendation:  DVI shall refer inmate/patients who are repeatedly placed in OHU or MHCBs for clinical review teleconference at headquarters.  A log of patients referred for clinical review including name, date referred, date of clinical interview, and outcome shall be maintained for 60 days.

Problem 15:  The Developmental Disability Assessment on 1/22/06 is inconsistent with all other reports of cognitive functioning.  The chrono should not indicate an inmate is NCF after he has already been identified as part of the Developmentally Disabled Program.
Recommendation:  DVI shall develop a QIT to ensure that no assessments for developmental disability are conducted without checking prior history.

Problem 16:  CMF housed the inmate-patient with his father, without a clinical treatment plan that included any rationale, possible consequences, or mental health interventions related to the impact of the relationship on the mental health of either inmate-patient.
Recommendation:  The CMF staff involved in this case shall review this case and make recommendations regarding future policies and procedures for housing inmate-patients with family members in the CDCR.  The SPRFIT at headquarters shall consider these recommendations for state-wide implementation.

Problem 17:  Discharge summaries and 23-hour assessment documentation for this inmate-patient's DMH treatment from 2/10/06 to 3/15/06 and from 4/4/06 to 4/5/06 were not available in the CDCR UHRs.

Recommendation: DMH and CMF shall convene a joint QIT to ensure that discharge documentation is placed in the inmate's UHR.

Problem 18: The account of the emergency response made no mention as to whether the inmate-patient's neck was braced for transport during the emergency response by the DMH.
Recommendation: DMH received verbal assurance from staff that neck bracing occurred. No cervical collar was used. The DMH supervising RN will review the emergency response to determine whether corrective action is required.

Problem 19: The DMH has only one defibrillator on each unit. When it is in use, no defibrillator is available for another emergency.
Recommendation: DMH will purchase two additional defibrillator devices. See DMH Root Cause Analysis issue number 6.

Problem 20: DMH emergency response equipment was not being adequately maintained. The date and time were not set correctly on the defibrillator.
Recommendation: DMH will revise policies for maintenance and audit of emergency response equipment. See DMH Root Cause Analysis issues numbers 7 and 7a.

Problem 21: Notes from executive case conference meetings between CMF and DMH were recorded informally and were not included in the in-patient record.
Recommendation: CMF and DMH executive staff will develop a process for recording these meetings in inmate-patient records.

In addition to the CDCR suicide report, DMH provided a Root Cause Analysis regarding this inmate's suicide. In their Root Cause Analysis, the suicide event was reviewed as well as other documents regarding the inmate's care. In their Root Cause Analysis dated 2/10/07, DMH identified 21 Issues, Recommendations, and Corrective Actions as follows:

Issue 1: In 2002, DMH determined that all APP cell windows had been installed with breakable glass, ordered approximately $35,000.00 of screening material recommended by CMF plant operations, and installed the screening material. In 2006, DMH ordered screening materials with 3/16 of an inch holes sufficient to change APP and MHCB outside windows, air vents, and doors because of a previous death by hanging as a condition of a self-imposed corrective action plan. This resulted in retrofitting of 25 S-1 cells at CMF. However, the remainder of the VPP Acute and MHCB unit windows and vent openings had not been retrofitted on S-2, Q-1, Q-2, or Q-3 units.
Action 1: DMH will continue to work to have CDCR Institutions Division fund and facilitate retrofit all of APP cells, with a timeline of 90 days.

Issue 2: In the best interest of patient safety and patient care, the vent screen retrofit project must be within 90 days as referenced in Action 1. Assistant

hospital administrator (AHA) to contact CMF plant operations to immediately expedite completion of the vent screen retrofit project, with a timeline of 90 days.

Issue 3:   APP cells were fitted with desks and stools, both of which were suspended from the wall, which potentially could be used by the inmate-patient for hanging.  The AHA, based upon CMF information, estimated the cost to remove all tables and stools from APP rooms to be $48,260.00.
Action 1:   AHA to contact CMF with work orders to begin retrofit, with a timeline of 90 days.

Issue 4:   DMH management recommends that all APP cell doors be retrofitted with new-styled doors, as the current doors are approximately 52 years old with locking mechanisms of the same vintage, and patients have used peeled metal pieces from the door for self-harm and harm to others, and additionally in order to prevent broken glass which could be used for self-harm or harm to others. Further, a stabilizing bar is attached to the door and secured to the opposite wall, which is a significant safety hazard.
Action 1:  AHA to contact CMF with work orders to begin retrofit to replace all cell doors in APP.  Timeline for completion: 180 to 240 days.

Issue 5:  Improve staff response to window covering by patient.
Action 1:   Memo dated 2/2/07 regarding emergency response to inmate-patient covering window to instruct all staff to activate an alarm immediately in response to a patient commencing to covering his window.   Timeline: immediately. Completed 2/2/07.
Action 2:  Review and revise identified policy and procedures.  Timeline 30 days.
Action 3:  In-service and train all clinical and nursing staff to follow procedures. Timeline: 30 to 45 days.

Issue 6:  In 2006, the APP executive management team, in response to a suicide in December 2005, determined that nine AEDs would be purchased, one for each unit and one for training.
Action 1:   Order two additional AED devices for units.   Timeline: 30 days. Completed 2/08/07.

Issue 7:  Approximately 12 to 16 months ago, executive management ascertained that emergency equipment on each acute unit varied, and was located in different areas on the unit.
Action 1:  Review APP policy 4.08 Emergency Equipment Storage, develop and implement a new procedure that involves auditing and endorsement of emergency equipment from RN to RN at the close of each shift.  Timeline: 30 days.
Action 2:  Train staff on policy and procedure.  Timeline: 30 to 60 days.
Action 3:  Locate and identify a specific area in each nursing station to permanently place an AED device.  Timeline: 30 days.

Issue 8:   AEDs were obtained; however, the time and date was entered incorrectly.
Action 1:  Contact the outside vendor to educate and train staff on the date and time calibration of AED devices.  Timeline: 30 days.

Issue 9:   APP beds afford the patient the opportunity to inflict self-harm by strangulation due to their height.
Action 1:  Research bed design options.  Timeline: 60-90 days.

Issue 9a:   Current beds are not suitable for appropriate application of patient restraints.  Several months ago, beds were ordered from PIA but have not arrived. Therefore, the APP will immediately seek an alternative vendor.
Action 1:   DMH will research a vendor and immediately order the beds. Timeline: 30 days.

Issue 10:   The Salinas Valley Psychiatric Program (SVPP) at SVSP staff researched and ordered high quality security blankets and none have been damaged, whereas several of the current VPP blankets have been damaged and fabricated into nooses for self harm.
Action 1:  Research the vendor and order 450 security blankets from the same vendor used by SVSP.  Replace current safety blankets upon receipt of shipment. Timeline: 30 days.

Issue 11:  Educate and train staff on current methodology and intervention for treatment of Axis II diagnoses, and identify valid subject matter expert to help facilitate education and training of staff.
Action 1:  Locate valid subject matter expert.  Timeline: 60 days.
Action 2:  Educate and train staff.  Timeline: 60-120 days.

Issue 12:  Implement the Positive Behavioral Support Team (PBST).
Action 1:  Implement PBST.  Timeline: 60 days.

Issue 13:   Implement annual mandatory training requirement for suicide prevention with a knowledge assessment component, with a minimum pass rate of 85 percent.
Action 1:  Implement annual mandatory training requirement for all clinical and nursing staff.  Timeline: 60 days.

Issue 14:  Review and rewrite policies APP 3.05, AD 06.06, and NPPs 203 and 303 to reflect increased frequency of rounds of patients on suicide precaution and differentiation of health and safety rounds from suicide precaution rounds.
Action 1:  Review and revise policies.  Timeline: 30 days.
Action 2:  IST for all clinical and nursing staff.  Timeline: 60 days.

Issue 15:   Provide specific medical staff IST so psychiatrists document the rationale for pharmacy ordered changes.

Action 1:  VPP will consult with DMH headquarters for selection of appropriate subject matter expert.  Timeline: 30 days.

Issue 15a:  Bring in a consultant to educate physicians in the application and use of psychopharmacological agents, dynamics between diagnosis and medications, contraindications to polypharmacy, use of a therapeutic review process, and the role of pharmacy in the overall process.
Action 1:  Identify subject matter expert.  Timeline: 30 days.
Action 2:  Educate and train staff.  Timeline: 60-90 days.

Issue 16:  Improve coordination and continuity of care and transfer of inmate-patients, with focus on primary and secondary diagnosis.
Action 1:  Educate and train staff on differential diagnosing.  Timeline: 60 days.
Action 2:  Develop an in-service education program that includes the development of a graph listing changes in diagnosis and medication orders.  Timeline: 90 days.

Issue 17:  Educate and establish expectations that all MHCB and/or APP patients during the course of treatment be considered for discharge to a higher level of care than EOP.  Require physicians, by means of a DMH special order, to consider in the discharge summary the levels care that are higher than EOP. Physicians will be required to refer patients to either ICF and/or day treatment, or to fully articulate why the EOP level of care is appropriate for each individual patient.
Action 1:  Draft special order.  Timeline: 30-45 days.

