prescribed Seroquel in addition to the Paxil that he had been taking while at the jail. The inmate also received a brief mental health screening in August 2001 and was diagnosed with Depression, single episode, severe without psychotic features, Cocaine Dependence, Alcohol Dependence, and Cannabis Dependence with a GAF of 50. This resulted in his being placed in the MHSDS at the 3CMS level of care. The inmate continued on medications with the above diagnoses while at SQ, with a change of anti-depressants from Paxil to Prozac. He was transferred to SVSP on 5/1/03. On that day at the bus screening at SVSP, the inmate did indicate he had been treated for mental illness, had had a suicide attempt by hanging in 2001, and had a current mental health problem. He was continued at the 3CMS level of care. His GAF ranged from 65 to 70 from 2003 to 2006. The condensed Mental Health Assessment and Treatment Setting Transfer (MH-4) indicated a diagnosis of Major Depressive Disorder, severe, without psychotic features in remission, GAF of 74. Medications of Seroquel and Prozac were discontinued on 1/18/06. This MH-4 completed at SVSP was signed by an MA psychologist and countersigned by a Ph.D. psychologist. The inmate's medications appeared to have been discontinued in January 2006, as he was prescribed Prozac but stated that he did not want to take it any longer.

An SRAC was completed on 4/26/06 by a psychologist who indicated the source of information was the inmate interview only. The psychologist noted static and slowly changing risk factors and protective factors, but identified no dynamic risk factors. The psychologist evaluated the imminent risk as "low risk," and recommended "no referral needed." In addition to the CCM and psychiatric contacts he received in the 3CMS program, the inmate was also involved in a depression group and a substance abuse group, as well as AA and NA. In September 2006, he assaulted his cellmate and was placed in administrative segregation. The treatment team determined the diagnoses of Mood Disorder NOS and Polysubstance Disorder in institutional remission, and his GAF was rated at 68. At that time, because he had not been receiving medications since January 2006, his level of care was changed from 3CMS to 3CMS for medical necessity.

He continued to be seen in compliance with the requirements for CCM contacts and psychiatric contacts at approximately 90-day intervals. He told his CCM on 9/25/06 that he had been preparing to appeal his conviction and had been reading court transcripts, concluding that the judge was biased against him. He told the psychologist that he had acted in self-defense, and that he had not had contact with family members since 2003. He said that he believed that his son who joined the Army in 2001 was missing in action and that that was the reason for not contacting him. He saw the psychiatrist four days later and was prescribed Effexor 75 mg q day and was diagnosed with Depressive Disorder. He had not been receiving medications since his Prozac was discontinued in January 2006.

On 9/13/06, an administrative segregation 3CMS IDTT determined the inmate's diagnoses to be Mood Disorder NOS and Polysubstance Disorder in institutional remission and a GAF of 68. It noted that the inmate was not compliant with prescribed medications, having taken his last Prozac on 1/18/06. The inmate was referred to psychiatry for a medication evaluation. It was noted that he had completed an anger

management group and was working with his clinician on issues relating to his depression.

A psychiatric progress note on 9/26/06 described the inmate's history and symptoms reported by the inmate as "I feel depressed I was on Prozac and told my therapist to get me medication." He said that he had some stomach upset with Prozac and wanted a different medication. Medication was changed to Effexor on that date, and the assessment was Depressive Disorder NOS.

A psychiatry note of 10/27/06 described the inmate's history and possible medication side effect as sleep disturbance, with assessment of probable mood disorder secondary to chronic substance abuse by history. The plan was to continue his current psych medication regimen with a note to give the treatment adequate clinical trial.

His CCM began seeing him weekly after his placement in administrative segregation on 9/4/06. His/her note of 10/30/06 indicated that the inmate told the psychologist that his wife had been unfaithful, that that had been the cause of their divorce, and that he continued to have trouble understanding why he had victimized his daughter and the instant offense. On the 11/21/06 note, suicidal/homicidal ideation and evidence of acute distress or decompensation are circled as "none noted." Another weekly contact was received on 11/28/06. During these contacts, the inmate was reported as negative for all symptoms, with the exception of difficulty sleeping and dysphoric mood on some occasions, but otherwise doing well. A treatment plan of 12/13/06 identified diagnoses of Mood Disorder NOS and Polysubstance Disorder, institutional remission with a GAF of 70, with a plan for psychiatry to see the inmate every 90 days and case management to see the inmate out-of-cell at least once per week.

By 12/11/06, the inmate told his CCM that he thought there was very little possibility of his paroling or winning an appeal on his case. The inmate refused to attend this IDTT meeting but was continued in 3CMS as medical necessity. His diagnoses remained Mood Disorder NOS and Polysubstance Abuse in institutional remission.

The progress note by the CCM on 1/8/07 indicated that the inmate reported that he refused to see his psychiatrist and that his Effexor was discontinued. There was no note by the psychiatrist in the medical record, however, that the Effexor order that was written in September 2006 expired in December 2006 and appeared not to have been renewed. The order actually expired on 12/28/06, but the inmate continued to receive the medication from staff until 12/30/06 with no valid order. The psychologist included a plan to refer the inmate to the psychiatrist. The inmate did not appear to have seen a psychiatrist prior to his transfer to CSP/Corcoran in February 2007. Prior to that transfer, the inmate refused to attend his ICC meeting, according to the progress note of 1/18/07 by the CCM. That would have been the third refusal to attend a scheduled appointment, including the IDTT meeting, psychiatric appointment, and then the ICC meeting, by the inmate in December 2006 and January 2007. The inmate was noted by the CCM to have stated that he saw himself in the county jail hanging, and felt that he was already dead on

1/18/07.  This was not perceived as a statement requiring the administration of a SRAC or any further evaluation.

The inmate was last seen by his CCM at SVSP on 1/25/07, when he was seen at the cell door.  The inmate was noted by the CCM to be stable and was receiving medication.  However, his medication order had expired in the previous month.  According to the note, the inmate denied suicidal ideation and told the psychologist that he was continuing to work on his legal papers.

On 2/14/07, the inmate was transferred to CSP/Corcoran.  The initial health screening, dated 2/14/07 was completed by a nurse who noted "yes" in response to attempted, specified in 2001.  It also indicated "yes" for routine referral within 14 days, but did not specify to whom the referral was made.  The inmate committed suicide on 2/21/07 at approximately 7:38 a.m.  He was not seen by mental health staff prior to his death at CSP/Corcoran.

The suicide report makes reference to the inmate having reported during his stay at SQ that he had been threatened by inmates at the Marin County Jail and requested a Sensitive Needs Yard (SNY).  He also had a fight with another inmate in June 2002 and reported that this fight was because of problems that he had had with the inmate at the Marin County Jail.  The inmates were determined to be enemies of each other.  On 5/1/03, the inmate was housed on the SNY at SVSP.  He was placed in the administrative segregation unit on 9/6/06 after he assaulted a cellmate on 9/4/06 at SVSP.  This assault was referred to the Monterey County DA, and the referral was pending at the time of the inmate's death. However, he was found guilty of battery on an inmate with great bodily injury by the ICC and assessed a 14-month SHU term at CSP/Corcoran.  He was subsequently transferred to the CSP/Corcoran SHU on 2/14/07.  He received an initial bus screening and was scheduled to have a mental health evaluation on 2/21/07, but he committed suicide on the morning of 2/21/07 at approximately 7:38 a.m.  Therefore, he was not seen by any mental health professional after his arrival at the CSP/Corcoran SHU.  His last mental health contact had been with his CCM on 1/25/07 at SVSP.

The suicide report identified two problems and recommendations, as follows:

> Problem 1:  At SVSP, the inmate-patient's antidepressant medication was allowed to expire.  The inmate was not re-scheduled to see the psychiatrist after refusing his appointment, nor was he seen after the CCM referred him back to psychiatry.
> Recommendation:  SVSP to form a QIT with representation from psychiatry, nursing, pharmacy, and mental health to determine why this breakdown occurred, and develop a plan of correction.  The resulting plan of correction should be approved by the quality management committee and implemented.

> Problem 2:  MAR at SVSP was incomplete and contained errors.  One MAR was not dated.  Health care staff continued to administer the medication for two days after the order expired.  They did not refer him for renewal.
> Recommendation:  The DCHCS request a Nursing Professional Practice Review.

A suicide death review was completed by a physician on 4/19/07. The physician summarized the inmate's history and circumstances of his death, including the emergency response. The reviewer stated that officers started CPR and were assisted by nurses as the patient was transported to the GACH at CSP/Corcoran. The physician's assessment was that there were no significant quality-of-care medical issues found in this suicide death review.

The inmate was a 3CMS inmate arriving at the SHU and, despite a history of mental illness, a suicide attempt in 2001, and a history of psychotropic medication, the inmate was given a routine referral to be seen in 14 days.

On 10/10/07, the director of mental health, DCHCS, and director (A) DAI issued their report on implementation of QIP for suicide of Inmate F, in response to the suicide report dated 4/24/07. In their report, the directors included a letter from the DON at SVSP stating that the minutes from the QIT that was established to review and correct findings from the suicide report were enclosed. The problem that was identified by the DON was "that the patient was not successfully re-scheduled to see a psychologist in a timely manner and his medications were allowed to expire." (Emphasis in original.) The QIP submitted by the QIT identified issues for "psych tech/nursing" as (1) the patient was scheduled to see a psychiatrist on 12/22/06, did not appear for the appointment, and there was no note from the psych tech as to why the patient did not keep his appointment, "even though that is a psych tech responsibility." The recommendation regarding this issue was that when a patient misses an appointment, the psych tech will determine the reason on that day and take appropriate clinical action, which may include "asking the psychiatrist to renew the medications until the patient can be rescheduled, and reschedule the appointment as appropriate." It is also noted that the patient was rescheduled for a psychiatrist visit on 1/9/07 in response to the referral from the psychologist, and as a routine reschedule from the missed appointment of 12/22/06 when the patient did not appear for that appointment, again with no note from the psych tech.

With regard to Problem Two, the MAR in December was incomplete and contained errors. The recommendation was education and re-training by the SRN-2 of the RNs and LVNs who give medication, and copies of the training agenda and sign-in sheets would be available. An additional issue for psych tech/nursing was that psych tech round notes for the week of December 24 stated "no meds," but the psych tech did not mention whether or not the patient was taking meds, when in fact at that point the patient was taking meds. The statement went on to state "they may have been looking at the pharmacy portion of the mental health tracking system which is not always accurate." The recommendation was for the SRN-2 to review patient documentation on psych tech round notes for accuracy. Staff did not rely on the printouts from the tracking system but verified medications for themselves. Education of the psych techs regarding documenting administrative segregation rounds in the MHTS would be given and documented.

With regard to psychiatry, the issues identified were (1) the IDTT for the inmate was held on 12/13/06 without a psychiatrist present and without the subject of medication being discussed. The recommendation was that "mental health guidelines state that a psychiatrist should be present as part of the IDTT. Since January 2007, IDTTs have been scheduled so that a psychiatrist is present." Issue number 2 was that the inmate was not seen on 1/9/07. The note in the MHTS stated "no UHR available," but there was no note as to whether or not the patient was available or willing to attend his appointment. The recommendation was that the psychiatrist will see a patient when he is expected to see him/her, even if the chart is not available. The medication profile and referral history can be printed on the spot, which will enable medications to be re-ordered as necessary. In the documents submitted by SVSP were two memoranda dated 9/5/07. The first memorandum was regarding psychiatry refusals and instructed that licensed psych techs will go to the inmate/patient to determine the reason for refusals, encourage the inmate/patient to attend scheduled appointments, provide education, and document the reason on a signed refusal form. It was also suggested that "14-day medication renewal and follow-up appointments for expiring medications" should be done. It was also noted that the psychiatrist may "also cell-front visit inmate/patient." The second memorandum was regarding daily rounds paperwork and instructed that, due to the "frequent inadequacy of MHTS psychiatric medication information, weekly check of all 3CMS/EOP inmate/patient MARs shall be conducted." Corrected information will be noted on the psych tech administrative segregation daily rounds form. Further medication discrepancies may be corrected by contacting the pharmacy directly. Minutes and attendance information for a QIT meeting were included for 7/12/07 (QIT charter), as were 7/12/07 and 7/24/07 progress update forms, with an 8/7/07 final recommendation. Although a psychiatrist is listed as a team member, the form was signed by the DON, and on none of the QIT documents did it appear that a psychiatrist had actually documented attendance at any of the QIT meetings.

In addition to the QIT, there was a Nurse Consultant Program Review Death Review Summary as part of the NPPEC Review process in response to Problem Two. The case was summarized, and problems identified by mental health included (1) the person responsible for medication on the yard did not contact the psychiatrist to obtain a telephone order to continue the medication times for 14 days until the patient could be re-scheduled; (2) the psychiatrist allowed the antidepressant to expire without assessing the patient and the DON believed that, per policy, "it is not the psychiatrist's responsibility to order another visit"; and (3) the case manager/psychologist did not write an order to re-schedule the appointment with the psychiatrist and, per the DON, the CCM could have written an order but may have left that for a nurse to do. With regard to mental health referral issues, errors in the MARs for self-administered medications were identified as were administration errors, including medications that were continued to be administered two days after the order expired without referral of the patient for medication renewal. An additional problem identified was that an RN noted that Effexor had expired, but did not refer the issue to the yard's licensed psych tech, and did not indicate the need for an urgent referral to mental health at CSP/Corcoran. The CAP included the following items: (1) the DON did comply with the QIT as required by mental health and provide a written report of the findings of the QIT within 15 days of the QIT report; (2) the DON was to

conduct an individual supervisory conference with the licensed psych tech responsible for the medication renewal, document the conference and place a signed copy in the employee's supervisory file within 30 days of receipt of the notice; and (3) the DON was to discuss, in a mandatory nursing staff meeting, their professional responsibility to work with pharmacy and mental health staff, and document the month and year on the MARs. The meeting shall be mandatory. The DON will provide instruction to anyone who cannot attend, and will provide a written summary of the meeting attendance within 30 days of receipt of the notice.

**Findings:**

This inmate's death does not appear to have been foreseeable, as he was not reporting suicidal ideation or intent, and did not give indications in his behavior of plans to harm himself. However, this death may have been preventable had the inmate been adequately treated with his antidepressant medication and seen by the psychiatrist as required by policy. Further, there was no attendance of a psychiatrist at the inmate's last IDTT, also in violation of policy, and there was no evidence that the psychiatrist and other team members made any efforts to assure that the inmate was continued on his antidepressant medication which had been re-started in September 2006, prior to his transfer to the SHU. Although there were CCM progress notes in the record from SVSP while the inmate was in the administrative segregation unit prior to his transfer, his medication was allowed to expire, and he was never seen by a mental health professional during the week that he had been transferred to CSP/Corcoran in the SHU. The continuity of care issues are not adequately addressed in the suicide report or recommendations, but the medication management issues are identified in it. The report of implementation of the QIP for this inmate appears to be woefully inadequate in that the corrective actions appear to be to remind staff to follow existing policy and the QIT. Despite listing the psychiatrist as a member, there did not appear to be any psychiatric input regarding addressing the overall issues identified as problematic in the suicide report.

## 7. Inmate G

**Brief History:**

This inmate was a 43-year-old African-American male who committed suicide by hanging on 3/12/07 at ASH. The inmate was the sole occupant of the patient room at ASH at the time of his death. The inmate entered the CDCR at the HDSP RC on 5/6/99 with a 15-year sentence for attempted second degree murder. He received an additional four-year sentence after incarceration. He had been a participant in the MHSDS program at the EOP level of care prior to transfer to a MHCB and subsequent transfer to ASH. This inmate's earliest possible release date was 5/12/14.

The inmate was discovered on 3/2/07 at approximately 8:55 p.m. by a senior psych tech responding to screaming from a patient in the hall stating, "staff, staff pull your alarm! Help!" According to the incident report, staff activated the "red light" indicating a hospital-wide alarm, ran to the patient room occupied by Inmate G, and found him

hanging from his night locker with a sheet around his neck.  The inmate's face was blue and he was unresponsive.  The sheet was tied to the inside of the locker.  While one staff member held the patient up to relieve the pressure on his neck, another untied the sheet.  The inmate was lowered to his bed and CPR was initiated, including utilization of the AED and oxygen started via ambu bag.  The number 2911 was called, the nursing officer of the day and the medical officer of the day were notified, and the patient was transferred to the urgent care room while CPR continued.  The incident report stated that the inmate's heartbeat was re-started, the inmate was intubated, and oxygen via the ambu bag was continued.  The patient began to breathe on his own and was transported to an outside hospital via ambulance.  The inmate was noted to have remained comatose following his resuscitation, and on 3/12/07 he was declared legally brain dead at the Twin Cities Community Hospital.

According to the incident report, he was discovered on 3/2/07 at approximately 8:55 p.m.  The cause of death at the hospital was given as cerebral ischemia/anoxia due to a failed suicide attempt.  The suicide report stated that the inmate was declared brain dead on 3/12/07, at 6:08 p.m. by a physician.  However, it also stated that the inmate was returned to the custody (officially per penal code 2685) of the CMC prior to the removal of life support equipment.  A document was provided by CDCR stating that the San Luis Obispo Coroner's Office did not conduct a medical autopsy on this inmate.

