study was performed and indicated that there were no common drugs of abuse in the peripheral blood specimen.

The suicide report recounted the inmate's criminal justice history, reporting an extensive criminal history beginning when the inmate was ten years old. The report identified eight recorded arrests as a juvenile, ranging from being a runaway to possession of an illegal weapon, resulting in probation and/or group home or foster placements. The inmate reported that prior to his first prison term, he had had seven adult arrests that were related to his drug addiction. The drug addiction he described included daily use of two ounces of methamphetamine, as well as use of heroin, LSD, marijuana, and alcohol. The inmate's commitment offense involved his receiving three years' probation and a 180-day county jail sentence on a conviction of grand theft of a firearm in June 1998. He violated this probation and was arrested on 12/23/98. He was remanded to HDSP for a 90-day diagnostic evaluation and subsequently returned to county jail in April 1999 with the recommendation of a three-year prison term. That three-year prison term began on 5/13/99 for his first CDCR incarceration via the HDSP RC.

The inmate paroled on 1/24/01, was re-arrested in June 2001 for possession of methamphetamine and a hypodermic needle, and returned to prison 10/19/01 via the DVI RC. The inmate paroled a second time on 1/5/02, again violated his probation by failing to appear, and was re-arrested on 3/23/02 after he had broken into a residence. He returned to custody on 6/5/02 and received a new sentence of four years and eight months for the possession of drugs and drug paraphernalia and residential breaking and entering offenses. Initially the inmate was placed at the California Rehabilitation Center (CRC) in June 2002, was sentenced in November 2002, and was transferred to SVSP on 4/24/03.

The suicide report made reference to the inmate paroling five additional times and that each time, he violated the conditions of parole, with his final return to prison on 1/4/07 with an anticipated release date of 5/29/07.

The inmate reported a long history of mental health problems including his having been placed on social security disability for a mental disability at the age of 12. He reported a diagnosis of ADHD and treatment with Ritalin. He also reported attempting suicide, twice by hanging and once by cutting his wrists during his childhood, although the ages are unclear. He also received past psychiatric treatment as both an inpatient and outpatient at the U.C. Davis Medical Center, Saint Mary's Hospital, Flathead Mental Health Clinic, and Tehama County Mental Health Clinic. According to the records reviewed, the inmate's drug addiction and alcoholism were major challenges throughout his life, beginning when he was a young adolescent. During his 90-day evaluation prior to his incarceration in 1999, he was noted to have been extremely fearful of going to prison. There were concerns that he might kill himself.

Despite this remarkable history, on 5/17/99 at HDSP, the inmate received a mental health screening that indicated no mental disorder. He was cleared for general population with transfer to CCC. In September 1999, he was referred by staff and placed on suicide watch because of his crying, reporting of suicidal ideation, and fear of other inmates. He

remained on watch for two days but was returned to general population. During his stay at CCC, he had two additional infirmary admissions because of depression, agitation, and suicidal ideation based on fears of his cellmate. Curiously, despite these multiple admissions, his reported suicidal ideation, and his past history, he was not placed in the MHSDS "until he paroled," according to the suicide report.

In October 2001, he was returned to prison for a parole violation and was included in the MHSDS at the 3CMS level of care. This placement was based on an evaluation that took into account his past history, and his having been prescribed Wellbutrin, Depakote, and Buspar while he was in the county jail. He was diagnosed with Bipolar I Disorder and these medications were continued. He remained in the 3CMS level of care throughout his returns to prison, sometimes as medical necessity, and had diagnoses of Bipolar I Disorder, Polysubstance Dependence, Borderline Personality Disorder, and Antisocial Personality Disorder. He was ultimately placed on SNY status based on his fear of other inmates. The inmate's presenting complaints resulted in very brief MHCB admissions or Outpatient Housing Unit (OHU) admissions, based on his safety concerns, agitation, withdrawal from drugs, and depression and crying with associated suicidal ideation. By March 2006, his medications included Depakote and Seroquel. In June 2006, he reported suicidal ideation, but subsequently told a clinician that he was not suicidal but was manic, which the suicide report stated that he appeared to be. The suicide report also noted his need for medication. That same day, he was seen by a psychiatrist to increase his medications and he reported improvement. He was then paroled in July 2006, only to be returned nine days later and admitted to an OHU for three days because of suicidal ideation. He was transferred to SVSP on 10/4/06. His medications were changed to Depakote and Buspar, and he was considered for EOP level of care, but he was not placed at that level of care.

Several SRACs were completed during this admission. An SRAC by a psychiatrist on 6/13/05 at HDSP was remarkable as it contained almost no information such as the reason for the evaluation, sources of information, any risk or protective factors, and evaluation of imminent risk. Comments were nearly illegible but made reference to agitation. The history indicated "coming off meth run." An SRAC completed by a social worker on 6/14/05 to assist with discharge planning for the MHCB program was remarkable in that sources of information did not include the inmate interview or staff interview, and the UHR and C-file were circled as "unavailable." The assessment was incomplete and did not identify any history of suicidal ideation or threats in the past. However, it did identify dynamic risk factors such as the inmate having affective instability or lability, having significant impulsivity, and being fearful for safety. The evaluation of imminent risk was "low risk." The inmate was discharged to 3CMS level of care with referral to clinician/case manager and psychiatrist. He was discharged with no medications. Five-day follow-up was to be conducted.

On 10/13/05, an SRAC was completed to determine the need for referral to a crisis program. Sources of information were identified as the inmate only. It also noted "no chart" and stated "not admitted" regarding suicidal ideation/threats in the past. The only dynamic risk factor identified was "anxious, agitated." However, "fearful" was crossed

out, the evaluation of risk was determined to have been negligible, and the plan was that no referral was needed. Comments included that the inmate was angry that he was not allowed to have two phone calls to tell his grandfather where he was, and that he denied current suicidal ideation. In his initial health screening form, dated 7/21/06 when the inmate was transferred from the county to DVI RC, he said that he was being treated for "Bipolar" and ADHD, and he indicated that he was thinking of committing suicide and had attempted suicide in the past.

On 7/21/06, an SRAC was completed by a psychologist at DVI. It was complete except for the only source of information being the inmate interview. The psychologist evaluated the level of risk as "high risk" and the inmate was admitted to the OHU.

The last treatment plan in the record was dated 10/25/06 and indicated diagnoses of Bipolar I (by history), ADHD predominantly hyperactive impulsive type, Polysubstance Dependence, and Antisocial Personality Disorder. The plan was to continue him at the 3CMS level of care and to change his medications from Seroquel to Depakote. The inmate paroled on 12/15/06.

Less than a month later, on 1/4/07, he returned to prison via HDSP. He reported suicidal ideation and saw a psychiatrist to whom he said that he needed to have his medications re-ordered.

An SRAC was completed by the psychiatrist on 1/8/07 to determine the need for a crisis bed and to formulate treatment planning. The SRAC identified the sources of information as CO or staff interview and inmate interview. It was complete and indicated a moderate risk for suicide. The plan was to refer the inmate to a psychiatrist for medication review with comments, "doctor I just need my meds re-started. I'm not suicidal." The psychiatrist also wrote a progress note stating that the inmate had been seen on an emergent basis and that he told the psychiatrist that he was Bipolar and needed his Depakote and Buspar reinstated. The psychiatrist did a complete mental status examination and assessed the diagnosis as Bipolar Disorder. The inmate denied acute suicidal ideation. The plan was to reinstate Depakote and Buspar and laboratory studies were ordered, including a Depakote level after five days. An RC mental health evaluation (MH-7) was completed by a psychologist on 1/12/07 and indicated diagnoses of Substance Induced Mood Disorder, Polysubstance Abuse, and Antisocial Personality Disorder. The plan was for the inmate to be placed in the 3CMS level of care with case management services as needed, and for psychiatry to assess needs based on medications for this inmate, with evaluation follow-up as needed. This reviewer could not locate any CCM notes after the RC mental health evaluation in 2007. The inmate was seen by a psychiatrist on 1/24/07 for medication follow-up. The psychiatrist indicated that the chart was reviewed and assessed the inmate as having Bipolar II with psychotic symptoms and Antisocial Personality Disorder by history. The psychiatrist stated that the inmate was not suicidal or violent, increased his Depakote, and continued Buspar.

His medications were renewed on 3/30/07, which appears to have been his last mental health contact. A note by a psychiatrist dated 3/30/07 stated that the inmate, except for

reporting difficulty sleeping and that he was tired all day, was doing well on Depakote 1500 mg per day and Buspar 60 mg a day. The inmate was oriented, rational, euthymic but tired, and had no evidence of psychosis. The plan was to add Remeron 45 mg at p.m.

There was a SVSP psychiatry progress note in the record with the inmate's name and date of birth, but it was not completed, signed, or dated. Despite his being at the 3CMS level of care, there did not appear to be CCM notes in the record after his return to prison on 1/4/07 and prior to his death on 4/26/07. He did, however, have a pre-parole placement on 4/17/07 with a social worker. His anticipated parole date was 5/29/07, approximately six weeks after the pre-parole placement interview.

It did not appear from the record that his Adult ADD was identified as a diagnosis in his later returns to prison, nor was there any particular treatment plan or medication prescribed for this disorder.

His medications at the time of his death were Depakote 1500 mg per day, Buspar 60 mg per day, and Remeron 45 mg per day. However, the MARs indicated that there were times when he missed his morning medications of Depakote and Buspar. The MAR for April 2007 indicated that Buspar had been prescribed from 3/26/07 to 4/9/07 and that the inmate had refused or "no-showed" for his morning medications on 4/2/07. There were no initials for April 4, 10, or 16 for Buspar or Depakote. His Remeron was ordered from 4/2/07 to 7/1/07 and he appeared to have received it every evening in April until 4/25/07, the day before his death.

In addition to treatment for mental illness, the inmate was also being treated for back pain secondary to scoliosis, asthma, and Hepatitis C.

The suicide report made reference to the inmate having 20 RVRs between July 1999 and August 2000, prior to his first parole, including violations for mutual combat, oppositional conduct such as refusing to work or not following orders, and disrespect for staff. At the time, he was not in the MHSDS and he was not receiving medications. There were also unverified reports in the C-file of his having been assaulted by other inmates, but he had reported that two different gangs had targeted him for a hit and that he was fearful for his safety. During his last prison stay, he was placed in a section of a building at HDSP which the suicide report stated was informally considered by staff as an "SNY" (sensitive needs) section of the building. He reportedly identified with two other inmates in that building as Native-Americans, although the records indicated that he frequently identified as Caucasian. The inmate had been double-celled, but his cellmate paroled in the days prior to his suicide.

The suicide report made reference to an ISU sergeant stating that on the day of his suicide, the inmate had not gotten up to receive his lunch bag prior to the breakfast meal being distributed, and then once he had received his breakfast tray, he refused to give it back. He was subsequently handcuffed and removed from the cell, and officers removed the tray. The report, however, stated that it was unclear why he was handcuffed, since RC inmates are allowed to come out of their cells without being handcuffed. When he

was placed back in his cell, the inmate reportedly resisted officers who were removing the handcuffs, started yelling "man down," and reportedly "may have threatened suicide." The control officer was interviewed by the suicide reviewer. He reportedly told the reviewer that the inmate had yelled "man down," then stood at the window for about 15 minutes, and was last seen by the control officer at 8:10 a.m. The inmate was discovered hanging at 8:35 a.m. Another inmate who was housed in a cell on the same tier, diagonally across from this inmate's cell, reportedly told the suicide reviewer that after the inmate was placed in his cell, he called out "man down, I'm gonna kill myself." He allegedly repeated this four times, but staff did not respond. The same inmate reported that after the inmate was taken out of his cell and returned, a lieutenant allegedly stated "throw that piece of shit back into the cell." The suicide reviewer also opined that "it appears that he impulsively decided to carry out his threat of suicide because he had been ignored. He may have felt that he did not have much to live for, but perhaps he found something to die for. His neatly printed poem suggested that he saw death as a release."

The inmate sent multiple health care services request forms to mental health because of concerns regarding his medication running out, side effects from medications, and requests for changes in medication. He reported symptoms of anger, frustration, hearing voices, and depression. Several of the MARs had blanks for various medications, particularly a.m. medications, but also p.m. medications, including Buspar and Seroquel. However, he appeared to be generally compliant with his medications during his last incarceration.

The suicide report identified one problem and recommendation as follows:

> Problem:  On the morning of the suicide, an officer allegedly threw the inmate's lunch off the tier when he did not come to the door quickly enough to retrieve it. The lieutenant allegedly stated "throw that piece of shit back into the cell" after the inmate called for help.  The inmate reportedly called "man down" and allegedly threatened to kill himself.  If this is true, he should have been placed into a holding cell and an emergency mental health referral been made.
> Recommendation:  Conduct a fact-finding into these events and determine whether any corrective action needs to be taken.

A suicide death review was conducted by a physician on 5/21/07.  The inmate's medical history was summarized and the physician concluded that "there were no significant medical quality of care issues identified in review of the patient's chart."

On 9/17/07, the director of the mental health DCHCS and director (A) DAI issued a memorandum with the subject "Incomplete Implementation of Quality Improvement Plan for suicide" of Inmate O.  In their memorandum, the directors stated that the QIP requested a fact finding inquiry regarding several aspects of alleged staff misconduct which were detailed in the suicide report.  However, the response from the institution "focused exclusively on whether the inmate stated that he would kill himself.  The other issues were not addressed."  HDSP was directed to submit a report addressing the remaining issue of staff misconduct upon receipt of this memorandum (dated 9/17/07).

Included with the director's memorandum was a memorandum from the warden of HDSP dated 8/1/07 which provided a synopsis investigation and interviews of various inmates, including interviews of approximately 24 inmates, most of whom reported that they heard an inmate yell "man down," while some reported they heard an inmate yell "I need help up here" or "I need to talk to a psych." Some of the inmates reported hearing this inmate kicking the doors and various officers stating in response to the inmate, "the only thing down is your pride," "the only thing down is your peter," "medical emergency," "cut down staff," "the only thing down is your pee pee," "the only thing down is the TV," "the only thing down is you," "push your alarm three times we have a hanger," "it is easy to falsify a report," "will get right on it." After reviewing all of the documentation concerning the suicide, the fact-finding inquiry ISU lieutenant concluded that there were only two inmates who reported that the inmate had told staff that he was going to kill himself. "However all the other inmates in these cells did not report hearing inmate ____ yelling out that he was going to kill himself except inmate _____." The lieutenant stated that in his opinion this inmate did not inform staff that he had intentions of committing suicide, as there was no reliable documentation of this fact. The lieutenant went on to state that the involved staff "has received formal training in the area of suicide detection and prevention. This training is conducted annually." The recommendation of ISU was that no further action be taken in this matter at this time.

On 10/18/07, the directors issued their report on the implementation of the QIP for the suicide of Inmate O, which included the memorandum of 9/17/07 and stated that the chief of mental health at HDSP sent an e-mail reporting that an inquest into the alleged staff misconduct was forwarded to the Office of Internal Affairs for an investigation. The memorandum went on to state that the investigation would be tracked to completion by the suicide review coordinator at the DCHCS and added that "this completes the institution's response to this suicide." There was no additional information provided with regard to any further ISU investigation or results, nor any information from the suicide review coordinator at DCHCS regarding this inmate's suicide.

**<u>Findings</u>:**

This inmate's suicide may have been both foreseeable and preventable. The inmate had a mental health history of impulsivity, suicidal ideation and statements, and past admissions to crisis bed or OHU housing because of indications of suicidality. Also, the inmate was being treated by mental health staff for a Mood Disorder and appeared to have been compliant with his medications. The events that took place on the morning of his suicide indicated that the inmate did make statements, including "man down," and references at least to his possibly wanting to kill himself. Despite this, an ISU investigation concluded that there was no need for further investigation and no actions required. This conclusion was based on custody staff having been trained in suicide detection and prevention, and a conclusion that the statements of other inmates were unreliable or inclusive because only two made reference to the inmate stating that he wanted to kill himself. The directors of the mental health program and DAI found the facility response unacceptable on 9/17/07 and directed a further review. The response from the facility as reflected in the directors' memorandum of 10/18/07 was that the

matter had been referred to the Office of Internal Affairs and that tracking of the completion of the investigation would be done by the suicide review coordinator at DCHCS. As of the time of this report, there was no further information provided by the directors regarding completion or results of this further investigation. The inmate apparently committed an impulsive act. However, in his property (on his desk in his cell) was a poem that was referenced in the suicide report. It was not a suicide note, but it was reflective of the inmate possibly seeing "death as a release." This inmate apparently had made statements that should have resulted in his being observed by custody staff and an emergency referral to mental health being initiated. Neither of these preventive measures had taken place by the time the inmate was discovered hanging approximately 25 minutes after he was last seen, according to the statement of the control booth officer.

The suicide report made reference to the inmate's multiple returns from parole violations to the CDCR. It appeared from the record that after his final return to custody, he received a mental health RC evaluation (MH-7) and multiple visits by psychiatrists regarding his medication. The record did not indicate that he had any CCM contacts after the RC evaluation from January 2007 through the time of his death on 4/26/07. This was not identified as a problem in the suicide report, but appeared to be a clear deviation from policy requirements. This inmate apparently committed suicide approximately six weeks prior to his release date. Based on his history and a review of the records, it appears that his suicide was an impulsive act that was causally related to the events that took place on the morning of his death, and that there were failures to take preventive action based on his statements to custody staff.

