the physician. The physician noted no deviations from the standard of care, and there were no specific recommendations. The reviewer noted that the case was not reviewed as a suicide, as it was beyond the scope of that review to determine whether the death was a suicide. Finally, the reviewer also stated that the psychiatric care the patient received was not specifically evaluated, although that should be done if the case is to be reviewed as a suicide.

There was no report submitted by the directors of the mental health program of the DCHCS or DAI regarding the implementation of the QIP regarding this inmate's death by suicide. A memorandum dated 9/15/08 from the supervising attorney at the Office of Legal Affairs was submitted. It stated, "The Office of Legal Affairs, has, as expressed in the final suicide report, gone beyond a strict reading of the injunction to challenge what is considered to be `inpatient' for the purposes of the prison setting." The memorandum continued on to state that the office has filed motions to reconsider at the Office of Administrative Hearings when it believes that a verdict rendered in a case was not appropriate. The memorandum continued on, stating that the Office of Legal Affairs was working with the Office of Legislative Affairs to re-write the Penal Code Section 2600 to negate the "inpatient" requirement in a prison setting for Keyhea petitions based on dangerousness. It further stated that the office also has, in accordance with agreements made in their QIP, a senior attorney review any and all cases that may be rejected for any basis prior to the actual rejection notice being sent, and lastly that the relationship with mental health "has improved tremendously" and that the office was working to train institutions and facilities throughout the CDCR on the Keyhea process. This was a failure to support the Keyhea request by clinical staff from the supervising senior staff counsel, Keyhea hearings, Office of Legal Affairs.

**Findings:**

This inmate's suicide does not appear to have been foreseeable as the inmate repeatedly denied that he had any intention to harm himself in the days to weeks prior to his actual death. The inmate also denied, at least initially, that his previous episode of water intoxication was a suicide attempt. However, he later acknowledged to several clinicians that it was indeed a suicide attempt, and the records indicated that clinicians believed that this inmate was in need of involuntary medication to treat his psychotic illness. The records also indicated that the staff was very much aware of the inmate's denial of mental illness and his efforts to hide his mental illness from clinicians. His death appears to have been possibly preventable if he had been properly assessed (SRAC) after his first attempt by water intoxication, and properly presented for a Keyhea action to provide him with medication. The suicide report appropriately identified a problem with the Office of Legal Affairs not supporting the clinical staff in pursuing a Keyhea order for an inmate whom the clinical staff determined was in need of involuntary treatment.

Based on this reviewer's understanding of the CDCR and the Keyhea process, it is the responsibility of the administrative law judge, not the Office of Legal Affairs, to determine whether or not an inmate should or should not be involuntarily treated, based on clinical opinion and presentation. This inmate was denied that opportunity and

therefore in this reviewer's opinion, his death was very likely preventable had he been appropriately treated. Despite the best efforts of the clinical staff to provide such treatment, they were hampered by what appears to be an unnecessary and unfortunate (for the inmate) barrier. The suicide report did not make reference to the failure of the clinical staff to refer this inmate to a higher level of care, given the particular dynamics of his illness and the interpretation that he had to be an "inpatient" for a Keyhea petition to be filed. The inmate was clearly described in the records as delusional, guarded, and evasive, with denial of mental illness. There was no mention in the record that the inmate was ever considered for referral to a higher level of care, i.e. an intermediate care program that would have been in a better position to observe, monitor, and manage his day-to-day activities once it was clear that he had indeed attempted to kill himself by water intoxication, the very method that he eventually was able to implement in taking his own life.

## 23. Inmate W

**Brief History:**

This inmate was a 44-year-old Hispanic male who committed suicide by hanging on 7/30/07 at CTF. The inmate was double-celled at the time and was a participant in the MHSDS at the 3CMS level of care. The inmate re-entered the CDCR on 5/4/05 via the WSP RC for his fifth term. This commitment offense was burglary. The inmate had two prior strikes, but he received a 12-year sentence with his earliest possible release date as 12/13/14.

The inmate was discovered on 7/30/07 at approximately 3:40 p.m. by two COs who were conducting regular hourly scheduled unlocks on this general population tier. The officers observed the inmate hanging in his cell after they had been informed by the inmate's cellmate that he was not going into his cell because there was something wrong inside his cell. One of the officers approached the cell, noticed a bloody paper partially covering the door window, and then requested assistance from his partner. The two officers opened the cell and found the inmate hanging from a sheet attached to the frame of the cell window, with blood on his wrists and hands. The officers activated their personal alarms and one requested assistance via the institutional radio. Additional officers arrived and lifted the inmate's body, using a razor blade they found on the bottom bunk to cut the noose around his neck. They carried him out of the cell and placed him on the tier. Other correctional staff then started CPR. At 3:50 p.m., staff requested an ambulance which arrived at 3:55 p.m. A nurse assessed the inmate as having no pulse or respiration, applied the AED, was advised "no shock," and the shock was therefore not applied. CPR continued. A physician arrived at the housing unit, examined the patient, and determined that he had fixed and dilated pupils and no spontaneous pulse or respiration. Staff continued CPR, but the inmate did not respond. The physician pronounced the inmate dead at 4:02 p.m. An autopsy report was issued by the Monterey County Sheriff-Coroner's Office. It stated that the autopsy was performed on 8/1/07 and determined the cause of death as asphyxia due to hanging. The autopsy also revealed half-inch to one-inch cuts on both forearms and wrists (presumably from the razor blade).

Toxicology studies determined that the decedent's blood contained no ethanol alcohol or common acidic, neutral, or basic drugs.

Discovered in the inmate's property was what appears to be a suicide note dated 7/28/07 addressed to "Hi Honeybee." In the note, the inmate reported that he had received the addressee's letter and how he was hurt by the writer's words. The inmate stated that he did love and still loved the addressee and that "I will take that to the grave." He went on to say that he wished that things would have turned out the way they had planned, but he guessed that fate had him destined for something else. He concluded that he missed the addressee, thought about her everyday, and wrote, "now all that is left is that I see you in heaven." He concluded that by the time the addressee read the note, "I will have gone the same way as the first time but more or less successful depending on your point of view." He continued on to state that he was sorry for not being what the addressee wanted, that he loved her, and ended with "take care of yourself and keep my soul in your prayers. Love always me."

The suicide report made reference to a second letter to the inmate's father found in the inmate's property and dated 7/28/07. The other letter, referenced above, was reportedly to his girlfriend. In the letter to his father, the inmate expressed hope that his father was doing well, that he wished that he had heard from him, and that he missed his father and his children. The inmate also apologized to his father for not being the son he wanted or being the father to his kids that he should have been. He stated that he was writing because he wanted his father to know how tired he had become of "this life and pains I've been feeling so I just decided I'll probably never be normal." He concluded by stating that he "can't take it anymore" and "at least I'm not behind prison walls anymore." He closed the letter by stating that he loved his father and wished that he had been a better person.

The suicide report recounted the inmate's criminal justice history. It stated that there was no known juvenile criminal record, but that the inmate had an adult criminal history that spanned more than 25 years. The suicide report stated he had had numerous drug related arrests and other property crimes that appeared to have been related to supporting his heroin addiction. His first incarceration in the CDCR was in October 1986 at CIM, and he had subsequently served time in a number of CDCR facilities. His last term was based on the commitment offense, as stated above, and began on 5/4/05. He was transferred to CTF on 9/6/05 with a 12-year sentence. The suicide report referred to a probation officer's report as stating that the inmate had attempted suicide while he was in the county jail, and that he was receiving medications for depression. The inmate also had a history of alcohol abuse since age 15, and marijuana use from ages 16 to 20, and cocaine and methamphetamine use, but his drug of choice appeared to have been heroin which he started injecting at age 15 and continued using up until the time of his arrest.

Prior to his return to the CDCR, he was receiving Seroquel 300 mg bid in the community, according to a "Mental Health Transfer Sheet" from Fresno County. The inmate admitted that he had been receiving treatment when he received a bus screening at WSP and reported that he had current mental health problems, including thoughts of harming

himself over the past year and current thoughts of suicide or having attempted suicide. Despite this history, he was referred for a mental health evaluation within 72 hours rather than as an emergency.  Approximately nine days later, on 5/13/05, the inmate was seen by a psychiatrist.  He denied suicidal thoughts but admitted depression.  He was prescribed medication at that time.  On 6/21/05, he received a RC mental health evaluation by a psychologist who diagnosed Opioid Dependence, Psychosis NOS, and Mood Disorder NOS, with a GAF at 75.  The psychiatrist did note a prior suicide attempt by hanging in 2003.  The inmate was placed at the 3CMS level of care at that time.

When the inmate transferred to CTF on 9/6/05, he received a bus screening.  He reported his history of mental illness and current mental health problems, but denied any history of suicidal or self-harming behavior.  Diagnoses of Mood Disorder NOS and Polysubstance Abuse was continued, and the inmate remained at the 3CMS level of care.  The records indicated that approximately one year later, on 9/28/06, the inmate was reported as being at the 3CMS level of care as medical necessity without explanation.  The inmate was receiving Remeron, Benadryl, and Vistaril at that time.  These medications continued through June 2007.  There was no MAR provided for July 2007 and the suicide report referred to this MAR as not being located.

The progress note of 6/21/07 by the CCM assessed the inmate as having Mood Disorder NOS and stated that he was compliant with his medications.  The inmate's last mental health contact was on 6/22/07, when he reported to his CCM that he was concerned about the time left on his sentence, but denied suicidal thoughts.  The inmate also reported that he would be looking for "some training for a skill" over the next seven years.  His diagnosis remained Mood Disorder NOS and his GAF was estimated at 50.  He was scheduled to see a psychiatrist on 7/17/07, approximately two weeks prior to his death, but did not report for the appointment.  The note by the psychiatrist on 7/17/07 simply states "N.S.-custody notified."  It does not appear the inmate was re-scheduled for another appointment, even though his medication was to have expired on 7/23/07.  It also does not appear from the record that the inmate's medication was renewed.

The inmate was seen in medical on 7/16/07 because he complained of feeling dizzy.  He reported that out of boredom he had taken his cellmate's medication, which included Remeron, and Clonidine, and he was evaluated by a physician who found no problems. A toxicology screen for drugs was negative.  The physician wrote in a progress note that the inmate's medications should be made DOT, but there was no doctor's order to change his medications to DOT.  The physician also wrote that he ordered the inmate's cellmate's medications to be DOT.

The suicide report identified five problems and recommendations, as follows:

> Problem 1:  On 7/16/07, the inmate informed correctional officers he was dizzy and was taken to the infirmary, where he informed medical staff that he had taken some extra prescribed medication (Mirtazapine) and some non-prescribed medication (Clonidine) the previous night because he was bored.  Medical staff

evaluated and treated him. However, the inmate was not referred for a mental health evaluation.

Recommendation: DCHCS will refer this issue to the Plata receiver's office for determination of what training may be needed to ensure that medical staff appropriately refer any inmate who reports taking an overdose of medication for a mental health evaluation and an SRA.

Problem 2: On 7/16/07, the physician who examined the inmate wrote in a progress note that all of his medications should be taken from him and that his medications should be dispensed by DOT. However, the UHR did not contain a corresponding physician order reflecting this change to DOT, nor was there any documented action to remove any medications from the cell.

Recommendation: The lack of communication between medical staff and mental health staff has been identified as a contributing factor in several suicides in the past. DCHCS will refer this issue to the Plata receiver's office for determination of what action the physician should have taken, such as writing a corresponding order to ensure that the inmate's medications were changed to DOT.

Problem 3: The MAR for July 2007 was not in the Unit Health Record and medical staff was unable to locate it. Whether and how the inmate-patient received his medication in July 2007 could not be determined.

Recommendation: CTF to submit a copy of the MAR for the month of July 2007.

Problem 4: The inmate did not appear for his medication review, and his medications expired a week later. The psychiatrist made the appropriate notification, but the inmate was not re-scheduled. CTF indicated that there was a shortage of office staff who fell behind in the scheduling. Once this problem was discovered, the chief of mental health authorized additional staff to resolve the problem in overtime.

Problem 5: At the WSP RC, the inmate was referred by the nurse completing the initial health screening for a mental health evaluation within 72 hours. The inmate saw a psychiatrist nine days later.

Recommendation: WSP to conduct an audit of timeliness of follow-up to referrals generated by initial health screenings and to report results of this audit.

A death review summary was completed by a physician on 8/31/07 regarding this inmate's death. The inmate's care and treatment were summarized, and the discussion stated that there were no provider/physician orders noted in which he ordered making psychiatric medications DOT, although he did mention it in his note. Further, no staff-psych consultation was called by the provider on 7/16/07, despite the inmate's overdose on Remeron and Clonidine. There were no conclusions stated, but the recommendations were "presentation in DRC for further discussion on the care provided by the mid-level provider on 7/16/07."

On 9/5/08, the director of the statewide mental health program, DCHCS, and the director of DAI issued their report on implementation of QIP for suicide of Inmate W and attached a copy of the recommendations and reports on implementation of the plan. The memorandum stated that by 5/9/08, the documents in response to the QIP was received by DCHCS, with one final document received on 8/6/08.

The deputy director of psychiatric services and chief psychiatrist of the mental health program, DCHCS, provided the response to QIP number one for the suicide of Inmate W. In his response to QIP number one, the deputy director stated that on 2/13/08, senior clinical staff of the DCHCS mental health program met with the statewide medical director and statewide director of nursing operations to discuss how best to work with medical personnel to improve their response to inmates who may be at elevated risk for self-harm and possibly suicidal behavior. The response went on to state that a variety of methods to inform and educate medical providers were specifically discussed. These included (1) educational posters placed in medical clinics, (2) the use of pocket-cards with key information regarding referral of inmates to local mental health programs, (3) IST programs for medical providers, (4) mental health content to be provided to all new medical providers as part of the regional medical training, beginning with the central region in May 2008, and (5) use of weekly chief medical officer (CMO) teleconferences to inform and educate. The response ended with a statement that at the conclusion of the meeting, the mental health program staff agreed to complete a draft plan of action and work with the Plata support division medical administration to approve and implement the plan. The response stated that the draft plan would be completed by 6/30/08.

In response to QIP number two, a memorandum was sent on 5/9/08 to the Plata receiver, the statewide medical director, and the Plata support division, by the deputy director of psychiatric services.

In response to QIP number three, the DON from CTF noted that a complete and thorough record search was done in an attempt to locate the MAR for July 2007, but the document was never located.

In response to QIP number four, CTF reported that the inmate's medication prescription for Remeron had expired on 6/23/07 and, because the facility was short of office technician staff, there was a backlog of tracking data to be entered into the MHTS, the data was not entered, and the prescription was not renewed. A meeting was held with the office technician staff and overtime work was approved so that they could catch up with the backlog of information. In addition, another office technician was hired.

In response to QIP number five, the response from WSP stated that this inmate was already on prescribed medications when he arrived, and that a referral was done on a pre-printed form which had a 72-hour timeframe. Referrals are to be triaged when they arrive in the mental health program by a psych tech, with consultation from clinical staff as needed. As this inmate was already on medications, he was scheduled for 72 hours "unless they are designated as emergency or crisis cases." There is no comment as to why this inmate was not designated as an emergency or crisis case, given that he reported

current suicidal ideation.  An audit was done on 18 cases that were screened during the time period from 11/1/07 to 12/31/07, and indicated that the average number of days from referral to appointment was nine.  The average time for inmates referred but not prescribed medications in R&R was 2.5 days, with a range of zero to five days.  This data was attached, but there was no further analysis offered by WSP of the data or corrective action to meet the 72-hour timeframe for referral or to explain why this inmate was not referred as an emergency.

**Findings**:

This inmate's suicide may have been foreseeable because, although he did not report to staff any ideation or intent to harm himself, his behavior (i.e., taking his cellmate's medications and being seen by medical as dizzy) was suggestive of such thoughts two weeks prior to his death.  The physician wrote plans to change the inmate's medication to DOT, but the inmate was not referred by medical to mental health for an SRAC after taking his cellmate's medications and feeling dizzy on 7/16/07.  This inmate's death may have been preventable, had he been seen and evaluated by the psychiatrist prior to his medications expiring, or been rescheduled as per the apparent plan indicated in the psychiatrist's last progress note.  The inmate's medications were clearly scheduled to expire and, despite the psychiatrist stating that his no-show was reported to custody, the explanation that there were failures in the MHTS and staffing issues that prevented the inmate from being re-scheduled was inadequate.[10]

Further, the suicide report identified the WSP intake process as being flawed.  Inmates not being seen within even the 72-hour referral timeline, although this inmate appeared not to have been properly identified as in need of an emergency or urgent appointment, even though he was reporting suicidal ideation.  There appears to have been no corrective action taken by WSP regarding this failure, and no response by DCHCS to this failure.  The collaboration between DCHCS and the Plata receiver's office, identified in Problems One and Two, stated that there will be memoranda and training as well as other measures implemented to assist in further effective communication.  There was no information submitted that confirmed that the measures were indeed implemented.

