psych med regimen" as well as patient education, discussion, and signing of informed consent.

There was a CCM note by a psychologist on 10/23/07 which reported that the inmate stated that he was "going through a phase of trying to get stabilized. This is my third prison, whole bunch of different cells buildings all in just one year." The note went on to state that the inmate began at WSP RC and was transferred to MCSP, where he remained for nine weeks, and ultimately to SCC. The assessment by the psychologist was that the inmate's mental status was essentially within normal limits, as he was fully oriented exception for his mood being moderately depressed, and his being "very obese, with greasy long hair and multiple scales from acne on his face." The inmate was noted to have spent the majority of his first and third sessions complaining about a variety of issues. The plan was to continue him at the 3CMS level of care, with the next clinical manager follow-up in 60 days.

The inmate was seen by a psychiatrist on 11/6/07. The note stated that the inmate was asymptomatic, had stopped his Seroquel ten days earlier, and was feeling better. The psychiatrist appeared to have agreed with the inmate's decision to stop his Seroquel, as he noted that the Seroquel had been decreased ten days earlier and that the plan was to continue Paxil and Remeron. Diagnoses at that time were Dysthymia Rule Out Bipolar I with a notation "watch now that he's off Seroquel." On 11/6/07, a medication noncompliance chrono was sent, as the inmate had refused or failed to appear for three consecutive dosages of medications or failed to take more than 50 percent of prescribed dosages. There was no indication as to what medication he had refused on that chrono.

A review of the MARs indicated that the inmate was compliant with his medications up until 10/27/07, when he stopped taking his Seroquel, and until approximately 11/23/07, when he appeared to have stopped taking both Remeron and Paxil. The MAR for December 2007 was not included in the documents received.

The inmate sent several health care services request forms because of his complaints of chronic pain in his right shoulder. He also complained of abdominal pain in "two separate places," with multiple health care services request forms sent to medical. It appeared that the inmate was last seen by a mental health staff member when he was seen on 11/6/07 by a psychiatrist (see note above).

The suicide report included references to a letter discovered in the inmate's property after his death. The letter stated:

> "[Name], This is just a final note to whoever wants to know what on earth was going on in my head. Was I in despair? Was I selfish?, etc. Well… I don't know how I feel actually except that I am not in despair. This is strictly an if/then thing. If the court decided this way then my mind was already set as to what I would do. Our lives here aren't final. There is something else and I believe so strongly in that that I just want to get this stage over with and rejoin those I love at a future time. I just want to go on up ahead to where we will all be anyway. I want the focus taken off of me. I refuse to sit powerless by and take up space & time

where I don't want to be. So… in a way I guess I'm being selfish but I am honestly just going on up ahead where I'll wait for y'all to catch up. So…move on. Enjoy your freedom! Your life is good…appreciate it [drawing of a smiley face]! I love you! Dennis"

The suicide report identified four problems and recommendations, as follows:

Problem 1:  On 10/18/06, the inmate arrived at WSP RC.  Records indicated that psychotropic medications were prescribed on 10/26/06.  A mental health screening was apparently not completed until 12/14/06.
Recommendation:  The health care manager at WSP shall conduct a training of reception center staff regarding policy and procedures for the mental health screening of new arrivals. In addition, an audit shall be conducted for the period of one month to ensure that mental health screenings are completed in the prescribed time frame, until 100 percent compliance is reached.

Problem 2:  The inmate reported a past suicide history to a psychiatrist on 10/26/06.  A signed consent and request for previous mental health treatment records were not found in the UHR.
Recommendation:  The chief psychiatrist at WSP shall conduct a fact-finding inquiry into the lack of appropriate documentation, identify the individual involved, and take appropriate action, including remedial training.

Problem 3:  The transfer summary from WSP indicated that the inmate had a suicide history.  However, an SRAC was not found in the UHR after he arrived at MCSP.
Recommendation:  The chief of mental health at MCSP shall conduct a fact-finding inquiry into the lack of appropriate documentation, identify the individual involved, and take appropriate action, including remedial training.

Problem 4:  On 9/10/07, a nurse completed the transfer form prior to the inmate's departure from MCSP.  The nurse indicated that the inmate was in 3CMS, but "Suicide History" was checked "No," even though the inmate had been placed in the OHU on suicide precaution three weeks earlier.
Recommendation:  The DON at MCSP shall identify the individual involved and conduct an audit of ten percent of that individual's charts over 30 days until 100 percent compliance with completeness of documentation is achieved.

The executive summary of the suicide report was dated 11/17/08 and provided by CDCR on 4/8/09.  A death review summary dated 3/23/08 was provided and listed the primary cause of death as possible aspirin overdose, and the diagnostic category of death as suicide.  The summary also noted the death was "possibly" preventable.  The review provided a summary of the inmate being a 47-year-old man who died on 12/5/07 at Sonora Regional Center Emergency Room from an overdose of aspirin while in custody at SCC.  It was noted that the inmate was received into custody at the WSP RC on 10/18/06 and transferred to MCSP on 7/3/07.  He transferred from MCSP to SCC on 9/12/07 and from SCC to the Sonora Regional Medical Center on 12/5/07.  The inmate

was reported as being treated for depression since 1981, and had made a suicide attempt when police inflicted a gunshot wound to his right arm and chest on 6/7/05. He was also noted to have made a suicide attempt by stabbing himself in the chest on 12/26/05. The inmate had an OHU admission for depression and suicidal ideation at MCSP on 8/20/07, and had complained on 10/15/07 of abdominal pain and gastrointestinal bleeding which was not medically evaluated. The executive summary determined that the patient died from possible suicide by aspirin ingestion unrelated to the medical care received at SCC. It also showed that the inmate had evidence of gastrointestinal bleeding from laboratory studies, but was not evaluated by a physician. The summary included that the patient received appropriate medical care on the day of his death. A chronology of the patient's medical treatment was also provided, including that he had blood in his stools on 11/5/07 with no physician follow-up. The failure to have medical follow-up was considered an "extreme departure" from the standard of care, and the recommendations were to provide the health care manager with a copy of the review as well referral to PPEC for the provider who had made an extreme departure from the standard of care.

In addition, a nurse consultant program review outcome summary report was provided to the nurse executive committee. This review noted that the issues for review had arisen from the failure to refer the patient for physician evaluation dated 10/15/07. The date of the review by a NPPEC was 6/5/08. There was also a case summary provided. It focused on the nursing and physician practices, with findings that there was a possible delay in the referral process, a failure to include adequate and objective information regarding the abdominal pain by the RN, a failure to refer to a physician, the RN's failure to documented the referral to a physician, and the schedule not having a record of any physician provider visit for the form 7362. The recommended corrective action was for the DON to conduct a supervisory conference with the RN to review the encounter and to discuss concerns identified in the report. These included nursing's physical assessment of the complaint of abdominal pain and bloody stools, appropriate disposition of patients with possible GI bleeding, and required documents, with a response due within 30 days of receipt of the notice. The DON was also to provide additional training, if necessary, and to place a signed copy in the RN's supervisory file.

On 4/ 7/09, this reviewer received an executive summary of the suicide report dated 11/17/08 that was completed by a psychologist suicide reviewer, but not submitted in the usual format. This reviewer subsequently received a suicide report signed by the director (A) DCHCS and the director DAI, dated 4/17/09. The executive summary of the suicide report dated 11/17/08 identified four problems and corrective actions, but the suicide report dated 4/17/09 contained only two problems with corrective actions. The two problems identified and endorsed by the directors were as follows:

Problem 1: On 10/18/06, the inmate arrived at WSP RC. Records indicated that psychotropic medications were prescribed on 10/26/06. A mental health screening was apparently not completed until 12/14/06. The 2006 Revised Program Guide requires in Chapter Two that mental health screenings be completed within seven calendar days of arrival.

Recommendation:  The chief of mental health at WSP shall conduct an audit for a period of two months to ensure that mental health screenings are completed in the prescribed timeframe, until 100 percent compliance is reached.

Problem 2:  The transfer summary from WSP indicated that the inmate had a suicide history, but an SRAC was not found in the UHR after he arrived at MCSP.  The 2006 Revised Program Guide requires in Chapter Ten that SRACs are to be completed any time a screening indicates a suicide history.

Recommendation:  The chief of mental health at MCSP shall conduct an inquiry into the lack of appropriate documentation, identify the individual involved, and take appropriate action including remedial training.

In addition to the suicide report, the suicide determination fact sheet was provided and was dated 12/5/07. The death was noted as overdose of medication-aspirin, referenced the inmate's history of suicide attempts in 2005 and 2007, and stated, "Death Review Summary indicates autopsy confirmed aspirin overdose caused death."  The conclusion was that a suicide review was required.  While the date of death was indicated as 12/5/07, this form was completed on 6/3/08.

On 5/1/09, the chief psychologist (A), Clinical Policy and Program Development, provided an explanation regarding the documentation and review requirements for this inmate's suicide.  He stated that, according to the record in their file, the DCHCS mental health program was not notified by the DCHCS death review coordinator, and there had been no communications with the institution about the inmate's death initially because there was no indication that the death was a suspected suicide.  Further, the institution did not file an official CDCR form 7229-A, initial inmate death report, until 2/6/08, which the DCHCS Mental Health Program staff received on 2/8/08.  The chief psychologist (A), Clinical Policy and Program Development, went on to state that the institution apparently did not file Form 7229-B, inmate suicide report, and the CDCR Form 837, incident report, did not indicate that the death was a suicide.  The Tuolumne County Sherriff's Coroner's death report, dated 1/15/08, indicated that the cause of death was drug overdose by Salicylate.  The death review summary was received by the full Death Review Committee on 4/2/08.  A memorandum dated 6/10/08 from the former senior psychologist specialist to the deputy attorney general stated that the death was never reported, although the mental health program had been following the case as a non-suicide.  On 6/3/08, the suicide case review committee met and determined that a report was indicated.  However, the chief psychologist (A), Clinical Policy and Program Development, stated "At that time, however, the committee was still uncertain as to whether the death was a suicide."  On 7/10/08, evaluators visited the institution and found a suicide note written by the inmate which "provided proof that the death was indeed a suicide."  There was no further information regarding implementation of the QIP in response to the suicide report.

**Findings**:

This inmate's suicide did not appear to have been foreseeable, as he was not reporting to staff suicidal ideation or intent in the days to weeks prior to his death. The inmate's death does not appear to have been preventable, as he appeared to have been able to obtain sufficient aspirin and store this until he took a toxic amount, resulting in a fatal overdose. The inmate was in general population, and custody staff was alerted to his distress by his cellmate. The inmate had sent numerous health care services requests for assistance with abdominal pain, which may have been a contributing factor, and the death review identified an "extreme departure" from the standard of care. However, he was seen in compliance with 3CMS mental health level of care requirements and did not request any additional service via the health care services request process. Therefore, he did not come to the attention of mental health staff and, despite having had a history of suicidal ideation and behavior, statements of the difficulties that he was having in adjusting to prison, and medical complaints, he did not report these concerns as causing him to have thoughts of intent to harm himself. He referenced in his 7/13/07 written statement that his appeal was being heard before the end of the year, but there was no information in the documents received by this reviewer that commented on whether he did or did not have his appeal heard and whether there were any known results. There were clear departures from the Program Guide and from standards of medical practice reflected in the documents reviewed, and in the suicide report problems and recommendations.

**32. Inmate FF**

**Brief History**:

This inmate was a 37-year-old Hispanic male who committed suicide by hanging on 12/6/07 in the administrative segregation unit at CSATF. The inmate was single-celled at the time of his death. He was a participant in the MHSDS at the 3CMS level of care at the time of his death. The inmate entered the CDCR on 2/10/92 via the CCI RC. The inmate had been convicted of second degree murder with use of a weapon on 1/16/92 and was sentenced to 15 years to life. His minimum eligible parole date was 9/21/01. The inmate also had an immigration and customs enforcement hold.

