# EXHIBIT A

**September 18, 2009 Plan for Prison Population Management
as Required by the August 4, 2009 Court Order**

### PURPOSE AND BACKGROUND

On August 4, 2009, this Court ordered the *Coleman v. Schwarzenegger* and *Plata v. Schwarzenegger* defendants (State Defendants) to "provide the court with a population reduction plan that will in no more than two years reduce the population of the CDCR's [California Department of Corrections and Rehabilitation's] adult institutions to 137.5% of their combined design capacity." Without waiving any appellate rights, State Defendants present this submission to the Three-Judge Court as required by the August 4, 2009 Order.

This "population reduction plan" (Plan) foremost represents the State's course of action to reform the State's prison policies and system. It also outlines the corresponding decrease in prison population that will occur as a result of the reforms identified in the plan. The following list of reforms, which are described in greater detail below, have either been implemented since the Three-Judge Court trial ended in December 2008, or will be implemented due to recent legislation that the Administration worked with the Legislature to obtain:

- **Implemented the Parole Violation Decision Making Instrument Statewide.** *Using scientific research to make evidenced-based decisions to send low risk offenders to appropriate programs and high risk offenders back to prison.*

- **Discharged Deported Parolees.** *Eliminated the wasteful and costly supervision for over 12,000 offenders who should be prosecuted by federal, not state, authorities if they illegally return.*

- **Parole Reform.** *New legislation aimed at reducing the churning and providing for better, targeted parole supervision of the State's most dangerous offenders.*

- **Enhanced Credit Earning.** *New legislation that encourages the completion of rehabilitative programs.*

- **Community Corrections.** *New legislation will provide fiscal incentives to keep low-level offenders local rather than returning them to prison.*

- **Parole Reentry Courts.** *New legislation that allows for intensive monitoring for parole violators in the community rather than returning them to prison.*

- **Increasing the Number of Inmates Housed Out-Of-State.** *Increasing the total number of inmates housed at out-of-state institutions, which currently stands at approximately 8,000.*

- **AB 900 Amendments.** *Recent legislation allows for funding and construction to start. Defendants prevailed in litigation that tried to stall construction*

- **Developed Bed Plan Which Will Increase Capacity to Address Crowding and Health Care Concerns.** *Includes new level IV infill, new healthcare infill, reception center beds, mental health beds, reentry facilities, and the conversion of Department of Juvenile Justice facilities.*

- **Expanding and Improving Clinical Care at Existing Prisons.** *Addressing health care capacity concerns including clinical and program space by allocating $500 million in AB 900 money.*

Since the time of this Court's tentative ruling and with even greater urgency since August 4, 2009, the State Defendants have studied a variety of measures that would reduce the prison population. The State Defendants believe that reducing the prison population to 137.5% within a two-year period cannot be accomplished without unacceptably compromising public safety. However, the Plan submitted here proposes mechanisms to safely reach a population level of 137.5% over time, and will achieve a more efficient capacity within 2-3 years than there is presently.[1]

The Plan has three parts: (1) the Plan describes recently obtained legislative authority and administrative changes designed to reduce the prison population; (2) the Plan describes the construction projects both underway and planned that will, upon completion, increase housing capacity and services to the severely mentally and/or medically ill populations housed in CDCR's instate adult institutions; and (3) the Plan addresses additional planned legislative reforms. CDCR estimates that when it implements the reforms for which it already has authority, the average daily prison population (ADP) at CDCR's adult instate institutions will be reduced by approximately 28,000 in three years. This reduction will result in an estimated population of approximately 155% at the existing 33 adult institutions. The State Defendants anticipate that in five years, the ADP will be reduced by approximately 34,000 resulting in an estimated population of approximately 147%. Moreover, if the Administration's planned legislative reforms are enacted, the crowding rate at the institutions would fall to 139% after three years, and 132% after five years.

Not only will the State lower its population through smart prison reforms and increase operational capacity through prison construction, the State is also committed to building beds specifically for the *Plata* and *Coleman* class members to accelerate the already dramatic improvements in the delivery of healthcare to CDCR's inmate-patients. In fact, over 5,800 beds

---

[1] That it is theoretically possible to reduce the prison population to 137.5% within two years says nothing about whether it would satisfy all of the PLRA's requirements to do so. For instance, a plan calling for the release of one in every four inmates at random or that inmates draw lots for their release would allow the 137.5% figure to be achieved within two years, if not instantaneously. But there is no doubt that such measures are not required by, much less would they satisfy, the PLRA because, among other reasons, they would provide no assurance of public safety. Thus, to submit a plan that would achieve the full population reduction within two years, without ensuring that the other requirements of the PLRA are satisfied, would be far less appropriate than the plan submitted here.

will be built with the specific and focused purpose of benefiting the class members of these cases. These beds are in addition to approximately 3,700 beds that will be constructed to meet general population needs at existing prisons, and 8,000 beds in reentry facilities throughout the state. Moreover, the general population and reentry beds will also have a full complement of healthcare space. Additionally, the State plans to spend roughly a half billion dollars in a healthcare improvement project at some of the existing institutions, which will accelerate the already dramatic improvements in healthcare delivery. Finally, these efforts will improve the operable capacity in CDCR's adult instate institutions which will, in turn, improve the rate of capacity in which CDCR can appropriately double cell inmates.

