1   EDMUND G. BROWN JR.
    Attorney General of California
2   JONATHAN L. WOLFF
    Senior Assistant Attorney General
3   DEBBIE J. VOROUS, State Bar No. 166884
    JEFFREY STEELE, State Bar No. 124668
4   Deputy Attorneys General
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 324-5345
     Fax: (916) 324-5205
7    E-mail: Debbie.Vorous@doj.ca.gov

8   Attorneys for Defendants

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11                  SACRAMENTO DIVISION

12

| | |
|---|---|
| 13  **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM P |
| 14                    Plaintiffs, | **DEFENDANTS' STAFFING** |
| 15          **v.** | **PLAN** |
| 16  **ARNOLD SCHWARZENEGGER, et al.,** | |
| 17                    Defendants. | |
| 18 | |

19

20      On June 18, 2009, this Court ordered that Defendants complete a staffing plan by the end of

21  August 2009, and that they develop the plan under the guidance of the *Coleman* Special Master.

22  (Docket No. 3613, ¶ 3.d.)  Defendants requested an extension of time to complete the staffing

23  plan.  (Docket No. 3651.)   This Court ordered that Defendants' staffing plan be filed and served

24  / / /

25  / / /

26  / / /

27

28

1

Defs.' Staffing Allocation Plan  (2:90-cv-00520 LKK JFM P)

1     on or before September 30, 2009.  (Docket No. 3665.)  Enclosed as Attachment A, with Exhibits

2     1 through 29, is Defendants' Staffing Allocation Plan.

3     Dated:  September 30, 2009

                                        Respectfully submitted,

4                                     EDMUND G. BROWN JR.
                                    Attorney General of California

5                                     JONATHAN L. WOLFF
                                    Senior Assistant Attorney General

6

7                                     /s/ *Debbie J. Vorous*

8                                     DEBBIE J. VOROUS
                                    Deputy Attorney General
                                    *Attorneys for Defendants*

9     CF1997CS0003

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Staffing Allocation Plan  (2:90-cv-00520 LKK JFM P)

# ATTACHMENT A

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Benjamin T. Rice
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



September 30, 2009

Ms. Debbie Vorous
Deputy Attorney General
Department of Justice
1300 I Street
Sacramento, CA  94244-2550

Dear Ms. Vorous:

Attached please find Defendants' "Staffing Allocation Plan" for submittal today in the case of *Coleman v. Schwarzenegger*.

Sincerely,

BENJAMIN T. RICE
General Counsel, Office of Legal Affairs
California Department of Corrections and Rehabilitation

Enclosures

TABLE 1. GLOSSARY OF TERMS

| Acronym | Term |
|---|---|
| AGPA | Associate Governmental Program Analyst |
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CHSA | Correctional Health Services Administrator |
| CIM | California Institution for Men |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CPHCS | California Prison Health Care Services |
| DAI | Division of Adult Institutions |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| EOP | Enhanced Outpatient Program |
| FTE | Full Time Equivalent |
| GP | General Population |
| HPS | Health Program Specialist |
| HRT | Health Records Technician |
| ICC | Institutional Classification Committee |
| IDTT | Interdisciplinary Treatment Team |
| IEX | Indecent Exposure |
| LCSW | Licensed Clinical Social Worker |
| LOP | Local Operating Procedures |
| LPT | Licensed Psychiatric Technician |
| MDO | Mentally Disordered Offender |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| OA | Office Assistant |
| OT | Office Technician |
| PBSP | Pelican Bay State Prison |
| PC | Primary Clinician |
| PSU | Psychiatric Services Unit |
| RC | Reception Center |
| Receiver | *Plata* Federal Receiver |
| RN | Registered Nurse |
| RT | Recreational Therapist |
| RVR | Rules Violation Report |
| SAC | California State Prison, Sacramento |
| SAM | Staffing Allocation Model |
| SATF | Substance Abuse Treatment Facility |

| SHU  | Security Housing Unit                 |
|------|---------------------------------------|
| SNY  | Sensitive Needs Yard                  |
| SPC  | Suicide Prevention Coordinator        |
| SPSW | Supervising Psychiatric Social Worker |
| SSA  | Staff Service Analyst                 |
| UHR  | Unit Health Record                    |

FOR SUBMITTAL TO THE *COLEMAN* COURT

*Staffing Allocation Plan*

---

On May 26, 2009, Defendants submitted a bed plan that set forth short-term, intermediate-term, and long-range projects to meet the bed needs of the *Coleman* class members. With respect to the short-term and intermediate-term projects, the California Department of Corrections and Rehabilitation (CDCR) informed the Court that some of their proposals would require hiring additional mental health, nursing, custody, and support staff to implement the projects. In response, counsel for the *Coleman* class members alleged that CDCR did not identify specific funding sources that it would use to fund the "proper" staffing levels for these projects. Defendants replied and informed the Court that implementation of these projects would not drive a need for additional position authority or funding. On June 18, 2009, the Court ordered that Defendants continue to take all steps necessary to resolve all outstanding staffing allocation issues, complete a staffing plan by the end of August 2009, and develop the plan under the guidance of the Special Master. On September 4, 2009, the Court extended the time to complete the plan to September 30, 2009, and ordered that it include a description of the funding source(s) for the staffing needs identified in the plan. The Court also ordered Defendants to file their completed plan with the Court.

This Staffing Allocation Plan (the Plan or Defendants' Plan), along with the attached clinical and support staff spreadsheets and the custody and correctional counseling staff narrative for the short-term and intermediate-term projects, respond to the Court's June 18, 2009 and September 4, 2009 Orders. Defendants' Plan, however, goes beyond these Orders; that is, it includes clinical staffing proposals for each of CDCR's mental health programs and administrative functions, not just *Coleman* programs or those related to the short-term and intermediate-term projects. Defendants have also identified the process for funding the entire Plan.[1]

This comprehensive plan makes several incremental changes to existing staffing plans. Thus, Defendants may need to alter the Plan as data on the Plan's effectiveness is obtained. Although the Defendants diligently prepared this Plan, and it represents a comprehensive, optimal staffing model with regard to CDCR's mental health program needs, the Plan will be reexamined, and possibly revised, once it is implemented.

The Plan is divided into four parts. First, there is an overview of the attached clinical and support staff spreadsheets. Second, the Plan describes the justifications for the clinical and

---

[1] Defendants do not concede that all of the programs and/or staffing identified in the Plan are required by the *Coleman* Court. Additionally, Defendants do not concede that the proposed staffing and services are constitutionally required, nor do they believe that this Plan would satisfy the Prison Litigation Reform Act's requirements that prospective relief be narrowly drawn, extend no further than necessary to correct the alleged violation of the federal right, and be the least intrusive means necessary to correct the alleged violation. Further, by creating this Plan, the Defendants make no representations that the State Legislature will fund any portion of the Plan, or that CDCR will be able to recruit and retain staff to meet the Plan's goals. Recruitment and retention are significant issues for the entire healthcare industry, and CDCR is not immune from that reality. Finally, even assuming appropriate funding, this Plan will need to be implemented over time, as some of the positions discussed in the Plan relate to beds and/or facilities that are not yet operational.

---

support staff identified in the spreadsheets for each mental health program area. Third, the Plan discusses custody and correctional counseling ratios for the short-term and intermediate-term projects identified in Defendants' May 26, 2009 bed plan. Last, the Plan discusses the funding aspects of the Plan.

# I.

## OVERVIEW OF CLINICAL AND SUPPORT STAFF SPREADSHEETS

Attached as Exhibits 1 to 6 and 11 to 29 are spreadsheets for the Plan that relate to CDCR staffing for mental health programs in the institutions (rather than regional and headquarter staffing). Exhibits 1 to 6 address functions that do not pertain to *Coleman,* and are provided in Defendants' efforts to provide the Court with their current Plan.[2] In addition, Defendants do not discuss at length all the positions for which the *Plata* Receiver provides services, e.g., Health Records Technicians, Nursing, and Licensed Psychiatric Technicians (LPT).[3] This staff is under the control and supervision of the *Plata* Receiver's office, and not the Defendants. Thus, staffing ratios for these positions are reflected in the spreadsheet entitled "Receiver's Office Positions." (*See* Exhibit 7.)[4]

The spreadsheets were developed using a collaborative process that engaged key leadership and staff from CDCR, including the Mental Health Chiefs from all 33 CDCR institutions, and the Department of Finance (DOF).[5] In order to develop the ratios, several work groups, one for each program area, were created. These work groups consisted of Chief Psychologists, Chief Psychiatrists, Senior Psychologist Supervisors, Supervising Psychiatric Social Workers, and Correctional Hospital Services Administrators from the institutions as well as headquarters staff. Each work group reported their recommendations to the Mental Health Chiefs, who reached consensus on the final recommended ratios. These work groups compared CDCR's existing staffing against a broad range of correctional mental health programs. Specifically, they reviewed data from the following sources:

- Staffing data from New York, Ohio, Michigan, New Jersey, and Alabama. The different states used for comparison were analyzed and the programs similar to those offered in CDCR were used for comparison. The staffing patterns for each respective program (e.g., MHCB, EOP, CCCMS) were placed in a grid for side by side comparison (see

---

[2] *See* Exhibits 1 to 6, 3002 Evaluations, Valdivia Evaluations, Z Case Evaluations, Clark Evaluations, Clark Program, and Mentally Disordered Offender Evaluations.
[3] The Receiver has assumed supervisory authority for all nursing and LPT positions. However, CDCR and the Receiver's office continue to discuss fiscal and supervisory authority over these positions. Nonetheless, CDCR's Division of Correctional Health Care Services (DCHCS) and the Receiver's office work collaboratively to provide appropriate care to Mental Health Services Delivery System (MHSDS) inmate-patients. As the State continues to pursue litigation to terminate the receivership and the Receiver's unilateral construction planning, the Defendants will continue to cooperate with the Receiver's office in good faith, as ordered by the district court in *Plata v. Schwarzenegger.*
[4] This spreadsheet does not include the ratios for support positions identified for the MHCB Stand Alone Facilities. (*See* Exhibit 20.)
[5] The nursing ratios found in the Receiver's Office Positions' spreadsheet were discussed with nursing leadership from the *Plata* Receiver's office.

