1  EDMUND G. BROWN JR.
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JEFFREY STEELE, State Bar No. 124668
   DEBBIE J. VOROUS, State Bar No. 166884
4  Deputy Attorneys General
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone: (916) 323-1937
    Fax: (916) 324-5205
7   E-mail: jeff.steele@doj.ca.gov

8  Attorneys for Defendants

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                    SACRAMENTO DIVISION

12

13  **RALPH COLEMAN, et al.,**                    2:90-cv-00520 LKK JFM PC

14                                 Plaintiffs,    **DEFENDANTS' MOTION TO MODIFY
15                                                THE SPECIAL MASTER'S EXPERT'S
                                                 REPORT ON SUICIDES COMPLETED
16         v.                                    IN THE CALIFORNIA DEPARTMENT
                                                 OF CORRECTIONS AND
17  **ARNOLD SCHWARZENEGGER, et al.,**           REHABILITATION IN CALENDAR
                                                 YEAR 2007**
18                                 Defendants.

19

20                              **INTRODUCTION**

21         Defendants object and request the following modifications to the Special Master's Report

22  on Suicides Completed in the California Department of Corrections and Rehabilitation (CDCR)

23  in Calendar Year 2007 .  (Court Record [CR] 3677.)  Defendants move to modify the report in

24  accordance with the order of this Court dated December 11, 1995.  (CR 640.)  Each of the

25  objections and proposed modifications sought by this motion were raised in response to the draft

26  report.  (Ex. A.)

27  / / /

28  / / /

                                              1

1

**ARGUMENT**

2    **I.    THE COURT SHOULD STRIKE THE LANGUAGE IN THE REPORT REFERRING TO A**
**"DISTURBING TREND" IN SUICIDES IN ADMINISTRATIVE SEGREGATION.**

3

4            In Section III, the report states that CDCR submitted a plan to reduce suicides in

5    administrative segregation in 2006 "to curb a disturbing trend of rising suicides in CDCR

6    administrative segregation units."  (Report, p. 4.)  Defendants object to this language, as it was

7    based on statistics covering only a 2-3 year period.  (Ex. A, p. 1.)  (The basis for that belief is

8    revealed below.)  Plaintiffs' own expert believes that trends in suicides should be based on a

9    minimum of five years of data.[1]  (Ex. A, p. 1.)

10            Dr. Patterson, author of the Special Master's report, addressed Defendants' objections in

11    footnote 3 of the report, stating that Defendants' "assumption" that the language referring to a

12    trend was based on 2-3 years of data was wrong.  (Report, p. 4, n. 3.)  Instead, he states that he

13    relied on "the longer-term general trend of increasing suicides in administrative segregation in

14    CDCR, which goes back to at least 1999[,]" and refers to the chart on pages 7-8 of his report in

15    support of this statement.  Id.

16            However, the chart on pages 7-8 of the report pertains to annual suicide rates since 1998 per

17    100,000 inmates in CDCR, not specifically to inmates housed in administrative segregation.

18    (Report, p. 7.)  Thus, the chart cannot provide support for the conclusion that there has been a

19    "disturbing trend" of rising suicide rates in administrative segregation, let alone that such a trend

20    dates back to 1999.

21            In fact, there has been no consistent pattern of suicide deaths in administrative segregation

22    units in the last ten years of the *Coleman* remedial phase.  (Canning Decl. ¶ 2.) The percentage of

23    suicides taking place in administrative segregation units has varied from a high of 69 percent of

24    / / /

25    _____

26            [1] In addition, Dr. Patterson has written that a minimum of five years of data are needed for
meaningful statistical analysis because of year-to-year variability and other factors affecting
mental health resources.  (Ex. B, Patterson and Hughes, <u>Review of Completed Suicides in the</u>
27    <u>California Department of Corrections and Rehabilitation, 1999 to 2004</u>, Psychiatric Services,
June 2008, at 678.)

28

2

total suicides in 2004 to a low of 24 percent in both 1998 and 2002.  (Canning Decl. ¶ 2.)  For the sake of completeness, here are the numbers:

| Year | Suicides in administrative segregation as a percentage of all suicides in CDCR |
|------|--------------------------------------------------------------------------------|
| 1998 | 23.8% |
| 1999 | 29.2% |
| 2000 | 50% |
| 2001 | 37% |
| 2002 | 23.8% |
| 2003 | 48.6% |
| 2004 | 69.2% |
| 2005 | 36.1% |
| 2006 | 41.9% |
| 2007 | 32.3% |

(See Canning Decl. ¶ 2.).

