# EXHIBIT A



**EDMUND G. BROWN JR.**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public:    (916) 445-9555
Telephone: (916) 323-1937
Facsimile: (916) 324-5205
E-Mail: Jeff.Steele@doj.ca.gov

July 28, 2009

<u>Via e-mail</u>

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes & Devereaux, LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908

RE:   Coleman, et al. v. Schwarzenegger, et al.
<u>USDC, Eastern District of California, Case No. 2:90-cv-00520 LKK JFM P</u>

Dear Special Master Lopes:

     Thank you for providing Defendants with the opportunity to review and respond to the draft Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2007. Defendants provide the following objections and comments concerning the narrative sections of the Report, the systemic improvements in reducing suicides among the Plaintiff class, and seven case reviews.

    **1.**    <u>**Narrative Section of Report**</u>

       **III.**   **Developments in Suicide Prevention**

     Defendants request that the following statement be revised: "This plan was ordered by the <u>Coleman</u> court on June 7, 2006, following a set of recommendations from the <u>Coleman</u> Special Master to curb a disturbing trend of rising suicides in CDCR administrative segregation units." (Report, p. 4.) Defendants understand that this "trend" was based on statistics covering a 2-3 year period. Because trends in suicides should be based on a minimum of five years of data, Defendants request that the Report eliminate reference to a "disturbing trend." *See* Lindsay Hayes, <u>Technical Assistance Report on Suicide Prevention Practices within the Ohio Department of Corrections and Rehabilitation</u>, November 19, 2004.

     Defendants also request that the following statement be clarified:

> Defendants had circulated proposals for screening inmates for
> suicidality prior to their placements in administrative segregation,

> and for awareness of potential suicidal tendencies following an inmate's receipt of "bad news" at court or otherwise. Defendants also reported that mental health staff would be conducting the aforesaid screening interviews in private settings, but *Coleman* monitoring found that some were still not occurring in confidential areas, and that defendants still had not conducted their assessments of resources to provide privacy for these sessions. (Report, p. 6.)

This paragraph appears to conflate two screening procedures. The pre-placement administrative segregation unit (ASU) screening was not designed or ordered to be done in private/confidential settings. These are brief (five-question) screenings done by medical personnel at the same time as medical clearances for ASU placement. On the other hand, the 31-item screening done within 72 hours of placement in ASU is to be done in a confidential setting.

In addition, Defendants have created and implemented policies and procedures for screening and eliciting information about recently received bad news, and have trained their personnel regarding these policies and procedures. A question about recently received bad news is now standard in all R&R interviews for new arrivals, as is pre-placement screening. The twenty-first round monitoring report confirms that these policies have been implemented. Defendants request that the Report reflect these developments.

## V.   **Discussion and Observations**

Defendants request that the Report be revised to take into account Appendix A attached to this letter. Robert Canning, Ph.D., Chief Psychologist with the CDCR Mental Health Program, prepared this Appendix, which is based on the timelines set forth in the 2006 Mental Health Services Delivery System Program Guide, Chapter 10, Section F: Suicide Death Review. According to Dr. Canning, the Appendix A attached to the Report contains some incorrect timelines.

Defendants request that the following paragraph be omitted:

> 2007 was not the first year for which the Department failed to comply with deadlines for completion and submission of required documentation. Following distribution of the Special Master's expert's 2006 report on suicides in the CDCR in draft form, defendants stated in their response that they had failed to provide any of the mental health records within the Unit Health Record for one of the inmates whose suicide in 2006 was reviewed and included in the draft report. In the final version of this reviewer's Report on Suicides in the CDCR in 2006, Defendants were admonished that they "must ensure that no such lapses in their production of information occur again. Review of incomplete records can lead to erroneous conclusion and recommendations,

and ultimately to allowing deficiencies in the defendants' suicide prevention efforts to remain undetected and uncorrected." *Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2006, filed 9/12/08, at 1, n.1.* Unfortunately, that admonition must be repeated, and failure to heed it in the future may result in a recommendation for an order from the court. (Report, pp. 13-14.)

