PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111-5994
Telephone: (415) 882-8200

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
ERNEST GALVAN, Bar No. 196065
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARK FEESER, Bar No. 252968
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No. Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>PLAINTIFFS' RESPONSE TO DEFENDANTS' POPULATION REDUCTION PLAN AND APPLICATION FOR ORDER TO SHOW CAUSE RE CONTEMPT |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ................................................................................................. 1

II. BACKGROUND .................................................................................................... 2

   A. Defendants' History of Intransigence in *Plata* and *Coleman* ............................. 2

   B. Defendants' defiance of the August 4 Order ......................................................... 5

III. THE COURT SHOULD ISSUE AN ORDER TO SHOW CAUSE RE
     CONTEMPT ........................................................................................................... 7

   A.  Legal Standard .................................................................................................. 7

   B.  Defendants' Defiance of the August 4 Order is Contemptuous ......................... 8

   C.  Defendants Have Acted in Bad Faith ................................................................ 9

   D.  Defendants Have No Excuse for Their Contemptuous Conduct ..................... 11

   E.  The Court Should Order Defendant Governor Arnold Schwarzenegger to Show
       Cause Why He Should Not be Held in Contempt of Court ............................. 14

IV. CONCLUSION………………………………………………………………………15

-i-

PLFS' RESP TO DEF. POP. REDUCTION PLAN AND APPLICATION FOR OSC RE CONTEMPT, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

# TABLE OF AUTHORITIES

## CASES

*Cooke v. United States*,
    267 U.S. 517 (1925) ................................................................................................................7

*Donovan v. Mazzola*,
    716 F.2d 1226 (9th Cir.1983) ..................................................................................................8

*Halderman v. Pennhurst State School & Hospital*,
    673 F.2d 628 (3d Cir. 1982) ..................................................................................................13

*Hicks v. Feiock*,
    485 U.S. 624 (1988) ..............................................................................................................14

*Hook v. Ariz. Department Corrections*,
    107 F.3d 1397 (9th Cir. 1997) ..........................................................................................8, 13

*Hook v. State of Ariz.*,
    907 F. Supp. 1326 (D.Ariz. 1995) ...........................................................................................8

*Nilva v. U.S.*,
    352 U.S. 385 (1957) ................................................................................................................7

*Sekaquaptewa v. MacDonald*,
    544 F.2d 396 (9th Cir.1976) ....................................................................................................8

*Spain v. Mountanos*,
    690 F.2d 742 (9th cir. 1982) ..................................................................................................13

*Spallone v. United States*,
    493 U.S. 265 (1990) ................................................................................................................7

*Stone v. City of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) .............................................................................................8, 13

*U.S. v. Powers*,
    629 F.2d 619 (9th Cir. 1980) ...................................................................................................8

*United States v. United Mine Workers of America*,
    330 U.S. 258 (1947) ................................................................................................................7

*Walker v. City of Birmingham*,
    388 U.S. 307 (1967) .................................................................................................................7

*Washington v. Washington State Comm'l Pasenger Fishing Bessel Association*,
    443 U.S. 658 (1979) ...............................................................................................................13

**STATUTES**

18 U.S.C.

    § 401(3) ....................................................................................................................................8
    § 3626(a)(1)(B)...................................................................................................................5, 14

California Government Code
    § 8571   ...................................................................................................................................14
    § 8627   ...................................................................................................................................14
    § 8646   ...................................................................................................................................14
    § 8658   ...................................................................................................................................14

**RULES**

Federal Rules of Criminal Procedure
    42(a)..........................................................................................................................................8

## I. INTRODUCTION

Defendants have demonstrated utter contempt for this Court's August 4, 2009, Opinion and Order (*Plata* Doc. No. 2197) ("August 4 Order"). In that opinion, the Court concluded that no relief, other than a reduction in the prison population, could remedy constitutional violations that are causing plaintiff class members to suffer and die. Although the Court could have ordered the State to reduce its prison population immediately, it instead issued an order giving defendants 45 days to submit a plan that would gradually reduce the prison population to 137.5% of design capacity over two years. A population reduction order is necessary because there is simply no other means to vindicate plaintiff class members' constitutional rights:

> We recognize the gravity of the population reduction order we issue herein, and we do not intervene in matters of prison population lightly. Nonetheless, when federal court intervention becomes the only means by which to enforce rights guaranteed by the Constitution, federal courts are obligated to act. "Without this, all the reservations of particular rights or privileges would amount to nothing." *The Federalist* No. 78 (Alexander Hamilton). California's prisoners have long been denied constitutionally adequate medical and mental health care, often with tragic consequences, and the overcrowding in California's prisons, which have become criminogenic, must be reduced if the prison system is to achieve constitutional compliance.

