PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
ERNEST GALVAN, Bar No. 196065
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARK FEESER, Bar No. 252968
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111-5994
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br>   Plaintiffs, <br><br>   v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br>   Defendants | No. Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA, et al., <br><br>   Plaintiffs, <br><br>   v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br>   Defendants. | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** <br><br> [PROPOSED] ORDER TO SHOW CAUSE RE CONTEMPT |

I. INTRODUCTION

This matter comes before the Court on plaintiffs' motion for an order requiring defendants to submit a population reduction plan in conformance with this Court's August 4, 2009, Opinion and Order ("August 4 Order") and requiring lead defendant Governor Arnold Schwarzenegger to show cause why he should not be held in civil and criminal contempt of court.

Defendants, including defendant Governor Arnold Schwarzenegger, failed to comply with this Court's August 4 Order, as follows:

The August 4 Order required defendants to submit a plan by September 18, 2009 "that will in no more than two years reduce the population of the CDCR's adult institutions to 137.5% of their combined design capacity." August 4 Order at 183. This amounts to a reduction of 40,000 prisoners.[1] The order further states "[s]hould any of defendants' proposed population reduction measures require the waiver of any provisions of state law, the state shall so advise the court, and shall explain why the requested waiver is permissible under 18 U.S.C. § 3626(a)(1)(B)." *Id.* The order requires that defendants' plan "shall set forth . . .the effective dates of the various actions they propose to undertake and [the State's] estimate of the reduction in population they expect to achieve after six, twelve, eighteen, and twenty-four months." *Id.*

Defendants appealed the August 4 Order, and sought a stay from this Court, and then from the United States Supreme Court. They contended that they should not have to submit a population reduction plan in accordance with the August 4 Order. This Court and the Supreme

---

[1] Currently, the design capacity of the in-state adult institutions at issue in this case (which excludes camps and community correction centers) is approximately 80,000 and the population is just under 150,000. *See* CDCR September 30, 2009 Weekly Population Report, available at

http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1Ad090930.pdf (site last visited October 8, 2009). Accordingly, the State's plan must provide methods to reduce the population of adult institutions to 110,000 prisoners, a reduction of 40,000 prisoners.

Court both denied their request.

Nonetheless, defendants failed to comply with the August 4 Order in the following respects:

- The order requires defendants to submit a plan that accomplishes a reduction to 137.5% of design capacity in two years. August 4 Order at 183. Defendants' plan would reduce the prison population to 166% of design capacity in two years, and would *never* achieve 137.5% of design capacity. Def. Pop. Reduction Plan, Exh. A at 15.
- The order requires defendants' plan to include six-month benchmarks. August 4 Order at 183. Defendants' plan has one-year benchmarks, tied to the Fiscal Year. Def. Pop. Reduction Plan, Exh. A at 15.
- The order requires defendants to advise the Court whether any population reduction measures require waiver of state law. August 4 Order at 183. Defendants refused to identify any state law barriers to reducing the prison population. Def. Pop. Reduction Plan, Exh. A at 16 n.11.

Neither the contents of defendants' plan nor the timeline for implementing it comply with the Court's August 4 Order; instead, they adhere to two enactments by the legislature: "SB xxx18," a bill recently passed by the state legislature but not signed by the Governor; and AB 900, a prison construction measure enacted in 2007. Def. Pop. Reduction Plan, Exh. A at 3-14.

## II. BACKGROUND

### A. Defendants' failures to follow earlier court orders

Defendants have a long history of intransigence, obstruction and delay in both the *Plata* and *Coleman* matters.

1. Plata. On June 13, 2002, the *Plata* court entered a Stipulation for Injunctive Relief, which required defendants to implement policies and procedures that would remedy the constitutionally-deficient prison medical care system at each of its 33 prisons. *Plata* Doc. No. 68 at 2-4. However, defendants failed to do so.

In the years following the adoption of the Stipulation, neutral, court-appointed experts visited prisons and audited prison medical care. Fully two years after the Stipulation for relief was entered, on July 16, 2004, the court-appointed experts submitted a report finding an "emerging pattern of inadequate and seriously deficient physician quality in CDC facilities." May 10, 2005 Order to Show Cause (*Plata* Doc. No. 294) at 3. Defendants were far from meeting their obligations under the Stipulation.

Defendants subsequently agreed to further orders for relief. On September 17, 2004, the *Plata* district court approved a Stipulated Order re Quality of Patient Care and Staffing. *Plata* Doc. No. 229. In this stipulation, defendants agreed to a further timeline for improving the quality of medical care in the prisons. *Id.* Defendants failed to meet their obligations under this stipulation as well.

