1   PRISON LAW OFFICE                  ROSEN, BIEN & GALVAN, LLP
2   DONALD SPECTER, Bar No. 83925      MICHAEL W. BIEN, Bar No. 96891
    STEVEN FAMA, Bar No. 99641         ERNEST GALVAN, Bar No. 196065
3   1917 Fifth Street                  JANE E. KAHN, Bar No. 112239
    Berkeley, California  94710        AMY WHELAN, Bar No. 215675
4   Telephone:   (510) 280-2621        MARK R. FEESER, Bar No. 252968
5                                      315 Montgomery Street, 10th Floor
                                       San Francisco, California  94104-1823
6                                      Telephone:   (415) 433-6830

7
    THE LEGAL AID SOCIETY –            BINGHAM, McCUTCHEN, LLP
8   EMPLOYMENT LAW CENTER              WARREN E. GEORGE, Bar No. 53588
    CLAUDIA CENTER, Bar No. 158255     Three Embarcadero Center
9   600 Harrison Street, Suite 120     San Francisco, California  94111
    San Francisco, California  94107   Telephone:   (415) 393-2000
10  Telephone:   (415) 864-8848

11
12  Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16  RALPH COLEMAN,                     Case No. Civ S 90-0520 LKK-JFM

17            Plaintiffs,              **PLAINTIFFS' OPPOSITION TO**
                                       **DEFENDANTS' MOTION TO MODIFY**
18       v.                            **THE SPECIAL MASTER'S EXPERT**
                                       **REPORT ON SUICIDES COMPLETED IN**
19                                     **THE CALIFORNIA DEPARTMENT OF**
    ARNOLD SCHWARZENEGGER, et al.,     **CORRECTIONS AND REHABILITATION**
20                                     **IN CALENDAR YEAR 2007**
21            Defendants.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

I.    THE SPECIAL MASTER'S DESCRIPTION OF THE "DISTURBING
      TREND" IN SUICIDES IN ADMINISTRATIVE SEGREGATION IS
      APPROPRIATE .......................................................................................................... 2

II.   DEFENDANTS HAVE CONSISTENTLY FAILED TO PRODUCE
      REQUESTED DOCUMENTS WITHIN THE REQUIRED TIMELINES AND
      REFERENCES TO THIS FAILURE SHOULD NOT BE STRICKEN FROM
      THE REPORT ............................................................................................................ 6

III.  DEFENDANTS' REQUESTS TO REVISE THE REPORT TO PRESENT A
      "MORE BALANCED" VIEW OF DEFENDANTS' PROGRESS IN
      REDUCING SUICIDES AND ADHERING TO THE PROGRAM GUIDE
      ARE WITHOUT MERIT AND SHOULD BE DENIED .................................................. 9

      A.    SRAC Compliance ........................................................................................ 9

      B.    Rate of Administration of CPR .................................................................... 11

      C.    CPR Response for Inmate Y ........................................................................ 14

      D.    30-Minute Welfare Checks .......................................................................... 16

IV.   THE SPECIAL MASTER'S CONCLUSIONS WITH REGARD TO
      INDIVIDUAL PRISONER SUICIDES ARE ADEQUATELY SUPPORTED ............... 17

      A.    Inmate D ..................................................................................................... 17

      B.    Inmate G ..................................................................................................... 20

      C.    Inmate W ..................................................................................................... 22

      D.    Inmate X ..................................................................................................... 24

V.    THE SPECIAL MASTER'S FINDINGS AND RECOMMENDATIONS
      SHOULD BE ADOPTED AND THE COURT SHOULD ENTER FURTHER
      ORDERS TO ADDRESS DEFENDANTS' CONFUSION REGARDING THE
      PROVISION OF REQUESTED DOCUMENTS TO THE SPECIAL MASTER
      AND REGARDING CRITERIA FOR EXCLUDING CDCR PATIENTS
      FROM HIGHER LEVELS OF CARE ............................................................................ 25

CONCLUSION .................................................................................................................... 27

i

[323247-2]

# TABLE OF AUTHORITIES

**Page**

## Cases

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) .......................................................................................... 19

## Other Authorities

Thomas W. White, *How to Identify Suicidal People: A Systemic Approach to Risk
    Assessment*
    (The Charles Press, Philadelphia, PA, 1999) ........................................................................... 24

## Rules

Fed. R. Civ. P. 53 ......................................................................................................................... 2

[323247-2]

1

## TABLE OF ABBREVIATIONS

2

| | |
|---|---|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CPR | Cardiopulmonary Resuscitation |
| CTF | Correctional Training Facility |
| DMH | Department of Mental Health |
| DOT | Directly Observed Therapy |
| EOP | Enhanced Outpatient Program |
| LVN | Licensed Vocational Nurse |
| MTA | Medical Technical Assistant |
| QIP | Quality Improvement Plan |
| SRAC | Suicide Risk Assessment Checklist |
| TTA | Triage and Treatment Area |
| UHR | Unit Heath Records |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[323247-2]

1    On September 17, 2009, the Special Master filed the *Report on Suicides Completed in the*

2   *California Department of Corrections and Rehabilitation in Calendar Year 2007* ("2007 Suicide

3    Report" or the "Report").  Docket No. 3677.  On October 1, 2009, Defendants filed the Motion to

4    Modify the Special Master's Expert's Report on Suicides Completed in the California

5    Department of Corrections and Rehabilitation in Calendar Year 2007 ("Defs' Motion").  Docket

6    Nos. 3695 through 3695-4.  The parties stipulated and the Court ordered, on October 7, 2009,

7    that Plaintiffs would file an opposition to Defs' Motion on or before October 23, 2009, and that

8    Defendants' reply brief will be filed on or before November 6, 2009.  Docket No. 3698.

9                                              **INTRODUCTION**

10        It has been nearly fourteen years since the Court first appointed a Special Master.  The

11   compliance reports filed by the Special Master have proved an invaluable tool in this case, not

12   only for identifying areas of continued shortcomings in the provision of mental health services at

13   California Department of Corrections and Rehabilitation ("CDCR") institutions, but in

14   developing recommendations to address those shortcomings.  The value of this process is no

15   more evident than with regard to the Special Master's annual reports on suicides completed

16   during each calendar year.  These suicide reports have resulted in significant orders in this case,

17   addressed at remedying the unacceptably high rate of suicide in CDCR and Department of

18   Mental Health ("DMH") institutions and in the administrative segregation units in particular.

19        Defendants now attack this fundamental part of the remedial process by raising a series of

20   meritless objections to the 2007 Suicide Report, diverting limited time and resources in this case

21   away from addressing the underlying substantive issues regarding suicide prevention.  As

22   described below, some of Defendants' objections amount to little more than wordsmithing of the

23   text of the 2007 Suicide Report, while other objections demonstrate a concerning lack of

24   awareness of the substance and historical underpinnings of this Court's orders with regard to

25   suicide prevention.  Further, to the extent Defendants attack the foundation for the expert opinion

26   of the Special Master and his experts, it is misplaced in light of the fact that the Special Master

27   and his experts, and in particular Dr. Raymond Patterson, have monitored suicides in CDCR for

28   nine years and have carefully reviewed the underlying documentation and are well qualified to

1

[323247-2]

1  offer their expert opinion.

2        It is disappointing that Defendants have determined to use this process to nitpick the

3  Special Master's Report with regard to a year in which the Special Master found that "[i]n 82

4  percent of the suicide cases in 2007, there was at least some degree of inadequacy in assessment,

5  treatment, or intervention, for the highest rate of inadequacy in these areas in the past several

6  years." 2007 Suicide Report at 1. Even Defendants' own declarant, Dr. Canning, has publicly

7  reported on the rising rate of suicides at CDCR, the unacceptably high rate of suicides in

8  administrative segregation units, and the positive correlation between overcrowding and suicide

9  rates. Defendants' objections are a distraction from the parties and this Court's efforts to reach

10  constitutional compliance in the context of an issue that so clearly involves life and death.

11  Accordingly, and for the reasons described below, Plaintiffs respectfully request that the Court

12  reject Defendants' objections to the 2007 Suicide Report and adopt the findings and

13  recommendations of the Special Master.[1]

14

                        **ARGUMENT**

15
16  **I.   THE SPECIAL MASTER'S DESCRIPTION OF THE "DISTURBING TREND" IN
      SUICIDES IN ADMINISTRATIVE SEGREGATION IS APPROPRIATE**

17        Defendants' first objection is to the Special Master's use of the words "disturbing trend of

18  rising suicides" to describe the state of administrative segregation unit ("ASU") suicides, which

19  led to the June 7, 2006 Order of this Court requiring Defendants to submit a plan to address the

20  suicide rate in ASU. Defs' Motion at 2; 2007 Suicide Report at 4. Specifically, Defendants

21

22  [1] Defs' Motion does not identify the relevant standard of review with regard to their objections to
   the 2007 Suicide Report. The Order of Reference appointing the Special Master and describing
23  the standard of review for "compliance reports" issued by the Special Master provides that where
   a party objects to the findings of a report of the Special Master, in reviewing the objection,
24  "[p]ursuant to Fed. R. Civ. P. 53(e)(2), the court shall accept the special master's findings of fact
   unless they are clearly erroneous." Docket No. 639 at 8:18-20. However, in 2003, Fed. R. Civ.
25  P. 53 was extensively revised, and now provides that when reviewing factual findings of a
   Special Master's report, "[t]he court must decide *de novo* all objections to findings of fact made
26  or recommended by a master, unless the parties, with the court's approval, stipulate that:"
   (1) "the findings will be reviewed for clear error" or (2) the findings will be final. Fed. R. Civ.
27  P. 53(f)(3). Nevertheless, under either standard, Defendants' objections should be denied.

28

                        2

[323247-2]

1  object that the use of the word "trend" is not appropriate based on the assumption that the Special

2  Master had relied upon statistics covering "only a 2-3 year period," and that trends cannot be

3  measured based on increments of time shorter than five years.  Defs' Motion at 2.  The Special

4  Master appropriately addressed this criticism, stating that Defendants' "assumptions are

5  mistaken" and noting that the Report relied upon "the longer-term general trend of increasing

6  suicides in administrative segregation in CDCR, which goes back to at least 1999."  2007 Suicide

7  Report at 4 n.3.  In citing to the longer-term trend of increasing suicides in ASU, the Special

8  Master references pages 7-8 of the Report, which contains a summary of annual suicide rates

9  from 1998 to 2007.

10         Nevertheless, Defendants assert that the annual suicide rates described at pages 7-8 of the

11  2007 Suicide Report are inapposite because they describe the suicide rates for all CDCR

12  prisoners, and are not limited to administrative segregation.  Defs' Motion at 2.  This objection is

13  without merit.  Although the 2007 Suicide Report does not specifically describe the annual

14  suicide rates for prisoners housed in administrative segregation, each of the suicide reports filed

15  by the Special Master since 1999 have contained statistical summaries of the number of suicides

16  in ASU.  *See* Declaration of Mark R. Feeser in Support of Plaintiffs' Opposition to Defendants'

17  Objections to the Special Master's Expert Report on Suicides Completed in the California

18  Department of Corrections and Rehabilitation in Calendar Year 2007 ("Feeser Declaration") at

19  ¶ 2.  There is no basis for Defendants' assumption that the Special Master did not rely on the

20  subset of the annual reporting data on ASU suicides in forming this conclusion.

21         In fact, looking at the actual number of ASU suicides as reported in Exhibit B to the

22  Declaration of Dr. Robert Canning in support of Defs' Motion ("Canning Declaration"), Docket

23  No. 3695-3, and calculating the annual suicide rate, the "disturbing trend" of rising suicides in

24

25

26

27

28

3

[323247-2]

ASUs prior to the June 7, 2006 Order (1999 to 2004) and after are striking.[2]

| Year | Suicides in Administrative Segregation | Total CDCR Population | Administrative Segregation Population Based on Assumed 5% of Total Population | Annual Administrative Segregation Suicide Rate Per 100,000 |
|---|---|---|---|---|
| **1999** | 7 | 162,064 | 8,103 | 86.39 |
| **2000** | 7 | 162,000 | 8,100 | 86.42 |
| **2001** | 10 | 161,497 | 8,075 | 123.84 |
| **2002** | 5 | 157,972 | 7,899 | 63.30 |
| **2003** | 18 | 160,838 | 8,042 | 223.83 |
| **2004** | 18 | 163,381 | 8,169 | 220.34 |
| **2005** | 13 | 164,034 | 8,202 | 158.50 |
| **2006** | 18 | 172,508 | 8,625 | 208.69 |
| **2007** | 10 | 173,274 | 8,664 | 115.42 |
| **Average** | 11.8 | 164,174 | 8,209 | 143.48 |

*See* Feeser Declaration at ¶ 13, Exhibit C.

Expressed as a line graph, the numbers and trend line for the period between 1999 and 2004, the data period upon which the June 7, 2006 Order was based, are as follows:



---

[2] As described in more detail in the Feeser Decl., data was not available with regard to the annual ASU population by year. Plaintiffs conservatively estimate that the ASU population is equivalent to five percent of the total CDCR population, which likely understates the actual annual ASU suicide rate. Additionally, the number of ASU suicides reported in Dr. Canning's Declaration in some years is lower than those reported by the Special Master in the relevant suicide report for the same year. The table and chart presented in this brief were also created using the Special Master's reported numbers and are included as Exhibits E and F to the Feeser

PLS' OPPOSITION TO DEFS' MOTION TO MODIFY THE SPECIAL MASTER'S EXPERT REPORT ON SUICIDES COMPLETED IN THE CDCR IN 2007 - CASE NO. CIV S 90-0520 LKK-JFM

[323247-2]

Feeser Declaration at ¶ 13, Exhibit D.  As the chart above demonstrates, the suicide rate in ASU

increased from fewer than 100 suicides per 100,000 in 1999 to over 200 suicides per 100,000 in

2003 and 2004.  Defendants' own suicide report found an even higher ASU suicide rate in 2004

of 248 per 100,000.  *Annual Suicide Report for 2004* at 15, Exhibit A to the Feeser Declaration.

Dr. Canning is no doubt aware of the staggering annual suicide rates in ASU over the period

relied upon by the Special Master.  *See* Declaration of Jane E. Kahn in Opposition to Defendants'

Motion to Modify the Special Master's Expert Report on Suicides in the California Department

of Corrections and Rehabilitation at Exhibit B (Presentation by Dr. Canning on July 12, 2009

distributed at the Conference on Correctional Mental Health Care in Seattle, Washington).  In

Dr. Canning's presentation, at slide 50, he notes the ten-year average segregation population of

11,205 inmates and an average number of segregation suicides of 14 during the same period,

which results in an annualized rate of 124.9 ASU suicides per 100,000 inmates, over twelve

times that of general population prisoners.[3]  *Id.* at Slide 50; Feeser Declaration at ¶ 8.



| Suicides in Segregated Housing | | | | |
|---|---|---|---|---|
| | Population | | Suicides | |
| Housing | N* | Percent | N* | Percent |
| General | 153,695 | 93.2 | 16 | 53.1 |
| Segregated | 11,205 | 6.8 | 14 | 46.9 |
| Total | 164,900 | | 29.2 | |

Chi Square = 68.4, p <.0001
*Ten year average

Declaration.

[3] This statistic is calculated by dividing the number of suicides by the population, and then
multiplying the result by 100,000.  The annual rate calculated using Dr. Canning's slide,
however, understates the annual suicide rate in ASU, as he includes all segregated inmates,
including a substantial number of SHU beds.

5

PLS' OPPOSITION TO DEFS' MOTION TO MODIFY THE SPECIAL MASTER'S EXPERT REPORT ON SUICIDES
COMPLETED IN THE CDCR IN 2007 - CASE NO. CIV S 90-0520 LKK-JFM

[323247-2]

1    Additionally, Dr. Canning's presentation further appears to demonstrate a rising trend in the

2    annual rate of suicide for all prisoners in CDCR institutions from 1999 to 2008.  Kahn

3    Declaration, Exhibit B at Slide 23 (depicting a rising suicide rate trend line).

4         In an attempt to refute the conclusion that a disturbing trend in ASU suicides preceded the

5    June 7, 2006 Order, Defendants purport to establish that "there has been no consistent pattern of

6    suicide deaths in [ASU] in the last ten years of the *Coleman* remedial phase" based on analysis of

7    the number of suicides in ASU as a percentage of all suicides in CDCR.  Defs' Motion at 2-3.

8    Defendants' analysis, however, focuses on data from 1998 to 2007, and primarily the distribution

9    of suicides between ASU and the general population from 2004 to 2007.  *Id.* at 3-4.  In contrast,

10   the statement regarding the "disturbing trend" in the Special Master's Report refers to the trend

11   that was evident at the time of the June 7, 2006 Order, which only included data through 2004

12   (the 2004 Suicide Report was published on May 9, 2006).  *See* 2007 Suicide Report at 4.  To the

13   extent any lack of a trend is evidenced by data from 2005 to 2007, it is irrelevant to the statement

14   in the 2007 Suicide Report.

15        For all of these reasons, defendants' bizarre objection to the Special Master's

16   characterization of a "disturbing trend" should be denied:  The trend in ASU suicides in CDCR is

17   by any measure, disturbing, and the use of the term by the Special Master is well founded and

18   appropriate.

19   **II.    DEFENDANTS HAVE CONSISTENTLY FAILED TO PRODUCE REQUESTED**
         **DOCUMENTS WITHIN THE REQUIRED TIMELINES AND REFERENCES TO**
20       **THIS FAILURE SHOULD NOT BE STRICKEN FROM THE REPORT**

21        Defendants also object to an entire paragraph on page 14 of the 2007 Suicide Report, as it

22   references Defendants' failure to provide the Special Master with the mental health records for

23   one of the inmates reviewed in preparing the 2006 draft suicide report.  Defs' Motion at 5.  The

24   paragraph at issue further notes that "2007 was not the first year for which the Department failed

25   to comply with deadlines for completion and submission of required documentation,"

26   admonishes Defendants for this continued failure, and warns that failure to heed this warning

27   "may result in a recommendation for an order from the court."  *Id.*  Defendants erroneously

28   assert that the reference to the 2006 failure is inaccurate because "CDCR is not to blame" for the

6

[323247-2]

PLS' OPPOSITION TO DEFS' MOTION TO MODIFY THE SPECIAL MASTER'S EXPERT REPORT ON SUICIDES
COMPLETED IN THE CDCR IN 2007 - CASE NO. CIV S 90-0520 LKK-JFM

1    missing mental health records, instead blaming the *Plata* Receiver, who had "inadvertently not

2    scanned all the records." *Id.* at 5. This objection is without merit and Defendants' request to

3    delete the entire paragraph at page 14 fails to recognize Defendants' well documented and

4    ongoing failures to comply with the deadlines for completion and submission of required

5    documentation to the Special Master concerning suicides.

6         First, despite Defendants' vague assertions regarding inaccuracy, Defendants do not

7    dispute that the Special Master was not provided with the mental health records for one of the

8    prisoners who committed suicide in 2006 prior to completion of the draft report, which was

9    served in June 2008. *See* Defs' Motion at 5:17-18. As the Special Master notes in the 2007

10   Suicide Report, Defendants themselves and not the *Plata* Receiver have the duty to produce

11   these records timely, and therefore it is "no excuse" to blame the *Plata* Receiver. 2007 Suicide

12   Report at 14 n.10. The Order of Reference provides that the Special Master shall "have

13   unlimited access to the records, files and papers maintained by defendants to the extent that such

14   access is related to the performance of the special master's duties under this Order of Reference.

15   Such access shall include all departmental, institutional, and inmate records, including but not

16   limited to, central files, medical records, and mental health records." Docket No. 639 at 6:15-21.

17   Moreover, Defendants offer no evidence that the *Plata* Receiver or his staff refused to let

18   Defendants copy the records themselves or inspect the production for completeness. Given the

19   lengthy history of Defendants' failure to timely and completely produce required records, this

20   "dog ate my homework" excuse is unacceptable.

21        Second, in citing to the example from 2006, the Special Master was merely demonstrating

22   a recent example of the ongoing failure by Defendants to complete and produce all required

23   records in a timely manner. *See* 2007 Suicide Report at 14. Each of the preceding suicide

24   reports covering the years 2000 to 2007 contain some record of Defendants' failure to timely

25   complete or produce documentation. ***See Report on Suicides Completed in the California***

26   ***Department of Correction in Calendar Year 2000***, April 25, 2002, Exhibit V to the Ninth

27   Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally

28   Approved Plans, Policies and Protocols ("**2000 Suicide Report**") Docket No. 1373 at 2 (noting

7

that delivery of required documents for suicides completed in 2000 were "extremely untimely");

*Report on Suicides Completed in the CDC in Calendar Year 2001* ("**2001 Suicide Report**"),

attached as Exhibit V to the Eleventh Monitoring Report of the Special Master on the

Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Docket No.

1519 at 3 (noting delays in collection of basic suicide documents); *Report on Suicides Completed*

*in the CDC in Calendar Year 2002* ("**2002 Suicide Report**"), December 9, 2003, attached as

Exhibit U to the Twelfth Monitoring Report of the Special Master on the Defendants'

Compliance with Provisionally Approved Plans, Policies and Protocols, Docket No. 1553 at 1-2

(noting "documentary materials for some [suicides] continued to be provided untimely"); *Report*

*on Suicides Completed in the California Department of Corrections in Calendar Year 2003*

("**2003 Suicide Report**"), April 28, 2005, Docket No. 1658 at 2 (noting that despite

improvement, some suicide reports and corrective action plans "were not submitted within

applicable timeframes"); *Report on Suicides Completed in the California Department of*

*Corrections in Calendar Year 2004* ("**2004 Suicide Report**"), May 9, 2006, Docket No. 1806 at

2-3 (noting continued untimeliness); *Report on Suicides Completed in the California Department*

*of Corrections in Calendar Year 2005* ("**2005 Suicide Report**"), November 26, 2007, Docket

No. 2566 at 6 ("deficiencies continued with the timeliness of provision of some documents");

*Report on Suicides Completed in the California Department of Corrections and Rehabilitation in*

*Calendar Year 2006* ("**2006 Suicide Report**"), September 12, 2008, Docket No. 3030 at 1 n.1

(describing failure to provide mental health records for a prisoner committing suicide in 2006).

        Defendants' ongoing failure to comply with its obligations to produce the appropriate

records is particularly egregious in the current reporting period.  As the preceding paragraph to

the one now complained of by Defendants, to which Defendants do not object, the Special

Master states that for the period covered in the 2007 Suicide Report:

> Departmental response to suicides was marked by widespread
> lateness in completion and submission of required documentation.
> (*See* Appendix A for pertinent timelines). As of April 30, 2009,
> deadlines were missed in the reviews of 27, or 79 percent, of the 34
> suicide cases. Data was incomplete for all three of the suicides in
> DMH facilities; for two of them, institutional responses to QIPs have

8

[323247-2]

not been produced as of this writing. For four of the suicide cases within CDCR prisons, institutional responses to QIPs were not provided to this reviewer or to the Special Master until May 1, 2009, and even then, they were incomplete. **For a completed suicide which occurred on December 5, 2007, the Department's suicide report was not produced to this reviewer or the Special Master until April 17, 2009, and needless to say, there is still no QIP for that suicide as of this time, even though approximately 18 months have passed since its occurrence.**

2007 Suicide Report at 14 (emphasis added).  Even if Defendants were somehow absolved of responsibility for failing to provide the 2006 prisoner's mental health records, the Special Master has cited adequate documentation of repeated failures to warrant a court order in this case, and Defendants' objection, requesting the deletion of the entire paragraph, is unwarranted and should be denied.

### III.   DEFENDANTS' REQUESTS TO REVISE THE REPORT TO PRESENT A "MORE BALANCED" VIEW OF DEFENDANTS' PROGRESS IN REDUCING SUICIDES AND ADHERING TO THE PROGRAM GUIDE ARE WITHOUT MERIT AND SHOULD BE DENIED

Defendants' third set of objections erroneously suggest that the 2007 Suicide Report findings "emphasize perceived shortcomings" and fail to "appropriately acknowledge [Defendants'] achievements in preventing suicides," and therefore request that four statements in the 2007 Suicide Report be revised.  *Id.* at 6-7.  Specifically, Defendants object to (1) the description of Defendants' Suicide Risk Assessment Checklist ("SRAC") compliance; (2) the description of Defendants' first responder cardiopulmonary resuscitation ("CPR") compliance; (3) the characterization of the failure to provide CPR to a specific inmate; and (4) the description of compliance with the requirement to provide 30-minute welfare checks.  *Id.*  As discussed below, the first two objections do not involve any substantive change to the factual statements in the 2007 Suicide Report.  The remaining objections, which involve substantive revisions of the author's conclusions conflict with the relevant court orders and evidence in this case.

#### A.   SRAC Compliance

Defendants' objection first requests that the sentence on page 12 of the 2007 Suicide

9

[323247-2]

1  Report, regarding completion of SRACs by revised from:

2
> While this reviewer found that SRACs were completed appropriately
3
> in the majority of cases, there were a number in which SRACs had
> resulted in a determination of "no risk."

4

5  To:

6
> While there were some instances in which SRACs resulted in a
7
> determination of "no risk," SRACs were completed appropriately in
> the majority of cases.

8

9  Defs' Motion at 6.  Defendants suggest that this revision is necessary because "[t]he fact that

10  CDCR completed the checklists appropriately in a majority of cases indicates that CDCR is not

11  deliberately indifferent to the risk of inmate suicide."  *Id.* at 6.

12      This objection is nonsensical and offensive.  The revised version of this sentence does not

13  change in any way the factual conclusion in the statement, that SRACs determining a prisoner

14  had "no risk" were prepared for some prisoners who committed suicide.  Whatever conclusions

15  might be drawn from this statement will not change as a result of this revision and this request is

16  a waste of the Court's and the parties' time.  As the 2007 Suicide Report makes clear,

17  Defendants improperly completed SRACs by failing to (1) obtain information that was available

18  in records or via staff referrals and instead relying on prisoner's self-reports, (2) assess risk or

19  protective factors, (3) properly define the risk, (4) develop and implement appropriate follow up

20  evaluations and care, and (5) recommend transfers to appropriate clinical or custodial settings.

21  2007 Suicide Report at 12-13.  Defendants have no substantive basis to wordsmith this text in the

22  Special Master's Report.

23      Further, Defendants' suggestion that because the majority of the SRACs were completed

24  appropriately somehow demonstrates that they are not deliberately indifferent is far outside the

25  scope of the 2007 Suicide Report, which makes no conclusions regarding deliberate indifference.

26  Such a conclusion is erroneous in any event.  The Special Master's report notes that in 82% of

27  the suicides cases in 2007 there "had been at least some degree of inadequacy in assessment,

28  treatment, or intervention," for the highest rate of inadequacy in these areas in the past several

10

[323247-2]

1    years.  2007 Suicide Report at 12.  As troubling as the 82% failure is, "even more concerning is

2    its indication that the pre-existing pattern of poor performance in this area continues." *Id.* at 13.

3    "These disheartening figures and the trend they indicate all point to the inexorable conclusion

4    that practices in the treatment of suicidal CDCR inmates must be improved greatly and

5    immediately." *Id.* at 14.  The fact that a majority of SRACs were appropriately completed falls

6    far short of demonstrating a lack of deliberate indifference in light of the pervasive failure to

7    comply with the relevant court orders regarding suicide prevention.  Accordingly, this objection

8    should be denied.

9         **B.    Rate of Administration of CPR**

10        Similarly to Defendants' objections regarding SRAC compliance, Defendants complain

11   that the 2007 Suicide Report should be revised "to give a more balanced picture of improvements

12   in the rate of administration of cardiopulmonary resuscitation (CPR)."  Defs' Motion at 6.

13   Specifically, Defendants object that on page 14 of the 2007 Suicide Report, compliance with

14   CPR requirements is reported as the percentage of cases where CPR was not performed in a

15   timely and/or appropriate manner.  *Id.*  Defendants argue that by focusing on non-compliance,

16   the report gives the "impression that CDCR is deficient in performance of CPR on inmates

17   attempting suicide." *Id.*

18        This request is once again without merit in that it does not seek to alter in any way the

19   substance of the report.  As written, the report credits Defendants for the improvement from a 40

20   percent non-compliance rate to a 22 percent non-compliance rate.  Report at 14.  There is simply

21   no basis to revise the report to reword this statement.  Any impression of deficient performance

22   derives from the 22 percent failure rate, not the choice of text by the Special Master.

23        More troubling, however, is the fact that Defendants assert that appropriate performance

24   of CPR, a life saving measure that is the subject of a specific court order, in only 78% of suicides

25   constitutes "substantial compliance."  Defs' Motion at 6.  On June 9, 2005, the Court adopted a

26   recommendation in the Special Master's 2003 Suicide Report, requiring that Defendants develop

27   and implement a policy that establishes "clearly and unequivocally for custody staff to provide

28   immediate life support, if trained to do so, until medical staff arrive to initiate or continue life

                                                11

support measures…." 2003 Suicide Report at 11; Order, June 9, 2005, Docket No. 1668. That

recommendation, which became the Court's Order, was based in part on earlier findings by the

Special Master in his previous Suicide Reports where prisoners were found during suicide

attempts and were not provided with emergency life support by custody officers. *See, e.g.*,

*Coleman Suicide Report*, October 10, 2000, Appended to the Sixth Monitoring Report of the

Special Master on Defendants' Compliance with Provisionally Approved Plans, Policies and

Protocols, Docket No. 1213, Inmate 5, at 11 (delays in response after inmate found hanging,

including CPR not immediately initiated), Inmate 18 at 18 (CPR not performed when inmate cut

down), Inmate 22 at 20 (CPR not performed until five minutes after discovered hanging), Inmate

23 at 21 (CPR not performed for eight minutes after found hanging and not until transferred to

ER), Inmate 24 at 21 (after cut down, noose never loosened and CPR never done), Inmate 29 at

26 (no CPR done)); 2001 Suicide Report, Docket No. 1519, Inmate 6 at 20 (inmate cut down but

no CPR initiated without any explanation),  Inmate 19 at 38 (inmate cut down but no CPR

initiated until he was transported to the urgent care clinic five minutes after his discovery),

Inmate 21 at 42 (inmate cut down with pulse but no CPR initiated until arrived at infirmary 15

minutes later), Inmate 24 at 47 (inmate handcuffed, then cut down, and transported to emergency

room before CPR initiated));  2002 Suicide Report, Docket No. 1553, Inmate 1 at 14 (no CPR

done), Inmate 3 at 20 (alive when found by officers, MTA began CPR five minutes later),

Inmate 5 at 25 (no CPR when cut down, provided in the ER), Inmate 9 at 32 (no CPR by

responders), Inmate 13 at 42 (inmate cut down and cuffed, MTA arrived five minutes later and

decided not to start CPR), Inmate 17 at 53 (inmate cut down by officer and placed on floor, six

minutes later MTA arrived and initiated CPR), Inmate 19 at 57 (inmate cut down with a faint

pulse, no CPR initiated until MTA arrives).

Similarly, in the 2003 Suicide Report, the Special Master identified 6 suicides where CPR

was not initiated as required:  Inmate 1 at 1 (no CPR provided with no explanation), Inmate 3 at

5 (CPR not initiated for 16 minutes after inmate found), Inmate 18 at 50 (inmate cut down and

cuffed, no CPR until MTA arrived ten minutes later and discovered pulse), Inmate 25 at 73 (no

CPR initiated until inmate arrived in the infirmary ten minutes after discovered hanging in his

12

[323247-2]

1   cell by officer), Inmate 27 at 84 (Inmate cut down and placed in handcuffs until MTA arrived

2   five minutes later to initiate CPR), Inmate 35 at 126 (no CPR initiated until inmate transported

3   from housing unit to emergency room).  Docket No. 1658.

4           In recommending that Defendants accelerate the timing for development and

5   implementation of the CPR policy, the Special Master noted that the Defendants had not objected

6   to the recommendation and "[b]y failing to object to this recommendation, the defendants have

7   known since March [2005] they will need to address this issue.  Because of the length of the

8   process for review of and comments on the draft version of this report and revisions to the draft

9   version in response to the comments, the recommended timeframe for the implementation of this

10  recommendation is reduced to 60 days from the entry of the court order."  2003 Suicide Report at

11  13.  Despite their knowledge of the requirement and the time provided by the Court, Defendants

12  failed to develop and implement a CPR policy as required by the June 9, 2005 Order.  *See*

13  Docket Nos. 1680; 1681; 1682; 1689; 1690; 1691.  Even months later, Defendants were

14  struggling with developing a policy and implementing it system-wide.  *See* Docket Nos. 1702;

15  1703; 1704; 1726; 1734; 1739; 1748.

16          The Revised Program Guide, filed with the Court in 2006, and later amended in 2009

17  included the requirements of the June 9, 2005 Order.  *See* 2009 Revised Program Guide at 12-10-

18  21 to 12-10-22.  The Special Master carefully monitors implementation of suicide prevention

19  protocols during the institutional monitoring tours, and in his monitoring reports, he notes the

20  availability of the suicide prevention cut-down kits with ambu-bags, the compliance by custody

21  staff with the requirement to carry CPR micro-shields at all times, and the percentages of custody

22  staff trained in CPR and participating in monthly emergency response drills.  *See, e.g.* Special

23  Master's 21st Monitoring Report.  Policies and Protocols, Docket No. 3638, at 40 (Pelican Bay

24  State Prison, toured on August 26-27, 2008), at 385 (1/4 of the institutions completed CPR

25  training for nearly all custody staff; and at 10 prisons, monthly emergency response drills in

26  ASU units were performed).

27          Tremendous effort has been expended by the Court, the Special Master and his monitors

28  and experts, and Defendants, to implement the requirement that custody officers as first

1  responders provide emergency response until relieved by medical staff.  After many years of

2  monitoring and efforts by Defendants, which are documented in their own pleadings filed in

3  response to Plaintiffs' Notice of Non-compliance, Docket Nos. 1689-1691, they now argue that

4  their failure to provide CPR in 22 percent of the suicides in 2007 should be considered

5  "substantial compliance."  Defendants appear to accept that officers will continue to fail to

6  provide this most basic emergency response when discovering a prisoner during a suicide

7  attempt, and in fact, want commendation for their "improvements."  However, failure to provide

8  CPR has real consequences on human life.  *See e.g.*, 2007 Suicide Report, Inmate H at 88

9  (prisoner found hanging in cell but CPR not initiated until transported to infirmary), Inmate BB

10 at 205, 207 (prisoner found hanging in cell but CPR not initiated for five minutes), Inmate DD at

11 216, 222 (prisoner found with plastic bag wrapped around face and head, yet CPR not

12 administered by first responders (correctional officers)).  Failing to provide CPR in twenty-two

13 percent of the suicides in 2007 is unacceptable and does not constitute substantial compliance.

14 This objection should be denied.

15      **C.    CPR Response for Inmate Y**

16      Despite the clear and unequivocal requirement that custody staff perform CPR,

17 Defendants requested that the draft 2007 Suicide Report clarify whether the Special Master

18 recommended that CPR be "performed in all cases."  Defs' Motion at 6.  Defendants sought this

19 clarification because the Report states that in four cases "CPR was determined to be not

20 applicable or was not initiated, based on the inmate's condition at the time of his discovery."

21 2007 Suicide Report at 17.  The final 2007 Suicide Report clarifies this point, stating that "[a]ll

22 correctional officers who respond to a medical emergency are mandated, pursuant to court order,

23 to provide immediate life support until medical staff arrives. Medical staff must then continue

24 life support measures unless and until the patient is revived, the situation is determined to be not

25 a medical emergency, or the patient is pronounced dead. Only a physician may pronounce a

26 patient dead."  2007 Suicide Report at 17 n.13 (internal citations omitted).

27      Nevertheless, Defendants now argue that the failure to perform CPR on one prisoner,

28 Inmate Y, should not be counted as inappropriate, and request that the paragraph on page 14,

14

described above, should be revised to state that CPR was performed in 27 of 33 suicides "for which CPR was arguably appropriate in 2007." Defs' Motion at 7. Inmate Y was a 52-year old male prisoner who committed suicide by jumping from a fifth floor bathroom window. 2007 Suicide Report at 187. He was found in a maintenance yard by an officer who saw him out the window. *Id.* at 187-188. The 2007 Suicide Report notes:

> CPR was not initiated by staff when the inmate's body was discovered. The reviewer noted that it was discovered 28 minutes after the inmate had been heard crashing to the ground. The extent of his traumatic injuries, as described by the medical examiner, and the duration quite likely made it apparent that he was well beyond rescue. *There was no indication as to who determined that the inmate should not receive CPR.*

*Id.* at 190 (emphasis added.)

Defendants fail to fully understand the requirements of the CPR policy, which state that "[t]he responding peace office will be required to articulate the decision made regarding the immediate life support and actions taken or not taken, including cases where life support is not initiated consistent with training and/or situations which pose a significant threat to the officer or others." 2009 Revised Program Guide at 12-10-21. A correctional officer cannot make a determination of death. In the case of the Inmate Y, the Special Master noted non-compliance with the CPR policy because "*[t]here was no indication as to who determined that the inmate should not receive CPR.*" *Id.* at 190 (emphasis added). This was an appropriate finding by the Special Master and Defendants' objection indicates a lack of understanding of the history of the CPR Order and the policy itself. In the early litigation over the Defendants' initial CPR policy, which was subsequently revised by Defendants, Plaintiffs' suicide expert, Lindsay Hayes noted that giving non-medical personnel virtually unlimited discretion not to initiate CPR/First Aid, would result "in a continuation of the current troubling practices within the CDCR in which correctional officers are delaying and/or refusing to initiate CPR/First Aid prior to the arrival of medical personnel." Declaration of Lindsay Hayes in Support of Plaintiffs' Notice of Defendants' Failure to Comply with the June 9, 2005 Order and Request for Relief, Docket No. 1703, at ¶ 9.

15

[323247-2]

1    Defendants' objection should be denied.

2        **D.    30-Minute Welfare Checks**

3        Defendants further request deletion of the last bullet point finding on page 16, arguing that

4    it implies that the failure to provide 30-minute welfare checks in one suicide reflects a failure to

5    implement the policy system-wide.  Defs' Motion at 7.  This objection is also without merit. The

6    Court's June 7, 2006 Order, which required that Defendants collaborate with the Special

7    Master's experts, and with Plaintiffs' expert Lindsay Hayes to develop a plan to address the

8    escalating percentage of suicides occurring in administrative segregation, resulted in a plan that

9    included 30-minute welfare checks by custody officers in order to increase the likelihood of

10    suicide prevention or rescue. Order, Docket No. 1830 at 3:1-3; *see* Report and Recommendation,

11    Docket 2084 at 6-7 of 11.  Although the 2007 Suicide Report cites only a single example in the

12    context of an actual suicide, there is ample evidence in other reports by the Special Master

13    covering the same period that supports a finding that there is a system-wide failure to implement

14    30-minute welfare checks.  Specifically, two Monitoring Reports were issued by the Special

15    Master covering monitoring tours in 2007 that discussed the status of 30–minute welfare checks.

16    In the first report, the 19th Monitoring Report (which covered early 2007 and included only 13

17    prisons), the Special Master noted that only five prisons had "implemented 30 minute welfare

18    checks in administrative segregation, a significant feature of the defendant's plan to reduce

19    suicides there."  Special Master's 19th Monitoring Report, July 25, 2008, Docket No. 2895, at 1,

20    119.  At a sixth prison, Valley State Prison for Women, "supervision was lacking and the

21    monitor discovered that welfare checks were being documented before they were actually made."

22    *Id.*  In the second report covering the later part of 2007 and all of the prisons, the 20th

23    Monitoring Report, the SM found that although custody 30-minute welfare checks were well

24    established at the majority of the prisons, less than half (14 prisons) had "suitably documented

25    staggered checks during the inmates' first 21 days in administrative segregation."  Special

26    Master's 20th Monitoring Report at 1-2, 340.  Based upon these two Monitoring Reports

27    covering 2007, CDCR had failed to implement 30-minute welfare checks systemically.  This

28    information was readily available to the Special Master at the time the Suicide Report was

drafted.[4]  Accordingly, Defendants' request to delete the entire paragraph at page 16 should be denied.

## IV.    THE SPECIAL MASTER'S CONCLUSIONS WITH REGARD TO INDIVIDUAL PRISONER SUICIDES ARE ADEQUATELY SUPPORTED

Finally, Defendants object to the conclusions asserted in the suicide report summaries for four prisoners who committed suicide in 2007.  Defs' Motion at 8-10.  Each of these objections asserts that various statements by the Special Master lack foundation and should be stricken.  *Id.* Defendants assert no legal authority for this "foundational" objection to statements in the Special Master's reports.  The Special Master and his experts have extensively monitored Defendants' compliance with remedial measures and court orders in this case, including monitoring suicides at CDCR institutions for over nine years.  Dr. Raymond Patterson, the Special Master's expert, and a prominent, board certified and highly qualified expert, has authored or co-authored each of the Special Master's suicide reports.  Additionally, the Special Master and his experts have thoroughly reviewed the underlying documents and Defendants' own reports on suicides in 2007.  The Special Master and his experts are well qualified to offer their expert opinion in this context.  In any event, the statements to which Defendants object are adequately supported and these objections should be denied.

### A.    Inmate D

Inmate D was a 31-year old male who committed suicide by hanging in the DMH APP-acute bed unit at CMF-Vacaville on January 29, 2007.  2007 Suicide Report at 53.  Mr. D had a substantial suicide attempt history both in the community and while incarcerated in jail and prison.  *Id.* at 54-55.  During his admission at Atascadero State Hospital ("ASH") in 2006, he

---

[4] Defendants' failure to provide 30-minute welfare checks is ongoing.  The Special Master's 21st Monitoring Report found that custody 30-minute welfare checks were completed at over 70 percent of the institutions, but that only 42% (13) of them achieved full compliance with documented staggered checks during the first 21 days of a prisoner's stay in ASU.  Special Master's 21st Monitoring Report at 387.  Seven more prisons completed the welfare checks, but they were not staggered appropriately.  *Id.*  Another five other prisons were not compliant with providing 30 minute welfare checks in their ASU units.  *Id.*  Even in this later report, CDCR had not successfully implemented this most basic of rounding requirements successfully.

[323247-2]

1  assaulted two patients within a week; behavior which clinical staff felt was the result of his

2  mental illness.  *Id.* at 55-56.  Despite this clinical conclusion, he was discharged back to prison.

3  *Id.* at 56.  Although Mr. D decompensated rapidly in prison, and clinical staff referred him back

4  to ASH, he was rejected because of his prior behavior.[5]  *Id.* at 56.  Mr. D was eventually

5  transferred to an acute bed in the APP.  *Id.* at 56-57.  He remained on either suicide watch or

6  precautions for many months, until just days before he successfully committed suicide.  *Id.*

7      The CDCR Suicide Report identified twelve problems in his care, including the failure to

8  complete mental health assessments in the reception centers, the failure to refer him to a higher

9  level of care after multiple MHCB admissions, his premature discharge from ASH to prison

10  rather than to APP, poor chart documentation in the APP charts, poor suicide prevention training

11  for APP staff, unclear suicide prevention policies in APP, unsafe suicide watch cells in Q-wing,

12  and lack of back-up emergency equipment.  *Id.* at 58-60.  DMH did their own analysis of the

13  suicide and offered a Root Cause Analysis of the death dated February 10, 2007, which identified

14  19 issues, with corrective actions.  *Id.* at 61.  The management of this prisoner-patient by both

15  CDCR and DMH was clearly inappropriate and resulted in his untimely death.

16      The Special Master concluded that this prisoner's suicide was both foreseeable and

17  preventable.  *Id.* at 66.  The 2007 Suicide Report notes multiple failures by both CDCR and

18  DMH, including the "precipitous" discharge from ASH, that occurred one day after Mr. D

19  assaulted another patient, which staff determined was directly related to his mental illness.  *Id.* at

20  56, 66.

21      Defendants initially objected to the draft 2007 Suicide Report and the reference to the

22  "precipitous" discharge of Inmate D from Atascadero for assaulting other patients, stating that

24  [5] Plaintiffs note that during the time period in which Mr. D was discharged from ASH, DMH was

25  experiencing severe shortages in clinical and custody staff following Defendants decision not to bring DMH clinical salary levels in line with corresponding CDCR staff pay increases.  *See*

26  Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Emergency Relief Regarding Defendants' Denial of Access to Inpatient Psychiatric Beds in DMH's State Hospitals,

27  March 23, 2007, Docket No. 2166, at 4-8.  As a result of the staff shortages, DMH hospitals including ASH restricted admissions.  *Id.* at 7.

28

18

[323247-2]

1   the discharge resulted from security concerns rather than clinical judgment of the prisoner's

2   mental health status.  Defs' Motion at 8, Exhibit A at 5.  Responding to this point, the Special

3   Master, in the 2007 Suicide Report, stated that "Defendants' objection lacks a legitimate basis. It

4   is the responsibility of forensic hospitals such as ASH to manage assaultive patients and not

5   simply discharge them to a different location, such as CDCR or to the outside, because of such

6   behavior."  2007 Suicide Report at 66 n.3.

7           Although Defendants continue to object to this characterization of the ASH discharge,

8   they provide no support for their objection; instead attacking the Special Master's foundation

9   because the Report cites no law or policy giving rise to a duty to treat this patient.  Defs' Motion

10  at 8.  However, the MHSDS Program Guide 2009 Revision provides that:

11          The California Department of Corrections and Rehabilitation
            (CDCR) is responsible for providing acute and intermediate inpatient
12          care, in a timely manner, to those CDCR inmates clinically
            determined to be in need of such care.  CDCR currently maintains a
13          contract with the California Department of Mental Health (DMH) to
            provide acute and long-term intermediate inpatient mental health care
14          to inmate-patients.

16  2009 Revised Program Guide at 12-6-1.  As this section makes clear, Defendants are obligated to

17  provide acute and inpatient care and are not relieved of this obligation because of custody

18  concerns.  While the Report does not specifically cite this provision of the Program Guide, the

19  Report clearly references the fact in 2006 this Court approved and ordered Defendants to

20  immediately comply with all but two provisions of the Program Guide.  *Id.* at 15.

21          Additionally, Defendants have a constitutional duty under the Eighth Amendment to

22  provide access to adequate mental health care.  *Coleman v. Wilson*, 912 F. Supp. 1282, 1298

23  (E.D. Cal. 1995).  If prisoners require higher levels of care due to the risk of harm to themselves

24  or others, yet are excluded from such higher levels of care due to the risk that they will harm

25  others, Defendants will never achieve constitutional compliance.  Defendants offered no

26  evidence that adequate care could be provided where prisoners such as Mr. D are excluded from

27  ASH.  Moreover, Defendants' own assessment identified as Problem 4 that:

28

19

[323247-2]

> On both of the previous DMH admissions, this inmate was
> inappropriately returned to the EOP level of care, where he had been
> unable to program successfully at any time during his incarceration.
> At ASH, the inmate was not considered ready for discharge until he
> assaulted two other inmates due to his paranoia, and then suddenly he
> returned to prison.

*Id.* at 58. Defendants cite no authority for the proposition that the Special Master's Report must identify the underlying policy for each finding, and Defendants should be aware of their obligations under the Program Guide and the Eighth Amendment.

Additionally, Defendants object to the 2007 Suicide Report's criticism of DMH for not providing documents with regard to Mr. D, referencing a "policy" requiring the provision of such documentation regarding Mr. D. Defs' Motion at 8. Defendants claim that there is no such policy. *Id.* Defendants are wrong. The documents that DMH failed to provide included implementation of their Root Cause Analysis Action Plan. 2007 Suicide Report at 66. The Root Cause Analysis Action Plan is covered by the MHSDS Program Guide requirements in Chapter 10: Suicide Prevention and Response, 2009 Revised Program Guide at 12-10-26 to 12-10-28 (discussing quality improvement plans, also known as corrective action plans, and the supporting documentation which shall be provided and forwarded to all necessary parties as it becomes available). The 2007 Suicide Report specifically references the Program Guide and its requirements for follow-up and reporting on each suicide at Chapter 10, "Suicide Prevention and Response" and the relevant court orders requiring its implementation, and therefore Defendants' assertion that the "policy" was not identified is erroneous. 2007 Suicide Report at 15. Moreover, to the extent that the CDCR Mental Health Officials responsible for suicide prevention and review are not requesting and obtaining DMH's Root Cause Analysis and action plans and implementation reports for all DMH suicides that involve CDCR patients, then Defendants are out of compliance with their own suicide prevention requirements. Accordingly, Defendants' objections with regard to Mr. D should be denied.

**B.    Inmate G**

Inmate G was a 43-year old male who committed suicide by hanging on March 12, 2007

20

[323247-2]

at ASH. *Id.* at 79. At various points, prior to his admission at ASH, there were notations in his records from CDCR and DMH clinicians describing him as "manipulative." *Id* at 80-81. When Mr. G was admitted to ASH on November 22, 2006, his diagnoses were "Major Depressive Disorder recurrent severe as well as Polysubstance Dependence and Antisocial Personality Disorder." *Id.* at 82. He also had psychological testing that suggested a diagnosis of Malingering. *Id*. After a suicide by another patient on February 15, 2007, Mr. G began making suicidal statements on February 18, 2007, and was placed on suicide watch and suicide observation for several days. *Id.* On February 24, 2007, he was found wandering and confused in another part of the hospital and was expressing thoughts of hopelessness and fatigue, but denied suicidal thoughts. *Id.* Mr. G was scheduled to be seen by a psychiatrist, but was never seen before his suicide. *Id.* The Report concluded that this suicide may have been preventable had staff referred him appropriately to a psychiatrist for a re-evaluation, but that this did not occur because staff had determined that he was manipulative, rather than seriously depressed. *Id.* at 85.

Defendants do not object to the conclusion that Mr. G's suicide was possibly preventable if he had been appropriately re-evaluated by a psychiatrist. Rather, they object to the Special Master's assumptions with regard to the reasons provided for this failure; that clinical staff had concluded that Mr. G was not seriously depressed and at risk of suicide, but rather was manipulative. Defs' Motion at 8-9. Defendants appear to miss the forest for the trees. In this particular case, Mr. G was exhibiting clear signs of decompensation, which a psych tech observed and resulted in a referral to a psychiatrist. Nevertheless, no other clinical response occurred, despite this patient's behavior, which included aimless wandering around the hospital in a confused and hopeless state, withdrawal from social contacts, staying alone in his room, interacting less with his peers, and isolation from his own relatives when they called. This is the foundation for the Special Master's conclusion that the clinical team had concluded that Mr. G was malingering. Moreover, if the clinical team had not concluded Mr. G was malingering or that he was malingering in addition to suffering from major depression, then the Suicide Report's conclusion should be harsher. In the absence of an assumed conclusion that Mr. G was

21

[323247-2]

1  malingering this suicide would have been both preventable and foreseeable, because clinical staff

2  would have failed to respond to a patient they knew was severely depressed and was exhibiting

3  this behavior for a week.  Accordingly, Defendants' objection with regard to Mr. G should be

4  denied.

5      **C.      Inmate W**

6          Inmate W was a 44-year old male who committed suicide by hanging on July 30, 2007 at

7  Correctional Training Facility ("CTF").  *Id.* at 177.   The 2007 Suicide Report concludes that

8  Mr. W's suicide was both foreseeable and preventable because, *inter alia*, his behavior in the two

9  weeks prior to his suicide indicated thoughts of harming himself, yet Mr. W was not referred for

10  a mental health evaluation.  *Id.* at 182.  Defendants' erroneously object that the characterization

11  of this suicide as foreseeable and preventable lacks foundation.  Defs' Motion at 9.  Specifically,

12  Defendants once again attempt to deflect blame, stating that the medical staff who failed to refer

13  Mr. W for a mental health evaluation were under the control of the *Plata* Receiver.  *Id.*  While

14  acknowledging that the medical staff member who examined Mr. W wrote in a progress note that

15  all medications should be taken from Mr. W and instead be dispensed to him by directly

16  observed therapy ("DOT"), that is by a trained clinician, following procedures to assure that the

17  medication is ingested and not hoarded or cheeked, Defendants point to the fact that the UHR did

18  not contain an order reflecting the change to DOT or to remove Mr. W's medications.  *Id.*

19  Finally, Defendants state that there is no evidence of a "causal connection" between the alleged

20  lapses and the suicide.  *Id.* at 10.  Responding to these objections the Special Master in the 2007

21  Suicide Report notes:

22          Defendants overlook the larger context of this inmate's suicide: a
        review of this inmate's record indicates concerns surrounding
23          suicidality. There should have been a referral of this inmate to mental
        health, but none was done, nor were the more intensive medication
24          monitoring and medication administration that this inmate needed.
        Mental health staff are expected to review the inmate's records.
25          Consequently, this reviewer's findings of foreseeability and
        preventability are based on a broader set of concerns than those that
26          the defendants would suggest.

27

28  2007 Suicide Report at 182.

[323247-2]

Mr. W's death was both foreseeable and preventable. Mr. W reported his own suicide attempt history in a bus screening when he re-entered Wasco State Prison in 2005. *Id.* at 178-179. He also reported current thoughts of suicide and was referred to mental health within 72 hours, rather than as an emergency contact. *Id.* His records included a probation report stating that he had attempted suicide by overdose in the county jail in 2005, and the psychiatrist who evaluated him at WSP noted a prior suicide attempt by hanging in 2003. *Id.* Two weeks before he committed suicide Mr. W went to the infirmary and reported that he had taken his cellmate's medications "out of boredom." *Id.* at 179. No referral was made to mental health for a suicide risk assessment, despite this prisoner's history of suicide attempts. *See id.* A week later his own psychotropic medications expired, yet he was not seen by a psychiatrist. *Id.*

Defendants state that there is "no indication that medications were the cause of Inmate W's suicide by hanging." Defs' Motion at 10. The Special Master's Report makes no such argument. Rather, the Suicide Report states that Mr. W's behavior – taking an overdose of his cellmate's medication and going to the infirmary to report this behavior – should have triggered a mental health response that may have resulted in a clinical intervention in response to this prisoner's cry for help. *Id.* at 182. Instead, there was no response. Again, when Mr. W's psychotropic medication expired he should have been seen by a psychiatrist, who would have asked him a variety of clinical questions. Had that happened, Mr. W may very well have reported some of his suicidal thoughts.

Defendants' argument that Mr. W's suicide by hanging and the identified problems are not causally related appears to suggest that a prisoner's prior suicidal history, and even recent suicidal behavior, is unrelated to the likelihood of a later successful suicide. This is contrary to literature on suicide prevention, including that written by Defendants' own suicide expert, Dr. Thomas White.[6] Dr. White writes that "because it is a generally accepted fact that a history

---

[6] In 2006, Defendants hired Thomas W. White, PhD, to assist them in developing their Plan to Address the Escalating Rate of Suicides in Administrative Segregation. *See* Kahn Decl. at ¶ 3, Exhibit C (Clinical Experts Consensus Forum Agenda for July 14, 2006, listing Dr. White as CDCR expert).

[323247-2]

1    of prior suicide attempts is one of the most important indicators that a person may be at greater

2    risk of eventually completing suicide, one of the first things a clinician should do in every suicide

3    assessment is to find out if the client has attempted suicide in the past, even if it does not appear

4    that the client is currently suicidal."  Thomas W. White, *How to Identify Suicidal People: A*

5    *Systemic Approach to Risk Assessment* 27 (The Charles Press, Philadelphia, PA, 1999).

6        Mr. W's suicide was clearly preventable and may very well have been foreseeable and

7    Defendants' objections should be denied.

8    **D.    Inmate X**

9        Inmate X was a 25-year old woman who committed suicide by hanging on August 4, 2007

10   at the Central California Women's Facility ("CCWF").  2007 Suicide Report at 183.  Ms. X was

11   housed in a dormitory at the time of her death.  *Id.*  Ms. X was discovered by another prisoner

12   who observed her hanging by a sheet around her neck and who screamed for help and removed

13   the sheet and lowered her to the floor.  *Id.*  Several officers responded to the emergency, and one

14   activated his personal alarm, notified the control, and requested medical staff and transport.  *Id.*

15   An officer started chest compressions, while one of the prisoners gave rescue breathing.  *Id.*  One

16   of the responding officers and a responding LVN felt a "slight" or "thready" pulse at that time.

17   *Id.*  Despite the attempts to resuscitate Ms. X, she was pronounced dead shortly after being

18   transported to the triage treatment area ("TTA") by ambulance.  *Id.*

19       CDCR's own Suicide Report for Ms. X identified one problem.  *Id.* at 185-186.  Although

20   two officers immediately responded to the emergency, and one officer began chest compressions,

21   it was a prisoner who gave rescue breaths.  *Id.*  The CDCR Report noted that "[o]fficers are

22   trained to provide CPR alone or with another officer and should have assumed responsibility for

23   all resuscitation efforts without the inmate's assistance.  Inmates are not trained to provide CPR.

24   It appeared that one officer was standing and observing resuscitation efforts as the inmate

25   continued to provide rescue breaths." *Id.*  The 2007 Suicide Report concluded that this death

26   "may have been preventable" due to the fact that CPR performed by another prisoner may have

27   been less effective.  *Id.* at 186.

28       Defendants erroneously object that the 2007 Suicide Report should be revised to omit the

24

[323247-2]

1  characterization of Ms. X's suicide as preventable, stating that it lacks foundation establishing

2  that the "correct administration of CPR would have produced a different result."  Defs' Motion at

3  10.  The foundation for the conclusion that this suicide "may have been preventable" is based on

4  the fact that "chances of successful resuscitation are substantially higher if it is performed by a

5  trained person."  2007 Suicide Report at 186 n.11.  While common sense would support this

6  statement, the Special Master and his experts are sufficiently qualified to offer this opinion.

7  Further, as the Special Master notes, Defendants failed to offer any evidence that the inmate who

8  performed CPR was competent to do so and CDCR's own suicide report had criticized CCWF

9  for allowing an inmate to perform CPR.  *Id.*  Finally, Defendants' own policies and procedures

10  mandate that officers trained as first responders provide emergency response because "*[i]n*

11  *medical emergencies, the primary objective is to preserve life*."  2009 Revised Program Guide at

12  12-10-21.  (emphasis in original)  Ms. X's suicide may very well have been preventable if she

13  had been provided with CPR by trained first responders, especially given the condition that at the

14  time of rescue she had a slight pulse.  *Id.* at 183. Accordingly, Defendants' objection with regard

15  to Ms. X should be denied.

16  **V.    THE SPECIAL MASTER'S FINDINGS AND RECOMMENDATIONS SHOULD
        BE ADOPTED AND THE COURT SHOULD ENTER FURTHER ORDERS TO
17        ADDRESS DEFENDANTS' CONFUSION REGARDING THE PROVISION OF
        REQUESTED DOCUMENTS TO THE SPECIAL MASTER AND REGARDING
18        CRITERIA FOR EXCLUDING CDCR PATIENTS FROM HIGHER LEVELS OF
        CARE**

19

20        As noted above, fourteen years after the Court first appointed a Special Master in this

21  case, and nine years after the Special Master began reporting on suicides in CDCR institutions,

22  the suicide situation in CDCR institutions has not significantly improved.  Despite numerous

23  court orders and monitoring:

24        Examination of the individual suicide cases in 2007 revealed that for
        24, or 82 percent, of the 34 inmates who completed suicides, there
25        had been at least some degree of inadequate assessment, treatment, or
        intervention. This finding was based on the presence of information
26        that was or should have been available to clinical staff. These
        suicides were, therefore, most probably foreseeable and/or
27        preventable. Even more concerning is the fact that this high rate of
        inadequacy in assessment, treatment, or intervention is worse than the

28

25

[323247-2]

1    rates of 72.1 percent for 2006, 74.4 percent for 2005, and 76.9
2    percent for 2004. These numbers clearly indicate no improvement in
3    this area during the past several years, and possibly signal a trend of
4    ongoing deterioration, given that the rate of inadequate assessment,
     treatment, or intervention five years earlier in 2002 was 45 percent.

5    2007 Suicide Report at 12.  Similarly, in July 2009, Dr. Canning presented data suggesting that

6    the suicide rate for all prisoners in CDCR institutions continues to rise and that there is a positive

7    correlation between overcrowding and the suicide rate.  Kahn Declaration at Exhibit B at Slide

8    23 (rising trend in the annual rate of suicide for all prisoners in CDCR institutions from 1999 to

9    2008), Slides 55-56 (rate and frequency plotted against population and percentage over capacity).

10   The 2007 Suicide Report provides a series of recommendations to attempt to reverse the

11   troubling trends with regard to the number of suicides and Defendants' compliance with the

12   Court orders to reduce the number and rate of suicides.  2007 Suicide Report at 18-19.  These

13   recommendations include:

14   • Identification of known and/or suspected medical problems and medications within the
15     prisoner's mental health treatment plans, and discontinue the practice of merely
16     alluding to this information in other records.

17   • Increased communication and collaboration between CDCR and DMH to ensure the
18     highest level of care is provided to those who are determined to need it.

19   • Access to inpatient care for CDCR inmates at DMH facilities should be given the
20     highest priority, particularly for Level III and IV prisoners.  This includes increased
21     transparency and accountability for DMH with regard to its decisions on admissions
22     and rejections.

23   • Full and timely implementation of the suicide prevention and review processes must
24     be given priority at both the institutional and departmental levels.

25   *Id.*  Each of these recommendations should be adopted in full.

26   Additionally, Defendants' objections to the 2007 Suicide Report raise troubling concerns

27   with regard to Defendants' understanding of its obligations under current court orders and the

28   Program Guide with regard to: (1) Defendants' obligation to ensure that all records requested by

26

[323247-2]

1  the Special Master are provided both timely and completely, regardless of whether those

2  documents that are in the possession of the *Plata* Receiver's office or DMH; and (2) CDCR

3  patient admission to DMH facilities, including ASH, as clinically appropriate, regardless of the

4  patient's prior behavior or conduct in DMH.  Accordingly, Plaintiffs respectfully request that to

5  the extent Defendants assert no such policies exist or that there is any ambiguity with regard to

6  the relevant policy, that the Court enters orders clearly identifying Defendants' obligations.

7  **CONCLUSION**

8  For all of the above reasons, Defendants' objections to the 2007 Suicide Report should be

9  denied.

10  Dated:  October 23, 2009                                Respectfully submitted,

11                                                                          ROSEN, BIEN & GALVAN, LLP

12

13                                                        By:  */s/ Mark R. Feeser*
                                                                  Mark R. Feeser
14                                                                  Attorney for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[323247-2]