EXHIBIT A

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Benjamin T. Rice
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 12, 2009


Mr. Paul Mello
Hanson Bridgett LLP
425 Market Street
San Francisco, CA  94244-2550

Dear Mr. Mello:

Attached please find Defendants' response to the October 21, 2009, Three-Judge Court Order.

Sincerely,

BENJAMIN T. RICE
General Counsel, Office of Legal Affairs
California Department of Corrections and Rehabilitation

Attachments

## STATE DEFENDANTS' NOVEMBER 12, 2009 RESPONSE TO THE THREE-JUDGE COURT'S OCTOBER 21, 2009 ORDER TO REDUCE PRISON POPULATION TO 137.5% OF DESIGN CAPACITY

### BACKGROUND AND SUMMARY OF RESPONSE

On August 4, 2009, this Court ordered the State to produce a prisoner reduction plan that would, within two years, reduce the State's prison population to 137.5% of design capacity – i.e., a reduction of more than 40,000 prisoners over a two-year period.[1] Defendants subsequently presented the Three-Judge Court with a plan to safely reduce the State's prison population over time. It did not achieve the prisoner reduction that the Court desired on the timeframe the Court ordered, because the State's plan (the September 18, 2009 Plan) reflected the State's goal to implement long-term prison reform that enhanced public safety and reduced the prison population. Although the State's plan significantly reduced the prison population over time while the number of State prisoners was projected to increase, to be sure, this plan was not designed as a short-term fix for prison crowding. But the Court rejected the State's plan and ordered the State to present a new plan that, "most important, provides for a reduction of the prison population to 137.5% of design capacity within two years."

Without waiving any appellate rights, conceding the appropriateness of the Three-Judge Court's prior rulings and findings, or admitting that the prisoner release order issued by the Three-Judge Court can be implemented without substantially adversely impacting public safety and the operation of the criminal justice system, Defendants submit this Response as required by the Three-Judge Court's October 21, 2009 order to meet the court-selected population figure of 137.5% of design capacity for California's prisons by the end of 2011.

In this Response to the Three-Judge Court's October 21, 2009 order, Defendants continue to propose the following items from their September 18, 2009 Plan, for which they already had the authority through legislation or executive or administrative powers:

1. Pre-Custody Reforms: California Community Corrections Performance Incentives Act of 2009.

2. In-Custody Reforms: Credit-Earning Enhancements.

3. Parole Reforms: (a) "Summary Parole;" (b) Parole Violation Decision Making Instrument; and (c) Reentry Courts.

4. Administrative Changes: (a) California Out-of-State Correctional Facility Expansion; (b) Community Correctional Facilities Utilization; (c) Commutations of Sentences;

---

[1] Based on the evidence at the time of trial, the Three-Judge Court estimates the prisoner reduction to be approximately 46,000 inmates. Because the actual prison population fluctuates over time, the estimated reduction does as well.

(d) Discharge of Deported Parolees; and (e) Alternative Sanctions for Violations of Parole.

5. Increased capacity through construction of new infill projects, healthcare projects, conversion of former Division of Juvenile Justice sites, and reentry projects.

Several of the reforms identified above were recently enacted by the State's executive and legislative branches. Moreover, the Defendants committed in their September 18, 2009 Plan, and remain committed now, to seeking additional State law changes through the State Legislature. Nonetheless, in rejecting the State's September 18, 2009 Plan, the Court ordered the State to identify State laws that limit the Defendants' ability to implement population reduction measures, and suggested that it might waive State laws to achieve the reduction it desires. Although the Defendants have complied with the Court's order, they do not believe it is appropriate for this federal Court to waive State laws. However, the prisoner reduction that this Court seeks – a reduction of more than 40,000 prisoners in two years – can only be accomplished if the State Legislature enacts new laws and/or this Court orders changes to State laws, as discussed in this Response. Thus, Defendants present the following proposals to reach the court-ordered population figure of 137.5% of design capacity within two years. Some of these proposals were included in the September 18, 2009 Plan, but the State Defendants had no ability to implement them at that time absent additional legislation or court orders:

1. Additional inmates housed in out-of-state facilities.

2. Changing of property crime thresholds.

3. Establishing alternate custody options for low-risk offenders.

4. Accelerating construction projects under AB 900.

5. Additional use of private in-state facilities.

6. County jail time for enumerated felonies.

The following discussion contains two sections: (1) a section discussing the proposals from the September 18, 2009 Plan that require no additional legislation or court orders; and (2) a section discussing the additional proposals, some of which were originally included in the September 18, 2009 Plan, that require either legislation or court orders to accomplish. The Table at the end of this Response sets forth the population reduction figures in six-month increments as required by the Three-Judge Court's order. In general, these estimates represent CDCR's best effort to project future impacts to a population that is dynamic and will change in ways that are not known today. Submitted concurrently with this Response are declarations addressing the Court's questions posed in its October 21, 2009 Order.

## SECTION ONE

## PROPOSALS FROM THE SEPTEMBER 18, 2009 PLAN THAT REQUIRE NO ADDITIONAL LEGISLATION OR COURT ORDERS TO IMPLEMENT

Defendants maintain that the September 18, 2009 Plan is the most effective way to safely and responsibly reduce its population and the elements of that plan are the foundation for this Response. Below, Defendants summarize the proposals of the September 18, 2009 Plan and address the questions from the Three-Judge Court's October 21, 2009 order. (Other answers are in the concurrently-filed declarations.) Specifically, this Court directed Defendants to set forth effective dates and to estimate reductions in population expected after six, twelve, eighteen, and twenty-four months after implementation. (Oct. 21, 2009 Order at 2:25-28.) Also, this Court ordered Defendants to "(1) explain the calculations through which they obtained the estimates of the population reductions associated with each action that they propose; (2) identify the assumptions underlying those calculations; and (3) explain why those assumptions are reasonable." (*Id.* 3:2-5.)

To respond to the Three-Judge Court, Defendants submit a Table that estimates the impact of the proposals in six month increments. As demonstrated in the Table, there will be a period of time during which Defendants will ramp up the programs and therefore it appears as though there is a delayed realization of the population reduction.

For each eligible number, in generating estimates of the impact on the reduction in average daily population (ADP), Defendants generated estimates based on eligible populations and factored in a ramp-up period, overlap with other programs, etc., in an attempt to obtain the most reasonable and reliable population reduction estimates. For the population reduction measures, CDCR chose to conservatively estimate the impact in order to pick the most reliable and achievable numbers. (*See* generally Decl. of Jay Atkinson describing the methodology employed by CDCR in calculating its population reduction estimates, filed concurrently.)

### I.

### LEGISLATIVE AND ADMINISTRATIVE REFORMS

### A. PRE-CUSTODY REFORMS: California Community Corrections Performance Incentives Act of 2009

The recent passage of Senate Bill 18 (SB 18)[2] creates a system of rewards for probation success by establishing the California Community Corrections Performance Incentives Act of 2009. The community corrections program created by this act will authorize counties to receive funding for implementing and expanding evidence-based programs for felony probationers. Counties will be required to track specific probation outcomes and, depending on the success of those outcomes, may be eligible for "probation failure reduction incentive payments" or "high

---

[2] Sen. Bill No. 18 (2009 3d Ex. Sess.). The third extraordinary legislative session ended on October 26, 2009. These proposals become law and operative on January 25, 2010.

performance grants." The new funding model created by SB 18 will sustain funding for improved, evidence-based probation supervision practices. By incentivizing probation success, California will lower the number of probationers sent to prison each year.

Defendants estimate this program will net an approximate 1,915 reduction in CDCR's ADP by December 31, 2011. Defendants were able to estimate this reduction by utilizing information in CDCR's Offender Information Services Branch's (OISB) data warehouse. CDCR's OISB compiles and retains summary statistical information about inmates and parolees. The OISB data reflected that CDCR receives approximately 19,150 new admissions as a result of felony probation revocations in a calendar year. CDCR then made the assumption that the average return for revocation was one year and took the conservative estimate that this program would have a ten percent success rate.

## B.  IN-CUSTODY REFORMS:  Credit Earning Enhancements

The passage of SB 18 also provides a number of credit earning enhancements. First, it provides one day of sentence credit for every day served in county jail from the time of sentencing. Prior to the passage of SB 18, the law provided one day of credit for every two days served in county jail. Second, it provides eligible inmates up to six weeks of credit per year for completion of approved programs. This approach to incentivizing good behavior for program completions has been suggested by several experts, including in the Expert Panel Report. Third, it provides that all parole violators returned to custody who are otherwise eligible should receive one day of credit for each day served. Prior to the new law, only some violators received such credit. Fourth, it provides two days of credit for every one day served once the inmate is endorsed to transfer to a fire camp, rather than providing such credit only after the inmate actually participates in the camp. Finally, it provides a consistent rule of one day of credit for every day served for all eligible inmates, whether those inmates are on a waiting list for a full-time assignment, participating in college, or undergoing reception center processing, so long as the inmate is discipline-free during that time. Previously, the law provided a similar credit structure, but did so through the existence, for example, of a "bridging program," whereby inmates in reception centers sign up for self-study programs and receive credit. This legislation makes credit earning consistent while obviating the need for a bridging program.

Defendants estimate this program will net an approximate 2,921 reduction in CDCR's ADP by December 31, 2011. The reduction in ADP for this proposal at the six, twelve, eighteen and twenty-four month mark can be found on Table 1. Defendants estimated the ADP reduction for this legislation by utilizing data at CDCR's OISB. CDCR has a simulation model that is used to create population projections for the future. This particular proposal is one that can use the simulation model to determine a net effect on the population on a month by month basis. Insofar as this proposal overlaps the proposal to house individuals in county jail who are convicted of certain enumerated offenses, CDCR discounted the reduction from this proposal by 15%.

## C. PAROLE REFORMS

### 1. "Summary Parole"

The enactment of SB 18 creates a new program of "summary parole" whereby CDCR is prohibited from returning to prison, placing a parole hold, or reporting to the Board of Parole Hearings, any parolee who meets all of the following conditions: (1) is not a sex offender;[3] (2) has not been committed to prison for a sexually violent offense;[4] (3) has no prior conviction for a sexually violent offense; (4) has no instant or prior convictions that are violent[5] or serious;[6] (5) has not been found guilty of a serious disciplinary offense as defined by CDCR during his or her current term of imprisonment; (6) is not a validated prison gang member or associate, as defined in CDCR regulations; (7) has not refused to sign any written notification of parole requirements or conditions; and (8) has not been determined to pose a high risk to reoffend pursuant to a validated risk assessment tool.[7]   Other offenders will be subject to traditional parole supervision upon release from prison.

Defendants anticipate that "summary parole" will reduce CDCR's institutional population because, when fully implemented, CDCR will be precluded from revoking parole and returning low risk parolees to prison for parole violations.

Defendants estimate this program will net an approximate 4,556 reduction in CDCR's ADP by December 2011.  Defendants estimated the 4,556 reduction in ADP by first identifying the total number of adult parolees in 2008 that were non-serious, non-violent, non-sex offenders, with no prior serious or violent offenses, which was converted to a percentage and applied to the Spring 2009 Population Projections number of parolees to give an updated number of applicable parolees.  Then using data from OISB, the percentage of this population that were low and moderate risk were applied to estimate the applicable parole population.  Then it was assumed that a like percentage of the total number of parole violators who return to custody (PV-RTC) would not go to prison, and this determined the total expected prison ADP reduction.  Then it was assumed that it would take approximately five months for the total impact of the ADP reduction to be realized so that was calculated to reduce the ADP in 2009-10.  The 4,556 number is based on the best knowledge available at the time.  Of course, actual implementation may vary from these numbers.  Factors that could not be accounted for include: 1) crimes that do not show up on OBIS such as those committed in other states that may render an individual ineligible; and

---

[3] California Penal Code, § 290, et seq.  Subsequent references will be to the Penal Code unless otherwise noted.

[4] California Welfare and Institutions Code, section 6600(b).

[5] § 667.5 (c).

[6] § 1192.7 (c).

[7] CDCR intends to employ the California Static Risk Assessment tool, a validated tool that predicts an offender's risk to reoffend on the basis of static information received from CDCR and the California Department of Justice.

2) changes in local prosecutorial behavior resulting in some of these offenders coming to prison with a longer sentence as a parole violator with a new term (PV-WNT).

## 2. The Parole Violation Decision Making Instrument

Senate Bill 18 requires that CDCR employ a parole violation decision making instrument (PVDMI) to determine the most appropriate sanctions for parolees who violate conditions of parole. As stated in more detail in the September 18, 2009 Plan, the PVDMI is an effective tool in placing parolees in the right programs and returning the high risk parole violators to prisons thereby increasing public safety while decreasing recidivism.

At this time, CDCR does not have sufficient information upon which to base a reduction in population. However, the decision making instrument has produced uniform, policy driven responses to violations of parole. In this way, CDCR can effect a cultural change at the field level to afford security to field staff that the CDCR administration supports and encourages the use of interim sanctions in response to violations of parole. It is too early in its implementation to identify a drop in returns to custody at this time though CDCR is hopeful that it will begin to see the impact of this policy in the near future.

## 3. Reentry Courts

Senate Bill 18 also authorizes CDCR to collaborate with the California Administrative Office of the Courts to establish and expand drug and mental health reentry courts for parolees. These reentry courts will provide an option for parolees with drug and mental health needs to receive highly structured treatment in the community, under the close supervision of their parole agent and the court, rather than being returned to prison for violations that may be related to those needs. The legislation provides that for participating parolees, the court, with the assistance of the parolee's parole agent, "shall have exclusive authority to determine the appropriate conditions of parole, order rehabilitation and treatment services to be provided, determine appropriate incentives, order appropriate sanctions, lift parole holds, and hear and determine appropriate responses to alleged violations."

The implementation of the reentry courts may have a significant impact on reducing the number of mentally ill inmates in CDCR because it should reduce the number of parolees with mental illness returning to prison.

Defendants anticipate a reduction of 435 ADP by December 2011. This ADP estimate was developed during the budget process, and it was associated with a $10 million budget reduction. CDCR does not have any additional information to provide on how effective this program will be in reducing returns to custody.

## D. ADMINISTRATIVE CHANGES

### 1. California's Out-of-State Correctional Facility Expansion

Defendants will expand the California Out-of-State Correctional Facility (COCF) program, which has as its primary purpose removing non-traditional beds and relieving crowding by transferring CDCR inmates to contracted out-of-state facilities. The COCF program was established in October 2006 under the Governor's Prison Overcrowding State of Emergency Proclamation. Assembly Bill 900 similarly authorized CDCR to transfer inmates out of state, but imposed additional restrictions on the transfer of inmates with medical and mental health conditions. CDCR currently maintains approximately 8,000 inmates in out-of-state facilities. Beginning in approximately February 2010, the COCF program will expand and CDCR has signed contracts to include up to 2,416 new Level III beds. By approximately January 2011, CDCR anticipates housing a total of 10,468 inmates at out-of-state facilities. The COCF program has been tremendously successful.

### 2. Community Correctional Facilities Utilization

Defendants intend to better utilize existing private Community Correctional Facilities (CCFs) in California to assist in the reduction of the prison population. CDCR established thirteen CCFs throughout California to house low-level inmates. CCFs prepare these inmates for their return to the community on parole. Robust oversight of the CCFs is already in place. However, CCFs have been underutilized by CDCR in the past, primarily because appropriate male inmates are also eligible for other types of housing, including minimum security facilities and camps. Yet, there appears to be an abundance of female inmates who are eligible for placement into these facilities.

Accordingly, CDCR recently closed three of these male facilities. The Information for Bid (IFB) will be sent out on or about January 27, 2010, with the last day for bidders' letters of inquiry on February 12, 2010.

Defendants estimate this program will net an approximate 800 inmate reduction by December 31, 2011.

### 3. Commutations of Sentence

The Governor will review cases of certain deportable inmates under his discretionary constitutional clemency authority. A commutation of sentence would result in an inmate's release from State custody into federal custody and deportation.

Defendants estimate this program will reduce CDCR's ADP by approximately 600 by December 31, 2011.

### 4. Discharge of Deported Parolees

Earlier this year CDCR implemented a new policy to discharge from parole the over 12,000 criminal aliens who have served their full state prison sentences and, upon release to parole, have been deported by the federal government. Previously, California had retained those criminal aliens on parole, even after their deportation. Under CDCR's new policy, those parolees have been discharged and additional parolees will be discharged from parole on an ongoing basis as CDCR receives confirmation of their deportation from the federal government. This new policy has resulted in fewer parolees being returned to state prison for parole violations and provides an incentive for federal prosecution of these offenders.

This proposal was in effect earlier this year and was accounted for in the new Fall 2009 Population Projections set forth in the Table at the end of this Response. Accordingly, the numbers previously stated in the September 18, 2009 Plan (at pp. 14, 19.) are not set forth separately in the Table.

### 5. Alternative Sanctions for Violations of Parole

CDCR will make greater use of electronic monitoring systems such as global positioning systems (GPS), for parole violators in lieu of revocation and re-incarceration. The expanded use of GPS and other electronic monitoring systems will permit CDCR to monitor those offenders outside of state prison for parole violations.

Defendants estimate this program will net an approximate 1,000 reduction in CDCR's ADP by December 31, 2011. This reduction reflects an assumption that CDCR will begin diverting offenders in March 2010, and that it will be able to acquire 300 GPS units per month until September 2010, when there will be 2,000 units in use. If the system truly diverted inmates for every day they would have otherwise spent in prison, the reduction in ADP would actually be 2,000. The 50% discount assumes that there will be processing time between offenders that wear the device and that, on average, a revocation action to prison would have been shorter than the time given to an inmate to wear GPS as a sanction.

## II.

## INCREASED CAPACITY

Assembly Bill 900 (AB 900) was passed by a bipartisan Legislature and signed into law by Governor Schwarzenegger on May 3, 2007. AB 900 allocates $7.6 billion, of which $6.4 billion is designed to reform CDCR by reducing prison overcrowding, increasing rehabilitation programs, and providing more beds for all inmates, including those requiring medical and mental health care. AB 900's comprehensive plan immediately relieved overcrowding by providing for additional out-of-state transfers. AB 900 also provides for new rehabilitation programs and re-entry facilities to ease parolees' transition back into California communities, thereby reducing recidivism, relieving prison overcrowding, and ensuring public safety.

The descriptions below are almost entirely the same as was presented to this Court in the State's September 18, 2009 Plan. Where numbers or timelines have changed, Defendants identify the discrepancy for the relevant project(s).

## A. INFILL PROJECTS

Construction projects will result in new annex housing units and renovation of existing facilities. These projects will add bed capacity as well as additional office and treatment space to relieve operational pressures throughout CDCR institutions.

Newly constructed facilities are planned in stand-alone units and will operate semi-autonomously from the main institutions, though some space and/or functions, such as administrative services, may be shared by the main institutions to ensure the newly constructed facilities are fully serviced. Each newly constructed facility will have appropriate programming space and staffing for the population to be served.

Renovated facilities primarily represent current or former juvenile correctional facilities that are being repurposed to serve an adult male population. All renovated facilities will also provide for the reduction of nontraditional beds, and will have the requisite amount of programming space and staff for their intended populations. A description of each project follows by phase of funding as outlined in AB 900.[8] There are a few projects that are not funded through the AB 900 appropriation and those projects are noted.

### 1. Kern Valley State Prison

This project will result in 930 new beds in a Level IV semi-autonomous facility at the existing Kern Valley State Prison site, with the addition of five housing units on 33 acres using the 270 design celled-bed prototype. This construction will include space for rehabilitative programming (i.e., vocational, academic, substance abuse), work opportunities, and a health services building of approximately 22,000 square feet. A portion of these beds will be wheelchair-compliant beds.

This project will be submitted to the Joint Legislative Budget Committee (JLBC) for its approval in early 2010 with a request for State Public Works Board (PWB) approval and interim financing from the Pooled Money Investment Board (PMIB) to immediately follow. Necessary environmental impact review (EIR) documents are already underway. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2012-2013.

---

[8] CDCR is currently pursuing legislation to redirect $1 billion from its infill funding appropriation under AB 900 to the healthcare funding appropriation. The time lines set forth in this Response may change depending upon passage of that legislation. In addition, Defendants anticipate funding the proposed Consolidated Care Facility with the $1 billion in funds redirected from the infill appropriation.

2. Reception Center – Southern California

This project will result in 943 new beds in a cell-design semi-autonomous facility with five housing units, including the support space necessary to house reception center inmates. This project will also include a health services building to accommodate this population. Its location will be on the grounds of the California Institute for Men in Chino where CDCR's need for additional reception center beds is greatest. A portion of these beds will be wheelchair-compliant beds.

The Reception Center Prototype planning is being coordinated with the proposed renovation at the Heman G. Stark facility. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2012-2013.

3. Wasco State Prison – Level IV Celled Facility

This project builds a 1,896 bed Level IV semi-autonomous celled facility based on CDCR's 180-design prototype. This project includes eight housing units, with support and programming space planned for available land located on the unused land at the existing prison in Wasco. This project will also include a Correctional Treatment Center (CTC) to serve the population and a portion of the overall beds will be wheelchair-compliant.

This project is currently proposed for funding in Phase 2 of AB 900. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2012-2013.

**B. DIVISION OF JUVENILE JUSTICE RENOVATIONS**

1. Heman G. Stark Conversion

This project renovates an existing 1,200-cell Department of Juvenile Justice facility in Chino. It includes the installation of design elements necessary to house an adult male population (i.e., lethal electrified fence, guard towers, etc.), ADA improvements, expanded or new administrative support buildings, and a new health services building. This plan provides for double-celling a portion of the facility and envisions approximately 1,800 beds. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, 700 beds should come on line in or about December 2010, and 1,100 beds in or about June 2011.

The description above, submitted as a part of the September 18, 2009 Plan, differs slightly from the November 6, 2009 long-range bed plan submitted in the *Coleman* court. The September 18, 2009 Plan set out to establish the net gain of 1,800 beds to the adult male population. These beds are being phased into CDCR's design capacity based on the vacancy of DJJ's ward population at Stark. The November 6, 2009 *Coleman* filing, on the other hand, reflects that these beds will be renovated to provide bed and treatment space for a designated EOP and medical population and reflects only the number of beds specific to the *Coleman* population. These mental health beds will come on line in or about Fiscal Year 2013-2014. CDCR continues to work on developing the scope of this project with the *Plata v.*

10

*Schwarzenegger* Receiver and the *Coleman* Special Master. The activation schedule submitted in the *Coleman* filing reflects full activation for the *Coleman* population.

2. Department of Juvenile Justice Conversion – Paso Robles

This project renovates a former juvenile justice facility located in Paso Robles. This facility currently includes both dorms and an existing 270-celled prototype. The intended capacity is approximately 899 beds which includes some double-celling of the population. This is intended for a general population facility with a health-care mission and will serve elderly inmates with healthcare needs. The scope of work would include a new lethal electrified fence to increase the security level of the facility from a Level I to a Level II, as well as building code updates, ADA improvements, and an expanded healthcare facility. A portion of these beds will be wheelchair-compliant beds.

This project is anticipated to be submitted to the JLBC in Fall 2009 for approval and will subsequently be submitted to the State PWB and the PMIB for approval and financing. The EIR document is already underway. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2012-2013.

3. Department of Juvenile Justice Conversion – DeWitt

This project renovates a former juvenile justice facility located in Stockton. The intended capacity is approximately 1,133 beds which includes some double-celling of the population. The facility is intended for a general population facility with a health care mission and will serve inmates with medical outpatient needs and inmates requiring Enhanced Outpatient Program mental health services. CDCR is consulting with the *Plata* Receiver to identify the appropriate scope for the project.

This project is currently proposed for funding in Phase 1 of AB 900. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2013-2014.

## C. HEALTHCARE PROJECTS

The healthcare projects described below include renovation and expansion of existing facilities to add housing, office, and/or treatment space to further meet the healthcare needs of CDCR's adult inmates at its existing prisons. Several of these projects are being constructed pursuant to specific court orders. Also, many of these projects are being planned in consultation with the *Plata* Receiver.

1. Northern Consolidated Care Facility

This project provides for a large healthcare facility serving a medical and mental health population to include specialized housing, treatment, and support space at the site of the former Karl Holton Juvenile Correctional Facility in Stockton and for which an environmental document has been filed with the State Clearinghouse. This facility would provide approximately 1,722

new beds serving high acuity medical and mental health patients, including mental health crisis beds.

The population number and occupancy dates for this project have been refined since the September 18, 2009 Plan. The bed number has increased from 1,702 to 1,722 and the occupancy date for the project has been set out to Fiscal Year 2013-2014. The original schedule submitted in the September 18, 2009 Plan was predicated on the *Plata* Receiver's delivery method. The current schedule, however, is based on that authority currently maintained by CDCR for design bid/build approach to construction.

2.   San Quentin State Prison – Correctional Treatment Center (Building 22)

This project is a renovation and replacement of the existing infirmary at San Quentin State Prison and will include a Correctional Treatment Center providing 41 medical and mental health beds. Assuming no obstacles arise, anticipated completion is in or about January 2010.

3.   California Men's Colony – Mental Health Crisis Beds

This project builds a 50-bed mental health crisis facility on available land at the California Men's Colony in San Luis Obispo. This project scope and schedule are being coordinated with the Special Master in the *Coleman* case. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, Defendants anticipate first occupancy in these beds in August 2012 with full occupancy by October 2012 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

4.   California State Prison, Lancaster – Enhanced Outpatient Program

This project builds additional treatment and office space to increase by 150 the number of Enhanced Outpatient Program mental health inmate patients served at California State Prison, Lancaster. This project's scope and schedule are being coordinated with the Special Master in the *Coleman* case. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, Defendants anticipate activation of this treatment and office space in July 2012 with full activation by mid September 2012 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

5.   California Medical Facility – Intermediate Care Facility

This project builds a 64-bed Intermediate Care Facility to serve mental health patients on the grounds of the California Medical Facility. This project scope and schedule are being coordinated with the Special Master in the *Coleman* case. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about November 2012 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

6. <u>California Medical Facility – Enhanced Outpatient Program</u>

This project adds 67 Enhanced Outpatient Program – General Population beds and builds office and treatment space to serve 600 Enhanced Outpatient Program – General Population inmate-patients on the grounds of the California Medical Facility. This project's scope and schedule are being coordinated with the Special Master in the *Coleman* case. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about April 2013 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

7. <u>California State Prison, Sacramento – Enhanced Outpatient Program</u>

This project builds office and treatment space to serve 192 Enhanced Outpatient Program mental health inmate patients on the grounds of California State Prison, Sacramento. This project scope and schedule are being coordinated with the Special Master in the *Coleman* case. This project is not funded through AB 900. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about November 2011 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

8. <u>San Quentin State Prison – Condemned Inmate Complex Correctional Treatment Center</u>

This project builds 1,152 beds in a new Condemned Inmate Complex on the grounds of San Quentin. This project will include a 24-bed Correctional Treatment Center serving the medical and mental health needs of the inmate population. CDCR will submit this project for funding in Fall of 2009 and expects to award contracts and break ground in March 2010. This project is not funded through AB 900. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about Fiscal Year 2011-2012.

9. <u>Salinas Valley State Prison – Enhanced Outpatient Program</u>

Defendants identified two Salinas Valley State Prison (SVSP) projects in their September 18, 2009 Plan: 1) a 96-Bed Enhanced Outpatient Program – General Population (EOP-GP) project that would convert an existing housing unit to provide EOP-GP housing for 96 EOP-GP inmates, and would expand the existing mental health services building to provide the additional treatment and office space needed for this increased EOP-GP capacity;[9] and 2) a 72-bed EOP Administrative Segregation Unit (ASU) that would provide housing, treatment, and office space for 72 EOP-ASU inmate-patients.

After careful analysis and, in consultation with the *Coleman* Special Master as well as the *Plata* Receiver, CDCR determined that the most feasible alternative would be to replace the two SVSP projects with a new consolidated project that will provide treatment and office space for 300 inmate-patients.

---

[9] This project was scoped to include the existing 192 EOP-GP inmate-patients, plus an additional 96 EOP-GP beds.

This new project, known as the 300 EOP-GP Treatment and Office Space A-Quad Project, will require the design and construction of a new treatment and office building on "A" yard and the relocation of all EOP-GP inmate-patients to that yard. This project will result in 12 more EOP-GP beds than CDCR's previous plan.[10] The 72-bed EOP-ASU unit will stay in its current location; that is, Buildings D1 and D2.[11] The existing Mental Health treatment space located on Facility D will accommodate the 72-bed EOP-ASU unit, and thereby negate the need for construction of treatment space for that population.

On November 6, 2009, Defendants sought approval from the *Coleman* Court to replace the two SVSP court-ordered projects with the new SVSP 300 EOP-GP Treatment and Office Space A-Quad Project. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about October 2013.

<u>10.  California Institute for Women – Psychiatric Services Unit</u>

This project intends to renovate existing housing at the California Institute for Women in Chino to provide housing and treatment for a 20-bed Psychiatric Services Unit serving the mentally ill offender population. This project scope and schedule are being coordinated with the Special Master in the *Coleman* case. This project is not funded through AB 900. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about February 2011 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

<u>11.  California State Prison, Sacramento – Psychiatric Services Unit</u>

This project provides office and treatment space to serve 152 Psychiatric Services Unit mental health inmate patients on the grounds of the California State Prison, Sacramento. This project scope and schedule are part of the construction projects proposed in the *Coleman* case.

If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about May 2013 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

<u>12. California State Prison, Corcoran – Enhanced Outpatient Program</u>

This project will add office and treatment space to serve an additional 45 Enhanced Outpatient Program mental health inmate patients on the grounds of California State Prison, Corcoran.

---

[10]  The current EOP-GP Treatment and Office Space and Housing Unit Conversion Project is designed to provide treatment and office space for the existing 192 EOP-GP inmate-patients, plus an additional 96 inmate-patients, for a total of 288 beds. The new 300 EOP-GP Treatment and Office Space A-Quad Project is designed to serve 300 inmate-patients, for an increase of 12 beds.

[11] The 72-bed EOP-ASU unit consists of 45 existing EOP-ASU beds as well as the 27 new beds that are part of Defendants' short-term bed plan filed on May 26, 2009, and which Defendants propose to make permanent.

If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about April 2013 as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

### 13. Southern California Crisis Beds

This project will site a new 60-bed unit, 30 beds of which will be designed as mental health crisis beds, at the Heman Stark facility in Chino. These beds were to be located initially at the Consolidated Care Facility. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, these beds should come on line in or about Fiscal Year 2013, as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

### 14. California Institute for Women – 45 Bed Intermediate Care Facility

This project will build a new 45-bed intermediate care facility at the California Institute for Women to serve the mental health population for female adults in the custody of CDCR. Preliminary plans are complete with this project and it is currently in the working drawings phase, with construction to be funded by AB 900 funds. The project scope and schedule are being coordinated with the *Coleman* Special Master. If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, anticipated completion is in or about March 2012, as reflected in the activation schedule submitted with the *Coleman* November 6, 2009 long-range bed plan.

## D. REENTRY PROJECTS

Pursuant to AB 900, reentry projects provide for the design and operation of secure community reentry facilities located in communities throughout the state. These facilities will hold a maximum of 500 inmates who are within 6-12 months of being released. These facilities will be autonomous facilities and have been designed to facilitate an intensive rehabilitative programming environment and include healthcare treatment space for the population to be served.

To date, eleven counties have agreed to locate a reentry facility to serve their population. The first reentry facilities are being planned in the counties of Kern, Madera, San Joaquin (to also serve Amador and Calaveras), San Luis Obispo (to also serve Santa Barbara and San Benito), and San Bernardino. A reentry facility planned for San Diego is currently being sited. Additional counties have expressed interest in supporting reentry facilities in their communities.

If requisite approvals are obtained, there are no legal challenges, and there are no construction delays, Defendants estimate this program will build approximately 500 beds in or about Fiscal Year 2010-2011, 500 additional beds in or about Fiscal Year 2012-2013, 1,500 additional beds in or about Fiscal Year 2013-2014, and 5,500 additional beds in or about Fiscal Year 2014-2015.

## SECTION TWO

## ADDITIONAL REFORMS THAT REQUIRE EITHER FURTHER LEGISLATION OR FEDERAL COURT ORDERS

The Administration has demonstrated its willingness to reform the State's prisons, and the Administration will continue to push for meaningful reforms like the reforms adopted in SB 18. The following measures, however, cannot be accomplished administratively, and they will require legislative changes or federal court orders. The Defendants believe that it is not appropriate for this Federal Court to effect State law changes, and that such changes should be implemented by the State's executive and legislative branches. Moreover, as the Defendants pointed out in the September 18, 2009 Plan, they believe that State law waivers are not permissible here.[12] Nonetheless, pursuant to the Court's October 21, 2009 order, Defendants now identify, wherever possible, State laws that, if waived or changed by federal court order, would allow the Defendants to implement additional reduction measures.

### A. ADDITIONAL CALIFORNIA OUT-OF-STATE CORRECTIONAL FACILITY EXPANSION

In addition to the 2,416 bed expansion set forth above, Defendants will work with the Legislature to remove the existing clause that calls for the termination of the out-of-state program. The 2006 Prison Overcrowding State of Emergency Proclamation suspended the consent provisions of Penal Code section 11191. However, it is unclear the extent to which CDCR will be able to rely on the Emergency Proclamation in the future for out of state transfers, and section 11191, which becomes operative on July 1, 2011, makes clear that inmates must consent to out of state transfers. This Court could immediately and indefinitely waive the consent provisions in section 11191 to allow out of state transfers to continue uninterrupted. Additionally, this Court could immediately waive the provisions in section 11191 requiring attorney consultations, which entails a costly and time consuming process. The Court could also waive the provisions of section 11191 that restrict CDCR's ability to transfer out of state inmates with serious medical and mental health conditions, and inmates in the mental health delivery system at the Enhanced Outpatient Program level of care or higher. These waivers would allow CDCR to continue to transfer inmates out of state indefinitely, expand the pool of inmates eligible for transfer, and expedite the transfer process. They would also facilitate CDCR entering

---

[12] The Court's August 4, 2009 order stated, "[s]hould any of defendants' proposed population reduction measures require the waiver of any provisions of state law, the state shall so advise the court, and shall explain why the requested waiver is permissible under 18 U.S.C. § 3626(a)(1)(b)." The State's September 18, 2009 Plan pointed out that this Court did not permit Defendants to introduce evidence regarding whether there are any current and ongoing violations of federal rights. Plaintiffs were also not required to prove, nor did they prove, that there are any current and ongoing violations. Thus, the State Defendants continue to preserve their objection that state law waivers are impermissible here, because State Defendants believe that the statutory requirements authorizing such waivers have not been satisfied. Furthermore, because the recent improvements to healthcare and the plans set forth throughout this submission provide a form of relief correcting alleged federal violations, the State Defendants have not and do not affirmatively seek the waiver of any State law under the PLRA (*see* 18 U.S.C. § 3626(a)(1)(B)(ii)-(iii)).

into additional contracts, or establishing long-term contracts, with out-of-state facilities willing to house CDCR inmates.

With these changes, State Defendants estimate they will be able to expand the out-of-state program by approximately 1,500 beds by December 31, 2011, reducing its ADP by that amount.

## B. PROPERTY CRIME THRESHOLDS

Numerous property crimes in California are punishable alternatively as a misdemeanor or a felony, depending on the dollar amount of the taking. For example, grand theft is punishable as a felony when the amount stolen exceeds $400, but is punishable as a misdemeanor when the amount stolen is $400 or less. In most cases, the threshold for determining the type of sentence imposed was established over 20 years ago. As time has passed and inflation risen, increasing numbers of these wobblers have become prosecutable as felonies, thereby resulting in greater numbers of offenders eligible for prison sentences rather than jail sentences.

For thirty-nine of these property crimes, SB 18 increased the dollar threshold to present-day values. For example, property crimes where the threshold was set at $400 were increased to $950. The aim was to expose fewer offenders to felony prosecution and prison terms and thereby reduce the prison population. However, SB 18 left the threshold for grand theft itself unchanged, an omission that does not capture the impact of that offense, and also undermines the effect of having changed many other property crimes because they could alternatively be charged as grand theft. Defendants seek legislation to increase the threshold of grand theft to $950. If fully implemented, Defendants estimate this program will net an approximately 2,152 reduction in CDCR's ADP.

This is not a proposal for which a Court order could waive the appropriate change in state law as an affirmative action is required. Absent additional legislation, Defendants would require a court order requiring them to refuse admission of any person into state prison who was convicted of a felony that did not meet the $950 threshold. This proposal would reduce the ADP at CDCR's adult institutions by 2,152 in December 2011.

The estimates for this proposal were obtained by a file review of 577 cases of inmates who were sent to prison based on the violations of specific state code sections. The files were then reviewed to determine the number of inmates that would not have been returned to custody if the property threshold was raised in value. This number was then projected out to all of similarly situated inmates to arrive at an anticipated reduction in ADP.

## C. ALTERNATIVE CUSTODY PROGRAM

The Administration will seek legislation to establish a program of alternative custody options for lower-risk offenders. Certain offenders would be eligible to serve the last 12 months of their sentence under house arrest with GPS monitoring. House arrest may include placement in a residence, local program, hospital, or treatment center. Eligible inmates include inmates with 12 months or less remaining to serve, elderly inmates, and medically infirm inmates. The custody criteria is:

- non-violent (current and prior terms)
- non-serious (current and prior terms)
- no sex offenders
- low or moderate risk on the California Static Risk Assessment
- no immigration hold
- did not serve a Security Housing Unit term during current term of incarceration
- no guilty finding for serious rules violations listed in Title 15, section 3315, subdivision (a)(3)(A) through (a)(3)(C), during current term of incarceration
- no history of escape
- no holds, warrants, detainers
- no stay in a Psychiatric Services Unit housing during current term of incarceration

Absent additional legislation, this Court would need to waive Penal Code section 1170(a), which requires a term of imprisonment in State prison. Additionally, the Court may need to waive article I, sections 28(a)(5) and 28(f)(5) of the California Constitution.

The State estimates that this program will net an approximate 4,800 reduction in ADP by December 2011. The 4,800 ADP number is an estimate based on both eligible inmates in prison at the time (in July 2009, when the estimate was completed) and eligible new admissions projected to come into prison. The latter projection is based on a FY 08/09 intake cohort from court. This 4,800 ADP estimate also reflects a 35% discount for file review ineligibility (based on sample file reviews), a 3% discount to account for homeless parolees (based on Division of Adult Parole Operations' records for homeless parolees who would otherwise meet the criteria), and a 10% discount for those who would be unwilling to volunteer. The ADP figure is also based on an estimated length of sentence for the eligible population.

## D. AB 900 CONSTRUCTION ACCELERATION

CDCR has cooperated with the *Plata* Receiver to develop CDCR's plan for healthcare beds, and has drafted legislation to enable CDCR to accelerate all of its construction authorized under AB 900 using alternative delivery methods. If the Legislature authorizes these amendments, CDCR would be able to expedite the construction of new capacity, including new healthcare facilities, and the construction of treatment and other support spaces to meet the needs of the *Plata* and *Coleman* class members.

Further, if so ordered by the Three-Judge Court, the following waivers of state laws may allow the State to complete some previously identified projects more expeditiously:

1.      California Environmental Quality Act (CEQA) (Public Resources Code sections 21000- 21177): The State's environmental review process is lengthy, and it invariably extends the timeframe to complete any of CDCR's construction projects. For example, with respect to the projects proposed in the State's November 6, 2009 Long-Range Mental Health Bed Plan, the CEQA process in many instances lengthens the construction timeline by more than 200 days, and in one instance (the Heman G. Stark conversion) by more than 450 days. Additionally, the

environmental review process may result in litigation, which can further extend the timeframe for completing construction projects.

Waiving the CEQA process could potentially expedite construction on these projects. However, it is unknown whether the Joint Legislative Budget Committee would approve a project or if bond counsel would offer an unqualified bond opinion regarding the validity of AB 900 bonds if the Court waived the State's environmental review process. The authorization in AB 900 provides the only funding available for many of CDCR's projects. Joint Legislative Budget Committee approval is required under AB 900 and an unqualified bond opinion is necessary to market the bonds.

2.    Public Contract Code (PCC) sections generally covering the approval and competitive bidding rules and requirements for State contracts:

    a.    Part 1 (sections 1100 et seq.) - General Administrative Provisions.

    b.    Part 2, Chapter 2, Article 2 (sections 10295 et seq.) - Approval of Contracts.

    c.    Part 2, Chapter 2, Article 3 (sections 10300 et seq.) - Competitive Bidding and Other Acquisition Procedures.

    d.    Part 2, Chapter 2, Article 4 (sections  10335 et seq.) - Contracts for Services.

    e.    Part 2, Chapter 3 (sections 12100 et seq.) - Acquisitions of IT Goods and Services.

    f.    Part 2, Chapter 3.5 (sections 12120 et seq.) - Acquisitions of Telecommunication Goods and Services.

## E. HOUSE INMATES IN PRIVATE FACILITIES

An additional possible method to reduce the population to 137.5% of design capacity is to rapidly increase the number of available prison beds by expediting leasing, building, and/or operating new beds through establishment of private vendor contracts to house inmates and operate private correctional facilities in the State. Such waivers of state law would help expedite the contracting process and make available private correctional facilities ready for operation by a private vendor by August 2011.

The following is the list of waivers that would be required to achieve the most expedited establishment of newly constructed prison beds:

1.    California Environmental Quality Act (CEQA) (Public Resources Code sections 21000- 21177) - In order for the vendor to provide housing and operation services pursuant to the above-described contract with CDCR, the vendor would need to construct one or more correctional facilities. CEQA applies to discretionary "projects" proposed to be carried out or approved by public agencies. Arguably, the contract between CDCR and the vendor may trigger CEQA in that the contract may be deemed an approval by CDCR of CEQA "projects" (including construction of a new facility). The CEQA compliance process is a time-consuming process

and construction of new correctional facilities by the vendor would be further delayed if legal actions are brought to challenge the adequacy of CEQA compliance.

2.   Public Contract Code (PCC) sections generally covering the approval and competitive bidding rules and requirements for State contracts (except for public works projects):

    a.   Part 1 (sections 1100 et seq.) - General Administrative Provisions.

    b.   Part 2, Chapter 2, Article 2 (sections 10295 et seq.) - Approval of Contracts.

    c.   Part 2, Chapter 2, Article 3 (sections 10300 et seq.) - Competitive Bidding and Other Acquisition Procedures.

    d.   Part 2, Chapter 2, Article 4 (sections  10335 et seq.) - Contracts for Services.

    e.   Part 2, Chapter 3 (sections 12100 et seq.) - Acquisitions of IT Goods and Services.

    f.   Part 2, Chapter 3.5 (sections 12120 et seq.) - Acquisitions of Telecommunication Goods and Services.

3.   Article VII of the California Constitution - Civil service hiring requirements.

4.   State Civil Service Act (Government Code sections 18500 et seq.) - The purpose of this Act is to facilitate the operation of Article VII of the Constitution.

5.

    Government Code section 19130 - Enumerated exceptions to the civil service hiring requirements. Waiver of this section would be needed to avoid any potential argument, even after waiver of the Article VII and the State Civil Service Act, that the existence of this section implies that contracting for personal services is not permissible unless the conditions under section 19130 are met.

The above list is a preliminary list of State laws that, if waived, would allow Defendants to expedite the process of contracting with vendors to operate private correctional facilities. However, given more time, other state law waivers or other federal court orders may be needed to accomplish this proposal.

If these waivers were obtained, it is estimated that CDCR could build, lease or contract for facilities for private vendors and reduce the population at the existing 33 adult institutions by 5,000 ADP by December 31, 2011.

## F.   JAIL TIME FOR ENUMERATED FELONIES

The Administration will seek legislation for the following enumerated offenses listed below that would allow the offenses to be charged as felonies, but would limit the maximum sentences to 366 days which could only be served in county jail. Thus, while convictions would result in imprisonment in county jail, the offenses would remain felonies within the meaning of section 17 of the Penal Code. This proposal does not apply to anyone who has a prior conviction set forth

in Penal Code Section 1192.7(c) or have not suffered a strike within the meaning of Penal Code Section 667.5.

Absent legislation, the Court would have to order that CDCR not accept to State prison those enumerated crimes listed in this proposal.

The crimes for this proposal would be as follows:

- Health and Safety Code section 11350, subdivision (a). Possession of a controlled substance, including cocaine.

- Health and Safety Code section 11377, subdivision (a). Possession of a controlled substance, including methamphetamine.

- Penal Code section 476a. Check fraud.

- Penal Code section 487, subdivisions (b) and (c). Miscellaneous grand theft provisions involving agriculture, labor and real property.

- Penal Code sections 496 and 496d. Receiving stolen property.

- Penal Code section 666. Petty theft with a prior conviction of a certain offense.

- Penal Code section 667.5. Theft with a prior felony conviction of a certain offense.

The reduction in the ADP as a result of this proposal would be 11,815 by December 2011. To determine the reduction of ADP for this proposal, CDCR utilized data in OBIS. Specifically, CDCR looked at the number of admits to CDCR for these particular crimes. CDCR then estimated a reduction in ADP based on the average length of sentence for these individuals.

## Three Judge Court-Ordered Response: Table 1

| Fiscal Year | Current | Jun-2010 | Dec-2010 | Jun-2011 | Dec-2011 | Dec-2012 | Dec-2013 |
|---|---|---|---|---|---|---|---|
| **Fall Population Projections[1]** | 168,427 | 167,453 | 167,535 | 169,345 | 170,164 | 171,940 | 174,001 |
| **Institution Population Reduction Measures** | | | | | | | |
| **Probation Reform** | | | | | | | |
| Community Corrections | 0 | 0 | 900 | 1,915 | 1,915 | 1,915 | 1,915 |
| **Sentencing Reform** | | | | | | | |
| Enhanced Credit Earning | 0 | 2,814 | 3,021 | 2,807 | 2,921 | 3,142 | 3,419 |
| **Executive Authority** | | | | | | | |
| Expansion of Out-Of-State Placements[2] | 0 | 1,434 | 2,352 | 2,416 | 2,416 | 2,416 | 2,416 |
| Expanded Utilization of Private Prisons | 0 | 0 | 0 | 400 | 800 | 800 | 800 |
| ICE Commutations | 0 | 300 | 600 | 600 | 600 | 600 | 600 |
| **Parole Reform** | | | | | | | |
| Summary Parole | 0 | 3,323 | 4,556 | 4,556 | 4,556 | 4,556 | 4,556 |
| Alternative Parole Sanctions | 0 | 119 | 600 | 1,000 | 1,000 | 1,000 | 1,000 |
| Parole Reentry Courts | 0 | 0 | 50 | 435 | 435 | 435 | 435 |
| **New Construction[3]** | | | | | | | |
| DJJ Renovations | 0 | 700 | 700 | 1,800 | 1,800 | 2,700 | 2,700 |
| Reentry | 0 | 0 | 0 | 500 | 500 | 500 | 1,000 |
| Infill (including Healthcare) | 0 | 64 | 125 | 125 | 125 | 1,436 | 7,111 |
| **Further Legislation/Court-Ordered Authority** | | | | | | | |
| Property Crime Thresholds | 0 | 425 | 1,700 | 2,121 | 2,152 | 2,152 | 2,152 |
| Alternative Custody | 0 | | 1,200 | 3,000 | 4,800 | 4,800 | 4,800 |
| No-Prison Felonies | 0 | 7,753 | 11,633 | 11,815 | 11,815 | 11,815 | 11,815 |
| Private In-State Prisons | 0 | 0 | 0 | 2,000 | 5,000 | 5,000 | 5,000 |
| Expansion of Out-of-State | 0 | 0 | 0 | 1,500 | 1,500 | 2,500 | 3,600 |
| **Total Population Reduction** | 0.000 | 16,932 | 27,437 | 35,490 | 42,335 | 45,767 | 53,319 |
| **Institution Population[4]** | 150,978 | 133,072 | 123,623 | 117,298 | 109,462 | 107,806 | 99,720 |
| **Institution Crowding Rate** | 190% | 167% | 155% | 147% | 137.5% | 135% | 125% |

[1] The current population is based on the actual population count on November 4, 2009. The projections in June 2010 and thereafter assume the transfer of any backlogged inmates into state custody.

[2] Assumes cooperation from *Plata, Coleman, Perez*, and *Armstrong* courts.

[3] The beds identified on this table reflect the actual capacity for which they are being built. The double celling rate of these facilities vary by project. However, whatever the double celling rate, the beds or projects are being designed with an appropriate amount of program and clinical space to accommodate that number of inmates. Additionally, increases in capacity in 2014 and 2015 are not reflected in this chart.

[4] Excludes inmates in camps, private facilities and out-of-state facilities.