IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,                    No. CIV S-90-0520 LKK JFM P

    vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.               <u>ORDER</u>

                                       /

        This matter is before the court on defendants' October 1, 2009 motion to modify the special master's expert's Report on Suicides Complete in the California Department of Corrections and Rehabilitation in Calendar Year 2007 (2007 Suicide Report), filed September 17, 2009. Plaintiffs oppose the motion.

STANDARD OF REVIEW

        Defendants bring their motion pursuant to paragraph C of the court's December 11, 1995 Order of Reference, which provides as follows:

> IT IS FURTHER ORDERED that any compliance report of the special master filed in accordance with paragraph A(5) above shall be adopted as the findings of fact and conclusions of law of the court unless, within ten days after being served with the filing of the report, either side moves to reject or modify the report. The court will entertain no objection to the report unless an identical objection was previously submitted to the special master in the

1

> form of a specific written objection in accordance with the provisions of paragraph A(5) above. The objecting party shall note each particular finding or recommendation to which objection is made, shall provide proposed alternative findings or recommendations, and may request a hearing before the court. Pursuant to Fed. R. Civ. P. 53(e)(2), the court shall accept the special master's findings of fact unless they are clearly erroneous.

Order of Reference, filed December 11, 1995, at 8.[1] Paragraph A(5) of the Order of Reference provides that prior to filing compliance reports the special master shall serve a copy thereof in draft form to the parties and afford them a reasonable time to submit specific written objections to him. Id. at 4-5.

## ANALYSIS

I. Language Referring to a "Disturbing Trend" in Suicides In Administrative Segregation

Defendants' first objection is to language in the second paragraph of section III of the 2007 Suicide Report, which begins as follows:

> On October 2, 2006, CDCR submitted its Plan to Address Suicide Trends in Administrative Segregation units, and on December 1, 2006, it submitted its amended version. [Footnote omitted.] This plan was ordered by the Coleman court on June 7, 2006, following a set of recommendations from the Coleman Special Master to curb a disturbing trend of rising suicides in CDCR administrative segregation units.

2007 Suicide Report at 4. Defendants object to the phrase "to curb a disturbing trend of rising suicides in CDCR administrative segregation units" on the ground that the special master's 2006 recommendation was allegedly based on statistics which cover only a 2-3 year period; defendants contend that "trends in suicides should be based on a minimum of five years of data." Ex. A to

---

[1] In their opposition, plaintiffs note, inter alia, that Federal Rule of Civil Procedure 53 was revised in 2003 and that Fed. R. Civ. P. 53(f)(3) now provides for de novo review by the court of "findings of fact made or recommended by a master, unless the parties, with the court's approval, stipulate that: (A) the findings will be reviewed for clear error; or (B) the findings of a master appointed under Rule 53(a)(1)(A) or (C) will be final." Fed. R. Civ. P. 53(f)(3). The question of whether the provisions of Fed. R. Civ. P. 53(f)(3) should apply in these proceedings has not been briefed by the parties, and plaintiffs cite no authority mandating its application. Accordingly, the findings cited by defendants will be reviewed under the "clearly erroneous" standard set forth in the December 11, 1995 Order of Reference.

Defendants' Motion to Modify, at 1.  Defendants request that this paragraph be modified so that it begins, instead, as follows:

> On October 2, 2006, CDCR submitted its Plant to Address Suicide Trends in Administrative Segregation Unit, and on December 1, 2006, it submitted its amended version.  This plan was ordered by the *Coleman* court on June 7, 2006, following a set of recommendations from the *Coleman* Special Master to reduce suicides in CDCR administrative segregation units.

Motion to Modify at 4.

Defendants raised this objection with the Special Master in response to the draft Report on 2007 Suicides circulated prior to filing.  <u>See</u> Ex. A to Motion to Modify, at 1.  The 2007 Suicide Report responds to this objection as follows:

> Defendants objected to this writer's use of the term "disturbing trend" on the assumption that it was based on the period of two to three years before 2006, and on the further assumption that trends can be measured over only five-year time increments.  These assumptions are mistaken, as this writer is relying on the longer-term general trend of increasing suicides in administrative segregation in CDCR, which goes back to at least 1999.  *See* page 7-8, *infra*.

2007 Suicide Report at 4-5 n.3.[2]

In the motion before the court, defendants take issue with the response to this objection, contending that the chart at pages 7 and 8 "pertains to annual suicide rates since 1998 per 100,000 inmates in CDCR, not specifically to inmates housed in administrative segregation" and that the chart therefore "cannot provide support for the conclusion that there has been a "'disturbing trend' of rising suicide rates in administrative segregation, let alone that such a trend dates back to 1999." Motion to Modify at 2.  Defendants also contend that "there has been no consistent pattern of suicide deaths in administrative segregation units in the last ten years of the Coleman remedial phase" and they tender evidence in an effort support this contention.  <u>Id</u>.  In

---

[2] Defendants also apparently seek to omit this explanatory footnote from the report.

3

opposition, plaintiffs note that "each of the suicide reports filed by the Special Master since 1999 have contained statistical summaries of the number of suicides in ASU" and contend "[t]here is no basis for Defendants' assumption that the Special Master did not rely on the subset of the annual reporting data on ASU suicides in forming this conclusion." Plaintiffs' Opposition to Defendants' Motion to Modify, filed October 23, 2009, at 3. Plaintiffs also contend that the phrase "disturbing trend" accurately describes the rising percentage of suicides in administrative segregation as shown in the data tendered by defendants in support of their motion for the period from 1999 through 2004.

The phrase to which defendants object is used in the 2007 Suicide Report to describe the basis for recommendations made by the special master in his May 9, 2006 Report on Suicides Completed in the California Department of Corrections in Calendar Year 2004 (2004 Suicide Report), which were adopted by this court in an order filed June 8, 2006. In the 2004 Suicide Report, the special master recommended that defendants develop "a plan for dealing with the escalating percentage of suicides occurring in administrative segregation." 2004 Suicide Report at 12. In objections submitted to the special master in response to the draft 2004 Suicide Report, defendants objected to the recommendation on the ground that escalation in the percentage of suicides in administrative segregation had "ceased to escalate further, based on a preliminary review of suicides in 2005." Id. at 13. The special master addressed this objection in the 2004 Suicide Report:

> The defendants' objection is posited on the fact that the reportedly "escalating" percentage of suicides occurring in administrative segregation units noted in 2004 ceased to escalate further, based on a preliminary review of suicides in 2005. Of course, data on 2005 suicides were neither complete nor fully available when the draft version of this report was being composed. *The judgment in the draft report on the escalation in the percentage of suicides occurring in administrative segregation, moreover, was based on performance during the two preceding years, as well as 2004 itself. In 2002, six suicides occurred in administrative segregation cells (27 percent of total suicides in that year); in 2003, 17 suicides occurred in administrative segregation (47 percent of the suicide total); and in 2004, 18 of a total of 26 suicides (69 percent)*

> *occurred in administrative segregation.* That history certainly reflects an escalating trajectory in the percentage of CDC suicides occurring in administrative segregation.
>
> The defendants report that a significantly reduced 37 percent of the department's suicides occurred in administrative segregation in 2005, a year in which the overall number of suicides soared to its highest total ever. The defendants attribute the decline in the number of suicides in administrative segregation in 2005, moreover, to their own aggressively proactive measures, which essentially make the special master's recommendation redundant. The plaintiffs respond with a somewhat different analysis of suicides in 2005, which points to the overall increase in suicides, lumps together all suicides occurring any "locked unit" and discounts from the total of 2005 suicides those that occurred in unusual units where previously suicides rarely, if ever, occurred. Whatever the arguments over the significance of the 2005 data on suicides, *the ratio of suicides among the administrative segregation population was relatively and extraordinarily high in 2004 and 2005 and continues, apparently, to be high in the current year.*

2004 Suicide Report at 13 (emphasis added). When the 2004 Suicide Report was filed, defendants did not object to the foregoing findings, and they agreed "to develop a plan for dealing with the suicide rate in administrative segregation units." Defendants' Response to Special Master Keating's Report on Suicides in Calendar Year 2004, filed May 19, 2006, at 2.

The issue before the court is whether it is clearly erroneous to describe the findings underlying the recommendation in the 2004 Suicide Report as reflective of a "disturbing trend of rising suicides in CDCR administrative segregation units." The special master's 2006 recommendation was based on findings that the percentage of suicides in administrative segregation had escalated between 2002 and 2004, and that the ratio of suicides in administrative segregation was "relatively and extraordinarily high in 2004 and 2005" and appeared to continue to be high in 2006. 2004 Suicide Report at 13. The description of this as a "disturbing trend" is not clearly erroneous -- it is apt. Defendants' objection is overruled.

II. <u>Information Regarding 2006 Suicide</u>

By their second objection, defendants request that an entire paragraph be stricken from the 2007 Suicide Report because it refers to a delay in receipt of health records that was

attributable to the Plata Receiver and not to defendants in this case.[3] Defendants raised this objection with the Special Master in response to the draft Report on 2007 Suicides circulated prior to filing. See Ex. A to Motion to Modify, at 2-3. The 2007 Suicide Report responds to this objection as follows:

> Defendants cite one 2006 suicide case in support of their plea that they should not be faulted for failing to produce the inmate's mental health records to this reviewer in a timely manner. The suicide they cite has already been covered in this writer's earlier Report on Suicides in 2006, and is therefore beyond the scope of this report. Defendants also argue that they should be excused from their tardiness because the UHR was in the possession of the Plata Receiver's office. That is no excuse, given their awareness of their duty to produce these records.

2007 Suicide Report at 14 n.10.

Defendants now contend (1) that they are not to blame for the delay in producing the Unit Health Record for the 2006 suicide referred to by the special master's expert and (2) the reference to that delay should be stricken in light of the special master's expert's statement that

---

[3]The paragraph reads:

> 2007 was not the first year for which the Department failed to comply with deadlines for completion and submission of required documentation. Following distribution of the Special Master's expert's report on suicides in the CDCR in draft form, defendants stated in their response that they had failed to provide any of the mental health records within the Unit Health Record for one of the inmates whose suicide in 2006 was reviewed and included in the draft report. In the final version of this reviewer's Report on Suicides in the CDCR in 2006, Defendants were admonished that they "must ensure that no such lapses in their production of information occur again. Review of incomplete records can lead to erroneous conclusion and recommendations, and ultimately to allowing deficiencies in the defendants' suicide prevention efforts to remain undetected and uncorrected." *Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2006*, filed 9/12/08, at 1, n.1. Unfortunately, that admonition must be repeated, and failure to heed it in the future may result in a recommendation for an order from the court.

2007 Suicide Report at 14.

the 2006 suicide was beyond the scope of the 2007 Suicide Report. The latter contention is without merit; the reference to the delay in producing the mental health records from a suicide in 2006 is included to illustrate that the delays in production of data reported in the 2007 Suicide Report were not new and that defendants have already been admonished by the special master to produce information in a timely manner.[4] Moreover, the determination that delay in production of records to the special master is not excused on the ground that the records were with the Plata Receiver is not clearly erroneous. Defendants' objection is overruled and their request to strike the cited paragraph is denied.

III. Request for Revisions to Present a Balanced View of CDCR's Progress in Reducing Suicides and Adhering to the Program Guide, and Areas in Which Progress Remains to Be Made

Defendants third objection to the 2007 Suicide Report is that "the Report tends to emphasize perceived shortcomings, and does not appropriately acknowledge their achievements in preventing suicides." Motion to Modify at 6. On the basis of this objection, defendants request revision of three parts of the 2007 Suicide Report.

First, defendants request revision of the sentence on page 12 of the 2007 Suicide Report, which presently reads "While this reviewer found that SRACs [suicide risk assessment

---

[4]Specifically, the special master's expert reports that
> Departmental response to suicides was marked by widespread lateness in completion and submission of required documentation. (*See* Appendix A for pertinent timelines). As of April 3, 2009, deadlines were missed in the reviews of 27, or 79 percent of, the 34 suicide cases. Data was incomplete for all three of the suicides in DMH facilities; for two of them, institutional responses to QIPs have not been produced as of this writing. For four of the suicide cases within CDCR prisons, institutional responses to QIPs were not provided to this reviewer or to the Special Master until May 1, 2009, and even then, they were incomplete. For a completed suicide which occurred on December 5, 2007, the Department's suicide report was not produced to this reviewer or the Special Master until April 17, 2 009, and needless to say, there is still no QIP for that suicide as of this time, even though approximately 18 months have passed since its occurrence.

2007 Suicide Report at 14. Defendants do not object to these findings.

checklists] were completed appropriately in the majority of the cases, there were a number in which SRACs had resulted in determination of 'no risk'", to read instead "While there were some instances in which SRACs resulted in a determination of 'no risk,' SRACs were completed appropriately in a majority of cases." <u>Id</u>. Defendants' preference for a different emphasis does not make the sentence in the report clearly erroneous. This objection is overruled.

Second, defendants request revision of the following paragraph:

> The Department continued its effort to reduce suicide deaths by providing training on CPR requirements and on the suicide review process. However, it was apparent that CPR was not performed in a timely and/or appropriate manner in seven, or 22 percent, of the 34 suicides. This rate of non-compliance is lower than it was in calendar year 2006, when there were 17 such instances among 43 suicides, for a non-compliance rate of 40 percent.

2007 Suicide Report at 14. Defendants contend that (1) the paragraph improperly focuses on instances of non-compliance with CPR requirements; (2) the statistics used by the special master's expert show the rate of compliance with CPR requirements improved in one year from 60 percent to 78 percent and the Report should reflect that; and (3) one of the inmates, Inmate Y, who did not receive CPR was clearly beyond resuscitation and should not be included in the rate of non-compliance. Defendants therefore request that the paragraph be amended to read:

> The Department continued its effort to reduce suicide deaths by providing training on CPR requirements and on the suicide review process. CPR was performed in 27 of the 33 suicides for which CPR was arguably appropriate in 2007, for a compliance rate with Program Guide requirements of 81 percent. In 2006, CPR was performed in 26 of 43 suicides, for a compliance rate of 60 percent.

Motion to Modify at 7.

Defendants did not include their objection about inclusion of Inmate Y's suicide in the data on CPR non-compliance in their objections to the draft 2007 Suicide Report.[5] <u>See</u> Ex.

---

[5] The fact that defendants provided the special master's expert with specific information concerning Inmate Y's suicide, <u>see</u> Declaration of Robert Canning, Ph.D., filed October 1, 2009, at ¶ 4, does not relieve them of the obligation to raise with the special master an objection identical to the objection tendered to this court, as required by paragraph C of the Order of

8

A to Motion to Modify. That objection is therefore not properly before the court. See Order of Reference at 8. Moreover, as with the previous objection, defendants' difference of opinion with the special master's expert concerning the emphasis used to report on defendants' compliance with CPR requirements does not make this part of the report clearly erroneous. For these reasons, this objection is overruled.

Finally, defendants request deletion of the last sentence on page 16 of the report, which reads:

> Although 30-minute welfare checks and confidential screens for inmates newly admitted to administrative segregation were features of the defendants' 2006 Plan to Address Suicide Trends in Administrative Segregation, circumstances of at least one suicide in 2007 raised questions about implementation of this policy.

2007 Suicide Report at 16. Defendants "are concerned that this statement questions implementation of the policy based on one suicide," Motion to Modify at 7, but they have not demonstrated that it is clearly erroneous. The objection is overruled.

IV. Objections to Specific Case Reviews

Defendants object to several statements in four of the case reviews appended to the 2007 Suicide Report, contending that the statements lack foundation. At the outset, the court notes that the 2007 Suicide Report was written by Dr. Raymond Patterson, a board-certified psychiatrist who has served as a mental health expert for the special master in this case since March 1996. See Order filed March 14, 1996. As will be discussed infra, many of the statements to which defendants object are plainly within the scope of Dr. Patterson's expertise.

A. Inmate D

Defendants object to (1) the statement that Inmate D's release from Atascadero State Hospital (ASH) was "precipitous"; (2) the statement that Atascadero State Hospital has a duty to manage assaultive inmates; and (3) the statements that the special master's expert should

---

Reference.

not have had to ask the Department of Mental Health (DMH) for documents concerning Inmate D because production of those documents is required by policy. Defendants contend that (1) the discharge was not "precipitous" because ASH cannot provide the necessary security for assaultive inmates; (2) the special master's expert's statement that ASH, as a forensic hospital, has a duty to manage rather than discharge assaultive inmates is without foundation; and (3) no policy requiring production of the specific documentation at issue is identified in the report and they dispute the existence of such a policy.

The case review of Inmate D includes the following as Problem 4 in the problems identified in the suicide report prepared after this inmate's suicide[6]:

> <u>Problem 4</u>: On both of the previous DMH admissions, this inmate was inappropriately returned to the EOP level of care, where he had been unable to program successfully at any time during his current incarceration. At ASH, the inmate was not considered ready for discharge until he assaulted two other inmates due to his paranoia, *and then suddenly he was returned to prison. He should have instead been sent to the APP [Acute Psychiatric Program at Vacaville]*.

2007 Suicide Report at 59 (emphasis added). The suicide report prepared by defendant officials after this inmate's suicide describes his discharge from ASH as "sudden". There is no error in describing the discharge as "precipitous."

Dr. Patterson's statement that ASH, as a forensic hospital, has a duty to manage, rather than discharge, assaultive patients, is within the scope of his expertise. Moreover, the statement tracks the finding of the suicide report that Inmate D should have been set to the Acute Psychiatric Program at Vacaville, which is also run by DMH, rather than returned to prison.

Finally, defendants have failed to demonstrate clear error in Dr. Patterson's statement that the documents requested from DMH concerning Inmate D's suicide are required by policy.

---

[6]Defendants have policies and procedures for review of inmate suicides that include preparation of suicide reports by staff. <u>See</u> Appendix A to 2007 Suicide Report.

10

B. <u>Inmate G</u>

Defendants request that the following paragraph be stricken from the case review of the suicide of Inmate G:

> Based on this reviewer's examination of the documents provided, it appears that the presumption by staff was that this individual [Inmate G], with diagnoses of several Personality Disorders and history of assessment by staff as being "manipulative," somehow suggested that he could not also have become seriously depressed and in need of intensive re-evaluation by psychiatry as well as the overall treatment team. This presumption appears to suggest that personality disorders and serious psychiatric disorders such as Major Depression are mutually exclusive. They certainly are not.

2007 Suicide Report at 85. Defendants objected to these statements in the draft report, contending that they lack foundation. Dr. Patterson responded to the objection as follows:

> The foundation for this passage is that, in the clinical judgment of this reviewer, this inmate should have been re-evaluated by the psychiatrist and the treatment team for his depression, but was not. The emphasis on personality and "manipulative" behavior appears to have adversely affected the team's focus and duty to assess and manage the inmate's depressive symptoms.

<u>Id</u>. at 85 n.6. Defendants now contend that Dr. Patterson's disagreement with other health professionals "does not provide a foundation for him to opine about the thought processes of the professionals with whom he disagrees." Motion to Modify at 9. Defendants' contention is without merit. The opinion offered by Dr. Patterson after reviewing documents provided to him falls well within the scope of his expertise. Defendants' objection to this passage is overruled.

C. <u>Inmate W</u>

Defendants object to Dr. Patterson's characterization of the suicide of Inmate W as foreseeable and preventable, contending that "mental health staff are not at fault for the deficiencies described by Dr. Patterson." Motion to Modify at 9. Defendants contend this alleged absence of fault renders Dr. Patterson's conclusion that the suicide was foreseeable and preventable without foundation.

/////

Dr. Patterson responded to defendants' objection as follows:

> Defendants objected to this reviewer's findings that this suicide was both foreseeable and preventable. They contend that because the physician did not order a change to DOT [Directly Observed Therapy] and for removal of all of this inmate's medications from him (despite the physician's progress note that all medications should be taken from this inmate), the UHR did not reflect any order for the change to DOT or the removal of medications from the cell, and therefore it was appropriate for medications to continue. They further posit that this inmate's hanging was not causally related to his medication. Defendants overlook the larger context of this inmate's suicide; a review of this inmate's record indicates concerns surrounding suicidality. There should have been a referral of this inmate to mental health, but none was done, nor were the more intensive medication monitoring and medication administration that this inmate needed. Mental health staff are expected to review the inmate's records. Consequently, this reviewer's findings and foreseeability and preventability are based on a broader set of concerns than those that the defendants would suggest. This reviewer's findings of foreseeability and preventability will not be withdrawn.

2007 Suicide Report at 182 n.10.

Dr. Patterson's conclusion that a suicide was foreseeable and preventable is within the scope of his expertise, and defendants' objection that this finding lacks foundation is without merit. Defendants also contend that there is no justification for criticizing defendants in this action for failures of medical staff, who are under the jurisdiction of the <u>Plata</u> Receiver and not any of the defendants in this action. This contention completely misses the mark, and certainly does not render clearly erroneous Dr. Patterson's conclusion that Inmate W's suicide was foreseeable and preventable.

D. <u>Inmate X</u>

Finally, defendants request revision of the 2007 Suicide Report to omit characterizing this inmate's suicide as preventable. Defendants contend that the sole basis for characterizing this suicide as preventable was that an inmate, rather than trained staff, performed CPR on Inmate X, and there is no evidence that CPR was administered incorrectly or that there

/////

would have been a different outcome with "correct administration of CPR." Motion to Modify at 10. Dr. Patterson responded to this objection as follows:

> Defendants objected to the characterization of this suicide death as preventable, on the ground that correctional staff allowed another inmate to perform CPR while a trained CO merely watched. Defendants stated that there was no evidence that the CPR was administered incorrectly, or that correct administration would have yielded a different result. The designation of this suicide death as preventable will not be withdrawn, as chances of successful resuscitation are substantially higher if it is performed by a trained person. CDCR did not offer any evidence whatsoever that the inmate who performed CPR was competent to do so. Moreover, CDCR's own suicide report criticized the institution's allowance of another inmate to perform CPR on Inmate X. It identified this as a problem, calling for the institution to conduct a fact-finding and to take appropriate action as indicated. *See* page 163, *infra*.[7]

2007 Suicide Report at 186 n.11.

Dr. Patterson's conclusion that a suicide was preventable based on the fact that CPR was performed by an inmate rather than trained staff is within the scope of his expertise, and defendants' objection that this finding lacks foundation is without merit.

For all of the foregoing reasons, defendants' objections to the case reviews are overruled.

V. Plaintiffs' Request for Orders

In their opposition to defendants' motion, plaintiffs request that the recommendations included in the 2007 Suicide Report be made orders of this court. In addition, plaintiffs request orders clarifying (1) defendants' obligation to ensure that all records requested by the special master are provided in a timely and complete fashion, without regard to whether the records are in the possession of the Plata Receiver or DMH; and (2) admission policies to DMH facilities for CDCR inmates regardless of inmates' prior conduct in DMH facilities.

/////

---

[7] The problem identified in the CDCR's suicide report is set forth at pages 185-186 of the 2007 Suicide Report.

Requests for such orders should come, if at all, from the special master.  Plaintiffs' requests will be denied without prejudice.

For all of the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendants' October 1, 2009 motion to modify the 2007 Suicide Report is denied;

2. Plaintiffs' request that the recommendations in the 2007 Suicide Report be made an order of this court is denied without prejudice; and

3. Plaintiffs' request for orders clarifying defendants obligations with respect to production of documents to the special master and admission of CDCR inmates to DMH facilities is denied without prejudice.

DATED: November 20, 2009.

/s/ Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT