| | |
|---|---|
| PRISON LAW OFFICE | ROSEN, BIEN& GALVAN, LLP |
| DONALD SPECTER, Bar No. 83925 | MICHAEL W. BIEN, Bar No. 96891 |
| STEVEN FAMA, Bar No. 99641 | ERNEST GALVAN, Bar No. 196065 |
| 1917 Fifth Street | JANE E. KAHN, Bar No. 112239 |
| Berkeley, CA 94710-1916 | AMY WHELAN, Bar No. 215675 |
| Telephone: (510) 280-2621 | LISA ELLS, Bar No. 243657 |
| | MARK R. FEESER, Bar No. 252968 |
| | 315 Montgomery Street, 10th Floor |
| | San Francisco, CA 94104-1823 |
| | Telephone: (415) 433-6830 |
| THE LEGAL AID SOCIETY – | BINGHAM, McCUTCHEN, LLP |
| EMPLOYMENT LAW CENTER | WARREN E. GEORGE, Bar No. 53588 |
| CLAUDIA CENTER, Bar No. 158255 | Three Embarcadero Center |
| 600 Harrison Street, Suite 120 | San Francisco, CA 94111-4066 |
| San Francisco, CA 94107-1389 | Telephone: (415) 393-2000 |
| Telephone: (415) 864-8848 | |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING** |

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

I. DEFENDANTS' LONG-RANGE BED PLAN FAILS TO MATERIALLY COMPLY WITH THE COURT-ORDERED ACTIVATION DATE ............................... 3

    A. Consolidated Care Center ("CCC") Delay .................................................. 4

    B. The DJJ Projects .......................................................................................... 5

II. DEFENDANTS' LONG-RANGE BED PLAN FAILS TO ADDRESS THE FEMALE EOP BED NEED ........................................................................................... 5

III. DEFENDANTS' PLAN FAILS TO CONFIRM DMH'S COURT-ORDERED DUTY TO PROVIDE INPATIENT CARE TO *COLEMAN* CLASS MEMBERS ................................................................................................................... 6

IV. DEFENDANTS' PLAN MUST INCORPORATE THE FINDINGS OF THE MODIFIED NEEDS ASSESSMENT ............................................................................. 8

V. DEFENDANTS MUST BE HELD TO THEIR ORIGINAL PROMISE TO IMPLEMENT A HEALTH CARE MISSION AT THE DJJ FACILITIES ....................... 9

VI. DEFENDANTS MUST SIGNIFICANTLY REDUCE THE EOP POPULATION PLANNED FOR THE DJJ STARK FACILITY ................................... 10

CONCLUSION ............................................................................................................................. 15

i

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

# TABLE OF AUTHORITIES

**Page**

### Cases

*Balla v. Idaho Bd. of Corrections*,
   595 F. Supp. 1558 (D. Idaho 1984),
   *vacated in other part by* 869 F.2d 461 (9th Cir. 1989) .............................................................. 12

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ................................................................................................................. 12

*Martino v. Carey*,
   563 F. Supp. 984 (D. Ore. 1983) .............................................................................................. 12

*Tillery v. Owens*,
   907 F.2d 418 (3d Cir. 1990) ..................................................................................................... 12

*Wade v. Haynes*,
   663 F.2d 778 (8th Cir. 1981) .................................................................................................... 12

*Wappler v. Huss*,
   2009 WL 3055202 (W.D. Mich. Sept. 18, 2009) .................................................................... 12

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

# TABLE OF ACRONYMS/ABBREVIATIONS

| | |
|---|---|
| ACA | American Correctional Association |
| ASU | Administrative Segregation Unit |
| CIM | California Institution for Men, Chino |
| CCC | Consolidated Care Center |
| CDCR | California Department of Corrections and Rehabilitation |
| CMC | California Men's Colony, San Luis Obispo |
| CMF | California Medical Facility, Vacaville |
| DJJ | Department of Juvenile Justice |
| DMH | Department of Mental Health |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| ICF | Intermediate Care Facility |
| ICF-H | Intermediate Care Facility-High Custody |
| MHCB | Mental Health Crisis Bed |
| SVPP | Salinas Valley Psychiatric Program |

iii

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

# INTRODUCTION

On March 31, 2009, this Court ordered Defendants to develop concrete proposals to meet the long-range bed needs of the Plaintiff class. Docket 3556 at 5:19-21. Following the September 22, 2009 status conference and hearing on Defendants' bed plan, this Court ordered Defendants to file within forty-five days of the hearing a detailed long-range plan, including activation schedules, with a date certain for completion of each of the projects in the plan, a description of each step necessary for completion of each project, a list of every state agency involved in each project, the names and addresses of all persons responsible for each of the projects, and a timetable for certification to the Special Master of the action or actions taken and whether the projects remain on schedule. Docket 3686 at 3:1-9 ("September 24, 2009 Order"). The September 24, 2009 Order also provided that "[t]he timetables for completion of each step described in the plan shall be developed in such a way that all projects in the long-range plan will be fully staffed and activated by the 2013 target date defendants have established." *Id.* at 3:9-11. In the event of material non-compliance, "the court will set an evidentiary hearing at which time the court will hear testimony from any person with knowledge of the reason or reasons for such non-compliance and from any party or agent of any party who has authority to ensure compliance with this order but who has failed to do so." *Id.* at 3:20-24.

An evidentiary hearing is necessary to address material deficiencies in Defendants' long-range bed plan.

On November 6, 2009, Defendants filed their long-range bed plan, including activation schedules. Dockets 3724, 3724-2. On November 10, 2009, Defendants met with Plaintiffs in Sacramento to answer questions regarding their bed plan filing. Declaration of Jane E. Kahn in Support of Plaintiffs' Response to Defendants' Long-Range Mental Health Bed Plan and Request for Evidentiary Hearing ("Kahn Decl.") ¶ 3. On November 17, 2009, the *Plata* Receiver met with Plaintiffs' counsel, CDCR representatives, the *Coleman* Special Master and representatives from his team, as well as the *Armstrong* and *Perez* court representatives, to respond to further questions regarding the long-range bed plan, especially in light of the revised Population Reduction Plan filed in the Three-Judge Court by Defendants on November 12, 2009.

1

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

Docket 3726; Kahn Decl. ¶ 4.

There are many critically needed projects included in the long-range bed plan and this Court should order Defendants to proceed with those projects with all deliberate speed.[1] Defendants' long-range mental health bed plan fails, however, to "materially comply" with this Court's September 24, 2009 Order in various ways that must be addressed. The majority of the long-range mental health beds will not be activated by 2013, in direct violation of this Court's Order. Docket 3686 at 3:9-11. Many of the mental health bed projects have been delayed or appear to be lower priority than other construction projects in Defendants' long term plans. In addition, Defendants have failed to even site the 70 female Enhanced Outpatient Program ("EOP") beds required to meet the 2013 Navigant bed need. Furthermore, Defendants intend to place the majority of "new" EOP beds in old Division of Juvenile Justice ("DJJ") facilities, but provide very little detail as to how they will retrofit these aging facilities to provide adequate, long-term mental health programs. One of the DJJ facilities, Heman G. Stark ("Stark"), has extremely problematic and inadequate housing units for the large EOP program currently planned to be sited there, and despite objections from the Special Master's experts and Plaintiffs, Defendants remain committed to double-celling the EOP population in Stark's inadequate housing. Kahn Decl. ¶¶ 3, 4, 13.

Defendants' failure to meet the 2013 deadline for so many critical, higher-level psychiatric beds is especially troubling given that Defendants' bed plan is only designed to meet the projected need based on Navigant's Spring 2009 projections. It is apparent from the current exploding inpatient psychiatric waitlists, which have expanded to more than 500 on the Intermediate Care Facility ("ICF") list and nearly 50 on the acute list, that the Navigant Spring

---

[1] Of course, in implementing the long-term bed plan, Defendants should be mindful that federal law, state law and various court orders in multiple cases require that these facilities be built or rehabbed in accordance with existing disability access standards and regulations. Each and every project must include appropriate architectural features to assure that all patients, including those with disabilities, have full access to the specialized programs and services provided by the State. This is crucially important with respect to the Stark project, as it promises to be the only facility in the state capable of housing Level I and II EOP prisoners. Kahn Decl. ¶ 4.

2

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

2009 projections underestimate the actual demand for these inpatient beds. Kahn Decl. ¶ 19. The ongoing Modified Assessment process has established, once again, that Defendants have large numbers of patients in need of higher levels of care who linger in inappropriate placements without even the necessary referrals to the mental health units they require.

Defendants' plan is fundamentally flawed in that it fails to provide the necessary beds for class members by 2013 as required by the Court; it ignores the Modified Assessment that has identified hundreds of *Coleman* class members requiring inpatient levels of care; and it will leave an "unmet need" even when the bed plan projects are completed in 2014 because the plan meets only the 2013 Navigant projections and not the larger Navigant bed need projections for 2014.

## ARGUMENT

### I. DEFENDANTS' LONG-RANGE BED PLAN FAILS TO MATERIALLY COMPLY WITH THE COURT-ORDERED ACTIVATION DATE

The Court's September 24, 2009 Order mandates that "all projects in the long-range plan will be fully staffed and activated by the 2013 target date defendants have established." Docket 3686 at 3:9-11. Despite this order, Defendants' plan fails to fully staff and activate three major bed projects until well into 2014. Docket 3724-2, Ex. 1, Ex. 10, & Ex. 12. These three projects include: (1) the Consolidated Care Center ("CCC"), which will have 137 Mental Health Crisis Beds ("MHCB"), 43 Acute Care Beds, and 432 ICF Beds; (2) the Stark DJJ Conversion,[2] which will house 775 EOP General Population ("GP") beds and 50 EOP Administrative Segregation Unit ("ASU") Beds; and (3) the Dewitt DJJ Conversion, which will have 375 EOP GP beds and 50 EOP ASU beds. These three projects include 1,862 mental health beds, representing 66 percent of the long-range bed projects.[3] Docket 3724-2, Ex. 1, Ex. 10, Ex. 12, & Ex. 14. In other words, nearly 70 percent of Defendants' long-range projects fail to meet the 2013

---

[2] The Stark DJJ Conversion also includes 30 MHCB beds, but they are scheduled for full activation by the end of 2013.

[3] Defendants' long-range bed plan includes a total of 2,819 mental health beds within the CCC, 3 DJJ renovations and the remaining court-ordered and new projects. Docket 3724-2 at 6-11, Ex. 14.

3

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

activation deadline mandated by this Court's Order.

## A.    Consolidated Care Center ("CCC") Delay

Defendants' plans for the completion of the CCC have been delayed from Fiscal Year 2011-2012 to the most recent projected completion date of September 15, 2014. *See* Docket 3726-2 at 11; Docket 3724 at n. 6 & Ex. 1. Explaining this delay, Defendants' most recent population reduction plan filed on November 12, 2009 (after the long-range bed plan), states:

> The population number and occupancy dates for this project have been refined since the September 18, 2009 Plan. The bed number has increased from 1,702 to 1,722 and the occupancy date for the project has been set out to Fiscal Year 2013-2104. The original schedule submitted in the September 18, 2009 Plan was predicated on the *Plata* Receiver's delivery method. The current schedule, however, is based on that authority currently maintained by CDCR for design bid/build approach to construction.

Docket 3726-2 at 12 (Defendants' Response to Three-Judge Court's October 21, 2009 Order).

While Defendants must themselves determine how to meet the court-ordered deadlines, one way to do so is through expedited planning and construction. The faster "design-build" method of public construction, for instance, was authorized on a limited basis by Senate Bill 4, signed into law by Governor Schwarzenegger on February 20, 2009. Kahn Decl. ¶ 6, Ex. A (chaptered version of Senate Bill 4). The law authorizes only five "design-build" projects for use by the CDCR, the state courts, and/or Cal Trans. During the November 17, 2009 meeting described above, the Receiver reported that one of the five authorizations has already been used by CDCR for a reentry facility. Chris Meyer, Facilities Manager for the CCC, reported that he had submitted a request for authorization to build the CCC as a "design-build" project in order to remedy the delay caused by the transition of the project from the Receiver (with his expedited construction method) to the CDCR. Kahn Decl. ¶ 5. If Mr. Meyer's request to use a second "design-build" authorization for the CCC is approved, and no other projects are approved, three more "design-build" authorizations will be available. During the November 17, 2009 meeting, Mr. Meyer estimated that use of the "design-build" method could accelerate a project by between 8 and 12 months compared to the ordinary "design-bid-build" method. Kahn Decl. ¶ 6.

4

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

### B. The DJJ Projects

The long-range bed plan includes three mental health bed projects in addition to the CCC that will add 1,440 EOP beds and 30 MHCB beds, meeting the projected Navigant bed need for the significant and long-standing shortage of EOP beds. Docket 3724-2 at 8. The majority of these beds will not come on line by the court-ordered deadline of 2013. Defendants have not sought "design-build" authority for any of these large mental health projects, and have not proposed any other strategy to complete these beds by the court-ordered deadline. Kahn Decl. ¶ 5. Moreover, Defendants have not articulated which construction projects will be prioritized, including, for instance, whether medical and mental health bed projects will be prioritized over general housing projects constructed at the same sites. Kahn Decl. ¶ 4.

Plaintiffs request that the Court order an evidentiary hearing at which time Defendants shall produce those persons with knowledge of the reason or reasons for non-compliance with the court-ordered timeframes for activation, as well as all persons responsible for ensuring compliance with this Court's September 24, 2009 Order. Defendants should also produce the actual person or persons responsible for applying for and deciding on the "design-build" waiver for CDCR and DMH projects, as well as to provide the status of the "design-build" waiver submitted for the CCC project and a further explanation why Defendants are not seeking additional "design-build" waivers for the other large health care projects located in the former DJJ sites. The witnesses should also be prepared to testify about Defendants' prioritization of construction projects, including how the mental health projects will be prioritized compared to medical and general housing projects.

### II. DEFENDANTS' LONG-RANGE BED PLAN FAILS TO ADDRESS THE FEMALE EOP BED NEED

Despite numerous court orders and hearings on Defendants' bed planning process, Defendants have again filed a long-range bed plan that fails to adequately plan for the needs of female prisoners requiring an EOP level of care. *See*, *e.g.*, Docket 2461 at 2:17-23 (10/18/07 Order) (finding that Defendants' August 2007 long-range bed plan failed to include the female EOP bed need). In this most recent version of their long-range bed plan, Defendants have failed

5

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

to even site the beds for meeting the identified female EOP bed need. Docket 3724-2 at 10. In contravention of this Court's September 24, 2009 Order, Defendants provide no site(s), no activation schedule, no timelines and no responsible individuals for these beds. Defendants include only a footnoted excuse for this failure, stating that "[i]t is anticipated that any parole, sentencing, and/or credit reforms, and the Three-Judge Court's prisoner release order, will significantly impact the female population." Docket 3724-2 at 10, n. 12. No evidence in support of this contention has been provided and no significant reduction in the female population appears in Defendants' population reduction plans. Defendants also offer a broad statement that "[t]his need will be met through converting existing housing to EOP-GP beds." *Id*. at 10.

Defendants have failed to comply with the Court's order to include a schedule with a date certain for completion of the female EOP bed project, have not described every step necessary to complete each project, and have failed to include a timetable, a list of every state agency involved, the names and addresses of persons responsible, and a timetable for certification by the Special Master. Docket 3686 at 3:1-13.

Defendants should be directed to have present at the evidentiary hearing those person(s) who can address the health care improvement programs currently underway to address the needs of female EOP prisoners and/or the other specific plans that are required to meet the female EOP-GP need by 2013. Those witnesses should be prepared to testify regarding the specific location of necessary beds, a schedule with a date certain for completion of the project(s), a description of each step necessary to complete the project(s), specific timetables by which each such step shall be completed, every state agency involved in the project(s), the names and addresses of all persons responsible for approval and/or execution of each project(s), and a timetable for certification to the Special Master for full activation by 2013.

### III. DEFENDANTS' PLAN FAILS TO CONFIRM DMH'S COURT-ORDERED DUTY TO PROVIDE INPATIENT CARE TO *COLEMAN* CLASS MEMBERS

Although the Court has clearly stated that CDCR will not replace the Department of Mental Health ("DMH") as the provider of inpatient care absent Court approval, Defendants' long-range plan fails to explain which inpatient beds, if any, DMH will continue to operate.

6

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

Kahn Decl. ¶ 21 & Ex. H at 15:5-11 ("Once again, out of the blue, has come DMH's divorce from CDCR … It isn't going to happen without this Court's approval.  And it won't happen unless this Court is absolutely satisfied that the people in the class will not be disserved by that divorce" (excerpt from June 16, 2009 Hearing on Defendants' Court-Ordered Bed Plan Projects)).  Defendants' long-range bed plans submitted in 2006 through 2008 attempted, in various forms, to disengage DMH from the *Coleman* case.  The first such attempt was Defendants' December 2006 long-range plan, which proposed transferring responsibility for *all* inpatient programs from DMH to CDCR.  Docket 2091 at 16.  After Plaintiffs' counsel and the Special Master raised serious concerns about CDCR's ability to build, license, staff and operate inpatient psychiatric hospitalization programs, this Court ordered Defendants to file a detailed plan responding to the various requirements necessary to transfer inpatient psychiatric hospitalization responsibilities from DMH to CDCR.  Docket 2173 (3/27/07 Order).  In response, Defendants first scaled back the proposed transition from DMH to CDCR, *see* Docket 2375-2 at 6-9 of 18, and then completely abandoned the plan altogether, stating "DMH [will] continue to provide all inpatient acute and intermediate mental health services instead of transferring responsibilities to provide those services to the CDCR."  Pls' Ex. P-477 at 2 of 20 (July 16, 2008 Mental Health Bed Plan).

Defendants' updated long-range bed plan is silent as to which entity – DMH or CDCR – will operate the licensed inpatient psychiatric hospital beds.  The CCC is a project that CDCR has taken over from the *Plata* Receiver which will contain 475 licensed inpatient psychiatric beds.  The Plan Exhibit for the CCC lists DMH's head of long-term care, Ms. Radavsky, among the responsible persons.  Docket 3724-2, Ex. 1.  The plan does not state, however, whether Defendants intend to continue DMH's role in providing inpatient care at the CCC, or at any other inpatient program providing care to the most seriously ill *Coleman* class members.  Other projects, like the 45 bed ICF unit at CIW, fail to list any DMH staff member responsible for the unit.  Docket 3724-2, Ex. 15.

Defendants, including DMH, should be directed to have present at the evidentiary hearing those person(s) who can address the planning, design and construction of all inpatient psychiatric

7

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

bed projects in the long-range bed plan, as well as plans to obtain licenses and staffing for each of the inpatient programs. Those witnesses should be prepared to testify regarding DMH's ongoing responsibility to ensure that these programs are appropriately designed, licensed and staffed on schedule for full activation in 2013, and in compliance with applicable laws, regulations and professional standards.

## IV.   DEFENDANTS' PLAN MUST INCORPORATE THE FINDINGS OF THE MODIFIED NEEDS ASSESSMENT

Defendants' long-range bed plan refers to the Modified Assessment, but fails to explain how or when Defendants will incorporate the data from that assessment into the long-range bed planning process. Docket 3724-2 at 3 ("The results of this modified unmet needs assessment may impact future mental health bed needs.") John Misener, the statistician who forecasts Defendants' need, has explained that it is important for the accuracy of his forecasts to incorporate the results of studies such as the Modified Assessment. Kahn Decl. ¶ 22 & Ex. I (Misener Deposition) at 49:7-18. Mr. Misener incorporated the results of the previous 2004/2005 unidentified needs study into his forecast, but explained that those numbers do not carry forward. *Id.* at 53:23-25 ("We don't have any new numbers to add to 2007 and 8 and going forward until—unless there happens to be another UNA type study to add on to it.").

The Modified Assessment currently underway at all CDCR prisons, except for the desert institutions, has already resulted in hundreds of additional prisoners identified for referral to an inpatient program. Kahn Decl. ¶ 20 & Ex. G. During Phase I and Phase II of the Modified Assessment, there were 1659 cases identified for potential referral to an inpatient level of care, resulting in a total of 559 prisoners that were referred to DMH. *Id.* As part of Phase III of the Modified Assessment, there were an additional 493 prisoners who met the criteria for potential referral and still required assessment, but the results of those assessments have not been provided. *Id.* Phase IV of the Modified Assessment, which is currently underway, involves the majority of the CDCR prisons that were not visited during the first three phases, and is likely to yield significant additional inpatient referrals. *Id.*

In addition, the most recent waitlist data Defendants provided on November 16, 2009

8

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

shows that as of October 31, 2009, there were 519 CDCR prisoners waiting for transfer to a bed in the SVPP ICF program. Docket No. 3728 (DMH Report on Monthly Bed Utilization for October 2009 filed under seal on November 16, 2009 (Cell Nos. 652-1280)). The report also identifies 43 male CDCR prisoners awaiting transfer to an acute care bed as of October 31, 2009, 4 prisoners pending admission and 18 CDCR prisoners rescinded from the referral list after waiting many weeks for a placement. *Id*. at Cell Nos. 239-303, 1282. Kahn Decl. ¶ 19.

Defendants should be directed to have present at the evidentiary hearing those person(s) responsible for analyzing the results of the Modified Assessment and forecasting long range bed need through the Misener/Navigant contract. The witnesses should be prepared to address how Defendants will account for this unmet need in the ongoing bed planning process.

## V. DEFENDANTS MUST BE HELD TO THEIR ORIGINAL PROMISE TO IMPLEMENT A HEALTH CARE MISSION AT THE DJJ FACILITIES

In their long-range bed plan, Defendants propose three conversions of DJJ facilities, located at Stark, Dewitt and Estrella. Docket 3724-2 at 8. Defendants promise to operate those facilities according to a health care mission, and establish the necessary policies and procedures, as well as provide trainings, to establish and foster that mission. Docket 3724-2 at 9. Defendants' subsequent filings in the overcrowding case, as well as statements made to Plaintiffs regarding their plans for the Stark facility, however, call into question Defendants' commitment to this model. Such a treatment-focused mission is of paramount importance, and Defendants must commit to ensuring it is implemented at the DJJ facilities as promised.

In their November 12, 2009 Population Reduction Plan, Defendants describe the Stark conversion as including high-security design elements such as a lethal electrified fence and guard towers. Docket 3726-2 at 10. It then goes on to state that the beds planned for the facility after these measures are in place are medical and mental health beds, referencing the instant long-range bed plan. *Id*. In a separate section on the same page of the Population Reduction Plan, Defendants state that they are planning to build a new reception center at the California Institute for Men (CIM), the prison near Stark in Chino, and that the planning for the reception center "is being coordinated with the proposed renovation at the Heman G. Stark facility." *Id.*

9

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

Additionally, in the November 17, 2009 meeting with the Receiver, Special Master, and Defendants described above, Defendants stated that they are planning to site a new reception center at Stark itself. Kahn Decl. ¶ 4. Both the Special Master's experts and Plaintiffs counsel expressed great concern about this, as reception centers are by their nature high-security facilities that consume significant medical and mental health resources. *Id.* As such, a reception center located within the same correctional facility at Stark is highly likely to undermine the establishment of the cultural norms necessary for a health care-focused mission and low security EOP beds, and will also introduce additional clinical staffing strains. Defendants did not address Plaintiffs' and the Special Master's concerns, and in fact reiterated their intent to build a reception center at Stark on November 19, 2009. Kahn Decl. ¶¶ 4, 9, 11. Nor have Plaintiffs received confirmation that the health care mission promised at the other DJJ facilities — Estrella and Dewitt — will in fact be implemented.

Accordingly, because the implementation of a health care mission at the DJJ facilities is crucial to their success, Defendants should be directed to have present at the evidentiary hearing those person(s) most knowledgeable about the DJJ projects, including those responsible for designing and implementing the health care mission, as well as about the Stark reception center project. In particular, staff members should be prepared to explain how the planned reception center at Stark, and any non-medical or mental health beds planned for any of the DJJ facilities, will affect the long-term bed plan project slated for the same DJJ facilities.

## VI. DEFENDANTS MUST SIGNIFICANTLY REDUCE THE EOP POPULATION PLANNED FOR THE DJJ STARK FACILITY

Defendants have proposed placing 825 prisoners requiring an EOP level of care in a project slated to be sited in what is now the DJJ Stark facility. The proposal is plagued with problems. The Stark project as designed will be overcrowded and require double-celling in an

10

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

inadequate facility.[4]  Additionally, Defendants have refused to adopt the Special Master's experts' recommendations on ways to mitigate the harms inherent in the existing plan.  But even if Defendants did agree to the requested changes, it is not realistic to believe that they could implement the recommendations.  Kahn Decl. ¶¶ 16, 18.  It is unacceptable that Defendants' long-term plan for the EOP population would knowingly rely on the use of such dangerous and overcrowded units.  Defendants must be ordered to revise significantly their plans for Stark by reducing the number of EOP beds, particularly for high custody class members, planned for the facility.

775 of the 825 proposed beds at Stark will be for EOP GP prisoners, and the remaining 50 beds will serve as an EOP ASU unit.  The 825-bed Stark project would be by far the largest EOP program within CDCR.  Kahn Decl. ¶ 7.  From even a short visit to Stark, however, it was eminently apparent to both Plaintiffs and the Special Master team that the proposed double-celling of this large EOP population at Stark is extremely problematic.

During a November 19, 2009 tour of the Stark facility attended by Plaintiffs' counsel, members of the Special Master team, and CDCR staff and their counsel, Plaintiffs visited one of Stark's two existing housing units designated for the new 825-bed EOP program.  Kahn Decl. ¶ 11.  The cells on the long, tiered hallways in the building have narrow glass windows that look out on the hallway through the cell door and out to the outside world through a very narrow back window.  *Id*.  The cells are extremely small, as had been previously reported by the Special

---

[4] In contrast to Stark, Defendants have provided little detail regarding the types of housing that will be created for the EOP programs at Estrella, which will have a 190-bed program, and Dewitt, which is slated to have a 425-bed EOP program. Docket 3724-2 at 8.  During the November 19, 2009 Stark tour described above, Defendants have suggested that they will be using newly constructed "270" design buildings. Kahn Decl. ¶ 17.  Defendants reported that buildings with the 270 design have cells smaller than the Stark cells, and also indicated that they intend to double-cell EOP patients in those small cells at both Estrella and Dewitt. *Id.*  Plaintiffs have concerns about this plan as a general matter, but are reserving objections at this point while awaiting further detail regarding these projects.  Plaintiffs look forward to working with Defendants, the Special Master and the Receiver to assure that any projects added by the long-range bed plan do not result in dangerous, overcrowded conditions for class members in need of higher levels of mental health care.

11

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

Master's team during meetings with Defendants, and each contained a double bunk, a toilet, a sink, a small desk with a swivel chair, and a storage cabinet, which Defendants indicated would be replaced with a CDCR-approved unit. *Id.* Additionally, all of the cells appeared to contain several places that would require retrofitting to remove points where a ligature could easily be attached for hanging. *Id.*

In fact, according to Plaintiffs' measurements of one cell that Defendants described as identical to all other non-ADA cells in both of the Stark housing units intended for EOP prisoners, the cell's total square footage was 55.7 feet, with a total of 28.5 square feet of unencumbered space.[5] Kahn Decl. ¶ 12 & Ex. C (Excel chart showing Plaintiffs' counsel measurements of cell No. 42). This is barely half of the minimum unencumbered space required for a cell occupied by two prisoners, according to the American Correctional Association ("ACA").[6] Kahn Decl. ¶ 12 & Ex. D. (ACA Standard 4-4132, 2008 Supplement). Indeed, it is an insufficient amount of space according to the ACA standards even if the cell was occupied by only *one* prisoner. *Id.* Although Defendants report a greater amount of unencumbered space in

---

[5] "Unencumbered space" refers to the square footage that remains after subtracting the space allocated to the fixtures (*e.g.*, the toilet, sink, desk and bunk) from the total square footage of the cell. *See* Kahn Decl. ¶ 12 & Ex. D (ACA Standard 4-4132, 2008 Supplement).

[6] While standards promulgated by expert groups like the ACA cannot themselves establish constitutional minima under *Bell v. Wolfish*, 441 U.S. 520, 543-44 n.27 (1979), they are relevant evidence of experts' recommended benchmarks. Indeed, courts frequently cite the ACA standards, including those pertaining to cell sizes, in support of holdings. *See, e.g.*, *Tillery v. Owens*, 907 F.2d 418, 422 n.2 (3d Cir. 1990) (comparing conditions at a prison to the ACA standards for cell space and affirming district court holding that double-celling violated contemporary norms of decency); *Wade v. Haynes*, 663 F.2d 778, 781 (8th Cir. 1981) (upholding verdict against defendant where evidence, including ACA standards, showed defendant knew or should have known plaintiff was likely to be assaulted in administrative segregation cell); *Wappler v. Huss*, 2009 WL 3055202, *1 (W.D. Mich. Sept. 18, 2009) (rejecting defendants' qualified immunity claim, which was based on evidence of compliance with ACA standards); *Balla v. Idaho Bd. of Corrections*, 595 F. Supp. 1558, 1566-67, 1575-76 (D. Idaho 1984) (relying extensively on ACA standards in finding prison deficient with respect to medical and mental health care, including with respect to room size in psychiatric unit), *vacated in other part by* 869 F.2d 461, 468-69 (9th Cir. 1989); *Martino v. Carey*, 563 F. Supp. 984, 1002 n.13 (D. Ore. 1983) (comparing standard for cell size imposed to ACA standard).

12

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

1   the non-ADA Stark cells,[7] even by Defendants' own measurements the cells are simply too small
2   to allow safe double-celling of EOP prisoners. Kahn Decl. ¶ 12.

3       Even more egregious, Defendants plan to house EOP ASU prisoners in the same small
4   cells. Under Defendants' normal EOP ASU program, EOP ASU prisoners are provided, at best,
5   with only three hours per day of out of cell programming, which includes yard and treatment.
6   Kahn Decl. ¶ 13. ACA standards recommend a minimum of *80 square feet* of total floor space
7   for prisoners in maximum custody units like administrative segregation, even when *single*-celled.
8   Kahn Decl. ¶ 13 & Ex. E (ACA Standard 4-4133, 2008 Supplement).

9       These space-related shortcomings identified by Plaintiffs not only have been echoed by
10  the Special Master's experts, but actually amplified. After visiting Stark and touring the housing
11  units designated for the new EOP program, the Special Master's experts objected to the large size
12  of the proposed Stark EOP program, which would require prisoners to be double-celled in
13  severely under-sized cells. They also objected to the lack of electrical outlets necessary for basic
14  recreation and programming using cable television or radio, the lack of appropriate natural or
15  electric lighting, and various other basic housing requirements. Kahn Decl. ¶ 8. The Special
16  Master's experts, based on their custodial and clinical experience, made a series of specific
17  recommendations outlining the minimum changes Defendants would need to make to mitigate
18  the foreseeable harm that will result from the plan to double-cell massive numbers of EOP
19  prisoners in this inadequate structure. Kahn Decl. ¶¶ 8, 9. Many of those recommendations are
20  designed to guarantee that patients spend sufficient amounts of time outside of the extremely
21  small cells, including, for instance, that the program house only low security Level I and Level II
22  prisoners, that the patients receive enhanced programming of at least twelve hours per day out of
23  cell, and that there be enough treatment and programming space such that at least 70% of
24  treatment occurs outside the housing unit. Kahn Decl. ¶ 8.

---

[7] Defendants estimate the cells to be 58.5 square feet total, with 38 square feet of unencumbered space. Kahn Decl. ¶ 12. Notably, Defendants did not provide Plaintiffs with the raw measurements Defendants used to reach their total and unencumbered square footage calculations. Kahn Decl. ¶ 12.

13

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

Defendants have refused to commit to the structural modifications and programmatic mitigations requested by the Special Master, *see* Kahn Decl. ¶ 9, and provide only scant details in their long-term bed plan as to how they will address the fundamental impediments to transitioning Stark's old, decrepit facility into CDCR's largest EOP program.

But even if Defendants agreed to make the far-reaching changes recommended by the Special Master, they are unlikely to be able to construct sufficient space and hire sufficient clinical and custodial staff to provide these essential services. As of the November 19, 2009 Stark tour, Defendants' plans to create sufficient treatment and program space for the 825 bed EOP program remained vague and undefined. Kahn Decl. ¶ 14. Defendants could not identify where treatment and office space would be located at Stark, much less provide any specific information on how much of this critical space would be made available. *Id.* Nor have Defendants come forward with any plan to provide the substantial additional custodial and clinical staffing necessary to provide the enhanced programming and treatment proposed by the Special Master's experts. *Id.* Nor is it likely that additional clinical staff can be found given the ongoing system-wide staffing shortages reported by Defendants. Kahn Decl. ¶¶ 16, 18 & Ex. F (September 2009 Executive Summary, MH Program Vacancy Report).

Given the severe risks to the health and safety of the EOP population posed by Defendants' plan for Stark, Plaintiffs have requested that Defendants reduce the size of the proposed Stark program by 225 EOP GP beds. Kahn Decl. ¶ 13 & Ex. J. (Michael Bien email of 11/20/09). Defendants have not yet responded to this request. *Id.* This reduced population level, to consist of 550 EOP GP beds and 50 EOP ASU beds, could be housed at Stark without the need for double-celling, thereby eliminating the known deleterious effects that accompany that practice. The extremely small size of the Stark cells could be further mitigated if the 225 EOP beds moved elsewhere comprised any non-Level I and II beds currently planned for Stark. If the Stark beds were reserved only for low custody class members, there is a significantly greater potential for increased out-of-cell programming, again recommended by the Special Master's team as a way to compensate for Stark's small cells. In addition, Level I and II prisoners in need of an EOP level of care would finally be able to receive that care without giving up the

14

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]

programming and other benefits associated with their lower security levels. Today, there are no Level I or II EOP beds in the CDCR.

Plaintiffs request that Defendants be required to produce at the evidentiary hearing those persons most knowledgeable about the Stark bed project, including the proposed programs and staffing, and any housing renovations. In particular, staff members should be prepared to explain housing plans at Stark, and shall address the concerns raised by the Special Master and Plaintiffs' counsel, including plans to house Level III and IV EOP class members at Stark and to double-cell patients in spaces well below ACA standards and in contravention of the Special Master team's clinical recommendations. In addition, Defendants should produce the person or persons most knowledgeable about other potential sites for EOP beds in the CDCR or DJJ system, particularly those that can accommodate higher security class members, as alternatives.

## CONCLUSION

Defendants' long-range bed plan fails to materially comply with this Court's most recent order mandating that all projects be fully staffed and activated by 2013. They offer excuses for their non-compliance, but fail to explain why these critical beds are delayed 9 or 10 months after the Court's clear deadline. The plan also fails to include the long-range bed needs of female EOP class members, fails to explain DMH's ongoing role providing inpatient care, fails to incorporate the results of the Modified Assessment and relies on overcrowding at Stark in order to build sufficient mental health beds.

Plaintiffs request that the Court order an evidentiary hearing at which time Defendants shall produce all persons with knowledge of the reason or reasons for non-compliance with the timeframes for activation of the bed plan projects, as well as all persons who have the authority to ensure compliance with the September 24, 2009 Order. Plaintiffs also request that Defendants be prepared to address the following additional outstanding issues at the evidentiary hearing:

1. "Design-build" authority for the CCC project and the three health care projects located at the Dewitt, Stark and Estrella sites, and the prioritization of mental health care projects related to planned medical and general population units;

  2. Long-range bed plan specific bed project(s) to meet the identified female EOP bed need by 2013;

  3. The Department of Mental Health's role in the design and development of the inpatient programs, including plans to staff and operate Defendants' inpatient psychiatric hospitalization programs in new and existing programs;

  4. Incorporation of the findings of the Modified Needs Assessment into the long-range bed plan;

  5. The Stark DJJ EOP program and alternative sites for EOP beds, including plans to ensure implementation of the health care mission at the DJJ sites.

Dated: November 30, 2009

Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP

By: */s/ Jane E. Kahn*
   Jane E. Kahn
   Attorneys for Plaintiffs

16

PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[329435-8]