| | |
|---|---|
| PRISON LAW OFFICE | ROSEN, BIEN & GALVAN, LLP |
| DONALD SPECTER, Bar No. 83925 | MICHAEL W. BIEN, Bar No. 96891 |
| STEVEN FAMA, Bar No. 99641 | ERNEST GALVAN, Bar No. 196065 |
| 1917 Fifth Street | JANE E. KAHN, Bar No. 112239 |
| Berkeley, CA 94710-1916 | AMY WHELAN, Bar No. 215675 |
| Telephone: (510) 280-2621 | LISA ELLS, Bar No. 243657 |
| | MARK R. FEESER, Bar No. 252968 |
| | 315 Montgomery Street, 10th Floor |
| | San Francisco, California 94104-1823 |
| | Telephone: (415) 433-6830 |
| THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER | BINGHAM, McCUTCHEN, LLP |
| CLAUDIA CENTER, Bar No. 158255 | WARREN E. GEORGE, Bar No. 53588 |
| 600 Harrison Street, Suite 120 | Three Embarcadero Center |
| San Francisco, CA 94107-1389 | San Francisco, California 94111-4066 |
| Telephone: (415) 864-8848 | Telephone: (415) 393-2000 |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants. | Case No. Civ S 90-0520 LKK-JFM <br><br> **DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING** |

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

I, Jane E. Kahn, hereby declare:

1. I am a member of the Bar of this Court and of counsel to Rosen, Bien & Galvan, LLP, counsel of record for the Plaintiffs in this case. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Response to Defendants' Long-Range Mental Health Bed Plan and Request for Evidentiary Hearing.

2. Defendants filed their long-range mental health bed plan on November 6, 2009. Docket 3724. Defendants' long-range mental health bed plan includes one consolidated care center ("CCC"), which has 612 inpatient beds and will be constructed in cooperation with the *Plata* Receiver for "integrated correctional health care for the higher acuity levels of physical and mental health." Docket 3724-2 at 6. In addition, there are three new projects sited in old Department of Juvenile Justice ("DJJ") facilities, where Defendants intend to house prisoners requiring Enhanced Outpatient ("EOP") level of care and prisoners with medical outpatient needs. *Id.* at 8; Defendants' Response to Three-Judge Court's October 21, 2009 Order, Docket 3726-2 at 10-11. In their long-range bed plan, Defendants state that their use of the former DJJ facilities (Stark, Dewitt and Estrella) will allow "for the designation of a health care mission through renovations and additional improvements at these existing facilities." Docket 3724-2 at 9. In Defendants' November 12, 2009 Response to the Three-Judge Court's October 21, 2009, a new reception center project, which will add 943 new beds next to the Stark Facility, is described as located "on the grounds of the California Institute of Men ("CIM") in Chino where CDCR's need for additional reception center beds is greatest'" but will also be "coordinated with the proposed renovation at the Heman G. Stark Facility." Docket 3726-2 at 10. Defendants have not clarified whether the new reception center facility will be located inside the Stark Health Care Unit, which will dramatically change the healthcare focus and custody levels of the prisoners currently designated for that facility (Level I and II), or on the grounds of CIM as stated in their November 12, 2009 filing. *Id.*

3. On November 10, 2009, I participated in a meeting held in Sacramento with Defendants to answer questions regarding their long-range mental health bed plan filed with the

1

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

Court on November 6, 2009. Also participating in this meeting were Plaintiffs' counsel Michael Bien, Ernest Galvan, and Amy Whelan, CDCR Staff Counsel Michael Stone and Katherine Tebrock, Debbie Vorous and Jeff Steele from the Attorney General's Office, Special Master Matthew A. Lopes, Jr., and members of his staff including Linda Buffardi, CDCR representatives, including Chris Meyer, Sharon Aungst, Judy Burleson, Deborah Hysen, Suzanne Streeter, and Joe Moss, Nathan Stanley from DMH, and Andrew Signey from the Department of Health and Human Services. During this meeting, Plaintiffs' counsel raised Defendants' failure to site or plan a project for female EOPs. Defendants reported that they were working with the Receiver and CDCR to address the female EOP bed deficit, but had no timeframe for when the plan would be complete. The Special Master raised his experts' serious concerns about the planned double-celling at Stark because of the small cell size and other physical limitations of the facility, but Defendants were unwilling to commit to the recommendations made by the Special Master's experts for mitigating the conditions by providing significantly enhanced programming. Defendants did not acknowledge the seriousness of the Special Master's concerns, noting that the small cell size at Stark was similar to the housing used for all EOP prisoners. Defendants did agree to consider permitting Plaintiffs' counsel to tour the facility and to continue discussions regarding the appropriateness of double-celling at Stark after the tour. Plaintiffs' counsel asked Defendants whether DMH would be running the inpatient beds in the Consolidated Care Center ("CCC") and elsewhere. Defendants acknowledged that they are required to seek the Court's permission to change the status quo and that currently, DMH was designated to run the inpatient programs. CDCR and DMH representatives expressly refused to make a long-term commitment that DMH would run the inpatient programs in the long term, however. Finally, Chris Meyers, CDCR Facilities Division, explained the CCC delay as the result of the transition from the Receiver (and his construction approach) to the usual process of "design-bid-build." Mr. Meyer reported that he has requested "design-build" authority from the Department of Finance ("DOF"), which could reduce the construction schedule by 8 to 12 months. Mr. Meyer did not report on any other applications for "design-build" authority to the

DOF. He indicated that he was awaiting response from DOF on his application for "design-build" authority for the CCC.

4. On November 17, 2009, I participated, via phone, in a meeting which was held at the Receiver's office at 510 J St, Suite 100, Sacramento, California. Also participating in this meeting were the Receiver and members of his staff, CDCR representatives, including Chris Meyer, Tim Rougeaux, Rich Kirkland, Deborah Hysen and Suzanne Streeter, Special Master Matthew A. Lopes, Jr., and members of his staff including Mohamedu Jones, Jeff Metzner and Kerry Walsh, *Perez* and *Armstrong* Court Representatives, Michael Bien, Ernest Galvan, and Don Specter, Debbie Vorous and Jeff Steele from the Attorney General's Office, Katherine Tebrock, CDCR Staff Counsel and *Plata* counsel, Paul Mello. During the meeting, Chris Meyer, CDCR Facilities Division, described the status of the long-range bed plan projects, including the CCC and the DJJ conversions, and reported that he is currently working with the various sub-contractors to develop a master schedule for all the outstanding building projects. Mr. Meyer said that he hoped to have a master schedule within several months time. He did not know how the priorities in the master schedule will be determined for establishing which building projects should move forward first, including the medical, mental health, and in-fill projects. Deborah Hysen responded to questions regarding the Stark DJJ renovation and described the project as including approximately 1,800 beds that will house chronically ill, Enhanced Outpatient ("EOP") prisoners, and a prisoner work crew. Originally described as a facility with a "health care mission," Ms. Hysen reported that Stark will now include a 943-bed reception center located on its grounds. Plaintiffs' counsel and *Coleman* expert, Dr. Jeffrey Metzner, expressed concerns about co-locating a new reception center on the grounds of the Stark facility because reception centers are by their nature high security facilities that consume significant medical and mental health resources. Reception centers house prisoners before they have been classified and include prisoners at all custody levels. As a result, they operate with higher security procedures which means that Level I/II prisoners will experience significantly greater restrictions in a reception center than they will once they transfer to their Level I/Level II mainline housing unit. Locating the reception center within the same correctional facility as Stark's Level I/II EOP program is

3

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

highly likely to undermine the establishment of the cultural norms necessary for a health care-focused mission, low security EOP beds, and will also introduce additional clinical staffing strains. Furthermore, there is no Level I/Level II EOP program that currently exists within CDCR, which has resulted in the housing of low custody EOP prisoners in higher security housing solely due to the lack of these beds. The establishment of the Level I/Level II EOP program at Stark offers a critically needed solution to this long-standing discrimination against EOP prisoners. During the meeting, Defendants did not address these concerns. Plaintiffs also raised concern about the extremely small cell size in the housing units designated for the 825 EOPs to be housed at Stark and objected to the proposal to double-cell this population. Defendants did not respond to this concern.

## TWO-YEAR DELAY IN THE CCC PROJECT

5. During the November 17, 2009 meeting, Michael Bien requested further information about the two-year delay in the CCC project from the stated completion date of 2011-2012 in Defendants' Population Reduction Plan, filed September 18, 2009 (Docket 3768-2 at 11) to the new completion date of September 15, 2014 reported in Defendants' long-term mental health bed plan. Docket 3724 at fn. 6; Ex. 1. Mr. Meyer indicated that the project delay was caused by the transition of responsibility from the Receiver to CDCR, which has required CDCR to revert back to its traditional "design-bid-build" method, rather than the expedited building methods used by the Receiver. Although Mr. Meyer indicated that he had submitted a request to the Department of Finance for authority to construct the CCC with "design-build" authority, he confirmed that he had not yet received approval, and could not provide a date certain when the decision on "design-build" authority would be made. Mr. Meyer did not indicate that he planned to request similar approval for other mental health bed projects.

6. The faster "design-build" method of public construction was authorized on a limited basis by Senate Bill 4, signed into law by Governor Schwarzenegger on February 20, 2009. A true and correct copy of the chaptered version of Senate Bill 4 is attached hereto as **Exhibit A**. The law authorizes only five "design-build" projects for use by the CDCR, the state courts, and/or CalTrans. During the November 17, 2009 meeting the Receiver reported that one

4

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

of the five authorizations has already been used by CDCR for a reentry facility. If Mr. Meyer's request to use a second "design-build" authorization for the CCC is approved, and no other requests have been submitted or approved, three more "design-build" authorizations will be available. During the November 17, 2009 meeting Mr. Meyer estimated that use of the "design-build" method could accelerate a project by between 8 and 12 months compared to the ordinary "design-bid-build" method.

## DJJ STARK FACILITY – SITE FOR 825 EOP PROGRAM

7. In Defendants' most recent Population Reduction Plan filed on November 12, 2009, Defendants describe the Stark Renovation (originally conceived in Defendants' September 18, 2009 Bed Plan) as a renovation of the existing 1,200-cell Department of Juvenile Justice ("DJJ") facility to house an adult male population that will result in approximately 1,800 beds by 2011. Docket 3726-2 at 10. The filing notes that the original plan now differs from Defendants' long-range mental health bed plan. *Id.* Although the Population Reduction Plan does not spell out all of the differences, the timeline for completion of the renovation is provided and it has changed significantly from a completion date in 2011 to a completion date of September 23, 2014. Docket 3726-2 at Ex. 10. The exact type of beds within the renovation are not specified beyond the specific mental health beds, which will include 825 EOP and 30 MHCBs, making this site the largest EOP program within the California Department of Corrections and Rehabilitation ("CDCR"). *Id.* at 10 and 15. By comparison, California Medical Facility ("CMF") has a 591 bed EOP program, California Men's Colony ("CMC") has a 634 bed EOP program and CSP-Sacramento ("SAC") has a 458 bed EOP program. *See* attached hereto as **Exhibit B**, a true and correct copy of the September 3, 2009 CDCR monthly mental health population report, entitled "Mental Health Population – Placement by Institution," provided by Defendants to the Special Master and to Plaintiffs' counsel as part of the *Coleman* monthly data package. CMF, CMC and SAC have well-established EOP programs located in prisons, which have long histories of supporting mental health programming and where mental health staffing has not been a significant obstacle to the provision of mental health care. *See* Docket 3683, Twenty-First Monitoring Report of the Special Master on the Defendants' Compliance with

5

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

Provisionally Approved Plans, Policies and Protocols ("21st Report") at 6 (CSP-Sacramento: overall functional staffing vacancy rate of 3.4 percent), 25 (CSP-Sacramento: EOP ASU confirmed receiving at least ten hours per week of structured therapeutic activities), 89 (California Medical Facility: vacancy rate with use of registry dropped to ten percent of the allocated 142 mental health positions), 95-96 (California Medical Facility: EOP program largely compliant with ten hours of group, treatment plans were individualized and many progress notes carried relevant clinical information), 221 (California Men's Colony: 84 percent of the 211.68 allocated mental health positions were filled), 226-227 (California Men's Colony: EOP ASU and EOP GP prisoners were offered 13 hours of group per week).

8. The Special Master's experts informed Plaintiffs' counsel by telephone that they visited the Stark DJJ Facility, including the housing units designated for the EOP program, and made the following specific recommendations to Defendants based upon their clinical expertise: (1) the Stark EOP program should house predominately Level I and Level II prisoners and should not include non-health care prisoners; (2) the EOP GP prisoners should be provided with enhanced programming that will include a minimum of twelve hours per day out-of-cell programming; (3) the EOP cells should be wired for electrical appliances and cable television; (4) the "quiet cells" located next to the control office should not be used in the EOP program; (5) there must be enough treatment and programming space created so that at least 70% of treatment is provided out of the housing unit; (6) there must be enough vocational and educational programs available for the EOP population; (7) EOP ASU prisoners must receive enhanced out of cell time beyond the required 10 hours of mental health treatment and 10 hours of yard; (8) EOP ASU prisoners cannot be held in ASU longer than 3-4 weeks; and (9) EOP ASU prisoners will be returned to the Stark GP EOP.

9. Most recently, during the meeting at the Receiver's office on November 17, 2009, Dr. Metzner repeated the recommendations set forth above in paragraph 8 regarding the necessary cell renovations and program augmentation needed to remedy the existing physical plant problems that make Stark unsuitable for an EOP program. In addition, Dr. Metzner expressed concern over learning that CDCR was now contemplating mixing the mental and

1  medical care population at Stark with a large reception center population and a prisoner
2  workforce, thereby diluting the healthcare atmosphere.  During the November 17th meeting, and
3  subsequent to the meeting, no CDCR official has made any commitment to provide the physical
4  plant renovations or the programmatic augmentation which the *Coleman* experts have
5  recommended as necessary for the Stark site.  Furthermore, there have been no assurances that
6  the reception center population and prisoner workforce will be housed in a separate location from
7  the medical and mental health programs at Stark.

## STARK TOUR BY PLAINTIFFS' COUNSEL

9   10.    During several meetings with Defendants, the Special Master's experts raised
10  concerns over the current proposed EOP census at Stark because it will require double-celling in
11  severely under-sized cells that lack electrical outlets, appropriate lighting, and other physical
12  plant requirements.  Defendants have provided few details in their long-term bed plan as to how
13  they will transform this old, decrepit facility into the largest EOP program within the State.

14   11.    On November 19, 2009, I, along with colleague Amy Whelan (Plaintiffs' counsel),
15  toured the Stark facility along with *Coleman* experts Dr. Kerry Hughes and Dr. William Alvarez,
16  CDCR staff Fountain Hutchison, Deborah Hysen, Chuck Stevens, Vicky Lundeby, and attorneys
17  Debbie Vorous (Deputy Attorney General) and Katherine Tebrock (CDCR Legal).  Defendants
18  described the plans to use two of the existing housing units, Buildings One and Two, for the 825-
19  bed EOP program, and permitted Plaintiffs to tour one of those two buildings.  Building Three
20  was described by Defendants as housing for medical patients and prisoner workers.  Defendants
21  pointed out a location on the perimeter where the new reception center would be sited, and
22  indicated that the reception center and the health care facility would be located inside a secure
23  perimeter surrounded by a lethal fence. During the tour of Building One, which included some
24  of the dayrooms, dining areas, shower and bathroom areas, and isolated "quiet rooms," we also
25  toured the cells, which are located down long hallway tiers.  The cells have narrow glass
26  windows that look out on the hallway through the cell door and out to the outside world through
27  an extremely narrow back window.  Each cell has a double bunk, a toilet, a sink, a small desk
28  with a swivel chair, and a storage cabinet, which Defendants indicated would be replaced with a

7

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND
REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

1  CDCR-approved unit.  There were several places within the cell that would require some
2  retrofitting to remove points where a ligature could easily be attached for hanging.  The cells are
3  extremely small as reported by the Special Master's experts during previous meetings with
4  Defendants.
5        12.  Plaintiffs' counsel stopped at cell No. 42, in the E/F wing in Building One, and
6  measured the cell's total square footage as well as its "unencumbered space," which is
7  determined by subtracting fixtures (toilet, sink, desk and bunk) from the total square footage.
8  Plaintiffs' counsel first measured the cell's length (113 inches or 9.42 feet) and width (71 inches
9  or 5.92 feet) to obtain the cell's total square footage (L x W = 55.71528).  Plaintiffs' counsel also
10  measured the toilet's length (28 inches or 2.33 feet) and width (31 inches or 2.58 feet) to obtain
11  the toilet's total square footage (L x W = 6.027778).  Plaintiffs' counsel measured the bunk bed's
12  length (77 inches or 6.42 feet) and width (30.5 inches or 2.54 feet) to obtain the bunk bed's total
13  square footage (L x W = 16.30903).  Next, Plaintiffs' counsel measured the desk's length (23.5
14  inches or 1.96 feet) and width (30 inches or 2.5 feet) to obtain the desk's total square footage (L
15  x W = 4.895833).  Lastly, Plaintiffs' counsel subtracted the square footage for the toilet, bunk
16  bed and the desk from the cell's total square footage to get the unencumbered square footage.
17  According to Plaintiffs' measurements, the cell was 55.7 square feet, and had a total of 28.5
18  unencumbered square feet, or only 14.25 square feet per prisoner if double celled.  Attached
19  hereto is a true and correct copy of **Exhibit C**, an excel chart created by an attorney in our office
20  which includes the measurements of cell No. 42 made by Plaintiffs' counsel during the Stark tour
21  on November 19, 2009.  The American Correctional Association has adopted standards for the
22  minimum unencumbered square footage of space required per prisoner in a cell (25 sq. feet if
23  double-celled; 35 sq. feet if single-celled) and has defined "unencumbered space" as "useable
24  space that is not encumbered by furnishings or fixtures."  A true and correct copy of Standard 4-
25  4132 of the American Correctional Association, Adult Correctional Institutions (ACI), 4th
26  Edition, 2008 Supplement, is attached hereto as **Exhibit D**.  CDCR staff persons Vicky Lundeby
27  and Deborah Hysen informed Ms. Whelan and me that cell No. 42 is identical to all of the cells
28  in Buildings One and Two, with the exception of cells that have been retrofitted for ADA

8

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

compliance. Ms. Hysen reported that the measurements for the Stark cells, excluding those cells that had been ADA retrofitted, were 58.5 square feet, with 38 square feet of unencumbered space (19 square feet per prisoner if double celled). Ms. Hysen did not provide us with the raw measurements used to reach Defendants' total and unencumbered square footage calculations, which might explain the different numbers reached in the parties' calculations. Using either CDCR's 38 square feet or Plaintiffs' 28.5 square feet measurements, however, leads to the same conclusion that the small cell size in the Stark housing units precludes double-celling of EOP prisoners absent the mitigation measures recommended by the *Coleman* experts.

13. I and Ms. Whelan discussed our concerns about the size of the Stark cells during the November 19, 2009 tour, as well as our belief that Defendants would be unable to provide the enhanced programming in accordance with the Special Master's experts' concerns. Defendants were unable to address our concerns during the tour. On November 20, 2009, the day after the tour, Plaintiffs' counsel Michael Bien sent an email to Defendants' counsel, the Special Master and the *Plata* Receiver outlining these concerns in writing. Attached hereto as **Exhibit J** is a true and correct copy of Mr. Bien's November 20, 2009 email to Special Master Matthew Lopes, Receiver Clark Kelso, and attorneys Debbie Vorous (Deputy Attorney General) and Katherine Tebrock (CDCR Legal). In his email, Mr. Bien requested that Defendants reduce the size of the 825-bed Stark EOP program based on the information obtained during Plaintiffs' inspection of the facility, on the comments received from the Special Master's experts and others, and after consultation with Plaintiffs' experts. Mr. Bien proposed a reduction of 225 EOP GP beds from the proposed capacity, due to the small size of the cells, and the age and other physical plant limitations of the facility. Mr. Bien also objected to Defendants' plan to double-cell prisoners at Stark, Dewitt and any other long-term mental health facility in violation of building, correctional and legal standards. To date, Defendants have not yet responded to this request.

14. During the November 19, 2009 tour at Stark, Defendants' plans to create sufficient treatment and program space for the 825-bed EOP program remained vague and undefined. None of the tour attendees could state with any specificity how much treatment and office space would be available, or even where it would be located. Defendants also refused to commit to any

of the Special Master's programmatic recommendations to mitigate the serious site defects, although Plaintiffs doubt Defendants can actually provide such substantial additional care even if they commit to do so, due to the substantial financial and logistical challenges of recruiting and retaining large numbers of "extra" custody and clinical staff that would be required to permit such a rich program. In addition, Defendants stated that the Stark EOP program would not be available to EOP prisoners with mobility impairments that require them to use wheel chairs. Plaintiffs' counsel observed, however, cells that were described by Defendants as retrofitted for ADA access and also noted that housing, treatment and program space were all on a single level.

15. Defendants also propose to house EOP ASU prisoners at Stark in the same small cells where the EOP GP prisoners will be located, but the regular EOP ASU program provides for, under the best circumstances, only 20 hours per week of out-of-cell programming, or fewer than 3 hours per day out-of-cell time for each EOP ASU prisoner. EOP ASU prisoners will remain locked in their cells for the remaining 21 or more hours of the day. *Coleman* Program Guide at 12-7-10; Cal. Code of Reg., tit. 15, § 3343 (h). The ACA standards mandate larger cell sizes for prisoners who are locked down for extended periods of time, such as the EOP ASU prisoners, requiring at least 80 square feet of total floor space per occupant. A true and correct copy of Standard 4-4133 of the American Correctional Association, Adult Correctional Institutions (ACI), 4th Edition, 2008 Supplement is attached hereto as **Exhibit E**. Due to the extremely small size of the cells at Stark, which Defendants propose to use for the EOP ASU population, the Special Master has recommended the Defendants limit the length of stay in the unit to fewer than four weeks and provide significant enhanced out of cell programming during the placement in the unit.

16. The mitigation measures recommended by the Special Master are critical to ensure that the EOP ASU population, as well as the EOP GP population is safely housed in a physical location that will not exacerbate mental health symptoms. Based on CDCR's continuing failure to meet normal EOP standards for programming and exercise, it is not realistic to assume that Defendants are capable of providing that enhanced level of programming. In fact, Defendants remain challenged to even provide the most basic of EOP programming system-wide. *See*, *e.g.*

10

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

Docket 3683 (21st Report) at 73-74 (Mule Creek State Prison: not offering ten hours of therapeutic activities in either EOP ASU or EOP GP program), 131-32 (San Quentin: not offering 10 hours of therapeutic activities in EOP ASU, not providing weekly case manager contact, not providing timely IDTTs), 165 (Corcoran State Prison: not offering the required group therapy to GP EOP population), 208 (Salinas Valley State Prison: unable to offer ten hours of structured therapeutic activities due to insufficient treatment space for the EOP GP population), 252-253 (Kern Valley State Prison: not providing the full array of EOP programming), 275 (Lancaster State Prison: not compliant with ten hours for EOP GP; group therapy offerings in EOP ASU particularly troubling), 314 (R.J. Donovan: no yard provided at all to segregation population on walk-alone status), 341 (California Institute for Women: not providing ten hours of structured therapeutic activities to GP EOPs), 369-70 (Valley State Prison for Women: during the monitoring period, EOP ASU prisoners were not offered ten hours of therapeutic programming). The enhanced programming recommended by the Special Master will require additional clinical and custody staffing, and adequate treatment and office space to support the enhanced schedule of programming. Defendants have not yet developed the staffing plan for the proposed 825-bed EOP program, even without the recommended enhancements.

17. Defendants have provided little detail about the types of housing that will be created for the new EOP programs at Estrella, which will have a 190-bed program, and Dewitt, which is slated to have a 425-bed EOP program. Docket 3724 at 8. During the November 19, 2009 Stark tour of the housing units, Defendants suggested that they will use newly-constructed "270" design buildings. Defendants reported that buildings with the 270 design have cells smaller than the Stark cells, and also indicated that they intend to double-cell in the EOP programs at both Estrella and Dewitt.

18. Defendants provide an update on their Mental Health Program staffing and vacancies as part of the *Coleman* Monthly Report. Attached hereto as **Exhibit F** is a true and correct copy of the September 2009 Executive Summary, Mental Health Program Hire Progress and Vacancy Report, which is provided monthly to the Special Master and to Plaintiffs' counsel as part of the *Coleman* Monthly Report. This Report summarizes the Mental Health Program

11

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

vacancies for September 2009, and reports an increase in vacant positions between April and September 2009 from 385 to 484 staff vacancies. *Id.* Even when adjusted for registry use, new hires and long-term sick leave, the overall number of vacancies reported in September 2009 remained high at 324 of the total 3,059 authorized staff positions in the Mental Health Program. *Id.* However, even more concerning is the fact that these staffing figures do not include the hundreds of additional mental health staff which have been identified in Defendants' Staffing Plan, which have not yet been requested through the budgetary process. Docket 3693, 3693-2 (Defendants' Staffing Plan with Exhibits 1 to 29). Thus, the Mental Health Program vacancy report currently underestimates the levels of staffing in CDCR's mental health programs. However, even these numbers show significant system-wide vacancies that exist now within CDCR. It is unlikely that Defendants will be able to hire additional clinical staff to support programmatic enhancements at Stark in order to mitigate the physical plant deficiencies for the EOP prisoners, while at the same time attempting to fill the newly identified positions in Defendants' Staffing Plan necessary to staff the long-range bed plan projects.

## MODIFIED NEEDS ASSESSMENT AND INPATIENT BED NEED

19. Every month Defendants file under seal a Monthly Bed Utilization Report for the Department of Mental Health ("DMH") Hospitals and Psychiatric Programs ("DMH Bed Report"), which includes the name of every CDCR prisoner referred to each DMH program and the status of each referral, including whether the prisoner was accepted, rejected, placed on a waitlist or has transferred to the DMH program. On November 16, 2009, Defendants filed their DMH Bed Report for the time period of October 1, 2009 through October 31, 2009. Docket 3728. I have reviewed the DMH Bed Report filed by Defendants on November 16, 2009, and have identified 42 CDCR prisoners who were listed as accepted to the Acute Psychiatric Program ("APP"), but placed on the waitlist. These prisoners are found in the DMH Bed Report at numbers 239 to 280, and 1282. Docket 3728. In addition, there were 4 prisoners who had been referred to APP during October 2009, but no decision had yet been made on their referral. These 4 prisoners are found in the DMH Bed Report at numbers 281-284. *Id.* Finally, there were 18 prisoners who had been accepted to APP and placed on the waitlist at an earlier date, but whose

12

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

1  acceptances were not rescinded during October 2009.  These 18 prisoners are found in the DMH
2  Bed Report at numbers 286 to 303.  *Id.*  The DMH Bed Report does not provide any information
3  why these acceptances were rescinded, however, some of the referrals date back to June 2009.
4  *Id.*  I also identified 519 CDCR prisoners who were listed as accepted to the Salinas Valley
5  Psychiatric Program ("SVPP"), but were placed on a waitlist.  These prisoners are found in the
6  DMH Bed Report at numbers 652 to 1280.  The October 2009 DMH Bed Report does not
7  include the additional CDCR prisoners who are likely to be identified as a result of the on-going
8  modified needs assessment that will be completed by December 31, 2009, and which will include
9  the remainder of the CDCR institutions not previously included in the modified assessment
10 conducted in response to the Court's March 31, 2009 Order.  Docket 3613 at 4:19-21.

11       20.     On July 9, 2009, CDCR submitted a Report on the CDCR/DMH Mental Health
12 Assessment and Referral Project ("Modified Assessment Report") in response to the Court's
13 March 31, 2009 Order requiring that CDCR and DMH clinicians work together to conduct a
14 modified assessment to determine whether there are unmet needs for inpatient care among the
15 Plaintiff class.  Attached hereto as **Exhibit G** is a true and correct copy of the Modified
16 Assessment Report.  During the Phase I of the Modified Assessment, 1,659 cases were identified
17 for potential referral to a DMH higher level of care, and of these 655 were reviewed in Phase II,
18 with 278 (or 42%) determined appropriate for DMH.  **Ex. G** at p. 8.  Between Phase I and
19 Phase II, prior to the review of cases by DMH and CDCR headquarters staff, 281 of the cases
20 identified for potential referral to DMH were referred.  Thus, by the end of Phase II, there were a
21 total of 559 of the 1,659 cases identified that were referred to DMH.  There were still 493
22 prisoners who met the criteria for potential referral to DMH who required review as part of Phase
23 III of the Modified Assessment in July 2009.  **Ex. G**, Table 3, p. 9.  Phase IV of the Modified
24 Assessment in currently underway pursuant to this Court's order to expand the assessment to all
25 non-desert CDCR prisons by December 31, 2009.  Docket 3613 at 4:19-21 (6/18/09 Order).
26 Early reports by Plaintiffs' counsel who have attended the expanded modified assessment tours
27 at Valley State Prison for Women, California Correctional Women's Facility and Deuel Training
28 Facility ("DVI") indicate that there continue to be a significant percentage of prisoners identified

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]

and referred to a DMH level of care during the assessment process. For example, I attended the expanded Modified Assessment conducted at DVI on November 3-4, 2009. During that assessment there were approximately 68 prisoners identified for potential referral to a DMH higher level of care, but a number of the prisoners had either transferred or paroled (14) and some had already been accepted in a DMH program (9). Defendants reviewed 44 prisoners, 16 (or 36 %) of which were referred to DMH. There were additional prisoners who had recently arrived in the reception center, often without a medical record, and clinicians were hoping to stabilize the patient within the first week. If they could not, they planned to refer those patients to DMH as well. The numbers of prisoners identified and referred to DMH as part of the extended Modified Assessment is likely to increase the inpatient bed need projections.

21. Attached hereto as **Exhibit H** is a true and correct copy of an excerpt from the transcript of the June 16, 2009 Hearing on Defendants' Court-Ordered bed Plan Projects at p. 15.

22. Attached hereto as **Exhibit I** is a true and correct copy of pages 49 and 53 of the January 29, 2008 Deposition of John Misener, the statistician who forecasts Defendants' bed need.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed this 30th day of November, 2009, in San Francisco, California.

*/s/ Jane E. Kahn*
Jane E. Kahn

14

DECL. OF JANE E. KAHN ISO PLS.' RESPONSE TO DEFS.' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING - CASE NO. CIV S 90-0520 LKK-JFM

[328647-3]