# EXHIBIT A

CA LEGIS 2EX 2 (2009)                                                                                          Page 1
2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**


### CALIFORNIA 2009 LEGISLATIVE SERVICE
### 2009 Portion of 2009-2010 2nd Extraordinary Session

Additions are indicated by Text; deletions by
\* \* \*. Changes in tables are made but not highlighted.

CHAPTER 2
S.B. No. 4
PUBLIC CONTRACTS--DESIGN-BUILD--PUBLIC PRIVATE PARTNERSHIPS


AN ACT to add Sections 14661.1 and 70391.7 to the Government Code, to add and repeal Section 20688.6 of, and to add and repeal Chapter 6.5 (commencing with Section 6800) of Part 1 of Division 2 of, the Public Contract Code, and to amend Section 143 of the Streets and Highways Code, relating to public contracts.

[Filed with Secretary of State February 20, 2009.]
LEGISLATIVE COUNSEL'S DIGEST


SB 4, Cogdill.  Public contract:  design-build:  public private partnerships.


(1) Existing law designates the Judicial Council as the entity having full responsibility, jurisdiction, control, and authority over trial court facilities for which title is held by the state, including the acquisition and development of facilities.

Existing law requires the Department of Corrections and Rehabilitation to design, construct, or renovate prison housing units, prison support buildings, and programming space as specified.

Existing law authorizes the Director of General Services, when authorized by the Legislature, to use the design-build procurement process for a specific project to contract and procure state office facilities, other buildings, structures, and related facilities.  Existing law requires a bidder participating in the process to provide written declarations, subject to misdemeanor penalties.

This bill would also authorize the Director of General Services or the Secretary of the Department of Corrections and Rehabilitation, as appropriate, to use the design-build procurement process in contracting and procuring a state office facility or prison facility, and would authorize the Judicial Council to use that same process in contracting and procuring a court facility, but would limit this authorization to 5 total projects, to be approved by the Department of Finance, as specified.  The bill would require the Department of General Services, the Department of Corrections and Rehabilitation, and the Judicial Council to submit to the Joint Legislative Budget Committee, before January 1, 2014, a report containing a description of each public works project procured through the design-build process, as specified.  The bill would require a bidder participating in the process to provide written declarations, subject to misdemeanor penalties, and would thereby impose a state-mandated local program.

(2) Existing law sets forth requirements for the solicitation and evaluation of bids and the awarding of contracts by public entities for the erection, construction, alteration, repair, or improvement of any public structure, building, road, or other public improvement. Existing law also authorizes specified state agencies, cities, and counties to implement alternative procedures for the awarding of contracts on a design-build basis. Existing law, until January

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

1,2011, authorizes transit operators to enter into a design-build contract, as defined, according to specified procedures.

This bill would, until January 1, 2014, allow certain state and local transportation entities, if authorized by the California Transportation Commission, to use a design-build process for contracting on transportation projects, as specified. The bill would require a transportation entity to implement, or contract with a third-party to implement, a labor compliance program for design-build projects, except as specified. The bill would also require these transportation entities to report to the commission, and the commission to submit a mid-term and a final report to the Legislature, regarding the design-build process as specified. The bill would establish a procedure for submitting bids that includes a requirement that design-build entities provide a statement of qualifications submitted to the transportation entity that is verified under oath. Because a verification under oath is made under penalty of perjury, the bill would, by requiring a verification, create a new crime and thereby impose a state-mandated local program.

(3) Under existing law, any work of grading, clearing, demolition, or construction undertaken by a redevelopment agency is required to be done by contract after competitive bidding if the cost of that work exceeds a specified amount.

This bill would, until January 1, 2016, authorize a redevelopment agency, with the approval of its duly constituted board in a public hearing, to enter into design-build contracts for projects, as defined, in excess of $1,000,000, in accordance with specified provisions. This bill would authorize up to 10 design-build contracts, would require an agency to apply to the State Public Works Board for authorization to enter a design-build contract, as provided, and would require the State Public Works Board to notify the Legislative Analyst's Office when 10 projects have been approved. This bill would also require an agency using the design-build method to submit a report to the Legislative Analyst's Office, as provided, and for the Legislative Analyst to report to the Legislature before January 1, 2015, on the agency's use of the design-build method, as provided.

This bill would require specified information to be verified under oath, thus imposing a state-mandated local program by expanding the scope of existing crime.

(4) Existing law authorizes the Department of Transportation and regional transportation agencies, as defined, until January 1, 2012, to enter into comprehensive development lease agreements with public and private entities, or consortia of those entities, for certain transportation projects that may charge certain users of those projects tolls and user fees, subject to various terms and requirements. Existing law limits the number of projects authorized pursuant to these provisions to 2 in northern California and 2 in southern California.

This bill would extend the authorization for these agreements to January 1, 2017, and would delete the restriction on the number of projects that may be undertaken pursuant to these provisions. The bill would require the projects to be primarily designed to achieve improved mobility, improved operations or safety, and quantifiable air quality benefits.

(5) Existing law requires that the negotiated lease agreements be submitted to the Legislature for approval or rejection. Under existing law, the Legislature has 60 legislative days to act after submittal of the agreement and the agreement is deemed approved unless both houses of the Legislature concur in the passage of a resolution rejecting the agreement. Existing law prohibits the Legislature from amending these lease agreements.

The bill would eliminate that prohibition and the provision requiring approval or rejection by the Legislature. The bill would require that all lease agreements first be submitted to the California Transportation Commission for approval, then to the Legislature and the Public Infrastructure Advisory Commission, as defined, for review, as specified. The bill would also require the Public Infrastructure Advisory Commission to perform specified acts and would authorize that commission to charge the department and regional transportation agencies a fee for specified services.

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

  (6) Existing law authorizes the department and regional transportation agencies to utilize various procurement approaches, including, among other things, acceptance of unsolicited proposals, as specified.

  This bill would prohibit the department or a regional transportation agency from awarding a contract to an unsolicited bidder without receiving at least one other responsible bid.

  (7) Under existing law, for these projects, tolls and user fees may not be charged to noncommercial vehicles with 3 or fewer axles.

  This bill would eliminate that prohibition.

  (8) Existing law imposes various contract requirements for these projects, including permitting compensation for a leaseholder for losses in toll or fee revenues in certain instances if caused by the construction of supplemental transportation projects, but prohibits the compensation to exceed the reduction in revenues.

  This bill would prohibit that compensation from exceeding the difference between the reduction in revenues and the amount necessary to cover the costs of debt service, as specified. The bill would additionally require the agreements to include an indemnity agreement, as specified, and to authorize the contracting entity or lessee to utilize the design-build method of procurement for transportation projects, subject to specified conditions. The bill would also require contracting entities or lessees to have specified qualifications.

  The bill would authorize the department or the regional transportation agency, when evaluating a proposal submitted by a contracting entity or lessee, to award a contract on the basis of the lowest bid or best value, as defined.

  The bill would provide that the Department of Transportation is the responsible agency for the performance of certain tasks and the preparation of certain documents, relative to projects on the state highway system, where a regional transportation agency is otherwise the sponsor of the project. The bill would state that the department may perform those functions with department employees or with consultants contracted by the department.

  (9) The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

  This bill would provide that no reimbursement is required by this act for a specified reason.

<div align="center">The people of the State of California do enact as follows:</div>

SECTION 1. Section 14661.1 is added to the Government Code, to read:

<div align="center">&lt;&lt; CA GOVT § 14661.1 &gt;&gt;</div>

14661.1. (a) For purposes of this section, the definitions in subdivision (a) of Section 13332.19 shall apply. For purposes of subdivision (a) of Section 13332.19, references to the Department of General Services shall be deemed to be references to the Department of General Services or the Department of Corrections and Rehabilitation, as applicable.

  (b) Notwithstanding any provision of the Public Contract Code or any other provision of law, when the Legislature appropriates funds for a specific project, or for any project using funds appropriated pursuant to Chapter 3.2.1 (commencing with Section 15819.40) or 3.2.2 (commencing with Section 15819.41) of Part 10b of this division, the

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

Director of General Services or the Secretary of the Department of Corrections and Rehabilitation, as appropriate, may contract and procure state office facilities and prison facilities pursuant to this section.

(c) Prior to contracting with a design-build entity for the procurement of a state office facility or prison facility under this section, the Director of General Services or the Secretary of the Department of Corrections and Rehabilitation shall:

(1) Prepare a program setting forth the performance criteria for the design-build project. The performance criteria shall be prepared by a design professional duly licensed and registered in the State of California.

(2)(A) Establish a competitive prequalification and selection process for design-build entities, including any subcontractors listed at the time of bid, that clearly specifies the prequalification criteria, and states the manner in which the winning design-build entity will be selected.

(B) Prequalification shall be limited to consideration of all of the following criteria:

(i) Possession of all required licenses, registration, and credentials in good standing that are required to design and construct the project.

(ii) Submission of evidence that establishes that the design-build entity members have completed, or demonstrated the capability to complete, projects of similar size, scope, or complexity, and that proposed key personnel have sufficient experience and training to competently manage and complete the design and construction of the project.

(iii) Submission of a proposed project management plan that establishes that the design-build entity has the experience, competence, and capacity needed to effectively complete the project.

(iv) Submission of evidence that establishes that the design-build entity has the capacity to obtain all required payment and performance bonding, liability insurance, and errors and omissions insurance, as well as a financial statement that assures the Department of General Services or the Department of Corrections and Rehabilitation that the design-build entity has the capacity to complete the project.

(v) Provision of a declaration certifying that applying members of the design-build entity have not had a surety company finish work on any project within the last five years.

(vi) Provision of information and a declaration providing detail concerning all of the following:

(I) Any construction or design claim or litigation totaling more than five hundred thousand dollars ($500,000) or 5 percent of the annual value of work performed, whichever is less, settled against any member of the design-build entity over the last five years.

(II) Serious violations of the California Occupational Safety and Health Act of 1973, as provided in Part 1 (commencing with Section 6300) of Division 5 of the Labor Code, settled against any member of the design-build entity.

(III) Violations of federal or state law, including, but not limited to, those laws governing the payment of wages, benefits, or personal income tax withholding, of Federal Insurance Contributions Act (FICA) withholding requirements, state disability insurance withholding, or unemployment insurance payment requirements, settled against any member of the design-build entity over the last five years. For purposes of this subclause, only violations by a design-build member as an employer shall be deemed applicable, unless it is shown that the design-build entity member, in his or her capacity as an employer, had knowledge of his or her subcontractor's violations or failed to comply

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

with the conditions set forth in subdivision (b) of Section 1775 of the Labor Code.

(IV) Information required by Section 10162 of the Public Contract Code.

(V) Violations of the Contractors' State License Law (Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code), excluding alleged violations or complaints.

(VI) Any conviction of any member of the design-build entity of submitting a false or fraudulent claim to a public agency over the last five years.

(vii) Provision of a declaration that the design-build entity will comply with all other provisions of law applicable to the project, including, but not limited to, the requirements of Chapter 1 (commencing with Section 1720) of Part 7 of Division 2 of the Labor Code.

(C) The Director of General Services or the Secretary of the Department of Corrections and Rehabilitation, when requested by the design-build entity, shall hold in confidence any information required by clauses (i) to (vi), inclusive, of subparagraph (B).

(D) Any declaration required under subparagraph (B) shall state that reasonable diligence has been used in its preparation and that it is true and complete to the best of the signer's knowledge. A person who certifies as true any material matter that he or she knows to be false is guilty of a misdemeanor and shall be punished by not more than one year in a county jail, by a fine of not more than five thousand dollars ($5,000), or by both the fine and imprisonment.

(3)(A) Determine, as he or she deems in the best interests of the state, which of the following methods listed in subparagraph (B) will be used as the process for the winning design-build entity. He or she shall provide a notification to the State Public Works Board, regarding the method selected for determining the winning design-build entity, at least 30 days prior to publicizing the design-build solicitation package.

(B) The Director of General Services or the Secretary of the Department of Corrections and Rehabilitation shall make his or her determination by choosing one of the following methods:

(i) A design-build competition based upon performance, price, and other criteria set forth by the Department of General Services or the Department of Corrections and Rehabilitation in the design-build solicitation package. The Department of General Services or the Department of Corrections and Rehabilitation shall establish technical criteria and methodology, including price, to evaluate proposals and shall describe the criteria and methodology in the design-build solicitation package. Award shall be made to the design-build entity whose proposal is judged as providing the best value in meeting the interests of the Department of General Services or the Department of Corrections and Rehabilitation and meeting the objectives of the project. A project with an approved budget of ten million dollars ($10,000,000) or more may be awarded pursuant to this clause.

(ii) A design-build competition based upon performance and other criteria set forth by the Department of General Services or the Department of Corrections and Rehabilitation in the design-build solicitation package. Criteria used in this evaluation of proposals may include, but need not be limited to, items such as proposed design approach, life-cycle costs, project features, and functions. However, any criteria and methods used to evaluate proposals shall be limited to those contained in the design-build solicitation package. Award shall be made to the design-build entity whose proposal is judged as providing the best value, for the lowest price, meeting the interests of the Department of General Services or the Department of Corrections and Rehabilitation and meeting the objectives of the project. A project with an approved budget of ten million dollars ($10,000,000) or more may be awarded pursuant to this clause.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)

**(Publication page references are not available for this document.)**

(iii) A design-build competition based upon program requirements and a detailed scope of work, including any performance criteria and concept drawings set forth by the Department of General Services or the Department of Corrections and Rehabilitation in the design-build solicitation package. Award shall be made on the basis of the lowest responsible bid. A project with an approved budget of two hundred fifty thousand dollars ($250,000) or more may be awarded pursuant to this clause.

(4) For purposes of this subdivision, the following definitions shall apply:

(A) "Best interest of the state" means a design-build process that is projected by the Director of General Services or the Secretary of the Department of Corrections and Rehabilitation to reduce the project delivery schedule and total cost of a project while maintaining a high level of quality workmanship and materials, when compared to the traditional design-bid-build process.

(B) "Best value" means a value determined by objective criteria that may include, but are not limited to, price, features, functions, life-cycle costs, experience, and other criteria deemed appropriate by the Department of General Services or the Department of Corrections and Rehabilitation.

(d) The Legislature recognizes that the design-build entity is charged with performing both design and construction. Because a design-build contract may be awarded prior to the completion of the design, it is often impracticable for the design-build entity to list all subcontractors at the time of the award. As a result, the subcontractor listing requirements contained in Chapter 4 (commencing with Section 4100) of Part 1 of Division 2 of the Public Contract Code can create a conflict with the implementation of the design-build process by requiring all subcontractors to be listed at a time when a sufficient set of plans shall not be available. It is the intent of the Legislature to establish a clear process for the selection and award of subcontracts entered into pursuant to this section in a manner that retains protection for subcontractors while enabling design-build projects to be administered in an efficient fashion. Therefore, all of the following requirements shall apply to subcontractors, licensed pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, that are employed on design-build projects undertaken pursuant to this section:

(1) The Department of General Services and the Department of Corrections and Rehabilitation, in each design-build solicitation package, may identify types of subcontractors, by subcontractor license classification, that will be listed by the design-build entity at the time of the bid. In selecting the subcontractors that will be listed by the design-build entity, the Department of General Services and the Department of Corrections and Rehabilitation shall limit the identification to only those license classifications deemed essential for proper completion of the project. In no event, however, may the Department of General Services or the Department of Corrections and Rehabilitation specify more than five licensed subcontractor classifications. In addition, at its discretion, the design-build entity may list an additional two subcontractors, identified by subcontractor license classification, that will perform design or construction work, or both, on the project. In no event shall the design-build entity list at the time of bid a total number of subcontractors that will perform design or construction work, or both, in a total of more than seven subcontractor license classifications on a project. All subcontractors that are listed at the time of bid shall be afforded all of the protection contained in Chapter 4 (commencing with Section 4100) of Part 1 of Division 2 of the Public Contract Code. All subcontracts that were not listed by the design-build entity at the time of bid shall be awarded in accordance with paragraph (2).

(2) All subcontracts that were not to be performed by the design-build entity in accordance with paragraph (1) shall be competitively bid and awarded by the design-build entity, in accordance with the design-build process set forth by the Department of General Services or the Department of Corrections and Rehabilitation in the design-build solicitation package. The design-build entity shall do all of the following:

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

 (A) Provide public notice of the availability of work to be subcontracted in accordance with Section 10140 of the Public Contract Code.

 (B) Provide a fixed date and time on which the subcontracted work will be awarded in accordance with Section 10141 of the Public Contract Code.

 (C) As authorized by the Department of General Services or the Department of Corrections and Rehabilitation, establish reasonable prequalification criteria and standards, limited in scope to those detailed in paragraph (2) of subdivision (c).

 (D) Provide that the subcontracted work shall be awarded to the lowest responsible bidder.

 (e) This section shall not be construed and is not intended to extend or limit the authority specified in Section 19130.

 (f) Any design-build entity that is selected to design and construct a project pursuant to this section shall possess or obtain sufficient bonding consistent with applicable provisions of the Public Contract Code. Nothing in this section shall prohibit a general or engineering contractor from being designated the lead entity on a design-build entity for the purposes of purchasing necessary bonding to cover the activities of the design-build entity.

 (g) Any payment or performance bond written for the purposes of this section shall use a bond form developed by the Department of General Services or the Department of Corrections and Rehabilitation. In developing the bond form, the Department of General Services or the Department of Correction and Rehabilitation shall consult with the surety industry to achieve a bond form that is consistent with surety industry standards, while protecting the interests of the state.

 (h) The Department of General Services or the Department of Corrections and Rehabilitation, as appropriate, shall each submit to the Joint Legislative Budget Committee, before January 1, 2014, a report containing a description of each public works project procured by that department through the design-build process described in this section that is completed after January 1, 2009, and before December 1, 2013. The report shall include, but shall not be limited to, all of the following information:

 (1) The type of project.

 (2) The gross square footage of the project.

 (3) The design-build entity that was awarded the project.

 (4) The estimated and actual project costs.

 (5) An assessment of the prequalification process and criteria.

 (6) An assessment of the effect of any retention on the project made under the law.

 (7) A description of the method used to award the contract. If the best value method was used, the report shall describe the factors used to evaluate the bid, including the weighting of each factor and an assessment of the effectiveness of the methodology.

 (i) The authority provided under this section shall be in addition to the authority provided to the Department of

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

General Services pursuant to Section 4 of Chapter 252 of the Statutes of 1998, as amended by Section 3 of Chapter 154 of the Statutes of 2007. The authority under this section and Section 70391.7 shall apply to a total of not more than five state office facilities, prison facilities, or court facilities, which shall be determined pursuant to this subdivision.

 (1) In order to enter into a contract utilizing the procurement method authorized under this section, the Director of General Services or the Secretary of the Department of Corrections and Rehabilitation shall submit a request to the Department of Finance.

 (2) The Department of Finance shall make a determination whether to approve or deny a request made pursuant to paragraph (1) if the design-build project requested will not exceed the five facilities maximum set forth in this section and Section 70391.7.

 (3) After receiving notification that the Department of Finance has approved the request and that the Legislature has appropriated funds for a specific project, the director or secretary may enter into a design-build contract under this section.

 (j) Nothing in this section is intended to affect, expand, alter, or limit any rights or remedies otherwise available under the law.

 SEC. 2. Section 70391.7 is added to the Government Code, to read:

<< CA GOVT § 70391.7 >>

70391.7. (a) For purposes of this section, the definitions in subdivision (a) of Section 13332.19 shall apply. For purposes of subdivision (a) of Section 13332.19, references to the Department of General Services shall be deemed to be references to the Judicial Council.

 (b) Notwithstanding any provision of the Public Contract Code or any other law, when the Legislature appropriates funds for a specific project, the Judicial Council may contract and procure court facilities pursuant to this section.

 (c) Prior to contracting with a design-build entity for the procurement of a court facility under this section, the Judicial Council shall:

 (1) Prepare a program setting forth the performance criteria for the design-build project. The performance criteria shall be prepared by a design professional duly licensed and registered in the State of California.

 (2)(A) Establish a competitive prequalification and selection process for design-build entities, including any subcontractors listed at the time of bid, that clearly specifies the prequalification criteria, and states the manner in which the winning design-build entity will be selected.

 (B) Prequalification shall be limited to consideration of all of the following criteria:

 (i) Possession of all required licenses, registration, and credentials in good standing that are required to design and construct the project.

 (ii) Submission of evidence that establishes that the design-build entity members have completed, or demonstrated the capability to complete, projects of similar size, scope, or complexity, and that proposed key personnel have sufficient experience and training to competently manage and complete the design and construction of the project.

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(iii) Submission of a proposed project management plan that establishes that the design-build entity has the experience, competence, and capacity needed to effectively complete the project.

(iv) Submission of evidence that establishes that the design-build entity has the capacity to obtain all required payment and performance bonding, liability insurance, and errors and omissions insurance, as well as a financial statement that assures the Judicial Council that the design-build entity has the capacity to complete the project.

(v) Provision of a declaration certifying that applying members of the design-build entity have not had a surety company finish work on any project within the last five years.

(vi) Provision of information and a declaration providing detail concerning all of the following:

(I) Any construction or design claim or litigation totaling more than five hundred thousand dollars ($500,000) or 5 percent of the annual value of work performed, whichever is less, settled against any member of the design-build entity over the last five years.

(II) Serious violations of the California Occupational Safety and Health Act of 1973, as provided in Part 1 (commencing with Section 6300) of Division 5 of the Labor Code, settled against any member of the design-build entity.

(III) Violations of federal or state law, including, but not limited to, those laws governing the payment of wages, benefits, or personal income tax withholding, or of Federal Insurance Contributions Act (FICA) withholding requirements, state disability insurance withholding, or unemployment insurance payment requirements, settled against any member of the design-build entity over the last five years. For purposes of this subclause, only violations by a design-build member as an employer shall be deemed applicable, unless it is shown that the design-build entity member, in his or her capacity as an employer, had knowledge of his or her subcontractor's violations or failed to comply with the conditions set forth in subdivision (b) of Section 1775 of the Labor Code.

(IV) Information required by Section 10162 of the Public Contract Code.

(V) Violations of the Contractors' State License Law (Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code), excluding alleged violations or complaints.

(VI) Any conviction of any member of the design-build entity of submitting a false or fraudulent claim to a public agency over the last five years.

(vii) Provision of a declaration that the design-build entity will comply with all other provisions of law applicable to the project, including, but not limited to, the requirements of Chapter 1 (commencing with Section 1720) of Part 7 of Division 2 of the Labor Code.

(C) The Judicial Council, when requested by the design-build entity, shall hold in confidence any information required by clauses (i) to (vi), inclusive, of subparagraph (B).

(D) Any declaration required under subparagraph (B) shall state that reasonable diligence has been used in its preparation and that it is true and complete to the best of the signer's knowledge. A person who certifies as true any material matter that he or she knows to be false is guilty of a misdemeanor and shall be punished by not more than one year in a county jail, by a fine of not more than five thousand dollars ($5,000), or by both the fine and imprisonment.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(3)(A) Determine, as the Judicial Council deems in the best interests of the state, which of the following methods listed in subparagraph (B) will be used as the process for the winning design-build entity. The Judicial Council shall provide a notification to the State Public Works Board, regarding the method selected for determining the winning design-build entity, at least 30 days prior to publicizing the design-build solicitation package.

(B) The Judicial Council shall make its determination by choosing one of the following methods:

(i) A design-build competition based upon performance, price, and other criteria set forth by the Judicial Council in the design-build solicitation package. The Judicial Council shall establish technical criteria and methodology, including price, to evaluate proposals and shall describe the criteria and methodology in the design-build solicitation package. Award shall be made to the design-build entity whose proposal is judged as providing the best value in meeting the interests of the Judicial Council and meeting the objectives of the project. A project with an approved budget of ten million dollars ($10,000,000) or more may be awarded pursuant to this clause.

(ii) A design-build competition based upon performance and other criteria set forth by the Judicial Council in the design-build solicitation package. Criteria used in this evaluation of proposals may include, but need not be limited to, items such as proposed design approach, life-cycle costs, project features, and functions. However, any criteria and methods used to evaluate proposals shall be limited to those contained in the design-build solicitation package. Award shall be made to the design-build entity whose proposal is judged as providing the best value, for the lowest price, meeting the interests of the Judicial Council and meeting the objectives of the project. A project with an approved budget of ten million dollars ($10,000,000) or more may be awarded pursuant to this clause.

(iii) A design-build competition based upon program requirements and a detailed scope of work, including any performance criteria and concept drawings set forth by the Judicial Council in the design-build solicitation package. Award shall be made on the basis of the lowest responsible bid. A project with an approved budget of two hundred fifty thousand dollars ($250,000) or more may be awarded pursuant to this clause.

(4) For purposes of this subdivision, the following definitions shall apply:

(A) "Best interest of the state" means a design-build process that is projected by the Judicial Council to reduce the project delivery schedule and total cost of a project while maintaining a high level of quality workmanship and materials, when compared to the traditional design-bid-build process.

(B) "Best value" means a value determined by objective criteria that may include, but are not limited to, price, features, functions, life-cycle costs, experience, and other criteria deemed appropriate by the Judicial Council.

(d) The Legislature recognizes that the design-build entity is charged with performing both design and construction. Because a design-build contract may be awarded prior to the completion of the design, it is often impracticable for the design-build entity to list all subcontractors at the time of the award. As a result, the subcontractor listing requirements contained in Chapter 4 (commencing with Section 4100) of Part 1 of Division 2 of the Public Contract Code can create a conflict with the implementation of the design-build process by requiring all subcontractors to be listed at a time when a sufficient set of plans may not be available. It is the intent of the Legislature to establish a clear process for the selection and award of subcontracts entered into pursuant to this section in a manner that retains protection for subcontractors while enabling design-build projects to be administered in an efficient fashion. Therefore, all of the following requirements shall apply to subcontractors, licensed pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, that are employed on design-build projects undertaken pursuant to this section:

(1) The Judicial Council, in each design-build solicitation package, may identify types of subcontractors, by subcontractor license classification, that will be listed by the design-build entity at the time of the bid. In selecting the

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

subcontractors that will be listed by the design-build entity, the Judicial Council shall limit the identification to only those license classifications deemed essential for proper completion of the project. In no event, however, may the Judicial Council specify more than five licensed subcontractor classifications. In addition, at its discretion, the design-build entity may list an additional two subcontractors, identified by subcontractor license classification, that will perform design or construction work, or both, on the project. In no event shall the design-build entity list at the time of bid a total number of subcontractors that will perform design or construction work, or both, in a total of more than seven subcontractor license classifications on a project. All subcontractors that are listed at the time of bid shall be afforded all of the protection contained in Chapter 4 (commencing with Section 4100) of Part 1 of Division 2 of the Public Contract Code. All subcontracts that were not listed by the design-build entity at the time of bid shall be awarded in accordance with paragraph (2).

 (2) All subcontracts that were not to be performed by the design-build entity in accordance with paragraph (1) shall be competitively bid and awarded by the design-build entity, in accordance with the design-build process set forth by the Judicial Council in the design-build solicitation package. The design-build entity shall do all of the following:

 (A) Provide public notice of the availability of work to be subcontracted in accordance with Section 10140 of the Public Contract Code.

 (B) Provide a fixed date and time on which the subcontracted work will be awarded in accordance with Section 10141 of the Public Contract Code.

 (C) As authorized by the Judicial Council, establish reasonable prequalification criteria and standards, limited in scope to those detailed in paragraph (2) of subdivision (c).

 (D) Provide that the subcontracted work shall be awarded to the lowest responsible bidder.

 (e) This section shall not be construed and is not intended to extend or limit the authority specified in Section 19130.

 (f) Any design-build entity that is selected to design and construct a project pursuant to this section shall possess or obtain sufficient bonding consistent with applicable provisions of the Public Contract Code. Nothing in this section shall prohibit a general or engineering contractor from being designated the lead entity on a design-build entity for the purposes of purchasing necessary bonding to cover the activities of the design-build entity.

 (g) Any payment or performance bond written for the purposes of this section shall use a bond form developed by the Judicial Council. In developing the bond form, the Judicial Council shall consult with the surety industry to achieve a bond form that is consistent with surety industry standards, while protecting the interests of the state.

 (h) The Judicial Council shall submit to the Joint Legislative Budget Committee, before January 1, 2014, a report containing a description of each public works project procured through the design-build process described in this section that is completed after January 1, 2009, and before December 1, 2013. The report shall include, but shall not be limited to, all of the following information:

 (1) The type of project.

 (2) The gross square footage of the project.

 (3) The design-build entity that was awarded the project.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(4) The estimated and actual project costs.

(5) An assessment of the prequalification process and criteria.

(6) An assessment of the effect of any retention on the project made under the law.

(7) A description of the method used to award the contract. If the best value method was used, the report shall describe the factors used to evaluate the bid, including the weighting of each factor and an assessment of the effectiveness of the methodology.

(i) The authority under this section and Section 14661.1 shall apply to a total of not more than five state office facilities, prison facilities, or court facilities, which shall be determined pursuant to this subdivision.

(1) In order to enter into a contract utilizing the procurement method authorized under this section, the Judicial Council shall submit a request to the Department of Finance.

(2) The Department of Finance shall make a determination whether to approve or deny a request made pursuant to paragraph (1) if the design-build project requested will not exceed the five facilities maximum set forth in this section and Section 14661.1.

(3) After receiving notification that the Department of Finance has approved the request and that the Legislature has appropriated funds for a specific project, the Judicial Council may enter into a design-build contract under this section.

(j) Nothing in this section is intended to affect, expand, alter, or limit any rights or remedies otherwise available under the law.

<< CA PUB CONT pr. 6800 (c. hd.) >>

SEC. 3. Chapter 6.5 (commencing with Section 6800) is added to Part 1 of Division 2 of the Public Contract Code, to read:

Chapter 6.5. The Design-Build Demonstration Program

<< CA PUB CONT § 6800 >>

6800. The Legislature hereby finds and declares all of the following:

The design-build method of procurement authorized under this chapter should be evaluated for the purposes of exploring whether the potential exists for reduced project costs, expedited project completion, or design features that are not achievable through the traditional design-bid-build method. A demonstration program will allow for a careful examination of the benefits and challenges of design-build contracting on a limited number of projects. This chapter shall not be deemed to provide a preference for the design-build method over other procurement methodologies.

<< CA PUB CONT § 6801 >>

6801. For purposes of this chapter, the following definitions apply:

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

 (a) "Best value" means a value determined by objective criteria, including, but not limited to, price, features, functions, life cycle costs, and other criteria deemed appropriate by the transportation entity.

 (b) "Commission" means the California Transportation Commission.

 (c) "Design-build" means a procurement process in which both the design and construction of a project are procured from a single entity.

 (d) "Design-build entity" means a partnership, corporation, or other legal entity that is able to provide appropriately licensed contracting, architectural, and engineering services as needed pursuant to a design-build contract.

 (e) "Design-build team" means the design-build entity itself and the individuals and other entities identified by the design-build entity as members of its team.

 (f) "Department" means the Department of Transportation as established under Part 5 (commencing with Section 14000) of Division 3 of the Government Code.

 (g) "Local transportation entity" means a transportation authority designated pursuant to Division 19 (commencing with Section 180000) of the Public Utilities Code, any consolidated agency created pursuant to Chapter 3 (commencing with Section 132350) of Division 12.7 of the Public Utilities Code, the Santa Clara Valley Transportation Authority established under Part 12 (commencing with Section 100000) of Division 10 of the Public Utilities Code, and any other local or regional transportation entity that is designated by statute as a regional transportation agency.

 (h) "Transportation entity" means the department or a local transportation entity.

<< CA PUB CONT § 6802 >>

6802. (a) Subject to the limitations of this chapter, a local transportation entity, if authorized by the commission, may utilize the design-build method of procurement for up to five projects that may be for local street or road, bridge, tunnel, or public transit projects within the jurisdiction of the entity.

 (b) Subject to the limitations of this chapter, the department, if authorized by the commission, may utilize the design-build method of procurement for up to 10 state highway, bridge, or tunnel projects.

<< CA PUB CONT § 6803 >>

6803. (a) Only 15 design-build projects shall be authorized under this chapter. The projects selected shall vary in size, type, and geographical location.

 (b) The commission shall determine whether a transportation entity may award a design-build contract based on lowest responsible bid or best value. The commission shall balance the number of transportation entities that may use the low bid and best value selection methods in order to ensure that the number of design-build contracts awarded will enable the commission to determine the costs and benefits of using each method.

 (c) In order to be eligible for consideration as one of the 15 design-build projects authorized under this chapter, the proposed project shall be subject to the existing process under the state transportation improvement program (Chapter 2 (commencing with Section 14520) of Part 5.3 of Division 3 of Title 2 of the Government Code), the Highway Safety, Traffic Reduction, Air Quality, and Port Security Bond Act of 2006 (Chapter 12.49 (commencing with Sec-

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

tion 8879.20) of Division 1 of Title 2 of the Government Code), the traffic congestion relief program (Chapter 4.5 (commencing with Section 14556) of Part 5.3 of Division 3 of Title 2 of the Government Code), or the state high-way operations and protection program established pursuant to Section 14526.5 of the Government Code.

 (d) The commission shall establish a peer review committee to conduct an evaluation of the 15 projects selected to utilize the design-build method of procurement.

 (e) The commission shall develop guidelines for a standard organizational conflict-of-interest policy, consistent with applicable law, regarding the ability of a person or entity, that performs services for the transportation entity relating to the solicitation of a design-build project, to submit a proposal as a design-build entity, or to join a design-build team. This conflict-of-interest policy shall apply to each transportation entity entering into design-build con-tracts authorized under this chapter.

<< CA PUB CONT § 6804 >>

6804. (a) For contracts awarded prior to the effective date of either the regulations adopted by the Department of Industrial Relations pursuant to subdivision (b) of Section 1771.55 of the Labor Code or the fees established by the department pursuant to subdivision (b), a transportation entity authorized to use the design-build method of pro-curement shall implement a labor compliance program, as described in Section 1771.5 of the Labor Code, or it shall contract with a third party to implement, on the transportation entity's behalf, a labor compliance program subject to that statute. This requirement does not apply to a project where the transportation entity or design-build entity has entered into any collective bargaining agreement or agreements that bind all of the contractors performing work on the projects.

 (b) For contracts awarded on or after the effective date of both the regulations adopted by the Department of Indus-trial Relations pursuant to subdivision (b) of Section 1771.55 of the Labor Code and the fees established by the de-partment pursuant to this subdivision, the transportation entity shall pay a fee to the department, in an amount that the department shall establish, and as it may from time to time amend, sufficient to support the department's costs in ensuring compliance with and enforcing prevailing wage requirements on the project, and labor compliance en-forcement as set forth in subdivision (b) of Section 1771.55 of the Labor Code. All fees collected pursuant to this subdivision shall be deposited in the State Public Works Enforcement Fund, created by 1771.3 of the Labor Code, and shall be used only for enforcement of prevailing wage requirements on those projects.

 (c) The Department of Industrial Relations may waive the fee set forth in subdivision (b) for a transportation entity that has previously been granted approval by the director to initiate and operate a labor compliance program on its projects, and that requests to continue to operate the labor compliance program on its projects in lieu of labor com-pliance by the department pursuant to subdivision (b) of Section 1771.55 of the Labor Code. This fee shall not be waived for a transportation entity that contracts with a third party to initiate and enforce labor compliance programs on the transportation entity's projects.

<< CA PUB CONT § 6805 >>

6805. The procurement process for the design-build projects shall progress as follows:

 (a) The transportation entity shall prepare a set of documents setting forth the scope and estimated price of the pro-ject. The documents may include, but need not be limited to, the size, type, and desired design character of the pro-ject, performance specifications covering the quality of materials, equipment, workmanship, preliminary plans, and any other information deemed necessary to describe adequately the transportation entity's needs. The performance specifications and any plans shall be prepared by a design professional who is duly licensed and registered in Cali-fornia.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

 (b) Based on the documents prepared as described in subdivision (a), the transportation entity shall prepare a request for proposals that invites interested parties to submit competitive sealed proposals in the manner prescribed by the transportation entity. The request for proposals shall include, but need not be limited to, the following elements:

 (1) Identification of the basic scope and needs of the project or contract, the estimated cost of the project, the methodology that will be used by the transportation entity to evaluate proposals, whether the contract will be awarded on the basis of the lowest responsible bid or on best value, and any other information deemed necessary by the transportation entity to inform interested parties of the contracting opportunity.

 (2) Significant factors that the transportation entity reasonably expects to consider in evaluating proposals, including, but not limited to, cost or price and all nonprice-related factors.

 (3) The relative importance or the weight assigned to each of the factors identified in the request for proposals.

 (4) For transportation entities authorized to utilize best value as a selection method, the transportation entity reserves the right to request proposal revisions and hold discussions and negotiations with responsive bidders and shall so specify in the request for proposals and shall publish separately or incorporate into the request for proposals applicable rules and procedures to be observed by the transportation entity to ensure that any discussions or negotiations are conducted in good faith.

 (c) Based on the documents prepared under subdivision (a), the transportation entity shall prepare and issue a request for qualifications in order to prequalify the design-build entities whose proposals shall be evaluated for final selection. The request for qualifications shall include, but need not be limited to, the following elements:

 (1) Identification of the basic scope and needs of the project or contract, the expected cost range, the methodology that will be used by the transportation entity to evaluate proposals, the procedure for final selection of the design-build entity, and any other information deemed necessary by the transportation entity to inform interested parties of the contracting opportunity.

 (2)(A) Significant factors that the transportation entity reasonably expects to consider in evaluating qualifications, including technical design and construction expertise, skilled labor force availability, and all other nonprice-related factors.

 (B) For purposes of subparagraph (A), skilled labor force availability shall be determined by the existence of an agreement with a registered apprenticeship program, approved by the California Apprenticeship Council, that has graduated at least one apprentice in each of the preceding five years. This graduation requirement shall not apply to programs providing apprenticeship training for any craft that was first deemed by the Department of Labor and the Department of Industrial Relations to be an apprenticeable craft within the five years prior to the effective date of this article.

 (3) A standard form request for statements of qualifications prepared by the transportation entity. In preparing the standard form, the transportation entity may consult with the construction industry, the building trades and surety industry, and other public agencies interested in using the authorization provided by this chapter. The standard form shall require information including, but not limited to, all of the following:

 (A) If the design-build entity is a partnership, limited partnership, joint venture, or other association, a listing of all of the partners, general partners, or association members known at the time of statement of qualification submission who will participate in the design-build contract.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(B) Evidence that the members of the design-build entity have completed, or demonstrated the experience, competency, capability, and capacity to complete projects of similar size, scope, or complexity, and that proposed key personnel have sufficient experience and training to competently manage and complete the design and construction of the project, and a financial statement that assures the transportation entity that the design-build entity has the capacity to complete the project.

(C) The licenses, registration, and credentials required to design and construct the project, including, but not limited to, information on the revocation or suspension of any license, credential, or registration.

(D) Evidence that establishes that the design-build entity has the capacity to obtain all required payment and performance bonding, liability insurance, and errors and omissions insurance.

(E) Information concerning workers' compensation experience history and a worker safety program.

(F) A full disclosure regarding all of the following that are applicable:

(i) Any serious or willful violation of Part 1 (commencing with Section 6300) of Division 5 of the Labor Code or the federal Occupational Safety and Health Act of 1970 (Public Law 91-596), settled against any member of the design-build entity.

(ii) Any debarment, disqualification, or removal from a federal, state, or local government public works project.

(iii) Any instance where the design-build entity, or its owners, officers, or managing employees submitted a bid on a public works project and were found to be nonresponsive or were found by an awarding body not to be a responsible bidder.

(iv) Any instance where the design-build entity, or its owners, officers, or managing employees defaulted on a construction contract.

(v) Any violations of the Contractors' State License Law, as described in Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, including alleged violations of federal or state law regarding the payment of wages, benefits, apprenticeship requirements, or personal income tax withholding, or Federal Insurance Contribution Act (FICA) withholding requirements settled against any member of the design-build entity.

(vi) Any bankruptcy or receivership of any member of the design-build entity, including, but not limited to, information concerning any work completed by a surety.

(vii) Any settled adverse claims, disputes, or lawsuits between the owner of a public works project and any member of the design-build entity during the five years preceding submission of a bid under this article, in which the claim, settlement, or judgment exceeds fifty thousand dollars ($50,000). Information shall also be provided concerning any work completed by a surety during this five-year period.

(G) If the proposed design-build entity is a partnership, limited partnership, joint-venture, or other association, a copy of the organizational documents or agreement committing to form the organization, and a statement that all general partners, joint venture members, or other association members agree to be fully liable for the performance under the design-build contract.

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(H) An acceptable safety record. A bidder's safety record shall be deemed acceptable if its experience modification rate for the most recent three-year period is an average of 1.00 or less, and its average total recordable injury/illness rate and average lost work rate for the most recent three-year period does not exceed the applicable statistical standards for its business category or if the bidder is a party to an alternative dispute resolution system as provided for in Section 3201.5 of the Labor Code.

(4) The information required under this subdivision shall be verified under oath by the design-build entity and its members in the manner in which civil pleadings in civil actions are verified. Information required under this subdivision that is not a public record under the California Public Records Act, as described in Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code, shall not be open to public inspection.

(d) For those projects utilizing low bid as the final selection method, the competitive bidding process shall result in lump-sum bids by the prequalified design-build entities. Awards shall be made to the lowest responsible bidder.

(e) For those projects utilizing best value as a selection method, the design-build competition shall progress as follows:

(1) Competitive proposals shall be evaluated by using only the criteria and selection procedures specifically identified in the request for proposals. However, the following minimum factors shall be weighted as deemed appropriate by the contracting transportation entity:

(A) Price.

(B) Technical design and construction expertise.

(C) Life-cycle costs over 15 years or more.

(2) Pursuant to subdivision (b), the transportation entity may hold discussions or negotiations with responsive bidders using the process articulated in the transportation entity's request for proposals.

(3) When the evaluation is complete, the top three responsive bidders shall be ranked sequentially based on a determination of value provided.

(4) The award of the contract shall be made to the responsible bidder whose proposal is determined by the transportation entity to have offered the best value to the public.

(5) Notwithstanding any other provision of this code, upon issuance of a contract award, the transportation entity shall publicly announce its award, identifying the contractor to whom the award is made, along with a written decision supporting its contract award and stating the basis of the award. The notice of award shall also include the transportation entity's second- and third-ranked design-build entities.

(6) The written decision supporting the transportation entity's contract award, described in paragraph (5), and the contract file shall provide sufficient information to satisfy an external audit.

<< CA PUB CONT § 6806 >>

6806. (a) The design-build entity shall provide payment and performance bonds for the project in the form and in the amount required by the transportation entity, and issued by a California admitted surety. In no case shall the amount of the payment bond be less than the amount of the performance bond.

Copr. © West 2008 No Claim to Orig. Govt. Works

Case 2:90-cv-00520-KJM-SCR    Document 3734-1    Filed 11/30/09    Page 19 of 81
CA LEGIS 2EX 2 (2009)                                                                                    Page 18
2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(b) The design-build contract shall require errors and omissions insurance coverage for the design elements of the project.

(c) The commission shall develop a standard form of payment and performance bond. In developing the bond form, the commission shall consult with entities authorized to use the design-build procurement method under this chapter and with representatives of the surety industry to achieve a bond form that is consistent with surety industry standards and practices, while protecting the public interest.

<< CA PUB CONT § 6807 >>

6807. (a) The transportation entity, in each design-build request for proposals, may identify specific types of subcontractors that must be included in the design-build entity statement of qualifications and proposal. All construction subcontractors that are identified in the proposal shall be afforded all the protections of Chapter 4 (commencing with Section 4100) of Part 1 of Division 2.

(b) In awarding subcontracts not listed in the request for proposals, the design-build entity shall do all of the following:

(1) Provide public notice of availability of work to be subcontracted in accordance with the publication requirements applicable to the competitive bidding process of the transportation entity.

(2) Provide a fixed date and time on which the subcontracted work will be awarded.

(3) Establish reasonable qualification criteria and standards.

(4) Provide that the subcontracted construction work shall be awarded either on a best value basis or to the lowest responsible bidder. For construction work awarded on a best value basis, the design-build entity shall evaluate all bids utilizing the factors described in paragraph (1) of subdivision (e) of Section 6805, and shall award the contract to the bidder determined by the design-build entity to have offered the best value.

(c) Subcontractors awarded subcontracts under this chapter shall be afforded all the protections of Chapter 4 (commencing with Section 4100) of Part 1 of Division 2.

<< CA PUB CONT § 6808 >>

6808. (a) Notwithstanding any other provision of this chapter, for a project authorized under subdivision (b) of Section 6802, the department is the responsible agency for the performance of project development services, including performance specifications, preliminary engineering, prebid services, the preparation of project reports and environmental documents, and construction inspection services. The department is also the responsible agency for the preparation of documents that may include, but need not be limited to, the size, type, and desired design character of the project, performance specifications covering quality of materials, equipment, and workmanship, preliminary plans, and any other information deemed necessary to described adequately the needs of the transportation entity.

(b) The department may use department employees or consultants to perform the services described in subdivision (a), consistent with Article XXII of the California Constitution. Department resources, including personnel requirements, necessary for the performance of those services shall be included in the department's capital outlay support program for workload purposes in the annual Budget Act.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

<< CA PUB CONT § 6809 >>

6809. Nothing in this chapter affects, expands, alters, or limits any rights or remedies otherwise available at law.

<< CA PUB CONT § 6811 >>

6811. (a) Not later than June 30 of each year after the design-build contract is awarded, the awarding transportation entity shall submit a progress report to the commission. The progress report shall include, but shall not be limited to, all of the following information:

(1) A description of the project.

(2) The design-build entity that was awarded the project.

(3) The estimated and actual costs of the project.

(4) The estimated and actual schedule for project completion.

(5) A description of any written protests concerning any aspect of the solicitation, bid, proposal, or award of the design-build project, including, but not limited to, the resolution of the protests.

(6) An assessment of the prequalification process and criteria utilized under this chapter.

(7) A description of the labor compliance program required under Section 6804 and an assessment of the impact of this requirement on a project.

(8) A description of the method used to evaluate the bid, including the weighting of each factor and an assessment of the impact of this requirement on a project.

(9) A description of any challenges or unexpected problems that arose during the construction of the project and a description of the solutions that were considered and ultimately implemented to address those challenges and problems.

(10) Recommendations to improve the design-build process of construction procurement authorized under this chapter.

(b) The commission shall submit an annual report to the Legislature that includes the information provided pursuant to subdivision (a).

<< CA PUB CONT § 6812 >>

6812. The provisions of this chapter are severable. If any provision of this chapter or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

<< CA PUB CONT § 6813 >>

6813. This chapter shall remain in effect only until January 1, 2014, and as of that date is repealed, unless a later

Copr. © West 2008 No Claim to Orig. Govt. Works

CA LEGIS 2EX 2 (2009)
2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

enacted statute, that is enacted before January 1, 2014, deletes or extends that date.

SEC. 4. Section 20688.6 is added to the Public Contract Code, to read:

<< CA PUB CONT § 20688.6 >>

20688.6. (a)(1) Notwithstanding any other law, an agency, with approval of its duly constituted board in a public hearing, may utilize an alternative procedure for bidding on projects in the community in excess of one million dollars ($1,000,000) and may award the project using either the lowest responsible bidder or by best value.

(2) Only 10 design-build projects shall be authorized under this section.

(b)(1) It is the intent of the Legislature to enable entities as provided in Part 1 (commencing with Section 33000) of Division 24 of the Health and Safety Code to utilize design-build for those infrastructure improvements authorized in Sections 33421 and 33445 of the Health and Safety Code and subject to the limitations on that authority described in Section 33421.1 of the Health and Safety Code.

(2) The Legislature also finds and declares that utilizing a design-build contract requires a clear understanding of the roles and responsibilities of each participant in the design-build process.

(3)(A) For contracts awarded prior to the effective date of either the regulations adopted by the Department of Industrial Relations pursuant to subdivision (b) of Section 1771.55 of the Labor Code or the fees established by the department pursuant to subparagraph (B), if the board elects to proceed under this section, the board shall establish and enforce for design-build projects a labor compliance program containing the requirements outlined in Section 1771.5 of the Labor Code, or it shall contract with a third party to operate a labor compliance program containing the requirements outlined in Section 1771.5 of the Labor Code. This requirement shall not apply to any project where the agency or the design-build entity has entered into any collective bargaining agreement or agreements that bind all of the contractors performing work on the projects.

(B) For contracts awarded on or after the effective date of both the regulations adopted by the Department of Industrial Relations pursuant to subdivision (b) of Section 1771.55 of the Labor Code and the fees established by the department pursuant to this subparagraph, if the board elects to proceed under this section it shall pay a fee to the department, in an amount that the department shall establish, and as it may from time to time amend, sufficient to support the department's costs in ensuring compliance with and enforcing prevailing wage requirements on the project, and labor compliance enforcement as set forth in subdivision (b) of Section 1771.55 of the Labor Code. All fees collected pursuant to this subdivision shall be deposited in the State Public Works Enforcement Fund, created by Section 1771.3 of the Labor Code, and shall be used only for enforcement of prevailing wage requirements on those projects.

(C) The Department of Industrial Relations may waive the fee set forth in subdivision (b) for a board that has previously been granted approval by the director to initiate and operate a labor compliance program on its projects, and that requests to continue to operate the labor compliance program on its projects in lieu of labor compliance by the department pursuant to subdivision (b) of Section 1771.55. This fee shall not be waived for a board that contracts with a third party to initiate and enforce labor compliance programs on the board's projects.

(c) As used in this section:

(1) "Best value" means a value determined by objective criteria related to price, features, functions, and life-cycle costs.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(2) "Design-build" means a procurement process in which both the design and construction of a project are procured from a single entity.

(3) "Design-build entity" means a partnership, corporation, or other legal entity that is able to provide appropriately licensed contracting, architectural, and engineering services as needed pursuant to a design-build contract.

(4) "Project" means those infrastructure improvements authorized in Sections 33421 and 33455 of the Health and Safety Code and subject to the limitations and conditions on that authority described in Article 10 (commencing with Section 33420) and Article 11 (commencing with Section 33430) of Chapter 4 of Part 1 of Division 24 of the Health and Safety Code.

(d) Design-build projects shall progress in a four-step process, as follows:

(1)(A) The agency shall prepare a set of documents setting forth the scope of the project. The documents may include, but are not limited to, the size, type, and desired design character of the public improvement, performance specifications covering the quality of materials, equipment, and workmanship, preliminary plans or building layouts, or any other information deemed necessary to describe adequately the agency's needs. The performance specifications and any plans shall be prepared by a design professional who is duly licensed and registered in California.

(B) Any architect or engineer retained by the agency to assist in the development of the project specific documents shall not be eligible to participate in the preparation of a bid with any design-build entity for that project.

(2)(A) Based on the documents prepared as described in paragraph (1), the agency shall prepare a request for proposals that invites interested parties to submit competitive sealed proposals in the manner prescribed by the agency. The request for proposals shall include, but is not limited to, the following elements:

(i) Identification of the basic scope and needs of the project or contract, the expected cost range, and other information deemed necessary by the agency to inform interested parties of the contracting opportunity, to include the methodology that will be used by the agency to evaluate proposals and specifically if the contract will be awarded to the lowest responsible bidder.

(ii) Significant factors that the agency reasonably expects to consider in evaluating proposals, including cost or price and all nonprice-related factors.

(iii) The relative importance of the weight assigned to each of the factors identified in the request for proposals.

(B) With respect to clause (iii) of subparagraph (A), if a nonweighted system is used, the agency shall specifically disclose whether all evaluation factors other than cost or price when combined are:

(i) Significantly more important than cost or price.

(ii) Approximately equal in importance to cost or price.

(iii) Significantly less important than cost or price.

(C) If the agency chooses to reserve the right to hold discussions or negotiations with responsive bidders, it shall so specify in the request for proposal and shall publish separately or incorporate into the request for proposal applicable rules and procedures to be observed by the agency to ensure that any discussions or negotiations are conducted in

Copr. © West 2008 No Claim to Orig. Govt. Works

CA LEGIS 2EX 2 (2009)                                                                                                    Page 22
2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

good faith.

 (3)(A) The agency shall establish a procedure to prequalify design-build entities using a standard questionnaire developed by the agency. In preparing the questionnaire, the agency shall consult with the construction industry, including representatives of the building trades and surety industry. This questionnaire shall require information including, but not limited to, all of the following:

 (i) If the design-build entity is a partnership, limited partnership, or other association, a listing of all of the partners, general partners, or association members known at the time of bid submission who will participate in the design-build contract, including, but not limited to, mechanical subcontractors.

 (ii) Evidence that the members of the design-build entity have completed, or demonstrated the experience, competency, capability, and capacity to complete, projects of similar size, scope, or complexity, and that proposed key personnel have sufficient experience and training to competently manage and complete the design and construction of the project, as well as a financial statement that assures the agency that the design-build entity has the capacity to complete the project.

 (iii) The licenses, registration, and credentials required to design and construct the project, including information on the revocation or suspension of any license, credential, or registration.

 (iv) Evidence that establishes that the design-build entity has the capacity to obtain all required payment and performance bonding, liability insurance, and errors and omissions insurance.

 (v) Any prior serious or willful violation of the California Occupational Safety and Health Act of 1973, contained in Part 1 (commencing with Section 6300) of Division 5 of the Labor Code, or the federal Occupational Safety and Health Act of 1970 (P.L. 91-596), settled against any member of the design-build entity, and information concerning workers' compensation experience history and worker safety program.

 (vi) Information concerning any debarment, disqualification, or removal from a federal, state, or local government public works project. Any instance in which an entity, its owners, officers, or managing employees submitted a bid on a public works project and were found to be nonresponsive, or were found by an awarding body not to be a responsible bidder.

 (vii) Any instance in which the entity, or its owners, officers, or managing employees, defaulted on a construction contract.

 (viii) Any violations of the Contractors' State License Law (Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code), including alleged violations of federal or state law including the payment of wages, benefits, apprenticeship requirements, or personal income tax withholding, or of Federal Insurance Contributions Act (FICA) withholding requirements settled against any member of the design-build entity.

 (ix) Information concerning the bankruptcy or receivership of any member of the design-build entity, including information concerning any work completed by a surety.

 (x) Information concerning all settled adverse claims, disputes, or lawsuits between the owner of a public works project and any member of the design-build entity during the five years preceding submission of a bid pursuant to this section, in which the claim, settlement, or judgment exceeds fifty thousand dollars ($50,000). Information shall also be provided concerning any work completed by a surety during this period.

Copr. © West 2008 No Claim to Orig. Govt. Works

Case 2:90-cv-00520-KJM-SCR    Document 3734-1    Filed 11/30/09    Page 24 of 81

CA LEGIS 2EX 2 (2009)                                                    Page 23
2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)

**(Publication page references are not available for this document.)**

(xi) In the case of a partnership, joint venture, or an association that is not a legal entity, a copy of the agreement creating the partnership or association and specifying that all general partners, joint venturers, or association members agree to be fully liable for the performance under the design-build contract.

(B) The information required pursuant to this subdivision shall be verified under oath by the entity and its members in the manner in which civil pleadings in civil actions are verified. Information that is not a public record pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code) shall not be open to public inspection.

(4) The agency shall establish a procedure for final selection of the design-build entity. Selection shall be based on either of the following criteria:

(A) A competitive bidding process resulting in lump-sum bids by the prequalified design-build entities. Awards shall be made to the lowest responsible bidder.

(B) An agency may use a design-build competition based upon best value and other criteria set forth in paragraph (2). The design-build competition shall include the following elements:

(i) Competitive proposals shall be evaluated by using only the criteria and selection procedures specifically identified in the request for proposal. However, the following minimum factors shall each represent at least 10 percent of the total weight of consideration given to all criteria factors: price, technical design and construction expertise, life-cycle costs over 15 years or more, skilled labor force availability, and acceptable safety record.

(ii) Once the evaluation is complete, the top three responsive bidders shall be ranked sequentially from the most advantageous to the least.

(iii) The award of the contract shall be made to the responsible bidder whose proposal is determined, in writing, to be the most advantageous.

(iv) Notwithstanding any provision of this code, upon issuance of a contract award, the agency shall publicly announce its award, identifying the contractor to whom the award is made, along with a written decision supporting its contract award and stating the basis of the award. The notice of award shall also include the agency's second- and third-ranked design-build entities.

(v) For purposes of this paragraph, skilled labor force availability shall be determined by the existence of an agreement with a registered apprenticeship program, approved by the California Apprenticeship Council, which has graduated apprentices in each of the preceding five years. This graduation requirement shall not apply to programs providing apprenticeship training for any craft that has been deemed by the Department of Labor and the Department of Industrial Relations to be an apprenticeable craft in the five years prior to enactment of this act.

(vi) For purposes of this paragraph, a bidder's safety record shall be deemed acceptable if its experience modification rate for the most recent three-year period is an average of 1.00 or less, and its average total recordable injury/illness rate and average lost work rate for the most recent three-year period does not exceed the applicable statistical standards for its business category or if the bidder is a party to an alternative dispute resolution system as provided for in Section 3201.5 of the Labor Code.

(e)(1) Any design-build entity that is selected to design and build a project pursuant to this section shall possess or obtain sufficient bonding to cover the contract amount for nondesign services, and errors and omission insurance coverage sufficient to cover all design and architectural services provided in the contract. This section does not prohibit a general or engineering contractor from being designated the lead entity on a design-build entity for the pur-

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

poses of purchasing necessary bonding to cover the activities of the design-build entity.

(2) Any payment or performance bond written for the purposes of this section shall be written using a bond form developed by the agency.

(f) All subcontractors that were not listed by the design-build entity in accordance with clause (i) of subparagraph (A) of paragraph (3) of subdivision (d) shall be awarded by the design-build entity in accordance with the design-build process set forth by the agency in the design-build package. All subcontractors bidding on contracts pursuant to this section shall be afforded the protections contained in Chapter 4 (commencing with Section 4100) of Part 1. The design-build entity shall do both of the following:

(1) Provide public notice of the availability of work to be subcontracted in accordance with the publication requirements applicable to the competitive bidding process of the agency.

(2) Provide a fixed date and time on which the subcontracted work will be awarded in accordance with the procedure established pursuant to this section.

(g) The minimum performance criteria and design standards established pursuant to paragraph (1) of subdivision (d) shall be adhered to by the design-build entity. Any deviations from those standards may only be allowed by written consent of the agency.

(h) The agency may retain the services of a design professional or construction project manager, or both, throughout the course of the project in order to ensure compliance with this section.

(i) Contracts awarded pursuant to this section shall be valid until the project is completed.

(j) Nothing in this section is intended to affect, expand, alter, or limit any rights or remedies otherwise available at law.

(k)(1) If the agency elects to award a project pursuant to this section, retention proceeds withheld by the agency from the design-build entity shall not exceed 5 percent if a performance and payment bond, issued by an admitted surety insurer, is required in the solicitation of bids.

(2) In a contract between the design-build entity and the subcontractor, and in a contract between a subcontractor and any subcontractor thereunder, the percentage of the retention proceeds withheld shall not exceed the percentage specified in the contract between the agency and the design-build entity. If the design-build entity provides written notice to any subcontractor who is not a member of the design-build entity, prior to or at the time the bid is requested, that a bond may be required and the subcontractor subsequently is unable or refuses to furnish a bond to the design-build entity, then the design-build entity may withhold retention proceeds in excess of the percentage specified in the contract between the agency and the design-build entity from any payment made by the design-build entity to the subcontractor.

(l) Each agency that elects to proceed under this section and uses the design-build method on a public works project shall submit to the Legislative Analyst's Office before December 1, 2014, a report containing a description of each public works project procured through the design-build process after January 1, 2010, and before November 1, 2014. The report shall include, but shall not be limited to, all of the following information:

(1) The type of project.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(2) The gross square footage of the project.

(3) The design-build entity that was awarded the project.

(4) Where appropriate, the estimated and actual length of time to complete the project.

(5) The estimated and actual project costs.

(6) A description of any written protests concerning any aspect of the solicitation, bid, proposal, or award of the design-build project, including the resolution of the protests.

(7) An assessment of the prequalification process and criteria.

(8) An assessment of the effect of retaining 5-percent retention on the project.

(9) A description of the labor force compliance program and an assessment of the project impact, where required.

(10) A description of the method used to award the contract. If best value was the method, the report shall describe the factors used to evaluate the bid, including the weighting of each factor and an assessment of the effectiveness of the methodology.

(11) An assessment of the project impact of skilled labor force availability.

(12) An assessment of the design-build dollar limits on agency projects. This assessment shall include projects where the agency wanted to use design-build and was precluded by the dollar limitation. This assessment shall also include projects where the best value method was not used due to dollar limitations.

(13) An assessment of the most appropriate uses for the design-build approach.

(m)(1) In order to comply with paragraph (2) of subdivision (a), the State Public Works Board is required to maintain the list of agencies that have applied and are eligible to be qualified for this authority.

(2) Each agency that is interested in proceeding under the authority in this section must apply to the State Public Works Board. The application to proceed shall be in writing and contain such information that the State Public Works Board may require.

(3) The State Public Works Board shall approve or deny an application, in writing, within 90 days of the submission of a complete application. The authority to deny an application shall only be exercised if the condition set forth in paragraph (2) of subdivision (a) has been satisfied.

(4) An agency that has applied for this authorization shall, after it determines it no longer is interested in using this authority, notify the State Public Works Board in writing within 30 days of its determination. Upon notification, the State Public Works Board may contact any previous applicants, denied pursuant to paragraph (2) of subdivision (a), to inform them of the availability to proceed under this section.

(5) The State Public Works Board may authorize no more that 10 projects. The board shall not authorize or approve more than two projects for any one eligible redevelopment agency that submits a completed application.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(6) The State Public Works Board shall notify the Legislative Analyst's Office when 10 projects have been approved.

(n) On or before January 1, 2015, the Legislative Analyst shall report to the Legislature on the use of the design-build method by agencies pursuant to this section, including the information listed in subdivision (l). The report may include recommendations for modifying or extending this section.

(o) Except as provided in this section, nothing in this act shall be construed to affect the application of any other law.

(p) This section shall remain in effect only until January 1, 2016, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2016, deletes or extends that date.

SEC. 5. Section 143 of the Streets and Highways Code is amended to read:

<< CA STR & HWY § 143 >>

143. **(a)(1) "Best value" means a value determined by objective criteria, including, but not limited to, price, features, functions, life-cycle costs, and other criteria deemed appropriate by the department or the regional transportation agency.**

**(2) "Contracting entity or lessee" means a public or private entity, or consortia thereof, that has entered into a comprehensive development lease agreement with the department or a regional transportation agency for a transportation project pursuant to this section.**

**(3) "Design-build" means a procurement process in which both the design and construction of a project are procured from a single entity.**

**(4)** "Regional transportation agency" means any of the following:

(A) A transportation planning agency as defined in Section 29532 or 29532.1 of the Government Code.

(B) A county transportation commission as defined in Section 130050, 130050.1, or 130050.2 of the Public Utilities Code.

(C) Any other local or regional transportation entity that is designated by statute as a regional transportation agency.

(D) A joint exercise of powers authority as defined in Chapter 5 (commencing with Section 6500) of Division 7 of Title 1 of the Government Code, with the consent of a transportation planning agency or a county transportation commission for the jurisdiction in which the transportation project will be developed.

**(5) "Public Infrastructure Advisory Commission" means a unit or auxiliary organization established by the Business, Transportation and Housing Agency that advises the department and regional transportation agencies in developing transportation projects through performance-based infrastructure partnerships.**

**(6)** "Transportation project" means one or more of the following: planning, design, development, finance, construction, reconstruction, rehabilitation, improvement, acquisition, lease, operation, or maintenance of highway, public street, rail, or related facilities supplemental to existing facilities currently owned and operated by the department or regional transportation agencies that is consistent with the requirements of *** subdivision **(c)**.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

**(b)(1) The Public Infrastructure Advisory Commission shall do all of the following:**

**(A) Identify transportation project opportunities throughout the state.**

**(B) Research and document similar transportation projects throughout the state, nationally, and internationally, and further identify and evaluate lessons learned from these projects.**

**(C) Assemble and make available to the department or regional transportation agencies a library of information, precedent, research, and analysis concerning infrastructure partnerships and related types of public-private transactions for public infrastructure.**

**(D) Advise the department and regional transportation agencies, upon request, regarding infrastructure partnership suitability and best practices.**

**(E) Provide, upon request, procurement-related services to the department and regional transportation agencies for infrastructure partnership.**

**(2) The Public Infrastructure Advisory Commission may charge a fee to the department and regional transportation agencies for the services described in subparagraphs (D) and (E) of paragraph (1), the details of which shall be articulated in an agreement entered into between the Public Infrastructure Advisory Commission and the department or the regional transportation agency.**

**(c)**(1) Notwithstanding any other provision of law, only the department, in cooperation with regional transportation agencies, and regional transportation agencies, may solicit proposals, accept unsolicited proposals, negotiate, and enter into comprehensive development lease agreements with public or private entities, or consortia thereof, for transportation projects.

**(2) Projects proposed pursuant to this section and associated lease agreements shall be submitted to the California Transportation Commission. The commission, at a regularly scheduled public hearing, shall select the candidate projects from projects nominated by the department or a regional transportation agency after reviewing the nominations for consistency with paragraphs (3) and (4). Approved projects may proceed with the process described in paragraph (5).**

**(3) The projects authorized pursuant to this section shall be primarily designed to achieve the following performance objectives:**

**(A) Improve mobility by improving travel times or reducing the number of vehicle hours of delay in the affected corridor.**

**(B) Improve the operation or safety of the affected corridor.**

**(C) Provide quantifiable air quality benefits for the region in which the project is located.**

\* \* \***(4) In addition to meeting the requirements of paragraph (3), t**he projects **authorized pursuant to this section** shall address a known forecast demand, as determined by the department or regional transportation agency.

\* \* \***(5) At least 60 days prior to executing a final lease agreement authorized pursuant to this section, the department or regional transportation agency shall submit the agreement to the Legislature and the Public**

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

**Infrastructure Advisory Commission for review.** Prior to submitting a lease agreement to the Legislature **and the Public Infrastructure Advisory Commission**, the department or regional transportation agency shall conduct at least one public hearing at a location at or near the proposed facility for purposes of receiving public comment on the lease agreement. Public comments made during this hearing shall be submitted to the Legislature **and the Public Infrastructure Advisory Commission** with the lease agreement. \* \* \***The Secretary of Business, Transportation and Housing or the Chairperson of the Senate or Assembly fiscal committees or policy committees with jurisdiction over transportation matters may, by written notification to the department or regional transportation agency, provide any comments about the proposed agreement within the 60-day period prior to the execution of the final agreement. The department or regional transportation agency shall consider those comments prior to executing a final agreement and shall retain the discretion for executing the final lease agreement.**

(d) For the purpose of facilitating those projects, the agreements between the parties may include provisions for the lease of rights-of-way in, and airspace over or under, highways, public streets, rail, or related facilities for the granting of necessary easements, and for the issuance of permits or other authorizations to enable the construction of transportation projects. Facilities subject to an agreement under this section shall, at all times, be owned by the department or the regional transportation agency, as appropriate. For department projects, the commission shall certify the department's determination of the useful life of the project in establishing the lease agreement terms. In consideration therefor, the agreement shall provide for complete reversion of the leased facility, together with the right to collect tolls and user fees, to the department or regional transportation agency, at the expiration of the lease at no charge to the department or regional transportation agency. At time of the reversion, the facility shall be delivered to the department or regional transportation agency, as applicable, in a condition that meets the performance and maintenance standards established by the department **or regional transportation agency** and that is free of any encumbrance, lien, or other claims.

(e) **Agreements between the department or regional transportation agency and the contracting entity or lessee shall authorize the contracting entity or lessee to use a design-build method of procurement for transportation projects, subject to the requirements for utilizing such a method contained in Chapter 6.5 (commencing with Section 6800) of Part 1 of Division 2 of the Public Contract Code, other than Sections 6802, 6803, and 6813 of that code, if those provisions are enacted by the Legislature during the 2009-10 Regular Session, or a 2009-10 extraordinary session.**

(f)(1)(A) **Notwithstanding any other provision of this chapter, for projects on the state highway system, the department is the responsible agency for the performance of project development services, including performance specifications, preliminary engineering, prebid services, the preparation of project reports and environmental documents, and construction inspection services. The department is also the responsible agency for the preparation of documents that may include, but need not be limited to, the size, type, and desired design character of the project, performance specifications covering the quality of materials, equipment, and workmanship, preliminary plans, and any other information deemed necessary to describe adequately the needs of the department or regional transportation agency.**

(B) **The department may use department employees or consultants to perform the services described in subparagraph (A), consistent with Article XXII of the California Constitution. Department resources, including personnel requirements, necessary for the performance of those services shall be included in the department's capital outlay support program for workload purposes in the annual Budget Act.**

(2) The department or a regional transportation agency may exercise any power possessed by it with respect to transportation projects to facilitate the transportation projects pursuant to this section. The department, regional transportation agency, and other state or local agencies may provide services to the contracting entity **or lessee** for which the public entity is reimbursed, including, but not limited to, planning, environmental planning, environmental certification, environmental review, preliminary design, design, right-of-way acquisition, construction, maintenance, and policing of these transportation projects. The department or regional transportation agency, as applica-

Copr. © West 2008 No Claim to Orig. Govt. Works

[330222-1]

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

ble, shall regularly inspect the facility and require the contracting entity or lessee to maintain and operate the facility according to adopted standards. Except as may otherwise be set forth in the lease agreement, the contracting entity or lessee shall be responsible for all costs due to development, maintenance, repair, rehabilitation, and reconstruction, and operating costs.

 (g)(1) In selecting private entities with which to enter into these agreements, notwithstanding any other provision of law, the department and regional transportation agencies may utilize, but are not limited to utilizing, one or more of the following procurement approaches:

 (A) Solicitations of proposals for defined projects and calls for project proposals within defined parameters.

 (B) Prequalification and short-listing of proposers prior to final evaluation of proposals.

 (C) Final evaluation of proposals based on qualifications and best value* * *. * * *The California Transportation Commission shall develop and adopt criteria for making that evaluation prior to evaluation of a proposal.

 (D) Negotiations with proposers prior to award.

 (E) Acceptance of unsolicited proposals, with issuance of requests for competing proposals. Neither the department nor a regional transportation agency may award a contract to an unsolicited bidder without receiving at least one other responsible bid.

 (2) When evaluating a proposal submitted by the contracting entity or lessee, the department or the regional transportation agency may award a contract on the basis of the lowest bid or best value.

 (h) The contracting entity or lessee shall have the following qualifications:

 (1) Evidence that the members of the contracting entity or lessee have completed, or have demonstrated the experience, competency, capability, and capacity to complete, a project of similar size, scope, or complexity, and that proposed key personnel have sufficient experience and training to competently manage and complete the design and construction of the project, and a financial statement that ensures that the contracting entity or lessee has the capacity to complete the project.

 (2) The licenses, registration, and credentials required to design and construct the project, including, but not limited to, information on the revocation or suspension of any license, credential, or registration.

 (3) Evidence that establishes that members of the contracting entity or lessee have the capacity to obtain all required payment and performance bonding, liability insurance, and errors and omissions insurance.

 (4) Evidence that the contracting entity or lessee has workers' compensation experience, history, and a worker safety program of members of the contracting entity or lessee that is acceptable to the department or regional transportation agency.

 (5) A full disclosure regarding all of the following with respect to each member of the contracting entity or lessee during the past five years:

 (A) Any serious or willful violation of Part 1 (commencing with Section 6300) of Division 5 of the Labor Code or the federal Occupational Safety and Health Act of 1970 (Public Law 91-596).

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

 **(B) Any instance where members of the contracting entity or lessee were debarred, disqualified, or removed from a federal, state, or local government public works project.**

 **(C) Any instance where members of the contracting entity or lessee, or its owners, officers, or managing employees submitted a bid on a public works project and were found to be nonresponsive or were found by an awarding body not to be a responsible bidder.**

 **(D) Any instance where members of the contracting entity or lessee, or its owners, officers, or managing employees defaulted on a construction contract.**

 **(E) Any violations of the Contractors' State License Law (Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code), including, but not limited to, alleged violations of federal or state law regarding the payment of wages, benefits, apprenticeship requirements, or personal income tax withholding, or Federal Insurance Contribution Act (FICA) withholding requirements.**

 **(F) Any bankruptcy or receivership of any member of the contracting entity or lessee, including, but not limited to, information concerning any work completed by a surety.**

 **(G) Any settled adverse claims, disputes, or lawsuits between the owner of a public works project and any member of the contracting entity or lessee during the five years preceding submission of a bid under this article, in which the claim, settlement, or judgment exceeds fifty thousand dollars ($50,000). Information shall also be provided concerning any work completed by a surety during this five-year period.**

 **(H) If the contracting entity or lessee is a partnership, joint venture, or an association that is not a legal entity, a copy of the agreement creating the partnership or association that specifies that all general partners, joint venturers, or association members agree to be fully liable for the performance under the agreement.**

 (i) No agreement entered into pursuant to this section shall infringe on the authority of the department or a regional transportation agency to develop, maintain, repair, rehabilitate, operate, or lease any transportation project. Lease agreements may provide for reasonable compensation to the \* \* \* **contracting entity or lessee** for the adverse effects on toll revenue or user fee revenue due to the development, operation, or lease of supplemental transportation projects with the exception of any of the following:

 (1) Projects identified in regional transportation plans prepared pursuant to Section 65080 of the Government Code\* \* \*.

 (2) Safety projects.

 (3) Improvement projects that will result in incidental capacity increases.

 (4) Additional high-occupancy vehicle lanes or the conversion of existing lanes to high-occupancy vehicle lanes.

 (5) Projects located outside the boundaries of a public-private partnership project, to be defined by the lease agreement.

 However, compensation to a \* \* \* **contracting entity or lessee** shall only be made after a demonstrable reduction in use of the facility resulting in reduced toll or user fee revenues, and may not exceed the **difference between the** reduction in those revenues **and the amount necessary to cover the costs of debt service, including principal and interest on any debt incurred for the development, operation, maintenance, or rehabilitation of the facility.**

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)

**(Publication page references are not available for this document.)**

**(j)**(1) Agreements entered into pursuant to this section shall authorize the contracting entity **or lessee** to impose tolls and user fees for use of a facility constructed by it, and shall require that over the term of the lease the toll revenues and user fees be applied to payment of the capital outlay costs for the project, the costs associated with operations, toll and user fee collection, administration of the facility, reimbursement to the department or other governmental entity for the costs of services to develop and maintain the project, police services, and a reasonable return on investment. The agreement shall require that, notwithstanding Sections 164, 188, and 188.1, any excess toll or user fee revenue either be applied to any indebtedness incurred by the contracting entity **or lessee** with respect to the project, improvements to the project, or be paid into the State Highway Account, or for all three purposes, except that any excess toll revenue under a lease agreement with a regional transportation agency may be paid to the regional transportation agency for use in improving public transportation in and near the project boundaries.

(2) Lease agreements shall establish specific toll or user fee rates. Any proposed increase in those rates **not otherwise established or identified in the lease agreement** during the term of the agreement shall first be approved by the department or regional transportation agency, **as appropriate,** after at least one public hearing conducted at a location near the proposed or existing facility.

(3) The collection of tolls and user fees for the use of these facilities may be extended by the commission or regional transportation agency at the expiration of the lease agreement. However, those tolls or user fees **shall** not be used for any purpose other than for the improvement, continued operation, or maintenance of the facility.

\* \* \*

**(k) Agreements entered into pursuant to this section shall include indemnity, defense, and hold harmless provisions agreed to by the department or regional transportation agency and the contracting entity or lessee, including provisions for indemnifying the State of California or the regional transportation agency against any claims or losses resulting or accruing from the performance of the contracting entity or lessee.**

**(l)** The plans and specifications for each transportation project **on the state highway system** developed, maintained, repaired, rehabilitated, reconstructed, or operated pursuant to this section shall comply with the department's standards for state transportation projects. The lease agreement shall include performance standards, including, but not limited to, levels of service. The agreement shall require facilities on the state highway system to meet all requirements for noise mitigation, landscaping, pollution control, and safety that otherwise would apply if the department were designing, building, and operating the facility. If a facility is on the state highway system, the facility leased pursuant to this section shall, during the term of the lease, be deemed to be a part of the state highway system for purposes of identification, maintenance, enforcement of traffic laws, and for the purposes of Division 3.6 (commencing with Section 810) of Title 1 of the Government Code.

**(m)** Failure to comply with the lease agreement in any significant manner shall constitute a default under the agreement and the department or the regional transportation agency, as appropriate, shall have the option to initiate processes to revert the facility to the public agency.

**(n)** The assignment authorized by subdivision (c) of Section 130240 of the Public Utilities Code is consistent with this section.

**(o)** A lease to a private entity pursuant to this section is deemed to be public property for a public purpose and exempt from leasehold, real property, and ad valorem taxation, except for the use, if any, of that property for ancillary commercial purposes.

**(p)** Nothing in this section is intended to infringe on the authority to develop high-occupancy toll lanes pursuant to Section 149.4, 149.5, or 149.6.

Copr. © West 2008 No Claim to Orig. Govt. Works

2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

(q) Nothing in this section shall be construed to allow the conversion of any existing nontoll or nonuser-fee lanes into tolled or user fee lanes with the exception of a high-occupancy vehicle lane that may be operated as a high-occupancy toll lane for vehicles not otherwise meeting the requirements for use of that lane.

(r) The lease agreement shall require the contracting entity or lessee to provide any information or data requested by the California Transportation Commission or the Legislative Analyst. The commission, in cooperation with the Legislative Analyst, shall annually prepare a report on the progress of each project and ultimately on the operation of the resulting facility. The report shall include, but not be limited to, a review of the performance standards, a financial analysis, and any concerns or recommendations for changes in the * * * program authorized by this section.

(s) Notwithstanding any other provision of this section, no lease agreement may be entered into pursuant to the section that affects, alters, or supersedes the Memorandum of Understanding (MOU), dated November 26, 2008, entered into by the Golden Gate Bridge Highway and Transportation District, the Metropolitan Transportation Commission, and the San Francisco County Transportation Authority, relating to the financing of the U.S. Highway 101/Doyle Drive reconstruction project located in the City and County of San Francisco.

(t) No lease agreements may be entered into under this section on or after January 1, 2017.

SEC. 6. (a) Notwithstanding any other provision of law, the peer review committee established pursuant to subdivision (d) of Section 6803 of the Public Contract Code shall continue to operate until it has fulfilled the reporting requirements of this section.

(b) The committee shall conduct an evaluation of all transportation projects using the design-build method of construction procurement authorized under Chapter 6.5 (commencing with Section 6800) of Part 1 of Division 2 of the Public Contract Code.

(c) The evaluation pursuant to subdivision (b) shall examine the procurement method, comparing those projects using low bid and best value, and shall consider whether the projects were on time and on budget. The evaluation shall also compare the design-build projects to similar transportation projects that used the design-bid-build method of construction procurement.

(d)(1) The California Transportation Commission shall submit a midterm report of its findings to the Legislature no later than June 30, 2012.

(2) The California Transportation Commission shall submit a final report of its findings to the Legislature no later than June 30, 2015.

SEC. 7. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

CA LEGIS 2EX 2 (2009)

END OF DOCUMENT

Copr. © West 2008 No Claim to Orig. Govt. Works

CA LEGIS 2EX 2 (2009)
2009 Cal. Legis. Serv. 2nd Ex. Sess. Ch. 2 (S.B. 4) (WEST)
**(Publication page references are not available for this document.)**

Copr. © West 2008 No Claim to Orig. Govt. Works

# EXHIBIT B

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                            ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
**MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA 94283-0001



September 30, 2009

Matthew A. Lopes, Jr., Esq.              Via:    Debbie Vorous, Esq.
Office of the Special Master                     Jeff Steele, Esq.
Pannone Lopes & Devereaux LLC                    Deputy Attorney General
317 Iron Horse Way, Suite 301                    Department of Justice
Providence, RI  02908                            1300 "I" Street, Suite 125
                                                 P. O. Box 944255
                                                 Sacramento, CA  94244-2550

**RE:  COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of August 2009 data (or as otherwise noted).
The following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy
    History.  **(Pending - to be posted next week)**
2.  MHSDS Hiring Activity Report.  **(Pending - to be posted next week)**
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary and
    Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly Report for
    all disciplines.
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC)
    Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient
    Psychiatric Aging Report.
7.  Referrals for Transfer to the Department of Mental Health (including admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals--Summary and Penal
    Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated
    Hub institutions.

Matthew A. Lopes, Jr., Esq.
Page 2

16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 324-2933.

Sincerely,

DENNIS BEATY
Deputy Director, Program Services
Mental Health Program
Division of Correctional Health Care Services

Enclosures

cc: Sharon Aungst, Chief Deputy Secretary, Correctional Health Care Services
Marion Chiurazzi, Psy.D, Deputy Director, Clinical Services, Statewide Mental Health Program, DCHCS
Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
Linda Buffardi, Esq., *Coleman* Deputy Special Master
Jeffrey L. Metzner, M.D., *Coleman* Expert
Dennis F. Koson, M.D., *Coleman* Expert
Kerry C. Hughes, M.D., *Coleman* Expert
Melissa G. Warren, Ph.D., *Coleman* Expert
Raymond F. Patterson, M.D, *Coleman* Expert
Pal Nicoll, MPA, *Coleman* Monitor
Ted Ruggles, Ph.D., *Coleman* Expert
Mary Perrien, Ph.D., *Coleman* Expert
Mary-Joy Spencer, Esq., *Coleman* Monitor
Yong Joo Erwin, LCSW, *Coleman* Expert
Kathryn A. Burns, M.D., MPH, *Coleman* Expert
Henry A. Dlugacz, Esq., *Coleman* Expert

Page 3

Kerry F. Walsh, Esq., *Coleman* Monitor
Angela Shannon, M.D., *Coleman* Expert
Patricia Williams, Esq., *Coleman* Monitor
Haunani Henry, *Coleman* Monitor
J. Ronald Metz, *Coleman* Monitor
William Alvarez, Ph.D., *Coleman* Monitor
Jeff Steele, Esq., Office of the Attorney General
Debbie Vorous, Esq., Office of the Attorney General
Michael Stone, Esq., Office of Legal Affairs
Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Karen Higgins, M.D., Deputy Director (A), Psychiatry Services, DCHCS
Judy Burleson, Coleman Compliance Manager, DCHCS
Mary Neade, Correctional Counselor II, Division of Adult Institutions
Sharon Riegel, HPS II, DCHCS

# Mental Health Population  -  Placement Per Institution

*Grouped by: Ad-Seg, GP, RC, and SHU*
DDPS Download Date: September 3, 2009

## SUMMARY

**Mental Health Population - Combined Placement Per Institution**

| Institution | CCCMS | | | EOP | | | MHCB | Total MH Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP | 1099 | 1400 | 127% | | 15 | | | 1415 |
| CAL | | 24 | | | 1 | | | 25 |
| CCI | 1349 | 1181 | 88% | | 61 | | | 1242 |
| CCWF | 899 | 1173 | 130% | 54 | 57 | 106% | 12 | 1230 |
| CEN | | 27 | | | | | | 27 |
| CIM | 999 | 1095 | 110% | | 182 | | 34 | 1277 |
| CIW | 499 | 693 | 139% | 85 | 104 | 122% | 10 | 797 |
| CMC | 1099 | 1209 | 110% | 634 | 527 | 83% | 36 | 1736 |
| CMF | 599 | 616 | 103% | 591 | 538 | 91% | 70 | 1154 |
| COR | 949 | 1235 | 130% | 204 | 203 | 100% | 23 | 1438 |
| CRC-M | 848 | 1035 | 122% | | | | | 1035 |
| CTF | 745 | 907 | 122% | | 8 | | | 915 |
| CVSP | | 16 | | | 1 | | | 17 |
| DVI | 649 | 649 | 100% | | 54 | | | 703 |
| FOL | 599 | 749 | 125% | | 4 | | | 753 |
| HDSP | 699 | 906 | 130% | | 18 | | 10 | 924 |
| ISP | | 21 | | | 1 | | | 22 |
| KVSP | 1000 | 1212 | 121% | 96 | 120 | 125% | 12 | 1332 |
| LAC | 1149 | 1187 | 103% | 354 | 411 | 116% | 12 | 1598 |
| MCSP | 1149 | 1343 | 117% | 546 | 538 | 99% | 8 | 1881 |
| NKSP | 799 | 932 | 117% | | 72 | | 10 | 1004 |
| PBSP | 349 | 345 | 99% | 66 | 71 | 108% | 10 | 416 |
| PVSP | 1499 | 1744 | 116% | | 6 | | 6 | 1750 |
| RJD | 1199 | 1352 | 113% | 393 | 408 | 104% | 14 | 1760 |
| SAC | 849 | 824 | 97% | 458 | 434 | 95% | 24 | 1258 |
| SATF | 1199 | 1549 | 129% | | 14 | | 20 | 1563 |
| SCC | 499 | 614 | 123% | | 12 | | | 626 |
| SOL | 1199 | 1489 | 124% | | 9 | | 9 | 1498 |
| SQ | 899 | 1161 | 129% | 36 | 123 | 342% | | 1284 |
| SVSP | 999 | 1109 | 111% | 237 | 242 | 102% | 10 | 1351 |
| VSPW | 849 | 1125 | 133% | 9 | 23 | 256% | | 1148 |
| WSP | 1049 | 1175 | 112% | | 107 | | 6 | 1282 |
| TOTAL | 25718 | 30097 | 117% | 3763 | 4364 | 116% | 336 | 34461 |

# EXHIBIT C

**Stark DJJ**
**Cell No. 42, E/F Wing**
**Building One Measurements by Plaintiffs' Counsel**

**November 19, 2009**

| **Cell Size** | Inches | Feet |
|---|---|---|
| Length | 113 | 9.416667 |
| Width | 71 | 5.916667 |
| Sq. Ft. | | 55.71528 |

| **Toilet** | Inches | Feet |
|---|---|---|
| Length | 28 | 2.333333 |
| Width | 31 | 2.583333 |
| Sq. Ft. | | 6.027778 |

| **Bed** | Inches | Feet |
|---|---|---|
| Length | 77 | 6.416667 |
| Width | 30.5 | 2.541667 |
| Sq. Ft. | | 16.30903 |

| **Desk** | Inches | Feet |
|---|---|---|
| Length | 23.5 | 1.958333 |
| Width | 30 | 2.5 |
| Sq. Ft. | | 4.895833 |

| | Sq. Feet |
|---|---|
| Cell Size | 55.7 |
| Toilet | -6.0 |
| Bed | -16.3 |
| Desk | -4.9 |
| **Unencumbered Cell Size** | **28.5** |
| | |
| **Per Prisoner (Double Occupancy)** | **14.2** |

# EXHIBIT D

# 2008

# Standards Supplement

METRO-DAVIDSON COUNTY
DETENTION FACILITY

Iowa Medical & Classification Center
Oakdale, Iowa

COMMISSION ON ACCREDITATION FOR CORRECTIONS

**ACA**
FOUNDED 1870

AMERICAN CORRECTIONAL ASSOCIATION

# 2008
# Standards Supplement

**American Correctional Association**

**In cooperation with the
Commission on Accreditation for Corrections**

**January 2008**

**4-4131**    Deleted August 2005.


**4-4132**    Revised January 2007. Cells/rooms used for housing inmates shall provide at a minimum, 25 square feet of unencumbered space per occupant. Unencumbered space is usable space that is not encumbered by furnishings or fixtures. At least one dimension of the unencumbered space is no less than seven feet. In determining unencumbered space in the cell or room, the total square footage is obtained and the square footage of fixtures and equipment is subtracted. All fixtures and equipment must be in operational position and must provide the following minimums per person:

- bed
- plumbing fixtures (if inside the cell/room)
- desk
- locker
- chair or stool

COMMENT: None.


**4-4133**    Revised August 2005. Written policy, procedure, and practice provide that single-occupancy cells/rooms, measuring a total of 80 square feet, of which 35 square feet is unencumbered space, shall be available, when indicated, for the following:

- inmates with severe medical disabilities
- inmates suffering from serious mental illness
- sexual predators
- inmates likely to be exploited or victimized by others
- inmates who have other special needs for single housing
- maximum custody inmates

COMMENT: The standard permits housing inmates of all security levels in multiple cells/rooms unless there is a need for single cells/rooms for an inmate in one of the groups listed. The caveat "when indicated" refers to determinations made by the classification system, medical diagnosis, or other professional conclusions.


**4-4141**    Interpretation August 2004. The Standards Committee determined that segregation housing does not have to be single celled.


**4-4147**    Revision August 2006. All inmate rooms/cells provide access to natural light. (Existing only)

COMMENT: None.

# EXHIBIT E

# 2008

# Standards Supplement



COMMISSION ON ACCREDITATION FOR CORRECTIONS

## ACA
### FOUNDED 1870

AMERICAN CORRECTIONAL ASSOCIATION

# 2008
# Standards Supplement

**American Correctional Association**

**In cooperation with the
Commission on Accreditation for Corrections**

**January 2008**

**4-4131**    Deleted August 2005.

**4-4132**    Revised January 2007. Cells/rooms used for housing inmates shall provide at a minimum, 25 square feet of unencumbered space per occupant. Unencumbered space is usable space that is not encumbered by furnishings or fixtures. At least one dimension of the unencumbered space is no less than seven feet. In determining unencumbered space in the cell or room, the total square footage is obtained and the square footage of fixtures and equipment is subtracted. All fixtures and equipment must be in operational position and must provide the following minimums per person:

- bed
- plumbing fixtures (if inside the cell/room)
- desk
- locker
- chair or stool

COMMENT: None.

**4-4133**    Revised August 2005. Written policy, procedure, and practice provide that single-occupancy cells/rooms, measuring a total of 80 square feet, of which 35 square feet is unencumbered space, shall be available, when indicated, for the following:

- inmates with severe medical disabilities
- inmates suffering from serious mental illness
- sexual predators
- inmates likely to be exploited or victimized by others
- inmates who have other special needs for single housing
- maximum custody inmates

COMMENT: The standard permits housing inmates of all security levels in multiple cells/rooms unless there is a need for single cells/rooms for an inmate in one of the groups listed. The caveat "when indicated" refers to determinations made by the classification system, medical diagnosis, or other professional conclusions.

**4-4141**    Interpretation August 2004. The Standards Committee determined that segregation housing does not have to be single celled.

**4-4147**    Revision August 2006. All inmate rooms/cells provide access to natural light. (Existing only)

COMMENT: None.

# EXHIBIT F

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                              ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
**MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA 94283-0001



September 30, 2009

|   |   |
|---|---|
| Matthew A. Lopes, Jr., Esq. | Via:    Debbie Vorous, Esq. |

Matthew A. Lopes, Jr., Esq.                    Via:    Debbie Vorous, Esq.
Office of the Special Master                              Jeff Steele, Esq.
Pannone Lopes & Devereaux LLC                    Deputy Attorney General
317 Iron Horse Way, Suite 301                        Department of Justice
Providence, RI  02908                                       1300 "I" Street, Suite 125
                                                                        P. O. Box 944255
                                                                        Sacramento, CA  94244-2550

**RE:  COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of August 2009 data (or as otherwise noted).
The following is the list of enclosures:

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.  **(Pending - to be posted next week)**
2. MHSDS Hiring Activity Report.  **(Pending - to be posted next week)**
3. Health Care Placement Oversight Program (HCPOP) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4. Mental Health Contract Services including Summary and Telemedicine Monthly Report for all disciplines.
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6. Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient Psychiatric Aging Report.
7. Referrals for Transfer to the Department of Mental Health (including admissions).
8. Atascadero State Hospital (ASH) Discharges.
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals--Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.

Matthew A. Lopes, Jr., Esq.
Page 2


16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.


If you have any questions, please contact me at (916) 324-2933.

Sincerely,

DENNIS BEATY
Deputy Director, Program Services
Mental Health Program
Division of Correctional Health Care Services


Enclosures

cc:  Sharon Aungst, Chief Deputy Secretary, Correctional Health Care Services
       Marion Chiurazzi, Psy.D, Deputy Director, Clinical Services, Statewide Mental Health
            Program, DCHCS
       Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
       Linda Buffardi, Esq., *Coleman* Deputy Special Master
       Jeffrey L. Metzner, M.D., *Coleman* Expert
       Dennis F. Koson, M.D., *Coleman* Expert
       Kerry C. Hughes, M.D., *Coleman* Expert
       Melissa G. Warren, Ph.D., *Coleman* Expert
       Raymond F. Patterson, M.D, *Coleman* Expert
       Pal Nicoll, MPA, *Coleman* Monitor
       Ted Ruggles, Ph.D., *Coleman* Expert
       Mary Perrien, Ph.D., *Coleman* Expert
       Mary-Joy Spencer, Esq., *Coleman* Monitor
       Yong Joo Erwin, LCSW, *Coleman* Expert
       Kathryn A. Burns, M.D., MPH, *Coleman* Expert
       Henry A. Dlugacz, Esq., *Coleman* Expert

Page 3

Kerry F. Walsh, Esq., *Coleman* Monitor
Angela Shannon, M.D., *Coleman* Expert
Patricia Williams, Esq., *Coleman* Monitor
Haunani Henry, *Coleman* Monitor
J. Ronald Metz, *Coleman* Monitor
William Alvarez, Ph.D., *Coleman* Monitor
Jeff Steele, Esq., Office of the Attorney General
Debbie Vorous, Esq., Office of the Attorney General
Michael Stone, Esq., Office of Legal Affairs
Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Karen Higgins, M.D., Deputy Director (A), Psychiatry Services, DCHCS
Judy Burleson, Coleman Compliance Manager, DCHCS
Mary Neade, Correctional Counselor II, Division of Adult Institutions
Sharon Riegel, HPS II, DCHCS

## EXECUTIVE SUMMARY
### Mental Health Program Hire Progress and Vacancy Reports
### September 2009 Reporting Period

- Summarized below are the Mental Health Program (MHP) vacancies for September 2009. The new FY 09/10 Schedule 7A Authorized position figure (3059) is consistent with the MHP Staffing Plan.

| FY 09/10 7A Authorized Positions [1] | SCO Filled Positions [2] | Unadjusted Vacancies | Vacancy Adjustment for Registry Usage [3] | Vacancies after Adjustment for Registry | Vacancy Adjustment for New Hires & Long Term Sick [4] | Vacancies after Adjustment for Registry, New Hires, and Long Term Sick |
|---|---|---|---|---|---|---|
| 3059 | 2574 | 485 | 136 | 349 | 25 | 324 |

- The following compares vacancies and the vacancy rates of April 2009 and September 2009.
- The September 2009 vacancy report appears to show an increase of 135 adjusted vacancies when compared to the 189 adjusted vacancies shown in the April 2009 report. This is due to the combined effect of an increase in the new FY 09/10 Schedule 7A position authority (after BMB Reconciliation) equal to 139 positions, and a net adjusted improvement of 4 positions for the MH Program during the six month period.

| Vacant positions and corresponding vacancy rates | April 2009 pos. / rate | September 2009 pos. / rate (after BMB reconciliation) |
|---|---|---|
| Unadjusted vacancies and vacancy rate | 385 / 12.5% | 485 / 15.9% |
| Vacancies adjusted for *registry use* only | 221 / 7.6% | 349 / 11.4% |
| Vacancies adjusted for *registry use, new hires, and long term sick* | 189 / 6.4% | 324 / 10.6% |

- The following compares the adjusted vacancies of August and September 2009. The significant improvement for September can be partially attributed to the fact that there were 4 reinstates, 4 part-time employees converted to full-time, and 14.8 positions filled through the use of "dual appointments." This action was taken to prevent having clinicians leave state service as a result of the furloughs. In addition, a number of field positions have recently been filled with displaced lateral candidates from other operational areas that are being downsized due to lack of funding.

| Comparison of August to September Adjusted Vacancies [5] | August 2009 Vacancies after Adjustment for Registry, New Hires, and Long Term Sick | September 2009 Vacancies after Adjustment for Registry, New Hires, and Long Term Sick | Vacancy Difference |
|---|---|---|---|
| Adjusted Vacancies | 365 | 324 | 41 |

General Notes:
- All institutions are currently in compliance with 30-Day Streamlined Hiring Procedures.
- The September 2009 baseline SCO data includes a reduction of 28.9 established positions (*4 of which were filled*) that were temporarily abolished per GC 12439 (Section 41) as of July 1, 2009. To compensate for the temporarily missing position data, departmental and institutional data was used to supplement and correct the SCO data for the month of September 2009.

---

[1]  Source:  FY 09/10 Schedule 7A of the Governor's Budget *(Excludes temp help, unfunded positions, and 2.8 NCRF (Folsom Re-entry Facility) positions.*
[2]  Source:  State Controller's Office (SCO) payroll data base
[3]  Source:  Institution contract analyst via the Institution Personnel Office (IPO).  Registry hours converted to full time equivalents (FTEs) based on 1 FTE = 173.3 hours/month.
[4]  Source:  The SCO Management Information Retrieval System (MIRS) and the IPO at each institution.
[5]  The difference in adjusted vacancies is attributed to the improvement between August and September 2009.

Executive Summary, Mental Health Program Hire Progress and Vacancy Reports September 2009
Author:  Anne Jackson, Personnel Liaison Section
File:  \\Hcs501jfile001\workgroups\Dental & Mental Health Recruitment\Reports\Vacancy Reports\2009_09
MH EXECUTIVE SUMMARY 09-2009.doc

**Division of Correctional Health Care Services - Mental Health Program**
**Six Month Registry Usage Summary**
**April-09 through September-09**

| GENERAL CLASSIFICATION | REGISTRY USAGE BY GROUP | | | | | |
|---|---|---|---|---|---|---|
| | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 |
| PSYCHIATRIST[1] | 57.8 | 53.0 | 55.2 | 60.4 | 53.4 | 52.5 |
| PSYCHOLOGIST[2] | 78.7 | 76.0 | 75.4 | 73.7 | 65.0 | 61.6 |
| OTHER MH CLINICAL STAFF[3] | 24.0 | 20.6 | 22.8 | 23.4 | 20.4 | 20.3 |
| ALL OTHER SUPPORT STAFF[4] | 3.6 | 3.6 | 0.7 | 1.0 | 0.0 | 2.0 |
| TOTAL | 164.1 | 153.1 | 154.1 | 158.6 | 138.7 | 136.4 |



**Registry Usage**

Each position represents 173.33 monthly registry hours.

Source: Summary (from invoices) provided by the institutions
Prepared by: Position Data and Compliance Unit, DCHCS

Page 1 of 2

Report Date: 10/28/2009

# Division of Correctional Health Care Services - Mental Health Program
## Six Month Registry Usage Summary
## April-09 through September-09

**¹PSYCHIATRIST**
7612 - CHIEF PSYCHIATRIST
9271 - SENIOR PSYCHIATRIST (SUPERVISOR)
9272 - STAFF PSYCHIATRIST
9758 - STAFF PSYCHIATRIST
9761 - SENIOR PSYCHIATRIST (SUPERVISOR)
9774 - CHIEF PSYCHIATRIST

**¹PSYCHOLOGIST**
9283 - PSYCHOLOGIST-CLINICAL
9287 - SENIOR PSYCHOLOGIST (SPECIALIST)
9288 - SENIOR PSYCHOLOGIST (SUPERVISOR)
9290 - STAFF PSYCHOLOGIST-CLINICAL
9851 - CLINICAL PSYCHOLOGY INTERN
9859 - CHIEF PSYCHOLOGIST

**²OTHER MH CLINICAL STAFF**
8182 - CERTIFIED NURSING ASSISTANT
8217 - MEDICAL TECHNICAL ASSISTANT
8252 - SENIOR PSYCHIATRIC TECHNICIAN (SAFETY)
8253 - PSYCHIATRIC TECHNICIAN (SAFETY)
8257 - LICENSED VOCATIONAL NURSE
8274 - LICENSED VOCATIONAL NURSE (SAFETY)
9263 - PHYSICIAN & SURGEON
9268 - DENTIST, CF
9275 - REGISTERED NURSE
9278 - NURSE PRACTITIONER
9280 - OCCUPATIONAL THERAPIST
9285 - PSYCHOMETRIST, CORRECTIONAL FACILITY
9286 - RECREATION THERAPIST
9291 - SUPERVISING PSYCHIATRIC SOCIAL WORKER I
9317 - SUPERVISING REGISTERED NURSE I
9318 - SUPERVISING REGISTERED NURSE II
9319 - SUPERVISING REGISTERED NURSE III
9346 - SENIOR OCCUPATIONAL THERAPIST
9371 - SUPERVISING DENTIST, CF
9872 - CLINICAL SOCIAL WORKER - SAFETY

**³ALL OTHER SUPPORT STAFF**
1139 - OFFICE TECHNICIAN (TYPING)
1148 - OFFICE SERVICES SUPERVISOR I (TYPING)
1150 - OFFICE SERVICES SUPERVISOR II (GENERAL)
1177 - MEDICAL TRANSCRIBER
1178 - SENIOR MEDICAL TRANSCRIBER
1379 - OFFICE ASSISTANT (TYPING)
1441 - OFFICE ASSISTANT (GENERAL)
1508 - MATERIALS AND STORES SUPERVISOR I
1663 - MEDICAL RECORDS CONSULTANT
1669 - HEALTH RECORD TECHNICIAN I
1887 - HEALTH RECORD TECHNICIAN II (SUPERVISOR)
2004 - CUSTODIAN SUPERVISOR II
2006 - CUSTODIAN (CORRECTIONAL FACILITY)
2153 - FOOD ADMINISTRATOR I
2183 - CORRECTIONAL SUPERVISING COOK
4672 - HEALTH ANALYST
4687 - LEAP CANDIDATE
4800 - STAFF SERVICES MANAGER I
4910 - CHSA I
4912 - CHSA II
5157 - STAFF SERVICES ANALYST (GENERAL)
5252 - HOUSING FINANCE ASSISTANT (RENTAL)
5278 - MANAGEMENT SERVICES TECHNICIAN
5393 - ASSOCIATE GOVERNMENTAL PROGRAM ANALYST
6216 - BUILDING MAINTENANCE WORKER
6713 - STATIONARY ENGINEER (CORRECTIONAL FACILITY)
6941 - MAINTENANCE MECHANIC -CORRECTIONAL FACILITY-
7887 - PUBLIC HEALTH LABORATORY TECHNICIAN I

**³ALL OTHER SUPPORT STAFF, cont.**
7979 - PHARMACY TECHNICIAN
7982 - PHARMACIST I
8104 - UNIT SUPERVISOR (SAFETY)
8202 - HEALTH PROGRAM COORDINATOR
8328 - STANDARDS COMPLIANCE COORDINATOR
8337 - ASSOCIATE HEALTH PROGRAM ADVISER
8338 - HEALTH PROGRAM SPECIALIST I
9265 - LABORATORY ASSISTANT
9293 - CLINICAL LABORATORY TECHNOLOGIST
9349 - SUPERVISING CLINICAL LABORATORY TECH
9551 - MEDICAL SECRETARY
9656 - CORRECTIONAL LIEUTENANT
9659 - CORRECTIONAL SERGEANT
9662 - CORRECTIONAL OFFICER
9691 - CHIEF DEPUTY ADMINISTRATOR
9901 - CORRECTIONAL COUNSELOR II (SPECIALIST)
9904 - CORRECTIONAL COUNSELOR I
9926 - SUPERVISING PROGRAM TECHNICIAN III

Source: Summary (from invoices) provided by the institutions
Prepared by: Position Data and Compliance Unit, DCHCS

Report Date: 10/28/2009

Division of Correctional Health Care Services - Mental Health Program
Six Month Vacancy Summary (Coleman)
April 2009 through September 2009

| GENERAL CLASSIFICATION | 09/10 SCH 7A POSITIONS AUTH FY 08/09 Beginning April 2009 | 09/10 SCH 7A AUTH POSITIONS | 09/10 SCH 7A AUTH POSITIONS (after BMB Adjustments August 2009) | April-09 | | May-09 | | June-09 | | July-09 | | August-09 | | September-09 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE | VACANT | VACANCY RATE |
| PSYCHIATRIST[1] | 290.5 | 284.7 | 299.3 | 93.5 | 32.2% | 92.0 | 31.7% | 85.0 | 29.3% | 83.0 | 29.1% | 101.8 | 34.0% | 89.8 | 30.0% |
| PSYCHOLOGIST[2] | 901.9 | 907.3 | 899.4 | 125.9 | 14.0% | 119.9 | 13.3% | 106.9 | 11.8% | 129.5 | 14.3% | 124.4 | 13.8% | 93.9 | 10.4% |
| OTHER MH CLINICAL STAFF[3] | 1261.7 | 1250.3 | 1355.2 | 123.7 | 9.8% | 120.0 | 9.5% | 113.0 | 9.0% | 104.9 | 8.4% | 203.3 | 15.0% | 190.7 | 14.1% |
| ALL OTHER SUPPORT STAFF[4] | 470.3 | 479.8 | 504.8 | 42.8 | 9.1% | 50.3 | 10.7% | 54.4 | 11.6% | 74.8 | 15.6% | 107.6 | 21.3% | 109.6 | 21.7% |
| TOTAL | 2924.4 | 2922.1 | 3058.7 | 385.8 | 13.2% | 382.1 | 13.1% | 359.2 | 12.3% | 392.1 | 13.4% | 537.0 | 17.6% | 483.9 | 15.8% |



Vacancies

[1] Vacancies calculated using Authorized Positions   (Governor's Budget Schedule 7A less SCO Filled = Vacant). Beginning with the August 2009 reporting period, 09/10 Schedule 7A total position authority for the Mental Health Program was increased from 2922.1 to 3058.7 based on a reconciliation by the CDCR Budget Management Branch. This increase in position authority created a corresponding increase in vacancies and vacancy rates for the August and September 2009 reporting periods.

[2] State Controllers Office (SCO) data approximately 45 days in arrears and does not consider adjustments for Blanket Positions, Hires, or Registry services. Also excludes 189.9 unallocated positions, and 2.8 NCRF (Folsom Re-Entry Facility) positions.

[3] The September 2009 baseline SCO data included a reduction of 28.8 established positions (4 of which were temporarily abolished per GC 12439 (Section 41) as of July 1, 2009. To compensate for the temporarily missing position data, departmental and institutional vacancy data was utilized to adjust and supplement information for the July, August and September 2009 reporting periods. It is anticipated that paperwork to re-establish these positions in the payroll system will be completed by October 2009.

[4] Vacancy data was further validated through a comparison with individual institutional position control spreadsheets.

Source: 7A, SCO
Prepared by: Position Data and Compliance Unit, DCHCS

Report Date: 10/28/2009

## Division of Correctional Health Care Services - Mental Health Program
### Six Month Vacancy Summary (Coleman)
### April 2009 through September 2009

**\*PSYCHIATRIST**
7612 - CHIEF PSYCHIATRIST
9271 - SENIOR PSYCHIATRIST (SUPERVISOR)
9272 - STAFF PSYCHIATRIST
9758 - STAFF PSYCHIATRIST
9761 - SENIOR PSYCHIATRIST (SUPERVISOR)
9774 - CHIEF PSYCHIATRIST

**\*PSYCHOLOGIST**
9283 - PSYCHOLOGIST-CLINICAL
9287 - SENIOR PSYCHOLOGIST (SPECIALIST)
9288 - SENIOR PSYCHOLOGIST (SUPERVISOR)
9290 - STAFF PSYCHOLOGIST-CLINICAL
8851 - CLINICAL PSYCHOLOGY INTERN
9659 - CHIEF PSYCHOLOGIST

**\*OTHER MH CLINICAL STAFF**
8182 - CERTIFIED NURSING ASSISTANT
8217 - MEDICAL TECHNICAL ASSISTANT
8552 - SENIOR PSYCHIATRIC TECHNICIAN (SAFETY)
8253 - PSYCHIATRIC TECHNICIAN (SAFETY)
8257 - LICENSED VOCATIONAL NURSE
8274 - LICENSED VOCATIONAL NURSE (SAFETY)
9263 - PHYSICIAN & SURGEON (INTERNAL MEDICINE/FAMILY PRACTICE)
9269 - DENTIST, CF
9275 - REGISTERED NURSE, CORRECTIONAL FACILITY
9278 - NURSE PRACTITIONER, CORRECTIONAL FACILITY
9280 - OCCUPATIONAL THERAPIST, CORRECTIONAL FACILITY
9285 - PSYCHOMETRIST, CORRECTIONAL FACILITY
9286 - RECREATION THERAPIST, CORRECTIONAL FACILITY
9291 - SUPERVISING PSYCHIATRIC SOCIAL WORKER I
9317 - SUPERVISING REGISTERED NURSE I
9318 - SUPERVISING REGISTERED NURSE II
9319 - SUPERVISING REGISTERED NURSE III
9346 - SENIOR OCCUPATIONAL THERAPIST
9371 - SUPERVISING DENTIST, CF
9872 - CLINICAL SOCIAL WORKER -SAFETY

**\*ALL OTHER SUPPORT STAFF**
1139 - OFFICE TECHNICIAN (TYPING)
1148 - OFFICE SERVICES SUPERVISOR II (TYPING)
1150 - OFFICE SERVICES SUPERVISOR III (GENERAL)
1177 - MEDICAL TRANSCRIBER
1178 - SENIOR MEDICAL TRANSCRIBER
1379 - OFFICE ASSISTANT (TYPING)
1441 - OFFICE ASSISTANT (GENERAL)
1508 - MATERIALS AND STORES SUPERVISOR I
1863 - MEDICAL RECORDS CONSULTANT
1869 - HEALTH RECORD TECHNICIAN I
1887 - HEALTH RECORD TECHNICIAN II (SUPERVISOR)
2004 - CUSTODIAN SUPERVISOR II (CORRECTIONAL FACILITY)
2006 - CUSTODIAN (CORRECTIONAL FACILITY)
2153 - FOOD ADMINISTRATOR I -CORRECTIONAL FACILITY-
2183 - CORRECTIONAL SUPERVISING COOK
4672 - HEALTH ANALYST
4687 - LIMITED EXAMINATION AND APPOINTMENT PROGRAM CANDIDATE
4800 - STAFF SERVICES MANAGER I
4910 - CORRECTIONAL HEALTH SERVICES ADMINISTRATOR I
4912 - CORRECTIONAL HEALTH SERVICES ADMINISTRATOR II
5157 - STAFF SERVICES ANALYST (GENERAL)
5252 - HOUSING FINANCE ASSISTANT (RENTAL)
5278 - MANAGEMENT SERVICES TECHNICIAN
5393 - ASSOCIATE GOVERNMENTAL PROGRAM ANALYST
6216 - BUILDING MAINTENANCE WORKER -CORRECTIONAL FACILITY-
6713 - STATIONARY ENGINEER (CORRECTIONAL FACILITY)
6941 - MAINTENANCE MECHANIC -CORRECTIONAL FACILITY-
7887 - PUBLIC HEALTH LABORATORY TECHNICIAN I -MICROBIOLOGY-

**\*ALL OTHER SUPPORT STAFF cont.**
7879 - PHARMACY TECHNICIAN
7982 - PHARMACIST I
8104 - UNIT SUPERVISOR (SAFETY)
8202 - HEALTH PROGRAM COORDINATOR
8328 - STANDARDS COMPLIANCE COORDINATOR
8337 - ASSOCIATE HEALTH PROGRAM ADVISER
8338 - HEALTH PROGRAM SPECIALIST I
9265 - LABORATORY ASSISTANT
9293 - CLINICAL LABORATORY TECHNOLOGIST
9349 - SUPERVISING CLINICAL LABORATORY TECHNOLOGIST
9551 - MEDICAL SECRETARY, CORRECTIONAL INSTITUTION
9656 - CORRECTIONAL LIEUTENANT
9659 - CORRECTIONAL SERGEANT
9662 - CORRECTIONAL OFFICER
9691 - CHIEF DEPUTY ADMINISTRATOR
9901 - CORRECTIONAL COUNSELOR II (SPECIALIST)
9904 - CORRECTIONAL COUNSELOR I
9926 - SUPERVISING PROGRAM TECHNICIAN III

Source: 7A, SCO
Prepared by: Position Data and Compliance Unit, DCHCS

Report Date: 10/28/2009

# EXHIBIT G

**FOR SUBMITTAL TO THE *COLEMAN* SPECIAL MASTER**

*June 9, 2009 Activity Report on CDCR/DMH Mental Health*

*Assessment and Referral Project in Response to the Deputy Special Master's Request*

*following the March 31, 2009 Court Order*

**GLOSSARY OF TERMS**

| Acronym | Term |
|---------|------|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CCIII | Correctional Counselor III |
| CCAT | Coordinated Clinical Assessment Team |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison, Corcoran |
| CSH | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| DAI | Division of Adult Institutions |
| DARS | Division of Addiction and Recovery Services |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| DPH | Department of Public Health |
| DTP | Day Treatment Program |
| EOP | Enhanced Outpatient Program |
| FPCM | Facilities, Planning, Construction, and Management |
| GACH | General Acute Care Hospital |
| GP | General Population |
| H&P | History and Physical |
| HQ | Headquarters |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| LAC | California State Prison, Los Angeles County |
| LOC | Level of Care |
| MAR | Medication Administration Record |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health-Outpatient Housing Unit |
| MOU | Memorandum of Understanding |
| PSU | Psychiatric Services Unit |
| RC | Reception Center |
| RJD | R. J. Donovan Correctional Facility |
| RPMB | Regulation and Policy Management Branch |
| SAC | California State Prison, Sacramento |
| SAP | Substance Abuse Program |

| SATF | Substance Abuse Treatment Facility |
|------|-----------------------------------|
| SFM | State Fire Marshall |
| SNY | Sensitive Needs Yard |
| SOL | California State Prison, Solano |
| SQ | California State Prison, San Quentin |
| SVSP | Salinas Valley State Prison |
| SVPP | Salinas Valley Psychiatric Program |
| UHR | Unit Health Record |
| UM | Utilization Management |
| VPP | Vacaville Psychiatric Program |
| WSP | Wasco State Prison |

**FOR SUBMITTAL TO THE *COLEMAN* SPECIAL MASTER**

*June 9, 2009 Activity Report on CDCR/DMH Mental Health*
*Assessment and Referral Project in Response to the Deputy Special Master's Request*
*following the March 31, 2009 Court Order*

---

### PURPOSE AND BACKGROUND

The *Coleman Court's* March 31, 2009 order required that California Department of Corrections and Rehabilitation (CDCR) and Department of Mental Health (DMH) clinicians work together to conduct a modified assessment to determine whether there are unmet needs for inpatient care among members of the plaintiff class and to refer on an expedited basis any inmates identified during this modified assessment for appropriate inpatient care.

This report responds to Deputy Special Master Mohamedu Jones's request that CDCR and DMH provide him with an update on the status of the CDCR/DMH Mental Health Assessment and Referral Project (the Project) as of June 9, 2009, and that they copy plaintiffs' counsel with the update.

The Project, which involves the assessment of 12 institutions, consists of three Phases; Phase(s) I and II, which are complete and Phase III, which has not yet commenced. This report, therefore, can only describe and summarize the outcome of the Project to date and is being jointly submitted by CDCR and DMH. Thus, it includes information and data available through June 8, 2009, on the number of inmate-patients identified and referred by the institutions in Phase I, the number of inmate-patients identified for referral to DMH in Phase II, and the number of inmate-patients that will be reviewed in Phase III. In addition, it provides data on the total number of Penal Code § 2684 referrals to DMH between April 1 and May 31, 2009. Last, it provides information regarding any obstacles encountered in the Project.

*Methodology*

Phase I was completed on April 30, 2009. During this Phase, CDCR staff at designated institutions identified and listed inmate-patients to be assessed for higher level of care referral. Phase II was completed on May 21, 2009. During this Phase, assessment teams comprised of clinical HQ staff from CDCR and DMH conducted reviews at all 12 designated institutions (CMF, MCSP, SAC, SQ, RJD, SVSP, COR, WSP, CIM, CCI, CMC, and LAC). The teams reviewed as many identified cases as possible from lists provided in Phase I in the short time frame allowed for the Project.

The DMH referral process started with the institutions identifying patients for potential DMH referral by using established clinical indicators. Each institution compiled a Master List of those identified patients that met the criteria delineated in Appendix i attached to this report.

---

4

Phase II consisted of the CDCR/DMH team reviewing patients from the initial Phase I list who had not already been referred by the institution. CDCR prioritized patients for review based on their Phase I clinical indicators.

Phase III will consist of reviewing patients from the Master List who were not reviewed during the Phase II CDCR/DMH assessment. Phase III will not include patients who have paroled, who were referred prior to Phase I, or who were referred in the interim between Phase I and Phase II.

During Phase I and prior to Phase II, 1659 total cases were identified for potential referral to a DMH higher level of care. (See Table 1 below.) Of these, 655 were reviewed in Phase II, with 278 determined appropriate for referral to DMH and 377 determined inappropriate. A total of 493 remain to be reviewed during Phase III. In the period between Phase I and Phase II, prior to review by the DMH and CDCR HQ review, clinicians at the institutions initiated a total of 281 referrals. This data is illustrated in Appendix ii attached to this report. This data, however, does not include the numbers for those inmate-patients referred prior to Phase I or those that paroled.

A table of referrals to DMH for a higher level of care broken down by institution and type of review/referral is attached to this report as Appendix ii. In addition, a number of indicators are being tracked to allow for more complete analysis and improvements in CDCR's process, including items related to timely referrals and admissions, custody factors, medication management and communication around clinical patient care issues.

## PHASE I

Initially, Phase I consisted of informing the Chiefs of Mental Health and custody leadership at the 12 selected institutions of the purpose and scope of the CDCR/DMH Mental Health Assessment and Referral Project. The representative from the DAI sent a memo to the Wardens and institutional custody leadership at the 12 institutions describing the purpose of the project. The 12 selected institutions joined teleconferences with CDCR Mental Health HQ either on April 8, 2009 or April 13, 2009. Participation by DAI enforced the need for the completion of the case factor sheets on all inmate-patients identified for inclusion on the institutional referral lists.

Concurrent with the teleconferences and instructions to the institutions, ongoing dialogue occurred with DMH, DAI, and the *Coleman* Deputy Special Master and experts on how to conduct the Project. This additional information was relayed to the institutions providing more details about Phase I and Phase II procedures. In retrospect, delaying the communication with the institutions until final information was available would have been beneficial in order to provide complete direction and create a smoother process. This may have given the institutions more opportunity to organize and prepare for the site visit.

The institutions were directed to cast a "very wide net" in identifying EOP inmate-patients in all housing and settings (ASU-EOP, PSU, MHCB, RC) in their programs for possible placement on the referral list. One item on the criteria for the possible placement on the referral list may have resulted in an over-inclusive number of inmate-patients in Phase I at some institutions. For instance, one institution placed all of their EOP population on the list stating that all their EOP patients met criteria 3 ("The inmate-patient would benefit from a comprehensive treatment program…and all of our patients meet this criterion and could benefit.") Additional direction and

clarification was given to the institutions when prioritizing their lists for the Phase II review. The lists sent from the institutions to DCHCS used various data formats which made it cumbersome to reconcile the data and merge with the lists derived from the Phase II review teams. Given more time before the start of Phase III, a standardized format to report the data will be provided to the institutions to facilitate data reconciliation.

The table below reflects a summary by institution of the number of inmate-patients on the lists constructed during Phase I.

Table 1. Summary of Results for Phase I

| Institution | Numbers on List |
|---|---|
| CMF | 282 |
| MCSP | 86 |
| SAC | 182 |
| SQ | 80 |
| COR | 72 |
| RJD | 212 |
| LAC | 94 |
| WSP | 79 |
| CCI | 35 |
| CIM | 156 |
| CMC | 279 |
| SVSP | 102 |
| Total | 1659 |

*Table 1 reflects the number of inmate-patients identified by each institution using the Phase I referral criteria.*

Many of the institutions decided to begin referring selected inmate-patients to DMH, based on clinical need, prior to Phase II referral teams arriving at their institutions. The institutions were directed to note on their referral lists those inmate-patients who were in active referral up to the time of the Phase II team arrival at their institutions. DCHCS HQ staff are tracking these initial referrals.

**PHASE II**

The Phase II teams consisted of CDCR HQ Psychologists, HQ Nurse Consultants, a HQ CCIII, HQ Health Program Specialists and DMH clinicians. The review team did not include institutional staff in the review process with the exception of correctional counselors. *Coleman* experts/monitors were on site to observe and to provide suggestions when indicated.

Frequent collaboration occurred with DMH staff, Deputy Special Master Jones, and the *Coleman* monitors on development of the Project. CDCR and DMH held face to face meetings to resolve issues regarding H&P format, diagnosis clarifications and to discuss Phase III development and procedures. In addition to reaching agreements on these issues, closer relationships were formed between CDCR and DMH, and the partnership became apparent in achieving completion of the Project. Other positive aspects in the Project included relationship development with the institutional staff due to time spent in the institutions. This also brought a better appreciation and clearer understanding of what types of inmate-patients can be treated and to which DMH institutions, based upon custody criteria, inmate-patients may be sent.

*Methodology*

The CDCR/DMH teams reviewed the UHRs using the inclusion criteria tool (see Appendix i) to determine potential inmate-patients for higher level of care referral. Based on the available documentation and a summary discussion of the clinical case factors known, a synopsis was presented to either the CDCR or DMH representative. The team members discussed their clinical findings to determine if the inmate-patient demonstrated the need for a referral to a higher level of care. If team members were unable to come to an agreement or additional clinical information was needed, the inmate-patient's primary clinician was interviewed and/or interview with the inmate-patient was conducted.

There was no instance of consensus not being achieved on the disposition of a recommendation for any inmate-patient's referral to DMH. A planned review similar to the CCAT process therefore did not have to be utilized. Final decisions for each case, including ultimate failure to arrive at a consensus, were to be documented, described, and summarized in a Project Report at the conclusion of this assessment. DMH referral packets were to be completed by assigned institutional staff within ten working days in order to expedite the process. The Assessment and Referral Teams established a case review and referral list for each site visit. A copy of the list remained at the institution for follow-through on completion of referral packets. A second copy was forwarded to DCHCS HQ. A third copy of the list was forwarded to DMH HQ.

Institutions were directed to submit all referrals to DCHCS HQ instead of directly to DMH in order to track, copy, and check for required documentation. Because most institutions are not submitting complete referral packages, requests for the additional documentation must be made. This delays forwarding some of the referral packages to DMH within the HQ internal timeline of 24 hours until the missing documents are received from the referring institutions.

A tracking log continues to be kept to document the date when referral packages are received at HQ from the institutions. The log denotes the date that DCHCS HQ forwarded the reviewed referral package to DMH and the length of time the referral packages were held at HQ.

A change in the process was made early in Phase II to include an inmate-patient interview when an acute level of care referral was being considered. This change was precipitated from feedback by the institutional staff to ensure that the inmate-patient's current clinical status was consistent with the records reviewed and indeed warranted acute LOC.

The assessment team members were liberal in the referral criteria in order to capture inmate-patients' cases that may benefit from establishing baseline behaviors, diagnostic clarification,

treatment goals and further plan of care. The intent of the referral was to include inmate-patients that presented a clinical need for a comprehensive treatment program with an emphasis on skill development and a structured treatment environment.

Some of the challenges encountered by the clinical teams during the Phase II assessment process were related to incomplete clinical documentation, backlog of filing, poorly organized UHRs, lack of current MARs and/or correlating physician orders, and documentation not being in chronological order, making it more time consuming for the teams to make a determination of clinical status of the inmate-patients under review.

Some of the challenges encountered by the institutional staff in completing the referral packages in an expedited fashion were related to additional work load demands and labor resources in completing the required paperwork within the specified ten-day timeframe while continuing their usual patient care assignments, for example, having available physicians to complete the H&P forms.

The table below reflects a breakdown of cases reviewed by the Phase II assessment team.

Table 2. DMH Referral Phase II Roll-up (12 Institutions)

| Cases Reviewed | 655 |
| Cases Identified to be Referred by Review Team | 278 |
| Cases Identified *not* to be Referred by Review Team | 377 |

*The Phase II review team identified if inmate-patients should be referred or not to DMH. If referral was indicated by the review team, the institutional staff is to complete and submit DMH referral packages.*

## PHASE III

CDCR and DMH are currently working with Deputy Special Master Jones and his staff to finalize the Phase III plan. At this juncture, Phase III will consist of a) completing reviews for the inmate-patients remaining on the institutional master lists; b) training of institutional staff on access to higher levels of care; and c) analysis of compiled data to better estimate bed planning needs.

The DCHCS Mental Health Utilization Management Unit, with DMH, shall implement a systematic joint review and training process with institutional staff to ensure ongoing referrals to a higher LOC in a standardized fashion. The most important part of MH UM is to improve access to care by creating standardized, measurable, and reliable processes. MH UM will strive to match the patient's needs with the appropriate level and type of mental health care, whether it be an outpatient CCCMS, EOP level, CDCR inpatient MHCB level, or DMH acute or intermediate level of care. In collaboration with DMH, the Mental Health UM unit will inspect, monitor and perform utilization reviews prospectively, concurrently, or retrospectively regarding the courses of treatment or inpatient care provided to *Coleman* class inmate-patients. These reviews shall be undertaken to determine whether the course of treatment or services respected

8

the inmate-patients' due process rights and is clinically necessary and performed in accordance with the agreed upon rules and guidelines between DMH and CDCR. This will establish the sustainable collaborative process of reviewing intake, treatment and discharge practices to optimize outcomes for inmate-patients.

The table below reflects the number of cases to be reviewed during Phase III that were not reviewed during Phase II.

Table 3. Phase III Cases

| Cases Remaining for Phase III Review | 493 |
|---|---|

*Methodology*

To begin Phase III, the master referral list will be verified for accuracy. The institutions will be requested to have all available primary and senior clinicians be part of Phase III. In addition to a review of the current records by the assessment team members, participation will begin by the primary clinicians after study of the *IDTT Screening Checklist - Referral to DMH ICF* (see Appendix iii) and DMH ICF MOU admission criteria. Participation by the primary clinicians will also include providing current clinical data on the inmate-patient being reviewed.

If no decision is achieved in this step, the team shall conduct an interview with the inmate-patient. In all cases of decisions to refer for acute level of care, the team will conduct an inmate-patient interview. If a decision regarding a higher level of care cannot be reached, the case will be referred for review by CDCR and DMH clinicians, similar to the CCAT process, for final disposition.

The Assessment and Referral Teams will establish a Case Review and Referral List for each site visit. A copy of the list will remain at the institution for follow-through on referrals to be completed, and a second copy will be forwarded to DCHCS HQ. A third copy will be forwarded to DMH. Inmate-patients determined to be in need of a higher level of care will have a DMH referral packet completed within ten working days by assigned institutional staff.

DMH staff in Phase III will take on a modified role and will be part of the teaching teams and not part of the assessment/referral teams as in Phase II. The scope will be expanded to include all institutions, in varying degrees dependent upon mission.

*Timeline*

The schedule of visits showing the proposed start and completion dates for Phase III that has been submitted to Deputy Special Master Jones for the 12 institutions is attached as Appendix iv to this report. This schedule may be subject to change in order to accommodate all 33 CDCR institutions that CDCR expects to add to this Project. The timetable and details will be developed by the stakeholders and by the Deputy Special Master and his staff with the goal of completing this Project by the end of this calendar year. While waiting for the start of Phase III, Mental Health program staff at the institutions will continue to review their caseloads for DMH referral as usual and make referrals as clinically indicated.

*Plan*

This plan includes that the IDTT will incorporate the checklist, use it routinely, and apply it to each inmate-patient reviewed in IDTTs to better determine ICF placements in the future. Furthermore, CDCR HQ Nurse Consultants and other staff will perform institutional audits, clinical training, referral processing and tracking. The tracking process will begin from time of referral to DMH acceptance or denial, through discharge and review of the treatment outcomes. This plan will allow for sustained, improved, quality outcomes by combining the ongoing assessment with a teaching component for institutional IDTT members.

## Referrals Received by DMH

The total number of referrals generated by the Assessment and Referral Project are indeterminate at this time and will be known upon the completion of Phase III. However, for the time frame of April 1, 2009, through May 31, 2009, the referral of inmate-patients in the *Coleman* class (Penal Code § 2684) for inpatient care provided by DMH is as follows:

Table 4. Referrals Received by DMH

| Total Referrals | 808 |
|---|---|
| *Admissions (From Ongoing Referrals)* | *166** |
| *Admissions (Pts. Identified in Project)* | *69* |
| *Wait List (DMH facilities total)* | *531* |
| *Rejected Referrals* | *3* |
| *Rescinded Referrals* | *43* |

*\*includes four inmate-patients that were referred in March 2009 and admitted in April 2009.*

The information in Table 4 reflects the total number of referrals to DMH between April 1 and May 31, 2009. A total of 235 *Coleman* class inmate-patients were admitted to DMH within this time frame of which 69 (46 ICF and 23 Acute) were inmate-patients referred for inpatient care as a result of this Project. DMH is currently developing a tracking system that will be capable of specifically identifying referrals made through this project. As soon as this tracking system is in place, DMH will provide updates on patient movement to Deputy Special Master Jones twice per month. At this time, DMH is working with Deputy Special Master Jones to develop a plan to admit inmate-patients referred through the project on an expedited basis.

## NEXT STEPS

A follow-up report will provide information regarding the outcome of Phase III including the number of referrals made to and accepted by DMH and inmate-patients placed in ICF beds as a result of the Project. A final report at the end of this Project detailing bed planning data will be provided to all the stakeholders and to Navigant Consulting.

# EXHIBIT H

1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF CALIFORNIA

3                            ---oOo---

4       BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6       RALPH COLEMAN, et al.,

7              Plaintiffs,

8       Vs.                              CASE NO. CIV. S-90-0520 LKK

9       ARNOLD SCHWARZENEGGER,
        et al.,

10

11             Defendants.

12      _____/                    RECEIVED

13

14                                                      JUN 2 5 2009

15

16                            ---oOo---

17

18                       REPORTER'S TRANSCRIPT

19                   TUESDAY, JUNE 16TH, 2009

20           RE:   STATUS HEARING ON DEFENDANTS' PROGRESS ON

21                     COURT-ORDERED PROJECTS

22

23                            ---oOo---

24

25      Reported by:                     CATHERINE E.F. BODENE,
                                         CSR. No. 6926

                CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                              (916) 446-6360

15

1    not threatening anything.

2              MS. VOROUS:  I understand.

3              THE COURT:  I just want to see progress, real honest

4    to God progress.

5              There's also this -- Once again, out of the blue, has

6    come DMH's divorce from CDCR.  I don't know why.  I don't

7    know what's going on.  I don't care.

8              It isn't going to happen without this Court's

9    approval.  And it won't happen unless this Court is

10   absolutely satisfied that the people in the class will not be

11   disserved by that divorce.

12             I mean, if that isn't typical of what's gone on in

13   this case.  "Yes, we are."  "No, we're not."  "Yes, we are."

14             Plaintiffs request that defendants be required to

15   extend the contract with Navigant Consulting.  In their

16   response, defendants indicate they are exploring contracting

17   options to pursue after the Navigant contract expires at the

18   end of this year.

19             I must say, in this Court's view, the Navigant

20   contract has been a significant component of the development

21   of useful planning tools.

22             Defendants do not yet have a long-range Bed Plan, and

23   even when the projects approved today are completed, they are

24   not -- it will not have enough beds to meet present demand,

25   particularly for the EOP level of care.

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6
        I certify that the foregoing is a correct transcript
7
from the record of proceedings in the above-entitled matter.
8

9

10            IN WITNESS WHEREOF, I subscribe this
certificate at Sacramento, California on this 22ND day of
11   JUNE, 2009.

12

13

14   /S/ Catherine E.F. Bodene
        CATHERINE E.F. BODENE, CSR NO. 6926
15      Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25

# EXHIBIT I

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3           AND THE NORTHERN DISTRICT OF CALIFORNIA

4     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6  RALPH COLEMAN, et al.,        )
                                 )
7                   Plaintiffs, )
                                 )
8          v.                    )No. Civ S 90-0520
                                 )    LKK-JFM P
9  ARNOLD SCHWARZENEGGER,        )
   et al.,                       )
10                               )
                    Defendants. )
11 _____)
                                 )
12 MARCIANO PLATA, et al.,       )No. C01-1351 TEH
                                 )
13                  Plaintiffs, )
                                 )
14         v.                    )
                                 )
15 ARNOLD SCHWARZENEGGER,        )
   et al.,                       )
16                               )
                    Defendants. )
17 _____)

18

19          Deposition of JOHN MISENER, taken

20          on behalf of the Plaintiffs, at

21          315 Montgomery Street, 10th Floor,

22          San Francisco, California, commencing

23          at 9:54 a.m., Tuesday, January 29, 2008,

24          before Karen Moon, Certified Shorthand

25          Reporter No. 12450.
```

2

BARKLEY
Court Reporters

1    to identify individuals and then extrapolate the

2    proportion that you're auditing to the whole population

3    and say, we're about 5 percent low in terms of what the

4    real needs are here.

5    BY MS. WHELAN

6         Q    So to summarize my understanding of what you

7    said, you, in your formula, consider wait list data as a

8    way to capture unmet need.  But the other piece of data

9    that you have recommended to CDCR to create is a

10   periodic update of the UNA study so that you can also

11   capture information about unmet need based on clinician

12   reviews of files and patients; is that correct?

13        A    I think that's a fair statement, yes.

14        Q    In the absence of periodic UNA type studies,

15   is it accurate to say that you have no way of

16   incorporating into your data unmet need, other than

17   through the wait list data?

18        A    I would say that's correct.

19             But during a forecast, we identify a

20   particular program that's going south or decreasing in

21   volume, and we bring it to the attention of the --

22   either the department or DMH as to why this is

23   occurring.  Because there may be reasons other than need

24   involved.

25             A good example of that is Patton State Prison.

49

BARKLEY
Court Reporters

1          So I'm not sure that that's as much concern to

2     me as the CMF issue.  I mean, it seems to build --

3     starting to build back up.  So I'm not sure exactly

4     what's going on, the most recent data.

5          Q    Going back to our discussion about the unmet

6     needs assessment, we looked at Exhibit 3, which was an

7     E-mail back in January 2006 from you to Sharon Riegel

8     discussing the UNA study.  And at that time, it appears

9     that you were trying to tie up loose ends about what

10    happened with the inmate patients involved in that

11    study.

12          I'm trying to understand whether or not that

13    study is part of your forecast now, or whether you have

14    since stopped referring back to that unmet needs

15    assessment with respect to your current formula.

16          A    We don't have any new adjustment factors

17    associated with the old study, no.  Except that the

18    actual increase in the -- in either the discharge rate

19    or the census rate over time reflects the UNA addition

20    in 2005 and 2006.  It's the actual curve in the use of

21    the formula to look at the future forecast, takes into

22    account that higher rate.

23          But we don't have any new numbers to add to

24    2007 and 8 and going forward until -- unless there

25    happens to be another UNA type study to add on to it.

                                53

BARKLEY
Court Reporters

1          <u>DEPOSITION OFFICER'S CERTIFICATE</u>

2

3   STATE OF CALIFORNIA          }
                                 }    ss.
4   COUNTY OF ALAMEDA            }

5

6          I, Karen Moon, hereby certify:

7          I am a duly qualified Certified Shorthand

8   Reporter in the State of California, holder of

9   Certificate Number CSR 12450 issued by the Court

10  Reporters Board of California and which is in full force

11  and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13  affirmations pursuant to California Code of Civil

14  Procedure, Section 2093(b) and prior to being examined,

15  the witness was first duly sworn by me.  (Fed. R. Civ.

16  P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18  counsel of any of the parties, nor am I a relative or

19  employee of such attorney or counsel, nor am I

20  financially interested in this action.  (Fed. R. Civ. P.

21  28).

22         I am the deposition officer that

23  stenographically recorded the testimony in the foregoing

24  deposition and the foregoing transcript is a true record

25                        / / /

                          235

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3         Before completion of the deposition, review of

4   the transcript [xx ] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated:  February 22, 2008

10

11   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BARKLEY

# EXHIBIT J

**Ritika Aggarwal**

| | |
|---|---|
| **From:** | Michael W. Bien [mbien@RBG-Law.com] |
| **Sent:** | Friday, November 20, 2009 5:43 PM |
| **To:** | Matt Lopes; 'Kelso, Clark' |
| **Cc:** | Katherine Tebrock; Donald Specter; Coleman Special Master Team; Coleman Team - RBG Only; Debbie Vorous |
| **Subject:** | Coleman: Stark Project |

Matt and Clark,

As you know, Jane Kahn and Amy Whelan were given an opportunity to tour Stark this week, along with Deborah Hysen, Katherine Tebrock, Kerry Hughes, Bill Alvarez (and others). Based on our inspection, the comments we received from Jeff Metzner and others, and consultations with our experts, the Stark EOP project should be reduced in scope substantially. It is simply incredible that CDCR will, in fact, provide the out of cell "mitigation" that Dr. Metzner stated would be necessary to address the deprivation of a crowded and double-celled Stark facility for EOP patients. Nor has any representative of CDCR agreed that the extra out of cell and programming time were necessary or even possible at Stark.

Given the size of the cells, the age and other limitations of the facility, and other challenges, we would not be comfortable with an EOP program at Stark that included double-celling. The capacity at Stark should be no more than 550 EOP GP's, 50 EOP ad seg beds and 30 MHCB beds. Given the Navigant projections, defendants would have to find a new location for approximately 225 EOP beds. If Dewitt is used, the program there would increase from 375 to 600.

Please also be aware that we cannot support any plan that intends to double-cell class members at Stark, Dewitt, or any other location. The cells that Jane and Amy observed are barely large enough, pursuant to ACA and other standards, to house a single person. We understand that the Dewitt cells will be modeled on the 270 buildings, which we have been informed, also include cells large enough for one person, not two. We cannot consent to long-range plans that require overcrowding in violation of building, correctional, and legal standards.


Michael Bien

ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
mbien@rbg-law.com
www.rbg-law.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com.

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

11/29/2009