PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
ALISON HARDY, Bar No. 135966
SARA NORMAN, Bar No. 189536
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
ERNEST GALVAN, Bar No. 196065
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARK FEESER, Bar No. 252968
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111-5994
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants | No. Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>PLAINTIFFS' RESPONSE TO DEFENDANTS' NOVEMBER 12, 2009 POPULATION REDUCTION PLAN |

1  The *Coleman* and *Plata* Plaintiff classes, through their respective counsel, jointly
2 submit this response to the States' Population Reduction Plan filed on November 12, 2009.
3 The State's plan meets the requirements of this Court's August 4, 2009 Order. It provides for a
4 reduction in the population of the 33 adult prisons to 137.5% of design capacity within two
5 years. Appendix A to State Defendants' Nov. 12, 2009 Response to the Three-Judge Court's
6 October 21, 2009 Order ("State's Plan"), *Plata* Docket No.2274-1 at 22. It includes six-month
7 benchmarks, and it identifies State law barriers to accomplishing the full population reduction.
8 *Id.* at 16-22.
9  In order to afford the State the maximum possible discretion in implementing a prison
10 population reduction, plaintiffs propose that the Court enter an order requiring the State to
11 reduce its prison population according to the six-month benchmark schedule set forth in the
12 State's population reduction plan. Rather than ordering the State to utilize particular
13 population reduction methods, the Court should leave to the State the discretion and flexibility
14 to choose which methods it uses to accomplish the reduction, and to modify those methods as
15 necessary to achieve the required population reduction. This approach is consistent with
16 *Bounds v. Smith*, 430 U.S. 817, 832-833 (1977) and *Lewis v. Casey*, 518 U.S. 343, 361-363
17 (1996), and with this Court's August 4 order (August 4 Opinion and Order at 122-124, 183). It
18 will not unduly interfere with prison administration and allows the State to exercise "wide
19 discretion within the bounds of constitutional requirements." *Lewis*, 518 U.S. at 363 (citation
20 omitted).
21  The PLRA requires that the Court "give substantial weight to any adverse impact on
22 public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. §
23 3626(a)(1)(A). The Court has done so, in great detail. August 4, 2009 Opinion and Order at
24 131-167. Most elements of the State's plan adhere to population reduction methods –
25 diversion and moderately reducing length of stay – that this Court has already found to be safe,
26 and that are consistent with policies found to be safe and effective in other states. *Id*. at 131-
27 181. The overwhelming evidence in this case is that reducing the population using such
28 methods will have no adverse impact on public safety or the operation of a criminal justice

system. *Id.* The State has also proposed reducing crowding by constructing new prison beds and transferring additional prisoners to out-of-state institutions, private institutions, and to federal custody, methods that merely shift the location of prisoners but do not have an adverse impact on public safety or the operation of the criminal justice system.[1]

If, however, the State finds that it cannot accomplish one of its chosen population reduction methods in time (*e.g.*, if construction takes longer than anticipated, or if one of the other methods does not result in the expected population reduction), the State should be given flexibility to change course and to accomplish the required population reduction method by a different means, while still meeting the court-ordered benchmarks.

It is unnecessary for the Court to order the waiver of any State laws at this time. As the State acknowledges, much of the population reduction can be accomplished under current State law. In addition, the State indicated that it will seek "additional reforms" from the Legislature. *See* State's Plan at 17 ("The Administration will seek legislation to establish a program of alternative custody options for low-risk offenders."). Moreover, because the Prison Overcrowding State of Emergency of 2006 remains in effect, the Governor maintains extraordinary powers to accomplish his chosen population reduction measures. Under the State of Emergency, the Governor has authority to "suspend any regulatory statute, or statute prescribing the procedure for conduct of state business, or the orders, rules, or regulations of any state agency." Cal. Gov't Code § 8571. The Governor's emergency power specifically includes releasing prisoners. *Id.* at § 8658.[2] In addition, the Secretary of CDCR has the

---

[1] Since the Court already has determined that the population reduction measures chosen by the State can be employed safely and since plaintiffs propose that the Court not order the State to adopt any specific method, there is no need for an evidentiary hearing on the impact of the State's plan. If intervenors believe that other methods will be equally effective and more safe, they are free to use the State's political process to promote a different approach. In the event the Court believes a hearing is necessary, plaintiffs suggest that the Court not consider intervenors' objections to a particular method unless they are accompanied by a proposal for an equally effective alternative.

[2] To date, the Governor has exercised his emergency powers to waive State laws so that he could implement one aspect of his population reduction plan: transferring prisoners to out-
(continued …)

authority in an emergency to limit the prison population by directing that prisoners serve their time in county jails or "other facilities". Cal. Penal Code, § 2900(b)(1).

If the State contends that it cannot accomplish the population reductions laid out in its November 12 plan without waivers of the State law, notwithstanding the Governor's emergency powers, the State should so advise the parties and the Court at the earliest possible date, so that proceedings regarding waivers of State law do not cause further delay.

As this Court's August 4, 2009 order demonstrates, the lives and well-being of tens of thousands of class members are in peril because of the drastic level of crowding in California's prisons. At the same time, violence in the prisons is swelling, causing ever more demand on the health and mental health care systems. Just after the court issued its August 4 order, a devastating riot erupted in an overcrowded prison at the California Institution for Men at Chino, California. The Governor toured the facilities, and attributed the riot to overcrowding. He noted that the riot "is a terrible symptom of a much larger problem, a much larger illness. *The reality is that the entire prison system is in a state of crisis. It is collapsing under its own weight.*" Appendix A (governor's remarks, published at http://gov.ca.gov/speech/13023 (site last visited Dec. 7, 2009); Appendix B (still frames from the October 5, 2009 BBC News story, "California's Overcrowded Prisons," showing recent conditions at the California Institution for Men in Chino, and images of the August 2009 prison riot and its aftermath, http://news.bbc.co.uk/2/hi/programmes/world_news_america/8291916.stm (site last visited Dec. 7, 2009)). It is imperative that the State begin implementing its population reduction measures as soon as possible.

Accordingly, plaintiffs respectfully request that this Court enter an order requiring

---

of-state prisons. Pls.' Exh. 1 at 6. The Governor could also invoke his emergency powers to implement other elements of the State's population reduction plan. Defendants never explain why waivers of State law are necessary in light of Penal Code § 2900(b)(1), the California Emergency Services Act and the California Court of Appeal's holding that the prison overcrowding emergency was sufficient justification to invoke the Governor's emergency powers. *California Correctional Peace Officers Association v. Schwarzenegger*, 163 Cal.App.4th 802 (Cal. App. 2008).

Defendants to achieve the benchmarks for reducing the population as described in the State's population reduction plan, and leave to the State the flexibility to implement and modify its population reduction measures.

Dated:  December 7, 2009                      Respectfully submitted,

PRISON LAW OFFICE

By:      /s/ *Rebekah Evenson*
         Rebekah Evenson
         Attorney for *Coleman* and *Plata* Plaintiffs

# Appendix A


Office of the Governor — ARNOLD SCHWARZENEGGER, THE PEOPLE'S GOVERNOR

# GOVERNOR'S REMARKS

Wednesday, 08/19/2009 1:35 pm

## Governor Tours the California Institution for Men in Chino

### WARDEN FAKHOURY:

Good morning and welcome to the California Institution for Men State Prison, Chino Reception Center West. I'm Aref Fakhoury, acting warden at the California Institution for Men, also known as CIM.

I'm pleased to have the opportunity to be here this morning with the governor of the great state of California, Governor Arnold Schwarzenegger, along with the Secretary of the California Department of Corrections and Rehabilitation Matthew Cate and Assemblywoman Norma Torres.

Before I introduce you to the Governor, let me take a moment to thank all the CIM staff for their courageous response to stop the major disturbance here at our C-West facility on August 8th, 2009. Through staff's quick and safe response they were able to control the incident, save lives and quickly bring order back to the facility. Staff's professional commitment to duty displayed throughout this incident is a shining example of their dedication to ensure our committees are safe.

I also want to thank our Correction families for their sacrifice through these types of incidents and situations and to thank our fellow staff from responding institutions for the assistance they provided. In addition I want to thank the local law enforcement from the city of Chino, Chino Hills, San Bernardino Sherriff, city of Ontario, as well as the Chino Valley Independent Fire District, for the valuable assistance they provided in response to the incident.

And now it is with great pleasure and honor that I introduce you to Governor Schwarzenegger. (Applause)

### GOVERNOR SCHWARZENEGGER:

Well, thank you very much, Warden Fakhoury, for your introduction and it's great to be here today and get a tour. Two weeks ago, as you know, these prison grounds were the scene of a tremendous amount of violence and a violent riot. It involved hundreds of inmates. Beds and mattresses were torn apart and destroyed and walls and bathrooms were destroyed. Inmates would pick up, to try to find anything they could to just hit each other, or stab each other with broken glass and so on and entire housing units were burned. It looks like a scene from one of my movies except this is a real danger here and real destruction.

A few minutes ago I had the chance of and shook hands with some of the brave men and women who entered the danger zone and restored order here. I want to thank Warden Fakhoury and Secretary Cate for taking me and also Assemblywoman Torres, on a tour here and showing us what was going on there.

Let me tell you something, they did an extraordinary job. And this is why I wanted to come here today to thank them for their spectacular job, because they did this all without the loss of a single life. Let me again thank them, to all of the staff at the California Institution for Men, for their extraordinary effort and work and for their bravery. You go to work every day under the most difficult and dangerous circumstances and conditions and California appreciates the great work that you are doing and the kind of great sacrifices that you make.

Now, the riot here at Chino was a single incident. However, it is a terrible symptom of a much larger problem, a much larger illness. The reality is that California's entire prison system is in a state of crisis. It is collapsing under its own weight. Spending on prisons has nearly doubled in the last five years. We spend here in our state nearly $49,000 per inmate per year, where the national average is $32,000.

Share Page

And it's hard to argue that the money is spent wisely and efficiently. We have one of the highest rates of recidivism in the nation. Our prisons are overcrowded and endangering the staff and the inmates. Here in Chino nearly 6,000 inmates are in these facilities and the facilities were built only for 3,000.

And the politicians in Sacramento have swept the problem under the rug for so long California is quite literally losing control of our prisons. A federal judge has taken over the healthcare system already. Two weeks ago the federal court imposed a cap that will force the early release of 40,000 inmates.

And all of this is happening in the midst of an economic crisis that has forced us to make tough cuts also right here, not only in government but in our prisons. The budget that I signed just a month ago includes $1.2 billion in cuts and the legislature right now is debating on how to achieve those kind of savings.

Some say that the answer is to just get rid of or weaken the Three Strikes but that's not going to happen on my watch. Others say let's just open up the gates and let criminals out and roam the streets. Well, let me tell you something, this is also not going to happen on my watch, because public safety is our number one priority.

I think it's very important we must be measured and smart about how we go about and create those reductions. We must find a way to cut costs and relieve overcrowding but without sacrificing public safety. Not all criminals and not all crimes are created alike, that's very clear and this is why I have proposed and put forward a certain proposal of reforms so that we can reduce the cost of running those prisons:

- For instance, reducing parole caseload ratios from 70/1 to 45/1, allowing us to strengthen supervision of the most serious and violent offenders;

- Or allowing certain low-risk offenders to serve the last 12 months of their sentence under house arrest with GPS monitoring;

- Or adjusting our property crime thresholds and reduce some of the 'wobblers' to misdemeanors. These are reforms that will make our communities safer, our prisons safer and give taxpayers a greater return on their investments.

And I cannot stress enough that the time for action is now. It is very important that the legislators recognize that every single day it costs us an extra $3 million if we don't have those reforms and this is why I urge Democrats and Republicans to work together and to create those reforms as quickly as possible. I know they can do it.

Thank you very much. And now I would like to bring up Secretary Cate to say a few words. Thank you.

### SECRETARY CATE:

At about 1:30 in the morning on Sunday, August 9, I got the call that no secretary of Corrections wants to hear; that there's a major riot in one of the prisons. On these fields and in these dorms we had almost 1,300 inmates rioting and we had about 30 officers, 30 cops in these dorms and in those towers and on this yard.

And my primary purpose is to thank those officers for the job they did in retaking this facility. I'm very proud of the work they did under those kind of odds. They retook it one-by-one without the loss of life. They retook it one-by-one without officers being severely injured, no hostages, no deaths and I just appreciate that very much.

I want to especially thank our version of the SWAT team, our Crisis Response Team, for the work they did in going through these dorms and storming them one-by-one and retaking them for the state.

I also want to thank Director Hubbard and Assistant Director Knowles for the work they did in organizing us in these last two weeks. I think that it's really a testament to the professionalism of our staff that we sit here today with so much of this already cleaned up.

I want to thank the inspector general, who is going to review this for us and especially our law enforcement partners who surrounded this facility to ensure that no inmate escaped regardless of what was happening.

So I just have a great deal of gratitude for all of the public servants who were at work that night and in those early morning hours and the work that they did. Whether they work for the state or for the local law enforcement or the fire department,

Share Page

they just did a great job.

The Governor is absolutely right about this crisis. There are 6,000 inmates in a 3,000-inmate facility and that makes everything we do more difficult. The Governor declared a state of emergency in overcrowding three years ago. We need action now and so with the Governor we'll be seeking reforms, the reforms that were first proposed by Governor Deukmejian in 2005 and the expert panel on recidivism reduction. Reforms will allow us to reduce overcrowding, to reduce recidivism rates.

I believe we can have a criminal justice system and a system of corrections that can one again be a leader, a national leader for inmate programs as well as safety and security. I think we can have it all; we just need to get a handle on this overcrowding issue first.

So I think we're at a turning point of this criminal justice issue and I want to say thank you to the Governor for his leadership, to Assemblymember Torres for her support in being here. Thank you to the warden for his work.

And now I'll turn it back over to the Governor for a question and answer period.

### QUESTION/ANSWER:

**GOVERNOR:** Again, I just want to reiterate also how proud I am of Warden Fakhoury and also of Secretary Cate for the great leadership that they have provided. I was very proud of them when this whole thing took place and it actually turned out, under the circumstances, so well without any lives lost. So thank you to both of you for your great leadership.

So if you have any questions about that, please feel free.

**QUESTION:** We all know how expensive it's going to be to clean up; we've heard upwards of $6 million. The state budget is not in a good position, teachers are getting laid off, people are frustrated that we're having to pay that kind of money because of a riot. How do you think, how do you feel about that?

**GOVERNOR:** Well, I think, first of all, it will cost us money; this is very clear. And this is why it was very important and why I fought a month ago when we did our budget, that we have a reserve. Remember, the legislature left me with $156 million in the hole. This would have been the first time where we had no reserve and this is why I fought for a reserve. And that's why we have a $500 million reserve, so we can take care of things like that, or if we have fires and so on, because there are always emergencies. We have to have the money available so that we can clean up quickly and rebuild as quickly as possible and that's what we're going to do.

But it doesn't address -- I just want to make sure also that you understand that it doesn't address really the larger issue. I think that the reforms will address some of the larger issues. The reality of it is, as you can see, in the last two decades we have had this mess. I mean, lawmakers and people are very quick to pass laws to be tough on crime. But every time you're tough on crime you put more people in the prisons but then where's the funding mechanism? Where are the funds, the extra funds? So what you basically do is and that's why I said earlier that we have doubled the amount of money we spend on prisons in the last five years and that means that you're taking money away from other programs.

So I think that it is very important we reform, that we reduce the prison population. We have already started doing great work by sending some of them outside the state to other prison facilities. And now we have to do some reforms and I think that will get us the savings.

Yes?

**QUESTION:** As your reforms are debated by the legislature there are several Republicans who feel that this is not a case of overcrowding and they have questioned and doubted that there is overcrowding. What do you say to that, specifically to your Republican colleagues?

**GOVERNOR:** I think it's very important to recognize that, when you go to a facility like here in Chino, that you have a facility that's built for 3,000 inmates and you have 6,000 here. That's overcrowding. No matter if you're a Republican or if you're a Democrat, that's overcrowding. And that is the case all over the state of California. We have facilities altogether that are for 100,000 inmates and we have 165,000 inmates. It's too many. That's why federal judges have now said that if we don't go and have reform and start ourselves looking at how to reduce the population that they will force us into reducing by 40,000 inmates. So we have to do something about it.

So look, I have been around. I have been going to prisons in my bodybuilding days, in the '70s, going to work out with inmates in various different prisons, basically all of the prisons all over California. So I see the difference between now and what it was then. Then there was no overcrowding. Now there is serious overcrowding and it's very, very dangerous for the staff and it's very dangerous for the inmates.

And we can do better and I think that we are going to do better now when the legislators go in there and start negotiating and creating those reforms.

Thank you very much, everybody. Thank you for coming out.

Share Page

# Appendix B



http://news.bbc.co.uk/2/hi/programmes/world_news_america/8291916.stm
BBC World News America, Oct. 5, 2009, last visited Dec. 1, 2009, frame occurs at approximately 0 minutes, 18 seconds



http://news.bbc.co.uk/2/hi/programmes/world_news_america/8291916.stm
BBC World News America, Oct. 5, 2009, last visited Dec. 1, 2009, frame occurs at approximately 2 minutes, 0 seconds

[330682-1]



http://news.bbc.co.uk/2/hi/programmes/world_news_america/8291916.stm
BBC World News America, Oct. 5, 2009, last visited Dec. 1, 2009, frame occurs at approximately 2 minutes, 15 seconds

[330500-1]

Case 2:90-cv-00520-KJM-SCR   Document 3742   Filed 12/07/09   Page 15 of 15



http://news.bbc.co.uk/2/hi/programmes/world_news_america/8291916.stm
BBC World News America, Oct. 5, 2009, last visited Dec. 1, 2009, frame occurs at approximately 2 minutes, 18 seconds.

[330499-1]