EDMUND G. BROWN JR.
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
DEBBIE J. VOROUS, State Bar No. 166884
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Debbie.Vorous@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                    Plaintiffs,<br><br>       v.<br><br>**ARNOLD SCHWARZENEGGER, et al.,**<br><br>                                    Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**DEFENDANTS' RESPONSES TO PLAINTIFFS' RESPONSE TO DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN AND REQUEST FOR EVIDENTIARY HEARING** |

///

///

///

1

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

| Acronym List | |
|---|---|
| **Term** | **Definition** |
| AB | Assembly Bill |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | Consolidated Health Care Facility |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| DJJ | Division of Juvenile Justice |
| DMH | Department of Mental Health |
| DOF | Department of Finance |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| ICF | Intermediate Care Facility |
| MCSP | Mule Creek State Prison |
| PSU | Psychiatric Services Unit |
| RJD | Richard J. Donovan Correctional Facility |

2

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

## INTRODUCTION

On November 6, 2009, Defendants submitted a detailed long-range mental health bed plan, including activation schedules, to which Plaintiffs then filed extensive comments in response. First, Plaintiffs erroneously assert that Defendants did not materially comply with this Court's September 24, 2009 order concerning three of their construction projects—the Consolidated Care Center (CCC) in Stockton, the Stark Division of Juvenile Justice (DJJ) facility, and the Dewitt DJJ facility. In addition, Plaintiffs ask this Court to make orders that reach beyond the scope of this Court's September 24, 2009 order, are not at issue in this proceeding, and are unnecessary. Lastly, Plaintiffs ask this Court to order that Defendants not double cell Enhanced Outpatient Program (EOP) General Population (GP) inmates at Stark. Plaintiffs also requested that the Court hold an evidentiary hearing on these matters.

Defendants submit this response in order to respond to Plaintiffs' inaccurate statements that Defendants have not materially complied with this Court's order, to address Plaintiffs' extraneous requests, and to explain why double celling at Stark is appropriate. Additionally, Defendants believe that an evidentiary hearing is unnecessary, particularly in light of this response. And notably, after Plaintiffs filed their response to the long-range mental health bed plan, Plaintiffs responded to Defendants' November 12, 2009 prisoner reduction plan, which included the same mental health projects that were identified in the long-range plan. But Plaintiffs acknowledged in their latter response that an evidentiary hearing was not needed. (Docket No. 3742 at 3, n.1.) Defendants agree. An evidentiary hearing is not necessary here because Defendants have materially complied with this Court's order.

## DEFENDANTS' RESPONSES

**I. DEFENDANTS' LONG-RANGE MENTAL HEALTH BED PLAN MATERIALLY COMPLIES WITH THIS COURT'S SEPTEMBER 24, 2009 ORDER.**

On September 24, 2009, this Court ordered that Defendants file with the Court a detailed long-range bed plan, including activation schedules, and that the timetables for completing the projects shall be developed in such a way that the projects will be fully staffed and activated by 2013. (Docket No. 3686 ¶ 2.) This Court also stated that in the event of material non-

3

1  compliance, it would set an evidentiary hearing concerning the reason or reasons for
2  noncompliance. (*Id. ¶ 5.*)
3   Defendants' plan materially complies with this Court's September 24, 2009 order. Because
4  Defendants' plan satisfies the mental health bed need projections set forth in the Navigant
5  Consulting Spring 2009 population projections to 2013, and it includes realistic activation
6  schedules and time tables that largely reflect the Court's timeframe, the plan materially complies
7  with the Court's order, and an evidentiary hearing is not needed. (Docket No. 3724–2.)
8   First, Defendants address Plaintiffs' concerns about the activation dates for the CCC, the
9  Stark DJJ Conversion, and the Dewitt DJJ Conversion. In their November 6, 2009 plan,
10  Defendants informed the Court that these three projects would be activated in 2014, after the
11  Court-ordered deadline. As discussed below, due to recent authorization to use the "design-
12  build" procurement process, CDCR anticipates that the CCC can be completed in 2013.
13  With respect to the Stark DJJ Conversion, Defendants informed the Court that, absent State law
14  waivers, the 2014 time line reflected the most realistic current depiction of the schedule given the
15  need to accommodate the short-term occupancy following the riot at California Institution for
16  Men (CIM). (Docket No. 3724–2 at 9, n.6.) And concerning the Dewitt DJJ Conversion, that
17  time line is premised on completion of the State's environmental review process—a lengthy
18  process outside Defendants' control. (*Id.*)
19   Second, Defendants address the 70-bed female EOP-GP beds. In their November 6, 2009
20  plan, Defendants identify where and how Defendants will meet the needed capacity. (Docket No.
21  3724-2.) Once the impacts from the prisoner reduction measures are realized, Defendants will
22  determine which of the three female institutions will house the EOP-GP population in 2013, and
23  whether the bed need remains. (*Id.*, at 12, n.12.)
24   Here, because Defendants have materially complied with this Court's September 24, 2009
25  order, this Court should deny Plaintiffs' request for an evidentiary hearing. Nonetheless,
26  Defendants provide the following information in further response to Plaintiffs' response.
27  / / /
28  / / /

4

### A. The Consolidated Care Center and DJJ Conversions.

#### 1. The Consolidated Care Center.

In Plaintiffs' November 30, 2009 filing, they requested an evidentiary hearing on the activation schedule for the CCC and the status of CDCR's request for "design-build" authority. (Docket No. 3733 at 9:11-17.) Such a hearing is not needed because the "design-build" authority was approved and the CCC beds are now scheduled to come on line in 2013.

Defendants' November 6, 2009 plan shows that patient admissions were scheduled to commence on December 19, 2013, and be completed on September 15, 2014. (Docket No. 3724–2, Ex. 1.) In order to expedite construction and activation of the beds, CDCR submitted a request to the California Department of Finance (DOF) under Senate Bill 4 (Second Extraordinary Session of 2009/10) for authorization to build the CCC as a "design-build" project to further accelerate the CCC construction time line. (Hysen Decl. ¶ 4; *see* Docket No. 3734, at 5:24–27, Ex. A.) This legislation authorizes CDCR to use the "design-build" procurement process in contracting and procuring a state prison facility for projects that will be completed after January 1, 2009 and before December 1, 2013. (Docket No. 3734, Ex. A.) On December 7, 2009, the DOF authorized CDCR to use the "design-build" procurement process in contracting and procuring a state contract for the CCC. (Hysen Decl. ¶ 4, Ex. 1 ) Based on this approval, CDCR expects that patient admissions will start on March 29, 2013, and be completed on December 24, 2013. (*Id.*) This activation schedule is subject to change based on issues outside the control of Defendants or the State, including litigation that is or may be pending to stop the project. (*Id.* ¶ 4.) Nonetheless, the CCC is scheduled to come on line in 2013, and an evidentiary hearing on this project is not needed.

#### 2. The DJJ Conversions.

In Plaintiffs' November 30, 2009 filing, they requested an evidentiary hearing on the activation schedules for the Stark and Dewitt DJJ Conversions and for further explanation as to why CDCR is not seeking "design-build" authority for these projects. (Docket No. 3733 at 9:16-19.) Such a hearing is not needed because the activation schedules present the most realistic and

5

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

1  reasonable time frames to complete these projects and the "design-build" process is not
2  appropriate for them.

3        To maximize the use of AB 900's funding resources, CDCR, in cooperation with the staff
4  of the *Plata* Receiver—(California Prison Health Care Services)—made a decision to renovate
5  three DJJ facilities—Stark, Dewitt, and Paso—as they were all viewed to include extensive
6  program and support space that would be appropriate to house a medical and mental health
7  population requiring outpatient healthcare services.  (Hysen Decl. ¶ 5.)  The decision to renovate
8  those facilities in order to maximize AB 900's funding resources, however, impacted Defendants'
9  ability to complete all of the mental health bed projects by 2013.  (*Id.* ¶ 6.)  Thus, as set forth in
10 the activation schedules, the time lines associated with renovating Stark and Dewitt extend into
11 2014.  (*Id.*; *see* Docket No. 3724–2 at 9, n.6.)  Nonetheless, the activation schedules that
12 Defendants submitted on November 6, 2009, for the Stark and Dewitt Conversions, reflect the
13 most realistic and reasonable time frames to renovate these projects.  (Hysen Decl. ¶ 7.)  In
14 addition, they reflect the time needed to accommodate the short-term occupancy at Stark
15 following the riot at CIM and the completion of a lengthy environmental review at Dewitt.  (*Id.* ¶
16 6.)  It would not have been appropriate for Defendants to set a time frame that they could not
17 meet.

18       Defendants noted in their long-range mental health bed plan that they would identify in
19 their November 12, 2009 prisoner reduction plan potential state law waivers "that could apply to
20 accelerate construction and activation of those projects requiring collaboration with the *Plata*
21 Receiver—the CCC and the three former DJJ facilities. . . ."  (Docket No. 3724-2 at 9, n.6.)  In
22 Defendants' prisoner reduction plan, they clearly identified state laws that lengthen the
23 construction and activation period beyond the 2013 timeframe.  (Docket No. 3726 at 20–21.)
24 This Court has appropriately put the burden to request state law waivers on the Plaintiffs, but they
25 did not request any such waivers in their response to Defendants' long-range plan.  (Docket No.
26 3686 ¶ 4.)

27       Plaintiffs also suggest that Defendants should seek "design-build" authority for the Stark
28 and Dewitt DJJ Conversions in order to accelerate inmate-patient admissions.  (Docket 3733 at

6

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

9:5–8.) But Plaintiffs offer no authority for the broad proposition that Defendants could utilize this legislative process for these projects. Regardless, the "design-build" approach is not a panacea to accelerating all project types. (Hysen Decl. ¶ 8.) These projects are not good candidates for use of "design build" because "design-build" projects are best suited to new construction projects where the early pairing of the architect and contract firm can reduce the planning and design time for buildings not yet designed. (*Id.*) This same pairing would not yield similar acceleration for the Stark and Dewitt projects because they involve renovating existing buildings. (*Id.*) This Court should therefore reject Plaintiffs' effort to replace their lay opinion for the professional opinions of CDCR facilities and program employees as well as the opinions of the *Plata* Receiver and his staff.[1]

Thus, an evidentiary hearing on these projects is not needed.[2]

**B.    Defendants' Long-Range Plan Addresses the Female Population.**

In Plaintiffs' November 30, 2009 filing, they requested an evidentiary hearing on Defendants' long-range mental health bed plan concerning the 70 EOP-GP female beds on the grounds that Defendants did not identify where they will place the 70 EOP-GP beds and did not submit an activation schedule. (Docket No. 3733 at 10:2–3.) Such a hearing is unnecessary, however, because Defendants have materially complied with this Court's order with respect to the female population. Defendants submitted activation schedules for the two court-ordered female projects—20 PSU Beds at California Institution for Women (CIW) and 45 ICF Beds at CIW—and explained their plan concerning the 70 EOP-GP beds. (Docket No. 3724-2 at 12–13.) Moreover, Defendants' plan to meet the 70 EOP-GP beds is unique, and to make a decision now with respect to the location, numbers, and timing would eliminate the ability of CDCR facilities

---

[1] Although Defendants have appealed the *Plata* District Court's order denying their motion to replace the Receiver with a Special Master and to terminate the Receiver's unilateral construction plans, no court has terminated the receivership or the Receiver's construction plans. Accordingly, Defendants continue to fully cooperate with the Receiver as required by court order in developing their long-range mental health bed plan.

[2] Plaintiffs also request an evidentiary hearing on prioritization of construction projects. (Docket No. 3733 at 9:19–21.) This Court should deny Plaintiffs' request because it is not relevant to these proceedings, reaches beyond the scope of this Court's September 24, 2009 Order, and is unnecessary.

7

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

and program employees to ensure that in 2013 there remains the same need for beds within the system. (Hysen Decl. ¶¶ 14–15.)

Defendants expect to meet the 2013 population projections for female EOP-GP inmates by converting existing housing to EOP-GP beds. (Docket No. 3724–2 at 7–8, 12.) It is premature to make the conclusion now, however, as to which of CDCR's three female prisons CDCR will utilize to meet this need in 2013. (Hysen Decl. ¶ 15.) It is possible that population reduction measures may reduce or eliminate the need for additional mental health beds in the female population. (*Id.*; *see* Docket No. 3726 at 5–10.) Defendants want to ensure that there remains a need for beds within the system, but the analysis with respect to where and when to convert the housing can only occur as CDCR rolls out its reform measures in 2010 and truer population impacts are known. (Hysen Decl. ¶ 15.) Moreover, given that CDCR anticipates that the conversion will be more akin to a population adjustment, rather than construction of a bed project, a detailed schedule on construction activity is not appropriate at this time. (*Id.* ¶ 14.) Thus, an evidentiary hearing is not needed.

## II. COMMENTS NOT ADDRESSED BY DEFENDANTS' PLAN.

Plaintiffs ask this Court to order that Defendants include in their plan two extraneous matters: (1) DMH's role in providing inpatient care to *Coleman* class members; and (2) findings of the modified needs assessment project. (Docket 3733 at 10:26–28, 12:8–11.) Plaintiffs further ask this Court to order an evidentiary hearing on aspects of Defendants' November 12, 2009 filing in the Three-Judge Court Proceeding. (*Id.*, at 14:13–19.) This Court should deny Plaintiffs' requests because they reach beyond the scope of this Court's September 24, 2009 order, are not at issue in this proceeding, and are unnecessary.

### A. DMH's Role in Defendants' Long-Range Plan.

Plaintiffs' request that Defendants' plan include specific details concerning DMH's role in the long-range mental health bed plan is beyond the scope of this Court's September 24, 2009 order and is not at issue in this proceeding. In addition, the request is unnecessary. Plaintiffs correctly point out that this Court, in response to Plaintiffs' prior request in conjunction with Defendants' May 26, 2009 filing, has already ordered that any "divorce" from CDCR must be

8

with its approval.  (Docket No. 3733 at 11:1-5; *see* Docket 3609 at 48:6–49:1, Plaintiffs' 6/9/09 comments on Defendants' May 26, 2009 bed plan.)  Moreover, Defendants have already "acknowledged that they are required to seek the Court's permission to change the status quo and that currently, DMH was designated to run the inpatient programs," including the CCC and elsewhere.  (Docket No. 3734 at 3:18-21.)  Therefore, no evidentiary hearing is needed.

### B.    The Modified Needs Assessment Project.

Plaintiffs' request that Defendants' plan include the findings of the modified needs assessment project is beyond the scope of this Court's September 24, 2009 order.  In addition, this Court has already determined that it "intends to assess each of the proposals before the Court with reference to the current needs as identified in the Navigant numbers, not with reference to the additional unmet needs now being reported."  (Docket No. 3632 at 3:14–17.)  Moreover, Plaintiffs' request is premature and unnecessary.  The modified needs assessment project is not complete—this Court has ordered that it "shall be completed by December 31, 2009."  (Docket No. 3613 ¶ 10.)  And Defendants have already committed to providing a final report to the Special Master and Navigant Consulting at the end of this Project, which will provide detailed bed planning data.  (Docket No. 3734-2 at 69.)  Therefore, no evidentiary hearing is needed.

### C.    Plaintiffs Acknowledge That an Evidentiary Hearing is Not Necessary.

In Plaintiffs' November 30, 2009 filing, they ask this Court to order an evidentiary hearing on Defendants' reception center, health care mission, and any non-medical or mental health care beds planned for any of the DJJ facilities.  (Docket No. 3733 at 14:13–19.)  Subsequently, on December 7, 2009, Plaintiffs informed the Three-Judge Court that no evidentiary hearing was needed on Defendants' November 12, 2009 revised prisoner reduction plan.  (Docket No. 3742 at 3, n.1.)  Because that latter plan contained the same mental health projects that were described in Defendants' long-range mental health bed plan, the same must hold true here.

Plaintiffs are also mistaken in their allegations—Defendants do not propose to change their healthcare mission at the DJJ facilities, and their plan remains to build a reception center on the grounds of CIM.  (*See* Docket No. 3724–2 at 11; Hysen Decl. ¶ 9.)  Regardless, Plaintiffs' request should be denied because it is based on inadmissible hearsay.  Cal. Evid. Code § 802; *see* Docket

9

No. 3734 at 4:19–21. In addition, Plaintiffs' request is beyond the scope of this Court's September 24, 2009 order, and is not at issue in this proceeding.

### III. THE COURT SHOULD NOT ORDER DEFENDANTS TO REVISE THEIR LONG-RANGE PLAN.

Plaintiffs ask this Court to order that Defendants revise their plan so that no EOP-GP inmates housed at Stark are double celled, and that CDCR only house Level I and Level II inmates at that facility. (Docket No. 3733 at 18:17–19:2.) Specifically, Plaintiffs request that Defendants reduce the planned EOP-GP inmate population at Stark by 225 inmates. (*Id.,* at 18:17-19.) Plaintiffs further argue that the Stark cells are too small for the EOP-ASU population. Plaintiffs ask that this Court order an evidentiary hearing on potential alternative sites for the EOP-GP population, Defendants' intention to house Level III and Level IV inmates at Stark, and proposed housing, programs, and staffing at Stark. (*Id.*, at 19:3–11.)

In support of their requests, Plaintiffs make five arguments: (1) that Stark is an inadequate and dangerous facility (Docket No. 3733 at 14:23–25:2); (2) foreseeable harm will result from double celling EOP-GP inmates at Stark, that it poses "severe risks to the health and safety of the EOP population," and "deleterious effects" come from that practice (*id.,* at 17:18, 18:17–18, 18:22); (3) the cell sizes are too small for EOP-ASU inmates (*id.*, at 17:3-4); (4) Defendants are unlikely to construct sufficient space and hire sufficient clinical and custodial staff to provide adequate out-of-cell time for EOP-GP inmates (*id.*, at 18:5-7); and (5) Stark should only house Level I/II EOP-GP inmates (*id.*, at 18:24–19:2). But, as already shown, Defendants' plan complies with this Court's September 24, 2009 order. This Court should therefore deny Plaintiffs' requests that Defendants revise their plan as noted above and their request for an evidentiary hearing. Nonetheless, Defendants provide the following discussion in further response to Plaintiffs' requests.

#### A. Plaintiffs Provide No Evidence to Support Their Contention That Stark is an Inadequate and Dangerous Facility.

Plaintiffs present no evidence to support their contention that Stark is an inadequate and dangerous facility. Instead, they simply criticize the narrow glass windows in the cells and

10

1 hallways, and note that a number of things in the facility need retrofitting. (Docket No. 3733 at

2 15:17-19, 16:1–5.) The windows at each CDCR facility are designed to ensure that they are safe

3 for the inmates, staff, and community. (Hysen Decl. ¶ 10.) The windows at Stark comply with

4 the required dimensions necessary to prevent escape. (*Id.*) CDCR intends to address during the

5 renovations a number of things in the cells, including the removal of desks/cabinets that present

6 ligature points, and the installation of electrical outlets for use in recreation and programming.

7 (*Id.*) In addition, CDCR's planned scope of work includes additional lighting, painting, general

8 cleanup, and repair/restoration to critical systems necessary to maintain operations. (*Id.*)

9 Therefore, no evidentiary hearing is needed.

**B.     Defendants' Plan to Double Cell EOP-GP Inmates at Stark is Appropriate.**

Plaintiffs present no credible evidence to support their contention that double celling EOP-GP inmates at Stark would be unsafe—they only present their own opinion on the practice.[3] But Plaintiffs are not experts, and this Court should reject Plaintiffs' counsel's efforts to replace their lay opinion for the professional opinions of CDCR facilities and program employees on the appropriateness of housing EOP-GP inmates at Stark.[4] *See* Cal. Evid. Code §§ 701–702; *Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979) (prison officials must be accorded wide-ranging deference in the adoption and execution of policies and practices concerning inmate housing).

Double celling inmates, including those participating in mental health services, is not only presumed, but is also consistent with California law. Cal. Code Regs. tit. 15, § 3269(a) (it is the

---

[3] Plaintiffs state that the Special Masters' experts echo their position that the cells are problematic, unsafe, and too small. (Docket No. 3733 at 17:9–24.) This Court should disregard any statements that Plaintiffs rely on as allegedly attributed to the Special Master's experts concerning Defendants' plan to house EOP inmates at Stark for the reason that these statements constitute inadmissible hearsay. Cal. Evid. Code § 802.

[4] CDCR expects to house up to 775 EOP-GP inmates at Stark. (Docket No. 3724–2 at 10.) Stark has three housing units—Units 1, 2, and 3. (Hysen Decl. ¶ 11.) CDCR expects to double cell up to 141% capacity. (*Id.*) Each housing unit has 400 cells. (*Id.*) CDCR expects to house EOP inmates in Unit 1 and in the West Wing of Unit 2, which encompass a total of 600 cells (400 cells in Unit 1 and 200 cells in Unit 2.) (*Id.*) The "quiet cells," which Plaintiffs' counsel mentions, are not included in this cell count. (*Id.*; *see* Docket No. 3734 at 7:17.) CDCR expects that Unit 1 will house only EOP-GP inmates in the 400 cells and that Unit 2 will house only EOP-GP inmates in 150 of the 200 cells and EOP-ASU inmates in 50 of the 200 cells. (*Id.*) Given a total of 550 cells available for EOP-GP inmates, and a total of 775 EOP-GP inmates, CDCR expects to double cell up to 141% capacity. (*Id.*)

11

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

expectation that all inmates double cell, whether housed in a Reception Center, GP, ASU, a Security Housing Unit, or specialty housing unit); § 3269(f) (in cases where single-cell status is recommended by clinical staff due to mental health concerns, a classification committee shall make the final determination of an inmate's cell assignment). Thus, Plaintiffs' argument ignores the protections embodied in the Institutional Classification Committee process—consideration of single-cell status, where clinically indicated.

In addition, the United States Supreme Court has held that double celling in and of itself is not unconstitutional; the analysis must encompass the specific circumstances of the application of a double cell policy. *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981) (rejecting district court's reliance on recommendation of several studies that each inmate have 50–55 square feet of living quarters to be insufficient to determine the constitutionality of double celling); *Bell*, 441 U.S. at 541–42 (rejecting district court's conclusion that double celling was unconstitutional based on mere fact cells were designed to house only one inmate).

Moreover, double celling mentally ill inmates has long been recognized in the research and in CDCR practice as the preferred method of housing. (Scaramozzino Decl. ¶¶ 4–5.) Double celling is a powerful deterrent to impulsive suicides. (*Id.* ¶ 5.) The reason is because individuals who are suicidal may be reluctant to engage in suicidal behaviors in front of others and CDCR's history indicates that there have been numerous occasions when an inmate with a cellmate has been prevented from completing an attempted suicide by the cellmate reporting the actions to staff. (*Id.*) Likewise, the mere opportunity to socially interact often reduces the suicidal impulse by providing an immediate thought to discuss one's thoughts and concerns before an action is planned or taken. (*Id.*) In addition, socialization and human interaction is a therapeutic treatment goal to enhance socialization skills and obtain a support network for mentally ill inmates. (*Id.* ¶ 6.) The continued human contact that occurs during the normal interaction of having a cellmate can assist in maintaining better reality testing skills. (*Id.*)

Plaintiffs also argue that the Stark cells are too small. Their argument, however, is premised on recommendations made by the American Correctional Association (ACA). (Docket

/ / /

12

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

No. 3733 at 16:10–14.)[5] But the ACA is not the bench mark. *See Bell*, 441 U.S. at 543 n.27 (holding that recommendations set forth in various studies, including the ACA standards, do not establish the constitutional minima; rather, they establish goals recommended by the organizations in question).

Therefore, no evidentiary hearing is needed.

**C.  EOP-ASU Inmates.**

Plaintiffs also argue that the Stark cells are too small for EOP-ASU inmates. (Docket No. 3733 at 17:3-4.) Again, their argument is premised on recommendations made by the ACA. (*Id.,* at 17:6–8.) Here, however, the cells meet the minimum unencumbered space recommended by the ACA. Defendants expect to house 50 EOP-ASU inmates at Stark. (Hysen. Decl. ¶ 11.) The ACA recommends that EOP-ASU cells have a minimum of 35 square feet of unencumbered space for single cell status. (Docket No. 3734-2 at 49.) The Stark cells have 38.55 square feet of unencumbered space. (Hysen Decl. ¶ 12.) Thus, Plaintiffs' own argument establishes that these cells are adequate to house EOP-ASU inmates. Regardless, Plaintiffs are not experts on this issue and CDCR officials must be accorded wide-ranging deference in the adoption and execution of their policies and procedures concerning EOP-ASU housing. *Bell*, 441 U.S. at 546–47. Therefore, no evidentiary hearing is needed.

**D.  Defendants Intend to Provide Adequate Program and Out-Of-Cell Time for EOP-GP Inmates.**

Plaintiffs present no evidence—only speculation—to support their contention that Defendants are unlikely to be able to construct sufficient space and hire sufficient clinical and custodial staff to provide adequate out-of-cell time for EOP-GP inmates. (Docket No. 3733 at 18:5-7.) But speculative arguments do not equal admissible evidence, and this Court should reject Plaintiffs' efforts to use this argument to support their position that Defendants' plan must be revised to reduce the EOP-GP population by 225 inmates. (*Id.*, at 18:5–16.) CDCR selected

---

[5] According to the architects and facility captains within CDCR's Design Standards Division, the cells measure 58.5 square feet in dimension, with 38.55 square feet of unencumbered space. (Hysen Decl. ¶ 12.)

13

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

the Stark facility for its extensive amount of space in and outside of the housing units and intends to provide sufficient programming and support space to service the EOP-GP population at that facility. (Kernan Decl. ¶¶ 6–7.) Moreover, CDCR recognizes its obligation to provide structured therapeutic programming for *Coleman* class members as outlined in the Mental Health Services Delivery System Program Guide (2009 Revisions). (*Id.* ¶¶ 3, 7.)

CDCR currently provides its EOP-GP populations at other CDCR facilities with programming and out-of-cell activities, which includes group and individual treatment with Mental Health staff, educational and vocational activities as available and appropriate for each inmate-patient, access to yard and dayroom and recreational activities, library, meals, showers, medical appointments, and religious services. (Kernan Decl. ¶ 3.) At this time, CDCR is still in the early stages of planning its program for the Stark facility, including the clinical and custody levels needed to support its program, but intends to model that program on the programming it has already established in already existing facilities that house EOP-GP inmates. (*Id.* ¶ 7.) Furthermore, CDCR has existing policies, procedures, and guidelines for programming EOP-ASU inmates, and CDCR intends to comply with those requirements as well. (*Id.* ¶ 9.)

Therefore, no evidentiary hearing is needed.

**E.    CDCR Has Discretion Where and How to House its EOP Population.**

Plaintiffs argue that Stark should only house Level I/II EOP-GP inmates because "there are no Level I or II EOP beds in the CDCR."[6] (Docket No. 3733 at 18:23-19:2.) Plaintiffs' reasoning, however, is faulty. CDCR has Level I/II EOP-GP programs at several prisons, including at the California Men's Colony, Mule Creek State Prison, Richard J. Donovan Correctional Facility, and the California Medical Facility. (Kernan Decl. ¶ 3.) Although Level I/II inmates may be housed in the same housing units as Level III inmates, CDCR provides the

---

[6] Plaintiffs also tell the Court that Stark must be rehabbed to accommodate inmates with existing disabilities since it will be the only facility capable of housing Level I/II EOP inmates. (Docket No. 3733, at 6:3, n.1.) Plaintiffs have already agreed to not object to the concentration of inmates and resources at particular institutions as long as such concentration is done in a manner consistent with the ADA. *See Armstrong v. Wilson,* No. C-94-2307 (N.D. Cal.), Docket No. 158.

14

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)

same program and out-of-cell activities for all EOP-GP inmates, regardless of their custody levels. (*Id.* ¶ 4.) This policy will not change at Stark. (*Id.* ¶ 8.)

Currently, CDCR intends to house predominately Level I and Level II EOP-GP inmates at Stark. (Kernan Decl. ¶ 6.) Stark, however, will be built to Level III security standards and will be surrounded by a lethal electrified fence, which CDCR requires for all facilities housing Level II and above inmates. (Hysen Decl. ¶ 13.) The facility will also include housing for the inmate work crew dedicated to maintain the facilities consistent with CDCR's policies. (*Id.*) These inmates will be separated from the EOP-GP population. (*Id.*) Should population reduction measures or other factors change CDCR's intended mission for this facility, however, CDCR retains the authority to determine whether to house not only Level I and Level II inmates at Stark, but also Level III inmates.

Therefore, no evidentiary hearing is needed.

## **CONCLUSION**

Defendants' long-range mental health bed plan materially complies with the Court's September 24, 2009 order, and is an appropriate response to the long-term bed needs of the Plaintiff class. Defendants believe that an evidentiary hearing is unnecessary, particularly in light of this response, and respectfully request that this Court deny Plaintiffs' request.

Dated:  December 11, 2009

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General

/s/ *Debbie J. Vorous*

DEBBIE J. VOROUS
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003
30914085

15

Defs.' Responses to Pls.' Response Re: Defs.' Long-Range Mental Health Bed Plan
(2:90-cv-00520 LKK JFM PC)