1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA  94710-1916
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARK R. FEESER. Bar No. 252968
315 Montgomery Street, 10th Floor
San Francisco, CA  94104-1823
Telephone:  (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107-1389
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, CA  94111-4066
Telephone:  (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

             Plaintiffs,

      v.

ARNOLD SCHWARZENEGGER, et al.,

             Defendants.

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDATIONS ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN CALENDAR YEAR 2007**

[338997-6]

PLS.' OPPOSITION TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDATIONS ON HIS EXPERT'S
REPORT ON SUICIDES COMPLETED IN CALENDAR YEAR 2007 - NO. CIV S 90-0520 LKK-JFM

1

# TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION ................................................................................................................ 1

4

ARGUMENT....................................................................................................................... 2

5

6

I.    DEFENDANTS WAIVED ANY OBJECTION TO THE
      RECOMMENDATIONS OF THE 2007 SUICIDE REPORT ........................................ 2

7

8

II.   THE RECOMMENDATIONS OF THE 2007 SUICIDE REPORT COMPLY
      WITH THE PLRA.................................................................................................... 5

9

      A.    Recommendation Number 1.............................................................................. 5

10

11

            1.    The Recommendation Addresses Defendants' Ongoing Failure to
                  Appropriately Utilize Available Information Located in Patients'
                  Unit Health Records or Central Files ............................................................ 6

12

13

14

            2.    The Recommendation, Which Merely Requires Identification of
                  Previously Documented Information, Does Not Interfere with the
                  Discretion and Peer Review Process of Treating Clinicians........................ 7

15

      B.    Recommendation Number 2.............................................................................. 7

16

17

            1.    The 2007 Suicide Report Constitutes the "Current Record" with
                  Regard to Suicide Review ........................................................................... 9

18

            2.    Defendants' Recent Filing Regarding ASH Admissions
                  Demonstrates the Need for the Special Master's Recommendation........... 10

19

20

            3.    The Recommendation Affords Appropriate Deference to
                  Defendants and Does Not Interfere with the Relationship between
                  DMH and CDCR ....................................................................................... 10

21

22

      C.    Recommendation Number 3............................................................................ 11

23

24

            1.    The Recommendation Addresses the Urgent Need to Put Clinical
                  Need First in Utilizing Inpatient Beds ...................................................... 12

25

            2.    Defendants' Inpatient Bed Planning Does Not Resolve the Need
                  for This Recommendation.......................................................................... 14

26

27

            3.    DMH Must Not Be Permitted to Avoid Accountability for
                  Admissions on the Pretext of Patient Confidentiality ................................ 15

28

      D.    Recommendation Number 4............................................................................ 16

i

[338997-6]

1.   The Special Master's Experts Have Determined a Full Review of Investigations into Staff Misconduct or Error is Necessary ...................... 16

2.   CDCR and DMH, as Defendants in this Case, are Required Under the Order of Reference to Produce Requested Documents to the Special Master ............................................................................................ 17

3.   The 2007 Suicide Report Contains Sufficient Evidence of Staff Misconduct, Negligence, or Error on the Part of DMH Regarding Suicides Occurring at DMH Facilities ......................................................... 17

CONCLUSION ..................................................................................................... 18

[338997-6]

# TABLE OF AUTHORITIES

Page

## Cases

*Cason v. Seckinger*,
    231 F.3d 777 (11th Cir. 2000) ........................................................ 9

*Gilmore v. California*,
    220 F.3d 987 (9th Cir. 2000) ........................................................ 9

*In re Portland Electric Power Co.*,
    97 F. Supp. 918 (D. Or. 1948) ........................................................ 2

*Madrid v. Gomez*,
    889 F.Supp. 1146 (N.D. Cal. 1995) ........................................................ 12

*Potter v. McCall*,
    433 F.2d 1087 (9th Cir. 1970) ........................................................ 17

*Steele v. Shah*,
    87 F.3d 1266 (11th Cir. 1996) ........................................................ 6, 7

## Statutes & Regulations

18 U.S.C. § 3626 ........................................................ 2, 5, 9

45 C.F.R. § 160.103 ........................................................ 8

45 CFR § 164.506 ........................................................ 8

Cal. Civil Code § 56.10(c)(1) ........................................................ 8

## Other Authorities

Fed. R. Civ. P. 53(g) 2003, Advisory Committee's Notes ........................................................ 2

PLS.' OPPOSITION TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDATIONS ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN CALENDAR YEAR 2007 - NO. CIV S 90-0520 LKK-JFM

[338997-6]

1

**TABLE OF ABBREVIATIONS**

2

| | |
|---|---|
| ASH | Atascadero State Hospital |
| CDCR | California Department of Corrections and Rehabilitation |
| DMH | Department of Mental Health |
| GACH | General Acute Care Hospital |
| HIPAA | Health Insurance Portability and Accountability Act |
| ICF | Intermediate Care Facility |
| OHU | Outpatient housing unit |
| PLRA | Prison Litigation Reform Act |
| QIP | Quality improvement plan |
| SNY | Special Needs Yard |
| SRAC | Suicide Risk Assessment Checklist |
| SVPP | Salinas Valley Psychiatric Program |
| UHR | Unit health record |
| VPP | Vacaville Psychiatric Program |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' OPPOSITION TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDATIONS ON HIS EXPERT'S
REPORT ON SUICIDES COMPLETED IN CALENDAR YEAR 2007 - NO. CIV S 90-0520 LKK-JFM

[338997-6]

1    On June 23, 2009, the Special Master submitted a draft of his Report on Suicides

2    Completed in the California Department of Corrections and Rehabilitation in Calendar Year

3    2007 ("Draft Report") to Defendants' and Plaintiffs' counsel.  Plaintiffs' counsel submitted

4    written comments regarding the Draft Report on July 22, 2009 and Defendants submitted written

5    comments on July 28, 2009.  On September 17, 2009, the Special Master, having carefully

6    considered the comments and objections of the parties, filed the final Report on Suicides

7    Completed in the California Department of Corrections and Rehabilitation in Calendar Year

8    2007 ("2007 Suicide Report" or "Report").  Docket No. 3677.  On October 1, 2009, Defendants

9    filed a Motion to Modify the Special Master's Expert's Report on Suicides Completed in the

10   California Department of Corrections and Rehabilitation in Calendar Year 2007 ("Motion to

11   Modify").  Docket Nos. 3695 through 3695-4.  Plaintiffs opposed Defendants' request to modify

12   the 2007 Suicide Report and requested that the recommendations of the 2007 Suicide Report be

13   adopted as orders of the Court.  Docket No. 3714.

14       On November 23, 2009, the Court entered an order denying Defendants' request to

15   modify the 2007 Suicide Report and denying, without prejudice, Plaintiffs' request that the

16   recommendations of the 2007 Suicide Report be made orders of the Court, stating that

17   "[r]equests for such orders should come, if at all, from the special master."  Docket No. 3731 at

18   13-14.  On December 24, 2009, the Special Master requested that the Court adopt the

19   recommendations of the 2007 Suicide Report.  Docket No. 3758 at 2.  On January 6, 2010,

20   Defendants filed objections to the Special Master's request that the recommendations of the 2007

21   Suicide Report be adopted as orders of the Court ("Defs.' Objections").  Docket No. 3762.

22   Plaintiffs hereby respond to Defendants' objections.

23                                    **INTRODUCTION**

24       Defendants previously raised a series of meritless objections to the findings of the 2007

25   Suicide Report, distracting attention and limited resources in this case away from addressing the

26   substantive underlying issues regarding suicide prevention identified in the Report, which found

27   that "[i]n 82 percent of the suicide cases in 2007, there was at least some degree of inadequacy in

28   assessment, treatment, or intervention, for the highest rate of inadequacy in these areas in the past

1

[338997-6]

1   several years." 2007 Suicide Report at 1.  The Court appropriately rejected each of Defendants'

2   objections to the findings in the 2007 Report.  Docket No. 3731.

3        Regrettably, rather than focusing on addressing the serious issues raised in the Special

4   Master's Report, Defendants now raise, for the first time, a series of meritless objections to the

5   recommendations contained in the Report based on the needs-narrowness-intrusiveness

6   requirement of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a).

7        Defendants waived any objection to these recommendations by failing to previously

8   object to the recommendations in the draft or the final 2007 Report as required by the Order of

9   Reference in this case.  Docket No. 640.  Further, each of these recommendations is appropriate

10  under the PLRA, as they are based on the findings of the 2007 Suicide Report as well as the

11  Special Master and his experts' extensive monitoring of Defendants' compliance with the

12  remedial measures and court orders in this case, including suicide reviews at California

13  Department of Corrections and Rehabilitation ("CDCR") institutions for over nine years.

14  Accordingly, the Court should adopt the recommendations of the Special Master as orders of the

15  Court.

16                                **ARGUMENT**

17
**I.    DEFENDANTS WAIVED ANY OBJECTION TO THE RECOMMENDATIONS**
18  **OF THE 2007 SUICIDE REPORT**

19        Defendants' objections to the recommendations of the 2007 Suicide Report should be

20  rejected because Defendants failed to object timely to the recommendations as required by the

21  Order of Reference in this case.  Order of Reference, Docket No. 640; *See* Fed. R. Civ. P. 53(g),

22  2003 Advisory Committee's Notes (though time limits for objections to a special master's order,

23  report, or recommendations are not jurisdictional, they are "important" and "a court may

24  properly refuse to entertain untimely review proceedings"); *see, e.g.*, *In re Portland Elec. Power

25  Co.*, 97 F. Supp. 918, 919-20 (D. Or. 1948) (declining to consider objections to special master's

26  report where objecting parties failed to object within required timeframe).

27        The Order of Reference entered by this Court on December 11, 1995 provides the

28  procedural framework for either party to object to the findings and recommendations of

                                2

[338997-6]

1  compliance reports of the Special Master.  Docket No. 640.  Specifically, paragraph A(5) of the

2  Order of Reference provides that with regard to compliance reports:

3              Prior to such filing, the special master shall serve, upon one
              designated representative of counsel for plaintiffs and one designated
4              representative of counsel for defendants, a copy of each compliance
              report in draft form, and shall afford counsel a reasonable time within
5              which to submit to the special master specific, written objections.
              Upon request of either party, submitted in conjunction with the
6              specific written objections, the special master shall, after giving
              reasonable notice to counsel, convene a hearing at which time he
7              shall fully consider the written objections of the parties.  Thereafter,
              the special master shall serve and file his compliance report with the
8              court in accordance with Federal Rule of Civil Procedure 53(e)(1).
9
10  *Id.* at 4:19-5:4 (¶ A(5)).

11         After affording both parties an opportunity to provide the Special Master with specific

12  written objections to the draft report (including the recommendations in the report), and filing the

13  final report with the Court, the Order of Reference provides that:

14             [A]ny compliance report of the special master filed in accordance
             with paragraph A(5) above shall be adopted as the findings of fact
15             and conclusions of law of the court unless, within ten days after being
             served with the filing of the report, either side moves to reject or
16             modify the report.  *The court will entertain no objection to the report
             unless an identical objection was previously submitted to the special
17             master in the form of a specific written objection in accordance with
             the provisions of paragraph A(5) above.*  The objecting party shall
18             note each particular finding or recommendation to which objection is
             made, shall provide alternative findings or recommendations, and
19             may request a hearing before the court.
20
21
22  *Id.* at 8:6-17 (emphasis added).

23         On June 23, 2009, a draft of the 2007 Suicide Report was provided to Defendants and

24  Plaintiffs' counsel.  Declaration of Jane E. Kahn in Support of Plaintiffs' Opposition to

25  Defendants' Objections to Special Master's Recommendations on his Expert's Report on

26  Suicides Completed in Calendar Year 2007 ("Kahn Decl."), ¶ 2, Ex. A.  The Draft Report

27  contained four recommendations aimed at addressing and resolving "fundamental impediments

28  to reducing suicides by CDCR inmates on a lasting basis."  Kahn Decl., Ex. A at 18.  Plaintiffs'

3

1    counsel submitted comments to the Draft Report on July 22, 2009.  *Id.* at ¶ 3.

2          Defendants submitted comments regarding the Draft Report on July 28, 2009.  *See*

3    Exhibit A to Docket No. 3695-2.  Defendants' response to the Draft Report provided objections

4    and comments "concerning the narrative sections of the Report, the systemic improvements in

5    reducing suicides among the Plaintiff class, and seven case reviews."  *Id.* at 2 of 20.  Defendants'

6    comments raised no objection to the recommendations of the Draft Report.

7          On September 17, 2009, the Special Master electronically filed and served the 2007

8    Suicide Report, Docket No. 3677, which contained recommendations identical to those included,

9    but not objected to, in the Draft Report.  *Compare* 2007 Suicide Report at 18-19, *with* Kahn

10   Decl., Ex. A (Draft Report) at 18.  On October 1, 2009, Defendants filed their Motion to Modify

11   the 2007 Suicide Report.  Docket Nos. 3695 through 3695-4.  Defendants' request to modify the

12   2007 Suicide Report contained a subset of the objections and comments raised in response to the

13   Draft Report, but once again raised no objection to any of the recommendations contained in the

14   Report.  *Id.*

15         On November 23, 2009, this Court rejected each of Defendants' objections and requests to

16   modify the 2007 Suicide Report.  Docket No. 3731 at 14.  This Court further denied, without

17   prejudice, Plaintiffs' request that the recommendations of the 2007 Suicide Report be adopted as

18   orders of the Court, stating that "[r]equests for such orders should come, if at all, from the special

19   master."  *Id.* at 13-14.  Accordingly, on December 24, 2009, the Special Master filed a request

20   that four recommendations be adopted as orders of the Court.  Docket No. 3758 at 2.  The

21   recommendations included in the Special Master's December 24, 2009 filing were substantively

22   identical to those included in the Draft Report and 2007 Suicide Report.  *Compare* Docket No.

23   3758 at 2, *with* 2007 Suicide Report at 18-19.

24         Defendants now seek a third bite at the apple, seeking to raise for the very first time new

25   objections to the 2007 Suicide Report recommendations, more than six months after receiving

26   notice of them.  Defendants, however, waived any objection to the recommendations because

27   they failed to submit "an identical objection" to the Special Master "in the form of a specific

28   written objection."  *See* Order of Reference, Docket No. 640, at 8:10-14.  Further, Defendants

4

PLS.' OPPOSITION TO DEFS.' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDATIONS ON HIS EXPERT'S
REPORT ON SUICIDES COMPLETED IN CALENDAR YEAR 2007 - NO. CIV S 90-0520 LKK-JFM

[338997-6]

1  failed to object to the recommendations within 10 days of being served with the 2007 Suicide

2  Report or to offer alternative recommendations.  *Id.* at 8:6-17.  Accordingly, as Defendants have

3  waived their right to object to the recommendations of the 2007 Suicide Report, Defendants'

4  objections to the recommendations of the Special Master should be rejected.

5

6  **II.    THE RECOMMENDATIONS OF THE 2007 SUICIDE REPORT COMPLY WITH THE PLRA**

7          Even assuming, *arguendo*, that Defendants' objections to the recommendations of the

8  Special Master were timely, their objections based on the PLRA are without merit.  Under the

9  PLRA, a court may approve prospective relief if it finds that the relief is narrowly drawn, extends

10 no further than necessary to correct the violation of the federal right, and is the least intrusive

11 means necessary to correct the violation.  18 U.S.C. § 3626(a)(1)(A).  Contrary to Defendants'

12 assertion, the Special Master's recommendations are necessary, narrowly tailored to specific and

13 ongoing violations, and the least intrusive means to correct the violation.  Each of these

14 recommendations are based on the findings of the 2007 Suicide Report as well as the Special

15 Master and his experts' extensive monitoring of Defendants' compliance with the remedial

16 measures and court orders in this case, including suicide reviews at CDCR institutions for over

17 nine years.  In particular, Dr. Raymond Patterson, the Special Master's expert, is a prominent,

18 board certified and highly qualified expert and who has authored or co-authored each of the

19 Special Master's suicide reports.

20         Accordingly, as discussed below, Defendants' objections are without merit.

21     **A.    Recommendation Number 1**

22         The Special Master's first recommendation seeks an order requiring that Defendants

23 "shall specifically identify inmates' known and/or suspected medical problems and medications

24 within these inmates' mental health treatment plans, rather than merely allude to them by

25 reference to other records."  Docket No. 3758 at 2 (recommendation number 1).  This

26 recommendation is necessary and supported by the Special Master's finding that "[a]s in

27 previous years, during 2007 clinicians failed to utilize available information that was located in

28 inmates' unit health records or central files, compromising the adequacy of treatment and

5

[338997-6]

1   interventions in 82 percent of cases." 2007 Suicide Report at 16. This recommendation meets

2   the narrowness and intrusiveness requirements of the PLRA because it addresses the specific and

3   repeated failure by clinicians to utilize available information in patients' files. *See Steele v.*

4   *Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996) (discontinuing a prisoner-patient's prescribed

5   psychotropic medications without examining prior medical records is a clearly established Eighth

6   Amendment violation). Defendants failed to object to this finding in either the draft or final

7   Report.

8       Nevertheless, Defendants argue that the recommendation (1) extends further than

9   necessary by requiring that Department of Mental Health ("DMH") and CDCR clinicians

10  document "*all* known or suspected medical problems, regardless of whether the mental health

11  treatment plan includes prescribing medication or whether the problem could impact the inmate's

12  mental illness," and (2) is overly intrusive in that it "interferes with the discretion and peer

13  review process afforded to the treating clinicians." Defs.' Objections at 2 (emphasis in original).

14  Defendants' objections are without merit.

15                  1.      **The Recommendation Addresses Defendants' Ongoing Failure to
                            Appropriately Utilize Available Information Located in Patients' Unit
16                          Health Records or Central Files**

17      As noted in the 2007 Suicide Report, a significant percentage (29 percent) of the prisoners

18  who committed suicide had "substantial medical illnesses." 2007 Suicide Report at 18.

19  Diagnostic information regarding these medical conditions is not only relevant to the mental

20  health treatment plan, but is also vital to providing an appropriate emergency response in the

21  event of a suicide attempt, regardless of whether the inmate-patient is prescribed medication for

22  their mental illness or whether the medical condition directly affects the inmate-patient's mental

23  health. Moreover, the Special Master has previously raised the failure of clinical staff to review

24  relevant medical records and Defendants have repeatedly failed to address the problem. *See*

25  Report on Suicides Completed in the CDCR in Calendar Year 2006, Docket No. 3030, at 8;

26  Report on Suicides Completed in CDCR in Calendar Year 2005, Docket No. 2566, at 10; Report

27  on Suicides Completed in the CDCR in Calendar Year 2004, Docket No. 1806, at 5, 8, 10-12.

28  Given that the failure to utilize available information in the inmate's medical or central files led

1  to compromised treatment and intervention in a shocking 82 percent of the suicides reviewed in

2  2007, 2007 Suicide Report at 1, this recommendation is both necessary and narrowly drawn and

3  should be adopted as an order of this court.

4            **2.    The Recommendation, Which Merely Requires Identification of Previously Documented Information, Does Not Interfere with the**

5                   **Discretion and Peer Review Process of Treating Clinicians**

6          Defendants' vague objection that the recommendation is overly intrusive in that it

7  interferes with the discretion and peer review process of treating clinicians, which is unsupported

8  by any evidence or explanation, is also without merit.  There is simply no basis for Defendants'

9  statement that requiring mental health staff to identify medical illnesses and medication

10 information interferes with the discretion and peer review process of the treating clinician.  This

11 information is already currently available in the inmate-patient's medical or central files, and

12 should be consulted as part of the mental health assessment.  2007 Suicide Report at 16 (failure

13 "to utilize available information … located in inmates' unit health records or central files …

14 compromis[ed]" the "adequacy of treatment and interventions in 82 percent of cases," including

15 failure to incorporate custody referral information "into all of the reviews in which they applied,"

16 which was "frequently absent" from Suicide Risk Assessment Checklist ("SRACs")); *Steele*, 87

17 F.3d at 1270.  Requiring that such information be specifically identified in the treatment plan

18 rather than by alluding to the medical or central files should in no way interfere with the

19 discretion and peer review process afforded to the treating clinicians.

20         Accordingly, because the Special Master's first recommendation is necessary, narrowly

21 drawn and is not overly intrusive, it should be adopted as an order of the Court.

22     **B.**    **Recommendation Number 2**

23         The Special Master's second recommendation seeks an order requiring that CDCR and

24 DMH "shall communicate and collaborate with each other to ensure that the highest level of care

25 provided by DMH to CDCR inmates is given to any inmate who has been determined to need it."

26 Docket No. 3758 at 2 (recommendation number 2).  This recommendation is necessary and

27 supported by the Special Master's finding that:

28

7

[338997-6]

1

2

> Required reports were not completed and therefore not produced and distributed in accordance with the Department's own suicide review process. Extreme examples of this included the suicides which occurred within DMH, for which it did not provide to CDCR documentation on implementation of QIPs and other action plans, on the pretext of confidentiality. This excuse is insupportable because CDCR and DMH are both responsible for care and treatment of the same patients. Consequently, there is no reasonable basis for a barrier to communication between these care providers.

3

4

5

6

7   2007 Suicide Report at 18. DMH's assertions regarding patient confidentiality are particularly

8   insupportable in light of DMH's joint responsibility with CDCR to provide care and treatment,

9   given that the Health Insurance Portability and Accountability Act ("HIPAA") permits covered

10  entities[1] to use and disclose protected health information to other covered entities. *See* 45 CFR

11  § 164.506(a), (c)(4)-(5). State law is in accord. *See* Cal. Civil Code § 56.10(c)(1). Accordingly,

12  this recommendation meets the PLRA's narrowness and intrusiveness requirements because it

13  only requires communication to the extent necessary to ensure the highest level of care is

14  provided to patients who require it while deferring to Defendants as to how that level of

15  communication and collaboration can be achieved.

16      Nevertheless, Defendants object that the Report's findings supporting this

17  recommendation are based on suicides occurring in 2007, and that the "current record," including

18  Defendants' recent filings regarding bed planning and admissions to Atascadero State Hospital

19  ("ASH"), demonstrate that DMH and CDCR are collaborating to ensure the highest level of care

20  is provided. Defs.' Objections at 3-4. Further, Defendants object that the order is overly broad

21  in that it does not define what it means for DMH and CDCR to collaborate and communicate

22  with each other, and overly intrusive in that it "interferes with the relationship between CDCR

23  and DMH." *Id.* Defendants' objections are without merit.

24

25

26

---

27  [1] A "covered entity" includes, *inter alia*, a "health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter." 45 C.F.R. § 160.103.

28

8

[338997-6]

1         **1.**    **The 2007 Suicide Report Constitutes the "Current Record" with Regard to Suicide Review**

2

3         Defendants' argument that the Special Master may not rely upon findings from the 2007

4 Suicide Report because it does not constitute a "current record" is absurd.[2] *Id.* at 4. In this

5 particular example, the failure by DMH to produce requested documents related to 2007 suicides

6 continued into 2009. *See* 2007 Suicide Report at 66 n.4; Motion to Modify, Docket No. 3695,

7 Appendix B, at 13-15 (Special Master's expert Dr. Raymond Patterson requesting, in May 2009,

8 quality improvement plans ("QIPs") from suicides that occurred in DMH in 2007). Moreover,

9 the 2007 Suicide Report is based on the most recent data available, given that Defendants' own

10 timeline for departmental review of suicides contemplates a 150-day period before the facility

11 warden and DMH are required to submit a report on implementation of the post-suicide quality

12 improvement plan. 2007 Suicide Report at 22. This timeline is of Defendants' own making, and

13 the fact that they are permitted to take so long analyzing suicides demonstrates considerable

14 deference toward them by the Special Master and the Court in the implementation of their

15 suicide prevention system. Nevertheless, Defendants have repeatedly failed to meet even these

16 long timelines, and to timely submit required documentation to the Special Master. *See Id.* at 14-

17 15.

18         By Defendants' logic, this Court could never issue any order related to suicide prevention

19 based on the Special Master's compliance reports as they inevitably are based on a review of

20 cases from prior years. This would be true despite the fact that Defendants have offered no

21 evidence that DMH has changed its position regarding the provision of documentation of QIP

22 and other action plans to CDCR or the Special Master.

23

24 _____

[2] Defendants' reliance on *Gilmore v. California*, 220 F.3d 987, 1010 (9th Cir. 2000), and *Cason*

25 *v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000), throughout their objections for the proposition

26 that prospective relief cannot be based on prior findings is misplaced. Both *Gilmore* and *Cason*
involved motions to terminate consent decrees under the PLRA, 18 U.S.C. § 3626(b), and the

27 requirement that the court make a finding that the prospective relief "remains necessary to

28 correct a current and ongoing violation of the Federal Right," not an order for prospective relief
in the first instance.

[338997-6]

1      **2.     Defendants' Recent Filing Regarding ASH Admissions Demonstrates**
           **the Need for the Special Master's Recommendation**

2

3          At least one of the "recent filings" that Defendants reference severely undercuts any

4    argument that CDCR and DMH are communicating and collaborating to provide the highest

5    level of care.  Remarkably, Defendants cite to their motion for temporary relief regarding this

6    Court's order that DMH admit a sufficient number *Coleman* class members to fill the 256

7    Intermediate Care Facility ("ICF") at ASH by December 31, 2009 (a deadline previously

8    extended from October 31, 2009).  Defs.' Objections at 4.  Defendants are currently keeping over

9    500 men on a waiting list for these vital inpatient psychiatric beds.  Kahn Decl. ¶ 6.  Yet, their

10   so-called "collaboration" has resulted in 58 of the 256 beds at ASH going unused by *Coleman*

11   class members as of December 18, 2009.  Defs.' ASH Extension Request, Docket No. 3760, at 4.

12   This Court initially ordered DMH to fill the full complement of ICF beds at ASH over two and a

13   half years ago, yet Defendants have been unable to fill these beds despite multiple court orders,

14   extensions of deadlines, a modified needs assessment that has identified nearly 1,000 patients in

15   need of higher levels of care, and implementation of a pilot program that revised the exclusionary

16   criteria for DMH ASH admissions.  Plfs.' Opp. to ASH Extension Request, Docket No. 3763, at

17   1-2.  It is ironic that Defendants would cite their own inability to fill badly needed DMH beds as

18   proof of collaboration and communication between DMH and CDCR.  However defined, the

19   "current record" demonstrated both by the 2007 Suicide Report and Defendants' request for

20   relief from an order to fill badly needed DMH beds clearly supports the Special Master's

21   recommendation.

22

23     **3.     The Recommendation Affords Appropriate Deference to Defendants**
           **and Does Not Interfere with the Relationship between DMH and CDCR**

24         Defendants' remaining objections, that the order goes further than necessary and is overly

25   intrusive, are similarly without merit.  The fact that the recommendation does not explicitly

26   define what it means for DMH and CDCR to communicate and collaborate to provide the highest

27   level of care merely demonstrates the Special Master's deference to Defendants on this issue.  If

28   the Special Master had precisely specified the details of the communication and collaboration, no

                                                   10

[338997-6]

1    doubt Defendants would now be decrying the "intrusiveness" of the remedy.

2        The necessity of this recommendation is clearly demonstrated by the Special Master's

3    observation that:

4            [S]ome required [suicide] reports were not completed and therefore
             not produced and distributed in accordance with the Department's
5            own suicide review process.  Particularly egregious examples of this
             included the suicides which occurred within DMH.  On a pretext of
6            patient confidentiality, DMH refused to provide documentation on
             implementation of the QIP and other action plans to CDCR.  That
7            practice should be stopped because it makes no sense.  CDCR and
             DMH are both responsible for the care and treatment of their mutual
8            patients, and must be able to communicate about these patients with
             each other.
9

10

11    2007 Suicide Report at 15.  The Special Master's recommendation does not seek to dictate the

12    extent of the relationship between CDCR and DMH, but rather makes clear that DMH may not

13    avoid any of its obligations in this case on the pretext of patient confidentiality.

14        Accordingly, because the Special Master's second recommendation is necessary, narrowly

15    drawn and is not overly intrusive, it should be adopted as an order of the Court.

16        **C.    Recommendation Number 3**

17        The Special Master's third recommendation seeks an order requiring that:

18            Defendants shall accord priority to access to inpatient care for CDCR
             inmates at DMH facilities, particularly for Level III and Level IV
19            inmates. This involves requiring clinical staff to properly assess
             suicide risk factors for inmates experiencing changes in mental health
20            functioning, particularly on placement in administrative segregation
             or other single-cell housing. A vital component of this process is
21            appropriate crisis-level service in treatment settings such as MHCBs,
             or limited treatment within OHUs, until transfers to DMH facilities
22            can be achieved. DMH must also be held accountable for its
             decisions on admissions or rejections and for its treatment provided
23            to CDCR inmates, and cannot be permitted to avoid transparency
             with CDCR on any pretext of patient confidentiality.
24

25

26    Docket No. 3758 at 2 (recommendation number 3).  This recommendation is necessary and based

27    on the Special Master's finding that "[i]ssues surrounding availability of DMH in-patient beds

28    figured prominently in whether there was prompt referral and transfer of inmates in need of

11

[338997-6]

1   hospital level care at these facilities.  One suicide occurred in an OHU and another in a GACH."

2   2007 Suicide Report at 17.

3        Provision of constitutionally adequate mental health care has been impeded consistently in

4   this case by shortages of inpatient beds, and by arbitrary custody restrictions that prevent

5   clinicians from getting their patients into these beds.  The shortages continue in spite of ten years

6   of Court orders.  Arbitrary custody restrictions that override clinical referrals to care have been

7   persistent.  Defendants even required Plaintiffs to litigate a motion before this Court to remove

8   barriers to inpatient care based on parole date and parole revocation status, regardless of clinical

9   need.  *See* Aug, 8, 2008 Order, Docket No. 2930, at 3:10-4:11.  As recently as June 18, 2009, this

10  Court once again ordered Defendants to expedite admissions to the inpatient DMH beds.  June

11  18, 2009 Order, Docket No. 3613, at ¶ 8.

12       The Special Master's recommendation meets the PLRA's narrowness and intrusiveness

13  requirements by squarely addressing Defendants' persistent failure to remedy the lack of access

14  to inpatient care for CDCR inmates at DMH facilities and the provision of interim housing while

15  awaiting transfer.  The recommendation is not overly intrusive in that it does not dictate where or

16  how Defendants must house any particular inmates.

17
              **1.    The Recommendation Addresses the Urgent Need to Put Clinical Need**
18                    **First in Utilizing Inpatient Beds**

19       Defendants make the through-the-looking glass argument that the recommendation

20  somehow elevates custody issues over clinical issues.  Defs.' Objections at 4.  This is double-

21  speak of the highest order.  The point of the recommendation is to remove custody-based barriers

22  to clinically required inpatient care.  The recommendation requires DMH to provide priority

23  access to DMH facilities for all CDCR inmates in need of inpatient care, "particularly" – but not

24  solely – for Level III and Level IV inmates.  Docket No. 3758 at 2; *cf. Madrid v. Gomez*, 889 F.

25  Supp. 1146, 1257-58 (N.D. Cal. 1995) (The requirement of ready access to adequate care

26  precludes prison officials from preventing treatment which is medically necessary in the

27  judgment of the treating doctor").  The recommendation does not dictate that DMH clinicians

28  must accept Level III or Level IV patients in front of lower security patients, but instead is aimed

1    at breaking down the non-clinical barriers that CDCR and DMH have erected that prevent such

2    patients from getting care.

3        It is Defendants' current practice of excluding patients from DMH care on the basis of

4    custody factors that necessitated this recommendation.  *See* 2007 Suicide Report at 55-56, 66 n.3

5    (describing inmate D, who was discharged from and later rejected from ASH as a result of

6    assaultive behavior that clinical staff felt was the result of his mental illness); Motion to Modify,

7    Docket No. 3695 at 8 (Defendants state that ASH "cannot provide the security level required for

8    assaultive inmates").  Defendants recently initiated a pilot project to "develop a sustainable

9    referral process between CDCR and DMH to increase access to mental health services for

10   inmates."  Kahn Decl. at ¶ 4, Ex. B at 08/35.  Defendants acknowledged in initiating this project

11   that "certain established custody, and security rules restricted endorsements of certain CDCR

12   [patients] for mental health treatment …".  *Id.*  However, even this pilot project imposes custody

13   restrictions on admissions to ASH, requiring a case-by-case review for patients who are, *inter*

14   *alia*, Special Needs Yard ("SNY"), Level IV security, or who have committed a Secured

15   Housing Unit-able offense.  *Id.* at 15/35, 34/35.

16       The absurdity of Defendants' use of custody barriers to inpatient psychiatric care becomes

17   quite stark when one considers the contrast with medical care.  In contrast to the delays in

18   admission to DMH facilities resulting from custody issues, a process already exists to transfer

19   promptly patients with serious medical conditions to an outside hospital and provide whatever

20   security is necessary.  *See Plata* Receiver's Eleventh Tri-Annual Report, June 1, 2009, *Plata*

21   Docket No. 2167-2, at 18 (staffing and procedures for operations both "inside the prisons and in

22   the community hospitals outside the prisons" implemented for three prisons with plans to create

23   locked guarding units "strategically placed in community hospitals around the state"); *Plata*

24   Receiver's Tenth Tri-Annual Report, January 20, 2009, *Plata* Docket No. 2011, at 20 (discussing

25   Receiver's recommendation for additional custody positions to ensure access to care within

26   certain institutions "as well as providing the necessary custody resources to provide coverage of

27   the patient-inmates within the local community hospitals").

28       It is disingenuous for Defendants to object to this recommendation on the basis that it

13

[338997-6]

1   interferes with DMH clinicians' ability to make sound clinical judgments when they have

2   consistently used custody criteria to exclude CDCR patients.  The current waitlist for high

3   custody ICF beds has swelled to over 500 patients, which will only grow as the final referrals

4   from the modified needs assessment are processed.  *See* Defs.' ASH Extension Request, Docket

5   No. 3760, at 8; Kahn Decl. at ¶ 6.  Even low custody patients face significant and unreasonable

6   delays in admission to DMH facilities, despite the implementation of the pilot project discussed

7   above.  Plfs.' Opp. to ASH Extension Request, Docket No. 3763, at 4-7.  This is true despite a

8   substantial number of vacancies for ICF beds at ASH.  *Id.* at 4-5; Defs.' ASH Extension Request,

9   Docket No. 3760, at 4.

10      As recently as June 18, 2009, this Court entered an order noting "there are a substantial

11  number of Coleman class members, over and above those identified in the Navigant projections,

12  who are presently in need of hospital care" and requiring Defendants to expedite admissions to

13  DMH.  Docket No. 3613 ¶ 8.  The Special Master's recommendation addressing the need to

14  prioritize admissions to DMH is no different, and represents yet another attempt to break down

15  the obstacles between DMH and CDCR to ensure *Coleman* class members are provided with

16  necessary care.  *See* August 8, 2008 Order, Docket No. 2930, at 2 n.1 (listing 19 prior orders

17  since 1998 regarding issues related to inpatient care access for CDCR patients).

18
                    **2.      Defendants' Inpatient Bed Planning Does Not Resolve the Need for This**
19                  **Recommendation**

20      Defendants' long-range bed plans do little to address the current need for inpatient care,

21  particularly for high custody inmates.  None of the high custody ICF ("ICF-H") beds included in

22  Defendants' long-range bed plan will be activated until at least August 2012, with the vast

23  majority of patient admissions not set to begin until December 2013.  *See* Defs.' Response to

24  Court's September 24, 2009 Order that Defs. File a Detailed Long-Range Plan Including

25  Activation Schedules, Docket No. 3724-2, at 16 of 68 (432 ICF-H beds at the Consolidated Care

26  Center will not begin to admit patients until December 2013) and 35 of 68 (64 ICF-H beds at

27  California Medical Facility will not begin patient admissions until August 2012).  *Coleman* class

28  members continue to linger on the waitlist awaiting inpatient care, very often in dangerous and

                                                    14

[338997-6]

1   inappropriate settings, including in Administrative Segregation, EOP, and even CCCMS beds.

2   *See* Kahn Decl., Ex. C at 2, (Monthly Report on the Licensure of ICF Programs at CMF,

3   Vacaville and SVPP), November 30, 2009 (Wait List Data by housing Unit/Level of Care).  As

4   noted above, the waitlist for high custody ICF beds has swelled to over 500 patients and

5   continues to grow.

6

7          **3.      DMH Must Not Be Permitted to Avoid Accountability for Admissions
                      on the Pretext of Patient Confidentiality**

8          Defendants also object to the final sentence of the third recommendation, which states

9   "DMH must also be held accountable for its decisions on admissions or rejections and for its

10  treatment provided to CDCR inmates, and cannot be permitted to avoid transparency with CDCR

11  on any pretext of patient confidentiality."  Defs.' Objections at 5.  This recommendation is

12  necessary and narrowly tailored in light of the Special Maser's collective review of hundreds of

13  suicide reports over many years, analysis of issues surrounding access to inpatient care at DMH,

14  and both past and present struggles with DMH over access to necessary information in this case.

15  It was in this context that this Court entered its May 23, 2007 Order requiring Defendants to

16  provide the Special Master with monthly reports detailing admissions and rejections and to

17  provide copies of DMH rejection letters.  *See* May 23, 2007 Order, Docket No. 2236.  Moreover,

18  the recommendation that DMH not be permitted to escape transparency on the basis of patient

19  confidentiality extends further than just decisions on individual admissions and rejections and

20  also includes "treatment provided to CDCR inmates."  Special Master's Report and

21  recommendations on Expert's Report on Suicides Completed in CDCR in 2007, Docket No.

22  3758; *see also* 2007 Suicide Report at 15 ("CDCR and DMH are both responsible for the care

23  and treatment of their mutual patients, and must be able to communicate about these patients

24  with each other").  Defendants' monthly submission of reports regarding admissions and

25  rejection letters is insufficient to demonstrate that DMH is currently accountable, particularly in

26  light of the ongoing failure to fill inpatient care beds that have been designated for *Coleman* class

27  members and DMH's continued assertion of patient confidentiality with regard to suicide

28  reviews (discussed with regard to recommendation number 2, above).

                                                15

[338997-6]

1    Accordingly, because the Special Master's third recommendation is necessary, narrowly

2    drawn and is not overly intrusive, it should be adopted as an order of the Court.

3        **D.    Recommendation Number 4**

4    Defendants object only to the portion of the Special Master's fourth recommendation

5    requiring Defendants to submit "documentation to the *Coleman* special master on the outcomes

6    of investigations of staff misconduct, negligence, and error."  Defs.' Objections at 5-7.  CDCR

7    objects to this portion of the recommendation on the basis that the Court has already issued an

8    order regarding investigations of staff and that the recommendation creates a broader obligation.

9    Defs.' Objections at 6 (citing Docket No. 1688).  DMH objects to this recommendation on the

10   basis that DMH was not a party when the Court issued its previous order regarding staff

11   investigations and that Suicide Reports prepared by the Special Master do not "reflect any

12   determination of staff misconduct, negligence, and/or error on the part of DMH staff" for

13   suicides occurring in DMH facilities.  Defs.' Objections at 6.  Further, Defendants object that this

14   recommendation is necessarily based on prior records and that requiring DMH to submit such

15   documentation interferes with the discretion afforded to DMH officials to investigate potential

16   misconduct and "violates the Constitutional right of privacy of DMH staff members."  *Id.* at 6-7.

17   Defendants' collective objections are without merit.

18
            **1.    The Special Master's Experts Have Determined a Full Review of
19            Investigations into Staff Misconduct or Error is Necessary**

20   CDCR's argument that this recommendation is not narrowly drawn or necessary in light

21   of this Court's previous order, Docket No. 1688, requiring "a summary description" of

22   investigations into staff misconduct or error, is meritless.  Having operated under the Court's

23   prior order in this regard since June 2005, the Special Master and his experts are uniquely

24   positioned to determine the necessity for a review of the underlying documents regarding

25   investigations into staff misconduct or error.  To the extent the Special Master recommends a full

26   review of the underlying documentation of staff investigations in the context of developing

27   workable suicide prevention policies; the Court should adopt this recommendation.  Defendants

28

16

[338997-6]

1  offer no authority to the contrary.[3]

2      **2.      CDCR and DMH, as Defendants in this Case, are Required Under the
            Order of Reference to Produce Requested Documents to the Special
3            Master**

4      Regardless of when DMH became a party in this case, it is bound by the Court's Orders.

5  The Order of Reference in this case very clearly grants the Special Master "unlimited access to

6  records, files and papers maintained by defendants to the extent such access is related to the

7  performance of the special master's duties under this Order of Reference."  Docket No. 640 at

8  ¶ 5.  Further, the Governor and the Secretary of CDCR have always been parties in this case and

9  CDCR has always contracted with DMH for inpatient care.  The Special Master should not have

10  to jump through additional hoops to obtain information from DMH.  Nor should the Special

11  Master have to identify prospectively which specific documents related to the outcome of

12  investigations into staff misconduct or error will be relevant to the suicide review process.  The

13  Special Master is entitled to these documents.

14      Further, Defendants cite no authority for their contention that requiring DMH to submit

15  documentation of outcomes of staff investigations violates those staff members' right of privacy.

16  In any event, a protective order is the more appropriate vehicle for addressing concerns of staff

17  privacy.

18      **3.      The 2007 Suicide Report Contains Sufficient Evidence of Staff
            Misconduct, Negligence, or Error on the Part of DMH Regarding
19            Suicides Occurring at DMH Facilities**

20      Defendants claim that the individual suicide reviews in the 2007 Suicide Report do not

21

22  [3] Defendants cite, without identification, the *dissent* in *Potter v. McCall*, 433 F.2d 1087, 1089

23  (9th Cir. 1970), which noted that "it is not ordinarily the function of the federal courts to interfere
    with the conduct of state officials in carrying out their duties of determining the nature and

24  character of medical treatment for state prisoners."  *See* Defs.' Objections at 6.  *Potter* involved a
    dismissal of an individual prisoner's medical care case for failure to state a claim.  433 F.2d at

25  1088.  Even if this *dissent* were somehow binding, it would have no application here, where

26  Eighth Amendment violations have been found at trial, and where the Court is entering a post-
    judgment order to address persistent remedial failures.  In any event, nothing in the

27  recommendation interferes with medical treatment.  On the contrary, the recommendation
    addresses the unfortunate instances where staff misconduct prevents implementation of

28  desperately needed remedial measures.

17

[338997-6]

1  "reflect any determination of staff misconduct, negligence, and/or error on the part of DMH staff

2  for suicides that occurred in DMH facilities."  Defs.' Objections at 6.  This claim is ridiculous

3  considering the Report's conclusions regarding the three suicides at DMH facilities in 2007,

4  which the Report notes were "particularly disturbing."  2007 Suicide Report at 15.  Specifically,

5  with regard to Inmate C, who committed suicide at the Vacaville Psychiatric Program ("VPP"),

6  the Special Master's expert noted "serious and systemic problems" including "practitioner

7  performance and communication deficiencies between CDCR and DMH" and finding on that

8  basis that the suicide was both foreseeable and preventable.  Id. at 52.  Similarly, with regard to

9  Inmate D, who committed suicide at VPP, the Special Master's expert noted "multiple failures to

10  appropriately treat and manage the inmate once he had been transferred to DMH" and again

11  concluding that the suicide was both preventable and foreseeable.[4]  Id. at 66.  Accordingly, the

12  2007 Suicide Report contains sufficient evidence demonstrating the need for DMH to submit

13  documentation of investigations into staff misconduct or error.

## CONCLUSION

15       For the above reasons, Defendants' objections to the recommendations of the 2007

16  Suicide Report should be denied and the Special Master's recommendations adopted as orders of

17  the Court.

19  Dated:  January 22, 2010                    Respectfully submitted,

20                                              ROSEN, BIEN & GALVAN, LLP

22                                              By:  /s/ Ernest Galvan
23                                                   Ernest Galvan
                                                     Attorney for Plaintiffs

---

[4] As discussed above, Defendants' objection that the 2007 Suicide Report does not reflect the current record in this case is without merit.

18

[338997-6]