PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARK R. FEESER. Bar No. 252968
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

            Plaintiffs,

      v.

ARNOLD SCHWARZENEGGER, et al.,

            Defendants.

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDATIONS ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN CALENDAR YEAR 2007**

[342913-1]

I, Jane E. Kahn, declare:

1.      I am an attorney admitted to practice law in California, a member of the Bar of this Court, of counsel to the firm of Rosen, Bien & Galvan, LLP ("RBG"), and one of the counsel of record for the Plaintiff class.  I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.  I make this declaration in Opposition to Defendants' Objections to Special Master's Recommendations on his Expert's Report on Suicides Completed in Calendar Year 2007.

2.      On or about June 23, 2009, the Special Master in this case e-mailed Plaintiffs' counsel and Defendants a draft version of the Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2007 ("Draft Report").  A true and correct copy of this email and the attached draft report are attached hereto as **Exhibit A**.  The draft report contained four recommendations.  *Id.* at 17-18.

3.      On or about July 22, 2009, Plaintiffs' counsel submitted written comments via e-mail to the Special Master regarding the Draft Report.

4.      On or about October 30, 2009, Defendants e-mailed to Plaintiffs' counsel, a regulatory package submitted to Office of Administrative Law ("OAL") on September 22, 2009.  This regulatory package is described as the "Mental Health/DMH ICF Pilot Program."  A true and correct copy of the transmittal e-mail and regulatory package are attached hereto as **Exhibit B**.

5.      Defendants produce a monthly report to Plaintiffs' counsel entitled "Status of Implementation of Plan for Increasing Capacity of Intermediate Care Facility Beds at the California Medical Facility."  This report contains summary data regarding the current housing unit/level of care for patients on the wait list for intermediate care beds.  A true and correct copy of November 30, 2009 report is attached hereto as **Exhibit C**.

6.      Defendants file their DMH Monthly Bed Utilization Report under seal and provide a copy to Plaintiffs' counsel.  This report is filed under seal because it includes a complete list of all class members currently waiting for transfer to any level of DMH hospital care.  Defendants filed this report showing data for December 2009 on January 15, 2010.  *See* Docket 3771.  The

1

1  December data shows that there were 515 patients waitlisted to received ICF care at SVPP,

2  including the 499 patients listed in cells 663-1162 and 16 Penal Code § 1370 patients listed in cells

3  1163-1178.  Although cells 663-1162 add up to 500 patients, Defendants skipped cell 911, resulting

4  in 499 patients, not 500.

5      I declare under penalty of perjury under the laws of the State of California and of the

6  United States of America that the foregoing is true and correct, and that this declaration was

7  executed this 22nd day of January, 2010 in San Francisco, California.

8

9                                                    */s/ Jane E. Kahn*

10                                                   Jane E. Kahn

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF JANE KAHN ISO PLS.' OPPOSITION TO DEFS' OBJS/ TO SPECIAL MASTER'S RECOMMENDATIONS ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN 2007 - CASE NO. CIV S 90-0520 LKK-JFM

[342913-1]

# EXHIBIT A

**Sofia Millham**

| | |
|---|---|
| **From:** | Michael W. Bien [mbien@RBG-Law.com] |
| **Sent:** | Tuesday, June 23, 2009 2:32 PM |
| **To:** | Coleman Team - RBG Only |
| **Subject:** | FW: 2007 suicide report |
| **Attachments:** | 2007 suicide report cover letter.DOC; Suicide Report 2007.doc; Table 1.XLS; Table 2.XLS; 2007 case reviews.doc; acronyms.doc; 2007 inmate ID list.xls |

Michael Bien

ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
mbien@rbg-law.com
www.rbg-law.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Spencer, Mary-Joy [mailto:mspencer@pldwlaw.com]
**Sent:** Tuesday, June 23, 2009 2:27 PM
**To:** Michael W. Bien; Debbie Vorous; Donald Specter; Jeff Steele
**Cc:** Jones, Mohamedu; linda buffardi; sharon.aungst@cdcr.ca.gov; Jane E. Kahn
**Subject:** 2007 suicide report

To all,
Please see the attached.
Thank you,
Mary-Joy

---

**MARY-JOY SPENCER**
**Attorney**                    **mspencer@PLDWLAW.COM**

**PANNONE**            317 Iron Horse Way, Suite 301
**LOPES**              Providence, Rhode Island 02908
**DEVEREAUX &**        **T**: 401 824 5157  **F**: 401 824 5123
**WEST** LLC               www.PLDWLAW.COM

COUNSELORS AT LAW

Please consider the environment before printing this email.

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address.

To insure compliance with Treasury Regulations (31 CFR Part 10, §10.35), we inform you that any tax advice contained in this correspondence was not intended or written by us to be used, and can not be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code. If you desire a formal opinion on a particular tax matter for the purpose of avoiding the imposition of any penalties, we will discuss the further Treasury requirements that must be met and whether it is possible to meet those requirements under the circumstances, as well as the anticipated time and additional fees involved.

1/21/2010

Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, D.C.   20009
Telephone:  301-292-3737
Facsimile:  301-292-6272

REPORT ON SUICIDES COMPLETED
IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION IN
CALENDAR YEAR 2007

## I.     Introduction

This is the ninth annual Report on Completed Suicides in the California Department of Corrections and Rehabilitations ("CDCR" or "Department"), covering all 34 such deaths which occurred in calendar year 2007.  It is submitted as part of the Special Master's continuing review of the Defendants' compliance with court-ordered remediation in the matter of Coleman v. Schwarzenegger, No. CIV S-90-0520 LKK JFM P (E.D. Cal.).

As discussed in greater detail in Parts V and VI below, a number of significant findings emerged from this reviewer's examination of all 34 suicides in 2007. These findings include the following:

- **In 2007, the rate of suicides in CDCR prisons was 19.7 per 100,000 inmates.  This rate was a continuation of the CDCR's pattern of exceeding the national prison suicide rate which was 17 per 100,000 for the period from 2005 through 2006 (the latest years reported).**

- **The CDCR suicide rate per 100,000 inmates for 2007 was higher by 1.5 percent than the CDCR average annual suicide rate per 100/000 inmates for the preceding nine years.**

- **In 82 percent of the suicide cases in 2007, there was at least some degree of inadequacy in assessment, treatment, or intervention, for the highest rate of inadequacy in these areas in the past several years.**

- **A number of inmate suicide risk assessments finding levels of risk ranging from "moderate" to "severe" were not followed by interventions that were appropriate to these risk levels.**

- **Some inmates whose assessments indicated that they should have been placed on the mental health caseload were not.**

- **In 22 percent of suicide cases, cardiopulmonary resuscitation was not performed in a timely and/or appropriate manner.**

1

- **Deadlines in completion and submission of required Departmental documentation of suicides were missed in 79 percent of cases.**

- **Some required Departmental reporting on suicides was not completed at all as of the time of this writing.**

- **Although three suicides of CDCR inmates occurred within the Department of Mental Health (DMH), it refused to provide documentation of the implementation of quality improvement plans (QIPs) and other action plans to CDCR on the pretext of patient confidentiality.**

Clearly, these findings give rise to concern and should be addressed by the Department, as discussed more fully later on in this report.

Like suicide reports for previous years, this one is a comprehensive report discussing all suicides which occurred during 2007. It summarizes the demographic and mental health characteristics of all of these inmates, and includes this reviewer's overall critique of the Department's levels of compliance with the various applicable standards for suicide prevention within CDCR institutions, as well as his recommendations based on his findings and conclusions.

Some of the information contained in this report is presented in chart format within the body of the report. Chart 1 shows the frequency of suicides by institution. Chart 2 shows inmate demographic information and other factors, categorized according to these factors. Tables 1 and 2 both show, by inmate, individual demographic and mental health characteristics,. Table 2 also includes limited information on the times of the Department's responses to certain suicide review protocols.

Appendix A summarizes the timeframes for clinical and executive review and documentation of completed suicides. Appendix B to this report contains in-depth case reviews of each of the 34 suicides. These individual case reviews also include an assessment and critique of the Department's own suicide review and its compliance with applicable procedures. Lastly, Appendix C is a glossary of the acronyms which appear in this report.

## II.    <u>Terminology and Definitions</u>

In this report, the terms "foreseeable" and "preventable" are used as they were in previous reports. They describe the adequacy and implications of the CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgments, and utilization of clinical and custodial alternatives that are used to reduce the likelihood of completed suicides. The CDCR Division of Correctional Health Care Services (DCHCS) has frequently required that facilities conduct suicide prevention training, and has taken the lead with it in its Suicide Prevention and Response Focused Improvement Team (SPRFIT) process. While the importance of such training cannot be understated, neither can the importance of staff supervision following the training. Currently, there appears to be a lack of adequate supervision at various levels. It should be conducted by both clinical and custodial supervisors at not only the institutional level but also at the level of the DCHCS and the Division of Adult Institutions (DAI).

2

The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of a substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s).  Assessment of the degree of risk, whether high, moderate, or low to none, is an important component in determining foreseeability.  In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk and the most appropriate and relevant interventions to prevent suicide.  These interventions may include, but are not limited to, changes in clinical level of care (LOC), placement on suicide precautions or suicide watch, and changes in housing, including utilization of safe cells and transfers to higher LOCs.  Individuals evaluated as "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation, with appropriate notification of clinical staff of a potential for self injury and/or suicidal ideation or activity.

The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy.  Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.  First responders in CDCR include custody officers.  As discussed in detail in Appendix B, in 2007 there were suicide cases in which custody officers did not perform CPR or other life saving measures, including first aid, on inmates when they arrived on the scene.  Again, this issue transcends mere training and calls for appropriate supervisory responsibility.

As utilized in the CDCR 2005 Annual Report on Suicides, "suicide" is defined in the sources indicated below, as follows:[1]

> World Health Organization:  Suicide is the result of an act deliberately initiated and performed by a person in the full knowledge or expectation of its fatal outcome.

> National Violent Death Reporting System, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention:  Suicide is a death resulting from the intentional use of force against oneself.  A preponderance of evidence should indicate that the use of force was intentional.

The CDCR Annual Suicide Report for 2005 classified as suicides any deaths under the circumstances described below:

- A person committed a suicidal act, then changed his mind, but still died as a result of the act.

---

[1] *See CDCR Annual suicide Report for 2005*, Appendix I, Suicide Determination Guidelines.

3

- A person intended only to injure rather than kill himself, for example by playing "Russian roulette" voluntarily with a firearm.

- Assisted suicide, including passive assistance to the decedent, for example by supplying only information or the means needed to complete the act.

- Intentional, self-inflicted death committed while under the influence of a voluntarily-taken mind-altering drug.

- Intentional, self-inflicted death committed while under the influence of a mental illness.

According to the CDCR Annual Suicide Report for 2005, deaths under the circumstances described below should *not* be classified as suicides:

- The physical consequences of chronic substance abuse, including alcohol or drugs (natural death).

- Acute substance abuse, including alcohol or drugs, with less than a preponderance of evidence showing intent to use the substance(s) against oneself (undetermined or unintentional injury or death).

- Death as a result of autoerotic behavior, e.g., self-strangulation during sexual activity (death by unintentional injury).

## III.    Developments in Suicide Prevention

In 2006 and 2007, there were a number of significant developments with regard to suicide prevention in the CDCR prisons. Study of the problem led to a more focused effort to identify and eliminate a number of factors that correlated with the disturbingly high rate of suicides in administrative segregation units. A summary of these developments is helpful for a greater understanding of the conditions that surrounded the suicides that are covered in this report.

On October 2, 2006, CDCR submitted its Plan to Address Suicide Trends in Administrative Segregation Units, and on December 1, 2006, it submitted its amended version. This plan was ordered by the Coleman court on June 7, 2006, following a set of recommendations from the Coleman Special Master to curb a disturbing trend of rising suicides in CDCR administrative segregation units. While development and implementation of the Plan remained ongoing at the end of 2006, CDCR had begun taking steps in its implementation.

In October 2006, CDCR began requiring 30-minute welfare checks of inmates during the initial three weeks of their stays in administrative segregation. It had also devised a plan to modify the large-mesh ventilation screens in 406 administrative segregation intake cells, on a schedule to modify 66 by April 2007, 85 by July 2007, and the remaining 255 by September 2007. Other cell modifications consisted of installation of concrete slabs, elimination of cell protrusions, replacement of vents or installation of cell vent coverings, replacement of light fixtures or

4

installation of light coverings, and replacement or modifications to cell doors to in order to increase visibility into cells.

Also as part of their Plan to Address Suicide Trends in Administrative Segregation Units, defendants submitted a procedure and timetable for pre-placement screening of inmates endorsed for transfer to administrative segregation units. These screenings were to be implemented by June 2007. However, they were not conducted in all facilities as anticipated. For example, in one of the suicide cases covered in Appendix B, the pre-placement screening was done in the presence of a captain as part of that facility's usual and customary procedure. Another item in the plan was proposed allowance of certain items of personal property for those inmates in administrative segregation for non-disciplinary reasons. By December 29, 2006, CDCR provided such proposed revisions to CDCR executive staff for their review.

The Coleman court order entered on June 9, 2005 also directed defendants to develop and implement a policy that requires properly trained custody staff to provide immediate life support until medical staff arrives, or to continue life support measures, irrespective of whether the obligation to do so is part of the custody staff member's duty statement. After extensive negotiation between the parties, CDCR reported to the Coleman court on January 31, 2006 that training on the amended CPR policy and use of the mouth-shield, preparation of procedures for taking inventories of cut-down kits, and the conduct of such inventories were occurring system-wide. In addition, CDCR directed wardens to ensure that any incident report form for incidents requiring the initiation of CPR must include whether CPR was performed, and if not performed, a detailed explanation as to why not; the classification of person(s) who administered the CPR; and the outcome of CPR efforts. Unfortunately, in the sole reported suicide death by a woman in 2007, CPR efforts were inadequate.

Another change in suicide prevention procedures during 2006 was CDCR's voluntary placement of a moratorium as of April 10, 2006 on the use of video monitoring as the sole means of conducting suicide watches. This suicide prevention measure was embodied in a stipulation signed by the Coleman parties and entered as an order by the Coleman court on August 8, 2006.

By mid-2007, efforts to implement suicide prevention measures in administrative segregation had continued, but more work was needed. On May 14, 2007, the Coleman Special Master reported in his Supplemental Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation that the defendants' proposed completion date for construction of more small management yards in 2012 was too late, and that defendants should not rely on inmate day labor to do the work, as that may lead to obstacles to completion of the yards. Thirty-minute welfare checks during the first three weeks of inmate stays in administrative segregation were occurring, but with inconsistencies in proper conduct and documentation. Defendants reported that modification of the large-mesh ventilation screens in 66 intake cells in stand-alone administrative segregation was completed by April 1, 2007, as required by their Plan. They reported to the Special Master that they were on schedule for completion of the balance of 340 such screens by September 1, 2007,[2] for a total of 406. The plan also required defendants to complete by July 2008 a number of changes to physical features

---

[2] As defendants had previously stated in their December 1, 2006 response to plaintiffs' objections to defendants Plan to Address Suicide Trends in Administrative Segregation, Declaration of George Sifuentes, ¶ 8.

of non-stand-alone intake cells, including replacing doors, in order to increase visibility into the cells. Defendants reported at the end of May 2007 that they were in the process of assessing their budget to accomplish these renovations.

With regard to reducing lengths of stay in administrative segregation, in the spring of 2007, defendants cited delays in referrals of charges to the local district attorneys and said that they would address these issues directly with the district attorneys. They also instructed all institutions to assess their logistical abilities to provide in-cell radios and televisions to inmates in administrative segregation for non-disciplinary reasons. Insofar as use of the mental health tracking system for tracking inmates' histories of suicidality, the Coleman Special Master stated in his May 14, 2007 report that staff needed further training and improved access to such inmate histories. Defendants had circulated proposals for screening inmates for suicidality prior to their placements in administrative segregation, and for awareness of potential suicidal tendencies following an inmate's receipt of "bad news" at court or otherwise. Defendants also reported that mental health staff would be conducting the aforesaid screening interviews in private settings, but Coleman monitoring found that some were still not occurring in confidential areas, and that defendants still had not conducted their assessments of resources to provide privacy for these sessions.

An important part of the defendants' plan was its initiative to aggressively increase emergency response to attempted suicides, including administration of CPR. It called for CPR refresher training, which refers to reinforcement of custody staff's awareness of its responsibility to provide CPR. The Coleman Special Master reported in mid-2007 that no documentation had been provided to establish that the required CPR refresher training had actually been completed.

Following the Special Master's report of May 14, 2007, the Coleman Court ordered on May 31, 2007 that the defendants must accomplish the following suicide-reduction measures within 60 days:

- o develop a plan to require each institution to train staff on accurate logging of 30-minute welfare checks and to track and self-monitor compliance with the performance of these checks;

- o provide budgetary figures for the construction of the physical features of the non-stand alone intake cells;

- o submit a report on each institution's capability to provide televisions and/or radios to inmates in administrative segregation;

- o submit a status report on the implementation of the suicide history tracking system and a plan to train staff in its use and improve access to suicidal history data at all relevant times;

- o provide a specific assessment of their space needs for providing confidential mental health interviews; and

> o   produce evidence that required CPR refresher training was accomplished by
>     submitting documentation of the required proof of practice.

The Coleman court also overruled defendants' proposed use of inmate day labor to construct small management yards as a basis for objection to the Special Master's recommendation that these yards be completed by the end of fiscal year 2008/2009.

On July 30, 2007, defendants reported that 367 of the 406 total large-mesh ventilation screens in administrative segregation intake cells had been modified, and that modification of the remaining 39 was on schedule for completion by September 1, 2007.  With regard to CPR training, defendants reported on August 3, 2007 that custody officers in administrative segregation units attended CPR refresher training in the fall of 2006.  Every shift at every institution was required to conduct an emergency response drill once per month, with varied scenarios to reflect a wide range of emergency situations.  Defendants also reported that in December 2006, ten correctional officers at each institution had received CPR/first aid trainer certification and were responsible for conducting CPR skills training they would continue to annual training in CPR skills.  On August 6, 2007, defendants further reported that they had devised and distributed their plan to require each institution to train staff on accurate logging of 30-minute welfare checks.  Defendants reported on August 21, 2007 that they had also surveyed availability of in-cell access to radio and television for non-disciplinary inmates in administrative segregation, and had found that in-cell electrical power access was unavailable at nine institutions

## IV.    Statistical Summary of Suicides in 2007

The chart below offers an overview of the annual rates of suicides among CDCR inmates which occurred during the decade ending with calendar year 2007.  As indicated below, although the suicide rate for 2007 was lower than it had been for the two immediately preceding years, it was still higher than the rate for six of the nine preceding years.  Annual suicide rates since 1998 per 100,000 inmates in CDCR have been as follows:

> 1998 – 22 suicides in a population of approximately 158,159
>         Completed suicide rate of 13.9/100,000
>
> 1999 – 25 suicides in a population of approximately 160,970
>         Completed suicide rate of 15.5/100,000
>
> 2000 – 15 suicides in a population of approximately 160,855
>         Completed suicide rate of 9.3/100,000
>
> 2001 – 30 suicides in a population of approximately 155,365
>         Completed suicide rate of 19.3/100,000
>
> 2002 – 22 suicides in a population of approximately 158,099
>         Completed suicide rate of 13.9/100,000
>
> 2003 – 36 suicides in a population of approximately 155,722

7

Completed suicide rate of 23.1/100,000

2004 – 26 suicides in a population of approximately 163,346
Completed suicide rate of 15.9/100,000

2005 – 43 suicides in a population of approximately 164,179
Completed suicide rate of 26.2/100,000

2006 – 43 suicides in a population of approximately 171,340
Completed suicide rate of 25.1/100,000

2007 – 34 suicides in a population of approximately 172,535
Completed suicide rate of 19.7/100,000

Charts 1 and 2 below summarize the 34 suicides which occurred in 2007 by various characteristics, as indicated:

## **CHART 1**

### Frequency of 34 total suicides, by facility:

| | |
|---|---|
| High Desert State Prison (HDSP) | 4 |
| California Correctional Institution (CCI) | 2 |
| California Medical Facility (CMF) | 2 |
| California State Prison, Sacramento (CSP/Sac) | 2 |
| California State Prison, Corcoran (CSP/Corcoran) | 2 |
| Correctional Training Facility (CTF) | 2 |
| DMH/APP at California Medical Facility (CMF) | 2 |
| Deuel Vocational Institution (DVI) | 2 |
| Atascadero State Hospital (ASH) | 1 |
| Avenal State Prison (ASP) | 1 |
| California Correctional Women's Facility (CCWF) | 1 |
| California Institution for Men (CIM) | 1 |
| California Rehabilitation Center (CRC) | 1 |
| California State Prison, Los Angeles County (CSP/LAC) | 1 |
| California Substance Abuse Treatment Facility (CSATF) | 1 |
| Corcoran District Hospital (from CSATF) | 1 |
| Kern Valley State Prison (KVSP) | 1 |
| Mule Creek State Prison (MCSP) | 1 |
| Pelican Bay State Prison (PBSP) | 1 |
| Pleasant Valley State Prison (PVSP) | 1 |
| Richard J. Donovan Correctional Facility (RJD) | 1 |
| San Quentin State Prison (SQ) | 1 |
| Sierra Conservation Center (SCC) | 1 |
| Wasco State Prison (WSP) | 1 |

TOTAL:                34

## **CHART  2**

o   Single-Cell Housing

      23 of 34        (68%)

o   Inmates Incarcerated for Sex Offenses ("R" Suffix)

      7 of 34          (21%)

o   Method

- Hanging

      25 of 34        (74 %)

- Overdose

      5 of 34          (15%)

- Suffocation

      2 of 34          (6%)

- Water Intoxication

      1 of 34          (3%)

- Trauma

      1 of 34          (3%)

o   History of Suicidal Behavior

      27 of 34        (79%)

o   History of Mental Health Treatment

      29 of 34        (85%)

o   Housed in Infirmary, mental health crisis beds (MHCBs), outpatient housing unit (OHU), psychiatric services unit (PSU), or DMH

      4 of 34          (12%)

9

- o Housed in Administrative Segregation Unit (ASU) or Secured Housing Unit (SHU)

  - ASU:  11 of 34   (32%)

  - SHU:    2 of 34   (6%)

  - Total:  13 of 34   (38%)[3]

- o Inmates on Keyhea Order for Involuntary Medication

    2 of 34        (6%)

- o Concomitant Severe or Life-Threatening Medical Illness

    10 of 34        (29%)

- o On Mental Health Service Delivery System (MHSDS) Caseload at Time of Death

    24 of 34        (71%)

  - 4 in Enhanced Outpatient Program (EOP) (15 % of all suicides, 21 % of suicides by inmates on the MHSDS caseload)

  - 17 in Correctional Clinical Case Management System (3CMS) (50 % of all suicides, 63 % of suicides by inmates on MHSDS caseload)

  - 3 in DMH ( 2 in CMF APP, 1 in ASH) (9% of all suicides, 13% of suicides by inmates on MHSDS caseload)

- o Age Range

  - Under 18      0        (0%)
  - 18-30       7 of 34    (21%)
  - 31-34      16 of 34   (47%)
  - 41-50       5 of 34   (15%)
  - 50+        6 of 34   (18%)

- o Race

  - Caucasian            15 of 34  (44%)

---

[3] Compare with rates of suicides in administrative segregation units or secured housing units, at 44 percent in 2006, 33 percent in 2005, 73 percent in 2004 (single-celled) and 57 percent in 2003.

- Hispanic              14 of 34  (41%)
- African American       3 of 34  (9%)
- Native American        1 of 34  (3%)
- Filipino               1 of 34  (3%)

  o  Gender

- Male                  33 of 34  (97%)
- Female                 1 of 34  (3%)

  o  Significant Indications of Inadequate Treatment

          28 of 34        (82%)

## V.    Discussion and Observations:

As stated above, there were 34 deaths during calendar year 2007 that, more likely than not, were the result of suicide.[4] Three of the 34 suicide deaths occurred within facilities of DMH. Thirteen of the suicides occurred in administrative segregation or a secure housing unit (SHU), and another three occurred within CDCR reception centers.  One was committed by an inmate in an OHU, and none were committed by inmates in MHCBs.  One of the suicides was committed by a woman housed in CCWF.  Twenty five, or 73 percent, of the suicides among CDCR inmates were accomplished by hanging.

The suicide rate for calendar year 2007 was 19.7 per 100,000, based on an average daily CDCR inmate population of 172,535.[5]  From 1998 to 2007, the suicide rate for inmates in CDCR ranged from a low of 9.3/100,000 in 2000 to a high of 26.2/100,000 in 2005. Overall, for the same ten-year period, the average annual suicide rate per 100,000 inmates was 18.2.  More recently, since 2004, the rate has ranged from 15.9 per 100,000 in 2004 to 26.2 per 100,000 in 2005, and most recently from  2006 to 2007, the suicide rate dropped from 25.1/100,000 to 19.7/100,000.

CDCR suicide rates have been consistently higher than national prison suicide rates.  Across prisons in the United States, the rate was calculated at 17 per 100,000 for the period from 2005 through 2006 (the latest years reported by the U.S. Department of Justice, Bureau of Justice statistics).

Examination of the individual suicide cases in 2007 revealed that for 24, or 82 percent, of the 34 inmates who completed suicides, there had been at least some degree of inadequate assessment, treatment, or intervention.  This finding was based on the presence of information that was or

---

[4] For one additional inmate death within CDCR, the coroner concluded that its manner and cause were both "undetermined."  Based on the insufficiency of presently available information, this reviewer agrees with CDCR's position that the cause and manner of this death are appropriately "undetermined" at this time.  In the event that additional information becomes available in the future and suggests a different conclusion, this death will be re-examined.

[5] Source: *Average Daily Prison Population, Calendar Year 2007*, CDCR official website.

should have been available to clinical staff.  These suicides were, therefore, most probably foreseeable and/or preventable.  Even more concerning is the fact that this high rate of inadequacy in assessment, treatment, or intervention is worse than the rates of 72.1 percent for 2006, 74.4 percent for 2005, and 76.9 percent for 2004.  These numbers clearly indicate no improvement in this area during the past several years, and possibly signal a trend of ongoing deterioration, given that the rate of inadequate assessment, treatment, or intervention five years earlier in 2002 was 45 percent.

The case reviews in Appendix B demonstrate the specifics with regard to individual inmates and suicide risk assessment checklists (SRACs).  While this reviewer found that SRACs were completed appropriately in the majority of the cases, there were a number in which SRACs had resulted in determination of "no risk."  Staff did not properly prepare SRACs according to CDCR policy by failing to:

- obtain information that was available in records or via staff referrals, and instead relying only on inmates' self-reports;

- assess risk and/or protective factors;

- define an estimate of the risk based on the evaluation as "high," "moderate," "low," or "none";

- develop and implement appropriate plans for follow-up evaluation and care; and/or

- recommend transfers of inmates to more appropriate clinical and/or custodial settings.

(*See* Tables 1 and 2, and Appendix B, for descriptions of specific instances of these deficiencies, in summarized and detailed fashion, respectively.)   In addition, there were a number of SRACs in which the risk was determined to be "moderate" or "high," and in one case "severe."  In these cases, the interventions should have been appropriate to these levels of risk, but were not.

In addition to the deficiencies in SRACs found among the aforementioned 82 percent of cases, there was also some measure of inadequate intervention and treatment, meaning that these suicides were therefore most probably foreseeable and/or preventable.  This finding was based on information that was or should have been available to clinical staff.  Instances of inadequate treatment included:

- canceled appointments that were not rescheduled
- referrals that drew no response
- past medical records that were not reviewed
- diagnoses that were unsupported
- inmate noncompliance with treatment that was not reassessed
- assignment of inmates to inappropriate levels of care
- failure to refer inmates to higher levels of care/supervision

12

- failure to provide immediate and/or appropriate CPR
- insufficient communication among clinical, medical, and custodial staffs
- failure to review documented histories in medical records, central files, and/or referral forms
- failure to provide adequate and timely screenings or custody monitoring and assessments of inmates on intake and/or placement in administrative segregation, upon transfers to other facilities, and/or on referrals to clinicians for assessment of suicide potential in correctional treatment centers (CTCs) or other clinical settings.

There continued to be inmates who were not placed on the mental health caseload, despite indications of their need for mental health interventions and/or psychotropic medications.  There were also cases with documented concerns about the need for assessment of inmates who demonstrated significant mental illness, past suicidal behavior, or suicidal ideation or statements, and for their placement into higher levels of care.

No doubt, the finding that 82 percent of cases were marked by inadequacy in treatment is troubling in itself.  However, even more concerning is its indication that the pre-existing pattern of poor performance in this area continues.  This is evidenced by a comparison of the 2007 rate with the rates found for preceding years. In 2006, the rate of findings of inadequate treatment or intervention was 72.1 percent, while in 2005, the rate was 74.4 percent, in 2004 it was 76.9 percent, and in 2003 it was 74.3 percent.  Prior to that, in 2002, the rate of suicides involving inadequate treatment or intervention was 45.4 percent. These disheartening figures and the trend they indicate all point to the inexorable conclusion that practices in the treatment of suicidal CDCR inmates must be improved greatly and immediately.

The Department continued its effort to reduce suicide deaths by providing training on CPR requirements and on the suicide review process. However, it was apparent that CPR was not performed in a timely and/or appropriate manner in seven, or 22 percent, of the 34 suicides.  This rate of non-compliance is lower than it was in calendar year 2006, when there were 17 such instances among 43 suicides, for a non-compliance rate of 40 percent.

Although there were some positive developments in suicide prevention policies and procedures, as described in Part III above, the Department not always keep pace with their implementation. Departmental response to suicides was marked by widespread lateness in completion and submission of required documentation.  (*See* Appendix A for pertinent timelines).  As of April 30, 2009, deadlines were missed in the reviews of 27, or 79 percent of, the 34 suicide cases**.** Data was incomplete for all three of the suicides in DMH facilities; for two of them, institutional responses to QIPs have not been produced as of this writing.  For four of the suicide cases within CDCR prisons, institutional responses to QIPs were not provided to this reviewer or to the Special Master until May 1, 2009, and even then, they were incomplete.  For a completed suicide which occurred on December 5, 2007, the Department's suicide report was not produced to this reviewer or the Special Master until April 17, 2009, and needless to say, there is still no QIP for that suicide as of this time, even though approximately 18 months have passed since its occurrence.

13

2007 was not the first year for which the Department failed to comply with deadlines for completion and submission of required documentation.  Following distribution of the Special Master's expert's 2006 report on suicides in the CDCR in draft form, defendants stated in their response that they had failed to provide any of the mental health records within the Unit Health Record for one of the inmates whose suicide in 2006 was reviewed and included in the draft report.  In the final version of this reviewer's Report on Suicides in the CDCR in 2006, Defendants were admonished that they "must ensure that no such lapses in their production of information occur again.  Review of incomplete records can lead to erroneous conclusion and recommendations, and ultimately to allowing deficiencies in the defendants' suicide prevention efforts to remain undetected and uncorrected."  *Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2006*, filed 9/12/08, at 1, n.1.  Unfortunately, that admonition must be repeated, and failure to heed it in the future may result in a recommendation for an order from the court.

While timely provision of complete information on suicides to the Office of the Special Master and his experts is important, its provision to CDCR facilities and staff is essential.  The information which is gleaned from Departmental suicide review and response is critical to identification of problems and development and implementation of meaningful suicide reduction measures.  Furthermore, the timelines for CDCR's follow-up and reporting on each suicide are not merely arbitrary guideposts or a suggested schedule.  They were established within the <u>Coleman</u> Revised Program Guide.[6]  By order dated March 2, 2006, the <u>Coleman</u> court approved and ordered the defendants to immediately implement all but two provisions[7] of the January 2006 Revised Program Guide, which includes Chapter 10, "Suicide Prevention and Response."  The aforesaid review and reporting timelines are set forth therein.   Thus, defendants' failure to abide by these suicide review timelines is not mere tardiness but is also a violation of court order.

In addition to lack of timeliness, some required reports were not completed and therefore not produced and distributed in accordance with the Department's own suicide review process.  Particularly egregious examples of this included the suicides which occurred within DMH.  On a pretext of patient confidentiality, DMH refused to provide documentation on implementation of the QIP and other action plans to CDCR.  That practice should be stopped because it makes no sense.  CDCR and DMH are both responsible for the care and treatment of their mutual patients, and must be able to communicate about these patients with each other.

As this reviewer's past annual suicide reports have noted, there is great need for full implementation of the Departmental suicide review processes that are already in place.  Suicide prevention training by DCHCS, in its SPRFIT process, has emphasized that suicide prevention measures must be taken on a case-by-case basis.  That, however, is only half of the story, for it remains clear that such training of staff must be reinforced by supervision.  This supervision

---

[6] *See Mental Health Service Delivery System Program Guide*, September 2006, Chapter 10, "Suicide Prevention and Response" at 12-10-24 – 12-10-29.
[7] At that time, two disputed provisions of the January 2006 Revised Program Guide would have, if implemented, reduced the amount of care which was mandated by the 1997 Program Guides.  Those two provisions concerned the number of daily psych tech rounds for non-MHSDS inmates in administrative segregation, and the number of clinical contacts for 3CMS inmates in administrative segregation.  The <u>Coleman</u> court ordered that the more stringent requirements of the 1997 Programs Guides continue to apply, rather than the lesser requirements proposed by the defendants.

must occur not only at the facility level by both clinical and custodial supervisors, but also at the central office level by the DCHCS and the DAI.  Those who are responsible for supervision and evaluation of staff must carry out this aspect of the suicide reduction process, or be held accountable for not doing so.

## VI.    __Findings__:

Analysis of the individual suicide cases reviewed in Appendix B yielded a number of findings. These were particularly disturbing for the three suicides by CDCR inmates which occurred in DMH facilities. Many of the findings drawn from the case discussions in Appendix B are consistent with conclusions reached in earlier annual suicide reports, and are as follows:

- The majority of the 34 inmates who committed suicide had histories of mental health treatment and/or suicidal behavior.  Twenty nine, or 85 percent, of the 34 suicides were committed by inmates who had received mental health treatment in the past, and 27, or 79 percent, had histories of suicidal ideation or behavior.

- Three suicides in administrative segregation were completed by suffocation, medication overdosing, or water intoxication, respectively.  These deaths raise serious concerns regarding the monitoring of inmates by custody and clinical staff.  Clinical assessment, custody monitoring, and access to controlled medications have been a continuing concern in administrative segregation units.  Among the cases reviewed, one involved an inmate in administrative segregation who managed to maintain possession of a plastic bag which he used to suffocate himself.  In another, the inmate overdosed on medications which should have been administered under some form of observation.  And in a third case, the inmate was able to overdose himself by drinking large quantities of water, in a cell where access to water is controllable. This inmate had a recent history of attempting to overdose on water in the recent past, clearly necessitating collaboration between clinical and custody staff.

- Inadequate and untimely completion of the SRACs remained an ongoing problem that was detected in review of a number of the suicides.  There were variations among the institutions with respect to screening inmates who were placed in administrative segregation units, as well as with conducting screenings in confidential settings.  This continued to have an adverse effect on the adequacy of information that clinicians were able to obtain and incorporate into their overall assessments.  Although such screenings are to be conducted in confidential settings, and staff continues to receive instruction via video that was instituted by CDCR administrative, supervision at the institutional level to ensure that these policies were being followed appeared to be inadequate.

- As in previous years, during 2007 clinicians failed to utilize available information that was located in inmates' unit health records or central files, compromising the adequacy of treatment and interventions in 82 percent of cases. Custody referral information was not incorporated into all of the reviews in which they applied, and was frequently absent from SRACs.

15

- In 2007, there were continuing concerns about daily rounds by psych techs and placement of inmates in cells presenting the lowest possible risk for suicide completion.  The defendants had not yet achieved full compliance with the <u>Coleman</u> Court order of June 9, 2005 requiring them to develop, among other things, a plan to alleviate the suicide risk posed by large-mesh ventilation screens in administrative segregation cells.  Of the 34 completed suicides in 2007, 23 (11 in administrative segregation, four in general population, three in DMH, two in a SHU, one in a general acute care hospital (GACH), one in condemned housing, and one in an OHU) involved hangings by single-celled inmates, although not all of these involved ventilation screens.

- Although 30-minute welfare checks and confidential screens for inmates newly admitted to administrative segregation were features of the defendants' 2006 Plan to Address Suicide Trends in Administrative Segregation, circumstances of at least one suicide in 2007 raised questions about implementation of this policy.

- As stated above, three of the suicides occurred within DMH facilities.  Issues surrounding availability of DMH in-patient beds figured prominently in whether there was prompt referral and transfer of inmates in need of hospital level care at these facilities.  One suicide occurred in an OHU and another in a GACH.  Continued use of ZZ cells and other holding cells for inmates awaiting transfers to *bona fide* CTCs with MHCBs, and OHU stays that exceeded the 72-hour time limit, were ongoing obstacles to the appropriate care of inmates in need of constant or close monitoring or timely transfer to higher levels of care.

- Three suicides occurred in institutional reception centers.  This re-focuses attention on an ongoing concern over whether the level of mental health services at the Reception Centers is commensurate with inmates' levels of care.

- In 2007, one of the 34 suicides was completed by a woman, for a rate of three percent of suicides by female inmates.  This is comparable to the years 2000 through 2003, and 2005, when none of the suicides were committed by women. In 2006, four of the 43 suicides were committed by women, for a rate of nine percent, which is comparable to the three out of 26 suicides in 2004, for a rate of 11.5 percent for that year.

- In seven, or 21 percent, of the 34 suicide cases reviewed, CPR was not performed or was not initiated in a timely manner when required.  Of these seven cases, CPR efforts were untimely in six. In four other cases, CPR was determined to be not applicable or was not initiated, based on the inmate's condition at the time of his discovery.  These determinations were made by various clinical staff members including registered nurses and medical technical assistants, but none were made initially by a physician. In the case involving a woman, a correctional officer and one inmate began CPR but their efforts were inadequate.

- Timeliness of the Department's conduct of the internal CDCR suicide review process deteriorated. Timeframes set forth in Appendix A were exceeded in 27 of the 34 cases. Missed deadlines occurred with suicide notifications, preparation of suicide reports and/or dates of implementation of QIPs, and recommendations at both the institutional and departmental levels. As these timelines are established within the Coleman 2006 Revised Program Guide, which defendants were ordered on March 2, 2006 to implement, defendants' failure to comply with these timelines is a clear violation of court order.

- Required reports were not completed and therefore not produced and distributed in accordance with the Department's own suicide review process. Extreme examples of this included the suicides which occurred within DMH, for which it did not provide to CDCR documentation on implementation of QIPs and other action plans, on the pretext of confidentiality. This excuse is insupportable because CDCR and DMH are both responsible for care and treatment of the same patients. Consequently, there is no reasonable basis for a barrier to communication between these care providers.

- The process for Departmental suicide review was lacking in some respects. There were cases with inadequate documentation of achievement of the goals and outcomes for specified corrective actions. Some institutional responses merely repeated previous responses to deaths that had occurred during preceding years at the same institutions. Others had recommendations including referrals to the Professional Practice Executive Committee (PPEC) or custody administration, but the results of these reviews were not provided to the <u>Coleman</u> Special Master.

- As in the past, the quality of CDCR suicide reports was varied. Many reflected appropriate quality-of-care standards, and were very thoughtful and well crafted despite the challenges encountered by facility clinicians and custody staff. However, other Departmental suicide reports appeared to ignore failures at the facility level, as well as several inadequate facility responses to the Department's corrective action recommendations. As of April 30, 2009, deadlines were missed in the reviews of 27 of the 34, or 79 percent of, suicide cases. Data was incomplete for all three of the suicides in DMH facilities; for two of them, institutional responses to QIPs have not been produced as of the time of this writing. For four suicides within CDCR prisons, institutional responses to QIPs were not provided to this reviewer or to the <u>Coleman</u> Special Master until May 1, 2009, and even then, they were incomplete or inadequate. For another completed suicide, which occurred on December 5, 2007, the Department's suicide report was not produced to this reviewer nor to the Special Master until April 17, 2009. There is no QIP for that suicide even though it occurred approximately one and a half years ago.

## VII.  <u>Recommendations</u>:

17

Based on all of the foregoing, this Reviewer recommends that the following actions be taken to address and resolve fundamental impediments to reducing suicides by CDCR inmates on a lasting basis:

- Identification of inmates' known and/or suspected medical problems and medications within these inmates' mental health treatment plans. Ten of the 34, or 29 percent of, inmates who committed suicide in 2007 had significant to substantial medical illnesses. Given this frequency of co-occurrence of medical problems and suicides, as well as that fact that medical problems are a known risk factor for suicide, mental health staff who are preparing inmates' treatment plans should specifically identify these inmates' medical illnesses and medications within the treatment plans rather than merely allude to them by reference to other records.

- Communication and collaboration between CDCR and DMH to ensure that the highest level of care provided by DMH to CDCR inmates is given to any inmate who has been determined to need it.

- Access to inpatient care for CDCR inmates at DMH facilities must be given priority, particularly for Level III and Level IV inmates. This involves requiring clinical staff to properly assess suicide risk factors for inmates experiencing changes in mental health functioning, particularly on placement in administrative segregation or other single-cell housing. It underscores the need for appropriate screening, assessment, and referrals to higher levels of care, especially at the DMH level, when indicated. A vital component of this process is appropriate crisis-level service in treatment settings such as MHCBs, or limited treatment within OHUs, until transfers to DMH facilities can be achieved. DMH must be held accountable for its decisions on admissions or rejections and its timely communication of important patient information, as well as for treatment it has provided to CDCR inmates, and cannot be permitted to avoid transparency on these things behind a pretext of patient "confidentiality."

- Full and timely implementation of the suicide prevention and review processes that are already in place, at both the institutional and department levels, should be given priority. This includes incorporation of revised policy and procedural guidelines and court orders into those processes. It also entails the identification of deficiencies at the facility and systemic levels, appropriate follow-up of corrective action plans, and submission of documentation to the Coleman Special Master on the outcomes of investigations of staff misconduct, negligence, and error. This process must include not only training but supervision and appropriate supervisory action regarding staff performance.

# Appendix A

<u>Tracking Timelines for Departmental Review of Inmate Suicides</u>

|  | **Event/Documents** | **Timeline** |
|---|---|---|
| 1. | Date of Death | 0 hour |
| 2. | Chief Medical Officer to Death Review Coordinator | 8 hours |
| 3. | Initial Inmate Suicide Report (Form 7229B) by Suicide Prevention Coordinator to Death Review Coordinator | 2 business days |
| 4. | Death Review Coordinator to Mental Health Suicide Prevention Coordinator | 3 business days |
| 5. | Mental Health Suicide Prevention Coordinator appoints Mental Health Suicide Reviewer | 5 business days |
| 6. | Mental Health Suicide Reviewer writes Preliminary Report; Notifications of suspected misconduct to Suicide Review Committee | 15 days |
| 7. | Suicide Review Committee completes Review and Adds Corrective Action Plan; Review to Mental Health Suicide Reviewer to Complete Executive Report | 30 days |
| 8. | Mental Health Suicide Reviewer submits Executive Report and all documents to Suicide Review Committee to complete Final Suicide Report | 60 days |
| 9. | Facility, Warden, and Chief Medical Officer or Health Care Manager implement Corrective Action Plan | 120 days |
| 10. | Report on implementation of Corrective Action Plan by facility Warden and Chief Medical Officer or Health Care Manager to Suicide Review Committee | 150 days |

19

# EXHIBIT B

**Sofia Millham**

---

**Subject:**       FW: Regulatory Package

**Attachments:** Rulemaking package for MH-DMH ICF pilot program.pdf

---

**From:** Debbie Vorous [mailto:Debbie.Vorous@doj.ca.gov]
**Sent:** Friday, October 30, 2009 2:16 PM
**To:** Jane E. Kahn
**Cc:** Debbie Vorous
**Subject:** Regulatory Package

Jane,

Attached is the regulatory package that was submitted to the OAL on September 22, 2009.  I sent this package out on September 23rd, but it apparently got hung on something.

Thanks,
Debbie

Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

REGULATION AND POLICY MANAGEMENT BRANCH
P.O. Box 942883
Sacramento, CA 94283-0001



September 22, 2009

Susan Lapsley
Director
Office of Administrative Law
300 Capitol Mall, Suite 1250
Sacramento, CA 95814

Dear Director Lapsley:

Pursuant to Penal Code 5058.1, the California Department of Corrections and
Rehabilitation (CDCR) hereby submits these documents to initiate a two year
pilot for increasing referrals of its inmates for Intermediate Care Facility treatment
at mental health programs administered by the California Department of Mental
Health (DMH).    The federal court in the Coleman v. Schwarzenegger case has
established goals for the CDCR and DMH to increase the utilization of available
mental health treatment beds at three programs/facilities operated by the DMH;
Atascadero State Hospital, the Vacaville Psychiatric Program on the grounds of
the California Medical Facility, and the Salinas Valley Psychiatric Program
located on the grounds of the Salinas Valley State Prison. The federal court has
identified specific custody "barriers" in CDCR regulations to mental health
referrals to dormitory-style settings such as those at DMH programs. It has
directed the CDCR to pilot exemptions to these custody rules for referrals for
mental health treatment.

The first benchmark date set by the court is October 31, 2009. CDCR would
appreciate an expedited review of this pilot program by the Office of
Administrative Law given the short court established timeframes and the time
needed for the CDCR and the DMH to ramp-up inmate referrals to mental health
treatment.    Your attention to this request for expedited review is greatly
appreciated.

If you have questions or concerns, please contact Rick Johnson, Health Care
Population Unit at 322-5765, or Dorothy Smith, Classification Services Unit,
Division of Adult Institutions at 322-0561.

Sincerely,

TIMOTHY M. LOCKWOOD, Chief
Regulation and Policy Management Branch
Division of Support Services
California Department of Corrections and Rehabilitation

STATE OF CALIFORNIA—OFFICE OF ADMINISTRATIVE LAW
**NOTICE PUBLICATION/REGULATION SUBMISSION**
(See Instructions on reverse)
For use by Secretary of State only

STD. 400 (REV, 01-99)

| OAL FILE NUMBERS | NOTICE FILE NUMBER Z- | REGULATORY ACTION NUMBER | EMERGENCY NUMBER |
|---|---|---|---|

For use by Office of Administrative Law (OAL) only

NOTICE

REGULATIONS

AGENCY WITH RULEMAKING AUTHORITY
California Department of Corrections and Rehabilitation

AGENCY FILE NUMBER (if any)
09-0082

## A. PUBLICATION OF NOTICE (Complete for publication in Notice Register)

| 1. SUBJECT OF NOTICE | TITLE(S) | FIRST SECTION AFFECTED | 2. REQUESTED PUBLICATION DATE |
|---|---|---|---|
| Mental Health/DMH ICF Treatment Pilot Program | 15 | 3999.8 | N/A |

| 3. NOTICE TYPE | 4. AGENCY CONTACT PERSON | TELEPHONE NUMBER | FAX NUMBER (Optional) |
|---|---|---|---|
| Notice re Proposed Regulatory Action ☐  Other ☒ | Rick Johnson HC-POP Unit | (916) 322-5765 | |

| OAL USE ONLY | ACTION ON PROPOSED NOTICE | | NOTICE REGISTER NUMBER | PUBLICATION DATE |
|---|---|---|---|---|
| | ☐ Approved as Submitted  ☐ Approved as Modified  ☐ Disapproved/ Withdrawn | | | |

## B. SUBMISSION OF REGULATIONS (Complete when submitting regulations)

| 1a. SUBJECT OF REGULATION(S) | 1b. ALL PREVIOUS RELATED OAL REGULATORY ACTION NUMBER(S) |
|---|---|
| Waiver of Custody Rules/DMH ICF Treatment Endorsements | None |

2. SPECIFY CALIFORNIA CODE OF REGULATIONS TITLE(S) AND SECTION(S) (including title 26, if toxics related)

| SECTION(S) AFFECTED (List all section number(s) individually. Attach additional sheet if needed.) | ADOPT 3999.8 |
|---|---|
| | AMEND |
| TITLE(S) 15 | REPEAL |

TYPE OF FILING

☐ Regular Rulemaking (Gov. Code §11346)
☐ Resubmittal of disapproved or withdrawn nonemergency filing (Gov. Code §§11349.3, 11349.4)
☐ Emergency (Gov. Code, §11346.1(b))

☐ Certificate of Compliance: The agency officer named below certifies that this agency complied with the provisions of Gov. Code §§11346.2-11347.3 either before the emergency regulation was adopted or within the time period required by statute.

☐ Resubmittal of disapproved or withdrawn emergency filing (Gov. Code, §11346.1)

☐ Emergency Readopt (Gov. Code, §11346.1(h))
☐ File & Print
☒ Other (Specify) Penal Code 5058.1 Pilot Program

☐ Changes Without Regulatory Effect (Cal. Code Regs., title 1, §100)
☒ Print Only

ALL BEGINNING AND ENDING DATES OF AVAILABILITY OF MODIFIED REGULATIONS AND/OR MATERIAL ADDED TO THE RULEMAKING FILE (Cal. Code Regs. title 1, §44 and Gov. Code §11347.1)

EFFECTIVE DATE OF CHANGES (Gov. Code, §§ 11343.4, 11346.1(d); Cal. Code Regs., title 1, §100)
☐ Effective 30th day after filing with Secretary of State
☒ Effective on filing with Secretary of State
☐ §100 Changes Without Regulatory Effect
☐ Effective other (Specify)

CHECK IF THESE REGULATIONS REQUIRE NOTICE TO, OR REVIEW, CONSULTATION, APPROVAL OR CONCURRENCE BY, ANOTHER AGENCY OR ENTITY
☐ Department of Finance (Form STD. 399) (SAM §6660)   ☐ Fair Political Practices Commission   ☐ State Fire Marshal
☐ Other (Specify)

| CONTACT PERSON | TELEPHONE NUMBER | FAX NUMBER (Optional) | E-MAIL ADDRESS (Optional) |
|---|---|---|---|
| Tim Lockwood | (916) 255-5500 | | Tim.Lockwood@cdcr.ca.gov |

I certify that the attached copy of the regulation(s) is a true and correct copy of the regulation(s) identified on this form, that the information specified on this form is true and correct, and that I am the head of the agency taking this action, or a designee of the head of the agency, and am authorized to make this certification.

SIGNATURE OF AGENCY HEAD OR DESIGNEE

DATE
9-21-09

TYPED NAME AND TITLE OF SIGNATORY
SCOTT KERNAN, Undersecretary Operations, CDCR

For use by Office of Administrative Law (OAL) only

STATE OF CALIFORNIA — DEPARTMENT OF FINANCE
## ECONOMIC AND FISCAL IMPACT STATEMENT
(REGULATIONS AND ORDERS)
STD. 399 (REV. 12/2008)                           *See SAM Section 6601 - 6616 for Instructions and Code Citations*

| DEPARTMENT NAME | CONTACT PERSON | TELEPHONE NUMBER |
|---|---|---|
| CDCR | Rick Johnson, AW, HC Placement Oversight Prog | 916-322-5765 |

| DESCRIPTIVE TITLE FROM NOTICE REGISTER OR FORM 400 | NOTICE FILE NUMBER |
|---|---|
| Division of Correctional Health Care Services (DCHCS) Intermediate Care Facility (ICF) Pilot Project | Z |

## ECONOMIC IMPACT STATEMENT

A. ESTIMATED PRIVATE SECTOR COST IMPACTS (include calculations and assumptions in the rulemaking record.)

1. Check the appropriate box(es) below to indicate whether this regulation:

☐ a. Impacts businesses and/or employees              ☐ e. Imposes reporting requirements

☐ b. Impacts small businesses                         ☐ f. Imposes prescriptive instead of performance

☐ c. Impacts jobs or occupations                      ☐ g. Impacts individuals

☐ d. Impacts California competitiveness               ☑ h. None of the above (Explain below. Complete the
                                                            Fiscal Impact Statement as appropriate.)

h. (cont.) State agency ICF pilot project does not impact the private sector.

(If any box in items 1 a through g is checked, complete this Economic Impact Statement.)

2. Enter the total number of businesses impacted:  None          Describe the types of businesses (Include nonprofits.): _____

Enter the number or percentage of total businesses impacted that are small businesses: _____

3. Enter the number of businesses that will be created:  None          eliminated: _____

Explain: _____

4. Indicate the geographic extent of impacts:    ☐ Statewide    ☐ Local or regional  (List areas.):  None _____

5. Enter the number of jobs created:  None   or eliminated: _____   Describe the types of jobs or occupations impacted: _____

6. Will the regulation affect the ability of California businesses to compete with other states by making it more costly to produce goods or services here?

☐ Yes        ☑ No        If yes, explain briefly: _____

B. ESTIMATED COSTS (Include calculations and assumptions in the rulemaking record.)

1. What are the total statewide dollar costs that businesses and individuals may incur to comply with this regulation over its lifetime? $  None

a. Initial costs for a small business: $ _____    Annual ongoing costs: $ _____    Years: _____

b. Initial costs for a typical business: $ _____   Annual ongoing costs: $ _____    Years: _____

c. Initial costs for an individual: $ _____    Annual ongoing costs: $ _____    Years: _____

d. Describe other economic costs that may occur:  None  _____

## ECONOMIC AND FISCAL IMPACT STATEMENT cont. (STD. 399, Rev. 12/2008)

2. If multiple industries are impacted, enter the share of total costs for each industry:  N/A

3. If the regulation imposes reporting requirements, enter the annual costs a typical business may incur to comply with these requirements. (Include the dollar costs to do programming, record keeping, reporting, and other paperwork, whether or not the paperwork must be submitted.): $  N/A

4. Will this regulation directly impact housing costs?  ☐ Yes    ☑ No    If yes, enter the annual dollar cost per housing unit: _____ and the number of units: _____

5. Are there comparable Federal regulations?  ☐ Yes    ☑ No    Explain the need for State regulation given the existence or absence of Federal regulations: _____

Enter any additional costs to businesses and/or individuals that may be due to State - Federal differences: $  None

---

C. ESTIMATED BENEFITS (Estimation of the dollar value of benefits is not specifically required by rulemaking law, but encouraged.)

1. Briefly summarize the benefits that may result from this regulation and who will benefit: _____
   This regulation benefits the mental health care for CDCR inmates referred to DMH.

2. Are the benefits the result of :  ☑ specific statutory requirements, or  ☐ goals developed by the agency based on broad statutory authority?
   Explain:  Coleman Court mandated the mental health MHSDS Program Guide transfer time frames and access to care requirements.

3. What are the total statewide benefits from this regulation over its lifetime? $  N/A

---

D. ALTERNATIVES TO THE REGULATION  (Include calculations and assumptions in the rulemaking record. Estimation of the dollar value of benefits is not specifically required by rulemaking law, but encouraged.)

1. List alternatives considered and describe them below. If no alternatives were considered, explain why not:  Court mandate.

2. Summarize the total statewide costs and benefits from this regulation and each alternative considered:

| | | | |
|---|---|---|---|
| Regulation: | Benefit: $ N/A | Cost: $ N/A | |
| Alternative 1: | Benefit: $ | Cost: $ | |
| Alternative 2: | Benefit: $ | Cost: $ | |

3. Briefly discuss any quantification issues that are relevant to a comparison of estimated costs and benefits for this regulation or alternatives: _____
   N/A

4. Rulemaking law requires agencies to consider performance standards as an alternative, if a regulation mandates the use of specific technologies or equipment, or prescribes specific actions or procedures. Were performance standards considered to lower compliance costs?  ☐ Yes    ☑ No
   Explain:  Performance standard measurement does not apply.

---

E. MAJOR REGULATIONS (Include calculations and assumptions in the rulemaking record.) Cal/EPA boards, offices, and departments are subject to the following additional requirements per Health and Safety Code section 57005.

## ECONOMIC AND FISCAL IMPACT STATEMENT cont. (STD. 399, Rev. 12/2008)

1. Will the estimated costs of this regulation to California business enterprises exceed $10 million ?  ☐ Yes  ☑ No (If No, skip the rest of this section.)

2. Briefly describe each equally as an effective alternative, or combination of alternatives, for which a cost-effectiveness analysis was performed:

Alternative 1: _____

Alternative 2: _____

3. For the regulation, and each alternative just described, enter the estimated total cost and overall cost-effectiveness ratio:

Regulation:        $ _____        Cost-effectiveness ratio: $ _____
Alternative 1:     $ _____        Cost-effectiveness ratio: $ _____
Alternative 2:     $ _____        Cost-effectiveness ratio: $ _____

# FISCAL IMPACT STATEMENT

A. FISCAL EFFECT ON LOCAL GOVERNMENT  (Indicate appropriate boxes 1 through 6 and attach calculations and assumptions of fiscal impact for the current year and two subsequent Fiscal Years.)

☐ 1. Additional expenditures of approximately $ _____ in the current State Fiscal Year which are reimbursable by the State pursuant to Section 6 of Article XIII B of the California Constitution and Sections 17500 et seq. of the Government Code. Funding for this reimbursement:

☐ a. is provided in _____ , Budget Act of _____ or Chapter _____ , Statutes of _____

☐ b. will be requested in the _____ Governor's Budget for appropriation in Budget Act of _____
                              (FISCAL YEAR)

☐ 2. Additional expenditures of approximately $ _____ in the current State Fiscal Year which are not reimbursable by the State pursuant to Section 6 of Article XIII B of the California Constitution and Sections 17500 et seq. of the Government Code because this regulation:

☐ a. implements the Federal mandate contained in _____

☐ b. implements the court mandate set forth by the _____

court in the case of _____ vs. _____

☐ c. implements a mandate of the people of this State expressed in their approval of Proposition No. _____ at the _____
       election;                                                                                                              (DATE)

☐ d. is issued only in response to a specific request from the _____

_____ , which is/are the only local entity(s) affected;

☐ e. will be fully financed from the _____ authorized by Section
                                    (FEES, REVENUE, ETC.)

_____ of the _____ Code;

☐ f. provides for savings to each affected unit of local government which will, at a minimum, offset any additional costs to each such unit;

☐ g. creates, eliminates, or changes the penalty for a new crime or infraction contained in _____

☐ 3. Savings of approximately $ _____ annually.

☐ 4. No additional costs or savings because this regulation makes only technical, non-substantive or clarifying changes to current law regulations.

## ECONOMIC AND FISCAL IMPACT STATEMENT cont. (STD. 399, Rev. 12/2008)

[✓] 5.  No fiscal impact exists because this regulation does not affect any local entity or program.

[ ] 6.  Other.

B. FISCAL EFFECT ON STATE GOVERNMENT (Indicate appropriate boxes 1 through 4 and attach calculations and assumptions of fiscal impact for the current year and two subsequent Fiscal Years.)

[ ] 1.  Additional expenditures of approximately $ _____ in the current State Fiscal Year. It is anticipated that State agencies will:

    [ ] a.  be able to absorb these additional costs within their existing budgets and resources.

    [ ] b.  request an increase in the currently authorized budget level for the _____ fiscal year.

[ ] 2.  Savings of approximately $ _____ in the current State Fiscal Year.

[ ] 3.  No fiscal impact exists because this regulation does not affect any State agency or program.

[✓] 4.  Other.

C. FISCAL EFFECT ON FEDERAL FUNDING OF STATE PROGRAMS  (Indicate appropriate boxes 1 through 4 and attach calculations and assumptions of fiscal impact for the current year and two subsequent Fiscal Years.)

[ ] 1 .  Additional expenditures of approximately $ _____ in the current State Fiscal Year.

[ ] 2.  Savings of of approximately $ _____ in the current State Fiscal Year.

[ ] 3.  No fiscal impact exists because this regulation does not affect any federally funded State agency or program.

[✓] 4.  Other.

| FISCAL OFFICER SIGNATURE | DATE 9/15/09 |
|---|---|
| AGENCY SECRETARY [1] APPROVAL/CONCURRENCE | DATE 9-21-09 |
| DEPARTMENT OF FINANCE [2] APPROVAL/CONCURRENCE  PROGRAM BUDGET MANAGER | DATE |

1.   The signature attests that the agency has completed the STD.399 according to the instructions in SAM sections 6601-6616, and understands the impacts of the proposed rulemaking. State boards, offices, or department not under an Agency Secretary must have the form signed by the highest ranking official in the organization.

2.   Finance approval and signature is required when SAM sections 6601-6616 require completion of Fiscal Impact Statement in the STD.399.

# CERTIFICATION OF PILOT PROGRAM
[per Penal Code Section 5058.1]

I, Scott Kernan, Undersecretary, Operations, California Department of Corrections and Rehabilitation (CDCR), certify that the "Mental Health/DMH ICF Pilot Program" is a departmentally authorized pilot program impacting no more that ten percent of the total state inmate population and meets the other specifications enumerated in Penal Code Section 5058.1.

This pilot program is being initiated to comply with instructions provided by the federal court in the case of Coleman v. Schwarzenegger for the CDCR to maximize its utilization of available mental health treatment beds operated by the California Department of Mental Health (DMH). The beds in question are licensed at an Intermediate Care Facility level for mental health treatment and are located at Atascadero State Hospital. The Vacaville Psychiatric Program is located on the grounds of California Medical Facility in Vacaville, and the Salinas Valley Psychiatric Program is located on the grounds of Salinas Valley State Prison in Soledad.

The purpose of the pilot program is to develop a sustainable referral process between CDCR and DMH to increase access to mental health services for inmates, while maintaining security for staff. Prior to this pilot, certain established custody, and security rules restricted endorsements of certain CDCR for mental health treatment because the receiving facilities operated by the DMH did not offer housing settings that met CDCR security requirements.

The pilot program will remain in effect for two years from the date of certification by the Office of Administrative Law. By that time, permanent regulations to continue the program will be adopted or the pilot program will lapse by operation of law. There will be an ongoing assessment of the program, both mental health and security outcomes, by the Department, who will monitor the implementation and effectiveness of the policies and procedures as set forth in the Instructional Memorandum.


SCOTT KERNAN                                           9-21-09
Undersecretary, Operations                              Date
California Department of Corrections
and Rehabilitation

Case 2:90-cv-00520-KJM-SCR    Document 3785    Filed 01/22/10    Page 35 of 65

State of California                                                  Department of Corrections and Rehabilitation

## Memorandum

Date  :   July 16, 2009·                 **INSTRUCTIONAL MEMORANDUM**

To    :   Associate Directors, Division of Adult Institutions
          Wardens
          Mental Health Chiefs

Subject:  **PILOT PROGRAM FOR INTERMEDIATE CARE FACILITIES AT ATASCADERO STATE
          HOSPITAL, CALIFORNIA MEDICAL FACILITY, AND SALINAS VALLEY STATE PRISON**

### PURPOSE

This Instructional Memorandum announces the establishment and implementation of the
California Department of Corrections and Rehabilitation (CDCR) pilot program for referring male
inmate-patients who are identified as needing placement at a Department of Mental Health
(DMH) Intermediate Care Facility (ICF), effective **(insert date here)**. The DMH ICF programs
are currently located at Atascadero State Hospital (ASH), Vacaville Psychiatric Program (VPP)
at California Medical Facility (CMF), and Salinas Valley Psychiatric Program (SVPP) at Salinas
Valley State Prison (SVSP). This memorandum does not impact the housing of inmate-patients
in the ICF at Patton State Hospital.

The goal of this statewide pilot program is to arrive at a sustainable CDCR-DMH referral process
that effectively provides for access to care to DMH ICF level of care, consistent with
inmate-patient, staff, and public safety and security requirements, based on custody criteria
developed specifically for DMH-ICF placement determination. Therefore, this pilot program is
designed to facilitate:

- *Timely court-ordered access to care.* Inmate-patients shall receive constitutionally
  required mental health care for a successful return to the Enhanced Outpatient Program
  (EOP) or Correctional Clinical Case Management System (CCCMS) levels of care, as
  clinically indicated within their respective institutions, and/or to return to society in
  general.
- *Central review and placement oversight of all cases referred to DMH ICF level of care.*
  Male inmate-patients with security concerns that require ICF level of care shall be
  housed in the most appropriate DMH ICF program, consistent with safety and security
  requirements.
- *Full utilization of beds available for CDCR inmate-patients referred to DMH ICF level of
  care.* There are a total of 664 ICF beds available for male CDCR inmate-patients.

Please inform all concerned persons of this Instructional Memorandum.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 2

## BACKGROUND

On May 1, 2008, CDCR submitted the *Referral Strategy for ASH ICF* to the *Coleman* Special
Master. This report included a long-term strategy to address systemic problems in the CDCR-
DMH referral process, which will be carried out by this pilot program. The CDCR currently
places designated inmates into ICF utilizing procedures outlined in the Intermediate Care/
Non-Acute Services Memorandum of Understanding (MOU) between DMH and CDCR and
previous instructional memoranda dated May 6, 2006, entitled "HOUSING POLICY FOR MALE
INMATES WITH IDENTIFIED HOUSING CONCERNS WHO ARE APPROVED FOR
PLACEMENT IN A DEPARTMENT OF MENTAL HEALTH TREATMENT PROGRAM AT THE
INTERMEDIATE LEVEL OF CARE," and June 4, 2007, entitled "TRANSFER OF SECURITY
HOUSING UNIT CASES TO DEPARTMENT OF MENTAL HEALTH INTERMEDIATE CARE
FACILITIES." The California Code of Regulations (CCR), Title 15, sections 3377.1, Inmate
Custody Designations; 3377.2, Criteria for Assignment of Close Custody; 3341.5, Segregated
Program Housing Units; and 3375.2, Administrative Determinants may require additions and/or
amendments in support of ICF placements at ASH, SVSP, and CMF. Specifically, the additions
and/or amendments to Title 15 will pertain to the placement of those inmates who have housing
concerns such as determinate or indeterminate Security Housing Unit (SHU) terms and close
custody designations into dormitory settings at ASH, CMF, and SVSP for treatment in the ICF.
This pilot program will allow the CDCR and DMH to evaluate the ICF custodial procedures and
clinical protocols, and to implement any necessary changes during the pilot program period.

## PROGRAM COMPONENTS

This pilot program involves the following components:

A.  Identification and referral of inmate-patients that meet the MOU clinical criteria for ICF
     level of care;
B.  Submission and review of regular (non case-by-case) ICF referrals;
C.  Submission and review of case-by-case ICF referrals;
D.  DMH review;
E.  Case handling procedures;
F.  Transfer process; and
G.  Program discharges.

## PROGRAM OVERVIEW

### A. Identification and Referral of Inmate-Patients that Meet the MOU Clinical Criteria for ICF
### Level of Care

The following process standardizes the clinical referral process of inmate-patients to DMH ICF.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 3

### 1. Interdisciplinary Treatment Teams (IDTT)

a. The institutions' IDTTs shall consider each inmate-patient in the Mental Health Services Delivery System (MHSDS) for referral to DMH ICF during all regularly scheduled IDTT meetings. The IDTT shall complete CDCR Form 7388, Mental Health Treatment Plan, and the "IDTT Screening Checklist – Referral to DMH-ICF" (Attachment 1) to assess the appropriateness of a referral to DMH ICF.

b. When the IDTT determines that an inmate-patient meets the screening criteria for a referral to ICF and meets the DMH ICF MOU criteria, the inmate-patient's Primary Clinician shall be notified.

c. When the IDTT determines that an inmate-patient does not meet the screening criteria for a referral to ICF, this decision is documented on the Screening Checklist.

d. When the IDTT determines that an inmate-patient meets the screening criteria but is not referred, this decision is documented on the Screening Checklist and is submitted to the CDCR-DMH Coordinator.

### 2. Primary Clinician

a. When notified that an inmate-patient meets the criteria for referral to ICF, the Primary Clinician shall complete the approved DMH Referral Form (Attachment 2).

b. The Primary Clinician shall endeavor to obtain the inmate-patient's signature on CDCR 128-MH9, Transfer to DMH – Due Process Chrono. If the inmate-patient refuses to sign the consent form, this information is forwarded to the CDCR-DMH Coordinator to -schedule a Vitek (due process) hearing.

c. The Primary Clinician shall document the completion of CDCR 7388, Mental Health Treatment Plan, and the "IDTT Screening Checklist – Referral to DMH-ICF" forms for entry into the Mental Health Tracking System (MHTS). The forms shall then be forwarded to the institutional CDCR-DMH Coordinator on the same day of the IDTT.

### 3. CDCR's DMH Coordinator

a. The CDCR-DMH Coordinator shall schedule a Vitek hearing if the inmate-patient refuses to sign the consent form.

b. The CDCR-DMH Coordinator shall maintain the DMH Referral Log Workbook in Excel (Attachment 3), which tracks, among other things, the date of approval by the Chief of Mental Health, date of referral, date of DMH acceptance or rejection, date of transfer, etc.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 4

> The CDCR-DMH Coordinator shall also log each of the cases that meet screening criteria but are not referred in the DMH Referral Log Workbook.

c. Consistent with monthly *Coleman* reporting requirements, the CDCR-DMH Coordinator shall submit a DMH Referral Log report, which is a printout of the spreadsheets in the DMH Referral Log Workbook, to the CDCR Statewide Mental Health Program every 5th day of each month.

## B. Submission and Review of Regular (non case-by-case) ICF Referrals

### 1. Referring Institution

*(Within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if Vitek hearing is required, the CDCR-DMH Coordinator shall ensure completion of the DMH ICF referral.[1])*

Under this pilot program, the 30 adult male institutions shall submit a_ll cases being referred for DMH ICF level of care to the Statewide Mental Health Program of the Division of Correctional Health Care Services (DCHCS) for placement recommendation, as follows:

a. Within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if *Vitek* hearing is required, the CDCR-DMH Coordinator shall ensure completion of the DMH ICF referral according to the "Department of Mental Health ICF/Non-Acute Referral Check List" (Attachment 4). All original forms shall be forwarded to Health Records for placement in the Unit Health Record (UHR).

b. If it has been clinically determined that an inmate serving a *determinate or indeterminate SHU term* requires placement in an ICF, the IDTT/ICC at the institution where the inmate is currently housed shall review the case for referral to either CMF-ICF or SVPP. The IDTT/ICC must consider the ability of the inmate to safely program in an open dayroom and yard program environment. The ICC shall:

     i) Suspend the determinate SHU term or end the indeterminate SHU term due to mental health treatment needs effective the date of arrival at SVSP or CMF; and designate appropriate custody level upon arrival at SVSP or CMF based upon a management concern as stated in CCR, Title 15, section 3377.2 (b)(2);

                       OR

     Leave the determinate or indeterminate SHU term and Max Custody in place through transfer where there are serious safety and/or security concerns. The concerns are to be clearly articulated in the CDCR 128-G, Classification Chrono.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 5

>   ii) Document whether the inmate meets double cell criteria based on CDCR policy.
>   iii) Expedite the CDCR 128-G, Classification Chrono, to ensure its inclusion in the
>        DMH referral packet.
>
>   iv) Document any security concerns the committee may have as a result of the
>       inmate's case factors.

c. *For unprocessed Reception Center (RC) referrals*, including new commitments and parole
   violators returned to custody, the referring mental health staff shall coordinate with the
   appropriate medical staff and make every effort to provide the Correctional Counselor
   (CC) with all the required medical documentation needed to expedite the completion of
   RC processing. Completed processing includes, but is not limited to:

   • CDCR 128-C1, Reception Center Medical Clearance/Restriction Information
     Chrono;
   • CDCR 128-MH1, Mental Health Screening Chrono;
   • CDC 128-C, Medical-Psych-Dental Chrono;
   • CDC 128-C2, Recommendation for Adaptive Support;
   • CDC 1845, Disability Placement Program Verification (if necessary);
   • Completed Institutional Staff Recommendation Summary (ISRS) and CDCR 839,
     Classification Score Sheet (for new commitments); and
   • CDCR 816, Reception Center Readmission Summary, and CDCR 841,
     Readmission Score Sheet (for parole violators).

d. The Classification and Parole Representative (C&PR), RC CC III, or designee, shall
   ensure that the DMH ICF Placement Screening Sheet (Attachment 5) is completed,
   signed, and provided to the referring mental health clinician for attachment to the referral
   packet. A Placement Screening Sheet that is not signed by the C&PR or RC CC III will be
   deemed incomplete and will not be accepted. Headquarters staff may require additional
   documentation and information for certain cases, and therefore, it is imperative for the
   institution to identify a contact person on the DMH ICF Placement Screening Sheet,
   including telephone number with area code and extension. The DMH ICF Placement
   Screening Sheet shall also delineate the DMH-ICF program(s) for which the inmate-
   patient is eligible.

e. A pending CDC 115, Rules Violation Report, will not preclude an inmate-patient from
   being transferred into an appropriate DMH-ICF program within the established timelines.
   However, the sending institution shall be responsible for addressing the disposition of any
   pending CDC 115 violations.

f. The CDCR-DMH Coordinator shall forward the completed ICF referral packet to the Chief
   of Mental Health (or designee) for approval and signature.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 6

g.  The Chief of Mental Health, or designee, shall certify or deny the ICF referral within one
    working day.  The CDCR-DMH Coordinator shall log the date of the decision in the DMH
    Referral Log Workbook.

h.  If the referral is denied by the Chief of Mental Health (or designee), the CDCR-DMH
    Coordinator shall schedule a Coordinated Clinical Assessment Team (CCAT) case
    conference within five working days so that a disposition determination can be made.
    DMH's participation in this conference is optional.

i.  If the referral is approved by the Chief of Mental Health (or designee), the CDCR-DMH
    Coordinator shall, within one working day, transmit the completed ICF referral packet to:

            California Department of Corrections and Rehabilitation
            Division of Correctional Health Care Services
            Statewide Mental Health Program
            P.O. Box 942883
            Sacramento, CA 94283-0001
            ATTN: Mental Health Utilization Management Unit

    The CDCR-DMH Coordinator shall log the date of transmittal in the DMH Referral Log
    Workbook.

2. Mental Health Program Services (MHPS)
   *(Once the referral is received at MHPS, the inmate-patient shall be transferred within
   30 days, if accepted at a DMH hospital or psychiatric program.[2])*

   a.  Once received, referral packets will be logged into a tracking system, which shall include
       referral dates, referral receipt dates, clinical review dates, custodial review dates, dates
       the referrals are sent to DMH or returned to the sending institution, admission dates, and
       discharge dates.

   b.  *On the same day of receipt*, packets will be assigned to a clinician to be screened for the
       clinical appropriateness of the referral, based on the CDCR-DMH MOU clinical criteria for
       ICF level of care, and will be simultaneously forwarded to the Health Care Placement
       Oversight Program (HC-POP) for custodial placement review and recommendation.

   c.  *Within three working days*, the clinician shall determine whether the case is an appropriate
       clinical referral.  If the clinician determines that the case is not an appropriate referral, the
       referring institution will be notified of the reason.

---

MHSDS Program Guide (2009 Revision)

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 7

### 3. Health Care Placement Oversight Program
*(Custodial review shall be completed within three working days of receipt for regular, non case-by-case ICF referrals.)*

HC-POP shall complete the custodial review in accordance with the newly developed DMH ICF Placement Screening Sheet. The new custody criteria, as detailed below, are designed to be inclusionary rather than exclusionary (see Attachment 6). The goal is to refer inmate-patients to the most appropriate ICF program with the lowest level of security possible based on their mental health acuity and custody case factors. Thus, the default institution is ASH rather than SVPP so that those inmates with the lowest custody needs are directed to ASH first, without compromising safety and security requirements. DMH shall review all referrals and the state hospitals/psychiatric programs will coordinate efforts for placement into the facility that best meets the inmate-patient's clinical need.

a. *Atascadero State Hospital.* ASH ICF is a 256-bed inpatient psychiatric program operated by DMH to provide mental health services to inmate-patients under the jurisdiction of CDCR. ASH has all dormitory beds with some unlocked individual rooms in locked units with no internal gun coverage; yet, it has the most secure perimeter within the state hospital system. For purposes of this review, ASH will be considered a level II type placement based on the established custody criteria. Inmate-patients transferring to/from CDCR and ASH are pursuant to Penal Code, sections 2684 and 2685.

HC-POP will refer CDCR inmates who are 18 years of age or older and that have a mental illness requiring ICF level of care to ASH, <u>unless</u> the inmate has:

- Maximum custody due to threatening, assaultive, or inciting behavior;
- A sentence of life without parole (LWOP);
- S-suffix due to non-clinical reasons (clinical staff shall document inmate-patients' clearance for dorm housing if the S-suffix is affixed for clinical reasons);
- Close A custody;
- Committed in-custody homicide;
- High notoriety/public interest; or
- An active hold for an offense with potential sentence of:
    - LWOP,
    - Multiple Life Term,
    - 50 years or more,
    - Life Term, or
    - 15 years or more.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 8

b. *Vacaville Psychiatric Program – CMF-ICF Dorms.* VPP is an inpatient psychiatric program located inside CMF that is jointly operated by CDCR and DMH. VPP includes an 84-bed ICF dormitory.

HC-POP will refer CDCR inmates who are 18 years of age or older and that have a mental illness requiring ICF level of care to CMF-ICF *dorms* if ineligible for placement at ASH, unless the inmate has:

- Maximum custody due to threatening, assaultive, or inciting behavior, or;
- A LWOP sentence; or
- S-suffix due to non-clinical reasons (clinical staff shall document inmate-patients' clearance for dorm housing if the S-suffix is affixed for clinical reasons).

c. *Vacaville Psychiatric Program – CMF-ICF Cells.* VPP also includes a 30-bed high custody ICF located inside CMF. CMF is a Level III institution with an electrified fence.

HC-POP will refer CDCR inmates who are 18 years of age or older and that have a mental illness requiring ICF level of care to *CMF-ICF cells* if ineligible for placement at ASH or CMF-ICF *dorms*, unless the inmate has:

- A LWOP sentence (without approval from the Departmental Review Board (DRB)).

CMF-ICF *cells* may consider lower custody cases if: 1) the beds at ASH and CMF-ICF *dorms* are full, and 2) beds are available at CMF-ICF *cells*. Preference shall be given first to those that meet the case-by-case criteria for CMF-ICF *dorms*, and second to those that meet the criteria for ASH.

d. *Salinas Valley Psychiatric Program.* SVPP is a 244-bed inpatient psychiatric program located within SVSP, a Level IV institution, and is jointly operated by CDCR and DMH.

HC-POP will refer cases that are ineligible for placement at ASH or VPP to SVPP. These cases include, but are not limited to, inmate-patients with LWOP status. SVPP may consider lower custody cases if: 1) the beds at ASH and VPP are full, and 2) beds are available at SVPP. Preference shall be given first to those that meet the case-by-case criteria for CMF-ICF *dorms*, and second to those that meet the criteria for ASH.

e. HC-POP staff will notify the MHPS of HC-POP's placement recommendation for tracking purposes and final disposition of the referral packet.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 9


4. Mental Health Program Services

    a.  MHPS staff will either return the referral to the sending institution or submit the referral to
       DMH based on the results of the CDCR central oversight clinical and custodial review
       process.

**C. Submission and Review of Case-By-Case ICF Referrals**
    *(Case-by-case evaluations shall be completed within 15 working days of receipt.)*

1. Referring Institution

The processes detailed in section A though B.2. above shall remain the same with the following
addition:

    a.  *Within five working days of identification by IDTT*, the CDCR-DMH Coordinator shall work
       with the C&PR to ensure completion of the DMH ICF referral packet.  The C&PR/ RC CC
       III shall immediately schedule a case-by-case referral for Institutional Classification
       Committee (ICC) following the required 72-hour notice period.  *Vitek* hearings shall be
       scheduled at the same time, if necessary.

2. Health Care Placement Oversight Program

HC-POP shall review those cases that have been identified as needing an expanded case-by-
case evaluation.  Case-by-case evaluations require ICC review prior to placement at ASH or
CMF-ICF dorms.  There will be no case-by-case evaluations for CMF-ICF cells or SVPP.
Case-by-case criteria for ASH and CMF-ICF dorms are as follows (see Attachment 7,
Case-By-Case Placement Guidelines):

    *Atascadero State Hospital*

       •  Maximum custody (based on non-disciplinary reasons)
       •  Committed SHU-able offense(s) per the CCR, Title 15, section 3341.5 (9), provided
          that the SHU Minimum Eligible Release Date (MERD) has been expired for 12 to 18
          months (depending on offense)
       •  Level IV placement scores
       •  Sensitive Needs Yard (SNY) or safety concerns
       •  Close B custody

    *CMF-ICF Dorms*

       •  Maximum custody (based on non-disciplinary reasons)

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 10

- • Committed SHU-able offense(s) per the CCR, Title 15, section 3341.5 (9), provided that the SHU MERD has been expired for at least 12 months
- • Level IV placement scores
- • SNY or safety concerns
- • Close A custody

The following steps shall be followed for case-by-case evaluations:

a. Placement recommendations shall be based on information available from the DMH ICF Placement Screening Sheet at the time of review. HC-POP staff may require additional documentation and information for certain cases. Because the referrals are time-sensitive, it is imperative that the institution's C&PR/RC CC III provide the requested information as soon as possible.

b. HC-POP staff will forward a CDC 128-B, Placement Recommendation Chrono, to the referring institution's C&PR/RC CC III, or designee, outlining the reason for the case-by-case placement recommendation. Should the institution find case factors that would preclude the placement recommendation, the C&PR/RC CC III shall immediately contact HC-POP's designated DMH central oversight CC III for a case conference and resolution. Any new or additional case factor information shall be provided to HC-POP's CC III.

c. For cases not resolved at the CC III level, the HC-POP Chief will case conference with the Division of Adult Institutions (DAI), Classification Services Unit (CSU) Chief and, if necessary, the appropriate DAI Associate Director for placement resolution. If the case cannot be resolved at the Chief level, the case will proceed to ICC per DAI's direction.

d. Institution staff will conduct ICC classification action based on the DAI placement direction. The classification committee shall document the classification action; the HC-POP placement recommendation; and, if necessary, the basis for not following the HC-POP placement recommendation on the ICC CDC 128-G, Classification Chrono. A copy of the ICC CDC 128-G, Classification Chrono, shall be immediately sent to the HC-POP Chief by the institutional C&PR/RC CC III.

e. The HC-POP Chief shall document and track all cases when the institution/DAI do not refer the inmate to the DMH ICF facility as recommended on the final HC-POP CDCR 128-B, Placement Recommendation Chrono. HC-POP will review the cases for any patterns and recommend any administrative remedies as appropriate.

f. HC-POP staff will notify MHPS of the placement determination for tracking and final disposition of the referral packet. If applicable, a copy of the HC-POP CDC 128-B, Placement Recommendation Chrono, and the ICC CDC 128-G, Classification Chrono, shall be included with the referral packet.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 11

### 3. Mental Health Program Services

    a. MHPS staff will either return the referral to the sending institution or submit the referral to DMH based on the results of the CDCR central oversight clinical and custodial review process.

### D. DMH Review

1. In accordance with existing policy, DMH ICF clinical staff shall review the CDCR DMH ICF referral packets and determine if the referral meets the ICF MOU clinical criteria *within three working days of receipt.*

2. If the referral is rejected by DMH staff, a CCAT conference is convened and a disposition determination is made.

### E. Case Handling Procedures

Upon acceptance into DMH ICF, the inmate-patient will be referred to the CSR for endorsement and scheduled for transfer to ASH, CMF, or SVSP. The C&PR at California Men's Colony-East (CMC-E), CMF, and SVSP shall coordinate with the C&PR at the sending institution and contact the CSU to request a teletype authorization for psych and return, when immediate program openings occur.

### 1. Inmate-Patients Requiring SNY Housing

    a. The receiving institution's C&PR at CMF and SVSP shall review the DMH ICF Placement Screening Sheet to ensure the inmate-patient is appropriately housed commensurate with his safety/security needs. The receiving institution shall conduct an ICC/IDTT to determine the level of safety precautions needed for the inmate-patient to facilitate his participation in the ICF program at their facility.

### 2. Inmate-Patients with Close Custody

    a. If an inmate-patient with Close custody is accepted at CMF-ICF dorms, a telephonic case review shall be conducted between the sending warden (or designee) and the CMF warden (or designee) prior to transport of the inmate. All Close custody inmates received at CMF-ICF dorms shall be seen by ICC for follow-up to the telephonic case conference previously held.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 12

b. Upon arrival at CMF or SVSP, the receiving institution's ICC/IDTT shall evaluate whether
the inmate-patient will retain Close custody based on management concerns and assign
an appropriate level of custody based on that evaluation.

### 3. Inmate-Patients with an Active SHU Term

a. In cases where an inmate arrives with an active SHU term, he will be eligible only to
participate in Phase One of the ICF program until such time as the ICC/IDTT reviews the
case to evaluate risk factors relative to safety and security, and acts to address the SHU
status. For inmates with a SHU term, Program Phase One requires the inmate to be
housed in a single cell and be escorted in restraints with enhanced security precautions
and limited movement until assessments of the inmate's compliance with medications and
therapy can be fully evaluated. This phase can last from 30 to 120 days. Upon clinical
evaluation, IDTT may submit a CDCR 128-C, Medical-Psych-Dental Chrono, to ICC for
further review and evaluation for potential transition through Phases II and III,
commensurate with the degree of successful participation in mental health therapy and
adaptation to dormitory living.

### 4. Inmate-Patient Housing Assignment

a. The receiving institution's ICC/IDTT shall address the inmate-patient's status relative to
double cell, single cell, or dorm housing. Inmates who have an S-suffix for non-clinical
reasons shall be housed in a cell and shall not have a cellmate regardless of their custody
level.

### F. Transfer Process

*Transport must be completed within 72-hours of bed assignment or notification by the state
hospital.* Established policies and procedures for the CDCR transfer process, including
timeframes, shall be applied to cases upon acceptance into a DMH-ICF program.

### G. Program Discharges

1. Inmate-patients discharged from DMH-ICF will continue to be processed in accordance with
the existing "Psych and Return" policy and the current MOU.

2. *For inmate-patients discharged from VPP and SVPP,* the following shall also occur:

a. Upon receipt of the CDCR 128-MH3, Mental Health Placement Chrono, stating that the
inmate-patient is to be discharged from the program, the CC shall complete a discharge
file review; CDCR 128-B, General Chrono; and the DMH Discharge Review Summary.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 13


b. The CDCR 128-MH3 and CDCR 128-B are forwarded to the CMF or SVSP C&PR who will
determine if the inmate-patient is able to return to the sending institution based upon his
current MHSDS level of care and the inmate-patient's case factors.  If so, the sending
institution's C&PR/RC CC III will be notified and arrangements will be made to transfer the
inmate back to the sending institution *within three working days*.

c. If the inmate-patient is unable to return to the sending or hub institution, the CC shall
issue the inmate-patient a CDCR 128-B1, Notice of Classification Hearing, and schedule
him for the next available classification hearing.  The classification committee shall review
the case factors, make placement recommendations, and refer the case to a
Classification Staff Representative (CSR) for transfer/placement endorsement.

d. Once discharged, inmates shall be moved to appropriate alternate housing, based on
case factors, outside the ICF to make bed space available for incoming ICF
inmate-patients.

e. SNY or SHU inmates who have been discharged from the ICF program will not normally
be retained within the program's housing unit.  The ICC/IDTT at CMF or SVSP shall
determine whether the inmate will be housed in the Administrative Segregation Unit or in
the general population pending transfer based upon his case factors.  Additionally, the
ICC/IDTT shall address the following:

- Re-impose a determinate SHU term or reassess an indeterminate SHU term,
clearly articulating the reason for returning the inmate to a SHU.  Validated gang
members or associates, active or inactive, who were received from SHU shall have
their indeterminate SHU term reassessed.

                                  OR

- Refer the case to a CSR for endorsement to an appropriate facility based upon the
inmate's case factors and treatment needs.

                                  OR

- If during ICC/IDTT, staff notes the inmate is eligible for an inactive gang status
review, as outlined in CCR, Title 15, section 3378 (e), the committee shall note this
fact in the CDCR 128-G, Classification Chrono.  The inmate will be transferred
back to the SHU facility from which he came and the appropriate staff at the
assigned institution will complete the inactive gang status review.

f. The Discharge Review Summary shall be filed in the UHR prior to transfer of the inmate.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 14

## STATEMENT AS TO THE DURATION OF THE PILOT PROGRAM

This pilot program shall remain in effect for a two-year period beginning (**insert date here**) through (**insert date here**). At the end of this two-year period, the pilot program will lapse by operation of law, or will be promulgated through the Administrative Procedure Act.

In conjunction with DMH and DAI, an ongoing evaluation of this pilot program will be conducted by HC-POP and the Mental Health Program under the DCHCS to ensure timely *court-ordered* access to care and central placement oversight is facilitated for inmate-patients requiring ICF level of care. The evaluation will also determine whether or not CDCR is fully utilizing the beds available for CDCR inmate-patients at ASH, VPP, and SVPP. A progress report will be provided to Executive Staff every six months that identifies any obstacles or issues with the pilot program and any recommended changes. It is intended that the pilot program will be adjusted throughout the two-year period, as necessary, until the goal is met.

## PILOT PROGRAM REQUIREMENTS

The ICF pilot program for ASH, CMF, and SVPP is operating as a pilot program pursuant to Penal Code section 5058.1. The goal of this statewide pilot program is to arrive at a sustainable CDCR-DMH referral process that effectively provides for access to care to DMH ICF level of care, consistent with inmate-patient, staff, and public safety and security requirements, based on custody criteria developed specifically for DMH-ICF placement determination.

## PILOT PROGRAM LOCATIONS

This pilot program shall be implemented at all CDCR adult male institutions that may refer an inmate-patient to DMH ICF at ASH, VPP, and SVPP. Additional CDCR institutions may be added, if needed, at the discretion of the Secretary and within the limits established in Penal Code section 5058.1.

Associate Directors, Division of Adult Institutions
Wardens
Mental Health Chiefs
Page 15

Inquiries regarding this pilot program should be directed as follows:

| Custody questions–DAI | Eric Arnold | Chief, Classification Services Unit | (916) 323-3660 | Eric.Arnold@cdcr.ca.gov |
|---|---|---|---|---|
| Placement questions–HC-POP | Rick Johnson | Associate Warden | (916) 322-5765 | Rick.Johnson@cdcr.ca.gov |
| Clinical questions–MH Program | Lucinda McGill | Nurse Consultant III | (916) 216-6955 | Lucinda.McGill@cdcr.ca.gov |

SUZAN L. HUBBARD
Director
Division of Adult Institutions

SHARON AUNGST
Chief Deputy Secretary
Division of Correctional Health Care Services

Attachments

cc: Scott Kernan
    Terri McDonald
    George Giurbino
    Timothy Lockwood
    Eric Arnold

Cindy Radavsky
Rollin Ives
Dennis Beaty
Health Care Managers
Nola Grannis

**INTERDISCIPLINARY TREATMENT TEAM (IDTT) - SCREENING CHECKLIST**
**REFERRAL TO DEPARTMENT OF MENTAL HEALTH - INTERMEDIATE CARE FACILITY**

The Interdisciplinary Treatment Team (IDTT) Screening Checklist is used to assess patient behaviors, symptoms and potential benefit from a referral to DMH-ICF. The Screening Checklist and Current Treatment Plan, CDCR form 7388-MH shall be completed at every IDTT, and filed together in the inmate-patient's Unit Health Record – Mental Health section.

Check applicable IDTT meeting:
☐ Initial IDTT ☐ Weekly IDTT ☐ 30-day IDTT ☐ 60-day IDTT ☐ 90-day IDTT ☐ 1-year IDTT ☐ other IDTT-
Date of last IDTT : _____

| Current LOC: | Total length of time at EOP(excluding MHCB admit) : | Parole Date(If Known) : |

| | UHR NOT AVAILABLE | Check the X box if the document is unavailable for review in the UHR |
|---|---|---|
| Check Applicable Box | Meets **one** of the established screenings for potential referral from MHCB, CCCMS, EOP (PSU, ASU-EOP) or RC to DMH-ICF: | |
| ☐Y ☐N ☐☆ | As a result of the major mental disorder, the inmate-patient unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) level of care. | |
| ☐Y ☐N ☐☆ | The inmate-patient requires highly structured inpatient psychiatric care with 24 hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms. | |
| ☐Y ☐N ☐☆ | The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and a structured treatment environment. | |
| ☐Y ☐N ☐☆ | The inmate-patient demonstrates chronic psychiatric symptoms (disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate level of functioning. | |
| ☐Y ☐N ☐☆ | Inmate-patient has less than 50% of staff cooperation/participation with programming and/or treatment plan during the last 6 months (i.e., mental health issues substantially affect ability to actively participate in treatment, the inmate-patient is noncompliant with medication, etc...) | |
| ☐Y ☐N ☐☆ | For Custody: the inmate-patient has incurred three (3) or more Rules Violation Reports during the last 3 months. | |
| ☐Y ☐N ☐☆ | The inmate-patient needs a comprehensive assessment for diagnostic clarification (only available at ASH, PSH, and VPP). | |
| ☐Y ☐N ☐☆ | The inmate-patient needs initiation of a trial of Clozapine. | |
| ☐Y ☐N ☐☆ | The inmate-patient had three or more admissions to a MHCB during the last six (6) months. (Include MHCB admissions if the inmate-patient paroled and returned during the last six (6) months.) | |
| ☐Y ☐N ☐☆ | The inmate-patient has been in a MHCB for ten (10) or more days for clinical issues, i.e. the inmate-patient is not yet stabilized. | |
| ☐Y ☐N | Are any of the above screenings checked yes? | |
| ☐Y ☐N | Does the inmate-patient meet criteria for DMH-ICF referral and MOU criteria for admission? If so, refer to DMH-ICF MOU criteria for admission. | |
| If inmate-patient met screening element(s) and/or for DMH-ICF referral, but was not referred, document clinical rationale for non-referral: | | |

| INSTITUTION: | IDTT DATE: | |
|---|---|---|
| NAME: | CDC #: | DOB: |

**MENTAL HEALTH TREATMENT PLAN**
CDCR 7388 (Rev. 06/09)
Confidential Client / Patient Information
Page 1 of 1

STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS AND REHABILITATION

## California Department of Corrections and Rehabilitation -Mental Health Program
### MOU CRITERIA FOR INTERMEDIATE CARE/NON-ACUTE ADMISSION (2008)

A. Criteria for inpatient care in a DMH hospital or psychiatric program requires an Axis I major (severe) mental disorder with active symptoms and any one of the following:

1. As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms.

3. Neurological/neuropsychological consultation services are available at ASH, PSH, and VPP. This level of assessment is not available at SVPP.

4. The inmate-patient requires an inpatient diagnostic evaluation.

5. The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and structured treatment environment.

6. The patient's psychiatric medication history indicates that a clozapine trial may be useful.

7. Inmate-patients (male only) who are deemed a significant assault risk have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner) or present a high escape risk, shall be referred to the SVPP ICF. CDCR refers to these inmate-patients as high custody I/Ps.

8. The inmate-patient's GAF indicates behavior that is considerably influenced by psychotic symptoms; OR serious impairment in communication or judgment; OR inability to function in almost all areas.

9. For SVPP only, the inmate-patient is medically appropriate as determined by the receiving Prison medical staff. The SVPP Clinical Assessment Team (CAT) will determine mental health suitability.

B. In addition to a primarily Axis I disorder, admission to a DMH hospital or psychiatric program shall be considered when:

1. The inmate-patient engages in ritualistic or repetitive self-injurious/suicidal behavior that has not responded to treatment in a CDCR facility. Without inpatient mental health treatment the inmate-patient is likely to develop serious medical complications or present a threat to his life.

2. The inmate-patient is chronically suicidal and has had repeated admissions to a MHCB.

C. Inmate-patient committed to DMH by the courts as being incompetent to stand trial per PC § 1370.

Inmate-patients who commit an offense while in CDCR, are referred to the District Attorney for prosecution, and are found by the court to be incompetent to stand trial per Penal Code § 1370 will first be considered for the SVPP. If there are no custodial or clinical reasons for admission to SVPP, they will then be considered for other DMH programs.

1. Whenever the CDCR institution referring clinician is in doubt concerning the appropriateness of referring a particular inmate-patient, the referring clinician will call the Chief, Classification and Parole Representative (C&PR), or designee then if necessary will call the State Hospital's PC§ 2684 screening clinician or the psychiatric programs' admission and discharge coordinator (ADC) to clarify the adequacy of the referral before formally submitting the referral.

2. When an inmate-patient is admitted to either a state hospital or psychiatric program as a PC 1370, the sending CDCR institution shall provide all the documentation that would be required if the inmate-patient were being admitted to DMH for ICF mental health care.

## California Department of Corrections and Rehabilitation -Mental Health Program

### INTERDISCIPLINARY TREATMENT TEAM –SCREENING CHECKLIST INSTRUCTION SHEET

*One tool shall be completed for each patient at every Interdisciplinary Treatment Team (IDTT) at all levels of care, including MHCB, CCCMS, EOP (PSU, ASU-EOP), or RC (when IDTT is being held in RC).*

> Check applicable: place a check in the box to indicate if it is the patient's initial, weekly, 30 day, 60 day, 90 day, 1-year or other time line IDTT, according to the level of care the patient is at and the IDTT requirement for that level of care. Be sure to specify if the IDTT is not a routine IDTT.

> Current LOC: Write on the line the current level of care the patient is assigned (CCCMS, EOP, MHCB).

> Total length of time at LOC: Write in how much time the patient has been at that level of care in total, include if the patient has transferred from one institution to another and maintained that level of care: Example: patient was at EOP level of care for 6 months at SQ and transferred to SOL EOP. He has now been at SOL for 3 months. His total length of time at EOP LOC is 9 months.

> Parole Date: Enter parole date if known

> Unit Health Record (UHR) not available: Check box if UHR is not available.

**CHECK** – This tool is intended to assist in screening patients for potential referral to an intermediate level of care facility. It is not intended to supersede clinical judgment. One or more yes answers may warrant consideration for a referral to ICF. If a decision is made by the IDTT to not refer the patient, the team shall document a clinical rationale for the non–referral at the bottom of the form.

> Questions: Yes or no questions regarding the patient's behavior. The questions may require review of the patient's unit health record and/or C-file and are not limited to only the time the patient has been at the current location.

> If any of the questions are checked yes it indicates that the patient may be a good candidate for referral to ICF.

> MOU Criteria: The next step is to determine if the patient meets DMH-ICF MOU referral criteria. The MOU referral criterion has been provided for reference on page 2 of the screening checklist. Review the MOU criteria and check yes if the patient meets the criteria and check no if the patient does not meet the MOU criteria.

> Referral to DMH-ICF: This question is asking if the patient meets both clinical and MOU criteria for referral to DMH-ICF, and if so, is a referral going to be made, yes or no.

> APP Referral: This question is asking if the patient met above criteria, but was not referred to ICF, was the patient referred to an Acute Psychiatric Program instead.

> DOCUMENTATION FOR NON-REFERRAL: This area is to be used to document why a patient was not referred to DMH-ICF if they met clinical and MOU criteria for referral. *Be specific in the justification for the non-referral.*

> Institution: Document full name of institution patient is housed.

> IDTT Date: Document date IDTT held.

> Name: Document last and first name of patient.

> CDC#: Document CDC# of patient.

> DOB: Document date of birth of patient.

# Department Of Mental Health Referral Form
## ~~~ Intermediate Care/Non-Acute Program ~~~

Referral for:        ☐ Atascadero State Hospital (ASH)  ☐ Patton State Hospital (PSH)

☐ Vacaville Psychiatric Program (VPP)  ☐ Salinas Valley Psychiatric Program (SVPP)

Referring Prison: _____ Date: _____

Current Custody/Clinical Placement:  ☐ CCCMS    ☐ EOP    ☐ Ad-Seg EOP    ☐ PSU    ☐ MHCB    ☐ APP

Inmate Name: _____ CDC#: _____ Date of Birth: _____

DDP: _____ Due Process: ☐ Yes ☐ No  Date: _____ Ethnicity: _____

*KEYHEA: ☐ Yes ☐ No ☐ In Process (incl. supporting documentation!)  Date Initiated: _____ Date Expires: _____

Housing: _____ Education (years) _____ GED: ☐ YES ☐ NO    Literate: ☐ YES ☐ NO

(Please Print)
Referring Clinician: _____ Ph _____ Pgr _____ Fax _____

Tx Psychiatrist: _____ Ph _____ Pgr _____ MH Secretary Ph _____

| Current Psychiatric Diagnosis: | Current Psych Medications: (name, dosage, freq, duration, target sxs) |
|---|---|
| Axis I _____ | _____ |
| _____ | _____ |
| Axis II _____ | _____ |
| Axis III _____ | _____ |
| Axis IV _____ | _____ |
| Axis V _____ | _____ |

Reason For Referral: (check all that apply and supply *detailed* narrative)

☐ Inadequate level of functioning in EOP: _____

_____

☐ Requires 24-hour nursing care: _____

☐ Requires neurological/neuropsychiatric/diagnostic testing: _____

☐ Would benefit from focused skills development not currently available in EOP: _____

Fax to 1) appropriate DMH facility and 2) Attn: Health Program Specialist, Health Care Services Division, at 916-322-2838

☐ Clozapine trial: _____

### Current Mental Status Exam:

Appearance: ☐ WNL _____

Behavior: ☐ WNL _____

Speech: ☐ WNL _____

Mood: ☐ WNL _____

Affect: ☐ WNL _____

Sleep: ☐ WNL _____ Appetite: ☐ WNL _____

Cognition:        1) Fund of information: ☐ WNL _____

                  2) Intellectual Functions: ☐ WNL _____

                  3) Organization of Thought: ☐ WNL _____

                  4) Association of Thought: ☐ WNL _____

                  5) Reality Contact: ☐ WNL _____

                  6) Thought Quality: ☐ WNL _____

Perception Disturbances (Hallucinations): ☐ None _____

Thought Content (Delusions): ☐ None _____

Sensorium (Orient'n, Mem, Attent'n, Concent'n): ☐ WNL _____

Insight & Judgment: ☐ WNL _____

Interview Attitude: ☐ WNL _____

Reliability (Historian): ☐ Good ☐ Fair ☐ Poor _____

*Suicidal and Homicidal Ideation; SEE BELOW·

What are desired Treatment Outcome Expectations? (be very specific)

_____

_____

_____

_____

Fax to 1) appropriate DMH facility and 2) Attn; Health Program Specialist, Health Care Services Division, at 916-322-2838

April, 2006                          Page 2 of 3                     Intermediate Care Program

History of Present Illness and Past Psychiatric History:   (Must Fill Out Completely)

Hx and Recent Suicidal or Axis I related Ritualistic or Repetitive Self-Injurious Behaviors: _____

_____

_____

_____

Hx and Current Violence and Behavioral Alerts: _____

_____

_____

_____

Hx and Current Substance Abuse: _____

_____

_____

Hx and Current Psychiatric Treatment / MHCB / Hospitalization: _____

_____

_____

_____

_____

Hx and current Medication Compliance (Document blood level verification of compliance): _____

_____

CDC Referring Clinician: Comments Regarding *Clinical Criteria / Factors / Signs / Symptoms* for DMH Placement Consideration

_____

_____

_____

_____

_____

_____

Referring Clinician Signature: _____   Date : _____

Fax to 1) appropriate DMH facility and 2) Attn: Health Program Specialist, Health Care Services Division, at 916-322-2838

09/23/2009  10:58  9163417366  RPMB  PAGE  38/35

ATTACHMENT 3

Department of Mental Health Referral Log

Institution _____    Date _____

| Current housing level at CDCR institution, not housing needed | DMH Level of Care (Acute, ICF) | Committee Date where agreed LOC needed | Date Referral Approved by Chief of Mental Health or Designee | Date Packet left institution | A separate line for each DMH institution referred to | Status: Accept or Reject | If Rejected-Reason | This is date of DMH Acceptance or Rejection | If Rejected date CCAT conducted | Date DMH assigns bed number as well as the bed number, if available | Date inmate endorsed or authorized to be transferred to DMH facility | Actual Transfer Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

This log is for *referrals* for the month. Keeping a running account is acceptable but the Date Referred to DMH should be for the current month.

| Name | CDCR # | Current Housing | Level of Care ICF/Acute Needed | Date LOC Needed | Date Approved | Date Referred to DMH | DMH Institution | Accept or Reject | Reason for Rejection | Date of Accept/Rej | Date of CCAT | Bed Assign Date | Date of Endt or Author | Transfer Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Please fax to Sharon Riegel, HPSII, Mental Health Program, Division of Correctional Health Care Services, at (916) 928-7653, by the 5th day of each month.

Institution: _____

Department of Mental Health Referral Log
**INMATE-PATIENTS NOT REFERRED**

Date: _____

| Current housing level at CDCR instiution, not housing needed | Current Level of Care | Criteria On Screening Checklist Met (numbers) | IDTT Committee Date | Reason for Non-Referral |
|---|---|---|---|---|
| | | | | |

This log is for patients who met ICF screening checklist criteria but were *not* referred. This monthly report must be submitted to MH HQ by the 5th day of each month.

| Name | CDCR # | Current Housing | LOC | Criteria number(s) | IDTT DATE | Reason for Non-Referral |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

April, 2006

# Department of Mental Health ICF/Non-Acute Referral Check List

~ For use *first* by the CDC sending institution, *then* the DMH receiving facility ~

| | |
|---|---|
| Inmate's Name: | |
| CDC No: | |
| Referring CDC Institution: | |
| DMH Facility: | |

This checklist is to be utilized by a CDC institution when compiling a referral packet to DMH. In order for this process to be the most efficient and expeditious, the referring CDC institution, before sending to DMH, must include ALL applicable items. Incomplete packets are unacceptable. The process of tracking down missing items wastes valuable clinical and administrative time and resources, *and*, most importantly, it delays the patient getting to the needed level-of-care. DMH should never have to check the "needed" column because a required document did not arrive in the referral packet. To ensure that referral packets are completed before sending, a CDC clinical supervisor or manager shall co-sign along with the referring clinician, certifying that the packet is complete. This checklist, with the two required signatures, is then sent to the appropriate DMH facility as part of the referral packet.

N/A = Not Applicable

| | Required Information: Clinical | Included √ | N/A √ | Needed √ | Comments: |
|---|---|---|---|---|---|
| 1 | Referral Form for ICF/Non-Acute | | | | |
| 2 | Transfer Medical Summary or History and Physical – (must be within 30 days of referral) **H&P is Required for SVPP** | | | | |
| 3 | Current Treatment Plan | | | | |
| 4 | Due Process – documentation (chrono) or written consent | | | | |
| 5 | Pharmacy Profile (computer printout) | | | | |
| 6 | Keyhea Order - or documentation supporting obtainment of a Keyhea Order *(CRITICAL)* | | | | |
| 7 | Interdisciplinary Progress Notes – for the past 15 days plus most recent psychiatrist note (RC's may have less for new arrivals) | | | | |
| 8 | Tuberculosis Chrono | | | | |
| 9 | Suicide Risk Assessment – most recent | | | | |
| 10 | This completed checklist form w/ dual sig's | | | | |
| | Required Information: Central File | Included √ | N/A √ | Needed √ | Comments: |
| 11 | Custody Case Factor Sheet for DMH Placement | | | | |
| 12 | Abstract of Judgement (State Hospital only) | | | | |
| 13 | Legal Status Summary (State Hospital only) | | | | |
| 14 | Chrono History (State Hospital only) | | | | |

| CDC Referring Clinician: | Print Name & Title: | | Phone number: | |
|---|---|---|---|---|
| | Signature: | | Pager number: | |
| Supervisor or Manager: | Signature Certification: | | Date sent:  ☐ Fax  ☐ Overnight Mail  ☐ Both | |
| Referral Coordinator | Print Name & Title: | | Phone number: | |
| | | | Pager number: | |
| Date Received by **DMH**: | | | Date Completed: | |
| Reviewed by: (Coordinator Signature) | | | Comments: | |

## Department of Mental Health Intermediate Care Facility
### Placement Screening Sheet

| Number: | Name: | | Release Date: ☐ RRD ☐ PRRD ☐ EPRD ☐ MEPD ☐ LWOP |
|---|---|---|---|

| te last received CDCR: | County of Commitment: | Length of Term or PV term: | PV Charge(s) (If applicable): |
|---|---|---|---|

| Offense(s): | | | DOB: |
|---|---|---|---|

---

| Custody/Last Custody (if RC/PV): | Single Cell: ☐ No (S-Suffix) ☐ Yes  Based On: | | | | High Notoriety/ ☐ No Public Interest: ☐ Yes |
|---|---|---|---|---|---|

| Placement Score: | Level: | Level IV  180 ☐  270 ☐ | Criteria Code: | SNY Placement: | ☐ No ☐ Yes  Based On: | |

| ASU: | ☐ No  ☐ Yes  Basis for Placement: |
|---|---|

| SHU/PSU: ☐ No  ☐ Yes Basis for Placement: | Current MERD: |
|---|---|

---

| Enemies: ☐ None Noted ☐ See 812 ☐ See 812-C   List enemy locations: Date of Last Review (Must be w/in 30 days): |
|---|

| Gang Affiliation: ☐ No  ☐ Yes  List: | Confidential File: ☐ Clear  ☐ Noted | Arson History: ☐ No ☐ Yes  Details: |
|---|---|---|

| Sex Offense History: ☐ No  ☐ Yes  Details: | Escape History: ☐ No ☐ Yes  Details: |
|---|---|

---

**Pending Disciplinary(s):**

Brief Disciplinary History (list violent, assaultive, pressuring behavior in last 18 mos., including SHU terms and expired MERDS):

---

| DDP Code: | DPP: ☐ No  ☐ Yes  Code: | CDC 1845: ☐ No  ☐ Yes | Impacts Placement: ☐ No  ☐ Yes Explain: |
|---|---|---|---|

| MHSDS Level of Care: | Medical Status: |
|---|---|

---

| Holds, Warrants or Detainers: ☐ No  ☐ Yes:  Pending Charges: |
|---|

---

| Comments: |
|---|

---

**Preclusions:**

| ☐ No Preclusions | ☐ Max custody due to threatening, assaultive, or inciting behavior | ☐ LWOP | ☐ S-Suffix due to non-clinical reasons | ☐ Close A Custody | ☐ Committed In-custody homicide | ☐ High Notoriety/ Public Interest | ☐ Active hold for an offense with potential sentence of: LWOP, multiple Life Term, 50 years or more, Life Term, or 15 years or more |
|---|---|---|---|---|---|---|---|

| Refer for Case-by-Case Evaluation: ☐ No  ☐ Yes |
|---|
| Based On: ☐ Max Custody (non-disciplinary reason)   ☐ Committed SHU-able offense(s) per CCR, § 3341.5 (9)   ☐ Level IV placement score   ☐ SNY/Safety Concerns   ☐ Close Custody ☐ A or ☐ B |

| Refer to DMH Program at (indicate lowest appropriate placement): |
|---|
| ☐ ASH      ☐ CMF/VPP (dorm)      ☐ CMF/VPP (cell)      ☐ SVSP/SVPP      ☐ PSH |

---

| ..me/Title: | Date: | Referring Inst: |
|---|---|---|

| Reviewed By/Title (C&PR/CCIII signature required): | Date: | Telephone Contact # |
|---|---|---|

# DMH-ICF CUSTODY CRITERIA FOR ICF PILOT PROJECT

| Start | ASH | CMF-ICF Dorms | CMF-ICF Cells | SVPP |
|---|---|---|---|---|

| | Refer case to ASH, unless: | Refer case to CMF-ICF Dorms if ineligible for placement at ASH, unless: | Refer case to CMF-ICF Cells if ineligible for placement at ASH or CMF-ICF Dorms, unless: | Refer all cases not eligible for placement at ASH or CMF-ICF, including, but not limited to: |
|---|---|---|---|---|
| CDCR inmate who is 18 years of age or older has a mental illness that requires ICF level of care | Maximum Custody due to threatening, assaultive or inciting behavior. | Maximum Custody due to threatening, assaultive or inciting behavior. | LWOP (without DRB approval) | • LWOP status |
| | LWOP | LWOP | | |
| | S Suffix due to non-clinical reasons (clinical staff shall document if S clearance for dorm housing if "S" suffix is affixed for clinical reasons). | S Suffix due to non-clinical reasons (clinical staff shall document if S clearance for dorm housing if "S" suffix is affixed for non-clinical reasons). | | |
| | Close A Custody | | | |
| | Committed in-custody homicide | | | |
| | High Notoriety/Public Interest | | CMF-ICF cells may consider lower custody cases if: 1) the beds at ASH and CMF-ICF *dorms* are full, and 2) beds are available at CMF-ICF *cells*. | SVPP may consider lower custody cases if: 1) the beds at ASH and VPP are full, and 2) beds are available at SVPP. |
| | Active hold for an offense with potential sentence of: - LWOP - Multiple Life Term - 50 years or more - Life Term - 15 years or more | | Preference shall be given first to those that meet the case-by-case criteria for CMF-ICF *dorms*, and second to those that meet the criteria for ASH. | Preference shall be given first to those that meet the case-by-case criteria for CMF-ICF *dorms*, and second to those that meet the criteria for ASH. |
| | CASE-BY-CASE EVALUATION (Refer to Case-By-Case Placement Guidelines) • Maximum custody (based on non-disciplinary reason) • Committed SHU-able offense(s) per the CCR title 15, § 3341.5 (9), provided that the SHU/MERD has been expired for 12 to 18 months (depending on offense); • Level IV placement score • SNY or Safety concerns • Close B custody | CASE-BY-CASE EVALUATION (Refer to Case-By-Case Placement Guidelines) • Maximum custody (based on non-disciplinary reason) • Committed SHU-able offense(s) per the CCR title 15, § 3341.5 (9), provided that the SHU/MERD has been expired for at least 12 months; • Level IV placement score • SNY or Safety concerns • Close A custody. | There will be no case-by-case evaluations for CMF-ICF cells. | There will be no case-by-case evaluations for SVPP. |

AT. __CHMENT 7

## CASE-BY-CASE PLACEMENT GUIDELINES
### For Atascadero State Hospital (ASH) and California Medical Facility-Vacaville Psychiatric Program (CMF-VPP) Intermediate Care Facility (ICF) Dorm Beds

| MAX CUSTODY (Class B non-disciplinary cases) | RECENT SHU-ABLE OFFENSE | LEVEL IV (ASSAULT RISK) | SNV THREAT (CLUSTERS) | CLOSE CUSTODY |
|---|---|---|---|---|
| Non-adverse or administrative placements such as: <br>• family member works at institution, <br>• local safety/enemy concerns, or <br>• SNY designation as basis for ASU placement <br>are cases that should be evaluated on a case-by-case basis to consider the totality of case factors, prior to placement. | Inmates who have a recent history of a SHU-able offense can be considered for ASH placement after case-by-case review using the following timeframes: <br>• Any Division A-1 or A-2 offense will be eligible for case-by-case review 18 months after expiration of SHU MERD, unless other factors preclude consideration, such as Close A custody or S-suffix. <br>• Multiple (three or more) SHU-able offenses that involved violence against others within a 12-month period will be eligible for case-by-case review 18 months after expiration of SHU MERD, unless other factors preclude consideration, such as Close A custody or S-suffix. <br>• All other SHU-able offenses will be eligible 12 months after expiration of SHU MERD. <br>Expiration of SHU MERD is defined as the date an active SHU term MERD expired or the date an active SHU term MERD is suspended, if not at an initial review. If a SHU term was suspended or commuted upon initial review, the case will be treated as if the inmate-patient did not have a SHU term. The behavior should still be considered as part of the totality of available information using sound correctional judgment and experience. <br>Case-by-case review shall consider the totality of case factors, prior to placement. Emphasis is to be placed on the inmate's current demonstrated threat of assaultive behavior. | Level IV cases are eligible for ASH, except for cases that are identified as posing a serious assault risk. <br>Within one year of the referral, serious RVR offenses – CCR, § 3315 (2)(A)-(D), CCR, § 3323 (a)-(f) Division A, B, C or D – which involved threatening, weapons, assaultive, or inciting behavior, will require case-by-case review to consider the totality of case factors, prior to placement. | Threat(s) by a group, gang, or unknown multiple parties due to verified information such as open court testimony, gang drop-out debriefing, etc. are excluded. <br>Other non-verified risk of assault or SNY designation due to committing offense will require case-by-case review to consider the totality of case factors, prior to placement. <br>Emphasis is to be placed on evidence of safety concern versus unsubstantiated fear. | Close B inmates will require case-by-case review for ASH placement. <br>Emphasis is to be placed on escape risk and management concerns, such as length of sentence/time to serve, time in custody, and felony holds. For review of escape risk, emphasis is to be placed on the inmate's current demonstrated threat and ability to escape from a secure perimeter facility. <br>Close A inmates are excluded from ASH. |
| Non-adverse or administrative placements such as: <br>• family member works at institution, <br>• local safety/enemy concerns, or <br>• SNY designation as basis for ASU placement <br>are cases that should be evaluated on a case-by-case basis to consider the totality of case factors, prior to placement. | Inmates who have a recent history of a SHU-able offense can be considered for CMF-VPP dorm placement 12 months after expiration of SHU MERD with a case-by-case review, unless other factors preclude consideration, such as S-suffix. <br>If a SHU term was suspended or commuted upon initial review, the case will be treated as if the inmate-patient did not have a SHU term. | Level IV cases are eligible for CMF-VPP dorms, except for the following cases that require a case-by-case review prior to placement to determine if they pose a serious assault risk: <br>• Inmate-patients who have received serious RVR offenses – CCR, § 3315 (2)(A)-(D), CCR, § 3323 (a)-(f) Division A, B, C or D – within six months of the referral if no SHU term. | Threat(s) by a group, gang, or unknown multiple parties due to verified information such as open court testimony, gang drop-out debriefing, etc. are excluded. <br>Other non-verified risk of assault or SNY designation due to committing offense will require case-by-case review to consider the totality of case factors, prior to placement. | Close A inmates will require case-by-case review for CMF-VPP dorm placement. <br>Emphasis is to be placed on escape risk and management concerns, such as length of sentence/time to serve, time in custody, and felony holds. For review of escape risk, emphasis is to be placed on the inmate's current demonstrated threat and ability to escape from a secure perimeter facility. <br>Close B inmates are eligible for CMF-VPP dorms without case-by-case review. |

# EXHIBIT C

CALIFORNIA DEPARTMENT OF
# Mental Health

1600 9th Street, Sacramento, CA 95814
(916) 654-2413

December 3, 2009

Matthew A. Lopes, Jr., Esq.            via:    Debbie J. Vorous
Office of Special Master                       Samantha Ramsey
Pannone, Lopes & Devereaux, LLC                Deputy Attorneys General
317 Iron Horse Way, Suite 301                  1300 I Street, Suite 125
Providence, RI  02908                          P.O. Box 944255
                                               Sacramento, CA  94244-2550

RE:    MONTHLY REPORT ON THE LICENSURE OF INTERMEDIATE CARE TREATMENT
       PROGRAMS AT THE CALIFORNIA MEDICAL FACILITY, VACAVILLE AND THE
       SALINAS VALLEY PSYCHIATRIC PROGRAM, SALINAS VALLEY STATE PRISON

In accordance with the July 24, 2007 Court order issued by Judge Karlton, the California
Department of Mental Health (DMH) is to provide a monthly report on the implementation of the
expanded Intermediate Care Programs (ICPs) at the California Medical Facility, Vacaville.  In
addition to the terms of the Court order, the DMH also is providing information on the
implementation of the expanded ICPs at the Salinas Valley Psychiatric Program to optimize
transparency and provide the full scope of our expansion of services.

Enclosed is the monthly report providing data on each program's census and wait list information.
The data reflects the time period of November 1, 2009 through November 30, 2009.

If you need clarification on any aspect of this report, please contact Nathan Stanley, Long Term
Care Services Division at (916) 654-2413.

Sincerely,

CYNTHIA A. RADAVSKY
Deputy Director

Enclosures

# STATUS OF IMPLEMENTATION OF PLAN FOR
## INCREASING CAPACITY OF INTERMEDIATE CARE FACILITY BEDS
## AT THE CALIFORNIA MEDICAL FACILITY
## REPORT DATE:  11/30/09

| VPP UNITS | CAPACITY | FILLED | HOLD | AVAILABLE |
|---|---|---|---|---|
| A-2 ICF | 44 | 27 | 0 | 17 |
| A-3 ICF | 40 | 29 | 0 | 11 |
| P-3 ICF Level IV | 30 | 29 | 1 | 0 |

| SVPP Units | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available | Dormitory Capacity | Dormitory Filled | Dormitory Hold | Dormitory Available |
|---|---|---|---|---|---|---|---|---|
| TC1 | 32 | 31 | 1 | 0 | 32 | 21 | 4 | 7 |
| TC2 | 64 | 63 | 1 | 0 | N/A | N/A | N/A | N/A |

| SVPP Delta Units | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available |
|---|---|---|---|---|
| D-5 | 58 | 57 | 1 | 0 |
| D-6 | 58 | 57 | 1 | 0 |

### WAIT LIST DATA

| UNIT | WAIT LIST |
|---|---|
| P2 ICF LEVEL IV | 0 |
| P3 ICF LEVEL IV | 0 |
| A2/A3 ICF LEVEL III | 0 |
| SVPP | 504 |

12/3/2009

1

# STATUS OF IMPLEMENTATION OF PLAN FOR
## INCREASING CAPACITY OF INTERMEDIATE CARE FACILITY BEDS
## AT THE CALIFORNIA MEDICAL FACILITY
## REPORT DATE: 11/30/09

### WAIT LIST DATA BY HOUSING UNIT/LEVEL OF CARE

| FACILITY | PSU | MHCB | ACUTE | AD. SEG - EOP | SHU | EOP | CCCMS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| P-3 ICF LEVEL IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A2/A3 ICF LEVEL III | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SVPP | 46 | 41 | 27 | 107 | 0 | 258 | 9 | 488 |
| SVPP PC 1370* | 8 | 0 | 0 | 4 | 0 | 3 | 1 | 16 |