PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARK R. FEESER, Bar No. 252968
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone:  (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone:  (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

          Plaintiffs,

     v.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' STATUS CONFERENCE STATEMENT REGARDING DEFENDANTS' INITIAL REPORT ON THE MENTAL HEALTH ASSESSMENT AND REFERRAL PROJECT (MHARP) AND THE ICF PILOT PROGRAM**

Date:  March 29, 2010
Time:  11:00 a.m.
Place:  Courtroom 4, 15th Floor

[359522-6]

PLS.' STATUS CONF. STATEMENT RE DEFS.' INITIAL REPORT ON THE MENTAL HEALTH ASSESSMENT AND REFERRAL PROJECT (MHARP) AND THE ICF PILOT PROGRAM - CASE NO. CIV S 90-0520 LKK-JFM

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ...................................................................................... ii

INTRODUCTION ............................................................................................................ 1

PROCEDURAL HISTORY LEADING UP TO THE STATUS CONFERENCE....................... 2

I.    THE MHARP REPORT DEMONSTRATES A SUBSTANTIAL,
      PREVIOUSLY UNIDENTIFIED AND CURRENTLY UNMET NEED FOR
      INPATIENT PSYCHIATRIC HOSPITALIZATION ........................................................ 4

      A.    The MHARP Process and Results............................................................... 4

      B.    Impact on Current Need and DMH Waitlists............................................. 5

      C.    Impact on Long-Range Bed Planning ....................................................... 8

II.   DEFENDANTS' USE OF INAPPROPRIATE CUSTODIAL EXCLUSIONS
      FOR LOWER CUSTODY ICF BEDS HAVE LEFT THOSE BEDS EMPTY
      AT A TIME WHEN THE SVPP WAITING LIST LINGERS JUST BELOW
      600 PATIENTS .................................................................................................. 10

      A.    Defendants' Underutilization of ASH and Other ICF Low Custody Beds............ 10

      B.    ICF Pilot Project and Exclusionary Criteria........................................... 10

III.  DEFENDANTS MUST BE PREPARED TO DISCUSS THE STEPS THEY
      WILL TAKE TO AVOID THE NEED FOR FUTURE SPECIAL
      ASSESSMENTS AND TO ENSURE THAT PATIENTS REQUIRING
      INPATIENT CARE ARE REFERRED AND ADMITTED IN A TIMELY
      MANNER ......................................................................................................... 13

      A.    Creating a Sustainable Process through Efficient Utilization of Current
            Resources................................................................................................. 14

            1.    Creating an Effective Referral and Transfer Process – Capturing
                  Lessons Learned from MHARP and the ICF Pilot Project........................ 14

            2.    Improper Custodial Exclusionary Criteria for ICF Beds ........................... 17

      B.    Addressing the Previously Unidentified Need for Inpatient Care ........................ 19

CONCLUSION ............................................................................................................... 20

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASP | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| CC | Correctional Counselor |
| CCC | Consolidated Care Center |
| CCAT | Coordinated Clinical Assessment Team |
| CCI | California Correctional Institution |
| CCIII | Correctional Counselor-III |
| CCWF | Central California Women's Facility |
| CEQA | California Environmental Quality Act Compliance |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison, Corcoran |
| CRC | California Rehabilitation Center |
| CSH | Coalinga State Hospital |
| CTF | Correctional Training Facility |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| DTP | Day Treatment Program |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| FOL | Folsom State Prison |
| HC-POP | Health Care Placement Oversight Program |
| HDSP | High Desert State Prison |
| HQs | Headquarters |
| I/Ps | Inmate-Patients |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| ICF-H | Intermediate Care Facility – High Custody |
| IDTT | Interdisciplinary Treatment Team |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| LWOP | Life Without Parole |
| MCSP | Mule Creek State Prison |
| MHARP | Mental Health Assessment and Referral Project |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| MOU | Memorandum of Understanding |
| NKSP | North Kern State Prison |

[359522-6]

| OAL | Office of Administrative Law |
|-----|------|
| PBSP | Pelican Bay State Prison |
| PC | Penal Code |
| PSH | Patton State Hospital |
| PSS | Placement Screening Sheet |
| PVSP | Pleasant Valley State Prison |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility & State Prison, Corcoran |
| SCC | Sierra Conservation Center |
| SHU | Security Housing Unit |
| SNY | Sensitive Needs Yard |
| SOL | California State Prison, Solano |
| SQ | California State Prison, San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| TC1 | SVPP Treatment Center 1 |
| UHR | Unit Health Record |
| UNA | Unidentified Needs Asessment |
| VPP | Vacaville Psychiatric Program |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

[359522-6]

# INTRODUCTION

The March 29, 2010 status conference set by this Court arises out of a series of interrelated orders concerning Defendants' efforts to fully and accurately assess *Coleman* class members' need for the highest levels of mental health care – inpatient psychiatric hospitalization in licensed Department of Mental Health ("DMH") facilities – and to ensure that those who are identified as needing inpatient psychiatric hospitalization are referred, admitted and transferred to inpatient beds in a timely manner, including to the 256 intermediate care beds at Atascadero State Hospital ("ASH"). In an effort to address these problems, Defendants and the Special Master team undertook a significant Mental Health Assessment and Referral Project ("MHARP") at all 28 non-desert institutions that resulted in nearly 1,000 additional referrals of patients to Intermediate Care Facility ("ICF") or acute inpatient beds. Additionally, Defendants began to address the problem of filling the historically underutilized ASH beds, including implementing a pilot program revising the custody exclusionary criteria for ASH referrals in an effort to expand the categories of class members who could be admitted for care.

The Special Master team and Defendants should be commended for their committed efforts to identify the extent of the unmet need, a process that Plaintiffs had the opportunity to observe firsthand, and for examining the longstanding problem of custodial barriers to access to inpatient psychiatric hospitalization, especially at ASH. The success of the coordinated, targeted MHARP procedure, however, necessarily had the effect of uncovering significant systemic problems that must be addressed in light of this Court's stated goals of ensuring that "the referral and transfer of inmates to higher levels of care is proceeding in a way that will avoid the need for any future special assessments of unmet need," and that "those who require inpatient care are referred and admitted in a timely manner." Docket 3787 at 7:7-11 (1/27/10 Order Setting Status Conference). In light of these stated goals, which the Court has asked Defendants to address at the March 29, 2010 status conference, Plaintiffs hereby submit this status conference statement in an effort to help frame the discussion.

[359522-6]

## PROCEDURAL HISTORY LEADING UP TO
## THE STATUS CONFERENCE

On March 31, 2009, this Court issued one of a series of orders directing Defendants to develop concrete proposals to meet the long-range bed needs of the Plaintiff class.  Docket 3556 at 5:19-21.  At the same time, the Court noted that the "Navigant consultant advised that there could be an unidentified need for inpatient beds among members of the plaintiff class and that the best way to determine this was to conduct an assessment." *Id.* at 3:8-11.  In recognition of the "troubled history between CDCR and DMH," the Court ordered CDCR and DMH to "work together to conduct a modified assessment to determine whether there are unmet needs for inpatient care among members of the plaintiff class and to refer on an expedited basis any inmates identified during this modified assessment for appropriate inpatient care." *Id.* at 3:11, 6:8-12.  Additionally, the Court expressed concern with regard to "artificial barriers" restricting admissions from CDCR to ASH, stating that if "these barriers interfere with referrals for inpatient care during the assessment process … defendant Mayberg will be directed to work, at the request of the special master, to develop new polices and procedures to expedite admissions to ASH." *Id.* at 3:17-22.

On June 18, 2009, following submission of various bed plans by Defendants, the Court in approving Defendants' short-term and intermediate bed plan observed and ordered:

> The modified needs assessment that is being conducted pursuant to this court's March 31, 2009 order demonstrates clearly that there are a substantial number of Coleman class members, over and above those identified in the Navigant projections, who are presently in need of hospital care. The short-term and intermediate projects approved by this order include conversions of hospital beds to provide a full complement of 256 intermediate care beds at ASH to Coleman class members.  That plan is approved subject to the condition that the Department of Mental Health (DMH) will admit Coleman class members to those beds at a rate of not less than ten per week until all 256 beds are filled by Coleman class members not later than October 31, 2009.

Docket 3613 at ¶ 8.  Defendants were further ordered to accelerate admissions to ASH where possible and to expand the modified needs assessment to all non-desert institutions with a

2

1  completion date of December 31, 2009. *Id.* at ¶¶ 9-10.

2      At Defendants' request, the October 31, 2009 deadline to fill the 256 beds at ASH was

3  postponed to December 31, 2009 in order to permit Defendants time to implement a recently

4  approved "pilot program" which "revised the custody exclusionary criteria utilized for CDCR

5  referrals to Atascadero State Hospital, and expanded the category of inmates that can be

6  considered for admission." Docket 3720 at 2. Defendants were required by November 30, 2009

7  to "review all of the inmate-patients on the waiting list for the Salinas Valley Psychiatric

8  Program at Salinas Valley State Prison using the Pilot Program to determine whether any of the

9  inmate-patients on the list are eligible for admission to Atascadero State Hospital or to the

10  intermediate care program at the Vacaville Psychiatric Program at California Medical Facility."

11  *Id.* at 2:9-13.

12      At Defendants' request, on January 27, 2010, the Court again extended Defendants' time

13  to fill the 256 beds at ASH through February 26, 2010. In so doing, the Court also set further

14  deadlines and standards to address delays in the referral process and in obtaining clinical

15  evaluations requested by DMH to process admissions. Docket 3787 at ¶¶1-3. The Court set this

16  matter for a status conference on March 29, 2010, indicating that, at the status conference, it

17  would ask Defendants to address "the steps they have taken and are taking to ensure that the

18  referral and transfer of inmates to higher levels of care is proceeding in a way that will avoid the

19  need for any future special assessments of unmet need and will ensure that those who require

20  inpatient care are referred and admitted in a timely manner." *Id.* at 7:7-11.

21      On March 4, 2010, Defendants notified Plaintiffs' counsel that on February 26, 2010, the

22  ASH census was 256, and that Defendants expected to maintain that census through March 5,

23  2010. Exhibit A to the Declaration of Jane E. Kahn in Support of Plaintiffs' Status Conference

24  Statement Regarding Defendants' Initial Report on the Mental Health Assessment and Referral

25  Project (MHARP) and the ICF Pilot Program ("Kahn Decl."). Further, on March 12, 2009,

26  Defendants submitted to the Special Master their Report on CDCR/DMH Mental Heath

27  Assessment and Referral Project and Intermediate Care Facility Pilot Program (collectively the

28  "MHARP Report"). Kahn Decl. Ex. B. Plaintiffs received a copy of that report on March 15,

3

2010.

## I.    THE MHARP REPORT DEMONSTRATES A SUBSTANTIAL, PREVIOUSLY UNIDENTIFIED AND CURRENTLY UNMET NEED FOR INPATIENT PSYCHIATRIC HOSPITALIZATION

### A.    The MHARP Process and Results

Working together with the *Coleman* Special Master team, Defendants developed and reviewed the mental health classification of selected CDCR prisoners to identify unmet needs for inpatient care among the *Coleman* class.  This MHARP process involved four phases, spanned nine months, and included patient reviews at all of CDCR's 28 non-desert institutions.  MHARP Report at 5-11.  CDCR mental health clinical staff at each of the 28 non-desert institutions also received five hours of training regarding access to higher levels of care, which has benefited and hopefully will continue to benefit the *Coleman* class.  *Id.* at 7.  Plaintiffs' counsel were permitted to attend training sessions at seven institutions, including two women's prisons.  *Id.* at 9. Additionally, Defendants and the Special Master team developed a comprehensive Microsoft Access Database containing information including 16 fields related to the referral, transfer, and final outcome for the 987 patients referred for inpatient care.  *Id.* at 4-6.  This data was the primary source of information presented in the MHARP Report.  *Id.* at 6.

As a result of the MHARP, more than 2,000 patients were reviewed,[1] selected on the basis of meeting one or more of 13 specific criteria that "warranted consideration for a potential referral to a higher level-of-care."  *Id.* at 5.  In total, 987 patients were referred to ICF or acute inpatient care either as a result of MHARP team visits or by institutions between MHARP phases.  *Id.* at 11 (Table 5).  417 patients actually transferred to DMH inpatient beds.  *Id.* at 11 (Tables 5 and 6).  *Id.* at 11 (Table 6).  The table below represents the distribution of the 417 patients actually transferred to DMH facilities.

---

[1] The MHARP Report does not summarize the total number of prisoners reviewed for Phase I. However, 660 prisoners were reviewed in Phase II, 333 in Phase III, and 807 in Phase IV. MHARP Report at 5-11.  An additional 247 prisoners were referred between Phase I and II.  *Id.* at 9.

4

[359522-6]

**Table 1.  MHARP Transfers to DMH Program (MHARP Report Table 6)**

| DMH Program | # of Admits |
| --- | --- |
| ICF-ASH | 183 |
| APP-VPP | 75 |
| ICF-SVPP | 73 |
| ICF-VPP Dorms | 40 |
| ICF-CSH | 35 |
| ICF-PSH | 11 |
| **Total Admits** | **417** |

In addition to those patients actually transferred to inpatient care, 291 prisoners were placed on the waitlist for DMH admission.  *Id.* at 11 (Table 5).  173 prisoners referred during the MHARP process paroled prior to being transferred to a DMH facility.  *Id.*  In other words, 173 prisoners who were so ill that they were referred for ICF and even acute care were actually paroled into the community without ever receiving inpatient care.

While a significant amount of data was collected as part of the MHARP process, Defendants' initial MHARP Report only summarizes the DMH program to which the prisoner was referred, the disposition of those cases, and the program to which those patients who were actually transferred to DMH were admitted.  *See id.* at 10-11.  The MHARP Report does not include the actual timeframes from referral to acceptance to transfer, what waitlist each prisoner was placed on, or the acuity level of those patients who paroled prior to transfer.  It also does not provide any institution-specific analysis of the data, or even a breakdown by gender.  Accordingly, this report must be viewed as an initial report, which should be supplemented with additional reporting and analysis.

**B.    Impact on Current Need and DMH Waitlists**

Equally important to identifying 987 prisoners in need of inpatient care, the MHARP process is critical to the ongoing efforts to identify both the current and future demand for inpatient psychiatric hospitalization for the *Coleman* class.  The impact of the MHARP process in this regard has been significant.

1.    The SVPP Waitlist

As a result of the referrals generated by the MHARP, the waitlist for acute and ICF-H

5

1  beds has increased to previously unseen levels.  As of February 28, 2010, the waitlist for high-

2  custody ICF beds (SVPP Waitlist) was at a staggering 574 patients.  Docket 3819 at cells 678-

3  1240 and 1250-1270, "Monthly Bed Utilization Report for DMH Hospitals and Psychiatric

4  Programs, February 1, 2010 through February 28, 2010," filed under seal on March 17, 2010.[2]

5  Four of those patients have been waiting for an inpatient ICF bed since 2008 and 203 other

6  patients have been waiting since June 2009 or earlier.  *Id.* at cells 678-894.  Moreover, the

7  patients who were actually accepted *and transferred* to an ICF high custody bed waited an

8  extremely long time to actually receive necessary, and often life-saving hospitalization and

9  treatment.  While this information was not provided by Defendants in connection with the initial

10  MHARP report, Plaintiffs were able to obtain some of this information from a review of

11  Defendants' regular monthly reports concerning access to DMH beds.  This data shows, for

12  instance, that patients admitted into D5, D6, and the two free-standing SVPP units since August

13  of 2009 waited an average of 72, 83, 116 and 72 days respectively for beds in those units.  *Id.* at

14  cells 470-482 (D5); cells 560-571 (D6); cells 622-627 (Treatment Center 1), and; cells 669-677

15  (Treatment Center 2) (calculating the difference between "Date of Referral" and "Date of

16  Admission" and averaging those results).  This is in spite of the Program Guide requirement that

17  patients transfer to an ICF bed within 30 days after referral.  *See* 2009 Revised Program Guide at

18  12-6-10 through 12-6-11.  Any system that has average waiting times of three to four months for

19  inpatient care is in serious crisis.

20          2.    The Acute Care Waitlist

21          The waitlist for male acute psychiatric hospitalization ("APP Waitlist"), the highest level

22  of care in the system, reached 64 patients as of February 28, 2010.  *Id.* at cells 245-308.  On

23  March 16, 2010, however, DMH reported during a conference call that the acute waitlist had

24  increased by 50% in just over two weeks and was now at 97 patients.  Kahn Decl. ¶ 4.  This

25  logjam for inpatient beds is creating a chronic cycle of inaccessible care.  For instance, of the 572

---

[2] Defendants did not use cells 770 through 779, so those cells must be excluded from any calculation of the SVPP waitlist.

[359522-6]

1    patients on the SVPP waitlist as of February 28, 2010, 92 patients are currently housed in acute

2    or mental health crisis beds.  Kahn Decl. Ex. C at 3 ("Monthly Report on the Licensure of

3    Intermediate Care Treatment Programs at the California Medical Facility, Vacaville and the

4    Salinas Valley Psychiatric Program, Salinas Valley State Prison").  While it may be clinically

5    sound to keep these patients in an acute setting until a bed at SVPP becomes available, those

6    patients are creating, in turn, backlogs for valuable and scarce acute and mental health crisis

7    beds.  Defendants' February 2010 data shows, for instance, that patients referred to acute beds at

8    CMF during that month waited an average of 14 days for an acute bed.  Docket 3819 at cells

9    221-244 (difference between "Date of Referral" and "Date of Admission" for patients who have

10   this information listed).  These lengthy wait times are notwithstanding the Program Guide's

11   mandate that patients in need of acute care transfer to those beds within 72 hours, but in no event

12   longer than ten days.  2009 Revised Program Guide at 12-6-5.

13       3.    Female Access to Inpatient Psychiatric Hospitalization

14       The MHARP process has also revealed significant unmet need for inpatient psychiatric

15   hospitalization for female *Coleman* class members.  The initial MHARP report does not

16   separately analyze the female population, although the data that is available demonstrates that

17   further analysis should definitely be undertaken.  Inpatient psychiatric hospitalization for female

18   CDCR prisoners is provided by DMH at Patton State Hospital ("PSH"), where 30 beds are

19   reserved for female ICF and acute patients.  Prior to the MHARP process, there was virtually no

20   waiting list for those beds.  As of February 28, 2010, however, 20 women were housed at PSH, 3

21   were pending review for admission, and 11 women were on the waiting list.  Docket 3819 at

22   cells 1618-1657.  Another woman waited nearly four months for an inpatient bed at PSH before

23   she paroled on February 4, 2010.  *Id.* at cell 1658.  Indeed, all of the women referred to PSH

24   during or since the MHARP process have waited an average of 68.4 days for an inpatient bed,

25   even though only about 20 of the 30 PSH beds have been filled at any given moment during

26   recent months.  *Id.* at cells 1630-1639; 1641-1643 (difference between "Date of Referral" and

27   "Date of Admission" for these women).

28       While the Program Guide requires DMH review of acute referrals within one calendar day

7

[359522-6]

1  and review of ICF referrals within three working days, DMH took 40 to 80 days to process six

2  recent referrals, and nine days to process a seventh one.  Kahn Decl. Ex. D at 2 (redacted).  There

3  were also delays of 7 to 28 days between CDCR's initial referral of these patients and the date

4  DMH received the referral.  *Id.* at 3.  Finally, although the Program Guide mandates that the

5  Coordinated Clinical Assessment Team ("CCAT") shall review rejections within two working

6  days, CCAT took 16 to 64 days to review seven recent female rejections, four of which were

7  eventually overturned.  *Id.*  It is unclear why female class members experience such long delays

8  in accessing inpatient care, but these are problems Defendants should assess and resolve.

9       4.    Short and Intermediate Term Bed Plan Projects

10      Defendants' short-term and intermediate bed plan projects for additional inpatient beds

11 will only partially address the current male and female demand for these highest levels of mental

12 health care.  Specifically, Defendants' project to activate 116 ICF-H beds at Salinas Valley State

13 Prison and to convert  32 beds in the P-1 housing unit at CMF from ICF to acute are slated for

14 activation by June 2010, and will provide a significant and necessary addition to the scarce

15 resources available to the *Coleman* class.  *See* Docket 3592 at 9-12 of 68.  Nevertheless, these

16 additional 148 inpatient beds fall far short of addressing the current combined SVPP and acute

17 waitlists of 638 patients.  Defendants also plan to build 45 ICF beds for women at California

18 Institution for Women ("CIW"), yet Defendants will not even begin patient admissions to that

19 unit until January of 2012 according to current plans.  Kahn Decl. Ex. E at 40 of 56 (March 2010

20 Activation Schedule).

21      C.    **Impact on Long-Range Bed Planning**

22      As the MHARP Report notes, the purpose of the MHARP and ICF Pilot Program

23 (discussed in more detail below), is to "establish[] a sustainable process of identification and

24 referral for those [patients] who need a higher level of care."  Kahn Decl. Ex. B at 17.  The

25 volume of referrals and demand that has resulted from the MHARP, therefore, should be

26 expected to continue to a large degree.  As a result, the impact of the MHARP on future bed need

27 projections will be significant once the results of the MHARP are fully factored into Navigant's

28 projections, which are based on a population model that relies on the average daily census for

[359522-6]

1    each level of care.  Docket 3814 at Ex. A at 5 (Fall 2009 Navigant Projections).  For example,

2    the Fall 2009 Navigant Projections assumed an average daily waitlist of only 45.9 male patients

3    for acute beds and 136.13 male patients for the SVPP waitlist, compared to the current waitlists

4    of 97 and 574 respectively.  *Id.* at 8, 13.  As a proxy for the potential impact of the MHARP on

5    Navigant's projections, Plaintiffs note that the current census of 574 SVPP *waitlist* patients, not

6    including patients actually in ICF-H beds, now exceeds what Navigant projected as the *total need*

7    of 490 ICF-H beds for this year.  *See id.* at 13.  Accordingly, while it is not possible to determine

8    the exact impact the previously unidentified need for inpatient beds will have on Navigant

9    projections, the future projected need for inpatient beds undoubtedly will increase substantially

10   once the projections for both ICF and acute beds are included.

11          The growing long-range need is also likely to be exacerbated by significant delays that

12   have already begun to plague Defendants' long-range inpatient construction projects.  For

13   example, the Consolidated Care Center ("CCC") project, which will include 432 ICF-H, 43

14   acute, and 137 Mental Health Crisis Beds, completion of the California Environmental Quality

15   Act Compliance ("CEQA") was already 94 days behind schedule as of February 22, 2010.  Kahn

16   Decl. at ¶ 7 and Ex. B at Ex. 13.  Defendants report that resolution of litigation regarding CEQA

17   will be completed by June 30, 2010, but do not indicate what impact this will have on the final

18   activation schedule.  *Id.*  Additionally, Defendants have already fallen behind in obtaining sign-

19   off from bond counsel to secure financing under AB 900.  *Id.*  Defendants note "[a]ll possible

20   solutions are outside the Defendants control and may delay the project," and that the Public

21   Works Board agenda item regarding AB 900 financing was pulled from the February 16, 2010

22   meeting, which will have at least a 30-day impact.  *Id.*  Activation of this project by December

23   2013 is therefore in serious doubt.[3]

24

25

26   _____
     [3] The Estrella renovation project, which will include 150 Enhanced Outpatient Program General
27   Population and 40 Enhanced Outpatient Program Administrative Segregation Unit beds, is also
     facing delays.  *Id.* at Ex. 15 (Legislative Analyst's Office has "requested additional information
28   from CDCR and will require more time for their review").

9

PLS.' STATUS CONF. STATEMENT RE DEFS.' INITIAL REPORT ON THE MENTAL HEALTH ASSESSMENT AND
REFERRAL PROJECT (MHARP) AND THE ICF PILOT PROGRAM - CASE NO. CIV S 90-0520 LKK-JFM

## II. DEFENDANTS' USE OF INAPPROPRIATE CUSTODIAL EXCLUSIONS FOR LOWER CUSTODY ICF BEDS HAVE LEFT THOSE BEDS EMPTY AT A TIME WHEN THE SVPP WAITING LIST LINGERS JUST BELOW 600 PATIENTS

Although Defendants have now completed the MHARP and have identified 880 patients in need of ICF care, DMH continues to have substantial numbers of vacant ICF beds in the system resulting in an underutilization of current resources for inpatient psychiatric hospital care. While the waitlist for ICF-H beds has grown, low custody ICF beds sit empty and unused.  And as discussed below, the underutilization of inpatient care resources continues to be due, at least in part, to self-imposed and unreasonable custody barriers to admission to DMH facilities.  Though the ICF Pilot Program was a step toward achieving better utilization of lower custody ICF beds, serious problems remain.

### A. Defendants' Underutilization of ASH and Other ICF Low Custody Beds

After receiving a three-month extension of time, Defendants were able to fill the 256 ICF beds at ASH by February 26, 2010.  Kahn Decl. Ex. A.  Defendants were only able to fill the ASH beds, however, by transferring 20 patients from the ICF inpatient program at Coalinga State Hospital ("CSH").  Docket 3819 at cells 1545-1564.  In other words, Defendants simply transferred patients who were already receiving an ICF level of care at CSH to the ASH beds in order to comply with this Court's order.  At the same time, Defendants have left a shocking number of ICF low custody beds completely vacant.  Defendants contracted to have a total of 390 lower level ICF beds currently available to male class members, including 50 beds at CSH, 256 at ASH, and 84 at CMF in the A2 and A3 units.  As of February 28, 2010, however, Defendants were utilizing only 317 beds, leaving 73 – or almost 20% – of the lower level ICF beds empty.  *Id.* at cells 342-370 (23 patients still in the A2 unit); 373-397 (22 patients still in the A3 unit); 1271-1564 (258 patients "Still at ASH"), and 1574-1589 (14 patients "Still at CSH").

### B. ICF Pilot Project and Exclusionary Criteria

On October 23, 2009, the California Office of Administrative Law approved Defendants' ICF Pilot Program for referring inmate-patients identified as requiring placement in a DMH program.  Kahn Decl. Ex. B at 11.  The stated goal of the ICF Pilot Program is to "increase referrals" by recommending for "referral to ASH or the VPP dorms, on a case-by-case

10

[359522-6]

1    evaluation, some [patients] whose custody factors would previously have prevented their referral

2    to an ICF low-custody bed." *Id.* at 12. Accordingly, the ICF Pilot Program process includes a

3    review of prisoners who would have previously been excluded from referral to ASH or the VPP

4    dorms. As part of the ICF Pilot Project, prisoners on the SVPP waitlist as of September 2, 2009,

5    as well as additional prisoners added to the SVPP waitlist between September 3, 2009 and

6    November 4, 2009, were reviewed using the new criteria. *Id.* at 11-16. Starting November 4,

7    2009, the ICF Pilot Program was expanded to those institutions that were still going through the

8    MHARP as described above. *Id.* at 11.

9         The first step in the ICF Pilot Program review of the SVPP waitlist was to exclude

10   patients who did not meet the new custody criteria for ASH or VPP dorm admissions, patients

11   who paroled, those who had already transferred to an ICF program, and those who were

12   otherwise unidentifiable. *Id.* at 13-14. A Correctional Counselor III in the Health Care

13   Placement Oversight Program ("HC-POP") then performed a custodial review of the remaining

14   SVPP waitlisted patients, using newly developed forms that specify new custody criteria and

15   guidelines. Following HC-POP review, an Institution Classification Committee ("ICC") at the

16   referring institution then conducted a separate case-by-case review to select those prisoners who

17   were appropriate for ASH or the VPP dorms. *Id.* at 14. As a result, prisoners who would have

18   previously been excluded from the ASH or VPP dorm were considered for admission.

19        As a result of the ICF Pilot Project, 70 patients from the SVPP waitlist received a case-by-

20   case individualized evaluation for referral to ASH and/or VPP dorms. *Id.* at 13 (Table 7). Of the

21   70 patients who received a case-by-case review, 29 were placed at ASH and 7 in VPP dorms. *Id.*

22   Eight additional patients paroled prior to transfer. *Id.* The table below summarizes the outcome

23   of the 70 cases receiving case-by-case reviews.

24

25

26

27

28

[359522-6]

**Table 2.  Summary of Case-By-Case Evaluations (MHARP Report Table 7)**

| HC-POP Placement Recommendation | Number | Disposition |
|---|---|---|
| ASH | 53 | 29 (at ASH) |
| VPP-Dorms | 14 | 7 (at VPP Dorms) |
| SVPP/VPP Cells | 3 | 0 |
| ASH Waitlist | | 6 |
| SVPP Waitlist | | 2 |
| Pending DMH Review/Approval | | 6 |
| Pending ICC Review | | 8 |
| In DCHCS HQ Process | | 3 |
| Clinically Rescinded | | 1 |
| Paroled (prior to transfer) | | 8 |
| **Total** | **70** | **70** |

The ICF Pilot Project criteria, however, excluded large categories of prisoners from the individualized case-by-case reviews who may, in fact, be safely treated in the lower-security ICF beds.  These excluded categories include, for example, prisoners who had:  (1) an assessed SHU term, projected SHU term, or expired SHU term ("SHU Criteria"); (2) identified escape histories; (3) lengthy time to serve with limited time in custody; (4) Sensitive Needs Yard ("SNY") designations associated with gang issues or verified safety concerns; (5) recent histories of violent behavior with higher custody case factors; and (6) life without parole sentences.  *Id.* at 14-16 (Tables 9-10); *id.* at Ex. 6.  As a result, at least 78 patients reviewed from the SVPP waitlist[4] were excluded from a case-by-case review based on these exclusionary criteria.  *Id.* at 14-16 (Tables 9-10).  An additional 341 prisoners reviewed from the SVPP waitlist were excluded on the basis that they did "not meet new custody criteria for ASH or VPP-Dorm placement consideration."  *Id.*  The MHARP Report does not identify the criteria under which these 341 patients were excluded.  *See id.*

Further, although the process did not specify a final review process by DMH, DMH staff

---

[4] The MHARP report does not summarize the cases reviewed using the ICF Pilot Project criteria as part of the MHARP process and therefore it is not possible to determine from the MHARP Report the total number of cases reviewed using the ICF Pilot Project criteria.

[359522-6]

did review and reject prisoners who were recommended for the VPP dorms.  *Id.* at 14.
Specifically, despite receiving a case-by-case HC-POP recommendation for the VPP dorm
program and a favorable ICC review, five cases sent to the VPP dorm staff for disposition were
"not clinically approved by VPP Dorm program staff for dormitory housing."  *Id.*  It is not clear
why these patients were rejected despite meeting the ICF Pilot Project criteria for admission.

Accordingly, although the ICF-Pilot Project and this Court's orders to fully utilize
inpatient care beds at ASH have resulted in increased admissions to DMH, the exclusionary
criteria for these beds have resulted in a continued inability to utilize current resources to reduce
the excessive waitlist for inpatient care.

## III.   DEFENDANTS MUST BE PREPARED TO DISCUSS THE STEPS THEY WILL TAKE TO AVOID THE NEED FOR FUTURE SPECIAL ASSESSMENTS AND TO ENSURE THAT PATIENTS REQUIRING INPATIENT CARE ARE REFERRED AND ADMITTED IN A TIMELY MANNER

Pursuant to the Court's January 27, 2010 Order, Defendants must be prepared to discuss
"the steps they have taken and are taking to ensure that the referral and transfer of inmates to
higher levels of care is proceeding in a way that will avoid the need for any future special
assessments of unmet need and will ensure that those who require inpatient care are referred and
admitted in a timely manner."  Docket 3787 at 7:8-11.  Experience demonstrates that if clinicians
have patients who linger on waitlists for months or years, they will simply stop referring patients
to those beds.[5]  Further, while the lack of current resources may make elimination of these
waitlists in the short term impossible, prompt processing of referrals is crucial to timely
admission and transfer to these limited inpatient beds.  Accordingly, ensuring that future special
assessments are not required must include a critical analysis of both the referral and transfer

---

[5] *See* Deposition of Vic Brewer, Sept. 4, 2008 at pp. 122:24-123:2 ("To refer a patient to a DMH
program, they must provide a reasonable amount of clinical information to support the mental
health diagnosis, and when the clinicians see their referrals sit on a wait list for a substantial
amount of time, they appear to be reluctant to continue to send referrals."), attached to
Declaration of Jane E. Kahn In Support Of Plaintiffs' Objections To Defendants' Bed Plan
Statement And Request For An Order Requiring Defendants To Prepare And Implement An
Interim Emergency Plan To Address The ICF, APP, MHCB And EOP Bed Shortages (Docket
3547) Ex. P-1013.

[359522-6]

1   processes as well as Defendant's bed planning efforts.  The MHARP creates a unique

2   opportunity to do this and Defendants must fully utilize the extensive data that came out of that

3   process.

**A.    Creating a Sustainable Process through Efficient Utilization of Current Resources**

**1.    Creating an Effective Referral and Transfer Process – Capturing Lessons Learned from MHARP and the ICF Pilot Project**

7           The comprehensive database created as a result of the MHARP process provides a unique

8   opportunity to examine the referral and transfer process for inpatient psychiatric hospitalization

9   for *Coleman* class members.[6]  Defendants' MHARP Report provides a good starting point

10  towards analyzing the previously unidentified need for inpatient care and clearly demonstrates a

11  systemic under-referral of patients to inpatient care.  However, given the wealth of data

12  developed through the MHARP process and the substantial current unmet need, additional

13  questions must be addressed as follows:

14          **Time Element:**  Maximizing the utility of the MHARP requires a careful analysis of the

15  timelines for referral and transfer to inpatient care.  Accordingly, the MHARP data should be

16  analyzed against the specific timelines for each step of the process between identification,

17  referral, admission, and transfer set forth in the Program Guide.  *See* 2009 Revised Program

---

[6] The database has not yet been made available to Plaintiffs' counsel.  The initial MHARP report does not provide the level of analysis or detail that Defendants provided through the UNA Study, which was published in March of 2005.  We assume and request that Defendants and the Special Master take advantage of the tremendous time, energy and money invested in the MHARP and use the data to develop appropriate remedial processes and improvements in the system of identification, referral and transfer of patients to inpatient psychiatric hospitalization.  For example, the UNA report included detailed, statistical analyses of multiple data points and issues including:  Whether patients met multiple referral criteria, a breakdown of referrals by institution and level of care, what percentage of the EOP population was identified as needing a higher level of care, the average monthly need for ICF and acute beds based on the study, an analysis of the underlying reasons for non-referrals, including "institutionalization" of clinical staff and the burdensome referral process, recommendations for future needs assessment studies, differences in referral processes and knowledge of DMH access across institutions, breakdowns of referrals and rejections by institution, and so on.  See Docket 1791 at Ex. E (UNA Assessment attached to the "Corrected Exhibits E-G to Declaration of Jane Kahn in Support of Plaintiffs' Objections to Defendants' In-Patient and MHCB Bed Plan," filed 4/24/06).

[359522-6]

Guide at 12-1-16. Defendants' MHARP Report fails to address this crucial element. For example, how much time elapsed between the date a case was reviewed and the date it was sent to headquarters for processing? How long were the delays between CDCR referral and DMH decisions on those referrals? How long did patients spend on the waitlist prior to transfer or parole? Were the referring institutions in compliance with the Program Guide Transfer Timelines? Each of the data points along the referral and transfer process presents an opportunity to identify barriers to both referral and admissions and to ensure that patients receive the proper level of care given the current scarce resources.

**Institution-Specific Analysis:** The data collected during the MHARP included the institution where cases were initially identified as potential referrals. Kahn Decl. Ex. B at 5. However, Defendants have not evaluated institution-specific delays or patterns and their impact on the referral process. For example, were certain institutions systematically under-referring to inpatient care, or to a particular level of inpatient care? Were some institutions more efficient in preparing referral packages, and if so, were they more successful in actually placing patients in inpatient beds? Which institutions were able to meet time-frames for referral and transfer within Program Guide standards? What can we learn from the institutions that were able to most efficiently process referrals and how can those lessons be applied system-wide to ensure institutional referrals are processed as expeditiously as possible?

**Priority for Waitlist Transfers:** Defendants' MHARP Report shows that 73 patients identified during the MHARP process were admitted to SVPP despite the substantial waitlist. *Id.* at 11 (Table 6). How did Defendants determine that those 73 patients should be admitted before patients who have been lingering on the waiting list for long periods of time? What mental health case factors did Defendants prioritize for those admissions? Is there or should there be a process to triage the most acute or time-sensitive cases for expedited admission, and if so, what are the proper criteria?

**Parole Prior to Transfer to Inpatient Care**: During the MHARP process, 173 prisoners in need of inpatient care paroled prior to being transferred to a DMH hospital. *Id.* at 11 (Table 5). Even a short stay in an inpatient care bed would have tremendous public safety

15

[359522-6]

1    benefits to the extent these prisoners can be stabilized and given appropriate medications or

2    treatment.  If these patients can be released into the community, surely they could be admitted to

3    ASH, which is a "self-contained inpatient psychiatric hospital situated within a fenced security

4    perimeter" with "state hospital police officers" and locked housing units configured with two and

5    four-man dorms.  *See* Radavsky Decl. in Support of Defs.' Request for Temp. Relief Re: 256

6    ICF Low-Custody Beds at ASH (Docket 3760-4) at ¶ 9.  For the patients who paroled prior to

7    DMH transfer, what was their level of acuity?  How much time passed between referral and

8    parole?  Were any of these prisoners placed on SVPP waitlist after being excluded from ASH or

9    other DMH facilities based on custody factors?

10        **Distinctions between Male and Female MHARP Issues:**  Defendants' MHARP report

11   does not separately assess female class members.  For instance, the data set forth in Table 6

12   simply states that 11 women transferred to ICF beds at PSH from the MHARP process.  Kahn

13   Decl. Ex. B at 11.  Defendants fail to state how many total women were referred during the

14   MHARP process, however, and how many failed to reach an inpatient bed.  Are there differences

15   in the inpatient referral processes for men and women?  Do women experience different delays

16   than men do and, if so, what steps will Defendants take to address those delays?

17        **Lengths of Stay for Inpatient Care and Utilization Management**:  A review of the

18   monthly data shows that some patients have occupied inpatient beds for significant periods of

19   time.  For example, although the acute care program is an intensive treatment program intended

20   to last approximately 30-45 days (2009 Program Guide at 12-6-2), the 48 male patients who

21   discharged from an acute bed during the month of February 2010 spent an average of 71 days in

22   the program, with ten patients spending 100 or more days in an acute bed.  Docket 3819 at cells

23   72-244 (averaging the "Length of Stay" for men who discharged in February).  There are also

24   long lengths of stay in ICF beds.  Although the ICF program targets a length of stay of about

25

26

27

28

[359522-6]

1    eight months, or 240 days (Deposition of Vic Brewer, Sept. 4, 2008 at p. 18:5-9),[7] the patients

2    discharged from D5 during February 2010 spent an average of 276 days in an ICF bed, with four

3    patients staying more than 300 days.  Docket 3819 at cells 409, 421, 427, 428, 432, 435, 438,

4    470.  The 5 men who discharged from the SVPP Treatment Center 1 (TC1) unit spent an average

5    of 348 days in the ICF beds.  *Id.* at cells 581, 582, 584, 588, 598.

6         Are these lengths of stay appropriate?  Should some of these patients be discharged in

7    order to free up limited resources for more patients with more acute needs?

8         **DMH Referral and Transfer Processes**:  Data collected during the MHARP includes the

9    date DMH received and accepted referrals, as well as whether DMH deferred the referral to

10    another program.  Are there process delays at DMH that could be addressed to ensure timely

11    access to care?  On what basis is DMH deferring referrals to another DMH program, and what

12    impact does this have on transfers?  Are there unnecessary administrative tasks required to

13    transfer patients to DMH, particularly for those prisoners on the waitlist, which create barriers to

14    transfer and discourage referrals by clinicians?

15              **2.    Improper Custodial Exclusionary Criteria for ICF Beds**

16         As discussed above, a substantial waitlist for ICF beds continues to exist, while empty

17    beds at CSH and ASH remain.  Yet some of the exclusionary factors utilized by HC-POP as part

18    of the ICF Pilot Project appear overbroad and may have eliminated prisoners who could

19    successfully program in ASH, CSH, and VPP dorms.  For example, although the case-by-case

20    review permits the consideration of prisoners who have an SNY designation due to their

21    committing offense, with the review to focus on the totality of each prisoner's case factors,

22    prisoners who have an SNY designation due to gang drop-out debriefing or open-court testimony

23    are excluded without the opportunity for a case-by-case review.  Kahn Decl. Ex. B at Ex. 8.  As a

24    result, HC-POP excluded 12 SVPP waitlist prisoners because their SNY status was due to their

25

26    _____

      [7] The Brewer deposition is attached to the Declaration of Jane Kahn In Support Of Plaintiffs'

27    Objections To Defendants' Bed Plan Statement And Request For An Order Requiring
      Defendants To Prepare And Implement An Interim Emergency Plan To Address The ICF, APP,

28    MHCB And EOP Bed Shortages, Docket No. 3547, as Exhibit P-1013.

[359522-6]

1    "gang issues," without ever considering the totality of their case factors. *Id.* at 14-16 (Tables 9

2    and 10). The clinical concerns of this group are no less serious, and in fact, in a recent suicide

3    review, CDCR clinical staff recognized the significant mental health stressors which result from

4    gang debriefing.[8]

5    Additionally, although the numbers of prisoners on the SVPP waitlist with life without

6    parole ("LWOP") sentences is not provided, LWOP is another exclusionary criteria in the ICF

7    Pilot Project, regardless of the prisoner's time served, his current custody level, his in-prison

8    behavior or staff recommendations.[9] This categorical barrier, in the place of a case-by-case

9    review, appears overbroad in light of the current significant SVPP waitlists and the empty low

10   custody ICF beds. What is the basis for these exclusionary criteria? Should these criteria be

11   revised to expand case-by-case reviews beyond those currently permitted under the ICF Pilot

12   Program?

13   Additionally, during the ICF Pilot Project, five cases were "not clinically approved by

14   VPP dorm program staff," despite having been referred following the case-by-case review. *Id.* at

15   14. No information was provided in the MHARP Report about the role that DMH plays in the

16   ICF Pilot. What factors do the program staff consider in accepting or rejecting patients who have

17   already been reviewed by HC-POP and the referring institutional ICCs? Is there a CCAT review

18   of any rejections by DMH staff after approval and referral of a prisoner to ASH and/or the VPP

19

20   _____

[8] On 7/17/09, a prisoner committed suicide at SVSP after requesting to debrief from a gang.
21   Kahn Decl. ¶ 8. The Suicide Reviewer noted that "it seems clear that inmates are very
     vulnerable emotionally when they are contemplating leaving their gangs … It would be good
22   preventative mental health practice to require a mental health referral early in the [gang]
     debriefing process." *Id.* Defendants exclusionary criteria appear to leave all prisoners who
23   debrief from gangs stuck on the lengthy SVPP waitlist where they will remain for months or
24   years waiting for an inpatient transfer.

[9] The named plaintiff in this case is serving a term of life without parole. Kahn Decl. ¶ 9.
25
     During his 31 years in prison, he has never been issued a serious rules violation and has never
26   been housed in segregation for discipline. Yet under the ICF Pilot Program, he would be
     screened out for his sentence although he is currently housed in a lower custody prison and
27   receives medical treatment in the community for medical conditions. *See* Ex. 6 to MHARP
     Report.
28

1   dorms by HC-POP and ICC as part of the ICF Pilot Program?  In light of the significant waitlist

2   for ICF-H beds, an expansion of the blanket exclusionary criteria and case-by-case reviews

3   should be considered.

4        Further, to the extent certain high custody prisoners cannot be admitted to ASH or other

5   DMH facilities, and therefore spend months on the waitlist under current policies, what should

6   Defendants do to augment the mental health care provided to these prisoners while they await

7   transfer to inpatient beds?  What is the appropriate level of mental health care for prisoners

8   awaiting inpatient beds?  Could teams of DMH or CDCR doctors provide additional *ad hoc*

9   treatment to patients awaiting transfer in CDCR facilities?  What steps can be taken to better

10  manage the waitlist and ensure that the most acute patients reach inpatient beds?  Can the

11  patients on the waitlist be triaged in order to treat those with the most serious need, or those who

12  have approaching parole dates, on a high priority basis?  Should Defendants take affirmative

13  steps to address the long lengths of stay in inpatient beds, such as establishing utilization

14  management processes?  Where high-security prisoners require inpatient mental health care, have

15  Defendants explored the possibility of having CDCR provide additional security at outside

16  mental health facilities similar to the security provided for prisoners in need of inpatient medical

17  care at outside hospitals?  *See, e.g.*, Docket 3763 at 8 n.4; Docket 3784 at 13.

18        **B.    Addressing the Previously Unidentified Need for Inpatient Care**

19        Where clinicians observe the futility of referring patients to inpatient beds with excessive

20  waitlists, they likely will be reluctant to continue to refer patients to those beds.  Given the

21  current size of the waitlists for acute and ICF-H beds, the likelihood that clinicians will stop

22  referring patients to inpatient care is significant.  Eliminating the need for future special

23  assessments of unmet need and ensuring that patients are referred and admitted in a timely

24  manner necessarily require an evaluation of Defendants' short-term and long-range bed planning,

25  which relied on the Fall 2008 and Spring 2009 Navigant projections, respectively.  Docket 3592

26  (Defendants' May 2009 Bed Plan).  As discussed above, those projections did not fully account

27  for the demand identified by the MHARP.  In light of the results of the MHARP and the resulting

28  waitlists, should additional long-range and short-term projects be considered in order to facilitate

19

[359522-6]

1  inpatient treatment for higher custody patients?  Could a unit at CSH or ASH be staffed and/or

2  renovated to provide enhanced security to permit CDCR patients additional access to these

3  hospitals?

## CONCLUSION

4

5          The MHARP and ICF Pilot Projects were huge undertakings that have resulted in vast

6  data regarding *Coleman* class members' access to inpatient beds and a significant increase in

7  admissions to DMH facilities.  Defendants and the Special Master team spent untold hours on

8  both projects and should be commended for their hard work.  In order to fully capitalize on these

9  processes, however, more must be done.  Specifically, Defendants must describe "the steps they

10  have taken and are taking to ensure that the referral and transfer of inmates to higher levels of

11  care is proceeding in a way that will avoid the need for any future special assessments of unmet

12  need and will ensure that those who require inpatient care are referred and admitted in a timely

13  manner."  *Coleman* class members' inability to achieve timely access to inpatient psychiatric

14  hospitalization remains a life-threatening, unsolved problem.  The MHARP and ICF Pilot Project

15  processes are essential to achieve better utilization of existing beds and improve forecasting of

16  future need.  Additional positive steps should be identified and implemented in the short and

17  medium term to better utilize this critical resource.

18

19  Dated:  March 24, 2010                    Respectfully submitted,

20                                            ROSEN, BIEN & GALVAN, LLP

21

22                                            By:  */s/ Michael W. Bien*
                                                   Michael W. Bien
23                                                 Attorney for Plaintiffs

24

25

26

27

28

[359522-6]