```
 1                  UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3                      (SACRAMENTO DIVISION)

 4                           ---oOo---

 5    COLEMAN, et al.                )
                                     )
 6                  Plaintiffs,      )
                                     )
 7         v.                        ) No. S-90-0520
                                     )
 8    SCHWARZENEGGER, et al.         )
                                     )
 9                  Defendants.      )
      _____)
10
          BEFORE THE HONORABLE LAWRENCE K. KARLTON, JUDGE OF THE
11    UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF
      CALIFORNIA, AND ON MARCH 29, 2010.
12

13             REPORTER'S TRANSCRIPT OF PROCEEDINGS

14

15    APPEARANCES:

16    For the Petitioner:          ROSEN, BIEN & GALVAN, LLP
                                   BY:  MICHAEL W. BIEN
17                                 315 Montgomery Street
                                   Tenth Floor
18                                 San Francisco, CA  94104

19    For the Defendants:          OFFICE OF THE ATTORNEY GENERAL
                                   BY:  DEBBIE J. VOROUS
20                                 1300 I Street
                                   Sacramento, CA  95814
21

22

23

24

25         Reported by:  KATHLEEN SKIDGEL, CSR No. 9039
```

                                                                    1

```
 1                MARCH 29, 2010, AT THE HOUR OF 11:09 A.M.
 2                BEFORE THE HONORABLE LAWRENCE K. KARLTON
 3                              ---oOo---
 4            THE CLERK:  Calling civil case S-90-0520, Coleman,
 5    et al. v. Schwarzenegger, et al.
 6            THE COURT:  Counsel, approach the podium and state
 7    your appearance for the record.
 8            MR. BIEN:  Michael Bien on behalf of the pendant
 9    class.
10            MS. VOROUS:  Debbie Vorous on behalf of
11    defendants.
12            THE COURT:  Ladies and gentlemen, I have read all
13    of the paper.  I did that over the weekend, among other
14    things.  And I want to say some good things before I say
15    some bad things.
16            It is clear that the process produced important
17    new information and that people worked honestly and hard on
18    it.  And they are to be complemented, and I want you to
19    convey to the appropriate folks the Court's recognition of
20    that.
21            Having said that, we're faced with yet another
22    crisis.  And it's like it doesn't matter -- I promised I
23    wouldn't do this, and I'm about to do it anyhow.  But every
24    time we get together, something demonstrates that we're way
25    behind the curve.  And I am trying very hard to understand
```

2

1    what to do.
2               Now we've got a whole bunch of new people that are
3    sick -- I mean, it's important to keep in mind what we're
4    talking about here.  We're talking about people who are
5    sick.  And we have no way -- and we have no plans for
6    treating them.  We don't know what to do with them.
7               I have talked to the Special Master, and I think
8    that the next thing to do is to engage in intensive
9    interchange run by the Special Master, under which we
10   attempt to deal with and plan what to do.  I mean, these are
11   all people who need treatment now.  And we have no place --
12   we have no beds for them.  I'm not blaming anybody.  I'm
13   just observing.
14              You know, I keep thinking we're going to get out
15   of this some day.  Some day we're going to turn this back to
16   you, and we don't even come close.  I mean, it's very
17   discouraging, ma'am.  It's very discouraging.
18              I am going to order the Special Master to engage
19   in a process of meeting with the parties and trying to
20   develop a program plan to deal with our present problem.
21   But long-term bed plan which is set to be completed in 2013,
22   is it -- which means 14 or 15 the way things have always
23   happened in this case -- won't address these people who are
24   now in need of help.  I don't know why I'm saying this other
25   than to express my own utter frustration.

3

1        I'm about to ask you an embarrassing question.
2   Tell me what the medical justification was for taking 20
3   people from one hospital and putting them in ASH to satisfy
4   the court's order?
5        Yeah. Exactly.
6        You go back to the department and tell them this
7   is not a numbers game. This is a serious problem with sick
8   people and they're to take -- sorry.
9        Tell them the next time they do that, somebody's
10  going to jail. Just that simple. People are going to be
11  straightforward and honest. If they can't make it, they
12  tell me they can't make it. They don't play ridiculous
13  games.
14       I am told that the -- and I would like now for you
15  to tell me whether it's right -- that the program reviewing
16  the people who have not been accepted at DMH because of
17  classification has produced about a five percent, I'm told,
18  four or five percent number of folks who are going into DMH
19  despite the apparent barrier of classification. Does that
20  appear to be right?
21       MS. VOROUS: I have not calculated it. But I do
22  understand that it does appear that they are creating
23  additional referrals and that DMH has seen an increase in
24  the number of referrals that are being sent to ASH and they
25  believe it's as a result of the private program and the new

1   custody criteria.
2            THE COURT: I mean, that's an important thing
3   that's happening. And people, again, should be told that
4   the Court recognizes that and applauds that effort.
5            The problem, Mr. Bien, I mean, of course you're
6   right, that part of the problem is the classification
7   system. But we are not in the classification business.
8   That is a custody problem.
9            It's not a mental health problem. And I can't --
10  everybody's dangerous. You're dangerous. But custody
11  people are in the business, and you can't blame them,
12  they're in the business of trying to secure a very dangerous
13  population. And so they're going to overreact. I mean,
14  it's just -- what's new? I mean it's just, in a sense, just
15  inevitable. And I think that the fact that we've been able
16  to produce four or five percent more people is itself some
17  measure of people trying to be more realistic.
18           MR. BIEN: May I address that, Your Honor?
19           THE COURT: Yes, please. I mean, if I sound like
20  I just don't know how to address this problem other than
21  shaking my finger at people, which is just besides the
22  point, that's what's going on. Yes.
23           MR. BIEN: First, we want to acknowledge, as the
24  Court did, that there's been a tremendous effort by the
25  defendants and DMH and the Special Master and his team to

5

1    identify people, move the referrals along, and it must be
2    acknowledged by everyone.
3            And I also think there's really nothing that will
4    solve the whole problem right now other than we think
5    obviously if the populations brought under control, it will
6    certainly be a great start.
7            But right now, we do have these hundreds and
8    hundreds of people that everyone agrees needs a higher level
9    of care.  And what we would suggest is bringing in
10   additional expertise on the custody side to really sit down
11   and see whether or not, on a case-by-case basis, more people
12   could be referred.  And I guess the analogy -- not analogy,
13   but medical people are brought constantly into the community
14   for treatment.
15           THE COURT:  But that's because we're in the
16   medical business.  You know, we're not in the custody
17   business.
18           I understand your position.  I really do.  And --
19   I shouldn't tell tales out of school.  As I said to one of
20   my colleagues on the three judge court, we don't have a
21   magic wand.  We're not going to solve all of our problems.
22   And it is important to recognize that some day this is going
23   back to the state, and the state has got to understand that
24   it is conceivable, even probably more than that, that the
25   classification system is impeding the self-interests of the

6

1   state, which is to get these people well enough to get them
2   out of the hospitals and --
3           Well, Mr. Master, I'm going to issue an order in
4   writing that will order you to get together with these
5   people and try and work on the problem of what to do about
6   the hundreds of people we've now --
7           Let me ask you this:  This may be not an answer
8   and it's just grasping at straws.  Is there any use -- well,
9   I'll leave that to the Special Master.  Well, in your view
10  at the moment, subject to your discussions with the Special
11  Master, plaintiff, would there be any use in trying to at
12  least consolidate the people who are on the waiting list
13  into a single, or at least limited number of institutions,
14  where they can be getting more help than they are out
15  wandering -- I don't mean wandering, but out in the general
16  population?
17          MR. BIEN:  I guess I'd have to defer to Special
18  Master on that, too.  I don't really know exactly where
19  those populations are.  I'm sure some people are in
20  situations which are dangerous, and others are probably
21  getting, you know, EOP or crisis bed care.  I'm sure that
22  we're in a situation where everything is full, and we're
23  shuffling.
24          THE COURT:  Everything is full except lower
25  custody.

7

```
 1              MR. BIEN:  Right.  Right.  And I still think
 2   there's some room there, and I guess our example would be
 3   the 170 people that paroled and are safe enough to go to
 4   streets, but they're not safe enough to go to ASH.
 5              THE COURT:  They're not safe enough to go to the
 6   street.  It's just that the legal system has reached the
 7   point where those people are no longer to be addressed by --
 8              MR. BIEN:  Right.
 9              THE COURT:  -- the class situation and they're out
10   on the street.  And maybe they're getting treatment, and
11   most likely they're not.
12              MR. BIEN:  Right.
13              THE COURT:  Which means they'll be back in prison
14   before you can shake a stick.  Somebody, somewhere ought to
15   say this system is counter-productive.  But, you know, I
16   think the answer is everybody knows it's counter-productive.
17   They just don't know how to stop it.
18              Ma'am, do you have any -- well, you want to wait
19   and talk to the Special Master, too, about whether
20   congregating these people would be of use at all?
21              MS. VOROUS:  Yes, I would prefer and wait and talk
22   to the Special Master about that.
23              THE COURT:  I don't blame you.  I don't know the
24   answer.  And I hate to say this, you may not either, but at
25   least the experts will give you some ideas about how to
```

8

1       proceed.
2              Assuming that I'm not going to order a
3       case-by-case -- assuming that I could, which I doubt, order
4       a case-by-case classification review, is there anything else
5       you think I ought to be doing that I'm not?
6              MR. BIEN:  The only thing we're hoping that both
7       the defendants and Special Master do is to make use of the
8       information that we now have to look at other issues that
9       might speed the process up, some unique situations like the
10      women who seem to be treated in an odd way since they don't
11      have the same shortage of beds, and just sort of use the
12      information that we've gathered to address some of these
13      other issues.
14             And I also think that the time frame needs to be
15      looked at a little bit more and see whether or not we could
16      speed up some of the referrals.
17             THE COURT:  There's another problem, and I don't
18      know whether we've really addressed that problem, which is
19      the local clinicians who say what's the point of referring
20      people?  They aren't going to get help.  And I don't know
21      what to do about that either.
22             Ma'am, is there anything else you think I should
23      be worrying about?  I don't mean that.  That would be useful
24      for me to order as you sit here now, or do you want to just
25      await further processing with the Special Master?

9

1          MS. VOROUS:  I do want to wait for the processing
2    with the Special Master.  But there's one thing I wanted to
3    bring to the Court's attention.
4          I'm bringing this only because I learned about a
5    potential delay with one of the short-term projects after
6    hours on Friday.  And just as a matter of informing the
7    Court, given the papers that I filed indicated that they
8    were on schedule, and it's my understanding that the C5, C6,
9    there may be a construction delay associated with Fire
10   Marshall, short delay, maybe to six to eight weeks beyond
11   when the activation schedule would indicate.  So the 30 days
12   we were required to notify the Special Master, so once I get
13   the details and confirm it we'll provide a notification.
14         THE COURT:  Thank you very much.
15         I just confess that the Court is very discouraged.
16   We've been at this so many years.  And of course, you know,
17   you got to keep reminding me we've made huge progress.
18   That's for sure, we have.  But it just seems that every time
19   we get together, there's another crisis that we are not
20   prepared to deal with.  And that's nobody's fault.  That's
21   just the way the world is.  It's very -- well, in any event.
22         Thank you, folks.  The Court will issue a written
23   order.  Thank you very much.  Stand in recess.
24              (Court adjourned at 11:24 a.m.)
25                       ---oOo--

10

CERTIFICATE OF SHORTHAND REPORTER

     I, Kathleen Skidgel, a Certified Shorthand Reporter of the State of California, do hereby certify that I am a disinterested person herein; that I reported the foregoing hearing in shorthand writing; that I thereafter caused my shorthand writing to be transcribed into typewriting.

     I further certify that I am not of counsel or attorney for any of the parties to said hearing, or in any way interested in the outcome of said hearing.

     IN WITNESS WHEREOF, I have hereunto set my hand this _____ day of _____, 2010.

_____
Kathleen Skidgel
Certified Shorthand Reporter
License Number 9039