1    PRISON LAW OFFICE
     DONALD SPECTER, Bar No. 83925
2    STEVEN FAMA, Bar No. 99641
     1917 Fifth Street
3    Berkeley, California  94710-1916
     Telephone:  (510) 280-2621
4
5
6

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN, Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California  94104-1823
Telephone:  (415) 433-6830

7    THE LEGAL AID SOCIETY –
     EMPLOYMENT LAW CENTER
8    CLAUDIA CENTER, Bar No. 158255
     600 Harrison Street, Suite 120
9    San Francisco, California  94107-1389
     Telephone:  (415) 864-8848
10

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111-4066
Telephone:  (415) 393-2000

11   Attorneys for Plaintiffs

12

13                    UNITED STATES DISTRICT COURT

14                    EASTERN DISTRICT OF CALIFORNIA

15

16

17   RALPH COLEMAN, et al.,

18              Plaintiffs,

19        v.

20   ARNOLD SCHWARZENEGGER, et al.,

21              Defendants.

22

23

24

25

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR AN EVIDENTIARY HEARING REGARDING THE C5/C6 PROJECT AT SALINAS VALLEY STATE PRISON, AND MOTION TO SHORTEN TIME**

Hearing Date:  TBD
Time:  TBD
Place:  Courtroom 4, 15th Floor
Judge:  Honorable Lawrence K. Karlton

26

27

28

[398241-1]

I, Jane E. Kahn, do hereby declare as follows:

1.     I am an attorney admitted to practice law in California and of counsel in the law firm Rosen, Bien & Galvan, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness, I could competently so testify. I make this declaration in support of "Plaintiffs' Emergency Motion for an Evidentiary Hearing Regarding the C5/C6 Project at Salinas Valley State Prison, And Motion to Shorten Time."

2.     The C5/C6 project at the Salinas Valley Psychiatric Program (SVPP), which will eventually have 116 high-custody Intermediate Care Facility (ICF) inpatient hospital beds, is one of the court-ordered projects intended to address the extreme shortage of ICF beds throughout the prison system. On April 20, 2010, defendants notified the Court and plaintiffs' counsel of an impediment to completing the C5 and C6 units at the SVPP. Specifically, defendants reported a 7-8 week delay in obtaining the license and activating the facility, pushing the completion date from June 2010 to August 2010. Docket 3841 at 2. Defendants promised they would continue "to explore ways to mitigate this delay," but offered no concrete solutions for doing so in violation of this Court's orders. *See* Docket 3686 at 3-4 (ordering that any notice of an impediment filed with the Court include "a proposed remedy to the impediment").

3.     Plaintiffs' counsel were concerned about this further delay and added the C5 and C6 project to the agenda for a policy meeting with defendants and the Special Master's team. The policy meeting took place on July 29, 2010 in Sacramento. A few days before that meeting, defendants provided plaintiffs' counsel with their proposed schedule for the C5/C6 unit. The schedule made clear that defendants planned to admit only five patients per week, meaning that the 116 beds will not be fully occupied for at least five months. A true and correct copy of defendants' activation schedule for C5 and C6 is attached hereto as **Exhibit A**. During the policy meeting on July 29, 2010, however, defendants reported yet another delay with the C5/C6 project, clarifying that admissions would not begin until September 6, 2010 and would still move at a rate of only five per week.

1

[398241-1]

4.      Plaintiffs' counsel first requested that defendants accelerate admissions to at least five patients per week in each of the two units (for a total of 10) at the policy meeting on July 29, 2010. We made this request in light of the huge waiting list for these ICF beds and asked defendants to even consider 10 patient admissions per week in each of the two units (for a total of 20 per week). At that time, plaintiffs were unaware that defendants planned to activate only one unit at a time (first filling C5 and then beginning the process of filling C6). Defendants would not commit to accelerate the admission process. On August 6, 2010, I sent a letter to defendants following up on issues discussed during the policy meeting, including defendants' slow pace of admissions to the C5/C6 units. Regarding the C5 and C6 units, plaintiffs noted that it would take defendants at least five months to fill the 116 beds if they admitted only 5 patients per week, and that this delay was unacceptable in light of the long waitlist for ICF care. Noting the "extreme emergency and the hundreds of patients waiting for these beds," plaintiffs urged defendants to admit at least 10 or even 20 patients into the units per week. A true and correct copy of my August 6, 2010 letter to defendants is attached hereto as **Exhibit B**. Although plaintiffs asked for a response before August 13, 2010, defendants asked to have until August 25, 2010 to respond and I agreed.

5.      Defendants' counsel did not contact me or anyone else in my office on August 25, 2010. Having still heard nothing by mid-afternoon, I left a voicemail message for Debbie Vorous, the supervising Attorney General on the case, asking her to call me about this urgent issue. Ms. Vorous did not respond. I then sent an email to Ms. Vorous late in the day detailing our communications about the C5/C6 admission process, requesting again that defendants expedite admissions, and asking for defendants' response by 6:00 p.m. I also notified Ms. Vorous that we would seek to shorten time on any motion we were forced to file, and asked her to agree to a shortened schedule. A true and correct copy of my August 25, 2010 email is attached hereto as **Exhibit C**. After defendants agreed to meet with plaintiffs and the Special Master's team to fully explain the problems, we delayed filing. On September 1, 2010, the meeting with plaintiffs' counsel, members of the Special Master's team, defense counsel and various defendants took place. From DMH, Nathan Stanley, Staff Mental Health Specialist for Long Term Care services, attended the

1   meeting, along with DMH staff counsel Ann Nguyen.  Plaintiffs' counsel proposed a variety of

2   strategies DMH could use to expedite admissions, including shifting clinical staff to C5 from

3   Coalinga State Hospital (CSH).  Defendants have allocated staff for class members at Coalinga, yet

4   do not have even a single class member housed at the hospital.  Plaintiffs' counsel also suggested

5   that DMH move stable patients into C5 and spread expedited admissions to other SVPP units

6   including D5, D6, TC1 and TC2 where there are already experienced and well-established staff.

7   Despite these suggestions, DMH refused to accelerate admissions to more than five patients per

8   week.  When defendants refused yet again to accelerate the admissions process at the September 1,

9   2010 meeting, counsel for both parties discussed an expedited briefing schedule.  On September 2,

10  2010, the Senior Assistant Attorney General, Jon Wolff, confirmed in a voicemail message that

11  defendants could file their opposition on September 16, 2010, and could be available for a hearing on

12  September 20, 2010.  In an email dated September, 3, 2010, Mr. Wolff also agreed that plaintiffs

13  could file a reply, if any, on September 18, 2010.  Mr. Wolff made clear, however, that defendants

14  do not agree that the hearing should be an evidentiary one.

15          6.      Plaintiffs' counsel requested an expedited briefing schedule in light of the undisputed,

16  continuing Eighth Amendment violations resulting from serious and ongoing delays to inpatient

17  psychiatric hospitalization.  An expedited briefing schedule is also warranted here due to the short

18  window of time within which to ensure expedited admissions in the C5/C6 units.  If this Court hears

19  this motion 28 days from the filing, as typically required by Eastern District rules, defendants could

20  implement their extremely slow admission process for two weeks before the hearing is even

21  scheduled (assuming admissions begin the week of September 21st).  *See* E.D. Local Rule 230(b)

22  (requiring twenty-eight (28) days notice of a motion prior to the hearing).

23          7.      On August 26, 2010, I participated in a phone conference with the Special Master,

24  Debbie Vorous, and Michael Bien from my office.  During that call, Ms. Vorous informed us that

25  there may be even further delays activating C5 and C6 beyond the September 6, 2010 date, resulting

26  from failures to obtain approvals from the Fire Marshal and problems with the sprinkler systems.

27  The resolution of these issues, according to Ms. Vorous, may further delay the completion and

28

3

[398241-1]

1 utilization of C-5 and C-6, although she could not provide exact time frames or estimates.  Ms.

2 Vorous also reported during that call that defendants could not commit to any more than five

3 admissions per week in only one of the C5 or C6 units.  Ms. Vorous also indicated that defendants'

4 plan was to gradually open the two units—first filling one and then starting to fill the other.  She

5 reported that defendants had not been allocated sufficient funding to hire the staff necessary to open

6 the units and admit patients at a more rapid rate than five per week.  In response to plaintiffs'

7 suggestion that DMH shift staff from Coalinga, where the Coleman patient census has been 0 for

8 many months, Ms. Vorous was uncertain about the status of that clinical staff and whether those

9 staffing positions could be allocated for C5/C6.

10         8.      On September 1, 2010, plaintiffs' counsel met with defendants and the Special

11 Master's team to discuss delays with the C5/C6 project, and potential ways to alleviate these delays.

12 Deborah Hysen, Chief Deputy Secretary of CDCR's Facility Planning, Construction and

13 Management division, Paul Scott, the head of Inmate Ward Labor (IWL) for that division, and Bill

14 Westin, a construction supervisor in the division, explained the physical plant delays in more detail.

15 They reported that the prison had discovered that a fire suppression sprinkler system in C-5 and C-6

16 (the same system is relied on throughout SVSP) was corroded and had developed leaks and that

17 various repairs are required to the pipes.  Because C5 and C6 are not currently occupied and are

18 subject to approval by the Fire Marshal, those units are particularly problematic.  There is no

19 urgency, apparently, to making these repairs on other occupied housing units at the prison.

20 Defendants stated that they must perform a temporary fix in C5 in order to obtain conditional

21 approval from the Fire Marshal for patients to move in to the unit.  At the same time, defendants

22 state they will begin to permanently fix C6 by replacing sprinkler piping throughout the unit.

23 Defendants plan to admit only five patients into C5 per week after the temporary construction is

24 complete, meaning that it will take at least three months to admit all 58 patients.  Once C6 is

25 permanently renovated, the patients in C5 will be moved over to C6.  Defendants will then begin the

26 permanent fix of C5, which they anticipate taking at least five to six weeks.  After that, and assuming

27 defendants can license the unit, they will begin yet another slow admission process of only five

28

[398241-1]

1   patients per week.  Although defendants intend to begin admissions into only one of the units (C5)

2   on September 21, 2010, they could not explain what the activation plan is for both units, or when

3   they will be fully occupied with patients.  Assuming five patient admissions per month based on

4   defendants' tentative schedule, however, means that C5 and C6 will not be fully occupied, in the best

5   case scenario, until May of 2011, nearly two years from the date this Court approved the C5/C6 plan.

6   Moreover, at the point defendants are ready to move the C5 patients into C6, there will only be about

7   45 to move (five patient admissions per week between September 21, 2010, and November 19, 2010,

8   or for nine weeks).  Mr. Westin acknowledged that if they renovated only a single pod (of the three

9   pods) in each building at a time, renovations could be done in C5 and C6 with patients housed in the

10  other two pods.  Meanwhile, defendants have no plans at all, and no funding, to fix the exact same

11  fire suppression sprinkler problems in other housing units throughout SVSP.

12      9.      On March 29, 2010, this Court held a status conference with the parties and the

13  Special Master's team in order to discuss the recently completed Mental Health Assessment and

14  Referral Project (MHARP), which resulted in hundreds of additional referrals of patients for ICF and

15  acute care.  As a result of the MHARP, for instance, the waitlists grew to 574 male patients awaiting

16  ICF care and another 64 male patients awaiting acute psychiatric services.  Docket 3831 at 2-3

17  (3/31/10 Order).  The Court noted that "the size of the wait lists suggests that the short-term bed

18  projects that have and will come on line will not be sufficient to eliminate the wait lists for inpatient

19  care…[and] defendants' long-term bed projects will not be activated for three years."  *Id.* at 3.  As a

20  result, the Court ordered defendants to meet with the Special Master in order to "develop a plan to

21  reduce or eliminate the wait lists for inpatient care and, in the interim, to better serve the treatment

22  needs of *Coleman* class members placed on such lists."  *Id.*  Defendants were to file the plan within

23  120 days, or by July 29, 2010.  *Id.* at 4.

24      10.     On June 3, 2010, plaintiffs' counsel sent a letter to defendants and the Special

25  Master's team outlining various strategies defendants should use to comply with the Court's March

26  31, 2010 Order.  Plaintiffs' counsel urged specific actions regarding three main issues:  (1) ways to

27  address obstacles defendants face when trying to move patients to inpatient beds; (2) ways to bring

28

[398241-1]

1   inpatient or enhanced mental healthcare to patients in their existing locations, and; (3) steps

2   defendants could take to reduce the need for inpatient care.  A true and correct copy of plaintiffs'

3   June 3, 2010 letter is attached hereto as **Exhibit D**.  Plaintiffs did not receive any response to that

4   letter, but assume defendants will incorporate all necessary strategies in its court-ordered plan.

5   Defendants recently notified plaintiffs, however, that they were unable to submit the plan by the

6   Court's deadline.  The parties stipulated to a 120-day extension for defendants' plan, or until

7   November 26, 2010.  *See* Docket 3892.  This Court made that stipulation an order of court on August

8   4, 2010.  Docket 3894.

9       11.    Defendants requested additional time to develop a comprehensive plan to target the

10  extremely long waiting lists for inpatient care, and plaintiffs stipulated to an extension.  Plaintiffs did

11  so, however, only because defendants are under an ongoing obligation to decrease the waiting lists

12  even before they file their plan.  *See* Docket 3831 at 3 (3/31/10 Order requiring that defendants

13  "forthwith direct their attention to solving the ongoing, and growing, problem of the[] wait lists [for

14  inpatient care]").  To date, defendants have not informed plaintiffs' counsel of any steps they are

15  taking to reduce the waitlists or even bring enhanced care to the class members awaiting inpatient

16  care.  When plaintiffs asked defendants to at least accelerate admissions in C5 and C6, they refused.

17      12.    It is undisputed that patients lingering in alternative placements while they await

18  inpatient ICF care are subject to unacceptable risk.  Indeed, between September of 2009 and January

19  of 2010, two class members committed suicide while they lingered on the SVPP waitlist.  I know

20  about these class members because we received notification of their deaths, along with suicide

21  reports.  The information I provide here is based on the suicide reports.  One of the men was referred

22  to an ICF bed on September 4, 2009.  He killed himself on September 23, 2009 in an administrative

23  segregation unit at California Institution for Men (CIM).  Immediately before his death, he spent 28

24  days in an MHCB.  Clinicians discharged him from the MHCB to administrative segregation because

25  they were unable to transfer him to an ICF bed.  Upon discharge from the MHCB, he was placed in a

26

27

28

[398241-1]

holding cell for two hours, in a ZZ cell[1] for 16 hours, and then finally in an ASU single cell.  He killed himself 12 hours after he was placed in ASU.  Another class member was referred to ICF care on October 22, 2009 and lingered on the waitlist until he killed himself on January 13, 2010.  Before he was even referred to an ICF bed, he spent nearly two months in an acute bed.  DMH staff concluded at the end of his acute stay that he needed an ICF bed, but they could not move him to one given the shortage.  Instead, he was discharged to administrative segregation at California State Prison-Corcoran, moved in and out of MHCBs, and then eventually killed himself in ASU.  Defendants were never able to move either man to an ICF bed, moves that very well could have saved their lives.

13.      Although I am not attaching the underlying suicide reports regarding these two class members to this declaration, I will notify defendants' counsel of the names and CDCR numbers of the men we are referring to.  In addition, I sent an email to defendants' counsel on January 28, 2010 regarding the Corcoran suicide.  I informed defendants' counsel that I was writing about this particular suicide because it illustrated the "devastating impact of the inpatient bed shortages on CDCR prisoners requiring inpatient care."  I also asked defendants' counsel whether the inmate was evaluated as part of the ICF Pilot Program for possible referral to Atascadero State Hospital or the Vacaville ICF beds and if so, why he was not transferred to either program.  Defendants never responded to my email.

I declare under penalty of perjury under the laws of California and the United States, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on September 3, 2010.

*/s/ Jane E. Kahn*
Jane E. Kahn

---

[1] ZZ cells are "contraband watch cells" that defendants use as overflow placements when MHCBs, Outpatient Housing Units (OHUs), and Mental Health Ouapatient Housing Units (MHOHUs) are unavailable and filled with other people.  *See, e.g.,* Docket 3201 at 33.

[398241-1]

# EXHIBIT A

1 of 1

**Project:** Convert two buildings C yard to ICF-H (116 beds)
**Responsible Person:** Sharon Aungst
**Address of Resp. Person:** 501 J Street, Sacramento, California
**Location:** Salinas Valley State Prison
**Court ordered Timeline** 6/16/2010
**Update:** 7/1/2010

| Primary Tasks | Duration (Cal. Days) | Planned Start(*Date court ordered) | Actual Start | Planned Complete | Actual Complete | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|
| **Construction & Retrofit:** | | | | | | | | |
| Conversion of dining to Group rooms/yard separation fence | 82 | 12/21/09 | 12/21/09 | 06/30/10 | | Bill Westin, CSIII, I/WL (916) 255-3050 | Receipt of remaining materials for the fire alarm system and locksets. | Work effort is underway and on schedule to complete by 7/22/10. Concerns regarding the timely receipt of fire alarm materials and door hardware, including locksets. These orders could jeopardize the ability to meet the current completion date. |
| Training & Orientation | | 06/01/09 | 07/05/10 | 07/30/10 | | Vic Brewer, DMH (831)678-5661 | | |
| Receive Furnishings & Equipment | | 01/01/10 | 01/01/10 | 06/01/10 | | Vic Brewer, DMH (831)678-5661 | | 75% Received. (04-14-10) |
| Equipment & Furnishings - Installation | | 03/31/10 | 07/05/10 | 07/30/10 | | IDL | | |
| Coleman Federal Court Order - Activation | | 06/01/10 | 06/01/10 | 06/01/10 | | Vic Brewer, DMH (831)678-5661 | | |
| Employee Facility Orientation | | 06/01/10 | 07/05/10 | 07/30/10 | | Vic Brewer, DMH (831)678-5661 | | |
| Facility Inspections & SVPP Operations | | 06/01/09 | 08/02/10 | 08/03/10 | | Vic Brewer, DMH (831)678-5661 & SVSP | | |
| Group Schedules | | 05/10/10 | 05/10/10 | 06/01/10 | | Vic Brewer, DMH (831)678-5661 | | |
| Mentor Program | | 05/26/10 | 05/26/10 | 06/14/10 | | Vic Brewer, DMH (831)678-5661 | | |
| Identify Patients For Admission | | 05/01/10 | 05/01/10 | 05/30/10 | | Vic Brewer, DMH (831)678-5661 | | |
| State Fire Marshal Facility Inspections | | 7/15/10 | | 07/22/10 | | State Fire Marshal | Inspect facility; draft POC (if needed), submit POC; receive Certificate of Occupancy; SF850 initial approval, Complete Punch List | |
| **Following timelines based on Punch list completion and State Fire Marshall approval by 7/22/2010** | | | | | | | | |
| Self Certification | | 7/23/10 | | 8/9/10 | | Rick Traversi, FPCM | Self-Certification must accompany license application or license will not be issued. | |
| Equipment & Furnishing Installation | | 7/23/10 | | 8/24/10 | | Vic Brewer, (707)449-6597 | Install equipment and furnishings; dry erase boards, Dayroom TV, etc. | |
| Stock Facility | | 7/23/10 | | 8/24/10 | | Vic Brewer, DMH (831)678-5661 | | |
| DCHCS Licensing Inspection | | 8/10/10 | | 8/12/10 | | David Horch (916) 327-5072 | | Initial licensing preparaton |
| **Following timelines based on budgetary approval for DPH licensing staff to travel** | | | | | | | | |
| DCHCS Licensing Inspection | | 8/23/10 | | 8/25/10 | | David Horch (916) 327-5072 | | Final licensing preparation |
| Department Of Public Health (Licensing Inspection) | | 8/25/10 | | 08/27/10 | | David Horch (916) 327-5072 | | |
| Schedule Patients For Admissions | | 08/30/10 | | 08/30/10 | | Vic Brewer, DMH (831)678-5661 | Activation Sequence | |
| Patient Admissions (5 Admissions Per Week) | | 08/30/10 | | 01/31/11 | | Vic Brewer, DMH (831)678-5661 | | |
| Completion Certification to SM | | 08/30/10 | | 08/30/10 | | Sharon Aungst, DCHCS (916) 323-1580 | | |

# EXHIBIT B

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

# ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104-1823
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
SUMANA COOPPAN
LISA ELLS
MARK R. FEESER
SHIRLEY HUEY[3]
LESLIE C. MEHTA[4]
MARIA MORRIS[5]
THOMAS NOLAN
BLAKE THOMPSON
KENNETH WALCZAK[6]
AMY WHELAN
SARAH O. ZIMMERMAN[6]

August 6, 2010

<u>VIA EMAIL ONLY</u>

Debbie Vorous, Deputy Attorney General
1300 I Street
Sacramento, CA 95814

     Re:    *Coleman v. Schwarzenegger*,
           Policy Meeting Follow-up
           <u>Our File No. 0489-3</u>

Dear Debbie:

Plaintiffs write to follow-up on a number of issues that were raised during the July 29, 2010 policy meeting.

    1.    <u>P1 Construction Delay and Expanding Acute Waitlist.</u>

During the policy meeting, Defendants reported that the timeline for the completion of the P1 retrofit at CMF to acute beds has been further delayed to a March 2011 activation date. These beds were originally set for completion in February 2010. Docket 3592 at 11-12 (Defendants' Response to Ct's March 31, 2009 Order that Defendants File a Final Proposal to Meet the Remaining Short-Term, Intermediate and Long-range Bed Needs); Docket 3613 at 2:9-10 (June 18, 2009 Order approving Defendants' Bed Plan timelines.)

Defendants also reported the possibility of mitigating some of the increasing delay by six weeks through a small business bid route, but no commitment was made to go this route. No other options were discussed, despite the fact that these beds are now delayed more than a year past the activation date provided in Defendants' filed bed plan. At the same time, the number of patients waiting for an acute bed continues to grow.

We request that Defendants provide an updated report on how they plan to expedite this critical bed project and what efforts are being made to meet the treatment needs of the patients waiting for an acute bed today.

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE MARYLAND, MISSOURI, KANSAS AND CALIFORNIA BAR
[5]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[6]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

[391665-1]

Debbie Vorous
August 6, 2010
Page 2

      2.      <u>C5/C6 Patient Admissions</u>.

      Defendants reported a further delay in the "activation" of the C5/C6 ICF units, from August 30th to September 6th, although no explanation was provided. Defendants presented their plan for patient admissions, which will begin on September 6th, and will occur at a rate of 5 patients per week. Based on our calculations, these units will not be filled with the 116 patients until February 8th, <u>five months after the date of activation</u>. This is simply unacceptable given the number of patients lingering on the ICF waitlist.

      As discussed at the meeting, given the extreme emergency and the hundreds of patients waiting for these beds, DMH must move beyond "business as usual" and accelerate the admission of patients to these units. During the meeting, DMH acknowledged that they have failed to fully staff the units to accept more than 5 patients a week. At minimum, DMH should commit to 5 patients a week in each of the two new units—given the relative risks and harms, it may be appropriate to plan for 10 patients per week in each of the two units.

      **Given the urgency of this issue, we request that defendants provide a written response with a revised admissions schedule for these units no later than Friday, August 13th. Plaintiffs will delay filing a motion before Judge Karlton pending receipt of defendants' revised plan for C-5/C-6 admissions.**

      3.      <u>Co-Mingling EOP and 3CMS Prisoners in the new RJD EOP SNY Unit</u>.

      Defendants were unable to confirm that EOP and 3CMS prisoners would not be housed together in the same cells during the co-mingling period. Although the *Coleman* experts and Defendants assumed this would not occur, it was not supported by any memo or documentation. Plaintiffs request written confirmation through a memo from the Warden to the Facility Captain or Central Office to the Warden and Facility Captain that EOP and 3CMS prisoners will not be housed together in the same cells in the RJD SNY EOP program on Facility 3.

      4.      <u>Alternative Placements/Confusion over Program Guide Requirements</u>.

      Plaintiffs found the discussion during the Policy Meeting concerning the logging of alternative placements and referrals to MHCBs quite disturbing for several reasons.

      <u>First</u>, it became apparent that the logging of these alternative placements has simply become a local exercise and is not being utilized by CDCR Headquarters for the multiple purposes underlying the Court's Order: (1) careful monitoring of prisoners who require MHCB referral, but are placed elsewhere due to shortages and are then returned to their housing, and (2) the identification of "unmet need" for MHCBs through documentation of the numbers of alternative placements system-wide.

      <u>Second</u>, and more concerning, was the fact that the discussion revealed the acceptance, and perhaps, training by CDCR Clinical Leadership to local clinicians to use

[391665-1]

Debbie Vorous
August 6, 2010
Page 3

alternative placements (OHUs, MHOHUs, and other "alternative placements") for extended periods of time before even making an MHCB referral.  In fact, it appears that only a failed attempt to stabilize a patient after several days would be cause for an MHCB referral under this guidance (*e.g.*, clinicians should "think," because some can work with a patient in a MHOHU or some other alternative setting for a few days and "fix them up without notifying HC-POP; questioning by CDCR leadership of the requirement to refer or transfer if they "don't need to be there, if they are going to be rescinded.").

Defendants are redefining the Program Guide requirements and the many years of work with the CDCR MH Program to train on the importance of referring patients to an MHCB when the need is identified, even if the patient, due to the shortage of MHCB beds, is placed in an alternative setting, and may be stabilized several days later before a bed becomes available.  If the referral is not made, the need will never be captured, and clinical staff will again resort to make-shift treatment occurring in alternative "bad clinical beds."

The Program Guide is clear on these issues and must be used as the standard to guide clinicians in the field.  Chapter 1 clearly states that a patient requiring MHCB level of care must be transferred within 24 hours of referral.  PG, 12-1-16.  It does not say to admit a patient to an alternative placement for a few days and see if the clinician can stabilize him or her, and if not, then make the referral.

Chapter 10 of the Program Guide clearly states that when a patient has been admitted to the OHU for suicide risk assessment and has been "determined to require MHCB level of care, including Suicide Precaution and/or Watch, he or she shall be recommended for admission to that higher level of care.  The established timeframe for MHCB transfers is 24 hours from the time a physician or licensed psychologist determines the need for a MHCB."  PG, 12-10-12.  Chapter 10 defines "Suicide Precaution" as "when an inmate is in an MHCB because of high risk of attempting self-injurious behavior but is not in immediate danger, he or she shall be placed on Suicide Precaution."  PG, 12-10-16.

Despite this clear language and direction, CDCR Clinical Leadership made multiple statements during the Policy Meeting that they did not agree that all patients observed on Suicide Precaution in an alternative setting should be referred to an MHCB.  However, the Program Guide provides that a patient admitted to an alternative setting, such as an OHU, can only be observed there on suicide precautions or suicide watch consistent with Chapter 10.  And Chapter 10 clearly states that MHCB LOC includes Suicide Precaution.  PG, 12-10-12.  What type of training have local clinicians at prisons without MHCBs been given regarding the appropriateness of housing patients on suicide precautions in alternative settings?

We strongly object to the language used in the Policy Meeting regarding the use of alternative settings described above and are quite concerned that there has been training

Debbie Vorous
August 6, 2010
Page 4

or communication to clinicians in the field which contradicts the Program Guide standards. We request confirmation that this has not occurred and that this is not current CDCR policy. This issue should also be addressed by defendants and the Special Master in the ongoing effort to reduce suicides in the system.

       5.      <u>Receiver's New Policy reflecting DNR Update</u>.

       During the Policy Meeting (and in a communication the next day from the Special Master team) we were informed that there have been modifications to the Receiver's Emergency Response Policy, which respect to DNR orders and suicide attempts. We request a copy of this updated policy. What is the plan to disseminate the new policy to the Field?

       6.      <u>Use of Handcuffs and Waist-Chains in DMH Facilities</u>.

       Defendant DMH reported that DMH patients are handcuffed and put in waist-chains in the SVPP program. (Plaintiffs did not inquire about the VPP programs, although we understand that cuffing and, possibly waist-chains, are also used in these programs.) During the discussion, Defendants reported that these restraints are used when patients are first admitted to the program, until they go through an ICC review, regardless of their previous housing and/or level of aggression. DMH described the restraints as "custodial," not clinically-ordered restraints. We remain somewhat confused by this differentiation, as SVPP is an intermediate care facility, under a CTC license and governed by the provisions of Title 22. Specific provisions within Title 22 cover the use of clinical restraint, treatment restraint and clinical seclusion. *See*, Sections 79511, 79513, 79577. In addition, Chapter 5 of the Program Guide sets forth requirements for the use of restraints in the crisis beds located in the CTC and GACHs, which conform to the licensing standards. Chapter 6, however, sets forth no standards for use of restraints nor does the new Draft ICF MOU.

       Plaintiffs request DMH/CDCR's written policy and procedure for use of restraints, including waist-chains within the SVPP and, if applicable, the VPP programs. Once we have received the policy and procedures, we will provide a separate letter setting forth the basis for our objections to the use of these restraints within these licensed units.

[391665-1]

Debbie Vorous
August 6, 2010
Page 5


       We would appreciate a timely response to Items 1-6 above.  Please feel free to contact me with any questions.

                               Sincerely yours,

                               ROSEN, BIEN & GALVAN, LLP

                               */s/ Jane E. Kahn*

                           By: Jane E. Kahn

JEK:amc
cc:    *Coleman* Co-counsel
       *Coleman* Special Master Team
       Michael Stone, CDCR Legal

EXHIBIT C

**Jane E. Kahn**

| | |
|---|---|
| **From:** | Jane E. Kahn |
| **Sent:** | Wednesday, August 25, 2010 4:44 PM |
| **To:** | Debbie Vorous |
| **Cc:** | Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team |
| **Subject:** | Defendants' Response to Plaintiffs' Request re C5/C6 Admissions |

Dear Debbie:

On August 6, 2010, almost three weeks ago, Plaintiffs sent a letter to Defendants setting forth a number of concerns, including Defendants' current plan to admit only 5 patients per week to the ICF program opening in C5/C6 at Salinas Valley State Prison.  During the July 29th policy meeting, Defendants first informed us that the activation of these critically needed beds would be delayed from August 30th to September 6th, although no explanation was provided.  In response to our request that at least 10 patients be admitted per week, in light of the SVPP waitlist of close to 500 patients, Defendants made no commitment at the policy meeting.

We requested a response by Friday, August 13th, but received none. You asked us to give Defendants an additional few weeks, until August 25th, to respond.  We have done so. Defendants have still not provided any response whatsoever.

Please indicate by 6:00 pm tonight whether Defendants will commit to admitting at least 5 patients per week in each of the two new units, for a total of at least 10 patients per week in C5/C6, beginning on September 6.  As we have indicated, balancing the risks and benefits, 10 patients per week in each of these two units, a total of 20 per week, could certainly be justified.  We will seek such an order from the Court if required to file a motion.

Assuming that defendants do not have a substantive response, this is also a request that defendants agree to an order shortening time given the urgency of this issue.  We propose the following schedule: Plaintiffs' moving papers:  Friday, August 27; Defendants' Opp:  Sept 1; Reply:  Sept 3:  Hearing:  Sept 7.

Sincerely,

Jane Kahn


ROSEN, BIEN & GALVAN
315 Montgomery Street, Tenth Floor
San Francisco, CA  94104
Telephone:  415/433-6830
Fax:  415/433-7104
jkahn@rbg-law.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# EXHIBIT D

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

## ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104-1823
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
SUMANA COOPPAN
LISA ELLS
ELIZABETH H. ENG
MARK R. FEESER
SHIRLEY HUEY[3]
LESLIE C. MEHTA
MARIA MORRIS[4]
ANITA NABHA
THOMAS NOLAN
BLAKE THOMPSON
KENNETH WALCZAK[5]
AMY WHELAN
SARAH O. ZIMMERMAN[5]

June 3, 2010

VIA EMAIL ONLY

Matthew A. Lopes, Jr.                         Debbie J. Vorous
Special Master                                Deputy Attorney General
Pannone Lopes Devereaux & West                P.O. Box 944255
317 Iron Horse Way, Suite 301                 Sacramento, CA 94244-2550
Providence, RI 02908                          Debbie.Vorous@doj.ca.gov

     Re:   *Coleman v. Schwarzenegger*
            Our File No. 489-3

Dear Matty and Debbie:

     We understand that in response to the Court's March 31, 2010 Order, Defendants and the Special Master and his experts have been meeting to "develop a plan to reduce or eliminate the wait lists for inpatient care and, in the interim, to better serve the treatment needs of *Coleman* class members placed on such lists." Docket 3831 at 3:19-20.

     In our view, the Plan must address (1) obstacles to moving patients on the waitlist to the appropriate beds (whether it is SVPP, lower custody level ICF, community hospital placements); (2) ways to bring the inpatient care or augmented care to the patients in their existing locations while they wait for transfer to an appropriate bed; and (3) steps that can be taken to reduce the need for inpatient care within this population. We will discuss these issues more fully below.

### Goal # 1:  Maximize use of empty lower security DMH beds

     In the March 2010 DMH data, there were close to 500 patients on the SVPP waitlist and almost 90 on the APP waitlist, yet at the same time there were empty beds at DMH-Vacaville and Coalinga State Hospital. Defendants currently plan to activate only 116 temporary ICF and 32 acute beds in the next three years. The mismatch between custody levels of the patients and the beds must be addressed in a serious manner.

     A.   Review Custody Barriers to Admission with custody experts:  Bring in a Coleman expert or an outside custody expert who the Warden, A/W, and DMH

[1] MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2] OF COUNSEL
[3] MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4] MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5] MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

[377762-1]

Matthew A. Lopes, Jr.
Debbie J. Vorous
June 3, 2010
Page 2

administrators will respect, to evaluate the current custody barriers to the programs and sort out the necessary from unnecessary ones. What is the basis for each barrier? Does the restriction or barrier originate with DMH or CDCR? Can the barrier be addressed with structural or programmatic adjustments designed to address custodial issues (doors, alarms, fences, etc.) Can it be addressed with additional custodial staffing, direct observation, use of MTA's, etc.?

      B.      <u>Review clinical barriers with clinical experts</u>: What is the issue? Is it a lack of medical services? If so, this needs to be addressed with the Receiver. Is it an ADA issue (wheelchair)? If so, it should be addressed.

      C.      <u>Ongoing SVPP Pilot Review</u>: Bring in additional custodial experts to work on pilot project of reviewing patients on the Wait List for security issues. Eliminate all blanket exclusions (as is true with medical care) based on underlying crime, points, gang status, etc. Use assumption that 8th Amendment requires prompt access to care and that, if SVPP is full, defendants must make appropriate security arrangements for ASH, Coalinga, Patton or CMF ICF by adding custody staff, etc. The Wait List should include more custodial information about each patient.

      D.      <u>Listen to the custody people currently working with the WL prisoners</u>. The custody people (c/os, sgts, ltns, captains, and CCs) are impacted when people linger in their units at the wrong level of care. Defendants should listen to their custody staff and factor in the custodial harms caused by allowing these patients to stay where they are. Change isn't the only thing that has a custody impact; tolerating the status quo also has an impact.

      E.      <u>Utilization Management</u>: Defendants should assess whether any of the patients currently in the DMH high security programs could be moved to lower security settings, in light of their behavior in the program, or any decisions regarding modifications to the Pilot Program criteria. That is, as patients improve, do they become stable enough to complete their ICF treatment at ASH or Coalinga? It may be that their security issues resolve once they become mentally stable.

**Goal # 2: Maximize use of existing higher security DMH beds at CMF and SVPP**

      A.      <u>Focus on improved use of APP beds and high security SVPP beds</u>, with efforts to cut down on extra wasted patient days due to delays caused by transportation, documents, lack of beds to discharge to, etc. By addressing these issues, more patients are provided with care and fewer beds are ultimately needed. Patients who do not clinically require hospitalization should be promptly discharged.

      B.      <u>Utilization Management</u>: length of stay for some programs is far in excess of program standards. Reducing length of stay can increase access to these beds for other patients.

[377762-1]

Matthew A. Lopes, Jr.
Debbie J. Vorous
June 3, 2010
Page 3

1.      Begin aggressive program of utilization management.

2.      Establish a QA process (follow cases that are discharged) so that system can learn from process.

C.      Discharge:  patients ready for discharge must be discharged within 24 hours from APP program.

1.      Waitlist data shows 43 patients occupying APP beds waiting for high security ICF beds.

2.      Establish, on an emergency basis, a step down unit at CMF for these patients to get them out of APP beds.

3.      Transfer these patients directly to Coalinga or ASH and add additional clinical and/or custodial staff necessary to provide appropriate security.

**Goal #3:  Reduce Demand for Inpatient Services**

A.      Patients drop off the Wait Lists because they parole (20 patients paroled off the SVPP WL in March 2010).

B.      Theory:  These patients are likely to recidivate at a high level through parole violations or new charges and return to the WL.  This issue was discussed, for example, at the recent SQ exit.

C.      Focus resources on pre-release planning, benefits applications, etc. for this population group.  Follow up on the cases to see what happens.  Use UCLA contracts that are already studying some or all of these programs (TCMP).

D.      Some of the prisoners on WL can actually drop off earlier if community placements are found (*Valdivia/Coleman* crossover MIS patients).  That is, if an appropriate community placement (including hospitalization) could be found, BPH would release from prison for placement in the community or DMH.

E.      Listen to the Parole Agents with the EOP caseloads.  What do they say they need in order to keep the paroled-from-the-WL people from just cycling right back in?

F.      Listen to the Parole Outpatient Clinic line clinicians.  Same question as above: what do they say they need to keep the paroled-from-the-WL people from just cycling right back in?

G.      What do other states do to prevent this sort of cycling?  Bring in the Council of State Governments reentry experts.  http://www.csg.org/programs/ policyprograms/justicecenter.aspx.  Bring in Texas Council on Offenders with Mental Illness.

[377762-1]

Matthew A. Lopes, Jr.
Debbie J. Vorous
June 3, 2010
Page 4

H.    For certain patients, use the Director's power under Penal Code Section 2974 to place about-to-be-paroled non-MDO/SVP prisoners who meet the LPS criteria in a state hospital in lieu of release on parole.

I.    Discharge patients from DMH <u>only</u> to prisons which offer mental health treatment at the level of care they need.  Revise "psych and return" procedures, if necessary.

## Goal #4:  Expand Inpatient Bed Options

A.    Contract for additional psychiatric beds and placements in the community.

B.    If necessary, bring additional security to the hospital (as is done for medical care).

## Goal #5:  Bring Psychiatric Services to Patients on WL

A.    <u>Care to the Patient</u>:  Assuming that timely access cannot be achieved for a significant number of patients on the WL, CDCR and DMH must bring mental health services to the patient.

B.    <u>Waitlist management</u>:  More effectively prioritize the waitlist to admit patients who are the most acute or who might have other time sensitive needs (paroling soon).  Re-examine existing priorities, periodically review the list, and establish a process for local institutions to provide updates.

C.    <u>Create Enhanced EOP program or DMH Day Treatment programs</u> with 20 hours a week of treatment, at prison locations where large populations on the APP/ICF waitlists currently reside.  CDCR/DMH's own data provides a blueprint for where these enhanced programs should be located. (*See* Chart of the SVPP/APP Waitlist Data, using March 2010 Monthly DMH Bed Utilization Report Data, attached hereto.)

[377762-1]

Matthew A. Lopes, Jr.
Debbie J. Vorous
June 3, 2010
Page 5


       These are our initial ideas for your meetings.  We hope that they are fruitful.  We are continuing to explore the community option and will provide you with any additional information that we locate.  Please feel free to contact us with any questions.

                                         Sincerely yours,

                                         ROSEN, BIEN & GALVAN, LLP

                                         */s/ Jane E. Kahn*

                                    By:  Jane E. Kahn

JEK:amc
Encl:  SVPP/APP Waitlist Chart
cc:     Coleman Co-counsel
       Special Master's Team
       Gregory Gomes, Deputy AG
       Michael Stone, CDCR Legal
       Rae DeLong, CDCR Legal



Institutional Distribution of Patients on SVPP and Acute Waitlist

| | SAC | CMF | LAC | COR | SVSP | CIM | RJD | CMC | KVSP | CCI | WSP | PBSP | MCSP | SQ | SOL | HDSP | NKSP | DVI | SATF | PVSP | ASP | SCC | CTF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # of Patients on Acute Waitlist | 24 | 12 | 1 | 4 | 7 | 1 | 1 | 5 | 4 | 0 | 2 | 6 | 10 | 1 | 2 | 1 | 7 | 0 | 2 | 2 | 0 | 1 | 0 |
| % of Total Acute Waitlist | 26% | 13% | 1% | 4% | 8% | 1% | 1% | 5% | 4% | 0% | 2% | 6% | 11% | 1% | 2% | 1% | 8% | 0% | 2% | 2% | 0% | 1% | 0% |
| # of Patients on SVPP Waitlist** | 91 | 75 | 37 | 34 | 32 | 27 | 27 | 26 | 22 | 21 | 21 | 18 | 11 | 9 | 6 | 6 | 4 | 4 | 4 | 3 | 2 | 2 | 1 |
| % of Total SVPP Waitlist | 19% | 16% | 8% | 7% | 7% | 6% | 6% | 5% | 5% | 4% | 4% | 4% | 2% | 2% | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 0% | 0% |

**Institutional Distribution**

*( Source: "Monthly Bed Utilization Report for DMH Hospitals and Psychiactric Programs*
*March 1, 2010 Through March 31, 2010")*

*The total number of patients on the SVPP waitlist is 483 and the total number of patients on the Acute waitlist is 83. An additional 20 patients on the SVPP waitlist paroled before they were transferred.

**43 of the 75 patients at CMF on the SVPP waitlist are housed in acute beds.