EDMUND G. BROWN JR.
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
DEBBIE J. VOROUS, State Bar No. 166884
GREGORY G. GOMEZ, State Bar No. 242674
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Debbie.Vorous@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM P |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR AN EVIDENTIARY HEARING REGARDING THE SALINAS VALLEY STATE PRISON C5/C6 PROJECT** |
| v. | |
| **ARNOLD SCHWARZENEGGER, et al.,** | |
| Defendants. | |

1

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

| Acronym List | |
|---|---|
| **Term** | **Definition** |
| **CDCR** | California Department of Corrections and Rehabilitation |
| **CSH** | Coalinga State Hospital |
| **DMH** | California Department of Mental Health |
| **DSFM** | Deputy State Fire Marshall |
| **EOP-GP** | Enhanced Outpatient Program-General Population |
| **ICF** | Intermediate Care Facility |
| **IDTT** | Interdisciplinary Treatment Team |
| **SFM** | State Fire Marshall |
| **SVPP** | Salinas Valley Psychiatric Program |
| **SVSP** | Salinas Valley State Prison |

2

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

**INTRODUCTION**

On September 3, 2010, Plaintiffs filed an emergency motion for an evidentiary hearing regarding Defendants' mental health bed project to convert two buildings (C-5 and C-6) on the Salinas Valley State Prison C yard to 116 Intermediate Care Facility high-custody beds (C-5/C-6 Project). Plaintiffs argue that an evidentiary hearing is necessary to: (1) understand the construction delays to the C-5/C-6 Project, understand what Defendants have done to mitigate the delays, and explore other means to mitigate the delays; and (2) understand why the Department of Mental Health (DMH) cannot accelerate the number of inmate-patients that it admits to the C-5/C-6 Project; that is, increase admissions from five inmates-patients per week to ten inmate-patients per week. (Docket No. 3907.) Additionally, because of the current number of high-custody inmate-patients on the wait lists for Intermediate Care Facility (ICF) and Acute levels of care at the Salinas Valley Psychiatric Program (SVPP) located at Salinas Valley State Prison (SVSP), Plaintiffs ask for an evidentiary hearing to evaluate and accelerate Defendants' court-ordered plan for those inmate-patients. (*Id.*)

An evidentiary hearing is unnecessary and will not provide the Court with any information the Court does not already have. Defendants presented evidence both previously and through the concurrently-filed declaration of CDCR employee William Westin that specifically describes the unanticipated and unavoidable construction issues that arose only after Defendants presented the C-5/C-6 Project in their bed plan. Defendants also present evidence of their efforts to mitigate the delays, evidence of what Defendants are doing to complete the C5/C6 Project, and the State Fire Marshall's conditions for occupancy. Additionally, the concurrently-filed declarations of DMH employees Cynthia A. Radavsky and Victor Brewer show why safety concerns prohibit DMH from accelerating admissions to C-5/C-6 as well as respond to Plaintiffs' suggested strategies to accelerate admissions. Lastly, with respect to the inpatient waitlists, the Plaintiffs stipulated to the additional time to respond to this Court's order regarding those waitlists. An evidentiary hearing now, on a process that is underway with the Special Master and incomplete at this time,

///

3

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

runs contrary to Plaintiffs' stipulation, and is premature and unnecessary.  Thus, Defendants request that the Court deny Plaintiffs' motion for an evidentiary hearing.[1]

**BACKGROUND**

Defendants have made exceptional gains in this case, particularly in the last three years. With respect to Defendants' bed planning efforts, the State authorized billions of dollars in bond financing to construct prison beds for the Plaintiff class.  The State also worked with the Special Master and the Receiver in *Plata* to develop a comprehensive mental health bed plan, which Defendants submitted to this Court on May 26, 2009.  (Docket No. 3592.)  The plan was comprised of short-term, intermediate, and long-range plans.  On June 18, 2009, this Court approved Defendants' short-term and intermediate-term proposals, but declined to approve Defendants' long-range mental health bed plan.  (Docket No. 3613.)  Defendants submitted a November 2009 long-range plan as well as a February 18, 2010 plan to provide 70 female Enhanced Outpatient Program-General Population (EOP-GP) beds at Central California Women's Facility and a May 13, 2010 amended Stark plan.  (Docket Nos. 3724, 3805, 3845, 3885.) Defendants await final approval of their long-range mental health bed plans for the 70 female EOP-GP beds and for the amended Stark plan.

Defendants, in consultation with the *Coleman* Special Master, identified the Navigant Consulting Fall 2008 Population Projections for Fiscal Year 2008/09 as the appropriate point in time to use in developing their short-term and intermediate-term proposals to meet the bed needs

---

[1] The Plaintiffs also baldly assert that "[w]ithout a substantial reduction in the overcrowded prison population, defendants' mental health bed construction plan will fall short of the ongoing and growing demand for specialized mental health beds." (Docket No. 3907 at 8:8–10.)  And "[b]ecause it will take years for defendants to build or convert necessary mental health facilities, and because population reduction measures have not been implemented, the Coleman class must rely on defendants' short and intermediate-term plans as an interim solution to relieve a small portion of the severe shortages." (*Id*. at 8:10–13.)  These arguments are irrelevant here. The three-judge court proceeding is currently on appeal in the U.S. Supreme Court.  Further, the relief ordered by the three-judge court was stayed by that court, and is not at issue in Plaintiffs' motion.  Additionally, Defendants anticipate that their long-range mental health bed plan will meet the needs of the Plaintiff class.  In any event, reducing the prison population will not assist the Plaintiff class waiting for ICF high-custody beds.  As demonstrated by the C-5/C-6 Project, considerable resources, time, and effort are required to put in place an inpatient ICF facility.  Not only must the facility be renovated, it must meet Title 22 licensing requirements.  Reducing the general inmate population does not equate to creating additional ICF beds for high-custody inmates.

4

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

of the Plaintiff class members. (Docket No. 3610 at 9:16–22.) With respect to the issues raised by Plaintiffs in their motion, Defendants, in order to implement a solution for the ICF high-custody population as quickly as possible and to meet the Navigant Consulting Fall 2008 Population Projections for Fiscal Year 2008/09, developed three short and intermediate-term proposals for the ICF high-custody population: (1) increase capacity by 116-beds in the SVPP; that is, the C-5/C-6 Project; (2) add 4 cells to the SVPP D-5/D-6 program; and (3) pilot double bunk 10 cells at the SVPP TC-2 unit for an additional 10 beds. (Docket No. 3592 at 8–9; Docket No. 3744.)[2]

These three proposals for ICF high-custody beds created 130 new beds, while the Navigant Consulting Fall 2008 Population Projections for Fiscal Year 2008/09 reflected a need for 129 more beds. (Docket No. 3544 at 87.) Moreover, in April 2009, the average SVPP ICF wait list for the high-custody population was 141—a number that fairly aligned with Defendants' May 26, 2009 short-term and intermediate-term bed plan. (Brewer Decl. ¶ 2.)

The second and third ICF high-custody bed projects are completed. (Docket No. 3828 at 8.) The first project—the C-5/C-6 Project—required modification of the physical plant because CDCR had to convert the existing housing units to operate as existing high-custody ICF beds; thus, Defendants did not expect to implement this project until 12 months after the Court approved it. (Docket No. 3592 at 12–13.) Though Defendants' May 26, 2009 plan does not specifically identify in what order DMH expected to implement the C-5 and C-6 units or how many inmate-patients it expected to admit per week, SVPP has historically admitted five inmate-patients into its ICF high-custody bed programs. (Brewer Decl. ¶ 3.) Here, the Court ordered that

---

[2] Defendants' long-range bed plan includes two projects for male ICF high-custody beds: (1) 64-bed ICF project at California Medical Facility (*see* Docket No. 3845–2 at 12–13 reflecting revised activation date starting on October 14, 2011 and ending on December 23, 2011) (*c.f.* Plaintiffs' Motion at 6 n.2 indicating a start date of 11/27/12); and (2) 432-bed ICF project as part of the California Health Care Facility (Docket No. 3794–2 at 3–4 reflecting activation starting on March 13, 2013 and ending on December 8, 2013). Defendants developed their long-range bed plan to meet the Navigant Consulting Spring 2009 Population Projections for Fiscal Year 2013. (Docket Nos. 3592 at 7, 3724–2 at 7–8.) The two long-range projects for ICF high-custody beds, combined with current program capacity and returned capacity, meet the Navigant Consulting Spring 2009 Population Projections for the Fiscal Year 2013, which is 624 ICF high-custody beds. (*See* Docket No. 3724–2 at 58; Docket No. 3845–2 at 15.)

5

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

the "C5 and C6 units at Salinas Valley shall be completed on the schedule proposed by defendants so that, upon completion, they are substantially similar to the D5 and D6 units when all construction is completed in said units in July 2009." (Docket No. 3613 ¶ 3.b.) DMH activated D-6 in May 2006 and continued to admit inmate-patients at the rate of five per week into that unit until it was filled in November 2006, and activated D-5 in December 2006 and continued to admit inmate-patients into that unit at the rate of five per week until it was filled in April 2007. (Brewer Decl. ¶ 3.)

## CONSTRUCTION OF THE C-5/C-6 PROJECT

The cell modifications in C-5/C-6 were completed on April 16, 2010. (Westin Decl. ¶ 5.) However, issues found during a peer review process required additional design documents that delayed the procurement processing for key materials required for the C-5/C-6 Project. (*Id; see also* Docket No. 3841–2 at 4 notification to the Special Master indicating a need to change the existing doors, the Group Room ceiling construction, and fabrication and delivery for the doors). On April 20, 2010, Defendants informed this Court that this change resulted in an estimated 7–8 week delay in obtaining the license and activating the facility, which moved the implementation date to August 2010. (Docket No. 3841.) Defendants also informed this Court that the original delay in implementing the project was 10 weeks, but that the California Department of Corrections and Rehabilitation (CDCR) was able to mitigate the delay by 3 weeks. (Docket No. 3841–2; *see also* Westin Decl. ¶ 5.) Thereafter, Defendants provided Plaintiffs with the schedule for the C-5/C-6 admissions, which reflected an August 2010 activation date. (Docket 3908 at 10.)

CDCR completed the C-5/C-6 project on July 28, 2010, and on July 29, 2010, the Deputy State Fire Marshall (DSFM) completed a site inspection and issued a "Beneficial Occupancy" certificate. (Westin Decl. ¶ 6.) The Beneficial Occupancy certificate allowed DMH to start its Licensing process, but not admit inmate-patients. (*Id.*) There were two items to complete in order to acquire full occupancy: (1) labeling of the New Group Rooms; and (2) installing back-ordered batteries for the exit lights. (*Id.*)

///

6

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

1         On July 29, 2010, the *Coleman* Special Master held an "All Parties Meeting."  During that
2  meeting, CDCR informed the parties that due to the further unanticipated issues with the C-5/C-6
3  Project, the activation date had been moved to the week of September 6, 2010.  (Docket No. 3907
4  at 9:15–18*; see also* Westin Decl. ¶ 6.)
5         On August 9, 2010, SVSP officials informed CDCR that the fire suppression systems that
6  cover the cell areas in C-5/C-6 were not holding the required air pressure within their constituent
7  pipes due to corrosion that had created pin-hole leaks in the pipes.  (Westin Decl. ¶ 7.)  The
8  DSFM issued a "Correction Notice" to fix this problem.  (*Id.*)  SVSP's maintenance staff started
9  making repairs to the system by replacing piping that had corroded from the inside out.  (*Id.*)
10 Additionally, CDCR met with representatives from CDCR Health Care Services, SVSP, Inmate
11 Ward Labor, DMH, and the DSFM to discuss the fire suppression issue and to develop a plan to
12 address it.  (*Id.*)  After reviewing the status of the system, the DSFM indicated that she would
13 allow temporary occupancy if the fire suppression systems in C-5 and/or C-6 could be made
14 operational, but only if she was provided with a clearly defined time line for complete
15 replacement of the fire suppression systems in both housing units, including converting from dry
16 to wet systems.  (*Id.*)  The consensus at that time was that the best approach was to allow SVSP's
17 maintenance staff to complete the repairs in C-5 so that the DSFM could allow Temporary
18 Occupancy and it could be activated as soon as possible. (*Id.*)
19        SVSP maintenance staff worked to put in place a temporary fix in C-5 in order to obtain
20 clearance from the DSFM to occupy that unit.  (Westin Decl. ¶ 8.)  Additionally, CDCR Inmate
21 Ward Labor Program developed a change order to put in place a permanent fix for C-5 and C-6
22 that would, to the extent possible, minimize the delay in activating both housing units. (*Id.*)
23        On August 25, 2010, the DSFM inspected C-5 and C-6 and tested the fire suppression
24 system in C-5.  (Westin Decl. ¶  9.)  The testing of the individual fire suppression systems in C-5
25 A, B, and C Pods resulted in only C Pod being approved for "Temporary Occupancy."  (*Id.*)  The
26 DSFM  provided written notice stating that:  (1) once "Temporary Occupancy" was granted for
27 C-5, that it would be good through November 30, 2010; (2) the C-6 fire replacement project shall
28

7

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

be completed and approved by the SFM by November 30, 2010; and (3) the C-5 fire suppression replacement project shall be completed and approved by the SFM by January 31, 2010. (*Id.*)

Additionally, on August 25, 2010, Defendants informed the *Coleman* Special Master that CDCR had discovered leaks in the fire suppression systems in the C-5 and C-6 units, that testing was occurring, and that CDCR and DMH expected delays in activating the C-5/C-6 Project. (Vorous Decl. ¶ 2.)[3] The DSFM retested the fire suppression systems in the A & B Pods on August 26, 2010, but A Pod again failed. (Westin Decl. ¶ 10.) That same day, Defendants' counsel, Plaintiffs' counsel, and the Special Master discussed the leaks, the ongoing testing, the expected delays, and the steps that CDCR had considered to fix both C-5 and C-6. (Vorous Decl. ¶ 4.) On August 27, 2010, Defendants provided the Special Master with written notice of the additional delays in completing the C-5/C-6 Project. (Docket No. 3903–1.) Defendants informed this Court of the delays on August 30, 2010. (Docket No. 3903.) The DSFM retested A Pod on August 31, 2010, and granted DMH Beneficial Occupancy for C-5, but found the emergency exit lighting in the Group Room areas deficient. (Westin Decl. ¶ 10.) The schedule was therefore adjusted to September 21, 2010, to reflect this setback. (*Id.*)

Defendants met with the Special Master and Plaintiffs' counsel on September 1, 2010, to explain the fire suppression issue, CDCR's approach to repairing the systems, and remedies to mitigate delays. (Docket No. 3907 at 9:23–10:13; Westin Decl. ¶ 11.) On September 2, 2010, the DSFM re-inspected C-5 and granted "Temporary Occupancy" in C-5 and to all support areas through November 30, 2010, and requested updated plans to replace the fire suppression systems in C-5/C-6 and to move the inmate-patients between C-5 and C-6. (Westin Decl. ¶ 12.) The DSFM has extended the "Temporary Occupancy" in C-5 to December 10, 2010. (*Id.*)

---

[3] On that same date, Defendants' counsel conveyed to the Special Master that DMH could not agree to accelerate the C-5/C-6 admissions to ten inmate-patients per week as Plaintiffs' counsel demanded due to safety concerns, and that Defendants' counsel intended to convey this response to Plaintiffs' counsel in writing. (Vorous Decl. ¶ 3.) Defendants' counsel, at the Special Master's request, delayed responding to Plaintiffs' counsel in writing pending an opportunity to discuss the C-5/C-6 Project with Plaintiffs' counsel, which occurred the next day—August 26, 2010. (*Id*. ¶ 3.) During the August 26, 2010 conversation, Defendants conveyed the reasons why DMH could not agree to accelerate admissions in C-5 and C-6. (*Id.* ¶¶ 3–4.)

8

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

Defendants are working with the DSFM to complete the replacement of the fire suppression systems in C-5/C-6 and to move the inmate-patients between C-5 and C-6. (Westin Decl. ¶ 13.) Defendants currently expect that the full activation and repair will occur according to the following schedule:

- September 21, 2010: start admitting inmate-patients to C-5;
- October 4, 2010: start replacement of fire suppression system in C-6;
- November 18, 2010: complete replacement of fire suppression system in C-6;
- November 19, 2010: gain occupancy of C-6 by the DSFM;
- December 10, 2010: complete certification and licensing of C-6;
- December 4, 2010 to December 10, 2011: transfer inmate-patients from C-5 to C-6;
- December 13, 2010: start replacement of fire suppression system in C-5;
- January 12, 2011: complete replacement of fire suppression system in C-5;
- January 14, 2011: gain occupancy of C-5 by the DSFM; and
- January 18, 2011: DMH to start admitting inmate-patients to C-5.

(Westin Decl. ¶ 13.)

**ARGUMENT**

**A.  The Court Should Deny Plaintiffs' Request for an Evidentiary Hearing to Address the Unanticipated Construction Delays that Defendants Currently Face in Activating C-5/C-6 Because a Hearing Will not Provide the Court with any Information the Court Does Not Already Have.**

Plaintiffs request that this Court order that Defendants produce at an evidentiary hearing numerous CDCR and DMH employees responsible for the construction of C-5/C-6 and the SFM in order to address the unexpected construction issues that Defendants currently face in activating C-5/C-6. (Docket No. 3907 at 15:21-16:1.) Because ordering an evidentiary hearing will not further aid the Court in understanding the delays and/or provide any additional mitigation measures, Defendants respectfully request that the Court deny Plaintiffs' motion. In addition, because the SFM is not a party to this case, has no notice of these proceedings, and has not been afforded an opportunity to respond, it would be improper to order that Defendants produce the SFM at an evidentiary hearing.

9

1  Plaintiffs request that CDCR and DMH employees be prepared to testify to seven subject
2  areas. (Docket No. 3907 at 16:3–18.) Responses to the first three subject areas—specific
3  construction delays that exist; what Defendants have done to mitigate those delays; and what
4  Defendants are doing moving forward—have already been provided either through filings to this
5  Court or in the declaration of William Westin filed concurrently with this opposition. (Docket
6  No. 3907 at 16:3–7.) Specifically, SVSP found that the fire suppression system in C-5/C-6 was
7  leaking, SVSP maintenance staff made temporary repairs to the pipes in C-5, and Defendants are
8  working to complete the replacement of the fire suppression systems in C-5/C-6 and the
9  movement of inmate-patients between C-5 and C-6 as expeditiously as possible. (Westin Decl. ¶¶
10 7–13.) Producing CDCR and DMH employees at an evidentiary hearing to once again address
11 these subject areas will not assist the Court to further understand the delays, what Defendants
12 have done to mitigate the delays, and/or what they are doing moving forward.

13 Plaintiffs' fourth subject area relates to Court waivers and a request that the SFM explain
14 what waivers he or she would need in order to open the units as soon as possible. (Docket No.
15 3907 at 16:8–10.) The Defendants have already identified here what issues they must correct
16 before activating the project. And as Defendants have stated repeatedly in this litigation, the State
17 should not be required to request waivers of State law. This Court previously, and appropriately,
18 placed this burden on the Plaintiffs, and they have never requested such waivers. (Docket No.
19 3868 ¶ 4.)

20 The last three subject areas focus on potential alternatives to replacing the fire suppression
21 systems in C-5 and C-6. (Docket No. 3907 at 16:10–17.) Plaintiffs suggest that Defendants
22 admit inmate-patients into one or two pods of the three pods in C-5 and/or C-6 while they
23 complete construction on only one pod. (*Id.* at 16:11–13.) This approach will likely increase the
24 duration of the construction schedule. (Westin Decl. ¶ 14). Thus, the current schedule is the most
25 efficient manner in which to address the fire suppression issue and allow activation of the two
26 housing units in the quickest manner possible. (*Id.*)

27 Plaintiffs also question whether the permanent renovations are necessary. (Docket No.
28 3907 at 16:14–15.) Those criticisms are equally unfounded. The DSFM has conditioned

10

1  occupancy on a "permanent fix" of C-5/C-6.  (Westin Decl. ¶¶ 7, 9.)  Last, Plaintiffs suggest that
2  the fire safety risk could be addressed by "other means."  (Docket No. 3907 at 16:16–17.)  Like
3  with the above-requirements, the DSFM has conditioned occupancy on CDCR replacing all the
4  pipes in C-5/C-6.  (Westin Decl. ¶¶ 7, 9.)  Defendants have fully explained these construction
5  issues and could provide no further information in an evidentiary hearing.

6      In summary, ordering that Defendants produce CDCR and DMH employees to attend and
7  testify at an evidentiary hearing will not further aid the Court in understanding the construction
8  delays and/or providing any additional mitigation measures.  All of the information in this regard
9  is included in this opposition and in concurrently-filed declarations.

**B.  The Court Should Deny Plaintiffs' Request for an Unnecessary Evidentiary Hearing to Explain Why The Department of Mental Health Cannot Accelerate the Number of Inmate-Patients that it Admits Into C-5/C-6.**

12      Plaintiffs request that this Court order that Defendants produce at an evidentiary hearing
13  DMH employees to testify as to why DMH cannot accelerate the number of inmate-patients that
14  the department admits into C-5 and C-6.  (Docket No. 3907 at 17:4–11.)  The Court should deny
15  Plaintiffs' motion because producing the relevant DMH employees for an evidentiary hearing will
16  not further aid the Court in understanding why DMH cannot accelerate admissions.

17      Plaintiffs request that DMH staff be prepared to testify to seven subject areas.  Four of the
18  subject areas (first, second, sixth, and seventh) essentially raise the same issue; that is, the
19  premise behind DMH's plan to admit five inmate-patients per week and why DMH cannot
20  accelerate that number to ten per week.  (Docket No. 3907 at 17:13–17, 18:2–6.)  The SVPP has
21  historically admitted five inmate-patients per week, including admissions to D-5 and D-6.
22  (Brewer Decl. ¶ 3.)  This admission rate has assured that the inmate-patients received appropriate
23  treatment upon admission to the various programs.  (*Id.*)  Additionally, this Court ordered that
24  DMH activate C-5/C-6 consistent with the D-5/D-6 programs, and DMH admitted five inmate-
25  patients per week in that program.  (Docket No. 3613 ¶ 3.b.)  Nonetheless, DMH is sensitive to
26  the increased need for ICF high-custody beds and remains committed to accelerate admissions
27  whenever possible.  (Brewer Decl. ¶ 4.)
28  / / /

11

1 However, from a safety and security perspective, DMH cannot increase admissions in the C-5/C-6 Project to ten inmate-patients per week. It is essential that SVPP meet all requirements under Title 22, Chapter 12, regarding required Interdisciplinary Treatment Team (IDTT) appointments and that it provide patient programming of between 35 and 40 hours per week during the activation process. (Brewer Decl. ¶ 5.) Title 22 requirements include a 72-hour IDTT, 10-day IDTT, and every 30 days thereafter. (*Id.*) With an increase of admissions to ten inmate-patients per week, the entire complement of professional, clinical, and nursing staff will be focused on intake, the development of the individualized treatment plan, attending to patient crises, housing, feeding, and medication administration. (*Id.*) Under this scenario, the inmate-patients will be locked in the housing pods without having the benefit of DMH programming and/or yard time. (*Id.*)

The safety and security issues for inmate-patients being placed on constant cell restrictions are abundant: patients may withdraw their consent to treatment without having received care; the availability of custody staff to ensure safety and security is reduced given that staff will be primarily escorting individual inmate-patients to either IDTTs or Institutional Classification Committees; inmate-patients may decompensate; and inmate-patients may become violent and/or act out toward staff, other inmates, or themselves. (Brewer Decl. ¶ 6.) On the other hand, releasing the inmate-patients to group or yard without adequate available clinical or escort staff, creates in and of itself a safety risk to not only staff but to the inmates. (*Id.*)

Additionally, physical plant limitations prohibit DMH from increasing admissions to ten inmate-patients a week. (Brewer Decl. ¶ 7.) With a focus on individual inmate-patient contact, the activities will be held in the treatment rooms of C yard dining areas. (*Id.*) There are three rooms available for interviews and IDTTs. (*Id.*) DMH cannot admit ten inmate-patients a week and ensure confidentiality given this limited treatment space. (*Id.*)

Plaintiffs' third subject area relates to Plaintiffs' belief that DMH can shift staff from Coalinga State Hospital (CSH) to the SVPP C-5/C-6 Project. (Docket No. 3907 at 17:17–19.) There are two primary reasons why DMH cannot shift staff from the 50-bed unit at CHS to expedite C-5/C-6 admissions. The first primary reason is due to how DMH staffs its mental

12

hospitals. (Radavsky Decl. ¶ 5.) The California Legislature allocates DMH a certain number of "established" positions to run CSH—it does not allocate DMH a certain number of "established" positions to provide care for the *Coleman* class members. (*Id.*) In the absence of a need for CSH's ICF low-custody beds, DMH had to either redirect the staff that were assigned to the *Coleman* beds or lose those "established" positions. (*Id.*) DMH redirected the staff. (*Id.*) In response to the Court's June 18, 2009 Order that DMH consider transferring non-*Coleman* inmate-patients at Atascadero State Hospital (ASH) to CSH, DMH activated a new 50-bed Mentally Disordered Offender unit at CSH and admitted non-*Coleman* patients transferred from ASH. (*Id.*) CSH redirected some of the staff previously assigned to the *Coleman* beds to the new 50-bed Mentally Disordered Offender unit. (*Id.*)

The second primary reason why DMH cannot simply shift staff from CSH to the C-5 and C-6 bed project at SVSP is because DMH does not have the ability to relocate staff from CSH to SVSP. (Radavsky Decl. ¶ 6.) CSH and SVSP are not even located in the same community. (*Id.*) CSH is located in Coalinga while SVSP is located in Salinas—a distance of approximately 100 miles. (*Id.*) Demanding that clinical staff move from Coalinga to Salinas Valley is not only unrealistic it could likely subject DMH to legal action. (*Id.*)

Plaintiffs' fourth subject area is: "Why defendants cannot pull staff from other units, or hire new staff, to accelerate admissions." (Docket No. 3907 at 17:20–21.) Experienced staff will be integrated into C-5 to provide a mix of new and experienced staff in the new unit as part of the transition plan implemented over the past two months. (Brewer Decl. ¶ 8.) To further increase the number of experienced staff to accelerate admissions would be clinically inappropriate and it would be unduly disruptive to the clinical relationship between the treatment teams and their patients. (*Id.*) DMH requested and received funding for staffing for the C-5/C-6 Project based on admitting five inmate-patients a week over an extended period of time. (*Id.*) DMH has and continues to hire staff for the C-5/C-6 Project based on its position authority. (*Id.*) Given this fiscal climate, it is unrealistic to expect that DMH could receive emergency funding to increase staff solely in order to accelerate activation from five to ten inmate-patients a week, particularly where their services would only be required during the activation phase.

13

Plaintiffs' fifth and last subject area relates to moving more stable inmate-patients into C-5 from other DMH programs. (Docket No. 3907 at 17:22–25.) This is implausible. Clinicians cannot be moved with their inmate-patients because the clinical teams assigned to the housing units in other DMH programs are not a 1:1 match. (Brewer Decl. ¶ 9.) Therefore, the transfer of inmate-patients from D-5, D-6, TC-1 and TC-2 to C-5 could not be facilitated without fundamentally disrupting the treatment teams' therapeutic relationship with their patients and would be clinically inappropriate. (*Id.*) Additionally, the vast majority of inmate-patients in SVPP are from Psychiatric Services Units or Administrative Segregation Units and represent a significantly greater risk of violence than the inmate-patients from the EOP-GP that have been identified for admission into C-5. (*Id.*) Because there is currently a shortage of Medical Technical Assistants, SVPP must admit the lowest custody inmate-patients for the protection of both the inmate-patients and staff. (*Id.*) Moreover, admissions in D-5, D-6, TC-1, and TC-2 combined, average 20 inmate-patients per week. (*Id.*) Creating more bed space in an existing unit through transfer to C-5 would produce the same admission pressures in that unit that DMH would encounter by accelerating admissions into C-5. (*Id.*)

Thus, because producing the relevant DMH employees for an evidentiary hearing will not further aid the Court in understanding why DMH cannot accelerate admissions, the Court should deny Plaintiffs' motion. All of the information in this regard is included in this opposition and in concurrently-filed declarations.

**C.   The Court Should Deny Plaintiffs' Request for an Evidentiary Hearing on Ways to Accelerate Defendants' Court-Order Plan Concerning the Inpatient Wait Lists.**

Plaintiffs argue that because of the growing wait list for inpatient care for ICF high-custody and Acute inmate-patients, an evidentiary hearing is necessary to evaluate Defendants' plan to reduce or eliminate that list and determine ways to accelerate it. (Docket No. 3907 at 18:7-19:22.)[4] But Defendants are working with the Special Master to finalize their plan to reduce or

---

[4] On March 31, 2009, this Court ordered that CDCR and DMH work with the Special Master and his experts to conduct a modified assessment to determine whether there were unmet needs for inpatient care among members of the Plaintiff class. (Docket No. 3556 at ¶ 7.) The assessment started in April 2009 and ended in December 2009. (Docket Nos. 3825–1, 3838.) It covered all 28 non-desert institutions. (*Id.*) The SVPP ICF high-custody wait list for April 2009 (continued…)

14

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)

eliminate these wait lists, and Plaintiffs and Defendants stipulated to extend the time line to submit their plan to no later than November 26, 2010. (Docket Nos. 3831, 3894.) The Court should, therefore, reject Plaintiffs' suggestion that the Court now order an evidentiary hearing to evaluate Defendants' unfinished plan and ways to accelerate it, pending an opportunity for Defendants and the Special Master to put this process in place.[5]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' motion for an evidentiary hearing.

Dated: September 16, 2010

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of California

/s/ *Debbie J. Vorous*

DEBBIE J. VOROUS
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

---

(…continued)
averaged 141 while the wait list in December 2009 increased to an average of 520. (Brewer Decl. ¶ 10.) The wait list for July 2010 averaged 482. (*Id.*)

[5] Plaintiffs also argue that, absent the wait list, the move of two men to ICF high-custody beds could "very well have saved their lives." (Docket No. 3907 at 14:5–21.) But Plaintiffs' counsel are not experts and their testimony on mental health care is inadmissible. Fed. R. Evid. 702, 703.

15

Defs.' Opp'n to Pls.' Mot. for an Evid. Hearing  (2:90-cv-00520 LKK JFM P)