EDMUND G. BROWN JR.
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
DEBBIE J. VOROUS, State Bar No. 166884
GREGORY G. GOMEZ, State Bar No. 242674
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 324-5345
  Fax: (916) 324-5205
  E-mail: Debbie.Vorous@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants. | 2:90-cv-00520 LKK JFM P <br><br> **DECLARATION OF VICTOR BREWER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR AN EVIDENTIARY HEARING REGARDING THE C5/C6 PROJECT AT SALINAS VALLEY STATE PRISON** |

I, Victor Brewer, declare:

1. I am the Executive Director of the Salinas Valley Psychiatric Program (SVPP) at Salinas Valley State Prison (SVSP) and employed by the California Department of Mental Health (DMH). I have personal knowledge of the facts stated in this declaration and if called to testify to those facts, could and would do so competently. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Emergency Motion for an Evidentiary Hearing Regarding the C5/C6 Project at Salinas Valley State Prison.

1

2. As the Executive Director of the SVPP, I oversee the completion and activation of Defendants' short, intermediate, and long-range construction bed projects involving DMH at SVSP, including the Defendants' mental health bed project to convert two buildings (C-5 and C-6) on the SVSP C yard to 116 Intermediate Care Facility (ICF) high-custody beds (C-5/C-6 Project.) In April 2009—the month before Defendants submitted their proposal for the C-5/C-6 Project, the average SVPP ICF wait list for the high-custody population was 141.

3. The SVPP has historically admitted five inmate-patients per week into its ICF high-custody bed programs at SVPP. For instance, DMH activated D-6 in May 2006 and continued to admit inmate-patients at the rate of five per week into that unit until it was filled in November 2006, and activated D-5 in December 2006 and continued to admit inmate-patients into that unit at the rate of five per week until it was filled in April 2007. This admission rate has assured that the inmate-patients received appropriate treatment upon admission to the various programs.

4. I am familiar with Plaintiffs' request that the Defendants testify at an evidentiary hearing regarding why DMH cannot accelerate the number of inmate-patients per week; that is, from five inmate-patients per week to ten inmate-patients per week. I am sensitive to the increased need for ICF high-custody beds and remain committed to accelerate admissions whenever possible. With respect to the C-5/C-6 Program, however, I have determined that, from a safety and security perspective, DMH cannot increase admissions to ten inmate-patients per week.

5. It is essential that SVPP meet all requirements under Title 22, Chapter 12, regarding required Interdisciplinary Treatment Team (IDTT) appointments and provide patient programming of between 35 and 40 hours per week during the activation process. Title 22 requirements include a 72-hour IDTT, 10-day IDTT, and every 30 days thereafter. With an increase of admissions to ten inmate-patients per week, the entire complement of professional, clinical, and nursing staff will be focused on intake, the development of the individualized treatment plan, attending to patient crises, housing, feeding, and medication administration. Under this scenario, the inmate-patients will be locked in the housing pods without having the benefit of DMH programming and/or yard time.

2

6. The safety and security issues for inmate-patients being placed on constant cell restrictions are abundant: patients may withdraw their consent to treatment without having received care; the availability of custody staff to ensure safety and security is reduced given that staff will be primarily escorting individual inmate-patients to either IDTTs or Institutional Classification Committees; inmate-patients may decompensate; and inmate-patients may become violent and/or act out toward staff, other inmates, or themselves. On the other hand, releasing the inmate-patients to group or yard without adequate available clinical or escort staff creates in and of itself a safety risk to not only staff but to the inmates.

7. Additionally, physical plant limitations prohibit DMH from increasing admissions to ten inmate-patients a week. With a focus on individual inmate-patient contact, the activities will be held in the treatment rooms of C yard dining areas. There are three rooms available for interviews and IDTTs. DMH cannot admit ten inmate-patients a week and ensure confidentiality given the limited treatment space.

8. It is my understanding that one of the subject areas that Plaintiffs request that DMH produce employees to testify regarding is why DMH cannot pull staff from other units, or hire new staff, to accelerate admissions. Experienced staff will be integrated into C-5 to provide a mix of new and experienced staff in the new unit as part of the transition plan implemented over the past two months. To further accelerate the number of experienced staff to accelerate admissions would be clinically inappropriate and it would be unduly disruptive to the clinical relationship between the treatment teams and their patients. DMH requested and received funding for staffing for the C-5/C-6 Project based on admitting five inmate-patients a week over an extended period of time. DMH has and continues to hire staff for the C-5/C-6 Project based on its position authority.

9. It is my understanding that another of the subject areas that Plaintiffs request that DMH produce employees to testify regarding is why DMH cannot move more stable inmate-patients into C-5 from other DMH programs. There are several reasons why it would be inappropriate to do this. First, clinicians cannot be moved with their inmate-patients because the clinical teams assigned to the housing units in other DMH programs are not a 1:1 match.

3

Therefore, the transfer of inmate-patients from D-5, D-6, TC-1 and TC-2 to C-5 could not be facilitated without fundamentally disrupting the treatment teams' therapeutic relationship with their patients and would be clinically inappropriate. Second, the vast majority of inmate-patients in SVPP are from Psychiatric Services Units or Administrative Segregation Units and represent a significantly greater risk of violence than the inmate-patients from the Enhanced Outpatient Program-General Population (EOP-GP) that have been identified for admission into C-5. Because there is currently a shortage of Medical Technical Assistants, SVPP must admit the lowest custody patients for the protection of both the inmate-patients and staff. Third, admissions in D-5, D-6, TC-1, and TC-2 combined average 20 inmate-patients per week. Creating more bed space in an existing unit through transfer to C-5 would produce the same admission pressures in that unit that DMH would encounter by accelerating admissions into C-5.

10. The SVPP wait list for ICF high-custody inmate-patients in April 2009 averaged 141 while the wait list in December 2009 averaged 520. The wait list for July 2010 averaged 482.

I declare under penalty of perjury that the foregoing is true.

Executed this 16th day of September, 2010, in Salinas, California.

*[signature]*
VICTOR BREWER

CF1997CS0003

4

Brewer Decl. in Supp. of Defs.' Opp'n to Pls.' Mot for an Evid. Hearing (2:90-cv-00520 LKK JFM P)