**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**


RALPH COLEMAN, et al.,

    Plaintiffs,

        v.                          **No. CIV S-90-0520 LKK JFM P**

ARNOLD SCHWARZENEGGER, et al.,

    Defendants



**SPECIAL MASTER'S REPORT ON DEFENDANTS' REVIEW OF SUICIDE**
**PREVENTION POLICIES, PRACTICES, AND PROCEDURES**

Matthew A. Lopes, Jr., Esq.
Special Master
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 317
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
September 27, 2010

# ACRONYMS

C-file:            Central File

CDC:               California Department of Corrections

CDCR:              California Department of Corrections and Rehabilitation

CPHCS:             California Prison Health Care Services

DAI:               Division of Adult Institutions

DCHCS:             Division of Correctional Health Care Services

DMH:               Department of Mental Health

EOP:               Enhanced Outpatient Program

HCPU:              Health Care Placement Unit

IDTT:              Interdisciplinary Treatment Team

MHCB:              Mental Health Crisis Bed

MHOHU:             Mental Health Outpatient Housing Unit

MHSDS:             Mental Health Services Delivery System

MHTS:              Mental Health Tracking System

MOD:               Medical Officer of the Day

OHU:               Outpatient Housing Unit

OIA:               Office of Internal Affairs

POC:               Psychiatrist on Call

POD:               Psychiatrist on Duty *or* Psychiatrist of the Day

QIP:               Quality Improvement Plan

QIT:               Quality Improvement Team

RN:                         Registered Nurse

SPRFIT:                     Suicide Prevention and Response Focused Improvement Team

SRA:                        Suicide Risk Assessment

SRAC:                       Suicide Risk Assessment Checklist

SRC:                        Suicide Review Committee

SRE:                        Suicide Risk Evaluations

UHR:                        Unit Health Records


(revised 9/27/2010)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.,

    Plaintiffs

      v.                        No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants


SPECIAL MASTER'S REPORT ON DEFENDANTS' REVIEW OF SUICIDE
PREVENTION POLICIES, PRACTICES, AND PROCEDURES

## I.    <u>Background</u>

The events culminating in this report began on September 17, 2009, with the

filing of the Special Master's Expert's Report on Suicides Completed in the California

Department of Corrections and Rehabilitation in Calendar Year 2007 ("2007 Suicide

Report"), by Raymond Patterson, M.D.  The report was the eighth of its kind by Dr.

Patterson, who has been reviewing and reporting annually on suicides that have occurred

among California Department of Corrections and Rehabilitation (CDCR) inmates since

late 1998.  Defendants moved to modify the report and objected to plaintiffs' request that

Dr. Patterson's recommendations be adopted as orders by the court, on the ground that

his recommendations did not meet the criteria for injunctive relief.  By this Court's order

entered November 23, 2009 (docket no. 3731), both defendants' motion and plaintiffs'

request were denied.  The Court stated that any requests for orders should come, if at all,

from the special master.  On December 24, 2009, the Special Master's Report and

Recommendations based on the 2007 Suicide Report was filed.  In that report, it was requested that orders be entered based on Dr. Patterson's recommendations.[1]  Defendants then objected to this request for orders, renewing their argument that the requests did not meet the criteria for injunctive relief as well as raising additional objections.

On April 14, 2010, the court entered an order (docket no. 3836) pointing out the decade-long history of the problems cited in the 2007 Suicide Report, the special master's recommendations in response to those problems, and the series of existing orders that had followed them.  The litany of recurring problems, recommendations, and orders, yet no discernible reduction in the number of suicides, highlighted the persistency of the suicide problem and the need for vigilance in eradicating it on a continuing basis.  The court decided to not adopt the special master's recommendations at that time, but rather ordered the defendants, under the guidance of the special master, to review all suicide prevention policies and practices, all suicide review and reporting processes, and the

---

[1] The recommendations were:

1. Defendants shall specifically identify inmates' known and/or suspected medical problems and medications within these inmates' mental health treatment plan, rather than merely allude to them by reference to other records.

2. CDCR and DMH shall communicate and collaborate with each other to ensure that the highest level of care provided by DMH to CDCR inmates is given to any inmate who has been determined to need it.

3. Defendants shall accord priority to access to inpatient care for CDCR inmates at DMH facilities, particularly for Level III and Level IV inmates.  This involves requiring clinical staff to properly assess suicide risk factors for inmates experiencing changes in mental health functioning, particularly on placement in administrative segregation or other single-cell housing.  A vital component of this process is appropriate crisis-level service in treatment settings such as MHCBs, or limited treatment within OHUs, until transfers to DMH facilities can be achieved.  DMH must be held accountable for its decisions on admission or rejections and cannot be permitted to avoid transparency behind a pretext of patient "confidentiality."

4. Defendants shall fully and timely implement the suicide prevention and review processes that are already in place, at both the institutional and department levels, and shall give this priority.  This includes incorporation of revised policy and procedural guidelines and court orders into these processes.  It also entails the identification of deficiencies at the facility and systemic levels, appropriate follow-up of corrective action plans, and submission of documentation to the Coleman special master on the outcomes of investigations of staff misconduct, negligence, and error.  This process must include not only training but supervision and appropriate supervisory action regarding staff performance.

implementation of such policies, practices and processes over the following 120 days.  As

part of that review, defendants were ordered to identify any and all specific modifications

to their prevention policies and practices, their suicide review and reporting processes,

and the implementation thereof as may be required to address the problem of inmate

suicides.  The DMH defendants were also ordered to meet and confer with the special

master concerning production of information essential to the special master's suicide

review process and to develop, if necessary, appropriate policies and procedures for such

production, during the 120-day period.  The Court noted the depth and urgency of the

problem of suicides among CDCR inmates and stated:

> The increase in both the inmate suicide rate and the percentage of suicide
> cases with "at least some degree of inadequacy in assessment, treatment,
> or intervention"[2] is deeply troubling.  The fundamental task at hand is for
> defendants to take all steps necessary to reduce both the inmate suicide
> rate and the inadequacies in assessment, treatment and intervention found
> in an unacceptably high percentage of completed suicides." . . . Before this
> court enters any further orders directed at the problems of inmate suicides,
> both the CDCR defendants and the DMH defendants will be directed to
> work with the special master to review all suicide prevention and review
> policies, as well as any other relevant policies and practices, and the
> implementation of policies at all institutions, and to identify any
> modifications to such polices and practices or implementation thereof that
> may be necessary to address the problem of inmate suicides.

Order, April 14, 2010 (docket no. 3836).

## II.    **The Process**

To carry out the court's order, I organized a work group made up of my deputy

Linda Buffardi, Esq.; my experts Raymond Patterson, M.D., Jeffrey Metzner, M.D., and

Kerry Hughes M.D.; and my monitor Haunani Henry (special master's work group).

This work group met in person with key representatives of the defendants on seven

---

[2] Referring to the 2007 Suicide Report: "In 82 percent of the suicide cases in 2007, there was at least some
degree of inadequacy in assessment, treatment, or intervention, for the highest rate of inadequacy in these
areas in the past several years."  *Id*. at 1.

occasions, beginning on May 18 and concluding on August 9.  These meetings were well-attended and included persons who were appropriately selected for the task at hand. They were also supplemented by three teleconferences that took place on July 19, August 12,  and August 25.

Before these meetings began, the Division of Correctional Health Care Services' Suicide Prevention and Response Focused Improvement Team (DCHCS SPRFIT) committee convened in May to review all policies, practices, and processes in the *Coleman* Program Guide (Program Guide) that relate to inmate suicides.  Then, representatives of CDCR and its Division of Adult Institutions, the Department of Mental Health (DMH), the *Plata*[3] receiver's office, and my work group began meeting to continue this review, identify concerns, decide whether any changes should be recommended to address those concerns, consider potential outcomes of any changes, and project timeframes for implementation of recommended changes.

To avoid redundancy or conflict with existing suicide prevention measures, the DCHCS SPRFIT reviewed all suicide prevention and response program actions that had already been taken between 2007 and 2010 in order to determine whether these measures had already addressed problems that were identified in Dr. Patterson's 2007 Suicide Report.  CDCR reviewed its October 2006 Plan to Address Suicide Trends in Administrative Segregation (Plan) to ascertain whether modification of that Plan or its implementation was needed.  It also reviewed the quality improvement plans (QIPs) which were created in response to all 37[4] suicides in 2008 and all 25 suicides in 2009, and the suicides which had already occurred as of that time in 2010.  CDCR concluded

---

[3] *Plata v. Schwarzenegger*, No. C 01-1351 TEH (N.D. Cal.).
[4] For calendar year 2008, my expert and CDCR disagree about whether one death was in fact a suicide. CDCR has taken the position that the total number of suicides in 2008 was 36.

that the suicide rate in administrative segregation remained a concern. Some parts of that Plan were not fully implemented or remained subject to ongoing audits and refinement.[5] Also, research indicated improper documentation of completion of 30-minute welfare checks and deficiencies in emergency response procedures. These findings prompted the formation of a multi-disciplinary work group to concentrate on improving working relations between custody and mental health.

In May 2010, the DCHCS SPRFIT organized its own work group made up of three institution-based mental health chiefs plus staff of the CDCR DCHCS (the chiefs' work group). This group solicited input from the mental health chiefs among CDCR institutions, reviewed it, and collated it by topical area. This compilation was then vetted through a best-practices exercise to determine which suggested strategies would be the most effective to address the problem of inmate suicides. Defendants then organized another work group among its CDCR Office of Legal Affairs, the Division of Adult Institutions (DAI), and mental health staff to work on improving communication and collaboration between custody and mental health staff (the DAI/mental health work group).

---

[5] Plan elements that Defendants acknowledge in their Report (*see* Exh. A, p. 9-10) are incomplete or in need of updating included:

- Provision of entertainment devices in all administrative segregation units where feasible;
- Additional modifications for housing inmates in retrofitted cells in administrative segregation for the first 72 hours of their stays;
- Refinement of auditing of 30-minute welfare checks during initial 21 days of stays in administrative segregation;
- Full implementation of priority for newly arriving inmates in administrative segregation having out-of-cell time;
- Reduction of lengths of stay in administrative segregation;
- Auditing of inmate refusals of screenings;
- Auditing of minimum stays of 60 days at the EOP level of care for inmates transferred to administrative segregation hubs;
- Transferring of inmate profiles when inmates are transferred between institutions; and
- Confidential treatment space for screenings post-placement in administrative segregation.

In the initial meetings of the special master's work group, the defendants identified a rather wide range of suicide prevention areas in need of improvement, and a broad variety of suggested tactics and innovations that were developed by the chiefs' work group process described above.  By the time of the third meeting, on July 7, defendants produced their initial draft of their strategic proposals and the first part of their proposed modifications to the Program Guide.  This initial draft suggested many creative and resourceful, albeit somewhat disjointed, approaches to the problem of inmate suicides.  My experts advised defendants to prioritize these ideas and focus their efforts on those accorded the highest rank.

By the time of the next meeting, on July 21, defendants identified the three top problem areas on which to focus improvement: (1) the elevated risk of suicide found in administrative segregation and other secured housing units, (2) management of the population of inmates who are at high risk for suicide, and (3) clinical competency of staff conducting suicide risk evaluations (SRE) of inmates/patients.[6]  Defendants refined

---

[6]Among the many other strategies that Defendants presented initially, there are meritorious ideas that may well be appropriate for consideration in the future.  These other strategies were:

- Continue training for clinicians regarding transference and counter-transference issues (including dealing with difficult patients, maintaining professional boundaries and improving distinctions between mental health functions in a correctional setting and correctional functions in a mental health setting);
- Promote a "culture of the whole" that includes custody, mental health, medical and other stakeholders in a prison setting (including improving the working relationship between custody and mental health and embrace custody colleagues as partners in treatment.);
- Evaluate how local mental heath programs can address the mental well-being of non-MHSDS inmates using a public health/education paradigm to promote wellness (i.e. groups, non-traditional approaches, etc.);
- Improve communication between the California Prison Health Care Services (CPHCS) (i.e. the *Plata* receiver's office) and DCHCS regarding chronic and serious medical issues, including end-of-life issues;
- Review policy of using suicide-prevention smocks for inmates in a mental health crisis bed (MHCB) unit;
- Explore general treatment issues such as the "continuity of care teams" utilized by San Quentin State Prison, and use of behavioral incentives in segregated housing as is done the in State of New York;
- Improve treatment plans for inmates being released from MHCBs; and
- Ensure appropriate follow-up on referrals from all sources, i.e. medical, custody, etc.

their proposal and produced a timely Report on Activities Taken Following the Court's April 14 Order ("Report") on August 12, and then updated it on August 25. (Exh. A).

In late August, defendants shared their Report with plaintiffs' counsel, and on September 1 they met with plaintiffs' counsel and the special master's work group.  The purpose of this interface with plaintiffs' counsel was to receive and discuss any input from plaintiffs on the directions proposed in the Report.

On September 8, 2010 plaintiffs' counsel provided me with a letter summarizing their position on defendants' Report as well as suggesting a variety of additional measures which they recommend to help reduce the number of suicides among CDCR inmates.  (Exh. B)  Defendants submitted to me their written reply to plaintiffs' letter on September 22.  (Exh. C).

## III.   <u>Defendants' Report</u>

In their Report, defendants identify specific modifications to the Program Guide and the implementation thereof as may be required to address the problem of inmate suicides.  They also identify three general categories to serve as the focal points for strategies to address this problem.  These three areas are: (1) change of conditions in administrative segregation units, (2) high risk inmate-patient management, and (3) clinical competency in the conduct of suicide risk evaluations.  Lastly, in response to that part of the court's April 14 order requiring DMH to develop appropriate policies and procedures concerning production of information to the special master, defendants also state in their Report that they are jointly developing an electronic secure website known as the SharePoint Site which will be used to facilitate collaboration, implement business

processes, and allow for sharing and producing information concerning inmate/patient

mental health care.

## A.    Defendants' Proposed Program Guide Modifications

Defendants reviewed the entire Program Guide for changes to improve suicide

prevention, response, and reporting functions.  Some of their recommended changes are

essentially semantical and were recommended in order to refine definition, meaning, and

consistency throughout the Program Guide.  The more substantive recommended changes

to the Program Guide are summarized as follows:

### 1.    Chapter 5, "Mental Health Crisis Bed"

#### a.    Suicide Risk Assessment Checklist

The former Suicide Risk Assessment Checklist (SRAC) has been changed to the

current Suicide Risk Evaluation (SRE), which, unlike its predecessor, requires a narrative

explanation of clinical rationale behind conclusions ergrding inmate suicidality/risk of

self-harm.  SREs may be administered only by a qualified mental health clinician

(defined as a psychiatrist, psychologist, clinical social worker, or psychiatric nurse

practitioner) who has been trained to conduct an SRE in a prison setting and who has

received the requisite proctoring on the administration of the SRE.  (PG p. 12-5-7, 12-10-

7 – 12-10-11)[7].

SREs, which are administered to patients before admission to an MHCB, will no

longer have to be automatically re-administered after admission. The SRE before

admission shall be utilized by the MHCB admitting clinician to determine the level of

suicide risk for treatment planning purposes.  (PG p. 12-5-8 – 12-5-9).

---

[7] Citations herein to Program Guide pages refer to the pagination utilized and cited by Defendants in their
Report, Exhibit A.

2.      **Chapter 10, "Suicide Prevention and Response"**

Historically there has been a demonstrated need for improvement in communication between CDCR headquarters and the institutions regarding the implementation of suicide prevention policies and strategies.  There have been discrepancies among the ways the institutions' SPRFITs have implemented these policies.  Defendants recommend that the DCHCS SPRFIT initiate quarterly meetings of the institutions' SPRFIT coordinators to improve communication between headquarters and institutions, and to standardize suicide reduction strategies.   (PG p. 12-10-2 – 12-10-4).

There has also been a lack of adequate collaboration among mental health, medical, and custody staff during reviews of inmate suicides, as well as lack of custody representation on local SPRFITs.  The present quorum requirement for SPRFIT meetings is so large as to make attainment nearly impracticable.  Defendants recommend a change in make-up of local SPRFITs to include the associate warden for health care or his designee, and the administrative segregation unit captain or his designee, in addition to mental health and medical/nursing staff.  They also recommend that a majority of the members shall constitute a quorum.  (PG p. 12-10-5 – 12-10-6).

Presently, health care staff other than mental health staff are not required to be trained in the conducting of SREs.  Defendants recommend that the training of non-psychiatric physicians be limited to screening for referral to mental health services and general warning signs of increased risk of suicidal behavior.  They further recommend that health care staff should be trained in appropriate referrals, warning signs of increased suicide risk, and how to use the SRE form to record gathered data for communication of

suicide risk information to mental health care providers.  Because of the importance of having only qualified staff conduct SREs to assure reliability, Defendants recommend that only a qualified clinician, i.e. a psychiatrist, psychologist, clinical social worker, or psychiatric nurse practitioner, may perform an SRE.  (PG p. 12-10-7 – 12-10-11).

The Program Guide currently states that if any CDCR employee becomes aware of an inmate's current suicidal ideation, threats, self-injurious behavior or suicide attempt, that inmate shall be placed under "direct observation" until a clinician trained to perform an SRE conducts a face-to-face evaluation.  Defendants recommend changing "direct observation" to "continuous direct visual observation."  (PG p. 12-10-7).

With regard to personnel who conduct suicide watches, defendants recommend revising the designation of such personnel to "health care staff or custody officer," and designating the guideline for suicide watch behavioral checks to "continuous observation and 15-minute nursing checks" in order to clarify that both means of checking behavior of suicidal inmates must be employed.  (PG p.12-10-16 – 12-10-19).

### 3.    Chapter 10, "Suicide Reporting"

Insofar as suicide review and reporting requirements, defendants recommend no changes to the existing Program Guide procedure or timeframes.  Defendants do acknowledge their history of missed timeframes for suicide reviews.  To rectify that, they implemented a number of ways to improve their suicide reports and to hasten suicide review completion times.  The DCHCS SPRFIT revised its process of tracking the suicide reporting process.  Staff created an individualized tracking tool which is sent to the suicide reviewer and the institutions to notify them of reporting due dates.  Additionally, CDCR will run quarterly workshops on suicide report writing.

The Program Guide requires that in cases of suicide review that call for investigation, the Office of Internal Affairs (OIA) must forward the outcome of its investigation to the DCHCS SPRFIT coordinator.  To minimize irregularity in receipt of OIA outcome reports, defendants now will send to the OIA the same notice of deadlines which is sent to the institutions for submission of their QIPs.

Historically, the institutions have been late with implementation of the QIPs, which are derived from reviews of completed suicides.  The Program Guide requires the institutions to ensure implementation of the QIPs within 60 days after receipt of the finalized executive summary of the CDCR suicide reviewer's report, with signature approval from the director of DCHCS.  The Program Guide then requires that local SPRFIT coordinators prepare a follow-up report on actions taken on the recommendations in the QIPs within 30 days after their implementation, and 90 days after receipt of the executive suicide report.  CDCR now adds a statement to the cover letter to the institutions that indicates the specific due dates for meeting the 60-day and 90-day timeframes, and urges the completion of the QIPs "as soon as possible" within the mandated deadlines.  CDCR has also designated a staff member to track and monitor the institutions' implementation of QIPs at the institutions.  (PG p. 12-10-26 – 12-10-28).

### B. Focus Areas for New Suicide Prevention Strategies

Defendants identified their top three focus areas for suicide prevention and their recommendations for strategies to address the problem of inmate suicides.  In their letter to me dated September 8, 2010, plaintiffs stated that they "have no objections to the three

strategies[8] developed by the CDCR workgroup in conjunction with the (s)pecial (m)aster and his experts."  (Exh. B., p. 5).

1.        **Change of Conditions in Administrative Segregation Units**

The rate of suicides within segregated housing units has dropped since 2006, but still has remained disproportionately high.  CDCR reports that the DAI/mental health work group has been working on improving conditions in administrative segregation units.  It is working on ways to improve systems for monitoring the institutions' compliance with Program Guide requirements, and improving communication between custody and mental health staff.  CDCR states that it intends to establish a regular quality management process in order to centralize policy making between the health care and custody divisions, thereby reducing the need for other processes and creating one centralized modality for CDCR to manage inter-divisional issues affecting the mental health population at the institutions.  DCHCS and DAI propose to create a new process for reporting from the institutions to headquarters whereby cross-division policy issues can be brought to a small group of policy makers who can respond with uniform and consistent decisions, and can provide clear policy direction to the field.  DCHCS and DAI propose to require that the institutions report to headquarters those issues that affect the operation of both divisions.  They report a projected update on this effort by mid-November 2010.

The DAI/mental health work group is also reported to be discussing an option to change conditions within the administrative segregation units to better meet inmates' mental health needs there.  They are looking at the feasibility of implementing a policy similar to the one used in the Pelican Bay State Prison Administrative Segregation Pilot.

---

[8] Discussed herein as items III B. 1, 2, and 3.

Specific steps to be taken by the work group are (1) discussion of the various components

of the Pelican Bay pilot program to ensure a mutual understanding of the specific ideas

being proposed; (2) discussion of any additional ideas to be considered; (3) creation of

lists of any potential foreseeable barriers, obstacles, or other difficulties in implementing

a statewide rollout of the project, as well as any specific concerns; and (4) present lists to

allow the work group to collaborate on methods of overcoming each potential obstacle

and still build a policy that can meet the needs and address the concerns of each

discipline.

While the changes described above sound promising and worthy of further

development, they are still largely in the planning stage.  It would be premature to

comment on their effectiveness or sustainability at this time.  Progress on these

innovations will have to be evaluated at a later time.

### 2.        High-Risk Inmate/Patient Management

This designation of this focus area is premised on the fact that there continues to

be a need for assessment for suicidality among inmates who display symptoms of serious

mental illness or past suicidal behaviors, statements, or ideation, i.e. inmates who are

deemed at high risk of suicide.  Defendants propose to develop a manner of identifying,

tracking, and treating such inmates.  Active management of their care will involve

ensuring continuity of care between mental health and medical care providers, and to

oversee delivery of services to these inmates to ensure the development of individualized

treatment protocols and consistency of treatment.

### a.   Identification of High–Risk Inmates

Work on identification of high-risk inmates will begin with CDCR headquarters' Utilization Management Team.  It is in the process of obtaining lists of inmates who have had multiple mental health inpatient admissions or who have frequently used mental health services.  A list will be based on and combined from data from both CDCR and DMH.  It will then be broken out into two groups.  One will be chronically mentally ill inmates who are at the EOP level of care and who have had multiple MHCB or DMH admissions.  Inmates in this category tend to be more prone to episodic decompensation and at baseline tend to be low-functioning.  The second group will be inmates who have chronic suicidal ideation or self-injurious behavior and who have had revolving DMH or MHCB admissions.  This information will then be analyzed to identify those institutions which have high users of DMH and MHCB services, and then suicide risk identification, tracking, and treatment programs will be created and piloted at those institutions.

Defendants report that either a high-risk coordinator (coordinator) will be appointed, or a crisis management/high risk team (team) composed of clinicians across disciplines will be established.  The program will not be limited to those inmates identified in the manner described above; any clinician may refer, using a form which will require a brief description of the reason for referral.  Referrals will be entered into a log or tracking system.  The program coordinator or staff will review the inmate's file, looking at suicide history, methods, and frequency of attempts, among other things, and identify relevant risk and protective factors.  When deemed appropriate, the inmate will be assigned to the high-risk program; if not appropriate, the reviewer will assess the inmate's need for a possible higher level of care.

**b.**      **Creation and Implementation of a High-Risk Program**

The coordinator or the team, as the case may be, will develop a High Risk Management Protocol for each inmate identified as high-risk.  This protocol will detail his history of development, criminal activity (including a description of the commitment offense and past offenses), substance abuse/dependence, violence, mental health, suicide attempts, family members' attempted or completed suicides, and diagnoses.  It will also include treatment recommendations and treatment management, including criteria for the inmate's exit from high-risk status.  Frequency of clinical contacts and IDTT meetings may be decided during case conferences.

The coordinator or team will communicate with appropriate clinicians whenever a new case manager has been assigned to a high-risk inmate, or the inmate has been moved into a different part of the institution for custody reasons.  Supervisory staff will be provided with a copy of the protocol to ensure continuity of care and reduce suicides.

The institutions may determine a process for the conduct of basic and comprehensive self-harm reviews.  These reviews will provide a mechanism by which clinicians can address clinical uncertainty in a peer review format. These reviews will also hopefully function as a teaching tool regarding treatment of high-risk inmates and will help identify systemic factors that may be contributing to suicide risk.  Use of these reviews for identified cases of suicide attempts will be promoted by the coordinator or the team.

3.      **Clinical Competency in Administering the Suicide Risk Evaluation**

The ability to evaluate an inmate's suicidality is the predicate to detection and timely intervention and ultimately to finally achieving a lasting solution to elevated rates of suicide among CDCR inmates.  The knowledge and skill that is required of a clinician to conduct a sound, reliable suicide risk evaluation is, appropriately, a high priority, if not the highest.  Defendants recommend implementation of a program to elevate competency levels in suicide risk evaluation, with the following features:

a.      A requirement that all newly-hired mental health clinicians (psychiatrists, psychologists, social workers, and psychiatric nurse practitioners) complete (face-to-face or remote) Program Guide training and participate in the most recent suicide risk assessment training for clinicians.

b.      A monthly suicide prevention videoconference (live or via intranet) provided to all clinicians.

c.      Weekly clinical supervision for unlicensed clinical staff.

d.      Proctoring of all newly-hired mental health clinicians on the proper use of the new SRE form, including direct supervision by an experienced clinician of one or more actual SREs.  Clinicians will not be considered qualified to conduct an SRE until and unless this requirement has been met.  Factors for being considered "qualified" will include a demonstrated ability to show:

- Data gathering (from the C-file, UHR, and collateral sources);
- Identification of risk and protective factors;
- Formulation of risk level;
- Clear rationale and justification for risk level, with focus on individual factors over a generic approach;
- Thoroughness of documentation;
- Clear identification of relevant concerns in the treatment plan; and
- Clear communication of evaluation of suicide risk to appropriate staff.

e.      Encouragement of the institutions' SPRFITs to disseminate information about intra-institutional suicide prevention developments to clinical staff in their institutions.  Material presented in SPRFIT meetings can be used to provide ongoing clinical discussion and quality improvement outside actual SPRFIT meetings.

19

      f.      Facilitation of ongoing clinical discussion by senior MHCB clinicians with other clinicians across treatment programs to facilitate dialogue and clinical discussion about difficult cases.

      g.      Encouragement of inclusion of suicide risk evaluation in institutional programs as a key indicator of clinical competence in peer review programs.

With regard to existing CDCR clinicians, defendants report that the staff at DCHCS suicide prevention and review and the chiefs' work group are developing a process for training them, and are considering an alternative process to "grandfather in" these clinicians without requiring them to undergo the training and proctoring process. Defendants acknowledge the importance of ultimately developing audit and monitoring tools to evaluate the efficacy of this approach.

## C.      DMH Information and Communication

CDCR and DMH reported that they are in the process of developing a secure website known as the SharePoint Site, via which they plan to address the court's order that they produce information that is essential to the special master's suicide review process. Defendants report that SharePoint will combine a number of capabilities under one service, including the supply of information between them on individual inmates' care. When fully operational, SharePoint is expected to also give DMH and CDCR access to, among other things, information on DMH referrals, DMH discharges, wait lists, and CDCR high-risk lists. In their letter to me dated September 8, plaintiffs state that they "do not know whether the SharePoint satisfies the special master and the Court's concerns or when or if it will be activated or fully implemented." (Exh. B., p. 6).

Because the SharePoint website is not yet developed and implemented, it would be premature to comment on its sufficiency to address the lack of communication of

DMH patient information. It remains to be seen whether the eventual use of this website

will not only provide a conduit for the flow of information to the special master's office

on completed suicides, but it will also support the long-standing need for effective

communication and collaboration between CDCR and DMH to better facilitate the care

of their mutual patients and hopefully avoid the occurrence of suicides among these

patients.  I recommend that defendants proceed as quickly as possible to implement and

refine this electronic tool, and that within 60 days they be required to demonstrate to me

and/or my designated staff members at a mutually convenient time the capabilities and

operation of the SharePoint website.

**IV.    Defendants' Interpretation of Program Guide Provisions Governing Use of
Outpatient Housing Units**

      With respect to the use of Outpatient Housing Units (OHUs)[9], Defendants

propose no written modification at this time to the OHU provisions in the Program

Guide.  They report that they are in the process of evaluating the role of OHUs in the

context of patient risk management, and that if they are going to propose any changes to

language on the OHU and/or MHCB sections of the Program to clarify any alleged

ambiguities or inconsistencies therein, they will present such changes to me with 45 days'

notice.[10]

---

[9] There is presently only one Mental Health Outpatient Housing Unit (MHOHU) which is a six-bed
unlicensed unit at Mule Creek State Prison.  Any references in this report to OHUs shall be construed to
include that MHOHU as well.

[10] In Defendants' Report, they highlighted the relevant Program Guide provision which they state is under
consideration for change.  It appears at pages 12-5-30-31, Part J. "Mental Health Patients in Outpatient
Housing Units":

    When an inmate is placed in the OHU for being potentially suicidal, a mental health clinician shall
    administer an SRAC at the times of placement and release.  On weekends, holidays, or after hours,
    the SRAC shall be administered by the MOD, POD, or RN trained on administration of the SRAC.
    Inmate-patients housed in OHU for suicide observation, who do not require MHCB level of care
    and who were discharged from the OHU before 24-hours, may be seen by clinicians and custody

It became apparent during the meetings of my work group with defendants that CDCR is interpreting and applying the Program Guide so as to currently use OHUs in at least some institutions in a manner that raises concern.  Defendants have indicated that they interpret pertinent Program Guide provisions to permit retention of potentially suicidal patients in the OHU and to allow for clinical discretion as to whether to comply with the 24-hour requirement for referral and transfer of seriously mentally ill patients in need of MHCB care from an OHU to an MHCB.  In their letter to me dated September 8, plaintiffs state that they "object to defendants' statements that the Program Guide permits the use of the OHU for patients requiring suicide precautions/suicide watch," and that they "remain quite concerned over the `training' that has been provided to clinical staff in OHU/MHOHU/alternative settings, who now think that retaining a patient in an unlicensed setting on suicide precaution/suicide watch is permitted within CDCR." They state that "CDCR central office should be required to cure the ambiguity they have created in the field." (Exh. B, p. 1-2)  Defendants replied that they are "continuing to evaluate the role of OHUs in the process of risk management" and that they will "agree to consulting with the (s)pecial (m)aster concerning the use of OHUs" and "to eliminate, as appropriate and/or necessary, any ambiguity and inconsistency in those (Program Guide) Chapters as related to the use of OHUs."  (Exh. C, p. 1-2).

In the estimation of my experts, the expanded use of OHUs, as described by defendants during the meetings, amounts to an extended stay for seriously mentally ill or suicidal patients in a setting that is not appropriate for their treatment or for conduct of suicide precaution or suicide watch.  Conduct of "observation" and "evaluation" in an

staff for follow-up care utilizing the process and timeframes described for MHCB suicide discharges, if clinically indicated.

OHU does not encompass conduct of suicide precaution and/or suicide watch, which require a higher level of care that is not available in an OHU but is available in a licensed facility such as an MHCB or intermediate or acute inpatient care in a DMH program.

The particular Program Guide language at issue appears to be the "observation and evaluation of behaviors that may be indicative of mental illness" and/or "inmates housed in OHU for suicide observation," which appears in the following portions of the Program Guide:

> When an inmate-patient requires ***observation and evaluation*** of behaviors that may be indicative of mental illness, a licensed mental health professional may document the need for placement of the inmate-patient into an Outpatient Housing Unit.

(PG p. 12-5-30, emphasis added).

> When an inmate is placed in the OHU for being potentially suicidal, a mental health clinician shall administer a SRAC[11] at the times of placement and release. On weekends, holidays, or after hours, the SRAC shall be administered by the MOD, POD, or RN trained on administration of the SRAC. ***Inmate-patients housed in OHU for suicide observation***, who do not require MHCB level of care and who were discharged from the OHU before 24-hours, may be seen by clinicians and custody staff for follow-up care utilizing the process and timeframes described for MHCB suicide discharges, if clinically indicated.

(PG p. 12-5-31, emphasis added)

Like statutes *in pari materia*, Program Guide provisions on the same subject matter should be construed together so that as a whole they are consistent with each other. The meaning and intent behind the terms "observation or evaluation" or "suicide observation" should be gleaned from reading these provisions in conjunction with other Program Guide provisions concerning OHUs and MHCBs, including the following:

---

[11] Suicide Risk Assessment Checklist.

**J.**      **Mental Health Patients in Outpatient Housing Units**

*      *      *

A physician or psychologist shall document the need for placement on a CDCR 7230, *Interdisciplinary Progress Note*, within 24 hours of placement.  ***Within 24 hours after placement each inmate-patient shall have an <u>evaluation</u>,*** including admission history and physical examination, for immediate care planning.  The Mental Health Evaluation shall be documented on a CDCR 7386, *Mental Health Evaluation*.

The patient shall receive an ***additional face-to-face <u>evaluation</u> by a mental health clinician or other qualified medical staff within 48 hours***. This contact shall be documented on a CDCR 7230, Interdisciplinary Progress Note.  ***If at any time during <u>this observation/evaluation</u> period it is determined that the inmate-patient requires inpatient care, arrangements shall be made to transfer the inmate-patient within 24 hours of the determination to a MHCB.  If evaluation of the inmate-patient's mental health need continues beyond 48 hours, arrangements shall be made to transfer the inmate patient to a MHCB or inpatient facility. Inmate-patients shall not remain in an OHU for more than 72 hours***.  The only exception to this 72-hour limit shall occur, on a case-by-case basis, only if both of the following criteria are met:

1.  The inmate-patient has been determined to need EOP level of care and is awaiting placement, and
2.  An IDTT determines that the inmate-patient may be at risk if returned to any of the housing units available at that institution while awaiting transfer.

*      *      *

***<u>Mental Health Conditions Appropriate for Placement into an OHU</u>***

1.  ***<u>Observation for Suicide Precaution or Suicide Watch</u>*** consistent with the CDCR Suicide Prevention and Response Project.
2.  Inmates who engage in behaviors that might be indicative of a mental disorder that interferes with daily living and requires further observation and evaluation.
3.  Inmate-patients who have been referred to an EOP or MHCB who are too ill or too vulnerable to be placed in the general population while waiting for transfer.

(PG p.12-5-30 – 12-5-32, emphasis added)

A reading of all of these provisions together indicates that the terms "observation"

and "evaluation" in the OHU refer to the assessment process that must take place within

the first 48 hours of the inmate-patient's placement in the OHU.  Notably, the terms

"observation" and "evaluation" are not used synonymously with either "suicide

precaution" or "suicide watch," signaling that "observation" and "evaluation" are

different from and not a substitute for either "suicide precaution" or "suicide watch."

Rather, "observation" and "evaluation" refer to the process by which clinical

determination shall be made within 48 hours of OHU placement as to whether the

inmate-patient requires transfer to a higher level of care and/or suicide precaution or

suicide watch.  Further, it is equally clear that once a determination has been made that

the inmate-patient needs a higher level of care, he shall be transferred to an MHCB

within 24 hours of that determination, and in no event shall the inmate-patient remain in

the OHU beyond 72 hours.

The foregoing construction of these terms is corroborated by other provisions

within the Suicide Prevention and Response sections of the Program Guide, such as the

following:

### Suicide Precaution and Suicide Watch

When clinically indicated, an inmate with active suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide Precautions or Suicide Watch.  These are methods used to provide a safe environment and prevent the inmate from harming him or herself or others.  Suicide Watch and Suicide Precaution procedures shall be a joint responsibility of custody and health care staff. A close working relationship shall be maintained between custody and health care staff to ensure the safety and security of the inmate.

***The preferred location to place an inmate on Suicide Precaution or Watch status is in the MHCB or in the OHU pending transfer to MHCB***. The use of Suicide Precaution or Suicide Watch in any non-medical location shall be a temporary, short-term approach until an inmate can be moved to an OHU or MHCB, and shall require constant direct visual observation.

* * *

Inmate-patients that are placed in an OHU for continued assessment of suicide risk, or in an MHCB for active suicidal ideation, threats, or attempt, shall have a note regarding progress toward the treatment plan goals and objectives recorded *daily*[12] by a treating clinician in the Interdisciplinary Progress Notes section of the UHR.

(PG p. 12-10-15, emphasis added)

This provision reinforces the requirement under the Program Guide for referral and transfer of any suicidal inmate to an MHCB for suicide precaution or suicide watch within 24 hours of determination of his need thereof.  Suicide precaution or suicide watch may need to occur within the OHU if an MHCB is not available, or pending transfer to an available MHCB, but such use of the OHU is disfavored, and should take place in an OHU only if no MHCB is available.

Since at least 2003, CDCR itself consistently communicated to its institutional leaders an interpretation of what constitutes approved use of OHUs that conforms to the intent of the Program Guide sections discussed above.[13]  The passages quoted below are

---

[12] Emphasis in original.

[13] *See e.g.* Exh. D, memorandum from the then-deputy directors of the CDCR Health Care Services Division and the Institutions Division, dated September 16, 2003, (emphasis added):

**HEALTH CARE PLACEMENT UNIT HOURS FOR MENTAL HEALTH CRISIS BED REFERRALS**

\* \* \*

***Once determination of a need for MHCB placement has been made***, the referring clinician shall make appropriate arrangements to have the inmate observed and monitored until the transfer to a MHCB has occurred.  The same shall take place if the need for a MHCB occurs after-hours (when HCPU staff are not available.)

\* \* \*

**SATURDAY/SUNDAY/HOLIDAY MHCB REFERRAL PROCESS**

\* \* \*

To make a MHCB referral, the sending POC shall page the HCPU[13] staff at (915) 491-8332 and leave a return telephone number of immediate contact.  HCPU staff will return the page, and after reviewing bed availability, HCPU staff will contact the receiving POC at the most appropriate institution.  The POC at the receiving institution must be available for immediate contact and shall accept MHCB referrals.  The receiving POC shall provide a specific bed number to be held for the sending institution for 24 hours.  Once a bed has been secured, the HCPU staff will call the referring clinician to provide the location and bed number of the vacant bed and the telephone number of the receiving POC to contact. The ending POC shall immediately contact the receiving POC to

from memoranda from CDCR headquarters to the wardens, health care managers, chief

psychiatrists, chief psychologists, and health care managers, and instruct adherence to the

above-cited limitations on the use of OHUs and the requirement to transfer seriously

mentally ill or suicidal inmates within 24 hours of referral from the OHU.

*See* Memorandum dated 9/6/05 from Director (A), Division of Correctional Health Care
Services (Exh. E):

> **STANDARDIZATION OF MENTAL HEALTH CRISIS BED
> ADMISSION PROCEDURES**
> * * *
>
> Holding Environment Pending Placement or Transfer to MHCB
> When an inmate-patient is determined to need a MHCB and there are no
> available beds in the sending institution, the steps outlined in the attached
> memorandum from September 16, 2003, shall be followed pending the
> placement/transfer.
> * * *
>
> On occasion, some inmate-patients cannot be ***placed into a MHCB within
> the policy requirement of 24-hours*** due to a lack of available beds.
> * * *
>
> - Until transferred to a MHCB the inmate-patient shall be observed and
>   monitored or if clinically indicated, placed under constant direct
>   observation for suicide watch . . .

---

communicate all clinical information about the inmate ***and to ensure transfer within 24
hours***.
* * *
**MONDAY THROUGH FRIDAY MHCB REFERRAL PROCESS**
* * *
HCPU staff will review the availability of MHCBs and contact the receiving clinician at
the most appropriate MHCB institution.  The receiving clinician must be available for
immediate contact and shall accept MHCB referrals.  The receiving clinician shall
provide a specific bed number to be held for the sending institution for 24 hours.  Once a
bed has been secured, the HCPU staff will return a call to the referring clinician and
provide the location and bed number of the vacant bed and the receiving clinician to
contact.  The sending clinician shall immediately contact the receiving clinician to
communicate all clinical information about the inmate ***and affect the transfer within 24
hours***.

*See also* Memorandum dated 3/26/07 from the Director (A) of the CDCR Mental Health Program, DCHCS, and the Deputy Director (A) of the CDCR Division of Adult Institutions.  (Emphasis added) (Exh. F):

**TRACKING AND TRANSFER OF INMATE-PATIENTS REQUIRING MENTAL HEALTH CRISIS BED CARE**

**Overview**

The purpose of this memorandum is to reiterate the Mental Health Services Delivery System (MHSDS) Program Guide policy that inmate-patients who require placement in a Mental Health Crisis Bed (MHCB) care *shall be referred and transferred to a MHCB as soon as possible, and within 24 hours when bed space is available*.

When an inmate-patient is identified as requiring a MHCB, and there are no available beds in the sending institution, the Health Care Placement Unit (HCPU) must be notified (see steps outlined in the attached memorandum dated September 16, 2003.)  **No inmate-patient identified as requiring MHCB care shall be housed in an Outpatient Housing Unit, Administrative Segregation Unit, or any other alternative housing, unless the HCPU has been notified of the need for an MHCB**. (emphasis in original)

All inmate-patients evaluated for possible need for MHCB care shall either be:
- Placed immediately into a MHCB;
- Placed in an Outpatient Housing Unit for further evaluation if a MHCB referral is not immediately indicated (see details below);
- Referred to the HCPU for transfer to a MHCB; or
- Returned to regular housing if MHCB care is clearly not required.

When an inmate-patient requires observation and evaluation of behaviors that may be indicative of mental illness, a licensed mental health professional may place the inmate-patient into an Outpatient Housing Unit.

MHSDS Program Guide pages 12-5-7 through 12-5-29 (attached) include policy regarding mental health treatment in the Outpatient Housing Unit (OHU) setting.  Inmate-patients shall not be housed in any other outpatient setting, except an OHU, for the purpose of evaluating the possible need for a MHCB.  *Inmate-patients shall not remain in an OHU for more than 72 hours (unless criteria on MHSDS Program Guide page 12-5-28 are met).*

28

Based on the discussions with defendants that took place during my work group's meetings and teleconferences with them, my experts and I disagree with the interpretation that defendants now appear to be giving the Program Guide provisions on OHUs, and presumably with whatever Program Guide textual modifications which defendants may be considering.  Their apparent interpretation contradicts the intent behind the resolution of past negotiations surrounding the lack of access to MHCBs, when the impetus for creation of OHUs was to provide at least a temporary safety valve from a dangerous insufficiency of MHCB care.  Defendants' interpretation of what is proper use of OHUs is not currently, and historically was never intended to be, within accepted use of OHUs.  They were conceived of, and eventually agreed to by the parties, as a stop-gap measure to provide at least a temporary safety net for inmates potentially in need of crisis level care, and those awaiting transfer to such care.  They were never considered a destination placement for conduct of suicide watch, suicide precautions, or prolonged assessment and/or treatment of serious mental illness or suicidality.

Back in November 2001, former special master J. Michael Keating said in his Report on Defendants' Plan to Expedite Access to a Mental Health Crisis Bed (MHCB) Level of Care:

> . . . [V]estiges of the historical problem[14] linger.  There is a departmental policy, currently in the process of revision and clarification, which permits OHUs to hold for up to 72 hours inmates who require crisis intervention or further observation and evaluation of behavior that may indicate mental illness.  The policy calls for a re-evaluation at 24 and 48 hours and requires that arrangements be made for transfer to a higher level of care, if the inmates' mental health needs continue beyond 48 hours.  The policy is not unreasonable.  Seriously mentally disordered inmates can become briefly agitated or depressed and need some isolation and quiet, which may suffice to restore equanimity relatively quickly.  Similarly, inmates with no prior mental health involvement may manifest temporarily

---

[14] i.e. delays in transfers of inmates to MHCBs.

symptoms of a mental disorder in the correctional environment, especially during the reception process.  A rigid requirement to transfer immediately every agitated inmate who enters an OHU makes no sense. As long as the OHU transfers an inmate as soon as it becomes clear that he or she needs, for example, a MHCB level of stabilizing care, the 72-hour observation period is acceptable.

**Problems occur when a clearly psychotic inmate arrives in an OHU and is "observed" or evaluated" there for 72 hours, without the supervision, monitoring, and treatment that can be provided in CDC only in a MHCB setting.  Such a situation, not a far-fetched scenario, is exacerbated when local clinicians and administrators in an OHU believe they can treat and stabilize inmates as well as, or better than, clinicians in MHCB units.  In practice, severely mentally ill inmates sometimes remain in an OHU for anywhere from three to ten or more days before a referral is made to a MHCB unit elsewhere.  The expedited transfer process, now available and successful, may mean the inmate gets to a MHCB level of care within 24 hours of the referral, an important improvement, but local clinical hubris and/or lack of confidence in the clinical skills of a MHCB unit elsewhere had delayed needed care, diverted local resources and, perhaps, created a potentially dangerous situation for a psychotic inmate.**

*Special Master's Report on Defendants' Expedited Process for Transfers to a Mental Health Crisis Bed Level of Care*, November 15, 2001, p. 5-6 (emphasis added) (Exh. G).

It also must be remembered that this is not merely an academic debate or a discussion of proper legal construction of the Program Guide.  At its heart, this is a matter of sound clinical practice.  My experts believe that clinical standards call for referral and transfer of suicidal patients to an MHCB within 24 hours of their having been found suicidal while under observation and evaluation in an OHU.  The level of care for inmates who have been deemed to require suicide precaution or suicide watch triggers a prompt referral and transfer.  My experts and I recommend rejection of any proposal by defendants for Program Guide modification to allow expanded or prolonged observation or evaluation of suicidal inmates in OHUs longer than 24 hours after they have been found to be suicidal, and in any event no longer than 72 hours after they were placed in

an OHU.  Suicide precaution and suicide watch in an OHU may continue only if and as

long as no MHCB is available.

V.      **The Special Master's Review of Suicides in 2008 and 2009**

        In the interest of expediting the suicide prevention and review process, and in

recognition of defendants' apparent re-dedication to improving its performance in suicide

review and reporting, I asked the parties to suggest a streamlined report format for my

expert's annual suicide report on the 37 suicide deaths in calendar year 2008 and the 25

suicide deaths in 2009.  Plaintiffs requested (Exh. B., p. 6-7), and the defendants have

agreed ((Exh. C., p. 4), that these two reports may consist of:

- A statistical summary.
- Chart 1[15], which covers suicides, by CDCR or DMH facility.
- Chart 2, which covers single-cell housing, incarcerated "R" suffix, method, history of suicidal behavior, history of mental health treatment, housing Keyhea, severe or life-threatening illness, presence on the mental health caseload at the time of death, significant indication of inadequate treatment, etc.
- Findings, including whether defendants complied with timelines of their own suicide review and reporting process, and the percentage of suicides that were foreseeable and/or preventable.
- Table 1, with all elements.
- Table 2, with all elements.

        I agree, and recommend, that the reports for 2008 and 2009 be prepared and

submitted in the summarized fashion suggested above.[16]  Although it is important to

continue and preserve the ongoing record of suicide reviews through those years, it is

equally important to quickly bring the full suicide review process into the present

calendar year, as some of the new suicide prevention strategies are already being put into

place.  Unfortunately, the data for 2010 so far is not showing improvement in suicide

---

[15] The charts and tables requested by plaintiffs refer to the charts and tables that have appeared in my expert's annual suicide reports to date.

[16] I reject both Defendants' and plaintiffs' requests and suggestions with regard to the methods my expert may wish to employ to complete his review, or as to his submission of any individual written case reviews. (Exh. B, p. 7, footnotes 3, 4; Exh. C, p. 4)

prevention.  As of this writing, there have been 26 suicides in CDCR in 2010, and it is only September.  The need for vigilance in solving this problem continues.  The goal is now to encourage the focus of resources on the implementation of these various new strategies and any needed refinement thereof, as may become apparent in the review process.  The sooner this process is begun, the better.  It is no exaggeration to say that lives are at stake.

**VI.**     **Plaintiffs' Additional Proposals**

In their letter to me dated September 8 (Exh. B), plaintiffs' counsel offered the following additional requests which were not proposed in defendants' Report:

**A.**     **Changes to Defendants' Handcuff Policy in Mental Health Crisis Bed Units**

Plaintiffs state that the defendants' policy for use of mechanical restraints in MHCB units violates applicable licensing standards and existing Program Guide provisions governing the use of such restraints, and maintains a non-therapeutic MHCB environment.  They want the defendants' policy to be changed. (Exh. B., p. 2-3).  The use of mechanical restraints within the MHCB units raises some interesting and provocative issues, and is worthy of further discussion.  However, this topic would be more appropriately taken up in the policy meeting process than in this context.

**B.**     **Suicide-Resistant Beds in Mental Health Crisis Bed Units**

Plaintiffs request that suicide-resistant beds be furnished for MHCB units, and that those units at San Quentin State Prison and California Medical Facility which have such beds should make use of them. (Exh. B., p. 3-4).  This is an important concern that plaintiffs have raised previously with defendants, but which remains unresolved.  There have been informal reports that in the absence of suicide-resistant beds in some MHCB

units, suicidal patients are not provided with any beds at all.  It is my understanding that

CDCR's decision thus far to not provide suicide-resistant beds is based solely on cost,

which I also understand is not prohibitively expensive.

My experts advise me that the failure to provide suicide-resistant beds, and the

practice of requiring suicidal MHCB patients to sleep on the floor, creates a needlessly

harsh environment that does not serve therapeutic purposes.  This practice, along with

other punitive-type practices, may even contribute to an inmate's decision to not report

thoughts of self-harm to staff.  I have been advised that the default practice in an MHCB

unit should be to provide a suicide-resistant bed unless clinically contraindicated.

Although defendants did not address this issue in their Report, it is serious and

deserving of prompt attention.  I recommend that defendants be required to submit a plan

within the next 60 days for procuring and providing suicide-resistant beds to suicidal

inmates within MHCB units in CDCR institutions.

**C.**      **Tracking of Suicidal Histories of All Inmates**

Plaintiffs request tracking of suicide history for all inmates, as a good means of

managing high-risk inmates systemwide. (Exh. B., p. 4, 6).  To date, tracking of inmate

suicidal history has been required for only mental health caseload inmates.  By order of

June 9, 2005, defendants are required to track the suicidal histories of inmates in CDCR's

mental health caseload in its Mental Health Tracking System (MHTS).  By memorandum

from the CDCR Division of Correctional Health Care Services to health care managers

and chiefs of mental health, dated October 2, 2006, whenever a caseload inmate transfers

from one CDCR institution to another, his or her inmate profile for suicidal history must

be included in the transfer envelope.  Further, for all such inmates being placed in

administrative segregation, the inmate profile must be generated and reviewed by the psych tech prior to the inmate's administrative segregation mental health screening. (*See* Exh. H). As plaintiffs note, tracking of suicidal history is important in suicide prevention not only among caseload inmates but among all inmates. (Exh. B., p. 4, 6).

On September 12, 2010, defendants notified me that the control board for MHTS.net, CDCR's new interactive electronic inmate mental health information tool, has approved the addition of a change request, to create a new system-generated alert for those inmates with a "high acute suicide risk." I have not been advised as to the scope of this alert, i.e. whether it will encompass all inmates who have a suicidal history, or when it will be in place and functional. I recommend that defendants proceed to incorporate and implement this system-generated alert for suicidal history for all inmates as quickly as possible, and that they demonstrate this new electronic suicide-history alert feature to me and/or designated members of my staff at a mutually convenient time within the next 60 days.

D.    **Alternative Means of Implementing "Bad News" Screening**

Plaintiffs requested that additional means of conducting "bad news" screening be explored, for example tracking of inmates serving life sentences who receive denials of requests for relief through the mail. (Exh. B., p. 5). There is already a "bad news" screening process in place, but its effectiveness for its intended purpose has not yet been explored or discussed in any depth. Before defendants proceed with any additional "bad news" screening measures, the existing screening process should be examined. This subject would be more appropriately introduced and explored in the context of a policy meeting.

**E.**     **Accountability for Conduct of 30-Minute Welfare Checks in Administrative Segregation and Emergency Life Support**

Plaintiffs note that there should be greater attention to, and accountability for, failures to provide 30-minute welfare checks in administrative segregation, and failures in emergency response. (Exh. B., p. 5).  Both of these functions are the subject of existing plans or orders and are currently examined and reported in the regular course of monitoring and reporting to the court.  I do not recommend any additional focus on these topics in this context at this time.

**F.**     **System-Wide Implementation of the Pelican Bay Administrative Segregation Pilot**

Plaintiffs also note that reducing lengths of stay and improving conditions in administrative segregation are important to preventing suicides not only for mental health caseload inmates in administrative segregation, but for the safety of all inmates there.  To that end, they request that the Pelican Bay Administrative Segregation Pilot program be implemented system-wide. (Exh. B., p. 5).  Before extension of the Pilot to other institutions, it needs to be evaluated for its adaptability for such use at other sites.  While this idea appears to have merit and is reportedly already under consideration by defendants, it too would be more appropriately explored within the context of a policy meeting.

**G.**     **Entertainment Devices in Administrative Segregation Units**

Plaintiffs state that some administrative segregation units have electrical capacity but are not currently permitting entertainment devices, in contravention of court order. They also request that other units which do not have such capacity should be evaluated for the cost of installing it. (Exh. B., p. 5).

This subject has been addressed within the Defendants' Plan to Address Suicide Trends in Administrative Segregation, and the court order of May 31, 2007 (docket no. 2255) which required a report from defendants on each institution's capability to provide these devices.  Defendants filed their report on August 13, 2007.  This topic has been previously taken up within policy meetings.  If it is to be revisited, it should be done within that forum.

**VII.    <u>Recommendations</u>**

Throughout this process, it has been apparent that defendants invested a great deal of effort in re-examining their suicide prevention and review policies and practices.  My experts and I agree that their proposed Program Guide revisions as well as their strategies in the areas of administrative segregation, management of high-risk inmate/patients, and clinical competency in administration of the suicide risk evaluation, are worthy of implementation.  I recommend that these changes be implemented, at least on a trial basis for now, with a view toward further evaluation and modification at a later time, if necessary.

With regard to the defendants' apparently germinating ideas concerning the use of OHUs and possible concomitant changes to the Program Guide that were expressed during our meetings, I believe that defendants are moving in the wrong direction.  My experts and plaintiffs have raised valid concerns based on what they heard about the conduct of activities within the OHUs that really should be taking place in a licensed inpatient facility, usually an MHCB. Although defendants have not formally offered any revisions concerning use of OHUs at this time, I urge them to give serious consideration

to my experts' input on this subject if they proceed further.  I also accept defendants' offer to continue to consult with my experts and me on this subject.

In their strategy to utilize staff training to improve clinical competency with use of the suicide risk evaluation, defendants refer generally to "grandfathering" of current (as opposed to newly-hired) CDCR clinicians "without requiring that those clinicians undergo the training and proctoring process."  No details of this "grandfathering" process are offered.  I recommend that defendants continue their work and augment their strategy for higher clinical competency among existing clinicians.  Defendants should be required to provide me within 60 days their proposal for elevating the competency levels of current CDCR clinicians with administration of the suicide risk evaluation.

The need for suicide-resistant beds in MHCB units is critical.  The current practice of having at-risk inmates sleep on the floor in MHCB units is objectionable and must be stopped.  I recommend that defendants be required to submit a plan within 60 days for the procurement and provision of suicide-resistant beds in their MHCB units.

Defendants offer two electronic solutions as part of their overall suicide prevention strategy:  the SharePoint website system for confidential patient-information sharing between CDCR and DMH for their mutual patients, and the addition of a system-generated alert on MHTS.net for those CDCR inmates who have a "high acute suicide risk."  These technological tools are not yet implemented.  I urge defendants to proceed as quickly as possible to implement them, and to conduct a demonstration of the operation of these tools for me and/or my designated staff members at a mutually convenient time within the next 60 days.

Accordingly, I recommend the following:

1. That the defendants' proposed Program Guide revisions and suicide prevention strategies presented in their Report of August 25, 2010 be implemented forthwith;

2. That defendants consult with my experts with regard to the use of, and clinical practices within, CDCR OHUs, and any related proposed changes to the *Coleman* Program Guide concerning OHUs;

3. That within the next 60 days, defendants submit their proposal for improvement of clinical competency levels of current CDCR clinicians with administration of the suicide risk evaluation;

4. That within the next 60 days, defendants submit a plan to furnish suicide-resistant beds in their MHCBs for any at-risk inmates who would otherwise not be provided with a bed while in an MHCB unit; and

5. That defendants implement the SharePoint website system and the system-generated alert for high acute suicide risk inmates on MHTS.net as soon as possible, and within the next 60 days conduct a demonstration of these systems for me and/or my designated staff members at a mutually convenient time.

Respectfully submitted,

/s/

_____
Matthew A. Lopes, Jr., Esq.
Special Master

September 27, 2010

38