# EXHIBIT A

# FOR SUBMITTAL TO THE *COLEMAN* SPECIAL MASTER

## DEFENDANTS' *AMENDED* AUGUST 25, 2010 UPDATED REPORT ON ACTIVITIES TAKEN FOLLOWING THE COURT'S APRIL 14, 2010 ORDER

| ACRONYM LIST | |
|---|---|
| **Term** | **Definition** |
| **AMBU** | Ambu Bag |
| **APP** | Acute Psychiatric Program |
| **ASH** | Atascadero State Hospital |
| **ASU** | Administrative Segregation Unit |
| **B-SHAR** | Basic Self Harm Review |
| **CCAT** | Clinical Case Assessment Team |
| **CCCMS** | Correctional Clinical Case Management System |
| **CCM** | Clinical Case Manager |
| **CDCR** | California Department of Corrections and Rehabilitation |
| **CMO** | Chief Medical Officer |
| **C-SHAR** | Comprehensive Self Harm Review |
| **CIW** | California Institution for Women |
| **CMC** | California Men's Colony |
| **CPHCS** | California Prison Health Care Services |
| **CPR** | Cardiopulmonary Resuscitation |
| **CSW** | Clinical Social Worker |
| **CTC** | Correctional Treatment Center |
| **DAI** | Division of Adult Institutions |
| **DCHCS** | Division of Correctional Health Care Services |
| **DDPS** | Distributed Data Processing System |
| **DMH** | Department of Mental Health |
| **DNC** | Death Notification Coordinator |
| **DOM** | Department Operations Manual |
| **DSM** | Diagnostic and Statistical Manual |

| ACRONYM LIST | |
|---|---|
| **Term** | **Definition** |
| EOP | Enhanced Outpatient Program |
| ERDR | Emergency Response and Death Review Committee |
| GACH | General Acute Care Hospital |
| GP | General Population |
| HCM | Health Care Manager |
| HCPOP | Health Care Placement Oversight Program |
| H&P | History and Physical |
| HQ | Headquarters |
| ICF | Intermediate Care Facility |
| ICC | Institutional Classification Committee |
| IDTT | Interdisciplinary Treatment Team |
| IST | In-Service Training |
| LOP | Local Operating Procedure |
| LOC | Level of Care |
| LOS | Length of Stay |
| LVN | Licensed Vocational Nurse |
| MAR | Medication Administration Record |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MHP | Mental Health Program |
| MHSDS | Mental Health Services Delivery System |
| MHSR | Mental Health Suicide Reviewer |
| MHTS | Mental Health Tracking System |
| MOD | Medical Officer of the Day |
| OHU | Outpatient Housing Unit |

| ACRONYM LIST | |
|---|---|
| **Term** | **Definition** |
| OIA | Office of Internal Affairs |
| OLA | Office of Legal Affairs |
| PBSP | Pelican Bay State Prison |
| PC | Primary Clinician |
| POC | Physician or Psychiatrist on Call |
| PPEC | Professional Practice Executive Committee |
| PSH | Patton State Hospital |
| PSU | Psychiatric Services Unit |
| PT | Psychiatric Technician |
| QIP | Quality Improvement Plan |
| QM | Quality Management |
| QMC | Quality Management Committee |
| RC | Reception Center |
| RN | Registered Nurse |
| RVR | Rules Violation Report |
| SCR | Suicide Case Review |
| SHU | Security Housing Unit |
| SNF | Skilled Nursing Facility |
| SRAC | Suicide Risk Assessment Checklist |
| SRE | Suicide Risk Evaluation |
| SPR FIT | Suicide Prevention and Response Focused Improvement Team |
| TB | Tuberculosis |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Record |

# I.

# INTRODUCTION

On April 14, 2010, the Court ordered that Defendants, over the next one hundred and twenty days and under the guidance of the *Coleman* Special Master, review all suicide prevention policies, practices, and processes and the implementation of those policies, practices, and processes.  The Court further ordered that Defendants, as part of this review, identify any need to modify its suicide policies, practices, and processes and the implementation thereof as may be required to address inmate suicides.  Additionally, the Court ordered that the California Department of Mental Health (DMH) meet and confer with the Special Master concerning production of information essential to the Special Master's suicide review process and develop, if necessary, appropriate policies and procedures for such production.

This Report, along with the attached Exhibits 1 to 6, responds to the Court's April 14, 2010 order.  The Report is divided into four parts:  First, the Report discusses the process that the California Department of Corrections and Rehabilitation (CDCR) followed to review all suicide policies, practices, and processes, and the implementation of those policies, practices, and processes.  Additionally, this section of the Report describes the process put in place by CDCR to share information essential to the Special Master's suicide review process. Furthermore, CDCR and DMH have collaborated to develop a SharePoint Site that, when available, can be used to facilitate collaboration, implement business processes, and supply information concerning an inmate-patient's mental health care.

Second, this Report describes the process that CDCR undertook to review and assess the need to modify the Defendants' October 2, 2006 Plan to Address Suicides in Administrative Segregation Units and/or how CDCR is implementing the Plan.  Additionally, this Section addresses concerns that CDCR identified with the Plan and discusses how it is or is planning to address those concerns.  Third, the Report identifies specific modifications to CDCR's suicide prevention policies and practices in the Mental Health Services Delivery System Program Guide (2009 Revision) (Program Guide) and the implementation thereof as may be required to address inmate suicides.

Last, the Report summarizes three new strategies that CDCR has identified to address inmate suicides: (1) Change of Conditions in Administrative Segregation Units; (2) High Risk Inmate-Patient Management; and (3) Clinical Competency in Performing Suicide Risk Evaluations.  Though CDCR has diligently considered these three new strategies, they remain in their infancy.  Additionally, because the strategies are dependent upon, among other things, staff availability and financing, they will be reexamined, and possibly revised, once they are implemented.

# II.

# REVIEW OF SUICIDE POLICIES, PRACTICES, AND PROCESSES, AND THE IMPLEMENTATION OF THOSE POLICIES, PRACTICES, AND PROCESSES

Defendants' review of the suicide policies, practices, and processes, and the implementation of those policies, practices, and processes involved four components, as follows:

5

**A.     Review of Mental Health Services Delivery System Program Guide (2009 Revision).**

In January 2010, CDCR Department of Correctional Health Care Services (DCHCS) staff members in the Suicide Prevention and Response Program evaluated how CDCR was implementing the suicide review and reporting process as set forth in the Program Guide, Chapter 10. Suicide Prevention and Response.  In May 2010, and in response to the Court's April 14, 2010 order, CDCR's Suicide Prevention and Response Focused Improvement Team (SPR FIT) committee convened to review those policies, practices, and processes that remained in the Program Guide and that relate to inmate suicides.

Thereafter, representatives from CDCR and DMH mental health and the CDCR Division of Adult Institutions (DAI) worked with the Special Master and his experts (hereafter referred to as *Coleman* monitors) as well as representatives from the *Plata* Receiver's Office to review all of the sections in the Program Guide that address suicide prevention policies and practices and suicide review and reporting processes.   This review included identification of concerns, a description of the nature of those concerns; that is, whether or not a change in policy or implementation was identified and suggested, the anticipated outcome of the suggested change, and the anticipated time frame for implementing the recommendation.  Exhibit 1 compiles all the sections in the Program Guide that are part of this review. Exhibit 2 summarizes this review. Additionally, this Report addresses the proposed changes below.

**B.     Review of CDCR Suicide Prevention and Response Program Actions Taken Between 2007 and 2010.**

The SPR FIT committee reviewed all suicide prevention and response program actions taken between 2007 and 2010.  This review was undertaken to ascertain which, if any, of the issues raised by Dr. Ray Patterson in his "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in the Calendar Year 2007," have since been resolved. Attached as Exhibit 3 is a list of those actions, including Policy Memoranda, SPR FIT actions, Training, Suicide Review Revisions, and DMH and CDCR Collaboration.  For example, in March 2010, CDCR revised Form 7447.  This form was previously identified as the Suicide Risk Assessment Checklist (SRAC).  It is now known as Form 7447, Suicide Risk Evaluation (SRE). (Ex. 4.)  The committee also reviewed agendas for the Suicide Prevention Videoconferences that occurred between 2007 and 2010 and that detailed monthly educational topics for viewing during statewide SPR FIT meetings.  Exhibit 5 is a list of the agendas for those videoconferences.  The agendas illustrate CDCR's attention to issues and its efforts to collaborate with the field to remedy deficiencies.

**C.     CDCR Work-Group.**

On May 18, 2010, SPR FIT organized a Work-Group consisting of three institution-based Chiefs of Mental Health and DCHCS staff members in the Suicide Prevention and Response Program (Chiefs Work-Group).  On May 19, 2010, the Chiefs Work-Group requested that the Chiefs of Mental Health of all 33 CDCR institutions review CDCR's policies, practices, and processes related to Suicide Prevention and Response.  Between May 20 and June 9, 2010, the input

6

received by the Chiefs Work-Group was collated and organized by topic area. Best practices were reviewed state-wide in order to determine which strategies were most effective in addressing suicide. CDCR, consequent to the activities and collaborative policy/procedure/implementation review processes outlined above, identified several general topic areas and corresponding suggestions for potential intervention to address inmate suicides. After consulting with the *Coleman* monitors on these general topic areas, the Chiefs Work-Group recommended that CDCR implement the following three new strategies to address inmate suicides:

- Change of Conditions in Administrative Segregation Units;

- High Risk Inmate-Patient Management; and

- Clinical Competency in the Administration of the Suicide Risk Evaluation.

This Report addresses these strategies in detail below.

Defendants discussed other areas of import with the *Coleman* monitors during the May – July 2010 meetings. The DCHCS SPR FIT, as well as the Chief's Work-Group, will discuss these topic areas, and address them for possible action:

o Continue training for clinicians regarding transference and counter-transference issues:
   1. Dealing with difficult patients;
   2. Maintaining professional boundaries and improving distinctions between mental health functions in a correctional setting and correctional functions in a mental health setting; and
   3. Improving the ability of clinicians to set priorities appropriately and offer inmate-patients care that recognizes the complexities of working in a prison setting.

o Promote a "culture of the whole" that includes custody, mental health, medical and other stakeholders in a prison setting:
   1. Improve the working relationship between custody and mental health – embrace custody colleagues as partners in treatment.

o Evaluate how local mental health programs can address the mental well-being of non-MHSDS inmates using a public health/education paradigm to promote wellness (groups, non-traditional approaches, etc.).

o Improve communication between the California Prison Health Care Services (CPHCS) and DCHCS regarding chronic and serious medical issues, including end-of-life issues.

o Review policy of using suicide-prevention smocks for inmates in a Mental Health Crisis Bed (MHCB) unit.

o Explore general treatment issues such as the "continuity of care teams" utilized by San Quentin State Prison, and use of behavioral incentives in segregated housing as is done in the state of New York.

- o   Improve treatment plans for inmates being released from a MHCB.

- o   Ensure appropriate follow-up on referrals from all sources: medical, custody, etc.

**D.      DMH/CDCR Plan to Share Documents.**

CDCR and DMH are developing a SharePoint Site, which they expect to be fully operational within the next few months. Microsoft SharePoint is a software platform for collaboration and web publishing that combines a number of capabilities under a single service.  SharePoint can be used to facilitate collaboration, implement business processes, and supply information concerning an inmate's mental health care.  It is expected that when SharePoint is fully operational, DMH and CDCR HQs, DMH programs, and CDCR institutions will have access to, among other things, DMH referrals, DMH discharges, waitlists, and CDCR high risk lists.

**III.**

**DEFENDANTS' OCTOBER 2, 2006 PLAN TO ADDRESS SUICIDES IN ADMINISTRATIVE SEGREGATION UNITS**

On June 8, 2006, the Court directed Defendants to develop a plan for dealing with the escalating percentage of suicides occurring in Administrative Segregation Units (ASU)—the *Coleman* Special Master's Report on Suicides Completed in CDCR in the Calendar Year 2004 reported that an escalating percentage of suicides were occurring in ASUs; that is, 69% of the suicides in Calendar Year 2004 occurred in an ASU.  Defendants submitted their Plan to Address Suicides in ASU (2006 ASU Plan) on October 2, 2006.

In response to the Court's April 14, 2010 order, CDCR reviewed the 2006 ASU Plan to assess the need to modify the Plan and/or modify how it is implementing the Plan.  Additionally in order to assess the Plan's impact on the rate of suicides in ASUs, CDCR reviewed the Quality Improvement Plans (QIPs) for all 36 suicides from 2008, all 25 suicides from 2009, and 15 suicides that occurred in the first 6 months of 2010.  This review revealed a reduction in the percentage of suicides occurring in ASU:  39% in 2008, 40% in 2009, and 40% in 2010, for an average percentage rate of 40%.  Nonetheless, CDCR identified the current rate of suicides in ASUs as an ongoing concern for two primary reasons.

First, while a review of the 2006 ASU Plan revealed that CDCR had successfully implemented numerous parts of the Plan, it also revealed that other proposals have only been partially implemented and are the subject of ongoing auditing or refinement.

The parts that have been successfully implemented are the following:

- • Double-celling of inmates in ASU when possible:  This programmatic part has been a longstanding feature of ASU's statewide.  DAI reviews all new ASU inmates to determine if they are suitable for double-cell placement.

8

- Construction of New Small Management Yards: CDCR completed this project on June 20, 2009.  This project was envisioned prior to the onset of the 2006 plan.

- "Bad News" Screening:  CDCR successfully implemented this proposal by adding questions to the CDCR Form 7277 Initial Health Screening.  CDCR administers this questionnaire to all inmates passing through the Receiving & Release process.

- Retrofitting of ASU Intake Cells:  CDCR completed this project as of January 31, 2009.

- Additional emergency response training including CPR:  CDCR completed this training program in the Fall of 2007 and continues to hold drills on a monthly basis.

- Daily coordination meetings in ASU: These meetings occur each morning throughout the CDCR system in order to identify inmates in need of services and new arrivals in ASU.

- Screening prior to placement in ASU:  CDCR coordinated implementation of this procedure with the CPHCS Nursing administration.  Training was provided to all nursing in the field by videoconference in July 2007.

By comparison, those parts that have been partially implemented and remain subject to ongoing auditing and refinement are as follows:

- Explore the feasibility of providing entertainment devices in ASU:  The Department conducted the feasibility study and found that only nine institutions could not provide power for entertainment devices.

- Upon placement into ASU, inmates are housed in retrofitted intake cells for 72 hours: Population pressures have adversely impacted full implementation of this provision.  After completion of initial construction, reviews of procedure and practice have revealed that additional modifications may be necessary to fully implement this provision.

- Custody welfare checks required every 30 minutes during the first 21 days in ASU: This provision has been successfully implemented throughout CDCR institutions and CDCR is continuing to refine its audit process.

- Priority for out-of-cell time for new arrivals in ASU:  CDCR directed the institutions to implement this procedure, but fully implementing it has been difficult due to population pressures creating difficulty auditing the out-of-cell time for new arrivals.

- Reducing length of stay in ASU:  Local audit teams have succeeded in reducing the length of stay for many inmates.  At all CDCR institutions, upon an inmate's placement in the ASU, the inmate is tracked in the institution's local ASU tracking

9

system. The institution then continuously tracks the inmate to determine whether or not the inmate should be considered for release from the ASU or referred to an alternative program/institution. For inmates at the Enhanced Outpatient Program level of care, additional levels of review occur when the inmate has been in the ASU for 90 days.  DAI initiated ASU Strike Teams in June 2010 for the dual purpose of evaluating institution ASU bed utilization and providing the institutions with assistance in identifying cases requiring additional consideration for release from an ASU. The Strike Teams performed on-site reviews of ASU Bed Utilization using an ASU Bed Utilization Audit Tool.  Additionally, the Teams provided direction and assistance to the institutions related to expedited handling of ASU cases that were appropriate for early release from ASU. The Strike Teams are currently completing their final reports on the reviews, and will develop modifications, if any, to departmental practice or policy based on those reports.  (See modification to Program Guide, page 12-7-9, discussion below.)

- Auditing of ASU screening refusals:  CDCR has directed its institutions to comply with this requirement and many have instituted local auditing procedures and processes to deal with those inmates who refuse the screening requests.

- Minimum stay of 60 days at EOP level of care for inmates transferred to ASU Hubs: CDCR directed its institutions to comply with this provision but thorough audits of compliance have not been completed.

- Transfer of Mental Health Tracking System (MHTS) Inmate Profiles when inmates are transferred between institutions:   CDCR implemented this procedure by memorandum but compliance has not been consistent throughout the state.  The roll-out of the new MHTS.net tracking system to all institutions by the end of 2010 will obviate the need for this paper-based  solution to suicide history tracking because all institutions will have networked access to tracking information in real-time.

- Confidential interview locations for post-placement screenings:  New construction and/or re-allocation of space for mental health services in ASU has been ongoing. Some local solutions have included construction of booths.  Exact results of this initiative are not available at this time.

With respect to these procedures, many are subject to ongoing local auditing and may not have system wide data available at this time.  The introduction of the fully networked MHTS.net system will allow real-time auditing of mental health processes.

The second reason that CDCR identified the current rate of suicides in ASU units as an ongoing concern derives from its review of the QIPs for the suicides that occurred between 2008 and the first six months of 2010.  Specifically, CDCR's review revealed a need to address a failure to properly complete or document the 30-minute custody checks.  Additionally, its review revealed various deficiencies in emergency response procedures.  In an effort to address these findings, CDCR's Office of Legal Affairs (OLA), DAI, and Mental Health staff formed a multi-disciplinary work group focused on improving communication and collaborative efforts between custody and mental health.  The first two meetings for this work group occurred on July 22, 2010

and August 4, 2010, at which time the group discussed, among other things, improving the systems for monitoring an institution's compliance with Program Guide requirements and communication between custody and mental health staff.

With respect to improving CDCR monitoring, CDCR intends to establish a regular Quality Management (QM) process in order to centralize policy making between divisions. This process would reduce the need for other processes by creating one centralized strategy for CDCR to manage interdivisional issues impacting the mental health population at CDCR's institutions. DAI and DCHCS propose to create a new reporting process from institutions to HQs whereby cross-division policy issues can be brought to a small group of policy makers who can respond with uniform and consistent decisions, providing clear policy direction to the field.  DAI and DCHCS propose to require that the institutions report to HQs those issues that impact the operation of both divisions. Currently, DAI and DCHCS divisions are developing this process and expect to provide an update to the *Coleman* monitors by mid-November 2010.

Finally, the DCHCS Mental Health Program and the CPHCS continue to collaborate to ensure appropriate Emergency Response.


## IV.

## IDENTIFICATION OF THE MODIFICATIONS TO THE SUICIDE POLICIES, PRACTICES, AND PROCESSES IN THE PROGRAM GUIDE AND THE IMPLEMENTATION THEREOF AS MAY BE REQUIRED TO ADDRESS INMATE SUICIDES

Defendants, in consultation with the *Coleman* monitors as well as representatives from the *Plata* Receiver's office, reviewed the policies, practices, and processes in the Program Guide, Chapters 1–10, that relate to inmate suicides.  Exhibit 1 represents a compilation of all the policies, practices, and processes in the Program Guide that relate to inmate suicides.  (Ex. 1 pp. 1–99.) For each policy, practice, and process that makes up Exhibit 1, Defendants, in consultation with representatives from the *Plata* Receiver's office, have indicated whether there is a proposed modification to policy or to implementation and noted any recommended modification.  To the extent that there is a modification to policy, that modification is reflected by track changes in the body of the text.  (*See also* Ex. 2, Summary of Proposed Changes to MHSDS Program Guide.)

**A.     Program Guide, Chapters 1–9:**

Set forth below are those sections in Chapters 1–9 that Defendants have identified as relating to inmate suicides.  This Report identifies, by Chapter, each section and indicates whether there is a proposed modification to policy or an identified need to change how CDCR, DMH, and/or the Receiver's Office implements that policy.

11

1.      **Chapter 1.  Program Guide Overview:**

Two sections in Chapter 1 relate to inmate suicides.  The first is Section C. Referrals to Mental Health, page 12-1-4 (Ex. 1 pp. 1–2).  The text in this section was modified to remove the term "qualified" from "qualified mental health clinician" and to add the terms "psychiatric nurse practitioner" to the definition of a "mental health clinician." (Ex. 1 p. 1.)  The second section is Section K. Mental Health Tracking System, page 12-1-14 (Ex. 1 p. 3).   There are no modifications to this Section, but in December 2009, CDCR rolled out the MHTS.net tracking system as a method to transmit relevant data between institutions and provide clinicians with an increased ability to provide continuity of care.

2.      **Chapter 2.  Reception Center Mental Health Assessment:**

One section in Chapter 2 relates to inmate suicides:  Section A. Introduction, page 12-2-1 (Ex. 1 p. 4).  There are no modifications to this section or to its implementation.

3.      **Chapter 3.  Correctional Clinical Case Management System:**

Three sections in Chapter 3 relate to inmate suicides.  The first is Section D. Treatment and Assessment Services, Clinical Intake Assessment, pages 12-3-7 to 12-3-8 (Ex. 1 pp. 5–6).  There are no modifications to this section or to its implementation.  The second is Section D. Treatment and Assessment Services, Transfer and Clinical Discharge, page 12-3-13, paragraphs 7 and 9 (Ex. 1 pp. 7–8).  There are no modifications to this section, but CDCR and DMH have identified a need to modify how to implement paragraph 9 relating to transfer and clinical discharge from a MHCB.  (Ex. 1 p. 8.)  CDCR and DMH have formed a collaborative work group to improve prioritization of referrals from MHCBs to DMH level of care.  (*Id; see also* Ex. 3, discussion on DMH and CDCR collaboration.)  There are no modifications to the third section—Section E. Inmate-Patient Monitoring and Clinical Case Review, Monitoring Contacts, page 12-3-15 (Ex. 1 p. 9)—or to the implementation of that section.

4.      **Chapter 4.  Enhanced Outpatient Program:**

There are no sections in Chapter 4 that address inmate suicides.

5.      **Chapter 5.  Mental Health Crisis Bed:**

There are nine sections in Chapter 5 that relate to inmate suicides, as follows:

* Section E. Admission, Pre-admission Screening, page 12-5-7 (Ex. 1 pp. 10–12):

  The text has been modified to reflect the new Suicide Risk Evaluation (SRE) form and specify that only "qualified" mental health clinicians (psychiatrist, psychologist, Clinical Social Worker, or psychiatric nurse practitioner) shall administer the SRE.  Standardized suicide risk evaluation training will be provided to mental health staff at each institution.  Clinicians shall be qualified to perform suicide risk evaluations only after completing the training and proctoring.  (Ex. 1 pp. 10–11.)

- Section E. Admission, Admission and Transfer Log, pages 12-5-8 to 12-5-9 (Ex. 1. pp. 13–14):

This text was modified to reflect the new SRE form.  Also, the text was modified to state that the MHCB pre-admission SRE is not required if the inmate is admitted to the MHCB because a SRE was done at the time of the referral to the MHCB.  The SRE form will have been completed by the referring clinician and then utilized by the MHCB admitting clinician to determine level of suicide risk for treatment planning purposes.  There are no modifications to implementing this Section.  (Ex. 1 pp. 13–14.)

- Section E. Admission, Procedure, pages 12-5-9 to 12-5-10 (Ex. 1 pp. 15–16):  This text was modified to reflect the new SRE form and to state that the MHCB pre-admission SRE is not required if the inmate is admitted to the MHCB; there are no modifications to implementing this section.

- Section F. Assessment and Treatment Services, Intake Assessment, page 12-5-11 (Ex. 1 p. 16):  There are no modifications to this Section or to its implementation.

- Section F. Assessment and Treatment Services, Interdisciplinary Treatment Team and Individualized Treatment Planning, pages 12-5-11 to 12-5-13 (Ex. 1 pp. 17–18):  There are no modifications to this Section or to its implementation.

- Section I. Discharge, Procedure, paragraph e, page 12-5-28 (Ex. 1 p. 19):  There are no modifications to this Section or to its implementation.

- Section I. Discharge, Procedure, paragraph i, page 12-5-29 (Ex. 1 pp. 20–21):  There are no modifications to this Section or to its implementation.

- Section J. Mental Health Patients in Outpatient Housing Units, pages 12-5-30 to 12-5-31 (Ex. 1 pp. 22–24):  This text was modified to reflect use of the new SRE form.  Additionally, Defendants indicate that they will notify the *Coleman* monitors within forty-five days of any additional proposed changes.

- Section J. Mental Health Patients in Outpatient Housing Units, Mental Health Conditions Appropriate for Placement into an OHU, page 12-5-32 (Ex. 1 p. 25):  There are no modifications to this Section or to its implementation.

6.      **Chapter 6.  Department of Mental Health Inpatient Program:**

There are five sections in Chapter 6 that relate to inmate suicides:  1) Section A.  Introduction, page 12-6-1 (Ex 1 p. 25); 2) Section B. Overall Treatment Criteria, Inpatient Placement General Requirements, page 12-6-2 (Ex. 1 p. 26); 3) Section C. DMH Acute Psychiatric Program (APP), Admission Criteria, pages 12-6-2 to 12-6-3 (Ex. 1 p. 27); 4) Section C. DMH Acute Psychiatric Program (APP), Referral Procedure, page 12-6-4 (Ex. 1 p. 28); and 5)  DMH Intermediate Care Facilities: ASH, CSH, PSH, SVPP, and VPP, Referral Procedure, pages 12-6-9 to 12-6-10 (Ex. 1 pp. 29–30).  The only modification to Chapter 6 is to Section C. DMH Acute Psychiatric Program (APP), Referral Procedure; that is, to modify the text to reflect the use of the new SRE form.  There are no modifications to implementing these Sections.

13

7.    **Chapter 7.  Administrative Segregation:**

Four sections in Chapter 7 relate to inmate suicides.  The first is Section D. Treatment Population, pages 12-7-2 to 12-7-3 (Ex. 1 pp. 31–32).  The text of this Section was revised to more accurately reflect the process of transferring an inmate's Medication Administration Record (MAR).  There are no modifications to implementing this Section.

The second is Section E. Clinical Rounds and Screening, Clinical rounds, pages 12-7-5 to 12-7-6 (Ex. 1 pp. 33–35). The text in this section was revised to reflect a change from referring to a "Licensed Psychiatric Technician" to a "Psychiatric Technician."  The text in the third Section— F. Clinical Evaluation, pages 12-7-6 to 12-7-7—was revised to reflect the use of the new SRE form. (Ex. 1 pp. 36–37).  There are no modifications to implementing either of these Sections.

The last section is Section H. Enhanced Outpatient Program Care, page 12-7-9 (Ex. 1 pp. 38–39). There are no modifications to this Section, but CDCR has identified a need to modify how it implements the requirements in paragraph 5 that relate to an inmate housed in an ASU for more than 90 days.  (*See* discussion at Section III above.)

8.    **Chapter 8.  Security Housing Unit:**

One section in Chapter 8 relates to inmate suicides:  Section F. Sources for Referral For Mental Health Services, pages 12-8-5 to 12-8-7 (Ex. 1 pp. 40–42).  The only modification to this Section is to reflect a change from referring to a "Licensed Psychiatric Technician" to a "Psychiatric Technician." (Ex. 1 pp. 40–41.)

9.    **Chapter 9.  Psychiatric Services Unit:**

Like with Chapter 8, only one section in Chapter 9 relates to inmate suicides:  Section F. Clinical Services, Intake Assessment, pages 12-9-3 to 12-9-4 (Ex. 1 p. 43). There are no modifications to this Section or to how it is implemented.

**B.    Program Guide, Chapter 10:**

Set forth below are all the Sections from Chapter 10.  Here, with the exception of Section A. Introduction, this Report identifies, by Section, each subject (by page number) within that Section and indicates whether there is a proposed modification to the policy or an identified need to change how CDCR, DMH, and/or the *Plata* Receiver's Office implements that policy.

1.    **Section A.  Introduction (Pages 12-10-1 to 12-2-2).**

The text "Suicide Risk Assessment" was revised to state, "Suicide Risk Evaluation."  This will require that the institutions update their Local Operating Procedures (LOPs).  (Ex. 1. pp. 44–45.)

2.    **Section B.  Suicide Prevention and Response Project.**

a.    Pages 12-10-2 to 12-10-4 (sets forth the purpose, policy, and procedure for the Suicide Prevention and Response Project) (Ex. 1 pp. 46–49):

14

The text has been modified as follows:  the terms, "The Coordinator shall be a licensed physician, psychologist, social work, nurse practitioner, or registered nurse (RN)," were revised to state "The Coordinator shall be a licensed physician, psychologist, social worker, or member of nursing staff" and the terms, "suicide gestures," were removed. (Ex. 1 p. 46.)  CDCR identified a need to modify how to implement this section and improve communication between HQs and the institutions regarding the policies and suicide prevention strategies—the DCHCS SPR FIT initiated quarterly meetings of institutional SPR FIT Coordinators, which commenced in February 2010.

> b.    Pages 12-10-5 to 12-10-6 (identifies the SPR FIT Membership, frequency of meetings, attendance requirements, and Management Reports) (Ex. 1 pp. 50–53):

The text has been modified as follows:  added "or designee" to the Chief Psychiatrist and Chief Psychologist members of the DCHCS; added Custody Representatives (**Associate Warden for Heath Care or Designee and ASU Captain or designee)** to the Local SPR FIT membership; deleted "Keyhea Coordinator" for optional membership in the Local SPR FIT; and added "or designee" to "Classification and Parole Representative."  Additionally, the text was revised from, "A quorum consists of the above listed mandatory members," to state, "A quorum consists of the majority of the mandatory members."  (Ex. 1 pp. 50–51). These changes will require that the institutions update their LOPs.

> **3        Section C.  Training for Staff.**

> a.    Pages 12-10-6 to 12-10-7 (identifies training components for health care and custodial employees) (Ex. 1 pp. 53–55).

The text has been modified to omit the definition of "Suicide gestures" and to change the terms "Suicide risk assessment" to "Suicide risk evaluation" (Ex. 1 pp. 53–54).  Again, these changes will require that the institutions update their LOPs.

> **4.        Section D.  Clinical Care Services.**

> a.    Page 12-10-7 (states that for any inmate who by which a CDCR employee becomes aware of that inmate's current suicidal ideation, threats, self-injurious behaviors or suicide attempt, shall be placed under direct observation until a clinician trained to perform a suicide risk assessment conducts a face-to-face evaluation) (Ex. 1 pp. 56–57).

The text has been modified to omit the term "gestures" and to replace the terms "suicide risk assessment" with "suicide risk evaluation."  Additionally, the text was revised to state that only a qualified clinician (psychiatrist, psychologist, clinical social worker, or psychiatric nurse practitioner) can perform a SRE.  Additionally, the terms "direct observation" have been changed to "continuous direct visual observation."  CDCR and the *Plata* Receiver's office identified a need to modify how to implement this Section relating to health care staff's role in CDCR's suicide prevention program.  CDCR intends to revise its training program to clarify the suicide prevention training appropriate for mental health and health care staff.  (Ex. 1 p. 57.)

> b.    Pages 12-10-7 to 12-10-11 (discusses the assessment for suicide risk and training on performing a suicide risk assessment and completing the form) (Ex. 1 pp. 58–63):

The text of this Section has been modified to reflect the re-design of the new SRE form and to conform to CDCR's program to improve clinical competency in the administration of the SRE (see discussion below). Consistent with CDCR's new program, the text reflects that clinicians shall be qualified to perform a suicide risk evaluation only after completing the training and proctoring. (Ex. 1 pp. 58–63.) Additionally, the text has been modified to clarify the role of health care staff in CDCR's suicide prevention program. To implement these changes, CDCR mental health and health care staff are collaborating to develop training commensurate with the roles of health care staff in evaluating suicide risk. (Ex. 1 p. 63.)

      c.      Pages 12-10-11 to 12-10-12 (peer consultation) (Ex. 1 pp. 64–65):

There are no modifications to this section, but CDCR did identify a need to modify how to implement it. Specifically, CDCR has determined that an increase in the practice of consulting experienced peers when evaluating an inmate for suicide risk may be an important factor in addressing inmate suicides. As such, CDCR is implementing a new program – High Risk Inmate-Patient Management (addressed below) to address this issue. (Ex. 1 p. 65.)

      d.      Pages 12-10-12 to 12-10-14 (interventions for suicidal ideation, threats, and attempts) (Ex. 1 pp. 66–69):

This text has been modified to clarify that only a "qualified clinician" can perform SREs, and to include psychiatric nurse practitioners in the definition of a "qualified clinician." Additionally, it has been modified to reflect the need for ICD coding and utilization of DSM coding. (Ex. 1 pp. 66–67.) This will require that the institutions update their LOPs.

      e.      Pages 12-10-15 to 12-10-16 (Suicide Precaution and Suicide Watch) (Ex. 1 pp. 70–72):

The section was modified to revise the terms "one book" under materials allowed to "one item of reading material." (Ex. 1 p. 71.) This will require that the institutions update their LOPs.

      f.      Pages 12-10-16 to 12-10-19 (Suicide Watch) (Ex. 1 pp. 73–76):

The text concerning the job classifications for Suicide Watch Posts was revised to more accurately reflect appropriate health care staff. The guidelines for "Behavior Checks" now states: **"Continuous observation and 15 minute nursing checks."** The changes also include deleting three bullets pertaining to emergency response procedures, which are outlined in separate documents. **(**Ex. 1 pp. 73–74.) This will require that the institutions update their LOPs.

      g.      Pages 12-10-19 to 12-10-21 (Discharge or return re: MHCB/OHU) (Ex. 1 pp. 77–79):

There are no modifications to this Section or to its implementation.

      h.      Pages 12-10-21 to 12-10-22 (Response to Self-Injurious Behaviors and Suicide Attempts) (Ex. 1 pp. 80–81):

There are no modifications to this Section or to its implementation.

      i.        Pages 12-10-22 to 12-10-23 (Emergency responses) (Ex. 1 pp. 82–83):

There are no modifications to this Section or to its implementation.

**5.      Section E.  Suicide Reporting.**

      a.        Pages 12-10-23 to 12-10-24 (Ex. 1 pp. 84–85):

There are no modifications to these Sections or to how they are implemented.

**6.      Section F.  Suicide Death Review.**

There are no modifications to the text in Section F, pages 12-10-24 to 12-10-28 (Ex. 1 pp. 85–97).  CDCR has, however, identified a need to modify how CDCR implements various parts of this Section, as follows:

      a.        Page 12-10-25 (completing the preliminary Suicide Report within 30 calendar days of the inmate's suicide) (Ex. 1 p. 87):

CDCR identified a need to modify how to implement this Section in two ways:  1) improve the time to complete the reports; and 2) revise the reports.  As a consequence of the Suicide Prevention and Response Program staff's January 2010 evaluation of the suicide review and reporting process, SPR FIT staff revised its process of tracking the suicide reporting process.  Additionally, staff created an individualized tracking tool that CDCR sends to reviewers and institutions putting them on notice of the reporting due dates.  Attached as Exhibit 6 is a copy of this tracking tool, which was disseminated in January 2010.  Additionally, CDCR has put in place quarterly writing improvement workshops, which commenced on May 5, 2010.

      b.        Page 12-10-26 (cases referred to the DCHCS Professional Practice Executive Committee (PPEC) for review of individual practice of clinicians when appropriate) (Ex. 1 p. 90):

CDCR identified a need to modify how to implement this Section after determining that cases were somehow inappropriately referred directly to PPEC.  CDCR finalized a process to have the Mental Health Peer Review Subcommittee screen the cases prior to formal PPEC referral.

      c.        Page 12-10-26 (Suicide Report shall be signed by Director of the CDCR DCHCS and the Director of DAI) (Ex. 1 p. 91):

CDCR identified a need to modify how to implement this Section after determining that it was not meeting the 60-day time line on a consistent basis.  CDCR Mental Health and DAI met on March 9, 2010, resulting in a renewed commitment to expedite the report.

      d.        Page 12-10-26 (When investigation is required, the Office of Internal Affairs (OIA) shall forward its outcome to the DCHCS SPR FIT coordinator) (Ex. 1 p. 92):

CDCR identified a need to modify how to implement this Section after receiving irregular reports from the OIA.  In order to address this, CDCR will include OIA in the e-mail sent to the

institution giving the institution a specific deadline in which to submit its Quality Improvement Plans (QIPs).

       e.    Pages 12-10-26 to 12-10-27 (setting 60-day and 90-day deadlines for submitting QIPs) (Ex. 1 pp. 93–94):

CDCR identified a need to modify how to implement this Section because the QIPs have frequently not been submitted in a timely manner, nor have they been adequately tracked by DCHCS SPR FIT. CDCR has added a statement to the cover letter sent electronically to the institution that indicates the specific due dates in order to meet the 60-day and 90-day deadlines. Additionally, it urges completion of the QIPs "as soon as possible" within the mandated deadlines.

       f.    Page 12-10-28 (requires follow-up report on implementing QIP) (Ex. 1 pp. 96–97): CDCR identified a need to follow-up QIPs in a consistent manner. On March 10, 2010, CDCR designated a staff member to track and monitor QIPs in order to ensure that institutions submit evidence of completing their QIPs.

Additionally, prior to the receipt of the April 14, 2010 Court order, CDCR had instituted several significant improvements in the suicide review process, resulting in an overall increase in meeting the Program Guide time-line requirements. The following steps were initiated in January 2010 in order to fully and in a timely manner complete suicide reports and ensure completion of Quality Improvement Plans (QIP) generated by those reports:

**Improve Report Quality:**

- Recruited, interviewed, and hired a retired annuitant for flexible availability enabling timely completion of suicide reports;
- Revised report style and content (e.g., reduce irrelevant detail, enhance summary and pertinent information) (ongoing);
- Created and provided ongoing report writing training sessions for reviewers (quarterly meetings established May 5, 2010); and
- Developed a draft audit tool in order to facilitate data gathering specific to Program Guide requirements.

**Improve Quality Improvement Plan Development:**

- Revised Suicide Case Review process to include greater collaboration with staff at the institutions, clarify questions raised in the course of suicide reviews, and to ensure the development of relevant QIPs;
- Expanded final editing of the suicide report following the case review process to include feedback from all members of the Suicide Case Review Focused Improvement Team;
- Legal consulted during development of QIPs; and
- Standardized QIP language.

**Improve Submission of Quality Improvement Plan:**

- Statement added to cover letter and electronically mailed with final report indicating deadlines for QIP submission, along with a request that QIPs be completed immediately or as soon as possible prior to the deadlines;
- Regional Chiefs included in emails and invited to all suicide case reviews; and
- Assigned duties to a QIP Coordinator for daily tracking of QIP submissions, preparing for review by committee, and consulting with institutional staff regarding submissions.

**Tracking System Update:**

- Revised tracking system in order to highlight problems with timely submission of reports; and
- Track receipt of autopsy results.

> 7.   **Section G.   Mental Health Evaluation Component for a Rules Violation Report (Pages 12-10-28 to 12-10-29).**

There are no modifications to this Section, but CDCR has identified a potential need to modify how it is implemented.  (Ex. 1 pp. 98–99.)  Specifically, CDCR is investigating the need for additional training for both custody and mental health staff on the RVR Process.  This is being addressed in the ongoing meetings between CDCR Mental Health and DAI that commenced on July 22, 2010.

**V.**

**STRATEGIES TO ADDRESS THE PROBLEM OF INMATE SUICIDES**

**A.   Change of Conditions in Administrative Segregation Units.**

The DAI/Mental Health work group is discussing an option to change conditions in ASU units to better meet the mental health needs of these inmates.  Using the pilot project implemented at Pelican Bay State Prison as a model, the work group is reviewing the feasibility of implementing a similar policy on a state-wide level.

Specifically, the work group expects to complete the following tasks over the next thirty days: (1) discuss the various components of the Pilot Project in order to ensure a mutual understanding of the specific ideas being proposed; (2) discuss any additional ideas to be considered; (3) create lists of any potential foreseeable barriers, obstacles, or other difficulties in implementing a state-wide roll out of the project, as well as any specific concerns; and (4)  present lists to allow the work group to collaborate on methods of overcoming each potential obstacle and still build a policy that can meet the needs and address the concerns of each discipline.

19

**B.      High Risk Inmate-Patient Management.**

Identified Concern:

Dr. Patterson concludes in his "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2007," that suicide reviews continue to reflect the need for improved assessments of inmates who display symptoms of serious mental illness or past suicidal behavior, ideation, or statements.

Reason for Identification:

The identification and management of inmates presenting as high risk is critical in order to address inmate suicides. Inmates who present as high risk include those who display signs of psychiatric decompensation, unstable medical conditions, grave disability, self-injurious behavior, danger to others, frequent DMH or MHCB admissions, or who have housing/custody concerns. Those who engage in suicidal behaviors such as suicidal ideation, or who attempt suicide, fall into the general category of inmates who are at risk. Research reveals that prior suicide attempts correlate with risk of eventual successful suicide. CDCR's review of the QIPs from the suicides that occurred between 2008 and the first 6 months of 2010, support this strategy.

Proposed Solutions:

The proposal is to develop a manner of identifying, tracking, and treating inmates identified as being at high risk of suicide. Active management of the high risk subpopulation of inmates is necessary to promote suicide reduction. This active management, as part of the MHSDS, will track these inmates to ensure continuity of care between health providers (Mental Health, Medical, and others) and oversee service delivery to ensure the development of individualized treatment protocols and consistency of treatment.

Method:

   Process to Identify High Risk Inmates:

The development of such programs will begin with the HQ-based Utilization Management Team. The Utilization Management Team, currently focused on reducing the wait list of CDCR inmates needing inpatient care, is in the process of obtaining lists of multiple admits, or frequent users of mental health services. These lists will be based on data provided by DMH and by CDCR. CDCR expects to receive the lists of high-user inmates by the end of August 2010.

Once the combined list is obtained, it will be broken down into two categories:

1. Chronically mentally ill inmates at the EOP level of care and who have multiple admissions to either MHCB units or DMH. The inmates in this category tend to be prone to episodic decompensation, but at baseline, tend to be low functioning.

2. Inmates who suffer from chronic suicidal ideation (SI) or self-injurious behavior (SIB) and who have revolving admissions to DMH or to a MHCB unit.

The information obtained from DMH and from the CDCR MHCB units will be analyzed to identify those institutions with high users of DMH and MHCB services. The HQ Utilization Management Team will determine the timeline for the analysis of the data once the data has been obtained.

Upon review of the data, and in conjunction with input from the Chiefs of Mental Health, there will be a determination of those institutions that have the highest number of repeat users. Then, risk identification/tracking/treatment programs will be created and piloted at those institutions.

Program Creation:

In accordance with institutional resources, a high risk coordinator is designated, or a crisis management/high-risk team composed of clinicians across disciplines, is established. Whether the institution utilizes a team or an individual coordinator, for purposes of simplification, the term "high risk program" will be used.

The Referral Process:

In addition to those inmates identified on the high user list provided by the HQ-Utilization Management Team, any clinician (Case Manager, Psychiatrist, etc.) can make a referral to the high risk program. The referral form would require a brief description of the reason for referral to the high risk program.

The referral is made to the high risk program and entered into a log or tracking system. The high risk program staff (or coordinator) will perform a file review focused on identifying risk factors as well as protective factors that may contribute to the inmate's high risk status. Suicide history, methods of suicide attempts, frequency of suicide attempts, and other relevant mental health and medical conditions are among the areas focused upon in the chart review.

Then, if appropriate, the inmate will be assigned to the high risk program. If not appropriate for the high risk program, the reviewer will assess the need for a possible higher level of care.

Management of High Risk Inmates:

The high risk team (or high risk coordinator) will develop a High Risk Management Protocol (HRMP) for each inmate identified as high risk.

The HRMP will contain a detailed description of the inmate's history, including: developmental history, criminal history, including a description of the commitment offense and past offenses, substance abuse/dependence history, history of violence, mental health history, history of suicide attempts, family history of suicide attempts or completed suicide, review of diagnoses, provision of treatment recommendations and treatment management including exit criteria (i.e., criteria for

patient's removal from high risk status).  Frequency of clinical contact, and IDTT meetings, can be decided during the case conference.

Whenever a high risk inmate for any reason is re-assigned a new case manager, or moves into a different part of the institution for custody reasons (Ad/Seg, etc.), the high risk team, or coordinator, will communicate with appropriate clinicians about the arrival/departure of a high risk inmate. Supervisory staff is also notified and provided with a copy of the high risk management protocol (HRMP) to ensure continuity of care and promote suicide reduction.

As a component of managing high risk inmates, the high risk management team (or high risk coordinator) will promote the conduction of Self-Harm Reviews on identified cases involving suicide attempts. The institutions may determine a process for conducting Basic Self Harm Reviews as well as Comprehensive Self-Harm Reviews. The Self-Harm Reviews provide an avenue for clinicians to address clinical uncertainty in a peer-review format.  It is anticipated that the reviews will provide ongoing education regarding the treatment of high-risk inmates and identify systemic factors that may be contributing to suicide risk.

## C.      Clinical Competency in Administering the Suicide Risk Evaluation.

Identified Concern:

In the "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2007," Dr. Patterson concludes that in 82% of the suicide cases in 2007, "there was at least some degree of inadequacy in assessment, treatment, or intervention, for the highest rate of inadequacy in these areas in the past several years."

Reason for Identification:

The knowledge and ability to complete an adequate suicide risk evaluation is a fundamental clinical competency for all CDCR clinicians.  CDCR's review of the QIPs from the suicides that occurred between 2008 and the first 6 months of 2010, support this strategy.

Proposed Solution:

CDCR must ensure that clinicians possess the knowledge and skills to adequately evaluate inmates who may be at an elevated suicide risk.  Clinicians must complete evaluations (including the use of the SRE form) in the unique and challenging correctional setting. This Mental Health Program is proposed to include the following:

o   A requirement that all newly hired mental health clinicians (psychiatrists, psychologists, social workers, and psychiatric nurse practitioners) complete MHSDS Program Guide training and participate in the most recent suicide risk assessment training for clinicians (either face-to-face training or distance learning).

o   The monthly suicide prevention videoconference provided to all clinicians, either live or via intranet.

22

o   Weekly clinical supervision for unlicensed clinical staff.

o   Proctoring of all newly hired mental health clinicians on the proper use of CDCR's SRE form.  This will include direct supervision by an experienced clinician of one or more actual SRE evaluations.  Clinicians will not be qualified to perform independent SREs until this requirement is met.  The clinician will be assessed as qualified based upon the demonstrated ability to show:

    o   Data gathering (from C-file, UHR, collateral sources)
    o   Identification of risk and protective factors
    o   Formulation of risk level
    o   Clear rationale and justification for risk level - focus on individual factors rather than a generic approach
    o   Documentation is thorough
    o   Treatment plan clearly identifies relevant concerns
    o   The evaluation of risk is clearly communicated to appropriate staff

o   Encouraging local SPR FITs to disseminate information about intra-institutional suicide prevention developments to clinical staff in their institutions.  Clinical material presented in SPR FIT meetings can be used to provide ongoing clinical discussion and quality improvement outside the actual SPR FIT meetings.

o   Senior clinicians from MHCB units can facilitate ongoing clinical discussions with clinicians across treatment programs to facilitate dialogue and clinical discussion of difficult case material.

o   Encourage institutional programs to include suicide risk evaluation as a key indicator of clinical competence in their peer review programs.

Training and Proctoring of Current CDCR Clinicians

CDCR HQ's Suicide Prevention and Review staff, in conjunction with the Chiefs Work Group, are developing the process for training and proctoring of current clinicians. Additionally, staff and the Chiefs Work Group are considering how to develop an alternative process to grandfather in clinicians without requiring that those clinicians undergo the training and proctoring process.  Moreover, staff and the Chiefs Work Group recognize the further need to ultimately develop audit and monitoring tools necessary to validate the success of this strategy.

# EXHIBIT LIST

| NUMBER | TITLE |
|--------|-------|
| 1 | Select Excerpts From Mental Health Services Delivery System Program Guide (2009 Revision) Concerning Suicide Prevention Policies and Practices and Suicide Review and Reporting Processes |
| 2 | Summary of Proposed Changes to 2009 MHSDS Program Guide |
| 3 | Suicide Prevention and Response Focused Improvement Team Actions Taken Between 2007 and 2010 |
| 4 | Suicide Risk Evaluation Form 7447 |
| 5 | Agendas for Suicide Prevention Videoconferences |
| 6. | Tracking Tool – Suicide Review Process |