# EXHIBIT B

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

**ROSEN, BIEN & GALVAN, LLP**
ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104-1823
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
SUMANA COOPPAN
LISA ELLS
MARK R. FEESER
SHIRLEY HUEY[3]
LESLIE C. MEHTA[4]
MARIA MORRIS[5]
THOMAS NOLAN
BLAKE THOMPSON
KENNETH WALCZAK[6]
AMY WHELAN
SARAH O. ZIMMERMAN[6]

September 8, 2010

VIA EMAIL ONLY

Matthew A. Lopes, Jr., Special Master
Pannone Lopes Devereaux & West
317 Iron Horse Way, Suite 301
Providence, RI 02908-5637

      Re:    Defendants' August 25, 2010 Report
              Our File No. 0489-3

Dear Matty:

      As requested, Plaintiffs set forth our response to Defendants' August 25, 2010 Report ("8/25/10 Report"), which described their suicide process review in four-parts, including: (1) Review of the MHSDS Program Guide; (2) Review of CDCR Suicide Prevention and Response Program Actions Taken Between 2007 and 2010; (3) CDCR Work Group Efforts to Develop Strategies; and (4) Creation of the DMH/CDCR Plan to Share Documents. In addition, we provide our suggestion for the Special Master's Suicide Reviews for the Calendar Years 2008 and 2009.

## I. Defendants' August 25, 2010 Report

### A. Review of the MHSDS Program Guide

      Plaintiffs' concerns regarding the Program Guide relate to issues that impact on suicide prevention. We have previously raised these concerns in letters and during policy and 30-Day Meetings.

           1.    Ch 5: OHU section at p. 23 of the materials.

      Plaintiffs object to Defendants' statements that the Program Guide permits the use of the OHU for patients requiring suicide precautions and/or suicide watch. The Program Guide, including the Transfer Timeline Chart, clearly provides that patients requiring MHCB level of care (including suicide precautions/suicide watch) shall be referred for transfer within 24 hours. Nevertheless, Defendants take the position that clinicians should be permitted to use their own clinical judgment when determining when to refer a patient admitted to an OHU, contrary to the clear dictates of the Program Guide, and

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE MARYLAND, MISSOURI, KANSAS AND CALIFORNIA BAR
[5]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[6]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

[397950-1]

Matthew A. Lopes, Jr., Special Master
September 8, 2010
Page 2

contrary to MHCB licensing standards. We remain quite concerned over the "training" that has been provided to clinical staff in OHU/MHOHU/alternative settings, who now think that retaining a patient in an unlicensed setting on suicide precaution/suicide watch is permitted within CDCR. As we stated in the September 1, 2010 meeting, this is a dangerous practice, and CDCR Central Office should be required to cure the ambiguity that they have created in the field.

    2.    <u>Ch. 5, Restraint section at 12-5-16.</u>

Defendants did not review this section as part of their suicide review, but it relates directly to their proposed <u>Memo, MHCB- Use of Mechanical Restraints and Escort Policies</u> ("MHCB Handcuff Policy"), which authorizes practices that have serious impacts on suicide prevention. Section 12-5-16 of the Program Guide sets forth the required standards for the use of clinical restraints inside of licensed MHCB units. It reads in part:

> Restraint and/or seclusion are special treatment procedures used to protect the safety of inmate-patients who pose an immediate danger to themselves or others, by restricting their ability to inflict injury by limiting body movement or by containing them in a safe environment…Restraints and/or seclusion shall be used only as a last resort and in response to an emergency to protect the inmate-patient and/or others from imminent harm, after less intrusive and non-physical interventions have been attempted or ruled out. Staff shall strive to minimize or eliminate the use of seclusion or restraint whenever possible, through proper training, thorough assessment, effective treatment planning, and continuous quality improvement efforts. This policy restricts the use of restraints for mental health purposes generally to MHCBs. The use of restraints, for mental health purposes, in areas other than a MHCB unit shall be restricted to the amount of time required for transfer to a MHCB unit.

Defendants' MHCB Handcuff Policy, which clarifies and purportedly moderates the existing practices in MHCBs of cuffing, chaining and caging all patients indefinitely, violates licensing standards and the MHSDS PG limitations on the use of restraints, and maintains a non-therapeutic MHCB environment.

<u>First,</u> the Handcuff Policy permits the use of handcuffs on patients who are admitted to the MHCB due to danger to others, without first attempting less intrusive and non-physical interventions, as required by the Program Guide. In fact, clinical staff has no role in the initial decision to place the patient in handcuffs, leg-chains, waist-chains and cages, aside from documenting the reason for admission. Under CDCR's MHCB

[397950-1]

Handcuff Policy, patients who pose a danger to others are denied the protections developed under Title 24 and the Program Guide, including the requirement that a physician order the restraints, conduct an examination within a specified period of time, and review the restraint order, and that nursing checks occur during specific timeframes.

Second, Defendants' MHCB Handcuff Policy permits non-segregated patients to remain locked down in cages, handcuffs, waist chains and leg irons for three days, simply because the IDTT is where decisions are made to remove these devices. This is excessive and unreasonable. CDCR custody staff are charged with knowing the housing location of every prisoner 24/7, and housing lists are available, as well as phones to call referring clinician or institutions. There is no reason that MHCB staff cannot determine whether a patient comes from a segregated housing unit within 24 hours of admission.

Finally, the MHCB Handcuff Policy permits custody to make discretionary decisions to put patients back in cuffs, waist-chains, leg-irons and cages, **even after** they are cleared through the review process. The policy reads: "Custody staff will continuously evaluate the need for use of mechanical restraints for all I/Ps housed in the MHCB. Custody staff may use discretionary decision-making and place I/Ps in restraints who are otherwise cleared from the use of mechanical restraints, as dictated by the situation." It appears that cuffing, leg chains, waist chains and cages have replaced the clinical restraint process within MHCBs and the MHCB Handcuff Policy seeks to formalize this process. This is an inappropriate delegation of clinical authority to custody inside of these licensed facilities. These excessive custody practices inside these licensed inpatient facilities have an impact on the therapeutic environment and increase depression, hopelessness, and prisoner reluctance to report suicidal thoughts to staff.

        3.     Ch 10: Suicide Watch/Suicide Precautions at p. 69 to 73.

Plaintiffs have repeatedly requested that Defendants provide suicide-resistant beds in the MHCB units that do not currently have them. Defendants have failed to respond to Plaintiffs' proposal.[1] *See* Kahn Letter of August 11, 2010, setting forth Plaintiffs' position. As noted in our request, the failure to provide suicide-resistant beds, and the practice requiring all MHCB patients to sleep on the floor, violates licensing standards, clinical standards, and creates a non-therapeutic, punitive environment. The result of these punitive practices – the lack of beds, the cuffing, and caging of all patients admitted to MHCBs – may result in suicidal patients not reporting their thoughts to staff.

The Program Guide currently provides that bed frames and sheets (as well as light cords and night stands) shall be removed, by order of a clinician, from the MHCB room, unless the patient is in physical restraints (at p. 69). The Charts for both Suicide Precaution (at p. 71) and Suicide Watch (at p. 73) provide for the removal of all furniture.

---

[1] Defendants acknowledge that CMF and SQ have provided "Moduform" beds, one type of suicide-resistant bed in their MHCB units.

In fact, the majority of MHCB units currently have no beds or furniture whatsoever. The Program Guide should be modified so that MHCB units with suicide resistant beds (SQ and CMF) can make use of them. CDCR should purchase suicide resistant beds for the remaining MHCB units.

        (a)    CDCR Suicide Prevention and Response Actions Between 2007 and 2010

During this discussion, Plaintiffs made several suggestions about Defendants' Review of their suicide prevention practices and their implementation of the 2006 ASU Suicide Plan.

First, Plaintiffs noted that many of the recent suicides in the past three years have involved prisoners currently not on the mental health caseload, including prisoners housed in segregated housing. Among those suicides, a significant percentage was found to have both prior suicide and mental health history. *See, e.g.*, Special Master's 2007 Suicide Report at Table 1 and 2. Plaintiffs suggested that Defendants track suicide attempt history for all prisoners, not just those on the mental health caseload, and also track former caseload prisoners.[2] Defendants reported that they can use MHTS.net to track former caseload prisoners and appeared open to tracking suicide attempt history for all prisoners. How Defendants will use this information remains undeveloped, but if available it would be critical information for staff to have when a prisoner is transferred into high risk environments, like ASU. Defendants may choose, for example, to include those prisoners (non-MHSDS with suicide history), in the mental health programs inside the Pelican Bay Pilot ASUs. Plaintiffs hope that the final Report will include a commitment to track the suicide history of all prisoners within CDCR.

Second, Plaintiffs noted that the current conditions of confinement within CDCR, which include lockdowns, modified programs, staffing cut-backs that result in cancelled yards, educational, vocational, visiting and work programs, may impact the increasing suicides within CDCR. Research has shown that overcrowded prison systems begin to look like high custody/segregated housing where there are higher suicide rates. M. Huey & T. McNulty, Institutional Conditions and Prison Suicide, Conditional Effects of Deprivation and Overcrowding, 85 *Prison Journal* 490-514 (2005), at 506. Plaintiffs suggested that Defendants explore ways to mitigate against these severe conditions of confinement, especially during lockdowns and modified programs. Plaintiffs also suggested that the suicide review process include an analysis of the prisoner's conditions of confinement prior to the suicide.

---

[2] The high number of non-MHSDS prisoner suicides was discussed, including those with prior suicide attempt history. Jeff Metzner noted that Lindsay Hayes' latest study shows that over half of the suicides involve non-caseload prisoners.

Third, Plaintiffs discussed the other ways in which "Bad News" screening might catch prisoners who would not be found through the regular R & R screen. For example, Lifers who get denials (which can now be for 15 years) are notified through the mail. There are lists of Lifer Hearings, which CDCR could obtain, and track. There are other ways in which staff could be alerted to potential suicide risks for this group that is under greater stress at this time with the change in the law impacting on their parole denials.

Finally, Plaintiffs emphasized that the failure to provide 30 minute welfare checks and emergency life support are custody duties that must be aggressively solved by DAI, Wardens, Deputy Wardens, and Facility Captains, who should be held accountable for staff failures to comply with these Court-ordered obligations.

### B.   Workgroup Strategies To Address Suicides

Plaintiffs have no objections to the three strategies developed by the CDCR Workgroup in conjunction with the Special Master and his experts.

#### 1.   Implementation of the Pelican Bay ASU Pilot system-wide:

During the discussion on September 1, 2010, although there was no disagreement that reducing length of stay is critical for reducing suicides in ASUs, everyone agreed that CDCR has not been successful to date, and enhancing conditions in the ASU was adopted to mitigate the extended stays. Plaintiffs agree that augmenting services in the ASUs is important given the extended stays and harsh conditions, but we suggest that if the goal is to reduce the suicide rate, that Defendants must augment services in the ASUs for non-caseload prisoners as well. The suicide data supports this conclusion.

In addition, during the discussion of the 2006 ASU Plan, it became evident that there are ASUs with electrical capacity that are not currently permitting entertainment devices (in contravention of the court's order). Furthermore, Defendants should evaluate and identify those ASUs, which do not have electrical capacity, and determine what the cost of providing such electrical capacity would be (.e.g. some units, such as Z-Unit at HDSP, have cables that were cut but the wires are still there and the fix may be easy).

Finally, we repeat our objection to the absence of length of stay limitations in ASUs, especially for MHSDS prisoners. With regard to EOP patients' length of stay, we have a Program Guide dispute that remains for litigation.

#### 2.   High Risk Patient Management:

Plaintiffs agree that identifying high risk patients is critical in reducing the suicide rate. In addition, providing enhanced care to those same high risk patients is equally important, and we assume that a sizeable percentage of these patients are backlogged on the DMH waitlists. We suggest that this project be coupled with any plan that DMH develops in response to the court's 3/31/10 Order to address the waitlist and provide care for the 500 patients who currently reside on the DMH Waitlist for ICF/APP beds.

[397950-1]

Matthew A. Lopes, Jr., Special Master
September 8, 2010
Page 6

Second, the impact of current conditions of confinement, which are discussed at great length on p. 4, must be considered in managing high risk patients.

Finally, as mentioned above, tracking suicide history for all prisoners is a good means of managing high risk patients system-wide.

### 3. Clinical Competency in Administering Suicide Risk Evaluation

Plaintiffs agree this is a critical project. We recommend that some of the training focus on Deliberate Self Harm behavior, and how staff should respond to this type of behavior. James Knoll has written an excellent article on the increased risk of suicide to prisoners who engage in acts of deliberate self-harm and the difficulty in distinguishing between patients who engage in self-harm from those who will ultimately commit suicide. J. Knoll, Suicide in Correctional Settings, 16 Journal of Correctional Health Care, 188-204 (2010), at 196-197.

### C. Creation of the DMH/CDCR Plan to Share Documents

The April 14, 2010 Order directed DMH defendants to "meet and confer with the special master concerning production of information essential to the special master's suicide review process and develop, if necessary, appropriate policies and procedures for such production." Docket 3836 at 7:22-8:2.

Defendants' August 25, 2010 Report does not directly address the court's concern regarding DMH's responsibility to provide the Special Master will the required information for the suicide review process. The Report discusses a "SharePoint Site," which is being created to improve communication between CDCR and DMH. Defendants refused to provide information about an activation date, full implementation date, and any obstacles to activation and full implementation. Plaintiffs do not know whether the SharePoint satisfies the Special Master and the Court's concerns or when or if it will be activated or fully implemented.

## II. Special Master's Review of Calendar Year 2008 and 2009 CDCR Suicides

Plaintiffs request that the Special Master's Review of the 2008 and 2009 Suicides include the following elements from previous Special Master Reviews:

1. Statistical Summary

2. Chart 1: Suicides by facility

3. Chart 2: Single-cell housing, Incarcerated R Suffix, Method, Hx of suicidal behavior, Hx of Mental Health Treatment, Housing, Keyhea, Severe or

[397950-1]

        Life-Threatening Illness, On MHSDS at time of death, etc., including significant indications of inadequate treatment.[3]

4. Findings, which should include whether Defendants complied with their own Suicide Review Process timelines, the % of suicides that were either foreseeable and/or preventable.[4]

5. Table 1: All elements

6. Table 2. All elements.

There is no need to make recommendations in the Reviews of Calendar Year 2008 and 2009 CDCR Suicides.

This type of review for 2008 and 2009 is critical. Without these two years of data, Defendants, the Special Master and Plaintiffs will be unable to do a meaningful analysis of CDCR suicide trends, which requires a minimum of five years of data. *See*, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, Raymond Patterson and Kerry Hughes (Defendants Trial Ex. 1281), at 678.

Thank you for the opportunity to provide these written comments. Please feel free to contact us with any questions or concerns about these comments.

        Sincerely yours,

        ROSEN, BIEN & GALVAN, LLP

        */s/ Jane E. Kahn*

        By: Jane E. Kahn

JEK:cg

---

[3] If the CDCR Report on its face identifies inadequate treatment, there would be no need to go to the UHR for further review to make a determination. If the Report identifies no problems, and the prisoner was not on the mental health caseload, and the Expert can make a determination without the need to go to the UHR, then no need. If the Expert is unable to make the determination, the Expert should review the UHR to determine whether treatment was adequate.

[4] Similar to the above footnote if the Expert can make a determination based on the CDCR Suicide Report, then there is no need to consult the UHR. If the expert requires additional data, then he should consult the UHR before making the determination, and should explain that review in the Report.

[397950-1]