# EXHIBIT C

*EDMUND G. BROWN JR.*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 324-5345
Facsimile: (916) 324-5205
E-Mail: Debbie.Vorous@doj.ca.gov

September 22, 2010

Via E-Mail

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes & Devereaux, LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908

RE: Coleman, et al. v. Schwarzenegger, et al.
U.S.D.C. Eastern District of California, Case No. 2:90-cv-00520 LKK JFM P

Dear Special Master Lopes:

This letter responds to Plaintiffs' September 8, 2010 letter commenting on Defendants' August 25, 2010 Updated Report on Activities Taken Following the Court's April 14, 2010 Order (Defendants' August 25, 2010 Report). Defendants also respond to Plaintiffs' suggestions for the Special Master's Suicide Reviews for the Calendar Years 2008 and 2009, and set forth additional suggestions for the Reviews.

**I. Defendants' August 25, 2010 Report.**

**A. Review of the MHSDS Program Guide.**

1. Chapter 5, Page 12–5–32, *Mental Health Conditions Appropriate for Placement into an Outpatient Housing Unit:*

Plaintiffs object to how Defendants are interpreting the Program Guide, Chapter 5 at page 12-5-32, concerning the conditions appropriate for placing an inmate into an Outpatient Housing Unit (OHU). Defendants did not identify any concerns with this section of the Program Guide and continue to maintain that they are interpreting it in a manner consistent with its intent. Additionally, Defendants strongly object to Plaintiffs' position that Defendants should not be able to rely on their clinical judgment within the parameters of the California Department of Corrections and Rehabilitation's suicide prevention policies and procedures.

Nonetheless, Defendants represent that they are continuing to evaluate the role of OHUs in the process of risk management. Defendants agree to continue consulting with the Special

Master concerning the use of OHUs. Defendants also agree to consult with the Special Master on Chapters 5 and 10 of the Program Guide in order to eliminate, as appropriate and/or necessary, any ambiguity and inconsistency in those Chapters as related to the use of OHUs.

2. Chapter 5, Pages 12–5–16 to 12–5–17, *Clinical Restraints and Seclusion:*

Plaintiffs argue that CDCR's Memo, MHCB-Use of Mechanical Restraints and Escort Policies relates directly to the section in the Program Guide, pages 12–5–16 to 12–5–17, on Clinical Restraints and Seclusion. Defendants disagree. A distinction must be made between clinically-ordered restraint or seclusion and custody-ordered restraint for safety and security issues. Chapter 5, page 12–5–16, relates to clinically-ordered restraints: "Restraints shall only be used on a written or verbal order of an authorized clinician." (Program Guide at 12–5–16.) On the other hand, the Memo relates to custody-ordered restraints. Custody staff makes independent decisions to use restraints for custodial reasons. Thus, Plaintiffs are incorrectly extracting language meant to deal with seclusion and exclusionary restraint with custody's direction for use of restraints during escorts and use of restraints when secured within a therapeutic module.

Regardless, CDCR's Division of Adult Institutions provided this Memo via defense counsel to Plaintiffs and the Special Master after discussing it at the July 29, 2010 policy meeting and agreeing to provide a copy to the Special Master. Thus, since this Memo is not part of Defendants' August 25, 2010 Report, it is not at issue here for this reason as well.

3. Chapter 10, Pages 12–10–15 to 12–10–19, *Suicide Prevention and Response:*

Plaintiffs demand that Defendants modify the Program Guide to require that all the MHCB units have "suicide resistant" beds. Plaintiffs also claim that Defendants have failed to respond to Plaintiffs' proposals concerning their demands. Defendants, however, conveyed to Plaintiffs at both the July 29, 2010 policy meeting and the September 1, 2010 suicide meeting that they could not agree to Plaintiffs' demands.

The Court's April 14, 2010 order states that Defendants shall review their suicide policies and identify any specific modifications to those policies as may be required to address inmate suicides. CDCR clinicians reviewed all sections of the Program Guide that address suicide prevention policies and practices. This review included the Program Guide section addressing furniture in a MHCB unit, but the clinicians did not determine that modification of this section was necessary in order to address inmate suicides. Plaintiffs are not clinicians and their judgment cannot replace the professional judgment of CDCR clinicians. Nor does the Court's order allow Plaintiffs to dictate what sections of the Program Guide Defendants modify.

Plaintiffs also argue that Defendants are violating licensing standards by not providing "suicide-resistant" beds. Defendants disagree—the licensing standards do not require that Defendants place "suicide resistant" beds in all their MHCB units, only beds. California Code of

Regulations, Title 22, section 79829, requires that a licensed Correctional Treatment Center (CTC) provide a bed for each licensed bed. Cal. Code Regs. tit. 22, § 79829. Section 79799(b) further provides that an inmate's right to a bed may be denied or limited for good cause with proper documentation. *Id.* § 79799(b). Moreover, California Code of Regulations, Title 22, section 70815 requires only that CDCR provide a bed in a General Acute Care Hospital. Cal. Code Regs. tit. 22, § 70815. Neither state law nor the Program Guide mandates that Defendants place "suicide-resistant" beds in all the licensed MHCB units.

**B. CDCR Suicide Prevention and Response Actions Between 2007 and 2010.**

Plaintiffs make several requests related to Defendants' review of the 2006 ASU Suicide Plan. First, Plaintiffs request that Defendants commit to tracking the suicide history of all CDCR inmates. CDCR has already committed to create a new system-generated alert for those inmates with a "High Acute Suicide Risk." Additionally, Defendants are moving forward with their strategy to identify and manage inmates presenting a high risk of suicides.

Second, Plaintiffs request that: (1) Defendants explore ways to mitigate the conditions of confinement; and (2) CDCR, as part of its suicide review process, analyze the inmate's conditions of confinement prior to the suicide. CDCR agrees to consider ways to mitigate the conditions of confinement through the on-going Chief's Work Group. CDCR's suicide review process, however, already includes a discussion of the inmate's conditions of confinement prior to the suicide. The section of the report entitled, "Precipitating Events and Pre-suicidal Functioning" addresses all the precursors that can be reasonably identified, which would include their housing and any issues pertaining to it.

Third, Plaintiffs raise the issue of identifying the Lifers as part of Defendants' "Bad News" screening. CDCR agrees to consider ways to identify this type of issue through the on-going Chief's Work Group and CDCR's Suicide Prevention and Response Focused Improvement Team (SPR FIT).

**C. Workgroup Strategies to Address Suicides.**

Plaintiffs do not object to the three strategies that Defendants developed to address Inmate Suicide, but do ask that Defendants undertake additional steps concerning the strategies. Defendants respond as follows.

1. Implementation of the Pelican Bay ASU Pilot System-wide:

Plaintiffs ask that Defendants extend this Pilot Project to non-caseload prisoners. Defendants designed this strategy to better meet the mental health needs of the inmates in ASUs, and they are not in a position to commit to extending this Pilot to non-caseload inmates.

2. High Risk Patient Management:

Plaintiffs ask that Defendants couple this project with any plan that DMH develops in response to the Court's March 31, 2010 order to address the inpatient wait lists. Defendants already are taking whatever steps they can to couple this project with their plan to address the inpatient wait lists.

3. Clinical Competency in Administering Suicide Risk Evaluation:

Plaintiffs suggest that Defendants include training on Deliberate Self Harm behavior as part of this strategy. Defendants disagree—this training is more appropriately part of a SPR FIT videoconference presentation on the topic area. Defendants' detailed SPR FIT videoconference agendas reflect ongoing presentations of relevant topic areas, and SPR FIT will add Plaintiffs' suggested article to its written resources.

**D. Creation of the DMH/CDCR Plan to Share Documents.**

The April 14, 2010 order requires that DMH "meet and confer with the special master concerning production of information essential to the special master's suicide review process and shall develop, if necessary, appropriate policies and procedures for such production." (Order, 4/14/2010). DMH complied with this order—it met and conferred with Deputy Special Master Buffardi concerning production of information essential to the special master's suicide review process. This process did not result in any need to create additional policies and procedures.

**II. Special Master's Review of Calendar Year 2008 and 2009 CDCR Suicides**

Plaintiffs request that the Special Master's review of the 2008 and 2009 suicides include six elements from the previous reviews. Defendants agree with the six elements, but are uncertain as to Plaintiffs' suggestion concerning the extent of the case reviews. Though Defendants understand that a review may be necessary in order to opine, for instance, that a suicide was either foreseeable and/or preventable, Defendants suggest that not only should the Expert selectively review the Unit Health Record, but also abbreviate the written Case Reviews. Specifically, the Expert should abbreviate the history portion of the review and, to the extent possible, the findings. Extensive case reviews may be redundant and ultimately not useful given the strategies that Defendants are putting in place to address inmate suicides.

Additionally, with respect to "Findings," Defendants suggest that an abbreviated discussion on the suicide review process would be more appropriate; that is, a brief critique or evaluation, given the measures that Defendants have put in place to address the suicide review process.

Please contact me if you have any questions with Defendants' response and comments. Thank you.

Sincerely,

DEBBIE J. VOROUS
Deputy Attorney General

For EDMUND G. BROWN JR.
Attorney General

DJV:

CF1997CS0003