```
 1                 IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                           ---O0O---

 4       BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

 5

 6   RALPH COLEMAN, et al.,

 7          Plaintiffs,

 8   Vs.                              CASE NO. CIV. S-90-0520 LKK

 9   ARNOLD SCHWARZENEGGER,
     et al.,
10

11          Defendants.

12   _____/

13

14

15

16                           ---o0o---

17

18                     REPORTER'S TRANSCRIPT

19                   MONDAY, OCTOBER 3RD, 2010

20   RE:  EVIDENTIARY HEARING REGARDING THE C5-C6 PROJECT AT SVSP

21

22                           ---o0o---

23

24

25   Reported by:                 CATHERINE E.F. BODENE,
                                   CSR. No. 6926
```

```
 1                        APPEARANCES

 2                         ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5             ROSEN, BIEN & GALVAN, LLP
               315 MONTGOMERY STREET, TENTH FLOOR
 6             SAN FRANCISCO, CALIFORNIA  94104

 7             BY:  MICHAEL BIEN, Attorney At Law
               BY:  JANE E. KAHN, Attorney At Law
 8             BY:  AMY WHELAN, Attorney At Law

 9

10

11    FOR THE DEFENDANTS:

12              STATE OF CALIFORNIA, DEPT. OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
13              13OO I STREET
                SACRAMENTO, CALIFORNIA  95814
14
               BY:  DEBBIE J. VOROUS,
15                  Deputy Attorney General

16

17

18    FOR THE STATE FIRE MARSHAL:

19              STATE OF CALIFORNIA, DEPT. OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
20              13OO I STREET
                SACRAMENTO, CALIFORNIA  95814
21
               BY:  CARYN L. CRAIG,
22                  Deputy Attorney General

23

24

25                        ---o0o---
```

```
 1                    EXAMINATION INDEX

 2                       ---o0o---

 3   FOR THE DEFENDANTS:

 4      EXAMINATION:                              PAGE

 5

 6    WILLIAM WESTIN

 7       Direct Examination by Ms. Vorous          2
         Cross-Examination by Ms. Kahn            17
 8       Further Cross-Examination by Ms. Kahn    88

 9

10    VICTOR BREWER

11       Direct Examination by Ms. Vorous         29
         Cross-Examination by Ms. Whelan          36
12       Examination by The Court                 97

13

14    JEAN BARAWED

15       Direct Examination by Ms. Vorous         55
         Cross-Examination by Ms. Whelan          59
16

17

18

19

20                       ---o0o---

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
1                           EXAMINATION INDEX

2                               ---o0o---

3

      FOR THE PLAINTIFFS:
4
            EXAMINATION:                                    PAGE
5

6        JOHN GUHL

7            Direct Examination by Ms. Whelan              62
             Cross-Examination by Ms. Vorous               84
8

9

10

11

12

13

14

15                              ---o0o---

16

17

18

19

20

21

22

23

24

25
```

1

1           SACRAMENTO, CALIFORNIA

2        MONDAY, OCTOBER 4TH, 2010 - 10:00 A.M.

3                  ---o0o---

4        THE CLERK:  All rise.

5        Court is now in session.

6        The Honorable Lawrence K. Karlton is presiding.

7        THE CLERK:  Calling Civil S-90-520, Coleman, et al.,

8   v. Schwarzenegger, et al.

9        THE COURT:  Counsel, approach the podium.  State your

10  appearance for the record.

11        MS. VOROUS:  Debbie Vorous on behalf of the State

12  defendants.

13        MS. WHELAN:  Amy Whelan on behalf of plaintiffs.

14        THE COURT:  The purpose of this hearing is an

15  evidentiary hearing --

16        MS. CRAIG:  Sorry, Your Honor.  Deputy Caryn Craig on

17  behalf of subpoenaed witness John Guhl with the Office of the

18  State Fire Marshal.

19        THE COURT:  Thank you very much.

20        The purpose of this hearing is to clarify what, to

21  say the least, is where -- I don't want to make comments

22  about what appears to be going on, but at in any event, to

23  clarify the state of where we are so that the Court can

24  figure out what to do about it.

25        You may proceed, ma'am.

2

1          MS. VOROUS:  Your Honor, let me -- If I can go back

2     and grab some of my...

3          THE COURT:  Sure.  You may retire, Ms. Whelan.

4          MS. VOROUS:  Your Honor, in response to the Court's

5     order, STATE FIRE MARSHA have brought three witnesses today

6     to testify.

7          THE COURT:  You may proceed.

8          MS. VOROUS:  STATE FIRE MARSHA would like to call as

9     the first witness William Westin.

10         THE COURT:  Come around and be sworn, sir.

11         THE CLERK:  Raise your right hand.

12                         WILLIAM WESTIN,

13    was thereupon called as a witness herein by the Defendants,

14    and having been sworn to tell the truth, the whole truth and

15    nothing but the truth, was thereupon examined and testified

16    as follows:

17         THE CLERK:  State your name, spell your last name and

18    speak directly into the microphone, please.

19         THE WITNESS:  My name is Bill Westin.  My last name

20    is spelled W-E-S-T-I-N.

21                         DIRECT EXAMINATION

22    BY MS. VOROUS:

23    Q.    Good morning, Mr. Westin.

24          Would you please tell us who your current employer

25    is?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3

1  A.      I work for the Department of Corrections in the

2  Inmate Ward Labor Program which is part of the Project and

3  Construction Management Division of Facilities Planning,

4  Construction and Management.

5  Q.      How long have you been with the California Department

6  of Corrections and Rehabilitation?

7  A.      Since 1996.

8  Q.      Can you please describe what the Inmate Ward Labor

9  Program is?

10 A.      The Inmate Ward Labor Program does construction

11 projects in the institutions -- adult institutions and

12 juvenile justice institutions using --

13         THE COURT:  I'm sorry, sir.  Will you just slow down.

14 I'm having a little trouble understanding you.  Not your

15 problem.  It is mine.  But you've just got to slow down a

16 bit.

17         THE WITNESS:  Yes, sir.

18         We do construction projects using inmate labor and

19 what we call casuals, which are union trades people.  We do

20 major cap outlay projects, minor cap outlay projects and

21 special repair projects, and I was going to add deferred

22 maintenance projects also.

23         THE COURT:  And you're going to add deferred

24 maintenance projects.

25         THE WITNESS:  Deferred maintenance, yes.

4

```
 1              THE COURT:  Go ahead.
 2   BY MS. VOROUS:
 3   Q.       How long have you been at your current position?
 4   A.       Since December of 2005.
 5   Q.       Are you familiar with the Salinas Valley Psychiatric
 6   C5-C6 Program?
 7   A.       Yes.  I'm the project director for that project.
 8   Q.       Can you describe what the C5-C6 project is?
 9   A.       Well, the project is a short-term mental health
10   project to provide an additional 116 ICF patient beds,
11   including modifications to cells and the construction of
12   group rooms in the existing dining area, along with exam
13   treatment rooms -- two exam treatment rooms, two nurses
14   stations and two offices.
15   Q.       Would you, for the benefit of the Court, please
16   describe what the C5 housing is?  Would you consider it a
17   housing unit?  Is it a building?  Can you describe what that
18   looks like?
19   A.       Yes.  C5 and C6 are two housing units that share the
20   same building.  The building is a 180 design, and each
21   housing unit are on one end of the building.  And each
22   housing unit contains three pods -- living pods.  And they
23   share resources in the center of the building which include
24   the dining, the kitchen and offices and control.
25   Q.       What is your role with respect the C5-C6 project?
```

5

```
 1    A.      Well, as I stated before, I'm the project director,
 2    and my main role is to understand and track progress on the
 3    construction schedule and coordinate between all the
 4    stakeholders involved, regularly meet with Healthcare
 5    Services and DMH and the institution for the purpose of
 6    talking about progress, and I report on progress in bimonthly
 7    project briefings.
 8    Q.      Is the construction of the C5-C6 project complete?
 9    A.      Yes.
10    Q.      When was the project complete?
11    A.      July 28th.
12    Q.      At some point after the construction of the C5 and C6
13    project was complete, did you learn the fire suppression
14    system that covered the cell areas in C5 and 6 was not
15    holding the required air pressure?
16    A.      Yes.
17    Q.      When did you learn this?  The approximate date?
18    A.      The institution made all the stakeholders aware of
19    that situation on August 9th by email.
20    Q.      Did you take any steps in response to learning about
21    this particular problem?
22    A.      Yes.
23    Q.      What steps did you take?
24    A.      Well, first we requested information from the
25    institution and evaluated the system ourselves.  Secondly, we
```

6

1   looked at the current available construction budget and

2   contingency for the purpose of determining whether or not we

3   could afford to make repairs or whatever was required at that

4   time.

5           Then we started the process of developing a plan.  In

6   order to do that, we requested and had a meeting with the

7   State Fire Marshal's Office to determine what their position

8   would be on the issue with the fire suppression system.

9           Then we developed a schedule that was shared with the

10  stakeholders to determine whether or not everybody was in

11  agreement that that was the best plan, best approach.

12          THE COURT:  When you say "stakeholders," who did you

13  meet precisely?

14          THE WITNESS:  The stakeholders that I'm referring to

15  are the institution, the Department of Mental Health and the

16  Healthcare Services.

17          THE COURT:  Never talked to the Special Master?

18          THE WITNESS:  We have had discussions on a couple of

19  occasions.

20          THE COURT:  I believe that.  I mean, I understand

21  that -- I'm sorry.  I don't mean to be angry.

22          THE WITNESS:  That's okay.

23          THE COURT:  Please, forgive me.

24          You may proceed, ma'am.

25  ///

7

BY MS. VOROUS:

Q.      Did the Deputy State Fire Marshal put any conditions or requirements on the plan that you were putting together?

A.      Yes.  During the discussion there was conditions.

Q.      What were those conditions?

A.      That we would need to do a complete replacement and provide a plan for that -- for accomplishing that.

Q.      What do you mean when you say you would need to do a "complete replacement"?

A.      Replacing all of the fire sprinkler piping as opposed to just making repairs.

Q.      Are you referring to all the sprinkler piping in C5 and C6, or just C5-C6, if you can clarify?

A.      C5 and C6, yes.

Q.      When did you finalize the plan and have it available for stakeholder review?

A.      August 24th is when I provided the schedule to the other stakeholders.

Q.      Can you describe what that -- the plan entailed that you had available on the 24th?

A.      The plan at that time identified the institution finalizing repairs in C5 and gaining occupancy in C5.  And then as soon as we were able to procure the necessary materials and design required for C6, that we would do a complete replacement of the fire sprinkler piping in C6 while

8

1   the inmates (sic) were admitting patients in C5.

2          Once C6 was completed and had gained occupancy and

3   was certified and licensed, then the patients would be moved.

4   The ones that had been admitted so far in C5 would be moved

5   to C6, and we would then start complete replacement on C5

6   pods.

7          THE COURT:  In the interim, when people were

8   committing suicide out there, that was just one of the

9   benefits of getting it right; is that right?

10         Never mind.  You're not the right person.

11         You may proceed.

12  BY MS. VOROUS:

13  Q.     At some point after August 24th, did you update that

14  plan?

15  A.     Yes.  I modified it on September 2nd due to the fact

16  that the original plan didn't identify the correct amount of

17  time to accomplish the certification and the licensing prior

18  to moving patients.

19  Q.     How did you update it?

20         What did you change in the plan?

21  A.     I added a period between 12-3 and 12-10 to accomplish

22  that.  So the patient movement would start after that.

23         That's not correct.

24  Q.     Go ahead.  Please --

25  A.     Basically added a couple of weeks.  But the 12-10

9

1   date would be when the patients had been moved.

2   Q.      Had been moved from C5 to C6?

3   A.      Correct.

4   Q.      Are you using inmates from the Inmate Labor Program

5   to do the permanent repairs in C5 and C6?

6   A.      That's correct.  That's part of what our program is

7   based on.

8   Q.      At some point did you provide the plan that you're

9   just describing to the Deputy State Fire Marshal?

10  A.      We did.  We provided that to them right after that.

11  Q.      Can you be a little more specific in terms of "right

12  after that"?  Are you referring to the August 24th date or a

13  different date?

14          THE COURT:  It's got to be after the September date,

15  right?

16          THE WITNESS:  Yeah.  Right.  It might have been the

17  same day, September 2nd or September -- I can't remember.

18  BY MS. VOROUS:

19  Q.      Let me go back to the initial plan that we were just

20  discussing, the August 24th plan.  Did you provide that plan

21  to the Deputy State Fire Marshal?

22  A.      Yes.  That was required to be provided when the fire

23  marshal had been scheduled to come out there for the first

24  time to approve and confirm that C5 was activated -- the fire

25  suppression system was activated and met testing

10

1    requirements.  That occurred August 25th.  And on that day we

2    provided that plan -- the original plan.

3    Q.      We've been referring to providing a plan to the

4    Deputy State Fire Marshal.  Are you -- Do you have a

5    recollection of which deputy was there, a particular deputy

6    from the State Fire Marshal, that you provided the plan to?

7    A.      On August 25th, the plan was provided to John Guhl,

8    who was on site at Salinas Valley that particular day.

9           On 9-2 or 9-3, when I provided the updated plan, that

10   was provided to the Deputy State Fire Marshal that had been

11   assigned after that.  Her name is Francis Wright.

12   Q.      We've been talking about the testing of C5 and

13   gaining temporary occupancy of C5.  Can you explain that a

14   little bit more, please?

15   A.      Yes.  When we decided on our approach, the

16   institution had been in the process of making repairs to the

17   piping in C5 where they were leaking.  And they believed that

18   they could get that done in a timely manner so we decided to

19   allow that to take place.

20          And once the repairs were made, the plan was for the

21   Fire Marshal to review.  And they had agreed to our plan to

22   approve temporary occupancy of C5 so that we could start

23   admitting patients as soon as possible.

24   Q.      Were there any other conditions that were placed on

25   obtaining -- placed on -- placed on the institution in terms

11

1    of obtaining temporary occupancy for C5?

2    A.      Yeah.  The temporary occupancy was based on our plan

3    to complete C6 by middle of November and have the patients

4    moved to the newly licensed C6 facility on approximately

5    12-10.  We were -- The Fire Marshals made it clear in their

6    Fire Correction Notice during the inspection that the

7    temporary occupancy for C5 would be through the end of

8    December.

9    Q.      Temporary occupancy for C5 was through the end of

10   December?

11   A.      I'm sorry.

12   Q.      Did you say -- I believe you just said that the

13   temporary occupancy for C5 was through the end of December?

14   A.      Through the end of December, yes.

15   Q.      Was there any other condition, besides the one that

16   you just indicated, with respect to obtaining temporary

17   occupancy?

18   A.      Yes.  The main issue too was to provide the Fire

19   Marshal's Office with our plan to do a complete replacement

20   on both C6 and C5.

21   Q.      At some point did the Deputy State Fire Marshal grant

22   temporary occupancy to the C5 unit?

23   A.      Yeah.  That occurred on September 2nd.

24   Q.      In your plan to make permanent repairs to C5 and --

25   Strike that.  Let me start that question over.

12

1          Does your plan to make permanent repairs to C5 and C6

2    have a schedule setting out when those repairs will be made?

3    A.     Yes.

4    Q.     What is the schedule with respect to C5?

5    A.     C5 would follow the completion of C6.  And it

6    currently shows us completing construction on January 14th

7    and gaining fire marshal occupancy within the next day or two

8    after that.

9    Q.     What does your schedule show with respect to

10   completing C6?

11   A.     C6, we're supposed to be completed with that by

12   November 18th and gain fire marshal occupancy approximately

13   the 19th of November.

14   Q.     If I'm understanding the plan correctly, at some

15   point, once the permanent repairs are made to C6, the plan

16   would be then to move the inmates that have been admitted

17   into C5 into C6; is that correct?

18   A.     That's correct.

19   Q.     And approximately when would that occur based on the

20   schedule you've just been discussing?

21   A.     That would occur between December 3rd and December

22   10th.  The period between November 19th and December 3rd is

23   the period to accomplish certification and the licensing of

24   the facility.

25   Q.     So based on that schedule there would be a period of

13

1   time between November and December when DMH would not be able

2   to admit inmate patients into either C5 or C6?

3   A.      Based on that schedule, they would stop admitting

4   patients on December 11th and not be able to admit patients

5   again until we were completed with C5 on approximately

6   January 17th.

7           THE COURT:  Let me be sure I understand.

8           Both C5 and C6 will not admit patients under this

9   schedule, which is as good as the schedule that I've been

10  given over the years.  You know, you're two years behind.

11  But both C5 and C6 would not be occupied during this period

12  of certification, correct?

13          THE WITNESS:  That's correct.

14  BY MS. VOROUS:

15  Q.      Have you looked at ways to try to reduce that period

16  of time that the Department of Mental Health would not be

17  able to admit patients into either C5 or C6?

18  A.      Yes.  I have come up with a better plan.

19  Q.      And what is that plan?

20  A.      Well, the plan is to, while we're doing C6 -- all

21  three pods in C6, is to also do the piping replacement in C5,

22  pod A, which is the largest of the three pods.

23  Q.      And would you please explain how that would impact

24  the number of days that DMH could not be admitting inmates

25  into either C5 or C6?

14

1    A.      Well, because we would complete C5-A at the same time

2    as the C6 pods, they could continue to admit patients in C5,

3    A pod, while the patients are being moved to C6 allowing us

4    access to pods B and C for the complete piping replacement.

5    Q.      And the permanent repairs that would occur in C5, pod

6    C -- pod A -- excuse me -- would those be occurring while

7    there were inmates in pod A?

8    A.      No.  The current admittance process, as I understand

9    it, is they're admitting patients right now in pod B of C5.

10   And then they will, after they're done with that, they'll

11   admit patients in pod C.

12          So according to the schedule, based on the admittance

13   of five patients per week, the C5, pod A, would be done prior

14   to their need to start admitting patients to C5-A.

15          THE COURT:  I'm sorry.  I really am just -- I'm sure

16   it is me.  They are presently admitting patients into C5 even

17   though it is -- the problem with the water pressure has not

18   been addressed?

19          THE WITNESS:  The pods in C5 have a temporary

20   occupancy by way of making repairs to the fire suppression

21   system.

22          THE COURT:  Okay.  So you can make temporary repairs

23   which will permit -- I'm asking you, not telling you.  I'm

24   just trying to understand.

25          You can make temporary repairs sufficient to permit

15

1   the admission of patients in C5?

2              THE WITNESS:  Right.

3              THE COURT:  You could do the same thing in C6, but

4   then you have to go back and replace the pipes somewhere?

5              THE WITNESS:  That's correct.  And the issue with

6   making repairs in C6 at this time is that there's no

7   guarantee how long it will take.  And --

8              THE COURT:  That's obvious.  I mean that's -- Never

9   mind.

10             THE WITNESS:  The repairs in C5 took a considerable

11  amount of time.  It was kind of a hit and miss thing.  We had

12  to keep testing it.

13             THE COURT:  What does "a considerable amount of time"

14  mean?

15             THE WITNESS:  Well, I believe it took over a month.

16  And C6 we're currently scheduled to start the construction

17  tomorrow.

18             THE COURT:  All right.  Go ahead.

19  BY MS. VOROUS:

20  Q.      And when is the construction for C6 -- What is the

21  anticipated completion date for the construction in C6?

22  A.      I'm sorry.  I can't hear you.

23             THE COURT:  When do you finish construction in C6?

24             THE WITNESS:  On November 18th.

25  ///

16

```
 1   BY MS. VOROUS:
 2   Q.      Assuming that the project did move forward according
 3   to the revised schedule that you have just been talking
 4   about, could the number of days that DMH has to stop
 5   admitting to C5 or C6 be reduced?
 6   A.      Yeah.  I believe it reduces it down to eight days.
 7   Q.      So in between -- Let me start that question again.
 8           So the proposal that was provided initially to the
 9   Office of the State Fire Marshal and the proposal that you
10   presented in your declaration to the court had a period of
11   time of 40 days where DMH would not be able to admit patients
12   to C5-C6.
13           Am I understanding your testimony to be that with
14   this new proposal, if all goes according to schedule, that
15   time could be reduced to eight days?
16   A.      That's correct.
17   Q.      Have you presented this proposal to the Office of the
18   State Fire Marshal for consideration?
19   A.      Yes.
20   Q.      Have you received a response back yet from the Office
21   of the State Fire Marshal?
22   A.      Not yet.
23           MS. VOROUS:  I have no further questions for this
24   witness at this time, Your Honor.
25           THE COURT:  Miss Whelan.
```

17

1          I guess not.  Someone else.

2          MS. KAHN:  Good morning, Your Honor.  Jane Kahn for

3    plaintiffs.

4                        CROSS-EXAMINATION

5    BY MS. KAHN:

6    Q.     Good morning, Mr. Westin.

7    A.     Good morning.

8    Q.     Do you have a copy of your declaration?

9    A.     Not in front of me, no.

10   Q.     Can I approach the witness?

11          (Declaration handed to witness for review.)

12   Q.     Mr. Westin, you were asked some questions about C5

13   and C6, the configuration of the units.  I just want to

14   follow up with a few questions there so the configuration is

15   clear to everybody in the courtroom.

16          C5 and C6 are standard prison housing units, correct?

17   A.     Yeah.  But there are more than one type of housing

18   units.

19   Q.     So the 180 design, and C5 and C6 are identical units?

20   A.     Yes.

21   Q.     And they each have three housing pods, A, B and C?

22   A.     Correct.

23   Q.     And the housing pods are separated, A, B, C are

24   separated by thick concrete walls, correct?

25   A.     That's correct.

18

1    Q.      They're locked units?

2    A.      Yes.

3    Q.      They're two-tiered units with patient rooms or cells

4    on each tier?

5    A.      Correct.

6    Q.      And they have a day room, correct?

7    A.      That's right.

8    Q.      And overlooking the day room is an officer who's

9    stationed in a watch tower looking down on the day room?

10   A.      We call that "control," yes.

11   Q.      Control.  And on the day room, can you describe

12   what's on the day room floor?

13   A.      Well, that varies, but they're mostly just open.

14   Q.      And the day room floors that you've renovated in C5

15   and C6?

16   A.      They have a couple of -- a few tables for patients to

17   sit at.  I believe there's some drinking fountains.  And

18   there used to be urinals, but we removed those.

19   Q.      So after the initial seven week delay of activating

20   C5 and C6, the construction, it was completed on July 28th,

21   and the Fire Marshal inspected the units the next day?

22   A.      Correct.

23   Q.      Did you accompany the Fire Marshal on that

24   inspection?

25   A.      I did not.

19

1   Q.       You did not.

2           During the inspection, the Fire Marshal identified

3   only two minor items that needed to be fixed before patients

4   could be admitted?

5   A.       Correct.

6   Q.       Those items were to label new group rooms and install

7   backorder batteries for exit lights?

8   A.       The new group room was signage for actual labels on

9   the doors.

10  Q.       And install the backorder batteries?

11  A.       Correct.

12  Q.       Nothing else was identified as problematic by the

13  Fire Marshal during the inspection?

14  A.       Correct.

15  Q.       As a result of the two problems, the Fire Marshal

16  issued Beneficial Occupancy Certification which allowed DMH

17  to start the inspection -- to start the licensing process,

18  but not admit patients?

19  A.       Correct.

20  Q.       Okay.  And the repairs had to be done first?

21  A.       That was not my understanding.

22  Q.       Before patients could be admitted?

23  A.       Correct.

24  Q.       Okay.  As a result of this, the activation of the

25  unit which was supposed to happen at the end of August was

20

1    moved a week until September 6th?

2    A.       That sounds correct.

3    Q.       Okay.  And then in your declaration you state there

4    is a subsequent inspection by the Fire Marshal on August

5    26th, which is almost a month later, and at that time the

6    Fire Marshal again found a problem with the emergency exit

7    lighting in the group rooms?

8    A.       That's correct.

9    Q.       Okay.  And that further delayed activation of the

10   unit from September 6th to September 21st?

11   A.       I believe at that time we were also aware of the fire

12   suppression issue.

13   Q.       In your declaration you state that the batteries were

14   a problem again and delayed the activation, correct?

15   A.       That's correct.

16   Q.       Okay.  You've testified that via email you learned

17   about problems with the piping in the fire suppression system

18   in C5 and C6 on August 9th?

19   A.       Yeah.  That's just for the cell areas.

20   Q.       Are you responsible for this project?

21   A.       I'm responsible for the construction project, yes.

22   Q.       Okay.  The Fire Marshal did not identify problems

23   with the piping in the fire -- in these cell areas in the

24   fire suppression system when the unit was inspected -- when

25   these units were inspected on July 29th?

21

1    A.        That's correct.

2    Q.        Okay.  Now, the Fire Marshal came out and looked at

3    these units in August and September of 2009, correct?

4    A.        September of 2009?  I'm not aware of that.

5    Q.        Okay.  Were there inspections that were done -- Was a

6    Fire Safety Correction Notice done which identified that all

7    the fire sprinkler systems in C -- in Facility C-yard and D

8    had to be serviced, and it was issued by the fire -- and

9    there was a Fire Safety Correction Notice issued in September

10   and October of 2009?  I correct myself.

11   A.        Which part of my declaration are you reading?

12   Q.        It is not from your declaration.  These are Fire

13   Marshal documents that we got that were issued --

14   A.        I'm not aware of those.

15   Q.        You're not aware of those.  Okay.

16   A.        Not in '09.

17   Q.        Not in '09?

18   A.        No.

19             I became involved in this project in August of 2009.

20   Q.        Okay.  All right.

21             THE COURT:  Where would the notice have gone to if it

22   wasn't directed to you?

23             THE WITNESS:  It would have gone to the

24   institution.

25             THE COURT:  To the warden?

22

1          THE WITNESS:  Or his designee.  Often the warden will

2     designate the correctional plant manager.

3          THE COURT:  I want to know who's responsible because

4     somebody is going to jail.  I take that back.  That's off the

5     table.

6          I want to know who's responsible.  Who would get the

7     notice, if you know?

8          THE WITNESS:  I don't know who got the notice.

9          Usually there's a signature at the bottom of the Fire

10    Correction Notice on who was with the Fire Marshal at the

11    time.

12         MS. KAHN:  These notices went to the Department of

13    Corrections and Rehabilitation, Division of Planning,

14    Acquisition and Design, Design Services, Sacramento.

15         THE COURT:  Sacramento?

16         MS. KAHN:  Facility Name, CDCR Salinas Valley.  It is

17    the C5-C6 dining conversion, yard fence, Salinas Valley.

18    Convert E-dining room into six mental health rooms.  And then

19    it governs the C-wing construction project.

20         THE COURT:  So it goes to Sacramento first, and you

21    have no idea.  It may have been sitting on somebody's desk

22    from '09 until sometime.

23    BY MS. KAHN:

24    Q.    This identified a number of issues, including the

25    fire suppression system which --

23

1    A.        Over the cell area?

2    Q.        Inside of the unit.

3              I mean, Mr. Westin, you're aware that the entire fire

4    suppression system within Salinas Valley needs to be

5    replaced, correct?

6    A.        It's just in the 180 housing units over the cell

7    areas.

8    Q.        And you have told the Fire Marshal that you will be

9    providing a plan by October 1st, 2010, correct?

10   A.        That's correct.

11   Q.        And are there prisoners living in those housing

12   units?

13   A.        Yes.

14   Q.        Is the plan to remove them from the housing units

15   because it is unsafe to house them in those units?

16   A.        That is not our plan.  I did provide a plan.

17   Q.        Is the plan to request an alternative means of

18   protection?

19   A.        No.  The plan is to do -- to evacuate one pod and to

20   do construction in one pod.  Move inmates, work in the next

21   pod and continuously do the project that way.

22   Q.        Why was that type of plan not presented for the

23   patients who are on the wait list to move into these ICF

24   units?

25   A.        Essentially, we're going to work in three pods

24

1    instead of one pod.  And actually, now I'm identifying four

2    pods instead of single pods.

3            THE COURT:  I'm completely confused.

4            The people who aren't sick, you're going to move them

5    out and work on one pod, and then move them back in?

6            Is that right or am I confused?

7            THE WITNESS:  That's correct.  The issue there is,

8    again, where do you move them.

9            THE COURT:  That's right.  That's right.

10           Where are you going to move them?  Do you know?

11           THE WITNESS:  That's not my job to do.  But they've

12   identified that they could find enough beds to allow

13   evacuation of one pod so that we could do construction.

14   BY MS. KAHN:

15   Q.      Mr. Westin, is there a timeline for that project?

16   A.      Yes.

17   Q.      What is the timeline?

18   A.      It would be completed in November of 2016.

19   Q.      Mr. Westin, I want to get back to the meeting that

20   you had with the stakeholders to develop a plan to address

21   this.  The Fire Marshal granted --

22   A.      I'm sorry.  Which plan are we talking about?

23   Q.      The meeting with all the stakeholders after you

24   learned that you had a problem with the fire suppression

25   system, the corroded pipes.

25

1   A.      Okay.

2   Q.      The Fire Marshal permitted you temporary occupancy of

3   C5 and C6 if you were able to make the fire suppression

4   systems operational, correct?

5   A.      The agreement was to gain temporary occupancy in just

6   C5.

7   Q.      In your declaration you state that if you could -- if

8   you could make these units -- if you could make them

9   operational, you could admit patients, but you had to come up

10  with some sort of plan, a timeline, to ultimately convert

11  these units.

12          Correct?

13  A.      That's correct.

14  Q.      Okay.  But she did not mandate any particular

15  timeline to fix the pipes, correct?

16  A.      No.  She asked us to provide the plan.

17  Q.      Exactly.  So your plan for the rest of the prison is

18  to correct the fire suppression system by 2016, correct?

19  A.      That's correct.

20  Q.      But the timeline for these ICF units was to not admit

21  patients and correct it immediately?

22  A.      We cannot admit patients until you have certification

23  and licensing.  In order to get licensing, you have to have

24  Fire Marshal occupancy approval, then a certification that it

25  meets Title 24.

26

1   Q.      But the Fire Marshal granted you a conditional

2   occupancy as long as you provided her with a timeline to

3   ultimately correct these -- replace these units.

4          Is there any reason why you couldn't have provided

5   her with a timeline that was several years out, correct?

6   A.      Our approach to this was to try and get it done as

7   soon as possible so that we didn't have any issues.

8          One of the issues that needs to be understood is that

9   C5 has temporary occupancy.  However, if for some reason the

10  system was to start leaking again, the Fire Marshal's Office

11  could revoke that occupancy.  Temporary repairs are not as

12  good as a permanent fix.

13         THE COURT:  For sure.  But in the meanwhile there are

14  people -- very sick people who don't have any place to go.

15  And the question that's being raised by these questions is

16  whether or not temporary occupancy, so that they can get some

17  kind of treatment, is better than nothing.

18         Has anybody considered that?

19         THE WITNESS:  Essentially, that's what we were

20  proposing was by getting occupancy of C5, that you start

21  admitting patients as soon as possible.

22         Looking at the repairs being done to C6, which the

23  institution hadn't even started yet, we were looking at the

24  very likelihood -- the likelihood we could complete the

25  complete replacement in a similar amount of time that it

27

1  would take to do the temporary repairs and gain occupancy.

2  BY MS. KAHN:

3  Q.      I don't really know what to say, Mr. Westin.

4          You just testified that you have a plan that is out

5  six years to replace the fire replacement -- the fire

6  suppression system in the rest of the prison where prisoners

7  are housed.

8  A.      That's correct.  You already have prisoners housed in

9  those units.  In C5 and C6 you needed to gain Fire Marshal

10 occupancy and certification and licensing before you admitted

11 patients.

12 Q.      The Fire Marshal granted you occupancy and said just

13 give us a plan.  And I've looked at -- I'm sure you've seen,

14 you know, Title 19, which the Fire Marshal is very reasonable

15 in those regulations and says that the goal is to work with

16 agencies, recognize their limitations, and have them develop

17 a plan to come into compliance.

18 A.      I believe that's what we did.

19         MS. KAHN:  Thank you very much.

20         I have no further questions.

21         THE COURT:  Miss Vorous?

22         MS. VOROUS:  No further questions for Mr. Westin.

23         THE COURT:  Sir, help me.  I am absolutely unable

24 to -- It is my fault, but I just don't understand.

25         You have three pods, I think you said, in 5, three

28

1    pods in 6.

2        Could you fix a pod and have that pod certified while

3    you're working on the other two pods?

4        THE WITNESS:  I'm not sure about that.

5        THE COURT:  Did you ask?  I'm not blaming.

6        THE WITNESS:  No.  I didn't ask that question because

7    at the time, seriously, the approach was to get occupancy in

8    C5 as soon as possible, to allow admissions to start, and to

9    come up with a plan to do a complete replacement on C6 so

10   that there would be a limited amount of time.

11       THE COURT:  Either way, it doesn't matter.

12       You could do a temporary fix in 5, put people in.

13   You've got three pods in 6.  Can you -- Can you -- Let's

14   start there.

15       Can you do a permanent fix in 6 pod-by-pod or do you

16   have to do the whole thing at one time?

17       THE WITNESS:  That's one of the things that is

18   interesting about that.  When the cells are evacuated that

19   way, I can actually do the repairs on all three pods in the

20   same amount of time as I can do one.  So that was the

21   approach.

22       If I do one pod at a time --

23       THE COURT:  All right.  If you tell me that it is

24   going to take the same time to do three as one, I don't

25   understand the math, but I'll take your word for it.

29

1           THE WITNESS:  It's simply that, you know, if you have

2     a certain size crew that you can work in the designated area,

3     I can do three crews versus one crew.

4           THE COURT:  Okay.

5           Anything further?

6           MS. KAHN:  No.  No, Your Honor.

7           THE COURT:  You may step down, sir.

8           MS. VOROUS:  The STATE FIRE MARSHA call Victor

9     Brewer.

10          THE COURT:  Come around and be sworn, sir.

11          Mr. Brewer.  There you go.

12          THE CLERK:  Please, raise your right hand.

13                         VICTOR BREWER,

14    was thereupon called as a witness herein by the Defendants,

15    and having been sworn to tell the truth, the whole truth and

16    nothing but the truth, was thereupon examined and testified

17    as follows:

18          THE CLERK:  Please, take a seat.

19          State your name, spell your last name and speak

20    directly into the microphone.

21          THE WITNESS:  My name is Victor Brewer, B-R-E-W-E-R.

22                       DIRECT EXAMINATION

23    BY MS. VOROUS:

24    Q.      Mr. Brewer, what is your current title?

25    A.      Executive Director of the Salinas and Vacaville

30

1   Psychiatric Programs.

2           THE COURT:  Can I ask you to pull up just a bit, sir.

3           Thank you.

4   BY MS. VOROUS:

5   Q.      How long have you been at this position?

6   A.      Since 2001.

7   Q.      Would you please describe your job duties?

8   A.      Overall responsibility for two inpatient psychiatric

9   programs, including daily operations, fiscal performance,

10  care of the patients.

11  Q.      First, do your duties include responsibility for

12  budget change proposals --

13          (Reporter requests counsel to repeat.)

14          THE COURT:  I'm having trouble hearing you both now.

15  BY MS. VOROUS:

16  Q.      Do your duties include responsibility for making

17  budget change proposals for program development?

18  A.      Yes.

19  Q.      As Executive Director with the Department of Mental

20  Health, what is your role with respect to the C5-C6 project?

21  A.      As in all previous activations, I oversee the

22  activation of Charlie-5 and Charlie-6.

23  Q.      If I refer to it as "C5," are you comfortable with

24  that versus "Charlie"?

25  A.      Yes.

31

1  Q.      Is the C5 unit currently licensed?

2  A.      Yes.

3  Q.      And has the Department of Mental Health started

4  admissions into C5?

5  A.      Yes.

6  Q.      How many inmates are currently admitted into C5?

7  A.      Ten.

8  Q.      And what pod are you currently admitting inmates

9  into?

10  A.      B pod.

11  Q.      After B pod is filled, what is the next pod in line

12  to admit inmates into?

13  A.      C pod.

14  Q.      Is C6 currently licensed?

15  A.      No.

16  Q.      Is the Department of Mental Health admitting inmates

17  into C6 at this time?

18  A.      No.

19  Q.      At some point is the Department of Mental Health

20  intending to ask for licensing of C6?

21  A.      Yes.

22  Q.      When will that occur?

23  A.      It is my understanding as soon as the renovation to

24  the sprinkler system is complete, we have received Fire

25  Marshal approval, ASH pod certification, we will immediately

32

1    have the application to the Department of Public Health for

2    licensing.

3    Q.      Can permanent renovations be done in C6 while the

4    patients are in that unit?

5    A.      In my opinion, no.

6    Q.      And why not?

7    A.      I am not sure as to the complete noise level.  I have

8    been informed they will be saw cutting steel pipes.  There is

9    an echo because it is a solid concrete structure.  There will

10   be workmen going in and out of the pods with their respective

11   tools, and that is a possibility of a danger to patients.

12   The noise level may result in a decompensation of a patient.

13   Q.      What about do you have any concern with

14   confidentiality?

15   A.      Yes, I do.

16   Q.      What is that concern?

17   A.      Either inmate labor or free labor, free staff, would

18   be coming in and out of a pod where patients are admitted,

19   and they may or may not recognize individuals giving up their

20   confidentiality.

21   Q.      How many patients per week does the Department of

22   Mental Health intend to admit into C5?

23   A.      Five per week.

24   Q.      What about C6?

25   A.      Five per week.

33

1    Q.       And why is the Department of Mental Health intending

2    on admitting five patients a week into the C5 and C6 program?

3    A.       It is based upon the structure.  We attempted to

4    admit more than that in Treatment Center 2 and found we could

5    not do all the necessary evaluations on patients, which were

6    the precursor for formation of the treatment team plan, which

7    we have to do on at 72 hours, one in ten days, one in 30

8    days, and special IDTTS in between if warranted.

9    Q.       If DMH were to increase admissions beyond five per

10   week, would the patients still receive the programming and

11   yard time that DMH typically provides as part of its

12   programming?

13   A.       No.  Because for each assessment there is five

14   different professional classifications, which we do an

15   assessment so there is five hours, plus one hour for the

16   IDTT.  So we would consume the vast majority of the time of

17   our clinical staff in doing preparation, evaluations, testing

18   and IDTTS.

19   Q.       Are there physical plant limitations that come into

20   play in making your determination as to the rate of

21   admission?

22   A.       Yes.

23   Q.       Are there those sorts of limitations with respect to

24   C5 and C6?

25   A.       Yes.  We have a total of three group rooms for C5.

34

1    So to hold individual sessions in private we would have to

2    escort the patient to the group room.  So I could do a

3    maximum of three per hour.

4           We do not hold them in the pods because it's a HIPAA

5    violation.  Other patients can hear what is going on in that

6    pod.

7    Q.     Is the Department of Mental Health able to pull staff

8    or, I guess, transfer staff from other units in the Salinas

9    Valley Psychiatric Program in order to accelerate admissions

10   into C5?

11   A.     In good conscience no, because then we would be

12   taking them away from their current patients, not providing

13   the care that we normally render.

14   Q.     Is DMH able to hire new staff to increase admissions?

15   A.     Our original BCP was to activate this unit at five

16   patients per week.  My staffing is staggered.  I have hired

17   the clinical staff necessary to open these buildings.

18   However, I do not have sufficient MTAs to carry out this duty

19   so I have asked for additional custody staff from the warden

20   to do so.  But in light of the structure, I can only put

21   patients in the three group rooms at this time.

22   Q.     You mentioned a moment ago that your staff is

23   staggered.  Can you explain that, please?

24   A.     In activating a unit, we receive permission up to one

25   year in advance to commence hiring.  So that means I have

35

1    both budgetary dollars and the hiring authority to advertise

2    and commence the interview and selection process.  So they're

3    staggered based on expectations of recruitment throughout the

4    year.

5    Q.      When would you -- When are you expecting to have the

6    full compliment of clinical staff for C5 and C6?

7    A.      Within 30 to 45 days.

8    Q.      IS DMH -- Is the Department of Mental Health able to

9    move more stable patients into C5 from the other programs in

10   the Salinas Valley Psychiatric Program?

11   A.      The vast majority of the patient admissions are SHU

12   patients and Ad. Seg.  Therefore, there is a very high

13   custody level.  Because I do not have sufficient MTAs to

14   staff round the clock, I would prefer to admit, for safety

15   sake of the patient and our employees, general population EOP

16   patients.

17           However, we will continue to admit in the other four

18   units both Ad. Seg. and PSU patients.

19   Q.      What is -- explain the shortage of the MTAs that you

20   referred to -- that you're referring to?

21   A.      MTAs are either a registered nurse, a licensed

22   psychiatric technician or a licensed vocational nurse who

23   applies to CDCR and goes through a physical abilities test, a

24   psychological evaluation and background check.

25           And it takes anywhere from four months to a year,

36

1   depending on the individual, whether or not they are cleared

2   or not cleared.

3   Q.      Are you currently in the process of trying to hire

4   and bring in more MTAs?

5   A.      Yes.  I have 248 in the application process.  We have

6   a full-time recruiting team for both Salinas and Vacaville to

7   bring in MTAs.

8          MS. VOROUS:  No more questions at this time, Your

9   Honor.

10                        CROSS-EXAMINATION

11  BY MS. WHELAN:

12  Q.      Good morning, Mr. Brewer.  We've met before, but I'm

13  Amy Whelan.  Good to see you again.

14          As of August 2010 the wait list for high-custody male

15  patients for ICF beds was 464 patients.  Is that about where

16  it is today as well?

17  A.      No.

18  Q.      What's your wait list today?

19  A.      It should be down around 403 if I recall statistics.

20  Q.      Does that include the 13 -- the Penal Code 1370

21  patients as well?

22  A.      No.

23          THE COURT:  I'm sorry.  I don't know what Penal Code

24  1370 is.

25          MS. WHELAN:  Incompetent to stand trial patients.

37

1          THE COURT:  Okay.

2    BY MS. WHELAN:

3    Q.      With those included, do you know what the wait list

4    is today?

5    A.      Approximately, 421, 422.

6    Q.      And the reason why we're here today is to talk about

7    the C5 and C6 units which are emergency units intended to

8    relieve this wait list that we've been talking about; is that

9    right?

10   A.      Correct.

11   Q.      And do you agree, we did some calculations in our

12   papers, that it looked like patients were currently waiting

13   an average of more than six months to access high-security

14   ICF beds, with many waiting much longer, more like eight to

15   ten months.  Does that sound correct to you?

16   A.      Yes.

17   Q.      And D5-D6 were originally intended to be temporary

18   units; is that correct?

19   A.      Yes.

20   Q.      And C5 and C6 are also intended to be temporary?

21   A.      Yes.

22   Q.      In your declaration -- Do you have that in front of

23   you?

24   A.      No.

25          MS. WHELAN:  May I approach?

38

1      (Declaration handed to witness for review.)

2  BY MS. WHELAN:

3  Q.      In your declaration you wrote that DMH requested and

4  received funding for staffing for the C5-C6 project based on

5  admitting five inmate patients a week over an extended time.

6      Is that correct?

7  A.      Where are you referring to, please?

8  Q.      (Pause.)

9      I don't see it immediately in the paragraph, but you

10 just testified on your direct to that admission, right?  Is

11 that correct?

12 A.      Correct.

13 Q.      And you submitted the BCP based on that admission,

14 right?

15 A.      Correct.

16 Q.      You're aware, correct, of this Court's prior orders

17 to accelerate the C5 and C6 projects, correct?

18 A.      Yes.

19 Q.      Why didn't you base your staffing plan on a more

20 rapid patient admission schedule given this Court's orders to

21 accelerate?

22 A.      When we wrote the BCP, the waiting list was 141.  We

23 were bringing on 116 beds to alleviate that problem.  Second,

24 increasing the staff will not increase the admission rates

25 due to the structural limitations of this building.

39

1    Q.      Well, let's talk about the structural limitations.

2            Back when you opened D5 and D6, in fact you had no

3    group rooms at all available for those patients, correct?

4    A.      Correct.

5    Q.      And so you have both buildings -- Right now with C5

6    and C6 you have six group rooms available; is that correct?

7    A.      There's six group rooms constructed.  That is

8    correct.

9    Q.      And with D5 and D6 you had zero, correct?

10   A.      That is correct.

11   Q.      And back when you opened D5 and D6, you had something

12   like 80 or 100 patients on the SVPP waiting list, correct?

13   A.      I do not recall.

14   Q.      Well, this would have been back around the end of

15   2006?

16           THE COURT:  Before we did the project to determine

17   whether there really were sick people out there that nobody

18   was paying attention to it was about 100, 120?

19           Is that right?

20           THE WITNESS:  Your Honor, I cannot recall what it was

21   precisely.

22           THE COURT:  I understand that.  But around 100 to

23   120, roughly?

24           THE WITNESS:  I believe so.

25           THE COURT:  Okay.

40

1    BY MS. WHELAN:

2    Q.      And you -- This was a big problem you pointed out.

3    In fact, you were very concerned that D5 and D6 were running

4    without group rooms for patients for more than two years,

5    correct?

6    A.      Correct.

7    Q.      But at the time you did it because there was an

8    emergency backlog, and you really needed to admit patients

9    into those units, correct?

10   A.      I admitted into Delta-6, completed through the pods

11   until I completed admissions, and then I commenced admissions

12   into D5.

13   Q.      My point is that you -- you used these two units that

14   had zero group rooms at that time, and you moved patients in

15   and worked out a therapeutic program for them based on the

16   space you had.  And you did that because you had a waiting

17   list and you had to start moving patients in, correct?

18   A.      I programmed patients within the pod.  I did IDTTS

19   within the pod, which is a HIPAA violation.  I did it out of

20   necessity.

21   Q.      I understand.  Because it is an emergency?

22   A.      Yes.

23   Q.      And now you have got more than 400 patients on a

24   waiting list, correct?

25   A.      Correct.

41

1    Q.      And you have six treatment rooms that are available

2    for those patients?

3    A.      I have six group rooms.  That is correct.

4    Q.      So you could work out a therapeutic program for those

5    patients as well.  It wouldn't be perfect, but it would be

6    much better than you did in D5 and D6, correct?

7    A.      Currently we've staged equipment into the other three

8    group rooms so I can activate Charlie-6 in a very short

9    period of time.

10           If I move those group -- that equipment out, the

11   result will be it will go back to the warehouse and that will

12   extend my time of activation.

13   Q.      I'm sorry.  I don't understand what you mean.

14   A.      When the building is turned over to us, there's no

15   equipment or furnishings.  We have to move the equipment from

16   the warehouse, calibrate the equipment before we install it.

17           If I move it from the three group rooms back to the

18   warehouse, I will have to go through that process which will

19   extend my activation.

20   Q.      Right now you've got C5, and you have three group

21   rooms available in C5, correct?

22   A.      That is correct.

23   Q.      And you're only moving patients into C5 at this

24   point?

25   A.      Correct.

42

1    Q.      You also talked about having a concern when you moved

2    patients into these units that you might disrupt therapeutic

3    relationships.

4           Do you recall testifying to that on your direct?

5           THE COURT:  She's talking about if you -- Never mind.

6           Do you recall that testimony that you had?

7           THE WITNESS:  No.  If you could repeat it for me, I

8    will.

9    BY MS. WHELAN:

10   Q.      I believe she asked you whether you could move -- you

11   could just move some staff from other units, other SVPP units

12   into C5.  And I believe you said that you had some concerns

13   about doing that because you would be removing those staff

14   from their existing patients; is that correct?

15   A.      That is accurate.

16   Q.      But when you move any patients into these units,

17   you're interrupting their clinical relationships, correct?

18   A.      Not with a new admission.  That's why --

19          THE COURT:  That's because they don't have any

20   therapeutic programs.

21   BY MS. WHELAN:

22   Q.      Right.  They're coming from all over the state.

23   They're coming theoretically from all 33 prisons and

24   different units within those prisons into the SVPP, right?

25   A.      That is accurate.

43

1    Q.      And you're not bringing clinicians from their

2    original prisons with them to maintain those therapeutic

3    relationships, correct?

4    A.      That is true.  However, you're going from an

5    outpatient service to an inpatient service, and that will

6    always be disrupted in the system.

7    Q.      You also move patients between SVPP units?  Like you

8    move patients between D5 and D6 or between the treatment

9    centers, right?

10   A.      It is done, but it is done as little as possible, not

11   to disrupt that patient's milieu.

12   Q.      But you do it?  You have to do it.  You sometimes

13   have to move patients between these units?

14   A.      That is correct.

15   Q.      Or you might use one unit as an admission unit, and

16   then move those patients?

17           You might use a treatment center as an admission unit

18   and then move those patients to D5 or D6, right?

19   A.      We do not use any one entity as an admission unit

20   now.

21   Q.      Okay.  But did you ever use admission units in a

22   separate unit for a different -- for instance, D5 and D6?

23   A.      No.  We used A-Wing and TC1 as an admission unit and

24   found out that was not a good idea.

25   Q.      Okay.  At the time you did that, you then moved

44

1    patients into D5 and D6 from the treatment centers?

2    A.      No.  I moved all the patients into D5 and D6, direct

3    admissions.

4    Q.      How many staff positions would you need for full

5    activation of C5 and C6?

6    A.      Four psychiatrists, four psychologists, eight social

7    workers, eight rehabilitation therapists, four SRNs, 22 RNs.

8    Q.      And can you say how many of each of those categories

9    you have right now?

10   A.      The psychiatrist positions are filled minus one with

11   either employees or contractors.  All the psychologist

12   positions are filled.  All the rehab therapist positions are

13   filled.  All the social worker positions are filled.  I

14   believe I have one vacancy for registered nurses.

15   Q.      And your senior registered nurses?

16   A.      I don't recall that number today.

17   Q.      When you say that they're filled, are those people

18   actually staffed and working at Salinas Valley right now?

19   A.      No.  Many of them we have commitments and are coming

20   on board over the next 30 to 45 days.

21   Q.      And how many staff do you have in the unit right now?

22   A.      Sufficient numbers to fully staff C5.

23   Q.      Now, you never went back and tried to alter your five

24   patients per week admission plan in light of the very long

25   waiting list for these beds; is that right?

45

1   A.      Because of the experience we had in TC2, which has

2   four group rooms and four interview rooms, six admissions

3   failed because of the complexity of those admissions and the

4   amount of hours necessary to do the evaluations.  So no, I

5   did not attempt to increase it.

6   Q.      And you also didn't attempt to increase it after you

7   learned about the construction problems that were happening

8   in the unit, like the delays with the sprinkler system,

9   correct?

10   A.      I do not understand your question.

11   Q.      After you learned that there were further

12   construction delays that would delay the opening of C5 and

13   C6, you also didn't go back and alter your plan to admit more

14   than five patients per week, correct?

15   A.      That is correct.

16   Q.      And you also didn't do so after plaintiffs' counsel

17   and the Special Master requested, at a meeting in July, that

18   DMH accelerate admissions beyond the five patients per week,

19   correct?

20   A.      We're accepting five patients per week because we can

21   appropriately assess the patient.  We do an IDTT in three

22   days, do another one at ten days, and do the 30 days

23   thereafter with the physical plant.

24   Q.      Mr. Brewer, I understand what the ideal programming

25   is for these patients, but here, from our perspective, we

46

1    want to get patients into these units as soon as possible.

2    So it may be that some of these requirements might not happen

3    exactly as they should, just like that happened in D5 and D6

4    back when you opened them.

5         So the question is, is there a way to accelerate

6    these admissions to get patients in, patients who are

7    lingering in units that are not inpatient units so that we

8    can get patients in as soon as possible?

9    A.     I believe you're confusing doing IDTT and assessments

10   in the pod with five admissions per week.  If I exceed five

11   admissions per week, I am not providing the care required

12   under Title 22 or any of our programmatic plans.

13   Q.     But you're not --

14        THE COURT:  That's true.  Right now of all of these

15   400 some people are just hanging out there.  Isn't that

16   right, sir?

17        They're not getting the appropriate program either.

18   Isn't that right, sir?

19        They're not getting much of any program?

20        THE WITNESS:  It is my understanding they are getting

21   a maximum of ten hours per week in the EOP.

22        THE COURT:  You may proceed, ma'am.

23        I'm sorry to have interrupted you.

24        MS. WHELAN:  Thank you, Your Honor.

25   ///

47

BY MS. WHELAN:

Q.     It sounds like from your testimony that the hiring freeze that the Governor implemented has not affected you; is that right?

A.     It did affect us in that we were instructed to seek a secondary approval for the positions.  We have done so and that has been granted.  So it did cost about 30 to 45 days.

Q.     And can you explain what the "secondary approval process" was?

A.     We asked for approval of the positions, which is an exception request, and it was sent to headquarters.  And because the agency has authorized the department to grant those for clinical care positions, ours were granted.

Q.     And if you were under an order to admit more than five patients per week, similar to the order to do so at ASH, Atascadero State Hospital at one point, what would you need? What staffing resources would you need to admit, for instance, seven patients per week?

A.     As I've stated before, staffing is not the issue.  If I'm ordered to do more, I will follow that order.

Q.     So the issue is the programming?

A.     Yes, sir -- Yes, ma'am.

Q.     And the programming depends on the staff that you have available to provide the programming, correct?

A.     And the physical plant.

48

1    Q.      And I believe C5 has only been open for about two

2    weeks?

3    A.      Our first admission was on the 21st.

4    Q.      And you testified earlier that there are ten patients

5    in right now; is that correct?

6    A.      As of last Friday.  And we're scheduled for five more

7    over the next 72 hours.

8    Q.      In terms of the MTA shortage that you testified

9    about, how many MTAs do you have in these units right now?

10   A.      I have pulled night staff.  I have one MTA in second

11   watch and third watch.  I have sufficient staff to do that

12   for all three pods in C5.

13   Q.      I'm sorry.  So you have one MTA available?

14   A.      One MTA per pod second watch and third watch.

15   Q.      And no MTA on first watch?

16   A.      That is correct.

17   Q.      And what time period is first watch?

18   A.      Ten o'clock at night until 6:00 in the morning.

19   Q.      And STATE FIRE MARSHA informed the Court in the

20   process of filing the papers for this hearing that the

21   current plan is to admit patients into C5 only from general

22   population EOP units.

23   A.      That is my preference.

24   Q.      And that means that some patients who have higher

25   acuity levels may be excluded from C5?

49

1      THE COURT:  Not may be.  Will be.  Is that right,

2   sir?

3      THE WITNESS:  Yes.

4   BY MS. WHELAN:

5   Q.     You talked earlier that your MTAs are either

6   registered nurses, psychiatric technicians, and you said a

7   third category.  What was that?

8   A.     Licensed vocational nurse.

9   Q.     And is there a reason that you need MTAs in these

10  units?

11     I mean in other words, can you just use psychiatric

12  technicians who are not -- who did not become MTAs for this

13  purpose?

14  A.     I have requested 120 psychiatric technicians or LVNs

15  through the various registry contracts because we will

16  supplement the lack of MTAs with LVNs or Psych-Techs.

17  Q.     Do you have sufficient LVNs and Psych-Techs right now

18  for those units?

19  A.     I've asked for 120 and received 12.

20     THE COURT:  You've asked who?

21     THE WITNESS:  The four registry contracts we have.

22     THE COURT:  And they've been only able to provide 12?

23     THE WITNESS:  That is correct.

24  ///

25  ///

50

1    BY MS. WHELAN:

2    Q.      And have you also sought to fill them with registered

3    nurses?

4    A.      Yes.

5    Q.      How many registered nurses did you request?

6    A.      If I recall, approximately 20.

7    Q.      And how many did you receive?

8    A.      Zero.

9    Q.      And did you also request LVNs for that purpose?

10   A.      I requested 120 LVNs and/or psychiatric technicians.

11   Q.      And have you asked to streamline the background or

12   security check process for those staff in order to hire them

13   more quickly?

14   A.      Are you referring to psychiatric technicians or MTAs?

15   Q.      The MTAs?

16          THE COURT:  That's not the problem.  He says he

17   doesn't have anybody to examine.  They only got 12 people out

18   of 120 requests.

19   BY MS. WHELAN:

20   Q.      You testified earlier that 248 people are in the

21   process --

22   A.      Yes.

23   Q.      -- of becoming MTAs?

24   A.      Correct.

25   Q.      And it takes approximately four to 12 months for them

51

1    to go through the background process, correct?

2    A.    Correct.

3    Q.    And is there a way to expedite that process for those

4    248 people who are in the process?

5    A.    We are working with CDC on a daily basis to expedite

6    that process.

7    Q.    Have there been any -- has there been any success

8    doing that?

9    A.    Yes.  It reduced it from six months a year ago to

10   four months now.  But the background is what normally will

11   hold it up because they're relying on other individuals

12   providing that information, and they have no control over

13   obtaining it.

14   Q.    And are there any other problems, besides the MTA

15   shortage, that is resulting in your preference to admit only

16   patients from general population EOP units?

17   A.    No.

18         MS. WHELAN:  Thank you.

19         THE COURT:  Anything further?

20         MS. VOROUS:  No further questions.

21         THE COURT:  What is the need for MTAs for Level IV

22   that is not satisfied with your -- let me stop there.

23         What is your need for MTAs for Level IV?

24         THE WITNESS:  The MTAs are peace officers and

25   therefore they have immediate access to the patients because

52

1    they carry keys to the cells.

2          THE COURT:  And that can be solved, I assume, asking

3    you, not telling you, that if you have COs temporarily acting

4    as MTAs until you can fill those spots, they would have keys?

5          THE WITNESS:  I have received supplemental COs for

6    both Charlie-5 and Charlie-6 to do exactly that, sir.

7          THE COURT:  How many?

8          THE WITNESS:  Two per pod second watch, two third

9    watch and one on first watch.

10         THE COURT:  And if you increase the number of --

11   Well, let's start there.

12         I take it that means that you can take Level IVs?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  And are you taking Level IVs?

15         THE WITNESS:  Only Level IVs.

16         THE COURT:  All right.  And if you can increase the

17   number of COs, can you increase the number of Level IVs that

18   you can take?

19         THE WITNESS:  That will not change.  More COs will

20   not change the requirement of the therapeutic end of it.  I

21   still need to do one hour for every classification to do the

22   IDTT and develop a treatment plan for that patient.

23         THE COURT:  I believe that, sir.  I have no reason

24   not to, but -- Well, that's not true either.  But what I'm

25   faced with is there are people out there who are getting, in

53

1   essence, no responsible inpatient treatment because they're

2   in Ad. Seg. or God knows where.

3        Now, that, I would think, anybody would think was a

4   serious emergency that requires extraordinary acts.  And yes,

5   you will undoubtedly delay the treatment programs being

6   developed, et cetera, but they will be in a place at least in

7   which there is a hope that there's a psychiatrist,

8   psychologist, somebody who has training, will be addressing

9   their most immediate problems, the decompensations, all that

10  goes on because they're not getting treatment.

11       Now, in comparing that problem with a less than

12  perfect treatment program, why have you selected the first

13  rather than the second?

14       THE WITNESS:  Under licensure requirements I'm

15  mandated to do those.  If those were waived, I have always

16  attempted to expedite admissions into this program.  And I

17  believe I have demonstrated that over the last eight years.

18       THE COURT:  So that if the Court says, as a temporary

19  matter, considering the -- I'm asking you, not telling you --

20  considering the nature of the emergency, that the standards

21  of three days and ten days -- I'm sorry, I don't remember --

22  will have to slip some to get people into at least beds, that

23  could be done?

24       It wouldn't be ideal, I understand that, but it could

25  be done?

54

```
 1          THE WITNESS:  Yes.

 2          THE COURT:  My questions invite questions?

 3     Counsel?

 4          MS. VOROUS:  I'm sorry, Your Honor?

 5          THE COURT:  Did my questions invite questions?

 6          MS. VOROUS:  No.

 7          THE COURT:  Counsel?

 8          MS. WHELAN:  No, Your Honor.

 9          THE COURT:  You may step down, sir.

10          MS. VOROUS:  Your Honor, STATE FIRE MARSHA call Gene

11     Barawed.

12          THE CLERK:  Remain standing.

13          Raise your right hand.

14                    JEAN BARAWED,

15     was thereupon called as a witness herein by the STATE FIRE

16     MARSHA, and having been sworn to tell the truth, the whole

17     truth and nothing but the truth, was thereupon examined and

18     testified as follows:

19          THE CLERK:  Please, take a seat.

20          State your name, spell your first and last name and

21     speak directly into microphone.

22          THE COURT:  May I interrupt for a moment?

23          Please, be seated, ma'am.

24          Mr. Vorous (sic) -- I can't see you back there, I

25     know you're back there somewhere -- if you had your druthers,
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

55

1    if you had your choice, what would be the best solution to

2    the problem of this enormous waiting list and relaxing the

3    standards?

4            Is that better or worse in your view?

5            Please, come to the microphone.  I'm sorry to have

6    done that.  I just don't -- Is it better or worse, sir?

7            WITNESS BREWER:  It is a balance, sir.  By doing

8    that, we can increase admissions.  The clinical team would

9    need to make up those lost assessments, but it possibly could

10   be done.

11           THE COURT:  Thank you, sir.

12           WITNESS BREWER:  Yes, sir.

13           THE COURT:  You may proceed.

14           THE WITNESS:  Jean Barawed, B-A-R-A-W-E-D.

15                        DIRECT EXAMINATION

16   BY MS. VOROUS:

17   Q.      Good morning.  What is your current title?

18   A.      I'm the Assistant Deputy Director for Long-term Care

19   Services with the Department of Mental Health.

20   Q.      How long have you been in this position?

21   A.      Since November 2006.

22   Q.      Would you please describe your job duties?

23           THE COURT:  Ma'am, I'm sorry.  I'm having trouble

24   hearing you.

25   ///

56

BY MS. VOROUS:

Q.      Would you please describe your job duties?

A.      It's my responsibility for the administration and oversight of our programs, operationally, administratively and clinically for five state hospitals and two psychiatric programs, for also our sex offender commitment program and conditional release program and the headquarter's support functions that support those.

Q.      Do your duties include leading the Long-term Care Services Division in absence of the director?

A.      Yes.

Q.      And as the Assistant Deputy Director, are you familiar with the staffing at Coalinga State Hospital?

A.      Yes.

Q.      Are you also familiar with the 50 bed unit at Coalinga State Hospital for Coleman class members?

A.      Yes, I am.

Q.      Are you familiar with the C5-C6 project at Salinas Valley State Prison?

A.      Yes, on paper.  I have seen D5 and D6.  I have not physically seen C5 and C6 yet.

Q.      You've been in the courtroom this morning, and you're aware of the fact that the plaintiffs have requested that the Department of Mental Health accelerate admissions of patients to the C5-C6 project?

57

1   A.      Yes.

2   Q.      Is the Department of Mental Health able to shift

3   staff from the empty 50 bed unit at Coalinga State Hospital

4   to the new C5-C6 project at Salinas Valley?

5   A.      The Department doesn't have a practice of moving --

6           THE COURT:  We understand that.  You're faced with a

7   terrible emergency.  The question is, is there some

8   prohibition or some practical problem in switching people?

9           THE WITNESS:  Yes, there would be.  The staff are

10  hired with negotiated contracts that require certain

11  notifications to do any forced mandatory transfers or

12  relocation.

13          So it is a negotiated process, generally lengthy.  I

14  would say at times I've been involved in moves that have

15  taken more than 120 days.  And by the time we were able to

16  manage that, I believe both C5 and C6 would be open.

17  BY MS. VOROUS:

18  Q.      Are you familiar with the fact that the Department of

19  Mental Health admitted ten inmates into ASH -- previously

20  admitted ten inmates a week into ASH in order to comply with

21  a prior order of this court?

22  A.      Yes.

23  Q.      Okay.  Do you consider the ASH program to be any

24  different from the Salinas Valley C5-C6 Program?

25  A.      I consider it to be very different.  It is kind of

58

1    like comparing apples and oranges.  Atascadero is a very

2    large facility.  They have multiple programs, they have

3    multiple admission units, a large number of staff to draw

4    from in the case of activating for ten admissions per week

5    for the Coleman class members.

6            This was done by virtue of all our clinical staff

7    reviewing one week at a time all of our bed utilization in

8    our other hospitals.  So in order for a Atascadero, who

9    normally admits a large number of people per week, to make

10   sure that ten of those admissions were Coleman class members,

11   we transferred individuals from one facility to another, we

12   looked at existing wait lists beyond the Coleman class

13   members for other legal admission categories and had to work

14   with our other facilities accepting some of those admissions,

15   and in many cases, leaving others of those at a longer point

16   in time on wait lists before they could get in.

17   Q.      So it is your opinion that the Department of Mental

18   Health cannot do the same thing with respect to increasing

19   admissions at Salinas Valley as it did at Atascadero State

20   Hospital?

21   A.      I do not believe they can.  Physically they're very,

22   very different structures.  And they're staffed with a larger

23   group of people at Atascadero than Salinas Valley have to

24   draw from over the overall facility.

25           MS. VOROUS:  No further questions.

59

                          CROSS-EXAMINATION

1

2   BY MS. WHELAN:

3   Q.      Good morning, Miss Barawed.

4   A.      Good morning.

5   Q.      Vic Brewer just testified that if there was an order

6   to admit more than five patients per week, that he would

7   comply with that order.  Would you do the same?

8   A.      Yes.

9   Q.      You talked about some of the delays moving staff from

10  one hospital facility to another, and that you have

11  encountered delays of up to 120 days giving them notice for

12  those moves.

13          Could you do it on a shorter time period?

14          THE COURT:  Forget that.  Let me ask it this way:

15  Can you temporarily assign people to Salinas Valley without

16  violating contractual obligations to meet and confer and

17  negotiate or whatever?

18          THE WITNESS:  No, not that I am aware of.

19  BY MS. WHELAN:

20  Q.      And have you asked any of the staff at Coalinga if

21  they would move to Salinas Valley?

22  A.      We provide recruitment and retention documents

23  system-wide that are available for all staff.  So if you're

24  at one facility, you happen to be aware of the openings at

25  any other facility at a given time based on postings.

60

1    So I have not specifically asked the question, but

2    the material is there if they're interested in applying and

3    moving.

4    Q.    But you've never taken any steps to affirmatively ask

5    staff if they would move during this crisis period to Salinas

6    Valley; is that right?

7    A.    No.

8    Q.    Some of your positions that you have at Coalinga --

9    some of your staffing positions that you have at Coalinga

10   existed in the first place only because of Coleman court

11   orders to open that 50 bed unit, correct?

12   A.    Yes.  We're staffed there for -- to meet licensing

13   standards on a staff to patient ratio.  Those 50 beds are a

14   part of that.

15   Q.    So technically those positions are for Coleman class

16   members, but none of those staff at Coalinga are currently

17   caring for even one Coleman class member, correct?

18   A.    Those positions are for anyone receiving intermediate

19   care level at Coalinga or who may be staffing a residential

20   recovery unlicensed unit at Coalinga.

21   Q.    But there are no Coleman class --

22        THE COURT:  The question was very specific.  It was

23   that I ordered 50 beds for Coalinga, which you said, "Okay,

24   we'll do what we're ordered to do."  But not a single person

25   who is a Coleman class member is being served at Coalinga; is

61

1   that right?

2         THE WITNESS:  Correct.  Today.

3         We have vacancies also in Atascadero and at Vacaville

4   for the lower level custody individuals for ICF services

5   also.

6         MS. WHELAN:  Thank you.

7         MS. VOROUS:  No further questions, Your Honor.

8         THE COURT:  You may step down, ma'am.

9         MS. VOROUS:  STATE FIRE MARSHA have no further

10  witnesses, Your Honor.

11        MS. WHELAN:  Your Honor, we subpoenaed the Fire

12  Marshal and would like to call him.

13        THE COURT:  Go ahead.

14        Come around and be sworn, sir.

15        THE CLERK:  Remain standing and raise your right

16  hand.

17                    JOHN GUHL,

18  was thereupon called as a witness herein by the Plaintiffs,

19  and having been sworn to tell the truth, the whole truth and

20  nothing but the truth, was thereupon examined and testified

21  as follows:

22        THE CLERK:  Please, take a seat.  State your name,

23  spell your last name and speak directly into the microphone.

24        THE WITNESS:  John Guhl.

25        THE COURT:  No.  Hang on.

62

1              THE WITNESS:  John Guhl, G-U-H-L.

2                      DIRECT EXAMINATION

3    BY MS. WHELAN:

4    Q.       Good morning, Mr. Guhl.

5    A.       Good morning.

6    Q.       Could you state your official title?

7    A.       Supervising Deputy State Fire Marshal.

8    Q.       And how long have you worked for the Office of the

9    State Fire Marshal?

10   A.       Twenty-two years, five months.

11   Q.       And you over see projects in Monterey County,

12   correct?

13   A.       That's correct.

14   Q.       Your deputy, Francis Wright, was specifically

15   assigned, along with you, to the C5 and C6 project at Salinas

16   Valley State Prison; is that right?

17   A.       That's correct.  I assigned Deputy Francis Wright,

18   and I joined her in August.

19   Q.       Could you explain for the Court the piping problems

20   that you encountered at Salinas Valley State Prison?

21   A.       The fire sprinkler piping, which is part of a

22   pre-action fire sprinkler system, the pipe shows signs of

23   corrosion, leaks, deterioration, some of the worst sprinkler

24   piping I have ever seen.

25              THE COURT:  I'm sorry.  Would you go back for just a

63

1    moment.  You say the system is a "pre-action fire sprinkler

2    system"?

3            THE WITNESS:  It's a pre-action fire sprinkler

4    system.

5            THE COURT:  Tell me what that is, sir?

6            THE WITNESS:  It's a system, instead of having water

7    in the sprinkler piping, it uses air, okay, for

8    precautionary.

9            And it is activated by either smoke, heat or pilot

10   heads.  In this case I think it is through smoke detection.

11   Its opens a deluge valve which allows water to go into the

12   system.

13           It appears that the system had been charged with

14   water in the past, and evidently -- and that there was

15   chemicals in the water supposedly that had actually caused

16   the corrosion from the inside out.  And they're in the midsts

17   of changing the pre-action system out and putting in a wet

18   pipe system.  And I understand they put in a -- put in a

19   plant to fix the water process a few years back so they have

20   a cleaner water which wouldn't cause the corrosion I

21   understand.

22           It is the only prison I'm aware of that actually has

23   a pre-action system.  Okay.

24   BY MS. WHELAN:

25   Q.    I just want to get some of the terminology down.

64

1    A.      Sure.

2    Q.      When you issued -- When the Fire Marshal issued a

3    Beneficial Occupancy Certificate, I think back at the end of

4    July, that allowed them to move forward with licensing only

5    but not admit patients; is that correct?

6    A.      Is that in August or July?  Excuse me.

7            THE COURT:  We heard it was August, but I don't know.

8    BY MS. WHELAN:

9    Q.      I'm talking about the initial Beneficial Occupancy

10   Certificate, not the conditional one, which I believe was

11   issued on July 29th?

12   A.      I'm not aware.  Okay.

13   Q.      Well, in general, when you issue a Beneficial

14   Occupancy Certificate, does that allow patients to be moved

15   in at that time?

16   A.      It may.  It's a conditional temporary occupancy so

17   all factors are considered.  In this case on 8-25-10 a

18   temporary occupancy was allowed.

19   Q.      Okay.

20   A.      That was for C5, pod C.

21   Q.      And at the point that you issued that temporary

22   occupancy certificate, Salinas Valley could have immediately

23   moved all 58 inmates into that unit, correct?

24           THE COURT:  He said only for pod 5 -- I'm sorry --

25   pod C.

65

1              THE WITNESS:  C.

2    BY MS. WHELAN:

3    Q.      C5?

4    A.      That's correct.  C5, pod C.

5    Q.      Okay.  And then you issued another -- you eventually

6    issued a conditional occupancy for the entire pod -- all

7    three pods in C5, correct?

8    A.      That's my understanding my deputy did.

9    Q.      At the point that certificate was issued, the prison

10   could have moved in all of the inmate patients into all cells

11   at that time, correct?

12   A.      Okay.  With the understanding that the fire alarm

13   system was to remain operational -- the fire sprinkler system

14   would remain operational in those units.

15              THE COURT:  I need your help.

16              THE WITNESS:  Sure.

17              THE COURT:  There's a fire alarm system which is

18   different than the piping that is corroded?

19              THE WITNESS:  That's correct.

20              THE COURT:  And that's -- there's no reason to think

21   that's not working?

22              THE WITNESS:  On the day that I was there it was

23   working, or most of it was working.  I think there was just a

24   few troubles.

25              THE COURT:  In the alarm system there were troubles?

66

1          THE WITNESS:  That's correct.

2          THE COURT:  Okay.

3          THE WITNESS:  They may have been repaired by now.

4          THE COURT:  So the condition was the alarm system had

5   to be working and -- I'm sorry -- and the fire sprinkler

6   system, which is the corroded system?

7          THE WITNESS:  Which they were doing, Your Honor.

8   They were replacing the pipe doing a temporary fix of the

9   pipes that were corroded.  Okay.

10         They have to maintain the pressure per NFPA 13, the

11  National Fire Sprinkler Standard, which is adopted by the

12  State of California, and pressure tested to 200 PSI for two

13  hours.

14         They replaced the pipes that are -- that had the

15  worst corrosion with the understanding they were going to go

16  back and do a permanent fix.

17         THE COURT:  Some day.

18         THE WITNESS:  We gave them, you know, like a maximum

19  time limit so some day we could see when that was happening

20  so it just wouldn't be stretched further and further and

21  further down the line.

22         THE COURT:  I'm just now going to demonstrate my

23  ignorance.  This system apparently is corroded throughout the

24  prison?

25         THE WITNESS:  It's my understanding now it is.  And

67

1    we did have deputies write them up last year.  We have a five

2    year -- Every five years the sprinkler system has to be

3    inspected and certified by a licensed concern or a State Fire

4    Marshal licensed concern.

5        THE COURT:  You're not saying that they're going to

6    have to close down Salinas State Prison.  You said they've

7    got to fix it in 16 years.

8        THE WITNESS:  We didn't agree to the time frame at

9    this time for the entire prison.  Not -- I'm not aware of

10    that.

11        THE COURT:  I'm sorry.  Until 2016.  Excuse me.

12        THE WITNESS:  Again, I'm not aware of that time

13    frame.

14        THE COURT:  Let's say they don't get it done.  You've

15    told them -- What have you told them they have to do?

16        I'm sorry.  I don't mean to interrupt.  I'm just

17    trying to understand why this -- Tell me what you've told

18    them they had to do.

19        THE WITNESS:  From the reports in the past, Deputy

20    April Horvatis, who used to oversee the prison there, she

21    wrote them up and said that all sprinkler systems shall be

22    inspected and a five year certification done, which includes

23    the complete sprinkler system.

24        THE COURT:  Well, you know it is not working right

25    now.  I mean, it is not -- it is corroded right now, but

68

1    you're just leaving it because?

2           THE WITNESS:  No.  That was the original, Your Honor.

3    Then I instructed Deputy Francis Wright to write-up the

4    entire institution.  And we will be going back to every

5    single housing unit and looking at every single housing

6    unit.

7           THE COURT:  I believe that.  But in the meantime

8    you're letting people be in prison there because as a

9    practical matter there is not a lot of choice.

10          Why doesn't that apply to this hospital unit?

11          THE WITNESS:  We're allowing the hospital unit to

12   give them the temporary occupancy, okay, with the

13   understanding --

14          THE COURT:  You and I are ships passing in the

15   night.

16          THE WITNESS:  Can I explain?

17          THE COURT:  Yes, please.

18          THE WITNESS:  CDCR has a history of not maintaining

19   the fire protection systems that they have.

20          THE COURT:  Yes.

21          THE WITNESS:  Okay.  They also have a history of not

22   repairing the existing fire protection systems when they're

23   out of commission in a timely manner.  So it's extremely

24   important that we get it fixed.  And we'll work with CDCR in

25   licensing as much as we can.

69

1          THE COURT:  I'll try once more, then I'll give up

2     because I don't know how to ask a question that is

3     responsive.

4          Your job is safety?

5          THE WITNESS:  That's correct.

6          THE COURT:  I take it from what you have told us, but

7     maybe I'm wrong, that the entire prison is unsafe?

8          THE WITNESS:  I have not seen the entire prison, Your

9     Honor.

10          THE COURT:  I understand that.  But your records

11     indicate that the entire system is corroded?

12          THE WITNESS:  I am going to make it, you know, my

13     responsibility to go down and to do the inspections with my

14     staff.

15          THE COURT:  I think what you're telling me is, but

16     maybe I'm not getting it, is that as long as you don't go

17     down, they can continue to keep prisoners there.  When you go

18     down, and you find that it isn't working, what's going to

19     happen?

20          You're not going to tell them to move all the

21     prisoners out, right?

22          THE WITNESS:  We're going to evaluate the system, and

23     then I'll set up a meeting with the Warden or Chief Deputy

24     for corrective actions.  I will make a determination at that

25     time.

70

1          THE COURT:  And the corrective actions can go on
2    while the prisoners are there?
3          THE WITNESS:  There's ways we can work with CDCR.
4          THE COURT:  And why isn't that as true for these
5    hospital units?
6          Why can't you just say:  Look, you got to fix them,
7    but you can keep these desperately sick people and let them
8    have treatment while you're figuring out how to do that?
9          THE WITNESS:  On the original plan that was presented
10   to us, we reviewed it, evaluated it, and we agreed to the
11   plan that was presented.
12         Now -- And again, there can be a revised plan.  And I
13   will review it, and we'll make it work.
14         THE COURT:  You may proceed.  I'm just -- Go ahead.
15   BY MS. WHELAN:
16   Q.     Back when you permitted temporary occupancy of C5 --
17   A.     Uh-huh.
18   Q.     -- you didn't designate any particular deadline by
19   which the prison had to do a permanent fix on C5 or C6,
20   correct?
21   A.     No.  The second time it was written up, I understand
22   on 8-26, Deputy Francis Wright wrote it up.  You're talking
23   about the entire institution?
24   Q.     No.  I'm talking right now about C5-C6?
25   A.     I'm sorry.  Please, ask your question again.

71

1  Q.     At the point you allowed temporary occupancy of C5,

2  your office did not mandate that the prison permanently fix

3  the sprinkler system by any particular date, correct?

4  A.     For C5?

5  Q.     Correct.

6  A.     No.  No.  It's my understanding that it says

7  temporary occupancy is granted for C5, pod C, only until

8  11-30-10, with the understanding that the fire sprinkler

9  system or fire alarm system shall remain 100 percent

10  operational.

11  Q.     What I'm getting at is that it wasn't the

12  department -- it wasn't the Office of the State Fire Marshal

13  that gave the CDCR any particular date by which they had to

14  permanently fix the sprinkler system, right?

15         That date never came from your office?

16         If the CDCR had said to you that we don't have any

17  money right now to do a permanent fix, so we need to go back

18  to our budget process, that date wouldn't be in there at all,

19  right?

20  A.     On Item Number -- On 8-25-10 on the report, Number 8,

21  it states:

22         "Fire sprinkler system C5 project shall be completed

23          and shall be approved by SFM on 1-31-11."

24  Q.     I understand.  But you didn't mandate that date,

25  correct?

72

1        The CDCR provided that date to you.  They said that

2   we think we can do a permanent fix by January 2011?

3   A.      Yes, that's correct.

4   Q.      And the Fire Marshal didn't mandate they have to do

5   that permanent fix by any particular date?

6   A.      We agreed to the date that was offered in the plan.

7   Q.      I understand.  But you didn't mandate a date?  You

8   didn't require them to do --

9        THE COURT:  Had they not given you a date you found

10  satisfactory, would you have given -- would you have told

11  them, "No, you have to get this done by a different date"?

12       THE WITNESS:  Yes.

13  BY MS. WHELAN:

14  Q.      So if they said to you, "We have no funding to do

15  this permanent fix, we have nothing in our budget, we can't

16  do it, we have to go back to the Governor, we have to go back

17  to the budgetary process so we also can't fix these units for

18  several years," what would you have done?

19       MS. VOROUS:  Objection, Your Honor.  That assumes

20  facts not in evidence.  That's not the situation we're in

21  today.  They have the money to fix them.

22       THE COURT:  Well, all right.  It's a problem not of

23  whether they have the money now or not, it's a question of

24  what would have happened had they not had the money, which

25  will inform the Court about whether these dates are just made

73

1    up or whether they have some reality.  And I don't know the

2    answer to that.

3         Let's assume, you know, the whole budget has run out,

4    they don't have the money.  What would you do?

5         THE WITNESS:  Well, then we would evaluate the entire

6    situation of the prison of what we can -- what would seem

7    reasonable to --

8         THE COURT:  So the real question --

9         THE WITNESS:  -- fire life safety.

10        THE COURT:  The real question is what is reasonable

11   under the totality of the circumstances, right?

12        THE WITNESS:  Uh-huh.

13        THE COURT:  Okay.  That means "yes"?

14        THE WITNESS:  While we're maintaining fire and life

15   safety, yes.

16        THE COURT:  God willing and the river don't rise.

17   The question is really different.

18        The realities of the situation -- of the

19   circumstances that you face determine what is reasonable

20   under the circumstances?

21        You're not going to close the prison?  You're going

22   to work with them?

23        THE WITNESS:  That's correct.

24        THE COURT:  Over years to get it done?

25        THE WITNESS:  It's also procedural.  Okay.

74

1    Procedures can be changed.  Sometimes that can increase the

2    fire life safety.

3         THE COURT:  All right.  I'm sure you're going to ask

4    about that in due course, but in the interim, we've got a

5    crisis.

6         THE WITNESS:  I understand.

7         THE COURT:  You may not understand it, but there are

8    400 very sick people who are not getting treatment.  Is that

9    in your mind a circumstance which has to be considered in

10   determining what is reasonable?

11        THE WITNESS:  Yes.  That's one of the determining

12   factors.

13        THE COURT:  Thank you, sir.

14        You may proceed, ma'am.

15   BY MS. WHELAN:

16   Q.    In fact, there are other ways of ensuring fire safety

17   in these units under Title 19 which are called "Alternative

18   Means of Protection," right?

19   A.    That's correct, yes.

20   Q.    And one option, for instance, is a Fire Watch System.

21        Could you explain for the Court what that is?

22   A.    Okay.  Which is not an alternative means of

23   protection, but a fire watch we use -- it is kind of like a

24   last ditch.  We'd first want a permanent fix.  Then secondary

25   would be a temporary fix with a date of when the permanent

75

1   would occur.  Then, at times, we use a fire watch condition.

2          A fire watch is approved by the authority having

3   jurisdiction, when allowed, and during a fire watch all

4   factors are considered; the building construction, the

5   occupancy classifications, the types of hazards, what other

6   fire protection systems that are working at the time.

7          Individuals who are allowed to be the fire watch,

8   their primary, okay, position would be with fire watch.

9   Forms of communication are also considered and procedures.

10          THE COURT:  We're going to take our luncheon recess.

11   We'll reconvene at 1:30.

12          I would very much like the two witnesses who preceded

13   Mr. Guhl to remain while we decide what to do next.

14          1:30, Ladies and Gentlemen.

15          (Off the record at 12:00 p.m.)

16          (On the record at 1:30 p.m.)

17          THE COURT:  Please, remain seated.

18          Court is back in session.

19          THE COURT:  Be seated everyone.

20          Sir, will you resume the stand.

21   BY MS. WHELAN:

22   Q.     Good afternoon, Mr. Guhl.

23   A.     Good afternoon.

24   Q.     I want to back up for one minute and just explain

25   that you're here today because my office subpoenaed you here;

76

1    is that correct?

2    A.        That's correct.

3    Q.        And in addition to subpoenaing you here to testify,

4    we also subpoenaed documents from your office?

5    A.        That's correct.

6    Q.        And specifically we subpoenaed all documents,

7    including, but not limited to, conditional occupancy letters

8    and reports regarding the C5-C6 buildings at Salinas Valley

9    State Prison, Yard C, Buildings 5 and 6, created on or after

10   May 1st, 2009?

11   A.        That's correct.

12   Q.        And you brought those documents with you today?

13             THE COURT:  At least copies of them hopefully?

14             THE WITNESS:  Yes.

15   BY MS. WHELAN:

16   Q.        Do you have them with you up there?

17   A.        Yes.

18   Q.        I'm looking in the pile that has "Plan Review

19   Transmittal Documents"?

20   A.        Okay.

21   Q.        And your office issued a Fire Safety Correction

22   Notice dated September 1st, 2009.

23             Do you see that one in there?

24   A.        Yes, I do.

25   Q.        And one of the items on that Fire Safety Correction

77

1    Notice had to do with the sprinkler system; is that right?

2    A.      That's correct.

3    Q.      And then again on October 7th, 2009, your office

4    issued another Fire Safety Correction Notice.

5            Do you see that one?

6    A.      Yes.  Item Number 10.

7    Q.      Right.  Again, Item Number 10 referred to the

8    sprinkler system?

9    A.      Correct.

10   Q.      And again, on October 21st, 2009, your office issued

11   another Fire Safety Correction Notice?

12   A.      Correct.

13   Q.      And that also dealt with the fire sprinkler system,

14   correct?

15   A.      Yes.  Item Number 9.

16   Q.      And did you provide these documents to the CDCR, as

17   well as to the prison?

18   A.      It's my understanding April Horvatis would have --

19   copies would have been given to the institution is my

20   understanding.

21           THE COURT:  Well, this is not unimportant.  People

22   may have a lot of trouble over this so it is not unimportant.

23           Who would you ordinarily issue the Fire Safety Notice

24   to?

25           To whom would it be given or sent or whatever you do?

78

1          THE WITNESS:  At the minimum, it would be given to

2     the Chief of Plant.

3          THE COURT:  At --

4          THE WITNESS:  At the institution.

5          THE COURT:  Okay.

6          THE WITNESS:  Okay.  The person who signed for it.

7          Then we try to instruct our deputies -- or instruct

8     our deputies to work with either the Associate Warden or

9     Warden or Chief Deputy.

10          THE COURT:  So at minimum Chief of the Plant would

11     have been served.  But under your standard operating

12     procedure, either the Warden or the Deputy Warden should have

13     been notified?

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.

16     BY MS. WHELAN:

17     Q.     Before we took a break, Judge Karlton was talking to

18     you about the totality of circumstances that you would look

19     at when you're working with an institution on fire safety

20     issues.

21          Do you recall that?

22     A.     Can I stop for a second -- one second and go back.

23          If we're doing an annual inspection, what I stated is

24     true.  If it's a project, then it would go to the project

25     manager.

79

1          THE COURT:  Okay.  So C5 and C6, which is the project

2     in issue, you think Mr. Westin, the gentlemen -- the first

3     person who testified should have been served?

4          THE WITNESS:  Or whoever is on site.  It may not be

5     the project manager on site.  Whoever is the project manager

6     or the inspector of record on site during a project would be

7     given a construction notice.  One is for construction

8     purposes, and one is an annual inspection for the

9     institution.

10          THE COURT:  When you found out it all was corroded,

11     was that an annual inspection or was that pursuant to some --

12          THE WITNESS:  That was an annual inspection, Your

13     Honor.

14          THE COURT:  So the annual inspection, at minimum the

15     Plant Manager and the -- I'm sorry -- the Chief of Plant and

16     either the Warden or Assistant Warden should have been either

17     served or at least notified?

18          THE WITNESS:  That's correct.

19          THE COURT:  Now, as relates -- I'm sorry.  I don't

20     want to take the case over, I'm just trying to understand.

21          As it relates to the project, the C5-C6, was that

22     separately noted as a problem, or was that noted as part of

23     the problem relating to the fact that the prison system isn't

24     working well?

25          THE WITNESS:  It appears that it was originally noted

80

1    during the annual inspection of the institution.

2              THE COURT:  Okay.  Okay.  Thank you, sir.

3              You may proceed, ma'am.

4    BY MS. WHELAN:

5    Q.      But the notices that we were just referring to refer

6    specifically to the C-Wing, correct?

7    A.      That's correct.  On September 1st, 2009.

8    Q.      And on -- Yes.  September 1st, 2009, refers

9    specifically to the C-Wing.

10             THE COURT:  Well, but he says it was noted as part of

11   the annual exam apparently.

12             THE WITNESS:  That was --

13             THE COURT:  It was not pursuant to an examination

14   relative to a particular project?

15             I'm asking you, not telling you.  I just realized it

16   sounded like I was.

17             THE WITNESS:  That's okay.

18             THE COURT:  But it was -- You discovered that the

19   whole system wasn't working on an annual?

20             THE WITNESS:  That was the first two she had brought

21   up on October 7th, 2009, and October 21st, 2009.  Those

22   appeared to be annual inspections.  September 1st, 2009,

23   appeared to be dealing with the C-Wing.

24   BY MS. WHELAN:

25   Q.      Thank you.

81

1          Judge Karlton was talking to you about the totality

2    of circumstances that you might consider when you're doing

3    fire safety work in the prison system.  And one thing he

4    brought up was if you knew that there were was a waiting list

5    of many -- 400-plus patients waiting to get into these beds,

6    that might be one circumstance that you would take into

7    consideration when working with the prison on a Fire Safety

8    Plan, correct?

9    A.       That's correct.

10   Q.       And you might also -- One possible way that you could

11   deal with the fire suppression system is to do a temporary

12   fix on C6 as well, similar to the one that you agreed to for

13   C5?

14   A.       That's correct.  That would be considered.

15   Q.       And another option might be to do a fire watch system

16   if you had concerns that there should be a staff person

17   available to be in charge of knowing whether there was a fire

18   risk at any given moment?

19   A.       That's correct.  For systems that are

20   non-operational, we would consider a fire watch.

21   Q.       And in a prison system, where these units are staffed

22   24-hours a day, it might be easier to do a fire watch system

23   than in places that are not staffed so richly?

24   A.       Not necessarily.  Because on a fire watch, as we

25   stated before, that it is the primary duties of the

82

1    individuals would be fire watch.

2    Q.       And when you and I spoke on the telephone about this,

3    and we talked about the Fire Watch System, I recall you

4    saying that when -- if they're doing work in the units

5    anyway, it may very well be that somebody who is doing that

6    work could be assigned also for fire watch?

7    A.       That's a possibility.  If there is -- Usually on work

8    you would have a foreman or extra personnel, depending what

9    they're doing.

10        Even when -- If we're doing hot work, using a torch,

11   well, that constitutes an immediate fire watch anytime you

12   are using a torch.  So those factors would be considered of

13   using, you know, personnel who are available.

14   Q.       And you would also consider whether or not there were

15   existing orders from this court requiring the prison to open

16   these units as soon as possible and get patients in as soon

17   as possible?

18   A.       We would consider all factors.

19   Q.       When you learned that these problems exist, the

20   piping problems, the corroded pipes exist throughout the

21   prison system --

22        THE COURT:  Well, throughout Salinas Valley.

23   BY MS. WHELAN:

24   Q.       -- throughout Salinas Valley, it sounds like

25   eventually the prison informed you that they exist throughout

83

1    seven housing units; is that right?

2    A.      I don't remember what the number was.  I was informed

3    by one of the CDC personnel that this condition existed

4    throughout, what was stated.  At that time I started going

5    back through reports.  Okay.

6    Q.      Yes.  So I'm looking at one of the emails you

7    produced today dated September 29th, 2010, from Francis

8    Wright.  And that's your colleague at the State Fire Marshal?

9    A.      She's one of my deputies I supervise.

10   Q.      Do you have that email in front of you?

11           It's pages 1 of 4.  First page is from Francis

12   Wright, September 29th, 2010?

13   A.      Yes, I do.

14   Q.      If you turn to page 3 of 4, one of the items she

15   flagged for Salinas Valley, which is about halfway down the

16   page, is Item 1:

17           "The automatic fire sprinklers systems provided and

18           installed at various parts of the SVSP institution

19           are corroded and deteriorating pipes and warrant

20           correction and/or re-installation of proper parts to

21           the systems.  Provide a written execution plan as to

22           how and when these systems will be

23           repaired/reinstalled properly and correctly

24           throughout the Salinas Valley State Prison facility."

25           Then it says:

84

1          "CDCR Facilities Planning Construction and Management

2          is aware of the urgency, and we are working to

3          develop a plan to replace the cell fire suppression

4          systems in the remaining seven housing units.  The

5          replacement will include converting the existing dry

6          systems to wet systems per the recommendation of our

7          Design Services Section.  We intend to provide a

8          clear plan of action, including how and when these

9          systems will be replaced by October 1st, 2010."

10         And to your knowledge, did they provide that plan on

11    October 1st, 2010?

12    A.    I have a plan that has been emailed.  I think it

13    arrived -- it was on Saturday.

14    Q.    So --

15    A.    Friday night or Saturday.  I would have to check the

16    date.

17    Q.    Three days ago.  So you probably haven't had time to

18    fully evaluate that plan; is that right?

19    A.    That's correct.  October 2nd, 10:52 a.m.

20    Q.    I believe Mr. Westin testified earlier that that plan

21    includes a completion date for all seven housing units in

22    November of 2016?

23    A.    That's what he testified.

24         MS. WHELAN:  Thank you, Mr. Guhl.

25                        CROSS-EXAMINATION

85

1   BY MS. VOROUS:

2   Q.      Good afternoon, Mr. Guhl.

3   A.      Good afternoon.

4   Q.      When you were talking about the various steps that

5   you would need to consider with respect to whether to

6   authorize some sort of a fire watch in connection with C6,

7   that does not -- is it correct that wouldn't take into

8   account whether or not it would be advisable from DMH's

9   perspective; is that correct?

10          THE COURT:  Advisable from DMH's?

11  BY MS. VOROUS:

12  Q.      In other words, what I'm asking is you're looking at

13  the advisability of the reasonableness of a fire watch solely

14  in your role as the Supervising Deputy State Fire Marshal?

15  A.      That's correct.

16  Q.      If I understand your testimony correctly, you're not

17  in a position today where you could say that it would be

18  reasonable to do a fire watch in C6; is that correct?

19  A.      That's correct.  We would have to evaluate all

20  factors.

21          THE COURT:  Ma'am -- I ask you, sir, if the Court

22  were to request it of you, how long would -- I'm not

23  suggesting that I'm going to do this, I'm just -- how long

24  will it take to get an analysis of whether a fire watch would

25  be appropriate?

86

1          THE WITNESS:  Within one week.

2          THE COURT:  Thank you, sir.

3          THE WITNESS:  Or by next week from Wednesday.

4  Okay.

5  BY MS. VOROUS:

6  Q.      Mr. Guhl, if I can draw your attention back to the

7  Fire Safety Correction Notice that is dated August 25th,

8  2010.  If you would, take a look at that for me, please.

9  A.      What's the date of that again?

10  Q.      August 25th.

11  A.      Okay.

12  Q.      Look at page 2.

13          In referring to page 2, Number 7, it states:

14          "The fire system C6 project shall be complete and

15          shall be approved by State Fire Marshal by

16          11-30-2010."

17          Do you see that?

18  A.      That's correct.  Number 7.

19  Q.      Was this, in fact, a condition of your August 25th,

20  2010, Fire Safety Correction Notice?

21  A.      Yes, it is.

22  Q.      And the next number, Number 8:

23          "The fire sprinkler system C5 project shall be

24          completed and approved by the State Fire Marshal

25          1-31-2011."

87

1    A.      Correct.

2    Q.      That also was a condition of the Fire Safety

3    Correction Notice, correct?

4    A.      That's correct.

5    Q.      And if, in fact, the State Fire Marshal were to

6    consider a request to look at the reasonableness of a fire

7    watch in C6, would that then require an amendment or some

8    sort of modification to this August 25th Fire Safety

9    Correction Notice?

10   A.      Yes, it would.

11           MS. VOROUS:  No further questions, Your Honor.

12           MS. KAHN:  Your Honor, can we recall Mr. Westin,

13   please.

14           THE COURT:  Are you finished with this witness?

15           MS. WHELAN:  Yes, Your Honor.

16           THE COURT:  You may step down, sir.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  Don't go away though.

19           Mr. Westin, come on back.  I remind you, sir, you are

20   still under oath.

21                      WILLIAM WESTIN,

22   having previously been called as a witness herein by the

23   Plaintiffs, and having been previously sworn to tell the

24   truth, the whole truth and nothing but the truth, was

25   thereupon examined and testified as follows:

88

1          MS. KAHN:  Your Honor, can I approach the witness?

2                    FURTHER CROSS-EXAMINATION

3    BY MS. KAHN:

4    Q.      Mr. Westin, I'm going to give you the Fire Marshal

5    documents.

6            (Documents handed to witness for review.)

7    A.      Thank you.

8    Q.      You're welcome.

9            Mr. Westin, you testified earlier today that you

10   began work on C5-C6 in August 2009?

11   A.      That's correct.

12   Q.      I would like you to turn --

13           THE COURT:  Speak into microphone.  I think the

14   microphone is off again.  Just hit it.  Let's see.

15           (Microphone adjusted.)

16   BY MS. KAHN:

17   Q.      Can you turn to the documents that have the Fire

18   Safety Correction Notices.  And is that the top documents

19   there?

20   A.      The August 8, 2009?

21   Q.      Yeah.  Turn to September 1.  I think it's the third

22   document in.

23           This is a document that's dated September 1st, and

24   it's a Fire Safety Correction Notice that lists work that is

25   scheduled to be performed for the C-Wing performed by the

89

1    Inmate Ward Labor for the installation of group rooms.

2            And at the bottom you'll notice that one of the tasks

3    that needs to be done was submit a complete set of plans by a

4    C-16 fire protection contractor for all worked performed on

5    the sprinkler system.

6            My question to you is did you receive a notice of

7    this Fire Safety Correction Notice?

8    A.      I didn't see this exact copy, but I'm aware of the

9    fact that we needed to provide plans from a C-16 licensed

10   contractor for the work that we were going to perform.

11   Q.      And when did you become aware of this?

12   A.      I was aware of it just by the nature of doing the

13   construction project.  The construction documents warrant

14   that we tie into the existing fire sprinkler system.

15   However, this is not the system in question.

16           THE COURT:  This is not the system in question?

17           THE WITNESS:  No.  See, in the house units, they have

18   a -- they have systems just for the cell area.  And we didn't

19   do any modifications to the system in the cell areas.

20           For the dining area that we added the group rooms, we

21   had to tie into the existing system there, which is a wet

22   system.  And we did that per plans and specifications.

23           We had the correct submittals that were approved by

24   the Fire Marshal's Office.  And we followed them, and we got

25   the Fire Marshal -- Deputy State Fire Marshal's approval on

90

1    the installation we did.

2    BY MS. KAHN:

3    Q.    So the sprinkler system in the housing unit is

4    different than the group areas?

5    A.    Well, it's -- Yeah.  Exactly.  The cell areas have a

6    separate system just for the cells.

7          THE COURT:  When did you find out -- When did you

8    find out that the cell system had to be replaced?

9          THE WITNESS:  I was unaware of any issues with the

10   cell system fire suppression system until August 9th when I

11   received word from the institution's correctional plant

12   manager.

13         THE COURT:  August 9th of this year?

14         THE WITNESS:  August 9th of 2010.

15         MS. KAHN:  That's the email that you testified to

16   earlier?

17         THE WITNESS:  Correct.

18         THE COURT:  And I gather -- Well, I'll ask counsel.

19         You've got the documents in front of you.  When did

20   the warden receive notice that the cell system had to be

21   replaced?

22   BY MS. KAHN:

23   Q.    Well, in your declaration you testified that there

24   was a -- that you were notified on August 9th, and then there

25   was a Fire Safety Correction Notice.  But the only one that

91

1   we have been provided with is one that's dated August 25th,

2   2010.

3   A.      There was a --

4   Q.      Was there an earlier one provided that we just have

5   not gotten from the Fire Marshal?

6   A.      I asked the same exact question when the issue came

7   up.  What was provided to me from the institution was a

8   description of the problem, obviously, and some pictures.

9          And they also provided a Fire Correction Notice.  I

10  believe it was dated June 25th.  And it basically stated that

11  there was a condition where the fire suppression system in

12  the cells had an alarm, and that the institution was taking

13  steps to correct that.

14         THE COURT:  This is -- I mean, the Fire Marshal --

15  maybe I'm wrong -- said that the initial notice was pursuant

16  to an annual inspection in August '09.  And he's nodding his

17  head so I got that much right.

18         So the question is why wasn't that transmitted to the

19  witness so that he would know he had to get working on that

20  thing in '09 instead of 2010?

21         And the answer to that is that whoever is responsible

22  isn't here.

23  BY MS. KAHN:

24  Q.      Mr. Westin, you're now testifying that there was a

25  notice that you were provided with in August that actually

92

1   was written in June?

2   A.      Approximately August 12 I was provided that

3   information.

4   Q.      That was a June 2010 notice of problems in the

5   cell --

6   A.      Written to the institution, correct.

7   Q.      Okay.

8   A.      My understanding is that's the point that they

9   started making the repairs in the C5 pod, and at some point

10  they decided to make us aware of it.

11          THE COURT:  That was kind of them, whoever "they"

12  are.

13  BY MS. KAHN:

14  Q.      Okay.  You testified earlier that you could do -- you

15  could do the permanent fix in C6 as quickly as you could do a

16  temporary repair; is that correct?

17  A.      The temporary repairs is a -- It's not a clear,

18  defined item because basically, based on what happened in C5,

19  they go in and they look at the piping and the condition it

20  is in, and they made replacements of sections of piping as

21  they were going.

22          And then through testing, to try and get it back

23  online, they found other areas because it would spring leaks

24  in other areas.

25          So knowing that, looking at the situation, how long

93

1    they spent on C5, I would assume that it is very possible it

2    could take them, you know, anywhere from a month to two

3    months.

4    Q.    And in your declaration you testified that the

5    repairs -- the time from beginning the repairs, which we

6    assume -- if we assume it started the day of the

7    notification, which was August 9, C5 was approved and

8    obtained its temporary license on August 31st, which is 22

9    days.

10            MS. VOROUS:  Objection.  Misstates the testimony.

11            THE WITNESS:  I don't know when they started the

12    repairs.

13    By MS. KAHN:

14    Q.    So they may have started -- You think they started

15    the repairs before they received the notification of the

16    problem?

17    A.    Well, I'm thinking maybe they started repairs, and

18    I'm just speculating, but after they got the June 25th

19    notification.

20            MS. VOROUS:  Objection.  Move to strike that response

21    as speculative.

22            THE COURT:  It will stand.

23            THE WITNESS:  Honestly, I don't know.

24    ///

25    ///

94

1    BY MS. KAHN:

2    Q.      Okay.  I would like -- In your own declaration you

3    testify that the Fire Marshal issued a Correction Notice to

4    fix this problem, which was the difficulty with the fire

5    suppression system in C5 and C6.  Then you testified, quote,

6    "As a result, Salinas Valley State Prison's maintenance staff

7    started making repairs to the system by replacing piping that

8    had corroded from the inside out."

9            This is paragraph seven on page 3.

10           Did that occur?

11   A.      Did what occur?

12   Q.      What you just testified to in your declaration?

13   A.      I don't know exactly when they started making the

14   repairs.

15   Q.      This is your testimony in your declaration?

16   A.      I understand.

17   Q.      Okay.

18   A.      I was aware of the fact through communication with

19   them that they were making repairs, and then I linked the two

20   that way.

21   Q.      Under the testimony in your declaration, you

22   testified the repairs began after August 9th, and on August

23   25th the State Marshal came out to inspect the repairs that

24   were completed.

25           So under that timeline the repairs were completed

95

1    within two weeks, then there was some problems and failures

2    and everything was fixed up and completed by the 31st so...

3            THE COURT:  But those are all temporary, am I right,

4    or is that permanent?

5            THE WITNESS:  Correct.

6            THE COURT:  Which is correct?

7            THE WITNESS:  It's temporary repairs.

8            THE COURT:  Right.

9    BY MS. KAHN:

10   Q.      The permanent repairs take seven weeks.  The

11   temporary repairs that occurred in C5 took approximately

12   three weeks, correct?

13   A.      Again, I don't know exactly how long it took, but you

14   can see that they thought they could do it in a couple of

15   weeks, and they had the Fire Marshal out there on the 25th,

16   and it was quite a while later before they had it done.

17   Q.      It was finally approved on the 31st?

18   A.      I thought it was September 2nd, but...

19   Q.      It was approved by the DSFM by January 31st?

20           THE COURT:  January?

21   BY MS. KAHN:

22   Q.      I'm sorry.  I'm misreading.  Excuse me.

23           The Deputy State Fire Marshal retested A pod on

24   August 31st, 2010, and granted DMH beneficial occupancy for

25   C5?

96

1   A.      Okay.

2   Q.      So it took an additional six days.

3   A.      I guess the answer to your -- the original question

4   was will temporary repairs in C6 take less time, and I don't

5   know because it's a method they go through where they repair

6   the obvious pipes that need to be replaced, and then there's

7   a test.  And until you actually go through that, you don't

8   know how long it is going to take.

9   Q.      And permanent construction can take longer than one

10  expects as well, correct?

11  A.      Well, no.  The permanent repairs I have a better idea

12  because it is a defined task.  I'm going to tear out existing

13  piping and install piping in kind so I can make educated

14  guesses about how long that is going to take.

15          MS. KAHN:  That's all.  Thank you.

16          THE COURT:  You may step down, sir.

17          Mr. Vorous (sic), I'm going to ask you to assume the

18  stand again because I am just so frustrated by what is going

19  on.

20          Excuse me.  Mr. Brewer.

21          MS. VOROUS:  That's fine.  I was ready.

22                          VICTOR BREWER,

23  having been previously called as a witness herein by the

24  STATE FIRE MARSHA, and having been previously sworn to tell

25  the truth, the whole truth and nothing but the truth, was

97

1    thereupon examined and testified as follows:

2                         EXAMINATION BY THE COURT

3            THE COURT:  There is a pilot project, Hopscotch,

4    that's not the name of it, but it's the process by which --

5    the pilot project by which they are examining IVs to see

6    whether they can nonetheless be taken into ASH, as an

7    example.

8            Are you aware of that, sir?

9            THE WITNESS:  I'm aware that they have done -- that

10   CDCR has done an evaluation to lower custody levels on

11   possible patients who are currently classified as a Level

12   IV.

13           THE COURT:  And are you aware that some -- I'm sorry.

14   Is my Special Master here?

15           How many folks were reclassified that they could take

16   in?  Do we know?

17           We don't.

18           At least some number were.  But they weren't

19   reclassified.  They continue to be IVs, but everybody agreed

20   it was appropriate to treat them as IIIs, and they were

21   admitted to ASH.  Some number.  I don't know what they were.

22           Now, your deputy was very proud of the fact that no

23   Coleman -- no member of the Coleman class was being treated

24   at Coalinga.  And I take it at least one reason for that was

25   because when I ordered 200 beds in ASH, the simplest thing

98

1    for them to do was take the people from Coalinga, that's why

2    it is empty now.

3          I don't mean it is empty.  It is full of people, but

4    it is not Coleman people.  Is that a fair analysis or am I

5    just being terribly cynical?

6          THE WITNESS:  I have no knowledge of the operation at

7    Atascadero or Coalinga State Hospital, sir.

8          THE COURT:  Thank you, sir.

9          I suppose I have to be more careful about my orders

10   and say "We're aren't kidding."

11         I take it -- I'm asking you, not telling you.  You

12   know, you deal with these things, and I've got a thousand

13   other cases besides.  I take it that if the pilot program

14   demonstrates a significant number of people who can be

15   filled -- I'm sorry.  I'm getting myself confused.

16         Matty, come here for a second.

17         (Court confers with the Special Master.)

18         THE COURT:  If some of the EOPs that are being

19   treated at Salinas that are classified as IVs, but under the

20   pilot program can be treated as IIIs, they could be moved to

21   Coalinga freeing up yet more beds in Salinas Valley, right?

22         THE WITNESS:  We have automatically transferred all

23   patients to Atascadero who met that criteria.  We screened

24   them --

25         THE COURT:  I understand that you filled Atascadero

99

1    that way.  The problem is moving people from Salinas who are

2    IVs, and therefore not "eligible" for Coalinga, which will

3    only take IIIs.

4          But if the pilot program demonstrates that those are

5    people who could be treated as IIIs, even though they're

6    officially IVs, they could be transferred to Coalinga,

7    therefore freeing up beds in Salinas.

8          Is that right or wrong?

9          If you know?

10         THE WITNESS:  I do not know, sir.

11         THE COURT:  Okay.  Thank you, sir.

12         My questions invite questions of counsel?

13         MS. VOROUS:  No, Your Honor.

14         MS. WHELAN:  No, Your Honor.

15         THE COURT:  Thank you, sir.  You may step down.

16         THE WITNESS:  Thank you.

17         THE COURT:  Well, I'm at a loss.  Obviously I can

18   make an order relative to increasing the number of people

19   received and that will do some good.

20         I can order a further examination under the pilot

21   program to see how many people can be transferred freeing up

22   the beds in Coalinga.

23         The Fire Marshal thing is just a total mystery to me.

24   Apparently people were notified in '09 and it wasn't until

25   2010 that the people on the job actually knew about the

100

1  problem.

2          What is it that you propose I do -- I order?

3          I mean within -- understanding that -- Well, tell me

4  what you think I can do.

5          I'm just -- I am more frustrated than you are, sir.

6          MR. BIEN:  Your Honor, Michael Bien for plaintiffs.

7          From what I heard today it sounds like we would

8  suggest that the Fire Marshal and the CDCR and DMH be given

9  another chance to look at the construction project and

10  consider whether or not alternative means, such as a fire

11  watch, such as temporary repairs, can be used so that both

12  units can be fully operational.

13          THE COURT:  But they won't be.  As I understand what

14  Mr. Westin said, yes, you can get it temporary, but at some

15  point the temporary has got to run out and you got to fix it

16  permanently anyhow.  And they don't want to do that while

17  there are people in the units.

18          MR. BIEN:  But, Your Honor, they fixed C5

19  temporarily.  They let them bring people in and repaired the

20  pipes.

21          THE COURT:  Right.

22          MR. BIEN:  So why don't we let C5 go on the

23  temporary, not take it down, replace the system in C6 as

24  they're planning to do.  Then we have -- In 30 or 40 days

25  we'll have two units that are fully operational.

101

```
 1              THE COURT:  No, we don't.  C5 --

 2              MR. BIEN:  C5 is better than any other unit in

 3    Salinas Valley.

 4              THE COURT:  That's true, but it doesn't meet the Fire

 5    Marshal's standards as I understand it.

 6              MR. BIEN:  The Fire Marshal said it is okay for

 7    occupancy.

 8              THE COURT:  That's because it's a temporary fix.

 9              MR. BIEN:  And I --

10              THE COURT:  I understand how frustrated you are.  Let

11    me tell you, it is not half as frustrated as I am.  But, you

12    know, you have to be realistic about what people are saying.

13              The Fire Marshal's job is to ensure that these

14    terribly sick people don't burn up, which apparently nobody

15    at CDC gives a darn about unless the Fire Marshal tells them.

16              MR. BIEN:  We have an operating system now.  They

17    fixed it temporarily.  And why can't they add whatever the

18    Fire Marshal says in terms of an extra watch or something to

19    keep that place going?

20              Don't forget we have another unit coming on in 2012.

21    This is just temporary.  And, you know, at that point we can

22    evaluate the program.

23              I mean, the fact that they're not fixing all these

24    other housing units means this is not as serious a fire

25    safety problem as --
```

102

1          THE COURT:  I don't know that that's true.  It may

2    just reflect the total indifference of CDCR to the well-being

3    of its charges.  I don't know.

4          MR. BIEN:  I don't know either.

5          THE COURT:  Don't go away.  We have other problems.

6    If I order -- If I order the Department to double the number

7    of people being taken in, apparently it will affect the level

8    of treatment of everybody in the unit.

9          My sense of it is it can't be worse than leaving

10   people out there in the general population, Ad. Seg.,

11   et cetera.  I mean, that's just -- It's just outrageous.

12         Miss Vorous, anything you want to tell the Court

13   before the Court takes this under submission and tries to

14   think of what can possibly be done?

15         I don't know.  It may be nothing can be done.  And

16   that can't be right.  Please come forward, ma'am.

17         You know, I don't mean to be beating on you, I assure

18   you, but this is just unbelievable.

19         It is just -- You know, I said to somebody a couple

20   of months ago, on an entirely different range of cases, that

21   when the Court orders something to be done -- it was also the

22   State, but not your department -- it expects it to be done

23   and it doesn't have to stand over and supervise.  Not that I

24   can.  And that's the truth here.

25         The Department has an obligation to obey court orders

103

1    or if they think they're wrong to appeal them, but not simply

2    wait a year to let the people know.

3            I mean -- I'm sorry.  It's got nothing to do with

4    what I asked you.  Tell me what you think I should be doing?

5            MS. VOROUS:  Your Honor, there's two things I was

6    going to offer, not for purposes of what you should be doing,

7    but I wanted to clarify that the Department of Corrections

8    and Rehabilitation is continuing to evaluate the custody

9    level for purposes of the Salinas Valley wait list under the

10   ICF pilot program.  That program is still going.

11           THE COURT:  I know it is two years.  Apparently it's

12   been successful.  Some people have been moved.

13           MS. VOROUS:  It has been successful.  And we did

14   provide an update to the Court several months ago.  I would

15   be more than happy to provide another update that provides

16   Your Honor with the updated numbers and where the inmates --

17   how many inmates have been able to be taken off the list.

18           In fact, that would be part of what STATE FIRE MARSHA

19   will be presenting this Court at the end of November in the

20   context of the plan that they are working on to try to

21   address this population.

22           The second thing is, and I can't speak to -- I can't

23   speak to the question that's come up with respect to the 2009

24   issues, but I would ask Your Honor to -- I would be happy to

25   provide copies of the notices that plaintiffs' counsel we're

104

1   referring to.

2        I received copies of those notices this morning and

3   do not have extra copies at this point. But Your Honor can

4   look at the notices and make his own determination as to

5   exactly what was said in those notices and what that

6   information would provide in terms of notice to the

7   institutions.

8        THE COURT: Thank you, ma'am.

9        You know, every time I think we're making significant

10  progress so that after 14 years I can finally get out of this

11  business -- I mean, I'm contrasting this with Valdivia where

12  the Special Master has been able to say that we can stop

13  examining these problems -- significant problems because the

14  State is complying, we have no reason to think they won't,

15  and I can see a way out of Valdivia.

16       But what happens in Coleman is that just

17  repeatedly... I mean, in part it is just this huge

18  bureaucracy. You know, it is the Queen Mary turning around,

19  but I'm not at all sure we really are turning around.

20       Well, I'll take the matter under submission.

21       The matter will stand submitted.

22       Thank you very much, Ladies and Gentlemen.

23       (Off the record at 2:20 p.m.)

24                       ---o0o---

25

```
1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5


6           I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 7TH day of
11   OCTOBER, 2010.

12

13

14   /S/_Catherine E.F. Bodene_____
           CATHERINE E.F. BODENE, CSR NO. 6926
15         Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25
```