| | |
|---|---|
| PRISON LAW OFFICE<br>DONALD SPECTER, Bar No. 83925<br>STEVEN FAMA, Bar No. 99641<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Telephone: (510) 280-2621 | ROSEN, BIEN & GALVAN, LLP<br>MICHAEL W. BIEN, Bar No. 96891<br>ERNEST GALVAN, Bar No. 196065<br>JANE E. KAHN, Bar No. 112239<br>AMY WHELAN, Bar No. 215675<br>LISA ELLS, Bar No. 243657<br>315 Montgomery Street, 10th Floor<br>San Francisco, California 94104-1823<br>Telephone: (415) 433-6830 |
| THE LEGAL AID SOCIETY –<br>EMPLOYMENT LAW CENTER<br>CLAUDIA CENTER, Bar No. 158255<br>600 Harrison Street, Suite 120<br>San Francisco, California 94107-1389<br>Telephone: (415) 864-8848 | BINGHAM, McCUTCHEN, LLP<br>WARREN E. GEORGE, Bar No. 53588<br>Three Embarcadero Center<br>San Francisco, California 94111-4066<br>Telephone: (415) 393-2000 |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF FROM THE COURT'S OCTOBER 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON** |

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................................ 1

ARGUMENT .................................................................................................................................... 2

I.  DEFENDANTS HAVE NOT ESTABLISHED THE LEGAL REQUIREMENTS FOR A STAY OF THIS COURT'S OCTOBER 5, 2010 ORDER AND THE COURT SHOULD THEREFORE LIFT THE STAY IMMEDIATELY ........................................................................................................... 2

II. DEFENDANTS HAVE FAILED TO ESTABLISH "EXTRAORDINARY CIRCUMSTANCES" WARRANTING RELIEF FROM THIS COURT'S OCTOBER 5, 2010 ORDER ........................................................................................... 4

    A.  The Fact that a Court Order May not Succeed is not an "Extraordinary Circumstance" Justifying Relief .............................................................................. 4

    B.  It is the Status Quo, Not this Court's Order, that Subjects Clinicians to Untenable Working Conditions and Legal Liability for their Clinical Actions .................................................................................................................. 4

III. THE COURT SHOULD DENY DEFENDANTS' MOTION, BUT ISSUE A SEPARATE ORDER REQUIRING THE SPECIAL MASTER TO EVALUATE STAFFING LEVELS, PHYSICAL PLANT ISSUES AND ANY OTHER BARRIERS TO EXPEDITED ADMISSIONS ................................................... 7

    A.  Contrary to Victor Brewer's Sworn Statements, Severe Staffing Shortages in the Salinas Valley Psychiatric Program Are Impacting DMH's Refusal to Expedite Admissions into the C5/C6 Units .............................. 8

    B.  Physical Plant Issues in C5 and C6 Are Not Serious Barriers to Increased Admissions in those Units .................................................................................. 10

IV. DEFENDANTS SHOULD PROVIDE A WRITTEN PLAN DETAILING THE TREATMENT PROGRAM THEY CAN PROVIDE ASSUMING 5-10 PATIENT ADMISSIONS PER WEEK AND THE SPECIAL MASTER SHOULD EVALUATE DEFENDANTS' HYPERBOLIC PREDICTIONS REGARDING COMPROMISED INPATIENT CARE ................................................... 10

CONCLUSION ............................................................................................................................... 13

[409706-4]

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Coleman/Plata v. Schwarzenegger*,
   Nos. CIV 90-0520 LKK/JFM, CIV 01-1351 TEH,
   2009 U.S. Dist. LEXIS 67943 (E.D./N.D. Cal. August 4, 2009) ................................. 1

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) ........................................................................................................ 2, 3

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988) ........................................................................................................ 2

*Lopez v. Heckler*,
   713 F.2d 1432 (9th Cir. 1983) ....................................................................................... 3

*United States v. Moyer*,
   2008 U.S. Dist. LEXIS 63995 (N.D. Cal. Aug. 12, 2008) ........................................... 3

**Statutes**

Cal. Code Regs. tit. 22 § 79747(a)(3) .................................................................................. 11

**Other Authorities**

American Psychiatric Association, Opinions of the Ethics Comm. on the
   Principles of Medical Ethics, 2009 Edition ................................................................. 6

American Psychiatric Association, *The Principles of Medical Ethics* (2009 ed.
   revised) ............................................................................................................................. 5

**Rules**

Fed. R. Civ. P. 60 .................................................................................................................... 2

Fed. R. Civ. P. 60(b)(6) ......................................................................................................... 2

Fed. R. Civ. P. 62(b) .............................................................................................................. 3

Fed. R. Civ. P. 62(b)(4) ......................................................................................................... 2

ii

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CDCR | California Department of Corrections and Rehabilitation |
| CMF | California Medical Facility |
| CSH | Coalinga State Hospital |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| EOP | Enhanced Outpatient Program |
| HC-POP | Health Care Placement Oversight Program |
| ICF | Intermediate Care Facility |
| ICF-H | Intermediate Care Facility – High Custody |
| MHARP | Mental Health Assessment and Referral Project |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| PSH | Patton State Hospital |
| PSU | Psychiatric Segregation Unit |
| SHU | Security Housing Unit |
| SNY | Sensitive Needs Yard |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| TC1 | SVPP Treatment Center 1 |
| TC2 | SVPP Treatment Center 2 |
| VPP | Vacaville Psychiatric Program |

# INTRODUCTION

After three briefs, multiple declarations, an evidentiary hearing, and yet another Court Order regarding the emergency Intermediate Care Facility (ICF) program in C5 and C6, defendants continue to ignore the crisis they have created for *Coleman* class members. Defendants are denying inpatient care to *more than 400 male class members* who need that care *right now*. The Department of Mental Health (DMH) has already accepted every one of those patients into its ICF program, yet DMH fails to actually provide that care for an average of more than six months, although hundreds of patients wait much longer. While they wait, CDCR houses those men in administrative segregation, psychiatric segregation, security housing or mainline Enhanced Outpatient units. None of those units are equipped, staffed, or licensed to provide inpatient care, or anything even remotely resembling inpatient care, and the conditions in segregation and locked-down units in particular actually *cause* further mental health decompensation. *Coleman/Plata v. Schwarzenegger*, Nos. CIV 90-0520 LKK/JFM, CIV 01-1351 TEH, 2009 U.S. Dist. LEXIS 67943, at *194, 214 (E.D./N.D. Cal. August 4, 2009) (locked-down units cause patients to decompensate or become suicidal and conditions of isolation, seclusion, and idleness exacerbate mental illness).

That is the reality hundreds of *Coleman* class members experience on a daily basis in the CDCR's prison system. In the face of that crisis, including the recent suicides of two class members who killed themselves waiting for these very beds, defendants should be brainstorming about and offering a full range of solutions to address the extreme deprivation of care. They should collaborate with the Special Master and plaintiffs' counsel to determine how best to fill the units with patients, and should be forthcoming to the Court about the resources they need to do so. Instead, defendants hid key information necessary to address the crisis,[1] devised and

---

[1] Defendants hid their MTA staffing crisis until they were forced to reveal it in their opposition to this motion and also hid the fact that they had diverted *Coleman* Court-ordered mental health staff at Coalinga State Hospital to non-*Coleman* patient populations. Similarly, defendants failed to reveal their plan to admit only General Population EOP patients into C5 and C6 until forced to do so in their opposition to this motion.

1

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

funded a staffing plan based on extremely slow admissions, and forced protracted litigation for a crisis that they should have worked informally to resolve with the Special Master and plaintiffs' counsel. Now that there has been an evidentiary hearing and an Order requiring them to increase admissions by only 5 patients per week—something defendants should have done on their own and were legally obligated to do based on prior orders—defendants seek relief from the Order based on specious claims of "extraordinary circumstances."

The only extraordinary circumstances that exist are the ones *Coleman* class members face every day—the callous reality that they will wait an average of more than six months for inpatient psychiatric care, and likely much longer. Defendants have not met their burden for relief and the Court should therefore deny this motion. Because serious staffing and other issues remain, however, the Court should issue a separate order requiring that the Special Master closely monitor C5 and C6 to determine the best course of action moving forward.

## ARGUMENT

Defendants' motion for a stay is unwarranted under the circumstances of this motion. Accordingly, the Court should immediately lift the stay. Defendants also seek relief from this Court's October 5, 2010 order pursuant to Fed. R. Civ. P. 60(b)(6). In order to prevail, defendants must show that "extraordinary circumstances" exist to warrant relief from the order. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-864 (1988). Defendants have failed to make such a showing and the Court should deny this motion.

**I.    Defendants Have Not Established the Legal Requirements for a Stay of this Court's October 5, 2010 Order and the Court Should Therefore Lift the Stay Immediately**

Defendants sought a stay of this Court's October 5, 2010 order pursuant to Fed. R. Civ. P. 62(b)(4), which permits a stay pending the disposition of a motion under Fed. R. Civ. P. 60. In deciding whether to grant a stay, the court should consider defendants' likelihood of success on the merits of their underlying Rule 60 motion, should balance the harms each party will suffer if the stay is granted or denied, and should assess where the public interest lies. *Hilton v.*

2

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

*Braunskill*, 481 U.S. 770, 776 (1987).[2]  With respect to stays pending appeals, the moving party is also required to "demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor."  *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983).

On October 13, 2010, this Court granted defendants' request for a stay.  Because defendants do not meet the standard, plaintiffs request that the Court immediately lift the stay.  First, defendants have not shown that they are likely to succeed on the merits since they have failed, as detailed below, to establish "extraordinary circumstances" warranting relief from the Court's order, an extremely high standard.  Second, defendants assert only vague and speculative harms to clinicians who "will suffer irreparable harm if they must provide care—for even the brief period during which admissions will be accelerated—that potentially falls below the standard of care for institutional mental health treatment in violation of ethical principles."  Docket 3933 at 5.  In contrast, plaintiffs have already established the actual harms they are suffering from defendants' denial of ICF inpatient psychiatric care, including the fact that class members are waiting an average of more than six months for these beds and that two class members recently committed suicide while waiting for ICF care in administrative segregation units.  Docket 3907 at 8-10.  Third, the public interest in ensuring timely access to inpatient psychiatric care for prisoners far outweigh speculative harms clinicians may suffer when they are unable to provide such care.  Finally, there are no serious legal questions warranting a stay.  *See Lopez*, 713 F.2d at 1435.  The "legal question" defendants rely on in their motion—"whether waiving the timelines for inmate-patient admissions and reviews so that DMH can accelerate admissions actually helps the problem that it seeks to remedy"—is not a legal question at all, but rather a question of fact.  *See* Docket 3933 at 6.

---

[2] Plaintiffs note that neither the Supreme Court nor the Ninth Circuit Court of Appeals has ever determined what factors a court should consider when assessing the request for a stay pursuant to Fed. R. Civ. P. 62(b).  The only district court within the Ninth Circuit that has addressed the issue found it appropriate, in light of the absence of an articulated test, to consider the same factors used to determine whether a stay is warranted pending an appeal.  *United States v. Moyer*, 2008 U.S. Dist. LEXIS 63995, at *15 (N.D. Cal. Aug. 12, 2008).  Plaintiffs will also use that standard here, but do not waive future arguments that a different standard should apply.

3

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

Because defendants have failed to satisfy the legal standard for a stay, this Court should immediately issue an order lifting the stay.

## II. Defendants Have Failed to Establish "Extraordinary Circumstances" Warranting Relief from this Court's October 5, 2010 Order

### A. The Fact that a Court Order May not Succeed is not an "Extraordinary Circumstance" Justifying Relief

Defendants seek relief from the Court's order to increase admissions by only five patients per week based on the "extraordinary circumstance[]…that the Court's order *may not help* the very problem that it seeks to remedy." Docket 3932 at 7 (emphasis added). Defendants fail to cite a single case, because one does not exist, to support their argument that such speculation constitutes an "extraordinary circumstance" warranting relief. Indeed, no Court can guarantee that an order will fully remedy a harm, particularly where, as here, the success of the order depends heavily on defendants' willingness and efforts to comply. Defendants' present motion makes clear that while they may literally comply with the Court's Order, they intend to do so using strategies that both undermine the Court's objectives and compromise patient care.

### B. It is the Status Quo, Not this Court's Order, that Subjects Clinicians to Untenable Working Conditions and Legal Liability for their Clinical Actions

Defendants also claim that the "extraordinary circumstance" warranting relief is that the Order will undermine their "responsibility in this litigation and under state law to provide appropriate intermediate care facility level of care," although they also claim this is primarily due to the "physical plant's limitation on treatment space." *Id.* at 10. Despite defendants' sworn testimony that they have sufficient staff right now to care for 58 patients in C5, and that they have 3-6 group rooms available to provide care, defendants now claim that the addition of only 5 patient admissions per week will throw the C5 program into such chaos that patients will not have treatment plans until all 58 patients are admitted, will be locked in their rooms for up to six

4

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

weeks and may not receive adequate care for up to six months. Docket 3932 at 9-10.[3] It defies reason that the addition of only one patient per weekday, if the unit is truly fully staffed, is the cause of this chaos. Even if all of defendants' hyperbolic and speculative predictions come true, though, *Coleman* class members admitted into the C5 unit (and later C6) will still receive vastly improved care from what they are receiving now, which is no inpatient care at all. As the Court pointed out during the evidentiary hearing, the simple transfer of patients into the inpatient C5 and C6 units will ensure that they are "in a place at least in which there is a hope that there's a psychiatrist, psychologist, somebody who has training" to care for them. *See* Declaration of Amy Whelan in Support of Plaintiffs' Opposition to Defendants' Motion for Relief from the Court's October 5, 2010 Order Regarding the C5/C6 Units at Salinas Valley State Prison, Ex. A at 53:6-9 (hereinafter "Whelan Opp. Decl.").

Defendants are apparently concerned that the real victims here are not the hundreds of class members with serious mental illnesses who are denied inpatient care, but rather clinicians who will be put in the "untenable position of providing treatment that could potentially fall below the standard of care…in violation of ethical principles."[4] Docket 3932 at 11. Defendants

---

[3] After acknowledging that the Governor's hiring freeze delayed his ability to hire staff for C5 and C6 for 30-45 days (Whelan Opp. Decl., Ex. A at 47:5-7), Mr. Brewer confirmed that he has enough staff working right now to fully staff C5." *Id*. at 44:22. Mr. Brewer also confirmed that he has six group rooms within which to provide care in C5 and C6. *Id.* at 39:5-8. In contrast, when he opened D5 and D6, the sister units to C5 and C6, he did so with no treatment rooms at all. *Id.* at 39:9-10.

[4] Dr. Lipon, a physician who does not even work at the SVPP, submitted a declaration regarding two standards of conduct in the American Psychiatric Association's *The Principles of Medical Ethics* (2009 ed. revised) ("APA Ethics"). He testified that clinicians might violate those principles if they are required to admit five more patients per week into C5. Plaintiffs note that defendants' clinicians also violate these standards when they deny inpatient care to patients who need it. Moreover, Dr. Lipon ignores the requirement that "[a] physician…support access to medical care for all people," something defendant clinicians cannot do in the current system. APA Ethics at 10 (available at http://www.psych.org/MainMenu/PsychiatricPractice/Ethics/ResourcesStandards/PrinciplesofMedicalEthics.aspx). In any event, ethical principles are rarely the benchmark for legal liability. Indeed, the Ethics Committee responded to one clinician inquiry about an overburdened public institution by stating that a clinician's "first effort should be directed at getting the hospital to remedy the situation…If you remain and do your best, you are behaving ethically. For us to declare otherwise might place an even greater burden upon our underfunded public institutions." American Psychiatric Association, Opinions of the Ethics Comm. on the Principles of Medical Ethics, 2009

(cont'd …)

5

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

all but ignore the rampant ethical violations and lapses in care that are happening right now as clinicians repeatedly refer patients to desperately-needed inpatient beds that do not exist, forcing clinicians to send patients back to the same segregation or EOP units in which they originally decompensated. It is this practice, and the overall inability of clinicians to provide inpatient care to patients who need it, that puts the patients, and their CDCR and DMH clinicians, at risk.

The best examples of professional lapses that subject clinicians to legal liability are the two recent suicides of men lingering on the SVPP waiting list.[5] In each of those cases, clinicians determined the men needed inpatient care, but failed to provide that care due to the current bed shortages. Specifically, clinicians in the MHCB unit at California Institution for Men (CIM) referred one of the patients to an ICF bed on September 4, 2009. Because no such bed was available, the clinicians discharged him instead to an administrative segregation unit. Docket 3908 at ¶ 12 (Kahn Decl.). Even that bed move was difficult, forcing the clinicians and staff to place the seriously ill patient in a holding cell for two hours, in a ZZ cell for 16 hours, and finally into the ASU cell. He killed himself 12 hours later. *Id.* The second suicide happened at California State Prison-Corcoran. DMH clinicians concluded at the end of the patient's acute care stay that he required longer-term ICF care. Although they referred him for that care, and DMH technically "accepted" him for inpatient care, clinicians were unable to move him to an

---

(… cont'd)
Edition, N.1.f. at 60-61 (http://www.psych.org/MainMenu/PsychiatricPractice/Ethics/ResourcesStandards/OpinionsofPrinciples.aspx).

Moreover, Dr. Lipon's declaration suffers from the same fatal flaw as Mr. Brewer's in that it ignores the abject failure of DMH to provide inpatient care to hundreds of class members. Consistent with DMH's leadership, Dr. Lipon takes the position that clinicians owe a duty of care only to the patients who are lucky enough to make it into their units, and not to the masses that have been accepted for care, but instead linger in adverse settings throughout the CDCR.

[5] Defendants' only response to these suicides in briefing before this Court was their nonsensical argument that plaintiffs' evidence about the suicides should be struck as "expert testimony" under Federal Rules of Evidence Fed. R. Evid. 702 and 703. Docket 3913 at 15, fn. 5. As plaintiffs pointed out in our reply, it does not take an expert to understand that people with severe mental illness requiring inpatient care are in extreme danger when they are deprived of that care, particularly when they are housed, as these two men were, in harsh conditions such as administrative segregation.

6

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

ICF bed. Instead, he moved in and out of Mental Health Crisis Beds (MHCBs)[6] for more than two months while he continued to linger on the waiting list. Clinicians who repeatedly discharged him from the MHCB also knew that he needed inpatient care, but could do nothing since he was already referred. He killed himself in his administrative segregation cell. *Id.*

Plaintiffs do not use these examples to blame individual clinicians for the quality of their care. Indeed, most of these clinicians are doing the best they can in a system that is catastrophically overwhelmed by the sheer number of patients it must treat. But if defendants want to talk about the legal liability their clinicians are subjected to, and the professional standards they must uphold, their focus on care *within* DMH inpatient psychiatric units is wholly misplaced. Clinicians have much more to worry about with respect to the hundreds of patients for whom they provide no inpatient care at all; in other words, the exact patients targeted by the Court's October 5, 2010 order.

### III. The Court Should Deny Defendants' Motion, but Issue a Separate Order Requiring the Special Master to Evaluate Staffing Levels, Physical Plant Issues and Any Other Barriers to Expedited Admissions

Defendants have not shown "extraordinary circumstances" warranting revision of this Court's order. The Court should therefore deny their motion. Because defendants have not made a collective and good faith effort to devise a plan to maximize the rate of admissions to C5 and C6 with the least possible compromise to the health and safety of the patients, serious issues remain. Plaintiffs respectfully request that the Court issue a separate order requiring that each of the defendant entities responsible for the C5/C6 program—the Governor's Office, the CDCR Secretary and the Warden of Salinas Valley State Prison, Steven Mayberg of DMH and the responsible DMH employees—be instructed to work directly with the Special Master and his team to determine the best course of action moving forward. Because staffing shortages appear to explain defendants' unwillingness to comply with the Court's Order, defendants should be

---

[6] Mental Health Crisis Bed units are short-term inpatient care units intended to provide mental health services for a maximum of 10 days. *See* Mental Health Services Delivery System Program Guide, 2009 Revision, at 12-1-8 to 12-1-9. Stays over ten days must be approved by the Chief of Mental Health, or designee. *Id.* at 12-1-8.

7

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

ordered to produce specific staffing data as outlined below, and should work with the Special Master on ways to alleviate the shortages.

### A. Contrary to Victor Brewer's Sworn Statements, Severe Staffing Shortages in the Salinas Valley Psychiatric Program Are Impacting DMH's Refusal to Expedite Admissions into the C5/C6 Units

Unlike the inpatient programs DMH operates at state hospitals and at California Medical Facility, the Salinas Valley Psychiatric Program has dangerously low staffing levels. On October 4, 2010, the same day as the evidentiary hearing, defendants' counsel produced, pursuant to this Court's prior order, monthly staffing data regarding DMH hospitals and programs providing care to *Coleman* class members. Whelan Opp. Decl. at ¶ 2 and Ex. B. That data shows that as of September 25, 2010, Atascadero State Hospital ("ASH") had a 0 percent staff vacancy rate, Patton State Hospital ("PSH") had a 1 percent staff vacancy rate, and Vacaville Psychiatric Program ("VPP") had a 9 percent staff vacancy rate. All of those vacancy levels account for the use of registry or contract personnel. In contrast, Salinas Valley Psychiatric Program ("SVPP") had a 35 percent staff vacancy rate with the use of registry staff. *Id.* These staffing shortages in the SVPP affect key positions impacting care. For instance, SVPP reports that 13 of the 19 allocated psychiatry positions are vacant, with only five positions filled by registry staff. *Id.* This leaves SVPP without 8 of the 19 psychiatrist positions it needs, or with a 42% vacancy rate. Shortages are nearly as dire for psychologists, with 5 of the 14 allocated positions vacant (or 36%) and no registry staff. Regarding social workers, 11of the 26 positions are vacant (42%) and only two of those positions are covered by registry staff. SVPP has also failed to fill 7 of 25 rehabilitation therapist positions, leaving a 27% vacancy rate and no registry coverage. *Id.*

Despite these alarming shortages, when Victor Brewer was asked under oath whether he would need more staffing resources to increase the level of admissions to C5, he responded: "As I've stated before, staffing is not the issue. If I'm ordered to do more, I will follow that order." Whelan Opp. Decl., Ex. A at 47:17-20. Instead, he claimed that "programming" was the problem. When pressed that programming simply "depends on the staff that you have" to

8

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

provide it, he agreed, but pointed also to the "physical plant." *Id.* at 47:21-25.[7]

It is simply not credible that inadequate clinical and custodial staffing is not a major part of the problem here. The staffing data does not yet reflect staffing for the C5/C6 units, but the vacancies are so severe in the rest of the SVPP (including Treatment Centers 1 and 2 and Buildings D5 and D6), that DMH has no ability to enhance care. What this data shows, and what Mr. Brewer neglected to explain to the Court, is that even if he wanted to move some staff from the other SVPP units to C5 or C6 to expedite intakes, he simply does not have the staff to do so.

Mr. Brewer's claim that "staffing is not the issue" is also belied by his testimony that he received only 12 of the "120 psychiatric technicians or LVNs" he requested through registry contracts, meaning that he has only 10 percent of the registry staff he needs in these positions. *Id.* at 49:14-19. He also testified that he needs 20 registered nurses to fill his staffing shortages in C5 and C6, yet he was unable to obtain even a single nurse through the registry. *Id.* at 50:2-8.

The staffing data also demonstrates another extremely disturbing thing about C5 and C6—DMH is apparently requiring clinicians to have much higher patient loads in C5 and C6 compared to the other SVPP units. Mr. Brewer testified that he needs "[f]our psychiatrists, four psychologists, eight social workers, eight rehabilitation therapists, four SRNs and 22 RNs" to fully staff C5 and C6. *Id*. at 44:6-7. Since those units will have 116 patients, that means each psychiatrist and psychologist will have 29 patients while each rehabilitation therapist and social worker will have 14.5 patients. According to defendants' staffing data, clinicians in the Treatments Centers and D5 and D6 have much lighter patient loads, with each psychiatrist treating only 13.4 patients, each psychologist treating 18.1 patients and each social worker and rehabilitation therapist treating approximately 10 patients. Whelan Opp. Decl., Ex. B (dividing budgeted positions for each category by 254 patients housed in the rest of SVPP).[8]

DMH needs to explain the serious staffing shortages throughout the SVPP, needs to

---

[7] Plaintiffs address the "physical plant" issues below.

[8] Treatment Center 1 has 64 beds, Treatment Center 2 has 74 beds and D5 and D6 each have 58 beds, for a total of 254 patient beds.

9

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

1 explain why it is requiring clinicians in C5 and C6 to carry such heavy patient caseloads, and
2 most importantly, needs to be forthcoming and honest about the resources it needs to ensure that
3 patients move into C5 and C6 as soon as possible without seriously compromising care.
4 Plaintiffs therefore request specific relief as detailed below.

### B. Physical Plant Issues in C5 and C6 Are Not Serious Barriers to Increased Admissions in those Units

Mr. Brewer claims in his newest declaration that the "physical plant's limitation on treatment space" will lower "the quality of treatment" to all of the patients in the unit. Docket 3932-1 at ¶ 4. While C5 and C6 are temporary units that do not have the treatment and office space typical of licensed inpatient units, they have six group treatment rooms available for patient care. Whelan Opp. Decl., Ex. A at 39:5-8. In contrast, when D5 and D6 opened back in 2006, there were no treatment rooms at all, forcing clinicians to do all client contacts in public areas like the dining room or the dayroom floor. *Id.* at 40:13-20.

While Mr. Brewer's concerns about treatment space are therefore important, they must be understood in this context. The "physical plant" issues in C5 and C6 do not even begin to approach the problems DMH faced when it opened D5 and D6, yet DMH never raised those issues with the Court as an "obstacle" or ethical issue precluding appropriate mental health treatment. Mr. Brewer testified that when he opened those units, he was forced, "out of necessity" to program "patients within the pod," and conduct "IDTTs within the pod," which, according to Mr. Brewer, violated HIPAA. *Id.* at 40:18-20. He conceded he did that because an emergency existed. *Id.* at 40:21-22. Yet the waiting list back in 2006 stood at about 100-120 patients (*id.* at 39:11-24) while it now has more than 400 patients (*id.* at 40:23-25).

### IV. Defendants Should Provide a Written Plan Detailing the Treatment Program they Can Provide Assuming 5-10 Patient Admissions Per Week and The Special Master Should Evaluate Defendants' Hyperbolic Predictions Regarding Compromised Inpatient Care

Defendants provide a list of relevant state laws that they would need waived in order to expedite admissions to C5 and C6. All of the statues they identify deal with timelines for providing initial and subsequent treatment plans or the minimum requirements and services

10

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

necessary for those plans.[9]  What defendants failed to provide, however, is an explanation as to what program they intend to offer patients in these units.  In other words, if defendants need the Court to waive the requirement that they determine the condition, provisional diagnosis and initial treatment plan for each patient within 24 hours of admission, within what period can defendants comply with that section?  Similarly, if defendants cannot ensure that a treatment team will develop a treatment plan within 72 hours of admission, how much time do they need?  Plaintiffs agree that defendants may need waivers of some of these provisions, but defendants have not provided enough information to permit the Court to issue an appropriate waiver order that also protects class members' interests.  Accordingly, defendants should be ordered to provide, within 3 working days, a written plan and schedule explaining the activities and mental health programming they can provide assuming 10, 9, 8, 7 and 6 patient admissions per week, compared to the programming they intended to provide to the originally planned 5 admissions per week.  Defendants should also provide the plan for 5 patient admissions a week that they seek permission to return to.  Each plan should also explain how particular compromises in patient care affect programming capabilities, including details as to which specific compromises will ensure the most enhanced programming possible.  If the Court waives the 30-day updates to treatment programs (Cal. Code Regs. tit. 22 § 79747(a)(3)), for instance, will defendants be able to provide 35-40 hours of programming per week?  *See* Docket 3913-3 at ¶ 5 (Brewer Decl.) (It is essential that SVPP provide 35-40 hours per week of programming during the activation process).  If not, what compromises in care will allow those programming hours?  Which compromises would allow 30-35 hours instead?

It is also essential that the Special Master closely monitor defendants' hyperbolic statements regarding compromised care.  Defendants claim that 10 patient admissions per week,

---

[9] Of the six Title 22 provisions defendants cite, one applies only to acute care patients and is thus irrelevant to an ICF program.  *See* Cal. Code Regs. tit. 22 § 79747(a)(3) (requiring that individual treatment plans be "reviewed an updated as often as indicated, but no less often than every seven (7) days…for *acute mental health patients*" (emphasis added).  As this provision does not apply, the Court should not waive it.

11

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

for instance, will result in their inability to provide individual treatment plans and therapeutic programming to even a single patient until all 58 patients are admitted, that it will take six weeks for ICC committees to make custody recommendations, that defendants will have to cease all mental health programming for patients already admitted to C5, that it will take up to six months for defendants to provide minimum treatment requirements under Title 22, and that it will take the unit 8-10 months to recover from the accelerated admission process.  Docket 3932 at 9-10.  Many of these dire predictions conflict with prior statements defendants have made, or seem unlikely to come to fruition if defendants take protective steps.  For instance, defendants claim that they are fully staffed right now in C5 to provide care to all 58 patients, and that staff for C6 will begin working within 30-45 days.  Whelan Opp. Decl., Ex. A at 44:4-22.  Given these seemingly high staffing levels, why do defendants predict so many compromises in patient care?

Defendants have also stated that they intend to admit only General Population EOP patients into C5 and C6, yet claim that it "will likely be at least six weeks before the inmate-patient treatment team can make a recommendation to the Institutional Classification Committee (ICC) for an alteration of the inmate-patient's custody status from being cuffed to un-cuffed."  Docket 3932 at 9-10; Docket 3292-1 at ¶ 5 (Brewer Decl.).  But the ICC process set forth in the Program Guide applies only to prisoners with SHU terms and thus is inapplicable to patients coming from General Population EOP units.  *See* Mental Health Services Delivery System Program Guide, 2009 Revision, at 12-6-9 (item 6).  Defendants also explained that they intend to renovate the largest pod in C5 right now (Whelan Opp. Decl., Ex. A at 13:20-22), meaning that C5 can admit only 36 patients between now and November 18, 2010, the anticipated date that renovation will be completed (*id.* at 15:23-24).  Defendants have not explained if they are moving forward with this plan and, if so, why staff sufficient to provide care to 58 patients cannot provide care to only 36 patients with slightly accelerated admissions.

Defendants have also explained that each of the six pods within C5 and C6 are independently locked wings segregated by thick concrete walls.  *Id.* at 17:23-18:2.  Given this floor plan, defendants have not explained why they cannot use one pod for admissions while programming patients on the other pods.  Finally, defendants' claims that it will take staff

12

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

"approximately eight to ten months to recover from the accelerated process because, in part, DMH must retrain the C-5 staff in the correct process for admissions and therapeutic expectations" are extremely suspect. Docket 3932 at 10. Defendants cite only six provisions of Title 22 for which they would need waivers, one that does not apply to ICF patients at all and five others that set forth extremely straight-forward standards for care.

The Court cannot determine which state laws to waive without knowing defendants' programming capabilities for patients in C5 assuming 5-10 admissions per week. Defendants should therefore be ordered to provide, within 3 working days, an explanation of the treatment plan they can provide assuming 5, 6, 7, 8, 9, and 10 admissions per week. The plan should also detail which statutes should be waived in order to ensure maximum programming for class members, including different combinations of waivers and their corresponding effects on care. The Special Master should also be ordered to work with the defendants to determine the best courses of action moving forward to ensure maximum mental health programming for *Coleman* class members during the period of accelerated admissions.

## CONCLUSION

Defendants have failed to show "extraordinary circumstances" warranting revision of this Court's October 5, 2010 Order and have failed to establish the standard for a stay. Accordingly, plaintiffs request the following:

1. The Court should immediately lift the stay.

2. The Court should deny defendants' motion for relief from its October 5 Order.

3. Because serious staffing and other issues remain, the Court should issue a separate order requiring that the Special Master closely monitor C5 and C6 to determine the exact barriers to care, and to recommend courses of action moving forward. Specifically, the Court should direct the Special Master to evaluate C5 during the period of expedited admissions to determine the impact, if any, on patient care, and to determine whether admissions should continue at that pace in both C5 and C6.

4. The Court should order that defendants provide to plaintiffs' counsel and the Special Master detailed staffing data regarding the SVPP, including the staffing plan submitted

13

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]

1  for C5 and C6, and the staffing ratios DMH uses for each building (including both of the
2  Treatment Centers, D5, D6, C5 and C6).  Defendants should also immediately provide updated
3  staffing data regarding budgeted, filled, vacant, contracted FTE, functional vacancy, and
4  percentage vacancies (both by authorized positions and through contractor offsets) for each of
5  the SVPP buildings.

6      5.    The Court should direct the Special Master to assess the staffing levels throughout
7  the SVPP, including the impact vacancies have on the provision of care and any obstacles that
8  exist to hiring new staff, so that he can make further recommendations regarding admissions
9  moving forward.

10      6.    The Court should direct defendants to provide, within 3 working days, a written
11  plan and schedule explaining the activities and mental health programming they can provide
12  assuming 10, 9, 8, 7 and 6 patient admissions per week, compared to the programming they
13  intended to provide to the originally planned 5 admissions per week.  Defendants should specify
14  the exact waivers they need related to the five Title 22 provisions cited in their motion.  For
15  instance, if they cannot provide initial treatment plans within 24 hours or IDTT treatment plans
16  within 72 hours, what time frames do they need assuming admissions at the 10, 9, 8, 7, 6, and 5
17  patient rates per week?  The plan should also explain how particular compromises in patient care
18  affect programming capabilities, including details as to which specific compromises will ensure
19  the most enhanced programming possible.

20  Dated:  October 20, 2010                                Respectfully submitted,

                                                                ROSEN, BIEN & GALVAN, LLP

                                                                 By: */s/ Amy Whelan*
                                                                        Attorneys for Plaintiffs

14

PLS.' OPPOSITION TO DEFS.' MOTION FOR RELIEF FROM THE COURT'S OCT. 5, 2010 ORDER REGARDING THE C5/C6 UNITS AT SALINAS VALLEY STATE PRISON – CASE NO. CIV S 90-0520 LKK-JFM

[409706-4]