# APPENDIX  A

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Benjamin T. Rice
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 24, 2010


Ms. Debbie Vorous
Deputy Attorney General
Department of Justice
1300 I Street
Sacramento, CA 94244-2550


Dear Ms. Vorous:

Please see enclosed, Defendants' November 24, 2010 Plan to Reduce or Eliminate Intermediate Care Facility and Acute Inpatient Waitlists in response to the Court's March 31, 2010 and August 4, 2010 orders in *Coleman v. Schwarzenegger*.

Sincerely,



BENJAMIN T. RICE
General Counsel

Enclosure

## ACRONYM LIST

| Acronym | Term |
|---------|------|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | California Health Care Facility |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CTC | Correctional Treatment Center |
| DCHCS | Division of Correctional Health Care Services |
| DMH | Department of Mental Health |
| EECP | Extended Enhanced Outpatient Program (EOP) Care Plan |
| EOP | Enhanced Outpatient Program |
| EOP-GP | Enhanced Outpatient Program-General Population |
| HC-POP | Health Care Placement Oversight Program |
| ICF | Intermediate Care Facility |
| ICF-H | Intermediate Care Facility-High Custody |
| IDTT | Interdisciplinary Treatment Team |
| I/P | Inmate-Patient |
| MHARP | Mental Health Assessment and Referral Project |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| Receiver | *Plata* Federal Receiver |
| MOU | Memorandum of Understanding |
| PBS | Positive Behavioral Services |
| PBST | Positive Behavioral Services Team |
| QM | Quality Management |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison, Sacramento |
| SME | Subject Matter Expert |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| UM | Utilization Management |
| VPP | Vacaville Psychiatric Program |

**FOR SUBMISSION TO THE *COLEMAN* COURT**

*Defendants' Plan Re: Intermediate Care Facility and Acute Inpatient Waitlists*

---

**I.**

**INTRODUCTION AND BACKGROUND**

The Department of Mental Health (DMH) operates two programs for male California Department of Corrections and Rehabilitation (CDCR) high-custody inmates who are referred to DMH for inpatient Intermediate Care Facility (ICF) mental health treatment and one program for inmates who are referred for Acute Psychiatric Program (APP) mental health treatment. The two programs that DMH operates for high-custody inmates who are referred for ICF treatment are:  (1) the Salinas Valley Psychiatric Program (SVPP) at Salinas Valley State Prison (SVSP); and (2) the Vacaville Psychiatric Program (VPP) at California Medical Facility (CMF).  The one program that DMH operates for inmates who are referred for APP care is the VPP at CMF.

On March 16, 2010, the waitlist for the inmates needing ICF treatment at SVPP totaled 542 not including Penal Code section 1370 inmate-patients and on March 15, 2010, the waitlist for the inmates needing APP treatment totaled 97.[1]  Consequently, on March 31, 2010, the Court ordered that Defendants, under the guidance of the *Coleman* Special Master, develop a plan to reduce or eliminate the SVPP and APP waitlists and, in the interim, to better serve the treatment needs of *Coleman* class member placed on those lists.  On August 4, 2010, the Court ordered that Defendants file their plan by November 26, 2010.

Defendants now present their plan in response to the Court's March 31, 2010 and August 4, 2010 orders.  Defendants' Plan is divided into three parts.  First, Defendants set out five approaches that they expect to implement in order to address the SVPP and APP waitlists: (1) Extended Enhanced Outpatient Program Care Plan to provide treatment interventions targeted to a specific subgroup of inmates who frequently experience a cyclical pattern of placement in ICF beds; (2) Utilization Management strategies to conduct prospective, concurrent, and retrospective reviews designed to optimize inmate-patient care; (3) expansion of the ICF Pilot Project to include quarterly review of the SVPP waitlist by CDCR Health Care Placement Oversight Program (HC-POP) to determine if any of the non case-by-case referrals that were recommended for SVPP high-custody placement had any recent case factor changes that would warrant an evaluation for alternative placement in a low-custody ICF beds;  (4) Activation of the SharePoint system that will allow CDCR and DMH to electronically share inmate-patient information; and (5) construction of ICF high-custody and APP mental health care beds.

---

[1]  Defendants selected March 16, 2010, to use as the starting point for showing their progress in addressing the SVPP and APP waitlists. *See* Court's March 31, 2010, referencing the APP waitlist as of March 16, 2010.

Second, Defendants discuss what they have done to address the mental health treatment needs of the inmate-patients on the SVPP and APP waitlists. Specifically, the inmate-patients continue to receive care at their current level of care, supplemented by CDCR headquarter's frequent and consistent interaction with the institutions to ensure that services are being provided beyond what the Mental Health Services Delivery System Program Guide requires. Additionally, CDCR and DMH have increased communications concerning the services available to inmate-patients upon return to CDCR and have expanded the use of consultative services from the DMH Positive Behavior Unit at VPP for difficult cases.

Last, Defendants demonstrate the impact of their Plan on the waitlists. Defendants have already substantially reduced the APP waitlist—as of October 31, 2010, Defendants had reduced the APP waitlist by 73, bringing it down to 24 inmate-patients. Defendants expect the APP waitlist will be at or near zero by December 2010 when the new APP P-1 project at CMF is fully occupied. Additionally, as of October 31, 2010, Defendants had reduced the SVPP waitlist by 149 inmate-patients, bringing it down to 393 (not including Penal Code section 1370 inmate-patients). This reduction was due, in part, to (1) Defendants' removal of inmate-patients from the waitlist that had paroled and removal of inmate-patients who, based on clinical indicators, no longer needed inpatient ICF care; and (2) inmate-patient admissions to DMH programs. At the same time, referrals averaged 51 inmates per week due, in part, to the processes that Defendants put in place during the recent Mental Health Assessment Referral Project (MHARP) in order to sustain the referral process. Defendants expect that the SVPP waitlist will be at or near zero by March 2014, as more fully explained below.

Though Defendants have diligently considered their Plan to address the waitlists for inpatient care, some of the strategies and goals remain in their infancy. Additionally, because continuing the strategies and goals in the plan are dependent upon, among other things, staff availability and financing, they will be reexamined, and possibly revised, once the entire plan is implemented.

## II.

### PLAN TO ADDRESS THE SVPP AND APP WAITLISTS

In responding to the Court's orders, Defendants took a systems-wide approach to develop a plan to address the SVPP and APP waitlists. Specifically, Defendants evaluated current plans, policies, practices, and processes to reduce the waitlists, reduce repeated referrals to DMH, and sustain the DMH referral process. In taking this approach, Defendants did five things.

First, Defendants developed a plan to provide specialized mental health treatment to inmate-patients who have a serious and persistent mental illness and require long-term support in order to function adequately in the Enhanced Outpatient Program (EOP) population, and are subject to frequent admissions to inpatient programs.

Second, Defendants refined and implemented Utilization Management (UM) strategies to coordinate and evaluate a multi-level review process and services for outpatient and inpatient care. Defendants' UM plan establishes three review processes: prospective, concurrent, and retrospective. A prospective review process is a process designed to review and intervene prior to providing care to an inmate-patient in an inpatient setting. This review determines if an inmate-patient's treatment can be maintained at the current level of care. The concurrent review process reviews treatment while the inmate-patient is in an inpatient setting. And the retrospective review process establishes a process to coordinate care after the inmate-patient is discharged with the goal that he can remain in an outpatient setting.

Third, Defendants evaluated how the recently implemented ICF Pilot Project could be utilized to address the SVPP waitlist by reviewing the waitlist on a continuing basis. Fourth, CDCR and DMH developed and implement a SharePoint system that will allow CDCR and DMH to electronically share inmate-patient referral and discharge information. Last, Defendants considered how Defendants' extensive bed planning efforts would address the SVPP and APP waitlists. Defendants believe that CDCR and DMH's specialized EOP plan and UM system represent a sustainable process that, when combined with the measurable impacts to the SVPP waitlist from the ICF Pilot Project and Defendants bed planning efforts, will reduce the SVPP and APP waitlists to at or near zero.

## A.    Extended Enhanced Outpatient Program Care Plan.

Defendants have implemented an Extended Enhanced Outpatient Program (EOP) Care Plan (EECP), which is designed to provide treatment interventions targeted to the subgroup of EOP inmate-patients who exhibit serious *and* persistent mental illness, and whose level of functioning is insufficient to allow general population placement. These inmate-patients may have received the benefit of licensed inpatient mental health services with no sustainable treatment effects; demonstrate episodic decompensation despite treatment; and, demonstrate significant limitations in overall daily living skills due to their mental health condition. Additionally, these inmate-patients frequently experience a cyclical pattern of placement in Mental Health Crisis Beds (MHCB) and/or ICF beds without any long lasting effects. Attachment A contains a description of CDCR's EECP.

The EECP should be considered not in terms of a new program or level of care but rather in terms of a specialized treatment continuum (module) within the EOP level of care. Stated differently, Defendants' EECP is designed to provide treatment to inmate-patients needing long term care for chronic and serious mental health needs, but not at the ICF level of care. The EECP inmate population should be differentiated from those who improve during ICF treatment but do not maintain their level of care due to transition issues. Furthermore, this care plan should be differentiated from the interim care being provided to the inmates who are in need of an ICF level of care.

The Division of Correctional Health Care Services, Mental Health Program, has been working with CDCR institutions to identify and implement the EECP. Currently, variations of the EECP exist at California Men's Colony (CMC) (Level III) and California Medical Facility (CMF) (Level III) to serve this subgroup of EOP inmate-patients. Less developed variations of the EECP are underway at Richard J. Donovan Correctional Facility (RJD) (Level III) and SVSP (Level IV 180 housing units). Over the next four months, CDCR expects to implement the EECP at California State Prison, Sacramento (SAC) and expand the EECP at CMF.

In evaluating potential inmate-patients for EECP at SAC and CMF, CDCR initially asked each CDCR male institution to review the inmate-patients currently on the SVPP waitlist to identify who met the EECP indicators outlined on page 1 of the Plan, Attachment A. CDCR has identified to date 68 inmates as meeting the EECP indicators for SAC or CMF—53 for SAC and 15 for CMF. In identifying these inmate-patients, CDCR also identified specific custody factors that would determine where the inmate-patient could be placed in the EECP. Examples of custody factors considered include current level of custody, single cell, double cell, or if the inmate-patient was housed in a 270 or 180 housing unit. Thus, in the near term, the EECP will directly reduce the SVPP waitlist because those 68 inmate-patients identified above will be receiving EECP treatment.

Before moving either these 68 inmate-patients or any future inmate-patients from the SVPP waitlist, CDCR and DMH will review the inmate-patient's suitability for ICF versus EECP services. The inmate-patient will not be removed from the waitlist until after this screening is completed and the inmate-patient is transferred to an institution with EECP availability. An inmate-patient will not be removed from the SVPP waitlist without the EECP availability. In the event that an inmate-patient is receiving EECP treatment but their suitability is poor, the inmate-patient's ICF referral will be re-activated and he will be placed on the waitlist at the same position he was in prior to being taken off of the list. The inmate-patient will continue receiving EECP treatment until placed in an ICF program.

Additionally, CDCR and DMH are working to identify and transfer the inmate-patients currently admitted to ICF or APP beds, as appropriate, to one of the identified institutions for an EECP treatment plan upon discharge. The discharge of these inmate-patients will reduce the SVPP waitlist in the future because those inmate-patients that would otherwise return to DMH, will stabilize with EECP treatment and not be put back on the SVPP waitlist. CDCR recognizes that some portion of those inmates currently at DMH will need to be referred for EECP treatment upon return to CDCR. This is necessary to maximize the benefits they received and to reduce the potential for deterioration once they reenter the prison environment.

The following graph reflects the SVPP waitlist by referring institution as of October 31, 2010. As noted, a large percentage of the targeted EOP inmate-patients are already currently housed at SAC and CMF.



## B.     Utilization Management Plan.

Attachment B and its accompanying Exhibits 1 to 5, contain a description of the various strategies that encompass CDCR and DMH's Utilization Management (UM) plan. These strategies are summarized below. The UM Plan has dual purposes. First, the UM Plan has, and will have, a direct impact on the number of inmate-patients on the SVPP and APP waitlists. Based on the quantifiable processes outlined below (diagnostic clarification, clozapine initiation, and review of the SVPP waitlist), CDCR, as of October 31, 2010, had clinically removed 120 inmate-patients from the SVPP waitlist: 23 inmate-patients were removed due to CDCR implementing diagnostic services in house; 8 inmate-patients were removed due to CDCR's implementing its clozaril initiation policy; and 89 removed because of improved level of functioning. CDCR and DMH estimate that, in going forward, the UM process will directly reduce the number of inmate-patients on the SVPP waitlist by 7 per month: 2 based on a review of length of stay; and 5 based on a review of the SVPP waitlist for removal due to improved level of functioning, which will diminish as the waitlist decreases. By initiating diagnostic clarification, initiating clozapine, and continued Positive Behavioral Services (PBS), CDCR and DMH anticipate that the inmate-patients who would otherwise have been referred to DMH will be re-directed and continue to receive treatment in CDCR. Review of the length of stay will potentially result in discharging inmate-patients from SVPP, which would open up beds for inmate-patients currently on the waitlist. Lastly, ongoing review of inmate-patients on the waitlist potentially will remove inmate-patients from it as their condition improves, or custody factors allow for placement in low-custody beds.

Currently, 14 inmate-patients remain on the SVPP waitlist for diagnostic clarification. CDCR expects to review and remove those inmates-patients by December 2010.

Second, the Plan represents a care management strategy for coordinating and integrating care among providers and between CDCR and DMH in order to achieve optimal inmate-patient outcomes. Therefore, a goal of the UM Plan is to put in place processes that are sustainable and that are evidence based and outcome driven and to make systemic changes to continue improving services. This is achieved by evaluating, through a comprehensive three-part review process, the appropriateness and effectiveness of mental health care services throughout every level within the Mental Health Services Delivery System (MHSDS), including inpatient DMH beds. This will have the indirect goal of reducing the waitlists, reducing readmissions to DMH, and sustaining the DMH referral process. The three review processes are: prospective, concurrent, and retrospective and include reviews of inmate-patients needing Mental Health Crisis Bed (MHCB), APP, and ICF levels of care. Within the three review processes, CDCR and DMH set out the various ways to complete the reviews.

### 1. Prospective Review:

Prospective reviews evaluate the appropriateness of referrals prior to placement in DMH. This type of evaluation will lead to a more appropriate placement within CDCR, which will reduce the likelihood of returning to DMH. The prospective review piece of Defendants' UM Plan contains five components, as follows.

#### a. Transition Planning and Continuity of Care.

Defendants have developed a Transition Planning and Continuity of Care plan to determine whether the inmate-patient's symptoms necessitate the requested level of care or if services can be provided at the current level of care. A copy of Defendants' Transition Planning and Continuity of Care plan is attached to Defendants' UM Plan, Attachment B, as Exhibit 1. To assist in making this determination on level of care, CDCR and DMH have revised and/or developed five forms: (1) DMH Referral Form for Acute and ICF Mental Health Services (Attach. B, Ex. 1.a.); (2) DMH Referral Packet Checklist (Attach. B, Ex. 1.b); (3) Mental Health Due Process Chrono (Attach. B, Ex. 1.c.); (4) the Health & Physical form is replaced with the CDCR Form 7371, Medical Classification Chrono (128-C3), Current Medication Profile, and Problem List (Attach. B, Ex. 1.d.); and (5) DMH Referral Decision form (Attach. B, Ex. 1.e.).

These forms require that more comprehensive inmate-patient information be shared between the CDCR and DMH clinical teams. The quality of information received by DMH will allow for a better understanding of the inmate-patient's background and mental illness. A treatment plan that can be developed and implemented more quickly, possibly decreases the time required for stabilization of the inmate-patient's mental illness. Additionally, the increased quality and quantity of information provided by DMH at the time of discharge provides the CDCR clinician more information to continue the treatment plan and possibly lengthen the time the inmate-patient remains in an outpatient setting.

7

**b.    Diagnostic Clarification/Psychological Assessments.**

CDCR has developed its own capacity to perform the majority of psychological assessments that once were referred to DMH. This has occurred as CDCR has filled the majority of its expanded positions of clinical psychologists. CDCR now has the time and skill set to be more precise in determining when DMH services would be beneficial. A copy of Defendants' Psychological Assessment plan is attached to Defendants' UM Policy, Attachment B, as Exhibit 2.

Based on a review of the SVPP waitlist that occurred since April 2010, CDCR determined that 23 inmate-patients on the SVPP waitlist no longer were appropriate candidates for diagnostic clarification at DMH. The process included discussion with the inmate-patient's Primary Clinician concerning the question of whether the inmate-patient was an appropriate candidate, including the reason for the diagnostic referral, discussion of current treatment, and if diagnostic treatment was still recommended, what testing in CDCR would be appropriate. The results of these discussions included a change of the referral question to DMH, setting up diagnostic testing within CDCR, or a referral back to the IDTT to rescind the DMH referral. These 23 inmate-patients were rescinded and removed from the SVPP waitlist and are not reflected in the current 393 number.

As of October 31, 2010, there were 14 inmate-patients on the SVPP waiting for diagnostic clarification. Assuming that these 14 inmate-patients are determined appropriate candidates for CDCR diagnostic clarification, they will be removed from the SVPP waitlist.

This process will indirectly reduce the waitlist going forward by decreasing the number of inmate-patients referred to DMH for diagnostic testing. Providing psychological assessments in CDCR rather than sending them to DMH will also reduce the wait times for other inmate-patients on the SVPP waitlist and, when admitted, will continue to decrease the waitlist. Based on the data gathered over the past seven months, CDCR estimates that 2 inmate-patients per month will be diverted from the SVPP waitlist.

**c.    Initiation of a Statewide Clozapine Initiation Policy.**

CDCR is establishing a policy to initiate Clozaril treatment at four CDCR institutions. A copy of Defendants' Statewide Clozapine Initiation Policy (summary) is attached to Defendants' UM Policy, Attachment B, as Exhibit 3. There is a direct impact to the SVPP waitlist from this process. There were initially 32 inmate-patients on the SVPP waitlist, 4 for primary reason for referral and 28 for secondary reason for referral. After further review of the reasons for referral, 8 inmate-patients were identified as appropriate referrals for initiation of Clozapine and 24 were removed from the SVPP waitlist for the purpose of initiation of Clozapine. Based on the data gathered over the past eight months, CDCR anticipates that there will be an indirect impact to the SVPP waitlist going forward; that is, an estimated 2 inmate-patients per month will be diverted from the SVPP waitlist.

8

### d.    Positive Behavioral Services.

CDCR is expanding its Positive Behavioral Services (PBS) with DMH to assist Interdisciplinary Treatment Team (IDTT) and inmate-patients in addressing and managing maladaptive behaviors utilizing least adverse treatment interventions in the least restrictive level of care. The goal is to reduce unnecessary re-referrals to inpatient hospitalization. A copy of Defendants' Positive Behavioral Support Team (PBST) plan is attached to Defendants' UM Policy, Attachment B, as Exhibit 4.

There are currently 4 inmate-patients on the SVPP waitlist that are involved in PBS. If these inmate-patients continue to show improvement, they may be taken off the waitlist by IDTT. To date, no inmate-patient has been taken off the waitlist.

The PBST also indirectly impacts the waitlists. The inmate-patients who may be referred for consultation with PBST have some of the highest utilization of inmate-patient hospitalization due to repetitive self-injurious behaviors. If PBST consultation is implemented with this population, a reduction in referrals should occur due to these inmate-patients being maintained in CDCR outpatient beds.

SAC has expanded PBS with their current resources. SAC has inmate-patients that have recently returned from DMH. PBS plans are being developed with the goal that the benefits of DMH inpatient care are sustained and the inmate-patients can function successfully in an outpatient setting. By implementing the PBS plans, inmate-patients who have been high users of APP and ICF programs will not have to return to DMH. SAC currently has 9 inmate-patients with active plans and 3 inmate-patients whose plans are being developed. CDCR headquarters expects to enhance this approach by providing additional resources to SAC, including staffing, equipment, and supplies as available.

### e.    Review of SVPP and APP Waitlists.

Since the Court's March 31, 2010 order, CDCR has reviewed the SVPP and APP waitlists to determine whether the inmate-patients on the lists continue to need inpatient care. A review of the waitlists provides closer monitoring of the inmate-patients and monitoring of their current mental health status and adjusting their treatment as needed. This review has already had an impact on the SVPP waitlist as discussed below. It will have a direct impact on the SVPP waitlist going forward by rescinding inmate-patients who no longer need a DMH referral due to improved mental health conditions, which CDCR estimates at 5 per month and diminishing as the SVPP waitlist decreases.

i.    **SVPP Waitlist**

The waitlist is being continuously monitored to remove individuals who have left CDCR, or have improved sufficiently to be removed from the list, while also establishing a sustainable referral process to DMH. The results of CDCR and DMH's review of the SVPP wait since March 2010 are summarized below.

The SVPP waitlist as of March 16, 2010, totaled 542, and as of October 31, 2010, it totaled 393.  The below graph depicts this reduction in the waitlist:



Between March 1, 2010 and October 31, 2010, CDCR clinicians referred 410 inmate-patients for ICF high-custody level of care, for an average referral rate of 51 per month. Between March 12, 2010 and October 31, 2010, DMH admitted 259 inmate-patients into its ICF high-custody programs, for an average admission rate of approximately 35 inmate-patients per month and discharged 224, for an average discharge rate of approximately 28 inmate-patients per month. The two below graphs depict these results:

**SVPP ICF Accepted Referrals between March 1, 2010 and October 31, 2010**



**Admissions and Discharges to the SVPP ICF High-Custody Programs Between March 12, 2010[2] and October 31, 2010**



---

[2] Defendants selected March 12, 2010, as the date to use for admission and discharge data because the data they used for their report on the MHARP and ICF Pilot Program was through March 12, 2010.

Additionally, through CDCR's review of the SVPP waitlist, 278 inmate-patients were removed from the original waitlist total of 542. Specifically, CDCR determined that 158 inmate-patients on the SVPP waitlist had paroled or had been admitted to a DMH program, and removed them from the list. And, as discussed above, CDCR clinically rescinded 120 inmate-patients from the waitlist. Of these 120, 77 inmate-patients were on the 3/16/2010 waitlist and 43 were placed on the waitlist after 3/16/2010. Last, out of the original 542 inmate-patients on the SVPP waitlist on March 12, 2010, 119 original inmate-patients remained on the waitlist as of October 31, 2010.



CDCR intends to continue to review the SVPP waitlist on a monthly basis as long as the waitlist exits. CDCR has conservatively estimated that it will remove 5 inmate-patients per month from the SVPP waitlist through this review process. CDCR believes, based on its most recent review on November 1, 2010, that its review process may result in even more removals from the waitlist. CDCR's November 1, 2010 review resulted in the identification of 33 additional inmate-patients that will be removed in November from the SVPP waitlist as follows: 8 – paroled or discharged; 14 – currently in a DMH bed; and 11 – rescinded, which will reduce the waitlist total to 360.

### ii.    APP Wait List

The APP waitlist as of March 15, 2010, totaled 97. As of October 31, 2010, it totaled 24. Because CDCR and DMH expect that the waitlist will be reduced to near or at zero by the end of December 2010, they have only reviewed it once, which did not lead to any reductions from the waitlist.

The below graph reflects the gradual overall reduction in the waitlist since March 15, 2010:



Additionally, as discussed below, Defendants opened up a 32-bed APP at CMF on November 1, 2010. Defendants anticipate that the program will be fully occupied by December 17, 2010, and, at that time, the waitlist reduced to near or at zero. CDCR intends to review the APP waitlist should there be one.

### 2.    Concurrent Review

Concurrent review implements processes to assess an inmate-patient's treatment while the inmate-patient is in an inpatient setting. To that end, CDCR is establishing a process to review the length of stay of inmate-patients in MHCB units over 15 days and CDCR and DMH are establishing a joint process to review the length of stay of inmate-patients in APP (over 90 days) and ICF (over 300 days) in order to track the rationale for continued stays. DMH already conducts internal reviews for extended lengths of stay in both APP and ICF levels of care. This concurrent review will identify this extended stay population and will identify any barriers and treatment options to transition the inmate-patient to an outpatient setting. The internal reviews will also help identify those inmate-patients that may benefit from the newly developed EECP.

Defendants expect that this review will impact the SVPP waitlist because the process will transfer inmate-patients who have been in inpatient beds for extended lengths of stay who no longer need inmate-patient care, and new DMH beds will be opened up for inmate-patients on the SVPP waitlist. Based on the data from the past seven months, CDCR expects that this review will result in removing 2 inmate-patients per month from the SVPP waitlist.

The UM form that is currently used at the State Hospitals is being revised for use at the Psychiatric Programs to supplement the existing internal UM process.  See Ex. 5 to UM Plan, Attachment B.

       **3.**        **Retrospective Review.**

Retrospective review establishes processes to coordinate care after an inmate-patient is discharged from DMH.  The goal is to successfully reintegrate the inmate-patient back into CDCR and maintain them in the CDCR setting.

       **a.**        **Transition Planning/Multiple Admits.**

CDCR is establishing a process to review cases of inmate-patients who have been recently discharged from inpatient care or who have multiple MHCB or DMH admissions.  As part of Defendants' Transition Plan (*see* Exhibit 1 to UM Plan, Attachment B), the Transition Planning Workgroup revised or developed the following forms related to the discharge process, which will be reviewed as part of this process:  (1) DMH Psychiatric Program Discharge Summary (Attach. B, Ex. 1.f.); (2) DMH Patient Discharge Checklist (Attach. B, Ex. 1.g.); and (3) Clinician to Clinician Transition Form (Attach. B, Ex. 1.h).

Defendants expect that this review will impact the SVPP waitlist by having the inmate-patient benefit from less frequent immediate referrals to MHCB on discharge from DMH and subsequent re-referrals to DMH.  The goal being that the inmate-patient remains stable for a longer period of time, which will decrease unnecessary hospitalizations.  By increasing direct contact and consultation between DMH and CDCR team clinicians, questions about information on the psychiatric discharge summary are discussed and inmate-patient treatment collaboration increases.

       **b.**        **Frequent Inpatient Hospitalizations.**

DMH headquarters has identified 60 inmate-patients who have had frequent inpatient hospitalizations.  CDCR will follow-up to identify potential continuity of care issues by reviewing DMH discharge plans to determine if successful interventions have been continued at the outpatient level of care or are appropriate for placement in an institution where the EECP is established. This will have an impact on the SVPP waitlist going forward because, with assessing current treatment needs and continuity of care, i.e., medication needs, the expectation is that fewer re-referrals to inpatient hospitalization will occur.

CDCR expects to continue this process by selecting cases of inmate-patients who have been recently discharged from inpatient care or who have multiple MHCB or DMH admits, and to review IDTT discharge orders, including clinician to clinician contact, medications, and treatment recommendations.

**4.      Additional Transition Planning and Continuity of Care Processes.**

In addition to the prospective, concurrent, and retrospective reviews already discussed, Defendants' Transition Planning and Continuity of Care plan sets out four additional processes to increase communications between CDCR and DMH and continue improving inmate-patient care:  (1) primary clinician visits; (2) CDCR Monthly DMH Coordinator conference calls; (3) DMH/CDCR quarterly conference calls; and (4) Non-formulary medications.

**C.      Intermediate Care Facility Pilot Project.**

Beginning November 4, 2009, CDCR implemented a Pilot Program for reviewing all ICF referrals based on revised custody case factors and guidelines and evaluating on a case-by-case basis select inmate-patients for possible referral to a low-custody bed at Atascadero State Hospital (ASH) or the VPP dorms.  The goal of the Pilot Program is to increase referrals of inmate-patients whose custody factors would have previously prevented their referral to a dorm setting in lieu of SVPP.  The Pilot Program is effective October 23, 2009, through October 23, 2011.  CDCR HC-POP has begun evaluating the necessary regulatory and policy changes to extend this program beyond its pilot period.

The Pilot Program has proved successful—between November 4, 2009 and November 12, 2010, HC-POP evaluated on a case-by-case basis a total of 277 ICF referrals, which to date has resulted in 201 acceptances at either ASH or the VPP dorms.  Table 1 below reflects the status of all case-by-case evaluations as of November 12, 2010:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**TABLE 1.  SUMMARY OF CASE-BY-CASE EVALUATIONS FOR REFERRALS RECEIVED 11/04/2009 OR AFTER**

| | HC-POP Placement Recommendation | Disposition | % of Total Case-by-Case Referrals |
|---|---|---|---|
| ASH | 194 | 154 (at ASH) | 55.6% |
| VPP-Dorms | 68 | 43 (at VPP-Dorms) | 15.5% |
| HC-POP initially recommended, but *redirected to SVPP or VPP cells based on updated case factors* | 15 | 7 (at SVPP or VPP-Cells) | 2.5% |
| Accepted by ASH *(pending transfer)* | | 2 | 0.7% |
| Accepted by VPP-Dorms *(pending bed assignment)* | | 2 | 0.7% |
| Determined appropriate for  high-custody ICF SVPP Wait List *(pending bed assignment)* | | 8 | 2.9% |
| Pending DMH Review/Approval | | 4 | 1.4% |
| DMH determined appropriate for APP | | 8 | 2.9% |
| Pending Institutional Classification Committee (ICC) Review | | 6 | 2.2% |
| In DCHCS HQ Process | | 1 | 0.4% |
| Rescinded | | 16 | 5.8% |
| Paroled *(prior to transfer)* | | 26 | 9.4% |
| **TOTAL CASE-BY-CASE REFERRALS** | **277** | **277** | **100.0%** |

Additionally, beginning January 2011, HC-POP staff expect to review the SVPP waitlist on a quarterly basis to determine if those non case-by-case referrals that were recommended for SVPP placement have had any recent case factor changes (i.e., custody level and placement score changes) that would warrant an evaluation for alternative placement at ASH or VPP dorms.  Though not yet a formal process, HC-POP has

16

reviewed the list and, to date, at least ten inmate-patients have been reconsidered and recommended for referral to ASH and/or the VPP dorms.[3]

Thus, the direct result of the ICF Pilot Project on the SVPP wait list is two fold. First, the Pilot Project allows CDCR to better manage the waitlist by not including inmate-patients on the waitlist who qualify for alternative placement in ASH and the VPP dorms in the first instance. Second, the quarterly review will reduce the SVPP waitlist. CDCR expects that this will result in a reduction of 2 inmate-patients per month.

## D.    **SharePoint.**

CDCR and DMH have worked collaboratively over the past several months to develop a SharePoint Site. SharePoint is a software platform for web-based sharing of information. It is a system for posting and managing DMH referrals, discharge summaries, program/institution waitlists, as well as Coleman Monthly reports and other pertinent information on a common web-based site that is accessible to DMH headquarters, State hospitals, and DMH programs, and to CDCR headquarters and prisons. Access to SharePoint is with permission only.

### 1.    **Goals of SharePoint:**

The goal of SharePoint is to enhance communication of critical inmate-patient care information between DMH and CDCR, which will lead to improved patient care by:

- Increasing efficiency in the referral process by facilitating the creation, transmission and access to referrals to higher levels of care between pertinent CDCR and DMH institutions;
- Standardizing the method for sharing information concerning CDCR inmate-patients who are waitlisted for DMH programs;
- Creating a common place for accessing DMH discharge information to enhance inmate-patient follow-up care; and
- Sharing statistical data to help monitor and improve the entire continuum of the referral process, from the time an inmate-patient is referred to a higher level of care at DMH to the inmate-patient's discharge and return from DMH to CDCR.

Additionally, SharePoint will allow CDCR and DMH to upload inmate-patient Referrals and Discharges in one file and track the information as one.

Though not directly quantifiable, SharePoint will have an indirect impact on the SVPP and Acute waitlists by improving the entire continuum of the referral and discharge process.

---

[3] HC-POP does not review the APP waitlist for alternative placement, however, its work with APP and CMF staff has collectively resulted in placing approximately 32 discharged APP inmate-patients in the VPP dorms.

### 2. Data Collection:

CDCR and DMH expect to post on SharePoint data or statistical information that they identify as information that should be shared between the departments. SharePoint has the capability to generate specific reports using the data imputed by CDCR and DMH. By using this information, each department will be able to quickly identify any weakness within the processes and make changes as appropriate to continue ensuring good quality inmate-patient mental health care.

### 3. Training and Implementation:

SharePoint trainings for CDCR and DMH staff are scheduled for November 30, 2010 and December 2 and 13, 2010. These trainings will be conducted in a face-to-face classroom setting and via AT&T Web Meeting for field staff and DMH staff that have been identified as users of the site. Attached as Attachment C is a copy of the Power Point for that will used at the SharePoint trainings. Additionally, the SharePoint training tutorial will be placed onto the site for reference and for future users. CDCR and DMH expect that after December 6, 2010, all new referrals and discharges will be placed onto the SharePoint site by the institutions. Referrals for those inmate-patients already on the SVPP and APP wait lists, or in DMH beds, will be posted by CDCR headquarters.

## E.    Defendants' Bed Projects

Defendants have made exceptional gains with respect to their bed planning efforts, especially in the last two years and especially with respect to the construction of mental health care beds for high-custody inmates needing ICF and APP levels of care. Defendants worked with the Special Master and the Receiver in *Plata* to develop a comprehensive mental health bed plan, which Defendants submitted to the Court on May 26, 2009. The plan was comprised of short-term, intermediate, and long-range plans. On June 18, 2009, the Court approved Defendants' short-term and intermediate-term proposals, but declined to approve Defendants' long-range mental health bed plan. Defendants submitted a November 2009 long-range plan as well as a February 18, 2010 plan to provide 70 female Enhanced Outpatient Program-General Population (EOP-GP) beds at Central California Women's Facility and a May 13, 2010 amended Stark plan. Defendants await final approval of their long-range mental health bed plans for the 70 female EOP-GP beds and for the amended Stark plan.

### 1. Short and Intermediate-Term Projects.

Defendants' May 26, 2009 short and intermediate-term projects were designed to meet the mental health bed need projections for Fiscal Year 2008/09 using the Navigant Consulting Fall 2008 Population Projections. Table 2 represents the difference between the existing mental health beds in May 2009 and the projected bed need through Fiscal Year 2008/09 as identified by the Navigant Consulting Fall 2008 Population Projections:

18

**TABLE 2. BED NEED THROUGH 2009**

| LOC | Bed Need 2009[4] | Actual Bed 2009[5] | Gap |
|-----|-----------------|--------------------|-----|
| APP | 218 | 155. | 63 |
| ICF-H | 370 | 306 | 64 |

Defendants' May 26, 2009 plan contained three projects to meet the ICF bed needs for high-custody inmates  and two projects to meet the APP bed needs:  (1) conversion of two buildings on the SVSP C yard to 116 ICF high-custody beds (C5/C6 Project); (2) add 4 cells to the SVPP D-5/D-6 program; and (3) pilot double bunk 10 cells at the SVPP TC-2 unit for an additional 10 beds;  (4) conversion of 36 beds in the P-1 housing unit at CMF to APP beds; and (5) conversion of 32 beds in the P-2 housing unit at CMF to APP beds.  Table 3 summarizes these projects:

**TABLE 3. SUMMARY OF SHORT-TERM AND INTERMEDIATE-TERM PROPOSALS**

| Proposal | LOC Served | Number of Beds |
|----------|-----------|----------------|
| SVPP: Convert two buildings of C yard to ICF-H | ICF-H | 116 |
| SVPP:  Add two beds in D-5 and two beds in D-6 for ICF-H | ICF-H | 4 |
| SVPP: Convert one 10-bed wing in TC1 to double cells for ICF-H | ICF-H | 10 |
| VPP: Convert P1 wing to APP | APP | 32 |
| VPP: Convert P2 wing to APP | APP | 36 |

The C5/C6 Project was activated on September 21, 2010, and there are currently 58 inmates in the C5 Unit.  In accordance with the Court's October 22, 2010 order, DMH will begin admitting the remaining 58 inmates to the C5 Unit on January 18, 2011, which will result in that unit being fully occupied by February 2011.  The second and third ICF projects are fully activated.  The P-1 project was activated on November 1, 2010, and will be fully occupied by December 17, 2010.  The P-2 project is fully activated.

Table 4 below reflects the total number of current ICF high-custody and APP beds available.  This table includes the short-term and intermediate-term ICF and APP projects outlined in Table 3 above.

---

[4] Mental Health Bed Need Study, Fall 2008, page 33.
[5] These figures are based upon HC-POP number of actual beds as of May 2009.

**TABLE 4. TOTAL CURRENT AVAILABLE ICF HIGH-CUSTODY BEDS AND APP BEDS**

| PROGRAM | Level of Care | Number of Beds | Number of Beds Beyond Bed Need 2009 |
|---|---|---|---|
| Vacaville Psychiatric Program | APP | | |
| P-1 | | $32^6$ | |
| P-2 | | 36 | |
| Q1, Q2, Q3, S1, S2 | | $150^7$ | |
| **TOTAL** | | _____ 218 | 0 |
| Salinas Valley Psychiatric Program | ICF High Custody | | |
| TC-1 | | 32 Cells | |
| TC-1 | | 32 Dorm Beds | |
| TC-2 | | 54 Cells | |
| TC-2 | | 20 Dorm Beds | |
| D-5 | | 58 Cells | |
| D-6 | | 58 Cells | |
| C-5 | | 58 Cells | |
| C-6 | | $58 \text{ Cells}^8$ | |
| **SUB-TOTAL** | | _____ 370 [52 Dorms and 318 Cells] | |
| Vacaville Psychiatric Program P-3 | ICF High Custody | 30 Cells | |
| **TOTAL** | | 400 | +30 |

## 2. Defendants' Long-Range Bed Plan.

Defendants' November 6, 2009 long-range bed plan was designed to meet the Navigant Consulting Spring 2009 Population Projections for Fiscal Year 2013. Table 5 represents the difference between the existing mental health beds in May 2009 and the projected bed

---

[6] P1 will be fully occupied by December 17, 2010.
[7] 4 beds are currently off-line due to retrofits to the cells.
[8] C5/C6 Project will be fully occupied by February 2011 per the Court's October 22, 2010 order.

need through 2013 as identified by the Navigant Consulting Spring 2009 Population Projections:

**TABLE 5. BED NEED THROUGH 2009**

| LOC | Bed Need 2013[9] | Actual Bed 2009[10] | Gap |
|-----|-----|-----|-----|
| APP | 193 | 155. | 38 |
| ICF-H | 624 | 306 | 318 |

Defendants' long-range bed plan includes new construction combined with the decommission of certain programs that the Court has ordered as temporary measures. The new construction projects for male ICF high-custody beds and APP beds are the following: (1) 64-bed ICF project at California Medical Facility; and (2) 432-bed ICF beds and 43 APP beds project as part of the California Health Care Facility (CHCF).

Table 6 summarizes these projects:

**TABLE 6. SUMMARY OF LONG-RANGE PLAN**

| Proposal | LOC Served | Number of Beds |
|-----|-----|-----|
| CHCF | APP | 43 |
| CMF new construction | ICF-H | 64 |
| CHCF | ICF-H | 432 |

The 64-bed ICF project at CMF is scheduled to start admitting inmates on October 14, 2011 and end on December 23, 2011. The 432-bed ICF project at the CHCF is scheduled to start admitting inmates on March 13, 2013 and end on December 8, 2013.

The projects that Defendants will request the Court's approval to decommission are: (1) SVSP ICF high-custody beds in D5/D6 (112 beds); (2) CMF ICF high-custody beds (66) and (3) 20 MHCB at CMF operated by DMH that will return to APP beds and create "new capacity." [11] Table 7 reflects these programs:

---

[9] Based on Navigant Consulting Spring 2009 population projections.
[10] Based on HC-POP number of actual beds as of May 2009.
[11] Though not noted in Defendants' long-range bed plan, Defendants also intend to request approval to decommission their short-term and intermediate-term proposals to convert two buildings of C yard at SVSP to 116 ICF high-custody beds and to add two beds in D-5 and two beds in D-6 at SVSP for ICF high-custody beds.

TABLE 7. TEMPORARY PROGRAMS TO BE DECOMMISSIONED

| SITE | PROGRAM | CAPACITY DECOMMISSIONED Number of Beds |
|------|---------|------------------------------------------|
| CMF | MHCB (APP) | 20 MHCB; to be returned to APP Beds |
| SVSP | ICF-H Beds (D-5 and D-6) | 112 ICF-H Beds |
| SVSP | ICF-H Beds | 66 ICF-H Beds |

Table 8 is a cumulative table of current capacity (as of May 2009), new planned capacity, returned capacity, and net capacity as compared to bed need projections:

TABLE 8. SUMMARY OF MEN'S NET CAPACITY

| LOC | Current Capacity | New Capacity | Returned Capacity | Net Capacity | Population Projections to 2013 | Over/ (Under) |
|-----|------------------|--------------|-------------------|--------------|-------------------------------|---------------|
| Acute | 155 | 63 | -25[12] | 193 | 193 | 0 |
| ICF-H | 306 | 496 | -178 | 624 | 624 | 0 |

**III.**

**INTERIM TREATMENT PROVIDED TO INMATES ON THE WAITLISTS**

Interim care refers to the care provided to inmate-patients who have been referred for ICF treatment, but are waiting for an open bed. These inmate-patients continue to receive treatment at the level of care where they were prior to their referral supplemented as described below.  The inmate-patients who are receiving interim care are also distinguishable from those in EECP, who have been determined to need the extended EOP care—on a case-by-case, individualized basis—and would not benefit from ICF care.  Thus, interim care inmate-patients need ICF care, but are on the waitlist because there is no open bed available, and so they continue to receive care at their current level of care, supplemented as described below, until they can be transferred to ICF.

The actions taken by CDCR headquarters since March 2010 to address the treatment needs of the inmate-patients on the SVPP waitlist include the following:

- Frequent and consistent interaction with the institutions requesting updated clinical status of the inmate-patients as well as provided encouragement to increase face-to-face activities between clinician staff and inmate-patients and one-on-one contacts as resources allowed.

---

[12] This number represents 25 APP beds at ASH that Defendants converted to ICF low-custody beds as part of their May 26, 2009 bed plan. This conversion was completed in June 2009.

- o Surveyed all 30 male institutions, which demonstrated a significant effort by clinicians to individualize treatment plans within their resource constraints.

- The 30 male institutions provided interim services beyond EOP program requirements, consistent with available resources, as follows:

  - o IDTTs offered every 30 days or more often as clinically indicated;
  - o IDTTs daily as clinically indicated;
  - o Psychiatrist review every 2 weeks;
  - o Referral to Coordinated Clinical Assessment Team consultation and development of individualized treatment plans;
  - o Assigned one psychologist to inmate-patients on the SVPP waitlist;
  - o Placements in MHCBs or Outpatient Housing Units, as appropriate;
  - o Placed on a high risk list as appropriate with high risk progress notes documented weekly;
  - o Contact with case manager twice a week;
  - o Housed in one specific area for easier observation and assessment by clinicians, licensed psychiatric technicians, and custody; and
  - o Developed Positive Behavioral Plan.

- Engaged in monthly teleconferences with the DMH coordinators at all 33 institutions to discuss how to improve the process regarding how new inmate-patients are being referred to the appropriate higher level of care, clarify directives; and facilitate changes.

- Reviewed twice a month the SVPP waitlist to track inmate-patient movement, including paroles, verify that the inmate-patients on the respective waitlist still need inpatient services, and remove those inmate-patients already placed in DMH programs, thereby optimizing bed usage and list accuracy.

- Improved the level of information exchange between DMH clinical staff and CDCR referring staff, particularly as it relates to understanding what services are available to an inmate-patient upon return to CDCR.

- Expanded the use of consultative services from the DMH Positive Behavior Unit at VPP in order to improve treatment plans for inmate-patients on the SVPP waitlist and provide consultative services for difficult cases.

- EECP at CMF and SVSP.

23

**IV.**

**SUMMARY OF IMPACT FROM QUALITY MANAGEMENT, ICF PILOT PROJECT, AND BED PROJECTS ON SVPP WAITLIST**

Defendants appropriately based their short-term and intermediate-term mental health care bed plan on Navigant Consulting Fall 2008 Population Projections for Fiscal Year 2008/09. At that time, and prior to completing the MHARP, the SVPP waitlist for ICF high-custody beds averaged 141. The waitlist for APP beds averaged 23. The bed gap was projected at 63 APP beds and 64 ICF beds. By comparison, Defendants' short-term and intermediate-term bed projects would add 130 new ICF beds and 66 new APP beds. But after completing the MHARP nine months later and putting in place steps to sustain the referral process, the SVPP and APP waitlists increased dramatically; that is, to 542 and 97 respectively.

With respect to the APP waitlist, Defendants expect that waitlist will be reduced to or near zero by December 2010 once the P-1 unit is fully occupied. With respect to the SVPP waitlist, Defendants have put in place a UM process that is expected to reduce the SVPP waitlist but, at this time, they cannot accurately project what that reduction will be. Nonetheless, Defendants believe that the measures that can be quantified—diagnostic clarification (14 by December 2010); length of stay reviews (2 per month); and wait list reviews (5 per month), combined with the ICF Pilot Project (2 per month) and Defendants' bed planning efforts (net 624 beds), will substantially reduce the SVPP wait list in the near term and reduce it to or near zero by March 2014, as follows:

| Date | Need (equals total of existing beds plus SVPP waitlist) | Number of Beds | Waitlist | Impacting Factor(s) |
|------|------|------|------|------|
| 3/16/2010 | 852 | 310 | 542 | Starting Point |
| 6/15/2010 | 750 | 310 | 440 | |
| 9/15/2010 | 763 | 310 | 453 | C-5 begins to admit I/Ps on 9/21 [11/8/10 waitlist totaled 372] |
| 12/15/2010 | 711 | 368 | 343 | 58 - C-5 fully activated on 11/17/10 with 58 beds. 14 - diagnostic clarification referrals removed from the waitlist prior to 12/15/2010 |
| 3/15/2011 | 653.6 | 426 | 227.6 | 58 - C-5 will again begin admitting I/Ps on 1/18/2011 at the rate of 10 per week; expected full occupancy February 2011. |

|  |  |  |  | 68 - EOP Extended Care Plan Services opens up first quarter of 2011 |
|---|---|---|---|---|
| 6/15/2011 | 664.1 | 426 | 238.1 |  |
| 9/15/2011 | 674.7 | 426 | 248.7 |  |
| 12/15/2011 | 667.9 | 490 | 177.9 | 64 - CMF adds 64 beds from 10/14/11 to 12/23/11 |
| 3/15/2012 | 663.2 | 490 | 173.2 |  |
| 6/15/2012 | 662.4 | 490 | 172.4 |  |
| 9/15/2012 | 663.6 | 490 | 174.6 |  |
| 12/15/2012 | 669.8 | 490 | 179.8 |  |
| 3/15/2013 | 677.1 | 490 | 187.1 |  |
| 6/15/2013 | 679.7 | 518 | 161.7 | 144 from CHCF -116 deactivated beds from C5/C6 as waitlist allows |
| 9/15/2013 | 674.7 | 546 | 128.7 | 144 from CHCF -116 deactivated beds from D5/D6 as waitlist allows |
| 12/15/2013 | 648.7 | 624 | 24.7 | 144 Fully activated CHCF -66 deactivate beds from CMF |
| 3/15/2014 | 624.6 | 624 | .6 |  |

This table is based on the following assumptions:

- The number of inmate-patients on the SVPP waitlist as of November 8, 2010, totaled 372.
- The monthly reduction for 2011 totals 9:  2 (UM length of stay reviews); 5 (review waitlist); 2 (HC-POP reviews).
- The average number of new referrals per month totals 51.
- The average number of discharges per month totals 28.
- The number of beds March through August 2010 totaled 310.
- The bed turnover rate is .0903226:  average discharges March 2010 to August 2010 divided by the number of beds (28/310).

The following graph, which compares bed need with the number of ICF-H beds, presents a visual depiction of the above-described reduction of the SVPP waitlist:



Legend:  diamonds = Bed Need; squares = Number of Beds

# ATTACHMENT A
# (Extended Enhanced Outpatient Program Care Plan)

**EXTENDED ENHANCED OUTPATIENT PROGRAM CARE PLAN**

I.      <u>Overview</u>:

The Extended Enhanced Outpatient Program (EOP) Care Plan (EECP) is designed to provide treatment interventions targeted to the subgroup of EOP inmate-patients who exhibit serious *and* persistent mental illness, and whose level of functioning is insufficient to allow general population placement.  These inmate-patients may have received the benefit of licensed mental health services with no sustainable treatment effects; demonstrate episodic decompensation despite treatment; and, demonstrate significant limitations in overall daily living skills due to their mental health condition. Additionally, these inmate-patients frequently experience a cyclical pattern of placement to Mental Health Crisis Beds (MHCB) and/or Department of Mental Health (DMH) Intermediate Care Facility (ICF) beds without any long lasting effects.  The EECP was developed from gathering best practices in California Department of Corrections and Rehabilitation (CDCR) institutions, DMH recommendations, and California Department of Developmental Services.

II.     <u>Clinical Profile</u>:

The inmate-patient meets the following clinical indicators:

- Has received services at EOP level-of-care, and the prognosis for eventual transition to Correctional Clinical Case Management System level-of-care is poor.
- Has an Axis I persistent condition requiring treatment primarily for management of:
  - o negative symptoms;
  - o impoverished thinking;
  - o low level of continuous positive psychotic symptoms; and
  - o medication management.
- Deficits in daily living skills, recreational and leisure activities.  Inmate-patient may present a cyclical regressive pattern of functioning.
- Currently, does not require Acute Psychiatric Program care.
- Currently, does not meet criteria for referral to ICF treatment

  OR

  Is not recommended for referral to ICF treatment, because IDTT determines inmate-patient is unlikely to benefit and reasons are clearly documented

  OR

  Has been treated at the DMH ICF level-of-care and continues to display significant emotional and behavioral impairments.
- The inmate-patient is not in need of further diagnostic clarification.
- The IDTT determines that EECP is most appropriate to meet the inmate-patient's needs.

III.    **EECP Model:**

A.    **EECP Model's Principles**
The EECP utilizes a biological, behavioral and psychosocial model of services, which evaluates and addresses an inmate-patient's needs and behaviors by considering their medical, cognitive/learning, adaptive behavior and social abilities and needs.   The care plan is a specialized behaviorally oriented treatment where the core focus is to promote an inmate-patient's self management of daily living skills and mental health needs at a sustainable individual optimal level of functioning.  It will focus on monitoring symptoms, providing assistance with and training in daily living skills and medication management and will provide structured opportunities for education, recreation, and socialization.  The treatment goal of the EECP is to maintain an inmate-patient at their highest level of functioning and engage them as frequently as possible at the level they are at.  Behavior modification and cognitive behavior therapy are the foundations of the treatment approach.  Positive reinforcement is utilized to promote and affirm an inmate-patient's efforts and progressive improvement in functioning.

B.    **EECP Model's Tenant**

1.    **Therapeutic environment:**    The EECP will provide a structured supportive environment in an out-patient setting that will resemble an environment of a community where there is stability of relationships, consistency, and minimal disruptions.

2.    **Treatment milieu:**  The EECP Multidisciplinary Team will consist of recreational therapists, nurses, social workers, psychologists, psychiatrists, and custody staff.  This mix of staff will differ from mainline EOP staffing with a greater emphasis on recreational therapists and nurses working with custody staff.  Enhanced staffing is required to meet the extensive one-to-one attention.   An inmate-patient's functioning will require careful management of time and a slower pace in completing tasks; thus, daily routines will require more time and diligence.

3.    **Treatment goals:**  The EECP will involve the inmate-patient in activities of high interest, low demand and multiple modes of expression in order to keep the inmate-patient engaged and promote socialization, self satisfaction, and independence.  A progressive involvement in as many activities as possible and as many activities as the patient can handle is the ultimate goal.  The focus of treatment is to promote socialization, self independence, and manage symptoms.

4.    **Therapeutic assignments:**  In order to ensure that the intensity of the therapeutic regiment is suitable to the inmate-patient's ability and tolerance level, the assignment to the therapeutic activities will be progressive.  This progressive treatment regiment will aim at ensuring the inmate-patient's integration by providing the inmate-patient with a gradual introduction to staff, other inmates and available therapeutic activities without

overwhelming the inmate-patient. Therapeutic activities will be based on the inmate-patient's high interest. This progressive assignment will allow the EECP Team to evaluate and tailor activities and therapeutic interventions in the event that the inmate-patient is not responding/participating to the assigned therapeutic regiment.

5. **Therapeutic activities:** EECP therapeutic activities will emphasize but not be limited to daily living skills, physical fitness, health education, mental health awareness, mental health symptom management, medical symptom management, problem solving, and leisure activities. Therapeutic activities will be delivered on a 1:1 level and in small and large groups as determined by the EECP Multidisciplinary Team. Activities will be accompanied by motivating social reward incentives.

6. **Level of programming:** EECP therapeutic structured activities will average 13 hours per week. Therapeutic group activities can be over-stimulating and tax an inmate-patient's poorly developed coping mechanisms, which may appropriately result in fewer structured activities. An inmate-patient's individual treatment level of programming will be tailored to meet the individual needs and progressive engagement of the inmate-patient, always aiming at the maximum level possible. Therefore, the EECP will provide inmate-patients a wide variety of activities to participate in that will be tailored to the inmate-patient's skills and abilities.

7. **Mainstreaming:** The EECP treatment will adhere to the principles of mainstreaming. As an inmate-patient demonstrates progress and independence, the treatment team will assess whether the inmate-patient can function at a more rigorous EOP-General Population (EOP-GP) treatment plan. Subsequently, based on the principle of "mainstreaming," the treatment team will provide the inmate-patient gradual and progressive transition opportunities. For example, the inmate-patient may join a transition group at the EECP level and/or a group activity at the GP-EOP level while still at the EECP level.

8. **Assessment of skills and behaviors:** The EECP Multidisciplinary team will evaluate an inmate-patient's daily living skills and maladaptive behaviors by utilizing functional behavioral analysis/assessment, which is a process of examining antecedents, consequences, and reinforcers of behavior.

9. **Peer-support services:** Peer-support has long been valued as an effective modality in enhancing socialization and interaction with others. It is the recommendation of the EECP to utilize peer-support services whenever feasible and within the parameters of the institutional security. The utilization of peer support services may vary depending on the custody level of the institution. Inmate-patients utilized for peer-support services will be carefully selected based on their ability to show patience, compassion, effective communication skills, and appropriate interaction with an inmate's suffering from mental illness. Security issues, staff respect, and work ethic are additional important variables to be considered.

IV.  **Implementation:**

The Division of Correctional Health Care Services, Mental Health Program, has been working with CDCR institutions to identify and implement the EECP.  Currently, variations of the EECP exist at California Men's Colony (CMC) (Level III) and California Medical Facility (CMF) (Level III) to serve this subgroup of EOP inmate-patients.  Less developed variations of the EECP are underway at Richard J. Donovan Correctional Facility (RJD) (Level III) and SVSP (Level IV 270 housing units).  Over the next four months, CDCR expects to implement the EECP at California State Prison, Sacramento (SAC) and expand the program at CMF.

The institutions that have referred the inmate-patients on the SVPP waitlist have reviewed their referrals to determine inmate-patients who meet the clinical profile for EECP.  CDCR has identified to date 68 inmate-patients as eligible for SAC or CFM.  Thus, in the near term, the EECP will directly impact the SVPP waitlist in two ways.  First, implementing the EECP at SAC will result in a reduction of the waitlist because those inmate-patients on the SVPP waitlist that meet the custodial conditions available at SAC, are estimated at 53.   Further, inmate-patients meeting the custodial conditions available at CMF expansion are estimated at 15.  Inmate-patients meeting the indicators, however, will not be removed from the waitlist until those inmates are housed at a designated EECP institution and an EECP treatment plan is developed.  Second, CDCR and DMH are working to identify and transfer the inmate-patients currently admitted to ICF or APP beds, as appropriate, to one of the identified institutions for an EECP treatment plan upon discharge.  The discharge of these inmate-patients will also reduce the SVPP waitlist in the future because those inmate-patients that would otherwise return to DMH, will stabilize in the EECP and not be put back on the SVPP Wait List.

# ATTACHMENT B
# (Utilization Management Plan)

<u>**UTILIZATION MANAGEMENT PLAN**</u>

**I.**    <u>**Overall Policy**</u>:

The overall policy of Utilization Management is to coordinate a multi-level care management review process designed to provide quality mental health care in the most effective and efficient method for inpatient mental health care among the California Department of Corrections and Rehabilitation (CDCR) and the California Department of Mental Health (DMH) providers and facilities. The UM Plan will assist in providing consistency between the CDCR and DMH Memorandum of Understanding (MOU) and the policies that are currently in place at both the CDCR and DMH institution and headquarter levels.

**II.**    <u>**Current Practices:**</u>

In the past, CDCR and DMH, based on the MOU, have implemented UM at multiple sites in an effort to review inmate-patient care. In order to provide a more comprehensive UM process, CDCR and DMH headquarters have gathered the best practices from each previous process and added additional components to create an integrated and comprehensive UM review process.

**III.**    <u>**Utilization Management Overview:**</u>

UM consists of prospective, concurrent, and retrospective reviews of inmate-patient's treatment. Undertaking these reviews establish and maintain mutually beneficial processes in the coordination and integration of mental health care by promoting reviews of treatment and conversations regarding inmate-patient care at the program level as well as between CDCR and DMH that focus on prospective, concurrent, and retrospective review of an inmate's treatment in inpatient and outpatient levels of care. The UM review process will focus on the Mental Health Crisis Bed (MHCB), Acute, and Intermediate Care Facility (ICF) levels of care.

**IV.**    <u>**Prospective, Concurrent, and Retrospective Reviews**</u>

    **A.**    **Prospective Review:**

Prospective Reviews are conducted prior to an inmate-patient being admitted to inpatient and/or outpatient treatment. This type of review will allow DMH and CDCR to determine if the inmate-patient's symptoms need a different level of care, can be maintained at the current level of care, or if the services could be provided at a lower level of care. Prospective reviews include processes such as transitions between levels of care, referrals, including diagnostic clarification and clozaril initiation, identification and provision of appropriate services while waiting for another level of care, and wait list management.

1.       **Transition Planning and Continuity of Care.**

Coordinated inmate-patient transition planning is an important part of effective UM processes because it provides a forum for discussion regarding continuity of care.  In April 2010, CDCR and DMH organized a Transition Planning Workgroup consisting of DMH Program Directors, Psychologists, a Psychiatrist, Social Workers, and a Consulting Psychologist and CDCR UM Nursing and a Psychologist and Psychologists from the field. The Transition Planning Workgroup revised or implemented five processes to improve the continuity of care between CDCR and DMH and improve inmate-patient care.  (*See* Exhibit 1, Defendant's Transition Planning and Continuity of Care Plan.)

The following updated forms and processes regarding transition planning tools will assist in determining if an inmate-patient's symptoms necessitate the requested level of care or if services can be provided at the current level of care:

- Revised current DMH referral form to be more comprehensive.   This form is currently with CDCR Forms and Regulations and remains in draft.  Ex. 1.a.
- Revised the DMH Referral Packet Checklist to reflect new forms.  Ex. 1.b.
- Revised the existing Informed Consent form, now known as Mental Health Due Process Chrono.  This form is currently with CDCR Forms and Regulations and remains in draft.  Ex. 1.c.
- The Health & Physical form is replaced with the following four forms:
    - CDCR Form 7371, Confidential Medical/Mental Health Information Transfer;
    - Medical Classification Chrono (128-C3);
    - Current Medication Profile; and
    - Problem List.
      These forms are final and already in use.  Ex. 1.d.
- Revised the current DMH Referral Decision Form.  This form is final and in use. See. Ex. 1.e.

2.       **Diagnostic Clarification/Psychological Assessment.**

CDCR has established a diagnostic clarification/psychological assessment process within CDCR utilizing CDCR Clinician's expertise.  *See* Exhibit 2, Psychological Assessment Plan.  Implementation and training on this new policy and procedure is expected to occur prior to December 31, 2010.  Training will be provided by videoconference to the DMH coordinators.  The DMH coordinators will be responsible to disseminate the information to clinical staff.

3.       **Clozaril Initiation.**

CDCR is establishing a process to review all ICF referrals for Clozaril initiation.  *See* Exhibit 3, summary of Statewide Policy on Clozaril Initiation.  Training on the new policy will occur as soon as the policy is approved.

### 4.    Positive Behavioral Services.

DMH has provided consultation to CDCR since 2005 on specific inmate-patients identified by both CDCR and DMH as needing more specific behavioral interventions to reduce any potential self injury as well as unnecessary hospitalizations. In 2006, DMH Vacaville Psychiatric Program implemented a Positive Behavioral Support Team (PBST) based on the PBST at the State Hospitals. Since PBST inception at VPP, CDCR has requested this service to assist Interdisciplinary Treatment Teams (IDTT) and inmate-patients in addressing and managing maladaptive behaviors on a limited basis. CDCR and DMH are expanding this service, which utilizes alternative treatment interventions allowing the inmate-patient to remain in the least restrictive level of care. This service will be provided to a limited number of inmate-patients. *See* Exhibit 4, Positive Behavioral Support Team (PBST) Plan.

### 5.    Review of SVPP Waitlist.

In April 2010, CDCR put in place a process to review the SVPP waitlist. CDCR expects to continue this review process as long as there is a waitlist. CDCR will review the wait lists on a monthly basis to determine whether the inmate-patient (1) continues to need DMH placement; or (2) has deteriorated and needs to be either referred to an APP level of care (assuming he is on the SVPP waitlist) or moved up on the SVPP waitlist. If the inmate-patient needs a referral to an APP level of care, the institution submits a new DMH referral and rescinds the ICF referral. If the inmate-patient needs to be moved higher up on the SVPP waitlist or the APP waitlist, the institution writes a progress note summarizing the inmate-patient's current mental status and sends it to CDCR headquarters. After CDCR headquarters reviews the progress note, the inmate-patient will be reprioritized. On the other hand, if the inmate-patient has improved, the institution writes a progress note summarizing the inmate-patient's current mental status, and sends it to CDCR headquarters for review. A CDCR Psychologist reviews the progress note and if it is determined that the inmate-patient no longer needs a DMH level of care, CDCR notifies DMH to take the inmate-patient off the relevant wait list.

### 6.    Review of APP Waitlist.

Review of the APP waitlist occurred on a one time basis when the Vacaville Psychiatric Program (VPP) at California Medical Facility provided PBST services to California State Prison, Sacramento (CSP Sac) related to individual cases of inmate-patients who were on the APP waitlist.

### B.    <u>Concurrent Review:</u>

Concurrent reviews are conducted while services are on-going. Concurrent review is the process of reviewing and coordinating current mental health services and assessing future needs for inmate-patient transition planning. Specifically, CDCR and DMH expect to conduct reviews of inmate-patients admissions to inpatient care that have exceeded

length of stays contained in Program Guide and MOU guidelines, and to address justification for such continued stays, as follows.

### 1.    CDCR Review of MHCB Units.

CDCR is establishing a process to conduct reviews in the MHCB units.  This process will involve CDCR conducting the review as soon as possible after an inmate has been in the MHCB unit for 15 days.  Institutions selected will send the rationale of continued stay to CDCR UM Staff in headquarters.

CDCR intends to pull a list of inmate-patients who have been in a MHCB over 15 days. CDCR will randomly select patients and notify the institution to send rationale for the continued stay.  CDCR headquarters will review justifications and track reasons for continued stays and analyze the data.  CDCR expects to implement this process in December 2010.

### 2.    DMH Review of ICF and APP Programs.

DMH currently conducts internal reviews for extended length of stay in both APP and ICF levels of care.  This will not change.

### 3.    CDCR and DMH Joint Review of ICF and Acute Program.

CDCR and DMH are re-establishing a process to jointly review lengths of stay in APP and ICF levels of care, based on the following lengths of stay:  APP – 90 days; ICF – 300 days.  If an inmate-patient continues in a level of care beyond this length of stay, the review should contain a rationale for the continuation of treatment and documented in the inmate-patient's file.  All inmate-patients over the above-mentioned length of stay will be reviewed by DMH IDTTs on a monthly basis.  The review will utilize a revised UM form that is currently used at the State Hospitals.  *See* Ex. 5, current UM form.  This form will be used for internal and external reviews.  The form will be used to gather data concerning the clinical rationale for extended stays in an inpatient mental health treatment program.  Once the form is developed, training will be provided to staff using the form.  DMH expects the form will be finalized by January 1, 2011.  DMH headquarters will provide a Training for the Trainers, which will begin in January. Training will occur in-house through video and/or teleconferencing, and emails.

### C.    Retrospective Review:

Retrospective review evaluates the continuity of care across the continuum, including the transition of an inmate-patient after treatment in another level of care and frequent inpatient admissions.

1.        **Transition Planning/Multiple Admits.**

As noted under Prospective Review, the Transition Planning Workgroup revised or implemented five processes to improve the continuity of care between CDCR and DMH and improve inmate-patient care. (*See* Exhibit 1, Defendant's Transition Planning and Continuity of Care Plan.)  As related to Retrospective Review, the Transition Planning Workgroup revised or developed the following forms related to the discharge process:

- Revised DMH Psychiatric Program Discharge Summary to be more comprehensive.  This form is final and in use.  See Ex. 1.f.
- Revised DMH Patient Discharge Checklist to incorporate the new and revised forms.  This form is final and in use.  See Ex. 1.g.
- Created a form to establish clinician-to-clinician contact to ensure continuity of care principles.  This form is still in development and not yet approved.  See Ex. 1.h.

Training has already occurred on all but the clinician-to-clinician contact form.  Ex. 1.h. After the form is finalized and approved by CDCR Forms and Regulations, training will be provided to the DMH Coordinators.  The DMH Coordinators will be responsible for training the clinicians at their institutions.

2.        **Frequent Inpatient Hospitalizations.**

CDCR is establishing a process to select, on a quarterly basis, cases of inmate-patients who have been recently discharged from inpatient care or who have multiple MHCB or DMH admits. This process will provide that CDCR review these inmate-patients for continuity of care, which will include review of IDTT discharge orders, including clinician to clinician contacts, medications, and treatment recommendations.  CDCR expects to implement this process in December 2010.

DMH headquarters has identified 60 inmate-patients who had frequent inpatient hospitalizations, 30 with APP admissions and 30 with ICF admissions.  CDCR expects to follow up on those inmate-patients to identify potential continuity of care issues.  Inmate-patients with high utilizations of inpatient mental health treatment are defined as those who have had more than a set number of hospitalizations in a specific time period.  If an inmate-patient had more than one hospitalization for APP treatment in one year or more than two hospitalizations for ICF care over two years, they were considered to have high utilization of these levels of care.

V.    **Additional Reviews:**

CDCR identified populations during the Mental Health Assessment and Review Project (MHARP) who do not currently need inpatient mental health treatment, but experience chronic, residual or high risk symptoms.  To that end, CDCR is developing ways to address their needs as follows:

chronic, residual or high risk symptoms.  To that end, CDCR is developing ways to address their needs as follows:

1.      **Chronic Suicidal Ideation.**

Inmate-patients who suffer from chronic suicidal ideation result in frequent admissions to DMH and CDCR MHCB.  These inmate-patients may be identified by the treatment teams as benefiting from a High Risk Management Review as identified by the high risk management protocol.  This review is in the initial planning stage.

# EXHIBIT 1 to ATTACHMENT B (UM PLAN)
# (Transition Planning and Continuity of Care Plan)

## TRANSITION PLANNING AND CONTINUITY OF CARE PLAN

### I.     Overall Policy.

The overall policy of transition planning and continuity of care is to address inmate-patient treatment issues through every level of care within the California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) including Department of Mental Health (DMH) inpatient beds.  The primary goal is to achieve overall system improvement to services provided within the mental health continuum of care by increasing the quality and quantity of information shared between CDCR and DMH team clinicians through the development of new forms and revision of previous forms, and increasing direct communication between team clinicians. This plan indirectly affects the current SVPP waitlist by increasing inmate-patient benefit through increased continuity of treatment, which should decrease unnecessary hospitalizations.

### II.    Monitoring.

CDCR and DMH recognize the need to ultimately develop audit and monitoring tools necessary to validate the success of the transition planning and continuity of care processes. CDCR and DMH are considering how to monitor outcome measures, such as decreased inpatient readmissions, including Mental Health Crisis Bed (MHCB) and DMH inpatient services.  Additionally, CDCR expects that this process will include a reporting requirement such that monitoring processes conducted by CDCR headquarters will be reported to the identified CDCR institution for inclusion in its Mental Health Quality Management (QM) Subcommittee Minutes and to DMH for inclusion in its QM process.

### III.   Processes.

CDCR and DMH have revised or implemented the following five new processes to improve the continuity of care between DMH and CDCR treatment teams and improve inmate-patient care, as follows:

   **A.     Process Revision and Development/Revision of CDCR and DMH forms related to referral and discharge:**

   **Referral Forms:**

      **1.     DMH Referral form.**  This form has been revised to be used for both Acute and ICF services and to provide DMH clinicians comprehensive information about the inmate-patient. This form is currently being processed through CDCR Forms and Regulations.  Training will be provided to the DMH coordinators by teleconference. The DMH coordinators will be responsible to disseminate this information to the Primary Clinicians at their institutions.  CDCR will provide DMH staff with a copy of the official

form when approved and will notify DMH when it can start using the form.  See Ex. 1.a., draft DMH Referral form.

        **2.**      **Referral Packet Checklist.**  This checklist has been revised to reflect the revised forms.  See Ex. 1.b.

        **3.**      **Mental Health Due Process Chrono Form.**  This form, which is for voluntary admission to the DMH psychiatric programs, provides information about each of the DMH facilities. This form is currently being processed through CDCR Forms and Regulations. Training will be provided to the DMH coordinators by teleconference. The DMH coordinators will be responsible to disseminate this information to the Primary Clinicians at their institutions.  CDCR will provide DMH staff with a copy of the official form when approved and will notify DMH when it can start using the form.  See Ex. 1.c., draft Due Process Chrono Form.

        **4.**      **Replacement Forms for History & Physical Form.**   Effective December 1, 2010, a History and Physical will no longer be a required part of a DMH referral package.  Instead, the DMH referral package will include:

        a.      CDCR Form 7371, Confidential Medical/ Mental Health Information Transfer;
        b.      Medical Classification Chrono (128-C3);
        c.      Current Medication Profile; and
        d.      Problem List.  See Ex. 1.d.

The inmate-patient's Primary Care Provider is responsible for completing the CDCR 7371, CDCR 128-C3, and the Problem List.  Including the above documents in the DMH referral package replaces the past DMH requirement for a hands-on history and physical.

Training for CDCR and DMH mental health staff on the revised DMH referral form and the Mental Health Due Process Chrono form will occur after the forms are approved by CDCR Forms and Regulations.  Training will be provided by videoconference to DMH coordinators. The DMH coordinators will be responsible for disseminating the information to clinical staff.  The California Prison Health Care Services intends to provide direction to the medical staff via memorandum.

        e.      DMH Referral Decision Form.  See Ex. 1.e.

**Discharge Forms**

        **1.**      **DMH Psychiatric Program Discharge Summary template**. This template provides comprehensive information regarding the inmate-patient's stay at DMH and helps provide continuity of care within CDCR after the inmate-patient is discharged from DMH.  Training was provided by DMH staff at the DMH inpatient programs.  See Ex. 1.f. The DMH Discharge Summary is used mainly in its electronic form, which allows for clear communication in a user friendly format that allows for

individualization.  An additional document exists the mirrors the summary template but provides cues to what inmate-patient information should be contained in the documents, if appropriate.

      **2.**      **DMH Patient Discharge Checklist.**  DMH revised this form to reflect new and revised forms.  See Ex. 1.g.

      **3.**      **Inmate-Patient Transition Form.**  This form will document phone contact between DMH and CDCR team clinicians to discuss inmate-patient continuity of care, including rationale for current treatment and medication. This form is currently being processed through CDCR Forms and Regulations Branch. Training will be provided to the DMH coordinators by teleconference.  The DMH coordinators will be responsible to disseminate this information to the Primary Clinicians at their institutions. CDCR will provide DMH staff with a copy of the official form when approved and will notify DMH when it can start using the form.  See Ex.1.h, draft Transition Form.  CDCR and DMH previously started clinician to clinician contacts in accordance with the ICF Memorandum of Understanding between CDCR and DMH.

      **B.**      **Primary Clinician Visits.**

CDCR and DMH have initiated Primary Clinicians visits to each other's programs for the purpose of sharing information about treatment programs and expectations and to develop a collegial relationship that will enhance the overall goal to improve inmate-patient continuity of care between CDCR and DMH.

      **1.**      CDCR Primary Clinicians and DMH and CDCR headquarters staff have visited the Acute program at California Medical Facility.
      2.      DMH Primary Clinicians have visited California State Prison, Sacramento's Psychiatric Services Unit.
      3.      Future CDCR Primary Clinician site visits include Salinas Valley Psychiatric Program, Atascadero State Hospital, and Patton State Hospital, as the budget allows.  Scheduling of visits will start again in February 2011.
      4.      Future DMH Primary Clinician site visits include California Men's Colony, California State Prison, Lancaster, and Richard J. Donovan Correctional Facility. Scheduling of visits will start again in February 2011.

      **C.**      **CDCR Monthly DMH Coordinator Conference Calls.**

CDCR implemented DMH Coordinator conference calls in April 2010 for the purpose of providing and clarifying information, training, and introduction of new policies and forms. DMH Coordinators from each institution are invited, along with the Chiefs of Mental Health and the Regional Chief.  The DMH coordinators are invited to give agenda suggestions.   Guest speakers and subject matter experts are invited.   An agenda is developed and minutes provided.

### D.        DMH/CDCR Quarterly Conference Calls.

DMH/CDCR quarterly conference calls are scheduled to start in January 2011.  The purpose of the quarterly conference call is so that DMH/CDCR can share information related to operational or administrative processes and monitoring outcomes.  Depending on the agenda of each meeting, the following DMH hospital and psychiatric staff will attend: Clinical Administrator, Program Director, and/or Forensic Staff.  The consulting Psychologist or designee from DMH headquarters and the Correctional Services and Support Unit may also be in attendance.

### E.        Non-Formulary Medications.

CDCR and DMH recognize the importance of continuing to share information on the processes required for use of a CDCR non-formulary medication in order to provide continuity when an inmate-patient returns to CDCR.  To that end, CDCR is developing an internal process to monitor the use and outcome of the Non-Formulary Medication Form that is currently in use and attached to the MOU.  Additionally, CDCR is continuing to provide training on the use of the form and the use of a CDCR non-formulary medication. DMH is also training and monitoring their process.

## IV.    Additional Topic Areas.

CDCR and DMH will address the following topic areas for possible action:

1.  Establish a full time CDCR's DMH Coordinator position in each institution as budget allows.
2.  Develop and implement a communication structure to ensure that DMH discharge information is forwarded by the HUB institution and then on to the receiving institutions.

# EXHIBIT 1.a to ATTACHMENT B (UM PLAN)
# (DMH Referral Form)

State of California
Department of Corrections and Rehabilitation
**DMH REFERRAL – ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**
CDCR XXXX
Confidential Inmate-Patient Information

| I. REFERRAL INFORMATION | | | | |
|---|---|---|---|---|
| Date of Referral: | Current LOC: | Requested LOC: ☐ Acute ☐ ICF | County of Commitment: | Custody Factor: |
| CDCR Psychiatrist | | Contact Number: | E-mail: | |
| CDCR Clinician: | | Contact Number: | E-mail: | |

| II. INMATE IDENTIFYING INFORMATION | | | |
|---|---|---|---|
| Ethnicity: | Religion: | Children: | Marital Status: |
| Voluntary Admission: | ☐ Yes | ☐ No | Vitek Hearing Date: |
| Keyhea Order Status: | ☐ Yes | ☐ No | Expiration Date: |

| III. PRESENTING SYMPTOMS/CHIEF COMPLAINT |
|---|
| Nature of target symptoms, when they first started, clinical course, precipitating factors and previous treatment. |
| |
| |

| IV. RISK ASSESSMENT | |
|---|---|
| ☐ Suicide and Self Injurious Behaviors (See SRE) | ☐ Assault/Aggression |
| Comments: | |
| | |
| | |

| V. STRENGTHS AND ASSETS |
|---|
| List personal strengths and protective factors. |
| |
| |

| VI. PSYCHIATRIC AND MEDICAL HISTORY | | | |
|---|---|---|---|
| DMH Hospitalization: ☐ Yes ☐ No | Hospital Name: | | Treatment Date: |
| Reason for admission: | | | |
| | | | |
| Community Hospitalization: ☐ Yes ☐ No | Hospital Name: | | Treatment Date: |
| Reason for admission: | | | |
| | | | |
| Current Medications: | 1. | | 2. |
| 3. | 4. | | 5. |
| Rationale for current medication regimen: | | | |
| | | | |
| | | | |
| History of psychotropic medications: | | | |
| | | | |

| VII. CURRENT DIAGNOSIS | | |
|---|---|---|
| Axis I | | |
| | | |
| Axis II | | |
| | | |
| Axis III | | |
| Axis IV | | |
| Axis V | Current GAF | Highest GAF: |

| | Name (Last, First, MI), CDCR Number, DOB |
|---|---|
| | |

State of California
Department of Corrections and Rehabilitation
**DMH REFERRAL – ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**
CDCR XXXX
Confidential Inmate-Patient Information

## INSTRUCTIONS – Page 1

**General Instructions:**
1. Print or type all the information on the form.
2. Information is to be completed by the referring CDCR clinician/designee.
3. If the information is unknown, specify unknown (UNK) or not applicable (NA)
4. Referrals to Department of Mental Health Intermediate Care Services (ICF):
   a. ICF referrals are sent to the institutions CDCR DMH Coordinator.
   b. The CDCR DMH Coordinator will send the ICF referral to the Division of Correctional Health Care Services – Mental Health Utilization Management staff within 5 days of identification by IDTT if inmates consent is obtained. Within 10 days if due process is required – Vitek hearing. (Mental Health Services Delivery System Program Guide, 2009 Revision, 12-6-9)
5. Referrals to DMH Acute Services:
   a. The completed form and all supporting data shall be sent directly to DMH Vacaville Psychiatric Program within two working days of identification. (Mental Health Services Delivery System Program Guide, 2009 Revision, 12-6-3)

**Referral Information:**
1. Indicate the date the form is completed, the name of the inmate-patient's primary psychiatrist and primary clinician, and contact number and e-mail for both.

**Inmate Identifying Information:**
1. Complete demographic information including the inmate-patient's race, religion, number of children and marital status.
2. Check "yes" if the inmate-patient signed the consent and this is a voluntary admission. Check "no" if the inmate-patient declined to sign the consent and enter the date the Vitek hearing occurred.

**Presenting Symptoms/Chief Complaint:**
1. Describe, in detail the target symptoms for treatment at DMH. Include previous treatments and longevity of symptoms.

**Risk Assessment:**
1. Check the suicide/self injurious behaviors box if the inmate-patient has a history of suicidal and/or self injurious behavior. Briefly describe the history, including most recent attempts and method, in the comments section.
2. Check the assault/aggression box if the inmate-patient has a history of assaults. Briefly describe this history, including most recent assaults/aggressive behavior, in the comments section.

**Strengths and Assets:**
1. Describe the inmate's strengths such as insight into mental illness, compliance with treatment plan, etc.

**Psychiatric and Medical History:**
1. Complete all information if available. If information is not available, write UNK (unknown).

**Current Diagnosis:**
1. Enter all five Axes diagnoses completely. If there is no diagnosis on a specific diagnosis, write V71.09 – no diagnosis. Included the most recent GAF and write the highest GAF within the past 6 months.

### Other documents to be submitted with the form include:
2. Completed Referral Form for ICF/Acute Care
3. Confidential Medical/Mental Health Information Transfer Summary, CDC Form 7371 (dated within 30 days, signed by MD)
4. Medical Classification Chrono, CDCR 128-C3
5. Current Pharmacy/Medication Profile (Computer printout)
6. Problem List
7. Tuberculosis Chrono (dated within 1 year)
8. Mental Health Due Process - Chrono or Signed Consent
9. Current Treatment Plan, CDCR 7388 (dated within 90 days for EOP, include update from date of referral)
10. IDTT Screening Checklist, CDCR 7388 (dated day of referral)
11. Interdisciplinary Progress notes (Last 15 days and most recent psychiatrist note – Psychiatry note must be dated within last 30 days in EOP.)
12. Suicide Risk Assessment – (most recent)
13. Keyhea Order – or documentation supporting Keyhea Order.
14. **Acute Referral** Only: MHCB Inpatient Record – if referred from MHCB
15. Custody Case Factor Sheet (dated within 30 days)
16. Abstract of Judgment
17. Legal Status Summary
18. Chrono History

State of California                                                          Department of Corrections and Rehabilitation
**DMH REFERRAL – ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**
CDCR XXXX
Confidential Inmate-Patient Information

| Diagnostic Formulation: |
|---|

| Justify all R/O, NOS or Deferred Diagnoses: ☐ N/A |
|---|

| Justify lack of Axis I Diagnosis: ☐ N/A |
|---|

| **VIII. FAMILY AND PERSONAL HISTORY** | | | | |
|---|---|---|---|---|
| ☐ Mother: | ☐ Substance Abuse | ☐ Mental Illness | ☐ Criminality | ☐ Unknown |
| ☐ Father: | ☐ Substance Abuse | ☐ Mental Illness | ☐ Criminality | ☐ Unknown |
| ☐ Siblings: | ☐ Substance Abuse | ☐ Mental Illness | ☐ Criminality | ☐ Unknown |
| ☐ Contact with Family ☐ Yes ☐ No | | Date of last contact: | | |

☐ Other Family/Significant Persons:

☐ Childhood/adolescent abuse history:

☐ Other:

☐ History of conduct disorder: ***There is evidence of Conduct Disorder with onset before age 15 for Antisocial Personality Disorder (ASPD).

| ☐ GED | ☐ High School Graduate | ☐ Trade School | ☐ College | ☐ Other/Comments: |
|---|---|---|---|---|

☐ Special Education:

☐ Learning Disabilities:

☐ Disciplinary Problems in School:

☐ Religious and Cultural Influences:

☐ Occupation/Military History:

☐ Branch:                                        Type of Discharge:

☐ Other Work History:

☐ SSI/SSDI Benefits:                             Year in Which Benefits Began:

☐ Marital History/Partnership:
☐ Married  ☐ Life Partner  ☐ Separated  ☐ Divorced  ☐ Never Married  ☐ Widowed
Children: ☐ No  ☐ Yes    If Yes, Gender and Age of Each:

☐ Sexual Orientation / History:

☐ Substance Abuse History:

Comments:

| **DMH REFERRAL**<br>**ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**<br>CDCR XXXX<br>Confidential Inmate-Patient Information **DMH REFERRAL**<br>**ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**<br>CDCR XXXX<br>Confidential Inmate-Patient Information | Name (Last, First, MI), CDCR Number, DOB |
|---|---|

State of California                                                              Department of Corrections and Rehabilitation
**DMH REFERRAL – ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**
CDCR XXXX
Confidential Inmate-Patient Information

INSTRUCTIONS – Page 2

**Family and Personal History:**
1.    Complete all information if available.



State of California                                                    Department of Corrections and Rehabilitation
**DMH REFERRAL – ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**
CDCR XXXX
Confidential Inmate-Patient Information

| IX REFERRAL QUESTION |
|---|
| Specifically state the referral question: |

| X. ASSESSMENT |
|---|
| Identified Reasons for neuropsychological assessment and other psychological assessments as clinically indicated. |
| In your clinical opinion is this inmate dorm appropriate? ☐ YES   ☐ NO      Provide rationale for decision. |

| XI. SIGNATURES | | |
|---|---|---|
| Position/Title: | Name: (Print) | Signature: |
| Primary Clinician | | |
| Psychiatrist | | |
| Clinician | | |

| | Name (Last, First, MI), CDCR Number, DOB |
|---|---|
| **DMH REFERRAL**<br>**ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**<br>CDCR XXXX<br>Confidential Inmate-Patient Information **DMH REFERRAL**<br>**ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**<br>CDCR XXXX<br>Confidential Inmate-Patient Information | |

State of California                                                        Department of Corrections and Rehabilitation
**DMH REFERRAL – ACUTE SERVICES AND ICF MENTAL HEALTH SERVICES**
CDCR XXXX
Confidential Inmate-Patient Information

**INSTRUCTIONS** – Page 3

**Referral Question:**
1. Specifically state the referral question.  Why are you referring the inmate-patient DMH?  What do you expect from DMH during their stay?  DMH will address the referral question in their discharge summary.

**Assessment:**
1. Check yes or no if the I/P is dorm appropriate.  ASH and VPP ICF have dorms.  The inmate-patient cannot be on single cell status.  In your clinical opinion, can the inmate-patient function in a dorm setting?



# EXHIBIT 1.b TO ATTACHMENT B (UM PLAN)
## (DMH Referral Packet Checklist)

**Department of Mental Health (DMH) <u>Acute Care & Intermediate Care</u> Referral Check List**

**PART I  Type and Location of Referral**

| Check one √ referral type: | Check √ Name of requested DMH Facility: |
|---|---|
| ☐ Acute Care | ☐ Vacaville Psychiatry Program |
| ☐ Intermediate Care Facility (ICF) | Check name of requested DMH Facility for ICF: ☐ ASH  ☐ VPP  ☐ PSH  ☐ SVPP |

**PRINT**

| | |
|---|---|
| Inmate/Patient (I/P) Name: | |
| CDCR Number: | |
| Referring CDCR Institution | |

**PART II Required Information**

| | | Included √ | Needed √ | Comments |
|---|---|---|---|---|
| **Clinical data source:  Unit Health Record** | | | | |
| 1. | Completed Referral Form for ICF/Acute Care | | | |
| 2. | CDCR Form 7371, Confidential Medical/ Mental Health Information Transfer Summary (dated within 30 days, signed by MD) | | | |
| 3. | Medical Classification Chrono (128-C3) | | | |
| 4. | Current Pharmacy / Medication Profile (Computer printout) | | | |
| 5. | Problem List | | | |
| 6. | Tuberculosis Chrono (dated within 1 year) | | | |
| 7. | Mental Health Due Process – Chrono or Signed Consent | | | |
| 8. | Current Treatment Plan (7388) (dated within 90 days for EOP, include update from day of referral) | | | |
| 9. | IDTT Screening Checklist (7388) (dated day of referral) | | | |
| 10. | Interdisciplinary Progress Notes (Last 15 days  for Case Management) and the most recent psychiatrist note – Psychiatry note must be dated within last 30 days in EOP.) | | | |
| 11. | Suicide Risk Assessment – (most recent) | | | |
| 12. | Keyhea Order & enter Keyhea expiration date with documentation supporting Keyhea Order  *(Not Applicable if patient not on Keyhea)* | | | Enter Keyhea Expiration Date: _____<br>**OR**<br>☐ Not Applicable |
| 13. | Acute referral only:  MHCB Inpatient Record – if referred from MHCB | | | ☐ Not Applicable |
| **Data source: Central File** | | | | |
| 14. | Custody Placement Screening Sheet (dated within 30 days) | | | |
| 15. | Abstract of Judgment | | | |
| 16. | Legal Status Summary | | | |
| 17. | Chrono History | | | |

**Part III Referral Submission**

| CDCR Referring Clinician: | Print Name & Title: | | Phone number: |
|---|---|---|---|
| | Signature: | | Pager number: |
| CDCR Supervisor | Print Name &Title: | | Enter date referral sent:_____<br>Check √ Method: ☐ Electronically (email)<br>☐ Overnight Mail  ☐ SharePoint |
| | Signature: | | |
| CDCR DMH Coordinator | Print Name & Title: | | Phone number: |
| | Signature: | | Pager number: |

| | | |
|---|---|---|
| Date Received by CDCR: _____ (NA for APP Referral)<br>Date CDCR Review Completed: _____ | | Reviewed by: (CDCR staff -Printed Name /Title: |

**PART IV:  APP REFERRALS**

| |
|---|
| Date APP referral packet sent to DMH VPP: _____ |
| Date APP referral packet received at DMH:  _____ |

Revised: November 2010

**Department of Mental Health (DMH) <u>Acute Care & Intermediate Care</u> Referral Check List**

**Page 2**
**Instructions**

General Instructions:
1.  Checklist is completed when submitting a referral packet for Inmate-Patient (I-P) admission to the Department of Mental Health's (DMH) acute care and intermediate care mental health services.
2.  The CDCR referring clinician/designee completes the Checklist.
3.  All information must be included in the referral package or it will be returned to the sending CDCDR institution as incomplete.

PART I:  Type and location of Referral
1.  Check if the referral is acute of intermediate and enter the requested location.
2.  For acute referral there is only one DMH facility at Vacaville Psychiatry Program (VPP).

PART II:  Required Information
1.  Enter a check mark as under the included or needed column.
2.  A check mark must be placed for each of the 17 required documents.
3.  All items listed as needed must have a brief comment as to why the document is not present in the referral package.
4.  The only non applicable will be in #12 and 13.

PART III Referral Submission
•   A CDCR clinical supervisor or manager and the referring clinician sign the check list validating the referral packet is complete.
•   Complete contact information.
•   Referral package is sent electronically to CDCR DCHCS DMH Referral Updates@CDCR or placed on SharePoint within 5 days of the referral or within 10 days if a Vitek hearing is required (Program Guide 2009 Chapter 6).
•   Faxed referrals are no longer accepted.

PART IV APP Referrals
1.   Completed APP referral packets are sent directly to VPP within 2 working days of identification of I-P needing APP services. (Program Guide 2009 Chapter 6).
2.  Forward  APP packet to DMH VPP APP electronically, SharePoint or overnight mail.
3.  APP referral packet sent to DMH VPP APP electronically, placed on SharePoint or overnight mail.
    DMH VPP APP email address: Cat@vpp.dmh.ca.gov contacts: Jody Hutchinson, SRN jody.hutchinson@vpp.dmh.ca.gov and Joe Cruz, SMTA (Admission and Discharge Coordinators),  #707—449-6579, fax #707-453-7097.
4.  CDCR to enter date referral packet sent to DMH- VPP
5.  DMH staff to enter date referral packet received at DMH – VPP.

Retain the checklist with the original referral packet.

Revised: November 2010

# EXHIBIT 1.c to ATTACHMENT B (UM PLAN)
## (Mental Health Due Process Chrono)

State of California                                                                                  Department of Corrections and Rehabilitation
**MENTAL HEALTH DUE PROCESS CHRONO**
CDCR XXXX
Confidential Inmate/Patient Information

## PART I: INMATE/PATIENT RESPONSE

I understand that:

- My treatment team has referred me to the Department of Mental Health (DMH) for psychiatric treatment.
- I have been advised that specific DMH facility placement is based on my individual custody factors and individualized mental health treatment needs.
- If I do not agree to a transfer, I have the right to a due process ("Vitek") hearing pursuant to CDCR regulations.
- I may be housed in a dormitory or cell depending upon my custody and clinical needs.

_____ I accept treatment at DMH                    _____ I refuse treatment at DMH

### PART II: SIGNATURES

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Inmate-Patient Name | Signature | Date |
| _____ | _____ | _____ |
| Witness Name/Title | Signature | Date |
| _____ | _____ | _____ |
| Staff Analyst Name | Signature | Date |
| _____ | _____ | _____ |
| Other/Title | Signature | Date |

### PART III: COMMENTS

_____
_____

### PART IV: DMH STATE HOSPITALS AND PSYCHIATRIC PROGRAMS

1. **Atascadero State Hospital (ASH):**
   Four to five man dorm housing
   Located in Atascadero, CA

2. **Coalinga State Hospital (CSH):**
   Four to five man dorm housing
   Located in Coalinga, CA

3. **Salinas Valley Psychiatric Program (SVPP):**
   Single cell, two, and four man dorm housing
   Located within the Salinas Valley State Prison (SVSP), Soledad, CA

4. **Vacaville Psychiatric Program (VPP):**
   VPP Intermediate Care Program
      4, 8, and 16 man dorm housing
      Access to GP mainline (under escort)
      Located within the California Medical Facility (CMF), Vacaville, CA
   VPP Acute Care Program
      Single cell housing
      Located within the CMF, Vacaville, CA

5. **Patton State Hospital (PSH):**
   Female facility
   Four woman dorm housing
   Located in San Bernardino, CA

---

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Name (Last, First, MI), CDCR Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ P/I asked questions | |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | **Please check one:** | |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached | |
| | ☐ Other* | *See chrono/notes | |
| 4. Comments: | | | |

State of California
**MENTAL HEALTH DUE PROCESS CHRONO**
CDCR XXXX
Confidential Inmate/Patient Information

Department of Corrections and Rehabilitation

## INSTRUCTIONS

The purpose of the Mental Health Due Process Chrono is to document the agreement between the Department of Mental Health (DMH) and the inmate-patient who is consenting to treatment in a DMH inpatient mental health program.

CDCR mental health clinical staff shall review the Chrono with the inmate-patient. Explain that by signing this document the inmate-patient consents to treatment in a DMH facility or if inmate-patient refuses the inmate-patient shall be referred for a Vitek hearing.

Inform the inmate- patient of the right to withdraw consent at any time prior to transfer to DMH.

For intermediate care and acute referrals the completed Chrono is submitted with the DMH referral package to CDCR Mental Health Utilization Management.

CDCR Health Care Placement Oversight Program (HCPOP) staff is responsible for making the recommendation for specific DMH facility placement after the  DMH ICF referral is submitted.

**PART I:  INMATE/PATIENT RESPONSE:**
1.  Read or have the inmate-patient read the sections starting with "I understand that:…"
2.  This section is informational only for the inmate-patient.
3.  Review or read to the inmate-patient the list of DMH facilities listed in the PART IV table.
4.  The CDCR reviewer and/or inmate-patient shall NOT mark or select a DMH facility.
5.  Inmate-patient DMH facility placement is determined by HCPOP.
6.  I-P to enter their initials as accepting or refusing treatment at DMH):
       ____ I accept treatment at DMH
       ____ I refuse treatment at DMH
7.  If the I-P refuses to initial the CDCR witness will note the refusal in Part III Comments.

**PART II:  SIGNATURES:**
1.  Inmate-patient to print and sign name and enter date.  If s/he refuses document in Part III Comments.
2.  CDCR witness (impartial member of CDCR staff) and a CDCR Staff Analyst shall  print and sign name and enter date the Chrono was reviewed and signed.
3.  Staff Assistant required for DDP, EOP, Foreign Language, etc.

**PART III:  COMMENTS:**
1.  Note refusals in the comment section. If the inmate-patient refuses to initial, sign, or participate in the Chrono review process, the witness will document the refusal in this section.
2.  Inmate-patient will be scheduled for a Vitek hearing.
3.  Enter additional comments.

**PART IV:  DMH STATE HOSPITALS AND PSYCHIATRIC PROGRAMS:**
1.  This section is informational only for the inmate-patient.
2.  Review or read to the inmate-patient the list of DMH facilities listed in the PART IV table.
3.  The CDCR reviewer and/or inmate-patient shall NOT mark or select a DMH facility.
4.  Inmate-patient DMH facility placement is determined by HCPOP.

# EXHIBIT 1.d to ATTACHMENT B (UM PLAN)
# (Replacement for H&P Form)

STATE OF CALIFORNIA
**HEALTH CARE TRANSFER INFORMATION**
CDCR 7371 (Rev. 06/07)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
**NEEDS IMMEDIATE ATTENTION**

☐ Medical and Return    ☐ Psychiatric and Return    ☐ Return from Medical and Return

| SENDING INSTITUTION | INMATE NAME | | CDC NUMBER |
|---|---|---|---|
| | | | |

Allergies:                                         No known allergies ☐

| SIGNIFICANT MEDICAL / DENTAL / MENTAL HEALTH PROBLEMS / COMMENTS | | |
|---|---|---|
| (e.g. suicide attempts, dental needs, special diet, pending or incomplete consults, laboratory tests, x-rays) | Chronic Care Program (List type) | Date of Last Visit |
| | | |
| | | |

Date of Last Physical:                    Keyhea ☐        Valley Fever Elevated Risk Criteria ☐

Medical Prosthetic Device(s)?        ☐ Yes        ☐ No        Type:

Medical Hold Initiated? ☐ Yes    ☐ No        Reason:

Medical Chronos reviewed?    ☐ Yes    ☐ No        Type of Medical Chrono?                    TB Alert Code:

Mental Health Level of Care:        ☐ None    ☐ CCCMS    ☐ EOP    ☐ MHCB    *Suicide History    ☐ Yes    ☐ No

Dental Priority Classification (DPC):    1 ☐    2 ☐    3 ☐    4 ☐    5 ☐

Dental Prosthesis(s)?   Full Denture      Upper ☐   Lower ☐
                        Partial Denture   Upper ☐   Lower ☐

| MEDICATIONS PRESCRIBED | | | | | | |
|---|---|---|---|---|---|---|

Medication Administration Recorded Attached: ☐ Yes   ☐ No       Pharmacy Profile Attached:    ☐ Yes    ☐ No

| Name of Medication (including TB) | Dose | Route | Frequency | Start Date | Stop Date | Heat Risk Med |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

| DIAGNOSTIC TESTS PERFORMED | Disability (See CDC 1845) | | Developmental Disability | |
|---|---|---|---|---|
| Is inmate pregnant? ☐ Yes  ☐ No  ☐ EDC _____ | DPW ☐ | DPS ☐ | DD1 ☐ | DD2 ☐ |
| Tuberculosis: | DPV ☐ | DPM ☐ | DD1A ☐ | DD3 ☐ |
| PPD Test _____ mm Date Read: _____ | DPH ☐ | DPO ☐ | | |
| Chest X-ray | | | | |
| ☐ Normal   ☐ Abnormal   Date Read: _____ | | | | |

**MISC TESTS** (Check each box that applies to inmate) RPR/VDRL:
Hepatitis:    ☐ Reactive   ☐ Non-reactive              Treated? ☐ Yes ☐ No   Date treated:_____
             ☐ Positive   ☐ Negative       Type:_____   Treated? ☐ Yes ☐ No   Date treated:_____

Other screening test results & date:              Other Laboratory:

                                                  Data:

| Pending Medical/Mental Health Appointments: | Date | Attachments? ☐ Yes ☐ No |
|---|---|---|
| ☐ Chronic Care | | Special Transport Instructions: |
| ☐ Specialty | | |
| ☐ Telemedicine | | |
| ☐ Other | | *Attach Mental Health Tracking System Inmate Profile |

| COMPLETED BY SENDING INSTITUTION (Print/Stamp Name) | RN SIGNATURE / TITLE / DATE / TIME | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| | | |
| REVIEWED BY RECEIVING INSTITUTION RN/MTA/LPT (Print/Stamp Name) | SIGNATURE / TITLE / DATE / TIME | |
| ORIGINAL - RECEIVING INSTITUTION
CANARY - SENDING INSTITUTION | RECEIVING INSTITUTION | |

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
**MEDICAL CLASSIFICATION CHRONO**
CDCR 128-C3 (10/09)                                                                            Page 1 of 2

| ○ Permanent | ○ Temporary | ○ Expires on: _____ | ○ Expiration Unspecified, review in 6 months |
|---|---|---|---|

| **Level of Care Based on Patient Need** | | **Classification Factors** | |
|---|---|---|---|
| OP ○ | Acute Rehab ○ | Temporary Medical Hold* □ | Long-Term Stay □ |
| | Hospice ○ | Temporary Med Isolation* □ | Override² * □ |
| OHU ○ | SNF ○ | | |
| CTC ○ | GACH/Outside Hospital ○ | | |

**Intensity of Services**

| *Proximity to Consult* | *Functional Capacity* | *Medical Risk* | *Nursing Care Acuity* |
|---|---|---|---|
| No particular need ○ | Vigorous Activity ○ | Low Risk ○ | Basic Nursing ○ |
| Infreq Basic Consultation ○ | Full Duty ○ | Medium Risk ○ | Uncomplicated Nursing ○ |
| Freq Basic Consultation ○ | Limited Duty* ○ | High Risk ○ | Low-Intensity Nursing ○ |
| Tertiary Consultations* ○ | Totally Disabled* ○ | | Medium-Intensity Nursing ○ |
| Community Placement* ○ | | | High-Intensity Nursing ○ |
| | | | Special Nursing ○ |

| **Specialized Services** | | **Institutional-Environmental** | |
|---|---|---|---|
| Clinical Category 1 □ | Therapeutic Diet¹* □ | Restricted – Altitude* □ | Req. Electrical Access¹* □ |
| Clinical Category 2 □ | Respiratory Isolation □ | Restricted – Cocci Area* □ | Requires Adaptive Eq¹* □ |
| Pregnancy Program □ | Speech/Occupational Th* □ | Restricted – No Stairs¹* □ | Req. Medical Transport* □ |
| Transplant Center □ | Physical Therapy □ | | ¹See CDCR 1845 and 7410* □ |
| Hemodialysis □ | Durable Med Equip¹* □ | | |
| Dementia □ | | | |

**Comments** *(all * items)*
*(non-confidential)*

_____

*(medically-confidential)*

| Completed By (print name): | CDC NUMBER,  NAME (LAST, FIRST, MI), DATE OF BIRTH: |
|---|---|
| Signature: | |
| Title: | Date: | |
| Institution: | |

**MEDICAL CLASSIFICATION CHRONO**

*\* Include details in Comments*                    *¹ Include detail in CDCR 1845 or CDCR 7410 as appropriate*
*² Regional Medical Executive only.  State factors overridden in Comments*

STATE OF CALIFORNIA                                                          DEPARTMENT OF CORRECTIONS AND REHABILITATION
**MEDICAL CLASSIFICATION CHRONO**
CDCR 128-C3 (10/09)                                                                                                    Page 2 of 2

**Level of Care**

| | |
|---|---|
| **OP** | Outpatients. No need for a medical setting that provides the patient with daily nursing care. |
| **OHU** | Patient health condition would not normally warrant admission to a licensed health care, but at risk if in OP. OHU patients may receive outpatient health services and assistance with the activities of daily living. |
| **CTC** | Patients do not require general acute care level of services but are in need of professionally supervised health care beyond that normally provided in the community on an outpatient basis. |
| **GACH** | General Acute Care Hospital level of services. |

**Proximity to Consultation**

| | |
|---|---|
| **No Particular Need** | No anticipated need for consultations at this time. |
| **Infrequent Basic Consultation** | General surgery, orthopedics, obstetrics, radiology, ophthalmology, internal medicine. |
| **Frequent Basic Consultation** | More than four consults a year are expected. |
| **Tertiary Consultation** | Close to tertiary care hospitals, services, and specialists: Hematology-Oncology, radiation therapy, invasive cardiology, subspecialty surgeons. |
| **Community Placement** | Permanent Community setting, ventilator dependent. Assign to institution most convenient to placement. |

**Functional Capacity**

| | |
|---|---|
| **Vigorous Activity** | Qualified for all assignments, including food-handling and fire-fighting. Good mobility, endurance, and bilateral grip strength. Able to dig ditches, chop wood, haul water, and wear a respirator. |
| **Full Duty** | Qualified for all institutional assignments, including food-handling, without restrictions. |
| **Limited Duty** | Restrictions on duty assignment, listed in comments. Unless specifically noted, is qualified for food-handling. |
| **Totally-Disabled** | Incapable of duty assignment. |

**Medical Risk**

| | |
|---|---|
| **Low Risk** | Routine medical conditions, focused on preventative care; chronic care of common conditions in good control throughout the last year (asthma with ACT > 20 and requiring < 4 rescue canisters, diabetes with A1c < 7.7, hypertension with BP < 161/101, seizure disorder with no breakthrough seizures and documented medication-adherence). |
| **Medium Risk** | Chronic care of well- or moderately-controlled common conditions (e.g. angina, anemia, asthma with ACT < 20 or > 4 rescue canisters in last year, Hgb A1c > 7.7 during last year, compensated end-stage liver disease, hypertension > 161/101 in last year, incapacitating endometritis, stable esophageal varices). Admission to OHU, CTC, GACH within last year. Requires time-sensitive laboratory studies. |
| **High Risk** | Chronic care of complicated, unstable, or poorly-controlled common conditions (e.g. asthma with history of intubation for exacerbations, uncompensated end-stage liver disease, hypertension with end-organ damage, diabetes with amputation). Chronic care of complex, unusual or high-risk conditions (e.g. cancer under treatment or metastatic, coronary artery disease with prior infarction). Implanted defibrillator or pacemaker. High risk medications (e.g. chemotherapy, immune suppressants, Factor VIII or VII, anticoagulants other than aspirin). Transportation over a several day period would post a health risk. *Case management required.* |

**Nursing Care Acuity**

| | |
|---|---|
| **Basic Nursing** | Needs minimum nursing care: Carry Medications, Episodic Sick Call, Emergency Response. |
| **Uncomplicated Nursing** | Care of largely well population, stable chronic uncomplicated chronic disease, acute injury and illness. Focus on prevention and wellness. Routine nursing care in primary care clinic. Unit Pill line BID; KOP available 7 days/wk. |
| **Low-Intensity Nursing** | Care of chronic stable disease, functional limitations compensated by adaptive equipment, patients able to participate in ADLs; q 30 day nursing plan update; maintenance of status, prevention of exacerbation, symptom control, management of pain, patient education. Unit pill line: DOT, Na, IM/SQ BID delivery and KOP. |
| **Medium-Intensity Nursing** | Care of complex stable or at-risk patients; uncomplicated post-surgical care; direct nursing care 2-4 hrs/day; daily nursing plan update; dementia, quadriplegia, hemiplegia able to participate in self-care, uncomplicated wound care; high risk for skin breakdown. *Case management required.* |
| **High-Intensity Nursing** | Care of complex unstable patients, direct nursing care > 4 hours/day; q8h nursing plan update; dementia and quadriplegia unstable and unable to participate in self-care, complex medication protocols. *Case management required.* |
| **Special Nursing** | Specialized nursing training and competencies: Chemo, TPN, Wound Care certification. *Case management required.* |

**Specialized Services, Institution-Environmental**

| | |
|---|---|
| **Clinical Category 1** | HIV with all of: never on anti-retrovirals, never had AIDS-defining opportunistic infection or malignancy, never had CD4 < 350 or < 20%, never had HIV VL > 100,000, has undetectable Hep-C VL, negative HBsAg, allows every three month testing of CD4 and HIV VL. |
| **Clinical Category 2** | All other HIV positive. |
| **Restricted – Cocci** | CID 1 or 2, lymphoma, solid organ transplant, chronic immunosuppressive therapy, moderate to severe COPD (intermittent or continuous O2), cancer on chemotherapy. |

*\* Include details in Comments*                                          [1] Include detail in CDCR 1845 or CDCR 7410 as appropriate
                                                                          [2] Regional Medical Executive only. State factors overridden in Comments

STATE OF CALIFORNIA                                              DEPARTMENT OF CORRECTIONS

# PROBLEM LIST

*ALLERGIES* _____
_____

Interim CDC Form # XXX

INSTRUCTIONS:  A Primary Care Provider (PCP) shall complete this form for any Medical Problem lasting more than six (6) months that is thought to be a potential chronic disease process.  Also include any on-going treatments, (i.e. ESRD/dialysis), or major surgery (i.e. CABG). A Psychiatrist shall complete this form for any DSMIV-Axis I diagnosis.  The Provider will enter date problem identified; Problem DX, name and signature; and Date resolved and initials when problem is resolved. This form is to remain at the top of the Physician Order section. *(To be brought forward at each visit.)*

| Date Identified | Problem | Signature | Date Resolved | Initials |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| INSTITUTION: | | CDC NUMBER, NAME (LAST, FIRST.MI) AND DATE OF BIRTH | | |

# EXHIBIT 1.e. to ATTACHMENT B (UM PLAN)
## (DMH Referral Decision Form)

MH 5652 (REV. 09/10)

## Department of Mental Health Referral Decision Form

| | |
|---|---|
| Inmate-Patient's Name: | |
| CDCR No: | |
| Referring CDCR Institution: | |
| DMH Facility: | |

**DMH Reviewing Clinician:** _____

_____

_____

_____

_____

**DMH Decision:**  ☐  Accepted                                    Date: _____

☐  Clinically Accepted _but_ Medically Deferred        Date: _____

☐  Not Accepted                                Date: _____

**If referral is clinically accepted but medically deferred, please provide specific details regarding deferment.**
_____
_____
_____
_____

**Based on the above reason for medical deferment please provide specific detailed criteria for reconsideration. Please indicate expectations of the patient's condition when admission shall be reconsidered by DMH.**
_____
_____
_____
_____

**If referral is not accepted please provide detailed reason for the decision**:  Please use official letterhead to write the rationale for the rejection.
_____

**DMH Clinician:** _____        Date: _____

**DMH Coordinator:** _____        Date: _____

**Fax to 1) referring CDCR institution and 2) If a REJECTION fax to DMH HQ 916-653-6376**

Confidential patient information subject to HIPAA 45 CFR § 164 et seq. ,  Welf. & Inst. Code § 5300 et seq., and Civil Code § 56 et seq

# EXHIBIT 1.f. to ATTACHMENT B (UM PLAN)
# (DMH Psychiatric Discharge Program Summary)

**MH5651 (REV. 09/10)**

**Department of Mental Health**
**Acute & Intermediate Care Discharge Summary**
**DMH Psychiatric Programs**

---

☐ **Vacaville Psychiatric Program**                    ☐ **Salinas Valley Psychiatric Program**


**PATIENT**:                                          **DATE OF ADMISSION**:

**CDCR #**:                                           **DATE DICTATED**:

**UNIT**:


**IDENTIFICATION**:

**SOURCES OF INFORMATION**:

**CHIEF COMPLAINT/REASON FOR ADMISSION**:

**HISTORY OF PRESENT ILLNESS**:

**PAST PSYCHIATRIC HISTORY**:

**SUBSTANCE ABUSE HISTORY**:

**MEDICAL HISTORY**:

    **ALLERGIES**:

    **ADVERSE DRUG REACTIONS**:

**FAMILY HISTORY**:

**DEVELOPMENTAL HISTORY**:

**SOCIAL HISTORY**:

**EDUCATIONAL/VOCATIONAL HISTORY**:

**MENTAL STATUS AT ADMISSION**: (Please describe and not use WNL)

**HOSPITAL COURSE—PSYCHIATRIC**:

    **MEDICATION TRIALS**:

    **RATIONALE FOR POLYPHARMACY**:

    **JUSTIFICATION FOR NON FORMULARY MEDICATIONS**:

    **AIMS EXAM**:

    **INTERMEDIATE CARE CONSIDERATION (APP ONLY)**:

Confidential patient information subject to HIPAA 45 CFR § 164 et seq. ,  Welf. & Inst. Code § 5300 et seq., and Civil Code § 56 et seq

**HOSPITAL COURSE—PHYSICAL PROBLEMS**:

**Height**          **Weight**          **BMI**          **Waist Circumference**

**LABORATORY RESULTS**:

**CONDITION AT DISCHARGE**:

**DSM IV-TR DIAGNOSES: Please indicate DSM Codes**:

**Axis I**:

**Axis II**:

**Axis III**:

**Axis IV**:          Incarceration,

**Axis V**:          **GAF**:          **GAF (previous)**:

☐     **CHANGE IN DIAGNOSES FROM CDCR ADMISSION DIAGNOSES?**

**If so, please explain**:

**RECOMMENTATIONS FOR PHYSICAL & PSYCHIATRIC FOLLOW-UP**:

**1. Discharge to**          **Level of care.**

**2. Diet**:

**3. Activity level**:

**4. Alerts**:

**5. Medical recommendations**:

**6. Recommendations for psychiatric/psychological/behavioral management**:

**7. Discharge medications**:

_____

**Name (type/print)**:          **Date Signed**:

**Staff Psychiatrist**


**XX/xx**
**Date Dictated**:
**Date Transcribed**:

Confidential patient information subject to HIPAA 45 CFR § 164 et seq. ,  Welf. & Inst. Code § 5300 et seq., and Civil Code § 56 et seq



**GUIDELINES FOR DISCHARGE SUMMARY TEMPLATE MH5651 (Rev. 09/10)**

The DMH-Acute and Intermediate Care Discharge Summary MH5651 (Rev. 09/10) replaces all previous templates and versions of the psychiatric discharge summary. This document was developed in collaboration with CDCR to provide the information most useful for continued care of our patients, and was approved by the Receiver's office.

A few new categories have been added to the previous discharge summary template. It is necessary to include these items in every discharge summary for CDCR patients discharging from the Department of Mental Health.

What follows is a description of each element of the discharge summary and their placement. For consistency, all discharge summaries should follow this format and have the same appearance, whether typed or transcribed.

Page one is a cover sheet containing demographic and reference information. Subsequent pages comprise the body of the discharge summary.

## DISCHARGE SUMMARY–COVER SHEET

The DCS cover sheet contains demographic and reference information. Related information in more detail can be entered in the body of the DCS.

1. **VPP or SVPP:** Check the program from which the patient will be discharged.

2. **Patient Information:** Patient name should be complete. Include first and last name and middle initial, if the name is common. Also include the CDCR number, date of birth, date of admission and date of discharge, which should be the actual date of discharge. The date of discharge is the only item (aside from the signature) that may be handwritten. Identify the unit from which the patient is discharging, and indicate APP or ICF/VPP or ICF/SVPP.

3. **Contact Information:** CDCR clinicians will be contacting DMH clinicians according to the new Memorandum of Understanding (MOU). Accurate contact information for the treating psychiatrist and psychologist should be provided. Use the means you prefer: pager or phone number. You may include your DMH email address but must include a phone number, since some CDCR clinicians do not have ready access to email. Be aware that as part of the medical record, this information potentially could be obtained by the patient.

4. **Involuntary Medication Order:** This section is very important and must be accurate. Specify whether the patient is currently subject to a court order authorizing the involuntary psychotropic medication (Keyhea). If so, specify the basis(es) – Grave Disability (GD), Danger to Self (DTS), Danger to Others (DTO) and the expiration date. Additional information regarding court-ordered

medication initiation, renewal, denials, etc., that have occurred during the admission should be included in the body of the DCS under Hospital Course – Psychiatric.

5. **Discharge Level of Care**: Specify if Intermediate Care Facility (ICF), Mental Health Crisis Bed (MHCB), Enhanced Outpatient Program (EOP), Clinical Case Management Services (CCCMS), or General Population (GP).

6. **Institution**: Specify the CDCR institution to which the patient is endorsed. This is subject to change if LOC changes. If so, indicate the sending institution.

7. **Custody Factors**: Specify custody level, points, and SNY status. This information can be found on the Case Factor Sheet.

8. **Maximum Commitment Date**: This information is found on the Case Factor Sheet.

9. **Expected Parole Date**: While subject to extension if the patient receives additional disciplinary action, this information is especially useful for understanding when the patient may be reentering the community or whether serving a lengthy sentence.

10. **County of Commitment**: This is useful information especially for those approaching parole.

11. **Additional Reports**: Indicate other reports, if any, that are included with the psychiatric discharge summary. Reports of Psychological testing and specialty medical consultations may be appended. Do not check if these documents are summarized in the DCS but not included.

12. **Non-Formulary Drug Requests, CDCR Form 7374**: Non-Formulary Drug requests should be included in all discharge packets, if the patient is discharged on non-formulary medications. Requests should include sufficient rationale to support the use of the non-formulary drugs in CDCR. CDCR clinicians are held to a high standard in justifying the use of non-formulary drugs. Our help in justifying needed medications and substantiating the rationale for these medications will assist them in continuing to provide continuity of care for our discharged patients.

## DISCHARGE SUMMARY–BODY

1. **VPP or SVPP**: Indicate the program initiating discharge.

2. **Demographic Information**: Identifying information will automatically be included in subsequent pages. Indicate the date of dictation rather than date of discharge, as the latter is often unknown. Discharge date should be handwritten on the cover page when the patient is actually discharged.

3. **Identification**: Include age, ethnicity, mental status, relevant social factors, referring institution, level of care on admission, prior admissions, custody factors, criminal history and gang affiliation.

4. **Sources of Information**: Specify which sources have contributed to the current report, for example: referral packet from the sending institution, review of current volume of UHR, review of all volumes, direct discussion with sending institution clinicians, collateral information by telephone from family, review of C-file, and patient self-report.

5.  **Chief Complaint/Reason for Admission**: Chief complaint is patient's stated complaint. Reason for admission should address the sending institution's reason for referral, specifying the referral questions and goals sought.

6.  **History of Present Illness:** Describe current episode, precipitating factors, context, background, and recent interventions, including medications and treatment prior to coming to DMH.

7.  **Past Psychiatric History:** This section should summarize as thoroughly as possible all known psychiatric history emphasizing what can be verified in the UHR, or from other clinical records. Patient statements should be identified as such, as well as whether they are corroborated or contradicted by the medical records. History of suicidal ideation and attempts and the details of such attempts, history of self-injurious behavior without lethal intent, and history of violence and assaults are important. Hospitalizations and the reasons, including location and dates should be documented. Include history of medication trials, dose, duration and response. Include role of substance abuse and medical problems in psychiatric problems.

8.  **Substance Abuse History:** Elaborate on the substances used and drug(s) of choice. Include all routes of administration, including history of IV use, duration of use, pattern of use, most recent use, and use while in prison. Include history of tobacco use, and history of treatment failures and successes for all drugs used.

9.  **Medical History:** Include all medical history, such as identified problems and hospitalizations. Include presence or absence of head injury history, surgeries, HIV status, and Hepatitis profile. Family medical history belongs here, including positive or negative history of diabetes, hypertension, dyslipidemia, and cardiovascular disease.

    **Allergies and Adverse Drug Reactions:** NKDA is acceptable. Differentiate true allergic reactions (e.g., rash, pruritus, hives) from adverse reactions.

10. **Family History:** Family constellation, family history of mental illness, suicide attempts, completions and substance abuse/dependence. Identify the relationship to the patient.

11. **Developmental History:** Include significant developmental problems, if known. Use "Unknown" if no pertinent information is known versus "No known developmental problems," if history of normal development. Include history of trauma, if known, including physical, psychological and sexual abuse.

12. **Social History:** Include all known social factors: significant relationships, marriage, divorce, number of children, level of social adaptation, social supports, and post-parole goals.

13. **Education/Vocational History**: Include grade completed, known learning problems/disorders and academic strengths, history of employment and military service (rank achieved, deployment history, disciplinary actions, reason for discharge, and adjustment in the military).

14. **Mental Status Exam at Admission:** This should be a thorough reiteration of MSE conducted at admission including:

    - Attitude/Cooperation
    - General Appearance
    - Speech

3

- Psychomotor activity
- Mood and affect
- Thought process and content
- General knowledge and comprehension
- Abstraction
- Cognitive, Orientation, and Memory
- Suicidal ideation, homicidal ideation
- Judgment
- Insight

15. **Hospital Course (Psychiatric):** This section summarizes the course of the hospitalization, including treatment decisions and outcomes of those decisions. The description should be both thorough and concise, and include any elements that clarify the overall course. Lengthy descriptions of treatment teams are unnecessary. Discuss any behavioral interventions or PBST plans. Include any incidents of self-harm, suicide attempts or violence, and any RVR's issued. Changes in court-ordered medication (Keyhea) status should be documented here. Summarize the results of psychological testing, unless a separate document is attached.

16. **Medication Trials:** Include all major medication trials while hospitalized with dose achieved, outcome, reason discontinued, side effects and adverse effects. Document adherence. Specify any drug levels obtained, the date obtained, and the dose of medication when obtained.

17. **Rationale for Polypharmacy:** Explain any case of two (2) or more medications from the same class per DMH Medication Guidelines for polypharmacy. If no polypharmacy indicate N/A.

18. **Justification for Non-Formulary Medications:** Elaborate clinical rationale for all non-formulary medications that are to be continued post-discharge. This explanation should include all the information provided on the CDCR Non-Formulary Drug Request Form 7374, documenting other formulary medications tried and failed. "Continuity of Care" is not sufficient. If the patient was admitted on two (2) non-formulary medications, indicate the reason, if known, or state "reasons unknown." This information will provide the basis for continued justification by CDCR clinicians for non-formulary medications.

19. **AIMS Exam:** Indicate date of most recent exam, score, and changes from past. If no antipsychotics are prescribed indicate "N/A, No antipsychotics prescribed."

20. **Intermediate Care Consideration:** Although it is not necessary to refer every patient to ICF, every patient should be considered and the reason for choosing to refer or not refer the patient should be detailed in this section. In selecting a level of care, the best interest of the patient is the primary consideration. Patient preference is not the primary consideration and should be highlighted only if the patient refuses ICF and could not be involuntarily committed (Vitek order), but would otherwise be appropriate. (See Vitek v. Jones, 445 U.S. 480::volume 445::1980:: U.S. Supreme Court.) For patients discharging from ICF, indicate "N/A."

21. **Hospital Course-Physical Problems:** Document height, weight, BMI, and waist circumference at time of discharge. Add additional lines to describe significant changes during hospitalization. Describe all medical problems identified and/or treated during the course of the hospitalization: Medical/Specialty Consultations/X-Rays/Radiology/Special Exams, etc.

4

22. **Lab Results:** Include all positive and pertinent negatives. Include all routine monitoring related to medications.

23. **Condition at Discharge:** This should be a narrative description of the patient's overall condition and a comparison to the MSE or admission. Include a targeted Mental Status Exam relevant to diagnosis and target symptoms. Provide an overall assessment of the patient's improvement and prognosis upon return to CDCR.

24. **DSM IV-TR Diagnosis:** Complete all five (5) axes with admission and discharge GAF scores.

25. **Change in Diagnosis:** Check if you have changed the diagnosis that was made on the DMH referral form and explain.

26. **Recommendations:**

    1. **Indicate level of care** – ICF, EOP, CCCMS, GP or MHCB (usually for patients about to parole who continue to need hospitalization).

    2. **Diet & Activity** – Indicate diet and activity to be continued post-discharge.

    3. **Alerts** – Indicate any ongoing issues with regard to self-injury, dangerousness, potential for seizures and falls.

    4. **Medical Recommendations** – Indicate treatment plan for any medical problems, follow-up medical appointments, or laboratory work. Specify any specialty medical consultations ordered but not yet completed. If time frames exist, specify.

    5. **Psychiatric, Psychological/Behavioral Management Recommendations** - All recommendations for behavioral management including PBST should be included as well as psychological issues and treatment recommendations for achieving continued stability. Recommendations that are feasible but not routinely accomplished in CDCR are acceptable. Recommendations that are incompatible with the recommended level of care should not be made.

    6. **Discharge Medications:** Include all psychotropic and non-psychotropic discharge medications. If patient is prescribed depot medication, indicate the date last given and next due. Additionally, include any recommendations for the future regarding medications changes, titration, schedules, possible switches, etc.

27. Signature Line: Type or print first, last name, degree (D.O. or M.D.), date and sign. If signing for someone else sign your first, last, M.D. /D.O. for first, last, M.D. /D.O.

This discharge summary is designed to be dictated and completed by transcription services, or by typing into a template, or by using voice recognition software, if available. Whichever method is used to complete the discharge summary, the final product should look the same to the end user. Those who choose to type should use Arial font, size 11, not bolded. Descriptions should be written in full sentences.

The final document should be free of spelling, grammatical, and voice-recognition errors. The document should also be free of handwritten corrections. Correct errors manually and reprint the document or resubmit to transcription. The only items which should be completed by hand are the signature and the actual date of discharge.

Discharge Summary Template Guidelines

## DISCHARGE SUMMARY WITH PROMPTS

In addition to the Discharge Summary Template, there is a "Discharge Summary with Prompts." This document is provided to assist you in your work by reminding you of important and easily overlooked items to be included in the DCS. The prompts include a number of items that stakeholders asked to see included in the discharge summary without fail. These items are included as prompts rather than as discrete categories so that the final document is not overly complicated and still follows the traditional discharge summary format with which virtually all psychiatrists are familiar. The specific prompts are not part of the final product.

The prompts are not all-inclusive. Some essential elements of a discharge summary, as enumerated in this document, are not included because we expect everyone to be familiar with their meaning. The prompts include items that are unique to our setting, specific to our patient population, often omitted, or specifically requested by CDCR. The "prompts" are flexible. We can add items that become frequently overlooked or remove those that everyone includes consistently and routinely. You may even create your own set of prompts, omitting the items which you routinely include or adding ones which you sometimes miss. However, at any given time, DMH will have a Discharge Summary with Prompts available as the standard for all Staff Psychiatrists, reflecting those items considered essential.

In summary, the goal is to be thorough without being cumbersome, to provide information that is accessible and user-friendly to those who will care for the patient in the future, and to make the completion of a discharge summary as efficient as possible while ensuring that all of the desired elements are present.

# EXHIBIT 1.g. to ATTACHMENT B (UM PLAN)
## (DMH Patient Discharge Checklist)

# DMH PATIENT DISCHARGE CHECKLIST

Patient Name: _____     ID Number: _____

CDCR Number: _____     Discharge Date: _____

**DATE**          **INITIALS**

**Sent as soon as DMH is notified of discharge by the C&PRs office the following will be sent to the CDCR DMH Coordinator  (when possible)**

1. The CDCR-DMH Transition Contact form          _____          _____
2. The non-formulary medication form (if necessary)     _____     _____
3. The Draft of the Discharge Summary          _____          _____

**Sent with inmate-patient upon discharge:**

1. Psychiatric Discharge Summary          _____          _____
2. Nursing Assessment and/or Discharge Summary     _____     _____
3. Current Physicians Orders          _____          _____
4. MAR          _____          _____
5. Current Suicide Risk Assessment          _____          _____
6. Current Treatment Plan          _____          _____
7. Current Treatment Plan and behavior plans          _____          _____
8. Psychological Assessments if available          _____          _____
9. Keyhea Order (if applicable)          _____          _____
10. "Request for Non-Formulary Medication Use"          _____          _____

**Within 2 weeks of Discharge:**

11.  Interdisciplinary Notes for past 15 days          _____          _____
12.  Physician Progress Notes for past 15 days          _____          _____
13.  Relevant Consults          _____          _____

**If applicable:**

14.  Psych and Return (128C)          _____          _____
15   MH Placement (128C)          _____          _____
16   For Parolees Only (CDCR 7371)          _____          _____

Staff member verifying packet contents: _____

Date: _____

October 2010

**EXHIBIT 1.h. to ATTACHMENT B (UM PLAN)
(Clinician to Clinician Inmate-Patient Transition)**

State of California                                                                                     Department of Corrections and Rehabilitation
**TRANSITION TO CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
CDCR XXXX
Confidential Inmate/Patient Information

D/C Date: _____          D/C LOC: _____          CDCR Arrive Date: _____

DMH Facility:_____

DMH Clinician: _____          Contact Number: _____

CDCR Institution/Parole Region: _____

CDCR Clinician: _____          Contact Number: _____

Conference Call Date: _____          DMH Contact: _____

Reason for referral:

_____

_____

Did DMH address the referral issues?

_____

_____

Outstanding issues and questions:

_____

_____

Discussion of medication changes/trials and patient response (include justification for non-formulary medications)

_____

_____

Current Medications/Issues:

_____

_____

Continuing MH treatment goals and recommended follow-up (include rationale for change in level of care):

_____

_____

Additional Information Needed

_____

_____

Sufficient information obtained:                    ☐ Yes          ☐ No

Clinician unable to schedule conference with DMH clinician:  ☐ Yes          ☐ No

Reason unable to make contact:

_____

_____

| | Name (Last, First, MI), CDCR Number, DOB |
|---|---|
| | |

State of California
Department of Corrections and Rehabilitation
**TRANSITION TO CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
CDCR XXXX
Confidential Inmate/Patient Information

**Directions**:

1.  Form to be used after the patient returns from the Department of Mental Health (DMH) to CDCR by the patient's clinician(s) to guide the mandated conversation with the DMH team clinician(s).
2.  The CDCR clinician is required to initiate telephone contact within 5 days of the inmate-patient returning to CDCR
3.  If the DMH clinician does not receive a call from CDCR within 5 days after inmate-patient discharge, they are required to initiate contact with the receiving institutions DMH coordinator.  They have 10 days from the original discharge to make this contact
4.  DMH Discharge Clinician: fill out the information in the box.  DMH and CDCR clinicians:
5.  Briefly complete the form during the conference call.
6.  Conversation must occur in no more than 5 days.
7.  Distribution:  Original: UHR Mental Health Section; Copy: your respective headquarters.



# EXHIBIT 2 to ATTACHMENT B (UM PLAN)
## (Psychological Assessment Policy)

**PSYCHOLOGICAL ASSESSMENT POLICY**

| | |
|---|---|
| **MH-xxxx** | Quality Standard:  Timely Psychological Assessments for CDCR Inmate-Patients |
| **Quality Standard** | California Department of Corrections and Rehabilitation (CDCR) inmate-patients shall no longer be automatically referred by their primary clinician to the Department of Mental Health (DMH) for psychological assessments.  All CDCR assessment referrals will be assigned to an assessment psychologists (either in-house or a CDCR assigned assessment Subject Matter Expert(SME)), who shall triage each referral and based upon their best judgment decide:  (1) that the inmate-patient no longer is an appropriate candidate for a psychological assessment; (2)  that CDCR should conduct the assessment;  or (3) send the inmate-patient  on to DMH for assessment for one or more of the following reasons: |

- o   Comprehensive Neuropsychological Assessments;
- o   The CDCR assessment provided inconclusive results;
- o   There is a need for a second opinion;
- o   The assessment is too complex, or beyond the assigned assessment psychologist's expertise or scope of practice; or,
- o   The assigned assessment psychologist determined that the inmate-patient would be better assessed in another environment. This would be at the discretion of the assigned assessment psychologist. Issues that may be considered, but not limited to, include the inmate-patient's  refusal due to distrust/paranoia and institutional environmental issues surrounding the inmate-patient that are considered "difficult" or "manipulative" that may make it difficult to complete an adequate assessment.

**Rationale**

Providing psychological assessments on site at CDCR institutions is designed to:

- Ensure appropriate treatment planning and overall Inmate-Patient care;
- Effectively use state resources; and
- Reduce the wait times for those high-custody inmate-patients that continue to require Intermediate Care Facility (ICF) level of care.

**Parameters**

- When appropriate, properly trained and experienced CDCR psychologists shall conduct a psychological assessment with an inmate-patient, rather than referring the inmate-patient to DMH for that purpose.
- To insure adequate objectivity, clinicians will not conduct psychological assessments with inmate-patients who they currently have a therapeutic relationship with.

- For institutions that do not have psychologists on staff with the necessary experience in psychological assessments, CDCR has created a SME pool of clinicians, previously screened and predetermined qualified to conduct psychological assessments.
- Clinicians can access the SME pool by contacting the Utilization Management Unit at CDCR headquarters  for assignment of an appropriate SME
- Prior to making a referral for a psychological assessment, the primary clinician is first instructed to begin the assessment process by thoroughly reviewing the inmate-patient's Unit Health Record (UHR) and C-File, followed by an extensive clinical interview with the inmate-patient that  includes a mental status exam and a thorough mental health history. The clinician will also make contact with the inmate-patients' collateral contacts including members of the Interdisciplinary Treatment Team (IDTT), custody working in their housing unit, and teachers and work supervisors. The results of this comprehensive assessment are to be documented in a Mental Health Assessment Form (CDCR Form 7386).
- If after completing the preliminary workup the primary clinician still feels the need for a psychological assessment, the clinician should consult with his or her program supervisor on the need.  If the supervisor concurs with the need for further assessment, the clinician will then formally present the inmate-patient's case to the IDTT and elicit additional multidisciplinary input from the IDTT. The IDTT will be responsible for making the final decision whether the inmate-patient's mental health treatment would benefit from an additional psychological assessment.
- All inmate-patient referrals for psychological assessments are to be forwarded to the assigned assessment psychologist, either in-house or SME, as appropriate. The assigned assessment psychologist will have a period of ten working days to review the referral and decide whether the psychological assessment can be adequately completed by the assigned assessment psychologist, or would be more appropriately referred to DMH.
- For all referrals that are determined appropriate for diagnostic assessment at CDCR, the assigned assessment psychologist will review available mental health and medical records, prior evaluations and assessments and have access to the IDTT members and other collateral contacts as needed.  They will have thirty working days to complete the assessment and produce a report.
- Inmate-patients identified as still needing a psychological assessment will be referred to DMH.
- At any point, the assigned assessment psychologist may also refer evaluations to DMH if the initial assessment provided

inconclusive results, and/or there is need for a second opinion, the assessment is to complex and/or beyond the clinician's scope of practice, the inmate-patient refuses due to distrust/paranoia, or there are institutional environmental issues surrounding I/Ps that are considered "difficult" or "manipulative" that may make it difficult to complete a fair and balanced assessment.

- For all referrals the assigned assessment psychologist determines to be appropriate for referral to DMH, the primary clinician will complete the DMH referral packet, which will be forwarded for review along with their initial assessment to the Utilization Management Unit psychologist at CDCR headquarters. If the UM psychologist concurs with the assigned assessment psychologist's decision, the inmate-patients' DMH referral packet will be forwarded to DMH.

- All inmate-patient referrals for testing will be tracked in the mental health tracking system. CDCR expects to track the following items:
  - Date referred
  - Referral type (DX clarity, neuropsychological)
  - Where referred, CDCR, or DMH
  - If DMH referral, primary or secondary referral, reason; second opinion, to complex, inmate-patient refusal, inmate-patient distrust/paranoia, and/or other environmental issues
  - Date Assessed (or I/P referral)
  - Date Report received

# EXHIBIT 3 to ATTACHMENT B (UM PLAN)
## (Summary of Clozaril Initiation Policy)

# Summary of Statewide Clozapine Initiation Policy

### A.    Policy.

It is the policy of the Mental Health Program, Division of Correctional Health Care Services (DCHCS), to provide a safe procedure for the initiation of Clozapine as a psychiatric treatment modality for inmate-patients.  This policy will be implemented for statewide initiation at selected facilities and has been approved by the Pharmacy and Therapeutics Committee.

### B.    Clozapine Initiation Facilities; Process for Requesting Clozapine Initiation at a Clozapine Initiation Facility.

The Statewide Chief of Behavioral Medicine in conjunction with the statewide Clozapine workgroup designated the California Department of Corrections and Rehabilitation institutions that will participate in the Clozapine initiation program.  As of November 16, 2010, the institutions designated as "Clozapine Initiating Facilities," are as follows: California State Prison-Sacramento, California Medical Facility-50 bed MHCB unit, San Quentin, and Central California Women's Facility.  Additions to this list will be determined as needed by the Statewide Chief Psychiatrist in conjunction with the statewide Clozapine workgroup.

The Clozapine Initiating Facilities shall become the primary Clozapine initiating facilities for DCHCS.  These facilities shall receive inmate-patients statewide through placement by the Health Care Placement Oversight Program (HC-POP).  Requests for clozapine initiation shall be made via a request to HC-POP for a Mental Health Crisis Bed within the Correctional Treatment Center (MHCB/CTC).  HC-POP shall locate a MHCB at one of the Clozapine Initiation Facilities.  Clozapine Initiation Facilities do not have the authority to independently admit an inmate-patient to their MHCB for the purposes of initiating Clozapine without first contacting HC-POP for an available MHCB bed. No medical CTC bed will be displaced for the purpose of initiating Clozapine unless secondary to those inmate-patients that have been granted clinical priority by the mental health program administration or the inmate-patient in need of Clozapine initiation also meets other criteria for placement in the MHCB unit. Clozapine referrals for MHCB placement will follow the routine statewide MHCB referral process, with the referring clinician contacting designated HC-POP MHCB staff and then the inmate/patient will be placed on the statewide MHCB waiting list in date order until a MHCB is available at an authorized MHCB Clozapine institution.  The wait list will note that the MHCB referral is for Clozapine placement, and Clozapine MHCB referrals will be placed in date order unless clinical priority is authorized by DCHCS Mental Health Program Clinical Administrative Staff.

The Department of Mental Health (DMH) shall continue to be a referral source for inmate-patients in need of Clozapine initiation when the situation requires (i.e. the severity of the inmate-patient requires DMH placement).

Each approved Clozapine Initiation Facility shall ensure that there is at least one Staff Psychiatrist assigned to the CTC/MHCB who shall function as the primary prescriber and a secondary psychiatrist or the Chief Psychiatrist or Senior Psychiatrist who shall function as the secondary prescriber, in the absence of the primary prescriber. The primary prescriber shall be responsible for the direct and routine care of the inmate-patient during the initiation and titration phases of treatment. The secondary prescriber shall serve as a back-up for the primary prescriber for scheduled and unexpected absences of the primary prescriber.

### C.    Initiating Clozapine.

A referral for Clozapine shall primarily be determined by the treating psychiatrist in conjunction with the Interdisciplinary Treatment Team and with the concurrence of the Chief Psychiatrist, designee or quality assurance committee. The Chief Psychiatrist, designee or quality assurance committee shall authorize all potential candidates. Relevant laboratory work shall be completed and must be within acceptable limits. After authorization and completion of the required laboratory and physical examination, the Clozapine candidate (inmate-patient) shall be referred to HC-POP for placement in a Clozapine initiation CTC/MHCB as described above.

Prior to initiating Clozapine treatment, individual eligibility must be verified by the pharmacy. The appropriate Clozapine Patient Registry shall conduct a re-challenge status check with the National Non Re-challenge Master file on all patients new to Clozapine, restarting Clozapine, or if Clozapine experience is unknown at the time of registration and prior to issuing treatment authorization. The pharmacy must receive a registration number for the inmate-patient prior to initiating and dispensing Clozapine. The inmate-patient must consent to Clozapine treatment and related monitoring.

The initiation phase of treatment will take place in the CTC/MHCB. The inmate-patient will remain in the CTC/MHCB for a minimum of 7-10 days during the initial medication titration up to the dose of 300 mg or as clinically indicated. Consistent with the 2009 Program Guide, additional CTC/MHCB days must be approved by the Chief Psychiatrist or his designee. Transfer may occur once the Clozapine dose is well tolerated and/or the inmate-patient has stabilized sufficiently to allow transfer. The inmate-patient will then be discharged to an approved Clozapine maintenance facility at the Enhanced Outpatient Program (EOP) level of care for 6 months, at which time they will become eligible for a change to a lower level of care.

The Statewide Clozapine Initiation Policy also includes sections on Quality Assurance; Clozapine Indications; Selection of inmate-patients for Clozapine Treatment; Contraindications and Cautions for Clozapine Use; Drug Interactions; Pre-Treatment and Baseline requirements and recommendations; Dosage and Administration; Monitoring, Evaluating and Discontinuing Clozapine; Possible Adverse Reactions; and CTC Discharge transfer to the EOP level of care. In addition, the Policy includes Nursing, Laboratory, and Pharmacy protocols.

# EXHIBIT 4 to ATTACHMENT B (UM PLAN)
## (Positive Behavioral Support Team Plan)

## POSITIVE BEHAVIORAL SUPPORT TEAM PLAN

**I.    Overall Policy: Positive Behavioral Support Services/Positive Behavioral Support Team.**

The fundamental purpose of Positive Behavioral Support (PBS) services is to assist Interdisciplinary Treatment Teams (IDTT) and inmate-patients address and manage maladaptive behaviors utilizing the least aversive treatment and the least restrictive level of care.  Maladaptive behaviors are those behaviors that a person may use to cope with stressors, but with negative consequences to the inmate-patient or towards others.

The PBS is an integrated process of collaborative assessment, intervention planning, and implementation of a treatment plan by the inmate-patient, the patient's IDTT, and the PBS Team (PBST).  The PBST is a multi-disciplinary team that provides consultation to an IDTT with an in-depth review of an inmate-patient who has identified specific target behaviors that are proving difficult to treat. The team is usually led by a psychologist with specialized training in behavioral psychology.  A PBST also provides training in the PBS philosophy and methods to treatment program staff, using specific curriculum developed for this purpose.

**II.    Current Practices.**

The Department of Mental Health (DMH) and the California Department of Corrections and Rehabilitation (CDCR) have already collaborated for this type of consultation in specific cases.  Patton State Hospital (PSH) staff have provided services and training to California Institution for Women (CIW) for female inmate-patients.

**III.    Expanding PBST Consultative Services**

CDCR and DMH are developing a process to expand PBST Consultative Services to CDCR's inpatient and outpatient programs as a tool in managing some inmate-patients in the least restrictive level of care.

There are two goals for the proposed PBST consultative services in the Utilization Management (UM) plan:

- First, direct inmate-patient services would be provided to CDCR treatment teams to assist them in treating a population of mentally ill inmate-patients who tend to be challenging to treat and are at high risk for injuring themselves and others.

- Second, indirect services would aim at training CDCR staff in the principles of PBS.  Then those staff who participated in the training could develop their own PBST services at their respective institutions.

A typical consultation begins with a referral for services after the treating IDTT has usually exhausted all other treatment interventions.  A referral for PBST services would

be generated by the current treating IDTT. The type and extent of consultative services would be determined by each individual referral as well as resources available to provide consultation.

The next step for the development of the PBST consultation process is to begin the process of identifying criteria for a referral for consultation. A workgroup including DMH and CDCR program and headquarter staff will be established to identify referral criteria and a process for requesting PBST consultation in January 2010. Once a referral criterion and process is established, the form will be finalized and training will occur for CDCR staff. Training will occur by email, tele- and videoconferencing.

Consultation services would be on a limited basis due to the potential workload and financial impact to the existing PBST services at both DMH and CDCR. The approval for consultation will be determined on a case by case basis based on the information provided by the IDTT and the availability of resources.

**EXHIBIT 5 to ATTACHMENT B (UM PLAN)**
**(UM Form, DMH Continued Stay Review)**

DMH Acute/Intermediate Treatment Continued Stay Review

Date of Review:
To:  Medical Director, UM Nurse
From:  Utilization Review
Re: _____ CDCR# _____
Bed Number #: _____
Admission Date: _____ Length of Stay: _____
Program and Level of Care: _____

Diagnosis:     I: _____
              II: _____
              III: _____
              IV: _____
              V: _____

Please indicate status of inmate-patient (I/P:
1.  Is this I/P's major mental disorder stabilized?                        _____ Yes     _____No
2.  Is this I/P's major mental disorder in remission?                      _____ Yes     _____No
3.  Is he a danger to himself at this time?                                _____ Yes     _____No
4.  Is he a danger to others due to a mental illness at this time?         _____ Yes     _____No
5.  Is he likely to improve if he continues treatment in this program?     _____ Yes     _____No
        If NO, date recommended by team for return to CDCR facility or refer for other inpatient treatment:
        _____.

        What specific treatment goals do you expect to achieve in the next 30 days?



        Identify barriers to transitioning to another level of care:


6. Given this I/P's risk factors for decompensation, (i.e. pre-existing conditions, environmental, social conditions)
what is the likelihood this person may continue to stabilize if returned to CDCR?  What interventions may decrease
that risk?


7.  Is this I/P a likely candidate for a MDO commitment?                   _____ Yes     _____ No
8.  Is he due to be released on parole within the next 30 days?            _____ Yes     _____ No
9.  Will this I/P need conservatorship upon parole?                        _____ Yes     _____ No
10.  What is the level of medication compliance? ( ) Uncooperative ( ) Reluctant – Requires prompts
( ) Forgetful – Needs prompts ( )  Cooperative – Independent
11.  Has the referral question been addressed?                            _____ Yes     _____No
If NO, why not:

12.  If returned to CDCR at this moment, which level of mental health treatment follow-up would s/he need?
( )  Weekly ( )  Biweekly  ( ) Monthly  ( )  Other/Explain:

Recommendation/Status:  ( )  Continued Stay ( )  Discharge  ( )  Discharged  ( )  Out to Court  ( )  Other/Explain:

Signature of Team Leader: _____     Date: _____

PLEASE RETURN THIS FORM TO THE UM NURSE


Confidential Patient Information – See Welfare and Institutions Code 5328

Instructions for use of Utilization Management Form

1. Stabilization refers to decrease in psychological and behavioral symptoms that resulted in the I/Ps referral or DMH identified treatment goal for at least two weeks and the I/P has an increased ability to participate in treatment.
2. Remission refers to the current DSM definition related to the I/P's diagnosis.
3. Danger to self includes suicidal ideation, self-injurious behavior, poor ADLs, i.e,. Failure to follow-up on medical appointments, refusing medication line, refusing to eat, etc.
4. Danger to others includes behaviors due to the I/P's mental health disorder that the IDTT believes will lead to violence towards others.
5. If the I/P continues mental health treatment in this inpatient treatment setting, will they improve to the extent that inpatient hospitalization is no longer needed at the current level of care.
6. Likelihood is defined as more likely than not.
7. Identify whether or not the I/P has a potential MDO commitment prior to parole.
8. Identify the I/Ps parole date.
9. Indicate whether the IDTT believes that this I/P will need a conservatorship upon parole.
10. Uncooperative means that the I/P refuses, hides and/or "cheeks" medication. Reluctant means that the I/P only takes medication when directly observed and/or prompted. Forgetful means that the I/P requires prompting by staff to take medication and/or could be forgetful in taking prescribed medication. Uncooperative means that the I/P is total independent in adhering to his medication regimen without prompts or need for involuntary medication orders.
11. Refer to original referral question located in the CDCR referral packet. If no, please describe the change in treatment goal based on the IDTT assessment.
12. Indicate how often the IDTT would like an I/P to see mental health treatment providers upon transition to another level of care.

# ATTACHMENT C
# (Power Point for SharePoint Training)



**California Prison Health Care Services**

# DMH – CDCR SharePoint Collaboration

- Kimberly Anderson @CDCR (Health Program Specialist )

- Shefali Dua @CDCR (Microsoft Technical Consultant)

*1*

# What is SharePoint?



- SharePoint is a software platform for web-based sharing of information.  The primary purpose of using SharePoint is to facilitate communication of information concerning California Department of Corrections and Rehabilitation (CDCR) inmate-patients who are referred to higher levels of care at the Department of Mental Health (DMH) between both DMH and CDCR.

*2*



## Why SharePoint?

- This is a system for posting and managing DMH referrals, discharge summaries, program/institution waitlists, as well as Coleman Monthly reports and other pertinent information on a common web-based site that is accessible to DMH headquarters, State hospitals, and programs, and to CDCR headquarters and prisons.

*3*

## The Collaboration



*4*



# Goals of SharePoint

- To enhance communication of critical patient care information between DMH and CDCR leading to improved patient care by:

  ➢ Increasing efficiency in the referral process by facilitating the creation, transmission and access to referrals to higher levels of care between pertinent CDCR and DMH institutions.

  ➢ Standardizing the method of sharing information concerning CDCR inmate-patients who are waitlisted at DMH institutions/programs.

  ➢ Creating a common place for accessing DMH discharge information to enhance inmate-patient follow-up care.

  ➢ Sharing statistical data to help monitor and improve the entire continuum of the referral process, from the time an inmate-patient is referred to a higher level of care at DMH to the discharge and return of the inmate-patient to CDCR from DMH.

*5*



# Documents to Share-Phase I

- ***CDCR* Contribution**
  - ☐ Initial Referral Packages
  - ☐ Referral Updates
- ***DMH* Contribution**
  - ☐ Waitlists (Pending)
  - ☐ Discharge Summaries



*6*



# Who is SharePoint for?

- DMH and CDCR programs/HQ, DMH Coordinators, IT, Field Staff, and other designated staff as appropriate.



7



# Will patient information be secured per HIPAA requirements?

Basic Principles for Privacy and Security:

- Health information belongs to the person.
- People are to be informed about the uses and disclosures of their health information.
- Health (and related) information kept Private and Secure.

Security:

- Confidentiality:  Information that is exempt from disclosure under the provisions of the PRA-California Public Records Act (6250-6265) and other state/federal laws.
- Integrity:  Complete, Accurate, Unmodified, Recoverable, and Tamper Proof.
- Availability:  Information available when needed to those authorized to have it in order to meet the organization's mission.

8



## How long will documents be assessable once posted?

- Indefinitely!!

  In Phase II of the SharePoint implementation, there will be an archival system.

9



## Data Collection:

- Any data or statistical information identified as needing to be shared between the departments will be posted on SharePoint.



10



## Over Sight and Management of SharePoint:

- A Designee from CDCR and a Designee from DMH, will monitor and ensure that the policies and procedures are being followed according to the MOU. Written follow-up will be provided if the MOU is not being followed or if changes need to be made to the policies or procedures.

*11*

## Future Documents to Share

☐ *Coleman* Reports
☐ Acceptance Chronos
☐ MOU's
☐ Program Guide-2009 Revision
☐ Etc.



*12*



SharePoint will allow CDCR and DMH to file the Referrals and Discharges in one file and track the information as one.  All documents, referrals and discharges, will be filed in the same area on SharePoint.  For tracking purposes and future reports, we will be using many different sets of meta-data on SharePoint.

*13*



# Examples of Reports Generated:

- Total Number of Referrals per Institution.
- Specific Criteria (ie; "Why Referred?").
- Time and Date specifics.
- Look for Trending Patterns within/between the Institutions.
- Etc.

*14*







# Obtaining a SharePoint Password

Meet your SharePoint Support Staff:

➢ Kimberly Anderson and Barbara Watson (CDCR)
➢ Candius Gordon-Burgess and Yolanda Smith (DMH)

*These are your primary and backup site owners that are ready to assist you in obtaining a password to gain entry into the DMH/CDCR SharePoint site.

*17*



# SharePoint Steps

- Link: http://extranet.cdcr.ca.gov
- First Time in SharePoint
- Change Your Password!
- Uploading Documents
- Exporting Documents
- Searching and Filtering
- Emailing Notification



*18*



# Log-On to SharePoint:

Website: [http://extranet.cdcr.ca.gov/](http://extranet.cdcr.ca.gov/)

Password information/Practice:

Complex passwords are required, and the system will simultaneously reject and inform the user during the profile update screen if their new personally chosen password is not sufficiently complex.

*19*



# Log-On to SharePoint: (Con't.)

Users are to log in to the system at least once every week to keep their account active and their passwords current, as the system will prompt the user to change their password when it is within 7 days of expiration; because there is no "unlock" feature for expired passwords, any account which is not logged-in within 42 days, is automatically shut off and cannot be recovered without I.T. administrative intervention (2 to 4 days to process).

Upon first logon, a user profile screen is presented which the user needs to complete in its entirety, and which looks like the following (part of the text is cut off, but the fields are complete):

*20*

## Update Your Security Profile

You have not set your password. Please do so now.

Password:

New Password:

Confirm New Password:

You are required to set your password reset question and answer. T question and provide the answer. As a security measure, you are al

New Password Reset Question:

New Password Reset Answer:

Please enter the following personal profile information.

Last Name:

First Name:

Company:

Phone Number:

Update

*21*

# Entry into the SharePoint site:



*22*



# Navigation:



Steps:

➢ Click the DMH tab

➢ Under lists – Click 'Inmate Packages'

➢ Click 'New Referral' and enter the Referral Information

➢ Click 'Attachments' to import scanned documents

*23*

# Naming Conventions

■ **Upload referrals as .tif files…<u>not</u> .pdf.**

■ **The naming convention for the Referral Packets <u>SHALL</u> be:**

  ☐ RF-(CDCR Number)-Last Name-First Initial-Date of IDTT

  ie. RF-D12345-Smith-I-12-10-10

*24*



# Naming Conventions for the DMH Contributions:

The Discharge Process moves in three phases.

- The first phase notifies the receiving institution of the I/P's pending discharge. The three documents are distributed to the institution – the CDCR/DMH Transition Contract Form; the Non Formulary Med Form; the Discharge Summary:

  PreDP-A12345-Smith-A-11-1-10

- The next phase is the actual discharge of the I/P. The entire packet will be posted on SharePoint and also a copy sent in the vehicle when the I/P physically leaves the DMH facility:

  DS-A12345-Smith-A-11-1-10

- The final phase is once the I/P has returned to the institution. Three documents are distributed to the institution – the Interdisciplinary Notes for the past 15 days; Physician's Progress Notes for the past 15 days; any Relevant Consultations:

  PostDP-A12345-Smith-A-11-1-10

*25*



# Naming Conventions for the DMH Contributions (con't):

The other forms that need to be included on the PowerPoint and the SharePoint platform are:

- DMH Decision Form (notifies the CDCR institution that the I/P has been clinically and medically cleared for admission. This is part of the referral process and not the discharge process):

  DF-A12345-Smith-A-11-1-10

- Acceptance Chrono (used only by SVPP and VPP to give out a bed number when the I/P is ready to be admitted. This is part of the referral process and not the discharge process):

  AC-A12345-Smith-A-11-1-10

*26*

# Referral Data Fields



*27*

# CDCR Practice and Protocol:

■ When all Acute/ICF Referral Checklist items are scanned in order and entered into the data-fields within SharePoint with completed dates, this makes a "COMPLETED" Package.

■ These completed forms must meet the specific timeframes as indicated in the Program Guide – 2009 Revision and MOU's.

*28*

## "Incomplete Packages"



- When CDCR HQ receives an incomplete package, the referral is "Pended" – awaiting data from the institutions--the referral process **HALTS**.
- HQ will send a request for the required information--the compliance time clock is ticking.
- HQ can track date/time data from the institution and trend out where the weaknesses are in the flow of paperwork completion.

*29*

## When a Referral Package is Complete…What happens next?



- CDCR-HQ along with Health Care Placement Oversight Program (HCPOP) will determine the patient's placement according to custody criteria and send to DMH for processing. The Referral is now ready for review by a DMH Facility.

*30*



# DMH Discharge Package:

- The information is entered by DMH and uploaded to the SharePoint site.  The Discharge is "COMPLETED" when the final discharge date has been entered along with the other required fields.



*31*



# E-Mail Notification

- Implementation of the e-mail notification system will be in the near future.
- This system will provide the user auto-matic notification when referrals or discharges are ready for processing.

*32*