PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN – 96891
ERNEST GALVAN – 196065
JANE E. KAHN – 112239
LISA ELLS – 243657
AARON J. FISCHER – 247391
315 Montgomery Street, 10th Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER – 158255
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

BINGHAM McCUTCHEN, LLP
WARREN E. GEORGE – 53588
Three Embarcadero Center
San Francisco, California  94111-4066
Telephone:    (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      Plaintiffs,

    v.

EDMUND G. BROWN, JR., et al.,

      Defendants.[1]

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS WAITLISTS FOR INPATIENT CARE AND TO REDUCE HARMS INFLICTED ON CLASS MEMBERS ON WAITLISTS**

---

[1] The names of Defendants currently serving and their official capacities have been substituted pursuant to Fed. R. Civ. P. 25.

[479124-7]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

I.    PROCEDURAL HISTORY ............................................................................... 1

    A.    Order for Defendants to Submit Plan ................................................... 1

    B.    History of Delays in Access to Inpatient Care and Related Failures ....... 3

II.   CONTENTS OF THE DMH PLAN ................................................................... 7

    A.    Defendants' Plan to Address Inpatient Care Waitlists .......................... 7

    B.    Defendants' Plan to Reduce the Harms Inflicted on Patients Lingering on
        Inpatient Waitlists .............................................................................. 7

    C.    Defendants' Report of Impact of DMH Plan on Waitlists to Date .......... 8

III.  DEFENDANTS' DMH PLAN IS INADEQUATE AND FAILS TO ADDRESS
     THE COURT'S CONCERNS ............................................................................ 9

    A.    Defendants' Plan to Reduce or Eliminate Waitlists Is Deficient and
        Unresponsive to the Court's Order ..................................................... 9

        1.    The Extended Enhanced Outpatient Program Care Plan Is Not
            Supported by Sufficient Staff and Other Resources, and Should
            Not Be Used as a Means to Remove Patients in Need of ICF from
            the Waitlist. ............................................................................. 9

        2.    Defendants' Expansion of the ICF Pilot Project Plan Is a Grossly
            Inadequate Means to Reduce or Eliminate the Inpatient Waitlists. ......... 11

        3.    Defendants' Rehashing of Current Bed Projects Is Unresponsive
            to the Court's Order ................................................................ 12

    B.    Defendants' Plan to Reduce the Harm to Class Members Denied
        Prescribed Inpatient Care Due to the Waitlists is Deficient and
        Unresponsive to the Court's Order .................................................... 13

IV.   THERE IS AN URGENT AND COMPELLING NEED FOR THE COURT TO
     ORDER EFFECTIVE RELIEF TO REMEDY ONGOING
     CONSTITUTIONAL VIOLATIONS HARMING CLASS MEMBERS. ................ 14

    A.    There are Hundreds of Class Members on Inpatient Waitlists in Spite of
        Numerous Unused Inpatient Beds. ..................................................... 14

[479124-7]

B.    There Is an Overwhelming Need for Judicially-Ordered Relief to Remedy the Continued Violation of Class Members' Eighth Amendment Rights.................................................................................... 17

    1.    Defendants must *address and eliminate artificial and irrational barriers* preventing class members from receiving clinically necessary inpatient treatment. .................................................. 18

    2.    Defendants must *use all existing resources* that have been designated to provide inpatient care to *Coleman* class members *for Coleman* class members. ...................................................... 20

    3.    Defendants must *expedite long-term projects* necessary to reduce or eliminate the waitlists. ............................................. 21

    4.    Defendants must make *serious and concrete commitments* to provide treatment services that reduce the ongoing harm to class members who remain in an improper level of care while waiting for an available inpatient bed. .................................... 21

CONCLUSION ............................................................................................. 22

[479124-7]

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*Bounds v. Smith*,
 430 U.S. 817 (1977)..........................................................................................................18

6

*Coleman v. Schwarzenegger*,
 2009 U.S. Dist. LEXIS 67943 (E.D. Cal. Aug. 4, 2009), *appeal pending*, 103
 S. Ct. 3413 (2010)..............................................................................................................5

*Coleman v. Wilson*,
 1994 U.S. Dist. LEXIS 20786 (E.D. Cal. June 6, 1994) ...........................................3

*Coleman v. Wilson*,
 912 F. Supp. 1282 (E.D. Cal. 1995).................................................................................1

*Lewis v. Casey*,
 518 U.S. 343 (1996)..........................................................................................................18

### Statutes

18 U.S.C. § 3626(a) ....................................................................................... 1, 17, 18, 22

Cal. Penal Code §§ 1026-1027 .......................................................................... 16, 19

Cal. Penal Code §§ 1367-1376 .......................................................................... 16, 19

Cal. Penal Code §§ 2960-2981 .......................................................................... 16, 19

Cal. Welf. & Inst. Code §§ 6600-6609.3 ............................................................ 16, 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

[479124-7]

1

**TABLE OF ABBREVIATIONS**

| APP | Acute Psychiatric Program |
|-----|---------------------------|
| ASH | Atascadero State Hospital |
| C5/C6 | Salinas Valley Psychiatric Program Intermediate Care Units located inside prison housing C5 and C6 |
| CDCR | California Department of Corrections and Rehabilitation |
| CMF | California Medical Facility |
| CSH | Coalinga State Hospital |
| EECP | Extended Enhanced Outpatient Program Care Plan |
| EOP | Enhanced Outpatient Program |
| DMH | Department of Mental Health |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| PSH | Patton State Hospital |
| SVPP | Salinas Valley Psychiatric Program |

[479124-7]

# INTRODUCTION

This Court has found that "[t]imely access to psychiatric hospitalization is a crucial part of the provision of constitutionally adequate mental health care to persons incarcerated in the Department of Corrections and Rehabilitation (CDCR)." Order at 2, Dkt. No. 2930, Aug. 8, 2008 (citing *Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995)). Defendants have a constitutional obligation to provide timely psychiatric hospitalization, or inpatient care, to mentally ill CDCR prisoners at the Intermediate Care Facility (ICF) and Acute Psychiatric Program (APP) levels of care. Such access to necessary care must be provided by the State, whether at CDCR or Department of Mental Health (DMH) facilities.

In spite of numerous orders by the Court requiring that substantial steps be taken to ensure that *Coleman* class members are provided this crucial component of constitutionally adequate mental health care, Defendants have failed to submit a sufficient plan to address this serious problem that has persisted for years. As Defendants' own submission to the Court makes clear, Defendants' plan will not effectively reduce the still massive waitlist for inpatient treatment in a timely way, and continues the unconscionable practice of leaving inpatient beds vacant in spite of the existing waitlists. Defendants also fail to provide a sufficient plan or tangible commitment to reduce the harm inflicted on prisoners who face denials and delays of inpatient care based on Defendants' exclusionary policies and artificial barriers.

Plaintiffs request that this Court order specific relief that will address the serious problem of waitlists. Plaintiffs propose relief, as detailed below, that is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a).

## I.    Procedural History

### A.    Order for Defendants to Submit Plan

On March 31, 2010, the Court found that the waitlists for mentally ill prisoners in need of and referred for inpatient care constituted a "serious and substantial problem." Order at 3, Dkt. No. 3831. At that time, the Court identified 574 prisoners on the waitlist for the high-custody Salinas Valley Psychiatric Program (SVPP) ICF beds, and as many as 97 prisoners on the

1

[479124-7]

1    waitlist for APP level of care.  *Id.* at 2-3 & n.1.  The ICF and APP units are operated by DMH,

2    and generally receive patient referrals from mental health clinicians at CDCR institutions.  The

3    Court recognized that the existing short-term bed projects to enhance capacity for inpatient care

4    "will not be sufficient to eliminate the wait lists," and noted that existing long-term bed projects

5    would not be activated for three years at the earliest.  *Id.* at 3.

6         Based on these findings, the Court directed Defendants to "forthwith direct their

7    attention" to addressing the problem of inpatients waitlists.  *Id.*  The Court ordered that "[w]ithin

8    ninety days, under the guidance of the special master[,] defendants shall work together to

9    develop a plan to reduce or eliminate the wait lists for inpatient care and, in the interim, to better

10   serve the treatment needs of *Coleman* class members placed on such lists."  *Id.*  Defendants were

11   required to submit their plan to the Court within 120 days of the March 31, 2010 order.  *Id.* at 4.

12   Defendants were unable to comply with this Court-ordered deadline, and sought a 120-day

13   extension of time to submit their plan.  The parties stipulated to this extension, which was

14   granted by the Court.  Order, Dkt. No. 3894, Aug. 4, 2010.

15        On November 24, 2010, Defendants submitted Defendants' Plan Re: Intermediate Care

16   Facility and Acute Inpatient Waitlists (hereinafter, the "DMH Plan") to the Court.  Dkt. No.

17   3962.  On January 3, 2011, Plaintiffs provided comments on Defendants' plan to the Special

18   Master Team and Defendants, documenting concerns and requesting additional information.  On

19   January 18, 2011, counsel for Plaintiffs and Defendants participated in a telephone conference

20   led by the Special Master and his team to discuss components of the DMH Plan and Plaintiffs'

21   concerns.  On February 4, 2011, Defendants provided supplemental materials on components of

22   the DMH Plan.

23        On February 7, 2011, the Court signed a Stipulation and Order in which the parties agreed

24   that Plaintiffs would not object to the following sections of the DMH Plan: (a) Section II.B.1.c,

25   Initiation of a Statewide Clozapine Initiation Policy; (b) Section II.B.1.d, Positive Behavioral

26   Services; (c) Section II.B.1.e., Review of SVPP and APP Waitlists; (d) Section II.B.2,

27   Concurrent Review; (e) Section II.B.3.b, Frequent Inpatient Hospitalizations; (f) Section II.B.4,

28   Additional Transition Planning and Continuity of Care Processes; and (g) Section II.D.,

SharePoint.  Stipulation and Order re: Defendants' Plan on the Intermediate Care Facility and Acute Inpatient Waitlists ¶ 2, Dkt. No. 3979, Feb. 7, 2011.  The Court approved the parties' proposed briefing schedule for Plaintiffs' objections to the DMH Plan.  *Id.* ¶¶ 2-3.

### B.    History of Delays in Access to Inpatient Care and Related Failures

While the Court is aware of the long history of Defendants' failures to ensure that *Coleman* class members receive timely access to critical inpatient mental health treatment, a brief summary of efforts to remedy this problem over the last decade and a half provides important context in assessing the adequacy of Defendants' current DMH Plan.

At the *Coleman* trial (1993), the evidence showed systematic delays in access to inpatient care at DMH facilities, resulting in transfer delays of "several months."  *Coleman v. Wilson*, 1994 U.S. Dist. LEXIS 20786, at *67 (E.D. Cal. June 6, 1994).  The Court found that "[s]ince these persons are inmates exhibiting symptoms deemed by a staff physician to require inpatient hospitalization for psychiatric illness, the delays are egregious."  *Id.*  The Court ordered steps to remove the barriers and delays that prevented severely mentally ill prisoners from accessing such care.  *See* Order, Dkt. No. 945, May 21, 1998 (approving State's plans for inpatient care to be provided by DMH).  Delays in access to inpatient care continued, however, and the Court directed the Special Master to investigate these problems and to assist Defendants in developing solutions.  *See, e.g.*, Special Master Interim Report on DMH Inpatient Care, Dkt. No. 1143, Mar. 31, 2000; Order, Dkt. No. 1195, Aug. 28, 2000 (adopting recommendations of Special Master report).

After several delays, the State expanded its inpatient capacity, but a substantial shortage of inpatient care beds remained.  In 2003, the State opened the first new inpatient facility contemplated under the *Coleman* remedial plans, a 64-bed standalone inpatient ICF unit at Salinas Valley State Prison, which was originally planned for opening in 2001.  The Court found in July 2004 that further involvement by the Special Master was needed due to "defendants' repeated failure to adequately assess the unmet need for DMH inpatient beds for seriously mentally ill inmates in the state prison population, and the concomitant delays that have attended access to such beds."  Order at 1-2, Dkt. No. 1594, July 9, 2004.  The Court prohibited the State

3

[479124-7]

1   from closing two inpatient programs that it had planned to close with the activation of the 64-bed

2   Salinas Valley unit, and set new deadlines for completion of an "unmet inpatient bed needs"

3   study, as well as other measures regarding needed additional inpatient capacity. *Id.* at 3-5. The

4   initial study of previously unidentified inpatient needs, completed in March 2005, found over

5   500 state prisoners who needed inpatient care but who had not been referred. *See* 15th Report of

6   Special Master at 377, Dkt. No. 1746, Jan. 23, 2006. Also in March 2005, the State submitted a

7   plan to meet inpatient needs through the construction of three regional facilities, each with 1,500

8   beds, to be completed in 2013. The state legislature, however, rejected this plan. *Id.* at 378. In

9   August 2005, the State developed an alternative plan, resulting in a Special Master

10  recommendation that the State submit a new plan, and that the Court hold an evidentiary hearing

11  on the problem of chronic inpatient bed shortages. *See* Order, Dkt. No. 1772, Mar. 3, 2006

12  (setting April 2006 evidentiary hearing).

13         Following the evidentiary hearing in April 2006, the Court concluded that "[i]t is

14  undisputed that the [inpatient bed] shortage is leaving critically mentally ill inmates languishing

15  in horrific conditions without access to immediately necessary mental health care." Order at 2,

16  Dkt. No. 1800, May 2, 2006. The State's then-Director of Correctional Health Care Services

17  repeatedly referred to the mental health bed shortage as a "crisis." *Id.* At that time, the prison

18  system had a shortage of 125 ICF beds. *Id.* The Court ordered a number of steps, including

19  acceleration of the activation of some inpatient beds planned for Salinas Valley State Prison,

20  identification of patients on the ICF waitlist appropriate for placement at Atascadero State

21  Hospital (ASH) or Coalinga State Hospital (CSH), and prompt activation of 50 ICF beds at CSH.

22  *Id.* at 5. The Court further directed Defendants to report on the feasibility of creating 30

23  additional higher-custody ICF beds at CSH. *Id.* Shortly thereafter, the Court added the director

24  of DMH as a defendant to the action, finding that "DMH's attempts to remedy the shortage of

25  inpatient beds [have] been marked by delay and difficulty." Order at 2, Dkt. No. 1855, June 28,

26  2006.

27         Defendants filed further plans to provide beds for class members in need of mental health

28  treatment. Defendants submitted a Mental Health Bed Plan in December 2006, Dkt. No. 2091,

4

[479124-7]

1   which the Special Master described as "even less than a plan for a future plan; it is more

2   accurately, a concept paper."  Special Master's Rep. & Recs. at 14, Dkt. No. 2133.  Defendants'

3   August 2007 Supplemental Plan, Dkt. No. 2375-2, was approved by the Court, with requirements

4   for Defendants to file supplemental information regarding Defendants' plans for CDCR to

5   replace DMH in providing licensed inpatient psychiatric care to CDCR prisoners, as

6   recommended by the Special Master.  Order, Dkt. No. 2461, Oct. 18, 2007.  Yet, by July 2008,

7   Defendants had changed course, asserting that DMH would continue to provide "all inpatient

8   acute and intermediate mental health services instead of transferring responsibilities to provide

9   those services to the CDCR."  *See* Defs.' Mental Health Bed Plan, Ex. Q, Dkt. No. 3064-1, Sept.

10   29, 2008.

11      At the time of the three-judge court trial on severe overcrowding in the prison system, it

12   was undisputed that the State had a shortage of 166 ICF beds, that DMH had maintained a

13   waitlist for those beds since at least 2007, and that the ICF waitlist had steadily expanded to as

14   high as 173 patients.  *See* Pls.' Objs. to Bed Plan Statement and Request for Order Requiring

15   Defs. to Prepare and Implement Interim Emergency Plan to Address ICF, MHCB and EOP Bed

16   Shortages at 22, Dkt. No. 3545, Mar. 23, 2009.  The three-judge court found "[a]t the level of

17   care reserved for the most mentally ill, inmates sometimes wait as much as a year before being

18   transferred to inpatient beds."  *Coleman v. Schwarzenegger*, 2009 U.S. Dist. LEXIS 67943, at

19   *166 (E.D. Cal. Aug. 4, 2009), *appeal pending*, 103 S. Ct. 3413 (2010).

20      Following the three-judge court overcrowding trial, this Court ordered a hearing in light of

21   its "substantial questions" as to the status of Defendants' plan to construct and to provide an

22   appropriate number of mental health beds for *Coleman* class members.  Order, Dkt. No. 3515,

23   Feb. 17, 2009.  Following extensive briefing, this Court ordered Defendants to take steps to

24   promptly activate a number of bed projects and to address problems related to unmet needs for

25   inpatient care among class members.  *See* Order, Dkt. No. 3556, Mar. 31, 2009.  In that order, the

26   Court recognized the Special Master's concern that "artificial barriers are being placed on

27   admissions from CDCR to ASH," and noted that, "[s]hould these barriers interfere with referrals

28   for inpatient care . . . at any point," it would become necessary for Defendants "to develop new

5

[479124-7]

1    policies and procedures to expedite admissions to ASH." *Id.* at 3.

2        Meanwhile, the inpatient care crisis deepened. The waitlist for male high-custody ICF

3    beds rose from 141 class members in April 2009 to 520 class members in December 2009. *See*

4    Decl. of Victor Brewer Supp. Def.' Opp. Pls.' Emergency Mot. for Evid. Hr'g Re: C5/C6 Project

5    at Salinas Valley State Prison ¶ 10, Dkt. No. 3913-3, Sept. 16, 2010. It is with this history that

6    the Court has once again directed Defendants to take affirmative steps to address the problem of

7    inpatient waitlists for class members. *See, e.g.*, Order ¶ 8, Dkt. No. 3613, June 18, 2009

8    (ordering that the admission rate at ASH ICF beds be no less than ten per week until all 256 beds

9    are filled by *Coleman* class members); Order at 3, Dkt. No. 3831, Mar. 31, 2010 (directing the

10    Special Master to assist the State "to develop a plan to reduce or eliminate the wait lists for

11    inpatient care and, in the interim, to better serve the treatment needs of *Coleman* class members

12    placed on such lists"); Order at 4, Dkt. No. 3945, Oct. 22, 2010 (ordering that admission rate for

13    SVPP ICF beds be no less than 10 per week until all C5 and C6 beds are filled by *Coleman* class

14    members).

15        The problem of mentally ill prisoners lingering on the inpatient waitlist for months, and

16    even years, following referral remains as serious and urgent as ever. As discussed herein, there

17    are still hundreds of Coleman class members on the inpatient waitlists. *See* Declaration of Aaron

18    J. Fischer in Support of Plaintiffs' Objections to Defendants' Plan to Address Waitlists for

19    Inpatient Care and to Reduce Harms Inflicted on Class Members on Waitlists (hereinafter

20    "Fischer Decl."), Ex. A, Jan. 2011 DMH Monthly Bed Utilization Report (listing 293 patients on

21    the waitlist, including 47 patients who have been waiting for more than one year for prescribed

22    inpatient care). Some patients have remained on an inpatient waitlist for almost two years. *Id.*

23    Other prisoners have been removed from the inpatient waitlists after extended waits, having been

24    admitted to a crisis level of care unit, such as a Mental Health Crisis Bed (MHCB), or having

25    simply reached their parole date. Plaintiffs have previously presented evidence of at least two

26    suicides committed by prisoners waiting in administrative segregation cells for transfer to

27    inpatient mental health care. *See* Order at 3, Dkt. No. 3945, Oct. 22, 2010. Meanwhile, as

28    discussed herein, there are substantial numbers of open and unused DMH inpatient beds.

6

[479124-7]

1   **II.     Contents of the DMH Plan**

2          **A.     Defendants' Plan to Address Inpatient Care Waitlists**

3          The DMH Plan submitted by Defendants identifies five discrete approaches to addressing

4   the ICF and APP inpatient waitlists: (1) Future staffing and implementation of an Extended

5   Enhanced Outpatient Program Care Plan to provide treatment interventions targeted to certain

6   patients who have a clinical history of requiring inpatient care; (2) Utilization Management;

7   (3) Repetition of the previously attempted "ICF Pilot Project" of reviewing some SVPP ICF

8   waitlists to determine whether they can be placed in lower-custody ICF beds; (4) Use of a new

9   on-line information system for sharing of patient information between CDCR and DMH; and

10  (5) Reiteration of Defendants' existing plans for construction of additional ICF and APP units.[2]

11
12         **B.     Defendants' Plan to Reduce the Harms Inflicted on Patients Lingering on
            Inpatient Waitlists**

13         Defendants state that CDCR Headquarters has contacted CDCR institutions "requesting

14  updated clinical status of the inmate-patients [on the waitlist] as well as *provided encouragement*

15  to increase face-to-face activities between clinician staff and inmate-patients and one-on-one

16  contacts *as resources allowed*."  DMH Plan at 22 (emphasis added).  Defendants further state

17  that they have surveyed thirty (30) CDCR institutions, and found that a number of interim

18  services beyond Enhanced Outpatient (EOP) program requirements may be provided to prisoners

19  on the waitlist.  *Id.* at 23.  The additional services that may be provided include: more frequent

20  interdisciplinary treatment team (IDTT) meetings; more frequent psychiatrist reviews; referral to

21  Coordinated Clinical Assessment Team consultation and development of individualized

22  treatment plans; assignment of a psychologist to patients on the SVPP waitlist; placements in

23  Mental Health Crisis Beds or Outpatient Housing Units, as appropriate; placement on a high risk

24  list as appropriate with high risk progress notes documented weekly; more frequent contact with

25  a case manager; clustered housing of patients on the waitlist; and use of a Positive Behavioral

26

27  _____
28  [2] Plaintiffs have no objections to Defendants' Utilization Management Plan and to Defendants'
    activation of the SharePoint System.

[479124-7]

1    Plan.  *Id.*  Defendants provide no commitment of additional staff or resources for interim

2    services, and no formal plan or policy to ensure that any interim services are provided.  They

3    instead state that interim services may be provided as "consistent with available resources."  *Id.*

4    **C.    Defendants' Report of Impact of DMH Plan on Waitlists to Date**

5    Defendants provide a summary of the impact of their efforts to address the inpatient

6    waitlists, charting waitlist statistics dating back to March 16, 2010, and projections through

7    March 15, 2014.  DMH Plan at 24-25.

8    This information demonstrates that Defendants have *no* plans to expedite ICF admissions

9    of *Coleman* class members on the waitlist, including taking steps to fill open, unused ICF beds,

10   such as those at ASH and CSH.  Instead, Defendants rely on rates of discharges from inpatient

11   facilities, removal of prisoners from the waitlist through utilization management and other

12   mechanisms, and the natural process of prisoners reaching their parole dates while still on the

13   waitlist (thus never having received the prescribed inpatient care).  DMH Plan at 12.  Defendants

14   also continue to rely on scheduled short- and long-term construction projects that this Court has

15   already found to be insufficient to timely remedy the "serious and substantial problem" of the

16   waitlists.  Order at 3, Dkt. No. 3831, Mar. 31, 2010.  According to Defendants' own projections,

17   once the SVPP C5/C6 units are filled, the number of class members on the ICF waitlist will

18   remain relatively consistent – between 172.4 and 248.7 – until June 2013.  DMH Plan at 24-25.

19   Defendants estimate that the waitlist will remain above 100 at least until the fall of 2013, and that

20   the waitlist will not be eliminated until at least March 2014, more than three years from now.

21   Some progress has been made with respect to the APP waitlist, with the recent activation

22   of the P1 and P2 wings at California Medical Facility (CMF).  Defendants note in the DMH Plan

23   that they expected the waitlist to be reduced to zero or near zero by December 2010, once the P1

24   APP unit at CMF was fully occupied.  DMH Plan at 24.  This would be, of course, an

25   improvement from the 97-patient APP waitlist that existed in March 2010.  *See* Order at 3 n.1,

26   Dkt. No. 3831, Mar. 31, 2010.  However, as of January 31, 2011, 22 patients remained on the

27   APP waitlist, despite Defendants' report that there were approximately 25 vacant APP beds at

28   CMF.  *See* Fischer Decl. ¶ 12 & Ex. A.

8

[479124-7]

**III.    Defendants' DMH Plan Is Inadequate and Fails to Address the Court's Concerns**

    **A.    Defendants' Plan to Reduce or Eliminate Waitlists Is Deficient and Unresponsive to the Court's Order**

        **1.    The Extended Enhanced Outpatient Program Care Plan Is Not Supported by Sufficient Staff and Other Resources, and Should Not Be Used as a Means to Remove Patients in Need of ICF from the Waitlist.**

Plaintiffs object to Defendants' plan to use the new Extended Enhanced Outpatient Program Care Plan (EECP) as a means of removing *Coleman* class members from the ICF waitlist.  Plaintiffs also object to Defendants' failure to commit necessary resources for timely implementation of EECP services.  EECP, if it is implemented and staffed in the future, may provide a means of reducing harm for those on the waitlist, and may, as Defendants predict, serve a group of patients who are not responding to either ICF treatment or to treatment in the existing understaffed EOP programs.  Even once this group of patients is identified and moved to EECP, there will remain the core group of patients who need ICF care, not improved EOP care, for whom this program will do nothing.

Defendants describe the EECP as designed to provide "treatment interventions targeted to the subgroup of EOP inmate-patients who exhibit serious *and* persistent mental illness, and whose level of functioning is insufficient to allow general population placement."  DMH Plan at 4.  Defendants caution that the EECP "should be considered not in terms of a new program or level of care but rather in terms of a specialized treatment continuum (module) within the EOP level of care."  *Id.*  Plaintiffs were informed during the January 18, 2011 phone conference with Defendants' counsel and the Special Master that the staffing levels in the EECP plan are the same as those required by the general MHSDS staffing plan, but would nevertheless constitute an enhancement in staffing given the fact that other EOP units are not presently meeting required staffing levels.  *See* Fischer Decl. ¶¶ 7-8.

It is clear that the EECP plan will require significant additions in staffing and other resources in order to provide the enhanced hours of treatment and other therapeutic components described in the plan.  *See* Fischer Decl., Ex. B, Defs.' Supp. Materials, EECP at 8 ("Enhanced staffing is required to meet the extensive one-to-one attention.").  Defendants have not provided

9

[479124-7]

1  information as to what staff has been hired for the EECP, and concede that staffing problems will

2  delay the initiation of the delivery of EECP services.  *See* Fischer Decl., Ex. B at 1 ("Currently

3  due to the hiring freeze, CDCR estimates that it will take up to two months from staff freeze

4  resolution to hire and train civil service staff to begin delivering services.").

5         This "plan" also targets a poorly defined sub-group of EOP patients, including prisoners

6  who "do not meet the criteria for referral to ICF treatment," "are not recommended for referral to

7  ICF treatment, because the IDTT determines [he] is unlikely to benefit," or "ha[ve] been treated

8  at the DMH ICF level-of-care and continue[] to display significant emotional and behavioral

9  impairments."  DMH Plan Att. A, Pt. II.  The first two of these sub-categories would not capture

10  *any* patients for whom inpatient ICF care is currently clinically indicated.  Likewise, some

11  patients in the third sub-category may very well benefit from stabilization in an ICF program but

12  have, in the past, been discharged into an EOP program that fails to provide the therapeutic

13  supports necessary to sustain the benefits of ICF inpatient care.  Defendants state that they have

14  identified 68 patients currently on the ICF waitlist appropriate for EECP, *see* DMH Plan at 5, yet

15  it remains unclear whether Defendants now consider these patients inappropriate for ICF level of

16  care, in need of interim services while awaiting admission into an ICF program, or capable of

17  stabilization through outpatient care.[3]  Plaintiffs object to the removal of patients from the

18  waitlist upon placement in EECP, prior to any clinical determination that ICF inpatient treatment

19  is no longer clinically necessary.[4]  Plaintiffs further object to Defendants' failure to timely secure

20

21

---

22  [3] Defendants state that class members referred for EECP will not be removed from the waitlist

23  until they are housed at a designated EECP institution and an EECP treatment plan is developed.
DMH Plan Att. A, Pt. IV.  Defendants further state that, in cases where a patient's EECP

24  "suitability is poor," his ICF referral will be "reactivated" and he will be placed back on the
waitlist at the same position he was in prior to removal from the waitlist.  DMH Plan at 5.  This

25  practice will almost certainly create unnecessary coordination problems, confusion among

26  clinicians, and further delays in the delivery of necessary inpatient care.

27  [4] To the extent the EECP plan can provide necessary enhanced treatment and services to patients
referred for ICF level of care and waiting for an open bed, Plaintiffs would support its timely

28  implementation.

1   necessary staff and other resources required to implement the services described in the EECP

2   plan.

### 2.   Defendants' Expansion of the ICF Pilot Project Plan Is a Grossly Inadequate Means to Reduce or Eliminate the Inpatient Waitlists.

5        Plaintiffs object to Defendants' planned expansion of the ICF Pilot Project as inadequate

6   and unresponsive to the Court's order.  The objective of the ICF Pilot Project was to review

7   high-custody SVPP ICF referrals based on revised custody case factors and guidelines, and to

8   evaluate patients, on a case-by-case basis, for possible referral to a low-custody ICF bed.

9   Plaintiffs have supported the custodial review of patients on the high-custody SVPP ICF waitlist,

10  and have encouraged Defendants to reconsider the exclusionary criteria that have been applied to

11  DMH referrals.  *See* Fischer Decl., Ex. C, CDCR Instructional Memorandum at 7-9, Attachment

12  6 (DMH-ICF Custody Criteria for ICF Pilot Project), July 16, 2009.  Plaintiffs object to such

13  exclusionary criteria, which have resulted in the denial of admission for hundreds of class

14  members into *open* low-custody ICF beds, and the consequent protracted waits on the SVPP ICF

15  high-custody waitlist.

16       Defendants note in their plan that, beginning in January 2011, they will review the SVPP

17  ICF waitlist on a quarterly basis to determine if referrals that were recommended for SVPP ICF

18  placement have had recent case factor changes, such as adjustments in custody level or

19  placement score, that would warrant a patient's placement in a lower-custody inpatient unit.

20  DMH Plan at 16-17.  Defendants concede that no formal process is in place for such reviews, and

21  report that they expect such reviews to effect a reduction of the waitlist at a rate of approximately

22  *two patients* per month.  *Id.*  For a waitlist of several hundred mentally ill prisoners in critical

23  need of immediate inpatient care, this number is woefully inadequate.

24       The failure of the related DMH-ICF Pilot Program for evaluation of prisoners presently

25  housed in high-custody inpatient facilities is instructive.  In addition to the above-described plan

26  to review patients referred for and awaiting inpatient care, this Court recently ordered Defendants

27  to "meet with the special master to develop a review program modeled on the DMH-ICF Pilot

28  Program for evaluation of inmates presently housed in Level IV [high-custody] inpatient hospital

11

[479124-7]

1  facilities to determine whether any of those inmates can be transferred to another ICF facility."

2  Order ¶ 5, Dkt. No. 3929, Oct. 5, 2010. Defendants were directed to complete this review and to

3  provide a report on the outcome. *Id.* On January 25, 2011, Plaintiffs' counsel received

4  Defendants' report (dated December 7, 2010) on this court-ordered review of patients in high-

5  custody inpatient facilities for possible transfer to a lower-custody facility, where beds currently

6  sit vacant, thus clearing the way for the admission of other class members on the waitlist. *See*

7  Fischer Decl., Ex. D, Report on Outcome of Evaluation of Inmates in Level IV DMH Inpatient

8  Hospital Facilities for Transfer to Another ICF Facility, Dec. 7, 2010. This review led to the

9  identification of 12 patients housed in a high-custody inpatient facility as potential candidates for

10 transfer to a low-custody inpatient placement within DMH. Defendants then conducted the

11 "same review used in the ICF Pilot Program to determine whether [the 12 patients were] eligible

12 for a case-by-case review for possible referral to a low-custody bed." *Id.* at 3. The outcome of

13 Defendants' review was striking: *None* of the 12 identified patients were found appropriate either

14 for a case-by-case evaluation under the ICF Pilot Program or for transfer to a lower-custody

15 setting. *Id.* at 4.

16      This outcome – zero patients referred to lower-custody ICF beds – demonstrates that

17 merely repeating or expanding the ICF Pilot Project Plan will not address the waitlists and

18 remedy the substantial constitutional violations that persist. Instead, more direct measures are

19 needed to address the long-standing resistance of DMH to care for patients whom they deem too

20 dangerous for their forensic hospital system.

21
        **3.    Defendants' Rehashing of Current Bed Projects Is Unresponsive to the**
22      **Court's Order.**

23      Defendants' rehashing of current bed planning projects submitted to the Court long before

24 the March 31, 2010 order are of little to no consequence for purposes of determination of the

25 adequacy of the DMH Plan. In the March 31, 2010 order, the Court concluded that Defendants'

26 short-term bed projects were insufficient to eliminate the waitlists, and ordered Defendants to

27 "forthwith direct their attention" to addressing the problem of inpatient waitlists. Order, Dkt. No.

28 3831 at 3. These long-term bed projects were already ordered when the Court issued its

1    additional order to address the waitlists. *Id.* With the exception of the 64-bed ICF project

2    scheduled for activation in fall 2011, these long-term bed projects remain years away from

3    completion. *See* DMH Plan at 20-22. While this section of the DMH Plan may offer a summary

4    of these projects long-known by the Court, it is not responsive to the Court's order to set forth

5    what steps Defendants intend to take *forthwith* to reduce or eliminate the inpatient waitlists.[5]

6        **B.    Defendants' Plan to Reduce the Harm to Class Members Denied Prescribed
          Inpatient Care Due to the Waitlists is Deficient and Unresponsive to the
7        Court's Order.**

8        Defendants have committed no additional staff or resources to provide necessary care to

9    persons being kept out of prescribed inpatient beds. The plan is thus insufficient and

10   unresponsive to this Court's order of March 31, 2010.

11       Defendants' plan is filled with qualifying language and makes clear that Defendants

12   provide no actual commitment of staff or resources to fill the dangerous gap in services for

13   patients who have been prescribed inpatient care, but are not transferred. Defendants state that

14   they are "*provid[ing] encouragement* to increase face-to-face activities between clinician staff

15   and inmate-patients [on the waitlist] and one-on-one contacts *as resources allowed*." DMH Plan

16   at 22 (emphasis added). Defendants then list a variety of interim services that may be provided

17   at CDCR institutions. *Id.* at 23. These services, Defendants concede, are provided as "*consistent*

18   *with available resources*" and "within [each institution's] *resource constraints.*" *Id.* at 23

19   (emphasis added). Defendants provide no information as to how many institutions are providing

20   these vital services, and document no consistent service requirements to be provided system-

21   wide. This failure is not surprising, given that *no* additional resources have been allocated to

22   care for patients who, as Defendants admit, "need ICF care, but are on the waitlist because there

23

24   _____

25   [5] The only bed project referenced in the DMH Plan that was not presented to the Court prior to
     the March 31, 2010 order is the amended plan to convert the Stark Juvenile Justice Facility to an
26   adult facility to house EOP-General Population and EOP-Administrative Segregation Unit
     prisoners. Amended Stark Plan, Dkt. No. 3845, 3845–2, May 13, 2010. This project, which
27   would not create additional inpatient beds for *Coleman* class members on the waitlists, has, in
     any event, been indefinitely delayed after funding was not approved. *See* Defs.' Update to Court
28   Re: Const. and Funding of Defs.' Amended Stark Plan at 5-6, Dkt. No. 3941, Oct. 19, 2010.

13

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS WAITLISTS FOR INPATIENT CARE AND TO
REDUCE HARMS INFLICTED ON CLASS MEMBERS ON WAITLISTS - CASE NO. CIV S 90-0520 LKK-JFM

1   is no open bed available." *Id.* at 22.

2          Some items listed as "interim services beyond EOP program requirements" do not in fact

3   represent an enhancement at all from what EOP patients should already be receiving, including

4   development of individualized treatment plans, placement in MHCBs or Outpatient Housing

5   Units as appropriate, and development of Positive Behavioral Plans. *See* MHSDS Program

6   Guide 12-4-6 (individual treatment plans must be completed for all EOP patients); MHSDS

7   Program Guide 12-5-3 (any prisoner "suffering from an acute, serious mental disorder resulting

8   in serious functional disabilities, or who is dangerous to self or others, shall be referred to a

9   MHCB"); MHSDS Program Guide 12-4-2 (EOP level of care to include treatment that "focuses

10  on achieving behavioral control and the development of socially acceptable behavior").

11         Notably, DMH – the State agency that has already admitted, on paper, the waitlisted

12  patients – has committed no additional staff or resources to patients on the inpatient waitlists.

13  The only services that DMH appears willing to provide are consultation services, which DMH

14  *already* provides through the Coordinated Clinical Assessment Team and the Positive Behavioral

15  Support Team. Even this continued role in providing such services is conditional and uncertain

16  pursuant to Defendants' current plan, which states that such "[c]onsultation services would be on

17  a limited basis due to the potential workload and financial impact to the existing PBST services

18  at both DMH and CDCR." DMH Plan, Ex. 4 to Attachment B at 3.

19  **IV.    There Is an Urgent and Compelling Need for the Court to Order Effective Relief to
            Remedy Ongoing Constitutional Violations Harming Class Members.**

20

21         **A.     There are Hundreds of Class Members on Inpatient Waitlists in Spite of
                     Numerous Unused Inpatient Beds.**

22         Defendants report that, as of November 8, 2010, there were 372 class members on the ICF

23  waitlist. DMH Plan at 25. As of January 31, 2010, there were 293 class members on the ICF

24  waitlist and 22 class members on the APP waitlist. *See* Fischer Decl., Ex. A. Patients referred

25  for ICF level of care had been on the waitlist for as long as 719 days. *Id.*

26         Meanwhile, there are currently over 100 *open* ICF beds designated for *Coleman* class

27  members requiring an ICF level of care. The 50-bed ICF unit at CSH designated for *Coleman*

28  class members remains completely unused, *see* Fischer Decl. ¶¶ 13, 15-16 & Ex. A, and

                                                14

[479124-7]

1    Plaintiffs are aware of no allocation of CSH staff or resources to provide care to *Coleman* class

2    members in need of ICF level of care.  The Court has mandated that these 50 beds be designated

3    for, and occupied by, *Coleman* class member in need of ICF level of care.  *See* Order at 5, Dkt.

4    No. 1800, May 2, 2006.  Similarly, the number of *Coleman* class members placed at the 256-bed

5    ICF unit at ASH has been declining steadily, dropping to 199 patients as of January 31, 2011.

6    *See* Fischer Decl. ¶¶ 14-15, Ex. A.  Defendants have reported that an additional 20 ICF beds at

7    CMF are currently vacant.  *See* Fischer Decl. ¶ 11 (94 of 114 ICF beds in the A2, A3, and P3

8    units at CMF filled as of February 2, 2011).  Given the ICF bed vacancies reported by

9    Defendants, there are thus at least *127* ICF beds in DMH facilities designated for *Coleman* class

10   members that are empty, in spite of several hundred patients lingering on the ICF waitlist.

11        Defendants should not be permitted to use custody classifications, or any other artificial

12   barriers, as a basis for denying class members timely access to appropriate mental health care.

13   That is exactly what is happening, however, with inpatient beds sitting unused while mentally ill

14   prisoners in crisis are made to wait indefinitely for the inpatient mental health care they need.

15   For male prisoners, this means being placed on a waitlist for as long as almost two years.  The

16   situation for female prisoners is also alarming.  Despite several open beds at the only inpatient

17   facility for female *Coleman* class members, Patton State Hospital (PSH), *see* Fischer Decl., Ex.

18   A (14 of 30 PSH beds occupied), at least two women referred for inpatient care were recently

19   denied admission based solely on Defendants' assessment of their "level of violence."  *See*

20   Fischer Decl. ¶ 6.  There is no alternative inpatient placement for these women, and Defendants

21   should not be permitted to deny them the level of care they require.[6]

22

23   _____

     [6]Defendants have also created a blanket exclusion from *all* ICF inpatient care for condemned

24   prisoners at San Quentin State Prison.  Defendants report that they have implemented a
     Specialized Treatment Plan to serve the needs of approximately 20 condemned prisoners who

25   have been identified as needing ICF level of care.  *See* Fischer Decl. ¶¶ 17-19.  Plaintiffs do not
     object to this new treatment program, but object to the continued blanket exclusion from DMH

26   inpatient admission for all condemned prisoners in need of inpatient care, regardless of whether
     the Specialized Treatment Plan proves effective in their individual cases.  Plaintiffs note that the

27   20 condemned prisoners identified as needing ICF level of care are not included in the ICF

28   waitlist statistics.  *See id.* Ex. A.

                                                    15

[479124-7]

1    Defendants attempt to explain the denials of admission to ICF beds at CSH, ASH, and

2    Patton State Hospital by referring to custody determinations and claims of patients'

3    "dangerousness."  The denial of admission based on the perceived dangerousness of *Coleman*

4    class members with mental illness is nonsensical and unjustifiable, given that DMH is *statutorily*

5    *responsible* for providing housing and treatment to individuals who have been committed as

6    "sexually violent predators," *see* Cal. Welf. & Inst. Code §§ 6600-6609.3, and as "severely

7    mentally disordered prisoners," *see* Cal. Penal Code §§ 2960-2981.  DMH-run state hospitals

8    provide housing and treatment to criminal defendants who have been found "not guilty by reason

9    of insanity," Cal. Penal Code §§ 1026-1027, or who have been found mentally incompetent to

10    stand trial, Cal. Penal Code §§ 1367-1376, regardless of their criminal history, their history of

11    violence, or assessed level of dangerousness.

12    In reality, DMH is uniquely qualified to provide inpatient care to *Coleman* class members

13    with mental illness requiring inpatient care, *including* those that may be dangerous.  Defendants

14    should be required to take appropriate steps to facilitate class members' timely admission into

15    DMH inpatient beds, whether by engaging in a comprehensive, good faith case-by-case review

16    of prisoner profiles or by providing the custody or security measures necessary to house patients

17    in available ICF beds.

18    With the recently activated APP units at CMF, patient admissions into open APP beds

19    must also proceed expeditiously.  *See* MHSDS Program Guide 12-6-5 (requiring that all patients

20    referred for APP level of care must be admitted within 10 days of the date of referral).

21    Defendants stated that the APP waitlist would be reduced to zero or near zero by December

22    2010.  DMH Plan at 24.  Yet, as of January 31, 2011, 22 patients remained on the waitlist,

23    despite Defendants' report that there were approximately 25 vacant APP beds at CMF.  *See*

24    Fischer Decl. ¶ 12 & Ex. A.  Twenty of the 22 patients on the APP waitlist had been waiting for

25    APP placement for more than ten days since the referral date, including 10 patients waiting for

26

27

28

[479124-7]

1  more than a month.  *See* Fischer Decl., Ex. A.[7]

2
3
    **B.    There Is an Overwhelming Need for Judicially-Ordered Relief to Remedy the Continued Violation of Class Members' Eighth Amendment Rights.**

4        The DMH Plan is, in the end, a plan for continued failures and constitutional harms.

5  Defendants have failed to present a plan that adequately addresses the massive waitlist for

6  inpatient treatment.  Defendants' proposals are insufficient to achieve anything resembling a

7  substantial reduction to the waitlist for the next several years.  Defendants continue to rely on

8  bed projects that this Court has already found to be insufficient to provide constitutionally

9  required timely access to inpatient mental health care.  Meanwhile, inpatient beds designated for

10 *Coleman* class members sit unused, an unconscionable disconnect between mental health care

11 supply and demand.  Defendants' plan also fails to include any actual commitment of resources

12 to reduce the harms faced by individuals on an inpatient waitlist; this aspect of the DMH plan is,

13 in effect, unresponsive to the Court's order.

14       Defendants' failure to adequately address the waitlist and to commit to the provision of

15 interim services necessary to reduce the harms being suffered by patients awaiting clinically

16 necessary inpatient treatment highlights the now indisputable fact that further judicial action is

17 required to ensure timely access to psychiatric hospitalization, which, as this Court has

18 confirmed, is a "crucial part of the provision of constitutionally adequate mental health care."

19 Order at 2, Aug. 8, 2008, Dkt. No. 2930.

20       The Prison Litigation Reform Act requires that prospective relief ordered in this action be

21 "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right,

22 and [be] the least intrusive means necessary to correct the violation of the Federal right."  18

23 U.S.C. § 3626(a).  This Court has properly given the State numerous opportunities to come up

24 with its own plans to address the serious and substantial problem of the lengthy inpatient

25
26 [7] An additional 9 *Coleman* class members were referred for and awaiting APP admission as of
January 31, 2011.  Defendants do not list these 9 patients on the waitlist, instead listing them
27 separately as "pending receipt of updates."  Each of these 9 patients had been awaiting admission
for more than 10 days from the date of referral, including 5 patients waiting for more than a
28 month.  *See* Fischer Decl., Ex. A.

[479124-7]

1  waitlists, and its devastating effects. *See Lewis v. Casey*, 518 U.S. 343, 361-363 (1996); *Bounds*

2  *v. Smith*, 430 U.S. 817, 832-833 (1977). Eight months after the Court directed Defendants to

3  develop a plan to reduce or eliminate the waitlists for inpatient care and reduce the harms faced

4  while people linger on those lists, it is plainly evident that more direction from the Court is

5  required to safeguard the Eighth Amendment rights of *Coleman* class members.

6      The Court should require Defendants to: (1) *address and eliminate artificial and*

7  *irrational barriers* preventing class members from receiving clinically necessary services, (2) *use*

8  *all existing resources* that have been designated to provide inpatient care to *Coleman* class

9  members, (3) *expedite long-term projects* necessary to reduce or eliminate the waitlists, and

10  (4) *make serious and concrete commitments* to providing enhanced interim services to class

11  members who remain in an improper level of care while waiting for an available inpatient bed.

12  Such relief is narrowly drawn, extends no further than necessary to correct the ongoing Eighth

13  Amendment violation, and constitutes the least intrusive means necessary to correct the violation.

14  *See* 18 U.S.C. § 3626(a).

15          1.      **Defendants must *address and eliminate artificial and irrational barriers***
16                  **preventing class members from receiving clinically necessary inpatient**
                    **treatment.**

17      Defendants should be directed to address and eliminate the artificial and irrational barriers

18  that prevent hundreds of patients referred for ICF level of care from being timely placed in an

19  ICF facility. Plaintiffs request a comprehensive, objective review of the exclusionary criteria

20  that prevent patients from being placed in ICF beds at lower-custody facilities, at which over 100

21  beds sit unused. Based on the outcomes of the DMH-ICF Pilot Program and related reports, it is

22  clear that Defendants are not capable of completing such a review themselves. An objective

23  review of the exclusionary criteria for DMH admission should thus be completed by an

24  independent expert appointed by the Court or by the Special Master.

25      Defendants report that a quarterly review of the SVPP ICF waitlist, initiated in January

26  2011, will lead to a waitlist reduction of two patients per month, a paltry impact in the context of

27  hundreds of mentally ill patients languishing for months or years before they can be admitted for

28  ICF care. The recent Court-ordered review of patients presently housed in high-custody ICF

[479124-7]

1  facilities for possible transfer to a lower-custody facility has proven even more meaningless, with

2  zero high-custody ICF patients being approved for transfer to a lower-custody facility for

3  purposes of opening desperately needed spots for other high-custody patients on the waitlist.

4      It is nonsensical for DMH to reject *Coleman* class members based on blanket exclusionary

5  criteria, including static custody factors that may be based on long-ago misconduct, or based on

6  determinations that class members are "dangerous."  DMH facilities, including ASH and CSH,

7  are responsible for providing housing and treatment to individuals who have been identified as

8  "sexually violent predators," *see* Cal. Welf. & Inst. Code §§ 6600-6609.3, or as "severely

9  mentally disordered prisoners," *see* Cal. Penal Code §§ 2960-2981, as well as criminal

10  defendants found "not guilty by reason of insanity," Cal. Penal Code §§ 1026-1027, or mentally

11  incompetent to stand trial, Cal. Penal Code §§ 1367-1376.

12      Defendants' practice is not only illogical, but harms public safety.  Mentally ill prisoners

13  can remain on the waitlist until they are released on parole, at which time they are released to the

14  community, without ever having received the prescribed inpatient treatment, and in whatever

15  decompensated condition they are in on their release day.  Given this reality, Defendants should,

16  at a minimum, be prohibited from excluding from any DMH ICF facility, including the lower-

17  custody ICF facilities at ASH and CSH, those *Coleman* class members who have been referred

18  for ICF level of care and have a scheduled parole date within one year.  There is no reasonable

19  basis for denying class members timely, constitutionally required mental health care based on

20  irrational exclusionary criteria and other artificial barriers that ignore DMH's own mission, the

21  State's constitutional obligations, and the interests of public safety.

22      The Director of DMH is a defendant in this case.  DMH has distinctive expertise and

23  resources to provide inpatient psychiatric care to patients referred for such care, regardless of

24  their dangerousness.  DMH should be ordered to provide timely care to *Coleman* class members

25  referred for inpatient care at their facilities.  ICF bed utilization must be maximized so long as

26  the ICF waitlist exists.

27

28

19

[479124-7]

1         2.     **Defendants must *use all existing resources* that have been designated to**
2    **provide inpatient care to *Coleman* class members *for Coleman* class**
     **members.**

3         Defendants should be required to utilize all existing resources that have been designated

4    to provide inpatient care to *Coleman* class members.  Given the long waitlist, the Court should

5    order that all fully activated facilities designated to provide inpatient care to class members

6    should admit referred patients such that Defendants achieve at least 90% bed utilization – an

7    evaluative marker previously found appropriate by this Court, *see* Order re ASH/CMF Bed Plan

8    at 2, Dkt. No. 1962, Aug. 23, 2006 – until the inpatient waitlists reach zero.

9         This Court has already ordered that all 256 ICF beds at ASH be dedicated to *Coleman*

10   class members, and that those beds be filled no later than February 26, 2010.  Order at 7, Dkt.

11   No. 3787, Jan. 27, 2010.  The Court recognized the "evident demand for inpatient care and the

12   continued drastic shortage of inpatient beds," as demonstrated by the "extraordinarily long"

13   waitlist for admission to ICF, and rejected Defendants' request to decrease the number of beds

14   designated for *Coleman* class members at ASH.  *Id.* at 6.  Yet ICF occupancy at ASH has

15   recently declined substantially: as of January 31, 2011, only 199 of the 256 ICF beds at ASH

16   dedicated to *Coleman* class members were filled.  *See* Fischer Decl. ¶ 14 & Ex. A.  Likewise,

17   even with a Court order for DMH to provide 50 ICF beds designated for *Coleman* class members

18   at CSH, *see* Order at 6, Dkt. No. 1800, May 2, 2006, Defendants report that not a single *Coleman*

19   class member is receiving ICF care at CSH.  *See* Fischer Decl. ¶ 13, 15-16.

20        Defendants should not be permitted to rely on blanket exclusionary criteria, or any

21   logistical, security, and custodial challenges, to excuse the denial of constitutionally adequate

22   mental health care to class members.  Defendants should be required to create and submit a plan

23   for DMH facilities providing ICF care to implement necessary security measures – including

24   staffing, resources, and physical plant modifications – to forthwith house and treat *Coleman* class

25   members referred for inpatient care.  There is no reason for activated facilities designated to

26   provide ICF care to class members to have inpatient bed utilization rates below 90% while the

27   ICF waitlist exists.

28        This rule should apply with equal force to APP admissions.  With the new APP units at

20

[479124-7]

1  CMF, and an apparently sufficient number of available beds to serve all or nearly all patients

2  referred for APP level of care, Defendants should be required to ensure APP inpatient bed

3  utilization rates of 90% or higher, and to ensure that admissions proceed expeditiously and

4  within MHSDS Program Guide requirements.  *See* MHSDS Program Guide 12-6-5 (requiring

5  that all patients referred for APP level of care must be admitted within 10 days of the date of

6  referral).

         **3.**    **Defendants must *expedite long-term projects* necessary to reduce or eliminate the waitlists.**

8        In their plan to reduce or eliminate inpatient waitlists, Defendants continue to rely heavily

9  on long-term bed planning projects, *see* DMH Plan at 20-22, all of which were submitted well

10  before the Court found inpatient waitlist statistics and projections to constitute a "serious and

11  substantial problem" and ordered that Defendants "forthwith direct their attention" to addressing

12  the problem.  Order at 3, Dkt. No. 3831.  Accordingly, Plaintiffs seek an order for Defendants to

13  submit a plan to accelerate construction projects so that desperately needed ICF beds can be

14  more promptly activated.  With respect to the 64-bed ICF project at CMF, scheduled to start

15  admitting patients on October 14, 2011, Plaintiffs seek an order for Defendants to modestly

16  accelerate admissions, from the planned 6 patients per week to 12 patients per week.  This Court

17  has repeatedly found such expedited admissions to be necessary and appropriate.  *See* Order ¶ 8,

18  Dkt. No. 3613, June 18, 2009 (ordering that the admission rate at ASH ICF beds be no less than

19  ten per week until all 256 beds are filled by *Coleman* class members); Order at 4, Dkt. No. 3945,

20  Oct. 22, 2010 (ordering that admission rate at SVPP ICF beds be no less than ten per week until

21  all C5 and C6 beds are filled by *Coleman* class members).

         **4.**    **Defendants must make *serious and concrete commitments* to provide treatment services that reduce the ongoing harm to class members who remain in an improper level of care while waiting for an available inpatient bed.**

25        The Court should direct Defendants to make *serious and concrete commitments* to provide

26  treatment services that reduce the ongoing harm to class members who require an inpatient level

27  of care and are forced to wait for an available inpatient bed.  Arguments based on purported lack

28  of resources and staffing do not justify the current Eighth Amendment violations, nor excuse

[479124-7]

1  Defendants from their constitutional duty to provide adequate mental health care services to class

2  members.  Defendants should be made to meet deadlines for implementing desperately needed

3  interim services to class members awaiting admission for inpatient care, including with respect to

4  the services contained in the EECP plan.

5        Plaintiffs further object to the current situation in which DMH staff and resources

6  designated for *Coleman* class members at CSH are not being used in any way to provide care to

7  class members.  Such staff and resources should be immediately used to provide services to

8  mentally ill prisoners referred for inpatient care, whether delivered at CSH or at the CDCR

9  facilities housing those prisoners on the ICF waitlist.

10  **CONCLUSION**

11        For the reasons stated above, Plaintiffs seek an order finding that Defendants' DMH Plan

12  is inadequate in addressing the waitlists for inpatient care, and in reducing the harms being

13  suffered by mentally ill prisoners who have been referred for inpatient care but remain on a

14  waitlist.  Plaintiffs request an order granting the above described relief, and other relief this Court

15  deems appropriate, and which is "narrowly drawn, extends no further than necessary to correct

16  the violation of the Federal right, and is the least intrusive means necessary to correct the

17  violation of the Federal right."  18 U.S.C. § 3626(a).

18

19  Dated:  February 25, 2011                    Respectfully submitted,

20                                       ROSEN, BIEN & GALVAN, LLP

21

22                                  By:  */s/ Ernest Galvan*

23                                        Ernest Galvan

24                                        Attorneys for Plaintiffs

25

26

27

28

[479124-7]