Issue 18:  Implement a "charting to court" standard defined as enhanced clinical documentation training, and provide annual training to staff on standards of charting.
Action 1:  Identify subject matter expert.  Timeline: 30 days.
Action 2:  Implement "change into court" training.  Timeline: 40-90 days.

Issue 19:  Draft and obtain a DMH special order for psychiatric programs requiring psychiatrists to conduct and complete a suicide assessment immediately upon admission of any patients referred for suicidal ideation and/or behavior.
Action 1:  Submit a proposal for DMH headquarters' consideration.  Timeline: 45 days.

Issue 20:  The department and executive management do not agree with the punitive approach contained with any "behavioral plan" for the treatment of any patient.
Action 1: Executive management will research all current policies and procedures regarding development of behavioral plans and ensure that all plans convey to all clinical staff that punitive measures will not be tolerated.  Timeline: 45 days.

Issue 21:  Executive management team noted there were failures by psychiatric, nursing, clinical, and supervisory staff in various areas during the patient's

hospital course. These areas included failure to adequately or appropriately document rationales for medication changes, changes in diagnoses, adequate and timely documentation of contacts or interactions with the patient, and failure to hold treatment team conferences per policy, etc. Executive management team will be reviewing these failures and administer appropriate remedies, which will include the progressive disciplinary process and appropriate personnel actions.

Action 1: Identify failures by staff to follow policies and procedures. Timeline: 60 days.

Action 2: Implement administrative remedies deemed to be appropriate. Timeline: 90 days.

Issue 22: Behavioral plans were developed by psychology and psychiatric staff without inclusion of all treatment team members, consensus was not reached in each case, and treatment teams did not have a totally unified approach towards this inmate's treatment.

Action 1: Review and revise AD 04.04 and pending PBST administrative directive. Timeline: 60 days.

On 8/14/07, the director of mental health, DCHCS, and director (A) DAI issued their report on implementation of QIP for suicide of Inmate C. In their report of 8/14/07 in response to the suicide report dated 4/16/07, the directors included a response from DMH dated 7/6/07. In their response, DMH stated that "due to issues of confidentiality the Department of Mental Health will forward directly to Deputy Attorney General" documentation of the progress on the plan of correction regarding the suicide of two inmates including this inmate.

Also in the response was a memorandum dated 7/16/07 from the director of mental health, which included a number of e-mails in response to the QIP stating that funding was requested in the May Revise and that the Legislature approved it so that the budget was awaiting final approval before going to the Governor for signature.

There was another memorandum dated 7/10/07 with the subject "Corrective Action Plan" for this inmate from CMF. It gave more specifics for CAP One (Number 16 in the former report), stating that the issue was discussed in a meeting of the SPRFIT QIT held on 7/3/07 and again at the institutional SPRFIT monthly meeting on 7/12/07. A memorandum was provided summarizing the recommendations. The memorandum essentially stated that any recommendation by mental health staff with regard to housing family members together will be made on a case-by-case basis, reviewed by the IDTT, documented, and clinically justified in the inmate's treatment plan. The ultimate hope was that the memorandum provided a general framework for a clinical procedure when custody is considering co-habitation of relatives, given that it is prudent for clinical staff to be consulted when custody is faced with an unusual occurrence such as this. The memorandum was intended to provide structure for clinical staff to follow in the event such a decision is made.

With regard to CAP Two (Number 17 in the former report) the CMF response was an audit of UHRs for 12 inmates released from VPP from 6/18/07 to 7/15/07.  It found the DMH Discharge Summary in 100 percent of the UHRs.  The records reviewed included all inmates released from VPP that required clinical five-day follow-up.

With regard to CAP Three (Number 21 in the former report), the CMF response was to attach a LOP with the meeting minutes from the 4/25/07 Higher Level of Care QIT.  Their LOP included a policy that CDCR would document case conferences to preserve the results of the conferences between DMH and CDCR, and clinical staff would be designated to write up the case conference and place the documentation in the UHR.  The QIT Higher Level of Care Committee minutes from 4/26/07 were included.

There were also responses from DVI for the QITs that were specifically related to CAP Items 13, 14, and 15 to directly address policies and procedures at DVI.  For CAP 13, DVI reported as of 7/19/07, all staff who received Dr. [____]'s training had been identified and most of the audits had been completed.  However, five outstanding clinician audits still needed to be completed.  The expectation was that those audits would be completed by the end of July.  With regard to the completed audit, any identified problems with the SRACs will have been addressed.  DVI provided the SRAC Audit Log and Audit Tool and completed SRAC Audit Logs for the clinicians who met the criteria for the audit.

With regard to CAP Item 14, DVI reported that all policies and procedures regarding this CAP Item have been resolved.  Further, on 6/8/07 Dr. [____] implemented the new procedures, referring appropriate cases to the Clinical Case Assessment Team and the relevant log to document these referrals.

With regard to CAP Item 15, DVI reported two main changes in policies and procedures implemented to meet CAP Item 15 requirements:  (1) policies and procedures were upgraded regarding all Phase One evaluations such that all new commitments received the Quick Test.  DVI uses the Clark Developmental Disability List which is e-mailed to the OT every day to ensure accuracy.  The OT also has been individually requesting data to ensure proper classification such that no Phase One evaluations are conducted without checking for prior history; and (2) the second change is related to centralized processing for Phase Two and above.  DVI has assigned one clinician as a Clark Coordinator to do all adaptive testing for Phase Two and above.  The DVI QIT "Suicide Prevention Procedures" Charter and Minutes were also included, specifically the Charter of 5/11/07 and Minutes of 6/12/07, 6/19/07, 6/27/07, 7/5/07, and 7/17/07.  A review of those minutes indicated that a number of the significant and appropriate items were listed for discussion regarding Suicide Prevention Procedures.  However, the charter identified ten members on 5/11/07, but on 6/1/07 only two members attended, on 6/12/07 five members attended, on 6/19/07 only the minute-taker was present, on 6/27/07 six members were present, and at the final meeting of 7/17/07 only two members were present.  Notably, the chief psychiatrist attended only one of the meetings, according to the minutes submitted.

The above represents the CDCR and DMH response to the suicide report QIP submitted to this reviewer as of 3/26/09.

On 1/2/08, the directors of the mental health program, DCHCS, and the DAI issued a supplemental report on implementation of the QIP for suicide of Inmate C. In that report, directors noted approval to close the CAP item number 14 ensuring that inmates with multiple OHU or MHCB admissions at DVI are reviewed and are provided appropriate care by the IDTT process (as DVI had demonstrated an ability to formulate sound clinical decisions regarding care of inmate/patients with multiple SHU and MHCB admissions). Further, DVI would implement a local operating procedure (LOP) so that any inmate-patient with three admissions within a three-month period would be referred for a clinical review in the IDTT. A log would be kept of all inmates referred to the IDTT, as well as documentation of the results reached by the IDTT. At DVI, a pre-Coordinated Clinical Assessment Team meeting two days before actual presentation to headquarters has been functioning as an IDTT. This would continue as a weekly meeting that would be renamed the "Multiple Admissions IDTT."

While at CMF in April 2007, this reviewer requested that CMF staff provide me with their responses to those items identified in the suicide report that required corrective actions at CMF. This reviewer was informed verbally that they had not received the suicide report and therefore had no CAPs that had been developed or implemented. This reviewer also requested from the SPRFIT in January 2009 at CDCR headquarters to be provided with the CDCR and DMH responses to this inmate's suicide (as well as the CDCR and DMH responses to the suicide report regarding inmate number four in this report). No additional information, other than that referenced above, was received for additional CDCR or DMH implementation of the QIP or other recommendations.

**Findings**:

This inmate's suicide appears to have been both foreseeable and preventable. Indeed, he had been placed in the VPP because of suicidal ideation and stated intent, which had been an ongoing concern. The CDCR suicide report and DMH Root Cause Analysis both identify serious and systemic problems with the treatment and management of suicidal inmates admitted to the Acute Care Program, as well as the evaluation, treatment, and management of inmates within the CDCR prior to transfer to the Acute Care Program. While these identified problems include physical plant and policy and procedural issues, they also include practitioner performance and communication deficiencies between CDCR and DMH. These problems were identified regarding this inmate's suicide, as well as the suicide of Inmate D in this report and the suicide of Inmate G, who committed suicide at Atascadero State Hospital (ASH). Despite the efforts of administrative staff from both CDCR and DMH to address a number of these issues and provide CAPs, the communication remains extraordinarily problematic between the two components, as well as communication to the Special Master and the Special Master's expert. There is a very serious problem in the actual implementation of the QIP by CDCR, as reflected in the documents submitted. The problem with the communication between DMH and CDCR is even greater, with DMH citing "confidentiality" as the reason to not inform

CDCR of the Implementation of the QIP or the Root Cause Analysis Action Items.[2]
These are problems that simply cannot be allowed to continue.

## 4. Inmate D

**Brief History:**

This inmate was a 31-year-old Hispanic male who committed suicide by hanging in the
VPP on 1/29/07. The inmate was single-celled in the VPP at the time of his death and
was a participant in the MHSDS at the EOP level of care prior to his admission to the
VPP. The inmate re-entered the CDCR on 3/17/05 as a second term inmate via the RJD
RC. The inmate was serving a nine-year term for a conviction of second degree robbery,
with his earliest possible release date of 10/3/12.

The inmate was discovered on 1/29/07 at approximately 7:58 pm by an MTA who was
walking past the inmate's cell which was occupied solely by him. Another MTA stated
that the inmate had covered his cell window, and the second MTA observed a sheet
covering the inmate's cell window. The second MTA remained at the cell while the first
MTA retrieved the plexiglass shield and returned to the cell. The second MTA then
utilized the shield to cover the food port and the first MTA opened the food port. A third
MTA reached into the cell and removed the sheet. The inmate was observed hanging by
the neck from a sheet at the door to the cell. One of the MTAs activated his personal
alarm device and yelled, "We have a hanger" and called for the cut-down tool. The
MTAs prepared for entry and opened the cell door. Two of the MTAs lifted the inmate to
relieve the weight of his body from the noose, and the fourth MTA handed one of the
MTAs the cut-down tool. The MTA then cut the sheet above the inmate's head, freeing
him from the vent above the door. The inmate was lowered to the floor outside the cell,
and one of the MTAs detected a weak and irregular pulse in the right carotid artery. The
gurney was called and ambu bag requested. The inmate was determined to be not
breathing and the ambu bag was utilized to assist him in breathing. The inmate was then
placed on a backboard and onto a gurney and transported to the B-1 emergency room.
The incident report indicated that a carotid pulse continued to be detected by MTAs
during transport. They continued to assist the inmate with breathing; however, when the
transport team entered the west elevator on the second floor, no pulse could be detected.
An MTA then straddled the inmate on the gurney and began chest compressions. After
that, a pulse was detected and chest compressions were discontinued, but the pulse was
once again lost and chest compressions began again. At approximately 8:02 p.m., the
transport team arrived at the B-1 emergency room and emergency room staff took over

---

[2] In response to this statement, defendants objected that this report does not accurately characterize the
relationship between CDCR and DMH. They said that by September 2007, DMH completed all 18
programmatic changes among the 22 areas identified in its Root Cause Analysis as requiring improvement,
and that DMH has now shared its Root Cause Analysis and Plan of Corrections with CDCR via the
Attorney General's Office. Their proclamation that these things have been done is not enough. It still does
not satisfy the need for timely communication of substantive information and sharing of feedback between
CDCR and DMH, including, for example, the details of DMH's implementation of the recommendations
from CDCR. There needs to be a practice of active therapeutically-driven cooperation between CDCR and
DMH that supports and enhances their respective capabilities to treat their mutual patients.

life-saving measures.  At 8:27 p.m. a physician ordered life-saving techniques to cease and pronounced the inmate dead.  An autopsy report was provided by the Sheriff/Coroner for Solano County and indicated the autopsy was conducted on 1/30/07 and determined the cause of death to be asphyxia due to hanging (minutes).  The coroner's report indicated that peripheral blood was saved and a urine drug screen was negative.

The suicide report recounted the inmate's criminal justice history and described the inmate as a "career criminal," having his first arrest at the age of nine for burglary.  The report goes on to state that at age 17, the inmate was convicted of second degree robbery with a firearm and sentenced to four years in the CYA.  Less than a year later, on 7/27/93, he was transferred to the custody of the CDCR as he was deemed unsuitable for the CYA.  He paroled on 1/18/95, but committed an armed robbery and was returned to corrections with a new four-year term for first degree burglary.  He paroled the second time on 9/21/98, but was rearrested for driving under the influence of alcohol/drugs on 4/7/01 and received a jail sentence.  Because of this jail sentence, his parole was revoked and he was returned to the CDCR on 4/17/01.  He paroled again on 2/6/02, returned to custody on 6/11/02, and paroled for his final time on 10/21/02.  The inmate's commitment offense occurred on 11/11/04 when he reportedly yelled at an elderly man and threw a coffee mug at him, resulting in a charge of assault with a deadly weapon (coffee mug).  Officers were responding to the report of an "armed robbery," and while looking for a suspect, identified the inmate-patient as appearing to have a gun in his hand and pursued him.  The inmate reportedly pointed the gun at the ground but did not drop it.  A police dog was deployed and knocked the gun out of the inmate's hand.  It was revealed to be a toy replica of a cap gun.  The inmate was taken into custody.  During transport, he stated to officers that he wanted to die and was going to aim the gun at the officers.  Subsequently, it was determined that the armed robbery involved the inmate begging for money from customers outside of a gas station convenience store and asking the clerk for spare money, with the inmate reportedly becoming intimidating and verbally abusive.  The clerk in the store believed the inmate had a gun, and gave him money.  Subsequently, the inmate was charged with armed robbery and received a four-year sentence with a five-year enhancement for the toy gun.

The inmate is reported to have a history of mental illness beginning at approximately age 26 which included his hearing voices that were threatening that he would be killed if he did not kill himself.  The suicide report makes reference to mental health and medical records from his prior prison terms, which were not available at the time of the suicide report, but the current medical record had substantial references to the inmate's history of mental illness and treatment prior to incarceration.  The history includes multiple suicide attempts that began at approximately age 26.  The inmate also had been hospitalized in the community secondary to suicide attempts, which included cutting his wrists at least three times, attempting to hang himself while in the jail prior to this current incarceration, and overdosing on medications or street drugs (heroin) at least four times.  The inmate was also noted to have had an extensive history of substance abuse including methamphetamine, heroin, cocaine, inhalants, PCP, LSD, and alcohol.

The inmate was placed in an MHCB for suicidal ideation on the day that he arrived at RJD.  On 3/28/05 the inmate was discharged from the MHCB to the EOP.  He reported that he feared for his safety in population and was transferred to the administrative segregation unit for protective housing.  Four days later, the inmate returned to an MHCB where he remained until 4/12/05 when he was transferred back to administrative segregation.  While at RJD, the inmate was diagnosed with Psychotic Disorder NOS, Polysubstance dependence, and he remained at the EOP level of care.  The inmate returned for a third MHCB admission, again for suicidal ideation, from 5/6/05 through 5/9/05.  After being placed back in population in the RC at the EOP level of care, he attempted to cut himself and was returned once again to the administrative segregation unit.  He remained in administrative segregation until 6/22/05 when he had his fourth MHCB admission which extended until 6/27/05, and was once again returned to the EOP level of care in the RC.  He remained in RC housing until he cut his wrists on 9/24/05 and was again placed in administrative segregation.  It does not appear from the records reviewed that he had SRACs completed during this time period, despite his repeated statements of suicidal ideation and fear of being harmed by gang members and/or other inmates.  The inmate was transferred to the EOP program at RJD, and in August 2005 was beginning to become involved in programming.  However, as reported above, in September 2005 he again reported suicidal ideation and cut his wrists.  The inmate reported depression, suicidal ideation, and auditory hallucinations but was described by staff as oriented without evidence of a thought disorder (despite his self-reported voices).  The inmate was diagnosed with a Major Depressive Disorder Recurrent with psychotic features, as well as Antisocial Personality Disorder in October 2005, as per a mental health assessment update (MH-4) while he was in the EOP program.

In early December 2005, the inmate was considered for referral to DMH because of his long-standing depression, reports of auditory hallucinations, and suicidal ideation.  However, he was not referred, and on 12/14/05 he overdosed on medications reportedly obtained from another inmate.  The inmate was transported to an outside hospital, and upon his return three days later he was placed in an MHCB.  He was then referred to DMH but was continued in the MHCB until he was transferred to CMC on 2/14/06.  His stay in the MHCB was just short of two months.  When he arrived at CMC, he was placed in the CMC OHU and was referred to ASH for their APP, again because of his reports of suicide ideation, stating at one point he would "do it if I had the chance."

The inmate was finally transferred on 2/27/06 to ASH, where he remained for three months until 5/30/06 because of suicidal ideation and depression.  The auditory hallucinations, paranoid ideation related to his fear of other inmates and the Southern Hispanic gang, as well as anxiety and agitation, were noted on admission and through his hospital stay.  He was also described in the ASH records as having a "sociopathic attitude."  He was transferred from the Acute Admission Unit to the Intermediate Care Unit where he continued to report suicidal ideation.  The inmate requested return to prison on 5/23/06, but he was not returned to prison.  Rather, he was recommended for transfer to Coalinga State Hospital because of continuing reports of depression, voices telling him to harm himself, and paranoia regarding other inmates.  Before he could be transferred to Coalinga State Hospital, the inmate assaulted another patient at ASH on

6/9/06 and again on 6/14/06.  Between these two assaults, he had been placed in restraints for 24 hours. Once released from restraints, he assaulted a second patient.  The staff at ASH determined that these assaults were because of his paranoia, although the inmate said that he was attempting to engineer his return to prison.  The inmate was in fact returned to prison at CMC on 6/15/06 and was on administrative segregation status.

After the inmate returned to the CDCR at the CMC on 6/15/06 he was placed in administrative segregation.  He requested transfer back to RJD because he reported having enemies at CMC.  He was referred by CMC staff back to ASH, but on 7/3/06 ASH refused to accept him because of his having assaulted a peer during his previous admission to ASH.  He was redirected to the VPP.  While being transferred to CMF on 7/13/06, the inmate was returned to CMC CTC because was unresponsive during transport, refusing to speak and displaying tremors.  He was sent to an outside hospital the following day and returned.  He was again sent to the outside hospital on 7/17/06 and was diagnosed with having Neuroleptic Malignant Syndrome with renal failure and muscle changes, as reflected in a high creatinine phosphokinase (CPK) level.  It appears from the record that initially the medical staff attributed the inmate's unresponsiveness to treatment, and his complaints of headaches and tremors as volitional and indicative of his not wanting to transfer to CMF.  Subsequently, when his creatinine phosphokinase levels were found to be high, he was returned to the outside hospital on 7/17/06 and treated in the intensive care unit with subsequent return on 7/19/06.

When the inmate first arrived at CMC on 6/15/06, he was placed in the crisis bed on suicide precautions because of his report of being suicidal.  Although he was on administrative segregation status based on the assault at ASH, he remained in the MHCB until he was seen at the outside hospital twice, and placed in the General Acute Care Hospital (GACH) at CMC.  On 7/28/06, he returned to the MHCB unit, reporting once again that he was suicidal and was placed in five-point restraints.  He continued to report that he had enemies on the yard and refused a physical examination or to leave his cell.  He was assessed on 8/23/06 as malingering suicidality to remain in a MHCB unit, although he had been referred to DMH at CMF.  On 9/27/06, he was transferred to the VPP, on Unit Q1.  He remained in the VPP until 12/12/06 when he was discharged and returned to the CMC EOP program.  The assessment by mental health staff at CMC was that the inmate was not improved.  He was placed in the MHCB on suicide precautions and re-referred to DMH.  Progress notes indicate the inmate was not improved during his three-month stay at DMH, and an SRAC indicated moderate risk on 12/18/06.  On 1/13/07, the inmate was once again placed on suicide precautions after he was observed by staff standing on his toilet with strips of underwear knotted together.  The inmate stated that he wanted to hurt himself.  His referral to DMH was still pending.

On 1/19/07, the inmate was returned to VPP and was re-housed, this time with admission to the Q2 unit on suicide precautions.  He was described as reporting his intent to kill himself by "whatever it takes," but denied having any suicide plan.  He also reported auditory hallucinations.  A 72-hour initial treatment plan on 1/22/07 estimated his suicide risk as moderate.  While he remained on Q 15 minute checks, his limited issue was increased to allow him to have, in addition to a blanket, clothing consisting of a tee shirt,

shorts, and socks.  Review of the record indicates that although he remained ordered for Q 15 checks, there does not appear to be any documentation of the Q 15 minute checks after 12:45 p.m. on 1/22/07.  On 1/24/07 the inmate was given full issue based on the order of the psychiatrist.  He was seen by the treatment team on 1/25/07 and denied both auditory hallucinations and suicidal ideation or plan, and was described as having a brighter mood, stating that he was looking forward to being able to program.  This suicide risk continued as moderate, although there does not appear to be documentation of Q 15 minute checks after 1/22/07.

The APP treatment plan of 1/25/07 identified the current focus of treatment as depression, and described his mood as "brighter in comparison since last TTC," with affect "broad."  It noted that the inmate appeared happier about programming, denied suicidal ideation, and had no SI since admission.  He reported a decrease in the frequency of auditory hallucinations, that he had not heard voices since admission, and that he would talk to staff as needed if the voices resumed.  His suicide risk was assessed as moderate, noting his history of suicidal behaviors, and reporting that the inmate currently stated that he had been feeling suicidal for the last five years, could not identify any precipitants, and denied current suicidal ideation.  His assault risk was estimated as low.  His diagnoses at DMH were Major Depression, Depressive Disorder recurrent, moderate; Polysubstance dependence; Antisocial Personality Disorder, and hypertension and obesity.  There were no Axis IV or Axis V specifiers on the treatment plan.

On 1/29/07, the inmate's medications were renewed after he was seen by a psychiatrist who reported "no change."  Later that day, at approximately 7:58 p.m., the inmate was discovered hanging at his door from a sheet that was knotted around his neck, as stated previously in this report.  The CDCR suicide report makes reference to statements by staff that this inmate's suicide may have been precipitated by the suicide of another inmate two days prior on the same unit, as a "copy cat" suicide.  The discharge summary from DMH also makes reference to the inmate possibly having taken an overdose of Seroquel on or about 7/13/06 while he was still at CMC, and possibly associated with the diagnosis of Neuroleptic Malignant Syndrome at that time.

The inmate was admitted to ASH from 2/27/06 to 6/16/06, VPP from 9/27/06 to 12/15/06, and VPP from 1/19/07 to the date of his death 1/29/07.

The documentation of the Q 15 minute checks were from the date of his APP admission on 1/19/07 to 1/22/07 at 12:45 p.m.  The documentation was every 15 minutes without staggering.

His medications that were renewed on 1/29/07 included Lexapro 10 mg po Q am (crushed), Seroquel 600 mg po HS (crushed), and Vistaril 50 mg po q 8 hours prn for agitation.

The physician's progress note indicated that the inmate was seen on 1/22/07 and a 72-hour TTC was held.  The inmate was seen by the treatment team. He was cooperative and did not report suicidal or homicidal ideation or auditory or visual hallucinations.  He was

noted to have clear speech, was coherent and alert, and was oriented times three. The assessment was that he was improving, and the plan was to discontinue suicide precaution, continue medications, and increase issue with the shorts, shirts, socks, and tee shirt. The psychiatric progress note of 1/24/07 consisted of two lines including "0 S/H behavior," and P with a circle around it (plan), full issue. There is no indication from the note that the inmate was actually seen by the psychiatrist on that date. The psychiatrist's note of 1/25/07 indicated the ten-day TTC was held, the patient attended, the treatment team was cooperative, and "0 S/H ideation," and "0 A/V hallucinations." It was also noted that the inmate was compliant with medications, with no side effects. The assessment was that he was improving and the plan was for him to program cautiously due to his assault history at ASH. The last progress note by the psychiatrist was on 1/29/07 and stated "no change" and "monthly order renewed." Once again, there was no indication that the inmate was actually seen by the psychiatrist on 1/29/07.

The suicide report dated 4/20/07 identified 12 problems and recommendations as follows:

> Problem 1: At the RJD RC, the MH-7 mental health assessment was not timely within Mental Health Program Guidelines. However, the inmate was already receiving services in the EOP.
> Recommendation: Due to the fact that he was already receiving services, the time task, and other corrective actions since then, there was no recommendation for this problem.

> Problem 2A: At the RJD RC, the inmate was sent to a MHCB three times, but was not referred to a higher level of care at DMH until after he went to the mainline and later overdosed (resulting in a fourth crisis bed placement).
> Problem 2B: Records of these admissions were not found, so it was not possible to determine whether referral to a higher level of care was considered.
> Recommendation 2A: RJD was to conduct an audit of the MHCB log to determine whether inmates are routinely considered for referral to DMH after three admissions within six months.
> Recommendation 2B: RJD was requested to locate the inpatient records which were evidently never filed in the chart.

> Problem 3: Narrative statements made by the emergency room nurse on 7/14/06 implied that the inmate's presentation was volitional or behavioral and were inappropriate, which may have influenced the care given.
> Recommendation: Refer to DCHCS Nursing Quality Management Assistance Team regarding this documentation.

> Problem 4: On both of the previous DMH admissions, this inmate was inappropriately returned to the EOP level of care, where he had been unable to program successfully at any time during his current incarceration. At ASH, the inmate was not considered ready for discharge until he assaulted two other inmates due to his paranoia, and then suddenly he was returned to prison. He

should have instead been sent to the APP. After his admission to Unit Q1, he should have been transitioned to intermediate care, given his fragile history.

Recommendation: DMH will provide training to staff at all DMH facilities that treat CDCR inmates, instructing that inmate-patients shall be discharged or transferred to the most appropriate settings consistent with their clinical and custody needs. The staff should make discharge and referral decisions based primarily on what is clinically indicated for the inmate-patient, using all available information. The rationale for these decisions shall be clearly documented. (See also Issues Number 14 and 15 in the DMH Root Cause Analysis.)

Problem 5: Documentation in the APP chart was often unclear about rationale for treatment decisions, particularly the use of assessments. For example, no connection was made between the rating of this patient's suicide risk as "moderate," and the lowering of the suicide precaution. Additionally, at times the rationale for medication orders was not documented, 14A.

Recommendation: DMH shall train their staff on clear and comprehensive documentation of all treatment decisions. DMH will also mandate their psychiatrists to complete SRAs upon admission. (See also Issues Number 16, 18, 13, 13A and 17 in the DMH Root Cause Analysis.)

Problem 6: There was no indication that the APP offered any debriefing or post-traumatic interventions for the other inmate-patients following the suicide of another inmate on the unit on 1/27/07.

Recommendation: DMH will renew and revise their suicide prevention policy to include patient de-briefing and intervention. Staff will be trained on the revised policy. (See DMH root cause analysis issue number 12A.)

Problem 7: Staff in the APP had not been required to have training in suicide prevention.

Recommendation: DMH will implement annual training for all staff in suicide prevention. (See DMH Root Cause Analysis Issue Number 11.)

Problem 8: The distinction between 15-minute suicide checks and 15-minute health and safety rounds on the unit was not clear.

Recommendation: DMH will review and re-write their policies to reflect frequency of rounds for patients on suicide precaution and differentiate the types of rounds being performed. (See DMH Root Cause Analysis Issue Number 12.)

Problem 9: When the inmate covered his window, staff had to obtain a shield, and then open the food port before they could see that he was hanging. This caused a slight delay in the emergency response.

Recommendation: DMH has already issued a memo instructing their staff to activate the alarm immediately in response to a patient commencing to cover his cell window. (See DMH Root Cause Analysis Issue Number 5.) This will be incorporated into revised policy.

Problem 10: DMH has been attempting to have the vents retrofitted in the patient rooms since the last hanging in December 2005. CDCR must facilitate the physical plant modifications requested.

Recommendation: CDCR shall expeditiously seek funding to retrofit patient rooms, including modifications to vents, doors, beds, desks, and stools, to minimize opportunities for easy access to self-harm behaviors. (See DMH Root Cause Analysis Issues Number 1, 2, 3, 4, 8, and 8A.)

Problem 11: When emergency equipment is in use, there are no back-ups in case of concurrent emergency situation.

Recommendation: DMH shall ensure that emergency equipment is available and maintained in a standardized location, with procedures in place to ensure accountability. (See DMH Root Cause Analysis Issues Number 6 and 7.)

Problem 12: The primary therapeutic modality provided in the APP is medication management. This does not address co-morbid Axis II disorders, which are seen with increasing frequency.

Recommendation: DMH will train staff on current methodology and intervention for treating Axis II diagnosis. Additionally, they will utilize a "positive Behavioral Support Team" to help staff understand the functions of "manipulative behaviors" and make specific recommendations for therapeutic interventions incorporated into the overall treatment plan. (See DMH Root Cause Analysis Issues Number 9 and 10.)

A death review/suicide case report was prepared by a physician on 3/12/07 reviewing this inmate's death by suicide. That reviewer offered the following comments/concerns:

1. The inmate had very few interactions with general medical services.

2. Management of the patient with renal shutdown and Rhabdomyolysis in a CTC, where limited hospital services are available, was a gross deviation from the standard of care. In addition, there are questions in (that reviewer's) mind on when and where the elevated renal indices CPK were identified. It is unclear whether he was in ARS as early as 7/14/06 during the first visit to Sierra Vista Hospital. Many contract hospitals are unclear on the limitations of CDCR care facilities. The staff MD at CMC has the responsibility of not accepting the patient if he was, in fact, in renal failure. The staff MD also should have sent the inmate back out earlier than 7/17/06, once worsening renal functioning was identified.

3. Patient with suspected Acute Coronary Syndrome should not be managed without cardiac monitoring. This is generally not available in CDCR hospitals. This is a gross deviation from the standard of care.

4. The emergency response seemed reasonable.

5.   A narrative of statements made by the ER nurse on 7/14/06 implying that the inmate's presentation was volitional or behavioral was inappropriate.  The assumption that the inmate was acting out may have contributed to treatment delays. (The assumption may have colored the report given to the MOD influencing care decisions.) The reviewer recommended (1) refer to general medication IPPEC regarding the care from 7/13/06 to 7/14/06 at the ER, and CTC in CMC; the Committee can also consider referral regarding CTC care for a "chest pain rule-out" on 7/26-28/06; (2) request medical records from Sierra Vista Hospital from 7/14/06 to clarify the inmate's status at discharge, test results and disposition; and (3) consider referral to nursing QMAT regarding documentation on 7/14/06.  There is a further statement that regarding Recommendation Number One, the report was discussed at Death Review Committee and it was determined that the inmate's initial care from 7/13/06 to 7/14/06 was deemed appropriate.  Further, the 7/26/06 review of the inmate's risk for Acute Coronary Syndrome found the risk low and that the data did not suggest the diagnosis.  Holding the inmate for observation was felt to be an appropriate measure, given his recent community hospital discharge.

DMH offered a Root Cause Analysis of this inmate's death dated 2/10/07.  There was an overall review of the inmate's VPP admission.  The Root Cause Analysis identified 19 issues with associated actions, as follows:

Issue 1:  In approximately 2002, the DMH Executive Management determined that all APP cell windows were installed with breakable glass and ordered the screening material recommended by CMF plant operations and costing approximately $35,000.00.  On 4/10/06, DMH Executive Management ordered screening material with 3/16-inch holes sufficient to change all APP and MHCB outside windows, air vents, and doors, as a condition of the self-imposed CAP because of a previous death by hanging. Twenty-five S1 cells were retrofitted. DMH Executive Management requested that the remainder of the VPP Acute and MHCB unit windows and vent openings be retrofitted with the new screening materials.  However, to date, none of the S2, Q1, Q2, or Q3 units have been retrofitted, with the single exception of one cell.  Until existing doors can be completely retrofitted throughout APP, per Recommendation Number 4 below, screens with 8/16-inch holes are to be replaced with screens with 3/16-inch holes in both the back window and the front window in each cell.
Action 1:  DMH will continue work to have the CDCR Institutions Division fund and facilitate retrofit all APP cells.  Timeline: Completion within 90 days.

Issue 2:  See historical issues contained in Issue 1.  In the best interest of patient safety and patient care, the vent screen retrofit project must be completed within 90 days, as referenced in Issue 1.
Action 1:  AHA to contact CMF plant operations to immediately expedite completion of the screening retrofit project.  DMH will continue to work to have the CDCR Institutions Division fund, facilitate, and retrofit all APP cells. Timeline: Completion within 90 days.

Issue 3:  On or around 12/20/06, the executive director directed the AHA to initiate work orders to remove all tables and stools from APP rooms.  AHA was informed that CMF lacked the manpower to complete the task.  The cost of having an outside contractor or CMF staff using overtime funded by VPP to complete the task was estimated at $48,250.00.

Action 1:  AHA to contact CMF with work orders to begin retrofit.  DMH will work to have CDCR Institutions Division fund and facilitate retrofit of all of APP cells.  Timeline:  Completion within 90 days.

Issue 4:  Replace all cell doors in APP.

Action 1:  AHA to contact CMF with work orders to begin retrofit.  DMH will work to have CDCR Institutions Division fund and facilitate retrofit all of the APP cells.  Timeline:  Completion within 180 days.

Issue 5:  Improve staff response to window-covering by patient.  Executive Management to review and revise APP policies, administrative policies, and nursing policy and procedure to assure more efficient response to patient obstruction of cell windows and doors.

Action 1:  Memo dated 2/2/07 to instruct all staff to activate alarm immediately in response to a patient commencing to cover his cell window. Timeline: Immediately.

Action 2:  Review and revise identified policy and procedures. Timeline: 30 days.

Action 3:  IST for all clinical and nursing staff to follow-up procedures with response to emergencies.  Timeline: 30-45 days.

Issue 6:  Order two additional AED devices that are alternative resources to the nine devices currently in place.

Action 1:  Order two additional AED devices for VPP.  Timeline: 30 days.  Status:  Completed 2/8/07.

Issue 7:  Emergency equipment on each unit was varied, located at different areas of each unit, and was not being maintained adequately.

Action 1:  Review APP policy 4.08 Emergency Equipment Storage as it pertains to AED devices and other emergency equipment.  Develop and implement a new procedure that involves auditing and endorsing emergency equipment from RN to RN at the close of each shift.  Timeline: 30 days.

Action 2:  Train staff on policy and procedure, including new form.  Timeline: 30-60 days.

Action 3:  Locate and identify a specific area in each nurse's station to permanently place an AED device.  Timeline: 30 days.

Issue 8:  Research new bed design options for entire APP program.

Action 1:  Research bed design options.  Timeline: 60-90 days.

Issue 8A:  Install restraint beds in the observation room located on each APP unit. Several months ago these beds were ordered from PIA but have not arrived. Therefore, in the interest of patient safety, the VPP will immediately seek an alternative vendor for the acquisition of the beds.

Action 1: DMH will research a vendor and immediately order the beds.  Timeline: 30 days.

Issue 9:  SVPP at SVSP ordered high quality security blankets.   Four years and nine months after opening, no blanket has been damaged, where as several of the current VPP blankets (commercially produced) have been damaged and the material fabricated into nooses of self-harm.

Action 1:  Research the vendor and order 450 security blankets from the same vendor used by SVSP.  Timeline: 30 days.

Issue 10:  Educate and train staff on current methodology and intervention for the treatment of Axis II diagnoses.  Identify valid subject matter expert to help facilitate education and training of staff.

Action 1:  Locate valid subject matter expert.  Timeline: 60 days.

Action 2:  Educate and train staff.  Timeline: 60-120 days.

Issue 11:  Implement the Positive Behavioral Support Team (PBST).

Action 1:  Implement PBST.  Timeline: 60 days.

Issue 12:  Implement an annual mandatory training requirement for suicide prevention with a knowledge assessment component that has a minimum pass rate of 85 percent.

Action 1:  Implement annual mandatory training requirement on suicide prevention for all clinical and nursing staff.  Timeline: 60 days.

Issue 13:  Review and re-write APP policies to reflect increased frequency of rounds for patients on suicide precaution and differentiation of policy regarding health and safety rounds from policy regarding suicide prevention rounds.

Action 1:  Review and revise policies.  Timeline: 30 days.

Action 2:  IST for all clinical and nursing staff.  Timeline: 60 days.

Issue 14:  Provide specific medical staff IST so psychiatrist can document the rationale for pharmacy order changes based upon the patient's condition and clinical response to the pharmaceuticals being administered.

Action 1:  VPP will consult with DMH headquarters for selection of appropriate subject matter expert to provide training.  Timeline: 30 days.

Issue 14A:  Bring in a consultant to educate physicians in the application and use of psychopharmacological agents, the dynamic between diagnosis and prescribed medications, contraindications to poly-pharmacy, the use of a therapeutic review process, and the role of pharmacy in the overall process.

Action 1:  Identify subject matter expert.  Timeline: 30 days.

Action 2:  Educate and train staff.  Timeline:  60-90 days.

Issue 15:  Improve coordination and continuity of care in transferring and admitting patients with focus on primary and secondary diagnoses.
Action 1:  Educate and train staff on clear and concise differential diagnosing based on psychiatric symptoms and behavior.  Timeline: 60 days.
Action 2:  Develop an in-service education program that includes development of a graph listing changes in diagnosis and medication orders, with an attached "diagnosis and medication changes table."  Timeline:  90 days.

Issue 16:  Educate and establish expectations that all MHCB and/or APP patients during the course of treatment be considered for discharge to a higher level of care than EOP. There should be special orders to require physicians to consider psychiatric programs in the discharge summary at levels of care higher than EOP and to refer patients to either ICF and/or day treatment level of care, or to fully articulate why the EOP level of care is appropriate for each individual patient.
Action 1:  Draft special order.  Timeline:  30-45 days.

Issue 17:  Implement a "charting to court" standard, which is defined as enhanced clinical document training.
Action 1:  Identify subject matter expert.  Timeline: 30 days.
Action 2:  Implement "charting to court" training.  Timeline:  40-90 days.

Issue 18:  Draft and obtain a DMH special order for psychiatric programs requiring psychiatrists to conduct and complete a suicide assessment immediately upon admission of any patient who is referred for suicidal ideation and/or behavior.
Action 1:  Submit a proposal for DMH Headquarters consideration.  Timeline:  45 days.

Issue 19:  Executive Management Team noted that there were failures by psychiatric, nursing, clinical, and supervising staff in various areas during the patient's hospital course.  These areas included failure to adequate or appropriately document rationales of medication changes and changes in diagnoses, failure to adequately and timely document contacts or interactions with the patient, and failure to hold treatment team conferences per policy, etc. The executive management team will be reviewing these failures and will be administering appropriate remedies which will include a progressive disciplinary process and appropriate personnel actions.
Action 1:  Identify failures by staff to follow policy and procedures.  Timeline: 60 days.
Action 2:  Implement administrative remedies determined to be appropriate.  Timeline:  90 days.

On 8/14/07, the director of mental health, DCHCS, and the director (A) DAI submitted their report on implementation of QIP for suicide of Inmate D, which was received by

64

this reviewer on 3/26/09. Included in their submission was a memorandum from DMH dated 7/6/07 stating that "due to issues of confidentiality the Department of Mental Health will forward directly to Deputy Attorney General" documentation of its progress on the Plan for Corrective Actions regarding the suicides of two inmates including Inmate D.

A memorandum from the director of mental health, DCHCS, dated 7/16/07 stated that funding had been requested in the May Revise and approved by the Legislature, and that the budget was awaiting final approval by both houses of the legislature before it goes for the Governor's signature. This was part of a series of e-mails regarding funding for modifications in 124 DMH operated cells.

Included in this submission was a 4/25/07 letter from the chief psychiatrist at RJD referencing CAP Items 2A and 2B. With respect to CAP Item 2A, the response was that an audit was performed by the acting senior psychiatrist over a six-month period from 10/1/06 to 3/31/07 for any MHCB inmates with three or more admissions within a six-month timeframe. Eight inmates met those criteria. IDTT forms were audited. The results showed that two were transferred to DMH at the conclusion of their third admission, five were formally evaluated at the MHCB IDTT for DMH referral, and one had no written documentation of any DMH referrals during his third admission. An enclosed work sheet was provided. The corrective action was that all inmates admitted to the MHCB with longer than a ten-day stay, or with three admissions within six months, must have results of the DMH "consideration" clearly placed in their IDTT notes, and every MHCB weekly IDTT for inmates with stays of ten days or longer shall consider DMH referral and record that determination in IDTT notes.

With regard to CAP Item 2B, the letter from RJD stated "see enclosed." However, the enclosure was a one-page document referencing the repeat admissions listed above. No other enclosure was provided.

With regard to CAP Item 3, the NPPEC provided a Nursing Consultant Program Review, Death Review Summary. The corrective action was for the director of nursing (DON) to conduct an individual supervisory conference with the TTA RN. The DON will discuss specific areas of concern (assessment of inmates with altered levels of consciousness, inappropriate conclusions, and possible prejudice against inmates with mental illness), identify where improvement will occur, and develop a plan for training. The DON will document the conference, place a signed copy in the employee's supervisory file, and discuss the findings with the regional DON to determine whether disciplinary action is indicated within 14-days of the notice dated 6/6/07. There was no further information or documentation provided with regard to the CAP.

The above constitutes the implementation of the QIP recommendations by CDCR and DMH to the suicide report of 4/20/07.

**Findings**:

This inmate's suicide appears to have been both foreseeable and preventable. There were multiple failures in the inmate's management by CDCR with regard to appropriately providing treatment while in CDCR facilities as identified in the CDCR suicide report. Further, there were multiple failures to appropriately treat and manage the inmate once he had been transferred to DMH. These failures included his precipitous discharge from ASH after he had committed an assault against other inmates,[3] his first stay in the VPP, his return to the EOP level of care without significant improvement, and his second stay in the VPP from 1/19/07 until the time of his death. Both CDCR and DMH submitted corrective actions provided as part of their suicide report and Root Cause Analysis, respectively. However, despite requests to have the documents implementing the corrective actions sent to this reviewer, the Special Master's Expert, only the CDCR responses were received by 3/26/09, as reflected above in the responses from the directors on 8/14/07. Included in those responses was the DMH letter stating that DMH would not provide their implementation of the QIP or Root Cause Analysis action plans to CDCR, but only to the Office of the Attorney General.[4]

The citing of "confidentiality" as the reason DMH did not provide information on the implementation of the CDCR QIP recommendations DMH Root Cause Analysis is unacceptable.[5]

## 5. Inmate E

**Brief History**:

This inmate was a 51-year-old Caucasian male who committed suicide by hanging in the minimum support facility dormitory at the California Institution for Men (CIM) on 2/15/07. The inmate was not a participant in the MHSDS at the time of his death. This

---

[3] Defendants objected to this reviewer's description of the inmate's release from ASH as "precipitous" on the ground that his discharge reflects security concerns arising from this inmate's assaultiveness, rather than from a clinical judgment about this inmate's mental health status. Defendants' objection lacks a legitimate basis. It is the responsibility of forensic hospitals such as ASH to manage assaultive patients and not simply discharge them to a different location, such as CDCR or to the outside, because of such behavior.

[4] In response to this statement, defendants stated that they asked DMH to generate documentation on its implementation of it Root Cause Analysis action plan in response to this reviewer's request for information on implementation of that plan. Preparation and submission of such documentation should not have to be specially requested; it is required by policy and should also have been provided to CDCR as well as to this reviewer. Moreover, what was eventually provided to this reviewer was insufficient in content.

[5] Defendants objected to statements in this case review concerning the lack of cooperation between CDCR and DMH, relying on the same grounds which they asserted in response to a similar finding by this reviewer for Inmate C. *See* page 31 n. 2, *infra*. Both CDCR and DMH prepared corrective actions as part of their respective suicide report and Root Cause Analysis. However, DMH refused to provide CDCR with its implementation of the action plans from the quality improvement plan and Root Cause Analysis, and was willing to provide them to only the Attorney General's office. As stated in footnote 2 above, such practice does not reach the level of cooperation that is required for both departments to treat their common patients effectively. Patient confidentiality can be protected without it being exploited as a barrier to important communication.

was the inmate's first prison term, which began on 7/7/05 via the RJD RC. He was sentenced to four years for transporting a controlled substance and an additional six years as an enhancement for prior drug offenses. His earliest possible release date was 1/4/10.

The inmate was discovered on 2/15/07 at approximately 6:36 a.m. by two officers who were informed by an inmate that there was a man down in "B" wing. The officers proceeded to the "B" wing and observed the inmate hanging towards the back of the upper bunk with a torn sheet wrapped around his neck. One of the officers notified control via his institutional radio and requested a Code One response, medical response, and activated his personal alarm device. The officer then removed the torn sheet from an electrical panel and loosened it from around the inmate's neck. Code One staff and medical staff arrived, and an MTA checked the inmate for vital signs and initiated CPR at approximately 6:39 a.m. The inmate was placed on a gurney and taken to the medical transport vehicle, at which time a MTA resumed CPR. There was an interruption of CPR from the time of the inmate being placed on the gurney to the time he was taken to the medical transport vehicle. The inmate was transported to the CIM hospital where CPR was continued. At approximately 6:55 a.m., a physician pronounced the inmate dead and CPR was stopped. The cause of death was listed as suicide. The noose around the inmate's neck was loosened but remained in place because the officer did not have a cut-down tool to cut and remove it. An autopsy was performed on 2/16/07 by the San Bernardino County Sheriff-Coroner Division. It determined the cause of death to be hanging (minutes) and the manner of death to be suicide. A toxicology analysis determined that there were no drugs of abuse or ethanol detected in the toxicology specimen.

A note was found taped to the antenna of the inmate's television on the morning of his death. The note was dated 12/26/06 and was addressed "to whom it may concern." The note contained the inmate's statement that he was driven to "this action" by a captain in the facility as part of the captain's "personal vindictive vendetta against me," which the inmate described as related to unsubstantiated and unfounded "lies" and a note from an anonymous inmate. The inmate stated that he had been punished, fired from his job, reassigned to a "punishment" assignment on a yard crew, and moved from cell-living to an open dormitory. The inmate went on to say that he had done nothing to warrant the punitive action and had not been written up for a disciplinary action prior to "this punishment." He asserted that the captain abused her authority and that he was a victim of her personal vendetta and punitive action. The statement said that he was not able to read the note from the anonymous inmate and "this is the only avenue left to me." It was signed with a post script to contact the inmate's sister. There was a second note, apparently to the inmate's sister and other family members, in which he stated "the time has finally come to say my final good bye." He said it was long overdue and that if he were a stronger person, he would have been able to have done this two years earlier and saved everyone a great deal of grief. He went on to end with "before 2001 my drug use was minimal but I" without finishing the sentence.

The suicide report recounted the inmate's criminal justice history and stated. It stated that his only prison term was for the instant offense, which occurred on 10/15/04 when he

was arrested during a traffic stop and found in possession of methamphetamine, marijuana, mushrooms, and drug paraphernalia.  This resulted in his probation being revoked and a sentence of four years plus the six-year enhancement for previous offenses.  Prior to his incarceration, the inmate had achieved a degree in Economics in 1979 and a paralegal certificate in 1978.  He was employed by Boeing and subsequently by General Dynamics, but in 1994 he left General Dynamics on full disability after being infected with what the records described as "an airborne contagious virus."  He subsequently was placed on various medications and, according to the records, became dependent on prescription pain medications in 1995.  He was arrested in March 2000 in San Diego for possession of a controlled substance, driving an unlicensed vehicle, and being an unlicensed driver.  He received three years' probation.  He was also arrested in August 2002 for selling methamphetamine to an undercover Drug Enforcement Administration agent and for possession of an illegal weapon (a handgun).  He received five years' probation and three years in State prison which was stayed.  However, the inmate was once again arrested in October 2002 for possession of methamphetamine, a sawed-off rifle, and ammunition.  Again, he received probation and a state prison sentence.  He was re-arrested December 2003 for possession of controlled substances.  The instant offense occurred on 10/15/04, as described above, for which he received a ten-year sentence which was upheld on appeal in the fall of 2006.

The inmate entered the CDCR at the RJD RC on 7/7/05.  He gave a history of having been treated for depression in 1994 and was prescribed Trazodone, Bupropion, and Doxepin at the time of his admission.  He had been diagnosed with Amphetamine Dependence and Depressive Disorder NOS.  It was also noted on the initial health screening (bus screening) that he had attempted suicide by overdose in 2001.  After admission to RJD, he was prescribed Remeron, Wellbutrin, and Benadryl at bedtime.

The mental health screening at RJD was positive on 7/8/05 due to his reporting an accidental overdose and feelings of guilt and shame in a past hospitalization in a psychiatric facility.  On 7/22/05, he was seen by a psychiatrist who reported a psychiatric follow-up.  The inmate was sleeping better with the addition of Benadryl and Remeron.  The plan was to refer him to psychology for evaluation, to continue the Wellbutrin, Benadryl, and Remeron, and to return to clinic in four weeks.  He did not appear to have been scheduled for a return follow-up appointment in four weeks, but was seen on 10/12/05 with a following notation by a psychiatrist.  The inmate was seen by the psychologist for his RC mental health evaluation.  The RC mental health evaluation form was undated and noted the data source as the interview with the inmate only.  The evaluation indicated the inmate had a history of mental illness and a possible mood disorder, and noted his current medications as Wellbutrin, Remeron, and Benadryl.  His mental status examination was noted as entirely within normal limits.  The inmate was noted to have wanted to be in the substance abuse treatment program.  The diagnostic impressions were Depressive Disorder NOS and Polysubstance Dependence by history, as well as Personality Disorder and a GAF of 60.  However, the psychologist who conducted the evaluation determined that the inmate did not meet the criteria for inclusion in the mental health treatment population.  The date at the end of the report was 7/25/05.

The inmate continued to receive medications throughout his stay at RJD, but did not receive follow-up by the psychiatrist who had seen him on 7/22/05 and written a plan for the inmate to return to clinic in four weeks, nor was he seen by any other clinician during his stay at RJD.

The inmate was transferred from RJD to the CIM on 9/19/05. Despite the bus screening indicating the inmate was receiving psychotropic medications and had a history of mental health treatment, he was not placed in the MHSDS. On 9/19/05, the inmate had orders for Wellbutrin 150 mg q am and HS, Remeron 15 mg q HS, and Benadryl 100 mg q HS. The inmate sent numerous Health Care Services Request forms for renewal of medications including Neurontin and Ibuprofen for pain as well as thyroid medications (Levothyroxine). The inmate sent a Health Care Services Request form dated 9/24/05 stating that he had not received his Neurontin 1200 mg twice per day since his arrival at CIM from RJD on 9/19/05. The inmate submitted a subsequent Health Care Services Request form dated 9/11/05, stating that after he moved within CIM from one facility to another, he had not received his Neurontin since 8/11/05.

The initial health screening (bus screening) when the inmate transferred from RJD to CIM on 9/19/05 was positive for the inmate's identifying neuropathy – use of a cane and an "H-Wave" stimulator machine daily for neuropathy, chronic spinal pain, as well as his complaints. The inmate was described by his prior managing physician from the University of California San Diego Pain Management Medical Group as having spinal stenosis and bilateral radiculopathy, resulting in chronic severe pain, muscle weakness, and progressive atrophy. The inmate was being treated with Neurontin 600 mg po bid and 1200 mg po bid prn for pain, as well as Levothyroxine .1 mg q day.

The inmate submitted a health care services request form on 10/9/05, stating "please discontinue Elavil prescription, this was prescribed to me without a consultation with a doctor. I have never taken Elavil and do not care for its effects. Please discontinue and do not prescribe any new medication. Thanks." The psychiatrist who discontinued his prescriptions for all psychotropic medications determined that he was not in need of mental health treatment, and apparently did not review the record, based on the psychiatrist's note. The inmate was referred to the general physician for discontinuation of the Elavil. The psychiatrist's note of 10/12/05 stated that the inmate was referred because he requested that his Elavil be removed. The psychiatrist reported that the inmate was alert, coherent, and cooperative, not psychotic, manic, or depressed, and denied suicidal ideation, homicidal ideation, and auditory and visual hallucinations, with the assessment "no mental symptoms" noted. The plan was for no need for psychiatric treatment and notation to return to clinic by patient request prn. There is no mention of the inmate's other psychotropic medications, review of the UHR, or past history of depression and suicidal behavior. The inmate had no further contacts with any mental health provider after 10/12/05. The Elavil was apparently prescribed for lower back pain and peripheral neuropathy.

The inmate had maintained a job as a clerk for the facility captain at CIM. However, on 12/7/06 he was removed from the clerk's position due to reported misconduct and placed on the yard crew. There was a medical chrono that limited his standing to less than 30 minutes, which would appear to have been problematic for his placement on the yard crew. The change in his job appeared to have been referenced in the inmate's note dated 12/26/06. According to the suicide report, the inmate's bunk mate told the suicide reviewer that on 2/14/07, the inmate had obtained a new job as a clerk in the kitchen. The suicide report also makes reference to the inmate having lost his position as a captain's clerk and to his housing being changed to dormitory housing. This was based on a search of his locker in December 2006, which uncovered baggies of tobacco, suggesting he was trafficking tobacco, as well as a previous RVR in October 2005 in which the inmate ultimately pled guilty to a charge of possession of controlled medications. In terms of the inmate's medical history, he was noted to have been treated for lower back pain, peripheral neuropathy, hypothyroidism, and asthma. He had a lower bunk chrono issued in December 2006 which expired in February 2007, but apparently was never enforced (his bunk assignment was an upper bunk at the time of his death) and was using an "H-Wave" stimulator for muscle stimulation to relieve pain.

The suicide report identified two problems and recommendations, as follows:

> Problem 1: Although the inmate was appropriately referred for medications and mental health evaluation after his entry to the RJD RC, he was never placed in the MHSDS by either of the psychiatrists who prescribed for him or by the psychologist who completed the RC mental health evaluation, despite noting that he was taking psychotropic medications.
> Recommendation: RJD: Conduct an audit of this psychologist's mental health evaluations to see whether inmates are generally being referred to mental health when appropriate, either through local peer review process or by the supervising psychologist. Additionally, have a discussion/IST with all mental health clinical staff to ensure that everyone is aware of the requirement for inmates on medications to be included in the MHSDS.

> Problem 2: Upon transfer to CIM, the inmate's current mental health needs and his prescriptions for psychotropic medications were noted by receiving staff, but no one noticed that he was not in the MHSDS. He was not referred for a psychiatry and/or mental health evaluation. When he saw a psychiatrist for a separate matter, the psychiatrist also failed to note that the inmate was not a participant in the MHSDS, and simply discontinued his psychotropic medications without the six-month monitoring period mandated by the mental health program guide.
> Recommendation: CIM nursing supervisor to provide "on the job training" for nurses working in the receiving and release unit regarding the need to refer to psychiatry and mental health any inmate who is prescribed psychotropic medications. The chief psychiatrist is to provide IST to all psychiatrists regarding the requirement for an inmate with psychotropic medications to be referred for a mental health evaluation, if not already included in the MHSDS.

A death/suicide review for Inmate E was conducted by a physician. However, the date of the review was not provided. The physician in his conclusion/recommendations stated that (1) pain management for this particular patient seemed to be adequate, (2) he did not think that the inmate's hypothyroid state caused him to go into a depression and commit suicide, but he did think it may have been a good idea to be "a little more aggressive" with the dosing of Levothyroxine, and (3) "mental health issues."

On 9/17/07, the director of mental health DCHCS and director (A) DAI issued their report on Implementation of QIP for suicide of Inmate E. This report was issued in response to the suicide report dated 5/8/07. The response from the warden and health care manager at RJD regarding Problem One stated that the placement chrono, which inappropriately indicated that the inmate did not meet criteria for inclusion in the MHSDS, appeared to be most consistent with an "isolated transcription error." The staff at RJD identified that the psychologist had been functioning as a senior psychologist supervisor and had been assigned to the administrative segregation unit for more than one year prior to that. Consequently, no charts in which the psychologist completed a mental health placement chrono were available at the institution. They went on to state that "nevertheless, since there had been an awareness of a separate problem with the prompt issuing of placement chronos, a memorandum was circulated on 8/8/05 which appeared inadvertently to add an additional mechanism to catch such errors and prevent MHSDS inmates from being listed as excluded general population." They also reported that a system of dual notification to mental health staff by both RC nursing staff and custody was initiated on 8/1/07 on a trial basis, with re-assessment to follow. They also reported that IST was held at the regular monthly mental health staff meeting in June, and provided IST sign-in sheets.

With regard to Problem Two, the warden, health care manager, and chief psychiatrist at CIM provided documentation of IST sign-in sheets for nursing staff. It consisted of participation in "on the job training" in the receiving and release unit to refer inmates who are prescribed psychotropic medications to mental health. Psychiatrists received training in the referral of any inmate with psychotropic medications for mental health evaluation, if not already included in the MHSDS.

**Findings:**

This inmate's suicide does not appear to have been foreseeable, as he was not reporting suicidal ideation or intent to a staff member. He did report chronic pain and dissatisfaction with his having a job change, based on what he considered inappropriate disciplinary actions. His suicide does not appear to have been preventable. He had not been placed in the MHSDS, as required by policy, when first admitted at RJD or subsequently when transferred to CIM. It is clear from the records that the inmate's psychotropic medications were continued at RJD and CIM until they were discontinued by a psychiatrist, with assessment without review of the UHR and no plan for follow-up at CIM in October 2005. The inmate had a history of chronic depression as well as chronic pain and was simply "missed" by clinicians at both institutions as meeting the

criteria for inclusion in the MHSDS. Further, although the inmate was referred to the psychiatrist in October 2005, based on his self-request for discontinuation of Elavil which had been prescribed for pain, the psychiatrist discontinued all of his psychotropic medications except Elavil, without any documented consideration of the inmate's history and record, and with no plans for follow-up of the inmate who presented as stable. The inmate was seen by medical regularly for his chronic pain, and was not referred by medical or self referred to mental health for assistance after October 2005.

**6. Inmate F**

**Brief History:**

This inmate was a 56-year-old Hispanic male who committed suicide by suffocation in the SHU at the CSP/Corcoran on 2/21/07. The inmate was a participant in the MHSDS at the 3CMS level of care as medical necessity. He was the single occupant of his cell at the time of his death. The inmate entered the CDCR via the San Quentin State Prison (SQ) RC on 8/2/01, having been convicted of attempted murder with premeditation and deliberation and infliction of great bodily injury and use of deadly weapon, assault with infliction of great bodily injury and use of a deadly weapon, and infliction of corporeal injury on a child resulting in a traumatic condition with infliction of great bodily injury and use of a deadly weapon with a prison term of 14 years to life. His earliest possible release date was 6/6/20.

The inmate was discovered on 2/21/07 at approximately 7:38 a.m. by a CO who was attempting to serve the inmate his morning meal. The inmate was the sole occupant of his cell and the officer attempted to get the inmate's attention, but he did not respond. He had a sheet covering his body and head. Another CO activated the unit alarm system and other custody staff responded to the cell door with their protective equipment. The sergeant ordered the cell door opened and staff entered the cell, moving toward the inmate and placing the protective shield between the inmate and staff. The sheet was removed and staff observed that the inmate had a plastic bag over his head and a ligature made of blue sheet around his neck. The staff also saw that the inmate had tied another sheet to both hands, running the sheet between his hands securing them together, and a sheet also went underneath the mattress. The sergeant and two officers took immediate lifesaving measures, including using a handcuff key to cut the ligature around the inmate's neck, while another officer retrieved an ambu bag, and the sergeant called on the institutional radio for an ambulance. After a Stokes liter was retrieved, the sergeant and an officer began CPR. The inmate was placed on a Stokes liter, carried downstairs to the ambulance, and was transported via ambulance to an outside hospital. The incident report noted that an RN and licensed vocational nurse (LVN) responded to give medical assistance but it did not specify what assistance they gave. At the outside hospital, a physician pronounced the inmate dead at 7:48 a.m., noting a provisional cause of death as suicide. An autopsy was conducted by the Office of the Sheriff County of Kings on 2/22/07 and determined the cause of death was suffocation (minutes). A toxicology report determined there was no alcohol, amphetamines, or cannabinoids in the blood specimen.

The suicide report provided the inmate's criminal justice history.  The inmate reported that he was born in Mexico and had attended the University of Mexico City, studying architecture and psychology.  He reported that he immigrated to the United States in 1983 and had one son and one daughter.  The inmate reported that he had a history of marijuana use in high school and used cocaine in 1999 and 2000 sporadically.  The inmate had an arrest in May 1987 for two acts of child molestation with two female victims.  He pleaded guilty to sexual battery in August 1987 and received a one-year county jail sentence and three years' probation.  His record was expunged of this offense in July 1991.  The instant offense involved the inmate having assaulted his 17-year-old daughter.  At the time she was preparing to leave the home because the inmate was coming to the home to pick-up belongings.  His wife had forced him to leave the home earlier that week.  The inmate reportedly strangled his daughter, cut her neck area with a knife, and subsequently stabbed her in the chest.  His daughter lost consciousness, and when she regained it she climbed out of the mother's bedroom window and alerted a neighbor who called police.  The inmate was arrested on 1/3/01 in Washington State and was convicted in June 2001 of the offenses listed earlier in this report.  He was ordered to pay a $10,000.00 fine and restitution to the victim as well as to serve a prison term of 14-years-to-life.  The inmate also had an Immigration and Naturalization Service (INS) hold.

The suicide report makes reference to the family members, including his wife, son, and daughter, writing letters to the Court and referencing the inmate's use of cocaine and marijuana, his paranoia regarding his wife's behavior, and his suspicions of her being unfaithful to him.  The suicide report also references the probation report indicating that the inmate may have believed that his defense attorney was against him, which may have interfered with his ability to cooperate with his attorney.  This potential conflict led to an evaluation of the inmate's competency to stand trial.  The suicide report references two mental health professionals evaluating the inmate as having eccentric thinking, thought disorder, and delusional thinking, his refusal to cooperate with his court-appointed attorney, and his representing himself at trial, as he was ultimately determined to be competent to stand trial.

Following his arrest in January 2001, the inmate was held in Marin County Jail.  He was placed on suicide watch from 7/30/01, as he was sentenced on that day.  He remained on suicide watch at the jail until his transfer to SQ on 8/2/01.  The suicide report makes reference to his having been on a hunger strike as of 7/30/01 and also includes a reference to the inmate having attempted to hang himself while in the custody of the Marin County Jail.  This information was apparently not reported by the inmate and not discovered in the record by the staff at CSP/Corcoran, although the bus screening did indicate that the inmate had reported a prior suicide attempt.  Further, the suicide report makes reference to the "inmate segregation profile" done after the inmate arrived at CSP/Corcoran.  It stated that the profile indicated no prior suicide attempts.  The inmate was prescribed Paxil by a jail psychiatrist and was ultimately transferred to the CDCR on 8/2/01.

On 8/3/01, the inmate was evaluated at the SQ RC by a psychiatrist and diagnosed as having Major Depressive Disorder with paranoia, provisional.  The inmate was