The suicide report contained this inmate's criminal justice history, stating that it began in November 1987 and continued with arrests for various assaults including assault with a firearm, assault with a deadly weapon, battery on a former spouse, child cruelty, inflicting corporeal injury on a spouse/cohabitant, vandalism, and health and safety violations, all of which resulted in probation or jail sentences.  This was the inmate's first prison incarceration, in which he received a 15-year sentence for attempted second degree murder and an additional four years sentence for a battery on a non-prisoner, to be served consecutively.  He entered the CDCR at the HDSP RC on 5/6/99 with his original 15-year sentence.  He was cleared for general population, as there were no indications on the initial health screening of past or current treatment for mental illness.  He was seen by a psychiatrist in May 1999 and was prescribed Tegretol and Paxil, but he was not placed in the MHSDS.  He was referred to mental health by a second psychiatrist, evaluated on 8/11/99, and diagnosed with Impulse Disorder NOS and Polysubstance Dependence in institutional remission, as well as with Personality Disorder NOS.  He was placed in the MHSDS at the 3CMS level of care as medical necessity.  The inmate had a history of Methamphetamine Dependence.  His instant offense involved his beating and burning with a blow torch the mother of his two-year-old son, nearly resulting in her death and reportedly while he was high on methamphetamine.

The suicide report makes reference to the inmate being described as "manipulative," including his having been placed in MHCBs four times from 11/19 through 12/31/03 because of suicidal ideations, threats, or gestures.  One of these gestures was described as "attempted hanging" in which he showed a noose to staff.  This was ultimately described by staff as "a rather pointedly manipulative suicidal gesture."  He was returned to the 3CMS level of care.  On 3/13/03, he was placed in administrative segregation unit after

he severely beat a female CO, resulting in charges of battery on the officer and ultimately an additional consecutive sentence of four years for battery on the CO. He was transferred to the VPP for approximately one week in January 2004, and for a second admission to the VPP from 1/21 through 2/5/04. A psychiatric assessment at DMH dated 1/9/04, the date of his second admission to the Q-2 unit, described the inmate's chief complaint as "it all started when I was falsely accused of assaulting staff. March of last year… ." The psychiatric evaluation continued that the inmate stated that he was depressed because he felt that he was being mistreated by staff, that he was suicidal, and that at one point he even made a noose in front of staff to show them that he was serious about killing himself. The psychiatrist continued on, stating that, on "reviewing the records it seems that (inmate) has been trying to manipulate the system and is not actually suicidal." The psychiatrist noted the history of diagnoses of Intermittent Explosive Disorder and Adjustment Disorder, and continued on stating, "as far as we know there has been no serious suicidal gesture or attempt." The evaluation was extensive and included review of the inmate's developmental, educational, vocational, social, and family histories. Within the family history, it was noted that his mother suffered from depression and that his father had "temper problems." The inmate's temper problems, difficulty within personal relationship with correctional staff and other inmates, substance abuse history, and assault on a CO, which was reported as his receiving "an additional 10 year sentence added to his 15 year sentence," and his multiple infirmary admissions, were noted. The psychiatrist concluded that on mental status examination, the inmate "might have a little bit of depression suggestive of a personality disorder." The diagnoses offered were Adjustment Disorder with depressed mood, Polysubstance Dependence, Borderline Personality Disorder, and Antisocial Personality Disorder with a GAF of 65. He was placed on a low suicide precaution, although the inmate denied thoughts of hurting himself and was given limited issue.

The discharge summary from the second admission described the inmate as being "suicidal" after his sentence on the battery charge, but it also described him as "manipulative" with a primary personality disorder. He returned to the administrative segregation unit at the 3CMS level of care as medical necessity, but he was not prescribed any medications. He was placed in a MHCB at HDSP from 8/4/04 through 8/10/04, again being returned to the 3CMS level of care.

The inmate was transferred to the Sierra Conservation Center (SCC) on 9/9/04 while still at the 3CMS level of care. After approximately one year, his level of care was changed to EOP because of reported continued depression and paranoia. He was subsequently transferred to CMC on 11/17/05 at the EOP level of care. He reportedly participated in the EOP program and had a job in the prison bakery, but continued to have complaints about his cellmates and was described as angry and irritable. He was placed in a MHCB from 6/24/06 through 6/27/06 because of depression and reportedly stating that he would probably accept a lethal injection if it were offered to him.

An RN wrote on 6/24/06 that the inmate was admitted to his cell on 6/24/06 in the MHCB because he wants to "give up." The nurse wrote that the inmate denied wanting to hurt himself or others but stated, "if someone offered me a lethal injection I will

probably take it." She continued, stating that the inmate reported that he was not hearing voices or hallucinating, and that his demeanor was calm and his speech clear and direct.

Although the inmate was returned to the EOP program, his functioning was described as deteriorating over the next several months. On 11/22/06 he was transferred to ASH. On 6/27/06, the inmate was discharged from the MHCB. A SRAC at that time was incomplete, as it only recorded static and protective factors. The inmate was noted in the record to have deteriorated over the following months. There were questions about his medication compliance, but he was not referred to a psychiatrist for re-evaluation of his medications. By November 2006, the inmate appeared depressed and was demonstrating psychomotor retardation as well as difficulty concentrating on his job. He requested a single cell. He was then referred to ASH because of his depression and paranoia. He was admitted to ASH on 11/22/06 and was diagnosed with Major Depressive Disorder recurrent severe as well as Polysubstance Dependence and Antisocial Personality Disorder. He was prescribed Trileptal and Effexor which was increased during his stay at ASH.

When admitted to ASH, the diagnoses were Major Depressive Disorder, recurrent severe, Polysubstance Dependence, and Antisocial Personality Disorder. He continued to receive mood stabilizing and anti-depressant medications. During his stay at ASH, a psychological evaluation was done and suggested a diagnosis of Malingering, but this was not added to his diagnostic descriptors.

On 1/14/07, the inmate was transferred from an Acute Admissions Unit to an Intermediate Care Facility unit, as he continued to demonstrate symptoms of depression, and was guarded and angry. His Trileptal was continued and there were questions of whether or not he indeed had a Bipolar Disorder. He was assigned to a number of groups and to a job assignment in the kitchen. While he was on this unit, another patient hanged himself on 2/15/07, and by 2/18/07, this inmate began to make a number of statements that he may harm himself including, "if I had a gun I would use it. I want to sign-up for that lethal injection." He was also noted to have stated that the suicide of the other inmate "was the right way. I think I understand" according to the suicide report, although he denied "a plan" for suicide. He was placed on one-to-one observation on 2/18/07, and on 2/20/07 this was reduced to 15-minute checks until 2/21/07, when they were discontinued. The inmate was noted to have been withdrawing from social contacts, staying in his room and interacting with peers less than he had been prior to this time. He reported that he thought he should not accept phone calls from relatives.

On 2/24/07, the inmate was discovered on a unit that was not his housing unit, where he was described as "wandering and appeared confused" and expressing thoughts of hopelessness and fatigue but denying suicidal thoughts. A note by a psych tech indicated on 2/25/07 that the inmate had been scheduled to see a psychiatrist for medical review because of the above behaviors and statements. However, he apparently was not seen and was again placed in the sick call book on 3/1/07. He was not seen by a psychiatrist prior to his hanging on 3/2/07, the following day. The suicide report makes reference to this inmate's hanging being the second hanging on the same unit in ASH in a two-week

period. After the inmate's hanging, the Positive Behavioral Support Team (PBST) "was implemented to assist with managing the unit," according to the suicide report. The suicide report went on to state that the inmate's "symptoms were most likely primarily characterological in nature, and consistent antisocial and narcissistic personality traits. While his sense of being victimized appeared to reach the level of paranoia at times, he was never described as displaying any form of thought disorder or psychosis. He was also coherent and rational. Medications never really seemed to help, possibly because his depression was driven by the anger and entitlement that were part of his primary character." The suicide report also stated, however, that "the records of inmate/patient ____ reflect a long, slow decline in his functioning from the time he was first incarcerated, particularly after he picked up the additional time for assaulting a correctional officer." The report went on to state that the inmate became increasingly "hopeless and frustrated, and his risk factor for suicide included his chronic agitated type of depression with intense anger and a history of violence and substance abuse." The suicide report concluded that "a decision to finally act on the suicidal thoughts may have been impulsive, driven by his entrenched feelings of hopelessness and lack of perceived supports."

This inmate's presenting complaints at HDSP for his MHCB admissions, including his threats of a hunger strike, were related to his statements that he believed his life was in danger at HDSP and his request to be transferred to another correctional facility. During various admissions, he reported his beliefs that attacks on another inmate were actually intended for him, that the attackers got the wrong victim, and that COs were conspiring against him in some matter. The SRAs, including SRAC's on 8/10/04 and 8/14/04, ranged from "negligible risk" to "moderate risk" based on interviews with the inmate and interviews of COs or staff during his stay at HDSP.

The inmate's stays in the MHCB at HDSP resulted in consistent diagnoses of Antisocial Personality Disorder with Borderline Features and Personality Disorder NOS. There is no evidence from the record that he was referred to a higher level of care after three admissions, but rather it was subsequently when his condition had deteriorated further.

His diagnoses have included Dysthymic Disorder, Intermittent Explosive Disorder, "Organic Bipolar," and PTSD, in addition to Personality Disorder and Adjustment Disorder.

The suicide report identified one problem and recommendation as follows:

> Problem: Lack of a process for accountability to assure that patients placed in the sick call book are seen timely by a psychiatrist.
> Recommendation: ASH will convene a work group to develop a process to assure accountability for follow-up to sick call requests.

On 9/17/07, the director of mental health DCHCS and director (A) of DAI issued their report on Implementation of QIP for suicide of Inmate G, in response to the suicide report dated 7/3/07. In their plan is a memorandum from staff at ASH stating that, regarding the

QIP, the ASH administration put the following improvements into action: Attachment One, a revision of nursing procedure 301.2 and subsequent training for nursing staff on the subject of the medical/psychiatric call log; Attachment Two, a revision of the Department of Psychiatry Operating Manual; and Attachment Three, an instructional memo to all physicians from the medical director outlining the procedures for reviewing the medical/psychiatric appointment log.

With regard to the medical/psychiatric appointment log, nursing procedure 301.2 states that hospital policy requires that clinicians be responsible for a systematic assessment and evaluation of individuals presenting with physical psychiatric problems. It goes on to say that the if the psych tech places an individual in the log, an RN is responsible for referring the individual to the appropriate provider within the medically indicated timeframe per section 2725(b)(4) of the California Nurses Practice Act. The purpose of the log is to facilitate timely psychiatric/medical services. The procedure and follow-up is to be included in the response. The action to be taken is that if the individual listed is not seen by a provider of services on that day, the RN will be notified to make a determination as to whether the individual needs to be seen sooner than the next day. The attachment for the attending psychiatrist's unit duties describes the responsibilities and duties associated with assignment to a hospital treatment unit. The directive is noted to provide greater specificity and clarification to the staff psychiatrist duty statement. Specifically, with reference to this QIP, the psychiatrist "shall review the medical-psychiatric appointment log ("sick call book") daily and shall initial the book, attend to the needs of individuals listed as requiring psychiatric attention, and make entries in the medical record regarding the examination or reasons for not providing a face-to-face examination, as well as findings, observations, treatment, and follow-up arrangements. The attachment regarding the sick call log (medical/psychiatric appointment log) re-emphasizes the requirement as of 7/25/07 for all physicians to review and initial the sick call log on a daily basis.

**<u>Findings</u>:**

This inmate's suicide does not appear to have been foreseeable but may very well have been preventable, had he been evaluated when he was supposed to have been seen. The CDCR suicide report stated all of the care provided by CDCR appeared to meet program criteria. The report also stated ASH provided "excellent care" except for the one problem identified in the CDCR report.

The documentation in the record indicates the inmate was seen by different clinicians as having primarily characterological issues with diagnoses of a number of Personality Disorders. He was also diagnosed with Intermittent Explosive Disorder, Malingering, PTSD, and possible Bipolar Disorder. It appears from the suicide report that the reviewer attributed the inmate's primary pathology to his characterological make-up. Despite there being clear evidence of his deteriorating status, described as increasing depression, social withdrawal from inmates and activities, withdrawal from his family, and increasing statements of hopelessness, as well as his referral to ASH (and while at ASH referrals for psychiatric re-evaluations which did not take place during his last admission as

requested), the CDCR reviewer concluded there were essentially no flaws or problems with his care and treatment with the exception of not placing him in the MHSDS.

Based on this reviewer's examination of the documents provided, it appears that the presumption by staff was that this individual, with diagnoses of several Personality Disorders and history of assessment by staff as being "manipulative," somehow suggested that he could not also have become seriously depressed and in need of intensive re-evaluation by psychiatry as well as the overall treatment team. This presumption appears to suggest that personality disorders and serious psychiatric disorders such as Major Depression are mutually exclusive. They certainly are not.[6]

In this reviewer's opinion, this inmate's death does not appear to have been foreseeable in that he was not reporting suicidal or self-harming ideation or intent in the days immediately preceding his suicide attempt. However, he was known for a history of chronic depression, characterological pathology including what appeared to be paranoid references, and a deteriorating condition, resulting in his referral to a higher level of care. Given this set of circumstances, the failure to complete the referrals for psychiatric re-evaluation equates to this inmate's death very possibly being preventable, had he had the re-evaluations by psychiatry that were requested by other mental health staff.

## 8. Inmate H

### Brief History:

This inmate was a 29-year-old Caucasian male who committed suicide by hanging on 3/9/07 at the DVI RC. The inmate was not a participant in the MHSDS at the time of his death. He was the sole occupant of his cell. A new inmate, who had been assigned to the same cell from receiving and release, entered the cell and discovered the inmate hanging behind a "privacy sheet." The inmate entered the CDCR via DVI RC on 3/5/07 for his first prison term, having entered a plea of *nolo contendere* for the rape of a mentally disabled patient with a six-year sentence in state prison.

The inmate was discovered on 3/9/07 at approximately 3:15 p.m. by his new cellmate who entered the cell and noticed a privacy sheet attached to the cell bar window and hanging across a portion of the cell, and property scattered across the floor. The other inmate looked behind the sheet, saw the inmate hanging and immediately started kicking the door and yelling "man down!" The door was opened by a control booth officer. A floor officer entered the cell, pulled the sheet down, and saw the inmate hanging from a sheet that was attached to the top of the cell window frame with the other end tied around his neck. The officer activated his alarm and called for a cut-down tool. Staff responded and a sergeant lifted the inmate's body to take the weight of his neck while the other

---

[6] Defendants objected to this paragraph as "lacking foundation." The foundation for this passage is that, in the clinical judgment of this reviewer, this inmate should have been re-evaluated by the psychiatrist and the treatment team for his depression, but was not. The emphasis on personality and "manipulative" behavior appears to have adversely affected the team's focus and duty to assess and manage the inmate's depressive symptoms.

officer cut the sheet.  The inmate was placed on the floor, pulled out of the cell, and placed on a Stokes Liter.  He was then carried to the institution's infirmary and en route they were met by an LVN with an electric gurney.  The inmate was placed on the electric gurney and taken to the infirmary.  After he arrived in the infirmary, medical staff determined that he was not breathing, called for an outside ambulance, and initiated CPR. Apparently, before the inmate could be transported, a physician at San Joaquin County General Hospital pronounced the inmate dead via telephone at approximately 3:46 p.m. An autopsy report was issued by the San Joaquin County Office of the Coroner and stated that the autopsy was performed on 3/11/07.  The cause of death was reported as asphyxia (minutes) due to hanging (minutes).  The toxicology report indicated that a complete drug screen was conducted on the blood sample and revealed no common, acidic, neutral or basic drugs, or ethanol alcohol.

The suicide report recounted the inmate's criminal justice history and stated that the inmate had a minimal criminal justice history prior to the commitment offense.  There was reference to the inmate having been placed in juvenile hall, and subsequently being hospitalized and started on psychiatric medications after he had been accused in October 1994 of molesting his younger sister.  The suicide report detailed the circumstances of that offense, including his undergoing a medication change from Zyprexa to Abilify and having sexually molested his sister while this change was in process.  After hospitalization, the inmate was determined to be severely mentally ill but did not meet the criteria for an insanity defense.  This prior criminal justice history occurred in October 1994. The victim was his severely developmentally disabled younger sister who was the same victim as in the instant offense.  The instant offense reportedly occurred on 4/13/05 as per the probation officer's report and stated that the inmate, who was then 27-years-old and diagnosed with Schizophrenia, apparently decompensated and was seen by his treating physician.  The defendant reported to the physician that he may have sexually abused his 17-year-old severely disabled sister on that date.  The inmate subsequently entered his plea of *nolo contendere*.

The inmate had a history of mental health treatment for Schizophrenia and Asberger's Disorder.  Psychological evaluations completed while he was in the jail prior to incarceration included these diagnoses, noting he appeared to have been going through a period of psychotic decompensation at the time of the commitment offense.  He had had at least two prior suicide attempts and three psychiatric hospitalizations in the community.  He was receiving mental health care prior to entering the CDCR but his care including medication was not continued, nor was he evaluated on an urgent basis by a psychiatrist.  The initial bus screening on 3/5/07 did indicate Depression, Paranoid Schizophrenia, and referral to psych within 72 hours.

The inmate received a Developmental Disability screening on 3/5/07 that concluded that the inmate was NCF i.e., receiving a passing score on the cognitive test and not needing further evaluation without referral.

His medication was changed from Abilify back to Zyprexa and he was also prescribed Prozac.  After he was admitted to the CDCR via the DVI RC, the inmate told the

registered nurse that he had a diagnosis of Schizophrenia and reported that he was taking medication. However, the "confidential medical/mental health transfer" form from the Sacramento County Jail indicated that he was not taking any medications. On the Initial Health Screening (bus screening), the nurse noted "depression paranoid schizophrenia," and referred the inmate to mental health, noting that the inmate reported his last dose of medications was two days prior to admission. Although the referral was received by mental health the following day, the inmate was not scheduled to see a psychiatrist within 24 hours. The following day, the inmate was seen by a social work intern who conducted a brief mental health screening through the cell door and referred the inmate for further evaluation. It was scheduled for 3/14/07, eight days after this inmate with a history of severe mental illness was screened by a social work intern through the cell door.

Although a brief mental health screening was performed by the social work intern, there was no summary of the screening but rather a referral noting that the inmate was referred for further evaluation. The suicide report reviewer noted that she interviewed the social work intern, who stated the inmate's cellmate at the time had initially refused to allow the inmate to come to the door for the interview. She reported that the screening was not conducted out of cell because the intern's supervisor "implied that custody staff was not cooperative." The reviewer continued on to state that she attempted to determine why the mental health screening was not conducted face to face in a private setting, because she felt that if that had occurred, most clinicians would have noticed the inmate's level of disability and hopefully would have referred the inmate for immediate evaluation and to be seen by the psychiatrist. However, based on this intake process, the reviewer stated that "the inmate would not have had the opportunity to resume his medications until nearly two weeks after he had reportedly last taken them." The reviewer continued on to state that after further inquiry, it "became apparent that the medical health clinicians were not asking for inmates to be removed from their cells for interviews." Consequently, the inmate did not receive any medication after he was transferred into the CDCR at DVI. The inmate had been placed in the west hall "special processing unit," which is described as a "soft" protective custody area for inmates as an alternative to administrative segregation. During his four-day stay in prison prior to his suicide, the inmate was reported to have had trouble getting along with his cellmate and was asking to move to another cell on several occasions, but was told by staff that "courtesy moves" are only done on the weekends. Staff also reported to the suicide report reviewer that they were told by the intern of her concerns about this cellmate, but did not see this as an immediate concern threatening the security of the institution and, therefore, waited until the weekend to let him find another cellmate.

The suicide report reviewer also interviewed the inmate's prior cellmate (not the cellmate who discovered the inmate hanging), and reported that this cellmate was a member of the "Northern Rider Disruptive Group." She reported that the cellmate stated that this inmate had requested his medication and stated that he was not feeling well, and that other inmates also stated that the inmate had asked a nurse for medication but was told to "see the psych." The cellmate stated that this inmate had attempted to leave the cell but was pushed back into the cell by an officer and told that he could not move. The cellmate reported that this inmate was given no personal supplies or soap, smelled bad, and would

not go to the shower because he was afraid of being in prison. The cellmate stated that he asked officers if they would be doing courtesy moves on the weekend and was told "no" because of TB testing. Therefore, the cellmate refused to go back into the cell and was placed in administrative segregation unit. That same afternoon, a new inmate was sent to house with this inmate and discovered him hanging, as reported above. There is also a reference in the suicide report to the cellmate stating that he heard three officers saying the inmate "got what he deserved" and one officer, while talking to the reviewer, referred to this inmate as a "chester," a derogatory term for sex offenders. The suicide report reviewer also stated in the suicide report that, while reviewing this case, she was told that the health care manager had told staff many times "that custody should never start cardiopulmonary resuscitation, but should instead rush victims directly to the infirmary where they could receive better care." She reported further that after some discussion, the staff would henceforth be directed to comply with the policy of initiating lifesaving measures at the scene while awaiting the arrival of medical staff.

The inmate had been diagnosed in childhood with Asperger's Disorder, and subsequently with Schizophrenia, Residual type.

There were some discrepancies in the timeline, as the suicide report recorded the time of discovery as 3:00 p.m., while the incident report recorded the time of discovery as 3:15 p.m. Further, a note by staff in the TTA reported as a late entry is also written at 3:15 p.m. on 3/12/07.

The suicide report identified four problems and recommendations as follows:

> Problem 1: CPR was not initiated at the scene, but was delayed while the inmate was transported to the infirmary. The institution reportedly followed this practice at the direction of the health care manager.
> Recommendation: The DVI chief deputy warden indicated at the time of the review visit that he would immediately direct staff to start CPR at the scene and wait the arrival of medical staff, as per policy. The DCHCS will make a referral to the Professional Practice Review Committee.

> Problem 2: Inmate arrived stating he was taking medication. Unfortunately, the jail transfer summary erroneously indicated no medication. No attempt was made to verify his medication claim with the sending jail, and he was not seen within 24 hours for a medication evaluation, as required by the September 2006, Mental Health Program Guide (September 2006, 12-2-7.)
> Recommendation: DVI shall report on their current progress in the process of implementing the September 2006 Program Guide and their plan to update and fully implement the local procedure for following up with undocumented medication claims within 24 hours by a psychiatrist. (Note that all medications, whether documented or not, should be indicated on the Initial Health Screening form.)

<u>Problem 3</u>:  The mental health screening was conducted through the cell door, in front of the cellmate.  The cellmate may have been pressuring the inmate and may have influenced his responses.  Furthermore, it is extremely difficult to observe an inmate while talking through the side of a solid door.  This does not allow for an adequate clinical assessment.   The September 2006, Mental Health Program Guide, mandates that all RC mental health screening and evaluations shall be conducted in a private confidential setting (September 2006, 12-2-3).

<u>Recommendation</u>:  Clinical staff must conduct all mental health screenings in a confidential setting.  The chief deputy indicated that custody will work with clinical staff to facilitate this, and that clinical staff must make their needs known and be willing to work around program needs.  A QIT is recommended for DVI to develop a process for both clinical and custody staff to follow, to ensure that inmates are screened out of cell.   Additionally, the local procedure must be updated.

<u>Problem 4</u>:   Custody staff at DVI demonstrated an unprofessional attitude regarding this inmate.  During the suicide review, an officer referred to the inmate as a "chester" (a derogatory term for sexual offenders).  In addition, the report stated that the inmate repeatedly asked for his medications and kept trying to leave his cell, but no referral was made to mental health.

<u>Recommendation</u>:  DVI to conduct a fact finding and take appropriate action.

A suicide death review on Inmate H was conducted by a physician but was undated.  There was a recorded synopsis of key events leading to the death of the patient, and the conclusion/recommendation was that no CPR was started at the time that the inmate was found hanging in the cell.  It was only after the inmate/patient was brought over to the infirmary or TTA that CPR was started.  This is not according to CDCR policy, so it seems that CPR should have been actually started in the cell and that they should not have waited until the patient was transferred over to the TTA or infirmary to start CPR.

On 10/10/07, the director of mental health DCHCS and director (A) DAI issued their report on Implementation of QIP for the suicide of Inmate H, in response to the suicide report dated 6/18/07.  Within the report there was a memorandum from DVI.  In the memorandum dated 8/13/07, a specific CAP for Items One, Two, Three, and Four was provided as follows:

"CAP One":  Immediately following the incident review, management staff was directed to inform/remind all staff to provide lifesaving efforts consistent with their documented training, and a memorandum was issued on 8/27/07 reiterating the CPR policy and ordering compliance.  It appears that the date of the memorandum as 8/13/07 was an error as the subsequent pages indicated that it was actually issued on 9/13/07.

"CAP Two":  A QIT was chartered and there was a follow-up meeting with notes, and final recommendations were made.  A second QIT was in progress to address documented and undocumented concerns.  The first QIT was chartered; a progress

update form (PUF) and a final recommendation form (FRM) were completed before they could include the information from the other QIT, but they were informed of the new information. A local operating procedure (LOP) was developed and was awaiting signatures regarding the procedures for undocumented/documented medications upon arrival. The LOP incorporated the suicide CAP items and brought the policy into alignment with the 2006 Program Guide. These documents were included in the submission from DVI.

"CAP Three": Regarding mental health screenings in a confidential setting, a QIT was already in progress and the information requirements from the CAP were communicated to the QIT with the inclusion "it is clearly understood that all screenings are going to be out-of-cell at DVI."

"CAP Four": With regard to the unprofessional attitude demonstrated by custody staff, the case was referred to the Office of Internal Affairs (OIA) and the final report is still pending at the time of this submission.

The documentation submitted was reviewed by CDCR administration staff and stated essentially that staff should be reminded to implement currently existing policies as per the <u>Coleman</u> Program Guide. It is of note that the QIT chartered to review the undocumented and documented medication procedure did not include a psychiatrist as a member of the QIT.

On 11/14/07, a supplemental report on implementation of QIP for suicide of Inmate H was submitted by the director of mental health program DCHCS and director (A) DAI. This addendum stated that on 9/26/07, the PPEC discussed the suicide case review referral of the health care manager at DVI. It went on to state that the health care manager was on extended leave for approximately one year, and therefore the regional medical director "agreed to handle this issue as part of an administrative and disciplinary process for this employee." There was no further information provided regarding this corrective action.

**<u>Findings</u>:**

This inmate's suicide does not appear to have been foreseeable as he was not reporting suicidal ideation or intent after his incarceration in the CDCR. This suicide was very highly likely to have been preventable, however, as the inmate reported that he was receiving psychotropic medications prior to incarceration in the community as well as in the jail.[7] The nurse at the initial health screening noted that he was receiving medication.

---

[7] Defendants requested that CDCR not be criticized for failing to verify the inmate's claim that he had been taking medication while at the jail from which he had been sent, and relying instead on the jail transfer summary which indicated that the inmate was not taking medication. Such reliance is not acceptable practice given the inmate's contradictory self-report with regard to medications. Defendants did not meet their duty to investigate this inmate's medication history in a situation in which they clearly should have. Furthermore, defendants' request for modification of this case review is perplexing, given that its own suicide report criticized the institution's failure to verify this inmate's self-report of medication with the sending jail and its failure to have this inmate seen within 24 hours for a medication evaluation, as required

DVI staff failed to implement and adhere to the Program Guides of the CDCR.  Not only was the inmate not seen by a psychiatrist within 24 hours, as per requirement, but a social work intern was directed to perform the brief mental health screening and did so at cell-front, with clear interference from the inmate's cellmate.  Despite this being reported to correctional staff and mental health staff as per the suicide report, there was no corrective action taken immediately to re-screen the inmate in a private or confidential setting or to have him seen by a psychiatrist, given his history and his having been receiving psychotropic medications.  This was an abysmal failure to implement the already existing policies and procedures as required in the Program Guides.  Further the inmate reportedly made clear not only his needs for a mental health treatment, including medications, but his anxiety and desire to move to another cell or have a different cellmate during his brief incarceration.  Given that this was the inmate's first incarceration, his history of mental illness, and what had been reported as the "attitude" of custody officers referring to him as a "chester," the referral for appropriate administrative actions to the PPEC as well as to custody administration in Adult Institutions appear to be absolutely warranted.  However, at the time of this writing,  there was no feedback regarding what custody administrative responses have been in regard to the attitudes and responses to the inmate by custody staff, and the explanation that the health care manager is on one-year leave does not address the issues and concerns referred to the PPEC.

## 9.  Inmate I

## Brief History:

This inmate was a 35-year-old Filipino-American male who committed suicide by hanging on 3/13/07 in the general population unit at Kern Valley State Prison (KVSP).  The inmate was the sole occupant of his cell at the time of his suicide and was not a participant in the MHSDS.  The inmate entered the CDCR at DVI RC on 7/28/04 after a plea agreement to one count of evading a police officer/wanton disregard for safety, and possession of a firearm by an ex-felon.  He received a three-year prison term on these charges.  He was subsequently transferred to out-of-court status in Sacramento County to stand trial for assault with a firearm which occurred on 5/9/04.  The inmate pleaded guilty to four counts of assault, kidnapping, and discharging a firearm, with six special allegations cited, resulting in a sentence of four years with a four-year enhancement for a total of eight years.  His minimum eligible parole date was 10/9/12.

The inmate was discovered on 3/13/07 at approximately 12:47 a.m. by a CO who was conducting a count in the general population building.  The officer observed the inmate hanging between the top and bottom bunk.  The inmate had tied his legs and neck with a braided state sheet and had suspended his entire body between the bunks.  The officer activated his personal alarm device and banged on the door to attempt to get a response from the inmate.  Additional COs arrived.  A sergeant ordered the door open while an officer retrieved the cut-down tool from control.  The officer cut both of the braided sheets and the inmate was lowered to the floor.  An officer checked for a pulse and

---

by the Program Guide.  These lapses were identified as problems in the defendants' own suicide report.  *See* page 66, *infra*.

immediately started CPR as the sergeant called for the emergency response vehicle (ERV). The inmate was placed on a Stokes Liter, and at approximately 12:55 a.m. the ERV arrived. Nursing staff relieved the officer and continued CPR. The inmate was placed in the ERV and transported to the TTA. The inmate was then transported by an ambulance to the Delano Regional Medical Center. However, he did not recover and was pronounced dead at 1:58 a.m. by a physician. The timeline indicates that it was approximately 11 minutes from the time the inmate was discovered to the time the outside ambulance was contacted, and an additional 16 minutes before the outside ambulance arrived at the CTC. An autopsy report was provided the Sheriff-Coroner-Public Administrator, Coroner's Division of the Kern County Coroner's Office. The autopsy was performed on 3/15/07 and determined the cause of death to be ligature hanging, and the manner of death to be suicide. The toxicology specimens including blood, urine, vitreous humor, bile, and gastric contents were submitted, and no common, acidic, neutral, or basic drugs or alcohol were detected in the specimens.

The suicide report recounted the inmate's criminal justice history. It states that while there was no information about his juvenile history, his first adult arrest occurred in 1993, when the inmate was 21 years old, for battery and making annoying telephone calls. The report indicates that over the years he had numerous arrests, many of which were dismissed, but several resulted in convictions including battery, theft, possession of dangerous weapons, possession of control substances, resisting arrest, and inflicting corporal injury on a spouse. He received either probation or jail sentences for up to one year on these charges. The inmate entered the CDCR on 7/28/04, as reported above. Circumstances of his commitment offense included his forcing a victim (references indicating possibly the mother of his youngest child) out of the car she was driving and which he was riding in as a passenger, while he was armed with a pistol at the time. The driver (the victim) ran from the car and was reportedly chased and caught by the inmate who grabbed his gun and began yelling at her before he went back to the car and drove away. When the police attempted to stop him, he refused and attempted to flee with a high speed chase. Eventually, he was apprehended by the police. After he was incarcerated in the CDCR in July, he was transferred out to court on 2/2/05 and subsequently pleaded guilty to four counts of assault, kidnapping, and discharging a firearm with six special allegations cited, resulting in an eight-year sentence. He returned to the CDCR and on 7/29/06 he was transferred to CSP/ Corcoran to serve a SHU term. He completed that term and was transferred to KVSP general population on 3/2/07, approximately 11 days before his death on 3/13/07.

The inmate reportedly had no mental health history or treatment prior to incarceration, and did not receive any mental health treatment after he was incarcerated in the CDCR. A mental health screening on 8/10/04 cleared the inmate for general population. He had a mental health screening on 3/4/05 and was again cleared for general population. He also received an initial health screening when transferred to CSP/Corcoran on 6/29/06, and once again was cleared for population with no mental health complaints or concerns. While he was at the Correctional Training Facility/Soledad (CTF), he was placed in the administrative segregation unit and was seen by a social worker on 4/6/06 in preparation for his initial administrative segregation unit ICC Review. Again, he was noted to have

no mental health complaints or concerns. He was placed in the administrative segregation unit on 4/2/06 because of a charge of battery on an inmate, which led to the 14-month litigated SHU term. The inmate completed the SHU term and was transferred to KVSP on 3/2/07. He had been given a vocational placement which was to begin on 3/12/07. However, the facility was in a lockdown at that time and he therefore could not appear for work. The inmate was offered a mental health screening at CSP/Corcoran on 2/21/07 when he was moving from the SHU to administrative segregation unit. However, the inmate refused to participate in the screening. There was an attempt to complete the screening prior to the inmate's death on 3/13/07.

The suicide report makes reference to the inmate having learned on 3/12/07 that he had become the primary suspect in a 1991 kidnap/torture/murder case. The report went on to state that two detectives from the Alameda County Sheriff's Department interviewed the inmate and served search warrants for his personal property and a DNA sample. The case involved a 1991 murder of a 14-year-old girl to whom the inmate had been connected by a DNA test. However, the report stated that the inmate was not told of the DNA "hit," but only that there was DNA evidence found in the victim's body. The inmate initially refused to provide a DNA sample, but finally agreed to give one because of the search warrant. The report continued on stating that the detectives spoke with custody staff and expressed no concerns about the inmate's life being in jeopardy or his presenting a threat to institutional safety. Therefore, there were no housing changes initiated for the inmate. An investigative services unit (ISU) officer who observed the inmate through a window during the interview with the detectives reported that the inmate appeared to have become angry and very agitated, and when the officer asked the inmate how he was feeling, the inmate responded "I'm fine, I'm cool." The suicide report made reference to the reviewer interviewing a number of custody staff who described the inmate as being initially angry when he returned to the unit, but having calmed down and appearing "normal" later in the evening. The report made reference to the inmate having laid out pictures of his family, written a suicide note, and leaving a Bible open with the card of one of the detectives above it.

Although the suicide note was not provided in the documents reviewed, it was referenced in the suicide report and stated, "first and foremost I would like to sincerely appolegize (*sic*) to all of my family members whom I have shamed." He went on to say that the incident, i.e. his death, was not admitting guilt, but was a way of preventing further humiliation to the family name. He then wrote "death before dishonor" and his name.

The suicide report dated 6/8/07 indicated no recommendations regarding the death by suicide of this inmate, and stated that it appeared that the policies and procedures were followed.

**Findings:**

This inmate's suicide did not appear to have been foreseeable or preventable. The inmate did not report any ideation or intent to harm himself or end his life prior to his death. Although he was interviewed by detectives with regard to a potential other case involving

a murder, his behavior appeared to be calm and returned to "normal" after the interviews, and he did not request any mental health assistance.  There is currently no CDCR policy requiring evaluation based on this type of occurrence.

### 10.    Inmate J

**Brief History:**

This inmate was a 36-year-old Hispanic male who committed suicide by hanging on 3/14/07 in his general population unit at PBSP.  The inmate was the sole occupant of his single cell at the time of his death and was not a participant in the MHSDS.  The inmate entered the CDCR on 8/13/96 via CCI in Tehachapi, having been convicted of two counts of murder, one count of carjacking, and one count of attempted murder with a sentence of two consecutive life terms without the possibility of parole.

The inmate was discovered on 3/14/07 at approximately 2:19 a.m. by a custody officer who was performing security rounds.  The inmate was observed to be hanging by his neck from a noose made of knotted cloth attached to the ventilation grate.  An officer called for the control booth officer to radio a medical emergency and requested a cut-down tool.  The control booth officer opened the cell door.  Officers entered the cell and cut the noose above the inmate's head.  The inmate was carried out of the cell, placed on a Stokes Liter, and carried to the rotunda where officers and a responding nurse began CPR.  An AED was placed on the inmate's chest and the device registered no shock.  Medical staff could not insert an airway because of the inmate's clenched jaw.  An outside ambulance arrived at 2:31 a.m.  While the ambulance was en route to Sutter Coast Hospital, the ambulance personnel discontinued CPR.  The inmate was pronounced dead by a physician at approximately 3:07 a.m.  The timeline from the incident report indicated that the inmate was discovered at 2:19 a.m.  "Video evidence" was collected by another officer at 2:22 a.m., and the ambulance was summoned by a lieutenant at the same time.  The timeline also indicated that CPR was discontinued in the sally port by the ambulance attendant at 2:35 a.m.  The ambulance was off grounds by 2:49 a.m., with arrival at Sutter Coast Hospital by 3:00 a.m.  The investigative report by the coroner's office stated that the investigator was informed that CPR continued until the arrival of the ambulance personnel, "but that the decedent was cold to touch at the time and *rigor mortis* had begun to set in."  The investigator wrote that the CPR was stopped in the sally port at the prison and the inmate was transported to the hospital by ambulance.  An autopsy was performed on 3/15/07 and identified the cause of death as asphyxia (minutes) due to hanging (minutes) and the manner of death as suicide.

The suicide report recounted the inmate's criminal justice history and stated that his first arrest was in 1986 at age 15 for assault on a person with a firearm.  He was detained, but the length of his detention was unclear. He was arrested a second time in June 1987 for robbery and subsequently for vehicle theft, for which he was incarcerated in the CYA from October 1987 to February 1991.  He was reportedly a member of the "18th Street Kings," a street gang.  The inmate paroled in 1991 but was arrested four months later for robbery and sentenced to two years in the CDCR.  He remained there from June 1991

through June 1992 when he was paroled.  In October 1993, the inmate shot and killed a fellow gang member and wounded that member's brother.  In December 1993, he carjacked a car and, with an accomplice, murdered the driver of the car.  He was subsequently arrested in January 1994 and found guilty of multiple murder and other charges in July 1996, with the sentence referred to above.

The inmate reported no history of mental illness or mental health treatment prior to incarceration and was never a participant in the MHSDS after his incarceration.

There was a suicide note referenced in the Death Review Committee Final Report, although it was not included in the documents reviewed that reportedly stated "I'm sorry."

The inmate was seen by a psychologist on 3/3/99 at California State Prison, Sacramento (CSP/Sac) for an ICC hearing.  The psychologist noted that the inmate was not in the 3CMS program, and had no signs or symptoms of psychosis, disordered mood, suicidality, or homicidality.  The inmate reported stable mental health, appeared stable, and did not appear to be suffering from a serious mental illness.  On 11/3/99, the inmate had a Brief Mental Health Screening which was negative for any mental health history or current mental health problems.  On 10/24/01, a social worker noted that the inmate needed an updated MH-7 screening.  On 6/12/02, a SHU evaluation by a social worker indicated that the inmate had no mental health history and that no screening was necessary at that time.  He was subsequently seen by a licensed psych tech for a mental health screening, but there was no screening date.  The inmate reported no history of psych meds, denied feeling depressed, and described his mental health as "okay."  A SHU mental health screening on 4/17/03 at PBSP indicated that the inmate did not meet criteria for inclusion in the MHSDS and did not have any additional exclusionary criteria to prohibit PBSP SHU placement.  The inmate did receive a MH-7 at PBSP on 4/17/03 which was negative for any current mental health problems or past history of mental illness.  No diagnosis was offered.  His GAF was estimated at 80.

The suicide report concluded that there were no problems identified during the review and there were no recommendations.

A memorandum dated 7/2/07 was received from plaintiffs' counsel regarding the suicide of Inmate J.  In their letter, the plaintiffs' counsel recounted the history including the inmate having been seen at a Unit Classification Committee (UCC) hearing on 3/13/07.  He was assigned to the Behavioral Modification Unit (BMU).  The inmate requested a cellmate but was refused one because of previous in-cell violence.  The letter went on to state that the reviewer "appears perplexed by his decision to end his life" and that the suicide report makes no recommendations and concludes that there was no evidence of any motivation to end his life or any events that typically would have been identified as precipitance of suicide.  Plaintiffs' counsel said that they disagreed because the inmate had "received bad news" the day before his suicide, and that he had remained discipline-free for more than two years in order to have been released from the SHU where he had been housed for almost five years.  The inmate was described as uncooperative during the

UCC hearing and reacted poorly to the news that he would be moved from general population to a single cell in the BMU. Plaintiffs' counsel also stated that it was not clear from the suicide report whether there was a mental health clinician who participated in the inmate's review. Plaintiffs concluded that "this suicide identifies the risks of moving inmates who have successfully completed SHU/administrative segregation terms into BMUs without accurate preparation for the move." They assert that an appropriate use of the BMU programs would be to move the inmates who are close to completion of SHU/administrative segregation terms to assist them in preparing for mainline programming, and that taking inmates out of general population units and putting them into restrictive conditions of the BMUs is unacceptable. Plaintiffs continued their objection to movement of inmates into these units from general population units, and further asserted that "to do so without the basic clinical safeguards provided in the SHU/administrative segregation unit is dangerous and can result in the suicide that occurred" with this inmate's placement.

**Findings:**

This inmate's suicide does not appear to have been foreseeable or preventable. The inmate did not report suicidal ideation or other intent to harm himself prior to his death. There was a note that the inmate received "bad news" the day prior to his suicide. Plaintiffs' counsel asserted that movement to a BMU was not appropriate for this inmate. However, the CDCR staff did follow the current Program Guides, and it remains unclear as to whether or not there was a mental health professional sitting on the UCC when the inmate was determined to be appropriate for placement in the BMU.

## 11. Inmate K

**Brief History:**

This inmate was a 54-year-old Caucasian male who committed suicide by overdose of Elavil in general population at Pleasant Valley State Prison (PVSP). The inmate was double-celled at the time of his death and was a participant in the MHSDS at the 3CMS level of care. He entered the CDCR on 12/1/04 via the DVI RC after being convicted of first degree murder. The inmate was sentenced to 25-years-to-life with the possibility of parole. His earliest possible release date was 5/15/28.

The inmate was discovered on 3/21/07 at approximately 6:00 a.m. by correctional staff who contacted the medical department to inform them that the inmate was "sitting on the floor of his cell naked." The officers removed him from the cell and saw an empty medicine bag with a label for "Amitriptyline (Elavil) 10 mg one tablet two times daily" for 60 tablets with a start date of 3/13/07 and a stop date of 4/29/07. Although the medication was issued as a keep-on-person, the label was also stamped "DOT" (direct observation therapy). The inmate was placed on a Stokes Liter and taken by the emergency response vehicle (ERV) to the TTA. Upon arrival, the inmate was incoherent, lost focus, and then lost consciousness. His blood pressure was normal but his pupils were sluggish in response to light and he had uncoordinated motor movement. There was

a small abrasion on his forehead, a one-inch lump below the abrasion, and a one-inch lump on the back of his head at the base of his skull. Upon interview, the inmate's cellmate told correctional staff that this inmate had been awake during the night for about three hours moving around the cell, but he would not respond to questions. He also reported that the inmate spent much of his time on the floor looking at family photographs. The inmate was transported from the TTA to the Coalinga Regional Medical Center and remained in a coma for the first 48 hours. Within the next 48 hours, he became coherent and oriented but had orthostatic hypertension and a left lower atelectasis. The records indicated that on 3/27/07, the inmate had a seizure while sitting in bed, followed by an apneic episode. Medical staff called a code and he was resuscitated successfully. However, the inmate coded again and, despite efforts of medical staff at Coalinga Regional Medical Center to resuscitate him, he did not recover and was pronounced dead at 4:26 p.m. The inmate did not leave any suicide note. However, among his papers that were discovered after his death was a document dated 1/16/07 from the Supreme Court of the United States' Office of the Clerk, Washington D.C., stating that his petition for a writ of certiorari (i.e. his appeal) was denied.

An autopsy report was provided by the Fresno County Coroner's Office. The initial certification of death was listed as bilateral pulmonary emboli secondary to deep vein thrombosis, secondary to prolonged immobilization, secondary to Elavil (Amitriptyline) overdose, and listed the mode of death as natural. However, on 4/30/07, the Fresno County Coroner's Office submitted an amended certificate of death and changed the mode of death to suicide due to ingestion of Amitriptyline as the originating cause. A number of the documents, including the suicide report, stated that the inmate was 53 years old. His date of birth was noted as 1/4/53, and therefore he was 54 years old at the time of his death.

The suicide report recounted the inmate's criminal justice history and stated he had had no prior contacts with the law or use of illegal substances prior to the commitment offense. The commitment offense involved the disappearance of the inmate's second wife, resulting in his arrest on 5/15/03 on charges of first degree murder. He was subsequently convicted of first degree murder and sentenced, as referenced above.

The inmate's mental health history appears to have begun after his arrest. He was reported to have cut both of his jugular veins while he was in jail. This was identified as the third suicide attempt the inmate had made while in jail, according to the California Forensic Medical Group/Eldorado County Jail dated 12/1/04. There was additional information provided by the jail, indicating that the inmate had been on 24-hour safety watch from 10/26/04 to at least 12/1/04, with "24 hour one-on-one care related to his suicide attempts." The memorandum continued by stating that, even while on 24-hour guard, the inmate had made another attempt on his life by breaking apart a safe institutional razor and cutting both of his jugular veins. The author of the memorandum underscored, "I can't emphasize enough how high risk for suicide attempt this inmate is." The author continued, "you must crush all of his pills because the second attempt was with pills stashed under his mattress. Please you must continue this one-on-on watch as it remains 24 hour guard duty with ROM (range of motion) q 20 (minutes)."

When the inmate arrived at DVI on 12/1/04, the initial health screening was completed and the inmate was admitted to the infirmary. Based on his suicide attempt of 11/25/04, he was placed on suicide precautions. The inmate continued to report hopelessness related to his life sentence. He was transferred the following day to a MHCB at SVSP, with a diagnosis of adjustment disorder with suicide risk. He was continued on suicide watch and remained in the MHCB until 12/8/04. The SRAC on 12/9/04 was incomplete, but identified appropriate risk factors including his life sentence for his prison term, suicidal ideation, depressed mood and hopelessness, with family support and helping others as protective factors. His estimate of risk was ultimately not determined. The inmate had spoken with his son, and then promised him that he would not hurt himself again. He was returned to DVI on 12/9/04 and on that date he was placed in the MHSDS at the 3CMS level of care, with a diagnosis of Adjustment Disorder with disturbance of emotional conduct and a GAF of 60.

Despite his promise to his son, the inmate attempted suicide by ingesting 15 Phenobarbital 30 mg tablets on 3/2/05. The inmate was discovered by an officer and was unresponsive on the floor of his cell, resulting in his being transported to the infirmary and sent to an outside hospital where he was admitted for five days. On 3/17/05, he returned to DVI and was admitted to the OHU on suicide precautions. The inmate informed mental health staff that he had bought the Phenobarbital from other inmates, and that he attempted suicide because he had lost his license as a paramedic, because his daughter was having problems, and because he was afraid of being transferred to another prison. He was transferred on 3/24/05 to Mule Creek State Prison (MCSP). The bus screening identified his history, appropriately including his suicide attempts, his thoughts of committing suicide, and his being treated for mental illness. An SRAC at MCSP on 3/24/05 was based on the inmate interview only. It was incomplete with regard to the suicide history, evaluated the risk as moderate and severe, and although no recommendation or plan was checked, it appeared that the inmate was placed in a MHCB. Although he was in fact placed in an MHCB because of continuing suicidal ideation and was referred to VPP, he was not accepted. He remained in the MHCB until 4/28/05, longer than one month, when he was discharged to the EOP. This inmate was placed in the administrative segregation unit after discharge from the MHCB because he had worked as a paramedic in Amador County, where MCSP is located. There were concerns about potential escape risks as well as about his having had contacts with former colleagues prior to his incarceration.

DMH sent a memorandum dated 4/8/05 specifying that the inmate was rejected by the correctional clinical assessment team. It referred to the inmate's multiple suicide attempts, including an overdose. It went on to state that the chief psychiatrist ordered Prozac, but he refused to take medication. Finally, the memo stated: "This patient needs Keyhea initiated for danger to self."

An SRAC dated 4/28/05 appeared to have been done at MCSP and was completely filled out, including all the factors, an evaluation of risk as mild, and a plan to change level of care to EOP. He was prescribed no psych meds when discharged to the EOP at MCSP on

4/28/05.  The orders specified that he must be double-celled in the administrative segregation unit.

The inmate was subsequently transferred to PVSP on 5/25/05.  A bus screening was completed.  The inmate responded "yes" to only questions about whether he had been treated for mental illness, but responded "no" to other questions, including those relating to suicide attempts and suicidal behavior.  In May 2005, his treatment level had been changed from EOP to 3CMS at MCSP prior to transfer.  This level of care was continued after transfer to PVSP, with a diagnosis of Adjustment Disorder and a GAF of 60 to 65.  The diagnosis did not appear to have changed until 7/18/06, when a psychologist diagnosed him as having Major Depressive Disorder in partial remission, but continued him in the 3CMS level of care and estimated his GAF as 65.  The inmate had been housed in a SNY at MCSP, but once he was transferred to PVSP, he was placed in population.  The progress notes from the CCM indicate that the inmate continued to have complaints of depression and problems with adjustment to prison life, although he was also hopeful because of his pending appeal of his conviction.

It appeared that a document dated 1/16/07 from the U.S. Supreme Court denied his petition for a writ, and that his appeal appeared to have been ended unsuccessfully.  It was unclear as to when this inmate received this information, because at his CCM contact on 2/16/07 with a psychologist, he reported that his appeal was still pending, that he had become eligible to get a porter's job, and that his children were doing well in their careers.  He was noted to have been in good spirits and appeared hopeful about his future.  The inmate was to have seen a psychiatrist on 1/13/07, but did not because the psychiatrist cancelled the appointment, noting that the inmate had been receiving Elavil for irritable bowel syndrome and not for psychiatric reasons.

With regard to his overall general medical health, this inmate had been receiving Amitriptyline since 10/20/06.  This was response to health services request forms that he had submitted in July, August, and September because of his irritable bowel syndrome.  The Amitriptyline was prescribed at 10 mg HS for 90 days.  The inmate also had complaints of problems with his feet, as well as pain in his shoulder and knee, for which he received Celebrex and Ibuprofen beginning in 2005.  The initial order for Amitriptyline was noted as "DOT per pharmacy," but it appears that as of December 2006 he was allowed to have Elavil as a keep-on-person medication and that the MAR had a written notification "may carry meds."  The inmate saw a physician the following day, and his medications were held, pending clarification as to how he was to receive them.  On 12/17/06, there was a "Self-Administration Medication Receipt" for him to keep his Amitriptyline on his person, with the notation "May carry."  This receipt stated that the inmate received 30 tablets with a start date of 11/22/06 and a stop date of 1/20/07.  The inmate sent an additional health care services request form on 12/20/06, stating that the Elavil was only working for him for about 15 hours and that he requested taking a second dose after breakfast, in addition to the evening dose for a total of 20 mg per day.

On 1/10/07, he wrote another request stating that he needed re-fills on Elavil, Ibuprofen, and Claritin. He subsequently received 120 Ibuprofen 600 mg tablets, and "Nine Amitriptyline 10 mg (Elavil) one tab every evening may carry, DOT," with a start date of 1/11/07 and a stop date of 1/20/07. There was an additional physician's order of 1/16/07 that read "Amitriptyline 10 mg one tab q p.m. for 100 days." A pharmacy prescription label dated 1/22/07 noted that this order had a start date of 1/19/07 and a stop date of 4/29/07. On 1/29/07, a physician ordered Amitriptyline 10 mg po bid for 90 days. He continued the Claritin at 10 mg per day. The "Self-Administration Medication Receipt," dated the next day, noted that these new orders were 60 tablets, plus an order of Loratadine 90 tablets, both to start on 1/29/07 and end on 4/29/07.

There was an additional pharmacy label dated 2/22/07 for Amitriptyline 10 mg one bid (69 tablets), to start 2/20/07, and an Ibuprofen 600 mg one tab bid (50 tablets), to start on the same date. The last Self-Administration Medication Receipt was on 3/14/07 for Ibuprofen 600 mg one tab bid (60 tablets), to start on 3/13/07.

The suicide report referred to the plastic bag for Amitriptyline that was reportedly found in his cell at the time of his suicide attempt. It also referred to the fact that order for the label in the plastic bag was not noted in the UHR, the inmate history, or patient profile prepared by the pharmacy department, and that there was no corresponding progress note in the UHR.

SRACs on 12/01/04, 12/06/04, 12/08/04, and 03/18/05 were incomplete because sources of information and previous suicide attempts were not reviewed. Other reasons why the SRACs were incomplete were because of lack of evaluations of risk, lack of signatures, and/or inadequacy of plans.

The inmate was placed in the administrative segregation unit when he entered the DVI RC, not because of issues related to his crime, but because in his role as a paramedic, he reportedly had testified against gang members. Ultimately, he was placed on a SNY at MCSP, but once he was transferred to PBSP, he was placed in population. The inmate's last contact with mental health staff was with his CCM on 2/16/07, as referenced above.

On 5/18/07, a physician performed the suicide death review, including review of the inmate's history and medical treatment. In the discussion section of the review, the physician stated that the use of tricyclic anti-depressants in low dosages for symptomatic treatment of irritable bowel syndrome was within the accepted community standard of care. He went on to state, however, that in this situation, the unmonitored use of Elavil in a patient with known strong suicidal tendencies created a high potential for an adverse outcome. The reviewer also stated that the inmate's medical sophistication also contributed to the prescribed treatment being not entirely reasonable. The physician opined that "misuse of the medication may have been avoided if the provider in the pharmacy had insisted on DOT administration in smaller quantities with very close follow-up and symptom assessment." The reviewer concluded, "I will refer the case to DRC[8] and/or PPEC[9]."

---

[8] Death review committee

The suicide report identified three problems and recommendations, as follows:

Problem 1:  When the inmate was found on 3/21/07 sitting naked on the floor of his cell with injuries to his head and an empty medication bag on the floor, correctional staff did not treat the inmate-patient's cell as a crime scene, did not conduct an investigation, and did not generate an incident report.  An extensive interview with the cellmate (who had since paroled) may have clarified the events surrounding the overdose.

Recommendation:  PVSP shall conduct a review of this case to determine whether Investigative Services' policy and procedures were followed in light of the evidence at the scene.

Problem 2:  The UHR documented this inmate's history of serious suicide attempts, including overdosing on medication, and explicitly warned of the need to crush his medications because of his high suicide risk.  Despite this, the medical physician prescribed Amitriptyline, a medication that is highly lethal in overdose, and therefore is non-formulary for mental health as a carry medicine.

Recommendation:  The medical director of the DCHCS will conduct a complete review of the policy regarding use of Amitriptyline and medications with similar overdose lethality, so that the policy shall apply uniformly to all prescribers.  The Medical Professional Practice Executive Committee is to review whether this physician adequately considered the inmate's documented suicide risk and a pharmacy precaution for Amitriptyline.  (Although this contract physician no longer works at the institution, an alert may be placed in the file, if indicated.)

Problem 3:  The prescription label generated by the pharmacy noted that this medication should be given under DOT, yet the medication nurses allowed the inmate-patient to keep this medication in his possession to self-administer as prescribed.

Recommendation:  Refer to the DCHCS Nursing Quality Assessment Team to investigate the problem of nursing staff handing "DOT" labeled medications to inmate as carry meds.

On 10/10/07, the director of the mental health program, DCHCS and director (A) DAI issued their report on Implementation of the QIP for suicide of Inmate K, in response to the suicide report dated 5/29/07.  In this submission, there was a memorandum from the warden of PVSP confirming compliance with the QIP.  The documents went on to state that with regard to Problem One, PVSP conducted a thorough and extensive review and found that the cell was not treated as a crime scene by correctional staff.  PVSP did generate a crime incident report for the inmate death and amended the cause of death to "suicide."  The associate warden directed training for all correctional staff of affected facilities on expectations for crime scene preservation. IST sign-in sheets were provided for a class entitled "Crime Scene Preservation."

---

[9] Professional practice executive committee

With regard to CAP Problem Two, several e-mails were sent from the senior psychiatrist supervisor for mental health program telemedicine, DCHCS, with the clarification "all tricyclic anti-depressants including drugs listed on the new CDCR formulary, including Propranolol, Elavil, Sinequan, and Tofranil, are considered to be non-formulary for all mental health indications." They went on to state that a non-formulary request was required and must be pre-approved by the supervising psychiatrist before a tricyclic anti-depressant prescription can be processed by the pharmacy. They continued on, stating that all tricyclic medications for medical indications (non-mental health) must have a clear indication written on the prescription by the prescriber before they can be processed by the pharmacy. The cover note for this memorandum included statements that the Pharmacy and Therapeutic Committee had decided that TCAs do not carry medications, and that the minutes from that meeting would be forthcoming. In addition, with regard to Problem Two, the PPEC reviewed the case and determined that two doctors, (Drs. "A" and "B"), did not order Elavil as a DOT medication. The PPEC members questioned the prescription of three months' worth of anti-depressants at the first prescription. Further, the members felt that Drs. "A" and "B" should have considered the patient's multiple documented previous suicide attempts. To address the practice deficiencies in this case, the Committee voted to refer the case to the health care manager at PVSP requesting that the manager review the case with Drs. "A" and "B," and counsel them regarding review of patient files and the need for DOT designations for medications particularly subject to abuse in a prison setting. The PPEC members also wanted this issue to be discussed by the Pharmacy and Therapeutics Sub-Committee.

With regard to Problem Three, the Nursing Consultant Program Review of the death review summary was provided. It included a review of the issues regarding nursing management, nursing standards of care, and compliance with CDCR policies. The problems identified included the ordering of Elavil as a self-administered medication for a patient with a history of lethal suicide attempts, with no documentation that medical physicians consulted with mental health providers; (2) lack of documentation by the MTAs/LVNs assigned to administer medication; (3) the fact that the MTAs and/or LVNs responsible for giving medications in November and December did not refer the patient's "no-shows" to the physician as required by policies; (4) the fact that the institution did not initiate an investigation with regard to the patient's head injuries; (5) the delay in calling 911 for a patient with an altered level of consciousness, cardiac arrhythmia, and signs of a head injury, and evidence of an overdose of prescription medication; (6) the 20-minute ambulance response time, which was to be referred to the DRC; and (7) the failure by the TTA RN to initiate or document the usual emergency measures, such as IV access, oxygen, cardiac monitor, etc. The corrective actions were to have the DON conduct individual supervisory conferences with appropriate staff, to discuss in a nursing staff meeting the requirements for the PVSP medication administration policy (both to be completed within 30 days of receipt of the notice), and to have the DON assure that emergency response exercises are developed, implemented, and documented, with drills to be held within 60 days of receipt of the notice.

**Findings**:

This inmate's death does not appear to have been foreseeable in that he did not report ideation or intent to harm himself or to commit suicide. That having been said, the inmate had a history of suicide attempts, was a trained and licensed paramedic prior to his incarceration, and was allowed to keep on-person medications with potentially high lethality when taken in overdose. It is clear from the inmate's ingestion of medications that he specifically chose Elavil very likely because of his knowledge of medications, that he requested and hoarded enough Elavil to result in an overdose, and that he successfully completed suicide. Based on review of the records, the failures to have an integrated multi-disciplinary approach to treatment for this inmate, and the flaws in policy with regard to prescription of medications with potential high lethality for inmates who are in the MHSDS and have a significant history of suicide attempts, this inmate's death may very well have been preventable.

Not only was the CDCR placed on notice by jail medical staff in the transfer documents via a handwritten note as well as in the Transfer Form that this inmate was a high risk for suicide, but the inmate also attempted to overdose on Phenobarbital that he bought on the yard after his incarceration in the CDCR. Incomplete and/or inadequate SRACs contributed to poor management of his suicide risk. Although at one point he was placed at the EOP level of care, curiously this level of care was reduced to the 3CMS level, with fewer mental health contacts at that level of care. Equally curiously and unfortunately, he was rejected by the DMH VPP. In its rejection letter, DMH stated that the inmate should be placed on a Keyhea order, but rejected him for admission to its acute or intermediate psychiatric programs. The suicide report makes no reference to this rejection or to the lack of adequate documentation to justify such rejection.

Lastly, the medication orders and medication management for this inmate were confusing at best, with both DOT and carry-on-person orders being written for Elavil and other medications. The suicide report and the corrective actions from DCHCS appeared to move in the direction of addressing these issues. However, it remains unclear at the time of this writing whether they have been completed and have resulted in both the auditing and reviews at PVSP, in corrective actions with regard to particular staff members (given that one of the physicians was a contract physician who no longer worked in the system at the time of the review), and in the necessary clarification to medical staff throughout the system.

## 12. Inmate L

**Brief History:**

This inmate was a 40-year-old African-American male who committed suicide by hanging on 3/31/07 in the administrative segregation unit at CMF. The inmate was the sole occupant of the cell, and was a participant in the MHSDS at the 3CMS level of care at the time of his death. The inmate entered the CDCR via the WSP RC on 9/26/96. He was serving a sentence of 15-years-to-life on a conviction of second degree murder.

While incarcerated, he was convicted of possession of a controlled substance. The inmate's minimal eligible parole date was 6/28/09.

The inmate was discovered on 3/30/07 at approximately 11:48 p.m. by a CO who was conducting half-hour security rounds on the psychiatric administrative segregation housing unit I-3. The inmate was the sole occupant of his cell. When the officer looked through the window of the cell with his flashlight, he observed the inmate in a sitting position on the floor, facing the cell door with a sheet tied around his neck. The sheet was tied to the upper bunk rail. The officer noticed that the inmate's buttocks were slightly off the floor and the sheet was taut. The officer called out to the inmate, but he was unresponsive. The officer made an institutional radio announcement and activated his personal alarm device. Medical staff from the B-1 clinic emergency room responded to the I-3 housing unit as additional responding staff were removing the inmate from his cell. A sergeant and several COs arrived at the unit before the medical staff. They removed the housing unit deadlock, opened the door, entered the cell, and utilized the cut-down tool to cut the sheet approximately half-way between the top of the sheet and the inmate. As the officers were exiting the cell, responding B-1 clinical staff arrived. The inmate was assessed by medical staff as not breathing, having no pulse, and feeling cold to touch. The inmate was placed on a gurney and two RNs initiated CPR and rescue breathing. The inmate was transported to the B-1 clinic emergency room with CPR continuing en route. The inmate did not recover. A physician pronounced him dead at approximately 12:19 a.m. on 3/31/07. The inmate had occupied his cell for approximately six hours. There were no suicide notes found in the cell, but two undated suicide letters discovered in his property, one addressed to plaintiffs' attorney in the Coleman case, and the other to the Prison Law Office. Although these letters were not provided in the documentation produced to this reviewer, the suicide report stated that the documents were "carefully written, detailing his pain, frustration, and belief that all staff were plotting to set him up to be killed." The report went on to state that the letters referred to his hearing voices, that he dropped his food which made everyone mad at him for making a mess, that he was placed in a dorm so that he could be more easily killed, which was why he was "kicked out of the EOP." The reviewer opined that "despite this seemingly delusional content, the letters were much more cohesive than something a psychotic person could write." The reviewer went on to state that the inmate said that he was tired of the pain, frustration, and the fight, that he refused to spend any more time in prison, and that he had had a dream of being called to be in a better place. Further, the inmate wrote he intended to end his life and that he had "ingratiated himself," apologizing for taking the intended reader's time and pleading for help. The letters apparently concluded with the inmate not specifying what kind of help he wanted, other than for the attorneys to call the prison themselves rather than call "those group of people in the Coleman Project Team." The reviewer reported that the letters were dated March 2007. The reviewer examined the "Coleman Project Team Urgent Response Log," which showed that the inmate had written several such letters in the past, and that typically when receiving a response to those letters, he denied any intention of self-harm, was "glad for the attention," and usually wanted something such as more contact and, after July 2006, to get back into the EOP. An autopsy report was provided by the Sheriff Coroner for Solano County. It stated that the autopsy was performed on 4/2/07 and

concluded that the cause of death was hanging (minutes).  No toxicology report was provided, although toxicology specimens were obtained at the time of autopsy.

The suicide report recounted the inmate's criminal justice history, stating that he had no juvenile history of record but that his adult criminal history started in 1986 at age 19. The report referenced offenses over the following ten years, including vehicle code violations, several resisting and evading arrests, driving under the influence of intoxicants, possession of a loaded firearm in a public place, spousal abuse, and receipt of stolen property.  These charges resulted in probation or jail sentences.  The commitment offense appeared to have been related to possible gang conflict, as a witness reported that the inmate was in a car with the victim and that the victim asked the inmate "what's up, blood," not knowing that the inmate was a member of the "Crips."  Subsequently, the witness left the car to go into a residence.  Upon his return, the victim was lying on the street unconscious and with a bloodied face, and the inmate had left the scene.  The victim ultimately died from head injuries.  The inmate was convicted of second degree murder and sentenced to 15-years-to-life.  While incarcerated at PVSP in November 2001, he was charged and convicted of possession of a controlled substance in prison, for which a 16-month sentence was imposed.

The inmate initially entered the CDCR at WSP, but was transferred in January 2000 to NKSP, in April 2000 to PVSP, in November 2002 to CSP/Corcoran, in February 2003 to the California Substance Abuse Treatment Facility (CSATF), in November 2003 to CSP/Sac, in February 2004 to SVSP, and ultimately on 4/29/05 to CMF where he remained until his death on 3/31/07.

With regard to his mental health history, the inmate initially denied any mental health history prior to incarceration.  Subsequently, however, he reported that he attempted to hang himself in a suicide attempt in 1987 after he had shot his brother in the stomach. The initial health screening completed in September 1996 indicated that he had no history of mental illness or suicide attempts.  The mental health screening on 9/30/96, however, resulted in his being referred for further evaluation which occurred on 10/9/96. Following that evaluation, he was immediately sent to the infirmary for further evaluation, based on his stating that he had had suicidal ideation.  He was placed in the MHSDS at the 3CMS level of care.  He reported suicidal ideation, depressed mood, and auditory hallucinations, and was diagnosed with Depression and at that time was prescribed Zoloft for depression.  He was placed in MHCBs in 1998 and 2002 because of suicidal behaviors, which were reported in the suicide report as "suicidal gestures" and included "cutting himself in 1998 and 2002."  Over the years, the inmate also reported that he believed authority figures were plotting against him and that he saw himself as a victim.  Although the suicide report stated that the inmate "was never truly psychotic," it went on to state that he was prescribed anti-depressants and anti-psychotic medications, and that his diagnoses were Major Depressive Disorder with Psychotic features as well as Polysubstance Dependence, Post Traumatic Stress Disorder, Bipolar Disorder, and Antisocial Personality Disorder.

On 11/2/03, the inmate was admitted from CSATF to the OHU at CSP/Sac because of an inability to walk and a diagnosis of paraplegia.  This was subsequently determined to be a Conversion Disorder (psychiatric).  Based on that admission, the inmate was placed at the EOP level of care.  Of note, in July 2002, he was diagnosed with lumbar radiculopathy, and in July 2004, he had a chrono for a walker and wheelchair at SVSP.  He was noted at that time to have muscle weakness and wasting.  On 2/9/04, the inmate fell down stairs. He was again admitted to the OHU and MHCB, provided with a walker, and was subsequently transferred to SVSP.  He continued at the EOP level of care, and on 4/29/05 he was transferred to CMF.  The inmate continued to complain of depression and suicidal ideation, and was described in the notes as paranoid and depressed.  He was also described as hostile, angry, and seeing himself as a victim, and was verbalizing paranoid delusions regarding staff plotting against him, as noted at his IDTT meeting on 11/17/05 at CMF.

The next treatment plan review in February 2006 described the inmate as having a sense of entitlement and sending 602s whenever he perceived injustices against him.  When confronted with this information, the inmate stated that the officers were against him and had engaged in retaliatory behaviors.  He also wrote complaints to the "Coleman Plaintiff Attorneys," wherein he expressed suicidal ideation, housing concerns, and perceived injustices, resulting in his being interviewed by "Coleman Project Team" members in February, March, and April 2006.

Despite the references to the inmate's perceived injustices and his prolific writing, he was transferred to ASH on 5/24/06 because he had endorsed suicidal ideation without a plan or intent, and was concerned about "being in a new environment" i.e. CMF.  During that time, the inmate's medications were reduced, based on his apparent socialization with peers on the unit, and he was diagnosed as malingering.  There was also a plan to discontinue his medications if psychological testing supported that diagnosis.  The testing was performed, with results indicating that the inmate had a marked tendency to magnify his symptoms to the point of fabrication, and reporting "a wide range of bizarre extreme constant symptoms very unlikely to be experienced by even the most impaired psychiatric patient."  The inmate was reported to have demonstrated a hostile attitude toward staff, engaged in breaking rules, and reportedly was overheard discussing assaulting a staff member.  He was determined to have "received maximum hospital benefit," and returned to CMF on 7/5/06.  His diagnoses at that time were Malingering, Polysubstance Dependence, and Antisocial Personality Disorder, and his GAF was estimated at 85.  It was recommended that he be tapered off of his psychotropic medications.

Following his return to CMF, the treatment team reduced his level of care from EOP to 3CMS, and he was moved to unit I-1 3CMS/ADA dorm housing on 7/18/06.  The treatment plan noted alerts for suicide and self-injury.  The CCM's notes of 7/26/06 and 9/18/06 indicated that the inmate complained about being in the dorm, not being able to sleep, and having thoughts of suicide.  His thought processes were noted as being illogical, and he was described as feeling angry and paranoid and wanting to lash out at others.  An IDTT meeting was held on 10/12/06.  The inmate continued to report "racing

thoughts about suicide," auditory hallucinations, suspiciousness, and sleep problems.  He was noted to be sad, irritable, and distressed, and had recently heard bad news about the health of his brother.  The staff also noted that there was "an element of disbelief" in reported symptoms, as he appeared to have been talking with others prior to entering the IDTT meeting but demonstrating an affect of "dire distress" when meeting with the team.  The team noted their suspicion of malingering, estimated his current risk of suicide as "low," and continued to plan that he would be treated with CCM contacts and medications.

Less than one week later, on 10/18/06, the inmate reported to his CCM continuing difficulties with placement in the dorm.  He stated that "if it doesn't get better," staff "might find" the inmate "hanging in there."  The CCM noted meeting with the inmate a second time on 10/18/06 and discussing his feelings, but the inmate denied current suicidality and was resistant to therapeutic suggestions.  There was no SRAC performed on that date, but there should have been, in light of the inmate's reference to "hanging."  An SRAC by a social worker dated 12/28/06 indicated that the reason for the assessment was "other," and the source of information was inmate interview only.  The risk assessment was incomplete in that it did not describe all of his suicide attempts and indicated no protective factors except group activities and other.  The evaluation of risk was estimated at medium and, despite the dynamic risk factors including hopelessness or helplessness, fear of safety, and recent acute/chronic suicidal ideation, the plan was to refer to the CCM.  Comments included that the inmate stated that he was "very paranoid at this time," that he wanted to return to EOP because of paranoia in the dorms,  but that he would be okay until he could see his CCM the following day.  It concluded with the inmate stating he had no plans to commit suicide.

The inmate sent another letter to plaintiffs' counsel indicating that he was feeling suicidal and was paranoid.  He reportedly stated, "I can't handle it around here anymore" and indicated that he wanted to be returned to the EOP level of care.  The inmate did see a psychiatrist on 1/9/07.  The psychiatrist noted that the inmate stated that he had continuing racing thoughts about suicide and problems living in the dorm, but the psychiatrist noted that although the inmate was a long-term suicide risk, it was difficult to identify him as an acute risk.  There did not appear to have been an SRAC completed at that time.  The social worker, who was not his regular CCM, noted on 1/16/07 the inmate denied suicidality, showed no evidence of mental illness other than a flat affect related to depression, and was working on his legal problems, which indicated planning for the future.  On 1/17/07, he saw his CCM because of his "feeling jumpy" and having difficulties with other inmates. However, he denied suicidal ideation at that time.  At the time of the inmate's death, the medications that had been ordered for him included Seroquel 800 mg per day, Remeron 15 mg HS, Prozac 60 mg a.m., Benadryl 150 mg HS prn for insomnia, and Vistaril 75 mg three times a day prn for anxiety.

The inmate had a number of medical problems, as reflected in the medical record.  He was treated for chronic back pain, headache, asthma, constipation, osteoarthritis, and penile warts.  He had a benign breast mass removed from his left breast in March 1999 and a mass removed from his right forearm at approximately that same time.  With regard

to the back and leg pain and difficulty with walking, the inmate had an MRI in 2002 which did not demonstrate any problems with his spine.  He had a fall down stairs in February 2004.  Despite the reported absence of clinical evidence and the suspicion that he was malingering or had a conversion disorder, by the time of his death, he had been provided with a cane and subsequently a wheelchair, based on a diagnosis of radiculopathy and his demonstrating apparent paraplegia and parathesis.  He also was receiving methadone 2 mg (crushed) twice a day, oxycodone 10 mg (crushed) three times a day prn pain, as well as Clonidine, prilosec, albuterol inhaler, and triamcinolone inhaler, with all of his medications to be administered DOT except for his inhalers.

The records indicated that the inmate wrote multiple health care services request forms, particularly with regard to his back pain and other medical complaints.  On 1/10/07, he also wrote to his CCM about his complaint of pain and stated "I don't know what to do, you told me not to talk about my suicidal ideations so I don't.  But I have been cutting on myself to ease the pain and release my frustrations."  There was also a subsequent health care services request form on 2/17/07, stating "you haven't come to see me yet.  If I do something you can't say I didn't tell you."  The following week, this CCM reportedly left the institution, and a new CCM was assigned to this inmate.  The records did not reveal documentation that SRACs were completed by anyone in response to these two health care services request forms, in which the inmate referred to his cutting himself and to his statement that "if I do something you can't say I didn't tell you."  The suicide report stated that "for reasons unknown, the triage nurse did not receive these two health care services request forms until 3/13/07, approximately two months and one month, respectively, after they were dated.  It went on to explain that it was possible that the inmate did not turn them in before 3/13/07.  It appeared from the record that on 3/16/07, the inmate's CCM found the two requests forms in her box and went to see the inmate, who stated that he had been told that his mother had died and said that "if it's true I might kill myself."  He also requested return to the EOP.  The CCM described his suicidal threats, dysphoric mood, and disheveled appearance. She completed an SRAC, indicated "medium risk," and recommended referral to DMH as well as paging the on-call psychiatrist.  The SRAC completed on 3/16/07 by the social worker indicated medium risk with a DMH referral.  The inmate was admitted to the DMH S-2 unit on 3/17/07.  He was discharged within 23 hours but he remained on that unit until 3/19/07.  A psychologist's note on 3/16/07 indicated that the CCM (a social worker) was consulted and provided a history that the inmate had been informed by another inmate (whose girlfriend knew the inmate's family) that his mother may have died recently, but the inmate had not been able to confirm this.  The psychologist continued on, stating that the referring clinician was concerned about the inmate's safety and that he may become actively suicidal.  The note went on to state that the inmate had current appetite and sleep disturbance as well as command auditory hallucinations.

According to the suicide report, the inmate was evaluated by a psychiatrist but the evaluation was in "an unsigned and undated typed note."  The psychiatrist recorded that the inmate described auditory hallucinations, not having slept well, and not being able to verify the report regarding his mother's death.  The psychiatrist continued on, noting that the inmate said that he "is not intending to kill himself, but over the following days....he

would ask for help (prn) and if the responder did not or could not provide him with help then 'I may do something' he says." The psychiatrist recommended hospitalization over the weekend, and the inmate was referred to the DMH S-2 unit for observation.

The S-2 unit was the psychiatric evaluation services unit providing crisis bed services by DMH within CMF. The inmate was placed on one-to-one observation overnight. When seen by DMH staff, he was reported to have denied feeling suicidal at the time. The record noted that the inmate's physical disability might possibly be due to malingering, and his diagnoses at ASH were Malingering and Antisocial Personality Disorder. The record also noted the psychiatrists' conferral with the medical director and program director regarding the inmate's physical needs. The psychiatrist decided to "discharge the inmate to EOP CDCR" and discontinued the one-to-one suicide watch for psychiatric reasons, but continued the watch for medical reasons until the inmate could be transferred back to CDCR.

Two days later on 3/19/07, an SRAC was completed by a DMH psychologist who opined that the risk was both "low" and "conditional" based on the inmate's statement that he wanted to find out if his mother had died. As to whether he would harm himself if indeed his mother had died, the psychologist noted that the inmate stated "I don't know." After seeing the inmate, the DMH treatment team reported that he did not want to be admitted to DMH and that he felt anxious and hopeless at times. However, the DMH treatment team decided to discharge him to EOP. The inmate was at the 3CMS level of care at the times of the DMH admission to S-2 and staff evaluations.

The suicide report contained important information about the communication between the DMH mental health staff and the CDCR mental health staff representatives. The report described as "particularly hostile" the DMH and CDCR clinical staff "morning meeting" in which they "discuss cases being transitioned between the two programs, with the work environment on S-2." It stated that "a DMH doctor directed a scathing litany of complaints about CDCR to the two CDCR representatives" and that the team process was "foreshortened" as a result. Further, the DMH psychiatrist who had assessed "the inmate" simply announced that he had been discharged on 3/17/07, so that it was just a "pro forma" encounter with the inmate "for purposes of cementing the discharge."

The inmate was subsequently moved from the S-2 DMH unit to the N-2 EOP unit for five-day follow-up, although his level of care had not been changed from 3CMS. A psychiatrist evaluated the inmate on 3/19/07 on N-2 and opined that "although he 'adamantly denies' suicidal ideation, based on past reports he is someone who remains at higher risk." The psychiatrist noted that the inmate remained impulsive and unpredictable, but indicated that the inmate should return to the 3CMS level of care. On 3/22/07, during the five-day follow-up, a social worker documented the inmate's reporting of auditory hallucinations telling him to kill himself. A social worker also reported that the inmate appeared to be coping with the death of his mother with minimal impact at that time.

The inmate was transferred to the I-1 3CMS/ADA dorm unit, but there was no explanation in the record as to why. His five-day follow-up was continued on I-1. The record was unclear as to why he was not referred to the team or psychiatrist or why an SRAC was not performed by the social worker on 3/22/07 based on his statements of voices telling him to kill himself. Apparently, on 3/23/07, the inmate had difficulties with receiving his medications; he initially refused to take his medications, but subsequently did take them. On 3/24/07, the last day of his five-day follow-up, an RN documented in a three-page note that the inmate was having trouble receiving his medications the night before. It was documented that although he had requested Seroquel 45 minutes earlier than the time it was prescribed to be given (8:00 p.m.), he was told that he could not have the medication early, and that the MTA had left the unit and had to be called back by a sergeant to give him his 8:00 p.m. medication. The inmate reported that he was given Benadryl, but not Seroquel, even though he told the nurse that he needed to have his Seroquel. This interview took place on 3/24/07 at approximately 10:00 a.m. The RN wrote that the inmate had asked for his Seroquel the night before and had told the MTA that he needed it because "voices telling him to hurt himself." She also noted that the inmate had two fresh scratches on his left anterior forearm. The RN noted that the inmate had not been seen after the incident the previous night, and said that custody told him that he would be written up for staff manipulation if he went to the B-1 clinic. The RN ordered the inmate escorted to the B-1 clinic to see the psychiatrist of the day. The notes indicated that on 3/24/07, the inmate was seen by the psychiatrist, who assessed him as having an Adjustment Disorder with anxious mood, and determined that the inmate was not a suicide risk.

The psychiatrist of the day was the same DMH psychiatrist that had evaluated the inmate on the S-2 unit when he was admitted on 3/17/07. On 3/24/07, this same DMH psychiatrist did not respond to her page for over one hour. When she did report to the B-1 clinic, reportedly she "nonchalantly and casually strolled in," saying that she had never been paged. The psychiatrist reportedly stated to the nurse, who had remained to provide the psychiatrist with a verbal report of her interview of the inmate, "that's him? I know him, he's a malingerer, he was just on S-2, he'll never do anything to hurt himself." Although the nurse reportedly replied that she was not so sure of that and requested the psychiatrist read her note, the nurse was dismissed by the psychiatrist. The psychiatrist did write a note at 12:20 p.m. stating that she talked to the inmate for approximately ten minutes and described the inmate as "animated" without suicidal ideation. The psychiatrist changed the inmate's Seroquel to divided dosages in the morning and evening, but did not perform an SRAC. The psychiatrist did not transfer the inmate to DMH and did not extend the inmate's five-day follow-up.

The following day, the inmate was seen by another nurse. He told her that he had not been given his Seroquel that morning because pharmacy had not created a label for the medication and because the DMH psychiatrist had written an incorrect order to "change" rather than "discontinue" the previous order. The order was re-written by another physician. The inmate was seen by a psychiatrist on 3/26/07. He informed the psychiatrist that he had cut himself two days earlier to relieve tension and relieve the voices, but denied suicidal or homicidal ideation. The psychiatrist re-wrote the

medication orders for Seroquel.  On 3/26/07, the inmate reported that his last suicide attempt had been two days previously when he had been observed by the RN as having two fresh scratches on his forearm.  An SRAC done at that time indicated "low risk," but had no signature and no date.  The SRAC indicated that the information was based on an inmate interview and the C-file, but the medical record was not documented as having been reviewed.

According to the suicide report, on 3/29/07 the inmate and another inmate in the dorm assaulted and battered a third inmate who was in the upper bunk.  At 3:30 a.m. on 3/30/07, the inmate was provided with an administrative segregation unit placement order which he signed.  However, the inmate refused to sign a second placement order at 4:50 a.m., even though it was noted as a neater but unchanged version of the previous order.  He was seen for medical clearance for the administrative segregation unit at 10:30 a.m. and was seen by his CCM for pre-placement mental health clearance at 11:40 a.m.  The inmate reportedly stated "I don't plan on anything.  I don't know," and denied suicidal ideation, although his history of suicidal threats followed by retractions was noted.  An SRAC was completed and indicated "low risk," but was incomplete and did not include the inmate's having been involved in an assault the previous day, his single-cell placement, his disturbance of mood, and his history of crisis bed placements.  The source of information identified on the SRAC was "inmate" only.

The suicide report made reference to the inmate's having over 12 RVRs since his incarceration, including falsification of documents, refusal to obey orders, displaying genitals in public, inmate-manufactured alcohol, excessive bodily contact during visits with his girlfriend, and a letter in which he made threats against staff.  While incarcerated in August 2001, he was also convicted of drug possession offense because he was caught receiving balloons filled with marijuana from his girlfriend in the visiting hall.  The foregoing resulted in an additional sentence, as stated above.  In 2001, he was placed in the administrative segregation unit for a brief time because of a letter threatening staff.  He was assessed a six-month SHU term.

The suicide report reviewer noted that staff and inmates were very surprised by this inmate's suicide.  They noted, however, that it was possible that the inmate was so angry at being caught in the assault and placement in administrative segregation unit that he hanged himself "in a very impulsive angry act much like his crime."  The suicide report reviewer also stated that staff did not attempt to contact the inmate's mother after his suicide because the inmate had said that his mother had died.  Instead, they contacted the inmate's sister who responded, stating that his mother wanted to know what was going on.  Given the doubt documented by staff that the inmate's mother was indeed dead, and the role that this played in the inmate's statements regarding his suicidal ideation, clinical and custody staff were curious that there were no attempts to contact the inmate's mother.

The suicide report identified eight problems and recommendations as follows:

> Problem 1:    On 3/19/07, contentiousness between DMH and CMF teams prevented adequate discussion of the inmate's treatment needs.  The Psychiatric

111

Evaluation Service run by DMH on Unit S-2 was a special arrangement allowing for inmates to be evaluated for up to 23 hours without going through a formal admission and discharge process. At the recommendation of the <u>Coleman</u> court monitors, this program was reportedly discontinued in April 2007. It was to continue to function as an MHCB.

<u>Recommendation</u>: Ensure that this program is no longer active.

<u>Problem 2</u>: On 3/19/07, the inmate was "discharged" from the 23-hour evaluation to EOP level of care by DMH. However, he continued to be treated at the 3CMS level of care by CMF, without a team review of his level of care.

<u>Recommendation</u>: CMF indicated that since the 23-hour evaluation program had been discontinued, this would no longer be a problem. Inmate/patients admitted to S-2 for crisis bed care are to go through a formal admission and discharge and are to have a formal interdisciplinary team meeting when they return to custody to determine their level of care. This process is reportedly being developed by the higher level of care focus improvement team at the institution.

<u>Problem 3</u>: On 3/19/07, at the discharge from S-2, the inmate was placed on N-2, an EOP unit, for his five-day follow-up. The five-day follow-up is intended to assist inmates in transitioning to their regular housing unit after an inpatient placement, and should NOT be conducted on a different unit than where the inmate will be normally housed, since every housing move requires some adjustment by the inmate. If there is a need to transition the inmate through a step down unit or program, there should be an additional five days of follow-up once the inmate has been returned to regular housing. (It is also good practice to end the five days on a week day when the regular case manager/primary clinician can make the final follow-up assessment.)

<u>Recommendation</u>: CMF to update their local procedure for five-day follow-up to indicate that the final five days of clinical follow-up must occur on the inmate's regularly assigned housing unit.

<u>Problem 4</u>: On 3/24/07, an RN took the inmate to the clinic because he appeared depressed, reported voices telling him to hurt himself, and had fresh scratches on his arm. When she was paged to see the inmate, the psychiatrist of the day reportedly failed to respond to the pages. She did not appear for over an hour and then reportedly denied that she had ever been paged. The RN had waited at the clinic for an hour to speak personally with a psychiatrist. The RN reported that the psychiatrist was "dismissive" of the inmate and quick to label him as malingering, despite the presence of scratches on his arm. Within ten minutes of her arrival, the psychiatrist sent the inmate back to custody without completing an SRA. This psychiatrist also wrote the inmate's medication change order incorrectly, resulting in it not being followed as she intended.

<u>Recommendation</u>: DMH is requested to review the actions of this psychiatrist to determine if any disciplinary action is warranted.

Problem 5:  On 3/25/07, the inmate was not given his morning Seroquel as ordered because the order did not match the pharmacy label.  The protocol for nurses administering medication based on new orders is not clear.  Evidently, some nurses wait to see the pharmacy label, while others follow the new orders as written.  Waiting for the label can cause delays that may impede timely care, particularly on a weekend.

Recommendation:  CMF to clarify its protocol and update the medication administration operating procedure as needed to ensure consistent practice, and to provide on-the-job training for all medication nurses.

Problem 6:  Documentation of the administrative segregation pre-placement mental health clearance on 3/30/07 suggested that the inmate was displaying significant depression and was vague and ambivalent in his response about suicidal ideation.  The SRA done at that time did not include all of the dynamic risk factors that were present, such as recent assaultiveness.  Neither the note nor the SRA was signed.

Recommendation:  Supervisor of this clinician to review the case with her and discuss the importance of placement in administrative segregation as a stressor.  To provide remedial training as needed.

Problem 7:  Upon the inmate's return from ASH, his EOP IDTT was held on 7/13/06 and his level of care was changed to 3CMS.  The initial IDTT meeting for 3CMS, however, was not held until 10/12/06.   Per the Mental Health Program Guide, the initial IDTT meeting for 3CMS should have been held within ten days of the change to 3CMS.

Recommendation:  For two months, conduct an audit of a representative sample of not less than ten charts of inmates reduced in level of care from EOP to 3CMS to ensure that intake IDTT conferences occur in accordance with Mental Health Program Guide timelines.

Problem 8:  Typed note from the B-1 psychiatrist on 3/16/07 was not dated.

Recommendation:  Supervisor to provide on-the-job training for the clinician and monitor documentation for compliance.

On 5/18/07, a medical suicide death review was conducted by a physician.  The physician summarized the inmate's treatment and concluded in his recommendation that he did not find any definite quality-of-care issues for the patient.  He added that he would have liked to review the emergency response flow sheet, but could not locate it.

On 11/28/07, in response to the suicide report dated 5/29/07, the director of the mental health program, DCHCS and director (A) DAI issued their report on implementation of the QIP for the suicide of Inmate L.  In their report, the directors included responses to the suicide report recommendations from CMF and DMH.  With regard to CAP Item One, CMF staff provided a memorandum, dated 4/17/07, with the subject "23 hour turnaround," signed by the medical director of the VPP, and directing that the psychiatric evaluation service be discontinued.  The memorandum also included that every case was

to be reviewed for referral to ICP or day treatment and that no discharge decisions were to be made outside of the treatment team setting.

With regard to CAP Item Two, CMF reported that since the 23-hour evaluation program had been discontinued, this would no longer be a problem. A formal IDTT would be held when inmates return to custody to determine their levels of care. At the time of the memorandum, the process was reportedly still being developed by the higher level of care focus improvement team.

With regard to CAP Item Three, CMF responded that they had revised their local procedure for five-day follow-up, including the responsibilities of clinical and custody staff at the receiving housing unit and documentation requirements. It did not appear from the operating procedure that the requirement that the five-day follow-up take place on the inmates' ultimate housing unit rather than on a transition unit was clarified.

With regard to CAP Item Four, CMF's response was to provide a memo to DMH verifying that review of the psychiatrist had occurred. The reader was referred to the executive director and medical director of DMH. No response from DMH was included in the documents reviewed.

With regard to CAP Item Five, CMF's response was to provide a copy of a memorandum from the SRN-2 titled "Administering Medication from a Written Order," with attached sign-in sheets, requiring that nurses be able to medicate a patient with the use of a doctor's handwritten order.

With regard to CAP Items Six and Seven, a memorandum from the supervisor was provided indicating that on-the-job training was provided for the identified clinician and the entire 3CMS staff in April 2007. For Problem Number Seven, the treatment team meeting was delayed because the housing coordinator did not receive the housing change documents. An audit was conducted, and it was determined that this issue would not pose a significant problem at this time. The over-reliance of clinicians on the computer documents versus retrieving the UHR for each clinical contact was also addressed through the on-the-job training. The response also included an audit of 27 charts which revealed that the corresponding treatment plans were completed within 14 days of referral/arrival, in compliance with the Program Guide.

With regard to CAP Item Eight, CMF responded that a memorandum was provided by the senior psychiatrist, indicating that the supervising psychiatrist had provided on-the-job training for the clinician and was monitoring documentation for compliance.

**Findings**:

It was very likely that this inmate's suicide may have been foreseeable. The inmate expressed chronic suicidal ideation that varied over time, and those statements largely appear to have been in response to his particular circumstances. He was reported to have denied suicidal ideation to his CCMs as well as to an RN and a DMH psychiatrist in the

days prior to his death.  The notes, however, also record that the inmate was unsure of whether or not he would "do something" or "kill himself" if his mother was indeed dead, and that he reported voices telling him to kill himself.  This inmate's suicide was highly likely to have been preventable because there were concerns expressed by staff, particularly the nurse who saw him on the fifth day of his five-day follow-up and referred him for evaluation to a psychiatrist in the B-1 clinic.  Unfortunately for the inmate, the psychiatrist was the same one who had discharged him from the psychiatric evaluation service program at DMH on 3/17/07.  This discharge from the psychiatric evaluation service appears to have been very inappropriate, given the inmate's presentation and the lack of any comprehensive work-up.  The discharge was clearly impacted by poor communication between DMH and CDCR staff.  The suicide reviewer made note of the hostile attitude by the psychiatrist, if not the whole DMH treatment team, as well as the precipitous discharge by the DMH psychiatrist and the "*pro forma*" interview of the inmate.  Unfortunately, the inmate was again seen by the same psychiatrist who did not provide a comprehensive psychiatric evaluation or an SRAC, but simply dismissed the RN's concerns regarding the inmate's safety, history, and impulsivity.  She stated that she "knew" the inmate and determined that he was a "malingerer," and therefore conducted a less than ten-minute interview and returned the inmate to his previous housing.

On 3/24/07, in response to the page to the B-1 clinic, the DMH psychiatrist interviewed the inmate and determined that the inmate was "malingering."  However, this was the same psychiatrist who wrote the admitting orders for the inmate to S-2 on 3/16/07, including continuation of his prescriptions of Seroquel, Prozac, Remeron, Benadryl, and Vistaril.  These medications were continued through his stay as well as after his transfer to the CDCR, indicating that he indeed was receiving anti-psychotic and anti-depressant medications despite the impression by the psychiatrist that he was "malingering" or suffering from an "Adjustment Disorder with Depressed Mood."  This was an abysmal failure of the role and responsibility of the DMH staff on S-2, particularly the psychiatrist, to perform the necessary and responsible assigned duties to properly evaluate any inmate, regardless of history and previous opinions, who presents as a potential or significant risk for self-harm or suicide.

The suicide report identified, with appropriate recommendations, the psychiatric evaluation service program, the actions of the psychiatrist, the follow-up by CMF staff, and the discharge of the inmate from ASH, as problems in this inmate's care and treatment.  At the time of this review, the Special Master has been informed that the psychiatric evaluation service program has been terminated.  It is unclear, however, whether or not other appropriate actions, particularly programmatic changes, communication issues, and personnel actions, were taken as corrective actions with regard to this inmate's death and to reduce the likelihood of similar deaths or unfortunate outcomes based on the egregious failures demonstrated in this case.

### 13. Inmate M

**Brief History:**

This inmate was a 32-year-old Caucasian male who committed suicide by hanging on 4/19/07 at the California State Prison, Los Angeles County (CSP/LAC). The inmate was a participant in the MHSDS at the 3CMS level of care and was double-celled at the time of his death. This was the inmate's first prison term, beginning on 9/15/05 after his being convicted of second degree murder and receiving an indeterminate sentence of 15 years to life. He was also convicted of evading an officer, causing death or injury (carrying a five-year sentence), evading an officer with willful disregard (carrying a three-year sentence), leaving the scene of an accident (carrying a four-year sentence), and driving without a license, which is a misdemeanor. He was also fined $71,004.00 in restitution fees.

On 4/19/07 at approximately 4:27 p.m., the inmate was discovered by a CO who was conducting cell feeding in his general population unit. The officer observed the inmate hanging from the upper bunk with a noose made from a state-issued sheet. The officer immediately yelled that there was a man down. A second officer activated his personal alarm device and responded to the cell. Additional officers responded to the cell, which was then entered. Two officers lifted the inmate's body up while a third officer utilized the cut-down tool to cut the noose from the inmate's neck. At about 4:28 p.m., the inmate was removed from the cell and officers checked for a pulse and breathing with negative results. The inmate was placed on a Stokes liter and was carried from the housing unit. As medical staff arrived, one of the officers started CPR. Medical staff placed an ambu bag on the inmate to continue rescue breathing while en route to the Facility D medical officer's office. At approximately 4:32 p.m., the inmate was placed inside the institutional medical transport vehicle and transported to the TTA emergency room, with CPR continuing en route. The time of arrival was 4:37 p.m. Paramedics were standing by in the emergency room and took over CPR until a doctor from Holy Cross Medical Center pronounced the inmate dead at 4:55 p.m. Reportedly, the unit had been on modified lockdown, and the inmate had been seen by an officer ten to 15 minutes prior to the opening of the food ports for unit cell feeding. The inmate had a cellmate who was at work at the time. An autopsy report was provided by the Department of the Coroner, County of Los Angeles. The autopsy was performed on 4/21/07. The cause of death was determined to have been hanging, and the apparent mode of death to have been suicide. A toxicology report was provided on 5/15/07 and indicated ethanol 0.13 g percent in femoral blood and ethanol 0.14 g percent in heart blood. It also indicated less than 0.10 ug/ml Mirtazapine and 0.52 ug/ml Paroxetine in heart blood.

The suicide report recounted the inmate's criminal justice history. It stated that the inmate was first arrested in 1993 at age 17 for being under the influence of a controlled substance, for which he was convicted and released to his parents. He had additional arrests and convictions for possession of a controlled substance, failure to appear, credit card fraud, driving with a suspended license, driving under the influence, writing bad checks, and possession of hypodermic needles and drug paraphernalia. The foregoing all

116

resulted in brief sentences in the county jail and/or probation. He also was given a mandatory drug treatment placement in 2002 as part of probation, but he did not attend.

The commitment offense occurred in 2003 at a time when the inmate had three active warrants for his arrest which were unrelated to the commitment offense. On 8/8/03, the inmate and his girlfriend, who would become his co-defendant, were in the process of traveling to buy drugs. A California highway patrol officer clocked the car as traveling at a rate of 90 mph, pursued them in a high speed chase, and called in the inmate's vehicle license plate. Ultimately, the inmate failed to stop at a posted stop sign and hit another vehicle. This resulted in the death of a nine-year-old girl at the scene and the injury of two other passengers in the other car. The inmate and his co-defendant fled the scene, but ultimately were caught and taken into custody on 8/9/03. The inmate was eventually found guilty of four felony counts and one misdemeanor charge, resulting in a sentence of 15 years to life, as stated above. On 9/15/05, the inmate entered the DVI RC for his first prison incarceration. He remained there until he was transferred on 12/22/05 to CSP/LAC, where he remained until his death on 4/19/07.

The inmate denied, and it did not appear from the record, that he had any history of mental health problems or mental health treatment prior to his incarceration in the county jail following his arrest on the commitment offense. When the inmate was transferred from Amador County to the DVI RC, he reported on the initial health screening, dated 9/15/05, that he was taking Buspar and that had an anxiety disorder. After that time, he reported that he was treated for anxiety attacks and depression. After he entered the CDCR, an MH-7 mental health assessment on 9/27/05 indicated a diagnosis of Major Depressive Disorder. The inmate was placed at the 3CMS level of care and was prescribed Buspar 10 mg twice a day, which was later changed to Paroxetine 20 mg per day. The inmate had no known history of suicidal ideation or suicide attempts prior to incarceration. He did report an extensive history of drug abuse beginning prior to the age of 17. His drug of choice appeared to have been methamphetamine, which he reported using daily for six months prior to the time of his arrest on the commitment offense.

After placement in the MHSDS at the 3CMS level of care, the inmate continued to report depressive symptoms including nightmares of the girl that he had killed, weight loss, and suicidal ideation with no plan or intent. On 11/19/05, the inmate sent a health services request form to see a psychologist or psychiatrist. The form was stamped as his having been seen by a psychologist on 11/22/05; however, there was no progress note in the record for that reported contact. On 11/25/05, he generated a second health services request form, stating that his medication was not working, that it was giving him a headache, that he was more depressed, that he was getting anxiety attacks, and that he was thinking about suicide. He requested that he see a psychologist or psychiatrist as soon as possible. On 12/1/05, he was seen by another psychologist who noted that the inmate's depression had worsened over the last three weeks and that he had lost parental rights to his children. The inmate also reported that he was being sued by one of the victims and that since these events had occurred, he had been thinking about hanging himself. The inmate reported that he would not hang himself, but he was described as "dysphoric and cheerful."

117

On 12/1/05, a very comprehensive SRAC was completed by a psychologist who stated that the reason for referral was to determine the need for a crisis program, with sources of information being the inmate and the UHR. The psychologist opined that the level of risk was moderate and that the plan was to refer the inmate to a psychiatrist. The psychologist also added comments that for the past three weeks the inmate had been having suicidal ideation with a plan (hanging) but no intent. The inmate also reported that he wanted to continue with psychiatric treatment and that he did not want to die. The psychologist made an immediate referral to the psychiatrist. The inmate was seen by a psychiatrist on the following day and his medication was changed. On 12/9/05, he was seen by a psychiatrist and psychologist,, both of whom noted that the inmate's depression had decreased and that he was looking forward to a transfer to CSP/LAC.

On 12/22/05, the inmate was transferred to CSP/LAC. On the initial health screening dated 12/22/05, when the inmate was transferred from DVI to CSP/LAC, he reported that he was taking Strattera for ADD, Vistaril for depression, and used an inhaler for asthma. He also reported having thoughts of hurting others in the past year. He was seen by a psychologist on 12/30/05 and again on 1/6/06. The psychologist noted that his depression was at a score of seven to eight on a scale of one to ten, and that his anxiety was at a score of nine on a scale of one to ten, presumably with the higher numbers meaning more intensity. An IDTT met with the inmate on 1/10/06. It diagnosed Adjustment Disorder with Mixed depression/Anxiety and reported the problem as mild anxiety. The inmate remained at the 3CMS level of care. He was noted as not having suicidality at the time. The next mental health contact was on 5/2/06, nearly four months after the IDTT meeting and the last psychologist contact, when his CCM described the inmate as "alert, cooperative, humorous," noted zero suicidal ideation, homicidal ideation, and auditory hallucinations, and that other mental status was within normal limits. The suicide report made reference to this note being "cursory and generic" with "no mention of treatment goals for his anxiety or depression, or any mention of treatment progress." He was next seen in July 2006 by a different psychologist who reported that the inmate denied suicidal or homicidal ideation, was not in distress, and was stable. On 7/8/06, the inmate sent a health services request form requesting that his Trazodone be discontinued because he continued to receive it, despite a psychiatrist having discontinued the order on 6/30/06. He was seen by a psychiatrist on 7/18/06 in response to this referral and his Paxil was increased. The psychiatrist noted the history of ADD, anxiety disorder, and Depression.

The inmate's next CCM contact was on 11/8/06, approximately four months after the previous contact in which the CCM saw the inmate for follow-up during a lockdown through the cell door and described the inmate as stable. The suicide report made reference to the inmate's contact having been rescheduled from 11/1/06, again past the 90-day limit for follow-up appointments, and stated that he was a "no show." The inmate sent a health services request form requesting emergency services and was seen on 12/4/06 by another psychologist who stated the inmate "was complaining that he had not received his Paxil," and that he was not suicidal or depressed but more worried about delay in medication delivery.

118

The inmate was seen by the IDTT on 1/18/07 for his annual mental health treatment plan. His mental status was described as being within normal limits and his problems were listed as "mood swings" and "anxiety." His diagnosis remained Adjustment Disorder with Anxiety, and his GAF was estimated at 65. The next day, the inmate reported to a psychiatrist that his anxiety had improved, but that he was having trouble sleeping. He was noted to be calm, cooperative, and stable. The suicide report made reference to the MHTS listing a contact with the inmate by his CCM on 12/11/06; however, there was no note in the record regarding that contact. On 2/6/07, the inmate's Paroxetine was increased to 60 mg q a.m. because of continued complaints of anxiety and depression. When he was seen the following day by a different psychiatrist to help him with his trouble sleeping at night, Remeron was added at 15 mg per night. He was last seen by a psychiatrist on 4/10/07, nine days before his suicide. The psychiatrist stated that the inmate reported that the medications were helpful and that he was "relatively stable with current treatment," with the decision to increase his Remeron. The inmate reportedly denied any suicidal ideation. His Paroxetine remained at 60 mg per day and his Remeron was increased to 30 mg at night; however, it appeared from review of the records that this order for the increase from 15 to 30 mg of Remeron at night was never implemented.

The inmate's last CCM contact was on that same day, 4/10/07. The CCM progress note consisted of five lines, consisting of the inmate's statement that "I'm doing okay;" objectives stating that his mood, affect, and speech were within normal limits; and statements that there was no homicidal/suicidal ideation, auditory hallucinations, or sleep/appetite problems. The inmates was assessed as stable, cooperative and polite, and the plan was to follow-up per 3CMS. The suicide report made reference to the progress note being "again cursory, and there is no mention of treatment goals or treatment progress." The suicide report reviewer referenced essentially all of the CCM notes as cursory and never mentioning any treatment goals or treatment progress regarding the inmate's depression and anxiety. The suicide report reviewer interviewed this CCM who reported that he had no memory of the patient, and that if he did see him on 4/10/07, it was at cell front because of a lockdown on his yard. The CCM went on to say that he would have to review the medical record to remember anything about this inmate, and that 4/10/07 was his first day back from his vacation. According to the suicide report and the medical record, the inmate was seen by this CCM five times between 1/10/06 and 4/10/07. The suicide report reviewer also interviewed custody staff who told her that even though the yard had been on lockdown, all ducats were being honored and therefore the inmate could have been seen out-of-cell.

The suicide report reviewer also interviewed the inmate's cellmate who reported he was surprised by the inmate's suicide because April 19 was his birthday, and that the inmate had given him a big hug and wished him a happy birthday prior to his going to work. The cellmate added that the inmate talked a lot about his father and his children and that he thought the inmate may have possibly committed suicide because he missed them. A letter, described as "positive," from the inmate's father was also found in the inmate's property. In this letter, the father repeatedly expressed his love for his son and wrote about his children's activities. The custody staff member who responded when the

119

inmate was discovered hanging reported that during resuscitation, the inmate "threw up and it smelled like inmate manufactured alcohol." This is consistent with the toxicology results.

A death/suicide review on Inmate M was provided by a physician but was undated. The inmate's medications and a synopsis of his past medical history of asthma and psychiatric treatment were reported, as were the key events leading to his death. The physician concluded that there were "no medical issues notified in this suicide review, code was run fine, no problems identified."

The suicide report identified three problems and recommendations, as follows:

> Problem 1: The MAR did not reflect the most current psychiatry order, and the inmate was being given just 15 mg of Mirtazapine at night instead of 30 mg as ordered on 4/10/07.
> Recommendation: Nursing and pharmacy staff at CSP/LAC must form a QIT to determine where the breakdown occurred in transferring the order correctly to the MAR, and revise local procedures to ensure that this problem does not occur in the future.
>
> Problem 2: There were problems with the provision of mental health services required by the Mental Health Program Guide: (a) the last CCM contact on 4/10/07 was conducted at cell front instead of in a confidential setting, which was reportedly available during the modified lockdown. Given that the previous CCM contact occurred during extended lockdown at cell front on 1/8/07, the patient should have been given a more appropriate and thorough clinical assessment on 4/10/07. (b) On two occasions, CCM 90-day contacts were delinquent by one month.
> Recommendation: The chief of mental health at CSP/LAC shall review any barriers to providing mental health contacts in a timely manner and in a confidential setting. Determine whether this is a systemic problem or was specific to the individual CCM, and report findings to Dr. [_____], chief psychologist, at the DCHCS.
>
> Problem 3: The CCMs' notes did not meet the standard of care. Treatment goals and progress were not addressed, and description of the mental status was generic and not consistent with documentation by other clinicians of his distress.
> Recommendation: Refer this clinician to the DCHCS PPEC.

On 4/29/08, in response to the suicide report dated 5/29/07, the director of mental health program, DCHCS and director (A) DAI issued their report on implementation of the QIP for the suicide of Inmate M. Within their report were documents provided by the warden and healthcare manager at CSP/LAC. With regard to Problem One, the minutes of a medication management pharmacy services committee meeting of 2/19/08 and the minutes of the suicide prevention committee meeting of 2/13/08 were provided. A final recommendation form regarding this inmate's suicide was also included. IST sign-in

120

sheets for training regarding referrals to mental health clinicians were included. The final recommendation form identified the purpose and goals of the QIT as (1) "To address the problems that currently exist with the medication delivery system when an inmate/patient movement occurs within our institution. This also includes updating the MAR when inmate/patient medication is ordered, changed, and/or discontinued." (2) "Create a check and balance system where the facility inmate/patient medication delivery protocol is maintained and accountability is ensured." Findings included a 12/7 medication management audit to look at medication dose changes that are received at the pharmacy by the end of the day following the order, and whether medication administration continues uninterrupted when inmates are transferred to other housing areas. For the first area, an 80 percent improvement for one month (100 percent total compliance) was reported. For the second area, a ten percent improvement for one month (60 percent total compliance) was reported.

With regard to Problem Two, the chief psychologist of the mental health program, DCHCS, stated that the chief psychologist at CSP/LAC completed an investigation into the potential barriers to providing mental health contacts in a timely manner and in a confidential setting. She stated that her findings indicated that this was a practitioner-specific problem and that CSP/LAC was addressing the issue with the practitioner in question.

With regard to Problem Three, the clinician in question was referred to the PPEC for a pattern of practice review, but was on medical leave at the time. It was further stated that if the clinician should return to work, her privileges would be suspended and she would not be assigned to provide patient care pending the outcome of the pattern of practice review. This memorandum from the chief psychologist of the mental health program was dated 10/31/07. A subsequent memorandum of 11/6/07 from the chair of the PPEC reported that the CCM was interviewed and was unable to recall anything about the inmate, although she had seen him five times for treatment planning and CCM contacts over the course of 16 months. The PPEC agreed that there was sufficient evidence of practice deficiencies to merit further investigation. The CCM was referred for a pattern of practice review, and further evaluation would be performed to assess imminent risk to patient safety. There was no further information provided with regard to the results of that further assessment.

**Findings:**

This inmate's suicide does not appear to have been foreseeable as he was not reporting suicidal ideation or intent of an imminent nature during the days to weeks prior to his suicide, although he did report chronic depression, anxiety, and periods of suicidal ideation. While his final diagnosis was Adjustment Disorder with Anxiety, review of the records indicated that he appeared to have a more serious Depression. There was very minimal comment regarding the inmate's ADD, although he was prescribed Strattera at different times during the course of his incarceration. This inmate's death may have been preventable, however, had he had appropriate and timely contacts with his CCM. The suicide report identified, and the PPEC supported the opinion, that the CCM did not meet

the standard of care for providing treatment to this inmate. Both made reference to the CCM being unable to remember the inmate despite sporadic and sometimes untimely contacts with him. The quality of the documentation only reinforces that this CCM did not adequately assess the inmate and therefore may very well have missed signs and symptoms of his increasing depression as well as his impulsivity, which ultimately may have contributed to his death.

**14. Inmate N**

**Brief History:**

This inmate was a 30-year-old Hispanic male who committed suicide on 4/25/07 by hanging in the administrative segregation stand-alone unit at CSP/Sac. The inmate was the sole occupant of the cell at the time of his death and was not a participant in the MHSDS. The inmate entered the CDCR on 4/17/01 via the WSP RC, having been convicted of murder and attempted murder and sentenced to 47 years to life in prison, which included significant sentence enhancements.

The inmate was discovered on 4/25/07 at approximately 6:34 a.m. by two officers distributing breakfast meals to inmates. As the officers approached the inmate's cell, they observed that the light was off and that the inmate was hanging from a light fixture with what appeared to be state-issued sheets. One officer notified control and requested a cut-down kit while the second officer activated the unit alarm. The first officer also obtained a Stokes liter and gurney and returned to the cell. Other officers arrived, the cell was entered, the inmate was cut down, and CPR began. The inmate had also tied knots from the state-issued sheets tied around his ankles and to his left wrist. At 6:37 a.m., the inmate was placed onto an emergency cart and transported to A-Facility for medical treatment. CPR continued with an ambu bag during transportation. At 6:45 a.m., staff continued to attempt to revive the inmate who had arrived at the TTA by that time. At 6:57 a.m., the inmate was pronounced dead by an RN. At approximately 7:01 a.m., emergency medical technicians arrived at the TTA and confirmed that the inmate did not have any vital signs. At 8:16 a.m., a physician examined the inmate and confirmed that he was dead. A suicide note was found in the inmate's property. It stated "I asked for help! And than I begged for help. And they cared not! For they left me here. And did not move me to a safe place. Even after all the help I was they left me here to get killed like some dog. When I was a father and a son. Prison workers don't care. But God does!" There was a hand drawn calendar of Sunday through Saturday with the dates for the 15th through the 24th crossed out and the 27th circled. A letter from his attorney dated 4/9/07 and reportedly received at CSP/Sac on 4/24/07, the day before his death, was found in the inmate's property. In the letter, his attorney notified him that the United States Supreme Court had denied their petition and that the federal judicial review process was closed. The attorney concluded that there was nothing more that he could do for the inmate.

On 4/26/07, an autopsy was performed at the Sacramento County's Coroner's Office. The cause of death was determined to have been suicide by hanging.

The suicide report recounted the inmate's criminal justice history. It stated that the inmate had been a member of a street gang called the Eastside Longos. The inmate reportedly had no juvenile criminal justice history. In November 1997, he had one adult offense of trespassing on property without consent, for which he was convicted and given one year probation and two days in jail. With regard to the commitment offense in January 1999, the inmate and another member of the Eastside Longos gang shot two Asian male adolescents, with one dying and the second surviving. The inmate was sentenced as noted above. The inmate appealed his conviction to the state supreme court and via the federal court system because he was tried with his co-defendant who was also implicated in a separate murder. After the inmate entered the CDCR via WSP, he was transferred to CSP/Sac on 7/3/01. The records did not contain documentation that the inmate had received a mental health evaluation (MH-7) while he was in the RC at WSP. He was transferred to the CSP/Corcoran SHU where he remained from October to December 2004, and was subsequently returned to CSP/Sac. The suicide report made reference to the inmate denying any history of mental health problems or treatment prior to his incarceration in the CDCR. The initial health screening and the initial mental health screenings performed at WSP were negative for any mental health history or mental health problems, and he was cleared for general population. He also was cleared on subsequent screenings, including on his placements in administrative segregation unit and in the SHU. The SHU mental health screening on 10/28/04 indicated that the inmate did not meet criteria for inclusion in the MHSDS and did not have any exclusionary condition. The inmate did not request mental health services during his commitment to the CDCR.

The inmate was placed in the administrative segregation unit at CSP/Sac on 5/5/04 after he assaulted another inmate in what was reportedly gang-related activity. This resulted in a SHU placement from 10/14/04 to 10/31/04 at CSP/Corcoran. He was then returned to the administrative segregation unit at CSP/Sac because of upcoming court dates related to his appeal. By 3/2/05, he was returned to general population. The inmate had multiple court visits from February 2005 to April 2006. On 4/16/07, he was transferred to the stand-alone administrative segregation unit for his safety because he had reported that he had been ordered by his gang to attack another inmate. The inmate was placed in protective custody where he remained until the time of his death on 4/27/07.

The suicide report concluded that all policies and procedures had been followed and that there were no recommendations. A death/suicide review of Inmate N was conducted by a physician, but the review was not dated. The conclusions/recommendations were: "no medical issues identified," "Case closed."

**Findings:**

This inmate's suicide does not appear to have been foreseeable or preventable. Although the suicide report identified no problems and made no recommendations, it was clear from the record that the inmate did not receive the mental health evaluation (MH-7) while he was at WSP. This was a failure in following policy. Initially, this reviewer was concerned that a nurse pronounced the inmate dead and that CPR was stopped while the

inmate was in the TTA. However, the note by the nurse indicated a timeline with the inmate arriving at the TTA at 6:45 a.m. with CPR in progress and oxygen being administered. At 6:53, the nurse noted "spoke with Dr. [___] via phone, orders given to give Epi, if remains in asystole to end CPR." The next line is timed at 6:55 a.m. and stated that "CPR was suspended after Epinephrine was given, and the monitor demonstrated asystole with no pulses and no respirations. Dr. [____] notified via phone. Code called." The order from the physician that the code was called was signed by the RN. Given the communication with the physician, it appears that the RN was acting on the orders of the physician and suspended CPR based on those orders. The technical pronouncement of death should have been reported as the time when the physician arrived at 8:16 a.m. and reaffirmed that the inmate was indeed dead.

## 15. Inmate O

### Brief History:

This inmate was a 30-year-old Native-American male who committed suicide on 4/26/07 by hanging in his RC cell at HDSP. The inmate was the sole occupant of the cell at the time of his death. He was a participant in the MHSDS at the 3CMS level of care. The inmate entered the CDCR on 3/11/99 for a diagnostic evaluation at the HDSP RC and was returned to the county on 4/15/99. Initially, he had been granted three years' probation on his commitment offense of grand theft of a firearm on 6/1/98. However, he violated probation and was returned to the CDCR after a diagnostic evaluation on 5/13/99 to serve a three-year term.

The inmate was discovered on 4/26/07 at 8:35 a.m. by a LVN who was distributing medications in the RC building. When she approached the inmate's cell, she saw the inmate hanging from the top bunk, unresponsive. The nurse yelled that there was a medical emergency and the control booth officer activated the building alarm. A sergeant and two officers responded to the cell. The sergeant kicked the door to arouse the inmate, ordered the door opened, entered the cell, and cut the ligature, releasing the inmate's body and lowering him to the floor. The inmate was pulled out onto the tier, the noose was cut, and an RN and two LVNs assessed the inmate and began CPR. The emergency van had been called and when it arrived, the inmate was placed on a Stokes liter with a cervical collar and was transported to the CTC with CPR continuing. He arrived at the CTC at 8:45 a.m. and was given advanced life support measures. These efforts continued until 9:19 a.m., when a staff physician pronounced the inmate dead. After his discovery, a poem that he had written was found in his property. It appeared to be entitled "Death on the Wind!" and had five stanzas, with indicated themes of death and dying including, "it couldn't really hurt to die, no more than it hurts to live, the people left always cry, when there's nothing to given." There were also references to "death is just a final sleep," and "to know death is to know the wind, that whispers through the trees," and "death is just another friend, blowing in the breeze." An autopsy report was provided by the Washoe County Medical Examiner/Coroner. It stated that on 4/27/07, the autopsy was performed and identified the cause of death as asphyxia due to hanging. A toxicology