## 16. Inmate P

**Brief History:**

This inmate was a 50-year-old Hispanic male who committed suicide by hanging in the administrative segregation unit at Avenal State Prison (ASP) on 5/23/07. At the time of his death, the inmate was the sole occupant of the cell and was not a participant in the MHSDS. The inmate entered the CDCR on 12/14/93 via the RJD RC for his first prison term. The inmate had been found guilty of first degree murder and sentenced to 25 years to life plus a one-year enhancement. His minimum earliest parole date was 10/8/10.

The inmate was discovered on 5/23/07 at approximately 7:18 a.m. by a CO who was collecting food trays from the second tier in the administrative segregation unit. The officer knocked on the door and asked the inmate if he had received a tray, but did not get a response. The officer proceeded to knock on the door several times and became concerned after not getting a response. The officer notified the administrative segregation unit sergeant that the inmate was not responding to his commands. The sergeant notified an LVN and RN that there was a possible man down on the unit. The sergeant ordered the officer to take the second tier "B" side off deadlock. The officer retrieved the bar box key from the administrative segregation unit control officer, and ran back upstairs to take the "B" side off deadlock. The sergeant and another officer entered the inmate's cell and observed the inmate seemingly lying on his bunk, with his feet

towards the back of the cell. The sergeant attempted to wake the inmate by touching his shoulder and shaking him while calling his name; however, the inmate did not respond. The sergeant pulled back a bed sheet that was covering the inmate, exposing the inmate's head and shoulder area. The inmate's head was up against the wall and he appeared to have a makeshift noose around his neck that was attached to the steel support of the upper bunk. The sergeant ordered an officer to get the cut-down kit; that officer ran down the stairs and retrieved the cut-down kit from the administrative segregation unit control officer. The officer tossed the cut-down kit to the sergeant who then used the cut-down scissors and cut the noose. An RN assessed the inmate's medical status and attempted to initiate rescue breathing, but was unable to do so due to the inmate's swollen, protruding tongue. The nurse and a second nurse told the sergeant that the inmate needed to be transported to the OHU and the sergeant ordered officers to carry the inmate downstairs, utilizing the inmate's mattress. The inmate was carried downstairs and out of the back door to await a transporting vehicle. The inmate was then taken to the OHU TTA where medical staff attempted to revive him. However, there efforts were unsuccessful and a physician pronounced the inmate dead at 7:39 a.m. According to the suicide report, the inmate arrived at the TTA at 7:25 a.m. Medical staff began CPR with 100 percent oxygen and cardiac compression, apparently seven minutes after his discovery. However, his airway was closed and rigor mortis was evident. An autopsy report was provided by the Kings County sheriff's office. It stated that the autopsy was performed on 5/24/07 and it determined the cause of death to have been ligature hanging (minutes). A toxicology screen was negative with the exception of morphine at 29 ng/ml.

The suicide report recounted the inmate's criminal justice history, reflecting that he had no history of juvenile arrest. According to the report, his first arrest was at age 18 for possession and use of false evidence of age. This was followed by arrests in 1976 and 1977 for drunk driving when the inmate was approximately ages 19 and 20. He was also arrested for disturbing the peace and exhibiting a deadly weapon (knife), and received a 90-day stay in jail and probation. During this time, he was also arrested for possession, manufacture, and sales of dangerous weapons, and for giving false information to a peace officer. He was sentenced to 14 days in jail, according to the suicide report. Later in 1977, he was arrested for assault with intent to commit rape, use of marijuana to induce a minor, and assault on a police officer, but those charges were dismissed for insufficient evidence. According to the suicide report, from 1977 through 1980, he had 14 additional arrests for similar crimes, including exhibiting a deadly weapon, disturbing the peace, drunk driving, possession of a controlled substance, driving on a suspended license, trespassing, reckless driving, and petty theft. For all of these, he received either fines or jail time. According to the suicide report, the inmate was wanted in California for a murder that occurred in April 1980. He was arrested in December 1992 in Marion, Illinois for growing marijuana when the outstanding warrant was discovered and the inmate was returned to California to face the murder charges. The inmate's commitment offense was the murder, in which he reportedly stabbed the victim 11 or 12 times after the inmate approached him for money, ultimately resulting in the victim's death by stabbing. The inmate was found guilty of first degree murder on 12/14/93.

After the inmate entered the CDCR at RJD in December 1993, he was transferred to Centinela State Prison (Centinela) on 1/19/94.  He remained in population until 6/12/96 when he was placed in administrative segregation pending his transfer to SVSP.  He was transferred to SVSP on 6/14/96 and returned to RJD on 8/7/97.  He was subsequently transferred to Folsom State Prison (Folsom) on 4/24/01 and ultimately to ASP on 4/20/04.  He remained in population at ASP until 5/21/07 when he was placed in administrative segregation because of his reporting concerns for his safety.

According to the suicide report, the inmate apparently participated in Alcoholics Anonymous and Narcotics Anonymous groups, a child abuse prevention walkathon, and a number of other positive activities including vocational work or school.  With respect to the foregoing, he entered the CDCR at a Level IV, and at the time of his death he was in a Level II prison with a 19-point custody score.  The inmate had also passed random urine drug tests, except in September 2006 when he failed a urine test.  In January 2007, he refused a urine test and received an RVR for his refusal.  He again refused a random urine test on 3/28/07, received a second RVR, and lost his job.  According to the suicide report, the inmate had been interviewed by the ISU because there was a suspicion of drug use.  The investigation determined that the inmate was addicted to heroin while he was in prison, and had spent over $22,000 dollars on heroin after his father died in April 2006.  His heroin use apparently contributed to his refusals of random urine specimens and ultimately the inmate's request to be placed in protective custody and cooperate with the investigation.  On 5/21/07, the inmate was ultimately placed in the administrative segregation unit on protective custody status.  The investigation by ISU was recounted in the suicide report and indicated that the inmate may have been in debt for about $10,000 dollars at the time of his death.  The suicide report referenced communications with ISU and other staff, but suggested that the inmate had attempted to detoxify himself from heroin on a number of occasions and was unsuccessful, ultimately resulting in his decision to end his life.

The inmate reported that he had no history of mental health treatment prior to his incarceration in the CDCR.  He also denied alcohol or drug problems prior to incarceration.  In April 1995, a psychologist at Centinela diagnosed him with Major Depression Single Episode Moderate and Alcohol Dependence in Institutional Remission.  This was related to complaints of poor sleep, appetite, concentration, anergia, and irritability related to marital problems and the stress of his incarceration and appeal.  He was prescribed Vistaril in response to these issues.  He received initial health screenings when transferred from one institution to another, as well as a Board of Prison Terms evaluation by a psychiatrist (September 1998), and administrative segregation unit mental health screening.  All of the foregoing indicated that, after his inmate-generated health care services request in 1995, he denied current mental health problems or the need for mental health treatment throughout his incarceration.  The inmate did report lower back pain and chronic knee pain as medical problems, and was treated with Celebrex, Robaxin, Motrin, and Ultram, and was given a lower bunk chrono at various times during his incarceration.  He was also treated for a chronic left wrist fracture in April 2007 and was ultimately given Rifampin, Bactrim, and Ibuprofen for the associated pain and infection.

The suicide report stated that "it appeared that all policies were followed, and there are no recommendations specific to his case." The report further stated that during the upcoming training for pre-screening for administrative segregation unit placement, nurses would be reminded to consider drug debt and drug detoxification among the issues that could precipitate depression and suicidal thinking.

A death review summary template was completed regarding this inmate's suicide and determined "no problems identified" and "case closed." In various documents including the inmate death report, the inmate was noted to have lividity and rigor.

On 8/6/07, plaintiffs' counsel wrote a memorandum regarding the death of this inmate which occurred two days after he was placed in the administrative segregation unit at ASP for protective custody reasons. Plaintiffs' counsel reported the following concerns about the suicide review: (1) The description in the incident report was recounted and plaintiffs' counsel asserted that, as a new admission to the administrative segregation unit, the inmate should have been on "intake status," and in accordance to CDCR administrative segregation unit policy, he should have been provided with 30-minute welfare checks. Counsel continued on, stating that the suicide report failed to discuss this fact and made no mention of whether he was identified as an inmate on intake status. Counsel also stated that the suicide report failed to discuss whether required 30-minute welfare checks were provided and their adequacy, if they had been provided. Counsel continued on, stating that "the evidence in the record clearly shows" that this inmate "was not provided with living, breathing checks every 30 minutes while housed in the ASU; he had been dead for hours when he was found." Plaintiffs' counsel concluded, "it is quite disturbing" that the suicide report failed to address these critical elements of the CDCR administrative segregation unit suicide plan. They requested that an addendum to the 7/27/07 suicide report be prepared, as well as a report on whether COs within the administrative segregation unit placed the inmate on intake status and provided him with 30-minute welfare checks. They requested that "if deficits are found, CDCR should make recommendations which include a Quality Improvement Plan and requires supporting documents."

**<u>Findings</u>:**

This inmate's death does not appear to have been foreseeable as he did not report suicidal ideation or intent or other intent to harm himself in the days to weeks prior to his death. However, his death may have been preventable had his suicide attempt been discovered in a more timely manner, based on the requirement for 30-minute welfare checks to determine if the inmate was indeed breathing and alive. Although it is not clear what time he actually fashioned and applied the noose resulting in his death, the timeliness and quality of 30-minute welfare checks is certainly in question, given that the review revealed that he had dependent lividity and was in rigor mortis, which prevented initial efforts at rescue breathing after the inmate was discovered. In addition, the death review provided by a physician as part of the death review summary did not appear to take into account the requirement for 30-minute welfare checks and the association of these

welfare checks with the inmate's having been discovered with dependent lividity and rigor mortis. Further, CPR was not provided by first responders, which was not identified as a problem.

While the inmate was not a participant in the MHSDS and had not been during his incarceration, he did have a number of stressors. These stressors included his admitted heroin addiction, his attempts to detoxify from heroin, and his requests for placement in protective custody and in an SNY due to his cooperation with an investigation into the drug trade at ASP. Of concern is that the inmate was discovered with lividity and rigor mortis in an administrative segregation unit, where frequent checks are the required rule. There was no recommendation in the suicide report regarding the quality and comprehensiveness of the checks conducted in the administrative segregation unit.

## 17.  Inmate Q

### Brief History:

This inmate was a 31-year-old Caucasian male who committed suicide by hanging on 5/28/07 in the MHOHU at CSP/Sac. Prior to his transfer to the MHOHU, the inmate had been a participant in the MHSDS at the 3CMS level of care. He was single-celled at the time of his death. The inmate entered the CDCR via the NKSP RC on 5/19/06. He had been convicted of arson of an inhabited dwelling with a three-year prison sentence and a five-year enhancement for another arson conviction, for a total sentence of eight years. The inmate's earliest possible release date was 12/1/12.

The inmate was discovered in the MHOHU on 5/28/07 at approximately 4:44 p.m. by two officers who were picking up the evening meal trays. The inmate was on suicide precautions at the time (q 15-minute checks). When the officers arrived at the cell, they saw the inmate hanging from a rope with a noose around his neck. The rope was fashioned from what appeared to be a strip from a suicide blanket that had been tied to the cell's air vent. One officer activated his personal alarm and the other officer called for the cut-down kit. A floor officer retrieved the cut-down kit from the control officer and responded to the cell. The three officers then ordered the cell door opened, entered the cell, cut the noose with a cut-down tool, and lowered the inmate to the cell floor. They checked for a pulse and breathing. When no breathing or pulse were found, the officers began CPR (chest compressions and rescue breathing). The inmate was placed on a Stokes liter, carried out of the cell to a rolling gurney, and taken to the B-Facility clinic. CPR was continued throughout the transfer to the clinic. Once in the clinic, an officer retrieved the AED, applied the pads, turned on the device, and proceeded. The efforts to revive the inmate continued in the B-Facility clinic under the guidance of an RN, LVN, a licensed psych tech, and with the assistance of the officers. At 5:22 p.m., the Folsom Fire Department Paramedics arrived and at 5:25 p.m. the inmate was pronounced dead.

The time sequence of events was provided in the incident reports. They described the inmate as being discovered hanging in his cell at 4:44 p.m., with the alarm being sounded

and staff responding at 4:48 p.m. to enter the cell, cut the inmate down, and begin CPR (a period of four minutes). The inmate was removed from the cell at 4:50 p.m. and arrived at the B-Facility clinic at 4:52 p.m. The call for the ambulance was not put out until 4:55 p.m., with arrival at 5:22 p.m. Ultimately, a determination was made by the paramedics that the inmate was dead and CPR was terminated at 5:25 p.m. There was no autopsy report provided, but the suicide report made reference to officers from the institution observing the autopsy. The suicide report stated that suicide by hanging was given as the preliminary cause of death.

The suicide report recounted the inmate's criminal justice history. It stated that there was no available information regarding his juvenile criminal history, and that he denied any juvenile history at the time of his arrest on the instance offense. His adult criminal history began on 12/3/95 and involved carrying a concealed weapon. He had subsequent arrests/convictions for carrying a concealed weapon, reckless driving, making a false report of an emergency, possession of marijuana, arson, theft, and threatening crime with intent to terrorize. For all of the foregoing, he received either probation or county jail time. The commitment offense occurred on 4/13/05, when the inmate set fire to a house because he reportedly was upset with the owner of the property. There were three people in the house at the time, including an elderly individual who suffered smoke inhalation. Several months later, the inmate admitted to the Long Beach Police Department that he had started the fire. He was arrested on 11/11/05 and subsequently sentenced on 4/14/06 to three years in prison for the crime of arson of an inhabited dwelling, plus a five-year enhancement for a previous arson conviction, for a total of eight years.

Prior to his incarceration, the inmate had a history of mental illness and treatment in the community, including several inpatient psychiatric hospitalizations. He had been diagnosed with Bipolar Disorder and had been prescribed psychotropic medications. He had a history of suicidal behavior including being committed as a danger to self in July 2005 and reportedly jumping off a freeway bridge in a suicide attempt in November 2005. When he was transferred from the Los Angeles County Jail, the transfer summary stated that the inmate had been diagnosed with Psychosis NOS and Mood Disorder NOS and that he had been prescribed Depakote ER 1000 mg pm and Seroquel 400 mg pm. The inmate reported the foregoing history when he entered the system. On 5/23/06, while being seen in NKSP RC, he reported his history of drug abuse which included marijuana, LSD, and methamphetamine. He was referred for further evaluation. On 6/7/06, an RC mental health evaluation (MH-7) indicated diagnoses of Depression and Cocaine Abuse, and a GAF of 55. At that time, he was placed in the 3CMS level of care and was recommended for medication follow up.

On 6/19/06, the inmate was seen by a psychiatrist who diagnosed Bipolar I, most recent episode manic with psychotic features because the inmate had been involved in a fight with another inmate and received injuries including a fractured hand and a bite on the thigh. The psychiatrist described distractibility and disorganization, and placed the inmate in a holding cell pending MHCB admission. The psychiatrist ordered the inmate to be on suicide watch at q 15-minute checks with a safety blanket and mattress. The psychiatrist also started Depakote 1000 mg as a stat dose, in addition to the already

136

existing Depakote 1500 mg qd and Seroquel 500 mg qd.  The inmate was returned to custody two days later and his Seroquel was increased to 600 mg per day.

A treatment plan (MH-2) completed at NKSP was incredibly incomplete and insufficient. It did not provide any general information or the names of IDTT members who attended, and was signed with an illegible signature.  In addition, the reader was referred to a MH-4 dated 6/27/06.  The diagnoses were indicated as Bipolar Disorder NOS and a GAF of 58. Severe mood swings were the only problem identified, while the inmate's strengths were identified as insightfulness and motivation for treatment, with a discharge plan to general population.

On 7/10/06, the inmate's Seroquel was reduced to 450 mg per day.  On 7/14/06, Depakote was ordered at 1500 mg per day.  The inmate apparently did not improve.  On 8/14/06, he was noted to have been confused and suicidal.  He was placed in a cell on suicide watch because he had stated that he wanted to climb to a high place and jump. The inmate was reportedly hearing voices that he thought were coming from the radio, and his speech was illogical, nonsensical, and tangential.  The records indicated that he was stabilized and that he was returned to the yard on 8/18/06 with a medication prescription for Seroquel at 700 mg per day.

Surprisingly, the very next day, he was returned to a MHCB holding cell because he was "unable to function on the yard" and had rapidly deteriorated to a very disorganized state. He was admitted to the infirmary on 8/21/06 for "situational anxiety," with a note indicating that the inmate was confused, disorganized, and had grave disability with flight of ideas, pressured speech, paranoia, irrational behavior, restlessness, and confabulation resulting in a diagnosis of Schizophrenia Disorganized Type.  He was, however, discharged from the MHCB on 8/28/06 with a recommendation that he be placed at the EOP level of care.  A clinician saw him on 9/13/06 and stated that he would be continued at the EOP level of care as the plan.  A psychiatrist saw him two days later and ordered his Seroquel at 800 mg per day and Depakote at 2000 mg per day.  The inmate's Depakote level was 108.4 on 9/25/06.  It did not appear that the inmate's dosage was lowered or that the level was repeated.  However, it appeared that the Depakote was discontinued because of the inmate's complaints of not feeling well and doing better without it.

The inmate's condition apparently did not improve.  On 10/8/06, he was seen in response to an emergency referral because he was banging his head, hitting the walls with his fists, and acting in a bizarre manner.  According to the suicide report, he was asked if he was suicidal and responded, "Everybody has to kill himself because life has an end to it."  He was noted as manic with flight of ideas, and was re-admitted to a holding cell on one-to-one suicide watch pending MHCB placement.  At that time, his orders were for Seroquel 600 mg per day and Depakote 2000 mg per day.  Reportedly, he was stabilized and returned to the general housing unit a few days later on 10/11/06.

Three days later on 10/14/06, he was returned to the infirmary for another emergency evaluation and he reported that he wanted to stab a pencil into his ear to hurt himself.  He

was held in a holding cell pending MHCB placement and was finally admitted to an MHCB on 10/15/06. He was described as disorganized and confused, with suicidal and homicidal ideation, but no plan. He was also noted to have a two-centimeter laceration on his neck that the staff believed was the result of a fight with his cellmate. The notes described him as continuing to have disorganized speech, incoherent, and with poor impulse control. He was also noted as sexually inappropriate and standing in his cell masturbating. The staff noted that he had an excellent response to Depakote and Seroquel and he was returned to the 3CMS level of care on 10/25/06.

The inmate was seen six days later on 10/31/06 for EOP case management. It was noted that he had confusion and delusional thinking about the television. However, his 3CMS level of care was continued. On 11/2/06, Risperidone 4 mg was added to his regimen of Seroquel 600 mg and Depakote ER 1500 mg. This was an apparent reduction from the 2000 mg previously prescribed. Less than two weeks later, on 11/15/06, he was placed on one-to-one suicide watch in a holding cell pending MHCB placement because he had demonstrated confused thinking and disorganized speech. However, he was discharged to population housing three days later on 11/18/06 with medication orders for Risperdal 4 mg, Seroquel 600 mg, and Depakote ER 500 mg, which was again a reduction. A patient observation record at NKSP for a CTC/MHCB admission dated 11/18/06 indicated suicide precautions "q 30 minutes," and there were notations every 30 minutes rather than q 15 minutes as required by policy. On 11/29/06, a psychiatrist increased his Depakote ER to 1000 mg, but reduced his Risperdal to 2 mg per day and Seroquel to 400 mg per day. The inmate's last mental health contact at NKSP was on 1/16/07 when he was described as having been stable for two months and having intermittent "agitation." He was retained at the 3CMS level of care pending transfer to Folsom.

On 1/23/07, he was transferred to Folsom. His diagnoses were Major Depression and Schizophrenia Paranoid Type. He had a mental health assessment on 2/1/07 and was diagnosed with Methamphetamine Dependence, Rule Out Bipolar Disorder, with a GAF of 62. His medications remained Risperdal, Seroquel, and Depakote.

The inmate's Depakote was discontinued on 2/28/07, after he told the psychiatrist that he felt better without it. In addition, from that date, his Seroquel was reduced and tapered with discontinuation over a four-week period. He was prescribed Geodon which was increased from 20 mg to 60 mg over the following three weeks. His Depakote was subsequently increased to 100 mg per day and Risperdal, another anti-psychotic, was added at 2 mg HS. This meant that the inmate was simultaneously receiving both Geodon and Risperdal, both anti-psychotic medications.

On 4/19/07, the inmate saw his CCM, who documented the inmate's fears that he might have cancer or AIDS and his requests for medical follow-up. It appeared from the record that at least one of the issues regarding medication had to do with the inmate "no-showing" for medications in April 2007. The April 2007 MAR noted that the inmate refused his Geodon on approximately 13 days and was blank for three other days. The inmate refused or did not appear for his Risperdal on approximately ten days, and the

MAR was blank for four days.  There was no notation in the record that the inmate was referred to a physician for noncompliance.

The inmate saw a psychiatrist on 4/23/07 regarding his noncompliance with medications. Based on that interview, the inmate's Geodon was stopped and Risperdal was continued. Benadryl was also added to assist him with sleep.  The inmate saw his CCM on 4/26/07 and it was reported that he was stable.  On 4/29/07, the inmate saw his CCM again and reiterated his fear of dying from a disease or medical condition.  The inmate was noted as "extremely anxious" and as having excessive motor movements.  The CCM referred him to medical for a blood test regarding any medical problems.  On 5/3/07, the CCM saw him again and reported that the blood test was negative.  The CCM documented that the inmate initially did not believe the blood test was negative, but appeared to be relieved, although he still exhibited some anxiety.  In several of his last contacts with mental health staff, the inmate's concerns about his perceived medical condition and the possibility of his dying from a disease or medical problem were documented.  On 5/8/07, he was once again seen by a psychiatrist because he continued to exhibit depression and anxiety.  The psychiatrist determined that a trial of an anti-depressant was indicated and he added Remeron 15 mg HS to his treatment regimen of Risperdal and Benadryl.

After the foregoing addition of an anti-depressant at a very low dosage, the inmate self-referred on 5/21/07 and 5/24/07 to mental health, reporting side effects from his medications, nervousness, and physical shaking.  On 5/21/07, he denied suicidal ideation, but on 5/24/07 he reported that he had been feeling suicidal for one week and could no longer keep from hurting himself.  The inmate reported that he had thoughts of throwing himself off of the tier to kill himself, racing thoughts, and anxiety.  He also reported that the current medications were not working and that he wanted to be put back on Depakote. An SRAC was done on 5/24/07 by a psychologist at Folsom to determine the need for referral to a crisis program.  The source of information was identified as the inmate, who was noted to have had a previous suicide attempt by head-banging in October 2006.  The psychologist identified suicide intent, suicide plan, disturbance of mood, and affective instability or lability as dynamic risk factors, as well as the inmate's reporting that he wanted to kill himself by jumping off of a tier.  The psychologist also noted that the psychiatrist thought that the inmate had akathesia and that the plan was for crisis bed placement on suicide precautions.  Notes by the CCM on 5/24/07 indicated that the inmate stated that he had been feeling suicidal for one week, and that "he could no longer stop himself from hurting himself so he came up here."  The note continued that the inmate wanted to throw himself off of the tier.  The evaluation of risk was "high risk."

The inmate was then referred for an MHCB placement, but he was transferred to the OHU at CSP/Sac to await transfer to an MHCB.  The inmate was placed on suicide precautions, but they were ordered as q 30-minute checks rather than the standard q 15-minute checks.  While he was in the OHU, the only medication that was ordered was Remeron.  Neither his anti-psychotic medications that had been prescribed in the recent past, nor the mood stabilizer Depakote that he had requested, were prescribed at that time.  Despite the suicide precautions being ordered as q 30-minute checks, the suicide

observation record indicated that the checks were on an hourly basis, beginning at 2:45 p.m. when the inmate was placed in a MHOHU cell.

There was some ambiguity in the record regarding the inmate being admitted to the MHOHU at 10:15 a.m., and whether the checks did not appear to begin until 2:45 p.m., and then only being done on an hourly basis by nursing staff. The inmate was seen on 5/25/07 at cell front by a psychologist. The inmate stated that he was "okay," but the psychologist noted that he appeared depressed and reported that suicidal ideation "comes and goes." An IDTT meeting was held on that same day, with the recommendation that the inmate should be transferred to an MHCB with hourly checks and continuation of prescribed medications. The inmate would not leave his cell on 5/25/07, 5/26/07, 5/27/07, or 5/28/07, but the records indicated that he denied suicidality. He remained on suicide precautions, but the hourly checks, rather than q 15-minute checks, were documented.

The inmate did not attend an IDTT meeting on 5/28/07, but was seen at cell-side and reportedly was alert, cooperative, stable, and did not have suicidal ideation. The plan was to return him to population. This plan was apparently based on the inmate's stating "I'm okay and ready to go back." However, no SRAC was performed in anticipation of his return to population. This cell-side interview on 5/28/07 was the last mental health contact that the inmate had before he was discovered hanging at 4:44 p.m. that same day.

The inmate was housed in the CSP/Sac MHOHU from 5/24/07 until the time of his death on 5/28/07. It was unclear from the record as to why he was not transferred to an MHCB within 72 hours of his placement in the MHOHU. There was a psychologist's note dated "27/07" (most likely meaning 5/27/07), noting that the inmate refused to exit the cell for a mental status examination. The psychologist reported that the inmate continued to deny that he was ever suicidal, although he told staff at Folsom that he was feeling suicidal and was placed in a MHOHU. The inmate was also reported to have stated that he felt better since he had stopped taking Risperdal. His mental status was described as alert and oriented. He denied suicidal and homicidal ideations, and there was no evidence of delusions. His speech was clear, his mood was stable, and his affect was appropriate to content. It was noted that he was medication-compliant and no behavior problems were reported by custody. His assessment was Bipolar Disorder NOS and a GAF of 35 (current). However, the plan was for continued placement on observed mental status and to "consider removal from MH-OHU to assigned housing Tuesday if mental status remains the same." Even though the GAF was listed as 35, the psychologist was considering sending this inmate back to population on the day prior to his death.

The suicide report reviewer opined that "he was appropriately referred to a crisis bed setting. He was prescribed an anti-depressant, not a mood stabilizer as he requested. The standard of care was not adequate, as he was only given hourly checks and orders for more frequent checks apparently disregarded." The reviewer went on to state, "Had such frequent checks been done, the likelihood that he could have successfully completed an active suicide would have been substantially decreased."

The suicide report included notations that were not included as identified problems to be addressed by the QIP.  The suicide reviewer stated that there were "two issues noted without recommendations on whether the inmate should have been in the Enhanced Outpatient Program (EOP), and how he obtained a cutting instrument while in a Mental Health Outpatient Housing Unit."  The reviewer went on to state that although the inmate was referred to an EOP when he was at NKSP, the designation "somehow disappeared" and he remained at the 3CMS level of care.   The reviewer continued with stating, "However just before his transfer, his level of care designation was reviewed and he was considered appropriate for 3CMS.  Therefore there is no recommendation."  The reviewer also stated that the inmate stopped taking his mood stabilizer, started requiring frequent staff contact in mid-April 2007, and that had the inmate lived, "he should probably have been considered for referral to EOP."  However, he opined that since the inmate functioned well on medications, it was understandable that the staff was making an effort to re-adjust and stabilize him before making such a referral.  The reviewer concluded, "Therefore, there is no recommendation."  Lastly, the reviewer reported "documentation that the inmate was stripped searched before being placed into his cell."  It appeared, however, that the inmate had a razor blade, and while it was unclear how he may have obtained it before or after being placed in the MHOHU, "After he used it, he likely flushed it."  The reviewer continued on stating, "It is not clear what else could have been done to prevent the inmate from obtaining a blade, and of course it is not known for certain that he even had a blade.  Therefore, there is no recommendation."

The suicide report reviewer did identify two problems with recommendations, as follows:

> Problem 1:  The standard for suicide precaution at CSP/SAC was q one hour checks.  Policy requires q 15-minute checks.  Nursing staff evidently ignored orders for 15- and 30-minute checks.  More frequent checks would have made it more difficult for the inmate to have an opportunity to create a noose.
> Recommendation:  CSP/Sac to ensure that local procedure complies with the policy of staggered q 15 random checks (i.e. not less than five checks per hour at intervals not greater than 15 minutes) and that any form such as pre-printed orders and nursing check sheets actually reflect the standard of q 15-minute checks.

> Problem 2:  At NKSP, the inmate was in crisis beds or on crisis bed status multiple times, but was never considered for referral to DMH as per policy.
> Recommendation:  NKSP to submit copies of crisis bed placement logs and DMH referral logs, and to audit admissions and discharges based on the logs for the past six months for compliance with policy.

A death review summary was submitted regarding this inmate's death and concluded that "there is no clear or convincing evidence to think any clinician would have acted differently than the care given." With regard to recommendations, "it is unclear why this inmate was removed from the EOP level of care and placed on 3CMS.  All treatment modalities were appropriate and handled to the best, given the information the inmate provided."  The review was dated 5/29/07.  This review simply ignored the CSP/Sac local

policy of providing suicide precaution checks on an hourly rather than a q 15-minute basis.

At the request of the <u>Coleman</u> Deputy Special Master, a <u>Coleman</u> Expert reviewed this inmate's care and treatment. In his review, the <u>Coleman</u> expert reported the inmate's clinical course. He noted that there was no evidence that after the inmate arrived at CSP/Sac, he was ever interviewed out-of-cell. He also noted that an IDTT note from 5/28/07, the date of the inmate's suicide, reported that he "remains stable and unremarkable." The <u>Coleman</u> expert visited the MHOHU and spoke with the assigned psychiatrist, a contract LVN, and two custody officers. He described the MHOHU as a 20-bed facility that houses 15 or more MHCB patients who are "awaiting transfer" into MHCB settings. He also noted that the lengths of stay in the MHOHU consistently exceeded the 72-hour limit and that stays of one week or more were common. The number of inmates on suicide watch was commonly five, and sometimes as many as ten. The staff reported that q 15-minute cell-front checks of inmates did not occur, and that custody staff made rounds on the unit on the hour, while nursing staff made rounds on the half hour. The actual times of observations were recorded as occurring at the hour or half hour. Interviewed staff reported to the <u>Coleman</u> expert that access to inmates for confidential clinical appointments was limited and that the psychiatrist stated that, at most, inmates were removed from cells once per week. With regard to one-to-one suicide watches, the <u>Coleman</u> expert observed that there were four staff members present on the unit assigned to such watches. These individuals sat in chairs several feet from the narrow windows in the cell front, so that it was doubtful that their position afforded a view of even a portion of a cell at any one point. The attention of the individuals was observed to be directed at the cell front on only an occasional basis.

The <u>Coleman</u> expert summarized his relevant findings which included the following: (1) this inmate had a history of apparent decompensation and diagnoses of Schizophrenia, but he was consistently diagnosed with Bipolar Disorder when placed in the CSP/Sac MHOHU. He opined that while it was possible that the information had been reviewed and discussed but not documented, the documentation did not clearly acknowledge the inmate's history of Schizophrenia and the differences in treatment approaches to Schizophrenia versus Bipolar Disorder. The inmate's psychiatric medications were adjusted and reduced during the months prior to his death, but several issues including his "anxiety," "agitation," and feelings that he was "dying," as well as the impact of the reductions of his medications, were unknown. The <u>Coleman</u> expert further reported that it was not clear whether out-of-cell contact would have allowed clinicians to better assess the inmate's condition, but it appeared that all of his contacts were cell-front after his admission to the CSP/Sac MHOHU. The <u>Coleman</u> expert also noted general issues with respect to the MHOHU program, including that while all inmates who were not on suicide watch or designated as "suicide precaution," none of them received a level of observation that is required per the Program Guide. He also reported that staffing for both clinical and custody staff in the MHOHU appeared to be insufficient. Lastly, he reported that one-to-one observations conducted for the purposes of "suicide watch" on the MHOHU did not appear to maintain constant visual contact with the inmate within the cell. The <u>Coleman</u> expert also conducted a review of the inmate's medications and

noted that his Depakote was discontinued on 2/28/07, and that by 3/29/07 he was receiving Risperdal and Geodon.  By 4/23/07, the Geodon was discontinued and he remained on 2 mg of Risperdal at HS.  By 5/8/07, Risperdal had been raised to 3 mg and Remeron 15 mg and Benadryl 100 mg were added.  By 5/24/07, his Risperdal and Benadryl were discontinued, and the inmate was prescribed only Remeron at 30 mg HS (an anti-depressant in low dosage) at the time of his death.

Plaintiffs' counsel provided a memorandum dated 7/2/07 with regard to this inmate's suicide.  Plaintiffs reported on the discussion at the <u>Coleman</u> parties' 6/12/07 policy meeting which included discussion of this inmate's suicide, as he had been observed on hourly suicide precautions rather than the staggered q 15-minute observations required by the Program Guide.  Their concerns were that the inmate was able to tear his "suicide blanket" and use it as a noose to hang himself.  They reported that there were also two other inmates at other institutions who were able to hang themselves after tearing their suicide blankets.  Plaintiffs' counsel stated that the quality of suicide blankets was possibly an issue in each of these suicides, and that the standard for staff checks at staggered intervals not to exceed 15-minutes was not followed in this inmate's death.  Counsel continued on to state that they had been informed since the policy meeting that in a CDCR conference call with clinicians, they were told that less frequent intervals than the 15-minute staggered checks were permissible.  They then quoted the Program Guide language stating that the clinicians can utilize these guidelines and/or make modifications based on clinical judgment, with documented justification.  Plaintiffs' counsel stated their objection to any direction from central office to institutional staff to utilize the language in the Program Guide to order staff checks of inmates on suicide precautions on a less frequent basis than the 15-minute staggered checks agreed to by the parties.  They also cite the NCCHC standards and expressed their concern regarding what has been conveyed to the local institutions about the Program Guide requirements, as well as concerns that "suicide prevention care should not and can not be triaged in this fashion."  They concluded that in the case of this inmate's suicide, "this type of cutting back has deadly results."  Plaintiffs concluded their memorandum with references to plaintiffs' expert on suicide recommending suicide-resistant blankets that are manufactured by Ferguson Safety Products and ways of contacting this organization.  Plaintiffs' counsel requested further information and clarification regarding the Department's policy and directions to institutions regarding suicide precautions.  They also included a copy of the standard orders of CSP/Sac that state frequency of suicide precautions checks. at q one hour or other.

Plaintiffs' counsel submitted a second memorandum dated 6/16/08 regarding the report on the implementation of the QIP regarding this inmate's suicide.  Counsel provided some of the history but objected to the suicide report recommendations, stating that "no mention was made of the fact that _____ was able to have a razor while on suicide precautions in the MHOHU," and further that the inmate's retention in the MHOHU was "well beyond timeframes permitted for patient requiring suicide observation."  Plaintiffs also commented on the response from the institutions to the two recommendations in the suicide report, as follows:  "CSP/Sac provided a revised OP 115 dated September 2007," but quoted the March 2006 version of a Program Guide on suicide precautions,

emphasizing that a clinician may make modifications based on clinical judgment with documentation of justification if the inmate-patient requires less frequent checks than q 15-minutes.  Counsel stated that CDCR "had since revised the Program Guide to clarify that patients observed on suicide precautions **must be observed at 15 minute staggered interval checks** (and nothing less)"  (Emphasis in original.)  Plaintiffs continued on to state that the "the offending language has been removed and (it) is concerned to see this language retained and submitted as part of an implementation plan."  They went on to state, "Most concerning is the fact that the implementation plan was approved by the Suicide Prevention Response Focused Improvement Team."  Plaintiffs concluded their memorandum by requesting that CSP/Sac be required to revise their OP115 to comply with the Program Guide standards and CDCR Headquarters, so that SPRFIT can ensure that all CDCR institutions have an updated version of the OP 115.

On 5/27/08, the director of the mental health program, DCHCS, and the director of DAI issued their report on implementation of the QIP for the suicide of Inmate Q, in response to the suicide report dated 8/20/07.  In their report, the directors included a response from CSP/Sac dated 4/16/08, stating that the QIP had been completed at CSP/Sac with an attachment of OP115, Suicide Prevention and Treatment of a Suicidal Inmate, Revised September 2007.  In their procedure, the dates on each page are listed as March 2006, despite the procedure having been revised September 2007.  The procedure referenced the 2006 Program Guide requirement for 15-minute staggered intervals for nursing or custody staff to observe the inmate, but went on to state that if the inmate requires more frequent checks, the clinician may make modifications based on clinical judgment with documentation of justification.  The submission includes in-service CTC meetings dated July and October 2007 regarding staggered q 15-minute checks dated 7/18/07 and 7/19/07.

With regard to Problem 2, the response from NKSP dated 4/2/08 was included.  It stated that the inmate had been admitted to MHCB housing twice during his stay at NKSP, with each admission less than ten days and the inmate stabilized and returned to yard/housing prior to the tenth day of the stay.  They went on to state that according to policy, the inmate did not meet criteria (ten-day stay) on either admission as a "DMH referral."  The response went on to state that after the first admission, the inmate was discharged as EOP, and after the second admission, he was discharged as 3CMS.  Staff at NKSP reported that they have two additional data base logs to capture more information than the previous single data base log, and that these logs are distinguished by MHCB admission activities and temporary housing admission.  There was also a third log that captured mental health follow-up contacts when an inmate was discharged from the MHCB, released from the temporary housing unit, or considered a "treat and return" from another facility.  The response also indicated that the MHCB discharge procedures at NKSP mandated a consensus from the IDTT members and development and implementation of any discharge plan.  Along with the memorandum, the documentation from the three logs for the six months from October 2007 through March 2008 was submitted.

**Findings**:

This inmate's suicide appears to have been both foreseeable and preventable. The inmate was admitted to the MHOHU because of suicidal ideation and was placed on suicide precautions. The inmate had been decompensating over a period of the preceding several months, and his medication management was seriously flawed, given his history, diagnoses, and decompensation. Indeed, at the time of his death, he was prescribed an anti-depressant at low dose despite his decompensation, escalating paranoia, and other symptoms of thought disorder. There was abysmal failure at CSP/Sac to follow Program Guides with regard to q 15-minute observations of inmates on suicide precautions. The suicide report and the institutional responses indicated a variety of reasons for this, but it was clear from the documentation that the standard operating procedure at CSP/Sac was for hourly checks for inmates on suicide precautions. Had this inmate been checked more frequently, in addition to having been properly assessed -- as it appears from the record that all of his clinical contacts at CSP/Sac in the MHOHU were at cell front -- his death may have been preventable. The suicide report correctly identified that this inmate's level of care appeared to have been under need for mental health services, and seems to have been underestimated as, despite his having MHCB and MHOHU admissions, he was at one time being recommended for the EOP level of care, but remained at the 3CMS level of care for inexplicable reasons. The NKSP response to the suicide report that the inmate did not meet criteria for DMH referral because his length of stay was less than ten days only addressed one of the referral criteria. It did not address in any way the inmate's decompensation, repeated crises, MHOHU bed placement, or need for stabilization at a higher level of care. The apparent reality that the inmate was able to tear enough materials from his "suicide blanket" to use to hang himself, as well as his having cut himself, with references to having a razor blade while he was in the MHOHU, also were not identified as problems requiring corrective actions in the suicide report. It is unclear why these two issues were not identified regarding this inmate's suicide specifically, and there are general concerns regarding the quality of the suicide blankets as well as the comprehensiveness of searches for inmates going into OHU and/or MHCB placements, particularly when their placements have been for suicidal ideation and/or suicidal behaviors.

## 18. Inmate R

**Brief History**:

This inmate was a 35-year-old Hispanic male who committed suicide by hanging on 6/5/07 in the administrative segregation unit at the HDSP. The inmate was single-celled at the time of his death and was a participant in the MHSDS at the 3CMS level of care as medical necessity. The inmate entered the CDCR on 12/30/03, his first prison term as an adult. He was committed after convictions on charges of armed robbery with a firearm and possession of ammunition by an ex-felon, and received a sentence of four years and eight months. His earliest possible release date was 1/21/08.

The inmate was discovered on 6/5/07 at approximately 5:05 a.m. by a CO who was conducting the institutional count. The officer observed the inmate hanging from the neck with what appeared to be a sheet tied around his neck with the other end secured to the top bunk. The officer immediately activated his personal alarm device. Responding staff, under the direction of a sergeant, entered the cell. The sergeant immediately untied the sheet from the top bunk and attempted to cut the sheet from the inmate's neck, but it was too thick, forcing him to untie the sheet. The inmate was no longer breathing and had no pulse. The sergeant and an officer began CPR. The inmate was then placed on a Stokes liter and carried to the Complex II Alleyway, where they were met by a RN. The sergeant and officer continued CPR as the inmate was placed in the CTC medical van and transported to the CTC emergency room. The suicide report referenced CPR beginning at approximately 5:10 a.m. After transport to the CTC, CPR was continued and at 5:20 a.m., an oral airway was placed, with minor difficulty due to stiffness in the jaw of the inmate at that time. At 5:22 a.m., the AED was attached and shock was not advised. Staff attempted to start IVs two times which apparently were not successful. A physician pronounced the inmate dead at 5:40 a.m. An autopsy report, described as a death narrative-Washoe County medical examiner/coroner, and the reporting agency designated as the Lassen County Sheriff, was provided. It reported that the autopsy was performed on 6/6/07. The immediate cause of death was determined to have been asphyxia due to hanging. A toxicology report was provided regarding blood specimens. It specified that no common drugs of abuse were detected, and no ethanol was found in the blood specimens.

The inmate's criminal justice history was recounted in the suicide report. It began at approximately age 14 when he served time in the CYA and county jails. He was noted to have been a validated gang member in the Marijuana Locos. His juvenile record included charges of burglary and assault with a firearm on person, and he was admitted to the CYA on two occasions. As an adult, he also had arrests and convictions for robbery, grand theft, malicious defacement, burglary, and receiving stolen property. The inmate's first prison term in the CDCR began on 12/30/03, as referenced above. The circumstances of the offense involved him and a co-defendant robbing a pizza restaurant, firing a weapon, with the inmate's wearing of a mask to hide his identity. He was subsequently arrested at home and ultimately sentenced, as referenced above.

After the inmate entered the CDCR at NKSP on 12/30/03, he reported hearing voices talking about him. He told the nurse performing the intake evaluation that he wanted to hurt himself. He was referred to mental health, and a psychologist noted that he again reported that he was hearing voices but he denied suicidal ideation. The inmate was diagnosed with Psychotic Disorder NOS as he reported auditory hallucinations, paranoia, and depression. He was placed in the MHSDS at the 3CMS level of care on 1/9/04. The records also stated that prior to his incarceration, he had been treated for mental illness in the community because of auditory hallucinations as well as paranoid ideation. Also, the inmate reported that he had been hospitalized in a psychiatric hospital on one occasion prior to incarceration. The inmate also reported a history of having gotten into an argument and shooting a man with whom he had previously fought at a party, but no charges were filed. The inmate was placed on Seroquel when he was at NKSP, and subsequently during his incarceration he was prescribed other anti-psychotic medications

146

including Navane, Risperdal, Thorazine, and anti-depressants including Zoloft and
Lexapro.  The inmate transferred from NKSP to Folsom on 9/15/05 but quickly became
non-compliant with his medications.  He was admitted to an MHCB at CMF from
12/15/05 through 12/21/05, with reports of suicidal ideation as well as psychotic
symptoms.  The inmate had multiple MHCB admissions because of suicidal ideation
from December 2005, including 3/4/07 to 3/8/07 and 4/3/07 to 4/10/07.

On 7/26/06, the inmate was removed from the MHSDS while he was housed at SCC.  He
reportedly wanted to be placed at a fire camp and therefore stopped taking his
medications.  However, the records indicated that he began to decompensate and was
placed in administrative segregation on 8/9/06 because of an RVR for resisting staff.
While in administrative segregation, the inmate sent an inmate services request form
requesting an SNY placement.  He stated that he was in fear for his life if he returned to
the mainline because he had gambling debts and "all Southsiders have the green light to
get me."  He was released to the mainline on 8/24/06 and was quickly assaulted by four
inmates.  The inmate was returned to the administrative segregation unit, even though he
was on SNY status.  On 3/1/07, he was returned to population, and once again on the
following day he was beaten by five inmates.

The inmate continued to have periods of psychotic symptoms and suicidal ideation
throughout his incarceration.  On 9/1/06, he reported hearing command hallucinations
telling him to commit suicide as well as "rumors" that he was gay.  He also reported that
other people were reading his mind and controlling his thoughts.  He was returned to the
3CMS level of care on 9/12/06 and was admitted to an MHCB from 9/15/06 through
10/2/06 at CMF.  At this point, his level of care was changed to EOP and he was
discharged to MCSP.  The inmate was returned to an MHCB on 10/10/06 after he had
been head-banging on the door of his cell.  He was placed on suicidal precautions on
10/6/06, once again because of auditory hallucinations and paranoid thoughts including
his fears that he might be gay.  During this MHCB admission, however, the suicide report
made reference to clinicians interpreting his statements as suggesting manipulation.  He
was diagnosed with Adjustment Disorder with Depressed Mood and his level of care was
designated as 3CMS.  He was discharged back to SCC and was again placed in
administrative segregation because of enemy concerns.  A mental health treatment plan
dated 10/11/06 was signed by a social worker only, and did not list any team members on
the MH-2.  The diagnoses were Psychotic Disorder NOS, Polysubstance Dependence by
History, and Antisocial Personality Disorder.  The problem identified was "suicidal
thinking," with a plan to stabilize the inmate's behavior, return to programming, and
prepare for parole within one year.  A contemporaneous progress note indicated that a
psychiatrist, social worker, RN, CC-2, and the inmate were present at the treatment team
meeting.  During the inmate's MHCB admission, the inmate had been placed on
Risperdal which, after his return to SCC, he was found to have been "cheeking." The
Risperdal was discontinued on 11/1/06.  The psychiatrist noted on 11/8/06 that the
inmate's medications had been discontinued because of a belief that the inmate's "voices
were concocted to get meds which he cheeked."  Of note, the psychiatrist wrote on
11/20/06, less than two weeks later, that the inmate had increased paranoid thoughts and
wanted to go back on medications.  At that time, the psychiatrist diagnosed PTSD and

Depressive Disorder NOS, versus Major Depressive Disorder with Psychotic Features, and prescribed Seroquel.

The inmate was next endorsed to HDSP instead of a SNY, "due to his wavering and the belief that he would be an unacceptable risk to those on the Sensitive Needs Yard or a re-integrated mix program," according to the suicide report. A transfer to HDSP was scheduled for 1/22/07, and he again requested a SNY. The inmate received an RVR for disobeying orders when he refused to come out of his cell. He inmate cited his having been attacked by inmates at SCC one hour after he had been released from administrative segregation and his belief that "I know I'm not going to make it out there in the general population yard." The inmate did eventually transfer to HDSP on 2/15/07 and was housed in administrative segregation..

After his transfer to HDSP, the inmate was initially housed in administrative segregation and then on 3/1/07 he was released to population. On 3/2/07, he was once again battered by inmates, resulting in an emergency psychiatric referral. He had been scheduled to see a psychiatrist on 2/27/07, but that appointment was recorded as "rescheduled" for unknown reasons. He was also prescribed Lexapro and Seroquel when he was transferred to HDSP for 14 days; those medications expired on 2/28/07. The previous order from SCC indicated Lexapro 10 mg q HS and Seroquel 100 mg q HS times 90 days. It was clearly the intent of the psychiatric staff at SCC that the inmate should be on his medications at least through 4/30/07. He did see a psychiatrist on 3/2/07 and told the psychiatrist that he would "rather kill himself by hanging rather than parole due to `vibes,' `voices,' and `other personalities' inside him." With regard to the other personalities, the inmate reportedly told the psychiatrist that he had three personalities, "a good guy, a bad guy, and a homosexual one." The psychiatrist performed an SRAC and estimated the level of risk as "moderate risk." He was referred for a further assessment but was not admitted to a MHCB. He was returned to the administrative segregation unit. No medications were re-ordered, nor was there a recommendation or plan to address the level of risk. On 3/3/07, another SRAC was completed, with the psychiatrist estimating the level of risk as "moderate risk." Once again, the inmate was not admitted to a MHCB. There was no medication ordered nor was there any recommendation or plan to address the level of risk.

On 3/4/07, an officer observed the inmate with a sheet around his neck and the other end tied to the upper bunk in his administrative segregation cell. When the officer ordered the inmate to be removed from the cell, the inmate refused and instead began hitting the door with his hand, causing injury to his hand. The inmate was pepper-sprayed and handcuffed, and staff removed the noose from his neck. In the emergency room, he was noted to have ligature marks on his neck and was yelling that he was a sexual offender. He was placed in five-point restraints for two days, based on his refusal to cooperate with medical staff and concerns that he might injure himself further. Still, he was not prescribed any psychotropic medication. He was, however, admitted to the MHCB reporting suicidal ideation and psychotic symptoms, but according to the suicide report, "clinicians were skeptical." The report went on to state that on 3/7/07, a psychologist wrote "inmate feigned distortion, voices, paranoia. Still has legitimate concerns and

probably does hear threats." On 3/8/07, another SRAC was done but it was incomplete, as the psychologist did not check many of the previously identified risk factors, including his recent attempted hanging and his history of depression. The psychologist did not provide an estimate of risk, and in the comment section he wrote, "fear and desperation, self injury to promote safety needs. Exaggerate symptoms of mental illness."

The IDTT met on that same date, and once again the inmate was noted to be "feigning mental health symptoms to avoid danger." He was diagnosed with Adjustment Disorder, with mixed disturbance of emotion and conduct. No medications were re-ordered, and he remained at the 3CMS level of care as medical necessity. The staff's opinion that the inmate was feigning mental illness and did not have any true psychotic disorder continued to be reflected in the notes, including one on 3/21/07 by a psychiatrist who wrote, "Report of suicide to protect family diametrically opposes any psychotic that I have seen due to heroic altruism." The psychiatrist noted that the inmate reported that he had tried to hang himself three times in five weeks, but the psychiatrist went on to give the inmate no Axis I diagnosis and did not order any medications.

Approximately two weeks, later the inmate was admitted to an MHCB from 4/3/07 through 4/10/07 because of auditory hallucinations, paranoid delusions, and statements that he wanted to hang himself. He reported the voices were in administrative segregation and then in the MHCB. Staff reported that his suicidal threats were made with the goal of manipulating housing and staff. He was given one dosage of Risperdal, but it was not continued or renewed. The staff went on to describe his behaviors as manipulative, and although suicidal ideation was noted, it was concluded that the inmate had "malingered psychosis and instrumental suicidality." The mental health staff did report the inmate's realistic fears of gang politics and his attempts to expedite his transfer to a SNY, but determined that he had "no thought disorder." The inmate was returned to administrative segregation. On 4/12/07, he requested from the psych tech that he see a psychiatrist because he had been prescribed Seroquel and Zyprexa, was unable to sleep, and was hearing voices to harm himself. He was seen on emergency referral by a psychiatrist who did order one dose of Thorazine but no continuing medication. On 4/16/07, the inmate was prescribed Thorazine for 30 days, according to a MAR. However, there was no physician's order or consent form in the record. A CCM's note in administrative segregation dated 4/30/07 indicated that the inmate would only say that he was "okay," but checked no symptoms, normal sleep, normal eating, no suicidal ideations, and mental status within normal limits, with affect appropriate, mood appropriate, thought content within normal limits, and orientation fully oriented. The inmate was assessed as stable and the plan was to continue the treatment plan. This was done at cell front. It is astounding that the psychologist would make these determinations based on the inmate only responding "okay."

The MAR for May 2007 stated that Thorazine 100 mg two tablets two times per day for a total of 400 mg per day was started on 4/16/07, with a stop date of 5/16/07. The inmate began refusing Thorazine on 5/7/07, and began refusing both dosages on 5/12/07. The medication was not re-ordered, nor was the inmate reassessed after 5/16/07. There was no corresponding doctor's order for this medication in the inmate's record. While in

149

administrative segregation, the inmate had a cellmate who died on 5/22/07, and the inmate became a suspect in the "mysterious" death of his cellmate, according to the suicide report. On 6/4/07, the inmate received a brief mental health evaluation in which he was noted to have denied thoughts and impulses for self-harm and to be functioning adequately. This mental health evaluation was done the day before he was scheduled to have a disciplinary hearing because of mutual combat with a former administrative segregation cellmate that had occurred on 4/24/07. However, the inmate committed suicide on the morning of 6/5/07, before this hearing could take place.

The suicide report reviewer made reference to having interviewed the inmate's most recent CCM who suggested that the inmate had realistic fears, that he would have been unlikely to make up concerns that he was gay, given that he was a validated Southerner gang member, and that a diagnosis of Psychosis NOS was suggested due to the inmate's hearing of voices. Curiously, this CCM's opinions did not appear to have influenced the treatment team in any meaningful way, given that his most recent diagnoses were Adjustment Disorder with mixed disturbance of emotions and conduct, and that he had two episodes of a single dose of an anti-psychotic medication and a mysterious order for Thorazine for 30 days recorded on a MAR without there being a doctor's order for that medication located in the record. The suicide report reviewer also stated, "When concluding that inmate was suffering was fabricating psychiatric symptoms, it appeared several HDSP clinicians did not take into account years of documented evidence of suicidal ideation and paranoid delusions, from long before the inmate had supposed ulterior motive of manipulating his housing." The reviewer also opined that there did not appear to have been any consideration of a personality disorder for this inmate and its possible relationship to his past medication compliance and denial of psychiatric symptoms.

The suicide report identified five problems with recommendations, as follows:

> Problem 1: After arriving at HDSP on medications, his prescription was renewed for 14 days. He was supposed to see a psychiatrist for medication review, but this never occurred. The appointment history showed "re-schedule," but he was never re-scheduled and the medications expired.
> Recommendation: Institution to review the procedure for ensuring that medications continue on arrival, are renewed, and continued further, until a psychiatrist sees the inmate for medication review. Ensure that all nursing staff is trained to monitor expiring medications and to follow up to ensure that medication renewal appointments are scheduled and kept.

> Problem 2: It happened that he did see a psychiatrist for an emergency evaluation about two weeks after arrival at this prison, and this psychiatrist also failed to notice and respond to the expiring medication order.
> Recommendation: The psychiatric staff in the MHCB unit at HDSP should have a pattern of practice review conducted by DCHCS, focusing on whether other medication renewals were not taking place.

Problem 3:  SRAs that were completed on 3/2/07 and 3/3/07 concluded that the inmate had a "moderate risk," but there was no plan to address this level of risk other than by requesting SNY housing.  He was not admitted to crisis beds or offered medication.

Recommendation:  All SRAs should be accompanied by a progress note describing the rationale for the level of risk and the plan to address the level of risk.  A "moderate" risk should definitely be followed up with a plan.  Ensure that all clinical staff, including psychiatrists, psychologists, and social workers, have received the most current training (7/18/07) on SRA.  The chief psychologist is to audit all charts of inmates seen for emergency suicide evaluations for two months, to ensure that each SRA has a corresponding progress note containing a rationale and a plan.

Problem 4:  The inmate was admitted to the MHCB on 3/4/07, following a suicide attempt by hanging, and was kept in restraints for two days.  However, several psychiatrists and psychologists in the MHCB unit at HDSP concluded that the inmate was feigning symptoms in order to manipulate his housing placement.  He was discharged on both occasions without medication, despite his request for medication and historical evidence that medications improved symptoms.

Recommendation:  The psychologists and psychiatrists from the MHCB unit at HDSP who evaluated this inmate and indicated he was feigning symptoms should be referred to the DCHCS PPEC to determine appropriate action.

Problem 5:  According to the MAR, the inmate was administered Thorazine starting on 4/16/07, but there was no physician's order seen other than a one-time dose on 4/12/07.  Also, no informed consent form for Thorazine was found in the record.

Recommendation:  It appears most likely that the order for Thorazine was misfiled.  Assuming this, lack of any informed consent is concerning.  Conduct an audit of informed consent for psychotropic medications covering the most recent three month period.

A death review summary dated 7/27/07 was completed for this inmate's suicide and provided a historical review of his death.  The review determined that the death was by suicide and was not preventable.  The review stated, "As far as medical care provides for the patient/inmate, it seems that the care was appropriate and the emergency response was fine, although no drugs were given during the code because of IV access."  There were no conclusions provided and the recommendations indicated "none."

On 4/21/08, the director of the mental health program, DCHCS and director (A) DAI issued their report of implementation of the QIP for the suicide of Inmate R, in response to the suicide report dated 10/1/07.  The report included a memorandum from the chief of mental health at HDSP, dated 3/13/08, and stated that in response to the QIP items, there had been provision of LOP 716 (health screening) and documentation of training of nurses and mental health staff regarding the LOP, both apparently in response to Problem 1.  Also in response to Problem 1, there had been a statement that the inmate was not seen

151

for the scheduled appointment prior to medication expiration, and had not been re-scheduled since he was seen on an emergency basis two days later.  There was also an addendum to the OP 716 that provided for RC inmates to be seen by medical, mental health, and dental staff, and that additionally a memo from the chief dental officer to the techs of the procedure, as well as provisions for "dental screening – RC," were to be added.

With regard to Problem 2, the HDSP response stated they were awaiting a memo from the PPEC.

With regard to Problem 3, it appeared that the statement that "the suicide risk assessment dated 3/2/07 notes 'inmate's Seroquel expired two days ago.  Return to ASU with no medications'" was a response to there being no plan to address the inmate's level of risk.  In addition, a copy of training rosters for all clinicians who did not receive training on 7/18/07 was attached, as well as an audit of emergency suicide evaluations for a two-month period.  The cover letter from the HDSP chief of mental health also stated that the requested audits were enclosed, showing a compliance rate of 52 percent.  It went on to state that "At the time of the audit, medical records had 104 inches of loose filing.  Currently loose filing is minimal so an attempt to audit the same records was conducted.  The audit is enclosed."

In response to Problem 3, a listing of "inmates seen emergency suicide evaluation" from 9/1/07 through 10/31/07 was provided.  It included 19 inmates.  An SRAC was completed on each of these inmates, and progress notes were made on all but two of the inmates.  The level of risk was not included, but the disposition indicated that of the 20 evaluations (one inmate was evaluated twice), 13 were admitted to the CTC and seven were returned to yard.  The audit did not include any information on the quality of the evaluations or the appropriateness of the disposition plan.

With regard to Problem 4, the PPEC suicide case review for this inmate was provided and dated 11/6/07.  The committee recounted the inmate's mental health care and management, including his history of six hospitalizations, four episodes of suicidal ideations from 2005 to mid-2006, and his need for suicide precaution or suicide watch in September and October 2006.  It also included HDSP staff documentation of clinicians' questioning the validity of the inmate's symptoms and describing him as manipulative.  The committee opined, "In addition to the poor care Mr. _____ received when admitted to an MHCB, the suicide case review committee questioned the case (*sic*) by a psychiatrist two weeks after _____'s admission to HDSP."  At the committee's meeting in September 2007, members arrived at the conclusion that "two aspects of the case needed to be addressed to preserve patient safety -- the skeptical "group think" occurring with the MHCB team at HDSP, and the tendency to disbelieve patients who may be present in the practice of one or more of the clinicians mentioned in the suicide report."  The committee requested a follow-up report on the findings and recommendations from the planned evaluation to be conducted by a multidisciplinary team to be sent to HDSP as per mental health program administrators.  The committee also referred the clinicians involved – two psychiatrists and two psychologists – for a

pattern of practice review.  They went on to state that when the pattern of practice review was completed, the PPEC will again address the quality of care and will take actions, as appropriate, to protect patient safety and otherwise address practice concerns.  There was no further documentation of the results of the intended corrective actions, or further corrective actions, in response to the proposed additional reviews.

With regards to Problem 5, HDSP provided a list of 23 inmates in which informed consent for medications was reviewed and a 52 percent compliance rate for informed consent requirements was found.  This audit occurred in March 2008, for an audit period of July, August, and September 2007.  The HDSP response also indicated that training was conducted for all current psychiatrists and would be ongoing for new psychiatrists. The cover letter and the response from HDSP stated that during 2007, HDSP had no state psychiatrists but utilized a total of 17 contract psychiatrists.  The cover memorandum went on to state that each psychiatrist had been informed earlier by the chief psychologist and given a memorandum similar to the enclosed memo directing them to obtain informed consents for medications.

No additional information was provided with regard to the corrective action recommendations.

**<u>Findings</u>:**

This inmate's suicide does appear to have been foreseeable.  The inmate had a long history of reported suicidal ideation as well as multiple psychotic symptoms, none of which appeared to have been addressed adequately by the staff at HDSP.  The inmate did receive SRACs by HDSP staff that indicated moderate risk, but were incomplete and did not indicate any recommendation or plan to manage the inmate.  Moreover, in terms of his overall treatment, the inmate was frequently documented by HDSP staff as being "manipulative" and attempting to influence his housing and/or transfer to an SNY because of what they variably described as realistic fears of gang or other inmate assault. Indeed, the record indicated that the inmate had been assaulted on at least three occasions within a day of his placement in population.  Despite this, there was no evidence of any multidisciplinary treatment planning, including attempts by custody staff to determine the most appropriate and safe placement for this inmate, nor did there appear to be any adequate or reasoned review of the inmate's history and record with regard to his psychosis and other symptoms over time.  Based on this information, this inmate's death appears very likely to have been preventable had the staff at HDSP provided adequate and comprehensive care in compliance with the Program Guides as well as standards of practice.  The suicide report reviewer correctly identified a number of these flaws and made referrals to the PPEC, resulting in four clinicians being referred for pattern of practice reviews.  Unfortunately, the results of these reviews, as well as an administrative/clinical review of the MHCB at HDSP which was proposed by the mental health administration, were not included in the documents received.

### 19. Inmate S

**Brief History:**

This inmate was a 28-year-old Caucasian male who committed suicide by hanging in the east block condemned unit at SQ on 6/10/07. The inmate was single-celled at the time of his death and was a participant in the MHSDS at the 3CMS level of care. The inmate entered the CDCR via the SQ RC on 3/10/07 as a condemned inmate, having been found guilty of the rape and murder of a pregnant woman as well as additional charges of rape, two burglaries, and two counts of watching a house.

The inmate was discovered on 6/10/07 at approximately 8:30 p.m. by an officer who was sweeping the first tier in the east block. The officer approached the inmate's cell and observed him hanging in the cell by what appeared to be an inmate-manufactured rope around his neck that was attached to the upper bunk frame. This officer notified two additional officers, one of whom activated his personal alarm device, and blew her whistle. An emergency extraction team was assembled and entered the cell. An officer used the cut-down tool to cut the rope around the inmate's neck. At approximately 8:32 p.m., the inmate was placed on a rolling Stokes liter. Responding medical staff and nurses checked the inmate for vital signs. Because it appeared that the inmate did have a pulse and that his respiration was shallow, CPR was not administered by staff who then proceeded to the TTA. At approximately 8:44 p.m., the inmate was transported via code III ambulance to the Marin General Hospital. However, he inmate did not recover and was pronounced dead by a physician at approximately 9:25 p.m. A chronology was provided on the crime/incident report (837-A1) detailed the timeline as discovery of the inmate at 8:30 p.m., movement of the inmate from the cell and placement of him on a gurney at 8:32 p.m., arrival at the TTA at 8:35 p.m., and commencement of CPR at 8:36 p.m. when the inmate was found to have had no pulse or respiration. At that same time, an ambulance was called. It arrived at the OHU at 8:40 p.m. Medical staff assessed the inmate's pulse, and respiration was restored at 8:42 p.m. The ambulance left the OHU at 8:45 p.m. CPR began once again at 8:48 p.m. when EMTs detected no pulse or respiration, and was continued during transport. The inmate was subsequently pronounced dead at 9:25 p.m. by a physician in the Marin General Hospital emergency room. The coroner's report was issued by the office of the coroner for San Rafael, California, and stated that the autopsy had been performed on 6/12/07 and determined the cause of death to have been asphyxiation (seconds) due to hanging (seconds). The toxicology of the blood specimen included a complete drug screen and revealed no detection of common acidic, neutral, or basic drugs and no blood ethyl alcohol.

The suicide report recounted the inmate's criminal justice history. The commitment offense resulted in the inmate's incarceration as his second prison term. On 5/12/05, the inmate committed a rape, and on 5/13/05 a rape and murder of a pregnant woman. It was reported that during the rape of the pregnant woman, the inmate stabbed the woman multiple times, cut her throat, and inserted a cordless telephone in her vagina. After two years in the Riverside County jail, he ultimately was committed to the CDCR via the SQ RC. His past history of criminal offenses began in 2003 when he was admitted to NKSP

154

to serve a two-year prison sentence. The suicide report referenced an increase in his custody points from Level I or II to a Level IV because of numerous RVRs for indecent exposure and "general troublemaking." From that incarceration, which began on 4/11/03, he was placed in a SHU on 5/04 until 12/04, and then he paroled from CSP/Corcoran on 3/12/05.

Beginning on 5/6/05, the inmate committed a series of crimes beginning with a burglary, followed by another on 5/9/05. He was also charged with two additional counts of "watching a house." On 5/12/05, he committed a rape, and on 5/13/05 he committed the rape and murder of a pregnant woman. The inmate was in the Riverside County jail for two years and ultimately was received at SQ on 3/10/07 with a death sentence as a condemned inmate.

The inmate reported that he had been treated for mental illness as a child and took medications, and stated that his mother was treated for Schizophrenia. He also reported that he had been removed from the family home at age ten, but there was no confirmation of that information. When he entered the CDCR in 2003, he was seen for mental health evaluations which determined that he had possible diagnoses of rule out Alcohol Abuse and rule out Impulse Control Disorder. He also was diagnosed with Depressive Disorder NOS and Alcohol Abuse after he had been in the system for approximately six months and was placed in the MHSDS at the 3CMS level of care as a medical necessity. This was later changed to 3CMS without medical necessity. The inmate was described as demonstrating depression, suicidal ideation, and medication noncompliance. He demonstrated self-harming/suicidal behavior in which he was found by clinical staff to have tied a sheet around his neck with the intent to hang himself.

While the records demonstrated that the inmate was diagnosed with Depressive Disorder NOS and alcohol abuse in 2003 and 2004, he also received four RVRs for indecent exposure between August 2003 and December 2003 as well as other violations including leaving his work assignment, delaying the count, conduct which could lead to violence, delay of a peace officer, refusing to remove a blanket from his window, and ultimately aggravated battery on a peace officer on 3/31/04 (see below). Some of these charges resulted in his being placed in the administrative segregation unit and admissions to the MHCB at NKSP. These violations resulted in his ultimate transfer to CSP/Corcoran. However, staff also determined on 4/5/04 that his level of care should have been increased to EOP. This was approximately one month before he was transferred to CSP/Corcoran on 5/10/04 to serve a SHU term for his inappropriate sexual misconduct and assault on a peace officer. While at CSP/Corcoran from 5/10/04 through 3/12/05, the inmate was admitted to the MHCB for self-injurious behavior and suicidal ideation, including his cutting himself on nine occasions. He reported auditory and/or visual hallucinations and intermittent suicidal/homicidal ideation. He also reported that he had been sexually abused at NKSP and reportedly had gender identity issues including a desire for a sex change operation. He was concerned that he might receive additional prison time for the officer assault, and was required to register as a sex offender. While at CSP/Corcoran, his diagnosis was changed to Major Depression and he continued to be seen in the EOP program. The suicide report made reference to his medical record

stating that he frequently expressed feelings of inadequacy and hopelessness, thoughts that no one would miss him if he were gone, irritability, having frequent problems with exposing himself, and a possibly having an eating disorder. While at CSP/Corcoran, staff did consider him for referral to a higher level of care and Coleman monitors requested that he be referred to the SVPP. The suicide report referenced the inmate's refusal to sign his consent, and therefore staff at CSP/Corcoran did not pursue a referral to a higher level to care in July 2004. In February 2005, he was identified as an inmate who met the requirements of the Unmet Needs Assessment (UNA) study, but he was not referred to a higher level of care because he was less than a month from parole. In November, 2004 he signed a refusal form regarding psychotropic medications and was not medicated during the remainder of his prison term. He did parole on 3/12/05.

The inmate was re-arrested for the commitment offenses and housed in the Riverside County jail from May 2005 to March 2007. The suicide report made reference to the jail information management system having reported that the inmate was a serious management problem. He was a danger to himself and others and was placed on suicide watch a number of times during the course of his stay. Some of these watches were because of his having episodes of his head-banging, self-mutilation, smearing of feces, urinating on the floor, assaulting officers, and destruction of property. However, the report went on to state that these records were not available to mental health staff at SQ until after his death. The report is unclear as to if and when the records were requested by staff at SQ.

The inmate was found guilty, sentenced to death, and arrived at SQ on 5/10/07. He was housed in the Adjustment Center as per CDCR protocol.

The inmate received a bus screening on 5/11/07 and a mental health evaluation by a psychologist on 5/16/07. He did not report any history of mental illness on the bus screening, but did endorse a history of mental health treatment and displayed some "disorganization" at the time of the evaluation. He stated that he had some symptoms of mild depression but denied any suicidal ideation or plan. He stated that he had stopped taking medications which had been prescribed for him in the jail during the eight- to nine-month period prior to his arrival at SQ. Notably, neither the medical screener nor the psychologist had access to the medical record when the inmate was seen for the screening or evaluation because it had not arrived at SQ by that time. With regard to the objective findings on the evaluation, he appeared to be appropriately groomed, was cooperative, and had normal speech and orientation, good eye contact, and a depressed mood with anxious traits. However, he was also noted to have disturbed thought processes with paranoia, but no indication of delusions. He also was assessed as having very poor insight and judgment, and hatred for his body which he associated with his desire for a sex change operation. The psychologist opined that the inmate "may be involved in a schizophrenic process" and described him as "vulnerable." Based on this history, he was placed at the 3CMS level of care and a diagnosis of Schizophrenia (provisional) was offered.

The inmate was next seen by a CCM who apparently erroneously dated the note as 5/6/07 (prior to the inmate's arrival at SQ) and noted that the inmate was anxious to program and get into population, i.e. out of the adjustment center. He also reported that the other inmates' knowledge that his alleged victim was pregnant made him feel "appalled" by his crime and state that he was innocent. The CCM determined that the inmate did not have any suicidal or homicidal ideation or any evidence of thought disorder such as auditory hallucinations or paranoia, that his adjustment regarding his appetite and energy were appropriate, but that his sleep was inconsistent. He informed the team that he had taken Lithium and Prozac in the past, but was doing well without medications and wanted to remain so. He also reported that he had had a history of depression. He was described as odd but responsive and appropriate. Of note, the inmate stated, "I will not kill myself." No evidence of psychotic disorder was discerned by the IDTT. He was to continue with his weekly case management contacts while in the adjustment center. No medications were prescribed. Later that same day, the inmate self-referred to mental health requesting "helpful strategies and pointers I can use in certain situations." The suicide report made reference to this self-referral being handwritten with an unusual quality, such as the letter "O" drawn in the shape of a heart and the letter "I" dotted with a heart to make it look like a cross. The inmate was seen six days later on 6/5/07 by a psychologist who noted that the inmate did not have any suicidal ideation or plan. He was also seen by his CCM on that date, reporting that he had some mild depression but again denied any suicidal ideation. While in the adjustment center, he did have psych tech rounds from 5/20/07 to 5/26/07 and again from 6/3/07 to 6/9/07. Initially he was described as having a flat affect, depressed mood, and "needy" with thought processes described as "pressured by others," but later his affect became depressed and his thought processes and content were described as disorganized, although it was noted that he denied feeling suicidal. There were no significant abnormalities noted in the upkeep of his cell or his hygiene/grooming, but one psych tech did note that the inmate should be monitored closely for any "sudden changes in behavior." The suicide report referenced this comment but stated that the note was not discovered until after the inmate's death and therefore was not seen by other clinicians. There was no comment with regard to whether the psych tech verbally reported concerns about the need to monitor the inmate "very close for any sudden changes with behavior."

Quite remarkably, the inmate was transferred from the adjustment center to the east block on 6/10/07. The suicide report made reference to this transfer having to do with need of the inmate's cell for another inmate who was being disruptive in his housing unit. The inmate was found hanging in a cell approximately 12 hours later.

The suicide report made reference to discrepancies in the medical record with regard to the inmate's mental health adjustment. These discrepancies included the inmate's prior prison term and his time at the Riverside County jail, where he was described as essentially unstable. After his incarceration in the CDCR at NKSP and CSP/Corcoran, the inmate had been housed in MHCBs and administrative segregation units multiple times because he was described as unstable with suicidal ideation. The inappropriate sexual behavior described in his first prison term, the description of his incarceration at the Riverside County jail as consistently disruptive, and the multiple RVRs for indecent

exposure etc. were very different from the description of his incarceration as a condemned inmate. The suicide report also referenced the fact that staff at SQ did not have access to this information and therefore did not have a complete understanding of the inmate's fragile personality, history of suicide attempts, and mental illness. It contained the opinion that "had this information been available, mental health staff could have taken more precautions in maintaining his safety."

The suicide report identified four problems and recommendations, as follows:

Problem 1: The inmate was moved out of the adjustment center after only one month and his prior records had still not arrived. The records arrived after his death and revealed that the inmate had been significantly more psychologically disturbed than he had presented to mental health clinicians at SQ, and had had an extensive history of suicidal behavior. A typical length of stay in the adjustment center for condemned inmates is reportedly six months.
Recommendation: SQ: a) Report on current procedure for processing condemned inmates through intake, and for obtaining UHRs and C-files from prior terms. b) Determine why the inmate was removed from the adjustment center so quickly. c) Form a QIT to develop recommendations for hastening the delivery of records from jail and prior terms, and for the appropriate length of time for newly condemned inmates to remain in the adjustment center.

Problem 2: Reports from inmates at SQ suggest that some staff may be engaging in unprofessional behavior. Name calling or teasing has an extremely negative impact, especially on those already under a great deal of stress and/or suffering from a mental disorder.
Recommendation: SQ Custody: Conduct a fact-finding inquiry as to whether custody staff were teasing this inmate and/or calling him a "baby killer."

Problem 3: There was an acknowledged lapse of communication regarding this inmate's mental status between the licensed psych tech, who documented disorganized thought process and disorganized thought content, and a CCM, who was not made aware of this until after the inmate's death.
Recommendation: SQ mental health staff had already started conducting a series of on-the-job training" sessions to develop procedures to facilitate timely communication among staff regarding clinical concerns.

Problem 4: This inmate had been in and out of MHCBs at least seven times during the ten months while he was at CSP/Corcoran, but no referral was made to a higher level of care, even after that had been suggested by the Coleman monitor. Long-standing policy has long required consideration of referral after three admissions within six months, and the notes clearly indicated that this inmate needed a higher level of care.

158

> Recommendation:  CSP/Corcoran to submit copies of crisis bed placement logs and DMH referral logs, and audit admissions and discharges based on the log for the past six months for compliance with policy.

A death review summary was completed by DCHCS on 7/23/07.  The reviewing physician stated the inmate's history, as well as the history of medical visits which did not occur after November 2004 and laboratory studies which did not occur after 5/10/07, and covered the emergency response.  With regard to the standard of care, the physician opined that the emergency medical response to this inmate's hanging was adequate.  There were no other medical quality of care issues found in the patient's UHR and the records provided.  The conclusion was for "case closure," with no recommendations.

On 1/15/08, the director (A) of the mental health program, DCHCS, and the director of the DAI issued their report regarding the incomplete implementation of the QIP for the suicide of Inmate S.  In their report, the directors stated that the institution's report on its implementation of its QIP in response to the suicide of this inmate was attached.  The suicide occurred on 6/10/07.  The suicide report was dated 9/17/07, and the QIP response was received by DCHCS on 11/14/07.  The directors stated that the institution's response to the two items was found to be inadequate.  They went on to state that the QIP item 1(c) requested that a QIT be formed to develop recommendations for expediting the delivery of records from jail and/or prior terms, and for the appropriate length of time for newly condemned inmates to remain in the adjustment center.  The QIP team meeting minutes were the only documentation received, and there were no recommendations or resulting actions included in the institution's response.  Secondly, the directors stated that QIP item 2 requested a fact-finding inquiry regarding custody staff, and that a letter had been received from the associate warden stating that the issue had been discussed with the A-facility captain, but it did not include documentation to indicate that any further fact-finding efforts such as interviewing mental health staff or inmates was done.  The directors went on to state that SQ had to submit a report addressing these remaining issues upon receipt of the memorandum.  They underscored that DCHCS had "no authority to extend the court-ordered deadline for completion of the Quality Improvement Plan, which at this point, is overdue."  Attached to the memorandum was the executive summary of the suicide report dated 9/17/07.

On 3/5/08, the director (A), mental health program, DCHCS and director, DAI submitted an additional report on implementation of the QIP for the suicide of Inmate S.  In that submission, the directors included a response to QIT items on Inmate S dated 1/23/08 from SQ.  In their response, the SQ warden stated with regard to QIT Item 1(c), per the Condemned Manual Section, Number 301, Initial Classification, all newly arrived condemned inmates housed in the adjustment center are to be reviewed by the Institution Classification Committee (ICC) within 14 days.  The ICC reviews the inmate's case factors and determines custody and program, and the inmate is placed on a schedule to be reviewed every 90 days if assigned Grade "B" or every 120 days if assigned Grade "A."  Housing placement decisions on whether to remain in the adjustment center or be transferred to east block are made on a case-by-case basis.

With regard to QIT Item 2, the warden responded that a fact-finding review was conducted, and that the officer doing the investigation was assigned off-post for three months off the unit. The clinician who made the allegation did not confirm in his report that the officer made the "baby killer" statement. The officer denied making the "baby killer" comment, but did admit that he approached the clinician in a hostile manner. The warden continued on to state, "thus the baby killer comment can not be substantiated." The warden concluded, however, that the officer received a disciplinary report dated 10/22/07 for his hostile approach to the clinician.

**Findings:**

This inmate's suicide does not appear to have been preventable in that the inmate did not report suicidal ideation or intent, although he did express concerns about his safety. The inmate's death does appear to have been very likely preventable, had he received the appropriate mental health evaluations, including a timely review of medical records regarding his mental status both before and after incarceration in the CDCR. Moreover, according to the suicide report, the reasons for this inmate being transferred out of the adjustment center appear to be unrelated to the inmate's adjustment. The failure of mental health staff to obtain the necessary information to provide a comprehensive evaluation is clearly identified as one of the problems in the suicide report. The references to custody staff labeling the inmate as a "baby killer" only serves as a potential exacerbating factor regarding the inmate's safety if he were placed in population or even a condemned unit such as East Block. The failure of implementation of the corrective actions was identified by the directors. They clearly identified that the facility did not provide appropriate responses.

**20. Inmate T**

**Brief History:**

This inmate was a 34-year-old Hispanic male who committed suicide on 7/1/07 in the administrative segregation unit at CSATF. The inmate was the sole occupant of his cell at the time of his death and was a participant in the MHSDS at the 3CMS level of care. This was the inmate's first incarceration which began in the CYA on 9/25/91 when he was convicted of attempted second degree murder and received a ten-year prison term. The inmate was 17 years old at the time of an attempted robbery which resulted in his co-defendant shooting the victim and the ten-year prison term. He was transferred to the CDCR on 4/9/92 via CIM. The inmate's expected parole date was 8/15/07, approximately six weeks from the time of his death.

The inmate was discovered on 7/1/07 at approximately 12:12 p.m. by a correctional lieutenant who was conducting his daily tour of the housing unit. The inmate was the sole occupant of his cell. He was observed hanging by a sheet that was tied around his neck and attached to the air vent inside his cell. The lieutenant immediately advised administrative segregation unit staff to respond to the area, and an officer in the control booth activated his personal alarm. A sergeant ordered the cell door opened, and an

officer retrieved the cut-down tool from the control booth officer and reported back to the cell. Additional officers arrived, and while one held the inmate up, another cut the sheet from around his neck and the inmate was removed from the cell. A psych tech initiated rescue breathing and an LVN started chest compressions when the inmate was removed from his cell. The emergency rescue vehicle was summoned and arrived at the facility. The inmate had been placed on a gurney prior to the ERV arrival, and was loaded into it. The inmate was transported to the CTC with CPR continued while en route. He arrived at approximately 12:25 p.m. The AED was utilized and advised shock that was given. The ambulance arrived at approximately 12:47 p.m. and the inmate was transferred to Corcoran District Hospital, leaving the institution at approximately 12:53 p.m. The inmate did not recover and was pronounced dead at Corcoran District Hospital at 1:18 p.m. by a physician. The suicide report reviewer stated that autopsy and toxicology reports were not received prior to the suicide report, and that an amendment of the report would be made.

The suicide report recounted the inmate's criminal justice history. It stated that this was the inmate's first incarceration and that he had no known prior criminal record. The specifics of his commitment offense, described above, indicated that he was arrested on 4/28/90, when he was 17 years old, for an attempted robbery in which a co-defendant shot the intended victim. After he was placed in the CYA on 9/25/91, he displayed problematic behavior, marked by aggression and disregard for rules and authority, as well as gang-related fights. He was ultimately transferred on 4/9/92 to the CDCR at the CIM. The suicide report went on to describe the inmate as having additional offenses after incarceration in the CDCR, including assault charges for stabbing another inmate in 1994, possession of a weapon in 1995, and aggravated battery by gassing an officer in 2004, resulting in the inmate having a total sentence of 18 years, rather than ten years from his commitment offense. The suicide report indicated that these RVRs were among 27 total RVRs, including 16 that were issued for violent behavior during the inmate's incarceration. The inmate was also on an INS hold, although he was scheduled to parole in August 2007. In addition, the inmate had been placed in the developmental disabilities placement program at the DD-1 level, based on the evaluation of 3/5/04, noting that the inmate refused to participate. A CYA screening test suggested the inmate had poor verbal skills and an impulsive behavioral pattern. Although the inmate's movement history indicated that he had spent brief periods of time in various facilities, including CCI, Calipatria State Prison (Calipatria), CSP/Corcoran, SQ, SVSP, and PBSP, including SHU terms and various out to court visits based on his RVRs while incarcerated, he ultimately was placed on a SNY at CSATF on 12/11/06 because of safety concerns.

The record indicated that the inmate had no treatment for mental illness prior to his incarceration in the CDCR. However, after his transfer to the CDCR in April 1992 and the additional charges that he received after transfer, he was first treated for mental health reasons in 1998. He was placed in a MHCB at PBSP on 8/11/98 because he reported that he could not breathe because of a microchip in his body. He also had not eaten for approximately one week, according to the suicide report, and was given a diagnosis of Delusional Disorder. After discharge, he reappeared at the emergency room and was diagnosed with Schizophrenia Paranoid Type and placed in an MHCB for four days.

Two months later, in October 1998, he was placed on involuntary medications due to danger to self because of his delusional thinking and was treated with Haldol, Cogentin, and Elavil.  The involuntary medications were discontinued in November 1998 and he was discharged to the EOP level of care and later placed at the 3CMS level of care.  He had additional mental health treatment at various levels of care -- in December 2002 at SVSP, at CSP/Corcoran in 2004, and at CSP/LAC in 2006 because of symptoms reflecting delusional thinking, auditory hallucinations, and "a scratched neck" which was considered a suicidal gesture.  His diagnoses during that period included Delusional Disorder as well as Psychotic Disorder NOS, Antisocial and Borderline Personality Disorders, and Malingering.  The inmate was transferred to CSATF in December 2006 and placed on a SNY because of his safety concerns and documented enemies at various institutions.

Remarkably, in December 2006, the inmate was described as not currently on psychotropic medications but also as disheveled, unshaven, and manic with thought derailment, grandiose ideation, and auditory hallucinations, according to the suicide report.  During this period, the inmate was diagnosed with Bipolar Disorder in addition to Antisocial Personality Disorder, and although he was reportedly scheduled to see a psychiatrist, the records indicated that he had no subsequent appointment after 12/28/06 for medication evaluation until 3/21/07.  His treatment plan of 12/28/06 indicated diagnoses of Bipolar I Disorder most recent episode manic and Antisocial Personality Disorder.  His GAF was estimated at 55.  During this period, he did see a CCM on 2/28/07 and 3/21/07 and was again described as demonstrating signs of mania, although he denied suicidal ideation.  An SRAC was completed on 3/21/07 and the evaluation referred the inmate to a psychiatrist for medication review.  On 3/21/07, he did see a psychiatrist but refused medications.  The psychiatrist saw him again on 4/12/07 and according to the medical record, ordered Seroquel 100mg HS for one week, and after 4/19/07 Seroquel 200mg HS for one week, and after 4/26/07 Seroquel 300mg HS for 90 days.

The suicide report referenced the inmate being compliant with his medication, with limited participation in anger management group therapy after that time.  The report also referenced that on 6/24/07, the inmate was taken to the emergency room by custody staff because he had broken the window of his cell, appeared agitated and anxious, and believed that he had an enemy on the SNY and requested protection.  The inmate was cleared for administrative segregation placement because of these enemy concerns.  The ER registered nurse consulted a psychiatrist by telephone, but there was no face-to-face evaluation by a mental health clinician, according to the suicide report, because "there was no indication of suicidal ideation or intent, and his present appeared to be motivated by his housing and enemy concerns."  After placement in administrative segregation, the inmate stopped taking his medications.  The suicide report referenced an interview with a psych tech reporting that a new MAR had been generated and that that MAR had documented the inmate was refusing his medication, but the document could not be located at the time of the review and was not provided to this reviewer.  The last medication administration of Seroquel was noted as 6/23/07.  The psych tech informed the suicide report reviewer that a referral was made on 6/28/07 and a psychiatry

162

appointment was scheduled for 7/5/07, four days after the inmate's death.  The suicide report also referenced the inmate having had an IDTT meeting on 6/27/07 that was held with the inmate *in absentia* since he refused to participate.  Even so, the IDTT did not identify medication compliance as an issue for immediate action by the treatment team.  Quite remarkably, the suicide report stated that, "Aside from noncompliance with medications, notes reflected no problems" for an inmate who had a documented history of progressive deterioration with delusional ideation as well as hallucinations influencing his behavior.

The memorandum by the SRN-2 dated 7/2/07 noted concerns regarding the death of this inmate.  In this memorandum there were timelines for various issues for the inmate, starting on 12/12/02 when he was diagnosed with Delusional Disorder and Antisocial Personality Disorder, as well for his noncompliance with medications and his request for EOP because of enemy concerns.  The memorandum continued with notations in December 2006 when the inmate arrived at CSATF from CSP/LAC, with him being determined to have no medical issues and no medications, but stating concerns about enemies, including statements that he was going to learn Hindu and Buddhism, and that "I am not going to let them get me."  The inmate was prescribed Seroquel in increasing dosages, from 100 mg to 300 mg HS.  The memorandum stated that by 6/24/07, the inmate was seen in the TTA for hearing voices, reporting fears of other inmates, and safety concerns, but denied being suicidal currently.  The inmate did report feeling suicidal "a few years ago," but acknowledged that he felt safe in administrative segregation unit housing.  The memorandum continued on stating that the inmate was educated to notify staff if he felt suicidal, but also that the inmate had manic symptoms, racing thoughts, and impulsive acting out, by his self report.  The memorandum also reflected medication compliance per the MAR, weekly case management and 90-day appointment notes, and psychiatric appointment 90-day notes.  The inmate was noted to have had an IDTT meeting with him *in absentia* as he did not attend on 6/27/07, and the next series of notes were regarding the emergency response to his being found hanging.

The suicide report referenced that 30-minute welfare checks were not documented by custody after the inmate was transferred to administrative segregation unit on 6/24/07.  Specifically on 7/1/07, there were no entries on the welfare check tracking sheet on or about 11:30 a.m. and all other entries were made exactly on the hour or half-hour as the start time, and at exactly five minutes after that for the end time.  The suicide report reviewer stated, "it seems unlikely that this could be an accurate reflection of actual start and end times for these checks.  The institution has initiated an investigation regarding this matter."

As reflected in the records, the inmate had been placed in administrative segregation on single-cell status one week prior to his suicide, and 30-minute welfare checks were not being conducted as required.  He was placed in administrative segregation because of enemy concerns, and had sporadic compliance with his medications.  Further, he refused to attend an IDTT meeting on 6/27/07, as referenced earlier in this report.  The psych tech notes in administrative segregation indicated that the inmate was essentially unremarkable, except for limited participation in contacts with the psych techs and

163

noncompliance with medication. Indeed, the last psych tech contact was on the day of his death at 9:30 a.m., when he did not get out of his bed but "indicated" that he was fine. He was discovered hanging on 7/1/07, less than three hours after this psych tech contact.

The CCM note of 6/29/07 stated that the inmate was seen for weekly 3CMS contacts at the cell door after refusing one-to-one contact in the treatment room. It was noted that the inmate refused mental health contact and reported no mental health concerns at that time. All of the mental status areas were circled as within normal limits, and the inmate was documented as denying suicidal ideation, homicidal ideation, and auditory and visual hallucinations, and was assessed as stable at those times. The plans were to continue one-to-one weekly contacts and encourage the inmate to come out of the cell. This was the last mental health contact, which occurred two days after the initial IDTT meeting in which the inmate refused to participate and which was held without the inmate present at a time when he was refusing psychotropic medications. Remarkably, despite the inmate's refusal to attend, the IDTT progress notes stated that the recommendations and plans were discussed with the inmate who was not there.

A review of the records revealed that the previous CCM note was on 3/22/07, when the inmate was seen without the chart as an emergency referral to the CCM because of his complaint of hearing voices. The psychiatrist who saw the inmate at that time assessed the inmate as "refused to take psych meds" and the plan was "no med given," with a follow up appointment for two weeks. There was a 4/12/07 notation on the same page stating that the inmate agreed to take Seroquel on that date, but there did not appear to have been any further psychiatric contacts after that time, despite the inmate's reported noncompliance with medications.

It did not appear from the records reviewed that the inmate was receiving quarterly 3CMS contacts prior to his placement in administrative segregation, and there did not appear to have been any further psychiatric contact with the inmate after his agreement with the psychiatrist on 4/12/07 to take medications.

The suicide report identified three problems with recommendations, as follows:

> Problem 1: Thirty-minute administrative segregation unit welfare checks by custody not completed or documented according to policy.
> Recommendation: CSATF initiated an investigation. DAI sent a directive to all wardens on 8/10/07 regarding training for the 30-minute welfare checks. Each institution submitted proof of compliance.

> Problem 2: On two occasions, 12/28/06 and 6/27/07 at CSATF, the case manager/IDTT documented significant symptoms and medication compliance problems that may have warranted a referral to psychiatry for medication review, but no documentation was found reflecting that such referrals were considered or indicated. In the first instance, the inmate went without medication for three and one half months, and in the second he remained unmedicated when he completed suicide.

Recommendation: CSATF mental health staff is to do a case review and determine why these treatment plans did not address the inmate's medication noncompliance, given his documented symptoms. Identify plan to remedy this deficiency.

Problem 3: The MAR that reportedly documented medication compliance/refusal during the inmate's administrative segregation placement could not be found. Inmate had been off medication since his administrative segregation placement on 6/24/07. The reviewer was unable to verify whether the inmate had been offered medication, and whether he had been referred to psychiatry for noncompliance. Recommendation: Locate the missing MAR.

A death review summary template was completed by the DCHCS on 7/31/07 and concluded that no significant nursing or systemic issues were identified, with recommendation "case closed" from the medical point of view.

On 3/5/08, the director (A) of the mental health program DCHCS and director of DAI submitted their report on the implementation of the QIP for the suicide of Inmate T, in response to the suicide report dated 10/10/07. In their report, the directors referenced documents provided by CSATF at Corcoran District Hospital which indicated that the QIP addressed the three identified problems from the suicide report.

With regard to Problem 1, the response indicated that the investigation had been turned over to the office of internal affairs, with the status pending as of 7/23/07. In addition, CSATF provided required training to officers assigned to conduct 30-minute welfare checks, and issued a memorandum instructing the administrative segregation sergeant to assign on a daily basis a specific officer responsible for conducting the 30-minute checks.

With regard to Problem 2, the senior psychologist supervisor conducted a case review including a review of the necessary documents, interviews with CCMs and psychiatrists, review of the MHTS reports and tracking forms, and IDTT membership compliance reports, and training on "medication noncompliance and psychiatry referrals" for CCMs on 12/4/07. IST training sheets were also provided.

With regard to Problem 3, the missing MAR was located and provided, demonstrating that the inmate had refused his Seroquel medication from 6/25/07 through 6/29/07, but documenting that he was given his Seroquel on 6/30/07. There were notations that the inmate had been refusing Seroquel for three days and was posted for a doctor. However, there was no indication that a psychiatrist had indeed reviewed this information or saw the inmate for noncompliance with his medications as per policy.

**Findings:**

This inmate's suicide does not appear to have been foreseeable, as he was not reporting intent to harm himself, although he did have a history of suicidal ideation. Notably, the inmate did have enemy concerns resulting ultimately in his placement in administrative

segregation. He had reported to staff that he believed he saw enemies in his previous housing location, resulting in a placement in administrative segregation. This inmate's suicide appears to have been preventable because he had a longstanding history of Psychotic Disorder and was effectively treated in the past, but had been noncompliant with medications, which was known to staff and documented on the MARs. However, it appears that he was not appropriately referred and/or seen by psychiatric staff to address his issues of noncompliance and his increasing paranoia and fears that he would be harmed by others. This was clearly a failure of adherence to programmatic guidelines and policies regarding medication noncompliance for an inmate who was seriously mentally ill. Factors contributing to this inmate's death appear to have been inadequate psychiatric and CCM evaluations and follow-up, and failure of the IDTT to adequately assess the inmate's noncompliance with medication and refer for prompt psychiatric reevaluation, given the inmate's history and recent placement in administrative segregation unit because of increasing fears of harm from others.

## 21. Inmate U

**Brief History:**

This inmate was a 36-year-old Hispanic male who committed suicide by hanging on 7/3/07 in the SHU at CCI. He was single-celled at the time of his death. The inmate was not a participant in the MHSDS at that time. The inmate entered the CDCR via the NKSP RC on 8/27/01, having been convicted of lewd and lascivious acts with a child under the age of 14, with a sentence of eight years. His anticipated release date was 3/26/08.

The inmate was discovered on 7/3/07 at approximately 10:10 a.m. by a CO who was to perform a medical escort of the inmate. The officer noticed the inmate with a noose around his neck attached to the cell air vent. The officer announced over his radio a medical emergency and possible suicide. Staff responded and obtained the cut-down tool and extraction shields. A correctional sergeant authorized the cell entry. The sergeant ordered the inmate to be lifted and then used the cut-down tool to cut the noose that was around the inmate's neck. The sergeant then began CPR, and medical staff, including an LVN and a RN, responded and initiated basic life support as the inmate was transported by gurney to the emergency room. The outside ambulance service was contacted as the inmate was being transported to the infirmary. A physician assisted medical staff with CPR during transport. The inmate was unresponsive, and at 10:44 a.m. the physician pronounced him dead. A timeline was provided and indicated that the inmate was discovered at 10:10 a.m., the cell was entered at 10:12 a.m., and medical staff arrived and assisted the sergeant at 10:14 a.m. The inmate was transported to the infirmary at 10:23 a.m. The ambulance was requested at 10:28 a.m. and arrived at 10:42 a.m. At 10:44 a.m., the inmate was pronounced dead. An autopsy report was provided by the sheriff-coroner of the Kern County Coroner's Facility and stated that the autopsy was performed on 7/5/07, with the cause of death determined to have been hanging and the manner of death to have been suicide.

Of note was a memorandum dated 7/17/07, with the subject "translation of six inmate requests from" Inmate U, deceased.  These translated request forms included the inmate's 6/10/07 statement of his concerns that he would like to have a cellmate and that he might be in danger.  He also requested that he be moved to another building with a Hispanic inmate so that he could "do my time peacefully and not have any type of problems."  He continued on stating that he had been approved for a cellmate but was not assigned one, and "today I don't know what is going on with me if I am in danger, don't know I come from a Level Two and I have never been in that situation."  He reported that he had no communication with anyone and again requested a move to another building with a Hispanic cellmate "in the same situation so I can do my time."  He continued on another statement, "I have not been given the necessary orientation, don't know if it's because of a racial situation or the language because I don't speak English, I don't know if I am in danger but I didn't understand anything in classification."  On 6/28/07, the inmate stated again in Spanish "sir coordinator I am in a dangerous and deadly situation, my information is posted on my door, and 206 and 207 investigated on the internet and yelled on the tier why I am here.  They passed a paper to every door in the building; they also passed it to the Southerner's so they would be informed so I wouldn't be able to run with them in other institutions."  He continued further, stating that he was in need of serious custody because "my life is in danger because they all know why I'm here and only have a little bit of time to go to my country Mexico."  On 6/30/07, he continued with "sir it's a matter of life or death, an emergency, I need to communicate with you because the ones out of 206 investigated my case over the internet."  The inmate in 207 "yelled out why I am here and passed out the information to all the cells.  203 is saying that I have a green light at any institution I go."  Finally, on 7/1/07, the inmate sent his last request, stating "I need support, it's urgent, all the inmates all day have passed out papers, they placed an announcement on the internet to cut my genitals that's why it is urgent."  He goes on to state that he needs to speak with someone and states, "I am thinking very bad things like killing myself.  I am in a situation I need to be orientated, I don't know what will happen in the future, it's my life or death."  He further stated that he would like to communicate with the Human Rights from Mexico, the Mexican Counsel, and wanted extradition to Mexico, concluding with, "thank you it's an emergency.  Thank you."  All of this correspondence was in Spanish, as the inmate did not speak English.

The suicide report recounted the inmate's criminal justice history.  It stated that his juvenile criminal history, if any, was not available.  It went on to state that his adult criminal justice history began in October 1992, with a conviction for petty theft, and that in 1997 he was convicted of lewd and lascivious acts with a child under the age 14 with a 30-day jail sentence, two years' probation, and six months of counseling.  An "R" suffix was applied to the inmate's number after this offense.  He also had another offense of "annoying a child under 18," although the date was not specified, and in August 1997 he was ordered to register as a sex offender.  According to the suicide report, the inmate had a number of other offenses including shoplifting, damaging property, disturbing the peace, driving under the influence of alcohol, trespassing, petty theft, assault with a deadly weapon (not a firearm), lewd and lascivious acts with a child under age 14, and sexual intercourse with a minor under the age of 16 when he was over the age of 21.  He

also had an active hold from INS.  His commitment offense occurred in 2001. He was convicted on 8/13/01, and entered the CDCR on 8/27/01, as noted above.

The inmate was never a participant in the MHSDS and, although he was cleared for general population, he spent considerable time in the administrative segregation unit and in protective custody (PC) status, as referenced above.  He was ultimately placed in the SHU because of possession of an inmate-manufactured weapon that occurred on 2/18/07.  The inmate had a knife under his mattress but denied that it was his. He received a nine-month SHU term because of this weapon possession.  He was transferred to CCI and had an initial health screening on 5/30/07 which stated that there was no indication that he was suffering from any mental illness.  Although the inmate had a Level II classification score, and although the suicide report indicated that a staff assistant/interpreter was present at his hearing for the SHU placement, the reviewer concluded "it seems apparent that he did not understand what took place at this meeting, and that he was extremely fearful for his safety based on his "R" suffix."  Indeed, as referenced above, the inmate submitted several inmate appeals and requests, all of which were written in Spanish.

The inmate did have several contacts with mental health staff.  These included contacts on 8/29/01 after his admission, on 2/19/07 after his placement in administrative segregation, and on 2/26/07.  All made reference to the inmate's denial of any past mental health history, his refusal of the 31-question mental health screening (on 2/19/07), and his appearing confused but in no distress.  None of these notes referenced the inmate's limited communication in English.  He was ultimately cleared for general population, even though he was going into a SHU on 5/30/07.  In addition to his requests for a cellmate and questions about his placement in the SHU, the inmate also sent several medical health care services request forms regarding problems with his ankle, shoulder, feet, heartburn, dizziness, and difficulty urinating.  He reported that he had been losing weight, was having difficulty sleeping and eating, had no energy, and had concerns that he may have had kidney stones.  The inmate was prescribed Tylenol, antacid, and Prilosec.

The inmate did submit a final health care services request form on 7/1/07, reporting that he continued to have problems with his ankle and weight bearing.  He was scheduled to be seen on 7/3/07, the day of his death, but he was not seen prior to his hanging.  The suicide report made reference to the fact that the inmate's requests written in English were in different handwriting than those written in Spanish, and opined that the inmate did not write these requests himself, but had other inmates write them for him. However, the requests that were written in Spanish appeared to be written in his own hand.  The suicide report made reference to the inmate's repeated concerns for his safety given his "R" suffix, and to other inmates' awareness of the reasons why he had been incarcerated.  The reviewer described the inmate's fears as being likely based on actual statements made to him, but also stated that his personality was basically "immature and poorly developed," and that he may have found himself to be "now the poorly defended victim."

The SHU placement was referenced by the suicide report reviewer as creating "great anxiety and fear for him."  The psych tech rounds on the date of his death, 7/3/07, were

from 9:50 a.m. to 10:00 a.m. which is approximately "the time of" the inmate's hanging, as per the suicide report. The suicide report also referenced the fact that the inmate's requests were provided to his counselor and, according to investigative services, the translations had not been done. It appeared that the translator received the requests on 7/11/07, over one week after his actual suicide, and that his urgent and emergency requests were never translated and provided to any staff by the counselor prior to his death. The suicide report made reference to a note found in the inmate's cell after his suicide which stated, "I need my information to be confidential yesterday the Southerners were making their weapons and they want to kill me. I put in medical requests and they put one in too to see if they take us together…I'm already dead I'm only counting the hours. As soon as I arrive at the Hospital they are going to kill me." The reviewer concluded, "he was clearly very fearful of being killed by other inmates, so much so that he took his own life."

The suicide report identified one problem with recommendation, as follows:

> Problem: Inmate U wrote six requests, dated between 6/10/07 and 7/1/07, to his correctional counselor following his institutional classification committee (ICC) hearing on 6/6/07. These notes clearly stated that the inmate had not understood the proceedings, did not understand what was happening with him, was being threatened with his life by gang members, was increasingly fearful and desperate, and finally that he was thinking of killing himself. There was no response to these requests. The counselor received them and had reportedly sent them to someone to be translated, which had not yet been done by the time when the inmate committed suicide. Clearly, if someone had read these notes, immediate action could have been taken that may have saved his life.
>
> Recommendation: CCI is requested to conduct a fact-finding to determine exactly why none of the inmate's requests had been translated or responded to. Clarify the process and appropriate timeline and take corrective action as indicated.

On 4/21/08, the director of mental health program, DCHCS and director (A) DAI issued their report on implementation of the QIP for the suicide of Inmate U, in response to the suicide report dated 10/10/07. In their report, the directors included a 3/19/08 memorandum from CCI stating that a CC-1 was interviewed, and that he was unable to provide a time as to when he received the inmate's requests. However, he surmised that he must have received them all at one time because at the time when a CO received them for translation, they were bundled together with a note from the CC-1 requesting translation. The CC-1 also indicated that he "immediately forwards" institutional mail and correspondence requiring certified translation via the institutional mail, in accordance with the CC-1's operational procedure which was attached to the memorandum. The referenced officer was noted to be a certified Spanish language translator and received the six requests on 7/11/07, bundled together and addressed from the CC-1 requesting translation. The officer reportedly stated that he received the request through institutional mail and contacted the ISU, stating that he had not translated the request because he was aware that the inmate had committed suicide on 7/3/07. The response from the CC-1

continued on to state that it was not uncommon for inmates to hold their mail and send multiple requests at the same time, and that the inmate's last request was on 7/1/07, indicating that it had been picked up on 7/2/07 and routed via institutional mail for translation, with receipt by the officer on 7/11/07 "(six business days)", with a notation that the CC-1 and mailroom staff do not work on holidays and weekends.  The memorandum also noted that the inmate had daily contact with SHU staff, that he never refused breakfast, lunch, or dinner, and that he had been offered 12 opportunities to shower.  The psych techs were noted to have completed the SHU round on a weekly basis and that staff's actions were consistent with policy.  The memorandum continued on to state that the inmate participated and understood all actions from the ICC and agreed with the committee's decisions.  However, the ICC documents did not demonstrate that the inmate required a certified Spanish language interpreter nor was he assigned a staff assistant, as the "issues were not complex and he was not a participant in the Mental Health Services Delivery System."  Based on the review, corrective actions that were undertaken included the writing and distribution of a memorandum by a facility captain regarding use of interpreters, a Spanish language fluency examination (which was attached) to increase the number of certified Spanish language staff interpreters, IST "to improve communication with inmates, changes in OP113 (inmate housing assignments) to have inmates with sensitive needs and safety concerns together, and review of the OP203 to facilitate the expedited processing of requests and institutional mail.  In addition, because of this inmate's suicide and two additional suicides in the SHU, the acting health care manager directed psych techs to make daily rounds of all SHU inmates as a temporary measure pending further review and consultation.

Plaintiffs' counsel wrote a memorandum dated 4/30/08 regarding their comments on recent suicide reports.  They included their concerns regarding the report on implementation of the QIP for this inmate.  Plaintiffs' counsel referenced the suicide review as having been completed eight months prior to their receipt of the report of implementation of the QIP, and noted concerns that the inmate had submitted six requests written in Spanish, including one in which he clearly stated he was suicidal, but they were not translated before his suicide and therefore not responded to appropriately.  They quoted the suicide report as stating that "clearly if someone had read these notes, immediate action could have been taken that may have saved his life."  Plaintiffs' counsel raised several questions regarding concerns that were not addressed by the suicide report's one recommendation.  These included questions as to whether or not the inmate was provided with a translator or Spanish-speaking clinician during his initial mental health screening, psych tech rounds, and the order by the health care manager to increase psych tech rounds because of a "rash of suicides in that unit."  Plaintiffs' counsel also referenced the suicide report, indicating that "following additional review and consultation" with the nurse consultant, psych techs "were directed to return to the previous weekly rounding schedule for SHU inmates."  Plaintiffs requested further clarification regarding the decision-making process that had been utilized to reverse the health care manager's direction and the reduction from daily to weekly rounds in the CCI SHU.  Plaintiffs requested follow-up on the issue of ensuring that initial and continuing mental health contacts occur with effective communication because of the problems identified in this inmate's suicide.

**Findings:**

This inmate's suicide appears to have been both foreseeable and preventable. The inmate sent multiple requests regarding his continuing and increasing fears of harm from other inmates because of his "R" suffix and information regarding his commitment offense having been known to other inmates, particularly Southerners at CCI. The inmate forwarded his requests to his CC-1 who, for whatever reasons, appears not to have bothered to have them translated. The requests are increasingly filled with the inmate's fears for his safety and ultimately referenced his suicidal ideation because of these fears. Had these requests been translated, the Program Guide requires that the inmate receive an SRA, and such assessment would very likely have determined that he was at significant to substantial risk for suicide and he should have been transferred to a higher level of care for treatment. He was not, and because of this he was able to commit suicide.

## 22. Inmate V

**Brief History:**

This inmate was a 39-year-old Caucasian male who committed suicide by water intoxication on 7/7/07 in the EOP administrative segregation unit at CSP/Corcoran. The inmate re-entered the CDCR on 12/12/01 via the SQ RC with a third-strike term of 26 years to life on a conviction of vehicle theft with special allegations. In addition, the inmate was convicted of battery on a non-prisoner, threats to an officer, and resisting an officer with force and violence on 12/21/06, with an additional sentence of 50 years to life, for a total prison term of 76 years to life. His minimal eligible parole date was 8/4/76.

The inmate was discovered on 7/7/07 at approximately 12:04 p.m., but the incident report did not state how or by whom he was discovered. The death report, incident report, and suicide report stated that the inmate was discovered unresponsive in his cell, and that the Emergency Transport Vehicle (ETV) was dispatched at 12:07 p.m. The inmate was noted to have been a diabetic and was making incomprehensible sounds and involuntary movements with rapid but shallow breathing. He was also noted to have soiled himself with urine and feces. He was taken to the emergency room at the prison and evaluated by a physician. His condition was described as critical, with the inmate semi-comatose with spontaneous breathing, rapid pulse, and elevated blood pressure. The records noted that the initial impression by the physician was status epilepticus versus rule out cerebral vascular accident. The inmate was treated with Valium, an airway was secured, and the inmate was noted to have stabilized. However, the physician attempted to arrange for transport to a higher level medical facility. The records stated that "many outside facilities were contacted, including Mercy Hospital at Bakersfield, Hanford Community Hospital, Delano Community Hospital, and Corcoran District Hospital," but transfer was denied. The suicide report stated, "this patient could not get an acceptance for higher level housing facility."

At approximately 2:15 p.m., the inmate was accepted for transport to Corcoran District Hospital. The inmate arrived at the emergency room, and the initial work-up via a CT scan revealed a massive subarachnoid hemorrhage. He was also noted to have low sodium and potassium. Although Corcoran District Hospital attempted to transfer the inmate to another hospital, it was unsuccessful and the inmate was maintained at Corcoran District Hospital on a respirator. The ER physician reportedly consulted with neurosurgeons at the University of California San Francisco and the University of California Los Angeles and determined that the inmate was brain dead. At 10:00 p.m., the physician contacted the inmate's next-of-kin and explained the inmate's medical condition, and the family elected to have life support withdrawn. The inmate was pronounced dead at 10:35 p.m.

An autopsy report was provided by the Kings County Sheriff-Coroner and stated that the autopsy performed on 7/9/07 determined the cause of death to have been brain swelling (minutes) due to water intoxication (minutes). The manner of death was noted to have been suicide. The pathologist noted "the history of prior suicide attempt by water intoxication and the finding of low vitreous humor sodium concentration support this finding." A toxicology report indicated the presence of benzodiazepam 82 ng/ml, below the therapeutic range, and in vitreous humor sodium 95 meq/L (136-145 meq/L detection level) and glucose 1 ng/dL (70-110 ng/dL detection level) as well as creatinine 0.4 mg/dL (0.6-1.0 ng/dL detection level).

The suicide report recounted the inmate's criminal justice history. It stated that he had been admitted to the CYA in 1985 after he had committed acts of vandalism, stolen a car, and ran away from his mother's home. The inmate paroled from the CYA in November 1985, but was re-arrested after he stole a car on 3/24/86, with ultimate discharge from CYA on 4/3/89. His juvenile record also included, in addition to auto theft, defrauding an innkeeper, receiving stolen property, vandalism, attempted escape from a county facility, resisting a public officer, and burglary. The inmate also had adult convictions for indecent exposure, burglary, assault with intent to commit mayhem/rape, robbery, vehicle theft, burglary, injuring telephone power line, battery, and threatening crime with intent to terrorize. He received probation or jail time for these offenses, and was convicted after he was arrested in September 1990 for shooting a gun in the air during a road rage incident.

On 6/9/91, the inmate broke into the home of a woman and was standing next to her bed when she awoke and started screaming. The inmate shot the woman, hit her in the face, threatened her, tore off her clothes, and attempted to rape her. According to the suicide report, the inmate could not get an erection and subsequently beat the woman further. After his arrest, he denied the crime but was sentenced to 15 years in the CDCR on 5/25/93 upon conviction of assault with intent to commit rape. The inmate initially entered the CDCR via the SQ RC on 6/4/93, but the judgment in this case was reversed on 2/9/95. He returned to court on 7/18/95 and entered a plea for assault to commit sodomy and other charges, resulting in an 11-year sentence with return to SQ on 8/21/95.

The inmate paroled on 9/23/98, but was returned to custody on 10/7/98 for a parole violation. He paroled again on 2/1/99 and was returned to custody on 6/18/99 with new charges of vandalism, assault on a person, and threatening crime with intent to terrorize. He was paroled on 10/31/00, returned on 11/8/00, and had his last parole on 1/1/01. On 1/15/01, he stole a vehicle, was arrested, and was convicted of vehicle theft with special allegations, resulting in a third strike and his return to the CDCR on 12/12/01 with a sentence of 26 years to life. On 12/21/06, the inmate was convicted on charges while in prison for threatening an officer, resisting an officer with force and violence, and battery on a non-prisoner. He received an additional 50 years to life, for a total term of 76 years to life.

The records indicated that the inmate had no mental health history prior to entering the CDCR and was initially placed in population, based on the initial mental health screening on 8/23/95 when he reported no mental health symptoms or history. He was diagnosed as having a toxic psychosis secondary to his admitted smoking of marijuana while in prison on 11/27/96. He also was reported to have had visual hallucinations of things coming out of the wall after he received a disciplinary write-up in December 1996 for possession of amphetamine. He was in an MHCB in June 1997 after he made multiple lacerations on his left wrist and forearm, described as self-mutilation. His diagnosis at that time was Adult Antisocial Behavior, and he was returned to population. The inmate's mental health symptoms appeared to have escalated. In August 1997, according to the suicide report, he wrote letters to newspapers and to his public defender stating that he had a tracking device/receiver implanted in himself when he had dental work done at the prison, which he claimed was because of his sex offense. He also reported hearing voices but insisted that he was not mentally ill. At that time, the inmate was requesting a CT scan and reportedly stated that he did not want to die and would never take his life. The inmate was seen by a clinician who referred him to a psychiatrist. Mellaril was ordered, but the inmate refused to take medication. He was placed at the 3CMS level of care with a diagnosis of Psychosis NOS and reported a series of delusions which included psychologists and implants in his brain. He was assessed as having delusions that were related to his methamphetamine use and, despite renewal order prescriptions for Mellaril, he refused to take it.

The inmate was eventually diagnosed with Delusional Disorder and Substance Induced Thought Disorder. He had sporadic compliance with anti-psychotic medication, eventually stopped taking medication, and was removed from the MHSDS in 1998. The inmate continued his letter writing, including letters to the American Civil Liberties Union (ACLU), describing his thoughts and his being controlled and tortured by others. The inmate was referred to the EOP, but the records were unclear as to whether he actually was a participant in the EOP before he paroled in September 1998. The inmate returned to prison, as noted above, and had a number of other diagnoses including Paraphilia NOS (rule out Exhibitionism and Sexual Sadism), Antisocial Personality Disorder, rule out Paranoid Schizophrenia, malingering, Delusional Disorder NOS, and Schizophrenia Paranoid Type. He continued to write letters to various parties including the DA's Office, the Prison Law Office, and others, but was not placed in the MHSDS until December 2005 at the 3CMS level of care as medical necessity. At that time, he

reported suicidal ideation and had a long SHU term.  The inmate was prescribed an anti-depressant at that time, which he appeared to have taken, although in subsequent evaluations he denied any history of mental illness, mental health treatment, or suicidal ideation.  He was being treated for Depressive Disorder NOS in the 3CMS level of care while serving the SHU term.  While at this level of care, he received treatment plans and initially was perceived by staff as having a mild depression and personality disorder until 7/16/06, when he was reported to have pressured speech, delusional thought processes, and paranoia.  He was also guarded and evasive with periods of hyperactivity and hyper-arousal, but he denied suicidal ideation.  His diagnosis at that point was changed to Schizoaffective Disorder with Bipolar features versus Bipolar Disorder with Psychotic features, but he remained at the 3CMS level of care.  He again would not take any anti-psychotic medication despite the staff's impression that he was delusional and had the above symptoms.

The inmate was treated at an outside hospital on 2/23/07 because he was found unresponsive.  While en route to the hospital, he had a seizure.  The hospital determined that the inmate was suffering from water intoxication, based on his electrolyte imbalance, determined that this was a life-threatening situation, and treated the inmate.  When he returned to the CDCR at CSP/Corcoran, he was placed in an MHCB on 2/28/07.  His diagnosis at that time was Paranoid Schizophrenia and he was placed on the anti-psychotic Zyprexa.  A Keyhea petition was dictated on 3/13/07.  The inmate denied his decompensation as having been a suicide attempt, although the hospital reported that he had made a suicide attempt.  The Keyhea petition repeated that the reason for the petition was because of his suicidal ideation and florid psychosis.  The petition included not only danger to self, but grave disability based on the inmate's impaired insight and judgment, refusal of treatment, potentially lethal episode of water intoxication, and paranoia.  The CDCR's Office of Legal Affairs rejected submission of the petition on the ground that the evidence was insufficient to bring a Keyhea action.  The suicide report made reference to the staff at CSP/Corcoran, particularly the psychiatrist, disagreeing with this denial and to a reference to a Keyhea injunction which "requires the act of self-harm to occur within an inpatient setting, a criterion that was not met in this case."

When the inmate was discharged from the MHCB, he was placed at the EOP level of care on 3/22/07 and housed in the administrative segregation EOP hub.  An SRAC was completed on 3/26/07, noting that the inmate had been presumed to have been suicidal, "but denies a recent coma was a suicide attempt."  This SRAC also stated that the inmate, COs and staff were interviewed, and the UHR and C-file were reviewed.  It was a comprehensive SRAC which identified static, slowly changing, and dynamic risk factors as well as protective factors.  The estimate of risk was "no apparent significant risk" as well as "moderate risk," and the plan was referral to the psychiatrist for medication review.  The psychologist who completed the SRAC noted in the "comments" section that the inmate denied that his recent coma was an attempt at suicide, but did also indicate a current impression that the inmate presented a moderate risk.

The inmate's last treatment plan was on 6/19/07, when he was described as having "circumscribed insidious delusions," given a diagnosis of Schizoaffective versus Bipolar,

depressed type, and noted to have evidence of an antisocial character and denying mental health issues.  The inmate was assessed by the treatment team as possibly presenting symptoms for secondary gain.  The plan was for him to remain in the EOP after he left the administrative segregation EOP hub, but he appeared to be a candidate for 3CMS.

While the inmate continued to deny mental health symptoms to various staff, a psych tech reported to the suicide report reviewer that she believed that the inmate was not being truthful when he avoided eye contact whenever his mental health issues were being discussed.  As evidence of the inmate's lack of truthfulness, the psych tech included the inmate's avoidance of eye contact when she attempted to discuss his previous episode of water intoxication as a suicide attempt.  She also noted that the inmate would talk to "someone who was not there," and that at times he was "yelling under his breath."  The psych tech concluded that the inmate was psychotic and attempted to hide his mental illness.  She also reported that he "always drank a lot of water" and that she believed that the inmate did intend to kill himself.

The inmate's CCM concurred that he was certain that the inmate's death was a suicide.  The CCM reported to the suicide report reviewer that the inmate eventually admitted his previous water intoxication episode had been a suicide attempt.  The reviewer also contacted the inmate's former psychiatrist, who reaffirmed his disappointment that "Sacramento" had denied the request for a Keyhea petition.  The inmate did agree to take Effexor, although the psychiatrist was not sure if he was actually taking it regularly, and the inmate had withdrawn from meeting with him after his previous water intoxication episode.  The laboratory values from Mercy Hospital for his previous water intoxication episode on 2/24/07 indicated that the inmate's potassium was 3.3, sodium 113, and chloride 78, all substantially below normal ranges.  His drug screen was negative, and it was determined the inmate had overdosed on water at that time.  Despite the inmate's very spotty compliance with medications, he had not been referred for a medication review prior to his suicide attempt by water intoxication in February 2007.

The suicide report dated 11/26/07 identified one problem with recommendation, as follows:

> Problem:  CDCR's Office of Legal Affairs rejected the Keyhea petition sought by a prison psychiatrist for this inmate because the injunction requires the event(s) which form the basis of the petition to occur within an inpatient setting, and his self-harm behaviors occurred in an outpatient setting.
> Recommendation:  The Office of Legal Affairs will work with the DCHCS mental health program to review and revise Keyhea protocols to facilitate and improve communication toward better meeting the clinical needs of the inmate-patient, and will have a designated senior counsel review the cases prior to making a final determination.

A death review summary was also provided.  Review of the history for this inmate stated that the patient died of cerebral edema due to hyponatremia, most likely from water intoxication.  However, the autopsy and medical examiner reports were not available to