---

[10] Defendants objected to this reviewer's findings that this suicide was both foreseeable and preventable. They contend that because the physician did not order a change to DOT and for removal of all of this inmate's medications from him (despite the physician's progress note that all medications should be taken from this inmate), the UHR did not reflect any order for the change to DOT or the removal of medications from the cell, and therefore it was appropriate for medications to continue.  They further posit that this inmate's hanging was not causally related to his medication.  Defendants overlook the larger context of this inmate's suicide: a review of this inmate's record indicates concerns surrounding suicidality.  There should have been a referral of this inmate to mental health, but none was done, nor were the more intensive medication monitoring and medication administration that this inmate needed.  Mental health staff are expected to review the inmate's records.  Consequently, this reviewer's findings of foreseeability and preventability are based on a broader set of concerns than those that the defendants would suggest.  This reviewer's findings of foreseeability and preventability will not be withdrawn.

Lastly, the suicide report was silent on the discovery in the inmate's cell of the razor blade, which he apparently used to cut both forearms and wrists, according to the coroner's report.

## 24. Inmate X

**Brief History:**

This inmate was a 25-year-old African-American woman who committed suicide by hanging on 8/4/07 at the Central California Women's Facility (CCWF). The inmate was housed in a dormitory at the time of her death and was not a participant in the MHSDS. She entered CCWF on 2/8/01 for her first prison incarceration. She was serving a 12-year sentence for second degree robbery with a handgun.

The inmate was discovered on 8/4/07 at approximately 6:20 p.m. by another inmate who was entering Room 12, a dormitory, and observed the inmate hanging by a sheet around her neck that was tied to the top of the cutout in the bathroom door. The discovering inmate screamed for help, removed the sheet from this inmate's neck, and lowered her to the floor. An officer responded, activated his personal alarm device, and notified control via institutional radio of a Code One medical emergency, "possible hanging," and requested medical staff and transport. Two other officers ran into the area and observed the inmate lying on the floor by the restroom with two other inmates who were crying, yelling, and attempting to awaken her. An officer felt a "slight pulse" and began chest compressions as one of the inmates gave rescue breathing. A second officer began clearing the room, and by 6:25 p.m. a LVN arrived and reportedly also felt a slight pulse. The inmate was placed in the recovery position and vomited twice. Chest compressions were suspended for ten or 15 seconds while the AED was placed on the inmate and indicated "no shock." CPR was resumed and approximately five minutes later, two additional licensed vocational nurses and one certified nursing assistant arrived. They noticed the inmate was "limp and cool" with a "possible weak, thready pulse." Ammonia packs were utilized, and at approximately 6:33 p.m. the inmate was placed on a gurney and transferred by institutional ambulance to the TTA of the CTC. The nurse also called central control for a Code Three ambulance while en route to the CTC. CPR and oxygen were provided continuously while in the transport vehicle, but upon arrival at the TTA at approximately 6:50 p.m., medical staff could not locate a pulse. Medical staff continued to provide advanced cardiopulmonary life support, but the inmate did not respond. Paramedics arrived at 7:00 p.m., and evaluated the inmate with no breath sounds, no heart sounds, and no pulse. Based on the information provided via phone by the paramedics, a physician pronounced the inmate dead at 7:05 p.m.

An autopsy report was provided by the Madera County Sheriff's Department. It indicated that the cause of the inmate's death was hanging, based on an autopsy that was completed on 8/6/07. The toxicology blood sample indicated a complete drug screen revealing no common acidic, neutral, or basic drugs, and no blood ethanol alcohol. Further, the incident report stated that a suicide note was found in the housing unit where the inmate resided, that was addressed to "Eight Ball," and stated "if U reading

this….That means I finally did it.  I want U 2 know I love U.  I'm just tired and like I've always said I'm ready 2 go & it's almost over.  Please let (names) I love them.  Call my grandma & let her know I love her more than life (phone number and name)."

The suicide report recounted the inmate's criminal justice history. It stated that the commitment offense occurred when she was 17 years old.  It was a result of her stealing a woman's car and purse at gunpoint, with references to this having occurred because of anger she felt toward her mother due to an argument they had earlier on the day of the crime.  The suicide report referenced the inmate's parents having substance abuse problems and repeated incarcerations with absences from her life, resulting in the inmate having been raised by her grandmother from age eight to age 17.

The inmate's mental health history preceded her incarceration.  It included a brief psychiatric hospitalization as a child and a trial of medication in jail after her arrest on the commitment offense.  When she had her initial health screening (bus screening) at CCWF, she reported a history of depression and psychotropic medications but denied past and current suicidal ideation.  Her RC mental health evaluation resulted in a determination that she was not in need of mental health services and that she was cleared for general population.  Approximately three years later, in January 2004, she was placed in the MHSDS at the 3CMS level of care because of reported depression and angry outbursts against staff.  According to the record, she did not want to be placed on medication.  In January 2004, an IDTT determined that she was not in need of medication.  By July 2004, she requested removal from the MHSDS which was approved.

She subsequently self-referred for mental health services, in addition to being referred by staff because of continuing issues of depression and anger.  She was placed in a group for anger management, which she completed.  She also participated in two group sessions dealing with grief and loss, but she did not complete that group therapy experience.  Both of these groups occurred after she had been removed from the MHSDS, and no further referrals for return to the MHSDS were demonstrated in the records reviewed.  The inmate also reported that she had suicidal ideation in December 2004, and although she was seen by a clinician, it was noted that the inmate "withdrew her statement" and agreed to notify custody if there was any recurrence of suicidal thoughts.  There is no evidence in the record that the clinician completed an SRAC or referred the inmate for further evaluation, despite her having been a past participant in the MHSDS at the 3CMS level of care.

The suicide report made reference to staff having been interviewed at CCWF.  They reported that she did not meet criteria for a specific personality disorder, but that her behavior and complaints were consistent with Borderline features, including difficulty controlling her anger, impulsivity, and affective instability.  It was also noted in the suicide report that the inmate had some insight into her distress and self-referred for treatment; however, there was no evidence that she was ever returned to the MHSDS, despite these self-referrals and staff impressions.  The references to her anger with staff and inmates was repeated in the suicide report, although she appeared to have been

184

placed in administrative segregation for minor disciplinary infractions, such as refusing a housing move. The latest disciplinary infraction occurred 18 months prior to her suicide.

The suicide report reviewer made reference to the inmate having a visit from her grandmother and other family members on 7/15/07, that she refused to let them talk about her remaining time and years, and that she preferred to state that she would be out of prison in "30-some months." The interview with family members appeared to indicate that the inmate was hopeful of returning to the community, but also was saddened by a recent death of a family member. She complained about conflicts with a female CO whom she alleged had been disrespectful to her. There was also a reference to a letter dated 8/2/07 from the inmate to her mother that was received after the inmate's death. The letter asked her mother to send her money so she could go shopping in the prison, and did not indicate that anything was wrong.

On 8/3/07, a CCWF phone referral for clinician of the day (COD) for mental health services was noted at 9:29 a.m. The reason for referral was circled as "withdrawn" and the comments were "I/M seems really depressed; not acting herself; supervisor concerned with a notation that it was T/C to Palacios," indicating a telephone call had been made. The reason why the inmate was not seen was documented as "non-emergent," with the stamp of the clinical psychologist and signature. This referral was made on the day before the inmate committed suicide. Despite the vocational supervisor's decision to make the telephone call to obtain mental health services, the clinician of the day determined that it was not urgent. The suicide report reviewer made reference to interviews with inmates who reported that this inmate had celebrated her dorm mate's birthday the night before, and that most inmates believed that her behavior on the day of her death was no different from any other day. The only exception was one inmate who observed the inmate appearing depressed and not as talkative as usual that day. The inmate subsequently hanged herself in the dormitory bathroom while her dorm mates went to dinner. The suicide note referenced in this report was found in her dormitory and was addressed to another inmate.

The suicide report reviewer made reference to a jewelry box found in the inmate's property that contained Zyprexa, Trazodone, methocarbamol, and indomethacin, none of which had been prescribed for her. The reviewer opined that it was "reasonable to wonder if she had considered an overdose as an alternative means of suicide." The reviewer also concluded that the inmate's suicide was an act of impulsivity. Finally, the reviewer opined that "given the inmate's referral history for mental health services and the absence of suicidal risk factors in this case, the determination that the referral was non-emergent appeared to be appropriate."

The suicide report identified one problem with recommendation, as follows:

> Problem: Two officers immediately responded to the emergency and one officer began chest compressions while an inmate gave rescue breaths. Officers are trained to provide CPR alone or with another officer and should have assumed responsibility for all resuscitation efforts without the inmate's assistance.

185

Inmates are not trained to provide CPR. It appeared that one officer was standing and observing resuscitation efforts as the inmate continued to provide rescue breaths.

Recommendation: Institution to initiate a Fact Finding into the response by the officers and take appropriate action as indicated.

On 2/11/08, the director (A) of the mental health program, DCHCS and the director of DAI issued their report on implementation of the QIP for suicide of Inmate X, in response to the suicide report dated 10/22/07. In their report, the directors included a response from the warden, health care manager, and chief of mental health at CCWF. In their submission, the staff at CCWF stated that, based on a review of the report and other documents by CCWF's internal affairs/ISU lieutenant, it was determined that a fact-finding inquiry was not necessary, as the facts and circumstances surrounding the inmate's suicide and actions of all involved staff were clearly documented. The staff determined that remedial training, with emphasis on responsibilities as trained peace officers during a medical emergency, would be appropriate in this case for the two COs who initially responded to the emergency. The staff specified that officers would be trained in the inappropriateness of allowing an inmate to assist in lifesaving efforts while staff trained in CPR are present. The CCWF staff also reported that the deputy inspector general of the Office of the Inspector General concurred with the institutional assessment, and that the matter could be resolved through documented on-the-job training for the two officers. They attached a review of the CAP and supporting documentation of IST for COs and correctional counselors.

**Findings:**

This inmate's suicide does not appear to have been foreseeable, as she did not report any suicidal ideation or intent to harm herself in the days to weeks prior to her suicide; however, this suicide may have been preventable. It appears that she carried out an impulsive but well-planned act to kill herself by isolating herself when other inmates went to the evening meal and enacting lethal means to end her own life. She also left a suicide note supporting the impulsivity of her actions.

The suicide report made reference to the inappropriateness of the COs allowing inmates to assist in CPR when they were on site, which this reviewer agrees with. Allowing another inmate to assist with CPR while a trained CO was present was unacceptable; consequently, CPR may have been less effective. Therefore, this death may have been preventable.[11] The suicide report made no reference to this inmate having several

---

[11] Defendants objected to the characterization of this suicide death as preventable, on the ground that correctional staff allowed another inmate to perform CPR while a trained CO merely watched. Defendants stated that there was no evidence that the CPR was administered incorrectly, or that correct administration would have yielded a different result. The designation of this suicide death as preventable will not be withdrawn, as chances of successful resuscitation are substantially higher if it is performed by a trained person. CDCR did not offer any evidence whatsoever that the inmate who performed CPR was competent to do so. Moreover, CDCR's own suicide report criticized the institution's allowance of another inmate to perform CPR on Inmate X. It identified this as a problem, calling for the institution to conduct a fact-finding and to take appropriate action as indicated. *See* page 163, *infra*.

medications in a jewelry box, none of which had been prescribed for her. There was no reference to need for review of the medication administration practices, specifically with regard to psychotropic medications that are not keep-on-person (KOP) and require nurse administration or DOT administration. Although this does not appear to have contributed to the inmate's death, the reality of this inmate obtaining and hoarding medications not prescribed for her appears to have been ignored in the suicide report.

The suicide report reviewer referred to the inmate's having made multiple self-referrals, but she was not referred by a staff member until the day before her death. Had the inmate been seen by a mental health professional on the day prior to her suicide, as per the referral by the vocational supervisor, additional information may have been gained that could have led to a full SRAC being completed, as well as other possible interventions. While this inmate made self-referrals on numerous occasions, as per the medical record and the suicide report, it appears that the clinician of the day relied on a discussion with the vocational supervisor, rather than on a review of past records or direct examination, and postponed this inmate's evaluation as a "routine" rather than "urgent" or "emergency" referral. This was a telephone referral which may have implied some urgency by the referring staff member, but the clinician made a judgment that it was non-emergent.

## 25. Inmate Y

**Brief History:**

This inmate was a 52-year-old Caucasian male who committed suicide on 9/5/07 at CRC by jumping from a fifth floor bathroom window, resulting in multiple blunt force injuries. The inmate was housed in a dormitory and was a participant in the MHSDS at the 3CMS level of care at the time of his death. The inmate was readmitted to the CDCR on 7/9/07 for his second prison term because of a probation revocation for failure to meet the conditions of his Proposition 36 probation. He received a two-year sentence from a June 2006 conviction for possession of a controlled substance (methamphetamine), which was reinstated.

On 9/5/07 at approximately 2:18 a.m., the inmate was found dead in the maintenance yard area at the CRC. The inmate had apparently accessed an exterior window in the bathroom of his assigned fifth floor dormitory and fell to his death. Prior to his discovery, a 12:00 a.m. count for dormitory 109 was cleared. At approximately 1:50 a.m., a CO heard a crashing sound from the maintenance yard. The officer looked out to the maintenance yard, did not see anything unusual, and returned to his duties. At 2:00 a.m., another officer was preparing for the 2:30 a.m. institutional count and saw that the inmate's assigned bed was empty. At 2:06 a.m., one of the officers found a window screen partially pulled off the dormitory bathroom and called for assistance. At approximately 2:12 a.m., a sergeant initiated a photo identification count when it was determined that this inmate was missing. An emergency count was initiated at 2:15 a.m. At 2:18 a.m., an officer in another dormitory looked out of a window in a hallway between the inmate's dormitory and the dormitory in which the officer was standing. He

saw the inmate lying on the ground in the maintenance yard area. The inmate's location was approximately three feet away from the building and 50 feet below the dormitory bathroom window. A coroner's investigation report from the Riverside County Sheriff-Coroner's Office stated that an autopsy was performed on 9/6/07, which determined the cause of death to have been multiple blunt force injuries (seconds), and the death was classified as the result of suicide. The toxicology analysis in vitreous humor determined that there was no ethanol alcohol and no evidence of amphetamines, benzodiazepines, cannabinoids, cocaine, opioids, phencyclidine, or barbiturates.

The suicide report recounted the inmate's criminal justice history, stating that he had a previous inmate number that had been discharged. It also stated that he did not have any known juvenile history. The inmate's criminal justice history began at the age of 18 when he was arrested on a drug related offense. The inmate had been charged with a number of crimes including theft, contributing to the delinquency of a minor, annoying or molesting a child under 18, and resisting arrest; there were notations indicating that all of these changes were disposed as "proceedings suspended/insane," and the cases were dismissed in lieu of a plea. He was convicted of indecent exposure in 1979 and sentenced to three years' probation; he was later charged with two additional counts of indecent exposure. His probation was revoked when he was convicted. He was remanded as a mentally disordered sex offender to DMH where he remained for approximately one year. Based on these convictions, he was required to register as a sex offender. He was subsequently convicted in 1980 of second degree burglary (on three occasions), resisting arrest, and possession of a controlled substance, but these proceedings were suspended because the inmate was found incompetent to stand trial due to major mental illness. He was subsequently determined to be competent by the court, and in March 1982 he was convicted of second degree burglary with a "prior," and was admitted to CIM on 3/10/82 for a diagnostic commitment (not yet sentenced). After one month, he was returned to the San Diego County Jail and sentenced to two years in the CDCR. He entered CIM on 5/19/82. He ultimately paroled from CMF in November 1983, and his previous inmate number was discharged. The inmate had multiple convictions during the next ten years, including petit theft on three occasions, possession of a controlled substance on two occasions, trespassing, arson, and being under the influence of a controlled substance. He received probation or county jail time for these offenses, but in 2002 he was convicted of possession of a controlled substance and being under the influence of a controlled substance and received probation with the condition of substance abuse treatment. He tested positive on multiple occasions and ultimately, because of his failures to meet the conditions of his probation, the 2006 two-year sentence for possession of methamphetamine was reinstated and modified such that he re-entered the CDCR on 7/9/07, as noted above. Based on that violation, he was returned to the CDCR for his second prison term on 7/9/07 via RJD.

The inmate's mental health history is complex and confusing, as he appears to have been found "suspended/insane" on charges of theft, contributing to the delinquency of a minor, and soliciting a lewd act, all prior to 1978. He was at PSH for involuntary psychiatric treatment as a mentally disordered sex offender from 1979 to 1980. It was during his

first CDCR incarceration in 1983 that he was placed at CMF for three months as a "category J," inmate indicating the need for mental health services.

The initial health screening that was conducted when the inmate was transferred from the county to RJD on 7/9/07 indicated that he had been receiving mental health treatment for "Paranoid Schizophrenia." This screening noted as additional comments "mental health referral." A mental health evaluation was conducted based on the inmate's positive initial health screening for mental illness, but it appears that his previous records were not reviewed. The psychologist who performed the mental health evaluation noted that the inmate denied any history of taking any psychotropic medication, and that there were "no clear symptoms" of mental illness on mental status. However, the psychologist referenced a "vague history" of treatment in Vacaville for paranoid ideation and auditory hallucinations. The psychologist opined that the inmate appeared stable and did not have paranoid ideations or auditory hallucinations at the time of the mental health evaluation on 7/10/07. Despite this, and perhaps based on his history, the inmate was placed at the 3CMS level of care with a GAF of 60. Despite the psychologist's noting he had no psychotic symptoms, the diagnosis was noted as "CPS by history," which would imply Chronic Paranoid Schizophrenia, but this was not spelled out. He also was diagnosed with Amphetamine Dependence.

The inmate was transferred to CRC on 8/22/07. The bus screening on that transfer identified as a mental health problem a history of Paranoid Schizophrenia. However, there was no indication that the inmate was referred within 24 or 72 hours to mental health.

On 8/27/07, the initial treatment plan noted that the inmate had a normal mental status and denied symptoms of mental illness, but he reportedly told the CCM that he had a history of Paranoid Schizophrenia "about 20 years ago." The CCM opined that the inmate had no evidence of a thought disorder and that his report of auditory hallucinations may have been related to his substance abuse. The CCM concluded that, other than anxiety, there were no identified problems necessitating that the inmate remain at the 3CMS level of care. The CCM performed an SRAC. Suicidal ideation was denied, with "no apparent risk" estimated. The treatment plan identified mild anxiety and history of auditory hallucinations as the inmate's problems. Despite the inmate's self-report of Paranoid Schizophrenia 20 years ago, the CCM decided not to make a psychiatric referral because, according to the suicide report, "he looked pretty okay to me." The inmate did not have an IDTT meeting, which would have been scheduled on or about 9/11/07, because he committed suicide on 9/5/07. The inmate was not prescribed any medications, as he had not been evaluated by a psychiatrist, based on the CCM's determination that a psychiatric referral was not indicated.

Of significant concern was the inmate's writing to an infectious disease nurse on 8/30/07, six days prior to his death, "52 years old I'll be dead soon," when he was offered preventive medications for tuberculosis and he subsequently provided a written denial. The suicide report reviewer noted that the nurse, when interviewed by the reviewer, stated that she had asked him about why he wrote that statement and that the inmate had

responded that he was old and that everyone will die sooner or later. She reported that she asked him if he were suicidal and he responded "oh no," but laughed and smiled inappropriately. The reviewer continued on stating that the nurse stated, "He did not seem depressed."

Curiously, the suicide report reviewer made reference to the inmate having been described by staff and inmates at CRC as someone who "looked like Charles Manson." The reviewer confirmed that other inmates called him "Charles Manson" and that he was found to be "daunting" because of his looks and demeanor. The inmate was described by other inmates who were interviewed after his death as a loner who was calm, dignified, and frequently talking to himself.

On 9/4/07, the inmate was interviewed by an institutional parole agent from parole, planning and placement who was completing a risk assessment and considering whether the inmate should wear an ankle global tracking device upon parole. The reviewer indicated in the suicide report that the parole agent had claimed in a memorandum that the inmate was not aware of the purpose of the interview, nor was he given any paperwork indicating his status, and further stated that the inmate's "demeanor seemed composed and he did not appear upset." The reviewer also stated several times in the suicide report that the inmate had said to the probation officer that he was "too old" to do prison time, and he possibly also told this to the infection control nurse and the parole agent. His parole would have been scheduled for January 2008 but the reviewer opined that "he was apparently experiencing psychological distress and hopelessness." The day following the interview by the parole agent, in the middle of the night on 9/5/07, the inmate apparently stood on an overturned trash can in the dormitory bathroom, pulled off a bathroom window screen, and jumped to his death 50 feet below. The reviewer also stated in the suicide report that following the suicide, all of the bathroom windows on the upper floor of the building were boarded over.

CPR was not initiated by staff when the inmate's body was discovered. The reviewer noted that it was discovered 28 minutes after the inmate had been heard crashing to the ground. The extent of his traumatic injuries, as described by the medical examiner, and the duration quite likely made it apparent that he was well beyond rescue. There was no indication as to who determined that the inmate should not receive CPR. The reviewer also excused the clinicians at CRC for not requesting past records because "it did not appear that the information from the former records, had it been available, would have changed the clinical assessment." Given that these records were not available or reviewed, it is unclear why the conclusion was made that they would not have changed the clinical assessment. This information would likely have clarified the inmate's history of serious and persistent mental illness and the need for referral.

The suicide report identified one problem with recommendation, as follows:

> Problem: A week before his death the inmate wrote on a medical denial form that he would be dead soon. The RN should have made an immediate referral to mental health for a suicide evaluation.

<u>Recommendation</u>:  CRC:  The DON shall ensure that all nursing staff have training in basic suicide prevention, and provide the nurse who interviewed the inmate with remedial instruction on making a mental health referral.

On 6/5/08, the director of mental health programs, DCHCS, and director of DAI issued their report on implementation of the QIP for the suicide of Inmate Y, in response to the suicide report dated 11/1/07.  In their report, the directors included a memorandum dated 5/7/08 from the DON at CRC, stating that the RN in question was identified and received remedial instruction on suicide prevention and on making appropriate mental health referrals.  In addition, suicide prevention training was provided to nursing staff via an IST on 9/13/07 during which sign-in sheets were provided.

## **Findings**:

This inmate's suicide may have been foreseeable and preventable.  Six days prior to his suicide, he told a nurse that he would "be dead soon" and laughed inappropriately when denying suicidal ideation.  This should have caused a staff referral to mental health, which was not done.  Further, his history of mental illness was a matter of record but was apparently unknown to staff at CRC.  The suicide report contains substantially more history than what was apparently reviewed and possibly available to the RJD and CRC staffs; although, it does not appear that they requested his records.  They seem to have underestimated this inmate's history of serious and persistent mental illness, including possible determinations of his having been found not guilty by reason of insanity, his commitments for competency evaluations, and his inpatient admissions, all of which were based on his longstanding mental illness.

The initial health screenings that were conducted when the inmate entered the CDCR via RJD and upon his transfer to CRC indicated a history of Paranoid Schizophrenia, yet there was never a referral to a psychiatrist.  This simply does not make sense and it is not reasonable that the CCMs at either facility did not refer this inmate to a psychiatrist for thorough assessment regarding a possible need for anti-psychotic medication.  For the CCM to simply "write this off" as secondary to chronic drug abuse is unreasonable and unsound.  This inmate's death may very well have been preventable, had he received appropriate referral and evaluation by a psychiatrist.  The suicide report was also silent regarding the psychologist's failure to refer this inmate for evaluation by a psychiatrist, given his history and the psychologist's diagnosis of Chronic Paranoid Schizophrenia.

## **26. Inmate Z**

## **Brief History**:

This inmate was a 39-year-old Caucasian male who committed suicide by hanging on 9/14/07 in the GACH at CMF.  The inmate was in a single cell at the time of his death and was a participant in the MHSDS at the EOP level of care.  The inmate entered the CDCR on 6/13/91 via the former Northern RC (NRC) at Vacaville.  The inmate pleaded no contest to murder in the second degree and was given a sentence of 15 years to life.

The inmate was discovered on 9/14/07 at approximately 7:15 p.m. by a CO in his single cell in the GACH at CMF on Unit G-2. The inmate had been transferred to an outside community hospital for esophageal banding as a medical procedure and returned on 9/12/07 to the GACH. On 9/14/07, the GACH physician wrote an order for the inmate to be discharged back to the EOP program and his former housing on Unit L-1. During that day, the inmate had several contacts with members of the mental health team from L-1 because he had a history of being immature, impulsive, impatient, and highly needy. He had diagnoses of mild Mental Retardation, Dependent Personality Disorder, Organic Mood Disorder, and Psychotic Disorder NOS.

At approximately 6:55 p.m. on 9/14/07, a CO told the inmate that he was being discharged to a cell on Unit L-3, not L-1. The inmate became upset and told the officer that he did not want to go to L-3 and the officer summoned a correctional sergeant. Both the sergeant and the officer talked with the inmate at approximately 7:05 p.m., telling him that he was going to be discharged to L-3. The inmate reportedly told custody that he would "fight the staff" if he were forced to move to L-3. The CO left the cell front and telephoned the lieutenant, asking him to come to the unit. At approximately 7:15 p.m., the CO returned to the cell and found the inmate lying face down on the floor with a sheet around his neck. The sheet was tied to the towel rail that was mounted approximately four feet above the floor. The officer activated his personal alarm, made an institutional radio announcement, retrieved a cut-down tool, and returned to the cell. Another sergeant and another officer responded to the cell. The first officer entered the cell, cut the sheet below the knot, and removed the noose from the inmate's neck. The officer and a registered nurse could not find a pulse nor respirations and started chest compressions and resuscitation with an ambu bag. Medical staff responded, and the inmate was placed on a gurney and moved into the hallway. A physician directed the staff to continue lifesaving measures. An IV line was inserted and emergency medications were administered, while CPR continued and another nurse assisted with the defibrillator. A Code 3 ambulance was called. Emergency medical services (EMS) staff from the Vacaville Fire Department arrived, placed the inmate onto a gurney, and continued CPR. The inmate was transferred to the Vaca Valley Hospital emergency room where a physician pronounced him dead from asphyxiation at 8:31 p.m.

An autopsy report was provided by the Office of the Coroner County of Solano. It stated that the autopsy was performed on 9/17/07, and determined the cause of death to have been hanging (minutes). A toxicology report indicated diphenhydramine, 1.11 mg/L (potentially toxic 1-5 mg/L) and morphine 0.05 mg/L (potentially toxic 0.15-0.5 mg/L) were detected in blood specimens. No other common acidic, neutral, or basic drugs or ethanol alcohol were detected.

A suicide note addressed to "Dear Lynn and Tim" was also discovered after the inmate's death. The note was very disjointed and difficult to read. In the note, the inmate stated that he was back from "that hell hole of a hospital" and described that he had a procedure in which his heart felt like it was going to explode. He went on to state, "I will not give you the right to keep me alive." The note further stated in a very disjointed way that the

192

inmate disagreed with the way he had been treated by doctors and with his medications having been changed or discontinued. He continued on stating, "its time to go for me and Chris you never sent me pictures of Bist or Macey what's up." He also stated, "by the way I sined (sic) a DNR." The note continued in a rambling fashion, making references to the inmate's refusing to sign papers, and references to food utensils, wedding bands, a gold cross, and a key from a lockbox. It ended with an unclear statement regarding "dead tx or to eight hours??????." Of note is the inmate's history of mild Mental Retardation, which may have clearly influenced how this note was written, as well as Impulse Control Disorder and Psychotic Disorder NOS.

The suicide report recounted the inmate's criminal justice history and stated that he had no juvenile criminal justice history. Prior to his commitment offense, he had one conviction for petit theft in 1987, was ordered to pay a fine (which he did not do), and therefore was ordered to spend two days in jail. The commitment offense for which the inmate was incarcerated occurred on 12/10/87. It involved a victim who was reportedly lured to a location near Folsom under the pretense of receiving back property that he had accused this inmate and another man of stealing. The victim's body was found the next day in a remote area, with his skull bashed by with a rock or other blunt object. The inmate was later identified as the perpetrator and was arrested. He spent three and one-half years in jail and also had, during that time period, psychiatric evaluations for competence for trial and a possible insanity defense. He also reportedly made suicide attempts while in the jail. The inmate ultimately pleaded no contest to murder in the second degree and received a sentence of 15 years to life, with incarceration in the CDCR.

The inmate's institutional history was also recounted in the suicide report. It stated that he had, in addition to his 15-year to life sentence for the commitment offense of second degree murder, an additional 16-month sentence for possession of a controlled substance in prison, to start upon completion of his current term. The inmate also had approximately 17 RVRs over the course of his incarceration, including battery on an inmate, mutual combat, destruction of property, self-mutilation, and over-familiarity. The inmate received a SHU term which was subsequently commuted by the ICC in May 2007. That decision appears to have been based on the inmate's medical and psychiatric issues.

The inmate's mental health history actually appears to have begun early in life, as the reports stated that he was developmentally delayed, and diagnosed with mild Cerebral Palsy, Scoliosis, and seizures as a child. The inmate completed high school, although he was diagnosed with Dyslexia and other learning disabilities, and reportedly was functionally illiterate. As an adolescent, there were reports of attempted suicide as a teenager, and alcohol and methamphetamine abuse. He received diagnoses of Mixed Developmental Disability and possible Intermittent Explosive Disorder. The inmate's trial did not occur until nearly four years after his arrest in 1987. He reportedly spent approximately eight months in ASH during this time period. He had been diagnosed with Atypical Depression, Conduct Disorder, mild Mental Retardation, Mixed Personality Disorder, Major Depression, Psychoactive Substance Abuse, Organic Mood Disorder,

193

and Dependent Personality Disorder. He had had treatment with a variety of anti-depressants and anti-psychotic medications as well as anxiolytic medication and Dilantin for seizures. In addition to the above diagnoses, a psychiatrist at the Northern RC in July 1991 noted that the ASH diagnoses included Paranoid Schizophrenia, Mental Retardation, and Epilepsy. He was transferred to CMF as a "category J" inmate and subsequently was transferred to the DMH VPP in November 1992 for approximately two weeks, and again for two days in October 1997. He was placed at the EOP level of care in 2000, but this level of care was changed to 3CMS in September 2001. He had additional DMH admissions in December 2002, January 2003, and September 2003. He was placed in administrative segregation at CMF in November 2003 due to threatening staff and a serious suicide attempt by hanging on 11/5/03. Despite this, he remained at the 3CMS level of care, and in December 2003 he was assessed at the DD2 developmental disability placement level, which was subsequently changed in December 2006 to DD1.

In August 2006, the inmate's brother was shot and killed, and this event appeared to have had a very emotionally devastating impact on this inmate. The suicide report referenced this event as the beginning of deterioration in his functioning and behavior. He had multiple housing changes, and ultimately by November 2006 he was placed in the administrative segregation unit where he then reported suicidal ideation and threatened to cut himself and throw blood on a CO. These threats against the CO resulted in an RVR for terrorist threats. He was transferred for two days to a DMH crisis bed and then returned to the 3CMS level of care in the administrative segregation unit.

The inmate's level of care was again changed to EOP on 12/14/06, while he was in administrative segregation. This change appeared to have been related to the inmate having deteriorated in terms of his hygiene, displays of increased agitation, worry about whether he would be prosecuted for the terrorist threats against a CO, and thoughts of ending his life due to frustration with his medical issues. Those medical issues included diabetes, Hepatitis "C," end-stage liver disease, gallstones, hypertension, foot neuropathy, coronary artery disease, asthma, degenerative disk disease with associated back pain, morbid obesity, history of seizure disorder, anemia, and dependency on a wheelchair. His medications at the time of his death included morphine 30 mg four times a day for pain, clonazepam 10 mg twice a day for seizures, and Oxycodone 5 mg prn for pain.

On 9/5/07, just prior to his death, the inmate was seen in medical because of dehydration and pain. He broke a glass window with his hand on 9/6/07 and also reported that he had experienced a seizure. On 9/7/07, he complained of chest pain and was sent to Queen of the Valley Hospital (QVH). The inmate had an esophageal band procedure to support severe varicose veins in his esophagus at QVH and was also noted to have advance cirrhosis of the liver and esophageal hemorrhoids. The inmate was to have had a peritoneal tap (i.e. removal of fluid) secondary to his cirrhosis of the liver, but he refused the procedure and was discharged from the hospital. The inmate's serum albumin was reported at 1.5 (normal level of 4.0), and his prognosis was described as "terrible" because of the severity of his medical conditions and his poor cooperation with treatment.

The inmate apparently had been considered for hospice placement by medical staff, but was considered "too disruptive" for such placement. The suicide report reviewer referenced an interview with the GACH treating physician in which the physician reported that she would have kept him in the hospital until Monday, had she known that he was "that fragile," and that she had expected him to be returned to L-1 where his mental health clinicians knew him and had been working with him daily.

A comprehensive treatment case conference with CMF and DMH clinical staff was held on 3/1/07 to address the inmate's multiple and serious medical and psychiatric needs. One of the areas discussed was the inmate's apparent improvement in functioning when he had frequent contacts and support from his mother, particularly after his brother had been killed. After his placement in administrative segregation, he could no longer have access to phone calls with her. The conference information summarized the inmate's functioning as suffering from cognitive deficits, with poor emotional development, impulsivity, poor judgment, and paranoia that occasionally escalated into delusional ideation. It concluded that he was a large man who sees himself as vulnerable and weak, operating in a state of perpetual dependency and turmoil. He was also self-injurious, acting out, and even making himself bleed so that he could get medical attention. The recommendation from this conference was that the inmate should have an updated evaluation, development of a behavioral treatment plan, and a more thorough assessment of suicide risk, noting that "although he does not impress as being sincere and suicidal ideation, he is viewed as High Risk."

The inmate did have neuropsychological testing with a report dated 4/1/07, which included much of the history stated above. The inmate's cognitive functioning was evaluated as "severely impaired." He was also noted to have psychotic tendencies, including delusions and paranoid thinking, which were exacerbated by his low intellect. He was also noted to have suffered emotionally from his brother's death and his own terminal illness. A recommendation from the report was to monitor the inmate for suicidal ideation and advise that his limited adaptive functioning to cope could lead to threats of actual self-injurious behavior.

On 4/22/07, the inmate attempted to hang himself in the Acute Care Hospital at the DMH VPP on Unit Q-1. An emergency extraction was necessary, and he was rescued. Although a transfer to SVPP was considered because of his medical condition, the abandonment issues related to his being transferred from CMF were deemed to likely be highly detrimental to his emotional state. The DMH team offered to work with the EOP team with a behavioral plan and therapy on the EOP unit.

On 5/3/07, the inmate threatened to puncture his eye with a plastic spoon while he still was in the DMH VPP program on Q-1. Pepper spray and emergency extraction were utilized in order to keep the inmate from pushing the plastic spoon into his eye. He was subsequently placed in a room on direct observation and was being considered for a higher level of care. He used a plastic tableware instrument to cut himself in response to frustration over the fact that he might be going to a different unit when transferred from DMH back to CMF. An SRAC of 5/14/07 indicated a low risk, and the following day he

was discharged back to EOP to Unit N-1.  On 5/26/07, custody staff alerted clinicians that the inmate may have been cutting the inside of his mouth in order to cause bleeding to "get staff attention."  However, the inmate reported that the bleeding was from his liver.  The inmate was moved back to the GACH on 6/1/07, and that same day he threatened staff and began banging on the door with his cane.  The inmate was sent to an outside hospital.  Upon his return on 6/4/07, he was placed in the EOP administrative segregation unit on I-3.  On 6/6/07 he was returned to a crisis bed at DMH, and was noted to have had seven prior suicide attempts and static risk factors, but his estimate of risk was noted as "low."  The inmate received emergency medications and a Keyhea petition was instituted.  On 6/27/07, he was discharged to the EOP team on L-1 with five-day follow-up ordered.  The inmate's last IDTT conference was held on L-1 on 7/6/07, and the case conference between DMH and CDCR was referenced.  It was noted that he had high suicide potential and multiple risk factors, but also that he was making a "fairly good adjustment" to the unit and liked his cellmate.  The "fairly good adjustment" appears contradicted by the inmate's having cut his hand by punching a window when he did not get his property.  The inmate had six admissions to the GACH or outside hospitals during the next two and one-half months while he remained on L-1, obviously limiting his participation in treatment activities.  The Keyhea petition was approved on 7/26/07 for involuntary medication.

As reflected earlier in this report, the inmate was transferred to an outside hospital on 9/7/07 for esophageal banding and returned to the GACH on 9/12/07.  The CCM's note at that time described his mental status as fully oriented, his grooming and hygiene as well as he could manage, his thought processes as organized, his behavior as hypomanic, his frustration tolerance as low, and his degree of impulsivity as high.  His last CCM contact was on 9/14/07 at approximately 3:30 p.m., due to the inmate reportedly being agitated and upset because he had not yet been moved back to L-1.  The CCM assured the inmate that he would be returning to L-1 as soon as possible.  He was described as alert with normal grooming for him, and as denying thoughts of harm to himself or others.

The suicide report reviewer opined that the inmate "resorted to an impulsive act of attempted hanging as he has done several times before while in the GACH," in response to the CO's informing him that he would be moving to L-3 rather than L-1.  The suicide report reviewer also provided an approximate rendition of the inmate's suicide note, and opined that the inmate's letter appeared to have conveyed that he expected to die when he reached age 40, as his brother had, "which was likely given his medical condition."

This reviewer's examination of the medical records indicated that, in addition to the esophageal banding he was to receive in QVH, the inmate had a large sacral decubitis ulcer with a diameter of two and one-half centimeters, and that during his stay at QVH, he was noted to be "acting out, pulling out IVs, ripping dressing from sacral d.u."  The admission note appeared to reflect that he returned to CMF at approximately 10:00 p.m. on 9/12/07 and was returned from QVH with "no MD to MD acceptance."  However, the psychiatrist of the day saw the inmate on 9/12/07 at 8:30 p.m. (in contradiction to the arrival time on the admission note as stated above) and noted that the inmate was on a Keyhea order and was receiving Thorazine.  The psychiatrist of the day stated that the

196

inmate was at QVH from 9/7/07 to 9/12/07, and stated that the inmate denied auditory and visual hallucination, paranoia, and suicidal and homicidal ideation.

On 9/13/07, the inmate was noted to be agitated, with insomnia and "DEP" (for dependent), but no suicidal ideation. The inmate was taking Thorazine, Benadryl, and Clonazepam, but the Thorazine was to be discontinued in order to start Abilify. The inmate was to be transferred to psych unit as soon as possible when his medical condition was stable. An SRA done on 9/14/07 was comprehensive and described the inmate's recent suicidal ideation, recent psychiatric hospitalization, affective instability, helplessness, and lack of personal support system. Three protective factors, including family, friends, and groups, were noted and the assessment was "low risk" with no referral. The sources included the CO/staff interview, inmate interview, and the UHR. A psychiatric progress note on the same date indicated that the inmate became agitated and "threatened to hang self with (illegible)." The note went on to state that when the inmate was seen, he denied vehemently any thoughts of hanging himself but seemed upset over the delay of transfer to L-1. The inmate reportedly asked an officer, "Do you want me to hang myself?" The inmate had been given Clonazepam prior to the evaluation by the psychiatrist of the day, and was reported as calm and cooperative with constricted affect, depressed mood, and denying suicidal ideation and homicidal ideation and current hallucinations and delusions. The inmate was reportedly relieved that he was going to L-1 soon. He was described as alert, oriented with fair insight, and as having a diagnosis of Psychotic Disorder NOS. The psychiatrist continued on stating that they discussed the inmate's condition with staff who knew him well and decided that he was not suicidal at the time.

The suicide report identified one problem with recommendation, as follows:

> Problem: Custody efforts all of that day to secure an appropriate bed on L-1, the unit to which the inmate had been promised and was prepared to return, instead resulted in trying to move him during third watch to Unit L-3. The inmate had had a recent history of impulsive but serious suicide attempts in situations in which he was highly frustrated. Institutional staff had made a comprehensive effort to contain his neediness and provide some sense of predictability to his otherwise chaotic life. However, when only custody and medical staff interacted with him on third watch and presented him with a situation for which he was unprepared, he made an impulsive but predictable suicidal gesture that unfortunately succeeded as a matter of timing.
>
> Recommendation: CMF shall form a QIT comprised of the appropriate stakeholders from custody, medical, and mental health, to evaluate and develop a pilot process for times when specific housing is required for mental health reasons to ensure that the housing move occurs as planned.

A death review summary dated "11/0/07 (sic)" was provided by a physician and summarized the inmate's past history. The death review summary concluded that there were no quality-of-care issues found in the patient's medical care or in the section of UHR reviewed. The recommendation was for case closure.

197

On 6/5/08, the directors of the mental health program, DCHCS, and DAI issued their report on implementation of the QIP for the suicide of Inmate Z, in response to the suicide report dated 1/24/08. In their report dated 4/9/08, the directors included a CAP from the warden, chief deputy for clinical services, and the chief of medical health from CMF. In their response, the CMF administrative staff reported that QIT meetings were held on 1/20/08, 2/5/08, and 3/11/08 to address the issues of inmates who have special housing needs. A draft proposal was attached to pilot a process to address situations in which specific housing is required. The pilot process described it as for "inmates with specific housing needs" who will be referred to the DCHCS SPRFIT for statewide consideration.

**<u>Findings</u>:**

This inmate's suicide appears to have been foreseeable because, although he had been seen by mental health staff who attempted to address his mental health needs after his return from QVH, he also made self-harming statements to custody staff and was subsequently left alone without direct observation. He was also a long-term potentially moderate to high suicide risk because of his mental illness, developmental disability, and the exacerbation of his emotional and mental distress because of his deteriorating medical conditions. Both the CDCR mental health team at CMF and the DMH mental health team worked vigorously to try to establish the best treatment and management plan for this inmate. Unfortunately, those plans appear to have been inadequate because there was very limited reference to consideration of a higher level of care over the long-term, such as placement in an Intermediate Care Facility (ICF) at DMH, which, because of this inmate's medical illness, was not likely to have been more than a year or two.

His suicide also appears to have been preventable. The breakdown in the treatment and management planning appears to have come from the custody staff determination that he would be placed on L-3 rather than L-1, based on bed availability without due consideration and deference to the mental health and medical staff's assessments that this inmate expected and needed to be transferred to L-1 because of his overall mental conditions. If ever there was a case in which the mental health and medical recommendations should override custody bed availability, this is illustrative of such a case. The inmate appeared to have engaged in an impulsive act, but he was well known to have engaged in impulsive acts of self-harm/suicidal threats and behaviors, and the level of this impulsivity may not have been well understood by custody staff. In this reviewer's opinion, therefore, that it was imperative in this case, and is very likely to be imperative in other cases, when circumstances such as the mental health and medical conditions of an inmate like this arise, mental health and medical staff must insist that the inmate be transferred to the appropriate level of care, and when necessary to the specific unit, based on those conditions. In response, custody must adhere to that insistence and not change the inmate's designated housing without concurrence from mental health staff. The other concern regarding the possible preventability of this inmate's death rests with the apparent lack of appropriate consideration and implementation of placement of

198

this inmate at a higher level of care such as an ICF, given his complex problems and needs.

## 27. Inmate AA

**Brief History:**

This inmate was a 67-year-old Caucasian male who committed suicide on 9/24/07 by overdose of Quetiapine and Doxepin at the DVI RC. The inmate was a participant in the MHSDS at the 3CMS level of care at the time of his death. He was double-celled. The inmate re-entered the CDCR via DVI on 8/16/07, having entered a plea to three counts of committing a lewd act upon a child and one count of penetration by a foreign object upon a child. He was sentenced to serve 25 years to life on the first count, with the remaining three counts stayed. His minimum eligible parole date was 8/10/28.

The inmate was discovered on 9/24/07 at approximately 12:45 p.m., unresponsive and lying on his bunk. His cellmate had notified an inmate worker that there was something wrong with this inmate. The inmate worker relayed the message to a floor officer who approached the cell and was told by the cellmate that this inmate would not wake up. The floor officer advised the sergeant of the situation and requested a gurney via institutional radio. The inmate was lying on his right side on the bottom bunk, with a state-issued sheet covering his entire body up to his neck. The officer opened the cell door and ordered the cellmate out of the cell. A second radio transmission was sent to the sergeant, advising that the inmate was not responsive and did not appear to be breathing. Prior to entering the cell, the floor officer activated his personal alarm device, and then entered the cell with the sergeant. The sergeant observed the inmate's face as "bluish," with fluid that appeared to be vomit on the pillow next to his mouth. The sergeant attempted to arouse the inmate with no response. The sergeant and the floor officer rolled the inmate onto his back and immediately started chest compressions. A second sergeant who arrived on the scene provided an ambu bag and began to provide ventilation to the inmate with the ambu bag. CPR was continued until medical staff arrived. The inmate was removed from the cell on a backboard, placed on a motorized gurney for transport, and taken to the TTA. CPR continued during transport. The inmate arrived at the TTA at approximately 12:49 p.m., and was pronounced dead by a physician at 12:57 p.m.

An autopsy report was provided by the Office of Sheriff-Coroner for the County of San Joaquin. The report stated that the autopsy was performed on 9/25/07 and determined the cause of death to have been overdose of Quetiapine and Doxepin (hours). The toxicology report determined that there was no blood ethanol alcohol or common acidic, neutral, or basic drugs of abuse detected. However, the following drugs were detected: acetaminophen 9.2 mg/L, Quetiapine 9.2 mg/L, Doxepin 2.9 mg/L, and Nordoxepin 0.51 mg/L. A suicide note was found in the inmate's cell. It stated "DVI To Whom It May Concern: I (Inmate AA) voluntarily took my life without any assistance or knowledge of anyone including my cellmate _____ in cell #E19 or his new cellmate #E117 _____." The suicide note was called a "last will and instructions." He also wrote another note

dated 9/23/07, reporting his "final after dinner cocktail, brewing since Saturday afternoon," consisted of 52 tabs of Atenolol, 54 tabs of hydrochlorothiazide as well as unknown dosages of Doxepin, "saraquel," flexaril, and "phenabarbetol" (*sic*). This note was ended with "marching to the end to the beat of a different drummer. To hell with the system."

The suicide report recounted the inmate's criminal justice history. It stated that his first known arrest was at the age of 26 for indecent exposure and he was placed on probation. He was convicted of embezzlement at age 35 and again received probation. His first prison term in the CDCR began at age 51, after two separate convictions for committing a lewd act upon a child. The inmate served 18 months and was discharged from his parole three years later, but he did not register as a sex offender. The inmate was arrested in Utah and convicted of failure to register as a sex offender, but he was able to escape prior to sentencing and was not re-arrested until the commitment offense. The circumstances of the commitment offense were stated as involving a 12-year period from 1994 through 2006 during which the inmate had been able to convince a family to sign over legal custody of their ten- and 13-year-old daughters. The inmate began sexually molesting both girls in 1994 and moved between different states in the western United States. The suicide report referred to the inmate and the girls living as "survivalists," to the inmate having convinced the girls that he was a prophet of the Mormon Church, that the world was coming to an end, and that he would protect them. In 2006, one of the girls subsequently escaped and informed the police. The inmate was charged with 30 separate counts of sexual acts perpetrated upon the elder girl, with the plea bargain ultimately as referenced above.

After the inmate was arrested in May 2007 in Idaho, he was placed on suicide watch because his wife, who had been the younger of the two female victims, told police that her husband had been taking several medications, including anti-depressants. The inmate had also stated to police that he wanted to "end it all" and received psychiatric treatment after transfer to a county jail.

Upon the inmate's arrival at DVI on 8/16/07, the inmate informed staff during his initial health screening that he had been taking medications for depression. He denied suicidal ideation, thoughts of harming himself, or suicide attempts, but reported auditory and visual hallucinations. He was referred for mental health services because of the auditory and visual hallucinations, and a physician wrote a prescription for Doxepin 100 mg. On 8/17/07, the inmate was seen by a psychologist who administered the brief mental health screening. However, the inmate gave conflicting information. He denied any history of suicidal thoughts or attempts and psychiatric treatment, and reported that he had not and was not currently taking any psychotropic medication. It is significant that this mental health screening was done in the presence of a captain. The suicide report reviewer stated that having a custody officer present at the mental health screening in the administrative segregation unit was standard protocol at DVI. Because of his offense, the inmate was placed in the administrative segregation unit when he arrived at DVI. There is also some confusion with regard to when this inmate actually began receiving Doxepin, as conflicting MARs indicated that it began on 8/18/07 or 8/23/07.

After the inmate was screened by the psychologist, he obtained the actual staff referral from the nurse who had reported the inmate's statements of auditory and visual hallucinations.  The inmate was referred by the psychologist to receive follow-up with a psychiatrist, as indicated by a mental health chrono.  However, the inmate was not scheduled to see a psychiatrist and the psychologist did not amend the mental health screening to indicate that the inmate had been prescribed Doxepin.

On 9/1/07, the inmate submitted a health care services request form, asking to see mental health and medical, complaining of a history of spinal injury, sleeping disorder, and a relapse of "anxiety and mild depression."  The inmate was seen three days later on 9/4/07 by a nurse who documented his complaints of insomnia, anxiety, depression, and constipation.  The inmate received a referred for a comprehensive physical examination for the next day, as well as a referral to mental health.  The inmate did receive a physical examination by a physician on 9/5/07, but there were no references to anxiety, depression, or other mental health problems.  There was another documentation flaw in this process in that the health care services request was dated 9/1/07 but was stamped as having been received on 8/1/07, prior to the inmate coming into the system.

On 9/11/07, the inmate was seen again by medical, after he had submitted another health care services request form on 9/9/07 with complaints that he had heart problems, Addison's disease, and spinal injury.  In response to this request, a nurse saw him and documented that the inmate was refusing to be seen for his medical issues.  There was also another health care services request form dated 9/9/07 that the inmate sent to mental health, again complaining of anxiety and problems sleeping, and requesting medication.  Medical also received this request on 9/10/07 and although the inmate was requesting assistance from mental health, this request appears to have been routed to medical.  The nurse who responded to the request to medical also responded to the request to mental health and reported that the inmate stated that he would wait until he got to his final designation "to do my test."  There was no documentation that mental health was aware of this request or responded to the inmate's complaints of anxiety and sleep disturbance.

The inmate was again seen in response to a health care services request form on 9/13/07 with a complaint of insomnia and a request for "something stronger" than Doxepin because it was not working.  The nurse referred the inmate to mental health on 9/17/07, and a psychologist completed a progress note of that evaluation.

The 9/17/07 note by the psychologist who placed him in the MHSDS indicated that he was told by the inmate that he had a Ph.D. in psychology from U.C. Irvine and that he wanted help with sleep.  He also reported that he knew Ericsonian methods of transactional analysis and was requesting psychotropic medication to help him sleep and help with anxiety.  The CCM found his mental status to be negative for psychosis, his affect to be within normal limits, his attention and concentration normal, with denial of suicidal and homicidal ideations.  The plan was to complete the evaluation, and to follow up and monitor inmate's psychiatric symptoms as needed.  The inmate's diagnosis was Adjustment Disorder with anxiety.  In the note, the psychologist further indicated that the

inmate again reported that he was not taking psychotropic medication and denied a history of any mental health problems. The psychologist assessed the inmate as suffering situational anxiety and sleep disturbance, in part based on the inmate's report that this was his first prison term. The inmate was placed in the MHSDS at that time at the 3CMS level of care as medical necessity and again was referred to a psychiatrist. The suicide report referenced an appointment being scheduled with a psychiatrist for 9/27/07, which was not completed because of the inmate's death on 9/24/07.

The suicide report reviewer provided opinions that "it seems clear from the foregoing history that Inmate AA made the decision to end his life when he was apprehended for his crimes, as he so stated to law enforcement officials at that time." The reviewer went on to state that the inmate's interactions with DVI medical and mental health staff were conflicting and "designed to obtain the necessary supply of medication needed to effect his own death, and capitalized upon the disorganization and lack of communication evident at that facility."

The suicide report identified four problems with recommendations, as follows:

Problem 1: Failure of DVI staff to respond appropriately to referrals of mental health evaluations and services:
• Psychologist receiving information via referral from the R&R nurse that inmate was prescribed Doxepin did not change information on mental health screening done earlier the same day they cleared him.
• Referral by same psychologist to psychiatry on 8/17/07 was not followed up.
• Referral forwarded from the TTA nurse on 9/4/07 was not followed up.
• Mental health self-referral by inmate on 9/9/07 was never responded to and may have been inappropriately intercepted by medical.
Recommendation: DVI shall form a QIT comprised of medical, mental health, and custody staff if necessary to develop a system to track all referrals to mental health and to assure appropriate follow-up.
• Referrals shall be transmitted or delivered to the mental health program, logged in, processed, logged, scheduled for follow-up, tracked to ensure follow-up is completed, and in particular there shall be a system for assuring that the follow-up is an adequate response to the issue. Supervisor shall continuously audit this system for a minimum of three months.

Problem 2: The mental health screening was not conducted in a confidential setting but in the presence of custody staff. This is reportedly the standard practice at DVI in ASU and is a clear deviation from CDCR policy. *2006 Revised Program Guide*, at 12-2-2.
Recommendation: All mental health screenings shall be offered in a completely confidential setting. DVI is to audit mental health screenings for three months and report 100 percent compliance with confidential setting, except for inmates who refuse.

Problem 3:  Multiple MARs made it impossible to determine when the inmate actually received medications and in what dosages.  He may have missed medications, and the dates overlapped on the different MARs.
Recommendation:  This issue will be referred to the Nursing QMAT at the DCHCS.

Problem 4:    Inmate AA was placed in administrative segregation overnight following his arrival and did not receive 30-minute custody welfare checks.  This is a custody policy (*see* October 30, 2006 Memorandum from DAI), and custody is aware of new arrivals as they are placed.  Thirty- minute checks should be implemented immediately upon arrival.
Recommendation:  DVI to audit all new arrivals to administrative segregation for two weeks for compliance with 30-minute checks implemented upon arrival, and continued for 14 days or until inmate is removed from administrative segregation, whichever is sooner.

A death review summary was completed by a physician on 11/13/07 regarding this inmate's suicide.  The physician summarized the inmate's health care and determined "no medical issues that may have led to the inmate committing suicide" and the recommendations were "case closed."

On 9/30/08, the director of Statewide Mental Health Programs, DCHCS and the director of DAI submitted their report on implementation of the QIP for the suicide of Inmate AA, in response to the suicide report dated 10/30/07.  In their report, the directors referenced the responses to the four recommendations identified in the suicide report.

With regard to CAP Item One, DVI formed a QIT comprised of medical, mental health, and custody staff to develop a system to track all referrals to mental health and to ensure appropriate follow up.  They developed LOP 236 which included the following:  (1) All mental health care service referrals will go into the blue "health care services" boxes around the prison so that all referrals go to a consolidated location; (2) The triage psychologist/case manager will sit with the triage registered nurse while they review all inmate/patient referrals to close the gap between the two; (3) A new form to refer and track mental health clinicians' referrals has been generated and is being piloted to better track referrals to more accurately monitor the internal referral process; (4) A new team was developed to specifically address medications/treatment continuity issues and processing in scheduling of inmate/patient self- and staff referrals and internal mental health staff referrals; (5) The triage psychologist/case manager is assigned to the new team in order to more accurately track, monitor, and ensure the timely scheduling of appointments in compliance with the MHSDS Program Guide requirements; (6) The triage clinician determines appropriate scheduling and gives them to the office technician (OT) for data entry and scheduling.  This will allow use of the MHTS to more accurately track response times;  (7) After completion of the above mentioned appointment with the mental health clinician, the OT will enter this referral as completed in the MHTS; and (8) Supervisors will audit this process every two weeks with the appropriate report in the MHTS for compliance.  Audits were submitted for this CAP Item and provided the

following results: An audit from January to March 2008 found compliance with Program Guide mandates regarding referrals and timed appointments at the rate of 51.3 percent, and it took an average of 6.4 days for the inmate to be seen. A QIT "Strike Team" was developed, and a second audit from April to June 2008 found a compliance rate of 73.8 percent, with the average time to appointments at 3.6 days. The strike team was given a directive to complete referrals within 24 hours. The third audit from 7/1/08 to 7/15/08 found a compliance rate of 91.7 percent, and that time to complete appointments had dropped to an average of 1.7 days.

With regard to CAP Item Two, DVI provided the response that "all ASU screenings are conducted in a private setting. Many times the screenings are conducted while the captain conducts his 114-D lock up orders." The response continued on to state that during that time, all inmates are given the opportunity to complete the 31-item screen without the captain present. Further, when screenings take place outside the 114-D process, the CCM uses the psych escort to pull the individuals for the confidential screening process and the psych escort is not present during that time. An audit for the prior two weeks demonstrated that all administrative segregation unit screenings were conducted in a confidential setting, with 36 percent of the screenings taking place outside the 114-D process and 64 percent taking place during the 114-D process. The logs were provided, and beginning 2/22/08 the logs were to be revised to use codes of Confidential Screening (CS) and Captain Present (CP).

With regard to CAP Item Three, DVI provided a final report stating that upon review of the issues, it was determined that the nurses at times did not identify if the inmate received, refused, or missed his medications on the appropriate space on the MAR, and that the nurses were not documenting on the back of the MAR if an inmate missed his medication or the reason he missed any prescribed dosages. A medication management LOP 203 was attached to address the issues of the MARs under general Medical Administration Procedure Numbers 2, 3, and 5. Training was provided by the Director of Nurses (DON) to the nursing staff and was documented on IST sign-in sheets which were also attached along with examples of the correct way MARs are to be completed.

With regard to CAP Item Four, DVI submitted a final report stating, "Contrary to the finding of the Executive Summary of the Suicide Report, a document review of ASU records by DVI management revealed that the '30-minute welfare checks were completed in L-2 ASU where inmate (AA) was housed 8/16-17/07 and the tracking sheets were attached.'" DVI concluded that an audit of the 30-minute custody welfare checks was not necessary, as DVI continued to be in compliance, and therefore there was no audit.

There was no response to the DVI response from DCHCS or DAI provided in the documents received.

**Findings**:

This inmate's suicide does not appear to have been foreseeable, as he was not reporting intent to harm himself in the several days prior to his death, but he did report suicidal

ideation prior to incarceration. His death may very well have been preventable, however, because he never saw a psychiatrist, despite having been referred for psychiatric evaluation multiple times. He also never received a SRAC in response to his reported history when he came into the facility. The suicide report reviewer identified several flaws in communications at DVI among mental health, medical, and custody staff. There was a violation of confidentiality in conducting the mental health screening in the presence of a custody officer. There were also documentation errors with regard to the inmate's MARs for Doxepin specifically. Despite reporting these ongoing flaws in the referral and assessment process at DVI, the reviewer opined that the inmate apparently planned to kill himself before he was incarcerated and gave conflicting information to various staff members to achieve this purpose. It was noteworthy, however, that much of this conflicting information was part of the medical record, particularly in the case of the first psychologist who saw him for the mental health screening, and then later after staff became aware of the conflicting information, they did not respond adequately to fully assess this inmate. It appears further that staff may have been "taken in" by the inmate's being articulate and "apparently well educated," and they were very likely unaware of issues of deception, misinformation, and manipulation to elude the law and prosecution for many years.

The responses to the QIP by DVI are quite remarkable, including the audits and the determination by DVI that the QIP was inaccurate. There was no documentation of any response by DCHCS or DAI to the implementation of the QIP by DVI.

## 28. Inmate BB

### Brief History:

This inmate was a 51-year-old Caucasian male who committed suicide by hanging on 9/25/07 in the administrative segregation unit at CTF. The inmate was not a participant in the MHSDS at the time of his death. He was single-celled at the time of his death. The inmate returned to the CDCR on 7/28/89 as a parole violator. While in prison he was convicted of second degree murder, evading a peace officer, vehicle theft, and transportation of marijuana. He received a sentence of 23 years to life. His minimum eligible parole date was 12/22/03.

The inmate was discovered on 9/25/07 at approximately 6:26 a.m. by two COs conducting morning security checks. The officers noticed the inmate standing against the wall with his right leg resting on the toilet and appearing to be watching television. The inmate did not respond when an officer asked if he was okay. When the officers looked closely in the cell, they noticed a white string wrapped around the inmate's neck and attached to the air vent above the inmate. One of the officers activated his personal alarm device and the other requested the cut-down tool. The cut-down tool was brought and the officers and a sergeant entered the cell, cut the inmate down, and carried him outside his cell and down the stairs to the first tier. The officers checked his vital signs, found no respirations or pulse, and started CPR at approximately 6:31 a.m. Medical nurses arrived, assisted with CPR, and utilized the AED but found no shockable rhythm. The

fire department staff arrived at approximately 6:42 a.m., and ambulance staff arrived at 6:50 a.m. The ambulance departed at 7:10 a.m. and transported the inmate to an outside hospital. Medical personnel continued CPR and administered stimulant medications. However, the inmate did not respond and was pronounced dead by a physician at 7:41 a.m.

An autopsy report was provided by the Monterey County Sheriff-Coroner's Office. It stated that the autopsy was performed on 9/26/07. The cause of death was determined to have been asphyxia (minutes) due to hanging (minutes), and the manner of death to have been suicide. A toxicology report determined that no blood ethanol alcohol or common acidic, neutral, or basis drugs were detected, with the exception of ibuprofen at 14.7 mg/L (effective level 5-50 mg/L).

The suicide report contained the inmate's criminal justice history. It stated that the inmate did not have a juvenile record but had a long history of arrests as an adult, beginning at approximately age 26. The inmate had four felony convictions including receiving stolen property, robbery, possession of a controlled substance, and theft. He had served jail and prison sentences. His first prison sentence began in 1984 at the age of 28 for robbery and possession of heroin. He paroled but returned to prison in 1986 for petit theft, paroled again but violated that parole, and was returned to prison for a third time in 1989. Prior to his return to prison, the inmate's commitment offense occurred when he was observed by police officers in a stolen truck. When they attempted to stop him, the vehicle that he was in broad-sided another vehicle and killed the driver. The inmate was also transporting 40 grams of marijuana and he was reportedly under the influence of drugs. These events led to the commitment offense, as noted above.

After the inmate entered the CDCR via CIM on 7/28/89, he was transferred to several facilities including Folsom, CSP/Corcoran, RJD, and ultimately CTF on 4/26/00. During his first eight years of incarceration, the inmate did not appear to have received disciplinary infractions and began working as a carpenter in 2003. His disciplinary infractions began in 2007. On 7/23/07, the inmate received his first RVR for possession of tobacco and was found guilty of this offense. He informed correctional staff that he owed debts on the yard for tobacco and drugs and was fearful for his safety. He would not provide the names of enemies but was placed in the administrative segregation unit due to safety and security concerns. The inmate was seen by the administrative segregation unit ICC on 7/26/07. He informed the committee that he planned to stipulate his Board of Parole hearing review, which would result in a two-year set off. On 8/30/07, at his next administrative segregation unit ICC hearing, he was interviewed briefly by a psychologist. He denied any mental health issues or problems and any suicidal or homicidal ideation. The suicide report made reference to the inmate's segregation record, showing that the inmate consistently refused to come out of his cell for exercise, spent a lot of time watching television, and did not stand out to staff for any specific reasons. The inmate was endorsed for transfer to CMC which was to take place on 9/26/07.

The inmate does not appear to have had any treatment for mental illness prior to his incarceration in 1989. Standardized bus screenings in June 1996 and April 2000

indicated that he answered "no" to all questions concerning mental illness. He also had evaluations by psychologists prior to Board of Parole hearing reviews in 1996, 2002, and 2005, all of which diagnosed him as having Antisocial Personality Disorder, and Polysubstance Dependence in institutional remission in the last evaluation.

When the inmate was placed in the administrative segregation unit, he received a mental health screening on 7/23/07 by a psych tech. Again, no mental health issues were identified. There also were no mental health issues identified at his administrative segregation unit ICC hearings in July and August 2007. Notably, however, the inmate did submit a health care services request form on 9/24/07, in which he stated, "I would like to talk to someone about my mental health. I haven't been able to sleep and my thoughts have been scattered. I feel like I'm falling apart inside my head. Please I need to talk to someone. Thank You." This request was received the following day, 9/25/07, and he was scheduled to see a psychiatrist at 8:00 a.m. Unfortunately, the inmate was discovered at approximately 6:26 a.m. on that day, prior to completion of the appointment.

As part of the coroner's report, an investigator contacted the inmate's niece on 9/26/07 to discuss her uncle. The inmate's niece informed the investigator that the family had lost contact with the inmate in recent months. She reported that the inmate had told her that he was trying to stop using drugs and that, when in prison, if you created a drug debt you could not pay, you either had to kill yourself or members of your family would be targeted outside of the prison. His niece stated her belief that possibly her uncle had committed suicide to protect the family from retaliation for money that he owed.

The suicide report reviewer concluded that all policies and procedures were followed appropriately. He further opined that there was no time for staff to respond to the inmate's request for mental health services. It had been submitted the previous day and received the same morning as the suicide, with the inmate scheduled to be seen at 8:00 a.m., but discovered hanging at 6:26 a.m. There were no recommendations by the suicide report reviewer in the suicide report, which was dated 11/26/07.

**Findings:**

This inmate's suicide does not appear to have been foreseeable or preventable, as he was not indicating any intent to end his life in the days prior to his death. He reported emotional and psychological distress on 9/24/07, but this request did not make reference to thoughts or intent to harm himself. He was scheduled for evaluation the following morning at 8:00 a.m. but committed suicide prior to the time scheduled for his appointment. CPR took approximately five minutes to begin; therefore, it was not started within the required timeframe.

### 29. Inmate CC

**Brief History:**

This inmate was a 39-year-old Hispanic male who committed suicide by hanging on 11/3/07 in the administrative segregation unit at HDSP. The inmate was single-celled and on intake status at the time of his death. The inmate was a participant in the MHSDS at the 3CMS level of care. He entered the CDCR on 11/16/06 via the NKSP RC. He was serving his first term, having been convicted of murder in the first degree with a sentence of 26 years to life in prison. His earliest possible parole date was 9/13/28.

The inmate was discovered on 11/3/07 at approximately 10:00 a.m. by a psychologist who knocked on his cell door to conduct a mental health screening, as the inmate was a new arrival at the administrative segregation unit. When the inmate did not respond to a verbal greeting, the psychologist looked into the cell and observed the inmate hanging with a cloth noose around his neck and with his torso wedged between the lower bunk and outer wall. The psychologist yelled to the control officer to open the door. At the same time, the Coleman escort officer who had accompanied the psychologist notified the control officer to retrieve a stokes liter from the medical officer. The control officer informed floor staff of a medical emergency and activated his personal alarm. At approximately 10:01 a.m., the door was opened by two officers who observed the inmate hanging by a noose that had been tied around his neck and attached to the top brace of the top bunk. According to the incident report, one officer grasped and broke the rope from the upper bunk and removed the noose from the inmate's neck as a third officer entered the cell. The three officers made several unsuccessful attempts to free the inmate from his wedged position. At approximately 10:04 a.m., they placed a sheet around the inmate's trunk, under his arms, and managed to pull him out from behind the bunk. CPR began, with one officer using the ambu bag and another officer giving chest compressions. The third officer yelled for the AED and ran outside the building to provide information to a responding licensed vocational nurse. The AED was in the responding institutional ambulance. The four officers placed the inmate on a gurney and carried him to the rotunda where they resumed CPR. At approximately 10:13 a.m., a LVN and registered nurse arrived, observed that the inmate was "purple/blue," not breathing, and had no pulse. The AED was attached and advised no shock. The inmate was moved by gurney to the institutional ambulance where CPR was resumed. The inmate was transported to the TTA, arriving at approximately 10:20 a.m. A physician's assistant assumed care and determined that the inmate had no pulse or respiration. Paramedics were already in the TTA on standby for transport of another inmate. They attempted to intubate the inmate twice, at approximately 10:22 a.m. and 10:25 a.m., without success. The physician's assistant called the time of death at 10:41 a.m. A coroner's report was provided by the Washoe County medical examiner/coroner. It stated that an autopsy had been performed on 11/5/07 and determined the cause of death to have been asphyxia due to ligature hanging. A toxicology report indicated that there were no ethanol or common drugs of abuse detected in blood or urine samples.

The suicide report contained the inmate's criminal justice history.  He had no known juvenile criminal history, although the suicide report referenced court records indicating that the inmate had a history of discipline problems that were likely exacerbated by his substance abuse, which included marijuana, alcohol, and cocaine for two years.  He was reported to have physically threatened his mother when in the eleventh grade and he was sent to live with his grandparents.  He had three misdemeanor convictions in 1996 for driving under the influence of drugs/alcohol and driving with a suspended license, for which he completed probation.  The commitment offense occurred on 9/12/02 when the inmate, while playing video games with his father, suddenly produced a knife and stabbed his father to death.  The inmate reportedly stopped his mother from using the telephone to summon help, restrained her, and told her that he had "saved" his father and the "demons" were gone.  The inmate was subsequently found walking on a nearby street and was taken into custody without incident.  He reported that he had to complete a "mission" to kill his father with a knife, and made similar references to his father being a "demon" and a "shape shifter," and to his belief that he would not be punished because what he did was "right."  The suicide report described the inmate after his arrest as being found incompetent to stand trial, placed at ASH, and subsequently transferred to PSH.  He was ultimately determined to be competent and returned to jail on 4/21/04.  On 7/13/06, he was convicted of murder in the first degree, and on 7/20/06 he was determined to have been sane at the time of his trial.  He was subsequently sentenced to 25 years to life in prison, plus one year for use of a weapon, and entered the CDCR on 11/16/06, as noted above.  The inmate was transferred to HDSP on 2/26/07 where he remained until he killed himself on 11/3/07.

The records indicated that the inmate had a long history of mental illness, beginning as a teenager and escalating in 1993 when he was approximately 25 years old.  The records stated that he was hospitalized in 1993 after his divorce.  At that time, he was smoking crack and was subsequently diagnosed with Bipolar Disorder, Schizophrenia Paranoid Type, and Polysubstance Abuse.  He was hospitalized involuntarily three times during that year and was treated with Depakote and Buspar.  He was subsequently treated as an outpatient by the Veterans Administration because he had been in the Army for two years.  The records indicated that he was described as delusional, with beliefs that the government monitored his activities, and was placed under a conservatorship because of his mental illness.  The inmate also reportedly attempted suicide by overdosing on methamphetamine in 2002, after he reportedly had witnessed his father sexually molesting his niece.

After his arrest, but prior to his conviction, the inmate was evaluated by a neuropsychologist who diagnosed Schizoaffective Disorder Bipolar Type, Polysubstance Dependence, and Antisocial Personality Disorder. He was described as suffering from delusions, hallucinations, and extreme mood swings.  The inmate was treated with Depakote, Buspar, and Zyprexa while in the hospital and jail prior to his transfer to CDCR.

After his arrival at NKSP on 11/16/06, the inmate had a mental health screening completed and was also evaluated by a psychiatrist who continued his prescriptions for

Depakote, Buspar, and Zyprexa. A RC mental health evaluation on 12/11/06 concluded that the inmate had a diagnosis of Schizophrenia Paranoid Type rule out Schizoaffective Disorder. The clinician reported the inmate's history of experiencing auditory hallucinations, delusional beliefs, and bizarre beliefs, including that "someone else's toes" were on his feet. On that date, the inmate was placed in the MHSDS at the 3CMS level of care. His medications were continued, and on 2/26/07 he was transferred to HDSP. The initial health screening completed at that time noted his history of suicidal attempt and ideation, and that he was receiving treatment such that he continued at the 3CMS level of care. He was diagnosed with Schizophrenia Paranoid Type and Amphetamine Dependence. Despite the notations that he had been receiving psychotropic medications prior to his transfer to HDSP, as referenced above, a social worker noted on 3/8/07 that the inmate had not been receiving his medications and had not been evaluated by a psychiatrist since his transfer to HDSP. The suicide report reviewer reported that she interviewed the pharmacist in charge at NKSP and was assured that the inmate's medications were transferred with him to HDSP. She also reported that the records from NKSP were found in the inmate's UHR, supporting the likelihood that the records and medications were sent to HDSP at the time the inmate was transferred.

On 3/8/07, the psychiatrist ordered to continue without change the inmate's previous medications, including Depakote, Buspar, and Zyprexa, but only Depakote and Buspar were found on the pharmacy's patient profile of medications dated 3/9/07. Reportedly the pharmacist in charge at HDSP could not provide an explanation for the exclusion of Zyprexa, other than it may have been a non-formulary medication. The suicide report reviewer stated further that there was no evidence that any psychotropic medication was ever given to the inmate at HDSP. The MARs from NKSP and Tulare County jail were found, but after 2/27/07, when the inmate transferred to HDSP, there were no records that psychotropic medications were dispensed to him. When seen by a psychiatrist on 3/20/07, the inmate reported that he had taken medications in the past, that each medication was important in controlling his symptoms, and that those medications were "fine." The psychiatrist also stated that when the inmate was not taking medications and not abusing methamphetamine, he believed that he could manage and seemed pretty normal. The inmate reported that he had been at HDSP for two weeks by that time (it was actually over three weeks), and that he complained of a headache and slow thoughts, but the psychiatrist determined that his mental status was entirely within normal limits. The psychiatrist then ordered that all the psychotropic medications be discontinued noting that the inmate preferred to discontinue all medications "rather than piecemeal."

As the inmate was at the 3CMS level of care, he saw a CCM four times between 3/27/07 and his death on 11/3/07. The CCMs (two social workers) noted that the inmate was stable but had auditory hallucinations and some unusual thoughts. They also noted errors in thinking and some anxiety. On 8/27/07, the inmate was seen for the last time by a social worker at cell front. The social worker noted that he had been off medications for six months, that his symptoms were in partial remission, and that the inmate wanted to "get off program," indicating discharge from the MHSDS. The social worker reported his belief to the suicide reviewer that the inmate was functioning well without medications. The inmate was never seen by a psychiatrist after 3/20/07, when the

psychiatrist on that date discontinued all of his medications.  There was no indication in the UHRs that the psychiatrist had reviewed this inmate's history in any detail.

The inmate was placed in administrative segregation on 11/2/07 at his own request because of fears for his safety.  According to the suicide report, there were concerns that the inmate was being pressured by a gang to stop medications and bring illegal drugs into the prison.  The inmate's cellmate had been placed in administrative segregation unit for the same reasons, and the ISU was investigating these issues.  Because the inmate had a history of suicide attempt and ideation, an evaluation of suicide risk by a mental health clinician was required.  This was done by a psychiatrist who completed a brief mental health evaluation.  The psychiatrist noted that the UHR was not available but did note that the inmate reported depression, insomnia, and auditory hallucinations, and requested medications for his psychotic symptoms.  The psychiatrist noted the inmate's suicide attempt in 2002, "vague" suicidal ideation without a plan, and previous psychiatric hospitalization, but he did not complete an SRAC.  Despite this inmate's history, particularly when not receiving psychotropic medications, no SRACs were completed during his incarceration.  The psychiatrist did, however, prescribe Geodon 80 mg and Trazodone 50 mg at night.  The inmate did not receive these medications because he killed himself the following morning.  The inmate had been cleared to remain in the administrative segregation unit, and the psychiatrist's plan was for a follow-up appointment in one week.  The suicide report reviewer interviewed the inmate's mother.  She reported that she was not aware that the inmate was not taking medication and stated that "without medications, it was a recipe for committing suicide."

The inmate also had a number of chronic medical problems, including hypothyroidism, diabetes, and hyperlipidemia, and when examined in January 2007, there were concerns about possible hypertension and hypoglycemia.  He was prescribed medications for these conditions.

The suicide report reviewer provided several opinions about possible precipitating events, including the possibility that the inmate felt pressured by gang associated inmates, had been receiving difficult news from family members, had confessed to a Catholic priest in prison and asked for forgiveness for killing his father, and finally that "the inmate had a documented 14-year history of psychosis, impaired reality testing, and delusional thinking," yet he had not taken psychotropic medications for nine months.  The reviewer went on to state that on the day prior to the inmate's death, the inmate informed the psychiatrist "that he had a history of suicide, had thoughts of killing himself, and wanted medications to alleviate symptoms of psychosis and depression."

The suicide report identified six problems with recommendations as follows:

Problem One:  On 2/22/07, a registered nurse at NKSP completed a CDCR 737 confidential medical/mental health information transfer – sending institution, and indicated that the medications would be attached.  According to the pharmacist in charge, the attachment was an envelope containing the inmate's MAR (which was filed in the UHR) and packets of medications.  However, there was no record that

any transfer medications were received and subsequently given to the inmate at HDSP.

Recommendation:  HDSP shall report its policy regarding methods for ensuring that medications are continued upon arrival.  Audit random sample of 20 medical charts over consecutive 30-day periods until 100 percent compliance is achieved.

Problem Two:    The HDSP receiving and release nurse noted that three psychotropic medications were prescribed for the inmate, and that three of six items were positive for mental health history and current needs on the initial bus screening, yet no referral was made to a psychiatrist.

Recommendation:  Refer to DCHCS NPPEC for a pattern of practice review for the nurse who conducted the screening.

Problem Three:  Inmate CC was prescribed three psychotropic medications on 3/8/07, but only Buspar and Depakote appeared on the pharmacy list dated 3/9/07.  No explanation was given regarding the exclusion of Zyprexa, and there was no record that another antipsychotic was prescribed as a substitute.  Further, none of the medications were placed on a MAR nor were they ever given to the inmate.

Recommendation:  HDSP shall form a QIT to include pharmacy and nursing to determine the reason why medications were not given and why Zyprexa was omitted.   The team shall correct errors and audit a random sample of 30 medication orders for delivery and MAR compliance over consecutive 30-day periods until 100 percent compliance is achieved.

Problem Four:   Based on documentation reviewed, mental health staff at HDSP did not appear to have a clear understanding of this inmate/patient's significant mental health history.  The psychiatrist allowed the inmate/patient to stop taking medications and, based on documentation, was unaware that the commitment offense in which he stabbed his father to death was motivated by delusional thinking.  The IDTT's mental health treatment plan was vague and the problems noted were very general with non-specific treatment.  For instance, the treatment plan noted that one of the goals for treatment was to reduce "aggressive incidents," yet the inmate/patient had had no incidents of violence in the six years since his initial incarceration in Tulare County.  Mental health charting noted ongoing (although "residual") psychotic symptoms and a GAF of 60 or less, yet it did not address the possibility that psychotic symptoms might be a risk factor for dangerous behavior. There was no record of in-depth evaluation of the inmate/patient regarding his history of substance abuse or current use in prison, nor of the possible connection among substance abuse, psychosis, and dangerous behavior.  Further, there was no written treatment plan that addressed the inmate's request to stop his medications.

Recommendation:  DCHCS will provide training on this case in the suicide prevention videoconferences.

Problem Five:  The inmate screened positive for suicide risk on the CDCR 128-MH7 ASU pre-placement chrono and was referred for an emergent mental health

evaluation, including an SRA.  The responding psychiatrist completed only a CDCR 7389 Brief Mental Health Evaluation.  The psychiatrist did not follow Program Guide requirements for an adequate evaluation of suicide risk, which includes a completed SRAC and a progress note justifying level of risk and a treatment plan.  The psychiatrist's documentation of suicide risk was vague, and offered no specific level of risk and no treatment plan to address the inmate/patient's suicidality.

Recommendation:  The psychiatrist in question was immediately identified as a new employee by the chief of mental health at HDSP.  The chief of mental health agreed to have the psychiatrist's work monitored by another psychiatrist for one month and report findings. A report was received, and the following additional information was requested:  a) The number of times that the psychiatrists met;  b) The number of cases that were reviewed; c) Whether any of those cases included an SRAC, and whether or not the checklist was completed appropriately; d) If/when the psychiatrist completed the SRA training; e) If/when the psychiatrist received an orientation with the various documents and forms according to Program Guide requirements; and f) A current review of the psychiatrist's work during the month of February 2008.

Problem Six:     An orientation and training of the new psychiatrist was not conducted prior to his/her seeing inmates/patients.

Recommendation:  The chief of mental health at HDSP shall provide the current local operating procedure regarding the orientation and training of new mental health employees, including SRA training.

A death review summary was completed by a physician on 1/31/08.  The inmate's medical history was summarized, and the physician determined that the standard of care had been reasonable.  The conclusion included: 1) Systemic issues; inmate/patient arrived at HDSP on 2/26/07, but did not receive any medications until 3/8/07; 2) Nursing PPEC referral for the nursing encounter on 7/22/07 when patient was having cough for three months, but no chest x-ray was ordered, and patient was not given any MD referral but was only given lozenges; and 3) No medical issues were involved in this particular suicide.  Recommendation was referral for death review for above reasons.

On 11/10/08, the directors of the Statewide Mental Health Program, DCHCS, and the director of DAI issued their report on implementation of QIP for the suicide of Inmate CC, in response to the suicide report dated 4/8/08.  In their report, the directors include a CAP proof of practice from HDSP dated 6/30/08.

In response to Problem One, HDSP provided their LOP number 716, health screening. The policy was a red-lined version and stated that an MTA or licensed psychiatric technician shall complete the initial healthcare screening process for all incoming inmates and document it on the standardized bus screening form, and that any abnormal findings should be referred to the R&R RN immediately or to the treatment triage area RN.  Based on the interview of each inmate individually, the RN is to complete referrals to medical, mental health, and correctional for follow-up care for the inmate, as necessary.  There

were provisions to notify the CMO/HMC if the UHR is missing. There were additional
provisions for housing the inmate if he is medically stable and referral of the inmate to
the TTA for evaluation and stabilization, if he is not stable. The R&R RN is to complete
the disposition portion to include referral timeframes for follow-up appointments so that
urgent needs can be met and every attempt will be made to maintain confidentiality. The
operating procedure went on to describe tuberculosis screening, medications, mental
health screening with criteria for referral to the TTA for psychiatric evaluation, and
possible placement. The evaluation is to be done by the psychiatrist or psychologist on
call if the inmate is behaving bizarrely or inappropriately, or shows evidence of
hallucinations, suicidal ideation, or self-harm. The inmate is also to be referred for a
mental health evaluation if he is a participant in the 3CMS/EOP program, has a history of
psychiatric care within the last six months, displays behavioral symptoms, or has a past
suicide attempt and/or mental health history. There were also provisions for RC inmates
and performance of the RC evaluation process, including seven days for mental health
evaluations and 14 days for complete history and physical and dental screening. The
policy was signed by the CMO/HCM and warden (A), with the original date of
November 2005, but once again this was a red-lined version with various changes. A
complete, finalized version was not provided. There was also an audit for April and May
2007 of all inmates arriving on psychotropic medications, which indicated that 14-day
bridging orders were ordered with 100 percent compliance for the month of May.

With regard to Problem Two, the HDSP response was "awaiting report from Nursing
Professional Practice Executive Committee." No such report was included in the
documents submitted.

With regard to Problem Three, a QIT was formed, and reported findings and audit
summaries were enclosed. The QIT was entitled "Medication Delivery Management –
Mental Health," and the members included a senior psychologist, pharmacist in charge,
SRN-2, senior psych tech, and HPS-1. The QIT met on 4/24/08, 5/15/08, 6/12/08, and
reportedly was to meet in July 2008, but there were no minutes included for July 2008.
The QIT summarized results, including results of audits for 30 UHRs in May revealing
that 100 percent of all orders were filled by pharmacy and received by inmates, as
documented on the MARs. The durations from the time the inmate was seen to the time
the inmate received the medication ranged from zero to five days. In the QIT's last
minutes, with regard to this inmate receiving only two of his three prescribed
medications, the QIT determined that the MAR for that month had never been found,
despite a check of loose filing. The QIT concluded that it could not be determined
whether the clinic actually received the medication, or whether it received the medication
but never prepared a MAR, or whether it prepared a MAR and may have actually
administered some medication but the MAR was eventually lost. The QIT also reported
that a non-formulary request was not needed for Zyprexa, that the pharmacist in charge at
the time was no longer at the institution, and that he would have been the person to
authorize a non-formulary request, had it been needed. The QIT reported that currently
non-formulary requests would be referred to the senior psychiatrist for approval, and that
the responsibility would lie with the provider who wrote the order. The QIT's final
conclusion was that there was a need to standardize the way orders were written, and a

need to train and educate the providers. There was no further information on standardization of orders or training for the providers.

With regard to Problem Four, IST sheets were provided for a suicide video conference that was held in January 2008.

With regard to Problem Five, HDSP reported that the contract psychiatrist was working two days per week during the last week of October, and met with a mentoring psychiatrist both days each week during November. Further, an average of ten cases per week were reviewed, and SRACs were completed in a satisfactory manner in two cases. An orientation in documents and forms was conducted in October 2007. An IST for SRA for correctional settings training was provided, indicating that the psychiatrist had attended the session on 11/13/07. There was no documentation of the mentoring psychiatrist's supervision of the identified psychiatrist. In February 2008, the psychiatrist saw an average of 40 inmates/patients per week, all for medication renewals. None involved SRACs or admissions to MHCBs. A random sample of 25 UHRs was reviewed; all medication orders and renewals were satisfactory.

With regard to Problem Six, HDSP submitted a newly proposed LOP. Number 737, mental health new employee orientation, was created and an in-service sign in sheet for new employees was submitted.

**Findings:**

This inmate's suicide was very likely foreseeable and preventable. The inmate's substantial history of psychotic illness, which included at least one suicide attempt, psychiatric hospitalizations, and longstanding treatment with psychotropic medications, as well as some apparent relevance to his commitment offense, were well documented in the records. These records appeared not to have been reviewed adequately, nor was the inmate accessed adequately at HDSP. On the day before his suicide, a psychiatrist saw the inmate as a newly-placed inmate in the administrative segregation unit. That psychiatrist completed a thoroughly inadequate evaluation. It did not include an SRAC and made no provisions for the management of this inmate other than to place him on other medications and return him to the administrative segregation unit environment.

The suicide report reviewer identified multiple problems at HDSP. The HDSP response was: (1) To provide a red-lined version of an LOP which does not appear to have been finalized but was signed by the HCM and warden; (2) To form a QIT that does not appear to have completed its meetings as per its own minutes and does not appear to have analyzed the data that was collected from the audits; (3) To have "mentoring" by another psychiatrist of the psychiatrist who last saw the inmate/patient, but there is no documentation of the actual mentoring results, except for a statement that all orders and the two SRACs that he/she completed were adequate or appropriate; and (4) To develop another LOP on orientation to a mental health program for new staff. Both of these LOPs appear to be essentially conditions of the already existing Program Guide, without adequate explanation as to why HDSP was not already following established policies and

procedures and did not have in place training regarding these policies and procedures. There is no adequate explanation for a lost MAR, nor any apparent plans on how to reduce the likelihood of similar occurrence in the future, nor any explanation as to why the inmate was given only two of three medications prescribed for him approximately ten days after his arrival at the institution, nor any explanation as to why a packet of medication that was reportedly sent to HDSP was never found.

## 30. Inmate DD

**Brief History:**

This inmate was a 36-year-old Caucasian male who committed suicide by suffocation on 11/21/07 in his cell on the SNY at RJD.  The inmate was not a participant in the MHSDS at the time of his death, although he had a history of treatment in the MHSDS at the 3CMS level of care as medical necessity.  The inmate entered the CDCR on 11/19/02 via the NKSP RC, having pled guilty to two counts of first degree murder, and was serving two terms of 25 years to life without the possibility of parole.

The inmate was discovered on 11/21/07 at approximately 12:23 p.m.  He was double-celled, but his cellmate was at his job at the time of the incident.  At 12:23 p.m., an officer was in the process of conducting an institutional close-custody count and noticed that the inmate was not standing for count as required.  The officer called out to the inmate, but he still did not stand.  The officer then shined his flashlight into the cell and discovered a sheet hanging across the cell in front of the sink.  The officer ordered the cell door opened and pulled the makeshift curtain back to reveal the inmate motionless, lying on his back with a plastic bag wrapped around his head and face.  The officer notified central control to send the ETV as soon as possible due to an unresponsive inmate.  The ETV arrived and medical staff was informed by the officer of this discovery. Among the medical staff arriving at the cell was a physician's assistant who took the plastic bag off the inmate's head, and checked for breathing and pulse with negative results. The physician's assistant and officer placed the inmate on the floor, began CPR at that time, and contacted a physician.  Additional staff responded and assumed CPR, and the inmate was transferred via the ETV to the TTA as CPR efforts continued.  A 911 emergency phone call was placed, and officials from American Medical Response and the San Diego Fire Department arrived at the TTA at approximately 12:45 p.m.  The inmate was pronounced dead at 12:46 p.m.

An autopsy report was provided by the Office of the Medical Examiner, County of San Diego, and stated that the autopsy was performed on 11/22/07.  The autopsy report stated that the cause of death was asphyxia due to plastic bag intentionally placed over head and neck.  Chlorpromazine toxicity was also listed as a contributing cause of death.  The manner of death was stated to have been suicide.  A toxicology report listed chlorpromazine as detected in peripheral blood (0.60 mg/L), liver (91 mg/kg), and gastric contents (360 mg), which would be consistent with the ingestion of chlorpromazine.  No ethanol alcohol or drugs of abuse were detected in blood specimens.  A note was found in

216

the inmate's cell.  It stated, "I was never getting out anyway so I wanted to end here."
The note went on to state that the inmate's cellmate was not involved.

The suicide report contained the inmate's criminal justice history, from which it appeared
that the inmate had no known juvenile history.  He had an adult criminal history
beginning in December 1997, when he was arrested for attempted murder, but there was
no disposition in the records.  The inmate also had a conviction for a vehicle code
violation in September 1998 with a three-year probationary period which he completed.
He also committed an offense on 10/21/01 when he used a gun in a drug store and robbed
a pharmacist of Vicodin and cough syrup with codeine.  He was not apprehended.  On
12/2/01 he got into a dispute with a man and woman in a bar, confronted them outside of
the bar, and shot and killed both of them.  This was his commitment offense.  He
attempted to carjack a car after the shooting.  He subsequently pleaded guilty to two
counts of murder in the first degree, and on 10/22/02 he was sentenced to two terms of 25
years without the possibility of parole.

The records indicated that the inmate had no known history of mental illness or treatment
prior to his incarceration.  His screening for mental health concerns when admitted to
NKSP was negative, as noted on the standardized bus screening and the mental health
screening.  The inmate was subsequently transferred to Calipatria on 1/23/03, from which
he transferred to RJD on 6/14/05, and then to CSP/LAC on 8/18/05.  He was
subsequently transferred from CSP/LAC back to RJD on 12/12/06 and was placed on a
SNY.  During his ICC hearing on 11/16/07, he was recommended for transfer to the
HDSP SNY, but he committed suicide five days later.

The inmate came to the attention of mental health staff when he told an officer on 6/13/05
that he needed to see a MTA because he had tried to kill himself again.  The inmate had a
two-inch laceration on his left wrist, according to the records, and was transported to the
medical clinic where he was seen by an MTA.  The inmate reportedly stated that he had
tried to hang himself during the previous week with a plastic bag around his neck, but he
failed to die because the bag had a hole in it.  The suicide report reviewer stated that the
MTA suggested "that the inmate may have actually meant to suffocate himself."  A
progress note by a psychologist on 6/13/05 indicated that the inmate had cut his wrist "to
get off yard."  He recounted the inmate's history and described objective findings of not
sleeping, poor appetite, social phobia, and urinating in cell before others.  His Axis I
diagnoses were Major Depression, Amphetamine Dependence, Alcohol Dependence, and
Opioid Abuse, and he was admitted to the OHU on suicide watch.  On 6/13/05, an SRAC
was completed by a psychologist, not the psychiatrist.  Curiously, the psychologist did
not provide an evaluation of imminent risk, but the plan was for crisis bed placement on
suicide watch.  The psychologist did not identify on the SRAC the sources of
information, but in his note made reference to the inmate and some historical factors that
may have been taken from the UHR.  The psychiatric progress note of 6/14/05, that was
completed while the inmate was at Calipatria, indicated that he was tense, perhaps
depressed, with poor eye contact and stated that his last amphetamine use was on 6/12/05.
The psychiatrist began his note by stating that the inmate said that he did not want to live.
The plan was to transfer him to an MHCB.  The inmate was seen by a psychiatrist on

217

6/14/05 and was prescribed Remeron 15 mg HS for 90 days.  The 6/14/05 treatment plan gave diagnoses of Major Depression, Amphetamine Dependence, Alcohol Dependence, Opioid Abuse, and Antisocial Personality Disorder, with a GAF of 30 to 40.   He was then transferred to an MHCB at RJD.

The initial health screening completed at RJD on 6/14/05 indicated that the inmate gave "yes" answers to past treatment for mental illness, mental health problems, and history of attempted suicide.  The following day, an SRAC was completed by a psychiatrist and identified a number of risk factors, including life prison term, first time in prison, administrative segregation unit housing, level four custody points, recent suicidal ideation, depression, hopelessness, suicidal ideation, current impulsivity, recent suicide attempt, and a well-planned lethal attempt, but curiously it did not provide an estimate of risk.  His diagnoses in the MHCB were Mood Disorder Secondary to Substance Abuse, Adjustment Disorder with mixed features, Amphetamine Dependence, and Schizoid Personality Disorder.  The inmate reportedly stated that he did not want to take any medication and that he had debts for heroin on the yard.  He also reported that he had attempted to kill himself by a heroin overdose a week earlier and subsequently cut himself three days prior to his transfer to RJD.  The inmate was refused medication while in the MHCB and was discharged on 6/20/05, but there was no discharge summary in the records provided.  The inmate was placed at the 3CMS level of care as medical necessity during this admission to the MHCB.

An SRAC was performed on 6/20/05 while the inmate was still in the MHCB, and listed as sources of information the inmate and the UHR.  It also described risk factors that included current suicidal ideation and threats, level four custody score, a longer life sentence, recent suicidal ideation, disturbance in mood, insomnia, fearfulness for safety, and recent suicide attempt, but it listed no protective factors and no evaluation of risk, with a place to refer to the primary clinician and refer to psychiatrist for medication review.

The inmate was actually transferred from the MHCB on 6/22/05 and placed in the administrative segregation unit because he was thought to be a threat to the safety and security of the institution "since you are a lifer without the possibility of parole."  He was also endorsed for transfer back to Calipatria.  It appeared from the record that the Remeron, which had been prescribed for the inmate at Calipatria, was not continued during this MHCB admission.  He was discharged on no medications, with a five-day follow-up plan from 6/23/05 to 6/27/05.  During the five-day follow-up, the inmate was noted to have been stable, without homicidal or suicidal ideation.  On 7/25/05, the inmate sent a health care services request form requesting medication, and a psychiatrist re-started his Remeron and changed the dosage to 15 mg in the morning and 30 mg HS.

He transferred to CSP/LAC on 8/18/05, and one week later he stated to a psychiatrist that he wanted to hurt himself because of bad memories of an ex-girlfriend.  The psychiatrist diagnosed Adjustment Disorder with anxiety, changed his prescription to Remeron 45 mg HS, and added Haldol 1 mg and Cogentin 0.5 mg in the mornings.  The Haldol was subsequently increased from 1 mg to 5 mg by a different psychiatrist on 8/30/05.  The

record was confusing, but it appeared that the psychiatrist who saw the inmate on 8/25/05 saw him a second time after the different psychiatrist saw him on 8/30/05, and discontinued the second psychiatrist's order for Haldol, replacing it with the exact same medication and dosage of Haldol 5 mg in the morning. It is unclear from the record as to why this was done. It was notable that the inmate had an IDTT meeting on that same date, which continued him at the 3CMS level of care as medical necessity but did not provide any diagnoses or any justification for the use of an anti-psychotic. His problem was identified as Depression.

On 9/21/05, the inmate was seen for a 30-day follow-up by a psychiatrist who reported the inmate was seen in an IDTT meeting on 8/30/05, and that Haldol, Remeron, and Cogentin were ordered for his anxiety. The inmate was seen at the cell door and reported that he was stable. The psychiatrist assessed Adjustment Disorder with Depressed Mood, with a plan to renew medications and follow up in 75 days.

A psychiatric progress note on 10/5/05 indicated that the inmate was seen for noncompliance and reported that he was "doing okay." The psychiatrist's note was very difficult to read, but the psychiatrist described the inmate's reporting that he had a problem with his cellmate and that, as a result, he has been missing his Remeron. He reported that the Remeron was helpful, and denied having thoughts of harming himself, although he did have thoughts of harming his cellmate. The psychiatrist continued on to state that the inmate denied having manic symptoms, was oriented times three, and denied side effects. He was assessed as rule out Psychotic Disorder NOS and Adjustment Disorder. His medications were renewed for 30 days. These treatment interventions occurred at CSP/LAC.

The inmate was scheduled for a second IDTT meeting on 11/28/05, which he declined to attend. Without explanation, the team changed his diagnosis to Schizophrenia Undifferentiated Type. That IDTT was attended by the primary clinician, psychiatrist, and custody counselor. The inmate continued at the 3CMS level of care as medical necessity, and on 11/30/05 his medications were changed by a psychiatrist to Geodon 60 mg, Remeron 15 mg, and Cogentin 0.5 mg for seven days, with the Geodon increased to 120 mg per day for 83 days (a total of 90 days). The MARs indicated that the inmate had variable compliance with his medications. On 1/13/06, the psychiatrist discontinued all of his psychotropic medications because of noncompliance.

The psychiatrist's progress note of 1/13/06 stated that the inmate was seen for evaluation and a follow-up appointment, and that he was stable off all psychotropic medications, because the inmate had discontinued his medications against medical advice three weeks earlier. He reported "I am fine I don't need any psych meds." The inmate was described as having good eye contact, speech with normal rate and rhythm, thought processes linear and logical, mood described as "I am just fine," and appropriate affect with full range. He denied suicidal ideation and homicidal ideation, but his insight and judgment were questionable. The assessment plan was to discontinue all psych meds per noncompliance at the inmate's request, and follow-up in 30 days. A note on 3/1/06 by a psychiatrist noted that the inmate was seen for follow-up, was stable off all meds, and had no

complaints. He denied suicidal and homicidal ideation, and his insight and judgment were estimated as fair. His diagnosis was Depressive Disorder NOS in remission, and the plan was to continue to monitor all psych meds with follow-up in 90 days.

Approximately three and a half months later, on 6/22/06, the IDTT met once again and discharged the inmate from the MHSDS with final diagnoses of Adjustment Disorder with Depressed Mood in full remission, Polysubstance Dependence, and Antisocial Personality Disorder, with a GAF of 70. The inmate was noted to have been stable off meds for six months. IDTT members were listed as the primary clinician, the psychiatrist, and the inmate.

On 12/12/06, the inmate was transferred to RJD. On the initial bus screening, he stated that he had prior suicide attempts but answered "no" to all other questions regarding mental health history and current mental health problems. Since the attempts did not take place during the year prior to his arrival at the institution, no further evaluation by mental health was required.

The inmate committed suicide on 11/21/07.

The suicide report made reference to the inmate's institutional functioning, including his reporting to staff that he had drug debts on the yard. He had an RVR in October 2005 when he attacked his cellmate because he had not helped the inmate with some problems he was having with black inmates. He was found guilty of conduct conducive to violence, and was recommended transfer for transfer to another facility and placement on the SNY in December 2005, after his release from the administrative segregation unit, because of his reported drug debts and enemies on the yard. The inmate also had an RVR for engaging in mutual combat with his cellmate in May 2007. The suicide report reviewer interviewed the inmate's last cellmate, who reported that he had known the inmate for approximately two years, and that the inmate was private and never discussed anything. The inmate was described as not socializing with anyone and spending most of his time by himself. He was also described as not taking adequate care of his hygiene and not eating regular meals. The cellmate believed that this inmate was using heroin, speed, and other drugs including psychiatric medications.

The suicide report identified two problems with recommendations as follows:

> Problem One: In June 2005, after the inmate's six-day placement in an MHCB at RJD, no discharge summary was completed.
> Recommendation: RJD staff need to determine if the discharge summary was done and if not, why not. Staff need to determine whether or not there were problems in the system with documents being filed in a timely manner.
>
> Problem Two: On 11/28/05, the IDTT changed the inmate's diagnosis from Adjustment Disorder with Anxiety to Schizophrenia Undifferentiated Type, without explanation. Two days later, on 11/30/05, the psychiatrist changed the medication order to Cogentin 0.5 mg, Remeron 15 mg, and Geodon 60 mg, all to

be administered at night for seven days, and after seven days, the Geodon was doubled to 120 mg for 83 days. Two and a half months later, all psychotropic medications were discontinued due to the inmate's noncompliance, without adequate documentation of an evaluation of the inmate's status or follow-up treatment plan.

<u>Recommendation</u>: The DCHCS will provide training on this case through the suicide prevention video conference regarding the importance of documenting reasons for changes in diagnoses and/or medication and progress notes.

On 5/1/09, the chief psychologist (A), Clinical Policy and Program Development, provided a memorandum dated 6/13/08 regarding the suicide report of Inmate DD. His memorandum included a statement that was signed by the CMO/HCM of RJD. It stated that an audit of five charts was completed on 6/13/08 and that the RJD CMO determined that discharge summaries had been completed and filed in a timely manner in the UHR.

With regard to Problem 2, a memorandum was provided regarding "Notification of Completion of Quality Improvement Plan," and stated that DCHCS had provided a video conference in September 2008, with references to Power Point slides and IST sheets documenting attendance. The attachments were not provided.

**<u>Findings</u>:**

This inmate's suicide does not appear to have been foreseeable, as he was not reporting suicidal ideation or intent in the days to weeks prior to his suicide. The suicide report appropriately identified the problems of the inmate having had changes in diagnoses and changes in medication without adequate or appropriate documentation. It appeared that, even though at various times he had diagnoses of Major Depression and Schizophrenia, he also had a diagnosis of Adjustment Disorder. The documentation in the record did not clearly indicate how these diagnoses had been derived or how they had been changed. When he had a diagnosis of Adjustment Disorder, he was prescribed anti-psychotic medication on at least two occasions. He was discharged from the MHSDS after being off medications for six months, but it appeared from the records that only one follow-up visit was conducted by a psychiatrist after his medications were discontinued. This was attributed to the inmate's noncompliance and his wish to not take medications.

The inmate screened negative for current mental health problems, but reported his history of suicide attempts. He was not referred to mental health because the attempts were greater than one year prior to transfer. He committed suicide over 11 months later.

The suicide report made reference to the inmate's stating that he had been using heroin. The records indicated not only heroin, but amphetamine as well as psychotropic medication. Indeed, the toxicology report indicated that he had in his system chlorpromazine, which had not been prescribed for him. The suicide report identified the inadequate assessment by staff of the possible impact of his ongoing substance abuse on his mental status. However, the suicide report did not make any recommendations regarding the inmate's having chlorpromazine in his system or regarding concerns about

how he was able to obtain this medication. This suicide may have been preventable if he had been referred for assessment after transfer to RJD, or if CPR had been initiated by first responders. It appears from the incident reports that CPR was not initiated by first responders, i.e. COs, but rather it was initiated when medical staff arrived on the scene. This may have been a contributing factor to this inmate's suicide being possibly preventable.

## 31. Inmate EE

Brief History:

This inmate was a 47 year-old Caucasian male who committed suicide by overdose of aspirin in his general population cell at SCC. He was double-celled at the time of his death, and was a participant in the MHSDS at the 3CMS level of care. This was the inmate's first prison term, which began on 8/18/06 when he entered the CDCR via the WSP RC. He had been convicted of kidnapping for ransom, first degree residential burglary, two counts of making criminal threats, and exhibiting a firearm with intent to resist arrest by a peace officer. These offenses occurred on 6/7/05. The inmate was convicted and entered the CDCR via WSP on 8/18/06, having been sentenced to life with the possibility of parole plus 17 years. His minimum eligible parole date was 12/20/25.

The inmate was discovered on 12/5/07 at approximately 7:00 a.m. by an officer who had been informed by the inmate's cellmate that this inmate was hyperventilating. The officer responded to the cell and found this inmate lying awake in his bed, unresponsive to verbal commands and questions. The officer went to the building custody office, called the Tuolumne Medical Building at SCC, and informed an RN of this inmate's condition. The RN arrived three minutes later, determined that the inmate needed to be taken to the clinic for further evaluation, and requested a wheelchair transport. While the inmate was awaiting wheelchair transport, the RN talked with the inmate's cellmate to obtain more information about this inmate. The cellmate told the RN that the inmate had been awake and had been having trouble breathing since approximately 2:00 a.m. According to the SCC encounter form, it showed asthma/bronchial spasm, dated 12/5/07, and indicated that the clinic received a call from the CO at 7:05 a.m., stating the inmate was having difficulty breathing and was sick. The RN was dispatched and assisted the inmate. At 7:08am, it was noted that he was incoherent and very anxious. His pupils were equally reactive to light and accommodation, but he was unable to answer simple questions. He was helped by his cellmate to get dressed, was able to stand, and cooperated with the examination. The wheelchair arrived at approximately 7:08 a.m. when he was placed in it and transported to the Tuolumne Medical Clinic. Upon arrival at the clinic, the inmate was assisted onto a gurney and medical staff began evaluating his condition. There were several attempts to do EKGs, but due to diaphoresis (sweating) and the inmate's constant movement, they were unable to perform a 12-lead EKG. It was determined that the inmate had sinus tachycardia and that his respiratory rate was rising to 44 breaths per minute. His oxygen saturation had dropped to 84 percent, and he became very dusky and had a small amount of frothy sputum in the corners of his mouth. A physician was contacted at 7:15 a. m. He ordered that the inmate be transported to the emergency room at Doctors' Hospital in Manteca. An officer called 911 and requested

an emergency ambulance.  At 7:30 a.m., the inmate was noted to exhibit seizure-like activity and was unresponsive to a sternal rub.  All of his extremities were noted as shaking, his eyes as rolled-up, and his color as dusky.  The ambulance arrived at SCC Tuolumne Medical Clinic at 7:40 a.m., and departed with the inmate at 8:05 a.m.  The ambulance left SCC at 8:05 a. m., and during transport, ambulance personnel decided to transport the inmate to Sonora Regional Medical Center, where they arrived at approximately 8:30 a.m.  The inmate was taken into the Medical Center and pronounced dead at 9:53 a.m. by a physician.  An autopsy report was provided by the Tuolumne County Office of the Coroner, stating that the autopsy was performed on "11/5/07" (error in date).  The cause of death was stated as drug overdose (minutes) due to salicylates (minutes).  A toxicology analysis reported no common acidic, neutral, or basic drugs of abuse detected, and no ethol alcohol detected.  However, the complete drug screen determined the presence of Salicylic Acid at 529.8 mg/L (potentially toxic 300-500mg/L).

The inmate's criminal justice history was reviewed via the UHR and other documents.  There was no known juvenile history reported.  The inmate's adult criminal history consisted of the commitment offense, which occurred on 6/7/05.  According to the documents reviewed, the inmate was an Alabama resident who traveled to California and presented himself to a security guard at a gated community, stating that he had a package for a resident.  After he had been admitted into the community by the security guard, the resident met the inmate at her home.  When asked for ID to give a package to the victim, the inmate forced her back inside her home at gunpoint.  Once inside the home, the inmate gave a note demanding $50,000 and threatening to harm the victim's housekeeper and child.  Subsequently, the inmate demanded that the victim accompany him.  When they left the home (but were in front of the home), the victim refused to go with him.  The inmate then entered his own vehicle and attempted to flee the scene.  During this situation, a neighbor had recognized trouble and called 911.  A responding officer observed the inmate fleeing the scene and gave chase.  The chase began with the responding officer, and included California Highway Patrol, as the inmate attempted his escape via interstate highways.  Ultimately, the inmate's vehicle was disabled by a strip of spikes, and SWAT arrived on the scene.  Subsequently, the inmate brandished a weapon, and was shot in the right arm after a four-hour standoff.  The wound resulted in the loss of his right humerus.  He was taken into custody and was ultimately found guilty by the court of the above-noted charges.

A mental health screening report of 12/14/06 at WSP indicated that the screener referred the inmate for further evaluation, with a notation "Major Depression."  There was a mental health chrono on 12/15/06 which indicated that the inmate had completed routine mental health screening and was referred for further evaluation. Although the chrono bore the typed name of a senior psychologist, it was unsigned.

The inmate was seen by a psychiatrist on 1/22/07, and was diagnosed with Mood Disorder NOS.  The inmate's medications of Paxil and Remeron were renewed.

The inmate was transferred from the WSP RC to MCSP on 7/3/07, and then was transferred to SCC on 9/12/07.

The inmate had a RC mental health evaluation on 1/30/07 at WSP RC. It noted that he had arrived at WSP on 10/18/06. The mental health screening was on 12/14/06. The evaluation provided the inmate's history, described his mental status as essentially within normal limits, except for his being "obese white male, stringy, somewhat disheveled hair," with his denial of any current or past symptoms of hallucinations or delusions. His insight and judgment were assessed as fair to good and his current suicidality was described as "none." Diagnoses offered were Mood Disorder NOS, Adjustment Disorder Unspecified, Rule Out Anxiety Disorder or Depressive Disorder. His GAF was estimated at 65 and he was placed at the 3CMS level of care. There was a progress note entitled "New Arrival Progress Note" that said he arrived at MCSP on 7/3/07. A condensed mental health assessment and treatment setting transfer, conducted on 7/13/07, noted the inmate's CDCR arrival date as 7/2/07 (arrival date at MCSP). The inmate's history was recounted, and his mental status was described as essentially within normal limits. He was provided a diagnosis of Adjustment Disorder and Mood Disorder NOS, with a GAF of 65.

The UHR included what appeared to be a handwritten note by the inmate dated "Friday the 13th of July 2007," entitled "Things That I am Stressed and Depressed About." The inmate went on to describe that he had been moved to different institutions, was waiting to come to MCSP since 10/18/07, worried that he would be immediately put in for a transfer, and was partially disabled and worried that he would not be able to work or get vocational training. He was also worried about his children in Alabama, divorcing his wife of 25 years, trying to get eyeglasses, and lastly he was anxious because "my first appeal will be decided before the end of the year." A treatment plan was developed at MCSP on 7/23/07 and determined that the inmate was very intelligent, that his mental status was essentially within normal limits, and that his diagnoses were Adjustment Disorder with Mixed Mood and Dysthymic Disorder. He was noted to have Borderline features, deferred on Axis II.

While at MCSP, the inmate was admitted to the OHU from 8/20/07 through 8/21/07 because of suicidal ideation and intent. An SRAC was conducted on 8/20/07; the reason for suicide risk evaluation was "other" for TTA assessment. The sources of information were identified as the inmate interview, UHR, and C-File. The SRAC identified a number of static risk factors including that the inmate was Caucasian, had had a history of violence, suicidal ideation, and threats in the past, and had a history of mental illness. It also identified multiple slowly-changing risk factors as well as dynamic risk factors, including the inmate's endorsing helplessness, acute recent suicidal ideation, a recent suicide attempt or self injury in 2005, and trauma or threat to self esteem. Protective factors were identified as family support, children at home, religious support, supportive friends, helping others, insight into his problems, and psychiatric treatment. The evaluation of risk was estimated as "severe" and the inmate was referred to the TTA for further assessment. The additional recommendations or comments included the inmate's statement, "I'm not totally sure how I'll commit suicide, but there are options." The

SRAC went on to note that the inmate mentioned going over the fence and "let them kill me."

The inmate was admitted to the OHU, where he remained over the next 24 hours. A progress note identified as an SRA evaluation addendum noted that the inmate had a history of two serious suicide attempts, with the first occurring at age 20 by overdose, and the second occurring in 2005 during a five-hour standoff with police during the instant offense. The note went on to state that the inmate felt "destabilized" and had been planning his suicide. The inmate went on to state that while he was at MCSP, he had such a plan because he felt the same as he did when he was shot by the police in 2005. While in the OHU, the inmate was treated with Remeron, Paxil, and Seroquel, and was noted as a transfer from WSP one month earlier. He gave a history of treatment with an antidepressant since 1981, stated that Paxil had been temporarily successful, but that he was "again depressed." The inmate also reported that he was "feeling fine until he found out he was to be transferred to Corcoran." Prior to his admission to the OHU, the inmate was ordered Remeron 45 mg HS and Paxil 40 mg HS, as his psychotropic medications. The previous orders of 9/21/07 included Remeron 45 mg HS, Paxil 40 mg HS, and Seroquel 300 mg HS. It appeared that the Seroquel was discontinued with the November 2007 order.

On mental status examination, the inmate was noted to have been angry and suicidal, but that he was later calmer, conversational, and not responding to internal stimuli. He was noted to have suicidal ideation but no plan. A diagnostic assessment by the psychiatrist was that he had an Adjustment Disorder and Major Depressive Disorder. On 8/21/07, the inmate had another SRAC which included as sources of information the inmate interview, UHR, and C-file. It repeated some of the risk factors and all of the protective factors, and determined that his evaluation of risk was "mild." It also determined that a referral was not needed. In the additional recommendations or comments, it was noted that the inmate reported that he felt that the previous day's intense urge to harm himself "reminded me a lot of the events which transpired during my crime." The inmate was subsequently discharged from the MHCB with five-day follow-up.

The inmate completed a six-day follow-up which ended on Monday 8/27/07. It was determined that he had completed the six-day follow-up without cause to be returned to a higher level of care.

A CCM note of 8/27/07 by a psychologist noted the inmate's statement that he "feels much better." It went on the state that the inmate felt it was "kind of satisfying to know that I can get along with the worst of the worst." The CCM also reported that the inmate did not want to move again after another month. The objective assessment was that the inmate's mood was stable, that his affect was full-range, and that he was cooperative. His activities of daily living were fair. The note also made reference to the inmate's statement that his suicide attempt in "2008" (this note was written in 2007) was "suicide by cop" (he was shot in a five-hour standoff with police while holding a gun to his head). The inmate denied current suicidal and homicidal ideation and was "looking forward to being helpful to his fellow man." The note also referenced a "history of brief psychosis

which led up to committing offense." The clinician noted that the inmate had little insight into the way other people think and behave, and had poor social skills, but was very intelligent. The assessment was Brief Psychotic Disorder in remission, Adjustment Disorder with Anxiety and Depressed Mood, and a reference to "several features of Autistic spectrum d/o (Aspergers)." The plan was to continue the inmate at the 3CMS level of care with follow-up in 90 days or prn, with a focus on "further assessment. Coping skills; goal setting."

On 9/7/07, the inmate was seen by a psychiatrist who reported that the inmate had been admitted to the OHU secondary to his being "unsettled" by the possibility of his being transported to CSP/Corcoran. The inmate was noted to have stated, "I am happy" and that he was continuing on Seroquel, Remeron, and Paxil, as previously prescribed.

An initial health screening was performed on 9/12/07 but did not specify the receiving or sending institution. The inmate was described as in the 3CMS program and receiving Seroquel, Paxil, and Remeron. He also reported that he had been treated for "Bipolar" and had thought of or attempted suicide in 2006. There was a notation that the inmate suffered a gun shot to the right upper arm in 2005, with decreased range of motion and strength. No referrals were noted on this form.

A treatment plan was formulated at SCC dated 9/15/07. It indicated that the inmate was a Level III inmate who had been chronically depressed since being a teenager. His problem was identified as sad mood, and the plan was for counseling with the CCM, medications by the psychiatrist including Paxil, Remeron, and Seroquel, and group on depression management.

An SRAC was performed by a psychologist at SCC on 9/15/07, with the checked reason "to formulate treatment planning." This SRAC was based on the inmate interview and UHR. It noted static risk factors including the inmate's 2005 "gun to head" suicide attempt as well as his history of suicide attempts, depression, violence, substance abuse, and his Caucasian ethnicity. Slowly-changing risk factors included his first prison term, life sentence, history of poor impulse control or poor coping skills, and earliness in prison term. Dynamic risk factors included chronic recent suicidal ideation, disturbance of mood with depression (underlined), and affective instability. Protective factors included family support, children at home, spousal support, and supportive friends. The summary stated that the inmate denied suicidal ideation/homicidal ideation. There was no evaluation of risk included in the SRAC, and the recommendation was for no referral.

The progress note by a psychiatrist on 9/21/07 indicated that the inmate was asymptomatic and "endorses value of meds as reason he's stable," and provided other information regarding the inmate's history. The inmate was noted to have been prescribed Seroquel, Paxil, and Remeron at that time. His mental status was essentially within normal limits and he was awaiting classification. The inmate was also noted as overweight but pleasant, and his mood was described as "very good." The assessment was Dysthymic Disorder with the Axis I diagnosis, Rule Out Bipolar I by history, and Axis III obesity. His GAF was estimated at 68 and the plan was to "continue current

226