The inmate was discovered on 12/6/07 at approximately 1:08 p.m. by a licensed psych tech who had been alerted by another inmate that this inmate was hanging in his cell. The psych tech observed the inmate, who appeared to be standing in the corner of his cell between the locker and the desk and looking out the window. The psych tech attempted to get the inmate's attention, but when he did not respond she contacted the building officer. The officer knocked on the cell door several times, got no response from the inmate, and yelled to a unit sergeant "he is unresponsive." The sergeant responded and also attempted to get a response from the inmate. A lieutenant who heard the officer yell to the sergeant requested the cut-down tool. The lieutenant also heard the alarm, retrieved the cut-down tool from the control booth officer, and ran to the cell. After arrival, the lieutenant called the inmate's name several times. The control booth officer

activated his personal alarm for staff to retrieve the emergency extraction equipment and the Stokes liter. Officers arrived and, once in place, the lieutenant ordered the control booth officer to open the cell door. Several officers then entered the cell behind the lead officer who carried the protective shield. They found the inmate leaning against the locker with one end of a torn piece of linen tied around his neck and the other end attached to the locker. The officers then cut the inmate down and carried him out of the cell. He was placed on a Stokes liter on the floor, handcuffed, carried down the stairs, and laid in front of the lieutenant's office. A Code One medical emergency "attempted suicide" was announced via the institutional radio. At approximately 1:10 p.m., a psychiatrist who was in the building responded to the scene and started CPR. Simultaneously, according to the incident report, at approximately 1:10 p.m. two nurses arrived at the facility and placed a neck brace on the inmate. A nurse applied the AED but there was no spontaneous electrical activity. The inmate did not show any signs of life while staff continued CPR. The sergeant requested the ETV and medical staff transported the inmate to the TTA, arriving at approximately 1:25 p.m. Advanced cardiopulmonary life support protocol was followed, and IV fluids were administered, with negative results. The paramedics arrived at approximately 1:31 p.m. and intubated the inmate at approximately 1:35 p.m. The inmate was transported by ambulance to Corcoran District Hospital. A physician pronounced the inmate dead at 2:04 p.m.

An autopsy report was provided by the Kings County Coroner-Office of Sheriff and stated that the autopsy was performed on 12/10/07. It determined the cause of death to have been ligature strangulation (minutes). A toxicology report indicated that there were no ethanol alcohol, common, acidic, or basic substances of abuse in toxicology specimens. This information was taken from the suicide report and the coroner's report. This reviewer was not provided with the incident reports, contrary to usual and customary practice, and had no timeline comparison for review.

The suicide report contained the inmate's criminal justice history. He appeared to have had no known juvenile criminal history and no adult criminal history prior to the commitment offense. The commitment offense occurred on 4/11/90 when the inmate choked and stabbed his aunt to death. The stabbing appeared to have been related to the inmate's aunt wanting his pregnant girlfriend to get an abortion. The inmate threatened to kill his aunt and his girlfriend if she indeed obtained an abortion. The inmate fled the scene and was arrested on 8/24/90 in York, Nebraska. He was transported to Los Angeles and was found guilty of second degree murder on 1/16/92, with the sentence as listed above.

After the inmate entered the CDCR via CCI, he was transferred to Calipatria on 3/13/92 and subsequently to CSP/LAC on 2/11/93, with his return to CCI on 4/23/97. He was then transferred to CSP/Solano on 5/22/97 and eventually to CSATF on 6/7/07. As noted above, his minimum eligible parole date was in September 2001, and he remained incarcerated for over six years after that minimum date. An immigration and customs enforcements hold was also in effect for this inmate.

The inmate's mental health history included a hospitalization at PSH as incompetent to stand trial from July to October 1991, based on the charges of killing his aunt. However, there were no records available in the UHR regarding the findings at PSH. He reportedly had a history of alcohol, marijuana, and cocaine abuse. The inmate was evaluated by psychologists in November 1994 and November 2000 in preparation for Board of Prison Term hearings. Both psychologists found no evidence of a major mental illness, and the inmate was diagnosed with Drug and Alcohol Dependence and Antisocial Personality Disorder. Quite remarkably, this inmate's record did not have any mental health information until a bus screening that stated the inmate arrived on 4/23/97, which was when he was transferred to CCI, but was otherwise undated and unsigned, and did not specify the institutions. The bus screening indicated that the inmate's responses to all the questions were "no" with regard to history of mental illness or current mental health problems. There were two other mental health screenings referenced, including one on 12/16/02 at CSP/Solano, and another on 6/6/07 at CSATF which was also negative for any mental health history or mental health problems.

The inmate had screened positively for tuberculosis. On 4/28/04, Isoniazid and Vitamin B-6 were ordered for 180 days. He also had complaints of low back pain and was receiving both medications and orthopedic consults to treat his back pain.

The inmate had sent several health care services request forms that may have been related to injuries from other inmates. On an uncertain date, he complained of pain on the right side of his face and on his nose, and of ringing in his ears for which he was seen on 6/26/07. He sent a health care services request on 9/19/07, stating that he fell from a bunk. He sent another on 9/22/07 with a complaint of pain around his nose and eyes; the assessment was that he had been involved in a fight. On 10/9/07, he sent another with complaints that his ears were ringing, mostly on the left side and also that his head was hurting.

The inmate sent a health care services request form to mental health on 6/14/07, approximately one week after he arrived at CSATF, which stated that he was having difficulty adjusting to the dormitory setting. The social worker who evaluated the inmate determined that he was stable, but because he was nervous and had trouble concentrating, he should consider entering the MHSDS at the 3CMS level of care. Four days later, the same social worker evaluated him because custody staff reported that he was having "behavioral problem with other inmates." He requested going to the administrative segregation unit because "this yard is gay." The social worker completed an SRAC, noting that the inmate had anxiety and fear for his safety but no protective factors, and that the inmate was a "moderate" risk for suicide. The social worker also indicated that the UHR was not available and that the inmate was uncooperative. The social worker informed the custody staff about the inmate's threats of violence to others, and encouraged the inmate to make a self-referral to mental health services, as needed. Despite the finding of moderate risk, the inmate was placed into the administrative segregation unit due to his threats of violence. The brief mental health screening on 7/19/07 concluded that there was no indication of mental illness. The following day, a social worker evaluated the inmate because of another health care services request for

233

"stress" and also found no indication of mental health problems. The inmate was told that he should ask for help if he felt suicidal.

An MH-4 (mental health assessment and treatment transfer form) completed on 7/25/07 included a brief narrative summary describing the inmate as a 37-year-old Hispanic male who believed that he has been sexually harassed by inmates in CSP/Solano and now at the SNY in CSATF. It went on to state that the inmate said that he liked being in the administrative segregation unit because he did not have to hurt anymore or defend himself, and that he felt he had to fight others when provoked and sexually taunted. The evaluator described the inmate as having no family support and no personal relationships with others. He further reported his history of being treated at PSH in 1991 for three months of observation, his murder charge that he did not want to talk about, and his "loss of sight" which he self-reported as being the result of pressure and pain on the top of his head that he had learned to ignore. He had an MRI completed in 2001 and had no medical treatment, but he continued to have pain in his left eye constantly. His diagnosis was Depressive Disorder and headaches. There was no plan included in this mental MH-4 that was completed by the social worker.

On 7/25/07, the social worker at CSATF also completed an SRAC. The SRAC indicated that the reason for the risk assessment was to formulate treatment planning. Sources of information were CO/staff interview and inmate interview, but not the UHR or C-file. Multiple risk factors were checked. These included the family history of suicide, history of mental illness, history of violence, hopelessness or helplessness, feelings of guilt or worthlessness, fearfulness for safety, recent assaultiveness or violence, and significant current impulsivity. The only protective factor was religious support. The evaluation of risk was "high" risk, but there was no recommendation/plan indicated on the form. Additional comments stated that the inmate denied a mental health history, but he was observed at PSH for three months. This social worker diagnosed the inmate with Depressive Disorder, with a GAF of 60, and placed the inmate in the MHSDS at the 3CMS level of care. The inmate remained in the administrative segregation unit, in part because he claimed that he was being sexually provoked and wanted to be transferred to another prison because he did not want to hurt anyone. He was not referred to a psychiatrist and he was not placed in a MHCB.

The IDTT reviewed the inmate's case on 8/1/07 and diagnosed him with Adjustment Disorder with Mixed Anxiety and Depressed Mood, with a GAF of 65. Because he said that he did not want to be discharged and preferred to stay in the administrative segregation unit, the inmate remained there. He was to receive weekly CCM contacts and medication management. He did see a CCM on 8/9/07 at the cell door because he refused to come out of his cell. The inmate reported heart-pounding and sweating, stated that he felt safer in the administrative segregation unit, and also made reference to feeling disrespected when inmates made comments about homosexuals. One week later, the inmate met with a CCM, stating that he felt "settled" in the administrative segregation unit and did not report any mental health issues. The CCM determined that the inmate was mildly depressed but stable. Nearly two weeks later, on 8/28/07, the inmate again met with his CCM. He told her that he experienced anxiety and dealt with it by doing

deep breathing exercises and reading the Bible. The CCM wrote that the inmate was stable. He saw a different CCM on 9/6/07 in the administrative segregation unit, and once again he refused to come out of the cell. The CCM reported that the inmate remained stable and remained in the 3CMS level of care.

The ICC for the administrative segregation unit reviewed the inmate's case on 9/7/07, and released him from the administrative segregation unit to population. His CCM came to see him that afternoon, but he refused to come out of the cell. Once again, the CCM wrote that the inmate was stable, and he was placed in population. He returned to the administrative segregation unit on 9/19/07, after he had been assaulted and refused to identify his assailants. The IDTT reviewed the inmate's case on 9/24/07 and determined that the same treatment plan should be followed without changes.

The inmate saw his CCM on 9/26/07, reporting that he was experiencing anxiety, dizziness, ringing in his ears, and numbness in his fingers, and that his anxiety had gotten worse after another inmate who was his friend had committed suicide several years ago. He also said that he was having trouble sleeping. There was no referral for a psychiatric evaluation noted in the records. The ICC saw the inmate again on 9/27/07. He refused to be housed on a SNY, but also reported that he did not want to be around anyone. On that same date, he told his CCM that he would be a threat to other inmates on a SNY and that he had received a disciplinary write-up because he refused to move to an SNY as per the ICC determination. The inmate reportedly asked the CCM for a pill to relax. The CCM told him that he should speak with a psychiatrist, which he said he would refuse to do. No referral to a psychiatrist was noted. Two days later, the psych tech referred the inmate back to the CCM because of increased depression. However, the records did not indicate that the inmate was seen by the CCM at that time.

Two days later, on 10/1/07, custody staff referred the inmate for a mental health evaluation because he was acting "strange." At the same time, he was evaluated by the CCM who completed an SRAC listing multiple risk factors, as noted in previous SRACs, including a family history of suicide, hopelessness, suicidal ideation in the past. An identified protective factor was his helping others, even though the inmate had not been involving himself with other inmates and had been recently assaulted. This clinician determined that the inmate was a "low" risk for suicide. He also told the CCM that he had felt empty during most of his life, and that he was feeling very tense but did not want any medications. The CCM reported that the inmate denied suicidal ideation. He was diagnosed with depression and anxiety.

The inmate saw his CCM on 10/11/07 outside of the cell in a treatment room. He said that he was thinking about people who had died in El Salvador and who were close to him during the civil war. He also reported that he needed to "discharge" his feelings, and talk about what was "inside of himself." In addition, he reported nightmares, insomnia, and poor appetite, but denied suicidal thoughts. Based on this information, the CCM diagnosed Post Traumatic Stress Disorder. On 10/23/07 and 10/30/07 the inmate continued to talk to his CCM about his family, life in El Salvador, and the deaths of his friends; the CCM referred the inmate to a psychiatrist.

On 10/31/07, the inmate was seen by a psychiatrist to whom he told similar information regarding his life in El Salvador and the brutal killings that he had witnessed, but again he denied suicidal thoughts. The psychiatrist prescribed Vistaril 50 mg twice a day to help the inmate with his anxiety. The inmate was seen by his former CCM approximately two weeks later, on 11/16/07, to tell him she was leaving and to discuss the transition to a new CCM. The former CCM noted that the inmate was unkempt and depressed, with poor sleep and poor appetite, and that the inmate told the CCM that he had stopped taking the medication (Vistaril) because it "irritated and provoked" him. The CCM noted that the inmate would be seen in one to two weeks by the psychiatrist. Later than same day, he also saw his new CCM, who documented that the inmate was lethargic, sleeping only three to four hours each day, and anxious, but denied suicidal thoughts and was stable. She also noted that the inmate was refusing his medication. Three days later, on 11/19/07, the inmate was evaluated by the psychiatrist. He continued to report nightmares and flashbacks of his experiences in El Salvador, and stated that Vistaril made him feel "not right in the head." He denied suicidal thoughts. The psychiatrist changed the Vistaril to Buspar twice a day, but the MAR indicates that the inmate also refused Buspar. The inmate signed multiple refusal slips for Buspar from 11/22/07 through 12/2/07, and for Vistaril from 11/1/07 through 11/19/07. He saw his CCM on 11/21/07 and said that he was not taking the medication because it caused him side effects which he described as numbness on his face. He continued to report insomnia but no thoughts of suicide.

On 12/1/07, the inmate reportedly told the psych tech that he did not want to take any medications and wanted to be removed from 3CMS. On 12/3/07, the Buspar was discontinued, but there was no psychiatric progress note or order recorded in the record. On 12/5/07, the inmate refused to see his new CCM. He requested to see his former CCM, who did see him and noted the inmate's appreciation for her "listening to his distress" but also that he wanted to be removed from the 3CMS level of care. The CCM noted that the inmate was stable, and that his new CCM would address his request to be removed from the MHSDS. It appears from the records that the new CCM who saw the inmate on 11/27/07 was a pre-licensed psychologist under supervision of one of two senior psychologist supervisors. The progress notes did not have any countersignatures of a supervisor, and there was no indication in the suicide report of evidence of active supervision. She saw him on 11/16/07, 11/21/07, and 11/27/07. His former CCM saw him on 11/6/07 for their last appointment, and again by his request on 12/5/07.

On 12/6/07, the psychiatrist saw him at the cell door because he refused to come out of his cell. On that date, the psychiatrist wrote a note at 9:15 stating that the inmate was seen at cell front because she had been told by the psych tech that "the inmate was not coming out to see me for a scheduled appointment." The psychiatrist noted that she spoke to the inmate for 20 minutes and that he was agitated but made eye contact. She noted that he was adamant about not wanting to talk to anyone or be at the 3CMS level of care anymore. The doctor reported that the inmate stated that he was going to refuse medications and meetings. She also reported that she had told him that things would work out better for him if he would come out and talk to her so she could record his

wishes in the chart, and so staff could follow him for a time before releasing him from 3CMS. She said that this was because they wanted to make sure he was okay. The doctor also noted that she had concerns because of having spent extended periods of time talking with him in the past, i.e. for longer than one hour each time. The doctor further noted that the inmate had expressed a lot of anxiety because the INS would be sending him back to El Salvador when he was released from prison, and that he was afraid to return because he had witnessed extreme brutality and vicious murders when he was growing up there. The doctor described the inmate's reporting of atrocities that he had witnessed and in which he has possibly been involved, and his feeling "terrible guilt and horror at what he experienced." She noted that they had tried Vistaril to help him, that he had refused an antidepressant, that he had more symptoms of PTSD including flashbacks, nightmares, and hypervigilance, and that a trial of Buspar had begun but he refused it and it was discontinued. The doctor noted that she asked him why he was agitated and whether anything had happened to cause this, and that he replied that he did not want to be 3CMS anymore. She then said that she asked him if he was okay, and he said "yes."

The psychiatrist documented a mental status examination. She described his speech as "more clipped than usual but had normal rate and rhythm," his affect as incongruent, and that with regard to his mood "he said was fine." His thought processes were organized, and he responded to questions appropriately and did not appear to be responding to internal stimuli. He denied homicidal and suicidal ideation as well as auditory and visual hallucinations. She reported that the inmate stated that he was comfortable in his cell. She told him that she would re-schedule to see him again next week rather than in two weeks to talk about some of the problems that he was dealing with. Her assessment was PTSD and Adjustment Disorder with anxiety and the plan was to see him the following week to discuss other medication options. Of particular note was the notation by the doctor that the UHR was not available. There was nothing in the progress note to indicate that the doctor considered admitting the inmate to an OHU or MHCB for observation, given his change in mental status, his refusal of medications, and his request to be discharged from the 3CMS level of care and not having any more meetings. She did, however, schedule to see him in one week rather in than two weeks. The inmate was discovered hanging that same day at approximately 1:08 p.m.

As it turned out, the psychiatrist was the same one who was noted in the emergency response to have begun CPR. She wrote an addendum at 2:30 p.m. to her previous note, stating that she was called to see the inmate at a few minutes after 1:00 p.m., and that he was on a half-shell stretcher coming down from the upper tier with several correctional staff. She assessed the inmate and began CPR. She reported that an initial attempt to "bag" the inmate was unsuccessful due to muscle tone in his tongue. An oral airway was placed, but there was such resistance in the chest wall that bagging was very difficult. She noted that he was given one shock but that it did not produce any electrical activity.

The suicide report makes reference to the inmate's institutional functioning and specifically to his being eligible for parole on 1/28/01. The Board of Prison Terms denied parole for four years, and he was not scheduled for another hearing until 2007, six years later. The inmate reportedly waived his right to a 2007 parole hearing because he

"wanted more time to prepare for his hearing." The inmate had several jobs while he was incarcerated, including work in the kitchen, dry cleaning, porter, and optical technician. He completed a GED. However, after he arrived at CSATF he spent most of his time in the administrative segregation unit and did not participate in any programs. He had been placed in the administrative segregation unit while at CSP/Solano because he stated that he was told by another inmate to assault a third inmate, refused to do so, and then feared for his safety. He was recommended for a SNY on at least two occasions but refused, stating that he was afraid for his safety and would assault other inmates. He reportedly stated that some of his safety concerns had to do with other inmates calling him names like "faggot," "queer," and "homosexual," and fears that he would get into fights with other inmates if he was placed on a SNY or in population. Indeed, he was released from the administrative segregation unit on 9/7/07 and returned on 9/19/07 because he had injuries that were consistent with being assaulted by at least one other inmate.

The suicide report reviewer stated that the inmate appeared to be outgoing and involved in programming during the first 15 years of his incarceration, but in the "last eight months of his life, he had a significant decline in his mental and adaptive functioning." The suicide report reviewer also interviewed an inmate in the cell next to this inmate's. He provided information that the inmate was distraught about his former CCM's leaving, did not want to come out of the administrative segregation unit. On the day of his suicide, he was agitated and at approximately 12:15 p.m. commented, "look there she goes. She's gone and I'm gone," referring to the former CCM and himself. This was less than one hour before the inmate was discovered hanging. This was the same inmate who had informed the psych tech that he was concerned about his neighbor. The psych tech subsequently found the inmate hanging.

The suicide report reviewer also made reference to letters or notes written in Spanish that were found in the inmate's cell. They suggested that his intent to commit suicide was related to what may have been delusional infatuation with his female psychologist CCM. The reviewer quoted one note as stating, "my dear D.R. _____? My _____, I want to tell you that you never deceived or betrayed me, but I would pretend and enjoy with all that and with your company. I already knew that everything was destined to last only a short time, and I enjoyed it with my heart. Since I saw you I feel in love with you. You're in my head and no one else and it hurts to think that you will never be mine. Fall in love with me." The note went on to express similar thoughts of the inmate's love and connection with the CCM, including "I have dreamed of you in life and I take you in my immortal memory. I'm dying anyway," and ended with "I'm saying good-bye. Don't forget me, I love you." The reviewer reported that he contacted the former CCM by telephone, and that on interview she stated that the inmate never showed any psychotic symptoms and that he had not detected any delusions. She also reported that she was unaware of any transference issues or of the inmate's fixation her. She stated that she did not recall anything unusual about their last contact, which was the day prior to the inmate's suicide.

The suicide report reviewer indicated that there were initially several concerns regarding the emergency response to this suicide, including that it appeared that neither the psych

tech nor the officer who found the inmate to be unresponsive activated a personal alarm. However, it appeared that upon additional review of the incident reports, the staff who were outside the cell did not see that the inmate was hanging but that he appeared to be standing and looking out the window. There was also a concern about handcuffing an unresponsive inmate. However, because the inmate was in the administrative segregation unit, officers were required to handcuff him prior to transport. A third question was raised regarding the reason why CPR was initiated by a psychiatrist and not by the responding officers. Custody staff, however, documented that the inmate's cell was located at the top of the stairwell, and that the psychiatrist who was already on the unit and was waiting for the inmate on the dayroom floor initiated CPR at approximately 1:10 p.m. The reviewer concluded that this transport of the inmate to the dayroom floor was appropriate in order for the inmate to receive medical attention and life support measures without interruption. Lastly, the reviewer indicated that there appeared to be a delay in requesting the ETV, but the documentation by medical staff indicated that at approximately 1:10 p.m., simultaneous with the start of CPR, the sergeant called for the ETV, which arrived at 1:15 p.m.

On 12/6/07, a note by a physician in the TTA timed at 1:50 p.m. stated that the patient was brought to the TTA on a gurney by the ETV. The patient was found hanging at 1:05 p.m. in his cell, and a nurse from the ER arrived at 1:10 p.m. At that time, the patient was already on the ground and was cyanotic, with mottling around his neck, as a result of the hanging. CPR was started by one of the staff in E-1 and was continued by the ER nurse and the TTA nurse until the patient arrived at the TTA at 1:25 p.m. CPR continued with chest compressions and ventilation by ambu bag. The note went on to state that IVs were inserted and a Code was continued, but the inmate was without pulse or respirations. Paramedics arrived at (time illegible) and the patient was intubated at 1:35 p.m. He was sent out by ambulance at 1:48 p.m. In the assessment/plan portion of the note, the physician noted the assessment as status post hanging and suicide, that the patient was young, and that the time of hanging was not known. The patient had full CPR from 1:10 p.m. until 1:48 p.m., when he was sent out. The note continued on, stating that the patient was pulseless, asystole, and breathless, with no neurological, and pupils reacting to light. He was sent to a higher level of care with continuation of CPR, although his prognosis was very poor.

The suicide report dated 7/15/08 identified two problems with recommendations, as follows:

> Problem 1: During the review of this suicide, on more than one occasion the reviewer noted that he was unable to read critical information in progress notes of mental health staff due to illegible writing.
> Recommendation: DCHCS will provide training on this case through the suicide prevention video conference.
>
> Problem 2: The inmate's medication was discontinued on 12/3/07, according to the MAR. However, a corresponding psychiatrist's order was not found in the UHR.

<u>Recommendation</u>: The health care manager at CSATF and the CSP/Corcoran were to conduct a fact-finding inquiry regarding why this medication was stopped and to identify whether or not this was a pharmacy, psychiatric, or nursing error.

The documents received did not contain an implementation plan from CSATF. With regard to DCHCS, a memorandum of 5/1/09 stated that the DCHCS mental health program had provided a suicide prevention video conference in February 2008 and that the slides and attendance sheets were referenced.

**<u>Findings</u>:**

This inmate's suicide does not appear to have been foreseeable, as he was not reporting any intent to harm himself in the days to weeks prior to his death. It also does not appear to have been preventable. The inmate had been assessed during his last several clinician contacts, even though the majority of these occurred through the cell door. Indeed, his last contact with the psychiatrist on the day of his death indicated that it was at cell front, that the inmate was behaving in an unusual and agitated manner, and that the UHR was not available. The inmate's history of noncompliance with medications and his withdrawal and agitation, which were noted by the psychiatrist who saw him on the date of his death, were important information, but she had evaluated him in the past and did an adequate mental status examination. He denied thoughts or intent to harm himself. Only after the inmate's death did his feelings about his former CCM become known to staff.

An additional concern in reviewing the record for this inmate is that he had several SRACs, including one that found moderate risk, and a second that found high risk, neither of which resulted in consideration of a higher level of care or change in his treatment other than to increase the frequency of CCM contacts and, in one case, to refer to a psychiatrist.

In addition, despite the suicide reviewer's concerns and explanations regarding the emergency response, the emergency response time appears to have been a total of two minutes from the time the inmate was first identified by a licensed psych tech, the door opened, staff assembled, and then carried the inmate from the top tier to the floor of the administrative segregation unit, and CPR began, according to the incident reports. Simultaneously, nursing staff from outside the building were arriving to assist. This seems to be a very short timeframe. Unfortunately in this case, a note by the physician in the TTA documented a discovery time of 1:05 p.m. and not 1:10 p.m. It would have been helpful had the suicide report reviewer identified this as a problem for further explanation and description with regard to the emergency response.

**33. Inmate GG**

**<u>Brief History</u>:**

This inmate was a 36-year-old Caucasian male who committed suicide on 12/20/07 by overdose of Quetiapine in the administrative segregation unit at MCSP. The inmate was

a participant in the MHSDS at the EOP level of care at the time of his death. He was single-celled at the time of his death. The inmate re-entered the CDCR via the WSP RC on 12/30/97 as a parole violator with a new term. He was convicted of possession of a firearm as a previously convicted felon. Because his performance on parole was unsatisfactory due to his failure to register his new address as a sex offender, changed residence and employment without notifying his parole agent, absconded, and used illegal drugs, the judge sentenced him under the three-strikes law to a total term of 25 years to life. His minimum eligible parole date was 6/2/22.

The inmate was discovered on 12/20/07 at approximately 6:45 a.m. in the administrative segregation unit. A CO observed the inmate lying on the cell floor under his bunk and unresponsive. At 6:45 a.m., the officer notified the sergeant who notified main control via his institutional radio of an emergency medical code. The administrative segregation unit staff responded to the location, and an emergency cell extraction team was assembled. The team entered the cell with precaution. An officer placed the shield over the inmate's body and then placed him in handcuffs and checked his pulse. The officer thought he felt a pulse and another officer placed leg restraints on the inmate's ankles. Three officers then removed the inmate from inside the cell, placing him on the second tier in front of his cell. An LVN started a medical assessment and checked the inmate for a pulse. The nurse observed that the inmate's face was turning blue and it appeared that he was not breathing. The sergeant instructed an officer to remove the handcuffs, and another officer placed a protective barrier over the inmate's mouth and started performing rescue breathing. The sergeant took over rescue breathing, and another officer started chest compressions. The inmate was then placed on a Stokes liter, carried down the stairs, and placed on the emergency medical cart. Two officers continued to perform CPR as the inmate was being transported to the TTA for further medical treatment.

The above information was taken directly from the incident report, CDCR 837-A1, but the suicide report provided a slightly different timeline. The suicide report stated that the inmate was discovered at approximately 6:40 a.m. by a CO who was conducting inmate feeding. The inmate was discovered lying non-responsive on the floor of his cell. The officer notified his sergeant at approximately 6:44 a.m. and the sergeant notified control. At approximately 6:45 a.m., an extraction team was assembled and entered the cell with caution. The remainder of the description was consistent with the incident report, as noted above, up until the point of the sergeant ordering the officer to remove handcuffs and begin CPR. The suicide report stated that the inmate subsequently vomited prior to being placed on the Stokes liter, carried to the emergency medical transport cart, and taken to the TTA.

The inmate arrived at the TTA at approximately 6:57 a.m. A nurse applied the AED to assess the inmate, and no shock was indicated. The nurse administered an injection of Narcan, which is antagonist to opiates, but there was no record of who ordered the injection or why it was given. At approximately 7:02 a.m., the AED was used to assess the inmate and again no shock was indicated. A physician's assistant arrived at approximately 7:03 a.m. and began supervision of the CPR and life support procedures. A nurse began an intravenous line at 7:04 a.m. and a second injection of Narcan was

ordered by the physician's assistant at 7:05 a.m.  The physician's assistant applied the AED, and once again it recommended no shock.  The second injection of Narcan was given at 7:07 a.m.  The physician's assistant noted that the inmate was non-responsive, that no carotid pulse could be sustained without chest compressions, and that the inmate's pupils were fixed and dilated.  He also noted the presence of vomit on the inmate's cornea, upper and lower eyelashes, and the rest of his face and mouth.  The physician's assistant ordered life support efforts to be discontinued and called the time of death at 7:10 a.m.  The on-site fire department arrived and was released at approximately 7:11 a.m.  An ambulance arrived at 7:13 a.m., was notified of the death, and left.  An autopsy report was provided by the Amador County Sheriff's Office.  It stated that the autopsy was performed on 12/21/07 and determined the cause of death to have been drug overdose (minutes) due to Quetiapine (minutes).  A toxicology report stated that there was Quetiapine at 1.42 mg/L (effective level 0.025-0.365 mg/L, potentially toxic 1.8 mg/L).  No blood ethanol alcohol or common acidic, neutral, or basic drugs were detected.

The suicide report made reference to inconsistencies in the initiation of life support efforts, citing the incident reports indicating that the officer discovered the inmate at approximately 6:40 a.m., and that the emergency was reported at approximately 6:44 a.m., but the inmate death report noted the time of discovery at 6:20 a.m.  It concluded that "CPR continued from 6:20 to 7:10 with no response of life signs, CPR was called at 7:10."  Remarkably, the suicide report also made reference to medical staff completing what appeared to be a critical timeline of the emergency response, but the contents of the note were "illegible" and the author did not print a name above or below the signature.  It was remarkable that there was no other way of determining who may have written this note.

The inmate had written several suicide notes, each in a separate envelope, including two letters to his grandparents, other letters to family members including his sisters and brothers, and a note addressed to officers.  The notes to his family members stated his love for them and that he would miss them and to his grandparents: "I am okay, I am home in your hearts."  The note to the officers stated, "please do not destroy my personal stuff.  They are only important letters to my family and I wish them to have.  Please these are only my last words to my family.  I know you could give a f---.  But please let them receive them.  My two family members need to hear my thanks to them."

The urgent/emergent response pre-TTA form in the UHR stated that at 6:45 a.m. on 12/20/07, the first responders were a CO and LVN.  The first medical responder was an LVN at 6:45 .m.  CPR was initiated at 6:45 a.m., and the AED was used at 7:10 a.m.  The mode of transportation to the TTA was noted as emergency cart at 7:05 a.m.  A progress note with an illegible signature in the same section stated that at approximately 6:44 a.m., the medical emergency of the inmate being unresponsive was announced over the institutional radio.  The inmate was transported to the TTA with CPR in progress and continued by an officer and LVN.  The emergency care flow sheet in the same section recorded CPR from 6:20 a.m. to 7:10 a.m., and the inmate was bagged at 6:58 a.m.  A timeline in that same section of the UHR noted the arrival, as follows:

6:57   Arrival at TTA, CPR in progress, AED on, advised no shock;   6:57 Narcan given IM;

7:02   AED advised no shock, continue CPR;

7:04   Normal saline 18 gage IV left hand;

7:05   Physician's assistant at bedside advises Narcan takes over CPR; 7:06 AED advises no shock, continue CPR;

7:07   Second Narcan administered;

7:09   PA assessed patient pupils fixed and dilated, discontinue CPR; 7:11 fire department arrived and released;

7:13   Ambulance and sally port notified of death;

7:15   Notifications of specific staff.

The timeline was undated and unsigned, but it appeared to reflect the date of the inmate's death.  There was a second timeline, dated 12/20/07 and signed with an illegible signature that was essentially identical to the first.  There was a TTA note signed by a physician's assistant who stated that the inmate arrived in TTA at approximately 7:03 a.m., CPR was in progress, an oral airway was in place, and the inmate was found unresponsive.  It went on to state that vomit was in the mask over the inmate's face and neck, and advised repeat of Narcan 1 mg, which was given but with no response.  CPR continued but the inmate remained non-responsive.  The note stated that the inmate had been found at 6:20 a.m. during the feeding.  It concluded with stating that CPR was called at 7:10 a.m. and was signed by the PA who appeared to have taken over in the TTA.

The suicide report contained the inmate's criminal justice history.  It stated that he had a juvenile history, having been charged with being under the influence of phencyclidine at age 16 and sent to forestry camp in the CYA.  At age 21, he was charged with domestic violence and ordered to attend a domestic violence diversion program.  However, he never enrolled in the program.  His arrests included being under the influence, driving under the influence, vandalism, lewd and lascivious acts with a child under the age of 14, sexual penetration with a foreign object with force, and the commitment offense of selling and possession of a firearm.  The inmate received his first CDCR prison term on 11/10/93 on two counts of lewd and lascivious acts with a child under the age of 14 and sexual penetration with a foreign object with force, based on his molestation of his wife's 12 year-old female cousin.  The inmate paroled on 12/23/96, but violated conditions of his parole and was returned to prison on 12/30/97 via the WSP RC, as stated above.  The suicide report stated that the inmate was sentenced under the three-strikes law because the court determined that he had had two prior serious felony convictions and that his performance on parole was unsatisfactory, as stated above.  The records reviewed included the probation officer's report, which recommended that the inmate be sentenced to 25 years to life.

The suicide report and records reviewed made reference to the inmate's beginning to abuse alcohol and drugs at approximately age 12.  He reportedly had become substance-dependent on methamphetamine, cocaine, marijuana, and alcohol by the age of 22.  Around that time, he also had his first incarceration in the CDCR, as noted above.  He

also, however, reported experiencing depression beginning when he was approximately age 22. In 1994, the inmate reportedly made a suicide attempt. By 1995, the CDCR staff psychiatrist diagnosed the inmate with Organic Brain Disorder and Polysubstance Dependence in Institutional Remission. The inmate received a Mentally Disordered Offender evaluation in August 1996, with diagnoses of Polysubstance Dependence in institutional remission with Organic Brain Syndrome as a sequelae. However, his GAF was estimated as 80.

It was unclear from the records whether or not the inmate received any mental health treatment between December 1996 and 1997 while he was on parole. After his return to CDCR, he received a mental health screening on 1/2/98 at WSP and was referred for psychiatric evaluation. His RC mental health evaluation was completed on 1/12/98. With regard to his substance abuse, the inmate was noted to have abused "everything" and to have reported that he had a very bad temper as well as feeling paranoid. He was noted to have poor insight and judgment and a blunted affect. He was diagnosed with Substance Induced Psychosis and Antisocial Personality Disorder and admitted to the MHSDS at the 3CMS level of care. According to the records, the inmate filled out a request for interview form, stating that he had thoughts of suicide and feelings of depression, adding that he had not tried to kill himself but that he was "afraid I might soon." Clinical staff responded to this referral and determined that he had no suicidal or homicidal ideation but was very concerned about possibly having a sexually transmitted disease.

The inmate was prescribed a variety of medications, including Serentil in July 1994, Pamelor in August 1995, Depakote in January 1998, Elavil in February 1998, and Risperdal in February 1998 which continued through May 2000.

The inmate signed a consent form for Seroquel, Abilify, Risperdal, Zyprexa, and Geodon, all anti-psychotics, on 4/14/06, and his consent was renewed on 1/16/07. He signed consent forms for Depakote on 5/16/07 and for Zoloft on that same date. On 7/31/06, he also signed consent forms for Prozac, Zoloft, Paxil, and Remeron. On 3/28/07, the inmate signed consent forms for Lamictal, an anti-convulsant used for mood stabilization. On 8/1/07, the inmate was prescribed Vistaril, Lamictal, Zoloft, and Seroquel.

On 7/17/01, the inmate was removed from the MHSDS, having been in remission for mental illness and free of psychotropic medications for at least one year, with his last medication administration having been in May 2000.

The mental health assessment and treatment setting transfer (MH-4) completed on 4/17/06, after the inmate had transferred to MCSP for placement on a SNY, indicated that he was serving a 25 year to life sentence for felony possession of a firearm and that he was on an SNY because he was a "skinhead dropout." His mental status was noted as marked by paranoid thought content and "shadows" as perceptual disturbances, and mood that was "panicky." His sleep, appetite, and sensorium were also noted as "not good." His diagnoses were PTSD, acute/chronic, and Polysubstance Dependence.

On 5/30/06, the psychiatrist doubled the inmate's Risperdal to 4 mg per day because of auditory hallucinations, suicidal ideation, and paranoid ideation. At that point, the inmate agreed to become a participant at the EOP level of care, and on 6/9/06, an IDTT changed his level of care from a 3CMS to EOP. His diagnosis at that time was Psychosis NOS, Polysubstance Dependence and Antisocial Personality Disorder with a GAF of 48. On 6/13/06, an SRAC was completed and estimated that he was a "mild" suicide risk. His diagnosis was changed approximately six weeks later on 7/24/06 to Major Depression with Psychotic Features.

A progress note dated 12/1/06 by a CCM reported that the inmate stated that he heard voices which began after he had used "bad" drugs. The inmate reported that he knew the voices were not real, but that he was concerned because he had stabbed and beat up people in the past when he was in a gang. He stated that the voices started after he had overdosed. Notably, on 12/15/06, he received an RVR because he was discovered crushing Wellbutrin in order to snort it and get high.

The inmate was noted on the MARs to have had multiple refusals of medications in March, April, and May 2007, with his highest number of refusals in June and July 2007. In June 2007, he refused medications on at least 14 of 30 days, and in July 2007, he refused his medications, particularly a.m. medications, at least 12 times. He also refused medications at least six times in August 2007, 18 times in September 2007, and twice in October 2007.

The inmate sent health care services request forms for low back pain, and was referred by mental health to medical for evaluation of benign prostatic hypertrophy.

The inmate's low back pain was secondary to ruptured discs at L-4 and L-5. He received MRIs and was being worked up for disc surgery at L-4 and L-5 prior to his transfer on 4/13/06. When he arrived at MCSP, His diagnosis was low back pain with radiculopathy to his right leg and foot.

The inmate was placed in the administrative segregation unit on 10/3/07 because of possession of a weapon. The clinical summary for the ICC on 12/5/07 indicated that the inmate had possession of the weapon because he had multiple enemies in population. The inmate remained at the EOP level of care, but was noted to have a poor response to treatment and his prognosis for stabilization in administrative segregation unit was "guarded." There was no IDTT recommendation for alternative placement, and the ICC decided to retain the inmate in administrative segregation, in a single cell, and on walk-alone status. This IDTT meeting was after the inmate had received an additional RVR on 11/15/07 because of obstruction of a peace officer, requiring a cell extraction including the use of force with OC spray. The mental health evaluation determined that the inmate had no psychotic symptoms, was cooperative, made good eye contact, and had no specific concerns to be taken into consideration with regard to the penalty. The actual RVR occurred on 11/15/07, and the evaluation was on 11/20/07.

245

A progress note dated 11/26/07 was prepared by a mental health staff member with the initials "PB" or "DB" in place of the signature. The note stated that the inmate remained "certain he is through in the entire State-system and remains resolved that he will not be safe with a cellie?" The note went on to say that the inmate was sure that he would be attacked if someone came into his cell, and that he was currently single-celled but expected that would be for only for 30 days which would soon pass. The inmate denied suicidal or homicidal ideations, but claimed that he could be a danger to his cellmate. The objective assessment was that he was anxious with fears for safety, and was not amenable to consideration of the fact that his fears could have be exacerbated due to acute stress. The overall assessment was "schizoaffective," and the plan was to continue him in the program. A prior note of 11/22/07 by the same clinician indicated that the inmate was stressed and believed that he "was done" all over the State because he believed his life was in danger. His belief was based on his "friends" (whites) who found out that he had an "R" on his jacket, and that he had always run with a group that "censures" (sic) inmates who are classified as sex offenders. In the previous note, his mental status was essentially the same in that the inmate was displaying anxiety, mood depression, and paranoia. The assessment was Schizoaffective, Depressed Type, and the plan was to continue the program, provide a message to the sergeant about the inmate/patient safety, and "attempt at reality testing."

On 11/6/07, a psychiatrist's note recorded the inmate as a "36-year-old Hispanic male lifer who came to ASU for safety (enemies)." The psychiatrist noted a history of Schizoaffective Disorder. The inmate denied any stressors but reported that it was hard for him to concentrate, and that he got "paranoid always, all day long." His medications at that time were Lamictal, Seroquel, and Zoloft. His mental status was described as alert, oriented, cooperative, with sad mood and affect that was congruent with mild sadness. His speech was clear, his thoughts were logical; the psychiatrist noted "lot of suicidal thoughts especially when his moods dip, but no plan." His assessment was Schizoaffective Disorder by history, Substance Abuse and Antisocial Personality Disorder. The psychiatrist increased his Lamictal from 100 to 200 mg per day, increased his Seroquel from 200 to 300 mg per day, and continued the Zoloft at 150 mg with follow-up for two weeks. Apparently, an SRAC was not conducted despite the inmate's report of suicidal thoughts, as noted above.

A note by a psychologist on 12/12/07 stated that the inmate was relieved to continue to have a single cell and that he remained convinced that the inmates had a "hit" on him. The inmate reported to the psychologist that he had made up his mind "that if he gets a cellie he will kill that cellie in order to get single-celled forever." Alternatives were discussed, including accepting consequences of "C" status and an indeterminate SHU placement. The inmate reported that he would rather kill his cellmate "so as not to lose TV and other privileges." The inmate asked to see the psychiatrist because his mood was depressed and he was feeling a loss of interest in activities. He was described as calm and remained convinced that he was in danger, which was described as "could be reality-based." He was assessed again as "Schizoaffective," and the plan was to continue programming. Custody was informed of the threats. There was no mention in the note of referral to a psychiatrist for follow-up.

On 12/17/07, the inmate saw the same psychiatrist whom he had seen on 11/6/07 (with a plan at that time to see the inmate again in two weeks). The psychiatrist reported that the inmate refused to come out of his cell for a one-to-one and was seen at the cell window. The psychiatrist reported that the inmate said "I'm alright" and that he responded "yes" to questions about taking medications. The inmate remained under his blanket in the lower bunk with his body turned to the wall during this interaction. The psychiatrist listed the inmate's medications as Vistaril 100 mg HS, Seroquel 200 mg HS, Lamictal 100 mg HS, and Zoloft 150 mg q pm. However, in the previous note of 11/6/07, the psychiatrist indicated his intent to increase the Seroquel to 300 mg HS and the Lamictal to 100 mg b.i.d. This note appeared to reflect the medication order prior to the 11/6/07 visit. The psychiatrist indicated that the UHR was reviewed and that the diagnosis of Schizoaffective Disorder was "ongoing," but "progress notes over many months describe the inmate's evasion of engagement with programs, claims of fear about enemies everywhere in CDCR." The psychiatrist also referenced the inmate's earlier references to hearing voices and suffering depression. The psychiatrist's impression was history of diagnoses of Schizoaffective Disorder, "Rule Out Malingering, with secondary gain of controlling housing and safety concerns." The plan was to "continue present meds, follow up in two weeks, and maintain assessment of validity of his major Axis I diagnosis." The inmate committed suicide three days later, on 12/20/07.

Even though the inmate was noted as not programming in several of the progress notes, during the week of 12/15/07 to 12/20/07, he was assigned to ten out-of-cell group therapy hours, as he remained in the EOP in administrative segregation unit. However, seven of those group sessions were cancelled, and the inmate attended only one of the remaining three hours of group therapy that were to have been provided during that week. Review of the records indicated that the structured therapeutic group therapy hours out of cell were cancelled twice as often as the inmate refused to attend. After seeing the psychiatrist on 12/17/07, which was the inmate's last contact with a mental health staff member, the inmate refused to attend two group therapy hours on 12/19/07 and committed suicide the following day.

The suicide report made reference to the inmate having essentially a very stormy institutional functioning, beginning in approximately May 1998 when he was placed in CSP/Corcoran administrative segregation, based on his being a participant in a battery with a weapon on an inmate. He received a 15-month SHU term. He was transferred in May 1999 to the CSP/Corcoran administrative segregation for safety concerns, and when transferred to CSP/Sac, he was placed in administrative segregation again for safety concerns in September 1999. The inmate received a second SHU term after being placed in administrative segregation on 1/4/01 for threats to a non-inmate; however, this term was suspended. He was returned to a SNY on 3/14/01. The following day, he returned to administrative segregation because of there being no room in the SNY, but he was placed in the SNY on 2/11/02. After a trip to an outside hospital because of his back pain, the inmate was returned to CSP/Sac and placed in administrative segregation on 6/2/02, with release to the SNY on 3/20/03. He again returned to administrative segregation on

8/25/03 because of an RVR for inmate-manufactured alcohol, but was returned to the SNY on 9/3/03.

In March 2004, the inmate transferred to CSP/LAC and was placed in general population, but once again was placed in administrative segregation for safety concerns in October 2005. In February 2006, he was transferred to a SNY at MCSP, and was once again placed in administrative segregation on 10/3/07 for possession of a weapon (knife). He remained in administrative segregation until his death.

The suicide report identified four problems with recommendations as follows:

Problem 1: The CDC-7229A, inmate death report, completed by the physician's assistant stated that CPR had been continuously provided from 6:20 a.m. until 7:10 a.m., which was inconsistent with all of the incident reports. The final words on the inmate death report were "CPR was called at 0710." It is assumed that the physician's assistant meant that the time of death was called at 7:10 a.m. However, there was no record of who pronounced time of death.
Recommendation: The health care manager at MSCP shall identify the physician's assistant and the supervisor of the physician's assistant, provide remedial training regarding accurate documentation of emergency response, and determine whether or not to make a referral to PPEC.

Problem 2: There was no documentation regarding the reason why Narcan was administered, the identity of the individual who gave the order for the first injection of Narcan, or the identity of the individual who gave the first injection of Narcan during emergency lifesaving procedures. In addition, medical staff completed what appeared to be a critical timeline of the emergency response procedures. However, the contents of the note were illegible and the author did not print a name above or below the signature.
Recommendation: The health care manager and the DON at MCSP shall provide training to all medical staff regarding accurate and legible documentation.

Problem 3: On 11/8/07, the psychiatrist noted that the inmate stated that he had "a hard time with depression the last two weeks," and admitted that he had a "lot of suicidal thoughts." However, an SRAC was not completed.
Recommendation: The chief of mental health and the chief psychiatrist at MCSP shall identify the psychiatrist and shall consider referral to PPEC. Further, training shall be provided to all staff regarding procedures for completing an SRAC.

Problem 4: Seven of ten scheduled group therapy hours were cancelled during the last week of the inmate's life.
Recommendation: The chief of mental health at MCSP shall conduct a fact-finding inquiry regarding reasons for the cancellations and form an administrative segregation QIT to improve the availability of treatment.

A death review summary was completed by a physician, but only the first page of the summary was included in the documents and therefore, there were no available summary, conclusions, or recommendations.

On 5/1/09, the chief psychologist (A), clinical policy and program development, provided a memorandum dated 7/29/08 and signed by the chief physician and surgeon at MCSP. In the memorandum, the chief physician and surgeon stated that the physician's assistant was the individual who was in the TTA when the inmate-patient was brought to the TTA for the medical evaluation and continuation of CPR on 12/20/07. The physician stated that, as the physician's assistant's supervisor, he met with her on 7/28/08 and reviewed areas of concern relevant to her, and that IST documentation was completed for the meeting. He went on to state that the documentation from the physician's assistant showing CPR commencing at 6:20 a.m. "was purely a misunderstanding of the report given to her by the accompanying officers who presented to the TTA with [Inmate-Patient GG]." The physician stated that the PA's administration of Narcan for this unconscious patient was appropriate, and concluded that referral to the PPEC was not warranted. He added that additional IST documentation had been completed by the medical physicians and physician's assistants regarding clinical procedures when there is a suspected overdose, legibility, and proper documentation. The memorandum by the chief psychologist (A), clinical policy and program development, went on to state that the IST sheets documenting attendance had been received, but that there was additional documentation of the completion of this QIP that had not been received.

**Findings**:

This inmate's suicide appears to have been foreseeable and preventable. There are numerous failures in the assessment process regarding the inmate's deterioration and functioning and, despite his having been reported to deny suicidal ideation, he made multiple statements regarding his fear for his safety and that he was unsafe anywhere in the CDCR outside of an administrative segregation single cell. Most notably, he informed the psychiatrist on 11/6/07 that he had "lots of suicidal thoughts," but the psychiatrist did not perform an SRAC or modify the inmate's treatment other than by increasing his medication. The same psychiatrist saw him three days prior to his death and noted that the inmate had his face turned to the wall and had minimal interaction with him, but stated he was taking his medication. A review of the MARs and the UHR revealed that the inmate was non-compliant with his medication (multiple refusals over several months), and that, although programming was reportedly scheduled for ten hours per week, during the week before his death, seven of those ten hours were cancelled and he participated in only one of the other three. The inmate's overall functioning was clearly deteriorating and, remarkably, he was assessed by the psychiatrist as Rule Out Malingering, despite his long mental health history and notes by the CCM regarding the possible validity of the inmate's safety concerns, given his gang history and "R" suffix. Although the inmate was assessed as denying suicidal ideation, the assessment was based on an inadequate interview, and there do not appear to have been any efforts to bring the inmate out of his cell and have him more thoroughly assessed, given his deterioration in functioning and historical and dynamic risk factors. The suicide report included a

recommendation for review of the psychiatrist and potential referral to the PPEC, but there was no information that this indeed had occurred.

There were significant discrepancies in the timeline with regard to the emergency response. The suicide report identified this appropriately as a problem to be addressed at MCSP. Again, the response from MCSP was not provided, and therefore it was not clear whether these issues had been addressed appropriately and/or resolved. The suicide report did not include information regarding the inmate's overdosing on quetiapine (Seroquel), despite the notation on the MARs that the inmate had been sporadically refusing quetiapine (Seroquel) and other medications administered during the six-month period prior to his death. The issue of an inmate in administrative segregation being able to hoard medications during a substantial period of time was not identified as a problem for review by the staff at MCSP or DCHCS.

## 34. Inmate HH

### Brief History:

This inmate was a 25-year-old Caucasian male who committed suicide by hanging on 12/21/07 in the SHU at CCI. The inmate was single-celled at the time of his death. He was also a participant in the MHSDS at the 3CMS level of care. The inmate entered the CDCR on 9/1/05 via the DVI RC, after he had been convicted of first degree murder and sentenced to 25 years to life. His minimum eligible parole date was 6/13/28.

The inmate was discovered on 12/21/07 at approximately 10:47 a.m. by a CO who was distributing personal supplies to inmates in the SHU. He observed the inmate hanging from a noose tied around his neck and attached to an air vent above the toilet in his cell. The officer shouted, "There is an inmate hanging in here" to the dayroom floor officer who alerted the control booth officer to activate the housing unit alarm via institutional radio. The control booth officer passed down the cut-down tool to the floor officer and also announced a Code One medical emergency. The officer put on protective gear, obtained an extraction shield, and ran up the stairs to the inmate's cell. An officer banged on the cell door, received no response, and signaled the control booth officer to open the door electronically. Two officers entered the cell, placed the extraction shield in front of the inmate, and determined that the inmate was unresponsive and motionless. The inmate was cut down, removed from the cell, and placed on the floor in front of the cell and handcuffed. Officers began CPR. At approximately 10:49 a.m., a sergeant and two registered nurses entered the unit, and the sergeant and one nurse went up the stairs to assist. At approximately 10:51 a.m., the nurse determined that the inmate had no pulse or respiration and ordered the officers to carry the inmate downstairs where he was placed on a gurney and the two nurses resumed CPR. The AED was used and advised "no shock."

One of the nurses called for an ambulance while the inmate was being manually transported to the medical clinic, and two nurses continuously performed CPR. The staff and inmate arrived at the medical clinic at approximately 10:52 a.m., where clinic

medical staff took over life supporting efforts. At approximately 10:53 a.m., the AED again advised "no shock." At 10:55 a.m., the cardiac monitor indicated asystole. An oral airway was placed and CPR was resumed. At 10:58 a.m., an IV line was placed and the advanced cardiopulmonary life support protocol was initiated. The ambulance arrived with paramedics at 11:03 a.m. The paramedics were successful in intubating the inmate on a second attempt. At approximately 11:08 a.m., the inmate vomited, but there was no change in his status. CPR was continued and the inmate was transported to an outside hospital where he arrived at approximately 11:18 a.m. A physician pronounced the inmate dead at 11:37 a.m.

An autopsy report was provided by the Kern County Sheriff-Coroner's Office. It stated that the autopsy had been performed on 12/24/07 and determined the cause of death to have been hanging and the manner of death to have been suicide. A toxicology panel was submitted and was negative for alcohol and common, acidic, neutral, and basic drugs. A note was found in the inmate's cell after his death. It was unaddressed but stated, "always remember and never forget, _____ with a capital ___, my life must be `understood' backwards but it also must be lived forward!!...Always move forward Playboy…Always do what it takes to remain focused on the future!! W/R A7." There were also two drawings of a young male wearing a baseball cap with his mouth sutured shut and the words "SUICIDE" written under the brim of each cap. According to the suicide report, one picture displayed the male with words coming out of his mouth saying "Boy I don't think I'll be debriefing."

The suicide report recounted the inmate's criminal justice history and stated he had been detained as a juvenile by police for committing "minor batteries" but had no record of juvenile arrests. The inmate's adult criminal history consisted of the commitment offense which, according to the records, occurred on 6/15/03 when the inmate and two friends confronted, robbed, and then killed a suspected child molester. The victim was fatally stabbed. The records indicated that the inmate may have been under the influence of methamphetamine. He was convicted of first degree murder on 6/12/05, sentenced to 25 years to life on 8/9/05, and entered the CDCR, as noted above.

The inmate's mental health history appeared to have begun at an early age, with his first suicidal ideation at the age of 14, and with subsequent suicide attempts and gestures while he was staying in group homes or under foster care placement. The inmate had been placed under the guardianship of his maternal grandmother during his childhood years, after his mother had been arrested and sent to prison. He was subsequently placed in foster homes while he attended elementary and junior high school, where he had a history of poor class attendance and fights with siblings and other students. He was ultimately taken to see a psychiatrist in 1996 after attempting to hang himself with an extension cord in a group home. At age 12, the inmate reportedly began using alcohol then subsequently cocaine and methamphetamine, escalating to daily use by the age of 16. He had also begun associating with the Skinheads and had encounters with the police, as noted above. It appeared from the records that he had multiple psychiatric hospitalizations from 2001 and through 2003, prior to the commitment offense and his arrest. The records indicated that the inmate cut himself, making a deep laceration on his

left forearm, as a suicide attempt at approximately age 20, associated with his coming down from methamphetamine. He had other suicide attempts by hanging and drug overdose. After his arrest, he was diagnosed in the jail as having Depression NOS, Amphetamine Dependence, and Adult ADD, and was treated with Wellbutrin, Remeron, Prozac, Imipramine, Seroquel, and Thorazine. The suicide report makes reference to a letter dated 11/18/03 that the inmate wrote while in the jail, stating "If they send me to prison for life for killing this child molester I will probly (*sic*) take my own life away anyways. I should have done it a long time…"

The inmate arrived at DVI on 9/1/05, and on 9/12/05 had a mental health screening by a psychiatrist who determined that he was not psychotic but had a possible mood disorder. The inmate denied his history of suicidal episodes and violence, but was referred for a mental health evaluation. He was seen by a clinician but was not placed in the MHSDS. On admission, the inmate was placed in administrative segregation because of his crime and safety concerns. On 9/28/05, he was released from administrative segregation to general population.

On 11/2/05, the inmate requested mental health services because he was concerned that his co-defendants might be in the same facility. He was noted as stable with no suicidal thoughts or plans. Also, according to the suicide report, the inmate received two RVRs, one on 1/1/06 for assaulting an inmate, and one on 1/27/06 for being under the influence of alcohol, and was given a two-month SHU term. He was also incorrectly identified as being at the 3CMS level of care. The inmate was finally placed at the 3CMS level of care as medical necessity on 2/7/06, after a mental health evaluation determined that he had a diagnosis of Mood Disorder NOS. He was also seen by a psychiatrist who prescribed Effexor and Geodon on that same day, but those medications were discontinued two weeks later on 2/23/06 because of the inmate's refusal of medications due to their side effects. On 3/7/06, the inmate was prescribed Celexa and Benadryl which he continued to receive through August 2006.

The inmate remained in administrative segregation during this time period and, according to the records, was not seen by his CCM for five weeks between 4/26/06 and 6/1/06.

On 7/12/06, the inmate was released from administrative segregation and placed in population. Almost one month later, on 8/10/06, the inmate threatened to kill a CO and was returned to administrative segregation. On 8/17/06, he sent a health care services request to mental health. It was logged in on 8/28/06, but it appeared that the inmate was not seen in response to this request. On 9/12/06, he was seen by an IDTT and requested removal from the 3CMS level of care. However, the IDTT decided to continue him at that level as medical necessity. The following day, the ICC gave the inmate a nine-month SHU term, based on the threats to kill a CO, and on that same date he received another RVR because of a razor found under his mattress during a cell search.

The inmate made a serious suicide attempt by cutting his wrists on 9/15/06. He was transferred to the KVSP acute care inpatient treatment unit for closure of the laceration, and remained at KVSP in an MHCB until 9/19/06. The medical necessity criteria for his

3CMS level of care were removed while at KVSP. He was diagnosed with Mood Disorder NOS and treated with Remeron. He returned to the administrative segregation unit at DVI on 9/20/06, and by 10/13/06 a psychiatrist discontinued the Remeron for reasons that are not clear.

The inmate began his nine-month SHU term with a concurrent 18-month SHU term at the CCI SHU on 12/1/06. It appeared from the suicide report and the MHTS that the inmate was not seen by a CCM from 12/16/06 to 2/27/07. He was seen by a psychiatrist on 3/19/07 and Wellbutrin was started. The IDTT was held in the absence of this inmate on 3/29/07, and his diagnoses was changed to Amphetamine Dependence in institutional remission and ADHD NOS.

The inmate refused his psychiatric appointment on 5/7/07, but his medications were continued at that time with a plan to re-schedule the visit. On 5/22/07, the inmate was seen at his request by the CCM, who noted that the inmate was depressed and irritable but also noted no suicidal ideation and no evidence of psychosis. The CCM noted that the patient reported that he was feeling increased anger toward his cellmate, feared losing his temper, and requested separation. The CCM further reported that the sergeant was contacted. She stated that she would work on a change of cellmate for the inmate. Diagnoses at that time were Depressive Disorder NOS and ADHD by history.

On 5/25/07, the inmate was seen by a psychiatrist, based on a staff referral which stated that the inmate had been recently found to have Hepatitis C. The inmate stated that he contracted Hepatitis C from tattooing/IV drug abuse. The psychiatrist noted that this inmate's current medications were Wellbutrin and Remeron, and that his mental status was essentially within normal limits. The psychiatrist assessed him as having a history of ADHD, and the plan was to continue medications and return to clinic in three weeks.

At the inmate's request, he was again seen by a CCM on 6/8/07, and again reported having irritability but denied suicidal ideation. His suicide history was not noted. The description by the CCM was that the inmate was feeling "down" in the evenings. He was prescribed Wellbutrin and Remeron at that time, and reported that he was taking the Remeron at night. The diagnoses remained the same, and the plan was for psychiatric referral. The psychiatrist saw the inmate on 6/11/07 and noted that he was less depressed, but refused to take Remeron and stated that he hallucinated on it. His mental status was again noted as being within normal limits and he was reportedly stable. The plan was to discontinue Remeron and continue Wellbutrin with follow-up in four weeks.

His CCM saw him again on 6/25/07. The CCM noted that the inmate denied feeling depressed currently, but stated that he was worried about his family and flooding in Oklahoma near the place where his family lived. He was assessed as stable. The CCM noted having spoken with the CC-1 to try to place a phone call for the inmate to his grandmother. On 7/17/07, a UCC noted in the inmate's annual review that his stress had increased and that he was prone to depression. It also imposed a SHU term of 45 days for delaying a peace officer and noted that the inmate wanted to be transferred to

Oklahoma to be near his family.  His minimum eligible release date from the SHU was 2/9/08.  The UCC note of 7/17/07 noted that the inmate was double-celled at that time.

The inmate was seen by a psychiatrist five days later, on 7/22/07, because of complaints of depression and difficulty sleeping.  The psychiatrist continued the inmate's Wellbutrin and recommended sleep hygiene.  The dosage of Wellbutrin at that time was 200 mg q a.m. and 150 mg q p.m.  The psychiatrist noted on 8/13/07 that the inmate was not seen because he had moved from the unit.  This was approximately the same time (8/14/07), when the inmate received a new RVR for striking an officer with a food tray.  On 8/22/07, the inmate received a brief mental health assessment which recounted the inmate's history (including his placement in the SHU for threatening a peace officer and possession of a weapon), his current management cell status due to his attempt to batter a peace officer on 8/14/07, and history of suicide attempt.  His mental status was described as essentially within normal limits, and he was evaluated as denying depressed mood and reporting medication compliance.  His diagnoses were Depressive Disorder NOS, ADHD NOS, and Amphetamine Dependence in a controlled environment.

On 8/29/07, he was again seen by a psychiatrist who added Remeron 15 mg to his medication regimen, which was Wellbutrin 350 mg per day at that time.  The plan was for him to return in three weeks.  Another brief mental health evaluation was done on 9/24/07 and described the inmate essentially as unchanged except for his mood being irritable.  On both brief mental health evaluations (on 8/22/07 and 9/24/07), there were no notations regarding the inmate's insight and judgment.  The diagnoses were continued, and it was noted that the inmate was requesting placement in group therapy.

A progress note by the psychiatrist on 10/10/27 recorded the psychiatrist's telling the inmate that his Wellbutrin would be tapered and stopped, with a plan to substitute Effexor.  The suicide report noted that this change was because Wellbutrin was being removed from the CDCR formulary.  The records indicate that the inmate was informed by his grandmother in early November 2007 that his mother had died of cancer.  On 11/16/07, the inmate reported, "Family is being threatened, if I don't come forward" and "I have nothing to live for."  The CCM reported that the inmate was having trouble getting along with his cellmate and that he appeared desperate and depressed.  The CCM indicated that the inmate was feeling worthless and experiencing suicidal ideation.  The plan was for a psychiatric referral.  Earlier that same day, the CCM had seen the inmate who reported at that time, "I'm hallucinating a lot because of the Effexor."  He also reported that he last saw a psychiatrist a month earlier and that "I get messed up on this."  The psychologist completed an SRAC on that day and noted the sources of information as CO or staff interview, inmate interview, and the UHR.  Multiple risk factors were noted as well as the inmate's history of suicide attempts, depression and psychosis.  No protective factors were noted.  The evaluation of risk was "high," the summary stated, with "inmate with numerous SAs in the past, hopeless – stopped eating times three days, very poor sleep, positive suicide intent."  Curiously, there was no recommendation/plan checked, although the inmate was admitted to the OHU.

On 11/18/07, an OHU coordinator's note stated that the inmate did not receive a private interview because he refused. However, the interview was done by the psychiatrist and the inmate stated that he was refusing to eat and that he wanted to die. He stated, "There is nothing to live for" and "Refuses food, drink, meds." He was placed on suicide precautions. His diagnosis was Major Depressive Disorder with Psychotic Features. An OHU coordinator's note on 11/20/07 provided more history, including that the inmate's grandmother had told him that his mother had died approximately two weeks earlier and that the inmate reported that custody was putting him in a position "to do something to my cellie." The inmate continued by stating, "Know I'm not getting out" and "If they won't give me a single cell, then I will do something to get my way," "I don't trust nobody," "you guys are responsible for it," and "if a cellie gets hurt, it's your fault." He was assessed as hopeless about not getting out. The diagnosis remained the same. There was a notation that the writer spoke with the sergeant about the cellmate process and speaking with the inmate. He also noted that there was no mental health chrono for a single cell at that time.

The suicide report also made reference to a notation that the inmate told this clinician on 11/16/07 that he had "killed three people at different times," that he felt hopeless, and that he "wanted to have an injection that would make him sleep forever." In the OHU note, the inmate also endorsed auditory hallucinations of his father and uncle talking to him, and stated that he wanted to "kill myself by any means possible…I don't want to do a life sentence, I just want to be with grand paw, let the State kill me…I tried to kill myself more than ten times, and my mother died of cancer two weeks ago."

An SRAC of 11/21/07 indicated that, at that point, the inmate was stable in the OHU and that his evaluation of risk was "low" risk to "moderate" risk. The recommendation/plan was referred to the CCM. During his stay in the OHU, the inmate was treated with Risperdal and Remeron; his Wellbutrin and Effexor had been discontinued.

The inmate refused medications in the OHU. On 11/18/07, the psychiatrist wrote an order for the inmate to be transferred to an MHCB. The suicide report made reference to transfer of the inmate to a local hospital for two days, being prescribed Risperdal and Remeron, and being stabilized prior to being returned to prison. The suicide report indicated that the inmate returned to the OHU and had five-day follow-up, but no SRAC was completed. This reviewer's examination of the records indicated that an SRAC was completed on 11/21/07, as noted above. The discharge note from the OHU indicated that the inmate was admitted on 11/16/07 and discharged to his housing unit on 11/21/07. The five-day follow-up was noted to have been from 11/23/07 through 11/27/07 in housing unit 6A.

On 11/29/07, the inmate was seen by the IDTT, which noted that he was in the SHU for threatening staff and possession of a weapon. His Wellbutrin had been discontinued. His problem list included two items, the first being depression, with intervention by the clinician to be one-to-one, and the second problem being "no 115." It was noted that he was receiving Remeron and Effexor for depression and that there were no current risk factors or behavior alerts. His mental status was essentially within normal limits, except

for his being disheveled and having "some problem pacing" with regard to his concentration. His diagnoses were Depression NOS, Amphetamine Dependence, and ADHD; the stressors on Axis IV were noted as "incarceration." There was no reference to his family issues or recent OHU admission.

An RVR mental health evaluation with regard to the RVR for threatening a prospective cellmate was undated, but was noted as received on 11/29/07. It provided a history of the inmate's diagnoses and treatment, but stated the inmate declined to discuss the RVR and stated that "he didn't know about 115." A progress note dated 12/15/07 appeared to have been completed by a psychiatrist and described the inmate as being "referred by custody for covering up during count but verbal." The inmate was apparently seen in his cell and was visible and verbal. He stated, "I want to talk to my uncle" who was in the military. The psychiatrist noted that custody had reported that the inmate had not eaten his meal that day and threatened to not eat, drink, or take his medications. He was described as alert with good eye contact, uncooperative, belligerent, angry, and dysphoric. The inmate stated that he wanted to go on a hunger strike to get to talk to his uncle. He further reported that he was a "lifer" for killing a molester, and that he had been incarcerated for four to five years. The psychiatrist continued his diagnosis of Depressive Disorder, Major Depressive Disorder with Psychotic Features, and noted that this inmate was taking Remeron and Effexor. The psychiatrist also noted the inmate's history of suicide attempts, but added, "He has no other active plan/SI but hunger strike." The psychiatrist also diagnosed ADHD by history, with a plan to refer to the CCM in the morning, offered the inmate medications (which he refused), and noted "monitor hunger."

On 12/17/07, a brief mental health evaluation form was completed by the CCM who reported that the inmate had started a hunger strike on 12/15/07 and recounted the inmate's history. In addition, the CCM noted that the inmate stated, "I got word my family was killed in Viet Nam and while I was in Viet Nam I just lost it. I bombed the U.N., Oklahoma City, and New York. I gave Hitler cyanide pill." The CCM also noted delusions of terrorists going after his family, shaved eyebrows, and a statement by the inmate that he has asked his family to not write because he was paranoid. The inmate was also noted to have stated that he would take "any white cellie that's not a rat, child molester, or rapist." The CCM diagnosed Depressive Disorder NOS, Rule Out Medication Induced Psychosis/Intoxication. He also noted that the inmate stated that he had been saving up Effexor and has taken a lot of it lately. There was also a notation to see the SRAC dated 12/17/07. There was no plan indicated on the form for change in level of care, referral to MHSDS, placement in the OHU, or follow up. The SRAC referenced by the CCM indicated multiple static risk factors, slowly changing risk factors, and dynamic risk factors, including the inmate's impulsivity, agitation, and hoarding of medication. However, the clinician did not indicate that the inmate had had recent rejection or loss, recent suicidal ideation (acute or chronic), or disturbance of mood (depression or mania). The CCM determined "moderate" risk and referred the inmate to the psychiatrist.

A progress note by a psychiatrist on that same date repeated the inmate's statement that he had refused to eat for the last three days and went on to report that the inmate stated, "I

feel depressed off and on for the last ten years." He made reference to his family having been killed, not having received letters from his family during the preceding five years, and his history of 21 suicide attempts, including "stabbing self, hang self." The psychiatrist also wrote that this time, the inmate agreed to eat his food. He assessed the inmate as having Major Depressive Disorder with Psychotic Features, with a plan for Effexor, Remeron, and Risperdal and return to the clinic in seven days.

The inmate's contact with the psychiatrist on 12/17/07 was his last contact with any mental health staff prior to his committing suicide by hanging on 12/21/07.

The suicide report dated 8/13/08 identified nine problems and recommendations, as follows:

> Problem 1: According to the tracking system, the inmate was not seen by his CCM for five weeks, from 4/26/06 to 6/1/06, while at the administrative segregation 3CMS level of care.
> Recommendation: The chief of mental health at DVI shall conduct a fact-finding inquiry into this problem, identify the mental health staff involved, take the appropriate disciplinary action, and ensure that remedial training occurs.

> Problem 2: The MAR pharmacy print-out and progress note indicated that on 8/11/06, the psychiatrist prescribed Celexa and Benadryl, but no order was found in the UHR.
> Recommendation: The chief psychiatrist at DVI shall conduct a fact-finding inquiry, identify the individual and systems involved, take the appropriate disciplinary actions, and ensure that remedial training occurs.

> Problem 3: On 8/17/06, the inmate completed a request for a mental health interview due to "having problems with unprovoked hostility." Mental health staff logged this request on 8/28/06, but there was no progress note from a clinician indicating that the inmate was seen.
> Recommendation: On 10/30/07, DVI was requested to form a QIT to develop a system to track all referrals to mental health and to ensure appropriate follow-up. Supervisor shall audit the system for three continuous months.

> Problem 4: Mental health staff and KVSP discontinued the medical necessity status of the inmate on 9/19/06, prior to his discharge from the CTC. However, on 9/20/06, when the inmate returned to DVI, the psychologist who completed the CDC-128C mental health placement chrono indicated that the inmate was included for medical necessity, and the chrono was not signed by the chief psychiatrist or designee.
> Recommendation: The chief of mental health at DVI shall conduct a fact-finding inquiry, identify the staff members involved, take the appropriate disciplinary actions, and ensure that remedial training occurs.

Problem 5:  At the inmate's arrival on 12/1/06 at the SHU at CCI, it appeared that a mental health evaluation (CDCR-7386) and SRAC were not completed.
Recommendation:  The chief of mental health at CCI shall conduct a fact-finding inquiry into these problems, identify the mental health staff involved, take the appropriate disciplinary actions, and ensure that remedial training occurs.

Problem 6:  The mental health tracking system indicated that the inmate was not seen in January 2007 while housed in the SHU at CCI.
Recommendation:  The chief of mental health at CCI shall conduct a fact-finding inquiry into this problem, identify the mental health staff involved, take the appropriate disciplinary actions, and ensure that remedial training occurs.

Problem 7:  In November 2007 at CCI, the inmate was placed in the OHU.  An SRAC could not be found in the UHR at the end of the five-day follow-up when the inmate was released.
Recommendation:  The chief of mental health at CCI shall conduct a fact-finding inquiry into this problem, identify the mental health staff involved, take the appropriate disciplinary actions, and ensure that remedial training occurs.

Problem 8:  There was no documentation regarding consideration of a higher level of care when the inmate was demonstrating a worsening of symptoms prior to his suicide at CCI.
Recommendation:  The chief of mental health at CCI shall conduct a fact-finding inquiry into this problem, identify the mental health staff involved, take the appropriate disciplinary actions, and ensure that remedial training occurs.

Problem 9:  According to the record, the inmate stated that he had multiple admissions to psychiatric facility from 1996 until his arrest in 2003.  However, no records from these psychiatric facilities were found in the UHR.
Recommendation:  DCHCS shall provide training at the monthly video conference to all institutions regarding the need to request previous psychiatric records.

This reviewer was provided with a memorandum from the DCHCS senior psychologist dated 1/21/09 and entitled, "Final Report and Corrective Action Plans for Inmate (HH)." This memorandum was not signed by the directors of DCHCS or DAI.  It referenced a memorandum from DVI dated 9/16/08 and stated more specifically, as follows:

CAP 1:  The UHR and C-file are no longer available, but the CCM had dictated his contact notes.  Upon review of the electronic copy of those notes, it was found that there were indeed contacts during the specified time period that conformed to Program Guide requirements.

CAP 2:  The UHR and C-file are no longer available, but with implementation of the Maxor pharmacy management information system, errors such as this should be minimized.

258

CAP 3:  After a review of the inmate history, it was noted that the inmate was seen by his CCM on 8/26/06, one day after the referral.

Previously, a QIT was conducted on improving the timeliness of response time to inmate requests.  Performance in this area has improved greatly.  DVI has established a "strike team" to focus on quick response to referrals.  It is this team and the related operational procedure that are responsible for increased compliance with Program Guide requirements.

CAP 4:  The CCM is no longer at DVI and currently works for the Division of Juvenile Justice.  Policy at DVI is for all medical necessity chronos to be co-signed by the chief of mental health or designee.  Also, in terms of negative impact on the inmate's mental health and welfare, the MHCB had changed his level of care to "GP" and discontinued his medications.  Upon return to DVI, he was returned to the 3CMS level of care as medical necessity and put back on medications in order to stabilize him.

On 5/1/09, a memorandum from the chief psychologist (A), Clinical Policy and Program Development, Mental Health Program, was provided.  It stated that, with regard to this inmate's QIP, DVI had provided:

1.  A memorandum from the CMO and the warden documenting clinical contacts.  The memorandum stated that copies of the contacts were attached, but this reviewer did not receive them.

2.  Via the memorandum referenced in Number 1, the institution indicated that the UHR was not available, but that the Maxor pharmacy management information system "will minimize errors of this kind.  The DCHCS mental health program is in discussion with the institution to answer this QIP more fully."

3.  Via the memorandum referenced in Number 1, the chief of mental health certified that the inmate was seen within the referral timeframe.  "Documentation of a Quality Improvement Team Process is included."

4.  Via memorandum referenced in Number 1, "Documents completion of this QIP."

5-8.  CCI:  "Documentation of completion of these QIPs has not been received."

9.  The DCHCS mental health program suicide prevention video conference of August 2008 was referenced as completing this QIP, and the memorandum, slides and attendance sheets were available.

259

**<u>Findings</u>:**

This inmate's suicide appears to have been both foreseeable and preventable. The inmate had been demonstrating deterioration in functioning for the last several weeks of his life and had a long history of mental illness, suicide attempts, and suicidal ideation. In the few weeks before his death, he was non-compliant with medication, evaluated as having delusional thinking, suspected of hoarding medication and possibly taking it in excess, and he reported suicidal ideation as well as fears for the safety of his family. He was evaluated by a psychologist, who estimated that he was at moderate risk for suicide and referred him to a psychiatrist for consideration for medication adjustment and possible admission to an OHU. The psychiatrist saw him the same day, but did not appear to have included the inmate's history and the risk factors endorsed by the psychologist on the SRAC for that same day. The only change in the inmate's treatment was to adjust his medications, as he had been non-compliant, and follow up in seven days. There was no evidence that there was any consideration by this psychiatrist for a higher level of care such as an OHU or MHCB, and no reference to review of the inmate's prior placement in the OHU. This inmate's mental status was clearly deteriorating. He was non-compliant with treatment, threatening a hunger strike, and suspected of hoarding medications in the days to weeks prior to his death. The SRAC indicating moderate risk should have caused the inmate to be placed in a higher level of care and in a more clinically and custodially safe environment such as an OHU or MHCB.

# Appendix C

## <u>ACRONYMS and ABBREVIATIONS</u>

3CMS:                Correctional Clinical Case Manager System

ACH:                 Acute Care Hospital

ADD:                 Attention Deficit Disorder

ADHD:                Attention Deficit Hyperactivity Disorder

ADLs:                Activities of Daily Living

AED:                 Automatic Electronic Defibrillator

AHA:                 Assistant Hospital Administrator

Ambu bag:            Ambulatory Bag Used for CPR

APP:                 Acute Psychiatric Program at Vacaville

ASH:                 Atascadero State Hospital

ASMHS:               Administrative Segregation Mental Health Services

ASP:                 Avenal State Prison

ASU:                 Administrative Segregation Unit

BLS:                 Basic Life Support

BMU:                 Behavioral Modification Unit

BPT:                 Board of Prison Terms

C-file:              Central File

C & PP:              Clinical Policy and Programs

C&PR:                Classification and Parole Representative

CAL:                 Calipatria State Prison

CAP:                    Corrective Action Plan

CAT II:                 Category II

CC I:                   Correctional Counselor I

CC II:                  Correctional Counselor II

CCAT:                   Coordinated Clinical Assessment Team

CCC:                    California Correctional Center

CCF:                    Community Correctional Facility

CCI:                    California Correctional Institution

CCPOA:                  California Correctional Peace Officers Association

CCWF:                   Central California Women's Facility

CDC:                    California Department of Corrections

CDCR:                   California Department of Corrections and Rehabilitation

CEN:                    Centinela State Prison

CIM:                    California Institution for Men

CIW:                    California Institution for Women

CM:                     Case Manager

CMC:                    California Men's Colony

CMF:                    California Medical Facility

CMO:                    Chief Medical Officer

CO:                     Correctional Officer

CPER:                   Clinical Performance Enhancement and Review Subcommittee

CPR:                    Cardiopulmonary Resuscitation

CRC:                    California Rehabilitation Center

CSATF (II):          California Substance Abuse Treatment Facility (II)

CSH:                 Coalinga State Hospital

CSP:                 California State Prison

CSP/Corcoran:        California State Prison/Corcoran

CSP/LAC:             California State Prison/Los Angeles County

CSP/Sac:             California State Prison/Sacramento

CSP/Solano:          California State Prison/Solano

CTC:                 Correctional Treatment Center

CTF:                 California Training Facility/Soledad

CTQ:                 Confined To Quarters

CVSP:                Chuckawalla Valley State Prison

CYA:                 California Youth Authority

DA:                  District Attorney

DAI:                 Division of Adult Institutions

DCHCS:               Division of Correctional Health Care Services

DDP:                 Developmental Disabilities Program

DDPS:                Distributed Data Processing System

DHS:                 Department of Human Services

DMH:                 Department of Mental Health

DNC:                 Death Notification Coordinator

DNR:                 Do Not Resuscitate

DOF:                 Director of Finance

DON:                 Director of Nursing

DOT:                Directly Observed Therapy

DRC:                Death Review Committee

DRMC:               Delano Regional Medical Center

DSM:                Diagnostic and Statistical Manual

DTP:                Day Treatment Program

DVI:                Deuel Vocational Institute

EOP:                Enhanced Outpatient Program

EPPD:               Earliest Possible Parole Date

EPRD:               Earliest Possible Release Date

ERDR:               Emergency Response and Death Review Committee

ERRC:               Emergency Response Review Committee

ERV:                Emergency Response Vehicle

ETV:                Emergency Transport Vehicle

FIT:                Focus Improvement Team

Folsom:             Folsom State Prison

FPTTP:              Foreign Prisoner Transfer Treaty Program

GACH:               General Acute Care Hospital

GAF:                Global Assessment of Functioning

GP:                 General Population

HCCUP:              Health Care Cost and Utilization Program

HCM:                Health Care Manager

HCPU:               Health Care Placement Unit

HCQMC:              Health Care Quality Management Committee

| | |
|---|---|
| HDSP: | High Desert State Prison |
| HQ: | Headquarters |
| HRT: | Health Records Technician |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| ICP: | Intermediate Care Program |
| ICU: | Intensive Care Unit |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IMHIS: | Inmate Mental Health Information System |
| IMSP: | Inmate Medical System Policy |
| INS: | Immigration and Naturalization Service |
| IP: | Inmate Profile |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training *or* Incompetent to Stand Trial |
| ISU: | Investigative Services Unit |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LCSW: | Licensed Clinical Social Worker |
| LLE: | Language Learning Enterprises |
| LOC: | Level of Care |

| | |
|---|---|
| LOP: | Local Operating Procedure |
| LOU: | Locked Observation Unit |
| LPN: | Licensed Practical Nurse |
| LPT: | Licensed Psychiatric Technician |
| LSW: | Limited Suicide Watch |
| LVN: | Licensed Vocational Nurse |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDD: | Major Depressive Disorder |
| MHCB: | Mental Health Crisis Bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHP: | Mental Health Program |
| MHQMS: | Mental Health Quality Management System |
| MHS: | Mental Health Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| MHSPC: | Mental Health Suicide Prevention Coordinator |
| MHSR: | Mental Health Suicide Reviewer |
| MHTS: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MOU: | Memorandum of Understanding |
| MPIMS: | Madrid Patient Information Management System |
| MSF: | Minimal Support Facility |
| MTA: | Medical Technical Assistant |

NCF:                    Normal Cognitive Functioning

NKSP:                   North Kern State Prison

NOS:                    Not Otherwise Specified

NPPEC:                  Nursing Professional Practice Executive Committee

NVDRS:                  National Violent Death Reporting System

OHU:                    Outpatient Housing Unit

OIA:                    Office of Investigative Affairs

OJT:                    On the Job Training

OP:                     Operating Procedure

OT:                     Office Tech

PBSP:                   Pelican Bay State Prison

PC:                     Primary Clinician

PES:                    Psychiatric Evaluation Service

PHU:                    Protective Housing Unit

PIA:                    Prison Industry Authority

po:                     *per os* (by mouth)

POC:                    Parole Outpatient Clinic *or* Psychiatrist on Call

POD:                    Psychiatrist on Duty *or* Psychiatrist of the Day

PPE:                    Personal Protective Equipment

PPEC:                   Professional Practice Executive Committee

PPRC:                   Psychological Peer Review Committee

PSH:                    Patton State Hospital

PSU:                    Psychiatrist Services Unit

PSW:                Psychiatric Social Worker

PT:                 Psychiatric Technician

PTSD:               Post-Traumatic Stress Disorder

PVSP:               Pleasant Valley State Prison

QIP:                Quality Improvement Plan

QIT:                Quality Improvement Team

QMAT:               Quality Management Assessment Team

QMT:                Quality Management Team

QNC:                Quality Nurse Consultant

QVH:                Queen of the Valley Hospital

R&R:                Reception and Receiving

RC:                 Reception Center

RJD:                Richard J. Donovan Correctional Facility

RN:                 Registered Nurse

RT:                 Recreational Therapist

RVR:                Rule Violation Report

SAC:                California State Prison/Sacramento

SCC:                Sierra Conservation Center

SHU:                Segregated Housing Unit

SI:                 Suicidal Ideation

SMTA:               Senior Medical Technical Assistant

SMY:                Small Management Yard

SNF:                Skilled Nursing Facility

SNY:                    Sensitive Needs Yard

SOA&P:                  Subjective Objective Assessment and Plan

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SPU:                    Special Processing Unit

SQ:                     California State Prison/San Quentin

SRA:                    Suicide Risk Assessment

SRAC:                   Suicide Risk Assessment Checklist

SRC:                    Suicide Review Committee

SRN:                    Senior Registered Nurse

SVP:                    Sexually Violent Predator

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TCMP:                   Transitional Case Management Program

TLU:                    Transitional Living Unit

TPU:                    Transitional Program Unit *or* Temporary Protective Unit

TTA:                    Triage and Treatment Area

UCC:                    Unit Classification Committee

UCSF:                   University of California at San Francisco

UHR:                    Unit Health Records

UNA:                    Unidentified Needs Assessment

VSPW:                   Valley State Prison for Women

VPP:                    Vacaville Psychiatric Program

WHO:                    World Health Organization

WSP:                    Wasco State Prison

(revised 6/23/09)