Lastly, this Plan represents current day projections. Future events and circumstances, including, but not limited to, further economic downturns, an increase in crime, voter-approved changes to the criminal justice system, and other unanticipated events, may require changes to this Plan.

## I.

## LEGISLATIVE AND ADMINISTRATIVE REFORMS

**A. PRE-CUSTODY REFORMS:** California Community Corrections Performance Incentives Act of 2009

California typically sends about 19,000 probation violators to prison each year, representing approximately 40% of all new prison admissions from the courts.[2] Unfortunately, California's prior funding model encouraged this high rate of probation failure. According to a recent report by the Legislative Analyst's Office, California's funding model provided "an unintended incentive for local agencies to revoke probation failures to state prison instead of utilizing alternative community-based sanctions."[3] That same report recommended that California instead establish a fiscal incentive program for probation success so that California could reduce the number of probationers entering the state prison system by rewarding those probation departments that demonstrate success.

The recent passage of Senate Bill 18 (SB 18)[4] creates exactly such a system of rewards for probation success. It establishes the California Community Corrections Performance Incentives Act of 2009. The community corrections program created by this act will authorize counties to receive funding for implementing and expanding evidence-based programs for felony probationers. Counties will be required to track specific probation outcomes and, depending on the success of those outcomes, may be eligible for "probation failure reduction incentive payments" or "high performance grants."

---

[2] "Achieving Better Outcomes For Adult Probation," Legislative Analyst's Office (May 29, 2009) at 20.
[3] *Id.* at 3.
[4] Sen. Bill No. 18 (2009 3d Ex. Sess.)

The new funding model created by SB 18 will provide sustainable funding for improved, evidence-based probation supervision practices. By incentivizing probation success, California will lower the number of probationers sent to prison each year.

State Defendants estimate this program will net an approximate 1,915 reduction in CDCR's ADP once fully implemented in or about Fiscal Year 2010-2011.

## B. IN-CUSTODY REFORMS:  Credit Earning Enhancements

The passage of SB 18 also provides a number of credit earning enhancements. First, it provides one day of sentence credit for every day served in county jail from the time of sentencing. Current law provides one day of credit for every two days served in county jail. Second, it provides eligible inmates up to six weeks of credit per year for completion of approved programs. This approach to incentivizing good behavior for program completions has been suggested by several experts including the Expert Panel Report. Third, it provides that all parole violators returned to custody who are otherwise eligible should receive one day of credit for each day served. Currently, only some violators receive such credit. Fourth, it provides two days of credit for every one day served once the inmate is endorsed to transfer to a fire camp, rather than providing such credit only after the inmate actually participates in the camp. Finally, it provides a consistent rule of one day of credit for every day served for all eligible inmates, whether those inmates are on a waiting list for a full-time assignment, participating in college, or undergoing reception center processing, so long as the inmate is discipline-free during that time. Current law provides a similar credit structure, but does so through the existence, for example, of a "bridging program," whereby inmates in reception centers sign up for self-study programs and receive credit. This legislation makes credit earning consistent while obviating the need for a bridging program.

State Defendants estimate this program will net an approximate 4,556 reduction in CDCR's ADP once fully implemented in or about Fiscal Year 2010-2011.

## C. PAROLE REFORMS

### 1. "Summary Parole"

The enactment of SB 18 creates a new program of "summary parole" whereby CDCR is prohibited from returning to prison, placing a parole hold, or reporting to the Board of Parole Hearings, any parolee who meets all of the following conditions: (1) is not a sex offender[5]; (2) has not been committed to prison for a sexually violent offense[6]; (3) has no prior conviction for a sexually violent offense; (4) has no instant or prior convictions that are violent[7] or serious[8]; (5)

---

[5] California Penal Code, § 290, et seq.  Subsequent references will be to the Penal Code unless otherwise noted.
[6] California Welfare and Institutions Code section 6600, subd. (b).
[7] § 667.5, subd. (c).

has not been found guilty of a serious disciplinary offense as defined by CDCR during his or her current term of imprisonment; (6) is not a validated prison gang member or associate, as defined in CDCR regulations; (7) has not refused to sign any written notification of parole requirements or conditions; and (8) has not been determined to pose a high risk to reoffend pursuant to a validated risk assessment tool.[9]  All other offenders will be subject to traditional parole supervision upon release from prison.

The State Defendants anticipate that "summary parole" will reduce CDCR's institutional population because, when fully implemented, CDCR will be precluded from revoking parole and returning approximately 35,000 parolees to prison for parole violations.

Defendants estimate this program will net an approximate 4,180 reduction in CDCR's ADP once fully implemented in or about Fiscal Year 2010-2011.

## 2. The Parole Violation Decision Making Instrument

SB 18 requires that CDCR employ a parole violation decision making instrument (PVDMI) to determine the most appropriate sanctions for parolees who violate conditions of parole.  The instrument standardizes departmental decision-making by properly accounting for both the severity of the parole violation and the offender's risk to reoffend as determined by a validated risk assessment tool.  This legislation comports with the recommendations of numerous expert reports, including the Rehabilitation Strike Team Report to the Governor, the California Expert Panel Report, and the Little Hoover Commission.

In fact, CDCR has already developed precisely such a tool and will have it fully deployed and in use throughout the State prior to the effective date of SB 18.  CDCR's PVDMI receives risk information from the California Static Risk Assessment (CSRA), a validated risk assessment tool developed by CDCR in conjunction with the University of California, Irvine, Center of Evidence-Based Corrections.  The CSRA predicts recidivism based on static demographic and criminal history information received from the California Department of Justice.  The use of the PVDMI allows CDCR to preserve correctional resources by maximizing the use of alternative parole violation sanctions while reserving incarceration for only the most dangerous parolees for whom the scientific research dictates such a result.  CDCR's pioneering work in both developing the CSRA and employing it as part of the CDCR's PVDMI has been recognized by the California Administrative Office of the Courts, which has asked CDCR to assist in the development of the Courts' own risk assessment tool.

---

[8] § 1192.7, subd. (c).
[9] CDCR intends to employ the California Static Risk Assessment tool, a validated tool that predicts an offender's risk to reoffend on the basis of static information received from CDCR and the California Department of Justice.

Although CDCR will not identify a population reduction associated with this reform at this time, the PVDMI is an effective tool in placing parolees in the right programs and returning the high risk parole violators to prisons thereby increasing public safety while decreasing recidivism.

### 3. Reentry Courts

SB 18 also authorizes CDCR to collaborate with the California Administrative Office of the Courts to establish and expand drug and mental health reentry courts for parolees. These reentry courts will provide an option for parolees with drug and mental health needs to receive highly structured treatment in the community, under the close supervision of their parole agent and the court, rather than being returned to prison for violations that may be related to those needs. The legislation provides that for participating parolees, the court, with the assistance of the parolee's parole agent, "shall have exclusive authority to determine the appropriate conditions of parole, order rehabilitation and treatment services to be provided, determine appropriate incentives, order appropriate sanctions, lift parole holds, and hear and determine appropriate responses to alleged violations." The court proceedings will feature a dedicated calendar, non-adversarial proceedings, and a highly structured approach featuring frequent drug and alcohol testing to ensure the best chance of parole success.

The implementation of the reentry courts should have a significant impact on reducing the number of mentally ill inmates in CDCR because it should reduce the number of parolees with mental illness returning to prison.

State Defendants estimate this program will reduce CDCR's ADP by approximately 435 inmates once fully implemented in or about Fiscal Year 2010-2011.

## D. ADMINISTRATIVE CHANGES

### 1. California's Out-of-State Correctional Facility Expansion

Defendants will expand the California Out-of-State Correctional Facility (COCF) program, which has as its primary purpose removing non-traditional beds and relieving crowding by transferring CDCR inmates to contracting out-of-state facilities. The COCF program has been in place since October 2006 and CDCR currently maintains approximately 8,000 inmates in out-of-state facilities. CDCR intends to expand the program to allow transfer of additional inmates out-of-state. CDCR maintains a robust quality assurance system over the program to ensure all inmates transferred out-of-state are able to obtain all appropriate services.

State Defendants estimate this program will net an additional approximate 1,250 reduction in CDCR's ADP in or about Fiscal Year 2009-2010, a 2,200 total reduction in CDCR's ADP in or about Fiscal Year 2010-2011, and a 2,500 total reduction in CDCR's ADP once fully implemented in or about Fiscal Year 2011-2012.

### 2. Community Correctional Facilities Utilization

State Defendants intend to better utilize existing private Community Correctional Facilities (CCFs) to assist in the reduction of the prison population. CDCR established thirteen CCFs throughout California to house low-level inmates. CCFs prepare these inmates for their return to the community on parole. Robust oversight of the CCFs is already in place. However, CCFs have been underutilized by CDCR in the past, primarily because appropriate male inmates are also eligible for other types of housing, including minimum security facilities and camps. Yet, there is an abundance of female inmates who are eligible for placement into these facilities. Recognizing this, CDCR intends to increase its use of CCFs by converting three CCFs to female facilities.

State Defendants estimate this program will net an approximate 800 inmate reduction in CDCR's ADP once fully implemented in or about Fiscal Year 2010-2011.

### 3. Commutations of Sentence

The Governor will review cases of certain deportable inmates under his discretionary constitutional clemency authority. A commutation of sentence would result in an inmate's early release from prison and deportation.

Defendants estimate this program will reduce CDCR's ADP by approximately 600 once fully implemented.

### 4. Discharge of Deported Parolees

Earlier this year CDCR implemented a new policy to discharge from parole the over 12,000 criminal aliens who have served their full state prison sentences and, upon release to parole, have been deported by the federal government. Previously, California had retained those criminal aliens on parole, even after their deportation. Under CDCR's new policy, those parolees have been discharged and additional parolees will be discharged from parole on an ongoing basis as CDCR receives confirmation of their deportation from the federal government. This new policy has resulted in fewer parolees being returned to state prison for parole violations and provides an incentive for federal prosecution of these offenders.

State Defendants estimate this policy will net an approximate 271 reduction in CDCR's ADP once fully implemented in or about Fiscal Year 2010-2011.

### 5. Alternative Sanctions for Violations of Parole

CDCR will make greater use of electronic monitoring systems such as global positioning systems (GPS), for parole violators in lieu of revocation and re-incarceration. The expanded use

of GPS and other electronic monitoring systems will permit CDCR to monitor those offenders outside of state prison for parole violations.

State Defendants estimate this program will net an approximate 119 reduction in CDCR's ADP in or about Fiscal Year 2009-2010, a 891 reduction in CDCR's ADP in or about Fiscal Year 2010-2011, and a 1,000 reduction in CDCR's ADP once fully implemented in or about Fiscal Year 2011-2012.

## II.

### INCREASED CAPACITY

Assembly Bill 900 (AB 900) was passed by a bipartisan Legislature and signed into law by Governor Schwarzenegger on May 3, 2007. AB 900 allocates $7.6 billion, of which $6.4 billion is designed to reform CDCR by reducing prison overcrowding, increasing rehabilitation programs, and providing more beds for all inmates, including those requiring medical and mental health care. AB 900's comprehensive plan immediately relieved overcrowding by providing for additional out-of-state transfers, which are authorized to continue until July 1, 2011. AB 900 also provides for new rehabilitation programs and re-entry facilities to ease parolees' transition back into California communities, thereby reducing recidivism, relieving prison overcrowding, and ensuring public safety.

### A.  INFILL PROJECTS

Construction projects will result in new annex housing units and renovation of existing facilities. These projects will add bed capacity as well as additional office and treatment space to relieve operational pressures throughout CDCR institutions.

Newly constructed facilities are planned in stand-alone units and will operate semi-autonomously from the main institutions, though some space and/or functions, such as administrative services, may be shared by the main institutions to ensure the newly constructed facilities are fully serviced. Each newly constructed facility will have appropriate programming space and staffing for the population to be served.

Renovated facilities primarily represent current or former juvenile correctional facilities that are being repurposed to serve an adult male population. All renovated facilities will also provide for the reduction of nontraditional beds, and will have the requisite amount of programming space and staff for their intended populations. A description of each project follows by phase of

funding as outlined in AB 900.[10]  There are a few projects that are not funded through the AB 900 appropriation and those projects are noted.

1. Kern Valley State Prison

This project will result in 930 new beds in a Level IV semi-autonomous facility at the existing Kern Valley State Prison site, with the addition of five housing units on 33 acres using the 270 design celled-bed prototype.  This construction will include space for rehabilitative programming (i.e., vocational, academic, substance abuse), work opportunities, and a health services building of approximately 22,000 square feet.  A portion of these beds will be wheelchair-compliant beds.

This project will be submitted to the Joint Legislative Budget Committee (JLBC) for its approval in Fall 2009 with a request for State Public Works Board (PWB) approval and interim financing from the Pooled Money Investment Board (PMIB) to immediately follow.  Necessary environmental impact review (EIR) documents are already underway.  If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2012-2013.

2. Heman G. Stark Conversion

This project renovates an existing 1,200-cell Department of Juvenile Justice facility in Chino.  It includes the installation of design elements necessary to house an adult male population (i.e., lethal electrified fence, guard towers, etc.), ADA improvements, expanded or new administrative support buildings, and a new health services building.  This plan provides for double-celling a portion of the facility and envisions approximately 1,800 beds.  If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, 700 beds should come on line in or about Fiscal Year 2009-2010, and 1,100 beds in or about Fiscal Year 2010-2011.

3. Reception Center – Southern California

This project will result in 943 new beds in a cell-design semi-autonomous facility with five housing units, including the support space necessary to house reception center inmates.  This project will also include a health services building to accommodate this population.  Its location will be at one of the Southern California prisons where CDCR's need for additional reception center beds is greatest.  A portion of these beds will be wheelchair-compliant beds.

The Reception Center Prototype initial planning is complete and siting options are underway.  If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in Fiscal Year 2012-2013.

---

[10] CDCR is currently pursuing legislation to redirect $1 billion from its infill funding appropriation under AB 900 to the healthcare funding appropriation.  The figures set forth in this Plan assume (and require) passage of that legislation and that the proposed consolidated care center facility will be funded with the $1 billion in funds redirected from the infill appropriation.

4.  <u>Department of Juvenile Justice  Conversion – Paso Robles</u>

This project renovates a former juvenile justice facility located in Paso Robles.  This facility currently includes both dorms and an existing 270-celled prototype. The intended capacity is approximately 899 beds which includes some double-celling of the population.  This is intended for a general population facility with a health-care mission and will serve elderly inmates with healthcare needs.  The scope of work would include a new lethal electrified fence to increase the security level of the facility from a Level 1 to a Level II, as well as building code updates, ADA improvements, and an expanded healthcare facility.  A portion of these beds will be wheelchair-compliant beds.

This project will be submitted to the JLBC in Fall 2009 for approval and will subsequently be submitted to the State PWB and the PMIB for approval and financing.  The EIR document is already underway.  If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in Fiscal Year 2011-2012.

5.  <u>Wasco State Prison – Level IV Celled Facility</u>

This project builds a 1,896 bed Level IV semi-autonomous celled facility based on CDCR's 180-design prototype.  This project includes eight housing units, support and programming space planned for available land located on the unused land at the existing prison in Wasco.  This project will also include a Correctional Treatment Clinic (CTC) to serve the population and a portion of the overall beds will be wheelchair-compliant.

This project is currently proposed for funding in Phase 2 of AB 900.  If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in Fiscal Year 2012-2013.

6.  <u>Department of Juvenile Justice Conversion – Northern California</u>

This project renovates a former juvenile justice facility located in Northern California at a site to be determined.  The intended capacity is approximately 1,133 beds which includes some double-celling of the population.  The facility is intended for a general population facility with a health care mission and will serve inmates with medical outpatient needs and inmates requiring Enhanced Outpatient Program mental health services.  CDCR is consulting with the *Plata* Receiver to identify an appropriate site and the appropriate scope for the project.

This project is currently proposed for funding in Phase 2 of AB 900.  If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in Fiscal Year 2013-2014.

**B.  HEALTHCARE PROJECTS**

The healthcare projects described below include renovation and expansion of existing facilities to add housing, office, and/or treatment space to further meet the healthcare needs of CDCR's adult inmates at its existing prisons.  Several of these projects are being constructed pursuant to specific court orders.  Also, many of these projects are being planned in consultation with the *Plata* Receiver.

1.  Northern Consolidated Care Facility

This project provides for a large healthcare facility serving a medical and mental health population to include specialized housing, treatment, and support space at a location in Northern California to be selected among several sites that have already been identified and for which environmental documents are underway.  This facility would provide approximately 1,702 new beds serving high acuity medical and mental health patients.   If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2011-2012.

2.  San Quentin State Prison – Correctional Treatment Center (Building 22)

This project is a renovation and replacement of the existing infirmary at San Quentin State Prison and will include a Correctional Treatment Center providing 41 medical and mental health beds.  Assuming no obstacles arise, anticipated completion is in or about January 2010.

3.  California Men's Colony – Mental Health Crisis Beds

This project builds a 50-bed mental health crisis facility on available land at the California Men's Colony in San Luis Obispo.  This project scope and schedule are being coordinated with the Special Master in the *Coleman* case.  Assuming no obstacles arise, anticipated completion is in or about October 2012.

4.  California State Prison, Lancaster – Enhanced Outpatient Program

This project builds additional treatment and office space to increase by 150 the number of Enhanced Outpatient Program mental health inmate patients served at California State Prison, Lancaster.  This project's scope and schedule are being coordinated with the Special Master in the *Coleman* case.  Assuming no obstacles arise, anticipated completion is in or about September 2012.

5.  California Medical Facility – Intermediate Care Facility

This project builds a 64-bed Intermediate Care Facility to serve mental health patients on the grounds of the California Medical Facility.   This project scope and schedule are being coordinated with the Special Master in the *Coleman* case.   Assuming no obstacles arise, anticipated completion is in or about November 2012.

6.  California Medical Facility – Enhanced Outpatient Program

This project builds office and treatment space to serve 658 Enhanced Outpatient Program mental health inmate patients on the grounds of the California Medical Facility. This project's scope and schedule are being coordinated with the Special Master in the *Coleman* case. Assuming no obstacles arise, anticipated completion is in or about April 2013.

7.  California State Prison, Sacramento – Enhanced Outpatient Program

This project builds office and treatment space to serve 192 Enhanced Outpatient Program mental health inmate patients on the grounds of California State Prison, Sacramento. This project scope and schedule are being coordinated with the Special Master in the *Coleman* case. This project is not funded through AB 900. Assuming no obstacles arise, anticipated completion is in or about November 2011.

8.  San Quentin State Prison – Condemned Inmate Complex Correctional Treatment Center

This project builds 1,152 beds in a new Condemned Inmate Complex on the grounds of San Quentin. This project will include a Correctional Treatment Center serving the medical and mental health needs of the inmate population. CDCR will submit this project for funding in Fall of 2009 and expects to award contracts and break ground in March 2010. This project is not funded through AB 900. Assuming no obstacles arise, anticipated completion is in or about Fiscal Year 2011-2012.

9.  Salinas Valley State Prison – Enhanced Outpatient Program

This project intends to add office and treatment space to serve 96 Enhanced Outpatient Program mental health inmate patients on the grounds of Salinas Valley State Prison. This project's scope and schedule are being coordinated with the Special Master in the *Coleman* case. This project is not funded through AB 900. Assuming no obstacles arise, anticipated completion is in or about April 2013.

10.  California Institute for Women – Psychiatric Services Unit

This project intends to renovate existing housing at the California Institute for Women in Chino to provide housing and treatment for a 20-bed Psychiatric Services Unit serving the mentally ill offender population. This project scope and schedule are being coordinated with the Special Master in the *Coleman* case. This project is not funded through AB 900. Assuming no obstacles arise, anticipated completion is in or about February 2011.

11.  California State Prison, Sacramento – Psychiatric Services Unit

This project provides office and treatment space to serve 152 Psychiatric Services Unit mental health inmate patients on the grounds of the California State Prison, Sacramento. This project scope and schedule are part of the construction projects proposed in the *Coleman* case.

12.  Salinas Valley State Prison – Enhanced Outpatient Program Administrative Segregation Unit

This project was originally planned to add both housing and treatment space to serve approximately 72 Enhanced Outpatient Program mental health inmate patients in the administrative segregation unit at Salinas Valley State Prison.  The scope of the project as developed by CDCR has been denied by the Joint Legislative Budget Committee, which directed CDCR to develop an alternative that would provide only office and treatment space for that population.  CDCR is currently exploring alternate options to comport with this direction. CDCR will seek relief from the *Coleman* court to modify the project as appropriate.

13. California State Prison, Corcoran – Enhanced Outpatient Program

This project will add office and treatment space to serve an additional 45 Enhanced Outpatient Program mental health inmate patients on the grounds of California State Prison, Corcoran.  This project's scope and schedule are being coordinated with the Special Master in the *Coleman* case.

14. Southern California Crisis Beds

This project will site a new 50-bed crisis facility at either the Heman Stark facility in Chino or another Southern California prison.  These beds were to be located initially at the Consolidated Care Facility.  However, given the need to add additional crisis beds in Southern California, this project is now a stand-alone unit.  State Defendants intend to consult with the Special Master in the *Coleman* case.  If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2012-2013.

15. California Institute for Women – 45 Bed Intermediate Care Facility

This project will build a new 45-bed intermediate care facility at the California Institute for Women to serve the mental health population for female adults in the custody of CDCR. Preliminary plans are complete with this project and it is currently in the working drawings phase, with construction to be funded by AB 900 funds.  This project's scope and schedule are being coordinated with the Special Master in the *Coleman* case.  State Defendants are currently evaluating their long-term need for this project.

## C.    REENTRY PROJECTS

Pursuant to AB 900, reentry projects provide for the design and operation of secure community reentry facilities located in communities throughout the state.  These facilities will hold a maximum of 500 inmates who are within 6-12 months of being released.  These facilities will be autonomous facilities and have been designed to facilitate an intensive rehabilitative programming environment and include healthcare treatment space for the population to be served.

To date, eleven counties have agreed to locate a reentry facility to serve their population.  The first reentry facilities are being planned in the counties of Kern, Madera, San Joaquin (to also serve Amador and Calaveras), San Luis Obispo (to also serve Santa Barbara and San Benito), and San Bernardino.  A reentry facility planned for San Diego is currently being sited.  Additional counties have expressed interest in supporting reentry facilities in their communities.

Assuming no obstacles arise, Defendants estimate this program will build approximately 500 beds in or about Fiscal Year 2010-2011, 2,500 additional beds in or about Fiscal Year 2012-2013, 2,500 additional beds in or about Fiscal Year 2013-2014, and 2,500 additional beds in or about Fiscal Year 2014-2015.

**California Department of Corrections and Rehabilitation**

**Population Management Plan: Table I**

| Fiscal Year | FY 08/09 | FY 09/10 | FY 10/11 | FY 11/12 | FY 12/13 | FY 13/14 | FY 14/15 |
|---|---|---|---|---|---|---|---|
| **Spring Population Projections**[1] | **167,985** | **172,232** | **172,205** | **174,003** | **175,177** | **177,317** | **178,915** |

| Institution Population Reduction Measures | | FY 08/09 | FY 09/10 | FY 10/11 | FY 11/12 | FY 12/13 | FY 13/14 | FY 14/15 |
|---|---|---|---|---|---|---|---|---|
| | **Probation Reform** | | | | | | | |
| | Community Corrections | | 479 | 1,915 | 1,915 | 1,915 | 1,915 | 1,915 |
| | **Sentencing Reform** | | | | | | | |
| | Enhanced Credit Earning | | 660 | 4,180 | 4,180 | 4,180 | 4,180 | 4,180 |
| | **Executive Authority** | | | | | | | |
| | Expansion of Out-Of-State Placements[2] | | 1,250 | 2,200 | 2,500 | 2,500 | 2,500 | 2,500 |
| | Expanded Utilization of Private Prisons | | 400 | 800 | 800 | 800 | 800 | 800 |
| | ICE Commutations | | 300 | 600 | 600 | 600 | 600 | 600 |
| | **Parole Reform** | | | | | | | |
| | Summary Parole | | 966 | 4,556 | 4,556 | 4,556 | 4,556 | 4,556 |
| | Discharge of Deported Parolees | | 279 | 271 | 271 | 271 | 271 | 271 |
| | Alternative Parole Sanctions | | 119 | 891 | 1,000 | 1,000 | 1,000 | 1,000 |
| | Parole Reentry Courts | | 50 | 435 | 435 | 435 | 435 | 435 |
| | **New Construction**[3] | | | | | | | |
| | DJJ Renovations | | 700 | 1,800 | 2,700 | 2,700 | 3,800 | 3,800 |
| | Reentry | | | 500 | 500 | 3,000 | 5,500 | 8,000 |
| | Infill | | 64 | 64 | 704 | 6,850 | 6,850 | 6,850 |
| **Total Population Reduction** | | | **5,267** | **18,212** | **20,161** | **28,807** | **32,407** | **34,907** |

| | FY 08/09 | FY 09/10 | FY 10/11 | FY 11/12 | FY 12/13 | FY 13/14 | FY 14/15 |
|---|---|---|---|---|---|---|---|
| **Institution Population**[4] | **150,655** | **149,635** | **132,416** | **132,292** | **123,022** | **120,388** | **117,346** |
| **Institution Crowding Rate** | **189%** | **188%** | **166%** | **166%** | **155%** | **151%** | **147%** |

The population in FY 08/09 is based on the actual population count on July 1, 2009.  The projections in FY 09/10 and thereafter assume the transfer of any backlogged inmates into state custody.

[2] Assumes cooperation from *Plata*, *Coleman*, *Perez*, and *Armstrong* courts.

[3] The beds identified on this table reflect the actual capacity for which they are being built.  The double celling rate of these facilities vary by project.  However, whatever the double celling rate, the beds or projects are being designed with an appropriate amount of program and clinical space to accommodate that number of inmates.

[4] Excludes inmates in camps, private facilities and out-of-state facilities.

# III.

## ADDITIONAL LEGISLATIVE REFORMS

This Administration has demonstrated its willingness to reform the State's prisons, and the Administration will continue to push for meaningful reforms like the reforms adopted in SB 18. The following reforms, however, cannot be accomplished administratively, and they will require legislative changes.[11]

## A.    ADDITIONAL CALIFORNIA OUT-OF-STATE CORRECTIONAL FACILITY EXPANSION

In addition to the 2,500 bed expansion set forth above, State Defendants will work with the Legislature to remove the existing clause that calls for the termination of the COCF program in 2011.  With this legislative change, State Defendants estimate they will be able to expand the COCF program by an additional 5,000 inmates reducing its ADP by that amount.

## B.    PROPERTY CRIME THRESHOLDS

Numerous property crimes in California are punishable alternatively as a misdemeanor or a felony, depending on the dollar amount of the taking.  For example, grand theft is punishable as a felony when the amount stolen exceeds $400, but is punishable as a misdemeanor when the amount stolen is $400 or less.  In most cases, the threshold for these wobblers (crimes that may be prosecuted as either misdemeanors or felonies) was established over 20 years ago.  As time has passed and inflation risen, increasing numbers of these wobblers have become prosecutable as felonies, thereby resulting in greater numbers of offenders eligible for prison sentences rather than jail sentences.

For thirty-nine of these property crimes, SB 18 increased the dollar threshold to present-day values.  For example, property crimes where the threshold was set at $400 were increased to $950.  The aim was to expose lesser number of offenders to felony prosecution and prison terms and thereby reduce the prison population.  However, Senate Bill 18 left the threshold for grand

---

[11] The Court's August 4, 2009 order stated, "[s]hould any of defendants' proposed population reduction measures require the waiver of any provisions of state law, the state shall so advise the court, and shall explain why the requested waiver is permissible under 18 U.S.C. § 3626(a)(1)(b)."  This Court did not permit Defendants to introduce evidence regarding whether there are any current and ongoing violations of federal rights.  Plaintiffs were also not required to prove, nor did they prove, that there are any current and ongoing violations.  Thus, the State Defendants do not assert that state law waivers are permissible here, because State Defendants believe that the statutory requirements authorizing such waivers have not been satisfied.  Furthermore, because the recent improvements to healthcare and the plans set forth throughout this submission provide a form of relief correcting alleged federal violations, the State Defendants do not seek the waiver of any State law under the PLRA (*see* 18 U.S.C. s 3626(a)(1)(B)(ii)-(iii)).

theft itself unchanged, an omission that does not capture the impact of that offense, and also undermines the effect of having changed many other property crimes because they could alternatively be charged as grand theft. The State Defendants seek legislation to increase the threshold of grand theft to $950. If fully implemented, Defendants estimate this program will net an approximately 2,700 reduction in CDCR's ADP.

## C. ALTERNATIVE CUSTODY PROGRAM

The Administration will seek legislation to establish a program of alternative custody options for lower-risk offenders. Certain offenders would be eligible to serve the last 12 months of their sentence under house arrest with GPS monitoring. House arrest may include placement in a residence, local program, hospital, or treatment center. Eligible inmates include inmates with 12 months or less remaining to serve, elderly inmates, and medically infirm inmates. Inmates are ineligible for alternative custody if they have a current or prior conviction for a violent offense, are required to register as a sex offender, have a history of escape, or pose a high risk to reoffend pursuant to the California Static Risk Assessment. If fully implemented, Defendants estimate this program will net an approximately 4,800 reduction in CDCR's ADP.

## D. SENTENCING COMMISSION

The Administration will seek legislation creating a permanent, independent sentencing commission that would set sentencing guidelines each year. The guidelines would later go into effect unless rejected by the Legislature and the Governor. The Commission would be a regulatory and research body housed within the Administrative Office of the Courts that would review the entire California Code in light of empirical statewide sentencing data, recidivism rates, risk assessments, and population projections, to accurately forecast public safety impacts and correctional costs for all sentencing proposals. The commission would create coherent and equitable sentence guidelines that rest explicitly on the goal of coordinating sentences with available correctional resources. Many states have sentencing commissions and most experts recommend establishment of sentencing commissions.

Under the Administration's proposal, a sentencing commission would consist of thirteen voting members, subject to staggered 3-year terms, including a balance of law enforcement officials, judges, researchers, and defense lawyers. The Commission would present the Legislature and the Governor with a set of sentencing and parole rules, along with recommended statutory changes, by 2013. The Commission would thereafter publish reports on its sentencing research. In the event any court orders a reduction in inmate population, the Commission would develop recommendations for court compliance.

## E. AB 900 CONSTRUCTION ACCELERATION

CDCR has collaborated with the *Plata* Receiver in his part as construction coordinator to develop CDCR's plan for healthcare beds, and has drafted legislation to enable CDCR to accelerate all of its construction authorized under AB 900 using alternative delivery methods. If the Legislature authorizes these amendments, CDCR would be able to expedite the construction of new capacity, including new healthcare facilities, and the construction of treatment and other support spaces to meet the needs of the class members.

| Fiscal Year | FY 08/09 | FY 09/10 | FY 10/11 | FY 11/12 | FY 12/13 | FY 13/14 | FY 14/15 |
|---|---|---|---|---|---|---|---|
| **Spring Population Projections[1]** | 167,985 | 172,232 | 172,205 | 174,003 | 175,177 | 177,317 | 178,915 |
| **Institution Population Reduction Measures** | | | | | | | |
| **Probation Reform** | | | | | | | |
| Community Corrections | | 479 | 1,915 | 1,915 | 1,915 | 1,915 | 1,915 |
| **Sentencing Reform** | | | | | | | |
| Enhanced Credit Earning | | 660 | 4,180 | 4,180 | 4,180 | 4,180 | 4,180 |
| Property Crime Thresholds | | | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| Alternative Custody | | | 2,400 | 4,800 | 4,800 | 4,800 | 4,800 |
| **Executive Authority** | | | | | | | |
| Expansion of Out-Of-State Placements[2] | | 1,250 | 2,200 | 7,500 | 7,500 | 7,500 | 7,500 |
| Expanded Utilization of Private Prisons | | 400 | 800 | 800 | 800 | 800 | 800 |
| ICE Commutations | | 300 | 600 | 600 | 600 | 600 | 600 |
| **Parole Reform** | | | | | | | |
| Summary Parole | | 966 | 4,556 | 4,556 | 4,556 | 4,556 | 4,556 |
| Discharge of Deported Parolees | | 279 | 271 | 271 | 271 | 271 | 271 |
| Alternative Parole Sanctions | | 119 | 891 | 1,000 | 1,000 | 1,000 | 1,000 |
| Parole Reentry Courts | | 50 | 435 | 435 | 435 | 435 | 435 |
| **New Construction[3]** | | | | | | | |
| DJJ Renovations | | 700 | 1,800 | 2,700 | 2,700 | 3,800 | 3,800 |
| Reentry | | | 500 | 500 | 3,000 | 5,500 | 8,000 |
| Infill | | 64 | 64 | 704 | 6,850 | 6,850 | 6,850 |
| **Total Population Reduction** | | 5,267 | 23,312 | 32,661 | 41,307 | 44,907 | 47,407 |
| **Institution Population[4]** | 150,655 | 149,635 | 127,316 | 119,792 | 110,522 | 107,888 | 104,846 |
| **Institution Crowding Rate** | 189% | 188% | 160% | 151% | 139% | 136% | 132% |

[1] The population in FY 08/09 is based on the actual population count on July 1, 2009. The projections in FY 09/10 and thereafter assume the transfer of any backlogged inmates into state custody.

[2] Assumes cooperation from *Plata*, *Coleman*, *Perez*, and *Armstrong* courts.

[3] The beds identified on this table reflect the actual capacity for which they are being built. The double celling rate of these facilities vary by project. However, whatever the double celling rate, the beds or projects are being designed with an appropriate amount of program and clinical space to accommodate that number of inmates.

[4] Excludes inmates in camps, private facilities and out-of-state facilities.

## IV.

## CONCLUSION

As required by the August 4, 2009 order, but without waiving its appellate rights, the State Defendants submit this Plan to reduce the State's prison population through smart reforms that do not compromise public safety.