---

Exhibit # 8, Other States).  In some cases, there were states that did not offer the level or type of service used in CDCR, and those areas were left blank.

- The Staffing Allocation Model established by Business Advantage Consulting as part of its June 2007 Mental Health Staffing Workload Study.

- MHSDS data collected and analyzed at the institutional as well as headquarters level on an ongoing basis to monitor compliance and to address quality improvement.

In addition, leadership and staff took into account the following:

- Current staffing at Pelican Bay State Prison (PBSP) Psychiatric Services Unit (PSU).

- California Code of Regulations, Title 22, §§ 79739-79761.

- MHSDS Program Guide (2009 Revision) (the Program Guide.)

The spreadsheets include, among other information, a proposed ratio by job classification.  In addition, they include relief factors to the extent applicable to the program area and classification.  Relief factors include holidays, sick leave, vacation, and training.  They vary depending on the type of classification and coverage provided.  The typical relief factor for five day a week clinical staff and operations staff that support clinical functions is ~1.211; the relief factor for seven day a week clinical staff and operations staff that directly support clinical functions is ~1.695.  These factors are averages as relief factors vary by classification (refer to spreadsheets).[6]

Exhibit #9 (Roll-up by Classification) shows the total proposed number of staff by classification, including relief factors.  This Exhibit does not include positions for nursing and LPTs.

Exhibit #10 (Time Estimates for Primary Functions) summarizes staffing ratios by  mental health programs (CCCMS, EOP, MHCB, MH-OHU, Non-Mental Health ASU) and by area (GP, RC, ASU, SHU, PSU), for psychiatrists, psychologists and social workers.  This exhibit contains estimated values reflecting the amount of time spent per Full Time Equivalent (FTE) for primary functions for each classification.  The hours reflected are statewide averages based on the experience of Chief Psychiatrists and Chiefs of Mental Health and supervising staff that perform these functions.

## II.

## STAFFING JUSTIFICATION FOR MENTAL HEALTH PROGRAM AREAS

In the following sections, Defendants provide justifications for the proposed staffing for each of CDCR's mental health program areas.  Before describing the programs and corresponding justifications, however, Defendants address three issues that require further explanation; that is, Women's Institutions, Nursing Services, and Licensed Psychiatric Technicians.  The nursing and

---

[6]  When pursuing budget allocations for these positions, a different formulation may be utilized that will result in similar staffing and coverage.  Budgeting generally adds position authority and does not reference that as "coverage."  Both methods, however, would provide the same level of mental health care to the inmates.

LPT discussion is provided in this section as it applies across program areas that utilize nursing services.

**Women's Institutions, Nursing Services, and Licensed Psychiatric Technicians:**

**Women's Institutions**

Research from the National Commission of Correctional Health Care indicates that incarcerated women utilize health care services at significantly greater rates than men. Incarcerated women have higher rates of depression than incarcerated men or the general community (Gunter, 2004). They also have experienced higher rates of sexual and physical abuse than the general community. For instance, it has been estimated that as many as 57 percent of female inmates have been physically or sexually abused, which in turn leads to possible psychological problems such as depressive disorders, stress disorders, and anxiety disorders. Women also have greater incidence of co-occurring diagnoses related to substance abuse.

Likewise, the National Institute of Corrections study involving 50 correctional departments across the United States, including the Federal Bureau of Prisons, found that demand for mental health services was greater for female inmates. This finding was based on data reflecting that women on average utilize mental health services at least 25 percent more often than their male counterparts.

Similar CDCR findings are illustrated in comparing female to male institutions with a general population CCCMS program, with the breakdown as follows:

- California Institution for Women-CCCMS mainline staff and self referrals total for the month of June, 2009: 462 (Population around 500)
- California Rehabilitation Center-CCCMS mainline staff and self referrals total for the month of June, 2009: 286 (Population around 1,000)

Referrals for the female population were in excess of 50 percent higher than the male population over the same time period. Numbers from Valley State Prison for Women and Central California Women's Facility are consistent with this trend. Consistent with these findings, and with past staffing patterns for CDCR women's facilities, is the fact that the staffing ratios for women are 20 percent higher than staffing ratios for services to men.

**Nursing Services**

As previously noted, nursing staff is under the control and supervision of the *Plata* Receiver's office, and not the Defendants. The nursing staff ratios are contained within the Receiver's Office Positions spreadsheet, but are not included in Defendants' Plan. (*See* Exhibit 7.) Nonetheless, DCHCS will continue to work with the Receiver's office as necessary to provide appropriate mental health care to CDCR inmates.

**Licensed Psychiatric Technicians**

Originally, LPT positions were established in CDCR to conduct rounds, crisis intervention, and screenings in segregated housing units, and later to conduct a portion of group treatment. The LPT's role has expanded to include medication administration consistent with their scope of practice. Per the Board of Vocational Nursing and Psychiatric Technicians, the duties within the LPT's scope of practice "include, but are not limited to, basic hygiene and nursing care; measurement of vital signs; performance of prescribed medical treatments; administration of prescribed medications; implementation of behavioral management techniques; crisis intervention; sensory and perceptual development assessment; social and vocational training; and, the facilitation of individual and group therapeutic activities."

LPTs provide daily and weekly rounds in segregated housing, including ASU and SHU. LPTs monitor the inmate-patient's condition and report changes to mental health clinicians and other members of the treatment team. LPTs also provide medication to inmate-patients in some programs. Further, LPTs provide patient education regarding medication compliance and daily self care skills, individually and in group treatment.

These positions perform nursing care, and as previously noted, the Receiver has assumed supervisory authority and control over LPTs. Because these positions are not in Defendants' control, staffing ratios for these positions are reflected in Exhibit 7. Nonetheless, DCHCS will continue to work with the Receiver's office to provide appropriate mental health care to CDCR inmates.

**Staffing Justifications for Mental Health Program Areas**

The following staffing justifications are predicated upon a baseline staffing level for each level of mental health care. With each change in acuity level or severity of the mental illness and impairment, the Plan further explains the reasons for staffing enhancements above and beyond this baseline level of care. The Plan also provides comparative information for each treatment setting that illustrates how the needs differ from the baseline setting.

In order to provide a comparison of current and proposed staffing, the Mental Health Chiefs for each prison provided estimates of staffing allocated to various programs or functions. The staffing ratios reflected in each program area below include the current estimated staff ratios and the Plan's staff ratios. The current ratios and the Plan's ratios presented below do not include any relief factors. However, relief factors are included, as appropriate, for proposed staffing represented in Exhibit 9 (Roll-up by Classification) and in the attached staffing spreadsheets.

**Correctional Clinical Case Management System (CCCMS)**

The goal of the CCCMS program is to systematically monitor the clinical needs and movement of MHSDS inmate-patients within and between CDCR institutions. Within this service delivery system, CDCR provides the best possible means of ensuring continuity of care while optimizing the use of available resources. Inmate-patients at this level of care have typically been diagnosed with a major mental illness but are able to function in the correctional setting including vocational and educational assignments with minimal interventions. Treatment modalities

include regular contacts with assigned primary clinicians, periodic review for medication needs as determined by a psychiatrist, interdisciplinary treatment team reviews, and group treatment as clinically indicated and determined by the primary clinician and treatment team. These interventions are designed to target symptoms of major mental illness and impairments in functioning to help inmate-patients participate appropriately in the custody program to which they are assigned, and to maintain them in the least restrictive custodial and treatment setting.

### CCCMS-General Population (refer to Exhibit #11 for CCCMS-GP)

The Plan's staffing ratios[7] for this population are as follows:

|  | Plan | Existing (averages)[8] |
|---|---|---|
| Primary Clinician | 1:97 | 1:94 |
| Staff Psychiatrist | 1:280 | 1:315 |
| Office Technician | 1:250 | 1:288 |
| Senior Psychologist, Supervisor | 1:1200 | 1:1163 |
| Supervising Psychiatric Social Worker | 1:1200 | None |

Program Guide requirements include comprehensive intake evaluations and initial Interdisciplinary Treatment Team (IDTT) meetings for inmate-patients new to the treatment setting, quarterly contacts with the assigned primary clinician, regular reviews of the need for psychotropic medications or medication adjustments by a staff psychiatrist, and individual psychotherapy and group treatment as clinically determined. IDTT meetings for review of the treatment plan (which are facilitated by the primary clinician) include, at a minimum, the psychiatrist, Correctional Counselor, and the inmate-patient, and must occur at least annually. Other attendees may include nursing staff or others who have direct knowledge of the inmate-patient's functioning and mental health needs.

Caseloads for staff psychiatrists do not always allow for psychiatrists' participation in IDTTs. Therefore, the Plan's staffing reflects a slight decrease in caseloads for staff psychiatrists. Because scheduling and tracking of mental health services now includes data and report production for the purposes of program and quality management, the work load for an Office Technician (OT) has increased in this and other program areas. Additional allocations will assist program supervisors and managers in necessary monitoring, documentation, and quality improvement functions.

Supervisory positions are based on an expectation for one supervisor to oversee the clinical activities of six primary clinicians and to conduct any administrative program oversight functions. It is anticipated that the workload for program supervisors will be distributed evenly between Senior Psychologists, Supervisors, and Supervising Psychiatric Social Workers.

Moreover, the Plan's ratios include enhanced staffing for CCCMS-GP Sensitive Needs Yard (SNY) populations as a distinct subset of the CCCMS-GP population. SNY inmates utilize mental health services at a greater rate than regular GP inmates.

---

[7] The top of each spreadsheet establishes what the ratios are based on, i.e., CCCMS-GP uses the number of inmates classified CCCMS GP, and CCCMS-RC Intake & Screening uses the number of inmates received each day.
[8]  All existing ratios provided in this document are based on rough estimates and are provided only for illustrative purposes.

*CCCMS–Reception Center (RC)*

The RC program provides mental health assessment for all inmates committed to CDCR, and basic treatment for those inmate-patients identified as having a major mental disorder while awaiting transfer to an institution with the appropriate treatment program.  When an inmate arrives at a RC, the inmate is screened to determine the need for mental health treatment. Current staffing is combined for both intake and screening and treatment under the treatment section. This Plan separates the intake and screening process from the treatment process.

1.    **CCCMS-RC Intake and Screening (refer to Exhibit #12 for Reception-Intake and Screening)**

The Plan's staffing ratios for this population are as follows:

|  | Plan |
|---|---|
| Clinical Psychologist | 1:11 |
| Staff Psychiatrist | 1:33 |
| Office Technician | 1:50 |
| Senior Psychologist, Supervisor | 1:200 |

The Program Guide requires mental health screenings for every incoming new commitment and parole violator.[9]  All new arrivals are screened within the first seven calendar days of arrival. Inmates with positive indicators on the initial screen receive a more extensive standardized mental health evaluation within 18 calendar days of arrival and within seven days if identified with a past history as an EOP inmate-patient.  Evaluations that yield a diagnosis of major mental illness and significant impairment in functioning result in placement in the MHSDS at a level of care appropriate for symptoms and degree of impairment.

Currently, every 100 new arrivals yield 15 to 16 inmates who need evaluation for psychotropic medications.  Given access realities, a psychiatrist can reliably complete approximately 5 to 6 evaluations in a work day, which results in a 3:100 ratio.

The current staffing allocation for RCs do not separate out the intake process from other RC mental health services and therefore does not provide easy comparison.  Limited information from other states exists.  In Ohio, psychologist positions were allocated at a ratio of 1:3 for the purpose of intake evaluation, and in Alabama, one psychiatrist was allocated for 66 inmates. CDCR's ratios were developed to adequately quantify the need for the intake process, which is based on the number of daily arrivals.

2.    **CCCMS–RC Treatment (refer to Exhibit #13 for CCCMS–RC)**

The Plan's staffing ratios for this population are as follows:

|  | Plan | Existing (averages) |
|---|---|---|
| Primary Clinician | 1:80 | 1:66 |
| Staff Psychiatrist | 1:200 | 1:301 |
| Office Technician | 1:300 | no existing standard |

---

[9] This is in addition to non-*Coleman* evaluations.  *See* footnote 2.

| | | |
|---|---|---|
| Senior Psychologist, Supervisor | 1:960 | no existing standard |
| Supervising Psychiatric Social Worker | 1:960 | None |

These ratios reflect an enhancement (except for the Office Technician) over the CCCMS-GP for the following reasons. The RC is a transitional setting in which arriving inmates have typically just come from a county jail or the community. Difficulties adjusting to the prison environment create an added need for interventions from mental health staff and at least brief treatment to stabilize the inmate-patient. In addition, limited information may be available about the inmate, including the inmate's past treatment for mental illness. This often necessitates frequent re-evaluation and modification of treatment planning as new information is received by attending clinicians.

Based on the above concerns, a clinical supervisor was added to oversee the evaluation process. And the proposed psychiatry staffing reflects a caseload decrease of approximately 33 percent. Finally, the support staff ratio reflects an increase to account for significant data management demands.

Comparison with other states shows a range of 200 to 300 inmate-patients per staff psychiatrist, while the range for primary clinicians is 38 to 75. Unlike the other comparison states, the State of Alabama is similar to California with respect to RCs. Alabama's *Bradley v. Haley* Settlement Agreement covers separate staffing ratios for a) screening and evaluations, and b) on-going treatment.

### *CCCMS–ASU and Condemned Unit (refer to Exhibit #14 for CCCMS–ASU)*

The Plan's staffing ratios for this population are as follows:

| | *Plan* | *Existing (averages)* |
|---|---|---|
| Primary Clinician | 1:25 | 1:18 |
| Staff Psychiatrist | 1:125 | 1:98 |
| Office Technician | 1:175 | 1:98 |
| Senior Psychologist, Supervisor | 1:150 | 1:195 |
| Recreational Therapist | 1:150 | 1:476 |

These ratios also reflect an enhancement over the CCCMS-GP for the following reasons. The ASU is a transitional setting in which inmates are typically housed from several weeks to several months, and at times may reside for up to a year. As clinical needs for condemned inmates are very similar to those inmate-patients in ASU, staffing for this population is included in this section. Inmates are housed in ASU pending investigation of serious rule infractions including assaults as well as for concerns regarding gang dropout or other safety concerns.

Situations leading to ASU placement often increase the stress experienced by the inmate-patient. Lack of in-cell activity and structure, etc., add to the increased stress level, which requires more frequent monitoring and intervention than does a GP setting. Therapeutic intervention targets stabilization of symptoms of mental illness, reduction of anxiety, and improved behavioral response.

Program Guide requirements indicate a significantly increased workload for most of the mental health classifications represented above. Primary clinicians see each inmate-patient at least once per week. Initial IDTTs occur for every new inmate-patient within 10 days of their arrival and at least every 90 days thereafter for the duration. There is an increased need for re-evaluation by a psychiatrist due to the acuity of the population and the increased suicide risk. Primary clinicians also attend the ICC on a weekly basis to provide input for custody in decisions regarding classification status and appropriate placement. Out-of-cell structured therapeutic activity is clinically indicated for most of these inmate-patients and is provided by primary clinicians, LPTs and Recreational Therapists (RTs).

In addition, an ASU contains particularly high risk inmates. Approximately 50 percent of the suicides have occurred in ASUs, and approximately half the inmates committing suicide in an ASU are non-MHSDS inmates. Thus, daily LPT rounds are conducted for all ASU inmates. And in order to facilitate timely communication and referral for inmates who may be at risk of self-harm, daily meetings between housing unit mental health and custody staff are needed to discuss new arrivals or concerns about inmates in the unit.

New arrivals in an ASU who are not already identified as MHSDS inmate-patients are screened for signs or history of mental illness upon arrival. Those showing at risk indicators are referred for a comprehensive intake evaluation and suicide risk assessment.

The Plan presumes using LPT staffing to provide medication administration for those inmate-patients on psychotropic medications. Senior Psychiatric Technicians are assigned as leads and are typically tasked with scheduling rounds, and collection and verification of compliance data. Defendants will continue to work with the Receiver's office to ensure sufficient LPT staff for these needs.

Comparison data with other states indicates that CDCR has proposed higher staffing levels, which levels are a result of increased services provided to its population as discussed above.

### CCCMS–SHU (refer to Exhibit #15 for CCCMS–SHU)

The Plan's staffing ratios for this population are as follows:

|  | Plan | Existing (averages) |
|---|---|---|
| Primary Clinician | 1:50 | 1:33 |
| Staff Psychiatrist | 1:200 | 1:149 |
| Office Technician | 1:175 | 1:159 |
| Senior Psychologist, Supervisor | 1:300 | 1:648 |
| Recreational Therapist | 1:150 | 1:324 |

These ratios reflect an enhancement over the CCCMS-GP for the following reasons. Upon adjudication of the offense or resolution of the security issue for which the inmate was placed in ASU, the inmate is released from ASU and placed in housing determined by custodial staff based on appropriate custodial factors. Serious rules violations for such things as assaultive or violent behavior, trafficking drugs, and possession of a weapon, may result in a SHU placement. A SHU term typically lasts from several months to several years. All inmate movement outside the cell is controlled, requiring a double custody escort and mechanical restraints. Movement

outside the cell is generally restricted to ten hours of yard activity a week, showers, law library appointments, and health care appointments. These security procedures can increase the stress experienced by the inmates housed in these units, particularly those with mental illness. Therefore, more frequent monitoring and intervention is provided than in a GP setting.

While in a SHU, treatment goals include improving an inmate-patients' constructive use of in-cell time, decreasing isolation, and reducing and stabilizing symptoms of mental illness. Interventions may further target anger and depression management, behavior modification, and preparation for return to a less restrictive environment. While psychiatric acuity is typically reduced and stabilized for most of these inmate-patients, there is a greater ongoing effort to provide cognitive-behavioral interventions and behavioral monitoring.

Inmate-patients in this setting are seen by a primary clinician at least monthly with annual IDTTs. Primary clinicians attend a weekly Institutional Classification Committee (ICC) to provide input to custody regarding classification and placement decisions. Intake evaluations, including suicide risk assessments, are conducted for each inmate-patient arriving in this custodial setting. As described above, there is a need for structured out-of-cell activities for many of these inmate-patients, which are clinically determined by the primary clinicians and the IDTT, and are provided by primary clinicians, RTs, and LPTs. Approximately 30 to 35 percent of this caseload population has been clinically determined to benefit from group treatment and is willing to participate. Therefore, this Plan allows for an average of two hours of group treatment for about 30 to 35 percent of this population.

The need for psychotropic medication review or medication adjustment is less frequent than in CCCMS–ASU due to decreasing acuity and suicide risk. However, isolation related decompensation, together with lack of structured activities, and the behavioral challenges often presented by this population result in more frequent psychiatric review than in CCCMS–GP.

LPTs conduct weekly rounds to monitor functioning and ensure appropriate referrals to primary clinicians and psychiatrists when indicated if matters cannot wait until the next routinely scheduled appointment. LPTs are typically the primary responders for crisis intervention on a daily basis. In addition, LPTs provide for medication administration. As referenced previously, Defendants will continue to work with the Receiver's office to ensure LPT staff for these needs.

Comparison with staffing in other states was limited to Ohio, reflecting a staffing pattern for clinical staff consistent with the Plan's staffing ratios.

### Enhanced Outpatient Program (EOP)

The EOP provides the most intensive level of outpatient mental health care to GP inmates with major mental illness. Most of them suffer from chronic disorders such as Schizophrenia or Bipolar Disorder and include those with chronic or recurrent signs of elevated suicide risk, including suicidal ideation, intent, attempts, and self-injurious behavior. The program is characterized by separate housing and structured activities that include individual and group treatment, psychiatric care, and educational programming, as available. Frequent reassessment by the primary clinician, psychiatrist, and the treatment team as a whole is generally completed for those being treated at this level of care. Some inmates are able to participate in vocational

training or activities when deemed appropriate by the IDTT and ICC. These increased services are required to effectively treat the severity of mental illness and impairment of this population.

The primary objective of the EOP is to improve an inmate-patients' level of functioning with symptom remission so that they can be returned to a lower level of care. A secondary objective is to provide longer-term care and treatment for those inmate-patients with chronic mental illness whose symptoms have stabilized but whose level of functioning remains significantly impaired and does not allow for placement at a lower level of care A structured therapeutic setting with supportive care, assistance with activities of daily living, recreational therapy, anger management, reality therapy, and programs related to symptom management and clinical pre-release planning are offered.

### EOP–GP (refer to Exhibit #16 for EOP–GP)

The Plan's staffing ratios for this population are as follows:

|  | Plan | Existing (averages) |
|---|---|---|
| Primary Clinician | 1:26 | 1:21 |
| Staff Psychiatrist | 1:120 | 1:99 |
| Office Technician | 1:60 | 1:86 |
| Senior Psychologist, Supervisor | 1:150 | 1:160 |
| Recreational Therapist | 1:45 | 1:53 |

These ratios are justified by the services provided in EOP-GP, which include:

1. Individual treatment planning by the IDTT at least every 90 days or as clinically needed.

2. Individual therapeutic contact, together with treatment plan formulation and modification with primary clinician at least weekly, or as clinically indicated.

3. Medication evaluation and management appointment with a psychiatrist at least monthly, or as clinically needed.

4. Minimum of ten hours of structured, out-of-cell therapeutic activities per week including group therapy, psycho-educational groups, individual therapy, and recreational or occupational activities. These activities are provided by primary clinicians, LPTs, and recreational therapists.

5. Pre-parole planning for inmate-patients with upcoming parole to enhance continuity of care and encourage successful return to the community. Staffing specific to this function is included under the heading Pre-Release Planning below.

The primary clinician conducts comprehensive intake evaluations with a focus upon diagnostic formulation for those newly arrived inmate-patients assigned to their caseload including a review of team generated psychosocial, psychogenic, clinical, and forensic history. Inmate-patients placed at the EOP-GP level of care are seen at least once a week for care management and individual therapy as clinically indicated. Approximately 50 percent of this population is seen at least twice per week and generally more often due to acuity or complexity of their treatment needs. Primary clinicians participate in weekly IDTT meetings and conduct about one third of group treatment.

The psychiatrist conducts psychiatric intake evaluations for newly arrived inmate-patients assigned to the caseload with a focus upon diagnostic and psychotropic medication history, as well as assessment of co-occurring medical conditions or significant medical history. Patients placed at the EOP-GP level of care are seen by a psychiatrist a minimum of once per month to ensure appropriate and effective medication management including monitoring of blood levels. The psychiatrist participates in all IDTT meetings. As part of psychotropic medication management, the psychiatrist performs evaluations for involuntary medication administration (*Keyhea*) and presents the findings and recommendation/petition to an Administrative Law Judge at a *Keyhea* Hearing. Approximately 20 percent of EOP-GP inmate-patients have a standing order for involuntary medication and need to be re-evaluated for this need upon expiration of court orders.

The proposed ratio for OTs is significantly increased over that of CCCMS in response to the demand for processing significant group treatment activities in EOP in addition to processing more frequent primary clinician and psychiatrists' appointments. OTs schedule and close out all appointments: intake evaluations for Staff Psychiatrist and Primary Clinician, weekly and monthly contacts, IDTT meetings for each EOP inmate-patient, and all group activities. Entry of this data into the Mental Health Tracking System is at the core of quality management reports and subsequent program supervision and management. The OT likewise ensures that this appointment information is transmitted to the Medical Records Department to ensure that Unit Health Records (UHRs) are available at the time of appointment as necessary, and to custody in facilitating custodial support.

Approximately one third of the weekly structured therapeutic activities are provided by LPTs. In addition, LPTs are among the first responders to EOP inmate-patients in crisis situations and are available in the evenings and on weekends and holidays. As part of the IDTT, the LPT attends weekly program and general staff meetings, as well as all IDTT meetings. The Defendants will continue to work with the Receiver's office to ensure sufficient LPT staff for these needs.

The proposed staffing shows a slight staffing increase for supervisors. The program supervisor is responsible for case assignment and supervision of program staff, including clinical oversight of inmate-patients on their caseload (up to 26 per primary clinician). The supervisor provides clinical direction according to established program guidelines and treatment needs of the patient, leads IDTT meetings, participates in the management of care, and provides therapeutic consultation or intervention for difficult or more complex cases. As supervisor of the overall program, they have responsibility for program development, implementation, program oversight of data management and response to key program indicators, and administration for EOP-GP. An average of 20 percent of the supervised caseload will require occasional direct inmate-patient contact or assessment by the supervisor.

Approximately one third of the weekly structured therapeutic activities are provided by a RT. These activities are designed to reduce stress, improve self-esteem and physical health, increase productive social participation in team efforts, and promote the constructive use of leisure time. As part of the IDTT, the RT attends weekly program and general staff meetings, as well as all IDTT meetings.

The Plan's staffing ratios are consistent with comparative data from other states. Ratio ranges for psychiatrists are from 40 to 135 inmate-patients per psychiatrist; and are from 15 to 50 inmate-patients per clinician. Ratios for OTs vary from 1:68 to 1:150.

*EOP–RC (refer to Exhibit #17 for EOP–RC)*

The Plan's staffing ratios for this population are as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Primary Clinician | 1:18 | 1:21 |
| Staff Psychiatrist | 1:120 | 1:99 |
| Office Technician | 1:100 | 1:86 |
| Senior Psychologist, Supervisor | 1:175 | 1:160 |
| Recreational Therapist | 1:45 | 1:53 |

These ratios are also justified by the services provided in EOP-RC, which include:

1. Mental health intake evaluations to be completed within 7 days of arrival.

2. Initial IDTT meeting within 14 days of arrival.

3. Follow-up IDTTs every 30 days to expedite transfer.

4. Weekly contacts with the assigned primary clinician.

5. Five hours of out-of-cell structured therapeutic activity (group treatment) per week.

This treatment plan provides EOP inmate-patients with expedited assessments and treatment planning. In addition, EOP-RC inmates with an imminent release date are provided with parole preparation. Staffing specific to this function is included under the heading Pre-Release Planning below.

Changes in the proposed ratios for this population are related primarily to differences in the management of care and requirements for group treatment. First, records are not always immediately available, requiring frequent re-evaluation and modification of treatment planning as new information is received by attending clinicians. Second, there is a greater need for frequent interventions by the primary clinician due to adjustment difficulties as these inmate-patients have just arrived from a county jail or the community.

*EOP–ASU and Condemned Unit (refer to Exhibit #18 for EOP–ASU and Condemned Unit)*

The Plan's staffing ratios for this population are as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Primary Clinician | 1:11 | 1:9 |
| Staff Psychiatrist | 1:64 | 1:58 |
| Office Technician | 1:50 | 1:47 |
| Senior Psychologist, Supervisor | 1:66 | 1:76 |
| Recreational Therapist | 1:45 | 1:53 |

These ratios also reflect an enhancement over the EOP-GP for the following reasons. As noted in the CCCMS-ASU discussion, the ASU is a transitional setting in which inmates are typically

housed from several weeks to several months, and at times may reside up to a year. And similar to CCCMS-ASU, staffing for condemned inmates is included in this section.

Clinical program requirements combine those of EOP-GP and ASU settings to provide intensive treatment for those with major mental illness and to reduce the elevated suicide risk in these settings. Therapeutic intervention targets stabilization of mental illness symptoms, reduction of anxiety, and improved behavioral response. Because of the chronic nature of the illness, together with the often serious and dangerous acting out behaviors, this patient population results in the greatest admission rate to higher levels of care including MHCB and DMH Intermediate and Acute levels of care. The EOP-ASU population also comprises the greatest percentage of inmate-patients with standing orders for involuntary medications (*Keyhea*).

This population also presents the greatest challenge and workload for psychiatrists in outpatient settings. Aside from regular psychiatry contacts, a large number of these inmate-patients require a psychiatric evaluation to assess the need for involuntary psychotropic medications. These evaluations are based upon monitoring of medication compliance, improvement with symptoms and overall functioning, and frequent consultation with other treatment team members. The results of this evaluation involve presentation of reports and expert testimony to apply for *Keyhea* orders in the event involuntary medication is deemed necessary. In addition, these patients have a higher rate of admission to higher levels of care, which, in turn, indicate increased medication management with monitoring by a psychiatrist upon return to the EOP-ASU setting.

LPTs are active IDTT participants in the program and are responsible for daily rounds, medication administration, providing approximately a third of the scheduled group treatment, crisis intervention, and daily consultation with other members of the treatment team including custody officers assigned to EOP-ASU housing units. The Defendants will continue to work with the Receiver's office to ensure sufficient LPT staff for these needs.

There is a change to the current ratio (1:9) for primary clinicians.[10] Based upon review of compliance data, similarity of program requirements with a PSU, comparison with data from other states, and consensus of mental health leadership from institutions with EOP-ASU hub programs, CDCR proposes to modify the ratio to provide one primary clinician to every eleven (1:11) inmate-patients.

### Psychiatric Services Unit (PSU) *(refer to Exhibit #19 for PSU)*

The Plan's staffing ratios for this population are as follows:

|                                 | *Plan* | *Existing (averages)* |
|---------------------------------|--------|------------------------|
| Primary Clinician               | 1:12   | 1:12                   |
| Staff Psychiatrist              | 1:64   | 1: 64                  |
| Office Technician               | 1:64   | 1:76                   |
| Senior Psychologist, Supervisor | 1:64   | 1:76                   |
| Recreational Therapist          | 1:45   | 1:62                   |

---

[10] By Court Orders dated July 23, 1999, and October 26, 2001, the *Coleman* Court established a 1:9 ratio.

The PSU provides care for EOP inmate-patients who have a SHU term. Inmate-patients at the PSU level of care receive individual therapy at least weekly, group therapy 10 hours per week, and an evaluation by a psychiatrist at least every 30 days. The incidence of a RVR requiring assessment (including indecent exposures that require additional evaluation and treatment), crisis intervention, referrals to higher levels of care, involuntary medication, and follow-up after discharge from crisis beds, creates a significant increase in the need for staffing to provide services. Program requirements for EOP-ASU and PSU are essentially identical.

Whereas existing staffing is an average between PBSP and California State Prison, Sacramento (SAC), the proposed staffing incorporates staffing patterns developed in the *Madrid* class action lawsuit and complies with those treatment requirements.[11] Staffing ratios of 1:64 for Staff Psychiatrist, OT, and program supervisor are an artifact of the unit size. There are currently three PSUs in institutions for men (two at SAC and one at PBSP), each of which are 64-bed units. Due to the uniqueness of these units, no comparison data was found in other correctional systems.

### Mental Health Crisis Beds *(refer to Exhibit #20 for MHCB)*

The goal of the MHCB program is to provide services for conditions that require an inpatient setting to ameliorate acute symptoms of mental illness in the least restrictive environment. Most of the patients admitted to a MHCB unit have a significantly elevated risk of self-harm and may require continuous observation or monitoring before the patient's treatment needs can be fully assessed or the crisis brought under control. Treatment goals include resolution of these crisis situations within ten days so that inmate-patients can either be returned to a lower level of care or transferred to an Intermediate Care Facility or Acute Psychiatric Program.

MHCB units operate 24-hours a day, seven days per week and are staffed to deal with frequent admissions and discharges. Therefore, staffing in these units is based on bed capacity of the unit rather than statewide population numbers so that staff are constantly available for these acute care needs and crisis situations. MHCB staffing is consistent with California Code of Regulation, Title 22, requirements for licensing an inpatient health care facility. In CDCR, MHCBs are licensed.[12]

The increased complexity driving the needs of this program is reflected in the attached Exhibit 20. Staffing requirements are described along three major components inherent to the MHCB program. First, ratios are provided to establish a baseline staffing component for small MHCB units that have no more than five beds. These units are labor-intensive, and this staffing level is required to ensure adequate response for a 24-hour, 7-day-per-week operation. Second, ratios are provided for clinical, support, and supervisory staff for MHCB units that have six or more crisis beds. Third, ratios are provided for additional medical, maintenance, and allied health professionals for stand-alone MHCB facilities. Currently, the only existing unit of this type is located at California Medical Facility (CMF). There is currently a Court Ordered project underway to build a second stand-alone 50-bed MHCB facility at CMC.

---

[11] The *Madrid* class action lawsuit alleged constitutional deficiencies in the custody and care of all inmates at PBSP.
[12] It should be noted that the Court has issued waivers of licensing requirements at California Institution for Men (CIM) and California Men's Colony (CMC) as a temporary measure pending construction of licensable beds.

The base-line staffing for the small MHCB units and the additional staff for stand-alone facilities is self-explanatory; thus, the following rationale focuses on those ratios for units with six or more beds, including the CMF MHCB unit, with an emphasis upon the comparison for clinical and support positions.

The Plan's staffing ratios for these facilities are as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Clinical Psychologist | 1.18:10 | 1:6 |
| Licensed Clinical Social Worker | 1:50 | 1:11 |
| Staff Psychiatrist[13] | 2.5:25 | 1:8 |
| Office Technician | 3.5:25 | 1:17 |
| Senior Psychiatrist, Supervisor | 1:50 | 1:133 |
| Senior Psychologist, Supervisor | 1:50 | 1:59 |
| Recreational Therapist | 1.76:25 | 1:62 |

Together with psychiatrists, psychologists serve as primary clinicians for this licensed facility and additionally provide assessment and psychological testing expertise when clinically indicated. Primary clinicians conduct emergency room evaluations in determining admission needs and are responsible for referring those patients needing a higher level of care upon discharge from a MHCB, to a DMH inpatient treatment facility.

The proposed staffing ratios include an increase in staff psychiatrists. In addition to the workload responsibilities described above, psychiatrists take the lead in managing the process for involuntary medication administration (*Keyhea*). Involuntary medication administration is typically initiated in a MHCB unit, and therefore drives a significant workload for psychiatrists assigned to these treatment settings. Psychiatrists also evaluate the medication needs for those inmate-patients who are placed in physical restraints subsequent to the presentation of immediate harm to self or others, and whose dangerous behavior cannot be controlled with other means. Senior Psychiatrists supervise staff psychiatrists, provide clinical care for difficult cases, review documentation initiating involuntary medication and restraints, and monitor use of restraints.

A significant staffing component in the MHCB unit is nursing. Nurses conduct an assessment for each newly admitted inmate-patient that includes an interview and orientation, assessing vital signs, chart assembly, and follow-up to admission and medication and laboratory orders. Nursing staff provide rounds and monitoring for inmate-patients on suicide precautions and as one-to-one observers for those inmate-patients on suicide watch. Additional duties include medication administration, coordination for medical services, and frequent consultation with other treatment team members. The Defendants will continue to work with the Receiver's office to ensure sufficient nursing staff for these needs.

RTs are allocated to MHCB units to engage inmate-patients in structured recreational or rehabilitation activities to improve level of functioning. These services are needed on a daily

---

[13] The Staff Psychiatrist ratio presented here combines the 2.35:25 Staff Psychiatrists with the on-call Psychiatrist .3:50.

basis in the form of group or individual activity as clinically indicated and determined by the IDTT.

Additional staffing ratios for stand-alone facilities are needed to provide access to medical care and to meet licensing requirements. These positions include staffing for a Physician and Surgeon as well as a Nurse Practitioner to conduct physical examinations for immediate care planning, and to prepare the inmate-patient for transfer to another facility such as a higher level of care at DMH. On-site laboratory services provide access to critical care evaluations. In addition, this facility requires on-site medical records management, and medical transcribers provide transcription services to ensure timely completion of admission and discharge summaries, as well as evaluation and reports for initiation of *Keyhea* orders.[14] Separate facility management positions staff the kitchen and provide maintenance services for the facility.

### Mental Health Outpatient Housing Unit (MH-OHU) *(refer to Exhibit #21 for MH-OHU)*

The goal of a MH-OHU is to provide short-term observation and evaluation, as well as clinical intervention for inmate-patients who require focused attention for mental health concerns, and/or special housing for security and protection during treatment. Placement in a MH-OHU is generally required when the inmate-patient's mental health deteriorates to the point of placing them at risk for further mental health complications if housed in a GP, ASU, or SHU. Generally, their condition, while serious, has not declined to the point of warranting admission to a licensed health care facility. The MH-OHU may be used for 72-hours to evaluate inmate-patients, determine their treatment needs for a higher level of mental health care, or while pending transfer to a higher level of care.

The Plan's staffing ratios for this population are as follows:

|  | *Plan* |
|---|---|
| Clinical Psychologist[15] | 1:4.37 |
| Staff Psychiatrist | 1:9 |
| Office Technician | 1:10 |
| Senior Psychiatrist, Supervisor | 1:150 |
| Senior Psychologist, Supervisor | 1:35 |
| Recreational Therapist | 1:10 |

MH-OHU clinical staffing is provided seven days per week. Nursing staff is assigned on all shifts, with at least one LPT on first watch. IDTT meetings are held daily to make timely decisions about placement into and removal from MH-OHU beds.

No comparative data is available, however, for this type of treatment setting. Thus, proposed staffing ratios are based upon constant and rapid turnover of inmate-patients in this setting together with meeting Program Guide requirements.

---

[14] While CDCR has position authority for some allied services, the Receiver's office has assumed supervisory responsibility for all MHCB support functions. The Defendants will work with the Receiver's office to ensure sufficient staff for these needs.
[15] The Clinical Psychologist ratio presented here combines primary clinician duties at 1:5 with the Clinical Psychologist ratio 1:35 for purposes of psychological testing.

Primary clinicians assume responsibility for clinical care of admitted inmate-patients. They conduct daily rounds on all assigned inmate-patients and complete evaluations, including risk assessment for harm to self and others. Since most inmate-patients only stay one or two days, there are new arrivals daily. Primary clinicians ensure placement of inmate-patients in MHCBs as clinically appropriate and consult with other treatment team members to achieve resolution of presenting questions.

Staff Psychiatrists conduct daily rounds for those referred inmate-patients needing medication evaluation, and they participate in daily IDTTs.

The primary function of nursing staff is to monitor the status and behavior of all inmate-patients 24-hours per day, document patient housing locations, and provide medication management including coordination of laboratory orders. Suicide precautions and suicide watch are to be completed in a licensed facility whenever possible; however, these functions are performed in the MH-OHU setting when there are no immediately available MHCBs. These suicide prevention functions are performed by nursing staff. The Defendants will continue to work with the Receiver's office to ensure sufficient nursing staff for these needs.

The OT tracks all clinical care activities including follow-up evaluations for suicide prevention and documentation of wellness checks.

### Desert Institutions *(refer to Exhibit #22 for Desert Institutions)*

CDCR has five institutions with limited mental health programming: California Conservation Center, Calipatria State Prison, Centinela State Prison, Chuckwalla Valley State Prison, and Ironwood State Prison. These prisons are staffed to provide necessary and standard mental health care, including assessment, treatment, monitoring and follow-up services, for inmates with symptoms of mental illness or acute psychological distress, until the inmate-patient can be transferred to an appropriate institution. A baseline staffing component was developed to ensure adequate clinical coverage for the GP setting at these institutions.

Following is the baseline staffing component:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Mental Health Director/Clinical Director | 1.0 | 1.0 |
| Primary Clinician | 3.0 per institution | 1.8 per institution |
| Staff Psychiatrist | .5 per institution | .4 per institution |
| Health Program Specialist I | 1.0 | None |
| Office Technician | 3.0 per institution | .5 per institution |

The Mental Health Director will serve a dual role as both administrative and Clinical Director for the institution's entire Mental Health Program (refer to below discussion on Mental Health Director and Clinical Director). In addition, the position will be responsible for oversight or execution of such tasks as auditing, writing or updating local operating procedures, management reports, and statistical reporting. At desert institutions, these functions will be staffed at the Senior Psychologist, Supervisor level.

Primary clinicians assess inmates who are self-referred or referred by institutional staff for symptoms of major mental illness or acute psychological distress. Inmates identified for inclusion in the MHSDS receive mental health services based on the indicated level of care until they are transferred to an appropriate institution. These mental health services include regular individual therapeutic appointments, IDTT meetings, and other therapeutic interventions as clinically indicated, including group treatment that is likewise provided by a primary clinician.

A staff psychiatrist is available for regular evaluations, addressing psychotropic medication needs and monitoring inmate-patients on these medications until they can be moved to an appropriate treatment setting, as well as attending IDDT meetings.

OTs schedule and track all clinical activities and provide data reports to the program supervisor for program management and quality improvement.

### Crisis Intervention *(refer to Exhibit #23 for Crisis Intervention)*

Crisis intervention is an essential function in any health care services delivery system.

The proposed staffing for this service is as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Clinical Psychologist | .6 per institution | none |
| Staff Psychiatrist | .3 per institution | none |

Adding these positions allows for much quicker intervention in the evenings and on weekends. This additional coverage will reduce costly overtime, while better serving the treatment needs with face-to-face contact and treatment outside the normal workday. A psychologist will be on grounds for five hours in the evening and a psychiatrist will be on grounds for six hours on Saturdays and Sundays and holidays.

Prisons that have assigned psychologists and/or psychiatrists to evenings or weekends have found that fewer inmates require admission to MHCBs or MH-OHUs. For example, at CIM, for the five months prior to the beginning of the door replacement project, the average daily admission to a MHCB was 5.2. During the door project, a psychiatrist was on duty during the evenings and admissions to the MHCB unit were reduced to 2.4 admissions per day – a 54 percent reduction in MHCB admissions. Other prisons that have had psychologists and/or psychiatrists assigned during evenings and/or weekends also experienced significant reductions.

### Non-MHSDS ASU *(refer to Exhibit #24 for Non MH ASU)*

The Program Guide requires a certain level of mental health screening for non-caseload inmates in isolated custodial settings for the purpose of suicide prevention and in recognition that such isolation can generate symptoms of mental illness. Therefore, a rigorous screening process along with ongoing monitoring is indicated for early identification of at-risk inmates. Each inmate (whether caseload and not) is screened for history or signs of mental illness upon placement in an ASU.

The Plan's staffing ratios for this area are as follows:

|  | Plan | Existing (averages) |
|---|---|---|
| Primary Clinician | 1:256 | none |
| Office Technician | 1:1000 | none |

In stand-alone ASUs, mental health services provide screening and monitoring to ensure that inmates with signs or symptoms of mental illness are promptly moved to an appropriate setting. Due to an existing Court Order, mentally ill inmates cannot be housed in these units.[16] Thus, inmates with symptoms or complaining of mental illness are referred to a psychologist for assessment for possible inclusion in the MHSDS and transfer to an appropriate ASU treatment setting. In the event the inmate is found to be suffering from mental illness, the inmate is transferred to a housing unit consistent with the inmate's level of care needs as determined by the psychologist. In addition, the psychologist participates in a weekly ICC process to provide input to custody around decisions of classification, housing, and placement.

LPTs make, and document, daily rounds. Inappropriate placements are identified by LPTs, who facilitate prompt movement. During the daily rounds, LPTs screen inmates exhibiting signs or symptoms of mental illness and refer them to the assigned psychologist. Stand-alone ASUs require substantial documentation not required in regular ASUs. Defendants will continue to work with the Receiver's office to ensure staff for these needs.

### Pre-Release Planning *(refer to Exhibit #25 for Pre-release caseload)*

The Program Guide identifies pre-release planning as a function for inmate-patients who are returning to the community, and it is a standard component in treatment plans. Under this Court's order dated October 3, 2007, mental health clinicians provide pre-release planning for EOP-RC inmate-patients who return to a RC as a parole violator with an imminent release date.

The staffing ratio for this task is as follows:

|  | Plan | Existing (averages) |
|---|---|---|
| Licensed Clinical Social Worker | 1:208 | None |

This ratio is based on the number of caseload inmates who parole annually (12,946), an average of 10 hours per plan, and four parole plans completed per clinician per week.

Currently, clinicians throughout the state report that they spend approximately three to five hours per inmate for this task. They further report that the total time needed to develop an adequate release plan would be about 10 hours per inmate. This average will vary considerably between complex cases and those that are simple releases to family with outpatient follow-up. Typically, pre-release planning includes the following activities:

---

[16] *See* Court Order dated October 10, 2002, stating that Defendants cannot house *Coleman* class members in the new SATF ASU or any of the other nine new ASUs scheduled to open unless certain procedures have been followed and approved by the Court.

- Gather information from Central Files, UHRs, community data, family contacts, etc.
- Parole-specific interviews three times per plan/parole episode.
- Evaluation of protective and risk factors.
- Assessing available resources specific to inmate.
- Contacting Parole Office and setting up release plan, assessing housing options, reviewing classification and level of care status, communicating specific treatment needs, etc.
- Consultations with case manager.
- Attendance in IDTT.
- Final contact with inmate and presentation of housing, treatment, parole obligations, printout and contact numbers.

### Mental Health Caseload Related Evaluations

**IEX-Sexual Misconduct** *(refer to Exhibit #26 for IEX Evaluations)*

This evaluation is conducted in accordance with CDCR policy developed in response to *Coleman* monitoring and a lawsuit filed by a CDCR employee for sexual harassment by an inmate. It requires that inmates who receive a RVR for certain sexually inappropriate behaviors such as indecent exposure, be evaluated by a psychologist. The purpose of the evaluation is to identify inmates who meet diagnostic criteria for *Exhibitionism* (DSM IV-TR) so that they can be referred to a treatment program.

The Plan's staffing ratio for this task is as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Clinical Psychologist | 1:1040 | None |
| Office Technician | 1:12480 | None |

**RVRs** *(refer to Exhibit #27 for RVR Evaluations)*

California Code of Regulations, Title 15, and the Program Guide require a mental health evaluation for some inmates who have received a RVR (CDC Form 115) to determine if mental illness contributed to the problematic behavior and to identify any mitigating factors to consider in the disciplinary hearing.

The Plan's staffing ratio for this task is as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Clinical Psychologist | 1:693 | None |
| Office Technician | 1:12480 | None |

### Mental Health Program Specialty Functions *(refer to Exhibit #28 for Specialist Positions)*

Currently, each institutional mental health program is required to perform specialty functions that are not accounted for in staffing allocations at this time. These include a variety of legally

mandated assessments and evaluations, suicide prevention, coordination with DMH for inmate-patients referred to and returning from DMH facilities or programs, and quality management/continuous quality improvement. Clinical staff are diverted from providing direct care to inmate-patients in order to perform these various specialty functions. The positions are proposed in order to provide a formal operational structure and to provide necessary standardization of program operations in service delivery and treatment response. In particular, the quality management/continuous quality improvement specialist is important to CDCR's success in initiating and maintaining long term systemic changes. It is a key component of CDCR's ability to self monitor and implement necessary action to maintain a quality delivery system. CDCR's Plan allocates Senior Psychologist, Specialist, Supervising Psychiatric Social Workers, and other clinical or administrative positions as well as support positions to staff these functions. These positions are not ratio driven, rather are derived from the number of institutions and size of the mental health programs.

### Assessment and Evaluations Specialist (new position, existing function)

A Senior Psychologist, Specialist for assessment and evaluations would be allocated to each institution responsible for oversight and coordination of the various evaluations completed for inmates. This oversight position ensures that evaluations to be completed for these various purposes are appropriately assigned to the staff indicated in Exhibits 1 to 3 and 26 to 27. One OT would be allocated to provide support for this coordination function. These evaluations are triggered by legal processes surrounding inmates who have mental illness, and include the following:

- Penal Code § 1203.03      Evaluations (Z-Cases)
- IEX                       Sexual Misconduct
- RVR                       Rules Violation Report
- Penal Code § 3002        Parole Evaluations
- Valdivia                  Parole Violators

The Plan's staffing ratios for this function are as follows:

|                            | Plan   | Existing (averages) |
|----------------------------|--------|---------------------|
| Sr. Psychologist, Specialist | .3   | None                |
| Office Technician          | 1:2600 | None                |

### Suicide Prevention Specialist (new position, existing functions)

Staffing consists of a .3 Senior Psychologist, Specialist per institution who will serve as the Suicide Prevention Coordinator (SPC) as well as the chair for the institution's suicide prevention committee. The SPC will coordinate prevention efforts through institutions including specific requirements in ASU and insure that suicide prevention training is provided as needed as well as any required follow-up on completed suicides. The SPC will also be responsible for communication and documentation in connection with suicide related meetings (minutes, agenda, etc).

For larger mental health programs, there will be a separate allocation at the rate of 1:500 Senior Psychologist, Specialist, to work with primary clinicians in tracking and monitoring high risk

inmate-patients, maintaining lists of inmates who have demonstrated suicidal gestures or self injurious behavior, and assisting the SPC with training, follow-up, and quality management audits related to suicide prevention efforts and interventions.

The Plan's staffing ratios for this function are as follows:

|  | Plan | Existing (averages) |
|---|---|---|
| Sr. Psychologist, Specialist | .3 | None |
| Sr. Psychologist, Specialist | 1:500 | None |

### Department of Mental Health Specialist (new position, existing function)

This Specialist will oversee the referral process for inmates with major mental illnesses and who are experiencing an acute crisis that is unresponsive to the interventions available within CDCR. This time sensitive and critical function requires professional clinical oversight in assuring the inmate-patient requiring acute or intermediate care services is transferred as expeditiously as possible and is placed in a level of care within DMH most appropriate to the treatment needs. This position will be a liaison between CDCR and DMH staff, arranging for clinician to clinician contact at the time of discharge. This specialist will ensure that referral packages are complete and forwarded timely, with tracking. Questions or differences in clinical opinion that arise relative to referrals will be directed to the DMH Specialist for resolution.

The Plan's staffing ratios for this function are as follows:

|  | Plan | Existing (averages) |
|---|---|---|
| Sr. Psychologist, Specialist | 1:350 | None |
| Staff Services Analyst/Assistant Government Program Analyst | 1:700 | None |

### Quality Management/Continuous Quality Improvement Specialist (new position, existing function)

Each institution will have one Senior Psychologist, Specialist or other clinical or administrative professional with quality management experience to lead the quality management team in overseeing the MH Quality Management Program. This individual will be responsible for analyzing all program data, determining program areas of systemic strength and weakness, and establishing collection procedures, timeframes and data sources for analyzing the overall delivery systems and operations, in terms of efficiencies, effectiveness, and quality. This Senior Psychologist, Specialist will be responsible for the institutional MH program database, maintenance and upgrades, and managing the clinical input and output reports. Further responsibilities will include attendance at all quality management meetings, and providing Mental Health Tracking System data to headquarters. This individual will also oversee production of the management report, assure its accuracy, and maintain oversight of the document production for *Coleman* monitoring site visits.

In addition, one Health Program Specialist I and one OT would be allocated for each 1,300 caseload inmates.

The Plan's staffing ratios for this function are as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Sr. Psychologist, Specialist | 1.0 | None |
| Office Technician | 1:1300 | None |
| Health Program Specialist I | 1:1300 | None |

### *Training and Orientation Specialist (new position, existing function)*

This Specialist will be responsible for training both mental health staff and custodial staff on all *Coleman* program requirements. In addition, this position will coordinate clinical supervision for unlicensed clinicians, and take on responsibility for professional staff development. Additional tasks include training and orientation for new hires and ensuring that staff has the most recent policy directions.

The Plan's staffing ratios for this function are as follows:

|  | *Plan* | *Existing (averages)* |
|---|---|---|
| Sr. Psychologist, Specialist | .3 | None |
| Office Technician | 1:5200 | None |

## Administration *(refer to Exhibit #29 for Administration)*

Mental Health programs at the institutional level are currently managed by a variety of managers and supervisors with assistance from their support staff including Chief Psychiatrists, Chief Psychologists, Senior Psychiatrists and Senior Psychologist Supervisors, along with Office Services Supervisors, specialists and secretarial staff. This management structure includes the designation of either a Chief Psychologist or Chief Psychiatrist as the Chief of Mental Health in the absence of a position solely dedicated to the administrative management of the program. At institutions with smaller, less complex mental health programs, Senior Psychologist Supervisors serve as Chiefs of Mental Health in addition to their clinical duties. To better manage mental health programs, CDCR's Plan identifies the following positions for each of CDCR's 33 prisons.

### *Director, Mental Health Services (new position)*

Each prison will have a designated Director of Mental Health Services, hired specifically to direct the entire mental health program. The Director will supervise all staff and work collaboratively with the Clinical Director for Mental Health Services who assures appropriate clinical care is provided. The Director will have administrative oversight of all staff and manage all administrative areas of the program. This new position will be responsible for providing overall leadership and management of a prison mental health program. Given that CDCR's mental health prison programs frequently employ over 100 mental health staff, its programs would benefit from a full time Mental Health Services Director.

The position is being requested as a Chief Psychologist but may be filled with a variety of different classifications depending on ability to recruit, skill sets, etc. These classifications include, but are not limited to: Chief Psychiatrist, Chief Psychologist, Supervising Psychiatric Social Worker, and Nursing Director. As explained previously, at Desert institutions, these

positions will be staffed at the level of Senior Psychologist, Supervisor due to the less complex and small size of the mental health functions at these institutions. Desirable qualifications for this position include a minimum of a Master's Degree in health care administration, public health administration, licensed psychiatrist, psychologist, social worker, or nurse. Candidates should have least five years experience managing complex mental health programs, part of which must be related to forensic or correctional mental health services. For prisons with only one mental health program or fewer than 500 MHSDS inmate-patients, the Director of Mental Health Services will serve as both Director and Clinical Director for the program and must be a licensed clinician.

### Clinical Director, Mental Health Services (working title; no specified position)

This position will be responsible for providing the clinical leadership of the mental health program and providing clinical supervision of all senior clinical staff. This position will not be a specified position in civil service. It will serve as a working title, and is therefore not indicated on Exhibit 29. The Clinical Director will be a licensed clinician and possess at least two years experience in a senior clinical leadership position as well as five years experience providing direct clinical care to persons with major mental illness. For prisons with fewer than 500 enrolled MHSDS inmates, this position will be combined with the Director position. The Chief Psychologist, Chief Psychiatrist, or Senior Psychiatrist positions described below, or a Supervising Psychiatric Social Worker, Nursing Director, or other managing clinical position, substituting for one of the positions below, could hold Clinical Director as their working title. The goal is to obtain a mix of various senior clinical positions available to the mental health program that can be assigned to provide clinical leadership at the institutions.

### Chief Psychiatrist (existing position)

At least half of all prisons will have a Chief Psychiatrist. Chief Psychiatrist positions will be allocated to prisons with MHCB units and prisons with complex and multiple mental health programs. A Chief Psychiatrist may be allocated as the Director, Mental Health Services. Likewise, a Chief Psychiatrist may hold the title of Clinical Director, and/or provide clinical leadership and management for staff psychiatrists or senior psychiatrists. In addition, the Chief Psychiatrist ensures appropriate participation by psychiatrists in IDTT in the mental health program. This position has primary responsibility for formulary oversight of psychiatric medications and for quality improvement related to psychiatric medication prescription, monitoring, adjustment, and delivery. In addition, the Chief Psychiatrist shares clinical oversight over the MHCB unit and is responsible for appropriate application of involuntary medication and physical restraint use. Quality Improvement functions include audits and professional practice review for psychiatrists. The Chief Psychiatrist is also responsible for writing and updating Local Operating Procedures (LOPs) related to the practice of psychiatry and responsible for ensuring that practices are consistent with the most recent departmental policies.

### Chief Psychologist (predominately existing with a few additions)

Every prison, except those with only one mental health program or fewer than 500 MHSDS inmate-patients, will have a Chief Psychologist to provide clinical supervision for the Senior Psychologist, Supervisors and Senior Psychologist, Specialists. In addition, the Chief Psychologist has overall management tasks related to direct program operations, staff coordination, program execution, evaluation referrals and completion, and the professional delivery of mental health services in a

corrections environment. In addition, the Chief Psychologist is responsible for the quality assurance of those program operations and systems under their direct oversight.

**Senior Psychiatrist, Supervisor (existing position although numbers are changing)**

Approximately one third of CDCR prisons will have a Senior Psychiatrist, Supervisor. Senior Psychiatrist, Supervisor positions will be allocated to prisons that do not have a Chief Psychiatrist but have a significant number of staff psychiatrists providing services to a largely stable inmate-patient population. Senior Psychiatrist, Supervisor positions will also be allocated to several prisons that have a Chief Psychiatrist and that have large and complex mental health services. Senior Psychiatrist, Supervisors will provide clinical supervision of staff psychiatrists, as well as various administrative tasks related to formulary, medication management, and continuity of psychiatric medications. Senior Psychiatrist, Supervisors are responsible for the generation and periodic reviews of LOPs pertaining to the practice of psychiatry and for ensuring that practices are consistent with the most recent departmental policies. Further, Senior Psychiatrist, Supervisors share responsibility for quality improvement activities including peer/professional review processes.

**Senior Psychologist, Supervisor (existing position)**

This position is included for discussion herein to provide clarity as to the intended composition and roles of the administrative team for mental health. The role of the Senior Psychologist, Supervisor includes administrative and clinical management of the program area under his or her direction, and, with the exception of psychiatry, supervision of the staff assigned to this program area. The Senior Psychologist, Supervisor carries overall responsibility for the delivery of all treatment and patient needs for that program. Responsibilities further include interface with custodial counterparts in resolving operational issues of the facility, unit or yard as appropriate. Additionally, they are responsible for coordination of program-related issues with custodial and health care counterparts, in partnership with the mental health management staff. This position ensures timely and systematic responsiveness to inmate-patient needs as well as the needs of the institution, facility, unit, and yard operations.

**Office Technicians or Administrative Assistants (existing positions)**

These positions provide administrative support to the Director and the Clinical Director. Programs serving more than 1,000 enrolled MHSDS inmates generate a workload requiring two positions.

**Correctional Health Services Administrator II (CHSA II) (mostly new positions)**

This position will manage the program budget, quality management data and analysis, audits, record keeping and management, legislated response, and responsiveness to the Court and Administration.

**Office Technician (new position)**

This position is a new position that will provide support to the CHSA II for institutions with more than one major mental health program and more than 500 MHSDS inmates.

**Health Program Specialist I (existing position)**

This position provides assistance to the CHSA II with budgeting, purchasing, and personnel issues. One HPS I position is provided for any mental health program with two or more major program areas

or at least 1,000 caseload inmates. Two HPS I positions are provided for any mental health program with three or more major mental health programs or at least 1,500 caseload inmates.

*Office Services Supervisor III (upgraded from OSS II)*

This position is provided for all mental health programs with more than two major mental health service areas and more than 1,500 MHSDS inmates. The number of OTs and Office Assistants (OA) performing decentralized tasks throughout the institution requires supervisory oversight to ensure adequate tracking of operational components of the program. The position supervises all OTs and OAs, coordinates their work, ensures cross-training in assuring program continuity, and supervises the structure of the information system, with responsibility for quality assurance in identifying and supervising key quality indicators. Using an OSS III or an OSS II will assist in recruitment efforts.

### III.

### CUSTODY AND COUNSELING STAFF

Custody staffing for the short-term and intermediate-term bed plan projects is being addressed by CDCR's Division of Adult Institutions (DAI). DAI has been actively engaged in analyzing the need for additional Correctional Officers and Correctional Counselors to support the short-term and intermediate-term bed plan projects.

Similar to CDCR's past practice, DAI proposes to enhance custody staff for the EOP with the ratios that were utilized in the Prevalence and Mix (Prev-Mix) population adjustment. When applied, this adjustment augments existing custody staff at a ratio of 14 to 1 for 270-design housing units and to 21 to 1 for 180-design housing units. DAI will continue to monitor and analyze the need for custody staff for the short-term and intermediate-term projects based on the current staffing levels, inmate security level, treatment type, and treatment space locations.

In regards to the Correctional Counselor staff for the short-term and intermediate-term projects, DAI proposes to provide these positions through the Correctional Counselor Ratio Distribution process at a ratio of 1 to 100 in accordance with historical practices. DAI will continue to monitor and analyze the need for Correctional Counselors and should additional position authority or funding be needed in the future, DAI will request the necessary resources through the annual budget process.

### IV.

### FUNDING FOR THE STAFFING ALLOCATION PLAN

**Short-Term and Intermediate-Term Bed Plan Projects**

Funding for clinical positions for the short-term and intermediate-term bed plan projects, based on the staffing ratios in the Court-approved Program Guide, are already included in the 2009-10 Budget Act. Custody staff for the short-term and intermediate-term projects for the 2009-10 fiscal year will be redirected from CDCR's existing resources. Any need for additional custody staff to support the short-term and intermediate-term projects will be addressed through the annual budget process, with any additional resources that are authorized by the Legislature potentially being available for allocation to the institutions as early as July 1, 2010.

**Staffing Allocation Plan**

Resources to implement this Plan can only be provided by the Legislature, as the Legislature is the sole state entity with the authority to appropriate funds and to provide additional permanent position authority to CDCR's mental health program. As such, any additional resources that are necessary to implement this Plan will be addressed through the annual budget process.

The annual budget process for support operations begins with a department submitting a budget change proposal to the DOF. Depending on the availability of resources, the DOF makes recommendations to the Governor's Office as to which proposals should be included in the Budget. Selected proposals are included in the Governor's budget and submitted for legislative consideration on January 10 of every year. Next, the Assembly budget subcommittees and Senate budget subcommittees hold separate public hearings to discuss the proposed budget, and each subcommittee votes to decide which proposals merit further consideration for inclusion in the budget bill. Issues where the subcommittees from each house take different actions are then brought before the Conference Committee for resolution. After the Conference Committee resolves the differences between the actions taken by the budget subcommittees, the resulting budget bill is submitted to both houses for a floor vote. The budget bill requires a 2/3 vote in both houses for passage, and is then submitted to the Governor for signature. Funding is available on July 1, or after the Governor signs the budget bill into law, whichever is later.