Expressed as a line graph, the numbers are as follows:



(See Canning Decl. ¶ 2).

This chart suggests that there is no significant trend in suicides in administrative segregation.  If one were to draw a straight line from the end points of 2002 and 2006 (the five-year period ending in 2006), the line would trend up, but if one included 2001, the line would be

/ / /

3

1    virtually flat.  If 2000 were included, the line would trend down.  Thus, while all suicides are

2    disturbing, there is no "disturbing trend" in suicides in administrative segregation units.

3        The percentage of suicides occurring in CDCR's administrative segregation units varies

4    widely because of the small numbers in any given year.  In fact, the percentage of suicides

5    occurring in CDCR administrative segregation units over the ten-year period 1998-2007 is lower

6    than the percentage occurring in the United States Bureau of Prison over a similar length of time.

7    (Canning Decl. ¶ 2.)

8        Having said this, the high water mark for suicides in administrative segregation units was in

9    2004.  That percentage appears to be an outlier.  (Canning Decl. ¶ 2.)  As such, it distorts any

10    trend line.  When 2004 is removed from the data, the rate of suicides in administrative

11    segregation from 1998 to 2007, expressed as a percentage of the overall suicide rate in CDCR, is

12    almost flat.  (Canning Decl. ¶ 2.)

13        Suicides in administrative segregation were also high in 2003 relative to other years, and

14    while they dropped significantly in 2005, they rose slightly again in 2006.  (Yet it is important to

15    note that 2007 saw the fewest suicides in administrative segregation since 2002.)  Thus, if the

16    Report considered only the 2-3 year period ending in 2006, an upward trend in suicides might be

17    seen.  Defendants' "assumption" that the Report was looking only at that period was simply an

18    attempt to match the Report's conclusion to the data, because a longer view of the data does not

19    support his perception of a "disturbing trend" in suicides in administrative segregation units.

20        Because the trend that the Report refers to does not exist, Defendants request that the report

21    be modified so that the language of the second paragraph of Section III, page 4, read as follows:

22        On October 2, 2006, CDCR submitted its Plan to Address Suicide Trends in
      Administrative Segregation Units, and on December 1, 2006, it submitted its
23        amended version.   This plan was ordered by the *Coleman* court on June 7, 2006,
      following a set of recommendations from the *Coleman* Special Master to reduce
24        suicides in CDCR administrative segregation units.   While development and
      implementation of the Plan remained ongoing at the end of 2006, CDCR had begun
25        taking steps in its implementation.

26    / / /

27    / / /

28    / / /

4

**II.    THE COURT SHOULD STRIKE THE LANGUAGE IN THE REPORT THAT CRITICIZES CDCR FOR NOT PROVIDING INFORMATION REGARDING A 2006 SUICIDE, BECAUSE IT IS INACCURATE.**

Defendants request that the following paragraph on page 14 be stricken from the Report:

2007 was not the first year for which the Department failed to comply with deadlines for completion and submission of required documentation.  Following distribution of the Special Master's expert's 2006 report on suicides in the CDCR in draft form, defendants stated in their response that they had failed to provide any of the mental health records within the Unit Health Record for one of the inmates whose suicide in 2006 was reviewed and included in the draft report.  In the final version of this reviewer's Report on Suicides in the CDCR in 2006, Defendants were admonished that they "must ensure that no such lapses in their production of information occur again.  Review of incomplete records can lead to erroneous conclusion and recommendations, and ultimately to allowing deficiencies in the defendants' suicide prevention efforts to remain undetected and uncorrected."  *Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2006*, filed 9/12/08, at 1, n.1.  Unfortunately, that admonition must be repeated, and failure to heed it in the future may result in a recommendation for an order from the court.

(Report, p. 14.)  The Report criticizes CDCR for not providing the Unit Health Record for one inmate who committed suicide in 2006.  However, CDCR is not to blame.  The *Plata* Receiver began scanning Unit Health Records in 2006, so that they would be available electronically.  CDCR forwarded to Dr. Patterson the electronic record, unaware that the *Plata* Receiver had inadvertently not scanned all the records.  When CDCR found out, via the draft 2006 suicide report, that Dr. Patterson did not have all the records, CDCR located the hard copies of the records and provided them.  (Canning Decl. ¶ 3.)  Dr. Patterson was notified of these events in 2007.  (Canning Decl. ¶ 3.).  CDCR should not be faulted for relying on the Receiver's office to correctly and completely scan the records.

In the final Report, Dr. Patterson states that the 2006 suicide is beyond the scope of his 2007 report.  (Report, p. 14, n. 10.)  But Dr. Patterson brought the matter within the scope of his 2007 report by referring to it in that report and repeating his criticism of CDCR for not providing the Unit Health Record.  Alternatively, if the 2006 suicide is beyond the scope of his 2007 report, then the statements regarding it should be stricken from the 2007 report.  Therefore, any reference to this episode in the 2007 Report should be stricken.

/ / /

5

III.   **THE REPORT SHOULD BE REVISED TO PRESENT A BALANCED VIEW OF CDCR'S PROGRESS IN REDUCING SUICIDES AND ADHERING TO THE PROGRAM GUIDE, AND AREAS IN WHICH PROGRESS REMAINS TO BE MADE.**

Defendants take suicide prevention seriously. Defendants contend that the Report tends to emphasize perceived shortcomings, and does not appropriately acknowledge their achievements in preventing suicides. Thus, Defendants request that four statements in the Report be revised to reflect improvement in their suicide prevention efforts.

First, Defendants request that the sentence on page 12 of the Report that reads, "While this reviewer found that SRACs [Suicide Risk Assessment Checklists] were completed appropriately in the majority of the cases, there were a number in which SRACs had resulted in a determination of 'no risk'" (Report, p. 12), be revised to state, "While there were some instances in which SRACs resulted in a determination of 'no risk,' SRACs were completed appropriately in the majority of cases." The fact that CDCR completed the checklists appropriately in a majority of cases indicates that CDCR is not deliberately indifferent to the risk of inmate suicide. Defendants raised this issue with Dr. Patterson. (Ex. A, p. 4.) He did not respond.

Second, Defendants request that the Report be revised to give a balanced picture of improvements in the rate of administration of cardiopulmonary resuscitation (CPR). The Report now reads:

> The Department continued its effort to reduce suicide deaths by providing training on CPR requirements and on the suicide review process. However, it was apparent that CPR was not performed in a timely and/or appropriate manner in seven, or 22 percent, of the 34 suicides. This rate of non-compliance is lower than it was in calendar year 2006, when there were 17 such instances among 43 suicides, for a non-compliance rate of 40 percent.

(Report, p. 14.) By focusing on instances of non-compliance, the Report gives the impression that CDCR is deficient in the performance of CPR on inmates attempting suicide. In fact, Dr. Patterson's statistics show that the rate of administration of CPR improved in one year from 60 percent to 78 percent. This represents substantial compliance with the program guide, and the Report should reflect that compliance.

In addition, Defendants asked Dr. Patterson to clarify whether he recommended that CPR be performed in all cases. (Ex. A, p. 4.) He responded that the Program Guide requires this.

6

1  (Report, p. 17, n.13.)  One of the inmates who did not receive CPR, however, was quite obviously

2  beyond rescue—which the Report admits.  (Report, p. 190.)  Inmate Y leaped 50 feet from a

3  window to his death on the pavement below.  (Case Reviews, p. 190.)  When he was discovered

4  28 minutes later, (Report p. 190), his skull was cracked open, and pieces of his brain lay on the

5  pavement nearby.  (Canning Decl. ¶ 4.)  This information was provided to Dr. Patterson.

6  (Canning Decl. ¶ 4.)  To criticize CDCR for not performing CPR on an inmate who quite

7  obviously was beyond revival, is to require a futile act.  (Canning Decl. ¶ 4.)  Thus, this suicide

8  should not be counted in evaluating CDCR's commitment to performing CPR on inmates who

9  have committed or attempted suicide.  Accordingly, Defendants propose that the paragraph be

10  modified to read:

11      The Department continued its effort to reduce suicide deaths by providing training on
        CPR requirements and on the suicide review process.  CPR was performed in 27 of
12      the 33 suicides for which CPR was arguably appropriate in 2007, for a compliance
        rate with Program Guide requirements of 81 percent.  In 2006, CPR was performed in
13      26 of 43 suicides, for a compliance rate of 60 percent.

14      Finally, Defendants request deletion of the last paragraph on page 16 of the report, which

15  reads, "Although 30-minute welfare checks and confidential screens for inmates newly admitted

16  to administrative segregation were features of the defendants' 2006 Plan to Address Suicide

17  Trends in Administrative Segregation, circumstances of at least one suicide in 2007 raised

18  questions about implementation of this policy."  Defendants originally requested that this

19  paragraph be revised so that it does not imply that this one suicide reflects a systemic failure that

20  negates the evidence of compliance in other cases.  (Ex. A, p. 4.)  Defendants are concerned that

21  this statement questions implementation of the policy based upon one suicide.

22      Dr. Patterson did not respond to Defendants' request and offered no justification for

23  questioning CDCR's commitment to implementing 30-minute welfare checks and confidential

24  screens for new admittees to administrative segregation based upon one case.  The Court should

25  therefore delete that sentence entirely from the final report.

26  / / /

27  / / /

28  / / /

7

1    **IV.    OBJECTIONS TO REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA**
          **DEPARTMENT OF CORRECTIONS AND REHABILITATION IN CALENDAR YEAR 2007,**
2         **CASE REVIEWS**

3         **A.    With Respect to The Suicide of Inmate D, The Court Should Strike The**
                  **Statement That The Inmate's Release from Atascadero State Hospital Was**
4                 **"Precipitous," And The Statement That The Department of Mental Health**
                  **Did Not Provide Information to Dr. Patterson, Because These Statements**
5                 **Lack Foundation.**

6         On page 66, the report criticizes the Department of Mental Health for its "precipitous"

7    discharge of the inmate from Atascadero State Hospital for assaulting other patients.  (Case

8    Reviews, p. 66.)  Defendants objected to this statement on the grounds that Atascadero cannot

9    provide the security level required for assaultive inmates.  (Ex. A, p. 5.)  In the final Report, Dr.

10   Patterson responds that Atascadero has a duty to manage assaultive inmates, rather than

11   transferring them back to the custody of CDCR.  (Case Reviews, p. 66, n. 3.)  No foundation is

12   provided for this statement.  Because the Report does not identify any law or policy giving rise to

13   such a duty, the statement lacks foundation and should be stricken from the report.

14        In addition, Defendants objected to the draft report's criticism of the Department of Mental

15   Health for allegedly not providing documents to Dr. Patterson regarding Inmate D.  (Ex. A, p. 6.)

16   In the final report, Dr. Patterson responded that he should not have had to ask for the documents,

17   and the documents should have been more completed, because "it is required by policy."  (Case

18   Reviews, p. 66, n. 4.)  The "policy" is not identified, and Defendants dispute that there is any

19   such policy.  In the absence of an identifiable policy supporting the opinion, and a citation to

20   relevant authority, the statement lacks foundation and should be stricken from the report.

21        **B.    With Respect to The Suicide of Inmate G, The Court Should Modify The**
                  **Report to Omit The Conclusion Regarding The Purported Opinion of Staff,**
22                **Because That Conclusion Lacks Foundation.**

23        Defendants request that the following language be stricken from page 85 of the Report:

24        Based on this reviewer's examination of the documents provided, it appears that the
          presumption by staff was that this individual [Inmate G], with diagnoses of several
25        Personality Disorders and history of assessment by staff as being "manipulative,"
          somehow suggested that he could not also have become seriously depressed and in
26        need of intensive re-evaluation by psychiatry as well as the overall treatment team.
          This presumption appears to suggest that personality disorders and serious psychiatric
27        disorders such as Major Depression are mutually exclusive.  They certainly are not.

28   (Case Reviews, p. 85.)

                                                    8

1   Defendants object that this conclusion lacks foundation.

2   Dr. Patterson responds in the final Report that the foundation for this statement is that this

3   inmate should have been re-evaluated by the psychiatrist and the treatment team for his

4   depression, but was not.  (Case Reviews, p. 85, n. 6.)  This, however, is not a foundation.  Dr.

5   Patterson is entitled to disagree with other professionals, but that disagreement alone does not

6   provide a foundation for him to opine about the thought processes of the professionals with whom

7   he disagrees.  It is equally possible, for example, that Department of Mental Health (DMH) staff

8   believed this inmate was being manipulative for reasons independent of his multiple diagnoses.

9   Dr. Patterson does not explain how he reached the conclusion that DMH staff thought personality

10  disorders and major depression are mutually exclusive, even after objection by Defendants  (Ex.

11  A, p. 6.).  Thus, the opinion lacks foundation.  Accordingly, Defendants ask that the language

12  quoted above be omitted from the final Report.

13  **C.      With Respect to The Suicide of Inmate W, The Court Should Omit The
            Characterization of The Suicide As Foreseeable And Preventable, Because
14          Mental Health Staff Are Not at Fault for The Deficiencies Described by Dr.
            Patterson.**
15

16   Defendants request that the Report be revised to omit characterizing inmate W's suicide as

17  foreseeable and preventable.  Defendants object that this characterization lacks foundation.  (See

18  Ex. A, p. 7.)  Dr. Patterson faults medical staff for not referring inmate W for a mental health

19  evaluation on July 16, 2007, despite the inmate's report that he had taken his cellmate's

20  medication because he was bored.  (Case Reviews, pp. 179-180, 182.)  Medical staff, however,

21  are under the control of the Receiver in *Plata v. Schwarzenegger*, USDC-ND, C 01-01351 TEH.

22  Defendants in this case do not control such staff.  In addition, although the physician who

23  examined him wrote in a progress note that all of his medications should be taken from him, and

24  that his medications should be dispensed by Direct Observation Therapy (Case Reviews, p. 182),

25  the Unit Health Record did not contain a physician order reflecting this change to Direct

26  Observation Therapy, nor any documented action to remove any medications from the cell (Case

27  Reviews, p. 180.)  Without that order, there is no basis to conclude that the medication regimen

28  should have been changed.

9

1    In response, Dr. Patterson states that his conclusion that the suicide was foreseeable and

2    preventable is based upon a "broader set of concerns," including, presumably, coordination

3    between medical staff and mental health staff.  (Case Reviews, p. 182, n. 10.)  He cites no facts

4    that would indicate that medical staff's failure to refer the inmate for a mental health evaluation

5    or note medication changes in the inmate's file are due to any act or omission by mental health

6    staff.  Thus, there is no justification to criticize Defendants in this case.

7    In addition, there is no indication that medications were the cause of Inmate W's suicide by

8    hanging.  Because there is no evidence of a causal connection between the alleged lapses by

9    medical staff and the suicide, there is no foundation for Dr. Patterson's opinion that the suicide

10    was foreseeable and preventable.  Defendants request, therefore, that this conclusion be omitted

11    from the Report.

12    
**D.    With Respect To The Suicide Of Inmate X, The Report Should Be Revised
To Omit The Characterization Of The Suicide As Preventable, Because It
Lacks Foundation.**

13    

14    Defendants request that the Report be revised to omit characterizing the suicide of inmate X

15    as preventable.  (Case Reviews, p. 186.)  The sole basis for this conclusion is that correctional

16    staff allowed an inmate to participate in the administration of CPR.  (*Id.*)  There is no evidence,

17    however, that CPR was administered incorrectly, or that correct administration of CPR would

18    have produced a different result.  There is no foundation, therefore, for Dr. Patterson's conclusion

19    that the suicide was preventable.  (See Ex. A, p. 7.)

20    / / /

21    / / /

22    / / /

23    

24    

25    

26    

27    

28

1

**CONCLUSION**

2

    For the foregoing reasons, Defendants respectfully request that the Court modify the

3

conclusions and language of Court Record 3677 to reflect the objections raised above

4

Dated:  October 1, 2009                                    Respectfully submitted,

5
                                             EDMUND G. BROWN JR.
                                            Attorney General of California

6
                                            JONATHAN L. WOLFF
                                            Senior Assistant Attorney General

7

8
                                            */s/ Jeffrey Steele*

9
                                            JEFFREY STEELE
                                          Deputy Attorney General
                                          *Attorneys for Defendants*

10
CF1997CS0003

11
30863141.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11