According to Dr. Canning, Dr. Patterson did not receive the mental health records within the UHR for one of the inmates whose suicide was reviewed in the 2006 report because the Receiver's office had the UHR and agreed to provide the information. They did not do so. Upon learning that the Receiver's office did not provide Dr. Patterson with the mental health records, CDCR promptly obtained the UHR and provided the records to Dr. Patterson.

### VI. Findings

Defendants request that the Report clarify the statement that "[t]here were variations among the institutions with respect to screening inmates who were placed in administrative segregation units, as well as with conducting screenings in confidential settings" because it is unclear whether the Report is referring to the pre-placement screenings or the 72-hour screenings. (Report, p. 15.)

Defendants also request that the tenth finding in this section be clarified. (Report, p. 16.) The Report notes that in four cases, CPR was determined to be not applicable based on the inmate's condition at the time he was discovered. These determinations were not made by a physician. But, it is not clear why these decisions are mentioned. Defendants do not know whether the monitors recommend a revision to suicide response plans or whether they recommend that CPR be administered in every case.

### 2. Defendants have made significant progress in implementing their suicide plan.

Defendants take suicide prevention seriously, and request that the Report acknowledge they have made significant progress in implementing their suicide plan. Specifically, in October 2006, Defendants put in place a plan to address suicides in ASUs. (Docket No. 1990.) According to CDCR, that plan has been fully implemented. And on March 9, 2009, the Special Master's Office was informed that retrofit of 406 cells in 64 administration units in all 33 prisons was complete, and that 2,235 cell vents were replaced in 45 ASUs in 28 prisons. Defendants recognize that the Report addresses suicides that occurred in 2007, but given its date, request that the Report acknowledge these significant developments.

In addition, Defendants believe that the Report tends to emphasize perceived shortcomings and does not appropriately acknowledge their achievement in preventing suicides. Thus, Defendants request that four statements in the Report be revised to reflect improvement.

Matthew A. Lopes, Jr.
July 28, 2009
Page 4

First, Defendants request that the sentence, which reads: "As indicated below, although the suicide rate for 2007 was lower than it had been for the two immediately preceding years, it was still higher than the rate for six of the nine preceding years" (Report, p. 7), be revised to state, "Defendants' programmatic improvements and physical plant improvements resulted in fewer suicides in 2007 than in the preceding two years."

Second, Defendants request that the sentence, which reads: "While this reviewer found that SRACs were completed appropriately in the majority of the cases, there were a number in which SRACs had resulted in determination of 'no risk'" (Report, p. 12), be revised to state, "While there were some instances in which SRACs resulted in a determination of 'no risk,' SRACs were completed appropriately in the majority of the cases."

Third, Defendants request that the following statement be revised to add that the compliance rate rose in one year from 60% to 78%:

> The Department continued its effort to reduce suicide deaths by providing training on CPR requirements and on the suicide review process. However, it was apparent that CPR was not performed in a timely and/or appropriate manner in seven, or 22 percent, of the 34 suicides. This rate of non-compliance is lower than it was in calendar year 2006, when there were 17 such instances among 43 suicides, for a non-compliance rate of 40 percent. (Report, p. 13.)

Last, Defendants request that the statement, which reads: "Although 30-minute welfare checks and confidential screens for inmates newly admitted to administrative segregation were features of the defendants' 2006 Plan to Address Suicide Trends in Administrative Segregation, circumstances of at least one suicide in 2007 raised questions about implementation of this policy" (Report, p. 16), be revised so that it does not imply that this one suicide reflects a systemic failure that negates the evidence of compliance in other cases. Defendants are concerned that this statement questions implementation of the policy based upon one suicide.

3.  **Case Review**

    **Inmate A**

Defendants request that the Report omit the conclusion that the suicide was preventable. Defendants object on the basis that it was "unclear" how the inmate obtained enough Seroquel to overdose. If it is unclear, no conclusion can be drawn about how the suicide was preventable. If it is clear that HDSP's medication management system is at fault, then Defendants request that the Report add a reference to the supporting evidence.

Defendants also request that the Special Master reconsider the evidence in the Report. While it may be true that the inmate avoided others and was afraid of gang activity, it is also true that he had a cellmate from whom he could have obtained the Seroquel. In addition, the Report

Matthew A. Lopes, Jr.
July 28, 2009
Page 5

cites evidence that inmate A received a CDCR 115 rules violation report for battering another inmate, possibly at the behest of a skinhead gang. Thus, there is evidence that inmate A had sufficient contact with other inmates. This evidence raises questions whether his possession of Seroquel in a lethal quantity was caused by poor medication management at the institution.

### Inmate C

Defendants request that the Report clarify the statement that "[t]here is a very serious problem in the actual implementation of the QIP by CDCR, as reflected in the documents submitted," by identifying which QIP the Report refers, or what problems were identified.

Defendants provide the following clarification concerning DMH's post-suicide review with respect to this inmate. Following the suicide, DMH did a comprehensive Root Cause Analysis (RCA). DMH identified twenty-two areas where improvements could be made. Of those twenty-two items, four were structural and the rest programmatic. All the programmatic changes were completed by September 2007. The structural changes took longer because they required funding. When funding was received in 2008, DMH could not retrofit cells in light of the waiting list. DMH received approval to do the retrofit in December 2008. Although it was delayed again because the cell doors that were received were not usable, the retrofit began in March 2009, and is proceeding. Thus, DMH has made significant progress in addressing the problems cited in the review of Inmate C.

Defendants believe that the Report does not accurately characertize the relationship between DMH and CDCR, and requests that it be revised to omit the statements about lack of cooperation. DMH shared its RCA and its Plan of Corrections with CDCR, albeit through the Attorney General's Office. According to DMH, it provided this information through the Attorney General's Office in order to preserve patient confidentiality by forwarding the documents only to those parties who were entitled and needed to receive them, and ensure that DMH's attorneys were involved in all communications with the Special Master's office.

Finally, Defendants request that the Report reflect that the training that DMH indicated would be initiated in response to problem 10 has been implemented.

### Inmate D

For the reasons identified as to inmate C, Defendants request that the Report be revised to omit the statements about lack of cooperation between CDCR and DMH.

Defendants request that the Report omit characterizing the discharge of inmate D from Atascadero State Hospital as "precipitous." The Report notes that the inmate assaulted other inmates. Although ASH is a secure facility, it does not provide the security level required for assaultive inmates. The discharge does not reflect a clinical judgment regarding inmate D's mental health status, merely his unsuitability for housing at ASH based on security concerns.

Matthew A. Lopes, Jr.
July 28, 2009
Page 6

Defendants provide the following clarification concerning the statement that Dr. Patterson did not receive documents he asked for with respect to inmate D. Exhibit B shows the email stream requesting the documents. On April 29, 2009, he wrote to Deputy Attorney General Debbie Vorous, requesting DMH's Quality Improvement Plan. When Ms. Vorous forwarded DMH's Plan of Corrections for inmates C and D, Dr. Patterson responded on May 1, 2009, that he already had them, and was asking for evidence of implementation of the Plans. DMH had prepared no such documents (Exhibit B), but did so in response to Dr. Patterson's request, and the Attorney General's Office forwarded them to him on May 15, 2009. (Exhibit C.)

Defendants request that the Report be revised to omit the following statement: "On a pretext of patient confidentiality, DMH refused to provide documentation on implementation of the QIP and other action plans to CDCR." As noted above, DMH did not generate documentation of its implementation of its Plan of Correction until asked to do so by Dr. Patterson on May 1, 2009.

**Inmate G**

Defendants request that the following statement be revised to omit the conclusion that DMH clinicians believed the inmate's manipulative personality excluded the possibility that he had personality or psychiatric disorders:

> Based on this reviewer's examination of the documents provided, it appears that the presumption by staff was that this individual [Inmate G], with diagnoses of several Personality Disorders and history of assessment by staff as being "manipulative," somehow suggested that he could not also have become seriously depressed and in need of intensive re-evaluation by psychiatry as well as the overall treatment team. This presumption appears to suggest that personality disorders and serious psychiatric disorders such as Major Depression are mutually exclusive. They certainly are not. (Report, p. 62.)

Defendants object that this conclusion lacks foundation.

**Inmate H**

Defendants ask that the Report be revised to omit criticism of CDCR for not verifying the inmate's claim that he was taking medication at the jail from which he was sent. The jail transfer summary indicated that the inmate was not taking medication. CDCR personnel were entitled to rely upon that the documentation.

**Inmate W**

Defendants request that the Report be revised to omit characterizing inmate W's suicide as foreseeable and preventable. Defendants object that this characterization lacks foundation. Medical staff did not refer inmate W for a mental health evaluation on July 16, 2007, despite his report that he had taken his cellmate's medication because he was bored. In addition, although the physician who examined him wrote in a progress note that all of his medications should be taken from him, and that his medications should be dispensed by DOT, the UHR did not contain a physician order reflecting this change to DOT, nor any documented action to remove any medications from the cell. Without that order, it was appropriate for medications to continue and there is no indication that medications were the cause of this suicide by hanging.

**Inmate X**

Defendants request that the Report be revised to omit characterizing the suicide of inmate X as preventable. Defendants object that this characterization lacks foundation. The sole basis for this conclusion is that correctional staff allowed an inmate to participate in the administration of CPR. There is no evidence, however, that CPR was administered incorrectly, or that correct administration of CPR would have produced a different result.

Defendants request an opportunity to meet with the Special Master and Dr. Patterson to discuss their responses to the draft Report and work through any remaining issues.

Thank you for your consideration of these matters.

Sincerely,

JEFFREY STEELE
Deputy Attorney General

For    EDMUND G. BROWN JR.
Attorney General

cc:    Special Master Team
Michael Bien
Steve Fama

CF1997CS0003
30816649.doc

# APPENDIX A

# Appendix A

## Tracking Timelines for Departmental Review of Inmate Suicides

| | **Event/Documents** | **Timeline** |
|---|---|---|
| 1. | Date of Death | 0 hour |
| 2. | Chief Medical Officer to Death Review Coordinator | 8 hours |
| 3. | Initial Inmate Suicide Report (Form 7229B) by Suicide Prevention Coordinator to Death Review Coordinator | 2 business days |
| 4. | Death Review Coordinator to Mental Health Suicide Prevention Coordinator | 3 business days |
| 5. | Mental Health Suicide Prevention Coordinator appoints Mental Health Suicide Reviewer | 5 business days |
| 6. | Mental Health Suicide Reviewer writes Preliminary Report; Notifications of suspected misconduct to Suicide Review Committee | 30 days |
| 7. | Suicide Review Committee completes Review and Adds Quality Improvement Plan (if recommended); Review to Mental Health Suicide Reviewer to Complete Executive Report | 45 days |

2

| | | |
|---|---|---|
| 8. | The report is signed by both Directors, and copied to Regional Administrators of DCHCS and DAI; Legal Affairs Division; and to the reporting institutions' Warden; Health Care Manager/Chief Medical Officer; Mental Health Program Manager, Chief/Senior Psychiatrist and Chief/Senior Psychologist; and, other appropriate interested and legally designated persons | 60 days |
| 9. | Facility, Warden, and Chief Medical Officer or Health Care Manager implement Quality Improvement Plan | 60 days from receipt of Executive Summary (120 days from date of death) |
| 10. | Report on implementation of Quality Improvement Plan by facility Warden and Chief Medical Officer or Health Care Manager to Suicide Review Committee | 150 days |

3

# APPENDIX B

**From:** Debbie Vorous
**To:** raymond patterson
**CC:** Debbie Vorous; Jeff Steele; LBuffardi@pldwlaw.com
**Date:** 5/1/2009 2:52 PM
**Subject:** Re: Suicide Report of Inmate ■■■■■■

Dear Dr. Patterson,

Thank you for your e-mail. I understand that you did receive the Plans of Correction for the two suicide events at CMF/DMH, and now seek a statement from CDCR and DMH concerning the status of the implementation of those Plans of Correction. Please note that the portion of the Plans of Correction addressing the removal of attachment points (such as tables, chairs, screens) is further developed in Defendants' March 19, 2009 filing at pages 9 and 43. I will relay your request for a status report to DMH and CDCR and inform you of their response.

Sincerely,


Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345

>>> raymond patterson <rpattersonmd@earthlink.net> 5/1/2009 1:26 PM >>>

Dear Debbie,
I appreciate your efforts, but the two sets of documents (Plans of Corrections) that you sent to me I already have; they were part of the DMH Root Cause Analyses and referenced in the CDCR Suicide Reports from 3/20/07 and 4/20/07, respectively. The documents I referred to in our discussions and my e-mail of 4/29/09 were the responses to those analyses and reports, i.e. what DMH and CDCR did to implement the Plans of Corrections. Although you may not have been clear on the differences, DMH and CDCR most certainly were and are. What was sent to you was without a cover letter signed by anyone, without explanation of it's intent and wholly unresponsive to my request. I have advised the Special Master that all deadlines for inclusion of additional documents in the 2007 Suicide Report have long passed, and efforts to extend completion of the Report while awaiting additional information from CDCR and DMH is no longer a reasonable option. Should you receive additional information/documents from CDCR or DMH regarding 2007 suicides you should certainly send them, but they will not be included in the Special Master's Report on Suicides in the California Department of Corrections for 2007.
Ray Patterson


-----Original Message-----
From: Debbie Vorous
Sent: May 1, 2009 2:15 PM
To: raymond patterson
Cc: Debbie Vorous , Jeff Steele , LBuffardi@pldwlaw.com
Subject: Re: Suicide Report of ■■■■■■

Dear Dr. Patterson,

Attached are the following: 1) ▮▮▮▮▮ Plan of Correction dated February 13, 2007; and 2) ▮▮▮▮▮ Plan of Correction dated February 13, 2007.

Sincerely,

Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345

>>> raymond patterson <rpattersonmd@earthlink.net> 4/29/2009 3:22 PM >>>

Dear Debbie,
As per our discussions on 4/21 and 4/28, I am providing the names and numbers for inmates that I don't have complete documents, as follows:
I have not received Quality Improvement Plans (i.e. responses from specific facilities/DCHCS/others identified in the Individual Suicide Reports for inmates (1) ▮▮▮▮, (2) ▮▮▮▮, (3) ▮▮▮▮ (4) ▮▮▮▮ (5) ▮▮▮▮ (6) ▮▮▮▮ and (7) ▮▮▮▮. As we discussed, the ▮▮▮ and ▮▮▮ deaths occured in DMH at CMF, and DMH reported they would not provide QIP's to CDCR because of "confidentiality" however they did provide a Root Cause Analysis to CDCR, which I also received. DMH stated they would provide responses to the Deputy Attorney General, but I have not seen them. Of note, a death occured in ASH (inmate ▮▮▮▮) and DMH did provide a response to CDCR in that death.
The draft of the Special Master's Suicide Report is near completion and he will determine whether or not any additional documents will be included since all of these documents should have been received by mid 2008.

Ray Patterson

-----Original Message-----
From: Debbie Vorous
Sent: Apr 24, 2009 5:57 PM
To: DocKC99@aol.com, DoctorKoson@aol.com, harconwil@aol.com, HowNani@aol.com, mperrien@aol.com, melissawarren@appliedforensics.org, HD@Dlugacz.com, rpattersonmd@earthlink.net, burnshill@gmail.com, ashannonpsychmd@mindspring.com, gasquetflat@msn.com, paul_nicoll@msn.com, kwalsh@pld-law.com, lbuffardi@pld-law.com, mlopes@pld-law.com, mspencer@pld-law.com, FEscamilla@pldlaw.com, mjones@pldwlaw.com, Jeffrey.metzner@uchsc.edu, vje@verizon.net, jronmetz@yahoo.com
Cc: Debbie Vorous , Jeff Steele , dspecter@prisonlaw.com, sfama@prisonlaw.com, awhelan@rbg-law.com, jkahr@rbg-law.com, mblen@rbg-law.com
Subject: Suicide Report of Inmate ▮▮▮▮

April 24, 2009

Re: Coleman v. Schwarzenegger

Dear Special Master Lopes:

Attached is an electronic suicide report of Inmate ███████████████, who committed suicide on December 5, 2007. You may already have received a hard copy of this report.

Sincerely,

Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# APPENDIX C

# Debbie Vorous - DMH Mental Health Suicide Plan of Correction Response

**From:** Debbie Vorous
**To:** rpattersonmd@earthlink.net
**Date:** 5/15/2009 3:36 PM
**Subject:** DMH Mental Health Suicide Plan of Correction Response
**CC:** Debbie Vorous; Jeff Steele
**Attachments:** Document.pdf

Dear Dr. Patterson:

Attached is a letter from the Department of Mental Health along with the Vacaville Psychiatric Program's responses to the Plans of Correction for inmates ▇▇▇ and ▇▇▇.

Please let me know if you have any questions.

Sincerely,

Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345



# California Department of Mental Health

1600 9th Street, Sacramento, CA 95814
(916) 654-2413

Dr. Ray Patterson
Office of Special Master
Pannone, Lopes & Devereaux, LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908

via:   Debbie J. Vorous
Jeffery Steele
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

**RE: DEPARTMENT OF MENTAL HEALTH SUICIDE PLAN OF CORRECTION RESPONSE**

In the enclosed attachments you will find the Vacaville Psychiatric Program's plans of correction that were developed in response to the suicides of inmate-patients Mr. M (deceased January 27, 2007) and Mr. M (deceased January 29, 2007). In addition, a list of acronyms is provided for your convenience. If you have any questions regarding these documents, please contact Nathan Stanley, Long Term Care Services Division at (916) 654-2413.

Sincerely,

CYNTHIA A. RADAVSKY
Deputy Director

Enclosures

# EXHIBIT B

CDCR Suicides: 1998 to 2007

| Year | Total Suicides | CDCR Population (June 30) | Raw Rate per 100K inmates | Psychiatric Inpatients |
|---|---|---|---|---|
| 1998 | 21 | 158,207 | 13.3 | 11 |
| 1999 | 24 | 162,064 | 14.8 | 8 |
| 2000 | 14 | 162,000 | 8.6 | 7 |
| 2001 | 27 | 161,497 | 16.7 | 14 |
| 2002 | 21 | 157,972 | 13.3 | 12 |
| 2003 | 37 | 160,838 | 23.0 | 13 |
| 2004 | 26 | 163,381 | 15.9 | 14 |
| 2005 | 36 | 164,034 | 21.9 | 21 |
| 2006 | 43 | 172,508 | 24.9 | 23 |
| 2007 | 31 | 173,274 | 17.9 | 20 |
| Total | 280 | 1,635,775 | 17.1 | 151 |

ASU Suicides

(table illegible)

Non-ASU Suicides

| Year | Psychiatric Non-ASU Suicides | Percent Non-ASU Suicides | Non-Psychiatric Non-ASU | Percent |
|---|---|---|---|---|
| 1998 | | 76.2% | | 43.8% |
| 1999 | 17 | 70.8% | | 35.3% |
| 2000 | | 50.0% | | 57.1% |
| 2001 | 17 | 63.0% | | 41.2% |
| 2002 | 16 | 76.2% | | 62.5% |
| 2003 | 19 | 51.4% | | 26.3% |
| 2004 | 8 | 30.8% | 3 | 37.5% |
| 2005 | 23 | 63.9% | 15 | 65.2% |
| 2006 | 25 | 58.1% | 12 | 48.0% |
| 2007 | 21 | 67.7% | 13 | 61.9% |