August 4 Order at 9.

Defendants appealed, and sought a stay of the requirement that they submit a population reduction plan. Both this Court and the Supreme Court denied their request for a stay. As this Court correctly found, the "court has been more than patient with the State and its officials. . . [I]t is now in the best interests of all concerned to act as swiftly as possible. Further delays and obstruction will not well serve the people of the state, and *will not be tolerated by this court*." Sept. 3, 2009 Order Denying Mot to Stay (*Plata* Doc. No. 2218) at 5 (emphasis added).

Having lost their application to stay, defendants nonetheless openly defied the August 4 Order. Defendants submitted a population reduction plan on September 18, 2009, that provides for a reduction in the prison population that is less than half of that ordered by this Court. One top CDCR official admitted that defendants September 18 submission does not

-1-

"meet the Court's requirements" and that defendants may be in contempt of court. Evenson Decl., Exh. A.

Defendants' defiance of this Court's order is all the more contemptuous because defendants have a plan to safely reduce the prison population by 37,000 prisoners, just short of the level required by the August 4, Order. Evenson Decl., Exh. B. They submitted this plan to the State legislature, but not to this Court.

Defendants' actions demonstrate utter disregard for the authority of this Court and the integrity of its orders, as well as the lives and well-being of tens of thousands of prisoners who suffer from inadequate care in overcrowded prisons. This is precisely the conduct that this Court stated "will not be tolerated." Sept. 3, 2009 Order at 5.

At this stage of the proceedings in these decades-old cases, in the face of defendants' bald defiance of the Court's order, and in light of the serious consequences faced by plaintiff class members with every delay, the Court must ensure that its orders are followed, and there must be consequences for defendants' unlawful acts. The Court must issue an order requiring defendants to submit a plan that fully complies with this Court's August 4 Order and requiring lead defendant Governor Arnold Schwarzenegger to show cause why he should not be held in civil and criminal contempt of court.

## II.   BACKGROUND

### A.  Defendants' History of Intransigence in *Plata* and *Coleman*

In *Plata*, defendants entered two separate stipulations requiring them to implement measures to remedy the deficiencies in prison medical care. June 13, 2002 Stipulation and Order for Injunctive Relief (*Plata* Doc. No. 68); Sept. 13, 2002, Stipulation and Order Re Quality of Patient Care (*Plata* Doc. No. 229). Then, they utterly failed to implement the reforms, and did not meet any of the deadlines or timelines upon which they had agreed. May 10, 2005 Order to Show Cause (*Plata* Doc. No. 294) at 3-4. The court employed myriad efforts to bring the state into compliance. It entered orders, which defendants ignored. *Id.* It appointed neutral experts to review conditions and report on recommendations; the experts came back with dismal progress reports month after month. *Id.* at 4-6. Finally, the district

court judge began personally meeting with the parties on a monthly basis in order to identify the impediments to reform and to assist defendants in overcoming them. Oct. 3, 2005 Findings of Fact and Conclusions of Law (*Plata* Doc. No. 371) at 38-39. Even that effort was unavailing. *Id.* Ultimately, nothing succeeded in persuading defendants to comply with the policies that they themselves admitted were necessary to remedy the constitutional violations. Accordingly, after remedial efforts had stalled for three years, the court issued an order to show cause as to why defendants should not be found in civil contempt and why a receiver should not be appointed to manage prison health care delivery. May 10, 2005 Order to Show Cause. The court held a six-day trial and ultimately imposed a receivership over the state prison medical care system. It did so, however, only after finding that defendants are "unwilling or incapable of breaking out of a deeply entrenched bureaucratic mind-set, and have refused or been unable to take the steps necessary to prevent further needless loss of life and suffering among its wards." Oct. 3, 2005 Findings at 37-39. The court held the contempt remedy in abeyance. *Id.* at 50.

The history of the *Coleman* case is similarly dismal. Since the *Coleman* court first held in 1995 that "seriously mentally ill inmates in the California Department of Corrections daily face an objectively intolerable risk of harm as a result of the gross systemic deficiencies that obtain throughout the Department," *Coleman v. Wilson,* 912 F. Supp. 1282, 1316 (E.D. Cal. 1995), defendants have demonstrated a persistent inability or unwillingness to comply with the remedial orders in that case.

For more than a decade, the *Coleman* court has repeatedly issued orders aimed at eliminating the shortage of beds for prisoners in need of mental health crisis treatment, inpatient psychiatric hospitalization, and specialized outpatient programs, as well as shortages in the amount of space necessary to operate such programs. *See* August 4 Order at 30-31. In 2006, the *Coleman* court took stock of the results of its orders:

> The special master reports, the record reflects, and defendants admit, that the plan presented to the court in no way adequately responds to the severe shortage of intermediate care facility beds and mental health crisis beds that currently exists in the CDCR. It is undisputed that the shortage is leaving critically mentally ill inmates languishing in

-3-

>  horrific conditions without access to immediately necessary mental health care.

5/2/06 Order at 2:14-18 (*Coleman* Docket No. 1800). Defendants' non-compliance persists to this day. The *Coleman* court recently evaluated defendants' response to an order for a long-term mental health bed plan, and noted that "the State has no current viable bed plan [and] is uncertain as to when [one] can be developed," which the court concluded "demonstrate[s] an unacceptable lack of commitment to its constitutional duty, much less to the orders of this court." 3/5/09 Order 1:24-2:3 (*Coleman* Doc. No. 3450); *see also* 9/24/09 Order at 3 (*Coleman* Doc. No. 3686).

Orders to implement defendants' own mental health program standards have met a similar fate. The *Coleman* court ordered defendants to comply with their mental health program standards, the "Program Guides," in June 1997. 6/27/97 Order (*Coleman* Doc. No. 858) (ordering defendants to implement, among other remedial documents, Program Guide submitted by Special Master); *see also* 5/30/97 Special Master's Report on Plans. The court has allowed defendants more than 10 years to come into compliance with these standards, and gave defendants permission to make major revisions to the Program Guides in 2006, *see* 3/3/06 Order (*Coleman* Doc. No. 1773), but defendants still fail to meet many of these standards. *See, e.g.*, P-264 (EOP Unmet Need Chart); D-1020 at 4; Dezember at RT 915:24-916:7; P-57 at 353; *see also* P-9 at 12-1-13.

Importantly, defendants still fail to comply with the Revised Program Guide standards and court orders regarding suicide prevention. *See generally* 9/17/09 Special Master's Report on Suicides in Calendar Year 2007 (*Coleman* Doc. No. 3677). As a result, there is an unacceptably high level of suicides directly tied to "inadequate clinical assessments, inappropriate interventions, incomplete referrals, missed appointments and appointments that were not rescheduled, unsupported diagnoses, failure to review records, assignments to inappropriate levels of mental health care, failure to provide protective housing, and the provision of inadequate or untimely resuscitation efforts." August 4 Order at 87 (internal quotation marks omitted).

In short, for decades defendants have been dragging their heels and flouting the orders of the *Plata* and *Coleman* district courts, and plaintiff class members have continued to suffer as a result. As this Court correctly found:

> [D]uring the 8 years of the *Plata* litigation and the 19 years of the *Coleman* litigation, the political branches of California government charged with addressing the crisis in the state's prisons have failed to do so. Instead, the rights of California's prisoners have repeatedly been ignored. Where the political process has utterly failed to protect the constitutional rights of a minority, the courts can, and must, vindicate those rights. *See* John Hart Ely, *Democracy and Distrust* 103, 173 (1980).

August 4 Order at 182.

The Governor himself has agreed with this Court's assessment that judicial intervention is necessary. The Governor stated: "I don't blame the courts for stepping in to try to solve the health care crisis that we have, the overcrowding crisis that we have, because the fact of the matter is, for decades the state of California hasn't really taken it seriously. It hasn't really done something about it." Pls.' Exh. P-384.

**B. Defendants' Defiance of the August 4 Order**

The Court's August 4 Order required defendants to submit a plan by September 18, 2009, "that will in no more than two years reduce the population of the CDCR's adult institutions to 137.5% of their combined design capacity." This amounts to a reduction of 40,000 prisoners.[1] August 4 Order at 183. The order further states, "[s]hould any of defendants' proposed population reduction measures require the waiver of any provisions of state law, the state shall so advise the court, and shall explain why the requested waiver is

---

[1] Currently, the design capacity of the in-state adult institutions at issue in this case (which excludes camps and community correction centers) is approximately 80,000 and the population is just under 150,000. *See* CDCR September 30, 2009 Weekly Population Report, available at http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1Ad090930.pdf (site last visited October 8, 2009). Accordingly, the State's plan must provide methods to reduce the population of adult institutions to 110,000 prisoners, a reduction of 40,000 prisoners.

permissible under 18 U.S.C. § 3626(a)(1)(B)." *Id.* The order requires that defendants' plan "shall set forth . . .the effective dates of the various actions they propose to undertake and [the State's] estimate of the reduction in population they expect to achieve after six, twelve, eighteen, and twenty-four months." *Id.*

Defendants appealed the August 4 Order, and sought a stay from this Court, and then from the United States Supreme Court. They contended that they should not have to submit a population reduction plan in accordance with the August 4 Order. This Court and the Supreme Court both denied their request.

Nonetheless, defendants willfully refused to comply with the August 4 Order in the following respects:

- The order requires defendants to submit a plan that accomplishes a reduction to 137.5% of design capacity in two years. August 4 Order at 183. Defendants' plan would reduce the prison population to 166% of design capacity in two years, and would *never* achieve 137.5% of design capacity. Def. Pop. Reduction Plan, Exh. A at 15.

- The order requires defendants' plan to include six-month benchmarks. August 4 Order at 183. Defendants' plan has one-year benchmarks, tied to the Fiscal Year. Def. Pop. Reduction Plan, Exh. A at 15.

- The order requires defendants to advise the Court whether any population reduction measures require waiver of state law. August 4 Order at 183. Defendants refused to identify any state law barriers to reducing the prison population. Def. Pop. Reduction Plan, Exh. A at 16 n.11.

Neither the contents of defendants' plan nor the timeline for implementing it comply with the Court's August 4 Order; instead, they adhere to two enactments by the legislature: "SB xxx18," a bill recently passed by the state legislature but not signed by the Governor; and AB 900, a prison construction measure enacted in 2007. Def. Pop. Reduction Plan, Exh. A at 3-14. Thus, rather than submitting a plan that complies with the August 4 Order, defendants essentially have told the Court that they will reduce the prison population as the State sees fit,

to a level the State deems appropriate, and in a timeframe the State has set for itself.

## III. THE COURT SHOULD ISSUE AN ORDER TO SHOW CAUSE RE CONTEMPT

Defendants' have defied this Court's order in a willful and bad faith manner, after being told by the United States Supreme Court to obey. CDCR's Deputy Chief of Staff openly admitted that defendants' "plan will not meet the court's requirements . . . I think we recognize we may be held in contempt." Evenson Decl., Exh. A.

### A. Legal Standard

Federal courts have the inherent power to enforce court orders through civil and criminal contempt. *See Spallone v. United States*, 493 U.S. 265, 276 (1990). The Court may "punish by fine or imprisonment, or both, at its discretion, such contempt of its authority" as "[d]isobedience or resistance to its lawful writ, process, order, rule, decree or command." 18 U.S.C. § 401. This power is necessary to "protect[ ] the due and orderly administration of justice" and "maintain[ ] the authority and dignity of the court." *Cooke v. United States*, 267 U.S. 517, 539 (1925). Thus, courts regularly impose contempt sanctions where a party refuses to comply with a court order. *See, e.g., Nilva v. U.S.*, 352 U.S. 385, 392 (1957) (affirming conviction of criminal contempt for disobeying court order to produce documents); *Walker v. City of Birmingham*, 388 U.S. 307, 321 (1967) (affirming conviction of criminal contempt for failure to follow court order, even where court order invalid: "One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.")

It is no defense that a party has appealed the operative order: "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *United States v. United Mine Workers of America*, 330 U.S. 258, 293 (1947). This is so regardless of the outcome on appeal: "[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal." *Id.* at 294.

District courts have wide latitude in determining whether there has been a contemptuous

-7-

defiance of a court order. *Stone v. City of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992). In civil contempt proceedings, the moving party must initially demonstrate that the alleged contemnors violated "a specific and definite order of the court." *Hook v. State of Ariz.*, 907 F.Supp. 1326, 1340 (D.Ariz. 1995). The burden then shifts to the alleged contemnors to demonstrate that they have taken "'all reasonable steps within [their] power to insure compliance' with the court's orders." *Hook v. Ariz. Dep't Corrections*, 107 F.3d 1397, 1403 (9th Cir. 1997) (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir.1976)); *see also Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir.1983). "In assessing whether an alleged contemnor took 'every reasonable step' to comply with the terms of a consent decree, a district court can consider (1) a history of noncompliance and (2) a failure to comply despite the pendency of the contempt motion." *Hook,* 907 F.Supp. at 1340 (quoting *Stone*, 968 F.2d at 857). "A party's subjective intent is irrelevant." *Id.*

In criminal contempt proceedings, the Court must provide the contemnor with notice of the contempt proceedings, appoint a prosecutor, and conduct a hearing. Fed. R. Crim. Proc 42(a). "Criminal contempt is established when there is a clear and definite order of the court, the contemnor knows of the order, and the contemnor willfully disobeys the order." *U.S. v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980).

**B. Defendants' Defiance of the August 4 Order is Contemptuous**

The Court's August 4 Order is clear on its face. It requires defendants to submit a plan by September 18, 2009, "that will in no more than two years reduce the population of the CDCR's adult institutions to 137.5% of their combined design capacity," and that includes six-month benchmarks to enable the Court to measure compliance. August 4 Order at 183.

Defendants failed to comply with that order, fully understanding the requirements of the order, and knowing that their conduct was likely contemptuous.

There can be no claim that defendants' September 18, 2009, submission "substantially" complies with the August 4 Order, because that submission provides a plan for less than half the population reduction required by the Court's order, and has no six-month benchmarks with which to measure progress. Under the Defendants' plan, the State will never achieve 137.5%

-8-

of design capacity. Defendants' plan would reduce the prison population to 166% of design capacity by the end of Fiscal Year 2010-2011(a reduction of 16,000 prisoners). Def. Pop. Reduction Plan, Exh. A at 15. By no measure is that substantially compliant with a requirement to bring the prison population to 137.5% of design capacity (a reduction of 40,000 prisoners).[2]

### C. Defendants Have Acted in Bad Faith

Although a finding of bad faith is not necessary for a finding of contempt, the record before the Court shows that defendants acted in bad faith.

First, defendants could easily have complied with the order by submitting a realistic population reduction plan. The Governor, the lead defendant in this case, has already drafted a plan that comes very close to complying with the order, and, with minor adjustments, would be compliant with the order.[3] In July and August of 2009, the Governor submitted a proposal to the State legislature that would safely reduce the prison population by 37,000 prisoners over two years. Evenson Decl., Exh. B. Defendant Cate trumpeted this plan: "Over the past several months, the Administration has worked with law enforcement stakeholders to refine a plan that we believe can reduce the prison population by up to 27,000 inmates this year, and 37,000 through 2009-10." *Id.* He urged the legislature to adopt the proposals: "[n]ow is the time for elected officials and law enforcement to come together and pass criminal justice reforms that will *safely reduce our inmate population*." *Id.* (emphasis added).

According to defendant Cate, the roadmap for accomplishing the 37,000 reduction was

---

[2] Defendants identify additional reforms that, if passed by the legislature, would reduce the prison population by another 5,000 prisoners over the first two years. According to defendants, these reforms might bring the prison population to 139% of design capacity by the end of FY 2012/2013 (4 years), and to 132% by the end of FY 2014/15 (6 years). However, this is not defendants' "plan;" it is a set of estimates for further measures defendants may take only if the legislature enacts them.

[3] Plaintiffs intend to submit, at a later date, a report from Dr. Austin concerning, among other things, the efficacy of the Governor's plan. However, this report has been delayed because defendants did not produce all the data required by this Court's September 11, 2009 Order until October 1, 2009 (13 days after the production date set by the Court's order).

clear: "The best minds in California and the nation have already provided us with recommendations. Five years ago, the Deukmejian Commission outlined ways that we can target resources on higher risk offenders and reduce costs, without increasing crime rates. An expert panel convened by the Schwarzenegger Administration has given us a roadmap to reducing recidivism. The Administration has adopted the recommendations of both these groups in drafting its current reform proposals." *Id.*[4]

Nonetheless, while defendants enthusiastically presented this plan to the State legislature, they submitted a very different – and far inferior – plan to this Court.

Moreover, defendants' population reduction plan relies upon construction for more than half of its crowding relief, and "many [of defendants' prison construction] projects are being planned in consultation with the *Plata* Receiver." Def. Pop. Reduction Plan, Exh. A at 11. However, defendants simultaneously are trying to prevent the Receiver from constructing any new facilities. Just two days before submitting this plan, defendants argued in the *Plata* case that the Receivership must be terminated and the Receiver must be enjoined from all construction planning. *Plata v. Schwarzenegger*, 9th Cir. Case No. 09-15864, Sept 16, 2009 Oral Argument, http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id=0000003923 (site last visited October 8, 2009); *see also Id.* Appellants' Opening Brief (July 31, 2009); Appellant's Reply Brief (Sept. 10, 2009). Furthermore, defendants do not plan to complete their construction for at least six years – four years after their deadline for complying with this Court's August 4 Order. And even this prolonged schedule is overly optimistic, as it is based on the assumptions that funding will be easily obtained, and there will be no delays in obtaining the requisite environmental approvals and other permits, no legal challenges, and no construction delays. Def. Pop. Reduction Plan, Exh. A at 11. Each of these assumptions is likely to be false. August 4 Order at 102-107.

Defendants' conduct is still more egregious in light of their long history of intransigence

---

[4] The 37,000 reduction plan included increasing good time credits, diverting low-level offenders and parolees, commuting sentences of certain immigrants, and changing sentencing
(continued …)

in the underlying *Plata* and *Coleman* cases. For decades, defendants have ignored, obstructed, and delayed implementation of court orders requiring them to remedy the unconstitutional conditions in the prisons, demonstrating utter disregard for the orders of the district courts or the lives and well being of the tens of thousands of plaintiff class members. *Supra* at 2-5.

In its August 4 Order, this Court expressed the fervent hope that "California's leadership will act constructively and cooperatively, and follow the mandate of this court and the PLRA, so as to ultimately eliminate the need for further federal intervention." August 4 Order at 182. Unfortunately, defendants have taken the opposite approach to that anticipated by the Court. Once again, they have engaged in obstruction and delay.

The fact that defendants have a plan to reduce the prison population in an amount very close to the magnitude required by this Court's order, yet still refuse to submit a plan that complies with the August 4 Order, is a direct affront to the authority of this Court. It undermines the Court's authority under the Supremacy Clause to correct constitutional violations, and it is detrimental to the lives and well being of plaintiff class members, lives that for too long have been endangered by the nightmarish conditions in California's overcrowded prisons.

Defendants' actions are all the more offensive because defendants are among the State's top law enforcement officials. They are charged with upholding and enforcing the law, and confining to prison those members of our society who break the laws. Of all people, the defendants in this action should not be allowed to pick and choose which laws and lawful court orders they follow, and which they simply ignore. Defendants are no more above the law than those in their custody.

**D. Defendants Have No Excuse for Their Contemptuous Conduct**

The only excuse defendants proffer for failing to comply with the Court's August 4 Order is that they "believe that reducing the prison population to 137.5% within a two-year period cannot be accomplished without unacceptably compromising public safety." Def.

---

laws so that certain felonies become misdemeanors. *Id.*

Population Reduction Plan, Exh. A at 2.[5]  But just last month defendants said precisely the opposite to the legislature and the California public:  they proclaimed that reducing the prison population by 37,000 prisoners over two years *can* be accomplished safely.  Evenson Decl., Exh. B.  Both of these assertions cannot be true; either defendants have been misleading the legislature and the general public, or they are misleading the Court.

In any event, the contention that a population reduction would be unsafe is an argument that this Court has already considered and rejected:  the Court examined overwhelming testimony from defendants, intervenors, and correctional experts regarding safe methods to reduce the prison population, and found that "the state has available methods by which it could readily reduce the prison population to 137.5% design capacity or less without an adverse impact on public safety or the operation of the criminal justice system."  August 4 Order at 181; *see also id.* at 131-177.

The Court did not make a final determination about public safety in its August 4 order because the State had not yet submitted its population reduction plan:

> . . . we cannot now determine with finality whether the population reduction plan the state will propose in response to our order would have an adverse impact upon public safety or the operation of the criminal justice system.  We do know, however, that the state *could* comply with our population reduction order without a significant adverse impact upon public safety or the criminal justice system's operation; the evidence before us clearly establishes its ability to do so.  We will consider the impact of the state's actual population reduction plan before approving it or any modified or substitute plan.  Whatever plan we do adopt will be consistent with our obligation to accord substantial weight to any adverse impact involved.

*Id.* at 133.

Nor do defendants have any claim that it was "impossible" for them to draft a plan that complies with the August 4 Order.  The existence of the Governor's plan to the legislature

---

[5] Defendants' only example of a public safety threat is telling—they argue that the "release of one in every four inmates at random or…inmates draw[ing] lots for their release…would provide no assurance of public safety."  Def. Pop. Reduction Plan, Exh. A at 2 n.1.  This Court has correctly noted the availability of numerous means of reducing the population safely.  Random release of prisoners is not among them.

1   demonstrates that it was possible. *See Hook*, 107 F.3d at 1404 ("impossibility defense relates
2   to 'literal physical impossibility of compliance' and not to a . . . [state] law that allegedly
3   makes compliance illegal") (quoting *Halderman v. Pennhurst State School & Hosp.*, 673 F.2d
4   628, 638 (3d Cir. 1982).

5   Furthermore, there are no legal barriers preventing defendants from submitting a plan
6   that complies with the August 4 Order.[6]  To be sure, the State legislature has not enacted such
7   a plan, and it would be preferable for any State plan to have the imprimatur of the legislature
8   and other stakeholders.  But it is not necessary.  The defendants had full authority to *submit* a
9   population reduction plan, and the parties and the Court have the authority to overcome any
10  state law barriers to *implementing* such a plan, as follows:

11  First, the legislature could approve any necessary changes in State law.  According to
12  defendants, a bill to obtain further prison population reductions is currently pending before the
13  legislature; if passed, such a bill could render moot any question about state law barriers to
14  reform.  *See, e.g.,* Def. Pop. Reduction Plan, Exh. A at 16.  Second, the Governor could
15  exercise his extraordinary powers under the State of Emergency he proclaimed in 2006, which
16  gives him authority to "suspend any regulatory statute, or statute prescribing the procedure for
17  conduct of state business, or the orders, rules, or regulations of any state agency." Cal. Gov't
18  Code § 8571.  The Governor has "complete authority over all agencies of the state government
19  and the right to exercise . . . all police power vested in the state by the Constitution and laws of
20  the State of California." *Id.* at § 8627.  The Governor's emergency power specifically covers
21  waiving state contracting law (*Id.* at § 8646), and releasing prisoners (*Id.* at §8658).[7]  Third, the

---

[6] Even if state law barred submitting a plan, that would not provide an excuse for noncompliance with a federal court order.  A party must comply with a federal court order to remedy constitutional violations irrespective of state law barriers to compliance.  *See, e.g., Washington v. Washington State Comm'l Pasenger Fishing Bessel Ass'n*, 443 U.S. 658, 695 (1979); *Hook,* 107 F.3d at 1402; *Stone*, 968 F.2d at 862, *Spain v. Mountanos*, 690 F.2d 742, 746 (9th cir. 1982).  That is, even if state law purports to limit a state official's authority to implement a federal court order, such state law does not provide an "impossibility" defense excusing compliance.  *Hook,* 107 F.3d at 1402; *Stone*, 968 F.2d at 862.

[7] To date, the Governor has exercised his emergency powers to waive state laws so that
(continued …)

Court could, consistent with the PLRA, enter an order requiring or permitting State officials to exceed their authority under State law. 18 U.S.C. § 3626(a)(1)(B).

Accordingly, there is no excuse for defendants' contemptuous failure to comply with the Court's August 4 Order.

### E. The Court Should Order Defendant Governor Arnold Schwarzenegger to Show Cause Why He Should Not be Held in Contempt of Court

It is defendants' responsibility to run the prison system in a constitutional manner, and to make, in the first instance, the determination regarding which methods to use to reduce the prison population. August 4 Order at 122-124. Defendants, and in particular lead defendant Governor Arnold Schwarzenegger, have failed to meet either obligation. Defendant Schwarzenegger, as the person who sets State prison policy and determines how defendants will respond to this Court's orders, bears ultimate responsibility for defendants' contemptuous conduct.

Contempt proceedings are necessary for two reasons. First, criminal contempt sanctions are necessary to punish defendant's willful violations of this Court's order, to protect the authority and integrity of the Court, and to act as a deterrent for future noncompliance. The Court should impose a fine for this contemptuous conduct.

Second, civil contempt sanctions may coerce defendant Schwarzenegger to comply with this Court's order and to exercise his prerogative to develop the necessary population reduction plan in the first instance. Civil contempt sanctions alone, however, would not sufficiently punish defendant Schwarzenegger for his defiance to date, or deter future noncompliance, because the Governor would be able to purge civil contempt sanctions by belatedly complying with the August 4 Order. *Hicks v. Feiock,* 485 U.S. 624, 631-636 (1988) (court may punish bad acts through criminal contempt, but in civil contempt proceedings contemnor must have opportunity to purge sanctions by later complying with court order). Additionally, the *Plata*

---

he could implement one aspect of his population reduction plan: transferring prisoners to out-of-state prisons. Pls.' Exh. 1 at 6. The Governor could also invoke his emergency powers to implement other elements of his population reduction plan.

-14-

court has already once threatened civil contempt, and held sanctions in abeyance (Oct. 3, 2005 Findings of Fact and Conclusions of Law at 50), and yet defendants have continued to defy the Court's orders. Accordingly, both civil and criminal contempt sanctions are appropriate and necessary.

## IV. CONCLUSION

Defendants have had ample time and notice to develop an adequate population reduction plan, having been warned of the Court's likely order in the Court's February, 2009, tentative ruling, and having been informed of the Court's final order on August 4, 2009. In the August 4 Order, the Court gave defendants another 45 days to draft their plan. Finally, the Court has specifically stated that further delay "will not be tolerated by this court." Sept. 3, 2009 Order at 5. The Court can give meaning to that order only by initiating contempt proceedings. Any other course of action will inevitably lead to further intransigence and delay, particularly in the implementation phase of the case, prolonging the suffering of plaintiff class members.

For the foregoing reasons, plaintiffs respectfully request that the Court order defendants to submit a plan that fully complies with the August 4 Order and order defendant Governor Arnold Schwarzenegger to show cause why he should not be held in civil and criminal contempt of court.

Dated: October 8, 2009                         Respectfully submitted,

                                               PRISON LAW OFFICE

                                               By:    /s/ *Donald Specter*
                                                      Donald Specter
                                                      Attorney for *Coleman* and *Plata* Plaintiffs

Dated: October 8, 2009                         ROSEN, BIEN & GALVAN, LLP

                                               By:    /s/ *Michael W. Bien*
                                                      Michael W. Bien
                                                      Attorney for *Coleman* Plaintiffs