On May 10, 2005, the *Plata* district court issued an order to show cause as to why defendants should not be found in civil contempt and why a receiver should not be appointed to manage health care delivery for the CDCR. May 10, 2005 Order to Show Cause (*Plata* Doc. No. 294). The Order to Show Cause recounts the extensive history of defendants' defiance of prior court orders. *Id.* at 2-10.

Although the June 2002 Stipulated Injunction called for implementation of the improved policies and procedures at seven prisons in 2003, and five additional prisons in each succeeding year, by mid-2005 "not a single prison ha[d] successfully completed implementation." *Id.* at 3. And defendants had also "failed to meet the terms of the [September 2004] Patient Care Order." *Id.* Moreover, the *Plata* court had held monthly meetings with the parties, during which court-appointed experts submitted a "shocking" report detailing "widespread evidence of medical malpractice and neglect." *Id.* at 4.

The Order to Show Cause further recounted the *Plata* district court's findings from a February 2005 tour of the medical facilities at San Quentin State Prison. Defendants were supposed to have implemented the revised medical policies and procedures at San Quentin by then, but when the *Plata* court toured the facility, it found "horrifying" conditions. *Id.*

The *Plata* district court recounted serious violations – observed first hand by the court,

1  and also recounted by the court-appointed experts – and noted that the court-appointed experts
2  have concluded that "overall compliance with the Stipulated Order and subsequent Court
3  Orders was non-existent" at San Quentin, that "there has been indifference to beginning the
4  process required in the Stipulated Order" and that while San Quentin may be the worst, the
5  problems at San Quentin are also found in the other 32 state prisons. *Id.* at 4-6 (internal
6  quotation marks and citations omitted).

7       In April 2005, defendants provided the *Plata* district court with their proposed
8  "Strategies to Improve Program Compliance," which noted vacancies in its upper management
9  of approximately 80% and other grave deficiencies in management and oversight. *Id.* at 7.
10 Yet defendants did not propose measures to solve these problems, noting instead that
11 implementation of any remedies "is contingent on Governor's approval, funding availability,
12 and legislative approval." *Id.* at 7 (internal quotation marks and citations omitted).

13      Defendants conceded that "the most [defendants] are able to do at this point is to
14 attempt to institute some 'stop gap' measures." *Id.* at 8. The *Plata* district court found that
15 "even some of those appear beyond their capability." *Id.*

16      The *Plata* court found that in the preceding four years, which included a year and half
17 during which the court was meeting with the parties on a regular basis, "two things have
18 become ever increasingly clear: (1) the Governor has appointed, and the State has hired, a
19 number of dedicated individuals to tackle the difficult task of addressing the crisis in the
20 delivery of health care in the California Department of Corrections ("CDC"), and (2) despite
21 the best efforts of these individuals, little real progress is being made. The problem of a highly
22 dysfunctional, largely decrepit, overly bureaucratic, and politically driven prison system, which
23 these defendants have inherited from past administrations, is too far gone to be corrected by
24 conventional methods." *Id.* at 1.

25      The *Plata* court specifically noted that even "defendants have publically conceded their
26 inability to find and implement on their own solutions that will meet constitutional standards."
27 *Id.* Indeed, the State conceded that it would be unable, on its own, to improve the medical
28 system for years into the future. *Id.* at 2.

1   Defendants' response to the Order to Show Cause conceded that "to date they have
2   failed to obtain compliance with all aspects of the Court Orders" and that "despite their best
3   efforts to effect improvements in health care and the systems for delivering it to California's
4   prison population, their efforts have been hampered by the complex statutory and regulatory
5   legal requirements and operational systems governing the prison system."  June 20, 2005, Def.
6   Response to OSC (*Plata* Doc. No. 328) at 5.

7   Commencing on May 31, 2005, the *Plata* district court held a six-day evidentiary
8   hearing to consider whether to issue a contempt order or to establish a receivership.  On
9   October 3, 2005, the *Plata* court issued detailed findings of fact and conclusions of law
10  supporting the establishment of a receivership.  October 3, 2005 Findings of Fact and
11  Conclusions of Law (*Plata* Doc. No. 371).

12  The *Plata* district court found that prison conditions pose a grave and immediate threat
13  of harm to prisoners (*Id.* at 35-36), that the court's efforts to identify less intrusive remedies
14  had failed, and that despite multiple efforts by the court to obtain compliance, "defendants
15  have been unwilling or incapable of breaking out of a deeply entrenched bureaucratic mind-set,
16  and have refused or been unable to take the steps necessary to prevent further needless loss of
17  life and suffering among its wards" (*Id.* at 37-39).

18  The *Plata* district court further found that "continued insistence on defendants'
19  compliance with Court orders would lead to nothing but further delay, as well as further
20  needless death and morbidity" and that defendants' "historical lack of leadership, planning, and
21  vision" is to blame for the crisis.  *Id.* at 43.  The court noted defendants' lack of will to correct
22  the problems, and that defendants' failures had caused a "huge waste of the taxpayer's
23  resources."  *Id.* at 45-46.  Indeed, the court found, "[e]ven following issuance of the OSC – on
24  the brink of possible contempt and the imposition of the Receivership – defendants were able
25  to enact only very limited and piece-meal measures, with no prospect for system-wide reform
26  or restructuring."  *Id.* at 39.

27  In short, the court found that defendants are "unwilling or incapable of breaking out of a
28  deeply entrenched bureaucratic mind-set, and have refused or been unable to take the steps

-5-

1 necessary to prevent further needless loss of life and suffering among its wards." *Id.*

2 The *Plata* court established a receivership, and held contempt sanctions in abeyance.
3 Oct. 3, 2005 Findings of Fact and Conclusions of Law at 49-50. Defendants did not appeal
4 this order, and the receivership took over operation of the state prison medical system in 2006.

5       2. Coleman. Since the *Coleman* court first held in 1995 that "seriously mentally
6 ill inmates in the California Department of Corrections daily face an objectively intolerable
7 risk of harm as a result of the gross systemic deficiencies that obtain throughout the
8 Department," 912 F. Supp. 1282, 1316 (E.D. Cal. 1995), defendants have similarly
9 demonstrated a persistent inability or unwillingness to comply with the remedial orders in that
10 case. As a result, the *Coleman* court has repeatedly been called upon to issue orders regarding
11 the development of short, intermediate, and long-term bed plans, staffing allocations, and
12 suicide prevention plans because defendants have failed to effectuate effectively the plans or
13 relief ordered.

14 In *Coleman*, "[a] significant amount of remedial effort . . . has been spent on the as yet
15 unsuccessful endeavor to develop a sufficient number of mental health care beds" for
16 placements at higher levels of care. August 4 Order at 30. When the court repeatedly ordered
17 defendants to submit plans for adding mental health treatment space, defendants' response was
18 to submit what often amounted to little more than plans for future plans, in one instance
19 submitting what the *Coleman* Special Master described as "even less than a plan for a future
20 plan; it is, more accurately, a concept paper." 2/7/07 Special Master's Report and
21 Recommendations on defendants' December 2006 Mental Health Treatment Plan at 14
22 (*Coleman* Doc. No. 2133); *see also* 3/23/09 Plaintiffs' Objections to Defendants' Bed Plan
23 Statement at 6-15 (*Coleman* Doc. No. 3545) (describing over 10 years of stop-and-start bed
24 planning). Despite ten years of court-ordered mental health bed and treatment space planning,
25 on March 5, 2009, the *Coleman* court noted that "the State has no current viable bed plan [and]
26 is uncertain as to when [one] can be developed," which the court concluded "demonstrate[s] an
27 unacceptable lack of commitment to its constitutional duty, much less to the orders of this
28 court." 3/5/09 Order 1:24-2:3 (*Coleman* Doc. No. 3450); *see also* 9/24/09 Order at 3 (*Coleman*

Doc. No. 3686).

Despite additional orders to develop a long-range bed plan, defendants' current plan, described in *Coleman* Doc. Nos. 3592, 3639, 3656 and 3678, once again reads more like a series of vague promises than a court-ordered plan to meet a severe long-range shortage of mental health placements. The current plan, at least the seventh submitted since March 2005, promises to construct a substantial number of "infill beds"[2] using AB 900 funds, but provides no detail as to where or when those beds will be constructed. *See* 5/26/09 Defendants' Final Proposal to Meet Remaining Short-Term, Intermediate, and Long-Range Bed Needs at 20 of 87 (*Coleman* Doc. No. 3592) (noting substantial number of unsited "Alternate Sites" for infill beds); 7/31/09 Defendants' Long-Term Bed Plan Status Report at 5 of 6 (*Coleman* Doc. No. 3639) (increasing the number of unsited infill beds after failure to sign memorandum of understanding to construct two Correctional Health Care Facilities ("CHCF") with *Plata* Receiver); *see also* 7/1/09 Defendants' Response re: Memorandum of Understanding at 2-3 (*Coleman* Doc. No. 3624) (stating that memorandum of understanding with *Plata* Receiver had not been signed).

The consequences of defendants' inability or unwillingness to comply with the Court's bed planning orders have been devastating for the *Coleman* class. This Court determined that "severe bed shortages at every level of the CDCR's mental health care system" have caused "inmates in need of higher levels of care to languish in clinically inappropriate settings." August 4 Order at 68. Between June and September of 2008, the severe shortage of Mental Health Crisis Beds prevented more than two-thirds of the prisoners referred to them (all of whom are in acute crisis) from actually being placed in a Mental Health Crisis Bed. *Id.* at 68-69. Failure to provide crisis care can lead to serious injury and death. *Id.* at 69-70. Similarly, prisoners in need of long-term inpatient care provided by the Department of Mental Health sometimes wait as long as a year before being transferred to the appropriate level of care. *Id.*

---

[2] Infill beds are those that "provide additional capacity at existing prisons," rather than construction of new facilities. Pls' Exh. P-316 at ¶ 7.

at 69 (citing August 15, 2008 Stewart Supp. Report ¶ 20).

Orders to implement defendants' own mental health program standards have met a similar fate.  The *Coleman* court ordered defendants to comply with their mental health program standards, the "Program Guides," in June 1997.  6/27/97 Order (*Coleman* Doc. No. 858) (ordering defendants to implement, among other remedial documents, Program Guide submitted by Special Master); *see also* 5/30/97 Special Master Report on Plans.  The court has allowed defendants more than 10 years to come into compliance with these standards, and gave defendants permission to make major revisions to the Program Guides in 2006, *see* 3/3/06 Order (*Coleman* Doc. No. 1773), but defendants still fail to meet many of these standards.  *See, e.g.*, P-264 (EOP Unmet Need Chart); D-1020 at 4; Dezember at RT 915:24-916:7; P-57 at 353; *see also* P-9 at 12-1-13.

Importantly, defendants still fail to comply with the Revised Program Guide standards and court orders regarding suicide prevention.  *See generally* 9/17/09 Special Master's Report on Suicides in Calendar Year 2007 (*Coleman* Doc. No. 3677).  As a result, there is an unacceptably high level of suicides directly tied to "inadequate clinical assessments, inappropriate interventions, incomplete referrals, missed appointments and appointments that were not rescheduled, unsupported diagnoses, failure to review records, assignments to inappropriate levels of mental health care, failure to provide protective housing, and the provision of inadequate or untimely resuscitation efforts."  August 4 Order at 87 (internal quotation marks omitted).

**B.  Defendants' paralysis with respect to population controls**

Long before this Court entered its August 4 Order to reduce prison crowding, defendants had been struggling with the dramatic overcrowding in the prison system, but they have utterly failed to implement effective measures to reduce crowding.

The Governor and a succession of state-appointed panels of experts have been recommending reform measures aimed at reducing prison crowding for decades.  *See* Pls.' Exh. P-2 at 77; Pls.' Exh. P-328 at 178.  "Since 1990, there have been more than a dozen reports published that deal with the crisis in California's adult prison system.  The major

-8-

1 recommendations made in all of these reports are entirely consistent with the recommendations
2 contained in [the Expert Panel] report." Pls.' Exh. P-2 at 77. However, the state has failed to
3 take any action to meaningfully reduce the prison population.

4      Defendants have, on two separate occasions, asked a panel of consultants to review the
5 CDCR and recommend changes. The Independent Review Panel, which included former
6 Governor Deukmejian and current CDCR Secretary Matt Cate (then the Inspector General)
7 released a report in June 2004 stating: "The key to reforming the system lies in reducing the
8 numbers," and recommending numerous strategies for population reduction. Pls.' Exh. P-4 at
9 123. An expert panel appointed by the CDCR subsequently described the need to reduce
10 overcrowding as a "'pre-condition' to success." Pls.' Exh. P-2 at viii. The first
11 recommendation of that report was to "[r]educe overcrowding in its prison facilities and parole
12 offices." *Id.* Defendants have failed to implement the major recommendations in either report.

13      In 2006, Governor Schwarzenegger attempted to address the overcrowding crisis by,
14 among other things, calling a special legislative session, declaring a state of emergency, and
15 proposing various measures to reduce the prison population. Pls.' Exh. P-1. Those proposals
16 were not enacted.

17      In May 2007 the state enacted AB 900, a measure to address prison crowding through
18 rehabilitative programs and building new prison beds, but the programs have recently been de-
19 funded (*see* http://www.cdcr.ca.gov/News/2009_Press_Releases/Sept_17_Programs.html (site
20 last visited Oct. 8, 2009)) and the building portion of that law has been entirely stymied.
21 August 4 Order at 102-108.

22      In 2008, Governor Schwarzenegger made two additional proposals for reducing the
23 prison population. Cate at RT 1680:18-1681:2, 1694:19-1697:20. However, he withdrew his
24 first such proposal. Cate at RT 1681:3-5. As for the second proposal, the legislature approved
25 similar measures in a bill in December 2008, but the Governor vetoed it. Jan. 1, 2009 Pls.'
26 Request for Judicial Notice, Exh. A (Text of ABX1_8); Exh. B (Veto Message for ABX1_8).

27      In 2009, the Governor submitted another package of reforms intended to reduce the
28 prison population. This package would reduce the population by 37,000 prisoners over two

-9-

years.  Matthew Cate, *Prisons: Its Time to Reform and Reduce the Population*, Capitol Weekly, August 13, 2009, available at http://www.capitolweekly.net/article.php?_c=ybr1t2urmkdejf&xid=y6x62x72akddqo&done=.ybr1ub1utqweuz (site last visited Oct. 8, 2009).  However, the legislature passed AB xxx18, which would result in less than half the reduction contemplated by the Governor's plan.  Def. Pop. Reduction Plan, Exh A at 15.  The Governor has yet to sign that bill.

The State has also attempted to implement a number of parole reforms aimed at reducing the prison population, most of which were slowed or stopped last year as a result of political opposition.  Hoffman at RT 1765:5-11, 1764:11-15.

In short, the political and bureaucratic paralysis within the state has stymied defendants' every effort to voluntarily remedy what all agree is a prison crowding crisis of monumental proportion that is having a devastating impact on both prisoner health and on public safety at large.

Defendant Schwarzenegger himself admits that this paralysis makes it necessary for the Court to take decisive action in this case.  The Governor stated: "I don't blame the courts for stepping in to try to solve the health care crisis that we have, the overcrowding crisis that we have, because the fact of the matter is, for decades the state of California hasn't really taken it seriously. It hasn't really done something about it."  Pls.' Exh. P-384.

### III.   LEGAL STANDARD FOR CONTEMPT PROCEEDINGS

Federal courts have the inherent power to enforce court orders through civil and criminal contempt.  *See Spallone v. United States*, 493 U.S. 265, 276 (1990).  The Court may "punish by fine or imprisonment, or both, at its discretion, such contempt of its authority" as "[d]isobedience or resistance to its lawful writ, process, order, rule, decree or command."  18 U.S.C. § 401.   This power is necessary to "protect[ ] the due and orderly administration of justice" and "maintain[ ] the authority and dignity of the court."  *Cooke v. United States*, 267 U.S. 517, 539 (1925).  Thus, courts regularly impose contempt sanctions where a party refuses to comply with a court order.  *See, e.g., Nilva v. U.S.*, 352 U.S. 385, 392 (1957) (affirming conviction of criminal contempt for disobeying court order to produce documents); *Walker v.*

*City of Birmingham*, 388 U.S. 307, 321 (1967) (affirming conviction of criminal contempt for failure to follow court order, even where court order invalid: "One may sympathize with the petitioners' impatient commitment to their cause.  But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.")

It is no defense that a party has appealed the operative order: "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *United States v. United Mine Workers of America*, 330 U.S. 258, 293 (1947).  This is so regardless of the outcome on appeal: "[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal." *Id.* at 294.

This Court has wide latitude in determining whether there has been a contemptuous defiance of a court order.  *Stone v. City of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992). In civil contempt proceedings, the moving party must initially demonstrate that the alleged contemnors violated "a specific and definite order of the court." *Hook v. State of Ariz.*, 907 F.Supp. 1326, 1340 (D.Ariz. 1995).  The burden then shifts to the alleged contemnors to demonstrate that they have taken "'all reasonable steps within [their] power to insure compliance' with the court's orders." *Hook v. Ariz. Dep't Corrections*, 107 F.3d 1397, 1403 (9th Cir. 1997) (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir.1976)); *see also Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir.1983).  "In assessing whether an alleged contemnor took 'every reasonable step' to comply with the terms of a consent decree, a district court can consider (1) a history of noncompliance and (2) a failure to comply despite the pendency of the contempt motion." *Hook,* 907 F.Supp. at 1340 (quoting *Stone*, 968 F.2d at 857). "A party's subjective intent is irrelevant." *Id.*

In criminal contempt proceedings, the Court must provide the contemnor with notice of the contempt proceedings, appoint a prosecutor, and conduct a hearing.  Fed. R. Crim. Proc 42(a).  "Criminal contempt is established when there is a clear and definite order of the court, the contemnor knows of the order, and the contemnor willfully disobeys the order." *U.S. v.*

-11-

*Powers*, 629 F.2d 619, 627 (9th Cir. 1980).

## IV. DEFENDANTS' DEFIANCE OF THE AUGUST 4 ORDER

### A. Defendants defied the clear and unambiguous order of this Court

The Court's August 4 Order is clear on its face. It requires defendants to submit a plan by September 18, 2009, "that will in no more than two years reduce the population of the CDCR's adult institutions to 137.5% of their combined design capacity," and that includes six-month benchmarks to enable the Court to measure compliance. August 4 Order at 183.

Defendants failed to comply with that order, fully understanding the requirements of the order, and knowing that their conduct was likely contemptuous.

Defendants' September 18, 2009 submission does not "substantially" comply with the August 4 Order, because that submission provides a plan for less than half the population reduction required by the Court's order, and has no six-month benchmarks with which to measure progress. Under the Defendants' plan, the State will never achieve 137.5% of design capacity. Defendants' plan would reduce the prison population to 166% of design capacity by the end of Fiscal Year 2010-2011(a reduction of 16,000 prisoners). Def. Pop. Reduction Plan, Exh. A at 15. By no measure is that substantially compliant with a requirement to bring the prison population to 137.5% of design capacity (a reduction of 40,000 prisoners).[3]

### B. Defendants have demonstrated bad faith

The record before the Court also demonstrates that defendants have acted in bad faith.

First, defendants could easily have complied with the order by submitting a realistic population reduction plan. The Governor, the lead defendant in this case, has already drafted a plan that comes very close to complying with the order, and, with minor adjustments, would be compliant with the order. In July and August of 2009, the Governor submitted a proposal to

---

[3] Defendants identify additional reforms that, if passed by the legislature, would reduce the prison population by another 5,000 prisoners over the first two years. According to defendants, these reforms might bring the prison population to 139% of design capacity by the end of FY 2012/2013 (4 years), and to 132% by the end of FY 2014/15 (6 years). However, this is not defendants' "plan;" it is a set of estimates for further measures defendants may take

(continued …)

the State legislature that would safely reduce the prison population by 37,000 prisoners over two years. Matthew Cate, *Prisons: Its Time to Reform and Reduce the Population*, Capitol Weekly, August 13, 2009, available at http://www.capitolweekly.net/article.php?_c=ybr1t2urmkdejf&xid=y6x62x72akddqo&done=.ybr1ub1utqweuz (site last visited Oct. 8, 2009). Defendant Cate trumpeted this plan: "Over the past several months, the Administration has worked with law enforcement stakeholders to refine a plan that we believe can reduce the prison population by up to 27,000 inmates this year, and 37,000 through 2009-10." *Id.* He urged the legislature to adopt the proposals: "[n]ow is the time for elected officials and law enforcement to come together and pass criminal justice reforms that will *safely reduce our inmate population*." *Id.* (emphasis added).

According to defendant Cate, the roadmap for accomplishing the 37,000 reduction was clear: "The best minds in California and the nation have already provided us with recommendations. Five years ago, the Deukmejian Commission outlined ways that we can target resources on higher risk offenders and reduce costs, without increasing crime rates. An expert panel convened by the Schwarzenegger Administration has given us a roadmap to reducing recidivism. The Administration has adopted the recommendations of both these groups in drafting its current reform proposals." *Id.*[4]

Nonetheless, while defendants enthusiastically presented this plan to the State legislature, they submitted a very different – and far inferior – plan to this Court.

Moreover, defendants' population reduction plan relies upon construction for more than half of its crowding relief, and "many [of defendants' prison construction] projects are being planned in consultation with the *Plata* Receiver." Def. Pop. Reduction Plan, Exh. A at 11. However, defendants simultaneously are trying to prevent the Receiver from constructing any

---

only if the legislature enacts them.

[4] The 37,000 reduction plan included increasing good time credits to reduce the length of stay in prison, diversion of low-level offenders and parolees, commutation of sentences of certain immigrants, and changing sentencing laws so that certain felonies become misdemeanors. *Id.*

facilities. Just two days before submitting this plan, defendants argued in the *Plata* case that the Receivership must be terminated and the Receiver must be enjoined from all construction planning. *Plata v. Schwarzenegger*, (Case No. 09-15864), September 16, 2009 Ninth Circuit Oral Argument, http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id=0000003923 (site last visited October 8, 2009); *see also Id.* Appellants' Opening Brief (July 31, 2009); Appellant's Reply Brief (Sept. 10, 2009). Furthermore, defendants do not plan to complete their construction for at least six years – four years after their deadline for complying with this Court's August 4 Order. And even this prolonged schedule is overly optimistic, as it is based on the assumptions that funding will be easily obtained, and there will be no delays in obtaining the requisite environmental approvals and other permits, no legal challenges, and no construction delays. Def. Pop. Reduction Plan, Exh. A at 11. Each of these assumptions is likely to be false. August 4 Order at 102-107.

Defendants' conduct is still more egregious in light of their long history of intransigence in the underlying *Plata* and *Coleman* cases. For decades, defendants have ignored, obstructed, and delayed implementation of court orders requiring them to remedy the unconstitutional conditions in the prisons, demonstrating utter disregard for the orders of the district courts or the lives and well being of the tens of thousands of plaintiff class members.

In our August 4 Order, we expressed the fervent hope that "California's leadership will act constructively and cooperatively, and follow the mandate of this court and the PLRA, so as to ultimately eliminate the need for further federal intervention." August 4 Order at 182. Unfortunately, defendants have taken the opposite approach. Once again, they have engaged in obstruction and delay.

The fact that defendants have a plan to reduce the prison population in an amount very close to the magnitude required by this Court's order, yet refuse to submit that plan to this Court despite its August 4 Order, is a direct affront to the authority of this Court. It undermines the Court's authority under the Supremacy Clause to correct constitutional violations, and it is detrimental to the lives and well being of plaintiff class members, lives that for too long have been endangered by the nightmarish conditions in California's overcrowded

prisons.

Defendants' actions are all the more offensive because defendants are among the State's top law enforcement officials. They are charged with upholding and enforcing the law, and confining to prison those members of our society who break the laws. Of all people, the defendants in this action should not be allowed to pick and choose which laws and lawful court orders they follow, and which they simply ignore. Defendants are no more above the law than those in their custody.

### C. There is no apparent excuse for defendants' contemptuous conduct

The only excuse defendants proffer for failing to comply with the Court's August 4 Order is that they "believe that reducing the prison population to 137.5% within a two-year period cannot be accomplished without unacceptably compromising public safety." Def. Population Reduction Plan, Exh. A at 2.[5] But just last month defendants said precisely the opposite to the legislature and the California public: they proclaimed that reducing the prison population by 37,000 prisoners over two years *can* be accomplished safely. Matthew Cate, *Prisons: Its Time to Reform and Reduce the Population*, Capitol Weekly, August 13, 2009. Both of these assertions cannot be true; either defendants have been misleading the legislature and the general public, or they are misleading this Court.

In any event, the contention that a population reduction would be unsafe is an argument that this Court has already considered and rejected: the Court examined overwhelming testimony from defendants, intervenors, and correctional experts regarding safe methods to reduce the prison population, and found that "the state has available methods by which it could readily reduce the prison population to 137.5% design capacity or less without an adverse impact on public safety or the operation of the criminal justice system." August 4 Order at

---

[5] Defendants' only example of a public safety threat is telling—they argue that the "release of one in every four inmates at random or…inmates draw[ing] lots for their release…would provide no assurance of public safety." Def. Pop. Reduction Plan, Exh. A at 2 n.1. This Court has correctly noted the availability of numerous evidence-based means of reducing the population. Random release of prisoners is not among them.

177; *Id.* at 131-177.

We did not make a final determination about public safety in our August 4 order because the State had not yet submitted its population reduction plan:

> . . . we cannot now determine with finality whether the population reduction plan the state will propose in response to our order would have an adverse impact upon public safety or the operation of the criminal justice system. We do know, however, that the state *could* comply with our population reduction order without a significant adverse impact upon public safety or the criminal justice system's operation; the evidence before us clearly establishes its ability to do so. We will consider the impact of the state's actual population reduction plan before approving it or any modified or substitute plan. Whatever plan we do adopt will be consistent with our obligation to accord substantial weight to any adverse impact involved.

*Id.* at 133.

Nor do defendants have any claim that it was "impossible" for them to draft a plan that complies with the August 4 Order. The existence of the Governor's plan to the legislature demonstrates that it was possible to draft such a plan. *See Hook*, 107 F.3d at 1404 ("impossibility defense relates to 'literal physical impossibility of compliance' and not to a . . . [state] law that allegedly makes compliance illegal") (quoting *Halderman v. Pennhurst State School & Hosp.*, 673 F.2d 628, 638 (3d Cir. 1982).

Furthermore, there are no apparent legal barriers preventing defendants from submitting a plan that complies with the August 4 Order.[6] To be sure, the State legislature has not enacted such a plan, and it would be preferable for any State plan to have the imprimatur of the legislature and other stakeholders. But it is not necessary. The defendants had full authority to *submit* a population reduction plan, and the parties and the Court have the authority to

---

[6] Even if state law barred submitting a plan, that would not provide an excuse for noncompliance with this Court's order. A party must comply with a federal court order to remedy constitutional violations irrespective of state law barriers to compliance. *See, e.g., Washington v. Washington State Comm'l Pasenger Fishing Bessel Ass'n*, 443 U.S. 658, 695 (1979); *Hook,* 107 F.3d at 1402; *Stone*, 968 F.2d at 862, *Spain v. Mountanos*, 690 F.2d 742, 746 (9th cir. 1982). That is, even if state law purports to limit a state official's authority to implement a federal court order, such state law does not provide an "impossibility" defense

(continued …)

overcome any state law barriers to *implementing* such a plan, as follows:

First, the legislature could approve any necessary changes in State law. According to defendants, a bill to obtain further prison population reductions is currently pending before the legislature; if passed, such a bill could render moot any question about state law barriers to reform. *See, e.g.,* Def. Pop. Reduction Plan, Exh. A at 16. Second, the Governor could exercise his extraordinary powers under the State of Emergency he proclaimed in 2006, which gives him authority to "suspend any regulatory statute, or statute prescribing the procedure for conduct of state business, or the orders, rules, or regulations of any state agency." Cal. Gov't Code § 8571. The Governor has "complete authority over all agencies of the state government and the right to exercise . . . all police power vested in the state by the Constitution and laws of the State of California." *Id.* at § 8627. The Governor's emergency power specifically covers waiving state contracting law (*Id.* at § 8646), and releasing prisoners (*Id.* at §8658).[7] Third, the Court could, consistent with the PLRA, enter an order requiring or permitting State officials to exceed their authority under State law. 18 U.S.C. § 3626(a)(1)(B).

Accordingly, there is no apparent excuse for defendants' contemptuous failure to comply with the Court's August 4 Order.

## V. CONTEMPT PROCEEDINGS ARE APPROPRIATE

It is defendants' responsibility to run the prison system in a constitutional manner, and to make, in the first instance, the determination regarding which methods to use to reduce the prison population. August 4 Order at 122-124. Defendants, and in particular lead defendant Governor Arnold Schwarzenegger, have failed to meet either obligation. Defendant Schwarzenegger, as the person who sets State prison policy and determines how defendants will respond to this Court's orders, bears ultimate responsibility for defendants' contemptuous conduct.

---

excusing compliance. *Hook,* 107 F.3d at 1402; *Stone*, 968 F.2d at 862.

[7] To date, the Governor has exercised his emergency powers to waive state laws so as to transfer prisoners to out-of-state prisons. Pls.' Exh. 1 at 6. The Governor could also invoke

(continued …)

-17-

PROPOSED] ORDER TO SHOW CAUSE RE: CONTEMPT:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

1    Initiating contempt proceedings against the Governor serves two purposes.  First,
2 criminal contempt sanctions appear to be necessary to punish defendant's willful violations of
3 this Court's order, to protect the authority and integrity of the Court, and to act as a deterrent
4 for future noncompliance.  The Court will consider imposing a fine for this contemptuous
5 conduct.

6    Second, civil contempt sanctions may coerce defendant Schwarzenegger to comply with
7 this Court's order and to exercise his prerogative to develop the necessary population reduction
8 plan in the first instance.  Civil contempt sanctions alone, however, would not sufficiently
9 punish defendant Schwarzenegger for his apparent defiance to date, or deter future
10 noncompliance, because the Governor would be able to purge civil contempt sanctions by
11 belatedly complying with the August 4 Order.  *Hicks v. Feiock,* 485 U.S. 624, 631-636 (1988)
12 (court may punish bad acts through criminal contempt, but in civil contempt proceedings
13 contemnor must have opportunity to purge sanctions by later complying with court order).
14 Additionally, the *Plata* district court has already once threatened civil contempt, and held
15 sanctions in abeyance (Oct. 3, 2005 Findings of Fact and Conclusions of Law at 50), and yet
16 defendants have continued to defy the Court's orders.  Accordingly, both civil and criminal
17 contempt proceedings are appropriate and necessary.

**VI.    ORDER**

19    Good cause therefore appearing, the Court now Orders that:

20    (1) Defendants shall submit a plan that meets all requirements of the August 4 Order
21 forthwith.

22    (2) Defendant Governor Arnold Schwarzenegger shall show cause as to why he should
23 not be held in civil and criminal contempt for failing to comply with the August 4, 2009, Order
24 of this Court.  A hearing on this matter shall be scheduled to commence on October __, 2009.

25    (3) _____ is appointed to prosecute the contempt, pursuant to Fed. R. Crim.
26 Proc 42(a)(2).

---

his emergency powers to implement other elements of his population reduction plan.

-18-

**IT IS SO ORDERED**

Dated: October __, 2009

_____
HON. STEPHEN REINHART
UNITED STATES CIRCUIT JUDGE
NINTH CIRCUIT COURT OF APPEALS

Dated: October ___, 2009

_____
HON. LAWRENCE K. KARLETON
SENIOR UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF CALIFORNIA

Dated: October ___, 2009

_____
HON. THELTON E. HENDERSON
SENIOR UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA